SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive,<br><br>                    Defendants. | Case No. 2:20-cv-02291<br><br>**COMPLAINT FOR:**<br><br>**(1) Negligence**<br>**(2) Violation of Mandatory Duty (Cal. Gov't Code § 815.6; Welf. & Inst. Code § 17000)**<br>**(3) Violation of Cal. Civ. Code § 3490, *et seq.***<br>**(4) Violation of Cal. Civ. Code § 3501 *et seq.***<br>**(5) Inverse Condemnation/Violation of Art. I § 19 of California Constitution**<br>**(6) Waste of Public Funds and Resources (Cal. Civ. Proc. Code § 526a)**<br>**(7) Violation of California Environmental Quality Act ("CEQA") (Cal. Pub. Res. Code § 21000 *et seq.*)**<br>**(8) Violation of California Disabled Persons Act (Cal. Civ. Code § 54, *et seq.*)**<br>**(9) Violation of TITLE II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.***<br>**(10)  Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 791 *et seq.***<br>**(11)  Violation of Due Process and Equal Protection (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)** |

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(12)   Violation of Due Process –
State Created Danger Doctrine
(42 U.S.C. § 1983; U.S. Const.
amend XIV)**
**(13)   Uncompensated Taking (42
U.S.C. § 1983; U.S. Const.
amend. V/XIV)**
**(14)   Municipal Liability for
Unconstitutional Custom or
Policy (42 U.S.C. §1983)**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

**INTRODUCTION**

1.      People are perishing in the streets at a rate of *three per day* while the City and County of Los Angeles have tried but failed to stem this tide of human tragedy.[1]  The numbers alone are staggering.  There are 58,936 homeless individuals in Los Angeles County ("County") and 36,300 in the City of Los Angeles' ("City")—an increase of 12 percent and 16 percent from just the prior year's count, respectively.[2]  The City's homeless population has nearly doubled in the last three years.  Some 75 percent of these are unsheltered persons who lack regular access to basic hygiene care such as toilets, running water to wash hands, showers, sinks, kitchen, laundry which has led to filthy (and unhealthy) conditions.  Los Angeles bears the dishonorable distinction of hosting the largest unsheltered population in the country.[3]

2.      In both the City and County, homeless encampments are becoming entrenched.  With increased population density, unlimited property accumulation has fostered a proliferation of flea-infested rats and other vermin, which are largely responsible for the recent outbreaks of medieval diseases.  Large items obstruct the free passage and use of the streets and sidewalks.  Encampments have brought with them rampant drug sales and use, which in turn provide a platform for violent assaults and property crimes.  Crime both on and by our

---

[1] County of Los Angeles, Public Health, Center for Health Impact Evaluation, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (October 2019), http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

[2] Los Angeles Homeless Services Authority ("LAHSA"), *2019 Greater Los Angeles Homeless Count* (Sept. 5, 2019), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

[3] U.S. Dep't of Housing and Urban Development ("HUD"), *The 2018 Annual Homeless Assessment Report (AHAR) to Congress* (December 2018), https://files.hudexchange.info/resources/documents/2018-AHAR-Part-1.pdf.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1

homeless residents has intensified.[4] The multiplication of makeshift structures, garbage, human waste, and other detritus has created circumstances throughout the City that are crippling for local businesses, unlivable for residents, and deadly for those on the streets. The environmental impact from power-washing human waste and used needles into our oceans is unassessed and untold. The City and County combined spend over a billion dollars annually providing police, emergency, and support services to those living on the streets. And still, the tragedy unfolds.

3. This crisis has been building for decades, as mental health affliction and drug addiction rates have risen, so has the cost of housing, and support structures for those on the streets have been stretched to the breaking point by burgeoning demands and insufficient funding by local, state, and federal governments. The population of people experiencing homelessness has surged 75 percent since 2012 while sustainable short- and long-term solutions have been in short supply. Los Angeles County Department of Public Health has repeatedly warned the City that basic hygiene services were needed to maintain public health in or near homeless encampments—but those critical services have been in short supply.[5]

---

[4] Joel Grover and Amy Corral, *A Homeless Man Punched Two People in the Face, But Was Cited and Released*, NBC Los Angeles, (Nov. 11, 2019, 4:00 PM), https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html; Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC Los Angeles (Dec. 10, 2018, 4:52 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, Los Angeles Magazine (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homeless-crime/.

[5] Matt Stiles, *As Homeless Crisis Worsens in L.A., The County Leans On City Officials To Act*, Los Angeles Times (June 8, 2019, 5:04 PM), https://www.latimes.com/local/lanow/la-me-homeless-county-letter-20190608-story.html.

---

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

4.    Homeless advocates have put pressure on the City and County for years to permit public camping, allow the accumulation of piles of personal property on the streets, and generally make it more comfortable for people to live on the streets.  But street-living is by no means more "comfortable," because of significant health issues and inherent danger involved in being unsheltered.  Enforcement of homeless-related crimes has been reduced, or in some cases eliminated, in the name of compassion.  But allowing people to die on the streets isn't compassionate; it's cruel.

5.    The massive build-up of property and tents has made the sidewalks unpassable: Charles Van Scoy, restricted to a wheelchair, is trapped in his own home; Karyn Pinsky must walk with her young son in a stroller in the middle of traffic.  The Inner-City Arts Center must hire security to walk with students and staff to and from campus.  Business owners have suffered as well—customers cannot access stores and are declining to patronize them due to conditions on the street, and business owners are spending hundreds of thousands of dollars on increased sanitation and security measures and cannot maintain employees.  Joseph Burk has lost tenants and hundreds of thousands of dollars in client accounts.  Residents and workers throughout the area are confronted daily by disease, illicit drug sales and use, prostitution, and general filth and squalor.  People are openly using drugs, urinating, and defecating in public.

6.    Residential and commercial buildings alike have endured fires from homeless camps, where makeshift heaters are used to keep people warm, open air fires are used to cook food, utility wiring is tampered with to provide electricity, and arsons arise out of drug or property disputes.[6]  Businesses are being dropped

---

[6] James Queally, *Firecrackers. Molotov cocktails. Fire attacks have shaken L.A.'s homeless community*, Los Angeles Times (Oct. 18, 2019, 7:00 AM), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire; Joel Grover and Amy Corral, *Los Angeles Homeless Illegally Use Fire Hydrants to Fill Water Balloons, Bathe, Shave*, NBC Los Angeles (Aug. 23,

by insurance companies because of the fire risks associated with the homeless living on their sidewalks.[7]

7.    The frequency of criminal conduct has increased so dramatically in some areas that law enforcement officials can respond only to the most egregious crimes—and often only after serious damage has been done.  And those who are experiencing homelessness pay the highest price for this lawlessness. Aggravated assaults against homeless victims rose 57 percent from 2017 to 2018; crimes with a homeless suspect increased by 28.5 percent.  Those percentages are set to increase again in 2019: in Central Division alone, the percentage of Part I (serious) crimes involving a transient victim year-to-date has risen 51.4 percent from 2018 and the percentage of Part I crimes involving a transient suspect has risen 45.1 percent (although the overall Part I crime rate has only increased 3.2 percent).  And as these crimes increase, recidivism is also on the rise as even the few arrested quickly return to the streets.[8]

8.    Humans living on the streets and in their cars have no regular access to sanitation facilities, so trash and human waste end up in public spaces and ultimately our oceans.  Businesses are regularly cleaning used syringes out of their drains; an untold number are washed into our waterways.  The environmental impact of the homelessness crisis was recently underscored in a

---

2019, 5:11 PM), https://www.nbclosangeles.com/investigations/Los-Angeles-Homeless-Illegally-Use-Fire-Hydrants-to-Fill-Water-Balloons-Bathe-Shave-558051461.html.

[7] Joel Grover and Amy Corral, *Your Insurance Is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[8] Grover, *supra* note 4, https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

letter from the Environmental Protection Agency.[9] Yet the governmental policies and inaction that perpetuate these pollutants continue unabated.

9. The City of LA's Bureau of Sanitation regularly power-washes streets, sidewalks, and other public spaces that have been occupied by unsheltered individuals; but those clean-ups cost millions of dollars and are ineffective in proactively addressing the crisis.[10] In 2018, it cost over $35 million to conduct almost 15,000 clean-ups of homeless encampments, yet the ultimate benefits both to the encampment residents and to surrounding community are minimal at best. The residents of the encampments are permitted to retain most of their belongings (health hazards included) back into the exact same area after the clean-up is conducted. Trash and human waste are often permitted to remain or are pushed into surrounding streets. *Id.* Yet the City's 2019-2020 budget has actually increased funding for these ineffective programs by $6.45 million.[11]

10. The mentally ill in this City and County are visibly suffering in the street, IMD (Institute for Mental Disease) facilities are overfilled, and even the antiquated conservatorship laws can't work as they were meant to when there is nowhere for conserved persons to go. Without medical supervision, the most severely affected cannot hold jobs or housing, and are left to wander and fend for themselves in a horrific cycle of degradation. And the number of those suffering

[9] Letter from Andrew Wheeler, Administrator, U.S. Environmental Protection Agency, to Gavin C. Newsom, Governor of California (Sept. 26, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

[10] Joel Grover and Amy Corral, *Homeless Encampment Cleanups: Are Millions of Tax Dollars Being Wasted?*, NBC Los Angeles, (May 13, 2019, 8:44 AM), https://www.nbclosangeles.com/news/local/Los-Angeles-Homeless-Encampments-Tent-City-Trash-Garbage-Waste-Cleanup-509849151.html.

[11] Emily Alpert Reyes and Benjamin Oreskes, *L.A. expands cleanup teams for homeless encampments, vowing to be 'less reactive'*, Los Angeles Times (June 28, 2019, 1:18 PM), https://www.latimes.com/local/lanow/la-me-ln-homeless-encampment-cleanups-plan-20190628-story.html.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

has climbed with the increased prevalence of illegal narcotics, which are being used to self-medicate or are the cause of the mental decline in the first place.

11.     The solutions currently under official consideration are too few, too expensive, and take too long.  There is no plan in place or being considered to provide shelter for a majority of the region's significant homeless population. In 2018 Mayor Garcetti unveiled his "A Bridge Home" initiative, which commendably would up to 2,000 shelter beds to the City's inventory.  Yet due to protests, legal challenges, construction costs, and location waffling, only 673 beds have opened to-date.  Even if all 2,000 beds were available today, they would barely scratch the surface of the 27,221 beds needed in the City to house its unsheltered population. An additional burden is placed on the defendants by many of the smaller neighboring municipalities, which have done very little to address their own crises and instead rely on the City and County to pick up their slack.  Yet instead of addressing these issues head-on, defendants maintain their inadequate trajectory.  And the problem continues to outpace the solutions.

12.     Proposition HHH, a $1.2 billion City project, is now expected to net only 5,873 supportive units and 1,767 affordable units, at a staggering cost of $531,000 to $700,000 *per bed*.[12]  Likewise Measure H—a county-wide tax increase that was originally estimated to net $355 million in homeless-relief funding available per year—is spread so thin that it has failed to make any significant dent in the crisis.[13]

---

[12] Ron Galpern, Los Angeles Controller, *Report: The High Cost of Homeless Housing: Review of Proposition HHH* (Oct. 8, 2019), https://lacontroller.org/audits-and-reports/high-cost-of-homeless-housing-hhh/.

[13] LAHSA, *LAHSA Releases 2019 Housing Inventory Count* (Sept. 19, 2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-inventory-count ("On our present course, it will take far too long to build far too few units of housing to effectively end this crisis" – Peter Lynn, executive director LAHSA).

13. Despite the magnitude of the problem, there is hope. Steps could be taken to provide safe sleeping spaces for the entire homeless population for a fraction of the funds currently devoted the homelessness crisis. Union Rescue Mission recently built a Sprung structure (large membrane tent) in a matter of months—the single tent houses more than 100 people at a cost of only $10,000 per bed (including a six-month stay, security, and social services).[14] The City has actually utilized this same structure in several places—yet for a variety of reasons, the City's cost was quadruple Union Rescue Missions', at $42,000 per bed.[15] In Hawaii, the city of Honolulu is putting up large military-grade inflatable tents in select parks to quickly and effectively provide shelter when the demand exceeds supply, at a cost of $6,000 per bed which also includes a 90-day stay, security, and social services.[16] Sacramento has purchased small Pallet shelters for $2,000 per bed.[17] Tiny houses are being used in Seattle to create micro-villages as bridge housing.[18] Entire kits can be purchased to house a family

---

[14] Rev. Andy Bales and J. Michael Arnold, *When it Comes to Homelessness, We Must Do More and We Must Do it Now*, Los Angeles Downtown News (Aug. 5, 2019), http://www.ladowntownnews.com/opinion/when-it-comes-to-homelessness-we-must-do-more-and/article_6b08711a-b57e-11e9-850e-670a231aefa4.html.

[15] Joel Grover and Amy Corral, *Inside the Massive Tent That Might be a Partial Solution Homelessness in LA*, NBC Los Angeles (Sept. 11, 2019, 1:45 PM), https://www.nbclosangeles.com/news/local/los-angeles-la-homeless-encampments-sprung-tents-shelter-skid-row/1965408/.

[16] Dan Nakaso, *Pilot project aimed at reducing Oahu's homeless will start in Waipahu*, Star Advertiser (Oct. 20, 2019, 5:28 PM), https://www.staradvertiser.com/2019/10/20/hawaii-news/pilot-project-aimed-at-reducing-oahus-homeless-will-start-in-waipahu/; Allyson Blair, *Giant inflatable tents for the homeless could be coming to a park near you*, Hawaii News Now (Nov. 27, 2018), https://www.hawaiinewsnow.com/2018/11/28/giant-inflatable-tents-homeless-could-be-coming-an-oahu-park-near-you/.

[17] Theresa Clift, *These small homeless shelters can be built in 20 minutes. Sacramento may buy dozens of them*, The Sacramento Bee (Nov. 13, 2019, 4:50 PM), https://www.sacbee.com/news/local/article237332039.html.

[18] Sharon Lee, *Tiny House Villages in Seattle: An Efficient Response to Our Homelessness Crisis* (March 15, 2019),

---

7

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

of 4 in a large tent complete with furniture, refrigerator, heater, and electrical generator for a little more than $2,000 ($500 per bed).[19]  Large "festival" tents that can be purchased for $400 are being used by the city of Modesto to address its own homelessness crisis.[20] 3D printed 400-square foot homes can be built in less than 24 hours and cost only $4,000 to construct.[21]

14.   Even using the $10,000-per-bed number and extrapolating, it would cost roughly $272 million to provide a bed for every unsheltered person in the City, and an extra $170 million to provide a bed for every unhoused person in the rest of the County.[22]  In other words, just one-quarter of the Proposition HHH funds could provide a bed for every unsheltered homeless person in the City. And using only 1.2 percent of the County's $36.1 billion annual budget (less than this year's Measure H funds allocated to "combat homelessness") the County

---

https://shelterforce.org/2019/03/15/tiny-house-villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.

[19] Relief ShelterKits, *Relief Tents: Concept Designs*, https://www.relieftents.com/relief-tents/shelterkit-living-supportkit/ (last visited Mar. 9, 2020).

[20]  Kevin Valine, *Modesto homeless camp is filling up, but officials adapt to find room for more*, The Modesto Bee (May 13, 2019, 4:58 PM), https://www.modbee.com/news/local/article230345544.html; QAMP, Qamp Tent, https://qamp.com/products/qamp-tent?variant=35987893763 (last visited on Mar. 9, 2020).

[21] Aria Bendix, These 3D-printed homes can be built for less than $4,000 in just 24 hours, Business Insider (Mar. 12, 2019, 2:09 PM), https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9; Sharon Jayson, *3-D-pringed homes a concept turns into something solid*, The Washington Post (Mar. 6, 2020, 3:00 AM), https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html.

[22] *See* LAHSA, *supra* note 2, https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

could provide a bed for every homeless person in its entire jurisdiction.[23]  When considering tent or pallet options, that amount is reduced even further.

15.    And there are places to put these kinds of shelters.  Hundreds of acres adjacent to LAX are owned and controlled by the City and could support thousands of beds.[24]  Under Title V of the McKinney-Vento Homeless Assistance Act[25], the federal government is obligated to lease or deed underutilized federal property to local governments for the specific purpose of homeless assistance, such as the abandoned Federal Aviation Administration (FAA) building in Hawthorne, toured by a White House delegation in September.[26] The County's General Hospital (LAC+USC) Building, with 1.5 million square feet of space in the heart of East L.A., has been vacant for over a decade—the County at one point considered utilizing it for homeless assistance but is now evaluating it as a "mixed use" property.[27]  St. Vincent Medical Center, a 366-bed facility, is closing and both the City and County are in talks about purchasing it (though the extent to which either could or would use the infrastructure to capitalize on the

---

[23] County of Los Angeles, *2019-2020 Los Angeles County Budget: LA County budget process concludes with adoption of $36.1 billion supplemental budget*, https://www.lacounty.gov/budget/ (last visited on Mar. 9, 2020).

[24] Rob Eshman, *Opinion: Imagine if L.A. put the same effort into housing the homeless that it does Olympic athletes*, Los Angeles Times: Opinion (Nov. 10, 2019, 4:00 AM), https://www.latimes.com/opinion/story/2019-11-10/homeless-crisis-housing-2028-olympics-los-angeles.

