Exhibit A

Fernando Gaytan (SBN 224712) fgaytan@lafla.org
Paul J. Estuar (SBN 167764) pestuar@lafla.org
Shayla R. Myers (SBN 264054) smyers@lafla.org
**LEGAL AID FOUNDATION OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel:   (213) 640-3831
Fax:   (213) 640-3988


Paul L. Hoffman (SBN 71244)
Catherine Sweetser (SBN 271142) catherine.sdshhh@gmail.com
**SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP**
723 Ocean Front Walk, Suite 100
Venice, CA 90291
Tel:  (310) 396-0731
Fax: (310) 399-7040

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES CATHOLIC WORKER, an unincorporated association; CANGRESS, a non-profit corporation; HARRY JAMES JONES, LOUIS GRADY, LLOYD HINKLE, WALTER SHOAF, individuals<br><br>Plaintiffs,<br><br>vs.<br><br>LOS ANGELES DOWNTOWN INDUSTRIAL DISTRICT BUSINESS IMPROVEMENT DISTRICT, CENTRAL CITY EAST ASSOCIATION, INC., CITY OF LOS ANGELES; DOES 1 -10<br><br>Defendants. | Case No.<br><br>**COMPLAINT: CIVIL RIGHTS**<br><br>**42 U.S.C. § 1983 AND FOURTH, FIFTH AND FOURTEENTH AMENDMENTS**<br><br>**CALIFORNIA CONSTITUTION ARTICLE I, §§ 7 AND 13**<br><br>**CALIFORNIA CIVIL CODE §§ 52, 52.1**<br><br>**CONVERSION**<br><br>**TRESPASS TO PROPERTY** |

## JURISDICTION AND VENUE

1.        This is an action for injunctive relief and damages pursuant to 42 U.S.C. § 1983, based upon ongoing violations by the defendants of the rights secured to plaintiffs by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution. Jurisdiction exists based on 28 U.S.C. §§ 1331 and 1343 in that this case is brought pursuant to 42 U.S.C. § 1983 and raises questions of federal constitutional law. The court has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2.        Venue is proper in the Central District in that the events and conduct complained of in this action occurred in the Central District.

## PRELIMINARY STATEMENT

3.        The City of Los Angeles is currently enjoined from seizing property from homeless people in violation of their Fourth and Fourteenth Amendment rights.  *See Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D.Cal. 2011) *affirmed by Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012).  This is the third time in the past thirty years that the Court has restrained the City of Los Angeles from seizing homeless people's property in the Skid Row area of Downtown Los Angeles.  *See also Adam Young Bennion v.  City of Los Angeles*, C637718 (LA Sup. Ct., February 25, 1987); *Justin v. City of Los Angeles*, CV 00-12352 LGB (C.D.Cal. 2001) (AIJx).)  The current injunction against the City is the result of explicit holdings by both the District Court and the Ninth Circuit Court of Appeals that it is a violation of the Fourth and Fourteenth Amendments to seize a homeless person's property that is not abandoned, or to seize abandoned property without notice or due process.  *Lavan*, 797 F. Supp. 2d at 1020; *Lavan v. City of Los Angeles*, 693 F.3d at 1030.

4.        Despite clear language from the Court that such behavior is unconstitutional, the Los Angeles Downtown Industrial District Business Improvement District, a special assessment district created by the City of Los

Angeles pursuant to California Streets and Highways Code § 36600, and its agent, the Central City East Association, with cooperation and participation by the City of Los Angeles, have engaged in a long-running campaign to seize homeless people's unattended property. BID officers take property they have no reason to believe is abandoned or creating a health and safety risk. They do so with no notice of any kind to individuals that their property will be taken. By design, the seizures serve no purpose other than to make life even harder for homeless residents in the BID, and individuals who live on the street cannot reasonably predict when their property will be taken or prevent it from happening. These actions are in clear violation of individuals' rights under the United States Constitution.

5.      In the face of these violations, yet another group of plaintiffs is forced to come before a Court to seek protection against these violations and the conditions created by defendants because of the seizure of their possessions.

6.      Plaintiffs are four homeless individuals and two organizational plaintiffs who live or operate in the area of Los Angeles known as Skid Row, which is largely encompassed by the Los Angeles Downtown Industrial District (LADID). It also has one of the largest concentrations of homeless people in the area as well as one of the largest concentrations of service providers that provide food, shelter, and other services to homeless people in the area.

7.      Like many other homeless individuals in Skid Row, the plaintiffs keep all of their worldly possessions with them during the day and use blankets and tents to shelter themselves at night. Although they each attempt to stay with their property as much as possible during the day, it is virtually impossible for them to stay in one place at all times, or to take their possessions with them wherever they go. They have no choice but to leave their property unattended to get food, use the restroom, attend court proceedings, and get medical treatment for ailments that are by all accounts made worse by their life on the streets. Defendants are aware that

homeless people must leave their property unattended at times during the day to attend to the necessities of life.

8.      When plaintiffs do leave their property, they risk having their property seized by the LADID and the CITY, which with no notice and seemingly at random, seize homeless people's unattended but clearly not abandoned property. Over the course of the last two years, the individual plaintiffs have all had their property seized by LADID's public safety officers who are performing municipal services in the LADID.  In each instance, the plaintiffs' property was neatly packed up, and plaintiffs were gone for only a short period of time.  When they returned, they each found their property had been seized.  They had no way of knowing their property would be taken when they were gone, and they had no way to prevent it. In one instance, one of the plaintiffs left a sign on his property, as he was told to do by the BID, stating that his property was not abandoned, yet his property was taken none-the-less.

9.      When their property is taken, individuals are often not given notice where their property is taken or how to retrieve it.  When they do discover that their property is being held at a storage facility, they are then forced to retrieve it from the facility, which is located more than a half mile away from where many homeless people stay.  What was hauled away in a truck, plaintiffs must then carry back, unassisted, to the place where they reside.  In the heat of the day or for individuals with mobility issues or health problems, this is a nearly impossible task.  It is made even more difficult because defendants seize and will not return any shopping carts used by individuals to cart or store their property or which were used as ambulatory assistance.  This includes carts given to people by the Los Angeles Catholic Worker specifically for this purpose.

10.     These BID officers, acting under color of law, seize this property in accordance with the LADID's policy of taking unattended property in the BID. The CITY has conspired with LADID and participated in and ratified these actions.

Together, the LADID and the CITY have deprived the individual plaintiffs of their property, in complete disregard of plaintiffs' Fourth and Fourteenth Amendment rights and in direct contravention of the Ninth Circuit's mandate in *Lavan* to ensure that these rights are protected.  Defendants are doing so as part of an ongoing campaign to make the streets less hospitable to the homeless residents of Skid Row, and as a result of these seizures, which plaintiffs cannot predict or prevent, they are more hesitant to leave their property during the day to seek medical care, get case management, attend court hearings, or even get food or perform personal tasks.

## PLAINTIFFS

11.     Plaintiff Los Angeles Catholic Worker (LACW), founded in 1970, is an unincorporated lay Catholic community of women and men providing services to homeless residents of Skid Row since its founding. Each week LACW provides free meals to as many residents as resources allow.  They provide these meals at their building on the corner of 6th Street and Gladys Avenue, which is nicknamed the "Hippie Kitchen" and is located in the area covered by the Los Angeles Downtown Industrial District Business Improvement District.  In addition to providing meals through the Hippie Kitchen, LACW provides hospice care for the dying, operates a dental clinic, and provides much-needed foot care to homeless people who spend significant time on their feet, often in worn and ill-fitting shoes. LACW provides toiletries, over-the-counter medications, and other tangible items to people in need.

12.     LACW also provides shopping carts to homeless residents of Skid Row.  The carts are loaned to homeless individuals who use the carts to move and store their personal possessions and as assistance for the many individuals in Skid Row with ambulatory disabilities. LACW purchases the bright red carts with their name embossed on the handle, and places laminated signs indicating they are "Shopping Carts for the Homeless".  The signs are attached in accordance with

Business and Professions Code § 22435.1 and provide notice to law enforcement and others, including the LADID officers that the shopping cart is owned by Los Angeles Catholic Worker and used with permission by homeless individuals in Skid Row.

13.    As a result of the policies and the practices of the LADID, CCEA and the CITY to illegally seize people's property, including their shopping carts, the LACW has had to expend worker time and resources to get their carts back from the LADID.  In addition, because carts are rarely returned after being seized by the BID officers, LACW has had to replace these carts.  LACW has also had to replace toiletries and other tangible items that are taken when property is seized.  These expenditures have diverted resources from other activities.  In addition, defendants' illegal policies and practices have frustrated LACW's mission of providing food and services to homeless residents of Skid Row.  Defendants' policies of seizing unattended property make it more difficult for people to leave their belongings when they seek services in Skid Row, including getting food from the Hippie Kitchen.  Finally, these policies have frustrated LACW's mission of ensuring that that homeless people are treated with dignity and respect by, among other things, disrespecting their rights and creating a hostile environment for homeless people living in Skid Row.

14.    Plaintiff CANGRESS, aka The Los Angeles Community Action Network ("LA CAN") is a grassroots, non-profit organization operating and organized under the laws of the State of California.  Its members include over 800 poor people in Skid Row, many of whom are homeless residents in Skid Row. The organization's main purpose is to organize and empower community residents to work collectively to address systemic poverty and oppression in their community. Since its founding in 1999, LA CAN has operated as the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles.  LA CAN brings

this action on behalf of its members whose property has been seized by BID officers as part of defendants' policies and practices of seizing unattended property in Skid Row.

15.    Plaintiff Harry James Jones is a 63-year-old disabled Vietnam War veteran who suffers from chronic medical conditions such as high blood pressure, glaucoma, diabetes, and PTSD.  He was homeless for nearly 40 years, since he was honorably discharged from the Marine Corps in 1975.  He resided in the Skid Row area for most of that time.  Mr. Jones has had all of his personal property seized by LADID officers on at least three occasions.  Each time, the BID officers failed to leave him notice that his property was taken, and as a result, he was unable to retrieve his property.

16.    Plaintiff Louis Grady is a 51-year-old homeless man who fell on hard times last year and has been living on the streets of Skid Row since then.  Although he works to support himself by doing odd jobs and collecting recycling, he does not earn enough to afford an apartment. Mr. Grady has had his personal property seized by BID officers on at least two separate occasions in the past year while he momentarily stepped away to perform life-sustaining activities.

17.    Plaintiff Lloyd Hinkle is a 61-year-old Vietnam War veteran who has lived in Skid Row for approximately a year. Since he started living on the streets, he has kept all of his personal belongings with him in shopping carts, but leaves them to get food and run other errands because he cannot take them with him into the missions or other agencies from which he receives services.  On or about June 30, 2014, BID officers and LAPD officers took Mr. Hinkle's property.  He was provided no notice of the seizure, and the BID and LAPD officers were repeatedly informed that his property was not abandoned but took it anyway.

18.    Plaintiff Walter Shoaf is a 62-year-old veteran who suffers from chronic pain and Post Traumatic Stress Disorder as well as other mental health issues.  He has been homeless and residing in the Skid Row area since he was

discharged from the army nearly 40 years ago.  In February 2014, Mr. Shoaf left his property for a short time to run an errand.  As he was returning to his property, he saw the BID officers loading all of it into a truck.  By the time he got to the place where he stays, they had loaded up his things, taking his property, including his military identification card and his tent.  Although he tried to stop them, the BID officers ignored him, and they left him no notice where to retrieve his possessions.

## DEFENDANTS

19.     Defendant Los Angeles Downtown Industrial District (LADID) is a Business Improvement District (BID) initially created by the City of Los Angeles in 1998, pursuant to California Streets and Highways Code Section 36600 *et seq*. *See* Los Angeles Municipal Ord. 172155.  LADID's boundaries are roughly between 3rd St. and 8th St. and Olympic to the North and South, and San Pedro and Alameda to the west and east.  The current BID was authorized through the passage of Los Angeles Municipal Ordinance 180801. The LADID is funded by the City of Los Angeles through an assessment on property owners located within the BID.

20.     Defendant Central City East Association ("CCEA") is a 501(c)(6) not-for-profit business corporation contracted by the City of Los Angeles to manage the LADID.  CCEA maintains offices in the City of Los Angeles. At all times relevant to this action, the LADID and CCEA, operating as the agent of LADID, acted under color of state law.

21.     Defendant the City of Los Angeles ("CITY") is a municipal entity organized under the laws of the State of California. The CITY is a legal entity with the capacity to sue and be sued. The CITY created the LADID and has authorized and/or ratified all of the actions of the LADID alleged herein.  The LADID and the CCEA act as agents of the CITY and have conspired with the CITY to violate plaintiffs' rights.  The departments of the City of Los Angeles include the Los

Angeles Police Department, employees of which have also engaged in acts constituting the violations of plaintiffs' rights alleged in this action.

22.    The identities and capacities of defendants DOES 1 through 10 are unknown to plaintiffs.  Plaintiffs, therefore, sue these defendants by fictitious names.  As to all defendants sued by fictitious names, plaintiffs will give notice of this Complaint and their true names and capacities when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, other corporate or business entities, agents, successors in interest, assigns, representatives, principals and/or employees of the defendants and are responsible for the acts and omissions resulting in the violations alleged in this complaint.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

23.    Each of the defendants acted as joint actors with joint obligations, and each defendant was and is responsible for the conduct and injuries herein alleged.

