Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel: (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel: (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Proposed Intervenors*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>            Plaintiff(s),<br><br>        vs.<br><br>City of Los Angeles, et. al.<br><br>            Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>STATUS REPORT OF INTERVENORS LOS ANGELES COMMUNITY ACTION NETWORK AND LOS ANGELES CATHOLIC WORKER<br><br>Date: March 19, 2020<br>Time: 10:00 a.m.<br>Ctrm: 1 (1st St. Courthouse)<br><br>Complaint Filed: March 10, 2020 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Intervenors Los Angeles Community Action Network (LA CAN) and Los Angeles Catholic Worker (LACW) file this status report in advance of the emergency conference on March 19, 2020.

Intervenors share the concerns raised by Court and the Plaintiffs about the urgent need to address the growing concerns related to COVID-19. The LA Intervenors join OCCW in raising concerns about the current proposals to create emergency shelters for approximately 6,000 Angelenos, LA CAN and LACW write separately to raise concerns and points of discussion regarding the City's current and ongoing deployment of resources for the more than 21,000 individuals who will remain unsheltered under the most publicly-available information from the City of Los Angeles.

We raise these concerns now because even the most expedited plan that could be adopted by the City will take time. The City's failure, to date, to move quickly to develop interim measures to protect individuals who are unhoused has left our most vulnerable residents without protection and placed the community at risk. And many of the actions taken by the City to promote social distancing have not taken into account homeless residents' reliance on those public spaces and public resources to survive. The closure of libraries, recreation centers, restaurants, DPSS offices, and other public spaces have meant that unhoused residents have less access to bathrooms and running water. They also have almost no access to internet and electricity. On the latter point, nearly all government services are going online, but homeless people have no way to charge phones if they have them, access the internet. They are not getting vital information, and as the City does take actions, they are not communicating with the community, so information is not shared.

The City's suspension of the enforcement of Los Angeles Municipal Code 56.11(9) to require individuals to take their tents down during the day is a good start, but it was an incredibly simple and common-sense request that took weeks to effectuate. But this does not go far enough for the 21,000 individuals who remain

1

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

unsheltered right now, and the tens of thousands of people who will remain unsheltered while any resources contemplated today are deployed.

We raise the following concerns regarding the City and County's ongoing efforts:

### 1.   Continued towing of vehicles for non-essential reasons

Although more than 15,000 homeless people in Los Angeles County use vehicles for shelter, which is vital for people for purposes of social distancing, the City and County have not announced the suspension of towing for non-essential public safety reasons.  The City has announced the suspension of some parking enforcement and will focus only on certain types of enforcement, but has not agreed to stop towing vehicles for non-essential reasons, including: expired registrations, five or more parking tickets, parking on the street for more than 72 hours in one location.[1]  Intervenors are also unclear about whether the County has taken any actions to suspend this enforcement.

### 2.   Continued seizure of homeless residents' belongings

The City continues to enforce a limit on individuals' property, which they enforce through seizures and destruction, even though the COVID-19 pandemic has disrupted individuals' ability to retrieve these belongings and need these belongings now, more than ever.[2]  When belongings are seized, if not immediately destroyed, they are taken to a central location in downtown Los Angeles.  If that storage facility is closed during any further shelter-in-place orders, individuals will have no way to retrieve these belongings.  Even now, to retrieve these belongings, a person has to call the BIN to find out if property is taken and then has to travel a far distance—

---

[1] San Francisco MTA has suspended these tows to address COVID-19 concerns.

[2] The City's enforcement of this ordinance is currently being challenged, *see Garcia v. City of Los Angeles*, No. 2:19-cv-06182.  Intervenors do not raise the constitutionality of these practices here, but only express concern about the continued enforcement at this time, during the pandemic.

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

often simply too far—on mass transit, in order to obtain their belongings again.  In normal times, this is a Sisyphean task. In the middle of a pandemic, the futility of this exercise is dangerous and reckless.

### 3.  Continued dislocation of individuals during comprehensive cleanups including when cleanups are not occurring

Although the City has scaled back many government resources,[3] the City engages in CARE+ cleanups at encampments:  each cleanup requires every individual in a given area to pack up their belongings, move those belongings usually to a corner outside the cleanup zone with all other encampment residents. For the duration of the cleanup, the residents have no other place to go—they cannot set up their tents again or leave their belongings until after the cleanup is finished.

The displacement does not usually result in cleaner sidewalks—the City does not ordinarily deploy power washers or clean the sidewalks.  They do spot cleaning with bleach, which is important but also done as part of the less invasive spot cleanings done called "CARE" cleanups, which focus on trash collection and addressing public health issues, but does not require individuals to be displaced or congregate together.

The City also places notices for far more cleanups than it does in a day, which means that individuals may put their tents down, pack up their belongings, help each other move their items out of the cleanup zone and congregate together, for a cleanup that never actually occurs.

Each full CARE+ cleanup demands a significant amount of resources that could otherwise be deployed to servicing hygiene stations and portable toilets.

