Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

| | |
|---|---|
| Shayla R. Myers (SBN 264054) | Catherine Sweetser (SBN 271142) |
| **LEGAL AID FOUNDATION OF LOS ANGELES** | **SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP** |
| 7000 S. Broadway | 11543 W. Olympic Blvd. |
| Los Angeles, CA 90003 | Los Angeles, CA 90064 |
| Tel: (213) 640-3983 | Tel:  (310) 396-0731 |
| Email: smyers@lafla.org | Email: catherine.sdshhh@gmail.com |

*Attorneys for Proposed Intervenors*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br>    Plaintiff(s),<br>vs.<br>City of Los Angeles, et. al.<br>    Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br>Hon. David O. Carter<br>Courtroom 1<br><br>STATUS REPORT OF INTERVENORS LOS ANGELES COMMUNITY ACTION NETWORK AND LOS ANGELES CATHOLIC WORKER<br><br>Date: March 26, 2020<br>Time: 10:00 a.m.<br>Ctrm:  Offsite<br><br>Complaint Filed:  March 10, 2020 |

Intervenors Los Angeles Community Action Network (LA CAN) and Los Angeles Catholic Worker (LACW) file this status report in advance of the emergency conference on March 26, 2020.

The Los Angeles Intervenors recognize and appreciate the gravity and enormity of the City and County's task, as it attempts to slow and control the spread of COVID-19 across a population of millions. Their efforts to date are unprecedented and remarkable, and Intervenors are grateful for the leadership shown by City and County officials to take incredibly difficult steps to mitigate the harm caused by the Pandemic. Intervenors are especially grateful for the decision by the City of Los Angeles to suspend towing of vehicles, stop enforcement of provisions of LAMC 56.11 related to the daytime use of tents, and suspend comprehensive cleanups at encampments. These actions will undoubtedly save lives.

Intervenors write separately to provide further resources and information to the Court regarding the impact of COVID-19 on unsheltered residents. These public health resources make abundantly clear that more urgent and comprehensive actions are necessary to slow the spread of the disease and to the extent possible at this point, decrease the impact amongst homeless residents.

### 1. Additional Public Health Information and Guidance Related to Controlling the Spread of COVID-19 to People who Unsheltered

There is no question that public health decisions must be guided by considerations of the best public health information available, including guidance by the Centers for Disease Control and Prevention and the local Department of Public Health. In addition, there is significant expertise related to the public health needs of individuals who are unsheltered  We attach the additional resources for the Court and parties, which focus specifically on the impact of the looming crisis on homeless residents, as well as the impact that the continued lack of resources and social distancing for unsheltered residents will have on the ongoing efforts to control the spread.

- **Exhibit A**. Estimated Emergency and Observation/Quarantine Capacity Need for the US Homeless Population Related to COVID-19 Exposure by County; Projected Hospitalizations, Intensive Care Units, and Mortality
- **Exhibit B**. Letter to Mayor Eric Garcetti and Council President Nury Martinez in Support of Measures Against COVID-19;
- **Exhibit C**. Open Letter: 100 Medical Experts Advocate for More Hotels for the Unhoused, and Quickly, published March 24, 2020

Exhibit A is a study conducted by the leading public health experts on homelessness at the University of Pennsylvania, UCLA, and Boston University, provides projections of infection, hospitalization, and fatalities specifically for homeless residents, with a focus on New York and Los Angeles. The projections found that over four present of the unsheltered homeless population would likely need hospitalization at the height of the impact of the pandemic, and provided guidance related to the need for true social distancing, greater support for encampments, and the use of hotels and motels to address the ongoing catastrophe.

Exhibit B is a letter from medical professionals in Los Angeles, who have reviewed and recommended the City follow many of the suggestions outlined by Intervenors in their previous status report, including actions taken by the City to date, such as stopping comprehensive cleanups of encampments and towing vehicles used by individuals to shelter in place. The experts also call on the City, first and foremost, to provide hotels and motels to unsheltered residents.

Exhibit C is an open letter published by 100 doctors in San Francisco, unequivocally calling on local government to prioritize making hotels and motels available to unhoused residents, "both to avoid mass illness and to provide this most basic need," given that "[l[ack of housing is ruinous to health." Exh. B. at 2.

**2. The City and County Must Prioritize Providing Hotels and Motels**

Intervenors share Plaintiffs' sense of urgency regarding the need for more hotels and motels to be brought online immediately, and more importantly, that

urgency is shared by Public Health experts who are calling on local officials to take urgent action to house individuals in vacant hotels and motels.  The public health experts in Exhibits A-C all agree that hotels and motels provide the best chance for preventing the spread of the virus.  *See e.g.*, Exh. A at 10 ("the ideal scenario would involve private accommodations for all clients [which would] dramatically reduce the likely transmission of disease relative to congregate shelters.")  As the 100 medical professionals in San Francisco made clear, the City and County must "recognize that the landscape of public health has changed completely.  We need to put our resources toward the interventions that work." Exh. C at 2.[1]

### 3. Public Space at The Recreation Center Shelters Could Be Opened to Allow Individuals to Shelter In Place Outside

While the City and County move to bring more hotels and motels online, Intervenors strongly support the opening of the public spaces at the recreation center shelters to allow more individuals access to the resources that are being deployed to these shelters and to allow individuals more opportunity to achieve the CDC's recommended 12 foot x 12 foot distance between tents and have access to necessary hygiene and sanitation.[2]

The City has undertaking the incredible task of standing up 42 shelters for unhoused residents.  It has made the sound and undoubtedly life-saving decision to scale back the number of beds at those shelters, but doing so means far less residents will be able to access the medical care, sanitation and hygiene services, and food and

---

[1] San Francisco is reportedly bringing 8,500 rooms online, see Exh. A at 10, even though they have approximately one third of the number of hotel rooms of Los Angeles County.

