```
 1            IN THE UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3     _____

 4     LA ALLIANCE FOR HUMAN RIGHTS,

 5     et al.,

 6           Plaintiffs,                    Case No.

 7        v.                                2:20-cv-02291-

 8     CITY OF LOS ANGELES, et al.,         DOC-KES

 9           Defendants.

10     _____

11                      HEARING

12     DATE:          Thursday, May 7, 2020

13     TIME:          10:03 a.m.

14     BEFORE:        Honorable David O. Carter

15     LOCATION:      Alexandria Hotel Ballroom

16                    501 South Spring Street

17                    Los Angeles, California 90013

18     REPORTED BY:   Austin Che, Notary Public

19     JOB No.:       4107129

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1                    A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFFS:

 3        ELIZABETH MITCHELL, ESQUIRE

 4        Spertus Landes & Umhofer, LLP

 5        617 West 7th Street, Suite 200

 6        Los Angeles, California 90017

 7        emitchell@spertuslaw.com

 8        (213) 205-6520

 9

10        MATTHEW D. UMHOFER, ESQUIRE

11        Spertus Landes & Umhofer, LLP

12        617 West 7th Street, Suite 200

13        Los Angeles, California 90017

14        matthew@spertuslaw.com

15        (310) 826-4700

16

17   ON BEHALF OF DEFENDANT CITY OF LOS ANGELES:

18        SCOTT MARCUS, ESQUIRE

19        City of Los Angeles

20        200 North Main Street, Room 700

21        Los Angeles, California

22        Scott.Marcus@lacity.org

23        (213) 978-4681

24

25
```

Page 2

```
 1                 A P P E A R A N C E S  (Cont'd.)

 2    ON BEHALF OF DEFENDANT COUNTY OF LOS ANGELES:

 3          BRANDON D. YOUNG, ESQUIRE

 4          Manatt, Phelps & Phillips, LLP

 5          11355 West Olympic Boulevard

 6          Los Angeles, California 90064

 7          bdyoung@manatt.com

 8          (310) 312-4181

 9

10    ALSO PRESENT:

11          Judge Andre Birotte, Jr.

12          Lauren Black

13          Joe Buscaino, Los Angeles City Council

14          Heidi Marston, Los Angeles Homeless Services

15              Authority

16          Michele Martinez

17          Nury Martinez, Los Angeles City Council

18          Byron McLain, County of Los Angeles

19          Christina Miller, City of Los Angeles

20          Shayla Myers, Legal Aid Foundation of Los Angeles

21          Jeff Newman, Caltrans

22          Carol Sobel

23          Brooke Weitzman

24          Unidentified Male Speaker

25          Unidentified Female Speaker
```

Page 3

```
 1                        I N D E X

 2    WITNESS(ES):                      DX    CX    RDX   RCX

 3

 4                     (None taken.)

 5

 6

 7                   E X H I B I T S

 8    NO.            DESCRIPTION                     PAGE

 9

10                    (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                           Page  4
```

```
 1                    P R O C E E D I N G S
 2               THE COURT:  All right, then.  We're on
 3      the record.  Judge Birotte joined by this Court today.
 4      A little bit more formal session.  After our initial and
 5      preliminary discussions today, we'll be back in federal
 6      court as quickly as possible -- as soon as the federal
 7      court opens up.  It's going to become much, much more
 8      formal.  Michelle, will you ask the United States
 9      Marshal to step in, along with the -- I'd like to pay my
10      respects to the Marshal's office today.
11               I'd like to begin the Court's session
12      this morning by honoring the United States Marshals
13      presence.  So, Inspector Marshal of the day, would you
14      step forward, sir?  And also joined today is Marshal
15      Quan.  If you notice, Cooper is the dog and Cooper has
16      done a search of all of you coming in.  I'm just kidding
17      you.  But Cooper is our security and bomb dog.  And I
18      want to thank both of you for being here as well.
19      Marshal Darcey, it's a pleasure to see you again, with
20      all the trials we've been in together.  And I want to
21      honor you, and as well as Marshal Diaz.  Marshal Diaz,
22      thank you very much.  So, you'll be our security for
23      today and throughout the rest of the proceedings,
24      because we're going to become much, much more formal.
25               Although Judge Birotte and I are not
```

Veritext Legal Solutions
866 299-5127

1    wearing a robe today, we're going to step up the

2    formality of the Court, and we're returning to federal

3    court as quickly as possible.

4              Each of you pledged to me that you would

5    have the ability to make a decision today.  Is that

6    correct?  I don't believe it.  I'll put that on the

7    record.  I think you're going to have to call somebody.

8    So, I want you to look around and notice who is not

9    here.  And by me not mentioning those names, I'm not

10   going to embarrass anybody.  But I can assure you the

11   next time those people will be invited, or if an answer

12   is filed they will be formally ordered to court.

13   Because if we get into these negotiations, preliminarily

14   I understand why persons might not want to be here.  But

15   the lawyers, in the long run, will not control this

16   process.  You'll enter into the discussion, but this

17   will be through the principals involved.  So, I expect

18   you to keep them absolutely informed at all times.  So,

19   if I reach out or they reach out to me, they're

20   knowledgeable.  And that's an affirmative nod by

21   everybody in this room.  Okay.

22              Now, the advocates are here in person.

23              MS. MICHELE MARTINEZ:  A little closer.

24   We can't hear.  We can't hear.

25              THE COURT:  All right.  So, first, I'm

                                                    Page 6

```
 1    going to start with something that I'm very, very
 2    appreciative of, and that is the hard work by Carol
 3    Sobel and by Mayor Joe -- I know him as Mayor Joe so,
 4    Mayor Joe, come on up for just a moment.  I can attest
 5    to the hours that they spent on Zoom, along with Judge
 6    Smith, who is supposed to be on Zoom, and this is
 7    actually the formality and the Court's acceptance today
 8    of the Whittier settlement.  On the last occasion, the
 9    council and the advocates had represented that this had,
10    in fact, taken place.  But they worked extraordinary
11    hard to secure all the signatures.  So, just a few brief
12    words from Mayor Joe, because you're sitting out,
13    because -- come forth with the settlement.
14              MR. VINATIERI:  Thank you.  May it please
15    the Court, ladies and gentlemen, if there's any
16    questions where I'm from, I'm Whittier -- the mayor of
17    the city of Whittier.  I'm very pleased to be here
18    today, because we have a final settlement agreement
19    that's been signed by all the parties, and has taken
20    many months to happen.  And today is a very important
21    day for the residents -- all residents of the city of
22    Whittier, because we are stepping up as a city, Your
23    Honor, and we're making a statement that they're going
24    to take care of all the people, all the people of our
25    city.
```

Veritext Legal Solutions
866 299-5127

```
 1                    We very much appreciate the leadership,
 2      the guidance, of the mayor of the city of Bellflower,
 3      Juan Garza, who basically showed us the way.  We are the
 4      second city in the county of Los Angeles to enter into
 5      the settlement agreement.  We are responding to our
 6      residents' needs, and ensuring that their quality of
 7      life is maintained in our parks, our public spaces, and
 8      we're looking forward to actually getting our navigation
 9      center up and running very shortly.
10                    We very much want to say thank you to the
11      active support of Judge Smith, Judge Carter, Michele
12      Martinez.  We say thank you to Carol and to Brooke for
13      their willingness to talk about these critical issues,
14      and have lots of long negotiations that have now brought
15      a solution that's both financially feasible and ensures
16      the stable services in Whittier former residents who are
17      experiencing homelessness.
18                    I want to encourage everyone here, the
19      County of Los Angeles, the City of Los Angeles -- again,
20      the County of Los Angeles and the City of Los Angeles,
21      to be part of this process.  It's long.  It's arduous.
22      It takes time and commitment and resolve.  But ladies
23      and gentlemen, it's worth it.  Thank you so very much,
24      Your Honor.
25                    THE COURT:  Thank you very much.  All
```

```
 1    right.  I'm going to formally accept this settlement

 2    document at this time, and I'm going to order that it be

 3    docketed under 18-cv-00155.  And Gary or Carol, if you

 4    could formally docket that with the Court, I would

 5    appreciate that.  I've also got the signed copy.  And

 6    once again, I want to very humbly than, you.  That was a

 7    long, arduous, well thought out process, with a lot of

 8    agreements, but a lot of disagreements that took a lot

 9    of courage on both of your parts.

10               I want to say, going into this, that what

11    you've accomplished is -- we'll talk about the extremes

12    the later on, the 5 percent, the 10 percent that we're

13    going to bicker about and be concerned about.  And we

14    should, on both sides.  But there -- the vast majority,

15    the 60 to 70 percent of these people seeking shelter,

16    humbly wanting to get a roof over their head, and for

17    the betterment of the community -- and I'm going to

18    constantly ask through this process, what are we able to

19    show to our citizens along the way also about some

20    progress in the common person's life in a community

21    that's measurable and seeable and doable, as we also

22    discuss the compassion that we need for the homeless.

23    So, there's the public also deserves to have credit in

24    this, and our continued support, because we can produce

25    the document.  So, I humbly believe that we're going to
```

```
 1    end up, if we can reach agreements in the next few days
 2    or few weeks, with 60 to 70 percent of the people who
 3    just humbly want to come into shelter, that will take
 4    care of our neighborhoods, treat the homeless with
 5    compassion, and what I hope is that we do not get bogged
 6    down with the 5 percent, et cetera, and if we do that we
 7    can reach some kind of accommodation to narrow those
 8    numbers and to treat them with better resources.
 9                    Now, I'm going to bring forward a couple
10    people.  But, I want to read to you just for a moment,
11    and I'm going to read slowly for a change, for the court
12    reporter:
13          "Let's call it what it is -- a disgrace -- that the
14          richest state in the richest nation, succeeding
15          across so many sectors, is failing to properly
16          house, heal and humanely treat so many of its own
17          people.  Every day, the California Dream is dimmed
18          by the wrenching reality of families, children and
19          seniors living unfed on a concrete bed.  Military
20          veterans who wore the uniform of our country in a
21          foreign land, abandoned here at home.  LGBTQ youth
22          fleeing abuse and rejection from their families and
23          communities.  Faces of despair.  Failed by our
24          country's leaders and our nation's institutions.
25          As Californians, we pride ourselves on our
```

```
 1          unwavering sense of compassion and justice for
 2          humankind -- but there's nothing compassionate
 3          about allowing fellow Californians to live on the
 4          streets, huddled in cars or makeshift encampments.
 5          And there's nothing just about sidewalks and street
 6          corners that aren't safe and clean for everybody.
 7          The problem has persisted for decades -- caused by
 8          massive failures in our mental health system and
 9          disinvestment in our social safety net --
10          exacerbated by widening income inequality and
11          California's housing shortage.  The hard truth is
12          we ignored the problem.  We turned away when it
13          wasn't our sister, our brother, our neighbor, our
14          friend.  And when it was a loved one, help wasn't
15          there.  Most of us experienced homelessness as a
16          pang of guilty, not as a call to action.  It became
17          normalized.  Concentrated in skid rows and tent
18          cities in big urban centers.  Now it's no longer
19          isolated.  In fact, some of the most troubling
20          increases have occurred in rural areas, in small
21          towns, and remote parts of our state.  No place is
22          immune.  No person untouched.  And too often, no
23          one wants to take responsibility.  I've even heard
24          local officials proclaim in public it's not my
25          problem.  Servants of the public too busy pointing
```

```
 1            fingers to step up and help.  That's shameful.

 2            Black Californians alone comprise 8 percent of Los

 3            Angeles's population -- but 42 percent of its

 4            homelessness.  And a recent poll found nearly half

 5            of Latinos in the state are afraid that they or

 6            their family could become homeless.  We have also

 7            directed Caltrans to make better use of other

 8            unoccupied spaces to get homeless housing up as

 9            fast as possible.  Because you can't manage what

10            you don't measure, it's time to start measuring.

11            It's time for our failed policy of not my problem

12            to be replaced by one shared responsibility across

13            every sector and every community.  Of course, the

14            fundamental building of California's solution has

15            to be more housing.  But now our imperative must be

16            bringing governments together as working partners,

17            not sparring partners in a court of law.  I don't

18            think homelessness can be solved.  I know

19            homelessness can be solved.  That's our cause.

20            This is our calling.  Let us rise to the challenge

21            and make California stand as an exemplar of what

22            true courage and compassion can achieve.  Let's get

23            to work."

24                    Humbly, I say that I wish I could have

25      written something like that.  But that's from the
```

Page 12

```
 1   governor of the state of California.  That's in his

 2   State of the State address, a call to action.  I think

 3   we could substitute that for all of us here in Los

 4   Angeles as a call to action.

 5              The second thing I'd like to say before

 6   we really get started with the hard work is that I want

 7   to thank all of you.  I can be pretty abrupt and pretty

 8   abrasive, and if I've been I want to humbly apologize to

 9   you.  We're working 24 hours a day, just like you are.

10              By the same token, I don't have any

11   tolerance for inertia.  I'm not going to spend my time,

12   if we can't get down to basic, simple, readable, doable

13   documents.  And so, I want to start on a very positive

14   note and thank all of you in this action for having

15   demonstrated a very enlightened approach to addressing

16   the issues before us.  The agreement of all of you as

17   parties that the Court would be allowed and encouraged

18   to engage in ex parte communication, with Judge Birotte

19   and myself and others, and nonparties, in pursuit of a

20   humane and efficient solution to these problems created

21   by homelessness has really enabled both of us, and our

22   colleagues to acquire a much better understanding of the

23   issues presented than would be possible in a more

24   conventional framework.

25              So, from the beginning I've said to you
```

Page 13

1    that you're going to come to see the federal court

2    anyway.  You normally come to see us when it's too late.

3    The problem has occurred, you're suing over a past harm,

4    and this is a much different solution.  Because by

5    working together on the front side, hopefully we can

6    achieve so much more than we can on the back side, when

7    the Court is giving you direction two years after the

8    problem even occurred.

9              I want especially to begin by thanking

10   Nury Martinez, who is here, who is the president of the

11   Los Angeles City Council, and the vice chair Joe

12   Buscaino -- but all of their colleagues.  In visiting

13   with each one of these colleagues and spending a

14   significant period of time in each of their districts, I

15   can't tell you how humbled I am by their description of

16   their district, their problems, and their vision of what

17   they believe should occur.  And by the way, they're not

18   here in front of me.

19             So, the wonderful thing about all of us

20   in Los Angeles is the mosaic, our differences, that

21   bring this great city together.  But that's also, in a

22   sense, a partial weakness.  And that is, how do you get

23   15 districts moving together.  And we're going to

24   discuss that today in terms of process and procedure,

25   right at the beginning of our substantive discussion.

Page 14

```
 1                    So, I also want to thank Kathryn Barger
 2      and the Board of Supervisors, and pay an equal
 3      compliment.  She's been responsive on every phone call
 4      between Judge Birotte, who also has a very close and
 5      personal friendship with her and the Court.  And I also
 6      want to humbly thank Mayor Garcetti.  I want to
 7      especially say on the record that I know that there has
 8      been an effort on the mayor's part for 15,000 units, et
 9      cetera.  I know that he is as of -- well, I call it the
10      Garcetti hour, but 24 shelters 87 percent capacity, 900
11      people in your rec centers, 505 recently acquired hotel
12      spaces in Operation Roomkey, a 25 percent jump,
13      according to my notes.  2,700 rooms countywide, a new
14      hotel that was added with 450 rooms, close to the
15      epicenter of Skid Row.
16                    Before anybody gets on a level of
17      criticism, the Court wants to step up and compliment the
18      mayor and compliment this courageous council.  Because
19      this is success.  It may be incremental.  It may not be
20      fast enough, because this problem got created over 20 or
21      30 years of neglect.  And it's been put on this
22      generation to try to solve this in such a short period
23      of time.  So, you're not going to hear from this Court a
24      complaint thus far about the speed, except we'll discuss
25      that privately.  Okay.
```

Page 15

1               Lastly, before I turn this over to,

2     first, the chair and president of the council, one of

3     the advocates said -- and this isn't too much of a

4     breach of the settlement -- any long-term plan for

5     addressing people experiencing homeless in the Los

6     Angeles region has to include a variety of alternatives,

7     and it must involve clear timelines for achieving

8     objectives without breaking any of your confidential

9     agreements and submissions to the Court.  As late as

10    last night at 10:00, every one of you said the same

11    thing in every document written to the Court.  And that

12    is you need a metric.

13               And I'm going to ask you how that metric

14    can possibly occur without a settlement.  Because if the

15    courts are involved, your metric is us writing a

16    decision about bulky items, or trash.  Where is your

17    metric in that.  The only metric that you're going to

18    ever have with the Court's help is a metric through a

19    settlement process.  And if you enter into an agreement,

20    I know Judge Birotte and this Court, and I'm pretty sure

21    Judge Gutierrez and I hope Dolly Gee, and a lot of our

22    colleagues are going to make you honor that.  So,

23    therefore, we're serious if you're serious.  So, when we

24    discuss this this has to be measurable, definable, and

25    it has to have the weight of the Court to make that

                                                   Page 16

```
 1    happen.  And if not, tell me.
 2                 The final thing is this.  If, in fact,
 3    you are inertia bound, if you are here to tell me either
 4    why you can't do it or why we're going to send it back
 5    to a committee for the rest of my natural life, and
 6    study it to death, then I'm not interested.  And let me
 7    repeat that.  And I don't think Judge Birotte is
 8    interested.  Are you?
 9                 JUDGE BIROTTE:  No.
10                 THE COURT:  I don't think Judge Gonzalez
11    is interested.  I don't think the federal court is
12    interested.  So, when I hear that your districts are
13    going to be redrawn in two years, and there might be a
14    district different -- nonsense.  It's now.  And I have
15    never seen a council come together with this kind of
16    leadership and courage.  I've never heard from a mayor
17    in the country calling for a FEMA-like approach.  I have
18    never had the leadership -- and this is not denigrating
19    Orange County, but never had the leadership that I've
20    seen with your supervisors coming together and saying to
21    all of us get it done.  It won't be pretty, but get it
22    done.
23                 So, if you can't get it done at any time
24    in these discussions, just put it on the record.  Say I
25    can't represent so and so, I give up, the problem is too
```

Page 17

```
 1   big for me and my group.  Therefore, inertia -- just
 2   make that statement.  But make it on the record for me,
 3   because I know you can get it done.
 4              Now lastly, I'll say this.  We're a mess.
 5   But that on the record, M-E-S-S.  We have such well-
 6   intentioned people in this county that I'm astounded at
 7   who you are.  I'm very complimentary.  But you are so
 8   stovepiped and so silent in our bureaucratic maze that
 9   I'm astounded that you got anything built or any
10   resolution.  And it's a real compliment to what you've
11   been able to achieve thus far.  And somehow, that has to
12   get broken.  And so, we're going to have some very blunt
13   discussions about that in a myriad number of ways.
14   Because I don't see that one entity that's able to take
15   all of your good intentions and break down all of those
16   barriers with the force of a hammer, quite frankly.
17              Now, I want to especially compliment the
18   president and vice chair.  I'll tell you, president --
19   if it's okay, Nury -- but, if you'd come up here a
20   moment -- well --
21              MS. NURY MARTINEZ:  Yeah.  Sure.
22              THE COURT:  Yeah, well, the pandemic is
23   supposed to be over, so --
24              MS. NURY MARTINEZ:  Do you want me to --
25              THE COURT:  Yeah.  You don't have to
```

Page 18

```
 1    touch it.  There.
 2                 MS. NURY MARTINEZ:  There you go.  Do you
 3    want me to take --
 4                 THE COURT:  I want you to be wherever you
 5    want to.  You're the president -- the chair.
 6                 MS. NURY MARTINEZ:  Can everyone hear me?
 7    First off, I want to thank -- I wanted to take the
 8    opportunity to say thank you to Judge Carter for your
 9    active engagement on this crisis.  We are here today
10    with the hope of beginning a fair dialogue and a robust
11    debate.  We are here with the hope that we will
12    establish a path forward that will uphold all collective
13    obligations to both help those suffering from
14    homelessness as well as ensuring conditions for many of
15    our neighbors are improved.  And frankly, we are here
16    today because of your direct involvement, your desire to
17    roll up your sleeves, walk street by street in our
18    communities, and talk to so many people.  And for
19    pushing for change and pushing everyone on all sides
20    well past their comfort levels.  Because that's what
21    real solutions look like.  So, thank you, Judge Carter.
22                 It is my hope that we can capitalize on
23    the opportunities with this brief -- this gift to
24    finally establish a true tangible path forward that in
25    -- always and in all directions is fair and complete to
```

Veritext Legal Solutions
866 299-5127

```
 1    everyone involved.

 2                I've been on the city council since 2013.

 3    And every day since then, I gain -- I've seen the

 4    impacts that this homelessness crisis has had on

 5    everyone, from the people who are living on the streets

 6    to children in motels and chairs, and it's devastating.

 7    This is no way to live.  And I've seen many of my

 8    colleagues so committed to doing the right thing,

 9    struggle to do enough, struggle to make impact, and

10    struggle with the sense that no matter what you do it's

11    simply not enough.

12                It has been incredibly frustrating to see

13    not everyone, and not every neighborhood, do its fair

14    share.  It's been painful to see so many disadvantaged

15    neighborhoods -- the same neighborhoods that have

16    historically stepped up and said yes to affordable

17    housing, supportive housing, and shelters -- I've seen

18    those communities got a raw deal.  They've gotten a raw

19    deal because while they say yes to their

20    responsibilities, lawsuits and policies have resulted in

21    gridlock and limited and precious public space for our

22    neighborhoods.  We cannot address vehicle dwelling,

23    camping rules, or overflow of personal belongings, and

24    we cannot implement adequate cleanup methods to

25    effectively protect public health and maintain our
```

Page 20

1    public right of way.

2                    And worse, it often feels that at the

3    city level we're in this alone.  Housing and shelter is

4    clearly needed, and we cannot deny that.  But mental

5    health, addiction are just as critical.  And yet, it's

6    hard to really see any meaningful action, progress or

7    financial investment to adequately address this

8    underlying issue moving forward anytime soon without the

9    county, state and federal involvement.  We cannot begin

10   to address all of this if we're not willing to address

11   mental health and drug addiction, to be able to finally

12   stop this crisis.  And our neighborhoods will continue

13   to shoulder the burden.

14                    NIMYBism has led to other communities

15   avoiding their responsibilities to do their fair share.

16   And because collectively not enough has been done,

17   encampments are not being cleaned, kids can no longer

18   walk to the park or libraries, and folks who clearly

19   need mental and drug addiction assistance are being left

20   to die in our streets.  And each one of these things is

21   heartbreaking and devastating, and it should not be

22   happening.

23                    Frankly, communities that are willing to

24   do their fair share are create -- or not -- I'm sorry,

25   frankly, communities who are not willing to do their

```
 1    fair share are creating undue harm on communities that
 2    are stepping up.  Neighborhoods that say yes to
 3    solutions, by building housing and shelters,
 4    neighborhoods that have said yes to helping their fellow
 5    Angelenos, now have an undue concentration of RVs and
 6    encampments taking over their streets.  Yet, when these
 7    communities say enough is enough, when these communities
 8    question why other parts of town don't do their fair
 9    share, they are often shamed, Judge Carter.  They are
10    often shamed for not being compassionate enough.
11              And let's just state the obvious.  Over
12    the years, it's been black and brown working class --
13    the working poor communities who have always said yes,
14    while more affluent communities have had enough money,
15    power and influence to say no, not in my neighborhoods.
16    And that has to change.  I have grown frustrated because
17    the compassion shown by so many hardworking communities
18    is being taken for granted, and is being taken advantage
19    of, NIMBYs and naysayers who wash their hands of this
20    societal crisis, and that's simply not fair.  It is not
21    fair to do the right thing and still be punished.  It's
22    not fair to do the right thing and then told that it's
23    not enough because other communities are not doing their
24    fair share.  And instead, they need your neighborhoods
25    to carry the load for the rest of the city.
```

Page 22

```
 1                    It is important for me and my colleague,
 2       Joe Buscaino, to be here today as the leadership of the
 3       city council.  While the issue of homelessness can be
 4       overwhelming, and the city clearly needs to do a lot
 5       more, the Los Angeles city council has implemented and
 6       created an infrastructure to finally begin to address
 7       homelessness and create a more than $1 billion
 8       supportive housing bond, which the voters approved in
 9       2016.  We are all at a critical moment, to implement
10       long overdue actions to provide true resources for
11       homeless individuals, providing housing and also uphold
12       the collective obligation to maintain our public right
13       of ways and restore order in our neighborhoods.  It is
14       time to ensure that everyone accepts responsibility that
15       we all share.
16                    But I'm not here to tell you, Judge
17       Carter, that we can't figure it out.  Instead, I'm here
18       to tell you that the city of Los Angeles and the L.A.
19       city council look forward to engaging in a genuine
20       discussion with the parties here today, and to use a
21       council by council framework, a framework that allows
22       each council member to utilize its skills, relationships
23       and community influence to successfully move this policy
24       forward.  And we look forward to a discussion that can
25       finally provide clear expectations, standards, and
```

Page 23

```
 1   commitments to  make an impact for the most vulnerable

 2   people in our city.  We look forward to discussions

 3   where we uphold principles of fairness and equity.

 4   We're here, and we also look forward to ensure that we

 5   don't overlook history and promises already made, and

 6   kept in poor communities, and where a new solution will

 7   ensure that all communities will contribute.  Where we

 8   can finally change that false and extremely insulting

 9   narrative that solutions to homelessness can only exist

10   in poor and disadvantaged communities.  This is an

11   affront to our unhoused neighbors as well as to black

12   and brown communities throughout the city of Los

13   Angeles.

14            We are ready to say goodbye to that false

15   narrative, and we are ready to get to work.  The City of

16   Los Angeles has submitted our settlement positions that

17   will uphold many critical principles and create

18   solutions that would be implemented and upheld.  Judge

19   Carter, we appreciate this gift that you have given us

20   today.  We understand that there is a very small window

21   of opportunity, and we need to ensure that we take

22   advantage of that, so we can actually begin a fair and

23   equitable dialogue.  Thank you.

24            THE COURT:  Thank you.  I'm humbled --

25            MS. NURY MARTINEZ:  Oh, can you give me
```

Page 24

```
 1    the --

 2                    THE COURT:  Michele.

 3                    MS. NURY MARTINEZ:  Michele.

 4                    MS. MICHELE MARTINEZ:  Oh, yes.

 5                    THE COURT:  Stay right there for a

 6    moment.

 7                    MS. NURY MARTINEZ:  Okay.

 8                    THE COURT:  Don't worry.  I'm -- at 76,

 9    I'm immune.

10                    MS. NURY MARTINEZ:  Oh, no, no.

11                    THE COURT:  Okay.  Now, that's the

12    strongest statement you're going to hear from any

13    council in America.  That's an absolute commitment to

14    negotiate in good faith, to not to table or waive or

15    give up a decision.  And do not expect the council to be

16    together on many of these issues.  There are 15 people

17    with distinctly different districts.  That's a direction

18    to move forward.  So therefore, they indeed may write

19    the history of this city and this county.

20                    Kathryn has been here on every occasion.

21    Do I have that absolute same commitment in terms of

22    willingness, or is this problem just too big for the

23    county and we shouldn't be wasting our time?

24                    MR. YOUNG:  You have the County's

25    commitment.
```

Page 25

```
 1                    THE COURT:  Absolute.  Right?  And I --
 2   therefore, I know that Judge Birotte can pick up the
 3   phone this evening and that if we start talking about
 4   enforcement today, or if we start talking about
 5   inflammatory words, numbers, that she will be able to
 6   have a discussion with us this evening about that.  Is
 7   that correct?
 8                    MR. YOUNG:  That is correct.
 9                    THE COURT:  Okay.  I'm going to put you
10   to that test.  I'm not going to call her tonight.  Judge
11   Birotte, we're not going to call her today, are we?
12                    JUDGE BIROTTE:  No.
13                    THE COURT:  No.  Probably not tonight.
14   We might tomorrow morning at 2:00 in the morning.  I'm
15   just kidding now.  But I expect that, and I'm going to
16   hit the roof, which means to be very frustrated, unless
17   I have got the decision of these people in this room
18   without having to make a phone call back, or so
19   knowledgeable that we can ask them to come before us in
20   federal court, when we go, but -- and they're at that
21   table accepting or not accepting these proposals.  Fair
22   enough?
23                    MR. YOUNG:  That's fair.
24                    THE COURT:  Okay.  Now, I'm going to come
25   to the advocates in just a moment.  I want to speak to
```

Page 26

```
 1    Caltrans.  And Nury and Joe, I'm going to ask if you'd
 2    remain for -- just for a moment.  And I want to show you
 3    something that's of concern to me, and I don't have the
 4    answer.  So, I was -- had Judge Smith contact a
 5    wonderful gentleman.  Sir, just state your name for
 6    everybody.
 7               MR. NEWMAN:  Yes.  Jeff Newman.
 8               THE COURT:  Jeff.  Okay.  We didn't know
 9    where to go, so we questioned the head of Division 7,
10    and he was kind enough to give us the name of a very
11    knowledgeable person.  These discussions that we've had
12    about 16th and Maple in Los Angeles are baby steps.
13    They were educational steps.  And what you don't
14    understand is that there are going to be some very bold
15    steps taken.  Maybe incremental, but much bolder than a
16    few piece of property, to make any headway.
17               And I'm going to show you for a moment
18    16th and Maple.  So, if you would be so kind.  We've got
19    a commitment on this piece of property, from both
20    parties, that the frontage is -- well, you can see the
21    frontage.  It's about two acres.  And this was a
22    Caltrans piece of property, that the governor was kind
23    enough to pledge to the city, as we understand it.  And
24    there was an agreement between the parties, in good
25    faith in this room.  One of the documents arrived
```

Page 27

 1    literally while we were in session.  It was a surprise
 2    to all parties.  And by 4:00, we were somewhat baffled
 3    about a need for some kind of environmental or hazardous
 4    report.  So, if you'd show the next slide for a moment.
 5                    This piece of property runs underneath
 6    the 10 freeway.  This is 16th Street.  This is the 10
 7    freeway.  And this is going to be a good example of many
 8    of the pieces of property that we're going to deal with,
 9    and the complexity.  When I say a mess, the better word
10    is complexity of the interaction between different
11    agencies.  And Caltrans and the City are just one that
12    I'd like to focus on on this piece of property.
13                    Through Mr. Marcus's smart efforts -- and
14    thank you, publicly -- this report came to us in a
15    record period of time.  But, I'm not going to go through
16    300 pieces of property piece by piece.  Can -- just stop
17    at one point, to -- can people -- if this was a Caltrans
18    piece of property, can people live underneath that
19    freeway?
20                    MR. NEWMAN:  There are currently people
21    who are unsheltered --
22                    THE COURT:  I'm sorry.  Can they?
23                    MR. NEWMAN:  Can they live underneath
24    there?
25                    THE COURT:  Can they underneath the 10

                                                    Page 28

```
 1    freeway?
 2                    MR. NEWMAN:  So, the restriction as to
 3    where it is that people are allowed to reside --
 4                    THE COURT:  I'm going to give you a glove
 5    to wear.  Here.
 6                    MS. MICHELE MARTINEZ:  Here.  Just turn
 7    that off, David, and I'll give him this one.  Just turn
 8    yours off, and then when he's finished speaking --
 9                    THE COURT:  Okay.
10                    MS. MICHELE MARTINEZ:  -- turn it on.
11                    THE COURT:  Yeah, I want to hear your
12    answers.
13                    MS. MICHELE MARTINEZ:  Well, turn yours
14    off.
15                    MR. NEWMAN:  Uh-huh.
16                    MS. MICHELE MARTINEZ:  Turn it off.
17                    MR. NEWMAN:  Okay.
18                    MS. MICHELE MARTINEZ:  And then --
19                    THE COURT:  So, the first question I'm
20    asking him is can people live underneath the freeway.
21                    MR. NEWMAN:  Okay.
22                    MS. MICHELE MARTINEZ:  He'll just turn it
23    off.
24                    MR. NEWMAN:  Yes, sure.  Are you --
25    Judge, I'm sorry.  Are you asking me if people can
```

Page 29

1    legally live underneath our freeway?  No, they can't

2    live legally underneath the freeway.

3                    THE COURT:  They cannot.

4                    MR. NEWMAN:  No, those people living

5    there -- squatting there are currently a camp.

6                    THE COURT:  So, the answer is no.

7                    MR. NEWMAN:  Yes.  It is.

8                    THE COURT:  Okay.  Can a -- now, this is

9    a silly question.  If I have a recreational vehicle or a

10   car or a van, and I'm in that car or van, could I live

11   underneath the 10 freeway?

12                   MR. NEWMAN:  We -- no, you cannot live

13   underneath the freeway in a car or a van either.

14                   THE COURT:  Okay.  And so, when you, and

15   the state, give this property or make it available to

16   the city, then do you believe before I ask the city

17   would they have the same restrictions, that people

18   cannot live in a van, car, recreational vehicle, or a

19   pop-up pallet home underneath this freeway?

20                   MR. NEWMAN:  Well, they don't have

21   jurisdiction underneath the freeway, with all due

22   respect.

23                   THE COURT:  Okay.  Now, how far back from

24   this freeway could people live?  What's my width?

25                   MR. NEWMAN:  They're able to live 20 feet

1    away from the edge of the freeway.

2                  THE COURT:  Okay.  So, if I walk 20 feet

3    they can live here and here.

4                  MR. NEWMAN:  That's correct.

5                  THE COURT:  So, it takes a two acre piece

6    of property and probably cuts it, if we had recreational

7    vehicles, to three-quarters of an inch.  Right?

8                  MR. NEWMAN:  That would be --

9                  THE COURT:  I mean, three-quarters of an

10   acre.

11                 MR. NEWMAN:  Yes.  That would be correct.

12                 THE COURT:  Now, who has jurisdiction

13   over this piece of property?  First of all, if it was

14   Caltrans property who cleans it?

15                 MR. NEWMAN:  Okay.  Caltrans has

16   jurisdiction over the property, unless it's -- well, we

17   have jurisdiction over the property.  That property had

18   been leased, under an --

19                 THE COURT:  Now, hold up.  This is really

20   simple, because I'm simple.  If Caltrans has not given

21   this to the city, and it's Caltrans property, are you

22   responsible for cleaning that property?

23                 MR. NEWMAN:  If there's no existing

24   lease, then that's correct.

25                 THE COURT:  I'm not asking you yet -- I'm

                                              Page 31

```
1    really a simple person.

2                   MR. NEWMAN:  Yes.   That's correct.

3                   THE COURT:  Yes.

4                   MR. NEWMAN:  Yes.

5                   THE COURT:  The answer is yes.  Okay.

6                   MR. NEWMAN:  If there had been a lease,

7    then --

8                   THE COURT:  See, I'm -- that's very

9    simple.  Yes.

10                  MR. NEWMAN:  Right.

11                  THE COURT:  Who has jurisdiction over

12   removing people underneath this piece of property if

13   they're not supposed to be --

14                  MR. NEWMAN:  Caltrans has jurisdiction --

15                  THE COURT:  Okay.

16                  MR. NEWMAN:  -- with regards to that.

17                  THE COURT:  Have you been doing that

18   since the 2005 agreement that you entered into with the

19   city?  And we'll put up the 2005 agreement if you're not

20   aware of it.

21                  MR. NEWMAN:  I don't know the complete

22   history of that property with regards to -- yes, it

23   would be our procedure to serve notice at several

24   different boundaries, and then work with agencies to

25   help to --
```

Page 32

```
 1                    THE COURT:  Are people living underneath
 2   the freeway now?
 3                    MR. NEWMAN:  They are in fact.
 4                    THE COURT:  Why?
 5                    MR. NEWMAN:  Because at this point in
 6   time, we are not able to move them until such time as
 7   they find shelter, because of Covid.  One of the things
 8   that we're doing, if I might, is to work through the
 9   city --
10                    THE COURT:  I accept that.
11                    MR. NEWMAN:  -- to actually have that
12   occur.
13                    THE COURT:  I accept that.  I want to
14   thank you that.  Now, explain to me before March 13th,
15   to 2005, if people lived underneath that freeway at some
16   period of time.
17                    MR. NEWMAN:  They did.
18                    THE COURT:  Before Covid.
19                    MR. NEWMAN:  Yes.  And they would be
20   served settlements and processors --
21                    THE COURT:  And why were they allowed to
22   live underneath that freeway?
23                    MR. NEWMAN:  They weren't allowed.
24                    THE COURT:  They weren't there?
25                    MR. NEWMAN:  I'm sorry?
```

Page 33

```
 1                    THE COURT:  They weren't there?

 2                    MR. NEWMAN:  I didn't say that.  I said

 3    they weren't allowed.  The fact --

 4                    THE COURT:  Okay.

 5                    MR. NEWMAN:  -- that there's encampments

 6    there is not --

 7                    THE COURT:  There's a big difference not

 8    being allowed --

 9                    MR. NEWMAN:  Yeah.

10                    THE COURT:  -- and then being there.

11                    MR. NEWMAN:  Yes, sir.

12                    THE COURT:  And if they were there, they

13    shouldn't' be there.

14                    MR. NEWMAN:  Yes.

15                    THE COURT:  Okay.  If I drive in the I-10

16    freeway, let's say in January, and I could put some film

17    up for you, and I see encampments over the freeway

18    overpasses -- all the way up the I-10, let's say from

19    the 405 to downtown Los Angeles, are people allowed to

20    be on those?

21                    MR. NEWMAN:  No, sir.  They're not

22    allowed to be on there.  And if I might, what happens is

23    they are removed and then they relocate.

24                    THE COURT:  So, is Caltrans responsible

25    for both the maintenance and the jurisdiction of those
```

```
 1    people living underneath the freeway or in the freeway

 2    underpass?

 3                  MR. NEWMAN:  Yes.  We're responsible for

 4    our vantage way.  And to -- we have a policy with regard

 5    to removal of illegal -- what we were calling at the

 6    time illegal encampments.  But, we're also pivoting

 7    towards looking at this differently, so that it's

 8    sheltering of people who are homeless and find

 9    themselves in camps -- find available space to --

10                  THE COURT:  Okay.

11                  MR. NEWMAN:  -- be able to --

12                  THE COURT:  Fair enough.  When you make

13    this property available to the city, and it passes to

14    the city of Los Angeles, we had a requirement, Marcus,

15    of a report -- help me with the name of it.

16                  MR. MARCUS:  The environmental report?

17                  THE COURT:  Yeah.  But the agency that we

18    went --

19                  MR. MARCUS:  Oh --

20                  MR. YOUNG:  DTSC.

21                  MR. MARCUS:  -- the Department of Toxic

22    Substances Control.

23                  THE COURT:  Yeah.  And I want to

24    compliment --

25                  MR. YOUNG:  DTSC.
```

Page 35

```
 1                    THE COURT:  Yeah.  I want to compliment

 2      you.  That was done in a very quick period of time.

 3      Thank you.

 4                    MR. NEWMAN:  Sure.  If I might, so, the

 5      current proposal from the city is to lease the property.

 6      It's not a transfer of ownership.  It's a lease, under

 7      the executive order, which I'm sure you're aware of.  If

 8      not, I can deploy it today.

 9                    THE COURT:  Okay.

10                    MR. NEWMAN:  Is now for the use of the

11      site for RVs.  The use of the site for RVs, as opposed

12      to the pallet shelters, actually changes the condition

13      of DTSC's interest.  They're no longer standing in the

14      way, just to speak frankly, of -- there's no requirement

15      that they have on this, and they no longer were --

16                    THE COURT:  I didn't hear.  Michele --

17                    MS. MICHELE MARTINEZ:  He said they can't

18      do pallet shelters.

19                    MR. NEWMAN:  So, in plain language, there

20      was one site plan has been replaced by another under the

21      city's initiative, Your Honor.

22                    THE COURT:  So, we certainly can't put

23      pallet shelters under here.

24                    MR. NEWMAN:  Right.  And that particular

25      site, to pallet shelters there, it would require a
```

Page 36

1    different environmental -- these are categorized for

2    RVs.  And that's what the city's proposal is.

3                    THE COURT:  To put pallet shelters

4    underneath the 10 freeway?

5                    MR. NEWMAN:  No.  I'm saying -- no, you

6    can't put RVs or pallet shelters under the freeway.

7    It's in that area that we spoke of earlier.  It's --

8    they don't --

9                    THE COURT:  So, are you -- I don't know

10   if you have the authority, and if not you don't have to

11   answer this question.  But I do need somebody today or

12   tomorrow or however long we're in session, next week.

13   Are you willing to work in partnership with the city and

14   the county to help shelter --

15                   MR. NEWMAN:  Yes.  We're in the process

16   of doing that currently.  We're -- we received a

17   proposed use from the city.  We're in the process of

18   negotiating a lease with them for the use of the

19   property to house RVs in the available space area.

20                   MS. MICHELE MARTINEZ:  Beyond

21   maintenance.

22                   THE COURT:  Huh?

23                   MS. MICHELE MARTINEZ:  Beyond

24   maintenance.

25                   THE COURT:  And this, remember, is what I

Page 37

```
 1    call a baby step.

 2                MR. NEWMAN:  Yes, Judge.

 3                THE COURT:  It's a learning step for the

 4    Court.  In and of itself, this is so small and so

 5    inconsequential for the boldness that's going to be

 6    needed by all of you.  And so, I'm going to say to you

 7    how many pieces of this donated property or available

 8    property that you've made available through Caltrans and

 9    the governor to the city have these kinds of conditions

10    where we might think initially we had two acres and then

11    frankly, through our naiveness and not having your

12    expertise, we find out that we might have three-quarters

13    of an acre?

14                MR. NEWMAN:  Well, currently, I have this

15    for you, if you'd like, of what available property we

16    have in the city and the county.

17                THE COURT:  Okay.

18                MR. NEWMAN:  And there are also

19    properties that are -- have been partially -- that are

20    already utilized pre-Covid.

21                THE COURT:  Great.

22                MR. NEWMAN:  So, one of those is at

23    Beacon Street in the San Pedro area, and Councilmember

24    Buscaino and I were both there, just the beginning of

25    that.
```

Page 38

```
 1                    THE COURT:  Are those pieces of property,
 2    let's say, equitably distributed through the 15 council
 3    districts, so that one district that might be, let's
 4    say, a little -- let's say not as -- I'll pick that
 5    carefully -- that one district doesn't feel that they
 6    are absorbing the brunt of either recreational parking
 7    or of tents.  In other words, is this a somewhat
 8    equitable distribution throughout the city?
 9                    MR. NEWMAN:  This is -- when you use the
10    term equitable, this is a consequence of where park and
11    rides took place.
12                    THE COURT:  Well, answer my question.
13    Answer my question.
14                    MR. NEWMAN:  Yes.
15                    THE COURT:  My question is --
16                    MR. NEWMAN:  I'm not --
17                    THE COURT:  -- is this an equitable
18    distribution throughout the city.
19                    MR. NEWMAN:  Sure.  They're not
20    distributed to all 15, no.
21                    THE COURT:  Are they primarily located in
22    what I would call disadvantaged areas of the city?
23                    MR. NEWMAN:  Let's see.  I would say yes.
24                    THE COURT:  Yes.  They are, aren't they?
25                    MR. NEWMAN:  Yes.  The park and rides
```

Page 39

1    along the freeway, yeah.

2                 THE COURT:  Why?

3                 MR. NEWMAN:  Because of -- why are park

4    and rides -- these parking lots happen to be near the

5    freeway, which is their function.

6                 THE COURT:  One of the compliments --

7                 MR. NEWMAN:  And also --

8                 THE COURT:  -- one of the compliments I

9    have for this city, amongst many, and the mayor is that

10   the first place I went to visit council people were what

11   I would believe would be less well-off districts.  And

12   what I found and would pass back to the mayor is that it

13   was a very equitable distribution.  In other words, when

14   you were starting your efforts I was concerned if there

15   was disparity.  Frankly, in this humble survey I didn't

16   see any of that.  It was a very good effort, to equally

17   distribute fairly.

18                So, these weren't initially recreational

19   centers being stood up, et cetera, but there was also

20   the greatest need in some areas.  Some areas had a

21   greater need.  But they were being supplied with nurses,

22   staff, just as fast if not faster than what I would say

23   would be other areas.  But I understood that -- I

24   thought that there might be a disparity problem.  I

25   didn't see that.  I saw areas of greater need being

                                                 Page 40

```
 1    stood up first.

 2                 MR. NEWMAN:  Just, I'm sorry.  If I

 3    might, I misspoke slightly.  The park and rides are next

 4    to transit.  That's park and ride.  So, you know, that's

 5    where the location was.

 6                 THE COURT:  Okay.  Michele, I want you to

 7    ask him this question.

 8                 MS. MICHELE MARTINEZ:  Thank you, sir.

 9    We have a question.  What is the average time frame for

10    a lease to be signed with the city?  Typically what

11    we've heard, it's about six months, and an additional

12    six months for state and fire marshals to sign off.  So,

13    it's almost a year.  And as we're trying to move with

14    settlements and trying to get some of these properties

15    to house folks, we want to know if the state and

16    Caltrans is going to be flexible to remove this red

17    tape.

18                 MR. NEWMAN:  The short answer is yes.

19                 MS. MICHELE MARTINEZ:  So, yes.

20                 MR. NEWMAN:  The --

21                 THE COURT:  And who would be that person

22    who we would have that pledge from, who has that power

23    to remove the red tape so we're -- I'm just not dealing

24    with a bureaucratic entity, whether it's the city or

25    Caltrans?  Give me the name of the person I would call.
```

Page 41

 1                     MR. NEWMAN:  Well, what I was going to

 2     say --

 3                     THE COURT:  I'm sorry.  Give me the name

 4     of the person I would call.

 5                     MS. MICHELE MARTINEZ:  Let him speak.

 6                     THE COURT:  No, he's not -- he's dodging

 7     the question.  Answer it.

 8                     MR. NEWMAN:  No, actually, I'm not, sir.

 9     There's an FHWA approval that has to take place, because

10     of its location.  And so I'm not -- if you want a

11     responsible party --

12                     THE COURT:  Yeah.

13                     MR. NEWMAN:  -- as far as that goes, I --

14     can I --

15                     THE COURT:  Assume I want somebody in

16     federal court on June 4th.

17                     MR. NEWMAN:  In our district, you should

18     call our district director, who is John Bulinski [ph].

19                     THE COURT:  And that's who I called.

20                     MR. NEWMAN:  Yes.

21                     THE COURT:  And you were polite enough to

22     come in his place.

23                     MR. NEWMAN:  Yes.  Since I'm --

24                     THE COURT:  I want to thank you.  Thank

25     you.

                                                Page 42

```
 1                    MR. NEWMAN:  Yes.

 2                    THE COURT:  Okay.  I may have a

 3     misimpression, but in most of the council people I talk

 4     to the relationship has not been described in a good way

 5     between Caltrans and the city.  And if you would like

 6     some names, I would be happy to give you those council

 7     people and ask them to come in.  And what I got

 8     disturbed about was the inability to understand the

 9     interaction going on between the city and Caltrans,

10     because if this wasn't the freeway -- and I'll just take

11     Monica Rodriguez's district for a moment.  A huge

12     encampment underneath what we believe is a city street,

13     but we're being told is both Caltrans and city, and

14     quite frankly nobody knows.

15                    MR. NEWMAN:  Are you talking about the

16     Pasadena --

17                    THE COURT:  I am.

18                    MR. NEWMAN:  And --

19                    THE COURT:  And that rabbit run.

20                    MR. NEWMAN:  Yes.  I understand.

21                    THE COURT:  Which is Caltrans property

22     that you recently fenced, and thank you.  I'm talking

23     about the rabbit run and I'm talking about that piece of

24     property underneath the highway.

25                    MR. NEWMAN:  Yes, sir.  We have revisited
```

Veritext Legal Solutions
866 299-5127

```
 1    that with the city and with the council member's office,

 2    and the property underneath the freeway is, in fact,

 3    ours.  However, there is a maintenance agreement with

 4    the city that allows them to more expeditiously -- both

 5    to clean up and refer to folks underneath the freeway,

 6    so that they can find shelter.

 7                THE COURT:  Now, all of you should know

 8    that that's been a very good success story.  Where it

 9    started months ago, it was not.  And there was

10    cooperation.  But watching that unwind and hearing the

11    stories of how long that took is why we're asking the

12    question about how -- why it took so long.

13                MR. NEWMAN:  I certainly appreciate that,

14    sir.

15                THE COURT:  Okay.  So, that's a

16    compliment to you.

17                MR. NEWMAN:  Yes, sir.

18                THE COURT:  You got it done.

19                MR. NEWMAN:  Yes, I know.

20                THE COURT:  Okay.  Should people have

21    been living underneath --

22                MR. NEWMAN:  I'm sorry.  Yes.

23                THE COURT:  Should people have been

24    living underneath that overpass?

25                MR. NEWMAN:  No, people shouldn't be
```

Page 44

```
 1    unsheltered in this state or in this city or in the

 2    county.  No, of course not.

 3                   THE COURT:  Then my last question is who

 4    is responsible for the maintenance of that or the

 5    cleaning of that?  Whether they picked up the tents for

 6    a couple hours and put them back, so at least it was

 7    clean, or they got toilets out there that they could

 8    use, whose responsibility was that?

 9                   MR. NEWMAN:  They -- in regard to that

10    area?

11                   THE COURT:  Yes.

12                   MR. NEWMAN:  It was --

13                   THE COURT:  Yes.

14                   MR. NEWMAN:  -- it was considerable

15    confusion, which we've straightened out.  And underneath

16    that freeway --

17                   THE COURT:  I, I --

18                   MR. NEWMAN:  -- is a --

19                   THE COURT:  I know you have.  You have a

20    compliment from me.

21                   MR. NEWMAN:  I'm sorry?

22                   THE COURT:  You have a compliment.  You

23    did a great job.

24                   MR. NEWMAN:  Thank you.

25                   THE COURT:  Now, I'm going to go back to
```

Page 45

1    when we weren't doing a great job.

2                   MR. NEWMAN:  Okay.

3                   THE COURT:  Because there was

4    considerable confusion.

5                   MR. NEWMAN:  Right

6                   THE COURT:  And I'm not going to stand

7    for the inertia -- not from you, but from the city or

8    you --

9                   MR. NEWMAN:  Understood.

10                  THE COURT:  -- of waiting for each piece

11   of property with that kind of inertia, as we try to

12   clean up the city.

13                  MR. NEWMAN:  I understand.

14                  THE COURT:  Okay.  How are we going to

15   get that moving quickly, and not in six months?

16                  MR. NEWMAN:  Yes.  The city's decision on

17   how they want to utilize park and rides for shelter

18   would be something we'd welcome.

19                  MS. MICHELE MARTINEZ:  Fantastic.

20                  THE COURT:  Good.

21                  MR. NEWMAN:  And so that would be --

22                  THE COURT:  Good.  Okay.  Now, hold on.

23                  MR. NEWMAN:  Yes.

24                  THE COURT:  I humbly want to thank you,

25   profusely, because I expected to have the director here

                                                Page 46

```
 1    and he sent you here.  And you've answered my questions.

 2    So although I can be a little rough on occasion, you

 3    have my appreciation.

 4                    MR. NEWMAN:  That's okay, sir.

 5                    THE COURT:  I don't care if it's a good

 6    or bad answer, I just want answers.

 7                    MR. NEWMAN:  I appreciate that.

 8                    THE COURT:  Okay.  Joe, do you have

 9    anything?

10                    MS. MICHELE MARTINEZ:  Please turn that

11    off.

12                    THE COURT:  Because I'm going to keep

13    that pledge, and you're not leaving today.  Because

14    we're going to get that list from you.  And we're going

15    to see if it's one or two pieces of property, or

16    multiple pieces of property.  Okay.

17                    COUNCILMAN BUSCAINO:  I was -- if it

18    pleases the Court, Your Honor, I think in light of the

19    Caltrans issue, it's important for the Court to hear the

20    frustration that we've had as a city council.  In my

21    specific case, we proposed a government site -- Caltrans

22    site in San Pedro, on the 500 block north of Beacon,

23    and, sir, you ought to know the bureaucracy, the red

24    tape.  We were -- I was really anxious to get A Bridge

25    Home site up.  100 beds, move 100 souls from sidewalks,
```

Page 47

```
 1    encampments, and into A Bridge Home.  The entire

 2    process, Your Honor, you should know -- finalizing at

 3    least -- took me at least 16 months.

 4                Now, those are the frustrations that I

 5    have.  And I got to the point where I called on the

 6    state governor last year to call in a statewide state of

 7    emergency.  And it's taken Covid-19 to move quickly and

 8    your direction to move quickly, and work with our

 9    partners.  So, it's important to know that.  It also

10    took legislative action from Assembly Member Gipson to

11    move on an Assembly bill to allow us to lease Caltrans

12    at $1 a year, so we can move on solutions.

13                But the -- you're right, sir.  The

14    bureaucracy, red tape, we -- there's a will here, in

15    this council, to move forward on the solutions.  But,

16    the red tape needs to get out of the way.

17                THE COURT:  I want to work with you in

18    some way to get this down to a minimal amount of time.

19    And that's not six months.  And therefore, I need your

20    help.

21                MR. NEWMAN:  Okay.

22                THE COURT:  Because what you just heard,

23    and I didn't know that Joe was going to speak, I must

24    have heard from 9 council people out of the 15 who

25    raised this gratuitously, with their issues between
```

Page 48

```
 1    Caltrans and the bureaucracy.  The second thing I've
 2    heard repeatedly is this, from the advocates, starting
 3    three years ago.  Our clients are dying 20 years earlier
 4    than the average citizen.  I don't know, frankly, if
 5    that's from hypothermia or tuberculosis or living a hard
 6    life.  I don't know why that is.  But, I can guarantee
 7    you if I got experts in from UCL or UCLA, it doesn't
 8    take a weatherman very long to know which way the wind
 9    is blowing out here.  That is not acceptable 2005, to
10    before the pandemic, and I don't care what you say,
11    people were living underneath our freeways and were
12    living over our overpasses, and a pandemic isn't an
13    excuse for shortening life expectancy.
14                    MR. NEWMAN:  Agreed.
15                    THE COURT:  And therefore, when I talk to
16    the council people, they point to you in Caltrans as
17    being in charge -- not you personally, sir, but you
18    being in charge of the maintenance and the safety, and,
19    quite frankly, ignoring it.
20                    MR. NEWMAN:  I --
21                    THE COURT:  And then, if I'm a federal
22    court and I know that -- and I ask the advocates this
23    yesterday.  If a federal court knows that life
24    expectancy is being shortened, because of people living
25    underneath an overpass or above -- I'm sorry, an
```

Page 49

```
 1   overpass or an underpass, what does the federal court do
 2   about that?  Ignore it, and just say that this is fine,
 3   that this is healthy?  You answer it for me.
 4                MR. NEWMAN:  You want me to answer it?
 5                THE COURT:  Yeah.  I want you to answer
 6   it.  What does a federal court do?
 7                MS. MICHELE MARTINEZ:  Turn it on.
 8                MR. NEWMAN:  I'm not one to tell a
 9   federal court what --
10                THE COURT:  Yeah.  I want you to tell me
11   what to do.  Let them stay there?
12                MR. NEWMAN:  Okay.  So, given that the
13   108,000 homeless under the last census, which we still
14   don't know what the count is for this census, and
15   certainly Covid is going to have a play into all of
16   this, the question of how to better integrate the
17   service provision through the COCs, the city, the
18   county, Caltrans, all of this needs to be, as you're
19   doing, wrapped up much tighter so that it's not just
20   having people being chased around --
21                THE COURT:  Excellent.
22                MR. NEWMAN:  -- and so forth.  So, that
23   would be an approach that I would --
24                THE COURT:  How do we accomplish that?
25                MR. NEWMAN:  A lot of dialogue and direct
```

Page 50

```
 1    contact, and also shortening up the loops between where

 2    people are currently and where they can be housed.

 3    However, you have the --

 4                    THE COURT:  And we would care if people

 5    aren't supposed to be there.

 6                    MR. NEWMAN:  Well, we --

 7                    THE COURT:  That we do something humane

 8    if we're asking them to move from these locations --

 9    wouldn't we want to be humane and say, look, in some way

10    we're trying to better your life a little bit, because

11    they're clustering under here for two reasons.

12                    MR. NEWMAN:  May I speak?

13                    THE COURT:  Heat.

14                    MR. NEWMAN:  Yes.

15                    MS. MICHELE MARTINEZ:  Turn it off.

16                    THE COURT:  They're afraid of the heat.

17    And they cluster because of the rain.

18                    MR. NEWMAN:  Yes.  Can I speak frankly?

19                    MS. MICHELE MARTINEZ:  You've got to turn

20    it off.

21                    THE COURT:  Yeah, go ahead.

22                    MS. MICHELE MARTINEZ:  Turn it off.  Turn

23    it off.

24                    THE COURT:  Give it to him.

25                    MR. NEWMAN:  Because, you know, it's one
```

Page 51

```
 1    thing to recognize that they shouldn't be there.  It's
 2    another thing to -- I'm just saying, it's one thing to
 3    recognize that they shouldn't be there.  It's another
 4    thing to have no other place for them to go.
 5                    THE COURT:  Okay.
 6                    MR. NEWMAN:  So, I agree with everything
 7    that you predicated, of course --
 8                    THE COURT:  And do you have Caltrans
 9    property that they could go to within a short distance
10    of some of these encampments?
11                    MR. NEWMAN:  I have, like I say, what we
12    have available currently.  And so --
13                    THE COURT:  It looks like a pretty small
14    sheet of paper.
15                    MR. NEWMAN:  That's exactly right, sir.
16                    THE COURT:  How many pieces of property?
17                    MR. NEWMAN:  Three, six -- potentially,
18    and we'd have to look at some of these on a specific
19    basis -- well, it's less than 20.  That's what we have
20    right now.  I wish there were more.
21                    THE COURT:  For the steps that the
22    federal court would contemplate, that's just baby
23    walking.
24                    MR. NEWMAN:  Yes.  That's correct, sir.
25                    THE COURT:  That's a baby step.
```

Veritext Legal Solutions
866 299-5127

```
 1                    MR. NEWMAN:  That's correct.
 2                    THE COURT:  Well, I would think that we
 3     would like to work together with two goals.  One,
 4     getting people out of a hazardous condition where we're
 5     literally, for want of a better word, poisoning them
 6     with fumes, because you've told me that they can't live
 7     underneath a freeway.  And treating them humanely and
 8     getting them, at least, to a better location.  And I
 9     would think that we would want to do that quickly, since
10     I know we haven't done that since 2005.
11                    MR. NEWMAN:  Yes.
12                    THE COURT:  Okay.  Fair enough?
13                    MR. NEWMAN:  Yes.
14                    THE COURT:  Who accomplishes that --
15     again, what's my process and procedure, other than
16     another committee and --
17                    MR. NEWMAN:  Direct --
18                    THE COURT:  -- me waiting for six months?
19                    MR. NEWMAN:  -- direct engagement with
20     the jurisdiction and --
21                    THE COURT:  Okay.  Could the director
22     come down here today?  Would he mind?  Is he the
23     decision maker, so he can make this pledge that he will
24     work with us, and you're not on the spot?  Because I --
25     once again, for the record, you have my absolute
```

Page 53

1    compliment.

2                    MR. NEWMAN:  Well, I'm actually also the

3    coordinator for the district in regard to the homeless

4    executive --

5                    THE COURT:  That you can make that

6    commitment?

7                    MR. NEWMAN:  Yeah.

8                    THE COURT:  Excellent.  Excellent.  Okay.

9    Any questions from first -- from Alliance?  Any

10   questions from the advocates?  Any questions from the

11   city?  Marcus?  County?

12                   MR. YOUNG:  None.

13                   THE COURT:  Okay.  I think our pledge

14   should be in a very short period of time, much quicker

15   than you think, that we should have the goal of these

16   folks not living underneath a freeway or an overpass if

17   it's harmful.  And if any of you think it's not harmful,

18   let's get some witnesses in here for a better record

19   because I don't think that's going to be very hard to

20   accomplish.  So, Shayla, is this harmful?

21                   MS. MYERS:  Your Honor, I mean, I think

22   it gets to the representative from Caltrans' point, as

23   to which is more harmful and which -- where do these

24   individuals have to go.  And they have to be given some

25   agency in that process.  We can't simply sit here in

                                              Page 54

```
 1    federal court and decide to close down spots on the

 2    assumption that that place is more dangerous than other

 3    locations.

 4                    THE COURT:  Carol?

 5                    MS. SOBEL:  I agree with what Shayla has

 6    said.  We -- I don't think this is Caltrans' fault, and

 7    I think that what I took away is that really this is

 8    this -- the municipal governments, the local governments

 9    stepping up to find places where people want to be and

10    can be.  And so -- and certainly, you know, we have

11    objected to having people under the freeway --

12                    THE COURT:  Sure.

13                    MS. SOBEL:  -- next to the freeway.  But,

14    the important point is we don't have anywhere because no

15    one has stepped up.  And so, it's not -- with all due

16    respect to Mr. Newman, you know, it's not his problem.

17    I don't mean it's not his problem.  It's not his fault.

18                    THE COURT:  No, it's not.

19                    MS. SOBEL:  You know.  And so, I think

20    that, you know, if there's a community of people, they

21    ought to talk to them.  They will -- they want to be

22    someplace where it's safe, I'm sure.  But there is no

23    alternative that's being offered to them at this point.

24                    THE COURT:  Agreed.  Okay.  For the city?

25    Christina?
```

```
 1                     MS. MILLER:  The city stands ready to

 2      offer an alternative, if we want to -- if all partners

 3      want to come together to work on that.

 4                     THE COURT:  LAHSA?

 5                     MS. MARSTON:  Agree.

 6                     THE COURT:  County?

 7                     MR. McLAIN:  Agree.

 8                     THE COURT:  How long do we wait to

 9      resolve this problem?  How long does the federal court

10      wait now, knowing that this is hazardous but taking into

11      account, you know, where do these people go?  How long

12      do I wait?

13                     MS. SOBEL:  I don't think the Court

14      waits, but I also do think that the alternative has to

15      be the right alternative.  And we know from assisting

16      our clients that the city frequently does not have

17      anything but a congregate shelter.  And at this point,

18      they are probably safer under the freeway, as dangerous

19      as it is, than being put into a place like Union Rescue

20      Mission, where one in ten people now tested positive --

21      one in five.

22                     COUNCILMAN BUSCAINO:  They're on a

23      private Caltrans site ready to go, PCH and Figueroa,

24      sir.

25                     THE COURT:  Okay. Anything else?
```

Page 56

```
 1                   MS. MICHELE MARTINEZ:  So, just for
 2    agreement purposes, so, as Covid-19 dissipates and we
 3    move towards post Covid-19 and the steps that we take
 4    towards this agreement, can we all agree that these are
 5    some of the first locations, if we're able to find
 6    alternatives -- no?
 7                   MS. SOBEL:  I don't know what that means,
 8    first locations.
 9                   MS. MICHELE MARTINEZ:  So, the
10    underpasses and overpasses, the judge has articulated
11    that they're not safe.
12                   MS. SOBEL:  There are lots of places that
13    aren't safe.
14                   MS. MICHELE MARTINEZ:  Yes.  But as we
15    move forward and we're able to get other alternative
16    sites to place --
17                   MS. SOBEL:  We could --
18                   MS. MICHELE MARTINEZ:  -- them in a safe
19    place, would you guys be willing to move --
20                   MS. SOBEL:  We need a plan.  We need a
21    plan.
22                   MS. MICHELE MARTINEZ:  Correct.  And
23    that's --
24                   MS. SOBEL:  And we're not going to, you
25    know, do it like these 10 people or these 20 people go
```

Page 57

1    to PCH and Figueroa, which is how many miles, Joe, from

2    where they are now?

3                    COUNCILMAN BUSCAINO:  I would say --

4                    MS. SOBEL:  And what are --

5                    COUNCILMAN BUSCAINO:  -- Carol, four or

6    five miles --

7                    MS. SOBEL:  -- your services --

8                    COUNCILMAN BUSCAINO:  -- -- from our --

9                    MS. SOBEL:  Yeah.  Where are your -- what

10   are your services there?  Are there medical doctors, or

11   -- you know, this is crazy.  We need a comprehensive

12   plan.

13                   MS. MICHELE MARTINEZ:  Comprehensive

14   plan.  I just said that to him.

15                   MS. SOBEL:  And I --

16                   MS. MICHELE MARTINEZ:  We need a

17   comprehensive plan.

18                   MS. SOBEL:  We're not --

19                   MS. MICHELE MARTINEZ:  Let's figure this

20   out.

21                   THE COURT:  Okay.

22                   MS. MICHELE MARTINEZ:  And to --

23                   THE COURT:  So, here's what we're going

24   to do.

25                   MS. SOBEL:  The biggest things we're

Page 58

```
 1   prioritizing --
 2               THE COURT:  In 17 years, we'll have
 3   another comprehensive plan.  I'm just kidding you.  No,
 4   we won't.  So, who is going to form this task force as
 5   of today, and be back to the Court by next Wednesday
 6   with our comprehensive plan?  That's my time schedule
 7   now.  You see, I can take action that none of you
 8   dreamed of.  And I want to give you the control
 9   initially.  I want to give you control initially.
10               UNIDENTIFIED MALE SPEAKER:  I see.
11               THE COURT:  So, why don't you go talk
12   quietly with the advocate for the city and the council.
13   Because I'm not kidding.  You haven't quite dreamed of
14   what I'm prepared to do yet.  I want to come up with
15   some methodology, some process and procedure, like Paul
16   Krekorian talked to me about, one of the council people.
17   I agree with that.  I want some timelines.  I want a
18   task force formed.  I want to see that property and get
19   that to you, so we know if it's five miles away.  I want
20   to know if we're waiting for 300 pieces of property with
21   these problems, or 20.  And I want that back, and I'm
22   going to work this weekend with you.  Except for
23   Mother's Day.  We'll all sit right here Saturday.
24               So, why don't all of you go have a little
25   conference in the back there, 6 feet away, and tell me
```

Veritext Legal Solutions
866 299-5127

```
 1   how -- no.  No, no.  That's an order.  That's not a

 2   request.  Get up out of your seats.  Go out in the

 3   hallway.  Go tell me a timeline before I impose one on

 4   you.

 5              MS. SOBEL:  A timeline for what?  For

 6   that small --

 7              THE COURT:  A discussion --

 8              MS. SOBEL:  -- group of people --

 9              THE COURT:  -- of who is going to form

10   this committee, and how we're going to get the very

11   information you're asking about.  How we're going to

12   come up with a comprehensive plan and methodology,

13   Carol, so it just doesn't leave the table and then we

14   come back two months from now still talking about a

15   comprehensive plan.

16              MS. SOBEL:  Are we talking about --

17              THE COURT:  Just give me a process and

18   procedure to work with.

19              MS. SOBEL:  It's extremely hard for me to

20   do that about people that I have not spoken to.  I don't

21   know who their medical providers are.  I don't know

22   where they get services.

23              UNIDENTIFIED FEMALE SPEAKER:  Well, let's

24   figure it out.

25              MS. SOBEL:  I'm relatively certain --
```

Page 60

```
1                    THE COURT:  And you'll --

2                    MS. SOBEL:  -- not --

3                    THE COURT:  -- never know unless you give

4      me some timeframes yourself, and some reasons.

5                    MS. SOBEL:  We're -- I'm -- Your Honor,

6      I'm willing to come here today.  I'm here because I

7      thought this was really important.  I'm here to talk

8      about comprehensive strategies.

9                    THE COURT:  Well, we are.

10                   MS. SOBEL:  And --

11                   THE COURT:  We are.

12                   MS. SOBEL:  -- and I would prefer not to

13     focus on one group.

14                   MS. MYERS:  Your Honor, I think what

15     we're saying a comprehensive strategy -- what we're

16     saying is given the state of housing in Los Angeles,

17     placing these 20 people in housing is just going to

18     supplant 20 other people.  Right.  Given the stock that

19     we have, we're not adding anything by moving these

20     individuals into housing in front of the line of other

21     people.

22                   LAHSA and the city of Los Angeles, they

23     have a mechanism by which they rank and they evaluate

24     who needs housing the most and what fits for them, based

25     on what the needs are.  If you want us to pick a group
```

Page 61

```
1    of 20 people today to say these people need to be moved

2    into housing, I mean, that's certainly one strategy.

3    But that is going to take 17 years, I assume.

4              THE COURT:  So, what I'm hearing so far

5    is that you're not willing to have that minimal

6    discussion and help me with that very process and

7    procedure that I'm asking for.  I'm not asking for a

8    resolution today.  I'm asking for a way to get this

9    information to us, so we can make intelligent decisions.

10   And if that's the case, just tell me that and then I'll

11   take it.

12             MS. SOBEL:  So, here's the problem for

13   us, Your Honor.  Brooke has just offered some

14   clarification from Michele.

15             MS. MICHELE MARTINEZ:  Yes.  I just --

16             MS. SOBEL:  I don't have a clue what the

17   environmental condition is --

18             THE COURT:  I don't --

19             MS. SOBEL:  -- for any of the properties

20   up there.  So, how can I pick a property.  I am certain

21   that if we went and offered the people who are living in

22   the tents under the 10 freeway -- if we offered them

23   room from their Project Roomkey, they'd go.  I think a

24   lot of people would probably --

25                      UNIDENTIFIED FEMALE SPEAKER:  That's one
```

Page 62

```
 1    option, Carol.

 2                    THE COURT:  That's one option.

 3                    MS. SOBEL:  -- go --

 4                    THE COURT:  And Carol, I agree with you

 5    100 percent.

 6                    MS. SOBEL:  But --

 7                    THE COURT:  The Court needs your help and

 8    I don't know how I get that other than hearing about a

 9    comprehensive plan --

10                    MS. SOBEL:  So, I think --

11                    THE COURT:  -- which is just allure and

12    no substance.

13                    MS. SOBEL:  I did --

14                    THE COURT:  And in July, we --

15                    MS. SOBEL:  I did ask for environmental

16    reports on the other properties.  I received nothing.  I

17    can't make an informed decision.

18                    THE COURT:  But let me ask.  Just why

19    don't you go -- there's always going to be a problem.

20    And the -- what I have seen and hearing constantly is

21    we'll go back and we'll meet again at some point, with

22    what?  You've got the process, right, you're starting,

23    you said in the phone call.  I'm asking for some time

24    frame from you and asking you to form a process and

25    procedure so Judge Birotte and I can become
```

Page 63

```
 1    knowledgeable.  And what I'm hearing is all the problems

 2    that we've heard for 17 years about why you can't even

 3    start.  I've been hearing the frustration over a year,

 4    about 16 months --

 5                  MS. SOBEL:  So --

 6                  THE COURT:  I mean, I'm not back in what

 7    I call the whack a mole.

 8                  MS. SOBEL:  So, I --

 9                  THE COURT:  All the reasons you can't.

10    Start thinking about what you can do and what you --

11                  MS. SOBEL:  I don't --

12                  THE COURT:  -- instead of what you can't

13    do.

14                  MS. SOBEL:  I don't think that's fair.

15                  THE COURT:  I do.

16                  MS. SOBEL:  Well, that's fine.  But I

17    don't that's --

18                  THE COURT:  I do.

19                  MS. SOBEL:  I don't think that's fair,

20    because it is not fair to ask us to decide on a property

21    with Caltrans --

22                  MS. MICHELE MARTINEZ:  We're not deciding

23    on a property.

24                  MS. SOBEL:  One of them was toxic.

25                  THE COURT:  I'm not asking you that.  I'm
```

Page 64

```
 1   asking you --

 2               MS. SOBEL:  I think the proposal --

 3               THE COURT:  I'm asking you a process and

 4   procedure.  I'm asking you to start laying out a

 5   methodology --

 6               MS. SOBEL:  Get us the --

 7               THE COURT:  -- about how we come up --

 8               MS. SOBEL:  Get us the --

 9               THE COURT:  -- with that comprehensive

10   plan.  That's all.

11               MS. SOBEL:  Get us the information on the

12   potential sites.

13               THE COURT:  I'm asking also for him to

14   start turning over these pieces of property, with no

15   decision on your part.  I didn't know if he was going to

16   come with zero pieces of property, 20, or 200.

17               MS. SOBEL:  He --

18               THE COURT:  And frankly, I'm a little bit

19   disappointed that there's only 20.

20               MS. SOBEL:  These are the same ones we've

21   been talking about since the beginning.  These are the

22   -- on the list --

23               THE COURT:  Okay.  So, is your answer no?

24   Is your answer no?

25               MS. SOBEL:  My answer is I don't
```

Veritext Legal Solutions
866 299-5127

```
 1   understand what's to be done and how to do it.  I'll
 2   reach an agreement that says you turn over to us all
 3   these properties and tell us what the resources are in
 4   the area.  We'll talk to the people.  We'll see what
 5   their needs are.  We'll see if their needs -- which one
 6   -- which place meets their needs.
 7              THE COURT:  I think that's all we're
 8   asking, is this.  If you want me to form the process and
 9   procedure without your help, I'll do it.  I will just
10   dictate your time frame.  I don't want to do that.  I
11   want to give that control to you first.  Number two, I
12   really don't care about seeing these pieces of property
13   today.  I didn't know if I was going to get 300, because
14   that was out on the table as our number before, or just
15   20.  He's brought 20 today.  I don't care if you get
16   into the individual piece of property today.  It's too
17   quick.
18              I'm just asking you -- and I think Paul
19   Krekorian was really helpful to me as a council member,
20   and I want to pay a compliment to him too.  Send that
21   back him.  He and I are both concerned about the process
22   and procedure, but I'm not even seeing that process and
23   procedure, because there's always another problem.  So,
24   if you don't want to participate, Judge Birotte and I
25   will set that out for you.  And if you don't want to
```

Page 66

```
 1    have a conference, that's fine.
 2                MR. UMHOFER:  Your Honor, on behalf of
 3    the Alliance, we are ready to participate.
 4                THE COURT:  Okay.  Go take ten minutes.
 5    I just want some kind of methodology, some kind of time
 6    period where you can get together outside my presence.
 7    You can start getting this information, and you can ask
 8    those questions.  Is this -- Joe, is this five miles
 9    away.
10                MS. SOBEL:  So --
11                THE COURT:  Gosh, that wouldn't be fair.
12                MS. SOBEL:  -- we have probably about
13    75,000 people on the streets now.
14                THE COURT:  Well, we're going to get to
15    that.
16                MS. SOBEL:  We -- are we going to use
17    this kind of process --
18                THE COURT:  No.
19                MS. SOBEL:  -- for all --
20                THE COURT:  No.  This is just a small
21    part of what we're doing today.  This is a baby step for
22    what we're going to do.  So, take ten minutes, okay.
23    You don't have to solve anything.  Just give me
24    something that we can work with that's reasonable for
25    all of you, before I impose that on you.
```

Page 67

1              COURT REPORTER:  This marks the end of

2    media number one.  The time is 11:15 a.m.  We are off

3    the record.

4                    (Off the record.)

5                    (End Media 1.)

6                    (Begin Media 2.)

7              THE COURT:  Come back and have a

8    discussion.  I asked you all to come back here for just

9    a moment.

10             MS. MITCHELL:  Your Honor, we actually

11   had an agreement.  We are heading for -- there was an

12   agreement as to one, an impasse as to one.

13             THE COURT:  Oh, sure.  Well, first of

14   all, thank you.  And I'd like to hear where you're at.

15   And by the way, I don't expect unanimity.  This is the

16   beginning of a conversation.  So, if somebody can just

17   tell me how you're trying to control this process and

18   where you are, I'd appreciate it.

19             MS. MITCHELL:  So, Your Honor, obviously

20   we spent quite a bit of time talking about this issue.

21             THE COURT:  Yeah.  There we go.  It's

22   off.

23             UNIDENTIFIED FEMALE SPEAKER:  He had the

24   microphone on.

25             THE COURT:  I had the microphone --

                                         Page 68

```
 1              MS. MITCHELL:  I think this is okay.  All
 2    right.  So, as to the Caltrans property, there were
 3    about 20 Caltrans locations.  Ten of them are in parking
 4    lots, and there are another ten Caltrans wasn't sure if
 5    people want it.  The basic agreement is that the city is
 6    going to take a look at those locations, come back to
 7    Caltrans within one week with a yes or no about whether
 8    they want those locations, and a list of assumptions of
 9    what's going to go on those properties.  Caltrans will
10    then take two weeks to review those set assumptions with
11    each individual property, and come back with an
12    assessment about whether or not those plans are
13    feasible.  There is one location that is on county
14    property, and not the city.  The county has agreed to
15    abide by the same timeline.
16              THE COURT:  Okay.
17              MS. MITCHELL:  There was one property
18    that is within the city of Hawthorne, that we all agreed
19    is not something that we can address today.
20              THE COURT:  Okay.
21              MS. MITCHELL:  Thereafter, after Caltrans
22    -- after that two week period and Caltrans comes back,
23    determines the feasibility of those plans, the city and
24    county have agreed to submit plans for what will go on
25    that site within two weeks.  So, we have one week for
```

Page 69

```
 1    the city to get back to Caltrans, two weeks for Caltrans
 2    to review, and then another two weeks for those plans to
 3    be identified for each site.  So -- yes?
 4              MR. NEWMAN:  Just one slight, one slight
 5    clarification on what we're saying.  It's not so much
 6    the feasibility of it as it is what the environmental
 7    constraints would be, and what facilitates that is when
 8    the city or the county comes back to us with a yes or
 9    no.  If there's a yes and there are toxic uses, then we
10    can see what --
11              THE COURT:  I'm going to need this part
12    marked.
13              MR. NEWMAN:  -- the -- and then that --
14              THE COURT:  I'm going to want a
15    transcript of this.
16              MS. MITCHELL:  So, that's a total
17    turnaround period of five weeks from today.
18              MS. MICHELE MARTINEZ:  So, to be clear,
19    we have one week for city and county to identify -- I
20    think it's ten -- did you guys say ten sites?
21              MS. MITCHELL:  There are 18 in the city.
22              MS. MICHELE MARTINEZ:  Eighteen.
23              MR. MARCUS:  We are going to look -- the
24    city is going to look at all of the sites listed on the
25    Caltrans list.  And we will provide a set of assumptions
```

Page 70

```
 1   to Caltrans saying here are the assumptions we want you

 2   to use as to what we're going to use the property for,

 3   for you to assess it by environmental, could you let us

 4   know what the constraints are.

 5               MS. MICHELE MARTINEZ:  And you're going

 6   to do that in one week.

 7               MR. MARCUS:  Correct.

 8               MS. MICHELE MARTINEZ:  And then two weeks

 9   Caltrans needs to assess those properties.  And then,

10   after that, the city and county are going to need two

11   weeks based on those identified properties to provide

12   that back to Caltrans, what's feasible on those sites.

13   And a plan.

14               MR. MARCUS:  Right.  So, once we hear

15   back the constraints from Caltrans, then the city will

16   be able to evaluate the property based on those

17   constraints and all the other factors to determine what

18   the city -- is the best use for that property, and draft

19   up a plan for that use.  That can be submitted to the

20   parties.

21               MS. MICHELE MARTINEZ:  Okay.  Fantastic.

22               THE COURT:  Okay.  Now, just a moment.

23   Let me understand something.

24               MS. MICHELE MARTINEZ:  Turn that off.

25               THE COURT:  Well, first of all, thank
```

Page 71

```
 1    you.  I've heard from Caltrans and from the state that
 2    there are, like, 300 pieces of property.  You'll hear
 3    that in discussions.  All I'm trying to find out is what
 4    do we actually have out there with reality, that we can
 5    start looking at for some use.  Have we gone from this
 6    popular notion of 300 pieces of Caltrans property down
 7    to about 18 or 20?  And I have no criticism if so, but I
 8    just don't want to have an expectation that there's 300
 9    pieces of property that Caltrans has available to us.
10    Because that's thrown at me all the time.
11                    MR. NEWMAN:  Right.  So, the short answer
12    would be yes.  That these are the available properties.
13    I'm not sure --
14                    THE COURT:  Okay.  So, I can --
15                    MR. NEWMAN:  Just let's --
16                    THE COURT:  Okay.
17                    MR. NEWMAN:  Yeah.
18                    THE COURT:  Thank you.  So, I'm -- I
19    don't have to worry about 300 pieces of property.
20                    MR. NEWMAN:  No.
21                    THE COURT:  I have to worry about 18
22    pieces of property.
23                    MR. NEWMAN:  Yes.
24                    THE COURT:  Okay.
25                    MS. MITCHELL:  Nineteen.
```

Page 72

1           THE COURT:  That's extraordinarily

2    helpful.

3           MS. MITCHELL:  Nineteen.  Nineteen pieces

4    of property.  Eighteen in the city and one in the

5    county.

6           THE COURT:  I'm not -- okay.  But

7    regardless, I'm going to cross out 300 pieces that I've

8    heard in speeches and I'm down to 19 pieces of property

9    that we're going to look at.

10          MS. MITCHELL:  Yes.

11          THE COURT:  Now, let me start -- before

12   you get to any portion you disagree about, I started

13   with a bombshell for you.  Hopefully I'm stirring your

14   blood.  I started with what I call a location-based

15   approach because in some settlements, and a lot of

16   discussions, it's been location based.  Versus let's

17   have safe zones around schools.  Let's guard airports or

18   libraries.  I call that a location-based approach.

19   That's not a people settlement approach.  So, when you

20   start with location-based approach, and the past

21   agreements I've seen sometimes is protecting, like,

22   airports or libraries that I started with three years

23   ago -- schools that I constantly hear about.  I call

24   those location-based approaches, and now I'm adding the

25   freeways, recently.  It's just a location-based approach

                                              Page 73

```
 1    that I'm raising with you.

 2                Now I want to turn it to what I call a --

 3    call it a people-centered approach.  Reverse this now,

 4    and assume that we weren't talking specifically about

 5    locations, as historic, but people.  So, let's take the

 6    flip side of the coin, and that's a people-based

 7    approach.  The questions I would be asking you in a

 8    comprehensive plan, if we're approaching it in that

 9    direction, then what is the criteria or comprehensive

10    plan.  For instance, the city made a decision -- it

11    doesn't matter what I think, but it's a great decision

12    -- they -- 65 and over with secondary concerns during

13    this period of time, high death rate potential, let's go

14    get those people into shelter, because of their age and

15    secondary condition.  People based.  Tough decision.  It

16    could be argued that somebody with bipolar or

17    schizophrenia is just as helpless on the street, but for

18    health reasons and to keep the death rate low, a

19    decision.

20                If a comprehensive plan was being brought

21    up, I don't expect you to agree between a location-based

22    approach or a people approach.  You're going to be all

23    over the place.  But now, let me focus on what would

24    that look like.  Would that be -- would the first

25    opportunity of movement in some way, 65 and older again.
```

Page 74

```
 1    Would it be people with mental illness, bipolar or
 2    schizophrenia.  Would we choose physically handicapped,
 3    paraplegic or wheelchair-bound.  Would we -- and the
 4    answer should be, by the way, all of those.  The answer
 5    should be all of those.  But we're going to have to
 6    start someplace because you're never going to get the
 7    resources on fast enough.  So, some tough decisions have
 8    to get made about just where we start, or there will be
 9    inertia for years.  And can you identify those.
10              So, let's say you chose libraries or an
11    airport to protect, supposedly, or a school or a freeway
12    or a park, or a recreation center.  If it's a people-
13    based approach, do we have enough information to go
14    through and say this person has severe mental issues,
15    and this person is the person we want to take out of
16    that group and treat first, and leave the rest, who are
17    able-bodied.  Or, if you were taking a park, for
18    instance, would you go into a park and say that we can
19    adequately identify a person who is severely
20    handicapped, mentally disabled -- I mean, does LAHSA
21    really have that number, and with a transient
22    population, you know, how many people do we miss, what's
23    our resource expenditure.
24              So, if we're coming up with a
25    comprehensive plan, then I'd also like to see a
```

Page 75

```
 1    comprehensive plan concerning how that would work from a
 2    -- I'm going to call it a people-centered approach.
 3    Give me a better word for it.  But when you're dealing
 4    with human beings, would that mean that we'd leave 20
 5    people in a public park and take 5 of the most severely
 6    incapacitated out of that park.  Would we take and do
 7    the same thing with a recreational center.  You see what
 8    I mean.  And how would we do that with resource
 9    expenditure, without having the city and LAHSA just
10    running crazy.
11                So, this is where I've always run into
12    conflict before.  And now I'm going to start with the
13    other explosive -- remember, location based.  And it's
14    going to get, I would assume, the advocates just
15    furious.  Now, I would assume also in a people-centered
16    approach, coming up with a comprehensive plan, that's
17    going to get the other side saying gee, my parks aren't
18    still being guarded, my airport, you know, the
19    recreational centers aren't open, my libraries aren't
20    being used -- you see.  Now, that should get the city
21    and the county really concerned about well, where is the
22    public message here, if we start with a completely
23    people-centered approach, because we haven't.
24                So, I'm going to ask, once again, that
25    now we approach it a different way.  What is our
```

Page 76

```
 1    response to a people centered approach.  What decisions
 2    would the Court go through.  How would I start to
 3    differentiate that.  And by the way, I think that some
 4    of the things that are being mentioned are versus
 5    wouldn't you want electricity, privacy, shade and cover
 6    for outdoor spaces, storage for belongings.  Wouldn't
 7    you want 24-hour access to the residents, because I'm
 8    hearing our residents are trapped.  If we get inside a
 9    shelter or a place that's almost like a prison, if we go
10    into one of these hotels, because they pull the fence
11    around it.  Wouldn't we want access for people with
12    disabilities, which is the ADA problem, or the -- that's
13    always confronted us and it's never been adequate.  What
14    about pets.  How would we deal with that.  And what
15    about shared living spaces for families, and how do you
16    define couples and relationships, which is always an
17    issue.
18              So, I don't know if I want to take the
19    same amount of time, but I'd like now to flip the coin
20    from where I started with the location-based approach,
21    that I'm so used to in terms of -- remember, when I
22    first got involved it was Judge, we want our parks back.
23    Judge, we want our libraries back.  Judge, we want X, Y
24    and Z back.  We want our airports protected.  That's
25    where I started.  I've now added freeways, because I got
```

Page 77

```
 1    concerned about health.
 2                   Now I'm going to flip the coin on you and
 3    say if it's a people-based approach, help me designate
 4    how I would approach that.  How I would make that work,
 5    along with you on the front side of the coin.  Okay.
 6    Now, I'm going to take a recess in just a moment, and
 7    have you maybe discuss that again.  Okay.
 8                   But, I want to take one more thing, and
 9    that is I want to take this idea of whether you agree or
10    not or whether there's a better plan to how we approach
11    a settlement if we ever get there.  And let me repeat to
12    you that my concern was that we are ten times larger
13    than anybody I have dealt with, but you have -- I'll put
14    it on the record -- I think better will -- a better
15    sense of having started down the line in terms of trying
16    to accomplish something in terms of homelessness, and
17    it's really refreshing to me how far you've made that
18    effort with goodwill.  Okay.  That's a compliment to
19    you.  And I've said -- I use the word, maybe I shouldn't
20    have used that, but it's dysfunctional in terms of all
21    the agencies trying to interact.  Okay.
22                   Here's where I started, and I want you to
23    tell me why I'm wrong.  I started with this wonderful
24    mosaic called Los Angeles, but because we're so diverse
25    I didn't believe that we could get anything but an
```

Veritext Legal Solutions
866 299-5127

```
 1    overarching settlement.  And when I looked at Boise, the
 2    Boise case talked about what.  Boise, Idaho, a
 3    municipality.  Right.  Well, that's my only guidance
 4    from the Ninth Circuit.  They didn't talk to me about
 5    Los Angeles Street or 16th and Maple.  The -- when Judge
 6    Berzon wrote that, she wrote about a municipality.  She
 7    didn't write about a spa.  She didn't write about a
 8    supervisorial district, because that's not what was in
 9    front of her.  So, I'm going to throw out some very
10    provocative things to you, which is going to cause each
11    side to flame on occasion.  Good.  Watch all matters.
12              Should it be a spa.  Well, if it's a spa
13    how many different supervisors are going to get involved
14    in that process, and how many different city council
15    people in that process are involved.  It should like
16    inertia to me, but I could be wrong.  Should it be a
17    supervisorial district.  Well, how many council people
18    are involved in a supervisorial district.  That larger
19    entity takes away what I thought was my most valuable
20    asset, and that was the councilperson and their
21    particular district.  So, when I started looking at
22    that, and I think I talked to Joe first, and I think I
23    talked to Mike Bonin on the same day or one day after.
24    I can't remember.  But we were all kind of thinking how
25    do we get the inertia going.  And it was all goodwill.
```

Page 79

```
 1    And so we started saying well, gosh, my district is
 2    bigger than Boise.  My district has 280,000 people, or
 3    300,000 people, and my best asset is either Mike Bonin
 4    on the ground or Paul or Marqueece, whoever, who knows
 5    their district.  And I thought why would a court come in
 6    with a broad settlement that caused everybody to act at
 7    one time, because there's such a different flavor in
 8    each district.  And I didn't know what the 60 percent
 9    was, or whether that was a valid number, or even if I
10    should be dealing with your number.  In other words, I
11    took the old model when I came up here.  And although
12    I've since -- I've thrown it away.  I'm wide open for a
13    discussion.
14            So, we thought -- Judge Smith, these were
15    private conversations.  Didn't involve Michele at the
16    time.  Just a lot of conversations back and forth.  The
17    best model seemed to be initially, when we were talking,
18    with the council model.  Now, since then a couple of
19    other things have been thrown out there.  Well, Judge,
20    what about ZIP codes.  Well, how many ZIP codes are
21    within a council district, and how do they overlay.  And
22    then, Judge, we're also going to have in two years a new
23    census that divides it.  Well, if you're going to wait
24    two years just tell me.  I mean, I'm wasting my time and
25    I'm wasting yours.  I can't wait two years, and I don't
```

Page 80

1    think you can either.  But if you can, just tell me two

2    years.  We're done.

3                    MS. MICHELE MARTINEZ:  Speak louder,

4    please.

5                    THE COURT:  So, I'm almost done.  If

6    there's a better model I'm wide open to listening to

7    that.  I just will repeat to you I thought that the best

8    person to know his or her district were you as the

9    council.  That it had to be an overarching agreement,

10   and something that Carol Sobel had said to me three

11   years ago, it -- when we first talked about the county,

12   and I'll repeat this, because I'm not breaking a

13   confidence, was, you know, my process and procedure is

14   very important to me.  How people are being treated in

15   this walk through homelessness is really important to

16   me.  I didn't understand that at the time.  But, that

17   process and procedure might be an easy thing to reach

18   for you, because you're so far ahead here in Los Angeles

19   of how you've been trying to deal with people than what

20   I'm used to.  And so, it's another compliment to you.

21                    You seem to have a really good idea of

22   the process and procedures going on in Los Angeles.  And

23   so, I've always thought that that might be the easier or

24   overarching thing to reach, although we've had some

25   experiences that caused me to throw away that old

                                                    Page 81

```
 1    template and start again afresh.  So, tell me what the

 2    model should be.  And if you think you can, by the way,

 3    get this city moving with one agreement, and one time

 4    frame, between John Lee -- and I'm just kidding you, and

 5    Mike Bonin and Marqueece and -- be my guest.  Tell me

 6    how to do that.

 7                  So, I'm wide open to this.  And I really

 8    want you to correct me now, because if it's ZIP codes

 9    tell me why it's better.  If it's a supervisorial

10    district, tell me why it's better.  Because I'm

11    listening now, for a change.  Now, if you want to have a

12    conference that's fine.  So -- yeah, Carol.

13                  MS. SOBEL:  I feel that I must say

14    something publicly, because we've had separately or

15    directly from the LA Alliance, we've talked to the

16    county, and I heard Nury speak this morning.  I firmly

17    believe that the 60 percent in district by district in

18    Los Angeles is unworkable.

19                  THE COURT:  Okay.

20                  MS. SOBEL:  And it operates off of

21    premises that haven't worked in the past.

22                  THE COURT:  Okay.

23                  MS. SOBEL:  So, we come into a city where

24    lots of published guidelines that said criminalization

25    doesn't work.  Yet, in Los Angeles we have had Safer
```

Page 82

```
 1    Cities initiative for 15 years, great -- for 14 years.
 2    Great proof that it doesn't work.  Okay.  So, we know
 3    that it's not going to work.  So, it's 60 percent and
 4    then you get to enforce, what are you going to enforce.
 5    Where are we putting people, and what is the cost of
 6    that.
 7                  THE COURT:  Right.
 8                  MS. SOBEL:  And as the Court knows, it is
 9    our position that at this point in history, given the
10    necessity to comply with Covid-19 restrictions for
11    probably the next two years, it would be a bad decision
12    to move towards more shelter.  Because you have to build
13    at least three times the number of shelters we currently
14    have in order to get that kind of space and protect
15    people.  Union Rescue Mission has something like one in
16    five people who have tested positive now for Covid-19.
17    We had the situation at the Granada rec center.  The rec
18    centers are going to close.
19                  So, my thought was what is the best use
20    of the city's money.  LAHSA did a report at the request
21    of the -- and as the Court knows -- and, I'm willing to
22    give anybody the settlement statement that we filed,
23    because there's nothing really secret in that.  We only
24    use public documents to come up with our numbers.  Okay.
25    We used the LAHSA report that was done, in response to a
```

Page 83

1    request.  It was a motion from Mike Bonin, tell us what

2    it would cost to put every single person in Los Angeles

3    who is on the streets now into shelter, and what it

4    would cost to operate that.  It was over $650 to create

5    that shelter system, two, three years ago.  So, it's

6    going to be a lot more expensive now, because of the

7    Covid-19.  And it would cost $360 million a year to

8    operate that.  $1 billion in the first two years.

9    Crazy.  Just crazy.

10              So, I started thinking about what is a

11   different approach here.  LAHSA reimburses about 60, $61

12   a day for each person in a shelter.  Most people in

13   shelters need to get back on their feet.  They're

14   economic homelessness in this city.  They work at jobs

15   that don't pay a living wage, because we're not quite at

16   what we call a living wage.  And even when we get to

17   that living wage, it is currently less than half of what

18   it takes to rent a crappy little apartment in this city.

19   Okay.  You have to earn at least, like 62, $63,000

20   pretax to be able to afford the mean on a studio in this

21   city.

22              So, I think about that.  And I think what

23   is the way out of this problem.  If we only build

24   shelters, and we continue to have the other factors

25   operating here -- because we're not moving fast enough.

Page 84

```
 1    You know, the Prop H is going to produce about 5,600

 2    units of permanent support housing.  A lot -- there's

 3    another, like, 1,500 units or so that go to managers and

 4    affordable units, something like that.  It's like a

 5    little over 7,000.  It's not the 10,000 in ten years.

 6    It was started -- a great idea, and a really -- and

 7    important.  And it's important that we do that.  But, it

 8    wasn't enough to begin with and it certainly isn't

 9    enough now, as we keep seeing homelessness jump about 12

10    percent a year.

11              We don't have the 2020 numbers, but given

12    what the -- what the LAHSA has said, what Sheila Cuel

13    [ph] has said, that we're housing 130 people a day or a

14    week, whatever it is, and 150 are becoming homeless.

15    That's a 15 percent jump right there.  So, we know that

16    it's going to be a significant increase, even before

17    Covid-19.  So, the question for me is what is the right

18    approach to get a real solution that is going to last

19    into the future.  We will never be able to -- you know,

20    we have some monies that are available, in special

21    monies.  We're not going to have, probably, as much

22    money as we expected.  The state is now in a hole of $56

23    billion for next year.  We have all that.  So, do we

24    throw good money after bad, or do we take a different

25    approach.
```

1           We have a -- you know, we talk about it
2    as a homelessness crisis.  We have a housing crisis.
3    Brandon yesterday called it an affordability crisis.
4    And we have a racial crisis in this city.  And they are
5    all tied together.  It isn't one or the other.  And so,
6    from my way of thinking anything that we do it is people
7    centered, but it's got to be something that's going to
8    change the dynamic and not create this huge shelter
9    system that is going nowhere, and that warehouses
10   people.

11           And again, as you know, I used the LAHSA
12   numbers on the success of getting people from there.  It
13   isn't -- you know, it's not LAHSA's fault that we don't
14   have housing in this city that's affordable for people.
15   It's a result of a lot of different things.  It's the
16   result of gentrification.  It's the result of city
17   policies and county policies that have allowed high-
18   rises to go up and redevelopments to go up without also,
19   at the same time, providing for the people who lived in
20   that before.  I understand that's, you know, progress.
21   But we don't have a comprehensive plan.  So, if we just
22   do shelters, it will just continue to get worse and
23   worse as the cost of housing escalates.

24           And none of this factors in what's going
25   to happen with all the Covid-19 people, people who are

Page 86

```
 1    dislocated.  I know the county wants to do rapid
 2    rehousing.  And that's critically important.  But, I
 3    really fear that what we're going to see is what we saw
 4    in 2008, when the Tom Varicks and Steve Mnuchins came
 5    through like a windstorm, and bought up all the
 6    distressed properties and people were -- no longer could
 7    afford it.  So, my concern is that we talk -- at least
 8    talk about whether it is as cost effective to get
 9    different properties now, whether it's modular homes,
10    whether it's some pallet homes -- we're not going to
11    build our way out of homelessness with pallet homes.
12    They're -- you know, they're cute, and they're useful.
13    But we're not going to do that, because we -- that
14    probably is something close to, I don't know, some 15
15    percent, 75,000 people on a low count.  And, you know,
16    and that's without Covid-19.
17                   So, I really do think that we need to
18    talk about -- if we come up with a settlement, we need
19    to talk about what percentage is going to be short-term
20    shelters that we initially need.  What percentage could
21    we build into housing now, whether it's, you know --
22    this isn't going to be a huge issue, but vacant
23    properties.  The Caltrans houses along the 710, the
24    Caltrans properties in Pasadena.  Not a huge number, but
25    a contribution towards the total.  And maybe micro
```

Page 87

```
 1    communities, for women -- you know, families with
 2    children.  Whatever it is.  But, we need to be -- have
 3    an approach that gets us density now and a permanent
 4    solution.  Otherwise, we are just throwing good money
 5    after bad, and we're not helping enough people to stem
 6    the flow.
 7                     And then -- and I would go back to when I
 8    filed the Jones case, I -- and I've told before this --
 9    I mean, I -- for a year, I told people I didn't know how
10    to file that case.  I didn't have any evidence.  I
11    didn't have -- you know, I knew people were on the
12    streets.  And that was in 2000.  So, you know, we didn't
13    have databases like we have now.  And then the economic
14    roundtable published a report, and said to the city of
15    Los Angeles and the county of Los Angeles you have a
16    problem around homelessness.  You need to stop the
17    feeder pools into homelessness.  If you do that now, it
18    will cost you X amount of dollars.  If you do it in five
19    years, it will cost you this much more.  Ten years -- I
20    think they went up to, like, 15 or 20 years.  My only
21    disagreement with that report is that they
22    underestimated what it would cost in 2020 dollars to
23    address the -- stopping the feeder pools into
24    homelessness.
25                     And we can't -- we've taken so much time.
```

Page 88

1    We come up with all these different reports.  The -- I

2    go back to the ten-year plan to end homelessness in Los

3    Angeles, which I think was in the 1990s, you know.  And

4    so, I really would like us to get to a settlement that

5    is realistic, and not a Band-Aid.  And that really said

6    what are the things we can change, how can we do it,

7    what would it cost us.  I personally think that if

8    you're paying $61 a day to have somebody in a shelter,

9    that means you're paying almost the cost of renting an

10   apartment.

11               THE COURT:  What's the cost of jail?

12               MS. SOBEL:  Pardon?

13               THE COURT:  What's the cost of jail on a

14   daily basis?

15               MS. SOBEL:  $129 a night for the LA

16   county --

17               THE COURT:  How much?

18               MS. SOBEL:  $129 a night for the LA city

19   jail.  For the LA city jail.

20               THE COURT:  Is that light for jail?

21               MS. SOBEL:  This is according to -- and,

22   Judge, this is the UCLA million dollar budget report,

23   which some of you may have seen.  It's a little less for

24   the county.  I think that's a reflection that the county

25   pays the sheriff's deputies.

Veritext Legal Solutions
866 299-5127

```
 1                    THE COURT:  So, I'm going to repeat
 2      something I heard.  If I'm homeless and you pick me up
 3      on a -- I got a citation and I failed to appear.  Very
 4      typical.  Eventually, I get two or three warrants and
 5      you pick me up.  I go into jail.  I arrive on a Friday
 6      night.  I'm going to spend Friday night, Saturday,
 7      Sunday, and if I'm lucky I hit -- if I don't get a bail,
 8      on my failure to appear, I'm going to hit court Monday.
 9                    MS. SOBEL:  Or Tuesday.
10                    THE COURT:  Now, a lot of judges might
11      think hi Dave, where you living.  I don't have a home.
12      Hi Dave, how much are you making.  I'm homeless.  Now, a
13      lot of judges might think, you know, four days, credit
14      for time served, let's get this person out of here
15      because of the cost.  So, now we've got that revolving
16      wheel.  It's meaningless to -- it's taking law
17      enforcement, a huge amount of their resources.  It's
18      taking the court, a huge amount of their resources.
19      It's taking the homeless person back on the street,
20      usually without their blanket to go back to or the tent
21      that they can't find, or identification that they can't
22      find.  So, the end result is -- I'm spending 101 -- no,
23      I'm a very conservative taxpayer.  Let's pretend that
24      for a moment.  $121 a day versus a shelter --
25                    MS. SOBEL:  129.
```

Page 90

```
 1                    THE COURT:  129 versus -- and I don't
 2     know the cost.  So, I leave that to you.  It may be --
 3     that thing out there is $7,600.  Okay.  I don't know
 4     what that figures out over a period of time.  By the
 5     way, I told Amy she could come in and speak.  I don't
 6     know if you know this, but all those folks who set up
 7     this morning are former homeless people.  Wow.  I mean,
 8     that's really -- is she still out there?  I want to take
 9     one --
10                    MS. SOBEL:  It's $4,900 actually.
11                    THE COURT:  Huh?
12                    MS. SOBEL:  4,900.
13                    MS. MITCHELL:  For the base.  It's --
14                    MS. SOBEL:  The base.
15                    THE COURT:  Yeah.
16                    MS. MITCHELL:  -- 7,600 for the air
17     conditioning, the heating, the --
18                    MS. SOBEL:  Yeah.  I --
19                    THE COURT:  Yeah.  The whole lot.  It's
20     got electricity.  Good.  It's got privacy, good.  It's
21     got a bed.  But if you don't like this -- if you don't
22     like Mayor Garcetti's purchase, please come forward --
23     yeah, Elizabeth, will you see if you can find Amy for a
24     moment?  It's a great story.  It takes five minutes, and
25     I'd like to have her do it.
```

Page 91

```
 1                 It seems to me, from my standard -- I
 2      mean, what a home run.  And I'm not saying that that's
 3      the solution.  Because remember, I only brought the
 4      trailers in to try to break an impasse and show what was
 5      out there at the time, out of the oil fields of North
 6      Dakota.  I kind of wish I hadn't done that in
 7      retrospect, because I'm not pushing for those trailers.
 8      But by the same token, I needed something in front of
 9      everybody that said, hey, here's some trailers
10      available.  If you want them, fine.  If you don't, fine.
11      So, Amy, come on up for just a moment.  Have a seat next
12      to me, over here.  And I'll be --
13                 MS. SOBEL:  Your Honor, can I just add
14      one more thing.  If people have places to live, even if
15      it's a small room or even a shared room, property
16      disputes will take care of themselves.  Because people
17      won't be on the street anymore if they had a secure and
18      stable place to live.  We won't be fighting over how
19      much property people have on the streets.
20                 THE COURT:  But let's hear something --
21                 MS. SOBEL:  Okay.
22                 THE COURT:  -- for a moment.  I didn't
23      know what this looked like.  And I thought, well, gee,
24      I'll go down to the warehouse, or wait until it's set
25      up.  But by that time, it's like it's too late and
```

Page 92

```
 1   somebody is complaining.  If somebody doesn't think that
 2   this is adequate, don't be choked by our conversation.
 3   Tell me it's not adequate.  Amy, we're waiting.  We'll
 4   see if you're adequate or not.
 5                   MS. KING:  Okay.
 6                   THE COURT:  Okay.  I -- hold on.  First
 7   line?
 8                   MS. MITCHELL:  We love the pallet
 9   shelters.
10                   THE COURT:  Shayla?
11                   MS. MYERS:  I mean, I think it's less
12   important what I think.  And it's more important what
13   unhoused folks think.  That's a conversation with
14   housing.
15                   THE COURT:  We go out and get 30 of them,
16   bring them in, take a survey.  I'm just kidding.
17                   MS. MYERS:  I mean, well -- I mean,
18   you're -- can -- sorry.
19                   THE COURT:  I don't know how -- Shayla, I
20   don't know how to deal with that.  Okay.
21                   MS. MYERS:  No, I -- what I was going to
22   say, Your Honor, is that, well, we have had
23   conversations and I do think that they -- for a fair
24   number of folks who were unhoused, I do think they check
25   a lot of the boxes.
```

Page 93

```
 1                    THE COURT:  But, are you objecting to

 2     this?  Mayor Garcetti bought 50, he had a competition,

 3     he thought that they were great.  If there's an

 4     objection, I don't want to wait until they're set up and

 5     then have to wrestle with some kind of --

 6                    MS. SOBEL:  Here's the problem.

 7                    THE COURT:  -- complaint.

 8                    MS. MYERS:  No.

 9                    MS. SOBEL:  He couldn't agree on a

10     location for RV parking.

11                    THE COURT:  I'm not worried about a

12     location.  I'm worried about these right now.  They're

13     right --

14                    MS. SOBEL:  No, no.  But, Your Honor, you

15     -- the problem with -- these are maybe a small part of

16     the solution.  The -- when we focus on what we're going

17     to do, if we're going to do something bigger, we have to

18     think about where can we create housing for people

19     without running into all of the NIMBYism.  Are there

20     existing buildings that can be repurposed.  Are there

21     locations that won't create the same kind of NIMBYism.

22     My concern about something like the pallet homes, and I

23     -- and I'm not -- you know, I'm not objecting.  I'm just

24     saying that they require more, almost, confrontation on

25     where they're going to be located.
```

<div align="right">Page 94</div>

1           THE COURT:  Okay.  Okay.

2           MS. SOBEL:  And so, one of the things I

3    was trying to think about is how can we scale up, how

4    can we get more people into stable houses, and minimize

5    the --

6           THE COURT:  Okay.  I'm going to respond

7    to that and give you an answer.  Everything is on the

8    table.  This is not one solution fits all.  I'm only

9    asking about the first 50 because if there was another

10   location, maybe the mayor's interested in hearing right

11   now, gee, we don't like these because -- well, you know

12   something, if we had another 100 of these it's worth our

13   investment without conflict or pushback.  I think Eric

14   would like to hear that.  And right now, I think for the

15   first 50 we're -- but, LAHSA, I know you're happy with

16   them, because the mayor purchased them.  County?

17          MR. YOUNG:  No issue.

18          THE COURT:  I'm spending the night, Amy,

19   and there's shelter out here in the --

20          MS. KING:  Great.  Love it.

21          THE COURT:  -- lobby -- okay.  Now, hold

22   on.  I just met her.  You told me a wonderful story

23   about the young people out there setting it up.

24          MS. KING:  Yes.

25          THE COURT:  Would you tell the folks that

1    story, so I'm not telling them who they are.

2              MS. KING:  Absolutely.  So, the people

3    that we employ to build and produce our pallet shelters

4    are individuals that are exiting the criminal justice

5    system, addiction recovery and homelessness.  All of

6    those men out there that came with me in the red shirts,

7    with the exception of one, that is my husband -- the

8    other three have all personal experience with

9    homelessness, addiction and incarceration.  We have over

10   the last five years, between pallet and our construction

11   company, employed over 500 people in the state of

12   Washington with that background, and we have a less than

13   3 percent recidivism rate.

14             THE COURT:  But you'll produce them right

15   here for our job base, won't you?

16             MS. KING:  I will be happy to produce --

17             THE COURT:  Yeah.

18             MS. KING:  -- them here for you.  Yes.

19             THE COURT:  See, and I'll tell you why.

20   Because if you talk to Gil Cedillo, Gil Cedillo will

21   tell you pointblank, and I don't have to break the

22   confidence, hey, I want building in my district.  I want

23   jobs out here.  You know, I want construction going on.

24   And Gil said and I'm telling you that right now, this is

25   a horrible thing that happened but I want -- you know, I

Page 96

```
1    want employment.  So, therefore, you're bringing that
2    employment here.  Right?
3                   MS. KING:  Yes.
4                   THE COURT:  You're not coming from
5    Seattle.
6                   MS. KING:  We would be happy to open a
7    line here.  Yes.
8                   THE COURT:  Yeah.  So, that's local folks
9    working local trades, et cetera.  Now, you can produce
10   how many hundred thousand in the next day?  I'm just
11   kidding.
12                  MS. KING:  We can produce quite a few.
13   So, we can get up to 500 a week out of our current
14   plant.
15                  THE COURT:  Uh-huh.  Now, I'm not pushing
16   any for your product.  In fact, I brought a bunch of
17   trailers from North Dakota or someplace.  I'm not
18   pushing that product.  All we're doing is telling you
19   capability, because everything is on the table.  And now
20   I'll tell you something else that's on the table.  I was
21   pretty harsh with the VA.  Okay.  I've got to tell you
22   that.  As a veteran, I'm not real pleased.  And I've got
23   a bias in terms of the way veterans have been treated.
24   And if I put that on the record, and admit you're
25   biased, then you can be fair, right.  But you got to
```

Page 97

```
 1    admit that sometimes.  I was biased against that.
 2                   I went out to the VA, and I got to tell
 3    you something.  They did a great job.  They did a great
 4    job.  Went out there and took a look, and they're
 5    setting up 209.  It -- oh, I know, it's too slow, too
 6    late, too little, subject to -- but they set it up.  And
 7    they've got two more or three more coming on board.  But
 8    the astounding thing is that they made a value choice.
 9    And I'll tell you how much is on the table right now.
10    They took the veterans off the street around the
11    encampment and put them behind on a parking lot.
12                   And I'll show you.  It was bring your own
13    tent, and bring your own stuff.  Because, first of all,
14    you're safer.  We've got hygiene.  We've got water.
15    We've got food, and we -- at least we've got a toilet.
16    Because Shayla, you were complaining that the city only
17    had X amount of toilets and hundreds of thousands of
18    people.  Now, is that a good solution.  Absolutely not.
19    But it's a great solution compared to what they had
20    before.  So, that's what Dr. Sharon --
21                   MR. YOUNG:  Sharon.
22                   THE COURT:  -- Sharon was trying to say
23    to us, and that is when getting these people, try to do
24    something along the way, even though it's not perfect.
25    Get moving.  So, you're one option for us.
```

Page 98

```
 1                    MS. KING:  Uh-huh.

 2                    THE COURT:  And you can produce 500,000

 3      in a week.

 4                    MS. KING:  Sure.

 5                    THE COURT:  No, I'm just kidding.

 6                    MS. KING:  You bet.

 7                    THE COURT:  But, you can take back to the

 8      mayor whatever you're going to do, that that's another

 9      option on the table.  And you're not hearing pushback.

10      So, if they get put up -- other than the location fight,

11      which is always going to take place, which place, how

12      much room, et cetera.  That will always be on the table.

13      Great.  So, Amy, anything else you want to say?

14                    MS. KING:  Well, our units can be moved.

15      So, if you need to change the site around -- we have

16      other deployments, where we've set them up and they've

17      been up for three to six months and then that -- in a

18      certain district, and then they move to a different site

19      in another district, so that different areas and

20      neighborhoods are sharing that load.  And then, in

21      Sonoma County, they've emptied out the -- or, cleared

22      the Joe Rodota Trail, and moved all those people into a

23      site that we set up there.  And the adoption rate was

24      almost 100 percent, of the homeless individuals there

25      chose -- they had the choice between the pallet
```

Page 99

```
 1    community and then a congregate shelter, and they were
 2    -- there's a wait list for the pallet shelters.
 3                    THE COURT:  Yeah.  And see, what -- it's
 4    just one more example.  This is not the solution.  The
 5    solution may be bring your own tents to the VA.  The
 6    solution may be these.  The solution may be hotels and
 7    motels that are purchased and become more permanent, for
 8    example.  Those are all on the table now, for everybody.
 9    But I wanted to bring that in today, just so we could
10    look at them.  Because I didn't know what they looked
11    at.
12                    Now, one of the things that happens also
13    is we used to talk about $600,000 per unit.  I leave
14    that to you.  Because I can imagine if you're living in
15    Kansas or any part of America that seems like a lot of
16    money.  Doesn't it.  So, I started -- and I have to tell
17    you another bias.  I started believing that we could
18    accomplish this long-term supportive housing, and maybe
19    we still can.  In fact, you've got a lot in the
20    pipeline.  But I show on the flip side of the crisis
21    where I came from, that everybody was living on the
22    riverbed, and honestly anything that I could do, even 10
23    percent better -- even getting a lousy toilet out on the
24    river -- Brooke, remember when the county wouldn't
25    supply one toilet on the river, because somehow that
```

Page 100

```
 1    would attract homeless, when you had 1,500 people on the
 2    river defecating.
 3                   And then the statistic was, to make you
 4    really ill, and I put this on the record -- make sure
 5    you put this down -- that one of the supervisors
 6    complained that there were 400 pounds of feces that they
 7    had picked up over three days.  I won't tell you the
 8    measurement made of that.  Now, you have to wonder over
 9    the five and a half years when people were on the Santa
10    Ana River, if you computed just that amount of feces for
11    three days, I wouldn't be swimming in the mouth of the
12    Santa Ana River or Newport Beach for a couple of years.
13    And I'll put that on the record.  Because all that was
14    going right down the river.
15                   So, from my perspective walking down the
16    river, I was somewhat stunned that there wasn't even a
17    modicum of a toilet, because somehow this would reduce
18    homelessness or attract homelessness in areas where the
19    homeless had already gathered.  So, I'm going to take
20    Alameda down in Wilmington.  Have any of you ever driven
21    -- done Alameda down in Wilmington?  Go drive down there
22    sometime.  Okay.  And I understand the permanency of
23    that.  So, the nice thing about somebody like you is
24    that once that purchase is made, somebody can reuse it.
25                   MS. KING:  Absolutely.
```

```
1                    THE COURT:  And if they can get it
2    cheaper from somebody else -- you're in a competitive
3    business.  Right?
4                    MS. KING:  Sure.
5                    THE COURT:  And this unit out here costs
6    how much money?
7                    MS. KING:  So, all in, the shipping,
8    taxes and deployment fee, that unit is $7,600.
9                    THE COURT:  Okay.
10                   MS. KING:  That's for everything, with us
11   setting it up.
12                   THE COURT:  And I got here and watched
13   you set that up in 23 minutes.  That took 23 minutes to
14   set that up.  Reusable.  Removable.  And we could fight
15   about where it goes, what parking lot or land later on.
16   But the nice thing is, if an investment is made in
17   something like that, I can keep reusing them.  And I can
18   keep reusing it in communities where I am moving to
19   next, and next, and next.  Because if, in fact, we were
20   moving people from libraries, or we're moving people
21   from airports, or we move people from parks or
22   recreational centers, this might offer us an option
23   immediately to put those people into humanely, rather
24   than just get out.  Okay.
25                   MS. KING:  Yeah.
```

Veritext Legal Solutions
866 299-5127

```
 1                    THE COURT:  Well, Amy, thank you very
 2     much.
 3                    MS. KING:  You're welcome.
 4                    THE COURT:  Yeah, I'm very humbled to
 5     have met you, by the way.
 6                    MS. KING:  And the same to you.  Thank
 7     you.
 8                    THE COURT:  So, thank you.  Yeah.  Okay.
 9     Now, I am hearing right now that there is no better plan
10     to include than some kind of hopeful overarching
11     settlement.  So we have some policies and procedures and
12     some uniformity, but I hope that we believed that our
13     council people have the best input and knowledge about
14     their particular district.  And therefore, if this does
15     work, that is going to require backbreaking work on
16     behalf of the federal court.  Because we're going to
17     have to get involved with you and Joe on the front side,
18     and all of the advocates, and work together to make it
19     work.  Otherwise, it's just lawsuits and come and see us
20     in two years.  Okay.  That's the kind of work it's going
21     to require.  That's why Judge Birotte, Judge Gonzalez --
22     a lot of people are getting involved behind the scenes.
23     We've kept them out.
24                    Okay.  Now, I want to talk about
25     something that's really inflammatory.  Because you
```

Page 103

```
 1    haven't had enough passion yet today.  You're not angry
 2    enough at each other and me yet.  Enforcement.  The
 3    areas that are causing great concern are what was our
 4    skeleton plan going to be, what does the word
 5    enforcement mean, bulky items and possessions -- that's
 6    a really touchy point.  I want to talk about
 7    enforcement.  Okay.  Whatever that means.  Okay.  I want
 8    to assume in the county that you've got some cities that
 9    like to write ordinances.  And those ordinances are
10    pretty tough ordinances.
11                   And you've got a big city over here, kind
12    of like this elephant called Los Angeles, and in this
13    neighboring city in the county that they write some
14    pretty horrific ordinances that really cause the
15    homeless to move.  They say, you know, I can't do X, Y
16    and Z, and so this ordinance in this city is so strong
17    that I'm going to go to another city that either has
18    that ordinance having previously been declared
19    unconstitutional -- and I'm not saying that there are
20    cities like that, but -- one of the things that the
21    advocates have to fear in any settlement is this.  And I
22    would think that the city would fear this, because
23    you've got what I call kind of these medium ordinances,
24    and they sweep citywide.  In other words, you can't
25    divide out your district, Joe, from --
```

Page 104

```
 1              COUNCILMAN BUSCAINO:  Correct.

 2              THE COURT:  -- John Lee's, from Mike

 3    Bonin's.  You can't do that.  So, you've got to, kind

 4    of, these ordinances -- or another city, if they wanted

 5    to, could take advantage of you.

 6              COUNCILMAN BUSCAINO:  Yes, sir.

 7              THE COURT:  So, I would assume that

 8    you're starting from a point that all of us recognize,

 9    anytime we don't have to arrest or even cite that that's

10    a good place to be.  And I would start from the point --

11    and a firm belief now, after three years, that most of

12    your homeless, however you define that number, actually

13    want shelter.  And I'm going to start from a point that

14    I think we've had it backwards talking about the 5

15    percent and the 5 percent, that I would love to see us

16    dealing with the 60 or 70 percent -- never forgetting he

17    others, by the way, don't get me in that position -- but

18    the 60 or 70 percent that we would be getting shelter up

19    -- or 75 percent, I don't know, or 80 percent -- I have

20    no idea what the number is, that -- who want to come

21    into shelter.

22              Because that would help the city

23    immensely with that voluntariness.  Right.  I mean, Joe,

24    it would clean up your district amazingly for your

25    public, and the perception.  And I've come to believe,
```

Page 105

```
 1    with a bias on my part that I freely admit, that most
 2    homeless people will come into shelter.  Most homeless
 3    people, if they had -- however you define decency and
 4    talk about that, with varying degrees, will actually
 5    want to come into shelter.  Now, I started with a rate
 6    of 60 percent, and I've thrown that out the window.
 7    It's meaningless to me right now.  And if that's the
 8    case, then how do we accomplish that and how quickly do
 9    we accomplish that for that -- whatever percentage it
10    is, as quickly.  So, Carol?  And now, solutions.   How
11    do we accomplish that?
12               MS. SOBEL:  Well, I want to talk about
13    Los Angeles, because I think, you know, what I've said
14    to the Court and what I will say publicly is when you're
15    talking about a city in Orange County that has --
16               THE COURT:  I'm not.
17               MS. SOBEL:  No, let me just set this out.
18    Because, you know, you know this but I -- you know, I've
19    said this to you, but I want to say it to everyone else.
20    When you're talking about a city in Orange County that
21    has maybe -- you know, what -- setting Santa Ana and
22    Anaheim aside, that has, maybe, you know, 96 homeless
23    people, and they set up a shelter that takes in, like,
24    56, and they're next to a city where they could -- you
25    know, they've got a -- the county operates a big
```

Veritext Legal Solutions
866 299-5127

```
 1    shelter.  You're talking about a very few people.  When
 2    you're talking about any percentage like that in Los
 3    Angeles, you're talking -- just using 2019 numbers, you
 4    are talking about more than 10,000 people still on the
 5    streets.  And if you're talking about what it is now,
 6    you're talking about 15,000 people.  You're talking
 7    twice the number of total people who are unsheltered in
 8    -- who are homeless in Orange County, both sheltered and
 9    unsheltered.
10              So, I don't understand what that means in
11    Los Angeles, nor do I understand what it means when we
12    have the LAHSA guidelines.  And I don't -- you know,
13    from my perspective, the LAHSA guidelines are what
14    should control what every city and the county does in
15    this jurisdiction.  And that is you don't criminalize.
16    If you have to arrest somebody, you have collaborative
17    court.  We don't have that.  You recognize that every
18    time you criminalize someone, you have created barriers
19    to both getting them into shelter, getting them into
20    services, and getting those services for them going
21    forward.  The LAHSA guidelines are excellent.  And they
22    should be what forms the discussion on this issue.
23    Otherwise, I don't understand why LAHSA did it.  But,
24    you know, I -- they're very good.
25              THE COURT:  Okay.  Carol and I have had
```

Page 107

```
 1    this discussion numerous times, I think the last one

 2    with Whittier.  So, let just have that discussion now,

 3    because we have agreements and disagreements.  I came up

 4    with a solution, a good or bad one, about using the word

 5    lawful enforcement.  Carol, you wanted to -- hold on.

 6    You wanted to write into the -- and let's be -- let's

 7    have this discussion.  You wanted to write into the

 8    agreement that they would only, at the most, be cited,

 9    with 840 or 850.  Right?

10                    MS. SOBEL:  853.

11                    THE COURT:  Yeah.  You said that that was

12    the last.

13                    MS. SOBEL:  That's state law.

14                    THE COURT:  And I came back, and my

15    response was I don't want to take away from you the

16    right to sue if an ordinance is onerous or

17    unconstitutional.  If a city -- if a neighboring city to

18    Joe's is taking advantage of that city, and creating an

19    unconstitutional law, and Joe is laboring under what I

20    call a constitutional law, you shouldn't be precluded

21    from suing that city and the county taking advantage of

22    you.  And I still stand by that.

23                    Our disagreement is that there has to be

24    some kind of enforcement.  And when I use that word, you

25    think arrest.  And immediately, the one or very few
```

```
 1    people who would ever be arrested -- but law enforcement
 2    has to have that, in a 138.  And Brooke, once again I
 3    apologize to you, or yesterday.  But I'm going to lay
 4    out the discussion Brooke and I had about this.  A city
 5    that I won't mention, named Stanton, has a clean-up.
 6    And in that clean-up, Brooke gets word last night that
 7    there is an enforcement action -- and Joe, this is going
 8    to be typical -- where ten people are arrested.  Okay.
 9    Ten people were arrested.
10              Now, what we don't know, because this is
11    coming through a client, and -- is that they've had
12    prior cleanups with no prior incidents, out in that
13    area.  So, of course, from an advocate's standpoint they
14    think ten people getting arrested.  I mean, what would
15    you think.  That's an enforcement action.  And you've
16    got a pretty conservative mayor out there, who has been
17    pretty vocal about enforcement.  Which means arresting.
18              What we find out is that 20 people
19    complied, 10 people didn't comply.  Neither one of us
20    are there, and the miscommunication is the advocate
21    should have known that that cleanup was taking place.
22    They had notified you.  You could have been there if you
23    chose to.  What we didn't know is we didn't know that
24    any mental health people were there.  Turned out that
25    the blue shirts -- what we call the blue shirts were out
```

Page 109

```
 1    there, like Heidi, but lots of them.  Okay.  But the
 2    nice thing about it is we got everybody into court, and
 3    I think -- and hopefully, we don't have a pattern and
 4    practice, if it was an enforcement action, because the
 5    federal court is watching that -- by the same token, if
 6    it was a cleanup and you've got a bunch of bad actors
 7    who was -- wouldn't move, then the question becomes how
 8    much do you escalate that.
 9              Now, most law enforcement people would
10    just like to get you to move so they could clean up that
11    location.  There's no advantage in putting you into
12    jail.  Now I'm going to tell you another incident Brooke
13    and I have a tremendous disagreement about.  And that's
14    the Placentia [ph] cleanup.  And that is, there we've
15    got a person who wanders out.  Brooke will give you a
16    different version, but my version is correct,
17    unfortunately.  Very -- no, my version is correct on
18    this.  You're wrong and I'm right on this one.  That
19    person comes wandering out of -- as we're spraying.
20    I've been out there two mornings, Brooke, and you can
21    verify that, walking up and down, talking to people
22    along with you and the city.  We're going to have --
23    you've leaving this encampment.
24              And this person walks out, and Brooke
25    will claim he's got a medical -- and he may have from
```

Page 110

```
 1    past circumstances some medical issue.  But this person
 2    is stopping.  He is not moving.  And what he is causing
 3    is the other people who are complying, moving up the
 4    street with wagons and belongings, because of his
 5    perceived attitude or actual attitude -- and I will say
 6    it was an actual attitude, period -- nobody is moving.
 7    Now, that's a 148.  He was told to move repeatedly, and
 8    wouldn't move.  At that point, that person needs to be
 9    given a real quick choice, and that is on that one-half
10    of 1 percent -- because by the way, we have 110 people
11    or something, 105 folks, I forgot what -- we had only
12    one incident out there.
13               Now, Brooke and I did a dog, cat and pony
14    show about it.  I never was going to have the guy go to
15    jail, as long as there was something immediately in
16    everybody's presence that said, you know, keep moving up
17    the street with your belongings to that location as we
18    directed you.  And eventually Brooke went over and
19    talked to him, came back to me, I talked to Brooke, this
20    deputy did a great job.  By the way, we got him
21    released, no harm, no foul.  But we did stop him.  That
22    was a 148, Joe.  Law enforcement has to have this,
23    because what the advocates can't write, and I'll say
24    this to you, you can't write the script for law
25    enforcement on the street.  You can't take out the
```

                                                    Page 111

```
 1    authority of law enforcement to act on that appropriate
 2    occasion, because that's their value judgement on the
 3    street.  Then you can complain to the Court.  No, I'm
 4    not done, Carol.  I'll give you unlimited time in just a
 5    moment.
 6              So, that's when I say -- when I say
 7    enforcement, that still has to be on the table in terms
 8    of eventually having to make arrests in that extreme
 9    position when it's called for.  But nobody wants that.
10    And what's getting lost in this conversation repeatedly
11    is I just mentioned one incident out of 105 or 110
12    people.  All of the rest lawfully complied, got out of
13    the area.  But I think as advocates, you'll come back to
14    me and first question my perception last night -- now,
15    hold on.  You're wrong about that.  I saw it.
16              Number two, to me that's a 148.  That is
17    absolutely where law enforcement should have acted,
18    period.  Now, Brooke and I can disagree.  I --
19              MS. SOBEL:  So --
20              THE COURT:  But no, I'm going to give you
21    a little bit of time --
22              MS. SOBEL:  Okay.
23              THE COURT:  -- believe it or not.  Your
24    time.  You've got to have that on the street when that's
25    called for by law enforcement.  Period.  But every
```

Page 112

```
 1    parent has to have that also with their children.  There
 2    has to be some consequence.  But Carol had a really good
 3    idea also, besides the LAHSA guidelines.  It was
 4    something that I realized on the Whittier that we
 5    neglected, that we talked about.  You also were going to
 6    put in an aspirational sentence, remember.  That the
 7    goal was to not arrest.  I'm --
 8                    MS. SOBEL:  It's in there.
 9                    THE COURT:  -- completely amenable to
10    that for one reason.  Law enforcement is getting, in a
11    sense, better trained when three years ago they would
12    have been hook and book.  When you said enforcement,
13    that -- lawful enforcement, that would be an arrest-
14    oriented atmosphere where I come from.  Here, you don't
15    seem to have that.  In other words, you're so much
16    farther ahead, that you seem to be willing to work the
17    other side, because the greatest benefit is you're
18    getting more people off the street voluntarily.  Now,
19    I'm going to stop.  I interrupted you.  Now I won't.
20                    MS. SOBEL:  Okay.  So, let me say a
21    couple thing.  One, what I said to you at the time that
22    we had this discussion about Whittier is if you want my
23    clients to abide by the law, then the police have to
24    abide by the law.  And 853.6 is the law in this state.
25    You cite and release, unless you have a specific reason
```

```
1    that you can give why you don't do that.  There is no

2    reason to take someone into custody to teach them a

3    lesson or to do anything else.

4                   THE COURT:  Okay.

5                   MS. SOBEL:  So, that's number one.

6    Number two, so --

7                   THE COURT:  Just --

8                   MS. SOBEL:  -- I think back to a couple

9    of things.  First, in this city -- and I realize the

10   Court isn't familiar with how law enforcement works in

11   this city -- periodically, this Metro police unit goes

12   out on their horses to intimidate homeless people.  I

13   have litigated this over and over against the city.

14   We've litigated it.  I've also opposed it.  I've written

15   to all the chiefs.  The purpose of that was just to

16   intimidate some homeless person.  It doesn't have to do

17   with them committing any crime.  One of my people was

18   this 67-year-old vet sitting on a bench on Venice Beach,

19   with his property, and the next thing you know he's got

20   to Metro officers on horseback, and they're writing a

21   citation that -- for a violation of law that doesn't

22   exist.  Part of that is because Los Angeles periodically

23   sends out Metro.  And while Metro may be really good at

24   SWAT, they are really bad at everything else, and

25   they're costing the city a fortune.  Whether it's the
```

Page 114

```
 1    stop of black and brown people in motor vehicles, or
 2    anything else, they're not useful.  But the police keep
 3    sending them out.  That's number one.
 4              Number two -- or, number three, is we had
 5    a homeless committee meeting a couple of years ago.  I
 6    think it was homeless.  It might have been public works.
 7    I don't remember.  But Mike Bonin was chairing the
 8    committee.  And the city of Los Angeles actually reduced
 9    a lot of its municipal code violations to infractions.
10    And those include most of the ones that would have been
11    applied to people living on the street.  Great idea,
12    right.  Reduce them to infractions.
13              Here's what the lieutenant on Skid Row
14    said at the time, and what I know is actually the case,
15    because -- at least was for a while, because my office
16    does two pro bono clinics, one on Skid Row, one in
17    Venice, for people who get these citations.  I pay
18    lawyers to go to court to represent people.  We have
19    volunteer lawyers who come in.  We do it on the same day
20    that -- in downtown that Legal Aid does their housing
21    and eviction clinic.  So, we know what's going on on the
22    street.  What the lieutenant said when Mike Bonin said
23    to him could you live with that if we reduce these
24    municipal code violations to infractions.  The
25    lieutenant said not a problem, we'll cite them under
```

Veritext Legal Solutions
866 299-5127

```
 1    state law.  Under the penal code.

 2                 THE COURT:  Okay.

 3                 MS. SOBEL:  So, they became misdemeanors.

 4    So, the obstruction became misdemeanor, which allowed

 5    them to then take somebody to jail.  Because that was

 6    how they were enforcing.  So --

 7                 THE COURT:  So now I'm going to give you

 8    a solution.

 9                 MS. SOBEL:  You can try to give a

10    solution, but, you know --

11                 THE COURT:  Well, we could go all day

12    long with the problems.  Now solutions.  First of all,

13    in the past this is -- your representation, excellent.

14    But somebody does something like this, and then you

15    decide I'm going to go seek redress in the court.  And

16    if you can find the homeless person who had this occur

17    to either he or she, it's a difficult task for you.  And

18    number two, if you can file the lawsuit, it's going to

19    take a while in Superior Court usually.  It wouldn't

20    come to federal -- but it could come to federal court.

21    But either court, it's going to take a while.  So, you

22    have to keep track of that person who may be stable,

23    maybe be transient.  That's a hard place for you to be

24    historically, to remedy these wrongs.

25                     When you have a settlement, you have the
```

Page 116

```
 1    Court involved on the front side.  Now, hold on.  So,
 2    the end result is -- could be that we're going to watch
 3    that city, we're going to make certain that that doesn't
 4    happen again.  You're going to get notice out.  And if
 5    you have one bad police officer doing this repetitively,
 6    we see it on the front side.  If we have a city doing
 7    this repetitively, we see it on the back side.  Or, the
 8    old method that you're operating under I don't think is
 9    bringing you the redress or the change that you perceive
10    is needed, and that is needed.  Because it's all over
11    here, when you try to recoup those clients and get them
12    into court and hold them for a year or two for
13    litigation.
14              MS. SOBEL:  Which is why I said to the
15    Court when we had this discussion a week or two ago,
16    whenever it was, is that if that's what -- you know,
17    that that doesn't work if the person is going into
18    custodial arrest because the damages are already done.
19    If the person is cited and released, there aren't --
20    there isn't the same injury.  And the LAHSA guidelines
21    talk -- just to go back to them again, talk about the
22    harm, the trauma of arresting homeless people and
23    putting them in jail.  We have a huge -- we had in, I
24    think it's 2013, the city decriminalized a lot of the
25    municipal ordinances, and the board of police
```

Page 117

```
 1   commissioners was involved and the city council approved

 2   it.

 3              And the reason they did it was they did a

 4   study of how much time it took to take -- arrest

 5   somebody and book them, versus how much time it was to

 6   cite and release them, or just take them to the station,

 7   book them, and let them go, if they didn't have proper

 8   ID and you didn't know who they were.  And they did a

 9   cost study.  They didn't do it because they were feeling

10   magnanimous about homeless people or anyone.  They did

11   it because it cost too much in officer time and overtime

12   pay, to do that.  So, they did this policy statement

13   that said you're going to comply with 853.6.

14              It's a -- you know, and we file the

15   document in some of our cases, just to remind the city

16   that this is what the city council passed.  This is what

17   the board of police commissioners passed.  So, Your

18   Honor, respectfully, we have a lot of experience in this

19   city, both collectively and individually.  And you know,

20   if there is an agreement that can be shaped that

21   addresses those problems -- but what we cannot agree to

22   is that the city is free to arrest people and then you

23   will address it on the back end, when --

24              THE COURT:  Nobody ever --

25              MS. SOBEL:  -- they should not be
```

Page 118

```
 1   arrested in the first place.

 2                 THE COURT:  -- nobody ever -- Carol,

 3   nobody ever said that.  And I think that what's getting

 4   lost is that that is such a -- or, should be such a rare

 5   occasion with this cite and release policy that those

 6   fears are mistaken.  That we're giving up on the huge

 7   number of people that you believe on this, hopefully,

 8   few occasions occur.  And I'm saying that the Court

 9   being involved with the front side is a better benefit.

10   Now, if you disagree, fine.  But what you're doing now I

11   don't think is working.

12                 MS. SOBEL:  Judge, I --

13                 THE COURT:  No, hold on.  From the very

14   beginning, have I ever said anything differently?  And

15   call me on this.  And I've always said I want strong

16   lawful enforcement and I want continuing enforcement

17   once these areas are cleaned up.  Have I ever said

18   anything differently than that in the last three years?

19                 MS. SOBEL:  That's not what we're talking

20   about.

21                 THE COURT:  No, don't -- timeout.  I want

22   to make certain that I'm --

23                 MS. SOBEL:  Yes.  Yes.

24                 THE COURT:  -- absolutely --

25                 MS. SOBEL:  So, instead --
```

Page 119

 1                    THE COURT:  Have I always said that, I
 2      want strong lawful enforcement?  I didn't say arrests
 3      and I didn't say infractions.  I said strong lawful
 4      enforcement.  And I've said that ever since I've met
 5      you, and I've made that a record.  And I want it
 6      continuing.  Once it's cleaned up.
 7                    MS. SOBEL:  But, the -- I don't know what
 8      that means, Your Honor.  I really don't understand what
 9      that means.  What are you enforcing for?  If it's
10      cleaned up and people don't have any place to live --
11                    THE COURT:  Because if, Carol --
12                    MS. SOBEL:  -- what do we do?
13                    THE COURT:  -- if it's cite and release,
14      that's fine.  It's --
15                    MS. SOBEL:  We've always --
16                    THE COURT:  It's -- hold on.  If it's
17      853, that's fine.  But on the occasion that I'm a 148,
18      and I'm not moving, and I chew up this ticket, flip you
19      the middle finger, and I stop other people, yeah, that's
20      a 148 and law enforcement should act on that occasion.
21      And they should not be choked.
22                    UNIDENTIFIED FEMALE SPEAKER:  Your Honor,
23      I think the problem is the --
24                    MS. MYERS:  Is it like a -- the case that
25      this --

                                              Page 120

```
 1                    THE COURT:  No, I can't hear.  One --
 2      Brooke, I'm sure --
 3                    MS. MYERS:  I think the issue is is that
 4      what is presented in front of us -- and I think, you
 5      know, if you want to have a different conversation,
 6      fine.  But certainly what folks have intimated that they
 7      want to discuss at this table is the enforcement of
 8      things like anticamping ordinances when there is no
 9      place else for people to go.  And I think --
10                    THE COURT:  Oh --
11                    MS. MYERS:  And that's what our problem
12      is.
13                    THE COURT:  But Shayla, there has to be a
14      place for people to go.
15                    MS. WEITZMAN:  Judge, that's what I was
16      hoping to clarify, is that to the extent -- like, even
17      if I'm wrong about all the facts on the other ones, the
18      cases that we were addressing were not arrests for
19      camping.  They were not quality of life tickets.  It was
20      only when it's a homeless person, how far did those law
21      enforcement officers need to go to bring in health care,
22      to do services, and when could they arrest for refusing
23      to move over for a cleaning.
24                    THE COURT:  Okay.
25                    MS. WEITZMAN:  Which is a very different
```

Page 121

```
 1    conversation than could they arrest them for --
 2                  THE COURT:  Listen closely.
 3                  MS. WEITZMAN:  -- purely --
 4                  THE COURT:  Because these are the areas
 5    historically in all of the settlements that we have been
 6    involved in that are the flash points.  So, we've
 7    covered a couple of them so far.  Okay.  And this issue
 8    concerning how you define that and how you enforce that
 9    has always been a flash point.  So, that's something
10    we're all going to have to deal with.  I'm going to
11    leave it for a moment.
12                  The next thing I'm going to touch upon,
13    just to have us start thinking, are bulky items.  In
14    other words, we're going a little this way now.  Bulky
15    items and the perception that the streets aren't clean
16    or are cleaned or you can carry a mattress or whatever.
17    And unless this is appealed, that's the law of the land.
18    Judge Fisher's ruling is it.  And so, right now that
19    would stand for a modicum of things I take with me.
20    Right.  And it's not, by the way, one 60-gallon can.
21    One 60-gallon trashcan was something that came into the
22    recreational centers, and Judge Fisher also talked about
23    that in her opinion, and hopefully a personal item.
24                  But one of the things that was said to me
25    by the advocates was this.  What happens if I go into a
```

                                                   Page 122

```
 1    shelter or recreational center and I'm -- and it's being
 2    used.  Then the city comes along and they create 30 days
 3    of motel space, because they really want to sweep the
 4    city.  Okay.  So, they create 30 days of hotel space,
 5    and I come in with my tent and I give it up, and I give
 6    up my towels and my personal effects.  And I go in.  And
 7    then the lease runs out, after 30 days.  And now I'm
 8    supposed to go back out on the street, but I've got no
 9    tent that anybody is going to supply me, no towels, and
10    I'm out.  So, it was just used for enforcement purposes.
11    That's one concern.
12               The other concern is always going to be
13    how much.  You know, if I'm living on the street how
14    much, and Judge Fisher decided that.  And so, what
15    happens if we create these shelters.  How much is coming
16    into these shelters, versus how much I can have on the
17    street if nothing has been created.  And so, if I'm in a
18    particular district, for instance, or city where you
19    created a shelter, is it fair to set some kind of
20    standard.  Because there's a concern that I should bring
21    my bicycle, I should bring my tent, and I think a tent
22    alone would fill up a 60-gallon trash bag.  So far in
23    this city, the standard is somewhat in the vicinity one
24    60-gallon can, in recreational shelters.  And a personal
25    item, like a bicycle, et cetera.  I don't know if I even
```

Page 123

```
 1    want to get into that discussion, but that is the third
 2    flash point that's come up in every one of -- well, most
 3    of the discussions that we've had.  And I think it's
 4    been a hot topic for the council --
 5                   COUNCILMAN BUSCAINO:  Sure.
 6                   THE COURT:  -- to deal with also.
 7                   MS. SOBEL:  We have decisions on that.
 8    We've had three court decisions.
 9                   THE COURT:  yeah.
10                   MS. SOBEL:  The Ninth Circuit, and two --
11    and three District Court.  I think I'm a little lost,
12    because it's not -- Your Honor, I'm a little lost with
13    understanding why it's an issue to be discussed here,
14    given those decisions.  Is the Court suggesting that you
15    would --
16                   THE COURT:  Did Judge Fisher address the
17    amount of belongings that I can bring, as a homeless
18    person, if I come into a shelter?
19                   MS. SOBEL:  That presumes that the
20    shelters are going to be the --
21                   THE COURT:  I'm sorry.
22                   MS. SOBEL:  -- option, and that's -- that
23    presumes that shelters are the only option here.
24                   THE COURT:  No, I -- but if I come into a
25    shelter, did she address that?
```

Page 124

```
 1                    MS. MYERS:  No, Your Honor.  That issue
 2      is not before the Court in Garcia.
 3                    THE COURT:  No.  Because what happened is
 4      the city had to address that, Christina, when you built
 5      the recreational shelters and it was decided that it was
 6      a 60-gallon trashcan, along with a bike, and that was
 7      the standard to come into your shelter.  Correct?
 8                    MS. WEITZMAN:  Judge, I think that's one
 9      of the spaces where if we look at the cost effective
10      housing solutions, and we look at giving people rooms,
11      then that issue resolves itself.
12                    THE COURT:  Well, the -- exactly.
13                    MS. WEITZMAN:  Because they just bring
14      their stuff in the room.
15                    THE COURT:  And that's why I'm addressing
16      it here.  In your discussions, hopefully towards
17      settlement, you have to address the difference between
18      if I'm living on the street and I've got no shelter --
19      you've got case law.  That's it.  But if I'm coming into
20      a shelter, what is a reasonable amount of things to
21      bring with me.  And I think, Carol, we just had that
22      discussion and Judge Fisher did not address that.  And
23      that is if I'm coming in is a 60-gallon can acceptable.
24      By the way, I've got two bicycles, can I have two
25      bicycles instead of one bicycle.  Can I have X, Y and Z.
```

Veritext Legal Solutions
866 299-5127

 1    That has to be discussed in these discussions.

 2                    MS. SOBEL:  It doesn't have to be --

 3                    MS. MYERS:  Your Honor, if I could just

 4    discuss --

 5                    MS. SOBEL:  -- discussed in -- I'm sorry.

 6    I'm going to defer to Shayla.

 7                    MS. MYERS:  I mean, I think -- so, I just

 8    want to flag how I think sometimes when it's articulated

 9    to us from nonhousing folks about belongings and going

10    into shelter.  I think frequently the concern is not how

11    much can they bring into a shelter, but is the -- are

12    they going to be discharged day to day, and they're

13    going to lose their belongings.  Right.  That's the

14    challenge with the winter shelters, and for the drop-in

15    shelters, and for any of these congregate shelter

16    settings, where a person has to make the decision to go

17    into a shelter day to day.  They might not get a bed the

18    next day, and they need their tent.  I think it's less

19    about -- I mean, some of it is about how much -- how

20    many belongings they can bring in.  But more is about

21    that decision about whether to go into a shelter in the

22    first place.  And I think it's a barrier to people going

23    into shelter.

24                    MS. WEITZMAN:  When we were looking at

25    this issue before, that's what -- you know, all of our

                                            Page 126

```
 1    shelters switched to 24-hour services, drop in day

 2    centers.  Mainly we did that by making sure that people

 3    didn't have to make that day to day choice and risk

 4    whether they passed up tonight, because they could keep

 5    their pet and they could stay all day, and they could

 6    get help all day.

 7              MS. MYERS:  And so, I think it's also --

 8    it's the argument for continuity in housing, rather than

 9    drop in shelters on a night to night basis.

10              THE COURT:  Okay.  So, it keeps coming

11    back to housing.  So, let's get into the last hot topic.

12    I mean, there's a lot of them.  But, when I started

13    hearing about all of these pieces of Caltrans property

14    -- I'm very thankful today for your appearance.  Because

15    I know I'm dealing with 19 pieces of property, and,

16    frankly, with what I was hearing I thought there were

17    300 pieces of available property.  Fine.  At least I

18    know what I'm dealing with.  And I'm also hearing from

19    Carol's standpoint that there's a lot of city property

20    around.  Available.  In other words, that people can go

21    into.  But when we watch the --

22              MS. SOBEL:  A lot of that is Caltrans.

23              THE COURT:  Well, hold on.  Yeah.  But we

24    when watch the buildup in the city, one of the things

25    that I was listening to was it was hard to get staffing
```

Page 127

```
 1    in.  In other words, even if we got the property, we're

 2    trying to ramp up but, you know, we're struggling to get

 3    this staffing in at the same time.  Now, hold on.  I saw

 4    that to begin with, but it got resolved by the city

 5    having to go out and hire their own nurses, which maybe

 6    they should have.  I don't know.  But, I don't have any

 7    idea, and I'm humbly telling you this, whether I should

 8    be listening to you, Carol, or this multitude of

 9    property, and then you describe one piece of property

10    down in Pasadena which withdrew, I don't know.  Or if

11    there's a limited piece of property, with, you know,

12    hazard concerns, or it's got asbestos in it, I don't

13    have a clear indication of what's really available out

14    there.

15                 So, now I've got 19 pieces of Caltrans

16    property.  What's fact and fiction.  What do I have from

17    just the city of Los Angeles.  And what kind of property

18    is it, and am I going to find out, like, it's Fairview,

19    where they, quite frankly, I'll put it on the record,

20    lied to me.  And told me that it was unfit, that it had

21    all sorts of problems when I, quite frankly, had snuck

22    in.  When the beds are turned down and they're using it

23    for first responders, sheriff's personnel, and I'm being

24    told as a judge that this facility is unfit for human

25    habitation.  Well, thank God for Sharon Quick-Silva, who
```

```
 1    is the Assemblyman who barged in with me.  And there's

 2    downturned beds.

 3                   Now, what am I supposed to believe when

 4    that happens, about all of these numbers?  So, you

 5    understand why I'm very suspicious when somebody throws

 6    out in good faith 300 Caltrans.  Or there's unlimited

 7    bed spaces.  Or whoops, now we have an environmental

 8    hazard, because we can't sleep under the freeway.  Or

 9    we've got asbestos.  I don't know the number out there,

10    Carol, so I believe you -- I think you're in good faith.

11    Do I believe you?  Not all.  Marcus, do I believe you?

12    Not one bit.  I think you're in good faith.

13                   How do I get those numbers of habitable

14    spaces?  So, if you make the argument that the city can

15    do this, but the courts say, you know what, you really

16    can do this -- or it's a staffing problem and, Judge, go

17    slowly, go incrementally.  You know, take a particular

18    council district, like Joe's over here, and work with

19    Joe, because he's got a large number.  And maybe work in

20    one council district to begin with, so we're not all

21    over the place.  But Joe, if you know the numbers, tell

22    me.  Do you know the number of habitable spaces in your

23    -- that we could convert to housing in your district?

24                   COUNCILMAN BUSCAINO:  The numbers of --

25                   THE COURT:  Yeah, like vacant places.
```

Page 129

```
 1    City-owned vacant property.

 2                 COUNCILMAN BUSCAINO:  Your Honor, I would

 3    want to be sure.  We do have --

 4                 THE COURT:  Oh, yeah.

 5                 COUNCILMAN BUSCAINO:  We have available

 6    18 lots.  Council has --

 7                 THE COURT:  I'd love it.

 8                 MS. SOBEL:  The city also -- correct me

 9    if I'm wrong, Joe.  The city identified all of its

10    property, identified some of it that it would sell off

11    in order to take the money from that to pay for --

12                 COUNCILMAN BUSCAINO:  The --

13                 MS. SOBEL:  Yeah, for -- so, they know

14    what they have.  There's another question that goes with

15    that, Your Honor, which is how do we look at the 75,000

16    people who are unhoused in, or underhoused, in Los

17    Angeles county and city and figure out who needs what

18    services.  We have some -- we have systems -- we have

19    some systems.  But then, how would we match them.  I

20    think that we keep falling back into this notion of

21    shelters for everyone.  And I think that's really

22    deleterious for a lot of people.  They don't need a

23    shelter, they need a place they can afford.  And one of

24    the things that I tried to do in our settlement

25    statement is I said -- I'm happy to give people, because
```

Page 130

```
 1    all I used were LAHSA numbers anyway, and other reports
 2    -- is to say we need to look at both who the population
 3    is and what the cost is.  And not going down the same
 4    road we've gone down before, which may not be the best
 5    use of our resources.  I don't think we have -- I mean,
 6    I think this is really our last chance for a really long
 7    time to come up with an innovative approach in this
 8    city.
 9               THE COURT:  Agreed.
10               MS. SOBEL:  And that means we have to
11    think about who it is that is in homelessness, why
12    they're in homelessness, how we can use innovative
13    properties, can we repurpose properties, are there
14    building -- you know, we're in this city where people
15    bought up all of these office buildings and repurposed
16    them as upscale mini-lofts.  You know, the old Salvation
17    Army building on 5th and San Julian was bought by a New
18    York developer who was going to do that, until it became
19    too cost prohibitive.  But, you know, but the notion
20    that you'd put upscale mini-lofts at 5th and San Julian
21    is -- you know, you ought to have your head examined to
22    begin with.  But, you could repurpose it to -- for, you
23    know, for housing, for use for people.
24               But there are other people who just need
25    a place where they can be.  And maybe some of it is the
```

Page 131

```
 1    vacant Caltrans properties.  Maybe some of it is other
 2    vacant properties that exist in the city.  Maybe some of
 3    it is repurposing buildings.  But I think the very first
 4    thing we need to decide is are we locked into just
 5    spending billions of dollars on shelters, or are we
 6    willing to come up with an innovative plan that gets us
 7    out of this hole we keep digging deeper and deeper.
 8                THE COURT:  Okay.  So, my response to
 9    that is that's your responsibility.  I hear all the
10    problems.  I'm still waiting for solutions.  And that's
11    what I'm going to ask you to do.  And after a period of
12    time, if we don't have that capability, just put it on
13    the table.  Because what you're really going to say is
14    the inertia has taken over, that this is just too big
15    for us to handle in government, and it's just same old,
16    same old, lawsuits flowing.  That's fine.  But in a
17    short period of time, I'm going to be asking if that's
18    where we are.
19                So, the last generally -- there's a lot
20    of hot spots.  But the last hot spot is really this
21    coordination, or lack thereof, between the city and the
22    county.  And unless we have a blunt discussion about
23    that, then we're just walking around the problem.  And
24    I'm not here to do that.  This idea of services versus
25    structure versus how that interlaps leads to the
```

Veritext Legal Solutions
866 299-5127

```
 1    following kinds of conversations that I hear.  Oh, the

 2    county has got the money.  Oh, it's the city's

 3    responsibility.  And I know that Kathryn Barger has an

 4    extraordinarily good relationship with Eric Garcetti.

 5    So, at the top I really believe that that mesh is taking

 6    place.  But it's flowing down in such a way that

 7    initially I perceive that that is an age-old problem.

 8                    And maybe that's why LAHSA was created.

 9    Maybe LAHSA came in as the 800-pound gorilla because we

10    had these historical problems.  But the city can't move

11    without the county's largesse and power, because the

12    city of Los Angeles is probably, guesstimate, 60 percent

13    of the county.  Now, I would -- make it fair, 50

14    percent.  I don't care.  I don't want to quibble about

15    that.  But it's a huge amount of the services and

16    housing aspect, and it frankly maybe just needs to be

17    worked out, you know, on a piece by piece basis.  Maybe

18    we need just to go that way.  But up to this time,

19    that's the complaint I'll hear.  When I'm walking

20    through it, that old historical they did this to me way

21    back when, they should have paid for it, or vice versa.

22    It's their responsibility.

23                    If we've got that good enough working

24    relationship, what could happen is instead of forgetting

25    the old past wounds, maybe we're moving piece by piece
```

```
 1    and just making it work.  So, I wanted to bring that up,

 2    because I've consistently heard that.  Put it on the

 3    table.  But I think you're right, I think it's a way

 4    forward from this point.  So, where do we go from here.

 5    Because if this is simply going to be I'll get back to

 6    you, gosh, just tell me that.  Because it's just inertia

 7    by committee.  And if in fact, if that's the case, then

 8    I want you to file an answer, get the litigation going.

 9              And if it's so shallow as to believe that

10    one of you are going to win or lose, I'll say, since

11    it's the end, let's just assume the city had a winner.

12    They got it knocked out on summary judgment, six months

13    or a year down the line.  Okay.  Another lawsuit is

14    coming.  It's just coming piecemeal, or in a different

15    form.  Or, if you prevail, what's the end result.  A lot

16    of people are going to look pretty bad for a lot of

17    things that they shouldn't have done, quite frankly.

18    We'll have a wall of shame.

19              But the end result is it hasn't solved

20    anything now, because it's the first time I've ever seen

21    a council come together with 15 people, with your

22    strength, frankly, and Kathryn and the board come

23    together, and you've got a mayor in there who is active

24    -- for goodness sakes, if not now, I don't know when.  I

25    mean, Carol, you said it.  If not now, when.  You're
```

Page 134

```
 1    going to write the history of this city right now, or
 2    we're just going to have to say that the problem was
 3    just too big.  And I guess if the problem is too big and
 4    we don't have a solution, I guess we don't have a
 5    problem.  Well, I think our public thinks a lot
 6    differently.
 7                    I'm going to ask you one other thing.  We
 8    focus on the homeless, and that's the right place to be.
 9    But what about the general public.  What are they seeing
10    and getting so far out of any of our litigation.  When
11    they drive down the freeway, and they just look, when
12    they see a homeless person who is yelling and screaming,
13    or they see somebody absolutely pitiful -- you know, a
14    woman sitting there with a dog, I mean, what -- how is
15    that perceived in terms of just human kindness.  What
16    does our public gain from this, who is going to pay the
17    bill for this, who voted H and HHH funds.  And go out
18    and ask the average person, because I don't know what
19    they think they've gotten out of that tax.  You answer
20    that question for me.  I don't think it's going to be
21    pretty.
22                    So, if we lose that sight of the citizen
23    out there, who is -- would like to see something happen,
24    they can't quite define it between maybe strong on, you
25    know, arrests versus a tremendous amount of kindness,
```

Page 135

```
 1    and that whole spectrum.  Ask yourselves along the way,
 2    the homeless are part of the citizens.  They're not the
 3    separate group.  They're not the -- the end all is what
 4    betters this entire city, of which the homeless are a
 5    part.  And that's the way I'm looking at it.  So, humane
 6    -- humanity has to take precedence.
 7                   But by the same token, there's got to be
 8    some activity here at some point.  And we can't even get
 9    started.
10                   MS. SOBEL:  If I could just --
11                   THE COURT:  Now, your turn.
12                   MS. SOBEL:  Okay.  If I could just add
13    one more thing that I did say to you, and I will say it
14    publicly, along those lines.  What I said was that -- I
15    think I said it to Andre, when I spoke to him a while
16    ago -- the public wants to see action.
17                   THE COURT:  Yeah.
18                   MS. SOBEL:  And it has taken us more than
19    two years to build 800 shelter beds under the Bridge to
20    Home.
21                   THE COURT:  Right.
22                   MS. SOBEL:  The rate of people getting
23    out of shelter and into some permanent placement, again
24    using LAHSA numbers from 2017, is 5 percent for the
25    drop-in shelters, 15 percent for something a little bit
```

Page 136

```
 1    nicer, and 25 percent for the Bridge to Home.  It may be
 2    too early to really have a Bridge to Home, because most
 3    of those came in after the 2017 point in time count.  We
 4    can't take two years to build 800 shelter beds, when we
 5    have 15 percent more each year.  We need to have a
 6    vision that says we're going to look at how we can move
 7    a significant number of people off the streets into
 8    stable situations in a very short period of time.
 9                    THE COURT:  Yeah.
10                    MS. SOBEL:  And then, let's see how we
11    work on the rest of it.
12                    THE COURT:  Yeah.
13                    MS. SOBEL:  But we've got to convince
14    people that this is money well-spent.  And that we can
15    do the job.
16                    THE COURT:  Yeah.
17                    MS. SOBEL:  And if -- and the way we're
18    proceeding now isn't going to get us there.  So, I say
19    again, I -- I'll give you my document.  I'll give you my
20    cost numbers.  Maybe they're a little bit off.  But I
21    don't think they're that far off.  And let's figure out
22    if there isn't a different approach here than the way
23    we've been dealing with it in the past.  Because we're
24    not getting anywhere with what we've been doing.
25                    THE COURT:  Okay.  Here's what I've just
```

```
 1    absorbed.  Can we deal with never forgetting -- can we
 2    deal with a huge number of people as quickly as
 3    possible, in a humane way, to get them off the street
 4    into something better.  And I can't define that right
 5    now, because it can't be done quick enough.
 6                 And then number two, maybe we still have
 7    the energy and resources that I hope for for that
 8    kindness to continue for the even more difficult.
 9    Because the more difficult seem to be taking and sucking
10    all the oxygen out of the room to begin with.  So, we're
11    forgetting that 60 or 70 percent of the people that, for
12    God's sakes, we can help if we just had shelter right
13    now, folks, I promise you, the bulky items gets solved.
14    You're talking 90 percent of these people out there who
15    say they'll go into shelter -- Judge, I don't care about
16    this.  Give me a place to sleep, food.  I'll walk away
17    from all this stuff, this mattress and everything else.
18    Okay.  It would sure help our law enforcement.  So, we
19    just need shelter.
20                 And I don't -- everything is on the
21    table.  Everything is on the table from the VA model, in
22    my world, where they bring their own stuff into a
23    parking lot, which is God awful, but they're protected.
24    To motel rooms and hotel rooms that are separate.  To
25    this, to -- everything is on the table right now.  Just
```

Page 138

```
 1    tell me and help me how to get there, because if you
 2    don't then I've got to be the onerous judge that just
 3    imposes it on you.  And that's why I did that little
 4    dog, cat and pony show, to send you out there.  I didn't
 5    expect you to reach unanimous agreement on everything.
 6    Understood.  But I did expect you to start yelling and
 7    talking to each other, to find where the differences
 8    were.  And then if we need to go to a mediation, fine.
 9    Or if I have to do something through a TR.
10              Now, let's test a couple things.  I'm
11    going to throw out some wild ideas to you.
12              MS. SOBEL:  Your Honor, I know I'm
13    talking a lot.  Can I say something?
14              THE COURT:  Wild idea.  There's a lot of
15    discussion about what Boise does and doesn't mean.
16    There's been a request to clarify Boise.  Well, you can
17    test that in a number of ways, if you want to.  I think
18    that you would read Boise one way.  There's other
19    advocates that would read Boise a different way.  And
20    I'll give you some models.  Hey, how do we start to
21    enforce.  Can we do that district-wide.  Do you have to
22    meet your whatever percentage or whatever scheme we come
23    up with.
24              Or another is this.  Another is to
25    propose, well, you know, we get a -- the Los Angeles
```

Page 139

```
 1    site, for instance, or another site.  And by the way, do
 2    we then enforce for a three-block radius around that
 3    site.  Well, one argument could be, you know, that's a
 4    great incentive to have other people build out quickly,
 5    because a couple streets get clear.  Right.  It sounds
 6    attractive.  But the downside of that is how do you
 7    start defining those sites.  And aren't you just pushing
 8    people like this.  So, that's why I've always been on
 9    the side of the district, because I could work with each
10    of you and the advocates who can work with you, Joe and
11    Nury, with a lot of work with each other's districts.
12    That's why I thought it was a better model.  But that's
13    another model.
14               You want to try the spa.  What a
15    nightmare that would be, but try that one.  How about
16    the supervisor's district.  The larger you get, it gets
17    unworkable.  So, I think this still is best, that I
18    touched on, is the wisdom of a council people knowing
19    their own district and working with the Court and
20    working with the advocates to get this thing going.
21    Now, you tell me where to go from here.
22               MS. SOBEL:  Can I just add one thing, so
23    I can just clarify for everyone in this room?  We have
24    never, ever said that bulky items protects --
25    mattresses, couches, things like that -- we specifically
```

Page 140

```
 1    in Levan, which is the first major property case, we
 2    specifically said that is not what we're talking about.
 3    You want to take those, take those.  We've never, never
 4    argued that people get to keep mattresses, chairs,
 5    couches, and things on the street.  So, it's really a
 6    nonissue.  And the bigger problem in this city is people
 7    dumping their old mattresses in the alleyways, which has
 8    nothing to do with homeless people.
 9                 THE COURT:  Okay.
10                 MS. SOBEL:  And as I said on an earlier
11    -- at an earlier court hearing, we have a special line
12    in the budget to clean the alleyways.  And that has
13    nothing to do with homelessness.
14                 THE COURT:  Okay.  I'm wide open to you
15    developing and guiding the Court.  It's not a threat,
16    but if you don't then you're going to leave me to my own
17    devices.  And once I decide it, I'm going to be very
18    reluctant to back up and start again.  So, I'm really
19    asking you for some comfort level -- and right now I've
20    heard that I'm working on a five-week time plan, between
21    you and Caltrans.  Right?  I want to thank you for that.
22    Because I promise you, without that input I would have
23    been very unfair about that.  I would have said, with my
24    impatience over this litigation, hey, I want it next
25    week.  Now, that would have been ludicrous, right.  But
```

Page 141

```
 1    that's what I would have said.  I wouldn't have known.
 2    So, am I going to work with you on five weeks.  Yeah,
 3    that was a good faith between you.
 4              So, if you can control me and make me
 5    wiser, I'm going to work with you.  Otherwise, I might
 6    make some outlandish decision that's got you chafing.
 7    But I'm not going to back up on that, once I make that.
 8    So, this is your opportunity.  I would suggest that you
 9    just some moments, have a conversation with each other,
10    lay out a timeline that you might want to develop a
11    location-based approach or a people-centered approach
12    that you talked about.  See what that timeline is, and
13    how that would be feasible and work.  I think you've
14    already got it in your minds.  I think that you would
15    want to start wrestling with what enforcement means,
16    okay, and how that's -- that debate is going to rage
17    back and forth.
18              MR. UMHOFER:  Your Honor, I do think that
19    there's a way to break off another chunk here and have
20    some success.
21              THE COURT:  Okay.  I can't hear you,
22    though.
23              MR. UMHOFER:  I do think that there's a
24    way to break off a chunk here and have some success in
25    one particular area.
```

Page 142

```
 1                    THE COURT:  Okay.

 2                    MR. UMHOFER:  And that may be the county

 3      and the unincorporated areas in the county.

 4                    THE COURT:  I agree.

 5                    MR. UMHOFER:  I think they -- that might

 6      be a very positive place to start.

 7                    THE COURT:  I agree.

 8                    MR. UMHOFER:  For lots of different

 9      reasons.  So, I'm going to propose that we start there,

10      and maybe try to make some progress on that today.

11                    THE COURT:  I think so, too.  And I think

12      I expressed to you that I thought there was a good

13      chance of your being the first to settle.  Have you

14      talked to the advocates?  Have you had a chance to have

15      a discussion with them?

16                    MR. YOUNG:  We have had preliminary

17      discussions with the advocates.

18                    THE COURT:  Okay.  Give me a time frame.

19      You know my hours, don't you.  But I would like to know

20      today if we're really making progress, if we can get

21      close or get it resolved.  And if we can, it's a step

22      along the way.  So, I agree with you.  Some of these

23      issues are going to come up, though, I promise you, in

24      that discussion.

25                    MR. UMHOFER:  So, my thinking is that we
```

Page 143

```
 1    would go and sit down with the county and try to work
 2    out a turf sheet.  And that that would be a good place
 3    for us to start, and may give a template -- it may give
 4    us a template for the districts.
 5                   THE COURT:  And maybe not, by the way.
 6                   MR. UMHOFER:  Maybe not.
 7                   THE COURT:  Don't expect consistency,
 8    necessarily.  Maybe not.  Okay.  What time would you
 9    like me to be here, to make that effort.  And by the
10    way, I would ask for that effort.  But if some party
11    decides not to participate, that's my answer.  That's my
12    answer.  Choose -- you choose to control this and
13    participate and be part of the process, or you don't.
14    And if you decide not to, just please tell me.
15                   MR. UMHOFER:  Alliance is in.
16                   THE COURT:  Let's go.  Let's go try.
17                   MS. MYERS:  I don't --
18                   THE COURT:  What do you have to lose.
19                   MS. MYERS:  I mean, I think you may have
20    a difference of opinion about where the different
21    parties are.  I mean, I think it's -- I think it has to
22    be said that we are not going to negotiate away the
23    constitutional rights of unhoused folks.  That just has
24    to be very, very clear.  And I think -- we are
25    absolutely open to every conversation that leads to
```

Page 144

```
 1    housing, right.  And so, we are very interested in

 2    housing and how to increase housing stock.  Because I

 3    think that will resolve the issues.  But again, we're

 4    just -- we are not going to negotiate away the

 5    constitutional rights of unhoused folks.  And so, we

 6    should have that conversation, certainly.  But it should

 7    be a conversation, and I think I'm -- we just want to

 8    make sure assuming --

 9                   MR. YOUNG:  We're happy to have that

10    conversation.

11                   THE COURT:  Yeah.  Specific proposals --

12                   MS. MYERS:  Well, so -- yeah.

13                   THE COURT:  Shayla, you may not be aware

14    of a confidential document to me, they may choose to

15    make those known to you.  You're probably not even aware

16    of some numbers, et cetera.  But, I would just encourage

17    you to go make the effort.

18                   MS. SOBEL:  We had a conversation for an

19    hour yesterday.  The county gave us a list of points.

20    Then they had to get another call.  Some of it was they

21    absolutely required that we incorporate this 23-page

22    document that I haven't even read yet.  My recollection

23    of seeing the press on it is that I strongly objected to

24    parts of it.

25                   THE COURT:  No, no.  Let me stop that
```

Page 145

```
1    right --

2                    MS. SOBEL:  So, how can I -- how can we

3    reach --

4                    THE COURT:  This document has to be --

5                    MS. SOBEL:  -- an agreement?

6                    THE COURT:  -- something that I can read.

7                    MR. YOUNG:  Yes.

8                    THE COURT:  Do you know how low that

9    standard is?

10                    MR. YOUNG:  Yes.  No, I don't know how

11   long that standard --

12                    THE COURT:  It's very low.  There aren't

13   a bunch of attachments to anything.  There isn't a

14   reference that I have to go look at footnote 42 and

15   refer to something that I'm never going to read.

16   Everything is in this document and it is really

17   understandable, so I, as a good beer drinking American,

18   can pick that up and read it.  Get it?

19                    MR. YOUNG:   Yes.

20                    THE COURT:  This is not for lawyers.  So,

21   attachments -- I don't even know what those are.  No.  I

22   don't read attachments.  I don't even read footnotes.

23                    MS. SOBEL:  Here's -- here's the --

24                    THE COURT:  Now, go -- why don't you go

25   back --
```

Page 146

```
 1                    MR. YOUNG:   Why don't we discuss --

 2                    THE COURT:   I think we've done enough

 3       talking.  Let's see --

 4                    MR. YOUNG:   Yeah.

 5                    THE COURT:   Like the governor said, it's

 6       time.

 7                    MS. SOBEL:   Here's the other question

 8       that I have.  Okay.  And this is based on our experience

 9       in Orange County.  And there was no city at this table

10       that is in Los Angeles county that is not independent

11       like Los Angeles city.  Okay.  So, none of them are

12       near.

13                    THE COURT:   Sure.

14                    MS. SOBEL:   So, the difficulty that has

15       occurred in Orange County, that -- and Michele is gone,

16       but -- or, I think -- but we discussed this when the

17       Court raised it a couple of times.  And the cities in

18       Orange County have raised it as well.  Is they are

19       opening shelters.  They are trying to get to a number so

20       that they can leverage enforcement.  And the problem is

21       they're spending a lot of money that they don't have.

22       So, they might have -- like, you know, Placentia passed

23       a sales tax.  Good luck with that, when no one is

24       shopping.

25                    And so, what they have all said -- and I
```

Page 147

```
 1    think this is really critical in any discussion with the
 2    county, what they have all said to the Court, what
 3    they've all said to Michele, what they've said to us, is
 4    we can't afford to do this and we don't have the
 5    commitment from the county to pay us.  To fund our
 6    shelters.  So, there are funding issues.  I -- you know,
 7    I know that from both Whittier and Bellflower they got
 8    some grants.
 9              So, it is not so simple with the county
10    as just dealing with the people in their unincorporated
11    areas.  It is what is the responsibility of the county
12    for the money that comes to the county first, in all
13    these other areas.  The county gets the CDBG money.  The
14    county gets the federal money.  You know, we need to --
15    it comes through LAHSA, and I realize a lot of it is,
16    you know, you have to make applications.  But, the
17    cities are asking those questions.  Bellflower asked it.
18    They got 750,000 from the Janis Hahn [ph], and then they
19    were told they had to go to LAHSA.  And, you know, we've
20    had this discussion with Fullerton and with other
21    cities, saying how is it that we get security of funding
22    for our programs.  We are taking on this enormous debt
23    to address an issue that we think the county should be
24    addressing anyway, in terms of services.  So, I'm just
25    saying to the Court, this is a bigger discussion than
```

Page 148

```
 1    just the unincorporated --
 2                    MR. YOUNG:  Your Honor -- I hear you,
 3    Carol.  Let's focus on solutions.  Those are problems.
 4    Let's focus on what we can accomplish and then figure
 5    out what else we need to accomplish after we've
 6    accomplished what we know we can agree upon.  So, I --
 7    let's take it piecemeal.  We're willing to talk.  We
 8    talked to you yesterday.  We're willing to talk to you
 9    again about what it looks -- what a settlement could
10    look like in unincorporated area.  It will either work
11    for you or it won't.  But let's at least have that
12    conversation and figure out what that might be.
13                    MS. SOBEL:  And that --
14                    THE COURT:  You only resolved it, and I'm
15    not -- since you brought up Orange County, you resolved
16    it through a county settlement in Orange County.  It's
17    already been done.  I know it's not your county, but --
18    no.  Okay.  What time?
19                    MR. YOUNG:  I mean --
20                    THE COURT:  Well, I'll be sitting here.
21    Go work.
22                    UNIDENTIFIED MALE SPEAKER:  We won't
23    start the discussion --
24                    THE COURT:  Go work.  I'm here.
25                    UNIDENTIFIED MALE SPEAKER:  Yeah.
```

Page 149

```
 1                         MR. YOUNG:  Let's start now, and --

 2                         THE COURT:  I'm here.

 3                         MR. YOUNG:  Yeah.

 4                         THE COURT:  Okay.  I've been in session

 5     to 1:15 in the morning.  So, I know you don't believe

 6     that, but I'm here.  Tell me when you can't reach -- or,

 7     you've reached --

 8                         MR. UMHOFER:  I mean, why don't we just

 9     say, Your Honor, we'll be back to you in an hour.

10                         THE COURT:  No.  I'm just --

11                         MR. UMHOFER:  Just to let you know where

12     we are.

13                         THE COURT:  Don't worry about it.

14                         MR. UMHOFER.  Okay.  All right.  Thank

15     you.

16                         THE COURT:  See you in five hours, if you

17     want it.  Talk until you're exhausted and you've reached

18     it or you haven't.  So, let's get that out of the way,

19     if we can.  Let's move forward.

20                         COURT REPORTER:  This marks the end of

21     media number two.  The time is 2:10 p.m.  We're off the

22     record.

23                         (Off the record.)

24                         (End Media 2.)

25                         (Begin Media 3.)
```

Veritext Legal Solutions
866 299-5127

```
 1                    THE COURT:  Back on the record, then.
 2     And please, let me turn the conversation over to
 3     counsel.
 4                    MR. YOUNG:  Thank you, Judge Carter.  On
 5     behalf of the county, the interveners and the
 6     plaintiffs, we're happy to report that we had a very
 7     productive meeting.  That kind of the lessons that we've
 8     learned so far, of not letting the good get in the way
 9     of the perfect -- or, whatever the standard --
10                    THE COURT:  Yeah.
11                    MR. YOUNG:  -- I mean, I think that's
12     been our -- other way around.  That's been our guiding
13     principle.
14                    MS. SOBEL:  It's not a guiding principle
15     for me.
16                    MR. YOUNG:  Okay.  Fair enough.
17                    MS. SOBEL:  I'm still pushing for better.
18                    MR. YOUNG:  Fair enough.  As you should.
19     So, I like to take inventory of where we are.  First, we
20     appear to be close to an agreement on the rough order of
21     magnitudes of the beds that would be needed in the
22     unincorporated area of the county, as well as agreement
23     to the general principle that there should be
24     flexibility with respect to the type of bed and the
25     location of those beds, but not at the expense of
```

Page 151

```
 1   creating a disproportionate level of things such as
 2   rapid rehousing or interim shelter.  That there needs to
 3   be an appropriate mix.  With respect to the term of the
 4   agreement, we're going to have to have further
 5   discussions on that.  We didn't come to an agreement on
 6   that.
 7                 THE COURT:  The term meaning --
 8                 MR. YOUNG:  The overall --
 9                 THE COURT:  -- the term that the Court
10   would have --
11                 MR. YOUNG:  -- length -- correct --
12                 MR. UMHOFER:  The length of time.
13                 MR. YOUNG:  Length of time.
14                 MR. UMHOFER:  Length of time --
15                 JUDGE BIROTTE:  Two years, three years'
16   time, he's saying.
17                 MR. UMHOFER:  -- which the Court would
18   supervise.
19                 THE COURT:  Right.
20                 MR. YOUNG:  With respect --
21                 THE COURT:  Fine, because -- can I ask
22   what the disagreement is in terms of time?  Or could --
23   would that -- I'll talk to you confidentially about that
24   if you'd like --
25                 MS. WEITZMAN:  I think kind of vaguely --
```

Page 152

```
 1    we're still kind of working out the schedule and the
 2    type of solutions that are coming online, and that's
 3    going to impact what the timeline is.  So --
 4                    THE COURT:  It -- it's me.
 5                    MR. YOUNG:  So, there are two issues, I
 6    would say.  The first -- one of the issues, as Brooke
 7    indicated, is the issue of what is an appropriate
 8    timeline based on the mix of housing that would be
 9    provided.  Right.  So, for example, things like
10    permanent supportive housing have a different timeline
11    than interim shelter.
12                    The other issue I think is more of a
13    fundamental question with respect to whether the
14    agreement should be -- from our perspective, consistent
15    with the length of time in the Orange County agreement,
16    versus something that's perhaps longer.  And without
17    kind of taking away -- I think what -- one concern is
18    entering into an agreement where beds are made
19    available, and then reaching that goal and then losing
20    the progress and letting it drip away at the end of the
21    agreement.  So --
22                    THE COURT:  Explain that to me a little
23    bit more.
24                    MR. YOUNG:  I'll let the plaintiffs
25    explain.
```

Page 153

```
 1              MR. UMHOFER:  The concern would be that

 2   if we set a term of time and then the beds goal was

 3   reached, that the question would be whether -- if the

 4   bed goal was reached, so that's the Court supervision is

 5   completed, or whether Court supervision continues in a

 6   way to prevent backsliding.  And so, the latter point is

 7   a point that, I think, we've raised a former point of,

 8   look, we got to the bed target, we should be good and we

 9   should be out from under Court supervision might be a

10   position that a municipality would take.  So, not a -- I

11   don't think that this is a deeply tense place in our

12   discussions.

13              THE COURT:  What breaks that impasse?

14   Because that could go on five minutes or five hours or

15   five days from now.  In other words, there's no -- what

16   breaks that so that --

17              MR. UMHOFER:  A conversation on Monday

18   afternoon where we've had time to discuss with our

19   clients and review some of these points of -- I think

20   we've got a handful of points and places where we've got

21   to go back to our clients and get more information.  So,

22   Monday afternoon our plan was to convene to work through

23   those areas of, just, refinement.  I don't even know if

24   they're a disagreement at this point.  They weren't

25   disagreements at this point.
```

                                                    Page 154

```
 1                    MS. WEITZMAN:  Judge, we -- I don't think
 2   any of us walked away saying that we see this as an
 3   insurmountable barrier.  I think we are --
 4                    THE COURT:  No.
 5                    MR. UMHOFER:  Yeah.
 6                    MS. WEITZMAN:  -- giving you -- we
 7   elected the county to give you the outline of where
 8   we're headed, and our plan for how to get there.
 9                    THE COURT:  The reason I'm asking is also
10   some questions I'm going to have unconnected to -- and
11   this process.  So, it's how many times I am bringing you
12   back for how long --
13                    MR. YOUNG:  Right.  Yeah.
14                    THE COURT:  And I'm trying not to bring
15   you back, you know, for a session this much.  It should
16   be meaningful, and so I've got some questions later on
17   that don't relate to you.  But -- or, to the settlement.
18   So, you'll hear those in a moment.
19                    MR. YOUNG:  Okay.  The other area where I
20   believe we have broad agreement, although the details
21   will need to be fleshed out, is with respect to what I
22   call compliance reporting.  In terms of having a
23   structure that allows for sufficient communication and
24   reporting, both to the Court and through the parties,
25   with respect to the progress that's made against the
```

```
 1    beds need -- what I'm calling the beds need.  As well as

 2    how you calculate compliance, assume -- you know,

 3    because here compliance would be an objective criteria,

 4    whether or not you've hit a certain number of beds.  On

 5    the formula piece, there is one type of element to the

 6    formula relating to a specific type of bed modality,

 7    rapid rehousing, and whether or not that should be

 8    counted.  We think we can work through those issues.

 9    But in general, the concept of some type of regular

10    reporting, including what the current status is of

11    certain plans, identification of sites, that sort of

12    thing in principle makes sense to all of us.

13                     THE COURT:  Okay.

14                     MR. YOUNG:  There is a -- we're going to

15    have to have further discussions on kind of what a

16    release of liability looks like.  And I'm confident

17    we'll be able to work out those issues.  So, I don't

18    want to elevate it.  But, it's really a question of

19    timing and scope of what the release would be,

20    recognizing that this is just the unincorporated area.

21                     We also had productive -- and I think, in

22    general, broad consensus on dispute resolution

23    provisions.

24                     THE COURT:  Okay.

25                     MR. YOUNG:  We're going to have to work
```

Page 156

```
 1    on, kind of, the number of days.  But in general, the
 2    idea is for an informal and formal process, for -- of
 3    dispute resolution.  That would begin with a meet and
 4    confer sort of process.  And then the idea is from there
 5    if we can't reach to compromise to elevate it to the
 6    Court for adjudication.  As part of that, we also have
 7    agreement on what I'm calling a force majeure process.
 8    And the concept of that process is in the event of
 9    something unforeseen that inhibits or prevents the
10    county from meeting its bed need -- so, catastrophic
11    funding change, or litigation that is delaying our
12    ability to work.  As we've seen in Project Roomkey,
13    that's certainly an issue for NIMBY type lawsuits.  We
14    want to, at least, have a process that allows the
15    parties to communicate those issues, and then if
16    necessary elevate to the Court for adjudication, as to
17    whether or not it is appropriate to reduce the beds need
18    based on those changes.
19                  MR. YOUNG:  Okay.  Good.
20                  MR. YOUNG:  In terms of a timeline, as
21    Matt mentioned, we have what I'm calling a touch-base
22    call at 4 on Monday.  Between now and then, we will have
23    exchanged a draft settlement agreement that the parties
24    will mark up and hopefully improve based on our
25    conversations.  I expect that Tuesday will be a day
```

Page 157

```
 1    where we have kind of more in-depth conversations with
 2    respect to those markups.
 3                    THE COURT:  Now, I'm going to be here --
 4    in other words, whenever you're back in session I'm
 5    going to be someplace in the building.  And the reason
 6    for that is if you need to reach out at that time and
 7    get a thought, I don't want that to shuffle back and
 8    forth needlessly.  So, I'll sit out in the lobby.
 9                    MR. UMHOFER:  Your Honor, our intention
10    was to meet by Zoom.  And --
11                    THE COURT:  Oh.
12                    MR. UMHOFER:  -- if necessary, you know,
13    we talk to you.
14                    THE COURT:  Well, I'll leave that to you.
15                    MR. YOUNG:  And then --
16                    THE COURT:  I'll still be here in the
17    lobby, then.  So, because you're not going to be meeting
18    by Zoom, because going back to our offices doesn't get
19    much done.  So, I will be here.
20                    MR. YOUNG:  So, we'll discuss, kind of,
21    what that touch-base looks like, then, on Monday.
22                    THE COURT:  So, I'll be here Monday and
23    I'll be here Tuesday.
24                    MR. YOUNG:  And then, the idea is on
25    Wednesday we would provide a joint report back on our
```

Veritext Legal Solutions
866 299-5127

```
 1    progress.
 2                    THE COURT:  I'll be here Wednesday.
 3    Okay.
 4                    MR. YOUNG:  And take it from there.
 5                    THE COURT:  Okay.  So, here, I have to
 6    make myself -- okay.  Let me trust you to that timeline.
 7    Thank you.  All right.  In -- yeah, in relation to one
 8    of the areas today that I formerly discussed with Marcus
 9    and Carol -- and asking both of their advice -- I am
10    going to put out a minute order that's a request of both
11    the county and the city.  And I'm making a request based
12    upon a timeline that you give to me, that you're
13    comfortable with.  What dates do the parties believe it
14    would be possible to get the following information to
15    the Court?  In aid of these ongoing settlement
16    negotiations, first -- and this does not apply to the
17    county -- first -- well, it may, in terms of services.
18    I'm sorry.  First, is there an estimated timeline for
19    converting the recreational centers back to their normal
20    use as the Covid-19 pandemic deescalates?  And are the
21    people currently sheltered there going to be sheltered
22    afterwards?
23                    Second, do the city and county of Los
24    Angeles plan to continue and expand Project Roomkey
25    after the Covid-19 pandemic draws to a close?  Is there
```

Page 159

1    an estimate on how many people will remain sheltered in

2    the contracted hotel and motel rooms?  In asking that,

3    that may be information necessary, in particular, for

4    ongoing settlement discussions with the city.  But, it's

5    information that may be of value also in terms of

6    settlement negotiations with the county.  I'm not too

7    certain that this is as necessary to the county, but I

8    may be wrong, as it is to the city.  Because I've seen

9    your confidential brief, and there's a way of wording

10   that that wouldn't preclude, I think, a settlement with

11   the county and unincorporated areas.  I think it does

12   make a difference in terms of our discussions with the

13   city.  And so, I'm very humbly asking a timeline that

14   you're comfortable with, and then I'll insert that into

15   my request.  So, why don't I leave the room so you can

16   literally discuss that amongst yourselves, instead of

17   moving all of you.  And -- while you've got other people

18   here who aren't connected to this.

19            MR. UMHOFER:  Not really.

20            THE COURT:  Not really?  Okay.  If you --

21   I don't care.  Well, why don't I review them so we all

22   -- you can have that discussion.  But I'd like a date,

23   you know, in consulting with you, so I don't drive that

24   too quickly.  I recognize there's some disadvantages

25   that could occur.  I think the council would have to

Page 160

```
 1    meet.  The mayor ought to be apprised of this, Marcus,

 2    if you'd be so kind, since Christina isn't here, that

 3    question -- maybe we would just step out.  Let's go.

 4    And then I think you can -- so, we'll be outside.  Why

 5    don't you summon on?  No, their discussions are off the

 6    record.  Yeah.

 7                   COURT REPORTER:  This marks the end of

 8    media number three.  The time is 5:34 p.m.  We are off

 9    the record.

10                        (Off the record.)

11                        (End Media 3.)

12                        (Begin Media 4.)

13                   THE COURT:  Yeah, on the record.

14                   MR. YOUNG:  Friday this week.

15                   THE COURT:  Huh?

16                   MR. YOUNG:  Friday?  Next week.  A week

17    from tomorrow.

18                   THE COURT:  A week from tomorrow.

19                   MR. YOUNG:  We'll have the answers.

20    We'll have -- we'll be able to tell you how soon we can

21    have the answers to the questions you --

22                   THE COURT:  Okay.  Friday, a week from

23    tomorrow.  Excellent.  I'll put that --

24                   MR. MARCUS:  But then, Your Honor, we had

25    a discussion of how would you like that information
```

Page 161

```
 1   communicated?  Our -- I'll tell you my concern.  We are
 2   trying to --
 3                   THE COURT:  Let us talk about it.
 4                   MR. MARCUS:  Okay.
 5                   THE COURT:  Let us talk.  Because we've
 6   got to work out the entire thing.  Could we talk for
 7   just to --
 8                   UNIDENTIFIED MALE SPEAKER:  Sure.
 9                   UNIDENTIFIED FEMALE SPEAKER:  Here we go.
10                   COURT REPORTER:  Off the record.  This
11   marks the end of media number four.  The time is 5:57
12   p.m.  We are off the record.
13                   (Off the record.)
14                   (End Media 4.)
15                   (Begin Media 5.)
16                   THE COURT:  All right.  After discussing
17   this with the parties, the parties believed it would be
18   in the best interests of their clients and all parties
19   to have this submitted to the Court confidentially next
20   Friday.  And can I say --
21                   MS. MITCHELL:  Can I make a request on
22   that, Your Honor?
23                   THE COURT:  Pardon me?
24                   MS. MITCHELL:  I appreciate the
25   conversation.  And I was not part of it.  My concern is
```

Page 162

```
 1    just having sufficient notice, if people are going to be
 2    discharged from rec centers and hotels, just from our
 3    perspective.
 4                    THE COURT:  Why don't you have a
 5    conversation, then, for just a moment?  You might have a
 6    better understanding.
 7                    MS. MITCHELL:  Sure.
 8                    THE COURT:  Because all of this will
 9    eventually become public.
10                    MS. MITCHELL:  Sure.  Will do.  Thank
11    you.
12                    THE COURT:  And I think you can --
13                    MS. MYERS:  We'll just join that one --
14                    THE COURT:  -- have that conversation,
15    that --
16                    MS. MYERS:  -- to prevent this from
17    happening.  We have the same questions.
18                    THE COURT:  And I think you'll --
19                    MS. MYERS:  We appreciate the
20    confidentiality.  We just want to be --
21                    THE COURT:  Yeah.  I, I think you're
22    going to like what's happening.
23                    MS. MYERS:  Your Honor, they decided they
24    don't want to share with us.  So, they're going to share
25    with you and then we'll share --
```

Page 163

```
 1                  THE COURT:  I can't hear you.
 2                  MS. MYERS:  They decided that they don't
 3      want to share it with the interveners or the plaintiffs.
 4      That they're going to share it with you and not with us,
 5      and that's their prerogative --
 6                  THE COURT:  Okay.
 7                  MS. MYERS:  -- unless you say otherwise.
 8                  THE COURT:  I'll initially make it
 9      confidential, as represented by the parties to the
10      Court.  There's some very good reasons I find for that
11      initially.  Eventually this will be made a public
12      document, and as such -- Monday, what time will you be
13      here?  Because I'll either join you or be available to
14      you.  But, I will be here -- what time are you meeting
15      with each other?
16                  MR. UMHOFER:  Do you want to see -- so,
17      Your Honor, I think the plan would be for us to be here
18      Tuesday.  You're here Tuesday.  We're all here Tuesday.
19      Is that --
20                  THE COURT:  Well, I'm going to be here
21      whenever you're meeting.  Even if you decide to meet by
22      Zoom, I'm going to be here.  So --
23                  MR. YOUNG:  Okay.
24                  MR. UMHOFER:  We'll be here on Tuesday.
25                  THE COURT:  Tuesday?
```

```
 1                    MR. UMHOFER:  Yes.

 2                    THE COURT:  Okay.  Tuesday.  So, what

 3    time would you like me here?

 4                    MR. UMHOFER:  Did we -- I don't know that

 5    we --

 6                    MR. YOUNG:  We didn't discuss a time.

 7                    MR. UMHOFER:  All right.  Let's take a

 8    look at 1 p.m.?  I want to say 1 p.m.

 9                    MR. YOUNG:  I would recommend we do it in

10    the morning, in -- if that's agreeable to people.  And I

11    will say --

12                    THE COURT:  So, what time?

13                    MR. UMHOFER:  10 a.m.

14                    THE COURT:  Ten?

15                    MR. YOUNG:  10 a.m.

16                    THE COURT:  10 a.m.  See you at 10 a.m.

17                    MR. YOUNG:  And Your Honor, one element

18    of this that I will just ask is me -- and I have trouble

19    hearing in this room.  And --

20                    THE COURT:  Trouble what?

21                    MR. YOUNG:  Hearing.

22                    THE COURT:  What?

23                    MR. YOUNG:  What?

24                    THE COURT:  I am too.  It's not --

25                    MR. YOUNG:  Yeah.
```

Page 165

```
 1                    THE COURT:  -- it's the echo.

 2                    MR. YOUNG:  So --

 3                    THE COURT:  I can't --

 4                    MR. YOUNG:  So, the -- and since it is

 5     going to be kind of a negotiation, perhaps if we could

 6     have it at county council's office.  We have a large

 7     room.  On the seventh floor.

 8                    THE COURT:  Sure.  I'll be here.  You go

 9     wherever you want to.

10                    MR. YOUNG:  Okay.

11                    MR. UMHOFER:  We can also host.  We have

12     several breakout rooms --

13                    MR. YOUNG:  Okay.

14                    MR. UMHOFER:  -- at our downtown office.

15     So --

16                    MR. YOUNG:  Okay.

17                    MR. UMHOFER:  -- we can meet there.

18                    MS. BLACK:  Okay.  So, we can confer

19     further on that.  Because I requested it, but it's after

20     5.  So, I don't have a response back from the

21     availability.  Because it's also a board meeting.

22                    MR. UMHOFER:  Our office is good.

23                    MR. YOUNG:  So, the point is it may not

24     be here.  It may be somewhere else.

25                    THE COURT:  That's fine.
```

Page 166

```
 1                    MR. YOUNG:  But it's going to happen.

 2                    THE COURT:  Sure.  I'll be here, or

 3     taking a walk or going over to the federal court or come

 4     back or whatever.  But I'll be here at 10:00.

 5                    MR. YOUNG:  Okay.

 6                    THE COURT:  Or whatever time you

 7     potentially need me.  And then Wednesday, we'll have a

 8     status conference at what time?

 9                    MR. UMHOFER:  I think the plan was

10     Tuesday would be -- that Tuesday --

11                    THE COURT:  Tuesday.

12                    MR. UMHOFER:  -- we were combining, sort

13     of, Monday and Wednesday on Tuesday.

14                    THE COURT:  Oh, okay.

15                    MR. UMHOFER:  So --

16                    THE COURT:  So, why don't I simply set

17     this for a status conference --

18                    MR. YOUNG:  No.

19                    MR. UMHOFER:  No.

20                    MR. YOUNG:  No, I think we will -- we'll

21     provide an update -- I think we had discussed Wednesday

22     at noon.

23                    MR. UMHOFER:  Yeah.  I'm sorry.  I

24     misunderstood our conversation, then.

25                    MR. YOUNG:  Yeah.
```

```
 1                    THE COURT:  Okay.

 2                    MR. YOUNG:  Okay.

 3                    THE COURT:  So, status conference here,

 4   and I'll schedule the court reporter, then, for noon,

 5   please.

 6                    MR. UMHOFER:  So, Wednesday at noon?

 7                    THE COURT:  Wednesday at noon.

 8                    MR. UMHOFER:  Wednesday at noon for

 9   status conference here.

10                    MR. YOUNG:  Yeah.  Yeah.

11                    MR. UMHOFER:  Tuesday at 10 a.m. for

12   discussions.

13                    MR. YOUNG:  Discussions.

14                    MR. UMHOFER:  Okay.

15                    MR. YOUNG:  Yeah.

16                    THE COURT:  Okay.  Now, is there anything

17   that you need from us to aid your efforts?  Or better

18   just --

19                    MR. UMHOFER:  We'll let you know.

20                    THE COURT:  Okay.  Let me know Tuesday.

21   All right, then.  There were a number of other things,

22   but I don't think they're that critical.  But I think

23   Elizabeth --

24                    MS. MITCHELL:  Yes.  I just wanted to

25   address this -- the parking issue on the south Los
```

Page 168

```
 1    Angeles site.  I wanted just to make it very clear what
 2    our position was.  Because we had -- after we agreed to
 3    749 South Los Angeles Street, several details came out
 4    that made it clear to us that it was not an appropriate
 5    site.  And I think the most important of those is the
 6    safety issue.  You have significant construction
 7    happening next door.  You have steel beams being lifted
 8    onto roofs and that kind of thing, in addition to other
 9    concerns.
10              And so, we had been -- for the Court's
11    edification, we had been -- I think just a couple days
12    later, on that Sunday, letting council know that we no
13    longer thought that it was an appropriate site, and
14    asking for negotiation of alternatives.  There was no
15    negotiation.  By last Thursday a week ago, we officially
16    emailed the parties and said we object to this site, we
17    don't think that this is an appropriate site.  As for
18    negotiation on the other sites, I was told no,
19    essentially.  There was no negotiation on alternative
20    sites that we provided.
21              And so, what I just wanted to put on the
22    record is that we are not a party to that agreement,
23    that there is no agreement.  And the reason I felt it
24    was important to put this on the record was because
25    there are some folks talking to me that have also spoken
```

Page 169

```
 1    to the mayor's office -- just so you know, Scott -- and
 2    they're being told by the mayor's office that the
 3    mayor's office didn't want to proceed with this site but
 4    they felt like they couldn't -- they didn't have a
 5    choice, because it was the parties' agreement.  And so,
 6    I wanted to be very clear that it is not deemed suitable
 7    to the parties' agreement.  We have withdrawn that
 8    agreement.  That agreement was done only in the -- as an
 9    alternative to the Maple Street location, which is now
10    an option.  There are a lot of other options downtown we
11    think are better.
12                 I just actually was over on the 16th
13    Street, talking to a couple folks that were living in
14    the RVs.  I asked them if you had a choice, if -- to
15    live downtown -- you know, downtown next to a busy
16    building or in, sort of, an empty lot in an industrial
17    area, where would you choose.  And they said we want to
18    be in an empty lot in the industrial area.  We don't
19    want to be downtown next to a busy building.  And so, I
20    just wanted to be very clear that whatever is happening
21    is not pursuant to an agreement by the parties, that if
22    the city wants to move that location to an alternate
23    location, I mean, it's the city's property, it's -- the
24    city needs to do that.  But wanted to be very clear on
25    the record that what is happening is not done pursuant
```

Page 170

```
 1    to an agreement, because of the reasons we have

 2    identified.  We don't think that it was appropriate.

 3                 MS. MYERS:  I mean, Your Honor, I don't

 4    think it's fair to say that we would not negotiate with

 5    them about additional sites.  We're happy to have a

 6    conversation about additional sites.  Because there is a

 7    huge need, as identified by all of the parties.  So, we

 8    are more than happy to have a conversation about the

 9    appropriateness of the other two sites.

10                 THE COURT:  Okay.

11                 MS. MYERS:  I think our challenge is all

12    of the parties had a thoughtful conversation about the

13    749 Los Angeles site, and our concern is that the

14    concerns that were articulated by LA Alliance were the

15    types of concerns that if they derail every agreement --

16    or, if they derail this agreement --

17                 THE COURT:  Yes.

18                 MS. MYERS:  -- they will derail every

19    agreement.  The suggestion that we've heard, from

20    letters submitted to the Court and also from LA

21    Alliance, that the property is not appropriate for

22    unhoused folks because it's in a bustling downtown area

23    next to residential buildings is really problematic to

24    us.  Because unhoused folks are people, and they need to

25    be in places that are fit for habitation.  And the
```

```
 1    suggestion that they shouldn't live in places that are
 2    residential areas is extremely problematic.  People
 3    should be living in residential areas.  So, that's our
 4    position on it.  We all reached an agreement on it, and
 5    we didn't think that the justifications that were
 6    provided were appropriate.  We agree that the site may
 7    not be the best location for the folks that apparently
 8    Ms. Mitchell has engaged with.  Other people can come
 9    into that site, though.  Right.  We've always said we
10    just need to build more.  More of everything.  And this
11    is more.
12               MR. MARCUS:  So, Your Honor, on behalf of
13    the city, we all -- all the parties made an agreement
14    with the Court at the Court's insistence to set up the
15    RV parking at this location.  And the Court asked for it
16    to be done in a very quick time frame, and we made the
17    promise to do it in that time frame, which was 30 days,
18    which I think you heard from both Ms. Miller and Ms.
19    Marston that's moving heaven and earth to set up a
20    parking situation in that time frame.
21               And the city started immediately
22    investing quite amount of time, quite amount of effort,
23    a lot of staff time, that could be used in other places
24    as well, but we have decided a tremendous number of
25    resources to getting this done in the time frame that we
```

Page 172

1   promised the Court it would be done.

2           When the LA Alliance withdrew its

3   agreement, and asked us to engage in other sites, the

4   city's response was we all had an agreement with the

5   judge to set this up.  And until we all agree and the

6   judge agrees on a different location, we're going to

7   keep going.  Because that is what we agreed to do, and

8   that is what we promised you that we were going to do.

9   Now, if the Court wants us to switch gears and move

10  someplace else, we can do that.  It will be a slight

11  waste of resources and time and maybe some frustration,

12  but if the Court wants us to look elsewhere we will look

13  elsewhere.  But the agreement we made two weeks ago was

14  to set it up here.  There's what we promised you we

15  would do.  And until you tell us otherwise, that's what

16  the city is going to continue to do.

17          THE COURT:  Okay.  Just one moment.

18  Yeah.  We had previously had a discussion, because we

19  knew a little bit about the concerns taking place.  And

20  I'm simply going to leave that to the parties.  And I

21  think that this is potentially the beginning of a lot of

22  sites that are going to be needed.  I think we'll just

23  leave it at that for the time beginning.  Thank you.

24          MR. MARCUS:  Thank you.

25          MS. MYERS:  Thank you, Your Honor.

```
 1                    THE COURT:  Now, is there anything
 2    further this evening?  Okay.  Marcus, anything?  Good?
 3    Good?
 4                    MR. MARCUS:  We're good.
 5                    THE COURT:  All right.  Good.  Thank you
 6    so much.
 7                    COURT REPORTER:  The time is 6:18 p.m.
 8    We're off the record.
 9                    (Whereupon, at 6:18 P.M., the proceeding
10                    was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                    Page 174

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2         I, AUSTIN CHE, the officer before whom the

 3    foregoing proceedings were taken, do hereby certify that

 4    any witness(es) in the foregoing proceedings, prior to

 5    testifying, were duly sworn; that the proceedings were

 6    recorded by me and thereafter reduced to typewriting by

 7    a qualified transcriptionist; that said digital audio

 8    recording of said proceedings are a true and accurate

 9    record to the best of my knowledge, skills, and ability;

10    that I am neither counsel for, related to, nor employed

11    by any of the parties to the action in which this was

12    taken; and, further, that I am not a relative or

13    employee of any counsel or attorney employed by the

14    parties hereto, nor financially or otherwise interested

15    in the outcome of this action.

16

17                                        AUSTIN CHE

18                            Notary Public in and for the

19                                State of California

20

21

22

23

24

25

                                           Page 175
```

```
 1              CERTIFICATE OF TRANSCRIBER
 2          I, JANE W. GILLIAM, do hereby certify that
 3   this transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to, nor
 8   employed by any of the parties to the action in which
 9   this was taken; and, further, that I am not a relative
10   or employee of any counsel or attorney employed by the
11   parties hereto, nor financially or otherwise interested
12   in the outcome of this action.
13
14
15              JANE W. GILLIAM
16
17
18
19
20
21
22
23
24
25
```

Page 176

**[& - 75]**

**&**

**&** 2:4,11 3:4

**0**

**00155** 9:3
**02291** 1:7

**1**

**1** 23:7 48:12 68:5 84:8 111:10 165:8 165:8
**1,500** 85:3 101:1
**10** 9:12 28:6,6,25 30:11 34:15,18 37:4 57:25 62:22 100:22 109:19 165:13,15,16,16 168:11
**10,000** 85:5 107:4
**100** 47:25,25 63:5 95:12 99:24
**101** 90:22
**105** 111:11 112:11
**108,000** 50:13
**10:00** 16:10 167:4
**10:03** 1:13
**110** 111:10 112:11
**11355** 3:5
**11:15** 68:2
**12** 85:9
**121** 90:24
**129** 89:15,18 90:25 91:1
**130** 85:13
**138** 109:2
**13th** 33:14
**14** 83:1
**148** 111:7,22 112:16 120:17,20
**15** 14:23 25:16 39:2,20 48:24 83:1 85:15 87:14

88:20 134:21 136:25 137:5
**15,000** 15:8 107:6
**150** 85:14
**16** 48:3 64:4
**16th** 27:12,18 28:6 79:5 170:12
**17** 59:2 62:3 64:2
**17929** 176:14
**18** 9:3 70:21 72:7 72:21 130:6
**19** 48:7 57:2,3 73:8 83:10,16 84:7 85:17 86:25 87:16 127:15 128:15 159:20,25
**1990s** 89:3
**1:15** 150:5

**2**

**2** 68:6 150:24
**2,700** 15:13
**20** 15:20 30:25 31:2 49:3 52:19 57:25 59:21 61:17 61:18 62:1 65:16 65:19 66:15,15 69:3 72:7 76:4 88:20 109:18
**200** 2:5,12,20 65:16
**2000** 88:12
**2005** 32:18,19 33:15 49:9 53:10
**2008** 87:4
**2013** 20:2 117:24
**2016** 23:9
**2017** 136:24 137:3
**2019** 107:3
**2020** 1:12 85:11 88:22

**205-6520** 2:8
**209** 98:5
**213** 2:8,23
**23** 102:13,13 145:21
**24** 13:9 15:10 77:7 127:1
**25** 15:12 137:1
**280,000** 80:2
**2:00** 26:14
**2:10** 150:21
**2:20** 1:7

**3**

**3** 96:13 150:25 161:11
**30** 15:21 93:15 123:2,4,7 172:17
**300** 28:16 59:20 66:13 72:2,6,8,19 73:7 127:17 129:6
**300,000** 80:3
**310** 2:15 3:8
**312-4181** 3:8
**360** 84:7

**4**

**4** 157:22 161:12 162:14
**4,900** 91:10,12
**400** 101:6
**405** 34:19
**4107129** 1:19
**42** 12:3 146:14
**450** 15:14
**4:00** 28:2
**4th** 42:16

**5**

**5** 9:12 10:6 76:5 105:14,15 136:24 162:15 166:20

**5,600** 85:1
**50** 94:2 95:9,15 133:13
**500** 47:22 96:11 97:13
**500,000** 99:2
**501** 1:16
**505** 15:11
**56** 85:22 106:24
**5:34** 161:8
**5th** 131:17,20

**6**

**6** 59:25
**60** 9:15 10:2 80:8 82:17 83:3 84:11 105:16,18 106:6 122:20,21 123:22 123:24 125:6,23 133:12 138:11
**600,000** 100:13
**61** 84:11 89:8
**617** 2:5,12
**62** 84:19
**63,000** 84:19
**65** 74:12,25
**650** 84:4
**67** 114:18
**6:18** 174:7,9

**7**

**7** 1:12 27:9
**7,000** 85:5
**7,600** 91:3,16 102:8
**70** 9:15 10:2 105:16,18 138:11
**700** 2:20
**710** 87:23
**749** 169:3 171:13
**75** 105:19

Page 1

[75,000 - ago]

**75,000**  67:13 87:15
130:15
**750,000**  148:18
**76**  25:8
**7th**  2:5,12

**8**

**8**  12:2
**80**  105:19
**800**  133:9 136:19
137:4
**826-4700**  2:15
**840**  108:9
**850**  108:9
**853**  108:10 120:17
**853.6**  113:24
**853.6.**  118:13
**87**  15:10

**9**

**9**  48:24
**90**  138:14
**900**  15:10
**90013**  1:17
**90017**  2:6,13
**90064**  3:6
**96**  106:22
**978-4681**  2:23

**a**

**a.m.**  1:13 68:2
165:13,15,16,16
168:11
**abandoned**  10:21
**abide**  69:15
113:23,24
**ability**  6:5 157:12
175:9 176:7
**able**  9:18 18:11,14
21:11 26:5 30:25
33:6 35:11 57:5
57:15 71:16 75:17
84:20 85:19

156:17 161:20
**abrasive**  13:8
**abrupt**  13:7
**absolute**  25:13,21
26:1 53:25
**absolutely**  6:18
96:2 98:18 101:25
112:17 119:24
135:13 144:25
145:21
**absorbed**  138:1
**absorbing**  39:6
**abuse**  10:22
**accept**  9:1 33:10
33:13
**acceptable**  49:9
125:23
**acceptance**  7:7
**accepting**  26:21
26:21
**accepts**  23:14
**access**  77:7,11
**accommodation**
10:7
**accomplish**  50:24
54:20 78:16
100:18 106:8,9,11
149:4,5
**accomplished**  9:11
149:6
**accomplishes**
53:14
**account**  56:11
**accurate**  175:8
176:5
**achieve**  12:22 14:6
18:11
**achieving**  16:7
**acquire**  13:22
**acquired**  15:11

**acre**  31:5,10 38:13
**acres**  27:21 38:10
**act**  80:6 112:1
120:20
**acted**  112:17
**action**  11:16 13:2
13:4,14 21:6
48:10 59:7 109:7
109:15 110:4
136:16 175:11,15
176:8,12
**actions**  23:10
**active**  8:11 19:9
134:23
**activity**  136:8
**actors**  110:6
**actual**  111:5,6
**ada**  77:12
**add**  92:13 136:12
140:22
**added**  15:14 77:25
**addiction**  21:5,11
21:19 96:5,9
**adding**  61:19
73:24
**addition**  169:8
**additional**  41:11
171:5,6
**address**  13:2
20:22 21:7,10,10
23:6 69:19 88:23
118:23 124:16,25
125:4,17,22
148:23 168:25
**addresses**  118:21
**addressing**  13:15
16:5 121:18
125:15 148:24
**adequate**  20:24
77:13 93:2,3,4

**adequately**  21:7
75:19
**adjudication**
157:6,16
**admit**  97:24 98:1
106:1
**adoption**  99:23
**advantage**  22:18
24:22 105:5
108:18,21 110:11
**advice**  159:9
**advocate**  59:12
109:20
**advocate's**  109:13
**advocates**  6:22 7:9
16:3 26:25 49:2
49:22 54:10 76:14
103:18 104:21
111:23 112:13
122:25 139:19
140:10,20 143:14
143:17
**affirmative**  6:20
**affluent**  22:14
**afford**  84:20 87:7
130:23 148:4
**affordability**  86:3
**affordable**  20:16
85:4 86:14
**affront**  24:11
**afraid**  12:5 51:16
**afresh**  82:1
**afternoon**  154:18
154:22
**age**  74:14 133:7
**agencies**  28:11
32:24 78:21
**agency**  35:17
54:25
**ago**  44:9 49:3
73:23 81:11 84:5

[ago - appropriate]

113:11 115:5
117:15 136:16
169:15 173:13
**agree** 52:6 55:5
56:5,7 57:4 59:17
63:4 74:21 78:9
94:9 118:21 143:4
143:7,22 149:6
172:6 173:5
**agreeable** 165:10
**agreed** 49:14
55:24 69:14,18,24
131:9 169:2 173:7
**agreement** 7:18
8:5 13:16 16:19
27:24 32:18,19
44:3 57:2,4 66:2
68:11,12 69:5
81:9 82:3 108:8
118:20 139:5
146:5 151:20,22
152:4,5 153:14,15
153:18,21 155:20
157:7,23 169:22
169:23 170:5,7,8,8
170:21 171:1,15
171:16,19 172:4
172:13 173:3,4,13
**agreements** 9:8
10:1 16:9 73:21
108:3
**agrees** 173:6
**ahead** 51:21 81:18
113:16
**aid** 3:20 89:5
115:20 159:15
168:17
**air** 91:16
**airport** 75:11
76:18

**airports** 73:17,22
77:24 102:21
**al** 1:5,8
**alameda** 101:20
101:21
**alexandria** 1:15
**alleyways** 141:7
141:12
**alliance** 1:4 54:9
67:3 82:15 144:15
171:14,21 173:2
**allow** 48:11
**allowed** 13:17
29:3 33:21,23
34:3,8,19,22 86:17
116:4
**allowing** 11:3
**allows** 23:21 44:4
155:23 157:14
**allure** 63:11
**alternate** 170:22
**alternative** 55:23
56:2,14,15 57:15
169:19 170:9
**alternatives** 16:6
57:6 169:14
**amazingly** 105:24
**amenable** 113:9
**america** 25:13
100:15
**american** 146:17
**amount** 48:18
77:19 88:18 90:17
90:18 98:17
101:10 124:17
125:20 133:15
135:25 172:22,22
**amy** 91:5,23 92:11
93:3 95:18 99:13
103:1

**ana** 101:10,12
106:21
**anaheim** 106:22
**andre** 3:11 136:15
**angelenos** 22:5
**angeles** 1:8,17 2:6
2:13,17,19,21 3:2
3:6,13,14,17,18,19
3:20 8:4,19,19,20
8:20 13:4 14:11
14:20 16:6 23:5
23:18 24:13,16
27:12 34:19 35:14
61:16,22 78:24
79:5 81:18,22
82:18,25 84:2
88:15,15 89:3
104:12 106:13
107:3,11 114:22
115:8 128:17
130:17 133:12
139:25 147:10,11
159:24 169:1,3
171:13
**angeles's** 12:3
**angry** 104:1
**answer** 6:11 27:4
30:6 32:5 37:11
39:12,13 41:18
42:7 47:6 50:3,4,5
65:23,24,25 72:11
75:4,4 95:7 134:8
135:19 144:11,12
**answered** 47:1
**answers** 29:12
47:6 161:19,21
**anticamping**
121:8
**anxious** 47:24
**anybody** 6:10
15:16 78:13 83:22

123:9
**anymore** 92:17
**anytime** 21:8
105:9
**anyway** 14:2
131:1 148:24
**apartment** 84:18
89:10
**apologize** 13:8
109:3
**apparently** 172:7
**appealed** 122:17
**appear** 90:3,8
151:20
**appearance**
127:14
**applications**
148:16
**applied** 115:11
**apply** 159:16
**appreciate** 8:1 9:5
24:19 44:13 47:7
68:18 162:24
163:19
**appreciation** 47:3
**appreciative** 7:2
**apprised** 161:1
**approach** 13:15
17:17 50:23 73:15
73:18,19,20,25
74:3,7,22,22 75:13
76:2,16,23,25 77:1
77:20 78:3,4,10
84:11 85:18,25
88:3 131:7 137:22
142:11,11
**approaches** 73:24
**approaching** 74:8
**appropriate** 112:1
152:3 153:7
157:17 169:4,13

[appropriate - based]

169:17 171:2,21
172:6
**appropriateness**
171:9
**approval**  42:9
**approved**  23:8
118:1
**arduous**  8:21 9:7
**area**  37:7,19 38:23
45:10 66:4 109:13
112:13 142:25
149:10 151:22
155:19 156:20
170:17,18 171:22
**areas**  11:20 39:22
40:20,20,23,25
99:19 101:18
104:3 119:17
122:4 143:3
148:11,13 154:23
159:8 160:11
172:2,3
**argued**  74:16
141:4
**argument**  127:8
129:14 140:3
**army**  131:17
**arrest**  105:9
107:16 108:25
113:7,13 117:18
118:4,22 121:22
122:1
**arrested**  109:1,8,9
109:14 119:1
**arresting**  109:17
117:22
**arrests**  112:8
120:2 121:18
135:25
**arrive**  90:5

**arrived**  27:25
**articulated**  57:10
126:8 171:14
**asbestos**  128:12
129:9
**aside**  106:22
**asked**  68:8 148:17
170:14 172:15
173:3
**asking**  29:20,25
31:25 44:11 51:8
60:11 62:7,7,8
63:23,24 64:25
65:1,3,4,13 66:8
66:18 74:7 95:9
132:17 141:19
148:17 155:9
159:9 160:2,13
169:14
**aspect**  133:16
**aspirational**  113:6
**assembly**  48:10,11
**assemblyman**
129:1
**assess**  71:3,9
**assessment**  69:12
**asset**  79:20 80:3
**assistance**  21:19
**assisting**  56:15
**assume**  42:15 62:3
74:4 76:14,15
104:8 105:7
134:11 156:2
**assuming**  145:8
**assumption**  55:2
**assumptions**  69:8
69:10 70:25 71:1
**assure**  6:10
**astounded**  18:6,9
**astounding**  98:8

**atmosphere**
113:14
**attachments**
146:13,21,22
**attest**  7:4
**attitude**  111:5,5,6
**attorney**  175:13
176:10
**attract**  101:1,18
**attractive**  140:6
**audio**  175:7 176:3
**austin**  1:18 175:2
175:17
**authority**  3:15
37:10 112:1
**availability**
166:21
**available**  30:15
35:9,13 37:19
38:7,8,15 52:12
72:9,12 85:20
92:10 127:17,20
128:13 130:5
153:19 164:13
**average**  41:9 49:4
135:18
**avoiding**  21:15
**aware**  32:20 36:7
145:13,15
**awful**  138:23

**b**

**b**  4:7
**baby**  27:12 38:1
52:22,25 67:21
**back**  5:5 14:6 17:4
26:18 30:23 40:12
45:6,25 59:5,21,25
60:14 63:21 64:6
66:21 68:7,8 69:6
69:11,22 70:1,8
71:12,15 77:22,23

77:24 80:16 84:13
88:7 89:2 90:19
90:20 99:7 108:14
111:19 112:13
114:8 117:7,21
118:23 123:8
127:11 130:20
133:21 134:5
141:18 142:7,17
146:25 150:9
151:1 154:21
155:12,15 158:4,7
158:18,25 159:19
166:20 167:4
**backbreaking**
103:15
**background**  96:12
**backsliding**  154:6
**backwards**  105:14
**bad**  47:6 83:11
85:24 88:5 108:4
110:6 114:24
117:5 134:16
**baffled**  28:2
**bag**  123:22
**bail**  90:7
**ballroom**  1:15
**band**  89:5
**barged**  129:1
**barger**  15:1 133:3
**barrier**  126:22
155:3
**barriers**  18:16
107:18
**base**  91:13,14
96:15 157:21
158:21
**based**  61:24 71:11
71:16 73:14,16,18
73:20,24,25 74:6
74:15,21 75:13

[based - bringing]

76:13 77:20 78:3
142:11 147:8
153:8 157:18,24
159:11
**basic**  13:12 69:5
**basically**  8:3
**basis**  52:19 89:14
127:9 133:17
**bdyoung**  3:7
**beach**  101:12
114:18
**beacon**  38:23
47:22
**beams**  169:7
**becoming**  85:14
**bed**  10:19 91:21
126:17 129:7
151:24 154:4,8
156:6 157:10
**beds**  47:25 128:22
129:2 136:19
137:4 151:21,25
153:18 154:2
156:1,1,4 157:17
**beer**  146:17
**beginning**  13:25
14:25 19:10 38:24
65:21 68:16
119:14 173:21,23
**behalf**  2:2,17 3:2
67:2 103:16 151:5
172:12
**beings**  76:4
**belief**  105:11
**believe**  6:6 9:25
14:17 30:16 40:11
43:12 78:25 82:17
105:25 112:23
119:7 129:3,10,11
129:11 133:5
134:9 150:5

155:20 159:13
**believed**  103:12
162:17
**believing**  100:17
**bellflower**  8:2
148:7,17
**belongings**  20:23
77:6 111:4,17
124:17 126:9,13
126:20
**bench**  114:18
**benefit**  113:17
119:9
**berzon**  79:6
**best**  71:18 80:3,17
81:7 83:19 103:13
131:4 140:17
162:18 172:7
175:9 176:6
**bet**  99:6
**better**  10:8 12:7
13:22 28:9 50:16
51:10 53:5,8
54:18 76:3 78:10
78:14,14 81:6
82:9,10 100:23
103:9 113:11
119:9 138:4
140:12 151:17
163:6 168:17
170:11
**betterment**  9:17
**betters**  136:4
**beyond**  37:20,23
**bias**  97:23 100:17
106:1
**biased**  97:25 98:1
**bicker**  9:13
**bicycle**  123:21,25
125:25

**bicycles**  125:24,25
**big**  11:18 18:1
25:22 34:7 104:11
106:25 132:14
135:3,3
**bigger**  80:2 94:17
141:6 148:25
**biggest**  58:25
**bike**  125:6
**bill**  48:11 135:17
**billion**  23:7 84:8
85:23
**billions**  132:5
**bipolar**  74:16 75:1
**birotte**  3:11 5:3,25
13:18 15:4 16:20
17:7,9 26:2,11,12
63:25 66:24
103:21 152:15
**bit**  5:4 51:10 65:18
68:20 112:21
129:12 136:25
137:20 153:23
173:19
**black**  3:12 12:2
22:12 24:11 115:1
166:18
**blanket**  90:20
**block**  47:22 140:2
**blood**  73:14
**blowing**  49:9
**blue**  109:25,25
**blunt**  18:12
132:22
**board**  15:2 98:7
117:25 118:17
134:22 166:21
**bodied**  75:17
**bogged**  10:5
**boise**  79:1,2,2 80:2
139:15,16,18,19

**bold**  27:14
**bolder**  27:15
**boldness**  38:5
**bomb**  5:17
**bombshell**  73:13
**bond**  23:8
**bonin**  79:23 80:3
82:5 84:1 115:7
115:22
**bonin's**  105:3
**bono**  115:16
**book**  113:12 118:5
118:7
**bought**  87:5 94:2
131:15,17
**boulevard**  3:5
**bound**  17:3 75:3
**boundaries**  32:24
**boxes**  93:25
**brandon**  3:3 86:3
**breach**  16:4
**break**  18:15 92:4
96:21 142:19,24
**breaking**  16:8
81:12
**breakout**  166:12
**breaks**  154:13,16
**bridge**  47:24 48:1
136:19 137:1,2
**brief**  7:11 19:23
160:9
**bring**  10:9 14:21
93:16 98:12,13
100:5,9 121:21
123:20,21 124:17
125:13,21 126:11
126:20 134:1
138:22 155:14
**bringing**  12:16
97:1 117:9 155:11

[broad - central]

**broad** 80:6 155:20 156:22
**broken** 18:12
**brooke** 3:23 8:12 62:13 100:24 109:2,4,6 110:12 110:15,20,24 111:13,18,19 112:18 121:2 153:6
**brother** 11:13
**brought** 8:14 66:15 74:20 92:3 97:16 149:15
**brown** 22:12 24:12 115:1
**brunt** 39:6
**budget** 89:22 141:12
**build** 83:12 84:23 87:11,21 96:3 136:19 137:4 140:4 172:10
**building** 12:14 22:3 96:22 131:14 131:17 158:5 170:16,19
**buildings** 94:20 131:15 132:3 171:23
**buildup** 127:24
**built** 18:9 125:4
**bulinski** 42:18
**bulky** 16:16 104:5 122:13,14 138:13 140:24
**bunch** 97:16 110:6 146:13
**burden** 21:13
**bureaucracy** 47:23 48:14 49:1

**bureaucratic** 18:8 41:24
**buscaino** 3:13 14:12 23:2 38:24 47:17 56:22 58:3 58:5,8 105:1,6 124:5 129:24 130:2,5,12
**business** 102:3
**bustling** 171:22
**busy** 11:25 170:15 170:19
**byron** 3:18

**c**

**c** 2:1 3:1 5:1
**calculate** 156:2
**california** 1:2,17 2:6,13,21 3:6 10:17 12:21 13:1 175:19
**california's** 11:11 12:14
**californians** 10:25 11:3 12:2
**call** 6:7 10:13 11:16 13:2,4 15:3 15:9 26:10,11,18 38:1 39:22 41:25 42:4,18 48:6 63:23 64:7 73:14 73:18,23 74:2,3 76:2 84:16 104:23 108:20 109:25 119:15 145:20 155:22 157:22
**called** 42:19 48:5 78:24 86:3 104:12 112:9,25
**calling** 12:20 17:17 35:5 156:1 157:7,21

**caltrans** 3:21 12:7 27:1,22 28:11,17 31:14,15,20,21 32:14 34:24 38:8 41:16,25 43:5,9,13 43:21 47:19,21 48:11 49:1,16 50:18 52:8 54:22 55:6 56:23 64:21 69:2,3,4,7,9,21,22 70:1,1,25 71:1,9 71:12,15 72:1,6,9 87:23,24 127:13 127:22 128:15 129:6 132:1 141:21
**camp** 30:5
**camping** 20:23 121:19
**camps** 35:9
**capability** 97:19 132:12
**capacity** 15:10
**capitalize** 19:22
**car** 30:10,10,13,18
**care** 7:24 10:4 47:5 49:10 51:4 66:12,15 92:16 121:21 133:14 138:15 160:21
**carefully** 39:5
**carol** 3:22 7:2 8:12 9:3 55:4 58:5 60:13 63:1,4 81:10 82:12 106:10 107:25 108:5 112:4 113:2 119:2 120:11 125:21 128:8 129:10 134:25 149:3 159:9

**carol's** 127:19
**carry** 22:25 122:16
**cars** 11:4
**carter** 1:14 8:11 19:8,21 22:9 23:17 24:19 151:4
**case** 1:6 47:21 62:10 79:2 88:8 88:10 106:8 115:14 120:24 125:19 134:7 141:1
**cases** 118:15 121:18
**cat** 111:13 139:4
**catastrophic** 157:10
**categorized** 37:1
**cause** 12:19 79:10 104:14
**caused** 11:7 80:6 81:25
**causing** 104:3 111:2
**cdbg** 148:13
**cedillo** 96:20,20
**census** 50:13,14 80:23
**center** 8:9 75:12 76:7 83:17 123:1
**centered** 74:3 76:2 76:15,23 77:1 86:7 142:11
**centers** 11:18 15:11 40:19 76:19 83:18 102:22 122:22 127:2 159:19 163:2
**central** 1:2

Veritext Legal Solutions
866 299-5127

[certain - cluster]

certain 60:25
  62:20 99:18 117:3
  119:22 156:4,11
  160:7
certainly 36:22
  44:13 50:15 55:10
  62:2 85:8 121:6
  145:6 157:13
certificate 175:1
  176:1
certify 175:3
  176:2
cetera 10:6 15:9
  40:19 97:9 99:12
  123:25 145:16
chafing 142:6
chair 14:11 16:2
  18:18 19:5
chairing 115:7
chairs 20:6 141:4
challenge 12:20
  126:14 171:11
chance 131:6
  143:13,14
change 10:11
  19:19 22:16 24:8
  82:11 86:8 89:6
  99:15 117:9
  157:11
changes 36:12
  157:18
charge 49:17,18
chased 50:20
che 1:18 175:2,17
cheaper 102:2
check 93:24
chew 120:18
chiefs 114:15
children 10:18
  20:6 88:2 113:1

choice 98:8 99:25
  111:9 127:3 170:5
  170:14
choked 93:2
  120:21
choose 75:2
  144:12,12 145:14
  170:17
chose 75:10 99:25
  109:23
christina 3:19
  55:25 125:4 161:2
chunk 142:19,24
circuit 79:4
  124:10
circumstances
  111:1
citation 90:3
  114:21
citations 115:17
cite 105:9 113:25
  115:25 118:6
  119:5 120:13
cited 108:8 117:19
cities 11:18 83:1
  104:8,20 147:17
  148:17,21
citizen 49:4
  135:22
citizens 9:19 136:2
city 1:8 2:17,19
  3:13,17,19 7:17,21
  7:22,25 8:2,4,19
  8:20 14:11,21
  20:2 21:3 22:25
  23:3,4,5,18,19
  24:2,12,15 25:19
  27:23 28:11 30:16
  30:16 31:21 32:19
  33:9 35:13,14
  36:5 37:13,17

38:9,16 39:8,18,22
  40:9 41:10,24
  43:5,9,12,13 44:1
  44:4 45:1 46:7,12
  47:20 50:17 54:11
  55:24 56:1,16
  59:12 61:22 69:5
  69:14,18,23 70:1,8
  70:19,21,24 71:10
  71:15,18 73:4
  74:10 76:9,20
  79:14 82:3,23
  84:14,18,21 86:4
  86:14,16 88:14
  89:18,19 98:16
  104:11,13,16,17
  104:22 105:4,22
  106:15,20,24
  107:14 108:17,17
  108:18,21 109:4
  110:22 114:9,11
  114:13,25 115:8
  117:3,6,24 118:1
  118:15,16,19,22
  123:2,4,18,23
  125:4 127:19,24
  128:4,17 129:14
  130:1,8,9,17 131:8
  131:14 132:2,21
  133:10,12 134:11
  135:1 136:4 141:6
  147:9,11 159:11
  159:23 160:4,8,13
  170:22,24 172:13
  172:21 173:16
city's 36:21 37:2
  46:16 83:20 133:2
  170:23 173:4
citywide 104:24
claim 110:25

clarification 62:14
  70:5
clarify 121:16
  139:16 140:23
class 22:12
clean 11:6 44:5
  45:7 46:12 105:24
  109:5,6 110:10
  122:15 141:12
cleaned 21:17
  119:17 120:6,10
  122:16
cleaning 31:22
  45:5 121:23
cleans 31:14
cleanup 20:24
  109:21 110:6,14
cleanups 109:12
clear 16:7 23:25
  70:18 128:13
  140:5 144:24
  169:1,4 170:6,20
  170:24
cleared 99:21
clearly 21:4,18
  23:4
client 109:11
clients 49:3 56:16
  113:23 117:11
  154:19,21 162:18
clinic 115:21
clinics 115:16
close 15:4,14 55:1
  83:18 87:14
  143:21 151:20
  159:25
closely 122:2
closer 6:23
clue 62:16
cluster 51:17

Veritext Legal Solutions
866 299-5127

[clustering - confident]

| | | | |
|---|---|---|---|
| clustering 51:11 | comfort 19:20 | compassion 9:22 | 76:16 86:21 |
| cocs 50:17 | 141:19 | 10:5 11:1 12:22 | comprise 12:2 |
| code 115:9,24 | comfortable | 22:17 | compromise 157:5 |
| 116:1 | 159:13 160:14 | compassionate | computed 101:10 |
| codes 80:20,20 | coming 5:16 17:20 | 11:2 22:10 | concentrated |
| 82:8 | 75:24 76:16 97:4 | competition 94:2 | 11:17 |
| coin 74:6 77:19 | 98:7 109:11 | competitive 102:2 | concentration |
| 78:2,5 | 123:15 125:19,23 | complain 112:3 | 22:5 |
| collaborative | 127:10 134:14,14 | complained 101:6 | concept 156:9 |
| 107:16 | 153:2 | complaining 93:1 | 157:8 |
| colleague 23:1 | commissioners | 98:16 | concern 27:3 |
| colleagues 13:22 | 118:1,17 | complaint 15:24 | 78:12 87:7 94:22 |
| 14:12,13 16:22 | commitment 8:22 | 94:7 133:19 | 104:3 123:11,12 |
| 20:8 | 25:13,21,25 27:19 | complete 19:25 | 123:20 126:10 |
| collective 19:12 | 54:6 148:5 | 32:21 | 153:17 154:1 |
| 23:12 | commitments 24:1 | completed 154:5 | 162:1,25 171:13 |
| collectively 21:16 | committed 20:8 | completely 76:22 | concerned 9:13 |
| 118:19 | committee 17:5 | 113:9 | 40:14 66:21 76:21 |
| combining 167:12 | 53:16 60:10 115:5 | complexity 28:9 | 78:1 |
| come 7:4,13 10:3 | 115:8 134:7 | 28:10 | concerning 76:1 |
| 14:1,2 17:15 | committing | compliance | 122:8 |
| 18:19 26:19,24 | 114:17 | 155:22 156:2,3 | concerns 74:12 |
| 42:22 43:7 53:22 | common 9:20 | complied 109:19 | 128:12 169:9 |
| 56:3 59:14 60:12 | communicate | 112:12 | 171:14,15 173:19 |
| 60:14 61:6 65:7 | 157:15 | compliment 15:3 | concluded 174:10 |
| 65:16 68:7,8 69:6 | communicated | 15:17,18 18:10,17 | concrete 10:19 |
| 69:11 80:5 82:23 | 162:1 | 35:24 36:1 44:16 | condition 36:12 |
| 83:24 87:18 89:1 | communication | 45:20,22 54:1 | 53:4 62:17 74:15 |
| 91:5,22 92:11 | 13:18 155:23 | 66:20 78:18 81:20 | conditioning |
| 103:19 105:20,25 | communities | complimentary | 91:17 |
| 106:2,5 112:13 | 10:23 19:18 20:18 | 18:7 | conditions 19:14 |
| 113:14 115:19 | 21:14,23,25 22:1,7 | compliments 40:6 | 38:9 |
| 116:20,20 123:5 | 22:7,13,14,17,23 | 40:8 | confer 157:4 |
| 124:2,18,24 125:7 | 24:6,7,10,12 88:1 | comply 83:10 | 166:18 |
| 131:7 132:6 | 102:18 | 109:19 118:13 | conference 59:25 |
| 134:21,22 139:22 | community 9:17 | complying 111:3 | 67:1 82:12 167:8 |
| 143:23 152:5 | 9:20 12:13 23:23 | comprehensive | 167:17 168:3,9 |
| 167:3 172:8 | 55:20 100:1 | 58:11,13,17 59:3,6 | confidence 81:13 |
| comes 69:22 70:8 | company 96:11 | 60:12,15 61:8,15 | 96:22 |
| 110:19 123:2 | compared 98:19 | 63:9 65:9 74:8,9 | confident 156:16 |
| 148:12,15 | | 74:20 75:25 76:1 | |

Veritext Legal Solutions
866 299-5127

[confidential - couple]

confidential  16:8
  145:14 160:9
  164:9
confidentiality
  163:20
confidentially
  152:23 162:19
conflict  76:12
  95:13
confrontation
  94:24
confronted  77:13
confusion  45:15
  46:4
congregate  56:17
  100:1 126:15
connected  160:18
consensus  156:22
consequence
  39:10 113:2
conservative
  90:23 109:16
considerable
  45:14 46:4
consistency  144:7
consistent  153:14
consistently  134:2
constantly  9:18
  63:20 73:23
constitutional
  108:20 144:23
  145:5
constraints  70:7
  71:4,15,17
construction
  96:10,23 169:6
consulting  160:23
cont'd  3:1
contact  27:4 51:1
contemplate  52:22

continue  21:12
  84:24 86:22 138:8
  159:24 173:16
continued  9:24
continues  154:5
continuing  119:16
  120:6
continuity  127:8
contracted  160:2
contribute  24:7
contribution
  87:25
control  6:15 35:22
  59:8,9 66:11
  68:17 107:14
  142:4 144:12
convene  154:22
conventional
  13:24
conversation
  68:16 93:2,13
  112:10 121:5
  122:1 142:9
  144:25 145:6,7,10
  145:18 149:12
  151:2 154:17
  162:25 163:5,14
  167:24 171:6,8,12
conversations
  80:15,16 93:23
  133:1 157:25
  158:1
convert  129:23
converting  159:19
convince  137:13
cooper  5:15,15,17
cooperation  44:10
coordination
  132:21
coordinator  54:3

copy  9:5
corners  11:6
correct  6:6 26:7,8
  31:4,11,24 32:2
  52:24 53:1 57:22
  71:7 82:8 105:1
  110:16,17 125:7
  130:8 152:11
cost  83:5 84:2,4,7
  86:23 87:8 88:18
  88:19,22 89:7,9,11
  89:13 90:15 91:2
  118:9,11 125:9
  131:3,19 137:20
costing  114:25
costs  102:5
couches  140:25
  141:5
council  3:13,17
  7:9 14:11 15:18
  16:2 17:15 20:2
  23:3,5,19,21,21,22
  25:13,15 39:2
  40:10 43:3,6 44:1
  47:20 48:15,24
  49:16 59:12,16
  66:19 79:14,17
  80:18,21 81:9
  103:13 118:1,16
  124:4 129:18,20
  130:6 134:21
  140:18 160:25
  169:12
council's  166:6
councilman  47:17
  56:22 58:3,5,8
  105:1,6 124:5
  129:24 130:2,5,12
councilmember
  38:23

councilperson
  79:20
counsel  151:3
  175:10,13 176:7
  176:10
count  50:14 87:15
  137:3
counted  156:8
country  10:20
  17:17
country's  10:24
county  3:2,18 8:4
  8:19,20 17:19
  18:6 21:9 25:19
  25:23 37:14 38:16
  45:2 50:18 54:11
  56:6 69:13,14,24
  70:8,19 71:10
  73:5 76:21 81:11
  82:16 86:17 87:1
  88:15 89:16,24,24
  95:16 99:21
  100:24 104:8,13
  106:15,20,25
  107:8,14 108:21
  130:17 132:22
  133:2,13 143:2,3
  144:1 145:19
  147:9,10,15,18
  148:2,5,9,11,12,13
  148:14,23 149:15
  149:16,16,17
  151:5,22 153:15
  155:7 157:10
  159:11,17,23
  160:6,7,11 166:6
county's  25:24
  133:11
countywide  15:13
couple  10:9 45:6
  80:18 101:12

113:21 114:8 115:5 122:7 139:10 140:5 147:17 169:11 170:13
**couples** 77:16
**courage** 9:9 12:22 17:16
**courageous** 15:18
**course** 12:13 45:2 52:7 109:13
**court** 1:1 5:2,3,6,7 6:2,3,12,25 7:15 8:25 9:4 10:11 12:17 13:17 14:1 14:7 15:5,17,23 16:9,11,20,25 17:10,11 18:22,25 19:4 24:24 25:2,5 25:8,11 26:1,9,13 26:20,24 27:8 28:22,25 29:4,9,11 29:19 30:3,6,8,14 30:23 31:2,5,9,12 31:19,25 32:3,5,8 32:11,15,17 33:1,4 33:10,13,18,21,24 34:1,4,7,10,12,15 34:24 35:10,12,17 35:23 36:1,9,16,22 37:3,9,22,25 38:3 38:4,17,21 39:1,12 39:15,17,21,24 40:2,6,8 41:6,21 42:3,6,12,15,16,19 42:21,24 43:2,17 43:19,21 44:7,15 44:18,20,23 45:3 45:11,13,17,19,22 45:25 46:3,6,10,14 46:20,22,24 47:5,8 47:12,18,19 48:17 48:22 49:15,21,22 49:23 50:1,5,6,9 50:10,21,24 51:4,7 51:13,16,21,24 52:5,8,13,16,21,22 52:25 53:2,12,14 53:18,21 54:5,8,13 55:1,4,12,18,24 56:4,6,8,9,13,25 58:21,23 59:2,5,11 60:7,9,17 61:1,3,9 61:11 62:4,18 63:2,4,7,7,11,14 63:18 64:6,9,12,15 64:18,25 65:3,7,9 65:13,18,23 66:7 67:4,11,14,18,20 68:1,7,13,21,25 69:16,20 70:11,14 71:22,25 72:14,16 72:18,21,24 73:1,6 73:11 77:2 80:5 81:5 82:19,22 83:7,8,21 89:11,13 89:17,20 90:1,8,10 90:18 91:1,11,15 91:19 92:20,22 93:6,10,15,19 94:1 94:7,11 95:1,6,18 95:21,25 96:14,17 96:19 97:4,8,15 98:22 99:2,5,7 100:3 102:1,5,9,12 103:1,4,8,16 105:2 105:7 106:14,16 107:17,25 108:11 108:14 110:2,5 112:3,20,23 113:9 114:4,7,10 115:18 116:2,7,11,15,19 116:20,21 117:1 117:12,15 118:24 119:2,8,13,21,24 120:1,11,13,16 121:1,10,13,24 122:2,4 124:6,8,9 124:11,14,16,21 124:24 125:2,3,12 125:15 127:10,23 129:25 130:4,7 131:9 132:8 136:11,17,21 137:9,12,16,25 139:14 140:19 141:9,11,14,15 142:21 143:1,4,7 143:11,18 144:5,7 144:16,18 145:11 145:13,25 146:4,6 146:8,12,20,24 147:2,5,13,17 148:2,25 149:14 149:20,24 150:2,4 150:10,13,16,20 151:1,10 152:7,9,9 152:17,19,21 153:4,22 154:4,5,9 154:13 155:4,9,14 155:24 156:13,24 157:6,16 158:3,11 158:14,16,22 159:2,5,15 160:20 161:7,13,15,18,22 162:3,5,10,16,19 162:23 163:4,8,12 163:14,18,21 164:1,6,8,10,20,25 165:2,12,14,16,20 165:22,24 166:1,3 166:8,25 167:2,3,6 167:11,14,16 168:1,3,4,7,16,20 171:10,17,20 172:14,15 173:1,9 173:12,17 174:1,5 174:7
**court's** 5:11 7:7 16:18 169:10 172:14
**courts** 16:15 129:15
**cover** 77:5
**covered** 122:7
**covid** 33:7,18 38:20 48:7 50:15 57:2,3 83:10,16 84:7 85:17 86:25 87:16 159:20,25
**crappy** 84:18
**crazy** 58:11 76:10 84:9,9
**create** 21:24 23:7 24:17 84:4 86:8 94:18,21 123:2,4 123:15
**created** 13:20 15:20 23:6 107:18 123:17,19 133:8
**creating** 22:1 108:18 152:1
**credit** 9:23 90:13
**crime** 114:17
**criminal** 96:4
**criminalization** 82:24
**criminalize** 107:15 107:18
**crisis** 19:9 20:4 21:12 22:20 86:2 86:2,3,4 100:20
**criteria** 74:9 156:3

[critical - difficulty]

**critical**  8:13 21:5
  23:9 24:17 148:1
  168:22
**critically**  87:2
**criticism**  15:17
  72:7
**cross**  73:7
**cuel**  85:12
**current**  36:5 97:13
  156:10
**currently**  28:20
  30:5 37:16 38:14
  51:2 52:12 83:13
  84:17 159:21
**custodial**  117:18
**custody**  114:2
**cute**  87:12
**cuts**  31:6
**cv**  1:7 9:3
**cx**  4:2

**d**

**d**  2:10 3:3 4:1 5:1
**daily**  89:14
**dakota**  92:6 97:17
**damages**  117:18
**dangerous**  55:2
  56:18
**darcey**  5:19
**databases**  88:13
**date**  1:12 160:22
**dates**  159:13
**dave**  90:11,12
**david**  1:14 29:7
**day**  5:13 7:21
  10:17 13:9 20:3
  59:23 79:23,23
  84:12 85:13 89:8
  90:24 97:10
  115:19 116:11
  126:12,12,17,17
  126:18 127:1,3,3,5

127:6 157:25
**days**  10:1 90:13
  101:7,11 123:2,4,7
  154:15 157:1
  169:11 172:17
**deal**  20:18,19 28:8
  77:14 81:19 93:20
  122:10 124:6
  138:1,2
**dealing**  41:23 76:3
  80:10 105:16
  127:15,18 137:23
  148:10
**dealt**  78:13
**death**  17:6 74:13
  74:18
**debate**  19:11
  142:16
**debt**  148:22
**decades**  11:7
**decency**  106:3
**decide**  55:1 64:20
  116:15 132:4
  141:17 144:14
  164:21
**decided**  123:14
  125:5 163:23
  164:2 172:24
**decides**  144:11
**deciding**  64:22
**decision**  6:5 16:16
  25:15 26:17 46:16
  53:23 63:17 65:15
  74:10,11,15,19
  83:11 126:16,21
  142:6
**decisions**  62:9
  75:7 77:1 124:7,8
  124:14
**declared**  104:18

**decriminalized**
  117:24
**deemed**  170:6
**deeper**  132:7,7
**deeply**  154:11
**deescalates**  159:20
**defecating**  101:2
**defendant**  2:17
  3:2
**defendants**  1:9
**defer**  126:6
**definable**  16:24
**define**  77:16
  105:12 106:3
  122:8 135:24
  138:4
**defining**  140:7
**degrees**  106:4
**delaying**  157:11
**deleterious**  130:22
**demonstrated**
  13:15
**denigrating**  17:18
**density**  88:3
**deny**  21:4
**department**  35:21
**deploy**  36:8
**deployment**  102:8
**deployments**
  99:16
**depth**  158:1
**deputies**  89:25
**deputy**  111:20
**derail**  171:15,16
  171:18
**describe**  128:9
**described**  43:4
**description**  4:8
  14:15
**deserves**  9:23

**designate**  78:3
**desire**  19:16
**despair**  10:23
**details**  155:20
  169:3
**determine**  71:17
**determines**  69:23
**devastating**  20:6
  21:21
**develop**  142:10
**developer**  131:18
**developing**  141:15
**devices**  141:17
**dialogue**  19:10
  24:23 50:25
**diaz**  5:21,21
**dictate**  66:10
**die**  21:20
**difference**  34:7
  125:17 144:20
  160:12
**differences**  14:20
  139:7
**different**  14:4
  17:14 25:17 28:10
  32:24 37:1 76:25
  79:13,14 80:7
  84:11 85:24 86:15
  87:9 89:1 99:18
  99:19 110:16
  121:5,25 134:14
  137:22 139:19
  143:8 144:20
  153:10 173:6
**differentiate**  77:3
**differently**  35:7
  119:14,18 135:6
**difficult**  116:17
  138:8,9
**difficulty**  147:14

Veritext Legal Solutions
866 299-5127

[digging - e]

| | | | |
|---|---|---|---|
| **digging**  132:7 | **discussion**  6:16 | 39:5 42:17,18 | **dollar**  89:22 |
| **digital**  175:7 176:3 | 14:25 23:20,24 | 43:11 54:3 79:8 | **dollars**  88:18,22 |
| **dimmed**  10:17 | 26:6 60:7 62:6 | 79:17,18,21 80:1,2 | 132:5 |
| **direct**  19:16 50:25 | 68:8 80:13 107:22 | 80:5,8,21 81:8 | **dolly**  16:21 |
| 53:17,19 | 108:1,2,7 109:4 | 82:10,17,17 96:22 | **donated**  38:7 |
| **directed**  12:7 | 113:22 117:15 | 99:18,19 103:14 | **don't**  49:6 |
| 111:18 | 124:1 125:22 | 104:25 105:24 | **door**  169:7 |
| **direction**  14:7 | 132:22 139:15 | 123:18 124:11 | **downside**  140:6 |
| 25:17 48:8 74:9 | 143:15,24 148:1 | 129:18,20,23 | **downtown**  34:19 |
| **directions**  19:25 | 148:20,25 149:23 | 139:21 140:9,16 | 115:20 166:14 |
| **directly**  82:15 | 160:22 161:25 | 140:19 | 170:10,15,15,19 |
| **director**  42:18 | 173:18 | **districts**  14:14,23 | 171:22 |
| 46:25 53:21 | **discussions**  5:5 | 17:12 25:17 39:3 | **downturned**  129:2 |
| **disabilities**  77:12 | 17:24 18:13 24:2 | 40:11 140:11 | **dr**  98:20 |
| **disabled**  75:20 | 27:11 72:3 73:16 | 144:4 | **draft**  71:18 157:23 |
| **disadvantaged** | 124:3 125:16 | **disturbed**  43:8 | **draws**  159:25 |
| 20:14 24:10 39:22 | 126:1 143:17 | **diverse**  78:24 | **dream**  10:17 |
| **disadvantages** | 152:5 154:12 | **divide**  104:25 | **dreamed**  59:8,13 |
| 160:24 | 156:15 160:4,12 | **divides**  80:23 | **drinking**  146:17 |
| **disagree**  73:12 | 161:5 168:12,13 | **division**  27:9 | **drip**  153:20 |
| 112:18 119:10 | **disgrace**  10:13 | **doable**  9:21 13:12 | **drive**  34:15 101:21 |
| **disagreement** | **disinvestment** | **doc**  1:8 | 135:11 160:23 |
| 88:21 108:23 | 11:9 | **docket**  9:4 | **driven**  101:20 |
| 110:13 152:22 | **dislocated**  87:1 | **docketed**  9:3 | **drop**  126:14 127:1 |
| 154:24 | **disparity**  40:15,24 | **doctors**  58:10 | 127:9 136:25 |
| **disagreements**  9:8 | **disproportionate** | **document**  9:2,25 | **drug**  21:11,19 |
| 108:3 154:25 | 152:1 | 16:11 118:15 | **dtsc**  35:20,25 |
| **disappointed** | **dispute**  156:22 | 137:19 145:14,22 | **dtsc's**  36:13 |
| 65:19 | 157:3 | 146:4,16 164:12 | **due**  30:21 55:15 |
| **discharged**  126:12 | **disputes**  92:16 | **documents**  13:13 | **duly**  175:5 |
| 163:2 | **dissipates**  57:2 | 27:25 83:24 | **dumping**  141:7 |
| **discuss**  9:22 14:24 | **distance**  52:9 | **dodging**  42:6 | **dwelling**  20:22 |
| 15:24 16:24 78:7 | **distinctly**  25:17 | **dog**  5:15,17 | **dx**  4:2 |
| 121:7 126:4 147:1 | **distressed**  87:6 | 111:13 135:14 | **dying**  49:3 |
| 154:18 158:20 | **distribute**  40:17 | 139:4 | **dynamic**  86:8 |
| 160:16 165:6 | **distributed**  39:2 | **doing**  20:8 22:23 | **dysfunctional** |
| **discussed**  124:13 | 39:20 | 32:17 33:8 37:16 | 78:20 |
| 126:1,5 147:16 | **distribution**  39:8 | 46:1 50:19 67:21 | |
| 159:8 167:21 | 39:18 40:13 | 97:18 117:5,6 | **e** |
| **discussing**  162:16 | **district**  1:1,2 | 119:10 137:24 | **e**  2:1,1 3:1,1 4:1,7 |
| | 14:16 17:14 39:3 | | 5:1,1 18:5 |

[earlier - exist]

earlier  37:7 49:3
  141:10,11
early  137:2
earn  84:19
earth  172:19
easier  81:23
easy  81:17
echo  166:1
economic  84:14
  88:13
edge  31:1
edification  169:11
educational  27:13
effective  87:8
  125:9
effectively  20:25
effects  123:6
efficient  13:20
effort  15:8 40:16
  78:18 144:9,10
  145:17 172:22
efforts  28:13
  40:14 168:17
eighteen  70:22
  73:4
either  17:3 30:13
  39:6 80:3 81:1
  104:17 116:17,21
  149:10 164:13
elected  155:7
electricity  77:5
  91:20
element  156:5
  165:17
elephant  104:12
elevate  156:18
  157:5,16
elizabeth  2:3
  91:23 168:23
emailed  169:16

embarrass  6:10
emergency  48:7
emitchell  2:7
employ  96:3
employed  96:11
  175:10,13 176:8
  176:10
employee  175:13
  176:10
employment  97:1
  97:2
emptied  99:21
empty  170:16,18
enabled  13:21
encampment
  43:12 98:11
  110:23
encampments
  11:4 21:17 22:6
  34:5,17 35:6 48:1
  52:10
encourage  8:18
  145:16
encouraged  13:17
energy  138:7
enforce  83:4,4
  122:8 139:21
  140:2
enforcement  26:4
  90:17 104:2,5,7
  108:5,24 109:1,7
  109:15,17 110:4,9
  111:22,25 112:1,7
  112:17,25 113:10
  113:12,13 114:10
  119:16,16 120:2,4
  120:20 121:7,21
  123:10 138:18
  142:15 147:20
enforcing  116:6
  120:9

engage  13:18
  173:3
engaged  172:8
engagement  19:9
  53:19
engaging  23:19
enlightened  13:15
enormous  148:22
ensure  23:14 24:4
  24:7,21
ensures  8:15
ensuring  8:6 19:14
enter  6:16 8:4
  16:19
entered  32:18
entering  153:18
entire  48:1 136:4
  162:6
entity  18:14 41:24
  79:19
environmental
  28:3 35:16 37:1
  62:17 63:15 70:6
  71:3 129:7
epicenter  15:15
equal  15:2
equally  40:16
equitable  24:23
  39:8,10,17 40:13
equitably  39:2
equity  24:3
eric  95:13 133:4
es  4:2 175:4
escalate  110:8
escalates  86:23
especially  14:9
  15:7 18:17
esquire  2:3,10,18
  3:3
essentially  169:19

establish  19:12,24
estimate  160:1
estimated  159:18
et  1:5,8 10:6 15:8
  40:19 97:9 99:12
  123:25 145:16
evaluate  61:23
  71:16
evening  26:3,6
  174:2
event  157:8
eventually  90:4
  111:18 112:8
  163:9 164:11
everybody  6:21
  11:6 27:6 80:6
  92:9 100:8,21
  110:2
everybody's
  111:16
eviction  115:21
evidence  88:10
ex  13:18
exacerbated  11:10
exactly  52:15
  125:12
examined  131:21
example  28:7
  100:4,8 153:9
excellent  50:21
  54:8,8 107:21
  116:13 161:23
exception  96:7
exchanged  157:23
excuse  49:13
executive  36:7
  54:4
exemplar  12:21
exhausted  150:17
exist  24:9 114:22
  132:2

[existing - fine]

existing  31:23
  94:20
exiting  96:4
expand  159:24
expect  6:17 25:15
  26:15 68:15 74:21
  139:5,6 144:7
  157:25
expectancy  49:13
  49:24
expectation  72:8
expectations
  23:25
expected  46:25
  85:22
expeditiously  44:4
expenditure  75:23
  76:9
expense  151:25
expensive  84:6
experience  96:8
  118:18 147:8
experienced  11:15
experiences  81:25
experiencing  8:17
  16:5
expertise  38:12
experts  49:7
explain  33:14
  153:22,25
explosive  76:13
expressed  143:12
extent  121:16
extraordinarily
  73:1 133:4
extraordinary
  7:10
extreme  112:8
extremely  24:8
  60:19 172:2

extremes  9:11

**f**

faces  10:23
facilitates  70:7
facility  128:24
fact  7:10 11:19
  17:2 33:3 34:3
  44:2 97:16 100:19
  102:19 128:16
  134:7
factors  71:17
  84:24 86:24
facts  121:17
failed  10:23 12:11
  90:3
failing  10:15
failure  90:8
failures  11:8
fair  19:10,25
  20:13 21:15,24
  22:1,8,20,21,22,24
  24:22 26:21,23
  35:12 53:12 64:14
  64:19,20 67:11
  93:23 97:25
  123:19 133:13
  151:16,18 171:4
fairly  40:17
fairness  24:3
fairview  128:18
faith  25:14 27:25
  129:6,10,12 142:3
falling  130:20
false  24:8,14
familiar  114:10
families  10:18,22
  77:15 88:1
family  12:6
fantastic  46:19
  71:21

far  15:24 18:11
  30:23 42:13 62:4
  78:17 81:18
  121:20 122:7
  123:22 135:10
  137:21 151:8
farther  113:16
fast  12:9 15:20
  40:22 75:7 84:25
faster  40:22
fault  55:6,17 86:13
fear  87:3 104:21
  104:22
fears  119:6
feasibility  69:23
  70:6
feasible  8:15 69:13
  71:12 142:13
feces  101:6,10
federal  5:5,6 6:2
  14:1 17:11 21:9
  26:20 42:16 49:21
  49:23 50:1,6,9
  52:22 55:1 56:9
  103:16 110:5
  116:20,20 148:14
  167:3
fee  102:8
feeder  88:17,23
feel  39:5 82:13
feeling  118:9
feels  21:2
feet  30:25 31:2
  59:25 84:13
fellow  11:3 22:4
felt  169:23 170:4
fema  17:17
female  3:25 60:23
  62:25 68:23
  120:22 162:9

fence  77:10
fenced  43:22
fhwa  42:9
fiction  128:16
fields  92:5
fight  99:10 102:14
fighting  92:18
figueroa  56:23
  58:1
figure  23:17 58:19
  60:24 130:17
  137:21 149:4,12
figures  91:4
file  88:10 116:18
  118:14 134:8
filed  6:12 83:22
  88:8
fill  123:22
film  34:16
final  7:18 17:2
finalizing  48:2
finally  19:24 21:11
  23:6,25 24:8
financial  21:7
financially  8:15
  175:14 176:11
find  33:7 35:8,9
  38:12 44:6 55:9
  57:5 72:3 90:21
  90:22 91:23
  109:18 116:16
  128:18 139:7
  164:10
fine  50:2 64:16
  67:1 82:12 92:10
  92:10 119:10
  120:14,17 121:6
  127:17 132:16
  139:8 152:21
  166:25

[finger - further]

finger  120:19
fingers  12:1
finished  29:8
fire  41:12
firm  105:11
firmly  82:16
first  6:25 16:2
   19:7 29:19 31:13
   40:10 41:1 54:9
   57:5,8 66:11
   68:13 71:25 74:24
   75:16 77:22 79:22
   81:11 84:8 93:6
   95:9,15 98:13
   112:14 114:9
   116:12 119:1
   126:22 128:23
   132:3 134:20
   141:1 143:13
   148:12 151:19
   153:6 159:16,17
   159:18
fisher  122:22
   123:14 124:16
   125:22
fisher's  122:18
fit  171:25
fits  61:24 95:8
five  56:21 58:6
   59:19 67:8 70:17
   83:16 88:18 91:24
   96:10 101:9
   141:20 142:2
   150:16 154:14,14
   154:15
flag  126:8
flame  79:11
flash  122:6,9
   124:2
flavor  80:7

fleeing  10:22
fleshed  155:21
flexibility  151:24
flexible  41:16
flip  74:6 77:19
   78:2 100:20
   120:18
floor  166:7
flow  88:6
flowing  132:16
   133:6
focus  28:12 61:13
   74:23 94:16 135:8
   149:3,4
folks  21:18 41:15
   44:5 54:16 91:6
   93:13,24 95:25
   97:8 111:11 121:6
   126:9 138:13
   144:23 145:5
   169:25 170:13
   171:22,24 172:7
following  133:1
   159:14
food  98:15 138:16
footnote  146:14
footnotes  146:22
force  18:16 59:4
   59:18 157:7
foregoing  175:3,4
   176:4
foreign  10:21
forgetting  105:16
   133:24 138:1,11
forgot  111:11
form  59:4 60:9
   63:24 66:8 134:15
formal  5:4,8,24
   157:2
formality  6:2 7:7

formally  6:12 9:1
   9:4
formed  59:18
former  8:16 91:7
   154:7
formerly  159:8
forms  107:22
formula  156:5,6
forth  7:13 50:22
   80:16 142:17
   158:8
fortune  114:25
forward  5:14 8:8
   10:9 19:12,24
   21:8 23:19,24,24
   24:2,4 25:18
   48:15 57:15 91:22
   107:21 134:4
   150:19
foul  111:21
found  12:4 40:12
foundation  3:20
four  58:5 90:13
   162:11
frame  41:9 63:24
   66:10 82:4 143:18
   172:16,17,20,25
framework  13:24
   23:21,21
frankly  18:16
   19:15 21:23,25
   36:14 38:11 40:15
   43:14 49:4,19
   51:18 65:18
   127:16 128:19,21
   133:16 134:17,22
free  118:22
freely  106:1
freeway  28:6,7,19
   29:1,20 30:1,2,11
   30:13,19,21,24

31:1 33:2,15,22
   34:16,17 35:1,1
   37:4,6 40:1,5
   43:10 44:2,5
   45:16 53:7 54:16
   55:11,13 56:18
   62:22 75:11 129:8
   135:11
freeways  49:11
   73:25 77:25
frequently  56:16
   126:10
friday  90:5,6
   161:14,16,22
   162:20
friend  11:14
friendship  15:5
front  14:5,18
   61:20 78:5 79:9
   92:8 103:17 117:1
   117:6 119:9 121:4
frontage  27:20,21
frustrated  22:16
   26:16
frustrating  20:12
frustration  47:20
   64:3 173:11
frustrations  48:4
fullerton  148:20
fumes  53:6
function  40:5
fund  148:5
fundamental
   12:14 153:13
funding  148:6,21
   157:11
funds  135:17
furious  76:15
further  152:4
   156:15 166:19
   174:2 175:12

Veritext Legal Solutions
866 299-5127

[further - good]

| | | | |
|---|---|---|---|
| 176:9 | gilliam 176:2,15 | 133:18 134:4 | 83:4,18 84:6 85:1 |
| future 85:19 | gipson 48:10 | 135:17 138:15 | 85:16,18,21 86:7,9 |
| g | give 17:25 24:25 | 139:8 140:21 | 86:24 87:3,10,13 |
| g 5:1 | 25:15 27:10 29:4 | 144:1,16,16 | 87:19,22 90:1,6,8 |
| gain 20:3 135:16 | 29:7 30:15 41:25 | 145:17 146:14,24 | 93:21 94:16,17,25 |
| gallon 122:20,21 | 42:3 43:6 51:24 | 146:24 148:19 | 95:6 96:23 99:8 |
| 123:22,24 125:6 | 59:8,9 60:17 61:3 | 149:21,24 154:14 | 99:11 101:14,19 |
| 125:23 | 66:11 67:23 76:3 | 154:21 161:3 | 103:15,16,20 |
| garcetti 15:6,10 | 83:22 95:7 110:15 | 162:9 166:8 | 104:4,17 105:13 |
| 94:2 133:4 | 112:4,20 114:1 | goal 54:15 113:7 | 107:20 109:3,7 |
| garcetti's 91:22 | 116:7,9 123:5,5 | 153:19 154:2,4 | 110:12,22 111:14 |
| garcia 125:2 | 130:25 137:19,19 | goals 53:3 | 112:20 113:5,19 |
| gary 9:3 | 138:16 139:20 | god 128:25 138:23 | 115:21 116:7,15 |
| garza 8:3 | 143:18 144:3,3 | god's 138:12 | 116:18,21 117:2,3 |
| gathered 101:19 | 155:7 159:12 | goes 42:13 102:15 | 117:4,17 118:13 |
| gears 173:9 | given 24:19 31:20 | 114:11 130:14 | 122:10,10,12,14 |
| gee 16:21 76:17 | 50:12 54:24 61:16 | going 5:7,24 6:1,7 | 123:9,12 124:20 |
| 92:23 95:11 | 61:18 83:9 85:11 | 6:10 7:1,23 9:1,2 | 126:6,9,12,13,22 |
| general 135:9 | 111:9 124:14 | 9:10,13,17,25 10:9 | 128:18 131:3,18 |
| 151:23 156:9,22 | giving 14:7 119:6 | 10:11 13:11 14:1 | 132:11,13,17 |
| 157:1 | 125:10 155:6 | 14:23 15:23 16:13 | 134:5,8,10,16 |
| generally 132:19 | glove 29:4 | 16:17,22 17:4,13 | 135:1,2,7,16,20 |
| generation 15:22 | go 19:2 26:20 27:9 | 18:12 25:12 26:9 | 137:6,18 139:11 |
| gentleman 27:5 | 28:15 45:25 51:21 | 26:10,11,15,24 | 140:20 141:16,17 |
| gentlemen 7:15 | 52:4,9 54:24 | 27:1,14,17 28:7,8 | 142:2,5,7,16 143:9 |
| 8:23 | 56:11,23 57:25 | 28:15 29:4 38:5,6 | 143:23 144:22 |
| gentrification | 59:11,24 60:2,3 | 41:16 42:1 43:9 | 145:4 146:15 |
| 86:16 | 62:23 63:3,19,21 | 45:25 46:6,14 | 152:4 153:3 |
| genuine 23:19 | 67:4 68:21 69:9 | 47:12,14,14 48:23 | 155:10 156:14,25 |
| getting 8:8 53:4,8 | 69:24 74:13 75:13 | 50:15 54:19 57:24 | 158:3,5,17,18 |
| 67:7 86:12 98:23 | 75:18 77:2,9 85:3 | 58:23 59:4,22 | 159:10,21 163:1 |
| 100:23 103:22 | 86:18,18 88:7 | 60:9,10,11 61:17 | 163:22,24 164:4 |
| 105:18 107:19,19 | 89:2 90:5,20 | 62:3 63:19 65:15 | 164:20,22 166:5 |
| 107:20 109:14 | 92:24 93:15 | 66:13 67:14,16,22 | 167:1,3 173:6,7,8 |
| 112:10 113:10,18 | 101:21 104:17 | 69:6,9 70:11,14,23 | 173:16,20,22 |
| 119:3 135:10 | 111:14 115:18 | 70:24 71:2,5,10 | gonzalez 17:10 |
| 136:22 137:24 | 116:11,15 117:21 | 73:7,9 74:22 75:5 | 103:21 |
| 172:25 | 118:7 121:9,14,21 | 75:6 76:2,12,14,17 | good 18:15 25:14 |
| gift 19:23 24:19 | 122:25 123:6,8 | 76:24 78:2,6 79:9 | 27:24 28:7 40:16 |
| gil 96:20,20,24 | 126:16,21 127:20 | 79:10,13,25 80:22 | 43:4 44:8 46:20 |
| | 128:5 129:16,17 | 80:23 81:22 83:3 | 46:22 47:5 79:11 |

[good - helping]

| | | | |
|---|---|---|---|
| 81:21 85:24 88:4 | **greatest**  40:20 | **hands**  22:19 | **health**  11:8 20:25 |
| 91:20,20 98:18 | 113:17 | **happen**  7:20 17:1 | 21:5,11 74:18 |
| 105:10 107:24 | **gridlock**  20:21 | 40:4 86:25 117:4 | 78:1 109:24 |
| 108:4 113:2 | **ground**  80:4 | 133:24 135:23 | 121:21 |
| 114:23 129:6,10 | **group**  18:1 60:8 | 167:1 | **healthy**  50:3 |
| 129:12 133:4,23 | 61:13,25 75:16 | **happened**  96:25 | **hear**  6:24,24 15:23 |
| 142:3 143:12 | 136:3 | 125:3 | 17:12 19:6 25:12 |
| 144:2 146:17 | **grown**  22:16 | **happening**  21:22 | 29:11 36:16 47:19 |
| 147:23 151:8 | **guarantee**  49:6 | 163:17,22 169:7 | 68:14 71:14 72:2 |
| 154:8 157:19 | **guard**  73:17 | 170:20,25 | 73:23 92:20 95:14 |
| 164:10 166:22 | **guarded**  76:18 | **happens**  34:22 | 121:1 132:9 133:1 |
| 174:2,3,4,5 | **guess**  135:3,4 | 100:12 122:25 | 133:19 142:21 |
| **goodbye**  24:14 | **guesstimate** | 123:15 129:4 | 149:2 155:18 |
| **goodness**  134:24 | 133:12 | **happy**  43:6 95:15 | 164:1 |
| **goodwill**  78:18 | **guest**  82:5 | 96:16 97:6 130:25 | **heard**  11:23 17:16 |
| 79:25 | **guidance**  8:2 79:3 | 145:9 151:6 171:5 | 41:11 48:22,24 |
| **gorilla**  133:9 | **guidelines**  82:24 | 171:8 | 49:2 64:2 72:1 |
| **gosh**  67:11 80:1 | 107:12,13,21 | **hard**  7:2,11 11:11 | 73:8 82:16 90:2 |
| 134:6 | 113:3 117:20 | 13:6 21:6 49:5 | 134:2 141:20 |
| **gotten**  20:18 | **guiding**  141:15 | 54:19 60:19 | 171:19 172:18 |
| 135:19 | 151:12,14 | 116:23 127:25 | **hearing**  1:11 |
| **government**  47:21 | **guilty**  11:16 | **hardworking** | 44:10 62:4 63:8 |
| 132:15 | **gutierrez**  16:21 | 22:17 | 63:20 64:1,3 77:8 |
| **governments** | **guy**  111:14 | **harm**  14:3 22:1 | 95:10 99:9 103:9 |
| 12:16 55:8,8 | **guys**  57:19 70:20 | 111:21 117:22 | 127:13,16,18 |
| **governor**  13:1 | **h** | **harmful**  54:17,17 | 141:11 165:19,21 |
| 27:22 38:9 48:6 |  | 54:20,23 | **heartbreaking** |
| 147:5 | **h**  4:7 85:1 135:17 | **harsh**  97:21 | 21:21 |
| **granada**  83:17 | **habitable**  129:13 | **hawthorne**  69:18 | **heat**  51:13,16 |
| **granted**  22:18 | 129:22 | **hazard**  128:12 | **heating**  91:17 |
| **grants**  148:8 | **habitation**  128:25 | 129:8 | **heaven**  172:19 |
| **gratuitously**  48:25 | 171:25 | **hazardous**  28:3 | **heidi**  3:14 110:1 |
| **great**  14:21 38:21 | **hahn**  148:18 | 53:4 56:10 | **help**  11:14 12:1 |
| 45:23 46:1 74:11 | **half**  12:4 84:17 | **he'll**  29:22 | 16:18 19:13 32:25 |
| 83:1,2 85:6 91:24 | 101:9 111:9 | **head**  9:16 27:9 | 35:15 37:14 48:20 |
| 94:3 95:20 98:3,3 | **hallway**  60:3 | 131:21 | 62:6 63:7 66:9 |
| 98:19 99:13 104:3 | **hammer**  18:16 | **headed**  155:8 | 78:3 105:22 127:6 |
| 111:20 115:11 | **handful**  154:20 | **heading**  68:11 | 138:12,18 139:1 |
| 140:4 | **handicapped**  75:2 | **headway**  27:16 | **helpful**  66:19 73:2 |
| **greater**  40:21,25 | 75:20 | **heal**  10:16 | **helping**  22:4 88:5 |
| | **handle**  132:15 | | |

Veritext Legal Solutions
866 299-5127

[helpless - ignore]

helpless  74:17
hereto  175:14
  176:11
hey  92:9 96:22
  139:20 141:24
hhh  135:17
hi  90:11,12
high  74:13 86:17
highway  43:24
hire  128:5
historic  74:5
historical  133:10
  133:20
historically  20:16
  116:24 122:5
history  24:5 25:19
  32:22 83:9 135:1
hit  26:16 90:7,8
  156:4
hold  31:19 46:22
  93:6 95:21 108:5
  112:15 117:1,12
  119:13 120:16
  127:23 128:3
hole  85:22 132:7
home  10:21 30:19
  47:25 48:1 90:11
  92:2 136:20 137:1
  137:2
homeless  3:14
  9:22 10:4 12:6,8
  16:5 23:11 35:8
  50:13 54:3 85:14
  90:2,12,19 91:7
  99:24 101:1,19
  104:15 105:12
  106:2,2,22 107:8
  114:12,16 115:5,6
  116:16 117:22
  118:10 121:20
  124:17 135:8,12

  136:2,4 141:8
homelessness  8:17
  11:15 12:4,18,19
  13:21 19:14 20:4
  23:3,7 24:9 78:16
  81:15 84:14 85:9
  86:2 87:11 88:16
  88:17,24 89:2
  96:5,9 101:18,18
  131:11,12 141:13
homes  87:9,10,11
  94:22
honestly  100:22
honor  5:21 7:23
  8:24 16:22 36:21
  47:18 48:2 54:21
  61:5,14 62:13
  67:2 68:10,19
  92:13 93:22 94:14
  118:18 120:8,22
  124:12 125:1
  126:3 130:2,15
  139:12 142:18
  149:2 150:9 158:9
  161:24 162:22
  163:23 164:17
  165:17 171:3
  172:12 173:25
honorable  1:14
honoring  5:12
hook  113:12
hope  10:5 16:21
  19:10,11,22
  103:12 138:7
hopeful  103:10
hopefully  14:5
  73:13 110:3 119:7
  122:23 125:16
  157:24
hoping  121:16

horrible  96:25
horrific  104:14
horseback  114:20
horses  114:12
host  166:11
hot  124:4 127:11
  132:20,20
hotel  1:15 15:11
  15:14 123:4
  128:24 160:2
hotels  77:10 100:6
  163:2
hour  15:10 77:7
  127:1 145:19
  150:9
hours  7:5 13:9
  45:6 143:19
  150:16 154:14
house  10:16 37:19
  41:15
housed  51:2
houses  87:23 95:4
housing  11:11
  12:8,15 20:17,17
  21:3 22:3 23:8,11
  61:16,17,20,24
  62:2 85:2,13 86:2
  86:14,23 87:21
  93:14 94:18
  100:18 115:20
  125:10 127:8,11
  129:23 131:23
  133:16 145:1,2,2
  153:8,10
huddled  11:4
huge  43:11 86:8
  87:22,24 90:17,18
  117:23 119:6
  133:15 138:2
  171:7

huh  29:15 37:22
  91:11 97:15 99:1
  161:15
human  1:4 76:4
  128:24 135:15
humane  13:20
  51:7,9 136:5
  138:3
humanely  10:16
  53:7 102:23
humanity  136:6
humankind  11:2
humble  40:15
humbled  14:15
  24:24 103:4
humbly  9:6,16,25
  10:3 12:24 13:8
  15:6 46:24 128:7
  160:13
hundred  97:10
hundreds  98:17
husband  96:7
hygiene  98:14
hypothermia  49:5

### i

idaho  79:2
idea  78:9 81:21
  85:6 105:20 113:3
  115:11 128:7
  132:24 139:14
  157:2,4 158:24
ideas  139:11
identification
  90:21 156:11
identified  70:3
  71:11 130:9,10
  171:2,7
identify  70:19
  75:9,19
ignore  50:2

Veritext Legal Solutions
866 299-5127

[ignored - issues]

**ignored** 11:12
**ignoring** 49:19
**illegal** 35:5,6
**illness** 75:1
**imagine** 100:14
**immediately**
 102:23 108:25
 111:15 172:21
**immensely** 105:23
**immune** 11:22
 25:9
**impact** 20:9 24:1
 153:3
**impacts** 20:4
**impasse** 68:12
 92:4 154:13
**impatience** 141:24
**imperative** 12:15
**implement** 20:24
 23:9
**implemented** 23:5
 24:18
**important** 7:20
 23:1 47:19 48:9
 55:14 61:7 81:14
 81:15 85:7,7 87:2
 93:12,12 169:5,24
**impose** 60:3 67:25
**imposes** 139:3
**improve** 157:24
**improved** 19:15
**inability** 43:8
**incapacitated** 76:6
**incarceration** 96:9
**incentive** 140:4
**inch** 31:7
**incident** 110:12
 111:12 112:11
**incidents** 109:12
**include** 16:6
 103:10 115:10

**including** 156:10
**income** 11:10
**inconsequential**
 38:5
**incorporate**
 145:21
**increase** 85:16
 145:2
**increases** 11:20
**incredibly** 20:12
**incremental** 15:19
 27:15
**incrementally**
 129:17
**independent**
 147:10
**indicated** 153:7
**indication** 128:13
**individual** 66:16
 69:11
**individually**
 118:19
**individuals** 23:11
 54:24 61:20 96:4
 99:24
**industrial** 170:16
 170:18
**inequality** 11:10
**inertia** 13:11 17:3
 18:1 46:7,11 75:9
 79:16,25 132:14
 134:6
**inflammatory**
 26:5 103:25
**influence** 22:15
 23:23
**informal** 157:2
**information** 60:11
 62:9 65:11 67:7
 75:13 154:21
 159:14 160:3,5

161:25
**informed** 6:18
 63:17
**infractions** 115:9
 115:12,24 120:3
**infrastructure**
 23:6
**inhibits** 157:9
**initial** 5:4
**initially** 38:10
 40:18 59:9,9
 80:17 87:20 133:7
 164:8,11
**initiative** 36:21
 83:1
**injury** 117:20
**innovative** 131:7
 131:12 132:6
**input** 103:13
 141:22
**insert** 160:14
**inside** 77:8
**insistence** 172:14
**inspector** 5:13
**instance** 74:10
 75:18 123:18
 140:1
**institutions** 10:24
**insulting** 24:8
**insurmountable**
 155:3
**integrate** 50:16
**intelligent** 62:9
**intention** 158:9
**intentioned** 18:6
**intentions** 18:15
**interact** 78:21
**interaction** 28:10
 43:9
**interest** 36:13

**interested** 17:6,8
 17:11,12 95:10
 145:1 175:14
 176:11
**interests** 162:18
**interim** 152:2
 153:11
**interlaps** 132:25
**interrupted**
 113:19
**interveners** 151:5
 164:3
**intimated** 121:6
**intimidate** 114:12
 114:16
**inventory** 151:19
**investing** 172:22
**investment** 21:7
 95:13 102:16
**invited** 6:11
**involve** 16:7 80:15
**involved** 6:17
 16:15 20:1 77:22
 79:13,15,18
 103:17,22 117:1
 118:1 119:9 122:6
**involvement** 19:16
 21:9
**isolated** 11:19
**issue** 21:8 23:3
 47:19 68:20 77:17
 87:22 95:17
 107:22 111:1
 121:3 122:7
 124:13 125:1,11
 126:25 148:23
 153:7,12 157:13
 168:25 169:6
**issues** 8:13 13:16
 13:23 25:16 48:25
 75:14 143:23

Veritext Legal Solutions
866 299-5127

[issues - know]

145:3 148:6 153:5
153:6 156:8,17
157:15
**item**  122:23
123:25
**items**  16:16 104:5
122:13,15 138:13
140:24
**i'm**  132:24

**j**

**jail**  89:11,13,19,19
89:20 90:5 110:12
111:15 116:5
117:23
**jane**  176:2,15
**janis**  148:18
**january**  34:16
**jeff**  3:21 27:7,8
**job**  1:19 45:23
46:1 96:15 98:3,4
111:20 137:15
**jobs**  84:14 96:23
**joe**  3:13 7:3,3,4,12
14:11 23:2 27:1
47:8 48:23 58:1
67:8 79:22 99:22
103:17 104:25
105:23 108:19
109:7 111:22
129:19,21 130:9
140:10
**joe's**  108:18
129:18
**john**  42:18 82:4
105:2
**join**  163:13 164:13
**joined**  5:3,14
**joint**  158:25
**jones**  88:8
**jr**  3:11

**juan**  8:3
**judge**  3:11 5:3,25
7:5 8:11,11 13:18
15:4 16:20,21
17:7,9,10 19:8,21
22:9 23:16 24:18
26:2,10,12 27:4
29:25 38:2 57:10
63:25 66:24 77:22
77:23,23 79:5
80:14,19,22 89:22
103:21,21 119:12
121:15 122:18,22
123:14 124:16
125:8,22 128:24
129:16 138:15
139:2 151:4
152:15 155:1
173:5,6
**judgement**  112:2
**judges**  90:10,13
**judgment**  134:12
**julian**  131:17,20
**july**  63:14
**jump**  15:12 85:9
85:15
**june**  42:16
**jurisdiction**  30:21
31:12,16,17 32:11
32:14 34:25 53:20
107:15
**justice**  11:1 96:4
**justifications**
172:5

**k**

**kansas**  100:15
**kathryn**  15:1
25:20 133:3
134:22
**keep**  6:18 47:12
74:18 85:9 102:17

102:18 111:16
115:2 116:22
127:4 130:20
132:7 141:4 173:7
**keeps**  127:10
**kept**  24:6 103:23
**kes**  1:8
**kidding**  5:16
26:15 59:3,13
82:4 93:16 97:11
99:5
**kids**  21:17
**kind**  10:7 17:15
27:10,18,22 28:3
46:11 67:5,5,17
79:24 83:14 92:6
94:5,21 103:10,20
104:11,23 105:3
108:24 123:19
128:17 151:7
152:25 153:1,17
156:15 157:1
158:1,20 161:2
166:5 169:8
**kindness**  135:15
135:25 138:8
**kinds**  38:9 133:1
**king**  93:5 95:20,24
96:2,16,18 97:3,6
97:12 99:1,4,6,14
101:25 102:4,7,10
102:25 103:3,6
**knew**  88:11
173:19
**knocked**  134:12
**know**  7:3 12:18
15:7,9 16:20 18:3
26:2 27:8 32:21
37:9 41:4,15 44:7
44:19 45:19 47:23
48:2,9,23 49:4,6,8

49:22 50:14 51:25
53:10 55:10,16,19
55:20 56:11,15
57:7,25 58:11
59:19,20 60:21,21
61:3 63:8 65:15
66:13 71:4 75:22
76:18 77:18 80:8
81:8,13 83:2 85:1
85:15,19 86:1,11
86:13,20 87:1,12
87:14,15,21 88:1,9
88:11,12 89:3
90:13 91:2,3,6,6
92:23 93:19,20
94:23 95:11,15
96:23,25 98:5
100:10 104:15
105:19 106:13,18
106:18,18,21,22
106:25 107:12,24
109:10,23,23
111:16 114:19
115:14,21 116:10
117:16 118:8,14
118:19 120:7
121:5 123:13,25
126:25 127:15,18
128:2,6,10,11
129:9,15,17,21,22
130:13 131:14,16
131:19,21,23
133:3,17 134:24
135:13,18,25
139:12,25 140:3
143:19,19 146:8
146:10,21 147:22
148:6,7,14,16,19
149:6,17 150:5,11
154:23 155:15
156:2 158:12

Veritext Legal Solutions
866 299-5127

[know - living]

160:23 165:4
168:19,20 169:12
170:1,15
**knowing**  56:10
140:18
**knowledge**  103:13
175:9 176:6
**knowledgeable**
6:20 26:19 27:11
64:1
**known**  109:21
142:1 145:15
**knows**  43:14 49:23
80:4 83:8,21
**krekorian**  59:16
66:19

**l**

**l.a.**  23:18
**la**  1:4 82:15 89:15
89:18,19 171:14
171:20 173:2
**laboring**  108:19
**lacity.org**  2:22
**lack**  132:21
**ladies**  7:15 8:22
**lahsa**  56:4 61:22
75:20 76:9 83:20
83:25 84:11 85:12
86:11 95:15
107:12,13,21,23
113:3 117:20
131:1 133:8,9
136:24 148:15,19
**lahsa's**  86:13
**land**  10:21 102:15
122:17
**landes**  2:4,11
**language**  36:19
**large**  129:19 166:6
**larger**  78:12 79:18
140:16

**largesse**  133:11
**lastly**  16:1 18:4
**late**  14:2 16:9
92:25 98:6
**latinos**  12:5
**lauren**  3:12
**law**  12:17 90:16
108:13,19,20
109:1 110:9
111:22,24 112:1
112:17,25 113:10
113:23,24,24
114:10,21 116:1
120:20 121:20
122:17 125:19
138:18
**lawful**  108:5
113:13 119:16
120:2,3
**lawfully**  112:12
**lawsuit**  116:18
134:13
**lawsuits**  20:20
103:19 132:16
157:13
**lawyers**  6:15
115:18,19 146:20
**lay**  109:3 142:10
**laying**  65:4
**leaders**  10:24
**leadership**  8:1
17:16,18,19 23:2
**leads**  132:25
144:25
**learned**  151:8
**learning**  38:3
**lease**  31:24 32:6
36:5,6 37:18
41:10 48:11 123:7
**leased**  31:18

**leave**  60:13 75:16
76:4 91:2 100:13
122:11 141:16
158:14 160:15
173:20,23
**leaving**  47:13
110:23
**led**  21:14
**lee**  82:4
**lee's**  105:2
**left**  21:19
**legal**  3:20 115:20
**legally**  30:1,2
**legislative**  48:10
**length**  152:11,12
152:13,14 153:15
**lesson**  114:3
**lessons**  151:7
**letters**  171:20
**letting**  151:8
153:20 169:12
**levan**  141:1
**level**  15:16 21:3
141:19 152:1
**levels**  19:20
**leverage**  147:20
**lgbtq**  10:21
**liability**  156:16
**libraries**  21:18
73:18,22 75:10
76:19 77:23
102:20
**lied**  128:20
**lieutenant**  115:13
115:22,25
**life**  8:7 9:20 17:5
49:6,13,23 51:10
121:19
**lifted**  169:7
**light**  47:18 89:20

**limited**  20:21
128:11
**line**  61:20 78:15
93:7 97:7 134:13
141:11
**lines**  136:14
**list**  47:14 65:22
69:8 70:25 100:2
145:19
**listed**  70:24
**listen**  122:2
**listening**  81:6
82:11 127:25
128:8
**literally**  28:1 53:5
160:16
**litigated**  114:13,14
**litigation**  117:13
134:8 135:10
141:24 157:11
**little**  5:4 6:23 39:4
47:2 51:10 59:24
65:18 84:18 85:5
89:23 98:6 112:21
122:14 124:11,12
136:25 137:20
139:3 153:22
173:19
**live**  11:3 20:7
28:18,23 29:20
30:1,2,10,12,18,24
30:25 31:3 33:22
53:6 92:14,18
115:23 120:10
170:15 172:1
**lived**  33:15 86:19
**living**  10:19 20:5
30:4 33:1 35:1
44:21,24 49:5,11
49:12,24 54:16
62:21 77:15 84:15

Veritext Legal Solutions
866 299-5127

**[living - marston]**

84:16,17 90:11
100:14,21 115:11
123:13 125:18
170:13 172:3
**llp**   2:4,11 3:4
**load**   22:25 99:20
**lobby**   95:21 158:8
158:17
**local**   11:24 55:8
97:8,9
**located**   39:21
94:25
**location**   1:15 41:5
42:10 53:8 69:13
73:14,16,18,20,24
73:25 74:21 76:13
77:20 94:10,12
95:10 99:10
110:11 111:17
142:11 151:25
170:9,22,23 172:7
172:15 173:6
**locations**   51:8
55:3 57:5,8 69:3,6
69:8 74:5 94:21
**locked**   132:4
**lofts**   131:16,20
**long**   6:15 8:14,21
9:7 16:4 23:10
37:12 44:11,12
49:8 56:8,9,11
100:18 111:15
116:12 131:6
146:11 155:12
**longer**   11:18 21:17
36:13,15 87:6
153:16 169:13
**look**   6:8 19:21
23:19,24 24:2,4
51:9 52:18 69:6
70:23,24 73:9

74:24 98:4 100:10
125:9,10 130:15
131:2 134:16
135:11 137:6
146:14 149:10
154:8 165:8
173:12,12
**looked**   79:1 92:23
100:10
**looking**   8:8 35:7
72:5 79:21 126:24
136:5
**looks**   52:13 149:9
156:16 158:21
**loops**   51:1
**los**   1:8,17 2:6,13
2:17,19,21 3:2,6
3:13,14,17,18,19
3:20 8:4,19,19,20
8:20 12:2 13:3
14:11,20 16:5
23:5,18 24:12,16
27:12 34:19 35:14
61:16,22 78:24
79:5 81:18,22
82:18,25 84:2
88:15,15 89:2
104:12 106:13
107:2,11 114:22
115:8 128:17
130:16 133:12
139:25 147:10,11
159:23 168:25
169:3 171:13
**lose**   126:13 134:10
135:22 144:18
**losing**   153:19
**lost**   112:10 119:4
124:11,12
**lot**   9:7,8,8 16:21
23:4 50:25 62:24

73:15 80:16 84:6
85:2 86:15 90:10
90:13 91:19 93:25
98:11 100:15,19
102:15 103:22
115:9 117:24
118:18 127:12,19
127:22 130:22
132:19 134:15,16
135:5 138:23
139:13,14 140:11
147:21 148:15
170:10,16,18
172:23 173:21
**lots**   8:14 40:4
57:12 69:4 82:24
110:1 130:6 143:8
**louder**   81:3
**lousy**   100:23
**love**   93:8 95:20
105:15 130:7
**loved**   11:14
**low**   74:18 87:15
146:8,12
**luck**   147:23
**lucky**   90:7
**ludicrous**   141:25

**m**

**m**   18:5
**magnanimous**
118:10
**magnitudes**
151:21
**main**   2:20
**maintain**   20:25
23:12
**maintained**   8:7
**maintenance**
34:25 37:21,24
44:3 45:4 49:18

**majeure**   157:7
**major**   141:1
**majority**   9:14
**maker**   53:23
**makeshift**   11:4
**making**   7:23 90:12
127:2 134:1
143:20 159:11
**male**   3:24 59:10
149:22,25 162:8
**manage**   12:9
**managers**   85:3
**manatt**   3:4
**manatt.com**   3:7
**maple**   27:12,18
79:5 170:9
**march**   33:14
**marcus**   2:18 35:14
35:16,19,21 54:11
70:23 71:7,14
129:11 159:8
161:1,24 162:4
172:12 173:24
174:2,4
**marcus's**   28:13
**mark**   157:24
**marked**   4:10
70:12
**marks**   68:1 150:20
161:7 162:11
**markups**   158:2
**marqueece**   80:4
82:5
**marshal**   5:9,13,14
5:19,21,21
**marshals**   5:12
41:12
**marshal's**   5:10
**marston**   3:14 56:5
172:19

Veritext Legal Solutions
866 299-5127

[martinez - mitchell]

| | | | |
|---|---|---|---|
| **martinez** 3:16,17 6:23 8:12 14:10 18:21,24 19:2,6 24:25 25:3,4,7,10 29:6,10,13,16,18 29:22 36:17 37:20 37:23 41:8,19 42:5 46:19 47:10 50:7 51:15,19,22 57:1,9,14,18,22 58:13,16,19,22 62:15 64:22 70:18 70:22 71:5,8,21,24 81:3 | 105:23 109:14 126:7,19 127:12 131:5 134:25 135:14 139:15 144:19,21 149:19 150:8 151:11 170:23 171:3 **meaning** 152:7 **meaningful** 21:6 155:16 **meaningless** 90:16 106:7 **means** 26:16 57:7 | **meets** 66:6 **member** 23:22 48:10 66:19 **member's** 44:1 **men** 96:6 **mental** 11:8 21:4 21:11,19 75:1,14 109:24 **mentally** 75:20 **mention** 109:5 **mentioned** 77:4 112:11 157:21 **mentioning** 6:9 | **michelle** 5:8 **micro** 87:25 **microphone** 68:24 68:25 **middle** 120:19 **mike** 79:23 80:3 82:5 84:1 105:2 115:7,22 **miles** 58:1,6 59:19 67:8 **military** 10:19 **miller** 3:19 56:1 172:18 |

**massive** 11:8
**match** 130:19
**matt** 157:21
**matter** 20:10 74:11
**matters** 79:11
**matthew** 2:10,14
**mattress** 122:16 138:17
**mattresses** 140:25 141:4,7
**mayor** 7:3,3,4,12 7:16 8:2 15:6,18 17:16 40:9,12 91:22 94:2 95:16 99:8 109:16 134:23 161:1
**mayor's** 15:8 95:10 170:1,2,3
**maze** 18:8
**mclain** 3:18 56:7
**mean** 31:9 54:21 55:17 62:2 64:6 75:20 76:4,8 80:24 84:20 88:9 91:7 92:2 93:11 93:17,17 104:5

89:9 104:7 107:10
107:11 109:17
120:8,9 131:10
142:15
**measurable** 9:21 16:24
**measure** 12:10
**measurement** 101:8
**measuring** 12:10
**mechanism** 61:23
**media** 68:2,5,6 150:21,24,25 161:8,11,12 162:11,14,15
**mediation** 139:8
**medical** 58:10 60:21 110:25 111:1
**medium** 104:23
**meet** 63:21 139:22 157:3 158:10 161:1 164:21 166:17
**meeting** 115:5 151:7 157:10 158:17 164:14,21 166:21

**mesh** 133:5
**mess** 18:4 28:9
**message** 76:22
**met** 95:22 103:5 120:4
**method** 117:8
**methodology** 59:15 60:12 65:5 67:5
**methods** 20:24
**metric** 16:12,13,15 16:17,17,18
**metro** 114:11,20 114:23,23
**michele** 3:16 6:23 8:11 25:2,3,4 29:6 29:10,13,16,18,22 36:16,17 37:20,23 41:6,8,19 42:5 46:19 47:10 50:7 51:15,19,22 57:1,9 57:14,18,22 58:13 58:16,19,22 62:14 62:15 64:22 70:18 70:22 71:5,8,21,24 80:15 81:3 147:15 148:3

**million** 84:7 89:22
**mind** 53:22
**minds** 142:14
**mini** 131:16,20
**minimal** 48:18 62:5
**minimize** 95:4
**minute** 159:10
**minutes** 67:4,22 91:24 102:13,13 154:14
**miscommunicati...** 109:20
**misdemeanor** 116:4
**misdemeanors** 116:3
**misimpression** 43:3
**mission** 56:20 83:15
**misspoke** 41:3
**mistaken** 119:6
**misunderstood** 167:24
**mitchell** 2:3 68:10 68:19 69:1,17,21 70:16,21 72:25

Veritext Legal Solutions
866 299-5127

[mitchell - neither]

73:3,10 91:13,16
93:8 162:21,24
163:7,10 168:24
172:8
**mix** 152:3 153:8
**mnuchins** 87:4
**modality** 156:6
**model** 80:11,17,18
81:6 82:2 138:21
140:12,13
**models** 139:20
**modicum** 101:17
122:19
**modular** 87:9
**mole** 64:7
**moment** 7:4 10:10
18:20 23:9 25:6
26:25 27:2,17
28:4 43:11 68:9
71:22 78:6 90:24
91:24 92:11,22
112:5 122:11
155:18 163:5
173:17
**moments** 142:9
**monday** 90:8
154:17,22 157:22
158:21,22 164:12
167:13
**money** 22:14
83:20 85:22,24
88:4 100:16 102:6
130:11 133:2
137:14 147:21
148:12,13,14
**monica** 43:11
**monies** 85:20,21
**months** 7:20 41:11
41:12 44:9 46:15
48:3,19 53:18
60:14 64:4 99:17

134:12
**morning** 5:12
26:14,14 82:16
91:7 150:5 165:10
**mornings** 110:20
**mosaic** 14:20
78:24
**motel** 123:3
138:24 160:2
**motels** 20:6 100:7
**mother's** 59:23
**motion** 84:1
**motor** 115:1
**mouth** 101:11
**move** 23:23 25:18
33:6 41:13 47:25
48:7,8,11,12,15
51:8 57:3,15,19
83:12 99:18
102:21 104:15
110:7,10 111:7,8
121:23 133:10
137:6 150:19
170:22 173:9
**moved** 62:1 99:14
99:22
**movement** 74:25
**moving** 14:23 21:8
46:15 61:19 82:3
84:25 98:25
102:18,20,20
111:2,3,6,16
120:18 133:25
160:17 172:19
**multiple** 47:16
**multitude** 128:8
**municipal** 55:8
115:9,24 117:25
**municipality** 79:3
79:6 154:10

**myers** 3:20 54:21
61:14 93:11,17,21
94:8 120:24 121:3
121:11 125:1
126:3,7 127:7
144:17,19 145:12
163:13,16,19,23
164:2,7 171:3,11
171:18 173:25
**myriad** 18:13

**n**

**n** 2:1 3:1 4:1 5:1
**naiveness** 38:11
**name** 27:5,10
35:15 41:25 42:3
**named** 109:5
**names** 6:9 43:6
**narrative** 24:9,15
**narrow** 10:7
**nation** 10:14
**nation's** 10:24
**natural** 17:5
**navigation** 8:8
**naysayers** 22:19
**near** 40:4 147:12
**nearly** 12:4
**necessarily** 144:8
**necessary** 157:16
158:12 160:3,7
**necessity** 83:10
**need** 9:22 16:12
21:19 22:24 24:21
28:3 37:11 40:20
40:21,25 48:19
57:20,20 58:11,16
62:1 70:11 71:10
84:13 87:17,18,20
88:2,16 99:15
121:21 126:18
130:22,23 131:2
131:24 132:4

133:18 137:5
138:19 139:8
148:14 149:5
155:21 156:1,1
157:10,17 158:6
167:7 168:17
171:7,24 172:10
**needed** 21:4 38:6
92:8 117:10,10
151:21 173:22
**needlessly** 158:8
**needs** 8:6 23:4
48:16 50:18 61:24
61:25 63:7 66:5,5
66:6 71:9 111:8
130:17 133:16
152:2 170:24
**neglect** 15:21
**neglected** 113:5
**negotiate** 25:14
144:22 145:4
171:4
**negotiating** 37:18
**negotiation** 166:5
169:14,15,18,19
**negotiations** 6:13
8:14 159:16 160:6
**neighbor** 11:13
**neighborhood**
20:13
**neighborhoods**
10:4 20:15,15,22
21:12 22:2,4,15,24
23:13 99:20
**neighboring**
104:13 108:17
**neighbors** 19:15
24:11
**neither** 109:19
175:10 176:7

Veritext Legal Solutions
866 299-5127

[net - okay]

net   11:9
never   17:15,16,18
   17:19 61:3 75:6
   77:13 85:19
   105:16 111:14
   138:1 140:24
   141:3,3 146:15
new   15:13 24:6
   80:22 131:17
newman   3:21 27:7
   27:7 28:20,23
   29:2,15,17,21,24
   30:4,7,12,20,25
   31:4,8,11,15,23
   32:2,4,6,10,14,16
   32:21 33:3,5,11,17
   33:19,23,25 34:2,5
   34:9,11,14,21 35:3
   35:11 36:4,10,19
   36:24 37:5,15
   38:2,14,18,22 39:9
   39:14,16,19,23,25
   40:3,7 41:2,18,20
   42:1,8,13,17,20,23
   43:1,15,18,20,25
   44:13,17,19,22,25
   45:9,12,14,18,21
   45:24 46:2,5,9,13
   46:16,21,23 47:4,7
   48:21 49:14,20
   50:4,8,12,22,25
   51:6,12,14,18,25
   52:6,11,15,17,24
   53:1,11,13,17,19
   54:2,7 55:16 70:4
   70:13 72:11,15,17
   72:20,23
newport   101:12
nice   101:23 102:16
   110:2

nicer   137:1
night   16:10 89:15
   89:18 90:6,6
   95:18 109:6
   112:14 127:9,9
nightmare   140:15
nimby   157:13
nimbyism   94:19
   94:21
nimbys   22:19
nimybism   21:14
nineteen   72:25
   73:3,3
ninth   79:4 124:10
nod   6:20
nonhousing   126:9
nonissue   141:6
nonparties   13:19
nonsense   17:14
noon   167:22 168:4
   168:6,7,8
normal   159:19
normalized   11:17
normally   14:2
north   2:20 47:22
   92:5 97:17
notary   1:18 175:1
   175:18
note   13:14
notes   15:13
notice   5:15 6:8
   32:23 117:4 163:1
notified   109:22
notion   72:6 130:20
   131:19
number   18:13
   66:11,14 68:2
   75:21 80:9,10
   83:13 87:24 93:24
   105:12,20 107:7
   112:16 114:5,6

115:3,4,4 116:18
   119:7 129:9,19,22
   137:7 138:2,6
   139:17 147:19
   150:21 156:4
   157:1 161:8
   162:11 168:21
   172:24
numbers   10:8
   26:5 83:24 85:11
   86:12 107:3 129:4
   129:13,21,24
   131:1 136:24
   137:20 145:16
numerous   108:1
nurses   40:21
   128:5
nury   3:17 14:10
   18:19,21,24 19:2,6
   24:25 25:3,7,10
   27:1 82:16 140:11

o

o   1:14 5:1
object   169:16
objected   55:11
   145:23
objecting   94:1,23
objection   94:4
objective   156:3
objectives   16:8
obligation   23:12
obligations   19:13
obstruction   116:4
obvious   22:11
obviously   68:19
occasion   7:8 25:20
   47:2 79:11 112:2
   119:5 120:17,20
occasions   119:8
occur   14:17 16:14
   33:12 116:16

119:8 160:25
occurred   11:20
   14:3,8 147:15
offer   56:2 102:22
offered   55:23
   62:13,21,22
office   5:10 44:1
   115:15 131:15
   166:6,14,22 170:1
   170:2,3
officer   117:5
   118:11 175:2
officers   114:20
   121:21
offices   158:18
officially   169:15
officials   11:24
oh   24:25 25:4,10
   35:19 68:13 98:5
   121:10 130:4
   133:1,2 158:11
   167:14
oil   92:5
okay   6:21 15:25
   18:19 25:7,11
   26:9,24 27:8 29:9
   29:17,21 30:8,14
   30:23 31:2,15
   32:5,15 34:4,15
   35:10 36:9 38:17
   41:6 43:2 44:15
   44:20 46:2,14,22
   47:4,8,16 48:21
   50:12 52:5 53:12
   53:21 54:8,13
   55:24 56:25 58:21
   65:23 67:4,22
   69:1,16,20 71:21
   71:22 72:14,16,24
   73:6 78:5,7,18,21
   82:19,22 83:2,24

[okay - parties]

84:19 91:3 92:21
93:5,6,20 95:1,1,6
95:21 97:21
101:22 102:9,24
103:8,20,24 104:7
104:7 107:25
109:8 110:1
112:22 113:20
114:4 116:2
121:24 122:7
123:4 127:10
132:8 134:13
136:12 137:25
138:18 141:9,14
142:16,21 143:1
143:18 144:8
147:8,11 149:18
150:4,14 151:16
155:19 156:13,24
157:19 159:3,5,6
160:20 161:22
162:4 164:6,23
165:2 166:10,13
166:16,18 167:5
167:14 168:1,2,14
168:16,20 171:10
173:17 174:2
**old** 80:11 81:25
114:18 117:8
131:16 132:15,16
133:7,20,25 141:7
**older** 74:25
**olympic** 3:5
**once** 9:6 53:25
71:14 76:24
101:24 109:2
119:17 120:6
141:17 142:7
**onerous** 108:16
139:2

**ones** 65:20 115:10
121:17
**ongoing** 159:15
160:4
**online** 153:2
**open** 76:19 80:12
81:6 82:7 97:6
141:14 144:25
**opening** 147:19
**opens** 5:7
**operate** 84:4,8
**operates** 82:20
106:25
**operating** 84:25
117:8
**operation** 15:12
**opinion** 122:23
144:20
**opportunities**
19:23
**opportunity** 19:8
24:21 74:25 142:8
**opposed** 36:11
114:14
**option** 63:1,2
98:25 99:9 102:22
124:22,23 170:10
**options** 170:10
**orange** 17:19
106:15,20 107:8
147:9,15,18
149:15,16 153:15
**order** 9:2 23:13
36:7 60:1 83:14
130:11 151:20
159:10
**ordered** 6:12
**ordinance** 104:16
104:18 108:16
**ordinances** 104:9
104:9,10,14,23

105:4 117:25
121:8
**oriented** 113:14
**ought** 47:23 55:21
131:21 161:1
**outcome** 175:15
176:12
**outdoor** 77:6
**outlandish** 142:6
**outline** 155:7
**outside** 67:6 161:4
**overall** 152:8
**overarching** 79:1
81:9,24 103:10
**overdue** 23:10
**overflow** 20:23
**overlay** 80:21
**overlook** 24:5
**overpass** 44:24
49:25 50:1 54:16
**overpasses** 34:18
49:12 57:10
**overtime** 118:11
**overwhelming**
23:4
**owned** 130:1
**ownership** 36:6
**oxygen** 138:10

## p

**p** 2:1,1 3:1,1 5:1
**p.m.** 150:21 161:8
162:12 165:8,8
174:7,9
**page** 4:8 145:21
**paid** 133:21
**painful** 20:14
**pallet** 30:19 36:12
36:18,23,25 37:3,6
87:10,11 93:8
94:22 96:3,10
99:25 100:2

**pandemic** 18:22
49:10,12 159:20
159:25
**pang** 11:16
**paper** 52:14
**paraplegic** 75:3
**pardon** 89:12
162:23
**parent** 113:1
**park** 21:18 39:10
39:25 40:3 41:3,4
46:17 75:12,17,18
76:5,6
**parking** 39:6 40:4
69:3 94:10 98:11
102:15 138:23
168:25 172:15,20
**parks** 8:7 76:17
77:22 102:21
**part** 8:21 15:8
65:15 67:21 70:11
94:15 100:15
106:1 114:22
136:2,5 144:13
157:6 162:25
**parte** 13:18
**partial** 14:22
**partially** 38:19
**participate** 66:24
67:3 144:11,13
**particular** 36:24
79:21 103:14
123:18 129:17
142:25 160:3
**parties** 7:19 13:17
23:20 27:20,24
28:2 71:20 144:21
155:24 157:15,23
159:13 162:17,17
162:18 164:9
169:16 170:5,7,21

Veritext Legal Solutions
866 299-5127

[parties - piece]

171:7,12 172:13
173:20 175:11,14
176:8,11
**partners**   12:16,17
48:9 56:2
**partnership**   37:13
**parts**   9:9 11:21
22:8 145:24
**party**   42:11
144:10 169:22
**pasadena**   43:16
87:24 128:10
**pass**   40:12
**passed**   118:16,17
127:4 147:22
**passes**   35:13
**passion**   104:1
**path**   19:12,24
**pattern**   110:3
**paul**   59:15 66:18
80:4
**pay**   5:9 15:2 66:20
84:15 115:17
118:12 130:11
135:16 148:5
**paying**   89:8,9
**pays**   89:25
**pch**   56:23 58:1
**pedro**   38:23 47:22
**penal**   116:1
**people**   6:11 7:24
7:24 9:15 10:2,10
10:17 15:11 16:5
18:6 19:18 20:5
24:2 25:16 26:17
28:17,18,20 29:3
29:20,25 30:4,17
30:24 32:12 33:1
33:15 34:19 35:1
35:8 40:10 43:3,7
44:20,23,25 48:24

49:11,16,24 50:20
51:2,4 53:4 55:9
55:11,20 56:11,20
57:25,25 59:16
60:8,20 61:17,18
61:21 62:1,1,21,24
66:4 67:13 69:5
73:19 74:3,5,6,14
74:15,22 75:1,12
75:22 76:2,5,15,23
77:1,11 78:3
79:15,17 80:2,3
81:14,19 83:5,15
83:16 84:12 85:13
86:6,10,12,14,19
86:25,25 87:6,15
88:5,9,11 91:7
92:14,16,19 94:18
95:4,23 96:2,11
98:18,23 99:22
101:1,9 102:20,20
102:21,23 103:13
103:22 106:2,3,23
107:1,4,6,7 109:1
109:8,9,14,18,19
109:24 110:9,21
111:3,10 112:12
113:18 114:12,17
115:1,11,17,18
117:22 118:10,22
119:7 120:10,19
121:9,14 125:10
126:22 127:2,20
130:16,22,25
131:14,23,24
134:16,21 136:22
137:7,14 138:2,11
138:14 140:4,8,18
141:4,6,8 142:11
148:10 159:21
160:1,17 163:1

165:10 171:24
172:2,8
**perceive**   117:9
133:7
**perceived**   111:5
135:15
**percent**   9:12,12,15
10:2,6 12:2,3
15:10,12 63:5
80:8 82:17 83:3
85:10,15 87:15
96:13 99:24
100:23 105:15,15
105:16,18,19,19
106:6 111:10
133:12,14 136:24
136:25 137:1,5
138:11,14
**percentage**   87:19
87:20 106:9 107:2
139:22
**perception**   105:25
112:14 122:15
**perfect**   98:24
151:9
**period**   14:14
15:22 28:15 33:16
36:2 54:14 67:6
69:22 70:17 74:13
91:4 111:6 112:18
112:25 132:11,17
137:8
**periodically**
114:11,22
**permanency**
101:22
**permanent**   85:2
88:3 100:7 136:23
153:10
**persisted**   11:7

**person**   6:22 11:22
27:11 32:1 41:21
41:25 42:4 75:14
75:15,15,19 81:8
84:2,12 90:14,19
110:15,19,24
111:1,8 114:16
116:16,22 117:17
117:19 121:20
124:18 126:16
135:12,18
**person's**   9:20
**personal**   15:5
20:23 96:8 122:23
123:6,24
**personally**   49:17
89:7
**personnel**   128:23
**persons**   6:14
**perspective**
101:15 107:13
153:14 163:3
**pet**   127:5
**pets**   77:14
**ph**   42:18 85:13
110:14 148:18
**phelps**   3:4
**phillips**   3:4
**phone**   15:3 26:3
26:18 63:23
**physically**   75:2
**pick**   26:2 39:4
61:25 62:20 90:2
90:5 146:18
**picked**   45:5 101:7
**piece**   27:16,19,22
28:5,12,16,16,18
31:5,13 32:12
43:23 46:10 66:16
128:9,11 133:17
133:17,25,25

[piece - principals]

156:5
**piecemeal** 134:14
  149:7
**pieces** 28:8,16
  38:7 39:1 47:15
  47:16 52:16 59:20
  65:14,16 66:12
  72:2,6,9,19,22
  73:3,7,8 127:13,15
  127:17 128:15
**pipeline** 100:20
**pitiful** 135:13
**pivoting** 35:6
**place** 7:10 11:21
  39:11 40:10 42:9
  42:22 52:4 55:2
  56:19 57:16,19
  66:6 74:23 77:9
  92:18 99:11,11
  105:10 109:21
  116:23 119:1
  120:10 121:9,14
  126:22 129:21
  130:23 131:25
  133:6 135:8
  138:16 143:6
  144:2 154:11
  173:19
**placement** 136:23
**placentia** 110:14
  147:22
**places** 55:9 57:12
  92:14 129:25
  154:20 171:25
  172:1,23
**placing** 61:17
**plain** 36:19
**plaintiffs** 1:6 2:2
  151:6 153:24
  164:3

**plan** 16:4 36:20
  57:20,21 58:12,14
  58:17 59:3,6
  60:12,15 63:9
  65:10 71:13,19
  74:8,10,20 75:25
  76:1,16 78:10
  86:21 89:2 103:9
  104:4 132:6
  141:20 154:22
  155:8 159:24
  164:17 167:9
**plans** 69:12,23,24
  70:2 156:11
**plant** 97:14
**play** 50:15
**please** 7:14 47:10
  81:4 91:22 144:14
  151:2 168:5
**pleased** 7:17 97:22
**pleases** 47:18
**pleasure** 5:19
**pledge** 27:23
  41:22 47:13 53:23
  54:13
**pledged** 6:4
**point** 28:17 33:5
  48:5 49:16 54:22
  55:14,23 56:17
  63:21 83:9 104:6
  105:8,10,13 111:8
  122:9 124:2 134:4
  136:8 137:3 154:6
  154:7,7,24,25
  166:23
**pointblank** 96:21
**pointing** 11:25
**points** 122:6
  145:19 154:19,20
**poisoning** 53:5

**police** 113:23
  114:11 115:2
  117:5,25 118:17
**policies** 20:20
  86:17,17 103:11
**policy** 12:11 23:23
  35:4 118:12 119:5
**polite** 42:21
**poll** 12:4
**pony** 111:13 139:4
**pools** 88:17,23
**poor** 22:13 24:6,10
**pop** 30:19
**popular** 72:6
**population** 12:3
  75:22 131:2
**portion** 73:12
**position** 83:9
  105:17 112:9
  154:10 169:2
  172:4
**positions** 24:16
**positive** 13:13
  56:20 83:16 143:6
**possessions** 104:5
**possible** 5:6 6:3
  12:9 13:23 138:3
  159:14
**possibly** 16:14
**post** 57:3
**potential** 65:12
  74:13
**potentially** 52:17
  167:7 173:21
**pound** 133:9
**pounds** 101:6
**power** 22:15 41:22
  133:11
**practice** 110:4
**pre** 38:20

**precedence** 136:6
**precious** 20:21
**preclude** 160:10
**precluded** 108:20
**predicated** 52:7
**prefer** 61:12
**preliminarily** 6:13
**preliminary** 5:5
  143:16
**premises** 82:21
**prepared** 59:14
  176:3
**prerogative** 164:5
**presence** 5:13 67:6
  111:16
**present** 3:10
**presented** 13:23
  121:4
**president** 14:10
  16:2 18:18,18
  19:5
**press** 145:23
**presumes** 124:19
  124:23
**pretax** 84:20
**pretend** 90:23
**pretty** 13:7,7
  16:20 17:21 52:13
  97:21 104:10,14
  109:16,17 134:16
  135:21
**prevail** 134:15
**prevent** 154:6
  163:16
**prevents** 157:9
**previously** 104:18
  173:18
**pride** 10:25
**primarily** 39:21
**principals** 6:17

[principle - pursuant]

**principle**  151:13 151:14,23 156:12
**principles**  24:3,17
**prior**  109:12,12 175:4
**prioritizing**  59:1
**prison**  77:9
**privacy**  77:5 91:20
**private**  56:23 80:15
**privately**  15:25
**pro**  115:16
**probably**  26:13 31:6 56:18 62:24 67:12 83:11 85:21 87:14 133:12 145:15
**problem**  11:7,12 11:25 12:11 14:3 14:8 15:20 17:25 25:22 40:24 55:16 55:17 56:9 62:12 63:19 66:23 77:12 84:23 88:16 94:6 94:15 115:25 120:23 121:11 129:16 132:23 133:7 135:2,3,5 141:6 147:20
**problematic**  171:23 172:2
**problems**  13:20 14:16 59:21 64:1 116:12 118:21 128:21 132:10 133:10 149:3
**procedure**  14:24 32:23 53:15 59:15 60:18 62:7 63:25 65:4 66:9,22,23 81:13,17

**procedures**  81:22 103:11
**proceed**  170:3
**proceeding**  137:18 174:9 176:4
**proceedings**  5:23 175:3,4,5,8 176:6
**process**  6:16 8:21 9:7,18 14:24 16:19 37:15,17 48:2 53:15 54:25 59:15 60:17 62:6 63:22,24 65:3 66:8,21,22 67:17 68:17 79:14,15 81:13,17,22 144:13 155:11 157:2,4,7,8,14
**processors**  33:20
**proclaim**  11:24
**produce**  9:24 85:1 96:3,14,16 97:9,12 99:2
**product**  97:16,18
**productive**  151:7 156:21
**profusely**  46:25
**programs**  148:22
**progress**  9:20 21:6 86:20 143:10,20 153:20 155:25 159:1
**prohibitive**  131:19
**project**  62:23 157:12 159:24
**promise**  138:13 141:22 143:23 172:17
**promised**  173:1,8 173:14

**promises**  24:5
**proof**  83:2
**prop**  85:1
**proper**  118:7
**properly**  10:15
**properties**  38:19 41:14 62:19 63:16 66:3 69:9 71:9,11 72:12 87:6,9,23,24 131:13,13 132:1,2
**property**  27:16,19 27:22 28:5,8,12,16 28:18 30:15 31:6 31:13,14,16,17,17 31:21,22 32:12,22 35:13 36:5 37:19 38:7,8,15 39:1 43:21,24 44:2 46:11 47:15,16 52:9,16 59:18,20 62:20 64:20,23 65:14,16 66:12,16 69:2,11,14,17 71:2 71:16,18 72:2,6,9 72:19,22 73:4,8 92:15,19 114:19 127:13,15,17,19 128:1,9,9,11,16,17 130:1,10 141:1 170:23 171:21
**proposal**  36:5 37:2 63:2
**proposals**  26:21 145:11
**propose**  139:25 143:9
**proposed**  37:17 47:21
**protect**  20:25 75:11 83:14

**protected**  77:24 138:23
**protecting**  73:21
**protects**  140:24
**provide**  23:10,25 70:25 71:11 158:25 167:21
**provided**  153:9 169:20 172:6
**providers**  60:21
**providing**  23:11 86:19
**provision**  50:17
**provisions**  156:23
**provocative**  79:10
**public**  1:18 8:7 9:23 11:24,25 20:21,25 21:1 23:12 76:5,22 83:24 105:25 115:6 135:5,9,16 136:16 163:9 164:11 175:1,18
**publicly**  28:14 82:14 106:14 136:14
**published**  82:24 88:14
**pull**  77:10
**punished**  22:21
**purchase**  91:22 101:24
**purchased**  95:16 100:7
**purely**  122:3
**purpose**  114:15
**purposes**  57:2 123:10
**pursuant**  170:21 170:25

Veritext Legal Solutions
866 299-5127

[pursuit - red]

**pursuit**  13:19
**pushback**  95:13
  99:9
**pushing**  19:19,19
  92:7 97:15,18
  140:7 151:17
**put**  6:6 15:21
  17:24 26:9 32:19
  34:16 36:22 37:3
  37:6 45:6 56:19
  78:13 84:2 97:24
  98:11 99:10 101:4
  101:5,13 102:23
  113:6 128:19
  131:20 132:12
  134:2 159:10
  161:23 169:21,24
**putting**  83:5
  110:11 117:23

**q**

**qualified**  175:7
**quality**  8:6 121:19
**quan**  5:15
**quarters**  31:7,9
  38:12
**question**  22:8
  29:19 30:9 37:11
  39:12,13,15 41:7,9
  42:7 44:12 45:3
  50:16 85:17 110:7
  112:14 130:14
  135:20 147:7
  153:13 154:3
  156:18 161:3
**questioned**  27:9
**questions**  7:16
  47:1 54:9,10,10
  67:8 74:7 148:17
  155:10,16 161:21
  163:17

**quibble**  133:14
**quick**  36:2 66:17
  111:9 128:25
  138:5 172:16
**quicker**  54:14
**quickly**  5:6 6:3
  46:15 48:7,8 53:9
  106:8,10 138:2
  140:4 160:24
**quietly**  59:12
**quite**  18:16 43:14
  49:19 59:13 68:20
  84:15 97:12
  128:19,21 134:17
  135:24 172:22,22

**r**

**r**  2:1 3:1 5:1
**rabbit**  43:19,23
**racial**  86:4
**radius**  140:2
**rage**  142:16
**rain**  51:17
**raised**  48:25
  147:17,18 154:7
**raising**  74:1
**ramp**  128:2
**rank**  61:23
**rapid**  87:1 152:2
  156:7
**rare**  119:4
**rate**  74:13,18
  96:13 99:23 106:5
  136:22
**raw**  20:18,18
**rcx**  4:2
**rdx**  4:2
**reach**  6:19,19 10:1
  10:7 66:2 81:17
  81:24 139:5 146:3
  150:6 157:5 158:6

**reached**  150:7,17
  154:3,4 172:4
**reaching**  153:19
**read**  10:10,11
  139:18,19 145:22
  146:6,15,18,22,22
**readable**  13:12
**ready**  24:14,15
  56:1,23 67:3
**real**  18:10 19:21
  85:18 97:22 111:9
**realistic**  89:5
**reality**  10:18 72:4
**realize**  114:9
  148:15
**realized**  113:4
**really**  13:6,21 21:6
  31:19 32:1 47:24
  55:7 61:7 66:12
  66:19 75:21 76:21
  78:17 81:15,21
  82:7 83:23 85:6
  87:3,17 89:4,5
  91:8 101:4 103:25
  104:6,14 113:2
  114:23,24 120:8
  123:3 128:13
  129:15 130:21
  131:6,6 132:13,20
  133:5 137:2 141:5
  141:18 143:20
  146:16 148:1
  156:18 160:19,20
  171:23
**reason**  113:10,25
  114:2 118:3 155:9
  158:5 169:23
**reasonable**  67:24
  125:20
**reasons**  51:11 61:4
  64:9 74:18 143:9

**164:10 171:1
rec**  15:11 83:17,17
  163:2
**received**  37:16
  63:16
**recess**  78:6
**recidivism**  96:13
**recognize**  52:1,3
  105:8 107:17
  160:24
**recognizing**
  156:20
**recollection**
  145:22
**recommend**  165:9
**record**  5:3 6:7
  15:7 17:24 18:2,5
  28:15 53:25 54:18
  68:3,4 78:14
  97:24 101:4,13
  120:5 128:19
  150:22,23 151:1
  161:6,9,10,13
  162:10,12,13
  169:22,24 170:25
  174:8 175:9 176:5
**recorded**  175:6
**recording**  175:8
  176:4
**recoup**  117:11
**recovery**  96:5
**recreation**  75:12
**recreational**  30:9
  30:18 31:6 39:6
  40:18 76:7,19
  102:22 122:22
  123:1,24 125:5
  159:19
**red**  41:16,23 47:23
  48:14,16 96:6

Veritext Legal Solutions
866 299-5127

[redevelopments - reusable]

redevelopments
86:18
redrawn   17:13
redress   116:15
117:9
reduce   101:17
115:12,23 157:17
reduced   115:8
175:6
refer   44:5 146:15
reference   146:14
refinement   154:23
reflection   89:24
refreshing   78:17
refusing   121:22
regard   35:4 45:9
54:3
regardless   73:7
regards   32:16,22
region   16:6
regular   156:9
rehousing   87:2
152:2 156:7
reimburses   84:11
rejection   10:22
relate   155:17
related   175:10
176:7
relating   156:6
relation   159:7
relationship   43:4
133:4,24
relationships
23:22 77:16
relative   175:12
176:9
relatively   60:25
release   113:25
118:6 119:5
120:13 156:16,19

released   111:21
117:19
relocate   34:23
reluctant   141:18
remain   27:2 160:1
remedy   116:24
remember   37:25
76:13 77:21 79:24
92:3 100:24 113:6
115:7
remind   118:15
remote   11:21
removable   102:14
removal   35:5
remove   41:16,23
removed   34:23
removing   32:12
rent   84:18
renting   89:9
repeat   17:7 78:11
81:7,12 90:1
repeatedly   49:2
111:7 112:10
repetitively   117:5
117:7
replaced   12:12
36:20
report   28:4,14
35:15,16 83:20,25
88:14,21 89:22
151:6 158:25
reported   1:18
reporter   10:12
68:1 150:20 161:7
162:10 168:4
174:7
reporting   155:22
155:24 156:10
reports   63:16 89:1
131:1

represent   17:25
115:18
representation
116:13
representative
54:22
represented   7:9
164:9
repurpose   131:13
131:22
repurposed   94:20
131:15
repurposing   132:3
request   60:2 83:20
84:1 139:16
159:10,11 160:15
162:21
requested   166:19
require   36:25
94:24 103:15,21
required   145:21
requirement
35:14 36:14
rescue   56:19 83:15
reside   29:3
residential   171:23
172:2,3
residents   7:21,21
8:6,16 77:7,8
resolution   18:10
62:8 156:22 157:3
resolve   8:22 56:9
145:3
resolved   128:4
143:21 149:14,15
resolves   125:11
resource   75:23
76:8
resources   10:8
23:10 66:3 75:7
90:17,18 131:5

138:7 172:25
173:11
respect   30:22
55:16 151:24
152:3,20 153:13
155:21,25 158:2
respectfully
118:18
respects   5:10
respond   95:6
responders   128:23
responding   8:5
response   77:1
83:25 108:15
132:8 166:20
173:4
responsibilities
20:20 21:15
responsibility
11:23 12:12 23:14
45:8 132:9 133:3
133:22 148:11
responsible   31:22
34:24 35:3 42:11
45:4
responsive   15:3
rest   5:23 17:5
22:25 75:16
112:12 137:11
restore   23:13
restriction   29:2
restrictions   30:17
83:10
result   86:15,16,16
90:22 117:2
134:15,19
resulted   20:20
retrospect   92:7
returning   6:2
reusable   102:14

Veritext Legal Solutions
866 299-5127

[reuse - seeking]

**reuse** 101:24
**reusing** 102:17,18
**reverse** 74:3
**review** 69:10 70:2
  154:19 160:21
**revisited** 43:25
**revolving** 90:15
**richest** 10:14,14
**ride** 41:4
**rides** 39:11,25
  40:4 41:3 46:17
**right** 5:2 6:25 9:1
  14:25 20:8 21:1
  22:21,22 23:12
  25:5 26:1 31:7
  32:10 36:24 46:5
  48:13 52:15,20
  56:15 59:23 61:18
  63:22 69:2 71:14
  72:11 79:3 83:7
  85:15,17 94:12,13
  95:10,14 96:14,24
  97:2,25 98:9
  101:14 102:3
  103:9 105:23
  106:7 108:9,16
  110:18 115:12
  122:18,20 126:13
  134:3 135:1,8
  136:21 138:4,12
  138:25 140:5
  141:19,21,25
  145:1 146:1
  150:14 152:19
  153:9 155:13
  159:7 162:16
  165:7 168:21
  172:9 174:5
**rights** 1:4 144:23
  145:5

**rise** 12:20
**rises** 86:18
**risk** 127:3
**river** 100:24,25
  101:2,10,12,14,16
**riverbed** 100:22
**road** 131:4
**robe** 6:1
**robust** 19:10
**rodota** 99:22
**rodriguez's** 43:11
**roll** 19:17
**roof** 9:16 26:16
**roofs** 169:8
**room** 2:20 6:21
  26:17 27:25 62:23
  92:15,15 99:12
  125:14 138:10
  140:23 160:15
  165:19 166:7
**roomkey** 15:12
  62:23 157:12
  159:24
**rooms** 15:13,14
  125:10 138:24,24
  160:2 166:12
**rough** 47:2 151:20
**roundtable** 88:14
**row** 15:15 115:13
  115:16
**rows** 11:17
**rules** 20:23
**ruling** 122:18
**run** 6:15 43:19,23
  76:11 92:2
**running** 8:9 76:10
  94:19
**runs** 28:5 123:7
**rural** 11:20
**rv** 94:10 172:15

**rvs** 22:5 36:11,11
  37:2,6,19 170:14

**s**

**s** 2:1 3:1 4:7 5:1
  18:5,5
**safe** 11:6 55:22
  57:11,13,18 73:17
**safer** 56:18 82:25
  98:14
**safety** 11:9 49:18
  169:6
**sakes** 134:24
  138:12
**sales** 147:23
**salvation** 131:16
**san** 38:23 47:22
  131:17,20
**santa** 101:9,12
  106:21
**saturday** 59:23
  90:6
**saw** 40:25 87:3
  112:15 128:3
**saying** 17:20 37:5
  52:2 61:15,16
  70:5 71:1 76:17
  80:1 92:2 94:24
  104:19 119:8
  148:21,25 152:16
  155:2
**says** 66:2 137:6
**scale** 95:3
**scenes** 103:22
**schedule** 59:6
  153:1 168:4
**scheme** 139:22
**schizophrenia**
  74:17 75:2
**school** 75:11
**schools** 73:17,23

**scope** 156:19
**scott** 2:18 170:1
**scott.marcus** 2:22
**screaming** 135:12
**script** 111:24
**search** 5:16
**seat** 92:11
**seats** 60:2
**seattle** 97:5
**second** 8:4 13:5
  49:1 159:23
**secondary** 74:12
  74:15
**secret** 83:23
**sector** 12:13
**sectors** 10:15
**secure** 7:11 92:17
**security** 5:17,22
  148:21
**see** 5:19 14:1,2
  18:14 20:12,14
  21:6 27:20 32:8
  34:17 39:23 40:16
  40:25 47:15 59:7
  59:10,18 66:4,5
  70:10 75:25 76:7
  76:20 87:3 91:23
  93:4 96:19 100:3
  103:19 105:15
  117:6,7 135:12,13
  135:23 136:16
  137:10 142:12
  147:3 150:16
  155:2 164:16
  165:16
**seeable** 9:21
**seeing** 66:12,22
  85:9 135:9 145:23
**seek** 116:15
**seeking** 9:15

Veritext Legal Solutions
866 299-5127

[seen - simply]

| | | | |
|---|---|---|---|
| **seen** 17:15,20 20:3<br>20:7,17 63:20<br>73:21 89:23<br>134:20 157:12<br>160:8<br>**sell** 130:10<br>**send** 17:4 66:20<br>139:4<br>**sending** 115:3<br>**sends** 114:23<br>**seniors** 10:19<br>**sense** 11:1 14:22<br>20:10 78:15<br>113:11 156:12<br>**sent** 47:1<br>**sentence** 113:6<br>**separate** 136:3<br>138:24<br>**separately** 82:14<br>**serious** 16:23,23<br>**servants** 11:25<br>**serve** 32:23<br>**served** 33:20<br>90:14<br>**service** 50:17<br>**services** 3:14 8:16<br>58:7,10 60:22<br>107:20,20 121:22<br>127:1 130:18<br>132:24 133:15<br>148:24 159:17<br>**session** 5:4,11 28:1<br>37:12 150:4<br>155:15 158:4<br>**set** 66:25 69:10<br>70:25 91:6 92:24<br>94:4 98:6 99:16<br>99:23 102:13,14<br>106:17,23 123:19<br>154:2 167:16<br>172:14,19 173:5 | 173:14<br>**setting** 95:23 98:5<br>102:11 106:21<br>**settings** 126:16<br>**settle** 143:13<br>**settlement** 7:8,13<br>7:18 8:5 9:1 16:4<br>16:14,19 24:16<br>73:19 78:11 79:1<br>80:6 83:22 87:18<br>89:4 103:11<br>104:21 116:25<br>125:17 130:24<br>149:9,16 155:17<br>157:23 159:15<br>160:4,6,10<br>**settlements** 33:20<br>41:14 73:15 122:5<br>**seventh** 166:7<br>**severe** 75:14<br>**severely** 75:19<br>76:5<br>**shade** 77:5<br>**shallow** 134:9<br>**shame** 134:18<br>**shamed** 22:9,10<br>**shameful** 12:1<br>**shaped** 118:20<br>**share** 20:14 21:15<br>21:24 22:1,9,24<br>23:15 163:24,24<br>163:25 164:3,4<br>**shared** 12:12<br>77:15 92:15<br>**sharing** 99:20<br>**sharon** 98:20,21<br>98:22 128:25<br>**shayla** 3:20 54:20<br>55:5 93:10,19<br>98:16 121:13<br>126:6 145:13 | **sheet** 52:14 144:2<br>**sheila** 85:12<br>**shelter** 9:15 10:3<br>21:3 33:7 37:14<br>44:6 46:17 56:17<br>74:14 77:9 83:12<br>84:3,5,12 86:8<br>89:8 90:24 95:19<br>100:1 105:13,18<br>105:21 106:2,5,23<br>107:1,19 123:1,19<br>124:18,25 125:7<br>125:18,20 126:10<br>126:11,15,17,21<br>126:23 130:23<br>136:19,23 137:4<br>138:12,15,19<br>152:2 153:11<br>**sheltered** 107:8<br>159:21,21 160:1<br>**sheltering** 35:8<br>**shelters** 15:10<br>20:17 22:3 36:12<br>36:18,23,25 37:3,6<br>83:13 84:13,24<br>86:22 87:20 93:9<br>96:3 100:2 123:15<br>123:16,24 124:20<br>124:23 125:5<br>126:14,15 127:1,9<br>130:21 132:5<br>136:25 147:19<br>148:6<br>**sheriff's** 89:25<br>128:23<br>**shipping** 102:7<br>**shirts** 96:6 109:25<br>109:25<br>**shopping** 147:24<br>**short** 15:22 41:18<br>52:9 54:14 72:11 | 87:19 132:17<br>137:8<br>**shortage** 11:11<br>**shortened** 49:24<br>**shortening** 49:13<br>51:1<br>**shortly** 8:9<br>**shoulder** 21:13<br>**shouldn't** 134:17<br>**show** 9:19 27:2,17<br>28:4 92:4 98:12<br>100:20 111:14<br>139:4<br>**showed** 8:3<br>**shown** 22:17<br>**shuffle** 158:7<br>**side** 14:5,6 74:6<br>76:17 78:5 79:11<br>100:20 103:17<br>113:17 117:1,6,7<br>119:9 140:9<br>**sides** 9:14 19:19<br>**sidewalks** 11:5<br>47:25<br>**sight** 135:22<br>**sign** 41:12<br>**signature** 176:14<br>**signatures** 7:11<br>**signed** 7:19 9:5<br>41:10<br>**significant** 14:14<br>85:16 137:7 169:6<br>**silent** 18:8<br>**silly** 30:9<br>**silva** 128:25<br>**simple** 13:12<br>31:20,20 32:1,9<br>148:9<br>**simply** 20:11<br>22:20 54:25 134:5<br>167:16 173:20 |

[single - spending]

| | | | |
|---|---|---|---|
| single 84:2 | slightly 41:3 | 141:10 145:18 | 49:25 93:18 |
| sir 5:14 27:5 34:11 | slow 98:5 | 146:2,5,23 147:7 | 124:21 126:5 |
| 34:21 41:8 42:8 | slowly 10:11 | 147:14 149:13 | 159:18 167:23 |
| 43:25 44:14,17 | 129:17 | 151:14,17 | sort 156:11 157:4 |
| 47:4,23 48:13 | small 11:20 24:20 | social 11:9 | 167:12 170:16 |
| 49:17 52:15,24 | 38:4 52:13 60:6 | societal 22:20 | sorts 128:21 |
| 56:24 105:6 | 67:20 92:15 94:15 | solution 8:15 | souls 47:25 |
| sister 11:13 | smart 28:13 | 12:14 13:20 14:4 | sounds 140:5 |
| sit 54:25 59:23 | smith 7:6 8:11 | 24:6 85:18 88:4 | south 1:16 168:25 |
| 144:1 158:8 | 27:4 80:14 | 92:3 94:16 95:8 | 169:3 |
| site 36:11,11,20,25 | snuck 128:21 | 98:18,19 100:4,5,6 | spa 79:7,12,12 |
| 47:21,22,25 56:23 | sobel 3:22 7:3 55:5 | 100:6 108:4 116:8 | 140:14 |
| 69:25 70:3 99:15 | 55:13,19 56:13 | 116:10 135:4 | space 20:21 35:9 |
| 99:18,23 140:1,1,3 | 57:7,12,17,20,24 | solutions 19:21 | 37:19 83:14 123:3 |
| 169:1,5,13,16,17 | 58:4,7,9,15,18,25 | 22:3 24:9,18 | 123:4 |
| 170:3 171:13 | 60:5,8,16,19,25 | 48:12,15 106:10 | spaces 8:7 12:8 |
| 172:6,9 | 61:2,5,10,12 62:12 | 116:12 125:10 | 15:12 77:6,15 |
| sites 57:16 65:12 | 62:16,19 63:3,6,10 | 132:10 149:3 | 125:9 129:7,14,22 |
| 70:20,24 71:12 | 63:13,15 64:5,8,11 | 153:2 | sparring 12:17 |
| 140:7 156:11 | 64:14,16,19,24 | solve 15:22 67:23 | speak 26:25 36:14 |
| 169:18,20 171:5,6 | 65:2,6,8,11,17,20 | solved 12:18,19 | 42:5 48:23 51:12 |
| 171:9 173:3,22 | 65:25 67:10,12,16 | 134:19 138:13 | 51:18 81:3 82:16 |
| sitting 7:12 114:18 | 67:19 81:10 82:13 | somebody 6:7 | 91:5 |
| 135:14 149:20 | 82:20,23 83:8 | 37:11 42:15 68:16 | speaker 3:24,25 |
| situation 83:17 | 89:12,15,18,21 | 74:16 89:8 93:1,1 | 59:10 60:23 62:25 |
| 172:20 | 90:9,25 91:10,12 | 101:23,24 102:2 | 68:23 120:22 |
| situations 137:8 | 91:14,18 92:13,21 | 107:16 116:5,14 | 149:22,25 162:8,9 |
| six 41:11,12 46:15 | 94:6,9,14 95:2 | 118:5 129:5 | speaking 29:8 |
| 48:19 52:17 53:18 | 106:12,17 108:10 | 135:13 | special 85:20 |
| 99:17 134:12 | 108:13 112:19,22 | someplace 55:22 | 141:11 |
| skeleton 104:4 | 113:8,20 114:5,8 | 75:6 97:17 158:5 | specific 47:21 |
| skid 11:17 15:15 | 116:3,9 117:14 | 173:10 | 52:18 113:25 |
| 115:13,16 | 118:25 119:12,19 | somewhat 28:2 | 145:11 156:6 |
| skills 23:22 175:9 | 119:23,25 120:7 | 39:7 101:16 | specifically 74:4 |
| 176:6 | 120:12,15 124:7 | 123:23 | 140:25 141:2 |
| sleep 129:8 138:16 | 124:10,19,22 | sonoma 99:21 | spectrum 136:1 |
| sleeves 19:17 | 126:2,5 127:22 | soon 5:6 21:8 | speeches 73:8 |
| slide 28:4 | 130:8,13 131:10 | 161:20 | speed 15:24 |
| slight 70:4,4 | 136:10,12,18,22 | sorry 21:24 28:22 | spend 13:11 90:6 |
| 173:10 | 137:10,13,17 | 29:25 33:25 41:2 | spending 14:13 |
| | 139:12 140:22 | 42:3 44:22 45:21 | 90:22 95:18 132:5 |

[spending - sunday]

147:21
spent  7:5 68:20
  137:14
spertus  2:4,11
spertuslaw.com
  2:7,14
spoke  37:7 136:15
spoken  60:20
  169:25
spot  53:24 132:20
spots  55:1 132:20
spraying  110:19
spring  1:16
squatting  30:5
stable  8:16 92:18
  95:4 116:22 137:8
staff  40:22 172:23
staffing  127:25
  128:3 129:16
stand  12:21 46:6
  108:22 122:19
standard  92:1
  123:20,23 125:7
  146:9,11 151:9
standards  23:25
standing  36:13
standpoint  109:13
  127:19
stands  56:1
stanton  109:5
start  7:1 12:10
  13:13 26:3,4 64:3
  64:10 65:4,14
  67:7 72:5 73:11
  73:20 75:6,8
  76:12,22 77:2
  82:1 105:10,13
  122:13 139:6,20
  140:7 141:18
  142:15 143:6,9
  144:3 149:23

150:1
started  13:6 44:9
  73:12,14,22 77:20
  77:25 78:15,22,23
  79:21 80:1 84:10
  85:6 100:16,17
  106:5 127:12
  136:9 172:21
starting  40:14
  49:2 63:22 105:8
state  10:14 11:21
  12:5 13:1,2,2 21:9
  22:11 27:5 30:15
  41:12,15 45:1
  48:6,6 61:16 72:1
  85:22 96:11
  108:13 113:24
  116:1 175:19
statement  7:23
  18:2 25:12 83:22
  118:12 130:25
states  1:1 5:8,12
statewide  48:6
station  118:6
statistic  101:3
status  156:10
  167:8,17 168:3,9
stay  25:5 50:11
  127:5
steel  169:7
stem  88:5
step  5:9,14 6:1
  12:1 15:17 38:1,3
  52:25 67:21
  143:21 161:3
stepped  20:16
  55:15
stepping  7:22 22:2
  55:9
steps  27:12,13,15
  52:21 57:3

steve  87:4
stirring  73:13
stock  61:18 145:2
stood  40:19 41:1
stop  21:12 28:16
  88:16 111:21
  113:19 115:1
  120:19 145:25
stopping  88:23
  111:2
storage  77:6
stories  44:11
story  44:8 91:24
  95:22 96:1
stovepiped  18:8
straightened
  45:15
strategies  61:8
strategy  61:15
  62:2
street  1:16 2:5,12
  2:20 11:5 19:17
  19:17 28:6 38:23
  43:12 74:17 79:5
  90:19 92:17 98:10
  111:4,17,25 112:3
  112:24 113:18
  115:11,22 123:8
  123:13,17 125:18
  138:3 141:5 169:3
  170:9,13
streets  11:4 20:5
  21:20 22:6 67:13
  84:3 88:12 92:19
  107:5 122:15
  137:7 140:5
strength  134:22
strong  104:16
  119:15 120:2,3
  135:24

strongest  25:12
strongly  145:23
structure  132:25
  155:23
struggle  20:9,9,10
struggling  128:2
studio  84:20
study  17:6 118:4,9
stuff  98:13 125:14
  138:17,22
stunned  101:16
subject  98:6
submissions  16:9
submit  69:24
submitted  24:16
  71:19 162:19
  171:20
substance  63:12
substances  35:22
substantive  14:25
substitute  13:3
succeeding  10:14
success  15:19 44:8
  86:12 142:20,24
successfully  23:23
sucking  138:9
sue  108:16
suffering  19:13
sufficient  155:23
  163:1
suggest  142:8
suggesting  124:14
suggestion  171:19
  172:1
suing  14:3 108:21
suitable  170:6
suite  2:5,12
summary  134:12
summon  161:5
sunday  90:7
  169:12

Page 35

[superior - test]

| | | | |
|---|---|---|---|
| **superior** 116:19 | **swimming** 101:11 | **takes** 8:22 31:5 | 50:8,10 59:25 |
| **supervise** 152:18 | **switch** 173:9 | 79:19 84:18 91:24 | 60:3 62:10 66:3 |
| **supervision** 154:4 | **switched** 127:1 | 106:23 | 68:17 78:23 80:24 |
| 154:5,9 | **sworn** 175:5 | **talk** 8:13 9:11 | 81:1 82:1,5,9,10 |
| **supervisor's** | **system** 11:8 84:5 | 19:18 43:3 49:15 | 84:1 93:3 95:25 |
| 140:16 | 86:9 96:5 | 55:21 59:11 61:7 | 96:19,21 97:20,21 |
| **supervisorial** 79:8 | **systems** 130:18,19 | 66:4 79:4 86:1 | 98:2,9 100:16 |
| 79:17,18 82:9 | **t** | 87:7,8,18,19 96:20 | 101:7 110:12 |
| **supervisors** 15:2 | | 100:13 103:24 | 129:21 134:6 |
| 17:20 79:13 101:5 | **t** 4:7 | 104:6 106:4,12 | 139:1 140:21 |
| **supplant** 61:18 | **table** 25:14 26:21 | 117:21,21 149:7,8 | 144:14 150:6 |
| **supplied** 40:21 | 60:13 66:14 95:8 | 150:17 152:23 | 161:20 162:1 |
| **supply** 100:25 | 97:19,20 98:9 | 158:13 162:3,5,6 | 173:15 |
| 123:9 | 99:9,12 100:8 | **talked** 59:16 79:2 | **telling** 96:1,24 |
| **support** 8:11 9:24 | 112:7 121:7 | 79:22,23 81:11 | 97:18 128:7 |
| 85:2 | 132:13 134:3 | 82:15 111:19,19 | **template** 82:1 |
| **supportive** 20:17 | 138:21,21,25 | 113:5 122:22 | 144:3,4 |
| 23:8 100:18 | 147:9 | 142:12 143:14 | **ten** 56:20 67:4,22 |
| 153:10 | **take** 7:24 10:3 | 149:8 | 69:3,4 70:20,20 |
| **supposed** 7:6 | 11:23 18:14 19:3 | **talking** 26:3,4 | 78:12 85:5 88:19 |
| 18:23 32:13 51:5 | 19:7 24:21 42:9 | 43:15,22,23 60:14 | 89:2 109:8,9,14 |
| 123:8 129:3 | 43:10 49:8 57:3 | 60:16 65:21 68:20 | 165:14 |
| **supposedly** 75:11 | 59:7 62:3,11 67:4 | 74:4 80:17 105:14 | **tense** 154:11 |
| **sure** 16:20 18:21 | 67:22 69:6,10 | 106:15,20 107:1,2 | **tent** 11:17 90:20 |
| 29:24 36:4,7 | 74:5 75:15 76:5,6 | 107:3,4,5,6,6 | 98:13 123:5,9,21 |
| 39:19 55:12,22 | 77:18 78:6,8,9 | 110:21 119:19 | 123:21 126:18 |
| 68:13 69:4 72:13 | 85:24 91:8 92:16 | 138:14 139:7,13 | **tents** 39:7 45:5 |
| 99:4 101:4 102:4 | 93:16 99:7,11 | 141:2 147:3 | 62:22 100:5 |
| 121:2 124:5 127:2 | 101:19 105:5 | 169:25 170:13 | **term** 16:4 39:10 |
| 130:3 138:18 | 108:15 111:25 | **tangible** 19:24 | 87:19 100:18 |
| 145:8 147:13 | 114:2 116:5,19,21 | **tape** 41:17,23 | 152:3,7,9 154:2 |
| 162:8 163:7,10 | 118:4,6 122:19 | 47:24 48:14,16 | **terms** 14:24 25:21 |
| 166:8 167:2 | 129:17 130:11 | **target** 154:8 | 77:21 78:15,16,20 |
| **surprise** 28:1 | 136:6 137:4 141:3 | **task** 59:4,18 | 97:23 112:7 |
| **survey** 40:15 | 141:3 149:7 | 116:17 | 135:15 148:24 |
| 93:16 | 151:19 154:10 | **tax** 135:19 147:23 | 152:22 155:22 |
| **suspicious** 129:5 | 159:4 165:7 | **taxes** 102:8 | 157:20 159:17 |
| **swat** 114:24 | **taken** 4:4 7:10,19 | **taxpayer** 90:23 | 160:5,12 |
| **sweep** 104:24 | 22:18,18 27:15 | **teach** 114:2 | **test** 26:10 139:10 |
| 123:3 | 48:7 88:25 132:14 | **tell** 14:15 17:1,3 | 139:17 |
| | 136:18 175:3,12 | 18:18 23:16,18 | |
| | 176:9 | | |

Veritext Legal Solutions
866 299-5127

[tested - timeline]

| | | | |
|---|---|---|---|
| **tested**  56:20 83:16 | 168:21 | 155:3 156:8,21 | **thursday**  1:12 |
| **testifying**  175:5 | **think**  6:7 12:18 | 160:10,11,25 | 169:15 |
| **thank**  5:18,22 7:14 | 13:2 17:7,10,11 | 161:4 163:12,18 | **ticket**  120:18 |
| 8:10,12,23,25 13:7 | 38:10 47:18 53:2 | 163:21 164:17 | **tickets**  121:19 |
| 13:14 15:1,6 19:7 | 53:9 54:13,15,17 | 167:9,20,21 | **tied**  86:5 |
| 19:8,21 24:23,24 | 54:19,21 55:6,7,19 | 168:22,22 169:5 | **tighter**  50:19 |
| 28:14 33:14 36:3 | 56:13,14 61:14 | 169:11,17 170:11 | **time**  1:13 6:11 |
| 41:8 42:24,24 | 62:23 63:10 64:14 | 171:2,4,11 172:5 | 8:22 9:2 12:10,11 |
| 43:22 45:24 46:24 | 64:19 65:2 66:7 | 172:18 173:21,22 | 13:11 14:14 15:23 |
| 68:14 71:25 72:18 | 66:18 69:1 70:20 | **thinking**  64:10 | 17:23 23:14 25:23 |
| 103:1,6,8 128:25 | 74:11 77:3 78:14 | 79:24 84:10 86:6 | 28:15 33:6,6,16 |
| 141:21 150:14 | 79:22,22 81:1 | 122:13 143:25 | 35:6 36:2 41:9 |
| 151:4 159:7 | 82:2 84:22,22 | **thinks**  135:5 | 48:18 54:14 59:6 |
| 163:10 173:23,24 | 87:17 88:20 89:3 | **third**  124:1 | 63:23 66:10 67:5 |
| 173:25 174:5 | 89:7,24 90:11,13 | **thought**  9:7 40:24 | 68:2,20 72:10 |
| **thankful**  127:14 | 93:1,11,12,13,23 | 61:7 79:19 80:5 | 74:13 77:19 80:7 |
| **thanking**  14:9 | 93:24 94:18 95:3 | 80:14 81:7,23 | 80:16,24 81:16 |
| **thereof**  132:21 | 95:13,14 104:22 | 83:19 92:23 94:3 | 82:3 86:19 88:25 |
| **thing**  13:5 14:19 | 105:14 106:13 | 127:16 140:12 | 90:14 91:4 92:5 |
| 16:11 17:2 20:8 | 108:1,25 109:14 | 143:12 158:7 | 92:25 107:18 |
| 22:21,22 49:1 | 109:15 110:3 | 169:13 | 112:4,21,24 |
| 52:1,2,2,4 76:7 | 112:13 114:8 | **thoughtful**  171:12 | 113:21 115:14 |
| 78:8 81:17,24 | 115:6 117:8,24 | **thousand**  97:10 | 118:4,5,11 128:3 |
| 91:3 92:14 96:25 | 119:3,11 120:23 | **thousands**  98:17 | 131:7 132:12,17 |
| 98:8 101:23 | 121:3,4,9 123:21 | **threat**  141:15 | 133:18 134:20 |
| 102:16 110:2 | 124:3,11 125:8,21 | **three**  31:7,9 38:12 | 137:3,8 141:20 |
| 113:21 114:19 | 126:7,8,10,18,22 | 49:3 52:17 73:22 | 143:18 144:8 |
| 122:12 132:4 | 127:7 129:10,12 | 81:10 83:13 84:5 | 147:6 149:18 |
| 135:7 136:13 | 130:20,21 131:5,6 | 90:4 96:8 98:7 | 150:21 152:12,13 |
| 140:20,22 156:12 | 131:11 132:3 | 99:17 101:7,11 | 152:14,16,22 |
| 162:6 169:8 | 134:3,3 135:5,19 | 105:11 113:11 | 153:15 154:2,18 |
| **things**  21:20 33:7 | 135:20 136:15 | 115:4 119:18 | 158:6 161:8 |
| 58:25 77:4 79:10 | 137:21 139:17 | 124:8,11 140:2 | 162:11 164:12,14 |
| 80:19 86:15 89:6 | 140:17 142:13,14 | 152:15 161:8 | 165:3,6,12 167:6,8 |
| 95:2 100:12 | 142:18,23 143:5 | **throw**  79:9 81:25 | 172:16,17,20,22 |
| 104:20 114:9 | 143:11,11 144:19 | 85:24 139:11 | 172:23,25 173:11 |
| 121:8 122:19,24 | 144:21,21,24 | **throwing**  88:4 | 173:23 174:7 |
| 125:20 127:24 | 145:3,7 147:2,16 | **thrown**  72:10 | **timeframes**  61:4 |
| 130:24 134:17 | 148:1,23 151:11 | 80:12,19 106:6 | **timeline**  60:3,5 |
| 139:10 140:25 | 152:25 153:12,17 | **throws**  129:5 | 69:15 142:10,12 |
| 141:5 152:1 153:9 | 154:7,11,19 155:1 | | 153:3,8,10 157:20 |

Veritext Legal Solutions
866 299-5127

[timeline - unconnected]

159:6,12,18 160:13
timelines  16:7 59:17
timeout  119:21
times  6:18 78:12 83:13 108:1 147:17 155:11
timing  156:19
today  5:3,5,10,14 5:23 6:1,5 7:7,18 7:20 14:24 19:9 19:16 23:2,20 24:20 26:4,11 36:8 37:11 47:13 53:22 59:5 61:6 62:1,8 66:13,15,16 67:21 69:19 70:17 100:9 104:1 127:14 143:10,20 159:8
toilet  98:15 100:23 100:25 101:17
toilets  45:7 98:17
token  13:10 92:8 110:5 136:7
told  22:22 43:13 53:6 88:8,9 91:5 95:22 111:7 128:20,24 148:19 169:18 170:2
tolerance  13:11
tom  87:4
tomorrow  26:14 37:12 161:17,18 161:23
tonight  26:10,13 127:4
top  133:5
topic  124:4 127:11

total  70:16 87:25 107:7
touch  19:1 122:12 157:21 158:21
touched  140:18
touchy  104:6
tough  74:15 75:7 104:10
towels  123:6,9
town  22:8
towns  11:21
toxic  35:21 64:24 70:9
tr  139:9
track  116:22
trades  97:9
trail  99:22
trailers  92:4,7,9 97:17
trained  113:11
transcriber  176:1
transcript  70:15 176:3,5
transcriptionist  175:7
transfer  36:6
transient  75:21 116:23
transit  41:4
trapped  77:8
trash  16:16 123:22
trashcan  122:21 125:6
trauma  117:22
treat  10:4,8,16 75:16
treated  81:14 97:23
treating  53:7
tremendous  110:13 135:25

172:24
trials  5:20
tried  130:24
trouble  165:18,20
troubling  11:19
true  12:22 19:24 23:10 175:8 176:5
trust  159:6
truth  11:11
try  15:22 46:11 92:4 98:23 116:9 117:11 140:14,15 143:10 144:1,16
trying  41:13,14 51:10 68:17 72:3 78:15,21 81:19 95:3 98:22 128:2 147:19 155:14 162:2
tuberculosis  49:5
tuesday  90:9 157:25 158:23 164:18,18,18,24 164:25 165:2 167:10,10,11,13 168:11,20
turf  144:2
turn  16:1 29:6,7 29:10,13,16,22 47:10 50:7 51:15 51:19,22,22 66:2 71:24 74:2 136:11 151:2
turnaround  70:17
turned  11:12 109:24 128:22
turning  65:14
twice  107:7
two  14:7 17:13 27:21 31:5 38:10 47:15 51:11 53:3

60:14 66:11 69:10 69:22,25 70:1,2 71:8,10 80:22,24 80:25 81:1 83:11 84:5,8 90:4 98:7 103:20 110:20 112:16 114:6 115:4,16 116:18 117:12,15 124:10 125:24,24 136:19 137:4 138:6 150:21 152:15 153:5 171:9 173:13
type  151:24 153:2 156:5,6,9 157:13
types  171:15
typewriting  175:6
typical  90:4 109:8
typically  41:10

u

ucl  49:7
ucla  49:7 89:22
uh  29:15 97:15 99:1
umhofer  2:4,10,11 67:2 142:18,23 143:2,5,8,25 144:6 144:15 150:8,11 150:14 152:12,14 152:17 154:1,17 155:5 158:9,12 160:19 164:16,24 165:1,4,7,13 166:11,14,17,22 167:9,12,15,19,23 168:6,8,11,14,19
unanimity  68:15
unanimous  139:5
unconnected  155:10

Veritext Legal Solutions
866 299-5127

[unconstitutional - walking]

unconstitutional
104:19 108:17,19
underestimated
88:22
underhoused
130:16
underlying 21:8
underneath 28:5
28:18,23,25 29:20
30:1,2,11,13,19,21
32:12 33:1,15,22
35:1 37:4 43:12
43:24 44:2,5,21,24
45:15 49:11,25
53:7 54:16
underpass 35:2
50:1
underpasses 57:10
understand 6:14
24:20 27:14,23
43:8,20 46:13
66:1 71:23 81:16
86:20 101:22
107:10,11,23
120:8 129:5
understandable
146:17
understanding
13:22 124:13
163:6
understood 40:23
46:9 139:6
undue 22:1,5
unfair 141:23
unfed 10:19
unfit 128:20,24
unforeseen 157:9
unfortunately
110:17
unhoused 24:11
93:13,24 130:16

144:23 145:5
171:22,24
unidentified 3:24
3:25 59:10 60:23
62:25 68:23
120:22 149:22,25
162:8,9
uniform 10:20
uniformity 103:12
unincorporated
143:3 148:10
149:1,10 151:22
156:20 160:11
union 56:19 83:15
unit 100:13 102:5
102:8 114:11
united 1:1 5:8,12
units 15:8 85:2,3,4
99:14
unlimited 112:4
129:6
unoccupied 12:8
unsheltered 28:21
45:1 107:7,9
untouched 11:22
unwavering 11:1
unwind 44:10
unworkable 82:18
140:17
update 167:21
upheld 24:18
uphold 19:12
23:11 24:3,17
upscale 131:16,20
urban 11:18
use 12:7 23:20
36:10,11 37:17,18
39:9 45:8 67:16
71:2,2,18,19 72:5
78:19 83:19,24
108:24 131:5,12

131:23 159:20
useful 87:12 115:2
uses 70:9
usually 90:20
116:19
utilize 23:22 46:17
utilized 38:20

**v**

v 1:7
va 97:21 98:2
100:5 138:21
vacant 87:22
129:25 130:1
132:1,2
vaguely 152:25
valid 80:9
valuable 79:19
value 98:8 112:2
160:5
van 30:10,10,13
30:18
vantage 35:4
varicks 87:4
variety 16:6
varying 106:4
vast 9:14
vehicle 20:22 30:9
30:18
vehicles 31:7
115:1
venice 114:18
115:17
verify 110:21
versa 133:21
version 110:16,16
110:17
versus 73:16 77:4
90:24 91:1 118:5
123:16 132:24,25
135:25 153:16

vet 114:18
veteran 97:22
veterans 10:20
97:23 98:10
vice 14:11 18:18
133:21
vicinity 123:23
vinatieri 7:14
violation 114:21
violations 115:9
115:24
vision 14:16 137:6
visit 40:10
visiting 14:12
vocal 109:17
voluntarily 113:18
voluntariness
105:23
volunteer 115:19
voted 135:17
voters 23:8
vulnerable 24:1

**w**

w 176:2,15
wage 84:15,16,17
wagons 111:4
wait 56:8,10,12
80:23,25 92:24
94:4 100:2
waiting 46:10
53:18 59:20 93:3
132:10
waits 56:14
waive 25:14
walk 19:17 21:18
31:2 81:15 138:16
167:3
walked 155:2
walking 52:23
101:15 110:21
132:23 133:19

Page 39

[walks - window]

| | | | |
|---|---|---|---|
| **walks** 110:24 | 158:7 163:20,24 | 140:1 142:19,24 | **weeks** 10:2 69:10 |
| **wall** 134:18 | 164:3,16 165:8 | 143:22 144:5,10 | 69:25 70:1,2,17 |
| **wandering** 110:19 | 166:9 170:3,17,19 | 150:18 151:8,12 | 71:8,11 142:2 |
| **wanders** 110:15 | **wanted** 19:7 100:9 | 154:6 160:9 | 173:13 |
| **want** 5:18,20 6:8 | 105:4 108:5,6,7 | **ways** 18:13 23:13 | **weight** 16:25 |
| 6:14 8:10,18 9:6 | 134:1 168:24 | 139:17 | **weitzman** 3:23 |
| 9:10 10:3,10 13:6 | 169:1,21 170:6,20 | **we've** 5:20 27:11 | 121:15,25 122:3 |
| 13:8,13 14:9 15:1 | 170:24 | 27:18 41:11 45:15 | 125:8,13 126:24 |
| 15:6,6 18:17,24 | **wanting** 9:16 | 47:20 64:2 65:20 | 152:25 155:1,6 |
| 19:3,4,5,7 26:25 | **wants** 11:23 15:17 | 81:24 82:14,15 | **welcome** 46:18 |
| 27:2 29:11 33:13 | 87:1 112:9 136:16 | 88:25 90:15 98:14 | 103:3 |
| 35:23 36:1 41:6 | 170:22 173:9,12 | 98:14,15,15 99:16 | **went** 35:18 40:10 |
| 41:15 42:10,15,24 | **warehouse** 92:24 | 103:23 105:14 | 62:21 88:20 98:2 |
| 46:17,24 47:6 | **warehouses** 86:9 | 110:14 114:14 | 98:4 111:18 |
| 48:17 50:4,5,10 | **warrants** 90:4 | 120:15 122:6 | **west** 2:5,12 3:5 |
| 51:9 53:5,9 55:9 | **wash** 22:19 | 124:3,8 129:9 | **whack** 64:7 |
| 55:21 56:2,3 59:8 | **washington** 96:12 | 131:4 133:23 | **wheel** 90:16 |
| 59:9,14,17,17,18 | **waste** 173:11 | 137:13,23,24 | **wheelchair** 75:3 |
| 59:19,21 61:25 | **wasting** 25:23 | 141:3 147:2 | **whittier** 7:8,16,17 |
| 66:8,10,11,20,24 | 80:24,25 | 148:19 149:5 | 7:22 8:16 108:2 |
| 66:25 67:5 69:5,8 | **watch** 79:11 117:2 | 151:7 154:7,18,20 | 113:4,22 148:7 |
| 70:14 71:1 72:8 | 127:21,24 | 154:20 157:12 | **whoops** 129:7 |
| 74:2 75:15 77:5,7 | **watched** 102:12 | 162:5 171:19 | **wide** 80:12 81:6 |
| 77:11,18,22,23,23 | **watching** 44:10 | 172:9 | 82:7 139:21 |
| 77:24 78:8,9,22 | 110:5 | **weakness** 14:22 | 141:14 |
| 82:8,11 91:8 | **water** 98:14 | **wear** 29:5 | **widening** 11:10 |
| 92:10 94:4 96:22 | **way** 8:3 9:19 | **wearing** 6:1 | **width** 30:24 |
| 96:22,23,25 97:1 | 14:17 20:7 21:1 | **weatherman** 49:8 | **wild** 139:11,14 |
| 99:13 103:24 | 34:18 35:4 36:14 | **wednesday** 59:5 | **willing** 21:10,23 |
| 104:6,7 105:13,20 | 43:4 48:16,18 | 158:25 159:2 | 21:25 37:13 57:19 |
| 106:5,12,19 | 49:8 51:9 62:8 | 167:7,13,21 168:6 | 61:6 62:5 83:21 |
| 108:15 113:22 | 68:15 74:25 75:4 | 168:7,8 | 113:16 132:6 |
| 119:15,16,21 | 76:25 77:3 82:2 | **week** 37:12 69:7 | 149:7,8 |
| 120:2,5 121:5,7 | 84:23 86:6 87:11 | 69:22,25 70:19 | **willingness** 8:13 |
| 123:3 124:1 126:8 | 91:5 97:23 98:24 | 71:6 85:14 97:13 | 25:22 |
| 130:3 133:14 | 103:5 105:17 | 99:3 117:15 | **wilmington** |
| 134:8 139:17 | 111:10,20 122:14 | 141:20,25 161:14 | 101:20,21 |
| 140:14 141:3,21 | 122:20 125:24 | 161:16,16,18,22 | **win** 134:10 |
| 141:24 142:10,15 | 133:6,18,20 134:3 | 169:15 | **wind** 49:8 |
| 145:7 150:17 | 136:1,5 137:17,22 | **weekend** 59:22 | **window** 24:20 |
| 156:18 157:14 | 138:3 139:18,19 | | 106:6 |

Page 40

[windstorm - zoom]

windstorm 87:5
winner 134:11
winter 126:14
wisdom 140:18
wiser 142:5
wish 12:24 52:20
92:6
withdrawn 170:7
withdrew 128:10
173:2
witness 4:2 175:4
witnesses 54:18
woman 135:14
women 88:1
wonder 101:8
wonderful 14:19
27:5 78:23 95:22
word 28:9 53:5
76:3 78:19 104:4
108:4,24 109:6
wording 160:9
words 7:12 26:5
39:7 40:13 80:10
104:24 113:15
122:14 127:20
128:1 154:15
158:4
wore 10:20
work 7:2 12:23
13:6 24:15 32:24
33:8 37:13 48:8
48:17 53:3,24
56:3 59:22 60:18
67:24 76:1 78:4
82:25 83:2,3
84:14 103:15,15
103:18,19,20
113:16 117:17
129:18,19 134:1
137:11 140:9,10
140:11 142:2,5,13

144:1 149:10,21
149:24 154:22
156:8,17,25
157:12 162:6
worked 7:10 82:21
133:17
working 12:16
13:9 14:5 22:12
22:13 97:9 119:11
133:23 140:19,20
141:20 153:1
works 114:10
115:6
world 138:22
worried 94:11,12
worry 25:8 72:19
72:21 150:13
worse 21:2 86:22
86:23
worth 8:23 95:12
wouldn't 142:1
wounds 133:25
wow 91:7
wrapped 50:19
wrenching 10:18
wrestle 94:5
wrestling 142:15
write 25:18 79:7,7
104:9,13 108:6,7
111:23,24 135:1
writing 16:15
114:20
written 12:25
16:11 114:14
wrong 78:23 79:16
110:18 112:15
121:17 130:9
160:8
wrongs 116:24
wrote 79:6,6

**x**

x 4:1,7 77:23
88:18 98:17
104:15 125:25

**y**

y 77:23 104:15
125:25
yeah 18:21,22,25
29:11 34:9 35:17
35:23 36:1 40:1
42:12 50:5,10
51:21 54:7 58:9
68:21 72:17 82:12
91:15,18,19,23
96:17 97:8 100:3
102:25 103:4,8
108:11 120:19
124:9 127:23
129:25 130:4,13
136:17 137:9,12
137:16 142:2
145:11,12 147:4
149:25 150:3
151:10 155:5,13
159:7 161:6,13
163:21 165:25
167:23,25 168:10
168:10,15 173:18
year 41:13 48:6,12
64:3 84:7 85:10
85:23 88:9 89:2
114:18 117:12
134:13 137:5
years 14:7 15:21
17:13 22:12 49:3
49:3 59:2 62:3
64:2 73:22 75:9
80:22,24,25 81:2
81:11 83:1,1,11
84:5,8 85:5 88:19

88:19,20 96:10
101:9,12 103:20
105:11 113:11
115:5 119:18
136:19 137:4
152:15,15
yelling 135:12
139:6
yesterday 49:23
86:3 109:3 145:19
149:8
york 131:18
young 3:3 25:24
26:8,23 35:20,25
54:12 95:17,23
98:21 143:16
145:9 146:7,10,19
147:1,4 149:2,19
150:1,3 151:4,11
151:16,18 152:8
152:11,13,20
153:5,24 155:13
155:19 156:14,25
157:19,20 158:15
158:20,24 159:4
161:14,16,19
164:23 165:6,9,15
165:17,21,23,25
166:2,4,10,13,16
166:23 167:1,5,18
167:20,25 168:2
168:10,13,15
youth 10:21

**z**

z 77:24 104:16
125:25
zero 65:16
zip 80:20,20 82:8
zones 73:17
zoom 7:5,6 158:10
158:18 164:22

Veritext Legal Solutions
866 299-5127