1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3       _____

4       LA ALLIANCE FOR HUMAN RIGHTS,

5       et al.,

6            Plaintiffs,                    Case No.

7          v.                               LA CV 20-02291-

8       CITY OF LOS ANGELES, et al.,        DOC-KES

9            Defendants.

10      _____

11                         HEARING

12      DATE:          Wednesday, May 13, 2020

13      TIME:          10:01 a.m.

14      BEFORE:        Honorable David O. Carter

15      LOCATION:      Alexandria Hotel Ballroom

16                     501 South Spring Street

17                     Los Angeles, CA 90013

18      REPORTED BY:   Austin Che, Notary Public

19      JOB No.:       4110812

20

21

22

23

24

25

                                              Page 1

```
 1                 A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFFS:

 3         ELIZABETH MITCHELL, ESQUIRE

 4         MATTHEW UMHOFER, ESQUIRE

 5         Spertus Landes & Umhofer LLP

 6         1990 South Bundy Drive, Suite 705

 7         Los Angeles, CA 90025

 8         emitchell@spertuslaw.com

 9         (213) 205-6520

10

11         CAROL SOBEL, ESQUIRE

12         Law Office of Carol A. Sobel

13         3110 Main Street, #210

14         Santa Monica, CA 90405

15

16         BROOKE WEITZMAN, ESQUIRE

17         Elder Law and Disability Rights Center

18         1535 East 17th Street

19         Santa Ana, CA 92705

20         (714) 617-5353

21

22

23

24

25

                                          Page 2
```

```
 1                    A P P E A R A N C E S

 2    ON BEHALF OF DEFENDANT CITY OF LOS ANGELES:

 3         SCOTT MARCUS, ESQUIRE

 4         City of Los Angeles

 5         200 North Main Street, Suite 700

 6         Los Angeles, CA 90012-4119

 7         Scott.Marcus@lacity.org

 8         (213) 978-4681

 9

10    ON BEHALF OF DEFENDANT COUNTY OF LOS ANGELES:

11         BRANDON D. YOUNG, ESQUIRE

12         Manatt, Phelps & Phillips, LLP

13         11355 West Olympic Boulevard

14         Los Angeles, CA 90064

15         bdyoung@manatt.com

16         (310) 312-4181

17

18         LAUREN BLACK, ESQUIRE

19         Principal Deputy County Counsel

20         County of Los Angeles Office of the County Counsel

21         500 West Temple Street #648

22         Los Angeles, CA 90012

23         (213) 974-1811

24

25
```

Page 3

```
 1              A P P E A R A N C E S
 2   ALSO PRESENT:
 3        Jenny Chavez, Chief of Staff to Joe Buscaino
 4        Elizabeth Chou, Los Angeles Daily News
 5        Sarah Dusseault, Los Angeles Homeless Services
 6   Authority
 7        Heidi Marston, Interim Executive Director, Los
 8   Angeles Homeless Services Authority
 9        Michele Martinez, Special Master
10        Byron McLain, Esq., Foley & Lardner LLP
11        Christina Miller, Deputy Mayor for City
12   Homelessness Initiatives LA, City of Los Angeles
13        Shayla Myers, Esq., Legal Aid Foundation of Los
14   Angeles
15        Ackley Padilla, Chief of Staff to Nury Martinez
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

1                          E X H I B I T S

2    NO.                 DESCRIPTION                        PAGE

3

4                        (None marked.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                    P R O C E E D I N G S

 2              JUDGE CARTER:  We're on the record, and

 3     the parties are present.  And first of all, I think that

 4     what you need to hear from the Court is that when the

 5     Court is wrong about something, that we have either the

 6     integrity or the ability to say we're sorry.  Isn't that

 7     refreshing?  This Court's never done that.

 8              I want to apologize for last week because

 9     the heart of the program was not the initial phase of

10     Caltrans and other things that we talked about.  And I

11     want to tell you that I got sidetracked, which is

12     totally my responsibility, because when you asked to

13     have an hour, I wanted to graciously give that to you.

14              But as we were standing, Christina,

15     Heidi, you have other things to do.  And I didn't want

16     to bring you back at 3:30 or 4 o'clock.  I didn't think

17     that was appropriate.  Once I'd led you go, I wanted to

18     let you go.  That getting off track is my

19     responsibility.  I want to apologize to you for that

20     because the meat of the program is not what we got to.

21              So Michele has been working literally

22     night and day at the special master's highly exorbitant

23     of nothing, free, because she's donating her time just

24     like Judge Smith.  And I will tell you that if I was

25     paying her, I want the city and the county to tell you,
```

Page 6

1   for the time I've spent with both Judge Smith and with

2   Michele, that it would be well over a million dollars.

3   And Judge Smith's past involvement with Orange County,

4   that's $1.4 million of gratuitous time that he has just

5   donated because he works with JAMS and it has a low rate

6   of $600 to $1,000 an hour.  You can imagine what that

7   is.  That's a public service.

8            So Michele has absolutely volunteered and

9   been involved with us for three years just because she

10  wants to see a better system.

11           So after that apology, we're going to get

12  back on track today.  Michele, I'm going to turn this

13  over to you.

14           MS. MARTINEZ:  Great.  Thank you, Your

15  Honor.  And thank you all for being here and thank you

16  for providing the confidential documents that you've

17  shared with the Court as we move with proceedings.  And

18  I'm going to lower this so that you all can hear me.

19           As the judge was speaking, that we want

20  to talk about a structure of how these settlement

21  negotiations are going to look like and one obviously

22  that you all have seen is what the housing

23  accommodations will look like for you all.  And then

24  obviously I think what we've all heard in this room is a

25  lot of the barriers and the red tape and the stuff

1   that's not working.  I think that's what we hear a lot.

2   It's everything that is not working.

3              What I want to hear from you all today is

4   what is working.  And let's build on that.  Let's scale

5   that up because we can sit here time and time, talk

6   about all the problems, all the barriers and never move

7   the needle forward.  And I think we're all here because

8   we want to move the needle forward.

9              And so, before I get off-page here, you

10  know, I want to read a couple of statements, as Judge

11  Carter read last time around.  And obviously these are

12  my statements.  But I want to inform you all that I

13  believe that the path ahead is going to be full of

14  obstacles.  But the biggest challenge for all of us is

15  to keep the end goal in mind.

16             Transforming these words into a living

17  document that's mirrored in day-to-day actions is not

18  something that is going to happen immediately.  It will

19  take a concerted and consistent effort over time.  But

20  history has shown us, whether it's through dramatic

21  reductions in smoking, alcohol-related fatalities,

22  traffic fatalities, that bold goals seem impossible

23  until they're not.

24             This will require taking a bird's eye

25  view of the issues, one that considers a big picture and

```
 1    what it truly means to end homelessness.  To truly scale
 2    this up, and I said this a little earlier, is that there
 3    has been tremendous work that LAHSA has done, the city
 4    of Los Angeles has done, the county of Los Angeles.
 5                   And as the judge continues to say,
 6    there's inertia.  And I believe that if we want the
 7    assistance of the Court, if we want to move the needle
 8    forward, we have to have a structure in place that is
 9    going to focus on the things that have worked.
10                   And so, what we want to hear from you all
11    today is what has worked and how can we scale that up.
12    So based on your housing accommodations, whether it's
13    bridge housing that's been successful, whether it's been
14    scattered sites that's been successful.
15                   Obviously we know that permanent housing,
16    that you all have invested a tremendous amount of money.
17    That's on the back end.  We will not see that housing
18    for three, four, five years.  But in the interim, the
19    things that have worked, how can we scale those up now.
20                   And the judge has talked about a 60
21    percent figure, whether it's going to be 60 percent, 70
22    percent based on the 2019 count, based on the 2020
23    count.  All of that is irrelevant.  What I want to hear
24    from you all first, what has worked specifically on
25    housing accommodations.
```

```
 1              And so, I'm going to pause there and
 2    let's start that dialogue because I've seen in some of
 3    your guys' documents, you guys have talked about bridge
 4    housing.  You've talked about interim housing.  You've
 5    talked about permanent housing.  You've talked about
 6    scattered sites.  You've talked about safe parking.
 7    You've talked about RV parking.  We now talk about
 8    pallets.  We put shed toughs, whatever they're called.
 9    All these different housing accommodations and what
10    those placements could look like, hotels and motels that
11    we have people in.
12              And so, from the Court's perspective, we
13    want to hear what can be scaled up.  If tomorrow the
14    Court ordered you all to say within 30 days we want x
15    amount of folks to be housed, what would be the plan?
16    What housing accommodations would you bring forward to
17    us to make that happen?
18              And so, I would love to hear from you
19    all.  I've had conversations with Shayla, with Carol,
20    with Brooke.  I've had conversations with Elizabeth.
21    I've had conversations with both the city and county.
22    And so, we would like to know, you know, collectively
23    because there has to be agreement, what that approach is
24    going to look like as it pertains to those temporary
25    housing accommodations because I think the end game for
```

Page 10

```
 1    everyone, you want permanent housing.  You want

 2    affordable housing.  We're not going to get there

 3    overnight.  And I think realistically we all understand

 4    that.

 5              But in the interim, to get folks off the

 6    street and hypothetically -- I'm just hypothetically --

 7    how do you get to that 60 percent.  What are those

 8    housing accommodations?

 9              So I'm going to shut up and open this up

10    to you all and would like to hear on -- and I'll start

11    with you, Elizabeth.  I would like to get your

12    perspective on what those housing accommodations can

13    possibly be.  I think you've seen on some of the

14    documents from the county and the city what those

15    housing accommodations are.

16              From your perspective, what do you think

17    that is cost-effective, that can get up and going in a

18    short relatively time to get people placed immediately.

19    Love to hear your thoughts.

20              MS. MITCHELL:  Sure.  I think that one of

21    the things historically has worked really well obviously

22    has been the sprung structure.

23              MS. MARTINEZ:  Sprung structures.  Okay.

24              MS. MITCHELL:  Which are a problem now

25    because I think the congregate shelters are moving
```

Page 11

```
 1    forward for the next 18 months are going to be a little
 2    bit difficult.  And so, I really like the individual
 3    options.  The pallet shelter that we have out here is I
 4    think fantastic.  The city obviously already has some.
 5                    And when you're looking at even for
 6    single occupation, you're looking at $7,600 per bed all
 7    in, obviously plus infrastructure.  You've got bathroom
 8    costs and kitchen costs.  But given those, that really
 9    low cost per bed, I think is an amazing option.  And you
10    don't have to do any infrastructure building which I
11    think is a really positive and can be set up in 20 to 30
12    minutes.
13                    There are other options like that.  These
14    tiny house villages that we see in Seattle that are
15    fantastic, they're looking at $4,000 to $5,000 per bed.
16    And some of those can have, you know, kitchenettes or
17    bathrooms attached if needed.
18                    So you all obviously -- you know, you
19    have some of these tents that you can get for $500 to
20    $1,000.  And I know that tents aren't the ideal option.
21    But when we're talking about a crisis of the magnitude
22    in Los Angeles and you're looking at 60,000 homeless
23    with 44,000 unsheltered in the county, I think those
24    low-cost options need to be explored given particularly
25    the budget crises that we are seeing today with the
```

Page 12

```
 1    COVID crisis.  So, and I think that those are all
 2    particularly good because they allow individual private
 3    space during this COVID crisis.  So that's what we
 4    really advocate for.
 5                    I would be interested to know the county
 6    and the city's perspective certainly on when they say
 7    what works and what doesn't.  But I do think that the
 8    days that we have seen of $50,000 a bed, $100,000 a bed
 9    is just not feasibly to scale up to 36,000 or 44,000 or
10    whatever we're talking about and then particularly in
11    today's budget crisis.
12                    So we would be interested in those low-
13    cost shelter options.  I think the pallet is a perfect
14    example.
15                    MS. MARTINEZ:  I'd like to go to the
16    county now.
17                    MR. YOUNG:  Sure.  I don't think there's
18    any objection to things like pallet shelter.  Obviously
19    it's dependent on money and land, just like everything
20    else.  And those are just barriers.  They're not --
21                    MS. MARTINEZ:  We'll talk about that
22    later.
23                    MR. YOUNG:  Yeah.  But, you know, we have
24    seen -- first of all, it's not just housing.  It's
25    providing the services that go with that housing and
```

Page 13

1   doing so --

2                    MS. MARTINEZ:  And we'll talk about that

3   later.  But right now, we're just wanting to talk about

4   -- yeah.

5                    MR. YOUNG:  So, so things like rapid

6   rehousing have been successful.  Those are short-term

7   rental subsidies.  And they're controversial in some

8   circles, but short-term rental subsidies where for the

9   price, for example, of converting one hotel room that

10  would be $200,000, you can house, you know, 20 people.

11                   And you get the double benefit of putting

12  somebody -- either maintaining where they live or giving

13  them an apartment so they have an address, privacy to

14  get another job.  So that'd be another modality that I

15  think we would like.

16                   MS. MARTINEZ:  Okay.  So rapid rehousing

17  is -- that's it for the county?  You believe --

18                   MR. YOUNG:  No.  Well, you asked -- you

19  asked what's successful.

20                   MS. MARTINEZ:  What works?  What has been

21  successful?

22                   MR. YOUNG:  What's been very successful.

23                   MS. MARTINEZ:  So just rapid rehousing?

24                   MR. YOUNG:  Well, no.  I mean, interim

25  shelter has been successful --

                                                  Page 14

1              MS. MARTINEZ:  Okay.

2              MR. YOUNG:  -- both with respect to, you

3     know --

4              MS. MARTINEZ:  And what do you mean by

5     interim shelter?

6              MR. YOUNG:  So, so it depends.  Trailer-

7     based shelters have been useful and they can be popped

8     up.  And they can house a fair number of people.  And

9     they may come with kitchenettes.  And they are a little

10    more robust than pallet shelters.  But it just depends

11    on the availability of land.

12             MS. MARTINEZ:  Yeah.  And we'll talk

13    about land later.

14             MR. YOUNG:  But sprung shelters too, you

15    know.

16             MS. MARTINEZ:  So, so sprung shelters.

17             MR. YOUNG:  Yeah.

18             MS. MARTINEZ:  Okay.  So on the county

19    side, I have rapid rehousing, interim shelters,

20    particularly trailer-based, pop-up and then sprung

21    shelters.  City of Los Angeles?

22             MS. MILLER:  Good morning.

23             MS. MARTINEZ:  Good morning.

24             JUDGE CARTER:  Microphone.

25             MS. MILLER:  You know, I would just start

                                              Page 15

```
 1    by saying that you need to invest in multiple parts of
 2    the system in order for any of these things to work
 3    well, right?  So I think that's what the county was
 4    alluding to.
 5                   Rapid rehousing is great for people who
 6    just need short-term rental assistance.  Supportive
 7    housing is great for people who need supportive housing
 8    for the rest of their lives.  Interim housing is
 9    necessary.  I think we've seen in this pandemic you need
10    to have a place where people can be well and healthy and
11    safe off the streets.
12                   As far as interim housing goes, I think
13    most ideally is taking an underused vacant building and
14    being able to rehab it for interim housing use.  I will
15    say those are very, very hard to find in the city.  But
16    when you do find it, that's probably the lowest cost
17    model.  It's just challenging to find vacant buildings
18    that you can rehab for low cost.
19                   But those are -- when they work, they
20    work really well.  And there's an example of that in
21    Council District 1 where we took an existing, you know,
22    residential facility and rehabbed it for very low cost.
23    Obviously the city is standing up somewhere in the
24    neighborhood of 20 sprung structures.
25                   So we obviously feel that those are
```

Veritext Legal Solutions
866 299-5127

```
 1    really good temporary solutions.  And then finally doing

 2    what we can to target homeless prevention resources.

 3    Sometimes you can just give a little bit of cash

 4    assistance and that stops a family from ever falling

 5    into homelessness.

 6                    MS. MARTINEZ:  Correct.  And we're going

 7    to get -- I'm going to get to that.

 8                    MS. MILLER:  Yeah.

 9                    MS. MARTINEZ:  I'm just right now just

10    specifically just want to talk about --

11                    MS. MILLER:  Yeah.

12                    MS. MARTINEZ:  -- the housing

13    accommodation so that I can bring it all together and

14    then we can then say we're all in favor of this, of

15    these particular modalities.

16                    MS. MILLER:  Yeah.

17                    MS. MARTINEZ:  And then we can move

18    forward to the next step which will then be how many

19    units we'll be able to provide, what types of services

20    on and so forth.  I want -- I think we all need to get

21    on board because there's various parties here.

22                    MS. MILLER:  Yeah.

23                    MS. MARTINEZ:  And I think, you know,

24    what the plaintiffs may want or what the interveners

25    think is suitable or what the city or county, we haven't
```

Page 17

```
 1   had this discussion.  We've read it.  But we have not
 2   come to terms of what those temporary interim solutions
 3   can be so that we can move forward.
 4              And so, for the city of LA, if it's only
 5   underutilized vacant buildings have been successful
 6   because they're low cost and you can rehab those and
 7   then sprung structures that you all have and you have
 8   about 20 across the city.  Is that correct?
 9              MS. MILLER:  That's right, and obviously
10   the pallet shelters is a thing.
11              MS. MARTINEZ:  And obviously the pallet
12   shelters.
13              MS. MILLER:  The city has purchased.  We
14   have not set them up yet.  But we feel confident because
15   they are state-certified --
16              MS. MARTINEZ:  Correct.
17              MS. MILLER:  -- that they are a really
18   good option and they provide that sort of small-scale --
19              MS. MARTINEZ:  Fantastic.
20              MS. MILLER:  -- private unit that people
21   sometimes want.  I'd also invite my council colleagues
22   to also share from the city's perspective.
23              MS. MARTINEZ:  Jenny?  Ackley?  And I
24   apologize for interrupting when -- because I'm asking
25   for something specific.  I think we're very accustomed
```

Page 18

1    to wanting to talk about what doesn't work or, you know,

2    wanting to talk about other services and speaking

3    specifically about common housing accommodations that

4    have been successful so that we can scale up.

5              So, you know, I think I've heard and I

6    know the judge has heard all the problems and what has

7    not worked, right?  What we want to know is what is

8    working and how can we scale that up.

9              MS. CHAVEZ:  Yeah.  I mean, we're -- in

10   addition to the things that Christina mentioned, we're

11   very interested in pursuing partnerships with the

12   private sector, with service providers.

13             MS. MARTINEZ:  Specifically housing

14   accommodations.

15             MS. CHAVEZ:  Yes.

16             MS. MARTINEZ:  Okay.

17             MS. CHAVEZ:  So, you know, like, for

18   example, you know, we've been talking to Salvation Army

19   --

20             MS. MARTINEZ:  Okay.  Fantastic.

21             MS. CHAVEZ:  -- about potentially, you

22   know, using their existing sites to build them out --

23             MS. MARTINEZ:  Okay.

24             MS. CHAVEZ:  -- and to form P3 with them.

25             MS. MARTINEZ:  Great.

Veritext Legal Solutions
866 299-5127

```
 1                    MS. CHAVEZ:  And, you know, have folks

 2      reside in their facilities.  But, you know, everything,

 3      everything's on the table.  And I think the urban

 4      campground, the base camps, immediately just putting

 5      tents up, like the VA is --

 6                    MS. MARTINEZ:  So right now --

 7                    JUDGE CARTER:  Hold on.

 8                    MS. MARTINEZ:  Jenny, what we want to

 9      hear right now is actually what has worked in the city

10      of LA.  I will then get to the point -- to the next

11      opportunity what are some potential housing

12      accommodations that we can test and then scale those up

13      later on.

14                    MS. CHAVEZ:  Yeah.

15                    MS. MARTINEZ:  So like as you're talking

16      about the Salvation Army and creating a P3, that in

17      Orange County was very successful, right, utilizing

18      that.

19                    I'm not sure if you guys have utilized

20      this specific model here in Los Angeles and that you

21      have evidence to back that up that it's been successful,

22      right, because at the end of the day I think we all make

23      assumptions that certain things can work or not work in

24      a specific jurisdiction or in a certain district.

25                    And I've tried to tell the judge as well
```

Page 20

```
 1    that what we've done in Orange County may not be, you
 2    know -- may not be able to work here in Los Angeles.
 3    But one thing is certain.
 4              As we've partnered up with the P3, we
 5    believe that is kind of universal, that when you're
 6    interacting with the private sector or the public sector
 7    like the Salvation Army, that model has been very
 8    successful in Orange County.  And so, we do believe --
 9    and the judge had the Salvation Army come and say that
10    they had specific sites and they were ready to partner
11    and they're open to that partnership.
12              But here what I would like to know
13    specifically now, what has worked in Los Angeles?  What
14    evidence do you have behind that?  And then, as we move
15    forward, what are some other temporary innovative,
16    creative things we would like to experiment as it
17    pertains to housing modalities so that we can figure out
18    over a period of time like we should do more of this.
19              JUDGE CARTER:  And you started to say
20    about the VA.  I want to hear your comments about that
21    because Michele and I have been out there.
22              MS. CHAVEZ:  Yes.  Yeah.  I mean, we have
23    limited sort of knowledge about that.  But that's
24    something we'd like to explore.
25              MS. MARTINEZ:  Okay.
```

Page 21

1              MS. CHAVEZ:  But in terms of going back

2     to your original question, I mean, for us, you know, I

3     think permanent supportive housing is a good model.

4     It's not necessarily going to be for everyone.  It's not

5     what everyone needs.  But it's a good model.  So that's

6     something to look at.  You know, it's important to look

7     at the bright side of it and not the down side of it --

8              MS. MARTINEZ:  Yes.

9              MS. CHAVEZ:  -- which is the cost.

10             MS. MARTINEZ:  Correct.  Yes.

11             MS. MITCHELL:  Michele, can I add one

12    thing I forgot?

13             MS. MARTINEZ:  Yeah.

14             MS. MITCHELL:  And I should have started

15    here originally, just the shared housing model.

16             MS. MARTINEZ:  Okay.

17             MS. MITCHELL:  So Share and Haven are two

18    examples of that where you're using existing structures

19    that are for lease or for sale and kind of create the

20    community similar to the sober living concept but not

21    being a sober living facility.

22             And that's been widely successful here in

23    the city and the county and elsewhere.  And that's

24    because you don't need added infrastructure, you can do

25    that relatively cheaply.  And then you also have folks

                                              Page 22

```
 1    that are contributing, you know, from their SSI checks
 2    or whatever to their rent.  And so, the end cost is
 3    very, very low.
 4                    I believe that there was a proposal in
 5    front of the city council in October of I want to say
 6    2017 to house 2,000 people for $8 million.  And so, it's
 7    something that's been very successful, low
 8    infrastructure costs, et cetera.  So that's another
 9    model that we would like to phase on.
10                    MS. MYERS:  Is there -- is there a zoom?
11                    MS. MARTINEZ:  Ackley?  Then I'll go --
12                    MR. PADILLA:  I think the only thing to
13    add is there's been a lot of models that we've tried.
14    There's been a lot of models proposed.  Part of the
15    discussions that have really accelerated at the city
16    side is narrowing this conversation down almost to the
17    immediate --
18                    MS. MARTINEZ:  Exactly.
19                    MR. PADILLA:  -- which is the COVID
20    crisis, the hard shelters and how to do it and
21    recognizing on both of those we have a finite amount of
22    time to do any needed calculation in the sense of the
23    hotel leases have a fixed term.  The park sites at some
24    time will need to reopen to the general public as well.
25    And what we cannot do is just close the doors and let
```

Page 23

1    everybody be back out on the street.

2              So the conversation that has truly

3    accelerated over the last few days is looking at that

4    population and recognizing what are the distinctions and

5    needs within that and how we can develop a specific game

6    plan for those.

7              And in that there's been many

8    conversations about extending the hotel lease, whether

9    that's the appropriate way to go, utilizing some of the

10   Caltrans lots, which we can do trailers or pods, all of

11   those.  You know, we don't have an answer exactly for

12   you today on it.  But I think we've gotten so much

13   closer to having more clarity on developing the

14   transition plan for that population.

15             And I think that exercise is going to be

16   truly helpful on establishing how we're going to tackle

17   the larger issue and what specifically does work.  You

18   know, the sprung structures have had some success.  But

19   -- a shared housing option and so forth.  But some of

20   them are not going to be online as fast as we want.

21             MS. MARTINEZ:  Correct.

22             MR. PADILLA:  And I think we understand

23   that.  But we have an immediate obligation that we have

24   to deal with quickly.

25             MS. MARTINEZ:  Correct.

Veritext Legal Solutions
866 299-5127

```
 1              MR. PADILLA:  And it's easier for us to

 2   knowingly make a long-term plan and decisions taking

 3   that into account, what the timeframe would be for

 4   certain options to come up online or how quickly can we

 5   get those.  Then that's when we balance out I think the

 6   financial conversation that we need to have on the city

 7   end, the service provision and all those elements.

 8              But just to be upfront, I think the

 9   immediate conversation that this Court has truly

10   jumpstarted for us has been some immediate response.

11              MS. MARTINEZ:  And we'll get there.

12   We're just wanting to talk -- identify various types of

13   housing accommodations that have been successful and

14   then -- and the potential for exploring new housing type

15   modalities that we can get up and running very quickly

16   that are cost-effective, that are not going to be the

17   exorbitant cost of a sprung shelter, right?

18              We've heard that one of them costs $2.3

19   million.  You're not going to be able to provide 20 or

20   40 more of those to impact the majority of the folks

21   that are out -- that are homeless and that are

22   unsheltered, right?  So that's -- we understand that

23   that's kind of unrealistic.  And so, we're looking for

24   other opportunities.

25              But there has to be a broad agreement
```

Page 25

```
1    amongst everyone here that these are the types of

2    modalities that we want to focus on.  So next I will go

3    with Shayla and Brooke.

4              MS. MYERS:  So, and we've talked about

5    this from the beginning, is hotels and motel

6    conversions.

7              MS. MARTINEZ:  Yeah.

8              MS. MYERS:  But looking specifically at

9    distressed properties that are coming online, I mean,

10   there is an opportunity that the city and county are

11   going to see that we probably will not see for a long

12   time which is the fire sale when the tourism industry

13   doesn't come back in certain locations.  There will be

14   an opportunity to bring on distressed properties online.

15             MS. MARTINEZ:  So Shayla, before you talk

16   about distressed properties or other opportunities, in

17   particular have you seen the city or currently the

18   county or LAHSA that have produced successful types of

19   modalities --

20             MS. MYERS:  Absolutely.

21             MS. MARTINEZ:  -- that we should scale

22   up?  Let's talk about that first.

23             MS. MYERS:  Sure.

24             MS. MARTINEZ:  And then talk about the

25   other innovative strategies in regards to housing.
```

Page 26

1              MS. MYERS:  And so, we don't see hotel

2     and motel conversions as innovative.  We see it as an

3     opportunity.

4              MS. MARTINEZ:  It's an opportunity.

5     Okay.

6              MS. MYERS:  But because it's a model that

7     has proven itself time and time again.

8              MS. MARTINEZ:  Yeah.  Okay.

9              MS. MYERS:  Skid Row and the majority of

10    affordable housing that exists in Skid Row and Westlake

11    and other communities is effectively hotel and motel

12    conversions because they're residential hotels that are

13    now permanent supportive housing.

14             MS. MARTINEZ:  Okay.

15             MS. MYERS:  Some of that can be cost-

16    effective.  Some of it can be very expensive.  Hollywood

17    has a perfect example of Step Up on Vine that adapted a

18    hotel and turned it into permanent supportive housing.

19    It is a model that works and it's an opportunity.

20             MS. MARTINEZ:  Correct.  Agreed.

21             MS. MYERS:  That's why I lead with that.

22             MS. MARTINEZ:  And so, you're looking at

23    it like twofold.  One, there can be conversions and then

24    also kind of a lease, on a lease basis.

25             MS. MYERS:  Sure.  And that is possible

```
 1    under the city's hotel conversion unit.
 2                    MS. MARTINEZ:  Correct.  Yeah.
 3                    MS. MYERS:  We agree with adaptive reuse.
 4                    MS. MARTINEZ:  Okay.
 5                    MS. MYERS:  Anything that can keep city
 6    and county properties in the hands of the city and
 7    county and turn the available stock of buildings into
 8    housing is a great model.  So we agree with Christina on
 9    that point.
10                    Modular units is not something LA has
11    tried.  But to echo Michele's point, it's been tried in
12    other -- or Liz's point, it's been tried in other
13    places, so great.
14                    One thing I have not heard mentioned but
15    we actually think is a fantastic model is the flexible
16    spending housing pool.  It is funded by city and county
17    money to basically model the Section 8 program for folks
18    who are most at risk of medical costs.  It is a
19    fantastic program that takes otherwise unaffordable
20    units and brings them back into affordable.
21                    So that's what we're looking for is
22    anything that adds beds, adds housing and adds
23    affordable.  Affordable housing, when we're talking
24    about density bonuses and the creation of affordable
25    housing in conjunction with market rate housing is very
```

Veritext Legal Solutions
866 299-5127

```
 1   successful and positive.

 2                   And then, the creation of RV lots.  This

 3   has not been something that historically the government

 4   has been involved in.  But it has been a stock of

 5   housing that's been available to people forever.  We

 6   have a lot of people who are living in RVs.  If you --

 7   we know the concept of RV lots works.  We just don't

 8   provide it as an opportunity for folks.

 9                   MS. MARTINEZ:  And I know Oakland and --

10   Oakland now has RV lots.  So I've done my research.  I

11   want you all to know.  So I've done my research.  I know

12   who has done what.

13                   MS. MYERS:  Yeah.

14                   MS. MARTINEZ:  And specifically in

15   regards to RV lots that they've created, Oakland is one

16   of the first cities to do that.

17                   MS. MYERS:  Yeah.  And --

18                   MS. MARTINEZ:  And they have been

19   measuring.  It's been successful.

20                   MS. MYERS:  And these are private

21   facilities --

22                   MS. MARTINEZ:  Correct.

23                   MS. MYERS:  -- in LA County, right?  But

24   the idea is -- and this is different than safe parking,

25   right?  This is not -- safe parking is 13 or 12 hours.
```

Veritext Legal Solutions
866 299-5127

```
 1    The person leaves.  This is literally a spot that's

 2    available for an RV for the RV to exist as housing.

 3    It's like what they're doing with the fancy government

 4    trailers.  You just do it with the people who have their

 5    own trailers.  So obviously you all know what is not on

 6    our list, which is sprung structures and congregate

 7    shelters.  We --

 8              MS. MARTINEZ:  Yes.  And so, I have a --

 9              MS. MYERS:  I'll leave it at that.

10              MS. MARTINEZ:  Yes.  Yes.  Brooke, is

11    there anything else you would like to add?

12              MS. WEITZMAN:  I don't think anything --

13              MS. MARTINEZ:  Okay.

14              MS. WEITZMAN:  I can't think of anything

15    -- well, I can think of a thousand things.  But I think

16    she pretty much covered them all.

17              MS. MARTINEZ:  Fantastic.  Heidi?

18              MS. MARSTON:  So I agree with what's been

19    said.  I think from the LAHSA side it's important to

20    note that we put out a system analysis that looked at

21    all of our housing interventions just recently.  And I

22    think the key to all of this is having the right

23    proportions, right?

24              MS. MARTINEZ:  Correct.

25              MS. MARSTON:  Semi-permanent housing with
```

                                                Page 30

```
 1    no permanent housing, off balance.

 2              MS. MARTINEZ:  Yes.

 3              MS. MARSTON:  So I think to the extent

 4    that we can ground ourselves in something like that that

 5    looks at what's been successful, which is everything

 6    that's been mentioned, both rapid rehousing, permanent

 7    housing, interim housing, all of that works in

 8    proportionality and scaling it up in the right way is

 9    the key.

10              MS. MARTINEZ:  Exactly.

11              MS. MARSTON:  And we do have a way to get

12    there.  We know what it costs to get there.  So I think

13    we can follow that trajectory.  The only thing I would

14    add I don't think that has been mentioned yet is the

15    need for permanent housing for folks who need a higher

16    level of care and don't have the ability to care for

17    themselves, so their activities of daily living.

18              So these might be your board and care

19    facilities, your assisted living facilities.  Some

20    people who are experiencing homelessness are too sick to

21    live on their own independently.  So that was a really

22    important step in all of this that should be considered.

23    But we also look at that in our system analysis.

24              MS. MITCHELL:  And Michele, Your Honor,

25    we Carol on Zoom now, just --
```

Page 31

```
 1                    MS. MARTINEZ:  Okay.  Fantastic.  Carol,
 2     is there anything you would like to add as it pertains
 3     to housing accommodations that have been successful in
 4     the city and county and/or potential new housing
 5     accommodations that we possibly can scale up at a
 6     reasonable time that would be an emergency interim
 7     solution?  I don't hear her.
 8                    JUDGE CARTER:  We can't hear her.
 9                    MS. MARTINEZ:  But I've --
10                    MS. MITCHELL:  Carol?
11                    MS. MARTINEZ:  I've asked her this
12     question before.  And Carol has always alluded to motels
13     and hotels, adaptive reuse, so pretty much what Shayla
14     has said.  And so --
15                    MS. WEITZMAN:  And other --
16                    MS. MARTINEZ:  Yes.  Correct.
17                    MS. WEITZMAN:  Anything sustainable,
18     long-term and private.
19                    MS. MARTINEZ:  And we'll get there.  I
20     just specifically just want to talk about the housing
21     accommodations again of what's worked and then what can
22     we scale up and then as well, you know, I keep on saying
23     the hypothetical 60 percent, how you're going to get
24     there, right?  And you're not going to do it all by
25     permanent housing.  You're not all going to do it just
```

Page 32

1  by sprung tents.  You're not all going to do it by

2  motels and hotels.  There has to be a certain percentage

3  to get here.

4              But we needed some -- we need some

5  agreement.  And, you know, and there is a little

6  disagreement because one thing that I did not hear from

7  the interveners and Shayla shared with us was the really

8  supporting the sprung shelters.  You all talked about

9  sprung shelters, the county, the city, right?

10             MS. MITCHELL:  So have we.

11             MS. MARTINEZ:  So has -- and so has Liz.

12 But the interveners, no on sprung shelters, right?  They

13 have not talked about that.  And so, I think as we move

14 forward, everything else there has been agreement on.

15             And I would like to ask the question, and

16 maybe you don't have these figures now.  But what we've

17 been told by certain councilmembers, that the cost for a

18 sprung shelter is about $2.3 million to $3 million.  Is

19 that an accurate figure?  Is that something that you all

20 can continue to do post-COVID-19?

21             JUDGE CARTER:  I would add --

22             MS. WEITZMAN:  Carol said she's trying to

23 add her list.

24             MS. MARTINEZ:  I can't hear her.

25             MS. MITCHELL:  She's not -- she's not

Page 33

```
 1    muted and it doesn't say she's saying anything.

 2                    MS. SOBEL:  Because somebody else was

 3    talking.

 4                    MS. MITCHELL:  There you go.

 5                    MS. MARTINEZ:  Okay.  Go ahead, Carol.

 6                    MS. SOBEL:  Okay.  So I have a couple of

 7    things to say.  One is, Michele, I heard you again talk

 8    about 60 percent.  I want to be absolutely clear --

 9                    MS. MARTINEZ:  I said hypothetical,

10    Carol.

11                    MS. SOBEL:  Even as a hypothetical, it

12    isn't worth discussing, okay?  That's just -- that's my

13    point of view.

14                    Number two is -- and I realize that I'm

15    not present.  But I really would like a bit of advanced

16    notice about what we're going to discuss at a particular

17    court hearing so that it isn't that, you know, the

18    Court's talked to people to come in to do a presentation

19    and then we have to respond on what we think works.

20                    I think, you know, we put a lot of stuff

21    in our settlement statements.  But it would be really

22    helpful --

23                    MS. MARTINEZ:  Judge?

24                    MS. SOBEL:  -- to know that we're not

25    talking about the city or the county right now.  We're
```

Page 34

```
 1    talking about other options and that's what we're going

 2    to be talking about this morning.

 3                   JUDGE CARTER:  Carol, I think there'll be

 4    a response from Brooke in just a moment.  I very

 5    carefully set out the agenda for today because before

 6    you came onboard this was part of the agenda for last

 7    week.

 8                   What I had not done, and I've apologized

 9    to the entire group, is I really wanted to hear what

10    their comprehensive plan was first.  I wanted to pay

11    everybody the courtesy of hearing what their ideas were.

12    And I talked to you separately and everybody else

13    separately.

14                   When it became obvious to me that I'd

15    gotten off track, and I've apologized for that because I

16    sent LAHSA home, I sent the city home.  When the county

17    wanted to discuss a settlement that would take one hour,

18    I didn't want to bring people back at 4 o'clock.

19                   So I very carefully set out an agenda

20    today on the -- and we are on that agenda right now.

21    And since nobody else was willing to structure it, we've

22    structured it.  So I think you got notice.  And Brooke,

23    if you disagree with me, you can read my order this

24    weekend.  You can take a photograph of it.  So this is

25    structured.
```

Page 35

```
 1                    MS. MARTINEZ:  Can I get my paper back?
 2    If I could get my --
 3                    JUDGE CARTER:  We'll get it squared away.
 4    Take a photograph of it.
 5                    MS. WEITZMAN:  Yeah.  That's what I was
 6    doing.
 7                    JUDGE CARTER:  All right.
 8                    MS. WEITZMAN:  It will take --
 9                    JUDGE CARTER:  No.  We're done.  Thank
10    you.  No.  Thank you.  When I take that kind of time on
11    a weekend, you got notice.
12                    MS. MARTINEZ:  Carol, were those your
13    points?
14                    MS. SOBEL:  I think my points were laid
15    out in the document we filed last week --
16                    MS. MARTINEZ:  Okay.
17                    MS. SOBEL:  -- of what we think works.
18                    MS. MARTINEZ:  Okay.  Then --
19                    MS. SOBEL:  I heard somebody mention
20    something about sprung structures.  We've never
21    supported sprung structures, not in Orange County, not
22    anywhere else.
23                    MS. MARTINEZ:  And I alluded to that,
24    Carol, that the interveners did not support sprung
25    structures.  But the city and county did speak of the
```

Page 36

```
 1    success of the sprung structures.  Yes, Christina?
 2                 MS. MILLER:  May I ask a clarifying
 3    question to the interveners?
 4                 MS. MARTINEZ:  Yeah.  Of course.  Yeah.
 5                 MS. MILLER:  Is it within the context of
 6    COVID that you are against congregate shelters of any
 7    sort of built environment or is it generally speaking
 8    you're opposed to congregate shelters?
 9                 MS. MYERS:  It is hard to distinguish
10    between the two.  I don't know.  I would assume that we
11    would have taken a similar position related to
12    congregate shelters in advance of COVID-19.  But I think
13    -- I don't know that that's a helpful conversation
14    because I think the reality is COVID-19 will be with us
15    for a very long time.
16                 And so, if we're talking about now or
17    even over two years, congregate shelters just --
18    everyone is saying congregate shelters are not an option
19    right now and for the foreseeable future.  You know, I
20    think for some people they can be an option that's
21    available in the absence of a global pandemic for which
22    homeless people are specifically susceptible and
23    vulnerable, so.
24                 MS. MARTINEZ:  So before we move forward,
25    and Judge Carter --
```

Page 37

```
 1                    JUDGE CARTER:  Oh, no.  I'm going to

 2      listen.

 3                    MS. MARTINEZ:  Yeah.  Correct.  I just

 4      wanted to -- so the first phase that we've gone through

 5      was just the housing accommodations and --

 6                    JUDGE CARTER:  Yeah.

 7                    MS. MARTINEZ:  -- you know, for the most

 8      part, everyone is in agreement with, you know, the

 9      hotels, motels, using distressed properties, adaptive

10      reuse, the potential of new modalities and obviously

11      rapid rehousing is imperative and, you know, permanent

12      supportive housing but also, you know, looking at a

13      flexible spending housing pool, creating RV lots.

14                    The one thing that I didn't hear, and I

15      know we've talked about this through the Court, is safe

16      parking, right?  And is there an opportunity to expand

17      that?  I didn't hear anyone talk about safe parking

18      except to distinguish the difference between RV parking

19      and safe parking and the time periods.

20                    And so, that's something that the Court

21      spoke about not just last week but two weeks ago.  And

22      so, we want to know right now is that something that

23      both the county and city, interveners and plaintiffs

24      want to expand on or not expand on.

25                    MR. PADILLA:  On the city end, I think
```

Page 38

Case 2:20-cv-02291-DOC-KES   Document 112   Filed 05/13/20   Page 39 of 223   Page ID
#:1598

1    it's an option.  I mean, I don't know if we've even

2    excluded any model.  So --

3                   MS. MARTINEZ:  So I didn't hear --

4                   MR. PADILLA:  We haven't spoken to

5    anything.  I don't think it could be excluded.

6                   MS. MARTINEZ:  Okay.  So I just want to

7    make sure that that's still on the table because I did

8    not hear it from anyone.

9                   MR. PADILLA:  Yeah.

10                  MS. MARTINEZ:  So safe parking is still

11   something that you all are going to look at as we move

12   forward to providing --

13                  MR. PADILLA:  Yeah.

14                  MS. MARTINEZ:  And so --

15                  MR. PADILLA:  And generally the model has

16   been any and all.

17                  MS. MARTINEZ:  And I left --

18                  MR. PADILLA:  And that would --

19                  MS. MARTINEZ:  I left that for the end

20   because I know that there's some issues as it pertains

21   to safe parking.

22                  The city hasn't been able to accommodate

23   or utilize that system effectively or efficiently

24   because LAHSA in many respects -- and I would like to

25   get the perspective from LAHSA on your regulations and

                                                     Page 39

Veritext Legal Solutions
866 299-5127

1    your standards of how safe parking and protocols and how

2    that's assessed and why there's only been 441 spaces.

3                    And when you look at the breakdown

4    according to district and who has safe parking and who

5    doesn't have safe parking, there seems to be some

6    limitations.

7                    And, you know, moving forward, there's

8    been discussions on council side talking about possibly,

9    you know, why couldn't the city take the lead on getting

10   the facility -- getting the property and utilizing the

11   facilities, getting folks to bring in different types of

12   facilities, whether it's wash, sanitation, on and so

13   forth to move that process much quicker.

14                   We did have a conversation that it takes

15   about two to three weeks to move that process forward.

16   And so, if safe parking is going to be on the table and

17   something that the city of Los Angeles or the county

18   wants to expand on, how will we be able to move that

19   needle forward in a way that is productive not just for

20   LAHSA but for the county and city.

21                   And again, we don't have to go into full

22   details of that.  But those are some concerns.  And so,

23   when we talk about barriers and challenges, I will --

24   I'm just forewarning that that's an issue.  But I didn't

25   hear safe parking.  And so, I just wanted to bring that

                                              Page 40

1    up in regards to the housing accommodations.

2                      And so, it's loud and clear that you all

3    are open to innovation and creativity.  And that's

4    exciting to hear.  And I'm glad that some of the things

5    that have worked, I would like for us to -- and we'll

6    ask -- the Court will ask you all later on the certain

7    housing accommodations that you all have said that have

8    been successful.

9                      I have seen Measure H's evaluations for

10   the three years.  And I shared that with the judge as

11   well and I reviewed that these past couple of days.  I

12   would love to see from the city's perspective as well

13   based on the evaluations on I think it's HHH, you know,

14   the housing accommodations and the monies that you all

15   have spent.  I'll have to look at those reports.

16                      But I would like to understand, you know,

17   what the evidence is behind the success of those

18   modalities.  You know, you all are telling me right now

19   that rapid rehousing, permanent housing has been

20   successful, right, and that that's great.

21                      But what's the evidence behind that and

22   how many people have you all housed?  And so, having

23   some of those numbers would be very helpful to us as we

24   move forward to making sure that that is success.

25                      On the hotels and motels issue, because I

Page 41

1   know that this has been brought up several times by the

2   interveners, and we talked about Project Room Key.  We

3   talked about rec centers and what the next process is as

4   it pertains to that and are you all going to be able to

5   keep folks placed in those particular settings now.

6   That is to be determined.  I know a plan has been

7   presented.  And we'll continue to reevaluate that.

8           And so, understanding the housing

9   accommodations of various modalities, I now want to move

10   us into the barriers and achievement to get us to move

11   in the direction that I believe I'm not going to go

12   because I think what we've seen in some of the documents

13   that you all have shared in regards to service levels,

14   to funding per option, the distribution option types by

15   council districts and/or a hybrid.

16           And I want to talk a little bit about

17   that because there has been some disagreement as it

18   pertains is it going to be by council district or is it

19   going to be a hybrid or whatever have you.  And I think

20   the Court was loud and clear last week.

21           And Judge, I'm not sure if you would like

22   to chime in on that because the next steps that I'm

23   going to take in regards to identifying public property.

24   And I want to thank you all for providing us the various

25   properties, public properties that you all have shared.

Page 42

```
 1   And I'm certain that there are more.  But we want to
 2   thank you for those that have been presented to us.  As
 3   we move towards equity and distribution of what that's
 4   going to look like, I know you talked about council
 5   districts, by regions and by hybrid.
 6                   Do you just want to articulate your
 7   position as we move forward in our discussions as we
 8   talk about, you know, this hypothetical process of going
 9   by council district or by a region or a hybrid?
10                   JUDGE CARTER:  Only briefly.
11                   MS. MARTINEZ:  Yes.
12                   JUDGE CARTER:  The reason I asked the
13   questions of you last week was so that I have some kind
14   of baseline because when I came here and started talking
15   to separate councilmembers, it was obvious to me that
16   each councilmember knew their district or council ward
17   extraordinarily well.  And why would the Court ever take
18   on a project of this magnitude without having that
19   councilperson who knows his or her district so
20   intimately involved in that process?
21                   In talking to all your councilmembers, it
22   became apparent that there was tremendous goodwill in
23   moving forward.  But there was tremendous disagreement
24   about how to move forward, different concepts.  So in
25   many of the discussions, it started to look like your
```

Veritext Legal Solutions
866 299-5127

```
 1    council districts looked like the city of Boise in that

 2    you could almost think of them like a municipality.  And

 3    in looking at the Ninth Circuit, I tried to get as close

 4    to Boise as we could so as the conversations started to

 5    evolve.

 6                And they evolved in this way.  We

 7    actually talked with some councilmembers about ZIP

 8    codes.  And it didn't seem to work because then you had

 9    overlying ZIP codes.  You had ZIP codes within council

10    districts.  So it was on the table and that's why I

11    asked you last week about the ZIP codes.

12                Then we talked about supervisorial

13    districts.  And there we came into a problem with

14    different cities.  It was so big that we didn't seem to

15    be -- we took the whale and made it a couple of

16    elephants quite frankly.  It became too large to move.

17    So we didn't have movement it seemed at the

18    supervisorial level, not because they weren't willing to

19    move but they then had to go to three or four different

20    councilmembers.

21                Then we talked about SPAs.  And SPAs

22    hasn't worked well, at least where I came from.  It may

23    work well for you.  They were arbitrarily drawn.  So

24    that's why I tossed out SPAs.  And remember Michele and

25    I now this week are into not criticizing, but what's
```

```
 1    going to work.  We only want to -- if you have a problem
 2    from now on, you have to give a solution.  So every
 3    problem you raise from now on, I'm going to ask you,
 4    well, what's your input.  What's a better solution?  So
 5    we're going to turn now.
 6                   Then I heard about census.  Oh, in two
 7    years or a year-and-a-half, the census is going to
 8    change.  Well, if not now, then when?  I mean, you're
 9    going to write the legacy of this history right now for
10    this county.  And I don't mean right now but, you know,
11    in the next period of time.
12                   And it's either going to be an incredible
13    legacy, a role model for the rest of the country or
14    you're going to be back to inertia.  And we might as
15    well just put that on the table when we gather the mayor
16    in my presence, you know, the chair of the council, the
17    board of supervisors.  And I'll basically be asking if
18    you can't do it, just tell me.
19                   But I don't want to do that.  I think we
20    can.  That's why I led it on council districts.  But it
21    was only after talking to so many of you.  It wasn't
22    originally my idea.
23                   The second thing I heard loud and clear
24    was this.  You know, Judge, we need some kind of
25    uniformity.  And it went from policies and procedures
```

Page 45

```
 1    that might be citywide to different ways of moving in
 2    different districts.  For instance, I'll use Mike Bonin,
 3    entirely different than John Lee.  Both goodhearted, but
 4    they can't move at the same time and in the same way.
 5    And they don't have the same problems as Marqueece does,
 6    for instance.  And that's why we were willing to expend
 7    our time and effort with each council.
 8                    And by the way, if we made a mistake, we
 9    come back and we do it right.  So I have to be -- I have
10    to be not afraid to try something from my position as a
11    judge and say, you know something, it didn't work.  It
12    didn't work.  Let's try this or whatever your suggestion
13    is.  And unless I'm willing to try it to make those
14    mistakes, we can't move forward.
15                    But I didn't want to cause immense harm.
16    So I thought, well, maybe after talking to all of you,
17    you know, council district by council district and we
18    came up with a concept, Michele, working with two or
19    three council districts to begin with that might have
20    opposite problems.
21                    Certainly we're going to focus on Skid
22    Row no matter what.  But for instance we could take
23    Bonin's district who might have a different philosophy
24    than maybe Monica out in her district.  I leave that to
25    Nury and the council to set up a pilot project so we can
```

Page 46

```
 1    see what's working because we're all so divergent.
 2              So I'll finish this.  If you once again
 3    have a better suggestion for the Court, I'm truly
 4    listening to you.  So if it's ZIP codes, tell me how
 5    that's going to work.  If it's SPAs, supervisorial
 6    districts.  Okay.  I'm going to take that then that
 7    we've got the best plan for some kind of overarching
 8    agreement if we can reach it.
 9              MS. MARTINEZ:  Right.
10              JUDGE CARTER:  But working with our
11    individual council, because they're going to get off at
12    different -- Brooke, you're shaking your head, so
13    please.
14              MS. WEITZMAN:  Yeah.  No.  I think we've
15    consistently said we don't think that council district
16    by district is a functional approach that --
17              JUDGE CARTER:  Okay.  Now, now what's
18    your suggestion though?  Now I want the positive.  What
19    works, Brooke?
20              MS. WEITZMAN:  So I think we need to get
21    increased stock now, so figure out where are the places
22    that we can get --
23              JUDGE CARTER:  No, no.  No, no.  No.
24    What scheme works to move this forward?  I'm not going
25    to let you do that.
```

Page 47

```
 1                    MS. WEITZMAN:  Right.
 2                    JUDGE CARTER:  I want to hear what
 3    structure the Court would have that would move this
 4    forward in a city and county of, you know, 11 million
 5    people.
 6                    MS. WEITZMAN:  So the structure that
 7    seems to make the most sense is focusing on increasing
 8    what is available and doing -- making the priority
 9    increased stock, whether -- get whatever the city and
10    the county are able to do, if that's motels and hotels,
11    safe parking, but working as fast as possible to do as
12    much as possible because we all know that the problem
13    right now is based on having nowhere for them to go.
14                    JUDGE CARTER:  We all agree about
15    increasing stock.
16                    MS. WEITZMAN:  And so --
17                    JUDGE CARTER:  There's no disagreement at
18    this table that we need to increase housing stock,
19    Brooke.  It's how to do that because so far there's been
20    inertia.  There's been inertia now for 30 years up here.
21    All I'm going to do is I'm going to ask you to help me
22    break that inertia or I will break that inertia.  I
23    promise you.
24                    So I'm going to hear one more time how do
25    we break this inertia that has not been working?
```

Page 48

```
 1    Because we all agree that we want to increase stock.

 2    The only scheme I could come up with, right or wrong,

 3    was working on an overlying agreement so we've got

 4    policies and procedures uniformly, but then working with

 5    the council district because I knew different

 6    councilmembers would move at different speeds.  And I've

 7    got to pay respect to the council because you know your

 8    district.

 9               Now if this was one entity, like even San

10    Francisco with the case filed with Tigar, that's -- or

11    Judge Tigar, that's an easy case to resolve in some ways

12    because you're dealing with San Francisco, 750,000

13    people.

14               MS. MARTINEZ:  Yeah.

15               JUDGE CARTER:  He's not going to have a

16    problem with that.  In fact, because it's a case like

17    Alliance, you as advocates may not even be involved in

18    that lawsuit up in San Francisco.

19               MS. WEITZMAN:  They called.

20               JUDGE CARTER:  Yeah.  They may have

21    called.  But they haven't been -- allowed to be

22    intervened yet by the Court.

23               MS. WEITZMAN:  I don't think anyone's.

24               JUDGE CARTER:  You watch closely.  I get

25    to be the judge.  And I'm warning you and telling you
```

Page 49

```
 1    very carefully I let you intervene in this so the

 2    homeless had representation also.

 3                    MS. WEITZMAN:  So I think --

 4                    JUDGE CARTER:  I don't know what Judge

 5    Tigar is going to do.  So I'm going to go back to my

 6    point.  You still haven't answered my question.

 7                    MS. WEITZMAN:  A place --

 8                    JUDGE CARTER:  How to structure it and

 9    how to proceed.

10                    MS. WEITZMAN:  A place to start and to

11    structure it is in this unique moment where there is

12    access to funds like we have not had before for this

13    issue, what are we doing to not miss that opportunity.

14    How are we spending those funds?

15                    How are we making sure that these hotels

16    and motels stay long-term?  How are we making sure that

17    these rec centers have safe exit plans, that there is a

18    place for people who are in those to go?

19                    JUDGE CARTER:  We all agree.  You haven't

20    answered my question.

21                    MS. MARTINEZ:  Brooke, we're speaking --

22                    MS. WEITZMAN:  But that's not something

23    we're --

24                    JUDGE CARTER:  That's the last time I'm

25    going to ask.  Brooke, the last time I'm going to ask.
```

Veritext Legal Solutions
866 299-5127

```
 1    I agree.  That isn't even on the table for discussion.

 2    How structurally does the Court move forward with a city

 3    of 11 million people, not a city like Boise with

 4    250,000?  Do I wait for the census?  Do I wait for the

 5    census?

 6                  MS. WEITZMAN:  No.

 7                  JUDGE CARTER:  Do I go by ZIP code?

 8                  MS. WEITZMAN:  I guess I don't understand

 9    --

10                  JUDGE CARTER:  Do I go by ZIP code?

11                  MS. WEITZMAN:  I don't understand.  No.

12    I don't understand --

13                  JUDGE CARTER:  Do I go by ZIP code?

14                  MS. WEITZMAN:  -- what the benefit is to

15    this geographic breakdown.

16                  JUDGE CARTER:  Brooke, do I go by ZIP

17    code?

18                  MS. WEITZMAN:  No.  I don't think that

19    would get anywhere.

20                  JUDGE CARTER:  Do I go by SPA?

21                  MS. WEITZMAN:  No.

22                  JUDGE CARTER:  Do I go by supervisorial

23    district?

24                  MS. WEITZMAN:  No.

25                  JUDGE CARTER:  What do I do except sit
```

Page 51

1   with inertia?

2              MS. WEITZMAN:  Go by the entire area.  I

3   just don't understand why we're breaking it down or

4   prioritizing one area over another when we know that

5   this is a broad problem.

6              JUDGE CARTER:  Okay.  All right.  Back to

7   you, Michele.  I've said enough.

8              MS. MARTINEZ:  Thank you, Judge.  But

9   this point is very important for us to move forward in

10  everything else.

11             JUDGE CARTER:  Well --

12             MS. MARTINEZ:  I think not just for the

13  city but for the county as well.  And so, you know, this

14  is the only second go around I'm going to go after

15  because then you all will be able to gather your own

16  information and put your structure together.

17             But it's just to articulate to you all

18  that there are some disagreements.  And how we're going

19  to be able to, you know, come to an agreement where we

20  actually can do some good.  All right.  If we're going

21  to continue with the inertia and just talk about the

22  problems --

23             MS. WEITZMAN:  That's --

24             MS. MARTINEZ:  -- we're not going to move

25  very far.  And so, on this point, Liz, I would just ask

                                        Page 52

```
 1    you are you supportive of council districts or some
 2    other structure that there could be uniformity of how we
 3    actually move this settlement agreement forward?
 4                 MS. MITCHELL:  So I would say as long as
 5    the agreement -- the overarching agreement with the city
 6    has consistent policies and then procedures set out,
 7    then implementation on a district-by-district basis,
 8    meaning the timing of the implementation --
 9                 JUDGE CARTER:  Yeah.
10                 MS. MITCHELL:  -- is rolled out on a
11    district-by-district basis, depending on each district's
12    unique circumstances, then I'm definitely in support of
13    and I think it's a really good idea.
14                 JUDGE CARTER:  Okay.
15                 MS. MARTINEZ:  City of Los Angeles?
16                 MS. CHAVEZ:  I mean, I for one -- and
17    I'll speak for my boss as well -- support this idea.  I
18    mean, given that we represent 4 million people and we
19    have 60 percent of the homeless population within the
20    city of Los Angeles, and each district has different
21    types of populations.  Our district, for example, has
22    the highest number of homeless in RVs.
23                 JUDGE CARTER:  Right.
24                 MS. CHAVEZ:  More than twice than in the
25    second highest district.  So, you know, and then the
```

Page 53

```
 1    Valley's different, the West Side's different.
 2                    JUDGE CARTER:  Yeah.
 3                    MS. CHAVEZ:  And so, the councilmembers
 4    are the ones that are best positioned to determined what
 5    that mix of solutions should look like to best address
 6    the needs of the population that needs it.  I mean, it's
 7    very different.
 8                    So, number one, it's just sort of having
 9    that on-the-ground, boots-on-the-ground.  Literally we
10    know our districts the best.  We work very well with,
11    you know, the other agencies, with LAHSA, the local
12    LAHSA teams.
13                    We have those relationships.  We work
14    with developers on, you know, finding locations for
15    housing.  We do all of that.  We are -- as the judge
16    mentioned, councilmembers are essentially, you know,
17    mayors for their council districts.
18                    JUDGE CARTER:  Right.
19                    MS. CHAVEZ:  And I think it also
20    increases accountability.  By creating true standards,
21    you know, you have a standard.  If you've met this
22    housing, you get to avail yourself of certain policies
23    and rules and procedures.  And it creates an incentive
24    that will then help us increase support from the public
25    to implement even more solutions and especially the
```

Page 54

```
 1    creative solutions that we haven't maybe done yet --
 2                    JUDGE CARTER:  Yeah.
 3                    MS. CHAVEZ:  -- because there was a lot
 4    of inertia or public resistance.  It will now break the
 5    logjam and allow us to move forward with those things if
 6    we get that buy-in.
 7                    So, I mean, I think it works well.  It
 8    provides both the knowledge, the intimate understanding
 9    at the local level but also allows us to access those
10    resources and increases accountability because
11    ultimately the councilmembers are the ones that get the
12    calls and the complaints.
13                    JUDGE CARTER:  Right.
14                    MS. CHAVEZ:  You know, so --
15                    MS. MARTINEZ:  I just want to articulate
16    there is no right or wrong answer here.
17                    JUDGE CARTER:  Yeah.
18                    MS. MARTINEZ:  Just wanting to get
19    perspective so that the Court can understand as we move
20    down the line.  Look, if you all are not going to be
21    able to make a decision, we're going to make the
22    decision for you, right?  I mean, we obviously don't
23    want to do that.
24                    JUDGE CARTER:  Promise it.
25                    MS. MARTINEZ:  And I obviously don't
```

Page 55

```
 1    speak for Judge Carter.

 2                    JUDGE CARTER:  Yes.  You do.

 3                    MS. MARTINEZ:  But I want to be blunt and

 4    very candid for you all that if there can't be any kind

 5    of agreement between all the parties here, we will be

 6    forced to make decisions for you all to move forward

 7    because the public wants answers.

 8                    JUDGE CARTER:  And the homeless need a

 9    better --

10                    MS. MARTINEZ:  And the homeless deserve

11    to have dignified, safe housing, right?  So I just want

12    us to be very clear because I know -- I see when people

13    are talking, some folks are just looking.

14                    This is to have an open conversation, one

15    that is based on basic things that I think we've all

16    discussed separately, whether it's been Shayla, yourself

17    with Carol or with your constituency or the city or

18    county.

19                    But I think as we move forward, we want

20    to have an understanding because if we cannot move

21    forward because there's no agreement between all of you,

22    decisions have to be made.  And so, I just want to make

23    that clear.  So before I move forward with you, Shayla,

24    --

25                    MS. MYERS:  Thank you.
```

Page 56

```
 1                    MS. MARTINEZ:  I want to finish the city
 2     of Los Angeles and then we'll move forward.
 3                    MS. MYERS:  Great.  Thank you.
 4                    MR. PADILLA:  I'll speak on two ends.
 5     With regards to the council as a whole, you know, a lot
 6     of the instruction and introduction that had been given
 7     to our senior attorney a couple of weeks ago was to have
 8     the conversation about a council -- among all the
 9     options, right?  I mean, this whole thing if fluid and
10     being shaped day to day.
11                    MS. MARTINEZ:  Yeah.
12                    MR. PADILLA:  But council by council was
13     part of the conversation that we did have.  With regards
14     to the council president specifically for the district
15     and the logic with regards to council district by
16     council district, it's something that everybody's
17     acknowledged.
18                    But it also emphasized a collective
19     responsibility and a collective societal obligation that
20     the entire city has.  And if we don't -- council by
21     council allows for every community to help address this
22     issue.
23                    JUDGE CARTER:  Yeah.  Right.
24                    MR. PADILLA:  And historically we
25     haven't, right?  And I think that's when you look at how
```

                                                    Page 57

```
 1    did Skid Row come to be and how did it grow so big.  It
 2    was essentially there was no standard policy.  I believe
 3    folks turned a blind eye.  The problem was over there.
 4    Great for us.  We don't have to deal with it.  And it
 5    wasn't right.  It just was not fair.
 6                    Everybody has an obligation societally to
 7    help those that need the help.  And everybody's got to
 8    do it where it's happening.  And we can't live in denial
 9    that homelessness isn't affecting every single part of
10    our community.  And if that's the case, we also have to
11    acknowledge we have a responsibility to do something
12    about it.
13                    MR. MARCUS:  Well, and --
14                    MR. PADILLA:  And a council by council
15    approach then allows people to do it and do it in a
16    fashion -- Judge, as you mentioned, everybody knows
17    their district best.  They know what may work best and
18    they'll get it.
19                    And it's also an easier way to -- I'll
20    use accountability for lack of a better word right now -
21    - to know kind of who is really contributing and who
22    needs additional help to get to where we all need to get
23    to.  That's why for us the council-by-council approach
24    makes the most sense.
25                    JUDGE CARTER:  Okay.
```

                                                        Page 58

```
 1                    MS. MARTINEZ:  Thank you.

 2                    MR. PADILLA:  The concerns that have --

 3       there have been a few that have raised concerns.  But to

 4       your point, Judge, even with the concerns being raised,

 5       I haven't heard a better alternative.

 6                    MR. MARCUS:  And I just want to add I

 7       don't think we're saying --

 8                    JUDGE CARTER:  You know, I'm going to

 9       come closer to the --

10                    MS. MARTINEZ:  He can't hear you.

11                    MR. MARCUS:  I'll talk louder.

12                    JUDGE CARTER:  Good.

13                    MR. MARCUS:  I don't think we're in

14       disagreement.  I think that the priority for all of us

15       is how quickly can we stand up as many beds as possible.

16       The district-by-district model allows that flexibility.

17       There are some districts that are simply ahead of

18       others.

19                    MS. MARTINEZ:  Yes.

20                    MR. MARCUS:  There are some districts

21       that already have plans in the works that we can

22       capitalize on.  There are other districts that don't

23       have the same resources available to them, whether it is

24       particular types of land, particular types of buildings.

25       So I think, you know, Liz said it best.  We're not
```

Page 59

```
 1    looking to prioritize one area of the city --
 2              MS. MITCHELL:  Over another.
 3              MR. MARCUS:  -- over another.  We are
 4    looking to implement as quickly as possible.  And that
 5    might mean that Mike Bonin can implement this more
 6    quickly and Marqueece Dawson can get this more quickly.
 7    John Lee needs a little bit more time.
 8              But we're all -- we're all going to get
 9    there.  But the district-by-district flexibility and
10    accountability gets that implementation, gets that stock
11    up as fast as we can.  I think that just makes the most
12    sense.
13              MS. MARTINEZ:  Okay.  Christina?
14              MS. MILLER:  Yeah.  I can add.  I think
15    the district-by-district approach allows more clarity in
16    what the takedown targets are for housing and interim
17    housing.
18              And it's not unprecedented.  The state
19    has regional housing targets for different parts of the
20    state.  The city had council district targets for
21    standing up supportive housing when HHH was passed.
22              MS. MARTINEZ:  Yeah.
23              MS. MILLER:  So this is -- this is
24    something that we've done before and it has worked.  And
25    it provides clarity.  I think logistically speaking, the
```

Page 60

```
 1    one thing that I would say is homeless service

 2    providers, nonprofits who doing the work on the ground

 3    don't often know council district or supervisorial

 4    district boundaries.

 5              And so, I think just logistically

 6    speaking, there will be some work we need to do to

 7    support them in supporting this, the targets that are

 8    agreed upon to make sure that there is clarity on the

 9    ground for their work.

10              JUDGE CARTER:  We were going on a

11    tangent.

12              MS. MARTINEZ:  Yeah.  We finished the

13    city of Los Angeles.  So I had to finish the city of Los

14    Angeles.  Now I'll go with Shayla.

15              MS. MYERS:  So, I mean, we are opposed to

16    the council district-by-council district model in part

17    because I think we are concerned about inertia.  And I

18    would just like to say that this concept that council

19    districts, that they are 15 mayors is just simply not

20    accurate.

21              They are 15 legislators that are

22    responsible for legislating for the city of Los Angeles

23    and representing the needs of individuals.  But they're

24    not individual mayors.  We have council districts that

25    are simply a representative form of government.  And the
```

Page 61

1    challenges that idea of council districts operating as

2    mayors.

3              I think we have to be honest, that that

4    is part of why we have gotten to where we are today,

5    right?  Because there has been this idea that council

6    members could set housing policies for their individuals

7    districts.

8              You know, the city of Los Angeles for

9    decades had a policy of letter signoffs on affordable

10   housing and left it up to the individual council

11   districts to approve or disapprove housing projects.

12   And because of that, because of that individual

13   accountability to the constituents, housing, affordable

14   housing was blocked for decades in different

15   neighborhoods.

16             So one of the ways that actually broke

17   through that was getting rid of the level of authority

18   that rested with council districts.  Councilmembers are

19   inherently political and responsible.  Part of the value

20   that was articulated by LA Alliance and part of what

21   people have looked to the federal court for is to break

22   through the politics.

23             I am very concerned and our clients are

24   very concerned that we are simply re-inscribing the

25   political impediments if we say to do this by council,

Veritext Legal Solutions
866 299-5127

1    by district.

2                    MS. MARTINEZ:  Let's talk about that

3    later in regards to the barriers.

4                    MS. MILLER:  So --

5                    MS. MARTINEZ:  But right now, what we

6    want to know, what's your solution.  So if it's not

7    implementation --

8                    MS. MILLER:  Housing stock.

9                    MS. MARTINEZ:  -- by council district --

10                   MS. MILLER:  Sure.

11                   MS. MARTINEZ:  -- what is the solution.

12                   MS. MILLER:  Look at it housing stock by

13   housing stock.

14                   MS. MARTINEZ:  Housing stock.

15                   MS. MILLER:  Let's take the types of

16   housing.  We're going to come up with a list at this

17   table about what we're going to do.  And let's look at

18   the availability of those different types of housing

19   models citywide.

20                   So tackle it type by type and prioritize

21   based on the needs and the desires of councilmembers who

22   are all going to weigh in.  If we say that the highest,

23   best use right now of the type of housing to develop is

24   safe parking -- obviously we think it's motels.  That's

25   clear.  If it's hotels and motels, prioritize that and

Page 63

```
 1    do that first and do it citywide.  And then move on to

 2    the next because then councilmembers -- councilmembers

 3    can all simultaneously work in their districts to do the

 4    ground level work that they do at the same time, right?

 5                    All of the councilmembers can be charged

 6    with finding adaptive reuse in their communities if

 7    that's what this group is focusing on.  It allows for an

 8    agglomeration and a scaling up of that type of housing.

 9                    And it gets all of the council districts

10    to pay attention to that particular type of housing and

11    at the same time because I don't think we want to get

12    into a situation where Councilmember Lee gets to work on

13    it now but Councilmember Price doesn't have to do it

14    until you turn your attention to that council district.

15                    Put all 15 of them who know their

16    districts best tasked with finding the hotels first and

17    then the places for safe parking and then the other

18    things.  And then, that -- and if they are all tasked

19    with that evenly and simultaneously, it will get away

20    from some of the political blocks that we're going to

21    wind up with.

22                    And it'll also give a sense of equality

23    that I know is -- that Council President Martinez is

24    very concerned about and we are equally concerned about.

25    We are concerned that the different districts will take
```

Page 64

```
 1    different approaches related to these issues and will

 2    re-inscribe the racism and classism that have led to

 3    homelessness, right?  If we let different districts talk

 4    about these things differently, then different districts

 5    that have different racial makeups, that have different

 6    types of housing stock will be able to continue to have

 7    those different conversations.

 8                    This is a citywide problem.  And we have

 9    got to tackle this as a citywide problem.  If we don't

10    do that, if you say it's Councilmember Buscaino's

11    problem, if you say it's Councilmember Lee's problem,

12    then it's just a political problem again.  It's not a

13    federal court problem.

14                    And it's not thinking about the homeless

15    residents of this city who don't know that they live in

16    council district eight or council district nine or 15.

17    They don't care.  They just need housing.

18                    MS. MARTINEZ:  Thank you, Shayla.

19                    MS. MYERS:  There you go.

20                    MS. MARTINEZ:  Brooke?

21                    MS. WEITZMAN:  I think she covered it.

22                    MS. MARTINEZ:  Okay.  Carol?

23                    MS. WEITZMAN:  Echo all of that.

24                    MS. MARTINEZ:  Okay.

25                    JUDGE CARTER:  Okay.
```

Page 65

```
 1                    MS. MITCHELL:  Carol, you there?
 2                    MS. MARTINEZ:  Okay.  Well, we'll move
 3      forward.
 4                    MS. WEITZMAN:  Let me -- I'll send it.
 5                    MS. MITCHELL:  She's muted.  Let me
 6      unmute her real quick.
 7                    MS. WEITZMAN:  The only message she said
 8      was --
 9                    MS. SOBEL:  I'm here.
10                    MS. WEITZMAN:  Oh, there she is.  Yeah.
11                    MS. MITCHELL:  Carol, do you have
12      anything to add?
13                    MS. SOBEL:  No.  I agree with Shayla
14      completely.  I also would add, you know, the equity
15      issue.
16                    MS. MARTINEZ:  Yeah.
17                    MS. SOBEL:  I think everything we see is
18      that in this city, homelessness is a racial issue.  And
19      a district-by-district solution is going to widen that
20      and just reinforce that.
21                    MS. CHAVEZ:  Can I ask a question?
22                    MS. MARTINEZ:  Okay.  Great.  Yes,
23      please.
24                    MS. CHAVEZ:  Shayla, to your point, just
25      a question.  So who would you put in charge of ensuring
```

Page 66

```
 1    that this would happen, the implementation would happen?
 2                    MS. MYERS:  I think that's why we're in
 3    Judge Carter's courtroom.
 4                    MS. CHAVEZ:  If you're not putting the
 5    councilmembers in charge, who would be in charge?
 6                    MS. MYERS:  I think that's why we're in
 7    Judge Carter's courtroom.  I mean, the ability in the
 8    moment --
 9                    MS. CHAVEZ:  Do you think we're --
10                    MS. MYERS:  I mean, that's what we're
11    here for.  The ability in the moment that we have is a
12    federal court is paying attention to this issue and
13    forcing people to come together and think differently
14    about this, so great.
15                    Like I mean that's where we are on it.
16    And if you say that there is political will in each of
17    the districts, great.  Let's capitalize on the political
18    will in each of the districts now, right?  And you can
19    be in charge for Councilmember Buscaino's office and you
20    can be in charge for Council President Martinez's office
21    and Councilmember Harris-Dawson's rep can be in charge.
22                    And you can have a -- you're going to be
23    the ones who are going to be in charge anyway.  It's
24    just, you know, for implementation in your districts,
25    it's just not letting districts off the hook as we go.
```

Page 67

1          MS. MARTINEZ:  County?

2          MR. YOUNG:  So I -- we have concerns

3    about being so heavily prescriptive such to the point

4    where it gets down to a council by council district,

5    recognizing that it is a useful organizing principle.

6          JUDGE CARTER:  Could you start again?  I

7    apologize.

8          MR. YOUNG:  Sure.  No, that's fine.

9          JUDGE CARTER:  There were people speaking

10   there.

11         MR. YOUNG:  Yeah.  I'll go -- I'll pivot.

12   We have concerns about an approach that is overly

13   prescriptive and recognizing that a council by council

14   district, you know, may be the best in lieu of an

15   alternative.  I would have -- I would have concerns very

16   similar to what Shayla just articulated with respect to

17   going down to that level of detail.

18              I also have significant concerns on what

19   that means for LAHSA and what it means for having a

20   comprehensive regional solution to homelessness and

21   really building economies of scale.  You know, from the

22   county's perspective, while the city is the big elephant

23   in the room, it is one of many cities.

24         MS. MARTINEZ:  Yeah.

25         MR. YOUNG:  And we need to have equity

Page 68

```
 1    across all cities, particularly those that have also

 2    been disproportionately impacted by homelessness.  And

 3    then finally, so LAHSA, equitability, overly

 4    prescriptive.

 5                    You know, these are the reasons why we

 6    have LAHSA.  These are the reasons why we have SPAs.

 7    They do depoliticize a lot of the determinations that

 8    get made.  They are made kind of with the reverence or

 9    the acknowledgement that subject matter experts, not

10    lawyers are actually making these decisions.  And I

11    think that's the best approach.

12                    I think it's also better than having

13    politicians.  I mean, we need politicians to make the

14    call obviously.  But we need to listen --

15                    MS. MARTINEZ:  Well, they're the

16    policymakers.

17                    MR. YOUNG:  Right.  But we need to listen

18    to the people.

19                    MS. MARTINEZ:  Yeah.

20                    MR. YOUNG:  We need to listen to our

21    experts and what they say.

22                    MS. MARTINEZ:  Correct.

23                    MR. YOUNG:  And so, one initiative that I

24    wish it was more developed because it would be my

25    solution is a people-centric approach.
```

1          MS. MARTINEZ:  Agreed.

2          MR. YOUNG:  One that, you know, the

3    county has actively been looking at with respect to the

4    -- at least starting with the population of over 65.  It

5    already has synergistic sort of effects because a lot of

6    those people are those that are already in Project Room

7    Key facilities.

8          They are those that are qualified for

9    benefits.  They are kind of in the most vulnerable

10   categories of our society.  And we owe it to them to

11   help them first.  And they are across all lines, all

12   council districts.  So that's how we view the issue.

13         MS. MARTINEZ:  Okay.  So I know you said

14   the solution would be a people-centered approach.

15   Beyond that, as the county continues to wanting to move

16   in that direction, you guys are obviously not there.  So

17   in the interim, a suggestion was made by the judge to

18   move towards council districts.

19         So if it's not council districts, Shayla

20   has just alluded to maybe housing stock by housing

21   stock, right?  So on your end, if you're not very

22   favorable to the council district because it's too

23   prescriptive, then what would be the solution on the

24   county's end to moving the needle forward here?

25         MR. YOUNG:  So I think it would be -- I

                                              Page 70

```
 1    don't have an answer.

 2                    MS. MARTINEZ:  You don't have an answer.

 3                    MR. YOUNG:  So I'm not going -- I'm not

 4    going to --

 5                    MS. MARTINEZ:  Thank you.  I appreciate

 6    your -- I appreciate your honesty.  Thank you.

 7                    MR. YOUNG:  But it's a conversation I'd

 8    want to have.  I'd want to have with people who actually

 9    know more than I do.

10                    MS. MARTINEZ:  Exactly.  And I just want

11    to be very clear that we're gathering all this

12    information.  And we're in a room full of attorneys,

13    right?  We're not in a room full of the experts, right?

14                    The next step for us -- and we've been

15    having these conversations with some of these experts

16    and others, that we would like -- who are the ones that

17    are going to implement this.  But we want to hear.  You

18    know, obviously the city council, you know, believes it

19    should go in one direction.  The interveners believe

20    they should go in another direction.

21                    But ultimately we all know at the end of

22    the day it's not going to be the attorneys in the room

23    that are going to implement this.  And so, we understand

24    that.  But we want to get your perspective now as we try

25    to move towards some kind of agreement.  What is that
```

Page 71

```
 1    going to look like, if we could even get there, right?

 2    And I think a decision has been made that you want to

 3    start settlement negotiations.  And we're here.  But it

 4    doesn't mean that we're going to get there.  And I think

 5    that's what --

 6                   JUDGE CARTER:  Oh, yes.  Yes.  We will.

 7                   MS. MARTINEZ:  Well, the judge, yes.

 8    Yes.  I definitely understand that you --

 9                   JUDGE CARTER:  We're going to write the

10    history and we're going to get there.

11                   MS. MARTINEZ:  Yes.  And so, I think it's

12    important for us to understand that he's already taken

13    some process about moving towards implementation by

14    council district.

15                   And so, what we're hearing is very

16    helpful and I think very helpful to him as we move

17    things along.  And so, anyone have any more questions as

18    it pertains -- yes, Ackley?

19                   MR. PADILLA:  I don't have a question.  I

20    just -- I need to --

21                   MS. MARTINEZ:  Clarification?

22                   MR. PADILLA:  -- make one final point.

23                   MS. MARTINEZ:  Yes.

24                   MR. PADILLA:  And I'd ask that you bear

25    with me.  And it goes back to the notion of a people-
```

Page 72

```
 1    based approach I believe is how you labeled it.  I want
 2    to remind everybody to me the people-based approach, I'd
 3    want to acknowledge -- when you talk about people, then
 4    we have an obligation to talk about everybody.
 5                    JUDGE CARTER:  Yeah.
 6                    MR. PADILLA:  Clearly the homeless
 7    population needs help and service.
 8                    JUDGE CARTER:  And the public.
 9                    MR. PADILLA:  But where the concentration
10    is happening, where a lot of the issues are, are also in
11    certain neighborhoods.
12                    JUDGE CARTER:  Yeah.
13                    MR. PADILLA:  And the people that live in
14    those neighborhoods are people too.
15                    JUDGE CARTER:  Yeah.
16                    MR. PADILLA:  So how are they part of the
17    equation as well?  Part of the concern that I think we
18    also need to acknowledge is that we're far from perfect.
19                    When you look at the diversity of the
20    city, when you look at the demographics of the city, of
21    council districts, when you look at the demographics of
22    the homeless population, when you look at the
23    demographics of the neighborhoods being heavily
24    impacted, I don't know how much those demographics are
25    fully represented here in the same fashion.
```

1          So as experienced, as able and as

2    committed as people are in this room too, there's got to

3    be a way to allow for more feedback and more solutions.

4    And again, it's what takes me back to I can't find a

5    better solution than the council district approach.  Not

6    perfect.  I don't know if there is anything that's

7    perfect.

8          But it's the best with what we've got.

9    And I just want to make sure that we get that out there

10   for all us here in the room, that this equation, this

11   problem that we're trying to solve, it's partly defined.

12   But it's so much broader than that and we can't forget

13   that broad elevation.

14          JUDGE CARTER:  Okay.

15          MR. PADILLA:  Thank you for hearing me.

16          MS. MARTINEZ:  Of course.  Elizabeth?

17          MS. MITCHELL:  If I can just add, I think

18   that Shayla's concerns as articulated, the county's

19   concerns are valid points.  I don't think that in my

20   perspective anyway we need to throw the baby out with

21   the bathwater.

22          MS. MARTINEZ:  Correct.  Exactly.

23          MS. MITCHELL:  I think we can take that

24   feedback and implement it into this structure.  And I

25   think particularly what resonated with me anyway was the

                                                 Page 74

```
 1    idea that one council district could start a year or two
 2    later, right, and the implementation would be too spread
 3    out.  And so, it's still unfairly implemented.  So I
 4    think issues like that can be taken into consideration
 5    and worked into this discussion as we are talking about
 6    the overall policies that will be part of the solution.
 7                   JUDGE CARTER:  Okay.
 8                   MS. MARTINEZ:  Judge?
 9                   JUDGE CARTER:  Yeah.  This idea was not
10    my idea professionally.  This idea came with discussions
11    with councilmembers and some members of your board of
12    supervisors.  So I'm going to ask you to go back
13    individually and start talking to the board because this
14    is not Judge Carter's original idea.
15                   Some of the members of the board want to
16    implement faster than others.  They're farther along.
17    Some members of the council have recreational vehicle
18    problems in a district that aren't the same as another
19    councilmember.  And so, when we were looking at this,
20    while we didn't have a better solution, the
21    implementation was on a different time track and in
22    different ways.
23                   And I'll use some names.  I hope I'm not
24    breaking confidence.  Mike Bonin would like to have some
25    ability to get rid of Third Street [ph], okay?  He'd
```

Page 75

```
 1    like to move people closer to the beach because there
 2    are already facilities there.  Now he may have changed
 3    his position.  But that was his original position.  He
 4    may be willing to do that in a very what you would refer
 5    to as a humane way, okay?  Doesn't want anybody put in a
 6    patrol car.  Wants to talk to people.  Great.
 7                    Another person may be more inclined to do
 8    that in a more harsh way.  Those are the policies and
 9    procedures I'd like to work out in a uniform way so that
10    the police are operating in a uniform way.  And whether
11    we get to the whatever standard that we're negotiating
12    with now compared to whatever we're doing with the city
13    in the future, there ought to be a policy and procedure
14    that covers the whole city or the county.
15                    I think that's the easy thing that we're
16    eventually going to resolve.
17                    MR. YOUNG:  Yeah.
18                    JUDGE CARTER:  What I'm absolutely
19    convinced of is that we have absolute inertia right now
20    because we can't start or we're afraid to start and
21    we're even afraid to make a mistake right now.  And so,
22    that's my concern, that for 20 or 30 years we haven't
23    even started to admit that we just kind of did it wrong
24    and we've got to back up and do it right because we're
25    looking for perfection.
```

Page 76

```
 1                    Now I'm going to ask you another question
 2    just to think about.  A court can operate in two
 3    different ways.  Normally I have a case in controversy
 4    come to the court.  And so, very patiently if I was up
 5    in San Francisco and I'd probably have an alliance
 6    between Hastings College of Law, okay, and I have an
 7    alliance between the city and they want the same thing.
 8    I don't know that the homeless will or will not be
 9    represented in an adequate manner.  I don't know about
10    that lawsuit.  But they may be.  So I'm not going to
11    intervene.
12                    I'll tell you my disappointment about the
13    intervention, and it's not with you, that all the
14    parties aren't at the table because in my discussions
15    what I've heard from the city is if we're going to
16    resolve this, we don't want to get consistently sued.
17    Where's the ACLU?  So eventually we worked out an
18    agreement.
19                    How do I go back to the council and say,
20    by the way, I've got good faith from you, Shayla, and
21    from the legal foundation.  Brooke and Carol, I've got
22    good faith from you.  But there's this other party not
23    at the table.  Now, hold on.  I don't even want an
24    answer to it.  So I've let everybody intervene that I
25    possibly asked to intervene except for some other groups
```

Page 77

```
 1    out in Venice that I simply declined.  If a court acts

 2    sua sponte, you lose control, right?

 3                 So I've given time for discussion so far.

 4    But by Thursday afternoon, I'm going to ask really where

 5    are we.  And I'm not saying that's my drop dead date.

 6    But I'm not going two or three more of these.  I can't

 7    and I won't.  So I'm going to pay you all the courtesy.

 8    And yesterday you told me at 5:30 you wanted to recess.

 9    You'd reached an impasse on the county level.  And that

10    was fine.  Go on home.

11                 I'll be up here Thursday, just so you

12    know.  Well, I'll be up in federal court.  If you need

13    me, fine.  But by tomorrow night, I want to know do we

14    have an agreement or not and why aren't people on the

15    phone.  And if you can't reach Mary, then reach Kathryn,

16    okay?  They should be available.  You pledged they would

17    be.

18                 For the city, now I'm asking you to

19    start.  We can walk and chew gum at the same time.  And

20    Marcus, you asked that in your confidential brief.  You

21    said you're ready to go.  I believe you.  Well, let's

22    start there.

23                 Let's start on Friday, okay?  And if

24    we're then going to have inertia, then I want to -- I

25    really want to get Eric in my courtroom.  I want to get
```

```
 1    Nury in.  I want to get the police chief in.  I want to
 2    get Kathryn in.  and I want you just to tell me you
 3    can't do it, that there's so much inertia here and red
 4    tape, that just represent to the Court that you can't
 5    get this resolved for the goodness of the city.  And
 6    it'll be on the record.  And that's it.  I get it.  I
 7    don't believe that.  There's too much goodwill here.
 8    It's just how you get there.
 9              So the only way I could see to break this
10    impasse and give you some control was implementation.
11    But Shayla, I'm worried about the same thing.  And
12    that's not faulting our differences.  I just don't know
13    how to break the logjam because for 20 years what you've
14    suggested doesn't seem to have been working because it's
15    so broad.
16              Now I may be wrong.  But I tell you, the
17    Court is going to do something.  I'd just like to get it
18    right the first time.  And I'd like to be a little bit
19    more patient.
20              But I promise you the Court is going to
21    take some action in this.  And I'm probably going to
22    have to take it sua sponte.  And if you haven't guessed
23    what it is right now, you haven't been listening very
24    closely because you've all got it figured out.  You just
25    haven't put it together yet.
```

Page 79

```
 1              Now I'm going to give some time for that,
 2    okay?  Go ahead.  Now that's the end of it.
 3              MS. MARTINEZ:  Thank you, Judge.  So the
 4    next thing -- and again, the Court wants to thank you
 5    all for providing some of the properties that are
 6    available, public property for city and county.
 7              And you all still need to go through that
 8    process to identify and to make sure what makes sense in
 9    those specific properties.  And so, as you now look at
10    the potential of the housing accommodations, matching
11    those with those properties, I'm not sure when the Court
12    is going to ask for you all to provide another report.
13              But we want to get this process started.
14    So I think you all know what the housing accommodations
15    are suitable.  Now you just have to match those to the
16    public properties that are available that you all have
17    provided.  And obviously you have to do your due
18    diligence.
19              One of the questions that I have to you,
20    you know, based on what's by right, I think when we
21    talked about Maple and 16th for the past couple of weeks
22    and the issues that we had in regards to environmental,
23    Caltrans, you name it --
24              JUDGE CARTER:  CEQA.
25              MS. MARTINEZ:  CEQA.  Before --
```

Page 80

```
 1              JUDGE CARTER:  Who's paying -- who's

 2    paying for what.

 3              MS. MARTINEZ:  Yeah.  Before any of these

 4    properties, that we want to make sure that you do your

 5    due diligence and that all of these properties that are

 6    being brought eventually back to the Court, that they

 7    are ready to go.

 8              We don't want to hear a week from the day

 9    you present that, oh no, we had no idea that we had a

10    CEQA issue or we had no idea that that property was

11    being utilized for x, y and z.  And so, the Court wants

12    to give you that time to identify and do your due

13    diligence and looking at the types of housing

14    accommodations, the amount of units you'll be able to

15    provide there.

16              We don't need to go into that detail.  I

17    think you all have the right staff to start figuring

18    that out.  And it's our hope that eventually the city

19    and county will start having those conversations

20    collectively as you all move that forward as it pertains

21    on the city side.  We talked about services.  And I

22    don't want to go into that discussion now.  I don't

23    think it's appropriate.  We'll do that at a different

24    time.

25              The next thing that we just want -- and
```

Page 81

```
 1    it keeps on coming up, right, the inertia, the barriers
 2    to achievement.  And I believe where there's a will,
 3    there's a way.  I believe that you guys have the right
 4    partners --
 5                    JUDGE CARTER:  Yeah.
 6                    MS. MARTINEZ:  -- whether it's LAHSA,
 7    whether it's the county, whether it's mental health,
 8    whether it's your service providers.  You know, there
 9    has been a system that has been in place as it pertains
10    to the political systems and to the systems of the city
11    very different from the issue that we are speaking of
12    today as it pertains to homelessness.
13                    I get that there's political issues.  And
14    that's something that we can talk about time and time
15    again.  And the reality is, is that this is not the
16    discussion that we want to have here.  What we want to
17    know is that what is it going to take if you all do
18    identify the housing accommodations and the properties,
19    before we get -- before you bring something to the
20    Court, what are some of those barriers and challenges?
21                    Is it going to be, you know, as it
22    pertains to jurisdiction issues, county versus city or
23    Caltrans?  You guys -- there's Metro property that we
24    saw on some of the listings.  There's community college.
25    There's all these other public properties.
```

Page 82

```
 1                   And so, we want to know as you all move

 2    forward, you know, what are those jurisdictional issues.

 3    What are some of the current regulations and systemic

 4    policies that you currently have in place that will not

 5    be able to help you move forward to some of these

 6    current housing accommodations that you all spoke of or

 7    some of them that have been working but you're not able

 8    to scale up.  We want to know that firsthand.

 9                   And then, I think the 800-pound elephant

10    in the room, as we deal with city and county finances,

11    right, the funding.  And that I believe too should not

12    be a barrier.  There are certain monies that have been

13    allocated, whether it's no because of COVID-19 and how

14    can we utilize those funds to house as many people as

15    you all possibly can.  That's an opportunity in hotels

16    and motels.

17                   But there's also, you know, funding

18    that's available that has been dedicated from the county

19    based on its recent budget discussions that they want to

20    allocate towards homelessness.  The city has

21    articulated, the mayor has and the council has

22    articulated that there are going to be certain revenues

23    that will be committed to homelessness.  And so, we know

24    what those figures are.

25                   And so, I get that some of the funding
```

Page 83

1    streams and the allocations, whether from the federal,

2    state, all the way down to the local level may not be at

3    the levels we may have hoped for post-COVID-19.

4              But we want to know what can we get done

5    with the funding that you do have available, right?  We

6    don't want to know what you can't get done.  We want to

7    know what you can get done.

8              And so, based on that, I would like to

9    open it up to you all because I just talked to you about

10   zoning and land use issues, funding streams and

11   allocations, the jurisdictional issues and obviously

12   some of the systemic policies and procedures that will

13   kind of delay some of these housing accommodations

14   and/or placements.

15             You know, if there are anything -- if

16   there's anything else that the Court may not know about,

17   we would like to know about that now so that as you all

18   move towards putting your plans together, we're not

19   blindsided.

20             JUDGE CARTER:  Yeah.

21             MS. MARTINEZ:  And so, that's important

22   for us.  So I'll just open up this discussion.  And I'll

23   start with you, Liz.

24             MS. MITCHELL:  Well, I'm certainly not

25   going to be identifying problems.

                                              Page 84

```
 1              MS. MARTINEZ:  Yes.

 2              MS. MITCHELL:  I think that you've done a

 3   great job in laying out some of the issues that have

 4   been historically concern.  On the money front, because

 5   that's something that we are hearing quite a bit, is

 6   that, you know, things are very uncertain with COVID.

 7   And as I pointed out, yes, things are very uncertain

 8   with COVID.  There have been monies that have already

 9   been allocated that can be reallocated.

10              There is also funding streams available

11   at the moment because of the COVID crisis that I think

12   we need to take advantage, which was Shayla's point

13   earlier, that we can jump on immediately.  But we have a

14   closing window of opportunity in which to do this.

15              We can also go to the state and request

16   additional funding.  Again, the window of opportunity is

17   here now because we have the May revise happening on the

18   state level.  We have a lot going on at the state level.

19              So if we can work together quickly both

20   to take advantage of the state funds, the emergency

21   funds that are available, I think that would be a huge

22   help.  there are also separate buckets of money that are

23   available both from the county level and on the city

24   level that I think we can really take advantage of --

25              But I've heard that a lot, that it's a
```

Page 85

```
1   money issue.  And I just want to reiterate that point,

2   Michele.  I don't -- while I understand money is an

3   issue, I don't think that that can be an impediment to

4   systemic change that we need to see.

5             MS. MARTINEZ:  City of Los Angeles?  Any

6   barriers that you see beyond what I discussed that has

7   been put out there --

8             JUDGE CARTER:  Yeah.  And let --

9             MS. MARTINEZ:  -- beyond what -- that

10  we've highlighted here.  Is there anything else that we

11  should be aware of?

12            JUDGE CARTER:  Can I read those off to

13  them?

14            MS. MARTINEZ:  Yes.  Go ahead, Judge.

15            JUDGE CARTER:  I want to read those off

16  to you because we spent all week --

17            MS. MARTINEZ:  Just --

18            JUDGE CARTER:  Saturday.  We tried to

19  think of all the things because you didn't have a plan

20  last time.  We put this down last week and then I made

21  the mistake and sent you home.

22            Okay.  So we put down systematic policies

23  and procedures as a barrier.  We put down regulations

24  and environmental concerns that we ran into with the

25  Maple property.  We put down jurisdictional issues.  We
```

Page 86

```
 1    put down funding streams and allocation, the age old
 2    fight between the county and the city frankly, which is
 3    why you're here, Heidi, for LAHSA.  I'm just kidding
 4    you.  But I'm not.  You're a compromise between the two
 5    of them, a wonderful compromise, by the way.  But you
 6    have no political power.  You can't make anybody move.
 7              And I constantly hear, no matter what you
 8    say at this table, that bickering back and forth about
 9    who's going to pay for it and with the city pointing at
10    the county and the  county putting at the city.  And I
11    want to put that right on the table.  I've got to break
12    that somehow.
13              And zoning and land use and cooperation
14    amongst government entities.  So last time we saw
15    Caltrans that I landed on.  I've got the city going like
16    this because Caltrans gave it to the city.  I can't
17    figure out the 2005 agreement.  Maybe some bureaucrat
18    can.
19              I mean, it is so intertwined and so
20    interwoven that if you tell me you can understand it,
21    I'm going to tell you that any one of the parties could
22    argue that that's an obstacle, an impediment and a
23    reason not to do it.
24              Where's the state?  I've got Caltrans
25    here.  But where's the state in our group?  Do we have
```

Page 87

```
 1    the right people at the table?  And it dawned on me I'm
 2    talking to Caltrans.  I'm talking to the state.
 3                   And let me give you an example.  I don't
 4    care what you said.  I've heard from the governor that
 5    we have hundreds and hundreds of pieces of property from
 6    Caltrans.  You've heard the same thing.  What do we
 7    have?
 8                   MS. MARTINEZ:  Nineteen.
 9                   JUDGE CARTER:  Nineteen.  And one of
10    those is county and the rest potentially are city.  And
11    we don't even know what the -- that's fine with me, as
12    long as I know what I'm operating under.  And Eric
13    should know that too, okay?  What do we really have?
14    And with the city, I used to hear we have thousands of
15    pieces of property.
16                   Well, I've got a confidential memo that
17    says we've got a couple of pages of pieces of property
18    right now.  Now eventually I'm going to ask the city
19    that released as exhibit A, if you might consider making
20    that public to the other side.  And the reason for that
21    is I want you to see what they're putting down because
22    you may know of five other pieces of property.  But
23    right now it's confidential to the Court.
24                   But if I've got now 40 or 50 pieces of
25    property, that's all I want to know.  I want to know
```

Page 88

```
 1   what my playing field is so I'm not hearing that there's
 2   thousands of pieces of city property when in fact we
 3   only have a couple hundred.  But that's fine.
 4              MS. MARTINEZ:  Sure.
 5              JUDGE CARTER:  Then I know how to make a
 6   semi-intelligent decision because you want me, whatever
 7   I'm doing, whether I'm acting sua sponte or whether I'm
 8   waiting for you to be making the best decisions possible
 9   for all of you.  And it's not going to be across the
10   board and none of you are going to be completely happy,
11   okay?  So I'm going to finish, Michele.  And then you go
12   on.
13              MS. MARTINEZ:  Okay.
14              JUDGE CARTER:  What are we missing?  By
15   the way, we're missing CEQA on this.
16              MS. MARTINEZ:  hat's a -- yeah, that's
17   regulation and environmental concerns.
18              JUDGE CARTER:  Yeah.  But what they do is
19   like in the federal court.
20              MS. MARTINEZ:  Because they're --
21              JUDGE CARTER:  Several of them have run
22   into state court, have a filing, hold up what we're
23   doing here.  And CEQA is part of this process.  And how
24   -- if we're going to settle, how in a sense do we give
25   the Court -- with all of our good faith working
```

```
 1    together, the ability to take on CEQA so you're not

 2    getting stalled with every project and every person.

 3                  And by the way, I know that you're in a

 4    problem with your Los Angeles property.  Let's put that

 5    on the table.  You know, this LA property, this site

 6    down here.  Hey, I'd like 10 of those.  Guess what?

 7    That is just baby steps.  And so, this Los Angeles

 8    person is complaining, rightly so, that he's got a

 9    project and somebody might get sued.

10                  Hey, there's going to be a lot of

11    lawsuits.  You know how to diffuse that?  Get me 10

12    pieces of property.  Get me all four pieces of property

13    that you initially put out in that memorandum, okay, and

14    expand this rapidly.

15                  So I've just been walking, trying to

16    discover.  But if you think I came up here for one piece

17    of property underneath the freeway, you're smoking

18    medical marijuana.  You think I came up here for one

19    site on Los Angeles Street?  Absolutely not.

20                  And so, what I'm saying to you, I really

21    wish we had 20 pieces of property in Skid Row on the

22    table right now and then that one person would not be

23    feeling singled out, okay?  So I'm back to you, Michele.

24                  MS. MARTINEZ:  So beyond the barriers

25    that we've just talked about, are there any other
```

Page 90

1    barriers that the Court should be aware of as you all

2    move toward putting your guys' agreement forward?

3                    MS. MYERS:  I mean, I -- so from the --

4                    MS. MARTINEZ:  No.  So go ahead.  Go

5    ahead, Shayla.

6                    MS. MYERS:  Yeah.  From the interveners'

7    side, I think, Judge Carter, you just identified --

8                    JUDGE CARTER:  Hold on.  I'm coming over

9    there.  I'm listening.

10                   MS. MYERS:  I think you just identified

11   it.  I mean, the parties came together on a site and

12   there were some nimby concerns about that site.  And the

13   city capitulated and they're no longer using that site.

14   And so --

15                   MR. MARCUS:  Wait.  Wait.

16                   JUDGE CARTER:  No, no.  No.

17                   MR. MARCUS:  No.  That is not what I said

18   at all.

19                   JUDGE CARTER:  Marcus, that's --

20                   MS. MYERS:  Is that not what happened?

21                   MR. MARCUS:  That is not what I said at

22   all.  No.

23                   MS. MARTINEZ:  No.  No.

24                   MR. MARCUS:  You are misconstruing the

25   email that I sent you.  Let me be very clear what I sent

                                                      Page 91

```
1    you.  We had an agreement to use a particular site --
2                    MS. MYERS:  Yes.
3                    MR. MARCUS:  -- as the RV safe parking.
4                    MS. MYERS:  Yes.
5                    MR. MARCUS:  The plaintiffs withdrew
6    their agreement --
7                    MS. MYERS:  Yes.
8                    MR. MARCUS:  -- to that particular site.
9                    MS. MYERS:  Yes.
10                   MR. MARCUS:  We brought that issue to the
11   judge.  The judge said he's leaving it to the parties.
12                   MS. MYERS:  Yes.
13                   MR. MARCUS:  So I sent around an email
14   this morning saying let's see if we can find a site that
15   all the parties agree to.
16                   MS. MYERS:  Yes.
17                   MR. MARCUS:  I didn't say we were giving
18   up on anything.  I didn't say we capitulated on
19   anything.  I said let's try to find agreement amongst
20   all the parties.  And I proposed some additional sites
21   that maybe we could all agree on.
22                   MS. MYERS:  Sure.  And I think to Judge
23   Carter's point, we need all of them.
24                   JUDGE CARTER:  Yeah.
25                   MS. MYERS:  And I think our concern is,
```

Page 92

1    is that we don't just need the Los Angeles site.  We

2    need the Gladys site.  We need the -- we need all of

3    those sites.  And so, Scott, if I could just finish

4    because the city had some time.  So I just want to take

5    just a brief minute.

6                    JUDGE CARTER:  Go ahead.

7                    MS. MYERS:  The problem is that the

8    politics that have caused inertia in this city for

9    decades, it's why we're concerned about council district

10   by council district.  And I appreciate that you're going

11   to make that decision.

12                    But it is that continued like wrapping up

13   siting of resources based on the politics of what is

14   going into those locations.  And the reality is unhoused

15   folks have been demonized for decades.  And so, the

16   suggestion that you would place housing on a site that

17   is a residential location becomes problematic for

18   communities because unhoused people are going to those

19   locations.

20                    That is -- there is no one at this table

21   who can say with a straight face that NIMBY concerns and

22   politics are not a huge obstacle.  And so, unless the

23   Court can find a way to cut through that and unless the

24   council districts can find a way to cut through that,

25   unless the mayor's office can find a way to cut through

                                                    Page 93

1    that, that is the inertia that killed this way more than

2    zoning and land use.

3                    JUDGE CARTER:  So I want you to translate

4    --

5                    MS. MARTINEZ:  Understand that --

6                    JUDGE CARTER:  -- what Shayla just said

7    in really simple terms.  More than one councilperson has

8    said, Judge, we wish you could make the decision.  Now,

9    hold on.  That means though that I'm acting in a sua

10   sponte manner.  I'm not the mayor of the city.  I'm not

11   the council of the city.

12                   But at some point, depending upon the

13   issue, the Court may have latitude to act in a sua

14   sponte manner.  But I don't have latitude to act and

15   direct public monies being billed or a specific location

16   and maybe not even the timing unless public health and

17   safety is involved, okay?  So I want to be careful with

18   that power.

19                   But by the same token, if it's

20   appropriate, I'm not concerned about exercising sua

21   sponte power.  It's just where and when.  So I'm being

22   very patient with you in terms of tomorrow afternoon I

23   expect to hear -- and I'm going to put it -- do we have

24   a settlement or not.  Do we have a settlement or not?

25                   MR. YOUNG:  Sure.

Page 94

```
 1                   JUDGE CARTER:  I want to know that

 2      tomorrow.  And I'll stay until midnight.  I kid you not.

 3      You guys went home early at 5:30.  Congratulations.  I

 4      want Mary involved.  I want Kathryn involved.  I want

 5      your board involved and I want you to make -- do you

 6      have a settlement or not.

 7                   If not, just tell me and we'll put it on

 8      the record we can't reach it, okay?  And then I'd like

 9      the city, Marcus, to start on Friday or Monday.  There's

10      no problem.  But your timing is going to tell me if I

11      need to act.  And I'm trying not to act and get in the

12      way of your settlement because what I might be thinking

13      about doing might be an interference of the good faith

14      negotiations.

15                   MR. MARCUS:  Well, and Your Honor, to

16      that point, to that point, if the purpose of this --

17                   JUDGE CARTER:  I can't hear you.

18                   MR. MARCUS:  If the purpose of this is

19      for all of us to come to a consensus, to come to an

20      agreement --

21                   JUDGE CARTER:  Right.

22                   MR. MARCUS:  -- then it's going to take

23      unfortunately a little bit of time.  And there's going

24      to be zigs and zags because there's going to be times

25      where we can all agree.  And there's going to be times
```

Page 95

```
 1    where we can't agree.  If we don't want to all agree on
 2    something, we can just go forward as we have been which
 3    is the city will do what it wants to do and we'll get
 4    sued.  And we'll figure out after the fact if it was
 5    right or not.
 6               But if the advocates want an agreement to
 7    not use sprung structures or congregate structures or
 8    congregate shelters, which the city isn't agreeing to
 9    until the CDC or DPH tells us otherwise, it's still a
10    viable option.  How is that any different?
11               Why do we have to adhere to your
12    objections but you don't have to adhere to their
13    objections?  If we're all looking for consensus, then
14    let's work towards consensus.
15               JUDGE CARTER:  Yeah.
16               MR. MARCUS:  If everyone can just object
17    and expect to be listened to on that objection --
18               JUDGE CARTER:  Yeah.
19               MR. MARCUS:  -- then we can just all go
20    home.
21               JUDGE CARTER:  Marcus, let me ask you
22    something.  I could conduct myself in what I call a slow
23    motion way.  I can get John Sherin back in here.  If you
24    listened very closely to him, he's in favor of
25    congregate shelters.  If you listen very closely -- no,
```

Page 96

 1    hold on a minute.  Now I'm talking.  Then you'll have

 2    unlimited opportunity.

 3              If you listen to him, he'd like to make

 4    it 10 percent better.  He'd like to make it anything

 5    better right now because he's tired of waiting.  And if

 6    you listen very closely, he just wants to approve it.

 7    Perfect?  Absolutely not.

 8              But he's afraid of not moving forward.  I

 9    think Barbara is going to take the same position, quite

10    frankly.  But I can conduct a public hearing and I can

11    get them in here under testimony.  I'm happy to do that

12    because I think they're going to add on congregate

13    shelters still at this point.

14              And why wouldn't the Court be closer to

15    listening to a mental health officer?  Or if they're not

16    in favor of it, I'd like to know that either way.  If

17    Barbara's changed her position and she's not in favor of

18    congregate shelters or these recreational sites, if she

19    thinks that that's bad because of one outbreak or more,

20    I'd like to know that.  I need to pay attention to that.

21              So I'm happy to conduct a public hearing

22    with those officials present to testify.  And frankly

23    that gives you all cover because frankly you're leaning

24    on your public officials for a lot of the decisions on

25    your public health officers because you don't want to be

                                              Page 97

```
 1    accused of politics, right?  So tell me at the end of

 2    the day if you want that public hearing because I'm

 3    happy to call it.  And we'll have a public hearing and

 4    hear what they have to say on the record.

 5                    MR. MARCUS:  I just want to make sure --

 6                    JUDGE CARTER:  Now I think right now

 7    you're at congregate shelters of some type.  I think

 8    you're even at the VA model, quite frankly, getting

 9    people who are sleeping on the street into an enclosed

10    area with security, lighting, food --

11                    MS. MARTINEZ:  Services.  Services.

12                    JUDGE CARTER:  Services.  And is that God

13    awful?  That is horrific.  But the end result is you are

14    seeing -- and I think the LA Times first or something,

15    Ben wrote an article about that recently about how happy

16    the people were out at the VA shelter.

17                    But remember those are veterans that are

18    getting in.  That doesn't treat a holistic population

19    where we've got tremendous diversity between people out

20    there.  And that's the people -- the person approach

21    that you're approaching, Shayla, that we need to be very

22    sensitive to.

23                    So almost done, almost done.  So

24    everything's on the table.  Everything is on this table.

25    It's on the table.  If you can get me housing, great.
```

Page 98

```
 1    If you can get me trailers, great.  If you can get me
 2    recreational, great.  If you can even get me better
 3    enclosures in a parking lot, then upgrade the services
 4    in some way where a person sleeping on the street --
 5    now, we can't do that -- we can't do that forcibly.  We
 6    can't say to you, you must go to this lot.
 7                 We have to create something that is
 8    better than people are getting so they're willingly
 9    ready to go.  And I'll represent to you I feel this
10    strongly.  If we do that even a little bit better like
11    the VA, 50, 70, 80 percent -- I'm asking up those
12    figures -- are voluntarily going to go there because
13    they get food.
14                 They get a shower.  They get a toilet,
15    that people have been complaining about, that before
16    this broke out we didn't even get toilets in the city.
17    They were fighting to get 50 more down on Skid Row.
18    What a great victory, you know?  Come on.
19                 If we do that and it's 10 percent better,
20    then I don't want to hear that it's a financial
21    obstacle.  It's not a financial obstacle.  I can say
22    police resources by putting two officers or three
23    officers down there.  You're burning out your time.  I
24    can get the trash that we're concerned about into a
25    congregate area so we can manage that.  We can even
```

Page 99

```
 1    start a funnel system where people are passing through

 2    and we see I they want these kinds of services.

 3                    I mean, are they really the people who we

 4    want -- who we can work with or are they shooting dope

 5    and, you know, the gangbangers and they don't want any

 6    part of this and we have to get something else for them.

 7    Maybe it's a good test case.  But we can do all those

 8    things cheaply.

 9                    So a part of this confidential thing says

10    it's going to cost x amount.  No.  It's not.  No.  It's

11    not because you're wasting so much time and resources

12    right now in what we're doing that I think I can make

13    that revenue neutral.  Now, the more money you give, the

14    better resources we can get.  Don't get me wrong.  But

15    we're not even starting with that process right now.

16                    So I'm telling you everything's open to

17    this Court on the table, everything from housing, long-

18    term, transitional, trailers, recreational vehicles to

19    getting a parking lot, quite frankly, as long as we're

20    upgrading the services because there's no difference

21    than sleeping on the ground here and giving a person an

22    opportunity to sleep on the ground over there.

23                    And by the way, what's wrong with

24    bringing your own tent?  You're not supplying tents fast

25    enough.  Am I afraid of the homeless bringing their
```

```
 1   items?  Hey, bring your items with you for goodness

 2   sakes.  Bring your tent if you want to, if you want to

 3   come.  But I doubt that you can force people because

 4   even if you thought you could force people in, you can't

 5   kill yourself out of a war.  And you can't arrest

 6   yourself out of homelessness.

 7                   So it's got to be better than because 60

 8   percent of these people I promise you will come in and I

 9   promise you they'll walk away from all these items, like

10   these bulky items and possessions, if they can get fed,

11   get a shower, get clothed.  And that's going to be

12   something then we can start to manage and move to this

13   other group.

14                   Now I'm going to stop for a moment

15   because I'm sucking the oxygen out of the room.  But I'm

16   telling you everything is on the table for this Court.

17   And I promise you, please --

18                   MS. MARTINEZ:  So --

19                   JUDGE CARTER:  -- settle this because --

20                   MS. MARTINEZ:  Some of the other --

21                   JUDGE CARTER:  -- I will settle it for

22   you.

23                   MS. MARTINEZ:  Yes, Brooke?

24                   MS. WEITZMAN:  I just -- so that's kind

25   of exactly the point about the concerns --
```

Page 101

```
 1                    JUDGE CARTER:  Hold on, Brooke.  I'm

 2      coming to you.   The room echoes.

 3                    MS. WEITZMAN:  In terms of the -- yes.

 4      I've noticed.  But in terms of the concerns about the

 5      response to the NIMBY folks, the response to the

 6      politics, that's exactly the point.  We said we're

 7      concerned about congregate living.  It is  dangerous.

 8      The CDC says not to do it.  And because it's one of the

 9      options on the table, the city did it anyway, which is

10      fine.

11                    When it comes down to one single parking

12      lot that we all agreed to, when the NIMBY attitude comes

13      out, the city says, well, let's talk about if there's

14      something else we can use instead, not we're barreling

15      forward and what else can we add.  And so, that's a

16      perfect example of the fact that we are concerned about

17      that barrier.

18                    MS. MARTINEZ:  Okay.  Great.  Thank you.

19      So I just want to move on.  There's three other things

20      that weren't listed that we've heard.  Capacity issues,

21      right?  I haven't heard anyone talk about that.  So I

22      just wanted to bring that there is capacity issues.

23                    Then county and the services that they're

24      going to be able to provide, right, whether it be to the

25      city of Los Angeles and what those services will look
```

Page 102

```
 1    like and/or -- and then as well systemically some of the

 2    issues and authority that LAHSA has.

 3                    I think what we've heard as we've been on

 4    this roadshow between various entities and elected

 5    officials, what we keep hearing, and no fault of their

 6    own, right, is that, well, LAHSA does this.  LAHSA

 7    doesn't do this.  Or we've heard from other

 8    jurisdictional cities, LAHSA -- you know, we're not at

 9    the table, right?  It's five members of the city, five

10    members on the county side that create this commission.

11                    And what about, you know, the

12    representation of all of these other smaller cities.

13    And we're not receiving the funding.  We're not

14    receiving the appropriate services.  And so, those have

15    been concerns as we've talked to various cities --

16                    JUDGE CARTER:  Yeah.

17                    MS. MARTINEZ:  -- across the region.

18    That's been some of those issues.  So I also wanted to

19    bring those out as well since we are here and talking

20    about barriers.  So now I'll go to the county because I

21    know he had some of the same concerns that I did.  But

22    go ahead.

23                    MR. YOUNG:  Yeah.  No.  I mean, I think

24    there's very clearly system capacity issues.

25                    MS. MARTINEZ:  System.
```

Veritext Legal Solutions
866 299-5127

```
 1                    MR. YOUNG:  And I am very worried,

 2    especially given kind of, you know, we don't know where

 3    this is going to go.  But I get very worried about

 4    whether we are being honest and equitable to LAHSA and

 5    whether LAHSA is going to be able to actually meet its

 6    charge.

 7                    I also think that obviously the NIMBY

 8    concerns are apparent.  I would just phrase it

 9    differently.  You know, for the city -- I mean, for the

10    county, and I assume for the city, we're going into this

11    process because we need to get some finality to do our

12    jobs.  And we can't be in an endless loop of litigation.

13    And there may not be an elegant way to fix it and it may

14    not be a problem we're going to get away completely.

15    But that's obviously a concern.

16                    And then, the other thing I don't see

17    here but I think it permeates all of it, particularly on

18    the funding -- and I don't want to focus on the funding

19    because I hear what everybody is saying.

20                    MS. MARTINEZ:  Yes.

21                    MR. YOUNG:  Time.

22                    MS. MARTINEZ:  Time.  Yeah.

23                    MR. YOUNG:  Where we are right now is

24    different than where we're even going to be two months

25    from now when we have kind of approved county budgets,
```

Page 104

```
 1    when we have the state budget and we have more certainly
 2    on kind of what the federal government is going to do
 3    with things like FEMA.  And the commitments we can make
 4    today might be very different than the commitments we
 5    can make tomorrow.
 6                   I know they're very different than the
 7    commitments we thought we were going to be able to make
 8    a month ago.  They're significantly less than what we
 9    thought.  So I was going to have Dee Allen talk.  But,
10    you know, I don't want to kind of belabor the point.
11    But property, time and money are kind of the issues.
12                   MS. MARTINEZ:  Okay.
13                   JUDGE CARTER:  Let me ask you something.
14    Can I bother you for one moment?
15                   MS. MARTINEZ:  Yeah.  Yeah.
16                   JUDGE CARTER:  We're going to be right
17    back.  If you want to use the restroom, go use it for a
18    moment because I want to ask -- there was some question.
19                   COURT REPORTER:  This marks the end of
20    media number one.  The time is 11:48 a.m.  We are off
21    the record.
22                   (Off the record.)
23                   (End Media 1.)
24                   (Begin Media 2.)
25                   JUDGE CARTER:  Okay.  Any other comments
```

Page 105

 1    or thoughts?  Otherwise I'm prepared to read to you.

 2    Okay.  This is the fourth or fifth draft.  I haven't

 3    completed this.  So it's a rough draft.  And I'll be

 4    sending this out to you by tomorrow.  And I'm going to

 5    give you five days for briefing.  That means you'll be

 6    working over the weekend.

 7              Alliance for Human Rights v. City of Los

 8    Angeles, et al.  Order for briefing.  As the record has

 9    developed in this case, the Court has become

10    increasingly concerned that a particular subset of

11    individuals experiencing homelessness, those who live

12    under freeway overpasses and underpasses and near

13    entrance and exit ramps, are exposed to severely

14    heightened public health risks as a result of where they

15    live.

16              Indeed all parties in this action agree

17    that it is unreasonably dangerous for humans to live in

18    areas that may, for example, be contaminated with lead

19    or other carcinogenic substances.  And I've got a

20    footnote one that refers back to a number of items that

21    we've discussed.

22              However as with many issues involving

23    individuals experiencing homelessness, no party appears

24    to be addressing this problem with any urgency.  The

25    Court is therefore considering -- I haven't issued it

Page 106

1    yet, but considering, to be polite to you, to get your

2    input, is considering issuing an emergency order

3    requiring this subset of individuals experiencing

4    homelessness be relocated away from freeway overpasses,

5    underpasses and ramps concerning public health risks of

6    living adjacent to freeways.

7              Since this case began on March 10, 2020,

8    the burgeoning COVID-19 pandemic has been of primary

9    concern.  This crisis poses an especial danger to the

10   vulnerable homeless population.  Without adequate access

11   to shelter, hygiene products and sanitation facilities,

12   individuals experiencing homelessness face a greater

13   risk of contracting the novel coronavirus and an

14   outbreak in the homeless community would threaten the

15   general public as well.

16             In its hearings, status conferences and

17   settlement negotiations, the Court has therefore

18   maintained a particular focus on the public health

19   issues facing the homeless community in the Greater Los

20   Angeles area.

21             As the Court has continued to learn from

22   the parties, as well as other participants in the

23   hearings and conferences, it has become clear that many

24   homeless individuals face an additional immediate health

25   hazard as a result of camping near freeway overpasses,

                                              Page 107

1    underpasses and ramps.  These locations pose a twofold

2    danger.  First, they expose homeless individuals to

3    elevated levels of pollutants and contaminants including

4    lead and other carcinogens which have deleterious health

5    impacts and can shorten a homeless person's life

6    expectancy by decades; in fact, over 20 years I've been

7    told repeatedly.  And if we need that backup, I'll get

8    that testimony on the record for you.

9                 Second, these locations also increase the

10   danger that a homeless person will be struck by a

11   vehicle or injured in the event of an earthquake or

12   crash, like the 880 freeway up in San Francisco.  And I

13   added that just as an example.

14                The Court's proposed emergency measures

15   to protect those individuals experiencing homelessness

16   currently living near freeway overpasses, underpasses

17   and ramps.  The Court is contemplating issuing an

18   injunction requiring that they be relocated away from

19   such areas.

20                Concerning the legal standard, the Court

21   may order injunctive relief on its own motion and is not

22   restricted to ordering the relief requested by a party,

23   citing Armstrong v. Brown.  A preliminary injunction is

24   an extraordinary remedy requiring courts to balance

25   competing claims on a case-by-case basis with particular

1    regard for public consequences of issuing an injunction.

2    Winter v. National Resources Defense Council, Inc.

3                    For a court to issue a preliminary

4    injunction, it must find, first, that there is a

5    likelihood of success on the merits; second, absent

6    preliminary relief, irreparable harm is likely; third,

7    the balance of equities tips in favor of preliminary

8    relief; and fourth, an injunction is in the public

9    interest.  I cite Trucking Association v. City of Los

10   Angeles.

11                   Alternatively an injunction can also be

12   justified if there are serious questions going to the

13   merits and the balance of hardships tips sharply in

14   favor of injunctive relief, assuming the other two

15   elements of the Winter test are met.  Citing Wild

16   Rockies v. Cottrell.

17                   A serious question exists when there is a

18   fair chance of success on the merits.  Citing Sierra On-

19   Line, Inc. v. Phx. Software.  The Ninth Circuit follows

20   a sliding scale approach to four preliminary injunction

21   elements such that a stronger showing of Wild Rockies

22   element may offset a weaker showing of another as long

23   as irreparable harm is likely.  Doe v. Kelly.

24                   Concerning the discussion.  And this is

25   where I wanted to give you an opportunity, although I

Veritext Legal Solutions
866 299-5127

```
 1    thought long and hard about giving you any opportunity

 2    and just issuing this.  This is something that I'm

 3    politely going to request your participation in.  But

 4    you are very close to just having this issued without

 5    any further discussion by the Court.

 6                    Under the California Welfare and

 7    Institution's Code provides as follows.  Every county

 8    and every city and county shall relieve and support all

 9    incompetent, poor, indigent persons and those

10    incapacitated by age, disease or accident.

11                    Lawfully resident therein, when such

12    persons are not supported and relieved by their

13    relatives or friends, by their own means or by state

14    hospitals or other state private institutions.

15    California Welfare and Institution's Code 1700.

16                    This provision is intended to, quote,

17    "provide for protection, care and assistance to the

18    people of the state in need thereof and to promote the

19    welfare and happiness of all of the people of the state

20    by providing appropriate aid and services to all of its

21    needy and distressed," end of quote.

22                    Such aid and services shall be provided

23    promptly and humanely with due regard for the

24    preservation of family life and on a nondiscriminatory

25    basis.  There is at the very least a serious question as
```

Veritext Legal Solutions
866 299-5127

1    to whether the city of Los Angeles and county of Los

2    Angeles have failed to meet these obligations under

3    California law by providing inadequate housing such that

4    homeless individuals must shelter in inherently

5    dangerous locations.

6                 The city of Los Angeles and the county of

7    Los Angeles may also have exposed the homeless residents

8    living near the freeways to a public nuisance.  And

9    while Martin v. City of Boise addressed only the Eighth

10   Amendment, it gave constitutional significance to the

11   availability of shelter which in this context could

12   plausibly implicate due process and equal protection

13   clauses of the Fifth and the Fourteenth Amendments.

14                 Accordingly the Court finds a sufficient

15   likelihood of success on the merits to support a

16   preliminary injunction and provide relief to the narrow

17   subset of individuals experiencing homelessness who live

18   under or around a freeway in the Greater Los Angeles

19   Area.

20                 I'm also going to include all city

21   streets in just a moment, not just the freeways because

22   I recognize that nobody has joined the state up to this

23   point and there will be finger pointing between the

24   state and the city and the county as to who has

25   responsibility.  I'll let you work that out.  I'm not

Page 111

```
 1    going to go through each overpass.  I'm just going to

 2    command that you do something.  And you'll figure it out

 3    from now on.

 4                   The likelihood of irreparable harm

 5    justifies preliminary relief.  Given the health hazards

 6    described above, the Court has no difficulty finding a

 7    grave risk of irreparable harm.  When homeless

 8    individuals are exposed to such dangers as toxic fumes,

 9    hazardous or waste concentrations of lead, car crashes

10    and the potential collapse of an overpass in an

11    earthquake, their health is threatened in a way that

12    monetary damages cannot adequately compensate.

13                   Additionally homeless persons living near

14    freeways need not suffer these harms at all or at least

15    need not suffer them any further.  And this outcome can

16    be achieved with a preliminary injunction.

17                   Because of the public health risks

18    inherent in living near freeways, the Court finds that

19    the homeless individuals that live in such locations

20    face a likelihood of irreparable harm justifying a

21    preliminary injunction.

22                   The balance of equities tips in favor of

23    a preliminary relief.  As already discussed, the

24    homeless individuals who live near freeway overpasses,

25    underpasses and ramps face severe health hazards.  By
```

```
 1    comparison, the city of Los Angeles and county of Los

 2    Angeles would only need to invest relatively modest

 3    financial -- and I repeat that, modest financial

 4    amounts.

 5                    So I will no longer hear that this costs

 6    x amount because I can almost assure you that this is

 7    revenue neutral and that the obstacle of constantly

 8    throwing these obstacles in front of the Court may get

 9    less care than the Court would like to give.  But these

10    are not obstacles.

11                    And the administrative resources to

12    provide safe and healthy shelters to these individuals.

13    As such, the Court finds that the balance of equities

14    weighs in favor of an injunction.  A preliminary

15    injunction is in the public interest.

16                    Finally a humane relocation.  And I

17    repeat that.  A humane relocation that you can

18    participate in or displacement from freeways in support

19    of public health will support the public interest.

20                    So the proposed relief is as follows.  As

21    mentioned above, to protect the homeless individuals

22    camping near freeway overpasses, underpasses and ramps,

23    the Court is considering issuing an injunction requiring

24    these individuals to be humanely -- and I stress that --

25    humanely relocated away from such areas.
```

Page 113

```
 1                    As part of this humane relocation effort
 2      and to promote the underlying public health goals, the
 3      city of Los Angeles and the county of Los Angeles would
 4      be required to provide shelter or alternative housing
 5      options such as safe parking sites or hotel or motel
 6      rooms contracted under Project Room Key or the open lot
 7      and open air facility provided at the VA facility where
 8      literally they are packed because people are coming in
 9      because they at least are still sleeping in a pallet
10      unfortunately or on the ground.
11                    But at least we've upgraded the services
12      concerning toilets that they haven't received, that
13      before this crisis the city wasn't willing to disperse
14      frankly.
15                    Number two, at least they're getting
16      medical in a concentrated place.  At least they're
17      getting food.  At least they're getting shelter.  And is
18      it good?  No.  But it's better then.  Now remember,
19      these folks aren't being forced in.  We firmly believe
20      that if you create this, enough people are going to move
21      into this location.  And if not, then we'll be proven
22      wrong.
23                    So here's the offer to you instead of
24      just issuing this relief today, which was what you were
25      about to get.  As part of this humane relocation effort
```

```
 1    and to promote the underlying public health goals, the
 2    city of Los Angeles and county of Los Angeles would be
 3    required to provide shelter or alternative housing
 4    options such as safe parking sites -- we could add
 5    recreational to it.
 6                  We could add pallet shelters.  We could
 7    add parking lots.  We could add anything to this list
 8    that you want.  So don't tell me that this is going to
 9    cost too much money.  It depends upon the services and
10    how humane we want to be.  And that's your decision.
11                  As shelters are established and homeless
12    camps are relocated away from freeway overpasses,
13    underpasses and ramps, the following criteria at a
14    minimum would have to be satisfied to ensure that the
15    process remains humane and serves the best interest of
16    the affected individuals experiencing homelessness.
17                  First, all shelters and alternate housing
18    options must be configured with adequate physical space
19    to allow the sheltered individuals to maintain the
20    minimum recommended social distance of six feet to
21    mitigate the transmission of SARS or COVID --
22                  MS. MARTINEZ:  Nineteen.
23                  JUDGE CARTER:  And if I need to get
24    Barbara Ferrer in here, if that standard has changed or
25    different, I want her on the record telling me that
```

Page 115

```
 1    she's not in favor of congregate shelters anymore and
 2    the Court will reconsider.
 3              If Dr. Sherin believes that, I want to
 4    reconsider.  But trust me, he's not.  He still believes
 5    strongly in congregate shelters.  And his position, if
 6    you listen closely, is what the Court's proposing, all
 7    the way from a parking lot that you stand up immediately
 8    to getting long-term supportive campers or recreational
 9    trailers.
10              Second, all shelters and alternate
11    housing options must have adequate hygiene facilities.
12    Let me repeat that.  Adequate hygiene facilities such as
13    handwashing stations and showers.  And I'm not going to
14    be your toilet guy checking anymore, although I was down
15    at Skid Row yesterday.  By the way, you did an excellent
16    job surfacing down there.
17              Okay.  There's a couple.  But don't worry
18    about that.  We'll burn those toilets and get two more.
19    Just kidding.  But I'm not.  I'm done being your toilet
20    guy.
21              Third, all shelters and -- in other
22    words, we just were walking.  You're going to start to
23    run.  You're going to walk and chew gum faster than you
24    ever thought you could unless you get on the ball and
25    take this out of the hands of some of us at this meeting
```

Page 116

```
 1    because if you don't, I'm taking baby steps with this, I
 2    promise you.
 3                    All shelters and alternate housing
 4    options must have nursing staff.  Let me repeat that.
 5    If you can stand that up in recreational facilities,
 6    you're going to get nursing staff.  And I would invite
 7    the city, since you're going to be tearing down
 8    recreational shelters, to seriously consider moving that
 9    already in place staff so you don't have to build it up
10    again to whatever we're going to get up in a very quick
11    period of time because otherwise you're going to
12    download it and then tell me you can't afford it.
13                    Well, you've got staff in place right now
14    with 24 shelters.  And you've done an excellent job, by
15    the way.  No reason you can't transfer that.  But I
16    leave that option to you.
17                    So here we go.  Nursing staff will upon
18    intake and test each homeless individual for
19    communicable diseases under the health conditions.  So
20    that will take away the -- if you decide to go with
21    parking lots, that will take away the enclosure problem.
22    If you decide to go with individual housing, which I
23    hope you do, great.  But that's your choice as the city
24    council and the mayor, et cetera.
25                    Fourth, all shelters and alternative
```

Page 117

```
 1   housing options must be staffed by security as necessary
 2   to ensure the safety of the homeless persons sheltered.
 3   Just go out to the VA and talk to the people and how
 4   happy they are to live in a humble parking lot just
 5   because they have the security and food.  Is that the
 6   option the Court wants?  Absolutely not.  But it is much
 7   better than when they were living on the street.  It's
 8   an iterative process.  That's all it is.
 9                Fifth, all homeless individuals will be
10   able to retain possession of their belongings.  Bring
11   what you've got because frankly I don't believe you in
12   the city and the county can provide that quickly enough.
13   So bring your stuff.
14                And must be staffed -- and whether they
15   choose to enter a shelter or alternative housing option
16   or simply relocate a sufficient distance away from
17   freeways, underpasses and ramps.  So they'll be able to
18   retain their possessions.  Now there may be somebody
19   with five pianos, and I'm joking about that.
20                But I think you're going to find 95
21   percent of these people or more are willing to walk away
22   from the bulk of the items as long as they can get
23   clean, take a shower and have food and not be afraid
24   that they're going to get kicked out for some arbitrary
25   enforcement reason.  So you build a structure, you kick
```

Page 118

```
 1     them out and they don't have a tent anymore and they're

 2     going out the door.

 3                    And six, before beginning the process of

 4     clearing freeway overpasses, underpasses and ramps, all

 5     homeless individuals living in the vicinity must be

 6     given notice in advance.  And here's what I would

 7     encourage and that is you've got a DHS team doing great

 8     things out there.

 9                    Well, for goodness sakes, let's get those

10     folks out talking to our homeless individuals and try to

11     persuade them that hopefully this is a better situation.

12     And if not, if they want to move down the street four

13     blocks, nobody is going to stop them.  This isn't a

14     forced displacement.  This has to be a little bit

15     better.

16                    And if it's attractive than the street,

17     then these folks will come in.  And if not, we might as

18     well know it.  So before beginning the process of

19     clearing the freeway overpasses, underpasses and ramps,

20     all homeless individualism living in the vicinity must

21     be given notice in advance.  Such notice shall include

22     information about nearby shelters and alternative

23     housing options, whatever you come up with.  And I'll

24     let you sort it out.

25                    Seven, all such notice is given -- after
```

Page 119

```
 1    such notice is given and after the city of Los Angeles
 2    and the county of Los Angeles provide an adequate
 3    alternative shelter for every individual experiencing
 4    homelessness living in the vicinity of a freeway.
 5                    And I'm going to include all overpasses
 6    and underpasses because remember the freeways are
 7    controlled by the state and by Caltrans, except I can't
 8    figure out your goofy agreement in 2005.  Some of it's
 9    controlled in maintenance.  Some of it's controlled in
10    jurisdiction.  Some of it's -- you're going to sort that
11    out for me.
12                    And why the state doesn't join in this
13    lawsuit, I'll frankly tell you I have no idea.  Why
14    we're at the table with the wrong players, without
15    Caltrans here and on the spot, I have no idea.  But
16    that's up to you.  But you're going to have to explain
17    why the city has to do it and the county has to do it.
18                    And I bet you Governor Newsome wakes up
19    real quick and the state figures that they're going to
20    be pretty embarrassed when you have to clear your
21    streets, your overpasses, underpasses when they're not
22    clearing the freeways, right?  It's going to have great
23    repercussions.
24                    Now, why?  After such notice is given,
25    after the city of Los Angeles and the county of Los
```

Page 120

```
 1   Angeles provide an adequate alternative shelter for
 2   every individual experiencing homelessness living in the
 3   vicinity of a freeway and/or city overpass or underpass,
 4   the city of Los Angeles and the county of Los Angeles
 5   will be allowed to enforce anti-camping laws in the
 6   vicinity of  freeways to ensure that these individuals
 7   are moved to a safer location.
 8                   And this is why individuals experiencing
 9   homelessness cannot be ordered by this Court -- I do not
10   intend to order the person to go to that specific
11   location.  But this person has no right to live in an
12   unsafe condition once the Court is aware of this from
13   this point forward or as quickly as we can implement
14   this.
15                   If all of the above requirements are met,
16   the enforcement of these limited freeway-adjacent areas
17   will be fully compliant with Martin v. Boise.
18                   Now here's the courtesy I paid to you
19   because you almost got this tonight.  The Court also
20   welcomes the parties' input on how this criteria might
21   be improved to better support the health and wellbeing
22   of the individuals experiencing homelessness currently
23   living near freeway overpasses, underpasses, ramps and
24   I'm going to of course include city and county in this.
25                   The Court also welcomes the parties'
```

Page 121

```
 1    input.  If enjoined, the city of Los Angeles and the
 2    county of Los Angeles would be responsible for
 3    disentangling which entity has authority over the
 4    subject freeway locations, city streets and underpasses.
 5    So I'm putting that burden on you because your 2005
 6    agreement is incomprehensible.
 7               And every place I go, whether it's
 8    talking to Joe or Nury or Monica or whatever, Caltrans
 9    is always on the line.  You know, we can't police it.
10    They're supposed to police it, et cetera.  So I just
11    don't understand why Caltrans and the state aren't in
12    this room right now.  We've got two-thirds of the
13    players.
14               Now although the Court believes that the
15    health risks described above constitute an emergency and
16    demand a swift response, the Court invites the parties -
17    - see, out of courtesy -- for input before ordering
18    injunctive relief.
19               To that end, the Court orders that the
20    parties file briefing on the above proposal on or before
21    the date.  And you can send it up to the Ninth Circuit.
22    Take it right up to the Ninth Circuit.  See if I'm right
23    or wrong on that.  I invite you to, in fact.  If I'm
24    wrong, I'll be corrected.  But where it's public health
25    and public healthy, the Court's going to act sua sponte.
```

Page 122

1    And this is citywide and countywide.

2              Now, each party can brief no more than 25

3    pages and should at a minimum discuss the party's

4    position on the legal justification for injunctive

5    relief so we have a good order or it'll be up to the

6    circuit, and proposed remedies outlined above.

7              But the Court further orders the city of

8    Los Angeles and county of Los Angeles to include an

9    estimate of how many individuals experiencing

10   homelessness would be affected by this proposed relief

11   no later than a date and time, Heidi, and I left that

12   blank.  I didn't expect you to have the numbers today.

13   I don't know if it's 250 people or 2,500 people.

14             So I'm going to be courteous in a moment.

15   I'm going to have all of you get together.  I'm going to

16   have you get a timeframe because I'm also a little

17   concerned about acting during the COVID crisis.  So in

18   other words, I'm telling you exactly what I'm going to

19   do.  But the timing is important to me.

20             If people are social distancing at the

21   present time and that saves lives, then I don't want

22   this done in 30 days.  Understood?  But as soon as this

23   lifts, this will be the order of the Court.  So you get

24   together and help me with the timeframe in a private

25   conversation.  And I'm going to recess.  And Michele and

```
 1    I are going to walk out of this room for just one
 2    moment.  You're going to be ordered or requested to
 3    remain because we've got a lot more to talk to you about
 4    today.  But if you can't give me guidance, then I'm
 5    going to set down the time.  And if you don't give me
 6    guidance on this, once I say the dates, that's concrete
 7    and conclusive.
 8                  Now I will get on the phone with Nury.  I
 9    will get on the phone with Joe.  This is citywide.  I'm
10    not now waiting for the district by district.  I'm not
11    waiting for 60 percent or 30 percent.  This is public
12    health and safety.  And if you couldn't figure out that
13    this was coming, I've got to tell you, you are really
14    dense.  And I'll put that on the record.
15                  You knew that I was concerned about that.
16    You knew that this was coming in some form.  It's just
17    when.  And I will not tolerate inertia in this regard
18    any longer.  So once I know it's public health and
19    safety, you're on a different footing and I feel I've
20    got great grounds regardless of Boise to act citywide
21    and statewide and I mean that sua sponte because you
22    didn't bring it to me.  And I'm disappointed in that.
23                  So you decide if you want the state
24    involved or not.  But this extends to the entire city.
25    This is going to extend to the entire county.  And if
```

Page 124

```
 1    you don't think I have the strength to back this up, I
 2    want you to test me.  I want you to see if I'm bluffing
 3    because the sanctions on this will be severe.  Everybody
 4    understand that?  You understand that?  Heidi?
 5    Christina?  Marcus?
 6                   MR. MARCUS:  Yes.  But I'm unclear --
 7                   JUDGE CARTER:  Not bluffing.  Thank you.
 8    All right.  Now go discuss this because I'm done with
 9    this conversation.  There will be no questions that are
10    going to be asked of it.  Thank you.  We'll walk out.
11                   COURT REPORTER:  This marks the end of
12    media number two.
13                   JUDGE CARTER:  Give me the dates.
14                   COURT REPORTER:  The time is 12:26 p.m.
15                   MS. MARTINEZ:  No.  He's asking them to
16    stay.
17                   COURT REPORTER:  We are off the record.
18                   (Off the record.)
19                   (End Media 2.)
20                   (Begin Media 3.)
21                   MS. MARTINEZ:  We're back in session.
22    Thank you.  We'd like to hear from whoever party, the
23    plaintiffs, the interveners and/or city or county.
24                   MS. MARSTON:  I think I was --
25                   MS. MARTINEZ:  Okay.  Heidi?
```

Veritext Legal Solutions
866 299-5127

```
1                    MS. MARSTON:  I'll start off.

2                    MS. MARTINEZ:  Yeah.

3                    JUDGE CARTER:  And pardon me.  I have to

4        come over by you.

5                    MS. MARSTON:  That's okay.  Come sit

6        down.

7                    JUDGE CARTER:  I apologize because I

8        can't hear you.

9                    MS. MARSTON:  It's okay.

10                   MS. MARTINEZ:  Go ahead, Heidi.

11                   MS. MARSTON:  Okay.  So we collectively

12       hear what the Court is saying and are sensitive to it

13       and agree that this is an important population to focus

14       on and that something needs to be done rapidly.  We need

15       until Friday to get a sense of the sheer scope of the

16       problem -- how many people are we talking about, who are

17       they -- to have some sort of plan.

18                        It also will help us to contextualize

19       this in this public health emergency where we're in a

20       crisis statewide right now for people who are highly

21       vulnerable and are impacted by COVID.  So we need to

22       keep that work moving forward and do these things at the

23       same time.  So coming back Friday will give us time to

24       have something that's more concrete.

25                   JUDGE CARTER:  One thing that was
```

```
 1    mentioned was a people approach.  In a really humane
 2    world, it would be nice that DHS or medical services
 3    were out there talking -- I mean, talking to people
 4    individually and they're -- we're trying to do
 5    something.  And if not, then they're given a choice.
 6    They don't have to go to this place.  But if they do go
 7    to the place, we increase their chances of treatment in
 8    some form.  And that's Dr. Sherin's position.
 9                 MS. MARSTON:  Yeah.
10                 JUDGE CARTER:  And why it helps.  But
11    I've watched your kids out on the street.  They're doing
12    a great job.  I've got the pictures.
13                 MS. MARSTON:  They sent the pictures
14    yesterday.
15                 JUDGE CARTER:  Yeah.  No.  It's --
16                 MS. MARSTON:  They were very excited.
17                 JUDGE CARTER:  You should be so proud.
18                 MS. MARSTON:  Yeah.
19                 JUDGE CARTER:  And these young people are
20    out there and they're as good as they come.  Anything
21    that we can do, one life at a time, is incredibly
22    valuable.  So on the one hand, no forced displacement.
23    But we have to build something humane enough that it's
24    one step up even though it's not the ultimate goal.  And
25    number two, we can't let this become a hole.  So I know
```

Page 127

```
 1    we can't get that far.  But eventually everybody's goal

 2    would be get folks moving up into this -- you don't have

 3    to solve that from the beginning.  But we do have to

 4    solve it.

 5                   So if we -- not if, we're going to do

 6    this -- I'm going to the only milestone that you do

 7    along that are okay.  I LAHSA and the county and the

 8    city I don't want what I think I have and that's

 9                   MS. MARSTON:  Just moving them.

10                   JUDGE CARTER:  Yeah.  So create that,

11    that and trying to make things better.

12                   MS. MARSTON:  Yeah.

13                   JUDGE CARTER:  Friday?

14                   MS. MARSTON:  Friday.

15                   JUDGE CARTER:  Friday --

16                   MS. MARSTON:  Yeah.

17                   JUDGE CARTER:  -- will be enough.  Okay.

18    Thank you.  Sarah?

19                   MS. DUSSEAULT:  And I just want to

20                   JUDGE CARTER:  Yeah.  Absolutely.  It

21    gives you the choice to prioritize it.  If I'm DHS out

22    there or I'm LAHSA or I'm -- I could have somebody I

23    could have somebody who's got coughing.  Now we know.

24    And what I'm forcing you to do is I'm forcing you to

25    disperse the streets because you've done it anyway.  I'm
```

Page 128

```
 1    just forcing you to do that.  Yeah.  And so, once -- if
 2    this works, what do is get a better idea of the
 3    population.  We're going to get a serious much better
 4    housing.  So we're going to have to make some tough
 5    decisions.
 6              Heidi, I can't thank you enough because I
 7    wouldn't have known.  I'll probably issue this order
 8    leaving it undefined until Friday.  So I will get this
 9    order out.  But what I'll do is I'll the date that's all
10    I'm asking.  Okay.
11              MS. MARTINEZ:  So just very quickly, just
12    a second --
13              JUDGE CARTER:  It's also --
14              MS. MARTINEZ:  Just what I heard, Heidi,
15    is that you guys need until Friday to figure out what
16    the scope is, what number of people are actually out
17    there in the overpasses and underpasses, what services
18    possibly they're going to need.
19              And I'm assuming you're going to look at
20    this from a subpopulation based on services.  Is it
21    families?  Is it those that are chronically ill, those
22    folks that have other issues?  Am I correct or not or
23    are you guys just going to go out there and just do an
24    estimate?
25              MS. MARSTON:  So --
```

Page 129

```
 1                    MS. MARTINEZ:  So I just want some --

 2                    JUDGE CARTER:  Well --

 3                    MS. MARTINEZ:  I just want some clarity.

 4    That's important for me.

 5                    JUDGE CARTER:  It was just a rough number

 6    on what --

 7                    MS. MARTINEZ:  So what --

 8                    JUDGE CARTER:  It's been a long road

 9    actually.

10                    MS. MARSTON:  Of course.

11                    MS. MARTINEZ:  So what does that mean

12    when you talk about scope and who they are and services

13    needed, you know, if you can break that down for me.

14                    MS. MARSTON:  Yeah.  So step one is are

15    we talking hundreds of people, thousands of people,

16    right?  So that's the first piece.  The second is how do

17    we address that in the context of a public health

18    emergency where we're prioritizing people.

19                    These people potentially -- to your

20    point.  But we're also working with folks who could die

21    if they get COVID.  So balancing the needs of both of

22    those so that we can make sure we're being responsive

23    under this --

24                    JUDGE CARTER:  Okay.  Fair enough.

25                    MS. MARSTON:  Yeah.
```

Page 130

```
1                       JUDGE CARTER:  Yeah.  So the first step
2      is numbers required.
3                       MS. MARSTON:  Right.
4                       JUDGE CARTER:  And then a further
5      discussion about how we can expend our resources
6      reasonably --
7                       MS. MARSTON:  Yeah.
8                       JUDGE CARTER:  -- to find out who these
9      folks are individually as people.
10                      MS. MARSTON:  Yeah, and how we can move
11     this quickly.  Yeah.
12                      JUDGE CARTER:  Right.  Yeah.
13                      MS. MARTINEZ:  Okay.
14                      JUDGE CARTER:  Okay.
15                      MS. MYERS:  And Your Honor, I just want
16     to add to that --
17                      JUDGE CARTER:  Hang on, Shayla.  I'm
18     coming over.
19                      MS. MYERS:  I just want to that that, I
20     mean, my understanding -- and obviously I'm not involved
21     in the Orange County litigation.  But to the extent that
22     there was some of these sort of location-based movement
23     of folks, one, it didn't happen in the course of COVID-
24     19.
25                      JUDGE CARTER:  Right.
```

Page 131

```
 1                    MS. MYERS:  And I think that is

 2   incredibly important when we're talking about relocating

 3   folks.

 4                    JUDGE CARTER:  I agree.

 5                    MS. MYERS:  And I think you acknowledged

 6   that.

 7                    JUDGE CARTER:  Absolutely.

 8                    MS. MYERS:  You know, folks -- we've

 9   actually spent a -- we have deep connections with some

10   of the folks at different underpasses in different

11   communities because there are so many underpasses and

12   overpasses in Los Angeles and the communities are very,

13   very different.

14                    But some folks are there because those

15   are the best places to, in different times, not socially

16   distance, but to have space for ADA compliance, those

17   kinds of things.  There aren't a lot of places in Los

18   Angeles where people can both survive on a sidewalk and

19   be ADA-compliant.  But some of the freeways and

20   underpasses are those locations.

21                    That's not to suggest that it is safer

22   for them because I hear you.  And I know our side

23   certainly raised these concerns about the respiratory

24   issues related to overpasses and underpasses.

25                    But what we want to make sure that we're
```

Page 132

```
 1    not doing is that we're not putting people in a rock and
 2    a hard place where they made the -- and we've talked
 3    about this, Robin.  Folks who are at underpasses and
 4    overpasses are making the decision to go there for very
 5    specific reasons.  We want to give them something
 6    better, absolutely.  But not to break confidences, but
 7    that is the conversation that we went back and forth
 8    about with the county is that unfortunately people move
 9    in and out of homelessness, right?
10              And so, overpasses and underpasses are
11    not -- are not static populations, right?  Who's there
12    today may not be who was there yesterday and may not be
13    who is there tomorrow.  But people are going to keep
14    going back to the underpasses and overpasses if they're
15    still being displaced in other places.
16              And so, what we feel very strongly about
17    is that an order from the Court related to protecting
18    public health doesn't, one, jeopardize folks' well-being
19    related to COVID-19 but also places them in a position
20    where they're relocating into neighborhoods and then
21    getting forced from those locations to other places,
22    right?  Does that make sense?  Because --
23              JUDGE CARTER:  Yes.
24              MS. MYERS:  Because we -- because people
25    go to underpasses and overpasses in this city for very
```

Veritext Legal Solutions
866 299-5127

```
 1    specific reasons.  They're sanctuaries.  And that is a
 2    horrible choice that people have.  But they're -- but
 3    people are resilient and smart and making decisions that
 4    are the best they have.  I'm concerned about the
 5    policing implications --
 6                    JUDGE CARTER:  I understand.
 7                    MS. MYERS:  -- and the lack of humanity
 8    after, right?  After this group of folks are moved, but
 9    then there is still this space that's available and
10    people are going to move back into that location.  What
11    it's going to take to keep those areas closed has to be
12    part of the conversation.  That's hundreds of miles.
13    And it's hundreds of miles of policing --
14                    JUDGE CARTER:  Yes.  It is.
15                    MS. MYERS:  -- in communities of color.
16                    JUDGE CARTER:  Good.  I'm glad all of you
17    are hearing this.  All stepping up.  You know, baby
18    stepping it up.  It's going to be hundreds of miles of
19    policing.  But it's going to be hundreds of miles of
20    mental health and it's going to be hundreds of miles of
21    medical.  And it's going to take a combined effort.
22    Absolutely.
23                    MS. MYERS:  But we're not adding enough
24    spaces.
25                    JUDGE CARTER:  Well, we are going to.
```

Page 134

```
 1                    MS. MYERS:  We're not doing that today.
 2     And the harm will be to unhoused folks.
 3                    JUDGE CARTER:  We're going to work
 4     together.  You're right by my side and you're watching.
 5                    MS. MYERS:  Okay.
 6                    JUDGE CARTER:  We're starting.  We're
 7     reconvening and we're also right now --
 8                    MR. YOUNG:  Your Honor, we -- we, the
 9     county, we share those concerns that Shayla has
10     articulated.  So one, I think that's positive that we
11     share those concerns.  But --
12                    JUDGE CARTER:  Now, I know you share the
13     concerns.  Tell me the solutions.
14                    MR. YOUNG:  So --
15                    JUDGE CARTER:  Tell me what we do
16     instead.
17                    MR. YOUNG:  Yeah.
18                    JUDGE CARTER:  You're a federal judge and
19     you hear from everybody --
20                    MR. YOUNG:  Right.
21                    JUDGE CARTER:  -- that people are sleeping
22     under the freeway with noxious fumes and you're supposed
23     to sit there and listen to this.  I don't think so.
24                    MR. YOUNG:  No disagreement with that
25     either.  I think part of the solution is taking a hard
```

```
 1    and sober look at what is our outreach and how are we

 2    affecting these populations.  The point I was going to

 3    make, Your Honor, is -- and I'm not exactly sure kind of

 4    which order you were articulating in terms of what

 5    you're going to order, what you're going to release.

 6                    JUDGE CARTER:  Clarification means that

 7    you don't want to do it.

 8                    MR. YOUNG:  But it's --

 9                    JUDGE CARTER:  So I'm done clarifying

10    now.

11                    MR. YOUNG:  Yeah.  So we want it.  We

12    want to be part of the solution.

13                    JUDGE CARTER:  You will be.

14                    MR. YOUNG:  And the -- we will be.

15    You're right, Your Honor.  We want to make sure that

16    what we're talking about is something that is

17    collaborative and that asks for statuses, just like kind

18    of what Heidi --

19                    JUDGE CARTER:  I know.  You become

20    collaborative because you feel we're moving too fast,

21    we're making a mistake very quickly.  And now, I'm

22    setting things.  I will deal within reason concerning

23    time period, humanity.  But you don't control the time

24    period.

25                    MR. YOUNG:  That's fine, Your Honor.  The
```

Page 136

```
 1    concern that we have is from a harm perspective and

 2    whether or not the balance of harms would exceed kind of

 3    the benefits.

 4                  JUDGE CARTER:  Take it to the circuit.

 5                  MR. YOUNG:  So --

 6                  JUDGE CARTER:  take it to the circuit.

 7    Write your brief and take it up there.

 8                  MR. YOUNG:  Right.

 9                  JUDGE CARTER:  And take the position that

10    you're all for living under freeways with noxious fumes.

11    I'm going to enjoy that, I think.

12                  MR. YOUNG:  Sorry?  I didn't hear that.

13                  JUDGE CARTER:  I'm hearing excuses.

14    That's what I got out of the conversation.

15                  MR. YOUNG:  I can't hear.

16                  MS. BLACK:  He said he's hearing excuses.

17                  JUDGE CARTER:  I can't be more blunt

18    about it.

19                  MS. BLACK:  He's hearing excuses.

20                  MR. YOUNG:  Oh, okay.

21                  JUDGE CARTER:  I'm hearing the woulda,

22    coulda, shoulda and I can't do it again.

23                  MR. YOUNG:  No.  That's not -- that's not

24    the position of the county.  The position of the county

25    is we're in a public health emergency and we need to
```

Page 137

```
 1    walk and chew gum at the same time.

 2                    MS. MARTINEZ:  And so --

 3                    JUDGE CARTER:  I am open to reason.

 4                    MR. YOUNG:  Yeah.

 5                    MS. MARTINEZ:  So Judge Carter --

 6                    MR. YOUNG:  And that's why I'm making the

 7    point with respect to time.

 8                    JUDGE CARTER:  And I am not helping you.

 9                    MS. MARTINEZ:  I think what is very

10    clear, all the -- what we want -- what you guys are

11    telling us is that you want to make sure that the

12    housing is secure, safe, right, for these folks.  You

13    don't want any kind of harm.

14                    And I get what you're talking about,

15    Shayla, in regards to the potential of displacing those

16    that already in these overpasses and underpasses that

17    have gone there for reasons, whether we like it or not,

18    is safe for them, in their mind.

19                    JUDGE CARTER:  Yeah.

20                    MS. MARTINEZ:  I think what the Court is

21    trying to say is that they don't -- we don't want to

22    relocate folks without not having a solution.  And I

23    think that's where you're coming from.  And I don't --

24                    JUDGE CARTER:  My impression is you're

25    not coming up with a solution.  You're giving me a
```

Page 138

```
 1    problem again.  I'm giving you a suggestion to cooperate

 2    with DHS.  I'm giving you the option of getting mental

 3    health together.

 4                   MR. YOUNG:  Yeah.

 5                   JUDGE CARTER:  But all I'm hearing is

 6    stalling by the county.

 7                   MR. YOUNG:  Well, that's why I mentioned

 8    outreach, Your Honor.

 9                   MS. MARTINEZ:  Yeah.

10                   JUDGE CARTER:  And you can put this

11    together.  So I think I'm almost done with this

12    conversation.

13                   MR. YOUNG:  I agree with you.  I agree

14    with you.  It's outreach.  It is mental health.  It is

15    health services.

16                   JUDGE CARTER:  Then do it.

17                   MR. YOUNG:  Exactly.

18                   JUDGE CARTER:  Do it.

19                   MR. YOUNG:  We are going to do it.

20                   JUDGE CARTER:  Okay.  I'll work with you

21    in terms of time.  I will not work with you in terms of

22    more clarification.  It'll be out in written form

23    tomorrow.  And I won't hear that this is too big for the

24    county.  That clear?  We've had 20 years.  Okay.  What

25    else?  Okay.  This will be out in written form tomorrow.
```

Page 139

```
 1    The next scheduling conference will be on Friday.  So I
 2    pay deference to you, Heidi, in terms of the numbers.  I
 3    will work.
 4              So all of you can take this back to the
 5    mayor, Nury, the board.  You can take this back to
 6    Kathryn, et cetera.  You'll see it in written form.  And
 7    then I'll work with you in terms of dates.  So in other
 8    words, of course we have the COVID crisis.  That's a
 9    wasted conversation.  I have no intention of moving
10    people who are self-distancing if we're saving lives
11    right now.
12              But if any of you would like a better
13    record, I invite you to invite me to get Dr. Sherin in
14    here.  He's just going to repeat exactly what he said
15    before and that is he's in favor of congregate.  He
16    wants mental health people out there.  He likes the
17    security.  He likes the lighting.  Would you like him to
18    testify?  How about Barbara Ferrer?
19              MS. MYERS:  Your Honor, I think we would
20    welcome testimony from Dr. Ferrer taking the position
21    that congregate --
22              JUDGE CARTER:  Well, if so, then I'll
23    have Dr. Sherin testify and LAHSA.  He's part of the
24    team.  But that will not stop this order going out.  It
25    will only shape, if you will, you know, how we respond
```

```
 1    forward because I'm depending upon -- heavily upon them.

 2                   MR. YOUNG:  And that was my --

 3                   MS. MARTINEZ:  Yeah.  Correct.  I

 4    understand.

 5                   MR. YOUNG:  Yeah.  Your Honor, and that

 6    was my --

 7                   JUDGE CARTER:  I hear the COVID problem,

 8    Shayla.  Don't intend to move somebody in that period of

 9    time.  But I'm heavily having trouble why if the

10    impression is -- they're not being forced to go

11    anyplace.  They're just being forced not to live in an

12    unsafe condition.

13                   So that's why I'm having problems with

14    any of your arguments today.  So they don't want to go

15    into a shelter?  My job is to create with all of you a

16    better situation where they actually want to go or some

17    percentage wants to go because even if you force people

18    in, you can't keep them there if it's not adequate or if

19    they're not getting a benefit.

20                   So if they can't was their hair or they

21    can't take a shower or they can't use the toilet that

22    you've been complaining about that's nonexistent, it's

23    silly to create this because they're going to move.  So

24    our duty is to create something better.  It just won't

25    meet you standards if we're going to start this process,
```

                                                   Page 141

```
 1    okay?  So I'm sorry for being so harsh.  But once again
 2    I'm hearing something I'm just not going to tolerate.
 3                    MR. YOUNG:  We're saying the same thing.
 4    I think we --
 5                    JUDGE CARTER:  We're going to do it.  We
 6    are going to do it.
 7                    MR. YOUNG:  I think the input with
 8    respect to Dr. Sherin, Dr. Ferrer are our
 9    considerations.  I think that's why I say we need to be
10    kind of mindful of what the balance of harms are with
11    respect to the public health emergency.  So that's all
12    I'm saying.
13                    JUDGE CARTER:  I've already made my
14    determination.  I've already made my determination of
15    balance of harms.  That's my ruling.  I'm only being
16    polite in telling you how I balanced those harms.
17    That's what you're going to see tomorrow in written
18    form.
19                    Now, if Dr. Sherin and Barbara can help
20    us in that regard, I'd welcome it.  But I'll have you
21    set that up and give me a date and time.  You'll call
22    them, make that convenient.  But then I want the mayor
23    here.  I want Nury here.  I want Joe here.  I want
24    Michael here.  I want all the major players in the room
25    if they testify.  Understood?  No.  That's it.  That's
```

Page 142

```
 1   my bottom line.  Dr. Sherin will be in here testifying
 2   again.
 3               But he's not testifying just to
 4   attorneys.  He's testifying to our principals along with
 5   Barbara Ferrer in this nice hotel.  And they can listen
 6   because now I want my principals here.  So that's my
 7   demand, that I have the decision-makers, not the
 8   attorneys, okay?  Kathryn.  Everybody's here.
 9               MS. CHAVEZ:  Is that Friday, Your Honor?
10               JUDGE CARTER:  No, no.  Not Friday.
11   Friday's only the number.  I want Heidi to have the time
12   to work with those numbers so we have some idea of the
13   ballpark.  I don't think it's fair for you to have folks
14   out in the street with a demand by me to do, you know,
15   all the mental health evaluations on how many people by
16   Friday.  I don't know if I'm dealing with 500 or 5,000.
17               And I don't know how many are going to
18   move and neither do you.  I'd like people to be treated
19   individually and humanely.  And I have the DHS teams to
20   do it.  You're everywhere.  I'm not sure I've got the
21   medical people to do that so far.  They haven't been
22   present, in my opinion.  But so I'm trying to work with
23   you.  Okay.  Back to you, Michele.  I've said enough.
24               MS. MARTINEZ:  Yeah.  Thank you, Judge
25   Carter.  And I would just conclude with the following,
```

```
 1    that the overreaching goal is still in play.  So just

 2    because the judge is talking about a potential

 3    injunction on overpasses and underpasses does not mean

 4    that you all cannot continue to work on a settlement

 5    agreement.

 6                    And so, it's two different things that

 7    we're discussing here.  Obviously there will be some

 8    benefit as we move forward if this moves forward with

 9    this population in finding suitable housing

10    accommodations for them to meet whatever number

11    hypothetically, you know, of your total unsheltered

12    population.

13                    So I just want you all to keep that I

14    mind, that we're still moving forward concurrently with

15    an overreaching agreement with the city, county,

16    plaintiffs.  And this has nothing to do with that

17    structure.

18                    JUDGE CARTER:  Yeah.  And once again,

19    with the Court's appreciation for allowing me to talk to

20    so many people and certainly like yesterday on Skid Row,

21    this is not a one person survey walking down Skid Row.

22    For goodness sakes, Shayla, you live down there.  You

23    know the people a lot better talking to them than I do.

24    I don't mean live.  But you work down there.

25                    But if we could work together on this, if
```

```
 1    we make a mistake, we can back up.  But I do believe
 2    that we've got the resources to be somewhat people-
 3    oriented.  I do believe that we have the resources to
 4    step up in terms of needs.  We don't even know what
 5    those needs are.  I don't even know the number of people
 6    living under the freeway system right now.
 7              And what I'm concerned about is this.
 8    Caltrans isn't here again.  I keep repeating that to
 9    you.  And I don't care about the good relationship
10    between the city and the county and Caltrans.  What I
11    get frustrated with is the fact that there's so much
12    finger-pointing going on over who has maintenance,
13    enforcement, cleaning, what is a city compared to a
14    Caltrans.
15              You ought to hear Mayor Rodriguez talk
16    about that overpass that were down there.  I wish you
17    could be present just about the confusion.  I wish you
18    could talk to Joe about the confusion with Caltrans.
19    You sort that out for me.  You made this.  So the
20    Court's not going to go through each piece of property
21    and then run into a problem like Maple.
22              You're going to do that.  You're going to
23    tell me what's available.  You're going to tell me how
24    many parking lots.  And I'll work with you in terms of,
25    you know, timing and security, okay?  But what I won't
```

Page 145

```
 1    do is stand for the inertia now.  So this order will be

 2    out tomorrow.  That will be for all of your constituents

 3    to read.  Okay.  You want to turn to this?  Can I turn

 4    to this?

 5                    MS. MARTINEZ:  Yeah.  Just if you're

 6    going to --

 7                    JUDGE CARTER:  Okay.  I'm going to review

 8    those.  I'm going to review the properties in

 9    conjunction with Caltrans.  The Court has been informed

10    that the city and county of Los Angeles have agreed to

11    work with Caltrans on the following timeline.

12                    First, the city and county shall respond

13    to Caltrans on or before May 14, 2020.  There was a

14    correction with that, I think, Marcus --

15                    MR. MARCUS:  Yes.

16                    JUDGE CARTER:  -- from you or from the

17    county.

18                    MR. MARCUS:  No.  It was from the city.

19    The city in the submission that I filed last night --

20                    JUDGE CARTER:  Yeah.

21                    MR. MARCUS:  -- I made it clear what the

22    city is providing to Caltrans by tomorrow are what are

23    called use assumptions.  Basically Caltrans, assume

24    we're going to use these properties for these certain

25    uses.  Caltrans then looks at those use assumptions and
```

Page 146

1   tells us --

2               JUDGE CARTER:  Will you --

3               MR. MARCUS:  -- what the environmental

4   concerns are based on those uses at that property.

5               JUDGE CARTER:  Will you help me rewrite

6   this more accurately then?  This is what I got from my

7   notes in the conversation.  So today I'm going to

8   rewrite this --

9               MR. MARCUS:  Okay.

10              JUDGE CARTER:  -- if you'd stay for one

11  moment.

12              MS. MARTINEZ:  It's in his -- it's in his

13  --

14              MR. MARCUS:  Yeah.  It's part of my

15  submission that I filed last night.

16              MS. MARTINEZ:  Yes.

17              JUDGE CARTER:  Well, we'll review it.

18  Second, Caltrans shall then respond to the city and

19  county on or before May 28th.  Is that correct?

20              MR. MARCUS:  Yes.  They'll get back to us

21  in two weeks.

22              JUDGE CARTER:  Regarding its

23  environmental or other concerns with tentative plans for

24  the chosen property.  Finally the city and county shall

25  draw up plans for each of the individual sites on or

Page 147

```
 1    before June 11, 2020.  And I want to help you with those

 2    dates because without Caltrans here, how would I be

 3    knowledgeable enough not to say that this was done

 4    within, you know, x period of time.  That's what I'm

 5    looking for in terms of cooperation.

 6                    So during the process, the city and

 7    county and Caltrans shall begin working together to form

 8    leases on the subject properties immediately upon

 9    receiving notice of Caltrans' environmental and other

10    concerns.

11                    So let me stop for a moment.  This Los

12    Angeles piece of property, I was told it could be up and

13    running in, what, 30 days.  How are we doing with it?  I

14    mean, the Los Angeles piece of property.  I was told

15    that Maple and 16th was going to get repaved, et cetera.

16    How are we doing with this?  Or is this a meaningless

17    discussion that we've had?  So are we on track to do

18    this?

19                    Help me, because otherwise it's just a

20    bunch of words and I'm not here for wordsmithing today.

21    And by the way, I want all four pieces of property.  I

22    don't want one piece of property where your owner feels

23    like he or she's being singled out.  I want to sweep the

24    board with everything you've gave me so far.  And that's

25    four pieces of property.  You said that these were
```

```
 1    available.  Make them available.
 2                  MS. MARTINEZ:  So are you asking for the
 3    status of those four properties?
 4                  JUDGE CARTER:  No.  I've got them in that
 5    first report.  I can go back and report.  But Marcus
 6    submitted to me four pieces of property.  One was over
 7    in Gil's district, which I was really worried about
 8    without Gil being contacted.
 9                  MS. MARTINEZ:  Correct.  But out of those
10    four --
11                  JUDGE CARTER:  One's down in Marqueece.
12    Yeah.  I'm sorry.
13                  MS. MARTINEZ:  Yeah.  But out of those
14    four properties, we focused on two which was the one on
15    Eighth Street.
16                  MR. MARCUS:  Yeah.
17                  JUDGE CARTER:  That's Gil's.
18                  MS. MARTINEZ:  On Los Angeles Street,
19    excuse me.
20                  JUDGE CARTER:  And I need the courtesy
21    out to --
22                  MR. MARCUS:  There is the -- so there's
23    the --
24                  JUDGE CARTER:  I need the courtesy out to
25    Gil.
```

Page 149

1                          MR. MARCUS:  So there was originally the

2      16th and Maple property --

3                          MS. MARTINEZ:  Yes.

4                          MR. MARCUS:  -- which the city is still

5      working to set up the safe parking at that site as well

6      because we can do that.

7                          MS. MARTINEZ:  Yeah.  And you all needed

8      three weeks for that, right?  And yeah --

9                          JUDGE CARTER:  Thirty days.

10                         MS. MARTINEZ:  You're at week two.

11                         MR. MARCUS:  No.  The 30 days was for --

12     at Los Angeles, not at 16th and Maple.  So originally it

13     was 16th and Maple.  It was originally going to be

14     pallet shelters.

15                         MS. MARTINEZ:  Yeah.

16                         MR. MARCUS:  The environmental concerns

17     came up.  The environmental concerns allowed for RV safe

18     parking.  So the city is still proceeding.

19                         JUDGE CARTER:  I'm sorry.  Allows RV?

20                         MR. MARCUS:  The environmental concerns

21     still allow for RV safe parking at 16th and Maple.  So

22     the city is still proceeding with 16th and Maple for RV

23     safe parking.  We reached an agreement amongst the

24     parties to do safe parking at the Los Angeles Street

25     location.

                                            Page 150

1        JUDGE CARTER:  Okay.

2            MR. MARCUS:  It was brought to your

3    attention last week that the plaintiffs have withdrawn

4    their agreement to that location and now object to that

5    again.

6                JUDGE CARTER:  Fine.

7            MR. MARCUS:  So I circulated some

8    additional other sites to see if we could also get

9    agreement on other sites as well.  So I just sent that

10   literally as I was walking down here today.

11           So hopefully we can reach an agreement

12   amongst the plaintiffs, the city and the interveners as

13   to another site so we can all do this by agreement

14   because the last time we were here, the Court wanted an

15   agreement.  We reached an agreement.  That agreement is

16   no longer valid.

17           We asked the Court, well, what do you

18   want us to do.  You said you were leaving it up to the

19   parties.  So I'm trying to find a different agreement to

20   a different site.  We're not saying no to Los Angeles.

21   We're saying if there's now an objection by one of the

22   parties to Los Angeles, let's see if we can find

23   something that everyone agrees to which is what the

24   Court asked us to do was to reach an agreement.

25               JUDGE CARTER:  And when is that taking

                                                    Page 151

1   place?  In other words, that was clear last week.  This

2   is this week.  When is this taking place?

3                    MR. MARCUS:  I just sent today the new

4   locations for them to assess.  I just sent that today.

5                    JUDGE CARTER:  And here's what I don't

6   understand.  I don't know that I care about any specific

7   piece of property.  But Los Angeles is just one of many

8   pieces of property.  That is a baby step.

9                    I mean, I don't know if I need four or

10  five.  But I'm going to want multiple pieces of

11  property.  And we would have avoided this whole process

12  and discussion if we had five pieces of property in this

13  area because then your client wouldn't feel singled out.

14  And as far as suing, they can sue the city.  That's

15  nice.

16                   MS. MITCHELL:  Not my client.  Not my

17  client.

18                   JUDGE CARTER:  So here's my bottom line.

19  The Court is not going to send a message of NIMBY-ism

20  because somebody decides to threaten to sue the city

21  because that message is as follows.  If I threaten to

22  sue you and I'm rich and powerful, somehow we're

23  supposed to back away because of the threat of the

24  lawsuit.

25                   And the second thing is it's an excuse

                                            Page 152

```
 1    for the wealthier to dump the problem quite frankly on

 2    the less fortunate because if you've got money to sue,

 3    the message is I'm strong and powerful and we the city

 4    or the county are going to buckle.  No.  You're not.  In

 5    fact, you're going to give me more property.

 6                So I don't understand why I don't have

 7    all four pieces of property, why I'm dealing with one

 8    piece of property.  You put four on the table for the

 9    city.  My recommendation is I have all four.  I've got

10    Los Angeles.  I've got Gil's or only after a courtesy

11    of, you know, talking with them each.  I want to talk to

12    them, okay?  And the other ones down in Marqueece and

13    Curtis' district, he deserves a call because it was way

14    down the way and I haven't seen it yet.

15                I want all four of those.  Now can I

16    order that?  No.  But I'm not about to send a message

17    from this Court of NIMBY-ism or somebody threatening to

18    sue.  Go ahead and sue.  And I think if you get 20 or 30

19    pieces of property out there, nobody's going to sue,

20    quite frankly, because they won't feel alone.  But right

21    now, one homeowner or one property person feels like

22    they're being singled out.  And that's nonsense.  We

23    need to step this up, not step this down.

24                So work it out.  But I would prefer all

25    four.  I can't order you to do that because there's no
```

1    health and safety problem here, right?  But if I could,

2    I would.  I'd order you to put every piece of property

3    you've got available on the table.  So I'll leave that

4    with you having those discussions about what you put up.

5                 Okay.  Here's the next.  The full extent

6    of the available properties.  So we know we went from

7    hundreds down to 19 and we know that the city has an

8    exhibit which is confidential.

9                 Marcus, can you share that confidential

10   exhibit?  Not the content of what you wrote me, but can

11   you share those city properties with the advocate so

12   that you can see what's on the table because I've come

13   down from the statement by the advocates where you

14   believe you have thousands of pieces of property, and

15   you may have.

16                Marcus has submitted to me a limited

17   number of properties.  And I'd like you, if you think

18   you have more properties available, but the city isn't

19   the only important resource.  If you've got something on

20   the 710 freeway that Carol is talking about and it's not

21   on this list and it's city property, I'd like to know

22   about it.  So can you share?

23                MR. MARCUS:  To be clear, Your Honor, the

24   exhibit A was part of the public filing that was sent to

25   all of the parties.

                                              Page 154

1           JUDGE CARTER:  Oh, it was?

2           MR. MARCUS:  Yes.

3           JUDGE CARTER:  Thank you.  I'm so used to

4    stove piping.  So I keep confidences really well

5    actually.  So that's a public record, right?  Then I

6    don't have to -- Marcus, thank you.  Very humbly, thank

7    you for that.

8           MR. MARCUS:  Yeah.

9           JUDGE CARTER:  Okay.  Okay.  I'm not

10   going to discuss the recreational centers today.  That

11   was in good faith, a confidential, something that came

12   to the Court.  That stays off the table for today's

13   date.  The mayor needs to work with that.  You need to

14   have the time.  I'm done.

15           MS. MARTINEZ:  Not everything was turned

16   in, in regards to what the structure would look like for

17   a settlement negotiation.  What you guys provided was

18   simply on the available properties, public properties

19   and which I shared with some of you that we were okay

20   because we wanted to have this conversation.

21           But we eventually want to come to some

22   kind of an agreement.  As we did today, I think we did

23   identify types of housing accommodations that folks can

24   agree upon.  Now it's going to be moving towards the

25   units, the beds per type.  And I know -- not to

                                        Page 155

```
1   disclose, some of you have presented that, but not
2   everyone.  And so, as well as the service level per
3   option, the funding per option, the distribution per
4   option, types by district.
5               And I think by right now, I think we are
6   going by district.  So unless that changes, correct,
7   Judge Carter?
8               JUDGE CARTER:  No.  That's correct.  And
9   I think that expresses the universal agreement, quite
10  frankly, of the council, without disclosing individual
11  conversations.  But every councilperson indicated to me
12  privately that.
13              MS. MARTINEZ:  And then finally what
14  would those timelines look like for the city and the
15  supervisor district and when would we be able to get
16  this moving.  So what are those benchmarks and some
17  timelines that are short-term, midterm and long-term to
18  house people.
19              I certainly understand that you're not
20  going to be able to get, you know, 25,000 to 30,000
21  people off the street in one week, two weeks, three
22  weeks, four weeks or all in hotels and motels.  And so,
23  I think we understand that.  And so, we would like to
24  get from you all what that would look like, what that
25  timeline would look like based on those housing
```

Page 156

1    accommodations across the board.

2                    JUDGE CARTER:  Yeah.  So let's do this.

3    Let's reassemble.  I expect an answer either at 5

4    o'clock or midnight tomorrow.  But I don't care.  But I

5    want a final answer if this is going to proceed to

6    settlement or not with the county.  And if you need

7    Kathryn or whoever, please, okay?

8                    MS. MARTINEZ:  How long do you want to

9    give them to put this together?

10                   JUDGE CARTER:  Oh ,what I'm going to do

11   is I'm going to --

12                   MS. MARTINEZ:  So yeah, because the

13   county settlement is totally different, I think.

14                   JUDGE CARTER:  It's totally separate.

15                   MS. MARTINEZ:  It's confusing.

16                   JUDGE CARTER:  I skipped.

17                   MS. MARTINEZ:  You skipped.  Yes.

18                   JUDGE CARTER:  I skipped.  Okay.  Let me

19   do this.  I'm going to put this out in its present form

20   where I'm actually requesting your participation.  I'm

21   not going to issue this as a final sua sponte

22   injunctive.  But it's done.  In other words, this is

23   what's eventually going to go out.  I want to hold that

24   though in a sense so that you have a chance to

25   participate in terms of timing, problems, whether we can

Veritext Legal Solutions
866 299-5127

```
 1    get DHS out there, what those teams would look like,

 2    parking lots to accommodations, how long that would take

 3    to ramp up.  And we can work together on that, but not

 4    much longer.

 5                So I'll put this out the way I read it to

 6    you as a courtesy today.  Fair enough?  Okay.  But this

 7    is exactly what's going to eventually happen if I issue

 8    injunctive relief, which I already have in a sense.

 9    This is how it's going to read.  Okay.  So all I'm doing

10    is working with you on dates and times now, not a change

11    in my position.

12                Okay.  Number two, I would really request

13    that somebody start contacting the governor of the state

14    of California about the freeway system because you're

15    going to be in a mess -- and I mean this -- with the

16    entanglement between who's got the 10 off-ramp versus

17    the transfer of the property from Caltrans to the city

18    who then points back to Caltrans who then points to the

19    city and says it belongs to you, let alone the county.

20                And listening to Monica and other council

21    people, it's a nightmare to figure out the jurisdiction

22    between maintenance, enforcement, et cetera, with all

23    the council people giving me their best input about this

24    2005 agreement that is an entanglement of confusion.

25    And I think it's going to be used against any progress
```

Page 158

```
 1    because one side can always say it's them.

 2                    So I don't know how you get the state

 3    involved.  I'm not suggesting a lawsuit if you've got a

 4    good working relationship.  But if you need to, the

 5    state needs to be at this table if the governor is

 6    serious about this and needs to be a part of this

 7    process because it's going to put tremendous pressure on

 8    the city and the county.

 9                    But this is going to issue.  In fact, it

10    has issued.  If I'm the state, all of a sudden I'm

11    thinking, well, what do I do now.  Well, maybe they

12    ought to get to the table and participate.  And by the

13    way, they should have some money for you.  Let me just

14    be blunt about that.

15                    If this is part of their problem

16    underneath the 10 freeway, I don't understand the

17    relations with the state.  I mean, if we're going to

18    clean this up in a sense and get people out from under

19    there and treat them more humanely, okay?  Okay.  Now

20    finally, how do we sort out the problem between who's

21    going to pay for what.

22                    And this is the second biggest

23    entanglement and I want you to cover that for a moment

24    because I am so frustrated listening to the county and

25    the city in private conversations, not with the council
```

Page 159

```
 1    because you're the odd ducks out.  I'm meeting with a

 2    lot of different people, quite frankly, about who's

 3    paying for what.

 4               It's why LAHSA was created and we're

 5    still fighting that battle.  Do I take this piece of

 6    property by piece of property?  Is that what I'm going

 7    to do?  I don't think so.  So Kathryn pledges.  Eric

 8    pledges.  I believe that they're genuine.  It's not

 9    getting down to the working level right now, not who's

10    paying for what.

11               So who do we get in this room?  Because

12    attorneys aren't suited to do this.  You're not the

13    right people at my table right now.  Who do I get here

14    to make this implement -- you know, to really implement

15    this?

16               MS. MARTINEZ:  So I guess on the county

17    side, we talk about services, one, what does that mean?

18    Two, how would you -- you know, your capacity issues to

19    distribute that, whether it's to the city of Los Angeles

20    since they're here.  But ultimately you also have a

21    responsibility for the other 87 cities which I'm fully

22    aware of that.

23               JUDGE CARTER:  Yeah.

24               MR. YOUNG:  Yeah.

25               MS. MARTINEZ:  And so, I think as we move
```

```
 1    down the line, you're not only going to be able giving
 2    services as you currently are now to the city of Los
 3    Angeles.  You are also doing that for the 87 cities.
 4    And so, how do you match what you're providing, what
 5    LAHSA's providing and what the city is providing.
 6                     Specifically let's just talk about the
 7    city since they are here.  Moving forward, what would
 8    that look like to housing the unsheltered population and
 9    what those services look like so that the city can have
10    an understanding what the county is more likely to
11    provide.
12                     MR. YOUNG:  Yeah.  So to give you a
13    straight answer first --
14                     MS. MARTINEZ:  Yeah.
15                     MR. YOUNG:  We have existing MOU
16    agreements that have not been exhausted.
17                     MS. MARTINEZ:  Okay.
18                     MR. YOUNG:  And so, the intent would be
19    to try to maximize on those.  The county and the city
20    have agreed basically an agreement where the county
21    would provide over a 10-year period of time services for
22    permanent supportive housing for 10,000 units.  And so,
23    it would be our expectation that we honor kind of that
24    agreement.  Now, I don't know what the ultimate city
25    kind of housing profile is going to be.  But that is the
```

Page 161

```
 1    commitment from the county.  Beyond that --
 2                  MS. MARTINEZ:  There's no interim --
 3    service solutions for interim housing?
 4                  MR. YOUNG:  So traditionally the answer
 5    to that has been no.
 6                  MS. MARTINEZ:  No.  Okay.
 7                  MR. YOUNG:  And that's -- we'll have to
 8    work through those issues.  That's obviously an issue.
 9    But the answer to that is no.  That's not to say there
10    aren't other resources to be brought to bear in the
11    contexts of interim housing.
12                  So for example when LAHSA, you know,
13    administers an interim housing site, you know, a portion
14    of that funding comes from the county.  The guidelines
15    by which services are established are kind of a
16    consensus document that reflects the services that are
17    provided.
18                  But the county also has, you know, DPSS
19    eligibility workers.  It has DMH workers.  So I think
20    when we're talking about services, it's not necessarily
21    the operational services for something interim housing.
22                  MS. MARTINEZ:  Correct.
23                  MR. YOUNG:  I think the question is what
24    are the mental health and health services that can be
25    brought to bear such that, you know, it's done in an
```

Page 162

```
 1    equitable way to not upset the balance of the remainder

 2    of the cities.  So I think we need to look at what kind

 3    of those resource needs are.  But that would be kind of

 4    the broad --

 5                MS. MARTINEZ:  So to meet your needs --

 6    and just hypothetically, to meet your number, whatever

 7    that's going to be -- I don't want Carol to yell at me

 8    about using 60 percent.  But just hypothetically, 60

 9    percent already of your unsheltered homeless population

10    is in the city of Los Angeles.

11                So understanding that, how would you be

12    able to meet your numbers and provide services, knowing

13    that 60 percent of your unsheltered population is in the

14    city of Los Angeles?

15                MR. YOUNG:  So the distribution -- I

16    mean, we view it based on stock because that's the

17    equitable way to do it.  So if there is a city council

18    district that overlaps a SPA and there's -- and the

19    needs are kind of divvied by those SPAs, the resources

20    would be allocated in accordance with that kind of

21    paradigm.

22                Now what that looks like in a given

23    situation for a given piece of property and a given city

24    council district depends on what the needs are of that

25    city council district and the surrounding city council
```

Page 163

```
 1    districts and the cities that are nearby that.  So it's

 2    not a straight line answer.  I wish I could give you

 3    one.  But I can't.

 4              MS. MARTINEZ:  Understood.  So walk me

 5    through what you currently provide.  And I get you have

 6    the MOU and you want to maximize that and that 10-year-

 7    period is for permanent supportive housing.

 8              But currently now -- and maybe I'm not

 9    understanding correctly.  The county is not providing

10    any services for interim housing solutions right now for

11    the city of Los Angeles or the other 87 cities or is it

12    LAHSA that's providing that?

13              MR. YOUNG:  Yeah.  It's --

14              MS. MARTINEZ:  I understand -- so just

15    let me get clear because I understand that there's a

16    makeup of 70 percent of the funding from LAHSA comes

17    from the county of Los Angeles.  So I have this, and

18    just to show you guys this presentation that was given

19    to us.  And I've read it time and time again.  So I

20    understand where the funding is coming from.  I

21    understand that.

22              So for everyone here in the room, because

23    I think when we're talking about funding, talking about

24    the unsheltered population and specifically talking

25    about the city of Los Angeles, I think we need to be
```

Page 164

```
 1    very clear who's providing the services.  And I know

 2    there's some overlap between the county and its funding

 3    to LAHSA.

 4                  But I think what we want to hear, who's

 5    responsible and what are those services.  What does that

 6    look like, not just from a permanent supportive housing

 7    perspective but from an interim because what the Court

 8    is asking the city of Los Angeles and the county is for

 9    you all to have a plan to house those unsheltered folks.

10                  And so, if you're telling me that

11    currently the MOU that currently stands is only for a

12    10-year-period for permanent supportive housing, are you

13    telling me that the resources that you're already giving

14    to LAHSA is to provide to the city?

15                  MR. YOUNG:  Right.  So your question was

16    kind of what is the county doing directly already.

17                  MS. MARTINEZ:  Yes.

18                  MR. YOUNG:  LAHSA kind of speak to kind

19    of what that looks like from the county to LAHSA.

20                  MS. MARTINEZ:  Okay.  So when LAHSA

21    speaks, they're speaking for the county per se when it's

22    providing services is what you're saying to me?

23                  MS. MARSTON:  The county -- yeah.  We're

24    like a pass-through in that sense.

25                  MS. MARTINEZ:  So you're a pass-through.
```

Page 165

1    Okay.  Got it.

2                    MS. MARSTON:  So we get -- the county

3    gives us the money and then we administer the services

4    through our providers.  That includes like the bridge

5    home sites, for example, in the city.  So it includes

6    the city of LA.

7                    MS. MARTINEZ:  So no, I want to -- go

8    ahead, Christina.

9                    MS. MILLER:  Yeah.  And I'd just say I

10   think that is an important distinction --

11                   MS. MARTINEZ:  Yeah.  Correct.

12                   MS. MILLER:  -- Brandon was saying that

13   the county provides services but doesn't provide the

14   operations.  They do, and the shelters that the city is

15   building and spending a lot of money on capital.

16                   We do rely on partnership with the county

17   to provide both services and operation dollars as well

18   to make that partnership work.

19                   MR. MARCUS:  Right.  Not limited to the

20   MOU.

21                   MS. MILLER:  Not limited.

22                   MR. YOUNG:  Right.  Not limited to the

23   MOU.

24                   MS. MARTINEZ:  Correct, and that's where

25   I was going at next.  So I think moving forward there

                                              Page 166

```
 1    has to be conversations between the city and county
 2    beyond this 10-year MOU and the services that they are
 3    already getting from LAHSA as it pertains to operations.
 4    And so, whether it's a brick and mortar perspective or
 5    other housing accommodations, I think we want to have an
 6    understanding what are you all willing to bring to the
 7    table.  And maybe you're not able to have that
 8    conversation now.
 9              But eventually we have to have that so
10    that there is an understanding that the city of LA, as
11    it moves forward to house its unsheltered population,
12    that they're going to have sufficient amount of
13    resources and backing from the county to make sure that
14    this does happen.
15              MR. MARCUS:  And it is the city's
16    expectation --
17              MS. MARTINEZ:  The city's expectation.
18              MR. MARCUS:  -- based on what has
19    happened in the past --
20              JUDGE CARTER:  Yeah.
21              MR. MARCUS:  -- that for the facilities
22    that the city builds for housing, whatever those
23    facilities may be, they have to be matched with the
24    commensurate amount of services --
25              JUDGE CARTER:  Right.  Right.
```

Page 167

```
 1                    MR. MARCUS:  -- from the county because a
 2      bed doesn't do any good if it's not going to be
 3      serviced.
 4                    JUDGE CARTER:  Yeah.  And Marcus, you hit
 5      it right on the button.  What my concern was and the
 6      reason that we're raising this is when we saw this ramp-
 7      up of the recreational centers in the early portion,
 8      everybody was going like this.
 9                    MR. MARCUS:  Well, you saw the LAPD guys
10      with the thermometers.
11                    JUDGE CARTER:  Yeah.
12                    MR. MARCUS:  Right.
13                    JUDGE CARTER:  And so, without fault-
14      finding about who owed who what, you heard me constantly
15      say, well, where are the -- the mental health people
16      were there.  But where are the medical people?  And then
17      I saw LA start to hire and have to hire privately.
18                    And I didn't know if that was supposed to
19      come through LAHSA at the time or as the county pointed
20      towards and said, well, that's not us and, you know,
21      we're reserving our people.  And the city then pointed
22      towards the county and said, well, they're supposed to
23      be providing services.  But we had to step up.
24                    I don't want to go through that mass
25      confusion.  I don't want to go through that property by
```

Veritext Legal Solutions
866 299-5127

```
 1    property.  So remember, from the Court's perspective, I
 2    don't care.  In other words, I just make the order and
 3    then hold you in contempt.
 4               So I'm asking you to work that out
 5    between the two of you.  And I can't go through the
 6    finger pointing about services.  And that's what Michele
 7    and I are asking.  Sort that out for us so we don't have
 8    to on the back side because I know you can.  Okay.  And
 9    maybe we have to get farther down the line to even have
10    this conversation.
11               MR. YOUNG:  Yeah.  I know we started
12    today the conversation on property and what's the
13    housing.
14               MS. MARTINEZ:  Yeah.
15               JUDGE CARTER:  Yeah.
16               MR. YOUNG:  Like that's the starting
17    point.
18               MS. MARTINEZ:  Correct.
19               MR. YOUNG:  And from there, we need to
20    figure out kind of what is the -- what are the
21    operational needs and who's responsible for payment.
22    It's not going to be a hundred percent county.  It's not
23    going to be a hundred percent LAHSA, right?
24               JUDGE CARTER:  Right.
25               MR. YOUNG:  So we just need to figure out
```

Page 169

```
1   what housing is going to come online, who's it going to

2   support.

3              JUDGE CARTER:  But you have to do that.

4   I'm not going to do that for you.

5              MR. YOUNG:  Correct.

6              JUDGE CARTER:  I'm not going to come down

7   here and get into this bureaucratic nightmare that

8   you've created.  You have to sort that out now, just

9   like Caltrans better sort this out with the city and

10  better sort this out with the county in terms of these

11  underpasses and overpasses.

12             I'm not chasing every piece of property

13  now.  I'm suggesting a humane way to do it.  But you're

14  going to sort that out.  Okay.  Let's do this --

15             MR. PADILLA:  Your Honor, I apologize.

16  But I have --

17             JUDGE CARTER:  Well, you wanted to make a

18  presentation.  Why don't you talk to your counsel and

19  see if you still wanted to make a presentation and we

20  can --

21             MR. YOUNG:  I think we can -- we were

22  talking about properties.  I think we can --

23             MS. MARTINEZ:  Okay.

24             JUDGE CARTER:  Okay.  Then let's do this.

25  In good faith, let's come back on Friday at 10 o'clock,
```

Page 170

1    okay?  Michele, do you have anything else?

2                    MS. MARTINEZ:  No.

3                    JUDGE CARTER:  No.

4                    MS. MITCHELL:  Can I -- can I ask Friday

5    for Friday at 10:00?  Originally we had talked about

6    starting sitting negotiations Friday.  Are we going to

7    be doing that Friday as well or is that just to talk

8    about the freeways?

9                    JUDGE CARTER:  I don't think it's going

10   to take very long at 10 o'clock.  So why don't you start

11   sitting the negotiations -- in fact, what are my hours -

12   - at 6 a.m.  We can meet at 8 o'clock in the morning for

13   our report and then you can go -- or 9 o'clock.  And

14   then you can go into your conference with the city.

15                   But I'd like to get that process started.

16   And I just don't think it's going to take very long

17   because I'm going to publish my order.  In fact, I'm

18   going to do it today so you have it in written form so

19   you can take it back to your respective parties and

20   you're not having to relay what I say.  It'll be in

21   writing for you, okay?

22                   But I'll simply set the next date for

23   Friday at 10 a.m.  And I will not hand down the final

24   injunctive relief.  I will wait to see what property

25   level you have.  But this will be an injunctive relief,

                                            Page 171

```
 1    by the way.  This is really going to be the order, okay?
 2    Understood?  Need clarification?  You want me to read it
 3    again?
 4                    MR. YOUNG:  As long as it says requests,
 5    we're happy.
 6                    JUDGE CARTER:  I can read it again to you
 7    verbatim if you'd like.
 8                    MR. YOUNG:  No.
 9                    JUDGE CARTER:  But this is going to be
10    the order I issue.  And in a sense, by issuing it, the
11    only thing I'm doing is giving you time to start
12    cooperating with me to start getting a reasonable time
13    schedule.
14                    But this is going to be the order we're
15    operating under, okay?  Okay.  Well listen, I want to
16    humbly thank you.  Michele, thank you.
17                    MS. MARTINEZ:  You're welcome.  Thank
18    you.
19                    JUDGE CARTER:  Anything further?
20                    MS. MARTINEZ:  No, Judge.
21                    JUDGE CARTER:  Well then let's get down
22    to business, okay?  Strike that.  What time on Friday?
23                    MR. YOUNG:  Ten o'clock.
24                    MR. MARCUS:  Ten o'clock.
25                    JUDGE CARTER:  Well, does that give you
```

Page 172

```
 1    enough time for negotiations?

 2                    MR. MARCUS:  No.

 3                    JUDGE CARTER:  No.  I know it's a start.

 4                    MS. MARTINEZ:  Yeah.  Yeah.

 5                    MR. MARCUS:  No.

 6                    JUDGE CARTER:  Well, why are we meeting

 7    on --

 8                    MS. MARTINEZ:  But I think just to focus

 9    on the housing and the properties is a good start.

10                    JUDGE CARTER:  Well, why don't we just

11    meet at 9 o'clock then for God's sakes --

12                    MS. MARTINEZ:  Yeah.

13                    JUDGE CARTER:  -- and get off to a decent

14    start so we can start with the negotiations at 10:00 or

15    11:00.

16                    MR. MARCUS:  You don't have to deal until

17    --

18                    MS. MARTINEZ:  You've got to deal with

19    that.  And I --

20                    MR. MARCUS:  It lets me know what

21    property to build.

22                    MS. MARTINEZ:  Yeah.  Exactly.

23                    MR. YOUNG:  Remember, Your Honor, before

24    you said maybe Friday or Monday would be a good time to

25    start and if you could --
```

Page 173

1              JUDGE CARTER:  Well no, Friday's a great

2     time to start.

3              MR. YOUNG:  If I'm working with LAHSA to

4     get the numbers you need for Friday at 10:00 --

5              JUDGE CARTER:  She'll have the numbers

6     for me.  She's going to say 2,000 people or 1,500 people

7     are living under the freeway.  And you haven't had time

8     to sort out who those are yet.  And then we're going to

9     work together on a couple of dates and see what's

10    reasonably from your perspective, Heidi --

11             MS. MARSTON:  Okay.

12             JUDGE CARTER:  -- in terms of teams, et

13    cetera, based upon those numbers.  And hopefully those

14    locations, they'll be listening.  Number two, I want to

15    take into account the COVID dilemma.  Are we going to

16    kill people by displacing them?  No.  We're not going to

17    do that, okay?  We're not going to do that.

18             And number three, I want to hear what

19    lots we have available.  I am utterly confused by

20    exhibit A and what lots are literally available or what

21    housing is literally available.  You guys tell me that.

22    And I think by Friday you should be able to tell me that

23    after 20 years, okay?

24             MS. MITCHELL:  Can I ask a clarification,

25    Your Honor?  I know -- sorry.  I used the bad word,

                                              Page 174

1    clarification, I know.  Scott, are you saying that the

2    city is not in a position to start negotiating on

3    Friday?

4                    JUDGE CARTER:  Well, tell me.  If you're

5    not in a position, just tell me.

6                    MR. MARCUS:  How about -- how about this?

7    Why don't you send me whatever the current version of

8    term sheets are based on the negotiations with the

9    county and the --

10                   MS. MITCHELL:  I did that.

11                   MR. MARCUS:  What?

12                   MR. MCLAIN:  It's a totally separate --

13                   MS. MARTINEZ:  Have you guys submitted

14   it?

15                   MR. MCLAIN:  It's a totally separate

16   thing.

17                   MS. MITCHELL:  Separate.

18                   MS. MARTINEZ:  Yeah.  Totally separate.

19                   MS. MITCHELL:  What we're talking about

20   with the county is just unincorporated hearings.  It's

21   totally separate --

22                   MR. MCLAIN:  Totally.

23                   MS. MITCHELL:  -- than what we're doing

24   with the city.

25                   MR. MARCUS:  Well, it'll give me an idea

                                                    Page 175

```
 1   of what the parties are interested in.

 2              MR. MCLAIN:  Well, she gave you an

 3   agreement.

 4              MR. MARCUS:  Yeah.  But now it's had the

 5   benefit of being vetted by the advocates.

 6              MR. MCLAIN:  No.  We haven't even focused

 7   on that agreement that she provided.  Ours is totally

 8   separate.  It's totally different.

 9              MS. MITCHELL:  Yeah.  That was a

10   nonstarter, so.

11              MR. MARCUS:  Okay.

12              JUDGE CARTER:  What's the time?  I'm

13   trying to be courteous.  Give me a time.  If you don't,

14   it's going to be 8 o'clock.

15              MR. YOUNG:  We just need to get into a

16   room and negotiate.

17              MS. MARTINEZ:  Yes.

18              MR. MARCUS:  Ten o'clock.

19              MS. MARTINEZ:  I agree.  So I think by

20   Friday you all need to get into a room and start the --

21   and I think I tried to start that with you all to focus

22   on the first two things before you could even move

23   towards services and funding is the housing

24   accommodations, what that structure's going to look

25   like.
```

Page 176

```
 1                    I think you all can work off this

 2      document on the identification of units, bed per type,

 3      all of that.  I didn't want to go into all of that with

 4      you all.  That's something that you all have to discuss.

 5                    And then obviously I think if we can talk

 6      about that and then the properties that may be feasible,

 7      that's a good starting point so that then the county can

 8      start realizing, okay, what housing accommodations are

 9      going to be on this property.  These are the types of

10      services and/or operations we will be able to provide.

11      Is that a correct statement or not?

12                    MR. YOUNG:  As well as the properties

13      that the county is developing within the city that help

14      alleviate the burden to the city.

15                    MS. MARTINEZ:  Agreed as well.  Both.

16      Both properties.

17                    MR. YOUNG:  So, yes.

18                    JUDGE CARTER:  Eventually, eventually I

19      want Mike Moore, the police chief.  But we'll talk about

20      that, okay?

21                    MS. MARTINEZ:  And have you shared the

22      exhibit of the properties with --

23                    MR. YOUNG:  Yeah.  We publicly filed our

24      --

25                    MS. MARTINEZ:  You filed that publicly as
```

Page 177

1    well?

2                   MR. YOUNG:  -- list of interim.  So --

3                   MS. MARTINEZ:  Okay.  So you guys have

4    the county properties as well.

5                   MR. YOUNG:  Yeah.

6                   JUDGE CARTER:  So we did a full and

7    productive day, then.

8                   MS. MARCUS:  Is that the one you filed

9    last night?

10                   MS. MARTINEZ:  Yeah.

11                   JUDGE CARTER:  We meet at -- we meet at 8

12   o'clock for this portion and can you plan on starting

13   your negotiations with the city at 10 o'clock?  And I'll

14   know whether we're settling with the county or not by

15   5:00 to midnight tomorrow night.  Fair enough?  Eight

16   o'clock?

17                   MR. MARCUS:  Your Honor, I suggest we

18   leave it at 10 o'clock.  I suggest we leave it at 10

19   o'clock on Friday.  I'll work with Liz offline as soon

20   as we leave and we'll start there.

21                   MS. MARTINEZ:  And this just for

22   negotiations for the city and county.  And Heidi, how

23   much time do you need Friday to get us the answer about

24   what the tentative -- what the population is going to be

25   on highways and overpasses and underpasses?

                                              Page 178

```
 1                      JUDGE CARTER:  At least for sanitation,

 2    how many people can you --

 3                      MS. MARSTON:  I think that's what we were

 4    targeting, Friday at 10:00.

 5                      MS. MARTINEZ:  Friday at 10 a.m. as well?

 6                      MS. MARSTON:  That's what we --

 7                      MS. MARTINEZ:  Okay.

 8                      MS. MARSTON:  Yeah.

 9                      MS. MARTINEZ:  Fantastic.  Great.

10                      JUDGE CARTER:  All right.  Ten in the

11    morning.

12                      MS. MARTINEZ:  Great.

13                      JUDGE CARTER:  Yeah.  Okay.  Okay.  Thank

14    you very much.

15                      COURT REPORTER:  The time is 2:48 p.m.

16    We are off the record.

17                      (Whereupon, at 2:48 p.m., the proceeding

18                      was concluded.)

19

20

21

22

23

24

25

                                                     Page 179
```

```
 1                    CERTIFICATE OF NOTARY PUBLIC

 2            I, AUSTIN CHE, the officer before whom the

 3    foregoing proceedings were taken, do hereby certify that

 4    any witness(es) in the foregoing proceedings, prior to

 5    testifying, were duly sworn; that the proceedings were

 6    recorded by me and thereafter reduced to typewriting by

 7    a qualified transcriptionist; that said digital audio

 8    recording of said proceedings are a true and accurate

 9    record to the best of my knowledge, skills, and ability;

10    that I am neither counsel for, related to, nor employed

11    by any of the parties to the action in which this was

12    taken; and, further, that I am not a relative or

13    employee of any counsel or attorney employed by the

14    parties hereto, nor financially or otherwise interested

15    in the outcome of this action.

16

17                                              AUSTIN CHE

18                                  Notary Public in and for the

19                                     State of California

20

21

22

23

24

25

                                                    Page 180
```

```
 1              CERTIFICATE OF TRANSCRIBER

 2          I, BENJAMIN GRAHAM, do hereby certify that

 3    this transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to, nor

 8    employed by any of the parties to the action in which

 9    this was taken; and, further, that I am not a relative

10    or employee of any counsel or attorney employed by the

11    parties hereto, nor financially or otherwise interested

12    in the outcome of this action.

13

14

15              BENJAMIN GRAHAM

16

17

18

19

20

21

22

23

24

25

                                            Page 181
```

[& - able]

| & |
|---|
| **&**   2:5 3:12 4:10 |

| 1 |
|---|
| **1**   16:21 105:23 |
| **1,000**   7:6 12:20 |
| **1,500**   174:6 |
| **1.4**   7:4 |
| **10**   90:6,11 97:4 99:19 107:7 158:16 159:16 161:21 164:6 165:12 167:2 170:25 171:10,23 178:13,18,18 179:5 |
| **10,000**   161:22 |
| **100,000**   13:8 |
| **10:00**   171:5 173:14 174:4 179:4 |
| **10:01**   1:13 |
| **11**   48:4 51:3 148:1 |
| **11355**   3:13 |
| **11:00**   173:15 |
| **11:48**   105:20 |
| **12**   29:25 |
| **12:26**   125:14 |
| **13**   1:12 29:25 |
| **14**   146:13 |
| **15**   61:19,21 64:15 65:16 |
| **1535**   2:18 |
| **16th**   80:21 148:15 150:2,12,13,21,22 |
| **1700**   110:15 |
| **17929**   181:14 |
| **17th**   2:18 |
| **18**   12:1 |
| **19**   33:20 37:12,14 83:13 84:3 107:8 |

131:24 133:19 154:7
**1990**   2:6

| 2 |
|---|
| **2**   105:24 125:19 |
| **2,000**   23:6 174:6 |
| **2,500**   123:13 |
| **2.3**   25:18 33:18 |
| **20**   12:11 14:10 16:24 18:8 25:19 76:22 79:13 90:21 108:6 139:24 153:18 174:23 |
| **20-02291**   1:7 |
| **200**   3:5 |
| **200,000**   14:10 |
| **2005**   87:17 120:8 122:5 158:24 |
| **2017**   23:6 |
| **2019**   9:22 |
| **2020**   1:12 9:22 107:7 146:13 148:1 |
| **205-6520**   2:9 |
| **210**   2:13 |
| **213**   2:9 3:8,23 |
| **24**   117:14 |
| **25**   123:2 |
| **25,000**   156:20 |
| **250**   123:13 |
| **250,000**   51:4 |
| **28th**   147:19 |
| **2:48**   179:15,17 |

| 3 |
|---|
| **3**   33:18 125:20 |
| **30**   10:14 12:11 48:20 76:22 123:22 124:11 148:13 150:11 153:18 |

**30,000**   156:20
**310**   3:16
**3110**   2:13
**312-4181**   3:16
**36,000**   13:9
**3:30**   6:16

| 4 |
|---|
| **4**   6:16 35:18 53:18 |
| **4,000**   12:15 |
| **40**   25:20 88:24 |
| **4110812**   1:19 |
| **44,000**   12:23 13:9 |
| **441**   40:2 |

| 5 |
|---|
| **5**   157:3 |
| **5,000**   12:15 143:16 |
| **50**   88:24 99:11,17 |
| **50,000**   13:8 |
| **500**   3:21 12:19 143:16 |
| **501**   1:16 |
| **5:00**   178:15 |
| **5:30**   78:8 95:3 |

| 6 |
|---|
| **6**   171:12 |
| **60**   9:20,21 11:7 32:23 34:8 53:19 101:7 124:11 163:8,8,13 |
| **60,000**   12:22 |
| **600**   7:6 |
| **617-5353**   2:20 |
| **648**   3:21 |
| **65**   70:4 |

| 7 |
|---|
| **7,600**   12:6 |
| **70**   9:21 99:11 164:16 |

| 700   3:5 |
|---|
| **705**   2:6 |
| **710**   154:20 |
| **714**   2:20 |
| **750,000**   49:12 |

| 8 |
|---|
| **8**   23:6 28:17 171:12 176:14 178:11 |
| **80**   99:11 |
| **800**   83:9 |
| **87**   160:21 161:3 164:11 |
| **880**   108:12 |

| 9 |
|---|
| **9**   171:13 173:11 |
| **90012**   3:22 |
| **90012-4119**   3:6 |
| **90013**   1:17 |
| **90025**   2:7 |
| **90064**   3:14 |
| **90405**   2:14 |
| **92705**   2:19 |
| **95**   118:20 |
| **974-1811**   3:23 |
| **978-4681**   3:8 |

| a |
|---|
| **a.m.**   1:13 105:20 171:12,23 179:5 |
| **ability**   6:6 31:16 67:7,11 75:25 90:1 180:9 181:7 |
| **able**   16:14 17:19 21:2 25:19 39:22 40:18 42:4 48:10 52:15,19 55:21 65:6 74:1 81:14 83:5,7 102:24 104:5 105:7 118:10,17 156:15 |

[able - agrees]

| | | | |
|---|---|---|---|
| 156:20 161:1 | accused 98:1 | addition 19:10 | afternoon 78:4 |
| 163:12 167:7 | accustomed 18:25 | additional 58:22 | 94:22 |
| 174:22 177:10 | achieved 112:16 | 85:16 92:20 | age 87:1 110:10 |
| absence 37:21 | achievement | 107:24 151:8 | agencies 54:11 |
| absent 109:5 | 42:10 82:2 | additionally | agenda 35:5,6,19 |
| absolute 76:19 | ackley 4:15 18:23 | 112:13 | 35:20 |
| absolutely 7:8 | 23:11 72:18 | address 14:13 | agglomeration |
| 26:20 34:8 76:18 | acknowledge | 54:5 57:21 130:17 | 64:8 |
| 90:19 97:7 118:6 | 58:11 73:3,18 | addressed 111:9 | ago 38:21 57:7 |
| 128:20 132:7 | acknowledged | addressing 106:24 | 105:8 |
| 133:6 134:22 | 57:17 132:5 | adds 28:22,22,22 | agree 28:3,8 30:18 |
| accelerated 23:15 | acknowledgement | adequate 77:9 | 48:14 49:1 50:19 |
| 24:3 | 69:9 | 107:10 115:18 | 51:1 66:13 92:15 |
| access 50:12 55:9 | aclu 77:17 | 116:11,12 120:2 | 92:21 95:25 96:1 |
| 107:10 | act 94:13,14 95:11 | 121:1 141:18 | 96:1 106:16 |
| accident 110:10 | 95:11 122:25 | adequately 112:12 | 126:13 132:4 |
| accommodate | 124:20 | adhere 96:11,12 | 139:13,13 155:24 |
| 39:22 | acting 89:7 94:9 | adjacent 107:6 | 176:19 |
| accommodation | 123:17 | 121:16 | agreed 27:20 61:8 |
| 17:13 | action 79:21 | administer 166:3 | 70:1 102:12 |
| accommodations | 106:16 180:11,15 | administers | 146:10 161:20 |
| 7:23 9:12,25 10:9 | 181:8,12 | 162:13 | 177:15 |
| 10:16,25 11:8,12 | actions 8:17 | administrative | agreeing 96:8 |
| 11:15 19:3,14 | actively 70:3 | 113:11 | agreement 10:23 |
| 20:12 25:13 32:3 | activities 31:17 | admit 76:23 | 25:25 33:5,14 |
| 32:5,21 38:5 41:1 | acts 78:1 | advance 37:12 | 38:8 47:8 49:3 |
| 41:7,14 42:9 | ada 132:16,19 | 119:6,21 | 52:19 53:3,5,5 |
| 80:10,14 81:14 | adapted 27:17 | advanced 34:15 | 56:5,21 71:25 |
| 82:18 83:6 84:13 | adaptive 28:3 | advantage 85:12 | 77:18 78:14 87:17 |
| 144:10 155:23 | 32:13 38:9 64:6 | 85:20,24 | 91:2 92:1,6,19 |
| 157:1 158:2 167:5 | add 22:11 23:13 | advocate 13:4 | 95:20 96:6 120:8 |
| 176:24 177:8 | 30:11 31:14 32:2 | 154:11 | 122:6 144:5,15 |
| account 25:3 | 33:21,23 59:6 | advocates 49:17 | 150:23 151:4,9,11 |
| 174:15 | 60:14 66:12,14 | 96:6 154:13 176:5 | 151:13,15,15,15 |
| accountability | 74:17 97:12 | afford 117:12 | 151:19,24 155:22 |
| 54:20 55:10 58:20 | 102:15 115:4,6,7,7 | affordable 11:2 | 156:9 158:24 |
| 60:10 62:13 | 131:16 | 27:10 28:20,23,23 | 161:20,24 176:3,7 |
| accurate 33:19 | added 22:24 | 28:24 62:9,13 | agreements |
| 61:20 180:8 181:5 | 108:13 | afraid 46:10 76:20 | 161:16 |
| accurately 147:6 | adding 134:23 | 76:21 97:8 100:25 | agrees 151:23 |
| | | 118:23 | |

Veritext Legal Solutions
866 299-5127

[ahead - assume]

ahead  8:13 34:5
  59:17 80:2 86:14
  91:4,5 93:6
  103:22 126:10
  153:18 166:8
aid  4:13 110:20,22
air  114:7
al  1:5,8 106:8
alcohol  8:21
alexandria  1:15
allen  105:9
alleviate  177:14
alliance  1:4 49:17
  62:20 77:5,7
  106:7
allocate  83:20
allocated  83:13
  85:9 163:20
allocation  87:1
allocations  84:1
  84:11
allow  13:2 55:5
  74:3 115:19
  150:21
allowed  49:21
  121:5 150:17
allowing  144:19
allows  55:9 57:21
  58:15 59:16 60:15
  64:7 150:19
alluded  32:12
  36:23 70:20
alluding  16:4
alternate  115:17
  116:10 117:3
alternative  59:5
  68:15 114:4 115:3
  117:25 118:15
  119:22 120:3
  121:1

alternatively
  109:11
amazing  12:9
amendment
  111:10
amendments
  111:13
amount  9:16
  10:15 23:21 81:14
  100:10 113:6
  167:12,24
amounts  113:4
ana  2:19
analysis  30:20
  31:23
angeles  1:8,17 2:7
  3:2,4,6,10,14,20
  3:22 4:4,5,8,12,14
  9:4,4 12:22 15:21
  20:20 21:2,13
  40:17 53:15,20
  57:2 61:13,14,22
  62:8 86:5 90:4,7
  90:19 93:1 102:25
  106:8 107:20
  109:10 111:1,2,6,7
  111:18 113:1,2
  114:3,3 115:2,2
  120:1,2,25 121:1,4
  121:4 122:1,2
  123:8,8 132:12,18
  146:10 148:12,14
  149:18 150:12,24
  151:20,22 152:7
  153:10 160:19
  161:3 163:10,14
  164:11,17,25
  165:8
answer  24:11
  55:16 71:1,2
  77:24 157:3,5

161:13 162:4,9
  164:2 178:23
answered  50:6,20
answers  56:7
anti  121:5
anybody  76:5 87:6
anymore  116:1,14
  119:1
anyone's  49:23
anyplace  141:11
anyway  67:23
  74:20,25 102:9
  128:25
apartment  14:13
apologize  6:8,19
  18:24 68:7 126:7
  170:15
apologized  35:8
  35:15
apology  7:11
apparent  43:22
  104:8
appears  106:23
appreciate  71:5,6
  93:10
appreciation
  144:19
approach  10:23
  47:16 58:15,23
  60:15 68:12 69:11
  69:25 70:14 73:1
  73:2 74:5 98:20
  109:20 127:1
approaches  65:1
approaching
  98:21
appropriate  6:17
  24:9 81:23 94:20
  103:14 110:20
approve  62:11
  97:6

approved  104:25
arbitrarily  44:23
arbitrary  118:24
area  52:2,4 60:1
  98:10 99:25
  107:20 111:19
  152:13
areas  106:18
  108:19 113:25
  121:16 134:11
argue  87:22
arguments  141:14
armstrong  108:23
army  19:18 20:16
  21:7,9
arrest  101:5
article  98:15
articulate  43:6
  52:17 55:15
articulated  62:20
  68:16 74:18 83:21
  83:22 135:10
articulating  136:4
asked  6:12 14:18
  14:19 32:11 43:12
  44:11 77:25 78:20
  125:10 151:17,24
asking  18:24
  45:17 78:18 99:11
  125:15 129:10
  149:2 165:8 169:4
  169:7
asks  136:17
assess  152:4
assessed  40:2
assistance  9:7 16:6
  17:4 110:17
assisted  31:19
association  109:9
assume  37:10
  104:10 146:23

Veritext Legal Solutions
866 299-5127

[assuming - big]

| | | | |
|---|---|---|---|
| **assuming** 109:14 129:19 | **back** 6:16 7:12 9:17 20:21 22:1 | **base** 20:4 | 145:1,3 154:14 160:8 |
| **assumptions** 20:23 146:23,25 | 24:1 26:13 28:20 | **based** 9:12,22,22 15:7,20 41:13 | **believes** 71:18 |
| **assure** 113:6 | 35:18 36:1 45:14 46:9 50:5 52:6 | 48:13 56:15 63:21 73:1,2 80:20 | 116:3,4 122:14 |
| **attached** 12:17 | 72:25 74:4 75:12 | 83:19 84:8 93:13 | **belongings** 118:10 |
| **attention** 64:10,14 67:12 97:20 151:3 | 76:24 77:19 81:6 87:8 90:23 96:23 | 129:20 131:22 147:4 156:25 | **belongs** 158:19 |
| **attitude** 102:12 | 105:17 106:20 | 163:16 167:18 | **ben** 98:15 |
| **attorney** 57:7 | 125:1,21 126:23 | 174:13 175:8 | **benchmarks** 156:16 |
| 180:13 181:10 | 133:7,14 134:10 | **baseline** 43:14 | **benefit** 14:11 |
| **attorneys** 71:12,22 143:4,8 160:12 | 140:4,5 143:23 145:1 147:20 | **basic** 56:15 | 51:14 141:19 144:8 176:5 |
| **attractive** 119:16 | 149:5 152:23 | **basically** 28:17 45:17 146:23 | **benefits** 70:9 |
| **audio** 180:7 181:3 | 158:18 169:8 | 161:20 | 137:3 |
| **austin** 1:18 180:2 180:17 | 170:25 171:19 | **basis** 27:24 53:7 53:11 108:25 | **benjamin** 181:2 181:15 |
| **authority** 4:6,8 | **backing** 167:13 | 110:25 | **best** 47:7 54:4,5,10 |
| 62:17 103:2 122:3 | **backup** 108:7 | **bathroom** 12:7 | 58:17,17 59:25 |
| **avail** 54:22 | **bad** 97:19 174:25 | **bathrooms** 12:17 | 63:23 64:16 68:14 |
| **availability** 15:11 | **balance** 25:5 31:1 | **bathwater** 74:21 | 69:11 74:8 89:8 |
| 63:18 111:11 | 108:24 109:7,13 | **battle** 160:5 | 115:15 132:15 |
| **available** 28:7 | 112:22 113:13 | **bdyoung** 3:15 | 134:4 158:23 |
| 29:5 30:2 37:21 | 137:2 142:10,15 | **beach** 76:1 | 180:9 181:6 |
| 48:8 59:23 78:16 | 163:1 | **bear** 72:24 162:10 | **bet** 120:18 |
| 80:6,16 83:18 | **balanced** 142:16 | 162:25 | **better** 7:10 45:4 |
| 84:5 85:10,21,23 | **balancing** 130:21 | **bed** 12:6,9,15 13:8 | 47:3 56:9 58:20 |
| 134:9 145:23 | **ball** 116:24 | 13:8 168:2 177:2 | 59:5 69:12 74:5 |
| 149:1,1 154:3,6,18 | **ballpark** 143:13 | **beds** 28:22 59:15 | 75:20 97:4,5 99:2 |
| 155:18 174:19,20 | **ballroom** 1:15 | 155:25 | 99:8,10,19 100:14 |
| 174:21 | **barbara** 97:9 | **began** 107:7 | 101:7 114:18 |
| **avoided** 152:11 | 115:24 140:18 | **beginning** 26:5 | 118:7 119:11,15 |
| **aware** 86:11 91:1 | 142:19 143:5 | 119:3,18 128:3 | 121:21 128:11 |
| 121:12 160:22 | **barbara's** 97:17 | **behalf** 2:2 3:2,10 | 129:2,3 133:6 |
| **awful** 98:13 | **barreling** 102:14 | **belabor** 105:10 | 140:12 141:16,24 |
| **b** | **barrier** 83:12 | **believe** 8:13 9:6 | 144:23 170:9,10 |
| **b** 5:1 | 86:23 102:17 | 14:17 21:5,8 23:4 | **beyond** 70:15 86:6 |
| **baby** 74:20 90:7 | **barriers** 7:25 8:6 | 42:11 58:2 71:19 | 86:9 90:24 162:1 |
| 117:1 134:17 | 13:20 40:23 42:10 | 73:1 78:21 79:7 | 167:2 |
| 152:8 | 63:3 82:1,20 86:6 | 82:2,3 83:11 | **bickering** 87:8 |
| | 90:24 91:1 103:20 | 114:19 118:11 | **big** 8:25 44:14 58:1 68:22 139:23 |

Veritext Legal Solutions
866 299-5127

[biggest - carefully]

**biggest** 8:14 159:22
**billed** 94:15
**bird's** 8:24
**bit** 12:2 17:3 34:15 42:16 60:7 79:18 85:5 95:23 99:10 119:14
**black** 3:18 137:16 137:19
**blank** 123:12
**blind** 58:3
**blindsided** 84:19
**blocked** 62:14
**blocks** 64:20 119:13
**bluffing** 125:2,7
**blunt** 56:3 137:17 159:14
**board** 17:21 31:18 45:17 75:11,13,15 89:10 95:5 140:5 148:24 157:1
**boise** 44:1,4 51:3 111:9 121:17 124:20
**bold** 8:22
**bonin** 46:2 60:5 75:24
**bonin's** 46:23
**bonuses** 28:24
**boots** 54:9
**boss** 53:17
**bother** 105:14
**bottom** 143:1 152:18
**boulevard** 3:13
**boundaries** 61:4
**brandon** 3:11 166:12

**break** 48:22,22,25 55:4 62:21 79:9 79:13 87:11 130:13 133:6
**breakdown** 40:3 51:15
**breaking** 52:3 75:24
**brick** 167:4
**bridge** 9:13 10:3 166:4
**brief** 78:20 93:5 123:2 137:7
**briefing** 106:5,8 122:20
**briefly** 43:10
**bright** 22:7
**bring** 6:16 10:16 17:13 26:14 35:18 40:11,25 82:19 101:1,2 102:22 103:19 118:10,13 124:22 167:6
**bringing** 100:24 100:25
**brings** 28:20
**broad** 25:25 52:5 74:13 79:15 163:4
**broader** 74:12
**broke** 62:16 99:16
**brooke** 2:16 10:20 26:3 30:10 35:4 35:22 47:12,19 48:19 50:21,25 51:16 65:20 77:21 101:23 102:1
**brought** 42:1 81:6 92:10 151:2 162:10,25
**brown** 108:23

**buckets** 85:22
**buckle** 153:4
**budget** 12:25 13:11 83:19 105:1
**budgets** 104:25
**build** 8:4 19:22 117:9 118:25 127:23 173:21
**building** 12:10 16:13 68:21 166:15
**buildings** 16:17 18:5 28:7 59:24
**builds** 167:22
**built** 37:7
**bulk** 118:22
**bulky** 101:10
**bunch** 148:20
**bundy** 2:6
**burden** 122:5 177:14
**bureaucrat** 87:17
**bureaucratic** 170:7
**burgeoning** 107:8
**burn** 116:18
**burning** 99:23
**buscaino** 4:3
**buscaino's** 65:10 67:19
**business** 172:22
**button** 168:5
**buy** 55:6
**byron** 4:10

**c**

**c** 2:1 3:1 4:1 6:1
**ca** 1:17 2:7,14,19 3:6,14,22
**calculation** 23:22
**california** 1:2 110:6,15 111:3

158:14 180:19
**call** 69:14 96:22 98:3 142:21 153:13
**called** 10:8 49:19 49:21 146:23
**calls** 55:12
**caltrans** 6:10 24:10 80:23 82:23 87:15,16,24 88:2,6 120:7,15 122:8,11 145:8,10,14,18 146:9,11,13,22,23 146:25 147:18 148:2,7,9 158:17 158:18 170:9
**campers** 116:8
**campground** 20:4
**camping** 107:25 113:22 121:5
**camps** 20:4 115:12
**candid** 56:4
**capacity** 102:20 102:22 103:24 160:18
**capital** 166:15
**capitalize** 59:22 67:17
**capitulated** 91:13 92:18
**car** 76:6 112:9
**carcinogenic** 106:19
**carcinogens** 108:4
**care** 31:16,16,18 65:17 88:4 110:17 113:9 145:9 152:6 157:4 169:2
**careful** 94:17
**carefully** 35:5,19 50:1

Veritext Legal Solutions
866 299-5127

[carol - circuit]

**carol**  2:11,12
10:19 31:25 32:1
32:10,12 33:22
34:5,10 35:3
36:12,24 56:17
65:22 66:1,11
77:21 154:20
163:7
**carter**  1:14 6:2
8:11 15:24 20:7
21:19 32:8 33:21
35:3 36:3,7,9
37:25 38:1,6
43:10,12 47:10,17
47:23 48:2,14,17
49:15,20,24 50:4,8
50:19,24 51:7,10
51:13,16,20,22,25
52:6,11 53:9,14,23
54:2,18 55:2,13,17
55:24 56:1,2,8
57:23 58:25 59:8
59:12 61:10 65:25
68:6,9 72:6,9 73:5
73:8,12,15 74:14
75:7,9 76:18
80:24 81:1 82:5
84:20 86:8,12,15
86:18 88:9 89:5
89:14,18,21 91:7,8
91:16,19 92:24
93:6 94:3,6 95:1
95:17,21 96:15,18
96:21 98:6,12
101:19,21 102:1
103:16 105:13,16
105:25 115:23
125:7,13 126:3,7
126:25 127:10,15
127:17,19 128:10
128:13,15,17,20

129:13 130:2,5,8
130:24 131:1,4,8
131:12,14,17,25
132:4,7 133:23
134:6,14,16,25
135:3,6,12,15,18
135:21 136:6,9,13
136:19 137:4,6,9
137:13,17,21
138:3,5,8,19,24
139:5,10,16,18,20
140:22 141:7
142:5,13 143:10
143:25 144:18
146:7,16,20 147:2
147:5,10,17,22
149:4,11,17,20,24
150:9,19 151:1,6
151:25 152:5,18
155:1,3,9 156:7,8
157:2,10,14,16,18
160:23 167:20,25
168:4,11,13
169:15,24 170:3,6
170:17,24 171:3,9
172:6,9,19,21,25
173:3,6,10,13
174:1,5,12 175:4
176:12 177:18
178:6,11 179:1,10
179:13
**carter's**  67:3,7
75:14 92:23
**case**  1:6 49:10,11
49:16 58:10 77:3
100:7 106:9 107:7
108:25,25
**cash**  17:3
**categories**  70:10
**cause**  46:15

**caused**  93:8
**cdc**  96:9 102:8
**census**  45:6,7 51:4
51:5
**center**  2:17
**centered**  70:14
**centers**  42:3 50:17
155:10 168:7
**central**  1:2
**centric**  69:25
**ceqa**  80:24,25
81:10 89:15,23
90:1
**certain**  20:23,24
21:3 25:4 26:13
33:2,17 41:6 43:1
54:22 73:11 83:12
83:22 146:24
**certainly**  13:6
46:21 84:24 105:1
132:23 144:20
156:19
**certificate**  180:1
181:1
**certified**  18:15
**certify**  180:3
181:2
**cetera**  23:8 117:24
122:10 140:6
148:15 158:22
174:13
**chair**  45:16
**challenge**  8:14
**challenges**  40:23
62:1 82:20
**challenging**  16:17
**chance**  109:18
157:24
**chances**  127:7
**change**  45:8 86:4
158:10

**changed**  76:2
97:17 115:24
**changes**  156:6
**charge**  66:25 67:5
67:5,19,20,21,23
104:6
**charged**  64:5
**chasing**  170:12
**chavez**  4:3 19:9,15
19:17,21,24 20:1
20:14 21:22 22:1
22:9 53:16,24
54:3,19 55:3,14
66:21,24 67:4,9
143:9
**che**  1:18 180:2,17
**cheaply**  22:25
100:8
**checking**  116:14
**checks**  23:1
**chew**  78:19 116:23
138:1
**chief**  4:3,15 79:1
177:19
**chime**  42:22
**choice**  117:23
127:5 128:21
134:2
**choose**  118:15
**chosen**  147:24
**chou**  4:4
**christina**  4:11
6:14 19:10 28:8
37:1 60:13 125:5
166:8
**chronically**
129:21
**circles**  14:8
**circuit**  44:3
109:19 122:21,22
123:6 137:4,6

[circulated - communicable]

circulated  151:7
circumstances
    53:12
cite  109:9
cities  29:16 44:14
    68:23 69:1 103:8
    103:12,15 160:21
    161:3 163:2 164:1
    164:11
citing  108:23
    109:15,18
city  1:8 3:2,4 4:11
    4:12 6:25 9:3
    10:21 11:14 12:4
    15:21 16:15,23
    17:25 18:4,8,13
    20:9 22:23 23:5
    23:15 25:6 26:10
    26:17 28:5,6,16
    32:4 33:9 34:25
    35:16 36:25 38:23
    38:25 39:22 40:9
    40:17,20 44:1
    48:4,9 51:2,3
    52:13 53:5,15,20
    56:17 57:1,20
    60:1,20 61:13,13
    61:22 62:8 65:15
    66:18 68:22 71:18
    73:20,20 76:12,14
    77:7,15 78:18
    79:5 80:6 81:18
    81:21 82:10,22
    83:10,20 85:23
    86:5 87:2,9,10,15
    87:16 88:10,14,18
    89:2 91:13 93:4,8
    94:10,11 95:9
    96:3,8 99:16
    102:9,13,25 103:9
    104:9,10 106:7

109:9 110:8 111:1
    111:6,9,20,24
    113:1 114:3,13
    115:2 117:7,23
    118:12 120:1,17
    120:25 121:3,4,24
    122:1,4 123:7
    124:24 125:23
    128:8 133:25
    144:15 145:10,13
    146:10,12,18,19
    146:22 147:18,24
    148:6 150:4,18,22
    151:12 152:14,20
    153:3,9 154:7,11
    154:18,21 156:14
    158:17,19 159:8
    159:25 160:19
    161:2,5,7,9,19,24
    163:10,14,17,23
    163:25,25 164:11
    164:25 165:8,14
    166:5,6,14 167:1
    167:10,22 168:21
    170:9 171:14
    175:2,24 177:13
    177:14 178:13,22
city's  13:6 18:22
    28:1 41:12 167:15
    167:17
citywide  46:1
    63:19 64:1 65:8,9
    123:1 124:9,20
claims  108:25
clarification  72:21
    136:6 139:22
    172:2 174:24
    175:1
clarifying  37:2
    136:9

clarity  24:13
    60:15,25 61:8
    130:3
classism  65:2
clauses  111:13
clean  118:23
    159:18
cleaning  145:13
clear  34:8 41:2
    42:20 45:23 56:12
    56:23 63:25 71:11
    91:25 107:23
    120:20 138:10
    139:24 146:21
    152:1 154:23
    164:15 165:1
clearing  119:4,19
    120:22
clearly  73:6
    103:24
client  152:13,16
    152:17
clients  62:23
close  23:25 44:3
    110:4
closed  134:11
closely  49:24
    79:24 96:24,25
    97:6 116:6
closer  24:13 59:9
    76:1 97:14
closing  85:14
clothed  101:11
code  51:7,10,13,17
    110:7,15
codes  44:8,9,9,11
    47:4
collaborative
    136:17,20
collapse  112:10

colleagues  18:21
collective  57:18,19
collectively  10:22
    81:20 126:11
college  77:6 82:24
color  134:15
combined  134:21
come  15:9 18:2
    21:9 25:4 26:13
    34:18 46:9 49:2
    52:19 58:1 59:9
    63:16 67:13 77:4
    95:19,19 99:18
    101:3,8 119:17,23
    126:4,5 127:20
    154:12 155:21
    168:19 170:1,6,25
comes  102:11,12
    162:14 164:16
coming  26:9 82:1
    91:8 102:2 114:8
    124:13,16 126:23
    131:18 138:23,25
    164:20
command  112:2
commensurate
    167:24
comments  21:20
    105:25
commission
    103:10
commitment
    162:1
commitments
    105:3,4,7
committed  74:2
    83:23
common  19:3
communicable
    117:19

[communities - conversation]

communities
27:11 64:6 93:18
132:11,12 134:15
community 22:20
57:21 58:10 82:24
107:14,19
compared 76:12
145:13
comparison 113:1
compensate
112:12
competing 108:25
complaining 90:8
99:15 141:22
complaints 55:12
completed 106:3
completely 66:14
89:10 104:14
compliance
132:16
compliant 121:17
132:19
comprehensive
35:10 68:20
compromise 87:4
87:5
concentrated
114:16
concentration
73:9
concentrations
112:9
concept 22:20
29:7 46:18 61:18
concepts 43:24
concern 73:17
76:22 85:4 92:25
104:15 107:9
137:1 168:5
concerned 61:17
62:23,24 64:24,24

64:25 93:9 94:20
99:24 102:7,16
106:10 123:17
124:15 134:4
145:7
concerning 107:5
108:20 109:24
114:12 136:22
concerns 40:22
59:2,3,4 68:2,12
68:15,18 74:18,19
86:24 89:17 91:12
93:21 101:25
102:4 103:15,21
104:8 132:23
135:9,11,13 147:4
147:23 148:10
150:16,17,20
concerted 8:19
conclude 143:25
concluded 179:18
conclusive 124:7
concrete 124:6
126:24
concurrently
144:14
condition 121:12
141:12
conditions 117:19
conduct 96:22
97:10,21
conference 140:1
171:14
conferences
107:16,23
confidence 75:24
confidences 133:6
155:4
confident 18:14
confidential 7:16
78:20 88:16,23

100:9 154:8,9
155:11
configured 115:18
confused 174:19
confusing 157:15
confusion 145:17
145:18 158:24
168:25
congratulations
95:3
congregate 11:25
30:6 37:6,8,12,17
37:18 96:7,8,25
97:12,18 98:7
99:25 102:7 116:1
116:5 140:15,21
conjunction 28:25
146:9
connections 132:9
consensus 95:19
96:13,14 162:16
consequences
109:1
consider 88:19
117:8
consideration 75:4
considerations
142:9
considered 31:22
considering
106:25 107:1,2
113:23
considers 8:25
consistent 8:19
53:6
consistently 47:15
77:16
constantly 87:7
113:7 168:14
constituency
56:17

constituents 62:13
146:2
constitute 122:15
constitutional
111:10
contacted 149:8
contacting 158:13
contaminants
108:3
contaminated
106:18
contemplating
108:17
contempt 169:3
content 154:10
context 37:5
111:11 130:17
contexts 162:11
contextualize
126:18
continue 33:20
42:7 52:21 65:6
144:4
continued 93:12
107:21
continues 9:5
70:15
contracted 114:6
contracting
107:13
contributing 23:1
58:21
control 78:2 79:10
136:23
controlled 120:7,9
120:9
controversial 14:7
controversy 77:3
convenient 142:22
conversation
23:16 24:2 25:6,9

[conversation - court]

| | | | |
|---|---|---|---|
| 37:13 40:14 56:14 | 25:16,17 27:15 | 67:5 75:11 | 157:13 158:19 |
| 57:8,13 71:7 | 33:17 100:10 | **councilperson** | 159:8,24 160:16 |
| 123:25 125:9 | 115:9 | 43:19 94:7 156:11 | 161:10,19,20 |
| 133:7 134:12 | **costs**  12:8,8 23:8 | **counsel**  3:19,20 | 162:1,14,18 164:9 |
| 137:14 139:12 | 25:18 28:18 31:12 | 170:18 180:10,13 | 164:17 165:2,8,16 |
| 140:9 147:7 | 113:5 | 181:7,10 | 165:19,21,23 |
| 155:20 167:8 | **cottrell**  109:16 | **count**  9:22,23 | 166:2,13,16 167:1 |
| 169:10,12 | **coughing**  128:23 | **country**  45:13 | 167:13 168:1,19 |
| **conversations** | **coulda**  137:22 | **county**  3:10,19,20 | 168:22 169:22 |
| 10:19,20,21 24:8 | **council**  16:21 | 3:20 6:25 7:3 9:4 | 170:10 175:9,20 |
| 44:4 65:7 71:15 | 18:21 23:5 40:8 | 10:21 11:14 12:23 | 177:7,13 178:4,14 |
| 81:19 156:11 | 42:15,18 43:4,9,16 | 13:5,16 14:17 | 178:22 |
| 159:25 167:1 | 44:1,9 45:16,20 | 15:18 16:3 17:25 | **county's**  68:22 |
| **conversion**  28:1 | 46:7,17,17,19,25 | 20:17 21:1,8 | 70:24 74:18 |
| **conversions**  26:6 | 47:11,15 49:5,7 | 22:23 26:10,18 | **countywide**  123:1 |
| 27:2,12,23 | 53:1 54:17 57:5,8 | 28:6,7,16 29:23 | **couple**  8:10 34:6 |
| **converting**  14:9 | 57:12,12,14,15,16 | 32:4 33:9 34:25 | 41:11 44:15 57:7 |
| **convinced**  76:19 | 57:20,21 58:14,14 | 35:16 36:21,25 | 80:21 88:17 89:3 |
| **cooperate**  139:1 | 58:23,23 60:20 | 38:23 40:17,20 | 116:17 174:9 |
| **cooperating** | 61:3,16,16,18,24 | 45:10 48:4,10 | **course**  37:4 74:16 |
| 172:12 | 62:1,5,10,18,25 | 52:13 56:18 68:1 | 121:24 130:10 |
| **cooperation**  87:13 | 63:9 64:9,14,23 | 70:3,15 76:14 | 131:23 140:8 |
| 148:5 | 65:16,16 67:20 | 78:9 80:6 81:19 | **court**  1:1 6:4,5 |
| **coronavirus** | 68:4,4,13,13 70:12 | 82:7,22 83:10,18 | 7:17 9:7 10:14 |
| 107:13 | 70:18,19,22 71:18 | 85:23 87:2,10,10 | 25:9 34:17 38:15 |
| **correct**  17:6 18:8 | 72:14 73:21 74:5 | 88:10 102:23 | 38:20 41:6 42:20 |
| 18:16 22:10 24:21 | 75:1,17 77:19 | 103:10,20 104:10 | 43:17 47:3 48:3 |
| 24:25 27:20 28:2 | 83:21 93:9,10,24 | 104:25 110:7,8 | 49:22 51:2 55:19 |
| 29:22 30:24 32:16 | 94:11 109:2 | 111:1,6,24 113:1 | 62:21 65:13 67:12 |
| 38:3 69:22 74:22 | 117:24 156:10 | 114:3 115:2 | 77:2,4 78:1,12 |
| 129:22 141:3 | 158:20,23 159:25 | 118:12 120:2,17 | 79:4,17,20 80:4,11 |
| 147:19 149:9 | 163:17,24,25,25 | 120:25 121:4,24 | 81:6,11 82:20 |
| 156:6,8 162:22 | **councilmember** | 122:2 123:8 | 84:16 88:23 89:19 |
| 166:11,24 169:18 | 43:16 64:12,13 | 124:25 125:23 | 89:22,25 91:1 |
| 170:5 177:11 | 65:10,11 67:19,21 | 128:7 131:21 | 93:23 94:13 97:14 |
| **corrected**  122:24 | 75:19 | 133:8 135:9 | 100:17 101:16 |
| **correction**  146:14 | **councilmembers** | 137:24,24 139:6 | 105:19 106:9,25 |
| **correctly**  164:9 | 33:17 43:15,21 | 139:24 144:15 | 107:17,21 108:17 |
| **cost**  11:17 12:9,24 | 44:7,20 49:6 54:3 | 145:10 146:10,12 | 108:20 109:3 |
| 13:13 16:16,18,22 | 54:16 55:11 62:18 | 146:17 147:19,24 | 110:5 111:14 |
| 18:6 22:9 23:2 | 63:21 64:2,2,5 | 148:7 153:4 157:6 | 112:6,18 113:8,9 |

[court - determinations]

113:13,23 116:2
118:6 121:9,12,19
121:25 122:14,16
122:19 123:7,23
125:11,14,17
126:12 133:17
138:20 146:9
151:14,17,24
152:19 153:17
155:12 165:7
179:15
**court's**   6:7 10:12
34:18 108:14
116:6 122:25
144:19 145:20
169:1
**courteous**   123:14
176:13
**courtesy**   35:11
78:7 121:18
122:17 149:20,24
153:10 158:6
**courtroom**   67:3,7
78:25
**courts**   108:24
**cover**   97:23
159:23
**covered**   30:16
65:21
**covers**   76:14
**covid**   13:1,3 23:19
33:20 37:6,12,14
83:13 84:3 85:6,8
85:11 107:8
115:21 123:17
126:21 130:21
131:23 133:19
140:8 141:7
174:15
**crash**   108:12

**crashes**   112:9
**create**   22:19 99:7
103:10 114:20
128:10 141:15,23
141:24
**created**   29:15
160:4 170:8
**creates**   54:23
**creating**   20:16
38:13 54:20
**creation**   28:24
29:2
**creative**   21:16
55:1
**creativity**   41:3
**crises**   12:25
**crisis**   12:21 13:1,3
13:11 23:20 85:11
107:9 114:13
123:17 126:20
140:8
**criteria**   115:13
121:20
**criticizing**   44:25
**current**   83:3,6
175:7
**currently**   26:17
83:4 108:16
121:22 161:2
164:5,8 165:11,11
**curtis**   153:13
**cut**   93:23,24,25
**cv**   1:7

---

**d**

**d**   3:11 6:1
**daily**   4:4 31:17
**damages**   112:12
**danger**   107:9
108:2,10
**dangerous**   102:7
106:17 111:5

**dangers**   112:8
**date**   1:12 78:5
122:21 123:11
129:9 142:21
155:13 171:22
**dates**   124:6 125:13
140:7 148:2
158:10 174:9
**david**   1:14
**dawned**   88:1
**dawson**   60:6
**dawson's**   67:21
**day**   6:22 8:17,17
20:22 57:10,10
71:22 81:8 98:2
178:7
**days**   10:14 13:8
24:3 41:11 106:5
123:22 148:13
150:9,11
**dead**   78:5
**deal**   24:24 58:4
83:10 136:22
173:16,18
**dealing**   49:12
143:16 153:7
**decades**   62:9,14
93:9,15 108:6
**decent**   173:13
**decide**   117:20,22
124:23
**decides**   152:20
**decision**   55:21,22
72:2 89:6 93:11
94:8 115:10 133:4
143:7
**decisions**   25:2
56:6,22 69:10
89:8 97:24 129:5
134:3

**declined**   78:1
**dedicated**   83:18
**dee**   105:9
**deep**   132:9
**defendant**   3:2,10
**defendants**   1:9
**defense**   109:2
**deference**   140:2
**defined**   74:11
**definitely**   53:12
72:8
**delay**   84:13
**deleterious**   108:4
**demand**   122:16
143:7,14
**demographics**
73:20,21,23,24
**demonized**   93:15
**denial**   58:8
**dense**   124:14
**density**   28:24
**dependent**   13:19
**depending**   53:11
94:12 141:1
**depends**   15:6,10
115:9 163:24
**depoliticize**   69:7
**deputy**   3:19 4:11
**described**   112:6
122:15
**description**   5:2
**deserve**   56:10
**deserves**   153:13
**desires**   63:21
**detail**   68:17 81:16
**details**   40:22
**determination**
142:14,14
**determinations**
69:7

Veritext Legal Solutions
866 299-5127

[determined - donating]

| | | | |
|---|---|---|---|
| **determined** 42:6 54:4 | **dilemma** 174:15 | **disease** 110:10 | 75:1,18 93:9,10 |
| **develop** 24:5 63:23 | **diligence** 80:18 81:5,13 | **diseases** 117:19 | 124:10,10 149:7 |
| **developed** 69:24 106:9 | **direct** 94:15 | **disentangling** 122:3 | 153:13 156:4,6,15 163:18,24,25 |
| **developers** 54:14 | **direction** 42:11 70:16 71:19,20 | **disperse** 114:13 128:25 | **district's** 53:11 |
| **developing** 24:13 177:13 | **directly** 165:16 | **displaced** 133:15 | **districts** 42:15 43:5 44:1,10,13 |
| **dhs** 119:7 127:2 128:21 139:2 143:19 158:1 | **director** 4:7 | **displacement** 113:18 119:14 127:22 | 45:20 46:2,19 47:6 53:1 54:10 54:17 59:17,20,22 |
| **dialogue** 10:2 | **disability** 2:17 | **displacing** 138:15 174:16 | 61:19,24 62:1,7,11 62:18 64:3,9,16,25 |
| **die** 130:20 | **disagree** 35:23 | **disproportionately** 69:2 | 65:3,4 67:17,18,24 67:25 70:12,18,19 |
| **difference** 38:18 100:20 | **disagreement** 33:6 42:17 43:23 48:17 59:14 135:24 | **distance** 115:20 118:16 132:16 | 73:21 93:24 164:1 |
| **differences** 79:12 | **disagreements** 52:18 | **distancing** 123:20 140:10 | **divergent** 47:1 |
| **different** 10:9 29:24 40:11 43:24 44:14,19 46:1,2,3 46:23 47:12 49:5 49:6 53:20 54:1,1 54:7 60:19 62:14 63:18 64:25 65:1 65:3,4,5,5,7 75:21 75:22 77:3 81:23 82:11 96:10 104:24 105:4,6 115:25 124:19 132:10,10,13,15 144:6 151:19,20 157:13 160:2 176:8 | **disappointed** 124:22 | **distinction** 166:10 | **diversity** 73:19 98:19 |
| | **disappointment** 77:12 | **distinctions** 24:4 | **divvied** 163:19 |
| | **disapprove** 62:11 | **distinguish** 37:9 38:18 | **dmh** 162:19 |
| | **disclose** 156:1 | **distressed** 26:9,14 26:16 38:9 110:21 | **doc** 1:8 |
| | **disclosing** 156:10 | **distribute** 160:19 | **document** 8:17 36:15 162:16 177:2 |
| | **discover** 90:16 | **distribution** 42:14 43:3 156:3 163:15 | **documents** 7:16 10:3 11:14 42:12 |
| | **discuss** 34:16 35:17 123:3 125:8 155:10 177:4 | **district** 1:1,2 16:21 20:24 40:4 42:18 43:9,16,19 46:17,17,23,24 47:15,16 49:5,8 51:23 53:7,7,11,11 53:20,21,25 57:14 57:15,16 58:17 59:16,16 60:9,9,15 60:15,20 61:3,4,16 61:16 63:1,9 64:14 65:16,16 66:19,19 68:4,14 70:22 72:14 74:5 | **doe** 109:23 |
| | **discussed** 56:16 86:6 106:21 112:23 | | **doing** 14:1 17:1 30:3 36:6 48:8 50:13 61:2 76:12 89:7,23 95:13 100:12 119:7 127:11 133:1 135:1 148:13,16 158:9 161:3 165:16 171:7 172:11 175:23 |
| **differently** 65:4 67:13 104:9 | **discussing** 34:12 144:7 | | |
| **difficult** 12:2 | **discussion** 18:1 51:1 75:5 78:3 81:22 82:16 84:22 109:24 110:5 131:5 148:17 152:12 | | |
| **difficulty** 112:6 | | | **dollars** 7:2 166:17 |
| **diffuse** 90:11 | | | **donated** 7:5 |
| **digital** 180:7 181:3 | **discussions** 23:15 40:8 43:7,25 75:10 77:14 83:19 154:4 | | **donating** 6:23 |
| **dignified** 56:11 | | | |

Veritext Legal Solutions
866 299-5127

[don't - equity]

**don't** 12:10 13:17 22:24 24:11 27:1 29:7 30:12 31:14 31:16 32:7 33:16 37:10,13 39:1,5 40:21 45:10,19 46:5 47:15 49:23 50:4 51:8,11,12,18 52:3 55:22,25 58:4 59:7,13,22 61:3 65:9,15,17 71:1,2 72:19 73:24 74:6,19 77:8,9,16,23 79:7 79:12 81:8,16,22 81:22 84:6 86:2,3 88:3,11 93:1 94:14 96:1,12 97:25 99:20 100:5 104:2,16,18 105:10 115:8 117:1,9 118:11 119:1 122:11 123:13,21 124:5 125:1 127:6 128:2 128:8 135:23 136:7,23 138:13 138:21,21,23 141:8,14 143:13 143:16,17 144:24 145:4,5,9 148:22 152:5,6,9 153:6,6 155:6 157:4 159:2 159:16 160:7 161:24 163:7 168:24,25 169:2,7 170:18 171:9,10 171:16 173:10,16 176:13
**door** 119:2

**doors** 23:25
**dope** 100:4
**double** 14:11
**doubt** 101:3
**download** 117:12
**dph** 96:9
**dpss** 162:18
**dr** 116:3 127:8 140:13,20,23 142:8,8,19 143:1
**draft** 106:2,3
**dramatic** 8:20
**draw** 147:25
**drawn** 44:23
**drive** 2:6
**drop** 78:5
**ducks** 160:1
**due** 80:17 81:5,12 110:23 111:12
**duly** 180:5
**dump** 153:1
**dusseault** 4:5 128:19
**duty** 141:24

**e**

**e** 2:1,1 3:1,1 4:1,1 5:1 6:1,1
**earlier** 9:2 85:13
**early** 95:3 168:7
**earthquake** 108:11 112:11
**easier** 25:1 58:19
**east** 2:18
**easy** 49:11 76:15
**echo** 28:11 65:23
**echoes** 102:2
**economies** 68:21
**effective** 11:17 25:16 27:16
**effectively** 27:11 39:23

**effects** 70:5
**efficiently** 39:23
**effort** 8:19 46:7 114:1,25 134:21
**eight** 65:16 178:15
**eighth** 111:9 149:15
**either** 6:5 14:12 45:12 97:16 135:25 157:3
**elder** 2:17
**elected** 103:4
**elegant** 104:13
**element** 109:22
**elements** 25:7 109:15,21
**elephant** 68:22 83:9
**elephants** 44:16
**elevated** 108:3
**elevation** 74:13
**eligibility** 162:19
**elizabeth** 2:3 4:4 10:20 11:11 74:16
**email** 91:25 92:13
**embarrassed** 120:20
**emergency** 32:6 85:20 107:2 108:14 122:15 126:19 130:18 137:25 142:11
**emitchell** 2:8
**emphasized** 57:18
**employed** 180:10 180:13 181:8,10
**employee** 180:13 181:10
**enclosed** 98:9
**enclosure** 117:21

**enclosures** 99:3
**encourage** 119:7
**endless** 104:12
**ends** 57:4
**enforce** 121:5
**enforcement** 118:25 121:16 145:13 158:22
**enjoined** 122:1
**enjoy** 137:11
**ensure** 115:14 118:2 121:6
**ensuring** 66:25
**entanglement** 158:16,24 159:23
**enter** 118:15
**entire** 35:9 52:2 57:20 124:24,25
**entirely** 46:3
**entities** 87:14 103:4
**entity** 49:9 122:3
**entrance** 106:13
**environment** 37:7
**environmental** 80:22 86:24 89:17 147:3,23 148:9 150:16,17,20
**equal** 111:12
**equality** 64:22
**equally** 64:24
**equation** 73:17 74:10
**equitability** 69:3
**equitable** 104:4 163:1,17
**equities** 109:7 112:22 113:13
**equity** 43:3 66:14 68:25

Veritext Legal Solutions
866 299-5127

[eric - farther]

| | | | f |
|---|---|---|---|
| **eric**  78:25 88:12 160:7 | **evolve**  44:5 | **exorbitant**  6:22 25:17 | |
| **es**  180:4 | **evolved**  44:6 | **expand**  38:16,24 | **face**  93:21 107:12 107:24 112:20,25 |
| **especial**  107:9 | **exactly**  23:18 24:11 31:10 71:10 | 38:24 40:18 90:14 | **facilities**  20:2 29:21 31:19,19 |
| **especially**  54:25 104:2 | 74:22 101:25 102:6 123:18 | **expect**  94:23 96:17 123:12 157:3 | 40:11,12 70:7 76:2 107:11 |
| **esq**  4:10,13 | 136:3 139:17 140:14 158:7 | **expectancy**  108:6 | 116:11,12 117:5 167:21,23 |
| **esquire**  2:3,4,11 2:16 3:3,11,18 | 173:22 | **expectation**  161:23 167:16,17 | **facility**  16:22 22:21 40:10 114:7 |
| **essentially**  54:16 58:2 | **example**  13:14 14:9 16:20 19:18 | **expend**  46:6 131:5 | 114:7 |
| **established**  115:11 162:15 | 27:17 53:21 88:3 102:16 106:18 | **expensive**  27:16 | **facing**  107:19 |
| **establishing**  24:16 | 108:13 162:12 166:5 | **experienced**  74:1 | **fact**  49:16 89:2 96:4 102:16 108:6 |
| **estimate**  123:9 129:24 | **examples**  22:18 | **experiencing** 31:20 106:11,23 | 122:23 145:11 153:5 159:9 |
| **et**  1:5,8 23:8 106:8 117:24 122:10 | **exceed**  137:2 | 107:3,12 108:15 111:17 115:16 | 171:11,17 |
| 140:6 148:15 158:22 174:12 | **excellent**  116:15 117:14 | 120:3 121:2,8,22 123:9 | **failed**  111:2 |
| **evaluations**  41:9 41:13 143:15 | **excited**  127:16 | **experiment**  21:16 | **fair**  15:8 58:5 109:18 130:24 |
| **evenly**  64:19 | **exciting**  41:4 | **experts**  69:9,21 71:13,15 | 143:13 158:6 178:15 |
| **event**  108:11 | **excluded**  39:2,5 | **explain**  120:16 | **faith**  77:20,22 89:25 95:13 |
| **eventually**  76:16 77:17 81:6,18 | **excuse**  149:19 152:25 | **explore**  21:24 | 155:11 170:25 |
| 88:18 128:1 155:21 157:23 | **excuses**  137:13,16 137:19 | **explored**  12:24 | **falling**  17:4 |
| 158:7 167:9 177:18,18 | **executive**  4:7 | **exploring**  25:14 | **families**  129:21 |
| **everybody**  24:1 35:11,12 58:6,16 | **exercise**  24:15 | **expose**  108:2 | **family**  17:4 110:24 |
| 73:2,4 77:24 104:19 125:3 | **exercising**  94:20 | **exposed**  106:13 111:7 112:8 | **fancy**  30:3 |
| 135:19 168:8 | **exhausted**  161:16 | **expresses**  156:9 | **fantastic**  12:4,15 18:19 19:20 28:15 |
| **everybody's**  57:16 58:7 128:1 143:8 | **exhibit**  88:19 154:8,10,24 | **extend**  124:25 | 28:19 30:17 32:1 179:9 |
| **everything's**  20:3 98:24 100:16 | 174:20 177:22 | **extending**  24:8 | **far**  16:12 48:19 52:25 73:18 78:3 |
| **evidence**  20:21 21:14 41:17,21 | **exist**  30:2 | **extends**  124:24 | 128:1 143:21 |
| | **existing**  16:21 19:22 22:18 | **extent**  31:3 131:21 154:5 | 148:24 152:14 |
| | 161:15 | **extraordinarily** 43:17 | **farther**  75:16 169:9 |
| | **exists**  27:10 109:17 | **extraordinary** 108:24 | |
| | **exit**  50:17 106:13 | **eye**  8:24 58:3 | |

Veritext Legal Solutions
866 299-5127

[fashion - fortunate]

| | | | |
|---|---|---|---|
| **fashion** 58:16 73:25 | **figure** 9:21 21:17 33:19 47:21 87:17 96:4 112:2 120:8 124:12 129:15 158:21 169:20,25 | **finish** 47:2 57:1 61:13 89:11 93:3 | 130:20 131:9,23 132:3,8,10,14 133:3,18 134:8 135:2 138:12,22 143:13 155:23 165:9 |
| **fast** 24:20 48:11 60:11 100:24 136:20 | | **finished** 61:12 | |
| | | **finite** 23:21 | |
| | | **fire** 26:12 | |
| **faster** 75:16 116:23 | **figured** 79:24 | **firmly** 114:19 | **follow** 31:13 |
| **fatalities** 8:21,22 | **figures** 33:16 83:24 99:12 120:19 | **first** 6:3 9:24 13:24 26:22 29:16 35:10 38:4 64:1 64:16 70:11 79:18 98:14 108:2 109:4 115:17 130:16 131:1 146:12 149:5 161:13 176:22 | **following** 115:13 143:25 146:11 |
| **fault** 103:5 168:13 | | | **follows** 109:19 110:7 113:20 152:21 |
| **faulting** 79:12 | **figuring** 81:17 | | |
| **favor** 17:14 96:24 97:16,17 109:7,14 112:22 113:14 116:1 140:15 | **file** 122:20 | | **food** 98:10 99:13 114:17 118:5,23 |
| | **filed** 36:15 49:10 146:19 147:15 177:23,25 178:8 | | |
| | | | **footing** 124:19 |
| **favorable** 70:22 | **filing** 89:22 154:24 | **firsthand** 83:8 | **footnote** 106:20 |
| **feasible** 177:6 | **final** 72:22 157:5 157:21 171:23 | **five** 9:18 88:22 103:9,9 106:5 118:19 152:10,12 | **force** 101:3,4 141:17 |
| **feasibly** 13:9 | | | |
| **fed** 101:10 | **finality** 104:11 | | **forced** 56:6 114:19 119:14 127:22 133:21 141:10,11 |
| **federal** 62:21 65:13 67:12 78:12 84:1 89:19 105:2 135:18 | **finally** 17:1 69:3 113:16 147:24 156:13 159:20 | **fix** 104:13 | |
| | | **fixed** 23:23 | |
| | | **flexibility** 59:16 60:9 | **forcibly** 99:5 |
| | **finances** 83:10 | | **forcing** 67:13 128:24,24 129:1 |
| **feedback** 74:3,24 | **financial** 25:6 99:20,21 113:3,3 | **flexible** 28:15 38:13 | |
| **feel** 16:25 18:14 99:9 124:19 133:16 136:20 152:13 153:20 | | | **foregoing** 180:3,4 181:4 |
| | **financially** 180:14 181:11 | **fluid** 57:9 | |
| | | **focus** 9:9 26:2 46:21 104:18 107:18 126:13 173:8 176:21 | **foreseeable** 37:19 |
| | **find** 16:15,16,17 74:4 92:14,19 93:23,24,25 109:4 118:20 131:8 151:19,22 | | **forever** 29:5 |
| **feeling** 90:23 | | | **forewarning** 40:24 |
| **feels** 148:22 153:21 | | **focused** 149:14 176:6 | **forget** 74:12 |
| | | | **forgot** 22:12 |
| **feet** 115:20 | **finding** 54:14 64:6 64:16 112:6 144:9 168:14 | **focusing** 48:7 64:7 | **form** 19:24 61:25 124:16 127:8 139:22,25 140:6 142:18 148:7 157:19 171:18 |
| **fema** 105:3 | | **foley** 4:10 | |
| **ferrer** 115:24 140:18,20 142:8 143:5 | | **folks** 10:15 11:5 20:1 22:25 25:20 28:17 29:8 31:15 40:11 42:5 56:13 58:3 93:15 102:5 114:19 119:10,17 128:2 129:22 | |
| | **finds** 111:14 112:18 113:13 | | |
| | **fine** 68:8 78:10,13 88:11 89:3 102:10 136:25 151:6 | | **forth** 17:20 24:19 40:13 87:8 133:7 |
| **field** 89:1 | | | |
| **fifth** 106:2 111:13 118:9 | | | **fortunate** 153:2 |
| **fight** 87:2 | **finger** 111:23 145:12 169:6 | | |
| **fighting** 99:17 160:5 | | | |

Veritext Legal Solutions
866 299-5127

[forward - go]

**forward** 8:7,8 9:8 10:16 12:1 17:18 18:3 21:15 33:14 37:24 39:12 40:7 40:15,19 41:24 43:7,23,24 46:14 47:24 48:4 51:2 52:9 53:3 55:5 56:6,19,21,23 57:2 66:3 70:24 81:20 83:2,5 91:2 96:2 97:8 102:15 121:13 126:22 141:1 144:8,8,14 161:7 166:25 167:11

**foundation** 4:13 77:21

**four** 9:18 44:19 90:12 109:20 119:12 148:21,25 149:3,6,10,14 152:9 153:7,8,9,15 153:25 156:22

**fourteenth** 111:13

**fourth** 106:2 109:8 117:25

**francisco** 49:10,12 49:18 77:5 108:12

**frankly** 44:16 87:2 97:10,22,23 98:8 100:19 114:14 118:11 120:13 153:1,20 156:10 160:2

**free** 6:23

**freeway** 90:17 106:12 107:4,25 108:12,16 111:18 112:24 113:22 115:12 119:4,19

**freeways** 107:6 111:8,21 112:14 112:18 113:18 118:17 120:6,22 121:6 132:19 137:10 171:8

**friday** 78:23 95:9 126:15,23 128:13 128:14,15 129:8 129:15 140:1 143:9,10,16 170:25 171:4,5,6,7 171:23 172:22 173:24 174:4,22 175:3 176:20 178:19,23 179:4,5

**friday's** 143:11 174:1

**friends** 110:13

**front** 23:5 85:4 113:8

**frustrated** 145:11 159:24

**full** 8:13 40:21 71:12,13 154:5 178:6

**fully** 73:25 121:17 160:21

**fumes** 112:8 135:22 137:10

**functional** 47:16

**funded** 28:16

**funding** 42:14 83:11,17,25 84:5 84:10 85:10,16 87:1 103:13

104:18,18 156:3 162:14 164:16,20 164:23 165:2 176:23

**funds** 50:12,14 83:14 85:20,21

**funnel** 100:1

**further** 110:5 112:15 123:7 131:4 172:19 180:12 181:9

**future** 37:19 76:13

**g**

**g** 6:1

**game** 10:25 24:5

**gangbangers** 100:5

**gather** 45:15 52:15

**gathering** 71:11

**general** 23:24 107:15

**generally** 37:7 39:15

**genuine** 160:8

**geographic** 51:15

**getting** 6:18 40:9 40:10,11 62:17 90:2 98:8,18 99:8 100:19 114:15,17 114:17 116:8 133:21 139:2 141:19 160:9 167:3 172:12

**gil** 149:8,25

**gil's** 149:7,17 153:10

**give** 6:13 17:3 45:2 64:22 79:10 80:1 81:12 88:3 89:24 100:13 106:5

**given** 12:8,24 53:18 57:6 78:3 104:2 112:5 119:6 119:21,25 120:1 120:24 127:5 163:22,23,23 164:18

**gives** 97:23 128:21 166:3

**giving** 14:12 92:17 100:21 110:1 138:25 139:1,2 158:23 161:1 165:13 172:11

**glad** 41:4 134:16

**gladys** 93:2

**global** 37:21

**go** 6:17,18 13:15 13:25 23:11 24:9 26:2 34:4,5 40:21 42:11 44:19 48:13 50:5,18 51:7,10,13 51:16,20,22 52:2 52:14,14 61:14 65:19 67:25 68:11 71:19,20 75:12 77:19 78:10,21 80:2,7 81:7,16,22 85:15 86:14 89:11 91:4,4 93:6 96:2 96:19 99:6,9,12 103:20,22 104:3 105:17 112:1 117:17,20,22

Veritext Legal Solutions
866 299-5127

[go - guys]

118:3 121:10
122:7 125:8
126:10 127:6,6
129:23 133:4,25
141:10,14,16,17
145:20 149:5
153:18 157:23
166:7 168:24,25
169:5 171:13,14
177:3
**goal** 8:15 127:24
128:1 144:1
**goals** 8:22 114:2
115:1
**god** 98:12
**god's** 173:11
**goes** 16:12 72:25
**going** 7:11,12,18
7:21 8:13,18 9:9
9:21 10:1,24 11:2
11:9,17 12:1 17:6
17:7 22:1,4 24:15
24:16,20 25:16,19
26:11 32:23,24,25
33:1 34:16 35:1
38:1 39:11 40:16
42:4,11,18,19,23
43:4,8 45:1,3,5,7,9
45:12,14 46:21
47:5,6,11,24 48:21
48:21,24 49:15
50:5,5,25,25 52:14
52:18,20,24 55:20
55:21 59:8 60:8
61:10 63:16,17,22
64:20 66:19 67:22
67:23 68:17 71:3
71:4,17,22,23 72:1
72:4,9,10 75:12
76:16 77:1,10,15
78:4,6,7,24 79:17

79:20,21 80:1,12
82:17,21 83:22
84:25 85:18 87:9
87:15,21 88:18
89:9,10,11,24
90:10 93:10,14,18
94:23 95:10,22,23
95:24,25 97:9,12
99:12 100:10
101:11,14 102:24
104:3,5,10,14,24
105:2,7,9,16 106:4
109:12 110:3
111:20 112:1,1
114:20 115:8
116:13,22,23
117:6,7,10,11
118:20,24 119:2
119:13 120:5,10
120:16,19,22
121:24 122:25
123:14,15,15,18
123:25 124:1,2,5
124:25 125:10
128:5,6 129:3,4,18
129:19,23 133:13
133:14 134:10,11
134:18,19,20,21
134:25 135:3
136:2,5,5 137:11
139:19 140:14,24
141:23,25 142:2,5
142:6,17 143:17
145:12,20,22,22
145:23 146:6,7,8
146:24 147:7
148:15 150:13
152:10,19 153:4,5
153:19 155:10,24
156:6,20 157:5,10
157:11,19,21,23

158:7,9,15,25
159:7,9,17,21
160:6 161:1,25
163:7 166:25
167:12 168:2,8
169:22,23 170:1,1
170:4,6,14 171:6,9
171:16,17,18
172:1,9,14 174:6,8
174:15,16,17
176:14,24 177:9
178:24
**good** 13:2 15:22
15:23 17:1 18:18
22:3,5 52:20
53:13 59:12 77:20
77:22 89:25 95:13
100:7 114:18
123:5 127:20
134:16 145:9
155:11 159:4
168:2 170:25
173:9,24 177:7
**goodhearted** 46:3
**goodness** 79:5
101:1 119:9
144:22
**goodwill** 43:22
79:7
**goofy** 120:8
**gotten** 24:12 35:15
62:4
**government** 29:3
30:3 61:25 87:14
105:2
**governor** 88:4
120:18 158:13
159:5
**graciously** 6:13
**graham** 181:2,15

**gratuitous** 7:4
**grave** 112:7
**great** 7:14 16:5,7
19:25 28:8,13
41:20 57:3 58:4
66:22 67:14,17
76:6 85:3 98:25
99:1,2,18 102:18
117:23 119:7
120:22 124:20
127:12 174:1
179:9,12
**greater** 107:12,19
111:18
**ground** 31:4 54:9
54:9 61:2,9 64:4
100:21,22 114:10
**grounds** 124:20
**group** 35:9 64:7
87:25 101:13
134:8
**groups** 77:25
**grow** 58:1
**guess** 51:8 90:6
160:16
**guessed** 79:22
**guidance** 124:4,6
**guidelines** 162:14
**gum** 78:19 116:23
138:1
**guy** 116:14,20
**guys** 10:3,3 20:19
70:16 82:3,23
91:2 95:3 129:15
129:23 138:10
155:17 164:18
168:9 174:21
175:13 178:3

[h - homelessness]

| h | | | |
|---|---|---|---|
| **h**  5:1 | **hazards**  112:5,25 | 168:14 | **highly**  6:22 126:20 |
| **h's**  41:9 | **head**  47:12 | **hearing**  1:11 | **highways**  178:25 |
| **hair**  141:20 | **health**  82:7 94:16 | 34:17 35:11 72:15 | **hire**  168:17,17 |
| **half**  45:7 | 97:15,25 106:14 | 74:15 85:5 89:1 | **historically**  11:21 |
| **hand**  127:22 | 107:5,18,24 108:4 | 97:10,21 98:2,3 | 29:3 57:24 85:4 |
| 171:23 | 112:5,11,17,25 | 103:5 134:17 | **history**  8:20 45:9 |
| **hands**  28:6 116:25 | 113:19 114:2 | 137:13,16,19,21 | 72:10 |
| **handwashing** | 115:1 117:19 | 139:5 142:2 | **hit**  168:4 |
| 116:13 | 121:21 122:15,24 | **hearings**  107:16 | **hold**  20:7 77:23 |
| **hang**  131:17 | 124:12,18 126:19 | 107:23 175:20 | 89:22 91:8 94:9 |
| **happen**  8:18 10:17 | 130:17 133:18 | **heart**  6:9 | 97:1 102:1 157:23 |
| 67:1,1 131:23 | 134:20 137:25 | **heavily**  68:3 73:23 | 169:3 |
| 158:7 167:14 | 139:3,14,15 | 141:1,9 | **hole**  127:25 |
| **happened**  91:20 | 140:16 142:11 | **heidi**  4:7 6:15 | **holistic**  98:18 |
| 167:19 | 143:15 154:1 | 30:17 87:3 123:11 | **hollywood**  27:16 |
| **happening**  58:8 | 162:24,24 168:15 | 125:4,25 126:10 | **home**  35:16,16 |
| 73:10 85:17 | **healthy**  16:10 | 129:6,14 136:18 | 78:10 86:21 95:3 |
| **happiness**  110:19 | 113:12 122:25 | 140:2 143:11 | 96:20 166:5 |
| **happy**  89:10 97:11 | **hear**  6:4 7:18 8:1,3 | 174:10 178:22 | **homeless**  4:5,8 |
| 97:21 98:3,15 | 9:10,23 10:13,18 | **heightened**  106:14 | 12:22 17:2 25:21 |
| 118:4 172:5 | 11:10,19 20:9 | **help**  48:21 54:24 | 37:22 50:2 53:19 |
| **hard**  16:15 23:20 | 21:20 32:7,8 33:6 | 57:21 58:7,7,22 | 53:22 56:8,10 |
| 37:9 110:1 133:2 | 33:24 35:9 38:14 | 70:11 73:7 83:5 | 61:1 65:14 73:6 |
| 135:25 | 38:17 39:3,8 | 85:22 123:24 | 73:22 77:8 100:25 |
| **hardships**  109:13 | 40:25 41:4 48:2 | 126:18 142:19 | 107:10,14,19,24 |
| **harm**  46:15 109:6 | 48:24 59:10 71:17 | 147:5 148:1,19 | 108:2,5,10 111:4,7 |
| 109:23 112:4,7,20 | 81:8 87:7 88:14 | 177:13 | 112:7,13,19,24 |
| 135:2 137:1 | 94:23 95:17 98:4 | **helpful**  24:16 | 113:21 115:11 |
| 138:13 | 99:20 104:19 | 34:22 37:13 41:23 | 117:18 118:2,9 |
| **harms**  112:14 | 113:5 125:22 | 72:16,16 | 119:5,10,20 163:9 |
| 137:2 142:10,15 | 126:8,12 132:22 | **helping**  138:8 | **homelessness**  4:12 |
| 142:16 | 135:19 137:12,15 | **helps**  127:10 | 9:1 17:5 31:20 |
| **harris**  67:21 | 139:23 141:7 | **hereto**  180:14 | 58:9 65:3 66:18 |
| **harsh**  76:8 142:1 | 145:15 165:4 | 181:11 | 68:20 69:2 82:12 |
| **hastings**  77:6 | 174:18 | **hey**  90:6,10 101:1 | 83:20,23 101:6 |
| **hat's**  89:16 | **heard**  7:24 19:5,6 | **hhh**  41:13 60:21 | 106:11,23 107:4 |
| **haven**  22:17 | 25:18 28:14 34:7 | **higher**  31:15 | 107:12 108:15 |
| **hazard**  107:25 | 36:19 45:6,23 | **highest**  53:22,25 | 111:17 115:16 |
| **hazardous**  112:9 | 59:5 77:15 85:25 | 63:22 | 120:4 121:2,9,22 |
| | 88:4,6 102:20,21 | **highlighted**  86:10 | 123:10 133:9 |
| | 103:3,7 129:14 | | |

Veritext Legal Solutions
866 299-5127

[homeowner - important]

homeowner
153:21
honest   62:3 104:4
honesty   71:6
honor   7:15 31:24
95:15 131:15
135:8 136:3,15,25
139:8 140:19
141:5 143:9
154:23 161:23
170:15 173:23
174:25 178:17
honorable   1:14
hook   67:25
hope   75:23 81:18
117:23
hoped   84:3
hopefully   119:11
151:11 174:13
horrible   134:2
horrific   98:13
hospitals   110:14
hotel   1:15 14:9
23:23 24:8 27:1
27:11,18 28:1
114:5 143:5
hotels   10:10 26:5
27:12 32:13 33:2
38:9 41:25 48:10
50:15 63:25 64:16
83:15 156:22
hour   6:13 7:6
35:17
hours   29:25
171:11
house   12:14 14:10
15:8 23:6 83:14
156:18 165:9
167:11
housed   10:15
41:22

housing   7:22 9:12
9:13,15,17,25 10:4
10:4,5,9,16,25
11:1,2,8,12,15
13:24,25 16:7,7,8
16:12,14 17:12
19:3,13 20:11
21:17 22:3,15
24:19 25:13,14
26:25 27:10,13,18
28:8,16,22,23,25
28:25 29:5 30:2
30:21,25 31:1,7,7
31:15 32:3,4,20,25
38:5,12,13 41:1,7
41:14,19 42:8
48:18 54:15,22
56:11 60:16,17,19
60:21 62:6,10,11
62:13,14 63:8,12
63:13,14,16,18,23
64:8,10 65:6,17
70:20,20 80:10,14
81:13 82:18 83:6
84:13 93:16 98:25
100:17 111:3
114:4 115:3,17
116:11 117:3,22
118:1,15 119:23
129:4 138:12
144:9 155:23
156:25 161:8,22
161:25 162:3,11
162:13,21 164:7
164:10 165:6,12
167:5,22 169:13
170:1 173:9
174:21 176:23
177:8
huge   85:21 93:22

human   1:4 106:7
humane   76:5
113:16,17 114:1
114:25 115:10,15
127:1,23 170:13
humanely   110:23
113:24,25 143:19
159:19
humanity   134:7
136:23
humans   106:17
humble   118:4
humbly   155:6
172:16
hundred   89:3
169:22,23
hundreds   88:5,5
130:15 134:12,13
134:18,19,20
154:7
hybrid   42:15,19
43:5,9
hygiene   107:11
116:11,12
hypothetical
32:23 34:9,11
43:8
hypothetically
11:6,6 144:11
163:6,8

**i**

idea   29:24 45:22
53:13,17 62:1,5
75:1,9,10,10,14
81:9,10 120:13,15
129:2 143:12
175:25
ideal   12:20
ideally   16:13
ideas   35:11

identification
177:2
identified   91:7,10
identify   25:12
80:8 81:12 82:18
155:23
identifying   42:23
84:25
imagine   7:6
immediate   23:17
24:23 25:9,10
107:24
immediately   8:18
11:18 20:4 85:13
116:7 148:8
immense   46:15
impact   25:20
impacted   69:2
73:24 126:21
impacts   108:5
impasse   78:9
79:10
impediment   86:3
87:22
impediments
62:25
imperative   38:11
implement   54:25
60:4,5 71:17,23
74:24 75:16
121:13 160:14,14
implementation
53:7,8 60:10 63:7
67:1,24 72:13
75:2,21 79:10
implemented   75:3
implicate   111:12
implications   134:5
important   22:6
30:19 31:22 52:9
72:12 84:21

[important - issue]

123:19 126:13
130:4 132:2
154:19 166:10
**impossible** 8:22
**impression** 138:24
141:10
**improved** 121:21
**inadequate** 111:3
**incapacitated**
110:10
**incentive** 54:23
**inclined** 76:7
**include** 111:20
119:21 120:5
121:24 123:8
**includes** 166:4,5
**including** 108:3
**incompetent** 110:9
**incomprehensible**
122:6
**increase** 48:18
49:1 54:24 108:9
127:7
**increased** 47:21
48:9
**increases** 54:20
55:10
**increasing** 48:7,15
**increasingly**
106:10
**incredible** 45:12
**incredibly** 127:21
132:2
**independently**
31:21
**indicated** 156:11
**indigent** 110:9
**individual** 12:2
13:2 47:11 61:24
62:10,12 117:18
117:22 120:3

121:2 147:25
156:10
**individualism**
119:20
**individually** 75:13
127:4 131:9
143:19
**individuals** 61:23
62:6 106:11,23
107:3,12,24 108:2
108:15 111:4,17
112:8,19,24
113:12,21,24
115:16,19 118:9
119:5,10 121:6,8
121:22 123:9
**industry** 26:12
**inertia** 9:6 45:14
48:20,20,22,22,25
52:1,21 55:4
61:17 76:19 78:24
79:3 82:1 93:8
94:1 124:17 146:1
141:1
**inform** 8:12
**information** 52:16
71:12 119:22
**informed** 146:9
**infrastructure**
12:7,10 22:24
23:8
**inherent** 112:18
**inherently** 62:19
111:4
**initial** 6:9
**initially** 90:13
**initiative** 69:23
**initiatives** 4:12
**injunction** 108:18
108:23 109:1,4,8
109:11,20 111:16
112:16,21 113:14

113:15,23 144:3
**injunctive** 108:21
109:14 122:18
123:4 157:22
158:8 171:24,25
**injured** 108:11
**innovation** 41:3
**innovative** 21:15
26:25 27:2
**input** 45:4 107:2
121:20 122:1,17
142:7 158:23
**inscribe** 65:2
**inscribing** 62:24
**instance** 46:2,6,22
**institution's** 110:7
110:15
**institutions** 110:14
**instruction** 57:6
**intake** 117:18
**integrity** 6:6
**intelligent** 89:6
**intend** 121:10
141:8
**intended** 110:16
**intent** 161:18
**intention** 140:9
**interacting** 21:6
**interest** 109:9
113:15,19 115:15
**interested** 13:5,12
19:11 176:1
180:14 181:11
**interference** 95:13
**interim** 4:7 9:18
10:4 11:5 14:24
15:5,19 16:8,12,14
18:2 31:7 32:6
60:16 70:17 162:2
162:3,11,13,21
164:10 165:7

178:2
**interrupting** 18:24
**intertwined** 87:19
**intervene** 50:1
77:11,24,25
**intervened** 49:22
**interveners** 17:24
33:7,12 36:24
37:3 38:23 42:2
71:19 91:6 125:23
151:12
**intervention** 77:13
**interventions**
30:21
**interwoven** 87:20
**intimate** 55:8
**intimately** 43:20
**introduction** 57:6
**invest** 16:1 113:2
**invested** 9:16
**invite** 18:21 117:6
122:23 140:13,13
**invites** 122:16
**involved** 7:9 29:4
43:20 49:17 94:17
95:4,4,5 124:24
131:20 159:3
**involvement** 7:3
**involving** 106:22
**irrelevant** 9:23
**irreparable** 109:6
109:23 112:4,7,20
**ism** 152:19 153:17
**issue** 24:17 40:24
41:25 50:13 57:22
66:15,18 67:12
70:12 81:10 82:11
86:1,3 92:10
94:13 109:3 129:7
157:21 158:7
159:9 162:8

Veritext Legal Solutions
866 299-5127

[issue - kind]

172:10
**issued** 106:25
    110:4 159:10
**issues** 8:25 39:20
    65:1 73:10 75:4
    80:22 82:13,22
    83:2 84:10,11
    85:3 86:25 102:20
    102:22 103:2,18
    103:24 105:11
    106:22 107:19
    129:22 132:24
    160:18 162:8
**issuing** 107:2
    108:17 109:1
    110:2 113:23
    114:24 172:10
**it'll** 64:22 79:6
    123:5 139:22
    171:20 175:25
**items** 101:1,1,9,10
    106:20 118:22
**iterative** 118:8
**i'm** 149:12 155:3

### j

**jams** 7:5
**jenny** 4:3 18:23
    20:8
**jeopardize** 133:18
**job** 1:19 14:14
    85:3 116:16
    117:14 127:12
    141:15
**jobs** 104:12
**joe** 4:3 122:8
    124:9 142:23
    145:18
**john** 46:3 60:7
    96:23
**join** 120:12

**joined** 111:22
**joking** 118:19
**judge** 6:2,24 7:1,3
    7:19 8:10 9:5,20
    15:24 19:6 20:7
    20:25 21:9,19
    32:8 33:21 34:23
    35:3 36:3,7,9
    37:25 38:1,6
    41:10 42:21 43:10
    43:12 45:24 46:11
    47:10,17,23 48:2
    48:14,17 49:11,15
    49:20,24,25 50:4,4
    50:8,19,24 51:7,10
    51:13,16,20,22,25
    52:6,8,11 53:9,14
    53:23 54:2,15,18
    55:2,13,17,24 56:1
    56:2,8 57:23
    58:16,25 59:4,8,12
    61:10 65:25 67:3
    67:7 68:6,9 70:17
    72:6,7,9 73:5,8,12
    73:15 74:14 75:7
    75:8,9,14 76:18
    80:3,24 81:1 82:5
    84:20 86:8,12,14
    86:15,18 88:9
    89:5,14,18,21 91:7
    91:8,16,19 92:11
    92:11,22,24 93:6
    94:3,6,8 95:1,17
    95:21 96:15,18,21
    98:6,12 101:19,21
    102:1 103:16
    105:13,16,25
    115:23 125:7,13
    126:3,7,25 127:10
    127:15,17,19
    128:10,13,15,17

128:20 129:13
130:2,5,8,24 131:1
131:4,8,12,14,17
131:25 132:4,7
133:23 134:6,14
134:16,25 135:3,6
135:12,15,18,18
135:21 136:6,9,13
136:19 137:4,6,9
137:13,17,21
138:3,5,8,19,24
139:5,10,16,18,20
140:22 141:7
142:5,13 143:10
143:24 144:2,18
146:7,16,20 147:2
147:5,10,17,22
149:4,11,17,20,24
150:9,19 151:1,6
151:25 152:5,18
155:1,3,9 156:7,8
157:2,10,14,16,18
160:23 167:20,25
168:4,11,13
169:15,24 170:3,6
170:17,24 171:3,9
172:6,9,19,20,21
172:25 173:3,6,10
173:13 174:1,5,12
175:4 176:12
177:18 178:6,11
179:1,10,13
**jump** 85:13
**jumpstarted** 25:10
**june** 148:1
**jurisdiction** 20:24
    82:22 120:10
    158:21
**jurisdictional** 83:2
    84:11 86:25 103:8

**justification** 123:4
**justified** 109:12
**justifies** 112:5
**justifying** 112:20

### k

**kathryn** 78:15
    79:2 95:4 140:6
    143:8 157:7 160:7
**keep** 8:15 28:5
    32:22 42:5 103:5
    126:22 133:13
    134:11 141:18
    144:13 145:8
    155:4
**keeps** 82:1
**kelly** 109:23
**kes** 1:8
**key** 30:22 31:9
    42:2 70:7 114:6
**kick** 118:25
**kicked** 118:24
**kid** 95:2
**kidding** 87:3
    116:19
**kids** 127:11
**kill** 101:5 174:16
**killed** 94:1
**kind** 21:5 22:19
    25:23 27:24 36:10
    43:13 45:24 47:7
    56:4 58:21 69:8
    70:9 71:25 76:23
    84:13 101:24
    104:2,25 105:2,10
    105:11 136:3,17
    137:2 138:13
    142:10 155:22
    161:23,25 162:15
    163:2,3,19,20
    165:16,18,18
    169:20

[kinds - limitations]

**kinds**  100:2
132:17
**kitchen**  12:8
**kitchenettes**  12:16
15:9
**knew**  43:16 49:5
124:15,16
**know**  8:10 9:15
10:22,22 12:16,18
12:20 13:5,23
14:10 15:3,15,25
16:21 17:23 19:1
19:5,6,7,17,18,22
20:1,2 21:2,12
22:2,6 23:1 24:11
24:18 29:7,9,11,11
30:5 31:12 32:22
33:5 34:17,20,24
37:10,13,19 38:7,8
38:11,12,15,22
39:1,20 40:7,9
41:13,16,18 42:1,6
43:4,8 45:10,16,24
46:11,17 48:4,12
49:7 50:4 52:4,13
52:19 53:25 54:10
54:11,14,16,21
55:14 56:12 57:5
58:17,21 59:8,25
61:3 62:8 63:6
64:15,23 65:15
66:14 67:24 68:14
68:21 69:5 70:2
70:13 71:9,18,18
71:21 73:24 74:6
77:8,9 78:12,13
79:12 80:14,20
82:8,17,21 83:1,2
83:8,17,23 84:4,6
84:7,15,16,17 85:6
88:11,12,13,22,25

88:25 89:5 90:3,5
90:11 95:1 97:16
97:20 99:18 100:5
103:8,11,21 104:2
104:2,9 105:6,10
119:18 122:9
123:13 124:18
127:25 128:23
130:13 132:8,22
134:17 135:12
136:19 140:25
143:14,16,17
144:11,23 145:4,5
145:25 148:4
152:6,9 153:11
154:6,7,21 155:25
156:20 159:2
160:14,18 161:24
162:12,13,18,25
165:1 168:18,20
169:8,11 173:3,20
174:25 175:1
178:14
**knowing**  163:12
**knowingly**  25:2
**knowledge**  21:23
55:8 180:9 181:6
**knowledgeable**
148:3
**known**  129:7
**knows**  43:19 58:16

**l**

**la**  1:4,7 4:12 18:4
20:10 28:10 29:23
62:20 90:5 98:14
166:6 167:10
168:17
**labeled**  73:1
**lacity.org**  3:7
**lack**  58:20 134:7

**lahsa**  9:3 26:18
30:19 35:16 39:24
39:25 40:20 54:11
54:12 68:19 69:3
69:6 82:6 87:3
103:2,6,6,8 104:4
104:5 128:7,22
140:23 160:4
162:12 164:12,16
165:3,14,18,19,20
167:3 168:19
169:23 174:3
**lahsa's**  161:5
**laid**  36:14
**land**  13:19 15:11
15:13 59:24 84:10
87:13 94:2
**landed**  87:15
**landes**  2:5
**lapd**  168:9
**lardner**  4:10
**large**  44:16
**larger**  24:17
**latitude**  94:13,14
**lauren**  3:18
**law**  2:12,17 77:6
111:3
**lawfully**  110:11
**laws**  121:5
**lawsuit**  49:18
77:10 120:13
152:24 159:3
**lawsuits**  90:11
**lawyers**  69:10
**laying**  85:3
**lead**  27:21 40:9
106:18 108:4
112:9
**leaning**  97:23
**learn**  107:21

**lease**  22:19 24:8
27:24,24
**leases**  23:23 148:8
**leave**  30:9 46:24
117:16 154:3
178:18,18,20
**leaves**  30:1
**leaving**  92:11
129:8 151:18
**led**  6:17 45:20
65:2
**lee**  46:3 60:7 64:12
**lee's**  65:11
**left**  39:17,19 62:10
123:11
**legacy**  45:9,13
**legal**  4:13 77:21
108:20 123:4
**legislating**  61:22
**legislators**  61:21
**letter**  62:9
**letting**  67:25
**level**  31:16 44:18
55:9 62:17 64:4
68:17 78:9 84:2
85:18,18,23,24
156:2 160:9
171:25
**levels**  42:13 84:3
108:3
**lieu**  68:14
**life**  108:5 110:24
127:21
**lifts**  123:23
**lighting**  98:10
140:17
**likelihood**  109:5
111:15 112:4,20
**likes**  140:16,17
**limitations**  40:6

Veritext Legal Solutions
866 299-5127

**[limited - maintained]**

**limited** 21:23
121:16 154:16
166:19,21,22
**line** 55:20 109:19
122:9 143:1
152:18 161:1
164:2 169:9
**lines** 70:11
**list** 30:6 33:23
63:16 115:7
154:21 178:2
**listed** 102:20
**listen** 38:2 69:14
69:17,20 96:25
97:3,6 116:6
135:23 143:5
172:15
**listened** 96:17,24
**listening** 47:4
79:23 91:9 97:15
158:20 159:24
174:14
**listings** 82:24
**literally** 6:21 30:1
54:9 114:8 151:10
174:20,21
**litigation** 104:12
131:21
**little** 9:2 12:1 15:9
17:3 33:5 42:16
60:7 79:18 95:23
99:10 119:14
123:16
**live** 14:12 31:21
58:8 65:15 73:13
106:11,15,17
111:17 112:19,24
118:4 121:11
141:11 144:22,24
**lives** 16:8 123:21
140:10

**living** 8:16 22:20
22:21 29:6 31:17
31:19 102:7 107:6
108:16 111:8
112:13,18 118:7
119:5,20 120:4
121:2,23 137:10
145:6 174:7
**liz** 33:11 52:25
59:25 84:23
178:19
**liz's** 28:12
**llp** 2:5 3:12 4:10
**local** 54:11 55:9
84:2
**location** 1:15
93:17 94:15
114:21 121:7,11
131:22 134:10
150:25 151:4
**locations** 26:13
54:14 93:14,19
108:1,9 111:5
112:19 122:4
132:20 133:21
152:4 174:14
**logic** 57:15
**logistically** 60:25
61:5
**logjam** 55:5 79:13
**long** 25:2 26:11
32:18 37:15 50:16
53:4 88:12 100:17
100:19 109:22
110:1 116:8
118:22 130:8
156:17 157:8
158:2 171:10,16
172:4
**longer** 91:13 113:5
124:18 151:16

158:4
**look** 7:21,23 10:10
10:24 22:6,6
31:23 39:11 40:3
41:15 43:4,25
54:5 55:20 57:25
63:12,17 72:1
73:19,20,21,22
80:9 102:25
129:19 136:1
155:16 156:14,24
156:25 158:1
161:8,9 163:2
165:6 176:24
**looked** 30:20 44:1
62:21
**looking** 12:5,6,15
12:22 24:3 25:23
26:8 27:22 28:21
38:12 44:3 56:13
60:1,4 70:3 75:19
76:25 81:13 96:13
148:5
**looks** 31:5 146:25
163:22 165:19
**loop** 104:12
**los** 1:8,17 2:7 3:2,4
3:6,10,14,20,22
4:4,5,7,12,13 9:4,4
12:22 15:21 20:20
21:2,13 40:17
53:15,20 57:2
61:13,13,22 62:8
86:5 90:4,7,19
93:1 102:25 106:7
107:19 109:9
111:1,1,6,7,18
113:1,1 114:3,3
115:2,2 120:1,2,25
120:25 121:4,4
122:1,2 123:8,8

132:12,17 146:10
148:11,14 149:18
150:12,24 151:20
151:22 152:7
153:10 160:19
161:2 163:10,14
164:11,17,25
165:8
**lose** 78:2
**lot** 7:25 8:1 23:13
23:14 29:6 34:20
55:3 57:5 69:7
70:5 73:10 85:18
85:25 90:10 97:24
99:3,6 100:19
102:12 114:6
116:7 118:4 124:3
132:17 144:23
160:2 166:15
**lots** 24:10 29:2,7
29:10,15 38:13
115:7 117:21
145:24 158:2
174:19,20
**loud** 41:2 42:20
45:23
**louder** 59:11
**love** 10:18 11:19
41:12
**low** 7:5 12:9,24
13:12 16:18,22
18:6 23:3,7
**lower** 7:18
**lowest** 16:16

**m**

**magnitude** 12:21
43:18
**main** 2:13 3:5
**maintain** 115:19
**maintained**
107:18

[maintaining - mean]

maintaining  14:12
maintenance
  120:9 145:12
  158:22
major  142:24
majority  25:20
  27:9
makers  143:7
makeup  164:16
makeups  65:5
making  41:24 48:8
  50:15,16 69:10
  88:19 89:8 133:4
  134:3 136:21
  138:6
manage  99:25
  101:12
manatt  3:12
manatt.com  3:15
manner  77:9
  94:10,14
maple  80:21 86:25
  145:21 148:15
  150:2,12,13,21,22
march  107:7
marcus  3:3 58:13
  59:6,11,13,20 60:3
  78:20 91:15,17,19
  91:21,24 92:3,5,8
  92:10,13,17 95:9
  95:15,18,22 96:16
  96:19,21 98:5
  125:5,6 146:14,15
  146:18,21 147:3,9
  147:14,20 149:5
  149:16,22 150:1,4
  150:11,16,20
  151:2,7 152:3
  154:9,16,23 155:2
  155:6,8 166:19
  167:15,18,21

168:1,4,9,12
172:24 173:2,5,16
173:20 175:6,11
175:25 176:4,11
176:18 178:8,17
marijuana  90:18
marked  5:4
market  28:25
marks  105:19
  125:11
marqueece  46:5
  60:6 149:11
  153:12
marston  4:7 30:18
  30:25 31:3,11
  125:24 126:1,5,9
  126:11 127:9,13
  127:16,18 128:9
  128:12,14,16
  129:25 130:10,14
  130:25 131:3,7,10
  165:23 166:2
  174:11 179:3,6,8
martin  111:9
  121:17
martinez  4:9,15
  7:14 11:23 13:15
  13:21 14:2,16,20
  14:23 15:1,4,12,16
  15:18,23 17:6,9,12
  17:17,23 18:11,16
  18:19,23 19:13,16
  19:20,23,25 20:6,8
  20:15 21:25 22:8
  22:10,13,16 23:11
  23:18 24:21,25
  25:11 26:7,15,21
  26:24 27:4,8,14,20
  27:22 28:2,4 29:9
  29:14,18,22 30:8
  30:10,13,17,24

31:2,10 32:1,9,11
32:16,19 33:11,24
34:5,9,23 36:1,12
36:16,18,23 37:4
37:24 38:3,7 39:3
39:6,10,14,17,19
43:11 47:9 49:14
50:21 52:8,12,24
53:15 55:15,18,25
56:3,10 57:1,11
59:1,10,19 60:13
60:22 61:12 63:2
63:5,9,11,14 64:23
65:18,20,22,24
66:2,16,22 68:1,24
69:15,19,22 70:1
70:13 71:2,5,10
72:7,11,21,23
74:16,22 75:8
80:3,25 81:3 82:6
84:21 85:1 86:5,9
86:14,17 88:8
89:4,13,16,20
90:24 91:4,23
94:5 98:11 101:18
101:20,23 102:18
103:17,25 104:20
104:22 105:12,15
115:22 125:15,21
125:25 126:2,10
129:11,14 130:1,3
130:7,11 131:13
138:2,5,9,20 139:9
141:3 143:24
146:5 147:12,16
149:2,9,13,18
150:3,7,10,15
155:15 156:13
157:8,12,15,17
160:16,25 161:14
161:17 162:2,6,22

163:5 164:4,14
165:17,20,25
166:7,11,24
167:17 169:14,18
170:23 171:2
172:17,20 173:4,8
173:12,18,22
175:13,18 176:17
176:19 177:15,21
177:25 178:3,10
178:21 179:5,7,9
179:12
martinez's  67:20
mary  78:15 95:4
mass  168:24
master  4:9
master's  6:22
match  80:15 161:4
matched  167:23
matching  80:10
matter  46:22 69:9
  87:7
matthew  2:4
maximize  161:19
  164:6
mayor  4:11 45:15
  83:21 94:10
  117:24 140:5
  142:22 145:15
  155:13
mayor's  93:25
mayors  54:17
  61:19,24 62:2
mclain  4:10
  175:12,15,22
  176:2,6
mean  14:24 15:4
  19:9 21:22 22:2
  26:9 39:1 45:8,10
  53:16,18 54:6
  55:7,22 57:9 60:5

[mean - motels]

61:15 67:7,10,15
69:13 72:4 87:19
91:3,11 100:3
103:23 104:9
124:21 127:3
130:11 131:20
144:3,24 148:14
152:9 158:15
159:17 160:17
163:16
**meaning** 53:8
**meaningless**
148:16
**means** 9:1 68:19
68:19 94:9 106:5
110:13 136:6
**measure** 41:9
**measures** 108:14
**measuring** 29:19
**meat** 6:20
**media** 105:20,23
105:24 125:12,19
125:20
**medical** 28:18
90:18 114:16
127:2 134:21
143:21 168:16
**meet** 104:5 111:2
141:25 144:10
163:5,6,12 171:12
173:11 178:11,11
**meeting** 116:25
160:1 173:6
**members** 62:6
75:11,15,17 103:9
103:10
**memo** 88:16
**memorandum**
90:13
**mental** 82:7 97:15
134:20 139:2,14

140:16 143:15
162:24 168:15
**mention** 36:19
**mentioned** 19:10
28:14 31:6,14
54:16 58:16
113:21 127:1
139:7
**merits** 109:5,13,18
111:15
**mess** 158:15
**message** 66:7
152:19,21 153:3
153:16
**met** 54:21 109:15
121:15
**metro** 82:23
**michael** 142:24
**michele** 4:9 6:21
7:2,8,12 21:21
22:11 31:24 34:7
44:24 46:18 52:7
86:2 89:11 90:23
123:25 143:23
169:6 171:1
172:16
**michele's** 28:11
**microphone** 15:24
**midnight** 95:2
157:4 178:15
**midterm** 156:17
**mike** 46:2 60:5
75:24 177:19
**miles** 134:12,13,18
134:19,20
**milestone** 128:6
**miller** 4:11 15:22
15:25 17:8,11,16
17:22 18:9,13,17
18:20 37:2,5
60:14,23 63:4,8,10

63:12,15 166:9,12
166:21
**million** 7:2,4 23:6
25:19 33:18,18
48:4 51:3 53:18
**mind** 8:15 138:18
144:14
**mindful** 142:10
**minimum** 115:14
115:20 123:3
**minute** 93:5 97:1
**minutes** 12:12
**mirrored** 8:17
**misconstruing**
91:24
**missing** 89:14,15
**mistake** 46:8
76:21 86:21
136:21 145:1
**mistakes** 46:14
**mitchell** 2:3 11:20
11:24 22:11,14,17
31:24 32:10 33:10
33:25 34:4 53:4
53:10 60:2 66:1,5
66:11 74:17,23
84:24 85:2 152:16
171:4 174:24
175:10,17,19,23
176:9
**mitigate** 115:21
**mix** 54:5
**modalities** 17:15
21:17 25:15 26:2
26:19 38:10 41:18
42:9
**modality** 14:14
**model** 16:17 20:20
21:7 22:3,5,15
23:9 27:6,19 28:8
28:15,17 39:2,15

45:13 59:16 61:16
98:8
**models** 23:13,14
63:19
**modest** 113:2,3
**modular** 28:10
**moment** 35:4
50:11 67:8,11
85:11 101:14
105:14,18 111:21
123:14 124:2
147:11 148:11
159:23
**monday** 95:9
173:24
**monetary** 112:12
**money** 9:16 13:19
28:17 85:4,22
86:1,2 100:13
105:11 115:9
153:2 159:13
166:3,15
**monica** 2:14 46:24
122:8 158:20
**monies** 41:14
83:12 85:8 94:15
**month** 105:8
**months** 12:1
104:24
**moore** 177:19
**morning** 15:22,23
35:2 92:14 171:12
179:11
**mortar** 167:4
**motel** 26:5 27:2,11
114:5
**motels** 10:10
32:12 33:2 38:9
41:25 48:10 50:16
63:24,25 83:16
156:22

Veritext Legal Solutions
866 299-5127

[motion - north]

| | | | |
|---|---|---|---|
| **motion** 96:23 108:21 | **multiple** 16:1 152:10 | 56:8 58:7,22 61:6 65:17 68:25 69:13 | **neighborhood** 16:24 |

**motion** 96:23
108:21
**mou** 161:15 164:6
165:11 166:20,23
167:2
**move** 7:17 8:6,8
9:7 17:17 18:3
21:14 33:13 37:24
39:11 40:13,15,18
41:24 42:9,10
43:3,7,24 44:16,19
46:4,14 47:24
48:3 49:6 51:2
52:9,24 53:3 55:5
55:19 56:6,19,20
56:23 57:2 64:1
66:2 70:15,18
71:25 72:16 76:1
81:20 83:1,5
84:18 87:6 91:2
101:12 102:19
114:20 119:12
131:10 133:8
134:10 141:8,23
143:18 144:8
160:25 176:22
**moved** 121:7
134:8
**movement** 44:17
131:22
**moves** 144:8
167:11
**moving** 11:25 40:7
43:23 46:1 70:24
72:13 97:8 117:8
126:22 128:2,9
136:20 140:9
144:14 155:24
156:16 161:7
166:25

**multiple** 16:1
152:10
**municipality** 44:2
**muted** 34:1 66:5
**myers** 4:13 23:10
26:4,8,20,23 27:1
27:6,9,15,21,25
28:3,5 29:13,17,20
29:23 30:9 37:9
56:25 57:3 61:15
65:19 67:2,6,10
91:3,6,10,20 92:2
92:4,7,9,12,16,22
92:25 93:7 131:15
131:19 132:1,5,8
133:24 134:7,15
134:23 135:1,5
140:19

**n**

**n** 2:1 3:1 4:1 6:1
**name** 80:23
**names** 75:23
**narrow** 111:16
**narrowing** 23:16
**national** 109:2
**near** 106:12
107:25 108:16
111:8 112:13,18
112:24 113:22
121:23
**nearby** 119:22
164:1
**necessarily** 22:4
162:20
**necessary** 16:9
118:1
**need** 6:4 12:24
16:1,6,7,9 17:20
22:24 23:24 25:6
31:15,15 33:4
45:24 47:20 48:18

56:8 58:7,22 61:6
65:17 68:25 69:13
69:14,17,20 72:20
73:18 74:20 78:12
80:7 81:16 85:12
86:4 92:23 93:1,2
93:2,2 95:11
97:20 98:21
104:11 108:7
110:18 112:14,15
113:2 115:23
126:14,21 129:15
129:18 137:25
142:9 149:20,24
152:9 153:23
155:13 157:6
159:4 163:2
164:25 169:19,25
172:2 174:4
176:15,20 178:23
**needed** 12:17
23:22 33:4 130:13
150:7
**needle** 8:7,8 9:7
40:19 70:24
**needs** 22:5 24:5
54:6,6 58:22 60:7
61:23 63:21 73:7
126:14 130:21
145:4,5 155:13
159:5,6 163:3,5,19
163:24 169:21
**needy** 110:21
**negotiate** 176:16
**negotiating** 76:11
175:2
**negotiation** 155:17
**negotiations** 7:21
72:3 95:14 107:17
171:6,11 173:1,14
175:8 178:13,22

**neighborhood**
16:24
**neighborhoods**
62:15 73:11,14,23
133:20
**neither** 143:18
180:10 181:7
**neutral** 100:13
113:7
**never** 6:7 8:6
36:20
**new** 25:14 32:4
38:10 152:3
**news** 4:4
**newsome** 120:18
**nice** 127:2 143:5
152:15
**night** 6:22 78:13
146:19 147:15
178:9,15
**nightmare** 158:21
170:7
**nimby** 91:12 93:21
102:5,12 104:7
152:19 153:17
**nine** 65:16
**nineteen** 88:8,9
115:22
**ninth** 44:3 109:19
122:21,22
**nobody's** 153:19
**nondiscriminatory**
110:24
**nonexistent**
141:22
**nonprofits** 61:2
**nonsense** 153:22
**nonstarter** 176:10
**normally** 77:3
**north** 3:5

[notary - option]

**notary** 1:18 180:1
180:18
**note** 30:20
**notes** 147:7
**notice** 34:16 35:22
36:11 119:6,21,21
119:25 120:1,24
148:9
**noticed** 102:4
**notion** 72:25
**novel** 107:13
**noxious** 135:22
137:10
**nuisance** 111:8
**number** 15:8
34:14 53:22 54:8
105:20 106:20
114:15 125:12
127:25 129:16
130:5 143:11
144:10 145:5
154:17 158:12
163:6 174:14,18
**numbers** 41:23
123:12 131:2
140:2 143:12
163:12 174:4,5,13
**nursing** 117:4,6,17
**nury** 4:15 46:25
79:1 122:8 124:8
140:5 142:23

**o**

**o** 1:14 6:1
**o'clock** 6:16 35:18
157:4 170:25
171:10,12,13
172:23,24 173:11
176:14,18 178:12
178:13,16,18,19
**oakland** 29:9,10
29:15

**object** 96:16 151:4
**objection** 13:18
96:17 151:21
**objections** 96:12
96:13
**obligation** 24:23
57:19 58:6 73:4
**obligations** 111:2
**obstacle** 87:22
93:22 99:21,21
113:7
**obstacles** 8:14
113:8,10
**obvious** 35:14
43:15
**obviously** 7:21,24
8:11 9:15 11:21
12:4,7,18 13:18
16:23,25 18:9,11
30:5 38:10 55:22
55:25 63:24 69:14
70:16 71:18 80:17
84:11 104:7,15
131:20 144:7
162:8 177:5
**occupation** 12:6
**october** 23:5
**odd** 160:1
**offer** 114:23
**office** 2:12 3:20
67:19,20 93:25
**officer** 97:15
180:2
**officers** 97:25
99:22,23
**officials** 97:22,24
103:5
**offline** 178:19
**offset** 109:22
**oh** 38:1 45:6 66:10
72:6 81:9 137:20

155:1 157:10
**okay** 11:23 14:16
15:1,18 19:16,20
19:23 21:25 22:16
27:5,8,14 28:4
30:13 32:1 34:5,6
34:12 36:16,18
39:6 47:6,17 52:6
53:14 58:25 60:13
65:22,24,25 66:2
66:22 70:13 74:14
75:7,25 76:5 77:6
78:16,23 80:2
86:22 88:13 89:11
89:13 90:13,23
94:17 95:8 102:18
105:12,25 106:2
116:17 125:25
126:5,9,11 128:7
128:17 129:10
130:24 131:13,14
135:5 137:20
139:20,24,25
142:1 143:8,23
145:25 146:3,7
147:9 151:1
153:12 154:5
155:9,9,19 157:7
157:18 158:6,9,12
159:19,19 161:17
162:6 165:20
166:1 169:8
170:14,23,24
171:1,21 172:1,15
172:15,22 174:11
174:17,23 176:11
177:8,20 178:3
179:7,13,13
**old** 87:1
**olympic** 3:13

**onboard** 35:6
**once** 6:17 47:2
121:12 124:6,18
129:1 142:1
144:18
**one's** 149:11
**ones** 54:4 55:11
67:23 71:16
153:12
**online** 24:20 25:4
26:9,14 170:1
**open** 11:9 21:11
41:3 56:14 84:9
84:22 100:16
114:6,7 138:3
**operate** 77:2
**operating** 62:1
76:10 88:12
172:15
**operation** 166:17
**operational**
162:21 169:21
**operations** 166:14
167:3 177:10
**opinion** 143:22
**opportunities**
25:24 26:16
**opportunity** 20:11
26:10,14 27:3,4,19
29:8 38:16 50:13
83:15 85:14,16
97:2 100:22
109:25 110:1
**opposed** 37:8
61:15
**opposite** 46:20
**option** 12:9,20
18:18 24:19 37:18
37:20 39:1 42:14
42:14 96:10
117:16 118:6,15

Veritext Legal Solutions
866 299-5127

[option - patiently]

139:2 156:3,3,4
**options**   12:3,13,24
13:13 25:4 35:1
57:9 102:9 114:5
115:4,18 116:11
117:4 118:1
119:23
**orange**   7:3 20:17
21:1,8 36:21
131:21
**order**   16:2 35:23
106:8 107:2
108:21 121:10
123:5,23 129:7,9
133:17 136:4,5
140:24 146:1
153:16,25 154:2
169:2 171:17
172:1,10,14
**ordered**   10:14
121:9 124:2
**ordering**   108:22
122:17
**orders**   122:19
123:7
**organizing**   68:5
**oriented**   145:3
**original**   22:2
75:14 76:3
**originally**   22:15
45:22 150:1,12,13
171:5
**ought**   76:13
145:15 159:12
**outbreak**   97:19
107:14
**outcome**   112:15
180:15 181:12
**outlined**   123:6
**outreach**   136:1
139:8,14

**overall**   75:6
**overarching**   47:7
53:5
**overlap**   165:2
**overlaps**   163:18
**overly**   68:12 69:3
**overlying**   44:9
49:3
**overnight**   11:3
**overpass**   112:1,10
121:3 145:16
**overpasses**   106:12
107:4,25 108:16
112:24 113:22
115:12 119:4,19
120:5,21 121:23
129:17 132:12,24
133:4,10,14,25
138:16 144:3
170:11 178:25
**overreaching**
144:1,15
**owe**   70:10
**owed**   168:14
**owner**   148:22
**oxygen**   101:15

**p**

**p**   2:1,1 3:1,1 4:1,1
6:1
**p.m.**   125:14
179:15,17
**p3**   19:24 20:16
21:4
**packed**   114:8
**padilla**   4:15 23:12
23:19 24:22 25:1
38:25 39:4,9,13,15
39:18 57:4,12,24
58:14 59:2 72:19
72:22,24 73:6,9,13
73:16 74:15

170:15
**page**   5:2 8:9
**pages**   88:17 123:3
**paid**   121:18
**pallet**   12:3 13:13
13:18 15:10 18:10
18:11 114:9 115:6
150:14
**pallets**   10:8
**pandemic**   16:9
37:21 107:8
**paper**   36:1
**paradigm**   163:21
**pardon**   126:3
**park**   23:23
**parking**   10:6,7
29:24,25 38:16,17
38:18,19 39:10,21
40:1,4,5,16,25
48:11 63:24 64:17
92:3 99:3 100:19
102:11 114:5
115:4,7 116:7
117:21 118:4
145:24 150:5,18
150:21,23,24
158:2
**part**   23:14 35:6
38:8 57:13 58:9
61:16 62:4,19,20
73:16,17 75:6
89:23 100:6,9
114:1,25 134:12
135:25 136:12
140:23 147:14
154:24 159:6,15
**participants**
107:22
**participate**   113:18
157:25 159:12

**participation**
110:3 157:20
**particular**   17:15
26:17 34:16 42:5
59:24,24 64:10
92:1,8 106:10
107:18 108:25
**particularly**   12:24
13:2,10 15:20
69:1 74:25 104:17
**parties**   6:3 17:21
56:5 77:14 87:21
91:11 92:11,15,20
106:16 107:22
121:20,25 122:16
122:20 150:24
151:19,22 154:25
171:19 176:1
180:11,14 181:8
181:11
**partly**   74:11
**partner**   21:10
**partnered**   21:4
**partners**   82:4
**partnership**   21:11
166:16,18
**partnerships**
19:11
**parts**   16:1 60:19
**party**   77:22
106:23 108:22
123:2 125:22
**party's**   123:3
**pass**   165:24,25
**passed**   60:21
**passing**   100:1
**path**   8:13
**patient**   79:19
94:22
**patiently**   77:4

[patrol - point]

patrol  76:6
pause  10:1
pay  35:10 49:7
   64:10 78:7 87:9
   97:20 140:2
   159:21
paying  6:25 67:12
   81:1,2 160:3,10
payment  169:21
people  10:11
   11:18 14:10 15:8
   16:5,7,10 18:20
   23:6 29:5,6 30:4
   31:20 34:18 35:18
   37:20,22 41:22
   48:5 49:13 50:18
   51:3 53:18 56:12
   58:15 62:21 67:13
   68:9 69:18,25
   70:6,14 71:8
   72:25 73:2,3,13,14
   74:2 76:1,6 78:14
   83:14 88:1 93:18
   98:9,16,19,20 99:8
   99:15 100:1,3
   101:3,4,8 110:18
   110:19 114:8,20
   118:3,21 123:13
   123:13,20 126:16
   126:20 127:1,3,19
   129:16 130:15,15
   130:18,19 131:9
   132:18 133:1,8,13
   133:24 134:2,3,10
   135:21 140:10,16
   141:17 143:15,18
   143:21 144:20,23
   145:2,5 156:18,21
   158:21,23 159:18
   160:2,13 168:15
   168:16,21 174:6,6

174:16 179:2
percent  9:21,21,22
   11:7 32:23 34:8
   53:19 97:4 99:11
   99:19 101:8
   118:21 124:11,11
   163:8,9,13 164:16
   169:22,23
percentage  33:2
   141:17
perfect  13:13
   27:17 73:18 74:6
   74:7 97:7 102:16
perfection  76:25
period  21:18
   45:11 117:11
   136:23,24 141:8
   148:4 161:21
   164:7 165:12
periods  38:19
permanent  9:15
   10:5 11:1 22:3
   27:13,18 30:25
   31:1,6,15 32:25
   38:11 41:19
   161:22 164:7
   165:6,12
permeates  104:17
person  30:1 76:7
   90:2,8,22 98:20
   99:4 100:21
   108:10 121:10,11
   144:21 153:21
person's  108:5
persons  110:9,12
   112:13 118:2
perspective  10:12
   11:12,16 13:6
   18:22 39:25 41:12
   55:19 68:22 71:24
   74:20 137:1 165:7

167:4 169:1
   174:10
persuade  119:11
pertains  10:24
   21:17 32:2 39:20
   42:4,18 72:18
   81:20 82:9,12,22
   167:3
ph  75:25
phase  6:9 23:9
   38:4
phelps  3:12
phillips  3:12
philosophy  46:23
phone  78:15 124:8
   124:9
photograph  35:24
   36:4
phrase  104:8
phx  109:19
physical  115:18
pianos  118:19
picture  8:25
pictures  127:12,13
piece  90:16 130:16
   145:20 148:12,14
   148:22 152:7
   153:8 154:2 160:5
   160:6 163:23
   170:12
pieces  88:5,15,17
   88:22,24 89:2
   90:12,12,21
   148:21,25 149:6
   152:8,10,12 153:7
   153:19 154:14
pilot  46:25
piping  155:4
pivot  68:11
place  9:8 16:10
   50:7,10,18 82:9

83:4 93:16 114:16
   117:9,13 122:7
   127:6,7 133:2
   152:1,2
placed  11:18 42:5
placements  10:10
   84:14
places  28:13 47:21
   64:17 132:15,17
   133:15,19,21
plaintiffs  1:6 2:2
   17:24 38:23 92:5
   125:23 144:16
   151:3,12
plan  10:15 24:6,14
   25:2 35:10 42:6
   47:7 86:19 126:17
   165:9 178:12
plans  50:17 59:21
   84:18 147:23,25
plausibly  111:12
play  144:1
players  120:14
   122:13 142:24
playing  89:1
please  47:13 66:23
   101:17 157:7
pledged  78:16
pledges  160:7,8
plus  12:7
pods  24:10
point  20:10 28:9
   28:11,12 34:13
   50:6 52:9,25 59:4
   66:24 68:3 72:22
   85:12 86:1 92:23
   94:12 95:16,16
   97:13 101:25
   102:6 105:10
   111:23 121:13
   130:20 136:2

[point - process]

138:7 169:17
177:7
**pointed**  85:7
168:19,21
**pointing**  87:9
111:23 145:12
169:6
**points**  36:13,14
74:19 158:18,18
**police**  76:10 79:1
99:22 122:9,10
177:19
**policies**  45:25 49:4
53:6 54:22 62:6
75:6 76:8 83:4
84:12 86:22
**policing**  134:5,13
134:19
**policy**  58:2 62:9
76:13
**policymakers**
69:16
**polite**  107:1
142:16
**politely**  110:3
**political**  62:19,25
64:20 65:12 67:16
67:17 82:10,13
87:6
**politicians**  69:13
69:13
**politics**  62:22 93:8
93:13,22 98:1
102:6
**pollutants**  108:3
**pool**  28:16 38:13
**poor**  110:9
**pop**  15:20
**popped**  15:7
**population**  24:4
24:14 53:19 54:6

70:4 73:7,22
98:18 107:10
126:13 129:3
144:9,12 161:8
163:9,13 164:24
167:11 178:24
**populations**  53:21
133:11 136:2
**portion**  162:13
168:7 178:12
**pose**  108:1
**poses**  107:9
**position**  37:11
43:7 46:10 76:3,3
97:9,17 116:5
123:4 127:8
133:19 137:9,24
137:24 140:20
158:11 175:2,5
**positioned**  54:4
**positive**  12:11
29:1 47:18 135:10
**possession**  118:10
**possessions**  101:10
118:18
**possible**  27:25
48:11,12 59:15
60:4 89:8
**possibly**  11:13
32:5 40:8 77:25
83:15 129:18
**post**  33:20 84:3
**potential**  20:11
25:14 32:4 38:10
80:10 112:10
138:15 144:2
**potentially**  19:21
88:10 130:19
**pound**  83:9
**power**  87:6 94:18
94:21

**powerful**  152:22
153:3
**prefer**  153:24
**preliminary**
108:23 109:3,6,7
109:20 111:16
112:5,16,21,23
113:14
**prepared**  106:1
181:3
**prescriptive**  68:3
68:13 69:4 70:23
**presence**  45:16
**present**  4:2 6:3
34:15 81:9 97:22
123:21 143:22
145:17 157:19
**presentation**
34:18 164:18
170:18,19
**presented**  42:7
43:2 156:1
**preservation**
110:24
**president**  57:14
64:23 67:20
**pressure**  159:7
**pretty**  30:16 32:13
120:20
**prevention**  17:2
**price**  14:9 64:13
**primary**  107:8
**principal**  3:19
**principals**  143:4,6
**principle**  68:5
**prior**  180:4
**prioritize**  60:1
63:20,25 128:21
**prioritizing**  52:4
130:18

**priority**  48:8
59:14
**privacy**  14:13
**private**  13:2 18:20
19:12 21:6 29:20
32:18 110:14
123:24 159:25
**privately**  156:12
168:17
**probably**  16:16
26:11 77:5 79:21
129:7
**problem**  11:24
44:13 45:1,3
48:12 49:16 52:5
58:3 65:8,9,11,11
65:12,13 74:11
90:4 93:7 95:10
104:14 106:24
117:21 126:16
139:1 141:7
145:21 153:1
154:1 159:15,20
**problematic**  93:17
**problems**  8:6 19:6
46:5,20 52:22
75:18 84:25
141:13 157:25
**procedure**  76:13
**procedures**  45:25
49:4 53:6 54:23
76:9 84:12 86:23
**proceed**  50:9
157:5
**proceeding**  150:18
150:22 179:17
181:4
**proceedings**  7:17
180:3,4,5,8 181:6
**process**  40:13,15
42:3 43:8,20

Veritext Legal Solutions
866 299-5127

[process - quite]

72:13 80:8,13
89:23 100:15
104:11 111:12
115:15 118:8
119:3,18 141:25
148:6 152:11
159:7 171:15
**produced** 26:18
**productive** 40:19
178:7
**products** 107:11
**professionally**
75:10
**profile** 161:25
**program** 6:9,20
28:17,19
**progress** 158:25
**project** 42:2 43:18
46:25 70:6 90:2,9
114:6
**projects** 62:11
**promise** 48:23
55:24 79:20 101:8
101:9,17 117:2
**promote** 110:18
114:2 115:1
**promptly** 110:23
**properties** 26:9,14
26:16 28:6 38:9
42:25,25 80:5,9,11
80:16 81:4,5
82:18,25 146:8,24
148:8 149:3,14
154:6,11,17,18
155:18,18 170:22
173:9 177:6,12,16
177:22 178:4
**property** 40:10
42:23 80:6 81:10
82:23 86:25 88:5
88:15,17,22,25

89:2 90:4,5,12,12
90:17,21 105:11
145:20 147:4,24
148:12,14,21,22
148:25 149:6
150:2 152:7,8,11
152:12 153:5,7,8
153:19,21 154:2
154:14,21 158:17
160:6,6 163:23
168:25 169:1,12
170:12 171:24
173:21 177:9
**proportionality**
31:8
**proportions** 30:23
**proposal** 23:4
122:20
**proposed** 23:14
92:20 108:14
113:20 123:6,10
**proposing** 116:6
**protect** 108:15
113:21
**protecting** 133:17
**protection** 110:17
111:12
**protocols** 40:1
**proud** 127:17
**proven** 27:7
114:21
**provide** 17:19
18:18 25:19 29:8
80:12 81:15
102:24 110:17
111:16 113:12
114:4 115:3
118:12 120:2
121:1 161:11,21
163:12 164:5
165:14 166:13,17

177:10
**provided** 80:17
110:22 114:7
155:17 162:17
176:7
**providers** 19:12
61:2 82:8 166:4
**provides** 55:8
60:25 110:7
166:13
**providing** 7:16
13:25 39:12 42:24
80:5 110:20 111:3
146:22 161:4,5,5
164:9,12 165:1,22
168:23
**provision** 25:7
110:16
**public** 1:18 7:7
21:6 23:24 42:23
42:25 54:24 55:4
56:7 73:8 80:6,16
82:25 88:20 94:15
94:16 97:10,21,24
97:25 98:2,3
106:14 107:5,15
107:18 109:1,8
111:8 112:17
113:15,19,19
114:2 115:1
122:24,25 124:11
124:18 126:19
130:17 133:18
137:25 142:11
154:24 155:5,18
180:1,18
**publicly** 177:23,25
**publish** 171:17
**purchased** 18:13
**purpose** 95:16,18

**pursuing** 19:11
**put** 10:8 30:20
34:20 45:15 52:16
64:15 66:25 76:5
79:25 86:7,20,22
86:23,25 87:1,11
90:4,13 94:23
95:7 124:14
139:10 153:8
154:2,4 157:9,19
158:5 159:7
**putting** 14:11 20:4
67:4 84:18 87:10
88:21 91:2 99:22
122:5 133:1

**q**

**qualified** 70:8
180:7
**question** 22:2
32:12 33:15 37:3
50:6,20 66:21,25
72:19 77:1 105:18
109:17 110:25
162:23 165:15
**questions** 43:13
72:17 80:19
109:12 125:9
**quick** 66:6 117:10
120:19
**quicker** 40:13
**quickly** 24:24 25:4
25:15 59:15 60:4
60:6,6 85:19
118:12 121:13
129:11 131:11
136:21
**quite** 44:16 85:5
97:9 98:8 100:19
153:1,20 156:9
160:2

Page 30

[quote - relocated]

| | | | |
|---|---|---|---|
| **quote**  110:16,21 | **realizing**  177:8 | **reconvening**  135:7 | **regulations**  39:25 |
| **r** | **reallocated**  85:9 | **record**  6:2 79:6 | 83:3 86:23 |
| **r**  2:1 3:1 4:1 6:1 | **really**  11:21 12:2,8 | 95:8 98:4 105:21 | **rehab**  16:14,18 |
| **racial**  65:5 66:18 | 12:11 13:4 16:20 | 105:22 106:8 | 18:6 |
| **racism**  65:2 | 17:1 18:17 23:15 | 108:8 115:25 | **rehabbed**  16:22 |
| **raise**  45:3 | 31:21 33:7 34:15 | 124:14 125:17,18 | **rehousing**  14:6,16 |
| **raised**  59:3,4 | 34:21 35:9 53:13 | 140:13 155:5 | 14:23 15:19 16:5 |
| 132:23 | 58:21 68:21 78:4 | 179:16 180:9 | 31:6 38:11 41:19 |
| **raising**  168:6 | 78:25 85:24 88:13 | 181:5 | **reinforce**  66:20 |
| **ramp**  158:3,16 | 90:20 94:7 100:3 | **recorded**  180:6 | **reiterate**  86:1 |
| 168:6 | 124:13 127:1 | **recording**  180:8 | **related**  8:21 37:11 |
| **ramps**  106:13 | 149:7 155:4 | 181:4 | 65:1 132:24 |
| 107:5 108:1,17 | 158:12 160:14 | **recreational**  75:17 | 133:17,19 180:10 |
| 112:25 113:22 | 172:1 | 97:18 99:2 100:18 | 181:7 |
| 115:13 118:17 | **reason**  43:12 | 115:5 116:8 117:5 | **relations**  159:17 |
| 119:4,19 121:23 | 87:23 88:20 | 117:8 155:10 | **relationship**  145:9 |
| **ran**  86:24 | 117:11 118:25 | 168:7 | 159:4 |
| **rapid**  14:5,16,23 | 136:22 138:3 | **red**  7:25 79:3 | **relationships** |
| 15:19 16:5 31:6 | 168:6 | **reduced**  180:6 | 54:13 |
| 38:11 41:19 | **reasonable**  32:6 | **reductions**  8:21 | **relative**  180:12 |
| **rapidly**  90:14 | 172:12 | **reevaluate**  42:7 | 181:9 |
| 126:14 | **reasonably**  131:6 | **refer**  76:4 | **relatively**  11:18 |
| **rate**  7:5 28:25 | 174:10 | **refers**  106:20 | 22:25 113:2 |
| **reach**  47:8 78:15 | **reasons**  69:5,6 | **reflects**  162:16 | **relatives**  110:13 |
| 78:15 95:8 151:11 | 133:5 134:1 | **refreshing**  6:7 | **relay**  171:20 |
| 151:24 | 138:17 | **regard**  109:1 | **release**  136:5 |
| **reached**  78:9 | **reassemble**  157:3 | 110:23 124:17 | **released**  88:19 |
| 150:23 151:15 | **rec**  42:3 50:17 | 142:20 | **relief**  108:21,22 |
| **read**  8:10,11 18:1 | **received**  114:12 | **regarding**  147:22 | 109:6,8,14 111:16 |
| 35:23 86:12,15 | **receiving**  103:13 | **regardless**  124:20 | 112:5,23 113:20 |
| 106:1 146:3 158:5 | 103:14 148:9 | **regards**  26:25 | 114:24 122:18 |
| 158:9 164:19 | **recess**  78:8 123:25 | 29:15 41:1 42:13 | 123:5,10 158:8 |
| 172:2,6 | **recognize**  111:22 | 42:23 57:5,13,15 | 171:24,25 |
| **ready**  21:10 78:21 | **recognizing**  23:21 | 63:3 80:22 138:15 | **relieve**  110:8 |
| 81:7 99:9 | 24:4 68:5,13 | 155:16 | **relieved**  110:12 |
| **real**  66:6 120:19 | **recommendation** | **region**  43:9 103:17 | **relocate**  118:16 |
| **realistically**  11:3 | 153:9 | **regional**  60:19 | 138:22 |
| **reality**  37:14 | **recommended** | 68:20 | **relocated**  107:4 |
| 82:15 93:14 | 115:20 | **regions**  43:5 | 108:18 113:25 |
| **realize**  34:14 | **reconsider**  116:2,4 | **regulation**  89:17 | 115:12 |

Veritext Legal Solutions
866 299-5127

[relocating - right]

**relocating** 132:2 133:20
**relocation** 113:16 113:17 114:1,25
**rely** 166:16
**remain** 124:3
**remainder** 163:1
**remains** 115:15
**remedies** 123:6
**remedy** 108:24
**remember** 44:24 98:17 114:18 120:6 169:1 173:23
**remind** 73:2
**rent** 23:2
**rental** 14:7,8 16:6
**reopen** 23:24
**rep** 67:21
**repaved** 148:15
**repeat** 113:3,17 116:12 117:4 140:14
**repeatedly** 108:7
**repeating** 145:8
**repercussions** 120:23
**report** 80:12 149:5 149:5 171:13
**reported** 1:18
**reporter** 105:19 125:11,14,17 179:15
**reports** 41:15
**represent** 53:18 79:4 99:9
**representation** 50:2 103:12
**representative** 61:25

**represented** 73:25 77:9
**representing** 61:23
**request** 85:15 110:3 158:12
**requested** 108:22 124:2
**requesting** 157:20
**requests** 172:4
**require** 8:24
**required** 114:4 115:3 131:2
**requirements** 121:15
**requiring** 107:3 108:18,24 113:23
**research** 29:10,11
**reserving** 168:21
**reside** 20:2
**resident** 110:11
**residential** 16:22 27:12 93:17
**residents** 65:15 111:7
**resilient** 134:3
**resistance** 55:4
**resolve** 49:11 76:16 77:16
**resolved** 79:5
**resonated** 74:25
**resource** 154:19 163:3
**resources** 17:2 55:10 59:23 93:13 99:22 100:11,14 109:2 113:11 131:5 145:2,3 162:10 163:19 165:13 167:13

**respect** 15:2 49:7 68:16 70:3 138:7 142:8,11
**respective** 171:19
**respects** 39:24
**respiratory** 132:23
**respond** 34:19 140:25 146:12 147:18
**response** 25:10 35:4 102:5,5 122:16
**responsibility** 6:12,19 57:19 58:11 111:25 160:21
**responsible** 61:22 62:19 122:2 165:5 169:21
**responsive** 130:22
**rest** 16:8 45:13 88:10
**rested** 62:18
**restricted** 108:22
**restroom** 105:17
**result** 98:13 106:14 107:25
**retain** 118:10,18
**reuse** 28:3 32:13 38:10 64:6
**revenue** 100:13 113:7
**revenues** 83:22
**reverence** 69:8
**review** 146:7,8 147:17
**reviewed** 41:11
**revise** 85:17
**rewrite** 147:5,8

**rich** 152:22
**rid** 62:17 75:25
**right** 14:3 16:3 17:9 18:9 19:7 20:6,9,17,22 25:17 25:22 29:23,25 30:22,23 31:8 32:24 33:9,12 34:25 35:20 36:7 37:19 38:16,22 41:18,20 45:9,10 46:9 47:9 48:1,13 49:2 52:6,20 53:23 54:18 55:13 55:16,22 56:11 57:9,23,25 58:5,20 62:5 63:5,23 64:4 65:3 67:18 69:17 70:21 71:13,13 72:1 75:2 76:19 76:21,24 78:2 79:18,23 80:20 81:17 82:1,3 83:11 84:5 87:11 88:1,18,23 90:22 95:21 96:5 97:5 98:1,6 100:12,15 102:21,24 103:6,9 104:23 105:16 117:13 120:22 121:11 122:12,22 122:22 125:8 126:20 130:16 131:3,12,25 133:9 133:11,22 134:8 135:4,7,20 136:15 137:8 138:12 140:11 145:6 150:8 153:20 154:1 155:5 156:5 160:9,13,13

[right - separate]

164:10 165:15
166:19,22 167:25
167:25 168:5,12
169:23,24 179:10
**rightly** 90:8
**rights** 1:4 2:17
106:7
**risk** 28:18 107:13
112:7
**risks** 106:14 107:5
112:17 122:15
**road** 130:8
**roadshow** 103:4
**robin** 133:3
**robust** 15:10
**rock** 133:1
**rockies** 109:16,21
**rodriguez** 145:15
**role** 45:13
**rolled** 53:10
**room** 7:24 14:9
42:2 68:23 70:6
71:12,13,22 74:2
74:10 83:10
101:15 102:2
114:6 122:12
124:1 142:24
160:11 164:22
176:16,20
**rooms** 114:6
**rough** 106:3 130:5
**row** 27:9,10 46:22
58:1 90:21 99:17
116:15 144:20,21
**rules** 54:23
**ruling** 142:15
**run** 89:21 116:23
145:21
**running** 25:15
148:13

**rv** 10:7 29:2,7,10
29:15 30:2,2
38:13,18 92:3
150:17,19,21,22
**rvs** 29:6 53:22

**s**

**s** 2:1 3:1 4:1 5:1
6:1
**safe** 10:6 16:11
29:24,25 38:15,17
38:19 39:10,21
40:1,4,5,16,25
48:11 50:17 56:11
63:24 64:17 92:3
113:12 114:5
115:4 138:12,18
150:5,17,21,23,24
**safer** 121:7 132:21
**safety** 94:17 118:2
124:12,19 154:1
**sakes** 101:2 119:9
144:22 173:11
**sale** 22:19 26:12
**salvation** 19:18
20:16 21:7,9
**san** 49:9,12,18
77:5 108:12
**sanctions** 125:3
**sanctuaries** 134:1
**sanitation** 40:12
107:11 179:1
**santa** 2:14,19
**sarah** 4:5 128:18
**sars** 115:21
**satisfied** 115:14
**saturday** 86:18
**saves** 123:21
**saving** 140:10
**saw** 82:24 87:14
168:6,9,17

**saying** 16:1 32:22
34:1 37:18 59:7
78:5 90:20 92:14
104:19 126:12
142:3,12 151:20
151:21 165:22
166:12 175:1
**says** 88:17 100:9
102:8,13 158:19
172:4
**scale** 8:4 9:1,11,19
13:9 18:18 19:4,8
20:12 26:21 32:5
32:22 68:21 83:8
109:20
**scaled** 10:13
**scaling** 31:8 64:8
**scattered** 9:14
10:6
**schedule** 172:13
**scheduling** 140:1
**scheme** 47:24 49:2
**scope** 126:15
129:16 130:12
**scott** 3:3 93:3
175:1
**scott.marcus** 3:7
**se** 165:21
**seattle** 12:14
**second** 45:23
52:14 53:25 108:9
109:5 116:10
129:12 130:16
147:18 152:25
159:22
**section** 28:17
**sector** 19:12 21:6
21:6
**secure** 138:12
**security** 98:10
118:1,5 140:17

145:25
**see** 7:10 9:17
12:14 26:11,11
27:1,2 41:12 47:1
56:12 66:17 79:9
86:4,6 88:21
92:14 100:2
104:16 122:17,22
125:2 140:6
142:17 151:8,22
154:12 170:19
171:24 174:9
**seeing** 12:25 98:14
**seen** 7:22 10:2
11:13 13:8,24
16:9 26:17 41:9
42:12 153:14
**self** 140:10
**semi** 30:25 89:6
**send** 66:4 122:21
152:19 153:16
175:7
**sending** 106:4
**senior** 57:7
**sense** 23:22 48:7
58:24 60:12 64:22
80:8 89:24 126:15
133:22 157:24
158:8 159:18
165:24 172:10
**sensitive** 98:22
126:12
**sent** 35:16,16
86:21 91:25,25
92:13 127:13
151:9 152:3,4
154:24
**separate** 43:15
85:22 157:14
175:12,15,17,18
175:21 176:8

Veritext Legal Solutions
866 299-5127

[separately - situation]

separately  35:12
35:13 56:16
serious  109:12,17
110:25 129:3
159:6
seriously  117:8
serves  115:15
service  7:7 19:12
25:7 42:13 61:1
73:7 82:8 156:2
162:3
serviced  168:3
services  4:5,8
13:25 17:19 19:2
81:21 98:11,11,12
99:3 100:2,20
102:23,25 103:14
110:20,22 114:11
115:9 127:2
129:17,20 130:12
139:15 160:17
161:2,9,21 162:15
162:16,20,21,24
163:12 164:10
165:1,5,22 166:3
166:13,17 167:2
167:24 168:23
169:6 176:23
177:10
session  125:21
set  12:11 18:14
35:5,19 46:25
53:6 62:6 124:5
142:21 150:5
171:22
setting  136:22
settings  42:5
settle  89:24 101:19
101:21
settlement  7:20
34:21 35:17 53:3

72:3 94:24,24
95:6,12 107:17
144:4 155:17
157:6,13
settling  178:14
seven  119:25
severe  112:25
125:3
severely  106:13
shaking  47:12
shape  140:25
shaped  57:10
share  18:22 22:17
135:9,11,12 154:9
154:11,22
shared  7:17 22:15
24:19 33:7 41:10
42:13,25 155:19
177:21
sharply  109:13
shayla  4:13 10:19
26:3,15 32:13
33:7 56:16,23
61:14 65:18 66:13
66:24 68:16 70:19
77:20 79:11 91:5
94:6 98:21 131:17
135:9 138:15
141:8 144:22
shayla's  74:18
85:12
she'll  174:5
shed  10:8
sheer  126:15
sheets  175:8
shelter  12:3 13:13
13:18 14:25 15:5
25:17 33:18 98:16
107:11 111:4,11
114:4,17 115:3
118:15 120:3

121:1 141:15
sheltered  115:19
118:2
shelters  11:25
15:7,10,14,16,19
15:21 18:10,12
23:20 30:7 33:8,9
33:12 37:6,8,12,17
37:18 96:8,25
97:13,18 98:7
113:12 115:6,11
115:17 116:1,5,10
116:21 117:3,8,14
117:25 119:22
150:14 166:14
sherin  96:23 116:3
140:13,23 142:8
142:19 143:1
sherin's  127:8
shooting  100:4
short  11:18 14:6,8
16:6 156:17
shorten  108:5
shoulda  137:22
show  164:18
shower  99:14
101:11 118:23
141:21
showers  116:13
showing  109:21,22
shown  8:20
shut  11:9
sick  31:20
side  15:19 22:7,7
23:16 30:19 40:8
81:21 88:20 91:7
103:10 132:22
135:4 159:1
160:17 169:8
side's  54:1

sidetracked  6:11
sidewalk  132:18
sierra  109:18
signature  181:14
significance
111:10
significant  68:18
significantly  105:8
signoffs  62:9
silly  141:23
similar  22:20
37:11 68:16
simple  94:7
simply  59:17
61:19,25 62:24
78:1 118:16
155:18 171:22
simultaneously
64:3,19
single  12:6 58:9
102:11
singled  90:23
148:23 152:13
153:22
sit  8:5 51:25 126:5
135:23
site  90:5,19 91:11
91:12,13 92:1,8,14
93:1,2,16 150:5
151:13,20 162:13
sites  9:14 10:6
19:22 21:10 23:23
92:20 93:3 97:18
114:5 115:4
147:25 151:8,9
166:5
siting  93:13
sitting  171:6,11
situation  64:12
119:11 141:16
163:23

Veritext Legal Solutions
866 299-5127

[six - state]

six 115:20 119:3
skid 27:9,10 46:21
  58:1 90:21 99:17
  116:15 144:20,21
skills 180:9 181:6
skipped 157:16,17
  157:18
sleep 100:22
sleeping 98:9 99:4
  100:21 114:9
  135:21
sliding 109:20
slow 96:22
small 18:18
smaller 103:12
smart 134:3
smith 6:24 7:1
smith's 7:3
smoking 8:21
  90:17
sobel 2:11,12 34:2
  34:6,11,24 36:14
  36:17,19 66:9,13
  66:17
sober 22:20,21
  136:1
social 115:20
  123:20
socially 132:15
societal 57:19
societally 58:6
society 70:10
software 109:19
solution 32:7 45:2
  45:4 63:6,11
  66:19 68:20 69:25
  70:14,23 74:5
  75:6,20 135:25
  136:12 138:22,25
solutions 17:1
  18:2 54:5,25 55:1

74:3 135:13 162:3
  164:10
solve 74:11 128:3
  128:4
somebody 14:12
  34:2 36:19 90:9
  118:18 128:22,23
  141:8 152:20
  153:17 158:13
somewhat 145:2
soon 123:22
  178:19
sorry 6:6 137:12
  142:1 149:12
  150:19 174:25
sort 18:18 21:23
  37:7 54:8 70:5
  119:24 120:10
  126:17 131:22
  145:19 159:20
  169:7 170:8,9,10
  170:14 174:8
south 1:16 2:6
spa 51:20 163:18
space 13:3 115:18
  132:16 134:9
spaces 40:2 134:24
spas 44:21,21,24
  47:5 69:6 163:19
speak 36:25 53:17
  56:1 57:4 165:18
speaking 7:19
  19:2 37:7 50:21
  60:25 61:6 68:9
  82:11 165:21
speaks 165:21
special 4:9 6:22
specific 18:25
  20:20,24 21:10
  24:5 80:9 94:15
  121:10 133:5

134:1 152:6
specifically 9:24
  17:10 19:3,13
  21:13 24:17 26:8
  29:14 32:20 37:22
  57:14 161:6
  164:24
speeds 49:6
spending 28:16
  38:13 50:14
  166:15
spent 7:1 41:15
  86:16 132:9
spertus 2:5
spertuslaw.com
  2:8
spoke 38:21 83:6
spoken 39:4
sponte 78:2 79:22
  89:7 94:10,14,21
  122:25 124:21
  157:21
spot 30:1 120:15
spread 75:2
spring 1:16
sprung 11:22,23
  15:14,16,20 16:24
  18:7 24:18 25:17
  30:6 33:1,8,9,12
  33:18 36:20,21,24
  37:1 96:7
squared 36:3
ssi 23:1
staff 4:3,15 81:17
  117:4,6,9,13,17
staffed 118:1,14
stalled 90:2
stalling 139:6
stand 59:15 116:7
  117:5 146:1

standard 54:21
  58:2 76:11 108:20
  115:24
standards 40:1
  54:20 141:25
standing 6:14
  16:23 60:21
stands 165:11
start 10:2 11:10
  15:25 50:10 68:6
  72:3 75:1,13
  76:20,20 78:19,22
  78:23 81:17,19
  84:23 95:9 100:1
  101:12 116:22
  126:1 141:25
  158:13 168:17
  171:10 172:11,12
  173:3,9,14,14,25
  174:2 175:2
  176:20,21 177:8
  178:20
started 21:19
  22:14 43:14,25
  44:4 76:23 80:13
  169:11 171:15
starting 70:4
  100:15 135:6
  169:16 171:6
  177:7 178:12
state 18:15 60:18
  60:20 84:2 85:15
  85:18,18,20 87:24
  87:25 88:2 89:22
  105:1 110:13,14
  110:18,19 111:22
  111:24 120:7,12
  120:19 122:11
  124:23 158:13
  159:2,5,10,17
  180:19

Page 35

[statement - susceptible]

statement  154:13
  177:11
statements  8:10
  8:12 34:21
states  1:1
statewide  124:21
  126:20
static  133:11
stations  116:13
status  107:16
  149:3
statuses  136:17
stay  50:16 95:2
  125:16 147:10
stays  155:12
step  17:18 27:17
  31:22 71:14
  127:24 130:14
  131:1 145:4 152:8
  153:23,23 168:23
stepping  134:17
  134:18
steps  42:22 90:7
  117:1
stock  28:7 29:4
  47:21 48:9,15,18
  49:1 60:10 63:8
  63:12,13,14 65:6
  70:20,21 163:16
stop  101:14
  119:13 140:24
  148:11
stops  17:4
stove  155:4
straight  93:21
  161:13 164:2
strategies  26:25
streams  84:1,10
  85:10 87:1
street  1:16 2:13,18
  3:5,21 11:6 24:1

75:25 90:19 98:9
  99:4 118:7 119:12
  119:16 127:11
  143:14 149:15,18
  150:24 156:21
streets  16:11
  111:21 120:21
  122:4 128:25
strength  125:1
stress  113:24
strike  172:22
strong  153:3
stronger  109:21
strongly  99:10
  116:5 133:16
struck  108:10
structurally  51:2
structure  7:20 9:8
  11:22 35:21 48:3
  48:6 50:8,11
  52:16 53:2 74:24
  118:25 144:17
  155:16
structure's  176:24
structured  35:22
  35:25
structures  11:23
  16:24 18:7 22:18
  24:18 30:6 36:20
  36:21,25 37:1
  96:7,7
stuff  7:25 34:20
  118:13
sua  78:2 79:22
  89:7 94:9,13,20
  122:25 124:21
  157:21
subject  69:9 122:4
  148:8
submission  146:19
  147:15

submitted  149:6
  154:16 175:13
subpopulation
  129:20
subset  106:10
  107:3 111:17
subsidies  14:7,8
substances  106:19
success  24:18 37:1
  41:17,24 109:5,18
  111:15
successful  9:13,14
  14:6,19,21,22,25
  18:5 19:4 20:17
  20:21 21:8 22:22
  23:7 25:13 26:18
  29:1,19 31:5 32:3
  41:8,20
sucking  101:15
sudden  159:10
sue  152:14,20,22
  153:2,18,18,19
sued  77:16 90:9
  96:4
suffer  112:14,15
sufficient  111:14
  118:16 167:12
suggest  132:21
  178:17,18
suggested  79:14
suggesting  159:3
  170:13
suggestion  46:12
  47:3,18 70:17
  93:16 139:1
suing  152:14
suitable  17:25
  80:15 144:9
suite  2:6 3:5
suited  160:12

supervisor  156:15
supervisorial
  44:12,18 47:5
  51:22 61:3
supervisors  45:17
  75:12
supplying  100:24
support  36:24
  53:12,17 54:24
  61:7 110:8 111:15
  113:18,19 121:21
  170:2
supported  36:21
  110:12
supporting  33:8
  61:7
supportive  16:6,7
  22:3 27:13,18
  38:12 53:1 60:21
  116:8 161:22
  164:7 165:6,12
supposed  122:10
  135:22 152:23
  168:18,22
sure  11:20 13:17
  20:19 26:23 27:25
  39:7 41:24 42:21
  50:15,16 61:8
  63:10 68:8 74:9
  80:8,11 81:4 89:4
  92:22 94:25 98:5
  130:22 132:25
  136:3,15 138:11
  143:20 167:13
surfacing  116:16
surrounding
  163:25
survey  144:21
survive  132:18
susceptible  37:22

Veritext Legal Solutions
866 299-5127

[sustainable - thereof]

sustainable 32:17
sweep 148:23
swift 122:16
sworn 180:5
synergistic 70:5
system 7:10 16:2
 30:20 31:23 39:23
 82:9 100:1 103:24
 103:25 145:6
 158:14
systematic 86:22
systemic 83:3
 84:12 86:4
systemically 103:1
systems 82:10,10

**t**

t 5:1
table 20:3 39:7
 40:16 44:10 45:15
 48:18 51:1 63:17
 77:14,23 87:8,11
 88:1 90:5,22
 93:20 98:24,24,25
 100:17 101:16
 102:9 103:9
 120:14 153:8
 154:3,12 155:12
 159:5,12 160:13
 167:7
tackle 24:16 63:20
 65:9
take 8:19 35:17,24
 36:4,8,10 40:9
 42:23 43:17 46:22
 47:6 63:15 64:25
 74:23 79:21,23
 82:17 85:12,20,24
 90:1 93:4 95:22
 97:9 116:25
 117:20,21 118:23
 122:22 134:11,21

137:4,6,7,9 140:4
 140:5 141:21
 158:2 160:5
 171:10,16,19
 174:15
takedown 60:16
taken 37:11 72:12
 75:4 180:3,12
 181:9
takes 28:19 40:14
 74:4
talk 7:20 8:5 10:7
 13:21 14:2,3
 15:12 17:10 19:1
 19:2 25:12 26:15
 26:22,24 32:20
 34:7 38:17 40:23
 42:16 43:8 52:21
 59:11 63:2 65:3
 73:3,4 76:6 82:14
 102:13,21 105:9
 118:3 124:3
 130:12 144:19
 145:15,18 153:11
 160:17 161:6
 170:18 171:7
 177:5,19
talked 6:10 9:20
 10:3,4,5,5,6,7 26:4
 33:8,13 34:18
 35:12 38:15 42:2
 42:3 43:4 44:7,12
 44:21 80:21 81:21
 84:9 90:25 103:15
 133:2 171:5
talking 12:21
 13:10 19:18 20:15
 28:23 34:3,25
 35:1,2 37:16 40:8
 43:14,21 45:21
 46:16 56:13 75:5

75:13 88:2,2 97:1
 103:19 119:10
 122:8 126:16
 127:3,3 130:15
 132:2 136:16
 138:14 144:2,23
 153:11 154:20
 162:20 164:23,23
 164:24 170:22
 175:19
tangent 61:11
tape 7:25 79:4
target 17:2
targeting 179:4
targets 60:16,19
 60:20 61:7
tasked 64:16,18
team 119:7 140:24
teams 54:12
 143:19 158:1
 174:12
tearing 117:7
tell 6:11,24,25
 20:25 45:18 47:4
 77:12 79:2,16
 87:20,21 95:7,10
 98:1 115:8 117:12
 120:13 124:13
 135:13,15 145:23
 145:23 174:21,22
 175:4,5
telling 41:18 49:25
 100:16 101:16
 115:25 123:18
 138:11 142:16
 165:10,13
tells 96:9 147:1
temple 3:21
temporary 10:24
 17:1 18:2 21:15

ten 172:23,24
 176:18 179:10
tent 100:24 101:2
 119:1
tentative 147:23
 178:24
tents 12:19,20
 20:5 33:1 100:24
term 14:6,8 16:6
 23:23 25:2 32:18
 50:16 100:18
 116:8 156:17,17
 175:8
terms 18:2 22:1
 94:7,22 102:3,4
 136:4 139:21,21
 140:2,7 145:4,24
 148:5 157:25
 170:10 174:12
test 20:12 100:7
 109:15 117:18
 125:2
testify 97:22
 140:18,23 142:25
testifying 143:1,3
 143:4 180:5
testimony 97:11
 108:8 140:20
thank 7:14,15,15
 36:9,10 42:24
 43:2 52:8 56:25
 57:3 59:1 65:18
 71:5,6 74:15 80:3
 80:4 102:18 125:7
 125:10,22 128:18
 129:6 143:24
 155:3,6,6 172:16
 172:16,17 179:13
that'd 14:14
thereof 110:18

[thermometers - today]

| | | | |
|---|---|---|---|
| **thermometers** 168:10 | 42:19 44:2 45:19 47:14,15,20 49:23 | **thinks** 97:19 **third** 75:25 109:6 | 82:14,14 86:20 87:14 93:4 95:23 |
| **thing** 18:10 21:3 | 50:3 51:18 52:12 | 116:21 | 99:23 100:11 |
| 22:12 23:12 28:14 | 53:13 54:19 55:7 | **thirds** 122:12 | 104:21,22 105:11 |
| 31:13 33:6 38:14 | 56:15,19 57:25 | **thirty** 150:9 | 105:20 117:11 |
| 45:23 57:9 61:1 | 59:7,13,14,25 | **thought** 46:16 | 123:11,21 124:5 |
| 76:15 77:7 79:11 | 60:11,14,25 61:5 | 101:4 105:7,9 | 125:14 126:23,23 |
| 80:4 81:25 88:6 | 61:17 62:3 63:24 | 110:1 116:24 | 127:21 136:23,23 |
| 100:9 104:16 | 64:11 65:21 66:17 | **thoughts** 11:19 | 138:1,7 139:21 |
| 126:25 142:3 | 67:2,6,9,13 69:11 | 106:1 | 141:9 142:21 |
| 152:25 172:11 | 69:12 70:25 72:2 | **thousand** 30:15 | 143:11 148:4 |
| 175:16 | 72:4,11,16 73:17 | **thousands** 88:14 | 151:14 155:14 |
| **things** 6:10,15 9:9 | 74:17,19,23,25 | 89:2 130:15 | 161:21 164:19,19 |
| 9:19 11:21 13:18 | 75:4 76:15 77:2 | 154:14 | 168:19 172:11,12 |
| 14:5 16:2 19:10 | 80:14,20 81:17,23 | **threat** 152:23 | 172:22 173:1,24 |
| 20:23 21:16 30:15 | 83:9 85:2,11,21,24 | **threaten** 107:14 | 174:2,7 176:12,13 |
| 34:7 41:4 55:5 | 86:3,19 90:16,18 | 152:20,21 | 178:23 179:15 |
| 56:15 64:18 65:4 | 91:7,10 92:22,25 | **threatened** 112:11 | **timeframe** 25:3 |
| 72:17 85:6,7 | 97:9,12 98:6,7,14 | **threatening** | 123:16,24 |
| 86:19 100:8 | 100:12 103:3,23 | 153:17 | **timeline** 146:11 |
| 102:19 105:3 | 104:7,17 118:20 | **three** 7:9 9:18 | 156:25 |
| 119:8 126:22 | 125:1,24 128:8 | 40:15 41:10 44:19 | **timelines** 156:14 |
| 128:11 132:17 | 132:1,5 135:10,23 | 46:19 78:6 99:22 | 156:17 |
| 136:22 144:6 | 135:25 137:11 | 102:19 150:8 | **times** 42:1 95:24 |
| 176:22 | 138:9,20,23 | 156:21 174:18 | 95:25 98:14 |
| **think** 6:3,16 7:24 | 139:11 140:19 | **throw** 74:20 | 132:15 158:10 |
| 8:1,7 10:25 11:3 | 142:4,7,9 143:13 | **throwing** 113:8 | **timing** 53:8 94:16 |
| 11:13,16,20,25 | 146:14 153:18 | **thursday** 78:4,11 | 95:10 123:19 |
| 12:4,9,11,23 13:1 | 154:17 155:22 | **tigar** 49:10,11 | 145:25 157:25 |
| 13:7,13,17 14:15 | 156:5,5,9,23 | 50:5 | **tiny** 12:14 |
| 16:3,9,12 17:20,23 | 157:13 158:25 | **time** 1:13 6:23 7:1 | **tips** 109:7,13 |
| 17:25 18:25 19:5 | 160:7,25 162:19 | 7:4 8:5,5,11,19 | 112:22 |
| 20:3,22 22:3 | 162:23 163:2 | 11:18 21:18 23:22 | **tired** 97:5 |
| 23:12 24:12,15,22 | 164:23,25 165:4 | 23:24 26:12 27:7 | **today** 7:12 8:3 |
| 25:5,8 28:15 | 166:10,25 167:5 | 27:7 32:6 36:10 | 9:11 12:25 24:12 |
| 30:12,14,15,15,19 | 170:21,22 171:9 | 37:15 38:19 45:11 | 35:5,20 62:4 |
| 30:22 31:3,12,14 | 171:16 173:8 | 46:4,7 48:24 | 82:12 105:4 |
| 33:13 34:19,20 | 174:22 176:19,21 | 50:24,25 60:7 | 114:24 123:12 |
| 35:3,22 36:14,17 | 177:1,5 179:3 | 64:4,11 75:21 | 124:4 133:12 |
| 37:12,14,20 38:25 | **thinking** 65:14 | 78:3,19 79:18 | 135:1 141:14 |
| 39:5 41:13 42:12 | 95:12 159:11 | 80:1 81:12,24 | 147:7 148:20 |

Veritext Legal Solutions
866 299-5127

[today - unfortunately]

151:10 152:3,4
155:10,22 158:6
169:12 171:18
**today's**  13:11
155:12
**toilet**  99:14 116:14
116:19 141:21
**toilets**  99:16
114:12 116:18
**token**  94:19
**told**  33:17 78:8
108:7 148:12,14
**tolerate**  124:17
142:2
**tomorrow**  10:13
78:13 94:22 95:2
105:5 106:4
133:13 139:23,25
142:17 146:2,22
157:4 178:15
**tonight**  121:19
**tossed**  44:24
**total**  144:11
**totally**  6:12 157:13
157:14 175:12,15
175:18,21,22
176:7,8
**tough**  129:4
**toughs**  10:8
**tourism**  26:12
**toxic**  112:8
**track**  6:18 7:12
35:15 75:21
148:17
**traditionally**
162:4
**traffic**  8:22
**trailer**  15:6,20
**trailers**  24:10 30:4
30:5 99:1 100:18
116:9

**trajectory**  31:13
**transcriber**  181:1
**transcript**  181:3,5
**transcriptionist**
180:7
**transfer**  117:15
158:17
**transforming**  8:16
**transition**  24:14
**transitional**
100:18
**translate**  94:3
**transmission**
115:21
**trash**  99:24
**treat**  98:18 159:19
**treated**  143:18
**treatment**  127:7
**tremendous**  9:3
9:16 43:22,23
98:19 159:7
**tried**  20:25 23:13
28:11,11,12 44:3
86:18 176:21
**trouble**  141:9
**trucking**  109:9
**true**  54:20 180:8
181:5
**truly**  9:1,1 24:2,16
25:9 47:3
**trust**  116:4
**try**  46:10,12,13
71:24 92:19
119:10 161:19
**trying**  33:22 74:11
90:15 95:11 127:4
128:11 138:21
143:22 151:19
176:13
**turn**  7:12 28:7
45:5 64:14 146:3

146:3
**turned**  27:18 58:3
155:15
**twice**  53:24
**two**  22:17 34:14
37:10,17 38:21
40:15 45:6 46:18
57:4 75:1 77:2
78:6 87:4 99:22
104:24 109:14
114:15 116:18
122:12 125:12
127:25 144:6
147:21 149:14
150:10 156:21
158:12 160:18
169:5 174:14
176:22
**twofold**  27:23
108:1
**type**  25:14 63:20
63:20,23 64:8,10
98:7 155:25 177:2
**types**  17:19 25:12
26:1,18 40:11
42:14 53:21 59:24
59:24 63:15,18
65:6 81:13 155:23
156:4 177:9
**typewriting**  180:6

**u**

**ultimate**  127:24
161:24
**ultimately**  55:11
71:21 160:20
**umhofer**  2:4,5
**unaffordable**
28:19
**uncertain**  85:6,7
**unclear**  125:6

**undefined**  129:8
**underlying**  114:2
115:1
**underneath**  90:17
159:16
**underpass**  121:3
**underpasses**
106:12 107:5
108:1,16 112:25
113:22 115:13
118:17 119:4,19
120:6,21 121:23
122:4 129:17
132:10,11,20,24
133:3,10,14,25
138:16 144:3
170:11 178:25
**understand**  11:3
24:22 25:22 41:16
51:8,11,12 52:3
55:19 71:23 72:8
72:12 86:2 87:20
94:5 122:11 125:4
125:4 134:6 141:4
152:6 153:6
156:19,23 159:16
164:14,15,20,21
**understanding**
42:8 55:8 56:20
131:20 161:10
163:11 164:9
167:6,10
**understood**
123:22 142:25
164:4 172:2
**underused**  16:13
**underutilized**  18:5
**unfairly**  75:3
**unfortunately**
95:23 114:10
133:8

Veritext Legal Solutions
866 299-5127

[unhoused - wanting]

**unhoused** 93:14
93:18 135:2
**uniform** 76:9,10
**uniformity** 45:25
53:2
**uniformly** 49:4
**unincorporated**
175:20
**unique** 50:11
53:12
**unit** 18:20 28:1
**united** 1:1
**units** 17:19 28:10
28:20 81:14
155:25 161:22
177:2
**universal** 21:5
156:9
**unlimited** 97:2
**unmute** 66:6
**unprecedented**
60:18
**unrealistic** 25:23
**unreasonably**
106:17
**unsafe** 121:12
141:12
**unsheltered** 12:23
25:22 144:11
161:8 163:9,13
164:24 165:9
167:11
**upfront** 25:8
**upgrade** 99:3
**upgraded** 114:11
**upgrading** 100:20
**upset** 163:1
**urban** 20:3
**urgency** 106:24
**use** 16:14 46:2
58:20 63:23 75:23

84:10 87:13 92:1
94:2 96:7 102:14
105:17,17 141:21
146:23,24,25
**useful** 15:7 68:5
**uses** 146:25 147:4
**utilize** 39:23 83:14
**utilized** 20:19
81:11
**utilizing** 20:17
24:9 40:10
**utterly** 174:19

**v**

**v** 1:7 106:7 108:23
109:2,9,16,19,23
111:9 121:17
**va** 20:5 21:20 98:8
98:16 99:11 114:7
118:3
**vacant** 16:13,17
18:5
**valid** 74:19 151:16
**valley's** 54:1
**valuable** 127:22
**value** 62:19
**various** 17:21
25:12 42:9,24
103:4,15
**vehicle** 75:17
108:11
**vehicles** 100:18
**venice** 78:1
**verbatim** 172:7
**version** 175:7
**versus** 82:22
158:16
**veterans** 98:17
**vetted** 176:5
**viable** 96:10
**vicinity** 119:5,20
120:4 121:3,6

**victory** 99:18
**view** 8:25 34:13
70:12 163:16
**villages** 12:14
**vine** 27:17
**voluntarily** 99:12
**volunteered** 7:8
**vulnerable** 37:23
70:9 107:10
126:21

**w**

**wait** 51:4,4 91:15
91:15 171:24
**waiting** 89:8 97:5
124:10,11
**wakes** 120:18
**walk** 78:19 101:9
116:23 118:21
124:1 125:10
138:1 164:4
**walking** 90:15
116:22 144:21
151:10
**want** 6:8,11,15,19
6:25 7:19 8:3,8,10
8:12 9:6,7,10,23
10:13,14 11:1,1
17:10,20,24 18:21
19:7 20:8 21:20
23:5 24:20 26:2
29:11 32:20 34:8
35:18 38:22,24
39:6 42:9,16,24
43:1,6 45:1,19
46:15 47:18 48:2
49:1 55:15,23
56:3,11,19,22 57:1
59:6 63:6 64:11
71:8,8,10,17,24
72:2 73:1,3 74:9
75:15 76:5 77:7

77:16,23 78:13,24
78:25,25 79:1,1,2
80:13 81:4,8,22,25
82:16,16 83:1,8,19
84:4,6,6 86:1,15
87:11 88:21,25,25
89:6 93:4 94:3,17
95:1,4,4,4,5 96:1,6
97:25 98:2,5
99:20 100:2,4,5
101:2,2 102:19
104:18 105:10,17
105:18 115:8,10
115:25 116:3
119:12 123:21
124:23 125:2,2
128:8,19 130:1,3
131:15,19 132:25
133:5 136:7,11,12
136:15 138:10,11
138:13,21 141:14
141:16 142:22,23
142:23,23,24
143:6,11 144:13
146:3 148:1,21,22
148:23 151:18
152:10 153:11,15
155:21 157:5,8,23
159:23 163:7
164:6 165:4 166:7
167:5 168:24,25
172:2,15 174:14
174:18 177:3,19
**wanted** 6:13,17
35:9,10,17 38:4
40:25 78:8 102:22
103:18 109:25
151:14 155:20
170:17,19
**wanting** 14:3 19:1
19:2 25:12 55:18

Page 40

[wanting - written]

70:15
**wants**   7:10 40:18
   56:7 76:6 80:4
   81:11 96:3 97:6
   118:6 140:16
   141:17
**war**   101:5
**ward**   43:16
**warning**   49:25
**wash**   40:12
**waste**   112:9
**wasted**   140:9
**wasting**   100:11
**watch**   49:24
**watched**   127:11
**watching**   135:4
**way**   24:9 31:8,11
   40:19 44:6 46:4,8
   58:19 74:3 76:5,8
   76:9,10 77:20
   79:9 82:3 84:2
   87:5 89:15 90:3
   93:23,24,25 94:1
   95:12 96:23 97:16
   99:4 100:23
   104:13 112:11
   116:7,15 117:15
   148:21 153:13,14
   158:5 159:13
   163:1,17 170:13
   172:1
**ways**   46:1 49:11
   62:16 75:22 77:3
**we've**   7:24 16:9
   18:1 19:18 21:1,4
   23:13 24:12 25:18
   26:4 33:16 35:21
   36:20 38:4,15
   39:1 42:12 47:7
   47:14 49:3 56:15
   60:24 71:14 74:8

76:24 86:10 88:17
   90:25 98:19
   102:20 103:3,3,7
   103:15 106:21
   114:11 122:12
   124:3 132:8 133:2
   139:24 145:2
   148:17
**weaker**   109:22
**wealthier**   153:1
**wednesday**   1:12
**week**   6:8 35:7
   36:15 38:21 42:20
   43:13 44:11,25
   81:8 86:16,20
   150:10 151:3
   152:1,2 156:21
**weekend**   35:24
   36:11 106:6
**weeks**   38:21 40:15
   57:7 80:21 147:21
   150:8 156:21,22
   156:22
**weigh**   63:22
**weighs**   113:14
**weitzman**   2:16
   30:12,14 32:15,17
   33:22 36:5,8
   47:14,20 48:1,6,16
   49:19,23 50:3,7,10
   50:22 51:6,8,11,14
   51:18,21,24 52:2
   52:23 65:21,23
   66:4,7,10 101:24
   102:3
**welcome**   140:20
   142:20 172:17
**welcomes**   121:20
   121:25
**welfare**   110:6,15
   110:19

**wellbeing**   121:21
**went**   45:25 95:3
   133:7 154:6
**west**   3:13,21 54:1
**westlake**   27:10
**whale**   44:15
**widely**   22:22
**widen**   66:19
**wild**   109:15,21
**willing**   35:21
   44:18 46:6,13
   76:4 114:13
   118:21 167:6
**willingly**   99:8
**wind**   64:21
**window**   85:14,16
**winter**   109:2,15
**wish**   69:24 90:21
   94:8 145:16,17
   164:2
**withdrawn**   151:3
**withdrew**   92:5
**witness**   180:4
**wonderful**   87:5
**word**   58:20 174:25
**words**   8:16 116:22
   123:18 140:8
   148:20 152:1
   157:22 169:2
**wordsmithing**
   148:20
**work**   9:3 16:2,19
   16:20 19:1 20:23
   20:23 21:2 24:17
   44:8,23 45:1
   46:11,12 47:5
   54:10,13 58:17
   61:2,6,9 64:3,4,12
   76:9 85:19 96:14
   100:4 111:25
   126:22 135:3

139:20,21 140:3,7
   143:12,22 144:4
   144:24,25 145:24
   146:11 153:24
   155:13 158:3
   162:8 166:18
   169:4 174:9 177:1
   178:19
**worked**   9:9,11,19
   9:24 11:21 19:7
   20:9 21:13 32:21
   41:5 44:22 60:24
   75:5 77:17
**workers**   162:19,19
**working**   6:21 8:1
   8:2,4 19:8 46:18
   47:1,10 48:11,25
   49:3,4 79:14 83:7
   89:25 106:6
   130:20 148:7
   150:5 158:10
   159:4 160:9 174:3
**works**   7:5 13:7
   14:20 27:19 29:7
   31:7 34:19 36:17
   47:19,24 55:7
   59:21 129:2
**world**   127:2
**worried**   79:11
   104:1,3 149:7
**worry**   116:17
**worth**   34:12
**woulda**   137:21
**wrapping**   93:12
**write**   45:9 72:9
   137:7
**writing**   171:21
**written**   139:22,25
   140:6 142:17
   171:18

Veritext Legal Solutions
866 299-5127

[wrong - zoom]

**wrong**   6:5 49:2
  55:16 76:23 79:16
  100:14,23 114:22
  120:14 122:23,24
**wrote**   98:15
  154:10

### x

**x**   5:1 10:14 81:11
  100:10 113:6
  148:4

### y

**y**   81:11
**yeah**   13:23 14:4
  15:12,17 17:8,11
  17:16,22 19:9
  20:14 21:22 22:13
  26:7 27:8 28:2
  29:13,17 36:5
  37:4,4 38:3,6 39:9
  39:13 47:14 49:14
  49:20 53:9 54:2
  55:2,17 57:11,23
  60:14,22 61:12
  66:10,16 68:11,24
  69:19 73:5,12,15
  75:9 76:17 81:3
  82:5 84:20 86:8
  89:16,18 91:6
  92:24 96:15,18
  103:16,23 104:22
  105:15,15 126:2
  127:9,15,18
  128:10,12,16,20
  129:1 130:14,25
  131:1,7,10,11,12
  135:17 136:11
  138:4,19 139:4,9
  141:3,5 143:24
  144:18 146:5,20
  147:14 149:12,13

149:16 150:7,8,15
155:8 157:2,12
160:23,24 161:12
161:14 164:13
165:23 166:9,11
167:20 168:4,11
169:11,14,15
173:4,4,12,22
175:18 176:4,9
177:23 178:5,10
179:8,13
**year**   45:7 75:1
  161:21 164:6
  165:12 167:2
**years**   7:9 9:18
  37:17 41:10 45:7
  48:20 76:22 79:13
  108:6 139:24
  174:23
**yell**   163:7
**yesterday**   78:8
  116:15 127:14
  133:12 144:20
**young**   3:11 13:17
  13:23 14:5,18,22
  14:24 15:2,6,14,17
  68:2,8,11,25 69:17
  69:20,23 70:2,25
  71:3,7 76:17
  94:25 103:23
  104:1,21,23
  127:19 135:8,14
  135:17,20,24
  136:8,11,14,25
  137:5,8,12,15,20
  137:23 138:4,6
  139:4,7,13,17,19
  141:2,5 142:3,7
  160:24 161:12,15
  161:18 162:4,7,23
  163:15 164:13

165:15,18 166:22
169:11,16,19,25
170:5,21 172:4,8
172:23 173:23
174:3 176:15
177:12,17,23
178:2,5

### z

**z**   81:11
**zags**   95:24
**zigs**   95:24
**zip**   44:7,9,9,11
  47:4 51:7,10,13,16
**zoning**   84:10
  87:13 94:2
**zoom**   23:10 31:25

Veritext Legal Solutions
866 299-5127