```
 1              IN THE UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3      _____

 4      LA Alliance for Human Rights, et al.,

 5             Plaintiffs,

 6         v.                            Case No.

 7      City of Los Angeles,            20-CV-02291-DOC-KES

 8             Defendants.

 9      _____

10                        HEARING

11      DATE:          Friday, May 15, 2020

12      TIME:          10:12 a.m.

13      BEFORE:        Honorable David O. Carter

14      LOCATION:      Los Angeles Homeless Services Authority

15                     811 Wilshire Blvd., 12th Floor

16                     Los Angeles, CA 90017

17

18

19

20

21

22

23

24      REPORTED BY:   Austin Che, Notary Public

25      JOB No.:       4115473
```

                                                    Page 1

```
 1                      A P P E A R A N C E S

 2

 3    SETTING ATTORNEY

 4          ELIZABETH MITCHELL, ESQUIRE

 5          Spertus Landes & Umhofer LLP

 6          617 West 7th Street, Suite 200

 7          Los Angeles, CA 90017

 8          mitchell@spertuslaw.com

 9          (213) 205-6520

10

11    ON BEHALF OF DEFENDANTS:

12          SCOTT MARCUS, ESQUIRE

13          City of Los Angeles

14          200 N. Main Street Room 700

15          Los Angeles, CA 90012

16          Scott.Marcus@lacity.org

17          (213) 978-4681

18

19          BRANDON D. YOUNG, ESQUIRE

20          Manatt, Phelps & Phillips, LLP

21          11355 W. Olympic Blvd.

22          Los Angeles, CA 90064

23          bdyoung@manatt.com

24          (310) 312-4181

25
```

Veritext Legal Solutions
866 299-5127

1    ALSO PRESENT:

2

3    Michele Martinez

4    Elizabeth Mitchell

5    Brandon Young

6    Scott Marcus

7    Andre Birotte Jr.

8    Shayla Myers

9    Brooke Weitzman

10    Christina Miller

11    Heidi Marston

12    Matt Umhofer

13    Carol Sobel

14    Ackley Padilla

15    Jenny Chavez

16    Elizabeth Chou (media)

17    Byron McLain

18    Lauren Black

19    Sarah Dusseault

20    Larae Cantley

21

22

23

24

25

Page 3

```
1                      P R O C E E D I N G S
2                THE COURT:  It's 10:00 and we're in
3      session.  I'm going to turn this over to the presenters
4      or whoever would like to speak.  Just be kind enough for
5      the Reporter just to identify who the speaker is.
6                     (Microphone check)
7                MS. MARSTON:  I'm Heidi Marston, Los
8      Angeles Public Services Authority.  Thanks for joining
9      us here today.  Based on our conversation on Wednesday,
10     we wanted to come back to give you an overview, first of
11     the, you know, the scope and the scale of what we see
12     and what we're estimating in terms of people who are
13     living under underpasses and in the vicinity for our
14     discussion on Wednesday.
15                Also wanted to talk today a little bit
16     about some of the lessons we've learned over time using
17     the strategy that we call a location-based approach and
18     some of the data that we have around that.  And then all
19     of that being within the context of our COVID response
20     and our project and key efforts, which I know that
21     you're aware of.
22                And then lastly, giving a brief overview
23     of our racial equity part, and we have LaRae Cantley
24     here, who is our co-chair of our Lived Experience
25     Advisory Board here at LAHSA, so she'll speak to that
```

```
 1   briefly too if you're open to it.  And we are going to

 2   get printed copies of this so you can have a hard copy

 3   as well.

 4             So just to jump right into it, we did

 5   some estimations in terms of the scope and the scale of

 6   what we're seeing under bridges, underpasses/overpasses,

 7   so these are very rough numbers and approximations.  But

 8   countywide, we're seeing about 6,000 to 7,000 people

 9   dwelling in those areas based on the definitions we

10   talked about Wednesday.  Specific to that, the county of

11   L.A., we estimate 2,000 to 3,000 people, the county

12   unincorporated in particular based on the ratios that we

13   know from our homeless count; that would mean there's

14   about 200 to 350.

15             THE COURT:  Wait a minute.  I'm going to

16   ask you to stop.

17             MS. MARSTON:  Okay.

18             THE COURT:  Okay, thank you.  Heidi,

19   thank you.

20             MS. MARSTON:  Okay.  And, yeah, and we do

21   have hard copies, so you'll have this.

22             THE COURT:  Nope, nope.  I'm just going

23   to slow it down.

24             MS. MARSTON:  Great.  So I wanted to talk

25   a little bit about some lessons we've learned when we
```

Page 5

```
 1      deployed a location-based strategy like this in other

 2      parts of Los Angeles.  The prominent example we draw

 3      from is called Encampment to Home.  It's an effort that

 4      took place over the course of about a year with an

 5      encampment that was targeted.  It was a very large

 6      encampment, very highly dense.  And the thought was,

 7      what if we build permanent supportive housing near this

 8      encampment.  And then as that's being constructed and

 9      operationalized, target the folks in the community

10      that's living in that encampment to go into permanent

11      housing so we can essentially relocate the entire

12      encampment.

13                  What we saw is, of course, when we

14      provided those permanent housing options, most people

15      took those and were relocated into permanent housing,

16      but it created some additional unintended consequences.

17      First off, word spread really quickly among the unhoused

18      community that, you know, if you're in this area, you're

19      going to have some prioritization for a permanent

20      housing resource.  So it ended up becoming a draw for

21      other people who want to come and be housed so that they

22      could then be prioritized for resources.

23                  Additionally, after we were able to

24      clear that encampment and move those folks into housing,

25      we just had new people essentially move in behind them
```

1     and create the encampment at the level that it was at

2     prior to housing with new people.

3                    THE COURT:  All right, now just a minute.

4     Thank you.

5                    MS. MARSTON:  And then again, there was -

6     - naturally those folks were prioritized over others.

7     And so, folks who were potentially more vulnerable were

8     unable to be served because they weren't in that

9     location, so that was another consequence of that.  But

10    all that to say the effort was successful in moving

11    people into permanent housing.  It just didn't stick in

12    terms of clearing the encampment.

13                   MR. BIROTTE:  Is it your experience that

14    the reason why the encampment didn't clear, is that just

15    in, for lack of a better term, the nature of the

16    situation?  If a place clears out, others are just going

17    to fill that void, generally speaking; and, if so, any

18    thoughts as to why?

19                   MS. MARSTON:  Yeah.  So in particular,

20    there are certain locations that are more desirable

21    because of their privacy, because of how easy it is for

22    people to set up, so this was one of those locations.

23    Underpasses tend to be another location like that

24    because they provide shade, so in terms of desirability,

25    that's a draw.  And I said, the prioritization piece was

Page 7

```
 1    very real too, that, hey, if you go here, you might get

 2    a permanent housing resource.

 3                    THE COURT:  Michele, could I talk to you?

 4                    MS. MARTINEZ:  Excuse us.

 5                    MS. MARSTON:  Yeah.

 6                    THE COURT:  Where can we go to have our

 7    private conversation?  So, all right, back to you.

 8                    MS. MARSTON:  Okay, thank you.  So, of

 9    course, like the Court, we're all very concerned about

10    deaths on the street in particular.  The county, even

11    prior to COVID, really started looking at our

12    unsheltered population to see what are the leading cause

13    of death for folks who are experiencing unsheltered

14    homelessness.  And their study found that overdose and

15    coronary artery disease were the primary drivers, so

16    really targeting that to make sure that we're doing

17    everything we can in those interventions to address that

18    so we don't lose more lives to those reasons.

19                    But then, of course, we have COVID-19

20    that's come along and vulnerability and how we look at

21    vulnerability has shifted to be compliant with our CDC

22    guidance, meaning people who are over 65 and who have

23    underlying medical conditions really need to be targeted

24    for sectors so that they don't contract the virus.  CDC

25    has also put out guidelines for unsheltered homelessness
```

Veritext Legal Solutions
866 299-5127

1    as it relates to encampments.  And those guidelines

2    state that if folks are not able to shelter in an

3    individual unit, rather than moving encampments or going

4    into a congregate setting, that encampments should be

5    left where they are during this crisis so we're

6    disrupting.

7                THE COURT:  It's on Page 2 of their

8    guidelines.

9                MS. MARSTON:  Yes.

10               THE COURT:  Second paragraph and it says

11   12 to 12 feet.

12               MS. MARSTON:  Yeah, yeah, the social

13   distancing is a huge part of that.

14               THE COURT:  All right, I'm aware of this.

15               MS. MARSTON:  And I know that you know

16   this, but I can't help but show a couple of pictures of

17   the Project Room Key and what's happened there.  So in

18   just a mere seven weeks, we've gone from zero to 26

19   hotels that are in service and 2500 -- close to 2600

20   rooms online.  And yesterday, we hit the 2000 mark and

21   we're now over 2000 folks sheltered.

22               THE COURT:  All right, now just one

23   moment.  Well, I was hoping to avoid this, and if you'll

24   notice, I left out of my order any discussion about

25   Operation Room Key because I wanted the county and the

1    city to have the most bargaining leverage in this period

2    of time, and I only addressed the recreational centers.

3    But this is changing the whole dynamic of the

4    discussion.  So the obvious question is: how long are

5    these leases now, when are they going to run, what's the

6    time duration?  And I hoped not to get there to give the

7    Mayor the latitude of sorting that out, but you're

8    putting me in a position now that's much different than

9    I expected to be in trying to cooperate with the Mayor

10   and the Council.

11              And so, be very careful because the

12   obvious questions now are: each motel lease, extended

13   funding, how long; are you putting these people back on

14   the street, what order?  I'd hoped you didn't take me

15   down this path, but here we are.

16              MS. MARSTON:  I know.

17              THE COURT:  Okay, please continue.

18              MS. MARSTON:  The last piece that we have

19   the overview on is the racial equity piece, which I know

20   that you're acutely aware of as well.  Our last point in

21   time count showed that 33 percent of the population --

22              THE COURT:  It was highest 42 percent are

23   black.

24              MS. MARSTON:  Black African American,

25   yeah, over representation --

                                                  Page 10

```
 1                    THE COURT:  Exactly, as high as 42

 2      percent.  This is inaccurate.  Maybe your stats, but

 3      there's a lot of stats out there that says 42 percent.

 4                    MS. MARSTON:  Yeah, there's a couple

 5      studies and 42 is also out there.

 6                    THE COURT:  Right.

 7                    MS. MARSTON:  And based on that, LAHSA

 8      has set goals to make sure that we're addressing those

 9      disparities and we're bringing that equity lens, and

10      those are kind of the three goals that are outlined on

11      the slide there.  So validating all individuals and

12      populations equally, recognizing and rectifying

13      historical injustice, and providing resources that are

14      according to need are three of the principles that we're

15      adhering to.

16                    THE COURT:  We'll be right back with you

17      on that.  Can I have a discussion with you.  Pardon our

18      discussion.  I will turn that back over to you and try

19      to be courteous.

20                    MS. MARSTON:  So, Judge Carter, if you're

21      open to it, I'd like to have LaRae just say a few things

22      with her -- okay.

23                    THE COURT:  I'm not.

24                    MS. MARSTON:  Okay.  I want this a more

25      public setting.  The press has been excluded, and I
```

Page 11

```
 1    think that this is a presentation now that's taken on
 2    public influence.  We're now in recess.  We'll
 3    reassemble at the Ambassador Hotel, and if you could
 4    call, give us a time at 12:00 noon.  And if you'd like
 5    to continue this presentation then with your staff
 6    present, I would welcome that.  I thought that this was
 7    simply going to be what was available, numbers,
 8    location, but we're getting into some very, very --
 9              MS. MARTINEZ:  Yes, Carol.
10              MS. SOBEL:  Your Honor, I think it would
11    be -- for some of us at least, it is helpful to --
12              THE COURT:  Good, then have that
13    presentation privately amongst all of you and make the
14    presentation to me later.  I will be data driven, but
15    not in a private setting.
16              MS. MYERS:  Your Honor, I understand from
17    at least the "L.A. Times", they are not here because of
18    a scheduling conflict, not because of the location.
19    They understood it was a public meeting and that it is
20    available to the public.  So it had nothing to do with
21    the location is my understanding.
22              THE COURT:  Am I hearing solutions?  Or
23    I'm hearing impediments because, thus far, the only
24    thing that's driven solutions has been the COVID crisis.
25    And although the Mayor's been crying for a FEMA-like
```

Page 12

```
 1    response, which I think was very responsible, until

 2    COVID crisis --

 3                  MS. MYERS:  They can't hear you.

 4                  THE COURT:  -- until the COVID crisis --

 5    oh, they can hear me -- until the COVID crisis.  If

 6    you're claiming success, I'd like to hear that.  And if

 7    you're claiming that these are obstacles and this

 8    presentation is designed to show me why we can't do

 9    this, then this discussion is over, because this meeting

10    today was to give me statistics about where people were,

11    the number of people.  That was the only reason we

12    assembled at the LAHSA offices is because you had

13    supposedly screens, et cetera.

14                  I had hoped that you would have joined

15    hands by now and figured out how to do it, not why you

16    can't do it.  I had hoped that you would have

17    suggestions with DHS teams, et cetera, over solutions,

18    and maybe I'm wrong.

19                  So I'm going to take a recess and you're

20    going to have a private discussion.  If you all agree

21    that we're going to continue, I'll be polite and

22    continue with this.  But right now, I'm in recess.  Call

23    me, I'll be out in the hallway.

24                  COURT REPORTER:  This marks the end of

25    Media #1.  The time is 10:29 a.m.  We are off the
```

Page 13

```
 1    record.

 2            (Recess)

 3                THE COURT:  We're in session.  We'll

 4    recess in just a moment, but we're back in session.

 5                I want to relay to you a concern

 6    apparently on the advocate's part, and apparently

 7    conveyed to the Court that your belief was that I was

 8    demanding an immediate activity on your part.  I was

 9    specific on the record, and I'll show you the portion of

10    the transcript if you need, that the Court never

11    intended to endanger people during the COVID crisis or

12    move them overnight.  Number two, it's ridiculous to

13    think that we could even get some of these housing

14    opportunities in place.

15                I'm hearing from the advocates that this

16    is strictly housing apparently in hotels, and I told you

17    at the last hearing everything's on the table from

18    parking lots like the VA to anything imaginable.  And

19    so, apparently, you're not listening.

20                And I thought today -- and apparently the

21    Court is misguided, should always be the first to

22    apologize.  I thought today was a recognition that

23    unless you could come up with a more humane way of doing

24    this with my eight bullet points, and resolve this

25    amongst yourselves in terms of timeframes, getting
```

Page 14

1    together cohesive teams of mental health workers, et

2    cetera.  But you're still arguing with the Court about

3    location and that people already approached.  And I'm

4    going to suggest to you they're both impossible, that

5    these are ridiculous arguments, and that both can be

6    accomplished.

