SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br> vs. <br><br> CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 10 inclusive, <br><br> Defendants. | Case No.: 2:20-cv-02291-DOC-KES <br> Assigned to Judge David O. Carter <br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION DATED MAY 15, 2020** <br> . |

Plaintiffs LA Alliance for Human Rights, Charles Van Scoy, Harry Tashdjian, George Frem, Leandro Suarez, Joseph Burk, Gary Whitter, Karyn Pinsky, and Charles Malow (collectively "Plaintiffs") hereby submit the following response to Defendants City and County's separate plans filed in response to the Order re: Preliminary Injunction issued May 15, 2020:

///

///

///

## I. Introduction

On May 15, 2020, this Court ordered the City and County of Los Angeles (the "Defendants") to relocate and provide housing for one of our most vulnerable populations: homeless individuals living on freeway underpasses, underpasses, and ramps. The Court did so *sua sponte*, recognizing that, in the best of times, homeless persons face innumerable hazards to their wellbeing. Those living in close proximity to freeways exhibit increased respiratory and cardiovascular health problems, which clashes fatally with the deadly virus sweeping the nation, targeting those with pre-existing respiratory and cardiovascular conditions. Waiting for ultimate resolution of Plaintiffs claims puts thousands of lives at risk, both those living in the identified geographic locations, and individuals throughout the Los Angeles area should the health system be overburdened by this crisis. This Court's preliminary injunction was carefully considered and should stand as ordered.

## II. Argument

### A. This Court Has the Inherent Authority to *Sua Sponte* Issue a Preliminary Injunction

As this Court noted, "[a] district court may order injunctive relief on its own motion and is not restricted to ordering the relief requested by a party." (Order at 3, May 15, 2020, ECF No. 108). *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014) ("[A] district court may *sua sponte* order or modify injunctive relief."); *cf In re Graves*, 279 B.R. 266, 273-74 (B.A.P. 9th Cir. 2002) (holding that bankruptcy court retained the authority to *sua sponte* issue an injunction). *In Clement v. California Dept. of Corrections*, 364 F.3d 1148, 1154 (9th Cir. 2004), the Ninth Circuit upheld a district court order which *sua sponte* granted summary judgment for a plaintiff and, *sua sponte*, issued a permanent, statewide injunction. Here, the District Court is not *sua sponte* granting summary judgment or even a permanent injunction, but a preliminary injunction limited to a subset of individuals in a single county, based on extensive discussions with

the parties about the health threat to these individuals and the community at large. The Court had and retains inherent authority to issue this *sua sponte* preliminary injunction.

### B. The Court Properly Evaluates the Standards for Enacting a Preliminary Injunction in This Case.

In the Ninth Circuit, the Court is required to evaluate four elements when considering a preliminary injunction. The Court must evaluate (1) the likelihood of success on the merits; (2) irreparable harm likely to result should the injunction not be issued; (3) the relative burdens of the preliminary injunction and balance of equities; and (4) whether the preliminary injunction favors the public interest. *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The likelihood of success on the merits and the possibility of irreparable injury are on a sliding scale where an increased likelihood of success decreases the necessary showing of irreparable harm and vice versa. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120-21 (9th Cir. 2005) (affirming grant of preliminary injunction).

#### 1. There Is a Sufficient Showing of Irreparable Harm

Even in the absence of a public health crisis, living near the roadway is deleterious to health. Several studies have shown that living near an active road is seriously harmful:

- "[W]e report an association between long-term exposure to traffic-related air pollution and the incidence of [chronic obstructive pulmonary disease]. The effect of air pollution appears to be amplified by coexisting diabetes or asthma but is not limited to these vulnerable subpopulations."[1]
- "[T]he Panel concluded that the evidence is sufficient to support a causal relationship between exposure to traffic-related air pollution and exacerbation of

