MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>    Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**BRIEF OF DEFENDANT CITY OF LOS ANGELES IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION TO BE ISSUED MAY 22, 2020 [DOCKET NO. 108]**<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

  Defendant City of Los Angeles respectfully submits this brief in response to the Court's May 15, 2020, Minute Order setting forth a preliminary injunction to be issued on May 22, 2020.  Dkt. 108.

# TABLE OF CONTENTS

I.   INTRODUCTION……………………………………………………………………1

II.  RELEVANT PROCEDURAL HISTORY AND BACKGROUND……………………3

    A. The City's Pre-Litigation Progress In Housing Unsheltered Angelenos ........3

    B. The COVID-19 Pandemic And This Action ....................................4

    C. The City's Efforts To Provide Shelter And Hygiene Facilities During The
       COVID-19 Pandemic Follow CDC And DPH Guidelines .........................5

    D. Settlement Discussions Concerning 16th and Maple .........................7

    E. The Proposed Preliminary Injunction...........................................7

III. ARGUMENT………………………………………………………………………9

    A. Standard of Review ..............................................................9

    B. The *Sua Sponte* Issuance Of The Injunction Is Procedurally Improper...........9

    C. The Injunction Is Impermissibly Vague ........................................10

    D. The Injunction Would Be Adverse To Public Health Recommendations .....11

    E. Separation Of Powers And Article III Preclude The Injunction ...................11

    F. The *Winter* Factors Do Not Support A Preliminary Injunction ....................14
       1. Plaintiffs cannot show they are likely to succeed on the merits ..................14

       2. The remaining *Winter* factors do not support the injunction .......................17

    G. If Issued, The Preliminary Injunction Should Be Stayed...............................18

IV.  CONCLUSION                                                                                        18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Wright*, 468 U.S. 737, 760 (1984) ......................................................... 13

*Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979) ................................. 9

*Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014)........................................... 10

*Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)............................................. 16

*Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ..................................................... 14

*Cantella v. State of Cal.*, 404 F.3d 1106, 1113 (9th Cir. 2004)............................................ 14

*Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1150 (9th Cir. 2004) .................................. 10

*County of Santa Clara v. Superior Court*, 50 Cal.4th 35, 55 (2010)............................... 15

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) ............................................. 13

*Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998) ............................................. 14

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ............................................. 9

*Jones v. City of L.A.*, 444 F.3d 1118, 1138 (9th Cir. 2006) *vacated by* 505 F.3d 1006 (9th Cir. 2007) ......................................................................................... 12

*Ketchum v. Cty. of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987) .............................. 17

*Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ........................................................ 14

*Lewis v. Casey*, 518 U.S. 343, 349 (1996)................................................................ 12

*Linda R. S. v. Richard D.*, 410 U.S. 614, 618 (1973) ................................................ 13, 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ......................................... 13

*Martinez v. City of Clovis*, 943 F.3d 1260, 1270-71 (9th Cir. 2019)............................... 17

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).................................................... 9

*Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850-51 (9th Cir. 2001) ......................................................................................... 12

*Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) ................................. 17

*Or. Prescription Drug Monitoring Program v. United States DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017)......................................................................................... 9

*Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) ........................................ 17

*Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) ..................................................... 12

*S. Cal. Edison v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002).............................. 14

*Schmidt v. Lessard*, 414 U.S. 473, 475 (1974) ................................................... 11

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976) ...................... 13

*Siskiyou Lumber & Mercantile Co. v. Rostel*, 121 Cal. 511 (1898) ................... 15

*Thomas v. County of Los Angeles*, 978 F.2d 504, 508-509 (9th Cir. 1992) ...................... 10

*Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) .............................. 16

*Warth v. Seldin*, 422 U.S. 490, 499 (1975)......................................................... 14

*Washington v. Cent. Puget Sound Reg'l Transit Auth.*, 533 Fed. Appx. 716, 719 (9th Cir. 2013) ..................................................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)................................. 9, 17

**Statutes**

Cal. Civ. Code § 3479................................................................................. 15

Cal. Civ. Code § 3493................................................................................. 15

**Rules**

Fed. R. Civ. P. 24 ......................................................................................... 14

Fed. R. Civ. P. 65 ......................................................................................... 10

CITY OF LOS ANGELES' BRIEF IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION ORDER [DKT. 108]

## I.  **INTRODUCTION**

The City of Los Angeles (the "City") appreciates the Court's early efforts, even before this case is at issue, to help resolve the region's homelessness crisis in collaboration with a diverse group of stakeholders.  Eight days ago, the Court, on its own motion, directed the City and the County of Los Angeles ("County"): (1) to create a plan to relocate people experiencing homelessness away from freeway onramps and underpasses and into shelters; (2) to strike an accord with the Plaintiffs and Intervenors that would accomplish this objective; and (3) to do all of this within less than one week.  If the parties could not agree, the Court stated, it would impose a Preliminary Injunction compelling implementation of this relocation and shelter order on Friday, May 22.

