**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KESDate: May 22, 2020

Title: LA ALLIANCE FOR HUMAN RIGHTS ET AL. v. CITY OF LOS ANGELES ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Kelly Davis | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):PRELIMINARY INJUNCTION**

**I.Background**

In response to the Court's Order re: Preliminary Injunction (Dkt. 108), at 6:58 p.m. on May 19, 2020, the Court was advised that a tentative agreement had been "signed off on by all parties and intervenors" and would be submitted to the Court momentarily. However, approximately thirty minutes later, the parties informed the Court that they were in fact unable to reach an agreement, and that the parties would be filing separate reports with the Court.[1]

In its Status Report (Dkt. 115) ("County Report"), filed jointly with Intervenors on May 20, 2020, the County of Los Angeles represents as follows:

> Following the issuance of the Court's injunction on May 15, 2020, the parties spent the last several days trying to reach an agreement regarding a joint filing. Regrettably, at approximately 7:30 p.m. the

---

[1] The Report (Dkt. 114) filed by the City of Los Angeles and Status Report (Dkt. 115) filed by the County of Los Angeles are attached to this Order as Exhibits A and B, respectively.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES					Date: May 22, 2020

Page 2

> day the filing was due, the City declined to participate in a joint filing, stating that it could not agree out of a concern over the payment for "services" at City-owned interim shelters and similar sites. The County offered to develop a package of mainstream services for persons experiencing homelessness and residing in shelters within the City. These services would include health and behavioral health outreach, disability benefit advocacy services, and connections to social services benefits. The City rejected the County's offer.
>
> The City would not agree to a shared funding arrangement as proposed by the County for operational costs (such as food, laundry, security, etc.) associated with the City's pilot programs. The City made a similar request for all City shelters proposed under the City's plan to address homelessness near freeways and for individuals currently occupying COVID-19 emergency beds in the City. These demands are inconsistent with past practice. In general, with the exception of Measure H funding administered by the County, the City funds operational costs for interim shelter sites in the City. The City is a major recipient of state and federal funds for homeless services, unlike other cities in the County (with the partial exception of Long Beach).
>
> In an effort to move the parties forward, the County suggested a joint funding strategy with the City for certain pilot programs, leaving the issue of broader operational costs for another time (perhaps with the intervention of a mediator). The City rejected that offer too. The City has requested that the County dedicate additional Measure H or other County funds to the City. However, Measure H funds are disproportionately spent in the City. In addition, Measure H funds are already appropriated to support the City as well as other jurisdictions in the region addressing homelessness. Despite these developments, the County will continue to pursue partnerships with the City.

County Report at 10-11.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                         Date: May 22, 2020

Page 3

       For its part, the City of Los Angeles, in its Report (Dkt. 114) ("City Report"), filed May 19, 2020, states:

> The City stands ready to provide the capital costs (subject to approval of the City Council) needed to implement a mix of shelter and housing solutions to serve a diverse homeless population, in partnership with the County of Los Angeles (County) and the Los Angeles Homeless Services Authority (LAHSA) to ensure those solutions include the services necessary to keep people off the streets.
>
> . . .
>
> In all, the City commits to creating 6,100 new shelter opportunities in the next 10 months.[2] The City's plan is contingent upon each shelter location receiving the appropriate levels of necessary County-funded support and operating services. Under the voter approved tax initiative Measure H, the County funds operating services for homeless facilities called for in the County Homeless Strategy. Operating services include specially trained staff dedicated to manage these facilities; case managers who work with clients in the facilities to access housing and other benefits; security services; and program enrollments/exits. These operating services are in addition to the "mainstream" systems of care (mental health, healthcare, substance abuse, etc.) provided by the County, which are also necessary—but not sufficient—to successfully operate the shelter opportunities the City is committed to creating.

City Report at 2-3.

