MICHAEL FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 N. Main Street, City Hall East, Room 675
Los Angeles, CA 90012
Telephone (213) 978-4681
Facsimile (213) 978-7011
scott.marcus@lacity.org

Attorneys for Defendant CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 10 inclusive,<br><br>Defendants. | Case No.: 2:20-cv-02291-DOC-KES<br>Assigned to Judge David O. Carter<br><br>**CITY OF LOS ANGELES ALTERNATIVE PLAN TO ADDRESS PERSONS EXPERIENCING HOMELESSNESS**<br><br><u>Status Conference</u><br>Date: May 20, 2020<br>Time: 10:00 a.m.<br>Location: 501 S. Spring St. |

Defendant City of Los Angeles ("City") respectfully submits its alternative plan to address individuals experiencing homelessness who live under freeway overpasses and underpasses and near entrance and exit ramps as requested by the Court in its May 15, 2020 Order Re: Preliminary Injunction. [Dkt. 108.]

The City of Los Angeles is committed to working with the Court and the parties and intervenors in this action to solve the crisis of homelessness. The City stands ready to provide the capital costs (subject to approval of the City Council) needed to implement a mix of shelter and housing solutions to serve a diverse homeless population, in partnership with the County of Los Angeles (County) and the Los Angeles Homeless Services Authority (LAHSA) to ensure those solutions include the services necessary to keep people off the streets. While the City remains focused on developing and implementing a comprehensive plan to address homelessness, the City plans to immediately prioritize two subsets of the unsheltered population: 1) people experiencing homelessness currently residing in the City's COVID emergency shelters (recreation centers and City-funded Project Roomkey beds); and 2) people who have taken shelter under freeway overpasses and underpasses, and near freeway entrance and exit ramps. Each group is vulnerable in its own way, and each deserves urgent action. And as was discussed at the May 13, 2020 Status Conference—which the Court agreed with—any plan to provide shelter to persons living under freeways must be within the larger context of the City's and County's response to the threat of COVID-19, which public health officials acknowledge presents a more immediate risk to persons experiencing homeless.

Therefore, the City proposes a two-phase plan (subject to change based on evolving guidance from local public health experts) by which the City will:

1) Identify and activate exits for the approximately 3,000 people brought into emergency City shelter settings (recreation centers and City-funded Project Roomkey hotels) over the course of 120 days; and

2) Create additional shelter beds and locations for the relocation of approximately 3,100 people who live under freeway overpasses and underpasses in the City of Los Angeles in the subsequent 180 days, while ensuring that the sheltering or housing of any such person does not supersede the placement of someone who is assessed by the public

    health and/or homeless services professionals to be at higher risk and/or more in need of shelter.

In all, the City commits to creating 6,100 new shelter opportunities in the next 10 months. The City's plan is contingent upon each shelter location receiving the appropriate levels of necessary County-funded support and operating services. Under the voter approved tax initiative Measure H, the County funds operating services for homeless facilities called for in the County Homeless Strategy. Operating services include specially trained staff dedicated to manage these facilities; case managers who work with clients in the facilities to access housing and other benefits; security services; and program enrollments/exits. These operating services are in addition to the "mainstream" systems of care (mental health, healthcare, substance abuse, etc.) provided by the County, which are also necessary—but not sufficient—to successfully operate the shelter opportunities the City is committed to creating.

As the first and most immediate steps in providing additional shelter and services to persons experiencing homelessness, the City proposes the following three pilot projects:

  1) <u>Hygiene at 16th and Maple</u>. The City will deploy hygiene facilities near 16th and Maple, where a group of people are living under a freeway. Delivery of portable toilets (with sinks) is expected on Wednesday, May 20, 2020, with a separate hand washing station to be delivered soon thereafter. Mobile shower services are already being provided twice a week (beginning last weekend).

  2) <u>Pallet shelters</u>. The City will establish, and the County will support, a Pallet shelter community pilot program (Pallet shelters are state-certified modular housing units). The City will provide hygiene stations and toilets, mobile showers, and administration facilities. This pilot program will contain approximately 50 Pallet shelters,

        providing shelter for 50-100 persons experiencing homelessness (based on public health guidelines), including but not limited to persons experiencing homelessness under freeways.  The Pallet shelter pilot program is expected to open within approximately 8-10 weeks of this filing.

