MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email: Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**CITY OF LOS ANGELES' STATUS REPORT IN RESPONSE TO DKT. 143**<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

Defendant City of Los Angeles ("the City") respectfully submits this status report setting forth the City's progress complying with the binding term sheet wherein the City agreed to provide 6,000 beds within 10 months, and an additional 700 beds within the following 8 months (6,700 beds in total within 18 months) to provide housing or shelter opportunities to (i) persons experiencing homelessness living within 500 feet of freeway overpasses, underpasses and ramps, and then to give priority to providing housing or shelter to (ii) persons experiencing homelessness who are 65 or older within the City of Los Angeles, and (iii) other vulnerable persons experiencing homelessness within the City of Los Angeles. [Dkt. 136.]

### Progress made by the City to date

The City has been working tirelessly on these issues and it has made substantial progress. The City prepared a PowerPoint presentation to summarize its work which the City was hoping to present to the Court at the July 16, 2020 status conference. In light of the postponement of the status conference [Dkt. 148], a copy of the PowerPoint is attached to this report as Exhibit A.

The City provides the following information in response to the specific matters addressed in the Court's Minute Order requesting this status report [Dkt. 143]:

**(1)   Current Status of Implementation of the Parties' Agreement in Each Council District, pursuant to the Binding Term Sheet (Dkt. 136).**

Each Council District within the City continues to work closely with the offices of the City Administrative Officer (CAO) and Chief Legislative Analyst (CLA), with tremendous diligence and urgency, to identify new shelter and housing opportunities that can be created within the district, and to maximize the use of existing, available beds that may exist within its boundaries. As previously discussed, these facilities or services may include interim housing facilities, such as A Bridge Home sites, modular (or pallet) shelters, safe parking sites, rapid rehousing rental assistance, shared housing, safe

camping sites, purchased, leased and/or converted hotels and motels (or vouchers), and the repurposing of state trailers currently being used to house unsheltered people who are vulnerable to COVID-19, and scattered or permanent supportive housing, among others. Copies of each Council District Plan are collectively attached to this report as Exhibit B.

Each Council District's plan reflects the diverse needs of, and unique housing intervention opportunities available in, each District. As before, these plans are a work-in-progress. The precise mix of shelter solutions and interventions will be determined on an ongoing basis, with each Council District maintaining flexibility and discretion to match the specific needs of each District's homeless population with the resources and opportunities available within each District. To the extent a planned intervention or site is rendered unfeasible, it will be replaced with other options explored by the City.

Each Council District plan includes cost estimates for new interventions based on the information currently available to the City. The current estimated total capital cost for development of *new interim housing* is $49,765,560, which does not include the cost of leasing hotels/motels or other privately-owned sites as those leases are yet to be negotiated. This is based on a $33,580 capital cost per bed, but since each bed is expected to serve at least two people per year (or ten people over five years), the estimated effective cost per bed for the term of the MOU being negotiated between the County and the City is $3,358. The current estimated total operating cost for *safe parking* is $5,343,600, which is based on an estimated $30 per car per night operating cost. The current total estimated operating cost for *interim housing (including pallet shelters)* is $25,984,350, which is based on an estimated $45 per bed per night. Estimated costs associated with rapid rehousing are not yet available as they are subject to LAHSA's proposal as well as approval from the Mayor and City Council.

The City is also working to develop a schedule for each Council District's projects, and all of the projects for the City as a whole, and anticipate such a schedule being ready in the near future. Both the mix of shelter interventions to be implemented, and the schedule for each, will be guided by outcomes of outreach and engagement, the continuing assessment of assets available for use to implement each solution, and updated guidance from public health officials in light of the changing nature of the coronavirus pandemic.

All new shelter opportunities and alternative housing options will be configured with adequate physical space to allow the sheltered individuals to maintain the minimum social distance recommended by local public health experts to mitigate the transmission of the COVID-19 virus during the pandemic. All shelter opportunities will have adequate hygiene facilities, such as hand washing stations and showers, and will be staffed by security as necessary to ensure the safety of the homeless persons sheltered there. To the extent the public health guidelines change and additional opportunities and housing options can be added, the City reserves the right to do so.

