Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel: (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel: (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff(s),<br><br>vs.<br><br>City of Los Angeles, et. al.<br><br>Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>INTERVENORS' STATUS REPORT IN ADVANCE OF AUGUST 7, 2020 STATUS CONFERENCE<br><br>Status Conference: August 7, 2020<br>Time: 10:00 a.m.<br>Location: 200 N. Spring St. |

Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker respectfully submit the following status report in advance of status conference on August 7, 2020, which this Court has scheduled to discuss the City and County's agreement to fund approximately 6,700 new "housing and shelter opportunities" in Los Angeles in the next 18 months.

In June, the City and County of Los Angeles reached a significant agreement, at the direction of this Court, to fund and create a significant number of new "housing and shelter opportunities" at a time when the City needs those resources the most. *See* Dkt. 136. Intervenors applaud the City and County's progress towards reaching an agreement about those resources. Intervenors are also heartened to see progress towards quickly bringing a number of new housing opportunities online.

However, Intervenors write separately to raise concerns about the plan filed by the City of Los Angeles on July 15. *See* Dkt. 149. Specifically, Intervenors are concerned that the plan to allocate new housing and shelter options based on an individual's current location fails to take into account other critically important factors, including a person's susceptibility or vulnerability to COVID-19. Moreover, the City's plan simply identifies encampments and potential housing interventions, seemingly without any consideration of whether the resources being created are appropriate for the individuals to be housed or whether the residents of the targeted encampments are the most in need of those resources.

While prioritizing the housing of individuals who are near freeways may have made sense under different circumstances, the continued and accelerating spread of COVID-19 and the recognition that the pandemic will continue for years demands that the City, County and Court revisit this issue. The approach outlined by the City does not reflect the seriousness of the current global pandemic and will divert critical resources away from the City's most vulnerable residents at the worst possible time.

The City's strategy in adopting its location-based approach raises other concerns as well. First, the City's plan undermines the stated goal of this Court to reduce individuals' exposure to pollution by 1) siting shelters near and in some instances

directly next to freeways and 2) prioritizing proximity to freeways over all other environmental harms.  The City's strategy undermines other attempts to address systemic and institutional racism that has resulted in the burden of homelessness being disproportionately shouldered by Black and Brown communities in Los Angeles—disparities that are only increasing because of COVID-19, not lessening.  The City's approach also seems to give city council members unfettered power to target specific encampments, the results of which are demonstrated even in the limited information provided by the City about which encampments are targeted.

In light of these concerns, Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker request the Court and the Parties consider the following questions and concerns about the City's planned approach to allocating new housing resources:

**1. How does the City's plan take into account the continued global COVID-19 pandemic?**

When Plaintiffs filed their lawsuit in March 2020, the City was not yet clearly in the midst of a catastrophic and deadly pandemic.  Even when this Court began to focus its attention on health outcomes associated with the proximity to freeways, it was not at all clear that the global health crisis would continue for this long or that cases of COVID-19 would continue to increase at such a staggering rate.  In fact, city and county leaders were taking steps to reopen aspects of the economy, and there was a sense that the crisis brought on by COVID-19 was waning.

Since then, however, it has become increasingly clear that the current pandemic is likely to continue for years.  While Intervenors applaud the new investments committed by the City and County to create new housing and shelter opportunities for people experiencing homelessness, Intervenors remain very concerned that the continued focus on prioritizing individuals based on their present location, rather than on their individual characteristics and vulnerabilities, is unwarranted and in fact, undermines the City and County's ability to address the current pandemic.  The focus on location necessarily pulls focus and resources away from the City's most

vulnerable residents, including individuals who are over the age of 65 or who have medical conditions that make them more vulnerable and susceptible to COVID-19.

Over the past five years, the number of individuals dying on the streets has increased steadily.[1] While this trend would most certainly have continued even without COVID-19, the pandemic is exacerbating this crisis. Rates of infection of COVID-19 have continued to increase among people experiencing homelessness.[2] As long as the pandemic continues, the City and County must focus energy and resources on housing individuals who are most at risk of COVID-19. This means targeting interventions that are most likely to bring people who are over 65 and have chronic medical conditions inside.

Addressing the spread of COVID-19 also means prioritizing the use of individual housing units over congregate shelters for the City's most vulnerable residents. Although bringing individuals inside, regardless of the setting, may have some public health benefits for some people experiencing homelessness, congregate shelters have been and continue to be the location of a number of significant outbreaks of COVID-19.[3] Rates of infection among people in congregate shelters in Los Angeles are

---

[1] Los Angeles Dept. of Public Health, Center for Health Impact Evaluation, "Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County," October 2019, available at http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf

[2] *See* Los Angeles Times, "How Many Homeless People have COVID-19?", available at https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/homeless/, last accessed on August 6, 2020. According to the last available data from August 3, 2020, 1,127 individuals experiencing homelessness have tested positive for COVID-19.

