UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

LA ALLIANCE FOR HUMAN )
RIGHTS, an unincorporated )
Association, JOSEPH BURK, )
HARRY TASHDJIAN, KARYN )
PINSKY, CHARLES MALOW, )
CHARLES VAN SCOY, GEORGE )
FREM, GARY WHITTER, and )
LEANDRO SUAREZ, individuals, )
)
                  Plaintiffs, )
)
     vs.                      ) Case No.
                              ) 2:20-cv-02291-DOC (KES)
City of Los Angeles, a        )
Municipal entity; COUNTY OF   )
LOS ANGELES, a municipal      )
entity; and DOES 1 through 200)
inclusive,                    )
)
                  Defendants. )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE
FRIDAY, AUGUST 7, 2020
10:05 A.M.
LOS ANGELES, CALIFORNIA

KATHERINE M. STRIDE, RPR, CSR
COURT REPORTER
LICENSE NO. 11773

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFFS:**

  SPERTUS LANDES & UMHOFER, LLP
  BY:  MATTHEW DONALD UMHOFER, ESQ.
   ELIZABEITH ANNE MITCHELL, ATTORNEY AT LAW
  617 West 7th Street, Suite 200
  Los Angeles, CA  90017
  (213)205-6520

**FOR THE DEFENDANT CITY OF LOS ANGELES:**

  LOS ANGELES CITY ATTORNEY'S OFFICE
  BY:  SCOTT D. MARCUS, ESQ.
  200 North Main Street, 7th Floor, Room 675
  Los Angeles, CA  90012
  (231)978-7558

**FOR THE DEFENDANT COUNTY OF LOS ANGELES:**

  FOLEY & LARDNER LLP
  BY:  BYRON J. McLAIN, ESQ.
  555 South Flower Street, Suite 3300
  Los Angeles, CA  90071
  (213)972-4500

  MILLER BARONDESS LLP
  BY:  LOUIS R. (SKIP) MILLER, ESQ.
  1999 Avenue of the Stars, Suite 1000
  Los Angeles, CA 90067
  (310)552-4400

**FOR THE INTERVENOR ORANGE COUNTY CATHOLIC WORKER:**

  CAROL A. SOBEL LAW OFFICES
  BY:  CAROL A. SOBEL, ATTORNEY AT LAW
  725 Arizona Avenue, Suite 300
  Santa Monica, CA  90401
  (310)393-3055

**APPEARANCES OF COUNSEL (CONTINUED):**

**FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:**

    SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
    BY:  CATHERINE E. SWEETSER, ATTORNEY AT LAW
    11543 West Olympic Boulevard
    Los Angeles, Ca  90064
    (310)396-0731

**FOR THE LEGAL AID FOUNDATION OF LOS ANGELES ON BEHALF OF INTERVENOR L.A. CATHOLIC WORKER AND LOS ANGELES COMMUNITY ACTION NETWORK:**

    LEGAL AID FOUNDATION OF LOS ANGELES
    BY:  SHAYLA R. MYERS, ATTORNEY AT LAW
    7000 South Broadway,
    Los Angeles, CA  90003
    (213)640-3983

**ALSO PRESENT:**

    Honorable Judge Andre Birotte, Federal Judge

**SPECIAL MASTERS:**
    Michelle Martinez
    Hon. James L. Smith (Ret.)

**CITY OF LOS ANGELES:**

Mayor Eric Garcetti
City Attorney Mike Feuer
Chief Procurement Officer Shanno Hoppes
Controller Ron Galperin
Police Chief Michel Moore
Fire Department Chief Ralph Terrazas

City Council President Nury Martinez (6th District)
Council Member Gil Cedillo (1st District)
Council Member Marqueece Harris-Dawson (8th District)
Council Member Curren Price (9th District)
Council Member Herb Wesson (10th District)
Council Member Mike Bonin (11th District)
Council Member-Elect Kevin de León (14th District)
Council Member Joe Buscaino (15th District)

**APPEARANCES (CONTINUED):**

**CITY OF LOS ANGELES:**

Council Member Paul Krekorian (2nd District)
Council Member Bob Blumenfield (3rd District)
Council Member David Ryu (4th District)
Council Member Paul Koretz (5th District);
Council Member Monica Rodriguez (7th District)
Council Member John Lee (12th District)
Council Member Mitch O'Farrell (13th District)

Kevin James - President of L.A. Board of Public Works
Vince Bertoni - Director of Dept. of City Planning
Martin Adams - General Manager of LA. Board of Water & Power
Enrique Zaldivar - Director & General Manager of L.A. Dept. of Sanitation & Environment

**COUNTY OF LOS ANGELES:**

Board of Supervisors Chair Kathryn Barger (5th District)
Supervisor Hilda Solis (1st District)
Supervisor Mark Ridley-Thomas (2nd District)
Supervisor Sheila Kuehl (3rd District)
Supervisor Janice Hahn (4th District)
Chief Executive Officer Sachi Hamai
Dept. of Health Services Director Dr. Christina Ghaly
Dept. of Mental Health Director Dr. Jonathan Sherin
Sheriff of the County of Los Angeles Alex Villanueva
Fire Department Chief Daryl Osby

**U.S. DEPARTMENT OF HUD:**

Robert Bowes, Michael Mason, Paul Webster

**CALTRANS DISTRICT 7:**

Director John Bulinski

**APPEARANCES (CONTINUED):**

**LAHSA:**

Executive Director Heidi Marston
Commission Chair Wendy Greuel
Acting Director of Finance Amy Perkins

**ORGANIZATIONS/SERVICE PROVIDERS:**

Pete White (LACAN)
Kevin Murray (Weingart Center)
Andy Bales (Union Rescue Mission)
Pastor Stephen "Cue" Jn-Marie
"General" Jeff Page
Katherine McNenny (Industrial District Green)
Monique Noel (Downtown Women's Action Center)
Pastor Don Dermont
Jim Hlawek (Volunteers of America)
Karl Calhoun (Volunteers of America)
Jennifer Hark Ditz (PATH)
Amy King (Pallet shelter Company
Patrick Diller (Pallet Shelter company)

**PROPOSED INTERVENOR - PLAINTIFFS LATINO COALITION OF LOS ANGELES:**

Christian Contreras, Esq.
Humberto Guizar, Esq.
Austin Dove, Esq.
Stephen King, Esq.
Raul Claros
Victor Curz, Jr.
Ingrid Rivera-Guzman
Pastor Josue (Josh) Tiguila

**LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 7, 2020**

**10:05 A.M.**

JUDGE CARTER:  Good morning to all of you present here today, and I really appreciate you being here.  I think all of us are adjusting to the COVID-19 pandemic, and, Mayor Garcetti, this is a rather extraordinary historic occasion when the Federal Court would assemble in the City Council chambers in Los Angeles.

The first thing, I think all of us are conscious about the COVID-19 pandemic, and I see all the attorneys and people gathered here and are doing your best.  Could you please distance yourselves six feet apart just to make me feel better.  Thank you.

This is going to be an extraordinary session. I believe that there's a tremendous amount of hope and reliance of your good faith, and I'm just going to start with just a couple compliments and extend those along the way because some of us very well deserve it.

The first is, when the pandemic started, there was a huge concern, and there still is, amongst the homeless population, and while those numbers are certainly overwhelming, it is not what apparently was expected or feared at the very beginning, and I think

that's a compliment to the Council, the Mayor, to all of you in a sense of trying to keep Skid Row portions clean and trying to keep distancing.

I also think that, in further discussion, there's a historic agreement of 6800 -- 6,000 new beds -- and I emphasize "new beds" -- which we'll talk about. And the question is can we quell any inertia, which is why I'm appreciative of Mayor Garcetti for responding so quickly and humbly to the request, on my part, to have some of the implementers here from the City. And that may involve different folks from -- the fire marshal, who I hope is here, the fire chief, and I'll just call on you, not now, later from the section in the back. I have some questions that are going to be asked to the Department of Water and Power, Planning, Building Safety, Public Works. And the constant question we all have of all the mayors also and the chairman of the City Council -- the chairperson -- is to make certain that inertia doesn't set in. The good faith that's been displayed has to be followed by action.

And so I'll begin by humbly saying that the City Council has reached a historic agreement with the Board of Supervisors, but they and the Court are the responsible parties involved; and, therefore, if the

worst happens in barely six months, then the City Council and the Board of Supervisors are the responsible parties when they're dealing with complications.  No in-between, and I want to have a decision about that and how they're going to implement a timeline along with all of you folks who have done a very good job so far.

I also want to compliment you on the cleanliness on Skid Row, but you've done a lot of things that I think were unheard of by the City Council laboring on this.  You've kept it as clean as possible, quite frankly.  You've installed permanent water stations down there, that I don't think the public even recognizes this at the present time.  We've got pictures of that.  But while I look forward to our success, I'm mindful of that and any failure eventually, which I do not anticipate and don't want that to simply be the responsibility of the City and County, and I don't think we're ever going to get to that part while we are in partnership together.

So before we get into the presentations, which I hope will be quick, I want you to constantly ask yourselves these questions whether you're the City Council, you're the Mayor, or the Board of Supervisors: How do we immediately get more people sheltered?  How do we get a low death rate?  How do we increase our health

and safety conditions as quickly as possible?

And, therefore, when we get into a discussion eventually of housing, I'm going to be concerned about how that debate takes place in terms of relationship to this Court because I'm going to constantly ask a question of myself anyway of how many people can we increase their well-being and how quickly.

I want to introduce Mike Feuer.  Mike, I want to publically apologize.  You were present on the last occasion, but I did not recognize and I did not notice you.  My humble apologies.  You're here, and it's a pleasure.

There's a lot of things that we have on our agenda, but I have to ask, with Council's consent and vice chair, if we could invite the speakers just immediately, and so let's start with members of our city.  If you would be so kind, sir, please, wherever you're comfortable.  And, once again, I want to thank you humbly for having me preside in the City Council chambers.

MAYOR GARCETTI:  Thank you very much, Judge, and thank you, as always to our council present for their leadership, and to our Council Members in these chambers where I spent 12 good years of my life.

I always say this is like a temple of

democracy, Judge.  It's built like a church, and it represents the highest aspirations of our City when it was built in the 1920s, and it is a testimony to how far we've come and our work that's been done.

When this was first built, and this is just a side note, the chamber is a horseshoe faced in towards the council with the backs towards the public.  After the 1994 earthquake, the one architectural change which the Historical Preservation Society allowed us to do was to open up it up to the people, and certainly this is a place for discussions and gatherings of certainly the most important decisions that move our city forward.

I want to start by thanking you because the space that you have opened up, Judge, the sense of urgency, which I have said from the very beginning, I share with you and I know that my fellow elected officials do.  You really have not only put your foot on an accelerator; it's like you're driving 16 or 17 vehicles at the same time and pushing those accelerators down, and that's what it will take.  The longer I work on the issue of homelessness, the more I recognize that, if we don't work on systemic changes, that they will continue to call on local governments to clean up the pieces of our collective failures as a nation whether that's with the housing policies, mental health

policies, the scourge of addiction, the trauma that people have from domestic and sexual violence in our society, and so much more.

So we're called in the end to clean up.

JUDGE CARTER:  Right.

MAYOR GARCETTI:  And I'm very proud of this group, and I've got to say the pandemic has brought the City and County closer than we've ever worked before, but so too have you, and I thank you for that and Judge Birotte and his extremely helpful mediation to say, "Now and do it quickly and figure out those dollars."

What excites me too is knowing that we have, I think, the strongest relationship between a mayor and council in our city's history maybe because I come from this body and respect so deeply as these Council Members do in their districts.  But for each of them to be able to, with you, go out there and start making the plans for the specifics, Judge, that is something that we feel very strongly about and we both have to have city-wide leadership and listen to communities.

Since we started these deliberations with you when this case launched, I believe there's seven different interim housing shelters that have opened up in the districts by men and women who are represented on this council.  We had one yesterday in Councilman

Krekorian's district.  We have one next week in Council President Martinez's district.  There's two that we've done just in the last couple weeks and going on another one in Council Member Buscaino's district, and we've done them as well in Councilman Price's district.  It's just extraordinary.  There's no city in the country building as much, but there's no city in the country that faces what we face, and we're not going to pat ourselves on the back when we see encampments in every single neighborhood.

But what we do have is a couple things, Your Honor, one is a historic agreement we never had before between the City and County.  It's specific.  It's 6700, but we know that's just in the first 18 months, and while the numbers are getting undefined outside of that, I know that the general managers that are here can be the same team that they have been for these interim-housing solutions with Bridge Housing.  They've looked at places where there's pipes that can be placed down.  The one that we opened up with Councilman Krekorian's district yesterday was on Caltrans' plan, which required the Department of Transportation and the Department of Water and Power to come together and put plumbing in and all this stuff, built by city workers from our General Services Department, and we broke

ground less than four months ago.  To me, that is that sense of urgency that we have out there.

I know for many who are -- and rightfully so -- the advocates for people experiencing homelessness -- and I consider myself one of those advocates too -- it's never enough and never fast enough, but as long as I think we keep focused on people who are in the greatest need rather than the feelings that we have, the people that are in the greatest need of housing as quickly as possible and needing an infrastructure that is bigger than our term in office, I think we can do great things here.

Second, as I would say, too, that I hope that we continue to be bigger and bolder with our ambitions, whether it's at the national level, trying to get Section 8 vouchers to be an entitlement, which is something that at least one presidential candidate has on his platform in order to revolutionize homeless housing in America -- if you can build and house people, a hundred percent of them in need in this country or whether it's what we're doing for the state, and our city is putting forward a $250-million application project, Homekey, through our Housing Authority.  And I don't know if the Housing Authority's representative is here today, but we're more than happy to bring them

because it's the most minimal entity in our city to be able to purchase.  They already own and run apartments as well as public housing developments, and they can pass them on to the City once those purchases are made.  The state gave us that $250 million of that application, and we know it's a big bold ask, but we also know we want a city that's stepped up with Project Roomkey and more than any other place in the state that has been able to house thousands of people in hotels and motels in Los Angeles --

So I won't give any more of a long speech, but I'll let you know that every single day we're committed to getting to solutions, not rhetoric, but results and to make sure that the very specifics to the neighborhoods that now I understand, if I don't have a solution down the block, it ain't going to go away.  I can't push it out to some place.  We're not going to move everybody out to the desert.  We're not going to put them on cruise ships.  We're not just going to move them along and have them pop up in somebody else's neighborhood.  It has to be solved, and I think that we need to come together with a sense of urgency which the City feels is unprecedented, and I thank you for bringing us to this point.

JUDGE CARTER:  How patient are you today?  I

know that you're extraordinarily busy, but there are a number of council people who are going to speak.

MAYOR GARCETTI:  Yes.

JUDGE CARTER:  I'm going to have a number of questions possibly of you, just as we have a collegiate dialogue.

MAYOR GARCETTI:  Sure.

JUDGE CARTER:  And I'm just wondering what your time schedule is today because I can come back.  I can delay an hour to find you.

MAYOR GARCETTI:  I have flexibility, and I'm just down the hall.  I'll be watching just to make sure I promote as much COVID-19 safety as we can.  I'll just be down the hall.  I'll be watching and listening to my Council Members, and if you say, "Mayor, come over," I'll come down right away.

JUDGE CARTER:  I hope you extend the same invitation to the council -- the chair council, Nury Martinez, and yourself to these chambers again in about five weeks.

MAYOR GARCETTI:  Sure.

JUDGE CARTER:  And the reason for that is to keep most of your staff safe.  They can be up in their offices, and we can monitor, and we can ask folks to come down at their convenience, and I'm very mindful of

your leadership in trying to stem this pandemic.  So whatever your patience level is, I'm going to ask if you would return at some point.

MAYOR GARCETTI:  Sure.  Just let me know.

JUDGE CARTER:  Thank you.

I'd like to recognize Nury Martinez and thank you very humbly as the chair of the City Council.  If you could be so kind and come up.

MS. MARTINEZ:  Thank you.

Welcome, Judge Carter, to this council's chambers where I'm honored serving with my colleagues.  You're going to be hearing several updates today, some related to specific items and others related to general efforts and challenges.

Judge Carter, when this lawsuit was filed, we could have taken an attitude that this was just one more lawsuit that the City was dealing with in regards to homelessness.  We could have chosen to simply fight the lawsuit and risk continuing the status quo, but, instead, you've encouraged us to view this as an opportunity to, once and for all, resolve so many of the issues we're struggling with, to address and put an end to the cycle of litigation that has hampered the City, cities that effectively need to respond to this crisis on our streets.

You know my frustrations. It feels like every direction the City goes in, we are faced with opposition. At the same time, we are drowning in a mentality that the pursuit of the perfect and the pursuit of the ideal is more important than pursuit of the greater good. We are drowning in a philosophy that has been so well-intended but has led to the circumstances that we find ourselves here today. The irony is, year after year, we put more and more money into homelessness. Yet, year after year, our homeless count continues to go up.

Judge Carter, this process is a difficult one, and you warned us and you warned us about that in the early days of this stage. It's requiring trust to build working relationships, and it is requiring us to challenge each other, and most importantly it's requiring us to challenge ourselves. Through it all, you have been transparent and accessible, and most importantly you have made yourself available to each and every one of our City Council Members. And I know that you've also made yourself available to any party interested or involved in this homeless crisis, so I want to thank you for that.

Every day a homeless person dies on the streets of Los Angeles. Every single day. It is a sobering

reminder that for all we preach and all the innovations we change, despite all the good work that we're doing, we're failing.  As a Latina and as a person of color, how can I be okay that 70 percent of the homeless individuals that are living in the streets today are black and brown, and we're letting them die every single day -- people that look like me or my relatives or my neighbors, black and brown policymakers, leaders, and activists -- despite the best of our efforts?  The system and strategy of this approach is failing our own people.  That, to me, is completely unacceptable.  Unacceptable that, as a society, we should be ashamed of ourselves as we continue to let this happen.

Homelessness is not a moment in time or a new concept, and right now our crisis is two-fold.  It is the overwhelming number of the people living on the streets of Los Angeles, more than 40,000 individuals in our city alone, and the fact that there is a pipeline of individuals and families that will end up on our streets if we do not address this now.

We need to stop the floodgates.  I know that.  It's obvious, but right now my fear and my concern and my anger is that, for all the solutions, innovations, and approaches that we need to address the floodgates, we are asking those who are currently living on our

streets to wait a little longer and to wait their turn. We'll leave them to be and come back later.  How is that okay?

We are failing to address the individuals who are already living on our streets, and we're failing to address the neighborhoods  that are being affected.  We have failed them before and, unless we challenge ourselves to deal with the reality on the streets in this very moment, then we're going to be failing them again.  There's an old line that says, "Fool me once, shame on you.  Fool me twice, shame on me."

Judge Carter, the City Council will not be fooled, and now you will hear from several different Council Members here today, and there will likely be frustrations raised and things that some people may not like or want to hear, but we have to be honest.  For all the goodwill in this room, it is simply not working, and we can't deny that.

The City Council has already set aside $100 million for homelessness, and we will invest more. The City Council will soon be reviewing several recommendations just released by our administrative officer for a homeless strategy under COVID, and we are pursuing state resources to acquire properties to deal with our homeless crisis.

And we have already asked a difficult question: Is the current LAHSA model the best for our city?  For everything great about what the City is doing right now, is it enough?

Our own city policies and bureaucracies are getting in our own way.  We will be challenging ourselves and each other.  Are LAHSA and the serve-providing agencies truly effective in their work?  We often hear individual success stories but take a look outside.  Go look outside this window, and you can't help to wonder what is happening.  Is there a consistency and effective correlation between LAHSA and the service-providing agencies?  In my district, for example, who's the lead at a particular encampment?  Is it LAHSA or LA Family Housing?  Is the left hand talking to the right hand?  Is there a reason we can't immediately get accurate information from the agency that we are part of?  When I asked who is being placed in the Project Roomkey, what encampment they were coming from, I couldn't get a straight answer, and that is a problem.

I can't help but to wonder where the hundreds of millions of dollars to this agency are going.  When I asked if the County is truly meeting its obligation, so much mental health and addiction, are those agencies

doing enough?  Is the County truly partnering with us or leading for us to fend for ourselves?  Is there a homeless philosophy as committed to address the street-level homelessness as this council is?

Judge Carter, I ask you these provocative questions because the moment requires it.  I have tremendous respect for my City Council and our County Supervisors and for the people who have committed their entire lives to serve the homeless.  I ask my colleagues to ask uncomfortable questions as well and to ensure that we are pursuing the best interest of the people who are being affected by the homeless crisis.  As you proceeded this effort, we always commit and agree that ignoring the reality of our streets, freeways, parks, and libraries are no longer an option.

With that, Judge Carter, I'm going to ask my colleagues to update you on some of their efforts and their challenges.

Thank you.

JUDGE CARTER:  Thank you very much, Chairperson.

Without further ado, I'm going to get into the heart of the issues immediately so that there's substance to this.

But for all the department heads, I'm going to

ask that later on there's an implementation meeting with the Special Master and with Judge Birotte. I want to recognize that Michelle Martinez works absolutely free, zero; Andre Birotte, almost zero. And we also have Judge James Smith, who's a Special Master, who's completely donated his time. So there's a group of incredible, dedicated figures, quite frankly, at no cost to the City or the County.

I'd like to now -- Gil, could you come up for a moment. No disrespect is intended, but this is Gil.

Gil, do you mind if I put up some slides to begin with to show your district?

MR. CEDILLO: Sure.

JUDGE CARTER: Gil, just for the record, because we have a reporter, would you be kind to state your full name? She's right beside you.

MR. CEDILLO: I'd be happy to.

JUDGE CARTER: Thank you so much.

MR. CEDILLO: Whenever you're ready, Judge.

JUDGE CARTER: And as you're getting your notes, let me say to the audience that the Court makes some mistakes, and I'm hoping to get it right with your help. By the same token, one of the issues I have is this city is so large, and it's very difficult to move in unison with 15 incredible districts. I hope I'm

right in that judgment call to each council person.

So first up is Gil.

JUDGE CARTER:  Gil, whenever you're comfortable.

MR. CEDILLO:  I'm sorry?

JUDGE CARTER:  Wherever you're comfortable, the counsel table or where you're comfortable.

MR. CEDILLO:  Okay.  Well, good morning, everyone.  I have to tell you it's so nice to wear shoes, so nice to get dressed, and so nice to see everybody, and I know we have grave problems and extraordinary challenges in front of us.  This morning in the *L.A. Times*, there's a very specific piece on the challenges confronting Los Angeles and the kind of precipice, the kind of edge or cliff that we're on that affects homelessness, and so I am fully aware of these problems.  I live downtown.  In the evenings at sunset, I'll take a walk, so I see this intimately every other day or so, and so I have a particular sensitivity for these challenges.

Some 10 or 15 years ago, about 35 city leaders went to New York to study the strategies and their efforts and to figure out what we could do to address those problems at that time.  Those strategies have failed us or their successes have been overwhelmed by

the changing circumstances and conditions.

I come here to you today to say that, on the other hand, our district has a record of success and of leadership.  I am proud of my staff and proud of the work we have done.  It has not been easy.  Our greatest challenge, frankly, has been ourselves, the bureaucracies, the commitments to protocols over moving people off the streets, the -- the politicization of this experience and, in this process, the efforts to -- to -- to be acknowledged as the leader of this effort rather than simply solving the problems.  Frankly, the challenges have been amongst ourselves as the president indicated.  And so, for us, I want to note to you that my district's proud to note that we had a drop in homelessness.

JUDGE CARTER:  3.8 percent.

MR. CEDILLO:  3.8 percent.  While the City went up 6.1, we dropped 3.8 percent.  We have actual, real numbers of people off the streets.  We don't have orders, and so people know my district, and they come to my district.  Homeless people know it.  Street vendors know it.  We're supposed to be the cool place to go because we are less draconian than others, and so we are proud of those accomplishments, 3.8 percent drop when others have gone up.  That's almost a 20 percent

separation between us, 19.9 percent.

And so I come here to state to you that that record of leadership and accomplishments should be acknowledged because we come here to you with specific requests. I have three requests. I have a goal of 430 homeless people to get off the street, and I say to you that I can do that if you help me be unencumbered by the bureaucrats of the City and the other departments that we get confronted with and challenged with.

We have an example, one is called Casa Azul, and we put some pictures in there to let you know how we bear on this problem with our creativity, with our ingenuity, with our resourcefulness, and with our respect for the dignity and of the -- those who are challenged with homelessness. We built that shelter for women who are whom are fleeing domestic violence, and we're very proud of it. We're proud of the commitment and the effort. It doesn't take much to provide people with that sense of dignity. You know, the cost of a gallon of blue paint and white paint is the same, and if, you know, you are creative and you use color and design and negotiate and -- and keep saying, "Yes," you can do that.

One side story, we're not only showing progress in this area, but we're also showing progress in the

development of affordable housing and of housing in general.  And we do that because we -- as I said the first day in office, we start with "Yes," and then when other people come back with a problem, we say, "Yes," and then after that, we say, "Yes."  And then we really get engaged, and so we have this commitment.  We're very bullish about our efforts.  My district's the poorest district.  It's 90 percent renters.

And so that conversation -- the two conversations, one about the precipice that we're on with respect to the homelessness in my district is ground zero.  The impacts of COVID-19, ground zero in my district.  The homelessness is obvious and abundant.  We have density, we have poverty, and we have higher workforce participation.  Those three factors, which were articulated in the *Los Angeles Times* this week, shows why there's an adverse impact in the Latino community, low-income community, community of color as our president just articulated.

JUDGE CARTER:  Several questions, Councilman. You know that the initial agreement is for 6,000 new units within ten months -- almost two months have already gone by -- and another 800 units after, within 18 months.  This only pertains if they're within 500 feet of freeway.  We're hoping for an omnibus, and

eventually Judge Birotte is prepared, once again, attempting it.  So this agreement is a -- is a beginning point.  It's really on health and safety standards, et cetera.  There's a lot of controversy on that.  I understand that.

Are you prepared to go forward with this?

MR. CEDILLO:  Absolutely.

JUDGE CARTER:  Okay.  You and I -- I want to divulge this to the audience -- have had more conversations at 10:00 o'clock at night than I can imagine.  I want to thank you.  I'm always open.

If you could show a couple pictures of the councilman when he was much younger.  That's the first shelter.  There you are.  It's astounding that you were able to reduce the streets 3.8 percent, and I got the document, which I'm not going to cause embarrassment, but I really want the department heads to see the offered and rejected locations, but this is something I'm going to constantly ask:  Can we speed these permits?  We can break down this bureaucracy?  Because, if you look at the second and third pages, which Councilman Gil Cedillo submitted to me, it's a constant request and then rejection.

So where I started originally -- so you will understand this, Department Heads -- but don't

fault-find me because I need you desperately -- all of us do -- is this:  I was told by Caltrans initially or I was told initially that we had -- I'm sorry.  Not Caltrans -- 200 to 250 pieces of Caltrans property.  One piece of property, 16th and Maple, no particular significance.  The parties didn't really know how it was used.

I was also told that, at the time, that property had been in negotiation for six months with the State of California, and that this was a negotiation with pallet shelters to go underneath the freeway.  I think in good faith the parties agreed to this, including the advocates in this matter -- or the intervenors.  I'm sorry.

At 4:00 o'clock, I shot an e-mail twice to Brooke Weitzman to call me and said, "This is falling apart."  No fault-finding, but from that headline of 250 pieces of property, we went to 19, and I think last week we were at three.  So you can understand the little concern on my part of what I'm dealing with and that each piece of property that's pursued has a new problem to it.  So I'm asking you later on, with the Special Master and Judge Birotte, to get together with us in the back room, and I'm going to humbly ask what can be done, if possible, along with the City Attorney to join us to

break down these barriers that's taking so long for this process.

I'm going to show you some pictures in a while to ingrain in all of us in the tragedy on the streets, but with your permission, Gil, I'll probably be calling you this weekend if that's okay.

MR. CEDILLO:  Sure.

JUDGE CARTER:  Everybody's talked about race disparity.  When we talk about race, that's an uncomfortable situation under any discussion.  I'm going to humbly ask -- and these figures have been under our nose for years, this statistics gathering -- how we got to this point of disparity.  In other words, what woke us up in the last couple months that makes all of us feel uncomfortable of the rate of 70 percent of our black population being homeless on Skid Row and 30 to 40 percent, depending upon which figures I'm dealing with, that are of black population, which is four times the amount.  By the way, the Hispanic population, if you don't know it, has the most in terms of numbers for their homeless.  Don't forget that.  And all of a sudden with all of these figures from all of these years, all of us are saying, "Let's do something about it."  I ask that question for you to answer and make certain that we do something about it.

So, Gil, I'm particularly interested in your district amongst others, and I'd like to see that the efforts we're making can somehow start homelessness downward and getting rid of this.

Okay. Now I'd like to get to Curren, but I can't thank you enough.

MR. CEDILLO: Yes. Let me finish with my request because you articulate the frustration that I have.

We've offered eleven sites that we believe are ready to go and only one was approved, and we have, as I said, a record of success. Let me give you those three sites because each site has a willing owner.

