MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Assistant City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email: Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**DEFENDANT CITY OF LOS ANGELES' STATUS REPORT FOR SEPTEMBER 17, 2020 STATUS CONFERENCE**<br><br>**[Responsive to Dkt. Nos. 172, 174 and 175]**<br><br>**Status Conference: September 17, 2020**<br>**Time: 10:00 a.m.**<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

Defendant CITY OF LOS ANGELES ("the City") provides the following report in advance of the September 17, 2020 status conference. This report also responds to Plaintiffs' status report, and notice of errata to status report, concerning the projected costs of pallet shelter (or tiny home) interventions for people experiencing homelessness (Dkt. Numbers 172 and 174), and the Court's Order inviting the City to respond to Plaintiffs' concerns (Dkt. No. 175).

The City is working diligently to establish a variety of different types of shelter opportunities as quickly as possible, with each intervention being selected because it is the most appropriate to serve the people experiencing homelessness in each particular location. Significantly, the tiny home communities, which currently total 525 beds in development, are only one type of intervention proposed by the City's Council Districts ("CDs"). In addition to tiny homes, the interventions in development include permanent supportive housing, A Bridge Homes, other interim housing, and safe parking. In addition to the beds already in development, the City is also planning to utilize rapid rehousing to take advantage of available rental properties currently on the market, as well as leasing private sites and acquiring hotels and/or motels. The City shares Plaintiffs' desire to create housing opportunities in the most efficient and cost-effective ways possible in order to maximize the number of people who will be served by those opportunities, while attempting to get persons experiencing homelessness sheltered as quickly as possible.

The City appreciates Plaintiffs' concerns about the estimated cost of the four tiny home interventions for people experiencing homelessness that are in development in three council districts in the City (Council Districts 2, 3 and 15). However, Plaintiffs' report reflects a fundamental lack of understanding of the costs to create the necessary infrastructure to develop and operate humane tiny home communities designed to serve up to 10 individuals per bed over the course of five years in a time-sensitive manner. Plaintiffs' report also fails to appreciate the numerous ways in which the City has already reduced costs for these projects, and makes comparisons to the costs incurred by

1

DEFENDANT CITY OF LOS ANGELES' STATUS REPORT FOR SEPTEMBER 17, 2020 STATUS CONFERENCE
[RESPONSIVE TO DKT NOS. 172, 174 AND 175]

other cities, without providing any information as to how those costs were calculated or what they were based on, so there is no way for this Court to know if the comparisons are accurate or fair.

The communities being developed in the City are not only for short-term emergency shelter, but are being developed to provide interim housing for three to five years of use, if needed, to serve people experiencing homelessness. The City expects each bed will service and house multiple people over the three-to-five-year period. When appropriately accounting for the number of individuals each bed will serve over the five years, the per-bed rate is *not* $41,932.83, as Plaintiffs suggest, but rather $4,193. The tiny homes are intended to provide humane housing with dignity, not merely to warehouse persons experiencing homelessness. As such, the City is committed to developing units that are safe, hygienic, and capable of providing services for the residents' basic daily needs.

- **The City is committed to reducing costs while building humane interventions as quickly as possible**

First, it is important to keep in mind Plaintiffs are relying on rough order of magnitude documents ("ROMS") which merely provide estimates of the costs. The City has and will continue to look for ways to minimize or reduce actual expenditures, but not at the expense of safety and hygiene, or of greater overall costs.

The City has already taken a number of steps to minimize and reduce costs of the tiny home communities, and it continues to explore ways to further reduce the estimated costs. For example, far from the "burdensome process" that Plaintiffs assume the City has established for developing these interventions (Plaintiffs' Report, Dkt. Nos. 172 and 174, p. 3), the City is taking advantage of relaxed codes for these shelters, as authorized by Los Angeles Municipal Code section 91.8605[1], in order to reduce costs and the time

---

[1] This provision was passed in 2018 in response to the City's declaration of a shelter crisis.

2

DEFENDANT CITY OF LOS ANGELES' STATUS REPORT FOR SEPTEMBER 17, 2020 STATUS CONFERENCE
[RESPONSIVE TO DKT NOS. 172, 174 AND 175]

it will take to bring these beds online.  Specifically, the City is not applying Title 24 of the California Building Standards Code (an energy code) or the Green Building Code (mandating use of reusable materials).  For these tiny homes, the City further does not have to comply with storm water runoff treatment requirements, or minimum parking rules (although some parking is provided at the request of the service provider).  It further is allowed to reduce the ratio of residents to restrooms/bathing to 15:1 (the ratio under the code is 8:1).  When feasible, the Department of Water & Power has permitted less-expensive overhead power delivery to these sites (for example, to both sites in Council District 2 and the Vanowen site in Council District 3), rather than requiring the more costly installation of an underground power source.  For some of the tiny home projects, the City is spacing each pallet 6 feet apart consistent with the LAFD's recommendation regarding a safe and compliant alternative to the normal minimum requirement of 10 feet spacing.  While this alternative does necessitate the inclusion and additional cost of certain items to ensure safety, including additional fire extinguishers, integrated smoke alarms and a fire watch, it allows the City to offer shelter to more people.

