SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive,<br><br>Defendants. | Case No. 2:20-cv-02291 DOC-KES<br><br>**PLAINTIFFS' STATUS REPORT** |

**TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Plaintiffs hereby submit the following status report to address three separate issues: 1) Responding to Intervenors' Request for Clarification and Status Conference; 2) Addressing the high cost of pallet shelter programs in Los Angeles, and 3) Requesting an Accounting of funds remaining in the County's

1
PLAINTIFFS' STATUS REPORT

Mental Health Services Act ("MHSA") fund and how those funds might be utilized for the increased shelter of persons experiencing homelessness that also require mental health services.

Response to Intervenors' Request for Clarification and Status Conference

On Friday, October 16, 2020 Intervenors collectively filed a Request for Clarification and Status Conference which contained many statements Plaintiffs do not agree with, and the record must be corrected.

**Agreement Between City and County**

On June 17, 2020 Defendants City of Los Angeles and County of Los Angeles jointly announced an agreement ("Agreement") between the two parties which ultimately agreed to provide 6,700 beds within a specified time frame, and services for five years thereafter. (Docket 134.) Neither Plaintiffs nor Intervenors were parties to that Agreement. The Agreement specified that the Binding Term Sheet is "subject to court approval, monitoring, and enforcement." (Docket 137.) The Court approved the binding term sheet and vacated its preliminary injunction with the requirement that "The Court retains jurisdiction to monitor and enforce the terms of the Binding Term Sheet." (Docket 138.)

In its role monitoring and enforcing the terms of the Agreement, the Court has been holding monthly hearings to oversee the progress of each council district in achieving its stated goal of providing a certain number of beds for persons experiencing homelessness over, under, and near freeways. The Court has also been meeting with and talking with individual council members, county supervisors, plaintiffs, and intervenors separately, under the parties' collective agreement to waive any objections to *ex parte* communications. That the Court is meeting with members and observing the implementation of the agreement directly cannot possibly convert that supervision into a "proceeding."

**Council District 3**

Plaintiffs happened to find out about the "operation" in Council District 3 on October 12, 2020, the day before it was to take place and asked to attend to see how it was being done.[1] To Plaintiffs' knowledge, the Court did not invite any counsel to attend. Counsel for Defendant County of Los Angeles was not present. No "proceedings" took place, no hearings were held, and no orders were given to Plaintiffs knowledge. Nothing was "shielded from public disclosure"; the entire process was outdoors and open to the public. The City cannot possibly be expected to give advance notice of every single similar "operation" that may take place under this or any other agreement; the effect would be a massive delay and slow-down of progress that should be celebrated rather than criticized.

This lawsuit has always been about providing a balanced solution that benefits both the unhoused and housed communities. Anything that gets people off the street to a safe environment with beds and services is something that should be applauded not criticized, attacked, or forestalled. Requiring relocation upon offering beds and services strikes that balance and saves lives.

**Discussions Regarding Implementation of Agreement**

Intervenors' suggestion that they have been left out of the conversations surrounding implementation of the agreement is also without merit. The Court has made it abundantly clear during court proceedings that it expects individuals to be humanely relocated away from freeways as part of its agreement to

---

[1] The "operation" to which Intervenors refer is a concerted effort to offer beds and services to individuals experiencing homelessness in Council District 3 that have been living under, over, and within 500 feet of freeways. To Plaintiffs knowledge the effort is designed to continue for two (2) weeks at which point individuals will be asked to relocate away from the freeways for health and safety reasons.

Intervenors are correct that Counsel for Plaintiffs notified Intervenors' counsel as a courtesy, after seeing a copy of the notices provided. Plaintiffs' counsel was not given advance notice nor was advance notice expected nor required by Court or any other party.

withdraw the preliminary injunction. That such a policy is now being implemented in districts where beds and services may now be provided is not only expected, but it was the subject of discussion during September's status conference.

