# RISE IN HOMELESS DEATHS
## 2019 VS. 2020

# The Homeless Are Dying in Record Numbers on the Streets of Los Angeles

Homeless people are dying across Los Angeles County, on bus benches, hillsides, railroad tracks and sidewalks.

By **Kaiser Health News**, Contributor    April 23, 2019



# Geography of Despair: Homeless Deaths Are LA's Other Epidemic

BY **CAPITAL & MAIN** IN **NEWS** ON JUNE 18, 2020 2:00 PM



*A homeless man sleeps on a bus bench on a hot day in Downtown Los Angeles. (Chava Sanchez/LAist)*

By Jessica Goodheart, Capital & Main

More than 1,000 people without homes died in L.A. County in 2019. They died in parking lots, in hospitals, on train station platforms and in encampments. They were still in their teens and well into their 80s. Some died violently of gunshot wounds or a hit-and-run, while many quietly passed away

**TABLE 1:** Leading Causes of Death in LA County Homeless Persons by Race/Ethnicity and Gender, 2013-2018

| | TOTAL Number (%) | Race/Ethnicity Number (%) | | | | Gender Number (%) | |
|---|---|---|---|---|---|---|---|
| | | Latino | African American | White | Asian/PI* | Male | Female |
| Coronary Heart Disease | 811 (22) | 163 (15) | 224 (26) | 376 (23) | 36 (32) | 717 (23) | 94 (14) |
| Drug/Alcohol Overdose (Unintentional)** | 795 (21) | 226 (21) | 164 (19) | 376 (23) | 15 (13) | 628 (20) | 167 (25) |
| Transportation-Related Injury (Unintentional)*** | 318 (9) | 110 (10) | 64 (8) | 123 (8) | 13 (12) | 235 (8) | 83 (13) |
| Homicide | 222 (6) | 97 (9) | 60 (7) | 57 (4) | † | 193 (6) | 29 (4) |
| Suicide | 185 (5) | 65 (6) | 15 (2) | 91 (6) | 10 (9) | 164 (5) | 21 (3) |
| Liver Disease/Cirrhosis‡ | 177 (5) | 84 (8) | 15 (2) | 67 (4) | † | 151 (5) | 26 (4) |
| Other Unintentional Injury | 137 (4) | 49 (4) | 27 (3) | 59 (4) | † | 116 (4) | 21 (3) |
| Other Heart Disease§ | 120 (3) | 27 (2) | 39 (5) | 48 (3) | † | 88 (3) | 32 (5) |
| Alcohol Abuse/ Dependence‡ | 77 (2) | 32 (3) | † | 32 (2) | † | 73 (2) | † |
| Hypertensive Heart Disease§ | 70 (2) | 15 (1) | 24 (3) | 28 (2) | † | 57 (2) | 13 (2) |

†Causes with fewer than 10 deaths are not reported. This includes all causes among American Indians/Alaskan Natives.
*PI – Pacific Islander. Asians and Pacific Islanders are reported together due to small numbers of deaths.
**88% of drug/alcohol overdose deaths were coded as drug overdoses and 12% were coded as alcohol overdoses.
***Transportation-related injury includes motor-vehicle and railway train related injuries. 82% of these deaths were among pedestrians & cyclists.
‡88% of liver disease/cirrhosis deaths were from alcoholic liver disease. Alcohol abuse/dependence deaths are related to alcohol abuse/dependence but are not the result of an acute overdose of alcohol.
§Other heart disease includes: acute and subacute endocarditis; diseases of pericardium and acute myocarditis; heart failure; and all other forms of heart disease. Hypertensive heart disease is a discrete ICD category of heart disease that is not included in CHD or other heart disease.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. LA CV 20-02291-DOC-KES          Date:  November 4, 2020

Title: LA ALLIANCE FOR HUMAN RIGHTS ET AL. v. CITY OF LOS ANGELES ET AL.

