UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, )
                              )
          PLAINTIFFS,         )
                              )
          VS.                 )   CASE NO. LA CV 20-02291-
                              )             DOC(KESx)
CITY OF LOS ANGELES, ET AL.,  )
                              )
          DEFENDANTS.         )
_____)

MONITORING STATUS CONFERENCE

DATE:        THURSDAY, NOVEMBER 5, 2020

TIME:        9:45 A.M.

BEFORE:      HONORABLE DAVID O. CARTER

LOCATION:    LOS ANGELES CITY HALL

             200 NORTH SPRING STREET

             LOS ANGELES, CA 90012

RECORDED BY:  FABIAN VENEGAS, NOTARY PUBLIC

TRANSCRIBED BY:  KRISTIN VARGAS, CSR 11908, RPR

JOB NO.:  4324850

Page 1

```
            A P P E A R A N C E S
               (IN PERSON AND VIA ZOOM)
     FOR PLAINTIFFS:
         SPERTUS LANDES & UMHOFER, LLP
         BY:  ELIZABETH MITCHELL, ATTORNEY AT LAW
         617 WEST 7TH STREET
         SUITE 200
         LOS ANGELES, CALIFORNIA 90017
         (213)205-6520
         EMITCHELL@SPERTUSLAW.COM


     FOR INTERVENOR PLAINTIFF LOS ANGELES CATHOLIC WORKER:
         LEGAL AID FOUNDATION OF LOS ANGELES
         BY:  SHAYLA MYERS, ATTORNEY AT LAW
         1550 WEST 8TH STREET
         LOS ANGELES, CALIFORNIA 90017
         (800)399-4529
         SMYERS@LAFLA.ORG


     FOR INTERVENOR PLAINTIFF OC CATHOLIC WORKER:
         CAROL SOBEL LAW OFFICE
         BY:  CAROL SOBEL, ATTORNEY AT LAW
         3110 MAIN STREET
         SUITE 210
         SANTA MONICA, CALIFORNIA 90405
         (310)393-3055


     FOR DEFENDANT CITY OF LOS ANGELES:
         CITY OF LOS ANGELES
         BY:  SCOTT MARCUS, ATTORNEY AT LAW
         200 NORTH MAIN STREET
         SUITE 700
         LOS ANGELES, CALIFORNIA 90012-4119
         (213)978-4681
         SCOTT.MARCUS@LACITY.ORG
```

Page 2

                        A P P E A R A N C E S

                           (Continued)


     FOR DEFENDANT COUNTY OF LOS ANGELES:

          MILLER BARONDESS LLP

          BY:  LOUIS R. MILLER, ATTORNEY AT LAW

          1999 AVENUE OF THE STARS

          SUITE 1000

          LOS ANGELES, CALIFORNIA 90067-4632

          (310)552-4400

          LMILLER@MILLERBARONDESS.COM

     AND

          FOLEY & LARDNER

          BY:  BYRON MCCLAIN, ATTORNEY AT LAW

          555 SOUTH FLOWER STREET

          SUITE 3300

          LOS ANGELES, CALIFORNIA 90071

          (323)636-2704

          BMCLAIN@FOLEY.COM


     ALSO PRESENT:

          Bob Blumenfield, Los Angeles City Council

          Mike Bonin, Los Angeles City Council

          Joe Buscaino, Los Angeles City Council

          Kevin de Leon, Los Angeles City Council

          Paul Koretz, Los Angeles City Council

          Nury Martinez, Los Angeles City Council

          John Lee, Los Angeles City Council

          Curren Price, Los Angeles City Council

          Monica Rodriguez, Los Angeles City Council

          David Ryu, Los Angeles City Council


                                                   Page 3

ALSO PRESENT:   (Continued)

    Michele Martinez, Special Master

    Heidi Marston

    Gloria Roberts

    Wendy Greuel

    Jon Sherin

    Pastor Don Farrah

    General Jeff Page

    Judge Andre Birotte

    Brooke Weitzman

    Ellie, law clerk

    Alexa, law clerk

Page 4

E X H I B I T S

(None marked.)

Page 5

Veritext Legal Solutions
866 299-5127

LOS ANGELES, CALIFORNIA;

THURSDAY, NOVEMBER 5, 2020;

9:45 A.M.

\*\*\*


P R O C E E D I N G S


THE ELECTRONIC RECORDER:  Good morning.  My name is Fabian Venegas.  I'm the recorder assigned by Veritext to take the record of today's proceedings.  I'm a notary authorized to take acknowledgments and administer oaths in the State of California.  We're now on the record.

This is the hearing taken in the matter of LA Alliance for Human Rights, et al., versus City of Los Angeles, et al. on Thursday, November 5, 2020, at Los Angeles City Hall, 200 North Spring Street, Los Angeles, California 90012.

Thank you.  We're going off the record at 9:45 A.M.

(Recess taken.)

THE ELECTRONIC RECORDER:  Back on the record at 10:08.

THE COURT:  He is recording on behalf of the court.

Page 6

And can you clearly hear me, young man?  And if not, you stop me at any time because sometimes I speak too quickly.

Well, this once again will be an official court proceeding, with the Court humbly thanking the City Council for making their chambers available, and especially Council President Nury Martinez.

Last evening, I sent out a supplemental that I hope most of you received.  And so for my law clerks, I would like for you to put up the first newspaper article amongst many that I have been reading over the last couple years.  I think this is from the Los Angeles Times.  It could be LA First but -- no, this is Kaiser.

And this was in 2019.  And it caught my eye at that time, along with subsequent articles.

And checking with the coroner's office -- and I would invite you to check as well to answer -- identify the information that I am receiving, and that is that homeless deaths this year are up 36 percent in Los Angeles County.  1,141 deaths have occurred in the first ten months of this year, compared to 837 deaths during the same period through October of last year.

Page 7

That's a rise of nearly four deaths per day.  And even accounting for COVID-19, there are 47 homeless citizens who have died through October.  By the way, today's count is 50.  Three more have died.

If the court took away the COVID-19 deaths, that still means that we have a 31 percent rise of homeless deaths in one year.

And at the end of the day when we are done speaking with your council members so that they can go on their way, I'm going to appreciate that the attorneys remain and convey back to your clients some of the thoughts we're going to share with each other.

I think all of us agree that there can be very few humanitarian catastrophes that I know about in our country that match the present death rate and degradation of the homeless in our neighborhood communities than what is occurring here in Los Angeles.

And so I just got off the phone with our mayor, Eric Garcetti, and had a very good conversation.  He has almost called for a FEMA-like emergency response.  And I'm going to be asking today very humbly if that's really something that

Page 8

can be achieved from the lead attorneys who I would hope would take that back to the Board of Supervisors and to the council.

I think we all agree that this is not acceptable.  And I'm going to be humbly asking you whether the Court should be more active in this. This Court has been extremely active and uncomfortable quite frankly with some of its own actions.

But it being uncomfortable -- well, unfortunately, that's the way change takes place. And if I'm not uncomfortable and you are not uncomfortable, change isn't going to take place because the same folks who got us into this mess may not be the very people who can lead us out of this mess.

So I hope I have some fresh thoughts today because I'm going to be looking for action and answers as best as you can supply them.  And if not, then I'll make the determination if I need to be -- I'll make a determination at a later time.

I also want LAHSA to be prepared. And eventually -- if you could flip to the Los Angeles County -- the room key download for a moment.  And I saw Wendy Greuel here.  And I have

Page 9

tremendous respect for her.  And I think I saw Heidi and equal respect.

Is Heidi here?

MS. MARTINEZ:  Yeah, Heidi is here.

THE COURT:  Heidi, okay.  Thank you.

And once again, let me apologize for my bluntness in the past.  That's who I am.

I'm going to put this slide up, but I want you to hopefully respond to a couple questions that I have got.

And that is, I have informally been told by reputable counsel that there may be a request, and read that there are another 15,000 rooms in addition to these 6,700 rooms.  And I have told you that this would be from this Court's belief, a tremendous amount of progress.

They were promised in July and September.  Perhaps the board is acting on that. But I'm a little chagrined -- I think that's a mild word to use -- that no member of the Board is here today.  Council people are here today.  The mayor and I have had a long talk today.

But I want it specifically noted that MRT has been here, that Catherine Thomsen has paid the courtesy and I have so far requested.  I'm

Page 10

a little concerned about the impression that the Board isn't present along with the City Council members today because, if we're going to reach a resolution because if we're going to reach a resolution that benefits the City, I need that continued and active involvement.

And although counsel can convey back my thoughts to their clients, I think I would humbly appreciate, once again, their presence.

All right.  From the very beginning, I have been consistently praise worthy of the efforts in terms of Operation Room Key.  I think it's a tremendous effort, and everybody is to be commended for it.

But these were temporary rooms.  And they were funded through COVID-19.  And they were targeted at 65 and older, which means FEMA reimbursed the city 75 percent, so the city was out 25 percent.

And all this was coming to an end. And I know the governor is trying with Operation Room Key, and the city is trying.  But there's always been a concern on this Court's part, that some day this would come to an end, and what would happen to those people.

Page 11

The settlement we reached for 6,700 beds included, from my understanding from Judge Birotte -- who is going to correct me in just a moment -- that at least 3,000 of these beds had nothing to do with freeway overpasses, underpasses or within 500 feet.  Let me repeat that.

We built in from the county that $300 million, adequate financing to this city, to account for approximately a thousand people who were in your recreational centers at the time.

And we built in to these discussions, as it was relayed to me, that, at the time we had approximately 2,200 to 2,600 people in Operation Room Key.

Now, those numbers went up since. They went up to as high as 3,900.

And in this settlement agreement, besides the freeway overpass and underpasses, we tried to make certain in our settlement negotiations between the city and the county that there was adequate financing that would account for the download of all of these folks because quite frankly this Court expected that I would be brought injunctive relief.

And if it's a secret to you, the

Page 12

Court was prepared to make certain that our most elderly and feeble were not tossed back out on the street at 65 years of age.

Later on, Marcus, if you have any disagreement, or Mike or Shayla or -- well, you weren't involved in those discussions.  I'm sorry -- or Skip --  I want you to call me on that.  But that was absolutely our understanding that this was a split bill, et cetera.  And that's why document 136, if you would put that up on the board for a moment.

All right.  This is document 136. This is the document you reached -- no, not 185 -- not 185-1.  It would be 136.  There we go. No, it's not the MOU.  I'm sorry.  So bear with us. We have a lot to show you.

MS. MARTINEZ:  Right there.

THE COURT:  Okay.  Here we go.

It's been represented to me by counsel on both sides in terms of not only through Judge Birotte but into my home -- my personal conversations -- that this document was going to supplant the preliminary injunction imposed upon the city.  And that was my expectation.

And in good faith, I was told, "Judge, this is a contract.  This is enforceable."

Page 13

And so I have been reading a lot and seeing the discussions going back and the intervener's concern. But they are not a party to this agreement. This is an agreement between the city and the county.

So let's read it together because it's not the MOU that's binding. It's this agreement that was represented to me was the binding agreement and to Judge Birotte that this was the binding agreement.

Paragraph 1. "The city agrees to provide 6,700 beds within 18 months to house or shelter first PEH living within 500 feet of a freeway" --

And I need to find that because I can't read it. Can you help me with that.

MS. MARTINEZ: Yes.

THE COURT: It's in the documents.

-- "overpasses, underpasses, ramps within the City of Los Angeles."

And then to give priority to providing housing or shelter to fill second PEH, 65-plus within the City of Los Angeles." And those I thought were our recreation and our room key downloads at the time -- a little over 3,000.

Page 14

And then "other venerable PEH within the city's limits of Los Angeles."

I listened to a very interesting discussion two sessions ago where Judge Birotte was speaking to both the county and the city. And I always viewed in the input, as I sat in the federal court as Judge Birotte came back from the negotiations that this was absolutely clear-cut between the two of you, that the new beds -- and these were new beds -- were not in existing agreements.

So when we discussed this we always believed --

Thank you so much, Michele.

MS. MARTINEZ:  Uh-huh.

THE COURT:  -- we always believed that this was an easy resolution, that if it was in an existing agreement, it fell into one category. But if it wasn't, it wasn't. And that was the end of the discussion.

And these were new beds because the county, in these negotiations had said, look, we just don't want to pay a flat rate. We want to see these beds actually filled. And that was our understanding. And also, the request was, Judge,

Veritext Legal Solutions
866 299-5127

please monitor this.  Please take a look at this.

Now, the other 700 beds -- by the way, when you first turned this down, I told Judge Birotte to double down on you and offer you 9,000 beds and immediately came back and settled for 6,700.  Congratulations.  That was at 9:00 o'clock at night.

The 700 beds, because of, Byron, your input to Judge Birotte, were the 700 beds in the next ten months and it was a financing issue.

And the Court gave you that ability. I thought it was convoluted but regardless, in good faith.  We had 6,700 beds.  But it really is 6,000 beds due in April.  And I'm going to ask you if we're not on a direct collision course because the interveners have always said -- especially Carol -- I'm very thankful, but I don't believe it because they believe that they have been promised sometimes new beds that haven't come through that Carol has told me a number of times, thank you, but let's see the beds.

So be prepared today when I ask where are the beds?  And what have we accomplished since the signing of this in June and today's date because unlike other bodies where you can say that

Page 16

you are going to obligate themselves -- yourselves and then later on say we made a mistake.  If we're heading for a collision course in April with potential contempt findings, we might as well discuss that right now.

So the next thing is -- I want you to take a look at Paragraph 5 for a moment.  And if you would slide down to that for just a second.

No, they --

MS. MARTINEZ:  Left, very left.

THE COURT:  Oh, okay.  Listen, I made a representation to Nury that the -- Nury Martinez -- and she's concerned and I am too.

There's supposed to be 50 people here.  No more; is that correct?

MS. MARTINEZ:  Correct.  Some people have to leave.

THE COURT:  I think it's filled with mostly attorneys and two of my law clerks.  So I'm just wondering if -- and that's directed to me; right?

MS. MARTINEZ:  Yes.

THE COURT:  I don't blame her.  Tell her I'm clearing that place now.

MS. MARTINEZ:  Yes.

Page 17

THE COURT: I'm going to ask the folks who aren't directly involved like the council people to wait out in the foyer, et cetera. I intend to keep my commitment to Ms. Martinez.

And Bob, would you be so -- I'm going to call you in first, literally. Curren, I'm going to call you in next.

But I would just like to cut down the numbers. Pastor Don, you are part of it.

And I'm going to be calling you in. But I need to honor that commitment. And I hadn't counted. And so Heidi or Wendy, if one of you would stay, but the -- the press can stay. Caltrans, if you would be kind enough, if you would wait outside just in the foyer and separate yourselves, I would really appreciate keeping that commitment. And I didn't specifically count.

I really appreciate that and that's unintentional. I apologize to the president.

Okay. I need to go to No. 5. It's the second page of this agreement.

All right. Do all of you have this docket number? If not, I'm going to read it to you. Then I'm going to ask you what my enforcement powers are.

Page 18

I have always been operating under Paragraph 5.  The agreement, subject to Court approval, monitoring and enforcement.

Now, Skip, that couldn't be any clearer to me.  You and I have had a number of conversations about this.

And I ask Marcus, if you turn to that paragraph, and Shayla, although you are not a party to it.  And Brooke.

So I have been operated under this Paragraph 5.  And so if there's criticism today, let's have that on the record and transparent with where I think I get my authority from.  And if you disagree, let's make that known to the Court.

And No. 7, "The parties will submit this term sheet to the Court upon approval of this term sheet" -- and this is Paragraph 7 -- "by the city and county that parties will respectfully request the Court to entertain an oral motion coupled with a joint stipulation for the city and county that the preliminary injunction dated May 22, 2020, be vacated without prejudice subject to the Court's later consideration of reinstatement of the preliminary injunction should the parties fail to comply with the terms identified above."

Page 19

Well, if either one of you are -- as a city or county -- are backing out of this agreement, I would like to hear that today because my belief was this Court gave up tremendous power in my faith and trust in both the city and county to try to work out these traditional disputes that have been ongoing for decades and which is why LAHSA was formed, to work together in good faith to see if we could reach a working accommodation with the first 6,800 beds, 3,000-plus for your recreational centers and Operation Room Key, and about 3,100 or so for the underpasses.

Because if, in fact, you couldn't reach that working relationship between the two of you, then an omnibus agreement involving 60,000 people was difficult.

All right.  And please call back and tell Nury my apologies and what happened.

MS. MARTINEZ:  I did already.

THE COURT:  That's apparent now.

And later on, we're going to get to that, concerning the motions for clarification, et cetera.

The next thing I would like to say to you before we get to the council members and get

Page 20

them on their way is I had always believed if you could put up Operation Room Key again, that in the belief that with the $2.5 billion in the last two years that's been at the city and county's disposal, that there was money to not only house our Operation Room Key and the freeway underpasses and overpasses, but also to accommodate so many of our other needs.

And I think that that was the reset that I talked about with Wendy Greuel because I knew that there was strong disagreement.  And on September 15 I asked Heidi Marston if there was sufficient funding to cover the costs associated with the freeway underpasses and overpass relocation as well as Project Room Key and the recreational facility download, so we weren't put in a conflict of  choice.

And at Page 61, line eleven through 163, line five and my law clerks have that transcript --

Put it right on the table.  Would you be so kind, Ellie, so anybody can step up and read it, those four pages.

It was represented on September 17, 2020, that these alternative housing arrangements and alternative shelters for these near freeways

Page 21

could be accommodated.

It was testified that LAHSA had the money, that it was there and it could be done -- we could do it all.

And if you remember back in March and in April, this Court took all of the excuses away.  It could be a hotel, a motel if you could achieve it quickly through eminent domain.  It could be what I called a Garcetti pop-up tent.  It could be a 3D.  It could even be a parking lot where you brought your own tent and 12 feet away brought all your possessions.

Because at that time, the Court was -- and I'm sure that all of you are and were -- very much concerned with this rising death rate.  And the expense that Ron Galperin talked to us about, a $550,000 to $750,000 is a perfect solution.  I think everybody believes in housing first.

But there had to be some different errings of some resources for something that was interim or temporary or a bridge to start accommodating people quickly so that at least we could get them out of these degrading conditions.

I haven't seen that turn yet.  And

Page 22

if that has turned and there is a different policy, I would like to hear it today because if we're still back in the old 550,000, 750,000, one size fits all, then my view is this Court is never going to be able to work with you and achieve, if you will, quickly and lower this death rate immediately because it's taking too long or there's too many broken promises.

And in five years from now, I don't think you are going to meet that goal.  In fact, you are already so far behind, it's disgraceful.

Okay.  You can take that transcript down, but just put it on the table for people to read in case they want to verify my accuracy.

So the next thing is -- and we'll get into the council people first it will go quickly.

Is Kevin de Leon going to be here today?

MS. MARTINEZ:  They are here.  They are all here.

THE COURT:  I would appreciate if Kevin de Leon would speak first.  I know you have got an order.  But I would like to delay Bob for just a moment.  And I wish that Bonin was here.

MS. MARTINEZ:  Kevin is coming.

Page 23

Bonin is not.

THE COURT:  Okay.  This is going to be a very transparent conversation today.

Recess for just a moment.

MS. MARTINEZ:  We're going to take a recess.

THE ELECTRONIC RECORDER:  This marks the end of media 2.  We're off the record at 10:32 A.M.  Thank you.

(Recess taken.)

THE ELECTRONIC RECORDER:  This marks the start of media 3.  We're back on the record, 10:35.

THE COURT:  Okay.  And I know many of you are busy.  But this may be one of the more important court sessions that we have quite frankly.  And so if you choose to leave, that's fine.

But today is going to have a lot of transparency and a lot of questions.  And I want to welcome Kevin de Leon.

And congratulations on your ascendancy and your representation of the 14th District.

I'm going to turn this over to you.  You and I have had many prior conversations.  And I

Page 24

want you to take me wherever you feel comfortable in our conversation and in the public sphere today.

COUNCILMEMBER DE LEON:  Very well.

First and foremost, good morning to you, Judge Carter.

Good morning, Judge Birotte -- Judge Birotte, as well to all the city hall staff as well as to our special master, Ms. Michele Martinez.

Judge Carter, I want to thank you very much for the opportunity to come before you to give you an update about the state of City 14 and the human catastrophe that my people in my district are experiencing.

First and foremost, what you are doing is extraordinary as opposed to litigating in the courtroom, we're negotiating and working out solutions in real time.

First, I would like to start off with the good news.  We're on track to build and open 432 new beds to shelter the target population designated by the LA Alliance lawsuit by early next year.

We have partnered with the county as well as Supervisor Hilda Solis on a project that will bring -- that will be using free fabricated

Page 25

modular housing, which will be built in only a few months.

With this project we're hoping to show that we can, in fact, build creative, sturdy structures in a very quick period of time.

We're also in the middle of acquiring Titta Inn in El Sereno, which would be coming online in the next few months as well.

These beds will go towards meeting the total goal of housing, 622 Angelenos that meet the target population set forth by the settlement agreement, meaning we have 190 beds to go for City 14 to meet our goal.

Now, to put this in context, as we all know, the settlement calls for the housing of 6,700 people who are living in and around freeways over the age of 65 or COVID vulnerable.

If all things were equal, each district would be housing 446 unhoused individuals. And we would be 14 units shy of meeting our goal.

But we know the reality is not things -- not all things are equal.  However, I feel confident that my colleagues and I will be able to meet our goals in the appropriate time frame to bring folks indoors as soon as possible.

Page 26

In addition, I have introduced a series of motions to study the feasibility of eleven potential new sites to add more housing beyond our 622 units.

We have hit the ground running and we have no intention of slowing down. Now, the extraordinary moment before us merits that and, frankly, so much more.

But even with housing these 622 individuals in my district, the challenge before us, before me, is much greater.

Per the last LAHSA data count this summer, Council District 14 had the highest number of unhoused Angelenos in the city, 7,896 people and that's over 20 percent of the entire unhoused population in the city.

Now, I know that you understand that. But it's worth repeating because this is what is at the top of my mind every single day. There are these 8,000 -- there are 8,000 individuals languishing on our sidewalks, languishing on our overpasses, underpasses, our parks, alleys, and freeways in my district.

When I say this is a human catastrophe and a dystopian nightmare, I'm not

Page 27

speaking in hyperbole.  While housing the folks under the bridge is a great start, we have so much more work to do.

Now, I often drive down Skid Row to remind myself of the lives that we, as a city council are responsible for.  And I am committed to creating way beyond just the 622 beds.  But we must all -- we must all be committed to this goal.

If we're successful in housing the 6,700 Angelenos per the LA Alliance lawsuit, that leaves us with 34,590 unhoused Angelenos left to house.

What we have done -- what we have before us is a decision we have to make.  Do we continue to piecemeal our way out of this or commit ourselves to a tangible, global solution, one that is immediate, one that is urgent and one that brings us altogether.

If not, we will continue to drown in lawsuits and go through the litigation merry-go-round that gets us a few steps forward each time and a few steps back each time because we know that is not nearly enough towards a comprehensive solution.

So far, we have gone through Jones

Page 28

versus Los Angeles, Lavan versus Los Angeles, Desert Train versus Los Angeles, Mitchell versus Los Angeles, Garcia versus Los Angeles.

And although not specific to LA, it's had a huge impact on Los Angeles.  Martin versus the City of Boise, Idaho.  And finally, the reason we're here today before you, Judge Carter and Judge Birotte us the LA Alliance versus the City of LA.

Our unhoused population can no longer afford this approach.  Our taxpayers can no longer afford this approach.  I have said from day one that there are no shortcuts, cutting corners or cheating on this issue.  We have to build, purchase and repurpose with a sense of urgency if we're going to take people off our streets, sidewalks, overpasses and underpasses.

And as we build and as we purchase and repurpose, we need value and volume.  We want clean safe streets for everyone to be able to walk on for our businesses to flourish and thrive and grow.  But that won't happen to the extent necessary until we house people.

Our resources are limited.  They are finite, not infinite.  Some who say they are

Page 29

nonexistent, short of repurposing current dollars in existence, either at the state or local levels.

Clearly, hanging our hat on the outcome of this presidential election, while not the cleanest and fiscally sound way to do things, it will definitely give us a sense of hope for the future and with unilateral action through the executive branch once a HUD secretary is in place, we might be able to drawdown on dollars, much needed dollars to expand greatly our housing plans.

Now, as if you didn't know as well, an eviction moratorium tsunami is on the near horizon that we all have to collectively contend with.

How are we going to stop Angelenos who haven't been able to pay rent due to COVID from being evicted after January 31, 2021.

And unlike many other polarizing issues, whether it's the issue of taxpayer funded vouchers or not, whether it's an issue of climate change, believing the facts and science or not, whether it's the issue of impression or Roe versus Wade, which has been litigated numerous times at the Supreme Court -- very culturally polarizing issues.

The issue of homelessness is not

Page 30

polarizing across the political spectrum, whether you are on the left, in the middle or on the right, whether you are pro business, whether you are a socialist, it doesn't make a difference.  Everyone wants the same goal, which is to get folks off the streets, off the sidewalks, off our parks and into housing.

Now, of course, there are tactical differences.  There are time frame differences that we all have.  But ultimately at the end of the day across the political spectrum on the issue of homelessness, everyone is on the same page.  It's how we go about doing it in the most efficient manner with the sense of urgency.  It will define, in fact, if we're successful or not.

Now -- I'm almost done, Judge Carter and Birotte, but I will say this.  Getting our unhoused community off the streets with dignity and respect should be our No. one, No. 2 and No. 3 most highest priorities.  We can't continue to keep playing at the margins.  I'm going to be a little vague here.  But we cannot adhere to the status quo because the status quo is not working.  As we deal with the homeless industrial complex -- and when I say that, I mean everyone from government entities

Page 31

to nonprofit organizations and everyone in between. We have to be disruptive, not push the envelope but in fact, tear the envelope apart if, in fact, we are to be successful and getting people off the streets with a roof over their head.

This is all hands on deck. Silos must be decimated. And everyone governmental level must coalesce and work together: City, county, state and federal.

It's like a family Thanksgiving. While everyone may not like each other, at times guarding territory or money they believe feels exclusively to them, belongs to them, but on the issue of homelessness, there should be no barriers. We are in this together. And as a result we must work together.

If not, we will be in litigation hell forever, spiraling out of control into a rabbit hole where the movie can blade runner looks quite bright and sunny and actually utopian in comparison to today's human catastrophic, dystopian nightmare in realtime, just down the street from City Hall.

Now, I want to thank you so very much for the time that you have given me today.

And I will also lastly, in

Page 32

conclusion, like to invite you, Judge Dave Carter, Judge Birotte as, well as our special master Michele Martinez, to hold the next hearing in City 14.  We are in City 14 today, but a little closer to the action.  Either in Boyle Heights a very proud historic working class community that has been largely impacted by the large push of unhoused individuals into that neighborhood or in Skid Row itself where we can host the next hearing, either in Boyle Heights or Skid Row.

So with that, Judge Carter, thank you very much again for the opportunity to share a few words with each and every one of you.  I'm more than happy to answer any and all questions that you may have.  Thank you.

THE COURT:  Okay.  First of all, with complete transparency, I want you to know that Kevin and I had this conversation yesterday.  So I'm not surprised by the invitation and the Court accepts.

The next federal court hearing will be in Skid Row.

And although you have offered Boyle Heights, the union mission is open.  I know that there have been a number just across from the police

Page 33

department and I have to tell you with complete transparency without naming the persons, I have been told numerous times that the federal court would be at an oddity, let's say.

But it seems to me that, since the Federal Courts are closed, that this Court along with Judge Birotte has been forced to go to the hotel.  And Carol expressed some concern in March about being in a hotel where the plaintiffs in a sense -- what was the name of that hotel.

MS. MARTINEZ:  The Alexandria.

THE COURT:  Alexandria.  But humbly, we thank that proprietor.  We have now been here in city hall.  I see absolutely no reason why this Court wouldn't humbly hold a session in Skid Row.  I accept.

COUNCILMEMBER DE LEON:  Thank you much.

THE COURT:  I would like it at Skid Row, though, for one reason.

COUNCILMEMBER DE LEON:  Thank you.

THE COURT:  I'm going to give a strong shout out and talk to you about what I talked about before.  Call me if there's anything that I haven't said to you or you haven't said to me with

Page 34

complete transparency now.  We're all done with...

First of all, you were not in office when I first came to Los Angeles in March.  I had heard rumors about another council person who decided not to make contact.  You were not able to take the oath early.  So unlike any other council district, whenever I have gone into a council district, I represent all council.  I have always paid the courtesy of calling that council person first to let them know that I was there or would like to come out, with two exceptions.

In Bonin's district, I have always called.  But I have gone by twice without him knowing it to check out the 10 and Venice freeway because it's on my way to my daughter's and grandchildren's house.  But that was a drive by.  That has different connotations in my prior profession, but it was a drive by, just to look.

I have received a lot of input from the business community, but the Skid Row Advisory Board was formed by this Court because I wanted to talk to homeless.  I have a tremendous criticism of people who aren't out on the street because those are our clients.

And therefore, initially with

Page 35

General Jeff, Catherine McNerny (phonetic), Pastor Cue --

MS. MARTINEZ:  Pete White.

THE COURT:  -- Pete White and recently Monique Noel, I got an invitation besides through the police department -- who you met that officer -- in March to just go out in the community with community workers.  And so I know where I can get barbecue.  I know where I can go to the Friday night movies -- I'm just kidding you.  And if I don't know every person down there, I know probably every fifth or sixth person down now.  And I'm not kidding about that.

In fact, just to joke, obviously it's a largely black American community.  And when I walk down the street, a lot of the folks kid me and say, well, "Hi, Judge.  How you doing, there goes the neighborhood."  So -- and everybody gets a great laugh out of that.

I've been told the council people won't show up.  Well, we created this.  I don't know why the federal court wouldn't go down and I don't know why any of you wouldn't have an excuse not to be present.  So we'll just see since Los Angeles created Skid Row, if they are willing to confront

Page 36

Skid Row.

And so therefore, I accept and want to thank you. And I would prefer, if possible, at the Union Mission because I would like to be on Skid Row with no denigration to Boyle Heights. And that will be official court proceeding.

I'll have to work out an accommodation with you because I need to make sure that the community is more than welcome, but I can't have people shouting and -- you know. But inside the mission, I think would be an appropriate place.

The second thing is you and I have transparently talked about my concern about the rising death rate and the perfection that's being demanded through a simple and one-size-fits-all housing accommodation of $550,000 to $750,000.

You know, I am deeply concerned that I'm heading on a collision course with this council and the board in terms of a contempt proceeding in April unless this is completed.

And to avoid that, I'm having these monitor hearings so that there is no doubt that, come April, that these 6,000 units are going to be in place.

Now, I know in politics, sometimes

Page 37

we break our word.  But I don't have to say it twice.  April is looming.  What housing has been created in your district so far?  What new housing is created in your district?  And you are not responsible.  You just took the oath.  But tell me what new housing is there.

COUNCILMEMBER DE LEON:  Judge Carter, very specifically, to stay germane on the question at hand with regards to --

THE COURT:  Yeah, what new housing is in your district?

COUNCILMEMBER DE LEON:  -- unhoused individuals specifically as it pertains to the LA Alliance lawsuit, to be specific, again we have -- we are on track to build and open 400 --

THE COURT:  Hold on.  Heidi -- Hilda called me.  A phone call.

COUNCILMEMBER DE LEON:  Yeah.

THE COURT:  A supervisor, extraordinarily nice person.  She says, Judge, I tried to get 600 on that site.  You know, I couldn't get that because the city pushed back and gave me 400.  And you know, I tried to get 400 and I ended up with 400 and she named a hundred, 220, or something on the site.

Page 38

COUNCILMEMBER DE LEON:  Yeah, that's correct.

THE COURT:  Okay.  And you know, I was very appreciative.  I said, you know, "Hilda, thank you.  You are very honorable.  You have done the best you can."

But it's of great concern to me that whatever the reasons are, if we had the opportunity for 600 -- and the city may have good reasons -- maybe it's a fire hazard.  We then went to 400.

COUNCILMEMBER DE LEON:  Uh-huh.

THE COURT:  We then went to 200.  So all I can say is thank you, but obviously, I'm concerned that on one hand, we're being successful and things are starting to break.  The inertia is starting to break, but it's nowhere near the numbers.

What else?  You have 11 new sites planned.  Are you going to reach this by April?

COUNCILMEMBER DE LEON:  Yeah.  I give you my word that I have all the confidence that we in City 14 are going to meet those goals.  But I'll extend it beyond City 14.  I have all the confidence in the world that my colleagues are on

Page 39

this horseshoe under the leadership of our current Councilmember Nury Martinez --

THE COURT:  Okay.

COUNCILMEMBER DE LEON:  You know, under her leadership, we will meet -- be meeting the 6,700 beds, shelter goals.

THE COURT:  All right.  The second thing you and I talked about was perfect getting in the way of good.

How are you going to get enough shelter quickly enough?  Because these funds are allegedly committed.  I keep hearing, oh, Judge, these funds are committed, but they are committed so far out that I need some kind of diversion to make this work or this city is going to be held in contempt.

And in fact, it's no secret, and I know that Mike will take me up to the Ninth Circuit on this -- each councilperson is going to be designated.  So I don't want that to come as a surprise.

And if that's improper, Mike, you know how to find the Ninth Circuit.  But I'm going to name the council people who aren't complying, not just the city, because in the past, the city could

Page 40

hide behind -- the city is found in contempt.  I'm going to look at each council district and name those council people who aren't complying.

COUNCILMEMBER DE LEON:  Well --

THE COURT:  So with that fair warning.

COUNCILMEMBER DE LEON:  Yeah.  What I would say to that, Judge Carter, is that --

THE COURT:  Are we going to get those funds diverted or not?

COUNCILMEMBER DE LEON:  That's the --

THE COURT:  Can you approach and -- to be the leader in that regard and lead something that gets -- apportion these funds out of loss' hands in this perfect one size fits all -- or quite frankly, the provider's hands who I'm going to talk about because this is part of the industrial complex quite frankly.

COUNCILMEMBER DE LEON:  Yeah, that's a very good point.

THE COURT:  They are enriching themselves.

COUNCILMEMBER DE LEON:  Yeah, that's a very good question.  Listen, we have a

Page 41

housing -- or I should say a homeless industrial complex of extremely, well-intentioned individuals and groups and organizations who have been dedicated to the issue of homelessness for years, if not decades.

We look at the outcomes.  And by any objective measurements we're not on a pathway --

THE COURT:  I don't find it accountable quite frankly -- I don't find it accountable.

COUNCILMEMBER DE LEON:  That's --

THE COURT:  And later on today, if we need to get into hearing that regard, I'm happy to do that, I think the Board is being ethical.  I think Skip believes what he is saying.  I don't see accountability on the provider's side.

COUNCILMEMBER DE LEON:  What I would say, Judge Carter, is the following -- is we have to look at through this lens.  Dollars, resources are not finite -- or I should say they are not infinite.

THE COURT:  You have got plenty of money.

COUNCILMEMBER DE LEON:  They are finite.

THE COURT:  You have got

Page 42

$2.5 billion and I'm not being rough on you; I'm being rough on the city right now.

COUNCILMEMBER DE LEON:  No, I understand wholeheartedly.

THE COURT:  Let me repeat that $2.5 billion.  H gave us 1.2.  We're supposed to have 350 million, maybe 240 million this year.  This county has a problem, not of money.  It's got a problem of courage and will.

COUNCILMEMBER DE LEON:  Creativity, innovation, leadership.  Let me just go back again, the dollars are not infinite.  They are finite. They end and then they disappear unless we re-up --

THE COURT:  Can you get us some money?  Can you get us some money so that we can build something temporarily and get people off the street while we wait for the perfect --

COUNCILMEMBER DE LEON:  Well, going back to reprioritizing current existing dollars at the local or state level or waiting for a boatload of cash to come in with the new administration at the federal level --

THE COURT:  Okay.

COUNCILMEMBER DE LEON:   -- what I would say is the following -- is that any dollars

Page 43

that have been committed, yet bond dollars have not been sold to the market -- we need to reexamine that sooner rather later.

THE COURT:  Okay.

COUNCILMEMBER DE LEON:  And that goes back to the same paradigm that currently does not work.

The city's contribution of an average of $150,000 to a larger pot of money with folks trying to stack different streams of revenue from the state, you know, from the federal government and waiting perhaps three, four, five years out to build traditional affordable housing for our unhoused community -- that model doesn't work with the human catastrophe that is -- that we are living today.

Perhaps it worked 10 years ago, 15, 20 years ago, when our unhoused population was minimal in comparison to what the numbers are today. But that current model doesn't work.

Yet we're stuck in a system where we'll continue to feed at the trough with that current system.  And ultimately, at the end of the day, you have to look at your output with the number of individuals.

Page 44

And that's why value to get volume is absolute critical unless there is a continued infinite stream of revenue that will be coming in. And therefore, you can paper all of the flaws that the current structure has.

THE COURT:  Okay.  I'm going to measure two things.  One, how quickly can we get some kind of shelter up to stop the death rate?  And is our death rate going down?

COUNCILMEMBER DE LEON:  Well, it's my understanding that we can get prefabricated modular housing up within 9 to 12 months, even sooner with a sense of urgency.

THE COURT:  Yeah.  And so let me talk to the city for a moment and let me talk to the city attorney.

I'm going to take some time today because in Appendix A of the budget, there's six -- 760, what I'm going to call pop-up -- I call them Garcetti pop-ups.  It's the -- could you put up for me, the shelter?

This is what, Mike -- Eric came to me with in March.  And these were the first 50. These were the only 50 that he was able to purchase and was very pleased with these pop-ups.  They are

Page 45

about $7,000 a piece.

So I got somewhat sold on these -- yeah, there they are.  I got somewhat sold on these at the beginning, thinking that this was the panacea.

Now, since then, I have come to believe that no, motel rooms, immediately, hotel rooms are quicker and faster.  But that's -- that's your concern.  You are the policy maker.

But at $7,000, what the city did is they came back with these 760 units and they made these $91 million, about twelve times the amount of every other city.

So you have got a bureaucrat -- and I can put his picture up there if you like.  But I think I'll save that embarrassment for a moment -- one of our deputy -- deputies over here -- who decided to tack on all of the long-term supported housing model.

In other words, if it was being built out for long-term supportive housing, he raised the cost of what should have been 720,000 times 7,000 -- or 720 times seven to 10,000, plus modest hook up cost and pretended that they were all long-term supported housing, and therefore, it's

Page 46

going to cost $91 million.

That's simply unexplainable because it's not apples to apples at all.  So if we're talking about temporary shelter, we have got a modest investment.

But I'm being told, as the Court, that we have these finite resources.  That's just monkeying with figures.  That's all.  And it comes from a bureaucrat.  I just leave that to you.  But $91 million is ridiculous.

Thank you.

COUNCILMEMBER DE LEON:  Thank you very much, Judge Carter.

THE COURT:  And maybe you are one of the leaders that we're looking for.  But he'll see. And I said that to you the other evening.  I think I have found another person who can move the ball forward, especially with experience in the state senate.

But, I am measuring now product --

COUNCILMEMBER DE LEON:  Well, thank you very much.

THE COURT:  Okay.  Okay.  Thank you very much.

COUNCILMEMBER DE LEON:  And I'll

Page 47

just finally say this.

I'm not concerned about our unhoused communities.  I'm concerned about --

THE COURT:  And you told me I got to come home.

COUNCILMEMBER DE LEON:   -- about bureaucrats.

THE COURT:  You told me I get to come home.  I'm coming home to Skid Row, okay.  The rest of this is interesting, but Skid Row is the target.

COUNCILMEMBER DE LEON:  Welcome back.

THE COURT:  Welcome back.

Okay.  And General Jeff is listening right now.  And so is Pastor Cue and Pete White and a number of other people.

Who is next?

Bob Blumenfield, please.  And this will answer some of the intervenor's questions about my conduct.

... the day.  This isn't going to just be rush in and -- a significantly different.

(Audio error.)

COUNCILMEMBER BLUMENFIELD:  Hello,

Page 48

Judge.

THE COURT:  Pleasure.

Any place that you would like to start and Pastor Cue, where are you?

MS. MARTINEZ:  It's Pastor Don.

THE COURT:  Pastor Don, I mean.  Would you ask him to come in and be seated with my staff?  And I want to keep the numbers down.

All right.  Let me start with -- I didn't intend to start the freeway effort in Councilman Blumenfield's district.  I intended to start it in Curren Price's district or Gil Cedillo's district or Marqueece Dawson's district.

The -- and MRT and Herb Wesson at the time underneath the 10 and the Venice Boulevard, near the Kaiser.  And I went to each of those locations.  I talked to everyone that I could possibly find in those encampments but Councilman Blumenfield moved quickly.  And I got a call that he wanted to go first and the others were having a little bit of trouble.

So Skip, get of your iPhone for a second.  And one of the problems was that the county got incensed -- so we have complete transparency -- because the provider initially

Page 49

stepped up with 78 units, then 28 units, then 22 units, then zero units, then back to 22 units with our finding another 10 detox centers.

And so because of your efforts, I decided that we would focus there, although I originally -- I thought you would be the third or fourth person down the line.

The second thing, is I introduced Pastor Don into this effort and Farrah and Joe and Mandy and Andy and a whole bunch of those advocates because my view is that the city didn't have the slightest idea how to implement -- let me repeat that you don't have the slightest idea how to, that you have never been through 16 encampments.

You have never devoted really the intensiveness of going through with a date of choice, which is what I'm going to call a date of choice.  And you have never been out on the streets quite frankly and gone tent to tent, although your providers told you that they had.  I think I could disprove that very quickly.

That is really an effort, in my past history, with Brooke who is here, and advocates taking to the street quite frankly, who did intensive work.  And because of that, we found

Page 50

shelters.

And I will give you an example.  You have Encampment to Home, which is a wonderful project and it took you a year.  And I believe that that was a tremendous success and complement all of you.

But in that year period of time, you had the homeless person who said, you know, I'm not ready to go today.  I'm -- got a girlfriend.  I have got a -- I'm a couple, I may be using dope.  I may just not want to go.  I may be psychotic.  And so what it did, at least in my part of the world where we were successful, it spaced it over such a long period of time that our bureaucracies couldn't perform efficiently because the homeless person said, I'm not ready to go today.

So we came back to visit with a clipboard two weeks later or a month later and it was a joke.  And the rest of the homeless people saw, well, that's not working.

So Brooke and I have tremendous fights.  How many times have we talked to each other this week?  Give me an estimate.

BROOKE WEITZMAN:  Ten.

THE COURT:  Ten at least in the last

Page 51

four days.  Probably.  Five days.  And we argue all the time.  But she's a true advocate.  And somehow it seemed to work because we haven't had one arrest.  And Bonin is right about that -- when I read this discussion going on with the council -- we haven't had one cite and release with 3,800 people in 16 encampments.

And so I'm watching this silly discussion going on inside this city about all of the things that could happen.  And it's because you haven't been through an implementation process until you took it on, Councilman, with tremendous obstacles that I'm not afraid to discuss and I hope you are not.  And if not, I'll call Pastor Don up here.

So in two weeks -- and it could be three weeks or it could be a month -- unlike the Encampment to Home over that you had before that took a year, you accomplished this in 14 days.  And the benefit is it made the bureaucracies perform in the time schedule.  And remember, I don't care if it's a month.  But it can't be six months, et cetera.

And that's because there had to be a day of choice.

Page 52

Now, you used the inflammatory word like enforcement, et cetera, but I have to say -- I want that script from you -- could you find that statement that you made?

MS. MARTINEZ:  Do you have it in here?

THE COURT:  Yeah.

And I want to take you through, Mike, something I would appreciate not happening again because Skip called this to my attention with complete transparency -- I think Shayla called this to my attention with complete transparency -- and that was the notice that was sent out.

And so we heard on the Friday that you had to fashion this notice yourself.  And we weren't involved and then saw a notice that caused Michele and me concern.

On Sunday or Monday -- was a holiday -- I saw the final notice going out.  And I would like to put that up for a moment.

Do you know the -- the notice.

MS. MARTINEZ:  (Inaudible.)

THE COURT:  Yeah.  Put up the notice for a moment.

I want to show you what works.  And

Page 53

if it doesn't work for you, so be it, but it's working for everybody else.  And this was the notice that was put up.  And it's hard to read.

But inserted in this notice is something to the effect that Judge Carter will be present on such and such a date.  And the complaint that came to me in a home phone call from Skip into my house; right, Skip?

MR. MILLER:  Yes.

THE COURT:  That you were concerned and the county was concerned that it looked like I was guiding this.  Trust me, I did not draft this notice.  But that's a truthful statement.  I was going to be present on October -- whatever that date was, Mike.  I can't read this anymore.

What is the date.

COUNCILMEMBER BONIN:  13th.

THE COURT:  October 27.  And I was there.

I would prefer, although you can control that if you draft this kind of notice.  And that is, put up the next notice from Fullerton. This is the last -- okay, this is the typical notice we put up.

What it says is "to assist persons

Page 54

experiencing homelessness in the city of Fullerton, the city is partnering with other north county cities and has access to three navigation centers providing homeless and support services:  Buena Park Center, Placentia Center, Fullerton Illumination Foundation.  Services and other resources are available for the homeless individuals."  And then it refers it to city net.  And then there's a deadline, okay.

And I'm going to represent to you that that deadline -- I have dealt with so many cities.  Some of those have enforcement provisions that say arrest.  Others have cite and release.  Others just leave it, frankly.  This is the first city, though, that I have been involved with that doesn't have an ordinance when we started this effort.

And so, Bob Blumenfield's complaint to me was, gee, Judge, I'm undertaking this but people may come back, and what do I do then?

I said, Bob, I don't know.  If you want to start, let's just start and do two things.  One, let's flip the paradigm and once again prove that we don't need to have law enforcement as the spear.

Page 55

And that was your discussion with Mandel recently on the radio, Mike, where you said, you know, if we can get away from that law enforcement spear -- and I think you and Shayla would join in that -- let's do that. But you have to understand that hasn't been done before. It's always led with law enforcement.

Well, now we have done it in Stanton. We have done in Whittier. We are going to do it in Fullerton. And I think that's a project of at least 200 -- isn't it Brooke? -- not 50.

And so to me it's almost laughable the numbers that you are dealing with in Los Angeles being so small and so inconsequential that we're having a heart attack over finding 50 spaces. And what I saw in this process is you don't have the housing.

So the provider actually volunteered the housing. This wasn't good old Judge Carter or Judge Blumenfield. The provider stepped forward and said you know, I have got the housing. So Skip, if the county is mad, you tell the county to go check the provider because they volunteered this housing.

Do you understand me? Check with him if you don't believe me. Check with Pastor Don.

Page 56

Check with Andre who is on the phone call listening to this conversation on a Monday night.

Now where is Heidi for a moment? Come on up, Heidi?

MS. MARTINEZ:  I found the link.

THE COURT:  I see this Phil Ansell letter, this nonsense.

Judge Birotte and I are on the phone call with you.  You call my home.  I put you together with Judge Birotte.  I put you on the line with -- and I asked you if you wanted to go forward, that that was your choice, didn't I?

MS. MARSTON:  Yes.

THE COURT:  And what was your response?

MS. MARSTON:  We felt that -- can you hear me?

THE COURT:  I can't hear you.  In other words, was this your choice, or was this the Court telling you to do this?

MS. MARSTON:  Can you hear me now? Okay.

THE COURT:  I can hear you now.

MS. MARSTON:  We felt, Your Honor, we had already started the work and we were far

Page 57

enough along that we wanted to continue the work that we started and follow through in our commitment to get those folks housed.

THE COURT: It was your final choice, wasn't it?

MS. MARSTON: Collectively, us with the provider who had resources, council office, we all wanted --

THE COURT: No, Heidi. You were asked specifically, Heidi, if you want to go forward, do you or not? And what was your response?

MS. MARSTON: As LAHSA, we wanted to but we weren't the only ones whose success it was hinged on.

THE COURT: Okay.

MS. MARSTON: It was as a team.

THE COURT: Okay. You take it back to the county, Skip, real quick. This was a choice that was made by your provider and by your agency. This isn't a court giving an instruction as Mr. Ansell seems to -- or Supervisor Ansell now, apparently, seems to infer.

Okay.

MR. MILLER: All right.

THE COURT: And if he's your Board

Page 58

of Supervisors, you get him in here.

All right, Heidi.  I'm going to come back to you.  I want to thank you for being so gracious.  I don't think I need to -- do you want to add anything to the conversation?  All right.

MS. MARTINEZ:  This is just the ordinance language.

THE COURT:  So I have always made it clear in the last 16 encampments as follows:  That I would support any ordinances on the books that are constitutional.  And I have supported every city in that regard.

So what that means is historically in our agreements of which there are -- I don't know, 16 now, Brooke?  I can't -- I have lost track. You have to draft a constitutional ordinance.  The harshness or leniency of that is up to you to withstand constitutional grounds.

So maybe lying or sitting is unconstitutional.  Maybe having encampments is not. But that's up to you to draft.

And that means that the advocates can attack that as -- on constitutionality grounds. But in every past settlement I have represented -- and I'll represent to you that I have

Page 59

always made it clear that I will support any ordinance on the books that is a constitutional ordinance.  And I'm going to state that because I told Bob I would state that categorically.  And I'm stating that categorically and you can tell Nury that also.

And I have supported that in every other city because the problem is that people come back.

So now, I'm going to turn it over to you to describe the process.

COUNCILMEMBER BLUMENFIELD:  Okay. Thank you very much, Judge Carter.  I appreciate you holding this hearing and the partnership, having you come out to the district, I think has been exceedingly helpful, so I want to thank you.

As you mentioned, though, it was -- this was -- LAHSA stepped up originally to work with us.  I was very eager to -- to go first and to get my underpasses cleared out and to get those people housed.  But I didn't have a way to do that.

LAHSA stepped up and said they were willing to do a pilot program initially just for the Winnetka underpass, which I should say is -- has

Page 60

broken the records on the number of complaints it receives in the city, even though it is not -- by far, not the underpass with the most encampments, we have the most complaints.

So it's been a real issue and -- as a number of the underpasses in my district have been.  We moved forward with LAHSA trying to put together a pilot program.  We are moving forward for a couple of weeks.

We then decided to move to include Winnetka and Corbin, since those two underpasses were inextricably linked.  People would go from one to the other.  And after lots of conversations about how it needs to be effective in a two-week period, I really pushed and LAHSA and LA Family Housing stepped up and agreed to do it within a two week period starting on October 13 and moving to the 27th.

During that time, we had an intensive outreach.  And I know LA family housing really stepped up.  Pastor Don stepped up.  My team was out there.  I was out there personally every other day.  And every person who was under those freeways was offered shelter.

And it -- and I have to say, you

Page 61

know, this idea of a choice date -- that's what made the difference because I had been out to these underpasses for years in the past with outreach workers talking to these same people -- many of the same people. And it was always as you described earlier, well, my girlfriend, my situation here, this, that, and the other.

But when we had those intense two weeks where we had the choice date, that's when we started to see movement. And it was -- it was really incredible because during that time, every single person, 60 -- and it ultimately ended up being 60 people -- were moved into some form of shelter.

THE COURT: Let's repeat that for a moment. 59 people received housing. One lady didn't and nobody is going to touch her until we get services in there for her. Period. There isn't going to be an arrest. There isn't going to be a cite. And that's why the court is standing there to ensure that that doesn't happen.

And we haven't had one arrest or one cite with 38- to 3,900 people in 16 encampments and we don't need that and we don't need to lead with law enforcement.

Page 62

So you and I wanted to go visit. I think it was 6:00 o'clock in the morning and we've got -- no, that was in the evening hours. And so Skip, the next concern was this guidance by the Court and I want the intervenors to hear this because they got concerned.

And that is, when I approach a homeless person, I don't want four cops, three LAHSA workers and a parade of people. I'm going to talk to that person humbly one on one. And I thought it was extraordinarily unprofessional of those organizations to cluster that many people walking down the street to approach some poor person in a tent when I want to have a personal conversation with them.

And I asked them to step aside for a moment so I could have that. And so if that's the basis of this concern, I want to be completely transparent. That's absolutely misplaced. All right. And if I need to put on testimony, Pastor Don is sitting right there.

So I think I visited -- if I missed any homeless person or you missed any homeless person, I would be surprised. I know that Pastor Don didn't. I know that LAHSA was there. I

Page 63

know that DMH came out.

But something happened at 6:00 o'clock in the morning on the next visit.  And that is -- you describe it -- and I'm not going to be kind about this.  You are hearing and I am hearing that people are being moved back from other locations to the freeway underpasses.  I want you to tell me about that.

COUNCILMEMBER BLUMENFIELD:  Well, I -- that was of grave concern because, of course, with this project starting out as just 30 people.  And more people were showing up.  And we didn't know why.  Part of that was because word gets out.

But then part of that was also -- and I think what you are referring to is that folks from LA Family Housing were referring people specifically from the river who were being displaced because the county was -- the people were living in those -- I don't know, drainage ditches whatever they -- the culverts and the county was doing a cleanup.

And so from there, LA Family Housing was saying, well, we don't have anything for you here.  Go to the underpasses.

So we started hearing that from

Page 64

various people, but the same time -- and so that gave me a locality of concern.  But LA Family Housing was willing to step up and house those people.  So our numbers ballooned a little bit to 60.  And we got all of those people housed.

But that was a -- of grave concern because if we're trying to clear the underpass and keep them clear, we don't want -- we don't want to make them the place where people are going.  And we don't want that to be known as the --

THE COURT:  And now the good news. The good news is because you broke the inertia and you started for a change, instead of just this back-and-forth talk going on, I think we housed close to 70 people, didn't we?

COUNCILMEMBER BLUMENFIELD:  I think it was 60 in total.

THE COURT:  60 total, yeah.

COUNCILMEMBER BLUMENFIELD:  There may have been some others.

THE COURT:  Got ya.  And we have one lady out there.  And nobody is going to touch her until we get services.

So Jon Sherin, come on up.  I want to complement you because you are out there

Page 65

6:00 o'clock in the morning.  He heads the agency. And you have nothing but my admiration.

Now, in Whittier, we have got Tara. We have got Quinn.  We have got Ernie; right, Pastor Don?

MS. MARTINEZ:  Yeah (inaudible).

THE COURT:  And because they haven't gotten services out in Whittier, nobody is going to touch them.  The Whittier police department understand categorically from this Court, you are not arresting a person.  You are not taking them into custody.  You are not even citing them until we get resources.

And if we have Mayor Joe come in here, he will tell you that most of your agencies here can't even find Whittier.  And you haven't been servicing Whittier frankly.  And if I need that testimony, Skip, I'm glad to call that in and make a record also.

Okay.  Let's talk about our provider services.  I called Jeff this morning and I have to -- I have to say that I believe the Board truly believes and the council truly believes that these services are being translated to the street.

But from everything I hear and see

Page 66

on Skid Row, minimally, in every city I visited -- every mayor -- and I represent every mayor, and we'll drag them in here one by one if you want -- and the community -- you know, the Moniques, the General Jeffs say no, these services, Judge, aren't reaching our streets.  They aren't reaching people here.

This industrial complex is providing money to providers.  And they are showing up with -- facetiously -- quote/unquote, clipboards, water, and sometimes masks, but they are not getting to the street.

Now, I can disbelieve that one time, but it's coming from the community.  And I'm just wondering as council and the court, if we're not remiss because we're not part of that process when we talk to each other, but we're not out talking to the homeless community.

I'm not going to get involved in this ordinance.  Whatever you write or do, that's not the Court's concern.  That's a place that I can't be.

But I do represent to you that you are the first city where there wasn't something of choice, but it's got to be humane.  And this

Page 67

discussion is backwards for this reason.  You have gotten so bound up in the discussion of an ordinance that we have all forgotten one thing.  This Court is not going to allow one thing to happen unless you have housing.

Let me say that again.  This conversation has turned so backwards in terms of what your enforcement is going to look like and criminalization.  It's nonsense.  I'm going to ask you again, are you satisfied with the housing, Skip, so far that's been produced after $300 million?

MS. MARTINEZ:  It hasn't (Inaudible.)

MR. MILLER:  No.

THE COURT:  Okay.  Where is the housing?  Because I'm losing faith that we reach an agreement in June.  I expected you to have an MOU one week later.  And three months later, only because of the intervention of Judge Birotte -- and quite frankly, Skip, you broke that and so did you Michele -- you broke that impasse in the settlement negotiations; we got an agreement.

Why should I have confidence in you producing anything when it takes three and a half months to get an MOU and you go out to the public

Page 68

and claim this great victory for public consumption?
Where is my housing?

Because what happened, Skip, was they did reach into the provider pocket.  The county shouldn't be angry at that because that's not the housing you paid for.

But by the same token, don't make a mole out of a -- you can deduct that in January if you want to, if you think you are out $2 million.  So it's silly.

So I want to ask you again, where is my housing?  Okay.  I'm just going to leave that on the table.  Because I'm not kidding you.  You come April and I will find you in contempt.  And if I just say that categorically now, there's no surprise about it.

All right.  Bob, anything else other than it's been a pleasure to work with you and I wanted to say on the record that this councilman walked tent to tent also.  And he started at 6:00 o'clock and he worked until 9:00 o'clock at night.  And so whatever your disagreements are, this is a councilman who may be philosophically in line with other entities or not, but this person worked night and day along with his staff -- thank you out

Page 69

there.

And by the way, along with Pastor Don who was told by one of the agencies that we weren't invited, to basically leave. And that was your provider. I can't tell you when people are out there working for free and trying to help how disgraceful that is. And you can take that back to the board also and back to that provider.

Okay. And by the way, we were left with the toughest cases at the last. So Bob, anything else?

COUNCILMEMBER BLUMENFIELD: Apprecia te that. And we are even -- you know, one of the problems with going first is that we have moved forward. But now because we're in a little bit of a limbo in terms of what -- how we keep these areas clear, we're starting to see folks come back.

I was out at the underpasses this morning. There's a new tent on -- a new person who has shown up on Winnetka. There's materials that have been left there on Canoga -- on Canoga that have been there for weeks that we can't seem to remove, even though they are abandoned.

THE COURT: Okay.

COUNCILMEMBER BLUMENFIELD: And this

Page 70

is part of the challenge that we have.

THE COURT:  Just ask yourselves this.  When it hits the headlines in January, 1,147 dead, a 36 percent increase in our homeless citizens dying out there.

And what is the explanation? Because it's the old model at $550,000 which you can't produce fast enough, or are we going to get some diversion of these funds into shelter immediately so we can do something to stop the death rate?

And I'm going to leave that to LAHSA and the county and the city.  But you can't come to me in April and claim that you haven't heard from the Court that I'm not going to take some action at that time.  You are killing people.  I don't know how else to say it.

COUNCILMEMBER BLUMENFIELD:  The last thing I'll say is you are asking about the housing. And we're putting up two cabin communities that are -- you know slated to go up in March, one directly behind my district office in Reseda, one in Tarzana.

Those cabin communities -- you know, one holds 50 units.  The other 75 potentially, you

Page 71

know, up to two people per room.  So we are trying to deal with the numbers as best we can, moving as fast as we can.

THE COURT:  Okay.  Well, I have seen your record.  I meant to start with Curren, meant to start with MRT and Herb, meant to start with Gil. That just didn't work.

COUNCILMEMBER BLUMENFIELD:  Yeah.

THE COURT:  So I ended up in the Valley first, but okay.

All right.  Andre, do you have any questions?

Okay.  Any questions?  Okay.

Why is this one lady left on the streets?  There's one lady out there right now. And --

COUNCILMEMBER BLUMENFIELD:  Her name is Teresa.

THE COURT:  Jon, you know who she is.  She's right at the corner of the Taft High School right now.

Page 72

FEMALE:  Your Honor, we want to object to this.  It is my understanding that --

THE COURT:  I can't -- I can't understand you.

FEMALE:  Your Honor, we want to object to any indication that the Department of Mental Health is going to provide HIPAA information to the Court, including this individual's name.

This person is not a party to this case.  This person, as we understand it is seeking out services from Department of Mental Health.  And we're very concerned that this information is being provided.

She is, as we understand, a patient -- and I believe that's what is about to be disclosed so --

THE COURT:  Okay.  Well, then, I'll assess the conversation then.  I can come back.  Okay.  I'll honor that.

First of all, let me complement you Jon, though, for coming out.  Okay.

Anything that you would like to add?

JON SHERIN:  I mean, if I could make statements that are generalized to the issue?

THE COURT:  I'm sorry?

Page 73

JON SHERIN:  I can make statements that are generalizable to the issue if that would be helpful.  It's not about one person.

THE COURT:  I couldn't hear.

MS. MARTINEZ:  Yes, yes.

THE COURT:  I couldn't hear him.

MS. MARTINEZ:  He says he can make statements that are general to the --

THE COURT:  Yes, please.  And I'm sorry.  It's the echo here.

JON SHERIN:  Well, you know, we have limitations in terms of the things that we can do, engaging people against their will, and we honor those.

There's laws in place in the state. The Lanterman-Petris-Short Act defines.

There's efforts afoot to revisit them.

We -- the County of Los Angeles are, I would say, spearheading a number of efforts to look at the definition of, for example, grave disability, which would likely be relevant in this -- in cases where we have people who are -- have, let's say profound persistent mental illness and are homeless.

Page 74

We are also in the process of exploring new ways to practice LPS-type laws around grave disability.  And I will say today, we actually had our first case of not having to involve any hospital and successfully had someone accept a conservatorship.

But these are processes that literally take months to do.  They do out of respect for the individual, their civil liberties.  And it's something that we will continue to struggle with because we honor people's decision-making.  It's very difficult to, I would say, descend upon a group and expect that there could be things done that would do otherwise.  And if that were the case in a given situation, we the Department of Mental Health, would honor the law and the civil liberties that existed.

I will say, with respect to this effort, we were there from the beginning.  And we moved people.  We engaged people.  We served people.  And we were there the last day.  I was there on decision day --

THE COURT:  Right.

JON SHERIN:   -- as you say at 6:00 o'clock in the morning to make sure that my

Page 75

staff was engaged.

THE COURT:  Right.

JON SHERIN:  And they were.  So there's some -- been some inference that we weren't.  And I would just like to clarify for the record that we were.  Although we are stretched across the entire county and trying very, very hard to focus on the most vulnerable, we cannot provide mental health services to the entire homeless populations.  It's not our charge.  And we're not properly resourced.  And we're fighting for it so that we can.

THE COURT:  You have got time for a story?  Because we're not going to rush through today.  We're all done with that quickness and I have got to be on my way because I'm a politician.

Whittier.  Tara.  Black American lady who sells herself for money.  Absolutely psychotic.  And when she can get money, she's fortunate because she gets raped.  She sleeps in a little tent right beside a commercial store.

Now, Tara goes through DTs.  And Pastor Don, why don't you come on up and -- we visited Tara so many times.

And if you can find Tara and she's lucid, she's needs some Vodka in the morning because

Page 76

it will kick the DTs for a while.  So for an hour, you can converse with her if she can get some Vodka.

So she's got a combination of needing to go through detox at the same time she's severely psychotic.  So your team did a wonderful job, Jon.

The two folks I'm riding around with, their names, Pastor?

PASTOR DON:  George and Anthony.

THE COURT:  Yeah.  Rode around with them.  And they did a fabulous job.  My complements.

But we couldn't get the detox people out from --

MS. MARTINEZ:  Public health.

THE COURT:   -- Public health --

JON SHERIN:  Public health.

THE COURT:  -- to get her in a condition so that your folks could work with her. And I see a complete breakdown in the cooperation between two agencies.  That's not your fault. That's public health's fault.

And so we ran into that problem. And nobody is going to touch her.  She can sleep any place she wants to in Whittier until we get services.

Page 77

Quinn.  Quinn is out there with two shopping carts to this day.  Quinn had a conservatorship, but she was put in outpatient.  And she bolted.

After 30 days, somebody, in their infinite wisdom, ceased the conservatorship because they couldn't find her.

Now, in Orange County, we keep you for a year or so if we pick you up again.  But here in Los Angeles, you might check into it because I have got a meeting with your presiding judge coming up.  And that is the termination of that conservatorship for some reason.  I don't know why.

So now, I'm told if we're going to go through the process again, we have got to spend $100,000 to put her back through a conservatorship to put her in the hospital to get her back into the system.  What an absolute waste of time.  Quinn is still out there.

Ernie.  Ernie is defecating in his pants.  Thank God for Pastor Don making a left turn on a Saturday night down an alley, who then called Joe in the red pickup truck with my blessings back to Joe and Farrah and you get her in a truck and he smells god-awful.  And they take him down to a

Page 78

hospital which we won't name -- what hospital is it?

MS. MARTINEZ:  Don't mention names.

THE COURT:  Oh, I won't mention the name, I'm sorry.  Just first name, never mind.  A hospital.

Pastor Don, did you leave a contact number.

PASTOR DON:  Yes, we did, Your Honor.

THE COURT:  I want you to describe to the audience what happened to that person.

PASTOR DON:  We left the -- our numbers and waited for about three hours before they took him inside.  And at that time, we did leave with the understanding that they were going to call us on next steps.

But we had it set up with volunteers to go right from the detox into the detox program.

THE COURT:  But did the hospital ever contact you?

PASTOR DON:  No, Your Honor.

THE COURT:  Okay.  Now, hold on.  We need to short circuit it.  What happened to Ernie or E?

PASTOR DON:  They released him out

Page 79

into the streets.

THE COURT:  And then what happened? Why don't you describe how the system really works with the hospitals.

For three days now, you have to understand that he's transported from Whittier to a location in Long Beach in a hospital.

All the contact information is being given so that when he comes out, we have got somebody to pick him up; right?  What happens?

PASTOR DON:  Forgive my emotions because it's a little emotional.

They exited him into the streets with no phone, with no money.  He didn't have anything on him and exited him out onto the streets into the city of Long Beach that he had no idea where he was at or where to go.

So then we went out -- when we called first thing in the morning --

THE COURT:  This is Saturday night that I got the call.  You are out there Sunday, Monday, Tuesday, trying to find him.  And thank goodness, a police officer sees him sitting on a bench.  Nobody knows how he survives for three days in a completely disoriented state.  That's how your

Page 80

system is working right now.

I can describe a number of deaths where we called 911; correct.

PASTOR DON:  Yes.

THE COURT:  Picks a person up at 3:00 o'clock.  They are dead by 9:00 o'clock, shoveled into the hospital, dumped out of emergency, dead six hours later.  That's how your system is working right now.  And if I hadn't seen it I wouldn't believe it.

Okay.  Pastor Don, I'm going to come back to you.

COUNCILMEMBER BLUMENFIELD:  Just that the person we're talking about is missing at the moment.

THE COURT:  Okay.

COUNCILMEMBER BLUMENFIELD:  And we're hoping that --

THE COURT:  Jon, anything else?  I appreciate it.  Okay.  Very much so.

COUNCILMEMBER BLUMENFIELD:  Thank you.

THE COURT:  All right.  Curren.

MS. MARTINEZ:  Yeah, you are done with Jon?  Okay.  Yeah, Curren Price.

Page 81

THE COURT:  Curren Price, please.

In other words, I'm not seeing accountability, and I'm not seeing coordination here.

And Jon, by the way, would you convey to your folks out there, my deep appreciation for all of their input and letting me ride around with them?

JON SHERIN:  Absolutely.

THE COURT:  Quite an education.  I'm very appreciative of that.

Councilman, how are you?

COUNCILMEMBER PRICE:  Well.

THE COURT:  Okay.

In a moment, we're going to talk about trash and Caltrans and I would like -- if somebody please -- thank you, Councilman, very humbly, let me introduce to you Councilman Curren Price, who I'm very appreciative of.

He has 482 people within 500 feet of a freeway.  I'm going to put that section -- Ellie -- Alexa -- I'm going to put that section up -- I would just say Caltrans for a moment, No. 6.

And we're going to get into trash in just a moment.  Of course, I expected lead counsel

Page 82

from Caltrans to call and have some excuse about their -- why their head person couldn't be here. And just like Pavlovian dog, that happened yesterday.

So I'll make the record I think it's just an avoidance, an excuse.

All right, Curren. Let me start and then you fill in -- and then you test me in terms of any credibility, anything.

COUNCILMEMBER PRICE:  Okay.

THE COURT:  And I went out to visit with you a number of times, have driven this location. And this is the excellent job that the city has done cleaning up. This is your city at work.

And if Enrique is here, is he here? Enrique, come on up for a second. I want to complement you. I watched the cleanup going on. And this is a real effort.

Plus, I want to complement one of your providers, Veronica, who just is really --

MS. MARTINEZ:  With HOPICS.

THE COURT:  With HOPICS, yeah. Who is really stepping up and deserved some recognition, Curren, without you. I just want to pay that

Page 83

complement.  When I see excellent -- that's excellent.

COUNCILMEMBER PRICE:  It's been a collaborative effort absolutely.

THE COURT:  All right.  Now, I want to take the next one because I got a call, and Monica Rodriguez will be down in, I hope, just a moment.  And we'll tell you exactly what the dealings are in terms of the county and your fire hazards.  And I don't know why I haven't slapped an injunction on the county up to this point.

Let me repeat that, Skip.  If you think I can write sua sponte injunctions, you just watch and wait until Monica gets here.

All right, this, Mike, is your city. This is your cleanup.  It looks good, doesn't it.

Next slide.  This is Caltrans.  One block away.  So if you drive between 52nd and 56th Street, you have got the city, Enrique, with my complements doing an excellent job, and you have got wonderful young workers -- and thank them very humbly for letting me talk to them.

And this is the Caltrans that they can't touch one block away.  So when Shayla, you heard that I was making decisions about trash, you

Page 84

bet I was.  I got on the phone immediately with Jon, the director of Caltrans and said what the heck is going on when the city is cleaning up -- and by the way, rats were running out of here, your workers are jumping from the city, that both the councilman and I are looking at.

COUNCILMEMBER PRICE:  Uh-huh.

THE COURT:  And this goes back, Brookes, to Anaheim when you were trying to explain with Carol to me what personal possessions were and the county was telling me that all of this was trash.  And you said they were all personal possessions.  And after three and a half days, I got off the bench and we went for an 8-mile walk.

Remember?

And on Schumacher, I walked down and said, that's trash and that's not.  That's trash and that's not.

COUNCILMEMBER PRICE:  Right.

THE COURT:  That is trash.

Now, somebody has to explain to me or at least to the councilman why these decisions aren't being made because this is a neighborhood with residential homes just across the street.

COUNCILMEMBER PRICE:  And why is it

Page 85

permitted to exist for week and week and week and months on end?

THE COURT:  Yeah.  Next one.  Next one.  Next one.

So maybe Penmar can complain and have some power.  So my hat is off to him.  But here the community is complaining and we're just not getting the cooperation with Caltrans.  And of course, their lead counsel is now protecting -- what is his name?

MS. MARTINEZ:  Who?

THE COURT:  What is the big guy who canceled on us?  Kim?

MS. MARTINEZ:  Oh, the secretary of transportation.

THE COURT:  Yeah, the secretary of transportation Kim just canceled yesterday because he has some problems in terms of coming and just humbly discussing this with you, Enrique, and with everybody.

If you are going to enter into some kind of program somehow, this trash situation has to be worked out.  And I think within 500 feet of the freeway, et cetera, I have got something to say about that in terms of enforcement, et cetera and

Page 86

this is trash.

And by the way, nobody is living there. Okay. So Curren, I'm going to turn this back to you for any discussion with just humbly letting me come out and visit with you.

COUNCILMEMBER PRICE: Well, thank you, Judge. I appreciate your effort and chief -- and Judge Birotte, thank you, sir, for your attention to this issue.

And Judge, let me thank you and your team for coming out to the district last month. Again, as you have done, to see firsthand what we're dealing with along the 110 freeway specifically.

As you know and have said, we have close to 500 people living along this stretch of the freeway. And in coordination with LAHSA and HOPICS, so far, we have been able to place 93 individuals in the housing. This is with the Streets to Home project.

THE COURT: Yeah. And we can thank Veronica, big fan.

COUNCILMEMBER PRICE: We thank our other collaborative partners. And in fact, we pioneered this Streets to Home in the 9th District several months ago.

Page 87

And we're planning to house more in the coming months as we work to identify more property owners, who are willing to sign up for the program. And we're aggressively and actively doing that recruitment.

Our plan is to house all individuals residing on the overpasses and the underpasses along the 110 freeway from Vernon to Slauson -- Vernon to Slauson. And we believe we can achieve that goal.

Although, we are currently in a state of limbo in terms of whether or not we'll be able to clean the area once the people have been offered shelter --

THE COURT: And Jeff Newman, would you be kind enough to come up and have a seat apparently? And I want to appreciate you being here.

JEFF NEWMAN: (Inaudible.)

THE COURT: I can't hear you.

JEFF NEWMAN: (Inaudible.)

THE COURT: Oh, Caltrans?

JEFF NEWMAN: Yeah.

THE COURT: Oh, come on up here for a second. I hope you have your statewide boss here, but apparently he was busy.

Page 88

COUNCILMEMBER PRICE:  Yeah.

JEFF NEWMAN:  (Inaudible.)

MS. MARTINEZ:  This is the new director.

THE COURT:  Are you taking -- are you the new director?

MS. MARTINEZ:  Taking John's place?

GLORIA ROBERTS:  I am the acting director.

MS. MARTINEZ:  Acting director.

THE COURT:  Acting director.  It's a pleasure to meet you.  I was talking to John on the phone when I placed the call.  Thank you so much.

GLORIA ROBERTS:  (Inaudible) last week.  So thank you.

THE COURT:  Thank you.  Thank you.  And by the way, I really do appreciate you being here.

GLORIA ROBERTS:  Absolutely.

THE COURT:  So please, Curren.  I'm sorry.

COUNCILMEMBER PRICE:  Okay.  So I mentioned that we are currently in a state of limbo whether or not we'll be able to clean the area once we have offered individuals shelter.

Page 89

Without the council taking action last week on amending our codes governing this issue and without reauthorizing the Care Plus cleanups, I don't believe we're going to have the tools in place to make this the effective effort that it could be. We have got to be able to move people and clean up areas.

Nevertheless, we're going to continue to move forward and house as many people as possible because it's the right thing to do.

I just hope that the residents whose homes abut the area will also be able to see the improvement. And you referenced these homeowners who have to suffer the trash debris that's on the Caltrans side of the fence, in addition to in the streets that we can work hard to keep clean.

And while the program has been successful in placing people, it has also created some other issues along the corridor. We have had a backlash from gangs in the area that have threatened people and have set several encampments on fire. And that's represented in the photo that I provided. Just unbelievable.

They are intimidated -- we have got gangs intimidating our homeless residents and taking

Page 90

over their areas once they leave.  It's just been a real -- it's been a real nightmare again for our homeless residents and for neighbored as well.

We have been monitoring the issue. But I just wanted to make you aware of some of the unintended consequences and some of these hurdles that we're facing.

Besides Streets to Home, we have also opened up an additional safe parking location with 30 spots this week.

THE COURT:  Right.

COUNCILMEMBER PRICE:  And I have another one with 17 spots opening later this month.

The first 100 beds set aside for veterans at the VOA site on 68th and Avalon that we referenced in our last meeting is going to open this month as well.  And we'll have another 60 beds opening early next year.

In addition to this, we have got three PSH projects opening before the end of the year that will total another 81 units.  And we have an additional bridge housing site that's going to house 15 families, 15 families.

But with all these efforts, Judge, we just need to do more -- we need to do it quicker.

Page 91

We have got to do more and we need to do it quicker. But that's my update for you at this time.  Happy to answer any questions that you have and again appreciate your attention to working collaboratively with us to make this possible.

THE COURT:  I just want to thank you humbly for being such a gracious host.  And your staff.  James, Curren, Akurris (phonetic).

I want to show you a really nice lady I visited with.  She's right alongside the freeway.  And she's sym- -- a symbol to me of not the big group that you see on Skid Row but just a human being.  And here she is.  See her?  She's in your district.

COUNCILMEMBER PRICE:  Uh-huh.

THE COURT:  Okay.  And if you can take me back to the little lady for a moment.  There she is.  She's right on the egress.  And remember the first cause of death -- I'll keep repeating to you, 22 percent of our homeless citizens die of a heart attack.  I can't do anything about that.  I feel helpless.

21 percent die of unintentional narcotics or alcohol ingestion.  That's according to Kaiser, accept it or not.

Veritext Legal Solutions
866 299-5127

The third leading cause consistently right behind them are homeless citizens getting hit by a car.  I can do something about that.

And here she is.  And when you walk across to talk to her, you'd better take your life in your hands because people just don't stop.

And the next photograph.  She's ready to go into housing tomorrow.  Where is my housing for this lady?  And I have got to tell you watching the city and the county, it does remind me -- and I'll keep repeating it -- of two millionaires at McDonalds fighting and haggling over who will pay for the price of that hamburger while the starving homeless person is sitting out in the parking lot.

All right.  The next one.

MS. MARTINEZ:  (Inaudible.)

THE COURT:  Okay.  Go back to the rise in homeless deaths or just put that up again.

I'll just keep repeating to you, 1,141 at 837 before a 36 percent increase and even with COVID.  I don't know how any of us can have an explanation come January because it's going to get worse.

I want to thank you and I'll come to

Page 93

visit, only by your invitation again, okay.

COUNCILMEMBER PRICE:  Okay.

THE COURT:  Now, do you have any questions of Caltrans?  Because apparently, I don't have their attention yet at the state level.  And I can understand that.

COUNCILMEMBER PRICE:  Well, we just need to establish a better line of communication so that we can coordinate the clean up of those areas. It's just a terrible eye sore.  It's a health and safety issue.

But fortunately, all along that Grand Avenue area and our off-ramps -- you know, if you get off -- if you are getting off north on King and -- King and the 110, you know, you have got a block long worth of trash, debris, burned items, dumpings before you get to the corridor.  And it's just a terrible sight to see as you are coming off the freeway.  And it's almost -- this is what you have in store.

And again, the hard part is it stays there for weeks and weeks and weeks and weeks.  You know, we complain.  The office complains.  Citizens complain.  Neighbors complain.  Strangers complain. Have you seen the freeways -- have you seen the

Page 94

trash?  Yes.  We say -- why can't we get it picked up?

THE COURT:  Yeah.

COUNCILMEMBER PRICE:  Yeah.  It's just frustrating.  It's just frustrating.  And again, it's just made worse by the fact that it stays in place for so long without being attended to:  I just want to establish a better line of communication --

THE COURT:  Okay.

COUNCILMEMBER PRICE:  -- so that we can take quicker action on these problem areas in my district alone, the 110 freeway.

THE COURT:  Well, I'm hoping that whatever is accomplished that there's some cooperation or increasing cooperation between Caltrans and the city.  I have no leverage.  I have no power in that regard.  But I do have the ability to call attention to it when I see it.

And when those two rats ran out, that was really an interesting experience. Everybody jumped.  And had the city cleaning up on one block and then have Caltrans leaving this -- and this is years.  This isn't just a dump.  There's nobody living there.  This is just a trash heap.

Page 95

And it goes for a block.  And then it's clean.  And then another trash heap.  I just don't understand how the city can undertake that and help residents out there or help our homeless population living as best they can.  And so I would like to also show you one more thing.  And that is I want to go underneath the freeway.

And while Caltrans is here, I'm going to ask Monica Rodriguez, but I would like to go to number -- the trash underneath the 101 freeway for a moment, okay.

Now, this is why you, as attorneys, don't journey with me.  And this is what I shouldn't be doing.  But I'm going to take you on a little walk, maybe as early as today.  Because I'm just waiting for that permit that says it's permissible, from the city, that people can live underneath the freeway.  You give me that permit.  And I have got no problems at all.  People can live underneath a freeway, except they have a decreased life expectancy and they are getting hit by cars.

So show me the next one.  Yeah. Now, I want you to take a walk underneath this freeway system with me.  It's right over here by the way, right on the 101.

Page 96

Curren, this isn't your district.

COUNCILMEMBER PRICE:  No, it's not but that --

THE COURT:  Okay.  This is Kevin's.

COUNCILMEMBER PRICE:  But I have seen scenes like that in my district.

THE COURT:  Yeah, I know.  I'm just showing a little bit of what our city looks like.

COUNCILMEMBER PRICE:  Right, yeah.

THE COURT:  And there's folks living under here.  Go over -- go down and talk to them. Have the pleasure.  And I don't travel with the police.  I don't need the police, for God sakes.

Next one.  There's your city.  There it is.

MS. MARTINEZ:  This is Caltrans --

THE COURT:  Caltrans, that's you.

I have no power.  I wish I did.  I wish you would join in this lawsuit quite frankly. I have to tell you that.  And I'm going to -- you take that right back to the governor and your director who suddenly was busy today through his counsel.  This is your responsibility.

Next one.  Oh, it's a vacant lot we'll talk about later on.

Page 97

Okay.  Well, I would like to put Monica Rodriquez on the phone -- Zoom for a moment.  Can we do that?  And if Caltrans would remain.

MS. MARTINEZ:  And Curren --

THE COURT:  And Curren, I want to thank you so much again.  Say high to James and Curtis and all that wonderful staff down.  I'll be down to see you soon at your invitation.

Hi, Monica.

COUNCILMEMBER RODRIGUEZ:  Hi, Your Honor.  How are you doing?  Can you guys hear me?

MS. MARTINEZ:  Yes.

THE COURT:  Yeah.  I have Caltrans here.  And we just finished an interesting discussion with Curren Price.  And if there's ever going to be time for transparency and your concerns, you need to have the same conversation that you have had with me --

Oh, Curren, thank you.

COUNCILMEMBER PRICE:  The fires.

THE COURT:  Oh, the fires, yeah.  We'll get to the fires, yeah.  Thanks.

Okay.  Monica, can you just start -- I mean Council Rodriguez.

MS. MARTINEZ:  Councilmember

Page 98

Rodriguez.

THE COURT:  Yeah.

COUNCILMEMBER RODRIGUEZ:  Monica is fine.  It's fine.

THE COURT:  Well, state senator -- no.

MS. MARTINEZ:  No.

THE COURT:  Any place that you would like to start?

COUNCILMEMBER RODRIGUEZ:  Well, Dave, I just want to thank you again for this opportunity to just provide an update.  And I want to first recap where we stand, just from -- where we -- where we began and where we are today.

And so just to recap in terms of my unsheltered freeway population, I had a total of 134 -- or, I'm sorry.  Yeah, the freeway population, 134.

Some of the challenge that's present in my district is that I don't have motel owners in my district that were willing to sell as part of the Project Home Key property search effort that we have engaged in.  And we don't have, as you know, city or county available for us to vie for the use of pallet shelters.  Beginning with the Paxton and Bradley

Page 99

efforts, we had 134 -- again, 134 in the population in my district of which 67 through the efforts of Paxton and Bradley -- 100 percent were houses as a result of the clearance of Paxton and Bradley.

As you know, we had been in an extensive amount of engagement with Caltrans given that the overpass and the maintenance of that area along a double-wide sidewalk, it was -- it was, I would say, more than a year of engagement involved in the back and forth and disappointingly even state legislators unable to help get and facilitate any additional support from Caltrans or cooperation in that effort to have some clarity over the jurisdictional issues, either enabling us to manage and maintain that area or not, which delayed a great deal of progress with respect to the Paxton and Bradley effort.

That said, once we finally achieved the conclusion that, in fact, we had right-of-way access, we were able to assure that that area was not going to be repopulated as a result of us having successfully placed those 67 that were at that encampment.

Again, that represents half of the population being placed into shelter and housing

Page 100

facilities as a result of Project Room Key.

In addition, since that and subsequent to the Paxton and Bradley effort, we have been working diligently to kind of work with our SPA (phonetic) lead, which is LA Family Housing to continue in our efforts.

While on a parallel track, I know, as I'm sure you might be aware, in the city we're working on strategies to help assure that we can actually prevent the repopulation -- after we go through all of this effort.  We don't want to keep chasing our tail with not providing an opportunity for us to maintain those areas because otherwise we'll never get out of this.

As a result, a subsequent effort that we launched along the 210 freeway and Foothill, we just successfully placed four from that encampment.  So now, that brings my number to 63 that remains as part of this effort that you have identified for the unsheltered freeway population.

I still have some PSH -- some permanent supportive housing that is approaching -- set to open this month, in fact.  That will provide 48 units as part of a 700-bed agreement.  And we are still in the process of

Veritext Legal Solutions
866 299-5127

trying to identify additional privately owned property -- parcels that we can potentially use for pallet shelter or the motel sites.

I'm happy to report that my -- the city staff has been successful in having a conversation with a motel owner for a potential sale. So this all has just happened very, very recently. Disappointingly, though, I just want to share with you so you can appreciate the context that I know I'm not alone, my colleagues are equally struggling with this -- the parcel that was identified that is privately owned that's vacant had a building permit that had been issued for that property.

As a result of engagements from city staff with the property owner, the property owner had agreed to potentially delay construction of that site but would do so at a cost that was six times the value of what that property was worth.

And so it makes it completely unfeasible for us to continue in pursuit of that vacant lot. And that, we just discovered this morning. We just were notified of that.

My biggest challenge right now with Caltrans is how they squander our time and our own

Page 102

city resources.  We have been -- you know, the city has had to take -- go through incredible lengths to clear and maintain their right-of-way.

THE COURT:  Why don't you walk through the county -- this unincorporated area, this fire zone.

COUNCILMEMBER RODRIGUEZ:  Correct.

THE COURT:  Because I just threatened Skip, just a moment ago, but he doesn't know why.  So walk through for just a moment what's happening out there because he has no idea where this came from right now, and I'll call him tonight at home and explain further.

But walk through what happened on that last day.  So you hear -- so you folks hear from Caltrans what is happening because, in a fire zone out there, I have no idea why we're not out there actively trying to get housing for our folks out there because when a fire comes, there's no -- there's no excuse.

So walk through and then where the priority of our homeless citizens are as far as Caltrans is apparently concerned -- because that was a really interesting discussion, how far down the list they were.  But I'll leave that to you.

Page 103

COUNCILMEMBER RODRIGUEZ:  So in addition -- in my district where I have had -- in my brief tenure in office, I have had three major wildfires in the first two years that I was in office.  And much of the properties involved -- in fact, one particular property is -- which presents a high fire danger is leased by Caltrans from the Army Corps of Engineers.

And we had been engaged in a conversation with Caltrans, my team, coordinating very closely with the -- with the spa lead for outreach.  We had been doing, in fact -- you know, we had a multiagency effort in this area, which included Caltrans, SoCalGas -- I'm sorry, SoCal Edison, rather, because Edison also has some right-of-way in these areas; and the Army Corps.

Caltrans had committed, in addition to all of the outreach that we had conducted for five weeks, twice a week, saying okay, on this date, folks, we're going to move you out.  We've reserved some rooms, we're going to help get all this stuff out here, but we need Caltrans out here to actually clear their right-of-way.

And in fact, because it still remains a high fire danger because of the brush and

Page 104

the lack of brush clearance that they conduct on their -- on their right-of-ways, and the same is true, just as a side note, we had a major -- we had a wildfire or a fire start along Caltrans property that the fire department had to respond to that was out of negligence and clearance and maintaining it by Caltrans property in Mission Hills and that occurred a couple of weeks ago.

But going back to this location along Osborne and the 210 freeway, we had been coordinating having conversations with the local staff at Caltrans as part of this multi -- multiagency effort, including all of the outreach that was conducted.

The day arrives.  My team is out there, SoCal Edison is out there.  And no Caltrans. And when my staff then starts calling all the different -- the local district for Caltrans and says hey, what happened, we're here, it was just a pointing of the fingers who is on first.

Oh, well, you shouldn't have talked to that person.  You should have talked to this person.  It was very unclear in terms of even the chain of command who was the appropriate person to speak to.

Page 105

And as I had documented to you because it was -- it's a waste of staff time.  It's disrespectful.  And it's just infuriating because it presents high fire danger, not just to the individuals encamped in those areas.  But when I have had to evacuate nearly half of my entire district as a result of a wildfire in and around these areas, Caltrans given -- is complicit in enabling these conditions.

So it was infuriating, to say the least, as I had shared with you because we had been engaged in coordinating all of this effort in good faith that everybody was going to follow through.

We're now in a position since, Dave, you and I had a conversation and I informed you of that circumstance -- we went as far as calling the governor's office and -- because I was just tired of this lack of response and follow through and so we called the governor's office.

We have resumed conversations with Caltrans again and some of the same individuals that are involved, so they can't suggest that they weren't aware or don't know because we have engaged everyone in those conversations again and we are scheduled to give this another shot in about a week

Page 106

for the clearance.

And so those that are encamped at that location have been notified.  We have got rooms reserved.  But that's -- that's where we stand today.

THE COURT:  Okay.  The same thing is happening to the Court because I don't have jurisdiction over Caltrans because there's been no intervention in this lawsuit with the state.  I call X attorney who refers me to X attorney, who refers me to X attorney.  Then Steve Kim -- is that his name?

MS. MARTINEZ:  Yeah, the director.

THE COURT:  The director is invited. Of course, it looks like he's going turn -- occur. And I told my special master Michele, you watch, I'm going to get a phone call or an email 24 hours before, just like a Pavlovian dog, whoops, he's busy today.

Well --

MS. MARTINEZ:  But we're grateful that the acting director --

THE COURT:  But we're grateful that you are here as the acting director.  And hopefully you have some authority because the Court has no

Page 107

power in this regard.  Hopefully the mayor does. You know, the city attorney does and you do because I am seeing this all over the city where the city is cleaning up through Enrique, doing a good job, and right down the street it is an absolute trash pit with nobody living there.  Now, if someone is living there, maybe that's another issue.  Nobody is living there.

So, okay.  Skip, the reason I growled just now was because it's going to be hard to explain, unless we can find housing -- and it's housing, housing, housing -- all these problems go away with housing.  In these unincorporated areas, if a wildfire ever breaks out, I won't even be growling because, in Sepulveda Basin, Nury Martinez has homeless.  Unincorporated areas.  Homeless.  Can you speak to the Board?

MR. MILLER:  Sure.

THE COURT:  Can you help?  Okay.  So as long as everybody is on notice, I'm just really perplexed, but you have got to get housing first, okay?  And that doesn't fall within the city's bailiwick in terms of the settlement.  Those unincorporated areas fall within the county's bailiwick separately.  I don't think the 300 million

Page 108

applied to -- okay.  So maybe we can talk tonight. Fair enough?  Okay.

I want to thank you very much Monica -- Councilman Rodriguez.  I'm sorry.

COUNCILMEMBER RODRIGUEZ:  No, you are good, Dave.  It's fine.

THE COURT:  You have a wonderful day.

I want to thank Caltrans actually for listening to all this.  If I had -- if I haven't heard it once, I have heard it too many times now. So I just had two people, Curren Price talk to you, Monica talk to you, Rodriguez, but it's out there repeatedly now.  So --

MS. MARTINEZ:  Ask them if they want to respond to any --

THE COURT:  If you want to respond to any of this, you are welcome to.  Otherwise, I admit, I have no power.  I just need to call it to people's recognition so in case there is a fire that breaks out in the county, everybody is on notice in terms of finding housing for our homeless and the noncooperation.

So I'll turn it over to you.

GLORIA ROBERTS:  So thank you, Your

Page 109

Honor.  And thank you for allowing me to be here.

And Councilmember Rodriguez, I sincerely apologize for the lack of response or kind of what you see as wasted time on our team's approach.  And so I would like to be looped into the conversation because Caltrans obviously -- you know, for us the preservation of human life and dignity is paramount.

So whatever we can do in terms of assisting the city and the county, we have done and will continue to do so.  So you have my commitment that we'll continue to move forward.  If you are not getting the response from staff that you are -- that you see is productive, please contact me directly.

COUNCILMEMBER RODRIGUEZ:  Okay.

GLORIA ROBERTS:  And so I'll be reaching out to you afterwards, Councilwoman.

COUNCILMEMBER RODRIGUEZ:  Yeah, I mean -- yeah, please send us all your contact info.  It's not that they haven't been responsive.  They have responded.  They just don't show up to do the work.

GLORIA ROBERTS:  Well, that --

COUNCILMEMBER RODRIGUEZ:  And so that's the problem.

Page 110

GLORIA ROBERTS:  Well, that to me is nonresponsive.

COUNCILMEMBER RODRIGUEZ:  I just want to make sure that we're all on the same page.

GLORIA ROBERTS:  Correct.  And that's not responsive to me.  So I really want to make sure that we're honoring our commitments.

And Judge Carter, I appreciate you coming to point out some areas last month on -- along the 110.  And after your visit, we did go out and clear out all of the trash and debris in the following few days.

And so, obviously, we recognize that it is a huge issue in terms of the litter and debris along all of our rights of way.  And so I understand that every city within the county has frustrations with Caltrans.  We're doing the best that we can with the resources that we have.

But we're also, you know, working in lockstep.  You know, we're meeting with the cities and trying to find the solutions.  So we're definitely not stepping away from our responsibility for our right-of-way, and I wanted to make sure that everybody knew that.

So thank you.

Page 111

THE COURT:  Well, that's between the governor and the mayor and the city attorney.  But thank you very much.

GLORIA ROBERTS:  Thank you.

THE COURT:  Okay.

MS. MARTINEZ:  On Zoom.

THE COURT:  Do you want to take him now?

MS. MARTINEZ:  Yeah, take him.

THE COURT:  Okay.  Monica, thank you so much.

Could we talk to Mike Bonin, please. I think he's on Zoom.

MS. MARTINEZ:  There he is.

THE COURT:  Hi, Mike.  Can you see me?

COUNCILMEMBER BONIN:  I can see a big, big chambers.  I assume you are sitting in there somewhere.

THE COURT:  I'm here someplace.

There's a camera.  I can see you. I'm not sure that you can see me, Mike.

COUNCILMEMBER BONIN:  I can hear you.  That's the important part.

THE COURT:  Okay.  All right.  Let's

Page 112

start.  Anything that you would like to say and then I would like to walk through a couple things with you.

COUNCILMEMBER BONIN:  Yeah, sure. First of all, thanks for doing this.  I wish I had known about it earlier.  I would have been there in person.  But I'm glad to join you at least virtually.

I'll give you an update on a couple of things and then I'm happy to answer any questions or talk about whatever you want.

On Venice Globe, the one underneath the 405 in my district, which, as you know, is on the border of three jurisdictions, mine, Mr. Koretz's and Culver City, the north side is in Los Angeles.  We identified at the beginning of this 32 people.

THE COURT:  Right.

COUNCILMEMBER BONIN:  15 of them have been sheltered.  4 more are scheduled to be put into temporary housing, either today or tomorrow, bringing us to 19.  And leaving us with 13 more, I guess.

Of the 32 on the north side, I had originally started with the premise that since it

Page 113

was the border between me and Mr. Koretz's district, I would be helping to relocate and house 16 and the other 16 would be the other side of the border.  But I am disregarding that and I am just assuming that I will be responsible for doing all 32.  So we're looking for an additional 13 placements.

THE COURT:  Mike, can we stop right there for a moment and engage --

COUNCILMEMBER BONIN:  Sure.

THE COURT:  -- in a conversation before we get to Penmar or something else?

COUNCILMEMBER BONIN:  Sure.

THE COURT:  All right.  First of all, I want to thank you for welcoming me numerous times into your district.

I'm going to get the special master Michele Martinez involved, just to walk us through some of the jurisdictional problems that we have.

COUNCILMEMBER BONIN:  Yep.

THE COURT:  And I'm going to start with a quick summary that on the north side of the Venice and 405 freeway, a portion of that is your district.

COUNCILMEMBER BONIN:  Yes.

THE COURT:  And a portion of that

Page 114

north side belongs to Paul Koretz.

COUNCILMEMBER BONIN:  Yes.

THE COURT:  And on the other side of that same underpass is Culver City's jurisdiction.

COUNCILMEMBER BONIN:  Yes.  So the entire encampment -- about half of it is Culver City, a quarter is Mr. Koretz, a quarter is mine.

THE COURT:  All right.  Now, we have had a shooting under there.

COUNCILMEMBER BONIN:  Yeah, and a fire.

THE COURT:  And you and I were over there with LAHSA with Heidi.

And Heidi, come on up for a second if you would be so kind.  And Heidi was very gracious with her team.  And the first person we contacted is Tex.  Remember Tex?

COUNCILMEMBER BONIN:  Yes, of course.

THE COURT:  Okay.  Tex describes that he has 12 tents, 12 tents.

COUNCILMEMBER BONIN:  Yeah, either 10 or 12, yeah.

THE COURT:  Maurice has 5 on the other side, but Tex has 12 tents.

Page 115

Heidi, 12?

MS. MARSTON:  Yeah.

THE COURT:  Yeah, either 12 or 15. I think it's 12.  So let's be sure it's the lower number so I'm not overstating.

And we show him a Garcetti pop-up module.  Flip that up again.  And we asked Tex, would you go to this?  And he says yes.

And you and I ask him what about the rest?  And his response was he would have everybody go there.  So I looked at him as kind of a shot caller.

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  Now, Heidi, if that's incorrect, correct me.

MS. MARSTON:  No, that's accurate.

THE COURT:  Mike, that's correct?

COUNCILMEMBER BONIN:  That's accurate.

THE COURT:  All right.  So we have probably cleared a quarter if we can resolve Tex's housing issues along with any other housing issues.

As we walk down, though, on the north side, we have got a guy with a 70-inch TV screen.  He's supposed to be a parolee.  We never

Page 116

contact him.  But then we cross over to Culver City. And I want Heidi to hear the problems that you are running into in taking a leadership role.

So tell us about Culver City for a moment.

COUNCILMEMBER BONIN:  Sure.  So, as I said, about a quarter of the area is mine; a quarter, Mr. Koretz; half, Culver City.

But at your request, I engaged Culver City with the assistance of Michele Martinez a couple of times.  And we have done a meeting with the Culver City electeds and city staff and a second with the -- the outgoing county supervisor staff. And we have come up with some strategies we think that could be helpful for cooperating with Culver City.  They are looking to see if there are any of the motels in their city.

And I said I would like us then -- it's too much paperwork for their small city to deal with the Project Room Key purchase.  So we're looking to see if the City of Los Angeles could do that.  And then we could house people from both sides.

The other thing they are looking into is whether or not they can provide some funding

Page 117

for share to help relocate into shared housing some of their people.

And what they need to start with is -- and this was identified by the County supervisor's office -- is they need to get a by-name registry done of everybody on the south side just as we have done on the north side so that St. Joseph Center, LAHSA and the county supervisor's office can help them identify the appropriate interventions for everybody there.

THE COURT:  Okay.  I would like the special master to describe the conversation with Culver City.

MS. MARTINEZ:  Yes, thank you, Judge Carter, and thank you, Councilman Bonin.  And we had great discussions with the various jurisdictions. But specifically for Culver City, what is -- it's not interesting, you know, the issues that Culver City is facing.  I think across the region in LA County, you see a lot of cities that are frustrated and I think what we got from Culver City was a lot of frustration, not a full attack on the County of Orange or a full attack on LAHSA, but I think a lot of duplicate services -- the County of Los Angeles and the amount of money that they are

Page 118

having to put up front to provide resources in Culver City, whether it be outreach or engagement and having to use St. Joseph's but having to pay out of their own money, having to pay for a psychiatrist to be part of their police department.

And they are very frustrated as they look at Measure H and understanding that their taxpayers are paying into this system and to ensure that there were going to be able to be services provided.

And so when you see a city that is articulating their frustration and duplicate of services and monies, I think it's important because Councilman Bonin was very gracious in wanting to put up some of his own money, figure out ways of how we can actually house folks in partnership with Culver City.

But what we have to be is realistic here. You are not going to have councilmembers -- a lot of council members like Councilman Bonin that is willing to step up and help.

So what is important for this Court is to understand what is the coordination with the County of Orange as it pertains to services to other cities like Culver City and LAHSA, your role in

Page 119

ensuring that cities like Culver City are able to move forward and be partners.

But when we see frustration on their end in not being able to -- to get information and/or services from LAHSA and/or the county, whether that is true or not, that was a frustration that was put out there that we heard.

And I think moving forward as there is conversations being had with the supervisor, outgoing supervisor and the council member and now Culver City that is willing to step up and be supportive and be helpful in these efforts, I think the coordination has to happen in a way where we're having an honest conversation about the true engagement and the resources financially for Culver City to be willing to step up to the table, but understanding is it their full responsibility to continue -- to continue to pay for these additional services so that they can, you know, do outreach in the communities, in the houseless community.

And so the judge wanted me to articulate that and state that for the record because as we move forward, we're not going to have other council members like Councilman Bonin that's going to be willing to step up.  And we need to make

Page 120

sure that the county and LAHSA is able to work with these cities to ensure that they are getting the services and resources necessary to help their houseless community.

Thank you.

THE COURT:  Mike, could I move to Penmar for a moment?

COUNCILMEMBER BONIN:  Yeah.  Let me -- if I could just do a couple more notes on Venice and Globe before we go to Penmar --

THE COURT:  Sure.

COUNCILMEMBER BONIN:  -- just to wrap it up.

One other thing that we're talking to Culver City about is, what I suggested to them is if they could identify a piece of property that they own.  And they own some property, both in Culver City and within the City of Los Angeles, then we could use that as a potential site for a pallet shelter, that if they could provide the land -- particularly if it's land in the City of L.A. that they own -- they have a parking lot, we could then put pallet shelters there.

THE COURT:  Okay.

COUNCILMEMBER BONIN:  For the

Page 121

remaining placements in Los Angeles on the north side, both in my district and in Mr. Koretz's, as I said, there's about 13 people living there.  There are others who come by and visit during the day, but 13 living there.  And we're looking for placements for them.

And I just want to be very clear on what the holdup is.  Our agency, St. Joseph Center and others do not yet have the resources -- they have not made it down the pipeline to them.  The county has given us money.  There's still 9 million that has been given to the City of Los Angeles that is unallocated.

Absent the council approving that money, St. Joseph Center -- and this isn't just my district, but St. Joseph Center does not have the resources to do the placement.

So we're -- it's very, very important that we get that approved so that we can get those additional placements done.

THE COURT:  Okay, Mike.  That's what I have been repeatedly asking today.  And that is, where is the housing?  In other words, all of this enforcement talk that you are going through is something for you and the city and Bob and others to

Page 122

sort out.  That's not my concern, although I have represented that I've allowed the enforcement of any lawful ordinance with every other city I have worked with.  This city apparently doesn't have an ordinance.

What I'm curious about is Penmar for a moment.

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  And you are not going to see what I -- I think what I'm about to put up, but Penmar district -- can you see?

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  Okay.  Would you put up the first one?  Okay.  This is what Penmar looked like before.  This is a golf course, a fence.  Mike, you can best describe it.  On the other side are your residential streets.

The next one is just another view before.

The next one -- you can see the residences.

The next one and the next one.  And then we'll -- and the next one and let's stop right there for a moment.  This is the cleanup that is taking place.

Page 123

First of all, give my best to Dr. Adams.  I noted with great interest the discussion that all of you had, Mike, on the air talk show with Mike Feuer, the city attorney, you, Dr. Adams.

And I was struck with the realization that Felicia has come to.  And that is she realized now that she has to have interim housing.

In other words, she was a long-term -- long-term supportive provider in a sense, but I was interested in that statement.  And also that she needed to have what I call a choice date, but what she called an identification date that was a final date for the person moving.

And what was so interesting to me, though, was you had a different situation because you had tree trimming.  And I know Mike Feuer was out there also a couple days before I was, talking to folks.

And what you were able to do, though, is you were able to go in and say to the homeless person, you know, we're going to take this third and we're going to -- you can move down the street a little bit or you can accept services.

Page 124

And you effectively did that along with Dr. Adams throughout that project.  But you put up fencing and so that fencing then was designed to protect people from tree trimming, but it also, quite frankly, kept people from coming back.  And that's not the model I'm going to operate under.

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  I'm not going to put up fencing around this city --

COUNCILMEMBER BONIN:  Right.

THE COURT:  -- or close off underpasses.

Is that fencing still up?

COUNCILMEMBER BONIN:  Yes, it is because the work in that area has not been completed --

THE COURT:  Good, because I drove by there and it's still up.  Excellent.  Okay.  Good.

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  Now, is that going to be the model for the future that we have to put up fencing so that folks aren't coming back to these pilot projects you have?  I mean, that's where I go to Pakistan.  That's what Pakistan looks like.  Is that the model?

Page 125

COUNCILMEMBER BONIN:  No, I don't think it does.  And first, let me just make clear -- I don't think you meant to imply -- you described it as a cleanup.  It was really a -- a massive housing placement program precipitated by the fact that we had a public works project coming.

So the public works project, when it was coming, we were faced with the concept that 80 or so people would be displaced and disbursed deeper into residential neighborhoods and really in violation of CDC guidelines.

So St. Joseph Center with the cooperation of both Supervisors Kuehl and Ridley-Thomas using resources that are not part of the MOU between the city and the county --

THE COURT:  Yeah.  And Mike, let me stop you for a moment.

Why is the county then having to use provider resources when they settled for $300 million?  Judge Birotte -- identified where is my housing?  Because all of this enforcement -- all of this talk means absolutely nothing because I'm not going to let the city do anything unless you have got housing.

COUNCILMEMBER BONIN:  Well, good.

Page 126

THE COURT:  Where is the housing?

COUNCILMEMBER BONIN:  I don't -- I mean, you have heard my opinion.  I don't think we should even be voting on something until we have the housing.

THE COURT:  Well, the third leading cause of death are people getting hit by cars along there.

COUNCILMEMBER BONIN:  Yep.

THE COURT:  And I can do something about that.  Where is my housing?

COUNCILMEMBER BONIN:  In this location, the city and the county -- or the county-used resources that were not part of that agreement that Judge Birotte allocated.  As I said earlier, some of the resources that are part of that agreement still haven't made it down to the service providers.

THE COURT:  Why?

COUNCILMEMBER BONIN:  And some of that is the interim housing that --

THE COURT:  Mike, Mike, Mike, Mike, Mike --

COUNCILMEMBER BONIN:  -- Dr. Adams is looking for --

Page 127

THE COURT: Mike, I don't mean to be rude. But we're five months into this agreement now.

COUNCILMEMBER BONIN: Yep.

THE COURT: You have got five months to go before I act.

COUNCILMEMBER BONIN: Yep.

THE COURT: Where is the housing?

COUNCILMEMBER BONIN: Well, if the money is allocated, the housing is there. I mean, St. Joe's can house people as soon as they get those resources.

Now, that is the interim housing. That's not the long-term. That is the interim. That's motels, that will be some shared housing. That will be some rapid rehousing. But that's what St. Joe's is waiting for.

And Dr. Adams is on the phone with me on a regular basis saying we're ready to go. We need it. We're ready to go. We need it.

THE COURT: Okay. You have a substitute motion, item 42. Would you put that up for a moment? Because I'm not interested in getting involved in the motions between you and Bob and the city attorney, et cetera.

Page 128

But I want to read to you the last portion of this.  "I further move that the City Council request that U.S. District Judge David O. Carter facilitate a settlement agreement between the City of Los Angeles, County of Los Angeles, unhoused residents and their advocates, the Alliance for Human Rights and other parties as appropriate, similar to the agreement he brokered in Orange County Catholic Worker versus Orange County, City of Costa Mesa, City of Anaheim and City of Orange, which led to the housing of thousands of unhoused residents and left the public rights-of-way free of encampments without a single arrest."

COUNCILMEMBER BONIN:  Please.

THE COURT:  Now, that's absolutely true so far.  But I give credit, quite frankly, to the advocates and their involvement.

What I'm worried about, though, is that Judge Birotte and I haven't seen such a request from you or the City nor the advocates to come to us for any meaningful settlement discussions and you believe they have been meaningful.  But without disclosing these settlement discussions, you are going to have to come up to us with a request right now so that we know you are serious.

Page 129

COUNCILMEMBER BONIN:  I'm hoping that the City will make one.  I am of the very firm belief after several months of this that the only way we're going to do this is to get out of our way and do it the way you did in Orange County.

For me, the conversation we have had about the ordinance has illustrated for me that I don't think that -- that the City of Los Angeles has the credibility with the activists to come up with an ordinance and that we are going to need your -- your -- your gentle but heavy hand to get there in order to -- to make sure that before the City does anything in terms of enforcement we have got the housing there and it's real.

And I have read that decision.  I have read that settlement agreement, and it gives things that we have not yet talked about --

THE COURT:  Okay.

COUNCILMEMBER BONIN:  -- doing here, which is having a protocol, but outreach for placement being done by social workers.

THE COURT:  Let me -- I wish Bob was here also because you two seem to be, in listening to the discussion, the two bookends in a sense.

One of the reasons -- and I'm not

Veritext Legal Solutions
866 299-5127

saying that I'm not open to a settlement -- was because of this 60 percent rule, which there should be a lot of disagreement about.

And let me just tell you candidly and all parties why that was formed and why that's an arbitrary and maybe archaic rule that shouldn't be applied but should be.

First, when we had the Santa Ana riverbed, we had well over a thousand people. And I think Brooks and Carol had a good point and they said, you know, Judge, we had 81 percent -- 810 people waiting for housing. So we talked about 81 percent.

And the County came back and said no, Judge, because we put up two weeks' notice, there were only about 60 percent because you saw three or 400 walkway before we started down the river.

So when you hear about this 60 percent rule, that's how it grew up, Mike. And I wish Bob was here to hear it. Okay?

Now, I think that should be criticized because, of course, we want to have housing for everybody, but the 60 percent rule was designed to incentivize the City to do something.

Page 131

And I recognize that the argument could be I was going against Boise, but also Boise could be very easily overturned.  Who in the circuit now gets it, nobody knows.

But the genius of what happened was we went to what I call a 60 percent plus one.  We tried to incentivize the cities, 28 of them now, not to build 100 percent, but to get that 60 percent off the street, I mean, tomorrow -- to start talking about the goodness that we had done, not the three that we had failed with.

But when you got to the 60 percent plus one, that one additional person, Mike, the city had to stop.

In other words, you had to offer housing at that time.  So what it did was it incentivized some of these smaller cities that didn't have any resources not to worry about the 100 percent but to get started with 60 percent, but if they got to the 61st person out of 100, they stopped.

Now, the second thing is that -- where is that statement that I had before about enforcing all of the ordinances?

I have always made it clear that I

Page 132

would support any ordinance on the books that are constitutional.  And I have supported all of the other cities in that regard.  So this is the first city I have ever worked with.  But as you know, I'm not an advocate of arrest.  I started in a much different position, by the way, Mike, four years ago.  I got educated, quite frankly, I think, through Carol and Brooke.  It was insightful.

But by the same token, there has to be some consequence, whatever you call that, because a lot of the folks just won't move at some point until the last day.

And quite frankly, our homeless population seems to make good choices.  We get a huge number of people going into detox who don't want to go in.

The other thing I'm worried about is you and I are sitting on the street because we move across -- and remember, Maurice, the tent that says "FU Judge Carter"?

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  Yeah, okay, okay.

Well, I'm sitting on the phone, on the sidewalk, and you may not see it, but I see dope sales going on.

Page 133

COUNCILMEMBER BONIN:  Oh, I saw it.

THE COURT:  Okay.  We have got a shooting under there.

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  LAHSA, it's my understanding, at the present time, is not going underneath that freeway overpass or I was told that as of a week and a half ago so, Heidi, are you going underneath that freeway overpass?

MS. MARSTON:  We are again now.

THE COURT:  You are now?  Bless you, that's old information, okay.

COUNCILMEMBER BONIN:  And one note on that.  They are back there.  I do want to note, though, we -- about a week ago, Caltrans authorized some fiber-optic work there.  So we're very concerned because there is now a fence that is essentially blocking everybody in.  I suppose it prevents some protection from traffic.

But given that there was a big fire there at the place where the big wide-screen TV was on Mr. Koretz's and on the eastern end last week, I'm very concerned about this chain-link fence there that is part of the fiber optic work.

And we have been reaching out to

Page 134

Caltrans, my staff has been -- trying to see if they can help us in providing resources to put into motels those people there now because I'm concerned about the impact of that fencing.

THE COURT:  And I probably talk to you as much or more than many other councilmen that I think -- maybe other than Curren Price, the two of you -- although, I have talked to everybody numerous times.

I have always said to you, you know what, if this city is serious and this was the 2028 games, God help us, I bet you that this city would do something because of their public image.  And that would be bad for the homeless.

COUNCILMEMBER BONIN:  Yeah, a lot of people are very afraid that it will be all enforcement and no housing.

THE COURT:  I don't know that that's true or not.  I'm just speculating as an old judge, but I bet you if the city fathers and mothers here decided to do something because it was the public image, they would have no problem taking care of it.

The problem is it's the wrong solution.  The problem is it comes quick.

COUNCILMEMBER BONIN:  Yep.

Page 135

THE COURT:  People are swept off the street.  But I can almost guarantee you a dollar to a donut that that's coming in 2028.  And I have got to tell you I'm worried about that because unless people are stepping up responsibly now, we're not solving homelessness, we're just pushing people around.

COUNCILMEMBER BONIN:  Yep.

THE COURT:  Mike, I need housing and I need it now.  And I will say to you bluntly that your old model of $550,000 is too slow, too costly.  And I'm not giving up on housing first.  But I need shelter now to stop 1,141 deaths.

COUNCILMEMBER BONIN:  I agree with you, Judge.

THE COURT:  Okay.

COUNCILMEMBER BONIN:  While I support all solutions and have supported permanent support of housing and will continue to in my district, a lot of it -- it has never been my preferred solution and it's why I have been talking since 2015 about shared housing.  You have met with Brian Olf from Share.

THE COURT:  Yep.

COUNCILMEMBER BONIN:  Rapid

Page 136

rehousing, master leasing, I would like, as you know, to see us take more of the hotels.

THE COURT:  Right.

COUNCILMEMBER BONIN:  We have got to get those resources online.

THE COURT:  Right.

COUNCILMEMBER BONIN:  And what I learned at Penmar is -- and of course I knew this. But what we saw again at Penmar is that yes, the fact that there was a public works project coming did incentivize some people perhaps to make a choice.

But what we saw is that once word got out about that project, that if you were there, there was a housing offer, people started moving there from other parts of Venice.  There is a hunger and a desire for housing.  And we talk too much about the service resistant, which is not a great term to begin with because it speaks to the service, not to the person.

But there are more people who want housing that we should make available.  And toward that end, I'll update you on a couple other things that we are doing.

We are -- we have got an interest

Page 137

from three different motels in my district.  And I know at least one of them, they are working on a letter of intent with.  And I have instructed our -- HACLA and CAO to please begin the letter of intent with the other two motels that would like to be part of Project Home Key.

We also have, as I have mentioned previously, a hotel that is being purchased privately that is in escrow now that we hope can be a very large participant in a master leasing program with LAHSA.

And with the cooperation of both Supervisors Kuehl and Hahn, we are looking at three different county-owned properties in my district that could be the site for pallet shelters, tiny home villages, whatever you want to call it.

Because all of them are in my district, most of which is -- a large portion of which is subject to the Coastal Act, we will need to get some approval or an emergency dispensation --

THE COURT:  Fair enough.

COUNCILMEMBER BONIN:  -- from the Coastal Commission in order to provide those.  But we're looking to move some Project Home Key and some tiny home villages online.

Page 138

THE COURT:  Would you give my best to Dr. Adams and tell her that I'm very appreciative of all of her invitations to come down.

COUNCILMEMBER BONIN:  Absolutely.

THE COURT:  And St. Joseph's.  I'm very impressed.

COUNCILMEMBER BONIN:  Okay.

THE COURT:  And also, you have often alluded to Encampment to Home as a success.

COUNCILMEMBER BONIN:  Yes.

THE COURT:  And let's be transparent with each other.  Although I have been very complimentary about that, I have been very uncomplimentary about the time period it took because Encampment to Home took almost a year with 57 people.

Remember?

COUNCILMEMBER BONIN:  Yeah.

THE COURT:  Okay.

COUNCILMEMBER BONIN:  And Penmar took three weeks for 70.

THE COURT:  Well, I'm not talking -- one at a time, okay -- well, that's because you put up a fence, but we'll talk about that in a moment.

Page 139

Encampment to Home took a year.  You see, to me, that's a provider's feeding trough.

And when I look at money and the claim that we don't have money and I see people showing up with a clipboard to offer nothing to my homeless population in terms of housing, I wonder, you know, in good faith how much money is flowing into these providers' pockets, promising people on the street who then get discouraged, including Skid Row, because all of these promises are constantly made, hi, I'm here with my clipboard, how are you doing?  I'll be back in two weeks.  Oh, I'll be back in two months.

And the more I walk around with General Jeff and the folks down there, the more I get to know them, there are so many people sitting on Skid Row that have been waiting for these empty promises.  And that really has me concerned.

So I toss back to you -- I think this is a provider's feeding trough, quite frankly.  Not evil, just the more time I take, why -- unless I have some designated period of time.  And I don't care if it's two weeks, Mike, or a month.  But what it does is it's not only for the homeless, it allows the bureaucracy to focus their resources in a finite

Page 140

period of time like Dr. Adams did in three weeks.

And you did a wonderful job getting folks -- and so did she -- into good housing.

When it takes a year, I see that fill-back factor.  And so that's what is concerning me about the -- what I see exorbitant costs that are taking place.  Now, I want you to push back on that.

COUNCILMEMBER BONIN:  So it doesn't need to take a year, though.  If the -- if the housing resources are online --

THE COURT:  Right.

COUNCILMEMBER BONIN:  -- if they are available, it doesn't take a year.

THE COURT:  Got it.

COUNCILMEMBER BONIN:  But often, what we see in -- and I'm as critical of the system as anybody.  But often what we see is people are going out with clipboards.  And it's not that they are slow in getting people into housing, it's the housing doesn't exist to get them into it.

THE COURT:  Right.

COUNCILMEMBER BONIN:  So the County has a successful program -- it doesn't get talked about enough -- called Housing for Health -- where they went out and they master leased units.

Page 141

So if you have a master lease program and the city or the county or whoever has an existing inventory of whether it's 30 or 3,000 units, when the person goes out and makes the offer and somebody says yes, they can get them in in a day or two and that's where Encampment to Home matched up with Project Room Key or commandeering some of the motels or a master leasing program through some of the funds that the County has allocated with Judge Birotte, that's housing real fast.  It can be done without any construction cost, without infrastructure cost, without having to --

THE COURT:  Then do it.  Then do it.

COUNCILMEMBER BONIN:  That's what I'm trying to do.

THE COURT:  All right.  So if you are serious, then I assume that you and Bob are both going to ask through the city attorney for a settlement conference.  But we're not coming to you this time, nor Bob.  That has to come from you for Alliance, the County, et cetera.  We're not chasing anymore because we found it extremely unproductive, quite frankly.  And it's taken too long.

And before you got on this, I am absolutely confused, perplexed and frustrated with

Page 142

the fact that we can enter into an agreement, a seven-paragraph agreement and it takes three months then to get an MOU, so I guess City Hall only does what they are forced to do and you are heading on a collision course with the Court.  And I'm not a politician.

So come April -- I want you to hear this.  I'll be going council by council district, okay.  I hope that you are sincere.  I think you are.  And I hope for your great success.

And the third leading causes of death are my freeways and I want them cleared.

COUNCILMEMBER BONIN:  I agree. Thank you, Judge.

THE COURT:  Okay.  Thank you very much.

MS. MARTINEZ:  Next is David Ryu.

THE COURT:  I appreciate it.

Hum?

MS. MARTINEZ:  David Ryu, David Ryu is on --

THE COURT:  Oh, Councilman Ryu, my apologies.  Thank you, sir.  Thank you for your patience also.

MS. MARTINEZ:  And we can let

Page 143

Caltrans go.

THE COURT:  Oh, Caltrans, thank you. I apologize for my rudeness.  I have got you sitting there.  And please go on your way.  We're trying to keep the population down.  I made an agreement and I want to keep that.

It's a pleasure seeing you, Councilman.

COUNCILMEMBER RYU:  Great seeing you, Judge.  I wanted to personally come and give you a quick update.  There's not much to update you on.

But as you know, the Los Feliz bridge home that was open a couple of months ago in my district, the current occupancy went down a little bit.  We have 57 people, 40 men and 17 women.

And the reason that it went down is because we had two residents test positive for coronavirus.  So there had to be some -- the two residents were relocated to a medical quarantine site per Department of Public Health medical protocol and the site had to go into lockdown.

But since then, I'm happy to report that the site has been cleared by public health and -- by the end of last week.  And intakes are now

Page 144

resuming.

Additional on top of that, I told you last time around that my Riverside two project for families, which has 80 beds, will be open by the end of this month. There has been a little bit of delay. It will open on February 1, but construction has begun and it -- they are moving as fast as possible.

The other two permanent housing sites are from the LGBT center, 26 beds for youth and 98 beds for seniors, which will open on January 14.

And this is on top of the interim housing that we bought, which is old apartment building as part of Project Home Key, which will be eleven beds. And the safe parking, thanks to Supervisor Sheila Kuehl, that we'll have in Oxnard Street in Sherman Oaks is -- we're having a little problem with the federal government and for getting some permissions, but that should also come online.

So basically, we are 100 beds open with 200 -- with another 214 beds that will be open by January, February. Our unhoused, unsheltered homeless population within 500 feet of freeways is 46, so we will be, I guess, 500 percent over.

Veritext Legal Solutions
866 299-5127

So we are looking good in Council District 4 when it comes to your ruling.

THE COURT:  Great.  I want to thank you very much.

COUNCILMEMBER RYU:  Thank you, Judge.

THE COURT:  Pleasure to see you.

COUNCILMEMBER RYU:  Judge, can I actually -- I heard the end of the tail discussion that you were talking about with Councilman Bonin. Can I just make one quick point about the permanent supportive housing?

THE COURT:  Please.

COUNCILMEMBER RYU:  I know you made the comment about the $555,000 per unit for permanent supportive housing is not -- is something that you are concerned about.  I just want to make sure that we know -- and I actually agree with you. And that's why a majority of the 300 beds that are open today in my district and the 300 beds that are coming online by end of next year are predominantly bridge housing, bridge housing shelters --

THE COURT:  Right.

COUNCILMEMBER RYU:  But I also want to reaffirm the figures of permanent supportive

Page 146

housing because a shelter, while it is very, very necessary and bridge housing is necessary to get people off the streets quickly and it is easier to build and faster to build, a shelter does not solve homelessness.  We need permanent supportive housing --

THE COURT:  You see, there is the problem.  I agree with you.  But the problem is it's always either or.  You are either in the permanent supportive housing group or the shelter group or -- there has to be a balance here.

COUNCILMEMBER RYU:  Yeah.

THE COURT:  Sir, nobody is giving up on permanent supportive housing.  It should be housing first, housing first.  It's just not possible to get this death rate reversed unless we get some immediate shelter.  And so when all of that money is put in that one bailiwick -- and quite frankly, HUD changed its position in 2016.  I really have to wonder why we aren't getting people off the streets.  And I promise you, I'm not going to abandon you.  I'm not going to let people languish in some shelter indefinitely.

In fact, we need to put -- we have got to get people off the street now.  We can't keep

Page 147

up the volume.

COUNCILMEMBER RYU:  I absolutely agree with you, sir.  And I want you to know that the city council with our leadership of council president Nury Martinez, we have put extra money on because Prop HHH is predominantly used for permanent supportive housing, but we put our own monies.  We put -- used COVID relief monies as well for a lot of these bridge -- and the heap (phonetic) money from the state as well.  That's how I am able to fund all these other projects.

So -- but I do want to know that -- let you know that the $555,000, we have to be careful not to go to the race to the bottom.

THE COURT:  Yeah.

COUNCILMEMBER RYU:  Because the reason why it costs $555,000 is because of the land costs, the construction costs and of course the labor costs.

THE COURT:  No, no, no.  Not buying it.  That's where you and I part company.

COUNCILMEMBER RYU:  Well, it's the same cost as a --

THE COURT:  Because I have seen the city take 760 or 720 pallet shelters and up the

Page 148

price to $91 million with a sharp pencil.  Go look at Appendix A.  Go look at your --

COUNCILMEMBER RYU:  Right, no, so I --

THE COURT:  -- pop-up Garcetti modules --

COUNCILMEMBER RYU:  Uh-huh.

THE COURT:  -- at 7,000 to $8,000 and look at the bottom line of $91 million, which is ten times the amount because they put all of the long-term supportive housing costs in there.  They didn't do apples to apples.  They did apples to bananas.

COUNCILMEMBER RYU:  Yeah.  So, you know, when it comes to pallet housing, yes, there might -- and I think there's a lot of streamline efficiencies that we should be doing in the City of LA.

And if we want to tackle this as an emergency crisis, we have got to cut all the red tape when it comes to planning and housing.  I fully agree with you on that.

THE COURT:  Yeah.

COUNCILMEMBER RYU:  But when it actually comes to the cost of building permanent

Page 149

supportive housing -- and you know, when we have like -- and this is why when we all took the pledge for -- with the United Way, the 222-unit pledge --

THE COURT:  The LUST report says you can do it for 125,000.

Did you know that?

COUNCILMEMBER RYU:  I'm sorry?

THE COURT:  The LUST report says you can do it for 125,000.

COUNCILMEMBER RYU:  Well, I haven't seen that report.  But I think they are wrong.  When it comes to permanent supportive housing, I would love to have built it for 125,000, but I don't know if -- what kind of labor you are using.  And I believe in living wages.

THE COURT:  Why don't you call Bill. He's over at UCLA.  And I just met with him and he gave --

COUNCILMEMBER RYU:  I will.  I'm a board member there.  And I will talk to them.

THE COURT:  Okay.

COUNCILMEMBER RYU:  But I think the 125,000 is probably a different figure because it -- because permanent supportive housing, I mean, it is the cost of a market right housing.  I fully

Page 150

agree with you, it takes -- one of the problems is, though, it takes too long to build.

THE COURT:  Well, you know, I -- if you can do it, I'm all for it.  I just know if I was living in Kansas and you told me I had a place for 100 -- or 525,000 in California, I couldn't pack my bags fast enough.  I would find it to be a magnet. And the more we get that message out there, the more you are going to absorb to New York and every other place.  Congratulations.

COUNCILMEMBER RYU:  Thank you, sir.

THE COURT:  Okay.  All right.  Thank you.

MS. MARTINEZ:  John Lee -- John Lee is here.

THE COURT:  Who?

MS. MARTINEZ:  John Lee.

THE COURT:  John.  I'm sorry, John Lee, please.  Thank you.  It's a pleasure to see you.

COUNCILMEMBER LEE:  How are you doing, Your Honor?

So since the LUST time we were here, we have made substantial progress on our Home Key site.  We had a community meeting two weeks ago to

Page 151

advise the community about the project that's going to be approved in their area.  This site in Chatsworth that's on the list of properties to be acquired through Project Home Key, which is 76 beds.

Just this morning we got the report that the service provider was identified.  It's Volunteers of America.  And so an organization, you know, that we have obviously heard about and different things but --

THE COURT:  Let me stop you for a moment.

COUNCILMEMBER LEE:  Uh-huh.

THE COURT:  I don't want to be critical today, but I do want to recognize they have done an outstanding job.  I want that on the record.

COUNCILMEMBER LEE:  Got it.  Well --

THE COURT:  They have really stepped up.  I mean, when I see excellence, they have really tried in every single way to support the city.  And very complimentary.

COUNCILMEMBER LEE:  Well, that's good to know because I don't have much interaction with them.  And to hear that from you puts that level of comfort in me because obviously the

Page 152

provider was the biggest concern of the community and making sure that we had a provider that understood, you know, how to run these -- a Home Key site for the community and so that's good to hear.

The second thing is the interim housing, the site that you and I have talked about often about -- with the person that I think you know, Bill Taormina.

THE COURT:  Yeah.

COUNCILMEMBER LEE:  Privately owned site.  After a site walk-through, we have had a preliminary site assessment.  The plan was prepared. The preliminary plan has been reviewed by city staff and a cost estimate has been prepared for the required improvements and upgrades.  And we're just in the process of identifying those funds.

Background work on this project is progressing and things are looking very good.  I hope by the next time we meet, I will have a little more concrete update.  We will be talking to the community by then about this next project.

That should be happening some time soon.

THE COURT:  Okay.

COUNCILMEMBER LEE:  And we acquired

Page 153

for safe parking, a city-owned transit station, up to 20 spaces, funding has been allocated and we're working with CAO and LAHSA on license agreements for site use and arranging service provisions.

                THE COURT:  I want to compliment you.  I think we have broken the inertia in your district --

                COUNCILMEMBER LEE:  Well, thank you very much.

                THE COURT:  -- and you have been complimented.  Thank you very much.

                COUNCILMEMBER LEE:  Thank you.

                THE COURT:  We'll see, though, okay.  All right.  Thank you.

                MS. MARTINEZ:  Paul Koretz.  He's on Zoom.

                THE COURT:  Okay.  Thank you, Councilman Koretz.  Can you see Councilman Koretz?  I'm waving at you.  Or can you hear me?  You are probably on mute.

                COUNCILMEMBER KORETZ:  Yes, I can hear you now.

                THE COURT:  And I can see you and hear you also, Councilman.  I hope you are well, I hope your family is well.

Page 154

COUNCILMEMBER KORETZ:  Thank you. Everybody is doing well.

THE COURT:  Good.

COUNCILMEMBER KORETZ:  I hope the same with you.

THE COURT:  Well, please, whatever thoughts or comments that you have would be appreciated.

COUNCILMEMBER KORETZ:  Okay.  Well, first of all, I would say we are still struggling in Council District 5.  The approach district by district makes it particularly hard on us because we don't have a lot of potential locations.  So it's certainly not ideal.  But we are doing our best.

A couple locations that we have didn't work out because the city determined that it's not efficient to use a lot that's not large enough.  I think for me to achieve my goal, even though it's cost inefficient, the city can't keep rejecting lots like this, so although I don't know whether I would have even gotten the property owner to agree.  But a couple were taken off the table.

Also, the couple parks locations I had were pretty small.  We were hoping to place about 25 people at each of the two locations.  One

Page 155

doesn't seem suited for the pallet shelters and the other one in the location in the park that would work well, it actually was taken over by the homeless, so there's now a very large encampment.

And to move pallet shelters there, I would have to force the homeless out.  So that probably doesn't make sense either.

So as far as what is open or in development, we have a family bridge shelter and a converted motel on La Cienega that opened and is housing 18 families.

We have mercy housing, 50 affordable units for seniors and veterans that's been in the works for a long time.  It's just about open now.

We have two HHH projects that are approved but still in the early going, one for 50 units and one for 49, one on Santa Monica Boulevard near Sepulveda and one on La Brea at Willoughby.

We have secured a safe parking site, 30 spaces at Saint John's Presbyterian church at 11000 National Boulevard.  And that's in preparation to go in hopefully relatively soon.

We still have a number of sites that are under review.  The West L.A. federal building for an undetermined number of tiny homes, but we're

Page 156

still trying to find the right person to communicate with at the federal level. And now we have to figure out which administration we're communicating with. So that may take a little time.

We have an 80-unit former elder care building at 8755 Olympic. It's still in litigation. And we probably can't attempt to buy it or lease it until it's out of litigation with the city.

We're still looking at a lot at 1018 Hilgard Avenue. It's owned by UCLA, but the previous owner has the right to refuse it for anything except UCLA faculty housing. And right now, it will be an empty lot for several years because UCLA is not ready to build that. So it's a perfect opportunity.

We're going through all of Christian Science Church concerns. And also the city has some concerns about the size of the lot not being large enough.

We have the Sherman Hotel site on Ventura Boulevard. It's currently a Project Home Key site. We're considering it for eminent domain. The current property owner would like to demolish it and build a boutique hotel. So it will probably be a long fight. It won't be the -- certainly the

Page 157

short-term answer for us.

We're also looking at the site of the National Council of Jewish Women.  We were looking at that for a possible eminent domain, but it sounds like the new owners of the property may consider leasing.  So that's a short-term possibility as well.

Then we've had a number of recent suggestions that we're reviewing.  One is an MTA storage yard at Irene Street and Exposition Boulevard in Palms.  A couple are vacant lots at Olympic Boulevard and Robertson and Olympic at La Cienega.  They both were gas stations as I recall years ago.  And I don't know if there's anything that needs remediation there.

We also have -- let's see -- seven other commercial properties that we are now looking at that are new to our list.  But it's been especially difficult in our district.  There aren't a lot of properties available.  And we keep pursuing them as they pop up.

THE COURT:  Councilman, thank you very much.  I hope you are well.

COUNCILMEMBER KORETZ:  Thank you, same to you, sir.

Page 158

MS. MARTINEZ:  Joe Buscaino, please.

THE COURT:  Joe Buscaino, please. It would be a pleasure.  Is Councilman Buscaino present?  He was on the list.

MS. MARTINEZ:  Yeah, he's coming. He's on Zoom.

THE COURT:  Okay.  He's on Zoom, I'm sorry.  Thank you so much.

Councilman, can you see me or hear me?

COUNCILMEMBER BUSCAINO:  Yes, Your Honor.  I can see you.  I can also hear you.

THE COURT:  Okay.

COUNCILMEMBER BUSCAINO:  (Inaudible. )

THE COURT:  Please.  It's a pleasure to see you and hear you.

COUNCILMEMBER BUSCAINO:  Fantastic. Thank you so much.

In terms of progress, Your Honor, and members and those in the council chambers, for our shelter facilities in Council District 15, there's been some significant movement that we're proud of.  My staff has been working hard to get things moving.  And I'm happy to report that our

Page 159

pallet shelter site that will provide 75 units will go out to bid tomorrow.

THE COURT:  Great.

COUNCILMEMBER BUSCAINO:  In addition, we are proposing two safe parking locations, one in Harbor Gateway as well as another site in my district office parking lot in San Pedro.

We have also submitted and were approved a Project Home Key site, where we're purchasing a motel in the Harbor Gateway area and we'll be turning it into housing to provide 40 rooms.

In addition, we have been -- and by the way, we're so proud of being one of the first in the city to provide 100 beds at the hotel in downtown San Pedro.  The 100 beds there and -- we're proud of -- I forget the name of the hotel off the top of my head.

In addition, we're also making significant progress in creating permanent supportive housing units in Watts.  We're under construction in two sites; one development for 64 units and 25 units.  In Harbor Gateway North, we have a 55-unit development also currently under construction.

Page 160

This aside from, of course, our El Segundo apartments that are up and running today, as well as Vermont Villas that are up and running today.

We have had another site that we are looking at that was on the original Caltrans surplus list. Just know that my staff has been in talks for months about using this site. And a couple weeks ago, we learned that Caltrans is concerned about potential hazards on the site and will not entertain an interim use agreement for this parcel, which I'm a little puzzled because it's being used right now as parking.

This was obviously disappointing so because of their -- because the site is correctly actively used for parking, but we can't use it for safe parking because of Caltrans concerns, this is baffling.

On to the bigger picture for the global settlement discussions, I feel that it's imperative that we come to an agreement so that we can create a path to create even more resources and more housing so that we can finally solve this crisis. But we need to be able to deliver on the promises that we made to our neighborhoods and to

Page 161

our disabled community to keep the public rights of way clear from obstruction.

It's essential for us to establish reasonable rules for how we can ensure the public health and clean our streets and walks.  This is why we need to approve amendments to 5611.  It's all about public health and hygiene.

But we also need to establish basic rules about limiting encampments in areas where people have been offered housing.  We also need to have basic rules about keeping clear of right-of-way on the sidewalks so that a wheelchair can easily pass by without having to go into the street.  And these are basic rules that we need to establish through 4118 -- I believe you are going to get to in a bit.

Your Honor, then finally, I want to -- if you allow me to share some of the concerns that we have had from our service providers, I want to share with you a following message that we received from -- it was sent to our district director, Gaby Medina, who has been on the ground almost every day with Alexis Laro (phonetic) and part of my team.

Now, this service provider attempted

Page 162

to outreach at our larger encampment at Lomita and McCoy. It's actually the largest encampment in my district. Here is the message that Gaby got.

The message was this: "We are attempting to connect homeless to social and medical services, but unable to because of the lack of health standards and the lack of access."

So take that in. Our service providers are begging for massive cleanup at Lomita and McCoy so they can do their work. And it's becoming unbearable for them to do their outreach work.

THE COURT: Just a moment. Where's -- just a minute. Joe, just a moment. Where is Skip?

MR. MILLER: I'm here.

MS. MARTINEZ: Byron is right here.

THE COURT: Byron, I'm sorry. I want someone from the county listening to this. So thank you. All right.

COUNCILMEMBER BUSCAINO: Yeah.

THE COURT: Because I'm hearing this repeatedly about lack of services for the providers.

COUNCILMEMBER BUSCAINO: Sure. You know, in our case, we have service providers. But

Page 163

they can't penetrate through the encampments that are clearly a threat to their public health and public safety as well.

And lastly, another message we got from our -- our neighbors and residents in Harbor Gateway, concerns about Rosecrans Park.  The fencing along this park has been compromised.  Families and their children feel unsafe and have deep concerns about their public health.

There's been a spillover of large soiled items that are now in the park.  Outreach has been done consistently.  But services have been refused.

So, again, just wanted to paint a picture on these two sites of many, I'm sure, throughout the city that there has been some -- of significant concerns about.

And I'm hopeful that we work -- and with your council president, Nury Martinez, on behalf of the city council to move on these discussions forward with even hopes of resuming a citywide Care Plus cleanings even outside the bridge home sites.

And Judge, you need to know that since we have resumed Care Plus within the bridge

Page 164

home zones, know that 3 tons of human waste was taken.  3 tons of human waste.  Urine and feces.  Just let that sit.  I hate that -- no pun, let that soak in a little bit.

There is clearly a -- we have a pandemic on our hands and I am concerned about, you know, a typhus spread, a hepatitis spread.  We need to restore quality of life.  But at the same time we are hearing from our social service providers that they cannot reach these souls and we're doing a disservice.  We're allowing these people to destroy themselves in our city.

Thank you, Your Honor.

THE COURT:  I don't think I have got any questions, do I?

MS. MARTINEZ:  Just read this over for him.  He asked about the ordinance.

THE COURT:  Yeah.  You had asked about the ordinance.  And I had said earlier today to both Mike and to Bob that I have always made it clear that I'll support any ordinances on the books, but they have to be constitutional.

And the problem is that the discussion is backwards.  I'm watching from afar and all of you out there are discussing it.  But the

Page 165

housing has to be available.  This Court is never going to allow anything unless the housing is there.

And I've tried to take away the barriers to a lot of the housing because I think the long-term reportable is too slow.  I mean, I'm a champion of housing first, but I'm just not seeing enough of it being built fast enough for the volume that we have got and for the shelter that we need immediately because our death rate is 1,141 already this year, a 36 percent increase over LUST year.  That's just horrific.

So I want to thank you and wish you the best and your family the best.

COUNCILMEMBER BUSCAINO:  Thank you, sir.  Just, again, another observation.  I think it's important for the Court to recognize, in our Wilmington site, we have nearly 60 beds available.  And with constant outreach, individuals continue to refuse to go in where, of course, you have wraparound services, showers, laundry services and the help that they need as we're bridging their way towards housing and permanent housing.

In San Pedro, there's, I believe, 6 to 10 beds available in our bridge home site.

So it's that proper balance.  We

Page 166

have made a commitment and promise to our neighborhoods that if you do say yes to a solution, we have promised clean streets free of encampments.

So, of course, we want to stick to a constitutional way forward, looking at the Boise case -- again, if you offer a solution, offer a bed that's available, we ought to have some consequence. And what does that consequence mean?  It's not about jail time.

Perhaps, if you don't move into a bridge home site, then you need to agree to get help for yourself, whether it's, you know, diversion, a drug diversion program.  There's got to be consequences, Your Honor.

THE COURT:  Well, we're back to that discussion, but get me the housing.  Get me the housing.

All right.  I want to thank you very much.  I sure appreciate it.  And --

COUNCILMEMBER BUSCAINO:  Thank you, sir.

THE COURT:  And can I just make one phone call here?  Hang on.  I want to talk to General Jeff.

Yeah, ask -- just General?

Page 167

MS. MARTINEZ:  Ask them to put him on.

THE COURT:  Yeah, could somebody put General Jeff on from Skid Row, city limits?

Jeff, are you there?

GENERAL JEFF:  Yes, I am, sir.

THE COURT:  Listen, I'll get rid of a few folks here so we honor it -- could you come on up by any chance at your leisure?

MS. MARTINEZ:  He's here.

GENERAL JEFF:  Okay.  On my way.

THE COURT:  Okay.  Thanks a lot.  I sure appreciate it.

GENERAL JEFF:  Thank you, sir.

MS. MARTINEZ:  Let Nury go next.

THE COURT:  Okay.

And Nury, I'm looking around.  I'm trying to keep it down so if any of you are done, goodbye.  Okay.  So yeah.

FEMALE:  County.

THE COURT:  Okay.  Good.

By the way, Nury, I want to thank you because we'll be going someplace else next time. We're going to go to the Union Mission.  So thank you for your hospitality.  It's been -- you have

been very gracious.

MS. MARTINEZ:  Well, she's next.

THE COURT:  Okay.

MS. MARTINEZ:  It's her update.  Ask her for her update.

THE COURT:  Okay.  So, Nury, your update at your leisure would be appreciated.

COUNCILMEMBER MARTINEZ:  Is the General coming?

MS. MARTINEZ:  No, he's on his way, but you can go.

THE COURT:  Yeah.

COUNCILMEMBER MARTINEZ:  Go now?

THE COURT:  Yeah, and this is your seat.  You should come up here for goodness sakes.

MS. MARTINEZ:  No, this is a court right now.

THE COURT:  Okay.  Well, it's still very --

COUNCILMEMBER MARTINEZ:  (Inaudible.)

THE COURT:  She should be up here.

MS. MARTINEZ:  No.  It's the court.  This is a court proceeding.

THE COURT:  All right.  Thank you.

Page 169

But she's very gracious.

COUNCILMEMBER MARTINEZ:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Councilwoman.

COUNCILMEMBER MARTINEZ:  So I just have a few updates for you this afternoon.

In regards to Home Key, we have received Home Key awards for two projects -- or two properties, I should say, in my district for about 100 units.

THE COURT:  Well, great.

COUNCILMEMBER MARTINEZ:  So those are in the works.  These units are going to go towards the use of our targeted population in our 6,700 bed effort.  And we're currently completing the acquisition process and selecting the operators for both of these two motels that will be coming online pretty soon.

The LUST time we were here, I spoke a little bit about the LAHSA project that we are working on.  That continues to be a pilot project along the 405 freeway and Parthenia in the community of North Hills.

This pilot does not have an

Page 170

established end date.  LAHSA is utilizing this pilot project to identify best practices, which I support. And we started with 25 individuals that we were working with underneath every freeway underpass.

And now, we're down to 13 individuals so we are continuing to do the outreach and identify permanent housing for them.  So we're currently still doing that.

We're going to continue to monitor these results and work with LAHSA and figure out what we can learn from this pilot, make the necessary tweaks or find other approaches, but this is something that is going to be an ongoing effort until we have identified housing for all the individuals in that area.

The Sepulveda Basin, Your Honor, you have mentioned this earlier today.  It's been an ongoing issue.  You know, I grew up in the Valley. So there's always -- the Sepulveda Basin is very familiar to me.  But over the course of the years, we have allowed more than over 100 individuals -- 150 individuals at one point live in the basin.

For the past few months, staff and providers have been working to address the nearly, like I said, over 150 people that are living in the

Page 171

basin.

As you know, the basin -- it's prohibited for overnight camping and it's a high risk for fires during the summer and flooding during the winter.

THE COURT:  Is that county or is it city?

COUNCILMEMBER MARTINEZ:  So it's a mix.  It's really the Army Corps of Engineers.  It's federal land.  And so there's different arrangements in terms of jurisdiction, but we lease from them.  And so there's always a back and forth in terms of who is in charge to make sure that it's being cleared.

I recognize the responsibility that the city has in terms of enforcing the no overnight camping rules and that's on us.  And we need to do a job to make sure that we stay on that, but it's an ongoing effort between the federal government and the City of Los Angeles.  And particularly, rec and parks because it's a recreational area.

THE COURT:  Okay.

COUNCILMEMBER MARTINEZ:  So this summer alone, we have had at least ten fires in the basin.  So every time there's a fire, we get an

Page 172

alert and everybody scrambles to make sure that no one dies because it's such a -- you know, the efforts there are just ongoing to make sure we keep it clear and make sure that people are not starting fires.  But so far, we have had at least ten.

75 people have moved into the Project Room Key facilities not too far away from the basin and the staff has identified about 50 individuals that remain in the basin as well.

And so we are currently still working with these 50 individuals to find alternative, you know, beds for them.  But this continues to be a major public safety priority for me and for the folks that are still living there.

My hope is that we continue to find -- whether we have vacancies at the Airtel and we continue to figure out how to move folks from the basin into the hotel in Van Nuys, we're going to continue to make sure that the basin is -- is a priority, particularly when it comes to 200-and-something beds that are at the Airtel in Van Nuys.

So with the winter approaching, I'm very concerned about more lives being put in danger only because, like I mentioned, it's a flood zone

Page 173

when it rains.  And you will see it on TV.  It will be on the 11:00 o'clock news when we have had to rescue people from the basin and so on.  So we want to be able to find permanent solutions for folks that are living there.

I'm currently looking at securing trailers at another location so we can have additional beds for folks in the basin.  So not only is the Airtel being -- becoming available, but we're actually identifying land in my district to be able to purchase trailers and offer additional beds for folks in the basin in particular to target that population.

THE COURT:  I want to thank you and I want to thank you for your leadership.  I want to show you a couple things.

Yeah, what is the city going to do with all the COVID trailers?

COUNCILMEMBER MARTINEZ:  What is the city going to do with all the COVID trailers?

MS. MARTINEZ:  That the state provided.

THE COURT:  That the state provided.  In other words, I went out and saw --

COUNCILMEMBER MARTINEZ:  Yeah, the

Page 174

ones in Los Feliz, the ones in Curren's district --

THE COURT:  Yeah, yeah.

COUNCILMEMBER MARTINEZ:  -- and so on, as far as I know, at some point, they are going back.  They are not ours.  So at some point, that's my understanding, the governor is going to take them back.

THE COURT:  Okay.  Well, listen, first of all, I want to inform you I'm going to kidnap Ackley, so if you don't see him again, we're sweeping him into our family.

COUNCILMEMBER MARTINEZ:  You want to kidnap Ackley?

THE COURT:  I'm just joking.

Well, I want to show you a couple things that's happening because just like Skip receives information, you receive information and the Board receives information, and I want to give you another experience about how good or bad our information can be coming to the Board or to you for a moment.

Would you put up No. 4, please.  Four.

This is an interesting situation.  Got it.  It's perfect.  Right there.  All right.

Page 175

Ackley, do you recognize this?  Do you recognize this?

FEMALE:  I do.

THE COURT:  About 6:00 o'clock in the morning.

Heidi, come on up for a moment if you would be so kind.  I would appreciate it.

And if Wendy is still here, I apologize.  I had to ask one of you to stay and one of you to leave.

MS. MARSTON:  She's in the back. Wendy is in the back.

THE COURT:  Oh, Wendy, if you are here, I didn't mean to be rude.  But more than welcome to come up and join us, please.  Is she here?

MS. MARSTON:  Yeah, she's in the back.

THE COURT:  Okay.  I was reading in the Valley that you had a huge sweep -- I think out in maybe Krekorian's district.  And that folks were standing in front of the homeless tents who were street watchers or advocates, and I followed it with interest because it was a big brouhaha, a big news item.

Page 176

And so you were kind enough to invite me out to your district. And this is early in the morning with Ackley and Michele Martinez. There's about six tents there, okay.

And if you would be kind enough to turn to the next slide, I just wanted you to see the person power for six tents for a moment. I leave that to you and the city attorney and the mayor. But it looked like we had a police jamboree out there.

The interesting thing is that I was told point-blank that all of these people had been notified about the cleanup that day. And so I would have told you that they had been notified about the cleanup that day.

You will probably know who that member was from LAHSA, but -- Michele? We were notified of the notification being given to the six homeless in tents.

Now, watch for a moment.

MS. MARTINEZ: I think it's this.

THE COURT: Of course we would want notification on a cleanup day because then the person can roll up their tent or get it cleaned and put it back down or whatever you are going to do.

Page 177

So there were two street watchers there, a little gal and a gal -- and a guy who kind of waved and motioned me over and I went for a walk with them.  And they said, Judge, there's been no notice given here.  I thought, well, okay.

So we went back and went tent to tent.  And I took Michele with me.  And I took Ackley with me.  And I represent to you that every one of those people told me, Judge, I didn't receive any notice from LAHSA.  I received nothing.  And in fact, one guy was so angry that it can't be feigned anger, he was just really angry.  And I was just thinking what the disconnect is and how peaceably that could have taken place with notice.

So, Wendy, in good faith, you would believe that there was notice, the president would believe that there was notice, I would believe that there was notice --

COUNCILMEMBER MARTINEZ:  I was told that there was notice.  And you and I have had conversations --

THE COURT:  I know you were --

COUNCILMEMBER MARTINEZ:  -- about not only the resources that it takes, but the presence of the police department, which is --

Page 178

THE COURT:  Yeah.

COUNCILMEMBER MARTINEZ:  It shouldn't be necessary.

THE COURT:  Exactly.

COUNCILMEMBER MARTINEZ:  It should never be that.  There's just so many police officers out there.  It just causes even more chaos and the tension that it creates around that.  And so my understanding is that there was notification.

THE COURT:  There was none.

COUNCILMEMBER MARTINEZ:  And so --

THE COURT:  So let's resolve that.  Instead of the problem, let's start coming up with the solutions in good faith because one incident doesn't have to be repeated.

COUNCILMEMBER MARTINEZ:  Right.

THE COURT:  But the end result was the breakdown appeared to be this, that the provider out there didn't even come on the scene, and I'm told, and it may be true or not, that because LAHSA uses the police on occasion, this provider objected to the police and, therefore, wouldn't come on the scene and wouldn't give notice.

So I'm thinking what an incredible disconnect between a provider who is supposed to be

Page 179

giving notice objecting to LAHSA that still uses the police.

And so whichever side of the ledger it's on is not my business, but there's no notice being given and you can't talk to seven or eight homeless people and just discount that every one of them, including the little gal out there, says, Judge, I had no notice.

And I took Ackley because he's much more credible than I am. And I took Michele so they could hear the same thing.

FEMALE: But there was notice on the bridge --

THE COURT: Now, there was notice on a --

FEMALE: Bridge.

THE COURT: -- post.

FEMALE: Post.

THE COURT: And if you were a squirrel with good eyes -- I'm just kidding you -- maybe you can read that. So I would be told as a judge, oh, Judge, there was notice, and technically, that would be correct way down the block, way up.

But by the time you get done reading it, it's like General Jeff when he showed -- I joked

Page 180

with you and showed you all those signs, those parking signs on Skid Row that we can't make any sense out of, I wouldn't expect any homeless person to ever take into account that notice.

So I leave that to you because in following this, it just occurred to me that so much of this strife could be avoided if the homeless person had adequate notice and that if we had providers out there who were supposed to doing this, doing this.

Because in good faith, the LAHSA person actually said in our presence, Judge, notice was given. They would believe it because they heard that from somebody else. No notice was given.

So let's turn to the next one. This is what you have constantly been talking about, the tip of the spear is law enforcement for six tents. And I just want you to see so we have a graphic --

Next one. And I like the LUST one with the teddy bear. We'll finish off with that. There we go. Okay.

If that's the way you choose to spend your money, don't come to me and tell me you are broke.

I'm going to repeat that. Don't

Page 181

come to the Court and tell me that you have no money between the city and the county if we're using that. We have got plenty of money.

Okay.  I want to thank you very, very much.  And humbly I want to thank you for your leadership.  I want to thank you for being so gracious, we will be departing city hall --

COUNCILMEMBER MARTINEZ:  That was not my intent.  I just want to make sure everyone is safe in here --

THE COURT:  Yeah.

COUNCILMEMBER MARTINEZ:  -- and that we keep it to a minimum of following county guidelines and so that my only concern is for the safety and well-being of everyone in council chambers.

THE COURT:  Oh, on the next one -- just before you leave, Nury, flip up the next one.

This is not you, Nury.  This is just cruising around.

COUNCILMEMBER MARTINEZ:  This is Gilmore.

THE COURT:  Keep going.  Next one. Next one.  Next one.  Next one.  Next one.  Next

Page 182

one.  Next one.  Next one.  Next one.  Next one.  Yeah.

What kind of inhumanity allows us to have this poor gentleman defecating in his pants --

COUNCILMEMBER MARTINEZ:  Uh-huh.

THE COURT:  -- literally?  And this won't be for publication.  This is just for you to look at because I don't want him embarrassed.  Sitting in a wheelchair in this great City of Los Angeles.  So if the death rate doesn't get your attention at 1,141, maybe just a personalized look at this poor gentleman who is the nicest guy you will ever talk to in your life.  Okay.  He's not a depraved human being.

The decency here, the lack thereof, is just astounding to me.  The next one.  Next one.  There's your public parks right over here.  Here is Echo.  Next one.  This is your trash.  I wonder if that's happening on the West side of LA.  Next one.  We'll leave it.  Okay.

So just running around the countryside, I just think if we could all just humbly come together, and I really say that -- that if you really want a settlement conference, then you have got to make it known that you truly want to get

Page 183

down to the bargaining table and give up a little bit on everybody's side.

Otherwise, welcome to 30 years of litigation because it's easy for the Court to hand down an injunction, but I don't want to punish a city.  But unless you come together, we're right back to I think what Judge Birotte's excellent ruling, that I wish I could have been smart enough to make, and that is 1985, they were still telling people, Andre, to lock them in a room and get a settlement from the LA editorial board.  And here we are 30 years later.

So I want to thank you.  Next time I'll invite you down to the Union Mission.  That's where we'll be holding it.  And anybody who doesn't show up, I'll have a couple comments.  We created it, why aren't you here?

Okay.  Let's turn to a couple other things and then wrap it -- I have got a whole bunch of motions for clarification.  The first motion for clarification is --

Oh, we need to take a break for 20 minutes and I want to humbly thank the recorder. And then we're going to get down to our motions for clarification and your briefing, okay?  So in 20

Page 184

minutes we'll be back.

THE ELECTRONIC RECORDER:  This marks the end of media 3.  We're off the record at 1:29 P.M.  Thank you.

(Recess taken.)

THE ELECTRONIC RECORDER:  Back on the record at 2:00 o'clock.

THE COURT:  Back on the record.  All the parties are present.  And we have a number of motions for clarification.

So I have them by different docket numbers.  Yeah.  Better yet, I'm just going to turn these over to the respective parties.

Shayla Myers, you were the first to file the clarification.  And then, I think one came from you, Liz, and then -- maybe just turn it over to you, Shayla Myers.

Let me start with you, please.

MS. MYERS:  Is this on?  Okay. Thank you, Your Honor.

We filed -- the request for clarification, Your Honor, related specifically to the operation that the city began conducting on October 13 in Council District 3.

Every representation from the City

Page 185

of Los Angeles that we have seen thus far has indicated that that operation to relocate individuals from the freeways in Council District 3 was being done pursuant to this Court's jurisdiction.

We represent the intervenors in this case as a party to this litigation.  We had no knowledge that this action was being taken.  And the action was not being taken pursuant to any public court proceedings that we were aware of.

We filed the request for clarification because, Your Honor, there is significant confusion about the way in which the city is proceeding relative to those court proceedings.

And as a result of that, we are very concerned that the city's actions in representing that this is part of the court proceeding is undermining the legitimacy of these court proceedings.  We raise that here because the city posted notices that indicated that its actions were being taken pursuant to this court proceeding and, as you noted earlier in this proceeding, that it was being done pursuant to your supervision.

We were here this morning.  We

Page 186

listened to your representations about what happened. We have had numerous conversations with the city, with the county, with providers, with others. We were there the morning of the 13th and again on the morning of the 27th. And it is still incredibly unclear what is going on and what happened in Council District 3 relative to these court proceedings.

From our perspective, it is one thing if the city wants to act and provide housing to 57 individuals. And to be clear, what I mean is shelter.

If the city wants to take that action to provide shelter to individuals along the freeways, that's great. We have no objection whatsoever to getting people into shelter.

We would say that we don't think that the 57 people who received shelter needed to go through this court proceeding in order to get that shelter, nor do we think that the units or the housing vouchers that they were given were created in any way relative to these court proceedings.

But our concern is that there is no clarity whatsoever about what is happening and what is the authority in which the city is operating and,

Page 187

quite frankly, which this court is overseeing these proceedings.  That's why we requested the clarification.

THE COURT:  Okay.  Well, thank you.  Brooke.

You see, when you are sitting there, I think of Carol because I don't want Carol put in the position because of some personal issues of having to appear.  So I think Shayla has a good point.  I should communicate more with you, Shayla, in the future, but I have always turned to Brooke because I think of you and Carol being synonymous so often.  So I will just communicate more directly with Shayla because Carol just has some personal issues in terms of being present.

MS. MYERS:  Your Honor, we just want to be clear.  We are not objecting to you communicating with the Orange County --

THE COURT:  Oh, no, it would be a pleasure not to talk to Brooke ten times a day.  I'm just kidding you, Shayla.

MS. MYERS:  Your Honor, our concern is that there is no court record of these -- of these operations.  There was no -- there is no public awareness about what is going on and that

Page 188

there was no notice that was provided to the Orange County intervenors to us.  We understand there was no notice being provided to the plaintiffs either.

Our concern is that these are extra judicial activities that are being conducted that are under the guise of these court proceedings but for which there is no court record, for which there is no accountability and for which there is no process.

THE COURT:  All right.  Thank you very much.

Let me turn to the other entity.  Absolutely, yeah.  And that would be First Alliance who is the original plaintiff.

MS. MITCHELL:  I have to say being in federal court and sitting is very uncomfortable but I will -- I'll do what I can.

THE COURT:  Please.  And move that microphone just a little bit closer because of the acoustics.

MS. MITCHELL:  Sure.  So the first -- the first request that we had was for an accounting for the MHSA funds.  And that is a separate pot of money, as the court is aware -- as the parties are aware -- where -- that I am, as

Page 189

representative of the plaintiffs, we're very interested in because as of at least earlier this year, there was a billion dollars in that account that was -- that was unallocated and unspent.

THE COURT:  Right.

MS. MITCHELL:  I know that some of that has been spent.  But there is no transparency surrounding what is in that account and how it is being spent.

There is certainly a budget process, but it is a separate pot of money that is not involved in the general fund.  The reason this is important is because -- and without revealing confidential communications, I think we're all aware that the general concern is the budgetary issues that are facing both the city and the county.

And when we were talking about the larger project, the 6,700 beds is certainly important.  But when we talk about the entire county and the desperate need for both shelter and mental health services in the county, that several hundred million dollars in that account that I believe there to be -- and maybe there's not.  Again, I don't know because I have not seen the numbers and despite this nine-page filing, I still haven't seen the

Page 190

numbers -- that's incredibly important when you have people suffering, as the court has shown up on the screen. You have people that are suffering in the streets of severe mental illness, people who are not appropriate for a shelter who do need desperate mental health relief.

When you have less than half of the appropriate IMD beds here in Los Angeles County and then you have several hundred million dollars in that account that appears to not be being spent.

So that transparency is incredibly important. And it is not for us to sit here and dictate how that money is spent. But I think transparency as to what is happening is important when we start talking about the larger goal, particularly when their claims are that money doesn't exist. So that's the first issue regarding the MHSA accounting.

Would the Court like me to continue?

THE COURT: Please.

MS. MITCHELL: So the second issue is regarding the Project Room Key exits. We have been told from various sources that some hotels are being closed and that resources are not being offered to individuals who are exiting those

Page 191

programs.

I don't know whether that's true or not.  I can't get clarification one way or another.  That's why this was a request for clarification, not a motion or injunction or something more severe.

If, in fact, everybody -- because I know that the project is winding down -- and if in fact everybody who is exiting those hotels is being offered alternative shelter, then that's wonderful and that's what I believe to be and I hope to be happening.

If that's not happening, I think, one, we would request notice before that happens so that, if legal action can be taken, we have the opportunity to do so.

Or alternatively, we would like some representation by the county or by LAHSA or whomever on the record that this will not happen, that people will not be released on the street from Project Room Key without being offered alternative shelter.

It would be incredibly cruel --

THE COURT:  Can we stop right there for just a moment.

MS. MITCHELL:  Sure.

THE COURT:  Could I invite General

Page 192

Jeff to come forward for just a minute, Jeff. And I really appreciate your presence. Thank you.

I want to give you an example of what may be presented to the court in the future in terms of room key because operation -- Liz, I'll come back to you in just a moment. But could you just grab a seat over here for a moment and be comfortable. I want to take this pause, this veteran is -- yeah.

So this is an example -- and if you are uncomfortable -- don't disclose the source. I think that source needs to remain privileged in terms of the veterans. And I want to take this as a small example of what could face the Court in the future, thinking ahead.

Let's say a person has a room, an Operation Room Key but there's a down loop because room key was temporary and turnkey didn't generate enough permanent housing.

So I have got my own room, but now you tell me that I'm going to go into a dormitory, okay. So the first question would be Shayla, Brooke, with no respective answer, but I would think that you would be concerned about me going from room key in a room where, Brooke, I think your complaint

Page 193

would be that I had, let's say, anxiety and I couldn't be housed in a dormitory or some other issue, that's when I would expect that you would bring that issue to the Court for my consideration. So I have no pre -- thought about that, but I have always anticipated that if there was no money or if we couldn't get permanent purchasing fast enough, that that issue might face the Court.

Second, we tried to build in the -- sir, this is where I rely on Judge Birotte telling me what is happening in the settlement -- we tried to build in the funding for room key and your recreational centers in our settlement $300 million.

So there should be plenty of money there. The problem is the ramp-up costs. Because there's $60 million each year with the first tranche of, let's say, 17 to 20 million recently, and then the other 20, I could hear the city saying Judge, we don't have enough money right now to take this huge download immediately.

But the county is looking at the city saying, we don't quite trust you yet until you show us the production of at least these initial rooms. So what we're facing is probably good will on both sides, but not enough money for the

Page 194

city -- I mean, if you had 100 million to begin with on the front side and it was, you know, 100 million and 100 million whatever or however you divvied it out later on, but it didn't get front loaded.

So the city may be in the position, Liz, of having to fork over some money in the initiation of this.  And the city will say I'm broke, which has caused me to come back to my original comment, no, they are not, because there's $600 million that they are downloading into these very expensive programs by December 31 on the county's level and 400 million that they are downloading into these very expensive programs by December 31 which is why I asked Kevin de Leon, are you prepared to bring a motion to divert some of those funds, at least temporarily, so we can get shelter.

So let's start with just a discussion.  I get a call, what, Friday night.  I forget, Thursday night.

GENERAL JEFF:  Uh-huh.

THE COURT:  You call me and what do you tell me about the plaza at our veteran's -- our 50 veterans down at Skid Row.

GENERAL JEFF:  This is General Jeff.

Page 195

Thank you for having me, Your Honor --

THE COURT:  Thank you for being here.

GENERAL JEFF:  -- on behalf of the Skid Row Advisory Council.  I first want to say that -- thank you to you and Judge Birotte for having the Skid Row --

THE COURT:  Let me -- before I get started, outside your presence, I have told Kevin and I'll tell you again that I'm -- I don't know what Kevin de Leon will do as a new council person, but I wanted the Skid Row Advisory Council because we should be talking to people who are houseless advocates of people on the Row.

And that's not what I'm seeing attorneys do.  And so therefore, you, Pastor Cue, Catherine who I saw in the back, Monique, and Pete White are all instrumental to me.  And I have expressed to Kevin that you are really part of the city, but you are not.  You have entirely different interests on occasion than the Downtown Business Council.  You have tried to get a voice for many years.  You have got swallowed by that council.  So frankly and bluntly, it gave the Court -- and I'm transparent with all of you -- the opportunity to

Page 196

get involved with Skid Row so you had a voice because I didn't perceive you had a voice.

Now, it's up to the councilman whether he continues it or not, but he knows we encourage it.

So let's go back to our veterans, okay. What is the conversation, so they hear about this.

GENERAL JEFF: Thank you, Your Honor. And so just to respond, we know that newly elected counsel member de Leon has just recently taken office and while, you know, he has given a yeoman's effort to hit the ground running, we know it's an extremely difficult task as he's trying to get up to speed. So he does have an attempted sense of urgency that we fully appreciate at Skid Row and so -- but we know it's very difficult.

That said, Skid Row -- Skid Row Advisory Council is actively out in the streets because we live in Skid Row. We're in Skid Row every day. I just came here today from Skid Row. Matter of fact, right now, I am mourning right now because I was at the candlelight vigil last night. Three nights ago, I was at another candlelight vigil.

Page 197

You know, Pete Clusso, David Lindley, Teaspoon, the coroner's van is frequently in Skid Row.  We may not know why it's always our community, but it's in our community like the white van with the blue stripe down the middle.  That means death that means someone just died.  Someone from our community.  And we have no understanding as to what the cause of death was, who it was, is there even a next of kin, has the next of kin been notified.

That -- seeing that white van with the blue stripe down the middle, that causes trauma to our community members, myself included.  And there's a lot of concern.  And so when we talk about Project Room Key, you know, there's a direct message to you from the folks that have met you in your community that really feel open enough and they say, "Hey, General Jeff, the next time you see the judge, tell him I'm ready for -- where is my hotel room at?  Tell him to make some -- get those people" -- not you -- "get those people to give us our hotel rooms.  It's going to get cold.  It's about to be wet.  We're about to be stuck in the rain.  What do I do with my stuff?"

Where are the answers?  This is a

Page 198

realtime information.  And I appreciate this opportunity to be able to give it to you today and along with the city and the county -- the city and the county and everyone else, LAHSA and everybody is like where is the sense of urgency?

You know, we hear about winter shelters.  So now what you are saying -- what you just said, there's, you know, concern because it sounds like a setup.  Project Room Key for 90 days, transfer over to a dorm room -- you just want to be in that dorm room all along.  We don't like the dorm rooms.  The dorm room is not a home.  I don't have my individual space.  What about people that are traumatized?  What about women that don't want to be around others?  What about those that -- then the conditions.

And I personally would say, like this as a community activist, in Los Angeles County, all restaurants have a grading system so people know, even before you go in there, what is the letter on the window?  Is it an A?  Is it a B?  Is it a D?  Is it performing well?  Is it underperforming?  I think that that same type of a system should exist for shelters because we are hearing the history of bedbugs, you know,

Page 199

people -- impolite staff.  You know, there's a lot of different issues that we, the people, have concerns that -- that slow us down from wanting to take over -- advantage of those services and so because of that, now, it turns into victim blaming. And the whole industry, whether it's the nonprofits, whether it's the city officials, law enforcement, all they do is victim blame.  But you know, in this society, the transgender community, LGBTQ, they found a way and done a wonderful job of reversing that.  Don't victim blame.  Why is victim blaming going on in homelessness?  Homeless industrial complex, the poverty pimps are winning the narrative.  And that's why we the people in Skid Row are fighting very hard to change that narrative. Thank you.

THE COURT:  Okay.  Have you got 50 to 70 veterans who served honorably in the country. And is it Ballinger Plaza?

GENERAL JEFF:  Ballington Plaza, yes.

THE COURT:  Yeah.  So the phone call comes in -- with complete transparency -- that they are about to be downloaded into a dormitory, individual rooms.

Page 200

GENERAL JEFF:  Uh-huh.

THE COURT:  The entity involved is a wonderful entity, but they are paying -- being paid 40 -- I forget the conversation -- $49 or $50 and they can't make it at that, which is why the download is about to take place.

It recently got raised to $62.  And what happened was they had already made the decision to take these 70 veterans, if you will, out of Ballinger [sic] Plaza and put them in a dormitory. Now, you can imagine PTSD.  You can imagine all sorts of issues when you have gone from a single room or even a double room.  It doesn't matter the ethnicity.  They are patriots.

Now, recently, though, that was raised.  So by the time this entity had made that decision -- in other words, had gone through somebody -- the rate had gotten raised to almost $100 a night.

So if that same decision would have been made and they would have had that rate, they wouldn't have downloaded folks into this particular dormitory style.

So because of your call to the court and maybe a couple other calls to the folks, that

Page 201

got reversed.  No, thank you for letting me know.

And I want to compliment that agency because you just took 70 veterans quite frankly who were going from what I call individualized rooms into a dormitory style, who are veterans who served this country and coming off of Skid Row and so my compliment and you keep your source secret, although I have talked to him.  And that is a really good thing.

So I want to compliment LAHSA because you raised -- you raised your rates, Heidi, in a sense.  Wendy, you raised your rates.

And what happened is they were able to reverse that by going back a couple of days and just redoing that, okay.

Now, what happens in the future, though?  What happens when you get a case, if Room Key is getting downloaded and they go from single or double rooms to dormitory style or ADA not compliant?  I have no opinion about that because that's wherein I would expect that the court would see a request for injunctive relief or some resolution through Judge Birotte in an informal settlement but that could be coming our way.  I just don't know.  It's close to coming our way in Orange

Page 202

County.  And if it does, I have told everybody get that into my court for consideration

So Liz, there's your first issue.

General Jeff, there's your first issue.

Shayla, city, there's your first issue.  I don't know.  I'll keep an open mind about that, but if that download is coming, how is that coming?  How impactful is that, who are we dealing with?  Is it ADA compliant?

And if the Court needs to get involved, it will.  But I would expect that you wouldn't be walking through the front door because these are -- in Room Key besides veterans, you have got supposedly over 65 when we're previously getting 75 percent reimbursement from FEMA and now the city is not getting that.  And if turnkey can't purchase rooms fast enough, then that's for future resolution.  Okay.

All right.  Liz, why don't you continue because we have got --

GENERAL JEFF:  Your Honor, if I may quickly -- Your Honor, if I may.

Earlier, I was listening via Zoom and going back to Council Member de Leon, you know,

Page 203

we the Skid Row Advisory Council appreciate the council members invitation to you to come to Skid Row for the next hearing and conference.  And we also concur with that invitation.

However, we just want to inform you that there was a recent outbreak at Union Rescue Mission that you mentioned as a possible location, but the Los Angeles Mission has a huge chapel/auditorium that should be sufficient.

THE COURT:  Why don't you talk to Kevin about that or I'll call him and then call to you, but I would prefer to be on Skid Row.

GENERAL JEFF:  Oh, absolutely on Skid Row, sure, sure.  Excellent.  Thank you, sir.

THE COURT:  Okay.  And we'll make it safe, okay.  We created it.  Let's go down and take a look at it.

All right, the next thing is my colleague handed down, I think a terrific position, Dale Fischer.  But by the same token, you can't walk down Skid Row right now on the sidewalk.  We have to walk in the street and I'll say that again.

FEMALE:  We do.

THE COURT:  Yeah, we do.  We walk right down the street because you can't walk down

Page 204

the Skid Row sidewalk.

Now, it's supposed to have 36 inches, but judges write orders.  We expect them to be obeyed.  And I see nothing in abeyance of Judge Fischer's order down there.

So I just toss that out to you because when we started in the summertime, everybody was on the street.  And when I'm down there, I'm still walking in the street and so are you.

So, okay.  Liz, the next clarification.

MS. MITCHELL:  Sure, Your Honor.

Going back to the project issue, we're still seeking clarification, particularly from LAHSA, regarding what the intentions are on those Project Room Key exits as well as what the intentions are in the court references --

THE COURT:  Okay.  Hold on.

MS. MITCHELL:  Yes.

THE COURT:  Wendy here.  And I have got Heidi.  And come on up.  You don't have to answer it.

And I'm not sure -- I want to make sure who is responsible because once again LAHSA gets caught in the middle because of the city/county

Page 205

creation in a sense.

So who do I talk to because every time I talk to LAHSA it's the city, the county and back to LAHSA and you know.

Yeah, who is responsible for Project Room Key?

MS. MARSTON:  Would you like me to respond, Your Honor?

Okay.  So on Project Room Key, the first piece around people being offered services, we can unequivocally say there have been eight sites that have come offline through Project Room Key. Every individual has been offered services.

And the vast majority have gone to other PRK sites.  However, nobody is exiting without being offered services another place to go.

THE COURT:  Okay.  Great.  Okay.

MS. MARSTON:  And the intention more broadly for Project Room Key, of course, is to offer everybody a permanent housing option.  However, if that's not feasible because we don't have the resources available or the housing, everybody is being offered an interim housing resource as well, so nobody is exited to the street.

THE COURT:  Okay.  From the city

Page 206

standpoint or the county standpoint or from first alliance or from Shayla, do you have any questions that you would like to ask Heidi?  She doesn't have to answer them.

MALE VOICE:  Nothing (Inaudible.)

THE COURT:  All right.  Shayla? Brooke?  Shayla or Brooke, any questions?

MS. MYERS:  I mean, Your Honor, we don't have any information.

THE COURT:  I can't -- I can't hear you, Shayla.  I'm sorry.

MS. MYERS:  Your Honor, we don't have any of the information about any of the accounting of any of the closing of Project Room Key.

So while we appreciate that people are being offered interim shelters, we have no idea what that looks like.  And I mean -- so we -- I mean, we can't sit here and pass judgment on what Ms. Marston was saying because we have no information about it.

I think -- I would agree with the intervenors -- or with the plaintiffs that there has been a lack of information about what is actually happening.  And whether or not it's part of these

proceedings, I think, is another question.  And I think the county had taken a position about that.

But with regards to the intervenor's position, we don't have one because we don't have enough information.

THE COURT:  Okay.  I was expecting that, if there was a continuing and exacerbating issue, that I would receive a request for preliminary injunction.  I'm just going to leave it at that for the time being because I have no preconception of what that would look like other than the call that I got from you concerning our veterans.

So I'm just going to leave that on the table for the time being because I would expect that you would be hearing, as advocates and as the city, if there was a problem.

And if it was a continuing problem, it would come to my doorstep in terms of a request for preliminary injunction.

MS. MARTINEZ:  Can I ask a question?

THE COURT:  Yeah, please.

MS. MARTINEZ:  Thank you, Judge Carter.

So to get some clarification -- and

Page 208

thank you Elizabeth and LAHSA for being here, can we get an understanding in the 6,700 beds, I think it's important for to us understand that only 3,300 of those beds for overpasses and underpasses, the judge alluded to it earlier that 3,100 of those beds would be for 65 years and older and a higher acuity, but more importantly, that those beds would also be for Project Room Key.

THE COURT:  Uh-huh.

MS. MARTINEZ:  So we want to get clarification because there wasn't clarification earlier from the county or city.  There was no nodding of heads.  When that agreement was done with Judge Birotte, we need to make sure because --

THE COURT:  This is what we were being told --

MS. MARTINEZ:  This is what we were being told because there's not 6,700 people in overpasses and underpasses and we want to make that very clear because there has been many inferences that there's 6,700 people in overpasses and underpasses.

So if we can please clarify that the other 3,100 beds that were part of this agreement, the intent was for the download of the rec centers

Page 209

and also for overpasses -- I'm sorry for Project Room Key, which at the time was at 2,200.

So if we can please get some understanding from the county -- is that a true statement or not?  And from the city and obviously from the intervenors and the plaintiffs.

THE COURT:  That's what Judge Birotte is telling me as I'm waiting for all of you negotiating over in his chambers at 10:00 o'clock at night.

MR. MILLER:  I can clarify that.

THE COURT:  Yeah.  Let's --

MR. MILLER:  I can clarify that. This is Skip Miller.  I'm the lawyer for the County of Los Angeles.  I also was the lawyer for the county that litigated against the cities that tried to block the implementation of Project Room Key.  So I'm very familiar with Room Key, okay.

Room Key was -- and by the way, we won all those cases.  We got injunctions against all of the moratoriums and all the cities that tried to say no Room Key in our city.

THE COURT:  Right.

MR. MILLER:  Okay.  Room Key was designed for people over 65 and particularly

Page 210

vulnerable.  That was the whole point of it.  I thought it was a brilliant idea.  And I would think -- I would expect that as people leave Room Key -- the Room Key motels and hotels that fall into that category, they would be eligible to come within our -- I'll call it the freeway deal -- the freeway plus the 3,000.  I think that was the intent.  I think it's pretty clear.

So I would -- you know, I would defer to the people in the field who are implementing it like Ms. Marston, but that's my understanding of how the contracts work together.

THE COURT:  Yeah.  And that was our understanding also because it was written that way in that particular order.  And that's what I thought was represented in the 300 million to accomplish both.

MR. MILLER:  Correct.

THE COURT:  In other words, we could walk and chew gum at the same time because we were accomplishing the recreation centers, which we had about a thousand.  That 2,200 was represented to us to be Room Key people, about 3,000 approximately were the freeway overpasses and underpasses and within 500 feet.

Page 211

So that's what you were financing in a sense with that 300 million because we never had 6,800 underneath a freeway.

MR. MILLER:  That's exactly right, Your Honor.

It was people over 65 who, by definition, are vulnerable.

THE COURT:  Yeah.

MR. MILLER:  And other people who have underlying conditions who are also vulnerable. That's how our agreement with the city was written. And I would think that would accommodate some Room Key people.

THE COURT:  Yeah.

MR. MILLER:  I'm not sure it will accommodate all of them, but a lot of them.

THE COURT:  I'm going to put Judge Birotte in here because he was --

MS. MARTINEZ:  Can we get the city -- let's get the city and then let's get every -- yes.

THE COURT:  Yeah, I want to make sure that's exactly it too.

MR. MARCUS:  Scott Marcus --

THE COURT:  You know, why don't you

Page 212

just have a seat, Scott, so we can hear you.  Don't worry about standing.

MR. MARCUS:  I can't talk to a Judge sitting down.

THE COURT:  Oh, okay.

MR. MARCUS:  Your original question and your understanding is correct, which is the number that we came up with, the 6,700, was intended to cover both the approximately 3,000 people that we believe are encamped within the 500 feet of the freeway and roughly again another 3,000 people which are both the Project Room Key within the city as well as the city's own rec center emergency shelter program that was also set up at the time.

So the number was intended to encompass both.

Mr. Miller's comment about the Project Room Key beds and hotels then converting to something else for the -- that wasn't -- I'm not sure exactly what he's talking about in terms of how the hotels are going to convert from one to another. That's not the city's -- that's not part of the term sheet.  It's not part of the MOU.

But to your point, yes, the numbers are intended to encapsulate both people under the

Page 213

freeway who are the first priority under the MOU and then seconded -- secondly, to then have enough for Project Room Key and MSRP shelter people, correct.

THE COURT:  Yeah, then we're fine. That's our understanding from the beginning.  And that means that we have got the money because the county is paying for that.

MR. MARCUS:  Well, let's just be clear.  The money that the city is receiving from the county is half of just the service costs once those beds are built.

The city has the obligation for all of the capital cost and 50 percent of the service costs.  So the idea that the 300 million is meant to cover anything other than half of the service is untrue.

MR. MILLER:  Your Honor, I'm not sure the city attorney --

THE COURT:  Could you pull that closer, Skip?

MR. MILLER:  I think we're saying the same thing.

THE COURT:  We are.

MR. MILLER:  Yeah, I think we're all on the same page here.

Page 214

MS. MARTINEZ:  LAHSA?  Heidi, do you have the same understanding.

MS. MARSTON:  Yes.

MS. MARTINEZ:  Okay.

Liz?

MS. MITCHELL:  That's exactly what I was seeking to clarify.  And I appreciate that and that's my understanding as well.

MS. MARTINEZ:  Intervenors.

MS. MYERS:  No, Your Honor we're incredibly confused about talking about beds versus people.  I mean that's where our confusion lies.

Our understanding about the agreement between the city and the county is about funding for beds.  Project Room Key is about people who are -- who are in those -- who are in the hotels right now who need to be moved into locations, but it's an apples to oranges conversations that we're having -- quite frankly, we're having a hard time following because we weren't part of those communications.

But the reality is, our understanding is Project Room Key locations are coming offline now.  And the beds that the city is purporting to -- the new beds that the city is

Page 215

purporting to put out in the world are not coming online until long after individuals are going to be moved out of Project Room Key.

So my -- my sentence was that was what Ms. Mitchell was asking for clarification about, was what is happening now and how are those individuals being moved?

I don't have any clarification on that particular point.

MS. MARTINEZ:  Thank you.  So my second question is that now that we understand that these 3,000 plus can go to new beds for Project Room Key -- and I get Ms. Myers regarding people and beds -- but for this agreement's purposes, the -- what is unclear is that only 17 million has been provided to the city.

You have 3,000 or so in Project Room Key that are going to be downloaded.  So from a funding standpoint, how are we going to cover these 3,000 folks if we have been told that the County is not going to provide services for those that are under freeways and overpasses and along the highway? Because this is what we have heard.

So I would like to get clarification that the funding is intact to help LAHSA get these

Page 216

folks if we decide to move forward and using this term sheet and now that she understands that these beds are available -- where would the funding come from I think is important to get clarification because there's 300 million over five years, 17 million has been provided up -- to the city already.  But if we were to ramp up to ensure that these folks don't get put out on the street and LAHSA is saying that that's not going to happen, what monies are you currently utilizing, LAHSA, to ensure that that doesn't happen?

And are you going to have to tap into some of these dollars that were part of this agreement to ensure that we have no one end up out on the street in regards to Project Room Key?

MS. MARSTON:  So my -- the funding that we currently have in place is a combination of funding from both the City of LA, the ESG dollars that the city has allocated as well as the County of LA.  It's a combination of the corona relief funds, county ESG dollars and measure H dollars and that's for Room Key.  And people who are COVID vulnerable under the freeways.

The new money from -- that has gone from the county to the city, we haven't had any

Page 217

conversations as LAHSA of what that's going to look like.  We're going to look to the city or county to tell us how they want that allocated and spent.

THE COURT:  Okay.  Okay.  Let's move on to the next point of clarification.

MS. MITCHELL:  The final point, Your Honor, was regarding the county's participation in the freeway project, as we're sort of calling it.  It is unclear, at least to me, whether they are participating -- whether there have been instructions for county personnel to not participate in those projects, whether there is sort of the county's ability and desire to move forward to make sure that those agreements are successful and that the project is successful because, in our perspective, it's not going to be successful without the county's participation of services with mental health public health.

THE COURT:  Okay.  Now, hold on for just a minute.

Would you publish that letter.

MS. MARTINEZ:  The email.

THE COURT:  The email from Phil Ansell.

FEMALE:  Yes.

Page 218

THE COURT:  Okay.  Heidi, Cheri, Marie, La Trina and Gary.  So let's just read this into the record.

"The county has not agreed to any of the following:  Redirection of existing interim or permanent housing resources from other people experiencing homelessness to people living near freeways.  Redirection of existing outreach or other county funded staff from serving other people experiencing homelessness to people living near freeways unless and until people experiencing homelessness -- unless and until the city has housing or shelter or other beds available for PEH encampments near freeways.  Participation by county funded staff and the enforcement of any restrictions on camping near freeways which may be implanted by the City of Los Angeles.  Additionally Judge Carter and his representatives have no authority to direct the work of the county, any county funded staff.  Please feel free to share this email as you deem appropriate with your staff and/or contractors.  And if you have any questions, please let me know.  Phil Ansell."

Skip?

And could you use that mic?  I

Page 219

apologize, Skip.  I just -- yeah, I  apologize.

MR. MILLER:  I have a number of things that I want to address with Your Honor, with the Court.

I gather the Court wants me to talk about the Phil Ansell memo first.

THE COURT:  Wherever you want to go.

MR. MILLER:  Okay.

THE COURT:  And I hope we put aside this silliness of directing the work of the county funded staff.  But if we haven't, then --

MR. MILLER:  Yeah.

THE COURT:   -- I'll start calling --

MR. MILLER:  Yeah, the first thing I want to talk about is the most important thing Your Honor brought up early this morning, mortality, okay.  That's a big deal.

THE COURT:  Yeah.

MR. MILLER:  We're talking about lives, okay.  That really got our attention.

THE COURT:  Okay.

MR. MILLER:  Okay.  So as soon as we got your order, we -- and it was late yesterday afternoon, we went in to action and we found out

Page 220

that the Board of Supervisors last year had -- let me finish -- last year had the same concerns and asked for a special task force to be formed within the county, all the key departments. It's called --

THE COURT: That's that 2019 task force.

MR. MILLER: Yeah.

THE COURT: Yeah.

MR. MILLER: It's the homelessness mortality prevention initiative work group, okay.

And they went to work on mortality because it's not a new problem. It's gotten worse because of COVID, I expect.

THE COURT: Right.

MR. MILLER: But it's a problem. It's -- you know, it's not just COVID. It's drug addiction, alcohol abuse, you know, whatever, all these things.

And just last week or a week and a half ago on October 23, 2020, this initial -- this homelessness mortality prevention initiative work group came up with an analysis and recommendation to reduce the morality among people experiencing homelessness in Los Angeles County.

Page 221

THE COURT:  Hum.

MR. MILLER:  And it addresses the Board agenda item from last October.  And it's quite extensive.

So I guess, my answer to that is, Your Honor, and I'm really glad Your Honor asked the question, we're on it.  The County of Los Angeles is on it.  This working group includes the Department of Public Health.

THE COURT:  Can I get a name specifically?  That's a pretty big department. Department of Public Health.

MR. MILLER:  Yeah, I'll give you the memo.

THE COURT:  Oh, that's okay, just read the name.

MR. MILLER:  Department of Public Health, department of health services, mental health department, chief medical examiner coroner, chief executive officer, and LAHSA.

THE COURT:  But do I have names? Often times I get bureaucracies and --

MR. MILLER:  Well, the memo is from Dr. Barbara Ferrer --

THE COURT:  Okay.

Page 222

MR. MILLER: -- who is the director of public health.

THE COURT: And could I ask who is on the -- who is copied on it?

MR. MILLER: I don't see copies.

THE COURT: Hum.

MR. MILLER: Oh, yeah. I'm sorry. I didn't see -- the copies are on the last page. It cc's all of those -- it cc's all the people I just named: Health services, mental health, chief medical examiner coroner, CEO homelessness initiative, LAHSA, chief executive officer, county counsel, and the executive officer of the Board of Supervisors.

THE COURT: But do we know who those specific people are that are responsible --

MR. MILLER: I don't have the names.

THE COURT: Okay.

MR. MILLER: I can get the names, you know. But this is a big deal within the county. Mortality is a very big deal.

THE COURT: Okay.

MR. MILLER: And if I can, I would like to mark this and hand this to the court.

THE COURT: Sure. It would be very

Page 223

much appreciated.

MR. MILLER:  It's a public document. I believe it's up on the county website.

THE COURT:  Very much appreciated thank you.

MR. MILLER:  Okay.

THE COURT:  I just -- I deal with some agencies across the United States government that I always like to have a specific person attached to the agency because sometimes it gets confusing in the agency about who is serving on this --

MR. MILLER:  Sure.

THE COURT:   -- task force.

MR. MILLER:  Okay.  That's the first thing I wanted to bring up.

THE COURT:  And back to this email, if you would.

MR. MILLER:  And I'll do this when I finish.  I'll hand it up to Your Honor.

THE COURT:  Okay.

MR. MILLER:  The second issue is the question that Your Honor -- I think the second issue that Your Honor brought up this morning after mortality and that is beds.

Page 224

THE COURT: Yeah.

MR. MILLER: We -- we -- of course the county stands by its agreement --

THE COURT: Okay.

MR. MILLER:  -- that we entered in. There's no issue about that nobody is backing off. A deal is a deal. When the County of Los Angeles signs on the dotted line, we stand -- we stick to our agreement.

THE COURT: Okay.

MR. MILLER: But we are -- we have another payment coming up, I think, on January 1. And we are very concerned about there being beds. And I wish the city attorney was -- Mr. Feuer is still here. Mr. Marcus is here. We want evidence of beds. Our deal was to pay for services once the people were in the beds at the shelter. That's what the agreement says.

I mean, he is shaking his head. I'll read it. I have it right here. Let me find it. Hold on. Where is it? Thank you.

THE COURT: No, he's --

MS. MARTINEZ: You have got the same thing.

MR. MILLER: It's H -- at the top of

Page 225

Page 6, it says "County will take action to provide a pathology of the following mainstream services to PEH residing in facilities -- residing in facilities established by city pursuant to this MOU at the scale and availability deemed appropriate by the county."

And then it goes on to specify the various mainstream services.  So obviously, we want to see -- we want there to be beds.  We can provide services to the people in those beds.

THE COURT:  Judge Birotte and I have the same question Michele is about to ask.

MS. MARTINEZ:  Thank you, Mr. Miller.  We would like to get back to this memo because it the very clear from Director Ansell here that, as the City of Los Angeles begins cleanups of encampments near freeways, I would like to share with you the county's position.  And I think the judge has already put it into the record.  And you heard it loud and clear -- are you providing mainstream services?

Because in CD3, beds were provided. So there is some contradiction here between this memo and what you just stated.  So can we clarify on the record that, what this memo says here, is it a

Page 226

true statement?  Is Mr. Ansell representing the county on this and Board of Supervisors, or was this a memo that the Board of Supervisors did not see, you did not see.

We would just like to get some clarification that mainstream services will be provided as the City of Los Angeles has provided beds to move forward with getting people housed on the freeways.

MR. MILLER:  Okay.  I'm happy to clarify that issue because I focused on the issue. I did not see the memo before it went out, okay, for whatever that's worth.

THE COURT:  Your representation is never in question, nor is your credibility.

MR. MILLER:  I don't normally mention judges by name in memos that I would send out, but I didn't see it.

THE COURT:  Right.  But is he operating on behalf of the Board, or is he operating on behalf of himself?  Because that's a tremendous difference to the Court?

If he is acting in this capacity on his own, so be it.  But if he's acting on behalf of the Board, then I'd better be forewarned about that

Page 227

because then I need to resolve that quickly.

MR. MILLER:  He is a member of the CEO's office.  And he's acting on behalf of the CEO's office in the County of Los Angeles.

THE COURT:  Okay.

MR. MILLER:  No question about that. He was not on a lark, doing this on his own.

THE COURT:  Okay.

MR. MILLER:  Okay.  The intent of the memo was to make clear what we made clear from day one, which the city has acknowledged, with you the MOU is clear on.  The County of Los Angeles is not involved -- not willing to be involved in any way, shape or form in enforcement or outreach moving people.  That's the deal we made.  There's nothing in the MOU that puts that obligation on us.

And in the negotiations of the MOU, the city asked us to agree to enforcement and outreach.  We said no.

And the city actually filed a report with Your Honor, with the Court acknowledging that we said no and that we would not participate in that.  That is the message that Mr. Ansell was trying to convey.

So I think the memo is accurate.

Page 228

And that's as far as it goes.  Once the people get into the shelter, into the bed, so to speak, we're there.  We're all in with our mainstream services in the Paragraph H that I read a few minutes ago.  There's no issue about that.

MS. MARTINEZ:  So moving forward, Mr. Miller, this memo, at any given time, whatever council district moves forward with getting folks off the overpasses and underpasses and folks along the freeway, mainstream services will be provided.

MR. MILLER:  When they get to the shelter.

MS. MARTINEZ:  How -- there is really -- it's not just shelters, sir.  We are doing -- the City of Los Angeles is doing scattered sites.  They are doing shared housing.  They are doing hotels and motels --

MR. MILLER:  Yes.

MS. MARTINEZ:  -- and CD3 for the most part.  That's what took place.  And then this memo comes out.  So I think there was a lot of flexibility in the term sheet as it pertains to the housing modalities, so it's not just shelter.

MR. MILLER:  Agreed.  I meant shelters in a broad generic sense.  When they get to

Page 229

their destination, whatever that shelter or housing or whatever you want to call it -- whatever it is, we'll be there with our mainstream services.

MS. MARTINEZ: So to clarify, there will be no services on the ground when LAHSA or service providers doing outreach and engagement because we were told many times by county staff through these multidisciplinary teams that are part of these spa areas with these service providers that mental health and public health and others are on the ground so I want to be clear that the only time that the county is going to provide mainstream services is only where there is housing available and not specifically on the ground when we're trying to house folks and do outreach and engagement.

MR. MILLER: Okay. You should have been a lawyer because your questions are very good.

MS. MARTINEZ: I am not a lawyer.

MR. MILLER: You sound like one. Let me answer that question because that's the same question that I asked when we were reading this.

Per our contract, that's exactly right. That's what our contract says. But -- but if there's somebody who otherwise -- a homeless person, a person experiencing homelessness, who

Page 230

otherwise would receive mainstream services is freaking out, having a psychotic breakdown or something like that then, of course, the county would do what they do for for anybody, whether they are homeless or otherwise.

We're not going to shirk our responsibility as the health officer for the city and the county quite frankly.

But as far as the contract is concerned, you are exactly right.

MS. MARTINEZ:  Thank you.

MR. MILLER:  I wanted to -- you know, it doesn't sound like I have to address the audit but I'm happy to.

THE COURT:  Now, it's my turn.

MR. MILLER:  Judge, Judge.

THE COURT:  So I have got Tara out there -- .

MS. MARTINEZ:  Let him finish and then --

THE COURT:  Oh, I'm sorry, Skip.

MR. MILLER:  I'm sorry.  This request for an audit of the mental --

THE COURT:  No, no we're not going there yet.

Page 231

MS. MARTINEZ:  We're not there yet.

THE COURT:  We have got plenty of time.

MS. MARTINEZ:  So do you want to go now?

THE COURT:  That means when I have got Tara or Quinn or Ernie out in Whittier or I have got another gal out in CD3 who I'm not going to get the police get any place near -- that person desperately needs those professional services that would come from DMH and other entities.  And you heard me give the example of Tara, who is repeatedly raped.

And I am a little astounded, not at your presentation.  But if that's the line, your providers cannot provide that service.  They are falling down on the job.

MR. MILLER:  I don't, I don't think that's what I said.

THE COURT:  I'm riding around watching it.  And I'm not getting the services out to the street with these acute people either by my providers out there.

MR. MILLER:  No, that's not what I said.

Page 232

THE COURT:  Okay.

MR. MILLER:  If there's an acute person -- if Tara is having a breakdown, a psychotic breakdown -- if I was having a psychotic breakdown, I would expect to be -- to receive services.

THE COURT:  Sure.

MR. MILLER:  Okay.  If Tara is having a psychotic breakdown, then she can expect to receive services, whether she's homeless or whether she is not.

THE COURT:  Okay.

MR. MILLER:  That's what I was saying.

MS. MARTINEZ:  We just want to clarify for the record that moving forward at any other council district, whether there's pilots that are being had in six of these council districts that are somewhat focused on an overpass or an underpass, is that correct, LAHSA, Heidi?

MS. MARSTON:  Whether the activities are happening?

MS. MARTINEZ:  Yes.

MS. MARSTON:  Yes.  So the city has provided us funding.  And we are bringing new outreach teams online that you are going to focus on

Page 233

each council district specifically for this work.

MS. MARTINEZ:  Yes.

MS. MARSTON:  But they are not MDT -- they are not medically trained teams like the county provides.

MS. MARTINEZ:  So the question is if a stance is needed from the county for mental health services or public health or DMH, with these outreach workers, these new teams that don't have the expertise and a call is made, Mr. Miller, would those services be provided?  Because it's focused on the freeways.

THE COURT:  And that's where the court gets accused of giving guidance because I have to personally get on the phone with Jon Sherin quite frankly because of the tragedy happening out on the street with somebody like Tara.  And thank God he responded.

So there's a huge schism and I would sure like to know the rules of the game from now on.

MR. MILLER:  It's what I said.  If Tara is having a breakdown, whether she's homeless or not -- she is homeless and LAHSA is trying to deal with her and they can't and they need Jon Sherin and Department of Mental Health, then yeah,

Page 234

they would be available.  That's what I am saying.

MS. MARTINEZ:  That's what we wanted clarified on the record.  Thank you.

MR. MILLER:  Yeah.  We're not walking away.  We have 11 million people in this county.  This county is bigger than most states.  We have more people voting in this county than most states have voting.  Okay.  We have a huge obligation.

THE COURT:  Then I need your help to stop this nonsense about directing the work of any county funded staff.  That's nonsense.

MR. MILLER:  Yeah, okay.

THE COURT:  And I trust that you will resolve that very quickly.

MR. MILLER:  Okay.

MICHELE MARTINEZ:  Because what we don't want is that we get a phone call from a council district saying now that these new teams started and LAHSA is out here and then we have got these folks out here but we're not getting any response from the county.

And what ends up happening is that Judge Carter or myself is calling to say hey, where are these needed services?  So we just want to be

Page 235

very clear that we are not -- because I'm one of his representatives that I am not directing the county, Judge Birotte is not directing the county.  Judge Carter is not directing the county or any service provider, but just wanted to let you know that in the past because these services were not provided in realtime and on the ground, that we had to make those phone calls.  But today, on the record, you are clarifying that for us Mr. Miller and we appreciate it.

MR. MILLER:  Yeah, you know, it reminds me the fliers.  When you put Judge Carter or Judge Birotte's name on something and that's a federal judge, that carries a lot of -- a lot of weight, a lot of cleanout, okay.  And people might think that the Judge is issuing an order or something.

THE COURT:  Yeah.

MR. MILLER:  But Judge Carter is just calling and saying poor Tara is having a breakdown, then that's a different thing.  And it got confused and garbled, I'm sorry, it wasn't intended that way.  We are -- the County of Los Angeles is going to do the same, you know, fine job delivering mainstream services to everybody in

Page 236

this county, including homeless people if they need it, okay.

THE COURT:  I'm going to -- are you good?  All right, you are good?

MS. MARTINEZ:  Yeah.

THE COURT:  Skip, thank you very much.

BYRON MCLAIN:  And Your Honor if I can just supplement with one thing as well and I think, you know, Mr. Marcus even mentioned this.

Per the agreement, the city's responsibility is the capital costs.  Our understanding also is that the city is providing up to $7 million of outreach initially.  And then as Mr. Miller just said, the county, if there's a specific instance of us needing to supplement with mental health services, et cetera, can be contacted, we'll provide that.

The other thing is the mainstream services that are being provided per the agreement that we provided for those new beds.  So it's specifically new beds.  That's what the county is focused on in the agreement is the new beds that are created.  And there's a specific definition for new beds in the agreement.

Page 237

But those mainstream services that are at the -- that are -- occur at the facilities is facilities that have new beds.  I just wanted to clarify that.

THE COURT:  Okay.  And new beds are not in existing agreements.  That couldn't be any clearer.  That's why Judge Birotte and I are a little stunned at the complexity that's being thrown at this and the disagreement between the two of you.  It's absolutely clear to both of us.  So all right.

MS. MYERS:  Your Honor, but we just want clarification on that point because, again, intervenors were not party to the agreement between the city and the county that led to the vacating of your order in May.

It was our understanding when that order was issued, that new beds meant new construction, that new beds meant new beds coming online.

What seems to be very clear is that that's actually not the case -- is that we looked.  The 857 beds that the city has represented that came online between June and now were all bridge home shelter -- were all bridge housing shelters that were created, funded, authorized in 2019.

Page 238

So I mean, I think it's really important that we all understand that new beds is just beds opening, that they were not actually adding anything as a result of this agreement.

THE COURT:  Remember, this information is coming to me from Judge Birotte and I'm sitting waiting so I want to make sure it's --

JUDGE BIROTTE:  All I was going to ask is, Mr. Marcus, if you want to add anything to this discussion, particularly as it relates to Ms. Myers' point.

MR. MARCUS:  Certainly.  So yes, we are adding new things.  Okay.

The 6,700 beds that were agreed to between the city and county includes beds that have never been thought of before.  If you want to think of it that way.  But it also does include some beds that we had thought of that we had tried to authorize that we may or may not have had funding for after six months or after a year.  And we worked out with the county which of those beds are counted towards the 6,000 and which of those beds are counted towards the 700.

To county counsel's point, though, about the mainstream services only applying to new

Page 239

beds, that's new to me because it doesn't say that in the MOU. So that's something that county counsel and I will have to discuss offline. And if it's an issue, we'll certainly raise it with the court.

But the idea that the 6,700 beds is nothing new is false. It includes some beds that are part of existing agreements between the city and the county where the county is already providing some measure of funding for those services and they didn't want to pay for those same beds twice. We understand that.

The 6,700 beds include some beds that the city wanted to build, whether they were bridge home or other types of shelters that the city certainly intended to build but had very insecure funding and may have disappeared after a year. So those are all being counted.

And then third, it accounts things that have never been thought of before, that are brand new to the floor plan or to the design plans and we are now going to have an opportunity to build those as well.

So it's --

JUDGE BIROTTE: Right. So it's a combination of --

Page 240

MR. MARCUS:  It is a combination, we are trying to build as much as we can as fast as we can.  We recognize the speed is not what anyone wants.  There's ramp up and there are costs that we can argue about whether they are legitimate or wanted, I guess, by the court.

We are certainly doing everything we can and as Mr. Miller stated, I can say the same for the city.  We stand behind this agreement.  We are doing everything we can to live up to this agreement and we fully intend to live up to this agreement.

JUDGE BIROTTE:  And so the only thing I would like to ask, that you and Mr. McLain have a conversation on that point.  I don't think there's a disagreement, at least from what I remember in the room.  But if there is, then we'll bring it back and discuss it, okay.

THE COURT:  Let me ask you -- one squabble that I think you can easy resolve right to begin with.

There was a complaint by a particular -- a complaint by the provider how am I going to get paid?  You two could have worked that out so easily because it's such a small amount of money that if you think that the county had to

Page 241

provide your -- provider beds that the city should have, you two can talk about deducting that from the $20 million.

And when we heard this, we were almost laughing at the small amount that this provider was complaining about at the time. And so I trust that you will, Skip, take care of that.

MR. MILLER: Yeah.

THE COURT: Okay.

MR. MILLER: We want to just come up with beds. We don't want to deduct if we don't --

THE COURT: Yes. But I'm just saying when I heard that, it just reminded me once again of the two millionaires at McDonalds haggling over almost nothing.

MR. MILLER: Yeah, yeah.

THE COURT: So just take care of that. It was just so di minimus to have this fall apart because I have given you that good faith back to try to work this out because, if we can work this out with the 3,000 recreational download and we can work this out with the freeway overpasses and underpasses, then we have now trust which I'm trying to create with you to move forward to something bigger. And if we can't work this out and I see a

Page 242

squabbling over just 50 beds, then I don't know how you move forward.

MS. MARTINEZ:  There's more.

THE COURT:  Okay, Liz.

MS. MITCHELL:  So I would just like to clarify with LAHSA that the understanding that we have today is going to be sufficient for the outreach workers.

So if we have outreach workers that are not part of this multidisciplinary team, that aren't DMTs, that aren't from Department of Mental Health, that aren't from public health, that that's going to work, meaning if they call, mental health will respond or public health will respond or whatever the issues are.

I'm concerned that if all we have are outreach workers and there's a significant issue, that that's not going to be sufficient.  So I would just be interested in Heidi's perspective about whether what our understanding and what the county has discussed today will be sufficient for this project.

MS. MARSTON:  As long as we have access to the MDFs when this outreach is taking place, the outreach workers we're bringing online

Page 243

through the new city resources will be trained in housing navigation, so the housing piece can be taken care of.

But people who have physical needs, mental health needs, other needs, we will absolutely need the support of the county MDT teams to even help move them to their destination, whether it is interim or permanent or whatever it is.  It has to be as a team.

MS. MITCHELL:  And that is something that the county is willing to provide?

MR. MILLER:  I have said what I'm going to say on that I have got nothing else on that.

MS. MARTINEZ:  That's a yes.

Heidi, can you walk us through what that process is going to be with these new outreach workers?  Because I have been on the ground.  And I have seen service providers, whether it's LA Family Housing, HOPICS, or St. Joseph Center.

For example St. Joseph Center has a nurse, has resident doctors are part of their teams, right.  Then you go to LA Family Housing that's part of this multidisciplinary team and works with the county that has somebody from DMH, DHS and

Page 244

when public health is needed.

Now you are creating this new outreach model for this specific need here.  When they are on the ground and you are making assessments at what point will you be contacting the county if mental health services are needed and/or, you know, public health as it pertains to detox.

THE COURT:  Or the provider.

MS. MARTINEZ:  And/or the provider.

MS. MARSTON:  So from our perspective -- and we talk about contacting the county for those, it really is providers because the county is paying the providers for those -- it really is providers because the county is paying the providers for those specialized services --

MS. MARTINEZ:  That's exactly what I wanted you to say.

MS. MARSTON:  Yeah, so it gets confusing.

For this coordinated outreach to work well, even though we're bringing in new teams that's going to bring that new capacity, it's essential that it's coordinated with the larger county outreach footprint because more likely than not these county teams have already been engaging

Page 245

with these people.  So we want to know that and we want to be able to work with them to the extent they have relationships.

So as we're building out our plans with each council office, we're going to want engagement from those teams early on to get a sense of what the picture looks like on the ground and then be able to reengage them as we need that more advanced support from the clinical or the medical side.

MS. MARTINEZ:  Fantastic. Mr. Miller, you know it's a yes, but moving forward and making sure that the coordination and communication after today with LAHSA and these new outreach teams that we're able to get Mr. Ansell, whoever else onboard to ensure that, when the folks from the county are going to be needed, that there will be coordination and cooperation.

MR. MILLER:  The answer is yes. Just as there had been before, and there will be going forward.

THE COURT:  Thank you.  Good.

MS. MARTINEZ:  Fantastic.

THE COURT:  Fantastic, okay.

MS. MITCHELL:  That's it for me,

Page 246

Your Honor.

THE COURT:  Okay.  Back to the county.  Skip?  Byron?

MR. MILLER:  Pardon me?

THE COURT:  Anything else?

MR. MILLER:  No.  We're good.

THE COURT:  Clarification, anything?  Marcus?

MR. MARCUS:  No, thank you.

THE COURT:  Let me just make sure around the room.

MR. MILLER:  I take it, Your Honor, there's no audit of the statewide program, the mental health services program.

MS. MITCHELL:  That's not what we --

THE COURT:  We'll wait until I get home, Skip.  No, I'm just kidding you.  There's no audit.  I don't have the -- I turned this over in good faith to take that opportunity with all of you to try to get a working relationship between the city and county which was god-awful quite frankly, historically.  I put a lot of faith and trust in that.  But I have got options later on and I don't want to discuss those options.  I hope I don't get

Page 247

there.

But my answer is the same as yours.

MR. MILLER:  Okay.

THE COURT:  We'll see.

MR. MILLER:  Got it.

THE COURT:  We'll see, all right.

MS. MITCHELL:  Thank you.

THE COURT:  General Jeff.

GENERAL JEFF:  Thank you.  On behalf of the Skid Row Advisory Council, I just want to have one -- go on the record as having one issue with Mr. Ansell's letter and the first sentence where it says the City of Los Angeles -- as the City of Los Angeles begins to quote clean up encampments --

THE COURT:  Yeah.

GENERAL JEFF:  -- is he talking about trash or is he talking about people?  It's very disrespectful to speak about human beings and say clean up.  I just want to go on record that we oppose that type of language.  It belittles and dehumanizes -- this effort is about homeless people, homeless human beings.  That is not a kind and caring tone --

THE COURT:  I know.

Page 248

GENERAL JEFF:  -- and is highly sensitive -- insensitive and is very disrespectful. So we just wanted to go on record stating as much.

THE COURT:  Appreciate it.

GENERAL JEFF:  Thank you.

THE COURT:  Shayla, back to you and then Brooke.

MS. MYERS:  First, Your Honor, we would request that all of the slides that Your Honor has put in the record become part of the official record for the court and that we be given an opportunity to respond.

The intervenors have set through numerous proceedings in this chambers for this city with significant presentations by council members who were elected and are responding to constituents in a political space.  But we have had no opportunity in a court proceeding to actually respond to the legitimacy of the information that is being put forward so...

THE COURT:  I'm going to leave these -- my preparation up here right on the table. Come on up and take a photograph of it, okay.

MS. MYERS:  Well, Your Honor we would ask that it be part of the court record.

Page 249

THE COURT:  Well, that's -- as soon as you tell me what because do you want Bonin's proposals?

MS. MARTINEZ:  The presentation, the presentation.

MS. MYERS:  The presentations, Your Honor, that you have put forth in this proceeding.

MS. MARTINEZ:  The slides, the slides.

MS. MYERS:  The slides.

MS. MARTINEZ:  That's what she wants for the record.

MS. MYERS:  The information that you are putting forward as part of the record.

THE COURT:  The slides I have shown.

MS. MARTINEZ:  Yes.

THE COURT:  That's what I am saying.

MS. MYERS:  Yes.

THE COURT:  In fact, I'll just put the whole thing in the horde.  How is that.

MS. MYERS:  That's what we're asking, Your Honor.

THE COURT:  Absolutely.  More than welcome to, sure.

MS. MYERS:  And we're asking that we

Veritext Legal Solutions
866 299-5127

be given an opportunity to respond.  We are very concerned that these proceedings are being used as a political opportunity for the city council members when they are supposed to be adversarial proceedings or that we're not engaging in the type of settlement communication and discussions that the court would find appropriate in these circumstances.

THE COURT:  No, just a moment. Judge Birotte and I are available 24/7.

MS. MYERS:  Your Honor, these are --

THE COURT:  You need to come to us if you want -- are serious about an omnibus settlement agreement.  You have got some pretty consequential things coming up quite frankly, but we're available.

But we want to know that you are serious enough, okay.  And if you are serious, the door is wide open.

MS. MYERS:  Your Honor, to be clear, we have contacted the court about this.  We understand that the city and the plaintiffs may have been engaging in settlement conversations without the intervenors, but we have contacted the court about settlement communications and about engaging

Page 251

in a conversation about a settlement that does what Your Honor is saying is important -- puts housing first.

THE COURT:  Uh-huh.

MS. MYERS:  We are always here for a conversation that involves housing.  What we are concerned about is a constant conversation that focuses solely on enforcement --

THE COURT:  Uh-huh.

MS. MYERS:  -- and arrest and criminalization.

If, Your Honor, the parties are interested in engaging in a conversation like the parties have presented that they are willing to engage in, we have been very clear, Your Honor, to the Court that the intervenors are prepared to engage in that conversation.  I think we have been clear in open court.  And I think we have been clear in our communications with the Court on that particular issue.

So to the extent it's now part of the record, we want to be clear on that point.

But, Your Honor, we are also very concerned that Your Honor is building a record and allowing the City of Los Angeles to build a record

Page 252

on these particular points without allowing any opportunity for us to respond.

I want to make one minor point.  But I think that it was really critical for one of the council member's points.

Councilmember Price talked repeatedly about trash along the 110 freeway.  We want to echo that sentiment.  We know that Mr. Saldivar from the City of Los Angeles from the bureau of sanitation was in the room when he made that point.  We want to echo that sentiment.

THE COURT:  Okay.

MS. MYERS:  And, Your Honor, to be clear, I have said this on the record, the attorneys in our office and the attorneys working on these issues, we actually do spend a considerable amount of time out in the community with folks.  We have spent a lot of time with folks in those encampments.  And here is what I would say.  Every time we speak with them, we ask them what is the No. 1 thing that would improve your quality of life under these circumstances.

And the thing they say is trash pickup and dumpsters.  And Your Honor, I just want to take a moment because we did sit through and

Page 253

continue to sit through hours of presentations, so I just want to take this point.

You showed pictures -- and this is why I want this in the record. You showed pictures of Caltrans, of the property. But what is clear in that picture is there's also a city trash can. The one city trash can that is there that advocates spent decades fighting to get there --

THE COURT: Right.

MS. MYERS: -- it is overflowing. That's on city property, Your Honor. That's a city trash can.

THE COURT: Yeah.

MS. MYERS: The city represented last year that they would pick up trash can -- they would do trash pickups at 500 discrete locations every single day. First of all, one trash can for the number of people who are at that encampment is never going to be enough.

THE COURT: Right. Yep.

MS. MYERS: And -- but we are hearing time and time again in these proceedings that there needs to be trash pickup. We agree. We also don't think there needs to be a court order for the city to engage in trash pickup.

Page 254

THE COURT:  Say that again.

MS. MYERS:  There does not need to be a court order for the city to engage in trash pickup at these locations.

MS. MARTINEZ:  That there should not have to be.

THE COURT:  Yeah.

MS. MYERS:  Your Honor, it is being represented constantly about the amount of trash that is on the street.  We have seen it every time we have sat in these proceedings.

THE COURT:  Uh-huh.

MS. MYERS:  To which, we would say engage in routine trash pick ups at these homeless encampments.

And Your Honor, we would also take issue with the representation of illegal dumping in the same conversation that we're having about homeless encampments.  That narrative that illegal dumping is the same as a homeless encampment makes it incredibly difficult for us to move forward and have conversations about reasonable regulations, about the types of services that are necessary.

I want to raise another point. Councilmember Buscaino made the point about 3 tons

Page 255

of feces.  He made that on the record repeatedly.  That is simply inaccurate.  It is not about 3 tons of feces.  There is something else that is going on there that is related to the amount of stuff that's being picked up not the streets.

The problem is, Your Honor, is this record keeps being made in these court proceedings.  And we're very concerned that we're not being given the opportunity to respond to the record that is being built in here because quite frankly, Your Honor, a lot of what is happening is self-serving relating to building out a record in these court proceedings.

And the last point that I want to make just in terms of a point of clarification, Your Honor is about who is engaging in the outreach as part of these encampment clearings that are happening as part of the freeway clearances.  We asked Your Honor for clarification on that particular point.  It was raised again related to the city, related to the county who was doing these clearings.  It is incredibly confusing on the ground.  We have heard from numerous providers.  We have heard from people who were present about who was in charge, and who is giving orders related to

Page 256

what is happening.

Related to what happened on October 13 through the 27 and going forward, Your Honor.

THE COURT:  Okay.  Thank you.

Brooke.  So Brooke, back to you.

BROOKE WEITZMAN:  I don't have anything I need to add to what Ms. Myers said.  She covered it.

THE COURT:  This is new and novel.

BROOKE WEITZMAN:  I have a lot of things, but none that will add value at this moment that you haven't already heard.

THE COURT:  Well, I'll talk to you in probably the next 15 minutes any way, Brooke.

Liz, back to you.

MS. MITCHELL:  I have nothing, Your Honor.

THE COURT:  Okay. All right.  Then, we have just had a little conference.  And I think.

(Inaudible background conversation.)

THE COURT:  So I agree.  I'm going to make the slides part of the record Shayla and give you 30 days to file any response.  That way you have got a record that will hopefully balance these

Page 257

proceedings as you see fit.

So anything further, Michele?

MS. MARTINEZ:  Hello, yeah, you can hear me.

Yes, Ms. Myers indicated that she wanted a clarification on the outreach.  And I agree that there's still some fuzziness here because now there's new outreach teams being created.  There's county outreach teams.  There's care teams.  There's various teams.  And then there's these service providers that have these teams.  And so I think as we move forward in regards to the coordination and communication ensuring that whoever is going to be in charge of the outreach and engagement at the underpasses and overpass and 500 feet along the freeway, that we're able to communicate who will be doing that outreach and engagement and being able to also inform all the parties so that we are all on the same page.

One of the issues that I think we have had is that some of the service providers -- and I think in CD3 there was no other option than to use one particular service provider and that service provider was hired by LAHSA.  And that service provider as well was really contracted

Page 258

by the county.

And so understanding that you have LAHSA you have the service provider, and then you have the council district and they have their own outreach teams, they need to make sure that as we move forward in whatever council district, that there is some clarification, communication and coordination so when we get out there and if -- and I want to make this last point.

Judge Carter has never forced a council district to choose a date.  That choice date.  It is up to the council districts if they want to move forward with clearing underpasses, overpasses -- that if they want to take the approach that Judge Carter has done in Orange County, in Whittier and Bellflower and now in Bob's district, that is up to them.

If they so choose not to want to do that or get guidance from Judge Carter, that is fine on the court side.  And so we want to make sure that that is very clear here today.

THE COURT:  Let's leave in good faith with each other and leave with a very positive thought.

When we started this in March, I

Page 259

think that this was strictly a law enforcement model in Los Angeles.  And you have now successfully flipped that script.

This effort in CD3 and Whittier, have you actually done this without law enforcement.  And that doesn't mean that you won't need law enforcement at some point with a couple of officers if you have some folks that are dangerous.

But you are accomplishing this without that law enforcement sphere and you talked about it.  But there's no other city that's done it so far.  And since we have seen it work time and time again, it will work here.

The second thing is if you are trying, there will always be mistakes.  There will be mistakes on your part and the court's part.  But that means we're trying.  That means we back up.  If we get it wrong, we try to get it right.  What is not acceptable is the inertia that is set in with these city over these decades and the unwillingness to make an attempt.

So the positive thing is you have got 58 or 59 people successfully housed out in CD3 that you didn't have before.  That should really be the message, but it's always the exception.  And

Page 260

Pastor Don and I talk about that all the time, about the goodness that you are seeing out there on the streets and we forget about the 59 people who are under shelter because yeah, there is one person out there that we can't account for yet.  But nobody is going to touch her or harm her.

So I leave with your best beneficiaries.  We'll reconvene again.  It will be on Skid Row.  I will try to not disturb your holiday.  It will probably be in January unless there's an emergency.

As far as settlement is concerned, you both have an awful lot at stake.  And I would say to you, if you are really serious, get through this door and talk to Judge Birotte and me as quickly as possible.  And we can set some dates and times.  Otherwise, unless you approach us, we are sitting here indicating.  But it will have to come from you now.

Put that on the record.  Put that on my docket.  We wish all of you the best and hope your families are well.

And Andre, do you have anything further?

JUDGE BIROTTE:  No.

Page 261

THE COURT:  Michele, do you?

MS. MARTINEZ:  No.

THE COURT:  Then we're in recess.
Thank you.

MR. MILLER:  Thank you, Your Honor.
Same to you.

THE COURT:  By the way, we'll go
back because I have got other slides that I didn't
show.  We'll go through those with my law clerk post
the ones, Alexa, when we get back today -- tomorrow
morning.  We'll post them and get a record.

THE ELECTRONIC RECORDER:  This marks
the end of media 4, we're off the record at
3:23 P.M.  Thank you.

\*\*\*

Page 262

CERTIFICATE OF NOTARY PUBLIC

I, FABIAN VENEGAS, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

FABIAN VENEGAS

Notary Public in and for the

STATE OF CALIFORNIA

Page 263

CERTIFICATE

OF

REPORTER


The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

That said audio-recorded material was transcribed into typewriting under my direction and supervision, and I hereby certify that said material is a full, true and correct transcript of the audio-recorded material.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

Executed this 8th day of November 2020, at West Hills, California.

Kristin Vargas

CSR 11908, RPR

Page 264

Veritext Legal Solutions
866 299-5127

[& - 393-3055]

**&**

**&** 2:4 3:10

**1**

**1** 14:11 145:6 225:12 253:20
**1,141** 7:22 93:21 136:13 166:9 183:11
**1,147** 71:3
**1.2.** 43:6
**10** 35:14 44:17 49:15 50:3 115:23 166:24
**10,000** 46:23
**100** 91:14 100:3 132:8,19,20 145:21 151:6 160:15,16 170:11 171:21 195:1,2,3 201:19
**100,000** 78:16
**1000** 3:6
**101** 96:10,25
**1018** 157:9
**10:08** 6:23
**10:32** 24:9
**10:35** 24:13
**11** 39:19 235:5
**110** 87:13 88:8 94:15 95:13 111:10 253:7
**11000** 156:21
**11908** 1:24 264:22
**11:00** 174:2
**12** 22:11 45:12 115:21,21,23,25 116:1,3,4
**125,000** 150:5,9,13 150:23

**13** 61:17 113:22 114:6 122:3,5 171:5 185:24 257:3
**134** 99:17,18 100:1 100:1
**136** 13:9,11,13
**13th** 54:17 187:4
**14** 25:11 26:13,20 27:13 33:3,4 39:23,24 52:19 145:12
**14th** 24:22
**15** 21:11 44:17 91:23,23 113:19 116:3 159:22 257:15
**15,000** 10:13
**150** 171:22,25
**150,000** 44:9
**1550** 2:11
**16** 50:14 52:6 59:9 59:15 62:23 114:2 114:3
**163** 21:18
**17** 21:23 91:13 144:16 194:17 216:15 217:6
**17500** 263:19
**18** 14:12 156:11
**185** 13:13
**185-1** 13:13
**19** 8:2,6 11:16 113:22
**190** 26:12
**1985** 184:9
**1999** 3:6
**1:29** 185:4

**2**

**2** 24:8 31:19 69:9
**2,200** 12:13 210:2 211:22
**2,600** 12:13
**2.5** 21:3 43:1,6
**20** 27:15 44:18 154:2 184:22,25 194:17,18 242:3
**20-02291** 1:7
**200** 1:19 2:5,21 6:17 39:13 56:11 145:22 173:21
**2015** 136:22
**2016** 147:19
**2019** 7:16 221:6 238:25
**2020** 1:15 6:2,17 19:22 21:24 221:21 264:15
**2021** 30:17
**2028** 135:11 136:3
**205-6520** 2:6
**21** 92:23
**210** 2:16 101:16 105:10
**213** 2:6,22
**214** 145:22
**22** 19:21 50:1,2 92:20
**220** 38:24
**222** 150:3
**23** 221:21
**24** 107:17
**24/7** 251:9
**240** 43:7
**25** 11:19 155:25 160:23 171:3
**26** 145:10
**27** 54:18 257:3

**27th** 61:18 187:5
**28** 50:1 132:7
**2:00** 185:7

**3**

**3** 24:12 31:19 165:1,2 185:3,24 186:3 187:7 255:25 256:2
**3,000** 12:4 14:25 20:10 142:3 211:7 211:23 213:9,11 216:12,17,20 242:21
**3,100** 20:11 209:5 209:24
**3,300** 209:3
**3,800** 52:6
**3,900** 12:16 62:23
**30** 64:11 78:5 91:10 142:3 156:20 184:3,12 257:24
**300** 12:8 68:11 108:25 126:20 146:19,20 194:13 211:16 212:2 214:14 217:5
**31** 8:7 30:17 195:11,14
**310** 2:17 3:7
**3110** 2:16
**32** 113:17,24 114:5
**323** 3:12
**3300** 3:11
**34,590** 28:11
**350** 43:7
**36** 7:22 71:4 93:21 166:10 205:3
**38** 62:23
**393-3055** 2:17

Veritext Legal Solutions
866 299-5127

[399-4529 - ability]

**399-4529**  2:12
**3:00**  81:6
**3:23**  262:14
**3d**  22:10

**4**

**4**  113:20 146:2
  175:22 262:13
**40**  144:16 160:11
  201:4
**400**  38:15,23,23,24
  39:11 131:17
  195:12
**405**  113:13 114:22
  170:23
**4118**  162:15
**42**  128:22
**432**  25:20
**4324850**  1:25
**446**  26:19
**46**  145:25
**47**  8:3
**48**  101:24
**482**  82:20
**49**  156:17 201:4

**5**

**5**  1:15 6:2,17 17:7
  18:20 19:2,11
  115:24 155:11
**50**  8:4 17:14 45:23
  45:24 56:11,15
  71:25 156:12,16
  173:8,11 195:24
  200:17 201:4
  214:13 243:1
**500**  12:6 14:13
  82:20 86:23 87:15
  145:24,25 211:25
  213:10 254:16
  258:15

**525,000**  151:6
**52nd**  84:18
**55**  160:24
**550,000**  22:17 23:3
  37:16 71:7 136:11
**552-4400**  3:7
**555**  3:11
**555,000**  146:15
  148:13,17
**5611**  162:6
**56th**  84:18
**57**  139:16 144:16
  187:11,18
**58**  260:23
**59**  62:16 260:23
  261:3

**6**

**6**  82:23 166:23
  226:1
**6,000**  16:13 37:23
  239:22
**6,700**  10:14 12:1
  14:12 16:6,13
  26:16 28:10 40:6
  170:16 190:18
  209:2,18,21 213:8
  239:14 240:5,12
**6,800**  20:10 212:3
**60**  62:12,13 65:5
  65:17,18 91:17
  131:2,16,20,24
  132:6,8,12,19
  166:17 194:16
**60,000**  20:15
**600**  38:21 39:9
  195:10
**61**  21:17
**617**  2:5
**61st**  132:20
**62**  201:7

**622**  26:10 27:4,9
  28:7
**63**  101:18
**636-2704**  3:12
**64**  160:22
**65**  11:17 13:3
  14:23 26:17
  203:15 209:6
  210:25 212:6
**67**  100:2,22
**68th**  91:15
**6:00**  63:2 64:3
  66:1 69:21 75:25
  176:4

**7**

**7**  19:15,17 237:14
**7,000**  46:1,10,23
  149:8
**7,896**  27:14
**70**  65:15 116:24
  139:21 200:18
  201:9 202:3
**700**  2:21 16:2,8,9
  101:24 239:23
**7094**  264:20
**720**  46:23 148:25
**720,000**  46:22
**75**  11:18 71:25
  160:1 173:6
  203:16
**750,000**  22:17 23:3
  37:16
**76**  152:4
**760**  45:19 46:11
  148:25
**78**  50:1
**7th**  2:5

**8**

**8**  85:14

**8,000**  27:20,20
  149:8
**80**  126:8 145:4
  157:5
**800**  2:12
**81**  91:21 131:11,13
**810**  131:11
**837**  7:24 93:21
**857**  238:22
**8755**  157:6
**8th**  2:11 264:14

**9**

**9**  45:12 122:11
**9,000**  16:5
**90**  199:9
**90012**  1:20 6:18
**90012-4119**  2:22
**90017**  2:6,11
**90067-4632**  3:7
**90071**  3:12
**90405**  2:17
**91**  46:12 47:1,10
  149:1,9
**911**  81:3
**93**  87:17
**978-4681**  2:22
**98**  145:11
**9:00**  16:6 69:21
  81:6
**9:45**  1:16 6:3,20
**9th**  87:24

**a**

**a.m.**  1:16 6:3,20
  24:9
**abandon**  147:22
**abandoned**  70:23
**abeyance**  205:4
**ability**  16:11 95:18
  218:13 263:9

Page 2

**[able - agencies]**

| | | | |
|---|---|---|---|
| **able** 23:4 26:23 29:20 30:9,16 35:5 45:24 87:17 88:12 89:24 90:6 90:12 100:20 119:9 120:1,4 121:1 124:21,22 148:10 161:24 174:4,10 199:2 202:13 246:2,8,15 258:16,17 | **accomplish** 211:16 **accomplished** 16:23 52:19 95:15 **accomplishing** 211:21 260:9 **account** 12:9,21 181:4 190:3,8,22 191:10 261:5 **accountability** 42:16 82:3 189:8 **accountable** 42:9 42:10 | **acting** 10:18 89:8 89:10,11 107:22 107:24 227:23,24 228:3 **action** 9:18 30:7 33:5 71:15 90:1 95:12 186:8,9 187:14 192:14 220:25 226:1 263:11,15 264:12 **actions** 9:9 186:17 186:21 | 145:2 174:8,11 **additionally** 219:17 **address** 171:24 220:3 231:13 **addresses** 222:2 **adequate** 12:8,21 181:8 **adhere** 31:22 **administer** 6:12 **administration** 43:21 157:3 |
| **absent** 122:14 **absolute** 45:2 78:18 108:5 **absolutely** 13:8 15:8 34:14 63:19 76:17 82:9 84:4 89:19 126:22 129:15 139:4 142:25 148:2 189:13 204:13 238:10 244:5 250:23 | **accounting** 8:2 189:23 191:18 207:14 **accounts** 240:18 **accuracy** 23:13 **accurate** 116:16 116:19 228:25 263:8 **accused** 234:14 **achieve** 22:8 23:5 88:9 155:18 | **active** 9:6,7 11:6 **actively** 88:4 103:18 161:16 197:19 **activist** 199:18 **activists** 130:9 **activities** 189:5 233:20 **acuity** 209:6 **acute** 232:22 233:2 | **admiration** 66:2 **admit** 109:19 **advanced** 246:9 **advantage** 200:4 **adversarial** 251:4 **advise** 152:1 **advisory** 35:20 196:5,12 197:19 204:1 248:10 **advocate** 52:2 133:5 |
| **absorb** 151:9 **abuse** 221:18 **abut** 90:12 **accept** 34:16 37:2 75:5 92:25 124:25 **acceptable** 9:5 260:19 **accepts** 33:20 **access** 55:3 100:20 163:7 243:24 | **achieved** 9:1 100:18 **ackley** 175:10,13 176:1 177:3 178:8 180:9 **acknowledged** 228:11 **acknowledging** 228:21 **acknowledgments** 6:12 | **ada** 202:19 203:10 **adams** 124:2,5 125:2 127:24 128:18 139:2 141:1 **add** 27:3 59:5 73:22 239:9 257:8 257:12 **addiction** 221:18 **adding** 239:4,13 | **advocates** 50:10 50:23 59:22 129:6 129:17,20 176:23 196:14 208:16 254:7 **afar** 165:24 **afford** 29:11,12 **affordable** 44:13 156:12 **afoot** 74:17 |
| **accommodate** 21:7 212:12,16 **accommodated** 22:1 **accommodating** 22:23 **accommodation** 20:9 37:8,16 | **acoustics** 189:20 **acquired** 152:4 153:25 **acquiring** 26:7 **acquisition** 170:17 **act** 74:16 128:6 138:19 187:10 | **addition** 10:14 27:1 90:15 91:19 101:2 104:2,17 160:5,13,19 **additional** 91:9,22 100:12 102:1 114:6 120:18 122:20 132:13 | **afraid** 52:13 135:16 **afternoon** 170:3,4 170:7 220:25 **age** 13:3 26:17 **agencies** 66:15 70:3 77:20 224:8 |

Veritext Legal Solutions
866 299-5127

[agency - anymore]

| | | | |
|---|---|---|---|
| **agency** 58:19 66:1 122:8 202:2 224:10,11 | **agreements** 15:11 59:14 154:3 218:14 238:6 240:7 | **alluded** 139:9 209:5 | 36:24 56:13 74:19 78:10 113:16 117:21 118:25 |
| **agenda** 222:3 | **agrees** 14:11 | **alongside** 92:10 | 121:18 122:1,12 |
| **aggressively** 88:4 | **ahead** 193:15 | **alternative** 21:24 | 129:5,5 130:8 |
| **ago** 15:4 44:17,18 87:25 103:9 105:8 | **aid** 2:10 | 21:25 173:12 192:9,20 | 172:20 183:10 186:1 191:8 |
| 133:7 134:8,15 | **air** 124:3 | **alternatively** | 199:18 204:8 |
| 144:14 151:25 | **airtel** 173:16,21 | 192:16 | 210:15 219:17 |
| 158:14 161:9 | 174:9 | **altogether** 28:18 | 221:25 222:7 |
| 197:24 221:21 | **akurris** 92:8 | **amending** 90:2 | 225:7 226:16 |
| 229:4 | **al** 1:8 6:15,16 | **amendments** | 227:7 228:4,12 |
| **agree** 8:15 9:4 | **alcohol** 92:24 | 162:6 | 229:15 236:24 |
| 136:14 143:13 | 221:18 | **america** 152:7 | 248:13,14 252:25 |
| 146:18 147:8 | **alert** 173:1 | **american** 36:15 | 253:9 260:2 |
| 148:3 149:22 | **alexa** 4:12 82:22 | 76:16 | **anger** 178:12 |
| 151:1 155:22 | 262:10 | **amount** 10:16 | **angry** 69:5 178:11 |
| 167:11 207:22 | **alexandria** 34:11 | 46:12 100:6 | 178:12 |
| 228:18 254:23 | 34:12 | 118:25 149:10 | **ansell** 57:6 58:21 |
| 257:22 258:6 | **alexis** 162:23 | 241:24 242:5 | 58:21 218:24 |
| **agreed** 61:16 | **allegedly** 40:12 | 253:16 255:9 | 219:23 220:6 |
| 102:17 219:4 | **alley** 78:22 | 256:4 | 226:15 227:1 |
| 229:24 239:14 | **alleys** 27:22 | **ana** 131:8 | 228:23 246:15 |
| **agreement** 12:17 | **alliance** 1:5 6:15 | **anaheim** 85:9 | **ansell's** 248:12 |
| 14:4,4,8,9,10 | 25:21 28:10 29:8 | 129:10 | **answer** 7:20 33:14 |
| 15:18 18:21 19:2 | 38:14 129:6 | **analysis** 221:23 | 48:20 92:3 113:10 |
| 20:3,15 26:12 | 142:21 189:13 | **andre** 4:9 57:1 | 158:1 193:23 |
| 68:17,22 101:25 | 207:2 | 72:15 184:10 | 205:22 207:4 |
| 127:15,17 128:2 | **allocated** 127:15 | 261:23 | 222:5 230:20 |
| 129:4,8 130:16 | 128:10 142:9 | **andy** 50:10 | 246:19 248:2 |
| 143:1,2 144:5 | 154:2 217:19 | **angelenos** 26:10 | **answers** 9:19 |
| 161:11,21 209:13 | 218:3 | 27:14 28:10,11 | 198:25 |
| 209:24 212:11 | **allow** 68:4 162:18 | 30:15 | **anthony** 77:9 |
| 215:14 217:14 | 166:2 | **angeles** 1:8,18,20 | **anticipated** 194:6 |
| 225:3,9,18 237:11 | **allowed** 123:2 | 2:6,9,10,11,19,20 | **anxiety** 194:1 |
| 237:20,23,25 | 171:21 | 2:22 3:4,7,12,16 | **anybody** 21:21 |
| 238:13 239:4 | **allowing** 110:1 | 3:17,18,19,20,21 | 141:17 184:15 |
| 241:9,10,11 | 165:11 252:25 | 3:22,23,24,25 6:1 | 231:4 |
| 251:14 | 253:1 | 6:16,17,18 7:14,22 | **anymore** 54:15 |
| **agreement's** | **allows** 140:24 | 8:20 9:24 14:20 | 142:22 |
| 216:14 | 183:3 | 14:23 15:2 29:1,1 29:2,3,3,5 35:3 | |

Veritext Legal Solutions
866 299-5127

[apart - authority]

apart  32:3 242:19
apartment  145:14
apartments  161:2
apologies  20:18
  143:23
apologize  10:6
  18:19 110:3 144:3
  176:9 220:1,1
apparent  20:20
apparently  58:22
  88:16,25 94:4
  103:23 123:4
appear  188:9
appeared  179:18
appears  191:10
appendix  45:18
  149:2
apples  47:3,3
  149:12,12,12
  215:18
applied  109:1
  131:7
applying  239:25
apportion  41:15
apprecia  70:12
appreciate  8:11
  11:9 18:16,18
  23:21 53:9 60:13
  81:20 87:7 88:16
  89:17 92:4 102:9
  111:8 143:18
  167:19 168:13
  176:7 193:2
  197:16 199:1
  204:1 207:16
  215:7 236:10
  249:4
appreciated  155:8
  169:7 224:1,4
appreciation  82:6

appreciative  39:4
  82:11,19 139:2
approach  29:11
  29:12 41:13 63:7
  63:13 110:5
  155:11 259:14
  261:17
approaches
  171:12
approaching
  101:23 173:23
appropriate  26:24
  37:11 105:24
  118:9 129:7 191:5
  191:8 219:21
  226:5 251:7
approval  19:3,16
  138:20
approve  162:6
approved  122:19
  152:2 156:16
  160:9
approving  122:14
approximately
  12:9,13 211:23
  213:9
april  16:14 17:3
  22:6 37:20,23
  38:2 39:20 69:14
  71:14 143:7
arbitrary  131:6
archaic  131:6
area  88:12 89:24
  90:12,20 94:13
  100:7,15,20 103:5
  104:13 117:7
  125:15 152:2
  160:10 171:15
  172:21
areas  70:16 90:7
  91:1 94:9 95:12

101:13 104:16
  106:5,8 108:13,16
  108:24 111:9
  162:9 230:9
argue  52:1 241:5
argument  132:1
army  104:7,16
  172:9
arrangements
  21:24 172:10
arranging  154:4
arrest  52:3 55:13
  62:19,22 129:13
  133:5 252:10
arresting  66:11
arrives  105:15
article  7:12
articles  7:17
articulate  120:22
articulating
  119:12
ascendancy  24:22
aside  63:16 91:14
  161:1 220:9
asked  21:11 57:11
  58:10 63:16 116:7
  165:17,18 195:14
  221:3 222:6
  228:18 230:21
  256:19
asking  8:24 9:5
  71:19 122:22
  216:5 250:22,25
assess  73:18
assessment  153:12
assessments  245:5
assigned  6:10
assist  54:25
assistance  117:10
assisting  110:10

associated  21:12
assume  112:18
  142:17
assuming  114:4
assure  100:20
  101:9
astounded  232:14
astounding  183:16
attached  224:10
attack  56:15 59:23
  92:21 118:22,23
attempt  157:7
  260:21
attempted  162:25
  197:15
attempting  163:5
attended  95:7
attention  53:10,12
  87:9 92:4 94:5
  95:19 183:11
  220:21
attorney  2:4,10,15
  2:20 3:5,10 45:16
  107:10,10,11
  108:2 112:2 124:4
  128:25 142:18
  177:8 214:18
  225:14 263:13
attorneys  8:12 9:1
  17:19 96:12
  196:16 253:14,15
audience  79:11
audio  48:24 263:7
  264:7,10
audit  231:14,23
  247:13,19
auditorium  204:9
authority  19:13
  107:25 187:25
  219:18

Veritext Legal Solutions
866 299-5127

[authorize - bench]

**authorize**  239:19
**authorized**  6:11
 134:15 238:25
**availability**  226:5
**available**  7:7 55:7
 99:24 137:22
 141:13 158:20
 166:1,17,24 167:7
 174:9 206:22
 217:3 219:13
 230:13 235:1
 251:9,16
**avalon**  91:15
**avenue**  3:6 94:13
 157:10
**average**  44:9
**avoid**  37:21
**avoidance**  83:6
**avoided**  181:7
**awards**  170:9
**aware**  91:5 101:8
 106:23 186:10
 189:24,25 190:14
**awareness**  188:25
**awful**  78:25
 247:22 261:13

**b**

**b**  5:1 199:21
**back**  6:22 8:12 9:2
 11:7 13:2 14:2
 15:7 16:5 20:17
 22:5 23:3 24:12
 28:22 38:22 43:11
 43:19 44:6 46:11
 48:13,14 50:2
 51:17 55:20 58:17
 59:3 60:9 64:6
 65:14 70:7,8,17
 73:18 78:16,17,23
 81:12 85:8 87:4
 92:17 93:18 97:21

100:10 105:9
125:5,22 131:14
134:14 140:12,12
140:19 141:5,7
167:15 172:12
175:5,7 176:11,12
176:18 177:25
178:6 184:7 185:1
185:6,8 193:6
195:8 196:17
197:6 202:14
203:25 205:13
206:4 224:17
226:14 241:17
242:19 247:2
249:6 257:6,16
260:17 262:8,10
**background**
 153:17 257:21
**backing**  20:2
 225:6
**backlash**  90:20
**backwards**  68:1,7
 165:24
**bad**  135:14 175:19
**baffling**  161:18
**bags**  151:7
**bailiwick**  108:23
 108:25 147:18
**balance**  147:11
 166:25 257:25
**ball**  47:17
**ballinger**  200:19
 201:10
**ballington**  200:20
**ballooned**  65:4
**bananas**  149:13
**barbara**  222:24
**barbecue**  36:9
**bargaining**  184:1

**barondess**  3:5
**barriers**  32:14
 166:4
**basic**  162:8,11,14
**basically**  70:4
 145:21
**basin**  108:15
 171:16,19,22
 172:1,2,25 173:8,9
 173:18,19 174:3,8
 174:12
**basis**  63:18 128:19
**beach**  80:7,16
**bear**  13:14 181:20
**becoming**  163:11
 174:9
**bed**  101:24 167:6
 170:16 229:2
**bedbugs**  199:25
**beds**  12:2,4 14:12
 15:9,10,21,24 16:2
 16:5,8,9,13,14,19
 16:21,23 20:10
 25:20 26:9,12
 28:7 40:6 91:14
 91:17 145:4,10,11
 145:16,21,22
 146:19,20 152:4
 160:15,16 166:17
 166:24 173:12,21
 174:8,11 190:18
 191:8 209:2,4,5,7
 209:24 213:18
 214:11 215:11,15
 215:24,25 216:12
 216:14 217:3
 219:13 224:25
 225:13,16,17
 226:9,10,22 227:8
 237:21,22,23,25
 238:3,5,17,18,18

238:22 239:2,3,14
239:15,17,21,22
240:1,5,6,10,12,12
242:1,11 243:1
**began**  99:14
 185:23
**begging**  163:9
**beginning**  11:10
 46:4 75:19 99:25
 113:16 214:5
**begins**  226:16
 248:14
**begun**  145:7
**behalf**  6:25 164:20
 196:4 227:20,21
 227:24 228:3
 248:9
**beings**  248:19,23
**belief**  10:16 20:4
 21:3 130:3
**believe**  16:17,18
 32:12 46:7 51:4
 56:25 66:22 73:15
 81:10 88:9 90:4
 129:22 150:15
 162:15 166:23
 178:16,17,17
 181:13 190:22
 192:10 213:10
 224:3
**believed**  15:13,16
 21:1
**believes**  22:18
 42:15 66:23,23
**believing**  30:21
**belittles**  248:21
**bellflower**  259:16
**belongs**  32:13
 115:1
**bench**  80:24 85:14

Veritext Legal Solutions
866 299-5127

[beneficiaries - bridge]

**beneficiaries**
261:8
**benefit** 52:20
**benefits** 11:5
**best** 9:19 39:6 72:2
96:5 111:17
123:16 124:1
139:1 155:14
166:13,13 171:2
261:7,21 263:9
**bet** 85:1 135:12,20
**better** 93:5 94:8
95:8 185:12
227:25
**beyond** 27:3 28:7
39:24
**bid** 160:2
**big** 86:12 87:21
92:12 112:18,18
134:20,21 176:24
176:24 220:18
222:11 223:20,21
**bigger** 161:19
235:6 242:25
**biggest** 102:24
153:1
**bill** 13:9 150:16
153:8
**billion** 21:3 43:1,6
190:3
**binding** 14:7,8,10
**birotte** 4:9 12:3
13:20 14:9 15:4,7
16:4,9 25:6,7 29:8
31:17 33:2 34:7
57:8,10 68:19
87:8 126:20
127:15 129:19
142:10 194:10
196:6 202:23
209:14 210:8

212:18 226:11
236:3 238:7 239:6
239:8 240:24
241:12 251:9
261:15,25
**birotte's** 184:7
236:13
**bit** 49:21 65:4
70:15 97:8 124:25
144:16 145:5
162:16 165:4
170:21 184:2
189:19
**black** 36:15 76:16
**blade** 32:19
**blame** 17:23 200:8
200:11
**blaming** 200:5,11
**blank** 177:12
**bless** 134:11
**blessings** 78:23
**block** 84:18,24
94:16 95:23 96:1
180:23 210:17
**blocking** 134:18
**blue** 198:5,12
**blumenfield** 3:16
48:19,25 49:19
56:20 60:12 64:9
65:16,19 70:12,25
71:18 72:12,21
81:13,17,21
**blumenfield's**
49:11 55:18
**bluntly** 136:10
196:24
**bluntness** 10:7
**bmclain** 3:13
**board** 9:2 10:18
10:20 11:2 13:10
35:21 37:19 42:14

58:25 66:22 70:8
108:17 150:20
175:18,20 184:11
221:1 222:3
223:13 227:2,3,20
227:25
**boatload** 43:20
**bob** 3:16 18:5
23:23 48:19 55:18
55:21 60:4 69:17
70:10 122:25
128:24 130:22
131:21 142:17,20
165:20
**bob's** 259:16
**bodies** 16:25
**boise** 29:6 132:2,2
167:5
**bolted** 78:4
**bond** 44:1
**bonin** 3:17 23:24
24:1 52:4 54:17
112:12,17,23
113:4,19 114:9,12
114:19,24 115:2,5
115:10,18,22
116:13,18 117:6
118:15 119:14,20
120:24 121:8,12
121:25 123:8,12
125:7,10,14,19
126:1,25 127:2,9
127:12,20,24
128:4,7,9 129:14
130:1,19 133:21
134:1,4,13 135:15
135:25 136:8,14
136:17,25 137:4,7
138:22 139:4,7,10
139:18,20 141:8
141:12,15,22

142:14 143:13
146:10
**bonin's** 35:12
250:2
**bookends** 130:24
**books** 59:10 60:2
133:1 165:21
**border** 113:14
114:1,3
**boss** 88:24
**bottom** 148:14
149:9
**bought** 145:14
**boulevard** 49:15
156:17,21 157:21
158:11,12
**bound** 68:2
**boutique** 157:24
**boyle** 33:5,10,23
37:5
**bradley** 99:25
100:3,4,17 101:3
**branch** 30:8
**brand** 240:20
**brea** 156:18
**break** 38:1 39:16
39:17 184:22
**breakdown** 77:19
179:18 231:2
233:3,4,4,8 234:22
236:21
**breaks** 108:14
109:21
**brian** 136:23
**bridge** 22:22 28:2
91:22 144:14
146:22,22 147:2
148:9 156:9
164:22,25 166:24
167:11 180:13,16
238:23,24 240:14

Veritext Legal Solutions
866 299-5127

[bridging - carol]

bridging  166:21
brief  104:3
briefing  184:25
bright  32:20
brilliant  211:2
bring  25:25 26:25
 194:4 195:15
 224:16 241:17
 245:22
bringing  113:22
 233:24 243:25
 245:21
brings  28:17
 101:18
broad  229:25
broadly  206:19
broke  65:12 68:20
 68:21 181:24
 195:8
broken  23:7 61:1
 154:6
brokered  129:8
brooke  4:10 19:9
 50:23 51:21,24
 56:11 59:15 133:8
 188:5,11,20
 193:23,25 207:7,7
 249:7 257:6,6,7,11
 257:15
brookes  85:9
brooks  131:10
brought  12:23
 22:11,11 220:17
 224:24
brouhaha  176:24
brush  104:25
 105:1
budget  45:18
 190:10
budgetary  190:15

buena  55:4
build  25:19 26:4
 29:14,18 38:15
 43:16 44:13 132:8
 147:4,4 151:2
 157:14,24 194:9
 194:12 240:13,15
 240:21 241:2
 252:25
building  102:13
 145:15 149:25
 156:24 157:6
 246:4 252:24
 256:12
built  12:7,11 26:1
 46:21 150:13
 166:7 214:11
 256:10
bunch  50:10
 184:19
bureau  253:10
bureaucracies
 51:14 52:20
 222:22
bureaucracy
 140:25
bureaucrat  46:14
 47:9
bureaucrats  48:7
burned  94:16
buscaino  3:18
 159:1,2,3,11,14,18
 160:4 163:21,24
 166:14 167:20
 255:25
business  31:3
 35:20 180:4
 196:21
businesses  29:21
busy  24:15 88:25
 97:22 107:18

buy  157:7
buying  148:20
byron  3:10 16:8
 163:17,18 237:8
 247:3

**c**

c  2:1 3:1 6:6
ca  1:20
cabin  71:20,24
california  1:2 2:6
 2:11,17,22 3:7,12
 6:1,13,18 151:6
 263:22 264:6,15
call  13:7 18:6,7
 20:17 34:24 38:17
 45:19,19 49:19
 50:17 52:14 54:7
 57:1,9,9 66:18
 79:15 80:21 83:1
 84:6 89:13 95:19
 103:12 107:9,17
 109:19 124:13
 132:6 133:10
 138:16 150:16
 167:23 195:19,22
 200:22 201:24
 202:4 204:11,11
 208:12 211:6
 230:2 234:10
 235:18 243:13
called  8:23 22:9
 35:13 38:17 53:10
 53:11 66:21 78:22
 80:19 81:3 106:19
 124:14 141:24
 221:5
caller  116:12
calling  18:10 35:9
 105:17 106:16
 218:8 220:14
 235:24 236:20

calls  26:15 201:25
 236:8
caltrans  18:13
 82:16,23 83:1
 84:17,23 85:2
 86:8 88:21 90:15
 94:4 95:17,23
 96:8 97:16,17
 98:3,13 100:6,12
 102:25 103:16,23
 104:7,10,14,17,22
 105:4,7,12,16,18
 106:8,21 107:8
 109:9 110:6
 111:17 134:15
 135:1 144:1,2
 161:6,9,17 254:5
camera  112:21
camping  172:3,17
 219:16
canceled  86:13,17
candidly  131:4
candlelight  197:23
 197:24
canoga  70:21,21
cao  138:4 154:3
capacity  227:23
 245:22
capital  214:13
 237:12
car  93:3
care  52:21 90:3
 135:22 140:23
 157:5 164:22,25
 242:7,17 244:3
 258:9
careful  148:14
caring  248:24
carol  2:15,15
 16:17,20 34:8
 85:10 131:10

Veritext Legal Solutions
866 299-5127

[carol - city]

| | | | |
|---|---|---|---|
| 133:8 188:7,7,12 188:14 | causes 143:11 179:7 198:12 | 182:16 210:9 249:14 | circuit 40:18,23 79:23 132:3 |
| carries 236:14 | cc's 223:9,9 | champion 166:6 | circumstance 106:16 |
| cars 96:21 127:7 | cd3 226:22 229:19 232:8 258:22 260:4,23 | chance 168:9 | circumstances 251:7 253:22 |
| carter 1:17 25:5,9 29:7 31:16 33:1 33:11 38:8 41:8 42:18 47:13 54:5 56:19 60:13 111:8 118:15 129:4 133:20 208:24 219:17 235:24 236:4,12,19 259:10,15,19 | | change 9:11,13 30:21 65:13 200:15 | |
| | cdc 126:11 | changed 147:19 | cite 52:6 55:13 62:20,23 |
| | ceased 78:6 | chaos 179:7 | cities 55:3,12 111:20 118:20 119:25 120:1 121:2 132:7,17 133:3 210:16,21 |
| | cedillo's 49:12 | chapel 204:9 | |
| | center 55:5,5 118:8 122:8,15,16 126:12 145:10 213:13 244:20,21 | charge 76:10 172:13 256:25 258:14 | |
| | | chasing 101:12 142:21 | citing 66:12 |
| carts 78:2 | centers 12:10 20:10 50:3 55:3 194:13 209:25 211:21 | chatsworth 152:3 | citizens 8:3 71:4 92:20 93:2 94:23 103:22 |
| case 1:7 23:13 73:10 75:4,14 109:20 163:25 167:6 186:7 202:17 238:21 | | cheating 29:14 | |
| | | check 7:19 35:14 56:22,24,25 57:1 78:10 | city 1:8,18 2:19,20 3:16,17,18,19,20 3:21,22,23,24,25 6:16,17 7:6 11:2,5 11:18,18,22 12:8 12:20 13:23 14:5 14:11,20,23 15:5 19:18,20 20:2,5 21:4 25:7,11 26:12 27:14,16 28:5 29:6,8 32:8 32:22 33:3,4 34:14 38:22 39:9 39:23,24 40:15,25 40:25 41:1 43:2 45:15,16 46:10,13 50:11 52:9 55:1,2 55:8,15 59:11 60:8 61:2 67:1,24 71:13 80:16 83:14 83:14 84:15,19 85:3,5 93:10 95:17,22 96:3,17 97:8,14 99:23 |
| | central 1:2 | checking 7:18 | |
| cases 70:10 74:23 210:20 | ceo 223:11 | cheri 219:1 | |
| | ceo's 228:3,4 | chew 211:20 | |
| cash 43:21 | certain 12:19 13:1 | chief 87:8 222:19 222:19 223:10,12 | |
| catastrophe 25:12 27:25 44:15 | certainly 155:14 157:25 190:10,18 239:12 240:4,15 241:7 | | |
| | | children 164:8 | |
| | | choice 21:16 50:17 50:18 52:25 57:12 57:19 58:5,18 62:1,9 67:25 124:13 137:12 259:11 | |
| catastrophes 8:16 | certificate 263:1 264:1 | | |
| catastrophic 32:21 | | | |
| categorically 60:4 60:5 66:10 69:15 | certified 264:5 | | |
| | certify 263:3 264:6,9,11 | | |
| category 15:18 211:5 | cetera 13:9 18:3 20:23 52:23 53:2 86:24,25 128:25 142:21 237:17 | choices 133:14 | |
| | | choose 24:17 181:22 259:11,18 | |
| catherine 10:24 36:1 196:17 | | | |
| catholic 2:9,14 129:9 | chagrined 10:19 | christian 157:16 | |
| | chain 105:24 134:23 | church 156:20 157:17 | |
| caught 7:16 205:25 | | | |
| cause 92:19 93:1 127:7 198:8 | challenge 27:10 71:1 99:19 102:24 | cienega 156:10 158:13 | |
| caused 53:16 195:8 | chambers 7:6 112:18 159:21 | | |

Veritext Legal Solutions
866 299-5127

[city - collaboratively]

101:8 102:5,15
103:1,1 108:2,3,3
110:10 111:16
112:2 113:15
115:7 117:1,4,8,10
117:12,12,16,17
117:19,21 118:13
118:17,19,21
119:2,11,17,25
120:1,11,16
121:15,18,18,21
122:12,25 123:3,4
124:4 125:9
126:15,23 127:13
128:25 129:2,5,9
129:10,10,20
130:2,8,13 131:25
132:13 133:4
135:11,12,20
142:2,18 143:3
148:4,25 149:17
152:20 153:13
154:1 155:16,19
157:8,17 160:15
164:16,20 165:12
168:4 172:7,16,20
174:17,20 177:8
182:2,7 183:9
184:6 185:23,25
186:14,20 187:3
187:10,13,25
190:16 194:18,22
195:1,5,7 196:20
199:3,3 200:7
203:6,16 205:25
206:3,25 208:17
209:12 210:5,22
212:11,20,20
213:12 214:9,12
214:18 215:14,24
215:25 216:16

217:6,18,19,25
218:2 219:12,17
225:14 226:4,16
227:7 228:11,18
228:20 229:15
231:7 233:23
237:13 238:14,22
239:15 240:7,13
240:14 241:9
242:1 244:1
247:22 248:13,13
249:14 251:3,22
252:25 253:9
254:6,7,11,11,14
254:25 255:3
256:21 260:11,20
**city's** 15:2 44:8
108:22 115:4
186:17 213:13,22
237:11
**citywide** 164:22
**civil** 75:9,16
**claim** 69:1 71:14
140:4
**claims** 191:16
**clarification** 20:22
184:20,21,25
185:10,15,22
186:12 188:3
192:3,4 205:11,14
208:25 209:11,11
216:5,8,24 217:4
218:5 227:6
238:12 247:7
256:15,19 258:6
259:7
**clarified** 235:3
**clarify** 76:5
209:23 210:11,13
215:7 226:24
227:11 230:4

233:15 238:4
243:6
**clarifying** 236:9
**clarity** 100:13
187:24
**class** 33:6
**clean** 29:20 88:12
89:24 90:6,16
94:9 96:1 162:5
167:3 248:14,20
**cleaned** 177:24
**cleanest** 30:5
**cleaning** 83:14
85:3 95:22 108:4
**cleanings** 164:22
**cleanout** 236:15
**cleanup** 64:21
83:18 84:16
123:24 126:4
163:9 177:13,15
177:23
**cleanups** 90:3
226:16
**clear** 15:8 59:9
60:1 65:7,8 70:17
103:3 104:23
111:11 122:7
126:2 132:25
162:2,11 165:21
173:4 187:11
188:17 209:20
211:8 214:9
226:15,20 228:10
228:10,12 230:11
236:1 238:10,20
251:20 252:15,18
252:18,22 253:14
254:5 259:21
**clearance** 100:4
105:1,6 107:1

**clearances** 256:18
**cleared** 60:20
116:21 143:12
144:24 172:14
**clearer** 19:5 238:7
**clearing** 17:24
259:13
**clearings** 256:17
256:22
**clearly** 7:1 30:3
164:2 165:5
**clerk** 4:11,12
262:9
**clerks** 7:11 17:19
21:18
**clients** 8:13 11:8
35:24
**climate** 30:20
**clinical** 246:9
**clipboard** 51:18
140:5,11
**clipboards** 67:10
141:18
**close** 65:15 87:15
125:11 202:25
**closed** 34:6 191:24
**closely** 104:11
**closer** 33:4 189:19
214:20
**closing** 207:14
**clusso** 198:1
**cluster** 63:12
**coalesce** 32:8
**coastal** 138:19,23
**codes** 90:2
**cold** 198:22
**collaborative** 84:4
87:23
**collaboratively**
92:4

Veritext Legal Solutions
866 299-5127

[colleague - concern]

| | | | |
|---|---|---|---|
| **colleague** 204:19 | 229:21 | **communicate** | **complements** |
| **colleagues** 26:23 | **comfort** 152:25 | 157:1 188:10,13 | 77:11 84:20 |
| 39:25 102:10 | **comfortable** 25:1 | 258:16 | **complete** 33:17 |
| **collectively** 30:13 | 193:8 | **communicating** | 34:1 35:1 49:24 |
| 58:6 | **coming** 11:20 | 157:3 188:18 | 53:11,12 77:19 |
| **collision** 16:15 | 23:25 26:8 45:3 | **communication** | 200:23 |
| 17:3 37:18 143:5 | 48:9 67:14 73:21 | 94:8 95:9 246:14 | **completed** 37:20 |
| **combination** 77:3 | 78:11 86:18 87:11 | 251:6 258:13 | 125:16 |
| 217:17,20 240:25 | 88:2 94:18 111:9 | 259:7 | **completely** 63:18 |
| 241:1 | 125:5,22 126:6,8 | **communications** | 80:25 102:20 |
| **come** 11:24 16:19 | 136:3 137:10 | 190:14 215:21 | **completing** 170:16 |
| 25:10 35:11 37:23 | 142:19 146:21 | 251:25 252:19 | **complex** 31:24 |
| 40:20 43:21 46:6 | 159:5 169:9 | **communities** 8:19 | 41:18 42:2 67:8 |
| 48:5,9 49:7 55:20 | 170:18 175:20 | 48:3 71:20,24 | 200:13 |
| 57:4 59:2 60:8,15 | 179:13 202:6,24 | 120:20 | **complexity** 238:8 |
| 65:24 66:14 69:13 | 202:25 203:8,9 | **community** 31:18 | **compliant** 202:20 |
| 70:17 71:13 73:18 | 215:24 216:1 | 33:6 35:20 36:7,8 | 203:10 |
| 76:22 81:11 83:17 | 225:12 238:18 | 36:15 37:9 44:14 | **complicit** 106:8 |
| 87:5 88:15,23 | 239:6 251:15 | 67:4,14,18 86:7 | **compliment** 154:5 |
| 93:23,25 115:14 | **command** 105:24 | 120:20 121:4 | 202:2,7,10 |
| 117:14 122:4 | **commandeering** | 151:25 152:1 | **complimentary** |
| 124:7 129:20,24 | 142:7 | 153:1,4,21 162:1 | 139:13 152:21 |
| 130:9 139:3 | **commended** 11:14 | 170:23 198:4,4,7 | **complimented** |
| 142:20 143:7 | **comment** 146:15 | 198:13,17 199:18 | 154:11 |
| 144:10 145:20 | 195:9 213:17 | 200:9 253:17 | **comply** 19:25 |
| 161:21 168:8 | **comments** 155:7 | **company** 148:21 | **complying** 40:24 |
| 169:15 176:6,15 | 184:16 | **compared** 7:24 | 41:3 |
| 179:19,22 181:23 | **commercial** 76:20 | **comparison** 32:20 | **comprehensive** |
| 182:1 183:23 | 158:17 | 44:19 | 28:23 |
| 184:6 193:1,6 | **commission** | **complain** 86:5 | **compromised** |
| 195:8 204:2 | 138:23 | 94:23,24,24,24 | 164:7 |
| 205:21 206:12 | **commit** 28:15 | **complaining** 86:7 | **concept** 126:8 |
| 208:19 211:5 | **commitment** 18:4 | 242:6 | **concern** 11:23 |
| 217:3 232:11 | 18:11,16 58:2 | **complains** 94:23 | 14:3 34:8 37:13 |
| 242:10 249:23 | 110:11 167:1 | **complaint** 54:6 | 39:7 46:9 53:17 |
| 251:12 261:18 | **commitments** | 55:18 193:25 | 63:4,18 64:10 |
| **comes** 47:8 80:9 | 111:7 | 241:21,22 | 65:2,6 67:21 |
| 103:19 135:24 | **committed** 28:6,8 | **complaints** 61:1,4 | 123:1 153:1 |
| 146:2 149:15,21 | 40:12,13,13 44:1 | **complement** 51:5 | 182:14 187:23 |
| 149:25 150:12 | 104:17 | 65:25 73:20 83:18 | 188:22 189:4 |
| 173:20 200:23 | | 83:20 84:1 | 190:15 198:14 |

Page 11

[concern - coordinated]

199:8
concerned  11:1
  17:13 22:15 37:17
  39:15 48:2,3
  54:10,11 63:6
  73:12 103:23
  134:17,23 135:3
  140:18 146:17
  161:9 165:6
  173:24 186:17
  193:24 225:13
  231:10 243:16
  251:2 252:7,24
  256:8 261:12
concerning  20:22
  141:5 208:12
concerns  98:16
  157:17,18 161:17
  162:18 164:6,8,17
  200:3 221:2
conclusion  33:1
  100:19
concrete  153:20
concur  204:4
condition  77:18
conditions  22:24
  106:9 199:16
  212:10
conduct  48:21
  105:1
conducted  104:18
  105:14 189:5
conducting  185:23
conference  1:13
  142:19 183:24
  204:3 257:20
confidence  39:22
  39:25 68:23
confident  26:23
confidential
  190:14

conflict  21:15
confront  36:25
confused  142:25
  215:11 236:22
confusing  224:11
  245:19 256:22
confusion  186:13
  215:12
congratulations
  16:6 24:21 151:10
connect  163:5
connotations
  35:17
consequence
  133:10 167:7,8
consequences  91:6
  167:14
consequential
  251:15
conservatorship
  75:6 78:3,6,13,16
consider  158:6
considerable
  253:16
consideration
  19:23 194:4 203:2
considering
  157:22
consistently  11:11
  93:1 164:12
constant  166:18
  252:7
constantly  140:10
  181:16 255:9
constituents
  249:16
constitutional
  59:11,16,18 60:2
  133:2 165:22
  167:5

constitutionality
  59:23
construction
  102:17 142:11
  145:6 148:18
  160:22,25 238:18
consumption  69:1
contact  35:5 79:6
  79:20 80:8 110:14
  110:19 117:1
contacted  115:17
  237:17 251:21,24
contacting  245:5
  245:11
contempt  17:4
  37:19 40:16 41:1
  69:14
contend  30:13
context  26:14
  102:9
continue  28:15,19
  31:20 44:22 58:1
  75:10 90:9 101:6
  102:21 110:11,12
  120:18,18 136:19
  166:18 171:9
  173:15,17,19
  191:19 203:21
  254:1
continued  3:2 4:1
  11:6 45:2
continues  170:22
  173:13 197:4
continuing  171:6
  208:7,18
contract  13:25
  230:22,23 231:9
contracted  258:25
contractors
  219:21

contracts  211:12
contradiction
  226:23
contribution  44:8
control  32:18
  54:21
conversation  8:23
  24:3 25:2 33:18
  57:2 59:5 63:14
  68:7 73:18 98:17
  102:6 104:10
  106:15 110:6
  114:10 118:12
  120:14 130:6
  197:7 201:4
  241:14 252:1,6,7
  252:13,17 255:18
  257:21
conversations
  13:21 19:6 24:25
  61:13 105:11
  106:20,24 120:9
  178:21 187:2
  215:18 218:1
  251:23 255:22
converse  77:2
convert  213:21
converted  156:10
converting  213:18
convey  8:12 11:7
  82:6 228:24
convoluted  16:12
cooperating
  117:15
cooperation  77:19
  86:8 95:16,16
  100:12 126:13
  138:12 246:18
coordinate  94:9
coordinated
  245:20,23

Veritext Legal Solutions
866 299-5127

[coordinating - countryside]

**coordinating** 104:10 105:11 106:12
**coordination** 82:3 87:16 119:23 120:13 246:13,18 258:12 259:8
**copied** 223:4
**copies** 223:5,8
**cops** 63:8
**corbin** 61:11
**corner** 72:24
**corners** 29:13
**corona** 217:20
**coronavirus** 144:19
**coroner** 222:19 223:11
**coroner's** 7:18 198:2
**corps** 104:8,16 172:9
**correct** 12:3 17:15 17:16 39:2 81:3 103:7 111:5 116:15,17 180:23 211:18 213:7 214:3 233:19 264:10
**correctly** 161:15
**corridor** 90:19 94:17
**cost** 46:22,24 47:1 102:18 142:11,12 148:23 149:25 150:25 153:14 155:19 214:13
**costa** 129:10
**costly** 136:11
**costs** 21:12 141:6 148:17,18,18,19

149:11 194:15 214:10,14 237:12 241:4
**council** 3:16,17,18 3:19,20,21,22,23 3:24,25 7:6,7 8:10 9:3 10:21 11:2 18:2 20:25 23:15 27:13 28:6 35:4,6 35:7,8,9 36:20 37:18 40:24 41:2 41:3 52:5 58:7 66:23 67:15 90:1 98:24 119:20 120:10,24 122:14 129:3 143:8,8 146:1 148:4,4 155:11 158:3 159:21,22 164:19 164:20 182:15 185:24 186:3 187:7 196:5,11,12 196:22,23 197:19 203:25 204:1,2 229:8 233:16,17 234:1 235:19 246:5 248:10 249:15 251:3 253:5 259:4,6,11 259:12
**councilman** 49:11 49:18 52:12 69:19 69:23 82:12,17,18 85:5,22 109:4 118:15 119:14,20 120:24 143:22 144:8 146:10 154:18,18,24 158:22 159:3,9 197:3

**councilmember** 25:3 34:17,21 38:7,12,18 39:1,12 39:21 40:2,4 41:4 41:7,11,20,24 42:11,17,23 43:3 43:10,18,24 44:5 45:10 47:12,21,25 48:6,12,25 54:17 60:12 64:9 65:16 65:19 70:12,25 71:18 72:12,21 81:13,17,21 82:13 83:10 84:3 85:7 85:19,25 87:6,22 89:1,22 91:12 92:15 94:2,7 95:4 95:11 97:2,5,9 98:10,20,25 99:3 99:10 103:7 104:1 109:5 110:2,15,18 110:24 111:3 112:17,23 113:4 113:19 114:9,12 114:19,24 115:2,5 115:10,18,22 116:13,18 117:6 121:8,12,25 123:8 123:12 125:7,10 125:14,19 126:1 126:25 127:2,9,12 127:20,24 128:4,7 128:9 129:14 130:1,19 133:21 134:1,4,13 135:15 135:25 136:8,14 136:17,25 137:4,7 138:22 139:4,7,10 139:18,20 141:8 141:12,15,22 142:14 143:13

144:9 146:5,8,14 146:24 147:12 148:2,16,22 149:3 149:7,14,24 150:7 150:10,19,22 151:11,21 152:12 152:16,22 153:10 153:25 154:8,12 154:21 155:1,4,9 158:24 159:11,14 159:18 160:4 163:21,24 166:14 167:20 169:8,13 169:20 170:2,6,13 172:8,23 174:19 174:25 175:3,12 178:19,23 179:2,5 179:11,16 182:8 182:12,22 183:5 253:6 255:25
**councilmembers** 119:19
**councilmen** 135:6
**councilperson** 40:19
**councilwoman** 110:17 170:5
**counsel** 10:12 11:7 13:19 82:25 86:9 97:23 197:11 223:13 240:2 263:10,13 264:12
**counsel's** 239:24
**count** 8:4 18:17 27:12
**counted** 18:12 239:21,23 240:17
**country** 8:17 200:18 202:6
**countryside** 183:22

Veritext Legal Solutions
866 299-5127

[county - court]

**county** 3:4 7:22 9:24 12:7,20 14:5 15:5,22 19:18,21 20:2,5 25:23 32:8 43:8 49:23 54:11 55:2 56:22,22 58:18 64:18,20 69:4 71:13 74:19 76:7 78:8 84:9,11 85:11 93:10 99:24 103:5 109:21 110:10 111:16 117:13 118:4,8,20 118:23,24 119:24 120:5 121:1 122:11 126:15,18 127:13,14 129:5,9 129:9 130:5 131:14 138:14 141:22 142:2,9,21 163:19 168:20 172:6 182:2,13 187:3 188:18 189:2 190:16,19 190:21 191:8 192:17 194:21 199:3,4,18 203:1 205:25 206:3 207:1 208:2 209:12 210:4,14 210:16 214:7,10 215:14 216:20 217:19,21,25 218:2,11 219:4,9 219:14,19,19 220:10 221:4,25 222:7 223:12,20 224:3 225:3,7 226:1,6 227:2 228:4,12 230:7,12 231:3,8 234:5,7

235:6,6,7,12,22 236:2,3,4,23 237:1 237:15,22 238:14 239:15,21,24 240:2,8,8 241:25 243:21 244:6,11 244:25 245:6,12 245:13,14,24,25 246:17 247:3,22 256:21 258:9 259:1,15
**county's** 21:4 108:24 195:12 218:7,13,17 226:18
**couple** 7:13 10:9 51:10 61:9 105:8 113:2,9 117:11 121:9 124:19 137:23 144:14 155:15,22,23 158:11 161:8 174:16 175:15 184:16,18 201:25 202:14 260:7
**coupled** 19:20
**courage** 43:9
**course** 16:15 17:3 31:8 37:18 64:10 82:25 86:9 107:15 115:19 123:15 131:23 137:8 143:5 148:18 161:1 166:19 167:4 171:20 177:22 206:19 225:2 231:3
**court** 1:1 6:24,25 7:5,5 8:6 9:6,7 10:5 12:23 13:1 13:17 14:18 15:7

15:16 16:11 17:11 17:18,23 18:1 19:2,14,16,19 20:4 20:20 22:6,13 23:4,21 24:2,14,16 30:24 33:16,19,21 34:3,6,12,15,19,22 35:21 36:4,22 37:6 38:10,16,19 39:3,13 40:3,7 41:5,9,13,22 42:8 42:12,21,25 43:5 43:14,23 44:4 45:6,14 47:6,14,23 48:4,8,14 49:2,6 51:25 53:7,23 54:10,18 57:6,14 57:18,20,23 58:4,9 58:15,17,20,25 59:8 62:15,20 63:5 65:11,18,21 66:7,10 67:15 68:3,15 70:24 71:2,15 72:8,13,23 73:3,8,17,25 74:4 74:6,9 75:23 76:2 76:12 77:10,15,17 79:3,10,19,22 80:2 80:20 81:5,16,19 81:23 82:1,10,14 83:11,23 84:5 85:8,20 86:3,12,16 87:20 88:14,19,21 88:23 89:5,11,16 89:20 91:11 92:6 92:16 93:18 94:3 95:3,10,14 97:4,7 97:10,17 98:5,13 98:21 99:2,5,8 103:4,8 107:6,7,14 107:23,25 108:19

109:7,17 112:1,5,7 112:10,15,20,25 113:18 114:7,10 114:13,20,25 115:3,8,12,20,24 116:3,14,17,20 118:11 119:22 121:6,11,24 122:21 123:9,13 125:8,11,17,20 126:16 127:1,6,10 127:19,22 128:1,5 128:8,21 129:15 130:18,22 133:22 134:2,5,11 135:5 135:18 136:1,9,16 136:24 137:3,6 138:21 139:1,5,8 139:11,19,22 141:11,14,21 142:13,16 143:5 143:15,18,22 144:2 146:3,7,13 146:23 147:7,13 148:15,20,24 149:5,8,23 150:4,8 150:16,21 151:3 151:12,16,18 152:10,13,18 153:9,24 154:5,10 154:13,17,23 155:3,6 158:22 159:2,7,13,16 160:3 163:13,18 163:22 165:14,18 166:1,16 167:15 167:22 168:3,7,12 168:16,21 169:3,6 169:12,14,16,18 169:22,23,24,25 170:4,12 172:6,22

Veritext Legal Solutions
866 299-5127

**[court - david]**

174:14,23 175:2,8
175:14 176:4,13
176:19 177:22
178:22 179:1,4,10
179:12,17 180:14
180:17,19 182:1
182:11,17,24
183:6 184:4 185:8
186:10,14,18,19
186:22 187:8,19
187:22 188:1,4,19
188:23 189:6,7,10
189:16,18,24
190:5 191:2,19,20
192:22,25 193:4
193:14 194:4,8
195:22 196:2,8,24
200:17,22 201:2
201:24 202:21
203:2,11 204:10
204:15,24 205:17
205:18,20 206:17
206:25 207:6,10
208:6,22 209:9,15
210:7,12,23
211:13,19 212:8
212:14,17,22,25
213:5 214:4,19,23
218:4,19,23 219:1
220:4,5,7,9,13,19
220:22 221:6,9,15
222:1,10,15,21,25
223:3,6,15,18,22
223:24,25 224:4,7
224:14,17,21
225:1,4,10,22
226:11 227:14,19
227:22 228:5,8,21
231:15,17,21,24
232:2,6,20 233:1,6
233:11 234:13,14

235:10,14 236:18
237:3,6 238:5
239:5 240:4 241:6
241:18 242:9,12
242:17 243:4
245:8 246:22,24
247:2,5,7,10,17
248:4,6,8,16,25
249:4,6,11,18,21
249:25 250:1,15
250:17,19,23
251:6,8,12,21,24
252:4,9,16,18,19
253:12 254:9,13
254:20,24 255:1,3
255:7,12 256:7,12
257:5,10,14,19,22
259:20,22 262:1,3
262:7
**court's** 10:15
   11:23 19:23 67:21
   186:4 260:16
**courtesy** 10:25
   35:9
**courtroom** 25:16
**courts** 34:6
**cover** 21:12 213:9
   214:15 216:19
**covered** 257:9
**covid** 8:2,6 11:16
   26:17 30:16 93:22
   148:8 174:18,20
   217:22 221:14,17
**create** 161:22,22
   242:24
**created** 36:21,25
   38:3,4 90:18
   184:16 187:21
   204:16 237:24
   238:25 258:8

**creates** 179:8
**creating** 28:7
   160:20 245:2
**creation** 206:1
**creative** 26:4
**creativity** 43:10
**credibility** 83:9
   130:9 227:15
**credible** 180:10
**credit** 129:16
**criminalization**
   68:9 252:11
**crisis** 149:20
   161:24
**critical** 45:2
   141:16 152:14
   253:4
**criticism** 19:11
   35:22
**criticized** 131:23
**cross** 117:1
**cruel** 192:21
**cruising** 182:21
**csr** 1:24 264:22
**cue** 36:2 48:16
   49:4 196:16
**culturally** 30:24
**culver** 113:15
   115:4,6 117:1,4,8
   117:10,12,15
   118:13,17,18,21
   119:2,16,25 120:1
   120:11,15 121:15
   121:17
**culverts** 64:20
**curious** 123:6
**curren** 3:23 18:6
   49:12 72:9 81:23
   81:25 82:1,18
   83:7,25 87:3
   89:20 92:8 97:1

98:4,5,15,19
   109:12 135:7
**curren's** 175:1
**current** 30:1 40:1
   43:19 44:20,23
   45:5 144:15
   157:23
**currently** 44:6
   88:10 89:23
   157:21 160:24
   170:16 171:8
   173:10 174:6
   217:10,17
**curtis** 98:7
**custody** 66:12
**cut** 15:8 18:8
   149:20
**cutting** 29:13
**cv** 1:7

### d

**d** 6:6 199:22
**dale** 204:20
**danger** 104:7,25
   106:4 173:24
**dangerous** 260:8
**data** 27:12
**date** 1:15 16:24
   50:16,17 54:6,14
   54:16 62:1,9
   104:19 124:14,14
   124:15 171:1
   259:11,12
**dated** 19:21
**dates** 261:16
**daughter's** 35:15
**dave** 33:1 99:11
   106:14 109:6
**david** 1:17 3:25
   129:3 143:17,20
   143:20 198:1

[dawson's - different]

dawson's 49:13
day 8:2,9 11:24
  27:19 29:12 31:10
  44:24 48:22 52:25
  61:23 69:25 75:21
  75:22 78:2 103:15
  105:15 109:8
  122:4 133:12
  142:5 162:23
  177:13,15,23
  188:20 197:21
  228:11 254:17
  264:14
days 52:1,1,19
  78:5 80:5,24
  85:13 111:12
  124:19 199:9
  202:14 257:24
de 3:19 23:17,22
  24:20 25:3 34:17
  34:21 38:7,12,18
  39:1,12,21 40:4
  41:4,7,11,20,24
  42:11,17,23 43:3
  43:10,18,24 44:5
  45:10 47:12,21,25
  48:6,12 195:14
  196:11 197:11
  203:25
dead 71:4 81:6,8
deadline 55:9,11
deal 31:23 72:2
  100:16 117:20
  211:6 220:18
  223:20,21 224:7
  225:7,7,16 228:15
  234:24
dealing 56:13
  87:13 203:9
dealings 84:9

dealt 55:11
death 8:18 22:15
  23:6 37:14 45:8,9
  71:10 92:19 127:7
  143:12 147:16
  166:9 183:10
  198:6,8
deaths 7:21,23,24
  8:1,7,8 81:2 93:19
  136:13
debris 90:14 94:16
  111:11,14
decades 20:7 42:5
  254:8 260:20
december 195:11
  195:14
decency 183:15
decide 217:1
decided 35:5
  46:18 50:5 61:10
  135:21
decimated 32:7
decision 28:14
  75:11,22 130:15
  201:8,17,20
decisions 84:25
  85:22
deck 32:6
decreased 96:20
dedicated 42:3
deduct 69:8
  242:11
deducting 242:2
deem 219:20
deemed 226:5
deep 82:6 164:8
deeper 126:9
deeply 37:17
defecating 78:20
  183:4

defendant 2:19
  3:4
defendants 1:9
defer 211:10
define 31:14
defines 74:16
definitely 30:6
  111:22
definition 74:21
  212:7 237:24
degradation 8:18
degrading 22:24
dehumanizes
  248:22
delay 23:23
  102:17 145:6
delayed 100:15
deliver 161:24
delivering 236:25
demanded 37:15
demolish 157:23
denigration 37:5
departing 182:7
department 34:1
  36:6 66:9 73:6,11
  75:15 105:5 119:5
  144:21 178:25
  222:8,11,12,17,18
  222:19 234:25
  243:11
departments
  221:4
depraved 183:14
deputies 46:17
deputy 46:17
descend 75:12
describe 60:11
  64:4 79:10 80:3
  81:2 118:12
  123:16

described 62:5
  126:3
describes 115:20
desert 29:1
deserved 83:24
design 240:20
designated 25:21
  40:20 140:22
designed 125:3
  131:25 210:25
desire 137:17
  218:13
desperate 190:20
  191:5
desperately
  232:10
despite 190:24
destination 230:1
  244:7
destroy 165:11
determination
  9:20,21
determined
  155:16
detox 50:3 77:4,12
  79:18,18 133:15
  245:7
development
  156:9 160:22,24
devoted 50:15
dhs 244:25
di 242:18
dictate 191:13
die 92:20,23
died 8:3,5 198:6
dies 173:2
difference 31:4
  62:2 227:22
differences 31:9,9
different 22:20
  23:1 35:17 44:10

Veritext Legal Solutions
866 299-5127

[different - domain]

48:23 105:18 124:17 133:6 138:1,14 150:23 152:9 172:10 185:11 196:20 200:2 236:21
**difficult** 20:16 75:12 158:19 197:14,17 255:21
**digital** 263:7
**dignity** 31:18 110:7
**diligently** 101:4
**direct** 16:15 198:15 219:18
**directed** 17:20
**directing** 220:10 235:11 236:2,3,4
**direction** 264:8
**directly** 18:2 71:22 110:14 188:13
**director** 85:2 89:4 89:6,9,10,11 97:22 107:13,14,22,24 162:22 223:1 226:15
**disability** 74:22 75:3
**disabled** 162:1
**disagree** 19:14
**disagreement** 13:5 21:10 131:3 238:9 241:15
**disagreements** 69:22
**disappear** 43:13
**disappeared** 240:16
**disappointing** 161:14

**disappointingly** 100:10 102:8
**disbelieve** 67:13
**disbursed** 126:9
**disclose** 193:11
**disclosed** 73:16
**disclosing** 129:23
**disconnect** 178:13 179:25
**discount** 180:6
**discouraged** 140:9
**discovered** 102:22
**discrete** 254:16
**discuss** 17:5 52:13 240:3 241:17 247:25
**discussed** 15:12 243:21
**discussing** 86:19 165:25
**discussion** 15:4,20 52:5,9 56:1 68:1,2 87:4 98:15 103:24 124:3 130:24 146:9 165:24 167:16 195:19 239:10
**discussions** 12:12 13:6 14:2 118:16 129:21,23 161:20 164:21 251:6
**disgraceful** 23:10 70:7
**disoriented** 80:25
**dispensation** 138:20
**displaced** 64:18 126:9
**disposal** 21:4
**disprove** 50:21

**disputes** 20:6
**disregarding** 114:4
**disrespectful** 106:3 248:19 249:2
**disruptive** 32:2
**disservice** 165:11
**district** 1:1,2 24:23 25:12 26:19 27:10,13,23 35:7,8 35:12 38:3,4,11 41:2 49:11,12,13 49:13 60:15 61:6 71:22 72:6 87:11 87:24 92:14 95:13 97:1,6 99:20,21 100:2 104:2 105:18 106:7 113:13 114:1,15 114:23 122:2,16 123:11 129:3 136:20 138:1,14 138:18 143:8 144:15 146:2,20 154:7 155:11,11 155:12 158:19 159:22 160:7 162:21 163:3 170:10 174:10 175:1 176:21 177:2 185:24 186:3 187:7 229:8 233:16 234:1 235:19 259:4,6,11 259:16
**districts** 233:17 259:12
**disturb** 261:9
**ditches** 64:19

**diversion** 40:14 71:9 167:12,13
**divert** 195:15
**diverted** 41:10
**division** 1:2
**divvied** 195:3
**dmh** 64:1 232:11 234:8 244:25
**dmts** 243:11
**doc** 1:7
**docket** 18:23 185:11 261:21
**doctors** 244:22
**document** 13:9,11 13:12,21 224:2
**documented** 106:1
**documents** 14:18
**dog** 83:3 107:18
**doing** 25:15 31:13 36:17 64:21 84:20 88:4 96:14 98:11 104:12 108:4 111:17 113:5 114:5 130:19 137:24 140:12 149:17 151:22 155:2,14 165:10 171:8 181:9,10 228:7 229:15,15 229:16,17 230:6 241:7,10 256:21 258:17
**dollar** 136:2
**dollars** 30:1,9,10 42:19 43:12,19,25 44:1 190:3,22 191:9 217:13,18 217:21,21
**domain** 22:8 157:22 158:4

Page 17

**[don - empty]**

| | | | |
|---|---|---|---|
| **don** 4:7 18:9 49:5 49:6 50:9 52:14 56:25 61:21 63:21 63:25 66:5 70:3 76:22 77:9 78:21 79:6,8,12,21,25 80:11 81:4,11 261:1 | **draft** 54:12,21 59:16,21 | **easily** 132:3 162:12 241:24 | 156:7 189:3 232:22 |
| | **drag** 67:3 | **eastern** 134:22 | **el** 26:7 161:2 |
| | **drainage** 64:19 | **easy** 15:17 184:4 241:19 | **elder** 157:5 |
| | **drawdown** 30:9 | | **elderly** 13:2 |
| | **drive** 28:4 35:16 35:18 84:18 | **echo** 74:10 183:18 253:8,11 | **elected** 197:11 249:16 |
| | **driven** 83:12 | **edison** 104:15,15 105:16 | **electeds** 117:12 |
| **donut** 136:3 | **drove** 125:17 | | **election** 30:4 |
| **door** 203:13 251:19 261:15 | **drown** 28:19 | **editorial** 184:11 | **electronic** 6:8,22 24:7,11 185:2,6 262:12 |
| | **drug** 167:13 221:17 | **educated** 133:7 | |
| **doorstep** 208:19 | | **education** 82:10 | |
| **dope** 51:10 133:24 | **dts** 76:21 77:1 | **effect** 54:5 | **eleven** 21:17 27:2 145:16 |
| **dorm** 199:10,11 199:11,12 | **due** 16:14 30:16 | **effective** 61:14 90:5 | **eligible** 211:5 |
| | **duly** 263:5 | | **elizabeth** 2:4 209:1 |
| **dormitory** 193:21 194:2 200:24 201:10,23 202:5 202:19 | **dump** 95:24 | **effectively** 125:1 | |
| | **dumped** 81:7 | **efficiencies** 149:17 | **ellie** 4:11 21:21 82:22 |
| | **dumping** 255:17 255:20 | **efficient** 31:13 155:17 | |
| | | | **email** 107:17 218:22,23 219:20 224:17 |
| **dotted** 225:8 | **dumpings** 94:17 | **efficiently** 51:15 | |
| **double** 16:4 100:8 201:13 202:19 | **dumpsters** 253:24 | **effort** 11:13 49:10 50:9,22 55:17 75:19 83:19 84:4 87:7 90:5 99:22 100:13,17 101:3 101:11,15,19 104:13 105:13 106:12 170:16 171:13 172:19 197:13 248:22 260:4 | **embarrassed** 183:8 |
| | **duplicate** 118:24 119:12 | | **embarrassment** 46:16 |
| **doubt** 37:22 | | | |
| **download** 9:24 12:22 21:15 194:20 201:6 203:8 209:25 242:21 | **dying** 71:5 | | **emergency** 8:24 81:7 138:20 149:20 213:13 261:11 |
| | **dystopian** 27:25 32:21 | | |
| | | | |
| | **e** | | |
| | **e** 2:1,1 3:1,1 5:1 6:6,6 79:24 | | **eminent** 22:8 157:22 158:4 |
| **downloaded** 200:24 201:22 202:18 216:18 | | **efforts** 11:12 50:4 74:17,20 91:24 100:1,2 101:6 120:12 173:3 | |
| | **eager** 60:19 | | **emitchell** 2:7 |
| | **earlier** 62:6 113:6 127:16 165:19 171:17 186:23 190:2 203:24 209:5,12 | | **emotional** 80:12 |
| **downloading** 195:10,13 | | **egress** 92:18 | **emotions** 80:11 |
| **downloads** 14:25 | | **eight** 180:5 206:11 | **employed** 263:10 263:13 |
| **downtown** 160:16 196:21 | | **either** 20:1 30:2 33:5,9 100:14 113:21 115:22 116:3 147:9,9 | |
| **dr** 124:2,5 125:2 127:24 128:18 139:2 141:1 222:24 | **early** 25:21 35:6 91:18 96:15 156:16 177:2 220:17 246:6 | | **employee** 263:13 |
| | | | **empty** 140:17 157:13 |
| | **easier** 147:3 | | |

Veritext Legal Solutions
866 299-5127

[enabling - existing]

enabling 100:14 106:9

encamped 106:5 107:2 213:10

encampment 51:3 52:18 100:23 101:18 115:6 139:9,15 140:1 142:6 156:4 163:1 163:2 254:18 255:20 256:17

encampments 49:18 50:14 52:7 59:9,20 61:3 62:23 90:21 129:13 162:9 164:1 167:3 219:14 226:17 248:15 253:18 255:15,19

encapsulate 213:25

encompass 213:16

encourage 197:5

ended 38:23 62:12 72:13

ends 235:23

enforceable 13:25

enforcement 18:24 19:3 53:2 55:12,24 56:4,7 62:25 68:8 86:25 122:24 123:2 126:21 130:13 135:17 181:17 200:7 219:15 228:14,18 252:8 260:1,5,7,10

enforcing 132:24 172:16

engage 114:8 252:15,17 254:25 255:3,14

engaged 75:20 76:1 99:23 104:9 106:12,23 117:9

engagement 100:6 100:9 119:2 120:15 230:6,15 246:6 258:14,17

engagements 102:15

engaging 74:13 245:25 251:5,23 251:25 252:13 256:16

engineers 104:8 172:9

enriching 41:22

enrique 83:16,17 84:19 86:19 108:4

ensure 62:21 119:8 121:2 162:4 217:7,11,14 246:16

ensuring 120:1 258:13

enter 86:21 143:1

entered 225:5

entertain 19:19 161:10

entire 27:15 76:7,9 106:6 115:6 190:19

entirely 196:20

entities 31:25 69:24 232:11

entity 189:12 201:2,3,16

envelope 32:2,3

equal 10:2 26:18 26:22

equally 102:10

eric 8:22 45:22

ernie 66:4 78:20 78:20 79:23 232:7

errings 22:21

error 48:24

es 263:4

escrow 138:9

esg 217:18,21

especially 7:7 16:16 47:18 158:19

essential 162:3 245:23

essentially 134:18

establish 94:8 95:8 162:3,8,14

established 171:1 226:4

estimate 51:23 153:14

et 1:8 6:15,16 13:9 18:3 20:23 52:23 53:2 86:24,25 128:25 142:21 237:17

ethical 42:14

ethnicity 201:14

evacuate 106:6

evening 7:9 47:16 63:3

eventually 9:23

everybody 11:13 22:18 36:18 54:2 86:20 95:22 106:13 108:20 109:21 111:24 116:10 118:6,10 131:24 134:18

135:8 155:2 173:1 192:6,8 199:4 203:1 205:7 206:20,22 236:25

everybody's 184:2

evicted 30:17

eviction 30:12

evidence 225:15

evil 140:21

exacerbating 208:7

exactly 84:8 179:4 212:4,23 213:20 215:6 230:22 231:10 245:16

examiner 222:19 223:11

example 51:2 74:21 193:3,10,14 232:12 244:21

exceedingly 60:16

excellence 152:19

excellent 83:13 84:1,2,20 125:18 184:7 204:14

exception 260:25

exceptions 35:11

exclusively 32:13

excuse 36:23 83:1 83:6 103:20

excuses 22:6

executed 264:14

executive 30:8 222:20 223:12,13

exist 86:1 141:20 191:17 199:24

existed 75:17

existence 30:2

existing 15:10,18 43:19 142:3 219:5 219:8 238:6 240:7

Veritext Legal Solutions
866 299-5127

[exited - fencing]

exited  80:13,15 206:24
exiting  191:25 192:8 206:15
exits  191:22 205:16
exorbitant  141:6
expand  30:10
expect  75:13 181:3 194:3 202:21 203:12 205:3 208:15 211:3 221:14 233:5,8
expectancy  96:21
expectation  13:23
expected  12:23 68:17 82:25
expecting  208:6
expense  22:16
expensive  195:11 195:13
experience  47:18 95:21 175:19
experiencing 25:13 55:1 219:7 219:10,11 221:24 230:25
expertise  234:10
explain  85:9,21 103:13 108:11
explanation  71:6 93:23
exploring  75:2
exposition  158:10
expressed  34:8 196:19
extend  39:24
extensive  100:6 222:4
extent  29:22 246:2 252:21

extra  148:5 189:4
extraordinarily 38:20 63:11
extraordinary 25:15 27:7
extremely  9:7 42:2 142:22 197:14
eye  7:17 94:10
eyes  180:20

**f**

fabian  1:23 6:9 263:2,20
fabricated  25:25
fabulous  77:11
face  193:14 194:8
faced  126:8
facetiously  67:10
facilitate  100:11 129:4
facilities  101:1 159:22 173:7 226:3,3 238:2,3
facility  21:15
facing  91:7 118:19 190:16 194:24
fact  20:13 23:9 26:4 31:15 32:3,3 36:14 40:17 87:23 95:6 100:19 101:23 104:6,12 104:24 126:5 137:10 143:1 147:24 178:11 192:6,8 197:22 250:19
factor  141:5
facts  30:21
faculty  157:12
fail  19:24
failed  132:11

fair  41:5 109:2 138:21
faith  13:24 16:13 20:5,8 68:16 106:13 140:7 178:15 179:14 181:11 242:19 247:20,23 259:23
fall  108:22,24 211:4 242:18
falling  232:17
false  240:6
familiar  171:20 210:18
families  91:23,23 145:4 156:11 164:7 261:22
family  32:10 61:15 61:20 64:16,22 65:2 101:5 154:25 156:9 166:13 175:11 244:19,23
fan  87:21
fantastic  159:18 246:11,23,24
far  10:25 23:10 28:25 38:3 40:14 57:25 61:3 68:11 87:17 103:22,24 106:16 129:16 156:8 173:5,7 175:4 186:1 229:1 231:9 260:12 261:12
farrah  4:7 50:9 78:24
fashion  53:15
fast  71:8 72:3 142:10 145:7 151:7 166:7 194:7 203:18 241:2

faster  46:8 147:4
fathers  135:20
fault  77:20,21
feasibility  27:2
feasible  206:21
february  145:6,23
feces  165:2 256:1 256:3
federal  15:6 32:9 33:21 34:3,6 36:22 43:22 44:11 145:19 156:24 157:2 172:10,19 189:16 236:14
feeble  13:2
feed  44:22
feeding  140:2,20
feel  25:1 26:22 92:22 161:20 164:8 198:17 219:20
feels  32:12
feet  12:6 14:13 22:11 82:20 86:23 145:24 211:25 213:10 258:15
feigned  178:11
felicia  124:7
feliz  144:13 175:1
fell  15:18
felt  57:16,24
fema  8:23 11:17 203:16
female  73:1,5 168:20 176:3 180:12,16,18 204:23 218:25
fence  90:15 123:15 134:17,23 139:24
fencing  125:3,3,9 125:13,22 135:4

[fencing - forget]

164:6
**ferrer** 222:24
**feuer** 124:4,18
  225:14
**fiber** 134:16,24
**field** 211:10
**fifth** 36:12
**fight** 157:25
**fighting** 76:11
  93:12 200:15
  254:8
**fights** 51:22
**figure** 119:15
  150:23 157:3
  171:10 173:17
**figures** 47:8
  146:25
**file** 185:15 257:24
**filed** 185:21
  186:11 228:20
**filing** 190:25
**fill** 14:22 83:8
  141:5
**filled** 15:24 17:18
**final** 53:19 58:4
  124:15 218:6
**finally** 29:6 48:1
  100:18 161:23
  162:17
**financially** 120:15
  263:14
**financing** 12:8,21
  16:10 212:1
**find** 14:15 40:23
  42:8,9 49:18 53:3
  66:16 69:14 76:24
  78:7 80:22 108:11
  111:21 151:7
  157:1 171:12
  173:11,16 174:4
  225:20 251:7

**finding** 50:3 56:15
  109:22
**findings** 17:4
**fine** 24:17 99:4,4
  109:6 214:4
  236:24 259:19
**fingers** 105:20
**finish** 181:20
  221:2 224:20
  231:19
**finished** 98:14
**finite** 29:25 42:20
  42:24 43:12 47:7
  140:25
**fire** 39:10 84:9
  90:21 103:6,16,19
  104:7,25 105:4,5
  106:4 109:20
  115:11 134:20
  172:25
**fires** 98:20,21,22
  172:4,24 173:5
**firm** 130:2
**first** 7:12,15,23
  14:13 16:3 18:6
  20:9 22:19 23:15
  23:22 25:4,14,18
  33:16 35:2,3,10
  45:23 49:20 55:14
  60:19 67:24 70:14
  72:14 73:20 75:4
  79:4 80:19 91:14
  92:19 99:13 104:4
  105:20 108:21
  113:5 114:13
  115:16 123:14
  124:1 126:2 131:8
  133:3 136:12
  147:15,15 155:10
  160:14 166:6
  175:9 184:20

185:14 189:13,22
  189:22 191:17
  193:22 194:16
  196:5 203:3,4,6
  206:10 207:1
  214:1 220:6,15
  224:15 248:12
  249:8 252:3
  254:17
**firsthand** 87:12
**fiscally** 30:5
**fischer** 204:20
**fischer's** 205:5
**fit** 258:1
**fits** 23:3 37:15
  41:16
**five** 21:18 23:8
  44:12 52:1 104:19
  128:2,5 217:5
**flat** 15:23
**flaws** 45:4
**flexibility** 229:22
**fliers** 236:12
**flip** 9:23 55:23
  116:7 182:18
**flipped** 260:3
**flood** 173:25
**flooding** 172:4
**floor** 240:20
**flourish** 29:21
**flower** 3:11
**flowing** 140:7
**focus** 50:5 76:7
  140:25 233:25
**focused** 227:11
  233:18 234:11
  237:23
**focuses** 252:8
**foley** 3:10
**foley.com** 3:13

**folks** 9:14 12:22
  18:2 26:25 28:1
  31:5 36:16 44:10
  58:3 64:16 70:17
  77:7,18 82:6
  97:10 103:15,18
  104:20 119:16
  124:20 125:22
  133:11 140:15
  141:3 168:8
  173:14,17 174:4,8
  174:12 176:21
  198:16 201:22,25
  216:20 217:1,8
  229:8,9 230:15
  235:21 246:16
  253:17,18 260:8
**follow** 58:2 106:13
  106:18
**followed** 176:23
**following** 42:18
  43:25 111:12
  162:20 181:6
  182:13 215:20
  219:5 226:2
**follows** 59:9
**foothill** 101:16
**footprint** 245:24
**force** 156:6 221:3
  221:7 224:14
**forced** 34:7 143:4
  259:10
**foregoing** 263:3,4
**foremost** 25:4,14
**forever** 32:18
**forewarned**
  227:25
**forget** 160:17
  195:20 201:4
  261:3

[forgive - gentleman]

forgive 80:11
forgotten 68:3
fork 195:6
form 62:13 228:14
formed 20:8 35:21
  131:5 221:3
former 157:5
forth 26:11 65:14
  100:10 172:12
  250:7
fortunate 76:19
fortunately 94:12
forward 28:21
  47:18 56:20 57:11
  58:11 61:7,8
  70:15 90:9 110:12
  120:2,8,23 164:21
  167:5 193:1 217:1
  218:13 227:8
  229:6,8 233:15
  242:24 243:2
  246:12,21 249:20
  250:14 255:21
  257:3 258:12
  259:6,13
found 41:1 47:17
  50:25 57:5 142:22
  200:10 220:25
foundation 2:10
  55:6
four 8:1 21:22
  44:12 52:1 63:8
  101:17 133:6
  175:23
fourth 50:7
foyer 18:3,15
frame 26:24 31:9
frankly 9:8 12:22
  24:16 27:8 41:17
  41:19 42:9 50:19
  50:24 55:14 66:17

68:20 97:19 125:5
  129:16 133:7,13
  140:20 142:23
  147:19 188:1
  196:24 202:3
  215:19 231:8
  234:16 247:22
  251:15 256:10
freaking 231:2
free 25:25 70:6
  129:12 167:3
  219:20
freeway 12:5,18
  14:14 21:6,13
  35:14 49:10 64:7
  82:21 86:24 87:13
  87:16 88:8 92:11
  94:19 95:13 96:7
  96:10,18,20,24
  99:16,17 101:16
  101:20 105:10
  114:22 134:7,9
  170:23 171:4
  211:6,6,24 212:3
  213:11 214:1
  218:8 229:10
  242:22 253:7
  256:18 258:16
freeways 21:25
  26:16 27:23 61:24
  94:25 143:12
  145:24 186:3
  187:15 216:22
  217:23 219:8,11
  219:14,16 226:17
  227:9 234:12
frequently 198:2
fresh 9:17
friday 36:9 53:14
  195:19

front 119:1 176:22
  195:2,4 203:13
frustrated 118:21
  119:6 142:25
frustrating 95:5,5
frustration 118:22
  119:12 120:3,6
frustrations
  111:16
fu 133:20
full 118:22,23
  120:17 264:9
fullerton 54:22
  55:1,5 56:10
fully 149:21
  150:25 197:16
  241:11
fund 148:10
  190:12
funded 11:16
  30:19 219:9,15,19
  220:11 235:12
  238:25
funding 21:12
  117:25 154:2
  194:12 215:15
  216:19,25 217:3
  217:16,18 233:24
  239:19 240:9,16
funds 40:11,13
  41:10,15 71:9
  142:9 153:16
  189:23 195:16
  217:20
further 103:13
  129:2 258:2
  261:24 263:12
  264:11
future 30:7 125:21
  188:11 193:4,15
  202:16 203:18

fuzziness 258:7

g

g 6:6
gaby 162:22 163:3
gal 178:2,2 180:7
  232:8
galperin 22:16
game 234:20
games 135:12
gangs 90:20,25
garbled 236:22
garcetti 8:22 22:9
  45:20 116:6 149:5
garcia 29:3
gary 219:2
gas 158:13
gateway 160:6,10
  160:23 164:6
gather 220:5
gee 55:19
general 4:8 36:1
  48:15 67:5 74:8
  140:15 167:24,25
  168:4,6,11,14
  169:9 180:25
  190:12,15 192:25
  195:21,25,25
  196:4 197:9
  198:18 200:20
  201:1 203:4,22
  204:13 248:8,9,17
  249:1,5
generalizable 74:2
generalized 73:24
generate 193:18
generic 229:25
genius 132:5
gentle 130:11
gentleman 183:4
  183:12

Veritext Legal Solutions
866 299-5127

[george - going]

| | | | |
|---|---|---|---|
| **george** 77:9 | **glad** 66:18 113:7 | **goal** 23:9 26:10,13 | 100:21 104:20,21 |
| **germane** 38:8 | 222:6 | 26:20 28:8 31:5 | 105:9 106:13 |
| **getting** 31:17 32:4 | **global** 28:16 | 88:9 155:18 | 107:15,17 108:10 |
| 40:8 67:11 86:8 | 161:20 | 191:15 | 114:16,20 119:9 |
| 93:2 94:14 96:21 | **globe** 113:12 | **goals** 26:24 39:23 | 119:19 120:23,25 |
| 110:13 121:2 | 121:10 | 40:6 | 122:24 123:9 |
| 127:7 128:23 | **gloria** 4:4 89:8,14 | **god** 78:21,25 | 124:23,24 125:6,8 |
| 141:2,19 145:19 | 89:19 109:25 | 97:13 135:12 | 125:20 126:23 |
| 147:20 187:16 | 110:16,23 111:1,5 | 234:17 247:22 | 129:24 130:4,10 |
| 202:18 203:15,17 | 112:4 | **goes** 36:17 44:6 | 132:2 133:15,25 |
| 227:8 229:8 | **go** 8:11 13:13,17 | 76:21 85:8 96:1 | 134:6,8 141:18 |
| 232:21 235:21 | 18:20 23:15 26:9 | 142:4 226:7 229:1 | 142:18 143:8 |
| **gil** 49:12 72:10 | 26:12 28:20,21 | **going** 6:19 8:11,13 | 147:21,22 151:9 |
| **gilmore** 182:23 | 31:13 34:7 36:7,9 | 8:24 9:5,13,18 | 152:1 156:16 |
| **girlfriend** 51:9 | 36:22 43:11 49:20 | 10:8 11:3,4 12:3 | 157:16 162:15 |
| 62:6 | 51:9,11,16 56:22 | 13:21 14:2 16:14 | 166:2 168:23,24 |
| **give** 14:21 25:11 | 57:11 58:10 60:19 | 17:1 18:1,6,7,10 | 170:14 171:9,13 |
| 30:6 34:22 39:22 | 61:12 63:1 64:24 | 18:23,24 20:21 | 173:18 174:17,20 |
| 51:2,23 96:18 | 68:25 71:21 77:4 | 23:4,9,17 24:2,5 | 175:4,6,9 177:25 |
| 106:25 113:9 | 78:15 79:18 80:17 | 24:18,24 29:15 | 181:25 182:24 |
| 124:1 129:16 | 93:8,18 96:6,10 | 30:15 31:21 34:22 | 184:24 185:12 |
| 139:1 144:10 | 97:11,11 101:10 | 37:23 39:20,23 | 187:6 188:25 |
| 175:18 179:23 | 103:2 108:12 | 40:10,15,19,23 | 193:21,24 198:22 |
| 184:1 193:3 | 111:11 116:8,11 | 41:2,9,17 43:18 | 200:12 202:4,14 |
| 198:21 199:2 | 121:10 124:22 | 45:6,9,17,19 47:1 | 203:25 205:13 |
| 222:13 232:12 | 125:23 128:6,19 | 48:22 50:16,17 | 208:9,14 212:17 |
| 257:24 | 128:20 133:16 | 52:5,9 53:19 | 213:21 216:2,18 |
| **given** 32:24 75:15 | 144:1,4,22 148:14 | 54:14 55:10 56:9 | 216:19,21 217:9 |
| 80:9 100:6 106:8 | 149:1,2 156:22 | 59:2 60:3,10 | 217:12 218:1,2,16 |
| 122:11,12 134:20 | 160:2 162:13 | 62:17,19,19 63:9 | 230:12 231:6,24 |
| 177:18 178:5 | 166:19 168:15,24 | 64:4 65:9,14,22 | 232:8 233:25 |
| 180:5 181:13,14 | 169:11,13 170:14 | 66:8 67:19 68:4,8 | 236:24 237:3 |
| 187:21 197:12 | 181:21 187:18 | 68:9 69:12 70:14 | 239:8 240:21 |
| 229:7 242:19 | 193:21 197:6 | 71:8,12,15 73:7 | 241:23 243:7,13 |
| 249:11 251:1 | 199:20 202:18 | 76:13 77:23 78:14 | 243:18 244:13,17 |
| 256:8 | 204:16 206:16 | 79:15 81:11 82:15 | 245:22 246:5,17 |
| **gives** 130:16 | 216:12 220:7 | 82:21,22,24 83:18 | 246:21 249:21 |
| **giving** 58:20 | 232:4 244:23 | 85:3 86:21 87:3 | 254:19 256:3 |
| 136:12 147:13 | 248:11,20 249:3 | 90:4,8 91:16,22 | 257:3,22 258:13 |
| 180:1 234:14 | 262:7,9 | 93:23 96:9,14 | 261:6 |
| 256:25 | | 97:20 98:16 | |

Veritext Legal Solutions
866 299-5127

[golf - headlines]

**golf** 123:15
**good** 6:8 8:22
13:24 16:12 20:8
25:4,6,19 39:9
40:9 41:21,25
56:19 65:11,12
84:16 106:12
108:4 109:6
125:17,18 126:25
131:10 133:14
140:7 141:3 146:1
152:23 153:4,18
155:3 168:21
170:2,4 175:19
178:15 179:14
180:20 181:11
188:9 194:24
202:8 230:17
237:4,4 242:19
246:22 247:6,20
259:22
**goodbye** 168:19
**goodness** 80:23
132:10 169:15
261:2
**gotten** 66:8 68:2
155:21 201:18
221:13
**governing** 90:2
**government** 31:25
44:12 145:19
172:19 224:8
**governmental**
32:7
**governor** 11:21
97:21 112:2 175:6
**governor's** 106:17
106:19
**grab** 193:7
**gracious** 59:4 92:7
115:16 119:14

**golf** 169:1 170:1 182:7
**grading** 199:19
**grand** 94:13
**grandchildren's**
35:16
**graphic** 181:18
**grateful** 107:21,23
**grave** 64:10 65:6
74:21 75:3
**great** 28:2 36:18
39:7 69:1 100:15
118:16 124:2
137:18 143:10
144:9 146:3 160:3
170:12 183:9
187:15 206:17
**greater** 27:11
**greatly** 30:10
**greuel** 4:5 9:25
21:9
**grew** 131:20
171:18
**ground** 27:5
162:22 197:13
230:5,11,14 236:7
244:18 245:4
246:7 256:23
**grounds** 59:18,23
**group** 75:12 92:12
147:10,10 221:11
221:23 222:8
**groups** 42:3
**grow** 29:22
**growled** 108:10
**growling** 108:15
**guarantee** 136:2
**guarding** 32:12
**guess** 113:23
143:3 145:25
222:5 241:6

**guidance** 63:4
234:14 259:19
**guidelines** 126:11
182:14
**guiding** 54:12
**guise** 189:6
**gum** 211:20
**guy** 86:12 116:24
178:2,11 183:12
**guys** 98:11

**h**

**h** 5:1 43:6 119:7
217:21 225:25
229:4
**hacla** 138:4
**haggling** 93:12
242:14
**hahn** 138:13
**half** 68:24 85:13
100:24 106:6
115:6 117:8 134:8
191:7 214:10,15
221:21
**hall** 1:18 6:17 25:7
32:22 34:14 143:3
182:7
**hamburger** 93:13
**hand** 38:9 39:15
130:11 184:4
223:24 224:20
**handed** 204:19
**hands** 32:6 41:16
41:17 93:6 165:6
**hang** 167:23
**hanging** 30:3
**happen** 11:25
29:22 52:10 62:21
68:4 120:13
192:18 217:9,11
**happened** 20:18
64:2 69:3 79:11

79:23 80:2 83:3
102:7 103:14
105:19 132:5
187:2,7 201:8
202:13 257:2
**happening** 53:9
103:11,16 107:7
153:22 175:16
183:19 187:24
191:14 192:11,12
194:11 207:25
216:6 233:21
234:16 235:23
256:11,18 257:1
**happens** 80:10
192:13 202:16,17
**happy** 33:14 42:13
92:2 102:4 113:10
144:23 159:25
227:10 231:14
**harbor** 160:6,10
160:23 164:5
**hard** 54:3 76:7
90:16 94:21
108:10 155:12
159:24 200:15
215:19
**harm** 261:6
**harshness** 59:17
**hat** 30:3 86:6
**hate** 165:3
**hazard** 39:10
**hazards** 84:10
161:10
**he'll** 47:15
**head** 32:5 83:2
160:18 225:19
**heading** 17:3
37:18 143:4
**headlines** 71:3

Veritext Legal Solutions
866 299-5127

[heads - homelessness]

heads 66:1 209:13
health 73:7,11
  75:15 76:8 77:14
  77:15,16 94:10
  141:24 144:21,24
  162:5,7 163:7
  164:2,9 190:21
  191:6 218:18,18
  222:9,12,18,18,18
  223:2,10,10
  230:10,10 231:7
  234:7,8,25 237:17
  243:12,12,13,14
  244:5 245:1,6,7
  247:14
health's 77:21
heap 95:25 96:2
  148:9
hear 7:1 20:3 23:2
  57:17,18,21,23
  63:5 66:25 74:4,6
  88:19 98:11
  103:15,15 112:23
  117:2 131:19,21
  143:7 152:24
  153:4 154:19,22
  154:24 159:9,12
  159:17 180:11
  194:18 197:7
  199:6 207:10
  213:1 258:4
heard 35:4 53:14
  71:14 84:25
  109:11,11 120:7
  127:3 146:9 152:8
  181:13 216:23
  226:20 232:12
  242:4,13 256:23
  256:24 257:13
hearing 6:14 33:3
  33:9,21 40:12

42:13 60:14 64:5
  64:6,25 163:22
  165:9 199:25
  204:3 208:16
  254:22
hearings 37:22
heart 56:15 92:21
heavy 130:11
heck 85:2
heidi 4:3 10:1,3,4
  10:5 18:12 21:11
  38:16 57:3,4 58:9
  58:10 59:2 115:13
  115:14,15 116:1
  116:14 117:2
  134:8 176:6
  202:11 205:21
  207:3 215:1 219:1
  233:19 244:16
heidi's 243:19
heights 33:5,10,24
  37:5
held 40:15
hell 32:18
hello 48:25 258:3
help 14:16 70:6
  96:3,4 100:11
  101:9 104:21
  108:19 118:1,9
  119:21 121:3
  135:2,12 166:21
  167:11 216:25
  235:10 244:7
helpful 60:16 74:3
  117:15 120:12
helping 114:2
helpless 92:22
hepatitis 165:7
herb 49:14 72:10
hereto 263:14

hey 105:19 198:18
  235:24
hhh 148:6 156:15
hi 36:17 98:9,10
  112:15 140:11
hide 41:1
high 12:16 72:24
  98:6 104:7,25
  106:4 172:3
higher 209:6
highest 27:13
  31:20
highly 249:1
highway 216:22
hilda 25:24 38:16
  39:4
hilgard 157:10
hills 105:7 170:24
  264:15
hinged 58:14
hipaa 73:7
hired 258:24
historic 33:6
historically 59:13
  247:23
history 50:23
  199:25
hit 27:5 93:2 96:21
  127:7 197:13
hits 71:3
hold 33:3 34:15
  38:16 79:22
  205:18 218:19
  225:21
holding 60:14
  184:15
holds 71:25
holdup 122:8
hole 32:19
holiday 53:19
  261:10

home 13:20 48:5,9
  48:9 51:3 52:18
  54:7 57:9 87:18
  87:24 91:8 99:22
  103:13 138:6,16
  138:24,25 139:9
  139:15 140:1
  142:6 144:14
  145:15 151:24
  152:4 153:3
  157:21 160:9
  164:23 165:1
  166:24 167:11
  170:8,9 199:12
  238:23 240:14
  247:18
homeless 7:21 8:3
  8:8,18 31:24
  35:22 42:1 51:8
  51:15,19 55:4,7
  63:8,23,23 67:18
  71:4 74:25 76:9
  90:25 91:3 92:20
  93:2,14,19 96:4
  103:22 108:16,16
  109:22 124:23
  133:13 135:14
  140:6,24 145:24
  156:4,6 163:5
  176:22 177:19
  180:6 181:3,7
  200:12 230:24
  231:5 233:9
  234:22,23 237:1
  248:22,23 255:14
  255:19,20
homelessness
  30:25 31:12 32:14
  42:4 55:1 136:6
  147:5 200:12
  219:7,10,12

[homelessness - humbly]

221:10,22,25 223:11 230:25

**homeowners** 90:13

**homes** 85:24 90:12 156:25

**honest** 120:14

**honor** 18:11 57:24 73:1,5,19 74:13 75:11,16 79:9,21 98:11 110:1 151:22 159:12,20 162:17 165:13 167:14 168:8 170:3 171:16 185:20,22 186:12 188:16,22 196:1 197:10 203:22,23 205:12 206:8 207:8,12 212:5 214:17 215:10 218:7 220:3,17 222:6,6 224:20,23 224:24 228:21 237:8 238:11 247:1,12 249:8,9 249:24 250:7,22 251:10,20 252:2 252:12,15,23,24 253:13,24 254:11 255:8,16 256:6,11 256:16,19 257:4 257:18 262:5

**honorable** 1:17 39:5

**honorably** 200:18

**honoring** 111:7

**hook** 46:24

**hope** 7:10 9:2,17 30:6 52:13 84:7 88:24 90:11 138:9

143:9,10 153:19 154:24,25 155:4 158:23 173:15 192:10 220:9 247:25 261:21

**hopeful** 164:18

**hopefully** 10:9 107:24 108:1 156:22 257:25

**hopes** 164:21

**hopics** 83:22,23 87:16 244:20

**hoping** 26:3 81:18 95:14 130:1 155:24

**horde** 250:20

**horizon** 30:13

**horrific** 166:11

**horseshoe** 40:1

**hospital** 75:5 78:17 79:1,1,5,19 80:7 81:7

**hospitality** 168:25

**hospitals** 80:4

**host** 33:9 72:6 92:7

**hotel** 22:7 34:8,9 34:10 46:7 138:8 157:20,24 160:15 160:17 173:18 198:19,21

**hotels** 72:5 137:2 191:23 192:8 211:4 213:18,21 215:16 229:17

**hour** 77:1

**hours** 63:3 79:13 81:8 107:17 254:1

**house** 14:12 21:5 28:12 29:23 35:16 54:8 65:3 88:1,6

90:9 91:23 114:2 117:22 119:16 128:11 230:15

**housed** 58:3 60:21 65:5,14 194:2 227:8 260:23

**houseless** 120:20 121:4 196:13

**houses** 100:3

**housing** 14:22 21:24 22:18 26:1 26:10,15,19 27:3,9 28:1,9 30:10 31:7 37:16 38:2,3,6,10 42:1 44:13 45:12 46:19,21,25 56:17 56:19,21,23 61:15 61:20 62:16 64:16 64:22 65:3 68:5 68:10,16 69:2,6,12 71:19 87:18 91:22 93:8,9 100:25 101:5,22 103:18 108:11,12,12,12 108:13,21 109:22 113:21 116:22,22 118:1 122:23 124:9 126:5,21,24 127:1,5,11,21 128:8,10,13,15 129:11 130:14 131:12,24 132:16 135:17 136:9,12 136:19,22 137:15 137:17,22 140:6 141:3,10,19,20,24 142:10 145:9,14 146:12,16,22,22 147:1,2,6,10,14,15 147:15 148:7 149:11,15,21

150:1,12,24,25 153:6 156:11,12 157:12 160:11,21 161:23 162:10 166:1,2,4,6,22,22 167:16,17 171:7 171:14 187:10,21 193:19 206:20,22 206:23 219:6,13 229:16,23 230:1 230:13 238:24 244:2,2,20,23 252:2,6

**hud** 30:8 147:19

**huge** 29:5 111:14 133:15 176:20 194:19 204:8 234:19 235:8

**huh** 15:15 39:12 85:7 92:15 149:7 152:12 183:5 195:21 201:1 209:9 252:4,9 255:12

**hum** 143:19 222:1 223:6

**human** 1:5 6:15 25:12 27:24 32:21 44:15 92:13 110:7 129:7 165:1,2 183:14 248:19,23

**humane** 67:25

**humanitarian** 8:16

**humbly** 7:5 8:25 9:5 11:8 34:12,15 63:10 82:18 84:22 86:19 87:4 92:7 182:5 183:23 184:23

Veritext Legal Solutions
866 299-5127

[hundred - infuriating]

| | | | |
|---|---|---|---|
| **hundred** 38:24 190:21 191:9 | **impasse** 68:21 | **inch** 116:24 | 166:18 171:3,6,15 171:21,22 173:9 |
| **hunger** 137:16 | **imperative** 161:21 | **inches** 205:3 | 173:11 186:3 |
| **hurdles** 91:6 | **implanted** 219:16 | **incident** 179:14 | 187:11,14 191:25 |
| **hygiene** 162:7 | **implement** 50:12 | **include** 61:10 | 216:2,7 |
| **hyperbole** 28:1 | **implementation** 52:11 210:17 | 239:17 240:12 | **indoors** 26:25 |

**i**

**idaho** 29:6
**idea** 50:12,13 62:1
  80:16 103:11,17
  207:17 211:2
  214:14 240:5
**ideal** 155:14
**identification**
  124:14
**identified** 19:25
  101:20 102:12
  113:16 118:4
  126:20 152:6
  171:14 173:8
**identify** 7:20 88:2
  102:1 118:9
  121:16 171:2,7
**identifying** 153:16
  174:10
**illegal** 255:17,19
**illness** 74:25 191:4
**illumination** 55:5
**illustrated** 130:7
**image** 135:13,22
**imagine** 201:11,11
**imd** 191:8
**immediate** 28:17
  147:17
**immediately** 16:5
  23:6 46:7 71:10
  85:1 166:9 194:20
**impact** 29:5 135:4
**impacted** 33:7
**impactful** 203:9

**implementing**
  211:11
**imply** 126:3
**impolite** 200:1
**important** 24:16
  112:24 119:13,22
  122:19 166:16
  190:13,19 191:1
  191:12,14 209:3
  217:4 220:16
  239:2 252:2
**importantly** 209:7
**imposed** 13:22
**impressed** 139:6
**impression** 11:1
  30:22
**improper** 40:22
**improve** 253:21
**improvement**
  90:13
**improvements**
  153:15
**inaccurate** 256:2
**inaudible** 53:22
  66:6 68:13 88:18
  88:20 89:2,14
  93:17 159:14
  169:20 207:5
  257:21
**incensed** 49:24
**incentivize** 131:25
  132:7 137:11
**incentivized**
  132:17

**included** 12:2
  104:14 198:13
**includes** 222:8
  239:15 240:6
**including** 73:8
  105:13 140:9
  180:7 237:1
**inconsequential**
  56:14
**incorrect** 116:15
**increase** 71:4
  93:21 166:10
**increasing** 95:16
**incredible** 62:11
  103:2 179:24
**incredibly** 187:6
  191:1,11 192:21
  215:11 255:21
  256:22
**indefinitely**
  147:23
**indicated** 186:2,21
  258:5
**indicating** 261:18
**indication** 73:6
**individual** 75:9
  199:13 200:25
  206:13
**individual's** 73:8
**individualized**
  202:4
**individuals** 26:19
  27:10,20 33:8
  38:13 42:2 44:25
  55:7 87:17 88:6
  89:25 106:5,21

**industrial** 31:24
  41:18 42:1 67:8
  200:12
**industry** 200:6
**inefficient** 155:19
**inertia** 39:16
  65:12 154:6
  260:19
**inextricably** 61:12
**infer** 58:22
**inference** 76:4
**inferences** 209:20
**infinite** 29:25
  42:20 43:12 45:3
  78:6
**inflammatory**
  53:1
**info** 110:19
**inform** 175:9
  204:5 258:18
**informal** 202:23
**informally** 10:11
**information** 7:20
  73:7,12 80:8
  120:4 134:12
  175:17,17,18,20
  199:1 207:9,13,21
  207:24 208:5
  239:6 249:19
  250:13
**informed** 106:15
**infrastructure**
  142:12
**infuriating** 106:3
  106:10

Veritext Legal Solutions
866 299-5127

[ingestion - jeff]

ingestion 92:24
inhumanity 183:3
initial 194:23
  221:21
initially 35:25
  49:25 60:24
  237:14
initiation 195:7
initiative 221:11
  221:22 223:12
injunction 13:22
  19:21,24 84:11
  184:5 192:5 208:9
  208:20
injunctions 84:13
  210:20
injunctive 12:24
  202:22
inn 26:7
innovation 43:11
input 15:6 16:9
  35:19 82:7
insecure 240:15
insensitive 249:2
inserted 54:4
inside 37:10 52:9
  79:14
insightful 133:8
instance 237:16
instructed 138:3
instruction 58:20
instructions
  218:11
instrumental
  196:18
intact 216:25
intakes 144:25
intend 18:4 49:10
  241:11
intended 49:11
  213:8,15,25

236:23 240:15
intense 62:8
intensive 50:25
  61:20
intensiveness
  50:16
intent 138:3,5
  182:9 209:25
  211:7 228:9
intention 27:6
  206:18
intentioned 42:2
intentions 205:15
  205:17
interaction 152:23
interest 124:2
  137:25 176:24
interested 124:12
  128:23 190:2
  243:19 252:13
  263:14 264:13
interesting 15:3
  48:10 95:21 98:14
  103:24 118:18
  124:16 175:24
  177:11
interests 196:21
interim 22:22
  124:8 127:21
  128:13,14 145:13
  153:5 161:11
  206:23 207:17
  219:5 244:8
intervener's 14:3
interveners 16:16
intervenor 2:9,14
intervenor's 48:20
  208:3
intervenors 63:5
  186:6 189:2
  207:23 210:6

215:9 238:13
  249:13 251:24
  252:16
intervention 68:19
  107:9
interventions 72:7
  118:9
intimidated 90:24
intimidating 90:25
introduce 82:18
introduced 27:1
  50:8
inventory 142:3
investment 47:5
invitation 33:19
  36:5 94:1 98:8
  204:2,4
invitations 139:3
invite 7:19 33:1
  177:2 184:14
  192:25
invited 70:4
  107:14
involve 75:4
involved 13:6 18:2
  53:16 55:15 67:19
  100:9 104:5
  106:22 114:17
  128:24 190:12
  197:1 201:2
  203:12 228:13,13
involvement 11:6
  129:17
involves 252:6
involving 20:15
iphone 49:22
irene 158:10
issue 16:10 29:14
  30:19,20,22,25
  31:11 32:14 42:4
  61:5 73:24 74:2

87:9 90:2 91:4
  94:11 108:7
  111:14 171:18
  191:17,21 194:3,4
  194:8 203:3,5,7
  205:13 208:8
  224:22,23 225:6
  227:11,11 229:5
  240:4 243:18
  248:11 252:20
  255:17
issued 102:13
  238:17
issues 30:19,24
  90:19 100:14
  116:22,22 118:18
  188:8,15 190:15
  200:2 201:12
  243:15 253:16
  258:20
issuing 236:16
item 128:22
  176:25 222:3
items 94:16
  164:11

**j**

jail 167:9
jamboree 177:9
james 92:8 98:6
january 30:17
  69:8 71:3 93:23
  145:12,23 225:12
  261:10
jeff 4:8 36:1 48:15
  66:21 88:14,18,20
  88:22 89:2 140:15
  167:24 168:4,5,6
  168:11,14 180:25
  193:1,1 195:21,25
  195:25 196:4
  197:9 198:18

Veritext Legal Solutions
866 299-5127

[jeff - know]

200:20 201:1 203:4,22 204:13 248:8,9,17 249:1,5
**jeffs** 67:5
**jewish** 158:3
**job** 1:25 77:6,11 83:13 84:20 108:4 141:2 152:15 172:18 200:10 232:17 236:25
**joe** 3:18 50:9 66:14 78:23,24 159:1,2 163:14
**joe's** 128:11,17
**john** 3:22 89:12 151:14,14,17,18 151:18
**john's** 89:7 156:20
**join** 56:5 97:19 113:7 176:15
**joint** 19:20
**joke** 36:14 51:19
**joked** 180:25
**joking** 175:14
**jon** 4:6 65:24 72:23 73:21,23 74:1,11 75:24 76:3 77:6,16 81:19,25 82:5,9 85:1 234:15,24
**jones** 28:25
**joseph** 118:7 122:8,15,16 126:12 244:20,21
**joseph's** 119:3 139:5
**journey** 96:13
**judge** 4:9 12:3 13:20,25 14:9 15:4,7,25 16:4,9 25:5,6,7,9 29:7,8

31:16 33:1,2,11 34:7 36:17 38:7 38:20 40:12 41:8 42:18 47:13 49:1 54:5 55:19 56:19 56:20 57:8,10 60:13 67:5 68:19 78:11 87:7,8,10 91:24 111:8 118:14 120:21 126:20 127:15 129:3,19 131:11 131:15 133:20 135:19 136:15 142:10 143:14 144:10 146:6,8 164:24 178:4,9 180:8,22,22 181:12 184:7 194:10,18 196:6 198:18 202:23 205:5 208:23 209:4,14 210:8 212:18 213:3 219:17 226:11,19 231:16,16 235:24 236:3,3,12,13,14 236:16,19 238:7 239:6,8 240:24 241:12 251:9 259:10,15,19 261:15,25
**judges** 205:3 227:17
**judgment** 207:19
**judicial** 189:5
**july** 10:17
**jumped** 95:22
**jumping** 85:5
**june** 16:24 68:17 238:23

**jurisdiction** 107:8 115:4 172:11 186:5
**jurisdictional** 100:14 114:18
**jurisdictions** 113:14 118:16

**k**

**kaiser** 7:15 49:16 92:25
**kansas** 151:5
**keep** 18:4 31:20 40:12 49:8 65:8 70:16 78:8 90:16 92:19 93:11,20 101:11 144:5,6 147:25 155:19 158:20 162:1 168:18 173:3 182:13,24 202:7 203:7
**keeping** 18:16 162:11
**keeps** 256:7
**kept** 125:5
**kesx** 1:7
**kevin** 3:19 23:17 23:22,25 24:20 33:18 195:14 196:9,11,19 204:11
**kevin's** 97:4
**key** 9:24 11:12,22 12:14 14:24 20:11 21:2,6,14 72:4 99:22 101:1 117:20 138:6,24 142:7 145:15 151:24 152:4 153:3 157:22 160:9 170:8,9

173:7 191:22 192:20 193:5,17 193:18,25 194:12 198:15 199:9 202:18 203:14 205:16 206:6,9,12 206:19 207:15 209:8 210:2,17,18 210:19,22,24 211:4,4,23 212:13 213:12,18 214:3 215:15,23 216:3 216:13,18 217:15 217:22 221:4
**kick** 77:1
**kid** 36:16
**kidding** 36:10,13 69:13 180:20 188:21 247:18
**kidnap** 175:10,13
**killing** 71:16
**kim** 86:13,17 107:11
**kin** 198:9,9
**kind** 18:14 21:21 40:14 45:8 54:21 64:5 86:22 88:15 101:4 110:3 115:15 116:11 150:14 176:7 177:1,5 178:2 183:3 248:23
**king** 94:14,15
**knew** 21:9 111:24 137:8
**know** 8:17 11:21 23:22 24:14 26:15 26:21 27:17 28:22 30:11 33:17,24 35:10 36:8,9,11,11 36:21,23 37:10,17

Page 29

**[know - leaders]**

37:25 38:21,23 39:3,4 40:4,18,23 44:11 51:8 53:21 55:21 56:3,21 59:15 61:20 62:1 63:24,25 64:1,12 64:19 67:4 70:13 71:16,21,24 72:1 72:23 74:11 78:13 84:10 87:14 93:22 94:13,15,23 97:7 99:23 100:5 101:7 102:10 103:1,10 104:12 106:23 108:2 110:6 111:19,20 113:13 118:18 120:19 124:18,23 129:25 131:11 133:4 135:10,18 137:2 138:2 140:7,16 144:13 146:14,18 148:3,12,13 149:15 150:1,6,13 151:3,4 152:8,23 153:3,8 155:20 158:14 161:7 163:25 164:24 165:1,7 167:12 171:18 172:2 173:2,12 175:4 177:16 178:22 190:6,23 192:2,7 195:2 196:10 197:10,12,13,17 198:1,3,15 199:6,8 199:20,25 200:1,8 202:1,25 203:7,25 206:4 211:9 212:25 219:22 221:17,18 223:15

223:20 231:13 234:20 236:5,11 236:24 237:10 243:1 245:7 246:1 246:12 248:25 251:17 253:8

**knowing** 35:14
**knowledge** 186:8 263:9
**known** 19:14 65:10 113:6 183:25
**knows** 80:24 132:4 197:4
**koretz** 3:20 115:1 115:7 117:8 154:15,18,18,21 155:1,4,9 158:24
**koretz's** 113:15 114:1 122:2 134:22
**krekorian's** 176:21
**kristin** 1:24 264:21
**kuehl** 126:13 138:13 145:17

**l**

**l.a.** 121:21 156:24
**la** 1:5,7 6:15 7:15 25:21 28:10 29:4 29:8,9 38:14 61:15,20 64:16,22 65:2 101:5 118:20 149:18 156:10,18 158:13 183:19 184:11 217:18,20 219:2 244:19,23
**labor** 148:19 150:14

**lacity.org** 2:23
**lack** 105:1 106:18 110:3 163:6,7,23 183:15 207:24
**lady** 62:16 65:22 72:18,19 76:17 92:10,17 93:9
**lafla.org** 2:12
**lahsa** 9:22 20:7 22:2 27:12 58:12 60:18,23 61:7,15 63:8,25 71:12 87:16 115:13 118:8,23 119:25 120:5 121:1 134:5 138:11 154:3 170:21 171:1,10 177:17 178:10 179:20 180:1 181:11 192:17 199:4 202:10 205:15,24 206:3,4 209:1 215:1 216:25 217:9,10 218:1 222:20 223:12 230:5 233:19 234:23 235:20 243:6 246:14 258:24 259:3
**land** 121:20,21 148:17 172:10 174:10
**landes** 2:4
**language** 59:7 248:21
**languish** 147:22
**languishing** 27:21 27:21
**lanterman** 74:16

**lardner** 3:10
**large** 33:7 138:10 138:18 155:17 156:4 157:18 164:10
**largely** 33:7 36:15
**larger** 44:9 163:1 190:18 191:15 245:23
**largest** 163:2
**lark** 228:7
**laro** 162:23
**lastly** 32:25 164:4
**late** 220:24
**laugh** 36:19
**laughable** 56:12
**laughing** 242:5
**launched** 101:16
**laundry** 166:20
**lavan** 29:1
**law** 2:4,10,15,15 2:20 3:5,10 4:11 4:12 7:11 17:19 21:18 55:24 56:3 56:7 62:25 75:16 181:17 200:7 260:1,5,6,10 262:9
**lawful** 123:3
**laws** 74:15 75:2
**lawsuit** 25:21 28:10 38:14 97:19 107:9
**lawsuits** 28:20
**lawyer** 210:14,15 230:17,18
**lead** 9:1,15 41:14 62:24 82:25 86:9 101:5 104:11
**leader** 41:14
**leaders** 47:15

Veritext Legal Solutions
866 299-5127

[leadership - long]

**leadership** 40:1,5 43:11 117:3 148:4 174:15 182:6
**leading** 93:1 127:6 143:11
**learn** 171:11
**learned** 137:8 161:9
**lease** 142:1 157:7 172:11
**leased** 104:7 141:25
**leasing** 137:1 138:10 142:8 158:6
**leave** 17:17 24:17 47:9 55:14 69:12 70:4 71:12 79:6 79:14 91:1 103:25 176:10 177:7 181:5 182:18 183:20 208:9,14 211:3 249:21 259:22,23 261:7
**leaves** 28:11
**leaving** 95:23 113:22
**led** 56:7 129:11 238:14
**ledger** 180:3
**lee** 3:22 151:14,14 151:17,19,21 152:12,16,22 153:10,25 154:8 154:12
**left** 17:10,10 28:11 31:2 70:9,21 72:18 78:21 79:12 129:12
**legal** 2:10 192:14

**legislators** 100:11
**legitimacy** 186:19 249:19
**legitimate** 241:5
**leisure** 168:9 169:7
**lengths** 103:2
**leniency** 59:17
**lens** 42:19
**leon** 3:19 23:17,22 24:20 25:3 34:17 34:21 38:7,12,18 39:1,12,21 40:4 41:4,7,11,20,24 42:11,17,23 43:3 43:10,18,24 44:5 45:10 47:12,21,25 48:6,12 195:14 196:11 197:11 203:25
**letter** 57:7 138:3,4 199:21 218:21 248:12
**letting** 82:7 84:22 87:5 202:1
**level** 32:7 43:20,22 94:5 152:25 157:2 195:12
**levels** 30:2
**leverage** 95:17
**lgbt** 145:10
**lgbtq** 200:9
**liberties** 75:9,16
**license** 154:3
**lies** 215:12
**life** 93:5 96:20 110:7 165:8 183:13 253:21
**limbo** 70:16 88:11 89:23

**limitations** 74:12
**limited** 29:24
**limiting** 162:9
**limits** 15:2 168:4
**lindley** 198:2
**line** 21:17,18 50:7 57:10 69:23 94:8 95:8 149:9 225:8 232:15
**link** 57:5 134:23
**linked** 61:12
**list** 103:25 152:3 158:18 159:4 161:7
**listen** 17:11 41:25 168:7 175:8
**listened** 15:3 187:1
**listening** 48:15 57:1 109:10 130:23 163:19 203:24
**literally** 18:6 75:8 183:6
**litigated** 30:23 210:16
**litigating** 25:15
**litigation** 28:20 32:17 157:6,8 184:4 186:7
**litter** 111:14
**little** 10:19 11:1 14:25 31:21 33:4 49:21 65:4 70:15 76:20 80:12 92:17 96:14 97:8 124:25 144:16 145:5,18 153:19 157:4 161:12 165:4 170:21 178:2 180:7 184:1

189:19 232:14 238:8 257:20
**live** 96:17,19 171:22 197:20 241:10,11
**lives** 28:5 173:24 220:21
**living** 14:13 26:16 44:16 64:19 87:2 87:15 95:25 96:4 97:10 108:6,6,7 122:3,5 150:15 151:5 171:25 173:14 174:5 219:7,10
**liz** 185:16 193:5 195:6 203:3,20 205:10 215:5 243:4 257:16
**llp** 2:4 3:5
**lmiller** 3:8
**loaded** 195:4
**local** 30:2 43:20 105:11,18
**locality** 65:2
**location** 1:18 80:7 83:13 91:9 105:9 107:3 127:13 156:2 174:7 204:7
**locations** 49:17 64:7 155:13,15,23 155:25 160:6 215:17,23 254:16 255:4
**lock** 184:10
**lockdown** 144:22
**lockstep** 111:20
**lomita** 163:1,9
**long** 10:22 23:7 46:18,21,25 51:13 80:7,16 94:16

Page 31

[long - martinez]

95:7 108:20
124:11,11 128:14
142:23 149:11
151:2 156:14
157:25 166:5
216:2 243:23
**longer** 29:11,12
**look** 15:22 16:1
  17:7 35:18 41:2
  42:6,19 44:24
  68:8 74:21 119:7
  140:3 149:1,2,9
  183:8,11 204:17
  208:11 218:1,2
**looked** 54:11
  116:11 123:14
  177:9 238:21
**looking** 9:18 47:15
  72:6 85:6 114:6
  117:16,21,24
  122:5 127:25
  138:13,24 146:1
  153:18 157:9
  158:2,4,17 161:6
  167:5 168:17
  174:6 194:21
**looks** 32:19 84:16
  97:8 107:15
  125:24 207:18
  246:7
**looming** 38:2
**loop** 193:17
**looped** 110:5
**los** 1:8,18,20 2:6,9
  2:10,11,19,20,22
  3:4,7,12,16,17,18
  3:19,20,21,22,23
  3:24,25 6:1,16,17
  6:18 7:14,22 8:20
  9:24 14:20,23
  15:2 29:1,1,2,3,3,5

35:3 36:24 56:13
74:19 78:10
113:16 117:21
118:25 121:18
122:1,12 129:5,5
130:8 144:13
172:20 175:1
183:9 186:1 191:8
199:18 204:8
210:15 219:17
221:25 222:7
225:7 226:16
227:7 228:4,12
229:15 236:24
248:13,14 252:25
253:9 260:2
**losing** 68:16
**loss** 41:15
**lost** 59:15
**lot** 13:15 14:1
  22:10 24:18,19
  35:19 36:16 93:15
  97:24 102:22
  118:20,22,24
  119:20 121:22
  131:3 133:11
  135:15 136:20
  148:8 149:16
  155:13,17 157:9
  157:13,18 158:20
  160:7 166:4
  168:12 198:14
  200:1 212:16
  229:21 236:14,14
  236:15 247:23
  253:18 256:11
  257:11 261:13
**lots** 61:13 155:20
  158:11
**loud** 226:20

**louis** 3:5
**love** 150:13
**lower** 23:6 116:4
**lps** 75:2
**lucid** 76:25
**lust** 150:4,8
  151:23 166:10
  170:20 181:19
**lying** 59:19

**m**

**mad** 56:22
**magnet** 151:7
**main** 2:16,21
**mainstream** 226:2
  226:8,21 227:6
  229:3,10 230:3,12
  231:1 236:25
  237:19 238:1
  239:25
**maintain** 100:15
  101:13 103:3
**maintaining** 105:6
**maintenance**
  100:7
**major** 104:3 105:3
  173:13
**majority** 146:19
  206:14
**maker** 46:9
**making** 7:6 75:11
  78:21 84:25 153:2
  160:19 245:4
  246:13
**male** 207:5
**man** 7:2
**manage** 100:14
**mandel** 56:2
**mandy** 50:10
**manner** 31:14
**march** 22:5 34:8
  35:3 36:7 45:23

71:21 259:25
**marcus** 2:20 13:4
  19:7 212:24,24
  213:3,6 214:8
  225:15 237:10
  239:9,12 241:1
  247:8,9
**margins** 31:21
**marie** 219:2
**mark** 223:24
**marked** 5:2
**market** 44:2
  150:25
**marks** 24:7,11
  185:2 262:12
**marqueece** 49:13
**marston** 4:3 21:11
  57:13,16,21,24
  58:6,12,16 116:2
  116:16 134:10
  176:11,17 206:7
  206:18 207:20
  211:11 215:3
  217:16 233:20,23
  234:3 243:23
  245:10,18
**martin** 29:5
**martinez** 3:21 4:2
  7:8 10:4 13:16
  14:17 15:15 17:10
  17:13,16,22,25
  18:4 20:19 23:19
  23:25 24:5 25:8
  33:3 34:11 36:3
  40:2 49:5 53:5,22
  57:5 59:6 66:6
  68:12 74:5,7
  77:14 79:2 81:24
  83:22 86:11,14
  89:3,7,10 93:17
  97:16 98:4,12,25

Veritext Legal Solutions
866 299-5127

**[martinez - middle]**

| | | | |
|---|---|---|---|
| 99:7 107:13,21 108:15 109:15 112:6,9,14 114:17 117:10 118:14 143:17,20,25 148:5 151:14,17 154:15 159:1,5 163:17 164:19 165:16 168:1,10 168:15 169:2,4,8 169:10,13,16,20 169:23 170:2,6,13 172:8,23 174:19 174:21,25 175:3 175:12 177:3,21 178:19,23 179:2,5 179:11,16 182:8 182:12,22 183:5 208:21,23 209:10 209:17 212:19 215:1,4,9 216:10 218:22 225:23 226:13 229:6,13 229:19 230:4,18 231:11,19 232:1,4 233:14,22 234:2,6 235:2,17 237:5 243:3 244:15 245:9,16 246:11 246:23 250:4,8,11 250:16 255:5 258:3 262:2 **masks**  67:11 **massive**  126:4 163:9 **master**  4:2 25:8 33:2 107:16 114:16 118:12 137:1 138:10 141:25 142:1,8 | **match**  8:17 **matched**  142:6 **material**  264:7,9 264:10 **materials**  70:20 **matter**  6:15 197:22 201:13 **maurice**  115:24 133:19 **mayor**  8:22 10:21 66:14 67:2,3 108:1 112:2 177:8 **mcclain**  3:10 **mccoy**  163:2,10 **mcdonalds**  93:12 242:14 **mclain**  237:8 241:13 **mcnerny**  36:1 **mdfs**  243:24 **mdt**  234:4 244:6 **mean**  31:25 49:6 73:23 98:24 110:19 125:23 127:3 128:1,10 132:9 150:24 152:19 166:5 167:8 176:14 187:11 195:1 207:8,18,19 215:12 225:19 239:1 260:6 **meaning**  26:12 243:13 **meaningful** 129:21,22 **means**  8:7 11:17 59:13,22 126:22 198:6,6 214:6 232:6 260:17,17 | **meant**  72:9,9,10 126:3 214:14 229:24 238:17,18 **measure**  45:7 119:7 217:21 240:9 **measurements** 42:7 **measuring**  47:20 **media**  24:8,12 185:3 262:13 **medical**  144:20,21 163:5 222:19 223:11 246:9 **medically**  234:4 **medina**  162:22 **meet**  23:9 26:10 26:13,24 39:23 40:5 89:12 153:19 **meeting**  26:9,20 40:5 78:11 91:16 111:20 117:11 151:25 **member**  10:20 120:10 150:20 177:17 197:11 203:25 228:2 **member's**  253:5 **members**  8:10 11:3 20:25 119:20 120:24 159:21 198:13 204:2 249:15 251:3 **memo**  220:6 222:14,23 226:14 226:24,25 227:3 227:12 228:10,25 229:7,21 **memos**  227:17 **men**  144:16 | **mental**  73:7,11 74:24 75:15 76:8 190:20 191:4,6 218:17 222:18 223:10 230:10 231:23 234:7,25 237:17 243:11,13 244:5 245:6 247:14 **mention**  79:2,3 227:17 **mentioned**  60:17 89:23 138:7 171:17 173:25 204:7 237:10 **mercy**  156:12 **merits**  27:7 **merry**  28:21 **mesa**  129:10 **mess**  9:14,16 **message**  151:8 162:20 163:3,4 164:4 198:15 228:23 260:25 **met**  36:6 136:22 150:17 198:16 **mhsa**  189:23 191:18 **mic**  219:25 **michele**  4:2 15:14 25:8 33:2 53:17 68:21 107:16 114:17 117:10 177:3,17 178:7 180:10 226:12 235:17 258:2 262:1 **microphone** 189:19 **middle**  26:6 31:2 198:5,12 205:25 |

Veritext Legal Solutions
866 299-5127

[mike - months]

mike  3:17 13:5 40:18,22 45:22 53:9 54:15 56:2 84:15 112:12,15 112:22 114:7 116:17 121:6 122:21 123:15 124:3,4,18 126:16 127:22,22,22,22 127:23 128:1 131:20 132:13 133:6 136:9 140:23 165:20
mild  10:19
mile  85:14
miller  3:5,5 54:9 58:24 68:14 108:18 163:16 210:11,13,14,24 211:18 212:4,9,15 214:17,21,24 220:2,8,12,15,20 220:23 221:8,10 221:16 222:2,13 222:17,23 223:1,5 223:7,17,19,23 224:2,6,13,15,19 224:22 225:2,5,11 225:25 226:14 227:10,16 228:2,6 228:9 229:7,11,18 229:24 230:16,19 231:12,16,22 232:18,24 233:2,7 233:12 234:10,21 235:4,13,16 236:9 236:11,19 237:15 241:8 242:8,10,16 244:12 246:12,19 247:4,6,12 248:3,5 262:5

miller's  213:17
millerbarondess....  3:8
million  12:8 43:7,7 46:12 47:1,10 68:11 69:9 108:25 122:11 126:20 149:1,9 190:22 191:9 194:13,16 194:17 195:1,2,3 195:10,12 211:16 212:2 214:14 216:15 217:5,6 235:5 237:14 242:3
millionaires  93:12 242:14
mind  27:19 79:4 203:7
mine  113:14 115:7 117:7
minimal  44:19
minimally  67:1
minimum  182:13
minimus  242:18
minor  253:3
minute  163:14 193:1 218:20
minutes  184:23 185:1 229:4 257:15
misplaced  63:19
missed  63:22,23
missing  81:14
mission  33:24 37:4 37:11 105:7 168:24 184:14 204:7,8
mistake  17:2
mistakes  260:15 260:16

mitchell  2:4 29:2 189:15,21 190:6 191:21 192:24 205:12,19 215:6 216:5 218:6 243:5 244:10 246:25 247:15 248:7 257:17
mix  172:9
modalities  229:23
model  44:14,20 46:19 71:7 125:6 125:21,25 136:11 245:3 260:1
modest  46:24 47:5
modular  26:1 45:12
module  116:7
modules  149:6
mole  69:8
moment  9:25 12:4 13:10 17:7 23:24 24:4 27:7 45:15 46:17 53:20,24 57:3 62:16 63:17 81:15 82:15,23,25 84:8 92:17 96:11 98:2 103:9,10 114:8 117:5 121:7 123:7,24 126:17 128:23 139:25 152:11 163:13,14 175:21 176:6 177:7,20 192:23 193:6,7 251:8 253:25 257:12
monday  53:18 57:2 80:22
money  21:5 22:3 32:12 42:22 43:8 43:15,15 44:9

67:9 76:17,18 80:14 118:25 119:4,15 122:11 122:15 128:10 140:3,4,7 147:18 148:5,9 181:23 182:1,3 189:24 190:11 191:13,16 194:6,14,19,25 195:6 214:6,9 217:24 241:25
monica  2:17 3:24 84:7,14 96:9 98:2 98:9,23 99:3 109:4,13 112:10 156:17
monies  119:13 148:7,8 217:10
monique  36:5 196:17
moniques  67:4
monitor  16:1 37:22 171:9
monitoring  1:13 19:3 91:4
monkeying  47:8
month  51:18 52:17,22 87:11 91:13,17 101:23 111:9 140:23 145:5
months  7:23 14:12 16:10 26:2,8 45:12 52:22 68:18 68:25 75:8 86:2 87:25 88:2 128:2 128:5 130:3 140:13 143:2 144:14 161:8 171:23 239:20

Veritext Legal Solutions
866 299-5127

[morality - negotiations]

**morality** 221:24
**moratorium** 30:12
**moratoriums** 210:21
**morning** 6:9 25:4 25:6 63:2 64:3 66:1,21 70:19 75:25 76:25 80:19 102:23 152:5 176:5 177:3 186:25 187:4,5 220:17 224:24 262:11
**mortality** 220:17 221:11,12,22 223:21 224:25
**motel** 22:7 46:7 99:20 102:3,6 156:10 160:10
**motels** 117:17 128:15 135:3 138:1,5 142:8 170:18 211:4 229:17
**mothers** 135:20
**motion** 19:19 128:22 184:20 192:5 195:15
**motioned** 178:3
**motions** 20:22 27:2 128:24 184:20,24 185:10
**mou** 13:14 14:7 68:17,25 126:15 143:3 213:23 214:1 226:4 228:12,16,17 240:2
**mourning** 197:22
**move** 47:17 61:10 90:6,9 104:20

110:12 120:2,23 121:6 124:24 129:2 133:11,18 138:24 156:5 164:20 167:10 173:17 189:18 217:1 218:4,13 227:8 242:24 243:2 244:7 255:21 258:12 259:6,13
**moved** 49:19 61:7 62:13 64:6 70:14 75:20 173:6 215:17 216:3,7
**movement** 62:10 159:23
**moves** 229:8
**movie** 32:19
**movies** 36:10
**moving** 61:8,17 72:2 120:8 124:15 137:15 145:7 159:25 228:14 229:6 233:15 246:12
**mrt** 10:24 49:14 72:10
**msrp** 214:3
**mta** 158:9
**multi** 105:12
**multiagency** 104:13 105:13
**multidisciplinary** 230:8 243:10 244:24
**mute** 154:20
**myers** 2:10 185:14 185:17,19 188:16 188:22 207:8,12 215:10 216:13

238:11 239:11 249:8,24 250:6,10 250:13,18,21,25 251:10,20 252:5 252:10 253:13 254:10,14,21 255:2,8,13 257:8 258:5

**n**

**n** 2:1 3:1 6:6
**name** 6:9 34:10 40:24 41:2 72:21 73:8 79:1,4,4 86:10 107:12 118:5 160:17 222:10,16 227:17 236:13
**named** 38:24 223:10
**names** 77:8 79:2 222:21 223:17,19
**naming** 34:2
**narcotics** 92:24
**narrative** 200:14 200:15 255:19
**national** 156:21 158:3
**navigation** 55:3 244:2
**near** 21:25 30:12 39:17 49:16 156:18 219:7,10 219:14,16 226:17 232:9
**nearly** 8:1 28:23 106:6 166:17 171:24
**necessary** 29:22 121:3 147:2,2 171:12 179:3 255:23

**need** 9:20 11:5 14:15 18:11,20 29:19 37:8 40:14 42:13 44:2 55:24 59:4 62:24,24 63:20 66:17 79:23 91:25,25 92:1 94:8 97:13 98:17 104:22 109:19 118:3,5 120:25 128:20,20 130:10 136:9,10,12 138:19 141:9 147:5,24 161:24 162:6,8,10,14 164:24 165:7 166:8,21 167:11 172:17 184:22 190:20 191:5 209:14 215:17 228:1 234:24 235:10 237:1 244:6 245:3 246:8 251:12 255:2 257:8 259:5 260:6
**needed** 30:9 124:13 187:18 234:7 235:25 245:1,6 246:17
**needing** 77:4 237:16
**needs** 21:7 61:14 76:25 158:15 193:12 203:11 232:10 244:4,5,5 254:23,24
**negligence** 105:6
**negotiating** 25:16 210:9
**negotiations** 12:19 15:8,22 68:22

Page 35

[negotiations - occasion]

228:17
**neighbored** 91:3
**neighborhood**
   8:19 33:8 36:18
   85:23
**neighborhoods**
   126:10 161:25
   167:2
**neighbors** 94:24
   164:5
**neither** 263:10
   264:11
**net** 55:8
**never** 23:4 50:14
   50:15,18 79:4
   101:14 116:25
   136:20 166:1
   179:6 212:2
   227:15 239:16
   240:19 254:19
   259:10
**nevertheless** 90:8
**new** 15:9,10,21
   16:19 25:20 27:3
   38:3,6,10 39:19
   43:21 70:19,19
   75:2 89:3,6 151:9
   158:5,18 196:11
   215:25 216:12
   217:24 221:13
   233:24 234:9
   235:19 237:21,22
   237:23,24 238:3,5
   238:17,17,18,18
   239:2,13,25 240:1
   240:6,20 244:1,17
   245:2,21,22
   246:14 257:10
   258:8
**newly** 197:10

**newman** 88:14,18
   88:20,22 89:2
**news** 25:19 65:11
   65:12 174:2
   176:24
**newspaper** 7:12
**nice** 38:20 92:9
**nicest** 183:12
**night** 16:7 36:10
   57:2 69:22,25
   78:22 80:20
   195:19,20 197:23
   201:19 210:10
**nightmare** 27:25
   32:21 91:2
**nights** 197:24
**nine** 190:25
**ninth** 40:18,23
**nodding** 209:13
**noel** 36:5
**noncooperation**
   109:23
**nonexistent** 30:1
**nonprofit** 32:1
**nonprofits** 200:6
**nonresponsive**
   111:2
**nonsense** 57:7
   68:9 235:11,12
**normally** 227:16
**north** 1:19 2:21
   6:18 55:2 94:14
   113:15,24 114:21
   115:1 116:24
   118:7 122:1
   160:23 170:24
**notary** 1:23 6:11
   263:1,21
**note** 105:3 134:13
   134:14

**noted** 10:23 124:2
   186:23
**notes** 121:9
**notice** 53:13,15,16
   53:19,21,23 54:2,4
   54:13,21,22,23
   108:20 109:21
   131:15 178:5,10
   178:14,16,17,18
   178:20 179:23
   180:1,4,8,12,14,22
   181:4,8,12,14
   189:1,3 192:13
**notices** 186:21
**notification**
   177:18,23 179:9
**notified** 102:23
   107:3 177:13,14
   177:18 198:10
**novel** 257:10
**november** 1:15
   6:2,17 264:14
**number** 16:20
   18:23 19:5 27:13
   33:25 44:24 48:17
   61:1,6 74:20 79:7
   81:2 83:12 96:10
   101:18 116:5
   133:15 156:23,25
   158:8 185:9 213:8
   213:15 220:2
   254:18
**numbers** 12:15
   18:9 39:18 44:19
   49:8 56:13 65:4
   72:2 79:13 185:12
   190:24 191:1
   213:24
**numerous** 30:23
   34:3 114:14 135:8
   187:2 249:14

256:23
**nurse** 244:22
**nury** 3:21 7:7
   17:12,12 20:18
   40:2 60:5 108:15
   148:5 164:19
   168:15,17,22
   169:6 182:18,20
**nuys** 173:18,22

**o**

**o** 1:17 6:6 129:3
**o'clock** 16:6 63:2
   64:3 66:1 69:21
   69:21 75:25 81:6
   81:6 174:2 176:4
   185:7 210:10
**oaks** 145:18
**oath** 35:6 38:5
**oaths** 6:12
**obeyed** 205:4
**object** 73:2,6
**objected** 179:21
**objecting** 180:1
   188:17
**objection** 187:15
**objective** 42:7
**obligate** 17:1
**obligation** 214:12
   228:16 235:9
**observation**
   166:15
**obstacles** 52:13
**obstruction** 162:2
**obviously** 36:14
   39:14 110:6
   111:13 152:8,25
   161:14 210:5
   226:8
**oc** 2:14
**occasion** 179:21
   196:21

Veritext Legal Solutions
866 299-5127

[occupancy - operators]

**occupancy** 144:15
**occur** 107:15
  238:2
**occurred** 7:23
  105:8 181:6
**occurring** 8:19
**october** 7:25 8:4
  54:14,18 61:17
  185:24 221:21
  222:3 257:3
**oddity** 34:4
**offer** 16:4 132:15
  137:15 140:5
  142:4 167:6,6
  174:11 206:19
**offered** 33:23
  61:24 88:13 89:25
  162:10 191:25
  192:9,20 206:10
  206:13,16,23
  207:17
**office** 2:15 7:19
  35:2 58:7 71:22
  94:23 104:3,5
  106:17,19 118:5,8
  160:7 197:12
  228:3,4 246:5
  253:15
**officer** 36:7 80:23
  222:20 223:12,13
  231:7 263:2
**officers** 179:6
  260:7
**official** 7:5 37:6
  249:10
**officials** 200:7
**offline** 206:12
  215:24 240:3
**oh** 17:11 40:12
  79:3 86:14 88:21
  88:23 97:24 98:19

98:21 105:21
134:1 140:12
143:22 144:2
176:13 180:22
182:17 184:22
188:19 204:13
213:5 222:15
223:7 231:21
**okay** 10:5 13:17
  17:11 18:20 23:11
  24:2,14 33:16
  39:3 40:3 43:23
  44:4 45:6 47:23
  47:23 48:9,15
  54:23 55:9 57:22
  58:15,17,23 60:12
  66:20 68:15 69:12
  70:9,24 72:8,14,17
  72:17 73:17,19,21
  79:22 81:11,16,20
  81:25 82:14 83:10
  87:3 89:22 92:16
  93:18 94:1,2
  95:10 96:11 97:4
  98:1,23 104:19
  107:6 108:9,19,22
  109:1,2 110:15
  112:5,10,25
  115:20 118:11
  121:24 122:21
  123:13,14 125:18
  128:21 130:18
  131:21 133:22,22
  134:2,12 136:16
  139:7,19,23 143:9
  143:15 150:21
  151:12 153:24
  154:13,17 155:9
  159:7,13 168:11
  168:12,16,19,21
  169:3,6,18 172:22

175:8 176:19
177:4 178:5
181:21 182:4
183:13,20 184:18
184:25 185:19
188:4 193:22
197:7 200:17
202:15 203:19
204:15,16 205:10
205:18 206:9,17
206:17,25 208:6
210:18,24 213:5
215:4 218:4,4,19
219:1 220:8,18,21
220:22,23 221:11
222:15,25 223:18
223:22 224:6,15
224:21 225:4,10
227:10,12 228:5,8
228:9 230:16
233:1,7,11 235:8
235:13,16 236:15
237:2 238:5
239:13 241:17
242:9 243:4
246:24 247:2
248:3 249:23
251:18 253:12
257:5,19
**old** 23:3 56:19
  71:7 134:12
  135:19 136:11
  145:14
**older** 11:17 209:6
**olf** 136:23
**olympic** 157:6
  158:12,12
**omnibus** 20:15
  251:13
**onboard** 246:16

**once** 7:4 10:6 11:9
  30:8 55:23 88:12
  89:24 91:1 100:18
  109:11 137:13
  205:24 214:10
  225:16 229:1
  242:13
**ones** 58:13 175:1,1
  262:10
**ongoing** 20:7
  171:13,18 172:19
  173:3
**online** 26:8 137:5
  138:25 141:10
  145:20 146:21
  170:19 216:2
  233:25 238:19,23
  243:25
**open** 25:20 33:24
  38:15 91:16
  101:23 131:1
  144:14 145:4,6,11
  145:21,22 146:20
  156:8,14 198:17
  203:7 251:19
  252:18
**opened** 91:9
  156:10
**opening** 91:13,18
  91:20 239:3
**operate** 125:6
**operated** 19:10
**operating** 19:1
  187:25 227:20,20
**operation** 11:12
  11:21 12:14 20:11
  21:2,5 185:23
  186:2 193:5,17
**operations** 188:24
**operators** 170:17

Veritext Legal Solutions
866 299-5127

[opinion - part]

opinion 127:3 202:20
opportunity 25:10 33:12 39:8 99:12 101:12 157:15 192:15 196:25 199:2 240:21 247:20 249:12,18 251:1,3 253:2 256:9
oppose 248:21
opposed 25:15
optic 134:16,24
option 206:20 258:23
options 247:24,25
oral 19:19
orange 78:8 118:23 119:24 129:8,9,10 130:5 188:18 189:1 202:25 259:15
oranges 215:18
order 23:23 130:12 138:23 187:19 205:5 211:15 220:24 236:16 238:15,17 254:24 255:3
orders 205:3 256:25
ordinance 55:16 59:7,16 60:2,3 67:20 68:2 123:3 123:5 130:7,10 133:1 165:17,19
ordinances 59:10 132:24 165:21
organization 152:7

organizations 32:1 42:3 63:12
original 161:6 189:14 195:9 213:6
originally 50:6 60:18 113:25
osborne 105:10
ought 167:7
outbreak 204:6
outcome 30:4 263:15 264:13
outcomes 42:6
outgoing 117:13 120:10
outpatient 78:3
output 44:24
outreach 61:20 62:3 104:12,18 105:13 119:2 120:19 130:20 163:1,11 164:11 166:18 171:6 219:8 228:14,19 230:6,15 233:25 234:9 237:14 243:8,9,17,24,25 244:17 245:3,20 245:24 246:15 256:16 258:6,8,9 258:14,17 259:5
outside 18:14 164:22 196:9
outstanding 152:15
overflowing 254:10
overnight 172:3 172:16
overpass 12:18 21:13 100:7 134:7

134:9 233:18 258:15
overpasses 12:5 14:19 21:6 27:22 29:17 88:7 209:4 209:19,21 210:1 211:24 216:22 229:9 242:22 259:14
overseeing 188:1
overstating 116:5
overturned 132:3
owned 102:1,12 138:14 153:10 154:1 157:10
owner 102:6,16,16 155:21 157:11,23
owners 88:3 99:20 158:5
oxnard 145:17

**p**

p 2:1,1 3:1,1 6:6
p.m. 185:4 262:14
pack 151:6
page 4:8 18:21 21:17 31:12 111:4 190:25 214:25 223:8 226:1 258:19
pages 21:22
paid 10:25 35:9 69:6 201:3 241:23
paint 164:14
pakistan 125:24 125:24
pallet 99:24 102:3 121:19,23 138:15 148:25 149:15 156:1,5 160:1
palms 158:11

panacea 46:5
pandemic 165:6
pants 78:21 183:4
paper 45:4
paperwork 117:19
parade 63:9
paradigm 44:6 55:23
paragraph 14:11 17:7 19:2,8,11,17 143:2 229:4
parallel 101:7
paramount 110:8
parcel 102:11 161:11
parcels 102:2
pardon 247:4
park 55:4 156:2 164:6,7,11
parking 22:10 91:9 93:15 121:22 145:16 154:1 156:19 160:5,7 161:13,16,17 181:2
parks 27:22 31:6 155:23 172:21 183:17
parolee 116:25
part 11:23 18:9 41:18 51:12 64:13 64:14 67:16 71:1 94:21 99:21 101:19,24 105:12 112:24 119:5 126:14 127:14,16 134:24 138:6 145:15 148:21 162:24 186:18 196:19 207:25 209:24 213:22,23

Veritext Legal Solutions
866 299-5127

**[part - performing]**

215:20 217:13
229:20 230:8
240:7 243:10
244:22,24 249:10
249:25 250:14
252:21 256:17,18
257:23 260:16,16
**parthenia** 170:23
**participant** 138:10
**participate** 218:11
228:22
**participating**
218:10
**participation**
218:7,17 219:14
**particular** 104:6
174:12 201:22
211:15 216:9
241:22 252:20
253:1 256:20
258:23
**particularly**
121:21 155:12
172:20 173:20
191:16 205:14
210:25 239:10
**parties** 19:15,18
19:24 129:7 131:5
185:9,13 189:25
252:12,14 258:18
263:11,14
**partnered** 25:23
**partnering** 55:2
**partners** 87:23
120:2
**partnership** 60:14
119:16
**parts** 137:16
**party** 14:3 19:9
73:9 186:7 238:13
264:12

**pass** 162:13
207:19
**pastor** 4:7 18:9
36:1 48:16 49:4,5
49:6 50:9 52:14
56:25 61:21 63:21
63:25 66:5 70:3
76:22 77:8,9
78:21 79:6,8,12,21
79:25 80:11 81:4
81:11 196:16
261:1
**path** 161:22
**pathology** 226:2
**pathway** 42:7
**patience** 143:24
**patient** 73:15
**patriots** 201:14
**paul** 3:20 115:1
154:15
**pause** 193:8
**pavlovian** 83:3
107:18
**paxton** 99:25
100:3,4,16 101:3
**pay** 15:23 30:16
83:25 93:13 119:3
119:4 120:18
225:16 240:10
**paying** 119:8
201:3 214:7
245:13,14
**payment** 225:12
**peaceably** 178:13
**pedro** 160:7,16
166:23
**peh** 14:13,22 15:1
219:13 226:3
**pencil** 149:1
**penetrate** 164:1

**penmar** 86:5
114:11 121:7,10
123:6,11,14 137:8
137:9 139:20
**people** 9:15 10:21
11:25 12:9,13
17:14,16 18:3
20:16 22:23 23:12
23:15 25:12 26:16
27:14 29:16,23
32:4 35:23 36:20
37:10 40:24 41:3
43:16 48:17 51:19
52:6 55:20 60:8
60:21 61:12 62:4
62:5,13,16,23 63:9
63:12 64:6,11,12
64:17,18 65:1,4,5
65:9,15 67:7 70:5
71:16 72:1 74:13
74:23 75:20,20,20
77:12 82:20 87:15
88:12 90:6,9,18,21
93:6 96:17,19
109:12 113:17
117:22 118:2
122:3 125:4,5
126:9 127:7
128:11 131:9,12
133:15 135:3,16
136:1,5,6 137:11
137:15,21 139:16
140:4,8,16 141:17
141:19 144:16
147:3,20,22,25
155:25 162:10
165:11 171:25
173:4,6 174:3
177:12 178:9
180:6 184:10
187:16,18 191:2,3

191:4 192:18
196:13,14 198:20
198:21 199:13,19
200:1,2,14 206:10
207:16 209:18,21
210:25 211:3,10
211:23 212:6,9,13
213:9,11,25 214:3
215:12,15 216:13
217:22 219:6,7,9
219:10,11 221:24
223:9,16 225:17
226:10 227:8
228:15 229:1
232:22 235:5,7
236:15 237:1
244:4 246:1
248:18,22 254:18
256:24 260:23
261:3
**people's** 75:11
109:20
**perceive** 197:2
**percent** 7:22 8:7
11:18,19 27:15
71:4 92:20,23
93:21 100:3 131:2
131:11,13,16,20
131:24 132:6,8,8
132:12,19,19
145:25 166:10
203:16 214:13
**perfect** 22:17 40:8
41:16 43:17
157:15 175:25
**perfection** 37:14
**perform** 51:15
52:20
**performing**
199:22

Veritext Legal Solutions
866 299-5127

[period - plus]

**period** 7:24 26:5 51:7,14 61:14,17 62:18 139:14 140:22 141:1
**permanent** 101:22 136:18 145:9 146:11,16,25 147:5,9,14 148:6 149:25 150:12,24 160:20 166:22 171:7 174:4 193:19 194:7 206:20 219:6 244:8
**permissible** 96:16
**permissions** 145:20
**permit** 96:16,18 102:13
**permitted** 86:1
**perplexed** 108:21 142:25
**persistent** 74:24
**person** 2:2 35:4,9 36:11,12 38:20 47:17 50:7 51:8 51:15 61:23 62:12 63:8,10,13,23,24 66:11 69:24 70:19 73:9,10 74:3 79:11 81:5,14 83:2 93:14 105:22 105:23,24 113:7 115:16 124:15,23 132:13,20 137:20 142:4 153:7 157:1 177:7,24 181:3,8 181:12 193:16 196:11 224:9 230:25,25 232:9 233:3 261:4

**personal** 13:20 63:14 85:10,12 188:8,14
**personalized** 183:11
**personally** 61:22 144:10 199:17 234:15
**personnel** 218:11
**persons** 34:2 54:25
**perspective** 187:9 218:16 243:19 245:11
**pertains** 38:13 119:24 229:22 245:7
**pete** 36:3,4 48:16 196:17 198:1
**petris** 74:16
**phil** 57:6 218:23 219:22 220:6
**philosophically** 69:23
**phone** 8:21 38:17 54:7 57:1,8 80:14 85:1 89:13 98:2 107:17 128:18 133:23 167:23 200:22 234:15 235:18 236:8
**phonetic** 36:1 92:8 101:5 148:9 162:23
**photo** 90:22
**photograph** 93:7 249:23
**physical** 244:4
**pick** 78:9 80:10 254:15 255:14

**picked** 95:1 256:5
**picks** 81:5
**pickup** 78:23 253:24 254:23,25 255:4
**pickups** 254:16
**picture** 46:15 161:19 164:15 246:7 254:6
**pictures** 254:3,4
**piece** 46:1 121:16 206:10 244:2
**piecemeal** 28:15
**pilot** 60:24 61:8 125:23 170:22,25 171:1,11
**pilots** 233:16
**pimps** 200:13
**pioneered** 87:24
**pipeline** 122:10
**pit** 108:5
**place** 9:11,13 17:24 30:8 37:11 37:24 49:3 65:9 67:21 74:15 77:24 87:17 89:7 90:4 95:7 99:8 123:25 134:21 141:7 151:5,10 155:24 178:14 201:6 206:16 217:17 229:20 232:9 243:25
**placed** 89:13 100:22,25 101:17
**placement** 122:17 126:5 130:21
**placements** 114:6 122:1,5,20
**placentia** 55:5

**placing** 90:18
**plaintiff** 2:9,14 189:14
**plaintiffs** 1:6 2:3 34:9 189:3 190:1 207:23 210:6 251:22
**plan** 88:6 153:12 153:13 240:20
**planned** 39:20
**planning** 88:1 149:21
**plans** 30:10 240:20 246:4
**playing** 31:21
**plaza** 195:23 200:19,20 201:10
**please** 16:1,1 20:17 48:19 74:9 82:1,17 89:20 110:14,19 112:12 129:14 138:4 144:4 146:13 151:19 155:6 159:1,2,16 175:22 176:15 185:18 189:18 191:20 208:22 209:23 210:3 219:20,22
**pleased** 45:25
**pleasure** 49:2 69:18 89:12 97:12 144:7 146:7 151:19 159:3,16 188:20
**pledge** 150:2,3
**plenty** 42:21 182:3 194:14 232:2
**plus** 14:23 20:10 46:23 83:20 90:3 132:6,13 164:22

**[plus - privileged]**

164:25 211:7 216:12
**pocket** 69:4
**pockets** 140:8
**point** 41:21 84:11 111:9 131:10 133:11 146:11 171:22 175:4,5 177:12 188:10 211:1 213:24 216:9 218:5,6 238:12 239:11,24 241:14 245:5 252:22 253:3,11 254:2 255:24,25 256:14,15,20 259:9 260:7
**pointing** 105:20
**points** 253:1,5
**polarizing** 30:18 30:24 31:1
**police** 33:25 36:6 66:9 80:23 97:13 97:13 119:5 177:9 178:25 179:6,21 179:22 180:2 232:9
**policy** 23:1 46:9
**political** 31:1,11 249:17 251:3
**politician** 76:15 143:6
**politics** 37:25
**poor** 63:13 183:4 183:12 236:20
**pop** 22:9 45:19,20 45:25 116:6 149:5 158:21
**population** 25:20 26:11 27:16 29:10 44:18 96:4 99:16

99:17 100:1,25 101:20 133:14 140:6 144:5 145:24 170:15 174:13
**populations** 76:9
**portion** 114:22,25 129:2 138:18
**position** 106:14 133:6 147:19 188:8 195:5 204:19 208:2,4 226:18
**positive** 144:18 259:23 260:22
**possessions** 22:12 85:10,13
**possibility** 158:7
**possible** 26:25 37:3 90:10 92:5 145:8 147:16 158:4 204:7 261:16
**possibly** 49:18
**post** 180:17,18 262:9,11
**posted** 186:21
**pot** 44:9 189:24 190:11
**potential** 17:4 27:3 102:6 121:19 155:13 161:10
**potentially** 71:25 102:2,17
**poverty** 200:13
**power** 20:4 86:6 95:18 97:18 108:1 109:19 177:7
**powers** 18:24
**practice** 75:2

**practices** 171:2
**praise** 11:11
**pre** 194:5
**precipitated** 126:5
**preconception** 208:11
**predominantly** 146:21 148:6
**prefabricated** 45:11
**prefer** 37:3 54:20 204:12
**preferred** 136:21
**prejudice** 19:22
**preliminary** 13:22 19:21,24 153:12 153:13 208:9,20
**premise** 113:25
**preparation** 156:21 249:22
**prepared** 9:22 13:1 16:22 153:12 153:14 195:15 252:16
**presbyterian** 156:20
**presence** 11:9 178:25 181:12 193:2 196:9
**present** 3:15 4:1 8:17 11:2 36:24 54:6,14 99:19 134:6 159:4 185:9 188:15 256:24
**presentation** 232:15 250:4,5
**presentations** 249:15 250:6 254:1
**presented** 193:4 252:14

**presents** 104:6 106:4
**preservation** 110:7
**president** 7:7 18:19 148:5 164:19 178:16
**presidential** 30:4
**presiding** 78:11
**press** 18:13
**pretended** 46:24
**pretty** 155:24 170:19 211:8 222:11 251:14
**prevent** 101:10
**prevention** 221:11 221:22
**prevents** 134:19
**previous** 157:11
**previously** 138:8 203:15
**price** 3:23 81:25 82:1,13,19 83:10 84:3 85:7,19,25 87:6,22 89:1,22 91:12 92:15 93:13 94:2,7 95:4,11 97:2,5,9 98:15,20 109:12 135:7 149:1 253:6
**price's** 49:12
**prior** 24:25 35:17 263:4
**priorities** 31:20
**priority** 14:21 103:22 173:13,20 214:1
**privately** 102:1,12 138:9 153:10
**privileged** 193:12

Veritext Legal Solutions
866 299-5127

[prk - providing]

prk  206:15
pro  31:3
probably  36:11
  52:1 116:21 135:5
  150:23 154:20
  156:7 157:7,24
  177:16 194:24
  257:15 261:10
problem  43:8,9
  60:8 77:22 95:12
  110:25 135:22,23
  135:24 145:19
  147:8,8 165:23
  179:13 194:15
  208:17,18 221:13
  221:16 256:6
problems  49:23
  70:14 86:18 96:19
  108:12 114:18
  117:2 151:1
proceeding  7:5
  37:6,19 169:24
  186:14,18,22,23
  187:19 249:18
  250:7
proceedings  6:11
  186:10,15,20
  187:8,22 188:2
  189:6 208:1
  249:14 251:2,4
  254:22 255:11
  256:7,13 258:1
  263:3,4,5,8
process  52:11
  56:16 60:11 67:16
  75:1 78:15 101:25
  153:16 170:17
  189:9 190:10
  244:17
processes  75:7

produce  71:8
produced  68:11
producing  68:24
product  47:20
production  194:23
productive  110:14
profession  35:18
professional
  232:10
profound  74:24
program  60:24
  61:8 79:18 86:22
  88:4 90:17 126:5
  138:10 141:23
  142:2,8 167:13
  213:14 247:13,14
programs  192:1
  195:11,13
progress  10:16
  100:16 151:24
  159:20 160:20
progressing
  153:18
prohibited  172:3
project  21:14
  25:24 26:3 51:4
  56:10 64:11 72:4
  87:19 99:22 101:1
  117:20 125:2
  126:6,7 137:10,14
  138:6,24 142:7
  145:3,15 152:1,4
  153:17,21 157:21
  160:9 170:21,22
  171:2 173:7
  190:18 191:22
  192:7,19 198:15
  199:9 205:13,16
  206:5,9,12,19
  207:14 209:8
  210:1,17 213:12

213:18 214:3
215:15,23 216:3
216:12,17 217:15
218:8,15 243:22
projects  91:20
  125:23 148:11
  156:15 170:9
  218:12
promise  147:21
  167:1
promised  10:17
  16:18 167:3
promises  23:7
  140:10,18 161:25
promising  140:8
prop  148:6
proper  166:25
properly  76:10
properties  104:5
  138:14 152:3
  158:17,20 170:10
property  88:3
  99:22 102:2,14,16
  102:16,19 104:6
  105:4,7 121:16,17
  155:21 157:23
  158:5 254:5,11
proposals  250:3
proposing  160:5
proprietor  34:13
protect  125:4
protecting  86:9
protection  134:19
protocol  130:20
  144:22
proud  33:5 159:24
  160:14,17
prove  55:23
provide  14:12
  73:7 76:8 99:12
  101:24 117:25

119:1 121:20
138:23 160:1,11
160:15 187:10,14
216:21 226:1,9
230:12 232:16
237:18 242:1
244:11
provided  73:13
  90:22 119:10
  174:22,23 189:1,3
  216:16 217:6
  226:22 227:7,7
  229:10 233:24
  234:11 236:6
  237:20,21
provider  49:25
  56:18,20,23 58:7
  58:19 66:20 69:4
  70:5,8 124:11
  126:19 152:6
  153:1,2 162:25
  179:18,21,25
  236:5 241:22
  242:1,6 245:8,9
  258:23,24,25
  259:3
provider's  41:17
  42:16 140:2,20
providers  50:20
  67:9 83:21 127:18
  140:8 162:19
  163:9,23,25 165:9
  171:24 181:9
  187:3 230:6,9
  232:16,23 244:19
  245:12,13,14,15
  256:23 258:11,22
provides  234:5
providing  14:22
  55:4 67:8 101:12
  135:2 226:20

Veritext Legal Solutions
866 299-5127

**[providing - read]**

237:13 240:8
**provisions** 55:12
154:4
**psh** 91:20 101:21
**psychiatrist** 119:4
**psychotic** 51:11
76:18 77:5 231:2
233:3,4,8
**ptsd** 201:11
**public** 1:23 25:2
68:25 69:1 77:14
77:15,16,21 126:6
126:7 129:12
135:13,21 137:10
144:21,24 162:1,4
162:7 164:2,3,9
173:13 183:17
186:9 188:25
218:18 222:9,12
222:17 223:2
224:2 230:10
234:8 243:12,14
245:1,7 263:1,21
**publication** 183:7
**publish** 218:21
**pull** 214:19
**pun** 165:3
**punish** 184:5
**purchase** 29:14,18
45:24 72:5 117:20
174:11 203:17
**purchased** 138:8
**purchasing** 160:10
194:7
**purporting** 215:25
216:1
**purposes** 216:14
**pursuant** 186:4,9
186:22,24 226:4
**pursuing** 158:20

**pursuit** 102:21
**push** 32:2 33:7
141:7
**pushed** 38:22
61:15
**pushing** 136:6
**put** 7:11 10:8
13:10 21:2,15,20
23:12 26:14 45:20
46:15 53:20,23
54:3,22,24 57:9,10
61:7 63:20 78:3
78:16,17 82:21,22
93:19 98:1 113:20
119:1,14 120:7
121:23 123:10,13
125:2,8,21 128:22
131:15 135:2
139:24 147:18,24
148:5,7,8 149:10
168:1,3 173:24
175:22 177:25
188:7 201:10
212:17 216:1
217:8 220:9
226:19 236:12
247:23 249:10,20
250:7,19 261:20
261:20
**puts** 152:24
228:16 252:2
**putting** 71:20
250:14
**puzzled** 161:12

**q**

**qualified** 263:7
**quality** 165:8
253:21
**quarantine** 144:20
**quarter** 115:7,7
116:21 117:7,8

**question** 38:9
41:25 193:22
208:1,21 213:6
216:11 222:7
224:23 226:12
227:15 228:6
230:20,21 234:6
**questions** 10:10
24:19 33:14 48:20
72:16,17 92:3
94:4 113:10
165:15 207:2,7
219:22 230:17
**quick** 26:5 58:18
114:21 135:24
144:11 146:11
**quicker** 46:8
91:25 92:1 95:12
**quickly** 7:3 22:8
22:23 23:5,16
40:11 45:7 49:19
50:21 147:3
203:23 228:1
235:15 261:16
**quickness** 76:14
**quinn** 66:4 78:1,1
78:2,18 232:7
**quite** 9:8 12:22
24:16 32:19 41:16
41:19 42:9 50:19
50:24 68:20 82:10
97:19 125:5
129:16 133:7,13
140:20 142:23
147:18 188:1
194:22 202:3
215:19 222:3
231:8 234:15
247:22 251:15
256:10

**quo** 31:22,23
**quote** 67:10
248:14

**r**

**r** 2:1 3:1,5 6:6
**rabbit** 32:18
**race** 148:14
**radio** 56:2
**rain** 198:23
**rains** 174:1
**raise** 186:20 240:4
255:24
**raised** 46:22 201:7
201:16,18 202:11
202:11,12 256:20
**ramp** 194:15
217:7 241:4
**ramps** 14:19 94:13
**ran** 77:22 95:20
**raped** 76:19
232:13
**rapid** 128:16
136:25
**rate** 8:18 15:23
22:16 23:6 37:14
45:8,9 71:11
147:16 166:9
183:10 201:18,21
**rates** 202:11,12
**rats** 85:4 95:20
**reach** 11:3,4 20:9
20:14 39:20 68:16
69:4 165:10
**reached** 12:1
13:12
**reaching** 67:6,6
110:17 134:25
**read** 10:13 14:6,16
18:23 21:22 23:13
52:4 54:3,15
129:1 130:15,16

Page 43

[read - relief]

165:16 180:21 219:2 222:16 225:20 229:4
**reading** 7:13 14:1 176:19 180:24 230:21
**ready** 51:9,16 93:8 128:19,20 157:14 198:19
**reaffirm** 146:25
**real** 25:17 58:18 61:5 83:19 91:2,2 130:14 142:10
**realistic** 119:18
**reality** 26:21 215:22
**realization** 124:7
**realized** 124:8
**really** 8:25 16:13 18:16,18 50:15,22 61:15,21 62:11 80:3 83:21,24 89:17 92:9 95:21 103:24 108:20 111:6 126:4,10 140:18 147:19 152:18,19 172:9 178:12 183:23,24 193:2 196:19 198:17 202:8 220:21 222:6 229:14 239:1 245:12,14 253:4 258:25 260:24 261:14
**realtime** 32:22 199:1 236:7
**reason** 29:7 34:14 34:20 68:1 78:13 108:9 144:17 148:17 190:12

**reasonable** 162:4 255:22
**reasons** 39:8,10 130:25
**reauthorizing** 90:3
**rec** 172:20 209:25 213:13
**recall** 158:13
**recap** 99:13,15
**receive** 175:17 178:9 208:8 231:1 233:5,9
**received** 7:10 35:19 62:16 162:21 170:9 178:10 187:18
**receives** 61:2 175:17,18
**receiving** 7:21 214:9
**recess** 6:21 24:4,6 24:10 185:5 262:3
**recognition** 83:24 109:20
**recognize** 111:13 132:1 152:14 166:16 172:15 176:1,1 241:3
**recommendation** 221:23
**reconvene** 261:8
**record** 6:10,13,20 6:23 19:12 24:8 24:12 66:19 69:19 72:9 76:5 83:5 120:22 152:15 185:3,7,8 188:23 189:7 192:18 219:3 226:19,25 233:15 235:3

236:8 248:11,20 249:3,10,11,25 250:12,14 252:22 252:24,25 253:14 254:4 256:1,7,9,12 257:23,25 261:20 262:11,13 263:9
**recorded** 1:23 263:6 264:7,10
**recorder** 6:8,10,22 24:7,11 184:23 185:2,6 262:12
**recording** 6:24 263:8
**records** 61:1
**recreation** 14:24 211:21
**recreational** 12:10 20:10 21:14 172:21 194:13 242:21
**recruitment** 88:5
**red** 78:23 149:20
**redirection** 219:5 219:8
**redoing** 202:15
**reduce** 221:24
**reduced** 263:6
**reengage** 246:8
**reexamine** 44:2
**referenced** 90:13 91:16
**references** 205:17
**referring** 64:15,16
**refers** 55:8 107:10 107:10
**refuse** 157:11 166:19
**refused** 164:13
**regard** 41:14 42:13 59:12 95:18

108:1 133:3
**regarding** 191:17 191:22 205:15 216:13 218:7
**regardless** 16:12
**regards** 38:9 170:8 208:3 217:15 258:12
**region** 118:19
**registry** 118:6
**regular** 128:19
**regulations** 255:22
**rehousing** 128:16 137:1
**reimbursed** 11:18
**reimbursement** 203:16
**reinstatement** 19:23
**rejecting** 155:20
**related** 185:22 256:4,20,21,25 257:2 263:10 264:12
**relates** 239:10
**relating** 256:12
**relationship** 20:14 247:21
**relationships** 246:3
**relative** 186:14 187:7,22 263:12
**relatively** 156:22
**relayed** 12:12
**release** 52:6 55:13
**released** 79:25 192:19
**relevant** 74:22
**relief** 12:24 148:8 191:6 202:22 217:20

Page 44

[relocate - results]

| | | | |
|---|---|---|---|
| **relocate** 114:2 118:1 186:2 | **reportable** 166:5 | **reseda** 71:22 | **respectfully** 19:18 |
| **relocated** 144:20 | **reporter** 264:3,5 | **reserved** 104:20 107:4 | **respective** 185:13 193:23 |
| **relocation** 21:13 | **represent** 35:8 55:10 59:25 67:2 67:23 178:8 186:6 | **reset** 21:8 | **respond** 10:9 105:5 109:16,17 197:10 206:8 243:14,14 249:12 249:19 251:1 253:2 256:9 |
| **rely** 194:10 | **representation** 17:12 24:22 185:25 192:17 227:14 255:17 | **residences** 123:21 | |
| **remain** 8:12 98:3 173:9 193:12 | | **resident** 244:22 | |
| **remaining** 122:1 | | **residential** 85:24 123:17 126:10 | |
| **remains** 101:19 104:25 | **representations** 187:1 | **residents** 90:11,25 91:3 96:3 129:6 129:12 144:18,20 164:5 | **responded** 110:21 234:18 |
| **remediation** 158:15 | **representative** 190:1 | | **responding** 249:16 |
| **remember** 22:5 52:21 85:15 92:18 115:17 133:19 139:17 239:5 241:16 | **representatives** 219:18 236:2 | **residing** 88:7 226:3,3 | **response** 8:24 57:15 58:11 106:18 110:3,13 116:10 235:22 257:24 |
| | **represented** 13:18 14:8 21:23 59:25 90:22 123:2 211:16,22 238:22 254:14 255:9 | **resistant** 137:18 | |
| | | **resolution** 11:4,5 15:17 202:23 203:19 | |
| **remind** 28:5 93:10 | | | **responsibility** 97:23 111:22 120:17 172:15 231:7 237:12 |
| **reminded** 242:13 | | **resolve** 116:21 179:12 228:1 235:15 241:19 | |
| **reminds** 236:12 | | | |
| **remiss** 67:16 | **representing** 186:17 227:1 | | **responsible** 28:6 38:5 114:5 205:24 206:5 223:16 |
| **remove** 70:23 | **represents** 100:24 | **resource** 206:23 | |
| **rent** 30:16 | **reprioritizing** 43:19 | **resourced** 76:10 | |
| **repeat** 12:6 43:5 50:12 62:15 84:12 181:25 | | **resources** 22:21 29:24 42:19 47:7 55:6 58:7 66:13 103:1 111:18 119:1 120:15 121:3 122:9,17 126:14,19 127:14 127:16 128:12 132:18 135:2 137:5 140:25 141:10 161:22 178:24 191:24 206:22 219:6 244:1 | **responsibly** 136:5 |
| | **repurpose** 29:15 29:19 | | **responsive** 110:20 111:6 |
| **repeated** 179:15 | | | **rest** 48:10 51:19 116:10 |
| **repeatedly** 109:14 122:22 163:23 232:12 253:7 256:1 | **repurposing** 30:1 | | |
| | **reputable** 10:12 | | **restaurants** 199:19 |
| | **request** 10:13 15:25 19:19 117:9 129:3,19,24 185:21 186:11 189:22 192:4,13 202:22 208:8,19 231:23 249:9 | | **restore** 165:8 |
| **repeating** 27:18 92:19 93:11,20 | | | **restrictions** 219:15 |
| **repopulated** 100:21 | | | |
| **repopulation** 101:10 | | **respect** 10:1,2 31:19 75:8,18 100:16 | **result** 32:15 100:4 100:21 101:1,15 102:15 106:7 179:17 186:16 239:4 |
| **report** 102:4 144:23 150:4,8,11 152:5 159:25 228:20 | **requested** 10:25 188:2 | | |
| | **required** 153:15 | | |
| | **rescue** 174:3 204:6 | | **results** 171:10 |

Veritext Legal Solutions
866 299-5127

**[resumed - ryu]**

| | | | |
|---|---|---|---|
| **resumed** 106:20 164:25 | 116:20 123:23 125:10 129:24 137:3,6 141:11,21 142:16 146:23 149:3 150:25 151:12 154:14 157:1,11,12 161:12 162:11 163:17,20 167:18 169:17,25 175:25 175:25 179:16 183:17 184:6 189:10 190:5 192:22 194:19 197:22,22 203:20 204:18,21,25 207:6 210:23 212:4 215:17 221:15 225:20 227:19 230:23 231:10 237:4 238:10 240:24 241:19 244:23 248:6 249:22 254:9,20 257:19 260:18 | **rode** 77:10 | 203:18 |
| **resuming** 145:1 164:21 | | **rodriguez** 3:24 84:7 96:9 98:10 98:24 99:1,3,10 103:7 104:1 109:4 109:5,13 110:2,15 110:18,24 111:3 | **rosecrans** 164:6 |
| **revealing** 190:13 | | | **rough** 43:1,2 |
| **revenue** 44:10 45:3 | | | **roughly** 213:11 |
| **reverse** 202:14 | | **rodriquez** 98:2 | **round** 28:21 |
| **reversed** 147:16 202:1 | | **roe** 30:22 | **routine** 255:14 |
| **reversing** 200:10 | | **role** 117:3 119:25 | **row** 28:4 33:8,10 33:22 34:15,20 35:20 36:25 37:1 37:5 48:9,10 67:1 92:12 140:10,17 168:4 181:2 195:24 196:5,7,12 196:14 197:1,16 197:18,18,20,20 197:21 198:3 200:14 202:6 204:1,3,12,14,21 205:1 248:10 261:9 |
| **review** 156:24 | | **roll** 177:24 | |
| **reviewed** 153:13 | | **ron** 22:16 | |
| **reviewing** 158:9 | | **roof** 32:5 | |
| **revisit** 74:17 | | **room** 9:24 11:12 11:22 12:14 14:24 20:11 21:2,6,14 72:1,4 101:1 117:20 142:7 173:7 184:10 191:22 192:19 193:5,16,17,18,20 193:24,25 194:12 198:15,19 199:9 199:10,11,12 201:13,13 202:17 203:14 205:16 206:6,9,12,19 207:14 209:8 210:2,17,18,19,22 210:24 211:3,4,23 212:12 213:12,18 214:3 215:15,23 216:3,12,17 217:15,22 241:16 247:11 253:10 | |
| **rid** 168:7 | | | |
| **ride** 82:7 | | | |
| **ridiculous** 47:10 | | | |
| **riding** 77:7 232:20 | | | |
| **ridley** 126:14 | | | **rpr** 1:24 264:22 |
| **right** 11:10 13:11 13:16 17:5,21 18:22 20:17 21:20 31:2 40:7 43:2 48:16 49:9 52:4 54:8 58:24 59:2,5 63:20,21 66:4 69:17 72:15,19,24 72:25 75:23 76:2 76:20 79:18 80:10 81:1,9,23 83:7 84:5,15 85:19 90:10 91:11 92:10 92:18 93:2,16 96:24,25 97:9,21 100:19 102:24 103:3,12 104:16 104:23 105:2 108:5 111:23 112:25 113:18 114:7,13 115:8 | | | **rude** 128:2 176:14 |
| | | | **rudeness** 144:3 |
| | **rights** 1:5 6:15 111:15 129:7,12 162:1 | | **rule** 131:2,6,20,24 |
| | | | **rules** 162:4,9,11 162:14 172:17 234:20 |
| | | | **ruling** 146:2 184:8 |
| | **rise** 8:1,8 93:19 | | **rumors** 35:4 |
| | **rising** 22:15 37:14 | | **run** 153:3 |
| | **risk** 172:4 | | **runner** 32:19 |
| | **river** 64:17 131:18 | | **running** 27:5 85:4 117:3 161:2,3 183:21 197:13 |
| | **riverbed** 131:9 | **rooms** 10:14,14 11:15 46:7,8 104:21 107:3 160:12 194:24 198:21 199:12 200:25 202:4,19 | |
| | **riverside** 145:3 | | |
| | **roberts** 4:4 89:8 89:14,19 109:25 110:16,23 111:1,5 112:4 | | **rush** 48:23 76:13 |
| | | | **ryu** 3:25 143:17 143:20,20,22 144:9 146:5,8,14 146:24 147:12 148:2,16,22 149:3 149:7,14,24 150:7 |
| | **robertson** 158:12 | | |

Veritext Legal Solutions
866 299-5127

**[ryu - sepulveda]**

150:10,19,22
151:11

**s**

**s**   2:1 3:1 5:1 6:6
**safe**   29:20 91:9
   145:16 154:1
   156:19 160:5
   161:17 182:10
   204:16
**safety**   94:11 164:3
   173:13 182:15
**saint**   156:20
**sakes**   97:13
   169:15
**saldivar**   253:9
**sale**   102:7
**sales**   133:25
**san**   160:7,16
   166:23
**sanitation**   253:10
**santa**   2:17 131:8
   156:17
**sat**   15:6 255:11
**satisfied**   68:10
**saturday**   78:22
   80:20
**save**   46:16
**saw**   9:25 10:1
   51:20 53:16,19
   56:16 131:16
   134:1 137:9,13
   174:24 196:17
**saying**   42:15 64:23
   104:19 128:19
   131:1 194:18,22
   199:7 207:20
   214:21 217:9
   233:13 235:1,19
   236:20 242:13
   250:17 252:2

**says**   38:20 54:25
   74:7 96:16 105:19
   116:8 133:19
   142:5 150:4,8
   180:7 225:18
   226:1,25 230:23
   248:13
**scale**   226:5
**scattered**   229:15
**scene**   179:19,23
**scenes**   97:6
**schedule**   52:21
**scheduled**   106:25
   113:20
**schism**   234:19
**school**   72:25
**schumacher**   85:16
**science**   30:21
   157:17
**scott**   2:20 212:24
   213:1
**scott.marcus**   2:23
**scrambles**   173:1
**screen**   116:25
   134:21 191:3
**script**   53:3 260:3
**search**   99:22
**seat**   88:15 169:15
   193:7 213:1
**seated**   49:7
**second**   14:22 17:8
   18:21 37:12 40:7
   49:23 50:8 83:17
   88:24 115:14
   117:12 132:22
   153:5 191:21
   194:9 216:11
   224:22,23 260:14
**seconded**   214:2
**secondly**   214:2

**secret**   12:25 40:17
   202:7
**secretary**   30:8
   86:14,16
**section**   82:21,22
**secured**   156:19
**securing**   174:6
**see**   15:23 16:21
   20:8 34:14 36:24
   42:15 47:15 57:6
   62:10 66:25 70:17
   77:19 84:1 87:12
   90:12 92:12,13
   94:18 95:19 98:8
   110:4,14 112:15
   112:17,21,22
   117:16,21 118:20
   119:11 120:3
   123:10,11,20
   133:24,24 135:1
   137:2 140:2,4
   141:4,6,16,17
   146:7 147:7
   151:19 152:19
   154:13,18,23
   158:16 159:9,12
   159:17 174:1
   175:10 177:6
   181:18 188:6
   198:18 202:22
   205:4 223:5,8
   226:9 227:3,4,12
   227:18 242:25
   248:4,6 258:1
**seeing**   14:2 82:2,3
   108:3 144:7,9
   166:6 196:15
   198:11 261:2
**seeking**   73:10
   205:14 215:7

**seen**   22:25 72:8
   81:9 94:25,25
   97:6 129:19
   148:24 150:11
   186:1 190:24,25
   244:19 255:10
   260:12
**sees**   80:23
**segundo**   161:2
**selecting**   170:17
**self**   256:11
**sell**   99:21
**sells**   76:17
**senate**   47:19
**senator**   99:6
**send**   110:19
   227:17
**seniors**   145:11
   156:13
**sense**   29:15 30:6
   31:14 34:10 45:13
   124:12 130:24
   156:7 181:3
   197:15 199:5
   202:12 206:1
   212:2 229:25
   246:6
**sensitive**   249:2
**sent**   7:9 53:13
   162:21
**sentence**   216:4
   248:12
**sentiment**   253:8
   253:11
**separate**   18:15
   189:24 190:11
**separately**   108:25
**september**   10:18
   21:11,23
**sepulveda**   108:15
   156:18 171:16,19

Veritext Legal Solutions
866 299-5127

[sereno - sides]

sereno  26:7
series  27:2
serious  129:25
  135:11 142:17
  251:13,18,18
  261:14
served  75:20
  200:18 202:5
service  127:17
  137:18,19 152:6
  154:4 162:19,25
  163:8,25 165:9
  214:10,13,15
  230:6,9 232:16
  236:4 244:19
  258:10,21,23,24
  258:25 259:3
services  55:4,6
  62:18 65:23 66:8
  66:21,24 67:5
  73:11 76:9 77:25
  118:24 119:9,13
  119:24 120:5,19
  121:3 124:25
  163:6,23 164:12
  166:20,20 190:21
  200:4 206:10,13
  206:16 216:21
  218:17 222:18
  223:10 225:16
  226:2,8,10,21
  227:6 229:3,10
  230:3,5,13 231:1
  232:10,21 233:5,9
  234:8,11 235:25
  236:6,25 237:17
  237:20 238:1
  239:25 240:9
  245:6,15 247:14
  255:23

servicing  66:17
serving  219:9
  224:11 256:11
session  34:15
sessions  15:4
  24:16
set  26:11 79:17
  90:21 91:14
  101:23 213:14
  249:13 260:19
  261:16
settled  16:5
  126:19
settlement  12:1,17
  12:19 26:11,15
  59:24 68:21
  108:23 129:4,21
  129:23 130:16
  131:1 142:19
  161:20 183:24
  184:11 194:11,13
  202:24 251:5,14
  251:23,25 252:1
  261:12
setup  199:9
seven  46:23 143:2
  158:16 180:5
severe  191:4 192:5
severely  77:5
shaking  225:19
shape  228:14
share  8:13 33:12
  102:9 118:1
  136:23 162:18,20
  219:20 226:17
shared  106:11
  118:1 128:15
  136:22 229:16
sharp  149:1
shayla  2:10 13:5
  19:8 53:11 56:4

84:24 185:14,17
  188:9,10,14,21
  193:22 203:6
  207:2,6,7,11 249:6
  257:23
sheet  19:16,17
  213:23 217:2
  229:22
sheila  145:17
shelter  14:13,22
  25:20 40:6,11
  45:8,21 47:4
  61:24 62:14 71:9
  88:13 89:25
  100:25 102:3
  121:20 136:13
  147:1,4,10,17,23
  156:9 159:22
  160:1 166:8
  187:12,14,16,18
  187:20 190:20
  191:5 192:9,20
  195:17 213:13
  214:3 219:13
  225:17 229:2,12
  229:23 230:1
  238:24 261:4
sheltered  113:20
shelters  21:25
  51:1 99:25 121:23
  138:15 146:22
  148:25 156:1,5
  199:7,24 207:17
  229:14,25 238:24
  240:14
sherin  4:6 65:24
  73:23 74:1,11
  75:24 76:3 77:16
  82:9 234:15,25
sherman  145:18
  157:20

shirk  231:6
shooting  115:9
  134:3
shopping  78:2
short  30:1 74:16
  79:23 158:1,6
shortcuts  29:13
shorthand  264:5
shot  106:25
  116:11
shout  34:23
shouting  37:10
shoveled  81:7
show  13:15 26:4
  36:21 53:25 92:9
  96:5,22 110:21
  116:6 124:4
  174:16 175:15
  184:16 194:23
  262:9
showed  180:25
  181:1 254:3,4
showers  166:20
showing  64:12
  67:9 97:8 140:5
shown  70:20 191:2
  250:15
shy  26:20
sic  201:10
side  42:16 90:15
  105:3 113:15,24
  114:3,21 115:1,3
  115:25 116:24
  118:6,7 122:2
  123:16 180:3
  183:19 184:2
  195:2 246:10
  259:20
sides  13:19 117:23
  194:25

Veritext Legal Solutions
866 299-5127

**[sidewalk - sorry]**

| | | | |
|---|---|---|---|
| **sidewalk** 100:8 133:24 204:21 205:1 | 144:21,22,24 151:25 152:2 153:4,6,11,11,12 154:4 156:19 | 205:1 248:10 261:9 | **socalgas** 104:14 **social** 130:21 163:5 165:9 |
| **sidewalks** 27:21 29:16 31:6 162:12 | 157:20,22 158:2 160:1,7,9 161:5,8 | **skills** 263:9 **skip** 13:7 19:4 42:15 49:22 53:10 | **socialist** 31:4 **society** 200:9 |
| **sight** 94:18 | 161:10,15 166:17 | 54:7,8 56:21 | **soiled** 164:11 |
| **sign** 88:3 | 166:24 167:11 | 58:18 63:4 66:18 | **sold** 44:2 46:2,3 |
| **signature** 263:19 264:20 | **sites** 27:3 39:19 102:3 145:10 | 68:10,20 69:3 84:12 103:9 108:9 | **solely** 252:8 **solis** 25:24 |
| **significant** 159:23 160:20 164:17 186:13 243:17 249:15 | 156:23 160:22 164:15,23 206:11 206:15 229:16 | 163:15 175:16 210:14 214:20 219:24 220:1 231:21 237:6 242:7 247:3,18 | **solution** 22:18 28:16,24 135:24 136:21 167:2,6 **solutions** 25:17 111:21 136:18 174:4 179:14 |
| **significantly** 48:23 | **sitting** 59:19 63:21 80:23 93:14 | **slapped** 84:10 | **solve** 147:4 161:23 |
| **signing** 16:24 | 112:18 133:18,23 | **slated** 71:21 | **solving** 136:6 |
| **signs** 181:1,2 225:8 | 140:16 144:3 183:9 188:6 | **slauson** 88:8,9 **sleep** 77:23 | **somebody** 78:5 80:10 82:17 85:21 |
| **silliness** 220:10 | 189:16 213:4 | **sleeps** 76:19 | 142:5 168:3 |
| **silly** 52:8 69:10 | 239:7 261:18 | **slide** 10:8 17:8 | 181:14 201:18 |
| **silos** 32:6 | **situation** 62:6 | 84:17 177:6 | 230:24 234:17 |
| **similar** 129:8 | 75:15 86:22 | **slides** 249:9 250:8 | 244:25 |
| **simple** 37:15 | 124:17 175:24 | 250:9,10,15 | **someplace** 112:20 |
| **simply** 47:2 256:2 | **six** 45:19 52:22 | 257:23 262:8 | 168:23 |
| **sincere** 143:9 | 81:8 102:18 177:4 | **slightest** 50:12,13 | **somewhat** 46:2,3 |
| **sincerely** 110:3 | 177:7,18 181:17 | **slow** 136:11 | 233:18 |
| **single** 27:19 62:12 129:13 152:20 201:12 202:18 254:17 | 233:17 239:20 **sixth** 36:12 **size** 23:3 37:15 41:16 157:18 | 141:19 166:5 200:3 **slowing** 27:6 **small** 56:14 117:19 155:24 | **soon** 26:25 98:8 128:11 153:23 156:22 170:19 220:23 250:1 |
| **sir** 87:8 143:23 147:13 148:3 151:11 158:25 166:15 167:21 168:6,14 194:10 204:14 229:14 | **skid** 28:4 33:8,10 33:22 34:15,19 35:20 36:25 37:1 37:4 48:9,10 67:1 92:12 140:9,17 168:4 181:2 | 193:14 241:24 242:5 **smaller** 132:17 **smart** 184:8 **smells** 78:25 **smyers** 2:12 | **sooner** 44:3 45:13 **sore** 94:10 **sorry** 13:6,14 73:25 74:10 79:4 89:21 99:17 104:14 109:4 |
| **sit** 165:3 191:12 207:19 253:25 254:1 | 195:24 196:5,7,12 197:1,16,18,18,20 197:20,21 198:3 | **soak** 165:4 **sobel** 2:15,15 | 150:7 151:18 159:8 163:18 |
| **site** 38:21,25 91:15 91:22 102:18 121:19 138:15 | 200:14 202:6 204:1,2,12,14,21 | **socal** 104:14 105:16 | 207:11 210:1 223:7 231:21,22 |

Page 49

[sorry - stepping]

236:22
sort 123:1 218:8 218:12
sorts 201:12
souls 165:10
sound 30:5 230:19 231:13
sounds 158:5 199:9
source 193:11,12 202:7
sources 191:23
south 3:11 118:6
spa 101:4 104:11 230:9
space 199:13 249:17
spaced 51:13
spaces 56:15 154:2 156:20
speak 7:3 23:22 105:25 108:17 229:2 248:19 253:19
speaking 8:10 15:5 28:1
speaks 137:19
spear 55:25 56:4 181:17
spearheading 74:20
special 4:2 25:8 33:2 107:16 114:16 118:12 221:3
specialized 245:15
specific 29:4 38:14 223:16 224:9 237:16,24 245:3
specifically 10:23 18:17 38:8,13

58:10 64:17 87:13 118:17 185:22 222:11 230:14 234:1 237:22
specify 226:7
spectrum 31:1,11
speculating 135:19
speed 197:15 241:3
spend 78:15 181:23 253:16
spent 190:7,9 191:10,13 218:3 253:18 254:8
spertus 2:4
spertuslaw.com 2:7
sphere 25:2 260:10
spillover 164:10
spiraling 32:18
split 13:9
spoke 170:20
sponte 84:13
spots 91:10,13
spread 165:7,7
spring 1:19 6:18
squabble 241:19
squabbling 243:1
squander 102:25
squirrel 180:20
st 118:7 119:3 122:8,15,16 126:12 128:11,17 139:5 244:20,21
stack 44:10
staff 25:7 49:8 69:25 76:1 92:8 98:7 102:5,16 105:12,17 106:2

110:13 117:12,13 135:1 153:13 159:24 161:7 171:23 173:8 200:1 219:9,15,19 219:21 220:11 230:7 235:12
stake 261:13
stance 234:7
stand 99:13 107:4 225:8 241:9
standards 163:7
standing 62:20 176:22 213:2
standpoint 207:1 207:1 216:19
stands 225:3
stanton 56:9
stars 3:6
start 22:22 24:12 25:18 28:2 49:4,9 49:10,12 55:22,22 72:9,10,10 83:7 98:24 99:9 105:4 113:1 114:20 118:3 132:9 179:13 185:18 191:15 195:18 220:13
started 55:16 57:25 58:2 62:10 64:25 65:13 69:20 113:25 131:17 132:19 133:5 137:15 171:3 196:9 205:7 235:20 259:25
starting 39:16,17 61:17 64:11 70:17 173:4

starts 105:17
starving 93:14
state 6:13 25:11 30:2 32:9 43:20 44:11 47:18 60:3 60:4 74:15 80:25 88:11 89:23 94:5 99:5 100:10 107:9 120:22 148:10 174:21,23 263:22 264:6
stated 226:24 241:8
statement 53:4 54:13 124:12 132:23 210:5 227:1
statements 73:24 74:1,8
states 1:1 224:8 235:6,8
statewide 88:24 247:13
stating 60:5 249:3
station 154:1
stations 158:13
status 1:13 31:22 31:23
stay 18:13,13 38:8 172:18 176:9
stays 94:21 95:7
step 21:21 63:16 65:3 119:21 120:11,16,25
stepped 50:1 56:20 60:18,23 61:16,21,21 152:18
stepping 83:24 111:22 136:5

Veritext Legal Solutions
866 299-5127

[steps - sure]

| | | | |
|---|---|---|---|
| steps 28:21,22 79:16 | 87:24 90:16 91:8 123:17 147:3,21 | 218:16 | support 55:4 59:10 60:1 100:12 |
| steve 107:11 | 162:5 167:3 191:4 | successfully 75:5 | 133:1 136:18,19 |
| stick 167:4 225:8 | 197:19 256:5 | 100:22 101:17 | 152:20 165:21 |
| stipulation 19:20 | 261:3 | 260:2,23 | 171:2 244:6 246:9 |
| stop 7:2 30:15 | stretch 87:15 | suddenly 97:22 | supported 46:19 |
| 45:8 71:10 93:6 | stretched 76:6 | suffer 90:14 | 46:25 59:11 60:7 |
| 114:7 123:23 | strictly 260:1 | suffering 191:2,3 | 133:2 136:18 |
| 126:17 132:14 | strife 181:7 | sufficient 21:12 | supportive 46:21 |
| 136:13 152:10 | stripe 198:5,12 | 204:9 243:7,18,21 | 101:22 120:12 |
| 192:22 235:11 | strong 21:10 34:23 | suggest 106:22 | 124:11 146:12,16 |
| stopped 132:21 | struck 124:6 | suggested 121:15 | 146:25 147:5,10 |
| storage 158:10 | structure 45:5 | suggestions 158:9 | 147:14 148:7 |
| store 76:20 94:20 | structures 26:5 | suite 2:5,16,21 3:6 | 149:11 150:1,12 |
| story 76:13 | struggle 75:10 | 3:11 | 150:24 160:21 |
| strangers 94:24 | struggling 102:11 | suited 156:1 | suppose 134:18 |
| strategies 101:9 | 155:10 | summary 114:21 | supposed 17:14 |
| 117:14 | stuck 44:21 | summer 27:13 | 43:6 116:25 |
| stream 45:3 | 198:23 | 172:4,24 | 179:25 181:9 |
| streamline 149:16 | study 27:2 | summertime | 205:2 251:4 |
| streams 44:10 | stuff 104:21 | 205:7 | supposedly 203:15 |
| street 1:19 2:5,11 | 198:24 256:4 | sunday 53:18 | supreme 30:24 |
| 2:16,21 3:11 6:18 | stunned 238:8 | 80:21 | sure 22:14 37:8 |
| 13:3 32:22 35:23 | sturdy 26:4 | sunny 32:20 | 75:25 101:8 |
| 36:16 43:17 50:24 | style 201:23 202:5 | supervision | 108:18 111:4,7,23 |
| 63:13 66:24 67:12 | 202:19 | 186:24 264:8 | 112:22 113:4 |
| 84:19 85:24 108:5 | sua 84:13 | supervisor 25:24 | 114:9,12 116:4 |
| 124:25 132:9 | subject 19:2,22 | 38:19 58:21 | 117:6 121:1,11 |
| 133:18 136:2 | 138:19 | 117:13 120:9,10 | 130:12 146:18 |
| 140:9 145:18 | submit 19:15 | 145:17 | 153:2 163:24 |
| 147:25 158:10 | submitted 160:8 | supervisor's 118:5 | 164:15 167:19 |
| 162:13 176:23 | subsequent 7:17 | 118:8 | 168:13 172:13,18 |
| 178:1 192:19 | 101:3,15 | supervisors 9:3 | 173:1,3,4,19 182:9 |
| 204:22,25 205:8,9 | substantial 151:24 | 59:1 126:13 | 189:21 192:24 |
| 206:24 217:8,15 | substitute 128:22 | 138:13 221:1 | 204:14,14 205:12 |
| 232:22 234:17 | success 51:5 58:13 | 223:14 227:2,3 | 205:23,24 209:14 |
| 255:10 | 139:9 143:10 | supplant 13:22 | 212:15,23 213:20 |
| streets 29:16,20 | successful 28:9 | supplement 237:9 | 214:18 218:14 |
| 31:6,18 32:4 | 31:15 32:4 39:15 | 237:16 | 223:25 224:13 |
| 50:18 67:6 72:19 | 51:13 90:18 102:5 | supplemental 7:10 | 233:6 234:20 |
| 80:1,13,15 87:18 | 141:23 218:14,15 | supply 9:19 | 239:7 246:13 |

Page 51

[sure - tension]

247:10 250:24 259:5,20

**surplus** 161:6

**surprise** 40:21 69:15

**surprised** 33:19 63:24

**surrounding** 190:8

**survives** 80:24

**swallowed** 196:23

**sweep** 176:20

**sweeping** 175:11

**swept** 136:1

**sworn** 263:5

**sym** 92:11

**symbol** 92:11

**synonymous** 188:12

**system** 44:21,23 78:18 80:3 81:1,8 96:24 119:8 141:16 199:19,24

**t**

**t** 5:1

**table** 21:20 23:12 69:13 120:16 155:22 184:1 208:15 249:22

**tack** 46:18

**tackle** 149:19

**tactical** 31:8

**taft** 72:24

**tail** 101:12 146:9

**take** 6:10,12 9:2 9:13 16:1 17:7 23:11 24:5 25:1 29:16 35:6 40:18 45:17 53:8 58:17 70:7 71:15 75:8 78:25 84:6 92:17

93:5 95:12 96:14 96:23 97:21 103:2 112:7,9 124:23 137:2 140:21 141:9,13 148:25 157:4 163:8 166:3 175:6 181:4 184:22 187:13 193:8,13 194:19 200:4 201:6,9 204:16 226:1 242:7,17 247:12 247:20 249:23 253:25 254:2 255:16 259:14

**taken** 6:14,21 24:10 142:23 155:22 156:3 165:2 178:14 185:5 186:8,9,22 192:14 197:12 208:2 244:3 263:3 263:12

**takes** 9:11 68:24 141:4 143:2 151:1 151:2 178:24

**talk** 10:22 34:23 35:22 41:17 45:15 45:15 63:9 65:14 66:20 67:17 82:15 84:22 93:5 97:11 97:25 109:1,12,13 112:12 113:11 122:24 124:4 126:22 135:5 137:17 139:24 150:20 167:23 180:5 183:13 188:20 190:19 198:14 204:10 206:2,3 213:3

220:5,16 242:2 245:11 257:14 261:1,15

**talked** 21:9 22:16 34:23 37:13 40:8 49:17 51:22 105:21,22 130:17 131:12 135:8 141:23 153:6 202:8 253:6 260:10

**talking** 47:4 62:4 67:17 81:14 89:12 121:14 124:19 132:9 136:21 139:23 146:10 153:20 181:16 190:17 191:15 196:13 213:20 215:11 220:20 248:17,18

**talks** 161:7

**tangible** 28:16

**taormina** 153:8

**tap** 217:12

**tape** 149:21

**tara** 66:3 76:16,21 76:23,24 231:17 232:7,12 233:3,7 234:17,22 236:20

**target** 25:20 26:11 48:11 174:12

**targeted** 11:17 170:15

**tarzana** 71:23

**task** 197:14 221:3 221:6 224:14

**taxpayer** 30:19

**taxpayers** 29:11 119:8

**te** 70:13

**team** 58:16 61:21 77:5 87:11 104:10 105:15 115:16 162:24 243:10 244:9,24

**team's** 110:4

**teams** 230:8 233:25 234:4,9 235:19 244:6,23 245:21,25 246:6 246:15 258:8,9,9 258:10,11 259:5

**tear** 32:3

**teaspoon** 198:2

**technically** 180:22

**teddy** 181:20

**tell** 17:23 20:18 34:1 38:5 56:22 60:5 64:8 66:15 70:5 84:8 93:9 97:20 117:4 131:4 136:4 139:2 181:23 182:1 193:21 195:23 196:10 198:19,20 218:3 250:2

**telling** 57:20 85:11 184:9 194:11 210:8

**temporarily** 43:16 195:16

**temporary** 11:15 22:22 47:4 113:21 193:18

**ten** 7:23 16:10 51:24,25 149:10 172:24 173:5 188:20

**tension** 179:8

Veritext Legal Solutions
866 299-5127

[tent - thinking]

| | | | |
|---|---|---|---|
| tent 22:9,11 50:19 | tex's 116:21 | 262:5,14 | 46:16 47:16 50:20 |
| 50:19 63:14 69:20 | thank 6:19 10:5 | thankful 16:17 | 53:11 56:4,10 |
| 69:20 70:19 76:20 | 15:14 16:20 24:9 | thanking 7:6 | 59:4 60:15 63:2 |
| 133:19 177:24 | 25:9 32:23 33:11 | thanks 98:22 | 63:22 64:15 65:14 |
| 178:6,7 | 33:15 34:13,17,21 | 113:5 145:16 | 65:16 69:9 83:5 |
| tents 115:21,21,25 | 37:3 39:5,14 | 168:12 | 84:13 86:23 |
| 176:22 177:4,7,19 | 47:11,12,21,23 | thanksgiving | 108:25 112:13 |
| 181:17 | 59:3 60:13,16 | 32:10 | 116:4 117:14 |
| tenure 104:3 | 69:25 78:21 80:22 | thereof 183:15 | 118:19,21,24 |
| teresa 72:22 | 81:21 82:17 84:21 | 264:13 | 119:13 120:8,12 |
| term 19:16,17 | 87:6,8,10,20,22 | thing 17:6 20:24 | 123:10 126:2,3 |
| 46:18,21,25 | 89:13,15,16,16 | 23:14 37:12 40:8 | 127:3 130:8 |
| 124:11,11 128:14 | 92:6 93:25 98:6 | 50:8 68:3,4 71:19 | 131:10,22 133:7 |
| 137:19 149:11 | 98:19 99:11 109:3 | 80:19 90:10 96:6 | 135:7 140:19 |
| 158:1,6 166:5 | 109:9,25 110:1 | 107:6 117:24 | 143:9 149:16 |
| 213:22 217:2 | 111:25 112:3,4,10 | 121:14 132:22 | 150:11,22 153:7 |
| 229:22 | 114:14 118:14,15 | 133:17 153:5 | 154:6 155:18 |
| termination 78:12 | 121:5 143:14,15 | 177:11 180:11 | 165:14 166:4,15 |
| terms 11:12 13:19 | 143:23,23 144:2 | 187:10 202:9 | 176:20 177:21 |
| 19:25 37:19 68:7 | 146:3,5 151:11,12 | 204:18 214:22 | 183:22 184:7 |
| 70:16 74:12 83:8 | 151:19 154:8,11 | 220:15,16 224:16 | 185:15 187:17,20 |
| 84:9 86:18,25 | 154:12,14,17 | 225:24 236:21 | 188:7,9,12 190:14 |
| 88:11 99:15 | 155:1 158:22,24 | 237:9,19 241:13 | 191:13 192:12 |
| 105:23 108:23 | 159:8,19 163:20 | 250:20 253:20,23 | 193:12,23,25 |
| 109:22 110:9 | 165:13 166:12,14 | 260:14,22 | 199:23 204:19 |
| 111:14 130:13 | 167:18,20 168:14 | things 26:18,22,22 | 207:22 208:1,2 |
| 140:6 159:20 | 168:22,24 169:25 | 30:5 39:16 45:7 | 209:2 211:3,7,8 |
| 172:11,12,16 | 174:14,15 182:4,5 | 52:10 55:22 74:12 | 212:12 214:21,24 |
| 188:15 193:5,13 | 182:6 184:13,23 | 75:13 113:2,10 | 217:4 224:23 |
| 208:19 213:20 | 185:4,20 188:4 | 130:17 137:23 | 225:12 226:18 |
| 256:15 | 189:10 193:2 | 152:9 153:18 | 228:25 229:21 |
| terrible 94:10,18 | 196:1,2,6 197:9 | 159:25 174:16 | 232:18 236:16 |
| terrific 204:19 | 200:16 202:1 | 175:16 184:19 | 237:10 239:1,16 |
| territory 32:12 | 204:14 208:23 | 220:3 221:19 | 241:14,19,25 |
| test 83:8 144:18 | 209:1 216:10 | 239:13 240:18 | 252:17,18 253:4 |
| testified 22:2 | 224:5 225:21 | 251:15 257:12 | 254:24 257:20 |
| testifying 263:5 | 226:13 231:11 | think 7:13 8:15 | 258:11,20,22 |
| testimony 63:20 | 234:17 235:3 | 9:4 10:1,19 11:8 | 260:1 |
| 66:18 | 237:6 246:22 | 11:12 17:18 19:13 | thinking 46:4 |
| tex 115:17,17,20 | 247:9 248:7,9 | 21:8 22:18 23:9 | 178:13 179:24 |
| 115:25 116:7 | 249:5 257:5 262:4 | 37:11 42:14,15 | 193:15 |

Veritext Legal Solutions
866 299-5127

[third - transportation]

third   50:6 93:1 124:24 127:6 143:11 240:18
thomas   126:14
thomsen   10:24
thought   14:24 16:12 50:6 63:10 178:5 194:5 211:2 211:15 239:16,18 240:19 259:24
thoughts   8:13 9:17 11:8 155:7
thousand   12:9 131:9 211:22
thousands   129:11
threat   164:2
threatened   90:20 103:9
three   8:4 44:12 52:17 55:3 63:8 68:18,24 79:13 80:5,24 85:13 91:20 104:3 113:14 131:17 132:10 138:1,13 139:21 141:1 143:2 197:24
thrive   29:21
thrown   238:8
thursday   1:15 6:2 6:16 195:20
time   1:16 7:2,17 9:21 12:10,13 14:25 22:13 25:17 26:5,24 28:22,22 31:9 32:24 45:17 49:15 51:7,14 52:2,21 61:19 62:11 65:1 67:13 71:16 76:12 77:4 78:18 79:14 92:2

98:16 102:25 106:2 110:4 132:16 134:6 139:14,23 140:21 140:22 141:1 142:20 145:3 151:23 153:19,22 156:14 157:4 165:8 167:9 168:23 170:20 172:25 180:24 184:13 198:18 201:16 206:3 208:10,15 210:2 211:20 213:14 215:19 229:7 230:11 232:3 242:6 253:17,18 253:19 254:22,22 255:10 260:12,13 261:1
times   7:14 16:20 30:23 32:11 34:3 46:12,23,23 51:22 76:23 83:12 102:18 109:11 114:15 117:11 135:9 149:10 188:20 222:22 230:7 261:17
tiny   138:15,25 156:25
tip   181:17
tired   106:17
titta   26:7
today   8:25 9:18 10:21,21,22 11:3 16:22 19:11 20:3 23:2,18 24:3,18 25:2 29:7 32:24 33:4 42:12 44:16

44:19 45:17 51:9 51:16 75:3 76:14 96:15 97:22 99:14 107:5,19 113:21 122:22 146:20 152:14 161:2,4 165:19 171:17 197:21 199:2 236:8 243:7,21 246:14 259:21 262:10
today's   6:11 8:4 16:24 32:21
token   69:7 133:9 204:20
told   10:12,15 13:24 16:3,20 34:3 36:20 47:6 48:4,8 50:20 60:4 70:3 78:14 107:16 134:7 145:2 151:5 177:12,14 178:9 178:19 179:20 180:21 191:23 196:9 203:1 209:16,18 216:20 230:7
tomorrow   93:8 113:21 132:9 160:2 262:10
tone   248:24
tonight   103:12 109:1
tons   165:1,2 255:25 256:2
tools   90:4
top   27:19 145:2,13 160:18 225:25
toss   140:19 205:6
tossed   13:2

total   26:10 65:17 65:18 91:21 99:16
touch   62:17 65:22 66:9 77:23 84:24 261:6
toughest   70:10
track   25:19 38:15 59:15 101:7
traditional   20:6 44:13
traffic   134:19
tragedy   234:16
trailers   174:7,11 174:18,20
train   29:2
trained   234:4 244:1
tranche   194:16
transcribed   1:24 264:7
transcript   21:19 23:11 264:10
transcriptionist   263:7
transfer   199:10
transgender   200:9
transit   154:1
translated   66:24
transparency   24:19 33:17 34:2 35:1 49:25 53:11 53:12 98:16 190:7 191:11,14 200:23
transparent   19:12 24:3 63:19 139:11 196:25
transparently   37:13
transportation   86:15,17

Veritext Legal Solutions
866 299-5127

[transported - understand]

| | | | |
|---|---|---|---|
| **transported** 80:6 | **trust** 20:5 54:12 | **two** 15:4,9 17:19 | **unallocated** |
| **trash** 82:16,24 | 194:22 235:14 | 20:14 21:3 35:11 | 122:13 190:4 |
| 84:25 85:12,17,17 | 242:7,23 247:23 | 45:7 51:18 52:16 | **unbearable** |
| 85:20 86:22 87:1 | **truthful** 54:13 | 55:22 61:11,14,16 | 163:11 |
| 90:14 94:16 95:1 | **try** 20:6 242:20 | 62:8 71:20 72:1,4 | **unbelievable** |
| 95:25 96:2,10 | 247:21 260:18 | 77:7,20 78:1 | 90:23 |
| 108:5 111:11 | 261:9 | 93:11 95:20 104:4 | **unclear** 105:23 |
| 183:18 248:18 | **trying** 11:21,22 | 109:12 130:23,24 | 187:6 216:15 |
| 253:7,23 254:6,7 | 44:10 61:7 65:7 | 131:15 135:7 | 218:9 |
| 254:12,15,16,17 | 70:6 72:1,5 76:7 | 138:5 140:12,13 | **uncomfortable** 9:8 |
| 254:23,25 255:3,9 | 80:22 85:9 102:1 | 140:23 142:6 | 9:10,12,13 189:16 |
| 255:14 | 103:18 111:21 | 144:18,19 145:3,9 | 193:11 |
| **trauma** 198:12 | 135:1 142:15 | 151:25 155:25 | **uncomplimentary** |
| **traumatized** | 144:4 157:1 | 156:15 160:5,22 | 139:14 |
| 199:14 | 168:18 197:14 | 164:15 170:9,9,18 | **unconstitutional** |
| **travel** 97:12 | 228:24 230:14 | 178:1 238:9 | 59:20 |
| **tree** 124:18 125:4 | 234:23 241:2 | 241:23 242:2,14 | **underlying** 212:10 |
| **tremendous** 10:1 | 242:23 260:15,17 | **type** 75:2 199:23 | **undermining** |
| 10:16 11:13 20:4 | **tsunami** 30:12 | 248:21 251:5 | 186:19 |
| 35:22 51:5,21 | **tuesday** 80:22 | **types** 240:14 | **underneath** 49:15 |
| 52:12 227:21 | **turn** 19:7 22:25 | 255:23 | 96:6,10,17,19,23 |
| **tried** 12:19 38:21 | 24:24 60:10 78:21 | **typewriting** 263:6 | 113:12 134:7,9 |
| 38:23 132:7 | 87:3 107:15 | 264:8 | 171:4 212:3 |
| 152:20 166:3 | 109:24 177:6 | **typhus** 165:7 | **underpass** 60:25 |
| 194:9,12 196:22 | 181:15 184:18 | **typical** 54:23 | 61:3 65:7 115:4 |
| 210:16,21 239:18 | 185:12,16 189:12 | | 171:4 233:18 |
| **trimming** 124:18 | 231:15 | **u** | **underpasses** 12:5 |
| 125:4 | **turned** 16:3 23:1 | | 12:18 14:19 20:12 |
| **trina** 219:2 | 68:7 188:11 | **u.s.** 129:3 | 21:6,13 27:22 |
| **trouble** 49:21 | 247:19 | **ucla** 150:17 | 29:17 60:20 61:6 |
| **trough** 44:22 | **turning** 160:11 | 157:10,12,14 | 61:11 62:3 64:7 |
| 140:2,20 | **turnkey** 193:18 | **uh** 15:15 39:12 | 64:24 70:18 88:7 |
| **truck** 78:23,24 | 203:17 | 85:7 92:15 149:7 | 125:12 209:4,19 |
| **true** 52:2 105:3 | **turns** 200:5 | 152:12 183:5 | 209:22 211:24 |
| 120:6,14 129:16 | **tv** 116:24 134:21 | 195:21 201:1 | 229:9 242:23 |
| 135:19 179:20 | 174:1 | 209:9 252:4,9 | 258:15 259:13 |
| 192:2 210:4 227:1 | **tweaks** 171:12 | 255:12 | **underperforming** |
| 263:8 264:9 | **twelve** 46:12 | **ultimately** 31:10 | 199:23 |
| **truly** 66:22,23 | **twice** 35:13 38:2 | 44:23 62:12 | **undersigned** 264:5 |
| 183:25 | 104:19 240:10 | **umhofer** 2:4 | **understand** 27:17 |
| | | **unable** 100:11 | 43:4 56:6,24 |
| | | 163:6 | |

Veritext Legal Solutions
866 299-5127

[understand - volunteered]

66:10 73:4,10,14
80:6 94:6 96:2
111:15 119:23
189:2 209:3
216:11 239:2
240:11 251:22
**understanding**
12:2 13:8 15:25
45:11 73:2 79:15
119:7 120:17
134:6 175:6 179:9
198:7 209:2 210:4
211:12,14 213:7
214:5 215:2,8,13
215:23 237:13
238:16 243:6,20
259:2
**understands** 217:2
**understood** 153:3
**undertake** 96:3
**undertaking** 55:19
**undetermined**
156:25
**unequivocally**
206:11
**unexplainable**
47:2
**unfeasible** 102:21
**unfortunately**
9:11
**unhoused** 26:19
27:14,15 28:11
29:10 31:18 33:7
38:12 44:14,18
48:2 129:5,11
145:23
**unilateral** 30:7
**unincorporated**
103:5 108:13,16
108:24

**unintended** 91:6
**unintentional**
18:19 92:23
**union** 33:24 37:4
168:24 184:14
204:6
**unit** 146:15 150:3
157:5 160:24
**united** 1:1 150:3
224:8
**units** 26:20 27:4
37:23 46:11 50:1
50:1,2,2,2 71:25
91:21 101:24
141:25 142:4
156:13,17 160:1
160:21,23,23
170:11,14 187:20
**unproductive**
142:22
**unprofessional**
63:11
**unquote** 67:10
**unsafe** 164:8
**unsheltered** 99:16
101:20 145:23
**unspent** 190:4
**untrue** 214:16
**unwillingness**
260:20
**update** 25:11 92:2
99:12 113:9
137:23 144:11,11
153:20 169:4,5,7
**updates** 170:7
**upgrades** 153:15
**ups** 45:20,25
255:14
**urgency** 29:15
31:14 45:13
197:16 199:5

**urgent** 28:17
**urine** 165:2
**use** 10:20 99:24
102:2 119:3
121:19 126:18
154:4 155:17
161:11,16 170:15
219:25 258:23
**uses** 179:21 180:1
**utilizing** 171:1
217:10
**utopian** 32:20

**v**

**vacancies** 173:16
**vacant** 97:24
102:12,22 158:11
**vacated** 19:22
**vacating** 238:14
**vague** 31:22
**valley** 72:14
171:18 176:20
**value** 29:19 45:1
102:19 257:12
**van** 173:18,22
198:2,5,11
**vargas** 1:24
264:21
**various** 65:1
118:16 191:23
226:8 258:10
**vast** 206:14
**venegas** 1:23 6:9
263:2,20
**venerable** 15:1
**venice** 35:14 49:15
113:12 114:22
121:10 137:16
**ventura** 157:21
**verify** 23:13
**veritext** 6:10

**vermont** 161:3
**vernon** 88:8,8
**veronica** 83:21
87:21
**versus** 6:16 29:1,1
29:2,2,3,6,8 30:22
129:9 215:11
**veteran** 193:9
**veteran's** 195:23
**veterans** 91:15
156:13 193:13
195:24 197:6
200:18 201:9
202:3,5 203:14
208:13
**victim** 200:5,8,11
200:11
**victory** 69:1
**vie** 99:24
**view** 23:4 50:11
123:18
**viewed** 15:6
**vigil** 197:23,25
**villages** 138:16,25
**villas** 161:3
**violation** 126:11
**virtually** 113:8
**visit** 51:17 63:1
64:3 83:11 87:5
94:1 111:10 122:4
**visited** 63:22 67:2
76:23 92:10
**voa** 91:15
**vodka** 76:25 77:2
**voice** 196:22 197:1
197:2 207:5
**volume** 29:19 45:1
148:1 166:7
**volunteered** 56:18
56:23

Page 56

**[volunteers - weeks]**

**volunteers** 79:17 152:7
**voting** 127:4 235:7 235:8
**vouchers** 30:20 187:21
**vs** 1:7
**vulnerable** 26:17 76:8 211:1 212:7 212:10 217:22

**w**

**wade** 30:23
**wages** 150:15
**wait** 18:3,14 43:17 84:14 247:17
**waited** 79:13
**waiting** 43:20 44:12 96:16 128:17 131:12 140:17 210:8 239:7
**walk** 29:20 36:16 85:14 93:4 96:15 96:23 103:4,10,14 103:21 113:2 114:17 116:23 140:14 153:11 178:3 204:20,22 204:24,25 211:20 244:16
**walked** 69:20 85:16
**walking** 63:12 203:13 205:9 235:5
**walks** 162:5
**walkway** 131:17
**want** 9:22 10:9,23 13:7 15:23,23 17:6 23:13 24:19 25:1,9 29:19

32:23 33:17 37:2 40:20 49:8 51:11 53:3,8,25 55:22 58:10 59:3,4 60:16 63:5,8,14,18 64:7 65:8,8,10,24 67:4 69:9,11 73:1 73:5 79:10 83:17 83:20,25 84:5 88:16 92:6,9 93:25 95:8 96:6 96:23 98:5 99:11 99:12 101:11 102:8 109:3,9,15 109:17 111:4,6 112:7 113:11 114:14 117:2 122:7 129:1 131:23 133:16 134:14 137:21 138:16 141:7 143:7,12 144:6 146:3,17,24 148:3 148:12 149:19 152:13,14,15 154:5 162:17,19 163:19 166:12 167:4,18,23 168:22 174:3,14 174:15,15 175:9 175:12,15,18 177:22 181:18 182:4,5,6,9 183:8 183:24,25 184:5 184:13,23 188:7 188:16 193:3,8,13 196:5 199:10,14 202:2,10 204:5 205:23 209:10,19 212:22 218:3 220:3,7,16 225:15

226:8,9 230:2,11 232:4 233:14 235:18,25 238:12 239:7,9,16 240:10 242:10,11 246:1,2 246:5 247:25 248:10,20 250:2 251:13,17 252:22 253:3,8,11,24 254:2,4 255:24 256:14 259:9,13 259:14,18,20
**wanted** 35:21 49:20 57:11 58:1 58:8,12 63:1 69:19 91:5 111:23 120:21 144:10 164:14 177:6 196:12 224:16 231:12 235:2 236:5 238:3 240:13 241:6 245:17 249:3 258:6
**wanting** 119:14 200:3
**wants** 31:5 77:24 187:10,13 220:5 241:4 250:11
**warning** 41:6
**waste** 78:18 106:2 165:1,2
**wasted** 110:4
**watch** 84:14 107:16 177:20
**watched** 83:18
**watchers** 176:23 178:1
**watching** 52:8 93:10 165:24 232:21

**water** 67:10
**watts** 160:21
**waved** 178:3
**waving** 154:19
**way** 8:4,11 9:11 16:3 21:1 28:7,15 30:5 35:15 40:9 60:21 70:2,9 76:15 82:5 85:4 87:2 89:17 96:25 100:19 103:3 104:16,23 111:15 111:23 120:13 129:12 130:4,4,5 133:6 144:4 150:3 152:20 160:14 162:2,11 166:21 167:5 168:11,22 169:10 180:23,23 181:22 186:13 187:22 192:3 200:10 202:24,25 210:19 211:14 228:14 236:23 239:17 257:15,24 262:7 264:13
**ways** 75:2 105:2 119:15
**we've** 63:2 104:20 158:8
**website** 224:3
**week** 51:23 61:14 61:16 68:18 86:1 86:1,1 89:15 90:2 91:10 104:19 106:25 134:8,15 134:22 144:25 221:20,20
**weeks** 51:18 52:16 52:17 61:9 62:9 70:22 94:22,22,22

Page 57

[weeks - ya]

94:22 104:19 105:8 131:15 139:21 140:12,23 141:1 151:25 161:8
**weight** 236:15
**weitzman** 4:10 51:24 257:7,11
**welcome** 24:20 37:9 48:12,14 109:18 176:15 184:3 250:24
**welcoming** 114:14
**wendy** 4:5 9:25 18:12 21:9 176:8 176:12,13 178:15 202:12 205:20
**went** 12:15,16 39:10,13 49:16 80:18 83:11 85:14 106:16 132:6 141:25 144:15,17 174:24 178:3,6,6 220:25 221:12 227:12
**wesson** 49:14
**west** 2:5,11 156:24 183:19 264:15
**western** 1:2
**wet** 198:22
**whatsoever** 187:16,24
**wheelchair** 162:12 183:9
**whichever** 180:3
**white** 36:3,4 48:16 196:18 198:4,11
**whittier** 56:9 66:3 66:8,9,16,17 76:16 77:24 80:6 232:7 259:16 260:4

**wholeheartedly** 43:4
**whoops** 107:18
**wide** 100:8 134:21 251:19
**wildfire** 105:4 106:7 108:14
**wildfires** 104:4
**willing** 36:25 60:24 65:3 88:3 99:21 119:21 120:11,16,25 228:13 244:11 252:14
**willoughby** 156:18
**wilmington** 166:17
**winding** 192:7
**window** 199:21
**winnetka** 60:25 61:11 70:20
**winning** 200:13
**winter** 172:5 173:23 199:6
**wisdom** 78:6
**wish** 23:24 97:18 97:19 113:5 130:22 131:21 166:12 184:8 225:14 261:21
**withstand** 59:18
**witness** 263:4
**women** 144:16 158:3 199:14
**won** 210:20
**wonder** 140:6 147:20 183:18
**wonderful** 51:3 77:5 84:21 98:7 109:7 141:2 192:9 200:10 201:3

**wondering** 17:20 67:15
**word** 10:20 38:1 39:22 53:1 64:13 137:13
**words** 33:13 46:20 57:19 82:2 122:23 124:10 132:15 174:24 201:17 211:19
**work** 20:6,8 23:5 28:3 32:8,16 37:7 40:15 44:7,15,20 50:25 52:3 54:1 57:25 58:1 60:19 69:18 72:11 77:18 83:15 88:2 90:16 101:4 110:22 121:1 125:15 134:16,24 153:17 155:16 156:3 163:10,12 164:18 171:10 211:12 219:19 220:10 221:11,12,22 234:1 235:11 242:20,20,22,25 243:13 245:21 246:2 260:12,13
**worked** 44:17 69:21,24 86:23 123:3 133:4 239:20 241:23
**worker** 2:9,14 129:9
**workers** 36:8 62:4 63:9 84:21 85:4 130:21 234:9 243:8,9,17,25 244:18

**working** 20:9,14 25:16 31:23 33:6 51:20 54:2 70:6 81:1,9 92:4 101:4 101:9 111:19 138:2 154:3 159:24 170:22 171:4,24 173:11 222:8 247:21 253:15
**works** 53:25 80:3 126:6,7 137:10 156:14 170:14 244:24
**world** 39:25 51:12 216:1
**worried** 129:18 133:17 136:4
**worry** 132:18 213:2
**worse** 93:24 95:6 221:13
**worth** 27:18 94:16 102:19 227:13
**worthy** 11:11
**wrap** 121:13 184:19
**wraparound** 166:20
**write** 67:20 84:13 205:3
**written** 211:14 212:11
**wrong** 135:23 150:11 260:18

| x |
|---|
| **x** 5:1 107:10,10,11 |

| y |
|---|
| **ya** 65:21 |

Page 58

**[yard - zoom]**

| | |
|---|---|
| **yard** 158:10 | 254:13 255:7 |
| **yeah** 10:4 38:10 | 258:3 261:4 |
| 38:18 39:1,21 | **year** 7:22,24,25 |
| 41:7,20,24 45:14 | 8:8 25:22 43:7 |
| 46:3 53:7,23 | 51:4,7 52:19 78:9 |
| 65:18 66:6 72:12 | 91:18,21 100:9 |
| 77:10 81:24,25 | 139:15 140:1 |
| 83:23 86:3,16 | 141:4,9,13 146:21 |
| 87:20 88:22 89:1 | 166:10,10 190:3 |
| 95:3,4 96:22 97:7 | 194:16 221:1,2 |
| 97:9 98:13,21,22 | 239:20 240:16 |
| 99:2,17 107:13 | 254:15 |
| 110:18,19 112:9 | **years** 7:13 13:3 |
| 113:4 115:10,22 | 21:4 23:8 42:4 |
| 115:23 116:2,3,13 | 44:13,17,18 62:3 |
| 121:8 123:8,12 | 95:24 104:4 133:6 |
| 125:7,19 126:16 | 157:13 158:14 |
| 133:21,22 134:4 | 171:20 184:3,12 |
| 135:15 139:18 | 196:23 209:6 |
| 147:12 148:15 | 217:5 |
| 149:14,23 153:9 | **yeoman's** 197:13 |
| 159:5 163:21 | **yep** 114:19 127:9 |
| 165:18 167:25 | 128:4,7 135:25 |
| 168:3,19 169:12 | 136:8,24 254:20 |
| 169:14 174:17,25 | **yesterday** 33:18 |
| 175:2,2 176:17 | 83:4 86:17 220:24 |
| 179:1 182:11 | **york** 151:9 |
| 183:2 185:12 | **young** 7:1 84:21 |
| 189:13 193:9 | **youth** 145:10 |
| 200:22 204:24 | **z** |
| 206:5 208:22 | |
| 210:12 211:13 | **zero** 50:2 |
| 212:8,14,22 214:4 | **zone** 103:6,17 |
| 214:24 220:1,12 | 173:25 |
| 220:15,19 221:8,9 | **zones** 165:1 |
| 222:13 223:7 | **zoom** 2:2 98:2 |
| 225:1 234:25 | 112:6,13 154:16 |
| 235:4,13 236:11 | 159:6,7 203:24 |
| 236:18 237:5 | |
| 242:8,16,16 | |
| 245:18 248:16 | |

Veritext Legal Solutions
866 299-5127