Case 2:20-cv-02291-DOC-KES   Document 215   Filed 02/04/21   Page 1 of 15   Page ID #:3693



COVID 19 RESOURCES

# MARK RIDLEY-THOMAS

LOS ANGELES CITY COUNCILMEMBER

=== DISTRICT 10 ===

 

# HOMELESSNESS AND SYSTEMIC INEQUALITY:

# OVERVIEW AND

# POLICY BRIEF

FILED
CLERK, U.S. DISTRICT COURT

2/4/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KD_____ DEPUTY

By Mark Ridley-Thomas, PhD



Nearly thirty-five years ago, while leading the Los Angeles chapter of the Southern Christian Leadership Conference, I wrote an article asserting that homelessness should not be treated as some sort of philanthropic fad or charitable moment. A few years later, I completed my doctoral work in the field of social ethics, which concentrated on the ethical dimensions of public policy making. As a forty-year student of this field of study, my academic and applied focus was then and is now: social criticism and social change.

As ethicists, we speak the language of norms, warrants, values, virtues, claims, rights, and, of course, the common good. My body of work over the past four decades — first as a local civil rights leader and then as a local elected official — has been focused on analyses, reflection, advocacy and solutions. Fundamentally, my approach has been to critique the status quo and push for systemic social change. In the public sector, where governance is central, this is generally called reform. Other more nuanced iterations of the push for change are terms such as *reinvent, reengineer* and, most recently, *reimagine*. The intersection of history, analysis, wisdom, and strategy has proven immensely useful in the effort to facilitate transparency, call for accountability and make way for substantive change.

In August 2019, writing as a Los Angeles County Supervisor, I released a Position Paper to outline some of the opportunities and roadblocks we faced as a region. As I embark on a new chapter and a different role at the Los Angeles City Council, this policy brief attempts to summarize the programmatic initiatives and innovations, as well as the extraordinary challenges, that have taken place over the last decade. This document further seeks to capture the policy deliberations and actions that must inform prospective proposals and chart possibilities for bold and unprecedented interventions that might alter the trajectory of homelessness in Los Angeles, e.g., unparalleled regional collaboration.

## I. Intersectionality and Social Ethics

The term "intersectional" was coined by UCLA Professor Kimberlé Crenshaw to describe how the intersection of race and gender was being inadequately considered in legal matters or by public policy experts. Academics such as USC Professor Ange-Marie Hancock Alfaro have applied an intersectional approach to research on major safety net subjects examining various challenging aspects of poverty.

Homelessness as a policy challenge is a site of intersectionality, a point of convergence for fields such as religion, politics, sociology, medicine, economics, ethics. Solutions to homelessness will inevitably draw on a range of disciplines and practices. From a social ethics framework, policy-makers, theologians, physicians, and economists must ask themselves brave questions. Who has the right to "land, labor and lodging" in Los Angeles? Who has the right to a roof over their heads to protect themselves from the elements, and a right to a door to safeguard their belongings? And whose duty or responsibility is it to uphold, protect and honor these rights?

A deep sense of urgency has driven my analysis, advocacy and activism on this point. Article 25 of the Universal Declaration of Human Rights recognizes the Right to Housing as a part of the right to an adequate standard of living.

For the better part of the last decade, my top priority has been to confront the crisis of homelessness. In a city as prominent as Los Angeles, a county as prosperous as Los Angeles, and a state as wealthy as California, and a country as powerful as the United States, homelessness is a moral crisis which will define our civic legacy in the eyes of future generations. The social ethicist is obliged to ask, "What ought we do in the face of this deepening humanitarian crisis?"

American Academy of Religion Annual Conference San Diego, CA (November 2019) Panel on Housing, Health and Equity: Government as a Site for Intersec-tional Justice. Left to right: J. Shawn Landres, PhD; Hon. Mark Ridley-Thomas, PhD; Hon. Sadat Jaffer, PhD; and Hon. Lois Capps, RN, MA (Ret.)

## II. LA County Homeless Initiative and Measure H

In August 2015, Los Angeles County declared homelessness a Countywide priority and established the Homeless Initiative within the County's Chief Executive Office. During the Fall and Winter of 2015, the County convened a series of 18 policy summits and public hearings involving community-based organizations, people with lived experience, faith leaders, advocates, academics, business, philanthropy and the 88 cities in the region. In February 2016, this process culminated in a comprehensive action plan with 47 strategies ranging from homelessness prevention to street outreach and intensive case management services, crafted in partnership with community stakeholders. In a display of strategic collaboration, the City of LA released their plans and recommendation on the same day. To evidence commitment, the County allocated $100M in one-time funds to implement the action plan – but I strongly felt that we had a pact with the community to find ongoing funds to implement the strategies in the years to come.



