THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
WILLIAM F. COLE, SBN 308624
  bcole@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for *Amicus Curiae*
Central City Association of Los Angeles

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>       Plaintiffs,<br><br>    v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>       Defendants. | CASE NO. 2:20-cv-02291<br><br>**BRIEF OF *AMICUS CURIAE* CENTRAL CITY ASSOCIATION OF LOS ANGELES PURSUANT TO THE COURT'S JANUARY 31, 2021 ORDER INVITING THIRD PARTY BRIEFING (DKT. 205)** |

**TABLE OF CONTENTS**

I.   STATEMENT OF INTEREST ..................................................................................1

II.  INTRODUCTION .....................................................................................................2

III. ARGUMENT .............................................................................................................6

   A.  The City of Los Angeles Has, For Years, Pursued a Failed Litigation Strategy that Has Only Served to Exacerbate the Homelessness Crisis .........................................................................................6

   B.  This Court Should Couple Any Resolution of This Lawsuit With A Requirement that the City Regulate the Public Right-of-Way to Promote Public Health and Safety ......................................................... 11

IV.  CONCLUSION ....................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*Jones v. City of Los Angeles*,
    444 F.3d 1118 (9th Cir. 2006) .................................................................................. 6, 7

*Jones v. City of Los Angeles*,
    505 F.3d 1006 (9th Cir. 2007) ..................................................................................... 7

*Lavan v. City of Los Angeles*,
    693 F.3d 1022 (9th Cir. 2012) ......................................................................... 8, 9, 10

*Martin v. City of Boise*,
    920 F.3d 584 (9th Cir. 2019) ..................................................................................... 12

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) ...................................................................................................... 13

*Mitchell v. City of Los Angeles*,
    No. 2:16-cv-01750, 2016 WL 11519288 (C.D. Cal Apr. 13, 2016) ........................... 9

*Mitchell v. City of Los Angeles*,
    No. 2:16-cv-01750, 2017 WL 10545079 (C.D. Cal. Sept. 25, 2017) ......................... 9

**STATUTES**

L.A. Muni. Code § 41.18 (a) ........................................................................................ 11

L.A. Muni. Code § 41.18 (d) ........................................................................................ 11

L.A. Muni. Code § 41.47.2 ........................................................................................... 11

L.A. Muni. Code § 56.11 ............................................................................................... 11

L.A. Muni. Code § 56.12 ............................................................................................... 11

**OTHER AUTHORITIES**

[Proposed] Stipulated Order of Dismissal, Ex. A (Settlement and Release
    Agreement), *Mitchell v. City of Los Angeles*, No. 2:16-cv-01760 (C.D. Cal.
    May 29, 2019), ECF No. 118-1 ................................................................................. 10

*A Court Decision Letting Homeless People Keep All Their Belongings Helps No One*,
    THE LOS ANGELES TIMES (May 31, 2019) ............................................................ 10

Gibson, Dunn &
Crutcher LLP

ii
BRIEF OF *AMICUS CURIAE* CENTRAL CITY ASSOCIATION OF LOS ANGELES

# TABLE OF AUTHORITIES

**CASES**

*Jones v. City of Los Angeles*,
    444 F.3d 1118 (9th Cir. 2006) .................................................................................. 6, 7

*Jones v. City of Los Angeles*,
    505 F.3d 1006 (9th Cir. 2007) ..................................................................................... 7

*Lavan v. City of Los Angeles*,
    693 F.3d 1022 (9th Cir. 2012) ......................................................................... 8, 9, 10

*Martin v. City of Boise*,
    920 F.3d 584 (9th Cir. 2019) ..................................................................................... 12

*Missouri v. Jenkins*,
    515 U.S. 70 (1995) ...................................................................................................... 13

*Mitchell v. City of Los Angeles*,
    No. 2:16-cv-01750, 2016 WL 11519288 (C.D. Cal Apr. 13, 2016) ........................... 9

*Mitchell v. City of Los Angeles*,
    No. 2:16-cv-01750, 2017 WL 10545079 (C.D. Cal. Sept. 25, 2017) ......................... 9

**STATUTES**

L.A. Muni. Code § 41.18 (a) ........................................................................................ 11

