RODRIGO A. CASTRO-SILVA (SBN 185251)
*County Counsel*
rcastro-silva@counsel.lacounty.gov
LAUREN M. BLACK (SBN 192302)
*Assistant County Counsel*
AMIE S. PARK (SBN 273346)
*Deputy County Counsel*
500 West Temple Street, Suite 468
Los Angeles, California 90012
Tel.:  (213) 974-1830 | Fax:  (213) 626-7446

BYRON J. MCLAIN (SBN 257191)
bmclain@foley.com
FOLEY & LARDNER, LLP
555 South Flower Street, Suite 3300
Los Angeles, California 90071
Tel.:  (310) 972-4500 | Fax:  (213) 486-0065

LOUIS R. MILLER (SBN 54141)
smiller@millerbarondess.com
MIRA HASHMALL (SBN 216842)
EMILY A. RODRIGUEZ-SANCHIRICO (SBN 311294)
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.:  (310) 552-4400 | Fax:  (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | **CASE NO. 2:20-cv-02291 DOC-KES** <br><br> **DEFENDANT COUNTY OF LOS ANGELES' BRIEF RE COUNTY'S PROGRESS AND COURT'S AUTHORITY TO ISSUE INJUNCTIVE RELIEF** <br><br> Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................5

II.   THE COUNTY HAS TAKEN SIGNIFICANT STEPS TO ADDRESS
      HOMELESSNESS ..................................................................................5

      A.    The County Is Working To Combat Homelessness ...............................6

      B.    The County Made Significant Progress In 2020.....................................6

            1.    Project Roomkey/Project Homekey ...............................................7

            2.    COVID-19 Testing .........................................................................7

            3.    Skid Row Outreach .........................................................................8

            4.    Increased Mental Health Services ...............................................8

            5.    Winter Shelters ...............................................................................8

            6.    Regional Recovery Plan .................................................................8

            7.    The 6,700 Bed Agreement ...............................................................9

III.  COUNTY PROPERTIES THAT SERVE AS TEMPORARY
      HOUSING LOCATIONS ......................................................................9

IV.   FUNDING .............................................................................................10

V.    THE COURT'S AUTHORITY.............................................................12

      A.    Courts Cannot Usurp The Legislative Function .................................12

      B.    No Statutory Framework Authorizes Injunctive Relief.....................17

      C.    *Brown v. Board Of Education* Is Not Applicable Here ........................18

VI.   CONCLUSION .....................................................................................19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Brown v. Bd. of Educ. of Topeka, Kan.*,
   349 U.S. 294 (1955) ........................................................................17, 18, 19

*Brown v. Plata*,
   563 U.S. 493 (2011) ...............................................................................17, 18

*Horne v. Flores*,
   557 U.S. 433 (2009) ...............................................................................15, 16

*Jones v. City of Los Angeles*,
   444 F.3d 1118 (9th Cir. 2006) ..............................................................12, 13

*Lewis v. Casey*,
   518 U.S. 343 (1996) ...............................................................................14, 15

*Marks v. New Edinburg Sch. Dist.*,
   259 F. Supp. 639 (E.D. Ark. 1966) ............................................................19

*Midgett v. Tri-Cty. Metro. Transp. Dist. of Or.*,
   254 F.3d 846 (9th Cir. 2001) ......................................................................16

*Missouri v. Jenkins*,
   515 U.S. 70 (1995) ......................................................................................15

*Rizzo v. Goode*,
   423 U.S. 362 (1976) ...........................................................................13, 14, 16

## STATE CASES

*Carmel Valley Fire Prot. Dist. v. State*,
   25 Cal. 4th 287 (2001)................................................................................16

*City of Dublin v. County of Alameda*,
   14 Cal. App. 4th 264 (1993).........................................................................5

*Cty. Sanitation Dist. No. 2 v. County of Kern*,
   127 Cal. App. 4th 1544 (2005).....................................................................5

