The Center in Hollywood
6636 Selma Ave.
Los Angeles, CA 90028

**Ending Isolation and Homelessness in Hollywood**
**THE CENTER**

March 2, 2021

The Honorable Judge Carter
c/o Elizabeth Mitchel, Esq.
LA Alliance for Human Rights

To: The Honorable Judge Carter,

As essential service providers for our community members experiencing homelessness, we want to ensure you hear from us regarding what is working, what is not effective, and what suggestions we hope you will consider in supporting efforts to end a person's experience with homelessness for good.

Below, we outlined just a few of our experiences to give you a deeper look at the challenges our teams problem-solve on a daily basis. These roadblocks pull our teams away from proactively moving clients closer to permanent housing and the healthcare they require to be well. We use the term client and participant interchangeably depending on if we see them more through our Outreach teams or our Wellness program.

We are starting with an overview of challenges we are open to discussing with you and would love resolution on. And then we offer some detailed examples of what our teams work entails – even before the conversation of housing enters the picture.

**Overview**
**Challenge: Accountability of county services.** Every agency has accountability, including ours. We ask that there exist greater accountability in FSP (Full Service Partnership) and HFSP, PRMT (Psychiatric Emergency Response Teams) because there is a lack of consistency in services from what our teams experience. Some teams have wonderful experiences, while others end up having to pick up the pieces.

**Example:** When an Outreach team member called the FSP contact for help for a gentleman who had diabetes and needed urgent support, the FSP contact did not do anything. So, our Outreach team members were left to navigate the person's medical care which took the Outreach team away from working with other clients experiencing homelessness.

**Recommendation:** Consistent training, and more money and resources into expanding these PRMT, FSP, HFSP teams so response times are faster and there is a baseline of the quality of service provided to every individual experiencing homelessness.

**BOARD OF DIRECTORS**
Peter Fryer | Board President
John Shaffner | Board VP
Kerry Morrison | Treasurer
Nancy Beyda | Secretary

Jason Brown
Dr. Yolanda Brown, Min
Patty Dryden
Shadi Enos
Rana Ghadban

Anne Loveland
Joseph Mariani
Al Marsella
Tom Meredith
Adam Miller

**EXECUTIVE DIRECTOR**
Nathan Sheets

6836 Selma Avenue
Hollywood, CA 90028
323-378-3225 main line

TheCenterInHollywood.org



**Challenge: Accessibility and equity of mental health and substance use services.** With the Coordinated Entry System, there is some kind of prioritization for folks going into housing. Outreach, and CES, are not perfect but there is at least a system in place and strategy for how we connect people to housing. It does not seem there is a method or strategy for how we deploy resources for folks in need of substance use services and/or mental health services. The SASH (Substance Abuse Service Helpline) line exists and there are some centers where people can go for support, but we do not have consistent experience of customer service and we cannot expect people to leave their belongings for an hour of therapy that is not close to "home".  This is a system that does not take the current challenges of our clients into consideration.

**Example:** Our Outreach team member sends an email every day at 7am for when there is an opening for substance use services, if it's the day a client can go in then we have to drop everything and try to rush that person in. That's if we can find the person in a short timeframe, and if they are in the perfect mindset to let us transport them to the appointment. If the stars do not align in that moment, then we have to start the process all over again and hope for another open window to get them to the location where services are provided.

**Recommendation:** Bring substance use recovery services and mental health support to the streets. Part of why outreach works is because we are meeting people where they are and bring resources to them. However, there are still needs in which the client is expected to go to the service provider, creating a challenge for someone who has high needs. We have to meet people where they are in all facets of homeless services. Expecting people under the influence, or with psychosis, schizophrenia and other mental illnesses, to transport themselves to a center, keep an appointment, and have a life-altering mental health intervention then return to the streets and maintain any sense of well-being is not at all realistic. Let's treat people in the environment in which they live. Experts need to see, smell, hear the challenges clients face in order to better address their substance use and/or their mental health. It is not equitable to expect people to have the presence of mind to make an maintain appointments as our mainstream community might be able to do.

  CenterInHollywood      CenterHollywood

6836 Selma Avenue
Hollywood, CA 90028
323-378-3225

TheCenterInHollywood.org



**Ending Isolation and Homelessness in Hollywood**

## THE CENTER

**etailed  ncidents**

**Challenge:  olicing  ersus     R  . Challenges for mental healthcare.**

**Example:** On 11/05/2020, three Community Wellness team members spent about four hours working with a participant, who is a   lack male in his 20s, to address a mental health crisis. This participant was experiencing suicidal thoughts, and after a suicide safety assessment, staff came to the conclusion that his safety was at risk and he urgently needed to be connected with mental health care. Staff discussed different options for him including calling PMRT  Psychiatric Emergency Response Team  and waiting for them to arrive.   nowing that from previous experience, it could take upwards of five hours for PMRT to arrive and they would then have to transport the participant to various behavioral health facilities which might not take him in or which also might have extremely long wait times, our team continued to support. As the conversation continued, and the participant's mother was included via phone call, the participant became more distraught, until staff felt that the only way to be sure that he could receive care for this crisis would be to call 911 with a 51-50.

