SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive, <br><br> Defendants. | Case No. 2:20-cv-02291 DOC-KES <br><br> **PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING** |

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**TABLE OF CONTENTS**

| | PAGE |
|---|---|
| I. INTRODUCTION | 1 |
| II. EQUITABLE REMEDIES ARE AVAILABLE TO THE COURT | 3 |
| A. Defendants Have Acknowledged That There Is A Factual Basis For Immediate Relief | 3 |
| B. This Court Has Broad Equitable Power To Issue Relief | 5 |
| 1. Constitutional Violations Provide Grounds for the Court to Issue Equitable Relief. | 8 |
| 2. Statutory Violations Provide Grounds for the Court to Issue Equitable Relief. | 10 |
| C. The *Plata* Case Guides This Court's Exercise of its Broad Injunctive Authority. | 13 |
| 1. The Supreme Court in *Brown v. Plata* Recognized That Courts May Act Even If Their Orders Have A Budgetary Impact On Local Government | 13 |
| 2. The District Court Decisions Underlying The Plata Opinion Are Analogous To The Circumstances Of This Case And Provide Support for Broad Judicial Relief | 15 |
| 3. Courts' Equitable Authority in the Face of Government Budgetary Concerns | 17 |
| III. THE CITY AND COUNTY HAVE NUMEROUS AVAILABLE PROPERTIES TO SERVE AS LOCATIONS FOR TEMPORARY HOUSING | 19 |
| IV. AVAILABLE FUNDS AND HOW THESE FUNDS ARE TO BE ALLOCATED | 20 |
| A. Hundreds of Millions of Dollars Are Available Under Proposition HHH | 20 |
| B. Though Less Immediate, Additional Funds Are Available Through Use of Enhanced Infrastructure Financing Districts and State and Federal Grants | 25 |
| V. CONCLUSION | 25 |

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

i

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

# TABLE OF AUTHORITIES

**CASES**                                                       **PAGE(S)**

*Armstrong v. Davis*,
275 F.3d 849 (9th Cir. 2001) ........................................................................ 10

*Brown v. Board of Education of Topeka, Kansas ("Brown II")*,
349 U.S. 294 (1955) ..................................................................................... 6, 8

*Brown v. Plata*,
563 U.S. 493 (2011) ................................................................ 7, 13, 14, 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ......................................................................................... 7

*Cooke v. Superior Court*,
213 Cal. App. 3d 401 (1989) ................................................................... 12, 18

*District of Columbia v. United States Department of Agriculture*,
444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 7

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
92 F.3d 1486 (9th Cir. 1996) ......................................................................... 7

*Gilmore v. California*,
220 F.3d 987 (9th Cir. 2000) ......................................................................... 8

*Harris v. Board of Supervisors*,
366 F.3d 754, 757 (9th Cir. 2004) ........................................................ 11, 12, 18

*Huezo v. Los Angeles Community College District*,
672 F. Supp. 2d 1045 (C.D. Cal. 2008) ......................................................... 11

*Hunter v. Santa Barbara County*,
110 Cal. App. 698 (1930) .............................................................................. 22

*Hutto v. Finney*,
437 U.S. 678 (1978) ................................................................................ 6, 9, 10

*Johnson v. California*,
543 U.S. 499 (2005) ...................................................................................... 10

*Lemon v. Kurtzman*,
411 U.S. 192 (1973) ................................................................................... 6, 7

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) .................................................................. 11, 18

*Milliken v. Bradley*,
433 U.S. 267 (1977) ......................................................................................... 8

*Plata v. Schwarzenegger ("Schwarzenegger I")*,
No. C01-1351 TEH,
2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) .............................................. 15, 16

ii

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

*Plata v. Schwarzenegger ("Schwarzenegger II")*,
No. C01-1351 TEH,
2008 WL 4847080 (N.D. Cal. Nov. 7, 2008) ................................................... 17, 19

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) ............................................................. 10, 17, 18, 19

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ....................................................................... 9, 10

*Rufo v. Inmates of Suffolk Cty. Jail*,
502 U.S. 367 (1992) ............................................................................................. 8

*Sierra Club v. Trump*,
963 F.3d 874 (9th Cir. 2020) ............................................................................. 8

*Steele v. Bulova Watch Co.*,
344 U.S. 280 (1952) ............................................................................................. 7

*Stone v. City and County of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ........................................................................... 16

*Swann v. Charlotte-Mecklenburg Board of Education*,
402 U.S. 1 (1971) ............................................................................................ 6, 8

*United States v. Fordice*,
505 U.S. 717 (1992) ............................................................................................. 6

*Watson v. City of Memphis*,
373 U.S. 526 (1963) ........................................................................................... 18

**STATUTES**

U.S. Const., art. III, § 2 ............................................................................................. 6

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

## I.    INTRODUCTION

Plaintiffs filed this case almost exactly one year ago; then, the situation on the streets of Los Angeles was desperate.  With the confluence of a massive health crisis and an ongoing trifecta of mental health, drug abuse, and housing crises, we have passed the tipping point of disaster.  Prior to the pandemic, people were entering homelessness at a far higher rate than exiting homelessness;[1] now it is estimated that chronic homelessness for working-age adults in Los Angeles County will increase by a whopping 86% by 2023.[2]  In 2020 an average of four people experiencing homelessness *per day* lost their life,[3] with one in five homicide victims being homeless.  According to KNX reporter Claudia Peschiutta, 165 homeless people died in January of this year, an increase of 74% from the year before.[4]  Crime both by and on homeless individuals has skyrocketed in the last five years.[5]  73% of all fires responded to by LA Fire Department in 2020 were related in homelessness.[6]

While Defendants have commendably increased their response to this crisis—most notably through the agreement as part of this lawsuit to create 5,300

[1] Los Angeles Homeless Services Authority ("LAHSA"), 2020 Greater Los Angeles Homeless Count Results (last updated Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results#:~:text=Put%20another%20way%2C%20an%20average,economic%20hardship%20as%20the%20cause.

[2] Daniel Fleming, Anthony W. Orlando, et al., *Locked Out: Unemployment and Homelessness in the Covid Economy*, Economic Roundtable (January 2021), https://economicrt.org/wp-content/uploads/2021/01/Locked-Out.pdf.

