SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive,<br><br>Defendants. | Case No. 2:20-cv-02291 DOC-KES<br><br>**DECLARATION OF ELIZABETH A. MITCHELL IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE COURT'S REQUEST FOR BRIEFING** |

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

DECLARATION OF ELIZABETH A. MITCHELL

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

## **DECLARATION OF ELIZABETH A. MITCHELL**

I, Elizabeth A. Mitchell, state and declare as follows:

1.     I am an attorney and counsel of record for Plaintiffs in this case.  I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.     Attached hereto as Exhibit A is a true and correct copy of the Oral Argument Transcript in the case of *Brown v. Plata*, 563 U.S. 493, dated November 10, 2010.

3.     Attached here as Exhibit B is a true and correct copy of the document entitled "Public Order Under City of Los Angeles Emergency Authority", Issue Date, April 17, 2020, Subject: Tolling HCIDLA Deadlines and Revising expiration of Emergency Orders, available publicly on the Mayor and HCID websites.

4.     Attached hereto as Exhibit C is a true and correct copy of the report for "Non-PEP" projects (projects in pre-development), generated for the Proposition HHH Oversight Committee on February 12, 2021, publicly available on the HCIDLA website.

5.     Attached hereto as Exhibit D is a true and correct copy of the 27 government-owned sites identified by LA Alliance within Los Angeles County that are ideal to provide immediate emergency and interim shelter facilities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 4, 2021 at Los Angeles, California.

_s/ Elizabeth A. Mitchell_____
Elizabeth Mitchell

2

DECLARATION OF ELIZABETH A. MITCHELL

# Exhibit A

Official

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - - - x

ARNOLD SCHWARZENEGGER, GOVERNOR OF:

CALIFORNIA, ET AL.,                    :

            Petitioners              :    No. 09-1233

      v.                              :

MARCIANO PLATA, ET AL.               :

- - - - - - - - - - - - - - - - - - - x

                              Washington, D.C.

                              Tuesday, November 30, 2010

            The above-entitled matter came on for oral

argument before the Supreme Court of the United States

at 11:10 a.m.

APPEARANCES:

CARTER G. PHILLIPS, ESQ., Washington, D.C.; on behalf

    of Appellants.

DONALD SPECTER, ESQ., Berkeley, California; on behalf of

    Appellees.

1

Official

C O N T E N T S

ORAL ARGUMENT OF                                          PAGE

CARTER G. PHILLIPS, ESQ.

    On behalf of the Appellants                          3

ORAL ARGUMENT OF

DONALD SPECTER, ESQ.

    On behalf of the Appellees                           37

REBUTTAL ARGUMENT OF

CARTER G. PHILLIPS, ESQ.

    On behalf of the Appellants                          76

`

Alderson Reporting Company

Official

P R O C E E D I N G S

(11:10 a.m.)

CHIEF JUSTICE ROBERTS:  We'll hear argument in Case 09-1233, Schwarzenegger v. Plata, and the related cases.

Mr. Phillips.

ORAL ARGUMENT OF CARTER G. PHILLIPS

ON BEHALF OF THE APPELLANTS

MR. PHILLIPS:  Thank you, Mr. Chief Justice, and may it please the Court:

What this Court has under review today is an extraordinary and unprecedented order issued by a three-judge district court requiring the release of between 36,000 and 45,000 inmates, currently incarcerated in the California penal system, within a 2-year period.

The order in this particular case is made particularly remarkable because it strikes me that at a minimum it is extraordinarily premature.  That -- it may come at some point in this process that an order, probably substantially smaller in scope than this one, may become appropriate.  But if this is supposed to be an order or remedy of last resort, and what the district court has done here is leapfrogged a series of steps that should have been taken ahead of going this particular route.

Official

JUSTICE GINSBURG:  One case, Mr. Phillips, is pending for 20 years; is that not so?

MR. PHILLIPS:  Yes, that's correct, Justice Ginsburg.

JUSTICE GINSBURG:  So it seems to me -- and there were something like 70 orders from the district court, the single-judge district court in that case.

MR. PHILLIPS:  That's absolutely true, Justice Ginsburg.

JUSTICE GINSBURG:  And no -- no change.  So how much longer do we have to wait?  Another 20 years? Longer than that?

MR. PHILLIPS:  No, Justice Ginsburg.  I think, obviously, the length of time you have to wait in some ways depends on what the state of the remedial phase is in the particular case.  And in this case and in recognition, frankly, of the substantial problems that were inherent in the -- in the penal system as it existed during the 1990s and up until the early 2000s, a receiver was appointed, specifically in the Plata class, but there was also connections between the receiver and the special master even in the Coleman class before the three-judge panel was convened.

And under those circumstances and given the extraordinary powers that the receiver had been

4

Official

accorded, what should have -- the most logical course, if this is supposed to be a remedy of last resort, was to allow the receiver an opportunity to implement the extraordinary powers that were conferred upon him, and then see -- because if it turns out that we aren't making progress --

JUSTICE SOTOMAYOR:  Excuse me.  Could you tell me -- from your briefs, I just haven't understood what the alternative steps are.  The court below talked about some proposals like construction and said the legislature has struck them down.  There's -- the fiscal crisis has gotten worse, so construction is really not an option.  I don't see how you wait for an option that doesn't exist.  They talked about hiring more staff, but the conclusion was that even if you maximize the staff, you don't have the facilities to add more staff, which is what you need to cure the constitutional violation.

So tell me what specific steps outside of this order should have been given time to be implemented, because the receiver has basically said: I've tried, and the small progress we made has been reversed because the population just keeps growing, so we can never get ahead of the problem.

MR. PHILLIPS:  The -- the --

JUSTICE SOTOMAYOR:  So slow down from the

5

Official

rhetoric and give me concrete --

MR. PHILLIPS:  Sure.

JUSTICE SOTOMAYOR:  -- details about what the least restricted means would have been, other than to say, throw it back to a receiver and special master who are saying we don't have a solution outside of reducing overcrowding.

MR. PHILLIPS:  I don't think that's a fair characterization of what the receiver said.  The receiver said that, at any population, he would in fact get you to the point --

JUSTICE SOTOMAYOR:  Oh, counsel, that was one statement years ago.  If that's all you're relying on --

MR. PHILLIPS:  No, no.  That's not all I'm relying on.  All I'm suggesting --

JUSTICE SOTOMAYOR:  That may be your weakest argument.  Tell me -- give me concrete steps that are least -- less restrictive.

MR. PHILLIPS:  Well, if you -- all you have to do is look at what the receiver has done over the course of the period of time since his appointment, and particularly when the second receiver was put in place.  First of all, A.B. 900 has been enacted.  There is significant construction.  There has been ground broken.

6

Official

There are substantial facilities in place.

Second, the receiver has had extraordinary success in the hiring process.  They are -- we are at close to 90 percent --

JUSTICE GINSBURG:  Is there in fact less overcrowding?  Because I thought that the -- what this case was all about was the receiver has said, the special master has said, we can't make any progress at all until there are fewer people; we have no place to put clinics.

The first step, not the last step, but given the -- given what we're dealing with here, the essential first step is that we have fewer people so there is more room for these health facilities, more room for staff to operate.

MR. PHILLIPS:  Justice Ginsburg, the fundamental issue in this case seems to me as -- what is the real cause of the constitutional violation here?  And the real cause of the constitutional violation here has always been the culture of disregard for the inmate.  What the receiver was put in place for, the reason he was appointed, and properly so -- this was with the State's consent; this is not over our objection -- was to change that fundamental culture and to provide, one, construction, to provide increased numbers, to

7

Official

provide --

JUSTICE GINSBURG:  Yes, but you can't -- you can't provide construction when the State doesn't supply the money for it.

MR. PHILLIPS:  Except that since the August 8th, 2008, period of time, you know, literally hundreds of millions of dollars have gone to construction specifically and more than $4 billion have been spent on the provision of health care in this particular system.  And a great deal of that is because of the receiver.

JUSTICE GINSBURG:  Then if you -- then if there -- if there are these great changes in circumstances so that now they -- medical care can be administered in something approaching a decent way, you could go back to the single-judge district court and say:  I'm moving under 60(b).  Circumstances have changed; it's no longer the case that it's impossible to render decent health care.

MR. PHILLIPS:  Justice Ginsburg, I don't think we could get that relief from the single-judge district court, unless you're asking me to actually seek to remove the entirety of the claim.  I mean, the order that says that we have to get to 137.5 percent of the design, the design capacity, within 2 years is a

8

Official

three-judge district court decision.

JUSTICE SOTOMAYOR:  So you go back to that panel because it invited you to.  It said if circumstances change, come back.

MR. PHILLIPS:  Right, but that will always be the case, Justice Sotomayor.  The fundamental question here is:  Congress shifted dramatically the approach that you're supposed to take as a court of equity in this context.  This is supposed to be a matter of last resort, which would mean that you would give the receiver a full opportunity to do what the receiver --

JUSTICE BREYER:  The receiver said the best statement that seemed to me to summarize it.  It's in his brief on page 9.  He has about two paragraphs.  And as you read that two paragraphs, it sounds as if overcrowding is a big, big cause of this problem, which is horrendous, which if you think it's accurately described in the mental case in the first page, two paragraphs -- now, if that's a fair description from the record, it's a horrendous problem.

MR. PHILLIPS:  Well --

JUSTICE BREYER:  What the receiver says is overcrowding is a big cause of it.  And then he says:  I think we've discovered you actually can provide care, and certainly our plan and turnaround plan believes we

9

Official

can provide constitutional levels of care no matter what the population is.

So then you look to the care and turnaround plan and it says spend $8 billion building more buildings.  And then the legislature rejected it.  Okay?

MR. PHILLIPS:  And then --

JUSTICE BREYER:  Now, there we are.  More time; what's supposed to happen?

MR. PHILLIPS:  No, but, Justice Breyer, the legislature also approved a smaller but nevertheless multibillion-dollar construction program.

JUSTICE BREYER:  Yes, it was 2.31 or something like that.

MR. PHILLIPS:  Well, I -- I mean, they approved --

JUSTICE BREYER:  And did they approve the 2.3 -- is that in place, 2.35?  Did they approve that?

MR. PHILLIPS:  Yes, they did approve that --

JUSTICE BREYER:  Okay.  So he said:  We need 8 --

MR. PHILLIPS:  -- and that money is being spent.

JUSTICE BREYER:  We need 8, and they approved 2.35.

MR. PHILLIPS:  Right, and the receiver --

10

Official

JUSTICE BREYER:  And is there any evidence here that suggests that 2.35 is sufficient to cure the constitutional violation?

MR. PHILLIPS:  Well, I don't know whether it will get you there or not.

JUSTICE BREYER:  So I take it from your answer the answer is no, there is no evidence.

MR. PHILLIPS:  Well, there is the evidence that the receiver asked for contempt for not getting the 8 billion and withdrew that motion.  So, obviously, there is some sense in which the receiver is reasonably satisfied with 2.35 billion as an opening gambit.

But, again, all of this goes to what is, at least from my perspective, the fundamental question the court should have evaluated in the first instance, which is:  Are we ready yet to give up hope at this point?

JUSTICE BREYER:  Well, what he says -- what the receiver says about the 2.35, that it is a significant step farther.  It is certainly better than no construction at all.  However, that is not equivalent to a conclusion that that current compromise will result in sustainable constitutional health care at current population density levels.

That's what he said about it.  So -- so we have his views, and I'm back to my question:  What else

11

Official

is supposed to happen?

MR. PHILLIPS:  Well, there's --

JUSTICE BREYER:  Which was your question initially.

MR. PHILLIPS:  Justice Breyer, when the receiver says that -- now remember, he says at current population levels.  He doesn't suggest, and his brief is very clear, that it doesn't urge this Court to affirm the particular order in this case.

JUSTICE ALITO:  Mr. Phillips --

MR. PHILLIPS:  Can I --

JUSTICE ALITO:  Yes.

MR. PHILLIPS:  -- just finish this?

And the reality is that the population levels have dropped pretty significantly since August, since the trial in this particular case.  And given the actions by the legislature in A.B. 18 and the actions of the legislatures in A.B. 900, there are both a lot of expenditures on the table and substantial reductions in the population size.  And so, therefore, even under the receiver's --

JUSTICE GINSBURG:  What -- do we have information about that substantial reduction?  I mean, in this record, it just seems to be that it's -- no matter how many efforts have been made, the population

12

Official

goes up.  And now you say that the population has gone down.  From what point in time and how much has it gone down?

MR. PHILLIPS:  Well, it's down to around, as I understand it, about 147,000 from a high of around 165 to 170,000, and it has dropped, as we know, because there has been a change in the good time credits.  There has been a significant number of transfers.  I mean, that was the purpose of the governor's proclamation declaring an emergency.

JUSTICE SOTOMAYOR:  So it's possible that within the 2-year period, you're going to hit the mark if you -- that's what the lower court's --

MR. PHILLIPS:  I think it unlikely.

JUSTICE SOTOMAYOR:  That's what the three-judge panel said, which is:  If you implement most of the proposals being made, you are likely to hit the mark.  So what you're saying is you're going to do it. And if you don't, they invited you to come back and -- you really don't think that if you hit 140 percentage, that the court is going to order an immediate release of the 2.5 percent over the limit it set?  It's going to ask you:  What have you put into place to reach that level over what additional period of time?

MR. PHILLIPS:  I mean, there's a core sort

13

Official

of federalism answer and then a basic sort of factual point to be made here.  Let me make the second one first, and then I want to come back to the -- what you may regard as rhetorical, but nevertheless I think important, which is that when we made our initial proposal to the three-judge court suggesting what we thought would be a reasonable reduction within a reasonable period of time, it was met with both a motion for contempt and summary rejection out of hand, notwithstanding that there was improvement at the time --

JUSTICE SOTOMAYOR:  So what are we fighting about?  Are we fighting about that the plan was wrong, or are we fighting about that you're angry that you were told to do it in 2 years -- in 22 years, as opposed to do it in 25 years?  Is that -- is that what you're objecting to?

MR. PHILLIPS:  No.  I think the -- no, this goes to the federalism point.

JUSTICE SOTOMAYOR:  Can -- can you do it in 5 years?

MR. PHILLIPS:  I don't know.  I -- you know, if -- if balancing all of the policies that the State has to take into account, can it get there and is that in the best interest of the State of California?  If it

14

Official

is, yes, then we can get there.

JUSTICE SOTOMAYOR:  Well, the best interest of the State of California, isn't it to deliver adequate constitutional care to the people that it incarcerates?  That's a constitutional obligation.

MR. PHILLIPS:  Absolutely.  And California recognizes that.

JUSTICE SOTOMAYOR:  So when are you going to get to that?  When are you going to avoid the needless deaths that were reported in this record?  When are you going to avoid or get around people sitting in their feces for days in a dazed state?  When are you going to get to a point where you're going to deliver care that is going to be adequate?

JUSTICE SCALIA:  But don't be rhetorical.

MR. PHILLIPS:  I'll do my best.  Thank you, Your Honor.

(Laughter.)

MR. PHILLIPS:  I mean, first of all, let's -- you know, if you look at the receiver's 2009 death review which came out in September 2010, it specifically says that there has been a significant downward trend over the past 4 years.  The suicides -- the 25 suicides in '09 were 66 percent of the average for the preceding 3 years, and the 9 homicides were 60 percent of the

15

Official

average.  There have been significant improvements.

And the more important point in response to your specific question, Justice Sotomayor, is that the record in this case was cut off in August of 2008, and so what we have are --

JUSTICE KENNEDY:  Of course, but the problem I have with that, Mr. Phillips, is that at some point the court has to say:  You've been given enough time; the constitutional violation still persists, as the State itself acknowledges.

MR. PHILLIPS:  Well, I'm not sure we've stated that.

JUSTICE KENNEDY:  Overcrowding is the principal -- overcrowding is the principal cause, as experts have testified, and it's now time for a remedy.

The court can't -- has to at some point focus on the remedy, and that's what it did, and that, it seemed to me, was a perfectly reasonable decision.

MR. PHILLIPS:  Justice Kennedy, I agree with everything you say except -- and I even agree with the last statement, because, you know, you needed a significant remedy.  There's no question about it.  But you got a significant remedy when the receiver was appointed in 2005 and implemented a program in 2006.  I mean, our --

16

Official

JUSTICE KAGAN:  How much time do you think the receiver needed?  I mean, how much time did -- should the court have given the receiver to develop his plan and to try to implement his plan?

MR. PHILLIPS:  Well, there's no -- Justice Kagan, there's no specific time frame.  I mean, obviously, we believe that we are entitled to a reasonable opportunity to comply with the receiver's orders and to bring ourselves ultimately into compliance with the Constitution, and --

JUSTICE KENNEDY:  Well, at some point the State itself said that if it had, I think, 7 years, it could get down to 137.5 and didn't seem to object to that.

MR. PHILLIPS:  No, that's -- Justice Kennedy, you know, given all of the other constraints, et cetera -- again, there's a fundamental difference between what you do under the hammer of a district court order, which is what we have under these circumstances, and what the State will do.  That said, the State is absolutely committed.

I mean, the -- again, to go back to what is the root cause of the constitutional violation, it's not overcrowding.  I mean, when California violated the constitutional rights of the mentally ill in the 1990s,

17

Official

the prisons weren't crowded.  It was because there was a fundamental lack of attentiveness to medical care under those circumstances.  And that's unfortunate, to be sure.  More than that.

But that was the reason.  To go back to your point, Justice Kennedy, that's why the receiver, which is an extraordinary remedy.  To confer upon a private individual the entire authority to run the California Department of Corrections, not just simply a facility or anything like that, but the entire Department of Corrections' medical and -- medical health provision, is incredible.

JUSTICE GINSBURG:  But I thought that officer himself said:  I can't do this without as a first step reducing the population; nothing else is going to work until we reduce the population to the point where there is room for clinics, room for medical personnel to operate.  I mean, that was the view of the district judge, the special master in one case, the receiver in the other case.

Everybody -- they all agreed reducing the population is not going to cure it, not going to make everything perfect, but without doing that as a first step, nothing -- there will be no cure.

MR. PHILLIPS:  Well, Justice Ginsburg, even

18

Official

if you accept that, and I don't think that's precisely how I would interpret what the receiver said under these circumstances anyway, but even if you accept that, the idea of a 137-1/2 percent design cap that has to be implemented within fewer than 2 years is a remedy that's neither necessary nor sufficient.  It is not aimed at the specific class.  It doesn't remedy the specific Federal rights as required by the Prisoners Litigation Reform Act.

JUSTICE GINSBURG:  I don't get the class thing, because what -- you can't have a remedy just limited to the class.  The class wants to have clinics. They want to have personnel who function someplace outside of a broom closet.  So you can't deal with this problem by just dealing with the mentally ill and the people with medical problems.  You have to provide space for facilities.

MR. PHILLIPS:  I think, Justice Ginsburg, the -- the fundamental point here is that it may eventually be that you have to get to that stage, but if you look at the receiver's reports since August 2008, which consistently analyzed this issue, and they say: And we have been able successfully to bring in very qualified personnel, and we have significantly larger numbers; we know there is construction in place; it may

19

Official

not be as substantial as what I originally proposed; it is nevertheless very significant.

And -- and Congress was very explicit that the remedy of a prisoner release order should be the remedy of last resort.

JUSTICE BREYER: What would I look at to find this? It's a big record. What I did was I -- it refers to on-line evidence, and I went and looked at the pictures, and the pictures are pretty horrendous to me. And I would say page 10 of the religious group's brief, for example, shows you one of them.

And what they're saying is, it's -- it's obvious. Just look at it. You cannot have mental health facilities that will stop people from killing themselves and you cannot have medical facilities that will stop staph and tubercular infection in conditions like this. And then you look at them.

Now, you've looked at them. I've looked at them. And what is the answer to that? There's nothing in here that -- the special master said $8 billion is the answer.

MR. PHILLIPS: Well --

JUSTICE BREYER: And they haven't come close. So how can I -- or you if you were in my position -- what would you say in an opinion that says

20

Official

that these three judges who have 200 pages of findings -- what would you say to -- as an answer to what I just said?

MR. PHILLIPS:  I would say that the Prisoners Litigation Reform Act has a series of very specific requirements that the Federal court has to comply with, and that in deciding to go to a three-judge district court in the first instance, you have to examine the orders that are in place and whether those orders have had a reasonable time within which to operate.  And --

JUSTICE KENNEDY:  Yes, but the State -- the State did not claim that either order in either case has succeeded in achieving a remedy.  You've never claimed that.

MR. PHILLIPS:  Well, it depends on what you mean by --

JUSTICE KENNEDY:  And -- and just if I could have your attention for a moment.  I have this problem with the case:  Overcrowding is, of course, always the cause.  If I'm running a hotel -- if I'm looking at a highway system, I need highways, what's the number of cars?  If the problem is bad service in a hotel, well, it's the number of employees per -- per guest.  I mean, that's fairly simple.

21

Official

Now, I recognize, of course, that Congress has -- had imposed a special duty on us. But I think it means that overcrowding must not be ordered unless that is the only efficacious remedy in -- in a permissible period of time. And it seems to me there is massive expert testimony to support that proposition on the part of -- of the prisoners.

MR. PHILLIPS: I -- I mean, it seems to me that, first of all, I'm not sure that's consistent with the language. It's the primary cause of the constitutional violation, not the primary impediment to the implementation of a specific remedy. So I think that's still a difficult and open question as to how to proceed.