[25] 42 U.S.C. § 11411.

[26] Jeff Stein, *Trump officials tour unused FAA facility in California in search for place to relocate homeless people*, The Washington Post (Sept. 11, 2019, 5:49 PM), https://www.washingtonpost.com/business/2019/09/12/trump-officials-tour-unused-faa-facility-california-search-place-relocate-homeless-people/.

[27] Jacqueline Ramírez, *Second community meeting explores future of former County Hospital*, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/; Alex Medina, *Community meeting to explore former County Hospital re-use*, Boyle Heights Beat (June 12, 2019), https://boyleheightsbeat.com/community-meeting-to-explore-former-county-hospital-re-use/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

9

COMPLAINT

property to house exponentially more than 366 is yet to be seen).[28]  The County owns over 200 acres of the Los Angeles County Fairgrounds ("Fairplex") in Pomona which, while currently leased to the non-profit Los Angeles County Fair Association, may be negotiated to support shelters. The L.A. City Controller has recently identified 13,948 separate properties within the City owned by various public entities, many of which are vacant or underutilized.[29]  Even small lots could support pallet houses individual tents, or "tiny home" communities with shared bathroom facilities.

16.     Board-and-care facilities—which offer housing, meals, and basic assistance for those who need supportive care—could also be part of the solution. But they are closing all over California at rapid rates because it is becoming economically infeasible to remain open.[30]  This has resulted in an estimated 1,000 individuals becoming homeless in Los Angeles County in the last couple years— and without such supportive care, their conditions inevitably decline.  Those same facilities—which are paid only $35 per-night-per-guest by government entities—could be utilized as temporary shelters with higher per-guest compensation ($60 per night).  No infrastructure would need to be built, and the

[28] Eric Heinz, *LA County bids to purchase St. Vincent Medical Center for homeless aid*, Los Angeles Daily News, (Feb. 7, 2020, 8:24 AM), https://www.dailynews.com/2020/02/07/la-county-bids-to-purchase-st-vincent-medical-center-for-homeless-aid/.

[29] Los Angeles City Controller, *Publicly-Owned Properties*, https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited Mar. 9, 2020); Los Angeles City Controller, *Property Panel: A guide to publicly-owned properties in the City of Los Angeles*, https://lacontroller.maps.arcgis.com/apps/Cascade/index.html?appid=b6d7907c1 18d4ea2a1dd96bc0425633d (last visited Mar. 9, 2020); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM), https://therealdeal.com/la/2019/05/28/despite-housing-crisis-la-lags-in-building-on-its-own-sprawling-land-portfolio/.

[30] Jocelyn Wiener, *Overlooked mental health "catastrophe:" Vanishing board-and-care-homes leave residents with few options*, CalMatters: Projects (Apr. 15, 2019), https://calmatters.org/projects/board-and-care-homes-closing-in-california-mental-health-crisis/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

property owners would have greater financial incentive to stay open to provide beds, meals, and basic care. Similarly, the shared housing model supported by SHARE!, Haaven, and others, boasts zero infrastructure costs with the added benefit of self-sustenance after a one-time $4,000-per-bed investment.[31]

17.   For decades, the City and County have failed to dedicate the necessary funds or build the infrastructure to support the significant numbers of unhoused persons.  This failure of public will has been exacerbated by recent legal decisions, including *Martin v. City of Boise*, in which the Ninth Circuit held, "'[S]o long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters,' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'"  *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (alterations in original omitted) (citation omitted), *cert. denied*, 140 S. Ct. 674 (2019).  In December 2019, the Supreme Court declined to take up the *Martin* case on review.  Despite the sweeping ruling in *Martin*, and huge increase in numbers of unsheltered in the City and County, neither entity has been able to pivot their strategy to address the decision, and the crisis has increased exponentially.  This has had a profoundly negative affect on both the homeless and the community as a whole.

18.   While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way.  Officials in both the County and City have gone to great lengths in the last couple years to address this crisis, and their efforts are impressive and commendable; yet much more needs to be done.  The *only* way to address this crisis with the urgency it deserves is an emergency response—providing immediate shelter for all and abating the degradation of our cities and

---

[31] *See* para. 70 *infra*.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

communities, for the good of everyone.  It can be done cheaply and quickly, and it must be done now.

## I.     JURISDICTION AND VENUE

19.    This action is brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (42 USC §§12131 *et seq.*) ("ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*) ("Section 504"), and the Fifth, and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

20.    This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

21.    All of the actions and omissions complained of occurred in the Central District of California.  Therefore, venue is proper in this District.  28 U.S.C. §1331.

## II.     GENERAL ALLEGATIONS

22.    Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants and Does 1-20 inclusive was the agent, employee, and co-conspirator of each of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment,  in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants.

23.    All causes of action brought under California law are for equitable and injunctive relief only.  Therefore, no tort claim was necessary prior to filing this suit.  *See* Cal. Gov. Code § 905 (West, 2019); *Qwest Commc'ns Corp. v. City of Berkeley,* 146 F. Supp. 2d 1081 (N.D. Cal. 2001); *Hart v. County of Alameda*, 76 Cal. App. 4th 766 (1999).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

24.     Each paragraph of this Complaint is expressly incorporated into each cause of action set forth below.

### III.     FACTUAL ALLEGATIONS

**A.     History of Homeless Treatment in Los Angeles**

25.     What is now known as Skid Row began in the late 1800s as a concentration of day-rate hotels, bars, and brothels catering to the "rail riders" (transients riding the trains) due to its proximity to where the trains terminated at Los Angeles.[32]  Service providers like the Union Rescue Mission opened their doors to help the indigent who congregated there.  Decades later, when the 1970s, brought a push for "de-institutionalization" of those suffering from mental illnesses, Skid Row became a beacon of hope for those needing services and shelter.[33]  At the same time, DTLA experienced an economic resurgence and developers began restoring the Skid Row area.  Activists pushed back and fought for a policy of "containment" with the goal of centralizing missions, charities, and other homeless services within the 50-square block area, encouraging "undesirable population elements" to stay within the boundaries, in return for an agreement with the City to keep redevelopment out of it.[34]  In one interview, the Reverend Andy Bales, who runs Union Rescue Mission, noted the containment

---

[32] Sebastin Kempkens, *L.A.'s Homelessness Crisis: How Did We Get Here?*, LA Weekly (Nov. 21, 2018), https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/; *99% Invisible: The Containment Plan*, Radiotopia (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/; Union Rescue Mission, *About Skid Row*, https://urm.org/about/faqs/about-skid-row/ (last visited Mar. 9, 2020).

[33] *See* Kempkens, *supra* note 32, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[34] Rich Connell, *SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating*, Los Angeles Times (Aug. 5, 1985, 12:00 AM), https://www.latimes.com/archives/la-xpm-1985-08-05-me-3525-story.html; 99% Invisible, *supra* note 32, https://99percentinvisible.org/episode/the-containment-plan/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

13

COMPLAINT

policy "basically said 'Let's send everybody who's struggling in all of L.A. to Skid Row and then let's turn our back on it."[35]  The policy is now widely considered a failure, yet unofficially continues today.

26.  The 1980 and 1990s, with the crack epidemic and simultaneous cuts to the welfare system, brought in true and enduring homelessness, with encampments springing up on sidewalks and criminals preying on the vulnerable.[36]  Then-mayor Tom Bradley opened an urban campground along the L.A. River, but it was soon closed due to terrible living conditions.  At various times groups have placed portable toilets in key encampment locations, only to have the city remove them when they became magnets for prostitution and drug use.  In the early 1990s, as a settlement of litigation between the City and County, Los Angeles Homeless Services Authority ("LAHSA"), a joint-powers authority, was created to oversee the City and County's homeless response.  The aim was more accountability, but ultimately it has resulted in an accountability deficit.

27.  That deficit is particularly apparent in the litigious history of two Los Angeles Municipal Code provisions ("L.A.M.C.")—section 41.18 and 56.11—that regulate behavior in public rights-of-way.  Section 41.18(d) provides "No person shall sit, lie or sleep in or upon any street, sidewalk or other public way."[37]  56.11 prohibits, among other things, storage of "excess personal

---

[35] *See* Kempkens, *supra* note 32, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[36] *Id.*

[37] The Los Angeles City Council is currently considering an amendment to 41.18(d) that would permit persons to sit, lie, or sleep in non-sensitive public areas (500 feet away from schools, parks, and day care facilities, out of tunnels, etc.) Emily Alpert Reyes, *L.A. is again considering limits on where homeless people can sleep — this time by schools and parks*, Los Angeles Times (Aug. 22, 2019, 5:25 PM), https://www.latimes.com/california/story/2019-08-22/homeless-sidewalk-sleeping-ban-restrictions-boise-case-shelter.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

property" meaning property which cumulatively exceeds 60 gallons in a public area.[38]

28.     In 2006, the City settled a case brought by several activists, *Jones v. City of Los Angeles*, agreeing not to enforce Section 41.18(d)'s restrictions on tents and people sleeping in public areas between the hours of 9 p.m. and 6 a.m. As part of the agreement, the parties concurred that a published court decision would be de-published and would no longer be binding authority.  According to the *Los Angeles Times*, "The [Jones] agreement set the stage for today's encampment explosion."[39]  And ironically, the de-published *Jones* decision was still oft-cited and essentially resurrected in the 2018 published decision of *Martin v. City of Boise*.

29.     In 2011, the Ninth Circuit upheld an injunction in *Lavan v. City of Los Angeles* that prohibited the City from seizing unattended property without notice absent objectively reasonable belief that it is abandoned, evidence of crime, contraband, or presents an "immediate threat to public health or safety." Unfortunately, it is difficult to determine when property is "abandoned" as opposed to momentarily "unattended" when there are tens of thousands of people living unsheltered in our public spaces.  The result is a massive build-up of

---

[38] LAMC 56.11 was amended in 2016 in direct response to *Lavan v. City of Los Angeles*, discussed *infra*.  Its express stated purpose was to "balance the needs of the residents and public at large to access clean and sanitary public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited of personal property in public areas."  Unsurprisingly, unhappy advocates have challenged the new amendment, first as applied to those living in Skid Row (*Mitchell v. City of Los Angeles,* 16-CV-01750 SJO JPR) and now city-wide (*Garcia v. City of Los Angeles*, 2:19-CV-06182 DSF PLA).

[39] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, Los Angeles Times (June 5, 2019, 11:10 AM), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html ( "'We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter,' said Westside Councilman Mike Bonin.").

---

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

property, which harbors significant health and safety risks that mostly go undetected until too late.

30.     Eight years after the Ninth Circuit upheld the *Lavan* injunction, the City entered into a settlement in the case of *Mitchell v. City of Los Angeles*. Under the terms of that settlement, the City bound its own hands in agreeing to significantly limit the enforcement of L.A.M.C. Section 56.11, permitting the accumulation of personal property beyond the code section's limits, and relegating enforcement to only certain bulky items such as couches, mattresses, refrigerators, and wooden pallets within a designated area known as "Skid Row and surrounding areas."  The *Mitchell* agreement has led to a sharp decline in health and safety for housed and unhoused alike not just in Skid Row but throughout downtown.  The agreement promotes and authorizes violation of a valid city ordinance and suffers from significant legal flaws.  *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("A federal consent decree or settlement agreement cannot be a means for state officials to evade state law."); *City of Glendale v. Superior Court,* 18 Cal. App. 4th 1768, 1778-79 (1993) ("It is well established that governments cannot divest themselves by contract of the right to exert their governmental authority 'in matters which from their very nature so concern that authority that to restrain its exercise by contract would be a renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties.'").[40]

31.     *Mitchell* was settled in the wake of a recent, broadly-sweeping decision addressing homeless regulation: *Martin v. City of Boise*, based almost entirely on the reasoning published (then de-published) in *Jones*.  *Martin* held

---

[40] *See* [Proposed] Intervenors' Notice of Motion and Motion for Relief from Order or Modification thereof, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 SJO (JPRx) (C.D. Cal. June 24, 2019), ECF No. 120-1.

that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters" a person may not be prosecuted for sitting, lying, or sleeping in public. *Martin*, 920 F.3d at 617 (original alterations omitted) (citation omitted).  The language in the *Martin* does not provide clear guidance for cities struggling with sizable homeless populations--in some passages, *Martin* suggests that there must be enough beds for <u>everyone</u> before <u>anyone</u> may be cited for sleeping on a sidewalk, while other aspects of *Martin* indicate that <u>individuals</u> "who do have access to adequate temporary shelter" but "choose not to use it" may be prosecuted without reference to the community. *Id.* at n.8.

32.     Regardless of how the *Martin* case is interpreted, it is clear the only way out of the current crisis is to provide beds to the unsheltered.  That will not be easy.  The homelessness crisis has now reached the highest numbers we have ever seen, with 58,936 homeless individuals in Los Angeles County and 36,300 homeless individuals in the City.  Approximately 75 percent of these are unsheltered, meaning living and sleeping in a place not meant for human habitation, including streets, parks, tents, and cars.  The task of finding beds for so many people is daunting, but it must be done if Los Angeles is to find its way clear of this crisis.

**B.     <u>Crime and Fire Incidents Have Escalated</u>**

33.     The crisis of so many unsheltered individuals in a wealthy City is a tragedy in and of itself.  But the tragedy has been exacerbated by a severe spike in crime both on and by homeless persons, particularly in violent attacks.[41] LAPD citywide data from 2017 to 2018 shows a 36 percent increase in crimes against homeless victims, aggravated assault increased 57 percent, and crimes

---

[41] Leonard, *supra* note 4, https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Matthew, *supra* note 4, https://www.lamag.com/citythinkblog/homeless-crime/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

with a homeless suspect rose 28.5 percent.  The statistics from 2018 to 2019 are even worse:

- The homicide rate citywide rose 5 percent last year yet homicides against a homeless victim in Central Bureau rose 33 percent.

- Violent crimes against a homeless person increased 18.9 percent citywide while property crimes identifying a homeless victim rose 43.8 percent.

- Violent crimes with an identified homeless suspect rose 22.5 percent citywide (48.1 percent in Central Division) and property crimes with an identified homeless suspect rose 18 percent citywide (27.9 percent in Central Division).

- Homicides in Central Division with an identified homeless suspect increased by a shocking 175 percent from 2018 to 2019.

34.    Drugs are being sold and used openly on streets and sidewalks. Public urination and defection have become the norm. LA Metro spent $36 million on a bike-share program, but those bikes go missing daily and many have been recovered, repainted or otherwise vandalized, in homeless encampments throughout the city.[42]  As the ranks of the desperate and downtrodden have grown exponentially in Skid Row and throughout the City and County, and quality-of-life laws are left unenforced, public order has deteriorated.

35.    In addressing the rise in crime within the homeless community, one City official accurately noted, "[T]here are certainly tensions that are rising within the homeless population. . . the connective tissue between them all is the increase in the concentration.  As the homeless encampments increase, so do fights over territory, over property, over intangibles, as well as domestic

---

[42] David Goldstein, *Goldstein Investigation: Hundreds Of Taxpayer-Funded Metro Bikes Stolen, Stripped*, CBS Los Angeles (Nov. 7, 2019, 11:59 PM), https://losangeles.cbslocal.com/2019/11/07/goldstein-investigation-taxpayer-funded-metro-bikes-stolen-stripped/.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

violence."[43] "Personal Security Tips" have been given to County employees walking to and from civil and mental health courts, advising them "remain vigilant," "travel in numbers," and "drive in a middle or left lane" due to the criminal element rising out of surrounding homeless encampments.

36.     Crime against homeless women in particular has become a "crisis within a crisis" with 60 percent of homeless women reporting violence in the last year and 25 percent experiencing it "often" or "always."[44] More than a quarter have experienced sexual assault in the last twelve months, and 37 percent report having experienced domestic violence in the same time period.[45]

37.     As crime has increased, so have fires.  There were 2,500 fires just involving the homeless community in Los Angeles in 2018, which is double the number of such fires in 2017.[46]  And the statistics for 2019, while not yet released were on track to far outpace 2018's record number.[47]  The industrial buildings and businesses downtown regularly experience fires from adjacent encampments, whether from heaters, food preparation, or arson.  In the first six months of 2019, there were 65 fires just in this one small area.  Businesses are being dropped by

---

[43] *See* Queally, *supra* note 6, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[44] Elijah Chiland, *For women, 'living on the streets in Los Angeles is dangerous and traumatic'*, Curbed Los Angeles (Jan. 30, 2020, 2:25 PM), https://la.curbed.com/2020/1/30/21115700/downtown-womens-center-homeless-report.

[45] Downtown Women's Center, 2019 Los Angeles City Women's Needs Assessment, https://www.downtownwomenscenter.org/wp-content/uploads/2020/01/DWC-2019-Los-Angeles-Womens-Needs-Assessment.pdf (last visited Mar. 9, 2020).