24.    Each of the defendants acted, alone or together jointly, under color of law.  The CITY has delegated traditional municipal functions, including additional sanitation and security services, to the LADID through the adoption of ordinances and pursuant to state law, and the CCEA, acting as an agent of the LADID, performs those municipal functions.

### HISTORY AND STRUCTURE OF THE LADID

25.    The Los Angeles Downtown Industrial District Business Improvement District was created by the City of Los Angeles pursuant to the Property and Business Improvement Area Law, codified as California Streets & Highways Code §§ 36600 *et seq.*[1]

---

[1] All statutory citations are to the California Streets and Highways Code unless otherwise noted.

26.     The purpose of the Property and Business Improvement Area Law is to promote the economic revitalization and physical maintenance of the business districts of its cities in order to create jobs, attract new businesses, and prevent erosion of the business districts and promote tourism. § 36601(b). To facilitate this, the law "provides an alternative method of financing certain improvements and activities" in an area of a city by allowing it to create BIDs.  Cities are then authorized to levy assessments on businesses in the area. § 36617.  The funds collected are in turn used to finance the improvement of public facilities within the district,[2] including maintaining or creating public parks, trash receptacles and public restrooms, widening city streets, and creating facilities or equipment to enhance security of persons or property within the area.  Funds can also be used for maintenance and activities[3] in the district.  § 36601(b).  Activities specifically contemplated include providing security, sanitation, graffiti removal, street and

---

[2] Improvement under the statute is defined as "the acquisition, construction, installation, or maintenance of any tangible property with an estimated useful life of five years or more."  § 36610.  Contemplated public facilities include parking facilities, benches, trash receptacles and public restrooms, street lighting, decorations, parks and fountains, closing, opening, widening or narrowing of existing streets, facilities or equipment, or both, to enhance security of persons and property within the area. *Id.*

"'Activities' means, but is not limited to, all of the following:
(a) Promotion of public events which benefit businesses or real property in the district.
(b) Furnishing of music in any public place within the district.
(c) Promotion of tourism within the district.
(d) Marketing and economic development, including retail retention and recruitment.
(e) Providing security, sanitation, graffiti removal, street and sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality.
(f) Activities which benefit businesses and real property located in the district. § 36613.

sidewalk cleaning, and other municipal services supplemental to those normally provided by the municipality. § 36613.

27.     The CITY established the LADID pursuant to § 36600 with the passage of Ordinance 172155 in 1997. The LADID was subsequently renewed by the CITY in 2003 and 2009. Los Angeles Municipal Ord. 175398, 180801.  The present BID was renewed through December 31, 2014.  *See* Los Angeles Municipal Ord. 180801.  On July 30, 2014, the CITY approved the renewal of the LADID for a period to run through December 31, 2021.  *See* Los Angeles Municipal Ord. 183156; *see also* Los Angeles Municipal Ord. 183068 (incorporating the 2014-2021 Management District Plan).  As required under the state statute, the enabling ordinance incorporated a Management District Plan, which outlined the approved activities of the BID for the duration of the BID.  Only the CITY has the authority to approve or change the LADID's Management District Plan.

28.     When the CITY approved the current BID, it approved a yearly levy of approximately $1.8 million in special assessments on businesses in the district in order to pay for the services outlined in the Management District Plan.  *See* Ord. 180699.  Under state law and the operating ordinance, those funds can only be used to perform the municipal services outlined in the Management District Plan, which is incorporated by reference into the enabling ordinance.  *See* Ord. 180801, Sect. 11; Ord. 180,699.

29.     According to the Management District Plan, CCEA is designated as the Owner's Association, which contracts with the CITY to administer the LADID in accordance with the Management District Plan.

30.     The special assessments levied by the CITY to pay for LADID activities are collected by the County of Los Angeles through its annual property tax assessment, and failure to pay the assessment results in a tax lien on the property.  All municipal services provided by the LADID are paid for by the CITY

1 with funds collected pursuant to the special assessment.  Los Angeles Municipal
2 Ord. 18086.

3      31.     Under the current Management District Plan, a vast majority of the
4 LADID's focus is on its Clean and Safe Programs.  Seventy seven percent of the
5 assessments on a yearly basis go to Clean and Safe Programs**.**

6      32.     The Clean and Safe program includes two components: an enhanced
7 security program dealing with crime prevention and inappropriate conduct in the
8 district, and an enhanced maintenance program, which provides amongst other
9 services, sanitation and maintenance services to the public streets and sidewalks in
10 the District.

11      33.     The LADID provides personnel to patrol the streets of the LADID and
12 to perform the municipal services outlined in the Management District Plan, as
13 approved by the CITY.  These "BID officers" are frequently referred to as "Red
14 Shirts" because of the red shirts they wear to signify that they are BID officers for
15 the LADID, although supervisors wear black shirts.  As provided for in the current
16 Management District Plan, BID officers provide both public safety and
17 maintenance in the public areas of the district.

18      34.     BID public safety officers wear red shirts that say "Public Safety" on
19 the back and wear badges.  These officers patrol the streets in the 44 block area of
20 the district on bicycles.  Pursuant to the Management District Plan, the purpose of
21 the public safety officers is to "prevent, deter, and report illegal activities taking
22 place on the streets, sidewalks, storefronts, parking lots and alleys."  According to
23 CCEA, BID officers are tasked with "controlling unsuitable street and alley
24 behavior" and "enforcing cleanliness and other street code compliances."  The
25 officers routinely cooperate with LAPD in the apprehension and arrest of violators
26 of these laws and provide police assistance as needed.  BID officers assist in crime
27 suppression and prevention, including assisting in the "prevention of break-ins,
28 automobile-related crimes and generally disruptive street elements."  BID officers

are connected via two-way radio to a dispatcher who can dispatch the BID officers to locations throughout the BID.  The BID officers and dispatch maintain communication with the LAPD area patrols.

35.     Other BID officers perform sanitation services for the district, including trash removal, graffiti removal, sidewalk cleaning/weed abatement and abandoned property removal.

36.     LADID also employs a fleet of trucks, which are dispatched to assist BID officers and LAPD with the seizure, storage, and destruction of homeless individuals' personal belongings.

## HISTORY OF PROPERTY SEIZURES AND INJUNCTIONS
## IN DOWNTOWN LOS ANGELES

37.     The deploying of LADID BID officers and their trucks to seize homeless people's property is only the latest step by the CITY to "clean up the streets of Skid Row."  Over the past 30 years, the CITY has repeatedly engaged in campaigns purportedly to address public health and sanitation in the area, but in doing so, has repeatedly implemented its programs in a way that has repeatedly led to the deprivation of the rights of homeless people living on the streets in Downtown Los Angeles.

38.     In 1987, homeless residents of Skid Row filed a lawsuit to enjoin the CITY from illegally seizing their property, which resulted in a restraining order against the CITY's seizures of people's property.  *See Young Bennion v. City of Los Angeles*, C637718, Exh. A. The terms of the restraining order included a requirement that the City give 12 hours written notice before removing property on the presupposition that it has been abandoned on the public streets of Skid Row. Exh. A, p.2("III. Notice Requirements"). The *Bennion* Order required City employees to post a "prominent notice in a conspicuous place at the site before the property is seized. The notice shall include the specific citation to the law allegedly

violated and state that the property will be subject to disposal if the violation is not corrected within twelve hours from the time the notice is posted." *Id*.

39.     In 2000, the CITY again began a campaign of confiscating the property of homeless persons, ordering them to move away from their belongings, and then immediately crushing all of the property in dump trucks. In response, several individuals filed a lawsuit entitled *Justin v. City of Los Angeles*, CV 00-12352 LGB (AIJx), Exh. B. On November 5, 2001, Judge Lourdes Baird entered a permanent injunction against the CITY, incorporating the terms of the *Bennion* restraining order and enjoining the CITY to

> not confiscate personal property that does not appear abandoned and destroy it without notice. Where applicable, defendants will give notice in compliance with the temporary restraining order issued in *Bennion v. City of Los Angeles* (C637718). Any personal property that does not appear intentionally abandoned collected by defendants will be retained for 90 days as provided in California Civil Code section 2080.2.

Exh. B, p.2.

40.     At the request of the CITY, the injunction expired after 48 months. *Id*.

41.     Yet again, in February 2011, CITY employees from the LAPD and the Bureau of Street Services began seizing and summarily destroying property they came upon on the public sidewalks of Skid Row, without any evidence that the property had been abandoned, and without any notice or due process to the owners of the property.

42.     In April 2011, eight homeless individuals filed another lawsuit against the CITY on behalf of themselves and all others similarly situated.  The lawsuit, *Tony Lavan, et.al. v. City of Los Angeles* (CV1102874), alleged, *inter alia*, that the CITY violated their Fourth and Fourteenth Amendment rights by seizing and

destroying their property, which they temporarily left on the public sidewalks while they attended to necessary tasks.

43. On June 21, 2011, U.S. District Court Judge Phillip Gutierrez granted the plaintiffs' request for a preliminary injunction and enjoined the City from

   a. Seizing property in Skid Row absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband; and

   b. Absent an immediate threat to public health or safety, destruction of said seized property without maintaining it in a secure location for a period of less than 90 days.

*Lavan,* 797 F. Supp. 2d at 1020, Exh. C, p. 16.

44. The injunction was affirmed by the Ninth Circuit on the ground that the taking of unabandoned property constituted a seizure under the Fourth Amendment, and that it was a deprivation of the plaintiffs' due process rights to take people's property without notice: "Government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking."  693 F.3d at 1032.  As a result, the injunction remains in effect today, and the litigation is ongoing.

## PROPERTY SEIZURE BY THE LADID

45. Although the CITY remains enjoined from seizing property that is not abandoned, presents an immediate threat to public health or safety, or is evidence of a crime, or contraband, and from destroying abandoned property without notice and due process of law, BID officers, acting under color of law and in coordination with the CITY and its agent, the LAPD, have continued the CITY's campaign of seizing homeless people's property.

46. As part of the municipal services provided by the LADID, BID public safety officers routinely seize unattended property on the streets.  The property the BID officers seize is often left for only minutes at a time by individuals who have

no choice but to leave their property on the streets while they are getting a meal at a mission in the District, attending an appointment, or even using the restroom.

47.     The BID officers make no effort to determine how long property has been unattended or whether property is abandoned before they remove the property.  Property could be unattended for as little as a few minutes or a few hours before it is seized. They seize property that no reasonable person could believe is abandoned.  On information and belief, the BID officers do not take into account any indicia that property is not abandoned, such as its appearance or whether it is packed neatly in a shopping cart, before property is seized.  Nor do BID officers ask individuals in the vicinity whether the property is abandoned.  BID officers ignore statements from neighbors that property is not abandoned or that the owner of the property has stepped away for only a moment.

48.     BID officers provide no notice of any kind to the community that it is conducting sweeps at any particular time, and the seizures are not pursuant to any established maintenance schedule that is made public in any way.  Nor do BID officers provide notice to any individuals that their property will be taken prior to its seizure.  The BID officers will seize a single person's property on a block but leave all the other property alone.  An individual who is living on the street has no way of discerning when or if his or her property will be taken, and has no way of avoiding a seizure by the BID officers if they must leave their property to perform vital tasks like going to the restroom, getting a meal, or receiving medical care or case management services from entities that frequently do not allow people to bring in their property when they are accessing services.

49.     BID officers routinely seize property at times that they know or should know that individuals will be away from their property for brief periods of time, including at times when area missions provide meals.

50.     Unlike when property is seized by the CITY's Bureau of Street Services, which the CITY has previously contended is not fast-moving and as

such, it is therefore apparent that street cleaning is underway, when BID officers seize property, it is extremely fast.  BID officers can identify, tag, and seize a person's property in five minutes.  If a person returns while the BID is removing the property, BID officers will not give the property back, and if individuals attempt to intervene either on their own behalf or on behalf of others, LAPD is called or stop on their own and prevent people from intervening or protesting with threats of arrest.

51.    When BID officers take property, they sometimes, although not always, leave an "unattended property receipt" which states that property can be reclaimed from the LADID's warehouse on 7th Street and Central Avenue.   The notice provides no other information about why the property was taken and states only that the property was "unattended."  When the BID officers leave a receipt, they may stick it on a wall above the location from where the property was seized, but individuals often do not receive the receipt.  On information and belief, BID officers do not consistently make any other attempts to ensure that the individual whose property was taken is notified that the property was seized.  This is true even though the BID officers ride or walk through the same streets frequently and interact with the owners of the property.

52.    LAPD officers conspire with the LADID in the seizure of property. They alert BID officers where and when homeless individuals' property is unattended.  They also directly participate in the seizures by standing at attention while the property is seized, interfering with individuals' protests when property is taken, and threatening individuals with arrest if they interfere with the BID officers' attempts to take property.  LAPD has also repeatedly refused to take statements or file reports for theft by individuals whose unabandoned property has been taken by the BID officers.  These actions were taken pursuant to an official custom and policy of the LAPD.

53.     According to CCEA, after BID officers seize individuals' property, it is taken to a warehouse on 7th Street and Central, where facility staff go through the items seized by the BID officers.  Items the staff deem perishable, soiled or wet are destroyed.  CCEA claims that other items are re-bagged and held at the facility for no more than 90 days.

54.     Although the Unattended Property Receipt directs individuals to the "Personal Property Storage Facility," a facility operated by CCEA which allows people to store a single bin of property during the day, property that is seized is not stored in the same area as the bin storage, and it cannot be accessed through the entrance on 7th Street.