---

[3]The City of San Jose stopped these cleanups because of COVID-19 concerns and because of the displacement caused by the cleanups.

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

### 4. Failure to provide sufficient handwashing stations, portable toilets, showers, and other hygiene facilities at scale

The rollout and deployment of handwashing stations, toilets has begun, but it has been slow and even the current increased projections do not provide sufficient resources for current numbers of individuals living in encampments and in vehicles, who do not otherwise have access to hygiene facilities. The most recent publicly available numbers from the City are the deployment of 250 handwashing stations. This is nowhere near the scale needed to provide public health and hygiene resources to people in encampments. The City of Los Angeles is approximately 500 square miles and individuals in encampments are spread out throughout Los Angeles and throughout the County.

Intervenors are also concerned that the current plan will not provide for adequate service to these stations, especially while the City continues to deploy sanitation resources to conduct resource-intensive comprehensive cleanups and seize belongings.

### 5. Failure to make existing public hygiene facilities open 24 hours a day

The City has restrooms with sinks and running water in public parks throughout Los Angeles, but many are closed during the day, and all are closed at night. The City Council defeated a motion that would have kept public and government buildings, parks, libraries and other resources open and instead, opted to study the feasibility of doing so. Park restrooms do not need to be studied. They can just be opened.

### 6. Continued Enforcement and Prosecution of Quality of Life offenses

Intervenors understand that enforcement of low-level quality of life offenses associated with homelessness, like sleeping on the sidewalk are down, but not suspended. Also, the Los Angeles Superior Court has suspended many day to day operations, but to date, has not suspended arraignments or cases for traffic tickets,

4

which in LA County and the City of Los Angeles, includes low-level infractions for quality of life offenses like sitting on the sidewalk.  To our knowledge, the City Attorney's office has not dismissed or continued the prosecution of quality of life offenses. The City Attorney's office could dismiss or suspend prosecution of these offenses during the emergency declaration. Suspension during this time of emergency would obviate the need for vulnerable populations to take public transit in order to congregate in courthouses, and free up city resources for more emergent tasks.

### 7. Failure to Account for Unhoused Residents in Planning for Changes at Department of Public Social Services (DPSS)

Yesterday, the DPSS announced that they were closing all DPSS offices throughout LA County, which provides General Relief and Calfresh (foodstamps). The only options for service are now to go online or make phone calls, but as discussed above, the closure of libraries, recreation centers, restaurants, etc., has made it impossible for individuals to charge their phones or access online services. Also, many unhoused residents use DPSS as their address for the delivery of mail, including notices, reporting packets, and EBT cards.  The County has not stated it will suspend termination of benefits, reporting requirements, or work requirements, and we are unaware of plans to accommodate individuals who use DPSS for their mail, including how people will get emergency benefits and their EBT cars delivered.

### 8. Failure to account for the loss of resources related to internet and phone access

With the closure of libraries, restaurants, and other places in public, individuals who are unhoused are struggling to charge phones and get access to the internet, which means they have no access to vital information about the pandemic and cannot access services that are increasingly moving online and to the telephone.

5

**Needed Action Items**

At a minimum, in order to address the emergency needs of unhoused residents who are currently homeless, while the City develops a more inclusive strategy to provide shelter, we request the City and County take the following actions:

1. Suspend towing of vehicles unless necessary for emergent public safety and waive fees and release vehicles if people are can demonstrate the vehicle is used for shelter;

2. Suspend enforcement of property limits that lead to seizure and destruction of vital property without mechanisms to retrieve those belongings;

3. Suspend encampment cleanups that lead individuals to congregate, unless the cleanup includes power washing or other services for which displacement is necessary;

4. Open all park bathrooms and other public bathrooms 24 hours a day, seven day a week;

5. Deploy all public health resources like hygiene stations and toilets at scale and provide services to ensure they are stocked;

6. Suspend enforcement of quality of life offenses that result in citations and court appearances and dismiss or continue existing court cases;

7. Ensure continued access to emergency, subsistence benefits from the county:
   a. Provide an access plan that accounts for lack of internet and phone service and provides for the delivery of DPSS mail (especially for people who are applying for expedited benefits)
   - Confirm that all terminations of county benefits will be suspended
   - Suspend SAR 7/QR 7 reporting, work requirements, requirement to recertify work exemption and medical need to receive benefits
   - Waive the requirement to apply for other benefits before applying for GR/Calfresh

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

8.  When closing public spaces, access and account for the impact on unhoused residents, including the decrease in public restrooms, running water, internet and electricity.

Dated: March 18, 2020

Respectfully submitted,
Legal Aid Foundation of Los Angeles


_____/s/ Shayla Myers_____
Attorneys for Proposed Intervenors


Schonbrun Seplow Harris & Hoffman LLP


_____/s/Catherine Sweetser_____
Attorneys for Proposed Intervenors


Law Office of Carol A. Sobel


_____/s/ Carol A. Sobel_____
Attorneys for Proposed Intervenor

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATUS REPORT FROM LOS ANGELES INTERVENORS**