[2] The City has added 350 handwashing stations and significantly more public toilets, but these resources do not come close to reaching the scale necessary to provide hygiene to all individuals.  This is especially true since intervenors have significant anecdotal evidence, echoed by media reports, that many of the stations have been out of water or soap.

water that is being stood up along with the shelters. Since the shelters have less capacity per square foot than anticipated, we strongly urge the City to make use of the considerable public space surrounding the shelters for unhoused residents to camp safely and to take advantage of the sanitation, medical, and food resources available at the new recreation center shelters. Attached as Exhibit D are aerial views of the 13 recreation centers, which show the capacity to expand the reach of these shelters to include more individuals than the current shelters will provide.

Opening this public space temporarily will allow individuals to shelter in place in closer proximity to resources and with adequate space for social distancing—a task that is often challenging, especially given that there has been a reduction in useable sidewalks and public spaces caused by planters and other obstructions placed in public rights of way throughout Los Angeles. In these spaces, the City can be able to provide those who want to come onto the campground the opportunity to shelter in place near food, hygiene services, internet.

If the City moves forward with this plan, it must do so in a way that protects the public health and civil rights of all residents, including by the following:

- Moving to the recreation centers must be voluntary and cannot be used to clear encampments in neighborhoods where there is pressure by housed residents to do so. That would be directly contrary to the Centers for Disease Control and Prevention guidance, as well as run the risk of violating individuals' civil rights. Moreover, as shown by the shelters, there is more than enough demand for this resource. Individuals who want to take advantage of the resources must be allowed to do so, without coercion or criminalization.
- The public spaces need to be configured to allow adequate social distancing. Public spaces have the benefit of allowing individuals to use their tents to create barriers between residents that are not being deployed in the shelters.

- Individuals need to have access to hygiene services, medical screenings, and food and water.
- Individuals must not face any greater restriction than any other Angeleno sheltering in place consistent with state and local Safer at Home orders.

Intervenors also encourage the City to make public parks, open spaces and all vacant lands and buildings available for individuals in encampments to spread out and social distance. This is especially critical and easy to achieve in public parks and open spaces near existing encampments There are a number of large encampments crowded onto sidewalks in communities throughout Los Angeles. These individuals cluster together to abide by laws related to park closures, clear passage on sidewalks, and other laws regulating the use of public spaces.

The City can and must allow individuals in those encampments to spread out into available public spaces, in order to maintain the requisite 12 feet by 12 feet of social distancing. Doing so would achieve this result without breaking up encampments and dispersing people into communities.

**4. Ensure Testing Resources Are Prioritized For Congregate Spaces And Public Health Matrixes Account For Homeless Residents' Accelerated Physical Decline And Lack Of Access To Healthcare**

As testing becomes available, the City and County must make critical decisions regarding who needs the testing the most. The matrixes that are being developed must take into account the increased vulnerability of unhoused residents.

First, the City must prioritize testing resources for congregate shelter settings. to ensure that, if any individuals test positive, the individual is isolated and entire community is quarantined, consistent with the most recent Los Angeles County order.

Second, any criteria that is being developed regarding testing, quarantine, and isolation, must account for the fact that, as outlined in Exhibit A, unhoused residents

5

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

have "accelerated physical decline" as a result of the harsh conditions in which the live. Exh. A at 2.  "Homeless individuals are admitted to hospital with medical-surgery conditions 10-15 years earlier than comparable, housed individuals, and with age-related impairments typical of housed residents 20 years older."  Exh. A, 2-3. Unhoused residents, who are unsheltered from particulates in the air and more impacted by wildfires and pollution, have greater instances of obstructive pulmonary disease, which makes them particularly susceptible to complications related to COVID-19.  *See* Exh. A at 3 (studies of homeless populations have observed pulmonary disease prevalence between 20-30%, compared to 10% of general adult population).  Based on the modeling outlined in Exhibit A, unhoused residents are 50-54 have the same projected hospitalization, critical care, and fatality as housed residents who are 65 and older.  *See* Figure 1, Age-specific risk and vulnerability assessments for resources, especially testing, must include homelessness in accessing risk.

In addition, testing assessments based on medical conditions must take into account that unhoused far less likely to have access to consistent medical care, which means that, although they are more likely to have chronic underlying medical conditions that put them at risk of these conditions, they may not be diagnosed as having these conditions.  This is exacerbated by the racial disparities and discrimination that has been documented to exist in the medical system; Black Americans are less likely to be properly diagnosed as having often life-threatening conditions, which in turn leads to markedly worse health outcomes.  Unhoused residents are disproportionately Black and people of color.  Studies have repeatedly found that people of color, and especially Black individuals are far more likely to have conditions that are undiagnosed by the medical community.  Amongst unhoused residents, Black individuals' vulnerability is less likely to be assessed accurately and is more likely to be underestimated, leaving Black Angelenos less likely to receive medical resources.

These factors must be accounted for in every vulnerability matrix that is developed to establish priorities for access to scarce resources such as testing and isolation/quarantine spaces.

Dated: March 26, 2020
Respectfully submitted,
Legal Aid Foundation of Los Angeles

　　　/s/ Shayla Myers　　　
Attorneys for Intervenors


Schonbrun Seplow Harris & Hoffman LLP

　　　/s/Catherine Sweetser　　　
Attorneys for Intervenors


Law Office of Carol A. Sobel

　　　/s/ Carol A. Sobel　　　
Attorneys for Intervenors

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

_____

**STATUS REPORT FROM LOS ANGELES INTERVENORS**