7             So if you could work with me in terms of

8    a timeframe to set up a structure.  If you can work with

9    the Court in terms of, like, sending mental health teams

10   out to talk to people on an overpass or underpass.  If

11   you can give me a feasible timeline for your health

12   workers to be involved.  If you could quit talking about

13   one solution, like just having to have motel rooms

14   immediately, which I would hope happens.  But if not,

15   then parking lots are on the table, sanitation stations

16   in those parking lots are on the table, security in

17   those parking lots are on the table.

18             Because it's better than the homeless

19   person sleeping under an underpass right now when the

20   Court consistently hears that there's no hygiene,

21   there's not even a shower, there's not even a toilet,

22   I'm being told, until the COVID crisis took place.

23             So if you're telling me that it's better

24   for homeless to sleep underneath a freeway because they

25   might have to move 200 yards and make the choice going

1     into a better establishment that we hope to accomplish

2     quickly, or they might move into a neighborhood if

3     you're valuing choice is life versus moving and

4     inconveniencing somebody because they might voluntarily

5     move, this is the wrong discussion with the Court.  Life

6     takes preference period.

7                    And you spelled out to me for so long all

8     of the safety concerns, including me not being able to

9     get a simple piece of property under the 16th and Maple

10    Freeway because you told me it's so hazardous.  So it

11    may not be up to your quality or your standards, but

12    it'll at least be 10 percent better in a parking lot and

13    it would be 100 percent better if you can get a motel

14    room.  And I don't care how you get that, but I do care

15    that there is now some action and activity.

16                   And all the Court was asking today was

17    what are the numbers, where are they located.  I've

18    tried to ask where are the parking lots versus other

19    structures.  The amount put out by the city in their

20    confidential report, which I won't disclose, is

21    absolutely ridiculous in terms of the cost.  I could

22    almost prove to you that it's rather unusual if we get

23    Mike Moore in here because what's the cost of two police

24    officers?  The same as the recreation center.  What's

25    the cost of sanitation stations that this city should

Veritext Legal Solutions
866 299-5127

 1    have had years ago?  What's the cost of security?

 2    What's the cost of getting food?  What's the cost of

 3    having John Sherman have the capability of starting to

 4    get a common people to talk to?  What's the problem with

 5    having medical workers check for hypothermia or

 6    pneumonia?  What's the probability we've been seeing if

 7    these people passing through are fit for an upgrade, if

 8    you will, into even better shelter, which we should have

 9    created decades ago?

10              Now, the problem is from the advocate's

11    standpoint, you're stuck on housing.  I agree with you,

12    but I haven't seen that in the city.  I'm almost done.

13    I'm walking out in a minute.  I agree with you.  Where

14    is it?  I don't see it.  And I don't see any movement,

15    quite frankly and bluntly, for the last 20 years, but

16    for the COVID crisis, and then I need a magnificent

17    effort with 3,000 people maybe.  If your solution is

18    3,000 people in this city, you're taking baby steps.

19              So this, we're going to do immediately,

20    the difficult, and the impossible is just going to take

21    us a little bit longer.  Now, finally, I've rethought

22    this injunctive relief.  It's probably going out after

23    this discussion regardless of the briefing schedule, and

24    then you can take it up to the Ninth Circuit.  I will

25    work with you in terms of timing.  I will work with you

Veritext Legal Solutions
866 299-5127

```
 1    in terms of humanity.  I will work with you in every
 2    way.  And don't tell me that you haven't slept, okay?
 3    How much sleep did you get last night?
 4                 MS. MARTINEZ:  Two hours.
 5                 THE COURT:  I got three, so we're out
 6    working, so don't give me a pitiful party that you're
 7    tired.  Now, if we're going on with this discussion, the
 8    first slide I really appreciated, Heidi.  I want that on
 9    the record.  That told me the information I needed.  I
10    don't need to know where you were because it's not
11    successful in my opinion, and I don't need to know where
12    you're going because that's a promise in the future;
13    it's meaningless to me.
14                 Now, if you have something data driven
15    that's useful to the Court and you have some plan of
16    implementation, so be it.  But, otherwise, I'm vacating
17    this briefing schedule.  There is no reason now to brief
18    25 pages on whether I have the authority or not.  I have
19    that sua sponte authority and, if not, the Ninth Circuit
20    will correct me, but we are all done with this inertia.
21    And apparently, my message wasn't clear.  Am I clear
22    with you now?  Bryan, am I clear with you?
23                 MR. McLAIN:  Yes.
24                 THE COURT:  I don't care if you agree
25    with me or not.  Am I clear?
```

Page 18

```
 1                     MR. McLAIN:  Yup.

 2                     THE COURT:  Okay.  Am I clear?

 3                     MR. YOUNG:  Yes.

 4                     THE COURT:  Am I clear?

 5                     MR. MARCUS:  Yes.

 6                     THE COURT:  This briefing schedule is now

 7     vacated.  I will be acting depending upon what you come

 8     up with today.  And if you can work with me, I'm going

 9     to work with you.  But it's no intention and it's

10     ridiculous that I have a conversation about moving

11     people and herding them during the COVID crisis.  I have

12     a specific record of saying that's exactly what the

13     Court wasn't going to do, hoping that you would come up

14     with something better than I propose.

15                     But don't kid yourself, parking lots are

16     on the table.  And, I mean, I want to know where the

17     locations are, and I want to know what's available

18     without excuses from LAHSA.  How many, where, what's my

19     environmental hazard?  That's what I expected to hear.

20     What's the timeline to get them up and running?  Even if

21     I ordered it today, I'm not silly enough to tell you to

22     do that in a specific time period without your input,

23     but you're not giving me that input.

24                     I want this done humanely.  And, frankly,

25     on the record, you haven't been of any help to the
```

Page 19

```
1    Court.
2                    MR. YOUNG:  If I may.
3                    THE COURT:  If you have something to say,
4    if you have something meaningful to say from this point
5    forward about helping me implement this, then you tell
6    me quickly what that is because I haven't had it today.
7                    MR. YOUNG:  If I may, Your Honor.
8                    THE COURT:  Please.
9                    MR. YOUNG:  And I, frankly, haven't been
10   able to discuss this with everybody.  This is how, at
11   least on behalf of the county, how we conceptualize a
12   solution or a framework for a solution.  I view it, at a
13   minimum, with respect to three phases.  The first phase
14   needs to be outreach, outreach, outreach.
15                    THE COURT:  Agreed.
16                    MR. YOUNG:  And so --
17                    THE COURT:  By the way, didn't I say
18   notice, I wanted notice given?  I think it's point
19   number six or seven.
20                    MR. YOUNG:  And with respect to outreach,
21   the county, the Sheriff's Department right now has host
22   teams deployed.  These are multidisciplinary teams for
23   homeless services prevention because, as we saw with
24   LAPD, it's similar to the Sheriff's Office, there is
25   kind of a capability within law enforcement to at least
```

Page 20

1    have outreach.  I teamed with LAHSA.  Right now the host

2    teams are supporting medical testing strategies at roads

3    and freeways near rivers.

4                    THE COURT:  That's not what I'm talking

5    about.  Hold on.  I'd like to hear the number.  I'd like

6    to hear where they are.

7                    MR. YOUNG:  Right.

8                    THE COURT:  I'd like to hear what they're

9    doing today.

10                    MR. YOUNG:  Yeah.  So with respect to

11   that, so two elements of that.  First, with respect to

12   medical testing, right, because that's an important

13   element to this, there is a focused effort at roads and

14   freeways at cross rivers, at the Los Angeles River, San

15   Gabriel River, and Rio Hondo River four to five days a

16   week.  The host teams separately also conduct outreach

17   under the 605, 5, 710, 60, 10 and 91.

18                    THE COURT:  Slow down.  We're trying to

19   make notes.  Would you mark this for me because then I'm

20   getting submitted information.

21                    MR. YOUNG:  And that's done four times a

22   week.  And that's part of kind of the effort to at least

23   identify where those tier -- you know, it's triage

24   obviously, but the tier one folks that we're really

25   focused on right now, the highly vulnerable, some of the

                                                      Page 21

```
 1    data we saw with LAHSA and what we know with respect to

 2    CDC guidance.  My recommendation would be that we find a

 3    way -- and I'm using this language loosely -- but to

 4    redouble those efforts.  We need to go into those

 5    communities as early and often as we can.

 6                     THE COURT:  Now let's just say the Court

 7    was in complete agreement and I wasn't driving the

 8    number or maybe -- but has that discussion taken place?

 9    This is what I was hoping --

10                     MR. YOUNG:  Yeah.

11                     THE COURT:  -- that we would be on board

12    with with some plan, so that if I was wrong, my eight

13    bullet points, you may it more about me.  You said, you

14    know, Judge, you forgot X, Y or Z, or you should do the

15    following.

16                     MR. YOUNG:  Right.

17                     THE COURT:  Now it's also being thrown up

18    to me that this should not be location based.  This is

19    both.  This is both location based and person based.

20    This is not one or the other that I'm hearing from any

21    of you.  You can get the best of both worlds, because

22    these folks are not going to be living underneath these

23    freeways, and I have been generous and not saying city

24    streets so far.  I'm about to change that opinion very

25    quickly on overpasses and underpasses.
```

Page 22

```
 1                    So if had sent out teams hypothetically,
 2       and we gave notice and we didn't act until the COVID
 3       crisis was over, until we talked we Barbara so we're not
 4       taking, you know, people who are self-distancing for
 5       this period of time, we wouldn't be harming anybody.
 6       We're not going to have a trail of tears.
 7                    Number two, they're not forced to go to
 8       whatever we're building.  We have to build something
 9       that would attract people to go there; and if they
10       won't, then, yeah, they are going to move.  But given
11       the value choice between the neighborhood and underneath
12       a freeway, my value is life and they're not going
13       underneath a freeway and down the road systems from this
14       point forward because I'm so disappointed, quite
15       frankly.  But I didn't hear that today.  I just heard
16       what we have done and what we're going to do.  And until
17       COVID came along, I don't perceive -- and maybe
18       wrongfully -- I'll leave that.
19                    Now what else are we going to do in a
20       positive way?
21                    MR. YOUNG:  So I think the representation
22       I would make to you, the gap that I personally am seeing
23       and I just don't know what the answer is yet, is there's
24       probably a mental health component here that needs to be
25       fixing.
```

Page 23

```
 1                      THE COURT:  Dr. Sheridan and I are on the
 2      phone.  By the way, you know what?  If you hadn't
 3      testified, I'll represent to you that he would say, just
 4      make it better and do something for my mental health
 5      teams.  And that includes parking lots, by the way, like
 6      the DA, okay?
 7                      MR. YOUNG:  That's good.
 8                      THE COURT:  Now I'm not a proponent of
 9      that, but you're not giving me housing quick enough and
10      I'm not waiting five years.  So, Dr. Sheridan would say
11      to you, I like this idea.  My mental health people can
12      get in there because my teams go across the county,
13      quote/unquote, to every single tent or location; we just
14      can't do it.  But if those people who voluntarily come
15      in, you know, we could direct our resources to it in a
16      finite sort of way.
17                      MR. YOUNG:  So I don't know what that
18      looks like, but there's --
19                      THE COURT:  I do.  It looks like a
20      parking lot with security and lights immediately with
21      toilets and sanitation.  You can bring your own tent;
22      that's one idea.  The other is get the housing that
23      we've been talking about for 20 years that's non-
24      existent because that's the ultimate goal.  I agree,
25      there should be a comprehensive plan.  And these people
```

Page 24

1    not only can't get stuck in these parking lots, those

2    will be the most willing, just like the recreational

3    centers, so we ought to be -- we ought to have a funnel

4    to get them out of there.  For the first time, we can

5    identify the services that they need.  We can't even do

6    that right now in this disburse, so I'm with you.

7                    MR. YOUNG:  And I think that flows into

8    what I would call the second prong of this or the second

9    frame or the second element of what I think would be a

10   workable framework, which is we need to know and we need

11   to identify and state definitely, at a minimum, what

12   housing is opening up in Q3 2020, Q4 2020 that we know

13   is going to come online.

14                   THE COURT:  Agreed.  And remember this,

15   if we can get people into housing, that's the ultimate

16   goal.

17                   MR. YOUNG:  Right.

18                   THE COURT:  But it's not going to sit

19   status quo because it's been sitting forever, and you

20   have a volume of housing that you've got to deal with,

21   and I don't know how to do that except lives are going

22   to be a little bit better.