---

[1] Zorana Andersen, et al., *Chronic Obstructive Pulmonary Disease and Long-Term Exposure to Traffic-related Air Pollution A Cohort Study*, 183 AM. J. RESPIRATORY & CRITICAL CARE MED. 455, 460 (2011), https://www.atsjournals.org/doi/pdf/10.1164/rccm.201006-0937OC.

asthma. It also found suggestive evidence of a causal relationship with onset of childhood asthma, nonasthma respiratory symptoms, impaired lung function, total and cardiovascular mortality, and cardiovascular morbidity . . ."[2]

- "The association in our study between living near a major road and mortality was stronger than the association between mortality and the estimated urban or rural background concentrations of traffic-related air pollution. … [We] identified a consistent association between cardiopulmonary mortality and living near a major road. … Our results are much the same as those in two US cohort studies [where] air pollution was associated with all-cause mortality."[3]

As the City of Los Angeles Department of City Planning summarized, "[a]ir pollution studies indicate a strong link between chronic exposure to vehicle exhaust and particulate matter from roads and freeways and elevated risk of adverse health impacts. . . Areas located within 500 feet of a freeway are known to experience the greatest concentrations of fine and ultrafine particulate matter [], a pollutant implicated in asthma and other health conditions."[4] For those reasons, the department suggests moving occupied open space areas such as play areas, courtyards, patios, etc. "as far away from the freeway sources as possible" and prioritizing the area nearest the freeway for non-habitable uses. *Id.* at 2.

On top of the normally hazardous conditions homeless persons face sleeping under overpasses, our country is in the midst of a public health crisis involving a quickly-

---

[2] Health Effects Institute Panel on the Health Effects of Traffic-Related Air Pollution, *Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects*, Health Effects Institute, Special Report 17, at 10 (January 2010), https://www.healtheffects.org/publication/traffic-related-air-pollution-critical-review-literature-emissions-exposure-and-health.

[3] Gerard Hoek, et al., *Association between mortality and indicators of traffic-related air pollution in the Netherlands: a cohort study*, 360 LANCET 1203, 1207-08 (2002), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(02)11280-3/fulltext.

[4] City of Los Angeles Department of City Planning, Freeway Adjacent Advisory Notice, ZI No. 2427, at 1 (2018), http://zimas.lacity.org/documents/zoneinfo/ZI2427.pdf.

spreading virus, particularly among confined populations. SARS-CoV-2, commonly known as COVID-19 or the Coronavirus, "is spreading very easily and sustainably between people" "mainly through close contact," according to the Centers for Disease Control and Prevention (the "CDC").[5] For this reason, the CDC considers persons maintaining a social distance of about 6 feet from one another very important in preventing the spread of COVID-19. *Id.* Additionally, the CDC recommends frequently washing hands with soap and water as well as disinfecting frequently touched surfaces to prevent the disease's spread. *Id.* Unfortunately for homeless persons living in Los Angeles, these options are frequently unavailable. They are unable to socially distance themselves in the cramped environment, public bathrooms are unavailable or are in disrepair, and homeless persons lack the resources to frequently disinfect the surfaces or items they touch. This unfortunate situation is likely the cause of the rapid spread of the virus through the homeless community in Los Angeles.[6]

The rapid spread of the disease among the homeless community is especially concerning because COVID-19 poses an increased health risk to the elderly and persons with underlying health conditions.[7] Therefore, the homeless community, which is typically both older and more likely to have medical issues, is in a much higher risk group. *Id.* And, the issue is compounded by the health risks associated with remaining close to freeways and roadways, which largely impacts the respiratory and cardiovascular systems.[8]

---

[5] *How COVID-19 Spreads*, CDC (2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[6] Joel Grover, *Coronavirus Spreading Further, Faster in LA's Homeless Community*, NBC4 LOS ANGELES (May 12, 2020), https://www.nbclosangeles.com/on-air/coronavirus-spreading-further-faster-in-las-homeless-community/2360902/.