On May 15, within less than 48 hours of the Court's directive, the City confidentially submitted a plan to implement the Court's goal of creating a sufficient number of shelter opportunities for homeless people living immediately adjacent to freeway entrance and exit ramps and under freeways in Los Angeles, but within the larger context of the City's response to provide shelter for homeless people at risk from COVID-19.  The City has since filed publicly its enhanced plan with a commitment to create housing solutions for more than 6,100 people experiencing homelessness within 10 months—an unprecedented effort in the history of Los Angeles.

But while the parties—reflecting diverse and sometimes conflicting interests, from downtown business owners to people experiencing homelessness to City and County governments with different resources and scopes of authority—made rapid, substantial progress, we could not reach full agreement on an alternative plan within the five days allotted by the Court.  In particular, the City's ability to create new shelter is contingent on County funding the appropriate levels of necessary support and operating services for that shelter, to which County has yet to agree.  In addition, while the City, County, and Plaintiffs all agree with the Court that the City may enforce, consistent with *Martin v. City of Boise*, state and local laws after offering adequate alternative shelter to

CITY OF LOS ANGELES' BRIEF IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION ORDER [DKT. 108]

1   individuals experiencing homelessness living in the vicinity of a freeway, the

2   Intervenors did not agree.

3       As a result, the City requests that this Court permit the parties two weeks to

4   continue their negotiations before deciding whether to impose its proposed Preliminary

5   Injunction.  During that time, the City will provide more detail, on a Council District-by-

6   Council District basis, about its alternative plan, including those parts of the plan that

7   directly impact persons living under or near freeways; identify, with specificity, what

8   support and services each part of the plan needs from the County; and strive to seek

9   agreement from the County to match the City's commitment.  The City may request the

10  Court's assistance in bringing these negotiations to a successful conclusion.

11      Granting the parties more time to suggest and pursue further actions makes

12  compelling sense, given the conundrum created by the various responses the City and

13  County have been forced to consider because of the effects of the COVID-19 pandemic

14  on their homeless populations, and the excruciating financial constraints on City and

15  County governments imposed by the pandemic-fueled cratering of the economy.

16      If the Court is not inclined to give the parties more time to reach a collaborative

17  solution to the Court's concerns, then the City submits the following objections.

18  Fundamentally, the Preliminary Injunction violates the separation of powers.  The

19  concept of separation of powers between the executive, legislative and judiciary

20  branches is more than a constitutional doctrine; it is a practical, functional division of

21  authority, entrusting to each branch of government those decisions for which it has

22  expertise and primary responsibility.  How to protect as many members of a city's

23  homeless community as possible in the midst of the pandemic is literally a matter of life

24  or death.  In such a circumstance, the Court's efforts to substitute its judgment for that of

25  the local government and public health officials best equipped to deal with, and

26  constitutionally responsible for handling, this public health crisis violates this separation.

27      Moreover, there is no legal authority for the Court to issue this injunction *sua*

28  *sponte*.  The Court stayed this case.  There is no evidentiary record—the most that could

be said is that there have been presentations and conversations surrounding settlement proposals.  No party sought the relief the injunction would impose.  Had Plaintiffs sought this relief—which they have not—they would lack standing to seek it.  And even if they had such standing, Plaintiffs would be unable to demonstrate they satisfy all the prerequisites to injunctive relief, including, importantly, the likelihood they would prevail on the merits.  In short, the injunction should not issue, especially not in the current circumstances.

Finally, if the Preliminary Injunction does issue, the City requests this Court immediately stay its order pending review by the Ninth Circuit Court of Appeals.

## II.   RELEVANT PROCEDURAL HISTORY AND BACKGROUND

### A.  The City's Pre-Litigation Progress In Housing Unsheltered Angelenos

Through Proposition HHH, passed in 2016, the City has committed $1.2 billion to build 10,000 supportive housing units over the next decade as a permanent solution to the crisis of homelessness affecting Los Angeles, and has expended extraordinary efforts to make almost 6,000 units ready for occupancy in the next 3 years.[1]  But these more permanent solutions take time, so the City is constantly identifying and developing temporary housing solutions for persons experiencing homelessness.

That is why the City initiated the A Bridge Home (ABH) shelter program in 2018 to create 222 shelter beds in each of the 15 Council Districts (3,330 beds in total).  To date, the City has opened 13 ABH shelters, creating 973 additional shelter beds, and the City expects 14 additional ABH shelters to be completed and opened by the end of 2020, creating 1,067 more shelter beds.[2]  The City continues to explore and implement a mix

---

[1] https://www.lamayor.org/hhh-projects-development-details.