       These submissions to the Court, combined with the last-minute collapse of the signed tentative agreement, lead the Court to conclude that there are relatively few unresolved issues, and that the remaining issues are tied to the longstanding conflict between the City and County as to which entity is financially responsible for which

---

[2] On this record, the Court understands that this total of 6,100 shelter opportunities includes the approximately 2,200 hotel and motel rooms contracted under Project Roomkey and the approximately 1,000 shelter beds in recreational centers, and thus represents an increase of approximately 2,900 shelter opportunities.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES																							Date: May 22, 2020

Page 4

homeless services. The Court reminds the City and County that these funds are not the property of the City and County, but have been allocated by the local taxpayers, the State of California, and the federal government as funds to provide shelter and services to persons experiencing homelessness. Moreover, the disagreement between the City and County over the relatively minor costs of this pilot program does not bode well for the future as the program is scaled up across the City and County. It is regrettable that this ongoing endeavor to develop humane and sustainable responses to the challenges of homelessness is beleaguered by a legacy of bureaucratic entanglement and gridlock.

The Court commends the efforts that have been undertaken to shelter vulnerable residents of the City and County of Los Angeles during the COVID-19 pandemic. Efforts to comply with the Court's preliminary injunction should broaden—not replace—these emergency public health efforts, and the two should run alongside each other, rather than sequentially. The City of Los Angeles and County of Los Angeles have the capacity and resources to comply with the injunction while maintaining their unprecedented efforts to protect vulnerable residents from COVID-19.

As the record has developed in this case, the Court has become increasingly concerned that a particular subset of persons experiencing homelessness—those who live near overpasses, underpasses, and ramps on all freeways and City and County streets—are exposed to severely heightened public health risks as a result of where they live. Indeed, all parties in this action agree that it is unreasonably dangerous for humans to live in areas that may, for example, be contaminated with lead or other carcinogenic substances, which have deleterious health impacts and can shorten a homeless person's life expectancy by decades.[3] These locations also increase the danger that a homeless person will be struck by a vehicle or injured in the event of an earthquake or crash.[4] Camps in these locations can also burden the general public—for example, by posing potential hazards to passing motorists, or by making sidewalks and other rights-of-way inaccessible to individuals with disabilities. However, as with many issues involving

---

[3] *See* California Department of Transportation, Hazardous Waste Assessment of Parcel for Air Space Lease for Homelessness Solutions Located at 16th Street and Maple Ave., Los Angeles (April 10, 2020) [hereinafter Assessment] at 3 ("However, based on the location of the parcel being directly under the heavily travelled I-10 Freeway and past use of leaded gasoline, there is a high probability that the unpaved soil areas on the parcel and around the perimeter of the parcel at the columns and fence will contain hazardous waste concentrations of lead."). The Assessment is available at Docket No. 103-1. *See also* Tr. of Apr. 13, 2020 Proceedings (Dkt. 94) at 75-76 (discussing danger of fumes to "people sleeping under freeways").

[4] *See* Tr. of Apr. 13, 2020 Proceedings at 75-76 (noting further danger of "the freeway collapsing in earthquakes").

Case 2:20-cv-02291-DOC-KES Document 123 Filed 05/22/20 Page 5 of 13 Page ID #:1945

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LA CV 20-02291-DOC-KES　　　　　　　　　　　　　　　　　　Date: May 22, 2020

Page 5

individuals experiencing homelessness, no party appears to be addressing this problem with any urgency.

The Court finds that these combined risks constitute an emergency and that a response cannot wait until this case is resolved by settlement or trial, and hereby ORDERS that this subset of individuals experiencing homelessness be offered housing and subsequently humanely relocated away from overpasses, underpasses, and ramps on all freeways and City and County streets (collectively, "overpasses, underpasses, and ramps"). This preliminary relief is appropriate to remedy the emergency health hazards facing these individuals experiencing homelessness. The Court's preliminary injunction shall be implemented on an ongoing basis independent of the parties' continuing settlement negotiations. In addition to improving the health and living conditions of individuals experiencing homelessness, the Court anticipates that this preliminary injunction will make the greater Los Angeles area healthier, safer, and more accessible for the general public.