3) <u>RV Safe Parking</u>.  The City will establish an RV safe parking pilot program (the first in the City and County of Los Angeles) that allows safe 24-hour parking in a designated area exclusively for RVs.  On-site security and restrooms will be provided, along with mobile showers and access to case management.  The RV pilot program will accommodate approximately 40 RVs.  The RV pilot is expected to open within approximately 4 weeks of this filing.

These pilot programs are new ways of providing shelter and services that the City has not tried before.  The City will report back to the Court every 30 days (or other interval as requested by the Court) with updates on units created, services provided, costs, and what strategies worked and which were less successful, as those details emerge.

**Phase 1:  Persons Housed in the City's COVID Emergency Shelter Sites**

The City is committed to ensuring that every person who currently resides in an emergency COVID-19 shelter bed will have the ability to transition into a non-emergency shelter facility as the COVID-19 emergency subsides. In order to achieve both the short term goal of safely exiting Angelenos from emergency sites and the long term goal of accelerating efforts to provide shelter and housing to those living in encampments, it will take the collective resources of the City, County, LAHSA, State, and Federal governments. The realities COVID has imposed on the homeless service system, paired with existing shortages of housing and shelter resources, requires the City to fund new solutions for safe exits from COVID housing—which the City is prepared to do.

Critical activities for Phase 1 include (*some activities are already underway*):

- The City's 26 recreation center emergency shelters will fully suspend new admissions and be prepared for return to their communities for recreation use by September 30th. (*Admissions have already been suspended on a number of sites and will only be allowed on an emergency basis between now and June 1*).
- County- and LAHSA-funded service providers will surge housing-focused case management services and needs assessments will be conducted for every person currently occupying an emergency bed.
- The City will explore extended lease agreements for Project Roomkey hotels and motels as needed (many will only need a 30 day extension).
- The City is working with LAHSA and County to identify current housing and shelter placements that are available through existing systems (*already underway*)
- The City is identifying contracted support and consultants to assist in acquiring new housing solutions, both temporary and permanent (*already underway*).
- City is identifying critical bureaucratic barriers that need to be removed to execute solutions on an expeditious basis to meet an aggressive 120 day timeline.

Phase 1 Chart below illustrates an approximate mix of exit scenarios including modular housing, purchased motel/hotel rooms, rental assistance, safe parking, family reunification, and supportive housing that the City intends to activate in Phase 1, all of which will require the appropriate levels of necessary County support and services.

**Phase 1 Chart – Sheltering COVID Emergency Residents**

| City Emergency Shelter | Total # of People | Assumptions | | # of People | Potential Exits | | |
|---|---|---|---|---|---|---|---|
| | | Service Need | % | | Exit Option | % | Units |
| Rec Center Program | 1,000 | Low to Mid Need | 60% | 600 | Rental Assistance | 10% | 60 |
| | | | | | Family Reunification | 10% | 60 |
| | | | | | Safe Parking | 10% | 60 |
| | | | | | Modular shelter | 70% | 420 |
| | | High Need | 40% | 400 | Scattered Site Supportive Housing | 50% | 200 |
| | | | | | Supportive Housing | 50% | 200 |
| Project Roomkey | 2,000 | Low to Mid Need | 50% | 1,000 | Rental Assistance | 30% | 300 |
| | | | | | Family Reunification | 10% | 100 |
| | | | | | Safe Parking | 10% | 100 |
| | | | | | Modular shelter | 50% | 500 |
| | | High Need | 50% | 1,000 | Bridge shelter (hotel/motel) | 60% | 600 |
| | | | | | Supportive Housing | 15% | 150 |
| | | | | | Scattered Site Supportive Housing | 25% | 250 |
| | | | | | Total Units: | | 3,000 |

The specific mix is will be based on individual needs that emerge during the surged assessment period, the availability of existing and new housing options, the ability of County to provide the appropriate services, the particular needs of each Council District, and funding. The City estimates that the potential capital costs to launch the strategies in Phase 1 will range from $75 million to $125 million over the next 120 days.

**Phase 2: Unsheltered Persons at Freeway Underpasses and Overpasses**

In partnership with the State, County, and LAHSA, the City stands ready to address the urgent housing needs of individuals living under freeways, within the context of the massive effort already underway to provide outreach and shelter to those at risk from COVID 19 city-wide, including on Skid Row. The County Department of Public Health (DPH) warns that persons who are age 65 and older and/or those with underlying health conditions are uniquely at-risk of becoming gravely ill due to COVID-19. Given this guidance, the homeless service system continues to focus on outreach to and identification of this vulnerable subset of the homelessness population. People living under freeways may fall within this high priority population. The City also acknowledges that the COVID crisis requires—for the foreseeable future—sustained attention and resources to both provide life-saving services and outreach to unsheltered persons meeting the vulnerability criteria as well as to ensure the people brought indoors during the crisis do not return to the streets once the emergency shelters are deactivated.