**(2) Current status of review of Caltrans Properties for use as shelter solutions and interventions.**

**Properties identified by Caltrans**

The City of Los Angeles reviewed the Park and Ride list provided by Caltrans for possible use for homeless interventions, a copy of which is attached to this Report as Exhibit C. Of the sixteen sites included in the list, seven are currently being leased to private entities, and therefore not available to the City, and three are not in the City of Los Angeles. Of the six remaining sites in the City, three are being considered for homeless interventions, two in CD 15 for safe parking sites, and one in CD 9 for interim housing

With respect to the remaining three sites, CD 2 and CD 8 were able to identify City-owned sites that are in close proximity to the two Caltrans Park and Ride sites in their respective districts which are more suitable for homeless interventions. Notably, if alternatives exist in the same area, the City's preference is to utilize the alternatives given the time frame involved and the uncertainty of receiving the necessary approval from the Federal Highway Administration (FHWA). The City understands Caltrans cannot execute a lease with the City to use the sites for homeless interventions without approval from FHWA, which FHWA has refused to grant. As such, the Caltrans sites in CD 2 and CD 8 are not being considered by the City at this time. The third Caltrans site is already under development as a community skate park.

Additionally, the City identified three more sites not on the Caltrans list, one of which (16th Street & Maple, CD 14) may be amenable for use by the City. The City has therefore asked Caltrans to initiate the FHWA approval process for the following sites (comprised of three provided by Caltrans on Exhibit C, and one additional site identified by the City):

    a.    1402 South Figueroa (CD 15) – Safe parking use;

    b.    600 East 116th Place (CD 15) – Safe parking use;

    c.    16th Street & Maple (CD 14) – Interim housing use; and

    d.    350 W. Slauson (CD 9) – Interim housing use

With regard to the other two Caltrans sites identified by the City unfortunately, Caltrans is not amenable to the use these two sites for the following reasons:

    1.    12501 Foothill Blvd in CD 7 – Caltrans was not willing to allow the use of this site because it is a highly used Park and Ride facility.

    2.    Saticoy/Strathern Park West - Caltrans stated that federal guidelines prevent the agency from granting the use of this site for homeless housing because the lease is under the FHWA's jurisdiction. Currently, the FHWA is only

considering market-rate leases under this lease. The City will pursue getting approval directly from the FHWA on this site.

**(3) Current status of properties discussed during these proceedings – viz., the 794 S. Los Angeles Street site and the 16th and Maple property.**

As indicated above, the City has asked Caltrans to initiate the FHWA approval process for an interim housing site located at 16th Street and Maple in Council District 14, which is a necessary prerequisite for Caltrans executing a lease with the City for the land to be used for homeless interventions. The request was made July 9, 2020, and the site plan was sent to Caltrans on July 13, 2020.

After the parties agreed that the City would develop a safe parking site for RVs at 749 S. Los Angeles Street, as discussed at the April 23, 2020 hearing and in the Joint Status Report submitted by the parties on April 27, 2020 [Dkt. 80], Plaintiffs rescinded their agreement to use this site [Dkt. 88]. This location is not being pursued in Council District 14's plan.

**(4) Current status of procurement, installation, and operation of rapid-design housing and shelter options.**

The City is exploring potential locations for placement of pallet shelters. For example, as reflected in its Council District plan referenced above and in Exhibit B, pages 2-3, CD 2 is currently working with the City's Bureau of Engineering (BOE) to design three sites for the placement of pallet shelters. This design plan is currently in progress, and two of the sites are expected to begin seeking contractors through a request for bid process this week. Attached as Exhibit D is a design rendering for one of the sites in CD 2.

The City's Department of General Services (GSD) has also initiated review of private leasing and acquisition options for placement of pallet shelters, and to ensure that there is no unnecessary delay, GSD has also ensured that the pallet shelter contractor, as

well as the hygiene trailer and other necessary contractors, are prepared to expedite orders as soon as additional sites are made available (through, for example, leasing or acquisition), have received all necessary approvals (including, for example, from the FHWA), and are ready for installation of pallet shelters. The pallet shelter contractor has confirmed that it can deliver pallet shelters within a week of the purchase order so the City will not face any delivery delays and will also not incur storage costs for pallet shelters until sites are ready for delivery.

BOE is also working on designs for pallet shelters at a site in CD 1 and an additional site in CD 6, and CD 6 has been in touch with the pallet shelter company to explore options.

**(5)   City-owned properties and the City's evaluation of them for homeless interventions.**

The City Controller compiled a list of nearly 14,000 properties in the City owned by six major public entities, including over 7,500 properties owned by the City. The complete list and map are publicly available on the Controller's website at https://lacontroller.org/data-stories-and-maps/propertypanel/. It should be noted that this list includes all property owned by the City, and does not indicate property that is or may be available for permanent or interim housing development or other services for persons experiencing homelessness. The City, however, constantly assesses its property for this very purpose.