[3] *See* Los Angeles Dept. of Public Health, Location and Demographics, Homeless Service Settings, available at http://publichealth.lacounty.gov/media/Coronavirus/locations.htm#peh-settings last accessed on August 6, 2020. The County's publicly available data provides information about the location of residence for only approximately 1/3 of all individuals experiencing homelessness who have tested positive for COVID-19.

significantly higher than among the general population. While the rates of infection of COVID-19 remain statistically similar for people experiencing homelessness and the general population[4], this is not true for people who are in congregate shelters, which account for a disproportionate number of cases of COVID-19 among people experiencing homelessness. There are currently reported cases of COVID-19 in at least nine of the City's recreation center shelters and at least four A Bridge Home shelters. There are also hundreds of reported cases at other shelters throughout Los Angeles, and there have been significant outbreaks at among others, Union Rescue Mission, Lamp Village, Zahn Memorial Center, and shelters in other cities in Los Angeles County.[5]

Using congregate shelters during the pandemic may make sense for some individuals experiencing homelessness, but the rates of infection in shelters illustrates why it is not an appropriate solution for all individuals, especially those who are particularly vulnerable to COVID-19. Yet the City's plan as drafted focuses on encampments, not people. Therefore, it does not appear to prioritize individuals who are most in need, and it does not focus on the most appropriate ways to address those needs. The focus on location, rather than on individuals and their particular needs and risks, distracts from and undermines the City's ability to assist the most vulnerable members of our community, at a time when the City's attention to this issue is a matter of life and death.

### 2. How will the City's plan address the chronic health impacts of exposure to pollution?

When this Court issued its now-vacated order on May 22, 2020, requiring individuals to be relocated from freeways, one of the justifications for the injunction was to prevent the chronic health conditions caused by long-term exposure to

---

[4] *See* Los Angeles Times, "How Many Homeless People have COVID-19?", available at https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/homeless/, last accessed on August 6, 2020.
[5] Los Angeles Dept. of Public Health, *supra* note 3.

particulate matter near freeways. *See* Dkt. 123 at 9. Although the Court has now vacated its May 22, 2020 order, *see* Dkt. 138, the City's focus remains on displacing encampments near freeways, and the City has made it clear that it intends to prevent individuals from living near freeways, ostensibly in order to address the chronic health concerns raised by this Court.

Despite the City's stated concerns about the proximity to freeways, the City continues to build A Bridge Home projects near, and in some instances, directly adjacent to freeways. For example, El Puente, the City's first A Bridge Home Shelter is immediately adjacent to the 101 freeway in Downtown Los Angeles. The Hope shelter, located at 2801 Hope Street, s similarly immediately adjacent to the 110 freeway near downtown Los Angeles—one of the most heavily-traveled freeway segments in the country. The shelter on Beacon Street in San Pedro, one of the City's newest A Bridge Home sites, is next to the 47 and 110 freeways. The Imperial shelter in Watts is directly next to the Imperial Highway. The newest safe parking location opening in Council District 4 and operated by the City and County, is located adjacent to the 405 freeway. And in the City's plan submitted to the Court, the City has indicated its intent to use 16th and Maple for interim shelter. *See* Dkt. 149 at 4. The placement of these shelters undermines the City's argument that displacing people from freeways is in their best interest, since placing interim housing directly adjacent to freeways, and then forcing individuals near those same freeways to go into the shelters (which often are even closer to freeways), does not reduce these individuals' exposure to pollution.

Focusing solely on proximity to freeways as a proxy for exposure to environmental harms also ignores the vast disparities in air quality that exist in Los Angeles. These disparities have been well-documented and have existed for decades. Moreover, environmental health disparities are frequently linked to racial

segregation.[6] In Los Angeles, communities of color, and in particular, communities of color in South and Southeast Los Angeles, are exposed to more environmental harms than white communities in other parts of Los Angeles.[7] Prioritizing proximity to freeways throughout Los Angeles above any other consideration ignores the much deeper and systemic impacts of environmental racism, which has led to far greater rates of chronic health conditions among Black and Latinx people. The impact of this racial disparity is of even greater consequence during the current pandemic, since Latinx and Black people are far more likely to contract COVID-19, and are disproportionately likely to suffer negative health outcomes from the virus.[8]

### 2. How will the court ensure that housing decisions are not politically-motivated?

As part of its July 15, 2020 filing, the City provided some details about its plan to offer new shelter and housing opportunities to individuals experiencing homelessness. These details include lists of encampments in each council district, which the council districts appear to have generated in response to a request to "identify[] the key encampments within your district you want to have addressed by the Sheltering Plan." *See* Docket 153, Exhibit B. The City does not, however, provide any details about how the "encampments" were identified or prioritized by individual City Council members, and the prompt to council districts to identify encampments raises considerable concerns.