JUDGE CARTER: Yeah, if I had an Elmo -- and I don't want to embarrass anybody -- but these are the cites, and we don't have an Elmo. So why don't you go through them quickly.

MR. CEDILLO: We offered eleven sites; one has been approved. So I'm asking you, as the judge here, to take jurisdiction to direct us. We have a site at 3rd and Alvarado, 318 South Alvarado, former medical building, just needs tenant improvements, access, and we can transform that. It's next to St. Vincent's. So they have the capacity. We have a service provider 200 feet away, and then -- so we have an experienced service

provider that we work with; it's not far from Casa Azul. We have a group that wants to work with us.  They're anxious to do this.  We can do this now, as the Mayor said, not rhetoric results.  As we say, real solutions to real problems now.

We have a turnkey.  We have Project Roomkey down the street.  Again, across the street from Good Samaritan Hospital.  This man has transformed this old hotel into this incredible place, but COVID has changed our world.

And so rather than it being a cool, hip place like the NoMad downtown or the NoMad in New York, it's going to be a place to put homeless people in it and provide services there, 294 beds, 30 beds up the street -- 294 beds across the street from Good Samaritan Hospital.  There's a museum used as Roomkey operation right now.  So it's good to go.  We can transfer it into Roomkey.

We have another site down the street, more towards the north side, near North Main Street.  That can do 70 beds, and we can create that.  So we have the capacity to do that if you give us the green light, and I'm talking now.  I'm not talking 18 months.  I'm not talking 180 days.  I'm talking now because we can rally our sources.  That community is very aware of what

challenges confront us, and we need to act.  We can mobilize organized labor.  We can get volunteers for the carpentry.  We can bring the various providers.  We have experienced providers right here.

JUDGE CARTER:  Volunteers of America and a lot of good folks.  I love those folks.

MR. CECILLO:  Judge Carter, I thank you for your leadership on this, your time.  You came on a Sunday afternoon and called me to go down the street and demonstrate, and you were willing to roll your sleeves up and to get right into it, and that's the type of leadership that's needed.  We all should emulate that. I look forward to your direction.  We have laid out our case, and I look forward for your review and consideration, and I thank you for all that you do.

JUDGE CARTER:  I'm also looking forward to working with you.  If it doesn't work now, it's never going to work.

MR. CEDILLO:  That's right, sir.

JUDGE CARTER:  It's right now.

MR. CEDILLO:  Thank you, everybody, so much.

JUDGE CARTER:  I want to thank you for your patience.  I want to thank Curren and your staff.

As you begin, for just a moment, could I just show your district?

Armando, if you would be so kind.

I just want to start -- because I know there's a lot of controversy about overpasses and underpasses. I want to take that on directly for a moment because the input that I'm getting that I just alluded to about the Caltrans property is either just as misleading as what I'm about to show you, and it's about the ones who are giving this input and is not out in the field and is not looking at these locations.  End of discussion.

And I want to thank you, Councilman, and your whole staff, and I haven't lived in your district yet, but I'm almost a citizen.

Okay.  This is 482.  That's people who are within 500 feet of a freeway.  Now, a person living above the overpass is subject to the same elements, rain or sun, as a person living under it, but there's a concern about the people living in the underpass, and I understand that.  The Court's not insensitive to that. But most of these people, most of these homeless, are living right along the freeway, and if you don't know that, then you haven't been out there.

So I'm going to show you some photos, and I'm going to have you call me on it.

Okay.  Is that the freeway?

MR. PRICE:  Yes.

JUDGE CARTER:  Do you remember?

MR. PRICE:  Yes.

JUDGE CARTER:  That's an underpass.  I counted roughly -- and I might have missed a couple -- about 35, maybe 40 people living under underpasses, around 482. Let me repeat that.  I could be off by 10.  I could be off by 10.  Where these folks are is alongside the freeway and along the embankments, on the egress and access routes.

Next one.  Now, these are within three blocks. We're just going to drive along the freeway -- and, by the way, if you have a chance, just stop because we're not only dealing with the homeless, we're dealing with citizens who live right across the street from the homeless.  So the homeless are part of our population, but there's a whole citizenry out there looking at all this.

Next one.  Next one.  This is the underpass. There are people and probably children there.  I agree. But what I'm curious about is the lower numbers that we're dealing with.  If I'm right about 30 to 40, we've been frozen in inertia because there are 440 people out there.  That's just driving along the freeway.

Here's another block.

Next one.  Next one.  Next one.  Next one.

Next one.  These are kids crossing.  And if you don't believe me, I'm going to invite you to challenge me on what you've just seen so you know I'm not cherry-picking and at 5:00 o'clock tonight, if you want to take a drive with me and cruise down that district.

Councilman, I'm going to turn it back to you. Thank you.  You've been a guiding light, and you introduced me to your community.  Thank you.

MR. PRICE:  Well, Judge, thank you.  You've been the guiding light.  I mean, we appreciate your commitment to our community -- and Judge Birotte -- you know, and your willingness -- your willingness to consider a district-by-district approach.  In other words, really battling down, seeing what's needed on the ground with that level of sensitivity that you've opened up and expressed.

I want to associate myself completely with the comments made by the Mayor and our Council President underscoring the -- the obstacles but opportunities that -- that exists, and so I share -- it's a pleasure to my experiences and that of my colleagues as we move forward.

As you know, District 9 has one of the highest concentrations of people who experience homelessness and not just by freeways.  Certainly, it's there as well.

In addition, after meeting my constituents, they look like me, and so I have a strong desire to do more and to do better regarding this portion of our population.

We estimate that 482 people live within 500 feet of the 110 Freeway, which runs -- we talked about an area between Olympic Boulevard and Manchester Boulevard, and I share your -- your concern about their vulnerability as we move forward.  And so while we -- you know, we're not quite sure about that number.  It could be more, and we certainly are planning well beyond that as we attempt to create the solution built on a mix of temporary shelters, public-support housing, safe parking, and others.

Let me share with you, Judge, some things we're doing.  A couple weeks ago, I met with a pallet shelter company I think you're familiar with, and we did a tour of my district.  And one of the sites we found was a Caltrans site between -- off near Slauson and Hollywood. It's a parking lot.  We're really excited about that. We estimate between 30 and 60 pallets to be placed there and particularly more if the Fire Marshal would work with us on space requirements -- our Fire Marshal.  This was ten feet apart.  In other districts, these pallets have been set up five to six feet apart.

JUDGE CARTER:  Can I stop you for just a

moment?

MR. PRICE:  Yes.

JUDGE CARTER:  The Fire Marshal -- one of the things we were going to ask you -- and you're the boss -- and that is:  There's a six-foot requirement in Los Angeles and six-foot requirement according to Rusty Bailey in Riverside.  We just need to know what those parameters are so we all can work on spacing.  We don't know if there's a reason for uniform control on spacing. So we'd like to have a quiet limitation session afterwards.

MR. PRICE:  Absolutely.  It's a great location. These plans were given to Caltrans.  We're waiting for the Federal Highway Administration to sign off.

JUDGE CARTER:  Hold on.  Where's Caltrans?

Hello, Caltrans.  Well, then we'll put it on the record you're hiding because I'd like an explanation how we went from 250 pieces of property down to 19 down to 3.  There is no good explanation.  I'll put that on the record.

Please continue, Councilman.

MR. PRICE:  We believe, Your Honor, once we get the sign-offs that -- that the site will be ready in 60 to 90 days; and, again, it's paid already.  There's electricity there already.  All the modifications to the

property and to the land presents an opportunity forward with the bureaucratic holdup.

JUDGE CARTER:  Counsel, do we have this to be able to put it up on the -- on the ELMO?

MR. PRICE:  We can work on that, and that's the next project, Your Honor.  That's on 68th and Avalon by converting an existing warehouse.  On Monday, I met with Volunteers of America, who are apparently doing a 160-bed facility on 68th and Avalon by converting an existing warehouse.  They've met with the property owner who's also offered to lease remaining warehouse space to create a 100,000-square-foot campus for homeless services.  We'll be able to add another 200 beds as well as 60 safe parking spaces to the site.

We're excited because St. John's is building out a health clinic on the site already.  There will also be a navigation center, water facilities, storage facilities, and because construction is already on its way, there's one section we can really economize or maximize the efforts to build out the remaining section, and that can be done within six months.

The first phase, 160 beds, is set to open next month, but BOA is still waiting for the sign-off by Building and Safety, and the sidewalk needs to be repaired in front of the facility and, of course there's

an encampment on that sidewalk.  Privately held up, Building & Safety said we could repair the sidewalk. There's an encampment on that sidewalk that prevents that to occur.  So we need some help.

We've got another site on 46th and Figueroa; and, again, this is converting an existing building into 15 units to house families, a project developed into a service provider.  The building should have opened a month ago, but Building and Safety has yet to sign off because they were not satisfied with the staircase on the site.  Now it's estimated the date opening is scheduled to be October, a three-month delay moving forward on that.

JUDGE CARTER:  Okay.

MR. PRICE:  Further down on Broadway, on 52 and Figueroa -- I'm sorry -- 52nd and Figueroa, we're going to be utilizing two city-owned parcels.  We have an agreement with the model developer to build 160 units of permanent supportive housing on these sites, and we estimate completion by April of next year.

We already have two safe parking sites in our district.  They've been successful, and we're planning on adding two more, one back at my district office that will accommodate about 17 vehicles, another one at the city-owned lot at the convention center that will

accommodate  30 vehicles.  So we're excited about that being operational within the next -- within the next two months.

So, again, Judge, to report, these projects, the ones just described, will create 600 beds, which far exceeds our 482 number; but, again, we need some help from the City to make sure that these sites can be processed in an expeditious manner.

In addition, Your Honor, to these units, we have another 224 units of permanent supportive housing in the pipeline.  As you know, a developer has offered to build out these sites, and there's four of these properties.  These could be up and running in six months; but, again, we need some City Department cooperation.

There's another site being held by DWP, and another site held by Building and Safety; but then, again, we just think that these projects need priority. They can't go back and give them the line, "Wait until they come up."  I think down the line, we need to prioritize and expedite it if we are really serious about trying to make a difference, especially if we have private-sector developers who are willing to put their money up and to -- to cooperate in a way that helps facilitate the availability of beds, temporary or

permanent.

Based on our meeting this week with HOPICS, we're excited that they have agreed to house another 90 individuals by October 31st.  They've identified homeless encampments on Hope and Exposition at Grand and Flower between 50th and 60th and on Broadway Place; but, again, I just want to make sure that we have full support of the City.

JUDGE CARTER:  And could I just interrupt you and pay special tribute to Veronica with HOPICS working with you?  I saw this e-mail from her to me last night about 10:00 o'clock, and she had pledged, by October 31st, 90 people currently living near the freeway.  So I want to thank you for your introduction.

MR. PRICE:  Well, you know, HOPICS has been superior in offering their services citywide, and so we rely on them whenever we can for providing services and technical assistance.

JUDGE CARTER:  Now, let me give you a surprise right here.  Volunteers of America can put out three teams.  St. Joseph's can put out another team, in two or three weeks' notice, for our severe mental health.

I think John is out there.

John, how many teams can you put out there?  If we go district by district, how could you help us at

all?

UNIDENTIFIED SPEAKER: (Indiscernible).

JUDGE CARTER: 5,000 teams? I'm just kidding you, but you can put out teams also.

We need to have the resources because the City is too big to do this alone.

MR. PRICE: Right.

JUDGE CARTER: Do you want this done?

MR. PRICE: Well, again, we appreciate these organizations, big or small. They're the ones who are doing the outreach and establishing relationships, who understand the various areas. So we think it's important that we expand and we work closely with our -- our community-based organizations that provide services. They are valuable and necessary because the City cannot just do it alone.

JUDGE CARTER: So we need to get our department heads together, good folks trying to knock down some of these barriers.

MR. PRICE: Yes.

JUDGE CARTER: Okay. And, number two, we need to implement as quickly as possible.

Specifically, do you want this done?

MR. PRICE: Yes.

JUDGE CARTER: Okay. How quick?

MR. PRICE:  Sooner than later, in the next 60 days, or we can come on-line in 90 days if we just happen to have the bureaucratic approvals necessary, some with the City, some with the State, and some with the Feds.

JUDGE CARTER:  I'll stand right beside you on this out in the district.  Okay?

MR. PRICE:  Okay.  Again, outreach is an important point.  We talked about the importance of our community-based organizations -- HOPICS, Volunteers of America, United Way, and others who are on the ground, but we think that the Encampment to Home model that was piloted in my area is the -- is the kind of programs we need to remove these encampments from the freeway.  We can't just take one person at a time.  We have to take a group.

JUDGE CARTER:  Let's try to do that.  Let's try to take a community into a community, okay, so folks know each other.  One by one, it's almost inhumane.  I think the folks, in my experience, live in 14 encampments -- now maybe 12, someplace in there -- but most of these folks are cooperating.

MR. PRICE:  We think the pilot programs with LAHSA, United Way on the encampments can be expanded, and this is the right time to do it.

Finally, Your Honor, if I may, enforcement. You have our commitment to build these beds. It's the right thing to do. Temporary beds and more permanent beds are just the right thing to do to get folks off the street, but we also want to enforce clean streets, having streets cleared of debris of -- of bulky items, of waste. And so we've got to find a way to make sure that, once we provide this housing, we have resources as we promised to do and have an obligation to do.

And so, you know, I hear from constituents every day that they are tired of the situation they're in, tired of homelessness, tired of the -- the -- the debris and filth that occurs on our streets. They're tired, Your Honor, and, quite frankly, so am I. This is no way to live, no way to govern, and we have to do this right, not just for the homeless citizens but for those who have a home and who are here or impacted by this.

So, again, we hope that these projects can get the priority they deserve for all parts of the city family as we move forward. We appreciate your commitment and your assistance in helping us do so; and, again, we stand ready and willing to collaborate with you and our colleagues to make some progress, some real progress in our city.

JUDGE CARTER: Councilman, thank you very much,

and I'll be on the phone with you and vice versa and in your district fairly quickly. Okay? Much appreciated.

Councilwoman Monica Rodriguez, what a pleasure to see you again. Thank you for being here.

And, Curren, thank you for being here.

Good morning.

MS. RODRIGUEZ: Good morning. Good to see everyone. I missed everybody.

Oh, Mary, you and I are both color-coordinated.

So good morning, Judge.

It's really good to see you, Michelle.

So just in terms of a quick overview, I guess we're just providing you with --

JUDGE CARTER: Especially, Paxton and Bradley. You were kind enough to take me there. I saw that. And let me just start by saying I'm extraordinarily pleased with your efforts. You're the controlling entity. You're the legislative and executive branch. I'm just a judge, but one of the things you were able to do is clear out an underpass and showed your frustration along the way.

MS. RODRIGUEZ: Correct.

JUDGE CARTER: Now, this isn't a beat-em-up day. It will be a good day by the time we're done. We're going to hopefully work together with this, but it

took too long.  You had to deal with Caltrans, which I would say was a nightmare for you.

Is Caltrans here yet?

MS. RODRIGUEZ:  Caltrans.

JUDGE CARTER:  Caltrans.  I'll just keep calling the name until they get here.

And I'm particularly interested in how you kept at it because I think all of us and the advocates are worried about what happens next because -- how did you do this?

MS. RODRIGUEZ:  So thank you.  Well, I want to kind of give you an overview of what our homeless population, our unsheltered population looks like and then focus on the efforts around Paxton and Bradley.

Currently, in my district, we have 677 based on the 2019 numbers.  We have 677 unsheltered homeless residents in the 7th District, 134 residents that are under the -- living under the freeway overpasses and that includes the 67 that were previously associated with the passing of Rapid Re-housing.  So Paxton and Bradley required upwards of more than a year's worth of outreach efforts, consistent outreach efforts -- cleaning and close coordination with both LAHSA and our SPA lead, which is LA County Housing.  It takes a ridiculous amount of time with respect to the back and

forth that we had endured with determining whether or not we actually had any right to do the clearance related to Paxton and Bradley because of Caltrans.  That in itself took, I want to say, about nine months to get that final determination from Caltrans, that we have the authority to continue with the clean-ups and maintaining that area.

As a result of --

JUDGE CARTER:  Could you hold on for a moment.

I don't know what resources we have, but the Court has been inviting people.  If somebody has the ability to tell Caltrans or call the person I invited, I would really appreciate that, and I'll just sit here and wait for them.  This isn't a day to hide, and I'll repeat that.

MS. RODRIGUEZ:  Well, I think what we have now, as an example, is the work that we conducted for Paxton and Bradley is the authority to assure that we can maintain that right of way.

JUDGE CARTER:  As a city attorney, I'm particularly interested in working with you.  I think you've got the ability and the wisdom to cut through that with Caltrans, et cetera.  And so I'm going to humbly come by again and visit you on this issue, and I'll make that at your convenience, not mine, but I want

to keep hearing that it's through good faith; and, as a city attorney, I think you're unique in that position.

MS. RODRIGUEZ: And so, with respect to that and those efforts, again, while we are maintaining and doing the work that, otherwise, would have been the responsibility of Caltrans -- and this is another example of what the City has taken on: The responsibility and the final obligations of helping to maintain and sustain these areas.

As a result of the extensive outreach that was conducted at Paxton and Bradley and the immediate availability of units associated with COVID-19 and Project Roomkey, many of the residents in that encampment were eligible, because of their age and/or their health, for Project Roomkey. And so we did a one week -- after more than a year's worth of outreach, we had a one-week coordinated both cleanup effort and relocation, also, the -- the collection of the personal belongings and the storage of those items with the Bureau of Sanitation. The tonnage that was involved -- I mean, I don't have to tell you what we -- what we discovered there, and this is after a sustained amount of cleanup efforts that we engaged in that area.

After the cleanup -- at the conclusion of the cleanup, Paxton and Bradley was fenced off. It was --

the fencing was compromised a day later because of individuals that were still trying to diverge and access the freeway areas.  And as I had shared with you, we had discovered a drug run that was running from the Paxton and Bradley location to San Fernando Road.  And so, as a result of it, again, reaching out with both Metrolink and Caltrans, it was just a really comprehensive effort.

Once we actually secured the fencing, we were concerned about the re-population of the area and, as a result, had river rock stored behind the -- the fenced area so that we could secure that location, and it's for several reasons.  Number one, it took a great deal of work and effort to clean those encampment areas, but the community deserves it.  It's adjacent, as you saw, to very highly populated residential and commercial areas. Many of these residents, as a result of living in their residences that abut the industrial areas, have become the bearer of the biggest burden when it comes to the regulations that allow some of this activity to -- to be contained in these areas, and that's something -- I know Ms. Martinez and I have given the makeup of our districts -- particularly difficult.

But with respect to how we go forward, if we take our 134, by the housing that we've completed with Paxton and Bradley -- and I also want to say, again, our

continued work with placing these individuals in permanent supportive housing is still also ongoing.  Of the 67, nearly a dozen have already been established into permanent supportive or re-connected with family.

We currently have a pipeline among the two -- I inherited a district that had two city-owned parcels remaining.  Those two city-owned parcels are currently under construction for permanent supportive housing, one in Lakeview Terrace at the Summit View site, which will house -- which provides 45 units for veterans, and then another location that we have currently in Sylmar.

We just opened, about two weeks ago, an interim Bridge Housing for women.  As a result of COVID-19, the 85 beds will only allow for 57 to be utilized to comply with COVID-19 regulations, but we have currently prepared to house 57 individuals, 57 women that are from the immediate area and associated with that.

We have our Rapid Re-housing and our shared-housing models, which collective will be the also 200 additional units.  So I'm very confident about the level of progress that we're making in this area to be able to take care of the needs for the population, those 134 that were particularly under encampments within and around the freeways.

That said, we recognize that we're keeping the

flexibility in continuing to secure the locations of the facilities that extend beyond that to address the remaining unsheltered population in my district.

JUDGE CARTER:  Will the -- well, I can't see that.  Will the Rapid Re-housing opening by January 1st, 2021 --

MS. RODRIGUEZ:  Uh-huh.

JUDGE CARTER:  -- accommodate this initial primarily 134?

MS. RODRIGUEZ:  Well, the 134 is the number before Paxton and Bradley.  So we're basically cutting that almost in half.

JUDGE CARTER:  Bringing it down.

MS. RODRIGUEZ:  Right.

JUDGE CARTER:  I personally don't care -- of this long-term supportive housing of $4- or $500,000, I personally don't care if it's pallet shelters, and I'll explain why on that, but I personally care if it's government encampments.  Okay?

Here's what I'm deeply concerned about:  I think, because of the ability of the City -- as a compliment to the City -- to try to get this COVID with the homeless under some kind of control, that they be -- will be criticized for what we have, but maybe the goodness of this will avoid a catastrophe.  I don't know

yet.

What I'm worried about is, historically, I've asked about the 2,019 deaths among the homeless.  Is there somebody that could --

UNIDENTIFIED SPEAKER:  2,019 deaths in L.A. County, approximately a thousand.

JUDGE CARTER:  About a thousand.  I'm going to make that a rough guesstimate.  My guess is that's gone up from probably 2018 and 2017, which is pretty significant.

What I'm worried about is -- I personally believe that I can absolutely be wrong -- we're losing more people because of pneumonia and secondary health causes that we've grown so callous to that we've just absorbed a thousand people a year.

And I'm going to show you some pictures that are just pathetic just to remind us that they're human beings and not numbers.

And when I gave up this power, in terms of this agreement between the City and the County, I gave up the Preliminary Injunction to work together, not to come in and find fault necessarily.  I really wanted to make that attempt.  I then gave up ten months -- and I'm not certain till this day if I was right on because I'm really worried about November when this death toll takes

off again on secondary causes, and I guarantee you it's from pneumonia and secondary conditions and ailments and asthma living on the street, going into the hospital, by the way, getting treated, and getting dumped right on the street because we just lost -- is Pastor Don here? Pastor Don just lost -- 3:00 o'clock in the afternoon picked up, into the hospital, dead or dumped back on the street at 9:00 o'clock.  Now, that is a story that just goes on and on.

So one of my colleagues calls it "poverty pimping," and I'm going to have a lot to say later on about getting right down to what my hospitals are doing and who's making a profit off this.  This is going to be a pretty good conversation.

MS. RODRIGUEZ:  Well, I think it's well warranted.  One of my frustrations, in terms of the consistency of the outreach efforts, which I believe are not being tracked effectively in order for us to be assured that it's consistent, in my district, what I'm working on with my staff is to assign the service providers specifically to encampments to hold them accountable because right now we have a situation where there's who's doing the outreach?  And that is the problem.  I can't -- I can't account for individuals because of HIPAA and all the other restrictions that

we're concerned about disclosing information.

All I want to show is that you've been to this location that, perhaps, had ten individuals and that, of those ten individuals, at least eight of them are participating in CES because our only way of facilitating these individuals to be placed in the housing and to facilitate that is to get the cooperation to assure the consistent outreach efforts are happening. And because I can't get consistent data from the service providers or LAHSA on that information, it's rough.

And that's the lack of accountability and oversight that I think is required right now at what I've been changing in my district specifically because I've been tired of it.  I've been asking it from the beginning, three years ago when I first got here, was to get that data because there were -- before the outreach dollars became available through HHH, we -- there were private individual discretionary funds that were allocated to service providers to do that outreach, and yet we couldn't get tangible feedback on what outreach was completed, how many, how many contacts were made, et cetera.  So I welcome that conversation because I think it's -- I think it's necessary, and I think there's accountability on all sides to make sure that we can eliminate this problem going forward.

And what I also want to say, with respect to what you've raised regarding the -- the cold winter months and the projections of those that will perish as a result, I have the only winter shelter in the entire San Fernando Valley.  I accommodate in that location, not just from my immediate territory in my district, but also for the City of Burbank and also from outlying areas.  Those numbers of that shelter population, when we do a homeless count, my homeless count is based on having those numbers reported under my council district when they're actually being accommodated from other areas, and those are some of the -- you know, those are some of the reporting conversations we need to have in terms of pegging down more accurately where the population lies, where the services are being provided for those populations so that we can also hold the municipalities within the county accountable to do their part.

JUDGE CARTER:  I was going to bring this up later, but let's have a conversation just for a moment. I really appreciate your attendance on behalf of the County.

I want to tell you a complaint that I would have and I'm hearing consistently, whether true or not on the City's part, and that is the City will say,

"Look.  We're a large entity, and we're playing by the rules, and we, on the City Level, are consistent in terms of our -- you know, our efforts."

But when we listen to the individual council people, they may have a county city right next door that they would consider would be egregious, egregious enforcement, and what that does is that egregious enforcement, like you can't breathe -- and I'm not kidding at all -- these folks camp, and they have to move because they can't exist, and so they're getting shoved over into the city that's playing fairly across the board while some of these smaller cities are getting very difficult.

Now, I've heard that from one, two, three, four -- nine to twelve of the council people.  So it's -- it's not a well-known.  Okay?  I'm just saying to the County and the City, get your act together with consistency because it's not fair to the City if we're getting our individual cities, like two stones to the swallows, but you're obeying as a city attorney, and then there are cities over there at the county level. That, somehow, needs to be coordinated.

I want to thank you.  And by the way, if you get into Project Roomkey, I'm a big fan.  That is an exemplary program.  I just don't know that they can keep

up with the pace that's needed right now.  We're going to discuss that later today.

MS. RODRIGUEZ:  Well, the goal is to be the first one completed of the 15 districts.  So I'm working on getting that done.

JUDGE CARTER:  Thank you.  Pleasure seeing you.

MS. RODRIGUEZ:  Thank you very much.

JUDGE CARTER:  Herb Wesson, who's on Zoom, if you  could be so kind.  Hi, Herb.  Hi, Herb.  Good morning.  You're on mute.  No politician should be on mute.

MR. WESSON:  Hey.  Sorry.  I have a dental appointment today.  That's why I'm not at City Hall.  So when I finished with you,I'm off to see the dentist.

JUDGE CARTER:  Okay.  Listen.  Whatever you'd like to say, I apologize for not calling you before, but thank your staff again for being so gracious taking me around your district.

I've got the stats right here.  We're not going to take long today because we're going to have another meeting, but about 77 within 500 feet of the freeway. This is not an omnibus agreement.  You've got 1,084 homeless folks out in your district.  But right now, it's just a preliminary settlement.  It's a step forward, 77 people, and you've got Rapid Re-housing and

safe parking.  So, please, let me turn this over to you.

Oh, by the way, Armando -- never mind.

MR. WESSON:  Well, you know, Judge, we want to be as cooperative as we can.  Things are going along.  I know at one point there was property that would have worked perfectly except for it had those high tension wires above it, but we -- we now have come to the conclusion that we can use some of that area as storage to store some facilities, and I'm excited about the opportunity to do that.

Our office is working with the -- the CLA's office or the CAO's office within the City looking at the possibility of acquiring one of the local motels or hotels in the district that could give us about 70 beds, you know.  So we're doing everything that we can to move forward and so that's, in a nutshell, where we are today.

JUDGE CARTER:  Herb, before you go -- I'm sorry.  Councilman, I've known you so well now as Herb -- I'm desperately concerned.  I'm frantic.  I'm panicked about the death rate that we've so callously accepted amongst our homeless population that becomes numbers.  You know, we lost a thousand, and then we pass it on as the next conversation.  And I'm really convinced that, because of that -- and the Federal Court

is responsible for this. I'm going to bear my share of complicity in this just in waking up.  We're all in this together.

MR. WESSON:  Yes.

JUDGE CARTER:  What could we do?  Because Judge Birotte is working on an omnibus agreement with the City.  We don't know whether it's going to be successful for the County, the advocates, et cetera. But, certainly, with these 77 people out in your district near the freeways, alongside of overpasses and underpasses, is recuperative care primarily something you're looking at out there to get these folks into shelters?

MR. WESSON:  I think we're looking at all of that, Judge.  So we're -- we're open, and we're -- you know, wherever there's an opportunity for us to try to reduce and remedy this situation, we are open to that. Definitely, there's a need for recuperative care as well, but I'm about as flexible as any other member on the council.  I'm committed.  I take the death rate seriously.  And, you know, I -- whenever -- so I'm going to be one of the easy Council Members to work with. That's my -- my goal.  You know, this is personal with me and --

JUDGE CARTER:  Because you're so difficult right, Herb?  I'm just kidding.  Okay.  I know you are. So let me ask this -- I'll stand right beside you on this.  I'm concerned about the weather.  The agreement's for ten months.  I'll repeat it to you.  I'm concerned about pneumonia.

MR. WESSON:  Yes.

JUDGE CARTER:  I think the City's done as good a job as they can under the circumstances.  I think we'll always be criticized about the pandemic rate.  I think the tragedy in all of this, we hope to avoid. Hopefully, the death rate is relatively low amongst the homeless population.  So I mean that's true to the City as well.  I don't know where it goes from here.

You've got Venice and the I-10 Freeway, you've got Washington and the I-10 Freeway, you've got Western and the I-10 Freeway, a little bit of Koreatown, and Leimert Park, I was going to show on some photos.

MR. WESSON:  You see the Western portion of the district?

JUDGE CARTER:  Yeah.