Moreover, because the City wants the interventions open as quickly as possible, it has taken several steps to expedite their development, which may have resulted in some increased costs.  For example, the City has expedited certain contracts, including for the pallet shelters and hygiene trailers, by foregoing the competitive bidding process.  While competitive bidding may possibly have discovered a contractor with a lower bid, that was not a certainty, and going through a competitive bid process would certainly have lengthened the time necessary to bring these tiny homes online.  The possible, yet uncertain, cost savings was outweighed by the necessity to work efficiently and rapidly.  In addition, the City decided to utilize electricity at the sites, rather than a combination of electricity and gas, in the interest of expediency to avoid delay resulting from requiring another entity outside the City (Southern California Gas) to install and provide services at the sites.  Furthermore, in the interest of speeding up the timeline for opening

the tiny home sites, the City has created standard plans for anchoring the tiny homes and for emergency access lanes, which permits the City to eliminate the time to do site-specific soil boring tests.

The cost estimates also factor in the anticipated use of these tiny homes for up to five years. Given that these tiny homes are expected to last years—and not just a very short period of time—it is more efficient to "front load" certain costs to minimize the City ultimately paying higher costs in the long-term for maintenance, upkeep, improper use, and human error. Indeed, facilities can be constructed at less costly amounts (such as by using temporary portable toilets and mobile laundry), but this would only result in higher maintenance costs—and thus higher overall costs—over the lifetime of the facilities.

- **Plaintiffs fail to show how the pallet shelter projects in other cities are comparable**

Even with all of the ways the City has found to reduce costs for these tiny home projects, the cost—as Plaintiffs point out—still appears to be higher "on paper" than the costs for some tiny home developments in other cities. However, Plaintiffs' representations regarding the "per-bed" rates do not provide any details regarding what those "per-bed" rates include, how they were calculated, or the life-cycle costs of the beds in other cities. Plaintiffs also provide no analysis to even suggest that these other projects are comparable to the City's. Indeed, there are a number of ways in which the projects do *not* appear to be comparable to the City's. First, most of the other projects pointed out by Plaintiffs were smaller projects designed to house far fewer individuals than any of the City's tiny home communities will house. Importantly, the sites relied on by Plaintiffs have a smaller number of beds. The Oahu private farmhouse has a maximum capacity of seven beds, Riverside has a maximum capacity of sixty beds, and Sonoma has a maximum capacity of seventy-four beds. Figure A, Dkt. Nos. 172 and 174, p. 4. Yet the number of beds the City is developing at the four tiny home community sites are 200 and 75 beds, respectively, in CD2, 150 beds in CD 15, and 100

4

1  beds in CD 3.  *See* Dkt. 174, Ex. B.  The number of beds (persons being housed) impact
2  the need for greater power, sewer and water—which are the "bigger ticket" items—and
3  the greater infrastructure results in greater costs.
4      Second, the physical locations Plaintiffs analogize to in Riverside, Sonoma and
5  Oahu are not comparable.  As depicted in Figure A of Plaintiffs' status report (Dkt. Nos.
6  172 and 174, p. 4), these sites were all built on a parking lot (Sonoma), a parking lot/an
7  existing shelter (Riverside), and a private farm (Oahu).  Plaintiffs note the site on the
8  Oahu private farm used an older, cheaper model and much work on the infrastructure
9  was donated by local partners.  Dkt. Nos. 172 and 174, p. 3.  What Plaintiffs
10 conspicuously omit was the residents of those pallet shelters each partook in clearing the
11 land and building their own shelter.  They are also all are required to pay rent.  *See*
12 https://www.hawaiinewsnow.com/2020/04/01/amid-pandemic-homeless-people-move-
13 into-states-first-kauhale-village/.
14     While Plaintiffs propose the use of volunteer or reduced-cost labor for the four
15 City sites (perhaps as a result of what occurred in Oahu), Plaintiffs fail to provide any
16 details substantiating their proposal.  Among other things, Plaintiffs have not provided
17 any information as to volunteers that have offered their services to the City.  Moreover,
18 various considerations come into play when providing the labor necessary to create these
19 tiny home communities, including OSHA, wage and hour provisions, and requirements
20 under the City Charter.
21     Third, it is expected that a private farm or an existing shelter would already have
22 basic infrastructure in place, including electricity.  From the news video on the website
23 regarding the Oahu private farm, it appears porta potties are used, and the tiny homes are
24 placed on concrete blocks.  *See* https://www.hawaiinewsnow.com/2020/04/01/amid-
25 pandemic-homeless-people-move-into-states-first-kauhale-village/.  It is unknown if the
26 shelters in the other cities are anchored.
27     Finally, for the 525 beds funded to date, the total estimated cost is $22,014,735,
28 resulting in a cost per bed of $41,933.  However, the City anticipates that multiple

5

people will be served by each bed. Based on turnover data that LAHSA maintains, the City expects each bed to serve as a temporary shelter for an individual for 6 months, after which the City expects that individual to be placed in a longer-term solution, such as Permanent Supportive Housing, allowing that bed to turnover and provide shelter for a new individual. At this rate, assuming 10 people are served per bed over the 5-year period, the capital cost per bed would total $4,193. This amount is less than the majority of the projects cited by Plaintiffs in Figure A of their report. Dkt. Nos. 172 & 174, p.4.