Importantly, for months now, the City, County, Plaintiffs, and Intervenors have been involved in settlement discussions, several of which surrounded the implementation of an agreement that would involve not just individuals nearing freeways, but throughout Los Angeles. Matthew Umhofer, counsel for Plaintiffs, announced in open court during September's status conference that the City and Plaintiffs have reached an agreement in principle (Transcript of September 17, 2020 hearing at 166:5-14). That agreement contains terms that are fully consistent with the notices provided by the City in Council District 3. And Intervenors were involved directly in the discussions that led to that agreement in principle and have had a copy of the terms of the agreement in principle for months.

In the City's Status Report, dated June 19, 2020 (Docket 140), the City stated:

> After sufficient and appropriate notice and outreach is provided, the City will provide a shelter opportunity to individuals experiencing homelessness who are currently camped within 500 feet of freeway overpasses, underpasses, and ramps.
>
> People who accept the offer of shelter will be appropriately screened upon intake by qualified staff for communicable diseases, including COVID-19, and other health conditions.
>
> If, during the humane relocation process, a social worker, mental health worker, law enforcement officer, or other

qualified personnel encounters an individual exhibiting COVID-19 symptoms, such individual will be referred to an appropriate testing and quarantine/isolation process.

People who decline the offer of shelter will be ordered to relocate at least 500 feet away from a freeway overpass, underpass, or ramp. After the relocation of all persons camping within 500 feet of a freeway overpass, underpass, or ramp within a Council District, the City will, if needed, enforce its laws, including its anti-camping laws, within 500 feet of such overpasses, underpasses, and ramps located in that Council District, consistent with *Martin v. City of Boise,* on an ongoing basis to ensure that no person can return to camp or reside in that area. The City expects the State and other municipal entities may similarly enforce their laws within 500 feet of freeway overpasses, underpasses, and ramps on property under their respective jurisdictions.

Any suggestion by the intervenors that they were unaware such a process was going to take place is disingenuous. The suggestion that the Court is somehow acting out of bounds by doing exactly what it is required to do and what each party has asked it to do—supervise the implementation of the City and County's Agreement—is without merit. And any suggestion that because the Court is facilitating the supervision by meeting council members in the field and actually observing the process outside of the sterile environment of the federal courthouse (or city council chambers) is similarly without merit.

Interim Shelter Programs

As always, Plaintiffs applaud and support the swift action being seen in numerous council districts throughout the City to fulfill the defendants' joint

obligation and agreement to provide 6000 beds for persons experiencing homelessness (PEH) by April 2021 and an additional 700 beds in the months thereafter (though some districts are decidedly moving quicker than others). Plaintiffs recognize the groundbreaking agreements between the City and County, most recently demonstrated by the joint MOU filed October 13, 2020, and congratulate Defendants on that achievement. Plaintiffs brought this suit in large part to prompt such action. However, Plaintiffs also brought this suit to address the massive waste of public funds that are being misspent in what is increasingly known as the Homeless Industrial Complex. This is particularly true given the dwindling resources of the City and County, and the unique opportunities to utilize federal and state resources to address the homelessness crisis (exacerbated by the Covid-19 pandemic).

The average Proposition HHH (permanent supportive housing) per unit cost is now up to $549,608 with some units of *small individual apartments* costing over $700,000, far more than market price.[2] A recent A Bridge Home project cost nearly $7,100,000 for 100 beds or $71,000 per bed.[3]

The recently proposed Pallet Shelter programs, created pursuant to the City and County MOU, are being constructed at a cost of $39,075 per bed, not including services.[4] This stands in sharp contrast to the reasonably low cost of

---

[2] Ron Galperin, LA Controller, *Meeting the Moment: an Action Plan to Advance Prop. HHH* (Sept. 9, 2020), https://lacontroller.org/audits-and-reports/hhhactionplan/#:~:text=HHH%20Projects%20Recommendations-,Introduction,other%20facilities%2C%20including%20interim%20housing.

[3] Allison B. Cohen, *Inside Los Feliz's Bridge Home Shelter*, Los Feliz Ledger (October 1, 2020), https://www.losfelizledger.com/inside-los-felizs-bridge-home-shelter/#:~:text=The%20Los%20Feliz%20structure%20cost,today%20is%20about%20half%20full.