---

PRESENT:

#### THE HONORABLE DAVID O. CARTER, JUDGE

| Kelly Davis | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

---

**PROCEEDINGS (IN CHAMBERS):**   **ORDER REQUESTING EXPLANATIONS AND SOLUTIONS FOR THE RISE IN HOMELESS DEATHS**

The Court REQUESTS of the parties explanations and solutions for the rise in homeless deaths. Homeless deaths are now up 36% in Los Angeles County—1,141 deaths in the first 10 months of this year, compared to 837 in the same period last year. That's a rise of nearly four deaths per day. Even accounting for 47 Covid-19 related deaths through October, this means at least a 31% rise of deaths amongst our homeless citizens. The parties are hereby on notice that the Court will expect the parties to address what efforts they have made, particularly with regard to immediately providing shelter, housing and services, to address this horrific figure on November 5, 2020.

The Clerk shall serve this minute order on the parties.





AGREEMENT (DKT. 136)

LA 20-CV-02291-DOC



FILED
CLERK, U.S. DISTRICT COURT

June 18, 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KD _____ DEPUTY

Confidential
Binding term sheet

LA Alliance for Human Rights v. City of Los Angeles

1.  City agrees to provide 6,700 beds within 18 months to house or shelter (i) PEH living within 500 feet of freeway overpasses, underpasses and ramps within the City of Los Angeles, and then to give priority to providing housing or shelter to (ii) PEH 65+ within the City of Los Angeles and (iii) other vulnerable PEH within the City of Los Angeles.

The schedule will be as follows:

New beds (not in existing agreements):  6000
5300 within 10 months (bonus of $8 million if 10 month target date met)
700 within 18 months

Beds in existing agreements
700 beds within 10 months

TOTAL:  6700 beds established within 18 months

5,300 of the 6,700 beds will be new beds and will be created within 10 months, and the 700 additional new beds created within 18 months, must be beds not previously captured in any agreement or plan between the City and County; 700 of the 6,000 beds created within 10 months may be beds previously captured in an agreement or plan between the City and County.

2.  To assist in funding services for the 6,000 new beds, County shall pay City up to $60 million per year for 5 years.  In the first year, County shall pay City $53 million: $17.66 million on 9/1/20; $17.67 million on 1/1/21; and $17.67 million on 4/1/21.  In the second through fifth years, County shall pay City $60 million on July 1; however, if 6,000 new beds have not been created by the July 1 payment date, County can prorate payment equal to $10,000 per new bed that exists or will open within 60 days of the payment date.

The funding under this agreement is exclusive and the County will continue to allocate Measure H funding by Service Planning Are (SPA) based on LAHSA's Homeless Count and, where applicable, the Homeless Population Estimate, consistent with Board policy.

3.  County will pay to City a one-time bonus of $8 million if the 5,300 new bed target is reached within 10 months from execution of agreement.

*SDM*
*(illegible signature)*

*MCW*
*6-16-2020*

---

4.  County will take action to provide a package of mainstream services for PEH residing in facilities established by the City pursuant to this Agreement.

5.  Agreement subject to court approval, monitoring, and enforcement.

6.  Agreement subject to City and County approval.

7.  The parties will submit this term sheet to the Court.  Upon approval of this term sheet by the City and County, the parties will respectfully request the Court to entertain an oral motion coupled with a joint stipulation from the City and County that the Preliminary Injunction dated May 22, 2020 be vacated without prejudice, subject to the Court's later consideration of reinstatement of the Preliminary Injunction should the parties fail to comply with the terms identified above.

FREEWAY ENTRANCES





14

15

# PROJECT ROOMKEY WIND-DOWN

16

# Los Angeles County

Out of 15,000 rooms promised, 3,485 rooms are operational as of October 30.



1. Where are the 15,000 rooms promised in July and September?

2. Why has it taken so long?

3. Why are we telling the public that they can depend on these rooms when we knew they were temporary?

4. Should the Court take action with or without the County or City's input?

Numbers last updated October 30, 2020. We have deprecated our projection since it has been announced that the program is ending.