Measure H passes with 69.24% of votes, surpassing the required two-thirds threshold. (March 2017.)

In December 2016, I authored the motion and led the charge on Measure H, a 10-year special sales tax that was overwhelmingly approved by Los Angeles County voters in March 2017. Measure H provides $355 million a year, dedicated to combatting and preventing homelessness, and has funded the expansion of street outreach, shelter and interim housing (including specialized beds such as recuperative supportive services) as well as rent subsidies and services for people living in supportive housing units throughout the 4,000 square miles that make up the County of Los Angeles. Beyond Measure H, data is captured in four dashboards maintained to track progress and assess the efficacy of the region's efforts to date.

Measure H funded nonprofits are collectively housing more people than ever before – almost 23,000 in 2019 alone. But, frankly, we underestimated the forces of unrelenting housing and employment markets – in 2019, for every 207 people that exited homelessness each day, an other 227 became homeless. In other words, despite the tireless work of the nonprofits, there is a daily net increase in homelessness.

## III. Governor's Council of Regional Homeless Advisors

In the face of this daunting challenge, in May 2019, Mayor Steinberg of Sacramento and I were appointed as co-chairs of Governor Newsom's Council of Regional Homeless Advisors, charged with thinking about solutions in three areas:

- Preventing and reducing street homelessness;
- Breaking down barriers to build more housing; and
- Connecting more people to mental health and substance use treatment.



Governor's Council of Regional Homeless Advisors, Sacramento, CA (January 2020).

On January 13, 2020, the Governor's Council released its 40-point Comprehensive Crisis Re-sponse Strategy, which is a framework for a bold and strategic response at both the State and local levels to address homelessness.

In addition to recommendations that will help keep people housed with rental assistance and services, and break the vicious cycle between jails, hospitals and homelessness, the Comprehensive Crisis Response Strategy put forward the idea of obligating government to provide a roof over everyone's head.

From a social ethics viewpoint, we see the law as the moral minimum or a floor upon which to build, and not a ceiling that has been reached. It is dynamic and ever evolving as consensus is being achieved in large and small iterations. Several lawsuits and the pursuant settlements have shaped the Los Angeles homeless policy-making arena for the past two decades. Regretfully, they have not been aspirational, instead they have been minimalist in substance; not prescriptive but proscriptive. In other words, these legal settlements have constrained government rather than compelled government; conferred on homeless persons a right to a park bench rather than obligating government to honoring a homeless person's dignity and their right to a roof.

With this understanding, an attempt was made, just before the pandemic, as the County began exploring the concept of piloting the government obligation of providing housing and services to homeless older adults, particularly homeless seniors aged 65 years and older. And then came another lawsuit filed by an alliance of downtown business owners and other stakeholders, which brought into play Judge David O. Carter. While some of the ensuing activity has helped spur a sense of urgency related to the homeless crisis, it has underscored the inter- and intra-governmental tensions, even dysfunction, within municipal offices, bureaucracies and struc-tures, i.e. city, county, and LAHSA. And all this was unfolding as our region grappled with a global pandemic on our shores.

## IV. Homelessness and COVID-19: A Crisis Within a Crisis

As the COVID-19 crisis gripped our region and the nation, it was imperative that we did our utmost to protect the health and well-being of those living outdoors. Beginning in April 2020, the State and LA County, in collaboration with LA City and its public and private partners, responded swiftly to launch Project Roomkey, which re-purposed almost 40 hotels, and brought indoors over 4,000 vulnerable adults, including homeless seniors, in less than three months.

The new federal administration has been quick to recognize the value of sustaining and expanding non-congregate shelter, including California's Project Roomkey, to curb the

spread of COVID-19 among vulnerable populations. A day after he was inaugurated, President Biden instructed FEMA to provide 100% Federal cost share reimbursement until September 30, 2021 for COVID-19 "emergency protective measures" such as non-congregate shelters for elderly and medically-vulnerable people experiencing homelessness.

Beyond the scaling up of these efforts, our region must continue to develop long-term plans so that once the COVID-19 crisis subsides, there is a strategy to create and sustain stable housing with services to help people thrive. With this in mind, in May 2020, the County approved and subsequently funded a plan to rehouse the Project Roomkey residents in long-term stable housing even before the pandemic receded.

In addition, through the State-sponsored program called Homekey, the County is poised to purchase 10 motels, which will provide almost 850 units of interim and permanent affordable housing to vulnerable people experiencing homelessness. The City's Homekey efforts will also create hundreds of units of interim and permanent affordable housing.