L.A. Muni. Code § 41.18 (d) ........................................................................................ 11

L.A. Muni. Code § 41.47.2 ........................................................................................... 11

L.A. Muni. Code § 56.11 ............................................................................................... 11

L.A. Muni. Code § 56.12 ............................................................................................... 11

**OTHER AUTHORITIES**

[Proposed] Stipulated Order of Dismissal, Ex. A (Settlement and Release
    Agreement), *Mitchell v. City of Los Angeles*, No. 2:16-cv-01760 (C.D. Cal.
    May 29, 2019), ECF No. 118-1 ................................................................................. 10

*A Court Decision Letting Homeless People Keep All Their Belongings Helps No One*,
    THE LOS ANGELES TIMES (May 31, 2019) ............................................................ 10

Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, THE LOS ANGELES TIMES (Mar. 10, 2018) .................................................................................................. 3

Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, THE ATLANTIC (Mar. 8, 2019) ................................................................... 3

Doug Smith & Benjamin Oreskes, *Are many homeless people in L.A. mentally ill? New findings back the public's perception*, THE LOS ANGELES TIMES (Oct. 7, 2019) ......................................................................................................... 2

Edward Ring, *While Venice Beach Residents Under Lockdown, Homeless and Encampments Grow and Thrive*, CALIFORNIA GLOBE (Mar. 26, 2020) ..................... 4

Emily Alpert Reyes, *Garcetti says L.A. can resume disputed ban on overnight sidewalk sleeping*, THE LOS ANGELES TIMES (June 22, 2018) .................................... 8

Eric Leonard, *LAPD Concerned about Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC 4 LOS ANGELES (Feb. 27, 2020) ......................... 5

Gale Holland, *Attacked, abused and often forgotten: Women now make up 1 in 3 homeless people in L.A. County*, THE LOS ANGELES TIMES (Oct. 28, 2016) ............. 4

Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, THE LOS ANGELES TIMES (June 5, 2019) ........................................................ 7

Genevive Finn, *String of Fires Triggers Homeless Camps' Clearance*, THE MALIBU TIMES (Nov. 18, 2020) ....................................................................... 4

Grace Matheny, *Crimes against homeless people increased 24% in 2019 while overall crime decreased, crime data shows*, ABC 7 (Jan. 14, 2020) ............... 2

Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, THE LOS ANGELES TIMES (Feb. 9, 2019) ................................... 3

Joel Grover & Josh Davis, *Venice Beach Up in Flames: Frequent Homeless Tent Fires Threaten Residents & Tourists*, NBC 4 (Oct. 10, 2020) ........................... 3

John Cadiz Klemack, *One Dead, One in Custody in Sepulveda Basin Fire*, NBC 4 LOS ANGELES (Sept. 9, 2020) ...................................................................... 4

*Jones v. City of Los Angeles Settlement Agreement*, available at https://veniceupdate.com/wp-content/uploads/2018/06/Jones-Settlement.pdf .......... 7

Jugal K. Patel, Tim Arango, Anjali Singhvi & Jon Huang, *Black, Homeless and Burdened by L.A.'s Legacy of Racism*, THE NEW YORK TIMES (Dec. 22, 2019) ....... 5

Kevin Murray, *Opinion: Why a one-size solution to L.A.'s homelessness crisis is destined to fail*, THE LOS ANGELES TIMES (Sept. 19, 2019) ..................................... 10

Koco McAboy, *Business owner on Venice boardwalk shutting down shop after rise in crime and drugs in the area*, FOX 11 LOS ANGELES (Jan. 29, 2021) ............... 4

LOS ANGELES CNTY. DEP'T OF PUB. HEALTH, RECENT TRENDS IN MORTALITY RATES & CAUSES OF DEATH AMONG PEOPLE EXPERIENCING HOMELESSNESS IN LOS ANGELES COUNTY (2021) ..................................................................................................... 2

LOS ANGELES HOMELESS SERVS. AUTH., GREATER LOS ANGELES HOMELESS COUNT 2020 (2020) ............................................................................................................ 2

Mike Arnold, President & CEO of The Midnight Mission, L.A. City Council Homelessness & Poverty Comm. (Oct. 3, 2018) ......................................................... 9