DEFENDANT COUNTY OF LOS ANGELES' BRIEF RE COUNTY'S PROGRESS AND COURT'S AUTHORITY
TO ISSUE INJUNCTIVE RELIEF

*Scates v. Rydingsword*,
    229 Cal. App. 3d 1085 (1991)..........................................................................16

**FEDERAL STATUTES**

18 U.S.C. § 3626..............................................................................................17

**OTHER AUTHORITIES**

Cal. Const. art. XI, § 7 .......................................................................................5

Los Angeles, Cal., County Code ch. 4.73, § 4.73.030 ......................................10

Los Angeles, Cal., County Code ch. 4.73, § 4.73.030(C) .................................11

Los Angeles, Cal., County Code ch. 4.73, § 4.73.060(A) .................................11

Los Angeles, Cal., County Code ch. 4.73, § 4.73.060(B) .................................11

Los Angeles, Cal., County Code ch. 4.73, § 4.73.060(C) .................................11

Los Angeles, Cal., County Code ch. 4.73, § 4.73.070 .......................................11

## I.   <u>INTRODUCTION</u>

This brief is submitted pursuant to the Court's January 31, 2021 Order requesting information from the County of Los Angeles ("County") and City of Los Angeles ("City") related to temporary housing locations and funding, as well as "[b]riefs addressing all equitable remedies available to the Court that would require the City of Los Angeles and its elected officials to take action to provide relief to the homeless community." [Dkt. 205.]  The Court has acknowledged the County's efforts, but has questioned the progress achieved by the City. [*Id.*]

The County is committed to tackling the homelessness crisis and has undertaken, and is currently undertaking, tremendous efforts to support and shelter or house people experiencing homelessness ("PEH").  As fully discussed below, the County respectfully submits the information and briefing requested by the Court. The County recognizes and appreciates this Court's dedication to helping the County and City find creative ways to bring PEH indoors.

## II.   <u>THE COUNTY HAS TAKEN SIGNIFICANT STEPS TO ADDRESS HOMELESSNESS</u>

Plaintiffs in this lawsuit are business owners and current and former PEH in the Skid Row area of the City of Los Angeles.  [Complaint ¶¶ 76-122.] Accordingly, the allegations in the Complaint focus on the City's failure to adequately house or shelter PEH.

The County, in turn, has responsibility over municipal affairs in the unincorporated areas of the County.  Cal. Const. art. XI, § 7; *see City of Dublin v. County of Alameda*, 14 Cal. App. 4th 264, 274-75 (1993) ("[T]he California Constitution specifies that the police power bestowed upon a county may be exercised 'within its limits,' i.e., only in the unincorporated area of the county."); *Cty. Sanitation Dist. No. 2 v. County of Kern*, 127 Cal. App. 4th 1544, 1612 (2005) ("[I]ncorporated areas of Kern County [i.e., cities] are necessarily outside the jurisdiction and authority of County; County's authority extends only to the

1  unincorporated areas within its borders.").

2      Despite the jurisdictional nature of local government, the County has a vested

3  interest in issues surrounding homelessness and plays a critical role at the regional

4  level.  The County has fulfilled all of its obligations and will continue to do so.

5          **A.    The County Is Working To Combat Homelessness**

6      The County spends hundreds of millions of dollars annually to address issues

7  related to homelessness.  None of this can be—or is—disputed.  Indeed, the County

8  has ramped up its efforts in recent years.  In 2015, the County Board of Supervisors

9  ("Board") identified homelessness as a top priority and established the County's

10  Homeless Initiative to reach across government and community boundaries to forge

11  effective partnerships and serve PEH Countywide.

12      Homelessness is an extraordinarily complex problem that demands a multi-

13  faceted approach and active, sustained collaboration among the State, the County,

14  all of the cities within the County, various public agencies, and a wide array of

15  community partners.  As such, in 2016, after conducting 18 policy summits

16  involving 25 County departments, 30 cities and other public agencies, and over

17  100 community partners and stakeholders, the Homeless Initiative developed

18  47 strategies in six key areas: (1) prevent homelessness; (2) subsidize housing;

19  (3) increase income; (4) provide case management and services; (5) create a

20  coordinated system; and (6) increase affordable/homeless housing.  The County

21  subsequently launched these strategies by infusing the region with $100 million in

22  2016.  Then, in March 2017, voters overwhelmingly approved Measure H, which is

23  discussed below.