Three police officers walked in, refusing to allow staff to notify the participant of their arrival, and immediately handcuffed his hands behind his back. This participant was treated as if he had committed a crime, as he stood there following the officers' directions while weeping off and on. Some of the   uestions that the officers asked felt unrelated to the crisis at hand, including asking if he was involved with any gangs. The participant was taken away in the back of a police car, taken to the police station where he was assessed by a mental health specialist, and held overnight. One staff member called the participant's mother, who was extremely upset and terrified to learn that her son was with the police. She was fearful of police brutality and prejudice towards   lack men like her son and felt powerless to protect him. Fortunately, he was not physically harmed, to our knowledge, and was released the next morning. However, he was not connected to any long-term mental health services. In the days after, he thanked the Wellness team for listening and staying with him as he was experiencing this crisis. We are fortunate that the participant had already built a relationship of trust with our staff, otherwise, that situation with police involvement could have broken that trust or his trust of any service provider    thereby delaying his connection to housing and mental healthcare and starting the process all over again. Had we had the positive experience of having a fast response team with success getting people to behavioral health centers   uickly, this participant could be mentally healthier and further along in the process to obtain permanent housing.

 



**Recommendation:** Consistency in Response and Expand the PMRT. They are worthy of more money, more staff, more resources. There is inconsistency with how law enforcement is trained and how they respond. We would like to utilize law enforcement for emergencies other than mental health crisis. We would like to use PMRT only for all the mental health crises interventions. There is a new program piloted by   idi Hirsch, and we hope that the resources are poured into that new program to make it successful and expansive. For someone like our participant, who has experienced trauma involving police before, the last place they should be while in a mental health crisis is handcuffed and put in the back of a police car. Support services connections. Even if a person is deemed well enough to be released after only one night in holding, anyone who experiences a 51-50 would benefit immensely from being connected to counseling or other long-term mental health care options instead of just being released.

**Challenge: Funding for proper on the ground, immediate responses.**

**Example:** On 12/2/2020 Wellness team members witnessed and worked with a client in the middle of the street experiencing a mental health crisis. The participant who is White and estimated to be 50 years of age, is bi-polar and was experiencing hysteria. Our team had to direct our line around him as he was yelling and causing a lot of chaos as we were trying to hand out food and hygiene items. Someone in line became very agitated with the hold-up that this participant was causing and approached him and punched him in the face. The participant did not fight back but appeared to be hurt. Moments later, a participant who the staff did not know or recognize came up and punched the participant even harder in the face. He had a bloody nose and was unable to respond due to the hysteria he was experiencing as well as the pain. The other team members removed the participant from the situation and called 911 and a 5150. Upon arrival after about thirty mins, the participant refused to go in the ambulance and ended up leaving. Later a Wellness team member called another ambulance for him and he again refused to go. The team members were left to navigate and de-escalate the man's health crisis meanwhile also moving the people who added violence to the situation away from the space so it would be safe for the rest of the community.

  



**Recommendation:** Enhance Mental Health Crisis Responses. Invest in trauma-informed security and support service providers with funding to hire such teams. The Center recently received short-term funding to hire Timelist, a trauma informed security agency. Since bringing them on they have been able to de-escalate matters allowing our staff to focus on providing services to participants.

**Challenge: Restricted   er ices.**

**Example:** On Wednesday 1/20/2021, four Community Wellness Team members spent three hours working with an individual, White male, early   0's, to address a mental health crisis. He came to staff at The Center in crisis, told them he was having suicidal thoughts, hearing voices and re uested help with getting transported to a rehabilitation facility for his mental health. After assessing the situation and conferring with the individual, staff learned that he was diagnosed as bipolar schizoaffective, they decided it necessary to call 911 for ambulance transportation. When the ambulance arrived, first responders informed staff they were not able to take him to the hospital because of overflow due to CO  I  . About fifteen minutes later, as the staff were calling various mental health facilities to see if they offer the services he was re uesting, the police showed up and attempted to make the same calls for the client. After an hour, the police were only able to give him the phone numbers to the facilities the staff were already calling.  The police presence seemed to escalate the individual even further.  After the police left, the staff found a facility that offered walk in urgent care appointments in hopes of being able to connect the individual to the rehabilitation facility he desired.  Unfortunately, it was much later in the afternoon, it was not likely he would be able to be seen but it was suggested by the facility he arrive first thing the next morning. The staff sat with the individual for another hour, making sure that he felt comfortable to arrive back at our site the next morning.    ecause of the rapport the staff had built with him over the course of the three hours, and the relationship they had built previously, they were confident he would return in the morning.