[3] Jessica Goodheart, *Homeless Deaths in Los Angeles Rose by More than 30% in 2020*, Capital & Main (Feb. 2, 2021), https://capitalandmain.com/homeless-deaths-in-los-angeles-rose-by-more-than-30-percent-in-2020-0202.

[4] @ReporterClaudia, Twitter (Feb. 4, 2021, 10:50 AM), https://twitter.com/ReporterClaudia/status/1357401123187945472.

[5] Nisha Venkat, *LA's homeless crime epidemic*, Crosstown (June 23, 2020), https://xtown.la/2020/06/23/homeless-crime-los-angeles/#:~:text=According%20to%20Los%20Angeles%20Police,from%20the%20level%20in%202015.

[6] John and Ken Staff, *LA Councilman Joe Buscaino Discusses the Latest Homeless Cleanup (Attempt)*, KFI AM-640 (Feb. 26, 2021), https://kfiam640.iheart.com/content/2021-02-26-la-councilman-joe-buscaino-discusses-the-latest-homeless-cleanup-attempt/.

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

"new" beds by April (a target which the City appears unlikely to meet), and through the use of state and federal funds to rent and purchase hotel rooms—the response has not been nearly sufficient to address the catastrophe on the streets. And new failures continue to come to light. The City has declined to increase renting hotel rooms for homeless individuals, despite FEMA promising to reimburse 100% of the cost, citing lack of up-front capital; yet the City has not yet even applied to FEMA for reimbursement of the millions of dollars spent in 2020 on hotel rooms *which would give it the up-front capital it claims it needs.*[7] And Mayor Garcetti inexplicably has suspended all HHH deadlines—including deadlines for additional funding to be raised for pre-development projects—thereby removing any accountability for producing the permanent units he claims are so necessary to address this crisis.[8]

This Court has broad powers to issue equitable relief, and Plaintiffs are filing a motion for said relief, which is available under the undisputed facts in this case and for the causes of action alleged in the complaint. Like the State of California in *Plata*, Defendants have acknowledged that immediate relief is necessary. The *Plata* case provides a roadmap to impose said broad equitable relief, even if the orders have a budgetary impact on the City and County (which, given the resources currently available, they should not). If the City is not willing to act swiftly—either through an agreed-on consent decree or significant unilateral action—the Court must do it for them to avoid ongoing constitutional and statutory violations.

On March 19, 2020, City and County officials gathered in front of this Court to pledge their allegiance to changing the trajectory of homelessness in Los Angeles. Mayor Garcetti begged this Court to "[H]elp us keep momentum, help us

---

[7] Benjamin Oreskes, *L.A. is entitled to federal aid to put homeless people in hotels. It hasn't asked for any yet*, Los Angeles Times (Mar. 3, 2021, 4:28 PM), https://www.latimes.com/homeless-housing/story/2021-03-03/la-slow-submit-fema-aid-paperwork-homeless-hotels.

[8] Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. B.

2

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

keep momentum, help us keep momentum," and noted that the City's "goal . . . is not to have an order but to have a collaboration." (Hr'g Tr. 17:24-18:2; 27:13-14, Mar. 19, 2020). Supervisor Barger noted approvingly that Bellflower voluntarily entered into a consent decree in the *Orange County Catholic Worker* case "to give them coverage so that they could be compassionate. Because it's not about criminalizing the homeless, but also being firm. . . . We have an opportunity, both the plaintiffs, the counties, and the cities to get this right." (*Id*. at 33:21-34:4.) Supervisor Barger also noted that "as a board" the County is "committed to moving forward" and that "we're going to be looking to you, Judge Carter, to help us navigate [the] waters." (*Id*. at 34:11-25).

Yet, one year later, nothing has changed: there has been no consent decree and the number of people living on the street has increased and along with them, death, disease, drugs, and violence. It is time for that to end.

Plaintiffs LA Alliance, et al. hereby respond to the Court's orders requesting briefing on the equitable relief available to the Court. And filed concurrently herewith is a notice of Plaintiffs' intention to file Motion for Preliminary Injunction to finally address these issues.

## II. EQUITABLE REMEDIES ARE AVAILABLE TO THE COURT

Plaintiff will be filing a motion for preliminary injunction that would require defendants to take immediate action to address this crisis. The Court has broad equitable powers to order relief on Plaintiff's claims in light of the undisputed factual record.

### A. Defendants Have Acknowledged That There Is A Factual Basis For Immediate Relief

It is undisputed that homelessness in Los Angeles is an ongoing crisis that merits immediate, emergency action. Defendants have admitted these facts in numerous public filings and statements. For example, Los Angeles Mayor Garcetti

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

has stated that the homelessness crisis is "The humanitarian crisis of our lives."[9] He has "called for a FEMA-level response to our homelessness crisis" and compared the ongoing damage to the aftermath of the 1906 Great San Francisco Earthquake, where more than 200,000 Californians became homeless.[10] He has further acknowledged that emergency action is required, demanding that we "***must respond like it's an earthquake – and do more, faster.***"[11] (emphasis added). Similarly, Hilda Solis, chair of the Board of Supervisors, has said "homelessness is the moral and humanitarian crisis of our time"[12] and "We have a moral and ethical responsibility to do our part."[13] And Heidi Marston, Executive Director of the Los Angeles Homeless Services Agency ("LAHSA"), recognizes that "[w]e have an emergency on our streets and we need an emergency response."[14]

Government officials have also acknowledged the impact racism has had on creating homelessness, which provides additional basis for the Court to impose equitable relief. For example, LAHSA'S Heidi Marston noted: "I want to be very

---

[9] *All Things Considered: LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis of Our Lives'* NPR (Sept. 21, 2019, 5:16 PM), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[10] Mayor Eric Garcetti, 2020 State of the City Address, https://www.lamayor.org/sites/g/files/wph446/f/landing_pages/files/SOTC2020Text.pdf; Mayor Eric Garcetti, *Rising to the Challenge: Helping Homeless Angelenos* (June 11, 2019), https://www.lamayor.org/rising-challenge-helping-homeless-angelenos.