But it still strikes me that the sequence that Congress envisions and the one that would make the most sense and ultimately the one that hopefully would accommodate both the plaintiffs' interests and the State's interests, and the Department of Corrections' interests, is to allow the receiver to stay on a course that candidly I think will in fact get you there.

I mean, again, one of the real flaws in this case, Justice Kennedy, is nobody doubts for a moment that there have been very significant violations of constitutional rights years gone by and, indeed, a

22

Official

failure on the mental health side ultimately to get you -- get to the point where we are in fact providing a significant remedy.

The reality is, is that in the course of the last 3 to 4 years under the guidance of the -- of the receiver, who coordinates with the special master on the mental health side and does it with the cooperation of the State of California, there have been significant -- there has been significant movement in the right direction.

And if the court had not jumped the gun and said, look, we're not going to -- we're not going to let that part play itself out, we are going to leap ahead and go to a three-judge court and go to the prisons -- to the prisoner release order, this process would have played itself out and we wouldn't be here --

JUSTICE ALITO:  All this talk about what the receiver may think can be done seems a little bit perplexing to me, because the receiver did not testify before the three-judge court; isn't that correct?

MR. PHILLIPS:  That -- that is true, Justice Alito.

JUSTICE ALITO:  You were not allowed to question him.

MR. PHILLIPS:  We were not allowed to --

23

Official

JUSTICE ALITO:  And now he has submitted what is styled an amicus brief where he doesn't address issues of law.  He explains his views about -- he tries to explain prior statements and supplement those prior statements.  Is that proper?

MR. PHILLIPS:  Well, you know, I'm a long-time believer that amicus briefs are pretty much open season in terms of anything you want to present on them.  But I mean, obviously, I -- I --

JUSTICE ALITO:  Well, is that true?  Can --

MR. PHILLIPS:  Clearly a better system is one in which we could --

JUSTICE ALITO:  Can a witness testify -- can a witness submit an amicus brief that consists of an affidavit?

MR. PHILLIPS:  No, Your Honor, that's obviously not appropriate, and one of the things we've complained about --

JUSTICE GINSBURG:  I thought the -- the -- that brief was filed because the -- there were -- in your presentations, there were representations about the special master, and he filed that brief to say:  You must understand this in context; I was making a speech at the club.

So he wanted to put in context what you had

24

Official

used.  You had quoted his statements.

MR. PHILLIPS:  Well, to be sure, although, candidly, we had -- we had referred to some of those same statements even in the jurisdictional statement in this litigation.  This has been part of the case for quite some time.

So I -- I don't know what motivated the special master to file an out-of-time brief -- or I mean, the receiver to file an out-of-time brief.  But I understand -- you know, we didn't object to it so long as the Court was of a mind to hear from the receiver.

But I do think the most important part of that, though, to keep in mind in this context is the receiver didn't ask for this Court to affirm.  The receiver simply clarified certain statements that had been made and tried to say, as Justice Alito described, put them into some kind of context.  And that's -- and that's fine, and we obviously don't have any quarrel with -- with that particular presentation.

But I do think to say that the receiver has insisted that he cannot get to a constitutionally permissible result without the order that has been imposed in this particular case is -- is simply not consistent with either the record and certainly not consistent with that amicus brief.

25

Official

JUSTICE KENNEDY:  Well, but the experts testified to that effect.

MR. PHILLIPS:  I mean, experts made the -- certainly reached that specific conclusion.  But this Court has recognized --

JUSTICE KENNEDY:  And the strike force and the governor's -- governor's commission reached the same conclusion.

MR. PHILLIPS:  Well --

JUSTICE KENNEDY:  The strike team, I think they called them.

MR. PHILLIPS:  Right.  But, again, it seems to me that there is a very, very, very big difference between what do you need to accomplish in order to remedy whatever -- whatever the constitutional violation is, recognizing in the first instance that the biggest element of an Eighth Amendment violation is the deliberate indifference prong, which absolutely seems to me to have been completely eliminated by the conduct of the State over the course of the last 3 to 4 years. There is no evidence to support --

JUSTICE BREYER:  What specifically will happen?  I mean, at the moment, you know, we could go through -- we have all these briefs.  I mean, there are all these experts, all the reports.  Everybody is saying

26

Official

you need to spend the money.  And we have -- if you really want to cure the constitutional violation, we have the legislature rejecting 8 billion but 2, which -- 2.35, and so -- and nothing, and a void, and give us more time.

I mean, I read the newspaper.  It doesn't seem to me California has been voting a lot of money for new programs.  The -- the -- what is it -- what is it specifically that would happen that would cure this problem were we to say -- I mean, a big human rights problem -- what would we say -- what would happen if we were to say, no, this panel's wrong?  What would happen that would cure the problem?

MR. PHILLIPS:  Well, it depends I suppose on some ways on how you --

JUSTICE BREYER:  A constitutional problem which the State itself admits --

MR. PHILLIPS:  Right.

JUSTICE BREYER:  -- is constitutional, a State with a governor who has said publicly that there's this tremendous safety and health problem in the prisons.  What -- what would happen?

MR. PHILLIPS:  Well, if the Court were to conclude that the three-judge panel shouldn't have been convened, that would be one outcome.  If the Court

27

Official

concludes that it was appropriate to convene it, but 137-1/2 percent is not narrowly tailored, it would be a different one.  Either way, it will go back, obviously, to a court of equity.  The receiver is in place.  The receiver has a comprehensive plan in place which he is implementing as we speak.

I mean, you know, one of the things that --

JUSTICE GINSBURG:  That's one piece of it. You said something about the 2.35 million.  They didn't come up with the 8 million, but they did come up with 2.35 billion.  And then I'm just looking at this brief for the receiver, and there's a footnote, page 11, footnote 3, that says:  No, that money isn't there; it's dependent upon several approvals that have not yet been secured, and such approvals ultimately may not be forthcoming.

MR. PHILLIPS:  Well, I mean, 400 million of it has already been spent.  The rest of it has already been earmarked for this particular purpose, and there is -- and the expectation from the State of California is that money is -- is going forward.  Construction is, as we speak, under way.  And the one thing we do know is that --

JUSTICE GINSBURG:  But not the --

MR. PHILLIPS:  -- every time the receiver

28

Official

asks for a check he gets one.

JUSTICE GINSBURG:  Not the 2.35 --

MR. PHILLIPS:  I'm sorry.

JUSTICE GINSBURG:  I mean, I think you did say earlier that this was a done deal, 2.35 billion. But this is a note telling us it's not so.

MR. PHILLIPS:  Well, the receiver is saying it's not etched in stone.  I understand that.  But our assumption and our expectation and our belief is that that money is going to be used for construction.  There are projects that are finished, there are projects that are under way, and there are project that are scheduled to begin within the next 6 weeks, all of which will be funded out of that $2.35 billion.

JUSTICE GINSBURG:  On one project, the joint legislative budget committee said, no, we're not going to give you money for that.

MR. PHILLIPS:  They asked for additional information, to be sure.  But the expectation, again, from the governor, both this governor and the governor-elect, is that that money will ultimately be approved and that that facility would be built.  And we're moving along very rapidly to get that construction under way, because we're talking about enormous facilities under these particular circumstances, Justice

29

Official

Ginsburg.

JUSTICE KAGAN:  Mr. Phillips, my trouble listening to you is that it seems as though you're asking us to re-find facts.  You know, you have these judges who have been involved in these cases since the beginning, for 20 years in the Plata case, who thought: We've done everything we can, the receiver has done everything he can; this just isn't going anywhere and it won't go anywhere until we can address this root cause of the problem.

And that was the view of the judges who had been closest to the cases from the beginning and the view of the three-judge court generally.  So how can we reach a result essentially without, you know, re-finding the facts that they've been dealing with for 20 years?

MR. PHILLIPS:  The -- there -- the fundamental problem with the fact-finding in this -- well, there are actually two fundamental problems. First of all, remember that the receiver gets appointed, and then 3 months later you get a motion for a three-judge court.  The three-judge court convenes itself before the receiver has even finalized the comprehensive plan to bring everybody into compliance in the first instance.

So the reality is that's -- that's the

30

Official

fundamental legal error I'm asking this Court to correct. But even if you get beyond that and you're looking at the primary cause analysis, it seems to me that's -- that's at most -- at best, a mixed question of law and fact, and it's the kind of standard that this Court ought to analyze to determine in the first instance and on an independent review whether or not the overcrowding is, quote, "the primary cause of the violation."

And what makes that inquiry particularly appropriate for this Court, as opposed to simply slavishly adhering -- deferring to the district court in this circumstance, is that the district court arbitrarily cut off the record in August of '08 and there have been enormous developments since then. And there were enormous developments --

JUSTICE GINSBURG: Can you explain me something about that? It was confusing in the briefs, Mr. Phillips. I thought that the State had said: We don't want the plaintiffs to tour these facilities anymore. We don't want to have discovery go beyond -- what was it -- some date in 2008.

I thought that it was the State that was urging: We don't need any more discovery, we don't want any more inspection tours.

31

Official

So how could -- how could the plaintiffs submit more than they did when the State said it's enough, 2008 should be the cutoff?

MR. PHILLIPS:  Well, there's a huge difference between not allowing formal tours and all of the rigamarole that goes with that, which is what the State specifically objected to.  But what the State wanted to do and what the intervenors on our side in even greater vehemence wanted to do was to bring forward evidence that proved that in the interim period of time there have been, in fact, significant improvements.

As I sit here today, Justice Kennedy, you said it's conceded that we're -- that we're in constitutional violation.  It is conceded that we have been in constitutional violation.  I don't know whether today we are in violation.

JUSTICE GINSBURG:  But then don't you have the burden?  If -- if you have -- you concede that you have been in constitutional violation, then it seems to me you have the burden of showing that's no longer the case.  That's generally so in -- in --

JUSTICE SOTOMAYOR:  Counsel, did you --

CHIEF JUSTICE ROBERTS:  I'm sorry.  Could you answer Justice Ginsburg's question first?

MR. PHILLIPS:  Yes.  Justice Ginsburg, I

32

Official

understand what the ordinary rule would be in a -- of a

court of equity dealing with a constitutional violation.

But we're talking about an order entered under the

Prisoners Litigation Reform Act, and it's quite clear,

the statute couldn't be any plainer, that it shifts the

burden significantly onto the plaintiff when you are

going to go for a remedy as extreme as insisting that

somewhere between potentially 36,000 and 45,000 inmates

be released within a -- within a 2-year period of time.

Again, if you go back, you know, the

receiver has not -- at the time that all of this took

place, the receiver had been appointed.  The receiver

had devised a plan.  The receiver is currently spending

an enormous amount of money, $4 billion on health care,

to get -- to get the system moving in the right

direction, with the right attitude, in order to bring

ourselves without question into constitutional

compliance.  The truth is we haven't really had an

assessment of where we are in the constitutional

compliance spectrum.

JUSTICE GINSBURG:  Well, maybe -- you're

talking about one of the cases, but the other one -- and

it's the newer one, instituted in 2001.  But what about

the one that started out in 1990?

MR. PHILLIPS:  Coleman is obviously a

33

Official

much -- a much more serious problem.  I don't doubt that.  But it seems -- and if the Court were to conclude ultimately that Coleman ought to go back for another analysis based on the problems there, I could understand that.  And it would be a very different prisoner release order under those circumstances because then you'd have to take out all of the evidence with respect to Plata and let that play out.

But even that, it seems to me, would be a mistake under these circumstances where the special master and the receiver have been in a sense joined at the hip in a variety of ways.  And it only makes sense, because the -- the receiver is controlling the provision of medical care in the CDCR and the special master is taking care of or trying to promote a very small slice of that.

So in the scheme of things, as you might expect, the receiver consistently gets the ultimate authority to make the decisions to help provide the kind of resources, both in quality and quantity and staff and construction and access to health care.

JUSTICE SOTOMAYOR:  Counsel, this issue about evidence -- did you proffer to the judge anywhere in this record what the additional evidence it was that you wanted to show?  I know that the decrease in

34

Official

suicides happened post-trial, so you couldn't have

proffered that pretrial.

MR. PHILLIPS:  Right.

JUSTICE SOTOMAYOR:  But you run the prisons.
I presume that you could have yourself without discovery
set forth a proffer for the court that says:  We had a
wait time between diagnosis and treatment that was
60 days, 90 days, 120 days in the past, and we've
reduced that down now to 2 weeks or whatever the reality
is.

MR. PHILLIPS:  Right.

JUSTICE SOTOMAYOR:  Why don't you -- you
keep saying we were blocked.

MR. PHILLIPS:  Because the district court --
because the district court could not have been plainer.
And when the intervenor's counsel stood up in the
opening statement and said, I want to start talking
about the beneficial changes and where the status is
today as opposed to where it was way back when, the
three-judge court, or at least one member of the
three-judge court said:  We have been as clear as we can
be that we are not entertaining any evidence on that
point.

So the notion of coming forward with a
proffer, while technically it might have been -- is

35

Official

clearly a futile act, and we had already annoyed the judges on our side by even making reference to it.  So I don't think it's an appropriate response to say that we should have put forward more, because the truth is we would have --

JUSTICE SOTOMAYOR:  Except that the district court invited you to proffer that evidence that went to the appropriateness of the remedy.  So you didn't have to proffer it -- it viewed you as saying, we're no longer violating, constitutionally violating the Eighth Amendment.  Instead, it said:  We'll take whatever you have to proffer to show that the remedy is inappropriate.

MR. PHILLIPS:  All right.  But Justice Sotomayor, there is, to my mind at least, a complete disconnect by saying, I'm not going to tell you exactly where the constitutional violation is today, we're not going to get into that, we're just going to assume there's a constitutional violation; now prove to me that the remedy -- you know, what remedy will or will not work under those circumstances.  It seems to me the exact opposite is the way to do it.  You determine where the constitutional violation is --

JUSTICE SOTOMAYOR:  When does -- well, we'll get back to Justice Kennedy's --

36

Official

CHIEF JUSTICE ROBERTS:  Counsel, I see your time is about to expire.

MR. PHILLIPS:  Thank you, Mr. Chief Justice.

CHIEF JUSTICE ROBERTS:  Mr. Specter.

ORAL ARGUMENT OF DONALD SPECTER

ON BEHALF OF THE APPELLEES

MR. SPECTER:  Thank you.  Mr. Chief Justice, and may it please the Court:

For 20 years, the overcrowding crisis has caused prisoners suffering from psychosis and life-threatening illnesses to languish in their cells because treatment facilities have no room for them. Prisoners are committing suicide at a rate twice the national average, and more than two-thirds of those suicides are preventable.  The absence of --

JUSTICE SOTOMAYOR:  Are you talking about current figures or past?  Tell us the date of the figures.

MR. SPECTER:  Sure.  That's from the trial court's opinion, Your Honor.  That's from the record.

JUSTICE SOTOMAYOR:  That's what I thought. How do you address your adversary's point --

MR. SPECTER:  Yes, ma'am.

JUSTICE SOTOMAYOR:  -- that the adequacy of a remedy can't be measured unless you measure the state

37

Official

of the situation at the time the remedy is imposed?

MR. SPECTER:  Well, I think, Your Honor, there was massive amounts of evidence about the constitutional violations that existed at the time that the remedy was imposed.  And if we -- I can point to the jurisdictional statement 1 appendix, page 30a, the court said:  "Nonetheless, as we describe below, fundamental unconstitutional deficiencies caused primarily by overcrowding continue to exist and" --

JUSTICE SCALIA:  They didn't take any evidence on the point, I thought.

MR. SPECTER:  No, Your Honor.  I'm sorry, that's not correct, with all respect.  They took massive amounts of evidence up to the day of trial about all the conditions as they relate to the remedy.  And those conditions were --

JUSTICE SOTOMAYOR:  Could you give us the record --

JUSTICE SCALIA:  Current conditions?

MR. SPECTER:  -- current -- current as of the time of the trial.

JUSTICE SCALIA:  What was -- what was your friend talking about when he said that they rejected any effort to show the current situation?

MR. SPECTER:  Well, my friend and I have a

38

Official

disagreement, but I think Justice Sotomayor accurately captured it.  What the three-judge panel said is:  Look, we're not going to -- you can't -- this isn't the place for you to come in and say everything's fine, it's -- everything's constitutional.

What the three-judge court did say is:  We will consider -- and they did, in fact, consider -- all the evidence from the State.  They had experts from the State, two of the prisons, in August of 2008.  Those experts wrote reports, they testified, and they've testified about the conditions current.  And one of them from the mental health side said --

JUSTICE SCALIA:  This was in 2008.

MR. SPECTER:  And that was the time of the trial, Your Honor.  There were -- the discovery --

JUSTICE KENNEDY:  They had a -- they had a cutoff date of some 2 months before the trial --

MR. SPECTER:  In August, and the trial started in November.

JUSTICE KENNEDY:  And that was a -- and -- but before that point, the experts that were -- had testified were aware of the conditions that existed.

MR. SPECTER:  Exactly, Your Honor.  And --

JUSTICE SCALIA:  And when was the remedy imposed?

39

Official

MR. SPECTER:  The remedy -- well, the final order came -- well, the close of evidence was in December of 2008.

JUSTICE SCALIA:  That was in the -- in the one-judge court, in the district court, wasn't it?

MR. SPECTER:  No, no.  In the three-judge court -- the three-judge court closed evidence in December of 2008.  We then argued the case after the post-trial briefing in February of 2009.  Then the court came out with the tentative decision about 20 days later, and then in August of 2009, it issued the 183-page opinion and the order that's at issue here.

CHIEF JUSTICE ROBERTS:  Did -- I'm sorry. Let me just keep track here.

The evidence was cut off when in 2008?

MR. SPECTER:  The trial closed in December of 2008, after all the parties had submitted all their evidence.

CHIEF JUSTICE ROBERTS:  All right.  So --

MR. SPECTER:  Then there was post-trial briefing for a month.  Then we had argument in February of that year.  And then a few weeks later, they issued a brief summary of their conclusions in an attempt to get the State and the parties to settle the case.

40

Official

CHIEF JUSTICE ROBERTS:  You -- you don't dispute the statement I have -- it's in the response of the intervenors -- that between October 2006 and October 2010, the population of the adult facilities declined by 14,832 inmates?

MR. SPECTER:  Well, I -- I agree with my friend Mr. Phillips that the population has declined by about 10,000 prisoners.  Most of that decline has been due to a transfer to out-of-State prisons, and, true, there's some -- some amount of it has been as a result of the marginal increase in good time credits, which the State elected to pursue on its own.

JUSTICE KENNEDY:  What about the argument that there was evidence that should have been admitted but that was not, with reference to new construction?

MR. SPECTER:  Well, I don't -- there was no evidence that wasn't -- that was offered that wasn't considered by the three-judge panel, Your Honor.  They considered all the evidence.  Their 183-page opinion is scrupulous in considering all the evidence, both that supported the order and they distinguished the evidence and, in fact, made credibility determinations based on the evidence that -- that was contrary.  But --

JUSTICE SOTOMAYOR:  Counsel --

MR. SPECTER:  Yes.  I'm sorry.

41

Official

JUSTICE ALITO:  Can you explain what the connection is between the 137.5 percent figure and the constitutional violations relating to the provision of medical care in general and treatment for -- for mental illness?

My understanding of the 137.5 percent figure is that that has to do with the total number of prisoners in the -- in the system in relation to design capacity; isn't that right?

MR. SPECTER:  That's correct, Your Honor.

JUSTICE ALITO:  Now, what does the ruling -- that doesn't speak to the number of personnel who are available in the system to attend to medical needs or mental illness.  It doesn't speak to the extent of the facilities that are available for those purposes.  It seems to be -- there seems to be a disconnect between those two.  Could you explain why that is narrowly tailored?

MR. SPECTER:  Yes, Your Honor.  There was -- the court made findings that 137.5 percent was the maximum number of prisoners that -- of the capacity, of the design capacity of the prison, that the prison could have that would enable the State to provide -- to have all those things that you just mentioned -- staffing, facilities, medication management -- be effective and

42

Official

reach the actual prisoners who are ill, seriously ill.

JUSTICE ALITO:  See, that's what I don't understand.  You can have a -- could you not have a prison where the cells are somewhat crowded -- and 137.5 percent of design capacity is not --

MR. SPECTER:  Right.

JUSTICE ALITO:  -- is not unconstitutional in itself, is it?

MR. SPECTER:  No, it remedies --

JUSTICE ALITO:  You could have --

MR. SPECTER:  It's a remedy, Your Honor.

JUSTICE ALITO:  Or you could have a prison where the -- the cells themselves are crowded, and yet there are other facilities available for medical care and plenty of staff to attend to those things.  So what's the connection?

MR. SPECTER:  Well, that's -- that's -- and you're right.  If there were -- if the cells were crowded but the prison had all the other facilities available, then there might not be a problem.  You have to -- well, I hope you can understand that in this case, the prisons were built to double-cell the prisoners, but they weren't built to provide 200 percent of health care needs.  So as soon as they started to double-cell these prisoners, they could meet their literal housing needs

43

Official

in the space of the cell, but they couldn't meet the needs of their health care.

And that's why, Your Honor, the 137.5 percent figure is reasonable, because the Court went almost a third overcrowding above what all the experts recommended.

JUSTICE ALITO:  But why order the release of around 40,000 prisoners, many of whom, perhaps the great majority of whom, are not going to be within a class in either of these lawsuits?  Why order the release of all those people, rather than ordering the provision of the construction of facilities for medical care, facilities to treat mental illness, hiring of staff to treat mental illness?  Why not go directly to the problem rather than address what seems to be a different issue altogether?