[46] *See* Queally, *supra* note 6, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[47] *Id.*; Marc Brown, Leanne Suter, et al., *LAFD incidents involving the homeless disproportionately high, data shows*, ABC Eyewitness News (Feb. 11, 2020, 11:15 AM), https://abc7.com/5919386/.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

COMPLAINT

insurance companies because of the fire risks due to the homeless living on their sidewalks.[48]  Fire hydrants are being repurposed by homeless for drinking, bathing, and washing clothes and personal items, compromising fire-readiness and putting an untold number of lives and structures at greater risk in the event of a fire.[49]  There have been no observable efforts to curb the use of open flames, despite fire code provisions that prohibit them and the frequent use of open flames in homeless encampments.[50]  In fact, the *Mitchell* settlement specifically permits violations of the fire code by allowing "open-flame cooking devices" as long as they have fuel containers under a certain size.  *See* Stipulated Order of Dismissal at 11, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 SJO (JPRx) (C.D. Cal. May 31, 2019), ECF No. 119.

38.    Fires originating in homeless encampments are now a regular occurrence in Los Angeles County.  One of the most destructive fires in Los Angeles over the last 10 years, the Skirball Fire, was caused by a cooking fire at a homeless encampment in the hills of Bel Air in 2017—that fire caused thousands to evacuate and destroyed several houses.[51]  In July 2019, a fire broke out in a homeless encampment in the Sepulveda Basin, where homeless residents report

---

[48] Joel Grover and Amy Corral, *Your Insurance is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[49] Joel Grover and Amy Corral, *Firefighters Lose Critical Tool to Battle Rise in Homeless Fires*, NBC Los Angeles (July 22, 2019, 3:17 PM), https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html.

[50] *See* Grover and Corral, *supra* note 49, https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html; County of Los Angeles, Ordinance re Open Fires § 307.6 (2017), http://lacounty-ca.elaws.us/code/coor_title32.

[51] Gale Holland, Laura J. Nelson, et al., *Fire at a homeless encampment sparked Bel-Air blaze that destroyed homes, officials say*, Los Angeles Times (Dec. 12, 2017, 5:55 PM), https://www.latimes.com/local/lanow/la-me-skirball-fire-cause-20171212-story.html.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   they put out "multiple fires daily," burning 6 acres and destroying the

2   encampment.[52]

3 **C.**   **Public Health is Compromised**

4      39.    Beyond crime and fire, the homelessness crisis presents a pressing

5   public health predicament.  The accumulation of property and food storage in

6   tents by homeless individuals has made Skid Row and other areas hotbeds for

7   flea-infested rats and other disease-carrying vermin, making some areas nearly

8   unlivable.[53]  Los Angeles has declared Skid Row a "typhus zone" and at least one

9   Deputy City Attorney has contracted typhus apparently from the conditions

10   surrounding her office building in Downtown Los Angeles.[54]  LAPD Officers

11   working Central Division downtown contracted typhoid fever, caused by

12   contamination of human fecal matter.[55]  LA City was recently cited by

13   Cal/OSHA for the homeless encampments outside City Hall East for exposing its

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[52] Ariella Plachta and Elizabeth Chou, *A Sepulveda basin encampment fire left dozens of homeless people displaced but service providers have little to offer them*, Los Angeles Daily News (July 31, 2019, 1:23 PM), https://www.dailynews.com/2019/07/31/a-sepulveda-basin-encampment-fire-left-dozens-of-homeless-people-displaced-but-service-providers-have-little-to-offer-them/.

[53] Lauren Fruen, *Collapse of a City That's Lost Control: Shocking New Pictures From Downtown LA Capture the Huge Problem it Faces With Trash and Rats Amid Fear of Typhoid Fever Outbreak Among LAPD*, Daily Mail and Associated Press, (June 2, 2019, 2:03 PM), https://www.dailymail.co.uk/news/article-7095533/Pictures-downtown-LA-capture-problem-faces-trash-tries-rodents.html.

[54] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, Los Angeles Times, (Feb. 9, 2019, 5:45 PM), https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-story.html.

[55] Jaclyn Cosgrove, *LAPD employee contracts bacteria that causes typhoid fever*, Los Angeles Times, (May 29, 2019, 8:44 PM), https://www.latimes.com/local/lanow/la-me-ln-lapd-typhoid-fever-20190529-story.html.

---

21

COMPLAINT

workers to trash and bodily fluids.[56]  Experts have predicted a "major infectious disease epidemic" outbreak in DTLA, including measles and/or tuberculosis.[57] The United Nations noted "Los Angeles failed to meet even the minimum standards the United Nations High Commissioner for Refugees sets for refugee camps in the Syrian Arab Republic and other emergency situations."[58]

40.    Beyond the societal implications associated with unsanitary conditions related to unsheltered homelessness, it has been well-documented that the physical and mental health of unsheltered persons is significantly worse than those of their sheltered or housed counterparts.[59]  According to a recent report from the Los Angeles County Department of Public Health ("DPH"), homeless-related deaths doubled from 2013 to 2018.[60]  On average, a homeless person in

---

[56] California News Wire Services*, State Slaps City Of LA Over Unsanitary Conditions,* Los Angeles, CA Patch.com (Aug. 16, 2019, 1:31 PM), https://patch.com/california/los-angeles/state-slaps-city-la-over-unsanitary-conditions.

[57] Victor Garcia, *Dr. Drew Pinsky Warns Los Angeles Could be at Risk of a Deadly Epidemic This Summer*, Fox News, (May 23, 2019), https://www.foxnews.com/us/dr-drew-pinsky-major-epidemic-los-angeles-kill-thousands.

[58] Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/125/30/PDF/G1812530.pdf.

[59] Adeline M. Nyamathi and Barbara Leake, et al., *Sheltered versus nonsheltered homeless women*, J. Gen. Intern. Med. vol. 15, issue 8, at pp. 565-72 (Aug. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495574/; Janey Rountree, Nathan Hess, and Austin Lyke, *Health Conditions Among Unsheltered Adults in the U.S.*, California Policy Lab (October 2019), https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[60] County of Los Angeles, Public Health, *supra* note 1, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Los Angeles will die 22 years earlier than the general population.[61]  Importantly, the report noted:

A principal finding is that the overall homeless mortality rate has steadily increased over the past six years.  This means that increases in the number of homeless deaths recently reported in the media cannot be attributed solely to the fact that the total number of homeless people has also been increasing.

**Put simply, being homeless in LA County is becoming increasingly deadly.[62]**

41.    Dr. Barbara Ferrer, director of DPH conceded: "Homeless people are in fact dying at a higher rate because they're homeless."[63]  Yet in New York City, where the number of people experiencing homelessness is high (91,897 persons) but the rate of *unsheltered* homelessness is low (5 percent compared to Los Angeles' 75 percent), the mortality rates of homeless persons compared to general population low-income adults is nearly identical.[64]  Unsheltered homelessness both causes and exacerbates physical and mental health problems.[65]

---

[61] *Id*. at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

[62] *Id*. (emphasis added).

[63] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[64] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based Assessment of the Health of Homeless Families in New York City, 2001–2003*, American Journal of Public Health (Sept. 20, 2011), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.

[65] County of Los Angeles, *supra* note 1, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations*, The Lancet, vol. 382, issue 9953, pp. 1529-40  (Oct. 25, 2014), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-6/fulltext.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

42.    Los Angeles County has recognized this, and in 2012 the Department of Health Services launched a program called Housing for Health, observing "[a]ccess to community based housing options is an important element of our evolving county healthcare system, particularly in response to the homelessness crisis."[66] A study conducted by the RAND Corporation on the first 890 participants enrolled found that the cost of providing health care per participant decreased by 40 percent (from an average of $38,146 to $15,358) because there was less need for the patients to access the system.[67]

**D.     Crowded and Blocked Sidewalks Put Everyone at Risk**

43.    The homelessness crisis has also impeded the use of a critical element of city life: sidewalks.  Municipalities have an obligation to keep sidewalks clear for use by the public.  The City itself recognized this in its recent Motion to Dismiss filed in the ongoing litigation in *Garcia v. City of Los Angeles*:

> Sidewalks serve numerous functions and implicate a myriad of individual interests.  Children on field trips, persons with disabilities, mail carriers with delivery carts, free-speech demonstrators, shop owners, travelers, and the many thousands of other persons that live, work, and visit Los Angeles—all have legitimate claims to use these narrow strips of public property.  As courts have long recognized,

---

[66] Health Services of Los Angeles County, *Housing for Health,* http://dhs.lacounty.gov/wps/portal/dhs/housingforhealth (last visited Mar. 9, 2020).

[67] Sarah B. Hunter, *Housing for Health; Los Angeles County's Department of health Tackles Homelessness with an Innovative Housing Program That Saves Money,* The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-health-los-angeles-countys-department-of.html (Notably the County experienced a net savings of 20% even taking the costs of housing into consideration (from an average of $38,146 per participant to $30,646). Of course, this number doesn't take into consideration the additional savings from other departments such as reduced law enforcement contacts.

24

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

"[t]he public is entitled to the free and unobstructed use of the entire streets and sidewalks . . . " *Vanderhurst* v. *Tholcke*, 113 Cal. 147, 152 (1896).  To balance among the many, often competing uses, cities have been designated as trustees of these public spaces.  In this capacity, they have not only the power but "the *duty* to keep their communities' streets open and available for movement of people and property."  *Schneider v. State*, 308 U.S. 147, 160-61 (1939) (emphasis added); *see also Smith v. Corp. of Wash.*, 61 U.S. (20 How.) 135, 146 (1858); Cal. Gov. Code § 37359 ("the legislative body having control of any property owned or controlled by the city may at any time withdraw…or limit the access or use in area or time or in any other reasonable manner deemed necessary.").

Def. City of Los Angeles' Mot. to Dismiss Suppl. Compl. at 2, *Garcia v. City of Los Angeles,* Case No.: 2:19-cv-6182-DSF-PLA (C.D. Cal. Oct. 21, 2019), ECF No. 22.

44.     Public sidewalks and the maintenance of them constitutes a "program, service, or activity within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973."[68] Municipalities have an obligation to ensure that public sidewalks are usable and compliant with ADA requirements, such as providing a minimum of 36 inches of clearance for wheelchair users, yet the City regularly ignores its obligations and fails to provide such clearance.

45.     Encampments throughout the City and County block sidewalks and public rights-of-way.  Local governments, as explained by the City, have an obligation to balance the needs of all citizens to access sidewalks, particularly for those with disabilities who have no alternative like stepping around a blockage.

---

[68] *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Yet the City is consistently failing to do so.  Disabled persons in wheelchairs such as plaintiffs Charles Van Scoy and Leandro Suarez must choose daily whether to stay in their homes or walk into the middle of the street with oncoming traffic.  Mothers with young children in strollers, like plaintiffs Deisy Suarez and Karyn Pinsky, do the same.  Children on their way to and from school daily risk injury by car where sidewalks are impassable.

46.     Citizens are calling 311 to request cleanup of sidewalk encampments at a skyrocketing rate—increasing 167 percent between 2016 and 2018.[69]  Yet if City officials even respond, it is to simply power-wash the sidewalk and then allow encampments to resume.[70]

47.     After *Martin v. Boise* was decided, Los Angeles Police Department's Office of the Chief of Police issued an order suspending all enforcement of L.A.M.C 41.18 except to provided "minimum clearance of a continuous three-foot wide pathway as required under the Americans with Disabilities Act" or "When a person is sitting, sleeping, or lying within ten (10) feet of any operational and utilizable entrance or exit of a building, driveway, or loading dock."

48.     The prevalent and virtually permanent nature of these encampments—unimpeded by any meaningful City enforcement or cleanup efforts despite notice to the City—reflects an unambiguous official City policy to permit usurpation of public sidewalks in certain areas.  For example, on Venice Boulevard under the 405 freeway, a large-scale encampment has been been

---

[69] Emily Alpert Reyes, Benjamin Oreskes, Doug Smith, *L.A. is swamped with 311 complaints over homeless camps. But are the cleanups pointless?*, Los Angeles Times (June 7, 2019, 5:00 AM), https://www.latimes.com/local/lanow/la-me-ln-homeless-cleanups-accelerate-20190607-htmlstory.html.

[70] *Id.*; Matt Tinoco, *LA /wukk Spend $30M This Year on Homeless Sweeps. Do They Even Work?*, LAist (Apr. 10, 2019, 6:00 AM), https://laist.com/2019/04/10/homeless_sweeps_los_angeles_public_health.php.

COMPLAINT

allowed to persist for over a year.  City workers have actively encouraged homeless persons in nearby areas to move to this encampment.  In the Skid Row area, as part of the *Mitchell v. City of Los Angeles* settlement, the City agreed to allow nearly unlimited property accumulation on the public sidewalks while providing little comfort to the ADA-based concerns regarding the navigational impediments to those with disabilities.  The freeway overpasses near the Los Angeles Civic Center now are so packed that it is difficult for an able-bodied individual to walk past without stepping in the street, and impossible for those who need the assistance of wheelchairs and walkers.

49.    The sidewalk problem directly affects businesses that are accessed by sidewalks.  This prevents disabled customers from reaching businesses, but also deters able-bodied customers who seek to access their businesses or abandon some businesses in favor of more accessible ones.  As discussed above, businesses are collectively spending hundreds of thousands of dollars on increased sanitation and security measures while struggling to maintain employees and tenants.  Both business owners and residents of the area are thus subject to substantial and unreasonable interference with their enjoyment of their property.  Indeed, the streets and sidewalks of Skid Row have been rendered unusable because of human waste, garbage, and encampments that the City has allowed to persist.

**F.    Environmental Impact**

50.    The unhealthy aspects of the homelessness crisis extend to the environment.  There appears to be no environmental impact study of the kind of widespread and systemic homelessness in Los Angeles.  Yet all indications show the impact has been significant.[71]  Every day, businesses and residents find used

---

[71] Courtenay White, *Environmental Impacts of Homeless Encampments in the Guadalupe River Riparian Zone*, School of Environment and Sustainability, Royal Roads University (Jan. 9, 2014),

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

needles in their drains, on sidewalks, and in gutters.  Los Angeles County has far more unsheltered people than Orange County, and officials there recovered over 14,000 hypodermic needles, plus over 5,000 pounds of "hazardous waste" including human waste, and toxic chemicals such as propane, pesticides, solvents, and paint during a clean-up of a homeless encampment in the Santa Ana Riverbed consisting of approximately 700 people.[72]  While City sanitation workers are deployed to identify and discard toxic waste, only 30 teams are working to cover 500 square miles, missing countless numbers of needles, human waste, and other toxic substances making its way into our ecosystems.

51.     The Environmental Protection Agency recently recognized this issue in a letter addressed to Governor Gavin Newsom:

> The EPA is aware of the growing homelessness crisis developing in major California cities, including Los Angeles and San Francisco, and the impact of this crisis on the environment.  Indeed, press reports indicate that "piles of human feces" on sidewalks and streets in these cities are becoming all too common.  The EPA is concerned about the potential water quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters.  San Francisco, Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[73]

---

https://viurrspace.ca/bitstream/handle/10170/665/white_courtenay.pdf?sequence=1&isAllowed=y.

[72] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, Los Angeles Times (Mar. 10, 2018, 4:30 PM), https://www.latimes.com/local/lanow/la-me-ln-riverbed-debris-20180310-story.html.

[73] Letter to Governor Gavin C. Newsom from Andrew R. Wheeler, September 26, 2019, https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

52.     Thousands of people camp in or near the Los Angeles River basin, without access to toilets and sanitation services.  The amount of related toxic and human waste making its way into our environment is, upon information and belief, substantial, but its full scope is unknown.[74]

53.     The power-washing scheme takes place daily throughout the City, and uses likely millions of gallons of water yearly to clean refuse and filth from the streets and into our drains and ultimately, oceans. In a city and state facing water shortages, just on the other side of a devastating eight-year drought, such water usage, particularly without any kind of review taking place, is shameful and ultimately threatening to the water systems of the City and County.

54.     The environmental impact of fires arising out of homelessness is also of great concern.  Fires originating in homeless encampments are not just a potential threat—they have actually destroyed thousands of acres of brush and wildlife.  The sweeping footprints of the City and County of Los Angeles encompass vast amounts of undeveloped land, full of dry brush and other readily combustible material.  Such areas are an attractive location for many homeless persons wishing to reside "off the grid" and the combination of propane-fueled cooking fires and bootlegged electricity in untended conditions is a recipe for, and indeed has already resulted in, massively destructive fires.

**G.     Property Values and Businesses are Affected**

55.     Another casualty of the homelessness crisis is the value of property and businesses.  Downtown Los Angeles has experienced a renaissance over the last 20 years with loft conversions, hundreds of new restaurants, and currently

---

[74] Anna Almendrala, *Fecal Bacteria in California Waterways Increases With Homelessness crisis*, CaliforniaHealthline.org (Jan. 6, 2020), https://californiahealthline.org/news/fecal-bacteria-in-californias-waterways-increases-with-homeless-crisis/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

over three million square feet of office space under construction.[75]  That renaissance is now in jeopardy due to the homelessness crisis.  Businesses are suffering and property values have been affected.  The average apartment occupancy rate, rent pricing, number of sales, and sale price per square foot downtown have all decreased from 2018 numbers correlating with a rise in homelessness at the same time. Businesses throughout Los Angeles, such as Desuar Spa on 5th Street, owned by Deisy Suarez, and Exclusive Motors on Venice Boulevard, owned by George Frem, both described *infra*, have customers declining to utilize their services due to nearby encampments.