55.     Instead, seized property is stored in a separate section of the storage facility, which is controlled by the LAPD.  Individuals picking up property confiscated by the BID are instructed to pick up their property from the LAPD Property Pickup section of the facility located on Industrial Street.  This entrance is also controlled by the LAPD.   The receipt indicates that property can be retrieved Monday through Friday from 8:00 a.m. to 4:00 p.m.; however, the posted hours of the facility are more circumscribed and states that it is closed on Monday, Saturday and Sunday, and only open only from 8:00 a.m. to 1:00 p.m. on Tuesday through Friday.

56.     An individual seeking to retrieve their property must present the "unattended property receipt".  On information and belief, without a receipt, the CCEA is frequently unable or unwilling to return an individual's possessions.

57.     When individuals whose property is seized and who are able to locate an unattended property receipt attempt to retrieve their property, they are not informed why their property was taken.  Nor are they shown or given a copy of any inventory taken of property seized or destroyed.  They are however required to sign a form which states that "I have examined the contents of the bag containing

my property and confirmed that all property is accounted for." and it is defendants' policy not to return any property unless an individual signs that statement.

58.     Defendants operate a strict "all of it or none" rule, in which individuals retrieving seized property may only take all of their possessions or none of their possessions.  An individual is not allowed to retrieve critical items like a wallet or medication without either taking all of his or her property or surrendering the property they cannot retrieve at that time and allowing it to be destroyed.  Therefore, if an individual has too much property to carry in one trip, he or she must leave the property unattended on the street or surrender it for destruction.

59.     Unattended property that is seized and taken to the facility is retained for 90 days.  If it is not claimed during that time period, it is destroyed.

## INDIVIDUAL PLAINTIFFS' SPECIFIC ALLEGATIONS
### HARRY JAMES JONES

60.     On or about March 1, 2013, plaintiff Harry James Jones stepped away from his property, as he did every day in order to get food or to receive the vital services necessary to survive.  As he did every day, he left his property neatly packed in the area where he stayed every night, on Towne Avenue near 3rd Street.

61.     There were no posted signs indicating that the streets would be cleaned or cleared while he was gone.  He was away from his property for only a short period of time. While he was gone, BID officers seized all of his personal property, including his identification card, his life-saving medication, his tent, and his clothing.  The BID officers provided Mr. Jones with no notice that his property would be taken before they took his property, and when he returned, there was no notice posted on the wall where his items were previously located.  Based on the way his property was packed at the time, there was no objectively reasonable basis to believe that the property was abandoned.  Nor was there any objectively reasonable basis to believe that the property caused an immediate threat to public

health or safety, or was evidence of a crime, or contraband.  On the contrary, the seizure of Mr. Jones's property, including his medication, created a threat to Mr. Jones's health.

62.     Because he had his property taken by the BID officers before, Mr. Jones understood that he should be able to obtain the property from the warehouse at 7th and Central.  However, when he went to retrieve his belongings, he was told they could not assist him because he did not have his "ticket."

63.     As a result of this seizure of his property, Mr. Jones went without his medication for approximately one month.  He was unable to refill his prescription because his identification card was seized along with his medication.  He became very ill as a result of his lack of medications and was hospitalized for several days.

64.     On or about December 30, 2013, Mr. Jones again stepped away from his property to get a meal, as he had done every day for the preceding months without incident.  While he was gone, BID officers once again came to the place he resided and seized all of his property.  There was again no notice given before his property was taken and no notice left afterwards, and Mr. Jones was once again unable to obtain his property after it was seized.

65.     As a result of the seizures of his property, including his military identification card and his medication, Mr. Jones suffered from severe health consequences.  He also suffered emotional distress and continues to suffer from severe anxiety that he will once again lose his property and suffer another medical setback as a result.

**LOUIS GRADY**

66.     On or about January 15, 2014, Louis Grady left the area where he resides on the sidewalk at 531 Towne Avenue to get lunch at the Midnight Mission.  Before he left, he packed his belongings in two LACW carts.  He wrote a note and posted it in front of his belongings to inform the BID officers that his property was not abandoned, as was his practice every time he left his things.  He

left the note because he knew that BID officers randomly seized property and had been told by a BID supervisor that he should leave a note to alert the BID officers that his property was not abandoned.

67.     Mr. Grady was gone for approximately 30 to 45 minutes.  When he returned, all of his possessions were gone, including the LACW carts, his tent, his blankets, his laptop computer and cell phone, and his personal journal.  A notice was posted on the wall behind where his things had been located, indicating that BID officers had taken his belongings to a warehouse.

68.     When Mr. Grady attempted to retrieve his property from the warehouse, he discovered that several items were missing, including his tent, his laptop, his cell phone and his journal.  The LACW carts were also not returned to him.  He was not given an inventory of the property that had been seized, and when he complained about the missing items, he was asked to leave.

69.     Because Mr. Grady was not given any carts back, it was very difficult for him to transport his property back to the place he stays.  He has a chronic knee condition that makes walking difficult.  He uses a cane and relies on the carts from the Hippie Kitchen to provide ambulatory assistance when moving his belongings.  Without the carts, it took him hours to transport the property returned to him to the place where he stays.  He could not carry the property back in a single trip, and so he was forced to move his belongings one bag at a time.  He left the remaining bags on the street, unattended.

70.     On another occasion several months later, Mr. Grady had other items seized by BID officers under similar circumstances.  He attempted to submit a complaint to the LADID, but he never received a response to or even an acknowledgment of his complaint.

71.     As a result of the property seizures, Mr. Grady has suffered emotional distress and anxiety.  He is less willing to leave his property on the street and as a

result, he has sometimes missed doctor's appointments and meals for fear that when he is gone, his things will be taken by the Red Shirts.

## WALTER SHOAF

72.     In February 2014, Mr. Shoaf stepped away from his property, which he kept neatly packed where he stays on Towne Avenue near 6th Street.

73.     He was gone for less than an hour.  As he was walking back to his property, Mr. Shoaf witnessed the BID officers seizing his property, including his identification card and his medication.  They were also packing up his tent, his extra clothing, and all of his other possessions.  Mr. Shoaf attempted to reach the BID officers and tell them that his property was not abandoned, that the things belonged to him and that he did not want them to take it.  By the time he reached them, the BID officers were almost finished loading it in the truck, and they drove away with his property.

74.     The BID officers did not provide Mr. Shoaf any information as to where they were taking his property or where he could retrieve it.  As a result, he did not know he should be able to retrieve his property from the warehouse.  He was forced to go without his medication for several weeks.  He was also forced to sleep in the cold without a tent or blankets.

75.     The loss of his property caused him extreme distress, discomfort, and pain.

## LLOYD HINKLE

76.     On June 30, 2014 at around 12:00 p.m., Lloyd Hinkle left his property neatly packed under a tarp on 5th Street between Gladys and Stanford.  Mr. Hinkle ensured that his property was out of the way and not blocking the sidewalk.  He then walked across the street to get lunch and on the way, passed BID officers.  He was not concerned that his property would be taken because it was clearly packed up, his neighbors knew he was in the area, and there was no notice anywhere of

any street cleaning or that property could be seized if left unattended. He also knew that he would not be gone long.

77. After Mr. Hinkle walked away, the BID officers approached the first property on the corner of Fifth Street and Gladys and began writing a receipt for the property, which belonged to Mr. Hinkle's neighbor.

78. The BID officers placed the receipt on the fence behind the neighbor's property and began to pack up the property. However, the property owner was present and confronted the BID officers who instead placed the receipt on Mr. Hinkle's property, which was down the block. While the BID officers were writing the receipt, they were joined by additional BID officers driving two pickup trucks. The BID officers then began packing up Mr. Hinkle's things.

79. Mr. Hinkle's neighbor informed the BID officers that Mr. Hinkle's property was not abandoned and that he was watching the property for Mr. Hinkle but the BID officers ignored him. Staff and members of LA CAN recorded the incident on video; they also informed the BID officers that the property was not abandoned, but they were ignored as well.

80. The BID officers were joined by two Los Angeles Police Department officers who parked their cruiser on the street and told the individuals present, including Mr. Hinkle's neighbor and LA CAN members and staff, to move back and allow the BID officers to do their jobs. When the LA CAN staff member said that the BID officers were stealing Mr. Hinkle's property, Officer Zambrano informed them that no one was stealing any property.

81. Officer Zambrano placed herself between Mr. Hinkle's neighbor and the BID officers who were packing up the property. She prevented him and LA CAN from intervening. She informed them that "we're going to take someone's property that is abandoned." During this interaction, another LAPD officer also was present while the BID officers seized Mr. Hinkle's property.

82.     Within five minutes, the BID officers and the LAPD, acting in concert, loaded Mr. Hinkle's property in the back of the white trucks, and the trucks drove away.  The remainder of the BID officers rode away on their bicycles. The LAPD officers stood watch and remained on the scene until after all of the BID officers left.

83.     When Mr. Hinkle returned less than a half hour later, his possessions were gone, and he was left with only a receipt for his property. The items that were taken included shopping carts, tarps and his bed roll, his sleeping bag, clothes, toiletries and medicine.

84.     The seizure of his property caused Mr. Hinkle to suffer extreme discomfort and emotional distress as everything he owned including the items he used to create shelter had been taken.  Although he was able to ultimately retrieve most of his property from the facility on 7th and Central, it was extremely difficult for him to do so.  The CCEA did not return his shopping carts, and he had no way to transport his possessions.  What had taken two CCEA trucks to take to the facility, Mr. Hinkle was left on his own to bring back to the place where he stays. It took him multiple trips from the storage facility, and he was forced to leave his property unattended each time he went to get another load of his possessions.

## DEFENDANT CITY'S LIABILITY

85.     These actions took place pursuant to the customs, practices, procedures, and policies of the defendants.  The LADID is a special assessment district created by the CITY pursuant to its authority under state law, to provide for the provision of municipal services, and CCEA is an agent of the LADID and the CITY.  Defendant CITY conspired with the LADID and CCEA to commit the above offenses.  Moreover, defendant CITY's employee police officers regularly participated, through threats and intimidation, in torts committed by the other defendants.

86.     Defendants CITY and LADID have engaged in a conspiracy to remove unattended property from the streets of Skid Row.  This conspiracy has continued since the *Lavan* injunction was imposed on the CITY.  On information and belief, the CITY and its officers and/or agents urged the BID to remove homeless individuals' property on Skid Row.   The CITY acts in concert with the BID to identify property to be removed and to ensure that the removals were not stopped or hindered.

87.     In addition, the CITY failed to train its officers that they should not aid and abet the conversion or trespass of BID officers taking property that is not abandoned.  The CITY failed to properly train officers to determine when property may or may not be removed.  The CITY instead maintained a policy of removing homeless people's property from Skid Row, regardless whether it was not abandoned, not blocking the sidewalks, or otherwise constituting a health and safety violation.  The CITY failed to adequately train its officers to take police reports concerning these actions, and instead maintained a policy that it would not take reports concerning BID officers' removal of property.

88.     Plaintiffs have repeatedly placed the CITY on notice of the LADID's actions.  The CITY has taken no actions to constrain defendants' illegal acts, despite authority under state law to do so and therefore ratified the actions of the LADID and the CCEA.

89.     LAPD, a department of the CITY, have refused to take complaints from individuals whose personal property has been seized in the manner described above.  LAPD intentionally conspired with the LADID in the removal and storage of property that was not abandoned.  In the case of Mr. Hinkle, and in other cases like his, LAPD officers were present to aid in the removal of property.  Officers working in Skid Row have provided materials to BID officers to assist in the seizure of property.

90.     Plaintiffs Jones, Grady, Shoaf, and Hinkle provided notice of defendant LADID and CCEA's actions by submitting a Government Tort Claim to the CITY pursuant to Government Code Section 916.  On information and belief, defendant CITY has not taken any action on these claims.  During the summer of 2013, plaintiffs Los Angeles Catholic Worker and Louis Grady, as well as other homeless advocates and homeless individuals attended the July and August Los Angeles Homeless Services Authority, Board of Commissioner  meetings, where an extension of  a contract with the LADID was discussed.   At these meetings, plaintiffs LACW, Mr. Grady, and LA CAN and its members, and others testified, verbally and in writing, about the LADID's illegal practice of seizing personal property despite and in circumvention of the *Lavan* injunction.  They also testified that the BID officers were committing the common law tort of conversion. The Los Angeles City Attorney advised LAHSA regarding the seizure of property and testified that CCEA was in compliance with the *Lavan* injunction.  Despite the complaints articulated at the meeting and evidence of the unlawful seizures, the LAHSA Commission voted to renew the contracts, without adding any language regarding the storage of unlawfully seized property.

91.     Subsequent to the filing of claims against the CITY and the LADID, the CITY renewed the LADID on July 30, 2014 for another seven years.   As such and by not taking any action to disestablish the LADID as it retains the sole authority to do pursuant to § 36670, defendant CITY has ratified the actions of the LADID and its agent, CCEA.

# FIRST CAUSE OF ACTION
## Right to Be Secure From Unreasonable Seizures
## 42 U.S.C. §1983 - Fourth Amendment; Art. 1,
## §13, California Constitution
## Against All Defendants

92.     Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

93.     Defendants violated plaintiffs' Fourth Amendment right to be free from unreasonable seizure of their property by taking plaintiffs' property without proper justification and without any authority to do so.