23                   MR. YOUNG:  And, you know, it's that.

24   And I think what you're latching on to, Your Honor, or

25   at least as I conceptualize it.  In a lot of ways, it's

                                                    Page 25

```
 1    obviously a supply issue, but it's a placement issue

 2    too.

 3                  THE COURT:  Absolutely.

 4                  MR. YOUNG:  And the data that we're

 5    getting I think was not necessarily intended to say

 6    what's better or worse, but to say that there are these

 7    considerations with respect to placement, because we do

 8    need to walk and -- we need to walk and chew gum at the

 9    same time.

10                  THE COURT:  A hundred percent agree.

11    Because if they come involuntarily and are bipolar, at

12    least John can have his folks in one center or 50

13    centers, and at least he could say, you know, here's a

14    specific problem.  I don't have to chase this, this

15    person wants help, and we can apply enough pressure to

16    the system to start hopefully get help.  We're not even

17    doing that right now because everybody's afraid, you

18    know, to bring folks in.  I'm not going to force them

19    in, by the way.  I hope we get a good enough center that

20    it's a little bit better.  And as far as bringing your

21    own tents, that's fine; bring your own possessions,

22    that's fine.  Or get me housing immediately, which I

23    don't see.

24                  But eventually, these folks are not going

25    to sit in these centers because I'm going to watch them
```

Page 26

```
1    like a hawk, and they're not going to become cesspools

2    where they sit there in encampments.  They're going to

3    start moving through in a comprehensive system, because

4    by getting them initially, it's going to force you to do

5    it.

6                    MR. YOUNG:  Yeah.

7                    THE COURT:  Now you're afraid of moving

8    them into neighborhoods.  Some people are going to move

9    into neighborhoods.  Okay?  You value choices: a couple

10   of people move into neighborhoods versus sleeping

11   underneath the freeway or an egress?  I don't know where

12   your value structure is on that.

13                   MR. YOUNG:  So with respect to this

14   thought, you know, the city is doing some pretty

15   remarkable things and that obviously factored in terms

16   of increasing immediately.  We've already seen it with

17   the recreation centers.  So we need to have a

18   conversation around what that looks like.

19                   THE COURT:  Agreed, but I'm not -- I'm

20   impressed with the Mayor -- I'll repeat that on the

21   record -- he's been calling for FEMA, and I'm especially

22   impressed with the Council.  But until COVID came

23   along...

24                   MR. YOUNG:  So on this issue of what I

25   call placement, there are a couple of considerations;
```

Page 27

```
 1    things we know and things we don't know, and for the
 2    things we don't know, we need to find out answers soon.
 3    So on the things that we know, we obviously know that we
 4    have CDC guidance and a population of highly vulnerable
 5    folks with respect to COVID.  Those placement decisions,
 6    I think, are -- they're the easiest ones, at least from
 7    my perspective, those are the easiest ones to make right
 8    now; we know who they are.  It's a question of outreach
 9    and finding placements.
10              THE COURT:  Sure.
11              MR. YOUNG:  Where it gets a little more
12    complicated, I think is the population that falls kind
13    of outside of that highly vulnerable definition.
14              THE COURT:  Let's have a conversation.  I
15    want to interrupt you for a moment because you had no
16    choice, okay.  Look, I might have even been open to a
17    pilot project, an area where we focus John's teams and
18    the medical teams, where they literally went out and
19    said, you know, you're camping here, we're not going to
20    move you, we're going to notify you or COVID's going to
21    be over, whatever.
22              And, by the way, I mean, at least we have
23    those folks identified as bipolar or some issue
24    humanely, and if they did come into a camp, we can keep
25    track of them.  If they went into a neighborhood, maybe
```

Page 28

```
 1    we couldn't keep track of them.  But the end result, at
 2    least we'd know humanely that we could start treating
 3    these people in a people-oriented manner.  But it has to
 4    also be once you put public safety and health on the
 5    table for me, they're a week in this freeway, and
 6    they're going to leave your city streets pretty soon,
 7    unless we make some progress today.
 8                   So I'm with you on that, but you've given
 9    me nothing.  I don't see a plan today.
10                   MR. YOUNG:  So with specific plan with --
11    so, again, I think the COVID, that's an easier answer.
12    With respect to the universe outside of COVID,
13    yesterday, the county issued a report.  They conducted a
14    needs assessment of 1800 people.
15                   THE COURT:  Okay.
16                   MR. YOUNG:  Persons experiencing
17    homelessness, led by the Department of Public Health,
18    Mental Health, Department of Health Services, the
19    Coroner, the CEO for Homelessness Initiative and LAHSA,
20    to identify mortality prevention strategies, looking at
21    what are the main causes of high mortality amongst the
22    homeless.  And those -- and Heidi started going into
23    some of that, which was, you know, drug and alcohol
24    overdose, heart disease, traffic-related deaths and
25    violence-related deaths.  So we've at least identified
```

Page 29

```
 1      kind of what are the main causalities.

 2                      And with respect to how we actually kind

 3      of implement strategies that would help guide kind of

 4      the placement decisions that we would need on the

 5      freeways and, frankly, elsewhere.

 6                      THE COURT:  And guide the Court, okay?

 7                      MR. YOUNG:  And guide the Court, that's

 8      right.  So right now, the idea is -- or at least those

 9      departments represented to the Board that within the

10      next 120 days that they're going to come back with kind

11      of actual steps and strategies.  And I don't know if I'm

12      representing this entirely correctly, but the idea would

13      be to find out what needs to be done based on those main

14      causes and how do we save people who are suffering from

15      things like substance abuse, traffic-related deaths, so

16      on and so forth.

17                      I think that needs to guide our placement

18      decisions, but we know with certainty certain

19      populations that we can affect today, right?  And so,

20      again, outside of Project Room Key, what I would like to

21      do is find out what is that additional population.  From

22      the county's perspective, it has been, and the thing

23      that we have been studying is over 65.  Now --

24                      THE COURT:  Well, now, hold on.  On one

25      hand, it's been argued to me privately, that's
```

Page 30

```
 1    discriminatory.  On the other hand, the city made a
 2    really difficult choice, and they tried to protect over
 3    65 with secondary ailments because that was the highest
 4    death rate, a very valid choice.  Why am I concerned
 5    about not taking a population that's subject to health
 6    and safety issues and moving them by location?  But
 7    before I ever do that, if there's a selected area going
 8    through as a trial and seeing if this works, and if it
 9    doesn't work, I know it.  But nobody's willing to try
10    it, even on a limited basis, and the timeframes are just
11    too great.
12              So if we really believe what I'm writing,
13    this is going to happen very quickly and you're going to
14    have to sort it out.  So I'm not on board with this time
15    schedule because there's so many creative things that
16    you could have done today -- frankly, all of you -- that
17    the Court was listening to or willing to listen to about
18    not hearing that this is a location-based approach or
19    solely a people; it's both.  And you both come out ahead
20    because these freeways are going to be cleared.
21              And second, you've got the opportunity
22    here to send out teams before hand to talk to these
23    folks to find out what their condition is.  And then if
24    they don't come in, there's nothing we can do about
25    that; they're not being forced to come in, but it's our
```

Page 31

```
 1    duty to create something better.  And if that is

 2    sanitation, if that is a toilet, if that is security,

 3    then we're going to create that and we're going to

 4    create that in a parking lot.  Now I'm fearful of that

 5    because I'm fearful that then they turn into encampments

 6    forever.

 7                    Well, not if you're involved with this

 8    Court because I'm going to watch that like a hawk.

 9    There has to be some kind of comprehensive plan.  But

10    there you've got the willing, don't you?  You've got the

11    very people who say I want to come in like the

12    recreational centers.  Those people have been law

13    abiding.  They're the very people that you know if you

14    put into a shelter right now at great expense would

15    probably give you your best return on your money, not

16    just picking up somebody like me off the street who

17    might be a gang banger, shooting dope, taking advantage

18    of the homeless.

19                    So my concern is this: I think there's a

20    duality that can be accomplished here.  I think safety

21    can be taken care of, and I think you can have a people-

22    oriented approach, and the question is how big.  Does

23    8,000 frighten me?  No.  I just get to make the order.

24    You get to sort it out for a change.  And all I'm

25    looking for is some cooperation, and I didn't get it.
```

Page 32

```
 1    I'll put that on the record.  So apparently, I'm at
 2    fault because I had miscommunicated with you.  So where
 3    do we go from here, because there's also something
 4    positive when we recess.
 5              MS. MARTINEZ:  Brandon, go ahead and wrap
 6    up.
 7              MR. YOUNG:  Yeah.  I just want to make
 8    two points.  One is to finish, I think, the thought
 9    where I was, and then just what I would call a third leg
10    of this.  With respect to a process that is both
11    location-based and people-centric, I view it as going
12    back to the same place multiple times and focusing on
13    different populations.
14              THE COURT:  Absolutely.
15              MR. YOUNG:  So it goes down like this, as
16    opposed to pulling out all potential.  When we're
17    talking about -- when we're talking about things such
18    as, like, the health report, that guides the placements
19    and -- I don't want to use the word priority, but at
20    least the strategy on how you winnow how that down.
21              THE COURT:  Good.
22              MR. YOUNG:  So that's what -- and it
23    needs to be driven --
24              THE COURT:  Good.
25              MR. YOUNG:  I think we all agree it needs
```

Page 33

1    to be driven by data.

2              THE COURT:  The average homeless person,

3    you talk to them the first time, in my humble belief,

4    they may not get the message.  They need to be talked to

5    more than one time.  We don't want to incarcerate people

6    and then have them get even a cite and release or an

7    arrest and just turn through the Court system and turn

8    them back on the street; that does absolutely no good.

9    It's not good for law enforcement, and it's certainly

10   not good for the homeless person.  It's not good for the

11   community.  It's not good for the courts; it's wasting

12   money.

13             So I had hoped today to hear that we were

14   going to have some kind of concerted effort in combining

15   both.  I had hoped to hear that we had parking lots.  I

16   had hoped to hear from the city and the county that we

17   had some cooperation, instead of squabbling about money,

18   about how quickly we could get this done, so I had some

19   idea.  I'm not talking about one piece of property; I'm

20   talking about a hundred pieces of property or 50 pieces

21   of property.  I didn't come up here, spending two hours

22   of sleepless nights to talk to you about a couple

23   thousand people.

24             And if this is your effort driven by

25   COVID, with literally no plan that I see yet for your

Page 34

```
1    recreation centers, and I won't even get into your -- is
2    that victory?  You're going to turn these people loose
3    back on the street?  Then being told I'm unfair.  Don't
4    you ever tell me that.  Understood?  You take it to the
5    Ninth Circuit.  If I'm going to deal with you, it will
6    be an open and blunt conversation.  Why don't I let you
7    finish off.
8              MR. YOUNG:  Yeah.  So the third element,
9    I think we're actually tracking --
10             THE COURT:  I do too.
11             MR. YOUNG:  -- is increasing the stuck
12   and identifying those properties reporting back where
13   they are.  You know, the county has identified
14   properties; it sounds like the city has too.  But
15   there's more than that though, Your Honor.  There is
16   what are we going to do to get the federal government
17   involved?  What are we going to do to get the city
18   government involved?
19             THE COURT:  I'm not waiting for the
20   federal government.  I'm wondering why LAHSA's not
21   involved.  I'm wondering why both of you are using LAHSA
22   as a punching bag, quite frankly.  I'm wondering why the
23   state's not involved because your relationship is too
24   cozy.  We'll get the federal government involved; that's
25   why I'm out at the VA.  Right?  So if you really want
```

Page 35

```
 1      this cleared up, then stand up because I'm tired of

 2      seeing this between the city and the county.  The state

 3      isn't even enjoined or joined through Caltrans.

 4                  We got LAHSA in the middle of it that has

 5      no political power.  They are feeding money through that

 6      was an age-old compromise trying to do their best job.

 7      That's really unfair to them.  And every time I talk to

 8      the city, say it was LAHSA; every time I talk to the

 9      county, it's LAHSA; every time I talk to the city, it's

10      the county; and every time I talk to the county, it's

11      the city.  You ought to hear the conversations going

12      back and forth.

13                  So where's the state?  Is LAHSA a part of

14      this lawsuit?  I don't know.  But Michele said the other

15      day, the players that we need are not at this table.

16      And so, you just deflected to get to the federal

17      government.  You give me the power and I'll set up some

18      encampments for you on federal ground.  Just call a

19      presser letting me do it.  I'm happy to do that and take

20      the criticism.  In fact, I love what the VA did because

21      even though it's Godawful they're opening a second

22      parking lot, because at least they got security in

23      there, food in there, counseling in there, I'm just

24      going to watch that like a hawk because we're going from

25      building 207 to 208 and 209.
```

Page 36

```
 1              And they better stay on track and build

 2      those buildings at a much more rapid pace and now they

 3      are.  I mean, they've gotten a kickstart in the last

 4      couple of weeks that you can't imagine.  So I'm not

 5      waiting for you to deflect to the federal government;

 6      this is your problem.

 7              MR. YOUNG:  And it's not a question of

 8      deflection.  I think what we are lacking here is

 9      definition.  It's one thing for me to say we need

10      federal support, we need state support, but it's more

11      than that.

12              THE COURT:  Then sue the state.

13              MR. YOUNG:  Can I -- if I may, Your

14      Honor.  You know, the county obviously is providing and

15      is working toward providing additional stock, and we can

16      represent kind of where we're going to go.  And we're

17      obviously working very actively with intervenors and

18      plaintiffs to increase that.  You know, the city is, you

19      know, equally involved in those efforts.

20              It's a question of when we're talking

21      about kind of, let's focus on federal support.  The

22      county, for example, with respect to -- and we've talked

23      about this a little bit before, but it's part of the

24      overall strategy.  What, for example, are we doing to

25      link up people who are homeless to federal services?
```

Page 37

1                    THE COURT:   Sure.

2                    MR. YOUNG:   And what do those plans look

3     like and how do they improve?   Even in the context of

4     this litigation, the county worked on strengthening its

5     veteran peer network, which takes, you know, homeless

6     people with experience who are veterans who are more

7     likely to actually be receptive to outreach.   And, at

8     least in the Skid Row area, find those linkages to

9     transport people, move them to the VA, assist with

10    getting them --

11                   MS. MARTINEZ:   Well, whose job is that,

12    Brandon, to help the homeless population with

13    entitlements?   Is that the city's job, is it LAHSA's

14    job, is it the county's job, right?   Where do those

15    funds come from, right; can you tell me?