[7] Emily Mosites, et al., *Assessment of SARS-CoV-2 Infection Prevalence in Homeless Shelters – Four U.S. Cities, March 27-April15, 2020*, 69 MORBIDITY & MORTALITY WKLY. REP. 521 (2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6917e1-H.pdf.

[8] *People Who Are at Higher Risk for Severe Illness*, CDC (2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Housed persons in Los Angeles living in proximity to freeways have a lesser concern due to protections afforded by structures (rather than open-air environments, similar to play areas, courtyards, and patios), and have the ability to maintain basic hygiene and social distance during the COVID-19 crisis.  As such, the Court's order is properly limited to those demonstrating clear irreparable harm.

In addition to the health risks facing individuals living under, over, and next to freeways, without significant structural support, such persons are at significant risk of harm if a major earthquake were to occur.  Earthquakes are a frequent disaster in California and have caused collapses of freeway structures.  For example, the 1994 Northridge Earthquake caused a section of Interstate 5 to collapse.[9]  Photographs of the incident show that if persons were located under the bridge they likely would have been crushed.  *Id.*

[10]

---

[9] Alan Taylor, *The Northridge Earthquake: 20 Years Ago Today*, THE ATLANTIC (January 17, 2014), https://www.theatlantic.com/photo/2014/01/the-northridge-earthquake-20-years-ago-today/100664/.

[10] *Id.*

5

PLAINTIFFS' BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION DATED MAY 15,2020


[11]

Other freeway locations did not collapse entirely but rained down debris as the roads were damaged by the quake. *Id.* Persons on top of or adjacent to the bridges would have been seriously injured or killed. Similarly, the 1989 Loma Prieta Earthquake caused a significant portion of the Nimitz freeway to collapse onto the ground below.[12] That collapse resulted in the deaths of 42 people who were trapped underneath and injuries to dozens more. *Id.* More recently in 2019 the Ridgecrest Earthquake caused significant damage to state roads; luckily, in that case, the majority of the quake was not centered where bridges could be affected.[13] If homeless persons are allowed to continue living under or over these roadways and a major earthquake occurs, there is a significant risk that they will suffer serious bodily harm or death.

### 2. Plaintiffs Have a Sufficient Likelihood of Succeeding on The Merits

Defendants are required by the California Welfare and Institutions Code to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully residing therein when such persons are not supported and

---

[11] *Id.*

[12] Ken Miguel, *1989 Loma Prieta Earthquake: Cypress Freeway collapse survivor Buck Helms remembered by Caltrans rescuer*, ABC7 NEWS (October 16, 2019), https://abc7news.com/loma-prieta-quake-earthquake-when-was-magnitude/5605965/.

[13] *The Ridgecrest Earthquake Split Open The Desert and We Went To Look At The Crack*, LAIST (July 5, 2019), https://laist.com/2019/07/05/ridgecrest_earthquake_crack.php.

PLAINTIFFS' BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION DATED MAY 15,2020

relieved by" other sources. Cal. Welf. & Inst. Code § 17000. Section 10000 clarifies and defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

Cal. Welf. & Inst. Code § 10000.

Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents. . . promptly and humanely." *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996). Counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health." *Id.* at 1240. The California Supreme Court has held that "subsistence medical services" must be provided. *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014-15 ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely."). Counties have an obligation to provide "medically necessary care, not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted). That includes care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014 (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413-15 (1989)). Importantly, a county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight." *Fuchino v. Edwards-Buckley*, 196 Cal. App. 4th 1128, 1134 (2011) (citation omitted). "Medically

necessary" for adults is defined in California Welfare & Institutions Code section 14059.5(a): "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst. Code § 14059.5(a).