[2] The number of beds in each ABH shelter has currently been reduced to allow for appropriate social distancing pursuant to Center for Disease Control and Prevention ("CDC") and Los Angeles County Department of Public Health ("DPH") guidelines.

of temporary shelter and housing solutions—from rental subsidies to modular housing to safe parking to hotel and motel conversions—to serve a diverse homeless population. And the City continues to do so despite its financial condition:  the City's proposed budget for Fiscal Year 2020-2021 acknowledges it will have to reduce expenditures to cover almost $600 million in projected revenue lost due to COVID-19,[3] but it still commits over $429 million to housing and services for persons experiencing homelessness.[4]

## B. The COVID-19 Pandemic And This Action

On March 4, 2020, California Governor Gavin Newsom, the County Board of Supervisors, and Mayor of Los Angeles Eric Garcetti declared an emergency in light of the COVID-19 pandemic, and initiated measures to protect the public health.[5]  On March 13, 2020, President Donald Trump declared a National emergency as of March 1, 2020.[6]

On March 10, 2020, Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdijan, Karyn Pinsky, Charles Malow, Charles van Scoy, George Frem, Gary Whitter and Leandro Suarez (collectively "Plaintiffs") initiated this action.  They assert fourteen federal and state claims against the City and the County for monetary, equitable and injunctive relief, contending Defendants have not made sufficient progress in providing housing and other services to the homeless population, which failure has resulted in

---

[3] See https://lacontroller.org/financial-reports/revised-revenue-forecast-2020-2021.

[4] See http://cao.lacity.org/budget20-21/BudgetSummary/mobile/index.html.

[5] See https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf (Governor Newsom emergency proclamation); http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2248 (Board of Supervisors declares emergency); https://www.lacity.org/highlights/mayor-garcetti-strengthens-readiness-against-coronavirus-declaring-local-emergency (Mayor Garcetti declares local emergency).

[6] See https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

4

impassable sidewalks and exposed the public to health risks, environmental hazards, increased crime, and untreated mental illness and addiction. Dkt. 1. Plaintiffs are demanding that Defendants provide immediate shelter for all homeless individuals to abate the degradation of the cities and communities. *Id.* at ¶ 18. On March 17 and March 18, 2020, homeless rights advocates Orange County Catholic Worker ("OCCW"), CANGRESS dba Los Angeles Community Action Network ("LA CAN") and Los Angeles Catholic Worker ("LACW") were allowed to intervene. Dkt. 18 and 29.

Six days after the Complaint was filed, on March 19, 2020, the Court scheduled an emergency status conference and invited various City, County, and other related officials to attend. Dkt. 12; Dkt. 17. The Mayor, the President of the City Council, and the City Attorney all attended the status conference because the City agreed the parties should not forgo this opportunity to address the homelessness crisis, despite the legal and factual deficiencies of Plaintiffs' Complaint. The City agreed to stay all proceedings to allow the Court to facilitate immediate settlement negotiations among the parties and the Court to try and reach an amicable resolution. *See e.g.,* Transcript of 3/19/20 Conference, Dkt. 39. All litigation in the case remains stayed to this day.

## C. The City's Efforts To Provide Shelter And Hygiene Facilities During The COVID-19 Pandemic Follow CDC And DPH Guidelines

In order to help stop the spread of the novel coronavirus, the Center for Disease Control and Prevention ("CDC") and the Los Angeles County Department of Public Health, ("DPH") have issued various guidelines, including safe hygiene practices, social distancing, and wearing masks.[7] In the two months since the Federal, State and local emergencies were declared, the City, in coordination and cooperation with the County,

---

[7] *See e.g.* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#coalition; http://publichealth.lacounty.gov/media/coronavirus/docs/homelessness/FAQ-PeopleExperiencingHomelessness.pdf

CITY OF LOS ANGELES' BRIEF IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION ORDER [DKT. 108]

1   and in accordance with the guidelines and recommendations instituted by the CDC and

2   DPH, has: (a) opened 24 emergency shelters at recreational centers across the City,

3   providing 1,012 beds and 111 safe parking sites for homeless individuals under the Mass

4   Shelter Expansion Program; (b) contracted with 12 hotels and motels to house homeless

5   Angelenos under Project Roomkey,[8] totaling 962 rooms; and (c) set up 305 trailers

6   leased from the State of California to provide Tier 1 housing or to supplement Project

7   Roomkey.  4/30/20 Joint Progress Report, Dkt. 88.

8         The City further installed sanitation units throughout the City, consisting of 360

9   hand-washing stations, 56 of which are in the Skid Row area, and 120 portable toilets

10   (with sinks), 54 of which are in the Skid Row area, as well as an additional 4 toilets in

11   locations identified as "high-traffic areas."  3/23/20 Status Report, Dkt. 43; 4/13/20