## II.　　Legal Basis for Preliminary Relief

### A.　　Legal Standard

A district court may order injunctive relief on its own motion and is not restricted to ordering the relief requested by a party. *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014) (citing *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1150 (9th Cir. 2004)). A preliminary injunction is an "extraordinary remedy," requiring courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

For a court to issue a preliminary injunction, it must find that (1) there is a likelihood of success on the merits; (2) absent preliminary relief, irreparable harm is likely; (3) the balance of equities tips in favor of preliminary relief; and (4) an injunction is in the public interest. *See Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). The Court has the authority to issue a mandatory injunction when the facts and law "clearly favor" issuance. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. LA CV 20-02291-DOC-KES					Date: May 22, 2020

Page 6

## B. Discussion

### 1. The Likelihood of Success on the Merits Supports Preliminary Relief

*State law grounds.* The California Welfare and Institutions Code provides as follows:

> Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

Cal. Welf. & Inst. Code § 17000 (West 2020). This provision is intended "to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." *Id.* § 10000. Such aid and services shall be "provided promptly and humanely, with due regard for the preservation of family life," and on a non-discriminatory basis. *Id.*

The Court finds that, at this stage of the litigation, it is sufficiently clear that the City of Los Angeles and County of Los Angeles have failed to meet these obligations under California law. The City and County of Los Angeles argue that these provisions of the Welfare and Institutions Code cannot serve as the basis of this injunction because "there is no mandatory duty in Section 17000 requiring the County to provide shelter to individuals experiencing homelessness." Resp. of County of Los Angeles (Dkt. 120) at 11; *see also* Resp. of City of Los Angeles (Dkt. 121) at 14 ("§ 17000 imposes no obligations on the City"). However, the California Supreme Court has "authoritatively interpreted" these provisions and held that "Section 17000 . . . *mandates* that medical care be provided to indigents and section 10000 *requires* that such care be provided promptly and humanely. . . . There is no discretion concerning whether to provide such care." *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996) (emphasis added) (summarizing extensive preceding analysis of California case law). To the extent the County and City argue that providing lifesaving housing to individuals experiencing homelessness who live in areas near overpasses, underpasses, and ramps does not qualify as "medical care," their insistence that a hazardous waste assessment be performed before using one such location as a shelter—and the subsequent finding that the location could

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                                  Date: May 22, 2020

Page 7

not be used as shelter due to a high probability of containing "hazardous waste concentrations of lead"—contradicts that proposition. *See generally* Assessment.

      ***Constitutional grounds.*** The Court also finds that the hazardous conditions of homeless camps near overpasses, underpasses, and ramps likely offend the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment provides, in relevant part, that no state[5] "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The vision of "liberty" enshrined in the Due Process Clause has been interpreted expansively to include rights "not mentioned explicitly in the Constitution." *Griswold v. Connecticut*, 381 U.S. 479, 486 & n.1 (Goldberg, J., concurring) (numerous citations omitted). Moreover, it has long been established that the Due Process Clause guarantees not only procedural protections, but also substantive rights, thereby "barring certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

      Substantive due process accordingly "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 870 (9th Cir. 1988) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). Although the government is generally "not liable for its omissions," *Martinez v. City of Clovis*, 943 F.3d 1260, 1270-71 (9th Cir. 2019), a government is required to act when it has "affirmatively place[d]" its citizens "in danger by acting with deliberate indifference to a known or obvious danger," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971-72 (9th Cir. 2011) (citations omitted). Here, the City and County of Los Angeles have acted with deliberate indifference to individuals experiencing homelessness, whom they allow to reside near overpasses, underpasses, and ramps despite the inherent dangers—such as pollutants and contaminants—of which the City and County of Los Angeles have actual knowledge. *See, e.g.*, Assessment at 3 ("However, based on the location of the parcel being directly under the heavily travelled I-10 Freeway and past use of leaded gasoline, there is a high probability that the unpaved soil areas on the parcel and around the perimeter of the parcel at the columns and fence will contain hazardous waste concentrations of lead.").