In order to develop Phase 2 for addressing homelessness under and over freeways, the City analyzed homeless encampment data from three sources: the California Department of Transportation ("Caltrans"), LAHSA, and the LAPD. (LAPD's census also included vehicle dwelling.)

- Caltrans census (3/5/20): 1,243 tents, which equals approximately 1,800 individuals (excludes "air leases," such as 16th & Maple)
- LAHSA census (4/20/20 - 5/14/20): 2,946 individuals
- LAPD census (5/14/20): 3,125 individuals (1,988 tents, 484 vehicles)

As the homeless service system successfully identifies new and existing placements for individuals exiting COVID emergency housing, the City will focus its efforts toward providing a proportional amount of field-based outreach teams to engage with the estimated 3,100 individuals living on freeway underpasses and overpasses. Given the acute needs of this population, the City intends to partner with multi-disciplinary teams from the County and LAHSA to conduct outreach and engagement,

needs assessment, and housing navigation for people living near freeways.  Concurrent to the service efforts launched to humanely relocate people away from freeways, the City will stand up a mix of new housing interventions.  While the precise interventions[1] will be determined on an ongoing, district-by-district basis, an approximate mix is illustrated in Phase 2 Chart below.

**Phase 2 Chart – Sheltering Persons Near Freeways**

| # of People | Assumptions | | # of People | Housing Interventions | | |
|---|---|---|---|---|---|---|
| | Service Need | % | | Exit Option | % | Units |
| 3,100 | Low to Mid Need | 80% | 2,480 | Rental Assistance | 5% | 124 |
| | | | | Family Reunification | 5% | 124 |
| | | | | Safe Parking | 45% | 1,116 |
| | | | | Pop-up / Pallet shelter | 45% | 1,116 |
| | High Need | 20% | 620 | Bridge shelter (hotel/motel) | 60% | 372 |
| | | | | Scattered Site Supportive Housing | 20% | 124 |
| | | | | Supportive Housing | 20% | 124 |
| | | | | Total Units: | | 3,100 |

It is also important to note that individuals prioritized in Phase 2 may be relocated and housed during Phase 1.

---

[1] The options identified in Chart 1 and Chart 2 are not an exhaustive list of shelter possibilities the City may pursue; every possible solution is on the table. For example, the City and County have instructed LAHSA to create a program design for a "Safe Sleep" program, where people living unsheltered can reside in a secure, organized outdoor environment where social distancing is encouraged and enforced with access to hygiene, food, medical monitoring, and some service support.

Similar to the flexibility needed to "right size" the City's housing interventions to exit people from its COVID emergency housing, this estimation of appropriate solutions is subject to change based on actual outcomes from outreach and engagement, the continuing assessment of assets available for use to implement these solutions, the amount of County's investment to fund the support and services necessary to run the solutions, and updated guidance from public health officials.  As these additional housing units are made available to people experiencing homelessness, the City intends to enforce its laws consistent with *Martin v. City of Boise*.  While executing multiple strategies like this is untested, the City believes it can create housing interventions for all 3,100 individuals in Phase 2 within 180 days.  Presently, the City estimates that the capital costs for Phase 2 will range from $100 million to $130 million.

Regional partnerships and shared financial responsibility is a cornerstone of success for both the short term plan outlined in this document and the long term plans necessary to bring a substantial number of Angelenos off the streets and into housing for good.  Subject to approval of the City Council, the City stands ready to commit the capital costs needed to implement Phase 1 and 2, in addition to its other ongoing efforts to create more shelter and housing opportunities for Angelenos experiencing homelessness.  However, the ongoing operating and service commitments needed to sustain these interventions and keep people off the streets come with a substantial cost, one that must be shared between the City, the County, and LAHSA.

Dated:  May 19, 2020            MICHAEL N. FEUER, City Attorney

By:  */s/ Scott Marcus*
SCOTT MARCUS, Senior Assistant City Attorney
Attorneys for Defendant City of Los Angeles