**Property Assessment**

As part of the City of Los Angeles' Comprehensive Homeless Strategy (CHS) approved in February 2016, the CAO was tasked with implementing Strategy 7D, "Using Public Land for Affordable and Homeless Housing." Since 2016, the CAO, with the assistance of various City departments, has assessed over 800 possible sites for permanent affordable and supportive housing, interim housing and other homeless

6
CITY OF LOS ANGELES' STATUS REPORT IN RESPONSE TO DKT. 143

facilities. This includes all of the 428 properties that were designated as "surplus" by the City's Asset Manager, GSD's Real Estate Services Division (RES), and the complete list of the City's Department of Transportation (DOT) parking lots. The City's review also included numerous sites owned by the City's proprietary departments including the Los Angeles World Airports (LAWA), the Port of Los Angeles (POLA), and the Los Angeles Department of Water and Power (LADWP), as well property owned by other government and transportation entities including Caltrans and METRO. (The majority of proprietary department land cannot be used for housing due to various federal or state regulations.) The City's Housing and Community Investment Department (HCID) also has partnered with METRO and the Los Angeles Unified School District (LAUSD) to finance affordable housing at METRO subway stops and on LAUSD land. A copy of the Surplus Property Report is attached as Exhibit E, the LADOT Parking Lots Assessment is attached as Exhibit F, the ABH/Shelters/Safe Parking Sites: Feasibility Outcomes is attached as Exhibit G, and City-owned Property in Development for Permanent Supportive and Affordable Housing is attached as Exhibit H.[1]

The City's property assessment determines a site's feasibility, including the review of the site's size, zoning, funds used to purchase the site (ownership/controlling department and restrictions on special funds used, e.g., park land, parking lots, federal highway or aviation administrations, etc.), environmental considerations/review, and utility access. For potential permanent housing sites, the following information is compiled for each site to determine feasibility: (a) a property profile; (b) preliminary title report; (c) grant deed(s); (d) legal description; (e) planning analysis; (f) any street vacation information; (g) sanitary sewer and storm drain information; (h) Phase I

---

[1] The City has previously provided certain of this information to the Court and/or the parties. *See e.g.,* Ex. B to Dkt. 88 (Ex. F hereto) and Ex. A to Dkt. 102 (Ex. H hereto). Furthermore, Exhibits E to H, inclusive, were provided to counsel for the parties under cover of email dated April 17, 2020.

environmental site assessment; and (i) other environmental reports. For public parking lots, a LADOT questionnaire, vehicle parking district files, parking waivers, and required replacement parking are also assessed.

### Sites Currently Under Consideration for Interventions

The sites currently under consideration for interim housing are included in the Council District Plans, Ex. "B" to this report. These plans will evolve as more sites are deemed feasible. Because the City has been reviewing sites for this purpose since 2016, most of the feasible City-owned sites have already been used for the A Bridge Home Program and/or permanent affordable and supportive housing, such as those funded under Proposition HHH. As such, the City is looking beyond publicly owned properties and is exploring leasing options in the private market as well as acquisition strategies.

Importantly, the City does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes.[2] Moreover, the majority of City-owned land that has been deemed feasible for housing development is leased – not sold – to the developer for a minimum period of 55 years, which is the term of the legally required affordability period for the units. This ground lease enables the City to have more control to extend the affordability period beyond the 55 years.

**(6) Hotel and motels used for Project Roomkey**

Project Roomkey is a collaborative effort that has successfully provided shelter through hotel and motel rooms for vulnerable individuals experiencing homelessness during the coronavirus pandemic. Project Roomkey is not a walk-up program. Rather, Project Roomkey participants are selected from a community queue of pre-qualified individuals according to criteria established by the Federal Emergency Management

---

[2] In fact, the City does not have enough land to accommodate its service and departmental needs, so it has to lease private property.

Agency (FEMA). In order to protect the intake process, the City is unable to provide a map of program locations, or a list of hotel names and addresses. But the tables below outline the number of Project Roomkey sites and rooms located in the City and the County, and the number of sites and rooms under contract with the City and the County.