First, as discussed above, targeting encampments based on location does not

---

[6] *See e.g*., Rachel Morello-Frosch, Russ Lopez, "The Riskcape and the Color Line: Examining the role of segregation in environmental health disparities," Environmental Research, Volume 102, Issue 2, October 2006.
[7] *See e.g.,* Racial/Ethnic Disparities in Cumulative Environmental Health Impacts in California: Evidence from a Statewide Environmental Justice Screening Tool, Am. J. Public Health, November 2015; *see also* Cal EnviroScreen 3.0, available at https://oehha.ca.gov/calenviroscreen/maps-data
[8] *See* Los Angeles Homeless Services Authority, COVID-19 Racial Equity Resource Guide, available at https://www.lahsa.org/documents?id=4499-covid-19-racial-equity-resource-guide.pdf.

account for the needs and experiences of the people who are living in those encampments. By focusing on encampments rather than individuals, it undermines the ability to provide appropriate interventions to individuals in these encampments or to provide targeted interventions to other vulnerable populations. Moreover, targeting encampments that are prioritized by council members potentially exacerbates this issue. The City did not provide information about why these specific encampments have been identified as priorities; allowing council members to identify encampments, unfettered by any transparent or objective criteria, encourages council members to specially target "encampments" based on their own individual priorities, whether it be the demands of housed constituents, businesses, donors, or others who may complain about the presence of unhoused individuals in their neighborhoods. It places the distribution of an incredibly scarce resource (housing and shelter beds) solely in the hands of individual politicians—a system that has proven problematic for decades.

Even when there is objective criteria, in this case a priority for encampments located with 500' of freeways, it appears that some council members are categorizing specific encampments as such, even when the encampments do not fit within the set parameters. For example, Council District 13 identified an encampment at Echo Park lake as being within 500' feet of a freeway. *See* Dkt. 153-1 at p. 17. This is not accurate. While the southern tip of Echo Park is within 500 feet of the 101 freeway, the encampment itself is at the northern part of the park (as indicated by the address for the encampment at Park Ave. and Glendale Blvd). *See* Exhibit A. This is well outside the 500' priority zone. It is worth noting that this encampment has been the location of significant political pushback, and the Council Member has faced political opposition to displacing the residents at the park.[9]

Similarly, Council District 15 has identified a long-standing encampment at

---

[9] Emily Alpert Reyes, "Homeless People and activist protest at Echo Park Lake, call for meeting with councilman," Jan. 24, 2020, Los Angeles Times, available at https://www.latimes.com/california/story/2020-01-24/homeless-activists-protest-echo-park-lake

Lomita Blvd. and McCoy St. as its number one priority and in doing so, categorized the encampment as being within 500' of the freeway.  *See* Dkt. 153-1 at p. 20.  Again, this is not accurate.  The eastern edge of the block of Lomita Blvd. that borders McCoy St. is within 500' feet of the Harbor Freeway; however, the encampment, which according to the Council District's plan includes 60-80 individuals, is primarily located at 253rd and McCoy.  *See* Exhibit B.  This is well outside the 500' zone identified in this Court's now-vacated preliminary injunction.

 Targeting specific encampments, as opposed to providing resources to individuals in are most in need, lends itself to political decision-making.  In normal times, this is problematic; in the middle of a pandemic, the consequences threaten to be even more devastating.

 As a result of this Court's intervention and the City and County's willingness to cooperate and reach a historic agreement on funding, there are now significant funds in Los Angeles committed to creating new housing and shelter opportunities for people experiencing homelessness.  At the same time, the global pandemic has dramatically shifted the needs of the community, and while focusing on chronic health conditions is an important goal, the current moment demands the City prioritize its limited resources on the individuals who are most in need, rather than on the location of encampments.  Intervenors request the City and this Court reconsider the priorities set out by the City in it its latest filing, and refocus these much-needed resources to address the current crisis brought on by COVID-19.

 //
 //
 //
 //
 //
 //

8

**STATUS REPORT FROM LOS ANGELES INTERVENORS**

Dated: August 6, 2020

Respectfully submitted,
Legal Aid Foundation of Los Angeles

    /s/ Shayla Myers
Attorneys for Intervenors

Schonbrun Seplow Harris & Hoffman LLP

    /s/Catherine Sweetser
Attorneys for Intervenors

Law Office of Carol A. Sobel

    /s/ Carol A. Sobel
Attorneys for Intervenors

Exhibit A

# CD 13 Priority 1

Echo Park Lake



Park Avenue & Glendale Boulevard

Distance from Echo Park encampment to Hollywood Freeway is approximately 1500 feet.



Exhibit B

# CD 15 Priority 1

Lomita and McCoy encampment



Approximately 500 feet from Harbor Freeway

Distance from Lomita Blvd. and McCoy St. to Harbor freeway is more than 500 feet.