MR. WESSON:  That's where we have the -- the power lines, where we could look at placing some of that storage items, which I think -- I would think that that would be helpful.  That's one of the things that we know

we have to put in place.

And what I don't want to do is not take advantage of this open space, and I think that we can structure it in a way where we could have storage of some significance that would not make the community grow crazy.  It's just a matter of figuring out where we can come up with some of these pallet homes or pallet shelters, and we're working, you know, as hard as we can to try to figure that out.  It's just in that Western portion is where we have just a -- a whole lot of area, but a whole lot of that DWP tension wires.

JUDGE CARTER:  Okay.  We're going to talk to the heads of the departments today and see, you know, what their suggestions are in terms of speeding up this process if possible.

MR. WESSON:  Yeah.  And, you know, the Mayor's office has been real flexible with us, you know, listening to our recommendations and suggestions.  So I would be optimistic that they would be willing to work with us to creatively try to solve this situation.  But if we -- if we add any kind of legal flexibility related to this high-tension areas, we could do more because we do have space that are just right in -- in those areas that, I guess, have health concerns themselves.

JUDGE CARTER:  Okay.  If you're ready to go,

we're ready to go.  I'm going to ask each councilperson if they're ready to implement this, and if you are, then let's get going.  If not, then I can move on to a different district and pay more attention to that, Herb.

MR. WESSON:  I'm a team player, Judge.

JUDGE CARTER:  Okay.  Well, thanks a lot.  Nice visiting with you.

MR. WESSON:  Okay.  Always good.  Thank you.

JUDGE CARTER:  Thank you.

Marqueece Harris-Dawson?  Oh, he's on Zoom.  Marqueece, where are you?  I have a bunch of photos to show.

Marqueece?  Marqueece?

MR. HARRIS-DAWSON:  Hello.

JUDGE CARTER:  Hello.  I have a bunch of photos of your district.  Okay?  But I can't show them because you're on Zoom, so I'll show them later on.  Let me just turn this over to you for a moment.  We've got a lot of folks still to talk, and I've got a few minutes.

You've got District 8, 84 people within 500 feet of the freeway.  One of the camps you and I visited was, once again, right alongside that freeway where we visited all the ladies out there; remember?

MR. HARRIS-DAWSON:  Yes, yes.

JUDGE CARTER:  Your thoughts.  Yeah, your

thoughts.  You've got shared housing, interim housing.

MR. HARRIS-DAWSON:  We've got a lot of categories of housing.  We've got about 84 people we counted near freeways.  Today, we've got about 50 -- a little over 50 empty beds that we know about.  There may be more that we can find out about as each day goes on, including 20 Bridge Home shelters.  But you and I visited one of the encampments there at the 105 Freeway and for miles saw that, you know, it was place where there were infants and really people of all ages.

JUDGE CARTER:  I'm going to show that in a few moments after we get off the Zoom so the folks see, once again, what we're dealing with alongside the freeway out there.

Marqueece, are you ready to move on and try to do something about these 84 people?  Because I can pass and move on to a different district.  You know, this all can't be done at one time.

MR. HARRIS-DAWSON:  Yeah.  I mean, we're prepared to move on.  Like I said, we have 50 beds that we know about.  If we've got the authority and tools that we need to remove people, I think we can do that and do it in relatively short order.

JUDGE CARTER:  Okay.  I'll get back to you in the future, and I humbly thank you.

MR. HARRIS-DAWSON:  Thank you.

JUDGE CARTER:  Okay.  Mike Bonin.  If Mike's here.

Councilman Bonin?  Okay.  He's on his way down.

Well, Marqueece, I'm going to cut you off because I want to show some pictures of your district while Mike comes down.  Okay?  I want to show the folks -- I don't think half the people -- I don't think they've been out there.

MR. HARRIS-DAWSON:  Yeah, I don't think they've been out there.

JUDGE CARTER:  I've been out there.

MR. HARRIS-DAWSON:  Okay.

JUDGE CARTER:  Put up Councilman Harris-Dawson for a moment.

And if it cuts out, Marqueece, my apologies.

Okay.  Let's just stop for a moment.  This is an encampment right beside the freeway.  It's not an overpass or underpass, which is the majority of what we're dealing with.  And, again, I just want to put a human face to what we're dealing with out here.  This is primarily women.

And the next one.  Now, stop for a moment. There's the freeway off to the right.  There's absolutely no reason why there aren't pallet shelters

there or tents or toilets or, for goodness sake, a shower.  This is a very vulnerable population, and let me repeat to you now.  You may be the experts, but I've been through 14 encampments, and this city has very little experience in terms of clearing encampments.  Let me say that right from you beginning.  One of them is 1,500.  Our lowest -- what was it, Brooke?  I forget -- was about 80 -- about 80 in Stanton, 90, something like that.  So that's about our lowest number.

So while I'm overwhelmed with your resources and your ability, I'm not overwhelmed with your practical experience, and we're going to talk about getting to all this and being humane and talking to folks because 99 percent of these people can be moved without any problem at all, if it's done correctly, to a better place, hopefully.  This is tragic.

And what you'll find when you talk to people -- and I think now, minimally, 1200, maybe as many as 1500, homeless people, I mean, I've had the privilege to talk to firsthand.  It's been my privilege.  It's humbled me. The women will tell you, "You know what?  I sleep here because I'm surrounded by other women, and the guys are women-friendly, and it's safe for us here, but I won't go down to that encampment down the road because those folks down there, they're going to hurt me.  They're

going to rape me.  And, number two, you know what?  I'll go to a better place, Judge, if you guarantee two things.  First of all, I'm not going to get dumped out if you take my bicycle and my tent because your office will promise me 30 days of Roomkey or whatever."

Mike, come on up for a second.

"And, number two, there's a group of us, and we formed a community out here."  And I give these people justification, by the way.  These people are basically very, very compliant, and that's --

Hi, Mike, come on up here.

MR. BONIN:  Here?

JUDGE CARTER:  Well, this is Mike Bonin.  What a privilege, and you and I are going to have a more extensive conversation than normal.

Have you gotten some rooms at the Ritz-Carlton yet, Mike?

MR. BONIN:  Not yet.

JUDGE CARTER:  No?

MR. BONIN:  No eminent domain yet.

JUDGE CARTER:  No, I'm waiting here because you know the question I'm going to ask eventually because I went over the question with you; right?

MR. BONIN:  Yeah.

JUDGE CARTER:  Okay.  If you can't get -- by

the way, we'll show a couple more pictures.

Armando, could you show -- this is your -- next one -- the freeway.

MR. BONIN:  Yeah.

JUDGE CARTER:  Do you recognize the district?

MR. BONIN:  Yeah.  I can't tell if that's the city of L.A. side or the Culver City Side.

JUDGE CARTER:  There you go.  Do you recognize it?

MR. BONIN:  Yeah.

JUDGE CARTER:  Okay.  Next one.  Recognize that?

MR. BONIN:  Oh, yes.  Yeah.

JUDGE CARTER:  This is your -- your troublesome spot, and I don't have any jurisdiction over it when I wrote this health and safety agreement.

MR. BONIN:  One of many, many troublesome spots, yeah.

JUDGE CARTER:  And I'm told, because of the health and safety agreement, there's no jurisdiction.

MR. BONIN:  Sure.

JUDGE CARTER:  I'm going to start with a really simple, tough question for you, which I hope you're prepared to think about because you haven't given me an answer.  If you don't get the Ritz-Carlton -- just

kidding you, but I'm not -- and you can't have eminent domain and the rains coming, what can we do to make these folks' lives better in your district before we kill them, quite frankly, with the rain and the temperature in November?  And I toss that back to you --

MR. BONIN:  Sure.

JUDGE CARTER:  -- because I tossed out government camps to you, pallet shelters, for God's sake, anything that keeps life.  So I'm going to put out the script.  You've been talking about housing for a long time.  I'm putting the script on you, like I said. I'm talking about what saves lives and what makes people's lives better, and I'm getting tired of hearing the excuse that it's about $600,000 a unit.

MR. BONIN:  I here you.

JUDGE CARTER:  So your turn.

MR. BONIN:  Great.  So let me start off by saying we don't have the Ritz-Carlton, and we don't have eminent domain, but we do have some stuff in place to get people off the -- the street quickly.  But as you know from our previous conversations, I have some personal reservations about the pallet system because it keeps people in the shelter.

JUDGE CARTER:  By the way, I agree too.

MR. BONIN:  And I think that there are

opportunities to use some other interventions that get people off the street.

JUDGE CARTER:  Now, stop.  Stop.  This is going to be the best conversation you and I have had on the record.

MR. BONIN:  Yeah.

JUDGE CARTER:  What are those other opportunities, Councilman, now so that I'm not waiting for promises that are not going to be fulfilled.

MR. BONIN:  Those other opportunities -- and we've worked with LAHSA on some of them -- keeping in mind that my population, freeway population is significantly smaller than others.

JUDGE CARTER:  And primarily Caucasian, also.

MR. BONON:  Yeah, like -- like the rest of Los Angeles, and it's sort of more reflective of the -- of the population on the west side, yes.

JUDGE CARTER:  So tell me how we're going to do it and time frame because I don't care if it's 600,000 a unit.

MR. BONIN:  So we have a population, a freeway population in our district of anywhere between 45 to 60 people.  It fluctuates.  The -- underneath the 405 is partially my district and partially Mr. Koretz's district.

JUDGE CARTER:  Let's go back to the previous slides and show that underpass.  Can you keep going.

MR. BONIN:  So the south side of this is not the city of Los Angeles.  The north side.  It's the boundary between me and Mr. Koretz.  So Mr. Koretz's side would be partially jointly dividing this population of 50 or about 25 of my 45 or 60 people.  So we're looking to use a combination of Rapid Re-housing, master leasing, and shared housing.  And we have been talking with LAHSA, and they have agreed because they also had provided pallet shelters to work with me to make this a pilot for using these faster interventions.

JUDGE CARTER:  So --

MR. BONIN:  They told me they will --

JUDGE CARTER:  Slow down.  Just help me. Again, I heard you partially worked with LAHSA.  What are we going to do?

MR. BONIN:  So they have agreed to provide me, for our freeway interventions, as many Rapid Re-housing vouchers as we need.  They have set those aside.

We are also looking to do --

JUDGE CARTER:  What time frame?  How fast?

MR. BONON:  They have outlined a pilot, and they started going out last week.  I don't think based, on their three-to-four-week calendar, it will be

September 1, but it should be September.  It should be Should be September.

JUDGE CARTER:  Sure.

MR. BONIN:  Yes.

JUDGE CARTER:  Okay.  Terrific.

MR. BONIN:  We are -- I am hoping -- if this works, it's a launch pad of doing things such as that of the other encampments in the district, Rose Penmar and others.  So we're also trying to master lease units, and we have identified the not-signed contracts yet for 46 new beds through master leasing, which is essentially the size of our population.  So between Rapid Re-housing and master leasing, we're looking pretty good.

We also are looking to do shared housing where people share a home and a bed.  There are right now -- and I would actually encourage the Court to invite future hearings about the Health and Recovery Exchange, which provides very quick intervention as quick as pallet shelters.

JUDGE CARTER:  Quicker.

MR. BONIN:  Yes, because you don't have to construct them.

JUDGE CARTER:  Great.

MR. BONIN:  They have available right now 30 to 35 vacancies in 50 houses, and they have 6 more homes

coming on-line in the next month or two for another 50 beds. Now, they do not have, currently, a contract with the City, and one of the reasons, I think, is the City wants flexibility in not having everything go through LAHSA. So we can contract with them for $2 million. If they can hire the peer navigators, they can -- they say they can house 200 people. That's at a cost of 2,000 per person. That doesn't require any utility upfront costs. It's not construction. It's no installation, and they're motto, which is not for everybody but at least for many, is based on sort of the 12-step recovery approach, and so they have peer counselors that come with it. So that -- that 2 million for 200 people would be inclusive of the service.

JUDGE CARTER: So we've got a continuum. We're just not warehousing people.

MR. BONIN: Yes.

JUDGE CARTER: Because this whole idea of pallet sheltering and government camps are strictly temporary and will eventually lead to a better place. I just don't want to wait anymore.

MR. BONIN: Well, on the website, it says they're good for five or six months. So these will all be long term, and you also want to know where our hurdles are, and one is we would need to actually move

from these deliberations to the Council approving, you know, the 14 plans and funding, and we need 2 million for that.

JUDGE CARTER:  If you need help, we've got a help.  There's some really good folks here today.  We've got the fire marshal.  We have get planning, public Safety, public works, et cetera, the folks sitting in the back, and that's because of all of you being so gracious for your help in the months to come.

What do you need help with?

MR. BONIN:  So for -- for these interventions, because the units already exist, we don't need to have, you know, DWP or utility installations.  I imagine for Project Roomkey or master leasing to come on board, they need a building inspection, but that's about it.

JUDGE CARTER:  Roomkey, are these rooms available to you in the next month or so?  And how do you have authority over other districts who may have a terrific program?  Let me keep repeating that, terrific program.

I just showed some slides right now that cause me great concern about their ability to meet the volumes.

MR. BONIN:  Yeah.

JUDGE CARTER:  So I don't want to detract from

people who are making an effort.  By the same token, we're still killing people --

MR. BONIN:  Sure.

JUDGE CARTER:  -- and I'm a little concerned.

MR. BONIN:  So I used Project Roomkey incorrectly to describe any sort of hotel.  I know there's also Project Housekey.  I'm talking about master leasing hotels and motels.

I've got a current project --

JUDGE CARTER:  Just a moment.  Do you have priority for these rooms?  Because we have about 3900 rooms, a little by bit more.  There's about 3400, approximately, give or take, people inside.  There's a little bit of leeway, but they may be moving out of your district to another district where these rooms are available.

Do you have some kind of priority ahead of the other council people?

MR. BONIN:  Well, to a certain extent, yes. It's not a guarantee for every room, but the way they have been doing Project Roomkey, at least in my district, is they have been drawing from the nearby community.

JUDGE CARTER:  Okay.

MR. BONIN:  But what I want to do for the 46

new beds that we've identified, and we actually have, not before September 1, potential for potentially 500 more rooms before the end of the year.

JUDGE CARTER:  I know the project.  You already mentioned it.

MR. BONIN:  Yeah, that would not require -- we would not want that to be Project Roomkey because that has an acuity eligibility that we don't want the project case done.

JUDGE CARTER:  Okay.  I can't thank you enough. I'm going to frequently call you.  I want to represent you.  Let me know when you get eminent domain then call me.  Let me know when you get the Ritz-Carlton.

MR. BONIN:  I understand you'll be talking to a number of my colleagues by the end of the day, and if you can line up a bunch of votes for me, I'd be happy to pick up a lot of stuff under eminent domain, but it may be too aggressive.

JUDGE CARTER:  Yeah, if you can do it, great. But in the meantime, you understand my point, and that is, while we're waiting in the pulpit, we've got people lying on the street out there who are dying.  I don't know how else to say it, and I'm getting sick and tired of waiting for the $600,000 per unit, and you and are a champion; right?

MR. BONIN:  Yeah.

JUDGE CARTER:  No problem.  But I'm not a champion of waiting for $600,000 a unit while we mess around while people are dying.

MR. BONIN:  And as part of my desire to do this approach is I don't want to have to wait for utility hookups.  If there's a room available tonight, let's move somebody tonight.

JUDGE CARTER:  You know, I only have jurisdiction over 84 people in a sense, and that's not jurisdiction anymore because I gave that back to the City and the County by agreement.  Okay?

MR. BONIN:  Yes.

JUDGE CARTER:  So if you fall on your face and you're putting your trust and faith in LAHSA or any other bureaucracy, the City Council and the Board of Supervisors are ultimately responsible that we get into a discussion in about eight months.  Okay?  I want to avoid that discussion.  Fair enough?  I think we can do that.  And you know what?  You're the champion of my voice.  I'm begging.  I'm humble.  I'm more worried about November than anything else because people are dying, and I think we just cast those folks off to the side just like we didn't recognize them for years.  There's disparity.  We knew it.

MR. BONIN:  Well, I'm just haunted as you are by the slides here, but I'm also haunted by Rose Pinmar, you know, the people who are outside of the elementary school at Mar Vista and Venice.  And, you know, as you know, Judge, the last time you and I met in person in my Westchester office, while I was waiting for you, someone died inside the office.

JUDGE CARTER:  Yeah, I'm sick and tired of it.  Yeah, there's no excuse.

So here's the bottom line:  We can do this humanely.  Bottom line.  If we need to, we can put together an implementation team, I mean, right here, right on the spot.  We can walk through that exercise and have two to three weeks' notice teams, mental health teams try to help the needs of the people out there.  I'm open to anything like that that makes it humane.

JUDGE CARTER:  Well, based on our last conversation, we worked to put together that team, and they actually began doing the outreach and the assessments here over the past few days.  And one of the reasons why it's not as easy as saying, "Here's a part number for this resource or this one," is because, until they do the assessments, they don't know whether the housing unit is better or the room.

So the assessments are the first step.  They

have outlined that as a three- or four-step process, and they have actually, as part of their recovery plan, they have created a few different Rapid Re-housing programs as potential pathways.  I get it, as well as anybody, that -- that the bureaucracy, whether it's the City or the County or LAHSA -- I don't point my finger at one rather than the other.

JUDGE CARTER:  Oh, I do if they start telling me they can't walk and chew gum at the same time with $2 million.

MR. BONIN:  This is going to make my office, continuing on a daily basis, making sure that these come through and going out with them.

JUDGE CARTER:  How soon?

MR. BONIN:  Well, before -- before the end of September.  I mean, their  -- their plan is -- let me just pull it up here.  They started doing assessments this week --

JUDGE CARTER:  Okay.

MR. BONIN:  -- which is a one- to two-week process, then weeks two to four is when they start determining where folks go, and anywhere from week three to week eight or so is when folks will actually get placed.

JUDGE CARTER:  I'll go out there with you, and

I was out there six out of the seven days with Pastor Don.

Where's Pastor Don?  Pastor Don, wave your hand.

And it was quite an experience.  The folks wil move.  They will eventually be given some sort of a deadline, like something happens on July 15th.

MR. BONIN:  And what will be interesting here, because it's also jointly responsible with District 5, is, since their approach is more pallet-shelter-based, we'll be able to see -- it's a good opportunity to see what you and I have discussed, not doing it with a single bullet, but having models to choose from.  The people here with the CD 5 interventions will have the opportunity of multiple avenues, and we'll see -- we'll be able to see side by side what's faster, what's more palatable, and what's more successful.

JUDGE CARTER:  I'll share with you the last 48 hours.  You know, we said July 15th out in Pastor Dan, which was the last one, and the folks won't move initially because they just don't leave.  So we'll see. You'll get 5, 10, maybe 15 people, but we've got to get bed housing for them.  In fact, oftentimes, we need to drive them over and show them what that housing is going to be or at least give them a picture.

Number two, it's got to be guaranteed that they're not just getting run of the place for 30 days. They give up their bicycles. They give up their blankets. They give up their place, and then they get dumped right back out on the street, and we kind of need to give them a uniform of solidarity.

I'll tell you what I've heard with a lot of folks out there in the community. One person said, "I won't go. Just give me some kind of guarantee. I'm not going to be toyed with because I gave up my space," et cetera. And if you can move communities at the same time, that's great.

MR. BONIN: Because you've got to be able to give people a place to go when they say yes.

JUDGE CARTER: Yeah, I'll stand right beside you on that, and I'll take the hit. How's that?

MR. BONIN: I look forward to it. That's great.

JUDGE CARTER: Okay. Mikey, thanks a lot, and I'll call you soon.

MR. BONIN: Thank you, Judge.

JUDGE CARTER: Okay. Councilman Joe Buscaino of District 15.

MR. BUSCAINO: Thank you, Your Honor.

Just listening to our colleague Councilman

Bonin and others before him and Madam President, thank you for your guidance of this leadership and this body here.

And I'm just proud of the fact that we are embracing solutions, removing all solutions, but we can't move fast enough.

Your Honor, back in September of 2015, I held a forum on homelessness at the Warner Grand Theatre in San Pedro where 1,200 people packed the seats desperate for solutions.

Five years ago, in April of 2018, we are reminded that Mayor Garcetti in the State of the Speech -- State of the City speech, rather, introduced the concept A Bridge Home.

And while 19 of these facilities had opened, including three in my district along with a storage center, none of us were happy with the pace in which they were constructed.

Today, we're dealing with our toughest challenge.  You, Judge Carter, will order to move 6,000 people from overpasses and underpasses quickly.  It's taken us over two years to house about 2,000 people.  Now we have less than a year to house 6,000 people.

JUDGE CARTER:  Six months.

MR. BUSCAINO:  Six months, to be exact.

Now, people talk about this subject as if it's "Mission Impossible," but, in reality, these next 6,000 will be a test. We're talking about a test run here, because, if we can pull this off, real challenge, I feel, will stand in front of us, the challenge of organizing another 50,000 homeless individuals countywide. And the biggest obstacle, as you heard from colleagues of mine, is the City and County bureaucracy.

While A Bride Home is a great tool and it works to get people off the street with better services and safety, we simply don't have enough of these facilities. We must -- we must do more quicker and more cost effectively. We're not seeing shared responsibility with other cities across L.A. County in regards to the homeless solutions.

These solutions we're talking about are permanent supportive housing, rental assistance, master leasing, hotel and motel acquisitions, Sprung shelters, pallet shelters, safe parking, and even safe camping. And I do want to add -- based on Mr. Bonin's testimony, I want to add shared housing costs. We're -- we're not seeing other cities step up and provide immediate basic humanitarian resources like restrooms, showers, storage facilities, public drinking fountains, out of fear that these basic amenities will be magnets and draw more

homeless people.

Now, here I am promoting the concept of all of the above, a menu of options for homeless solutions. Everything will have to be on the table, and we can't let perfect be the enemy of better.  And I know that there are homeless service providers who do God's work. They're our foot soldiers, and some of these providers don't like the idea of safe parking, safe camping, or even pallet shelters because it doesn't achieve the goal of permanently housing people.

In my distinct, I have 2300 homeless residents. We saw a slight decrease in 2019, but only 194 reside under or near a freeway.  I do, however, have a thousand individuals living in their vehicles, which is more than any other council district, Your Honor.  And that's why most of my plan to address homelessness includes putting up safe parking sites where people can feel safe, have access to showers, and get -- as well as get the services that they need.

Now, it may not sound perfect to many, but it will bring more immediate improvement to the health and well-being of our homeless residents and surrounding neighborhoods.

With over a thousand homeless people dying on our L.A. County sidewalks every year, with more homeless

people becoming victims of crime, we must act now. There must be a reward also for the neighborhoods who accept homeless solutions, who say yes to homeless solutions.  When a neighborhood agrees to host A Bridge Home or any of other possible solutions, and if they've done their part, they must be given the opportunity to introduce no-camping zones around the shelter or supportive-housing development or safe parking or safe camping.  If camping continues to be allowed after a shelter is built in a neighborhood, it would only disincentivise neighborhoods for saying yes to solutions.

Now, we saw the City of Torrance and saw an increase.  Now, I know that Torrance would be able to build 200 beds if it will earn them a no-camping zone in their city, and others will follow because the alternative is tents on the sidewalks.

Now, let me create a picture for you.  If each city in this county were to produce one Bridge type of shelter, we would have an additional 8700 beds and accommodate nearly all the chronically homeless people in the county, and we must regularly clean up encampments throughout the city.  If we don't, we don't just stop -- we stop street cleaning.  If we don't clean our encampment picture today, we stop street cleaning,

or stop picking up trash on a regular basis.  If we don't move swiftly on solutions, we'll continue to experience pure chaos in our streets.  Without consequences, we'll continue to allow chaos, violence, filth, and disease.

Now, unless we all agree to all the solutions, we're only pretending to try to solve this problem, Your Honor.  Thank you.

JUDGE CARTER:  You got 194 within 500 feet of the freeway?

MR. BUSCAINO:  Yes, sir.

JUDGE CARTER:  Some of those are on city -- well, you've got interventions that are proposed at Figueroa Place, Beacon, et cetera.  It's on the bottom of that diagram you submitted to me.  With the folks inside recreational vehicles, it's still inhumane to be in the rain and elements.  They need some protection.

What do you have, Councilman, on the streets out of 194?  Because I don't have jurisdiction over the 2,377 right now.

MR. BUSCAINO:  We are ready to deploy pallet shelters on rec-and-park sites right next to the L.A. Harbor College at 1221 South Figueroa Place.  We can start tomorrow, sir.

JUDGE CARTER:  And that's the diagram you

showed me out there, that same lot?

MR. BUSCAINO:  Correct.

JUDGE CARTER:  And how many?

MR. BUSCAINO:  That would accommodate 150 beds.

JUDGE CARTER:  150.  Wow.  And that's -- I want to compliment you.  Nothing's changed since our conversation.  You're starting tomorrow.  What do you need?  In other words, we still need two- to three weeks' notice to get teams out there, hopefully, Department of Health Services, Volunteers of America, St. Joseph's.

MR. BUSCAINO:  We -- again, there are systems in place both in the County and the City that prevent us from moving quickly.  So in our case here, Your Honor, we need -- we need to have the Bureau of Engineering to prepare a site plan.  We also -- rec and park are doing further maintenance assessments, and they're also looking at an internal review.

JUDGE CARTER:  Okay.  Just a moment.  What pushes that?  Because I heard that literally not from every single councilperson.  So this isn't about a bad day for the folks of these different agencies.  They're good people, but the end result is it's stifling.  It's glaring.  And one of the things that Michelle Martinez did -- and I saw -- was she literally took a building

inspector and put that building inspector on site and signed off on it sitting in the chair because, once it went back to a person's office, it sat there, in good faith, for days and weeks.  It went back for approval, et cetera.

What could we suggest -- how could we work together, for the folks in the back, to start speeding this process?

MR. BUSCAINO:  This is going to -- this can be all in one room and get it done before we leave.

JUDGE CARTER:  Why don't you stick around today.

MR. BUSCAINO:  Yes, sir.

JUDGE CARTER:  Okay.  If you can.  Let's find out.

Mitch O'Farrell.  Mitch, you're here.  If you could be so kind.  And this is District 14, of course, and I've got photos that we'll see momentarily.

MR. O'FARRELL:  Good morning, Your Honor.  We have two more minutes of good morning.  Good morning.

JUDGE CARTER:  Good morning.

MR. O'FARRELL:  So I can talk a little bit about the 13th District.  I can talk about what I find important in order for us to achieve the order, and then I can talk about our interventions and then the -- the

challenges but also how we're working on the challenges.

So I'm not going to offer a bunch of empty complaints.  We've got challenges, bureaucratic and otherwise, and I'll go over those, but also to convey that I think collectively we're working on breaking down all those barriers that exist, that Mr. Buscaino said as part of his presentation we all know exist.

So we'll just talk a little bit about the district profile.  Geographically, we're the smallest in the Council District.  We also have some of the densest neighborhoods anywhere in the City of Los Angeles, also some of the census tracts that have the lowest income levels of any census tract in the City of Los Angeles. So I did refer to a lot as the Hollywood Council Member, but that is misleading because I always say this:  That just beneath the glitz and glamour are real struggles in real neighborhoods where -- where people need help.

So we also have three freeways running through the district, which is where this -- this order, in particular, comes into play:  The 101, the 5, and the 2 Freeways.

JUDGE CARTER:  About 568 folks.

MR. O'FARRELL:  That's right.  So you have all of that, and we have, again, that number and even more that are living in vehicles and/or RVs.

Now, here's something that's really very, very important, Your Honor.  The interventions that we engage in to reach our legal obligations from your settlement must be reserved and offered to those who are currently homeless and receiving services in the 13th District before opening to SPA 4.  SPA 4 includes, you know, all of Skid Row and everything else.

So what I need -- and this is what we're working with all of our partners to achieve from LAHSA to the service providers -- is to understand that we must meet the needs of those in our own districts as we strive to create these new beds; otherwise, our numbers won't move in the direction this settlement requires. In other words, in order to meet our legal obligation, we must focus on district-specific reductions of people experiencing homelessness, in other words, goals to get people housed, which is what I've been really focusing on since being in office, and I think we all need to focus on making sure that we have homelessness reduction, people to be housed.

I'm sure you've heard this all morning, too, but all of these interventions and efforts are fluid. And even the document that we supplied to you last month shows there are dynamics taking shape in searching for new hotels for Project Roomkey, Project Homekey.  We're

taking a look at all available motels and real estate in our district and some Homekey acquisitions.

Right now, we're vetting properties in the 13th District for consideration to purchase. We may have an answer today for 42 rooms for purchase, and so that will be important. Right now, the five that we're vetting -- and that's not all that's on the list -- but the five that we're currently vetting will get us to over 200 rooms by late this calendar year or early next year; interim housing, expanding on existing partnerships. We've got the Salvation Army in Hollywood that opened 40 beds as a temporary shelter during the winter, and they're in the process of making that a permanent shelter.

JUDGE CARTER: By the way, they're in the room.

MR. O'FARRELL: Oh, terrific. They've been wonderful to work with, and maybe you've heard from them as well.