- **Plaintiffs fail to understand the costs involved to create the necessary infrastructure for the tiny homes**

The City is designing and building tiny homes deliberately, saving money where possible but also ensuring that the tiny homes will provide shelter for as many individuals as possible with safety and dignity, and that the City does not fall into the trap of seeking cheaper up-front costs that only lead to even greater costs down the line. Plaintiffs' report seems to underestimate or lack an appreciation for some of the necessary costs involved in creating tiny homes within that framework.

In order to provide safe and hygienic shelters that can last up to five years, the City needs to ensure basic health and safety provisions are included in the tiny home communities. As designed, the tiny home communities provide services people need, including laundry facilities, showers, fire safety, and sufficient power. As referenced above, the infrastructure for showers, toilets, sinks, and laundry facilities necessitates construction of long sewer lines, which adds to the "front end" cost of the projects. Laundry facilities require a higher burden on water and sewage use, and this increased demand increases the cost. Similarly, while portable toilets have low up-front construction costs (no sewer hook-up, no underground piping), they have higher ongoing service costs because they require frequent pumping of the units and regular cleaning and maintenance, on top of addressing concerns caused by potential overflow which poses a high risk to the health and safety of residents. For a short-term duration that

6

DEFENDANT CITY OF LOS ANGELES' STATUS REPORT FOR SEPTEMBER 17, 2020 STATUS CONFERENCE
[RESPONSIVE TO DKT NOS. 172, 174 AND 175]

might work, but for a solution meant to serve as many people as possible for up to five years, the City believes its approach is the best and the most cost effective.

Additionally, with the 6 feet spacing between tiny homes, for fire protection reasons, certain items are necessary, including additional fire extinguishers, integrated smoke alarms and fire watch, all of which are costs that the City "front loads" into the ROMs relied on by Plaintiffs. The hygiene and fire safety precautions also implicate the utility costs. Given the need for a fire line, and the construction of a fire hydrant at least on one site, the costs are higher due to the increased water pressure needed for fire suppression purposes. The DWP charges the proportional cost for the services provided consistent with its legal and constitutional requirements, including Propositions 26 and 218.

Furthermore, the vendor's design of the tiny homes increases the power costs. The tiny homes do not contain a power-switch and their design are based on worst-case power usage, meaning the air-conditioner and the heater are running at the same time. This design results in a draw of about 24 amps per tiny home. Because there is not a 24-amp circuit breaker, the City has to use the next size available, 30-amp. If a power switch was added by the vendor, the City could design for a 20-amp load per tiny home. The extra power currently required by the design results in a higher cost, which is exacerbated given the number of pallets that are being placed at each site. For example, based on a 30-amp load, and a design of 33 tiny homes at the Chandler site in CD2, the power demand is 391 amps. The City then needs to order a 400 amp service, which requires a bigger transformer, and a greater cost.

Moreover, given the scarcity of available sites in Los Angeles, and particularly within certain Council Districts, the sites being utilized for the tiny home projects do not have existing infrastructure nor are they currently sited for tiny homes. The City must therefore invest in not only bringing sewer and utility lines to the sites, but also in grading. For example, the Chandler site is currently a dirt lot, and the Alexandrea Park

7

DEFENDANT CITY OF LOS ANGELES' STATUS REPORT FOR SEPTEMBER 17, 2020 STATUS CONFERENCE
[RESPONSIVE TO DKT NOS. 172, 174 AND 175]

location is a portion of a recreation and parks site.[2] Thus, the Chandler and Alexandrea Park sites required extensive grading, both to make the site level and for drainage. Driveways are needed to be added for emergency egress, at least one fire hydrant needed to be placed, pedestrian egress provisions constructed, and the City needed to ensure compliance with various laws, rules and regulations, including state fire codes.

Instead of merely "warehousing" individuals in these tiny homes, the City feels it is important to invest in items to make the sites are more livable and dignified for the people experiencing homelessness, including grading for drainage so the tiny homes will not flood during a storm; providing compacted walkways to reduce mud; landscaping; providing storage bins for each resident; providing Wi-Fi; and creating attractive open space such as painting the asphalt, painting the tiny homes, staggering the placement of the tiny homes, and providing areas for pets.

Taking into account all of the above considerations, the City is designing and establishing all of the interventions in the Council District plans, including these tiny home communities, in the most cost-effective way possible.

DATED: September 15, 2020

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Asst City Attorney
SCOTT MARCUS, Senior Assistant City Attorney
GABRIEL S. DERMER, Assistant City Attorney
ARLENE N. HOANG, Deputy City Attorney
JESSICA MARIANI, Deputy City Attorney

By: /s/_____
Arlene N. Hoang, Deputy City Attorney
Counsel for Defendant City of Los Angeles

---

[2] Compare that to the Riverside, Sonoma, and Tacoma sites, which, according to the limited information Plaintiffs provided, appear to have been placed on parking lots, indicating the land was likely already graded with asphalt overlay.