[4] *See* City's Quarterly MOU Status Report dated October 15, 2020, Exhibit C [Docket 186-3, p.3] and Exhibit D [Docket 186-4] p. 2. As of Plaintiffs' last status report, dated September 7, 2020, the City has included a

the Pallet shelters themselves ($8,332 per shelter i.e. $4,166 per bed), and the low cost other cities have managed with the same structures – notably $8,252 per bed in Riverside, CA and $14,875 per bed in Sonoma.[5]

In response to Plaintiffs' concerns, the City filed a status report explaining the cost disparity claiming other projects are not comparable because they were smaller projects (Dkt. 176, p. 5), utilized donated labor (Dkt 176 p. 6), and multiple people would be served per bed, reducing the total cost (Dkt 176, p. 6-7). However, Plaintiffs have identified a *per-bed* rate, so size of the project should not matter, the City has failed to demonstrate why volunteer labor could not be utilized in this project,[6] and why the multiple-people-per-bed theory wouldn't be equally applicable to the other identified projects as well.[7] The City also claims that Plaintiffs fail to understand the costs involved to create infrastructure for tiny homes (p. 7), including the vendor's design which draws 24 amps per tiny home. However, it is crucial to point out that this amperage usage *only happens when both the air conditioner and heater are running on full blast at the same time*. This should only occur very rarely and would be easily

---

second project in CD3 and apparently withdrawn a project in CD15, causing a slight cost adjustment.

[5] Attached as Exhibit A is a copy of the comparison chart previously provided in Docket 174.

[6] For some reason Defendant City blames Plaintiffs for not proposing this idea when Plaintiffs were never consulted or otherwise notified of these projects ahead of time. Regardless Plaintiffs refer the City to a number of ways volunteer labor could be utilized, including Construction for Change (www.constructionforchange.org), Habitat for Humanity (www.habitat.org), or local volunteer organizations through churches, United Way, or other focused organizations throughout Los Angeles which could and would provide basic unskilled labor for tasks such as painting and landscaping. Plaintiffs are happy to facilitate if the City would consider these options.

[7] If the City assumes LA's Pallet shelters can provide beds for 10 people, the parties may also assume the same for projects in Riverside, Sonoma, and beyond; therefore the cost of those projects must also be divided by 10, still making the LA projects exorbitantly expensive.

remedied by simply turning the breaker back on and admonishing the resident not to run both at the same time; utilizing a 30-amp breaker for each shelter is costly and unnecessary. To Plaintiffs knowledge, no other Pallet community utilizes 30-amp breakers.

To properly address City's arguments supporting the excessive costs, Plaintiffs requested assistance from a neutral third party, familiar with the shelter-building process but unconnected to the City of LA or Pallet Shelter directly. RPM Teams is a design-build firm specializing in using pre-engineered, pre-fabricated, and modular construction building products. They have extensive experience leading the construction of homeless shelters throughout the west coast, including San Francisco, Huntington Beach, Stockton, Kern County, Fresno, Salinas, Sacramento, and Reno. Plaintiffs provided RPM with a copy of the City's Rough Order of Magnitude for the Alexandria Park and the design specifications, as obtained through a public records request. A copy of that Rough Order of Magnitude (ROM) is attached hereto as Exhibit B. RPM's comments are attached hereto as Exhibit C. The important points from RPM's comments are included below:

> Domestic water line, fire water line, and sewer water lines account for $1,884,000 – this is flagrant. Facts about the site: there are not 200 connections, the restroom facilities are rather consolidated and concentrated, and a single "hot tap" maxes out at $125,000, the conclusion is there must be money going elsewhere. Creative joint trenching and efficient space planning to place restroom facilities closer to utility sources would cut the $1.8mm number in half.
> 
> $837,000 and $465,000 devoted to general conditions and contingencies totals $1,302,000, representing 20% of the

8
PLAINTIFFS' STATUS REPORT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

construction value. 20% is egregious and does not match the industry standard for fee's on public projects.