17

# Los Angeles County

Out of 15,000 rooms promised, 3,485 rooms are operational as of October 30.



5. It was represented to the Court on September 15th by Executive Director Heidi Marston that LAHSA had sufficient funding to cover the costs associated with freeway underpass and overpass relocation as well as Project Roomkey and the recreational facility download.

Numbers last updated October 30, 2020. We have deprecated our projection since it has been announced that the program is ending.

18

# SEPTEMBER 17, 2020
# HEARING TRANSCRIPT (DKT. 181)

19

Case 2:20-cv-02291-DOC-KES   Document 181   Filed 09/22/20   Page 161 of 226   Page ID
Case 2:20-cv-02291-DOC-KES   Document 199   Filed 11/06/20   Page 20 of 65   Page ID
#:3202

```
 1          MS. MARSTON:  So, Your Honor, I

 2   absolutely agree with you.  It's not -- it can't be a

 3   one-size-fits-all or putting all of our eggs in one

 4   basket.

 5          We have to have a balance between interim

 6   solutions, whether it's pallet shelters, safe parking,

 7   all of the things we've been talking today and the --

 8          THE COURT:  How about emergency?  Are you

 9   onboard with emergency?

10          MS. MARSTON:  Absolutely.  Yeah.

11          THE COURT:  Okay.  So we're no longer in

12   the position of, golly gosh, we can't do it all.  Is

13   that correct?

14          MS. MARSTON:  No.  We're going --

15          THE COURT:  We can do it all.

16          MS. MARSTON:  -- to ramp up as quickly as

17   possible.  And we want all of it.

18          THE COURT:  And we've got the money,

19   don't we?

20          MS. MARSTON:  Right now?  Yes.

21          THE COURT:  We've got $2.4 billion.  Sure

22   you do, because you're trying to get rid of -- not get

23   rid of.  That's a bad term.

24          You've got $600 million you have to

25   account for besides December 31st and another $400
```

                                                    Page 161

1    million over here from the city before December 31st.

2           And what I'm afraid of is that you're

3    putting it all into this solution as fast as you can at

4    exorbitant cost and then coming into my court and

5    claiming that you don't have enough money.

6           MS. MARSTON:  So, Your Honor, the money

7    that expires on the 31st of December, we have $50

8    million from the county.  The rest isn't coming through

9    LAHSA for these interventions.

10          THE COURT:  Okay.  I think that's the

11   fundamental concern I have.  And you've heard that

12   before.  You can do it all with $2.4 billion, $2.5

13   billion.  If I wanted to go back, I don't think anybody

14   would look very good if I called for a federal

15   accounting.  Do you understand me?

16          MS. MARSTON:  Mm-hmm.

17          THE COURT:  I never want to hear that you

18   don't have the money.  You not only have the money,

19   you've got the money for the 6,800, you've got the money

20   for the old folks in this town and if you don't, you

21   tell me right now and we'll have an accounting.

22          MS. MARSTON:  So the billion, the $2

23   billion --

24          THE COURT:  Do you have the money?

25          MS. MARSTON:  We don't have the $2

                                              Page 162

Case 2:20-cv-02291-DOC-KES   Document 181   Filed 09/22/20   Page 163 of 226   Page ID
Case 2:20-cv-02291-DOC-KES   Document 199   Filed 11/06/20   Page 22 of 65   Page ID
#:3204

```
 1   billion at LAHSA.  LAHSA has $50 million in corona
 2   relief funds that expires December 31st.
 3              THE COURT:  Can you do both?  Can you do
 4   both?
 5              MS. MARSTON:  Yes.
 6              THE COURT:  Okay.  That's a substantial
 7   change.  I appreciate that.  Okay.  Hold on for just a
 8   second.
 9              I will help you in any way possible as a
10   court if you're accountable.  I will help you in any way
11   possible to avoid this situation where we can't acquire
12   property quickly enough and we've got our homeless
13   population in a situation where we're being told we
14   don't have money and we're going to take these 3,000
15   people and put them out on the street and we're going to
16   slow down and not account for, you know, this other
17   50,000 or 60,000 out there.
18              But I am astounded at the past.  I
19   disagree with your policies.  I will state that in terms
20   of everything being in one bucket.  And I think that
21   that's what's happened with these 500,000 units which I
22   applaud if you can get them.
23              I applaud long-term supportive housing.
24   I don't applaud the lack of mix in the past, letting
25   those people die.
```