From March 2020 until December 2020, the COVID-19 positivity rate among people experiencing homelessness had been lower than the positivity rate in the general population. The lower positivity rate was due to the intensive collective efforts by public agencies and nonprofits to carry out safety protocols in shelters and congregate settings, including reducing the number of beds and modifying interior layouts to create physical distancing, adding airflow ventilation systems, providing Personal Protective Equipment to staff and clients, and constant sanitizing of spaces. In addition, street outreach teams provided wellness checks to people living in encampments, triaged people with symptoms to quarantine and isolation units, and connected seniors and medically-vulnerable people to non-congregate Project Roomkey temporary housing units. The County further supplemented the street outreach teams with mobile Coronavirus Response Teams made up of physicians, emergency medicine technicians and nurses who administered weekly COVID-19 prevalence testing and provided infection control guidance in shelters and on the streets.

Collaboration between the City and the County, the State and the Federal Government continue to be critical as our region contends with the predicted post-Thanksgiving surge in COVID-19 cases. During the first week of November 2020, there were 49 COVID-19 positive cases among people experiencing homelessness but during the first week of December, the numbers had soared to 271 cases, a 453% increase.



As we await vaccines for elderly and vulnerable unhoused people and the essential workers that serve them, we must maintain our emergency posture and secure additional non-congregate settings to safely shelter and house people. To this end, Governor Newsom's proposed budget which sets aside $1.75B to multiple Homekey sites for elderly, medically vulnerable and those living with serious mental health issues will be a critical and timely resource.

## V. Disparities and Systemic Racism



Launch of the report of the Ad Hoc Committee on Black People Experiencing Homelessness at California African American Museum, Los Angeles (February 2019). Glenn Harris, President, Race Forward; Jacqueline Waggoner, LAHSA Com-missioner and Chair of the Ad Hoc

COVID-19 has exacerbated and highlighted long-standing community disparities and systemic injustices, propagated by racism and socioeconomic hierarchies. Even before the protests of the early summer of 2020, the data and experiences of LA County residents had starkly illuminated the deeply-etched inequities in the foundation of our society. For example, Black people make up only eight percent of Los Angeles County but they constitute one third of the homeless population – a disparity disturbingly mirrored throughout California and the United States. This is why in April 2018, LAHSA Commissioner Jaqueline

Committee; Earl Edwards, UCLA; Reba Stevens, Mental Health Commissioner and Lived Expertise; Dr. Va Lecia Adams Kellum, President and CEO, St Joseph Center; Dr Jack Barbour, CEO, SCHARP. Waggoner led the county's first Ad Hoc Committee on Black People Experiencing Homelessness which resulted in a ground-breaking study, issued in December 2018, with 67 recommendations to reduce these unconscionable disparities.

In July 2020, I introduced a motion which established an Anti-Racist policy platform within the County of Los Angeles, and led to the launch of the Anti-Racism, Diversity and Inclusion Initiative.

The Anti-Racism efforts will unfold with a deep nexus with the ongoing work of the Ad Hoc Committee on Black People Experiencing Homelessness and that of the Alternatives to Incarceration Initiative, which builds on the results of the LA County Office of Diversion and Re-entry, which was created by my motion in September 2015.

## VI. Unearthing the Roots of the Homelessness Crisis

Without Measure H funds we would be worse off, but as the structural drivers of homelessness continue to escalate, Measure H funds alone are insufficient. There is universal recognition that the incomes of the typical renter have not kept up with increasing rents and that we collectively face an affordable housing gap of over half a million rental units in Los Angeles County.

In the 1970s, LA City residents voted in favor of "down-zoning" and restricting the number of parcels available to build housing; research shows that LA City went from a city that could accommodate housing for ten million people to a city that could only accommodate housing for four million residents. In tandem with housing supply going down, since the 1970s, the typical worker's wages have stagnated in spite of increased profits and productivity of the companies that employ them.

In the 1960s, the federal government went all-in to fund rental assistance to needy households and effectively cut poverty in half. But since the 1980s and 1990s, a series of budget-cutting exercises at the federal level has decimated the amount of rental assistance, causing the number of renter households with "worst-case" needs to explode. Throughout the country, only one in every four households that need rental assistance receive federal vouchers, and the case in LA City is even more dire, where only one in every eight eligible households receive federal rent vouchers. The bottom line is that while many people lived in poverty in the 1960s and 1970s, there was surplus housing, which made sure that they did not have to resort to living in their vehicles or on the sidewalk.