Susan Shelley, *Los Angeles is right to back away from the Jones settlement*, THE ORANGE COUNTY REGISTER (June 26, 2018) ............................................................. 7

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. IV ............................................................................................... 8, 9

U.S. CONST. amend. VIII ..................................................................................... 6, 7, 12

U.S. CONST. amend. XIV ...................................................................................... 8, 9, 13

# I.     STATEMENT OF INTEREST

Central City Association of Los Angeles ("CCA") is the premier advocacy organization in the Los Angeles region and a leading visionary on the future of Downtown Los Angeles.  Founded in 1924, CCA represents the interests of over 300 members, including businesses, trade associations, and nonprofit organizations from a broad range of industries like homeless service providers, housing developers, large employers, cultural institutions, and more.  CCA's mission is to enhance the vibrancy of Downtown Los Angeles and increase opportunity in the region through advocacy and civic engagement.  CCA is deeply involved in policy deliberations concerning homelessness and was part of a broad coalition that supported Proposition HHH, Measure H, A Bridge Home, No Place Like Home, and many permanent and temporary housing projects for unhoused persons, such as reimagining the Men's Central Jail site into a housing- and service-focused, all-inclusive campus. CCA is committed to advancing comprehensive solutions to house persons experiencing homelessness, including by addressing the underlying systemic issues that perpetuate the vicious cycle of homelessness.

CCA is gravely concerned with the ever-worsening homelessness crisis playing out daily on the streets of Los Angeles and, in particular, in Downtown Los Angeles. Street encampments pose the greatest harm to the unhoused persons who reside there, as these sites cannot and do not allow for healthy or safe living conditions.  CCA is especially concerned with the City of Los Angeles's unsustainable approach to managing litigation implicating issues of homelessness.  CCA believes that the City's pattern of entering into settlement agreements under which it consents to the abdication of its duty to protect public health and safety is unworkable and has contributed in significant part to the growth of the current crisis, which has harmed the unhoused and the general public, including businesses and nonprofit organizations in Downtown Los Angeles.  Accordingly, CCA submits this amicus brief to respectfully request that this Court ensure that any resolution of this lawsuit, in addition to

providing long-needed temporary and permanent housing and services to those experiencing homelessness, holds the City to its obligation to safeguard public health and safety for all City residents.[1]

## II.   INTRODUCTION

As this Court has correctly recognized, the homelessness crisis gripping the State of California—and the City of Los Angeles in particular—is a calamity that closely approximates the ravages of a natural disaster.  Dkt. 205 at 1.  More than a thousand persons experiencing homelessness died last year on the streets of Los Angeles alone, and over *41,000* are without shelter—a number that increases every year.[2]  Violence, crime, and the free flow of drugs run rampant throughout the encampments in which many unhoused persons live, posing a grave danger to life and limb and trapping many in cycles of poverty, addiction, and mental illness.[3]

---

[1] This brief is submitted in accordance with the Court's invitation for third party briefing in its January 31, 2021 order.  *See* Dkt. 205 at 4.  No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.  No person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] LOS ANGELES CNTY. DEP'T OF PUB. HEALTH, RECENT TRENDS IN MORTALITY RATES & CAUSES OF DEATH AMONG PEOPLE EXPERIENCING HOMELESSNESS IN LOS ANGELES COUNTY AT 6 (2021), *available at* http://www.publichealth.lacounty.gov/chie/reports/HomelessMortality2020_CHIE Brief_Final.pdf; LOS ANGELES HOMELESS SERVS. AUTH., GREATER LOS ANGELES HOMELESS COUNT 2020 at 4 (2020), *available at* https://www.lahsa.org/documents?id=4558-2020-greater-los-angeles-homeless-count-presentation.