24          **B.    The County Made Significant Progress In 2020**

25      Although 2020 was a year filled with unprecedented public health and fiscal

26  challenges, the County made significant headway in its efforts to provide shelter or

27  housing for PEH within the County.  At the start of the year, on January 21, 2020,

28  the Board approved a motion entitled "Establishing a Comprehensive Homelessness

Crisis Response Strategy in Los Angeles."  This established an accountability framework for PEH in the County.  Specific, targeted efforts followed, such as:

### 1.   Project Roomkey/Project Homekey

In March 2020, with the onset of COVID-19, the County participated in Project Roomkey and a quarantine and isolation program to bring an especially vulnerable subset of the homeless population into hotel and motel rooms where they could isolate or practice social distancing, and reduce the likelihood of contracting and spreading COVID-19.  In 2020, the County leased 31 hotels and motels, with a total of over 2700 rooms for Project Roomkey.  Together, the County and City brought nearly **6,800 PEH** into their respective Project Roomkey locations.  When COVID-19 surged following the holiday season, the County shifted some Project Roomkey locations to meet the need for additional quarantine and isolation facilities.

When the State announced Project Homekey to build upon the success of Project Roomkey and permanently house PEH in converted hotels and motels, the County worked quickly to implement that program, too.  Between November and December 2020, the County purchased 10 hotels and motels, with a total of approximately 850 rooms, to provide interim and permanent housing for PEH.  The nine sites currently offering interim housing will be renovated to provide permanent supportive housing.  Approximately **600 PEH** have already benefited from Project Homekey.

### 2.   COVID-19 Testing

The County's Department of Health Services ("DHS") has led COVID-19 mitigation and testing efforts for PEH and the workforce members who serve them. COVID-19 Response Teams have visited over 300 interim housing sites and almost 2,400 encampments across Los Angeles County.  As of March 1, 2021, the County has performed over **111,484** tests for PEH as a component of the work by the Department of Public Health's outbreak management and rapid response teams,

7

which provide early interventions at high-risk outbreak locations.

### 3.   Skid Row Outreach

Since April 2020, DHS has staffed existing multidisciplinary outreach teams with street-based nursing staff to increase clinical capacity in Skid Row and provide COVID-19 testing.  The Department of Mental Health ("DMH"), in turn, has deployed additional outreach workers to supplement the existing mental health services in Skid Row.

### 4.   Increased Mental Health Services

DMH has worked closely with DHS and Los Angeles Homeless Services Authority's ("LAHSA") Homeless Engagement Teams to provide additional mental health outreach at encampments in Los Angeles County, including Skid Row and at freeway encampments, to ensure that PEH are receiving appropriate levels of care.

### 5.   Winter Shelters

The County provides winter shelters countywide to protect PEH during the colder months, and these shelters are currently open every day in light of the COVID-19 pandemic.  As of February 22, 2021, there were a total of 16 sites and 712 winter shelter beds throughout the County.  The County also operated an augmented winter shelter program earlier this year, which provided an additional six sites and 271 beds.

### 6.   Regional Recovery Plan

The County is developing post-pandemic housing plans for PEH.  On May 12, 2020, the Board directed LAHSA to work with partner agencies to develop a post-COVID-19 recovery plan for homelessness.

On June 23, 2020, LAHSA submitted its COVID-19 Recovery Plan to the Board.  The Recovery Plan requires the participation of both the County and the City, and encompasses the entire region.  It proposes using bridge housing, rental subsidies and rehousing services to provide permanent housing placements and long-term housing stability for thousands of the County's most vulnerable PEH.