He did return at 7:30 the next morning, from there, staff paid   50 to get him a ride share service to the behavioral center. About two hours after arrival, we received word that he left the urgent care facility because they weren't able to do anything for him there.  The care was available, but because the individual had used a controlled substance, Crystal meth, within so many days of seeking care he was not a candidate for the overnight rehabilitation.

  CenterInHollywood        CenterHollywood

6836 Selma Avenue
Hollywood, CA 90028
323-378-3225

TheCenterInHollywood.org



The staff continued to see the client on and off for the next month, about a month after, on 2/23/21, he appeared to have many bruises and abrasions on his body, a missing tooth and stitches above his right eye.  When the staff asked him what happened he replied that he got in a fight with himself, he was hearing people yelling at him and chasing him, was seeing flashing red lights and threw himself into the asphalt, causing harm to himself, lucky to be alive.  Had services been provided on the day the staff spent hours searching the city for what the client was re uesting, his self-inflicted injuries might not have occurred and he could be on the path to recovery and housing. Instead, he is still homeless and the process to find proper care has started all over again.

**Recommendation:** Look at city and county services that receive public funding and what service they truly offer, then evaluate if they can expand their clientele re uirements or if we need new low-barrier facilities. Just like housing, sometimes our client do not fit into the exact boxes that need to be checked in order for them to receive services. So where do people end up when they are not the perfect client   The street. There absolutely have to be more low-barrier facilities that provide the right care to people. While a facility needs to be a right fit, we also need to acknowledge that there needs to be a safe space for people who are extremely challenging to serve. We have to have that space for them or else we will never see an end to homelessness.

**Challenge:  ac  of  o    arrier and   arm Reduction   ousing.**

**Example:** Our Project Roomkey staff gained insight into various barriers for people experiencing homelessness. One is the gap in integrative care and dwelling rules at shelters before moving on to permanent supportive housing.

Staff witnessed resistance to change which can be   uite normal with the population we serve. Major changes in lifestyle can manifest mental confusion which in turn may turn to resistance. Residents sometimes do not understand all that is expected of them and the reality does not set in until the shelter obligations present themselves. After being on the streets for over five years, our vulnerable population gets accustomed to old familiar surroundings and stimuli.

 



Upon moving into a shelter, or interim housing such as Project Roomkey, residents are asked to give up privacy, control of their daily schedule, and have to immediately trust staff members they just met and adjust to rules they did not have to previously abide by. At Project Roomkey guests had to submit to a security search upon arrival at the site, follow a curfew, and forfit any substances from alcohol to marijuana to other substances. This was to abide by FEMA guidelines, but in the end it did more harm than good to our hardest to reach clients. Our goal is to be as low-barrier as possible while maintaining the safety and well-being of all guests. However, they were not rules that we created but had to abide by.

The gaps in integrative health will forever be a challenge. The route to housing and healthcare is already challenging for the average person. What our staff witnessed were individuals with physical / mental barriers attempting to navigate the healthcare system knowing their basic needs are only being temporarily met. Some individuals lose or get their medication stolen and are not able to get additional refills due to Medi-Cal restrictions. This poor compliance affects treatment outcomes and housing plans tend to get derailed a bit.

Having strict rules at interim housing sites are understandable to have a structured environment however we believe we have to apply harm reduction and trauma informed care each time.

Many people experiencing homelessness have uni ue ways of coping with their reality. To demand individuals to limit indulging in libations on the streets before coming to their newly found temporary home creates a barrier and sometimes lack of trust between provider and participant. People who have the comfort of a home can enjoy a glass of wine or a few glasses of whiskey in the comfort of their own home after a challenging day, without judgement.   ut here guests had to go cold turkey when on site. While we offered recovery groups and support, it is unrealistic to think every single person can stop drinking or using a substance just because a rule is created.   iseases don't disappear overnight because there are new rules being implied. Safely monitoring and implementing low barrier / harm reduction models will give participants a chance to find purpose and work on recovery, hence helping overcome hurdles on the journey to permanent housing.

  



**Recommendation:** Work with FEMA and local agencies to educate on, and expand, low barrier / harm reduction models in shelters to permanent housing. The goal is to end a person's homelessness and help them achieve good overall health. We are excluding people from this possibility when we implement rules that ostracize folks who have more challenges to overcome. This is not easy, for providers or clients. We have to meet people where they are to get them in the door if we have any shot of addressing serious mental, emotional, and physical health needs that are barriers to housing.

If you made it this far, thank you. We are a partner in finding all solutions that lead to preventing and ending isolation and the cycle of homelessness for good. Feel free to contact us for a conversation, to brainstorm, or for more details. Please contact Nathan at nathan@thecenterinhollywood.org and 213.610.3100 or Jackie at jackiev@thecenterinhollywood.com or 202.997.5053.

Thank you,

The Center in Hollywood staff

  CenterInHollywood      CenterHollywood

6836 Selma Avenue
Hollywood, CA 90028
323-378-3225

TheCenterInHollywood.org