[11] Mayor Eric Garcetti (@MayorOfLA), Facebook (June 12, 2019), https://www.facebook.com/MayorOfLA/posts/10157299485724806?comment_id=10157306801444806&reply_comment_id=10157308404509806.

[12] Los Angeles County Supervisor, Hilda L. Solis, First District Chair, *Innovation and Rapid Construction of Housing to Alleviate Homelessness to Launch at Former Jail Site* (Sept. 29, 2020), https://hildalsolis.org/innovative-and-rapid-construction-of-housing-to-alleviate-homelessness-to-launch-at-former-jail-site/.

[13] Alicia Victoria Lozano, *California fast-tracks plans to house homeless residents amid COVID-19 outbreak*. ABC News (Apr. 9, 2020, 5:00 AM), https://www.nbcnews.com/news/us-news/california-fast-tracks-plans-house-homeless-residents-amid-covid-19-n1179656.

[14] Rob Hayes, *LA homelessness authority calls for government to treat homelessness crisis with same urgency as natural disaster*, ABC7 Eyewitness News (Feb. 19, 2020), https://abc7.com/society/la-agency-wants-homeless-crisis-to-be-treated-like-natural-disaster/5945026/.

4

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

clear that homelessness is a byproduct of racism. We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their White counterparts."[15] Only 9% of the population in Los Angeles is Black, yet Black Angelenos make up 33% of the homeless population.[16]  Plaintiffs are prepared to submit additional evidence beyond the party admissions, including declarations from numerous people impacted by homelessness to support the Court's exercise of its equitable powers.

Although the City and County have taken laudable action to address the issue, these actions have clearly been inadequate to date—a fact which defendants do not dispute.  In just the eleven months that this litigation has been pending there has been a 32% increase in the number of homeless deaths than in the year prior.[17] Between March and July 2020, alone, 713 homeless people died; over twice the number of units of Proposition HHH housing built in the four years since the measure passed.[18]  It took this Court's *sua sponte* preliminary injunction for the City and County to provide beds for people experiencing homelessness near freeways.  Given the factual bases set forth above and in further detail in Plaintiffs' proposed motion for preliminary injunction, there is ample support for the Court to take further action.

### B.    This Court Has Broad Equitable Power To Issue Relief

Article III of the Constitution establishes that "[t]he judicial Power" of the

---

[15] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAist (June 12, 2020, 7:57 PM), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[16] *Id.*

[17] Goodheart, *supra* note 3.

[18] County of Los Angeles, Public Health, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (January 2021), http://publichealth.lacounty.gov/chie/reports/HomelessMortality2020_CHIEBrief_Final.pdf.

5

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

federal courts "shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States[.]" U.S. Const., art. III, § 2. The Supreme Court has consistently stated that courts are vested with extensive equitable powers to craft relief appropriate to redress unlawful conduct.

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "In fashioning and effectuating the decrees, the courts will be guided by equitable principles." *Brown v. Bd. of Educ. of Topeka, Kan.("Brown II")*, 349 U.S. 294, 300 (1955). Traditionally, "equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id.* District courts accordingly have wide latitude to fashion comprehensive relief that addresses "each element contributing to the violation" at issue. *Hutto v. Finney*, 437 U.S. 678, 687 & n.9 (1978). The Court's equitable powers allow it to craft relief specific to novel circumstances; procedural complexity does not prevent equitable results. *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.").

Courts' broad equitable powers can be used to prohibit action and as a vehicle for enforcement, compelling defendants to take certain prescribed steps to ensure compliance with constitutional mandates. *See Brown II*, 349 U.S. at 301 (instructing the district courts "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases"); *see United States v. Fordice*, 505 U.S. 717, 727-28 (1992) (observing that *Brown v. Board of Education* and its progeny mandate an "affirmative duty to dismantle its prior dual education system" and "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its

6

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

prior *de jure* dual system that continue to foster segregation"). A district court exercising its equitable power is not beholden to the plaintiff's prayer for relief but has broad discretion to fashion a flexible remedy that balances the various interests at stake. *See Brown v. Plata*, 563 U.S. 493, 538 (2011); *Lemon*, 411 U.S. at 200-01 (plurality op.).

Federal courts' broad equitable powers also extend to issuing injunctions that affect the rights or duties of parties not before the court. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("the District Court in exercising its equity powers may" enjoin conduct "outside its territorial jurisdiction") (citations omitted). In *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), the Supreme Court, addressing a question about nationwide class actions, described that principle of "complete relief," stating that nationwide classes were not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." 442 U.S. at 702. "Nationwide relief here is necessary to provide complete relief to the plaintiffs for the 'violation established.'" *District of Columbia v. U.S. Dep't of Agric.* 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (citing *Califano*); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) ("an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit-even if it is not a class action-*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.") (emphasis in original) (citation omitted).

Courts have frequently used these broad equitable powers to remedy constitutional and statutory violations by local governments. Notably, the Ninth Circuit has specifically upheld equitable relief in the context of equal protection and due process violations, in addition to statutory violations of the Americans with Disabilities Act and California Welfare and Institutions section 17000, all of which have been alleged in the operative Complaint.

7

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

### 1.    Constitutional Violations Provide Grounds for the Court to Issue Equitable Relief.

In accord with the above principles, courts have imposed structural equitable relief when necessary to remedy constitutional violations.  *See Sierra Club v. Trump*, 963 F.3d 874, 888 (9th Cir. 2020) ("Certain provisions of the Constitution give rise to equitable causes of action.  Such causes of action are most plainly available with respect to provisions conferring individual rights, such as the Establishment Clause or the Free Exercise Clause."); *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 399 (1992) (Stevens, J. dissenting) ("When a district court determines, after a contested trial, that a state institution is guilty of a serious and persistent violation of the Federal Constitution, it typically fashions a remedy that is more intrusive than a simple order directing the defendants to cease and desist from their illegal conduct. A district court has a duty to command a remedy that is effective, and it enjoys the broad equitable authority necessary to fulfill this obligation.") (citations omitted).  Of course, "the nature and scope of the remedy are to be determined by the violation." *Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000). "But where [] a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'" *Id*. (citation omitted).