MR. SPECTER:  Well, I have two responses to that, and they're both a little separate.

The first point:  It's important to understand that this is not a release order.  It's a population-crowding reduction order.  The court is not ordering the State to throw open the gates of its doors and release people.  They can reduce crowding through more transfers to out of State.  To your construction point, if the State so chooses, it can construct new facilities to increase the capacity.  And the

44

Official

three-judge panel said if you increase the capacity, you

can increase the population.

The point about --

JUSTICE ALITO:  If all they do is to build

more cells, they're not going to address the problem.

So I --

MR. SPECTER:  Exactly.  So that goes to the

second part of your question, which is:  Why don't they

try other things, like ordering the prisons to hire more

doctors, ordering better medication management, all of

those kinds of things?  And the answer to that is in the

appendix to the Appellee's Coleman brief, which lists 70

discrete orders which the Coleman court, single-judge

Coleman court, tried over a period of 15 years, which

have proven singularly to be ineffective.  And that's

why the court analyzed all those things; the trial court

analyzed all these things, and it made a finding of fact

that based on the statements by the special master, by

the receiver's reports, and by the general state of the

horrendous conditions which we have in these prisons,

that those discrete orders would not solve the problem.

And given the level of harm --

JUSTICE ALITO:  I -- I still don't get it.

You're saying that they were ordered to do a variety of

things that directly address the problem and they didn't

45

Official

comply.  So as a --

MR. SPECTER:  No.

JUSTICE ALITO:  In order to -- in order to provide some kind of a remedy, we're going to order something else that doesn't address the problem --

MR. SPECTER:  No, that --

JUSTICE ALITO:  -- that these lawsuits aim at addressing.

MR. SPECTER:  No, Your Honor.  To the contrary, Justice Alito, we -- I think the court believes based on the facts that it found that this would be an effective remedy.  All of the testimony that they heard from experts from Texas, from Pennsylvania, from Washington State -- all of whom had suffered, had dealt with crowding in their prison systems, have said that when you reduce the crowding, that's the critical thing that you have to do now, because unless you reduce the crowding, nothing else is going to work.  And the court found that that was exactly true.

Nothing else over 20 years in one case and over 8 years in another case has worked.  And -- and all -- as Justice Kennedy said, massive amounts of evidence show that the primary reason it hasn't worked is one singular word, overcrowding; and when you reduce overcrowding, the prison will be able to operate and

46

Official

will be able to provide those services that it can't provide now, so the doctors will have room to be able to work, which they don't have now.

There will be less prisoners, so officers will be able to take them from one place to another to get treatment.  There won't be so many lockdowns, which inhibit care.

JUSTICE SOTOMAYOR:  Counsel --

JUSTICE ALITO:  That's a very indirect way of addressing the problem, and it has collateral consequences.  If -- if I were a citizen of California, I would be concerned about the release of 40,000 prisoners.  And I don't care what you term it, a prison release order or whatever the --

MR. SPECTER:  Crowding --

JUSTICE ALITO:  -- terminology you used was. If 40,000 prisoners are going to be released, do you really believe that if you were to come back here 2 years after that, you would be able to say they haven't -- they haven't contributed to an increase in crime --

MR. SPECTER:  Well --

JUSTICE ALITO:  -- in the State of California?  In the -- in the amicus brief that was submitted by a number of States, there is an extended

47

Official

discussion of the effect of one prisoner release order with which I am familiar, and that was in Philadelphia; and after a period of time they tallied up what the cost of that was, the number of murders, the number of rapes, the number of armed robberies, the number of assaults. You don't -- that's not going to happen in California?

MR. SPECTER:  Your Honor, this trial court found, based on 50 pages of its opinion, based on expert testimony not only from our experts but from the State's experts, from the intervenors' experts, they all came to the unanimous conclusion that there are methods that -- by which you can reduce crowding which will not increase crime and that are safe.

The Secretary of the Department of Corrections who was the secretary at the time of trial so testified that he was in favor, for example, of increasing prisoners' good time credits.  That's one way to reduce crowding.

And, moreover, there was statistical evidence saying -- looking at all the other States that had reduced their prison population over a period of about 15 years, and they all came to the same conclusion, all of those studies came to the same conclusion, which is there's no -- there is no increase in the crime rate.  In --

48

Official

CHIEF JUSTICE ROBERTS: But that's not what -- that is not what the three-judge district court determined. The Prisoner Litigation Reform Act requires that court to give substantial weight to adverse impact on public safety.

MR. SPECTER: Yes. Yes, Your Honor.

CHIEF JUSTICE ROBERTS: And when -- and then it said to the State, look, you come up with a plan that gets you to 137.5 in 2 years.

MR. SPECTER: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: The State did --

MR. SPECTER: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: -- and the State did not say -- emphatically did not say this is not going to have an adverse impact on public safety.

MR. SPECTER: Right, but the --

CHIEF JUSTICE ROBERTS: If you follow the double negative there. But -- and what the district court said -- it didn't examine that. It said, well, we're sure the State's not going to do anything that has an adverse impact on public safety. I'm looking at page 4a of the jurisdictional statement.

MR. SPECTER: Right. I know it.

CHIEF JUSTICE ROBERTS: It said -- and so it did not make those determinations, but the PLRA requires

49

it to determine that what it's ordering -- or at least give substantial weight to the public safety issue.  So isn't that a basis for overturning the remedy that's imposed here?

MR. SPECTER:  I would respectfully disagree with that, and I'll tell you why --

CHIEF JUSTICE ROBERTS:  I thought you would.

(Laughter.)

MR. SPECTER:  At least it's respectful.

(Laughter.)

MR. SPECTER:  I'll tell you why I think that.  The court examined all of the methods that are commonly used and that the governor himself has proposed to reduce crowding.  The governor himself wanted to reduce the prison population by 37,000.  That was in one of his legislative enactments, and the secretary of corrections testified that those proposals were safe.

CHIEF JUSTICE ROBERTS:  Did he want to do it within the 2-year period the district court ordered?

MR. SPECTER:  Yes, Your Honor, he did.  He submitted legislation to the legislature for that, and the legislature wouldn't -- wouldn't take it.  And the governor actually said, reacting to that, after a riot at Chino which was partly -- at one of the -- Chino is a prison in California -- a riot; he said, and the quote:

50

Official

"And the politicians in Sacramento have swept the problem under the rug."

CHIEF JUSTICE ROBERTS:  Right.  Right.  No, my -- my question is specifically with respect --

MR. SPECTER:  And I'll get to that.

CHIEF JUSTICE ROBERTS:  -- to the 2-year plan --

CHIEF JUSTICE ROBERTS:  -- and I'd like an answer to that --

MR. SPECTER:  Yes.

CHIEF JUSTICE ROBERTS:  -- because I look at this record; I don't see that the district court did what was required by the Act with respect to the plan that it's ordering.

MR. SPECTER:  Right.

CHIEF JUSTICE ROBERTS:  It just simply said, oh, we're sure -- I'm sure the State wouldn't do anything to hurt public safety -- after telling the State you've got to give me a plan in 2 years that gets to 137.5.

MR. SPECTER:  Right.  Well, I think all of the -- it didn't -- it didn't analyze the plan, because the court was trying -- well, there was no plan.

The court, what they -- what the court did was it said, we want to give the State the maximum

51

Official

flexibility, for comity reasons, to determine how best to remedy the constitutional violations.

Now, on cert, then they said -- they also said that we're sure the State can do it in a safe way, but it's not our job --

CHIEF JUSTICE ROBERTS:  Well, they said we're sure, because -- but --

MR. SPECTER:  Because there are methods --

CHIEF JUSTICE ROBERTS:  -- because we trust -- I'm just quoting from 4a --

MR. SPECTER:  Yes.

CHIEF JUSTICE ROBERTS:  "We trust that the State will comply with its duty to ensure public safety as it implements the constitutionally required reduction."

The State is saying it cannot meet the 137.5 in 2 years without an adverse impact on public safety.

MR. SPECTER:  Right.  And the -- that's the State's position --

CHIEF JUSTICE ROBERTS:  Right.

MR. SPECTER:  -- and had been the State's position all along.  The court's findings that a population reduction of this magnitude were clear, and they're not shown to be clearly erroneous here.  They -- the court said point blank that we're -- we're -- we --

52

Official

it's our finding that the State can reduce the

population to its current levels -- from its current

levels to 137.5 safely.  They made that finding --

JUSTICE SOTOMAYOR:  Counsel, didn't

the court --

MR. SPECTER:  -- and it has not been shown

to be clearly erroneous.  So they didn't have to look at

particulars.  In an effort to give the State the maximum

flexibility, they wanted to allow the State to choose

the methods that it wanted.  If the State -- if the

court had ordered --

JUSTICE SOTOMAYOR:  Counsel --

JUSTICE SCALIA:  Well, what do you mean they

can do it?

MR. SPECTER:  I'm sorry.

JUSTICE SCALIA:  Of course, they could do it

safely if they built, you know, umpteen new prisons, but

that --

MR. SPECTER:  But they can also do it

safely --

JUSTICE SCALIA:  But that's -- you know,

that's pie in the sky.  That's not going to happen.

MR. SPECTER:  No, it isn't, Your Honor,

because they can also do it safely by good time credits.

They can do it safely --

53

Official

JUSTICE SCALIA:  What -- doesn't good time credits let -- let people out who would not otherwise be out?

MR. SPECTER:  Just a -- you know, the -- the evidence was at trial, and the court's finding about that evidence was, and the State officials so testified, that giving prisoners good time credits is not a threat to public safety.

JUSTICE SCALIA:  But --

JUSTICE SOTOMAYOR:  Counsel, didn't --

JUSTICE KAGAN:  Why wouldn't it have been the better course, for the State -- excuse me -- for the court to say, you know, the State said it can do this in 5 years --

MR. SPECTER:  Right.

JUSTICE KAGAN:   -- without any public safety problem?  So why don't we let them take those 5 years?

MR. SPECTER:  Because, Your Honor, as Justice Ginsburg and others have been saying before, the constitutional violations have been ongoing for 20 years.  We're dealing here with cases of life and death and serious injury.  And after all these years, in -- when they -- when they heard the evidence that said that population could be -- and they made the findings which the State doesn't argue are clearly erroneous --

54

Official

when they made those findings, that it could be reduced

safely, they had an obligation to provide a remedy that

would provide constitutionally adequate care in the

safest manner possible -- in the quickest manner

possible.

CHIEF JUSTICE ROBERTS:  I think --

JUSTICE SOTOMAYOR:  Counsel --

CHIEF JUSTICE ROBERTS:  I think Justice

Sotomayor has been patient.

JUSTICE SOTOMAYOR:  I have several

questions, but I'm -- I'm not sure why you have not been

responding to Justice -- to the Chief Justice.  Didn't

the district court discuss different safe ways --

MR. SPECTER:  Yes.

JUSTICE SOTOMAYOR:  -- of reducing the

population --

MR. SPECTER:  Yes.

JUSTICE SOTOMAYOR:  -- and said we're not

imposing them because we want the State to do -- to

choose among them?

MR. SPECTER:  Yes, Your Honor.

JUSTICE SOTOMAYOR:  As I've looked at the

State's final plan, I thought that they had in fact not

only accepted all of the recommendations, but they added

a couple of additional remedies that the court had not

Official

suggested.

MR. SPECTER:  Yes, Your Honor.

JUSTICE SOTOMAYOR:  Is it a fair statement that the district -- that the three-judge panel was saying, if you do these things -- that's their finding -- you can do it without affecting public safety?  Wasn't that what they were saying?

MR. SPECTER:  Yes, Your Honor.  If I didn't make that clear, I meant to.

CHIEF JUSTICE ROBERTS:  Well, but I thought the --

JUSTICE SOTOMAYOR:  The second and more important question is going back to something that Justice Scalia asked you, which was:  You made the statement that no one was stopped from proffering evidence about prison conditions --

MR. SPECTER:  Yes, Your Honor.

JUSTICE SOTOMAYOR:  -- up till 2 months before the trial.  So what evidence was excluded?

MR. SPECTER:  Nothing.  Nothing.

JUSTICE SOTOMAYOR:  What point is the other side making that they were excluded from making?

MR. SPECTER:  Well, as we said in our briefs, Your Honor, there was no evidence that was excluded, and, in fact, the State's witnesses testified

56

Official

about conditions, some of the conditions current as of the day of the -- of the testimony.  So it was very current, and nothing was excluded.  That way, even if the court made a ruling which was error, which we don't believe it was, there was absolutely no prejudice.

JUSTICE BREYER:  What is -- what is the number?  I mean, I -- I was puzzled by the same thing that Justice Sotomayor was.  I read, on page 253 of the appendix, a conclusion where the district court said it is our conclusion that they can reduce this by how many people?  What is it -- 30,000?  It's a lot.

MR. SPECTER:  Thirty-five thousand.

JUSTICE BREYER:  Thirty-five thousand.  That this could be done safely.

MR. SPECTER:  Yes.

JUSTICE BREYER:  Preceding page, whatever that was -- I have it -- it was 253.

MR. SPECTER:  Right.

JUSTICE BREYER:  There are about six pages where they summarize evidence from all kinds of criminologists that say, for example, there are 17,000 technical parole violators that are being sent to prison who haven't committed additional crimes, and they could perhaps be released from some of the time that they're spending in prison.  Then they go on to this good time,

57

Official

which would, I guess, lead to people who are 50 years old or 60 years old who have been in prison for 40 years would be released at age 55 instead of age 75. I guess there's some category there.

MR. SPECTER: Yes, Your Honor.

JUSTICE BREYER: Then they had several other things. Okay. Now, what are some facts about that?

MR. SPECTER: There was also -- and there was also testimony that the Department of Corrections was using a risk assessment instrument to identify the low-risk prisoners. So --

JUSTICE ALITO: Isn't it true that one of the main programs that they were -- that was cited as providing a safeguard is evidence-based rehabilitation programs?

MR. SPECTER: Yes, Your Honor. All the -- all the witnesses from the State, the intervenors, the local witnesses, our experts -- they all found that those would help reduce crime and that they would be most effective if used in the community, but they would be effective also if they were implemented --

JUSTICE ALITO: What's the general record of the success of rehabilitation efforts?

MR. SPECTER: Well, different -- you can't say generally because different programs have different

58

Official

records.  But do we --

JUSTICE ALITO:  What did Congress think when it enacted the -- the Sentencing Reform Act?

MR. SPECTER:  I don't know, Your Honor.

JUSTICE KENNEDY:  I have this question, and this goes just to remedy.

MR. SPECTER:  Yes, Your Honor.

JUSTICE KENNEDY:  I recognize the district court has to be given considerable discretion.

It shows the 137.5 figure because it's halfway between 145 and 130.

MR. SPECTER:  Yes, Your Honor.

JUSTICE KENNEDY:  I think that certainly the Prison Litigation Reform Act means that you have to, if you -- if there's going to be a release order, it must be releasing the minimum amount --

MR. SPECTER:  Yes, Your Honor.

JUSTICE KENNEDY:  -- that will effect the purposes of the remedy order.  There was substantial expert opinion that 145 -- 145 percent would be sufficient.  Isn't -- doesn't the evidence indicate to you that at least 145 ought to be the beginning point, not 137.5?

MR. SPECTER:  Well, I -- I --

JUSTICE KENNEDY:  That there was no -- and I

59

Official

understand --

MR. SPECTER:  May I make this --

JUSTICE KENNEDY:  There were more -- correct me if I'm wrong -- there were more experts that testified that 145 would work than there were that 130 was necessary.

MR. SPECTER:  No, I -- I respectfully disagree with the record, Your Honor.  The 145 figure came from a report by the former governor, Deukmejian, and a group that he organized, and they said that they could operate a crowded system at 145 percent of capacity.  And that figure was high, the district court found, because it didn't take into account health care needs.

JUSTICE KENNEDY:  And --

MR. SPECTER:  It didn't take into account health care needs, which is the issue here.  And our experts testified that, because it didn't take into account health care needs, 130 percent was the -- was the better number.  It's the number that the strike team had thought of, the -- the administration's own strike team.  It is the number that these professional experts believed would be sufficient to remedy the population.

And back to my answer to Justice Alito's question is the health care facilities themselves were

60

built to provide services to only 100 percent of --

health care services to only 100 percent of the

prisoners.  So --

JUSTICE KENNEDY:  But the experts --

MR. SPECTER:  -- 137 --

JUSTICE KENNEDY:  The experts that -- who were testifying were quite aware of the fact that overcrowding related to the constitutional violations. That was their whole theory.

MR. SPECTER:  Yes.

JUSTICE KENNEDY:  And any number of them suggested that 145 would be sufficient.

MR. SPECTER:  I think there might have been only one; one expert suggested 145.  Most of -- I think most -- the majority of the experts suggested 130.  The court found -- and it has not been challenged here as clearly erroneous -- that the weight of the evidence went to 130.  They wanted to do what you're saying, which was minimize the intrusion, maximize the population.  So to -- even though they -- the court had ample basis to issue an order saying it should be 130, they said in an abundance of caution and to give -- to give the State the benefit of the doubt and to make sure, we're going to bump it up an extra 7.5 percent.

JUSTICE KENNEDY:  I see no evidence in the

61

Alderson Reporting Company

Official

record that the State -- that the -- pardon me -- that your clients said that 145 wouldn't work.

MR. SPECTER:  I think --

CHIEF JUSTICE ROBERTS:  Maybe you can answer.

JUSTICE SOTOMAYOR:  Did the expert who gave --

CHIEF JUSTICE ROBERTS:  Maybe you can answer, counsel, please.

MR. SPECTER:  Thank you.  My recollection of the testimony was that our experts said it had to be -- get down to 130 in order for the other remedies to be effective, Your Honor.

JUSTICE SOTOMAYOR:  The expert who gave the 145?

MR. SPECTER:  Pardon me.

JUSTICE SOTOMAYOR:  The expert who gave the 145 --

MR. SPECTER:  There was no expert -- well, there was one expert who said maybe in the best of circumstances it could get to 145.  All the others talked about 130 percent.

JUSTICE SOTOMAYOR:  Let's go to the one who has used the 145 figure.

MR. SPECTER:  He was a psychologist, Your

62

Official

Honor.

JUSTICE SOTOMAYOR:  He was a what?

MR. SPECTER:  He was -- he was a psychologist who has expertise in prison health care.

JUSTICE SOTOMAYOR:  And did he say that at 145 you could deliver health care safely?

MR. SPECTER:  He was equivocal on that point.  He thought -- he said that at the outer reaches it might be true.

But I want to emphasize that the district court has allowed the State to come back in at any time to modify its order and to modify this percentage point if the circumstances changed.  So, since the --

JUSTICE GINSBURG:  Mr. Specter, there -- there has been at least two significant changes.  One is the good time credit.  The California legislature did pass the law that upped the good time credits and also addressing the probationers and the parolees --

MR. SPECTER:  Yes, Your Honor.

JUSTICE GINSBURG:  -- and the technical violators to divert them from the system.  Do you have any information about what effect that legislation that was passed January?

MR. SPECTER:  It was passed, I think, last year.  I think it went into effect in July of last year,

63

Official

I believe, if that's what -- what you're referring to.

JUSTICE GINSBURG:  So, do we -- do we know at all what effect it has had?

MR. SPECTER:  It has had a marginal effect on reducing the population.  There have been no reports that it has led to an increase in crime.

But to get back to my earlier point and your point, Justice Kennedy, about the -- the remedy and that it should be the least intrusive possible.  This order is set to take effect over a 2-year period, and during that 2-year period, if Mr. Phillips is correct that the conditions are constitutional and that they can deliver services at 145 percent, then the State is free to come in and make a motion to -- to bring those changed circumstances to the court.  And, if anything, this court has been incredibly sensitive to the -- to the needs and desires of the State, and it -- it was extremely reluctant to enter this order in the first place, and it would -- and it would bend over backwards to give the State discretion while attempting to --

JUSTICE KENNEDY:  I -- I don't see a finding by the three-judge court that 145, is it, would not be an efficacious remedy.  I know that it --

MR. SPECTER:  Yes.

JUSTICE KENNEDY:  I know that it would for

64

Official

137.

MR. SPECTER:  Yes, Your Honor.  I don't think -- I don't think it's explicitly said 145, but I think it discussed the 145 figure in the context of the -- of the fact that it didn't provide for health care services.  So it discounted that a little bit and went down about 7 percent.  But it came close to that figure, I believe.

CHIEF JUSTICE ROBERTS:  Can I ask you a hypothetical question that I know is not your case?  But let's say you had the district court entering an order saying you have to bring it down to 137.5 in 2 years.  That will, as a practical matter, result in the release of 40,000 prisoners.  The State comes back and makes a showing supported by experts saying, look, if you give us 4 years, we can reach the figure without releasing any prisoners.

Do you think it would violate the Prison Litigation Reform Act for the district court to say: No, I want this done in 2 years, not 4 years, and we'll just have to deal with the fact there are going to be 40,000 prisoners out on the streets.

MR. SPECTER:  Well, the Prison Litigation Reform Act requires the court to give substantial weight to --

65

Official

CHIEF JUSTICE ROBERTS:  Right.

MR. SPECTER:  -- the public safety implications of its decision.  So, under those circumstances, it's -- under those hypothetical circumstances, there's always the possibility that, in those cases, the degree of public safety problems might outweigh the harm.