56.    Nowhere is the impact felt more strongly than on Skid Row itself, where encampments are visibly choking out local property owners and businesses.  As discussed in further detail *infra*, Plaintiff Joseph Burk can no longer maintain tenants in his building and production companies are declining to work there due to the surrounding environment.  He has been trying to sell the property but the offers he receives have been less than half of what other comparable properties receive in neighboring areas. The offers he has accepted have dropped out of escrow due to concerns about the area.  He has been trying to rent the property, but no one will rent it. He and his wife have been living there, but due to the conditions on the sidewalk outside his home, it is becoming nearly unlivable.  He is now saddled with what should be a valuable building that is near-impossible to sell, rent, live in, or use for business purposes—all due to conditions outside his property that are beyond his control, but *are* directly within the City's control.

---

[75] Vivian Marino, *Revitalization Projects Reawaken Downtown Los Angeles*, The New York Times (Mar. 5, 2019), https://www.nytimes.com/2019/03/05/business/revitalization-projects-reawaken-downtown-los-angeles.html; Andrea Lo, *How downtown Los Angeles made a stunning comeback*, CNN.com (Feb. 16, 2017, 3:50 PM), https://www.cnn.com/2017/02/15/architecture/downtown-la-revival/index.html.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

57.    As detailed *infra,* Alliance member Lisa Rich's family has owned commercial property in the Skid Row area for decades, but she is now having to heavily discount the rents she charges, repair at least one building damaged by fires at a cost of $80,000, and pay four times her prior premiums for fire insurance. These burdens have her to consider abandoning all financial dealings in the area.  Alliance member Mark Shinbane has difficulty hiring and retaining employees, has had to replace doors and fences, has to clean the perimeter of the building multiple times per day, and hire additional staff to handle cleaning and maintenance, all at economic cost.  Alliance member Larry Rauch has doubled his spending on security and cleaning to keep employees and maintain certifications, all at economic cost.  Plaintiff Harry Tashdjian has been forced to spend over $100,000 on upgraded fire and security systems and pest control just in the last few years while simultaneously losing customers due to the property's surroundings.

## H.    The Homelessness Crisis Harms Society

58.    The City and County have basic obligations to its citizens—all its citizens—to preserve the public health, to ensure a semblance of law and order, to maintain public areas and infrastructure for the use and enjoyment of all its residents.  Yet the homelessness crisis persists and threatens all of these: general public welfare and health threatened by disease, rats, and toxic waste permeating public areas.  Law and public order are being threatened by the increased crime both on and by homeless, driven by rampant drug addiction and its concomitant gang and property-related crimes. Unchecked waste and disease affect the sheltered and unsheltered alike living in or near these areas.

59.    The County, as the provider of last resort, has the additional obligation to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident . . . when such persons are not supported and relieved by their relatives or friends, by their own means, or by

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

state hospitals or other state or private institutions." Cal. Welf. & Inst. Code §17000. The purpose animating Section 17000 is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." Cal. Welf. & Inst. Code §10000. Yet the "incompetent, poor, [and] indigent persons" are not being relieved and supported, nor is "protection, care, and assistance" being given to those who desperately need it. The result is readily observable: squalor, lawlessness, disease, and death.

## I.   Crucial Funds That Could Alleviate This Man-Made Disaster Are Used In a Manner Unable to Achieve the Ostensible Goal

60.   The challenges presented by the homelessness crisis persist despite massive expenditures of taxpayer dollars. For the 2019/2020 fiscal year, the City of Los Angeles has approved a $10 billion budget that includes approximately $176 million in homeless assistance (including $85 million in HEAP grants from the state), roughly 1.7 percent of the budget.[76] This doesn't include money received and allocated pursuant to Proposition HHH. This also doesn't include the portions of the various department budgets dedicated to homelessness (such as police and fire response), estimated in 2015 to be over $100 million—and the number of unsheltered homeless Angelenos has nearly doubled in that time, from 14,968 to 27,221.[77]

61.   In 2016, City residents voted overwhelmingly to increase their property taxes and issue general obligation bonds to generate a total of $1.2

[76] City of Los Angeles, Budget Summary (2019-2020), http://cao.lacity.org/budget19-20/2019-20Budget_Summary.pdf.

[77] Los Angeles Almanac, *Homelessness in Los Angeles County 2019* (2019), http://www.laalmanac.com/social/so14.php; Office of the City Administrative Officer, Miguel A. Santana, *Homelessness and the City of Los Angeles* (Apr. 16, 2015), https://clkrep.lacity.org/onlinedocs/2015/15-0211_rpt_CAO_04-21-2015.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

32

COMPLAINT

billion over a ten-year period with the claimed goal of building 10,000 units of Permanent Supportive Housing ("PSH").[78]  The City of Los Angeles has now allocated nearly all of that $1.2 billion, for a slated total of "5,873 supportive units for homeless residents and another 1,767 affordable units" presumably for low-income (but not yet homeless) persons.[79]  While permanent housing is certainly a valuable piece of the puzzle, the median cost of HHH housing is now an astonishing $531,000 per unit, greater than many market-rate homes for sale in Los Angeles County.  "An unusually high 35 to 40 percent of costs are so-called 'soft costs' (development fees, consultants, financing, etc.) compared to just 11 percent for actual land costs."[80]  Part of the high cost is due to the "elongated approval and construction timelines"—three to six years—which is "plainly out of step with the City's urgent need to bring tens of thousands of people off the streets and into housing."[81]  The purpose of HHH was to provide a significant solution to address the increasing homelessness crisis.  Yet for less than a quarter of the $1.2 billion price tag, the City of Los Angeles could provide a bed for

---

[78] The Proposition HHH ballot described it thus:

> To provide safe, clean affordable housing for the homeless and for those in danger of becoming homeless, such as battered women and their children, veterans, seniors, foster youth, and the disabled; and provide facilities to increase access to mental health care, drug and alcohol treatment, and other services; shall the City of Los Angeles issue $1,200,000,000 in general obligation bonds, with citizen oversight and annual financial audits?

City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

[79] Ron Galperin, LA Controller, *High Cost of Homeless Housing: Review of Proposition HHH*, (Oct. 8, 2019), https://lacontroller.org/wp-content/uploads/2019/10/The-High-Cost-of-Homeless-Housing_Review-of-Prop-HHH_10.8.19.pdf.

[80] *Id.*

[81] *Id.*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

every unsheltered Angeleno.[82]  Instead, year after year, the point-in-time count has increased and to date, over three years since Proposition HHH was passed, only 46 PSH units have been opened.  In focusing almost exclusively on PSH, a solution which is laudable but alone takes too long, is too expensive, and provides less than 20 percent of the beds actually needed, the City has wasted its best opportunity to address this crisis and failed to accomplish its stated goal as promised to the voters in 2016.

62.     While most of the HHH money has been committed (though many have not even broken ground yet), there have been several opportunities to pivot strategies and claw-back some of the funding. For example, on December 10, 2019 City Council voted to give an extension to several developers who have missed deadlines.[83]  That extension represented $225 Million that could have been pulled back from Permanent Supportive Housing and used to provide shelter approximately **20,000** homeless individuals. As it is, these projects only fund **410 units**, of which 284 are for supportive housing for chronic homeless and 126 for low-income families.

63.     Another significant source of waste is found in the City's encampment clean-up strategy.  In July 2019 the City Council approved an increase of $6.45 million on top of $26.5 million already in the budget for both noticed and "rapid response" clean-ups consisting of Sanitation workers and LAPD Officers responding to particular areas of homeless encampments, having

[82] HHH is funded using General Obligation (G.O.) bonds, which are limited by the California Constitution to fund "the acquisition or improvement of real property."  Cal. Const. art. 13A § 1(b)(2).  The phrase "acquisition or improvement of real property" is not defined by legal authority.  There are many options presented herein which could easily fall within this category, including tiny home structures, 3D printed homes, or modification of existing structures such as the abandoned L.A. County hospital.

[83] City of Los Angeles, City Clerk, LACityClerk Connect, Council File: 17-0090-S2, https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=17-0090-S2 (last visited Mar. 9, 2020).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

camp residents move their property, process what is left (dumping literally thousands of tons of needles and toxic waste yearly), and then permitting the same encampments to return to the same location.[84]  The cycle repeats itself with no ultimate change or real net positive benefit for the campers or society.  As one person noted about the plan: "This, while well-intentioned, is housekeeping service for encampments."[85]  Mayor Garcetti apparently agrees this program is a waste: "We can't sweep or move homelessness away. . . We're not going to wash down sidewalks one day, only to see an encampment return the next, and people not helped. It doesn't get any single person off the street with that strategy."[86]

64.    The County also faces tough questions about its management of homelessness-related funds.  This fiscal year, the County passed a $36.1 billion budget for this fiscal year, which includes $532.8 million raised by Measure H dedicated to addressing homelessness.  Measure H was described as a tax voted for county residents in 2017 to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults."[87]  This amount is wholly

[84] City of Los Angeles, Mayor Eric Garcetti, *Mayor Garcetti Announces New Plan to Deploy New Sanitation Teams, Deliver Services to Homeless Encampments* (June 19, 2019), https://www.lamayor.org/mayor-garcetti-announces-new-plan-deploy-new-sanitation-teams-deliver-services-homeless-encampments.

[85] Emily Alpert Reyes, *L.A. could overhaul how homeless encampments are cleaned*, Los Angeles Times (June 19, 2019, 3:00 AM), https://www.latimes.com/local/lanow/la-me-ln-homeless-encampment-cleanup-dumping-bathrooms-trash-20190619-story.html.

[86] Aaron Schrank, *LA seeks permanent solution to homeless encampments*, Marketplace (Apr. 26, 2018), https://www.marketplace.org/2018/04/26/la-seeks-permanent-solution-homeless-encampments/.

[87] County of Los Angeles, *LA County budget process concludes with adoption of $36.1 billion supplemental budget* (2019-2020),

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

separate from, and <u>in addition</u> to, the significant percentage of County funds allotted to departments to address issues of homelessness, including those housed and treated in County jails, emergency treatment and transport, Department of Mental Health, LA County Fire Department, medical treatment through various hospitals and treatment centers, and criminal prosecution and defense costs, not to mention funding General Relief and other myriad social services.

65. Measure H has generated a significant amount of money, yet a substantial portion of these funds are wasted through a failure to spend the funds. In the 2017/2018 fiscal year, $258,937,000 was allocated for homeless services under Measure H and astonishingly $86,727,737 was left unspent at the end of the year. For the 2018/2019 fiscal year the County of Los Angeles allocated $412,241,000 for homeless services through Measure H; $39,323,000 remained unused.[88] In this time of critical emergency, for any funds to be left unspent is a tragedy. Moreover, there is little indication that the funds spent have actually reduced the homelessness crisis. The problem is outpacing the solution, and the goal of Measure H—reducing and preventing homelessness—remains largely unrealized.[89]

---

https://lacounty.gov/budget/; Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H, Ballotpedia.org (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_Services_and_Prevention,_Measure_H_(March_2017).

[88] County of Los Angeles, FY 2018-2019 Actuals Measure H Expenditures (Aug. 30, 2019), http://file.lacounty.gov/SDSInter/lac/1060405_COAB-MeasureH18-19Expenditures.pdf.

[89] County of Los Angeles, *County develops action plan for homelessness prevention* (Dec. 16, 2019), https://homeless.lacounty.gov/news/county-develops-action-plan-for-homelessness-prevention/ (approximately 133 people per day are finding some sort of housing, while an estimate 150 people per day are entering homelessness); Erika D. Smith, *In 2019, homelessness truly felt like a crisis in every corner of L.A.*, Los Angeles Times (Dec. 20, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-12-10/homeless-housing-crisis-los-angeles.

COMPLAINT

66.     In addition, the County has failed to meet its statutory obligation to provide appropriate mental health services.  A healthy community will have 50 IMD (Institute for Mental Disease) beds per 100,000 people; Los Angeles only has 23.[90] Courts are reticent to declare a person conserved because there's nowhere for them to go, and the system designed to address these issues is massively overburdened.  As of 2019 the County had almost $1 billion in funds allocated to it through the Mental Health Services Act, and while there has been some discussion about what to do with these funds, to date no reported expenditure has been made. [91]  The County points to the state's antiquated and restrictive conservatorship laws and the Federal government's refusal to permit Medicaid finances for IMD beds, both of which do need to be addressed. Yet even under the existing scheme, local courts could conserve many severely mentally ill persons were there sufficient beds available. The blame for insufficient placement rests squarely on the County's shoulders.  And people suffering from very serious mental diseases decline living on the street instead, many of whom pay the ultimate price.[92]

67.     Both the County and City have hundreds of millions of dollars in emergency funds to be used for disaster relief.  This homelessness crisis is

---

[90] E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

[91] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.

[92] Dennis McDougal, *Op-Ed: My daughter was murdered, but it was misguided mental health laws that put her in danger,* Los Angeles Times (Jan. 26, 2020, 3:00 AM), https://www.latimes.com/opinion/story/2020-01-26/i-hope-police-catch-my-daughters-killer-but-i-know-her-mental-illness-also-played-a-role-in-her-death.

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

nothing short of a disaster, with thousands of casualties and massive collateral consequences, yet emergency funds remain untapped.

68.     Together, the County and City fund LAHSA, which has been totally ineffective at stemming the growing tide of homelessness.  Among LAHSA's shortcomings is the failure to move people up and out from emergency shelters and bridge shelters to permanent housing.  One woman at the Downtown Women's Center has been there for five years as she waits for housing; unfortunately those deemed "sickest" get priority for housing and women like her who are more capable of caring for themselves get pushed down the list.  The agency has been so disorganized, it apparently just discovered 3,000 units they "didn't know about" in their system.[93]

69.     Solutions exist that would meet the articulated program goals in a time- and cost-effective manner, including Sprung structures (already being used in many places in Los Angeles), military-grade inflatable tents (being utilized in Honolulu), pallet shelters (being used in Sacramento), and festival tents (utilized in Modesto), discussed in para. 13 *supra*.  Board and care facilities could be utilized as bridge shelters.  The City of Seattle has created small "villages" of tiny houses which don't require a lot of property (6,000 to 30,000 square feet) and can be built in a matter of months, with building cost of $1,500-$7,500 per unit (depending on utility connections) and run on an annual budget of $3,000-$7,000 depending on services provided.[94]  Hundreds of smaller properties

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[93]  Elijah Chiland, *Agency responsible for housing LA's homeless discoverys 3,000 units it 'didn't know about*, Curbed Los Angeles (Feb. 20, 2020), https://la.curbed.com/2020/2/20/21145578/lahsa-units-homeless-housing.

[94]  Lee, *supra* note 18, https://shelterforce.org/2019/03/15/tiny-house-villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.

COMPLAINT

throughout the City and County of Los Angeles fit the bill and could be utilized in a large-scale way to provide an "enhanced shelter" option.[95]

70.     One of the most promising solutions to this crisis already exists in the form of collaborative housing, yet LAHSA refuses to refer homeless persons to the program, calling it "undignified" because it houses two to a room (like college dormitories or sober living facilities), and doesn't permit alcohol and drug use within the houses (even though LAHSA purports to encourage a life style of recovery).[96]   SHARE! collaborative housing provides affordable permanent supportive housing in single-family houses and duplexes throughout Los Angeles County.  It utilizes a shared housing model, wherein existing single family homes are purchased or leased, or new homes or duplexes are constructed, the home is furnished with low-cost basic furniture, and persons are housed two-to-a-room forming a sense of community and kinship, and supported by peer advocate counselors. Residents pay rent averaging $600 per month (sufficiently low that it is covered SSI, SSDI, or low wage jobs with enough left over for food and other basics of life); no security deposit is required and all bedding, cleaning supplies, and utilities are provided. It costs roughly $4,000 per person to get started, and thereafter is self-sustaining; no infrastructure is required as it relies on existing homes for sale or rent (over 30,000 currently listed in the County).  A proposal was made to the LA City Council in October of 2017 to house and

[95]Examples cited in one private study include 3.6 acres of empty, county-owned property located at Soto and E. Cesar Chavez, 13.5 acres of underutilized county-owned property located at Adams and Grand, 1.3 acres of empty state-owned property at 1616 Maple Ave, 20,000 square feet of City-owned property at 5800 S. Figueroa Street, a 15,000 square foot empty lot located at 2301 San Pedro Street, 1.4 acres of unoccupied city-owned property at 4521 Browne Ave., a combined 3 acres of city and county owned property at Alpine and Spring in Chinatown, 2.7 acres of city-owned property at 9413 S. Spring, and 8 useable acres adjacent to Hope Gardens Family Center in Sylmar which is unable to expand due to conditional use permits.

[96] Share!, History & Vision, https://shareselfhelp.org/about-share-the-self-help-and-recovery-exchange/history-vision-share-the-self-help-and-recovery-exchange/ (last visited Mar. 9, 2020).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

(note)

provide peer services to 2,000 people for the minimal cost of $8 million. This evidence based, housing-first program for chronically and other homeless individuals with proven outcomes of success has yet to be funded.