94.     Defendants' actions at all times were under color of law.

95.     Defendants' unlawful actions, through the conduct of their employees, were done with the specific intent to deprive plaintiffs of their constitutional rights to be secure in their property.

96.     Plaintiffs are informed and believe that Defendants' employees and agents are seizing property intentionally without a lawful justification or authority to do so, or at least defendants were deliberately indifferent to the likely consequence that the property would be seized without lawful justification or authority to do so, based on the past circumstances of similar constitutional and statutory violations of the law, and in light of an existing injunction against such actions.

97.     As a direct and proximate consequence of the acts of defendants' agents and employees, plaintiffs Harry James Jones, Lloyd Hinkle, Walter Shoaf, and Louis Grady have suffered and continue to suffer injury and loss.  These plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fourth Amendment rights.

98.     Plaintiffs are also entitled to injunctive relief prohibiting defendants from seizing their property in the future.  Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law. Members of LA CAN, and individual plaintiffs Lloyd Hinkle, Louis Grady, and Walter Shoaf continue to reside on or operate in Los Angeles' Skid Row and are frequently forced to leave some of

their property behind, packed neatly and clearly not abandoned, when attending to their daily needs. LACW's mission is frustrated by these practices, and they continue to divert resources as a result of these practices.  The practices detailed in the preceding paragraphs will continue to violate their constitutional rights.

## SECOND CAUSE OF ACTION
### Right to Due Process of Law
### 42 U.S. C. §1983, Fifth and Fourteenth Amendments; Art. I,
### §7 Calif. Constitution
### Against All Defendants

99.    Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

100.    Defendants owed plaintiffs a duty under the due process clause of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, sec. 7 of the California Constitution, to protect the personal property of plaintiffs that was known not to be abandoned.

101.    Defendants provided plaintiffs with no notice that their property was at risk of being seized and/or destroyed. Even when defendants were specifically put on notice that the property was not abandoned and given an opportunity to stop the seizure of plaintiffs' personal items, defendants proceeded with the seizure, denying plaintiffs any due process.

102.    Plaintiffs are informed and believe that defendants' employees and agents are seizing property intentionally without a lawful justification or authority to do so, or at least defendants were deliberately indifferent to the likely consequence that the property would be seized without lawful justification or authority to do so, based on the past circumstances of similar constitutional and statutory violations of the law, and in light of an existing injunction against such actions.

103.   Insofar as defendants rely on Los Angeles Municipal Code section 56.11[4] to justify the seizure of plaintiffs' property, defendant LADID and CCEA are without any authority to enforce such an ordinance.  To the extent the ordinance is enforced by the CITY or by defendants LADID or CCEA pursuant to a valid grant of authority, the ordinance is unconstitutional and violates the Fourteenth Amendment by failing to require the CITY and its agents to provide notice of the seizure of property that is unattended but not abandoned or otherwise creating a health and safety hazard.

104.   As a direct and proximate consequence of the acts of defendants' agents and employees, plaintiffs Harry James Jones, Lloyd Hinkle, Walter Shoaf, and Louis Grady have suffered and continue to suffer injury and loss.  These plaintiffs are entitled to compensatory damages for the loss of and damage to property and other injuries to their persons that resulted from the violation of their Fifth and Fourteenth Amendment rights.

105.   Plaintiffs are also entitled to injunctive relief prohibiting defendants from seizing their property in the future without due process. Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage in said wrongful conduct for which plaintiffs have no adequate remedy at law.  Members of LA CAN, and individual plaintiffs Lloyd Hinkle, Louis Grady, and Walter Shoaf continue to reside on or operate in Los Angeles's

---

[4] Los Angeles Municipal Code § 56.11 states

> No person shall leave or permit to remain any merchandise, baggage or any article of personal property upon any parkway or sidewalk. Provided, that boxes, barrels and other receptacles for merchandise may be unpacked and their contents removed upon parkways or sidewalks outside of the Central Traffic District if such boxes, barrels and other receptacles for merchandise are removed immediately thereafter.

Skid Row and are frequently forced to leave some of their property behind, packed neatly and clearly not abandoned, when attending to their daily needs. LACW's mission is still frustrated by these policies and practices, and they continue to divert resources as a result of these policies and practices. The practices detailed in the preceding paragraphs will continue to violate their constitutional rights.

## THIRD CAUSE OF ACTION

## Violation of Civil Rights: Interference By Threat, Intimidation or Coercion California Civil Code § 52.1

106.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91as though fully set forth herein.

107.   Defendants' agents and employees have used threats of arrest and intimidation to interfere with plaintiffs' rights secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State of California.

108.   Plaintiffs are entitled to an injunction pursuant to California Civil Code § 52.1. Plaintiffs are informed and believe that unless restrained from doing so, defendants will continue to engage is said wrongful conduct for which plaintiffs have no adequate remedy at law. Plaintiffs are also entitled to damages pursuant to Civil Code §§ 52 and 52.1.

## FOURTH CAUSE OF ACTION

## Conversion

109.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91as though fully set forth herein.

110.   Plaintiffs owned and had a right to the possession of their personal property at the time that defendants' agents and employees seized their property without notice. Plaintiffs' property was not abandoned at the time that defendants seized it.

111.   Defendant's agents and employees intentionally and substantially interfered with Plaintiffs' property rights by unlawfully taking possession of their property and preventing plaintiffs from securing their personal property and the personal property of others left in their care. Even when able to reclaim their property, plaintiffs found that some of it was broken or missing.

112.   Defendants had no legitimate interest, governmental or otherwise, justifying confiscation of plaintiffs' property without prior notice to plaintiffs.

113.   As a direct and proximate consequence of the acts of defendant's agents and employees, plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## FIFTH CAUSE OF ACTION

## Trespass to Personal Property

114.   Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 through 91 as though fully set forth herein.

115.   Defendants had no legal right or justification to remove plaintiffs' property from where it was found and to store it in their warehouse.  Upon finding plaintiffs' property on the public sidewalk, and without notice to plaintiffs, defendants took and carried away all of plaintiffs' personal effects. Defendants stored the property in a place where it was difficult for plaintiffs to obtain it,  in a facility where plaintiffs could only obtain it between certain hours of the day.

116.   This taking and carrying away of plaintiffs' property restricted plaintiffs' use of said property while it was in storage and outside of plaintiffs' control.  As a direct and proximate consequence of defendants' acts, plaintiffs suffered injury: namely, the deprivation of their property for a period of time and the expenditure of time and energy to retrieve the property.

117.   Plaintiffs are entitled to compensatory damages for the impairment of the right to use their property, including but not limited to any and all injuries and

distress they suffered as a result of not having their property and for any damage to their property while in storage.

**WHEREFORE**, plaintiffs pray as follows:

1. For an injunction, enjoining and restraining defendants from engaging in the policies, practices and conduct complained of herein;

2. For a declaratory judgment that defendant's policies, practices and conduct as alleged herein violates plaintiffs' rights under the United States Constitution, the California Constitution and the laws of California;

3. For plaintiffs Harry James Jones, Lloyd Hinkle, Louis Grady, and Walter Shoaf , damages in an amount to be determined according to proof but in no event less than $4,000 per incident pursuant to Cal. Civ. Code §§ 52, 52.1 and Cal. Government Code § 815.6.

5. For costs of suit and attorney fees as provided by law;

6. For such other relief as the Court deems just and proper.

Dated: September 19, 2014                    Respectfully submitted,

                                             Legal Aid Foundation of Los Angeles
                                             Schonbrun DeSimone Seplow
                                             Harris and Hoffman


                                             By:_____/s/_____
                                                   Fernando Gaytan
                                                   Attorneys for Plaintiff

Exhibit B

JS-6

**FILED**
CLERK, U.S. DISTRICT COURT

May 31, 2019

CENTRAL DISTRICT OF CALIFORNIA
BY: _____VPC_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARL MITCHELL, MICHEAL ESCOBEDO, SALVADOR ROQUE, JUDY COLEMAN, as individuals; LOS ANGELES CATHOLIC WORKER, CANGRESS, as organizations, | **CASE NO. CV16-01750 SJO (JPRx)** *[Assigned to the Honorable S. James Otero, Courtroom 1]* |
| PLAINTIFFS, | **[Proposed] STIPULATED ORDER OF DISMISSAL** |
| v. | **Action Filed: March 14, 2016** |
| CITY OF LOS ANGELES, a municipal entity; LT. ANDREW MATHIS, SGT. HAMER and SGT. RICHTER, in their individual and official capacities, | |
| DEFENDANTS. | |

**STIPULATED ORDER OF DISMISSAL**

On March 14, 2016, plaintiffs Carl Mitchell, Judy Coleman, Michael Escobeda, Sal Roque, the Los Angeles Catholic Worker, and Cangress ("Plaintiffs") filed the above-captioned against the City of Los Angeles ("City"), Lieutenant Andrew Mathis, Sergeant Hamer, and Sergeant Richter (collectively with the City the "Defendants").  Plaintiffs alleged that the City unlawfully seized, destroyed, and/or failed to preserve or store property located in the Skid Row area of downtown Los Angeles belonging to homeless individuals in violation of, among other things, the Fourth and Fourteenth Amendments of the United States Constitution and state and federal disability laws.  Defendants denied all material allegations in the complaint.

On April 13, 2016, this Court entered a Preliminary Injunction against enjoining the City and its agents and employees relating to the seizure, destruction, and/or storage of property located in Skid Row or its surrounding areas, incident to an arrest or as part of a clean-up of an area where homeless people are located.  [ECF Dkt. No. 51].  On September 25, 2016, this Court further addressed the terms of the preliminary injunction in an order denying Defendants' Motion for Clarification of the Preliminary Injunction Order.  [ECF Dkt. No. 102].

Following extensive discussions, the Parties subsequently reached a settlement resolving the disputed claims in this Action.  A copy of the executed Settlement and Release Agreement ("Settlement Agreement") is attached hereto as Exhibit A, the terms of which are expressly incorporated herein by reference.

The Court hereby expressly retains jurisdiction to resolve any future disputes regarding the interpretation, performance, or enforcement of the Settlement Agreement for a period of no more than three (3) years from the date of this Order. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

**NOW THEREFORE**, pursuant to Federal Rule of Civil Procedure 41(a)(2), and good cause appearing therefore, the Court HEREBY ORDERS AND DECREES the following:

**STIPULATED ORDER OF DISMISSAL**

1.   The Court's Preliminary Injunction dated April 13, 2016 is hereby dissolved in its entirety.

2.   The Court expressly incorporates all of the terms of the Settlement Agreement, attached as Exhibit A, into this Order, including all non-monetary terms outlined in Section 4 of the Settlement Agreement.

3.   The Court expressly retains exclusive jurisdiction for a period of three (3) years from the date of this Order to enforce the Settlement Agreement, and to resolve any future disputes regarding interpretation, performance, or enforcement of the Agreement, including and expressly, the non-monetary terms set forth in the Agreement.

4.   The Parties shall comply with the Dispute Resolution procedures in the Settlement Agreement before seeking Court intervention to address any disputes related to the Settlement Agreement.

5.   Except as may be provided otherwise in the Settlement Agreement, each side shall bear their own fees and costs in this Action.

6.   This entire Action is hereby dismissed with prejudice as to all Defendants.

**IT IS SO ORDERED**.

Dated:   5/31/19

_____
Hon. S. James Otero
Judge, United States District Court

2

**STIPULATED ORDER OF DISMISSAL**

**APPROVED AS TO FORM:**

Dated:  May 28, 2019          LOS ANGELES CITY ATTORNEY'S OFFICE

By:  _____/s/_____

FELIX LEBRON
Deputy City Attorney

Attorney for Defendants
City of Los Angeles, Lt. Andrew Mathes,
Sgt. Richter, and Sgt. Hamer

Dated:  May 28, 2019          SCHONBRUN SEPLOW HARRIS &
HOFFMAN LLP

By:  _____/s/_____

CATHERINE SWEETSER

Attorneys for Plaintiffs

Dated:  May 28, 2019          LAW OFFICE OF CAROL A. SOBEL

By:  _____/s/_____

CAROL A. SOBEL

Attorneys for Plaintiffs

Dated:  May 28, 2019          LEGAL AID FOUNDATION OF LOS
ANGELES

By:  _____/s/_____

SHAYLA R. MYERS

Attorneys for Plaintiffs Carl Mitchell, Judy
Coleman, Michael Escobedo, CANGRESS,
and Los Angeles Catholic Worker

All parties have authorized the use of their electronic signatures for this document.

3

**STIPULATED ORDER OF DISMISSAL**

EXHIBIT A

## SETTLEMENT AND RELEASE AGREEMENT

This **SETTLEMENT AND RELEASE AGREEMENT** (the "**Agreement**") is made and entered into as of April 25, 2019, by and among Carl Mitchell, Judy Coleman, Salvador Roque, the Los Angeles Catholic Worker, and Cangress (collectively the "**Plaintiffs**") and the City of Los Angeles (the "**City**"). The City and Plaintiffs may sometimes be each referred to as a "**Party**" or, collectively, the "**Parties**."