16                   MR. YOUNG:   It's all of our jobs.   I

17    think it's a false scenario to suggest it's one or the

18    other.

19                   THE COURT:   And we're not even taking the

20    first timid steps that breaks this inertia, to go out

21    and make an effort to say, you know what, that didn't

22    work, let's back up and do it right again.   We're not

23    even doing that.

24                   MS. MARTINEZ:   Carol has a comment,

25    Judge.

                                                    Page 38

```
 1              MS. SOBEL:  I appreciate everything the
 2     city and county is focusing on now.  But I can't let
 3     this conversation go on without saying you did decades
 4     of neglect.  All of you did decades of neglect.  And the
 5     reason why we have the biggest problem in the country is
 6     because we have something like a 17 percent vacancy rate
 7     on luxury units in areas and we have big buildings and
 8     we have 2 percent for people that we pat ourselves on
 9     the back, where we go up to, quote, "living wage."  And
10     if you got paid that living wage and worked 35 hours a
11     week, you would be at the bottom of the affordable
12     housing scheme for L.A. County for one person.
13              So I really think that Brandon, while I
14     appreciate what people are doing, I think it's really
15     important to recognize that we are in the situation we
16     are in today because of deliberate choices that the
17     county made, that the city made.  I can go through
18     conversations with current members of the Board of
19     Supervisors who would not take particular actions
20     because somebody else had their name on that project
21     (inaudible) used to be on.  You know, I've been through
22     this with Ed Edelman.  And I realize and I'm probably
23     older than everybody in this room except Judge Carter,
24     but... (laughter).
25              THE COURT:  Let the record reflect
```

Page 39

 1    there's hilarious laughter.

 2               MS. SOBEL:  I just think that it's

 3    important to recognize what those two -- what life was

 4    in the past and what the current policies are that

 5    continue to foster gentrification in what were stable

 6    areas.  You know, one of the examples I would use is all

 7    the transit steps.  We build density, we do transit

 8    steps.  What we have succeeded in doing is destroying

 9    stable communities of color and making them white in

10    this -- and that's why those numbers are so high for

11    people of color; it's one of the contributing factors,

12    low wages and all of that.

13               So I think you need to -- you need to,

14    you know, you need to think about that because the

15    answer always come back to where are people going to go,

16    where are people who are mentally ill going to go, where

17    are people who are just economically disadvantaged going

18    to go, and I don't see an honest discussion of that in

19    either the city or the county.  I see a goal towards

20    warehousing a large segment of the population that's

21    only going to increasingly become a larger segment.

22               So I hope that -- and when we come up

23    with solutions here, whether it's the city, the county.

24    And, you know, Heidi's relatively new to this position;

25    it's not Heidi's fault.  But LAHSA has a long history of

Page 40

```
 1    having money and not -- never being corrupt.  I want to
 2    be really clear about that.  There's never been an
 3    allegation that LAHSA, you know, somebody stole the
 4    money, somebody misspent the money, but just keeping
 5    track of it.  And I know Heidi brought on more financial
 6    people; we need to figure out.  We need to get people
 7    stabilized immediately, and we need it in something that
 8    is supportive, recognizing that most people are just
 9    economically disadvantaged and more will be economically
10    disadvantaged.
11               And then I said this the other day and
12    I'll say it again.  Cities in the county need to look at
13    their policies.  When you pass a development project,
14    what is the impact of that development project on making
15    people homeless?  It is not fair to say that you're
16    going to do a redevelopment on, like, an open grassy
17    area that's been historically a low income black
18    community, and then have people tell people you can come
19    back when the project is done.  You can't come back when
20    the project is done if your only income is social
21    security and it's $15,000 a year, whatever.
22               So there needs to be a more wholistic
23    approach by both agencies.  That's more long term, but
24    it's also short term because if you read all of the
25    agendas, you see all the projects week by week that are
```

Page 41

1    the development projects where people are being given a

2    density bonus for nothing, for nothing, you know.  They

3    get an extra 20 -- an extra 200 units if they build one

4    unit of affordable housing.  And that's a little bit of

5    an exaggeration, but not that much.

6                    So I really do think that while I

7    appreciate what you're saying, I really think that it's

8    not rooted in historical reality.

9                    THE COURT:  So here's what I'm

10   suggesting.  I expected today to get a number -- and,

11   Heidi, first of all, if there's been any discourtesy,

12   let me be the first to always apologize on the record.

13   Okay?  That's my responsibility.  You've done an

14   excellent job of presenting.

15                   My disappointment is that I don't want to

16   hear what you're going to do.  I want to know what

17   you've done.  And I want to know the timelines in the

18   future of what you're going to do, and I want to know

19   milestones.  I don't want to see a broad presentation

20   anymore about what did and didn't work.  It hasn't

21   worked, and it didn't work for you, Heidi, until the

22   COVID crisis came along.  And then the Mayor and the

23   Council finally had the leverage, quite frankly, you

24   know, to increase this to 3,000 spaces.  But I am deeply

25   disturbed about 1,000 people coming out of our

Page 42

```
 1     recreational centers.  And I know Murray's called for

 2     that and Joe has called for that, et cetera.  I will

 3     keep that document in confidence, but let's just say I'm

 4     not very confident and I don't see how the Council could

 5     be very confident right now about what happens to these

 6     people.

 7                 I specifically stayed away because I

 8     represented to you from Operation Turn the Key.  But

 9     here I get a presentation by Heidi everything that you

10     asked me to keep off the table, so the Mayor and the

11     Board had leverage.  Listen to me, Marcus and Cristina,

12     this is important to you.  Everything you've asked me to

13     keep off the board, I did.  And now I'm getting a

14     presentation that causes me to respond right back when

15     I'm trying to empower the Mayor so he can deal with the

16     cities.  You're not talking to each other, and you

17     certainly didn't talk to Heidi because she walked right

18     into it.

19                 So now my questions are obvious: how long

20     are these leases; what are you going to do with these

21     people?  Are we going to take 2,000 more people who are

22     the most willing and able, plus 1,000 in our

23     recreational centers, and just put them back on the

24     street?  And by the way, most of them, a lot of them are

25     65 and older because you made a value choice about that.
```

Page 43

```
 1    I have no problem with those choices.  They're good
 2    choices.  And it wouldn't matter if they were; that
 3    belongs to the city and the county.
 4                   So I'm tired of hearing that it has to be
 5    a people-based approach solely, and I'm tiring of
 6    hearing it has to be a location-based approach.  This is
 7    location based and it is going to sweep this city in
 8    terms of these freeway underpasses.  And I will ask
 9    again, there is too cozy of a relationship between the
10    city and the state, in my opinion, and the state should
11    have been involved a long time ago with Caltrans, but I
12    leave that to you for the time being.
13                   Number two, I may be able to enjoin the
14    necessary party.  I'm just sitting and watching for a
15    moment, go research block.  If you don't have the
16    courage to do it, maybe the Court does.  Number two, do
17    I want to enjoin LAHSA?  Well, you're both using LAHSA
18    because of your age-old disputes between the county and
19    the city and then everybody points at LAHSA that has no
20    political power at all.  They've got the money and
21    they've got the wisdom and the ability out there, but
22    you haven't empowered them.
23                   So the briefing schedule is now vacated.
24    You have until Monday at 3:00.  Unless you have
25    something productive for the Court, I will issue this
```

Page 44

```
 1    TRO.  I will do that sua sponte, and from now on, you
 2    take it to the Circuit.  Understood?  Am I clear about
 3    that?
 4                    MR. UMHOFER:  Your Honor, you are --
 5                    THE COURT:  No.  Am I clear about that?
 6    Let me start here.  Am I clear or am I miscommunicating
 7    in some way?  You have until Monday at 3:00; that means
 8    you work this weekend.  I'm here until 10:00 or 11:00
 9    tonight with -- by the way, thank you.  On the record, I
10    think all persons involved showed the Court that you
11    genuinely care when you're working until 10:00 at night.
12    Am I clear with you, Matt?
13                    MR. UMHOFER:  Yes, sir.
14                    MS. MYERS:  Yes, Your Honor.
15                    THE COURT:  3:00, that's Monday, that's
16    it.  Clear?  Now, Marcus, you, Cristina.
17                    MR. MARCUS:  Two points, Your Honor.
18    First, you made a comment earlier that the city doesn't
19    have a plan and is going to turn the rec center
20    occupants back to the street.  That is not true.  We
21    submitted that plan to you confidentially, but we do
22    have a plan.  You may disagree with it, you may not.
23                    THE COURT:  My apologies.  I may just --
24                    MR. MARCUS:  Oh, you do have the plan.
25                    THE COURT:  Yeah.  I may have misspoken.
```

Page 45

1     The city has a plan.

2                    MR. MARCUS:  And second, with respect to

3     --

4                    THE COURT:  But Operation Turn Key, you

5     walked right in on me today unexpectedly, so...

6                    MR. MARCUS:  Understood.  And with --

7                    THE COURT:  There, I don't want to say

8     it, but maybe we don't have all that money.  Let's leave

9     that alone.

10                    MR. MARCUS:  And with respect to any

11    order that the Court intends to issue.

12                    THE COURT:  I don't intend; I'm going to

13    do it.

14                    MR. MARCUS:  The city requests the

15    opportunity to brief that order before it is issued.

16                    THE COURT:  You have 24 hours.  We're

17    done now.  Because now, this order is going to issue,

18    you're really writing for the Ninth Circuit.  So if

19    you're opposed to that, you get that brief in, but I

20    want it by Saturday.  I'm working 24 hours a day because

21    this order will issue and then you can take it up to the

22    Ninth Circuit, because what your brief is not going to

23    do is dissuade me from doing this.

24                    I was hoping that that brief would show

25    the Court how to do it better or more humanely or time

Page 46

```
 1    constraints.  All right.  Okay, anything else.  Okay.
 2    Briefing by 5:00 on Saturday.  We're working all weekend
 3    and so are you.  Order will issue at 3:00 on Monday.
 4    Anything further?  If you need another meeting with me,
 5    you can come together as a group and you have a timeline
 6    humanely to implement this, I'm listening.  Nobody
 7    should get hurt by this; this shouldn't be forced.  You
 8    should be creating something better.  If not, if you
 9    leave it to me, then... that's your choice.  Okay?  Did
10    you have anything further?
11                    COURT REPORTER:  The time is 11:28 a.m.
12    You're off the record.
13                    (Whereupon, at 11:28 AM, the proceeding
14                    was concluded.)
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1                CERTIFICATE OF NOTARY PUBLIC

 2            I, AUSTIN CHE, the officer before whom the

 3      foregoing proceedings were taken, do hereby certify that

 4      any witness(es) in the foregoing proceedings, prior to

 5      testifying, were duly sworn; that the proceedings were

 6      recorded by me and thereafter reduced to typewriting by

 7      a qualified transcriptionist; that said digital audio

 8      recording of said proceedings are a true and accurate

 9      record to the best of my knowledge, skills, and ability;

10      that I am neither counsel for, related to, nor employed

11      by any of the parties to the action in which this was

12      taken; and, further, that I am not a relative or

13      employee of any counsel or attorney employed by the

14      parties hereto, nor financially or otherwise interested

15      in the outcome of this action.

16

17

18

19

20            AUSTIN CHE

21            Notary Public in and for the

22            STATE OF CALIFORNIA

23

24

25

                                             Page 48
```

```
 1              CERTIFICATE OF TRANSCRIBER

 2              I, SONYA LEDANSKI HYDE, do hereby certify that

 3      this transcript was prepared from the digital audio

 4      recording of the foregoing proceeding, that said

 5      transcript is a true and accurate record of the

 6      proceedings to the best of my knowledge, skills, and

 7      ability; that I am neither counsel for, related to, nor

 8      employed by any of the parties to the action in which

 9      this was taken; and, further, that I am not a relative

10      or employee of any counsel or attorney employed by the

11      parties hereto, nor financially or otherwise interested

12      in the outcome of this action.

13

14

15

16

17

18

19

20                  _____

21                  SONYA LEDANSKI HYDE

22

23

24

25

                                            Page 49
```

[& - apologize]

**&**

**&** 2:5,20

**0**

**02291** 1:7

**1**

**1** 13:25
**1,000** 42:25 43:22
**10** 16:12 21:17
**100** 16:13
**10:00** 4:2 45:8,11
**10:12** 1:12
**10:29** 13:25
**11355** 2:21
**11:28** 47:11,13
**12** 9:11,11
**120** 30:10
**12151** 49:20
**12:00** 12:4
**12th** 1:15
**15** 1:11
**15,000** 41:21
**16th** 16:9
**17** 39:6
**17500** 48:19
**1800** 29:14
**19** 8:19

**2**

**2** 9:7 39:8
**2,000** 5:11 43:21
**20** 1:7 17:15 24:23
  42:3
**200** 2:6,14 5:14
  15:25 42:3
**2000** 9:20,21
**2020** 1:11 25:12,12
**205-6520** 2:9
**207** 36:25
**208** 36:25
**209** 36:25

**213** 2:9,17
**24** 46:16,20
**25** 18:18
**2500** 9:19
**26** 9:18
**2600** 9:19

**3**

**3,000** 5:11 17:17
  17:18 42:24
**310** 2:24
**312-4181** 2:24
**33** 10:21
**35** 39:10
**350** 5:14
**3:00** 44:24 45:7,15
  47:3