Despite this obligation, many thousands of Los Angeles residents are left to fend for themselves on the street, and the numbers are increasing year-over-year.[14]  These persons are forced to live without shelter, medical assistance, proper hygiene, or other necessities to live safely in our City or County.  The Defendants' refusal to appropriately provide for these individuals defies both compassion and the legal requirements placed on the Defendants by the California Welfare and Institutions Code.  This refusal is particularly salient given the significant health crises facing unhoused persons residing under, over, and next to freeways in the midst of the COVID-19 global pandemic; the effects are potentially deadly to both those in the area, and those members of the community who may need the hospital beds but are unable to access them due to a overwhelmed health care system (particularly in the fall with an expected COVID-19 spike and elimination of "scaled" hospital options such as St. Vincent's and the USS Mercy).

The Defendants' ongoing refusal to care for these individuals also implicates both the Due Process and Equal Protection principles of the Constitution as described further in Plaintiffs' complaint, incorporated herein by reference.  By permitting individuals to continue to reside on freeway underpasses, overpasses and ramps, yet not permitting homeless individuals to reside elsewhere and failing to provide adequate alternative shelter, the City and County have affirmatively created or increased the risk to exposure of dangerous conditions.

---

[14] Los Angeles Homeless Services Authority ("LAHSA"), *2019 Greater Los Angeles Homeless Count* (Sept. 5, 2019), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

Defendants' refusal to provide shelter and assistance to homeless persons forced to live near or under overpasses, underpasses, and ramps has subjected them and others in the community, including Plaintiffs, to a public nuisance, due to the ongoing health threats articulated *supra*.  Plaintiffs also have a sufficient likelihood of prevailing on the merits of their claims under California Code of Civil Procedure section 526a because without immediate redress, Defendants are likely to spend significantly more taxpayer dollars on emergency response and medical care given the serious health and medical issues during this pandemic, which could be avoided by relocating homeless individuals in these areas to adequate alternative shelter which complies with CDC requirements.

The Court is right in its preliminary conclusion that Plaintiffs have sufficient likelihood of success on the merits on these issues.

### 3. The Balance of Equities is In Favor of Ordering Preliminary Relief

Homeless Angelenos under, over, and near freeways are forced to live every day in conditions which expose them to harmful pollution and in cramped quarters exposing them to an increased likelihood of contracting COVID-19.  These two sources of harm also contribute to and exacerbate one another as pulmonary and cardiovascular issues caused by proximity to high traffic conditions create a dangerous underlying condition increasing the likelihood of death or serious harm from COVID-19.  Comparatively, the burden on the Defendants is low because they would only need to spend financial and administrative resources handling the movement of these vulnerable people.  In fact, it is likely that not complying with the terms of the preliminary injunction would actually lead to greater spending by the Defendants.  The costs of emergency care and services to stymie the harms of COVID-19 in the homeless population and prevent its further spread across Los Angeles are likely to be significant and may dwarf the costs of complying with the Court's order.  Therefore, the Court's finding that the balance of equities favored the Plaintiffs is correct.

### 4. The Public Interest Is Served by the Preliminary Injunction

The public interest is served by the preliminary injunction because it both promotes the health of vulnerable citizens and is likely to assist in preventing the spread of a dangerous virus across Los Angeles. The primary consideration in determining public interest is the impact on non-parties. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)). The pandemic tearing through the streets of Los Angeles and the nation has nearly brought activity to a standstill. Preventing the further spread of COVID-19 is one of the nation's highest priorities, as is evidenced by the numerous stay-at-home orders and social distancing requirements (including those in place for this Court). Public health is a quintessential public interest. By following the terms of the preliminary injunction, Defendants will protect a population particularly at-risk for being harmed by the disease. They will also reduce the likelihood of those persons further transmitting it amongst the greater Los Angeles population.

## III. Conclusion

The Court takes an important and compassionate step to protect a significant portion of homeless persons and the community from likely harm by issuing this preliminary injunction, and its analysis and conclusion is legally correct.

Dated: May 21, 2020          */s/ Elizabeth A. Mitchell*
                              SPERTUS, LANDES & UMHOFER, LLP
                              Matthew Donald Umhofer (SBN 206607)
                              Elizabeth A. Mitchell (SBN 251139)

                              *Attorneys for Plaintiffs*