12   Status Report, Dkt. 65.  The City distributed over 5,000 reusable and washable masks in

13   Skid Row, set up COVID-19 testing sites for homeless residents, and arranged for the

14   Los Angeles Convention Center to serve as a Medical Relief Center.  Dkt. 65.  In

15   addition to hygiene stations and portable toilets, the City deployed 12 mobile shower

16   trailers (consisting of 8 showers each), and eased restrictions on vehicle and parking

17   laws to help homeless residents living in vehicles.  Dkt. 43.  Furthermore, the City

18   entered into temporary agreements with eight YMCA facilities across the City,

19   providing access to bathrooms and showers, and the City provided free transportation to

20   those YMCA facilities and emergency shelters.  Dkt. 65.  To date, over 800 community

21   members have utilized the YMCA services, resulting in over 4,600 showers. The City

22   continues to engage in additional efforts to safely and securely shelter homeless

23   residents in accordance with CDC and DPH guidelines.  Among other things, the City is

24

25

26

27   _____

[8] Project Roomkey is a collaborative State, County, and City effort to secure hotel and motel rooms for the vulnerable homeless population.

28

CITY OF LOS ANGELES' BRIEF IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION ORDER [DKT. 108]

attempting to locate additional safe parking locations,[9] and is searching for additional housing locations and opportunities, including ABH and modular housing.

## D.  Settlement Discussions Concerning 16th and Maple

In early April, the Court requested the parties to begin settlement discussions, initially focused on relocating the recreational vehicles parked along the I-10 Freeway near downtown Los Angeles.  4/7/20 Transcript at 54:4- 60:19; 4/10/20 Order, Dkt. 62. The parties focused on a site owned by the California Department of Transportation ("Caltrans") at 16th and Maple Streets.  The day before the parties were to discuss this site in Court, and unbeknownst to counsel at the time, the City received a hazardous waste assessment from Caltrans indicating concerns with the site "…based on the location of the parcel being directly under the heavily travelled I-10 Freeway and past use of leaded gasoline, there is a high probability that the unpaved soil areas on the parcel and around the perimeter of the parcel at the columns and fence will contain hazardous waste concentrations of lead."  4/10/20 Caltrans report, Dkt. 103-1 at p. 3; see also Dkt. 77.  The Court then held an emergency status conference on April 23, 2020 regarding the suitability of using the 16th and Maple site.  4/15/20 Order, Dkt. 70.

## E. The Proposed Preliminary Injunction

On May 13, the Court, *sua sponte*, said it was considering entering a preliminary injunction mandating Defendants relocate and provide shelter to homeless residents living under freeway overpasses and underpasses or near ramps unless the parties came up with a better plan.  Dkt. 103; see also 5/13/20 Transcript at pp. 106-125, Dkt. 112. As evidentiary support for the proposed relief, the Court cited, in part, a colloquy between the Court and counsel for the City from the April 23 conference.  Dkt. 103, fns. 2, 3.

---

[9] Although a site at 749 S Los Angeles Street was previously agreed upon by all parties, Plaintiffs reneged on their agreement after neighborhood residents and businesses complained about the site.  *See e.g.,* 4/27/20 Joint Status Report, Dkt. 80 and 4/30/20 Defendants' Joint Progress Report, Dkt. 88.

1    The Court ordered the parties to return to Court two days later, on May 15, 2020,

2    to provide it with an estimate of the number of persons experiencing homelessness who

3    shelter on freeway overpasses and underpasses and near on and off ramps, and with a

4    better plan. Dkt. 106. The City submitted, confidentially, its plan to address the Court's

5    concerns on the morning of May 15, before that day's hearing began.

6    At the May 15 hearing, experts from the Los Angeles Homeless Services

7    Authority ("LAHSA") opined that, in the midst of the COVID-19 emergency,

8    prioritizing people experiencing homelessness under freeways should not be the region's

9    principal response to addressing the needs of the homeless population in the midst of the

10   pandemic crisis. The Court responded by vacating its previous briefing schedule, stating

11   the preliminary injunction would issue May 22, and inviting the parties to avoid the

12   injunction by again submitting an alternative plan by Tuesday, May 19. When the City

13   requested an opportunity to be heard on the preliminary injunction, the Court ordered

14   briefs due by 5:00 pm the next day, Saturday, May 16. 5/15/2020 Transcript at 46:10-

15   47:10, Dkt. 117. Later that day, the Court issued a written order allowing the parties

16   until Thursday, May 21, to submit briefs on the Court's injunction. Dkt. 108.