      Indeed, because these locations offer shelter from the elements, by failing to provide adequate shelter or alternative housing options, the City and County of Los

---

[5] Local governments, such as cities and counties, are "state actors" for purposes of the Fourteenth Amendment. *E.g.*, *Bd. of Trs. V. Garrett*, 531 U.S. 356, 369 (2001).

Case 2:20-cv-02291-DOC-KES   Document 123   Filed 05/22/20   Page 8 of 13   Page ID #:1948

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                                                 Date: May 22, 2020

Page 8

Angeles have essentially forced individuals experiencing homelessness to camp in these dangerously polluted locations. It is clear to the Court that the Due Process Clause does not allow this kind of governmental conduct. While the Court is not aware of any previous case finding this modest substantive due process right, the Court is confident that this limited right is "implicit in the concept of ordered liberty." *See Nunez*, 147 F.3d at 870. As the Supreme Court has held, rights arise not only from "ancient sources," but also "from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). The severe health hazards attendant on living near overpasses, underpasses, and ramps—to say nothing of the public health risks illuminated by the ongoing COVID-19 pandemic—present just such an urgent crisis and better inform the constitutional understanding of ordered liberty.

The Ninth Circuit's recent decision in *Martin v. City of Boise*, 920 F.3d 584, further illuminates the constitutional values at stake in this litigation. In its analysis of the Eighth Amendment, the Ninth Circuit held that "the Cruel and Unusual Punishments Clause not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also 'imposes substantive limits on what can be made criminal and punished as such.'" *Martin v. City of Boise*, 920 F.3d 584, 613 (9th Cir. 2019) (quoting *Ingraham v. Wright*, 430 U.S. 651, 667 (1977)). The Ninth Circuit concluded that the Cruel and Unusual Punishments Clause "bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to." *Id.* at 603.

But if citing an individual experiencing homelessness for sleeping outside rises to the level of *cruel and unusual punishment*, then—a fortiori—it is likely also cruel and unusual to act with such indifference that an individual experiencing homelessness is forced to take shelter in an inherently hazardous location. That is, when there is such a dearth of available shelter that the best option for an individual experiencing homelessness is to camp in a dangerous location, this functionally constitutes a punishment for the crime of being homeless. Much like a formal criminal citation, the Court finds that it is cruel and unusual, in violation of the Eighth Amendment, to leave individuals experiencing homelessness no better option than to camp in hazardous areas when they have no other available shelter to enter.

Given these serious issues of state and federal law, the Court finds that the likelihood of success on the merits clearly favors issuing a preliminary injunction.

Case 2:20-cv-02291-DOC-KES Document 123 Filed 05/22/20 Page 9 of 13 Page ID #:1949

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                               Date: May 22, 2020

Page 9

### 2. The Likelihood of Irreparable Harm Justifies Preliminary Relief

Given the health hazards described above, the Court has no difficulty finding a grave risk of irreparable harm. When homeless individuals are exposed to such dangers as toxic fumes, "hazardous waste concentrations of lead," car crashes, and the potential collapse of an overpass in an earthquake, their health is threatened in a way that monetary damages cannot adequately compensate. Additionally, homeless persons living near overpasses, underpasses, and ramps need not suffer these harms at all—or, at least, need not suffer them any further—and this outcome could be achieved with a preliminary injunction.

Because of the public health risks inherent in living near overpasses, underpasses, and ramps, the Court finds that the homeless individuals that live in such locations clearly face a likelihood of irreparable harm, justifying a preliminary injunction.

### 3. The Balance of Equities Tips in Favor of Preliminary Relief

As already discussed, the homeless individuals who live near overpasses, underpasses, and ramps face severe health hazards. By comparison, the City of Los Angeles and County of Los Angeles would only need to invest relatively modest financial and administrative resources to provide safe and healthy shelters to these individuals. As such, the Court finds that the balance of the equities clearly weighs in favor of an injunction.