1. **Number of Hotels and Rooms in the City of Los Angeles by Council District**

| Council District | Number of Hotels | Number of Rooms |
|---|---|---|
| 1 | 5 | 532 |
| 2 | 1 | 150 |
| 3 | 2 | 126 |
| 5 | 2 | 228 |
| 6 | 1 | 242 |
| 9 | 1 | 69 |
| 10 | 2 | 97 |
| 11 | 1 | 47 |
| 14 | 2 | 644 |
| 15 | 1 | 100 |
| **Total** | **18** | **2,235** |

2. **Number of Hotels and Rooms in the County by Supervisorial District**

| Supervisorial District* | Number of Hotels | Number of Rooms |
|---|---|---|
| 1 | 5 | 464 |
| 2 | 3 | 239 |
| 4 | 8 | 911 |
| 5 | 4 | 293 |
| **Total** | **20** | **1,907** |

*All sites located in Supervisorial District Three (3) are located in the City of Los Angeles*

### 3. Hotels and Rooms Under Contract with the City and the County

| Contract | Number of Hotels | Number of Rooms |
|---|---|---|
| City | 6 | 1,271 |
| County | 32 | 2,871 |

The City is currently developing a strategy to acquire or lease hotel and motel properties, including hotels participating with Project Roomkey, in numerous Council Districts with capacity for over 700 individuals.

**(7) MOU**

The City has been negotiating in good faith to develop a Memorandum of Understanding ("MOU") from the binding term sheet signed by the City and County on June 16, 2020 [Dkt. 136]. Unfortunately, the MOU is not yet completed.

The City's obligations under the binding term sheet are straight forward:

(1) In the first 10 months, the City agreed to create 5,300 "new" housing and shelter opportunities; "new" meaning ones not currently subject to a funding agreement between the City and the County;

(2) In the same first 10 months; the City agreed to create 700 beds that can be the part of existing funding agreements between the City and County;

(3) Within 18 months, the City will create an additional 700 "new" beds.

The County's obligations under the term sheet are similarly straight forward: rather than partner with the City to build shelters or provide services, the County chose to provide lump-sum payments to the City to cover 50% of the average cost of providing services to people in the shelter and housing opportunities to be created by the City, but only for the first five years. The County agreed to pay certain amounts on certain dates, beginning with a lump-sum payment of $17.6 million due on September 1, 2020. In order to maintain accountability, the City and County agreed that the County could prorate its payments in the second through fifth years if the City did not create the 6,000

new beds by the agreed-upon payment date. As an added incentive and measure of accountability, the City and County agreed that the County will pay the City an $8 million bonus if the City creates all 5,300 new beds within ten months from June 16, 2020 [Dkt 136].

Despite these straight-forward terms, the County now wants the City to agree to additional terms and obligations *before* the County "effectuates payments" it agreed to in the term sheet. [Dkt. 147, p. 2.] The County also seeks to restrict the definition of "new" beds in a way not discussed during the negotiation of the term sheet, to refuse to pay for services to people who get off the streets through family reunification (a proven intervention), and to avoid payments if the City misses a reporting obligation. These efforts are all designed to reduce or eliminate the County's commitment to provide the lump-sum payments that it already agreed to in the term sheet.

The City stands by the commitments it made in the binding term sheet, and is confident that the County will too. The City will continue to work with the County in good faith to finalize an MOU that honors both the letter and spirit of their agreement.

The City will also continue to work with the County and LAHSA to ensure Angelenos experiencing homeless receive the best possible services and access to resources. However, even LAHSA has recognized that the ability to provide services can be challenged by the rapid creation of new shelter and housing opportunities as is contemplated in the binding term sheet. (*See* https://laist.com/2020/07/13/homeless-covid-recovery-plan-lahsa.php: "In public meetings, LAHSA and county staff have said the biggest bottleneck was staffing — they simply didn't have enough workers to arrange more rooms for people experiencing homelessness.") While services provided to people who are sheltered or housed in opportunities created under the term sheet will often be facilitated and supported by LAHSA, the City may also contract directly with service providers from time to time. Such an arrangement will not detract from the ultimate

goal of the City, County, and LAHSA: to provide as many housing and shelter opportunities, with the appropriate level of services—both operational services and mainstream services provided by the County—to as many people experiencing homelessness in Los Angeles as quickly as possible.

DATED: July 15, 2020

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Ass't City Attorney
SCOTT MARCUS, Senior Assistant City Attorney
GABRIEL S. DERMER, Assistant City Attorney
ARLENE N. HOANG, Deputy City Attorney
JESSICA MARIANI, Deputy City Attorney

By: /s/___*Scott Marcus*_____
SCOTT MARCUS, Senior Assistant City Attorney
Counsel for Defendant City of Los Angeles