And then we are identifying new sites with willing partners as well as looking at city-owned property. We have all sorts of schematics that we want to --

JUDGE CARTER: You heard -- maybe you weren't here -- of my little talk about Caltrans owning 250 pieces to 19 to 3 and who knows what we've got today.

I want to start with the City property.  I started with the belief from the advocates and the statements that we have thousands and thousands and thousands of pieces of City property.  It was told to me by Carol Sobel that we have 15,000, and I think in good faith.  But now we've got those documents, and we've got 400-something and 250 aren't available.  This isn't directed at you, but it sure is to the City.

What the Court's trying to discern and trying to make certain is we don't get into a contempt process or proceeding, you know, down the line because I'm not going to take  gobbledygook for an answer.  I've got problems with the data I'm given, you know, we have 250 Caltrans property and now we're down to 3.  I'm being told we have thousands of pieces of property, and now we're down to 400.  Oops, 250 available for some magical reason.  I've got double-accounting going on because the 6,800 is not 6,000.  That's public property.

It's really about 3,000 that was created because the City almost had to account for a thousand people who are in the recreational shelters.  They always had to account for about 2,000 to 2,200 when we struck this agreement.  So the City was on the hook for 3,200 people that they had to do something with anyway; you understand?  And I know that they had to come to my

federal court, and they probably hoped for an injunction that said, "You're not ruling these people out because politicians have a tough time making that lifetime type of decision."

Okay.  So let's just assume hypothetically that the federal court isn't going to let those people back out on the street, you know, to this type of deprivation.  So the public is being told 6,800 units, and I'll go along with that, but we only had 3,000; right?

MR. O'FARRELL:  I wasn't in the room.

JUDGE CARTER:  Oh, don't tell me that.

MR. O'FARRELL:  I'm sure I can tell you about the properties in the 13th, though.  I don't know what you've been told.

JUDGE CARTER:  Now, well, I'll just wait. That's another discussion.  So what I'm concerned about is whether this input I'm getting to try to make, you know, decisions in health now, that that could be malfeasance.  I don't know what that is, but I'm going to take it as malfeasance right now, and I need accuracy.  So that's not your discussion, but that is a discussion we're going to have later on with the Mayor, I think, who's been called that verified this, but I'm all done with the fiction and hope we can fix this,

quite frankly.

MR. O'FARRELL:  All right.  So I know the 13th. When I'm talking about publically owned properties, I'm talking about parking lots.  I'm talking about recreational and library parking lots.  As far as publically owned property available, we have slivers that you couldn't build or put a pallet on, like slivers along the river and weird places, and the 13th doesn't have vast holdings of publically owned property.

So when I'm talking about using spaces that are not being currently utilized or under-utilized, if you will, or we have to make room for it to put pallet housing --

JUDGE CARTER:  Remember when we leave your office on the driveway to the street and kind of take a left turn and there's an encampment right there?

MR. O'FARRELL:  The field office?

JUDGE CARTER:  Yeah, yeah, the field office. I'm sorry.  The recreation center where I first met you. When you drive up, there's -- there's no jurisdiction that Judge Birotte or I have on that piece of property. That's not within 500 feet of a freeway; you understand that?  Okay.  And there's no agreement now between the City and the County when I put out that Preliminary Injunction.  So that has to wait for an omnibus

agreement in some of these places, and if we don't reach it, then it will be just litigation time.  Okay.

Well, how quickly are you able to move on some of this?

MR. O'FARRELL:  We think that we can get to the requirements of your order in the timeline that was given based on all that we're working on now and the searches that we're doing to acquire properties, whether it's Project Roomkey or Homekey acquisition, which the deadline is -- is this month for purchases, but we hope to do that.  But we feel that we can reach your settlement agreement with us, but we're looking way beyond that.  I don't want to get sucked in -- in the limitations of just housing a bare minimum based on the settlement.  We're looking so far beyond that.  I come from the belief that everyone who is experiencing homelessness needs to be -- needs to have a roof over their head.

So we're -- in my view, we're going to reach the requirements of the settlement, but my goal is to house every single person who we can cajole into accepting it at the earliest possible convenience, and part of that is through our housing efforts through HHH and beyond.  We're also building permits for housing not under the HHH umbrella and lots of extremely low-income

housing.  We're at 20 percent in Hollywood, and so -- it's -- it's the whole totality of the approach, and this settlement falls into that.  So I think -- I think it behooves us all to look way beyond just making sure we've reached everything you required of us.

JUDGE CARTER:  Well, I do too, and hopefully we can all move forward.  I just want to make certain that, if we can't do this, I don't know what we can do in the future because this is a baby step.  And so the end result is I want to pass back to you the housing fight.  I want to say to you, "Move over to the human dignity, human rights, human safety, human health fight," and I've come to the conclusion -- and this is a bias on my part -- that anything that improves a person's life 10 percent like a shower and shave is where I'm at now.  It's as simple as that, and if we can do that, it's a good night and we can sleep peacefully.  The death rate is absolutely unacceptable.  Same as disparity, it's unacceptable, and it was right under our noses.

So we're going to get together in September.  I'm not going to ask what you're going to have done.  I'm going to ask you what you have done.  These promises of 15,000 units or 6,800, from now on, my criteria is what have you done.  Okay.  Fair enough?

MR. O'FARRELL:  Fair enough.

JUDGE CARTER:  And by the way, don't worry.  If you break that log jam, we're all in it.  There's a lot of a success out there.  We open the doors -- we open the doors to funding, quite frankly.

MR. O'FARRELL:  Well, I hope that everyone in this gallery, everyone at this hearing -- because I know we have advocates, we have critics, we have journalists -- needs to unite in this effort.

JUDGE CARTER:  I hope so.  I hope we come out of this with a little bit of bruising today in all parts, including -- all of us need to be uncomfortable right now.  And if we can come out of that in some kind of unified form and we cut through some of this bureaucratic inertia, quite frankly, this malaise, and lower the death rate, then the Court really wants to work with you.

MR. O'FARRELL:  I'll close with this:  I was at a forum yesterday evening with constituents with County Services experts, with the City Attorney's Office, and we talked about how homelessness has only grown over the years.  It didn't start this year or last year or ten years ago.  It has been building for decades.  Clearly, there's something wrong with the system.  That's -- that's a given.  If the system was working, we wouldn't have 41,000-plus homeless living in the City of

Los Angeles.

However, having said all that, it's no time for us to wring our hands.  It's time for us to find solutions and either repair the system or create a new one that's going to work.

JUDGE CARTER:  You don't want to blow something up unless there's something to replace it.  It's as simple as that.  It may need to get re-imagined, et cetera, but by the same token, if it's not working year after year, then there has to be a dramatic change, and I don't know where I stand even theoretically on that right now.  It's not my position to stand anyplace, but I know right now it doesn't appear, at least to the public, that this isn't working, and it doesn't appear by the numbers, and it doesn't appear by the deaths in any immeasurable amount.

I'm back to how many people can we get off the street as quickly as possible and do something more humane while we wait for that perfect solution.  If we get the Ritz-Carlton, hey, I'll be the first to sign it.  I'm just kidding you.  If it's eminent domain, I'll be there tomorrow.  But in the meantime -- I think Mike was really candid with me today, you know, as he always is.  He said, "You know, Judge, along the way, we're going to do something on the basis of where it doesn't become

permanent."  So I think, right now, I hope that gets re-imagined by everybody.

MR. O'FARRELL:  Well, your solution as a judge, I think, is what the motivating factor is for all the parties to get on board and put differences aside and keep deaths down, which is ask what we had wanted all along.

JUDGE CARTER:  Let's try.

MR. O'FARRELL:  Thank you.

JUDGE CARTER:  I'll talk to you soon.  So in September, I'll be asking what have you done.

Councilman Blumenfield, I just saw you.  There you are.  Pardon the formality.  It's nice to see you.

MR. BLUMENFIELD:  First off, because of quorum issues, I only got here a bit ago, so I don't know quite the flow of the room, but I really appreciate you doing this, putting us together.

I know a lot of people don't expect us to succeed.  I'm sure there are people in this room who believe that we're going to fail and that the Court is misguided in terms of this approach, but I really believe in what you're doing, and we've talked about this, and I want to -- I want to help.  I want to help you and appreciate that you're here trying to help us move forward on real solutions on homelessness.

What I gave you -- and I'll go through it in a minute -- is a little rundown of what's happening in the district. But what I gave you -- and I'm happy to make a copy available -- is some of the stumbling blocks. I wanted to put it in writing so that it was -- it was clear because I know there was a lot going on, and things get lost. Although, the last two speakers that I heard, I really agree with the messages that they've been putting forward.

So just to give you a sense, I mean, you've been in my district. We're fortunate in that, of all of the districts, I had the fewest number of homeless people in my district. However, you wouldn't know that by the reactions of my constituents. In fact, it has been more than once where we -- in my district, we broke the record on 311 on the number of calls about homeless encampments even though we have fewer encampments than other -- other cities. So that tells you something that this is -- it's a serious issue in our community, and obviously it's a very serious issue because people are dying on the street. So we are trying -- I'm trying in my district to move as quickly as we can on a number of solutions.

In order of certainty, I'll give you some of the things that we've got going. The most certain is

that we have a Bridge Home opening up on December 31st. That's -- I don't know what that document is, and I can't read it that far.  But, you know, that's 80 homes, and that's money in the bank.  That's there.

And then we are looking at pallet shelters in a couple of locations -- in a number of locations, but at least two are -- are very likely.  The one that's most likely is in Reseda on public property, and we're looking at about 50 pallet shelters, and we already have BOE looking at the design and trying to figure that out. We are plagued by what other people have raised, which is the fire marshal issue and the fact that they have to be 10 feet apart, which I'm hoping we can come up with some more creative solutions, but we're plagued by the cost of the utilities.  I put a motion in to create a temporary -- a temporary rule with regard to electric hookups so that, like other cities have done, where it would be cheaper than all of the things that we have to do.  There's a lot of hoops we have to go through even for pallet shelters.

Similarly, we have -- I'm looking at about 50 bed pallet shelters in Canoga Park where we would lease, and it's already in a public motion, and it's at the Knights of Columbus.  They're building --

JUDGE CARTER:  You don't have to tell me the

location.

MR. BLUMENFIELD:  Okay.  It's already in a public motion.  It's already out there, and we are in active -- GSD is negotiating currently on a lease price, and we're optimistic that that will -- that will happen.

This has been part of the creative solution where myself and my team have been going out and talking to different folks and different properties and saying, "Can you help us with this?  Can we lease this," because, unlike a lot of areas, I don't have public lands.  I have very, very few public properties and even city properties, and the ones that we have are being actively used for parking lots or other things.

JUDGE CARTER:  Let's go over this for a moment just on the agreement between the City and the County concerning the 500 feet within the freeway, because the Court has no jurisdiction, and there's no agreement between the City and the County or the advocates or the plaintiffs about an omnibus agreement with the City.  I saw that freeway underpass.

MR. BLUMENFIELD:  Yes.

JUDGE CARTER:  And there you have some situations like where women are living underneath the underpass, and I have some photos of it.

MR. BLUMENFIELD:  That's the --

JUDGE CARTER:  It's a small number of people. There, would you be able to take advantage of Operation Roomkey or something else to get those folks, you know, housed immediately and in a much better situation or create a better situation?  Your numbers are so small that it seems to me that you're one of the districts moving very quickly because we're not dealing with 482 people.  That's a big undertaking.

MR. BLUMENFIELD:  And I've been out -- you're talking about the Winnetka underpass, which is -- which is the most complained about spot, I think, in the city on many occasions.  It's certainly in my district, and I go out there regularly.  I was just out there a couple weeks ago.  In fact, this one kid, 20 years old or something, I talked to him and talked to his mother back in Colorado.  Long story, I bought him a bus ticket and got him back on his way.

JUDGE CARTER:  But there --

MR. BLUMENFIELD:  They don't qualify -- most of them don't qualify for Project Roomkey.

JUDGE CARTER:  No, but that's what I'm pointing out.  You might have pallet shelters, and maybe it's economical to build out if you've got 50 or more because you need hookups, but it may not be economical at all if you build four pallet shelters.  You might have Roomkey

available.  You might have a group care available.  You might have somebody else available that you know is quick that you can accommodate these folks more.

MR. BLUMENFIELD:  Well, the problem -- I mean, I go out there with the LAHSA workers, and I say, "What does it take to get these folks out of this underpass?" They are -- they are clearly suffering."  I mean, I could give you their names and story, I've been out there so many times.  And what I did was -- most of the people under that particular underpass are drug addicts. That's the reality.  I mean, I'm not saying all homeless.  But that particular underpass, for whatever reason, most of those folks have major addiction.

I had these three guys, just the other day, say say to me, "If you could get me to a treatment program, I would go tomorrow."

JUDGE CARTER:  Okay.

MR. BLUMENFIELD:  And can we get them into a treatment program?  No.

JUDGE CARTER:  Why?

MR. BLUMENFIELD:  Because they're not available.  Just to be straight up, there is a long line.  We don't have the power of the City.  It's the County's responsibility to have these programs, and they're not there.  And -- and this is a big issue, too,

because, if you move people into a pallet shelter -- in fact, these guys were friendly with me because I asked each of them, under this freeway, "If I could get you into a pallet shelter tomorrow, would you go?"  Every single one of them said, "Yes."

JUDGE CARTER:  Okay.

MR. BLUMENFIELD:  However, these three guys, they said to me -- well, two guys and a gal, and they were Reseda High School graduates.  They were local folks.  They said, "Yeah, we'll go to a pallet shelter, but we're drug addicts.  Unless we get into a program, we're still going to be using drugs."  And they said to me, "If you get me into a program, I'll go."

JUDGE CARTER:  I heard that the 14 or 15 people you visited -- and I'll round off a bit -- but 10 or so aren't drug addicts.  10 or so would go into a pallet shelter or something else, a hotel or motel or whatever pretty readily.  If I'm hearing we have a special case with the three, we should obviously have some continuing services.

So here's my thought:  I've come to believe, and may be naive, but I'd like to think we've got the 10 off the street as quickly as possible.  I'd like to never forget the three, but I'm afraid that we'll need the three or the one, before we get to the vast

majority.  You know, Carol Sobel, I'm going to believe what she said, "You know, Judge, 70 percent of the folks that I represent don't need any support services.  They just need a handout."  And if she's right about that, which I tend to believe, then I keep thinking that our resources are so focused here, which they should be, but that we keep forgetting about that 70 percent that we could do something about immediately, and they're dying.

MR. BUSCAINO:  Judge, can I?

JUDGE CARTER:  Yeah.

MR. BUSCAINO:  In realtime, this is happening right now in Wilmington right behind my municipal building in an alley.  With extensive outreach, showers, COVID-19 testing, sanitation, the Care Plus team, and offering a bed at Bridge Home in Wilmington, 31 individuals.  Out of the 31 individuals, Your Honor, 11 accepted and are moving to the Bridge Home.  20 declined and said, "Absolutely not.  This is what I want.  This is a way of life."  But we should not take those 20 and we should not give up on those souls.  That's the thing. But at the same time, we need to see that, the frustrations and the challenges in -- in holding folks accountable, and sometimes it's through consequences, Your Honor.

JUDGE CARTER:  You can continue, please.

MR. BLUMENFIELD:  Well, I agree with you in terms of the folks -- there are a lot of folks who we don't provide services to because they're not sick enough or they're not homeless enough.  I have safe parking behind my office.  We used to do that almost a year ago, and I have met regularly with those folks.  I've had dinner with these folks.  They are all sort of the middle class and the homeless.  Most of them have jobs.  They pretty much lost a lot of things, but they held on to their vehicle, but none of them qualify for getting any sort of assistance or handout because they're not acute enough.  They don't score high enough to get any sort of assistance with first month, last month, or the kind of little things we can do that could give them that boost that could get them out of their vehicle and into a better life.  And that, to me, is extremely painful as well because I think there are a lot of folks that we could help before they spiral down and become the person under the Winnetka underpass who has hit that bottom multiple times.

JUDGE CARTER:  I hope so.  I'm going to get in contact with your colleague Paul Krekorian, and I'll be back on the phone with your office.

MR. BLUMENFIELD:  Your Honor, can I just say a couple --

JUDGE CARTER:  Please.

MR. BLUMENFIELD:  I gave you the memo, and I didn't get to finish with the different things that we're doing with Project Roomkey.  We've got 125 beds that we could convert into actual rooms, is my hope, as well as we have some private property.

I was talking to someone yesterday who owns a very large piece of property.  They purchased it,  and they're putting up a major development that's going to take a number of years to go up, and I talked to them and I said -- as I said, I do this creative thing, I talk to different property owners to see if they can help.  Usually, I get laughed out of the room.  These folks were willing to listen, and he said,  "They're just parking lots and not going to be used for a while."

"Could you help us with either pallet shelters or RVs on the property because I have nowhere to put these RVs?"

So many people live in RVs or other vehicles, and at first they said, "No, we're trying to be a good neighbor in this area.  We've become, you know, an encampment, and we build a project, everybody's going to hate us, and we're not going to get any tenants."  And then when we started talking about it, I said, "Well, actually, you could be a hero here by helping get people

off the streets."  They were interested.

But one of the key things they said was they would only consider this -- and they are seriously considering this, which would be a huge gift in the sense that I can get a hundred RVs onto their property. They said, if, and only if, we did this, and then we were able to tell with neighboring buildings with RVs in front of their buildings, the RVs are no longer there because we are taking them and if we could -- if we could basically be able to enforce.

And I bring this up because I heard Joe and other people talk about the need for enforcing around these Bridge Homes and around the pallet shelters.  I think it's critical, not just for the community acceptance, but also for us to be able to leverage properties like this.  Here's an opportunity.  We could leverage this property potentially -- and as private property, and they would essentially give it to us for five years or so.  But we'd have be able to show them that we can enforce.

Like I said, if I can take RVs here, then the entire community will not have RVs, and they'll all know because you've taken the burden off of them, and we'll be able to enforce that, where you're not going to have tents on the Winnetka underpass or close to the Winnetka

underpass because you have taken in pallet shelters.

And they're willing to do that, but they say -- and they're very familiar with you because they actually have an Orange County link, and they said, "If this will help you get to Judge Carter's final deal and where you could actually start enforcing, then we will be there, help as a good community person.  But if it's just to create, you know, more encampments on our property, we're not interested."

So I think that's important as another perspective on why it's important to be able to have an enforced cleanup around these sites, not just for community acceptance, which is important, but also to leverage more housing.

JUDGE CARTER:  Thank you very much.  I appreciate it.

MR. BLUMENFIELD:  Thank you.

JUDGE CARTER:  Councilman Krekorian, thank you so much for being here.

MR. KREKORIAN:  Good afternoon, Your Honor, and welcome to our council chambers.  I'm delighted to have the opportunity to talk to you about some of the progress that we've already made and what we still plan to accomplish in my district.

And let me say, first, how important I think it

is that you are inviting us all here to have this discussion. There are so many other stakeholders who are concerned about this issue because I think all of us, every single member of this council and probably every resident of Los Angeles, has had it with grandstanding and posturing and blame, and they just want action. These are solvable problems. They're complicated and difficult solvable problems. But every member of this council is dedicated to finding solutions, and your engagement in this, I believe, is going to help us to do that.

So let me tell you a little bit about what we've accomplished in the last few months, and then what I expect to accomplish in the next few months.

First of all, in my district, we established the first safe parking lot in the San Fernando Valley and the first one to be built anywhere in the city on city land.

In the last six months, we've constructed the first homeless services navigation center in the City of Los Angeles at an expense of $6.5 million dollars. The navigation center has been widely successful. We've been able to provide over 3,600 showers. There are restroom facilities. We've provided storage for over 160 individuals and case intake for 430 people operating

in March.  When COVID-19 hit, this navigation center was the only hygiene facility operating in the entire San Fernando Valley to the homeless population.

Last month at the navigation center, we had a client who had just been beaten by her so-called boyfriend.  A case manager was able get her into a domestic violence shelter within an hour of her arrival at the navigation center.  We've also connected many clients through the navigation center to Project Roomkey rooms, and in September, the operator of the navigation center will also be operating the site as a day labor center so we'll be able to provide job opportunities with the other services that are provided at the navigation center and storage and hygiene and so forth.

We also in recent months have initiated an RV pilot program because, in my district and in much of the San Fernando Valley, RV residents are a significant portion of our homeless population.  So under our pilot program, we have used septic tank emptying and intensive LAHSA outreach and trash pick-up and clean-up in the area to ensure that centralized location residents are provided with extra service, a better opportunity for them to find their way into a continuum of care through contact with LAHSA outreach workers, but it's also been much better to the surrounding neighborhood.  We're

serving 85 RVs in two specific areas in this program.

In July, we opened the first Bridge Home site in my district.  The first one is in the San Fernando Valley and spent $2.5 million dollars.  This was also the least expensive Bridge Home site in the City of Los Angeles today.  That facility, which Your Honor had an opportunity to visit while it was still under construction, has 88 beds and has been in operation since July.

Yesterday we cut the ribbon on a Bridge Home site on Van Nuys Boulevard at an expense of $6 million. That site will be open to participants on August 17th. It has 100 beds.  It is the largest Bridge Home facility built in the City of Los Angeles to date.

Lastly, of course, we have the permanent supportive housing units that we have already opened. We have over 200 that we've already opened, and there are another 250 or so that are in the pipeline for groundbreaking this year.

Now, I want to look forward because, as Your Honor knows, because you have emphasized the importance of the population residing in and around freeways, we examined the population -- the amount of our population that is in that category, and it turns out that my district has over 200 people living there --

JUDGE CARTER:  About 203 according to LAHSA.

MR. KREKORIAN:  And it appears that we are the 5th largest population of freeway-adjacent residents in the city.

Well, I'm pleased to say, Your Honor, between the two Bridge Home facilities that we have just opened, we can accommodate 188 of those 200.

JUDGE CARTER:  Let me write that down.  So of 203, you can accommodate 188.

MR. KREKORIAN:  We have space right now for 188.

JUDGE CARTER:  How soon you want to move on this?

MR. KREKORIAN:  Well, we are moving on it. It's a question of LAHSA outreach getting out to those people and bringing them into the facilities.

JUDGE CARTER:  Okay.  I'm going to ask LAHSA in a few moments after this about a participation list, along with Volunteers of America and other groups.

MR. KREKORIAN:  Now, obviously, Your Honor, that -- that population is not the entire homeless population.

JUDGE CARTER:  But you are ready to move now. I went out and looked at three sites.  You and I went out to one site and out the driveway and made a

left-hand turn and went up the hill and go down the street and walked down.

MR. KREKORIAN:  Yes, Your Honor.

JUDGE CARTER:  What do you have?  In other words, do you need to go to pallet shelters, or do we need to move directly to something else and not use anything in the interim?

MR. KREKORIAN:  So, Your Honor, in addition to the 188 beds that we have open, that we'll have open this month, we also have the three sites that you had visited, which we'll be proceeding with right now.

JUDGE CARTER:  Are they still going to be pallet shelters?

MR. KREKORIAN:  Yes, that is the plan, and I can give you a progress report on each of the three sites.

First of all, as to the sites at --

JUDGE CARTER:  You don't have to give me the address, just location.

MR. KREKORIAN:  So the park site, which was near the shopping center that was adjacent to the freeway, that one as well as the one in North Hollywood Park were approved yesterday by the Board of Recreation and Parks Commission.

JUDGE CARTER:  Okay.  I got a document this

morning, and I don't think the City Council -- they're just receiving it.  Often, the City of Administrative Office -- I'm not sure if you're aware of this yet, but I got this at 6:00 or 7:00 o'clock this morning.  I was trying to read it quickly.  I don't think you've got time to look at this.  This needs to be analyzed further and subject to approval, but it's the beginning, apparently, of something, and I'm not certain how -- how this plays.

But on page -- on Page 6 of this report, other interim beds including pallet shelters, 740.  I'm assuming -- and you're probably not aware of this.

MR. KREKORIAN:  I'm not aware.

JUDGE CARTER:  So I caught you by surprise.  Some of those are vague, and one of the advantages or disadvantages may be that at least you own it.  If you use it in an interim fashion, it could be moved to another district as an asset that you can retain, you own.  What I'm always concerned about is not being able to purchase hotels quickly enough and how long the funding lasts with COVID-19.  And if there is a back seat eventually -- God help us -- hopefully soon, what happens to that funding?

So everything in the interim basis I'm concerned about.  But if we get people off the street in

hotels is fine, temporary is fine, or interim is fine to stop the inhumanity placed out there, but I want you to be aware we've got 740 on this one, which is a pie in the sky.

MR. KREKORIAN:  Well, I'm not sure what that document represents, Your Honor, but I can tell you what:  My plans are not at all a pie in the sky.

JUDGE CARTER:  No, not yours.

MR. KREKORIAN:  In fact, I can show you the diagrams right now.

JUDGE CARTER:  I've seen that.  I've seen that, Paul, and I believe you can do this -- I think you can do this pretty quickly, in fact.

MR. KREKORIAN:  We will be breaking ground on two of the projects in September.

JUDGE CARTER:  Okay.

MR. KREKORIAN:  And we will be completed with these projects within six months.

JUDGE CARTER:  Are those the two sites you showed me?  The pallet homes?

MR. KREKORIAN:  Yes.  There are three sites, two of which are ready to go, the third is --

JUDGE CARTER:  Now, I want to walk you through a scenario that caught me by surprise -- no fault-finding -- and that is originally these pallet

homes were presented to me on March 17th, and we had 50

of those purchased by the Mayor, and I was very

complimentary.  That was a great step forward.  Then

later on, it may have changed.  They may have switched

back to more long-term supportive housing, but I don't

know.  But I was caught by surprise when there was no

order placed, and supposedly it had passed from the

procurement officer of the City to the individual

councilperson.  That was the complete surprise because

the councilperson that I visited had no idea that this

passed to their responsibility to order.  Have you

ordered these?

MR. KREKORIAN:  So, Your Honor, with any

project we work on, we work hand in glove with the

Bureau of Engineering.

JUDGE CARTER:  I know that.  Now, my question

is:  Have you ordered these?

MR. KREKORIAN:  So the -- the contractor is

still to be selected by the Bureau of Engineering, and

that will conclude the purchase of the --

JUDGE CARTER:  I don't mean to interrupt.  I'm

going to say it again, and then there's where my

curiosity is in the breakdown or, you know, the goodness

of this, and that is one entity thinks these things

being ordered because, of course, they were ordered, is

118

cheaper, and there may transportation costs, but there storage costs involved.  So nobody cares if it's 3,000 or 100 one or whatever that is.  That's up to the City if they're interested in them.  But it caught everybody by surprise when it was supposed to be with the City, and then it's with the individual councilperson.  That's going to be a decision I want to have after you and I finish.

MR. KREKORIAN:  Yes, Your Honor, that's -- that's an issue that I was not aware of because we have site-preparation work on the three sites that needs to be done.  So on two of the -- the two projects, the Alexandria, which has a capacity for 200 beds; the Chandler, which has a capacity for 64 beds, we are on pace and ready to go.  We've been approved by the Board of Recreation and Parks, and so we're ready to break ground.

JUDGE CARTER:  Well, when will you order these?

MR. KREKORIAN:  Well, again that's going to be a --

JUDGE CARTER:  Come on.  If you want to help us, this is only going to take a second for you to help the Court and council.

Where's the City Engineer?  Is he here?  He's right behind you.

MR. MOORE:  Good morning.  Good morning, Your Honor.

JUDGE CARTER:  Hi..

MR. MOORE:  Yes.  Gary Lee Moore, City Engineer.  We had planned and ordered these pallet shelters within the next three weeks.

JUDGE CARTER:  Okay.  Thank you.  I really appreciate it.  So next three weeks.

MR. KREKORIAN:  Okay.  So within the next six months we'll be completing those projects with a capacity of 264 beds between the two of them.

So in addition to my 185 that we have built, another 264 in-house.

JUDGE CARTER:  And when you're done with them, hopefully this will temporarily get these people off the streets and move them into better housing, you know, in the meantime, hopefully.

MR. KREKORIAN:  In the interim, we're continuing to move forward with construction of 250 more permits for housing units as well as our Project Homekey, which we have a problematic motel on that property, and I'm not pleased it's a problem.  We have long-struggled with problematic hotel in my district, and I'm pleased that we appear to be on the precipice requiring it so that we can use that for Project

Homekey.

JUDGE CARTER:  It's a terrific program.

MR. KREKORIAN:  So if I can get to my problem, Your Honor, because it's a -- I hope it will be a relatively minor problem, but one of the sites that you visited, which we are very much looking forward to putting up 138 beds in pallet shelters on that site, is a city art site that has been leased to the City by Caltrans because it's a remanent property for construction near the freeway.

Now, under the Quartering Act of the legislature, when the state leases property like this, it is restricted to park use.  Now, it's my contention that building cabins that can be tapped in on a park adequately satisfies that requirement as park use.  We have camping in other parks in the city.  There's no reason that we can't have camping in this park in compliance with the lease.  How we select the people to camp there should be entirely a municipal decision that's not the concern of the state.  So I hope we can work this out with Caltrans and the California Transportation --

JUDGE CARTER:  Well, he's on Zoom right now finally, but I'm not going to interrupt your presentation as courtesy of you being present because,

if he's interested, he could come down.