$186,000 for 30% bridging documents is not an effective use of funds given the use of pre-engineered and pre-fabricated building products - manufacturers produce their own drawings. At $160/hr, $186,000 represents 1,162 hours, or 48 working days for bridging documents. Typically, single line drawings and written reports will suffice for bridging documents for emergency shelter projects because the design is executed by the contractor or design-build entity. 3D renderings and landscape drawings are not required for bridge docs.

$326,00 for contractor design is three times more than the industry standard for architectural and engineering services. RPM produced design documents for permits for City of Huntington Beach's 175 bed emergency shelter for under $40,000. Kern County's design documents for their 150 bed Navigation Center was $77,500. City of Sacramento 100 bed XB Center was $98,250.

Revisiting the bed/individual breakdown for the Alexandria site; these efforts run $42,000 per individual. Kern County's 150 bed CapK Navigation Center was $20,000 per individual.

While RPM recommends building out individual rooms into a shell with lifetime materials, Plaintiffs note that Pallet Shelters have been highly successful in other communities and may be offered at lower prices than traditional shelters precisely because of their temporary nature. The high cost of engineering and

inability or unwillingness to trouble-shoot to achieve lower costs, including using volunteer labor where possible, lower amp-breakers or utilizing solar power (particularly donated grants), and permanent utility and sewer connections for a temporary project combined have driven costs far higher than any other community utilizing the same structures.

The ultimate concern with the high cost of these projects is the implication on future projects, and the ability of City and County to support significant projects moving forward. If City is paying such a high cost to shelter a limited number of persons, when basic cost-control measures could be taken to significantly reduce expenditures, Plaintiffs are concerned those expenditures threaten to derail the higher goal of providing tens of thousands more beds. In other words, the City cannot spend exorbitant sums now and plead poverty later.

At this juncture, Plaintiffs understand the projects are moving forward and it is not Plaintiffs intention to derail or delay any projects which provide welcome relief to those who desperately need it; however on future projects Plaintiffs strongly suggestion more attention to cost-saving measures that may be utilized to prevent such significant expenditures which threaten to leave too many on the streets.

Accounting of Mental Health Services Act Account

The mental health crisis amongst persons experiencing homelessness in Los Angeles has been well documented (and anecdotally observed by most Angelenos) over the last several years. While some of the blame lands on the state and federal governments, much of the misfortune has been permitted by the County's insufficient infrastructure, facilities, and personnel. Los Angeles County has approximately half of the recommended IMD (institute for mental disease) beds required for a healthy community. During the "operation" in Council District 3 on October 13, only two (2) individuals from the Department

of Mental Health were present, a far insufficient number to address the crises on the street.

California's Mental Health Services Act, known as the "millionaires tax" was passed in 2004 to increase tax revenue to counties to care for those with serious mental illness. As of early 2020, approximately $1 billion MHSA money remained in Los Angeles County coffers unspent, while thousands of mentally ill remain in crisis on the streets. To Plaintiffs' knowledge, some of those funds have since been allocated, but the ultimate benefit to those who are in crisis is questionable. Moreover, it appears several hundred million dollars remain in the County's MHSA fund which could go to provide much-needed relief for those suffering in the streets. Plaintiffs request an accounting of MHSA funds in 2020, including the amount currently unspent, and how those funds may be spent on shelter or housing for homeless individuals suffering from mental illness.

Respectfully submitted,

Dated: October 20, 2020

*/s/ Elizabeth A. Mitchell*
SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)