Page 163

PALLET SHELTERS

23





25







# LA STREETS – MACARTHUR PARK





31





TRASH UNDERNEATH 101 FREEWAY

34



35



36



37

# NEED FOR CALTRANS COOPERATION







NOTICE

43



NOTICE OF MANDATORY RELOCATION BY ANYONE SITTING, LYING OR SLEEPING WITHIN 500 FEET
OF THE 101 FREEWAY BETWEEN LINDLEY AND VALLEY CIRCLE AND
ENFORCEMENT OF REGULATIONS REGARDING STORAGE OF PERSONAL PROPERTY IN PUBLIC AREAS

## EFFECTIVE OCTOBER 27, 2020
[Posted October 13, 2020]

ON OCTOBER 27, 2020, ANYONE SITTING, LYING OR SLEEPING OR LODGING WITHIN 500 FEET OF THE 101 FREE-WAY BETWEEN LINDLEY AND VALLEY CIRCLE WILL BE REQUIRED TO RELOCATE. On October 27, 2020, beginning at 6:00 a.m., the City of Los Angeles will begin enforcement of Los Angeles Municipal Code Section 41.18(d)* and California Penal Code Sections 555 and 647(e)** as well as Los Angeles Municipal Code Section 56.11 within 500 feet of the 101 freeway between Lindley and Valley Circle and enforce regulations regarding storage of personal property in public areas, pursuant to Los Angeles Municipal Code Section 56.11.***

This enforcement action is taken to protect individuals experiencing homelessness who are lodging or camping unsheltered or in tents or makeshift shelters near freeway overpasses, underpasses, and ramps, and also to protect the public health, safety and welfare.

Any Person lodging in this posted area as of October 13, 2020 will be offered shelter for relocation or alternative housing options by Outreach and Engagement Personnel. The shelter or alternative housing options include government encampments following the existing Veterans Affairs model, safe parking sites, or hotel and motel rooms consistent with the Project Roomkey model.

Persons who are offered shelter or housing options will be given a warning and an opportunity to relocate before being subject to enforcement.

Representatives of the United States District Court, Central District of California, Southern Division, will be present on October 13 and October 27, and may be present on multiple days during that time period.

ALL PERSONAL PROPERTY MUST BE REMOVED FROM THIS POSTED AREA WITHIN 500 FEET OF THE 101 FREEWAY BETWEEN LINDLEY AND VALLEY CIRCLE BY 6:00 AM ON OCTOBER 27, 2020. Any personal property remaining in this area after 6:00 a.m. on October 27, 2020, will be removed and maintained in a secure location for 90 days or, if available for retrieval - regardless of the size of any item or the total volume - except for trash, and personal property that constitutes an immediate threat to health or safety of the public, or evidence of a crime or contraband.

On the day of enforcement, the City will provide trash bins and voluntary trash services prior to cleaning this area of remaining personal property.

Personal property may be retrieved for 90 days following removal at The BIN, located at 507 Towne Avenue, Los Angeles, California 90013 (213) 806-6355 or (844) 475-1244) between the hours of 8:00 a.m. and 5 p.m. Monday through Friday, 8:00 a.m. and 1:00 p.m. on Saturdays (closed Sundays).

For assistance locating shelter or mental health, substance abuse, or other services call 211 or visit www.la-hsip.org.

*Los Angeles Municipal Code Section 41.18(d) will be applied in a manner consistent with the decision in Martin v. City of Boise, 920 F.3d 584 (9th Cir. 2019) and the settlement agreement in the case of Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007).