This woeful government retreat was made worse in 2012 with the dissolution of "redevelopment" in California, a Statewide investment program which had required localities to set aside 20 percent of all tax increment generated through redevelopment to create and preserve housing that would be affordable to low- and moderate-income residents.



**FUNDING FOR HOUSING**

In Los Angeles County, state funding **decreased 15%** while federal funding **increased 68%** for housing production and preservation from FY 2008-09 to FY 2018-19.

| FUNDING SOURCE | FY 2008-09 (in thousands) | FY 2018-19 | % CHANGE |
|---|---|---|---|
| Redevelopment Housing | $274,788 | $0 | -100% |
| State Housing Bonds and Budget Allocations | $177,836 | $347,199 | 95% |
| State LIHTC | $0 | $36,696 | --% |
| **STATE TOTAL** | **$452,623** | **$383,895** | **-15%** |
| Federal LIHTC | $268,646 | $667,922 | 149% |
| HUD Block Grants | $252,196 | $207,608 | -18% |
| **FEDERAL TOTAL** | **$520,841** | **$875,530** | **68%** |

The 2019 UCLA Quality of Life index showed that a quarter of all Los Angeles residents surveyed feared losing their homes and becoming homeless. Housing affordability as an issue was paramount especially among younger residents, renters, and households with incomes less than $60,000 a year. In the 2020 UCLA Quality of Life index (forthcoming), the proportion of survey respondents worried about losing their homes and becoming homeless jumped to 31%.

## VII. Scaling Up the County and City Response

It is clear that the aftermath of the pandemic will leave hundreds and thousands of households on the precipice of economic disaster. Residents of under-served communities disproportionately suffer from underlying conditions that make them most susceptible not only to serious health outcomes but also negative economic and housing outcomes. As the pandemic rages on, tenant protections and eviction prevention become public health interventions. While the County and the City have both created rent relief and eviction defense programs, they are insufficient in the face of the fallout that awaits us when the rent moratoria come to a close. The City Council has submitted a request to the Los Angeles Superior Court seeking the halting of in-person eviction proceedings and the issuance of unlawful detainers so that we continue to protect the tenancies of needy households and preserve public health during the pandemic.

The pandemic has also dealt a severe blow to our local revenue options such as Measure H, so additional revenue will need to be pursued to ensure sufficient funds. It is to this end that Los Angeles County is sponsoring a new statewide plan launched by local and statewide advocates called "Bring California Home." If we are to fully confront this once-in-a-century situation, we will need a "New Deal" type response from the State and Federal governments that helps local jurisdictions accelerate housing and employment supports.

It is time to redouble our collaborative efforts when it comes to assisting those who are forced to sleep on the streets. What has been shown to work are targeted intensive "multi-disciplinary" street engagement teams, made up of substance use counselors,

mental health clinicians, nurses, people with lived experience and social workers, who can offer tailored support services and an array of immediate housing options. In June 2015, my motion took the first steps to create and coordinate countywide multi-disciplinary street engagement teams that used a client-centered, service-focused approach. The model was piloted in Skid Row and then scaled up through Measure H funds. A recent independent evaluation clearly shows the efficacy of this model.

## VIII. The Value of a Health-Focused, Trauma-Informed Approach

I have often said that involuntary poverty is a form of violence, and that homelessness is the most extreme manifestation of involuntary poverty. This is why we should take a trauma-informed, health-focused approach to addressing homelessness rather than a conventional criminal justice approach. Only a diligent and consistent commitment to an intersectional approach and a social ethical critique in response to this crisis, will bring us closer to correcting this violence.

Georgetown Law Professor Peter Edelman's most recent text, ***Not a Crime to be Poor***, makes it abundantly clear that criminalizing poverty is counterproductive and proven to be ineffective. Further, he contends that a law enforcement led strategy will not address the root causes of homelessness—which include skyrocketing rents and a lack of living wages. What does work is meeting people where they are and providing real wrap-around services with a commitment to help people attain dignity and worth. In other words, this is the hard work of operationalizing the Right to Housing.

In the most extensive recent polling on homelessness in Los Angeles, it is noteworthy that voters wanted disaster assistance-like interventions in dealing with homelessness. Not once did they call for police presence or law enforcement tactics; instead, they called for everything from four to seven story apartment buildings in residential and commercial neighborhoods, to rapid building of temporary housing and safe parking in public lots, encouraging shared housing and providing funds to prevent renters from being evicted. In essence, the voters understand that since this issue was years in the making, it will take an unrelenting, multi-pronged effort to the trajectory of homelessness.

The voters of this County have affirmed these approaches, which is why the same poll showed that 60% preferred the pursuit of long-term solutions over band-aids or a big display of "command and control force." There is no silver bullet but instead an arsenal of tools that must all be deployed simultaneously for a prolonged period of time.