[3] *See* Grace Matheny, *Crimes against homeless people increased 24% in 2019 while overall crime decreased, crime data shows*, ABC 7 (Jan. 14, 2020), *available at* https://abc7.com/lapd-crime-stats-data/5849457/ (noting that crimes against persons experiencing homelessness in Los Angeles increased by 24% in 2019, with a 19% increase in serious violent crime, including homicide, rape, robbery, aggravated assault, burglary, motor vehicle theft, larceny-theft, and arson); Doug Smith & Benjamin Oreskes, *Are many homeless people in L.A. mentally ill? New findings*

Encampments littered with mountains of rotting trash, drug paraphernalia, and even human waste pose significant public-health hazards by serving as vectors for the transmission of medieval diseases such as typhus, typhoid fever, and tuberculosis.[4] Not even Los Angeles City Hall, located mere blocks from Skid Row, is immune: in the fall of 2018 a deputy city attorney allegedly contracted typhus while working at City Hall.[5]

Such conditions harm not only residents of the encampments and the health of the public, but they also impact the environment writ large. In Orange County, a February 2018 clean-up of a two mile-long encampment along the Santa Ana River that hosted more than 700 people uncovered "404 tons of debris, 13,950 needles, and 5,279 pounds of waste," including human waste, propane, and pesticides.[6] And in Los Angeles in 2020, "fires related to homeless [we]re up 82% over the last year."[7] In just

---

*back the public's perception*, THE LOS ANGELES TIMES (Oct. 7, 2019), *available at* https://www.latimes.com/california/story/2019-10-07/homeless-population-mental-illness-disability (noting that an LA Times investigation revealed that 51% of those living on the streets suffered from mental illness).

[4] Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, THE ATLANTIC (Mar. 8, 2019), *available at* https://www.theatlantic.com/health/archive/2019/03/typhustuberculosis-medieval-diseases-spreading-homeless/584380/.

[5] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, THE LOS ANGELES TIMES (Feb. 9, 2019), *available at* https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-story.html.

[6] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, THE LOS ANGELES TIMES (Mar. 10, 2018), *available at* https://www.latimes.com/local/lanow/la-me-ln-riverbed-debris-20180310-story.html.

[7] Joel Grover & Josh Davis, *Venice Beach Up in Flames: Frequent Homeless Tent Fires Threaten Residents & Tourists*, NBC 4 (Oct. 10, 2020), *available at* https://www.nbclosangeles.com/investigations/venice-beach-up-in-flames-frequent-homeless-tent-fires-threaten-residents-and-tourists/2442123/.

the past year alone, homeless encampments have sparked fires in areas abutting Tuna Canyon Park and the Sepulveda Basin.[8]

As this lawsuit demonstrates, local residents, business owners, and visitors, have not been spared of the chaos unfolding on the streets of Los Angeles either. Residents have reported being subjected to verbal and physical harassment and vandalization of their property.[9] Encampments block sidewalks and other public rights of way, forcing disabled persons, schoolchildren, and young mothers with kids to walk in the streets—or avoid such paths altogether. Compl. ¶¶ 5, 76a, 93–96, 104. Businesses—such as an immigrant-owned ice cream shop on the Venice Beach boardwalk—are unable to attract customers or guarantee the safety of their employees and are forced to shutter their doors.[10] Nowhere have the effects of this crisis been more pronounced than in downtown Los Angeles, especially on Skid Row—a locale where "more than a quarter" of women have reported being sexually assaulted, where crime and violence is perpetrated in broad daylight, and where businesses struggle to survive.[11]

---

[8] Genevive Finn, *String of Fires Triggers Homeless Camps' Clearance*, THE MALIBU TIMES (Nov. 18, 2020), *available at* http://www.malibutimes.com/news/article_ad0fe93a-29d6-11eb-8e3f-635b2cb90b1d.html; John Cadiz Klemack, *One Dead, One in Custody in Sepulveda Basin Fire*, NBC 4 LOS ANGELES (Sept. 9, 2020), *available at* https://www.nbclosangeles.com/news/local/one-dead-one-in-custody-in-sepulveda-basin-fire/2425962/.

[9] *See* Edward Ring, *While Venice Beach Residents Under Lockdown, Homeless and Encampments Grow and Thrive*, CALIFORNIA GLOBE (Mar. 26, 2020), *available at* https://californiaglobe.com/section-2/while-venice-beach-residents-under-lockdown-homeless-and-encampments-grow-and-thrive/ (collecting anecdotes).