1  The County has contributed $167.1 million to the Regional Recovery Plan.

2  **7.  The 6,700 Bed Agreement**

3  In June 2020, the County and the City reached an agreement to establish

4  6,700 beds within 18 months to house or shelter (i) PEH living within 500 feet of

5  freeway overpasses, underpasses, and ramps in the City of Los Angeles, and to give

6  priority to providing housing or shelter to (ii) PEH 65+ and (iii) other vulnerable

7  PEH within the City of Los Angeles.  [Dkt. 137.]  As part of the agreement, the

8  County committed up to $293 million over the next five years to assist in funding

9  services for 6,000 of these beds.

10  Thus far, the County made two payments to the City, totaling $35.33 million,

11  with a third payment scheduled for April 2021.  The County will also provide a set

12  of mainstream services at sites the City establishes in connection with the

13  agreement.

14  **III.  COUNTY PROPERTIES THAT SERVE AS TEMPORARY HOUSING**

15  **LOCATIONS**

16  The Court has requested an inventory of City- and County-owned properties

17  that will serve as locations for temporary housing.  [Dkt. 205 at 2.]  The County is

18  engaged in ongoing efforts to identify additional locations for temporary housing.

19  For example, in 2018 the County acquired the property located at 1060 North

20  Vignes Street —a short distance away from Skid Row.  [Dkt. 208 at 3.]  In 2020, the

21  County used this property to develop the Vignes Project, an innovative housing

22  model with low-cost, rapid design construction, expected to create approximately

23  232 new units of interim housing for PEH who could later be transitioned into

24  permanent housing.  [*Id.*]  The Vignes Project is anticipated to open in April 2021.

25  In 2019, the Board passed a motion that led to a joint County/City interim

26  housing facility located at a County-owned parking lot for the H. Claude Hudson

27  Comprehensive Health Center.  The interim housing facility is a part of the "A

28  Bridge Home" initiative in the City of Los Angeles.  The approximately 28,284

square foot site is to operate as interim housing for up to three years, under a gratis lease.  It provides personal hygiene, storage for belongings, meal services, case management, and supportive services for 100 PEH in the surrounding area.

In 2020, through Project Homekey, the County purchased 10 hotels/motels with approximately 850 rooms to provide interim and permanent supportive housing to PEH throughout the County.  [*Id*. at 5.]  Approximately 600 individuals already have moved into the County's Project Homekey sites and received critical supportive services.  [*Id*.]  The County continues to explore new ways to address the many issues leading to homelessness, including providing residential services at the LAC+USC campus and repurposing the historic Los Angeles County General Hospital to provide low-income housing and community services in Boyle Heights. [*Id*. at 4.]

An inventory of County locations for temporary housing that have become available since March 2020, or are expected to become available in April 2021, is attached hereto as **Exhibit A**.  This list includes winter shelter (along with the augmented winter shelter program), Project Roomkey, Project Homekey, Isolation and Quarantine Sites, Restorative Care Village Facilities, and other interim housing locations.

## IV.   FUNDING

In March 2017, voters approved Measure H—a quarter percent increase to the County's sales tax that funds mental health, and other services, rental subsidies, and shelter for PEH.[1]  Los Angeles, Cal., County Code ch. 4.73, § 4.73.030.  The

---

[1] Measure H appeared on the ballot as the following question: "Los Angeles County Plan to Prevent and Combat Homelessness.  To fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults; shall voters authorize Ordinance No. 2017-0001 to levy a ¼ cent sales tax for ten years, with independent audits and

California Board of Equalization administers and collects the tax.  *Id.* § 4.73.030(C).  This revenue funds street outreach, emergency shelter, rapid rehousing, and supportive housing for PEH throughout the County.  It also funds programs for homeless prevention, disability benefits advocacy, housing location and navigation, and other strategies.  The Homeless Initiative provides oversight and hands-on guidance to deploy the Measure H funds as part of a comprehensive, regional approach encompassing its 47 interconnected strategies.