*Brown v. Board* and its progeny established the clear authority of courts to address constitutional violations, including equal protection violations, propagated by state and local governmental agencies through mandatory injunctions.  In *Brown*, the Supreme Court ruled that courts had very broad equitable powers to order structural changes in school systems to desegregate schools, including "ordering the immediate admission of plaintiffs to schools previously attended only by white children."  *Brown II*, 349 U.S. at 300-01; *see also Swann,* 402 U.S. at 31 (affirming injunction requiring school board to implement plan to desegregate school district); *Milliken v. Bradley*, 433 U.S. 267, 269 (1977) (upholding the equitable powers of a

8

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation."). The Supreme Court has also extended the equitable authority of federal courts to order structural changes to redress unconstitutional due process violations. *See, e.g., Hutto*, 437 U.S. at 683 (describing district court's orders to change various prison practices and policies to remedy constitutional violations).

In *Roman v. Wolf*, detainees at an immigration and customs enforcement ("ICE") processing center brought a class action arguing that conditions of the ICE facility placed them at risk of Covid-19 and violated their Fifth Amendment due process rights. 977 F.3d 935, 942 (9th Cir. 2020). The Ninth Circuit affirmed in part the district court's issuance of a preliminary injunction imposing a moratorium on the ICE facility's receipt of new detainees, requiring specific sanitation measures, and ordering a reduction in the facility's population, because "the district court had broad equitable authority to grant provisional relief to remedy a likely constitutional violation." *Id*. at 939. In so holding, the Ninth Circuit recognized the broad equitable powers inherent to district courts, emphasizing that "[c]ourts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation," and "the district court's power to grant injunctive relief included the authority to order a reduction in population, if necessary to remedy a constitutional violation." *Id*. at 941-42. The Ninth Circuit reiterated that "if the district court determines, based on current facts, that particular measures are necessary to ensure that conditions at [facility] do not put detainees at unreasonable risk of serious illness and death, it may require such measures." *Id*. at 945. The court's authority to remedy a constitutional violation extends to ordering measures that the district court determines are necessary to "bring the conditions to a constitutionally adequate level." *Id*. at 945-46. Specifically, in "time-sensitive circumstances, the district court's authority to issue broad equitable relief encompassed the authority to grant provisional relief 'to bring

9

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

an ongoing violation to an immediate halt.'" *Id*. at 942 (citing *Hutto*, 437 U.S. at 687 n.9). In affirming the issuance of the injunction, the Ninth Circuit recognized that the district court made detailed factual findings to support the preliminary injunction and noted approvingly that the district court left to the Government's discretion how to achieve the requisite population reduction and which detainees to release, deport, or transfer. *Id*. at 939.

### 2. Statutory Violations Provide Grounds for the Court to Issue Equitable Relief.

A district court's power to compel government action has been extended to address statutory violations. *See Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (stating that "[s]ystem-wide [injunctive] relief is required if the injury is the result of violations of a statute . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury.").

In *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004), Medi-Cal patients with special needs asserted an Americans with Disabilities Act ("ADA") claim against all defendants, including Los Angeles County, and moved the district court for a preliminary injunction seeking to bar Los Angeles County from closing Rancho Los Amigos National Rehabilitation Center (Rancho) without providing plaintiffs with necessary medical and rehabilitative services elsewhere. The district court concluded plaintiffs demonstrated a likelihood of success on their ADA claim and granted an injunction barring the County from closing Rancho or terminating or reducing inpatient or outpatient services at Rancho until the County could assure that plaintiffs would continue to receive comparable services from other Medi-Cal providers in Los Angeles County. *Id*. at 993. In ordering the injunction the district

10

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

court considered the County's projected budget shortfall if it did not close Rancho, but was not persuaded that closing Rancho would, as the County claimed, save the County $58.6 million annually. *Id*. at 994. The Ninth Circuit held that the district court did not abuse its discretion in finding the likelihood of an ADA violation. *Id*. at 998. The Ninth Circuit acknowledged the County's concerns of financial hardship if it was forced to keep Rancho open, but noted that the injunction does not mandate the County keep the hospital open "at any cost" but rather, requires the County to, "somehow, somewhere, continue to offer the services currently provided [there]." *Id.* at 999. The Ninth Circuit thus held the district court did not abuse its discretion because the County is free to reorganize its health care system within the requirements of the injunction, emphasizing that when "[f]aced with[ ] a conflict between financial concerns and preventable human suffering, [the Ninth Circuit has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Id*. (citing *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

District courts in the Ninth Circuit have similarly taken affirmative action and ordered mandatory injunctions to plaintiffs and non-plaintiffs alike when faced with ADA violations. *See e.g. Huezo v. L.A. Cmty. Coll. Dist.*, 672 F. Supp. 2d 1045, 1048 (C.D. Cal. 2008) (upon finding of ADA violation, enjoining Los Angeles Community College District to remove accessibility barriers and change discriminatory policies).

A district court's power to issue equitable relief extends to state statutes as well as federal statutes. *Harris v. Board of Supervisors,* is instructive. 366 F.3d 754, 757 (9th Cir. 2004). In *Harris*, a group of chronically ill indigent patients also sued the County to prevent its planned closure of Rancho and the County's simultaneous decision to reduce the number of hospital beds at Los Angeles County–USC Medical Center (LAC–USC). The district court entered a preliminary injunction after finding that the County's hospitals were not equipped to

11

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

accommodate patients displaced from Rancho's closing and the reduction in beds at LAC-USC. The Ninth Circuit affirmed, holding that plaintiffs had established the elements of a preliminary injunction predicated on California Welfare and Institutions Code sections 10000, 17000 and 17001. *Id*. at 764. Considering the County's budget crisis, the Ninth Circuit specifically noted that California has interpreted the California Welfare and Institutions provisions to require a county to provide care even in the face of a budget shortfall. *Id*. "A lack of funds is no defense to a county's obligation to provide statutorily required benefits." *Id*. (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413-14 (1989)). The Ninth Circuit noted that section 17000 mandates that the County "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." *Id*. The Ninth Circuit found no abuse of discretion and that the district court's factual findings were supported by the record in that closing Rancho would deprive plaintiffs of medically necessary care, thereby violating the state law requirements described above. *Id*. at 765. In so holding the Ninth Circuit highlighted that public interest considerations weigh on "both sides of the scale" – "[t]he County suggests that the injunction forces it to cut other important programs, such as vaccinations, routine physicals, and well-baby care for those patients who do not fall under the strict statutory definition of indigent." *Id*. at 766. But the Court noted that "whether any or all of those programs will actually be impacted by the court's injunction is much more speculative than the probable injury the chronically ill plaintiffs face absent preliminary injunctive relief." *Id*. Accordingly, the Ninth Circuit held that the district court did not abuse its discretion by concluding that the public interest favored issuance of a preliminary injunction.