That -- as you said, that's not this case. They found that we could do it.  And they -- the three-judge panel found that the State could reduce the population safely.  And there was no suggestion in -- in the record that this 2- or 4-year period would make that much of a difference.

You have to put the 40,000 or 35,000 figure in context.  California releases 120,000 prisoners every year on parole.  That's a lot of prisoners.  And the findings of the district courts are, even when California increases the number of parolees in the communities, that doesn't increase the crime rate.

JUSTICE ALITO:  What's the recidivism -- what is the recidivism rate for those parolees?

MR. SPECTER:  Well, it depends on the risk of the parolees.  The high-risk ones --

JUSTICE ALITO:  In general, what is the recidivism rate?

66

Official

MR. SPECTER:  Well, overall, the risk is around 70 percent, but if you -- for low-risk prisoners, the risk is 17 percent who re-violate, and --

CHIEF JUSTICE ROBERTS:  I'm sorry.  I couldn't -- what was the first --

MR. SPECTER:  The first number, when you take all parolees, all together, it's 70 percent.

CHIEF JUSTICE ROBERTS:  Seven-zero?

MR. SPECTER:  Seven-zero, because -- within 3 years.  That's what -- the situation we have now, and that's the situation that the governor, the secretary, the court described as a failure.  With parole reform, you could reduce that number in many ways, and the court described how you could do that.  But for the low-risk prisoners --

JUSTICE ALITO:  But for the -- for the low-risk prisoners, it's 17 percent?

MR. SPECTER:  Seventeen percent, and California has a risk-assessment instrument which the court found could be used to make sure that what happened in Philadelphia doesn't happen again.  If I understand it --

JUSTICE ALITO:  Well, I understood that of the low-risk -- if only the low-risk people are released, around 3,000 of them are going to commit

67

another crime.

MR. SPECTER:  They -- but they don't have to be released.  First, I want to make sure I emphasize the point that this is a crowding-reduction measure.  You don't have to release 35,000 prisoners.

JUSTICE ALITO:  They -- they don't have to be released if you can build enough cells --

MR. SPECTER:  Or you can divert, or you can improve the parole system so that parole violators don't commit so many crimes, if you offer rehabilitation alternatives, if you provide a number of -- diversion into the community.  There are a number of other options short of releasing prisoners.

And the 70 percent figure includes the --

JUSTICE ALITO:  The 17 percent figure -- and the 17 percent figure goes to exactly my concern.  This is going to have -- it seems likely this is going to have an effect on public safety.  And the experts can testify to whatever they want, but you know what?  If this order goes into effect, we will see.

MR. SPECTER:  But the --

JUSTICE ALITO:  We will see, and the people of California will see:  Are there more crimes or are there not?

MR. SPECTER:  Well, based on the experience

Official

in other jurisdictions, the court found we wouldn't.

And I want to just -- I want to clarify one point, Your Honor:  The 70 percent figure includes -- doesn't always include crimes.  It includes lots of technical parole violators, people who have missed their appointments, for example.  So it's not as grave as some of the figures that are -- been thrown by the -- by the other side.

JUSTICE BREYER:  Is there any likelihood --

JUSTICE GINSBURG:  Is -- is there any other case where the prison reduction has been done under the PLRA, or is this the first -- the first one?

MR. SPECTER:  It's the first one to reach this Court, obviously.  There have been a few others that have been resolved by consent, as I understand it, or not appealed, but just a few.

JUSTICE BREYER:  Is there any evidence on -- I -- I see their suggestions that the technical parole violators go elsewhere --

MR. SPECTER:  Yes, Your Honor.

JUSTICE BREYER:  -- that the elderly and infirm prisoners --

MR. SPECTER:  Yes, Your Honor.

JUSTICE BREYER:  -- some of them be released.

69

Official

MR. SPECTER:  Right.

JUSTICE BREYER:  The good time credits for older people would have effect, be increased, and also, halfway houses and other kinds of prison facilities which used to be called less -- less physically restrictive punishments, or taking the money you save and building new prisons.  Okay, that seems to be the gamut.

Is there any evidence, statistically or otherwise -- because it used to be that States did rely on halfway houses, that relied upon -- they relied upon certain camps -- prison camps --

MR. SPECTER:  Yes, Your Honor.

JUSTICE BREYER:  -- for example, and some of them were pretty tough.  And there were a whole range of what used to be called intermediate punishments.

MR. SPECTER:  Yes, Your Honor.

JUSTICE BREYER:  All right.  Is there any statistical evidence on the part -- on the point that is -- that Justice Alito raised --

MR. SPECTER:  Yes, Your Honor, there's --

JUSTICE BREYER:  -- as to whether these did or did not result in higher crime rates?

MR. SPECTER:  Well, the evidence was, and the court found -- and, again, it's not clear error --

70

Official

that these programs were not -- were more effective than prison in reducing recidivism, and they were less expensive. And -- and that's part of the reason why the three-judge panel concluded that a reduction in the prison population wouldn't increase crime.

CHIEF JUSTICE ROBERTS: Counsel, one of the thing that concerns me about this type of institutional reform litigation --

MR. SPECTER: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: -- is that the State is responsible for a lot of different things.

MR. SPECTER: Yes, Your Honor.

CHIEF JUSTICE ROBERTS: And what happens when you have this case, another district court ordering the State to take action with respect to environmental damage, another court saying, well, you've got to spend this much more on education for disabled, another court saying you've got to spend this much more on something else? How does the State sort out its obligations? Does it say --

MR. SPECTER: We would prefer --

CHIEF JUSTICE ROBERTS: -- well, I'll spend more money to build prisons, but I'll violate this other district court order saying I have to spend more money to build water treatment plants?

71

Official

MR. SPECTER:  Well, Your Honor, in this particular case --

CHIEF JUSTICE ROBERTS:  I know you like your particular case --

(Laughter.)

CHIEF JUSTICE ROBERTS:  -- and you want the State to say this is where I'm going to put my money.

MR. SPECTER:  No, we're not --

CHIEF JUSTICE ROBERTS:  But the point is it's a budget prioritization that the State has to go through --

MR. SPECTER:  Right.

CHIEF JUSTICE ROBERTS:  -- every day, and now it's being transferred from the State legislature to Federal district courts throughout the State.

MR. SPECTER:  Well, I believe the Federal courts have an obligation to enforce the Constitution and the laws of the United States.

CHIEF JUSTICE ROBERTS:  No, no.  I believe that as well, counsel.

(Laughter.)

CHIEF JUSTICE ROBERTS:  What I'm saying is that you have conflicting orders from different district courts telling them you've got to comply with the Constitution by spending 8 billion here; and another

72

Official

court saying, I've got another constitutional problem of my own, and you've got to spend 8 billion over there. What is the State supposed to do in that situation?

MR. SPECTER:  Well, my simple answer to your question, Your Honor -- and I don't mean to be flippant -- but they're -- they have an obligation to follow the Federal law, constitutional law and other laws.  And if they're not, then the Federal court has an obligation to impose a remedy.

In this particular case, the State has a choice.  It can either incarcerate 140,000 prisoners in a system built for 80,000, or it can incarcerate a -- a lesser number.  If it chooses to incarcerate 148,000 prisoners in a space built for 80, it's going to incur certain obligations.  And we believe, as I said in answer to Justice Breyer's question, the State could choose to use less restrictive punishments, alternative punishments, get a better bang for their buck, have more public safety.

But that's -- if we -- if the court imposed that kind of a rule, then the State would be here saying it's -- it's violating comity provisions and making policy choices for the State which it shouldn't.  I believe in this case, the court gave the State the maximum degree of flexibility to make all the policy

73

Official

choices surrounding -- surrounding the incarceration of these prisoners.  You just -- the Constitution prevents the State from incarcerating somebody and then not providing them the basic medical care they need to escape from the prison and not die before their sentence is out.  And that's what we have here.

Thank you.

JUSTICE KENNEDY:  If you take the State's concession that it can meet a goal in 5 years and the Federal court order is 2 years, we're talking about 3 years.  Is there any indication of how fast the State's remedy would click in?  Are we talking maybe about a 5 percent differential for the last 3 years, or --

MR. SPECTER:  Well, there are a lot of things the State can do quickly.  For instance, it can reform its parole system; it cannot re-incarcerate technical parole violators.  It can --

JUSTICE KENNEDY:  No, no.  I'm saying, assuming --

MR. SPECTER:  Yes.

JUSTICE KENNEDY:  Compare what the State concedes that it will do with what the court has ordered it to do.

MR. SPECTER:  The State -- well, I just want to remind you that the governor proposed to the

74

Official

legislature that he reduce the prison population; he said it could be done safely by the same amount, roughly 37,000 prisoners, in 2 years.  So what the court found was basically what the governor had believed was safe.

The 5-year -- the 5-year period is longer, and the 5-year period is longer because it takes time to construct the facilities that the -- that the State wants to construct.  I believe that's the major difference between the two remedies.  But the other methods -- the good time credits, parole reform, diversion -- those can be implemented very quickly, and those substantial reductions can be accomplished safely in that amount of time.

JUSTICE SOTOMAYOR:  So should the court have said 2 years for everything but construction?  Wouldn't that have been a more narrowly tailored remedy?

MR. SPECTER:  Well, the State --

JUSTICE SOTOMAYOR:  Except that they --

MR. SPECTER:  Well, I was --

JUSTICE SOTOMAYOR:  -- there was going to be no construction adequate, because there was no money.

MR. SPECTER:  Right.  And the State has -- has not really put up the money to construct those new prisons.  This case has been ongoing since 2006, and they've hardly constructed anything.  Even if it was a

75

Official

more narrow remedy, the court found that construction

wouldn't be a viable alternative.

My time is up.

CHIEF JUSTICE ROBERTS:  Thank you, counsel.

Mr. Phillips, you have 3 minutes left.

REBUTTAL ARGUMENT OF CARTER G. PHILLIPS

ON BEHALF OF THE APPELLANTS

MR. PHILLIPS:  Thank you, Mr. Chief Justice.

Just a few points.  First of all, with

respect to the state of the record and what was

proffered and what was not proffered, if you look at the

joint appendix at 2085, there's a specific proffer that

is made by the intervenors in that context -- or I

mean -- I'm sorry.  There's a specific proffer made by

the State of the --

JUSTICE SOTOMAYOR:  I'm sorry.  What page

was that?

MR. PHILLIPS:  2085.  That's volume 6 of the

-- and it is at that point where the plaintiffs, the

intervening plaintiffs say we'd like to put on evidence

of constitutional violations.  And Judge Karlton says:

Twice this court has said we will not receive that

evidence.  You've made a clear -- as clear a record as

you can; please don't waste our time.

And then later, at 2338, which is again in

76

Official

volume 6, where we enter Mr. Dezember, who is the

assistant secretary of CDCR in charge of health care, he

specifically said -- I've read the -- I've read the

Dezember declaration, and it will not be received to the

extent that it says the State is in compliance.

So we've made our efforts --

JUSTICE SOTOMAYOR:  I'm sorry --

MR. PHILLIPS:  -- and we were rebuffed.

JUSTICE SOTOMAYOR:  I don't know what the

declaration said.  Is the actual declaration in the

record somewhere?

MR. PHILLIPS:  Yes, I believe the actual

declaration is in the record, Justice Sotomayor.

JUSTICE SOTOMAYOR:  All right.

JUSTICE KAGAN:  Mr. Phillips, sorry, but on

a -- on a different subject.  Does the State stand by

its representation that it can do this without any

public safety impact in 5 years?

MR. PHILLIPS:  Yes.  I mean, we made that

submission to the court, and we -- we believe that we

could comply with it.  That said --

JUSTICE KAGAN:  That remains true --

MR. PHILLIPS:  We --

JUSTICE KAGAN:  -- notwithstanding budget --

MR. PHILLIPS:  Well, it's --

77

Official

JUSTICE KAGAN:  -- economic differences, budget differences?

MR. PHILLIPS:  Look, I mean, the plaintiffs' counsel talks about all of the things that you can do, and if you -- if you look at 70a of the -- the jurisdictional statement appendix, it specifically says there's a line; above the line we can implement, and that will get you about 16,000 inmates, and below the line you need legislation in order to implement these things.  But the reality is that anytime you say you're going to release 30,000 inmates in a very compressed period of time, I guarantee you that there's going to be more crime and people are going to die on the streets of California.  I mean that --  there's no way out of that particular box.

JUSTICE KAGAN:  But if there were 5 years, you think you could do it without any public safety impact in the way that you told the court you could?

MR. PHILLIPS:  I think so, but I'm still concerned, because the district court in this specific says -- said:  We have not evaluated the -- the safety impact of each of the State's -- of the elements of the State's proposed plan.

And it seems to me they had an obligation to do that.

78

Official

The other point I want to make with respect to Justice Kennedy's question is that there is not a shred of evidence that 137.5 makes any sense whatsoever. That is a pulled-out-of-the-air number. Theirs was aspirational. None of that is based on what is the constitutional violation that exists at the time you adopt that particular percentage.

And it seems to me that's the entire problem with this -- this exercise, which is to say we're going to fix this across the board, rather than what would make much more sense, which is to evaluate these matters facility by facility, to evaluate these matters on the basis of the various elements discrete elements of how you can reduce the prison population, and to do it in -- in conjunction with a receiver who is in place who can help to implement this in a very systemic way and that will get us to where we want to get to.

JUSTICE SOTOMAYOR: So why didn't you give the court that as your plan? The court gave you absolute discretion to implement the plan that you wanted; it said we don't want to do facility by facility, because we want you to figure out where you need to implement.

So, your plan didn't do that; why? Either in your 5-year plan or in your 2-year plan.

79

Official

MR. PHILLIPS:  Because the district court's order said you're going to have to reach 137.5 percent in 2 years, period.  That's the categorical rule.  And the first time we went in to suggest something above 137.5, Judge Henderson said:  I'm not hearing that.

CHIEF JUSTICE ROBERTS:  Thank you, counsel.  Mr. Phillips, Mr. Specter.

The case is submitted.

(Whereupon, at 12:31 p.m., the case in the above-entitled matter was submitted.)

`

Alderson Reporting Company

**A**

**able** 19:23 46:25 47:1,2,5,19
**above-entitled** 1:12 80:10
**absence** 37:15
**absolute** 79:20
**absolutely** 4:8 15:6 17:21 26:18 57:5
**abundance** 61:22
**accept** 19:1,3
**accepted** 55:24
**access** 34:21
**accommodate** 22:18
**accomplish** 26:14
**accomplished** 75:12
**accorded** 5:1
**account** 14:24 60:13 60:16,19
**accurately** 9:17 39:1
**achieving** 21:14
**acknowledges** 16:10
**act** 19:9 21:5 33:4 36:1 49:3 51:13 59:3,14 65:19,24
**action** 71:15
**actions** 12:17,17
**actual** 43:1 77:10,12
**add** 5:16
**added** 55:24
**additional** 13:24 29:18 34:24 55:25 57:23
**address** 24:2 30:9 37:22 44:15 45:5 45:25 46:5
**addressing** 46:8 47:10 63:18
**adequacy** 37:24
**adequate** 15:3,14 55:3 75:21
**adhering** 31:12
**administered** 8:15

**administration's** 60:21
**admits** 27:17
**admitted** 41:14
**adopt** 79:7
**adult** 41:4
**adversary's** 37:22
**adverse** 49:4,15,21 52:17
**affidavit** 24:15
**affirm** 12:8 25:14
**age** 58:3,3
**ago** 6:13
**agree** 16:19,20 41:6
**agreed** 18:21
**ahead** 3:24 5:23 23:13
**aim** 46:7
**aimed** 19:6
**AL** 1:4,7
**Alito** 12:10,12 23:17 23:22,23 24:1,10 24:13 25:16 42:1 42:11 43:2,7,10,12 44:7 45:4,23 46:3 46:7,10 47:9,16,23 58:12,22 59:2 66:20,24 67:16,23 68:6,15,22 70:20
**Alito's** 60:24
**allow** 5:3 22:20 53:9
**allowed** 23:23,25 63:11
**allowing** 32:5
**alternative** 5:9 73:17 76:2
**alternatives** 68:11
**altogether** 44:15
**Amendment** 26:17 36:11
**amicus** 24:2,7,14 25:25 47:24
**amount** 33:14 41:10 59:16 75:2,13

**amounts** 38:3,14 46:22
**ample** 61:21
**analysis** 31:3 34:4
**analyze** 31:6 51:22
**analyzed** 19:22 45:16,17
**angry** 14:14
**annoyed** 36:1
**answer** 11:7,7 14:1 20:19,21 21:2 32:24 45:11 51:9 60:24 62:5,9 73:4 73:16
**anymore** 31:21
**anytime** 78:10
**anyway** 19:3
**appealed** 69:16
**APPEARANCES** 1:15
**Appellants** 1:17 2:4 2:10 3:8 76:7
**Appellees** 1:19 2:7 37:6
**Appellee's** 45:12
**appendix** 38:6 45:12 57:9 76:12 78:6
**appointed** 4:20 7:22 16:24 30:19 33:12
**appointment** 6:22
**appointments** 69:6
**approach** 9:8
**approaching** 8:15
**appropriate** 3:21 24:17 28:1 31:11 36:3
**appropriateness** 36:8
**approvals** 28:14,15
**approve** 10:16,17 10:18
**approved** 10:10,15 10:24 29:22
**arbitrarily** 31:14

**argue** 54:25
**argued** 40:8
**argument** 1:13 2:2,5 2:8 3:3,7 6:18 37:5 40:21 41:13 76:6
**armed** 48:5
**ARNOLD** 1:3
**asked** 11:9 29:18 56:14
**asking** 8:22 30:4 31:1
**asks** 29:1
**aspirational** 79:5
**assaults** 48:5
**assessment** 33:19 58:10
**assistant** 77:2
**assume** 36:18
**assuming** 74:19
**assumption** 29:9
**attempt** 40:24
**attempting** 64:20
**attend** 42:13 43:15
**attention** 21:19
**attentiveness** 18:2
**attitude** 33:16
**August** 8:6 12:15 16:4 19:21 31:14 39:9,18 40:11
**authority** 18:8 34:19
**available** 42:13,15 43:14,20
**average** 15:24 16:1 37:14
**avoid** 15:9,11
**aware** 39:22 61:7
**A.B** 6:24 12:17,18
**a.m** 1:14 3:2

**B**

**back** 6:5 8:16 9:2,4 11:25 13:19 14:3 17:22 18:5 28:3 33:10 34:3 35:19

36:25 47:18 56:13 60:24 63:11 64:7 65:14
**backwards** 64:19
**bad** 21:23
**balancing** 14:23
**bang** 73:18
**based** 34:4 41:22 45:18 46:11 48:8,8 68:25 79:5
**basic** 14:1 74:4
**basically** 5:20 75:4
**basis** 50:3 61:21 79:13
**beginning** 30:6,12 59:22
**behalf** 1:16,18 2:4,7 2:10 3:8 37:6 76:7
**belief** 29:9
**believe** 17:7 47:18 57:5 64:1 65:8 72:16,19 73:15,24 75:8 77:12,20
**believed** 60:23 75:4
**believer** 24:7
**believes** 9:25 46:11
**bend** 64:19
**beneficial** 35:18
**benefit** 61:23
**Berkeley** 1:18
**best** 9:12 14:25 15:2 15:16 31:4 52:1 62:20
**better** 11:19 24:11 45:10 54:12 60:20 73:18
**beyond** 31:2,21
**big** 9:16,16,23 20:7 26:13 27:10
**biggest** 26:16
**billion** 8:8 10:4 11:10,12 20:20 27:3 28:11 29:5,14 33:14 72:25 73:2

**bit** 23:18 65:6
**blank** 52:25
**blocked** 35:13
**board** 79:10
**box** 78:15
**Breyer** 9:12,22 10:7
10:9,12,16,19,23
11:1,6,17 12:3,5
20:6,23 26:22
27:16,19 57:6,13
57:16,19 58:6 69:9
69:17,21,24 70:2
70:14,18,22
**Breyer's** 73:16
**brief** 9:14 12:7
20:10 24:2,14,20
24:22 25:8,9,25
28:11 40:23 45:12
47:24
**briefing** 40:9,21
**briefs** 5:8 24:7 26:24
31:18 56:24
**bring** 17:9 19:23
30:23 32:9 33:16
64:14 65:12
**broken** 6:25
**broom** 19:14
**buck** 73:18
**budget** 29:16 72:10
77:24 78:2
**build** 45:4 68:7
71:23,25
**building** 10:4 70:7
**buildings** 10:5
**built** 29:22 43:22,23
53:17 61:1 73:12
73:14
**bump** 61:24
**burden** 32:18,20
33:6

—— **C** ——

**C** 2:1 3:1
**California** 1:4,18

3:15 14:25 15:3,6
17:24 18:8 23:8
27:7 28:20 47:11
47:24 48:6 50:25
63:16 66:15,18
67:19 68:23 78:14
**called** 26:11 70:5,16
**camps** 70:12,12
**candidly** 22:21 25:3
**cap** 19:4
**capacity** 8:25 42:9
42:21,22 43:5
44:25 45:1 60:12
**captured** 39:2
**care** 8:9,14,19 9:24
10:1,3 11:22 15:4
15:13 18:2 33:14
34:14,15,21 42:4
43:14,23 44:2,12
47:7,13 55:3 60:13
60:17,19,25 61:2
63:4,6 65:5 74:4
77:2
**cars** 21:23
**CARTER** 1:16 2:3
2:9 3:7 76:6
**case** 3:4,16 4:1,7,16
4:16 7:7,17 8:18
9:6,18 12:9,16
16:4 18:19,20
21:13,20 22:23
25:5,23 30:6 32:21
40:8,25 43:21
46:20,21 65:10
66:8 69:11 71:14
72:2,4 73:10,24
75:24 80:8,9
**cases** 3:5 30:5,12
33:22 54:21 66:6
**categorical** 80:3
**category** 58:4
**cause** 7:18,19 9:16
9:23 16:14 17:23
21:21 22:10 30:9