71.     Another promising option is 3D-printed homes, currently being built in Austin, Texas and Tabasco, Mexico, which come in various square foot models (400-800 square feet), cost around $4,000 per unit, and take only 24 hours to build.[97]  The company that innovated this model is willing to sell their upgraded printer, the Vulcan II, which would expedite building and potentially reduce costs.  More land is needed than some of the more temporary options described *supra*, and several hundred acres of land are available in less populated areas of the City and County.  When paired with wrap-around services, and transportation to facilitate job accessibility, the County and City could develop nearly self-sustaining communities that have been successful in other cities.[98]

72.     Utilizing any of the options described in the preceding paragraphs, or a combination, in a large-scale manner would be an effective way of spending taxpayer funds that would actually accomplish the goals identified by the programs.  Yet still the City focuses on funding exorbitantly expensive PSH units and wasting taxpayer dollars on "housekeeping services" for encampments, neither of which are addressing the immediate crisis on the ground. And the County spends massive amounts on a host of programs that, while positive, lack focus and fail to solve the most pressing problems presented by the homelessness crisis.

**J.     Neither City nor County Has Proffered Workable Holistic Solutions**

---

[97] Jayson, *supra* note 21, https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html; Aria Bendix, *supra* note 21, https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9.

[98] Mobile Loaves & Fishes, *Community First! Village,* https://mlf.org/community-first/ (last visited Mar. 9, 2020).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

73. While the City and County have made efforts to address this crisis, they are at best scattered and neither has developed comprehensive plans to solve it. The new County mapping tool shows a total of 4,506 interim housing units coming online in the next two years (which includes beds within the City of Los Angeles and other locations), and 9,960 supportive housing units in the "pipeline" (the majority of which are funded through HHH and will not be ready for another several years).[99] That is less than 15,000 new beds becoming available when there are more than 44,000 people in the County without a safe place to sleep on a nightly basis, and many of those beds that are planned won't be available for years.

74. Plaintiffs do not suggest the City and County are doing nothing; the amount of effort and resources that have been devoted to addressing this issue is considerable and admirable. But the actual result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such efforts and resources.

75. Without beds to offer, the City and County's efforts are stymied and destined to fail under *Martin v. City of Boise*. And so the crisis continues and accelerates, with little hope of a City- or County-driven solution. Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs and the entire City and County are suffering under the weight of an urgent crisis. Plaintiffs are left with no choice but to resort to the Courts for relief.

---

[99] County of Los Angeles, Los Angeles County Homelessness & Housing Map: A Data Driven GIS Map of Interim and Supportive Housing (Dec. 12, 2019), https://storymaps.arcgis.com/stories/400d7b75f18747c4ae1ad22d662781a3.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## IV.     THE PARTIES

## PLAINTIFFS AND INDIVIDUALIZED HARMS

76.     **LA ALLIANCE FOR HUMAN RIGHTS** (the "Alliance") is an unincorporated association consisting of a broad coalition of Los Angeles stakeholders who understand that homelessness in LA is a human rights crisis and are working towards solutions to address the crisis and its related impact on health and safety issues throughout the region.  Each of its members is a resident of Los Angeles City and Los Angeles County, and pays municipal taxes to each.  All individual plaintiffs herein are members of the Alliance.  Additionally, the following individuals are representative of the membership:

a.     **BOB SMILAND** is the President and chief executive officer of Inner-City Arts—a non-profit organization dedicated to providing elementary, middle, and high school students instruction in a range of subject areas within the visual, performing, and media arts.  The organization serves almost 10,000 students per year and is open 6 days a week from 7:30 a.m. to 9:30 p.m.  As the CEO and President, he is directly responsible for the safety of the students and staff.  He both lives and works in the Skid Row area.  The increase in squalor, disease, and violence over the last several years has threatened not only his personal well-being, but that of his co-workers, and the hundreds of students he works with on a daily basis.

Mr. Smiland's apartment building, which houses 53 residents, experiences at least one break-in a week, and neither he nor his visitors can safely leave their cars parked on the street overnight, as cars left overnight are frequently vandalized.  Ambulances appear at all times of the day and night outside the building, and the last two years have brought an increase of gun shots, and other violent noises in the area.

The explosion in in the number of tents, people, and personal belongings stored on the sidewalks in the area creates regular blockades, preventing Inner-

City Arts staff and students from walking to the school.  Because of this blockade, those staff members that rely on the 7th and San Pedro bus stop, roughly 6 blocks away, are forced to walk in the street the entire way.  Staff members no longer walk to work out of fear that they will be attacked.  It is no longer safe for students to walk between their schools alone—they must be escorted by staff members of the Central City East Association.  Mr. Smiland—an imposing man at 6 feet, 5 inches—does not feel safe walking the 40 yards from the school to the post office during the day.  Each time he makes this walk, he is confronted by multiple people whose conduct poses a threat to his safety.

Inner-City Arts has experienced a sharp increase in vandalization.  Graffiti, once a rare occurrence, appears weekly on the organization's buildings.  There has also been a sharp rise in break-ins to the campus over the past year.  These break-ins are a major safety concern for the school, its staff, and its students.  Because of the increased danger, violence, and vandalization, the school's security costs have risen from minimal to over $80,000 per year.  The school has also been forced to install a fence for protection, a large capital expense that impedes the carefully designed architectural aesthetic of the property.  These expenses have diverted resources away from the core work of the organization.

As someone who both lives and works within the Skid Row area, Mr. Smiland has been treated differently than other similarly situated individuals living and working outside of this area.  He is subjected to violence, garbage, narcotics use, offensive odors and sounds, forced to walk in the middle of the street, and lacks police enforcement of the laws protecting his safety and security, different from individuals living and working outside of this geographic area and not subject to these same conditions at the same rate. This unfair, unequal treatment funnels these problems into the area where he lives and works, increasing the homeless population density and exacerbating existing problems.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

43

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

    b.    **DONALD SHAW** has lived in or near Skid Row for the last 25 years.  He was in and out of jail for much of that time but has been free, clean and sober since 2013.  He is now the residential manager of security at the Midnight Mission (the "Mission"), located at 601 San Pedro Street, in the heart of Skid Row, where he lives and oversees a one-year drug and alcohol program that helps 150 men get clean each year. While working as the assistant manager, he became the liaison between the Mission and the Los Angeles Police Department ("LAPD").  He represented the Mission at all LAPD meetings.  In attending these meetings, he began to understand the challenges the LAPD has in the Skid Row area, and he informed the LAPD how concerned the Mission's security team was about the hazards personal property created outside the Mission.  He also asked LAPD officers multiple times if they could help get people to move their possessions off the Mission's walls or keep their property from blocking entrances.  The officers seemed sympathetic to his plight but explained there was nothing the LAPD could or is allowed to do to alleviate such conditions.

    When he walks to work, he is forced to walk in the street due to the blocked sidewalks, and as a result, he was nearly hit twice by passing cars. He has also witnessed and experienced the significant increase in drugs and violence in the Skid Row over the last several years arising out of the increase in unsheltered homeless persons living in encampments on the sidewalks in the area.  The conditions surround Mr. Shaw and those at the Mission is such that going out at night is too big a risk, so he doesn't.

    c.    **GALVESTER GAULDING** has struggled with drug and alcohol abuse for the past 20 years, and in 2005 became homeless and ended up in jail due to drug-related issues.  From 2007 to 2008, he lived in a halfway house, and, during this time, started attending meetings and battling his addiction, constantly alternating between rehab and the hospital. Mr. Gaulding suffers from

44
COMPLAINT

both mental and physical health issues, including bipolar disorder, severe depression, and hypertension.  The time he spent without regular shelter exacerbated those issues: he rarely was able to sleep more than a few hours at a time, he was exposed to the heat in summer and the cold and rain in winter. He took illegal drugs to self-medicate, both for his mental health issues and to cope with the stress of living on the streets; the narcotics further intensified his chronic illnesses. It wasn't until he finally entered the Union Rescue Mission approximately two years ago that he began to heal: he was able to sleep without fear of attack or exposure to the elements and began to take his medication regularly.  But he will never be the same.

When he arrived at the Mission, he was told that if he finished the one-year drug and alcohol program, they would give him the resources he needed to find a place to live.  He was successful and received a Section 8 voucher for permanent housing.  But the only available housing was on Skid Row, which is rife with conditions threaten his sobriety and safety.  He was terrified to take the offered housing on Skid Row and waited an extra year until he was finally able to find housing out of the area. He received his keys and moved in three weeks ago.

In the last two years while living in Skid Row, he was physically attacked, witnessed multiple stabbings, and saw multiple dead bodies.  As a former addict who has struggled with this disease for his entire life, he it was nearly impossible to stay clean on Skid Row; he mostly chose to avoid going outside at all because the moment he did, someone offered him drugs.

d.     **KYLE HARPT** is formerly homeless and on July 5, 2016, he enrolled in a program at the Mission.  He came to the Mission because of the facilities and the programs it offered and stayed at the Mission for a year and a half.  He has remained sober since then.  After graduating from the Mission, he moved to 5th and Main Street, adjacent to Skid Row.  He began to see the dire circumstances afflicting Skid Row on a daily basis, and was fearful of the

1   increase in violence, unchecked drug use, and exploding sanitation and disease

2   problems that continue to plague the area. Concerned for his health, he got

3   various vaccinations, including the vaccine for Hepatitis A.

4       Mr. Harpt has observed people openly using drugs on the street and the

5   prevalent absence of police enforcement. Walking down the street, he has seen

6   people smoking meth out of glass pipes or smoking crack, and he is regularly

7   accosted by individuals offering to sell him drugs. Mr. Harpt observed no effort

8   by city officials, including the police, to stem this flagrant use of drugs.

9       From 2016-2019 he worked at the Mission doing data base work. To

10  avoid dangerous areas and altercations in Skid Row, Mr. Harpt used a set path

11  well out of his way to get to and from work. A couple years ago, he was robbed

12  outside of his house in broad daylight—the offender pulled a knife and stole his

13  bicycle. This incident and the violent altercations he observed on the streets of

14  Skid Row caused Mr. Harpt to fear for his own safety. In late 2019 Mr. Harpt

15  changed jobs and left the area; he would like to return to downtown if conditions

16  change for the better.

17      e.    **MARK SHINBANE** is the President and part-owner of Ore-

18  Cal Corporation which is a family-owned business in the Skid Row area. He has

19  also been the Chairman of Central City East Association (CCEA) for several

20  years. Ore-Cal Corporation is an international seafood importer, processor, and

21  distributor. It is a second-generation family-owned-business and they have

22  owned property in the general area since 1961. Ore-Cal has been located on 634

23  Crocker Street since 1971. Four years ago, Crocker Street and other streets in

24  that vicinity—such as 6th Street, 7th Street and Towne Avenue—were free of

25  encampments. Mr. Shinbane recalls small homeless encampments west of San

26  Pedro Street on San Julian Street and Wall Street in the past, but personal

27  possessions were generally kept contained, crime was generally addressed, and

28  the sidewalks were usable.

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

46

COMPLAINT

In 2016, immediately after the injunction issued in *Mitchell v. City of Los Angeles*, Crocker Street, the neighborhood surrounding Ore-Cal became a haven for homeless individuals.  The streets rapidly filled with tents and encampments, inundating the area, which coincided with an increase in violence and an inability to traverse the sidewalks.  Individuals loiter at all times of the day, and the growing encampments block sidewalks, doorways, driveways, and streets. Mr. Shinbane regularly observes open drug use and people walking in a perpetual drug-induced state, and bodies lying on the sidewalks or doorways near his business.  There has been an increase of used needles on the streets, sidewalks, and inside drains located on the business' property.

Mr. Shinbane's conversations with LAPD Officers and Detectives in the area indicate that gang members are supplying narcotics to homeless individuals right outside of Ore-Cal.  There has been an increase in violence with both homeless (as victims and perpetrators) and gang members.  His employees and transportation drivers are frequently assaulted or threatened by homeless individuals.  Illegal entry onto their property, car break-ins, and thefts are now a common occurrence.

Ore-Cal and its employees are subject to an increased risk of fire because of the encampment fires that surround the property.  This danger is made worse by the huge quantities of trash and debris that litter their street and surrounding neighborhood.  The conditions on the street are worsening and there has been a significant increase in rats and vermin as well as urine and feces in their gutters and on their property.  These conditions have made it extremely difficult for Mr. Shinbane to hire new workers, and his company has lost many well qualified candidates due to the unpleasant neighborhood and environment—at least 10 candidates for administrative or managerial roles declined an offer because of concern for their safety or the conditions in the area.  Approximately 25 to 40

percent of candidates decline offers or interviews based solely on the location. This never used to be the case.

To combat some of the deteriorating conditions, Mr. Shinbane's business has completely fenced its property to prevent individuals from camping on their grounds and to keep the used needles from being fed into their exterior drains from the rampant narcotics use.  He was forced to replace roll up doors and add sections of fence due to individuals constantly urinating on them, a cost of $25,000.

Ore-Cal has also had to significantly increase its exterior maintenance by washing and sanitizing the perimeter of their facility daily.  In some cases, it is necessary to clean multiple times a day, in order to maintain cleanliness.  He now spends $15,000 a year—a new expense—on supplies and staff dedicated to maintaining the perimeter and external areas of their facility.

His company's property has appeared in footage taken recently by a reporter for a local television affiliate that accurately captures the conditions in Skid Row.  (*See* Chris Cristi, *L.A.'s homeless: Aerial tour of Skid Row, epicenter of crisis*, ABC7.com (June 13, 2019), https://abc7.com/society/las-homeless-aerial-tour-of-skid-row-epicenter-of-crisis/5344680/.)  The video shows mounds of trash with tents, structures, and other property completely blocking sidewalks and spilling into the streets at the corner of 6th and Crocker, just yards away from the Ore-Cal building.

Mr. Shinbane has observed no meaningful efforts by the City to address these issues and has noted a lack of law enforcement activity in the area surrounding his business despite the prevailing state of lawlessness.

f.     **LARRY RAUCH** is the president of Los Angeles Cold Storage Company located at 400 South Central Avenue within the Skid Row area.  Los Angeles Cold Storage is a public refrigerated warehouse that stores frozen and refrigerated foods for hundreds of customers.  It is owned by Standard

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Southern Corporation, which Mr. Rauch's family owns.  He has worked for Los Angeles Cold Storage for over 45 years.

Mr. Rauch is one of the founding members of CCEA, has been Chairman twice and has also sat on the Finance and Executive Committees. He is also the past Chairman of both the International Association of Refrigerated Warehouses and the World Food Logistics Organization, both of which are international organizations representing his industry.  He is a past Chairman of the Jewish Family Service, the oldest Jewish social service agency in Los Angeles.  He is also a past Chairman of the Jewish Community Foundation.

Over the past three years, there has been an explosion in the numbers of people living on the streets near Los Angeles Cold Storage.  This rapid increase in the population has resulted in dangerously unhealthy living conditions and a sharp decrease in sanitation.  With the increase in individuals has come an increase in personal property, trash, and human feces, all of which line the streets that he, his employees, and his customers depend on daily. Given the nature of their business, sanitation and health conditions in the immediate area surrounding the facility are a high priority for them.

Los Angeles Cold Storage is inspected by a variety of government agencies including: the Food and Drug Administration (FDA), the United States Department of Agriculture (USDA), the United States Department of Commerce (USDC), the Los Angeles City Public Works (Sanitation), the Occupational and Safety Administration (CAL OSHA), the Los Angeles County Health Department (Environmental Health), the Los Angeles City Fire Department, departments: 1) Fire Safety and 2) CAL/ARP, Los Angeles County Fire Department (HAZMAT), the City of Los Angeles Public Works (Watershed Protection Division and Industrial Waste Management Division), and the State of California Department of Public Health (Food and Drug branch).  Their ability to remain operational and profitable as a business depends on their compliance with

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the rules and regulations of each of the organizations listed above. The increase in squalor, feces, and trash has required the company to wash their sidewalks down every morning before 6 a.m. to maintain the necessary certifications certification and ensure the employees and truck drivers do not bring the unsanitary conditions from the street into the warehouses or offices.  Efforts to remain sanitary are made even more difficult by the rodent infestation on the nearby streets.  Trash left out by those on the streets ensures that the rodents are well fed each day and continue to maintain a home on the streets, which in turn creates health risks for those living on the street and working and living in the area, including Los Angeles Cold Storage employees.

Some Los Angeles Cold Storage customers require that the company be audited and certified by the British Retail Consortium ("BRC"), a global safety and sanitation program.  While Los Angeles Cold Storage holds an AA certification, the highest possible level, with BRC, their customers expect them to maintain this high-level certification.  The lack of sanitation, and accumulation of trash and human waste outside constantly poses an imminent risk of failing BRC audits, which would result in the loss of valuable customers.

The company continues to incur significant additional security costs to protect their property and avoid graffiti, and has installed extra cameras and lighting to protect its buildings, as well as employing a security guard to escort employees to company vehicles and monitor the safety of the building throughout the night.  Annual security costs for Los Angeles Cold Storage have skyrocketed by nearly 100 percent to a current level of $150,000.

Los Angeles Cold Storage employees are often endangered on their commute to work.  Because the sidewalks are often completely blocked with individuals, personal belongings, and tents, employees have been forced to walk in the middle of the street to access the parking lot.  Employees have experienced harassment on multiple occasions in the forms of panhandling or individuals

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

exposing themselves.  These panhandlers create even greater danger for those forced to walk in the street, because when they approach cars for money the cars swerve to avoid them.  The number of individuals in the street causes a great danger to vehicles passing through, and for vehicles entering and leaving their facility.