## RECITALS

A.  **WHEREAS**, on or around March 14, 2016, Plaintiffs filed a lawsuit against the City and Los Angeles Police Department officers Lieutenant Andrew Mathis, Sergeant Mark Hamer, and Sergeant Jack Richter in the United States District Court, Central District of California, Case No. CV-16-01750 SJO (JPRx), alleging claims that the City unlawfully seized, destroyed, and/or failed to preserve or store property located in or around downtown Los Angeles belonging to homeless individuals in violation of, among other things, the Fourth and Fourteenth Amendments of the United States Constitution and state and federal disability laws (the "**Action**");

B.  **WHEREAS**, the City expressly denies all claims alleged in the Action and further denies that the City and any of its officers, employees, or agents violated any laws or committed any wrongful acts or omissions against the Plaintiffs as alleged in the Action;

C.   **WHEREAS**, on April 13, 2016, the District Court entered a preliminary injunction against the City and its agents and employees relating to the seizure, destruction, and/or storage of property located in Skid Row[1] or its surrounding areas incident to an arrest or as part of a clean-up of an area where homeless people are located;

D.   **WHEREAS**, on September 25, 2017, the District Court further addressed the terms of the preliminary injunction in an order denying the City's motion for clarification of the order granting the preliminary injunction; and

E.   **WHEREAS**, the Parties desire to fully and finally compromise and settle all claims arising out of or relating to all matters alleged or that could have been alleged in the Action, without any admission of fault, liability, or wrongdoing, in the

---

[1] "Skid Row" is defined in *Jones v. City of Los Angeles*, 444 F.3d 1118, 1121 (9th Cir. 2006) as being bordered by Third Street to the north, Seventh Street to the south, Alameda Street to the east, and Main Street to the west.

interests of avoiding the additional expense and the inherent uncertainties of protracted litigation upon the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **MONETARY TERMS.**  The City shall pay a total amount of $645,000.00, which shall be inclusive of any and all claims for damages, attorneys' fees, or costs claimed by Plaintiffs in the Action ("**Settlement Sum**").  Within thirty (30) days of the City obtaining all necessary approvals, the City shall pay the Settlement Sum in the form of a check or checks made payable to the Legal Aid Foundation of Los Angeles, and shall deliver that payment to the Legal Aid Foundation of Los Angeles, 7000 S. Broadway, Los Angeles CA  90003.

2. **STIPULATED SETTLEMENT AND ORDER OF DISMISSAL.**

   a. Within ten (10) business days after receiving written notice from the City confirming that the City has obtained all approvals needed to make this Agreement final and binding, as set forth in Section 7 below, Plaintiffs and City shall jointly file a Stipulated Settlement  and Order of Dismissal, the form of which is attached hereto as **Exhibit A** ("**Order**").

   b. This Agreement shall have a term of three (3) years commencing on the date the Court enters the Order.  The Order shall include an express provision for the District Court to retain jurisdiction to enforce the terms of this Agreement for a period of three (3) years following the date of the Court's entry of the Order.  The Court's jurisdiction may be extended-in whole or in part-for an additional period of one year upon proof that the City has failed to substantially comply with the provisions of the Order.  Any determination of a failure to substantially comply under this provision shall be based on the totality of circumstances and not a single or isolated failure during otherwise sustained compliance.

   c. If necessary to permit the City adequate time to remedy an alleged failure to comply with the Order, the Parties may submit a joint request to extend the Court's initial period of jurisdiction.

2

3. **RELEASES.**  The following releases shall become effective upon the City's payment to Plaintiffs of the Settlement Sum as provided in Section 1:

   a. The undersigned Plaintiffs to this Agreement, each on behalf of themselves, and their respective heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors do hereby forever release, acquit, and discharge the City and all of its boards, bureaus, departments, administrators, officers, agents, employees, including but not limited to, Andrew Mathis, Mark Hamer, and Jack Richter, and all persons that acted on behalf of the City (collectively the "**City Released Parties**") from any and all claims, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever, whether known or unknown, contingent or otherwise, at law or in equity, and whether or not expected to exist (the "**Claims**") which the undersigned Plaintiffs to this Agreement had, have or may have against the City Released Parties, and each of them, arising out of or related to the Action, and any allegations, events, transactions or occurrences that were alleged or that could have been alleged therein (the "**City Released Claims**").

   b. The undersigned Plaintiffs further acknowledge and agree that, as to the City Released Claims, they waive and relinquish the provisions of any protection under **Section 1542 of the *California Civil Code* of the State of California**, and/or any similar law, either federal or of any state or territory of the United States or statute or applicable law anywhere existing.  Plaintiffs acknowledge and agree that they understand the meaning of *California Civil Code* Section 1542, which provides as follows:

   **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER, MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

   c. The undersigned Plaintiffs expressly acknowledge that each of them understands the significance and consequence of such a specific waiver of Section 1542 as applied to the City Released Claims.

3

4. **NONMONETARY TERMS**.

  a. <u>Covered Area</u>:  For purposes of this Agreement, the "Covered Area" shall be defined as the area of downtown Los Angeles bordered by: Second Street to the north; Eighth Street to the south; Spring Street to the west; Alameda Street to the east.  A map of the Covered Area is attached as **Exhibit B**.

  b. <u>Seizure of Property as Part of a Cleanup within the Covered Area</u>: Unless otherwise specified in this Agreement, within the Covered Area, the City will not seize property as part of a cleanup of an area where homeless people's property is located, absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband.  Where the City plans to engage in a cleanup of an area where homeless people are located within the Covered Area, whether as part of Operation Healthy Streets or other cleanup, the City must adhere to the following provisions, and may seize property that remains within the cleanup area as part of that cleanup, provided it does so consistent with the following:

     i.   The City must provide at least 24 hours advance notice of the cleanup, advising homeless individuals of the cleanup and possible seizure of property and advising such individuals to remove property from the cleanup area before the cleanup begins;

     ii.  The City must provide a 30 minute warning and opportunity for individuals to remove property when a cleanup is imminent on any block about to be cleaned;

     iii. The City will not close off more than any block on which it is actually conducting a cleanup and for no more time than cleanup personnel and equipment are actually present on the block;

     iv.  If an individual's belongings remain after an area has been closed for cleaning, and the owner arrives on the scene before the process of screening and removal of his or her property has been completed, any medication, medical equipment, or identification found in the screening process will be given to the claimed owner at the scene if he or she so requests rather than sent to storage. With respect to other items which are designated for storage after the screening process, Bureau of Sanitation personnel conducting the cleanup will have discretion to give the property

4

to the owner at the scene rather than removing the property to storage; and

    v.   The City will not conduct cleanups if it is raining or the temperature is below 50 degrees, unless the Director of the Bureau of Sanitation determines that the cleanup is necessary to respond to an urgent condition risking public health or safety.  If a cleanup is halted or postponed because of rain, the cleanup will not commence again until the City has provided new posted notice consistent with Section 4(b) of this Agreement.

Nothing contained in this Agreement shall prohibit the City from performing routine sanitation services in the Covered Area, such as picking up trash, debris, litter, and recycling, or sanitizing and cleaning streets and sidewalks, as long as such activities do not involve the seizure or removal of individuals' property.

c.   <u>Seizure of Property Incident to Arrest within the Covered Area</u>: Within the Covered Area, the City will not seize property incident to an arrest absent an objectively reasonable belief that the property is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband.  Nothing contained in this Agreement limits (i) the City's right to seize property under any other applicable exception to the warrant requirement of the Fourth Amendment, including the Community Caretaking doctrine, as defined by relevant legal standards; or (ii) any arguments the Plaintiffs may make that such a seizure constitutes a violation of the Fourth Amendment of the United States Constitution, either through Plaintiffs' enforcement of this Order or in any other legal proceeding.

d.   <u>Storage of Property Seized within the Covered Area:</u>

    i.   Unless otherwise specified in this Agreement, the City will not destroy property seized within the Covered Area, absent an immediate threat to public health or safety, without maintaining the property in a secure location for a period of no less than 90 days.

    ii.   The City will provide notice advising individuals whose property is seized within the Covered Area of the address where seized property may be recovered and the hours of operation for that facility.  This notice will be posted prominently in the location from which the property was taken or provided to individuals when they are released from custody.

5

    iii.    Property seized within the Covered Area will be stored in a facility that clearly catalogs and segregates property based on the name and identification, when available, of individuals from whom the property was taken.

    iv.    Property seized within the Covered Area will be stored in a facility from which property may be retrieved during regular business hours.

    v.    When the City seizes medication, medical equipment, and uncontaminated tents, sleeping bags, and blankets within the Covered Area, these items must be accessible within 24 hours of seizure or an individual's release from custody (where the belongings were seized from an arrestee), whichever is later. Other property seized within the Covered Area will be accessible within 72 hours after seizure.

e.    <u>Large Furniture, Appliances, and Similar Items</u>:  Nothing contained in this Agreement shall prohibit the City from seizing within the Covered Area, with or without notice, nor require the City to store or maintain, the following items:

    i.    couches, mattresses, dressers, or other similarly-sized or larger furniture;

    ii.    wooden pallets;

    iii.    refrigerators or other similarly-sized or larger appliances, or barbeques or other open-flame cooking devices having fuel containers with a water capacity greater than 2.5 pounds.

f.    <u>Impeding ADA Access or Ingress/Egress</u>:

    i.    If property in the Covered Area is (a) obstructing entrance into, or exit from, any building or property, including impeding entry or exit into a driveway, loading dock, or other ingress or egress point of a building, business, residence, or real property, or (b) impeding access as required by the American with Disabilities Act, the property may be moved, with or without notice, to provide appropriate clearance.

    ii.    If (a) property is attended and the person attending the property refuses to move it or have it moved to another location for them to provide appropriate clearance of the obstruction or impediment or (b) property is unattended and City personnel

6

responsible for moving the unattended property reasonably
determine that the unattended property cannot reasonably be
moved to provide appropriate clearance, then the City may
seize the property, with or without notice, and store it in
accordance with Section 4(d) of this Agreement; provided,
however, that if the person attending the property is impaired
and incapable of moving the property, City personnel may
reasonably assist the individual with compliance if the attended
property can reasonably be moved to provide appropriate
clearance.

g. <u>Documentation</u>:  The City must document and maintain records
containing sufficient detail to document compliance with the terms
and conditions of Section 4 of this Agreement.  The City shall
maintain the documentation for a period of no less than one year.  The
City will make such documentation available to Plaintiffs within
twenty (20) business days after the receipt of a written request made
to the City Attorney's Office pursuant to the Notice provisions in
Section 23 of this Agreement.  The time in which to request or
produce such documentation may be extended by mutual agreement
of the Parties.

5. **EXPRESS RESERVATION.**  This Agreement shall not prohibit or prevent
the City from enforcing laws otherwise applicable within the Covered Area
that are not inconsistent with this Agreement.  Nor do the Parties waive any
right to dispute in the future whether or not enforcement of any law
otherwise applicable in the Covered Area violates state or federal law or the
California or United States Constitutions.

6. **MODIFICATION CLAUSE**.  If a court issues an order or judgment
regarding the constitutionality of, or the City's ability to enforce, any law,
code, ordinance, or regulation (including but not limited to LAMC § 56.11),
or if the City and Plaintiffs Los Angeles Catholic Worker and Cangress enter
into a written agreement regarding City's policies or procedures concerning
the property of homeless individuals, and that order, judgment, or agreement
conflicts with or is inconsistent with any part or subpart of the terms
contained in Section 4 of this Agreement, the Parties agree that the
conflicting or inconsistent part(s) or subpart(s) of this Agreement shall no
longer be effective.  In the event a Party asserts that an order, judgment, or
agreement conflicts with or is inconsistent with a part or subpart of the terms
contained in Section 4, the Party shall notify the other Parties pursuant to
Section 23 of this Agreement.  If the Parties disagree as to whether a conflict

7

or inconsistency exists, the question of whether a conflict or inconsistency exists shall be resolved according to Section 22 of this Agreement.

7. **FINAL APPROVAL.**  The Parties understand and agree that this Agreement is subject to final approval by the City Council or other City officers, boards, commissions, or entities, and that the execution of this Agreement is subject to and conditioned upon the granting of all such City approvals needed to make this Agreement final and binding.  The person signing this Agreement on behalf of the City will recommend that this Agreement be so approved. Once the City has formally and finally approved this Agreement, the City shall provide the Parties' respective counsel of record with written confirmation of said approval within ten (10) business days of such approval being given.

8. **NO RELIANCE.**  Except as expressly set forth herein, the Parties are not entering into this Agreement in reliance upon any express or implied warranty, representation, agreement, or understanding of any kind made by, or entered into by, the Parties.  The Parties expressly acknowledge and agree that they have each relied upon their own information and investigations as to all matters agreed, represented, warranted, or acknowledged herein, and the Parties do not have any desire for further information or for further investigation.

9. **INTEGRATION.**  This Agreement supersedes any and all other agreements, understanding or representations, either oral or in writing, with respect to the matters addressed herein.  This Agreement sets forth the entire agreement of the Parties hereto with respect to such matters.

10. **AMENDMENTS.**  Except as otherwise provided in Section 6, the Parties agree that this Agreement shall only be amended by written instruments executed by the Parties.  Plaintiffs Carl Mitchell, Judy Coleman, and Salvador Roque expressly assign their rights to amend this Agreement to Plaintiffs Los Angeles Catholic Worker and Cangress.

11. **ADVICE OF COUNSEL.**  In entering this Agreement, the Parties represent that they have had the opportunity to seek the advice of an attorney of their own choice, to review and explain the terms of this Agreement, and/or that they have voluntarily and willingly waived such right having read and understood the Agreement on their own behalf.

12. **GOVERNING LAW.**  This Agreement shall be construed in accordance with the laws of the State of California.