**4**

**4115473** 1:25
**42** 10:22 11:1,3,5

**5**

**5** 21:17
**50** 26:12 34:20
**5:00** 47:2

**6**

**6,000** 5:8
**60** 21:17
**605** 21:17
**617** 21:17
**65** 8:22 30:23 31:3
  43:25

**7**

**7,000** 5:8
**700** 2:14
**710** 21:17
**7th** 2:6

**8**

**8,000** 32:23
**811** 1:15

**9**

**90012** 2:15
**90017** 1:16 2:7
**90064** 2:22
**91** 21:17
**978-4681** 2:17

**a**

**a.m.** 1:12 13:25
  47:11
**abiding** 32:13
**ability** 44:21 48:9
  49:7
**able** 6:23 9:2 16:8
  20:10 43:22 44:13
**absolutely** 16:21
  26:3 33:14 34:8
**abuse** 30:15
**accomplish** 16:1
**accomplished** 15:6
  32:20
**accurate** 48:8 49:5
**ackley** 3:14
**act** 23:2
**acting** 19:7
**action** 16:15 48:11
  48:15 49:8,12
**actions** 39:19
**actively** 37:17
**activity** 14:8 16:15
**actual** 30:11
**acutely** 10:20
**additional** 6:16
  30:21 37:15
**additionally** 6:23
**address** 8:17
**addressed** 10:2
**addressing** 11:8
**adhering** 11:15
**advantage** 32:17

**advisory** 4:25
**advocate's** 14:6
  17:10
**advocates** 14:15
**affect** 30:19
**affordable** 39:11
  42:4
**afraid** 26:17 27:7
**african** 10:24
**age** 36:6 44:18
**agencies** 41:23
**agendas** 41:25
**ago** 17:1,9 44:11
**agree** 13:20 17:11
  17:13 18:24 24:24
  26:10 33:25
**agreed** 20:15
  25:14 27:19
**agreement** 22:7
**ahead** 31:19 33:5
**ailments** 31:3
**al** 1:4
**alcohol** 29:23
**allegation** 41:3
**alliance** 1:4
**ambassador** 12:3
**american** 10:24
**amount** 16:19
**andre** 3:7
**angeles** 1:7,14,16
  2:7,13,15,22 4:8
  6:2 21:14
**answer** 23:23
  29:11 40:15
**answers** 28:2
**anybody** 23:5
**anymore** 42:20
**apologies** 45:23
**apologize** 14:22
  42:12

Veritext Legal Solutions
866 299-5127

[apparently - certainly]

| | | | |
|---|---|---|---|
| **apparently**  14:6,6  14:16,19,20 18:21  33:1 | **b** | **black**  3:18 10:23  10:24 41:17 | **california**  1:2  48:22 |
| **apply**  26:15 | **baby**  17:18 | **block**  44:15 | **call**  4:17 12:4 |
| **appreciate**  39:1,14  42:7 | **back**  4:10 8:7  10:13 11:16,18 | **blunt**  35:6 | 13:22 25:8 27:25  33:9 36:18 |
| **appreciated**  18:8 | 14:4 30:10 33:12 | **bluntly**  17:15 | **called**  6:3 43:1,2 |
| **approach**  4:17  31:18 32:22 41:23  44:5,6 | 34:8 35:3,12  36:12 38:22 39:9  40:15 41:19,19  43:14,23 45:20 | **blvd**  1:15 2:21 | **calling**  27:21 |
| | | **board**  4:25 22:11  30:9 31:14 39:18  43:11,13 | **caltrans**  36:3  44:11 |
| **approached**  15:3 | **bag**  35:22 | **bonus**  42:2 | **camp**  28:24 |
| **approximations**  5:7 | **banger**  32:17 | **bottom**  39:11 | **camping**  28:19 |
| **area**  6:18 28:17  31:7 38:8 41:17 | **barbara**  23:3 | **brandon**  2:19 3:5  33:5 38:12 39:13 | **cantley**  3:20 4:23 |
| | **bargaining**  10:1 | | **capability**  17:3  20:25 |
| **areas**  5:9 39:7  40:6 | **based**  4:9,17 5:9  5:12 6:1 11:7  22:18,19,19 30:13  31:18 33:11 44:5  44:6,7 | **breaks**  38:20 | |
| | | **bridges**  5:6 | **care**  16:14,14  18:24 32:21 45:11 |
| **argued**  30:25 | | **brief**  4:22 18:17  46:15,19,22,24 | **careful**  10:11 |
| **arguing**  15:2 | | | **carol**  3:13 12:9  38:24 |
| **arguments**  15:5 | **basis**  31:10 | **briefing**  17:23  18:17 19:6 44:23  47:2 | |
| **arrest**  34:7 | **bdyoung**  2:23 | | **carter**  1:13 11:20  39:23 |
| **artery**  8:15 | **becoming**  6:20 | **briefly**  5:1 | |
| **asked**  43:10,12 | **behalf**  2:11 20:11 | **bring**  24:21 26:18  26:21 | **case**  1:6 |
| **asking**  16:16 | **belief**  14:7 34:3 | | **causalities**  30:1 |
| **assembled**  13:12 | **believe**  31:12 | **bringing**  11:9  26:20 | **cause**  8:12 |
| **assessment**  29:14 | **belongs**  44:3 | | **causes**  29:21 30:14  43:14 |
| **assist**  38:9 | **best**  22:21 32:15  36:6 48:9 49:6 | **broad**  42:19 | |
| **attorney**  2:3 48:13  49:10 | | **brooke**  3:9 | **cdc**  8:21,24 22:2  28:4 |
| | **better**  7:15 15:18  15:23 16:1,12,13  17:8 19:14 24:4  25:22 26:6,20  32:1 37:1 46:25  47:8 | **brought**  41:5 | |
| **attract**  23:9 | | **bryan**  18:22 | **center**  16:24 26:12  26:19 45:19 |
| **audio**  48:7 49:3 | | **build**  6:7 23:8 37:1  40:7 42:3 | |
| **austin**  1:24 48:2  48:20 | | | **centers**  10:2 25:3  26:13,25 27:17  32:12 35:1 43:1  43:23 |
| | **big**  32:22 39:7 | **building**  23:8  36:25 | |
| **authority**  1:14 4:8  18:18,19 | **biggest**  39:5 | | |
| | **bipolar**  26:11  28:23 | **buildings**  37:2  39:7 | **central**  1:2 |
| **available**  12:7,20  19:17 | | | **centric**  33:11 |
| | **birotte**  3:7 7:13 | **bullet**  14:24 22:13 | **ceo**  29:19 |
| **average**  34:2 | **bit**  4:15 5:25 17:21  25:22 26:20 37:23  42:4 | **byron**  3:17 | **certain**  7:20 30:18 |
| **avoid**  9:23 | | **c** | **certainly**  34:9  43:17 |
| **aware**  4:21 9:14  10:20 | | **c**  2:1 4:1 | |
| | | **ca**  1:16 2:7,15,22 | |

[certainty - court]

certainty 30:18
certificate 48:1
  49:1
certify 48:3 49:2
cesspools 27:1
cetera 13:13,17
  15:2 43:2
chair 4:24
change 22:24
  32:24
changing 10:3
chase 26:14
chavez 3:15
che 1:24 48:2,20
check 4:6 17:5
chew 26:8
choice 15:25 16:3
  23:11 28:16 31:2
  31:4 43:25 47:9
choices 27:9 39:16
  44:1,2
chou 3:16
christina 3:10
circuit 17:24
  18:19 35:5 45:2
  46:18,22
cite 34:6
cities 41:12 43:16
city 1:7 2:13 10:1
  16:19,25 17:12,18
  22:23 27:14 29:6
  31:1 34:16 35:14
  35:17 36:2,8,9,11
  37:18 39:2,17
  40:19,23 44:3,7,10
  44:19 45:18 46:1
  46:14
city's 38:13
claiming 13:6,7
clear 6:24 7:14
  18:21,21,22,25

19:2,4 41:2 45:2,5
  45:6,12,16
cleared 31:20 36:1
clearing 7:12
clears 7:16
close 9:19
cohesive 15:1
color 40:9,11
combining 34:14
come 4:10 6:21
  8:20 14:23 19:7
  19:13 24:14 25:13
  26:11 28:24 30:10
  31:19,24,25 32:11
  34:21 38:15 40:15
  40:22 41:18,19
  47:5
coming 42:25
comment 38:24
  45:18
common 17:4
communities 22:5
  40:9
community 6:9,18
  34:11 41:18
complete 22:7
compliant 8:21
complicated 28:12
component 23:24
comprehensive
  24:25 27:3 32:9
compromise 36:6
conceptualize
  20:11 25:25
concern 14:5
  32:19
concerned 8:9
  31:4
concerns 16:8
concerted 34:14

concluded 47:14
condition 31:23
conditions 8:23
conduct 21:16
conducted 29:13
confidence 43:3
confident 43:4,5
confidential 16:20
confidentially
  45:21
conflict 12:18
congregate 9:4
consequence 7:9
consequences 6:16
considerations
  26:7 27:25
consistently 15:20
constraints 47:1
constructed 6:8
context 4:19 38:3
continue 10:17
  12:5 13:21,22
  40:5
contract 8:24
contributing
  40:11
conversation 4:9
  8:7 19:10 27:18
  28:14 35:6 39:3
conversations
  36:11 39:18
conveyed 14:7
cooperate 10:9
cooperation 32:25
  34:17
copies 5:2,21
copy 5:2
coronary 8:15
coroner 29:19
correct 18:20

correctly 30:12
corrupt 41:1
cost 16:21,23,25
  17:1,2,2
council 10:10
  27:22 42:23 43:4
counsel 48:10,13
  49:7,10
counseling 36:23
count 5:13 10:21
country 39:5
county 5:10,11
  8:10 9:25 20:11
  20:21 24:12 29:13
  34:16 35:13 36:2
  36:9,10,10 37:14
  37:22 38:4 39:2
  39:12,17 40:19,23
  41:12 44:3,18
county's 30:22
  38:14
countywide 5:8
couple 9:16 11:4
  27:9,25 34:22
  37:4
courage 44:16
course 6:4,13 8:9
  8:19
court 1:1 4:2 5:15
  5:18,22 7:3 8:3,6
  8:9 9:7,10,14,22
  10:17,22 11:1,6,16
  11:23 12:12,22
  13:4,24 14:3,7,10
  14:21 15:2,9,20
  16:5,16 18:5,15,24
  19:2,4,6,13 20:1,3
  20:8,15,17 21:4,8
  21:18 22:6,6,11,17
  24:1,8,19 25:14,18
  26:3,10 27:7,19

Veritext Legal Solutions
866 299-5127

[court - elizabeth]

28:10,14 29:15
30:6,6,7,24 31:17
32:8 33:14,21,24
34:2,7 35:10,19
37:12 38:1,19
39:25 42:9 44:16
44:25 45:5,10,15
45:23,25 46:4,7,11
46:12,16,25 47:11
**courteous**  11:19
**courts**  34:11
**covid**  4:19 8:11,19
12:24 13:2,4,5
14:11 15:22 17:16
19:11 23:2,17
27:22 28:5 29:11
29:12 34:25 42:22
**covid's**  28:20
**cozy**  35:24 44:9
**create**  7:1 32:1,3,4
**created**  6:16 17:9
**creating**  47:8
**creative**  31:15
**crisis**  9:5 12:24
13:2,4,5 14:11
15:22 17:16 19:11
23:3 42:22
**cristina**  43:11
45:16
**criticism**  36:20
**cross**  21:14
**crying**  12:25
**current**  39:18 40:4
**cv**  1:7

**d**

**d**  2:19 4:1
**da**  24:6
**data**  4:18 12:14
18:14 22:1 26:4
34:1

**date**  1:11
**david**  1:13
**day**  36:15 41:11
46:20
**days**  21:15 30:10
**deal**  25:20 35:5
43:15
**death**  8:13 31:4
**deaths**  8:10 29:24
29:25 30:15
**decades**  17:9 39:3
39:4
**decisions**  28:5
30:4,18
**deeply**  42:24
**defendants**  1:8
2:11
**definitely**  25:11
**definition**  28:13
37:9
**definitions**  5:9
**deflect**  37:5
**deflected**  36:16
**deflection**  37:8
**deliberate**  39:16
**demanding**  14:8
**dense**  6:6
**density**  40:7 42:2
**department**  20:21
29:17,18
**departments**  30:9
**depending**  19:7
**deployed**  6:1
20:22
**designed**  13:8
**desirability**  7:24
**desirable**  7:20
**destroying**  40:8
**development**
41:13,14 42:1

**dhs**  13:17
**different**  10:8
33:13
**difficult**  17:20
31:2
**digital**  48:7 49:3
**direct**  24:15
**disadvantaged**
40:17 41:9,10
**disagree**  45:22
**disappointed**
23:14
**disappointment**
42:15
**disburse**  25:6
**disclose**  16:20
**discourtesy**  42:11
**discriminatory**
31:1
**discuss**  20:10
**discussion**  4:14
9:24 10:4 11:17
11:18 13:9,20
16:5 17:23 18:7
22:8 40:18
**disease**  8:15 29:24
**disparities**  11:9
**disputes**  44:18
**disrupting**  9:6
**dissuade**  46:23
**distancing**  9:13
23:4
**district**  1:1,2
**disturbed**  42:25
**division**  1:2
**doc**  1:7
**document**  43:3
**doing**  8:16 14:23
21:9 26:17 27:14
37:24 38:23 39:14
40:8 46:23

**dope**  32:17
**dr**  24:1,10
**draw**  6:2,20 7:25
**driven**  12:14,24
18:14 33:23 34:1
34:24
**drivers**  8:15
**driving**  22:7
**drug**  29:23
**duality**  32:20
**duly**  48:5
**duration**  10:6
**dusseault**  3:19
**duty**  32:1
**dwelling**  5:9
**dynamic**  10:3