17   Over the ensuing weekend and first days of this week, the City worked with the

18   County, Plaintiffs, and Intervenors to agree on a joint plan, based largely on the plan the

19   City had previously submitted confidentially. The parties made significant progress in

20   this short time period, including agreeing to pilot projects, but were unable to fully

21   conclude an agreement on the alternative plan. The major outstanding issue is who

22   should pay for the necessary operational support and services required for each shelter

23   location to be created by the City. In addition, the City, County, and Plaintiffs agreed

24   with the Court that the City may take enforcement action, if necessary, consistent with

25   *Martin v. City of Boise*, after offering adequate alternative shelter to homeless people

26   living in the vicinity of a freeway, but the Intervenors did not.

27

28

CITY OF LOS ANGELES' BRIEF IN RESPONSE TO COURT'S PRELIMINARY INJUNCTION ORDER [DKT. 108]

## III. **ARGUMENT**

The City shares the Court's concern for the safety and health of homeless residents living near freeways, ramps, underpasses and overpasses.  It also appreciates the efforts the Court has undertaken to mediate a resolution of this case for the benefit of the parties, unhoused residents, and the community.  But the Preliminary Injunction is not the proper vehicle, procedurally or constitutionally, to achieve these goals.

### A. Standard of Review

A preliminary injunction is an "extraordinary and drastic remedy" and one that should not be granted unless a moving party demonstrates that it both: (1) has Article III standing, *Or. Prescription Drug Monitoring Program v. United States DEA*, 860 F.3d 1228, 1233 (9th Cir. 2017); and (2) is entitled to preliminary injunctive relief.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  To establish entitlement to preliminary injunctive relief, plaintiff must make a "clear showing" that:  (1) they are "likely to succeed on the merits," (2) "likely to suffer irreparable harm"; (3) "the balance of equities tips in [their] favor"; and (4) the injunction "is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Mandatory injunctions, like the one to be issued here, are "particularly disfavored."  *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979).  Such injunctions are subject to higher scrutiny and carry an even heavier burden of persuasion than prohibitory injunctions—they can be issued only if the plaintiff establishes that the facts and law "clearly favor" plaintiff.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *see Washington v. Cent. Puget Sound Reg'l Transit Auth.*, 533 Fed. Appx. 716, 719 (9th Cir. 2013).

### B. The *Sua Sponte* Issuance Of The Injunction Is Procedurally Improper

The City re-emphasizes its strong desire to engage collaboratively with the Court and all parties.  The City's active participation in these proceedings underscores this desire to work together to make progress on our homelessness crisis.  But both for this Court to consider and to preserve its appellate rights, the City offers the following

9

1  objections to the Preliminary Injunction.

2      No party moved for injunctive relief; the Court issued the injunction *sua sponte* in

3  the midst of settlement discussions.  There is no applicable authority for a preliminary

4  injunction on a *sua sponte* basis, and *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir.

5  2014) and *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1150 (9th Cir. 2004) do not

6  support the proposition that the Court can issue one here.  In *Armstrong,* the Court's *sua*

7  *sponte* modification of a permanent injunction followed years of litigation and was made

8  on a thorough and detailed evidentiary record.  *Armstrong,* 768 F.3d at 978-80.

9  Similarly, the district court's *sua sponte* permanent injunction in *Clement,* 364 F.3d

10 1148, was issued after a well-developed record and litigation, and followed a noticed

11 motion for summary judgment.  *Id.* at 350-51.  Notably, in *Clement,* there is no

12 indication that the propriety of the district court issuing the injunction *sua sponte* was

13 challenged.

14     Conversely, the limited circumstances that authorized a *sua sponte* injunction in

15 *Armstrong* and *Clement* do not exist here: there has been no lengthy litigation and there

16 is no evidentiary record.  The preliminary injunction was issued two months after the

17 case was initiated and while the case is stayed, before any defendant responded to the

18 Complaint and before any discovery was exchanged.  The lack of any evidentiary

19 foundation would independently invalidate the injunction.  *See e.g., Thomas v. County of*

20 *Los Angeles*, 978 F.2d 504, 508-509 (9th Cir. 1992) (injunction improperly entered

21 without finding of fact and without resolving serious factual disputes).

22 **C. The Injunction Is Impermissibly Vague**

23     The injunctive relief proposed by the Court does not meet the requirements of

24 Rule 65(d)(1), which requires that an injunction both "state its terms specifically" and

25 "describe in reasonable detail… the act or acts restrained or required."  Fed. R. Civ. P.

26 65(d)(1).  The purpose of this rule is "to prevent uncertainty and confusion on the part of

27 those faced with injunctive orders, and to avoid the possible founding of a contempt

28 citation on a decree too vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 475

(1974) (noting that "the specificity provisions of Rule 65(d) are no mere technical requirements").

The Preliminary Injunction requiring that people living "near" freeway overpasses, underpasses, and ramps be relocated "a sufficient distance away" from such areas is impermissibly vague. "Near," "away," and "a sufficient distance" are geographically vague terms that lack any specificity as to the precise distance the City must relocate someone before they risk a contempt citation.