### 4. A Preliminary Injunction Is in the Public Interest

Finally, a humane relocation away from overpasses, underpasses, and ramps in support of public health will promote the public interest. A district court should look at the injunction's impact on non-parties in determining what is in the "public interest." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)). The Court finds that this preliminary injunction will substantially benefit public health at large. Providing housing for individuals experiencing homelessness—and ensuring that appropriate CDC guidance is followed at the locations that will shelter those individuals—will not only help stop the spread of COVID-19 amongst the population impacted by this injunction, but will also reduce the likelihood that disease will spread throughout the greater Los Angeles community. Furthermore, the public has a right to have local ordinances enforced when City and County actors can legally do so. This injunction will allow the enforcement of anti-

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                         Date: May 22, 2020

Page 10

camping ordinances at an appropriate time and in compliance with *Martin v. Boise*. Such enforcement is also in the public interest.

Therefore, the Court finds that this factor clearly favors an order of preliminary relief.

## III. Provisions of Preliminary Injunction

To protect the individuals experiencing homelessness camping near overpasses, underpasses, and ramps—and the general public—the Court hereby ORDERS that individuals experiencing homelessness camped within 500 feet of an overpass, underpass, or ramp must be offered housing as described below and subsequently humanely relocated at least 500 feet away from such areas by no later than September 1, 2020.[6] As part of this humane relocation effort, and to promote the underlying public health and safety goals, the City of Los Angeles and County of Los Angeles must provide shelter—or alternative housing options, such as government encampments following the existing Veterans Affairs model, safe parking sites, or hotel and motel rooms contracted following the Project Roomkey model—to individuals experiencing homelessness. In addition to the foregoing examples, the Court is open to receiving any other suggestions from the parties for reasonable alternative housing options.

As shelters are established and homeless camps are relocated away from overpasses, underpasses, and ramps, the following criteria, at a minimum, must be satisfied to ensure the process remains humane and serves the best interests of the affected individuals experiencing homelessness and the general public:

(1) All shelters and alternative housing options must be configured with adequate physical space to allow the sheltered individuals to maintain the minimum recommended social distance of six feet to mitigate the transmission of SARS-CoV-2.

---

[6] The requirement of 500 feet is taken from the City of Los Angeles Department of City Planning, which reports that "[a]ir pollution studies indicate a strong link between chronic exposure to vehicle exhaust and particulate matter from roads and freeways and elevated risk of adverse health impacts . . . . Areas located within 500 feet of a freeway are known to experience the greatest concentrations of fine and ultrafine particulate matter (PM), a pollutant implicated in asthma and other health conditions." City of Los Angeles Department of City Planning, Freeway Adjacent Advisory Notice, Zoning Information File No. 2427, at 1 (2018). This Advisory Notice is available at the following URL: http://zimas.lacity.org/documents/zoneinfo/ZI2427.pdf.

Case 2:20-cv-02291-DOC-KES   Document 123   Filed 05/22/20   Page 11 of 13   Page ID #:1951

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                            Date: May 22, 2020

Page 11

(2) All shelters and alternative housing options must have adequate hygiene facilities, such as handwashing stations and showers.

(3) All shelters and alternative housing options must have qualified staff who, upon intake, can test each homeless individual for communicable diseases and other health conditions. The Court may consider revising this aspect of the preliminary injunction in the future, depending on the state of the COVID-19 pandemic.

(4) If any individual experiencing homelessness tests positive for COVID-19, that individual must be sheltered in a facility in which they can be individually isolated until they recover.

(5) All shelters and alternative housing options must be staffed by security as necessary to ensure the safety of the homeless persons sheltered therein.

(6) Before beginning the process of clearing overpasses, underpasses, and ramps, all homeless individuals living in the vicinity must be given advance notice of at least ten days; such notice shall include information about available shelters and alternative housing options in that council district or supervisorial district.

(7) At a minimum, in the interim period between notice and relocation, social workers, mental health workers, and LAHSA authorities shall reach out to noticed individuals experiencing homelessness to provide services and facilitate the transition to shelter. The Court also encourages such outreach to occur as early as possible, even before notice is given.