MR. KREKORIAN:  Thank you.  AND I believe we can work this out.  I believe that they see that that is the case and that they see this is not, at all, inconsistent with the transportation concerns of the state and that we'll be able work this out.  But it may result in a little bit more delay because there is a Sacramento aspect of approval to this that will take a longer period of time, but that's 138 beds with Caltrans' support and approval.

So to sum that up, Your Honor, that would bring us up to 590 -- approximately, 590 beds.  The entire nonshelter homeless population in my district, excluding vehicle dwelling is 693.

JUDGE CARTER:  So just a moment.  The homeless population of 1,613 includes your vehicles?

MR. KREKORIAN:  Right.

JUDGE CARTER:  Taking away from that, it would come out to 600-some basically sleeping in tents or on the sidewalk.

MR. KREKORIAN:  Exactly.

JUDGE CARTER:  But you're awfully close to that.

MR. KREKORIAN:  590 of the 690.

JUDGE CARTER:  Thank you all.  Okay.  I'll be

back to you and vice versa.  My phone's open to you anytime.

MR. KREKORIAN:  Very well.  Thank you very much, Your Honor.

JUDGE CARTER:  And it's been a pleasure.

MR. KREKORIAN:  Thank you very much, Your Honor.

JUDGE CARTER:  Thank you very much.  You've been exemplary.  I appreciate the tour.

Okay.  I'd like to take council of District 4 in just a moment.

Armando, would you show -- go back.

Okay.  This is the river bed, I guess, dry river beds now.  This is your district.  See that bridge?  Who's living up there?  It looks like human beings; right?  Is that acceptable?

MR. RYU:  I'm sorry, sir?

JUDGE CARTER:  Is that acceptable?

MR. RYU:  It is completely unacceptable.

JUDGE CARTER:  Good.  We're on the same page.

Armando, next one.  Totally and completely unacceptable.

I'm going to turn this over to you.  No one should be under the bridge like that, and if that's our understanding of Los Angeles, that's the gateway to the

city.

MR. RYU: Thank you, Judge. Thank you for your collaborative efforts with the entire City Council. I know we've met on several occasions and have spoken on the phone as well, and you've also done that with all my colleagues as well.

I do have some pictures of my -- some of my projects that are open today that I can share with you as well as a hot sheet map of some of the hot spots, homeless encampments, and the pictures that you've shown are actually those unhoused neighborhoods that is kind of invisible to the public because they all at the LA river, but we have lots of homeless individuals that are camped out especially under the freeway underpasses.

JUDGE CARTER: Now, before I take that trip with you, we only have jurisdiction initially because of the Preliminary Injunction, which I vacated a good faith to work with everybody to give this a shot, and so I can only talk to you today -- and, unfortunately, I'm going to delay it. Until we have an omnibus settlement, I don't have any jurisdiction. So what I've got is I've got the number -- can you help me. I can't see that one.

MR. RYU: 47.

JUDGE CARTER: 47. What do we do with 47

people?

MR. RYU:  Thank you, sir.

JUDGE CARTER:  And later on there would be an omnibus agreement in order to work together for the benefit of your district.

MR. RYU:  So these pictures are for projects in my district that can house those who are in the settlement area.

JUDGE CARTER:  Can you house them now?

MR. RYU:  I'm sorry?

JUDGE CARTER:  Can you house 47 people now?

MR. RYU:  Yes, sir.  So it is fortunately our unhoused population under or near freeway underpasses. We have about 47 in District 4.

JUDGE CARTER:  What kind of housing do we have for them?  How do we improve their lives?

MR. RYU:  So right now I have a hundred beds open that opened two weeks ago with vacant beds.  That's the Riverside Bridge Housing facility, which you have pictures for there.  I don't know, latest, what the vacancy is.  I'm sure we have over 50 vacancies, you know, for every single one of our unhoused neighbors in Council District 4 near bridges.  I'm trying to report from PATH, who is -- so there's pictures behind too. No, behind the inserts.

JUDGE CARTER:  Oh, got it.

MR. RYU:  And we do have great reports early on that some of the unhoused neighbors in the freeway underpasses are willing to accept services and accept housing.  We're getting an updated report, as we speak, to see how many has actually accepted.  We believe 11 expressed interested in the past, recent past.  So we're very hopeful that those 11, if not more, or we actually have the ability to move the entire encampment indoors.

Now, every single one of the individuals accepting might be another sorry, but we are lucky enough to have 100 beds that just opened two weeks ago, and we also have another 80 beds that are going to open also in the Los Feliz area.  We don't have an exact date, but we're very confident, with support from the Mayor's office, that they will open by the end of the year.  That's 180 beds, plus we'll also have RV parking, safe parking in the Sherman Oaks area.  It looks like it will be 13 and will actually open by the end of the year.  So by the end of the year, we'll have about 200 units, which is probably four-fold of the population that we have in Council District 4.

But more importantly in Council District 4, we have about, depending on which LAHSA and County numbers you look at, we have roughly about 1100 homeless

individuals overall and about a thousand of them are unsheltered, and those numbers could be off maybe -- maybe by a hundred, or something like that, pending on the number account.

So the goal in my district is to try to build housing for every single one of those individuals because, as you know, Judge, my district borders many of my other neighboring council districts.  So just because we are successful in Council District 4, does not mean we can solve the homeless problems, and we are working very closely with Councilman Mitch O'Farrell's office, which is bordering the Hollywood area, and also with Council Member Paul Krekorian and Council Member Nury Martinez because we have bordering jurisdictions.  And we try to work together because, like I said, just because an encampment is on my side of the district and offers services, it doesn't solve the homeless problem because the homeless problem is a citywide issue, and so we're trying to, in my district, build as much housing as possible.  I already have 272 beds already open in the past year.  We have another 300 and -- about 335 coming on-line hopefully by the end of next year with -- with additional programs, like having interim housing; safe parking; Rapid Re-housing, known as scattered-site housing so we can eventually hit that entire thousand or

so unhoused individuals in District 4.

JUDGE CARTER:  I want to thank you, and you know the phone's always open.  In five weeks, I'm going to ask you what happened to these 47 people?  There's no jurisdiction, either by agreement or by litigation over an omnibus settlement at the present time with the City.  That's what Judge Birotte's working on hopefully with all the parties, and we'll resume that shortly, but there is an agreement concerning 500 feet within freeway overpasses and underpasses.

I want to show you -- Armando, go back to the -- there's a shark -- just a joke -- but I'm really curious how all these folks are living on this river, and if they're seeking a place that they can live and if there's place with some kind of dignity, some kind of place where they're not being harassed and moved around, so whatever we do, we got to get them something better than what they've got because there's no reason for them to move unless we're offering something better; right?

MR. RYU:  Correct.

JUDGE CARTER:  And I'm going ask what that better is and how to define that because I'm having trouble deciding on which district to have any consistency on my part.  It varies from district to district.  With Curren, I think he's got a huge problem.

You, you've got a much smaller problem, which may be easier to deal with.  Maybe you've got better access to LAHSA.  Maybe they've got better operations with Operation Roomkey.  Maybe others may have to go to another methodology.

But the death has to stop or it has to start decreasing, and that's the way I'm going to measure this from now on.  I'm a little tired of the discussion about, you know, $600,000 shelters versus encampments versus whatever.  I'm going to constantly ask what can we do better for these folks.

MR. RYU:  So, Judge, my last comment on that: I think that's why scattered-site housing is something that the City of L.A. is looking towards because that gives permanent supportive housing that we could put individuals in.  So we have immediate placement available for my constituents living on the L.A. river, but one challenge that we do have is it is easier to build Bridge homes and Bridge shelters as well as pallet homes.  But, in many cases, many of our unhoused neighborhoods don't want to go to an open setting of that kind.

JUDGE CARTER:  And if these were permanent, how could we possibly get them to leave and they're not lying on the walk?

MR. RYU:  Uh-huh.

JUDGE CARTER:  Let me say that again:  This idea of permanency is ridiculous, but living on the sidewalk also with this death rate is also ridiculous. So, in a way, I don't see us making a lot of progress with $4- to $600,000 of long-term supportive housing, quite frankly, in the volume we need.  And I just want you to take $400,000 or take the minimum amount that's been tossed around times 60,000 people.  What is that?

MR. RYU:  About five, six.  No, seven.

JUDGE CARTER:  Billion.  So I don't see any problem diverting a little bit, like $2.6 million that the City's had and the County's had over the last 24 months; do you?

MR. RYU:  No, sir.

JUDGE CARTER:  So if could probably walk and chew gum at the same, we can.

MR. RYU:  Yes, sir.

JUDGE CARTER:  I'm just waiting for somebody to come up here and tell me we don't have any resources and money.

MR. RYU:  Well, we have it now.

JUDGE CARTER:  We'll have a discussion about that.

MR. RYU:  Yeah, and that's in the long-term.

In my district, I've approached it from having temporary shelters all the way permanent supportive housing. We know the permanent supportive housing model is ideal and is very expensive and takes two to three years to build if -- if we're lucky.

JUDGE CARTER: Or much people will die.

MR. RYU: Right. And that's why we're pushing for scattered housing, which will get people into housing immediately, and that's going to require a huge effort on our part, but that also needs the services you mentioned from the County.

JUDGE CARTER: Let's get them off the street and give them a shower, shave. Let's get them some help in the meantime, okay, temporarily; fair enough?

MR. RYU: Fair enough, sir.

JUDGE CARTER: Okay. Thank you very much. I want to thank you again. You know me as Dave on a first-name basis.

MR. RYU: Great name, sir.

JUDGE CARTER: John, I apologize. I see you right there. Nice seeing you.

I'm going to show you a photograph, John, and thank you for taking me on a tour of your district.

MR. LEE: Of course.

JUDGE CARTER: And could you put up, Armando,

District 12.

I'm absolutely positive that this is your underpass.

MR. LEE:  I'm sorry?

JUDGE CARTER:  Is this your underpass?

MR. LEE:  It could possibly be.

JUDGE CARTER:  I think it is, but there are folks there seeking shelter.

And next.  Next one.

Do you recognize this, John?

MR. LEE:  No.  I apologize, Your Honor.

JUDGE CARTER:  Next one.  Next one.  Next one.

I think we walked down this street?

JUDGE CARTER:  Yeah.

JUDGE CARTER:  That young man lifting weights; remember?

MR. LEE:  I do remember.

JUDGE CARTER:  You reached out and gave him a lot of help.

MR. LEE:  Yeah, we reached out to him, and we asked him.  We know that he has shown interest in moving.  He's willing if where able to find someplace for him.

JUDGE CARTER:  Okay.  Federal Court signs all sorts of orders.

Can you keep going, Armando.  I want to see the effect of our orders.  Could you keep going back.  Keep going.  Keep going.  Right there.

Did a wheelchair pass?

MR. LEE:  Yes, sir.

JUDGE CARTER:  I'm sure a lot more of the people down in Skid Row walking the street, but also there's some of the builders down there putting nice planters, but we'll get to that in just a moment.

Okay.  Your numbers and what can you do?

MR. LEE:  Your Honor, you and I discussed this a few weeks ago.  It's been a little busy.  It's more than a year since I was elected.  So I think we've made incredible advances in trying to identify different properties that can hold a whole host of different needs.

As expected, Your Honor, as we move to the initial process of identifying properties, the properties come off for whatever reason.  We find just as many that pop up.  So it's a constant movement of trying to identify as many places as possible.  We have very little in the way of vacant City-controlled property.

JUDGE CARTER:  Just a moment.

Armando, can we go back to that initial slide.

This is what is of concern to me, and that's the numbers.  I'm going to kick you a little bit because we have a very little City property; right?  And all I hear is excuses and too expensive.  All these look like they're under review.

MR. LEE:  Correct.

JUDGE CARTER:  But if we added up the numbers and you were successful, that's a lot of capacity.  I mean this would be -- you would not only take care of 70 people, but you would be well on your way down to a good portion of --

MR. LEE:  Yes, Your Honor.  As identified, while we do have the lowest number of unhoused living in the underpasses, that's definitely not the goal that we're setting.  We're obviously setting our sights much higher.  There's a lot of different properties that we are moving on.

JUDGE CARTER:  Part of my frustration is we started with thousands of pieces property I'm being told the City had, and now it went down to 400, then 250 of those are in some kind of magical consideration.  There's a problem.

MR. LEE:  I'm sorry?

JUDGE CARTER:  There's a problem.  These properties, they're all under review.  How long have

they been under review?

MR. LEE:  Those individual properties?  I'm sorry, Your Honor.  I don't know exactly which properties because --

JUDGE CARTER:  Well, why don't you and I get together so we don't belabor this.

MR. LEE:  Sure.

JUDGE CARTER:  We got MetroLink, Park and Ride, the courthouse property, the House of Worship.  They're all under review.

MR. LEE:  Yeah.  I believe the properties that are located under the Department of Transportation, we're trying to look at those.  We just asked the Councilman Ryu about having that whole -- what we can do for those immediate people that live under our underpasses.  I think that's a goal that we definitely can achieve the next time we meet.  That's something that we are in the process of not only identifying some City property that we do have not only safe parking, but we also met with seeing the pallets and the uses of it in places, and also met with different service providers to make sure that we have a good fit in moving forward.

JUDGE CARTER:  I don't want to be blunt, but I will be.  I hear the problems, but what's the solution?

MR. LEE:  So, you know, we have -- I just want

to give you some updates on where we are.

So we're moving on the safe parking location that has been identified in the area close to where we were walking together that day.  In discussion with City agencies, we are trying to identified service providers.

We're currently looking at roughly a 2,500-square-foot site that we think will accommodate at least 150 interim beds.  We met with someone.  I believe you know the name, Bill -- is it Taormina?  He said that he could work with you in Orange County -- Taormina.

JUDGE CARTER:  Taormina?

MR. LEE:  Yeah.  We met with his --his family members and the property owners at the site yesterday.

JUDGE CARTER:  And I know all about the legacy interest, and you don't have to divulge any of that.

MR. LEE:  Correct.  Correct.  And so I think this is a perfect site.  We want to take a look at it to see the different uses for what I think that we want to see there, and what we talked with the providers about not just having shelters and not just having a roof over their heads.  This is a perfect facility that would provide medical facilities, job training.  If you know the site, it just seems like a perfect site, and Mr. Taormina's company said they can absolutely get that done for you in Orange County.

JUDGE CARTER:  I want to thank you and just say that hopefully we're going to meet and hopefully you'll be kind enough to join me here, once again, with the Council Members, and I'm certainly going to ask one question, and that is:  What's occurred between today and the next meeting date?  What promises have you made?  What can you point to between today's date and when we meet in five weeks?

MR. LEE:  Well, I believe that we have -- we have just identified something for Project Homekey, approximately, I want to say, 60-plus -- 60-plus beds that we're looking to acquiring or putting applications in for --

JUDGE CARTER:  So Homekey might be 60 beds?

MR. LEE:  Correct.

JUDGE CARTER:  Okay.

MR. LEE:  Correct, sir.

JUDGE CARTER:  Okay.  Great.

MR. LEE:  And we are also moving toward the property we were just talking about, the 2,500-square-foot property.  We will have a project moving forward at that location.  I think the way that it's built, if we are talking about the same property, it is ideal that we can immediately provide, not only just for family units but individuals, a safe place.

And, again, we're trying to look at all the different uses of the one company that we are trying to partner with, and we met with Hope of the Valley, which can be utilized as both a shelter and also Bridge Housing, and also they can expand the kitchen because it's already a commercial-size kitchen on site.  If they we can expand that, then they can sort of use that as the center hub for the entire valley.

We're unclear of the numbers, but Mr. Taormina is supposed to get back to us an actual amount, but I believe that project can go forward -- the safe parking on the DOT sites, possible pallet identification, and Project Homekey -- in nine weeks.

And then we have long-term private sites, like industrial property using, like, philanthropic investments.  We found in these times that, you know, instead of just giving money, people are willing to give a little bit more, and we're partnering with a bunch of companies that I think are going to be private and will truly transform what is involved, and that's potentially 90,000square feet.

JUDGE CARTER:  I want to thank you.  I appreciate it.  Nice to have you.

MR. LEE:  Thank you.

JUDGE CARTER:  Hello.  Hello, Paul.  Can you

hear us?

MR. KORETZ:  Yes I can.

JUDGE CARTER:  Hi.  How are you?.

MR. KORETZ:  I'm doing well.  I know you're on here somewhere.

JUDGE CARTER:  I'm here.  I'm Dave Carter. It's nice to meet you.

MR. KORETZ:  Yes, Your Honor.  Good to -- good to speak to you again.

JUDGE CARTER:  Let me turn this over to you. You showed me your district, and you've got District 5, of course, and you have some numbers, about 94 folks within 500 feet of the freeway and about 846 unsheltered.

MR. KORETZ:  Okay.  And first of all, just for the record, I do want to express some concerns I have about this solution just because we've heard from the CDC and the County Public Health about actually moving homeless people around other than into shelter is a bad idea due to COVID, and we know certainly that there may be hundreds, if not thousands, of people citywide when we try to move them away from freeway underpasses and move them elsewhere, and they may scatter and spread COVID.  So I have expressed those concerns not just from my district but citywide.

But having said that, I've been involved in this issue, you should know, for about the 30 years back when we had our last significant increase of homelessness around the early '90s when I was on the West Hollywood council member, and I helped to create the PATH program, which now houses over 2500 homeless people. So I'm certainly concerned and have been for many years.

I also want to note that I made it clear to everyone that I've spoken to that any location we can find anywhere in my district, regardless of circumstances, we will use and regardless of neighborhood objections.

Ironically, I might have the noobiest district in the City, but I've got very little push-back as we've tried to find sites. Unfortunately, we found sites that, one after another, have fallen through, and I have driven the district many times as have my staff and community members, and we've tried a number of things to create Bridge Homes. Usually, either a developer will take the site from under us as we're in the process of leasing, or we -- we find that the person that seems interested eventually drops their interest and says that they're a private property and decided to let us do it.

So it hasn't been -- for lack of effort or

community support, it is just been difficult, and we have so little obvious space and so few empty lots and such a high property value that, for all of us, it's been tough.

JUDGE CARTER:  You have the San Vicente encampment?

MR. KORETZ:  The San Vicente and what?

JUDGE CARTER:  The encampment right next to the V.A.?

MR. KORETZ:  No.  That's in Mike Bonin's district.  I believe it's on the other side of Sepulveda, which is roughly the boundary.

We have gotten a few things moved lately. Ironically, the first site that we sought for Bridge Housing about three years ago, that fell through when somebody bought it to build a huge development; but it, instead, changed hands again.  It's a motel that they turned it, from a flophouse where prostitution and drug dealings had gone on for about 30 years, into a very nice site, and then they were willing to let us lease it.  So that's our first location.

We also have enough affordable housing project just about to open near Pico and Robertson.  It took us over ten years to get to this point, and it's going to house seniors and veterans, and both of those were

listed as interventions and development in our plan that was submitted.

JUDGE CARTER: Okay. Well, let me ask you something, Paul. I don't have any jurisdiction nor is there any kind of agreement between the parties. I wanted to focus on the 94 people we have within 500 feet of the freeway.

MR. KORETZ: Well, I do have a list of proposed interventions that we're working on, none of which, unfortunately, is nailed down at this point, but there are -- are many that are possibilities, the sites through HHH projects that are in predevelopment and a state parking site that we're pursuing on National Boulevard in the Palms with about 20 spaces. We have some possibilities.

The one we're enthusiastic about is the interim housing concept represented by pallet shelters and tiny houses, and I'd be happy to place a number of these various locations in my district on the Westside; although, like I said, none of them have been completely solidified.

Two locations I've proposed are where the city currently has short-term COVID-related gymnasium shelter and trailer installations in a couple of our large parks, and these are controlled by the Department of

Recs and Parks, which understandably is feeling that it's hard for the homeless this year, and some of those neighbors dislike that it takes up space in the parks. But since I have no unused or city-owned property in my district, other than the one HHH site that's already in the works, I don't see how I can fulfill your mandate without that department's help in letting us some place tiny houses.

JUDGE CARTER:  And what -- what department is that again?

MR. KORETZ:  Parks and Recreation.

JUDGE CARTER:  Okay.

MR. KORETZ:  The two parks that we asked to be considered as sites for the pallet houses.

JUDGE CARTER:  And what are you asking of me to help you?

MR. KORETZ:  If you have a way to help out with those developments, I -- I would like to build around 50 pallet homes in those two combined sites, which I don't think is that -- that much to ask, but that is about 50 of the spaces.

JUDGE CARTER:  And, Paul, have you approached Parks and Recreation about this?

MR. KORETZ:  I think we have asked informally and have been given a "no," but we're setting up a

meeting with Department Management now to talk to them about it.

JUDGE CARTER:  Why don't we do this:  Instead of belaboring it now, why don't you and I talk and see in five weeks about having another get-together and see if there's been any progress on your part or if I could help.  Certainly, we'd like to enter into that with you. But in the meantime --

MR. KORETZ:  Okay.  We also have another site immediately adjacent to one of the parks that is controlled by the Department of Water & Power that we think we can do 25 spaces.  The Department of Water & Power has been unwilling to do so, and we have a meeting scheduled to discuss that as well.

JUDGE CARTER:  Do you know if that is scheduled today in this council chamber?

MR. KORETZ:  I don't know if it's scheduled or if it's in the process, but it should be within the next few days, either way.

JUDGE CARTER:  Okay.  Well, let me -- let me thank you, then.  Instead of putting you on the spot, why don't we just talk in five weeks and see how comfortable you at that time.

MR. KORETZ:  Yes.  Then exterior for the City, the City was in discussion with the Mayor and HUD

Secretary Carson before the pandemic hit about space on the federal building parking lot, and that was suspended during COVID.  I have a call in to Ted Lew (phonetic), and I think we have an appointment scheduled to see if he can help us get an agreement for what I would hope to be about 100 spaces potentially there.

There also could be some space for some additional veterans at the VA's existing encampment sites, which is just outside my district, but they've expressed willingness that, potentially, if we can find veterans would be between 50 and 100 spaces.

Most promising, I had a discussion with the chancellor of UCLA, and there are two parking lots that might be available for this calendar year because a lot of students are not on campus.  Those are not certain. Probably more certain and a little longer term is there's a lot, which they were planning on building faculty housing on.  Their financing and others things have changed.  So it's more likely that they would be able to lease that site to us for three years, maybe more, and that would be about 50 to 100 spaces at that location.

Also, lastly, there's a small portion of my district that's in Encino where we have possibly 50 to 100 homeless people near the 101 Freeway.  What we don't

have is any location with -- Encino's built out, and the city-owned property is north of the 101 Freeway in Council President Nuri Martinez's district.

JUDGE CARTER:  Sure.

MR. KORETZ:  And I'd be happy to collaborate with her and creating an intervention.  I don't know what she's proposed for that area, which districts, if anything, but I'd be -- I'd be open to that.

And also there is a hotel that's currently part of Project Roomkey, and we're pursuing for acquisition using State funds.  If the property owner winds up not being willing to do that, which is a distinct possibility, I wish we had the ability to eminent domain of a couple of the sites in my district like.  We've been given discouraging legal advice about that process, but it seems like a tool that would be valuable and especially in my district where there aren't that many sites.  I would love to be able to pursue the eminent domain process.

There's a few other buildings that are in the process that are smaller, that probably aren't worth going over today.

And, finally, we have a list of residential properties that are being newly foreclosed, and if we were able to obtain those for shared housing, which is a

concept successful in Westwood and which I know Councilman Bonin is a fan of, we can see around 30 people at least at these locations.  So I'd ask the City to pursue those as well.

So those are all the things that are possibly in the works; but, as I said, none of them are 100 percent opened up.

JUDGE CARTER:  Well, first of all, let me thank you very much for appearing today.  I appreciate it.

I want to correct one thing and that is:  This Court in good faith has given a tremendous amount of discretion when the City and the County entered this agreement.  So this is now the City and County's agreement, and my time schedule of September morphed into 10 months.  So this is your agreement now.  This is your bargain, not the Court's.  Whatever action hopefully need in the future, let's just leave that work on the table in good faith if possible.

And I wish you the best, and why don't we talk in five weeks and see if there's been a bit of progress that you're comfortable with and just be kind enough to tell me so.

Lastly, I say this:  I will constantly ask you, as a councilperson, what decreases inhumanity?  I will constantly ask you how you've helped or guided me in

terms of your efforts to decrease the death rate on our streets, and I look forward to working with the Council in that regard.

As you know, I'm also very concerned about the past costs because the past costs because the cost has been an option, the idea that it's $400,000 for long-term supportive, and now it's $600,000 units, which would be something that I think we would all champion if we do it.

Eminent domain, a wonderful idea if we could get it.  Mike was just here.  Certainly, if we can get the Ritz-Carlton or the hotels, we'd be obliged for that.

Meanwhile, I'm very much concerned about the rising numbers but, more importantly, about just the inhumanity of the deaths in the various cities.  We shouldn't be callous to that.

So, Councilman, I want to thank you very much, and hopefully we'll talk soon.

MR. KORETZ:  Thank you.  And thank you for your approach to this and in helping to bringing the County and the City together in this effort.

JUDGE CARTER:  Well, hopefully, this will work. If not -- if it doesn't work now, I don't know when because it's been going on well into 17 years.

MR. KORETZ:  Or longer.

JUDGE CARTER:  Thank you very much, Councilman.

As the chairperson, let me call on you, Nury Martinez, if you have any further comments or thoughts you'd like to make.

MS. MARTINEZ:  Thank you, Your Honor.  I can just give you a brief update.  I'll make it really quick in terms of my district plan.

If we weigh the homeless population of approximately 125 individuals, we have two locations in Sun Valley that are being vetted by the Bureau of Engineering, and we will be proceeding with designing along with establishing an implementation calendar.

Eighty public shelters from a private company provided us a possible layout with 60 public shelters for 180 sites, which is currently being under review.

In addition, we are looking at 14 safe parking spaces for RVs at a City-owned parking lot in Sun Valley as well, and the Bureau of Engineering has provided some designs for both these two sites.

We have eight properties currently being vetted for feasibility.  Some are privately owned and some are publically owned and will be undergoing their availability very soon in the next couple weeks.

Lastly, we have 10 properties that are not

immediately available, but we're looking at those 10 different sites and want to keep those in mind for our long-term efforts.

As our work continues on Monday, we'll be opening up 70 beds in Van Nuys or under the Bridge Home program.

Your Honor, we haven't faced any extraordinary challenges yet.  So I don't have any critical problems to report at this time.  In the next few weeks, we'll be taking steps to make sure we are proceeding with design and resources for these sites so they can become feasible in the near future.

Time is of the essence, Your Honor, and my staff knows that we've got to make sure we come to you with a real timeline to be able to meet our obligations that are set forth by our agreement with you.  No matter what the challenges or difficulties are, it's our obligation to deliver, and that's what we plan to do. Thank you.

JUDGE CARTER:  I want to thank you, and I want to thank you for being so gracious for waiting to be the last person concerning your district.  It's extraordinary and very much appreciated.

I'd like to turn to the County.

JUDGE CARTER:  It's good to see you by the way.

MR. MILLER:  Same here.

Could I just bring up a preliminary matter? Your Honor mentioned a document was delivered this morning, and we haven't seen that document.  I asked the City Attorney if they would provide us with a copy, and he said he would.  So we look forward to seeing that document because if it's a matter of concern to us --

JUDGE CARTER:  I don't think most of the members of the Council have received the document. Apparently, it was dated August 5th.  I just received a copy this morning.

MR. MILLER:  Okay.  Well, I'm sure sooner or later we'll all see it.

I guess our report is that we're moving forward with our -- our freeway homeless and our over-65 homeless.  It's approximately --

JUDGE CARTER:  Skip, could you just hold on a second.  I'm just wondering, because I'm going to show certain things after the County's done, could we get the head of the agencies together with the Mayor's permission and use the Special Master and maybe Judge Birotte?  I'm just wondering if all you folks could meet with the Special Master and Judge Birotte and Skip, and I think that will save a lot of time.

So if you'd like, agency heads, come forward, I

think, instead of waiting.  And there's one question I would like to ask:  Is there any way we can speed the process?  I was going to ask the Mayor about that.

Yeah, we're going to take you in the back if that's okay.


(Brief interruption)


JUDGE CARTER:  Okay.  Thank you very much.

UNIDENTIFIED SPEAKER:  Your Honor, there's representatives from the Fire Department and Sheriff's Department.  One of them has to go in for some kind of medical treatment, and they would like permission to leave.

JUDGE CARTER:  Hold it.  They're invited.

UNIDENTIFIED SPEAKER:  That's okay?

JUDGE CARTER:  I especially want to thank the Sheriff for being here.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

JUDGE CARTER:  Just as long as we resolve the ten feet, six feet apart.  Everybody's struggling with those different standards in the different counties.  So you don't have be in uniform.  It's just an oddity.  It's a six-feet distance in Riverside, and ten-feet distance here, and three-feet distance someplace else.