*Attorneys for Plaintiffs*

# Exhibit A

| Project | City | # of 64s | # of 100s | Total Beds | Location Type | Shelter Cost | Site Infrastructure | Per-Shelter cost | Per-Bed cost |
|---|---|---|---|---|---|---|---|---|---|
| Housing Matters | Santa Cruz, CA | 30 | 0 | 32 | Parking Lot / Existing Shelter | $80,801 | $0 | $2,693 | $2,525 |
| Poverello House | Fresno, CA | 0 | 30 | 120 | Unk | $299,568 | $55,000 | $11,819 | $2,955 |
| City of Santa Cruz | Santa Cruz, CA | 15 | 0 | 60 | Parking lot | $213,598 | $0 | $14,240 | $3,560 |
| Private Oahu Farm | Waimanalo, HI | 7 | 0 | 7 | Farm | $53,751 | $1,500 | $7,893 | $7,893 |
| City of Riverside | Riverside, CA | 30 | 0 | 60 | Parking Lot / Existing Shelter | $205,100 | $290,000[1] | $16,503 | $8,252 |
| City of Tacoma | Tacoma, WA | 58 | 0 | 232 | Parking Lot/Sprung Tent | $392,433 | $2,300,000[2] | n/a | $11,605 |
| County of Sonoma | Santa Rosa, CA | 56 | 10 | 74 | Parking Lot | $438,514 | $1,525,000 | $29,750 | $26,534[3] |
| City of Los Angeles (Van Owen) | Los Angeles, CA | 52 | 0 | 104 | Vacant Lot | $433,264 | $2,955,636 | $65,171 | $32,586 |
| City of Los Angeles (Alexandria) | Los Angeles, CA | 100 | 0 | 200 | Park | $833,200 | $7,623,100 | $84,563 | $42,282 |
| City of Los Angeles (Chandler) | Los Angeles, CA | 33 | 0 | 66 | Vacant Lot | $274,956 | $4,658,744 | $149,506 | $74,753 |
| City of Los Angeles (S. Figueroa) | Los Angeles, CA | 75 | 0 | 150 | Vacant Lot | $624,900 | $4,610,935 | $69,811 | $34,906 |

**FIGURE A**

---

[1] Infrastructure estimate; final cost TBD
[2] Infrastructure cost included $2m Sprung Structure
[3] Single-bunk in 64 square foot structure; double bunking would reduce to $14,875 per bed

# Exhibit B

# CD 2 Alexandrea Park

Pallet Shelter 200 Beds Complex on Recreation and Park Site

Rev. Date: 7/24/20

WO #: E1908753  CD: 2  ROM

| Activity | Action By | Phase | Amount |
|---|---|---|---|
| **Project Management & Other Direct Costs** | | | |
| Design (30%) Bridging Document | BOE | Design | $ 186,000 |
| CEQA | BOE | Design | $ 6,000 |
| Support (Consultant;scheduler, geotech, Survey) | BOE | Design/Constr | $ 144,000 |
| Project Support (BCA, LADOT, BSS, Acct) | BCA, LADOT, ITA, Acct | Design/Constr | $ 91,000 |
| BOE (PM, CM, Design Support, inspection) | BOE, BCA | Design/Constr | $ 359,000 |
| Related Cost (All City Staff) | City Staff | Design/Constr | $ 180,000 |
| Miscellanous | | Design/Constr | $ 38,000 |
| | | **Subtotal:** | **$ 1,004,000** |
| **Vendor Purchase** | | | |
| Pallet Shelter (105) Including Assembly | BOE | Vendor | $ 846,000 |
| Hygiene Trailer (3) | BOE | Vendor | $ 302,000 |
| | | **Subtotal:** | **$ 1,148,000** |
| **Construction** | | | |
| Contractor Design | | Contactor | $ 326,000 |
| Cargo Container (2) | | Constactor | $ 97,000 |
| Foundation | | Contactor | $ 151,000 |
| Grading/Paving | | Contactor | $ 1,410,800 |
| Pet Area | | Contactor | $ - |
| Landscaping | | Contactor | $ 180,000 |
| Fencing | | Contactor | $ 150,000 |
| Gates (2) | | Contactor | $ 23,000 |
| Yard Lighting | | Contactor | $ 45,000 |
| Telecommunication | | Vendor | $ 27,000 |
| Demolition | | Constr | $ - |
| Water Line (domestic) | | DWP/Contactor | $ 492,000 |
| Water Line (Fire) | | DWP/Contactor | $ 492,000 |
| Sewer Line (street) | | City Forces | $ 78,000 |
| Sewer Line (site) | | Contractor | $ 900,000 |
| Electrical line | | DWP | $ 360,000 |
| Switch Gear | | Contactor | $ 75,000 |
| Transformer | | DWP | $ 85,000 |
| Electrical Subpanel | | Contractor | $ 75,000 |
| Light Relocation | | City Forces | $ - |
| General Conditions | | Const | $ 837,000 |
| Estimate/Construction Contingency | | | $ 465,000 |
| | | **Construction Subtotal** | **$ 6,268,800** |
| | | Project Total: | $ 8,420,800 |
| | | Project Contingency: | $ - |
| **TOTAL PROJECT COST** | | | **$ 8,420,800** |
| **Fixture, Furniture & Equipment** | | | |
| Picnic Table/Umbrellas | | | $ 35,500 |
| | | | $ 35,500 |