**California Penal Code Sections 555 and 647(e) will be applied in a manner consistent with the decision in Martin v. City of Boise, 920 F.3d 584 (9th Cir. 2019) and the settlement agreement in the case of Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir. 2006), vacated, 505 F.3d 1006 (9th Cir. 2007).

***Enforcement of Los Angeles Municipal Code Section 56.11 will comply with the Court injunction issued in Garcia v. City of Los Angeles, Federal District Court, Central District of California case number 2:19-cv-06182-DSF-PLA.



# LACK OF STREET CLEANING NOTICE

48











53

# PENMAR – BONIN DISTRICT
## WITHOUT AND WITH FENCING

54



55







58



59





# PHIL ANSELL EMAIL

From: **Phil Ansell** PAnsell@ceo.lacounty.gov
Subject: LA City Freeway Encampments
Date: October 15, 2020 at 5:23 PM
To: Heidi Marston hmarston@lahsa.org, Cheri Todoroff ctodoroff@dhs.lacounty.gov, Maria Funk MFunk@dmh.lacounty.gov, La Tina Jackson LTJackson@dmh.lacounty.gov, Gary Tsai GTsai@ph.lacounty.gov

Heidi, Cheri, Maria, La Tina, and Gary:

As the City of Los Angeles begins to clean-up encampments near freeways, I'd like to share with you the County's position.

The County has not agreed to any of the following:

- Redirection of existing interim or permanent housing resources from other people experiencing homelessness to people living near freeways.
- Redirection of existing outreach or other County-funded staff from serving other people experiencing homelessness to people living near freeways unless and until the City has housing or shelter or other beds available for PEH in encampments near freeways.
- Participation by County-funded staff in the enforcement of any restrictions on camping near freeways which may be implemented by the City of Los Angeles.

Additionally, Judge Carter and his representatives have no authority to direct the work of any County-funded staff.

Please feel free to share this e-mail as you deem appropriate with your staff and/or contractors. If you have any questions, please let me know.

Thanks.

Phil Ansell
Director, Homeless Initiative
Chief Executive Office
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 493
Los Angeles, CA 90012
(213) 974-1752
Pansell@ceo.lacounty.gov

63

SETTLEMENT REQUEST BY BONIN?

64

Rather than repeatedly revisiting and trying unworkable and legally questionable enforcement proposals, the City must make significant and expanded efforts to actually help transition people out of encampments and into housing, shelter and service

**I THEREFORE MOVE** that the City Council instruct the City Attorney to detail what steps need to be taken, and by which agency, body, or person, to begin commandeering hotels and motels for use as homeless housing, and report back to the Council within 10 days.

**I FURTHER MOVE** that the City Council direct the Los Angeles Homeless Services Authority, in consultation with the City Administrative Officer, develop a plan for a significant expansion of Encampment to Homes programs, coupled with a significantly scaled-up City of Los Angeles Master Leasing program. Such programs could use a coordinated, concentrated, services-based approach to rapidly house residents of an entire encampment simultaneously, through readily available master leased units. The report should include cost and staffing estimates, and consider federal grants, COVID relief funds, state and County assistance, and reprogramming from other efforts that do not result in the rapid housing of unhoused individuals.

**I FURTHER MOVE** that the City Council request that the Los Angeles Homeless Services Authority detail, within 10 days, what is prohibiting the development and use of a broadly accessible app that would provide real-time information on available housing and shelter beds and how to access them, and detail resources required to develop it and make it available.

**I FURTHER MOVE** that the City Council request that U.S. District Court Judge David O. Carter facilitate a settlement agreement between the City of Los Angeles, County of Los Angeles, unhoused residents and their advocates, the Alliance for Human Rights, and other parties as appropriate, similar to the settlement agreement he brokered in *Orange County Catholic Worker, et al, vs. Orange County, City of Costa Mesa, City of Anaheim & City of Orange*, which led to the housing of thousands of unhoused residents and left public rights of way free of encampments without a single arrest.

65