## IX. Strengthening the Safety Net

Beyond lawsuits that seek to confine and segregate access to certain parts of the city, there is an opportunity to elevate the discussion to how we distribute resources in an equitable fashion. How we choose to treat the least among us will be the arbiter of what we stand for as a city, as a county, as a society.

Grand opening of 127th and El Segundo Apartments: 160 units of affordable supportive housing. Los Angeles, CA (October 2018)

If it is the case that we are half a million rental units short in Los Angeles County and so lacking in a ready supply of affordable rental units that teachers, bus drivers, janitors – the pre-pandemic essential worker glue that kept our communities together – are forced to spend more than half of their income on rent, then what should we do about that? Should we not be using every opportunity we have, as fellow-residents, to advocate for more housing? Should we not be thinking about how we boost the number of housing units available for households categorized as very low-income – in Los Angeles, that means single adults making less than $23,000 a year or 3-person households making less than $30,000 a year? Over the last six years, the City of Los Angeles only approved 6,430 units for low income households – but over 92,000 units were approved for households making above moderate income. And as we face the impending cliff of expiring eviction moratoria, shouldn't we be advocating that the Biden Administration swiftly enact a program of mortgage relief for landlords, followed by rent forgiveness for tenants? The pandemic has shown that when you line up resources with a sense of urgency and political will, solutions will materialize at scale.

We should not squander this opportunity to act boldly to preserve tenancies across the City and safeguard the landlords who rent to even more tenants who desperately need shelter.

## X. Right to Housing Motion

On December 15, 2020, my first action as a new LA City Councilmember was to introduce a Right to Housing motion. The Right to Housing provides a framework for a jurisdiction to take progressive steps to adopt legislative, administrative, judicial and budgetary measures to advance the Right to Housing for all. According to the UN Committee on Social and Economic and Cultural Rights, the Right to Housing contains at least seven elements: (1) security of tenure; (2) availability of services, materials, facilities, and infrastructure; (3) affordability; (4) habitability; (5) accessibility; (6) location; and (7) cultural adequacy. Adoption of a Right to Housing framework with policy and legislative components, provides a jurisdiction with a pathway to plan the allocation of resources and housing entitlements. Once established, a Right to Housing framework provides guiding principles for the allocation of resources and protections, especially when a government is faced with difficult decisions in the midst of a financial crisis.

My second action was to ask Los Angeles City to support the Bring California Home plan, which would endeavor to close tax loopholes for multinational corporations, and secure $2.4 billion a year dedicated to funding housing and services to address homelessness throughout the State. To successfully establish a Right to Housing will require close collaboration between local, state and federal entities to harness the necessary resources combined with political will and a sense of urgency.

## XI. Civic Engagement: A CALL TO ACTION

Measure H passed because we had an inclusive and broad base of community support. Addressing the root causes of homelessness will take political will, tenacity and a spirit of communal unity and collective action. There is no shortage of ways to engage both large and small, personal or corporate. Consider the following partial list of options to pursue:

- Learn about the causes and solutions for homelessness in Los Angeles County and City;
- Support and fund the community-based nonprofits that are active in your community and region;
- Ask for interim housing and affordable housing to be placed in your neighborhood;
- Voice your support for new sites and safety-net programs that provide services to the needy residents in your community;
- Listen into public meetings and learn more about what is being done to address homelessness
- If you are an employer, learn more about how you could employ formerly-homeless people; and

- If you are a landlord, learn more about how you could rent out your unit.

  Above all, consider yourself part of the Army for Good that is being assembled to counter this crisis.

Much has been accomplished, but much more remains to be done. Hard work lies ahead, but we must stay resolute. If everyone in our region is to prosper, it cannot be a matter of political expediency, it must be understood as a moral imperative, and an economic necessity, that all who call Los Angeles home are able to attain their full measure of dignity, self-worth and self-determination. More effective collaboration between the City and the County must be the order of the day.

**Mark Ridley-Thomas** *is Chair of the LA City Council Homelessness and Poverty Committee, Co-Chair of CA Governor Gavin Newsom's Council of Regional Homeless Advisors, and author of LA County's Measure H (.25 cents sales tax, generating $3.5B for rental subsidies, services and treatment over a ten year period: 2017-2027).*

Share This:

# CONTINUE READING



Councilmember Ridley-Thomas' Statement on His Appointment to Chair The Homelessness and



Ensuring Angelenos Have a "Right to Housing"





# Operationalizing a Crisis Response Strategy to Fight Homelessness through an



Terms Of Use