[10] Koco McAboy, *Business owner on Venice boardwalk shutting down shop after rise in crime and drugs in area*, FOX 11 LOS ANGELES (Jan. 29, 2021), *available at* https://www.foxla.com/news/business-owner-on-venice-boardwalk-shutting-down-shop-after-rise-in-crime-and-drugs-in-area.

[11] Gale Holland, *Attacked, abused and often forgotten: Women now make up 1 in 3 homeless people in L.A. County*, THE LOS ANGELES TIMES (Oct. 28, 2016), *available at* https://www.latimes.com/projects/la-me-homeless-women/;

Against this backdrop, the City of Los Angeles has, for more than a decade, pursued a failed litigation strategy that has served only to entrench this status quo. That strategy—entering into broad and unworkable settlements that prevent the City from protecting the health and safety of the general public—has effectively created a de facto constitutional right to camp in public spaces and to store in that encampment unlimited amounts of personal property.  These settlements have contributed in no small part to the steady deterioration of the conditions on the streets of Los Angeles, while harming both housed and unhoused residents.  Sadly, the effects of the City's policy of abdicating of municipal law—and the crisis of homelessness more generally—are also unjustly borne disproportionately by communities of color; indeed, Black Angelenos are disproportionately represented in the homeless population compared to the Los Angeles population as a whole.[12]  The City's abandonment of its duty to protect the public and address the homelessness crisis must come to an end.  It is especially troubling that the City enters these settlements behind closed doors, without transparency, making it difficult for constituents to hold elected officials accountable for their decisions.

This Court can and should make certain that the City's wrongheaded approach to these issues ends with this lawsuit.  Any resolution of this lawsuit should require the City to account for the significant public health, safety, and environmental harms caused by encampments and compel it to provide temporary and permanent housing

---

Eric Leonard, *LAPD Concerned about Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC 4 LOS ANGELES (Feb. 27, 2020), *available at* https://www.nbclosangeles.com/news/local/lapd-concerned-about-increase-in-sexual-violence-against-women-experiencing-homelessness/2318899/; Compl., ¶¶ 76e–h, 77–92.

[12] Jugal K. Patel, Tim Arango, Anjali Singhvi & Jon Huang, *Black, Homeless and Burdened by L.A.'s Legacy of Racism*, THE NEW YORK TIMES (Dec. 22, 2019), *available at* https://www.nytimes.com/interactive/2019/12/22/us/los-angeles-homeless-black-residents.html (concluding that "[t]he historic displacement and fracturing of black communities in South Los Angeles have pushed black Angelenos . . . onto the streets at more than eight times the rate of other groups.").

and regulate the public right-of-way through longstanding, but since-abandoned, municipal laws designed to safeguard public health and welfare. Any other result will simply perpetuate the existing crisis.

## III.   ARGUMENT

### A.   The City of Los Angeles Has, For Years, Pursued a Failed Litigation Strategy that Has Only Served to Exacerbate the Homelessness Crisis

In response to lawsuits designed to restrict its ability to apply basic public health and safety laws, the City of Los Angeles has, for more than a decade, pursued a litigation strategy in which it enters into broad settlement agreements following setbacks in litigation, which have directly contributed to and exacerbated the ever-worsening conditions on Los Angeles's streets. By capitulating to these lawsuits and agreeing to abandon municipal laws regulating public health and safety, the City has facilitated the creation of a de facto constitutional right to camp in public spaces and to store in encampments unlimited amounts of personal property, regardless of the impact that those encampments have on public health and safety, the environment, and the city at large. Wholesale nonenforcement of the law is not a proper or rational public purpose—it is an improper and unlawful abdication of the fundamental obligations of any municipal government.

The City's use of this approach to litigation was first evident in connection with *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), a case in which six persons experiencing homelessness sued the City, alleging that its enforcement of a municipal ordinance prohibiting "sit[ting], l[ying], or sleep[ing] in or upon any street, sidewalk or other public way" violated the Eighth Amendment of the United States Constitution, which prohibits "Cruel and Unusual Punishment." *Id.* at 1122–25. The district court granted Los Angeles's summary judgment motion, holding that enforcement of this ordinance did not violate the Eighth Amendment because the ordinance penalized the plaintiffs for their "conduct," not for the "status" of being homeless, as the plaintiffs had argued. *Id.* at 1125.