The Board must approve all allocations of Measure H funding, and any money not spent in the current fiscal year automatically is transitioned to the following fiscal year.  Pursuant to its responsibility to manage the Measure H funds, the Board has created an independent Citizens' Oversight Advisory Board ("COAB").  Los Angeles, Cal., County Code ch. 4.73, § 4.73.060(A).  The COAB is comprised of five members with a wide range of experience in public service and the non-profit sector.  *Id.* § 4.73.060(B).  The COAB's role is to ensure public accountability for Measure H funds by reviewing all expenditures from the Measure H sales tax.  *Id.* § 4.73.060(C).  An independent auditor also annually reports on the amount of revenue collected and expended from Measure H, and the status of projects and services funded.  *Id.* § 4.73.070.

Measure H was originally projected to raise $355 million per year for 10 years, creating dedicated funding to address homelessness.  The County provided $259 million to fund the Measure H strategies in FY 2017-18, $412 million in FY 2018-19, and $460 million in FY 2019-20.  Although the anticipated revenues from Measure H have declined due to the COVID-19 pandemic, the County continues to budget over $400 million annually toward Measure H-related strategies as an indication of its continued commitment to service PEH.  Measure H has helped over **26,083 PEH** receive permanent housing, and over **48,712 PEH** obtain interim

citizens' oversight?"

11

housing.[2]

## V.     THE COURT'S AUTHORITY

Combatting homelessness is, and will continue to be, a community-wide undertaking.  As such, the County works with key stakeholders to develop and pursue innovative solutions.  The County is committed to achieving meaningful progress to combat homelessness throughout the County, and remains ready and willing to work collaboratively with the City to do so.  Moreover, the County is in full compliance with its legal obligations.

As noted above, the Court has requested "[b]riefs addressing all equitable remedies available to the Court that would require the City of Los Angeles and its elected officials to take action to provide relief to the homeless community."  [Dkt. 205.]  The County understands that this question is directed at the City, but will nevertheless respond, as directed by the Court.

The County has done the research, and legal precedent generally does not allow a court to direct local government how to act.  Under Supreme Court and Ninth Circuit precedent, federal courts are not supposed to interfere with the functions of local government, and that precedent applies in the circumstances here.

### A.     Courts Cannot Usurp The Legislative Function

The Court has expressed its reluctance to substitute its judgment for that of elected officials.  [Dkt. 205 at 3.]  That reluctance is well founded.

Courts have often found themselves facing the quandary of how to balance their role vis-à-vis the function of local governments.  In *Jones v. City of Los Angeles*, the Ninth Circuit acknowledged that while a court has the power to prevent the enforcement of laws it deems unconstitutional, it cannot dictate the manner in which the local government deals with homelessness.  444 F.3d 1118,

[2] https://homeless.lacounty.gov/wp-content/uploads/2020/12/Homeless-Initiative-Quarterly-Report-No.-18.pdf.

1138 (9th Cir. 2006) ("We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless.  We do not desire to encroach on the legislative and executive functions reserved to the City Council and the Mayor of Los Angeles." (citation omitted)).

The U.S. Supreme Court has also repeatedly rejected federal court interference with matters of state and local policy.  In *Rizzo v. Goode*, 423 U.S. 362 (1976), plaintiffs brought a class action against the City of Philadelphia, the mayor, and other city and police officials alleging a pervasive pattern of illegal and unconstitutional police mistreatment of minority citizens and other city residents. Plaintiffs sought equitable relief, including appointment of a receiver to supervise the police department and civilian review of police activity.  The district court found that, although defendants did not have a policy of violating plaintiffs' legal or constitutional rights, police procedures discouraged the filing of civilian complaints and minimized the consequences of police misconduct.  *Id*. at 368-69.  As a result, the court ordered the city officials to submit "a comprehensive program for dealing adequately with civilian complaints," in accordance with comprehensive court-ordered "guidelines."  *Id*. at 369.  The Court of Appeals, finding that the existing procedures for handling citizen complaints were "inadequate," affirmed on the grounds the equitable relief order "appeared to have the potential for prevention of future police misconduct."  *Id*. at 365-66.