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

**C.     The *Plata* Case Guides This Court's Exercise of its Broad Injunctive Authority.**

*Brown v. Plata* provides recent and relevant guidance regarding district courts' authority to issue mandatory relief, confirming that a district court's powers may appropriately be used when necessary to address constitutional violations even where such power shapes local government's authority and impacts budgetary concerns.  563 U.S. 493 (2011) ("*Plata*").

**1.     The Supreme Court in *Brown v. Plata* Recognized That Courts May Act Even If Their Orders Have A Budgetary Impact On Local Government**

*Brown v. Plata* was a consolidation of two class actions in California resulting in an order requiring California to drastically reduce its prison population.  In the first case, California prisoners with serious mental disorders brought a class action against the Governor of California alleging that they received inadequate mental health care due to prison overcrowding, in violation of the Eighth Amendment prohibition of cruel and unusual punishment. *Plata,* 563 U.S. at 506. The District Court held the prisoners' Eighth Amendment rights had been violated and appointed a special master to oversee the development and implementation of a remedial plan at the prisons. *Id.* at 506-07.  Separately, California prisoners with serious medical conditions brought a class action against the California Governor asserting constitutional claims similar to those in the first class action. *Id*. at 507-08. In that case, the State stipulated to remedial injunction, and, after the State failed to comply with that injunction, the District Court appointed a receiver to oversee remedial efforts. *Id.*  Upon request by the plaintiffs in both cases, a three-judge panel was convened pursuant to Prisoner Litigation Reform Act ("PLRA") (which permits only a "three-judge court" to limit a prison population) and the cases were consolidated before that panel.  The panel entered a remedial order requiring the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

13

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

State to reduce its prison population to 137.5 percent of design capacity within two years.  The Governor of California appealed.

At oral argument, Chief Justice Roberts questioned the scope of a federal district court's ability to order various structural remedies that may exhaust a local government's capacity and budget, transferring budget prioritization from the State legislature to Federal district courts.  Specifically, Chief Justice Roberts asked

> [W]hat happens when you have this case, another district court ordering the State to take action with respect to environmental damage, another court saying, well, you've got to spend this much more on education for disabled, another court saying you've got to spend this much more on something else? How does the State sort out its obligations?

(Mitchell Decl. Ex. A, *Brown v. Plata*, Oral Argument Transcript at 71:13-19 (Nov. 30, 2010).)  Appellees' response was that the state has "an obligation to follow the Federal law, constitutional law and other laws.  And if they[] [do] not, then the Federal court has an obligation to impose a remedy." (*Id.* at 73:6-9.)  Appellees' attorney further contended that where the injunction had given the State the maximum degree of flexibility to make the policy choices surrounding the incarceration of prisoners, where inaction leads to Constitutional violations, there must be a remedy.  (*Id.* at 73:20-74:6.)  Plaintiffs would submit where health and safety are at stake—particularly the risk to thousands of lives—such issues should take priority.

The Court affirmed the panel's ruling holding that the PLRA authorizes the relief afforded in this case and that the court-mandated population limit was necessary to remedy the violation of prisoners' constitutional rights.  *Plata*, 563 U.S. at 502.  Echoing appellees' arguments, the Court held that "the law and the Constitution demand recognition of certain [] rights. . . . [¶ If government fails to fulfill [its] obligation, the courts have a responsibility to remedy the resulting [] violation." *Id*. at 510-11.  In response to the State's concerns that the Court's order limits the State's authority to run its prisons, the Court noted that "[w]hile the order

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

14

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion . . . The order's limited scope is necessary to remedy a constitutional violation." *Id*. at 553. Further, echoing the *Swann* court cited *supra*, "Courts have substantial flexibility when making these judgments. 'Once invoked, "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies."'" *Id*. at 583 (citations omitted).

Ultimately, in acknowledging the considerations of federalism but ordering relief nonetheless, *Plata* provides guidance regarding the broad scope of courts' authority to provide equitable relief. The government cannot avoid its obligations where there is a Constitutional violation. If a court finds an ongoing Constitutional violation, it is obligated to impose a remedy, and practical concerns regarding competing court orders or the exhaustion of capacity/budget can be adequately addressed by the Court engaging in a dialogue with the City regarding this concern and/or giving the City sufficient discretion in how to address the problem.

> **2.      The District Court Decisions Underlying The Plata Opinion Are Analogous To The Circumstances Of This Case And Provide Support for Broad Judicial Relief**

In the Northern District of California case filed in 2001 that was later consolidated into the case that led to the *Plata* decision, the plaintiffs alleged that the State of California was providing constitutionally inadequate medical care at all California state prisons. *Plata v. Schwarzenegger* ("*Schwarzenegger I*"), No. C01-1351 TEH, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005). In 2002, "[d]efendants agreed to enter into a consent decree and to implement comprehensive new medical care policies and procedures at all institutions," *id*., and in 2004, the defendants further committed to taking steps to address certain identified issues in a Stipulated Order. *Id*. at *2. But, as is the case here, the defendants failed to take the necessary action—at best, "enact[ing] only very

15

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

limited and piece-meal measures, with no prospect for system-wide reform or restructuring." *Id*. at \*26.