31:3,8
**caused** 37:10 38:8
**caution** 61:22
**CDCR** 34:14 77:2
**cell** 44:1
**cells** 37:11 43:4,13
43:18 45:5 68:7
**cert** 52:3
**certain** 25:15 70:12
73:15
**certainly** 9:25 11:19
25:24 26:4 59:13
**cetera** 17:17
**challenged** 61:16
**change** 4:10 7:24
9:4 13:7
**changed** 8:18 63:13
64:14
**changes** 8:13 35:18
63:15
**characterization** 6:9
**charge** 77:2
**check** 29:1
**Chief** 3:3,9 32:23
37:1,3,4,7 40:13
40:19 41:1 49:1,7
49:11,13,17,24
50:7,18 51:3,6,8
51:11,16 52:6,9,12
52:20 55:6,8,12
56:10 62:4,8 65:9
66:1 67:4,8 71:6
71:10,13,22 72:3,6
72:9,13,19,22 76:4
76:8 80:6
**Chino** 50:24,24
**choice** 73:11
**choices** 73:23 74:1
**choose** 53:9 55:20
73:17
**chooses** 44:24 73:13
**circumstance** 31:13
**circumstances** 4:24
8:14,17 9:4 17:20

18:3 19:3 29:25
34:6,10 36:21
62:21 63:13 64:15
66:4,5
**cited** 58:13
**citizen** 47:11
**claim** 8:23 21:13
**claimed** 21:14
**clarified** 25:15
**clarify** 69:2
**class** 4:20,22 19:7
19:10,12,12 44:9
**clear** 12:8 33:4
35:21 52:23 56:9
70:25 76:23,23
**clearly** 24:11 36:1
52:24 53:7 54:25
61:17
**click** 74:12
**clients** 62:2
**clinics** 7:10 18:17
19:12
**close** 7:4 20:24 40:2
65:7
**closed** 40:7,16
**closest** 30:12
**closet** 19:14
**club** 24:24
**Coleman** 4:22 33:25
34:3 45:12,13,14
**collateral** 47:10
**come** 3:19 9:4 13:19
14:3 20:23 28:10
28:10 39:4 47:18
49:8 63:11 64:13
**comes** 65:14
**coming** 35:24
**comity** 52:1 73:22
**commission** 26:7
**commit** 67:25 68:10
**committed** 17:21
57:23
**committee** 29:16
**committing** 37:13

**commonly** 50:13
**communities** 66:19
**community** 58:20
68:12
**Compare** 74:21
**complained** 24:18
**complete** 36:15
**completely** 26:19
**compliance** 17:9
30:23 33:18,20
77:5
**comply** 17:8 21:7
46:1 52:13 72:24
77:21
**comprehensive** 28:5
30:23
**compressed** 78:11
**compromise** 11:21
**concede** 32:18
**conceded** 32:13,14
**concedes** 74:22
**concern** 68:16
**concerned** 47:12
78:20
**concerns** 71:7
**concession** 74:9
**conclude** 27:24 34:2
**concluded** 71:4
**concludes** 28:1
**conclusion** 5:15
11:21 26:4,8 48:11
48:23,24 57:9,10
**conclusions** 40:23
**concrete** 6:1,18
**conditions** 20:16
38:15,16,19 39:11
39:22 45:20 56:16
57:1,1 64:12
**conduct** 26:19
**confer** 18:7
**conferred** 5:4
**conflicting** 72:23
**confusing** 31:18
**Congress** 9:7 20:3

22:1,16 59:2
**conjunction** 79:15
**connection** 42:2 43:16
**connections** 4:21
**consent** 7:23 69:15
**consequences** 47:11
**consider** 39:7,7
**considerable** 59:9
**considered** 41:18,19
**considering** 41:20
**consistent** 22:9 25:24,25
**consistently** 19:22 34:18
**consists** 24:14
**Constitution** 17:10 72:17,25 74:2
**constitutional** 5:17 7:18,19 10:1 11:3 11:22 15:4,5 16:9 17:23,25 22:11,25 26:15 27:2,16,19 32:14,15,19 33:2 33:17,19 36:17,19 36:23 38:4 39:5 42:3 52:2 54:20 61:8 64:12 73:1,7 76:21 79:6
**constitutionally** 25:21 36:10 52:14 55:3
**constraints** 17:17
**construct** 44:24 75:7 75:8,23
**constructed** 75:25
**construction** 5:10 5:12 6:25 7:25 8:3 8:8 10:11 11:20 19:25 28:21 29:10 29:23 34:21 41:15 44:12,23 75:15,21 76:1
**contempt** 11:9 14:9

**context** 9:9 24:23,25 25:13,17 65:4 66:15 76:13
**continue** 38:9
**contrary** 41:23 46:10
**contributed** 47:20
**controlling** 34:13
**convene** 28:1
**convened** 4:23 27:25
**convenes** 30:21
**cooperation** 23:7
**coordinates** 23:6
**core** 13:25
**correct** 4:3 23:20 31:2 38:13 42:10 60:3 64:11
**corrections** 18:9,11 22:19 48:15 50:17 58:9
**cost** 48:3
**counsel** 6:12 32:22 34:22 35:16 37:1 41:24 47:8 53:4,12 54:10 55:7 62:9 71:6 72:20 76:4 78:4 80:6
**couple** 55:25
**course** 5:1 6:22 16:6 21:20 22:1,20 23:4 26:20 53:16 54:12
**court** 1:1,13 3:10,11 3:13,23 4:7,7 5:9 8:16,22 9:1,8 11:15 12:8 13:21 14:6 16:8,16 17:3 17:19 21:6,8 23:11 23:14,20 25:11,14 26:5 27:23,25 28:4 30:13,21,21 31:1,6 31:11,12,13 33:2 34:2 35:6,14,15,20 35:21 36:7 37:8

38:6 39:6 40:5,5,7 40:7,9 42:20 44:4 44:20 45:13,14,16 45:16 46:10,19 48:7 49:2,4,19 50:12,19 51:12,23 51:24,24 52:25 53:5,11 54:13 55:13,25 57:4,9 59:9 60:12 61:16 61:20 63:11 64:15 64:16,22 65:11,19 65:24 67:12,13,20 69:1,14 70:25 71:14,16,17,24 73:1,8,20,24 74:10 74:22 75:3,14 76:1 76:22 77:20 78:18 78:20 79:19,19
**courts** 66:17 72:15 72:17,24
**court's** 13:13 37:20 52:22 54:5 80:1
**credibility** 41:22
**credit** 63:16
**credits** 13:7 41:11 48:17 53:24 54:2,7 63:17 70:2 75:10
**crime** 47:21 48:13 48:25 58:19 64:6 66:19 68:1 70:23 71:5 78:13
**crimes** 57:23 68:10 68:23 69:4
**criminologists** 57:21
**crisis** 5:12 37:9
**critical** 46:16
**crowded** 18:1 43:4 43:13,19 60:11
**crowding** 44:22 46:15,16,18 47:15 48:12,18 50:14
**crowding-reduction** 68:4

**culture** 7:20,24
**cure** 5:17 11:2 18:22 18:24 27:2,9,13
**current** 11:21,22 12:6 37:17 38:19 38:20,20,24 39:11 53:2,2 57:1,3
**currently** 3:14 33:13
**cut** 16:4 31:14 40:15
**cutoff** 32:3 39:17

---
**D**
---

**D** 3:1
**damage** 71:16
**date** 31:22 37:17 39:17
**day** 38:14 57:2 72:13
**days** 15:12 35:8,8,8 40:10
**dazed** 15:12
**deal** 8:10 19:14 29:5 65:21 `
**dealing** 7:12 19:15 30:15 33:2 54:21
**dealt** 46:15
**death** 15:20 54:22
**deaths** 15:10
**December** 40:3,8 40:16
**decent** 8:15,19
**deciding** 21:7
**decision** 9:1 16:18 40:10 66:3
**decisions** 34:19
**declaration** 77:4,10 77:10,13
**declaring** 13:10
**decline** 41:8
**declined** 41:4,7
**decrease** 34:25
**deferring** 31:12
**deficiencies** 38:8
**degree** 66:6 73:25

**deliberate** 26:18
**deliver** 15:3,13 63:6 64:12
**density** 11:23
**Department** 18:9,10 22:19 48:14 58:9
**dependent** 28:14
**depends** 4:15 21:16 27:14 66:22
**describe** 38:7
**described** 9:18 25:16 67:12,14
**description** 9:19
**design** 8:25,25 19:4 42:8,22 43:5
**desires** 64:17
**details** 6:3
**determinations** 41:22 49:25
**determine** 31:6 36:22 50:1 52:1
**determined** 49:3
**Deukmejian** 60:9
**develop** 17:3
**developments** 31:15 31:16
**devised** 33:13
**Dezember** 77:1,4
**diagnosis** 35:7
**die** 74:5 78:13
**difference** 17:18 26:13 32:5 66:13 75:9
**differences** 78:1,2
**different** 28:3 34:5 44:15 55:13 58:24 58:25,25 71:11 72:23 77:16
**differential** 74:13
**difficult** 22:13
**direction** 23:10 33:16
**directly** 44:14 45:25
**disabled** 71:17

disagree 50:5 60:8
disagreement 39:1
disconnect 36:16
   42:16
discounted 65:6
discovered 9:24
discovery 31:21,24
   35:5 39:15
discrete 45:13,21
   79:13
discretion 59:9
   64:20 79:20
discuss 55:13
discussed 65:4
discussion 48:1
dispute 41:2
disregard 7:20
distinguished 41:21
district 3:13,22 4:6
   4:7 8:16,22 9:1
   17:19 18:19 21:8
   31:12,13 35:14,15
   36:6 40:5 49:2,18
   50:19 51:12 55:13
   56:4 57:9 59:8
   60:12 63:10 65:11
   65:19 66:17 71:14
   71:24 72:15,23
   78:20 80:1
diversion 68:11
   75:11
divert 63:21 68:8
doctors 45:10 47:2
doing 18:23
dollars 8:7
DONALD 1:18 2:6
   37:5
doors 44:21
double 49:18
double-cell 43:22,24
doubt 34:1 61:23
doubts 22:23
downward 15:22
dramatically 9:7

dropped 12:15 13:6
due 41:9
duty 22:2 52:13
D.C 1:9,16

_____

**E**

E 2:1 3:1,1
earlier 29:5 64:7
early 4:19
earmarked 28:19
economic 78:1
education 71:17
effect 26:2 48:1
   59:18 63:22,25
   64:3,4,10 68:18,20
   70:3
effective 42:25
   46:12 58:20,21
   62:13 71:1
efficacious 22:4
   64:23
effort 38:24 53:8
efforts 12:25 58:23
   77:6
Eighth 26:17 36:10
either 21:13,13
   25:24 28:3 44:10
   73:11 79:24
elderly 69:21
elected 41:12
element 26:17
elements 78:22
   79:13,13
eliminated 26:19
emergency 13:10
emphasize 63:10
   68:3
emphatically 49:14
employees 21:24
enable 42:23
enacted 6:24 59:3
enactments 50:16
enforce 72:17
enormous 29:24

31:15,16 33:14
ensure 52:13
enter 64:18 77:1
entered 33:3
entering 65:11
entertaining 35:22
entire 18:8,10 79:8
entirety 8:23
entitled 17:7
environmental
   71:15
envisions 22:16
equity 9:9 28:4 33:2
equivalent 11:20
equivocal 63:7
erroneous 52:24
   53:7 54:25 61:17
error 31:1 57:4
   70:25
escape 74:5
ESQ 1:16,18 2:3,6,9
essential 7:12
essentially 30:14
et 1:4,7 17:17
etched 29:8
evaluate 79:11,12
evaluated 11:15
   78:21
eventually 19:20
everybody 18:21
   26:25 30:23
everything's 39:4,5
evidence 11:1,7,8
   20:8 26:21 32:10
   34:7,23,24 35:22
   36:7 38:3,11,14
   39:8 40:2,7,15,18
   41:14,17,19,20,21
   41:23 46:23 48:20
   54:5,6,23 56:16,19
   56:24 57:20 59:21
   61:17,25 69:17
   70:9,19,24 76:20
   76:23 79:3

evidence-based
   58:14
exact 36:22
exactly 36:16 39:23
   45:7 46:19 68:16
examine 21:9 49:19
examined 50:12
example 20:11
   48:16 57:21 69:6
   70:14
excluded 56:19,22
   56:25 57:3
excuse 5:7 54:12
exercise 79:9
exist 5:14 38:9
existed 4:19 38:4
   39:22
exists 79:6
expect 34:18
expectation 28:20
   29:9,19
expenditures 12:19
expensive 71:3
experience 68:25
expert 22:6 48:8
   59:20 61:14 62:6
   62:14,17,19,20
expertise 63:4
experts 16:15 26:1
   26:3,25 39:8,10,21
   44:6 46:13 48:9,10
   48:10 58:18 60:4
   60:18,22 61:4,6,15
   62:11 65:15 68:18
expire 37:2
explain 24:4 31:17
   42:1,17
explains 24:3
explicit 20:3
explicitly 65:3
extended 47:25
extent 42:14 77:5
extra 61:24
extraordinarily 3:18

extraordinary 3:12
   4:25 5:4 7:2 18:7
extreme 33:7
extremely 64:18

_____

**F**

facilities 5:16 7:1,14
   19:17 20:14,15
   29:25 31:20 37:12
   41:4 42:15,25
   43:14,19 44:12,12
   44:25 60:25 70:4
   75:7
facility 18:9 29:22
   79:12,12,21,22
fact 6:10 7:5 22:21
   23:2 31:5 32:11
   39:7 41:22 45:17
   55:23 56:25 61:7
   65:5,21
facts 30:4,15 46:11
   58:7
factual 14:1
fact-finding 30:17
failure 23:1 67:12
fair 6:8 9:19 56:3
fairly 21:25
familiar 48:2
farther 11:19
fast 74:11
favor 48:16
February 40:9,22
feces 15:12
Federal 19:8 21:6
   72:15,16 73:7,8
   74:10
federalism 14:1,19
fewer 7:9,13 19:5
fighting 14:12,13,14
figure 42:2,6 44:4
   59:10 60:8,12
   62:24 65:4,7,16
   66:14 68:14,15,16
   69:3 79:22

**figures** 37:17,18 69:7
**file** 25:8,9
**filed** 24:20,22
**final** 40:1 55:23
**finalized** 30:22
**find** 20:7
**finding** 45:17 53:1,3 54:5 56:6 64:21
**findings** 21:2 42:20 52:22 54:24 55:1 66:17
**fine** 25:18 39:4
**finish** 12:13
**finished** 29:11
**first** 6:24 7:11,13 9:18 11:15 14:3 15:19 18:15,23 21:8 22:9 26:16 30:19,24 31:6 32:24 44:18 64:18 67:5,6 68:3 69:12 69:12,13 76:9 80:4
**fiscal** 5:11
**fix** 79:10
**flaws** 22:22
**flexibility** 52:1 53:9 73:25
**flippant** 73:6
**focus** 16:17
**follow** 49:17 73:7
**footnote** 28:12,13
**force** 26:6
**formal** 32:5
**former** 60:9
**forth** 35:6
**forthcoming** 28:16
**forward** 28:21 32:9 35:24 36:4
**found** 46:11,19 48:8 58:18 60:13 61:16 66:9,10 67:20 69:1 70:25 75:3 76:1
**frame** 17:6

**frankly** 4:17
**free** 64:13
**friend** 38:23,25 41:7
**full** 9:11
**function** 19:13
**fundamental** 7:17 7:24 9:6 11:14 17:17 18:2 19:19 30:17,18 31:1 38:7
**funded** 29:14
**futile** 36:1

**G**

**G** 1:16 2:3,9 3:1,7 76:6
**gambit** 11:12
**gamut** 70:8
**gates** 44:21
**general** 42:4 45:19 58:22 66:24
**generally** 30:13 32:21 58:25
**getting** 11:9
**Ginsburg** 4:1,4,5,9 4:10,13 7:5,16 8:2 8:12,20 12:22 18:13,25 19:10,18 24:19 28:8,24 29:2 29:4,15 30:1 31:17 32:17,25 33:21 54:19 63:14,20 64:2 69:10
**Ginsburg's** 32:24
**give** 6:1,18 9:10 11:16 27:4 29:17 38:17 49:4 50:2 51:19,25 53:8 61:22,23 64:20 65:15,24 79:18
**given** 4:24 5:19 7:11 7:12 12:16 16:8 17:3,16 45:22 59:9
**giving** 54:7
**go** 8:16 9:2 17:22

18:5 21:7 23:14,14 26:23 28:3 30:9 31:21 33:7,10 34:3 44:14 57:25 62:23 69:19 72:10
**goal** 74:9
**goes** 11:13 13:1 14:19 32:6 45:7 59:6 68:16,20
**going** 3:24 13:12,18 13:21,22 15:8,9,11 15:12,13,14 18:16 18:22,22 23:12,12 23:13 28:21 29:10 29:16 30:8 33:7 36:16,18,18 39:3 44:9 45:5 46:4,18 47:17 48:6 49:14 49:20 53:22 56:13 59:15 61:24 65:21 67:25 68:17,17 72:7 73:14 75:20 78:11,12,13 79:9 80:2
**good** 13:7 41:11 48:17 53:24 54:1,7 57:25 63:16,17 70:2 75:10
**gotten** 5:12
**governor** 1:3 27:20 29:20,20 50:13,14 50:23 60:9 67:11 74:25 75:4
**governor's** 13:9 26:7,7
**governor-elect** 29:21
**grave** 69:6
**great** 8:10,13 44:8
**greater** 32:9
**ground** 6:25
**group** 60:10
**group's** 20:10
**growing** 5:22

**guarantee** 78:12
**guess** 58:1,3
**guest** 21:24
**guidance** 23:5
**gun** 23:11

**H**

**halfway** 59:11 70:4 70:11
**hammer** 17:18
**hand** 14:9
**happen** 10:8 12:1 26:23 27:9,11,12 27:22 48:6 53:22 67:21
**happened** 35:1 67:21
**happens** 71:13
**harm** 45:22 66:7
**health** 7:14 8:9,19 11:22 18:11 20:14 23:1,7 27:21 33:14 34:21 39:12 43:23 44:2 60:13,17,19 60:25 61:2 63:4,6 65:5 77:2
**hear** 3:3 25:11
**heard** 46:13 54:23
**hearing** 80:5
**help** 34:19 58:19 79:16
**Henderson** 80:5
**high** 13:5 60:12
**higher** 70:23
**highway** 21:22
**highways** 21:22
**high-risk** 66:23
**hip** 34:12
**hire** 45:9
**hiring** 5:14 7:3 44:13
**hit** 13:12,17,20
**homicides** 15:25
**Honor** 15:17 24:16 37:20 38:2,12

39:15,23 41:18 42:10,19 43:11 44:3 46:9 48:7 49:6,10,12 50:20 53:23 54:18 55:21 56:2,8,17,24 58:5 58:16 59:4,7,12,17 60:8 62:13 63:1,19 65:2 69:3,20,23 70:13,17,21 71:9 71:12 72:1 73:5
**hope** 11:16 43:21
**hopefully** 22:17
**horrendous** 9:17,20 20:9 45:20
**hotel** 21:21,23
**houses** 70:4,11
**housing** 43:25
**huge** 32:4
**human** 27:10
**hundreds** 8:7
**hurt** 51:18
**hypothetical** 65:10 66:4

**I**

**idea** 19:4
**identify** 58:10
**ill** 17:25 19:15 43:1 43:1
**illness** 42:5,14 44:13,14
**illnesses** 37:11
**immediate** 13:21
**impact** 49:4,15,21 52:17 77:18 78:18 78:22
**impediment** 22:11
**implement** 5:3 13:16 17:4 78:7,9 79:16 79:20,23
**implementation** 22:12
**implemented** 5:20

16:24 19:5 58:21 75:11

**implementing** 28:6
**implements** 52:14
**implications** 66:3
**important** 14:5 16:2 25:12 44:18 56:13
**impose** 73:9
**imposed** 22:2 25:23 38:1,5 39:25 50:4 73:20
**imposing** 55:19
**impossible** 8:18
**improve** 68:9
**improvement** 14:10
**improvements** 16:1 32:11
**inappropriate** 36:13
**incarcerate** 73:11 73:12,13
**incarcerated** 3:14
**incarcerates** 15:4
**incarcerating** 74:3
**incarceration** 74:1
**include** 69:4
**includes** 68:14 69:3 69:4
**increase** 41:11 44:25 45:1,2 47:20 48:12,24 64:6 66:19 71:5
**increased** 7:25 70:3
**increases** 66:18
**increasing** 48:17
**incredible** 18:12
**incredibly** 64:16
**incur** 73:14
**independent** 31:7
**indicate** 59:21
**indication** 74:11
**indifference** 26:18
**indirect** 47:9
**individual** 18:8
**ineffective** 45:15