The high concentration of desperate people has led to an increase in violence in the area.  Now, his employees must be escorted to and from their cars in order to avoid harassment.  Employees have also experienced an increase in theft and physical damage done to their cars.

Mr. Rauch's daily observation of the human tragedy in Skid Row both saddens and frustrates him—he is sobered by the squalor in which unsheltered individuals live, and irked by the inaction of the City in the face of this crisis.

g.     **HAL BASTIAN,** a commercial real estate professional in Los Angeles for 37 years, has been one of the leaders of the Downtown Los Angeles Renaissance for the last 26 years. He began working as a retail broker for Cushman & Wakefield in Downtown Los Angeles ("DTLA") in 1994.  He later transitioned to the role of leasing director for The Old Bank District—the first adaptive reuse project in downtown that converted historical office buildings into loft apartments.  From 2001 to 2014, he served as the Director of Economic Development for the Downtown Center Business Improvement District (DCBID), and eventually, its Executive Vice President.  During this time, Mr. Bastian facilitated the construction of over 22,000 housing units, leading tours and producing special events that recruited thousands of new residents and resulted in the construction of dozens of new commercial and mixed-used developments, and attracting over 300 new businesses to the downtown area, including Ralphs, Fresh Fare, Bottega Louie and Whole Foods Market.  He lives in DTLA.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    Mr. Bastian's extensive experience in DTLA has made it clear to him that

2 both action and inaction by the City has been a substantial contributing factor in

3 the current homelessness crisis.  In particular, the City's response to a series of

4 federal lawsuits has coincided with this crisis, which affects the homeless and

5 housed alike, and he joins this lawsuit to bring about a substantial change in the

6 deteriorating conditions of DTLA.

7    h.    **LISA RICH** owns several buildings in Skid Row, which she

8 rents out to various businesses.  Her family has been running the properties for

9 over 40 years and has brought significant numbers of jobs to the area.  Over the

10 past several years, the number of homeless persons on the sidewalk in front of the

11 buildings has dramatically increased, as has the amount of personal possessions.

12 Frequently, tents and belongings block the sidewalks for days at a time, bringing

13 with them refuse, criminal activity, and unhygienic conditions.  At times, the

14 buildup of property has physically prevented tenants and patrons from accessing

15 the buildings.  Tenants have complained and requested rent reductions due to the

16 effect the homeless encampments are having on their business.

17    Ms. Rich attempted twice to contact LAPD for assistance in moving the

18 property, but received no help.  When she asked why the LAPD had not moved

19 homeless persons or their property, she was informed that there was nothing

20 LAPD could do.  After learning the City would not help, Ms. Rich attempted to

21 install fencing around some of her higher risk properties to keep tents from being

22 propped directly against the buildings.  However, for one of the buildings, the

23 City warned her that the fencing was unlawful and would lead to fines.  Before

24 she could remove the fencing at issue, an unknown person or entity removed the

25 chain link, and tents returned, gathering around the bare fence poles.

26    In late 2017, a campfire at a homeless encampment burned out of control

27 and set one of Ms. Rich's buildings on fire.  The blaze significantly damaged the

28 building's offices and electrical system, requiring more than $80,000 worth of

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

repairs.  The fire and repair process disrupted her tenant's business for significant time.  At her next policy renewal period, her fire insurer refused to renew the policy covering <u>all</u> of her buildings, claiming her buildings could no longer be insured because of the risks posed by the adjacent homeless encampments.  Ms. Rich then approached 24 other insurers—of those, 23 insurers outright refused to insure her buildings at any rate.  Eventually, one insurer offered to cover her buildings at a premium more than four times her original rate.  As a result of these developments, she is actively considering selling her family's business and abandoning the Skid Row area.

i.      **DEISY SUAREZ** is a resident of and business owner in Downtown Los Angeles.  She lives and works on 5th Street ("5th") and Broadway Street ("Broadway").  Ms. Suarez is the proud mother of two young children, both under two.  Due to the violence and disease surrounding the encampments throughout downtown, Ms. Suarez fears for her and her children's safety each time they leave their home.  In fact, this fear has become almost paralyzing, often preventing Ms. Suarez from leaving the building by foot.

Given her children's young age, Ms. Suarez uses a stroller when traveling by foot.  The increase in homeless persons and their property on the streets hinders Ms. Suarez's ability to freely travel the public sidewalks and regularly puts her and her children's lives in danger.  She finds it difficult to travel 3rd Street and Main Street, between 7th and 8th Street along Maple Street, along the east side of Los Angeles Street between Winston and 5th Street, between 5th and 6th Street on Los Angeles Street, and along Main Street between 6th and 7th Street.

Some of these routes are blocked by street vendors who become extremely aggressive, and whose belongings and "shops" take up the entire sidewalk.  On other streets, tents and personal belongings fill the sidewalk, making it difficult or impossible for a person with a stroller or someone in a wheelchair to pass. When

she asks individuals to move themselves or their belongings so that she can use the sidewalk, she is often met with aggression.  As a result, Ms. Suarez is frequently forced to walk, with her children in their strollers, in the street with moving cars, to reach her destination because the streets are blocked with individuals and belongings.  As a mother of young children, Ms. Suarez feels extremely vulnerable walking on the streets.

Ms. Suarez's business has also been negatively impacted by the homeless crisis in Downtown Los Angeles.  She owns Desuar Spa, a day spa, that is located in the same building where she and her family live.  At least a few times a month, she and her staff receive phone calls from clients canceling their appointments because they are afraid of getting out of the car or walking to the building.  The hotel concierges at the Intercontinental and the Weston have expressed safety concerns for guests looking to visit the day spa.  Sometimes, there are individuals asleep on the sidewalk in front her business, making it difficult, and unnerving for individuals to enter the building.  The increase in homeless persons living and sleeping outside of her business has made it difficult for her to retain staff.  Multiple staff members have quit as a direct result of frightening interactions with the homeless individuals.  And Ms. Suarez has struggled to recruit new staff members because of the danger the location of the spa poses.

77.  **JOSEPH BURK** owns an historic building utilized for a company he created called Location 606, Inc.  His property is primarily rented for film, television, commercial and music video production.  Until 2017, he rented part of the property to tenants, but since then, due to the conditions in the area, he can no longer get a tenant to occupy the property, and he now lives there with his wife. He pays property taxes, but cannot use the public sidewalks around his own property.  Mr. Burk's residence has become unlivable due to surrounding conditions, and his business has been destroyed.  Production companies have

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

stopped using his building for film shoots, and he has gotten countless rejection emails and letters citing the conditions around his property.  He has lost hundreds of thousands of dollars because production companies cannot use Mr. Burk's property since they need accessible driveways and sidewalks for heavy equipment, lighting and sound items, and costume trucks, and the exits and entrances to his property are often fully blocked by shelters and possessions.  On at least one occasion when his property was to be used for filming, the crew was unable able to bring their equipment inside his building and demanded its money back.  His property has been on the market for years without an acceptable offer, and he has experienced a significant decline in his own quality of life as a result of the increased filth, violence, and drug use in the surrounding areas.

78.     Over the past three years, Mr. Burk has received the following communications from production companies considering his property for filming:

a. October 11, 2016 email: "After driving past your place on 6th and Crocker yesterday I can no longer present your property for upcoming commercial shoots.  The homeless condition directly around your property is out of control and I wouldn't feel safe bringing any film crew into that area."

b. October 24, 2016 email: "Sorry the scout left before going inside to see your space today.  He told me that when he showed up, he could barely walk down the street because there were so many homeless tents and people around.  He said it would be a nightmare to try and film there and didn't want to put the option in front of the director.  Also, wouldn't be appealing to bring the client there due to all the homeless people."

c. February 7, 2017 email: "Thank you for showing [interested client] your place.  She really liked it.  But she is concerned about the

neighborhood because her show has a big star attached.  Thanks again."

d. June 27, 2017 email: "When the location manager showed up with the director, his instant reaction was 'I won't shoot here, because I won't get out of the car[.]'  Due to the severity of the homelessness in your area, I fear you are losing out on a lot of shoots.  I know it[']s out of your hands, but thanks for all your help today."

79. From 2003 to 2017, two full-time tenants, a married couple, lived in the building, but they moved out due to the declining quality of life arising out of the homelessness crisis.  The amount of noise and trash coming from the encampments had become too much for them.  The wife was harassed repeatedly and the husband had his bike stolen numerous times.  People would (and still do) urinate and defecate on the property's fence, which would run down toward the front door.  The tenants frequently came across used needles which were left behind from people in the encampments, and called 911 several times to report individuals overdosing on drugs.

80. Since those tenants moved out, Mr. Burk has struggled to find a full-time tenant for the property.  People are not interested in renting his property as a home or living space because of the surrounding area.  LAPD officers have told Mr. Burk that they have been instructed by their superiors not to ask the homeless to move their belongings from the sidewalks or from his property.  Because of this, when he has asked people to move their belongings from blocking the entrance to his home, he has been threatened, spit on, and verbally attacked.  Weekly, he witnesses public sex, prostitution, and/or nudity on 6th Street and Crocker street.  His security cameras often catch violent encounters, like a shooting that occurred in the end of January across the street from his building.

81. Insurance premiums on his property are significantly higher than on properties in other areas of DTLA due to the increased danger surrounding him

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

daily.  The building across from him caught on fire from a homeless encampment's open flame; the building down the street recently caught on fire for the same reason.  He has difficulty receiving mail or packages.  The mail carrier will not deliver his mail if his mailbox is blocked and will not get out of his truck to deliver mail or packages to his front door because he has said it is not safe.  He regularly receives his neighbors' mail because the carrier simply chooses the mailbox that is not blocked that day to put the entire block's mail in.  If everyone's mailboxes are blocked, mail is not delivered.  Food delivery services will no longer deliver food to his property after dark.  Rideshare drivers such as Lyft or Uber will refuse to pick up or drop off there.

82.     Mr. Burk has been trying to sell the property since early 2018.  There have been several interested buyers, yet the property has not sold, as the conditions surrounding the building and the recent and widely reported typhus and hepatitis outbreaks in the area have scared off potential buyers.  His property has dropped out of escrow multiple times.  All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reason they would not purchase the property.

a.  For example, on January 17, 2018, he received an email from a potential buyer stating, in part, "Just wondering how you're planning to sell it when the homeless are 3 tents deep all around that.  I know that DTLA is working on the problem but isn't the skid row development company super close? . . . [W]hat precautions and what actions can be taken regarding the sidewalks around the property as owners[,] if we were to buy it?"  The email also included a text message screen shot from a potential buyer stating, "Thanks for letting me know about the sidewalk directly around the building.  I just know that it will make it awfully hard for pedestrians to walk over from the arts district . . . if no one will venture over because the

rest of the surrounding streets look like a scene from Mad Max then that could be a hiccup."

83.    In 2018, the City of Los Angeles inquired about acquisition of Mr. Burk's property.  The City would not tell him why they were interested in his property, but in January 2019, he found out from an article in the *Los Angeles Times* that the City was looking to turn his property into a Homeless Hygiene Center.  The City has not made an offer on the property but has made matters worse by releasing his address to the public.

84.    Last year, Mr. Burk spoke to some young men who told him they came to Skid Row from the Valley because they knew they could pitch a tent, buy and use drugs, without any repercussions.  To be clear, they were not homeless, they were simply capitalizing on the drug-haven Skid Row has become.  This is just one example of the "attractive nuisance" of Skid Row as a result of the City and County's current lax enforcement policies.

85.    The homelessness crisis right outside Mr. Burk's building is heartbreaking, but what is even more heartbreaking is that the City is allowing it to get worse.

86.    **HARRY TASHDJIAN** owns an upholstery supplier in the industrial area of DTLA, and the property surrounding the business location.  Mr. Tashdjian's building typically houses millions of dollars' worth of inventory.  When he purchased the building in 2013, tents were not allowed on the streets during the day.  Because his business operates during traditional business hours, he believed that the location would not hinder business, which generally has between 70 and 100 will-call orders per day through which customers order product then come into the business shop to pick it up.

87.    In mid-2016, Mr. Tashdjian saw an immediate increase in tents on the streets and sidewalks outside of his business.  Today, tents occupy the sidewalks at all hours, and it is difficult for him and his customers to access his

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

1    business due to the piles of property and people loitering on the sidewalk and in

2    the street.  Customers constantly tell him how difficult it is to get into the

3    building or the adjacent parking lot without hitting people.  Mr. Tashdjian has

4    been repeatedly told that customers prefer to do business with competitors to

5    avoid the hassle and inconvenience of trying to access his store.

6        88.    Vendors from all over the world—Italy, Germany, United Kingdom,

7    China, etc.—visit Mr. Tashdjian's shop and express shock and dismay that such

8    horrendous conditions exist in Los Angeles.  His business is now at a much

9    greater risk for vandalism, violence, and fire damage.  Homeless individuals

10   frequently urinate into or onto his building or the adjacent parking lot, and there

11   has been an increase in graffiti on his building.  The number of tents immediately

12   outside of his building puts his business at risk of fire damage—indeed, the fire

13   department responds at least once a year to a tent fire that has started immediately

14   outside his building.  Sometimes it is an innocent accident from an open flame;

15   other times, it is intentional due to some drug dealers' disagreement.  His security

16   has caught these arsons on camera.

17       89.    The conditions surrounding his property have cost Mr. Tashdjian a

18   great deal of money.  Because of the immediate fire danger posed by the tents

19   outside his building, he has been forced to upgrade his fire monitoring system

20   which cost approximately $40,000.  He has also had to spend approximately

21   $37,000 on a new security surveillance system to protect the building.  The

22   LAPD frequently seeks footage caught on this security system during

23   investigations.  Theft is also a major concern—pallets are constantly stolen from

24   their building and car batteries are frequently stolen from inside people's cars.

25       90.    There has also been a significant uptick in the population of rats

26   surrounding his building, and as a result, rat feces coat all three fences

27   surrounding his property.  To address the increase in fecal matter on his property,

28   as well as the proliferation in cockroaches, he has hired a pest control company

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

59

COMPLAINT

1  and had the health department visit the property multiple times.  The gate

2  surrounding is property has been repeatedly damaged, costing him thousands of

3  dollars in repairs.

4      91.    Over the last few years, as the City and County have permitted the

5  homelessness crisis to grow, the risk to his property from fire damage and

6  vandalism has increased exponentially—the business constantly replaces gates

7  and other property, cleans the facilities, and pays security to safeguard its

8  property.  They have had to spend over $100,000 in upgrades to their system and

9  increased monitoring and pest control just as a result of the increased homeless

10 persons and property in the area.  He and his employees cannot walk anywhere in

11 the area and are constantly subject to risk of disease due to the putrid conditions

12 outside the business.

13     92.    The City and the County have offered no assistance to Mr. Tashdjian

14 and have taken no steps to address the impact of the homelessness crisis on his

15 business or to enforce the laws that are broken daily in the area around his

16 business.

17     93.    **KARYN PINSKY** works in DTLA and lives there with her husband

18 and their three-year-old son.  She and her husband moved to DTLA in 2010

19 because they were drawn to the architecture, history, and walkability of the area.

20 Homeless people have always been present near their home, but in far fewer

21 numbers.  In 2010, the only tents west of Skid Row were on Broadway, and they

22 were erected every night and removed shortly after sunrise.  From 2010 to 2016,

23 Ms. Pinsky and her husband, and later her son, were able to enjoy many

24 wonderful features of DTLA—they regularly walked their dog along Main Street,

25 and they felt comfortable walking to the many wonderful establishments and

26 restaurants that were nearby.

27     94.    All this has changed dramatically over the past several years as the

28 homelessness crisis has deepened.  When walking outside, Ms. Pinsky is fearful

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

60

COMPLAINT

that either she or her son will be the subject of some random act of violence. This fear stems from dangerous encounters either she or her husband have had with individuals on the streets.  Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards her because she thought Ms. Pinsky was "judging" her—only when her husband and others intervened was the situation defused.  On another occasion, her husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it.  Earlier this year, a homeless man seated outside a café on 6th Street near Broadway, a block from their house, randomly pushed a stranger into the street in front of an oncoming bus.  The man was struck by the bus and ultimately died. Another neighbor on a different floor was attacked in the middle of the night by someone who gained access through a fire escape window.  Now, as a result, she no longer feels safe sleeping with her window cracked even a little at night because of its proximity to the fire escape.

95.     Sexual assaults on women also have increased significantly in the last several years, and as a result, Ms. Pinsky is terrified of being assaulted while running errands or just walking to or from a restaurant.  The conditions immediately surrounding their home have gotten so dangerous that neither she nor her husband will leave the house late at night, even to let their elderly dog out.  A woman in their building was attacked twice near the building while walking her dog at night.  Since then, she and her husband decided to put a diaper on their dog to avoid going out.