13. **SEVERABILITY.**  If any provision of this Agreement shall for any reason be determined by a court of competent jurisdiction (sustained on appeal, if

8

any) to be unenforceable in any respect, the remainder of this Agreement shall remain unaffected and in full force and effect.

14. **COUNTERPARTS.**  This Agreement may be executed in any number of counterparts.  Any such counterpart, when executed, shall constitute an original of this Agreement, and all such counterparts together shall constitute an original of this Agreement, and all such counterparts together shall constitute one and the same Agreement.  Any photocopied, faxed, or emailed version of this Agreement bearing one or more authentic signatures shall be valid, binding, and admissible for all purposes as though original.

15. **FURTHER ASSURANCES.**  Each Party agrees to make, execute, and deliver such other instruments or documents, and to do or cause to be done such further or additional acts, as reasonably may be necessary in order to effectuate the purposes or to implement the terms of this Agreement.

16. **BINDING.**  This Agreement shall be binding upon and inure to the benefit of the Parties, their heirs, successors, and assigns.

17. **NO THIRD PARTY BENEFICIARIES.** Notwithstanding anything in this Agreement to the contrary, there are no intended third-party beneficiaries that may assert rights or defenses under this Agreement, except the Parties to this Agreement.

18. **WAIVER.**  No waiver of any provision of this Agreement shall be effective unless such waiver is in writing and signed by the waiving Party, and any such waiver shall not be deemed a waiver of any other provision of this Agreement.

19. **NO ADMISSION OF LIABILITY.**  This Agreement is in compromise of disputed claims, and neither the execution and delivery of this Agreement, nor the performance of any obligations thereunder, shall be construed as an admission of liability or wrongdoing or as an admission of any other matter on the part of any of the Parties, or any of them.

20. **CONSTRUCTION.**  This Agreement shall not be construed against any of the Parties and the rule of construing contract ambiguities against the party drafting the contract shall be inapplicable.

21. **EFFECT OF HEADING.**  The headings used in this Agreement are for convenience only and shall not affect the construction or interpretation of this Agreement.

22. **DISPUTE RESOLUTION.**  If a dispute arises between the Parties regarding the interpretation, performance, or enforcement of this Agreement, the Parties shall meet and confer within a reasonable time after either Party receives

written notice of a dispute provided in accordance with Section 23 of this Agreement. The Parties shall endeavor in good faith to resolve any dispute during a meet-and-confer meeting. In the event that the Parties are unable to resolve the dispute within a reasonable time after the meeting, Plaintiffs or the City may, pursuant to the Order, submit the matter to the District Court for review and decision.

23. **NOTICES.** Any notice required under this Agreement shall be in writing and shall be delivered in-person, or with proof of receipt by a nationally recognized delivery service or by United States Certified Mail. Notices are effective when received. Either Party may change the name or address for receipt of notice by providing notice of such change to the other Party, without having to amend this Agreement. The Parties shall deliver notices to the following persons and addresses:

    a. <u>Notice to City</u>:

        i. Office of the Los Angeles City Attorney
          Attn: Deputy City Attorney Felix Lebron
          City Hall East, Business and Complex Litigation Division
          200 N. Main Street, Room 675
          Los Angeles, CA 90012
          felix.lebron@lacity.org
          Tel: (213) 978-7559

        ii. Office of the Los Angeles City Attorney
          Attn: Senior Assistant City Attorney Scott Marcus
          City Hall East, Civil Litigation Branch
          200 N. Main Street, Room 700
          Los Angeles, CA 90012
          scott.marcus@lacity.org
          Tel: (213) 978-4681

    b. <u>Notice to Plaintiffs</u>:

        i. Shayla Myers
          Legal Aid Foundation of Los Angeles
          7000 S. Broadway
          Los Angeles, CA  90013
          smyers@lafla.org
          Tel:  (213) 640-3983

        ii. Catherine Sweetser
          Schonbrun Seplow Harris and Hoffman LLP

11543 W. Olympic Blvd.
Los Angeles, CA 90064
csweetser@sshhlaw.com
Tel:  (310) 396-0731

iii.  Carol Sobel
Law Offices of Carol Sobel
725 Arizona Avenue, Suite 300
Santa Monica, CA 90401
carolsobellaw@gmail.com
Tel: 310-393-3055

11

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be
duly executed and delivered as of the date first above written.

DATED: _5/7/19_

___CARL A Mitchell___
**CARL MITCHELL**

DATED: _5-17-19_

___Judy Coleman___
**JUDY COLEMAN**

DATED: _5-20/2019_

___Salvador Roque___
**SALVADOR ROQUE**

DATED: _4-26-19_

**LOS ANGELES CATHOLIC WORKER**

By: ___Catherine Morris___

Printed: _CATHERINE MORRIS_

Its: _____

DATED: _____

**CANGRESS**

By: _____

Printed: _____

Its: _____

DATED: _____

**THE CITY OF LOS ANGELES**

By: _____

Printed: _____

Its: _____

Reviewed and approved as to form and content:

12

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

DATED:_____          _____

                                         **CARL MITCHELL**

DATED:_____          _____

                                         **JUDY COLEMAN**

DATED:_____          _____

                                         **SALVADOR ROQUE**

DATED:_____          **LOS ANGELES CATHOLIC WORKER**

By:_____

Printed:_____

Its:_____

DATED:_05/21/2019_          **CANGRESS**

By: _[signature]_____

Printed:_ Pete White _____

Its:_ Executive Director _____

DATED:_____          **THE CITY OF LOS ANGELES**

By:_____

Printed:_____

Its:_____

Reviewed and approved as to form and content:

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

DATED:_____      _____

                                 **CARL MITCHELL**

DATED:_____      _____

                                 **JUDY COLEMAN**

DATED:_____      _____

                                 **SALVADOR ROQUE**

DATED:_____      **LOS ANGELES CATHOLIC WORKER**

                                 By:_____

                                 Printed:_____

                                 Its:_____

DATED:_____      **CANGRESS**

                                 By:_____

                                 Printed:_____

                                 Its:_____

DATED: *5.22.19*      **THE CITY OF LOS ANGELES**

                                 By: *[signature]*

                                 Printed: *Scott Marcus*

                                 Its: *Senior Assistant City Attorney*

Reviewed and approved as to form and content:

_Carol Sobel_ _____

Carol Sobel
Law Office of Carol Sobel
Counsel for Plaintiffs

_____

Scott Marcus
Los Angeles City Attorney's Office
Counsel for Defendants


_____

Catherine Sweetser
Law Offices of Schonbrun Seplow Harris and Hoffman
Counsel for Plaintiffs


_____

Shayla Myers
Legal Aid Foundation of Los Angeles
Counsel for Plaintiffs

_____                _____
Carol Sobel                                     Scott Marcus
Law offices of Carol Sobel                      Los Angeles City Attorney's Office
Counsel for Plaintiffs                          Counsel for Defendants


_____
Catherine Sweetser
Law Offices of Schonbrun Seplow Harris and Hoffman
Counsel for Plaintiffs



_____
Shayla Myers
Legal Aid Foundation of Los Angeles
Counsel for Plaintiffs

13

_____                    _____
Carol Sobel                                          Scott Marcus
Law offices of Carol Sobel                           Los Angeles City Attorney's Office
Counsel for Plaintiffs                               Counsel for Defendants




_____
Catherine Sweetser
Law Offices of Schonbrun Seplow Harris and Hoffman
Counsel for Plaintiffs




_____
Shayla Myers
Legal Aid Foundation of Los Angeles
Counsel for Plaintiffs

13

_____
Carol Sobel
Law offices of Carol Sobel
Counsel for Plaintiffs

_____
Scott Marcus
Los Angeles City Attorney's Office
Counsel for Defendants

_____
Catherine Sweetser
Law Offices of Schonbrun Seplow Harris and Hoffman
Counsel for Plaintiffs

_____
Shayla Myers
Legal Aid Foundation of Los Angeles
Counsel for Plaintiffs

13

EXHIBIT A

1

2

3

4

5

6

7

8

9

10                          **UNITED STATES DISTRICT COURT**

11                          **CENTRAL DISTRICT OF CALIFORNIA**

12

13   CARL MITCHELL, MICHEAL          **CASE NO. CV16-01750 SJO (JPRx)**
     ESCOBEDO, SALVADOR ROQUE,        *[Assigned to the Honorable S. James Otero,*
14   JUDY COLEMAN, as individuals; LOS   *Courtroom 1]*
     ANGELES CATHOLIC WORKER,
15   CANGRESS, as organizations,       **[Proposed] STIPULATED ORDER OF**
                                        **DISMISSAL**
16
                   PLAINTIFFS,
17
18        v.                           **Action Filed: March 14, 2016**

19   CITY OF LOS ANGELES, a municipal
20   entity; LT. ANDREW MATHIS, SGT.
     HAMER and SGT. RICHTER, in their
21   individual and official capacities,

22
                   DEFENDANTS.
23

24

25

26

27

28

                          **STIPULATED ORDER OF DISMISSAL**

On March 14, 2016, plaintiffs Carl Mitchell, Judy Coleman, Michael Escobeda, Sal Roque, the Los Angeles Catholic Worker, and Cangress ("Plaintiffs") filed the above-captioned against the City of Los Angeles ("City"), Lieutenant Andrew Mathis, Sergeant Hamer, and Sergeant Richter (collectively with the City the "Defendants").  Plaintiffs alleged that the City unlawfully seized, destroyed, and/or failed to preserve or store property located in the Skid Row area of downtown Los Angeles belonging to homeless individuals in violation of, among other things, the Fourth and Fourteenth Amendments of the United States Constitution and state and federal disability laws.  Defendants denied all material allegations in the complaint.

On April 13, 2016, this Court entered a Preliminary Injunction against enjoining the City and its agents and employees relating to the seizure, destruction, and/or storage of property located in Skid Row or its surrounding areas, incident to an arrest or as part of a clean-up of an area where homeless people are located.  [ECF Dkt. No. 51].  On September 25, 2016, this Court further addressed the terms of the preliminary injunction in an order denying Defendants' Motion for Clarification of the Preliminary Injunction Order.  [ECF Dkt. No. 102].

Following extensive discussions, the Parties subsequently reached a settlement resolving the disputed claims in this Action.  A copy of the executed Settlement and Release Agreement ("Settlement Agreement") is attached hereto as Exhibit A, the terms of which are expressly incorporated herein by reference.

The Court hereby expressly retains jurisdiction to resolve any future disputes regarding the interpretation, performance, or enforcement of the Settlement Agreement for a period of no more than three (3) years from the date of this Order. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

**NOW THEREFORE**, pursuant to Federal Rule of Civil Procedure 41(a)(2), and good cause appearing therefore, the Court HEREBY ORDERS AND DECREES the following:

1.     The Court's Preliminary Injunction dated April 13, 2016 is hereby dissolved in its entirety.

2.     The Court expressly incorporates all of the terms of the Settlement Agreement, attached as Exhibit A, into this Order, including all non-monetary terms outlined in Section 4 of the Settlement Agreement.

3.     The Court expressly retains exclusive jurisdiction for a period of three (3) years from the date of this Order to enforce the Settlement Agreement, and to resolve any future disputes regarding interpretation, performance, or enforcement of the Agreement, including and expressly, the non-monetary terms set forth in the Agreement.

4.     The Parties shall comply with the Dispute Resolution procedures in the Settlement Agreement before seeking Court intervention to address any disputes related to the Settlement Agreement.

5.     Except as may be provided otherwise in the Settlement Agreement, each side shall bear their own fees and costs in this Action.

6.     This entire Action is hereby dismissed with prejudice as to all Defendants.

**IT IS SO ORDERED**.

Dated:

_____
Hon. S. James Otero
Judge, United States District Court

2

**STIPULATED ORDER OF DISMISSAL**

**APPROVED AS TO FORM:**

Dated: _____         LOS ANGELES CITY ATTORNEY'S OFFICE

                               By: _____/s/_____
                                     FELIX LEBRON
                                     Deputy City Attorney

                               Attorney for Defendants
                               City of Los Angeles, Lt. Andrew Mathes,
                               Sgt. Richter, and Sgt. Hamer

Dated: _____         SCHONBRUN SEPLOW HARRIS &
                               HOFFMAN LLP

                               By: _____/s/_____
                                     CATHERINE SWEETSER

                               Attorneys for Plaintiffs

Dated: _____         LAW OFFICE OF CAROL A. SOBEL

                               By: _____/s/_____
                                     CAROL A. SOBEL

                               Attorneys for Plaintiffs

Dated: _____         LEGAL AID FOUNDATION OF LOS
                               ANGELES

                               By: _____/s/_____
                                     SHAYLA R. MYERS

                               Attorneys for Plaintiffs Carl Mitchell, Judy
                               Coleman, Michael Escobedo, CANGRESS,
                               and Los Angeles Catholic Worker

[All parties have authorized the use of their electronic signatures for this document.]