**e**

**e**  2:1,1 4:1,1
**earlier**  45:18
**early**  22:5
**easier**  29:11
**easiest**  28:6,7
**easy**  7:21
**economically**
40:17 41:9,9
**ed**  39:22
**edelman**  39:22
**effort**  6:3 7:10
17:17 21:13,22
34:14,24 38:21
**efforts**  4:20 22:4
37:19
**egress**  27:11
**eight**  14:24 22:12
**either**  40:19
**element**  21:13
25:9 35:8
**elements**  21:11
**elizabeth**  2:4 3:4
3:16

Veritext Legal Solutions
866 299-5127

[employed - give]

| | | | |
|---|---|---|---|
| **employed** 48:10 48:13 49:8,10 | **everybody's** 26:17 | **figured** 13:15 | **forth** 30:16 36:12 |
| **employee** 48:13 49:10 | **everything's** 14:17 | **fill** 7:17 | **forward** 20:5 23:14 |
| **empower** 43:15 | **exactly** 11:1 19:12 | **finally** 17:21 42:23 | **foster** 40:5 |
| **empowered** 44:22 | **exaggeration** 42:5 | **financial** 41:5 | **found** 8:14 |
| **encampment** 6:3,5 6:6,8,10,12,24 7:1 7:12,14 | **example** 6:2 37:22 37:24 | **financially** 48:14 49:11 | **four** 21:15,21 |
| **encampments** 9:1 9:3,4 37:2 32:5 36:18 | **examples** 40:6 | **find** 22:2 28:2 30:13,21 31:23 38:8 | **frame** 25:9 |
| **endanger** 14:11 | **excellent** 42:14 | **finding** 28:9 | **framework** 20:12 25:10 |
| **ended** 6:20 | **excluded** 11:25 | **fine** 26:21,22 | **frankly** 17:15 19:24 20:9 23:15 30:5 31:16 35:22 42:23 |
| **enforcement** 20:25 34:9 | **excuse** 8:4 | **finish** 33:8 35:7 | |
| **enjoin** 44:13,17 | **excuses** 19:18 | **finite** 24:16 | **freeway** 15:24 16:10 23:12,13 27:11 29:5 44:8 |
| **enjoined** 36:3 | **existent** 24:24 | **first** 4:10 6:17 14:21 18:8 20:13 21:11 25:4 34:3 38:20 42:11,12 45:18 | |
| **entire** 6:11 | **expected** 10:9 19:19 42:10 | | **freeways** 21:3,14 22:23 30:5 31:20 |
| **entirely** 30:12 | **expense** 32:14 | **fit** 17:7 | **friday** 1:11 |
| **entitlements** 38:13 | **experience** 4:24 7:13 38:6 | **five** 21:15 24:10 | **frighten** 32:23 |
| **environmental** 19:19 | **experiencing** 8:13 29:16 | **fixing** 23:25 | **funding** 10:13 |
| **equally** 11:12 37:19 | **extended** 10:12 | **floor** 1:15 | **funds** 38:15 |
| **equity** 4:23 10:19 11:9 | **extra** 42:3,3 | **flows** 25:7 | **funnel** 25:3 |
| **es** 48:4 | **f** | **focus** 28:17 37:21 | **further** 47:4,10 48:12 49:9 |
| **especially** 27:21 | **fact** 36:20 | **focused** 21:13,25 | **future** 18:12 42:18 |
| **esquire** 2:4,12,19 | **factored** 27:15 | **focusing** 33:12 39:2 | **g** |
| **essentially** 6:11,25 | **factors** 40:11 | **folks** 6:9,24 7:6,7 8:13 9:2,21 21:24 22:22 26:12,18,24 28:5,23 31:23 | **g** 4:1 |
| **establishment** 16:1 | **fair** 41:15 | | **gabriel** 21:15 |
| **estimate** 5:11 | **falls** 28:12 | **following** 22:15 | **gang** 32:17 |
| **estimating** 4:12 | **false** 38:17 | **food** 17:2 36:23 | **gap** 23:22 |
| **estimations** 5:5 | **far** 12:23 22:24 26:20 | **force** 26:18 27:4 | **generally** 7:17 |
| **et** 1:4 13:13,17 15:1 43:2 | **fault** 33:2 40:25 | **forced** 23:7 31:25 47:7 | **generous** 22:23 |
| **eventually** 26:24 | **fearful** 32:4,5 | **foregoing** 48:3,4 49:4 | **gentrification** 40:5 |
| **everybody** 20:10 39:23 44:19 | **feasible** 15:11 | **forever** 25:19 32:6 | **genuinely** 45:11 |
| | **federal** 35:16,20 35:24 36:16,18 37:5,10,21,25 | **forgot** 22:14 | **getting** 12:8 14:25 17:2 21:20 26:5 27:4 38:10 43:13 |
| | **feeding** 36:5 | | **give** 4:10 10:6 12:4 13:10 15:11 18:6 32:15 36:17 |
| | **feet** 9:11 | | |
| | **fema** 12:25 27:21 | | |
| | **figure** 41:6 | | |

Page 5

**[given - idea]**

| | | | |
|---|---|---|---|
| **given**  20:18 23:10 29:8 42:1 | 37:5 | 44:6 | **honorable**  1:13 |
| **giving**  4:22 19:23 24:9 | **grassy**  41:16 | **hears**  15:20 | **hope**  15:14 16:1 26:19 40:22 |
| **go**  6:10 8:1,6 22:4 23:7,9 24:12 33:3 33:5 37:16 38:20 39:3,9,17 40:15,16 40:18 44:15 | **great**  5:24 31:11 32:14 | **heart**  29:24 | **hoped**  10:6,14 13:14,16 34:13,15 34:16 |
| | **ground**  36:18 | **heidi**  3:11 4:7 5:18 18:8 29:22 41:5 42:11,21 43:9,17 | **hopefully**  26:16 |
| | **group**  47:5 | | **hoping**  9:23 19:13 22:9 46:24 |
| | **guidance**  8:22 22:2 28:4 | **heidi's**  40:24,25 | |
| **goal**  24:24 25:16 40:19 | **guide**  30:3,6,7,17 | **help**  9:16 19:25 26:15,16 30:3 38:12 | **host**  20:21 21:1,16 |
| **goals**  11:8,10 | **guidelines**  8:25 9:1,8 | | **hotel**  12:3 |
| **godawful**  36:21 | **guides**  33:18 | **helpful**  12:11 | **hotels**  9:19 14:16 |
| **goes**  33:15 | **gum**  26:8 | **helping**  20:5 | **hours**  18:4 34:21 39:10 46:16,20 |
| **going**  4:3 5:1,15 5:22 6:19 7:16 9:3 10:5 12:7 13:19 13:20,21 15:4,25 17:19,20,22 18:7 18:12 19:8,13 22:22 23:6,10,12 23:16,19 25:13,18 25:21 26:18,24,25 27:1,2,4,8 28:19 28:20,20 29:6,22 30:10 31:7,13,13 31:20 32:3,3,8 33:11 34:14 35:2 35:5,16,17 36:11 36:24,24 37:16 40:15,16,17,21 41:16 42:16,18 43:20,21 44:7 45:19 46:12,17,22 | | **herding**  19:11 | |
| | **h** | **hereto**  48:14 49:11 | **housed**  6:21 |
| | **hallway**  13:23 | **hey**  8:1 | **housing**  6:7,11,14 6:15,20,24 7:2,11 8:2 14:13,16 17:11 24:9,22 25:12,15,20 26:22 39:12 42:4 |
| | **hand**  30:25 31:1 31:22 | **high**  11:1 29:21 40:10 | |
| | **hands**  13:15 | **highest**  10:22 31:3 | |
| | **happen**  31:13 | **highly**  6:6 21:25 28:4,13 | |
| | **happened**  9:17 | | **huge**  9:13 |
| | **happens**  15:14 43:5 | **hilarious**  40:1 | **human**  1:4 |
| | | **historical**  11:13 42:8 | **humane**  14:23 |
| | **happy**  36:19 | **historically**  41:17 | **humanely**  19:24 28:24 29:2 46:25 47:6 |
| | **hard**  5:2,21 | **history**  40:25 | |
| | **harming**  23:5 | **hit**  9:20 | |
| | **hawk**  27:1 32:8 36:24 | **hold**  21:5 30:24 | **humanity**  18:1 |
| | | **home**  6:3 | **humble**  34:3 |
| | **hazard**  19:19 | **homeless**  1:14 5:13 15:18,24 20:23 29:22 32:18 34:2,10 37:25 38:5,12 41:15 | **hundred**  26:10 34:20 |
| **good**  12:12 24:7 26:19 33:21,24 34:8,9,10,10,11 44:1 | **hazardous**  16:10 | | **hurt**  47:7 |
| | **health**  15:1,9,11 23:24 24:4,11 29:4,17,18,18 31:5 33:18 | | **hyde**  49:2,21 |
| | | | **hygiene**  15:20 |
| | | **homelessness**  8:14 8:25 29:17,19 | **hypothermia**  17:5 |
| **gotten**  37:3 | **hear**  13:3,5,6 19:19 21:5,6,8 23:15 34:13,15,16 36:11 42:16 | **hondo**  21:15 | **hypothetically**  23:1 |
| **government**  35:16 35:18,20,24 36:17 | | **honest**  40:18 | |
| | | **honor**  12:10,16 20:7 25:24 35:15 37:14 45:4,14,17 | **i** |
| | **heard**  23:15 | | **idea**  24:11,22 30:8 30:12 34:19 |
| | **hearing**  1:10 12:22,23 14:15,17 22:20 31:18 44:4 | | |

Veritext Legal Solutions
866 299-5127

[identified - leg]

| | | | |
|---|---|---|---|
| **identified** 28:23 29:25 35:13 | **inertia** 18:20 38:20 | **john's** 28:17 | **l** |
| **identify** 4:5 21:23 25:5,11 29:20 | **influence** 12:2 | **joined** 13:14 36:3 | **l.a.** 5:11 12:17 39:12 |
| **identifying** 35:12 | **information** 18:9 21:20 | **joining** 4:8 | **la** 1:4 |
| **imaginable** 14:18 | **initially** 27:4 | **jr** 3:7 | **lacity.org** 2:16 |
| **imagine** 37:4 | **initiative** 29:19 | **judge** 11:20 22:14 38:25 39:23 | **lack** 7:15 |
| **immediate** 14:8 | **injunctive** 17:22 | **jump** 5:4 | **lacking** 37:8 |
| **immediately** 15:14 17:19 24:20 26:22 27:16 41:7 | **injustice** 11:13 | **k** | **lahsa** 4:25 11:7 13:12 19:18 21:1 22:1 29:19 35:21 36:4,8,9,13 40:25 41:3 44:17,17,19 |
| **impact** 41:14 | **input** 19:22,23 | **keep** 28:24 29:1 43:3,10,13 | |
| **impediments** 12:23 | **intend** 46:12 | **keeping** 41:4 | **lahsa's** 35:20 38:13 |
| **implement** 20:5 30:3 47:6 | **intended** 14:11 26:5 | **kes** 1:7 | **landes** 2:5 |
| **implementation** 18:16 | **intends** 46:11 | **key** 4:20 9:17,25 30:20 43:8 46:4 | **language** 22:3 |
| **important** 21:12 39:15 40:3 43:12 | **intention** 19:9 | **kickstart** 37:3 | **lapd** 20:24 |
| **impossible** 15:4 17:20 | **interested** 48:14 49:11 | **kid** 19:15 | **larae** 3:20 4:23 11:21 |
| **impressed** 27:20 27:22 | **interrupt** 28:15 | **kind** 4:4 11:10 20:25 21:22 28:12 30:1,2,3,10 32:9 34:14 37:16,21 | **large** 6:5 40:20 |
| **improve** 38:3 | **intervenors** 37:17 | | **larger** 40:21 |
| **inaccurate** 11:2 | **interventions** 8:17 | **know** 4:11,20 5:13 6:18 9:15,15 10:16,19 18:10,11 19:16,17 21:23 22:1,14 23:4,23 24:2,15,17 25:10 25:12,21,23 26:13 26:18 27:11,14 28:1,1,2,3,3,8,19 29:2,23 30:11,18 31:9 32:13 35:13 36:14 37:14,18,19 38:5,21 39:21 40:6,14,24 41:3,5 42:2,16,17,18,24 43:1 | **lastly** 4:22 |
| **inaudible** 39:21 | **involuntarily** 26:11 | | **latching** 25:24 |
| **incarcerate** 34:5 | **involved** 15:12 32:7 35:17,18,21 35:23,24 37:19 44:11 45:10 | | **latitude** 10:7 |
| **includes** 24:5 | | | **laughter** 39:24 40:1 |
| **including** 16:8 | **issue** 26:1,1 27:24 28:23 44:25 46:11 46:17,21 47:3 | | **lauren** 3:18 |
| **income** 41:17,20 | | | **law** 20:25 32:12 34:9 |
| **inconveniencing** 16:4 | **issued** 29:13 46:15 | | **lawsuit** 36:14 |
| **increase** 37:18 42:24 | **issues** 31:6 | | **leading** 8:12 |
| **increasing** 27:16 35:11 | **it'll** 16:12 | | **learned** 4:16 5:25 |
| **increasingly** 40:21 | **j** | **knowledge** 48:9 49:6 | **lease** 10:12 |
| **individual** 9:3 | **jenny** 3:15 | | **leases** 10:5 43:20 |
| **individuals** 11:11 | **job** 1:25 36:6 38:11,13,14,14 42:14 | | **leave** 23:18 29:6 44:12 46:8 47:9 |
| | **jobs** 38:16 | | **led** 29:17 |
| | **joe** 43:2 | | **ledanski** 49:2,21 |
| | **john** 17:3 26:12 | | **left** 9:5,24 |
| | | | **leg** 33:9 |