The temporal scope of the injunction is equally vague. It is unclear whether the injunction orders a one-time relocation of the individuals currently living within the vaguely-contemplated geographic scope, followed by immediate enforcement of "anti-camping laws" to ensure that no individuals can return, or if it imposes a continuing obligation on the City to constantly relocate and provide shelter to individuals who may, in the future, reside "near" freeways. These imprecisions render the Preliminary Injunction too vague to provide appropriate notice to the parties of the specific steps necessary to comply with it (or what conduct would constitute contempt). *See Schmidt*, 414 U.S. at 475.

### D. The Injunction Would Be Adverse To Public Health Recommendations

In the midst of the pandemic, the advice of public health officials is to leave unsheltered individuals and encampments where they are if individual housing options are unavailable. *See* https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#coalition. Thus, to the extent the Court is requiring the City to order an unsheltered resident "to relocate an adequate distance away from freeway locations" (Dkt. 108 at p. 6) to a different area in the City rather than an offered shelter, the injunction requires the City to contradict public health guidelines.

### E. Separation Of Powers And Article III Preclude The Injunction

While the City appreciates the Court's efforts to help resolve heretofore intractable issues relating to homelessness, the separation of powers doctrine dictates that "it is not the role of courts, but that of the political branches, to shape the institutions

11

of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996) (holding that injunction to correct "inadequacy" of prison policies on a systemwide basis exceeded court's jurisdiction); *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (when a party seeks to enjoin a local government practice, its case "must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs"); *see also Midgett v. Tri-Cty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850-51 (9th Cir. 2001) ("a federal court must exercise restraint when a plaintiff seeks to enjoin any non-federal government agency").

Indeed, in prior cases involving municipal laws and practices affecting unhoused persons, the Ninth Circuit has limited the scope of judicial relief based on separation of powers principles:

> We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless. [] We do not desire to encroach on the legislative and executive functions reserved to the City Council and the Mayor of Los Angeles. There is obviously a 'homeless problem' in the City of Los Angeles, which the City is free to address in any way that it sees fit, consistent with the constitutional principles we have articulated.

*Jones v. City of L.A.*, 444 F.3d 1118, 1138 (9th Cir. 2006) *vacated by* 505 F.3d 1006 (9th Cir. 2007) (internal citations omitted).

Insofar as the Preliminary Injunction dictates how the City must prioritize the sheltering of certain persons experiencing homeless over others, and the manner in which it must spend its tightly limited and decreasing funds, it reaches beyond the constitutional limits of the Court's authority.

The preliminary injunction here also exceeds the Court's Article III jurisdiction for three reasons. First, the injunction seeks to redress a harm identified by the Court, not a "case or controversy" presented by Plaintiffs. Nowhere in the Complaint do Plaintiffs allege they were harmed as a result of encampments in overpasses, underpasses or near freeway ramps.

1    Second, to the extent the Complaint requests the Court to order the City to build
2    shelters and housing, Plaintiffs lack standing to seek such broad prophylactic injunctive
3    relief.  To meet the "irreducible constitutional minimum" of Article III standing,
4    Plaintiffs must establish: (1) an injury-in-fact, that is, an invasion of a legally protected
5    interest which is (a) concrete and particularized and (b) actual or imminent and not
6    conjectural or hypothetical; (2) a causal connection between the injury and the conduct
7    complained of—the injury has to be fairly traceable to the defendant's challenged
8    conduct and not the result of the independent action of third parties; and (3) it is likely,
9    and not merely speculative, that the injury will be redressed by a favorable decision.
10   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

11   Here, Plaintiffs have not shown that they suffered a concrete and particularized
12   injury that was caused by any conduct of the City, nor that any of their alleged injuries
13   could be redressed by a favorable decision.  Instead, their claims are premised on
14   generalized grievances about the effects of homeless encampments on business owners
15   and residents, and their disapproval of the manner in which the City allocates its
16   resources in addressing the homelessness crisis.  Indeed, the causal connection between
17   providing additional support for unhoused individuals and the harms alleged by
18   Plaintiffs is entirely too attenuated and speculative to support jurisdiction under Article
19   III.  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976); *Linda R. S. v.
20   Richard D.*, 410 U.S. 614, 618 (1973).  Article III precludes the Court from dictating
21   how the City exercises its discretionary spending to address issues arising out of
22   homelessness.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006); *Allen v.
23   Wright*, 468 U.S. 737, 760 (1984).

24   Finally, the lack of a "case or controversy" is also evidenced by the fact that the
25   Preliminary Injunction is focused on harms to unhoused persons who are not before the
26   Court, and not any harm alleged by Plaintiffs.  *See* Dkt. 108 at p. 4.  Plaintiffs do not
27   have standing to represent the interests of third-party unhoused persons.  *Linda R.S.*, 410
28   U.S. at 619 ("a private citizen lacks a judicially cognizable interest in the prosecution or

13

nonprosecution of another"); *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  Rather,

Plaintiffs must "assert [their] own legal rights and interests and cannot rest [their] claim

to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490,

499 (1975); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)[10]  The Court thus

lacks jurisdiction to issue the preliminary injunction.