(8) The City and County of Los Angeles may not relocate individuals experiencing homelessness in a given council district or supervisorial district until after such notice is given, and after the City of Los Angeles and/or County of Los Angeles provide adequate alternative shelter for all individuals experiencing homelessness in that council district or supervisorial district. After these conditions are met, the City of Los Angeles and County of Los Angeles will be allowed to enforce anti-camping laws in that council district or supervisorial district within 500 feet of overpasses, underpasses, and ramps located. This process helps to ensure that these individuals are being moved to safer locations. To be clear, while an individual experiencing homelessness cannot be ordered to enter a shelter facility, they must be given that option, and if they decline, can then be ordered to relocate at least 500 feet away from an

Case 2:20-cv-02291-DOC-KES   Document 123   Filed 05/22/20   Page 12 of 13   Page ID #:1952

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES                                              Date: May 22, 2020

Page 12

overpass, underpass, or ramp. If, during the humane relocation process, a social worker, mental health worker, law enforcement officer, or other qualified personnel encounters an individual exhibiting COVID-19 symptoms, such individual should be referred to an individual testing and quarantine process, such as, but not limited to, Project Roomkey. If all of the above requirements are met, then relocation in these limited areas would be fully compliant with *Martin v. City of Boise*.[7]

As they begin efforts to comply with this preliminary injunction, the City of Los Angeles and County of Los Angeles are responsible for disentangling which entity has authority over the subject locations and the relevant funding mechanisms.

The Court is hopeful that this initial, limited action will assist the parties moving forward, as they work to overcome years of bureaucratic inertia and develop humane solutions in the best interests of both individuals experiencing homelessness and the general public. Indeed, the parties' efforts to provide emergency shelter and services since the onset of the COVID-19 crisis present a stark contrast to the characteristic inaction that has persisted for years with respect to homelessness in the greater Los Angeles area. The Court is concerned, however, that as the COVID-19 pandemic subsides, the present momentum will be lost to longstanding disputes over funding and jurisdictional authority. The most recent filings by the City and County of Los Angeles, quoted at length above, already demonstrate a resurgence of the quarreling and deadlock surrounding the issues of homelessness.

Notwithstanding the failure of the parties to reach an agreement on the terms and conditions of a settlement, the Court, based on input from both City and County elected officials, as well as Plaintiffs and Intervenors, finds these decision-makers are fully aware of the crises created by homelessness in our communities and are dedicated to formulating solutions that will not only improve the living conditions of our homeless population, but also enhance the opportunities for the general public to enjoy the benefits

---

[7] The Court hereby takes judicial notice of the Interim Guidance on People Experiencing Unsheltered Homelessness issued by the Centers for Disease Control and Prevention ("CDC") in response to the COVID-19 pandemic. The CDC recommends, inter alia: "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for disease spread." The Court's preliminary injunction complies with the CDC's Interim Guidance, because providing shelter is a prerequisite to relocating individuals. The CDC's Interim Guidance is available at the following URL: https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-KES　　　　　　　　　　　　　　　　　Date: May 22, 2020

Page 13

that will result from an enlightened approach in addressing these issues. All parties have the same goal in mind; their differences lie in the route to be followed in achieving that goal. The Court is confident a global solution to the homelessness crisis will be found while the parties take the initial step of remedying the emergency health hazards targeted by this injunction.

　　　　To facilitate the Court's monitoring of compliance with the terms of this preliminary injunction, the Court will require periodic status reports from the parties as to their progress. The first such report shall be filed with the Court no later than 12:00 noon on Friday, June 12, 2020. At minimum, this report shall detail a plan for establishing shelter and clearing overpasses, underpasses, and ramps in each council district or supervisorial district no later than September 1, 2020. The Court reserves the authority to advance the deadline of September 1, 2020 in the event that the interim status reports do not demonstrate satisfactory progress towards compliance with the preliminary injunction. Furthermore, the Court shall conduct additional hearings to monitor compliance as the Court finds necessary.

　　　　The Clerk shall serve this minute order on the parties.


MINUTES FORM 11　　　　　　　　　　　　　　　　　　　　　Initials of Deputy Clerk: kd

CIVIL-GEN