MR. MILLER:  Okay.  So I wanted to give Your Honor a report on the freeway and over-65 homeless in the Unincorporated.

When we started this process, it was around 350.  We took it down by more than half that, about 170, 175 in the Unincorporated, and now it's crept back up to about 200, 250, 256, or something like that.

JUDGE CARTER:  Went down and back up.

MR. MILLER:  Yeah, it went down and back up. Maybe the word's out that if you go to the freeway and you're homeless.  I don't know, but we're all over it. We're on it.

JUDGE CARTER:  Skip, this is important.  The court reporter needs to use the restroom.  Could you freeze for a moment so the court reporter could use the restroom for a second.

And thank you so much.  I'm glad to know that.

(Recess taken from 1:31 p.m. to 1:35 p.m.)

JUDGE CARTER:  Okay.  Back on the record, please.

MR. MILLER:  Okay.  The other item is that we're working with the City toward a long-form MOU on the -- to flesh out the binding term sheet that we

entered into, and it's been a give-and-take; and, you know, I think we're getting close.  I think the only major concern for us is we've committed a lot of money, you know, a very significant amount of money, and we want to make sure that there's accountability and that the 67 or 6800 beds are new beds -- new, new beds -- not beds that are in the pipeline or beds that were available somewhere else, but they're additives to, you know, whatever else has been going on.  And that's really the main issue that is still out there that I wanted to apprise this Court of.

JUDGE CARTER:  That's why you've heard my concern about the public's acceptance that there are 6800 beds.  Those are truly new beds, but I have discounted about 3,000 of those beds because I always felt that the City, by giving us recreation centers and Operation Roomkey, which I think is very complimentary, that those were beds that had already been accounted for.

And I always thought that the parties, the Plaintiffs in this matter, would have to come to Federal Court and was going to eventually have a motion before it where one of the parties say, "Judge, we don't want to throw these people back on the street, because they are law-abiding."  And, of course, these are

recreational centers that people need, especially in poor communities. So that's going to put a politician almost in an impossible position and would have to rely on the Federal Court to make a difficult decision about potentially keeping recreational centers until additional housing can be worked out or putting people back on the street.

So I almost discounted that, and I've had the same issue recently, and I had a very good conversation with high complimentary remarks during that conversation with Judge Birotte that there's been a lot of notoriety of about 15,000 new bed spaces being created quickly. I want to make certain that it's completely understood it's 15,000 in addition to the 6,800 because you gave $300 million to the City, and that accounts for that 6,800.

The advertisement to the public here is that there's 15,000. That's 15,000 new bed spaces being told that LAHSA's going to create, not taking the 6,800 in the settlement and drawing that in.

Now, if we're talking about 21,000 new bed spaces, I'm very excited to do a happy dance. If we're talking about taking that 6,800 and, you know, putting that together, I think that's a tremendous disadvantage to your board in terms of what you're being told, and

I'll talk to LAHSA about that in just a moment.

MR. MILLER:  Yeah, our understanding is that 15,000 are new beds.

JUDGE CARTER:  Yeah.

MR. MILLER:  And I thought it was -- I heard it was 6700 are new beds.  So 15,000 plus 6,700 is 21,700.

JUDGE CARTER:  That's absolutely our understanding also, but I want to get that on the record just so that LAHSA stands on that because I'm a little concerned about, not loss, but concerned about the County and what's going on and what the public's being told about bed spaces.  I was told we have 6,800 beds by agreement, and there's going to be 15,000 new additional beds.

MR. MILLER:  I can't speak to the 15,000.  I wasn't in the loop.  I don't represent LAHSA.

My understanding, Your Honor, and it's the County's understanding, that the 67- or 6800 beds are new beds, not beds that are already in the pipeline of the City, but new beds, and they're separate and apart from the 15,000.

JUDGE CARTER:  That's the $300 million.

MR. MILLER:  Yes, that's -- that's the County's understanding.

JUDGE CARTER:  Okay.  That's our understanding

also.  That's my understanding as well.  I just wanted to make absolutely certain.

MR. MCLAIN:  If I could just add one -- one piece, Your Honor.

JUDGE CARTER:  Well, hold on.

MR. MILLER:  This is my co-counsel.

MR. MCLAIN:  I just want to clarify that the 15,000 bed plan has not been flushed out completely.  So I just want to be clear that that's not something that's definite.  It's a goal and aspiration, and so I don't want anyone to take that as a firm commitment.  I just want to be clear about that.

JUDGE CARTER:  And I just want to be sure the Court's position is clear.

MR. MILLER:  I think we're all clear.

JUDGE CARTER:  Yeah.

MR. MILLER:  I think the article I read in the paper, from what I've heard, we're still looking for full financing of the 15,000.

JUDGE CARTER:  Just as long as your board knows what they're voting on with the Board of Supervisors, and that's the $15,000 new units.

MR. MILLER:  I think that pretty much covers it for us.

JUDGE CARTER:  Okay.  One of the reasons for

the meeting today was you got a binding agreement with the seven paragraphs.  We all have adopted that.

MR. MILLER:  Right.

JUDGE CARTER:  And one of the reasons for having the meeting today was we saw the inability to reach an MOU, and Judge Birotte and I expected that that would add milestones, time frames.

So, Andre, if you want to make any comments.

First of all, let me compliment both of you. Let me tell you something that I think you've done exceptionally well.  First, you're paying for beds that are occupied.  Let me say that again.  Remember, as a provider, even though I'm in good faith, I get a couple million dollars, but there's no incentive for me if I've got a 100-bed shelter that fills all 100 beds.  I might fill 70 of those and still make a profit.  I think that you two are exempt from the City and County's behalf in negotiating the agreement because you're paying for the beds that are full.

MR. MILLER:  That's right.

JUDGE CARTER:  It's simple as that.

Number two, I see transparency because nobody wants to see the City and County in contempt.  Nobody does.  And so the end result is I gave up what I thought was a timeline of September, which I realize couldn't be

reached in good faith, to work with the two entities to absolutely attempt giving them a longer period of time, but you hear the panic in my voice because there are people dying out there.  I'm giving you a longer period of time in good faith to work with the Court.  Okay?  But I want to be absolutely clear that the County and City are absolutely responsible for this agreement, and it can't LAHSA, it can't be another entity, it can't be a provider like PATH or whoever, but the County and City are the ones who are going to reach the agreement.

Now, Mr. Marcus, I apologize.  You wanted to say something.

MR. MARCUS:  Thank you, Your Honor.  I just want to clarify that the County -- first, I can't speak to 15,000.

JUDGE CARTER:  I'm sorry.

MR. MARCUS:  I cannot speak to the 15,000 beds, to LAHSA's deal and the issues with that.

With respect to the term sheet, the agreement between the City and the County -- and the County is not perfect.  Because what the term sheet says is that the new beds, the 6,000 new beds, are beds that are not currently the subject of an agreement between the City and the County to provide funding.  It was always the City's intention to use some beds that are currently

being imagined or that are in the pipeline which should count towards those 6,000 beds.  That was never a question, and it's not what the term sheet says.  So for the County to take the position that any bed in the pipeline is not any bed is contrary to the agreement that we made.  If they want to try to make a new agreement, we can, but that isn't the agreement that we made.

MR. MCLAIN:  To be clear, it's not contrary to the agreement.  What's described in the agreement -- the first part that you said, that new beds cannot include any bed that has an agreement between the City and the County and then negotiating the details of that.  So at first, there was an issue as to whether or not a new bed could be something that was created before the agreement was even signed, and we pushed back and said, "Absolutely not."  The City agreed to that.  We agreed to that.  That's some of the progress that we've made.

MR. MARCUS:  That wasn't progress.  That was never a question.

MR. MCLAIN:  It seemed like it was an issue. It's not an issue now.  The next piece is that it's our understanding that -- and we sent them an exhibit, Exhibits A and B to the MOU.  One lists about 1,500 beds that are in the pipeline of new housing; another was

about 7,000 supportive housing in the pipeline that the City was already going to do.  We're saying that's not a bed.

What we're paying for is something that is the pallet shelters, the Rapid Re-housing that we're going to add to the number.  So that's where the conflict is. I just want -- I just want to be optimistic that almost 80 percent of the MOU we agreed upon, but this is a crucial point that we get clarity on.

And we appreciate the Court's guidance on this area and some of the other smaller points, too.

JUDGE BIROTTE:  What would be the funding for what you've just described?  I think you said something about 7,000 beds.

MR. MCLAIN:  I'm sorry?

JUDGE BIROTTE:  What would be the funding source for those 7,000 beds that you just mentioned?  I think you said there was something on Exhibit A and B.

MR. MCLAIN:  Yes, those were things that the City already knew.  So the City is funding that.  What the County is funding is new beds, things that were not --

JUDGE BIROTTE:  Let me ask Mr. Marcus:  What Mr. McLain just described, those pre-date the agreement?

MR. MARCUS:  The plans for some of those beds

pre-date the agreement, yes, but the beds themselves, if they open after the date of the term sheet, are new beds under the term sheet.

JUDGE BIROTTE:  But wait.  They pre-date the agreement.  Okay.  I just want to play this out.  They pre-date the agreement.  Let's say we never had the discussion.  Where was the funding source going to be for those beds?

MR. MARCUS:  I don't know.  I know the funding sources for those beds had been determined or secured. The City is certainly funding the -- the capital costs, the building costs of those beds, but the funding source of those beds hasn't been determined.

JUDGE BIROTTE:  So I guess that strikes me as an issue.  If the services for those beds had not already been -- been prepaid or resolved, you're now saying, as a result of this agreement, you can use the money that they're providing to you to deal with the beds that you already had planned to build?

MR. MARCUS:  Some of them, yes.  That was always the City's intention was to use some beds in the pipeline to -- to meet the goal that we agreed to in this term sheet.  That was absolutely part of it.  And the term sheet was clear that the only thing that is not a new bed is a bed that is currently the subject of the

agreement between the City and County through funding. That was it.  If they wanted to exclude items from the pipeline, if they wanted to exclude beds that had been imagined to that date, they certainly could have done so.  They did not.  That is not the deal that we signed.

JUDGE BIROTTE:  Mr. McLain, do you have anything else you want to add?

MR. MILLER:  May I just respond?

So excuse me.  What I'm hearing is the City had beds in the pipeline, presumably had a -- an idea how they were going to pay for them or a mechanism or the money was already committed.  I don't know.  But now they're going to take those beds, and they're going to substitute the money that we're giving them to support those beds.  That was not the deal that we made. Absolutely not.

So our -- our deal was for -- our $300 million dollars was for new, new beds, not old beds, the funding source, or a basis, or some, you know, rationale behind it, and then they go out and get our money and fund those prior commitments.  Not the deal.

JUDGE BIROTTE:  Mr. Marcus, let me tell you:  I have trouble seeing the distinction you're drawing between the two beds.  Walk me through it again.  I'm having trouble here.

MR. MARCUS:  So there are existing agreements between the City and the County.  For example, there is an existing MOU in which the County has agreed to fund the services for up to 10,000 units per housing.  That's a deal that has already been struck for providing services to beds that are being built by the City because the City is always in charge of the capital costs.  We always build the beds.  The issue is the service costs of those beds.

Under the term sheet that was agreed to between the City and the County, the County only agreed to provide 50 percent, or the average of 50 percent of the cost of the services for those beds.  The City is coming up with the other 50 percent of the cost of the services for the beds.

The issue is how do we build 6,000 beds in a ten-month time frame?  And it was the City's intention, and it was always the City's intention, to use some beds that were currently in the pipeline, beds that the City was developing, and the funding for those beds, I don't know if that had been determined, but it had always been the intention of the City that some beds in the pipeline would count towards that goal.

In fact, that is why at the last minute, you will remember, the 6,000 beds actually became 6,700

beds, because 700 beds were not new beds under the term sheet, meaning 700 beds are beds that count because they already are part of an existing agreement of funding. So those are excluded.

And as a result of that, the City agreed to create 700 more beds to -- to take part -- to take the place of those beds that were already part of the agreement.

But the only thing that defines a new bed in the term sheet -- and this is clear from the beginning -- is -- is a bed that is currently the subject of a funding agreement between the City and the County. And that was -- the fact that the County now wants to back out of that deal is unfortunate, but that was the deal that they made.

JUDGE BIROTTE: Well, in fact, I have a different view because I do think -- I guess you can take the -- I guess you can go by the actual letter of what's in the term sheet, maybe. I'm not sure I'm there, but I think the intention was -- I mean, in essence, it looks like the City is trying to create -- they're trying to get funding for beds that they already committed to do. That's what it looks like. I mean, I don't know how else to say it. That's what it looks like.

You already had these beds in the works.  You were trying to figure out how to get funding somehow, some way, and now you found the answer, and I seem to recall that's where things sort of broke down.  And if my memory serves me correctly, the C.A.O. and C.E.O. of the City met to hash that out, and I think you're right that 700 beds was part of it, but the result that was made clear of that was that anything that pre-dated the agreement, this money wasn't going to be used.  That was my impression.

MR. MARCUS:  And you're correct that the C.A.O. and the C.E.O. did have discussions, and that's what adjusted the numbers.  So, again, it was clear in those conversations that --

JUDGE BIROTTE:  But you adjusted the numbers toward the 700.  That's why the 700 -- that's why the number raised up.

MR. MARCUS:  Because those 700 were not only in the pipeline --

JUDGE BIROTTE:  They already had an agreement.

MR. MARCUS:  -- but they were already a subject to the agreement between the City and the County.  There were other beds in the pipeline that were not subject to that funding.

The issue is that the County didn't want to pay

twice for the same beds.  That's why those 700 beds were excluded.  They were in the pipeline.  They were known to both parties, but they were already subject to a funding agreement.  The County didn't want to double-pay for those beds.  That's completely understandable.  So that's why those 700 beds that were already part of an existing agreement for funding were excluded from the 6,000 goal.  That's why we agreed to create an additional 700 beds to make up for that goal.

But the idea that beds in the pipeline would never count towards the goal is absolutely incorrect, and the County is kind of revising history here because those 700 beds were excluded not just because they were in the pipeline but because they were -- were subject to an existing agreement.

JUDGE BIROTTE:  Hold on.  I let you speak.  Let me have my turn.  Okay?  Under your analysis, then, if the City had planned already, had 5,999 beds in the works but they didn't have the services lined up, your position would be that this money that would come in could be used to fund those 5,999 beds?

MR. MARCUS:  That was the deal we made.

JUDGE BIROTTE:  All right.  And I -- I don't think that's what the County -- I don't think -- and, I guess, how many beds are we talking about?

MR. MARCUS:  I don't have the precise numbers, but I can get that.

MR. MCLAIN:  It's 1500.  Approximately, 1500 beds.

MR. MARCUS:  I don't know if that's correct or not.  I just don't know.

MR. MCLAIN:  Based on our numbers of 1500, I'm assuming you'll agree that the 7,000 of supportive housing are to be covered by the MOU in 2017.  So I would assume we're on the same page on that.

MR. MARCUS:  Correct.

MR. MILLER:  You know, my take on this is, if it's 1500 -- and I -- and I have every reason to think he's right -- then they should have said, instead of 700 in the pipeline, we've got 2,200 in the pipeline, and we would have had an 8200-bed deal instead of a 6,700 bed deal.  They didn't tell us what they were contemplating, and we did not agree to pay for beds that are under the prior MOU.  I remember it the same way the Court does.

MR. MCLAIN:  And to be precise, it's 1,457.

JUDGE BIROTTE:  I'm sorry?  I didn't --

MR. MCLAIN:  It's 1,457 beds.

MR. MARCUS:  Again, Your Honor, the 700 beds weren't excluded because they were in the pipeline.  They were excluded because there's already an existing

funding agreement.

And as to the numbers, I'm not questioning Mr. McLain, I just don't have those numbers.  So I can't confirm whether it's accurate or not, but I can certainly get that information.  But I can say it's a bit disconcerting, Your Honor.  The City has --

JUDGE BIROTTE:  With all due respect, Mr. Marcus, what's disconcerting is the position you're taking from my vantage point, and I'm just -- you can say what you want.  I get it.  You're not going to budge, but new meant new.  I mean new meant new, and this doesn't sound like new because, again, under your analysis, you said, if the City had already been working on 5,999 beds, basically, you would say that that counts even though that was already in the works.  But you weren't trying to figure out where you were getting the funding, but now you just got the funding.

MR. MARCUS:  What I'm saying is that was always the City's intention.

JUDGE BIROTTE:  I get that.  That may have been the City's intention, but I don't think that's the meeting of the minds as it relates to that.

MR. MARCUS:  Well, that's what the term sheet says.

JUDGE BIROTTE:  That's your opinion.  I mean

that's your opinion, and I strongly disagree, but we may have to go back to the drawing board, then.  Yeah, or the Court will interpret it, and since there's a disagreement, we'll try to resolve it.

Okay.  Well, thank you for your time.  I appreciate it.

JUDGE CARTER:  Okay.  Let me show you a couple things while the Special Master is back in the back, and I think we can thank all of you.

I think too often that, at least in my career, in the sense of humanity, and over of the years of being a judge, you're always treating people as a number.  So I wonder for a moment that I'd like to talk to -- General Jeff's here.  I saw Pete for a moment, but it was a privilege talking to First Alliance and being able to walk through the communities and just meet a lot of people who are very concerned about their community.  That's been real educational for me in Skid Row.

So, General Jeff and Pete's here, and one of the things that occurred to me along the way is that Skid Row has a voice.  They're a part of the downtown association, and the development interests are strong in the City with the folks, let's say, uptown.  There's a lot of goodness up there.

And you look at Skid Row, and you see that the

whole country perceives to be focused on Los Angeles and particularly when they talk about Skid Row.  That doesn't account for all the homeless population here.  It's huge, and it's diverse, but I got very concerned that there was a voice from that community because of Council issues there, and they needed to hear what folks out in Skid Row had to say rather than what all of you were saying as Council.

And although I trust your input, quite frankly, I wanted to hear the homeless population, and I had the privilege of that from well over a thousand people with the assistance of General Jeff and Pastor Cue, Pete and his wife, which was well taken on my part.

I'm going to invite General Jeff to come up and say whatever he wants to.  I've had an earful, quite frankly, about numerous issues, but I'm going to let you have the lectern, and you can have a seat if you'd like to.

MR. PAGE:  I'm good standing, Your Honor.  Thank you.

Test.  Test.  Can you hear me?  Oh, there we go.

My name is General Jeff.  For the last 14 years, I was a prior Skid Row resident and leader.  I'm a home-grown Angelino, born and raised in South Central

Los Angeles in the Crenshaw district, troubled by a lot of what I'm hearing today.

First, I want to say on behalf of Skid Row residents and homeless residents outside of Skid Row that I represent, we want to thank you, Your Honor, for convening this matter. We, more importantly, want to thank you for giving a voice to we, the people of Skid Row and of homelessness, because there's always been a long -- a long-standing issue of we, the people, not being able to have a seat at the decision-making table. While we do not have a seat at this table, we do have representations by way of intervenors, and, you know, there is some tracks for that, and so we're definitely grateful for the opportunity to be heard.

Myself, I'm here representing Skid Row. Kathy McNenny, who will speak in a minute, is here, and Pete White is in the building.

JUDGE CARTER: Is Katherine here, also?

MR. PAGE: Yes, she is.

JUDGE CARTER: Why don't you ask her to come on up.

MR. PAGE: And then Pastor Cue, he was on his way. But, you know, one thing about being a frontline soldier on the fight of homelessness and you get a crisis call, you got to tend to the community. So

Pastor Cue is no longer here.  He was unable to make it because he had to attend to a matter in the community.

You know, I want to be clear and hit the reset button that, you know, we have representatives from both the City and the County and others, but we're not here out of the kindness of our hearts.  We're here because of a lawsuit.  It's not like anybody said, "Hey, we really got to do something about homelessness, you know, the homeless community."  We're not here to help homelessness.  We're not here to think about homeless.  We are homeless.  We're the very people that these decisions are affecting, or lack thereof.

And, you know, while we're here in this meeting, which has already been going on for quite a few hours, you know, my -- my personal thoughts are about what -- how many of our constituents died while we've been in this room, which is an average of a thousand -- over a thousand per year.  I mean that average is around three per day.  Okay.  Today, that means someone has fallen ill.  I had to drive by ambulances on my way here this morning on my walk here from Skid Row.

And so when we think of City Hall, where we are right now, it's on the northwest corner of 1st and Main.  The most northern corner of Skid Row is 3rd and Main, which is two blocks from here.

And so, you know, we can actually look out the window and see homelessness out of every single direction -- north, south, east, and west -- of the building.

And so this is a situation that is very near and dear to our hearts because it's our lives.  People are dying out here, and, you know, it's so disingenuous to, just moments ago, hear a debate, a legal debate based on a technicality where there's funding allocated, and then the numbers are being played with does it count here?  No, it doesn't this.  Is it a new bed or old bed?  It's pre-existing.  Those -- those are not beds.  Those are human beings that will be in those beds.

So when you get entities that are being legal -- you know, playing legal gamesmanship with each other, you know, you're playing legal gamesmanship with -- with people's lives, with people that I know, people that I know that are dying on the streets.  You know when people die anywhere in this city and across the country and the people burn candles, have candle vigils and pay their respects, you know, that's -- and candles like all throughout, not only Skid Row but all across this county, those people can be in beds.  Those people can be in housing.  Those people can be getting services, but there's no sense of urgency.

And so I specifically want to talk about the energy that's going, not only in this city, but across this country and around the world.  It's not the politicians that are leading the energy in the streets.  It's not the preachers.  It's definitely not the black preachers.  It's the activists and especially the black activists that are out there in the streets that are fighting for we the people.

And when look at Skid row, the majority of the Skid Row population are African-American.  You know, when we look at the homelessness in terms of Council Districts 8, 9, 10, you know, we can see that, you know, there's an African -- a strong African-American presence.

When we look at LAHSA's numbers, you know, you can clearly see that there's a significant number, the historical number is made of African-Americans in terms of per population, and so there's significant issues because there's a racial undertone to this entire matter.

And so, again, we're definitely thankful that Your Honor has given us this opportunity to add our voices and conversation.

But when we look at the overall representation across the board, there's not enough African-American

representation.

You know, there's a lot of black women that are homeless, woman that are homeless with children, and homeless families. There's not enough talk about, you know, low-income or very low-income or even no-income housing for mothers -- mothers with children and families. We're -- we're just, you know, starting the conversation about freeway overpasses and underpasses. You know, Project Roomkey, that's temporary. That's not exciting -- 30 days, 60 days, 90 days -- and then what? It's right back on the streets.

You know, where's the significant funding? We're hearing about hundreds of millions of dollars. We're hearing about billions of dollars. Well, where are the -- where's the long-term solutions? You know, that's why we need our voice to be added to this conversation, and it's absolutely just deplorable that time and time again for us to be listening to all this rhetoric about what they hope to establish in the pipeline to be established, and then for Skid Row to be the homeless capital of America.

And you have reports from every single council. There are 15 council districts in the city. Oh, minus one, Council District 14, which happened to include the homeless capital of America. So what do we have to do?

We have to wait until November before we have our Council Member Elect to come in and -- then it's unfair to Town Member Elect Kevin de Leon because he's got to hit the town on day one with solutions. You know, that's -- you know, we can't expect him to actually come to our -- you know, to this discussion that's been going on for months and months and months and actually have it all fixed out. So Skid Row, we're behind the eight ball, literally, if you will.

And so, you know, I'm close with that. In fact, again, we're not here to sing Kumbaya because we all care about homeless folks. We're here because of a lawsuit, and now people are acting like they care, which, in essence, everybody in this room that's listening to this -- this conference has to admit within themselves we're here because of failed leadership.

You know, there are 60,000 homeless people that are out here in L.A. County, and we think the number, personally, is higher than that. That's 60,000 people that -- that our elected officials have -- have left for dead, that was forsaken, and the solution -- Project Roomkey, 15,000 max, could never house 60,000. Measure HHH to house up to 10,000 people will never house 60,000 people.

So the solutions that are being discussed in

these very proceedings, which are far more advanced than we have had in recent years, is still significantly less than what's necessary, and it's like I'm here -- I'm not here to make friends with everybody.  I know a lot of people in the room, but, you know, I'm just here to hit the reset button, to hit the reality button.  While we can pat each other and ourselves on the back, we're still far short from where -- where we are.

And speaking of short, you know, for me and for my constituents that I represent, you know, LAHSA has to go.  You know, the City and the County -- even legal counsel, they can't even agree together.  If they can't get an agreement on a number, how in the heck are they going to get any solutions agreed upon?  And so in the meantime, we, the people in Skid Row, and we, the people of homelessness across the entire city of L.A. County, are suffering in the meantime.

So just like when Governor Brown shut down the C.R.A., the redevelopment agencies, you know, now they put in place a successor agency.  It's now time to see what a successor agency to LAHSA would look like.  There's a waste of $400 million annually.  There's a starting point right there.  The City can take its resources back.  The County can take its resources back.

Thank you for your time, Your Honor, for your

time.

JUDGE CARTER:  Don't go away.  I want to thank you and Katherine for being here.  I want to have a meeting with the advocates in Skid Row just as I have a meeting with First Alliance, the Intervenors, and the City and County.

And it's somewhat unique because normally I go to the councilperson first, you know, as a courtesy.  But in this case, I'm really very pleased, and humbly so, that I had a chance to go to the community first, and I think that's been a real plus and a real education, and I say that with humbleness.

I'd like you to stay with me because I want to talk to all of you folks and just start with:  What the heck is this judge doing about something called pallet shelters?  Why would I be interested?  And I got to tell you I may need your help and impression on this in just a moment.

And, Armando, I want you to start with just something that I showed the Mayor.  Remember when I first came down here, I had the pleasure of meeting all of you, although I may have been a little abrupt, and I want to apologize for that on my part.  I'm a product of my own experience.  You have to understand that.  So I need help along the way.

I need to grow and continue to grow. And so I saw what this great country can do because I go into combat zones for human rights issues, especially women's issues and especially refugee camps, and a lot of counter-terrorist work. This is the Republic of Georgia. The Russians come across the border of South Ossetia, and you've seen this before, Marqueece. I don't think you have, General Jeff. This is the United States' money, and this took less than 60 days to put up.

So I'm not only seeing those huge, huge encampments go up, but look at this housing. I mean really stare for a moment at what this country could do when it takes folks when the City Council is seized upon, and so has the County. That's what you can do.

And if I took you up to Mazar-e Sharif in Afghanistan or down to Delaram or flew you over to Shorawak, I could duplicate this with this country's money overnight. Let me repeat that. So if I hadn't seen it, I wouldn't believe it. I'd just say, you know, this judge is making it up. But I got to tell you that if this country wants to do something, my God, we can do it. We're not second to none. We're the greatest country in the world. That's what you can do.

So it's hard for me to understand when I first

came into the city -- and this is my bailiwick, this is all I knew.  I didn't know about tent encampments.  I heard about your long-term supportive housing and was absolutely baffled by $600,000, but if you get -- I applaud you for that.

Now, I show up in March whatever, 17th, and was introduced to these module pop-up homes.

So, Armando, please show -- I think these look pretty good.  As I was told by the City, this was our solution at 16th and Maple, that 50 of these had been purchased by the City, and these were going to be put up under 16th and Maple, and we've been negotiating with the State of California through Caltrans for these.

Now, hold on for just a second, Armando.

So I actually had Amy bring her crew in.  They put it up in 22 minutes.  I timed it, and I thought, look.  At least this could be purchased.  It's moveable.  It gets people off the street.  For goodness sakes, we don't want to have long-term housing.  This is an answer to stop the death rate.  That's where I was.

So this is Riverside now.  This is Rusty Bailey.

Hold on.  I'm just getting wound up with this one.

This is Rusty Bailey out in Riverside.  So now

these shelters go up.  They're not permanent, but I understand the intervenors' point of view, and that is, if you go that route -- I understand your point.  I want you to hear that these become the standard and that we don't move on.  So I wouldn't care if there was a Sunset Clause, they would have them for 90 days and then move them to a new district.  I wouldn't care if we just had them for the wintertime to stop them from dying.  Okay?

So I just saw this as a quick solution, but then we ran into the bureaucracy.  I want you to hear this.  Every piece of property that this Court touched turned to mush.  Let me say that.

Where is Caltrans?  Are they here finally?  I wanted to hear them by Zoom.  I wanted to hear from the Council.  We're down to 19, and then we're down to 3. How in the world did we go from 250 pieces of Caltrans properties, representing to the Court that these are available in March, down to 19, then down to 3, and I don't even know what they have?  So that's kind of fiction to me.

Before we go, maybe give a quick report from Michelle to these folks.  So before you leave for a moment, I want to show you what you can accomplish or might choose not to accomplish.  And if you hear the rasp in my voice, it's because I'm 76 years old and I

wouldn't want to leave this good earth with a mark on my soul if we could do something about this.  There's too many dead people, and I really need your help.  You can outlast any politician.  You can stonewall this if you want to.  You can take three weeks.  I understand that.

But let's go back to the beginning and start again.

Armando, show Georgia.  My country built this in the Republic of Georgia.  Built it in 60 days.  The Russians came across into South Ossetia.  These go up.