NOTES:
1. Estimate does not include soil remediation

## CD 2 Chandler

Rev. Date: 7/23/20

Pallet Shelter 66 Beds on Rec and Park Land Across from North Hollywood Rec Center

WO #: E1908752  CD: 2  ROM

| Activity | Action By | Phase | Amount |
|---|---|---|---|
| **Project Management & Other Direct Costs** | | | |
| Design (30%) Bridging Document | BOE | Design | $ 111,000 |
| CEQA | BOE | Design | $ 6,000 |
| Support (Consultant;scheduler, geotech, Survey) | BOE | Design/Constr | $ 134,000 |
| Project Support (BCA, LADOT, BSS, Acct) | BCA, LADOT, ITA, Acct | Design/Constr | $ 74,000 |
| BOE (PM, CM, Design Support, inspection) | BOE, BCA | Design/Constr | $ 204,000 |
| Related Cost (All City Staff) | City Staff | Design/Constr | $ 111,000 |
| Miscellanous | | Design/Constr | $ 23,000 |
| | | **Subtotal:** | **$ 663,000** |
| **Vendor Purchase** | | | |
| Pallet Shelter (36) Including Assembly | BOE | Vendor | $ 299,000 |
| Hygiene Trailer (1) | BOE | Vendor | $ 112,000 |
| | | **Subtotal:** | **$ 411,000** |
| **Construction** | | | |
| Contractor Design | | Contactor | $ 194,000 |
| Cargo Container (1) | | Constactor | $ 58,000 |
| Foundation | | Contactor | $ 66,000 |
| Grading/Paving | | Contactor | $ 539,000 |
| Pet Area | | Contactor | $ 42,000 |
| Landscaping | | Contactor | $ 45,000 |
| Fencing | | Contactor | $ 100,000 |
| Gates (2) | | Contactor | $ 23,000 |
| Yard Lighting | | Contactor | $ 45,000 |
| Telecommunication | | Vendor | $ 11,000 |
| Demolition | | Constr | $ - |
| Water Line (domestic) | | DWP/Contactor | $ 185,200 |
| Water Line (Fire) | | DWP/Contactor | $ 115,000 |
| Sewer Line (street) | | City Forces | $ 1,080,000 |
| Sewer Line (site) | | Contractor | $ 63,000 |
| Electrical line | | DWP | $ 360,000 |
| Switch Gear | | Contactor | $ 35,000 |
| Transformer | | DWP | $ 75,000 |
| Electrical Subpanel | | Contractor | $ 25,000 |
| Light Relocation | | City Forces | $ - |
| General Conditions | | Const | $ 498,000 |
| Estimate/Construction Contingency | | | $ 277,000 |
| | | **Construction Subtotal** | **$ 3,836,200** |
| | | Project Total: | $ 4,910,200 |
| | | Project Contingency: | $ - |
| **TOTAL PROJECT COST** | | | **$ 4,910,200** |
| **Fixture, Furniture & Equipment** | | | |
| Picnic Table/Umbrellas | | | $ 23,500 |
| | | | $ 23,500 |