The Ninth Circuit reversed. The Court held that "so long as there is a greater number of homeless individuals in Los Angeles than the number of available [shelter] beds, the City may not enforce" its public-camping ordinance "at all times and places throughout the City against homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* at 1138. The Court reasoned that persons experiencing homelessness "are in a chronic state that may have been acquired 'innocently or involuntarily'" and that "sitting, lying, and sleeping . . . are universal and unavoidable consequences of being human." *Id.* at 1136 (internal citation omitted). Thus, the Court held that the Eighth Amendment prohibits the City from "mak[ing] it an offense to be idle, indigent, or homeless in public spaces" *and* "criminaliz[ing] conduct that is an unavoidable consequence of being homeless—namely sitting, lying, or sleeping on the streets of Los Angeles's Skid Row." *Id.* at 1137.

Following the Ninth Circuit's decision, the parties entered into a settlement agreement that led to the Ninth Circuit vacating its decision. *Jones v. City of Los Angeles*, 505 F.3d 1006 (9th Cir. 2007). Under the settlement agreement, the City agreed that it would not enforce its public-camping ordinance in Skid Row between the hours of 9:00 p.m. and 6:00 a.m. *Jones v. City of Los Angeles Settlement Agreement*, *available at* https://veniceupdate.com/wp-content/uploads/2018/06/Jones-Settlement.pdf. The City also agreed that this policy of nightly non-enforcement would remain in effect until the City constructed an additional 1,250 units of permanent supportive housing for persons experiencing homelessness. *Id.* Thus, through this settlement, the City paved the way for legalized nightly camping in Skid Row and the explosive growth of encampments there.[13] Unfortunately, in spite of this

---

[13] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, THE LOS ANGELES TIMES (June 5, 2019), *available at* https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html; Susan Shelley, *Los Angeles is right to back away from the Jones settlement*, THE ORANGE COUNTY REGISTER (June 26, 2018),

settlement, conditions in Skid Row continued to spiral downhill—even after the additional 1,250 units called for by the settlement were built.[14]

Though *Jones* only concerned the use of public areas for sleeping, lying and sitting, the next frontier was the storage of personal property. The City's pattern of settling in the face of litigation setbacks continued with respect to this issue too. In *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), eight persons experiencing homelessness sued the City of Los Angeles, alleging that the City's seizure and destruction of their personal property, left unattended in public areas, violated their Fourth Amendment right to be free of unreasonable searches and seizures and their Fourteenth Amendment "procedural due process" rights. *Id.* at 1024–26. The district court agreed with the plaintiffs and issued an injunction prohibiting the City from (a) seizing property in Skid Row "absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health and safety, or is evidence of a crime, or contraband" and (b) "destr[oying] [such] seized property without maintaining it in a secure location for a period of less than 90 days," "[a]bsent an immediate threat to public health or safety." *Id.* at 1026.

The Ninth Circuit affirmed. The Court held that "even if the seizure of the [Plaintiffs'] property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable." *Id.* at 1030. The Court also held that "homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment," and that the City violated the plaintiffs' Fourteenth Amendment procedural due process rights by failing to provide them with "notice" and

---

*available at* https://www.ocregister.com/2018/06/26/los-angeles-backs-away-from-the-jones-settlement/.

[14] Emily Alpert Reyes, *Garcetti says L.A. can resume disputed ban on overnight sidewalk sleeping*, THE LOS ANGELES TIMES (June 22, 2018), *available at* https://www.latimes.com/local/lanow/la-me-ln-sidewalk-sleeping-20180622-story.html.

an "opportunity to be heard" before it "seized and destroyed their property." *Id.* at 1032–33.