The Supreme Court reversed, holding that "*the judgment of the District Court represent[ed] an unwarranted intrusion by the federal judiciary into the discretionary authority committed to [the city officials] by state and local law to perform their official functions*."  423 U.S. at 366 (emphasis added).  The Supreme Court explained that the scope of federal equity power does not "extend[] to the fashioning of prophylactic procedures for a state agency," and in cases where "the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal

13

1    equitable power and State administration of its own law.'" *Id*. at 378 (citation

2    omitted).  Thus, "[w]hen a plaintiff seeks to enjoin the activity of a government

3    agency . . . his case must contend with 'the well-established rule that the

4    Government has traditionally been granted the widest latitude in the "dispatch of its

5    own internal affairs."'" *Id*. at 378-79 (citations omitted).

6    　　　Twenty years later, the Supreme Court reaffirmed the limited scope of federal

7    equity power in *Lewis v. Casey*, 518 U.S. 343 (1996).  In *Lewis*, prison inmates sued

8    the Arizona Department of Corrections for alleged violations of their right of access

9    to the courts.  The district court appointed a special master to investigate and report

10   about how best to accomplish the goal of providing constitutionally adequate court

11   access for inmates.  The special master submitted a proposed permanent injunction

12   with changes to the Arizona state prison system, which the court adopted.

13   　　　The Supreme Court held that the district court's actions violated separation of

14   powers, explaining that "it is not the role of courts, but that of the political branches,

15   to shape the institutions of government in such fashion as to comply with the laws

16   and the Constitution."  518 U.S. at 349.  As explained in the concurring opinion:

> Principles of federalism and separation of powers impose
> stringent limitations on the equitable power of federal
> courts. When these principles are accorded their proper
> respect, Article III cannot be understood to authorize the
> Federal Judiciary to take control of core state institutions
> like prisons, schools, and hospitals, and assume
> responsibility for making the difficult policy judgments
> that state officials are both constitutionally entitled and
> uniquely qualified to make.  Broad remedial decrees strip
> state administrators of their authority to set long-term
> goals for the institutions they manage and of the flexibility
> necessary to make reasonable judgments on short notice
> under difficult circumstances.  At the state level, such
> decrees override the "State's discretionary authority over
> its own program and budgets and forc[e] state officials to
> reallocate state resources and funds to the [district court's]
> plan at the expense of other citizens, other government
> programs, and other institutions not represented in
> court." *The federal judiciary is ill equipped to make these
> types of judgments, and the Framers never imagined that*

14

Case No. 2:20-cv-02291 DOC-KES

> *federal judges would displace state executive officials and state legislatures in charting state policy.*

*Id*. at 385-86 (alteration in original) (emphasis added) (citations omitted).

More recently, in *Horne v. Flores*, 557 U.S. 433 (2009), English Language–Learner ("ELL") students and their parents filed a class action alleging Arizona was violating the Equal Educational Opportunities Act ("EEOA") by failing to take appropriate action to overcome language barriers.  The district court concluded Arizona was violating the EEOA, issued an injunction requiring the state to increase funding for ELL programs, held the State in civil contempt for failing to do so, and rejected the State's proposed legislation as inadequate.  Arizona's Superintendent of Public Instruction and leaders of the Arizona legislature intervened, moved to purge the contempt order, and sought relief from the injunction.  The district court denied the requests, and the Court of Appeals affirmed.

The Supreme Court reversed, explaining that "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities" because "[s]tates and local governments have limited funds."  557 U.S. at 448, citing *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) ("A structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds.").  The EEOA required only that the state "take *appropriate action* to overcome language barriers that impede equal participation by its students in its instructional programs," which "grants States broad latitude to design, fund, and implement ELL programs that suit local needs and account for local conditions."  *Id*. at 440, 468.  The *Horne* court concluded that "by requiring petitioners to demonstrate 'appropriate action' through a particular funding mechanism, the Court of Appeals improperly substituted its own educational and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted."  *Id*. at 455.