The district court therefore issued an Order to Show Cause as to "(1) why a Receiver should not be appointed to manage health care delivery for the [California prison system] until defendants prove that they are capable and willing to do so without Court intervention, and (2) why defendants should not be held in civil contempt of this Court's prior orders." *Id*. at \*2.  Following a subsequent evidentiary hearing, the court found that the defendants had "Fail[ed] to provide constitutionally adequate medical care," causing "extreme harm" to the plaintiffs. *Id*. at \*3.  The court then issued an order removing "control of the medical delivery system of the" prison system from the defendants, and "plac[ing] it under the auspices of a Receivership."  *Id*. at \*2.

Just as this Court has recognized that "the paralysis of the political process" in Los Angeles has "endanger[ed] the lives of homeless and the safety of the communities in which they reside," (ECF No. 205 at 3), the *Schwarzenegger I* court also recognized the role that the failure of the political will played in the constitutional crisis in California's prisons:

> **To a significant extent, this case presents a textbook example of how majoritarian political institutions sometimes fail to muster the will to protect a disenfranchised, stigmatized, and unpopular subgroup of the population.  This failure of political will, combined with a massive escalation in the rate of incarceration over the past few decades, has led to a serious and chronic abnegation of State responsibility for the basic medical needs of prisoners.  This is a case where "the failure of the political bodies is so egregious and the demands for protection of constitutional rights [is] so importunate that there is no practical alternative to federal court intervention."**

*Id*. at \*32 (emphasis added) (citation omitted).  The result of that failure of political will was the *Plata* court's conclusion that it had "no choice but to step in and fill the void," *id*. at \*31, because "where federal constitutional rights have been traduced, principles of restraint, including comity, separation of powers and pragmatic caution dissolve[.]" *Id*. at \*24 (quoting *Stone v. City and County of San*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

16

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

*Francisco,* 968 F.2d 850, 861 (9th Cir. 1992)).

Three years later, the court issued an opinion further expanding that equitable remedy, directing the State of California "to transfer $250 million to the Receiver in furtherance of the Receiver's work to remedy the undisputed and ongoing constitutional inadequacies in the delivery of medical care in California's prisons." *Plata v. Schwarzenegger* ("*Schwarzenegger II*"), No. C01-1351 TEH, 2008 WL 4847080, at *1 (N.D. Cal. Nov. 7, 2008). In an opinion denying the State's motion to stay the transfer order, the court addressed the State's argument that transferring $250 million would be a financial hardship, observing that because "the $250 million at issue here has already been allocated" to support the corrections system— much like the City of Los Angeles has already allocated funds through Proposition HHH to address the homelessness crisis—"[d]efendants' claim of economic hardship is . . . less compelling." *Id*. at *5. And in any event, "financial hardship cannot outweigh the human suffering and preventable and possibly preventable deaths that will occur" if a stay were imposed. *Id*. The court concluded that "[s]ignificant financial difficulties do not . . . outweigh the public interest in ensuring that the State protects the welfare of its citizens and complies with the United States Constitution." *Id*. at *6.

### 3. Courts' Equitable Authority in the Face of Government Budgetary Concerns.

As observed in the *Plata* oral argument by Chief Justice Roberts, there are financial considerations inherent to any equitable relief requiring a government entity to act or to refrain from acting that may increase the difficulty to a government in "sort[ing]" out its [financial] obligations." (Mitchell Decl. Ex. A, *Plata* Transcript at 71:19.) But, while a governmental entity's "interest in balancing its . . . budget and controlling costs is strong," *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004), "[f]ederal courts [still] have an obligation to enforce the Constitution and the laws of the United States." (Mitchell Decl. Ex. A, *Plata*

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Transcript at 74:16-19.)  And this is consistent with controlling authority in this area: as the Supreme Court observed when directing the City of Memphis to immediately desegregate city parks and recreational facilities despite the city's argument that such desegregation may require funding that was not provided for in the budget, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963).  The Ninth Circuit has addressed these considerations at some length, concluding:

> [P]hysical and emotional suffering shown by plaintiffs . . . is far more compelling than the possibility of some administrative inconvenience or monetary loss to the government. . . Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor. . . .
>
> In a broader sense, however, the government's interest is the same as the public interest.  The government must be concerned not just with the public fisc but also with the public weal.  In assessing this broader interest, we are not bound by the government's litigation posture. Rather, we make an independent judgment as to the public interest.
>
> It is not only the harm to the individuals involved that we must consider in assessing the public interest. Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges.  Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required.  It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time.  It would be unfortunate, but far less harmful to society, were the government to succeed in overturning the preliminary injunction but be unable to recoup all or a portion of the funds.

*Lopez*, 713 F.2d at 1437-38 (affirming district court order requiring the federal government to restore disability benefits to large number of social security recipients); *see also Rodde*, 357 F.3d at 999 (when "[f]aced with[ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor") (citing *Lopez*); *Harris*, 366 F.3d at 764-65 ("[a] lack of funds is no defense to a county's obligation to provide statutorily required benefits") (citing *Cooke*, 213

18

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Cal. App. 3d at 413-14.

Courts may also consider certain circumstances to weigh in favor of equitable relief, even where such relief has financial consequences. For example, as is clear from *Schwarzenegger I*, any argument brought by the government regarding the financial hardship of the court's order is "less compelling" where the money has already been allocated to be spent on the issue targeted by the equitable relief. *Schwarzenegger II*, 2008 WL 4847080, at \*5. Similarly, in an opinion affirming a preliminary injunction barring a county from moving forward with the plan to close a county hospital, the Ninth Circuit considered the extent to which the cost of the relief—closing the hospital was budgeted to save the county $58.6 million annually, *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004)—was offset by the savings caused by the relief—avoiding the increase in costs caused by the displaced patients going elsewhere for treatment. *Id*. Through this analysis, the Ninth Circuit concluded that, "while it is unclear just how much financial hardship the district court's injunction creates for the County, it is apparent that the cost is lower than the County contends." *Id*.