**infection** 20:16
**infirm** 69:22
**information** 12:23 29:19 63:22
**inherent** 4:18
**inhibit** 47:7
**initial** 14:5
**initially** 12:4
**injury** 54:22
**inmate** 7:20
**inmates** 3:14 33:8 41:5 78:8,11
**inquiry** 31:10
**insisted** 25:21
**insisting** 33:7
**inspection** 31:25
**instance** 11:15 21:8 26:16 30:24 31:7 74:15
**instituted** 33:23
**institutional** 71:7
**instrument** 58:10 67:19
**interest** 14:25 15:2
**interests** 22:18,19 22:20
**interim** 32:10
**intermediate** 70:16
**interpret** 19:2
**intervening** 76:20
**intervenors** 32:8 41:3 48:10 58:17 76:13
**intervenor's** 35:16
**intrusion** 61:19
**intrusive** 64:9
**invited** 9:3 13:19 36:7
**involved** 30:5
**issue** 7:17 19:22 34:22 40:12 44:15 50:2 60:17 61:21
**issued** 3:12 40:11 40:23

**issues** 24:3

---
**J**

**January** 63:23
**job** 52:5
**joined** 34:11
**joint** 29:15 76:12
**judge** 3:13 18:19 34:23 76:21 80:5
**judges** 21:1 30:5,11 36:2
**July** 63:25
**jumped** 23:11
**jurisdictional** 25:4 38:6 49:22 78:6
**jurisdictions** 69:1
**Justice** 3:3,9 4:1,3,5 4:9,10,13 5:7,25 6:3,12,17 7:5,16 8:2,12,20 9:2,6,12 9:22 10:7,9,12,16 10:19,23 11:1,6,17 12:3,5,10,12,22 13:11,15 14:12,20 15:2,8,15 16:3,6 16:13,19 17:1,5,11 17:16 18:6,13,25 19:10,18 20:6,23 21:12,18 22:23 23:17,21,23 24:1 24:10,13,19 25:16 26:1,6,10,22 27:16 27:19 28:8,24 29:2 29:4,15,25 30:2 31:17 32:12,17,22 32:23,24,25 33:21 34:22 35:4,12 36:6 36:14,24,25 37:1,3 37:4,7,16,21,24 38:10,17,19,22 39:1,13,16,20,24 40:4,13,19 41:1,13 41:24 42:1,11 43:2 43:7,10,12 44:7

45:4,23 46:3,7,10 46:22 47:8,9,16,23 49:1,7,11,13,17 49:24 50:7,18 51:3 51:6,8,11,16 52:6 52:9,12,20 53:4,12 53:13,16,21 54:1,9 54:10,11,16,19 55:6,7,8,8,10,12 55:12,15,18,22 56:3,10,12,14,18 56:21 57:6,8,13,16 57:19 58:6,12,22 59:2,5,8,13,18,25 60:3,15,24 61:4,6 61:11,25 62:4,6,8 62:14,17,23 63:2,5 63:14,20 64:2,8,21 64:25 65:9 66:1,20 66:24 67:4,8,16,23 68:6,15,22 69:9,10 69:17,21,24 70:2 70:14,18,20,22 71:6,10,13,22 72:3 72:6,9,13,19,22 73:16 74:8,18,21 75:14,18,20 76:4,8 76:16 77:7,9,13,14 77:15,22,24 78:1 78:16 79:2,18 80:6

---
**K**

**Kagan** 17:1,6 30:2 54:11,16 77:15,22 77:24 78:1,16
**Karlton** 76:21
**keep** 25:13 35:13 40:14
**keeps** 5:22
**Kennedy** 16:6,13,19 17:11,16 18:6 21:12,18 22:23 26:1,6,10 32:12 39:16,20 41:13

46:22 59:5,8,13,18 59:25 60:3,15 61:4 61:6,11,25 64:8,21 64:25 74:8,18,21
**Kennedy's** 36:25 79:2
**killing** 20:14
**kind** 25:17 31:5 34:19 46:4 73:21
**kinds** 45:11 57:20 70:4
**know** 8:6 11:4 13:6 14:22,22 15:20 16:21 17:16 19:25 24:6 25:7,10 26:23 28:7,22 30:4,14 32:15 33:10 34:25 36:20 49:23 53:17 53:21 54:4,13 59:4 64:2,23,25 65:10 68:19 72:3 77:9

---
**L**

**lack** 18:2
**language** 22:10
**languish** 37:11
**larger** 19:24
**Laughter** 15:18 50:8 50:10 72:5,21
**law** 24:3 31:5 63:17 73:7,7
**laws** 72:18 73:8
**lawsuits** 44:10 46:7
**lead** 58:1
**leap** 23:13
**leapfrogged** 3:23
**led** 64:6
**left** 76:5
**legal** 31:1
**legislation** 50:21 63:22 78:9
**legislative** 29:16 50:16
**legislature** 5:11

10:5,10 12:17 27:3
50:21,22 63:16
72:14 75:1
**legislatures** 12:18
**length** 4:14
**lesser** 73:13
**let's** 15:19 62:23
65:11
**level** 13:24 45:22
**levels** 10:1 11:23
12:7,15 53:2,3
**life** 54:21
**life-threatening**
37:11
**likelihood** 69:9
**limit** 13:22
**limited** 19:12
**line** 78:7,7,9
**listening** 30:3
**lists** 45:12
**literal** 43:25
**literally** 8:6
**litigation** 19:8 21:5
25:5 33:4 49:3
59:14 65:19,23
71:8
**little** 23:18 44:17
65:6
**local** 58:18
**lockdowns** 47:6
**logical** 5:1
**long** 25:10
**longer** 4:11,12 8:18
32:20 36:10 75:5,6
**long-time** 24:7
**look** 6:21 10:3 15:20
19:21 20:6,13,17
23:12 39:2 49:8
51:11 53:7 65:15
76:11 78:3,5
**looked** 20:8,18,18
55:22
**looking** 21:21 28:11
31:3 48:20 49:21

**lot** 12:18 27:7 57:11
66:16 71:11 74:14
**lots** 69:4
**lower** 13:13
**low-risk** 58:11 67:2
67:14,17,24,24

**M**

**magnitude** 52:23
**main** 58:13
**major** 75:8
**majority** 44:9 61:15
**making** 5:6 24:23
36:2 56:22,22
73:22
**management** 42:25
45:10
**manner** 55:4,4
**MARCIANO** 1:7
**marginal** 41:11 64:4
**mark** 13:12,18
**massive** 22:5 38:3
38:13 46:22
**master** 4:22 6:5 7:8
18:19 20:20 23:6
24:22 25:8 34:11
34:14 45:18
**matter** 1:12 9:9 10:1
12:25 65:13 80:10
**matters** 79:11,12
**maximize** 5:15
61:19
**maximum** 42:21
51:25 53:8 73:25
**ma'am** 37:23
**mean** 8:23 9:10
10:14 12:23 13:8
13:25 15:19 16:25
17:2,6,22,24 18:18
21:17,24 22:8,22
24:9 25:9 26:3,23
26:24 27:6,10 28:7
28:17 29:4 53:13
57:7 73:5 76:14

77:19 78:3,14
**means** 6:4 22:3
59:14
**meant** 56:9
**measure** 37:25 68:4
**measured** 37:25
**medical** 8:14 18:2
18:11,11,17 19:16
20:15 34:14 42:4
42:13 43:14 44:12
74:4
**medication** 42:25
45:10
**meet** 43:25 44:1
52:16 74:9
**member** 35:20
**mental** 9:18 20:13
23:1,7 39:12 42:4
42:14 44:13,13
**mentally** 17:25
19:15
**mentioned** 42:24
**met** 14:8
**methods** 48:11
50:12 52:8 53:10
75:10
**million** 28:9,10,17
**millions** 8:7
**mind** 25:11,13 36:15
**minimize** 61:19
**minimum** 3:18 59:16
**minutes** 76:5
**missed** 69:5
**mistake** 34:10
**mixed** 31:4
**modify** 63:12,12
**moment** 21:19 22:23
26:23
**money** 8:4 10:21
27:1,7 28:13,21
29:10,17,21 33:14
70:6 71:23,24 72:7
75:21,23
**month** 40:21

**months** 30:20 39:17
56:18
**motion** 11:10 14:8
30:20 64:14
**motivated** 25:7
**movement** 23:9
**moving** 8:17 29:23
33:15
**multibillion-dollar**
10:11
**murders** 48:4

**N**

**N** 2:1,1 3:1
**narrow** 76:1
**narrowly** 28:2 42:17
75:16
**national** 37:14
**necessary** 19:6 60:6
**need** 5:17 10:19,23
21:22 26:14 27:1
31:24 74:4 78:9
79:23 `
**needed** 16:21 17:2
**needless** 15:9
**needs** 42:13 43:24
43:25 44:2 60:14
60:17,19 64:17
**negative** 49:18
**neither** 19:6
**never** 5:23 21:14
**nevertheless** 10:10
14:4 20:2
**new** 27:8 41:15
44:24 53:17 70:7
75:23
**newer** 33:23
**newspaper** 27:6
**note** 29:6
**notion** 35:24
**notwithstanding**
14:10 77:24
**November** 1:10
39:19

**number** 13:8 21:22
21:24 42:7,12,21
47:25 48:4,4,5,5
57:7 60:20,20,22
61:11 66:18 67:6
67:13 68:11,12
73:13 79:4
**numbers** 7:25 19:25

**O**

**O** 2:1 3:1
**object** 17:13 25:10
**objected** 32:7
**objecting** 14:17
**objection** 7:23
**obligation** 15:5 55:2
72:17 73:6,9 78:24
**obligations** 71:19
73:15
**obvious** 20:13
**obviously** 4:14
11:10 17:7 24:9,17
25:18 28:3 33:25
69:14
**October** 41:3,3
**offer** 68:10
**offered** 41:17
**officer** 18:14
**officers** 47:4
**officials** 54:6
**oh** 6:12 51:17
**Okay** 10:5,19 58:7
70:7
**old** 58:2,2
**older** 70:3
**ones** 66:23
**one-judge** 40:5
**ongoing** 54:20 75:24
**on-line** 20:8
**open** 22:13 24:8
44:21
**opening** 11:12 35:17
**operate** 7:15 18:18
21:11 46:25 60:11

**opinion** 20:25 37:20 40:12 41:19 48:8 59:20
**opportunity** 5:3 9:11 17:8
**opposed** 14:15 31:11 35:19
**opposite** 36:22
**option** 5:13,13
**options** 68:12
**oral** 1:12 2:2,5 3:7 37:5
**order** 3:12,16,19,22 5:19 8:23 12:9 13:21 17:19 20:4 21:13 23:15 25:22 26:14 33:3,16 34:6 40:2,12 41:21 44:7 44:10,19,20 46:3,3 46:4 47:14 48:1 59:15,19 61:21 62:12 63:12 64:9 64:18 65:11 68:20 71:24 74:10 78:9 80:2
**ordered** 22:3 45:24 50:19 53:11 74:22
**ordering** 44:11,21 45:9,10 50:1 51:14 71:14
**orders** 4:6 17:9 21:9 21:10 45:13,21 72:23
**ordinary** 33:1
**organized** 60:10
**originally** 20:1
**ought** 31:6 34:3 59:22
**outcome** 27:25
**outer** 63:8
**outside** 5:18 6:6 19:14
**outweigh** 66:7
**out-of-State** 41:9

**out-of-time** 25:8,9
**overall** 67:1
**overcrowding** 6:7 7:6 9:16,23 16:13 16:14 17:24 21:20 22:3 31:8 37:9 38:9 44:5 46:24,25 61:8
**overturning** 50:3

**P**

**P** 3:1
**page** 2:2 9:14,18 20:10 28:12 38:6 49:21 57:8,16 76:16
**pages** 21:1 48:8 57:19
**panel** 4:23 9:3 13:16 27:24 39:2 41:18 45:1 56:4 66:10 71:4
**panel's** 27:12
**paragraphs** 9:14,15 9:19
**pardon** 62:1,16
**parole** 57:22 66:16 67:12 68:9,9 69:5 69:18 74:16,17 75:10
**parolees** 63:18 66:18,21,23 67:7
**part** 22:6 23:13 25:5 25:12 45:8 70:19 71:3
**particular** 3:16,25 4:16 8:10 12:9,16 25:19,23 28:19 29:25 72:2,4 73:10 78:15 79:7
**particularly** 3:17 6:23 31:10
**particulars** 53:8
**parties** 40:17,24

**partly** 50:24
**pass** 63:17
**passed** 63:23,24
**patient** 55:9
**penal** 3:15 4:18
**pending** 4:2
**Pennsylvania** 46:13
**people** 7:9,13 15:4 15:11 19:16 20:14 44:11,22 54:2 57:11 58:1 67:24 68:22 69:5 70:3 78:13
**percent** 7:4 8:24 13:22 15:24,25 19:4 28:2 42:2,6 42:20 43:5,23 44:4 59:20 60:11,19 61:1,2,24 62:22 64:13 65:7 67:2,3 67:7,17,18 68:14 68:15,16 69:3 74:13 80:2
**percentage** 13:20 63:12 79:7
**perfect** 18:23
**perfectly** 16:18
**period** 3:15 6:22 8:6 13:12,24 14:8 22:5 32:10 33:9 45:14 48:3,21 50:19 64:10,11 66:12 75:5,6 78:12 80:3
**permissible** 22:4 25:22
**perplexing** 23:19
**persists** 16:9
**personnel** 18:18 19:13,24 42:12
**perspective** 11:14
**Petitioners** 1:5
**phase** 4:16
**Philadelphia** 48:2 67:21

**Phillips** 1:16 2:3,9 3:6,7,9 4:1,3,8,13 5:24 6:2,8,15,20 7:16 8:5,20 9:5,21 10:6,9,14,18,21 10:25 11:4,8 12:2 12:5,10,11,13 13:4 13:14,25 14:18,22 15:6,16,19 16:7,11 16:19 17:5,15 18:25 19:18 20:22 21:4,16 22:8 23:21 23:25 24:6,11,16 25:2 26:3,9,12 27:14,18,23 28:17 28:25 29:3,7,18 30:2,16 31:19 32:4 32:25 33:25 35:3 35:11,14 36:14 37:3 41:7 64:11 76:5,6,8,18 77:8 77:12,15,19,23,25 78:3,19 80:1,7
**physically** 70:5
**pictures** 20:9,9
**pie** 53:22
**piece** 28:8
**place** 6:23 7:1,9,21 10:17 13:23 19:25 21:9 28:4,5 33:12 39:3 47:5 64:19 79:15
**plainer** 33:5 35:15
**plaintiff** 33:6
**plaintiffs** 22:18 31:20 32:1 76:19 76:20 78:3
**plan** 9:25,25 10:4 14:13 17:4,4 28:5 30:23 33:13 49:8 51:7,13,19,22,23 55:23 78:23 79:19 79:20,24,25,25
**plants** 71:25

**Plata** 1:7 3:4 4:20 30:6 34:7
**play** 23:13 34:8
**played** 23:16
**please** 3:10 37:8 62:9 76:24
**plenty** 43:15
**PLRA** 49:25 69:12
**point** 3:19 6:11 11:16 13:2 14:2,19 15:13 16:2,7,16 17:11 18:6,17 19:19 23:2 35:23 37:22 38:5,11 39:21 44:18,24 45:3 52:25 56:21 59:22 63:8,12 64:7 64:8 68:4 69:3 70:19 72:9 76:19 79:1
**points** 76:9
**policies** 14:23
**policy** 73:23,25
**politicians** 51:1
**population** 5:22 6:10 10:2 11:23 12:7,14 12:20,25 13:1 18:15,16,22 41:4,7 45:2 48:21 50:15 52:23 53:2 54:24 55:16 60:23 61:20 64:5 66:11 71:5 75:1 79:14
**population-crowdi...** 44:20
**position** 20:25 52:19 52:22
**possibility** 66:5
**possible** 13:11 55:4 55:5 64:9
**post-trial** 35:1 40:9 40:20
**potentially** 33:8
**powers** 4:25 5:4

**practical** 65:13
**preceding** 15:24 57:16
**precisely** 19:1
**prefer** 71:21
**prejudice** 57:5
**premature** 3:18
**present** 24:8
**presentation** 25:19
**presentations** 24:21
**presume** 35:5
**pretrial** 35:2
**pretty** 12:15 20:9 24:7 70:15
**preventable** 37:15
**prevents** 74:2
**primarily** 38:8
**primary** 22:10,11 31:3,8 46:23
**principal** 16:14,14
**prior** 24:4,4
**prioritization** 72:10
**prison** 42:22,22 43:4 43:12,19 46:15,25 47:13 48:21 50:15 50:25 56:16 57:22 57:25 58:2 59:14 63:4 65:18,23 69:11 70:4,12 71:2 71:5 74:5 75:1 79:14
**prisoner** 20:4 23:15 34:5 48:1 49:3
**prisoners** 19:8 21:5 22:7 33:4 37:10,13 41:8 42:8,21 43:1 43:22,25 44:8 47:4 47:13,17 48:17 54:7 58:11 61:3 65:14,17,22 66:15 66:16 67:2,15,17 68:5,13 69:22 73:11,14 74:2 75:3
**prisons** 18:1 23:14

27:22 35:4 39:9 41:9 43:22 45:9,20 53:17 70:7 71:23 75:24
**private** 18:7
**probably** 3:20
**probationers** 63:18
**problem** 5:23 9:16 9:20 16:6 19:15 21:19,23 27:10,11 27:13,16,21 30:10 30:17 34:1 43:20 44:14 45:5,21,25 46:5 47:10 51:2 54:17 73:1 79:8
**problems** 4:17 19:16 30:18 34:4 66:6
**proceed** 22:14
**process** 3:19 7:3 23:15
**proclamation** 13:9
**professional** 60:22
**proffer** 34:23 35:6 35:25 36:7,9,12 76:12,14
**proffered** 35:2 76:11,11
**proffering** 56:15
**program** 10:11 16:24
**programs** 27:8 58:13,15,25 71:1
**progress** 5:6,21 7:8
**project** 29:12,15
**projects** 29:11,11
**promote** 34:15
**prong** 26:18
**proper** 24:5
**properly** 7:22
**proposal** 14:6
**proposals** 5:10 13:17 50:17
**proposed** 20:1 50:13 74:25 78:23

**proposition** 22:6
**prove** 36:19
**proved** 32:10
**proven** 45:15
**provide** 7:24,25 8:1 8:3 9:24 10:1 19:16 34:19 42:23 43:23 46:4 47:1,2 55:2,3 61:1 65:5 68:11
**providing** 23:2 58:14 74:4
**provision** 8:9 18:11 34:13 42:3 44:11
**provisions** 73:22
**psychologist** 62:25 63:4
**psychosis** 37:10
**public** 49:5,15,21 50:2 51:18 52:13 52:17 54:8,16 56:6 66:2,6 68:18 73:19 77:18 78:17
**publicly** 27:20
**pulled-out-of-the-...** 79:4
**punishments** 70:6 70:16 73:17,18
**purpose** 13:9 28:19
**purposes** 42:15 59:19
**pursue** 41:12
**put** 6:23 7:10,21 13:23 24:25 25:17 36:4 66:14 72:7 75:23 76:20
**puzzled** 57:7
**p.m** 80:9

**Q**

**qualified** 19:24
**quality** 34:20
**quantity** 34:20
**quarrel** 25:18

**question** 9:7 11:14 11:25 12:3 16:3,22 22:13 23:24 31:4 32:24 33:17 45:8 51:4 56:13 59:5 60:25 65:10 73:5 73:16 79:2
**questions** 55:11
**quickest** 55:4
**quickly** 74:15 75:11
**quite** 25:6 33:4 61:7
**quote** 31:8 50:25
**quoted** 25:1
**quoting** 52:10

**R**

**R** 3:1
**raised** 70:20
**range** 70:15
**rapes** 48:4
**rapidly** 29:23
**rate** 37:13 48:25 66:19,21,25
**rates** 70:23
**reach** 13:23 30:14 43:1 65:16 69:13 80:2
**reached** 26:4,7
**reaches** 63:8
**reacting** 50:23
**read** 9:15 27:6 57:8 77:3,3
**ready** 11:16
**real** 7:18,19 22:22
**reality** 12:14 23:4 30:25 35:9 78:10
**really** 5:12 13:20 27:2 33:18 47:18 75:23
**reason** 7:21 18:5 46:23 71:3
**reasonable** 14:7,8 16:18 17:8 21:10 44:4

**reasonably** 11:11
**reasons** 52:1
**rebuffed** 77:8
**REBUTTAL** 2:8 76:6
**receive** 76:22
**received** 77:4
**receiver** 4:20,21,25 5:3,20 6:5,9,10,21 6:23 7:2,7,21 8:11 9:11,11,12,22 10:25 11:9,11,18 12:6 16:23 17:2,3 18:6,20 19:2 22:20 23:6,18,19 25:9,11 25:14,15,20 28:4,5 28:12,25 29:7 30:7 30:19,22 33:11,12 33:12,13 34:11,13 34:18 79:15
**receiver's** 12:21 15:20 17:8 19:21 45:19
**recidivism** 66:20,21 66:25 71:2
**recognition** 4:17
**recognize** 22:1 59:8
**recognized** 26:5
**recognizes** 15:7
**recognizing** 26:16
**recollection** 62:10
**recommendations** 55:24
**recommended** 44:6
**record** 9:20 12:24 15:10 16:4 20:7 25:24 31:14 34:24 37:20 38:18 51:12 58:22 60:8 62:1 66:12 76:10,23 77:11,13
**records** 59:1
**reduce** 18:16 44:22 46:16,17,24 48:12