96.     Each time she takes her son outside, she's afraid that he will contract one of the many diseases that are plaguing the area—typhus, tuberculosis, typhoid, hepatitis, or the plague.  To avoid disease and violence, she's stopped allowing her son to play at the park in Pershing Square, and she's stopped taking him to Story Time at the Central Library.  Family and friends are so fearful of the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

COMPLAINT

disease and violence in the area that they will no longer come to visit Ms. Pinsky. The area was not always like this, but the City's failure to limit the goods accumulated on sidewalks or remove tents during the day has fundamentally altered the neighborhood and her experience of it.  Ms. Pinsky has been greatly affected and has a very real interest in remediating this issue insofar as her quality of life and basic enjoyment of her property has been severely diminished. At the same time, she also has compassion and empathy for those on the streets who are subject to the assaults (particularly women), the elements, the drug pushers, the gang members, the rats, filth, and disease.  For Ms. Pinsky, this is no way for a society to treat its most helpless members.

97.     **CHARLES MALOW** has been living at Union Rescue Mission, within the Skid Row area, since 2012.  Prior to 2008, he worked as a garage door installer for 29 years, and from 2000 to 2006 he worked part-time as a security guard.  He became homeless in 2008 when the economy tanked.  From 2010 to 2012, he lived on the streets of Glendora, California.  In the winter of 2011 and 2012, he stayed at a Glendora Winter Shelter and then decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.  When he first arrived at URM in 2012, police officers would come by in the morning, and wake-up the people sleeping on the streets.  They were required to pack up their belongings and stow them, so the sidewalks were not blocked. This also allowed illegal activity such as narcotics and weapons sales to be more easily discovered and therefore addressed.  At that time, there were no tents in front of URM.

98.     For a little over two years, Mr. Malow has been an Ambassador at URM.  The Ambassador program allows a small group of men to live at URM indefinitely.  Since living at URM, he has worked at Home Depot and in URM's janitorial department, known as the EVS team.  He knows that diseases such as typhus have made a resurgence on Skid Row, and this makes him extremely

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

concerned that his work with the EVS team puts him at greater risk of contracting a disease.

99.     In the last several years Mr. Malow has seen a big increase in the volume of tents and belongings on the streets.  This has greatly affected his daily life.  He has observed a dramatic increase in the rodent problem on Skid Row and has seen rats running in and out of tents when he sweeps the sidewalks and gutters outside of URM.  A major cause of this rodent problem is the volume of trash disposed of on the streets—because individuals living on the streets throw food and trash in the streets, rats have more than enough food to flourish.  There has also been a huge increase in the amount of human feces on the street which carries with it the significant risk of disease, not to mention the odors.

100.    There is absolutely no room to walk on the sidewalk, so if he leaves URM, Mr. Malow is forced to walk in the street.  Even in places where he could physically walk between the encampment and the wall, he still must walk on the streets or risk violent confrontation from people who accuse him of invading their "space."  When he leaves URM, he must plan his route carefully even if traveling by public transportation.  Due to an increase in crime, including narcotics sales and violent activity, he must use a car service to get back from the metro or bus station after visiting his mother in Anaheim.  He always has the car drop him off directly in front of URM to avoid dangerous encounters on the street.

101.    Mr. Malow does not leave URM between the hours of 4 p.m. and 6 a.m., because he is concerned for his safety on the streets.  When he does leave, he is incessantly approached and offered illegal drugs for sale.  He regularly sees people just outside his home using illegal narcotics in the form of pills or smoking or injecting themselves. He sees people lying motionless in gutters, often without clothes or shoes, and is constantly looking to see if that person is dead or merely unconscious from drugs or alcohol.  As a person who has

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  struggled with drug and alcohol use, it is particularly painful to watch and
2  experience.

3    102.   The excessive build-up of tents and debris over the last few years is
4  directly responsible for this significant increase in crime because it allows
5  criminals to operate in relative anonymity.  This increase in debris, tents, and
6  personal items on the streets also makes it impossible for health and safety
7  workers to identify public health risks, causing disease and unsafe conditions to
8  spread right outside his home.  As a formerly homeless individual, Malow knows
9  first-hand the difficulties that come from living on the street and is deeply
10  troubled by both the City's actions and inaction in the face of the homelessness
11  crisis.

12    103.  **CHARLES VAN SCOY** also lives at Union Rescue Mission and
13  has been homeless or lived in shelters at various points in time over the last three
14  decades.  Sometime after 2010, he moved to Long Beach Rescue Mission, where
15  he lived for two or three years.  He has been living at the URM for three years
16  and is part of its Ambassador program.

17    104.   Due to various illnesses, Mr. Van Scoy is confined to a wheelchair.
18  He depends on Access Services ("Access"), Los Angeles County's Paratransit
19  program, when traveling further distances within the city. Sometimes Access is
20  available to him, but sometimes it is not—it is a limited program and he is
21  regularly in danger of losing qualification for its services.  Because of the
22  homelessness crisis, it is presently impossible for Mr. Van Scoy to navigate the
23  sidewalks surrounding the URM, and so he must choose every day to stay inside
24  or risk traversing busy streets in a wheelchair and risking accident and injury—
25  indeed, the risk is even greater for him on the streets because the massive
26  amounts of trash and property (and sometimes unconscious bodies) in the gutters
27  require him edge closer to the center of the streets.  When he asks people to move
28  their belongings on the sidewalk to make a path for his 32-inch wheelchair, he is

64
COMPLAINT

met with threats and aggression, so he doesn't even ask anymore. He has missed important doctors' appointments and meetings because it is so difficult for him to move along public sidewalks.

105. Every time Mr. Van Scoy leaves URM, people approach him to buy or sell drugs. As a recovering addict, it feels like walking into a firestorm. So many of the tents and enclosures are used by gang members to sell drugs and weapons that people who come to Skid Row looking for services frequently find themselves targets for drug pushers.

106. Mr. Van Scoy has observed that the increase in debris on the streets has been accompanied by a rodent infestation that carries with it the high risk of disease. The lack of sanitation and accumulation of trash and human waste have made the streets increasingly dangerous for him. He knows of one individual who came into contact with human feces and developed an infection that led to the amputation of a leg. Van Scoy's medical conditions make him particularly vulnerable to the spread of bacteria and disease.

107. All these circumstances combine to render Mr. Van Scoy a prisoner in his own home.

108. **GEORGE FREM** owns a luxury auto-shop in Mar Vista California, which primarily services high-end vehicles. In 2015, a few homeless individuals set up tents under the 405 freeway adjacent to his business. Since then, the population of the encampment has continually increased, and he currently estimates that more than 80 people live there. The residents have brought a variety of goods with them including tents, mattresses, wardrobes, and more. The encampment effectively fully covers the sidewalk on one side of the road. Mr. Frem now sees drug use, prostitution, violence, and public indecency on a regular basis. In the summer, the scent of urine and feces permeates the air, causing Mr. Frem and his patrons to question whether the area is safe to occupy.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

109.   The City conducts weekly sanitary cleanups of the camp.  When they do so, the City tells the homeless persons that any property left within a designated zone will be considered abandoned and disposed of accordingly.  This causes the unsheltered persons to move themselves and all of their belongings to the area immediately outside of the cleanup area and directly in front of Mr. Frem's business.  Additionally, every Friday LAHSA representatives set up a mobile shower station directly in front of Mr. Frem's business, resulting in lines of people on the sidewalk for hours as they wait for the showers to be available.  When this occurs, customers frequently question whether their vehicles are safe in the lot and whether they will be stored inside overnight.

110.   Before the encampment was in place, Mr. Frem received significant business from other auto shops who would sub-contract to him for repairs.  The encampment and related activity, especially the presence of homeless persons immediately outside of the property, caused those shops to doubt the safety of their vehicles while at Mr. Frem's shop, and has caused them to stop using him for sub-contract work.  Prior to 2015, Mr. Frem would get significant walk-in business from his prime location on a major arterial road, but now long-time customers tell Mr. Frem that they do not feel safe picking up their vehicles late at night and potential customers turn away when they see the conditions outside of the shop.

111.   This has decreased the number of service orders the shop has every year since the encampment arose.  Before the encampment was in place, Mr. Frem's shop consistently performed over 1000 repairs per year.  But, because of the City's policies effectively maintaining and promoting the camp, the numbers have declined year on year, and now, the shop can only draw around 600 repair jobs per year.  The City's homelessness policies have caused serious economic damage to Mr. Frem's business and have effectively destroyed the value of his enterprise.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

112.   **LEANDRO SUAREZ** is chief petty officer ("CPO") in the United States Navy and has served for over 22 years.  He resides with his sister, Deisy Suarez, at Fifth Street and Broadway four days of the week.  While stationed off the coast of Southern California, he was involved in an accident that resulted in the amputation of his right leg and his left big toe.  It took him nearly two years to be healthy enough to use a prosthetic leg.  He also suffers from lower back problems and problems with his toes, knees, and feet.  Currently, he can only walk for five to eight minutes at a time with the assistance of two crutches.  Because of his limited mobility with the prosthetic, CPO Suarez relies on an electric wheelchair for most daily activities, *e.g.* walking the dog, grocery shopping, or going "long" distances.

113.   Navigating the streets of Downtown Los Angeles is nearly impossible for CPO Suarez, and he is often confined on his block at Fifth and Broadway.  The swelling number of persons living on the streets with their possessions severely limit Mr. Suarez's ability to travel by wheelchair throughout DTLA.

114.   Streets that contain businesses with outdoor patios, chairs, or other decorative materials pose a particularly difficult problem for CPO Suarez.  While the law requires businesses to ensure a certain portion of the sidewalk remain clear, homeless persons openly camp in front of these establishments, effectively blocking the entire sidewalk.  CPO Suarez cannot get around these persons, and because he is in a wheelchair, he must go back to the corner so he can use the ramp to access the street and cross to the other side.  This is a laborious, time-consuming, and dangerous process.  And the constant backtracking limits CPO Suarez's ability to travel within the city because his wheelchair is not made for long distances.

115.   When CPO Suarez asks homeless persons to move themselves or their belongings, they often become aggressive with him, demanding that he

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

prove he "owns the sidewalk," or that he give them cigarettes or other paraphernalia as a "tax." More often than not, people simply refuse to move, again, forcing Mr. Suarez to find a curb, cross to the other side of the street, and hope that there will be enough public walkway for his wheelchair to fit through so that he can complete a simple errand, task, or outing.

116. The buildup of goods and persons on the streets prevents CPO Suarez from freely traveling throughout the city. He is limited in the distance and the places he can travel because his electric wheelchair has a limited battery life. When streets are blocked with property and people, CPO Suarez is forced to find a different, unobstructed, route to his destination. And sometimes, because CPO Suarez's wheelchair has limited battery life, he is prevented from even reaching his destination. In fact, at times the idea of traveling outside is so daunting that Mr. Suarez is forced to remain indoors.

117. Mr. Suarez's difficulties are exacerbated when construction projects limit the sidewalk further. A construction project between 4th and 5th Street has made it is nearly impossible for Mr. Suarez to travel down Broadway because while a makeshift walkway exists, the walkway is often blocked by homeless persons or their property. Mr. Suarez's request that the individuals move is often rebuffed, preventing him from descending down the ramp or having full and free access to public sidewalks or the ability to travel the streets.

118. Mr. Suarez regularly endures verbal abuse from the individuals he asks to move so that he can access the public walkway. Already physically vulnerable, this constant beratement has left Mr. Suarez fearful of traveling outside.

119. **GARY WHITTER** has been homeless on and off in the Los Angeles area for the last 13 years. He struggles with alcoholism, depression, bipolar disorder, chronic back pain, and hypertension. While he was living on the streets, he would sleep wrapped up in a blanket, usually on hard cement or a

blanket. He could not get more than an hour or two of sleep at a time because of fear of attacks, noise, people asking him to move, physical pain, or exposure to the elements. Sleep deprivation caused his mental state to spiral, exacerbating his depression, bipolar, and hypertension conditions.  The hard sleeping conditions and constantly carrying all his belongings everywhere he went lead to severe back pain.

120.   The stress of the stigma of being homeless was also significant, adding to his depression and hypertension.  As hard as he tried, he understood that he always looked and smelled terrible. It was impossible to keep his hygiene up and as a result he was constantly sick. Due to his unpredictable living and sleeping conditions, he lacked regular medical and dental care. He frequently encountered persons attempting to scam him or victimize him in some way.  All of this caused his mental and physical state to further decline.

121.   In the middle of March, 2019, he entered into a program at the Union Rescue Mission, and has now been there for almost a year.  He is able to get a full night's sleep which has significantly increased his mental stability and reduced his hypertension.  Sleeping on a bed, and not having to carry his worldly possessions on his back, has helped his back pain tremendously and he can move uninhibited which has itself improved his mental stability and hypertension.  He now has regular access to medical and mental health clinics, and his mental and physical health has improved markedly. This is the third time he has been through Union Rescue Mission's program and he is unsure about what will happen in the future once he graduates. He is aware that permanent housing is difficult to find, but he is fearful of living on Skid Row or returning to living on the streets.

122.   Staying on Skid Row has its own dangers.  He often has to walk on the street because the sidewalks are completely blocked with tents and possessions. Even when there is room to walk on the sidewalk, he often must

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   walk in the street anyway or risk harassment for walking in a person's

2   "backyard" (the area in front of the tent). Other than walking to Rite-Aid to pick

3   up his prescriptions or to the Department of Public Social Services office to get

4   his General Relief check, he stays inside because he is too afraid to leave the

5   building. At night he can hear gunshots and sirens all night long, and on the roof,

6   it isn't uncommon to witness people getting attacked on the street, including

7   women getting beaten or raped.

8

9                           **DEFENDANTS**

10      123.    **CITY OF LOS ANGELES** ("City") is a municipal entity existing

11   under the laws of the State of California, with the capacity to sue and be sued.

12   The departments of the City include the Los Angeles Department of Public

13   Works with its various sub-departments include the Los Angeles Department of

14   Sanitation (LASAN), and the Los Angeles Police Department (LAPD).

15      124.    **COUNTY OF LOS ANGELES** ("County") is a municipal entity

16   existing under the laws of the State of California, with the capacity to sue and be

17   sued. The departments of the County include the Los Angeles Sheriff's

18   Department (LASD), the Department of Mental Health (DMH), the Department

19   of Public Health (DPH), and the Department of Public Social Services (DPSS).

20      125.    The **CITY** and **COUNTY** jointly fund, manage, and administer the

21   Los Angeles Homeless Service Authority (LAHSA), an independent joint powers

22   authority. According to its website, "LAHSA is the lead agency in the Los

23   Angeles Continuum of Care, which is the regional planning body that coordinates

24   housing and services for homeless families and individuals in Los Angeles

25   County. LAHSA coordinates and manages over $300 million annually in federal,

26

27

28

COMPLAINT

state, county, and city funds for programs that provide shelter, housing, and services to people experiencing homelessness."[100]

126.   Does 1 through 200, inclusive, are persons, entities, government bodies, municipal employees, the names and identifies of which are currently unknown.

## V.   CAUSES OF ACTION
### FIRST CAUSE OF ACTION
### Negligence
### (Against all Defendants)

127.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 126 of this Complaint as though set forth fully herein.

128.   Defendants, by and through their agents and employees, have sole right and responsibility to control, maintain, and keep safe and clean the public and public-right-of-way areas in the City and unincorporated parts of the County, including parks, sidewalks, streets, public buildings, and certain undeveloped areas such as alongside freeways and other transportation routes, and to make and enforce laws assuring the public health and safety thereof for its citizens and their guests.  Among other things, Defendants have the duty to maintain these areas in a manner which does not unreasonably interfere with the free passage or use by plaintiffs, and which addresses and alleviates conditions which are harmful to health, or indecent or offensive to the senses, and which create a fire hazard or permit crime to occur unabated including the illegal sale of controlled substances.

129.   As controlling law makes clear, "The public is entitled to the free and unobstructed use of the entire streets and sidewalks. . ." *Vanderhurst*, 113

---

[100] LAHSA, *About LAHSA*, https://www.lahsa.org/about (last visited Mar. 9. 2020).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Cal. at 152. Indeed, municipalities have "the duty to keep their communities' streets open and available for movement of people and property." *Schneider*, 308 U.S. at 160-61.

130. In 2016, the City sponsored and supported a ballot measure which promised to "provide safe, clean affordable housing for the homeless, and … to provide facilities to increase access to mental health care, drug, and alcohol treatment and other services" if its citizens authorized the issuance of $1,200,000,000 in general obligation bonds for that purpose.[101] Proposition HHH passed overwhelmingly and became law in 2017, thereby obligating and creating a duty of the City to implement it in a manner to achieve its purposes.

131. In 2017, the County sponsored a ballot measure which promised to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults" if its citizens authorized a ¼ cent sales tax for ten years to be used for that purpose. Proposition H passed overwhelming and became law, thereby obligating the County to implement it in a manner to achieve its purposes.

132. Defendants and their agents have breached their duty to its citizens, including and specifically to plaintiffs and Alliance members, and each plaintiff and Alliance member has suffered damages as a result, as described more fully *supra*. The bases of this cause of action is the conduct, acts, and omissions of individual responsible officials, including Does 1-150, inclusive, based on the theory of *respondeat superior*.

---

[101] City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

133.   Plaintiffs seek no damages hereunder and seek equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

### SECOND CAUSE OF ACTION
### Violation of Mandatory Duty
### Cal. Gov't Code § 815.6; Welf & Inst. Code § 17000
### (Against Defendant County of Los Angeles)

134.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 133 of this Complaint as though set forth fully herein.