3

**STIPULATED ORDER OF DISMISSAL**

EXHIBIT B

# SKID ROW AND SURROUNDING AREA



### SKID ROW
**NORTH - 3RD STREET**
**WEST - MAIN STREET**
**EAST - ALAMEDA STREET**
**SOUTH - 7TH STREET**

### SURROUNDING AREA
**NORTH - 2ND STREET**
**WEST - SPRING STREET**
**EAST - ALAMEDA STREET**
**SOUTH - 8TH STREET**

Exhibit C

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
Scan Only ____

CASE NO.:  <u>CV 16-01750 SJO (GJSx)</u>          DATE:  <u>August 27, 2019</u>

TITLE:          <u>Carl Mitchell, et al. v. City of Los Angeles et al.</u>

========================================================================
PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                              Not Present
Courtroom Clerk                            Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**      **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                  Not Present

========================================================================
**PROCEEDINGS (in chambers): ORDER DENYING MOTION TO INTERVENE FOR LACK OF JURISDICTION** [Docket No. 120]**.**

This matter is before the Court on Proposed Intervenors DTLA Alliance for Human Rights, Joseph Burk, Harry Tashdijian, Karyn Pinsky, Charles Malow, and Charles Van Scoy's (collectively, "Proposed Intervenors") Motion To Intervene ("Motion"), filed June 24, 2019.  Plaintiffs Carl Mitchell, Michael Escobedo, Salvador Roque, Judy Coleman, Los Angeles Catholic Worker, and Cangress' (collectively, "Plaintiffs") filed an Opposition to the Motion ("Plaintiffs' Opposition") on July 15, 2019.  Defendants City of Los Angeles ("the City"), Lieutenant Andrew Mathes, Sergeant Hamer, and Sergeant Richter (collectively, "Defendants") filed an Opposition to the Motion ("Defendants' Opposition") on July 15, 2019.  Proposed Intervenors filed two separate Replies to each of the Oppositions on July 29, 2019.  For the following reasons, the Court **DENIES** the Motion for lack of jurisdiction.

I.        FACTUAL AND PROCEDURAL BACKGROUND

        A.        Factual Background

In this action, Plaintiffs, a group of homeless individuals and organizations providing support services to the homeless, sued Defendants for purported violations of their constitutional and statutory rights.  According to Plaintiffs, the City has undertaken a mass practice and policy of clearing homeless people from the Skid Row area in Los Angeles.  Since around December of 2015, Defendants have allegedly seized and deprived Plaintiffs of property, without a pre- or post-deprivation hearing, in violation of the Fourth and Fourteenth Amendments to the Constitution and various federal and California state laws.  (*See generally* First Am. Compl. ("FAC"), ECF No. 1).

        B.        Procedural Background

Plaintiffs initially brought eleven causes of action against Defendants.  Plaintiffs claimed that Defendants' confiscation and destruction of Plaintiffs' property, without a warrant or a pre- or post-

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:   CV 16-01750 SJO (GJSx)          DATE:  August 27, 2019**

---

deprivation hearing, violated the Fourth, Fifth and Fourteenth Amendments of the Constitution. (FAC ¶¶ 72-86).  Plaintiffs also contended that Defendants falsely arrested certain Plaintiffs based on faulty allegations that they stole shopping carts, committed the tort of conversion by wrongfully seizing Plaintiffs' property, and contravened California state and federal laws protecting disabled individuals by depriving homeless people suffering from disabilities of necessary medications and medical equipment.  (FAC ¶¶ 87-102, 106-110 119-21).

On March 30, 2016, Plaintiffs filed an Ex Parte Application for a Temporary Restraining Order ("Application"), seeking to enjoin the City from confiscating property during arrests and cleanups of homeless areas.  Plaintiffs contended that "they have lost all or nearly all of their possessions without prior notice and adequate advisement of post-deprivation resources to reclaim their property" and that "the loss of key items, including [Plaintiffs'] medications, has taken an enormous toll on them, especially when they are left without protection from the elements at night."[1]  (Appl. 4.)

The Court granted the Application in part and issued a preliminary injunction that provided as follows:

"The City, its agents and employees are hereby enjoined from:

 1.     Confiscating property in Skid Row or its surrounding areas, incident to an arrest or as part of a cleanup of an area where homeless people are located, absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband; and

 2.     Destroying property in Skid Row or its surrounding areas, absent an immediate threat to public health or safety, without maintaining the property in a secure location for a period of less than 90 days; and

 3.     Storing seized property from Skid Row or its surrounding areas in a facility not open during regular business hours; and

 4.     Failing to provide notice advising homeless individuals whose property is seized of the address where seized property is being stored; and

 5.     Storing seized property from Skid Row or its surrounding areas in a facility that does not clearly catalog and segregate property based on the names

---

[1]  The instant case is related to a prior case in the Central District of California, *Tony Lavan et al. v. City of Los Angeles*, CV-11-2874 (PSG).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 16-01750 SJO (GJSx)</u>          **DATE:** <u>August 27, 2019</u>

and identification, where available, of individuals from whom the property is taken; and

6.     Storing seized property from Skid Row or its surrounding areas in a facility that is not accessible within 72 hours of seizure.  Medication, medical equipment, and uncontaminated tents, sleeping bags, and blankets must be accessible within 24 hours of seizure or an individual's release from custody, whichever is later.

7.     Additionally, where the City plans to engage in a mass cleanup of an area in Skid Row or its surrounding areas, the City must provide 24 hours advance notice advising homeless people of the cleanup and possible seizure of property and advising such individuals to remove essential property that they do not want confiscated."

The Court modeled the injunction after a prior injunction issued against the City in *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, a*ff'd* 693 F.3d 1022 (9th Cir. 2012).  The Court limited the scope of the injunction to the area surrounding Skid Row.

After this preliminary injunction, the instant litigation remained dormant for several years.  On April 25, 2019, Plaintiffs and Defendants entered a Settlement Agreement.   (*See* Settlement Agreement, ECF No. 119.)  Among several provisions, the Settlement Agreement contained the following requirements: (1) the City shall pay a total amount of $645,000 to Plaintiffs in this action (Settlement Agreement at 2); (2) Plaintiffs released Defendants from any claims related to the instant litigation (Settlement Agreement at 3); (3) the City would not seize property as part of a cleanup "absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband" (Settlement Agreement at 4); (4) "the City must provide at least 24 hours advance notice of the cleanup, advising homeless individuals of the cleanup and possible seizure of property and advising such individuals to remove property from the cleanup area before the cleanup begins" (Settlement Agreement at 4); and (5) "[t]he City must provide a 30 minute warning and opportunity for individuals to remove property when a cleanup is imminent on any block about to be cleaned" (Settlement Agreement at 4).

Prior to entering the Settlement Agreement, the City held several closed-door City Council sessions to analyze the merits of entering the Settlement Agreement. (Letter From City Attorney Dated March 16, 2019, Ex. B., ECF No. 123-1).  During the public portion of the closed-door hearings, the City asked for and received comments from constituents, interested individuals, and organizations. (Speaker Request List, Special Meeting  – Homelessness and Poverty Committee dated September 7, 2018, Ex. C, ECF No. 123-1; Speaker Request List, Homelessness and Poverty Committee Meeting dated October 3, 2018, Ex. D., ECF No. 123-1).  Prior to voting on

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:  CV 16-01750 SJO (GJSx)**          **DATE:  August 27, 2019**

the Settlement Agreement, City Council members also considered correspondence from constituents.  (*See* Letter To Councilmember Huizar dated September 10, 2018, Ex. E, ECF No. 123-1; Letter To Council President Wesson dated March 4, 2019, Ex. G, ECF No. 123-1).

After considering the Settlement Agreement and the comments submitted at the hearings on the Settlement Agreement, the City Council voted to enter the Settlement Agreement with Defendants. The Court dismissed the instant litigation, reserving its jurisdiction only for the purpose of "resolv[ing] any future disputes regarding the interpretation, performance, or enforcement of the Settlement Agreement for a period of no more than three (3) years from the date of this Order."

Proposed Intervenors, a group of people who "live, work, and own business and/or property within the area entitled 'Skid Row and Surrounding Area,'" subsequently filed the instant Motion.  (Mot. at 5, ECF No. 120.)  They seek to intervene in this litigation to challenge the terms of the Settlement Agreement.  (*See generally* Mot.)  Proposed Intervenors mainly contend that the City entered the Settlement Agreement without giving them a meaningful opportunity to object to its terms. Moreover, they contend that the City's actions pursuant to the Settlement Agreement have had a hugely detrimental effect on them.  For example, the City has purportedly caused health and hygiene issues at some of Proposed Intervenors' businesses.

II.    DISCUSSION

A.    Legal Standard

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).  Article III of the federal Constitution limits the jurisdiction of federal courts to actual "cases" or "controversies."  "It is not enough that a case presents a live controversy when it is filed. An actual controversy must exist at all stages of federal court proceedings." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 834 (9th Cir. 2014) (internal citations omitted).

A third party may intervene in litigation only if the underlying litigation meets the case or controversy requirement of the federal Constitution. Accordingly, before allowing a third party to intervene, a court must determine if it has jurisdiction over the underlying litigation.  *See Hernandez v. Campbell*, 204 F.3d 861, 865 (9th Cir. 2000).  Where there is no such jurisdiction, a court must deny the motion to intervene. *W. Coast Seafood Processors Ass'n v. Nat. Res. Def. Council, Inc.*, 643 F.3d 701, 704 (9th Cir. 2011)   A court has "a continuing obligation to assess its own subject-matter jurisdiction," *Allstate Ins. Co. v. Hughes,* 358 F.3d 1089, 1093 (9th Cir.2004), and the court "may not entertain an action over which it has no jurisdiction." *Hernandez,* 204 F.3d at 865 (citation omitted).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 16-01750 SJO (GJSx)**          DATE:  **August 27, 2019**

The burden to demonstrate proper subject matter jurisdiction lies with the party seeking to invoke federal jurisdiction—here, the Proposed Intervenors.  *See Jou v. Kimberly-Clark Corp.*, No. 13-CV-03075-JSC, 2015 WL 4537533, at *2 (N.D. Cal. July 27, 2015).

      B.      Application

Having reviewed the pleadings in this matter, the Court concludes that it lacks jurisdiction over the litigation between Plaintiffs and Defendants.  Because there is no active case or controversy before this Court, the Court **DENIES** Proposed Intervenors' Motion for lack of jurisdiction.

On May 31, 2019, the Court dismissed the underlying litigation between Plaintiffs and Defendants with prejudice and terminated the case.  (*See* Stipulated Order of Dismissal at ¶ 6, ECF No. 119.)  As summarized in detail above, the Settlement Agreement provided that the City would pay Plaintiffs a sum of $645,000, that Plaintiffs relinquished legal claims against the City, and that the City would provide notice prior to seizing property from Plaintiffs and other homeless people located in certain areas of Skid Row.  (*See* Settlement Agreement at 2, 4.)  This Settlement Agreement brought an end to the litigation, which at its core involved the City's seizure of Plaintiffs' property in a series of organized cleanups. The Court's dismissal terminated the proceedings before this Court, eliminating the active case or controversy that had existed.

Accordingly, Proposed Intervenors cannot intervene in this litigation.  *See Kokkonen*, 511 U.S. at 382.    "Because the underlying litigation is over, [t]his Court cannot grant [Intervenors] any 'effective relief' by allowing [them] to intervene now."  *W. Coast Seafood Processors Ass'n*, 643 F.3d at 704 (quoting *United States v. Ford*, 650 F.2d 1141, 1143 (9th Cir. 1981)).

In *West Coast Seafood Processors*, the Natural Resource Defence Council and the Pacific Marine Conservation Council (together, "NRDC") challenged the National Marine Fisheries Service's ("NMFS") program to preserve groundfish species off the coast of California.  *Id.* at 702-03.  The West Coast Seafood Processors Association ("WCSPA") sought to intervene in the litigation, and the district court denied this intervention.  *Id.* at 704.  While an appeal of the district court's denial was pending, the underlying litigation ran its course.  The district court issued a final decision on NRDC's and NMFS' cross-motions for summary judgment and entered a final judgment, which the parties did not appeal.  *Id.* After this occurred, the Ninth Circuit held that the motion to intervene was moot and dismissed it for lack of jurisdiction.  *Id.*  The Ninth Circuit ruled that it could not order WCSPA to be included as intervenors in litigation that had terminated.  *Id.*

The instant case is in almost the same procedural posture as *West Coast Seafood Processors*.  Plaintiffs and Defendants were litigating before this Court, but the parties  entered the Settlement Agreement.   This Court then dismissed the litigation with prejudice.   After the Court granted

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** **CV 16-01750 SJO (GJSx)**       **DATE:** **August 27, 2019**

dismissal, the parties did not appeal.  The litigation between Plaintiffs and Defendants was over.  After all of this occurred, Proposed Intervenors filed the instant Motion. Much like in *West Coast Seafood Processors*, Proposed Intervenors cannot participate in litigation that has terminated.

Proposed Intervenors contend, perhaps rightly, that some of Plaintiffs' and Defendants' actions taken pursuant to the Settlement Agreement have resulted in adverse consequences to them. Proposed Intervenor Harry Tashidijian, for example, argues that as a result of this Court's injunction and the subsequent Settlement Agreement, "[t]he risk to his property from fire damage and vandalism has increased exponentially in the last several years; the business is constantly having to replace gates and other property, clean the facilities, and post security to safeguard its property. They have had to spend over $100,000 in upgrades to their system and increased monitoring and pest control just as a result of the increased homeless and property in the area." (Mot. at 7.) If these types of allegations are true and are traceable to Plaintiffs' or Defendants' actions under the Settlement Agreement, Proposed Intervenors may have standing to pursue independent litigation against Plaintiffs or Defendants.  Any such litigation is not part of the litigation between Plaintiffs and Defendants, which has terminated.