[lens - necessary]

lens   11:9
lessons   4:16 5:25
letting   36:19
level   7:1
leverage   10:1
   42:23 43:11
life   16:3,5 23:12
   40:3
lights   24:20
limited   31:10
link   37:25
linkages   38:8
listen   31:17 43:11
listening   14:19
   31:17 47:6
literally   28:18
   34:25
litigation   38:4
little   4:15 5:25
   17:21 25:22 26:20
   28:11 37:23 42:4
lived   4:24
lives   8:18 25:21
living   4:13 6:10
   22:22 39:9,10
llp   2:5,20
located   16:17
location   1:14 4:17
   6:1 7:9,23 12:8,18
   12:21 15:3 22:18
   22:19 24:13 31:6
   31:18 33:11 44:6
   44:7
locations   7:20,22
   19:17
long   10:4,13 16:7
   40:25 41:23 43:19
   44:11
longer   17:21
look   8:20 28:16
   38:2 41:12

looking   8:11 29:20
   32:25
looks   24:18,19
   27:18
loose   35:2
loosely   22:3
los   1:7,14,16 2:7
   2:13,15,22 4:7 6:2
   21:14
lose   8:18
lot   11:3 16:12
   24:20 25:25 32:4
   36:22 43:24
lots   14:18 15:15,16
   15:17 16:18 19:15
   24:5 25:1 34:15
love   36:20
low   40:12 41:17
luxury   39:7

**m**

magnificent   17:16
main   2:14 29:21
   30:1,13
making   40:9 41:14
manatt   2:20
manatt.com   2:23
manner   29:3
maple   16:9
marcus   2:12 3:6
   19:5 43:11 45:16
   45:17,24 46:2,6,10
   46:14
mark   9:20 21:19
marks   13:24
marston   3:11 4:7
   4:7 5:17,20,24 7:5
   7:19 8:5,8 9:9,12
   9:15 10:16,18,24
   11:4,7,20,24
martinez   3:3 8:4
   12:9 18:4 33:5

38:11,24
matt   3:12 45:12
matter   44:2
mayor   10:7,9
   27:20 42:22 43:10
   43:15
mayor's   12:25
mclain   3:17 18:23
   19:1
mean   5:13 19:16
   28:22 37:3
meaning   8:22
meaningful   20:4
meaningless   18:13
means   45:7
media   3:16 13:25
medical   8:23 17:5
   21:2,12 28:18
meeting   12:19
   13:9 47:4
members   39:18
mental   15:1,9
   23:24 24:4,11
   29:18
mentally   40:16
mere   9:18
message   18:21
   34:4
michele   3:3 8:3
   36:14
microphone   4:6
middle   36:4
mike   16:23
milestones   42:19
miller   3:10
minimum   20:13
   25:11
minute   5:15 7:3
   17:13
miscommunicated
   33:2

miscommunicati...
   45:6
misguided   14:21
misspent   41:4
misspoken   45:25
mitchell   2:4,8 3:4
moment   9:23 14:4
   28:15 44:15
monday   44:24
   45:7,15 47:3
money   32:15
   34:12,17 36:5
   41:1,4,4 44:20
   46:8
moore   16:23
mortality   29:20,21
motel   10:12 15:13
   16:13
move   6:24,25
   14:12 15:25 16:2
   16:5 23:10 27:8
   27:10 28:20 38:9
movement   17:14
moving   7:10 9:3
   16:3 19:10 27:3,7
   31:6
multidisciplinary
   20:22
multiple   33:12
murray's   43:1
myers   3:8 12:16
   13:3 45:14

**n**

n   2:1,14 4:1
name   39:20
naturally   7:6
nature   7:15
near   6:7 21:3
necessarily   26:5
necessary   44:14

[need - permanent]

**need** 8:23 11:14
14:10 17:16 18:10
18:11 22:4 25:5
25:10,10 26:8,8
27:17 28:2 30:4
34:4 36:15 37:9
37:10 40:13,13,14
41:6,6,7,12 47:4
**needed** 18:9
**needs** 20:14 23:24
29:14 30:13,17
33:23,25 41:22
**neglect** 39:4,4
**neighborhood**
16:2 23:11 28:25
**neighborhoods**
27:8,9,10
**neither** 48:10 49:7
**network** 38:5
**never** 14:10 41:1,2
**new** 6:25 7:2
40:24
**night** 18:3 45:11
**nights** 34:22
**ninth** 17:24 18:19
35:5 46:18,22
**nobody's** 31:9
**non** 24:23
**noon** 12:4
**nope** 5:22,22
**notary** 1:24 48:1
48:21
**notes** 21:19
**notice** 9:24 20:18
20:18 23:2
**notify** 28:20
**number** 13:11
14:12 20:19 21:5
22:8 23:7 42:10
44:13,16

**numbers** 5:7 12:7
16:17 40:10

**o**

**o** 1:13 4:1
**obstacles** 13:7
**obvious** 10:4,12
43:19
**obviously** 21:24
26:1 27:15 28:3
37:14,17
**occupants** 45:20
**office** 20:24
**officer** 48:2
**officers** 16:24
**offices** 13:12
**oh** 13:5 45:24
**okay** 5:17,18,20
8:8 10:17 11:22
11:24 18:2 19:2
24:6 27:9 28:16
29:15 30:6 42:13
47:1,1,9
**old** 36:6 44:18
**older** 39:23 43:25
**olympic** 2:21
**once** 29:4
**ones** 28:6,7
**online** 9:20 25:13
**open** 5:1 11:21
28:16 35:6 41:16
**opening** 25:12
36:21
**operation** 9:25
43:8 46:4
**operationalized**
6:9
**opinion** 18:11
22:24 44:10
**opportunities**
14:14

**opportunity** 31:21
46:15
**opposed** 33:16
46:19
**options** 6:14
**order** 9:24 10:14
32:23 46:11,15,17
46:21 47:3
**ordered** 19:21
**oriented** 29:3
32:22
**ought** 25:3,3 36:11
**outcome** 48:15
49:12
**outlined** 11:10
**outreach** 20:14,14
20:14,20 21:1,16
28:8 38:7
**outside** 28:13
29:12 30:20
**overall** 37:24
**overdose** 8:14
29:24
**overnight** 14:12
**overpass** 15:10
**overpasses** 5:6
22:25
**overview** 4:10,22
10:19

**p**

**p** 2:1,1 4:1
**pace** 37:2
**padilla** 3:14
**page** 9:7
**pages** 18:18
**paid** 39:10
**paragraph** 9:10
**pardon** 11:17
**parking** 14:18
15:15,16,17 16:12
16:18 19:15 24:5

24:20 25:1 32:4
34:15 36:22
**part** 4:23 9:13
14:6,8 21:22
36:13 37:23
**particular** 5:12
7:19 8:10 39:19
**parties** 48:11,14
49:8,11
**parts** 6:2
**party** 18:6 44:14
**pass** 41:13
**passing** 17:7
**pat** 39:8
**path** 10:15
**peer** 38:5
**people** 4:12 5:8,11
6:14,21,25 7:2,11
7:22 8:22 10:13
13:10,11 14:11
15:3,10 17:4,7,17
17:18 19:11 23:4
23:9 24:11,14,25
25:15 27:8,10
29:3,3,14 30:14
31:19 32:11,12,13
32:21 33:11 34:5
34:23 35:2 37:25
38:6,9 39:8,14
40:11,15,16,17
41:6,6,8,15,18,18
42:1,25 43:6,21,21
44:5
**perceive** 23:17
**percent** 10:21,22
11:2,3 16:12,13
26:10 39:6,8
**period** 10:1 16:6
19:22 23:5
**permanent** 6:7,10
6:14,15,19 7:11

[permanent - ratios]

| | | | |
|---|---|---|---|
| 8:2 | **point** 10:20 20:4 20:18 23:14 | **principles** 11:14 | **protect** 31:2 |
| **person** 15:19 22:19 26:15 34:2 34:10 39:12 | **points** 14:24 22:13 33:8 44:19 45:17 | **printed** 5:2 **prior** 7:2 8:11 48:4 | **prove** 16:22 **provide** 7:24 |
| **personally** 23:22 | **police** 16:23 | **prioritization** 6:19 7:25 | **provided** 6:14 **providing** 11:13 |
| **persons** 29:16 45:10 | **policies** 40:4 41:13 **polite** 13:21 | **prioritized** 6:22 7:6 | 37:14,15 **public** 1:24 4:8 |
| **perspective** 28:7 30:22 | **political** 36:5 44:20 | **priority** 33:19 | 11:25 12:2,19,20 29:4,17 48:1,21 |
| **phase** 20:13 | **population** 8:12 10:21 28:4,12 | **privacy** 7:21 **private** 8:7 12:15 | **pulling** 33:16 **punching** 35:22 |
| **phases** 20:13 **phelps** 2:20 | 30:21 31:5 38:12 40:20 | 13:20 **privately** 12:13 | **put** 8:25 16:19 29:4 32:14 33:1 |
| **phillips** 2:20 **phone** 24:2 | **populations** 11:12 30:19 33:13 | 30:25 **probability** 17:6 | 43:23 **putting** 10:8,13 |
| **picking** 32:16 **pictures** 9:16 | **portion** 14:9 **position** 10:8 | **probably** 17:22 23:24 32:15 39:22 | |
| **piece** 7:25 10:18 10:19 16:9 34:19 | 40:24 **positive** 23:20 | **problem** 17:4,10 26:14 37:6 39:5 | **q** |
| **pieces** 34:20,20 **pilot** 28:17 | 33:4 **possessions** 26:21 | 44:1 **proceeding** 47:13 | **q3** 25:12 **q4** 25:12 |
| **pitiful** 18:6 **place** 6:4 7:16 | **potential** 33:16 **potentially** 7:7 | 49:4 **proceedings** 48:3 | **qualified** 48:7 **quality** 16:11 |
| 14:14 15:22 22:8 33:12 | **power** 36:5,17 44:20 | 48:4,5,8 49:6 **process** 33:10 | **question** 10:4 28:8 32:22 37:7,20 |
| **placement** 26:1,7 27:25 28:5 30:4 | **preference** 16:6 **prepared** 49:3 | **productive** 44:25 **progress** 29:7 | **questions** 10:12 43:19 |
| 30:17 **placements** 28:9 | **present** 3:1 12:6 **presentation** 12:1 | **project** 4:20 9:17 28:17 30:20 39:20 | **quick** 24:9 **quickly** 6:17 16:2 |
| 33:18 **plaintiffs** 1:5 | 12:5,13,14 13:8 42:19 43:9,14 | 41:13,14,19,20 **projects** 41:25 | 20:6 22:25 31:13 34:18 |
| 37:18 **plan** 18:15 22:12 | **presenters** 4:3 **presenting** 42:14 | 42:1 **prominent** 6:2 | **quit** 15:12 **quite** 17:15 23:14 |
| 24:25 29:9,10 32:9 34:25 45:19 | **press** 11:25 **presser** 36:19 | **promise** 18:12 **prong** 25:8 | 35:22 42:23 **quo** 25:19 |
| 45:21,22,24 46:1 **plans** 38:2 | **pressure** 26:15 **pretty** 27:14 29:6 | **properties** 35:12 35:14 | **quote** 24:13 39:9 |
| **players** 36:15 **please** 10:17 20:8 | **prevention** 20:23 29:20 | **property** 16:9 34:19,20,21 | **r** |
| **plus** 43:22 **pneumonia** 17:6 | **primary** 8:15 | **proponent** 24:8 **propose** 19:14 | **r** 2:1 4:1 **racial** 4:23 10:19 **rapid** 37:2 **rate** 31:4 39:6 **ratios** 5:12 |

[read - segment]

**read**  41:24
**real**  8:1
**reality**  42:8
**realize**  39:22
**really**  6:17 8:11,16
  8:23 18:8 21:24
  31:2,12 35:25
  36:7 39:13,14
  41:2 42:6,7 46:18
**reason**  7:14 13:11
  18:17 39:5
**reasons**  8:18
**reassemble**  12:3
**rec**  45:19
**receptive**  38:7
**recess**  12:2 13:19
  13:22 14:2,4 33:4
**recognition**  14:22
**recognize**  39:15
  40:3
**recognizing**  11:12
  41:8
**recommendation**
  22:2
**record**  14:1,9 18:9
  19:12,25 27:21
  33:1 39:25 42:12
  45:9 47:12 48:9
  49:5
**recorded**  48:6
**recording**  48:8
  49:4
**recreation**  16:24
  27:17 35:1
**recreational**  10:2
  25:2 32:12 43:1
  43:23
**rectifying**  11:12
**redevelopment**
  41:16

**redouble**  22:4
**reduced**  48:6
**reflect**  39:25
**regardless**  17:23
**related**  29:24,25
  30:15 48:10 49:7
**relates**  9:1
**relationship**  35:23
  44:9
**relative**  48:12 49:9
**relatively**  40:24
**relay**  14:5
**release**  34:6
**relief**  17:22
**relocate**  6:11
**relocated**  6:15
**remarkable**  27:15
**remember**  25:14
**repeat**  27:20
**report**  16:20 29:13
  33:18
**reported**  1:24
**reporter**  4:5 13:24
  47:11
**reporting**  35:12
**represent**  24:3
  37:16
**representation**
  10:25 23:21
**represented**  30:9
  43:8
**representing**
  30:12
**requests**  46:14
**research**  44:15
**resolve**  14:24
**resource**  6:20 8:2
**resources**  6:22
  11:13 24:15
**respect**  20:13,20
  21:10,11 22:1