### F.   The *Winter* Factors Do Not Support A Preliminary Injunction

#### 1.  Plaintiffs cannot show they are likely to succeed on the merits

The Court's discussion of the likelihood of success on the merits is brief, and

largely focuses on Plaintiffs' second cause of action, *i.e.*, failure to discharge a

mandatory duty under California Welfare and Institutions Code § 17000.  The Court

concludes that "[t]here is, at the very least, a serious question as to whether the City of

Los Angeles and the County of Los Angeles have failed to meet these obligations under

California law."  Dkt. 108 at p. 4.  But § 17000 cannot form the basis of an injunction

against the City because: (1) the claim is not asserted against the City (*see* Dkt. 1 at

¶ 134); and, even if it had been, (2) § 17000 imposes no obligations on the City.  *See*

Cal. Welf. & Inst. Code § 17000-17001.5; *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069,

1104 n.18 (1995).

The Court cites *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2013) in support of

its conclusion that Plaintiffs are likely to prevail on the merits.  Dkt. 108 at p. 4.  But as

the Court itself acknowledges, *id.*, *Boise* addressed only Eighth Amendment claims

challenging the enforcement of anti-camping laws against homeless people as cruel and

---

[10] The Intervenors' presence in this action does not change the standing analysis.
Intervention under Fed. R. Civ. P. 24 is a procedural means for entering an existing
federal action.  *Cantella v. State of Cal.*, 404 F.3d 1106, 1113 (9th Cir. 2004).  Rule 24
does not extend the Court's jurisdiction.  *Id.*  Intervenors' "protectable interests" in this
action relate to their respective consent decree and settlement agreement entered in other
actions.  *See* Dkt. Nos. 16, 25.  Rule 24 cannot be used "to allow the creation of whole
new lawsuits by the intervenors."  *S. Cal. Edison v. Lynch*, 307 F.3d 794, 803 (9th Cir.
2002); *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).

unusual punishment in circumstances where they lacked access to shelter and their conduct was deemed involuntary. Here, Plaintiffs do not allege such claims. Rather, Plaintiffs are housed residents and businesses who seek to vindicate their own rights under the Fourteenth Amendment, not the rights of unhoused persons regarding criminal enforcement under the Eighth Amendment.

The Court also states that a public nuisance "may" exist, and that Equal Protection and Due Process "could plausibly" be implicated. Plaintiffs are unlikely to succeed on the merits of those claims, either.

> a.   Public Nuisance Claim

Plaintiffs allege that the City "perpetuat[e] and facilitate[ed] nuisance violations" by their "failure to maintain the public property under its control, and to enforce the laws requiring the same." Dkt. 1 at ¶ 76. The alleged nuisances include blocked sidewalks, health and safety risks, increased crime, and a general negative impact on quality of life. *Id.* at ¶ 77.[11] Plaintiffs are unlikely to succeed on this claim. Although nuisance is broadly defined to include "[a]nything which is injurious to health…" (Cal. Civ. Code § 3479), to state a claim for public nuisance, Plaintiffs must show that the nuisance was "specially injurious" to them. Cal. Civ. Code § 3493; *County of Santa Clara v. Superior Court*, 50 Cal.4th 35, 55 (2010). This requires Plaintiffs to show that their injuries were different in *kind* from the general public, not just in magnitude. *See Siskiyou Lumber & Mercantile Co. v. Rostel*, 121 Cal. 511 (1898) (no nuisance claim where obstruction of sidewalks caused same injury to public as to businesses operating near obstruction). Plaintiffs cannot make the requisite showing of a special injury because, as even they concede, the alleged nuisance conditions affect everyone in the City, not just Plaintiffs. Dkt. 1 at ¶ 58.

---

[11] The Preliminary Injunction re-crafts Plaintiffs' nuisance theory to focus on the harms to unhoused persons rather than Plaintiffs. *See* Dkt. 108 at p. 4. As discussed, Plaintiffs do not have standing to bring such a claim based on alleged third-party harm.

b.  Equal Protection

Plaintiffs allege that the City has violated the Equal Protection Clause by enforcing its ordinances against unhoused persons less aggressively in Skid Row than in other areas of the City.  Dkt. 1 at ¶ 86.  Even assuming the truth of these allegations, Plaintiffs have not shown, as they must, that the City "acted with an intent or purpose to discriminate against [them] based upon membership" in a particular group.  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  Nothing in the Complaint suggests that the City's decisions on how to enforce its laws in Skid Row were motivated by an intent to discriminate against Plaintiffs—much less that any such discrimination was based on membership in the group they represent, *i.e.*, business owners and housed residents in Skid Row.  For this reason, Plaintiffs are unlikely to succeed on their Equal Protection claim.  *See, e.g., Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (facts must demonstrate discriminatory intent).[12]

c.  Due Process ("State Created Danger") Claim

In support of their due process claim, Plaintiffs allege that "Defendants affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result."  Dkt. 1 at ¶ 189.  Plaintiffs are unlikely to succeed on this claim.