I can take you out to Afghanistan.  I go there a lot but not lately, seven months now, but I can take you out to the Syrian border to the refugee camps, which I'll show you in just a moment, which is a lot better than what we're doing in Skid Row right now.

So I came here with an innate limitation on me that I just knew these kinds of housing.  I hadn't even thought about government encampments like the V.A.  I haven't even thought about -- you know, I heard about long-term supportive housing and, quite frankly, thought who could support $600,000 a unit.  But if they can get it, pay for it, so be it.  Then I heard about $1.2 billion of triple H funds down to 10,000, down to 6,000.  God knows.  I don't know what to believe.  I hope we can get 3,000, and I'm going to make that up.

So I came here in March, and the Mayor, who I'm very appreciative of, got up and in good faith said, "Look. We've got 50 of these."

So, Armando, show us the 50. Here's 50. There's four homeless people, and I love the fact that the homeless are being employed to clean up Skid Row. Why not pay the bureaucrats to do that or service agencies to help give back to the community? And we set this up at the -- we set this up in the lobby of the Alexandria Hotel.

Now, I don't ever want to get in the way of the County. That's their problem. But remember, I'm being sold with my shallow history of seeing this go up in Afghanistan along the Iraqi border, and now I see these, and I think, well, I never want them necessarily permanent, but if we can stop people from dying, why not.

And I'm told these 50 shelters would go underneath the 16th and Maple freeways. And, in fact, I was told pointblank that we had been negotiating with the State for six months, and these were going to go underneath the freeways and everybody accepted it. I think Brooke signed off on it. Carol signed off on it, and Shayla signed off on it. We signed off on it at 4:00 and realized we needed the EPA report.

Now, remember.  I'm being told we have 250 pieces of Caltrans properties.  We're down to 19, and now we're down to 3.  So I've given up.  Well, I haven't given up, believe me.  Okay.

Is that permanent?  I doubt it.  But at least it's an investment because you're not going to get one out in 30 days.  We can move them place to place to set them up temporarily.  Move them over to Joe's district. Let's get people out of the rain and keep them from dying.  At least it's an asset.  I don't know if that's perfect or not, and I do understand the Intervenor's concern that it becomes permanent, but they have to understand my concern:  That I'm not waiting for $600,000 units because this has become an interest to me, and I think everybody's got their hand in the pot and people are making money off of this, and people are dying.

So here we are.  Now, I don't know the cost of infrastructure by the way.  Plumbing has to go in, but they don't have plumbing here.  They got electricity. Outhouses have to be put up.

This is ADA.  So this is an ADA facility.  So I'm just telling you that this went up quickly.  It's a -- I'm not a champion for government encampments.  I'm not a champion for pallet shelters.  I'm not a champion

for long-term supportive housing for $600,000.

Okay.  As much as I admire the Mayor, and I'm so appreciative of this Council, you have the solution because you can outlast us; understood?  And the problem is I've got to unload a contempt citation in six months if this doesn't get done, because we're down two months now on the City and the County.

So the next one, Armando.  Just a moment.  Bear with me.  Next one.

Okay.  I want to show you something that's really neat that this City did.  Okay.  For a long time, we didn't have any sanitation.  These are our new permanent water supply down in Skid Row.  In fact, if I pass away tomorrow, I'd be very happy and very humble with some folks being able to drink out of a water fountain.  That's human kindness.  Okay.  So I really have a compliment to the City Council and the City, because for a long time we couldn't get a toilet out in this City.  And it was an abomination down there when I walked down there with General Jeff and Pastor Cue.

And, by the way, I was amazed that I was told I was the first federal judge to go to Skid Row.  There's a Superior Court judge who goes down there.  I go down there now and interact with the people.

So next one.  You got permanent stations there,

and I know First Alliance is concerned about the permanency, but they're not concerned about humanity. The problem is that they don't know what to do in their negotiations with permanency or moving people out and if that's fair, but remember Skid Row needs to be treated fair by all of us.

And our jail, we have 20 people running down the street at 4:00 o'clock in the morning with untied shoelaces, which is kind of interesting because they end up at Skid Row and go to the Weingart Center to get fed.

Now, I went to a Syrian refugee camp. It's not pretty. Okay. Here's a distribution center. You know, people very graciously line up. We're going to get our tent. We're going to get our food. We're going to get something for distribution.

Next one. Now, this is what the camp looks like. It's certainly not pretty, but it looks like Skid Row, and Gary Moore says to me, "I worry about the influx of people who are going to become homeless," and I worry about all of these people coming into our system. We've already got tent encampments that are just scattered all over the place, and it's going to make it awfully hard for Dr. Sherin and all of you to service these because it's astronomical. You're going to have to go place to place. COVID is breaking. The

third leading cause, by way of death, people getting killed on the road, homeless people.  It's right behind drugs.

Next one.  These are kids.  Okay.  Here's your homeless in Los Angeles.  I just want to slow down and have you internalize this.  These are living, breathing folks, and the problem with me is I've grown so accustomed to sitting about three feet off the ground that I worry about just losing my humanity on occasion.  I worry over 42 years of being a judge that I would still like there to be human beings in all of us.  Here we are.  The police department does an incredible job out there by the way.  There's a lady crawling across the street.  And by the way, Station 9 down there, they're terrific.  You've done a great job.  You should be so proud.  Human kindness, just helping a person up off the street.  You've got to explain that to me.  If there's any explanation, please, just raise your hand and tell me how that happened.

Next one.  This little lady is just sitting there.  She has no place to go.  And by the way, there's LAHSA housing and three more down the way.  We'll talk about that in a minute.

Next one.  This was out in Skid Row.

Next one.  Next one.  This is one I want you to

focus on.  This is so common.  These people just walk by.  Now, just internalize that for a moment.  People just walk by.  You're the first responders, and I don't know how you do it.  But people just walk by.  You wonder why?  Because nobody goes down there, and I'm over by San Pedro at the light there.  I haven't decided to do that yet, but I just may move my court down there next time because nobody goes down there to look at it.

Next one.  Now, three feet -- you're supposed to give three feet.  What a joke.

Next one.  Now, this is Michelle and I.  We're walking along the other day.

Michelle, why don't you just describe what happened.

MS. MARTINEZ:  Yeah.  Last week, we were headed to the Central Market for a meeting with service providers, and as we're walking, you know, I see the gentleman, and he just collapsed just right in front of us as we were crossing the street.  And, you know, I look at the judge, and I said, "Is he kidding?"  And we went to him and say, "Hey, are you okay?"  And he just said, "I can't make it to Skid Row."  And thank goodness your police department and fire department came.  You guys were very gracious and really helped him, but we experienced this for ourselves every day with public

safety and just people in general but specifically this homeless person that needed -- he was trying to get to Skid Row, trying to get services and just was fatigue and sick and just wanted help.

But I will tell you that we saw a lot of human kindness, just people driving and stopping, wanting to help. So it was great for us to experience what some of you experience here every day.

JUDGE CARTER: And I worry about people like -- me -- and I use me as an example so I don't use you -- who has grown so callous to those folks down at Skid Row. Those folks, they have a sense of community. They love. They care about the crime, and it's easy to pass this off as being crime and drugs. Nonsense. There's a huge amount of kindness down there, and you'd be surprised. The poor gives to the poor. There's some people just reach out, and they'll give a helping hand.

Next one. Next one. Okay. Next one. Next one. Next one. Next one. Next one. Next one.

Okay. I've taken you through the homeless at underpasses and overpasses.

Okay. There's also a debate and, I think, a problem that occurred that I would like -- Wendy Greuel is here.

Wendy, are you here?

MS. GREUEL:  Yes.

JUDGE CARTER:  Come on up for a moment.  First of all, I want to compliment you.  I think we can have a reset button.  I really do, and I'm very hopeful of that.  I want to start very positively.

Here's the falsity of what's occurred:  "We can't service 65 year olds because, Judge, you're reaching an agreement over the 6,800."

Is that still your position?

MS. GREUEL:  I heard you correctly, Your Honor. You're asking if we are going to serve those that --

JUDGE CARTER:  Your position -- historically, not yours, Wendy -- but let's say past regime, "We can't service the 65 years olds and older because, Judge, you may be taking assets and resources away by reaching an agreement concerning the 6,800 people living under the overpasses and underpasses."  And that may be a bailiwick position, and I may be wrong.  So let's discuss that.

Is that still your position, or are you going to get on board?

MS. GREUEL:  So just one thing, I'm one of the chair of LAHSA any a been 0.

JUDGE CARTER:  I know, and I appreciate that.

MS. GREUEL:  Yes, I just wanted to you to know

why I was here.  Amy Perkins sends her best, and I'm texting with her.

JUDGE CARTER:  I had a very good meeting with her and very complimentary.  I want that on the record.

MS. GREUEL:  So, you know, we believe -- and you can correct me if I'm wrong -- that -- that with focusing in on those underneath the freeways and underpasses and priority of the 65 and older, that we can, you know do that.

JUDGE CARTER:  Can you do both?

MS. GREUEL:  Yes.

JUDGE CARTER:  Then let's have that reset button because I was about to take you on with some of the $2.6 billion dollars.  I was about to point out a lot of figures that made that meticulous argument, we can do both.  That's always been the position, and it's been -- it's been harmful, in a sense, in portraying to the public it was either or.  That's never been the position, and if you're on board, I'm on board again.  Okay?  Fair enough.

MS. GREUEL:  Fair enough.

JUDGE CARTER:  Okay.  Let's take care of our 65 year olds.  We've got the assets to do that, and let's take care of the overpasses and underpasses and see if we can get to those folks, et cetera, and we can do

both.  We've got the money and the resources, and if anybody wants to challenge me, I'll put up some figures that are staggering.  Okay?

All right.  I want to show you something I'm concerned about.

Armando, help me.  Would you put up the first chart showing the progression of LAHSA, and this isn't a criticism.  I want to start right on the record where you can understand the following.  I'm very complimentary because the Mayor and the City has done things faster than has ever occurred before and has been terrific.  So let's start out very complimentary.

The problem is that all of our eggs are in one basket, and we're waiting for Roomkey that I'm very concerned because it's not that you're not making a huge effort.  It's not that you're not being more successful than you've ever been.  I just know 41 days went by between this purchase and this purchase.  And so if we're about, let's say -- I think you were 3900, maybe a little bit more in terms of room, and I think 3,400 -- I forget the exact number.

Next slide.  Initially, the rate that was being told to the Board and other people was "We can reach 17,000 rooms after April, 2021," and that's a valid chart.  I'm not arguing with you.  That was as of

June 15th, but on July 31st, you could no longer predict or if we could reached the goal of 15,000 rooms that the County has contracted, and I understand you have staffing problems.

So these are two statements, and so here's my concern, Wendy: If you can reach 15,000 rooms quickly and house people, I'm your biggest supporter, but if you can't, then the fate of the City and the County is in your hands because I have to hand out contempt citations. It's not against LAHSA. They put all their eggs in one basket. And if you can truly reach this goal, maybe the chairperson of the City Council's buying into this, maybe MRT's buying into this. And if you fail, there's no reason for you to exist. So I'm going to come back to this in just a moment.

I'm afraid that the COVID-19 -- I'm not afraid. I hope that the COVID-19 runs out because now we have a vaccine. People are dying. I mean that's our goal. But every time we talk to a homeless person out in the street with Pastor Cue or General Jeff, they say one thing, "Why should I go into Roomkey because it's not guaranteed for 30 days or 60 days," and there's community pushback. They don't want them by a hotel in Lawndale or whatever. So they can't be purchased fast enough, and my fear is that, if we fail in this with a

perfect, I've got people dying out there because we got all of our eggs in one basket, and we're afraid of pallet shelters because they might become permanent, and we're afraid of government encampments. Bring all your possessions. I don't care. You can have pop-up shelters, pallet shelters, but the idea that we can't divert a couple million dollars out of $2.6 billion -- or even $30 million -- is beyond my imagination, and that's why I think we have this reset button between the two of us. If you're resetting, I'm resetting. Let's do both. Let's get it going.

Also, you haven't seen this document, but the City is proposing 740 pallet shelters it was 3,000. 740 is fine. They can be reused district to district because we can't do all the districts at one time. I need your help.

So is Volunteers of America here? Come on up for a moment. I think the Salvation Army is here. I see Dr. Allen. You're here. All right. Where is St. Joseph? No, she was here. Veronica was here.

Okay. I didn't know what your position would be. So I kind of just decided maybe I need to --

So, Curren, with Volunteers of America, how many teams can we put up?

Why don't you come on up here. We can put out

how many teams?

By the way, say your name for the record.

MR. CALHOUN:  Karl Calhoun of Volunteers of America.  Thank you for allowing me to be here today.

We can put up, you know, for Curren's district, Councilman Price's district, we can put out three to five teams based on the need.

JUDGE CARTER:  I want to thank all of you.  Three to five teams.  All right.  We can also put out health teams, acute mental health teams.  Okay.  We can literally flood this area, try to get people humanely into better places than we've been able to do in Orange County, quite frankly.

So if we want, maybe we can take care of some of the ADA problems in Orange County.  Maybe, we can take care of some of the mental health problems.  We'll have a tussle over how that's going to occur.  I understand that.

So if you're on board with LAHSA, you may be the center or you my be ability to implement all of this with Wendy, and if you are, then welcome.  I'm looking for central authority.  But I don't think you've got the implementation yet.  I think you formed out the path or whatever, and that's fine.  You're not a pastor.  I don't think you're used to implementations, of course.

So let me talk to you about that privately.

MR. CALHOUN:  Okay.

JUDGE CARTER:  I'd like, with LAHSA, to see if this works.  Okay?  If it doesn't, then you really hold the City and the County in your hands, and they better heed my word, and that is:  If you fail and you take this on and you put all of your eggs in one basket with long-term supportive housing and you can't give us that -- we're talking about 6,800 units -- then the City is going to be in contempt and so is the County.  Okay?  You understand how important this is?

Now, what I'm worried about also is there's no double-counting, and I'm talking to Heidi about that.  This 6,800 are created units.  That why the County's paying $300 million to the City.  That's why you're paying that money, for units, and it's got nothing to do with the representation made by Heidi to the Board that there are 15,000 new units because what you can't do is take the 6,800 units already promised to Marcus and put those into this package and call that 15,000 because that's not -- you're really creating about 8,000 new units.  Do you understand?

That's the double-counting that's going on that's causing me a little bit of concern, and I don't know how to turn that.  I'm not going to give it a name.

I just want you to be on notice that you're representing 15,000 to the Board, you're representing 15,000 new units to the Board over and above what was said of 6,800.  And if not, then the Board of Supervisors is asking for $800 million for 9,000 units or 6,000, whatever that figure is.  Fair enough?

Okay.  Now, let's go on for just a moment.  Okay.  I think I've got -- I'm going to show you a sign just to leave you with kind of a smile on your face for law enforcement and for our folks out there.

Could you find that last sign that the community introduced me to.  It's a parking sign.  Yes, right there.  Right there.  Okay.  This is great.

If you ever want to see a parking infraction, here it is.  I want you to try to park your car and read this sign sometime.  I can give you a ticket under any circumstances because this is so convoluted, and I want to keep this sign here for a second.  I just chuckled.  The City might want to clean that up.  Clean it up.

Now, let talk to this gentleman here that's arrived at 2:00 o'clock.

Come on over and help me by telling me how you can help and introduce yourself to me.  By the way, it's a pleasure to have you with us.

MR. MOORE:  Gary Lee Moore, city engineer.

It's a pleasure.  We had to oversee the Bridge Home design construction, and we set up a war room, and we're going to continue that to deliver new housing.

JUDGE CARTER:  I appreciate it.  Let's just get that far, meeting each other.  We're all trying to get to the same places.  So we're going to have huge arguments between all of the parties, but we'll try to get to the same place just maybe in different ways.  Okay.  Thank you.  It's a pleasure to meet you.  I want to thank you for being so patient.

MR. MOORE:  Thank you, Your Honor.

MR. JAMES:  Good morning, Your Honor -- or good afternoon, Your Honor.  Kevin James.  I'm the president of the Board of Public Works, and you have our full commitment to move as expeditiously and as aggressively as possible.

JUDGE CARTER:  We desperately need your help to stop people from dying because you can out-last us.  Did you know that?

MR. JAMES:  Maybe.

JUDGE CARTER:  You're more powerful in A sense.  You really are.  So we desperately need your help just to stop people from dying.  I'll be that blunt about it.  Okay?

MR. JAMES:  We're all in.

JUDGE CARTER:  If you're in, hey, I'm in.  I'll work with you.  I promise.  Thank you.

MR. JAMES:  Thank you, Your Honor.

JUDGE CARTER:  It's a pleasure.

MR. ADAMS:  Good afternoon, Your Honor.  I'm Martin Adams, general manager of the Department of Water & Power, and so we are working as well as we can -- all the City departments and Council offices -- to make sure our projects move forward.

JUDGE CARTER:  Yeah, anything you could do to cut through the bureaucracy.  I've also talked to a huge number of private builders now.  Sometimes they're looking for upgraded zoning.  Okay.  But other times, there are folks out there who can generally build out. I think some other districts are streamlining quickly and will finance it themselves.  Okay.  So I mean I'll get the Council approach you about that, but it's a pleasure to meet you.

MR. ADAMS:  Thank you.  We're working on some more great solutions.

JUDGE CARTER:  Okay.  Anything you can do to lessen.

MR. ADAMS:  Yeah, thank you.

JUDGE CARTER:  I appreciate it.

Hold on.  We're going to wipe down that

microphone.

Thank you, sir.

MR. ZALDIVAR:  Your Honor, it's a pleasure to meet you.  Enrique Zaldivar.  I'm the general manager of the Bureau of Sanitation and Environment.

JUDGE CARTER:  Pleasure.

MR. ZALDIVAR:  We protect public health and the public right-of-ways, as well, throughout the City, and we will help all the other departments with anything to expedite the construction of the temporary shelters.

JUDGE CARTER:  If you can turn that around. I'm asking, begging, you to somehow decrease the time because it's costly, and I don't have time to wait.  I will walk down with you with General Jeff.  It will break your heart.  It will just break your heart.  Thank you, sir.  Thank you for being so patient with us.  It's been quite a day.

MR. BERTONI:  Yes, Your Honor.  Vince Bertoni, director of City Planning.  We handle zoning of the City.  We've been working very hard in, you know, both racial and social injustice concerning planning issues. So this is something that's near and dear to what we do, and we appreciate all of your work on this.  We're worked with the State to really streamline the processes up to today of what we can do.

So, for example, any shelter that are going through temporary -- that are under the emergency order for shelters, our effort is to clear it through City-owned properties, things like that, but we're looking at every way we can to streamline the processes.

JUDGE CARTER:  Okay.  I'm going to find a way through the Special Master, Michelle Martinez, or Judge Smith or Judge Andre Birotte and myself that you all have access.  I don't want to bypass the Mayor or the Council.  That's their bailiwick.  But by the same, token anything that the Court can do to support you in decreasing this time, it will be a benefit.  I think we're all on the same page.  I think the City has a great chance to re-write, but not only that, to really be an exciting example.  So thank you.

Oh, my goodness.  I didn't see you.

MR. CASTRO:  I've been losing weight. (Indiscernible) Castro.  I'm general manager of City Services.  I know what it means, you know, to be homeless and what it means to work for the City.  So we're committed.  I think we pushed that reset button on working together, and I think we can get it done.  Thank you.

JUDGE CARTER:  You know what, Folks?  If we could just try.  I'm not afraid to make a mistake, and I

humbly apologize to you and the whole world; but, somehow, I can't let this go without trying, and I don't think we're going to be wrong, but if we are, I humbly apologize for that, and you'll try along with us.  We're all on the same page, and I think that's good for today.

Gentlemen, I want to thank you so much.  We'll be back, by the way.  We'll have another meeting in five weeks.

Katherine, would you introduce yourself?

MS. MCNENNY:  Can you hear me okay?

Thank you, Judge Carter.  My name is Katherine McNenny.  I'm an 11-year resident of the Skid Row district.  I don't come from Social Services.  I was not homeless, but I have lived in the community, and so I come -- my perspective is one from walking the streets of Skid row.  In my off time, I like to plant trees in the area, and so I'm outside a lot.  I've witnessed more death in the streets than I would have ever thought imaginable, and I appreciate you, Judge, for talking about the objective, which is to reduce the deaths.  So.

I have a couple comments on the documentation that the City and County provided, and it has to do with their lists of properties.  So I think we need a new list, from the City, of properties that they're planning to sell or lease.  These parcels must be separated from

the current lists that sort according to council district.

While the City does state its plan to sell some of the parcels it owns, it is impossible to tell, by the way they've arranged the list, which ones these are. For some properties in single-family home communities, the City states that it, quote, "would benefit financially if the properties were added to the property tax," end quote, "See page 33."  And it goes on to suggest, quote, "affordable homeownership," end quote, for these parcels.  Whatever that means.  We are talking about saving the lives of tens of thousands of people on the streets now, not homeownership.  These parcels could and should be used for shared housing, something the City itself has put forth as a solution.  See Page 17. Wouldn't this be more valuable to tax-paying Angelenos than any property tax that would only go into a black hole?  The benefits of moving -- housing and securing people into stable neighborhoods would be tangible.

Page 61 of the City's report, lists a property at 3757 North Harriman Avenue.  It has a note that reads, quote, "City-owned vacant lot in single-family zone, not feasible due to zoning restrictions," end quote.  But when I checked that site on satellite image, there was literally a multi-family apartment complex

next to the vacant parcel.

Also, from Page 33, why would the City sell land just because it borders state or federal land? This is not explained.  (Indiscernible) is surely more valuable than any the City might purchase in the future. Conducting transactions and preparing the land for sale, costs taxpayers money to be paid out for the salary to the City staff, which is referenced, plus we are looking at something that may or may not happen down the road, which would have less or no control of in terms of oversight.  In other words, a bird in the hand is two in a bush.

Lastly, when is a good time to sell property? Prices are already showing signs ever depression due to strains of COVID-19.

My suggesting is ask for a list of the City properties to sell or lease, and then have an independent property expert determine the feasibility of housing of sheltering people there.

And then just very briefly, on the County document, they didn't even list -- they didn't even have a list of properties.  Page 15 of the County document, Section B, called "County Properties," states that the full list of properties that the County owns is in the thousands and submitting a full list, quote, "may not be

helpful to the Court," end quote.  The County suggests that they should submit a list based on the needs the Court outlines.  The County should, however, submit a list of all properties it owns broken down into the ones they believe would be best suited for housing or shelter and the ones they wish to sell or lease or not use for whatever reason similar to what the County should be submitting.  Thank you.

JUDGE CARTER:  Thank you very much.

Council Chair and Joe, you've been so courteous.  I've got another hearing.  I beg your indulgence.  Folks, who are another intervenor.  I'm happy and would like to hear some witness statements, but you've been so gracious.  I just want to humbly thank you again, Councilwoman Martinez and Councilman Buscaino.

Please.  Hello.

MS. NOEL:  Hello.  My name is Monique Noel from the Downtown Women's Action Coalition.

JUDGE CARTER:  I'm going to ask you to move the microphone a little bit closer to you just because of my hearing.  You're doing great, though.

MS. NOEL:  I'm Monique Noel from the Downtown Women's Action Coalition.  I want to thank you, Your Honor, for opening up this space to hear our

voices.  I'd also like to hand to you a report that we just released this morning, the Women's Needs Assessment of Skid row, if I may.

JUDGE CARTER:  Thank you.

MS. NOEL:  From that report, I'd like to list some of the recommendations about the 2020 Skid Row Women's Needs Assessment, which is a community-led research project.

The number of houseless women continues to rise and the conditions in Skid Row are a recipe for extinction.  Woman need housing, and they need housing now.

This morning, I heard Council Members suggest they can't do this work because of the bureaucracy, a bureaucracy that's getting in the way, but they are the administrators of that bureaucracy.  So, in essence, they get in their own way.

So our recommendations:  Treat the housing crisis like the emergency that it is.

House the 2,000 women currently houseless in Skid Row immediately.

JUDGE CARTER:  Could I stop you a moment along the way.  I don't want to lose these points.

How many women do you estimate are on Skid Row, a rough figure?  I'm not holding you to this because I

heard different numbers of the total, and I think these are -- what? -- houseless people, not homeless, houseless people.  And so what am I dealing with out there?  Am I dealing with 3- to 5,000 on Skid Row?  A thousand?  1500?  What?

MS. NOEL:  Yeah, our report said about.

JUDGE CARTER:  Okay.  Please.

MS. NOEL:  Thank you.

Develop effective protocols that are flexible and unbiased entry into all housing relief programs such as Project Roomkey.  Women on Skid Row were given severely limited participation in these programs, and while, at the same time, being the most vulnerable.

Convert all vacant City-owned property and to house women and families.  Any property on Skid Row must be used and turned over to non-profits like ours who are developing low-cost alternative housing that actually is your own room key and your own bathroom and kitchen, et cetera.

Ensure state and local government provide eviction protection for women.

Criminalization displaces women from the very limited resources available to them.  It further traumatizes and creates barriers for entry into housing. It actually places women in unsafe and unsanitary

conditions.

Stop disrupting lives with traumatizing street sweeps and municipal ordinances that criminalize poverty that are violations of human rights, and they must end.

L.A.P.D. current outreach and encouragement strategies are not making women's lives safer, and that must end too.  De-escalate intense situations.  Do not put these on women.

Provide clean and accessible public restrooms for handwashing across Skid Row immediately.

Install easy-to-find usable water fountains that are available 24/7.

Make menstrual hygiene products available in all public restrooms.

Create a lot of --

JUDGE CARTER:  Can I stop you for just a moment?

MS. NOEL:  Yes.

JUDGE CARTER:  Are you sure?

MS. NOEL:  Yes.

JUDGE CARTER:  One of the things that our community pointed out to me was, "Oh, my goodness.  All these sanitary stations that we were trying to get, which we put out 50 of these, they're taking all the paper."  And I think I said to General Jeff, "That's

great because the community just told me what they're lacking.  They're lacking paper.  So we need to get more paper."

Please.

MS. NOEL:  We advocate for minimal resources towards spaces and support services for non-binary and transgender women in Skid Row immediately.

And, lastly -- and this is very, very important -- Skid Row is disproportionately black.

JUDGE CARTER:  Say that again.

MS. NOEL:  Disproportionately black, and I say black to include African Americans and black immigrants there, too.

JUDGE CARTER:  I'm going to joke with you. Here I am.  What am I?  I'm Caucasian.  I'm out with General Jeff and I think four or five other people, and somebody walks by and yells out with a great sense of humor, "There goes the community."  You're right.  It's 70 percent black American.

MS. NOEL:  Yes.  So anti-black racism must be purged from all systems, organizations, and institutions responsible for providing houseless services.  As noted in the recent LAHSA Black People Experiencing Homeless Report, race continues to be a powerful determinant of who gets housing and who doesn't.

JUDGE CARTER:  One of my past disappointments but hope for the future -- however, we failed -- we certainly had the statistics about the disproportionality of black Americans who were on Skid Row.  I'm finding tremendous problems with that, and maybe it's just because judges like me aren't getting out, driving in and out of the courthouses, quite frankly.  And, therefore, I find a tremendous fault, not with my colleagues, but with me, and I must say it's quite an education.

It's nice seeing you.  I'll see you on Skid Row or Skid Park in the future; right?

MR. WHITE:  Good afternoon, Judge Carter, Judge Birotte, and Special Master Michelle Martinez, and thank you for holding this whole thing together.

JUDGE CARTER:  I heard you're a pain for the City sometimes.

MR. WHITE:  Well, you know, someone told me, Judge, if people have nothing to say about you, it's probably because you're not doing enough work.

Just in brief, just following up on my colleague, Monique Noel, and her preparation.  I think I've been doing this work since 1992, and when we started going it work in 1992, the dominant narrative about why people were houseless is because they just

didn't try hard enough, they were drug addicts.  It was -- it was all of these things that was about them.

Finally, 25, 26 years later, the City of Los Angeles and the County of Los Angeles acknowledges that the root cause of houselessness is housing affordability, housing availability, and poverty; right?

And then, just to double-down, this year, LAHSA says that if racism didn't exist in this George Floyd moment, 15,000 less houseless people -- 15,000 less black people would be houseless in Los Angeles.

Now, I'm not sure I agree with that, but what we're saying is we've moved away from this idea that this is about broken people.  This is about broken systems.

I sat here all morning, and I listened to folks responsible for the bureaucracy, the caretakers of the bureaucracy talk about they couldn't get through the bureaucracy to get things done.  "We have to reject that.  We have to say no.  We have to say no to units. That the only solution are units that cost 600- to $700,000 apiece to build."

There are so many different types of models and designs that we can move forward on today, and we can get homeless Angelenos, 75 to 80 percent which come from Los Angeles, off the streets.

When we think about the social deterrents of health, we think about housing.  We think about jobs.  We think about education.  When we think about the social deterrents of safety, we must think about the same things.