NOTES:
1. Estimate does not include soil remediation

Department of Public Works/Bureau of Engineering     1 of 1

# CD 3 Vanalden Street

Pallet Shelter 104 Beds in West Valley existing parking lot

Rev. Date: 8/4/20

WO #: E1908762  CD: 3  ROM

| Activity | Action By | Phase | Amount |
|---|---|---|---|
| **Project Management & Other Direct Costs** | | | |
| Design (30%) Bridging Document | BOE | Design | $ 116,000 |
| CEQA | BOE | Design | $ 4,000 |
| Support (Consultant; scheduler, geotech, Survey) | BOE | Design/Constr | $ 128,000 |
| Project Support (BCA, LADOT, BSS, Acct) | BCA, LADOT, ITA, Acct | Design/Constr | $ 43,000 |
| BOE (PM, CM, Design Support, inspection) | BOE, BCA | Design/Constr | $ 185,000 |
| Related Cost (All City Staff) | City Staff | Design/Constr | $ 91,000 |
| Miscellanous | | Design/Constr | $ 12,000 |
| | | **Subtotal:** | **$ 579,000** |
| **Vendor Purchase** | | | |
| Pallet Shelter (55) Including Assembly | BOE | Vendor | $ 450,000 |
| Hygiene Trailer (2) | BOE | Vendor | $ 207,000 |
| | | **Subtotal:** | **$ 657,000** |
| **Construction** | | | |
| Contractor Design | | Contactor | $ 120,000 |
| Cargo Container (1) | | Constactor | $ 51,000 |
| Foundation | | Contactor | $ 80,000 |
| Grading/Paving | | Contactor | $ 228,000 |
| Pet Area | | Contactor | $ 30,000 |
| Landscaping | | Contactor | $ 14,000 |
| Fencing | | Contactor | $ 110,000 |
| Gates (4) | | Contactor | $ 23,000 |
| Yard Lighting | | Contactor | $ 25,000 |
| Telecommunication | | Vendor | $ 11,000 |
| Demolition | | Constr | $ - |
| Water Line (domestic) | | DWP/Contactor | $ 254,000 |
| Water Line (Fire) | | DWP/Contactor | $ 183,400 |
| Sewer Line (street) | | City Forces | $ 75,000 |
| Sewer Line (site) | | Contractor | $ 225,000 |
| Electrical line | | DWP | $ 135,000 |
| Switch Gear | | Contactor | $ 35,000 |
| Transformer | | DWP | $ 75,000 |
| Electrical Subpanel | | Contractor | $ 25,000 |
| Light Relocation | | City Forces | $ - |
| General Conditions | | Const | $ 261,000 |
| Estimate/Construction Contingency | | | $ 172,000 |
| | | **Construction Subtotal** | **$ 2,132,400** |
| | | **Project Total:** | **$ 3,368,400** |
| | | **Project Contingency:** | **$ -** |
| **TOTAL PROJECT COST** | | | **$ 3,368,400** |
| **Fixture, Furniture & Equipment** | | | |
| Picnic Table/Umbrellas | | | $ 20,500 |
| | | | $ 20,500 |

NOTES:
1. Estimate does not include soil remediation

# Exhibit C



**Los Angeles's Alexandria Park Project Proposal Breakdown for Spertus, Landes & Umhofer**

The RPM project team has executed over ten homeless shelter and Navigation Center projects on the west coast. This team is pioneering a new project delivery method coined, the Manufacturing-Led-Design process, which creates lower project costs by working within the confines of a given building manufacture's strengths and limitations. RPM selects manufacturer's that have pre-engineered designs that aid to the healing process for residents and guests of outcome based transitional housing facilities.

RPM Team is lending its expertise and contractor network to Spertus Law to help showcase the overestimation and inefficiencies found in the proposed Alexandria Park project. This document covers:
-RPM's reference projects
-Proposal review summary
-New estimate by G&G Builders based on existing design
-Cost comparisons
-Conclusion


**RPM's Reference Projects**

RPM Team is lead by David Renard, a program manager with over 3,000,000 square feet of experience. David leads the design teams, manufacturing teams, and contractor teams, quarterbacking the design-build process. David has led Navigation Center design and construction in Oregon, Washington, Nevada, and California, and has managed teams for the 175 bed San Francisco Division Circle Navigation Center, the 175 bed Huntington Beach Cameron Shelter, the 50 bed emergency shelter for Stockton Shelter for the homeless, the 150 bed Kern County CAPK Navigation Center, the 100 bed Fresno Rescue Mission, the 100 bed Oregon Harbor of Hope shelter, the 100 bed Yakama Nation Homeless Shelter, the 200 bed Reno emergency shelter, the 50 bed Salinas Navigation Center, and the two 125 bed Sacramento Navigation Centers.