The Ninth Circuit carefully cabined its holding in *Lavan* by noting that the case did not "concern any purported right to use public sidewalks as personal storage facilities." *Id.* at 1033. But that limitation did not last long. In *Mitchell v. City of Los Angeles*, No. 2:16-cv-01750, 2016 WL 11519288 (C.D. Cal Apr. 13, 2016), four plaintiffs sued the City of Los Angeles, alleging that the City had been engaged in a pattern and practice of unconstitutionally seizing their property incident to arrest in violation of the Fourth and Fourteenth Amendments. *Id.* at *1. The district court agreed and issued a preliminary injunction enjoining the City from "[c]onfiscating property in Skid Row or its surrounding areas, incident to an arrest or as part of a cleanup of an area where homeless people are located, absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband." *Id.* at *7. When the City sought clarification as to the scope of the district court's injunction—namely as to whether it also prohibited the City from enforcing an ordinance permitting it to seize "bulky items," such as sofas, appliances, and sheds left unattended on the streets—the Court held "[t]here is no additional exception [in its injunction] for bulky items" and if a bulky item "does not pose" an "immediate threat to public health or safety" "then it must not be seized." *Mitchell v. City of Los Angeles*, No. 2:16-cv-01750, 2017 WL 10545079, at *4 (C.D. Cal. Sept. 25, 2017).

Los Angeles then settled the *Mitchell* case in May 2019, over the objections of many city stakeholders, including service providers operating in Skid Row who feared that this settlement would make it even more difficult to deliver services to those who most need them.[15] As the President of one of the service providers on Skid Row

---

[15] Mike Arnold, President & CEO of The Midnight Mission, Testimony at the L.A. City Council Homelessness & Poverty Comm. 23:20 (Oct. 3, 2018), *available at* http://lacity.granicus.com/mediaplayer.php?view_id=46&clip_id=18406; *see also*

observed, "[i]n the interest of not criminalizing homelessness, we tend to avoid taking more affirmative steps and enforcing basic societal norms, ultimately leaving many to live in filth and subject themselves to further victimization."[16]  Despite this, under the settlement, the City promised that, for a three-year period, it would not "seize property as part of a cleanup of an area where homeless people's property is located, absent an objectively reasonable belief that it is abandoned, presents an immediate threat to public health or safety, is evidence of a crime, or is contraband."  [Proposed] Stipulated Order of Dismissal, Ex. A, ¶ 4(b) (Settlement and Release Agreement), *Mitchell v. City of Los Angeles*, No. 2:16-cv-01760 (C.D. Cal. May 29, 2019), ECF No. 118-1.  The City further agreed that it would provide "at least 24 hours advance notice" of any encampment clean up and then "provide a 30-minute warning and opportunity for individuals to remove property when a cleanup is imminent on any block about to be cleaned."  *Id.*  Thus, through the *Mitchell* settlement the City agreed to take *Lavan* to its furthest logical extension.  As the Los Angeles Times aptly put it, as a result of this settlement, unhoused persons "now have the right to keep a nearly unlimited amount of possessions with them on the sidewalks of skid row."[17]

---

Brief of the People Concern and Weingart Center Association as Amici Curiae Supporting Petitioner, City of Boise v. Martin, 140 S. Ct. 674 (2019) (No 19-247) (service-provider brief expressing concern with the impact of the Ninth Circuit's decision in *Martin v. City of Boise*).

[16] Kevin Murray, *Opinion:  Why a one-size solution to L.A.'s homelessness crisis is destined to fail*, THE LOS ANGELES TIMES (Sept. 19, 2019), *available at* https://www.latimes.com/opinion/story/2019-09-18/homeless-solutions-housing-shelters-rooms-los-angeles-skid-row.

[17] *A Court Decision Letting Homeless People Keep All Their Belongings Helps No One*, THE LOS ANGELES TIMES (May 31, 2019), *available at* https://www.latimes.com/opinion/editorials/la-ed-mitchell-homeless-settlement-20190531-story.html.

**B.  This Court Should Couple Any Resolution of This Lawsuit With A Requirement that the City Regulate the Public Right-of-Way to Promote Public Health and Safety**

For too long the City of Los Angeles has agreed to short-sighted legal settlements that do nothing but perpetuate the ever-worsening homelessness crisis. These settlements have done nothing to address the root causes of the crisis, and have led the City to turn a blind eye towards the increasing harms experienced by those living in encampments as well as those in the surrounding communities. Worse still, these settlements have also served as a convenient scapegoat for City officials who have persistently been one step behind a crisis that is growing exponentially worse by the day. These settlements have done more harm than good, most of all for the unhoused persons trapped in dangerous encampments and the residents and businesses nearby.