Thus, federal courts lack authority to fashion "prophylactic procedures" for

15

1   how the County exercises its discretion.  *See Rizzo*, 423 U.S. at 378.  To do so

2   would amount to the precise type of "unwarranted intrusion by the federal judiciary

3   into the [local government's] discretionary authority" the Supreme Court has

4   repeatedly held to violate the constitutional separation of powers.  *Id*. at 366; *Horne*,

5   557 U.S. at 450 ("[F]ederal-court decrees exceed appropriate limits if they are aimed

6   at eliminating a condition that does not violate [federal law] or does not flow from

7   such a violation." (second alteration in original) (citation omitted)); *Midgett v. Tri-*

8   *Cty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 851 (9th Cir. 2001) ("[A] federal

9   court must exercise restraint when a plaintiff seeks to enjoin any non-federal

10  government agency . . . .").

11          How local governments allocate financial and human resources, and how they

12  prioritize access to housing and shelter for PEH, are legislative decisions.  Courts

13  may not usurp discretionary authority of a local government to "dispatch of its own

14  internal affairs."  *Rizzo*, 423 U.S. at 379.  State law is in accord.  *Scates v.*

15  *Rydingsword*, 229 Cal. App. 3d 1085, 1102 (1991) ("Fiscal planning demands that

16  control of aid programs be in the hands of the local governing body, not left to the

17  uncertain fate of judicial construction."); *Carmel Valley Fire Prot. Dist. v. State*, 25

18  Cal. 4th 287, 300-01 (2001) ("The power of appropriation includes the power to

19  withhold appropriations.  Neither an executive administrative agency nor a court has

20  the power to require the Legislature to appropriate money" as "the appropriate

21  function of the Legislature" is "to define policy and allocate funds").

22          In sum, the development of a homelessness policy is a legislative function

23  reserved for local governments.  The County has committed hundreds of millions of

24  dollars and spent years developing programs and strategies to support and shelter

25  PEH.  It has worked with—and continues to work with—cities, stakeholders,

26  businesses, homeless service providers, and others to ensure that the programs and

27  strategies effectively and humanely address the needs of individuals and families

28  experiencing homelessness.  The County is tackling the complexities of

1    homelessness head on.

2    **B.    No Statutory Framework Authorizes Injunctive Relief**

3        The Court noted that the contours of a federal court's equitable authority has

4    come up in other contexts, including in *Brown v. Plata*, and in the aftermath of

5    *Brown v. Board of Education*.  [Dkt. 205 at 4.]  But as the Court noted, those

6    "constitutional violations were of a different sort."  [*Id.*]

7        The Court asked the parties to address the comments of Chief Justice Roberts

8    in oral argument in *Brown v. Plata*, 563 U.S. 493 (2011), concerning the prospect of

9    government by federal district court order.  [Dkt. 205 at 4.]

10       In *Brown*, California prisoners filed class-action lawsuits alleging

11   overcrowding and inadequate mental and medical care violated the Eighth

12   Amendment's prohibition of cruel and unusual punishment.[3]  563 U.S. at 500.  After

13   years of litigation, the State failed to comply with the district court's orders, and as a

14   result the plaintiffs requested a three-judge district court under the Prison Litigation

15   Reform Act of 1995 ("PLRA") to address the State's failure.  *Id.*; *see* 18 U.S.C.

16   § 3626.  The Ninth Circuit convened the three-judge district court and consolidated

17   the cases.  563 U.S. at 500.

18       The three-judge district court exercised its authority under the PLRA to issue

19   a remedial order requiring California to reduce the inmate population to within

20   137.5% of the prisons' total design capacity.  563 U.S. at 501.  The Governor

21   appealed.  *Id.* at 500.  The Supreme Court affirmed the three-judge district court's

22   order, ruling that "the PLRA does authorize the relief afforded in this case and . . .

23   the court-mandated population limit is necessary to remedy the violation of

24   _____

25   [3] The case was borne out of Eighth Amendment violations relating to the health and
     safety of inmates.  Here, the Eighth Amendment is not implicated, nor is it a basis
26   for injunctive relief against the County.  The County does not have ordinances that
     impose criminal sanctions against PEH.  To the contrary, the County has a
27   "Care First" model and does not support enforcement as a solution to homelessness.
28

prisoners' constitutional rights." *Id*. at 502.