## III. THE CITY AND COUNTY HAVE NUMEROUS AVAILABLE PROPERTIES TO SERVE AS LOCATIONS FOR TEMPORARY HOUSING

While City and County officials are in a better position to answer this question, LA Alliance is aware of public reports stating that there are over 600 acres of government owned land in Los Angeles County that is suitable for homeless housing, and the Los Angeles Controller has put out a list of 13,948 parcels owned by government entities, many of which are vacant or underutilized.[19] Plaintiffs have identified 27 government-owned sites adding up to 166.58 acres of land that

---

[19] Los Angeles City Controller, *Publicly-Owned Properties*, https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited Mar. 3, 2021); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM)

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

are currently available for immediate housing of homeless individuals.[20]  340 acres adjacent to LAX are being redeveloped into a commercial space that could be utilized for temporary homeless shelters, or at least safe campgrounds?[21] The County's general hospital (LAC+USC building has 1.5 million square feet of space and has been vacant for over a decade, having at point been considered for homeless assistance.[22]  The County is set to demolish dozens of buildings on nearly 100 acres on what used to be a government-owned "poor farm" to build a new office park.[23]  There are no doubt spaces available, it's just a matter of prioritizing what matters.

## IV.    AVAILABLE FUNDS AND HOW THESE FUNDS ARE TO BE ALLOCATED

The City and County are in a better position to identify available funds for immediate shelter and housing.  However, Plaintiffs have identified two sources of dedicated, non-general fund dollars that could and should be utilized to fully fund emergency housing for unhoused individuals: Proposition HHH dollars, and the use of Enhanced Infrastructure Financial Districts.

### A.    Hundreds of Millions of Dollars Are Available Under Proposition HHH

According to the City's Prop HHH Progress website, $968,393,734 of the $1.2 billion has been "committed" which leaves **$231,606,266** which could be

---

[20] A list of each one of these sites, as well as information about each site, is attached to the Declaration of Elizabeth Mitchell as Exhibit D.

[21] Connect Media, *340-Acre LAX Site Redevelopment Set to Take Off* (June 20, 2016), https://www.connectcre.com/california/340-acre-lax-site-redevelopment-plan-place/.

[22] Jacqueline Ramírez, *Second community meeting explores future of former County Hospita*l, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/.

[23] LA Conservancy, *Rancho Los Amigos,* https://www.laconservancy.org/issues/rancho-los-amigos (last visited March 4, 2021); A Modest Proposal For Saving Rancho Los Amigos and Helping the Homeless of Los Angeles County, Kim Cooper (June 19, 2020), https://esotouric.com/2020/06/19/rancholosamigos/.

20

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

immediately utilized for emergency and interim shelter opportunities.[24]  Of the funds that have been "committed," $502 million are for projects in the "predevelopment" stage meaning letters of commitment have been issued but no final contract has been signed.[25]  The City should be required to disclose the potential for some or all of these funds to be clawed back and utilized for emergency shelter.

Proposition HHH explicitly provided that approved funds would be made available for three types of housing:  (a) supportive housing for homeless individuals where services such as health care, mental health, and substance sharp abuse treatment may be provided, (b) temporary shelters and facilities, such as storage and showers, and (c) affordable housing (up to 20% of bond funds).[26]  The ballot measure required that at least 80 percent of HHH funds be used on supportive housing, shelters and facilities and affordable housing, but it did not specify how to distribute funds between those categories.[27]  The City unilaterally decided to spend the vast majority of the funding on supportive housing and virtually nothing on temporary shelters.[28]  As of September 2020, only $58 million—a mere 5% of total

[24] Los Angeles Housing and Community Investment Department ("LAHCID"), HHH Progress (Feb. 23, 2021), https://hcidla2.lacity.org/housing/hhh-progress; LAHCID, Proposition HHH Developments Summary (Feb. 24, 2021), https://hcidla2.lacity.org/housing/prop-hhh-developments-summary.  *But see* Ron Galperin, LA Controller, Meeting the Moment: An Action Plan to Advance Prop. HHH (Sept. 9, 2020), https://lacontroller.org/audits-and-reports/hhhactionplan/ issued by the City Controller September 9, 2020 which noted that $1.17 billion had been committed, and only $30 million remained unallocated.  The City should provide accurate updated numbers so the Court may determine the funds available.
[25] LAHCID, HHH Progress, *supra* note 22.
[26] Los Angeles, California, Homelessness Reduction and Prevention Housing, and Facilities Bond Issue, Measure HHH (November 2016), https://ballotpedia.org/Los_Angeles,_California,_Homelessness_Reduction_and_Prevention_Housing,_and_Facilities_Bond_Issue,_Measure_HHH_(November_2016)
[27] *Id.*
[28] Galperin, *supra* note 22; (*see also* Hr'g Tr. 99:25-100:5, Feb. 4, 2021 (Meg Barclay: "[W]e made a recommendation to discontinue the facilities program in order to—because we were not getting a lot of applications for new beds and because we wanted to make sure that the Measure was focused on permit units which, as you know, is the permanent solution to homelessness.") and 100:14-20

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

21

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Proposition HHH funds—had been allocated to interim shelter and facilities projects.  Of the shelters funded by Proposition HHH, the overwhelming majority of the projects (19 of 24) were mere renovations to existing shelters and facilities rather than new construction, providing only 196 additional shelter beds.  Should the Court find this unilateral decision by the City—to almost exclusively focus on permanent supportive housing in lieu of shelter beds—is contrary to the language of the proposition passed by voters, the Court may invalidate contracts that conflict with the proposition's stated purpose.  *Hunter v. Santa Barbara County*, 110 Cal. App. 698 (1930) (where voters approved issuance of bonds for construction of a road, and the board of supervisors approved a contract that would spend the majority of the bond money on just a part of the road, the contract was "illegal and void" because it "called for the construction and improvement of only a portion of the road . . . and left an amount of money in the fund wholly insufficient to construct and improve the balance of the road.")

Four years have passed since the passage of Proposition HHH and very little housing has been built.  Only seven projects, containing 361 units, have been completed.  There are an additional approved projects with 5,760 supportive and 1,423 non-supportive units in the pipeline.[29]  As of September, 2020, only 19 percent of the units remaining in the HHH development pipeline will be completed by January 1, 2022, and only 43 percent of total units are scheduled to be completed by January 1, 2023.[30]  It is highly unlikely that all projects will be completed by 2025, with the average project timeline ranging between three and six years.[31]  Even with nearly 8,000 projects in the pipeline, if the City were to construct housing at its

("So, it wasn't that the City's focus was not on assisting facilities, we just chose to—the recommendation that was approved by Council and the Mayor was to focus Proposition HHH on permanent housing and the permanent solution for people and to use other resources to significantly expand the amount of shelter that was available in the community.")).