48:18 50:14,15 53:1 57:10 58:19 66:10 67:13 75:1 79:14
**reduced** 35:9 48:21 55:1
**reducing** 6:7 18:15 18:21 55:15 64:5 71:2
**reduction** 12:23 14:7 44:20 52:15 52:23 69:11 71:4
**reductions** 12:19 75:12
**reference** 36:2 41:15
**referred** 25:3
**referring** 64:1
**refers** 20:8
**reform** 19:9 21:5 33:4 49:3 59:3,14 65:19,24 67:12 71:8 74:16 75:10
**regard** 14:4
**rehabilitation** 58:14 58:23 68:10
**rejected** 10:5 38:23
**rejecting** 27:3
**rejection** 14:9
**relate** 38:15
**related** 3:5 61:8
**relating** 42:3
**relation** 42:8
**release** 3:13 13:21 20:4 23:15 34:5 44:7,10,19,22 47:12,14 48:1 59:15 65:13 68:5 78:11
**released** 33:9 47:17 57:24 58:3 67:25 68:3,7 69:25
**releases** 66:15
**releasing** 59:16

65:16 68:13
**relied** 70:11,11
**relief** 8:21
**religious** 20:10
**reluctant** 64:18
**rely** 70:10
**relying** 6:13,16
**remains** 77:22
**remarkable** 3:17
**remedial** 4:15
**remedies** 43:9 55:25 62:12 75:9
**remedy** 3:22 5:2 16:15,17,22,23 18:7 19:5,7,11 20:4,5 21:14 22:4 22:12 23:3 26:15 33:7 36:8,12,20,20 37:25 38:1,5,15 39:24 40:1 43:11 46:4,12 50:3 52:2 55:2 59:6,19 60:23 64:8,23 73:9 74:12 75:16 76:1
**remember** 12:6 30:19
**remind** 74:25
**remove** 8:23
**render** 8:19
**report** 60:9
**reported** 15:10
**reports** 19:21 26:25 39:10 45:19 64:5
**representation** 77:17
**representations** 24:21
**required** 19:8 51:13 52:14
**requirements** 21:6
**requires** 49:3,25 65:24
**requiring** 3:13
**resolved** 69:15

**resort** 3:22 5:2 9:10 20:5
**resources** 34:20
**respect** 34:7 38:13 51:4,13 71:15 76:10 79:1
**respectful** 50:9
**respectfully** 50:5 60:7
**responding** 55:12
**response** 16:2 36:3 41:2
**responses** 44:16
**responsible** 71:11
**rest** 28:18
**restricted** 6:4
**restrictive** 6:19 70:6 73:17
**result** 11:21 25:22 30:14 41:10 65:13 70:23
**reversed** 5:22
**review** 3:11 15:21 31:7
**re-find** 30:4
**re-finding** 30:14
**re-incarcerate** 74:16
**re-violate** 67:3
**rhetoric** 6:1
**rhetorical** 14:4 15:15
**rigamarole** 32:6
**right** 9:5 10:25 23:9 26:12 27:18 33:15 33:16 35:3,11 36:14 40:19 42:9 43:6,18 49:16,23 51:3,3,15,21 52:18 52:20 54:15 57:18 66:1 70:1,18 72:12 75:22 77:14
**rights** 17:25 19:8 22:25 27:10

**riot** 50:23,25
**risk** 58:10 66:22 67:1,3
**risk-assessment** 67:19
**robberies** 48:5
**ROBERTS** 3:3 32:23 37:1,4 40:13 40:19 41:1 49:1,7 49:11,13,17,24 50:7,18 51:3,6,8 51:11,16 52:6,9,12 52:20 55:6,8 56:10 62:4,8 65:9 66:1 67:4,8 71:6,10,13 71:22 72:3,6,9,13 72:19,22 76:4 80:6
**room** 7:14,14 18:17 18:17 37:12 47:2
**root** 17:23 30:9
**roughly** 75:2
**route** 3:25
**rug** 51:2`
**rule** 33:1 73:21 80:3
**ruling** 42:11 57:4
**run** 18:8 35:4
**running** 21:21

---

**S**

**S** 2:1 3:1
**Sacramento** 51:1
**safe** 48:13 50:17 52:4 55:13 75:4
**safeguard** 58:14
**safely** 53:3,17,20,24 53:25 55:2 57:14 63:6 66:11 75:2,12
**safest** 55:4
**safety** 27:21 49:5,15 49:21 50:2 51:18 52:13,17 54:8,16 56:7 66:2,6 68:18 73:19 77:18 78:17 78:21

**satisfied** 11:12
**save** 70:6
**saying** 6:6 13:18 20:12 26:25 29:7 35:13 36:9,16 45:24 48:20 52:16 54:19 56:5,7 61:18 61:21 65:12,15 71:16,18,24 72:22 73:1,21 74:18
**says** 8:24 9:22,23 10:4 11:17,18 12:6 12:6 15:22 20:25 28:13 35:6 76:21 77:5 78:6,21
**Scalia** 15:15 38:10 38:19,22 39:13,24 40:4 53:13,16,21 54:1,9 56:14
**scheduled** 29:12
**scheme** 34:17
**Schwarzenegger** 1:3 3:4
**scope** 3:20
**scrupulous** 41:20
**season** 24:8
**second** 6:23 7:2 14:2 45:8 56:12
**secretary** 48:14,15 50:16 67:11 77:2
**secured** 28:15
**see** 5:5,13 37:1 43:2 51:12 61:25 64:21 68:20,22,23 69:18
**seek** 8:22
**sense** 11:11 22:17 34:11,12 79:3,11
**sensitive** 64:16
**sent** 57:22
**sentence** 74:5
**Sentencing** 59:3
**separate** 44:17
**September** 15:21
**sequence** 22:15

series 3:23 21:5
serious 34:1 54:22
seriously 43:1
service 21:23
services 47:1 61:1,2
   64:13 65:6
set 13:22 35:6 64:10
settle 40:24
Seventeen 67:18
Seven-zero 67:8,9
shifted 9:7
shifts 33:5
short 68:13
show 34:25 36:12
   38:24 46:23
showing 32:20 65:15
shown 52:24 53:6
shows 20:11 59:10
shred 79:3
side 23:1,7 32:8
   36:2 39:12 56:22
   69:8
significant 6:25
   11:19 13:8 15:22
   16:1,22,23 20:2
   22:24 23:3,8,9
   32:11 63:15
significantly 12:15
   19:24 33:6
simple 21:25 73:4
simply 18:9 25:15
   25:23 31:11 51:16
single-judge 4:7
   8:16,21 45:13
singular 46:24
singularly 45:15
sit 32:12
sitting 15:11
situation 38:1,24
   67:10,11 73:3
six 57:19
size 12:20
sky 53:22
slavishly 31:12

slice 34:15
slow 5:25
small 5:21 34:15
smaller 3:20 10:10
solution 6:6
solve 45:21
somebody 74:3
someplace 19:13
somewhat 43:4
soon 43:24
sorry 29:3 32:23
   38:12 40:13 41:25
   53:15 67:4 76:14
   76:16 77:7,15
sort 13:25 14:1
   71:19
Sotomayor 5:7,25
   6:3,12,17 9:2,6
   13:11,15 14:12,20
   15:2,8 16:3 32:22
   34:22 35:4,12 36:6
   36:15,24 37:16,21
   37:24 38:17 39:1
   41:24 47:8 53:4,12
   54:10 55:7,9,10,15
   55:18,22 56:3,12
   56:18,21 57:8 62:6
   62:14,17,23 63:2,5
   75:14,18,20 76:16
   77:7,9,13,14 79:18
sounds 9:15
space 19:16 44:1
   73:14
speak 28:6,22 42:12
   42:14
special 4:22 6:5 7:8
   18:19 20:20 22:2
   23:6 24:22 25:8
   34:10,14 45:18
specific 5:18 16:3
   17:6 19:7,7 21:6
   22:12 26:4 76:12
   76:14 78:20
specifically 4:20 8:8

15:21 26:22 27:9
   32:7 51:4 77:3
   78:6
Specter 1:18 2:6
   37:4,5,7,19,23
   38:2,12,20,25
   39:14,18,23 40:1,6
   40:16,20 41:6,16
   41:25 42:10,19
   43:6,9,11,17 44:16
   45:7 46:2,6,9
   47:15,22 48:7 49:6
   49:10,12,16,23
   50:5,9,11,20 51:5
   51:10,15,21 52:8
   52:11,18,21 53:6
   53:15,19,23 54:4
   54:15,18 55:14,17
   55:21 56:2,8,17,20
   56:23 57:12,15,18
   58:5,8,16,24 59:4
   59:7,12,17,24 60:2
   60:7,16 61:5,10,13
   62:3,10,16,19,25
   63:3,7,14,19,24
   64:4,24 65:2,23
   66:2,22 67:1,6,9
   67:18 68:2,8,21,25
   69:13,20,23 70:1
   70:13,17,21,24
   71:9,12,21 72:1,8
   72:12,16 73:4
   74:14,20,24 75:17
   75:19,22 80:7
spectrum 33:20
speech 24:23
spend 10:4 27:1
   71:16,18,22,24
   73:2
spending 33:13
   57:25 72:25
spent 8:9 10:22
   28:18
staff 5:14,15,16

7:14 34:20 43:15
   44:13
staffing 42:24
stage 19:20
stand 77:16
standard 31:5
staph 20:16
start 35:17
started 33:24 39:19
   43:24
state 4:15 8:3 14:23
   14:25 15:3,12
   16:10 17:12,20,21
   21:12,13 23:8
   26:20 27:17,20
   28:20 31:19,23
   32:2,7,7 37:25
   39:8,9 40:24 41:12
   42:23 44:21,23,24
   45:19 46:14 47:23
   49:8,11,13 51:17
   51:19,25 52:4,13
   52:16 53:1,8,9,10
   54:6,12,13,25
   55:19 58:17 61:23
   62:1 63:11 64:13
   64:17,20 65:14
   66:10 71:10,15,19
   72:7,10,14,15 73:3
   73:10,16,21,23,24
   74:3,15,21,24 75:7
   75:17,22 76:10,15
   77:5,16
stated 16:12
statement 6:13 9:13
   16:21 25:4 35:17
   38:6 41:2 49:22
   56:3,15 78:6
statements 24:4,5
   25:1,4,15 45:18
States 1:1,13 47:25
   48:20 70:10 72:18
State's 7:23 22:19
   48:9 49:20 52:19

52:21 55:23 56:25
   74:8,11 78:22,23
statistical 48:19
   70:19
statistically 70:9
status 35:18
statute 33:5
stay 22:20
step 7:11,11,13
   11:19 18:15,24
steps 3:23 5:9,18
   6:18
stone 29:8
stood 35:16
stop 20:14,16
stopped 56:15
streets 65:22 78:13
strike 26:6,10 60:20
   60:21
strikes 3:17 22:15
struck 5:11
studies 48:23
styled 24:2
subject 77:16
submission 77:20
submit 24:14 32:2
submitted 24:1
   40:17 47:25 50:21
   80:8,10
substantial 4:17 7:1
   12:19,23 20:1 49:4
   50:2 59:19 65:24
   75:12
substantially 3:20
succeeded 21:14
success 7:3 58:23
successfully 19:23
suffered 46:14
suffering 37:10
sufficient 11:2 19:6
   59:21 60:23 61:12
suggest 12:7 80:4
suggested 56:1
   61:12,14,15

**suggesting** 6:16 14:6
**suggestion** 66:11
**suggestions** 69:18
**suggests** 11:2
**suicide** 37:13
**suicides** 15:23,23 35:1 37:15
**summarize** 9:13 57:20
**summary** 14:9 40:23
**supplement** 24:4
**supply** 8:3
**support** 22:6 26:21
**supported** 41:21 65:15
**suppose** 27:14
**supposed** 3:21 5:2 9:8,9 10:8 12:1 73:3
**Supreme** 1:1,13
**sure** 6:2 16:11 18:4 22:9 25:2 29:19 37:19 49:20 51:17 51:17 52:4,7 55:11 61:24 67:20 68:3
**surrounding** 74:1,1
**sustainable** 11:22
**swept** 51:1
**system** 3:15 4:18 8:10 21:22 24:11 33:15 42:8,13 60:11 63:21 68:9 73:12 74:16
**systemic** 79:16
**systems** 46:15

**T**

**T** 2:1,1
**table** 12:19
**tailored** 28:2 42:18 75:16
**take** 9:8 11:6 14:24 34:7 36:11 38:10

47:5 50:22 54:17 60:13,16,18 64:10 67:7 71:15 74:8
**taken** 3:24
**takes** 75:6
**talk** 23:17
**talked** 5:9,14 62:22
**talking** 29:24 33:3 33:22 35:17 37:16 38:23 74:10,12
**talks** 78:4
**tallied** 48:3
**team** 26:10 60:20,22
**technical** 57:22 63:20 69:5,18 74:17
**technically** 35:25
**tell** 5:8,18 6:18 36:16 37:17 50:6 50:11
**telling** 29:6 51:18 72:24
**tentative** 40:10
**term** 47:13
**terminology** 47:16
**terms** 24:8
**testified** 16:15 26:2 39:10,11,22 48:16 50:17 54:6 56:25 60:5,18
**testify** 23:19 24:13 68:19
**testifying** 61:7
**testimony** 22:6 46:12 48:9 57:2 58:9 62:11
**Texas** 46:13
**Thank** 3:9 15:16 37:3,7 62:10 74:7 76:4,8 80:6
**Theirs** 79:4
**theory** 61:9
**thing** 19:11 28:22 46:17 57:7 71:7

**things** 24:17 28:7 34:17 42:24 43:15 45:9,11,16,17,25 56:5 58:7 71:11 74:15 78:4,10
**think** 4:14 6:8 8:21 9:17,24 13:14,20 14:4,18 17:1,12 19:1,18 22:2,12,21 23:18 25:12,20 26:10 29:4 36:3 38:2 39:1 46:10 50:11 51:21 55:6,8 59:2,13 61:13,14 62:3 63:24,25 65:3 65:3,4,18 78:17,19
**third** 44:5
**Thirty-five** 57:12,13
**thought** 7:6 14:7 18:13 24:19 30:6 31:19,23 37:21 38:11 50:7 55:23 56:10 60:21 63:8
**thousand** 57:12,13
**threat** 54:7
**three** 3:12 21:1
**three-judge** 4:23 9:1 13:16 14:6 21:7 23:14,20 27:24 30:13,21,21 35:20 35:21 39:2,6 40:6 40:7 41:18 45:1 49:2 56:4 64:22 66:10 71:4
**throw** 6:5 44:21
**thrown** 69:7
**till** 56:18
**time** 4:14 5:19 6:22 8:6 10:8 13:2,7,24 14:8,11 16:8,15 17:1,2,6 21:10 22:5 25:6 27:5 28:25 32:10 33:9 33:11 35:7 37:2

38:1,4,21 39:14 41:11 48:3,15,17 53:24 54:1,7 57:24 57:25 63:11,16,17 70:2 75:6,10,13 76:3,24 78:12 79:6 80:4
**today** 3:11 32:12,16 35:19 36:17
**told** 14:15 78:18
**total** 42:7
**tough** 70:15
**tour** 31:20
**tours** 31:25 32:5
**track** 40:14
**transfer** 41:9
**transferred** 72:14
**transfers** 13:8 44:23
**treat** 44:13,13
**treatment** 35:7 37:12 42:4 47:6 71:25
**tremendous** 27:21
**trend** 15:22
**trial** 12:16 37:19 38:14,21 39:15,17 39:18 40:16 45:16 48:7,15 54:5 56:19
**tried** 5:21 25:16 45:14
**tries** 24:3
**trouble** 30:2
**true** 4:8 23:21 24:10 41:9 46:19 58:12 63:9 77:22
**trust** 52:10,12
**truth** 33:18 36:4
**try** 17:4 45:9
**trying** 34:15 51:23
**tubercular** 20:16
**Tuesday** 1:10
**turnaround** 9:25 10:3
**turns** 5:5

**twice** 37:13 76:22
**two** 9:14,15,18 30:18 39:9 42:17 44:16 63:15 75:9
**two-thirds** 37:14
**type** 71:7

**U**

**ultimate** 34:18
**ultimately** 17:9 22:17 23:1 28:15 29:21 34:3
**umpteen** 53:17
**unanimous** 48:11
**unconstitutional** 38:8 43:7
**understand** 13:5 24:23 25:10 29:8 33:1 34:4 43:3,21 44:19 60:1 67:22 69:15
**understanding** 42:6
**understood** 5:8 67:23
**unfortunate** 18:3
**United** 1:1,13 72:18
**unprecedented** 3:12
**upped** 63:17
**urge** 12:8
**urging** 31:24
**use** 73:17

**V**

**v** 1:6 3:4
**variety** 34:12 45:24
**various** 79:13
**vehemence** 32:9
**viable** 76:2
**view** 18:18 30:11,13
**viewed** 36:9
**views** 11:25 24:3
**violate** 65:18 71:23
**violated** 17:24
**violating** 36:10,10

73:22

**violation** 5:17 7:18
7:19 11:3 16:9
17:23 22:11 26:15
26:17 27:2 31:9
32:14,15,16,19
33:2 36:17,19,23
79:6

**violations** 22:24
38:4 42:3 52:2
54:20 61:8 76:21

**violators** 57:22
63:21 68:9 69:5,19
74:17

**void** 27:4

**volume** 76:18 77:1

**voting** 27:7

---

**W**

**wait** 4:11,14 5:13
35:7

**want** 14:3 19:13
24:8 27:2 31:20,21
31:24 35:17 50:18
51:25 55:19 63:10
65:20 68:3,19 69:2
69:2 72:6 74:24
79:1,17,21,22

**wanted** 24:25 32:8,9
34:25 50:14 53:9
53:10 61:18 79:21

**wants** 19:12 75:8

**Washington** 1:9,16
46:14

**wasn't** 40:5 41:17
41:17 56:7

**waste** 76:24

**water** 71:25

**way** 8:15 28:3,22
29:12,24 35:19
36:22 47:9 48:17
52:4 57:3 78:14,18
79:16

**ways** 4:15 27:15

34:12 55:13 67:13

**weakest** 6:17

**weeks** 29:13 35:9
40:22

**weight** 49:4 50:2
61:17 65:24

**went** 20:8 36:7 44:5
61:18 63:25 65:6
80:4

**weren't** 18:1 43:23

**we'll** 3:3 36:11,24
65:20

**we're** 7:12 23:12,12
29:16,23,24 32:13
32:13 33:3 36:9,17
36:18 39:3 46:4
49:20 51:17 52:4,7
52:25,25 54:21
55:18 61:24 72:8
74:10 79:9

**we've** 9:24 16:11
24:17 30:7 35:8
77:6

**whatsoever** 79:3

**withdrew** 11:10

**witness** 24:13,14

**witnesses** 56:25
58:17,18

**word** 46:24

**work** 18:16 36:21
46:18 47:3 60:5
62:2

**worked** 46:21,23

**worse** 5:12

**wouldn't** 23:16
50:22,22 51:17
54:11 62:2 69:1
71:5 75:15 76:2

**wrong** 14:13 27:12
60:4

**wrote** 39:10

---

**X**

**x** 1:2,8

**Y**

**year** 40:22 63:25,25
66:16

**years** 4:2,11 6:13
8:25 14:15,15,16
14:21 15:23,25
17:12 19:5 22:25
23:5 26:20 30:6,15
37:9 45:14 46:20
46:21 47:19 48:22
49:9 51:19 52:17
54:14,17,21,22
58:1,2,2 65:12,16
65:20,20 67:10
74:9,10,11,13 75:3
75:15 77:18 78:16
80:3

---

**$**

**$2.35** 29:14

**$4** 8:8 33:14

**$8** 10:4 20:20

---

**0**

**08** 31:14

**09** 15:24

**09-1233** 1:5 3:4

---

**1**

**1** 38:6

**10** 20:10

**10,000** 41:8

**100** 61:1,2

**11** 28:12

**11:10** 1:14 3:2

**12:31** 80:9

**120** 35:8

**120,000** 66:15

**130** 59:11 60:5,19
61:15,18,21 62:12
62:22

**137** 61:5 65:1

**137-1/2** 19:4 28:2

**137.5** 8:24 17:13

42:2,6,20 43:4
44:4 49:9 51:20
52:16 53:3 59:10
59:23 65:12 79:3
80:2,5

**14,832** 41:5

**140** 13:20

**140,000** 73:11

**145** 59:11,20,20,22
60:5,8,11 61:12,14
62:2,15,18,21,24
63:6 64:13,22 65:3
65:4

**147,000** 13:5

**148,000** 73:13

**15** 45:14 48:22

**16,000** 78:8

**165** 13:5

**17** 67:3,17 68:15,16

**17,000** 57:21

**170,000** 13:6

**18** 12:17

**183-page** 40:12
41:19

**1990** 33:24

**1990s** 4:19 17:25

---

**2**

**2** 8:25 14:15 19:5
27:3 35:9 39:17
47:18 49:9 51:19
52:17 56:18 65:12
65:20 66:12 74:10
75:3,15 80:3

**2-year** 3:15 13:12
33:9 50:19 51:6
64:10,11 79:25

**2.3** 10:17

**2.31** 10:12

**2.35** 10:17,24 11:2
11:12,18 27:4 28:9
28:11 29:2,5

**2.5** 13:22

**20** 4:2,11 30:6,15

37:9 40:10 46:20
54:21

**200** 21:1 43:23

**2000s** 4:19

**2001** 33:23

**2005** 16:24

**2006** 16:24 41:3
75:24

**2008** 8:6 16:4 19:21
31:22 32:3 39:9,13
40:3,8,15,17

**2009** 15:20 40:9,11

**2010** 1:10 15:21
41:4

**2085** 76:12,18

**22** 14:15

**2338** 76:25

**25** 14:16 15:23

**253** 57:8,17

---

**3**

**3** 2:4 15:25 23:5
26:20 28:13 30:20
67:10 74:10,13
76:5

**3,000** 67:25

**30** 1:10

**30a** 38:6

**30,000** 57:11 78:11

**35,000** 66:14 68:5

**36,000** 3:14 33:8

**37** 2:7

**37,000** 50:15 75:3

---

**4**

**4** 15:23 23:5 26:20
65:16,20

**4a** 49:22 52:10

**4-year** 66:12

**40** 58:2

**40,000** 44:8 47:12
47:17 65:14,22
66:14

**400** 28:17

Official

Page 94

**45,000** 3:14 33:8

_____ **5** _____

**5** 14:21 54:14,17
  74:9,13 77:18
  78:16
**5-year** 75:5,5,6
  79:25
**50** 48:8 58:1
**55** 58:3

_____ **6** _____

**6** 29:13 76:18 77:1
**60** 15:25 35:8 58:2
**60(b)** 8:17
**66** 15:24

_____ **7** _____

**7** 17:12 65:7
**7.5** 61:24
**70** 4:6 45:12 67:2,7
  68:14 69:3
**70a** 78:5
**75** 58:3
**76** 2:10

_____ **8** _____

**8** 10:20,23 11:10
  27:3 28:10 46:21
  72:25 73:2
**8th** 8:6
**80** 73:14
**80,000** 73:12

_____ **9** _____

**9** 9:14 15:25
**90** 7:4 35:8
**900** 6:24 12:18

# Exhibit B



ERIC GARCETTI

MAYOR

## <u>Public Order Under City of Los Angeles Emergency Authority</u>

### Issue Date: April 17, 2020

**Subject: Tolling HCIDLA Deadlines and Revising Expiration of Emergency Orders**

To further aid in our efforts to slow the spread of the COVID-19 virus, by virtue of authority vested in me as Mayor of the City of Los Angeles under the provisions of the Los Angeles Administrative Code, Chapter 3, Section 8.29 to promulgate, issue, and enforce emergency rules, regulations, orders, and directives, I hereby declare the following order to be necessary for the protection of life and property and I hereby order, effective immediately and until the end of the emergency period, that:

All deadlines prescribed by the Los Angeles Housing and Community Investment Department (HCIDLA) related to the financing and predevelopment activities necessary to develop or rehabilitate affordable and supportive housing shall be tolled and suspended until further notice. This will ensure development of affordable housing can continue within the limits of the Safer At Home order, and after the emergency has ended, without penalties caused by missed deadlines.

This order shall apply, without limitation, to the following non-exhaustive list of circumstances:

1. Exclusive Negotiation Agreements: During the effective period of this order, toll the term of Exclusive Negotiation Agreements and all deadlines contained within them.

2. Site Control: During the effective period of this order, toll the deadline to demonstrate site control as required by the Mayor's Housing Innovation Challenge.



3.      Schedule of Performance: During the effective period of this order, toll all dates contained within executed Term Sheets and Disposition and Development Agreements.

4.      Funding Commitments:  During the effective period of this order, toll the commitment expiration dates contained within all HHH Commitment Letters and Managed Pipeline Commitment Letters.

HCIDLA is authorized to hold public hearings prescribed by the Tax Equity and Fiscal Responsibility Act (TEFRA) in a manner consistent with the Governor's Executive Order N-29-20, and any subsequent orders or published guidance, pertaining to local bodies.

Nothing in this Order prohibits HCIDLA from continuing to process applications in a reasonable and timely manner.

This Order is subject to any applicable superseding State and Federal deadlines, including but not limited to, deadlines related to Federal and State bond inducement, TEFRA, or issuance resolutions.

**Order Extending the Expirations of Prior Orders**

The expiration of the City of Los Angeles public emergency orders, dated March 15, 21, and 23, 2020, are hereby extended until the end of the local emergency period.

_____
                Eric Garcetti, MAYOR

Dated: April 17, 2020 at Los Angeles, California
Time:  6:30pm

Filed with the City Clerk
Date: _____
Time: _____
By: _____

# Exhibit C

**NON PEP PROJECTS**
**As of 2/12/2021**

| # | PSH Project Name | CD | HCID Staff Assigned? Y/N | Sub Stage (Predevelopment, Loan Close, In Construction) | PEP | Homeless Population Served | HHH Project Award | Total Development Cost Approved in PEP | Updated Total Development Cost | TDC Per Unit | HHH Per Unit | Total Units | Total PSH Units | Construction Start Date Approved in PEP | Updated Constr. Start Date | NTP Issued | Est. Ready for Occupancy Date | Percent Complete | Received HHH Extension? Y/N | HHH Commitment Expiration | HHH Commitment Expiration Date Plus Tolling Order (April 17 - February 12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U |
| 1 | Los Lirios Apartments | 14 | N | Predevelopment | TBD | Homeless families Homeless individuals Low income families Chronically homeless | $2,000,000 | n/a | $35,719,050 | $558,110 | $31,746 | 64 | 20 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| 2 | Normandie 84 | 8 | N | Predevelopment | TBD | Homeless senior Low income senior Chronically homeless | $8,180,000 | n/a | $18,149,299 | $432,126 | $199,512 | 42 | 34 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| 3 | Rousseau (fka Enlightenment Plaze - Phase I) | 13 | Y | Predevelopment | TBD | Homeless individuals Homeless veterans Chronically homeless | $9,600,000 | n/a | $34,101,000 | $324,771 | $93,204 | 105 | 103 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| 4 | Santa Monica & Vermont Apartments Phase 1 | 13 | Y | Predevelopment | TBD | Homeless menal illness Other homeless Low income families Non homeless individuals Chronically homeless Transition aged youth Victims of domestic violence | $12,000,000 | n/a | $53,270,603 | $566,709 | $129,032 | 94 | 47 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 3/19/2021 | 1/14/2022 |
| 5 | Santa Monica & Vermont Apartments Phase 2 | 13 | Y | Predevelopment | TBD | Homeless menal illness Other homeless Low income families Non homeless individuals Chronically homeless Transition aged youth Victims of domestic violence | $12,000,000 | n/a | $53,262,118 | $572,711 | $130,435 | 93 | 47 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 3/19/2021 | 1/14/2022 |
| 6 | Barry Apartments | 11 | N | Predevelopment | TBD | Homeless individuals Non homeless individuals Chronically homeless | $6,918,400 | n/a | $31,932,359 | $523,481 | $115,307 | 61 | 34 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 7 | Vermont/Manchester | 8 | Y | Predevelopment | TBD | Homeless families Homeless senior Chronically homeless | $12,400,000 | n/a | $44,845,034 | $723,307 | $206,667 | 62 | 60 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 2/8/2021 | 12/6/2021 |
| 8 | My Angel (fka The Angel) | 6 | N | Predevelopment | TBD | Homeless individuals Homeless veterans Chronically homeless | $5,565,000 | n/a | $28,226,850 | $522,719 | $105,000 | 54 | 53 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 9 | Oak Apartments (fka 2745-2759 Francis Ave) | 1 | N | Predevelopment | TBD | Homeless senior Chronically homeless | $6,610,000 | n/a | $30,851,806 | $482,059 | $104,921 | 64 | 63 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 10 | 4507 Main St. | 9 | N | Predevelopment | TBD | Homeless individuals Non homeless individuals Chronically homeless | $7,239,000 | n/a | $24,839,171 | $407,200 | $120,650 | 61 | 31 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 11 | Maple Apartments (fka 537-541 N. Western Ave) | 4 | N | Predevelopment | TBD | Homeless individuals Chronically homeless | $6,614,118 | n/a | $30,997,101 | $484,330 | $104,986 | 64 | 63 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 12 | Central Apartments | 9 | Y | Predevelopment | TBD | Homeless individuals Homeless veterans Chronically homeless | $7,840,000 | n/a | $32,338,017 | $567,334 | $140,000 | 57 | 56 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 13 | Chavez and Fickett | 14 | N | Predevelopment | TBD | Homeless families Homeless individuals Chronically homeless | $6,300,000 | n/a | $41,186,592 | $686,443 | $106,780 | 60 | 30 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 14 | Hope on 6th | 15 | N | Predevelopment | TBD | Homeless individuals Homeless mental illness Chronically homeless | $6,040,000 | n/a | $28,615,371 | $529,914 | $113,962 | 54 | 31 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 15 | Lincoln Apartments | 11 | N | Predevelopment | TBD | Homeless youth Other homeless Chronically homeless | $5,460,000 | n/a | $19,537,023 | $488,426 | $140,000 | 40 | 39 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 16 | Voltaire (fka Montesquieu Manor/Enlightenment Plaza-Phase II) | 13 | Y | Predevelopment | TBD | Homeless individuals Chronically homeless | $9,940,000 | n/a | $32,726,000 | $448,301 | $138,056 | 73 | 72 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 17 | The Palm Tree Motel (fka Sepulveda Apartments Preservation) | 6 | N | Predevelopment | TBD | Homeless individuals Chronically homeless | $10,500,000 | n/a | $29,821,884 | $392,393 | $140,000 | 76 | 75 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 18 | Studio 6 Motel (fka Sherman Way Apartments Preservation) | 2 | N | Predevelopment | TBD | Homeless individuals Chronically homeless | $7,700,000 | n/a | $20,808,990 | $371,589 | $140,000 | 56 | 55 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 19 | SOLA at 87th | 8 | N | Predevelopment | TBD | Homeless individuals Homeless veterans Chronically homeless | $9,000,000 | n/a | $61,705,999 | $617,060 | $91,837 | 100 | 51 | n/a | 11/14/2022 | NTP Issued | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 20 | Thatcher Yard Housing | 11 | Y | Predevelopment | TBD | Homeless families Homeless senior Chronically homeless | $11,660,000 | n/a | $63,366,720 | $674,114 | $125,376 | 98 | 49 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 10/15/2021 | 8/12/2022 |

# Exhibit D

| Address | City | APN (Primary) | Owner | Acreage | Current Use | Surrounding Area |
|---|---|---|---|---|---|---|
| 2432 E Cesar E Chavez Ave | Los Angeles, CA | 5180-001-904 | LACMTA | 2 | Vacant lot. Previous slated for dev. | Commercial buildings, single family homes |
| 2524 E Cesar E Chavez Ave | Los Angeles, CA | 5180-008-901 | LACMTA | 1.64 | Vacant lot. Previous slated for dev. | Commercial buildings, single family homes |
| 2930 Pomona Blvd | Pomona, CA | 8710-013-905 | Los Angeles County | 2.5 | Vacant lot | Industrial buildings, freeway |
| 14835 Rinaldi St | Mission Hills, CA | 2664-023-903 | LA County Flood Control District | 1.89 | RV and boat storage lot | Medical center, offices |
| 12998 Paramount Blvd | Downey, CA | 6245-016-934 | Los Angeles County | 83 | Old "poor farm" | SFR, railway, modern industrial, public facilities |
| 13671 Telegraph Rd | Whittier, CA | 8156-029-901 | Los Angeles County | 1.45 | Road maintenance yard. Not heavily used | Water tower, SFR, multifamily |
| 38550 Sierra Hwy | Palmdale, CA | 3008-033-915 | Los Angeles County | 2.17 | Vacant lot ajoining Palmdale Animal Control Shelter. Fenced off from rest of property. No indication of future plan | Light industrial, SFR |
| 118 Pony Express Rd | San Dimas, CA | 8390-016-907 | LA County Flood Control District | 2.74 | Utility yard | Sheriff's Department, various empty lots, abutting railway |
| 600 S Central Ave | Los Angeles, CA | 5147-015-905 | LACMTA | 1 | Parking lot | Commercial properties |
| 228 E Alondra Blvd | Compton, CA | 6163-028-900 | Los Angeles County | 1.54 | Parking lot | SFR, railway, gov't building |
| 2201 W 8th St | Los Angeles, CA | 5141-017-905 | LA Department of Water & Power | 1.2 | Paved lot | Bungalows, multifamily buildings |
| 7600 Tyrone Ave | Van Nuys, CA | 2215-001-913 | LA City/LA DWP | 17 | Various, unclear | Railyard, industrial buildings |
| 22322 Collins St | Woodland Hills, CA | 2146-004-904 | LA Unified School District | 9.6 | Vacant lot | Woodland Hills Rec Center, Single family homes |
| 5600 Laramie Ave | Woodland Hills, CA | 2151-014-900 | LA Unified School District | 7 | Vacant lot | Single family homes |
| 7711 Alabama Ave | Canoga Park, CA | 2110-016-901 | LA City | 2.5 | Public works yard | Industrial buildings, power structures |
| 13211 Hubbard St | Sylmar, CA | 2511-026-900 | LA City Community College District | 1.7 | Vacant lot | Mission College, Single family homes |
| 18200 S Normandie Ave | Los Angeles, CA | 6111-026-900 | LA Department of Water & Power | 1.1 | Vacant lot | School, graveyard, single fmily homes |
| 110 E C St | Wilmington, CA | 7418-031-903, et. Al. | LA City | 0.8 | Paved lots | Warehouses, commercial buildings |
| 599 S Central Ave | Los Angeles, CA | 5147-015-904, et. al. | LACMTA | 1 | Parking lot | Industrial properties |
| 12400 Imperial Hwy | Norwalk, CA | 8047-006-918 | LA County | 8.6 | Parking lot | County buildings, single family homes |
| 1855 E Imperial Hwy | Watts, CA | 6069-029-903, et. Al. | LA City | 0.7 | Vacant lot | Freeway offramp |
| 6700 Salonica St | Los Angeles, CA | 5493-028-900, et. Al. | LA City | 1.7 | Vacant building, parking | Park, single family homes |
| 1230 W 3rd St | Los Angeles, CA | 5152-014-908 | LA City | 1.75 | Small medical office building and parking lot | Apartments, office buildings |
| 739 N Spring St | Los Angeles, CA | 5408-026-903 | Los Angeles County | 1.6 | Parking lot | Commercial properties |
| 850 N Mission Rd | Los Angeles, CA | 5410-009-913 | LA City | 1.2 | Dirt lot with storage | Busyard, railyard |
| 1 Biscailuz Dr | Castaic, CA | 2866-004-909 | LA County | 5.2 | Parking lot | Freeway, riverbed |
| 7610 Gloria Ave | Van Nuys, CA | 2206-009-902 | LA City | 4 | Parking lot | Parking structure, industrial buildings |
| | | | | 166.58 | | |

**NON PEP PROJECTS**
**As of 2/12/2021**

| # | PSH Project Name | CD | HCID Staff Assigned? Y/N | Sub Stage (Predevelopment, Loan Close, In Construction) | PEP | Homeless Population Served | HHH Project Award | Total Development Cost Approved in PEP | Updated Total Development Cost | TDC Per Unit | HHH Per Unit | Total Units | Total PSH Units | Construction Start Date Approved in PEP | Updated Constr. Start Date | NTP Issued | Est. Ready for Occupancy Date | Percent Complete | Received HHH Extension? Y/N | HHH Commitment Expiration | HHH Commitment Expiration Date Plus Tolling Order (April 17 - February 12) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T | U |
| 21 | The Main | 6 | N | Predevelopment | TBD | Homeless families Homeless youth Chronically homeless | $6,795,000 | n/a | $41,018,669 | $640,917 | $109,597 | 64 | 33 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 22 | The Rigby | 6 | N | Predevelopment | TBD | Homeless families Homeless youth Chronically homeless | $6,795,000 | n/a | $41,970,484 | $655,789 | $109,597 | 64 | 33 | n/a | 11/14/2022 | n/a | 11/14/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 23 | Topanga Apartments | 12 | N | Predevelopment | TBD | Homeless individuals Chronically homeless | $7,560,000 | n/a | $25,775,924 | $468,653 | $140,000 | 55 | 54 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 24 | 841 N Banning | 15 | N | Predevelopment | TBD | Homeless individuals Chronically homeless | $8,000,000 | n/a | $31,648,058 | $494,501 | $126,984 | 64 | 63 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 25 | Ambrose (fka 1615 Montana St.) | 13 | Y | Predevelopment | TBD | Homeless senior Chronically homeless | $6,300,000 | n/a | $34,745,002 | $542,891 | $100,000 | 64 | 63 | n/a | 5/27/2021 | n/a | 10/27/2022 | 0% | N | 10/15/2021 | 8/12/2022 |
| 26 | La Veranda | 14 | Y | Predevelopment | TBD | Homeless families Homeless mental illness Homeless families Chronically homeless | $9,120,000 | n/a | $59,722,843 | $775,621 | $120,000 | 77 | 38 | n/a | 4/26/2021 | n/a | 10/18/2022 | 0% | N | 3/19/2021 | 1/14/2022 |
| 27 | The Quincy (fka 2652 Pico) | 1 | Y | Predevelopment | TBD | Homeless senior Chronically homeless | $3,550,000 | n/a | $33,395,055 | $618,427 | $66,981 | 54 | 53 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 10/15/2021 | 8/12/2022 |
| 28 | Washington Arts Collective | 10 | Y | Predevelopment | TBD | Homeless families Chronically homeless | $2,097,200 | n/a | $36,067,078 | $644,055 | $38,131 | 56 | 20 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 10/15/2021 | 8/12/2022 |
| 29 | The Wilcox (fka 4906-4926 Santa Monica) | 13 | Y | Predevelopment | TBD | Homeless senior Chronically homeless | $5,225,000 | n/a | $36,038,114 | $581,260 | $85,656 | 62 | 61 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 10/15/2021 | 8/12/2022 |
| 30 | Lorena Plaza | 14 | Y | Predevelopment | TBD | Homeless families Homeless individuals Chronically homeless | $2,903,202 | n/a | $30,567,980 | $623,836 | $60,483 | 49 | 32 | n/a | 1/10/2022 | n/a | 4/1/2024 | 0% | N | 10/15/2021 | 8/12/2022 |
| 31 | Confianza | 2 | Y | Predevelopment | TBD | Homeless individuals Chronically homeless | $10,000,000 | n/a | $36,163,959 | $565,062 | $158,730 | 64 | 63 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| 32 | Westlake Housing (The Lake House) | 1 | Y | Predevelopment | TBD | Homeless families Homeless mental illness Chronically homeless | $6,510,000 | n/a | $35,482,656 | $563,217 | $105,000 | 63 | 62 | n/a | 7/9/2021 | n/a | 7/7/2023 | 0% | N | 10/15/2021 | 8/12/2022 |
| 33 | La Guadalupe (fka First and Boyle) | 14 | Y | Predevelopment | TBD | Homeless families Homeless individuals Chronically homeless | $9,460,000 | n/a | $26,147,899 | $594,270 | $220,000 | 44 | 43 | n/a | 7/9/2021 | n/a | 12/30/2022 | 0% | N | 3/19/2021 | 1/14/2022 |
| 34 | Westlake 619 | 1 | Y | Predevelopment | TBD | Homeless families Homeless individuals Chronically homeless | $3,149,580 | n/a | $41,088,413 | $526,775 | $40,904 | 78 | 30 | n/a | 11/15/2021 | n/a | 5/15/2023 | 0% | N | 10/15/2021 | 8/12/2022 |
| 35 | 6th and San Julian | 14 | Y | Predevelopment | TBD | Other homeless Non homeless individuals Chronically homeless | $15,320,000 | n/a | $59,782,492 | $635,984 | $164,731 | 94 | 93 | n/a | 7/9/2021 | n/a | 12/30/2022 | 0% | N | 3/19/2021 | 1/14/2022 |
| 36 | Ambrosia | 8 | Y | Predevelopment | TBD | Homeless individuals Non homeless individuals Chronically homeless | $11,200,000 | n/a | $48,958,841 | $543,987 | $125,843 | 90 | 80 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| 37 | Grandview Apartments | 1 | N | Predevelopment | TBD | Homeless families Homeless individuals Low income families Chronically homeless | $12,000,000 | n/a | $59,535,453 | $595,355 | $121,212 | 100 | 54 | n/a | 7/8/2022 | n/a | 7/8/2024 | 0% | N | 10/19/2020 | 8/16/2021 |
| 38 | Weingart Tower 1B - HHH PSH | 14 | Y | Predevelopment | TBD | Homeless individuals Homeless veterans Chronically homeless | $16,000,000 | n/a | $64,622,612 | $621,371 | $155,340 | 104 | 83 | n/a | 3/21/2022 | n/a | 3/21/2024 | 0% | N | 3/19/2021 | 1/14/2022 |
| | **SubTOTAL (Non-PEP)** | | | | | | $305,551,500 | n/a | $1,459,032,519 | n/a | n/a | 2,624 | 1,971 | | | | | | | | |
| | **AVERAGE** | | | | | | $8,040,828.95 | n/a | $38,395,593 | $556,034 | $116,445 | 69 | 52 | | | | | | | | |