135.   Defendant County of Los Angeles is liable under California Government Code section 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide medical care for the indigent. California Welfare and Institutions Code section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

136.   Section 10000 clarifies and defines the purpose of these obligations as follows:

The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed.  It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

2

3

4

5

6

7

8

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code.  That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

Cal. Welf. & Inst. Code § 10000.

137.   Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents. . . promptly and humanely." *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996). This means counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health." *Id.* at 1240.  The California Supreme Court has held that "subsistence medical services" must be provided. *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014-15 ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely.")  Counties have an obligation to provide "medically necessary care, not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted).  That includes care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014 (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413-15 (1989)). Importantly, a county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight."  *Fuchino v. Edwards-Buckley*, 196 Cal. App. 4th 1128, 1134 (2011) (citation omitted). "Medically necessary" for adults is defined in California Welfare & Institutions Code section 14059.5(a): "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or

significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code § 14059.5(a).

138. Given the above described facts and circumstances, and significant studies, statistics, and reports including those set forth *supra*, and other such evidence as may be provided, it cannot be doubted that a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death. As Dr. Barbara Ferrer, director of the LA County Department of Public Health, admitted: "Homeless people are in fact dying at a higher rate because they're homeless."[102] Recognizing this, the LA County Department of Health Services has implemented limited program to provide housing as part of its larger healthcare obligation which has been wildly successful. But unfortunately, it has not gone far enough to address the homeless crisis which is ravaging the city and county, such that approximately 44,000 persons remain unsheltered in the County as of January 2019.

139. Basic shelter is "medically necessary" insofar as it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain" and the City and County's failure to provide the same to its homeless population constitutes a breach of its duty under California Welfare & Institution Code Sections 17000 and 10000.

140. Plaintiffs, and each of them, have been damaged by the County's failure to provide beds, as described in detail *supra*.

141. Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only. As such neither the City nor County are entitled to any claims of immunity pursuant Cal. Gov. Code § 814.

---

[102] Flores, *supra* note 63, https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**THIRD CAUSE OF ACTION**

**Violation of Cal. Civ. Code § 3490, *et seq*.  (Public Nuisance)**

**(Against all Defendants)**

142.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 141 of this Complaint as though set forth fully herein.

143.   California has defined nuisance as

[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479.

144.   A nuisance cause of action "is plainly aimed at protecting the public from the hazards created by public nuisances*." People v. ConAgra Grocery Prod. Co*., 17 Cal. App. 5th 51, 136 (2017).  In addition to health and safety hazards, "[a] reduction in property values caused by activities on a . . . piece of land, and an assault on the senses by noise, dust, and odors, are just the kinds of harm that common law suits to abate a nuisance are designed to redress*." Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996).  A public nuisance is the substantial and unreasonable interference with a public right. *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938-39 (1996).

145.   As described above, the City, by its failure to maintain the public property under its control, and to enforce the laws requiring the same, is perpetuating and facilitating nuisance violations.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

146.   All Plaintiffs have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or room rented; each have suffered and continue to be threatened with respect to their health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, and encampments outside their property.

147.   Each plaintiff and Alliance member has been damaged in his or her own right, in a manner specially injurious to him or herself.  No plaintiff or Alliance member consented to defendants' conduct.

## FOURTH CAUSE OF ACTION
### Violation of Cal. Civ. Code § 3501, *et seq*. (Private Nuisance)
### (Against all Defendants)

148.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 147 of this Complaint as though set forth fully herein.

149.   Each Plaintiff and Alliance member identified owns, leases, occupies, or otherwise controls all of a portion of the home or business identified. By Defendants' actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

150.   Defendants' conduct has been and is intentional and unreasonable, unintentional but negligent or reckless, and/or the condition permitted to exist was the result of abnormally dangerous activity which substantially interfered with each plaintiff's and Alliance member's use or enjoyment of his or her land that an ordinary person would reasonably be annoyed or disturbed by.  No plaintiff or Alliance member consented to Defendants' conduct; each was

harmed, Defendants' conduct was a substantial factor in causing the harm, and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

151.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

## FIFTH CAUSE OF ACTION

### Inverse Condemnation/Cal. Const. art. I § 19

### (Plaintiffs Alliance, Burk, and Frem against City)

152.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 151 of this Complaint as though set forth fully herein.

153.   California Constitution, article I § 19 provides in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  The actions by the City have limited, damaged, and/or burdened the owners' property and/or business so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

154.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.

//
//
//
//
//
//

COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# SIXTH CAUSE OF ACTION

## Waste of Public Funds and Resources

## Cal. Civ. Proc. Code § 526a

## (Against All Defendants)

155.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 154 of this Complaint as though set forth fully herein.

156.   California Code of Civil Procedure section 526a permits private individuals or entities to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency."

157.   Plaintiffs and Alliance members, each of them, are residents of the City of Los Angeles and/or County of Los Angeles and/or own property and/or businesses therein and pay income tax, sales tax, property tax, and/or business license taxes and therefore having standing to bring an action under section 526a.

158.   As described more fully in paragraphs 59 through 69 *supra*, taxpayer funds have been misused and wasted by the City and County of Los Angeles, such they are incapable of achieving the ostensible goal of addressing the homelessness crisis in any significant way, much less "ending" it.  Such expenditures, particularly when taken in the aggregate, cost several factors more than alternative available measures which are demonstrably effective in addressing the crisis.

159.   Proposition HHH and Measure H were promoted and passed by the electorate to address the homelessness crisis in a comprehensive and effective way.  Instead, homelessness has steadily increased in this City and County.

160.   As detailed above the City and the County have spent enormous amounts of public funds on the homelessness crisis in ways that have had little or no effect on the crisis, and thereby wasted those public funds.

1    161.   Plaintiffs seek no damages hereunder and submit this claim for

2    equitable and injunctive relief only.  As such neither the City nor County are

3    entitled to any claims of immunity pursuant to California Government Code

4    section 814.

5

6                          **SEVENTH CAUSE OF ACTION**

7        **Violation of California Environmental Quality Act ("CEQA")**

8            **Cal. Public. Res. Code § 21000 *et seq***

9                        **(Against All Defendants)**

10    162.   Plaintiffs re-allege and incorporate herein by this reference each and

11    every allegation set forth in paragraphs 1 through 161 of this Complaint as

12    though set forth fully herein.

13    163.   The California Environmental Quality Act requires local

14    governments to consider the environmental implications of their actions to

15    "[e]nsure that long term protection of the environment. . . shall be the guiding

16    criterion in public decisions." Cal. Pub. Res. Code § 21001(d).  Before any

17    agency commences a "project", environmental analysis must be complete.

18    "Project" is defined as an "activity which may cause either a direct physical

19    change in the environment, or a reasonably foreseeable indirect physical change

20    in the environment. . ." Cal. Pub. Res. Code § 21065; *see also*, Cal. Code Regs.

21    tit. 14, § 15378(a).  "Activity," for this purpose, includes "[a]n activity directly

22    undertaken by any public agency," (Cal. Pub. Res. Code § 21065(a)), as well as

23    "[a]n activity that involves the issuance to a person of a lease, permit, license,

24    certificate, or other entitlement for use by one or more public agencies."  Cal.

25    Pub. Res. Code § 21065(c).

26    164.   The adoption of a rule or regulation can be a project subject to

27    CEQA.  *Plastic Pipe & Fittings Ass'n  v. California Bldg. Standards Comm'n*,

28    124 Cal. App. 4th 1390, 1412 (2004); *Wildlife Alive v. Chickering*, 18 Cal. 3d

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

80

**COMPLAINT**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

190, 206 (1976). "A direct physical change in the environment is a physical change in the environment which is caused by and immediately related to the project. Examples of direct physical changes in the environment are the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant."  Cal. Code Regs. tit. 14 § 15064(d)(1).

165.   Numerous acts by the City constitute a "project", including the power-washing scheme which flushes thousands of tons per year of toxic substances into our oceans.  The City's decision to settle *Mitchell v. City of Los Angeles* is another example of a "project" in the Skid Row area; permitting unlimited property accumulation in the area has caused untold amounts of human waste, trash, debris, and toxic substances to wash into our waterways. Substantial evidence exists, as discussed *supra*, that the growing homelessness crisis may have a significant effect on the environment.[103] Yet no review has ever been done prior to adopting these projects, in violation of the California Environmental Quality Act.

166.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

//
//
//
//
//
//

[103] *See* para. 49-53, *supra*.

81
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**EIGHTH CAUSE OF ACTION**

**Violation of California Disabled Persons Act**

**Cal. Civ. Code § 54,** *et seq*

**(Plaintiffs Charles Van Scoy and Leandro Suarez Against Defendant City)**

167.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 166 of this Complaint as though set forth fully herein.

168.   California's Disabled Persons Act codifies requirements that ensure equal and full access to individuals with disabilities.  That Act provides, in part:

> Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places.

Cal. Civ. Code § 54 (a).

> Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians' offices . . . and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.

Cal. Civ. Code § 54.1(a)(1).

169.   As detailed above, Plaintiffs Charles Van Scoy and Leandro Suarez are individuals with disabilities as defined by the Disabled Persons Act, and are being denied full and equal access to places to which the general public is invited, including "free and full use" of public sidewalks, by the policies and

82

COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

practices of the City of Los Angeles, including its failure to regularly maintain its sidewalks in a manner which permits wheelchair-bound individuals "full and free use" thereof.

170.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

### NINTH CAUSE OF ACTION
### Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131, *et seq*.
### (Plaintiffs Charles Van Scoy and Leandro Suarez against Defendant City)

171.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 170 of this Complaint as though set forth fully herein.

172.   The Americans with Disabilities Act ("ADA") provides that people with disabilities be afforded "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation …"  42 U.S.C. § 12182(a).  Further, the ADA ensures that transportation facilities are constructed to a set of standards that ensures accessibility for the disabled.  Sidewalks are the most common element of transportation infrastructure, yet if they are not accessible, they pose great challenges and dangers to anyone in a wheelchair or who has other mobility restrictions.

173.   Sidewalks are subject to the access requirements of Title II of the ADA and § 504 of the Rehabilitation Act.  42 U.S.C. § 12101(1); *Willits*, 925 F. Supp. 2d at 1093 ("Any public sidewalk over which the City of Los Angeles has responsibility to inspect and notify property owners of repair needs is a 'program,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   service, or activity' within the meaning of Title II of the Americans with

2   Disabilities Act and Section 504 of the Rehabilitation Act of 1973."").

3   Accordingly, sidewalk width requirements ensure that sidewalks are accessible

4   for use by wheelchair-bound individuals.

5       174.   The minimum width for an ADA-compliant sidewalk is 36 inches.

6   36 C.F.R. § 1191, app. D, § 403.5.1 (2014) ("the clear width of walking surfaces

7   shall be 36 inches (915 mm) minimum"").  Where obstructions such as telephone

8   poles, traffic signal cabinets, or other utilities exist, the sidewalk must be

9   constructed to allow the minimum width requirement of 36 inches between the

10  edge of the obstruction and the edge of the sidewalk.  *Id*.  "A public entity shall

11  maintain in operable working condition those features of facilities and equipment

12  that are required to be readily accessible to and usable by persons with

13  disabilities by the Act or this part."  28 C.F.R § 35.133(a) (2011).

14      175.   Throughout Los Angeles, the City and County are failing to uphold

15  their obligations to maintain clear and accessible sidewalks and public rights-of-

16  way for its disabled residents and visitors, resulting in regular violations of the

17  Americans with Disabilities Act.  These ADA violations are obvious and known

18  to the City and County both through its own inspections and various reports of

19  blocked sidewalks due to encampments through its own reporting mechanisms,

20  such as 311.  Defendants and its agents and employees have failed and continue

21  to fail to provide reasonable accommodations for disabled persons using public

22  sidewalks.

23      176.   Defendants are obligated to operate the "service, program, or

24  activity" "so that . . ., when viewed in its entirety, it is readily accessible to and

25  useable by individuals with disabilities.  28 C.F.R. § 35.150(a) (2012).  Yet when

26  "viewed in its entirety" public rights-of-way are not provided by Defendants to

27  be "readily accessible to and useable" by individuals bound to wheelchairs.

28

177.   The discrimination and denial of access to the City's rights-of-way for persons with disabilities is the direct result of Defendants' policies and practices of deliberately permitting encampments to proliferate, particularly in certain areas such as Skid Row or on Venice Blvd under the 405 freeway, and the failure to adopt or implement any adequate procedure for regularly inspecting and maintaining the pedestrian rights-of-way clear of obstructions.

178.   As a direct and proximate result of the aforementioned acts, including but not limited to Defendants' deliberate indifference to the violation of Mr. Van Scoy and Mr. Suarez's federally protected rights, both have suffered pain, humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.  This causes each of them to be deprived of their independence and prevents each from accessing the services and benefits of public establishments.

179.   Pursuant to 42 U.S.C. § 12133, Plaintiffs Van Scoy and Suarez are entitled to recover compensatory damages and reasonable attorneys' fees and costs incurred in bringing this action.

### TENTH CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act
### 29 U.S.C. § 791 *et seq.*
### (Plaintiffs Charles Van Scoy and Leandro Suarez against Defendant City)

180.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 179 of this Complaint as though set forth fully herein.

181.   Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "[N]o otherwise qualified individual with a disability. . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . ." 29 U.S.C. § 794(a) (2016).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

182.   Plaintiffs are otherwise qualified to participate in the services, programs, or activities that are provided to individuals in the City.  The City is a recipient of federal financial assistance and therefore subject to Section 504.  Upon information and belief, Defendants and their agents and employees have and continue to violate Section 504 of the Rehabilitation Act by excluding Plaintiffs Van Scoy and Suarez from participation in, denying them the benefits of, and subjecting them to discrimination regarding the benefits and services involved in utilizing public rights-of-way based solely on their disability

183.   Upon information and belief, said discrimination occurred with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

## ELEVENTH CAUSE OF ACTION
### Violation of Due Process and Equal Protection
### 42 U.S.C. § 1983; U.S. Const. amend. V/XIV
### (Against all Defendants)

184.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 183 of this Complaint as though set forth fully herein.

185.   Defendants, by enforcing the law in some areas and declining to enforce the law in others, and by abdicating their duties under the law, have arbitrarily determined where homeless encampments may or may not be located and what communities should be affected, without following their own respective procedures and in violation of both state and federal law. This has placed a disproportionate burden on some persons, communities, and businesses over others.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

186.   Upon information and belief, City and County officials have within the last year affirmatively notified and/or instructed homeless individuals that some areas (for example, Skid Row, certain areas in Venice, or under the 405 freeway) were locations where camps would be allowed to exist and persist.  This policy of allowing encampments in some areas and not others without review, public comment, vote, or other appropriate process is in direct violation of the Fifth and Fourteenth Amendments' prohibitions against deprivation without due process and unequal protection of the law.  When the City entered into the *Mitchell* settlement providing for the foregoing it agreed by its very terms, and implicitly, to treat a segment of the population (those living, working, and owning property within the "Designated Area" known as Skid Row and the surrounding blocks), including many Plaintiffs herein differently than those outside the "Designated Area."  The City had no rational basis for doing so.

187.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

## TWELFTH CAUSE OF ACTION

### Violation of Due Process Clause (State-Created Danger Doctrine)

### 42 U.S.C. § 1983; U.S. Const. Amend. 14

### (All Plaintiffs against All Defendants)

188.  Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 187 of this Complaint as though set forth fully herein.

189.  By the acts and omissions described above, Defendants have affirmatively created or increased the risk that Plaintiffs would be exposed to

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result

190.   Defendants knew or should have known that their acts or omissions specifically endangered Plaintiffs, and were deliberately indifferent thereto.

### THIRTEENTH CAUSE OF ACTION
### Uncompensated Taking
### 42.U.S.C. § 1983; U.S. Const. Amend. V/XIV
### (Plaintiffs Alliance, Burk, and Frem Against City)

191.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 190 of this Complaint as though set forth fully herein.

192.   The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment is applied to the states through the Fourteenth Amendment.  *Chicago, Burlington, & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897).  The actions by the City, as described in detail *supra,* have limited, damaged, and/or burdened the property owners' so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

193.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

//
//
//
//

88
COMPLAINT

1

2

3

**FOURTEENTH CAUSE OF ACTION**

**Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

**(Against All Defendants)**

4

5

6

194.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 193 of this Complaint as though set forth fully herein.

7

8

9

10

11

12

13

195.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendants City of Los Angeles and County of Los Angeles and their respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the City and County of Los Angeles.

14

15

16

17

18

196.   The actions and inactions of the City of Los Angeles and County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

19

20

197.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

21

22

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

23

//

24

//

25

//

26

//

27

//

28

//

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

COMPLAINT

## VI.    PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.    Injunctive/equitable relief in a manner to be determined by law;

2.    As to the federal claims and claims under the California constitution only, compensatory damages and other special, general and consequential damages according to proof;

3.    An award of costs of suit, including attorneys' fees; and

4.    Such other and further relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: March 10, 2020                    */s/ Elizabeth A. Mitchell*
                                        SPERTUS, LANDES & UMHOFER, LLP
                                        Matthew Donald Umhofer (SBN 206607)
                                        Elizabeth A. Mitchell (SBN 251139)

                                        *Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

COMPLAINT