To clarify this last point, the Court provides Proposed Intervenors with an example.  Consider that Neighbor A and Neighbor B are engaging in private nuisance litigation because Neighbor A has raucous parties seven days a week that begin at 10 p.m..  The neighbors enter a settlement agreement, which provides that Neighbor A may continue to have parties, but the parties must begin at 8:00 pm and can only occur three times a week.  Although contractually binding on Neighbor A and Neighbor B, the results of this agreement could impact the rights of third parties that were not involved in the litigation (for example, Neighbor C, who lives on the other side of Neighbor A).  Neighbor C, of course, retains the right to bring a lawsuit against Neighbor A for having parties three times a week.

Similarly, Proposed Intervenors can bring a lawsuit against Plaintiffs or Defendants for actions that Plaintiffs or Defendants are taking pursuant to the Settlement Agreement, assuming that the actions have an adverse effect on Proposed Intervenors. Such an action is a separate dispute requiring its own basis for jurisdiction.

As a final matter, the Court addresses Proposed Intervenors' argument that this Court has jurisdiction over the instant Motion because the Settlement Agreement specifies that: "The Court hereby expressly retains jurisdiction to resolve any future disputes regarding the interpretation, performance, or enforcement of the Settlement Agreement for a period of no more than three (3) years from the date of this Order."  Although the Court retains jurisdiction over disputes between Plaintiffs and Defendants about the interpretation and enforcement of the Settlement Agreement, this is the extent of the Court's jurisdiction.  The Settlement Agreement is only binding on Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:**  <u>CV 16-01750 SJO (GJSx)</u>          **DATE:**  <u>August 27, 2019</u>

and Defendants, and the Court can only resolve disputes between these parties.[2]   This Court's jurisdiction does not extend to non-parties' desire to challenge the Settlement Agreement.

III.     <u>RULING</u>

The Court **DENIES** Intervenors Motion To Intervene for lack of jurisdiction.

IT IS SO ORDERED.

---

[2]  Although the City has incurred broad obligations under the Settlement Agreement, this is not a class action, and the terms of the Settlement Agreement are only binding on the named Plaintiffs and Defendants.  Proposed Intervenors insist that the City has enacted a legislative policy through the Settlement Agreement without following the constitutionally-required process.  Although this may be true, the instant litigation is not the appropriate forum in which to pursue this argument.

Exhibit D

Search documents in this case: [ ] Search

## No. 19-247

| Title: | **City of Boise, Idaho, Petitioner**<br>**v.**<br>**Robert Martin, et al.** |
|---|---|
| Docketed: | August 26, 2019 |
| Linked with 18A1264 | |
| Lower Ct: | United States Court of Appeals for the Ninth Circuit |
|   Case Numbers: | (15-35845) |
|   Decision Date: | April 1, 2019 |

| DATE | PROCEEDINGS AND ORDERS |
|---|---|
| Jun 03 2019 | Application (18A1264) to extend the time to file a petition for a writ of certiorari from June 30, 2019 to August 29, 2019, submitted to Justice Kagan.<br><br>**Main Document**     **Lower Court Orders/Opinions**     **Proof of Service** |
| Jun 04 2019 | Application (18A1264) granted by Justice Kagan extending the time to file until August 29, 2019. |
| Aug 22 2019 | Petition for a writ of certiorari filed. (Response due September 25, 2019)<br><br>**Petition**     **Appendix**     **Certificate of Word Count**     **Proof of Service** |
| Sep 05 2019 | Blanket Consent filed by Petitioner, City of Boise.<br><br>**Blanket Consent** |
| Sep 06 2019 | Motion to extend the time to file a response from September 25, 2019 to October 25, 2019, submitted to The Clerk.<br><br>**Main Document** |

| Sep 06 2019 | Blanket Consent filed by Respondent, Robert Martin, et al. |
| | **Blanket Consent** |
| Sep 09 2019 | Motion to extend the time to file a response is granted and the time is extended to and including October 25, 2019. |
| Sep 20 2019 | Brief amicus curiae of Brentwood Community Council filed. |
| | **Main Document**    **Main Document**    **Main Document**    **Main Document** |
| Sep 20 2019 | Brief amicus curiae of Criminal Justice Legal Foundation filed. |
| | **Main Document**    **Proof of Service**    **Certificate of Word Count** |
| Sep 23 2019 | Brief amicus curiae of The Downtown Denver Partnership filed. |
| | **Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Sep 24 2019 | Amicus brief of Amici Curiae States of Idaho, Alaska, Indiana, Louisiana, Nebraska, South Dakota and Texas not accepted for filing. (September 24, 2019 -- Corrected version to be submitted) |
| Sep 24 2019 | Brief amici curiae of Amici Curiae California State Association of Counties and 33 California Counties and Cities filed. |
| | **Main Document**    **Proof of Service**    **Certificate of Word Count** |
| Sep 24 2019 | Brief amicus curiae of City of Aberdeen, Washington filed. |
| | **Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Sep 24 2019 | Brief amici curiae of Amici Curiae States of Idaho, Alaska, Indiana, Louisiana, Nebraska, South Dakota and Texas filed. |
| | **Main Document**    **Main Document**    **Main Document** |
| Sep 24 2019 | Brief amicus curiae of Boise Metro Chamber of Commerce, Inc. filed. |
| | **Main Document**    **Certificate of Word Count**    **Certificate of Word Count** |
| Sep 25 2019 | Brief amicus curiae of Stephen Eide filed. |

|  |  |
|---|---|
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of Seven Cities in Orange County filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of California State Sheriffs' Association, California Police Chiefs Association, and California Peace Officers' Association filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of Maryrose Courtney and Ketchum-Downtown YMCA filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amicus curiae of Center for Constitutional Jurisprudence filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of The People Concern and Weingart Center Association filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of Los Angeles Area Chamber of Commerce and Central City Association filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of International Municipal Lawyers Association, et al. filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amicus curiae of League of Oregon Cities filed. |
|  | **Main Document**     **Certificate of Word Count**     **Proof of Service** |
| Sep 25 2019 | Brief amicus curiae of Venice Stakeholders Association filed. |

| | |
|---|---|
| | **Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Sep 25 2019 | Brief amicus curiae of City of Los Angeles filed.<br><br>**Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Sep 25 2019 | Brief amicus curiae of Building Owners and Managers Association of Oregon filed.<br><br>**Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Sep 25 2019 | Brief amici curiae of International Downtown Association, et al. filed.<br><br>**Main Document**    **Proof of Service**    **Certificate of Word Count** |
| Oct 25 2019 | Brief of respondents Robert Martin, et al. in opposition filed.<br><br>**Main Document**    **Proof of Service**    **Certificate of Word Count** |
| Nov 13 2019 | DISTRIBUTED for Conference of 12/6/2019. |
| Nov 13 2019 | Reply of petitioner City of Boise filed. (Distributed)<br><br>**Main Document**    **Certificate of Word Count**    **Proof of Service** |
| Dec 09 2019 | DISTRIBUTED for Conference of 12/13/2019. |
| Dec 16 2019 | Petition DENIED. |

| NAME | ADDRESS | PHONE |
|---|---|---|
| Attorneys for Petitioner | | |
| Theane Evangelis Kapur<br>    Counsel of Record | Gibson, Dunn and Crutcher, LLP<br>333 South Grand Ave.<br>48th Floor<br>Los Angeles, CA 90071<br><br>tevangelis@gibsondunn.com | 213.229.7726 |

| Party name: City of Boise | | |
|---|---|---|
| **Attorneys for Respondents** | | |
| Michael Evan Bern<br>   Counsel of Record | Latham & Watkins, LLP<br>555 11th Street NW, Suite 1000<br>Washington, DC 20004-1304<br><br>michael.bern@lw.com | 202-637-1021 |
| Party name: Robert Martin, et al. | | |
| Other | | |
| Stanley L. Garnett<br>   Counsel of Record | Brownstein Hyatt Farber Schreck, LLP<br>410 Seventeenth Street<br>Suite 2200<br>Denver, CO 80202-4437<br><br>sgarnett@bhfs.com | 303.223.1100 |
| Party name: The Downtown Denver Partnership | | |
| Fred D. Heather<br>   Counsel of Record | Glaser Weil Fink Howard Avchen &<br>Shapiro LLP<br>10250 Constellation Blvd.<br>19th Floor<br>Los Angeles, CA 90067<br><br>fheather@glaserweil.com | 3105533000 |
| Party name: Brentwood Community Council | | |
| Anna Marie Joyce<br>   Counsel of Record | Markowitz Herbold PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br><br>annajoyce@markowitzherbold.com | 503-295-3085 |
| Party name: League of Oregon Cities | | |
| Michael Edward Kenneally Jr.<br>   Counsel of Record | Morgan, Lewis & Bockius, LLP<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br><br>michael.kenneally@morganlewis.com | (202) 739-3000 |
| Party name: The People Concern and Weingart Center Association | | |

Mary Patrice Kent      City of Aberdeen      3605373233
  Counsel of Record      200 East Market Street
         Aberdeen, WA 98520

pkent@aberdeenwa.gov

Party name: City of Aberdeen, Washington

Megan Ann Larrondo      Office of the Attorney General, State      208-332-3548
  Counsel of Record      of Idaho
         954 W. Jefferson -2nd Floor
         Boise, ID 83720-0010

megan.larrondo@ag.idaho.gov

Party name: Amici Curiae States of Idaho, Alaska, Indiana, Louisiana, Nebraska, South Dakota and Texas

Jeffrey Lewis      Jeff Lewis Law      3109354001
  Counsel of Record      609 Deep Valley Drive
         Suite 200
         Rolling Hills Estates, CA 90274

Jeff@JeffLewisLaw.com

Party name: Venice Stakeholders Association

Lori Alvino McGill      Lori Alvino McGill PC      9146469410
  Counsel of Record      1056 Thomas Jefferson Street, NW
         Washington, DC 20007

alvinomcgill@gmail.com

Party name: Los Angeles Area Chamber of Commerce and Central City Association

Craig L. Meadows      Hawley Troxell Ennis & Hawley LLP      208-388-4866
  Counsel of Record      877 Main Street, Suite 1000
         PO Box 1617
         Boise, ID 83701

cmeadows@hawleytroxell.com

Party name: Boise Metro Chamber of Commerce, Inc.

Jacob Moshe Roth      Jones Day      202-879-7658
  Counsel of Record      51 Louisiana Avenue NW
         Washington, DC 20001

yroth@jonesday.com

Party name: Seven Cities in Orange County

Kent S. Scheidegger            Criminal Justice Legal Fdtn.        9164460345
  Counsel of Record          2131 L Street
                                      Sacramento, CA 95816

                                      briefs@cjlf.org

Party name: Criminal Justice Legal Foundation

Richard A. Simpson             Wiley Rein, LLP                    (202) 719-7000
  Counsel of Record          1776 K Street, NW
                                      Washington, DC 20006

                                      rsimpson@wileyrein.com

Party name: MARYROSE COURTNEY AND KETCHUM-DOWNTOWN YMCA

Teresa Lynn Stricker           Renne Public Law Group, LLC        4158487200
  Counsel of Record          350 Sansome Street
                                      Suite 300
                                      San Francisco, CA 94104

                                      tstricker@publiclawgroup.com

Party name: Amici Curiae California State Association of Counties and 33 California Counties and Cities

James R. Touchstone            Jones & Mayer                     714-446-1400
  Counsel of Record          3777 North Harbor Boulevard
                                      Fullerton, CA 92835

                                      jrt@jones-mayer.com

Party name: California State Sheriffs' Association, California Police Chiefs Association, and California Peace Officers' Association

Matthew Donald Umhofer          Spertus, Landes & Umhofer LLP     213-205-6520
  Counsel of Record          617 W. 7th Street, Suite 200
                                      Los Angeles, CA 90017

                                      matthew@spertuslaw.com

Party name: International Downtown Association, et al.

Kathryn J. Zoglin             Office of the City Attorney         408-535-1900
  Counsel of Record          200 East Santa Clara Street
                                      16th Floor
                                      San Jose, CA 95113

                                      katie.zoglin@sanjoseca.gov

Party name: International Municipal Lawyers Association, et al.

| | | |
|---|---|---|
| Owen Douglas Blank<br>  Counsel of Record | Tonkon Torp LLP<br>888 SW 5th Ave.<br>Suite 1600<br>Portland, OR 97204 | 5038022011 |
| | owen.blank@tonkon.com | |

Party name: Building Owners and Managers Association of Oregon

| | | |
|---|---|---|
| John C. Eastman<br>  Counsel of Record | Center for Constitutional<br>Jurisprudence<br>c/o Fowler School of Law Chapman<br>University<br>One University Drive<br>Orange, CA 92866 | 877-855-3330 |
| | jeastman@chapman.edu | |

Party name: Center for Constitutional Jurisprudence

| | | |
|---|---|---|
| Valerie Louise Flores<br>  Counsel of Record | Los Angeles City Attorney's Office<br>200 North Main Street, MS 140, 7th<br>Floor<br>Los Angeles, CA 90012 | 2139788130 |
| | vflores262@gmail.com | |

Party name: City of Los Angeles

| | | |
|---|---|---|
| Theodore Harold Frank<br>  Counsel of Record | Hamilton Lincoln Law Institute<br>1629 K Street NW, Suite 300<br>Washington, DC 20006 | 7032033848 |
| | tfrank@gmail.com | |

Party name: Stephen Eide