26:7 27:13 28:5
  29:12 30:2 33:10
  37:22 46:2,10
**respond**  43:14
**response**  4:19 13:1
**responsibility**
  42:13
**responsible**  13:1
**result**  29:1
**rethought**  17:21
**return**  32:15
**ridiculous**  14:12
  15:5 16:21 19:10
**right**  5:4 7:3 8:7
  9:14,22 11:6,16
  13:22 15:19 20:21
  21:1,7,12,25 22:16
  25:6,17 26:17
  28:7 30:8,8,19
  32:14 35:25 38:14
  38:15,22 43:5,14
  43:17 46:5 47:1
**rights**  1:4
**rio**  21:15
**river**  21:14,15,15
**rivers**  21:3,14
**road**  23:13
**roads**  21:2,13
**room**  2:14 9:17,25
  16:14 30:20 39:23
**rooms**  9:20 15:13
**rooted**  42:8
**rough**  5:7
**row**  38:8
**run**  10:5
**running**  19:20

s

**s**  2:1 4:1
**safety**  16:8 29:4
  31:6 32:20

**san**  21:14
**sanitation**  15:15
  16:25 24:21 32:2
**sarah**  3:19
**saturday**  46:20
  47:2
**save**  30:14
**saw**  6:13 20:23
  22:1
**saying**  19:12 22:23
  39:3 42:7
**says**  9:10 11:3
**scale**  4:11 5:5
**scenario**  38:17
**schedule**  17:23
  18:17 19:6 31:15
  44:23
**scheduling**  12:18
**scheme**  39:12
**scope**  4:11 5:5
**scott**  2:12 3:6
**scott.marcus**  2:16
**screens**  13:13
**second**  9:10 25:8,8
  25:9 31:21 36:21
  46:2
**secondary**  31:3
**sectors**  8:24
**security**  15:16
  17:1 24:20 32:2
  36:22 41:21
**see**  4:11 8:12
  17:14,14 26:23
  29:9 34:25 40:18
  40:19 41:25 42:19
  43:4
**seeing**  5:6,8 17:6
  23:22 31:8 36:2
**seen**  17:12 27:16
**segment**  40:20,21

Veritext Legal Solutions
866 299-5127

[selected - sure]

| | | | |
|---|---|---|---|
| selected  31:7 | single  24:13 | specifically  43:7 | street  2:6,14 8:10 |
| self  23:4 | sir  45:13 | spelled  16:7 | 10:14 32:16 34:8 |
| send  31:22 | sit  25:18 26:25 | spending  34:21 | 35:3 43:24 45:20 |
| sending  15:9 | 27:2 | spertus  2:5 | streets  22:24 29:6 |
| sent  23:1 | sitting  25:19 44:14 | spertuslaw.com | strengthening |
| separately  21:16 | situation  7:16 | 2:8 | 38:4 |
| served  7:8 | 39:15 | sponte  18:19 45:1 | strictly  14:16 |
| service  9:19 | six  20:19 | spread  6:17 | structure  15:8 |
| services  1:14 4:8 | skid  38:8 | squabbling  34:17 | 27:12 |
| 20:23 25:5 29:18 | skills  48:9 49:6 | stabilized  41:7 | structures  16:19 |
| 37:25 | sleep  15:24 18:3 | stable  40:5,9 | stuck  17:11 25:1 |
| session  4:3 14:3,4 | sleeping  15:19 | staff  12:5 | 35:11 |
| set  7:22 11:8 15:8 | 27:10 | stand  36:1 | studies  11:5 |
| 36:17 | sleepless  34:22 | standards  16:11 | study  8:14 |
| setting  2:3 9:4 | slept  18:2 | standpoint  17:11 | studying  30:23 |
| 11:25 12:15 | slide  11:11 18:8 | start  26:16 27:3 | sua  18:19 45:1 |
| seven  9:18 20:19 | slow  5:23 21:18 | 29:2 45:6 | subject  31:5 |
| shade  7:24 | sobel  3:13 12:10 | started  8:11 29:22 | submitted  21:20 |
| shayla  3:8 | 39:1 40:2 | starting  17:3 | 45:21 |
| she'll  4:25 | social  9:12 41:20 | state  9:2 25:11 | substance  30:15 |
| shelter  9:2 17:8 | solely  31:19 44:5 | 36:2,13 37:10,12 | succeeded  40:8 |
| 32:14 | solution  15:13 | 44:10,10 48:22 | success  13:6 |
| sheltered  9:21 | 17:17 20:12,12 | state's  35:23 | successful  7:10 |
| sheridan  24:1,10 | solutions  12:22,24 | states  1:1 | 18:11 |
| sheriff's  20:21,24 | 13:17 40:23 | stations  15:15 | sue  37:12 |
| sherman  17:3 | somebody  16:4 | 16:25 | suffering  30:14 |
| shifted  8:21 | 32:16 39:20 41:3 | statistics  13:10 | suggest  15:4 38:17 |
| shooting  32:17 | 41:4 | stats  11:2,3 | suggesting  42:10 |
| short  41:24 | sonya  49:2,21 | status  25:19 | suggestions  13:17 |
| show  9:16 13:8 | soon  28:2 29:6 | stay  37:1 | suite  2:6 |
| 14:9 46:24 | sort  24:16 31:14 | stayed  43:7 | supervisors  39:19 |
| showed  10:21 | 32:24 | steps  17:18 30:11 | supply  26:1 |
| 45:10 | sorting  10:7 | 38:20 40:7,8 | support  37:10,10 |
| shower  15:21 | sounds  35:14 | stick  7:11 | 37:21 |
| signature  48:19 | spaces  42:24 | stock  37:15 | supporting  21:2 |
| 49:20 | speak  4:4,25 | stole  41:3 | supportive  6:7 |
| silly  19:21 | speaker  4:5 | stop  5:16 | 41:8 |
| similar  20:24 | speaking  7:17 | strategies  21:2 | supposedly  13:13 |
| simple  16:9 | specific  5:10 14:9 | 29:20 30:3,11 | sure  8:16 11:8 |
| simply  12:7 | 19:12,22 26:14 | strategy  4:17 6:1 | 28:10 38:1 |
| | 29:10 | 33:20 37:24 | |

Veritext Legal Solutions
866 299-5127

[sweep - understood]

sweep   44:7
sworn   48:5
system   26:16 27:3
    34:7
systems   23:13

**t**

table   14:17 15:15
    15:16,17 19:16
    29:5 36:15 43:10
take   10:14 13:19
    17:20,24 35:4
    36:19 39:19 43:21
    45:2 46:21
taken   12:1 22:8
    32:21 48:3,12
    49:9
takes   16:6 38:5
talk   4:15 5:24 8:3
    15:10 17:4 31:22
    34:3,22 36:7,8,9
    36:10 43:17
talked   5:10 23:3
    34:4 37:22
talking   15:12 21:4
    24:23 33:17,17
    34:19,20 37:20
    43:16
target   6:9
targeted   6:5 8:23
targeting   8:16
teamed   21:1
teams   13:17 15:1,9
    20:22,22 21:2,16
    23:1 24:5,12
    28:17,18 31:22
tears   23:6
tell   18:2 19:21
    20:5 35:4 38:15
    41:18
telling   15:23

tend   7:23
tent   24:13,21
tents   26:21
term   7:15 41:23
    41:24
terms   4:12 5:5
    7:12,24 14:25
    15:7,9 16:21
    17:25 18:1 27:15
    44:8
testified   24:3
testifying   48:5
testing   21:2,12
thank   5:18,19 7:4
    8:8 45:9
thanks   4:8
thing   12:24 30:22
    37:9
things   11:21 27:15
    28:1,1,2,3 30:15
    31:15 33:17
think   12:1,10 13:1
    14:13 20:18 23:21
    25:7,9,24 26:5
    28:6,12 29:11
    30:17 32:19,20,21
    33:8,25 35:9 37:8
    38:17 39:13,14
    40:2,13,14 42:6,7
    45:10
third   33:9 35:8
thought   6:6 12:6
    14:20,22 27:14
    33:8
thoughts   7:18
thousand   34:23
three   11:10,14
    18:5 20:13
thrown   22:17
tier   21:23,24

time   1:12 4:16
    10:2,6,21 12:4
    13:25 19:22 23:5
    25:4 26:9 31:14
    34:3,5 36:7,8,9,10
    44:11,12 46:25
    47:11
timeframe   15:8
timeframes   14:25
    31:10
timeline   15:11
    19:20 47:5
timelines   42:17
times   12:17 21:21
    33:12
timid   38:20
timing   17:25
tired   18:7 36:1
    44:4
tiring   44:5
today   4:9,15 13:10
    14:20,22 16:16
    19:8,21 20:6 21:9
    23:15 29:7,9
    30:19 31:16 34:13
    39:16 42:10 46:5
toilet   15:21 32:2
toilets   24:21
told   14:16 15:22
    16:10 18:9 35:3
tonight   45:9
track   28:25 29:1
    37:1 41:5
tracking   35:9
traffic   29:24 30:15
trail   23:6
transcriber   49:1
transcript   14:10
    49:3,5
transcriptionist
    48:7

transit   40:7,7
transport   38:9
treating   29:2
triage   21:23
trial   31:8
tried   16:18 31:2
tro   45:1
true   45:20 48:8
    49:5
try   11:18 31:9
trying   10:9 21:18
    36:6 43:15
turn   4:3 11:18
    32:5 34:7,7 35:2
    43:8 45:19 46:4
two   14:12 16:23
    18:4 21:11 23:7
    33:8 34:21 40:3
    44:13,16 45:17
typewriting   48:6

**u**

ultimate   24:24
    25:15
umhofer   2:5 3:12
    45:4,13
unable   7:8
underlying   8:23
underneath   15:24
    22:22 23:11,13
    27:11
underpass   15:10
    15:19
underpasses   4:13
    5:6 7:23 22:25
    44:8
understand   12:16
understanding
    12:21
understood   12:19
    35:4 45:2 46:6

Veritext Legal Solutions
866 299-5127

[unexpectedly - zero]

| | | | |
|---|---|---|---|
| **unexpectedly** 46:5 | **volume** 25:20 | 27:16 29:25 37:22 | **writing** 31:12 |
| **unfair** 35:3 36:7 | **voluntarily** 16:4 | **wednesday** 4:9,14 | 46:18 |
| **unhoused** 6:17 | 24:14 | 5:10 | **wrong** 13:18 16:5 |
| **unincorporated** | **vulnerability** 8:20 | **week** 21:16,22 | 22:12 |
| 5:12 | 8:21 | 29:5 39:11 41:25 | **wrongfully** 23:18 |
| **unintended** 6:16 | **vulnerable** 7:7 | 41:25 | **x** |
| **unit** 9:3 42:4 | 21:25 28:4,13 | **weekend** 45:8 47:2 | **x** 22:14 |
| **united** 1:1 | **w** | **weeks** 9:18 37:4 | **y** |
| **units** 39:17 42:3 | **w** 2:21 | **weitzman** 3:9 | **y** 22:14 |
| **universe** 29:12 | **wage** 39:9,10 | **welcome** 12:6 | **yards** 15:25 |
| **unquote** 24:13 | **wages** 40:12 | **went** 28:18,25 | **yeah** 5:20 7:19 8:5 |
| **unsheltered** 8:12 | **wait** 5:15 | **west** 2:6 | 9:12,12 10:25 |
| 8:13,25 | **waiting** 24:10 | **western** 1:2 | 11:4 21:10 22:10 |
| **unusual** 16:22 | 35:19 37:5 | **white** 40:9 | 23:10 27:6 33:7 |
| **upgrade** 17:7 | **walk** 26:8,8 | **wholistic** 41:22 | 35:8 45:25 |
| **use** 33:19 40:6 | **walked** 43:17 46:5 | **willing** 25:2 31:9 | **year** 6:4 41:21 |
| **useful** 18:15 | **walking** 17:13 | 31:17 32:10 43:22 | **years** 17:1,15 |
| **v** | **want** 6:21 11:24 | **wilshire** 1:15 | 24:10,23 |
| **v** 1:6 | 14:5 18:8 19:16 | **winnow** 33:20 | **yesterday** 9:20 |
| **va** 14:18 35:25 | 19:17,24 28:15 | **wisdom** 44:21 | 29:13 |
| 36:20 38:9 | 32:11 33:7,19 | **witness** 48:4 | **young** 2:19 3:5 |
| **vacancy** 39:6 | 34:5 35:25 41:1 | **wondering** 35:20 | 19:3 20:2,7,9,16 |
| **vacated** 19:7 | 42:15,16,17,18,19 | 35:21,22 | 20:20 21:7,10,21 |
| 44:23 | 44:17 46:7,20 | **word** 6:17 33:19 | 22:10,16 23:21 |
| **vacating** 18:16 | **wanted** 4:10,15 | **work** 15:7,8 17:25 | 24:7,17 25:7,17,23 |
| **valid** 31:4 | 5:24 9:25 20:18 | 17:25 18:1 19:8,9 | 26:4 27:6,13,24 |
| **validating** 11:11 | **wants** 26:15 | 31:9 38:22 42:20 | 28:11 29:10,16 |
| **value** 23:11,12 | **warehousing** | 42:21 45:8 | 30:7 33:7,15,22,25 |
| 27:9,12 43:25 | 40:20 | **workable** 25:10 | 35:8,11 37:7,13 |
| **valuing** 16:3 | **wasting** 34:11 | **worked** 38:4 39:10 | 38:2,16 |
| **versus** 16:3,18 | **watch** 26:25 32:8 | 42:21 | **yup** 19:1 |
| 27:10 | 36:24 | **workers** 15:1,12 | **z** |
| **veteran** 38:5 | **watching** 44:14 | 17:5 | **z** 22:14 |
| **veterans** 38:6 | **way** 14:23 18:2 | **working** 18:6 | **zero** 9:18 |
| **vicinity** 4:13 | 20:17 22:3 23:20 | 37:15,17 45:11 | |
| **victory** 35:2 | 24:2,5,16 26:19 | 46:20 47:2 | |
| **view** 20:12 33:11 | 28:22 43:24 45:7 | **works** 31:8 | |
| **violence** 29:25 | 45:9 | **worlds** 22:21 | |
| **virus** 8:24 | **ways** 25:25 | **worse** 26:6 | |
| **void** 7:17 | **we've** 4:16 5:25 | **wrap** 33:5 | |
| | 9:18 17:6 24:23 | | |

Veritext Legal Solutions
866 299-5127