Due process "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."  *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quotation omitted).  It is well settled that the Due Process Clause is not a

---

[12] Plaintiffs also allege that the *Mitchell* settlement creates this unequal treatment in enforcement.  Plaintiffs cannot rely on the City's settlements as the basis for their claims.  Litigation-related conduct, including settlements, are protected petitioning activity; the *Noerr-Pennington* doctrine precludes liability based on such activity.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006); *see also Thomas v. Hous. Auth.*, No. CV 04-6970 MMM (RCx), 2005 U.S. Dist. LEXIS 46426, at *40-42 (C.D. Cal. June 2, 2005) (collecting cases).

1  "guarantee of certain minimal levels of safety and security." *Martinez v. City of Clovis*,

2  943 F.3d 1260, 1270-71 (9th Cir. 2019).  In fact, "[t]he general rule is that a state is not

3  liable for its omissions" and due process does not "impose a duty on the state to protect

4  individuals from third parties." *Id.*  Thus, "[s]imply failing to prevent acts of a private

5  party is insufficient to establish liability" under the Due Process Clause. *Id.* (*citing Patel*

6  *v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011)).  This is true "even if the state was

7  remiss in allowing the third person to be in a position in which he might cause harm to a

8  member of the public." *Ketchum v. Cty. of Alameda*, 811 F.2d 1243, 1247 (9th Cir.

9  1987).

10  Plaintiffs allege their due process claim is based on the "state created danger"

11  exception, which is simply not applicable here.  Under this limited exception, due

12  process may require a government to protect a plaintiff if it "affirmatively places" that

13  plaintiff "in danger by acting with deliberate indifference to a known or obvious

14  danger." *Patel*, 648 F.3d at 971-72 (internal citations omitted).  Plaintiffs do not

15  articulate what "danger(s)" form the basis of their claim, much less any "actual,

16  particularized danger that they would not otherwise have faced."  The Complaint is

17  devoid of any "affirmative acts" by the City that subjected Plaintiffs to any purported

18  danger.  In fact, to the extent the Complaint discusses affirmative actions taken by the

19  City, it characterizes them as "impressive and commendable." Dkt. 1 at ¶ 18.  Absent an

20  affirmative act, the state-created danger exception cannot be invoked here.

21  **2.  The remaining *Winter* factors do not support the injunction**

22  To obtain injunctive relief, Plaintiffs must also demonstrate "immediate

23  threatened injury" and that the equities and public interest weigh in favor of an

24  injunction. *Winter*, 55 U.S. at 20.  First, although Plaintiffs claim to have suffered

25  injuries due to homeless encampments in and around their residences and businesses,

26  they allege no injuries arising from encampments near freeways.  Thus, the Preliminary

27  Injunction does not address Plaintiffs alleged injuries, but instead focuses on potential

28  injuries to third parties not before the Court.  Second, there is no evidence that the

Preliminary Injunction would serve the interests of the public, or even the interests of the third-party unhoused persons the Court seeks to protect; indeed, there is some information to the contrary presented to the Court.  Absent such evidence, there is no basis on which to conclude that the equities or public interest favor the preliminary injunction.

### G. If Issued, The Preliminary Injunction Should Be Stayed

Finally, if the Court issues the Preliminary Injunction, the City requests an immediate stay of the order pending review by the Ninth Circuit Court of Appeals.  Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a).

## IV.  CONCLUSION

The City shares the Court's deep concern for the safety and health of homeless residents living near freeways, and appreciates all the efforts the Court has undertaken to mediate a resolution of this case for the benefit of all.  But, for all the reasons set forth above, the Court should not issue the Preliminary Injunction.  The City again requests this Court permit the parties briefly to continue negotiations.  In the alternative, the City request the Court immediately stay its Preliminary Injunction pending appellate review.

DATED: May 21, 2020          MICHAEL N. FEUER, City Attorney
                             KATHLEEN A. KENEALY, Chief Ass't City Attorney
                             SCOTT MARCUS, Senior Assistant City Attorney
                             GABRIEL S. DERMER, Assistant City Attorney
                             ARLENE N. HOANG, Deputy City Attorney
                             JESSICA MARIANI, Deputy City Attorney


                             By: /s/_____
                             SCOTT MARCUS, Senior Assistant City Attorney
                             Counsel for Defendant City of Los Angeles