I appreciate you and Michelle walking the streets and actually talking to people -- right? -- moving back towards this Masonian model of democracy which could be further instilled in this chamber.  But you, as a Judge, and Michelle talking to people are cutting through the barriers and cutting through the noise.  We're not going to agree.  Moving people away from the freeways without having actual places for them, that includes a house, it includes a key.  We're using the word "shelter" in a very sort of unique way.

I want to talk more about housing.

JUDGE CARTER:  Don't go away.

Armando, help me with the Preliminary Injunction that went by the wayside.

I want you to see something, Pete.

MR. WHITE:  I want to see it.  I can't see that, Judge.  I need glasses, man.

JUDGE CARTER:  It's okay.  We're going to disagree a lot.

MR. WHITE:  I think we're only in 10 percent

agreement.

JUDGE CARTER:  Okay.  July 28th because we're not going to do anything unless we create something better, and the definition is going to be what's better; right?

MR. WHITE:  That's right.

JUDGE CARTER:  Of course, you want long-term supportive housing.  Good for you.  Okay.

MR. WHITE:  That's right.

JUDGE CARTER:  Okay.  Now, hold on.

What I specifically said is that this Court, at a minimum, must be satisfied to ensure the process remains humane and serves the best interest of the affected individuals who are experiencing homelessness. Remember, the advocates aren't helping me, the intervenors aren't helping me.  I'm kind of sitting down here making this up with my law clerks, talking to as many people as I can.

*(1)  All shelters and alternative housing options must be configured with adequate physical space to allow the sheltered individuals to maintain the minimum recommended social distance of six feet to mitigate the transmission of SARS-CoV-2.*

Now, hold on.  Later on, I find out that the guidelines of the CDC, I think, are twelve feet or ten feet.  I forget.

        *(2)  All shelters and alternative*

              *housing options must have adequate*

              *hygiene facilities, such as*

              *handwashing stations and showers.*

    Apparently, we've had a stumble with the City for 17 years just getting toilets out according to Shayla.

        MR. WHITE:  Oh, it's true.  It's true.  We had to build our own sanitation stations.

        JUDGE CARTER:  Now, wait.

        *(3)  All shelters and alternative*

              *housing options must have nursing*

              *staff who, upon intake, can test*

              *each homeless individual for*

              *communicable diseases and other*

              *health conditions.  The Court may*

              *consider revising this aspect of*

              *the Preliminary Injunction in the*

              *future, depending on the state of*

              *the COVID-19 pandemic.*

        And the reason for that is I don't know if I need a full-time nurse or what in the future.

        *(4)  All shelters and alternative*

*housing options must be staffed*

*by security as necessary to ensure*

*the safety of the homeless persons*

*sheltered therein.*

And now I understand the debate of does this security look like?  Does it look like a prison?  That's a big word.  Okay.  That's a clairvoyant.  A prison?  No.  Okay.  I don't know where we fall on this, but that's up to the Council, et cetera.

MR. WHITE:  That's an important point because what we don't want is --

JUDGE CARTER:  Okay.  Here we go.

*(5)  All homeless individuals shall*

*be able to retain possession*

*of their belongings, whether they*

*choose to enter a shelter or*

*alternative housing option, or*

*simply relocate a sufficient*

*distance away from freeway*

*overpasses, underpasses, and ramps.*

Now, that's a big debate over possessions, but historically, you know something, this isn't even an issue.

You know what?  Some of these homeless will walk away just as long as they're guaranteed -- they

just want to know that they don't shut down their tent and get shoved in the street the next day.  They'll walk away from it.  It's amazing.  We'll have dump trucks out there.

> *(6)  Before beginning the process of clearing freeway overpasses, underpasses, and ramps, all homeless individuals living in the vicinity must be given advance notice; such notice shall include information about nearby shelters and alternative housing options.*

You know, we judges aren't very smart.  Let me put that on the record.  How do we know unless we got so involved with the homeless person where they might be going?  Is it a better place?  What does a shelter look like?  Is it a low barrier or high barrier?  Okay.  Are we going to give them 21 days or 14 days or some kind of notice?

> *(7)  After such notice is given, and after the City of Los Angeles and/or County of Los Angeles provide adequate alternative shelter for individuals...*

In other words, create something better.  Of

course, you want perfect.  I can't wait for it to be perfect because a $600,000 shelter isn't going to get built, and I've got to watch people die out there while we wait for the perfect.  So am I for pallet homes?  Yeah.  Am I for government encampments?  Absolutely.  Do you want these to be permanent?  Absolutely not?  But something's got to done because I'm getting so tired of the death rate here while we -- and you were so proud of something.  Remember when you told me, "Judge, we have a 3D printer coming"?  Remember?

MR. WHITE:  A 3D what?

JUDGE CARTER:  3D printer.  Has it arrived yet?

MR. WHITE:  No, it hasn't.

JUDGE CARTER:  In your lifetime.

MR. WHITE:  But I also said I have a project that could bring in units of housing far less than 600,000.

JUDGE CARTER:  It's not you.  It's somebody else.

MR. WHITE:  I would just say this, Judge, in closing:  We are not looking for the perfect.  We're looking for the humane.  We've been --

JUDGE CARTER:  Go over and tell them that.

MR. WHITE:  Tell who?

JUDGE CARTER:  Them (Pointing).

MR. WHITE:  Who's them?

JUDGE CARTER:  The intervenors.

MR. WHITE:  I'm talking to you right now.


(Simultaneous speaking.)


MR. WHITE:  So we're not looking for the perfect, but we're also not looking to duplicate things that have failed in the past, being really clear about that.  We've had government-run tent cities before in this chamber right here in 1983.  Mayor Tom Bradley had to open this chamber to allow houseless people to sleep.

So also clear to where we sit, we're not looking for perfect, but we're looking for the humanity, and like you, we're looking for a pathway to permanency.  That's what we're looking for, and we know -- I've been there a long time.  I know when something feels the same, and I know when something feels different.

Thank you for your time today, Judge.

JUDGE CARTER:  Thank you.  I want to tell you something on the way out.

MR. WHITE:  Tell me something.

JUDGE CARTER:  First Alliance, the business groups, and activists are all going to be disappointed at different times with me; do you understand that?

MR. WHITE:  Yes.

JUDGE CARTER:  I make my living by giving you disappointment.  I tell you what?  The one thing they can't stand is the present inertia.  No matter what we do, we've to get started doing something and make it better.

MR. WHITE:  100 percent, I agree, not 10 percent, not 91.  Thank you.

JUDGE CARTER:  Thanks a lot.

MR. BUSCAINO:  Amy, from Pallet shelter, can you please come forward.

Just for the record, during the presentation it was indicated that the pallet shelters only last five to six months.  In my presentation, I'm ready to deploy 120, 150 in my district to an encampment near an underpass, but can you just clarify.

MS. KING:  Yeah, I'd be happy to.  Our shelters last ten-plus years, not five or six.

MR. BUSCAINO:  Thank you.

Thank you, Your Honor.

JUDGE CARTER:  Okay.  Let's move on to the intervenor matter.

(Brief interruption.)

JUDGE CARTER:  Okay.  Folks, thank you very much.  If you'd be so kind to come on up here.  You wanted to intervene.  I'd like to meet you.

MR. CONTRERAS:  Good Afternoon, Your Honor.  Good afternoon, Judge Birotte.  Good afternoon, Special Master Martinez.  My name is Christian Contreras.  I'm with Justice X.  It's a pleasure meeting you.  We're a collision of black and brown people and we represent the black and brown people's interest and the interest of the marginalized.

JUDGE CARTER:  Are these folks with you?  Would you be so kind to introduce me to the members of the coalition today.  I'd like to meet you individually.

MR. GUIZAR:  Thank you, Your Honor.  Humberto Guizar.  I'm one of the founders of Justice X.  The coalition consists of black and brown lawyers advocating for social justice in the City of Los Angeles.

JUDGE CARTER:  And give us some time to wipe up that microphone.

MR. GUIZAR:  I'm sorry, Your Honor.

JUDGE CARTER:  We're doing our best.

MR. DOVE:  Good afternoon, Your Honor.  Austin Dove.  I'm also co-founder of the Justice X Law Group, and one of our arms the Protesters Defense Alliance, which is nonprofit organization that's based on

supporting causes for black and brown communities.
Thank you.

JUDGE CARTER:  Thank you.  Nice meeting you.

MR. KING:  Good afternoon, Your Honor.  Stephen King, also co-founder of Justice X.

JUDGE CARTER:  Stephen King, nice meeting you.

MR. KING:  Spelled the same as the author.

JUDGE CARTER:  Yeah, thank you.

MR. CLAROS:  Good afternoon, Your Honor.  My name is Raul Claros.  I'm the founder of Latino Coalition of Los Angeles.

JUDGE CARTER:  Nice meeting you.  It's a pleasure.

Why do they save you for last?  These men should have gotten out of your way.

MS. RIVERA-GUZMAN:  Good afternoon, Your Honor. My name is Ingrid Rivera-Guzman, and I'm the vice president of the Latino Collision of Los Angeles.

JUDGE CARTER:  It's pleasure to meet you.

MS. RIVERA-GUZMAN:  You as well.

MR. CRUZ:  Good afternoon, Your Honor.  My name is Victor Cruz.  I'm a Board Member for the Latino Coalition of Los Angeles.

JUDGE CARTER:  It's a pleasure to meet you. Now, I've this a chance to meet each of you

individually.

Is there one more gentleman?

PASTOR TIGUILA:  Good afternoon, Judge.
Pastor Josh, or Pastor Josue Tiguila, from First Church
of the Nazarene in Los Angeles.

JUDGE CARTER:  Yes, I know you.  It's nice to
meet you.

PASTOR TIGUILA:  Thank you.

JUDGE CARTER:  It's a pleasure.

Counsel.

MR. CONTRERAS:  Your Honor, the Latino
Coalition of Los Angeles and Pastor Josue Tiguila are
planning to intervene as a matter of right or,
alternatively, as a matter permissibly.

Homelessness in Los Angeles is a racial justice
issue.  Latinos comprise of 36.1 percent of the homeless
population --

JUDGE CARTER:  You're the highest number.
Proportionately, you're not the highest.  Black
Americans are.

MR. CONTRERAS:  That's accurate, Your Honor.
That's based on homelessness count of 2020, and that's
not considering --

JUDGE CARTER:  Just don't go away.  The court
reporter needs a break for just a moment, and if you

don't mind, we'll be right back with you.  Let's take five or 10 minutes for her.

MR. CONTRERAS:  Thank you, Your Honor.

(Recess taken from 3:22 p.m. to 3:35 p.m.)

JUDGE CARTER:  Okay.  We're back on the record. Would you like to start over again because I interrupted you for a restroom break.

So if you would like to start from the beginning.

MR. CONTRERAS:  Good afternoon, again, Your Honor.  My name is Christian Contreras.  I'm with Justice X.  I'm here representing the Latino Coalition of Los Angeles and Pastor Josue Tiguila for an application for intervention.

Homelessness in Los Angeles County is a racial justice issue.  Latinos in Los Angeles County comprise of 36.1 percent of the homeless population while comprising of 50 percent of the general population, and that's not considering the lack of L.A. County -- based off of a wide range of issues including the definition of homelessness and just the very nature of the cultural aspect of Latinos.

And the Latino Coalition of Los Angeles, my

clients here who are present, they represent the interest of the community, and I stand here before you as a formerly homeless person.

When I was 12 years old my mother was involved in a tragic car accident that paralyzed her from the waist down, and she couldn't work, and we were in Skid Row. So those pictures you were showing earlier are pictures I'm very familiar with, and I actually live currently at the border of Skid Row on San Pedro Street. So myself, my colleagues from Justice X and Latino Coalition of Los Angeles and Pastor Josue Tiguila are advocates for the homeless community, and we're advocates for the homeless community, and, we're advocates for the population of Los Angeles County as a whole with an emphasis on marginalized communities. Communicate.

And our point is that, by it's very nature, homelessness affects Latinos, affects black people, affects Caucasians, but because Latinos make up such a huge population of the homeless population, this case's implications, potential resolutions, and/or settlement will, in effect, make decisions about us or without us, and the application to intervene is essentially a form of advocacy for my clients, the Latino Coalition of Los Angeles and Pastor Josue Tiguila because of its

significance.  This case is a case that's going to affect homelessness in Los Angeles County, and we believe that inclusion of Latino Coalition of Los Angeles and Pastor Josue Tiguila will enrich and make a decision more robust, make any settlement more robust, make any agreements within this case more robust because of our involvement in the community.

I would like my clients to be heard, actually, because they are the people in the community, people who were actually dealing with these issues every day, and once we get to the legal discussion, I'll make my points, my client's points, and proceed, but I would have my clients go first before me.

Mr. Claros, would you come to the podium.

MR. CLAROS:  Thank you, Your Honor.  Thank you, not only for this opportunity, but for the intervention.

I currently sit on the Affordable Housing Commission, appointed but our great Mayor, and when I was appointed to that commission, which I'm not hear speaking on behalf of the commission but for identification purposes so you can kind of get a -- a look through my eyes, I let the Mayor's office know I'm not into rubber-stumping stuff.  I'm not a cookie-cutter type of guy.  I found the Latino Coalition of Los Angeles about 11 years ago at about 29, 28 years old

because, as a Central America Latino, we weren't black enough, we weren't Chicano enough, we weren't Mexican enough, I've never been tall enough, and at that time, I wasn't old enough.  And so we've never really ever fit in, and that's how the Latino community has been treated when we talk about census counts, homeless counts. We're not underneath the freeways.  We're hiding up in the hills of Elysian Park.  We are in shacks thinking we're not homeless in converted garages with no smoke detectors.

I've just finished working with the American Red Cross --

JUDGE CARTER:  Hold on.

Armando, can you help me again?  Can you put up, if possible, the river -- the river.

I'm sorry.  I wanted to show you a photo because you're absolutely right about that.

MR. CLAROS:  So we're living in converted garages.  We live in shacks.  We're living in vans.  We don't even know that we're homeless.

When the study came out from LAUSD that talked about the most homeless population when it comes to our youth, it was a Latino case up in Ms. Rivas's district, and she responded tremendous, an assembly member.

JUDGE CARTER:  The study by Ben -- I'm meeting

with him next week, the gentleman over at USC.  I met with Gary last week, but I think I'm meeting with the person who wrote a progress report.

THE SPEAKER:  Yeah.  And, you know, it was -- it was a reality check, and I appreciate the leadership up there.

And so I -- I represented for the American Red Cross in the Antelope Valley, where everyone gets a voucher, just like Vegas, a one-way trip.  Get out of here.  Go become somebody else's problem.  But those are for the lucky people that even get to step up because they're not afraid to get deported.  Because, when you get deported, you get hunted and lynched and set on fire when you go back to the country that our parents left and have been sending our unaccompanied minors down here, and so that is just some of the reality behind numbers, to also talk about our homosexual community, out transgender community, our LGBTQ.  There's Latinos of every walk of life; right?  Those are folks that are scared to be counted, to come outside and let anyone know anything.

That's who we're here to talk about, and when we look up and we found out about this matter on top of the murder of (Indiscernible), the murder of Daniel Hernandez, the fact that Phil Ansell's got to go

because, somehow, that guy figured out how to get himself and his department $1.5 million when every other department in the City and County has either had to furlough, get cuts, or there's been change in leadership, but there was a change in the City; right? That was our general manager for HSIG, and so now there's a new general manager, and I think there's a meet-and-greet that's getting set up for our Affordable Housing Commission.

So we're here to say we're willing to fill that void. We have Afro-Latinos. We have Filipinos. We have African-Americans. We have Koreans, another invisible community, you know, the Korean community that no one wants to talk about, because in our cultures, there's so much pried sometimes to even be out there. We also understand, just like the ratio of black men in jail, when you got such a small black population and such an inflated number of black homeless people, we understand that struggle, just like we understood the struggle that black lives matter when we're protesting side by side, risking our lives during the pandemic.

So we apologize if we were late to the show, but some of the folks that had been part of the show know who we are. We've been in their face, and we've been controversial for a long time unapologetically,

boldly.  But, also, we've worked with them, we've partnered.  That's how I was able to get appointed.  That's how now you see Ingrid, our vice president, and Victor, or board secretary, are between the average age of 20 and 30 years old.

I got a four-year old girl that I got to raise now.  I don't have the time and energy to be out here, but they, but what I can do is give them guidance to learn from my mistakes.  What I can't afford is to sit on the sidelines anymore and just watch this continue to happen.  It's the definition of insanity.  We're looking for a different result with the same Band-Aid effect.  We appreciate you now stepping in so that we can rip the Band-Aid off and we can start healing the trauma that is really out here.

We need -- you started putting in public safety, too.  I appreciate you praising the fire department.  I praise them, too, but the way law enforcement has gone after this -- and there's great officers.  There really are -- but when we're out here in the streets, they've been part of a system that has been criminalized, being houseless and homeless, and that's not right either, but they're not social workers.  They weren't trained.  You're setting up these cops to fail as well, and I'm not talking about you.  I'm

talking about the system.

So when are we going to fix it?  If not now, 2020 is the perfect year to re-imagine, not reform, to re-imagine how we move forward because 2020 -- 2021 is waiting for us, and we can't go back to 2019, and we're never going to be able to go back to normal after COVID, but the civil unrest, that teaches us that we can't go back trying the same old tricks with different figure heads up in front.

Thank you for your time.

MR. CONTRERAS:  Your Honor, I would like MY pastor -- my client, Josue Tiguila, who I met while I was in Skid Row homeless and who mentored me for 12 years.

PASTOR TIGUILA:  Good afternoon, Your Honor.

JUDGE CARTER:  Good afternoon.

PASTOR TIGUILA:  It's really an honor, and peace and grace to you all.  I think everybody here is amazing, being able to just sit down and listen to a lot of -- a lot of good stories, a lot of good reports, numbers.  When -- when you were just listing the numbers, I would say, "Okay.  What am I doing here?" But then I ask the only one that can really help us in very hard turmoils and very difficult situations, and I ask give us guidance and give us a voice, and I really

think he has.  We cannot forget the people who really have a name, the people who really make the difference, the people who really are, you know, dying.  Someone said three -- three persons per day.  I didn't know that, to be honest with you.  I've seen people dying in the street.

But, you know, at the same time, I would like to bring forward the good stories, you know, the good stories when we really make sense, when we really work together.  This is what I received today this afternoon: You're asking all of us to do our part, and not just our part, but the young, if we can, and be able to work together, and I think that makes a big difference.

You know, yes, I've been given the privilege and honor to be here almost 44 years from Central America, from Guatemala.  I didn't know I was coming to the United States.  My mom said, "Hey, we're going to see an aunt."  Okay.  And a week afterwards, we were in Los Angeles.  A week after, I was in church, and First Church of the Nazarene, the first church of 1895, began in Skid Row by Phineas Bresee, our founder.  He started this -- this desire of helping the ones who did not have a voice, the ones who did not have a place at the table, and the ones who were invited to be in the front row, and I think that's basically what we're trying to say

over here.  We want to be, not just at the table, but in the front row of everything.  Maybe, we started in the back, but why not come all the way to the front.

So, yes, there's good stories out here, but at the same time, I was thinking and reminding myself of all the young people that we've been able to connect with, mentor, coach.  And, yes, I'm very proud of Christian Contreras.  He is like one of our sons that we have in many, many years of ministry in the church, but that's a good story.  And then there's many more good stories that I think for us to be able to find and if we work together.

Right now, at First Church of the Nazarene, we had to stop because of our COVID-19 mandates.  We were doing worship in our congregation, and I'm the senior pastor of the congregation.  I'm the lead pastor of all the campus there, but we minister to Latinos, Koreans, north Koreans.  We have right now a north Korean group in our church as well.  And speaking about people not wanting to be seen or known where they're at, they are at First Church of the Nazarene, people who really don't have a voice, but people who are determined to progress and to move forward.

So my desire is for you to really continue your efforts.  We continue lifting you in prayer in this

beautiful group here that is helping you and to just be able to know that God is in the midst of everything you're doing.  Even though we might not think of it, he is.  And the other thing is we need to understand that we do need to have us, not just at the table, but why not in the front of the table, in the front of the pews where our church believes that everybody deserves a place.

So I'm not sure if you have a questions for me, but I just thank you, once again, for having the opportunity to come be in front of you.

JUDGE CARTER:  Pastor, thank you very much.

PASTOR TIGUILA:  Thank you.

JUDGE CARTER:  In this effort, federal courts are very careful about the segregation between the church and the state, the First Amendment.  The problem is that, while this Court is equally respectful of that, I think we need a faith-based community.  I'll repeat that.  We need to have a faith-based community involved in trying to help in this homeless situation, and I think we can keep those lines straight.

Well, Counsel, your thoughts, and then I got a couple thoughts.

MR. CONTRERAS:  Your Honor, as articulated by my clients, the protectable interest of my clients is

two-pronged:  The first prong is Latino Coalition's ability to advocate both coalitions amongst the multi-racial, multi-cultural groups, and in order to advocate for the homeless population, that's Latino Coalition's significant protectable interest.

Pastor Josh's significant protectable interest is his ability to adequately and especially provide direct serves to those homeless individuals which he services in his church, which is located in Westlake -- in the Westlake region of Los Angeles.

JUDGE CARTER:  The church is in Westlake?

PASTOR TIGUILA:  Westlak, Korea Town.

MR. CONTRERAS:  That significant protectable interest will be impaired or impeded if my clients are not included in this action because they won't be able, as a practical matter, to effectively achieve those goals and effectively advocate for the homeless population that they represent throughout Los Angeles County.

And in items of the timeliness showing, F.R. 24, which is the federal rule which allows us to intervene either permissibly or as a right, this action was filed March, 2020.  We're now August.  That's roughly four months later, and, of course, we're at this stage of the proceedings with the amount of time that

passed as well as any prejudice to any parties.

As far as the prejudice to any of the parties currently in the action, the opposite prejudice will occur.  Like I mentioned earlier, this is going to be enriching and there's going to be a more robust discussion if we are included, if my clients are included in this action.

And, finally, the fourth showing under F.R. 24, Federal Rules of Civil procedure, the parties currently, in particular, Cangress, Legal Aid, and Catholic Worker, they're great advocates.  There's nothing wrong with what they're doing.  However, those parties do not fully represent the interest of Latinos and the interest of Los Angeles County.

While I love Skid Row and lived in Skid Row and I live right next to it now, what I'm reading from the records and gleaning from the records today is that a lot of the focus is on Skid Row, and Skid Row is the epicenter of homelessness in Los Angeles County, but homelessness permeates throughout the entire county, and Latinos are also homeless throughout Los Angeles County, not just Skid Row.  And for that reason, we believe that the current parties are not adequately representing the interest that we've articulated, and for that reason, we're asking that Court to grant us intervention into

this action.  Thank you.

JUDGE CARTER:  Thank you.

General.

MR. PAGE:  After listening to the valid position of -- of the Latino Coalition of Los Angeles group, obviously, I feel compelled to speak when they speak about Skid Row.

For those of you who don't know me, I'm General Jeff.  I spoke earlier today.  I'm a Skid Row resident and community leader and a Skid Row community activist, and I have a couple concerns:  One, this matter that's already before you is not about race.  If you're going to have a Latino coalition, then you have to have a black coalition, you got a have an Asian coalition, you got to have a Caucasian coalition, and indigenous people coalition, and all of a sudden, if anyone is excluded, any decisions that are made by you are then potentially subjected to discrimination, which takes us far, far away from what this is about.

During the speaker's presentation when they talk about representing Latinos in the foothills, I heard you speak earlier today, Your Honor, and said this -- this matter is about the overpasses an underpasses where your jurisdiction is focused on.

And so while what they're saying is valid in

terms of homelessness and Latinos suffering from homelessness as well as the other nationalities countywide, to me it seems very suited that they filed their own lawsuit and focus on their actual causes. What we -- what we speak about in Skid Row in terms of this matter is a majority African-American community that is well documented.  When we talk about the freeway underpasses from CD 8, CD 9, CD 10, CD 14, the majority is African-American.

We don't need to get into this battle about black versus brown or this race versus that race.  This issue is about homelessness.  And -- and as far as I understand, it's not about homelessness countywide. It's only a specific, limited scope, and if it goes beyond that, I wish you would to speak to that and clarify exactly where this is.  And so if you are going to include these folks, then I don't know if there's a black lives matter equivalent to a black coalition that specifically focuses on black homelessness.  But, you know, I'm the chair of the Skid Row Neighborhood Council Formation Committee, and we have all nationalities in our organization.  They, you know, is mentioned Cangress, which is short for LACAN, the Los Angeles Community Action Network, and there are different nationalities including Latinos also in that group.  And

so it's not like this is an entire exclusion of the Latino community, but it's quite alarming to set this dangerous precedent if you just focus on including a group that's just Latino focused -- Latino-based focus. I'm concerned. I'm waiting to hear your clarification. Thank you.

JUDGE CARTER: Okay. Thank you.

MR. CONTRERAS: Your Honor, the points that we were raising is not based on legal racial grounds. We provided Latino context just to provide context as to what is really affecting homelessness in Los Angeles County, but we're not saying that, because we're Latinos, that we should be included. We're saying that it's a racial justice issue and that it affects certain populations differently, and for that reason, our party should be included -- our clients should be included because we add to the discussion. We can enrich it. But my papers, the application that I filed, does not articulate a legal ground based on race. I did provide a background, but the protected interest in my argument is not based on race, and I will emphasize that I am from Justice X. We are a black and brown coalition of black and brown lawyers.

So I'll have my clients speak now. Thank you, Your Honor.

JUDGE CARTER:  Thank you.

MR. CLAROS:  I echo with Christian on what our attorney just talked about because I just finished meeting with the first City Council president that's African-American, and he sent her blessing this morning, and I know that you've had an opportunity to meet with him.  I also know that you've been able to meet with Council Member Elect Kevin de Leon.  We've talked about Council Member Curren Price's district, and the 9th district, and the 10th district, and we look at numbers. The majority of their population, although they're African-American officials, when I'm talking about population, are Latinos.

And, again I want to just remind General Jeff, whether it's in downtown or in his districts, that we're not being counted or we're invisible because we're afraid of ICE; right?  And so as much as we're -- and, by no means, do I want my words to be misused that we're over here race painting or putting one over the other. What we're saying is we all want to be included, and we should include indigenous people, we should include Latinos, and everyone else who's been hurt by this because, like someone said earlier, we're all God's people, and we got to figure this out together because certain clicks and groups have been trying to do this

unsuccessfully for a very long time.

And so I just want to remind you, Judge, that I think that that's why you've even had to come down here, sir.  It hasn't worked so far.  You had to come down from your bench and walk these streets with a multi-cultural group that I think looks like the city; right?  And now two groups, black and brown are both asking you to let us be at the table, not even so much a decisionmaking table, the solution table.

JUDGE CARTER:  Thank you.

County.

MR. MILLER:  Thank you, Your Honor.  I agree with what both sides said.  This is a Skid Row lawsuit. Skid Row is in the city of L.A.  Skid Row is the focal point of this whole lawsuit, and the County certainly cares about everybody in the County and wants to take care of everybody in the County.

As far as Skid Row is concerned, it's in the City, and I would submit it to the Court to do whatever the Court thinks is the appropriate thing to do here. The County doesn't favor one race or another race.  We would submit on that basis.

JUDGE CARTER:  Okay.  Thank you.

Let me think about this over the weekend.

I'm sorry.  I didn't see you.  In fact, speak

from there if you like as long as I can see you.

UNIDENTIFIED SPEAKER:  I just want to clarify because there's been a discussion that this is Skid Row focused, this is a Skid Row lawsuit.  This is not a Skid Row lawsuit.  We've been very clear from the beginning that this affects the Angelenos, both housed and unhoused, throughout Los Angeles.  So we have members from all over the City and from all over the County, and so we want to be very clear that -- that this is not just Skid Row focused, and I don't want -- I don't want that to be out there.

We can talk more about representation and whether we need more robust conversations since they're quite robust enough, and I'm sure Judge Birotte can attest to that during mediation.  I just want to leave that to the Court on what it wants to do about it, and I just want the record to be clear this is not just about Skid Row.  This is about all of Los Angeles.

MR. MILLER:  When I said this case was about Skid Row, I said it based on my reading of the Complaint.  Every single one of the Plaintiffs in this Complaint is located in downtown L.A., Skid Row, and they're complaining about issues and allegations and things that supposedly occurred in Skid Row.  That's the basis of my statement.

JUDGE CARTER: Well, then give me a little bit of time. I've been struggling with this, and I have to tell you, historically, I've tried to stay away from racial groups up to this point. I want to re-think that in light of your argument today, which is why I invited you in, to be challenged because I wanted to hear your arguments. There's been excellent representation across the board, and let me think about that this weekend.

We're done with the arguments now. I've been courteous in giving all you folks time. In other words, I wanted you to be heard just as I wanted Skid Row to be heard.

I want to thank all of you. It's been a pleasure to be here today.

(Proceedings concluded.)

--oOo--

**C E R T I F I C A T E**


I hereby certify that, pursuant to Title 28, Section 753, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Certified on August 31, 2020.


/s/ Katherine M. Stride
KATHERINE M. STRIDE, CSR, RPR
Court Reporter
License No. 11773