**Proposal Review Summary**

Los Angeles is proposing $8,420,800 to set up facilities to house 200 individuals. This equates to startup costs of $42,000 per individual to get the facility up and running – other cities in California have much lower start up costs, closer to $15,000 per individual. Los Angeles is spending close to three times more than other cities to house their homeless populations. The higher startup costs are not the result of Los Angeles being a more expensive market, the costs are three times higher because of inefficient use of design funds, lack of value engineering, and inflated costs hidden in contingencies.

**New Estimate by G&G Builders Based on Existing Design**

G&G Builders, a California general contractor, helped City of San Francisco develop their first Sprung Structure Navigation Center project with David Renard; since then they have continued to help San Francisco develop and execute the city's additional 200 bed Navigation Center, the two 125 bed Navigation Centers in Sacramento, the 50 bed Salinas Navigation Center, and the 100 bed Santa Rosa Navigation Center. G&G Builders reviewed the City of Los Angeles Engineering bridging documents and estimated site development and construction efforts at $5,044,337.99, compared to Los Angeles's

existing proposal of $6,268,800. A general contractor with experience in the homeless construction space can build this site for $1,224,462 less than the contractor that was selected for this project, or for the proposed value of this project.

**Cost Comparisons**

Public Records Request gave RPM access to the previously estimated numbers for the Alexandria site and several anomalies jump out after quick inspection.

Domestic water line, fire water line, and sewer water lines account for $1,884,000 – this is flagrant. Facts about the site: there are not 200 connections, the restroom facilities are rather consolidated and concentrated, and a single "hot tap" maxes out at $125,000, the conclusion is there must be money going elsewhere. Creative joint trenching and efficient space planning to place restroom facilities closer to utility sources would cut the $1.8mm number in half.

$837,000 and $465,000 devoted to general conditions and contingencies totals $1,302,000, representing 20% of the construction value. 20% is egregious and does not match the industry standard for fee's on public projects.

$186,000 for 30% bridging documents is not an effective use of funds given the use of pre-engineered and pre-fabricated building products - manufacturers produce their own drawings. At $160/hr, $186,000 represents 1,162 hours, or 48 working days for bridging documents. Typically, single line drawings and written reports will suffice for bridging documents for emergency shelter projects because the design is executed by the contractor or design-build entity. 3D renderings and landscape drawings are not required for bridge docs.

$326,00 for contractor design is three times more than the industry standard for architectural and engineering services. RPM produced design documents for permits for City of Huntington Beach's 175 bed emergency shelter for under $40,000. Kern County's design documents for their 150 bed Navigation Center was $77,500. City of Sacramento 100 bed XB Center was $98,250.

Revisiting the bed/individual breakdown for the Alexandria site; these efforts run $42,000 per individual. Kern County's 150 bed CapK Navigation Center was $20,000 per individual.

**Moving Forward**

Our biggest fear after reviewing the Alexandria project is that Los Angeles is investing $8,420,800 to house 200 individuals with a building product whose website reports a 10 year lifespan. Los Angeles is spending three times more for a product that lasts three times less than what the rest of California has been successful in using. This could negatively influence public opinion about the allocation of funds for homeless housing and will possibly disrupt future funding because of the site development needed for less durable options that are already effective throughout the state.

The proposed shelter product creates an additional efficiency challenge with its individual utility hook ups per unit, versus a product that follows a tenant in common model creating, which would create more efficient utility channeling. We understand the dignity that comes with an individual's own space, though the physical separation between each unit creates unnecessary costs associated with utilities.

Los Angeles could reduce their startup costs by building out individual rooms, offsite, into a shell with lifetime materials, then lining them up in such a way that utilities could be exposed and running along a chase in the center – this would reduce the total project costs by 50%, while achieving an indefinite lifespan, and maintaining the dignity for individual's own space.