While CCA is not opposed to a resolution of this lawsuit via a settlement, it respectfully requests that this Court ensure that any resolution requires the City to take proactive steps to provide much-needed relief to all housed and unhoused City residents. Such steps should include the provision of temporary and permanent housing, outreach and service offerings, and safeguarding public health and safety through application of laws regulating public camping, the storage of personal property in public areas, the obstruction of pedestrian traffic and rights of way, and more.[18] Most importantly, any such resolution should be marked by coherence and simplicity, avoiding a tangle of contradictory process rules and red tape that simply breed more litigation, cause legal paralysis due to an ever-shifting legal landscape, and divert valuable municipal resources.

---

[18] *See* L.A. Muni. Code § 41.18 (a) (forbidding the obstruction of pedestrian traffic); L.A. Muni. Code § 41.18 (d) (forbidding public camping); L.A. Muni. Code § 41.47.2 (forbidding urination and defecation in public spaces); L.A. Muni. Code § 56.11(regulating the storage of personal property on sidewalks); L.A. Muni. Code § 56.12 (forbidding the obstruction of public rights-of-way).

There are no legal impediments to pairing the provision of relief to persons experiencing homelessness with the application of long-neglected public-health-and-safety laws.  The Ninth Circuit's decision in *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), far from foreclosing such a result, demonstrates why it is fully permissible.  To be sure, the Court in *Martin* reaffirmed the crux of the vacated *Jones* decision by holding that "an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them." *Id.* at 604.  Yet the Court expressly qualified this broad holding by explaining that it was not dictating that cities must "allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* at 617.  It further clarified that its holding "does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Id.* at 617 n.8 (emphasis original).  And it assured governments that it did not mean to "suggest that a jurisdiction with insufficient shelter can *never* criminalize the act of sleeping outside," because "[e]ven where shelter is unavailable, an ordinance prohibiting sitting, lying, or sleeping outside *at particular times or in particular locations* might well be constitutionally permissible," along with "an ordinance barring the obstruction of public rights of way or the erection of certain structures." *Id.* (emphasis added).

As the foregoing demonstrates, this Court would be well within the ambit of its authority to order the City to couple its provision of housing to those experiencing homelessness—in whatever form it ultimately takes—with the implementation of longstanding municipal laws regulating public health and safety.  In fact, the City's failure to enforce such laws in the first place constitutes a dereliction of its most basic duties to its residents, resulting in clear violations of numerous state and federal statutes, the California and United States Constitutions, and creating a public and private nuisance. Compl. ¶¶ 127–197.  These infringements of the Plaintiffs' rights

should be remedied without delay. True, "the nature and scope of the remedy are to be determined by the [legal] violation," which means that "federal-court decrees must directly address and relate to the [legal] violation itself." *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995). But here, where the City's wholesale abdication of its duties to its residents are unprecedented in nature and scope—resulting in violations of laws as diverse and varied as the California Environmental Quality Act, the Americans with Disabilities Act, and the Equal Protection and Due Process Clauses—the Court has ample authority to craft a remedy that is carefully tailored to remedying violations of the specific statutes, constitutional provisions, and torts at issue.

## IV.   CONCLUSION

By agreeing to abandon basic, commonplace municipal laws regulating public health and safety in exchange for settling contentious litigation, the City of Los Angeles has, over the course of the last two decades, adopted a legal strategy that has accelerated the deterioration of conditions on its city streets. In facilitating the resolution of this lawsuit, this Court should ensure that any settlement or other disposition does not allow Los Angeles to continue to neglect these deplorable conditions and the plight of unhoused and housed residents and business, like the Plaintiffs, who are directly affected. Instead, the Court should make certain that any settlement obligates the City to actually address the homelessness crisis, including through housing and through the regulation of the public right-of-way through longstanding, commonsense municipal laws that the City has abandoned.

Dated: March 4, 2021    GIBSON, DUNN & CRUTCHER LLP

By:   /s/ *Theane Evangelis*
       Theane Evangelis

Attorneys for *Amicus Curiae* Central City Association