This holding is specific to the PLRA. The PLRA provides the federal courts with detailed guidelines for issuing injunctive relief. 563 U.S. at 511-12. A three-judge district court can only issue a remedial order limiting the prison population when several conditions are met and the ordered relief is "narrowly drawn, extends no further than necessary …, and is the least intrusive means necessary to correct the violation." *Id*. at 512 (citation omitted). In other words, the PLRA provides a strict statutory framework to ensure that a federal district court only takes the extreme action of issuing an injunction against a State, like reducing a prison population, in extremely limited circumstances and when procedural safeguards are satisfied. *Id*. at 511-12.

At oral argument, Chief Justice Roberts expressed his concerns about federal district courts ordering governments to spend money in specified ways. The Chief Justice questioned what would happen if one court told a particular governing body to spend $8 billion in one way, while another court told it to spend the same $8 billion a different way. Relevant excerpts of the transcript are attached hereto as **Exhibit B**.

Federal judges do not have inherent authority to make complex policy decisions about how to manage the public health, public safety, and financial implications of the homelessness crisis. Here, unlike in *Brown*, there is no statutory framework like the PLRA that expressly authorizes extraordinary injunctive relief.

## C. *Brown v. Board Of Education* Is Not Applicable Here

In *Brown v. Board of Education of Topeka, Kan.*, 349 U.S. 294 (1955), the Supreme Court confronted a facially discriminatory policy of segregation in public schools which had a devastating impact on the quality of education students received, solely because of their race.

While the tragedy of homelessness is not a direct result of a facially discriminatory government policy, the County shares this Court's concern that

1    homelessness disproportionately impacts communities of color.  The County's goal
2    is to rally the necessary stakeholders and resources to address this problem in a
3    meaningful—and expeditious—way.

4         *Brown v. Board of Education* does not offer the correct roadmap to address
5    the impact of homelessness on communities of color.  In the school desegregation
6    context, the Supreme Court had directly admonished the district courts to carry out
7    "judicial appraisal" of whether schools were taking appropriate action to implement
8    the governing constitutional principles.  349 U.S. at 299.

9         District courts took on that responsibility.  In *Marks v. New Edinburg School*
10   *District*, 259 F. Supp. 639, 645-46 (E.D. Ark. 1966), for example, the district court
11   addressed the Supreme Court's admonishment and carried out the requisite "judicial
12   appraisal."  However, the same district court was also unwilling to direct the school
13   district to comply with specific guidelines to "completely disrupt the operation of
14   the school," or to "invoke an impossible burden on the board and officers of the
15   school district."  *Id*. at 646.  In other words, even in the uniquely pressing context of
16   segregation in public schools, which lingered for far too long after the Supreme
17   Court's ruling in *Brown v. Board of Education*, district courts were still required to
18   exercise restraint.

19        Here, the Supreme Court has not admonished district courts to perform a
20   "judicial appraisal" of policymaking regarding homelessness.  Nor has the Supreme
21   Court articulated any constitutional principles that suggest the district courts should
22   do so.

23   **VI.   CONCLUSION**

24        The Court has expressed concern about how to balance the entire spectrum of
25   a local government's responsibilities against limited resources, with the pressing
26   needs imposed on those same governments by the homelessness crisis.  [Dkt. 205 at
27   4.]  The County and its Board grapple with those same concerns on a daily basis, a
28   challenge exacerbated as a result of the pandemic.

1    The County values the Court's input and understands that this crisis requires
2  more than "business as usual" from government.  The County is doing—and will
3  continue to do—its part on this pressing and critically important issue facing our
4  community.

5  DATED:  March 4, 2021                Respectfully submitted,

6                                       MILLER BARONDESS, LLP
7

8

9                                       By:  _____/s/ Louis R. Miller_____
10                                           LOUIS R. MILLER
11                                           Attorneys for Defendant
                                             COUNTY OF LOS ANGELES
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT COUNTY OF LOS ANGELES' BRIEF RE COUNTY'S PROGRESS AND COURT'S AUTHORITY
TO ISSUE INJUNCTIVE RELIEF