[29] LAHCID, HHH Progress, *supra* note 22
[30] Galperin, *supra* note 22.
[31] *Id.*

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

current rate, it would take nearly 30 years to build enough housing for over 66,000 people currently experiencing homelessness.

Proposition HHH housing is also very expensive – higher than market rate housing. The median price to construct a Proposition HHH unit in Los Angeles is $535,000. More than 28 percent of units in construction exceed $600,000 per unit and nearly 33 percent of units in pre-development are projected to exceed the same cost threshold. For one development project in particular, pre-development costs exceeded $76 million. *Id.* Indeed, The City's Comprehensive Homelessness Strategy (January 2016) estimated that the cost of building each studio/one-bedroom unit would be $350,000, and the cost of a two-bedroom unit or larger would be $414,000.[32] The average cost to build a custom home in Los Angeles starts at $350,000.[33] At this rate, more individuals will become homeless than will be able to occupy the permanent units as they come online.

Perhaps most shocking is in April, 2020, all benchmarks and deadlines pertaining to current HHH projects were <u>indefinitely suspended</u>.[34] Traditionally under Proposition HHH a project is given a commitment letter and two years to obtain the rest of the funding (the pre-development phase); upon a project obtaining full finding, the project may commence with certain deadlines and benchmarks. However, the Mayor of Los Angeles, using his emergency powers, unilaterally suspended all deadlines including Site Control, Schedule of Performance, and Funding Commitments. The Mayor's order came directly after the State of California specifically exempted construction workers and financial institutions

---

[32] Ron Galperin, LA Controller, High Cost of Housing: Review of Proposition HHH, (Oct. 8, 2019), https://lacontroller.org/wp-content/uploads/2019/10/The-High-Cost-of-Homeless-Housing_Review-of-Prop-HHH_10.8.19.pdf.

[33] *See e.g.* Pacific Green Homes, How Much Does it Cost to Build a House in Los Angeles?, https://www.pacificgreenhomesinc.com/new-home-construction/how-much-does-it-cost-to-build-a-house-in-los-angeles/#:~:text=The%20relative%20scarcity%20of%20vacant,only%20goes%20up%20from%20there (last visited Mar. 3, 2021).

[34] *See* Mitchell Decl. Ex. B.

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

from the stay-at-home order as "essential workers."  So there was no reason for this across-the-board tolling of all dates and deadlines, and there certainly is no reason for the order to be continuing to this day.[35]  **The result of this unilateral, indefinite order is zero accountability for any deadlines in the pipeline, zero accountability for the production of any housing units in construction, and zero accountability for the over $700 million sitting in the city's coffers collecting dust.**  This is absolute waste of a massive amount of money that could be used to save lives.

Since the passage of Proposition HHH in 2016, the number of unhoused people in the City of Los Angeles ballooned from 28,464 to 41,290, an explosion of nearly 70 percent.[36]  While permanent supportive housing is an important component within the broader plan to address homelessness, it cannot be the only solution: at its current cost and pace, thousands will suffer and die, and thousands more will deteriorate—becoming increasingly drug dependent and mentally ill—before any housing from Proposition HHH becomes realistically available.  Peter Lynn, former executive director of LAHSA, has observed that "[o]n our present course, it will take far too long to build far too few units of housing to effectively end this crisis."[37]  Indeed, in the four years since Proposition HHH was passed *5,000 people have died on the streets of Los Angeles*.

---

[35] *See* Mitchell Decl., Ex. C, a report generated on February 12, 2021.  The "U" column is labeled "HHH Commitment Expiration Date Plus Tolling Order" with an end date of February 12 (i.e. the date the report was generated).  To Plaintiffs knowledge, the tolling did not end on February 12, 2021, that date was used because it was the date the report was generated.  This demonstrates unambiguously that tolling of all deadlines is still ongoing, and the Proposition HHH Oversight Committee is aware of said tolling yet still it continues.

[36] LAHSA, 2016 Homeless Count Results Los Angeles County and LA Continuum of Care (updated May 10, 2016), https://www.lahsa.org/documents?id=1294-2016-homeless-count-results.pdf.  *See also* LAHSA, 2020 Greater Los Angeles Homeless Count Results (last updated Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.

[37] LAHSA, LAHSA Releases 2019 Housing Inventory Count (last updated Oct. 1, 2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-inventory-count&ref=policy.

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## B.     Though Less Immediate, Additional Funds Are Available Through Use of Enhanced Infrastructure Financing Districts and State and Federal Grants

In addition to the funds immediately available under HHH—and not as a substitute therefor—the City and County should use an Enhanced Infrastructure Financing District (EIFD) to fund projects that will need to be built down the line—for example, building affordable and permanent housing and establishing interim shelter structures to supplement temporary facilities and sanctioned encampments. EIFDs use an existing tax base in an established year; as property values increase, the tax base increases, and the difference in the two tax bases is called "tax increment."  Using an EIFD, government agencies can dedicate a portion or all of their increased tax revenue in an established district towards improvement of public projects.  Importantly the Authority running the EIFD exists as a separate entity and creates an accountability structure which includes benchmarks and deliverable results. Depending on the entities participating in the EIFD, the length of time the EIFD lasts, the number and value of projects developed, the percentage of tax increment dedicated, and how large of an area the district established, the revenue amount from a downtown LA EIFD likely ranges from several hundred million dollars to several billion dollars.  While an EIFD can take over a year to set up—and therefore is not an immediate funding source—it should serve as a valuable piece of the longer term solution.

## V.     CONCLUSION

The Court enjoys broad powers of equitable relief when ongoing constitutional or statutory violations are found, such as those alleged in the operative Complaint.  Here it is undisputed that none of the current measures being taken by Defendants are sufficient to address the clear humanitarian crisis on our streets and it will take the Court's broad powers to end what Defendants have failed to address.

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING

Respectfully submitted,

Dated: March 4, 2021

*/s/ Matthew Donald Umhofer*
SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)

*Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

26

PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING