MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Deputy City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-6952
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>        Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**DEFENDANT CITY OF LOS ANGELES' BRIEF RE EQUITABLE REMEDIES AND RESPONSES TO REQUESTS FOR INFORMATION [DKTS. 205, 206, 213]**<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     STRUCTURAL EQUITABLE REMEDIES AVAILABLE TO FEDERAL
        DISTRICT COURTS AND THE LIMITS OF THAT AUTHORITY .................. 3

        A. Injunctive Remedies ........................................................................... 3

                1.      Federalism and Separation of Powers Doctrines Provide
                        Fundamental Limitations On A Court's Equitable Powers .............. 5

                2.      Structural Remedies Must Be Narrowly Tailored To The Nature
                        And Extent Of The Constitutional Violation .................................... 9

        B. Consent Decree ................................................................................ 11

III.    RESPONSES TO COURT'S REQUESTS FOR INFORMATION ................... 12

        A. Information Requested In The January 31, 2021 Order [Dkt. 205] ........... 12
                1.      *Question 1* ....................................................................... 12

                2.      *Question 2* ....................................................................... 13

        B. Information Requested In The February 3, 2021 Order [Dkt. 206] ........... 14
                1.      *Question 1* ....................................................................... 14

                2.      *Question 2* ....................................................................... 16

                3.      *Question 3* ....................................................................... 17

                4.      *Question 4* ....................................................................... 18

                5.      *Question 5* ....................................................................... 18

                6.      *Question 6* ....................................................................... 20

                7.      *Question 7* ....................................................................... 21

                8.      *Question 8* ....................................................................... 22

                9.      *Question 9* ....................................................................... 22

        C. Information Requested In The February 8, 2021 Order [Dkt. 213] ........... 25
                1.      *Question 1* ....................................................................... 25

i

| | | | |
|---|---|---|---|
| 2. | *Question 2* | .................................................................................. | 266 |
| 3. | *Question 3* | .................................................................................. | 32 |
| 4. | *Question 4* | .................................................................................. | 39 |
| 5. | *Question 5* | .................................................................................. | 41 |

IV.   CONCLUSION ................................................................................................ 42

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Bd. Of Educ.*,
  347 U.S. 483 (1954).................................................................................... 5

*Brown v. Bd. Of Educ.*,
  349 U.S. 294 (1955).................................................................................... 5

*Brown v. Plata*,
  563 U.S. 493 (2011).............................................................................*passim*

*City & Cty. of San Francisco v. Barr*,
  965 F.3d 753 (9th Cir. 2020) ...................................................................... 9

*Conservation Northwest v. Sherman*,
  715 F.3d 1181 (9th Cir. 2013) .................................................................. 12

*Dayton Bd. Of Ed. v. Brinkman*,
  433 U.S. 406 (1977)............................................................................ 4, 9, 10

*Freeman v. Pitts*,
  503 U.S. 467 (1992).................................................................................... 10

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)................................................................................. 3

*Hills v. Gautreaux*,
  425 U.S. 284 (1976)...................................................................................... 5

*Horne v. Flores*,
  557 U.S. 433 (2009)................................................................................. 7, 8

*Hunt v. Superior Court*,
  21 Cal.4th 984 (1999) ............................................................................... 39

*Hutto v. Finney*,
  437 U.S. 678 (1978)....................................................................... 2, 4, 5, 9

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905)...................................................................................................... 6

*Labor/Community Comty. Strategy Ctr. v. L.A. County Metro. Transp. Auth.*,
  263 F.3d 1041 (9th Cir. 2001) ................................................................................... 6

*Lewis v. Casey*,
  518 U.S. 343 (1996)............................................................................................... 6, 11

*Local No. 93, Int'l Assoc. of Firefighters v. Cleveland*,
  478 U.S. 501 (1986) ............................................................................................ 11, 12

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ................................................................................... 3

*Midgett v. Tri-Ct. Metro. Transp. Dist. of Oregon*,
  254 F.3d 846 (9th Cir. 2001) ..................................................................................... 6

*Milliken v. Bradley*,
  418 U.S. 717 (1974) (*Milliken I*) ............................................................................ 10

*Milliken v. Bradley*,
  433 U.S. 267 (1977)....................................................................................4, 5, 6, 9, 10

*Missouri v. Jenkins*,
  515 U.S. 70 (1995)............................................................................................... 4, 10

*Rizzo v. Goode*,
  423 U.S. 362 (1976)............................................................................................ 6, 7, 10

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019).............................................................................................. 5

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992).................................................................................................. 9

*S. Bay Pentecostal Church v. Newsom*,
  592 U.S. __, 2021 U.S. LEXIS 758 (2021) .............................................................. 6

*Sierra Club, Inc. v. Elec. Controls Design, Inc.*,
  909 F.2d 1350 (9th Cir. 1990) ................................................................................. 12

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................... 3

iv

**Statutes**

Cal. Code Civ. Proc. §§ 1230.010 *et seq.* ........................................................... 23

Cal. Gov't. Code § 8558 .......................................................................................... 24

Cal. Welf. & Inst. Code § 17000 ....................................................................... 9, 39

Equal Opportunities Act of 1974 ............................................................................. 8

LAAC § 10.37 *et seq.* ............................................................................................ 36

LAAC § 8.30 ........................................................................................................... 23

LAMC § 189.00, *et seq.* ........................................................................................ 36

LAAC § 8.27 ........................................................................................................... 23

Los Angeles County Code Chapter 2.68 ................................................................ 25

LAMC § 187.00, *et seq.* ........................................................................................ 37

Ordinance No. 186606 ............................................................................................ 15

Ordinance No. 186607 ............................................................................................ 16

**Other Authorities**

CA Const., Article XIIIA, Section 1(b)(2) .............................................................. 27

California Policy Lab, *Unsheltered in Los Angeles: Insights from Street Outreach Service Data,* February 24, 2021 ............................................................................ 40

David Cooper, *Workers of color are far more likely to be paid poverty-level wages than white workers,* Feb. 21, 2018 .......................................................................... 35

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

## I.   INTRODUCTION

The crisis of homelessness is among the greatest challenges facing our region. The City of Los Angeles (the "City") continues to prioritize its response to the region's homelessness crisis and to collaborate with the County and other stakeholders.

All would agree that much more must be done to address all facets of this crisis. It is also true that both prior to and since the commencement of this litigation in March 2020, the City and its leaders have provided more housing and shelter to people experiencing homelessness than ever existed in the City and continue to work to improve the lives of those who remain unsheltered. The City has already made substantial progress toward fulfilling its commitment to create 6,700 beds within 18 months of signing the binding term sheet with the County in June 2020, which was later memorialized in a Memorandum of Understanding ("MOU") [Dkt. 185-1]. Indeed, as of February 24, 2021, the City has opened 2,724 of the 8,632 interventions that it is working to build pursuant to the MOU. That is an average of approximately 11 new beds per day since the term sheet was signed. The City's creation of beds pursuant to the MOU is in addition to all of the City's other existing, ongoing efforts to improve living conditions for people experiencing homelessness and to provide them with shelter, including the A Bridge Home program which now has 25 sites providing 1,945 beds; the creation of permanent supportive housing pursuant to Proposition HHH, with 7 sites and 489 units currently open; and the City's substantial investment of funding and resources to improve access to hygiene, sanitation, and other services for those living on the streets. The City continues to focus its available funds and resources to respond to the homelessness crisis, despite the City's current projected General Fund budget gap of over $750 million.

While district courts have the authority to grant equitable relief, the scope of that authority, and the situations in which the exercise of that authority is appropriate, are subject to fundamental constitutional limitations on a federal court's power. The Court's January 31, 2021 Order [Dkt. 205] references the type of broad structural relief that is typically reserved for last-resort, drastic judicial interventions after protracted litigation

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

and other equitable remedies and governmental efforts to correct a constitutional violation have been exhausted. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 683 (1978) (noting that "[a]fter finding the conditions of confinement unconstitutional, the District Court did not immediately impose a detailed remedy of its own" and instead gave prison administrators multiple opportunities to remedy the violation on their own); *Brown v. Plata,* 563 U.S. 493, 500 (2011) (approving structural remedial order to reduce California's prison system population only "after years of litigation, [when] it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population.").

Here, by stark contrast, the case is not even at-issue. The parties have not litigated whether there is a constitutional violation. The City and County have struck an interim agreement to create additional shelter and services, and potential further agreements are being explored. Remedies short of the broad structural relief to which this Court refers have not been exhausted. As a result, drastic unilateral intervention into elected officials' governance of municipal affairs would, at the barest minimum, be premature.

Moreover, the instances where courts have been upheld in imposing sweeping structural remedies after finding major constitutional violations following significant litigation pertain to public institutions (such as school boards and prison systems) which have independent authority over the major factors causing the violations. Resolving the homelessness crisis does not admit of similar treatment. Instead, this case is a quintessential example of a highly complicated social issue that has multiple and complex contributing factors and a range of public entities and officials with authority to address them—necessitating a multi-faceted solution involving City, County, State, and Federal policies, agencies and actors, all of whom must work together to confront this crisis successfully.[1]

---

[1] The Court refers to its perception of "political paralysis" [Dkt. 205] as a catalyst for its potential unilateral intervention at this early stage of litigation. But precedent cautions

2

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

## II.   STRUCTURAL EQUITABLE REMEDIES AVAILABLE TO FEDERAL DISTRICT COURTS AND THE LIMITS OF THAT AUTHORITY

In its January 31 Order [Dkt. 205], this Court requested briefing that addressed all equitable remedies available to the Court that could require the City of Los Angeles and its elected officials—and, presumably, defendant County of Los Angeles and its elected officials as well—to take action to provide relief to the homeless community, and the outer limit of the Court's structural equitable remedy power in these circumstances.[2]

While district courts have the authority to provide equitable relief upon a finding of a constitutional violation,[3] the extent and limits of that authority, and the situations in which the exercise of that authority is appropriate, are determined not only by fundamental constitutional limitations on a federal court's power, but also by case law, as set forth below.

### A.   Injunctive Remedies

A preliminary injunction[4] issued prior to a trial on the merits and final judgment is "an extraordinary and drastic remedy" that may not be granted unless the moving party establishes standing and a clear showing of entitlement to the relief. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (affirming district court's denial of preliminary injunction); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-

___

against courts substituting their political judgment for that of elected officials. *See, e.g., Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("Failure of political will does not justify unconstitutional remedies.") (citation omitted).

[2] Pursuant to the Court's January 31, 2021 Order [Dkt. 205 at 4], the City and County jointly submitted an agreed-upon Statement of Facts [Dkt. 237], which the City incorporates by reference herein.

[3] The City notes that whether there is a constitutional violation has not been litigated. Indeed, the case is not yet at-issue. The City expressly reserves any and all arguments as to whether a constitutional violation, or any other violation of law, exists in this case.

[4] In light of the Court's requested focus on structural relief, this brief does not address other limitations on the Court's ability to issue injunctive relief, some of which were discussed in briefs previously filed by the City. *See* Dkt. 121.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

22 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

Even more drastic than granting a motion for a preliminary injunction would be the issuance, at this stage of the litigation,[5] of a mandatory structural injunction of the kind referenced in this Court's January 31, 2021 Order to mandate the City address homelessness in a manner selected by the Court. *See* Dkt. 205. The Supreme Court has found such orders appropriate only in limited contexts – and only after protracted litigation and where less drastic measures have proven insufficient – because for federal courts to impose such broad structural injunctions essentially "turn[s] judges into long-term administrators of complex social institutions such as schools, prisons, and police departments." *Brown v. Plata,* 563 U.S. at 538 (Scalia, A., dissenting) (approving structural remedial order to reduce California's prison system population only "after years of litigation, [when] it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population."); *see also Hutto v. Finney*, 437 U.S. at 683 (noting that "[a]fter finding the conditions of confinement unconstitutional, the District Court did not immediately impose a detailed remedy of its own" and instead gave prison administrators multiple opportunities to remedy the violation); *Missouri v. Jenkins*, 515 U.S. 70, 73-74 (1995) (noting that the district court entered its first remedial order in 1985, eight years after the litigation commenced, and that the litigation had since been ongoing for 18 years).

A structural remedy cannot even be contemplated in the absence of a constitutional violation. *See e.g., Dayton Bd. Of Ed. v. Brinkman,* 433 U.S. 406, 419-20 (1977) (noting "remedial powers of the federal courts to restructure the operation of local and state governmental entities…is not plenary. It may be exercised only on the basis of a constitutional violation.") (citations and internal quotations omitted). And

---

[5] Moreover, the City is not aware of any cases approving the *sua sponte* issuance of such a broad structural remedy on a defendant against which no finding of a constitutional violation has been made, and, in fact, which has yet to respond to the complaint.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

even where a constitutional violation is found after the issue has been litigated, a structural injunction – like any equitable remedy – must not only be narrowly tailored to the nature and scope of a constitutional violation, but must be "designed as nearly as possible to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct," and "must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *See Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977).[6]

### 1.  Federalism and Separation of Powers Doctrines Provide Fundamental Limitations On A Court's Equitable Powers

---

[6] Examples of the types of constitutional violations rising to a level that the Supreme Court has found sufficient to support structural relief have included segregation of public schools in violation of the Fourteenth Amendment (*Brown v. Bd. Of Educ.*, 347 U.S. 483 (1954) and *Brown v. Bd. Of Educ.*, 349 U.S. 294 (1955)); ongoing cruel and unusual punishment practices in violation of the Eighth Amendment (*Hutto v. Finney*, 437 U.S. 678 (1978)); and deliberate creation of a racially segregated public housing system in violation of the Fifth Amendment (*Hills v. Gautreaux*, 425 U.S. 284 (1976)).  In each of these cases, the constitutional violation supporting the structural remedial relief was alleged by the plaintiffs in the pleadings and subsequently either conceded by the defendants, or found on a developed evidentiary record to have in fact existed and to have been directly caused by the defendants.  *See Brown v. Bd. Of Educ.*, 347 U.S. at 488-91 (plaintiffs alleged and proved that segregation of public schools deprived them of the equal protection of the laws under the Fourteenth Amendment); *Hutto v. Finney*, 437 U.S. at 681-82 (plaintiffs' allegations of unconstitutionally cruel and unusual prison conditions caused by state prison officials were "amply supported by the evidence"); *Hills v. Gautreaux*, 425 U.S. at 286-288, 297 ("Uncontradicted evidence submitted to the District Court established that the public housing system operated by CHA was racially segregated" as had been alleged by the plaintiff classes); *see also Brown v. Plata*, 563 U.S. at 506-07 ("after a 39-day trial, the *Coleman* District Court found 'overwhelming evidence of the systemic failure to deliver necessary care to mentally ill inmates'" and in *Plata v. Brown*, "the State conceded that deficiencies in prison medical care violated prisoners' Eighth Amendment rights.").  This conforms to well-settled justiciability principles that a federal "Court's authority to act…is 'grounded in and limited by the necessity of resolving, according to legal principles, a plaintiff's particular claim of legal right.'" *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019) (holding that partisan gerrymandering claims presented political questions beyond the reach of the federal courts).

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

Assuming *arguendo* that the Court were to find a constitutional violation after the matter is litigated, the Court must take into consideration two important, fundamental, and well-established constraints on a federal court's equitable remedial powers in deciding whether – and to what extent – to invoke those powers: the doctrines of federalism and separation of powers. *See Lewis v. Casey*, 518 U.S. 343, 385 (1996) ("Principles of federalism and separation of powers impose stringent limitations on the equitable power of federal courts.") (Thomas, J., concurring).

The Supreme Court has consistently recognized that "the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley*, 433 U.S. at 280-81; *see also Labor/Community Comty. Strategy Ctr. v. L.A. County Metro. Transp. Auth.*, 263 F.3d 1041, 1050-51 (9th Cir. 2001) (upholding consent decree in civil rights lawsuit but acknowledging that "[w]hen imposing a remedial scheme on a state institution, a federal court must not unduly insert itself into the institution's management."); *Lewis v. Casey*, 518 U.S. at 362-63 (district court failed to accord adequate deference to state prison authorities where it imposed system wide remedial injunction that was "was inordinately – indeed, wildly – intrusive" and failed to give prison officials primary responsibility for devising a remedy). Government has traditionally been afforded the "widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 380 (1976). Moreover, "the Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States." *S. Bay Pentecostal Church v. Newsom*, 592 U.S. __, 2021 U.S. LEXIS 758, at *11 (2021) (Roberts, C.J., concurring); *see also Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905).

Accordingly, politically accountable local officials are owed significant deference in shaping policies to deal with complex social issues, especially those that impact the health and safety of the people that elected them. *See id.*; *see also Midgett v. Tri-Ct. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001) ("a federal court must

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

exercise restraint when a plaintiff seeks to enjoin any non-federal government agency, be it local or state.") (citation omitted).

The Supreme Court has cautioned that broad structural remedies raise particular federalism and separation of powers concerns that require courts to exercise restraint in deciding whether to impose them. *See e.g., Horne v. Flores*, 557 U.S. 433, 448 (2009) ("institutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility, such as public education.") (citation omitted); *see also Rizzo v. Goode*, 423 U.S. at 380 (noting that "principles of federalism…have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments") (1976). As a result, a court must take care to avoid overstepping its authority by excessively intruding on the discretion of local officials, especially that of local elected officials who are tasked by voters with addressing competing societal issues with finite resources.

As the Court noted in its Order [Dkt. 205 at 4], Chief Justice Roberts highlighted these concerns when he asked, during the oral argument in *Brown v. Plata*, how a State would be expected to handle competing federal court structural remedial orders that each compel exhaustion of the local government's capacity and funds:

> What I'm saying is that you have conflicting orders from different district courts telling them you've got to comply with the Constitution by spending $8 billion here, and another court saying, you've got another constitutional problem and you've got to spend 8 billion over there. What is the State supposed to do in that situation?

*See* Tr. of Oral Argument at 72:22-73:3, *Brown v. Plata*, 563 U.S. 493 (2011) (No. 09-1233). The Chief Justice, who dissented in *Brown v. Plata*, recognized the concerns associated with a court taking away the local officials' discretion to prioritize and allocate its finite resources to address complex social issues, potentially at the expense of

7

other competing interests and issues not before the court and, potentially, in conflict with other federal judges' orders.  The City shares the Chief Justice's concerns.

Chief Justice Roberts' concern was similar to the one addressed by the Supreme Court in *Horne v. Flores*, 557 U.S. 433 (2009), when it reversed the denial of relief from a decree requiring Arizona and its state legislators to "appropriately and constitutionally fund" English Language Learners programs to overcome student language barriers, as required by the Equal Opportunities Act of 1974:

> Federalism concerns are heightened when, as in these cases, a federal-court decree has the effect of dictating state or local budget priorities.  States and local governments have limited funds.  When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs.

*Horne v. Flores*, 557 U.S. at 448 (citing *Jenkins*, 515 U.S. at 131 (Thomas, J., concurring) ("A structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds.")).

Thus, assuming *arguendo* that there were a record to support the finding of a constitutional violation sufficient to warrant the Court's exercise of its equitable powers (which does not exist here), the doctrines of federalism and separation of powers would still militate against the Court exercising its equitable powers in a way that would usurp the discretion of the City's elected officials to continue responding to the complex homelessness crisis, as well as other crises that draw on local resources—such as COVID-19 and the current budget crisis facing the City.  These doctrines arguably apply with even greater force here, where there is no single cause of the current regional homelessness crisis, nor a single action, agency, or official that can be ordered to fix it. Rather, the complexities of the regional homelessness crisis, and the associated competing interests highlighted by this lawsuit, demand a collaborative response

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

together with other governmental entities, including the County (and specifically its Departments of Mental Health and Public Social Services), which has unique legal responsibility, expertise, and funding to provide services to help individuals experiencing homelessness, and to protect individuals from falling into homelessness in the first place.[7]

### 2.   Structural Remedies Must Be Narrowly Tailored To The Nature And Extent Of The Constitutional Violation

So as not to offend the federalism and separation of powers principles discussed above, even if a constitutional violation sufficient to warrant some equitable relief were proven after contested litigation, the selected remedy must be narrowly tailored in scope and form to address only that violation. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992) ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated."); *see also Milliken v. Bradley*, 433 U.S. at 281-82 ("…federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.").

As the Supreme Court recently noted in the *Brown v. Plata* opinion cited in the Court's order, "[o]nce invoked, 'the scope of a district court's equitable powers…is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Plata*, 563 U.S. at 538 (citing *Hutto v. Finney*, 437 U.S. at 687 n. 9). However, the Supreme Court has also consistently held that such power "is not plenary." *See e.g., Dayton Bd. Of Ed. v. Brinkman*, 433 U.S. at 420. Thus, even when a court makes a finding of a constitutional violation, the remedy to cure that violation must be tailored to the nature and extent of the constitutional violation. *See id.*; *see also City & Cty. of San Francisco*

---

[7] *See e.g.*, Compl. ¶¶ 134-141 (asserting claim against County for failing to provide basic shelter and services in violation of Cal. Welf. & Inst. Code § 17000); *see also* Dkt. 189-1 (listing County's Departments, including Mental Health, Public Health, and Public Social Services, with programs serving people experiencing homelessness).

*v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.") (citations omitted).  The remedy must "directly address and relate to the constitutional violation itself."  *Missouri v. Jenkins*, 515 U.S. at 88 (holding that district court exceeded its remedial authority by fashioning an overbroad remedy) (citation omitted).  Put another way, "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992).

With those limitations in mind, on numerous occasions the Supreme Court has invalidated broad structural remedies imposed by lower courts, ruling those orders stretched beyond remedying the specific identified constitutional violation.  *See e.g., Milliken v. Bradley*, 418 U.S. 717, 752-53, 746 (1974) (*Milliken I*) (invalidating overbroad remedy that went beyond remedying the identified violation, and noting that a desegregation remedy must be "necessarily designed, as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct."); *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. at 418 ("the Court of Appeals imposed a remedy which we think is entirely out of proportion to the constitutional violations found by the District Court, taking those findings of violations in the light most favorable to respondents.").  In one such example, the Supreme Court in *Rizzo v. Goode*, 423 U.S. 362 (1976), reversed the district court's injunctive order on the grounds that it had overreached in dictating police procedures for handling citizen complaints against police officers.  *See Rizzo v. Goode*, 423 U.S. at 380-81.  The Court held that the district court's order "constitute[d] an unwarranted federal judicial intrusion into the discretionary authority of petitioners to perform their official functions as prescribed by state and local law" and further specifically held that the order could not be upheld on the basis that such equitable relief was sanctioned in *Swann v. Charlotte-Mecklenburg Bd. Of Educ.* because unlike in *Swann* where the state authorities had implemented segregation, the defendants in *Rizzo* had not played any affirmative role in

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

depriving constitutional rights and "federal 'judicial powers may be exercised only on the basis of a constitutional violation.'" *Rizzo*, 423 U.S. at 377. Moreover, in rejecting the proposed extension of federal equity power, the Supreme Court held that federalism considerations militate against a court using its equitable power to create prophylactic procedures for a state agency in such cases, and cautioned that "federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" *Id.* at 378 (citations omitted).

Likewise, in *Lewis v. Casey*, 518 U.S. 343 (1995), the Supreme Court held that the district court's injunction mandating detailed and sweeping changes designed to ensure the Arizona Department of Corrections provided meaningful access to courts overstepped the court's authority in a number of ways, including by failing to limit the remedy to the two instances of constitutional violations that produced the injury in fact established by the plaintiff class, and by failing to give appropriate deference to state officials in the "inordinately – indeed, wildly – intrusive" order. *Lewis v. Casey*, 518 U.S. at 359, 362.

As these cases demonstrate, should it be appropriate for a district court to implement an equitable remedy for a constitutional violation, such remedy must be confined to the scope of the identified constitutional violation.

## B.   Consent Decree

Although a federal district court does not have the authority to order a party to do more than the law requires, "a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." *See Local No. 93, Int'l Assoc. of Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986) (upholding a district court's entry of consent decree that went beyond the type of relief provided by the civil rights statute under which the suit had been brought). This is because "it is the parties' agreement that serves as the source of the court's authority to enter any judgment" based on a consent decree. *Id.* at 522

11

(citation omitted).

Federal district courts have the equitable authority to approve and subsequently enforce a consent decree agreed to by the parties as long as the consent decree is "fair, reasonable and equitable and does not violate the law or public policy," comes within the general scope of the case made by the pleadings and furthers the objectives upon which the law is based. *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) (citations and internal quotations omitted); *see also Local No. 93*, 478 U.S. at 525-26. The only limitation is that the remedy must come within the general scope of the case made by the pleadings, and may not conflict with any applicable law. *See Local No. 93*, 478 U.S. at 525; *see also Conservation Northwest v. Sherman*, 715 F.3d 1181, 1189 (9th Cir. 2013) (district court abused its discretion by approving consent decree that impermissibly conflicted with applicable laws).

Whether by consent decree or traditional settlement agreement, the City continues to explore the possibility of reaching a resolution of this action that benefits the parties, homeless Angelenos, and everyone in the City who shares our public spaces.

## III.    RESPONSES TO COURT'S REQUESTS FOR INFORMATION

In response to the Court's questions in its Orders dated January 31, 2021 [Dkt. 205], February 3, 2021 [Dkt. 206], and February 8, 2021 [Dkt. 213], the City provides the following information.

### A.    Information Requested In The January 31, 2021 Order [Dkt. 205]

*1. An inventory of city and county properties which will serve as locations for temporary housing, including the location of the property and capacity in terms of the number of beds it can facilitate.*

At present, the City owns or leases 61 properties that are serving or will serve as locations for temporary housing. This includes properties being developed for interim housing, Project Roomkey, and Project Homekey sites being used for interim housing, both for the agreement reached with the County in June 2020 to create 6,700 beds, and other emergency and temporary housing the City has and will continue to create for unhoused Angelenos, including the A Bridge Home ("ABH") interim shelters. These 61

12

properties will have the capacity to shelter 5,555 persons in total. (An additional 26 properties are being used by the City to create 1,013 interventions in Safe Parking and Permanent Supportive Housing sites.)

Attached hereto as Exhibits A (ABH sites), B (Roadmap Sites), and C (Roadmap Interventions) are documents reflecting the full inventory of 72 City properties which are serving or will serve as locations for temporary housing and safe parking with 5,754 beds to serve unhoused Angelenos. (Ex. B also includes 814 permanent supportive housing interventions at 15 sites being created as part of the Homeless Roadmap.) In addition to these site-based temporary housing beds, the City is funding 3,000 rapid rehousing/shared housing placements, for a total of 9,568 interventions to serve unhoused Angelenos. Exhibit C also shows the expected opening dates of those properties that will serve as temporary housing locations and are still being developed. (Similar information was previously provided to the Court in the City's Quarterly Status Reports, filed at Dkts. 149 and 204.).

In addition, the City contributes funding for 666 additional beds at year-round shelter sites and 535 additional beds at Winter Shelter sites (which sites are currently scheduled to remain open through March 31, 2021). *See* Exhibit D.

These locations reflect the results of extensive efforts by the City to identify and maximize its real property for use in addressing the homelessness crisis. Over the last several years, the City evaluated more than 275 properties to determine if they could serve as sites for any type of intervention to aid persons experiencing homelessness, including interim shelters and navigation sites. *See e.g.,* Dkts. 149, 149-5, 149-6, 149-7 and 149-8.

### *2. A report disclosing all available funds to service the homeless and how these funds are to be allocated.*

The City Administrative Officer has prepared a report disclosing all available funds to provide services to people experiencing homelessness and how the City has allocated or intends to allocate those funds. In total, for Fiscal Year 2020-2021, the City

13

has identified approximately $786.3 million in total funds that could be used to provide housing or homeless services. This amount includes $367.3 million in federal grants, $19.3 million in state monies/one-time homeless grants, and $399.7 million in money from the City's general fund and special fund sources. Attached hereto as Exhibit E is the report. These amounts include over $300 million in funding commitments the City has provided to the Los Angeles Homeless Services Authority ("LAHSA"). The City's adopted homeless budget for Fiscal Year 2020–2021 provides additional detail regarding how certain of the funds are allocated, and is attached as Exhibit F.

**B.      Information Requested In The February 3, 2021 Order [Dkt. 206]**

*1. What new actions to address the homeless crisis have been taken since June 18, 2020 and for the entire year 2020?*

The City continues to take action to address the homelessness crisis. Since June 18, 2020, the City has completed 2,724 of the 6,700 interventions that it is building pursuant to its agreement with the County, including 234 new Permanent Supportive Housing ("PSH") units in 4 sites; 197 units in Project Homekey hotels; 499 rapid rehousing or shared housing placements; 1,079 A Bridge Home ("ABH") beds in 12 facilities; 75 beds in the City's first pallet shelter community; and 110 spaces in five new safe parking sites. Fifty-five (55) of these PSH units, along with an onsite health clinic, opened in Skid Row in February 2021.

On February 10, 2021, Mayor Garcetti announced the extension and expansion of the Project Roomkey program. Lease agreements for three city-leased hotels currently participating in Project Roomkey ("PRK") will be extended, and these three hotels provide in excess of 900 rooms. At the time of the announcement, there were 635 occupied rooms, and approximately 274 vacant rooms immediately available. From February 11 through February 26, 2021, 153 unhoused women from Skid Row have been placed in two of these three hotels, along with 42 unhoused Angelenos from the Echo Park Lake area. More hotel placements focused on unsheltered individuals from Skid Row and throughout the City will continue in the weeks to come. The City expects

14

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

these lease extensions of the three PRK sites will result in providing shelter to approximately 1,200 people experiencing homelessness.  The City is working to expand the program further and has identified four additional hotels, which would provide 200 additional PRK rooms and providing shelter to close to 400 unhoused Angelenos as a result.

These actions are in addition to the City's COVID-19 homelessness response, which included: creating 1,027 beds in 24 recreation centers to provide emergency shelter from April through September 2020 wherein approximately 2,200 individuals were provided shelter, on-site showers, food, medical care, mental health services, pet care, art therapy, and case management; providing 1,273 rooms in 300 State-issued trailers and 6 hotels (the leases on 3 of which the City will be extending to ensure at least 900 rooms remain open to continue providing shelter); extending the Winter Shelter program from the usual March 31, 2020 close date so that the Winter Shelters have remained open continuously during this pandemic; providing more than 30,000 wellness checks at homeless encampments across the City; administering over 12,000 COVID-19 field tests; and expanding hygiene services with more than 156 additional portable restrooms and 261 additional hand-washing stations deployed Citywide, as well as contracting with 9 YMCA facilities that have provided over 40,000 showers since March 2020

In addition, in the Skid Row area, the City funded leasing, tenant improvements, and operating costs to double storage capacity for unhoused Angelenos' personal property to 2,500 total storage bins; the City invested $1.5 million to move women experiencing homelessness off the streets and into permanent housing; the City invested $250,000 for a Skid Row Women's Emergency Shelter; and the City installed 8 additional dumpsters for trash removal.  *See* Dkt. 207-1.  Additionally, in an effort to help prevent sheltered Angelenos from becoming unsheltered, the City enacted Ordinances to protect against evictions during COVID-19 (Ordinance No. 186606), and to protect against rent increases in Rent Stabilization Ordinance ("RSO") properties

15

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

during COVID-19 (Ordinance No. 186607).

### *2. Are there fewer or more persons experiencing homelessness in Skid Row today than in June 18, 2020 and for the entire year 2020?*

As a result of the COVID-19 pandemic, the United States Department of Housing and Urban Development ("HUD") exempted LAHSA from conducting the Greater Los Angeles Homeless Count this year.  In lieu of 2021 Count data, LAHSA reports that it polled a diverse group of key providers in the Skid Row community.  The polled providers reported that the number of unhoused Angelenos in Skid Row ebbed and flowed since the beginning of the pandemic for a variety of reasons.  These include that when the pandemic first began, an influx of previously-sheltered residents of Skid Row became unsheltered due to fear of COVID-19, the decompression of certain interim housing sites to reduce occupancy levels to allow for social distancing in compliance with public health guidance,[8] and the periodic quarantine of some interim housing sites. However, PRK assisted in providing housing for persons experiencing homelessness in Skid Row.  It was further reported to LAHSA that non-Skid Row residents were coming to the area to obtain services or engage in other activities.

Interim and permanent housing needs for unhoused Skid Row residents remain great, with a significant need for higher level of care beds and housing options.  This includes resources for those who cannot perform their Activities of Daily Living and those with other complex mental health, substance use, and/or physical health limitations.  LAHSA has three Homeless Engagement Teams (HETs) dedicated exclusively to Skid Row, in addition to teams from the City and County, including four

---

[8] *See, e.g.,* Los Angeles County Department of Public Health Guidance for Interim Housing Settings, available at: http://publichealth.lacounty.gov/media/coronavirus/docs/homelessness/GuidanceInterimHousingSettings.pdf

16

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

C3 ("City, County, Community") teams, partly funded by the City, that are operated by The People Concern.

### 3. What has been done to increase access to services for those persons experiencing homelessness who suffer from mental illness?

The County, through its Department of Mental Health, is the public health entity responsible for providing services to persons experiencing homelessness who suffer from mental illness in both the City and the County. Therefore, the County is in the best position to present information concerning access to mental health services.

Although the City is not responsible for providing such services, the City has gone above and beyond its obligations by working to increase access to various services, including mental health services, for unhoused Angelenos. For example, in 2017, the City and the County signed a Memorandum of Understanding to increase the supply of permanent supportive housing ("PSH") in the City, which pairs rental assistance with appropriate supportive services, including linkage to mental health and substance abuse services. Through this MOU, the City committed to facilitate PSH opportunities by creating thousands of new PSH units over the ten-year duration of the MOU through capital financing and land donation, while the Housing Authority of the City of Los Angeles ("HACLA") agreed to provide project-based vouchers, and the County agreed (among other things) to provide residents with services to ensure their connection to appropriate medical, substance abuse, and mental health services.

Using funding through Proposition HHH, the City has built permanent supportive housing with on-site health services, such as the PSH site that opened in February 2021 in Skid Row with an on-site health clinic run by Joshua House Health Center that provides mental health care, substance abuse services, medical care, and dental care.

Furthermore, while not limited to unhoused Angelenos, the City provides various services to assist people needing mental health care. The City Attorney's Office staffs a mental health court and manages LA Door (Diversion, Outreach and Opportunities for Recovery), which uses grant funds from Proposition 47 to proactively engage

17

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

participants in mental health support, substance abuse treatment, physical healthcare, and case management. LA Door also offers pre-booking diversion on eligible arrests, and assists with expunging eligible criminal records, such as for drug possession and shoplifting. The vast majority (over 80%) of LA Door's participants experience chronic homelessness. Outreach through LA Door is performed by a non-profit (Project 180) in various "hotspots" throughout South and Central Los Angeles. Moreover, the Los Angeles Police Department ("LAPD") deploys a Mental Evaluation Unit that assists patrol officers with mental health-related outreach, including to persons experiencing homelessness. Within the LAPD's Mental Evaluation Unit are "SMART" Teams (Systemwide Mental Assessment Response Teams), which pair LAPD officers and County Department of Mental Health clinicians together to respond to calls involving people in crisis to link them to appropriate mental health services.

> ***4. What is death rate amongst the homeless population in 2020 and the progression over the last five years in Skid Row?***
>
> ***(and)***
>
> ***5. How many people experiencing homelessness have died in Skid Row, the City and the County since June 18, 2020 and for the entire year 2020? What is the progression over the last five years on Skid Row, the City and County?***

The County, through its Medical Examiner-Coroner, is the local government entity responsible for determining and reporting death information, and thus the County should have more robust and accurate data than the City to respond to this question.

However, since 2018, the Los Angeles Fire Department ("LAFD") has included whether a patient is a person experiencing homelessness in the data it collects when LAFD paramedics respond to a medical emergency. LAFD tracks this data Citywide and specifically for Fire Station 9, which encapsulates the Skid Row area but is not limited to Skid Row. Importantly, the data collected by the LAFD is not validated, and relies on several variables including (a) manual entries into the database by the

18

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

responding paramedics (b) based on the LAFD paramedics' interpretation or understanding that a person experiencing homelessness was involved.

With that caveat, Fire Station 9 paramedics responded to 55 cardiac arrests suffered by individuals believed to be homeless in 2018, 57 in 2019, and 91 in 2020.  Of those individuals, 34 were pronounced dead upon the paramedics' arrival in 2018, 32 in 2019, and 64 in 2020. Citywide, LAFD paramedics responded to 354 cardiac arrests suffered by individuals believed to be homeless in 2018, 411 in 2019, and 727 in 2020.  Of those individuals, 245 individuals were pronounced dead upon the paramedics' arrival in 2018, 259 in 2019, and 532 in 2020.  The information is summarized in the tables below:

**Total Number of Cardiac Arrests Involving Homeless Individuals To Which LAFD Responded**

| Calendar Year | Citywide | Fire Station 9 (Skid Row) |
|---|---|---|
| 2018 | 354 | 55 |
| 2019 | 411 | 57 |
| 2020 | 727 | 91 |

**Total Number of Cardiac Arrest Deaths Upon Arrival Involving Homeless Individuals To Which LAFD Responded:**

| Calendar Year | Citywide | Fire Station 9 (Skid Row) |
|---|---|---|
| 2018 | 245 | 34 |
| 2019 | 259 | 32 |
| 2020 | 532 | 64 |

This data reflects instances of cardiac arrest, irrespective of cause of death (*e.g.*, medical reasons, drug overdose, trauma, etc.).  It should be noted that this data includes individuals who were pronounced dead upon the paramedics' arrival as well as those on whom resuscitation was attempted and/or were transported to the hospital.  For this reason, the data maintained by the LAFD does not capture deaths that may have resulted after transportation to a hospital of an individual on whom resuscitation was attempted.

19

Again, the County, not the LAFD or the City, should have better and fuller information to identify and explain the current death rate amongst people experiencing homelessness in the City and County.

> **6. How many reported fires involving the people experiencing homelessness have occurred in Skid Row, the City and County since June 18, 2020 and for the entire year 2020? What is the progression over the last five years on Skid Row, the City and County?**

Since 2017, the data collected by the LAFD has included whether it responded to a fire that involved a person experiencing homelessness.  Again, this data by the LAFD is not validated, and relies on several variables including (a) manual entries into the database by LAFD employees (b) based on the LAFD employees' interpretation or understanding that a person experiencing homelessness was involved with the fire.

With that caveat, since June 18, 2020, there have been 6,105 fires responded to in the City of Los Angeles that were attributed to persons experiencing homelessness, and 164 fires that were responded to by LAFD Fire Station 9 (which encapsulates, but is not limited to, the Skid Row area) that were attributed to persons experiencing homelessness.  In the entire year of 2020, there were 7,315 fires responded to Citywide that were attributed to persons experiencing homelessness, and 209 fires responded to by LAFD Fire Station 9 that were attributed to persons experiencing homelessness.  The data for calendar years 2017 through 2020, and for 2021 up through February 28, 2021 is summarized in the following table below:

| Calendar Year | Citywide | Fire Station 9 (Skid Row) |
|---|---|---|
| **2017** | 1753 | 87 |
| **2018** | 3233 | 155 |
| **2019** | 4067 | 99 |
| **2020** | 7315 | 209 |
| **2021 (01/01– 02/28)** | 1570 | 55 |

20

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

**7. Did the tents erected last week in Skid Row and did the City provide some relief for the homeless?**

While LAHSA is the subject-matter expert on this issue, the City does not believe that the tents erected in Skid Row at 5th and San Pedro on January 29, 2021, provided the intended relief for the people experiencing homelessness in the area.  The City is not aware of any plans put in place for staffing, meals, hygiene, security, or COVID-19 infection controls with the tents, and the City has been informed that no individuals slept under the two large canopy tents erected on 5th and San Pedro.

On January 29, 2021, a concerted effort was made to respond to the Court's request to connect women on Skid Row with the limited beds available.  While additional beds at Winter Shelter sites were offered to the unhoused women identified by the Court, all of the women turned down the offer, presumably because the available Winter Shelter beds were at locations outside of Skid Row.  Additionally, four women experiencing homelessness on Skid Row were transported by LAHSA to PRK sites, and the City understands that some number of women were provided hotel rooms paid for by the Hon. David O. Carter and Councilmember Kevin de Leon.  Furthermore, on January 29 and February 4, 2021, at least 100 individual tents donated by the Salvation Army were distributed to people experiencing homelessness in Skid Row, with the majority of the tents being provided to women.

Immediately following the events of January 31, the City worked with LAHSA to identify and bring online additional 60 beds at the Weingart Center as of Tuesday, February 2.  LAHSA also identified beds that might be available within their system, which initially included beds at the Paloma shelter, though that site was placed on quarantine the following day.  COVID-19 infections and the resulting need to quarantine sites has had a tremendous impact on the availability of beds and the ability of outreach teams to plan for placements.

The Downtown Women's Center reports that it has provided shelter for an additional 5 women and permanent housing for an additional 10 women since January

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

29th. It should be noted that for many years, the Downtown Women's Center, with funding provided by the City, has provided safe, client-centered housing with intensive services to 119 unaccompanied women from Skid Row at two sites that they own and operate.

### 8. Can more tents be erected? Can they be staffed with services?

Although more tents could be erected, the City believes identifying ways to extend Project Roomkey and bring online additional socially distanced congregate shelters is highly preferable at this time to additional tents. LAHSA reports there are limitations related to available funding to pay for staff, and even if funding is identified, LAHSA has seen significant limitations in its providers' ability to hire, onboard, and train new staff quickly. Without appropriately trained staff to manage a make-shift shelter, there is potential for interpersonal conflict resulting in security risks. Erecting a tent also does not help to mitigate hygiene needs as there are no facilities immediately available to unsheltered Angelenos who might seek shelter under the tent. Moreover, in response to the report issued by LAHSA's Ad Hoc Committee on Women and Homelessness, there has been a concerted effort to provide trauma-informed care to women experiencing homelessness, and large tents without appropriate staffing and security, and other features like beds, bathrooms or safe heating, may not meet the standards of a trauma-informed approach.

### 9. What emergency efforts can be employed by the City and County to address interim/emergency housing shelters for the population in Skid Row?

The City has taken several steps to address interim and emergency housing shelters for people experiencing homelessness in Skid Row. Beginning in 2018, the City took advantage of the new state law that enabled cities to construct bridge housing faster than ever before in response to a declared shelter crisis. Capitalizing on this opportunity, the City began siting and building ABH interim housing facilities, the first of which was built near Skid Row in the El Pueblo area in downtown Los Angeles.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

More recently, the City Council has taken a series of actions to address the needs of persons experiencing homelessness in Skid Row, such as suspending enforcement of City regulations requiring tents to be taken down during daytime hours; instructing City staff to install as many services as possible at major encampments, including in Skid Row, to provide mobile portable toilets, dumpsters and vermin-proof trash cans, weekly shower service, and hand washing stations; and instructing City staff to identify vacant or under-used properties that can be used for emergency housing or camping, with hygiene services. The City also increased funding to continue and expand hygiene services in the Skid Row area. These measures, all passed on March 17, 2020, are collectively attached as Exhibit G (Motions 72P, 72P-A, and 72II).

As noted in the Court's January 31 Order, Los Angeles City Charter ("Charter") Section 231 and Los Angeles Administrative Code ("LAAC") Section 8.27 give the Mayor the discretionary power to declare a local emergency "when he finds that any of the circumstances described in Section 8.22 [] exist, or at any time a disaster or emergency is declared by the President of the United States or the Governor of California." [Dkt. 205, p. 2; LAAC § 8.27]. The Mayor exercised that power when he declared a local emergency on March 4, 2020 due to the coronavirus pandemic. (Chapter 2.68 of the Los Angeles County Code similarly provides that the Chair of the Los Angeles County Board of Supervisors may declare a local emergency, which then-Chair Barger also did on March 4, 2020 with respect to the COVID-19 crisis.) The Mayor has issued several directives and additional orders as this local emergency continues to affect the City.[9]

When a local emergency is declared, LAAC § 8.30 authorizes the Mayor, as the Director of the Emergency Operations Organization, to commandeer private property as is needed for the protection of life and property of the people, and to bind the City to pay the fair market value of the property. Unlike the power of eminent domain set forth in

---

[9] The orders are accessible at https://www.lamayor.org/COVID19Orders.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

state law (Cal. Code Civ. Proc. §§ 1230.010 *et seq.*), the power to commandeer property during a state of emergency is a temporary, not a permanent, means of utilizing that property for the duration of the declared emergency. A local emergency declaration also empowers the City Council to suspend competitive bidding requirements by a resolution adopted by a two-thirds vote and approved by the Mayor. Charter § 371(e)(6).

The state law authorizing local emergency declarations principally lists natural disasters, epidemics, terrorist attacks, and similarly discrete occurrences to justify such a declaration. *See* Cal. Gov't. Code § 8558. While the words and phrases in this statute are most commonly associated with sudden, catastrophic events, rather than chronic, though severe problems like homelessness, the Government Code's list is not exhaustive, and the application of the statute to homelessness has never been litigated.

To address the Court's inquiry directly, however, the City is not aware of any precedent or other authority suggesting a municipal authority can be *compelled* by judicial decree to exercise its discretion to declare a specific local emergency. To be sure, homelessness poses tremendous challenges, but at this juncture such extraordinary judicial intervention (even if it were permissible) is not warranted. Just this week, the City Council approved a motion to seek FEMA funding to expand Project Roomkey to provide 10,000 hotel rooms for the next six months, and to request advice from the City Attorney as to whether the City can use federal funds, including FEMA reimbursements, for any activity that could be considered a taking.[10] Council File 21-0235.[11] In addition, as discussed above, the City, in partnership with the County and LAHSA, continues to work cooperatively with property owners and others to secure additional housing units

---

[10] A prior report from the City Attorney to the City Council regarding how the City may commandeer motel and hotel rooms for use as homeless housing under the Mayor's existing local emergency declaration (Report R 21-0055 contained in Council File 21-0113) is attached as Exhibit H.

[11] The motion and full Council File are accessible at
https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=21-0235

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

for Project Homekey in a responsible manner to ensure that the interventions are sustainable for the entire length of time they will be needed.  Moreover, the parties continue to create and provide services for thousands of permanent supportive, interim, and emergency shelter beds as they implement the 2017 MOU under Prop HHH and the 2020 MOU to create the 6,700 beds, while at the same time exploring other potential agreements and engage their State and Federal partners to address the multiple facets of this formidable challenge.

    **C.**        **Information Requested In The February 8, 2021 Order [Dkt. 213]**

        ***1. How many people experiencing homelessness have received shelter in interim or emergency shelters in Skid Row, the City, and the County since June 18, 2020 and for the entire year 2020? Of those individuals, how many have exited into permanent housing placements? How many have entered into transitional housing placements? Of those that have exited into permanent or temporary housing since June 18, 2020, how long were they were in interim housing before they exited into permanent housing or transitional housing?***

According to the attached report (Exhibit I) prepared by LAHSA, 25,036 people experiencing homelessness were placed in interim or emergency shelters in the City in 2020, and, as of February 9, 2021, 17,776 individuals had been placed in such shelters in the City since June 18, 2020 (although, as stated in the attached report, LAHSA reports that it is likely more participants are being served who are not captured in this data).  In addition, 1,441 people were placed in interim or emergency shelters in Skid Row in 2020, with 885 placed between June 18, 2020 and February 9, 2021.  Of the 25,036 individuals placed in interim or emergency shelters in the City in 2020, 3,733 people exited to permanent housing in 2020, and 4,690 entered transitional housing placements in 2020.  Of those that exited into permanent or temporary housing since June 18, 2020, the average length of stay in interim housing before exiting into permanent or transitional housing was 254 days.  Additional information is provided in Exhibit I.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

***2. The Court is trying to ascertain whether there has been deliberate indifference on the part of the City in not providing adequate shelter options for the homeless. Is it the City's position that a lack of resources has prevented it from establishing more interim shelter options for persons experiencing homelessness? If so, what is the City's response to the issue raised by Plaintiffs, that a significant amount of Proposition HHH funds could be clawed back from projects in the pre-development phase and used for temporary shelter facilities? What is the City's ability to terminate pre-development projects? What is the cities position to divert a portion of these allegedly future committed funds to obtain immediate relief for the thousands of homeless on the streets of Los Angeles.***

Far from being deliberately indifferent, the City has been working for years to establish more housing and interim shelter options for persons experiencing homelessness. The City has pioneered new and innovative ways to produce more housing. One such invention to create more permanent housing, in partnership with the County, was the creation of Proposition HHH, just one of the innovations the City has spearheaded or participated in to create more interim housing.

Prior to 2012, most funding for permanent supportive housing and other housing interventions came from the Community Redevelopment Agency ("CRA") of Los Angeles. However, CRAs were dissolved in 2012 by the Governor as a result of state budget shortfalls stemming from the 2008 economic crisis and the recession that followed. Without CRA funding, the City's ability to fund supportive housing was greatly reduced, at a time when the need for such housing continued to rise.

In February 2016, the City adopted its Comprehensive Homeless Strategy.[12] (The City's Strategy was developed in coordination with the County's Homeless Initiative

---

[12] The full Strategy document can be accessed at http://clkrep.lacity.org/onlinedocs/2015/15-1138-s1_misc_03-21-2016.pdf.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

which was approved by the County in February 2016 as well.)  The City's Comprehensive Homeless Strategy identified the production of affordable and permanent supportive housing as the key component to address the region's increasing numbers of homeless people.  The Strategy cited and relied upon studies that demonstrated that well-operated supportive housing had a high success rate in keeping people housed, and that the cost of building units was lower over the long term, with lower operating costs, than the cost of leasing such units.  City leaders began working on possible revenue sources to fund the permanent housing the Strategy called for.

The primary measure created by the City to fund the construction of permanent supportive housing was Proposition HHH.  Proposition HHH was a voter-approved general obligation ("GO") bond measure that authorized the City to issue $1.2 billion in GO bonds to fund certain homeless housing and facilities.  Under the California Constitution, proceeds from voter-approved GO bonds can only be used towards the acquisition or improvement of real property.  CA Const., Article XIIIA, Section 1(b)(2). Thus, money generated under Prop HHH is limited to the acquisition or improvement of real property; proceeds cannot be used to finance the acquisition of equipment, supplies, or other portable property, or to pay for homeless services.  In connection with Prop HHH, the County put forward its own revenue measure, Proposition H, to create a stream of revenue to finance the County providing the services necessary to successfully operate the permanent supportive housing that the City built under Prop HHH.

Consistent with the constitutional limits that would be placed on Prop HHH funds, voters of the City were asked the following ballot authorization question:

> HOMELESSNESS REDUCTION AND PREVENTION, HOUSING, AND FACILITIES BOND. PROPOSITION HHH. To provide safe, clean affordable housing for the homeless and for those in danger of becoming homeless, such as battered women and their children, veterans, seniors, foster youth, and the disabled; and provide facilities to increase access to mental health care, drug and alcohol treatment, and other services; shall the City of Los Angeles issue $1,200,000,000 in general obligation bonds, with citizen oversight and annual financial audits?

27

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

Exhibit J (relevant portions of the Prop HHH voter information pamphlet).[13]  A brief outline of how Prop HHH proceeds would be spent ("Exhibit 1") was included in the ballot question and was part of City Council's election resolution.  This outline similarly identified eligible uses of Prop HHH funds including supportive housing or supportive housing units and other physical facilities from which assistance and homeless services could be provided.  Ex. J at p. 22.  It made clear that Prop HHH proceeds had to be spent on permanent, physical *facilities*, and could not be used to finance any services or operations, or to supplant existing City funding for affordable housing, supportive housing, or other facilities used to provide services to the homeless or those at risk of homelessness.

In addition, an Impartial Summary of Prop HHH authored by the City's Chief Legislative Analyst, which provided background on the sizing of the $1.2 billion measure, noted that the City's Comprehensive Homeless Strategy "determined that 13,000 units of new housing, including 10,000 units of new supportive housing, are needed at an estimated cost exceeding $1 billion to house the homeless."  Ex. J at p. 8. The Impartial Summary further documented that the City had adopted the position of both the United States Department of Housing and Urban Development and LAHSA "that providing stable housing to a homeless individual prior to providing needed services is more effective at resolving homelessness compared to offering services without guaranteed housing."  *Id.*  Thus, materials prepared by the City for voters' consideration showed an intent to use the vast majority of the $1.2 billion in available HHH funding to build permanent supportive housing and affordable housing.

Prop HHH passed with the support of over 77% of voters during the November 2016 election.  Importantly, the voters passed Prop HHH with full knowledge that the

---

[13] Prop HHH documents approved by the City Council can be accessed at https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=16-1800-S2

28

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

Proposition envisioned a 10-year window in which to finance and construct the permanent supportive housing units.

In less than five years since its passage, 124 HHH housing projects have opened or are in development.  In total, they are expected to deliver 7,961 total units.[14]

- 7 HHH projects (489 total units) are up and running.
- 44 HHH projects (2,779 total units) are either actively in construction or have closed on their construction financing, meaning construction is imminent.
- 16 HHH projects (858 units) are expected to close their construction financing by June 1, 2021.
- 28 HHH projects (1,929 units) are expected to close their construction financing by the end of 2021.
- 29 HHH projects (1,906 units) are expected to close construction financing by the end of 2022.

Each one of these projects was approved by both advisory committees set up by the ballot measure to oversee Prop HHH expenditures—the Citizen's Oversight Committee and the Administrative Oversight Committee—as well as by the City Council and Mayor.  These projects are consistent with bond requirements in the state's Constitution,

---

[14] A small component of Prop HHH funding is being used to construct new facilities or rehabilitate existing facilities that provide services (but not additional housing units) to people experiencing homelessness.  Approximately $58 million in HHH funding has either been used or is committed for future use for this "facilities" program.  Again, however, these projects are or were for new construction or capital improvements that extend each permanent facility's useful life, as is required by the California Constitution; HHH funds cannot be used for temporary structures.  As was described to the Court at the February 4, 2021 hearing (Transcript of February 4, 2021 hearing [Dkt. 218], pp. 98-100), after the second fiscal year of the Prop HHH program, the Prop HHH advisory committees and Mayor and Council approved a plan to halt further funding of new HHH facilities program projects, in order to preserve the remainder of HHH funding for the construction of permanent supportive housing.  Exhibit K (CAO Report dated June 14, 2018, CF 17-0090.)

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

the Prop HHH ballot measure, and the opinions of local and federal experts regarding the need for long-term investments in permanent housing as the key component of the City's overall strategy to address the homeless crisis.

Approximately $30 million of the total $1.2 billion in Prop HHH funds are unallocated, with potential for an additional $20-$30 million that could be released from existing projects if those projects successfully line up additional leveraged funding.

Whether it is feasible or advisable to "claw back" HHH funds or terminate HHH commitments involves discretionary decisions that implicate municipal policy and privileged legal advice that is outside the scope of this brief. Any withdrawal of the City's commitments to build PSH units, and the repurposing of those funds for emergency or interim housing, would significantly reduce the housing goals pledged to voters who approved Prop HHH.

Moreover, every project has received a commitment letter, approved by City Council, that provide each developer with a two-year commitment to fund an HHH award up to a maximum dollar amount, subject to extension with further approvals from City Council and Prop HHH committees. Developers' HHH commitments generally come early in the projects' development process and help developers shop for the further financing needed to pay for the full construction costs (leveraging HHH dollars with additional potential funding from the federal government, State, County, bonds, private lenders, etc.). Having an HHH commitment allows developers to be more successful in lining up other funding sources, many of which are competitive and have better chances of success when backed by another committed funding source such as HHH. Moreover, on April 17, 2020, due to the impact of the COVID-19 crisis on the schedules of all development across the City, the Mayor issued an emergency order tolling all deadlines prescribed by the City's Housing and Community Investment Department ("HCIDLA") related to the financing and development of affordable housing. *See* Exhibit L. All such deadlines, including commitment letter expirations, will remain tolled until the emergency order is modified or lifted.

30

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

The cost differences associated with the various models of housing also implicate the potential repurposing of funds. Congregate housing has high operating costs, but can have much lower capital costs, especially with temporary solutions such as tents and sprung structures. However, Prop HHH funding cannot be used for these temporary solutions, as they do not involve the acquisition or improvement of real property. Interim housing such as Project Roomkey and A Bridge Home has moderate operating and capital costs. Permanent supportive housing, which provides residents with the means to live more independently, has the lowest operating costs but the highest capital costs. Thus, even if the City were to re-purpose some HHH funds for interim housing (that would have to include the acquisition or improvement of real property), the City or County would then have to identify significant additional dollars for operating costs as well, which cannot be paid for from HHH funds.

In addition to the City's commitment to permanent supportive housing in Prop HHH as a long-term solution to the homelessness crisis, the City has invested and continues to invest substantial funds and resources in interim and emergency shelter options that can be brought online faster than permanent housing options. [15] In the last 3 years, the City has located, built, and opened ABH 25 interim shelters with 1,945 beds, spending $107 million for construction alone. Under the decompression guidelines issued by the County's Department of Public Health (DPH) and Department of Health Services (DHS) (*see* footnote 8, *supra*), there are approximately 900 beds in ABH locations that currently cannot be used. This is similar to other congregate shelters which have been decompressed by as much as 40%-50%. The City is working with DPH and DHS to recompress the sites as vaccination rates increase, but ultimately the County dictates whether the City can fill a bed to get a person experiencing

---

[15] Despite the City's current budget crisis, the City continues to identify more funds outside of HHH from the State and Federal governments to provide more interim housing. For example, the City has committed $426.2 million to MOU projects from CARES Act, HEAP, and HHAP grants.

31

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

homelessness off the streets. There are 3 more ABH sites set to open over the next 2 months which will add another 180 beds. In addition to construction costs, the City has allocated $40 million on services, maintenance, and other related costs through June 30, 2021.

The City has also worked to take advantage of the State's Project Roomkey and Project Homekey programs. These projects demonstrate that it can be faster to buy existing hotels and apartment buildings, and operate them as interim housing, when such buildings are available. The City and County have been doing this with rapid rehousing vouchers for several years – placing households into motels as interim housing. However, HHH funds cannot be used for vouchers or to lease these properties—the California Constitution requires the money be used to acquire or improve real property. When purchased with HHH funds, the units often require significant additional funding for renovation costs to address deferred maintenance or to convert them to permanent housing.

Lastly, the City entered into an agreement with the County under which the City will create 6,700 additional housing and shelter units and pay for 50% of the service costs of those units, and the County will pay the other 50% of the service costs. The City continues to report its progress under this agreement to the court in separate filings that are not necessary to repeat here. *See* Dkt. 149 and 204. All of these efforts—HHH, ABH, the 6,700 bed agreement, Projects Roomkey and Homekey, and others— demonstrate significant commitment and that there has not been deliberate indifference on the part of the City; to the contrary, the City has provided, is providing, and will continue to provide shelter options for people experiencing homelessness in the City of Los Angeles.

> **3. The Court is trying to ascertain whether the City's policies with regard to Skid Row have been intended to be a gathering place, voluntary or involuntary, for racial minorities. Is there any evidence in the records of the city or the county that either government intended Skid Row or**

32

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

*any other section of the city to be a gathering place, voluntary or involuntary, for individuals who are homeless, knowing said individuals are disproportionately racial minorities? Is any evidence in the records of the city or the county that either government intended Skid Row or any other section of the city to be a gathering place, voluntary or involuntary, for racial minorities? Please produce any material where race has been discussed or considered with regard to Skid Row policy.*

It is deeply troubling that Black residents comprise 38% of people experiencing homelessness in the City, while only 8% of the residents of the City are African-Americans, according to LAHSA's 2020 Point-In-Time Count.  Exhibit M.[16]  (In the same report, LAHSA reported that Latinos make up 33% of people experiencing homeless, a number roughly equal to the Latino population across the entire City.  (*Id.*))  The disproportionate number of African-Americans experiencing homelessness here, in other metropolitan areas, and nationwide underscores the distinctive impact of systemic racism on the Black community across America.[17]  The City actively works with LAHSA, the County, non-profit organizations, and others to address and reduce the disproportionate impact of the homelessness crisis on minorities.

The City is not aware of any evidence that the City intentionally gathered persons experiencing homeless in Skid Row (or any other section of the city) knowing these individuals are disproportionately racial minorities, or intended Skid Row or any other

---

[16] The 2020 Greater Los Angeles Homeless Count for the City of Los Angeles is accessible at https://www.lahsa.org/documents?id=4680-2020-greater-los-angeles-homeless-count-city-of-los-angeles.

[17] *See* HUD 2019 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations Full Summary Report, available at: CoC_PopSub_NatlTerrDC_2019.pdf (hudexchange.info);
HUD's 2019 Annual Homeless Assessment Report to Congress, Part 1, available at: https://www.huduser.gov/portal/sites/default/files/pdf/2019-AHAR-Part-1.pdf

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

section of the city to be a gathering place, voluntary or involuntary, for racial minorities. A recent report by the UCLA Luskin Center for History and Policy detailed the various policy decisions that led to the consolidation of services for homeless people in Skid Row, which go back nearly a century. The majority of the time those policies were in place—whether made by city, county, state, or federal agencies, or by non-profit or community organizations—Skid Row was overwhelmingly white and male.[18]

There is evidence that a policy to contain persons experiencing homelessness and the services those people rely upon in the Skid Row area was adopted with respect to Skid Row in the 1970s. According to the UCLA Luskin Center report, this policy was adopted in response to proposals to eliminate Skid Row and transform the area as part of a larger revitalization of downtown, which could have had the effect of dispersing people experiencing homelessness more broadly across the city. But, as the report notes, this effect happened anyway, as the region experienced ever increasing numbers of people becoming homeless. Indeed, while the UCLA Luskin Center's report concluded that historical and institutional racism in housing and employment led to the current racial disparity in homelessness, the report did not cite any evidence that the City intended Skid Row or any other section of the city to be a gathering place, voluntary or involuntary, for racial minorities.[19]

---

[18] For example, one of the reasons Skid Row continued to grow as an area dominated by homeless individuals is because the County had only one facility for single men seeking general relief, located in Skid Row. Any time a single man applied for general relief at any other office in Pomona, Burbank, San Pedro, or Pasadena, he was referred downtown. *Skid Row: Recommendations to Citizen Advisory Committee on the Central Business District Plan for the City of Los Angeles*, 1976 ("Blue Book"), p. 64-65, cited in *The Making of a Crisis: A History of Homelessness in Los Angeles County*. The full report by the UCLA Luskin Center can be accessed at https://luskincenter.history.ucla.edu/2021/02/10/lchp-releases-report-on-the-history-of-homelessness-in-los-angeles/.

[19] The UCLA Luskin Center's Report came to conclusions similar to an April 2018 report by the Ad Hoc Committee for Black People Experiencing Homelessness

34

More recently, to help address and reverse the concentration of homeless people in the Skid Row area, the Los Angeles City Council voted in 2016 to formally reverse the policy of attempting to contain homelessness in Skid Row, and declared its intention to make services, facilities, and housing for people experiencing homeless accessible city-wide.  *See* Exhibit N (Motion and Report from Council File 16-0046).  This is consistent with one of the guiding principles of the Comprehensive Homeless Strategy adopted that same year:  to "[e]nsure that services and housing are provided throughout the City and County.  Homelessness is a Citywide and regional concern and the solutions must be provided Citywide and throughout the region." *See* Fn. 11, p. ii.

The City of Los Angeles has taken a progressive approach to preventing homelessness and has been a national leader in legislation to address the racial disparity in the root causes of homelessness.  Poverty is the obvious and most significant reason for homelessness in Los Angeles where one in five residents lives below the poverty line.[20]  Beginning as early as 1975, the City required a provision in every City contract and subcontract, precluding employment discrimination in all City contracts and subcontracts based on race, color, national origin, and other protected categories.  LAAC§ 10.8.2.  Recognizing that African-American and Latino workers are over-represented in the share of workers earning poverty wages,[21] in 1997, the City enacted

commissioned by LAHSA: "The impact of institutional and structural racism in education, criminal justice, housing, employment, health care, and access to opportunities cannot be denied: homelessness is a by-product of racism in America." *See* https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness.

[20] *See*, Homelessness:  How We Got Here & How L.A. Is Responding, available at: https://www.lamayor.org/HomelessnessCausesAndResponses.

[21] According to the Economic Policy Institute, the share of Black workers earning poverty wages has consistently been 1.5 times that of White workers.  The share of Hispanic workers earning poverty wages increased to 2.2 times the share of White workers in 2017.  *See* David Cooper, *Workers of color are far more likely to be paid poverty-level wages than white workers*, Feb. 21, 2018, available at:

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

an ordinance requiring City contractors to pay their employees a living wage. LAAC § 10.37 *et seq.* In 2016, the City was one of the first jurisdictions in the United States to enact a Minimum Wage ordinance applicable to all private employers in the Los Angeles, requiring workers in the City to receive a minimum wage that exceeded the California and Federal minimum wages. Los Angeles Municipal Code ("LAMC") § 187.00, *et seq.* In an effort to address disparity in incarceration rates for people of color, understanding that a large percentage of the City's homeless population have a history of incarceration impacting their job prospects, the City adopted a Fair Chance Initiative, precluding private employers from inquiring into an applicant's incarceration history until after a conditional offer of employment is made. LAMC § 189.00, *et seq.*

Funded by the County, the Los Angeles City Attorney's Office staffs the Homeless Court Program (also known as Homeless Engagement and Response Teams ("HEART")), which connects unhoused Angelenos and individuals at risk of experiencing homelessness with social services and criminal record clearing assistance. The City Attorney's Office staffs a homeless court in various locations throughout the City, including in park spaces, shelters, service provider facilities and libraries, which helps resolve traffic and pedestrian citations by allowing individuals to engage in services in lieu of paying fines or fees. Through HEART, courts are asked to dismiss open infractions, suspend outstanding fines and fees, and recall any associated warrants. Between July 2015 to March 2020 (before the City and County stay-at-home orders were implemented), HEART hosted 161 events, 40 of which (25%) were hosted in Skid Row. The City Attorney's and District Attorney's Offices also administered a large-scale dismissal project to resolve over 2 million outstanding infraction citation cases. In Fiscal Year 2019-2020, 35% of new participants enrolled in HEART and 32% of the

---

https://www.epi.org/blog/workers-of-color-are-far-more-likely-to-be-paid-poverty-level-wages-than-white-workers/.

36

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

individuals served by HEART self-identified as Black, and 43% of the new participants enrolled and served self-identified as Hispanic/Latino.

Furthermore, the City's Economic and Workforce Development Department ("EWDD") operates 16 WorkSource Centers and 3 portal offices throughout the City offering employment services to underserved Angelenos, including individuals experiencing homelessness, veterans, seniors, dislocated workers and the re-entry population. These centers provide job training, resume building and interview skills services, offer telephone and computer access, host workshops, provide employment referrals, as well as career guidance and placement assistance. Two WorkSource Centers are located in or near Downtown Los Angeles, including one in the Westlake/Pico-Union area (near Good Samaritan Hospital) and one at the Central Library. A third WorkSource Center is in Boyle Heights, just outside downtown Los Angeles.

One of the programs managed by the City's EWDD is LA:RISE, which was recognized in 2020 by the Department of Labor as a national best practice. LA:RISE is an innovative partnership between the City and County that helps serve Angelenos experiencing homelessness or at-risk of experiencing homelessness, including previously incarcerated individuals, individuals on parole or probation, or young adults aged 18 to 24 who are currently out of school or work. LA:RISE provides enhanced transitional employment and support services, which may include childcare, housing, transportation, financial literacy, mental health counseling and mentorship, to help Angelenos experiencing high employment barriers to obtain jobs, stay employed and build a better economic future. Presently, LA:RISE is a partnership between 12 social enterprise partners, 7 WorkSource/YouthSource partners, and 2 specialized job retention providers that provide a 3- to 12-month employment program, providing subsidized transitional employment and job training, and assistance finding unsubsidized, full-time employment in the open labor market. Two of the social enterprise partners specifically service Skid Row: Chrysalis and the Downtown Women's Center.

37

The City also provides 16 one-stop community centers, known as FamilySource Centers, in high need areas of the City, which offer various social, educational, work, and family support systems to help unhoused and at-risk sheltered Angelenos to increase their income and academic achievement.  One FamilySource Center is located in the Westlake/Pico-Union area, and another is in Boyle Heights, both near Downtown Los Angeles.  The City funds and employs services to help avoid homelessness to individuals and families through eviction prevention, legal assistance, relocation support and financial coaching.  The goal of these programs is to help prevent homelessness by stabilizing housing and working with individuals and households to build a more financially secure future.  Multiple youth services are also provided which assist youth ages 16-24 with job placement, diploma completion, mentoring and obtaining higher education.  The FamilySource System is recognized as a model both statewide and nationally.  In 2011, the California Council for Excellence awarded the California Award for Performance Excellence to the FamilySource System and in 2019, the National Community Development Association (NCDA), recognized the FamilySource System as a Community Development Block Grant Public Services Best Practice at the NCDA 50th Annual Conference.

On July 5, 2016, the City's Department of Aging implemented a pilot program, the Older Workers Employment Program ("OWEP"), to provide paid on-the-job training for older unsheltered Angelenos or older Angelenos who are at-risk of experiencing homelessness.  At the time the OWEP report attached as Exhibit O was prepared, 75% of the clients served by the program self-identified as Black, and 13% self-identified as Latino.  OWEP received the 2018 Aging Innovation Award by the National Association of Area Agencies on Aging.  Furthermore, the City's Department of Disability provides outreach and referrals to unsheltered Angelenos and persons at-risk of experiencing homelessness who are victims of domestic violence and human trafficking, and works with the Unified Homeless Response Center to address needs of persons with disabilities who are experiencing homelessness and provides accessibility support to shelters.

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

The City is continuing to explore ways to alleviate issues experienced by racial minorities throughout the City, including in Skid Row. Among other things, the Mayor's Office has a director dedicated to issues on Skid Row within its Homeless Initiatives Office. And the City recently set up a Civil + Human Rights and Equity Department. As the information set forth above demonstrates, the City continues to work deliberately and innovatively to address the racial inequities that exist among people experiencing homelessness in Los Angeles.

> ***4. The Court is trying to ascertain whether the City's policies have been deliberately indifferent to those with mental illness. Is there any evidence in records of the City that either government intended Skid Row or any other section of the city to be a gathering place, voluntary or involuntary, for the mentally ill? Please produce any material that where the problem of mental illness has been discussed or considered with regard to Skid Row policy.***

The County is the health office for the City of Los Angeles and the City relies on the County to provide these crucial services. As such, the County is obligated to, requested to, and needs to, provide health services to City residents, including (a) public health services (through the County's Department of Public Health), (b) mental health services (through the County's Department of Mental Health), (c) medical health services (through the County's Department of Health Services), (d) social services (through the County's Department of Public Social Services) and (e) adult protective services (through the County's Workforce Development Aging & Community Services Department). Thus, the County is responsible for providing treatment and developing policies to address mental illness among Los Angeles City residents, including the over 9,000 (25% of) persons experiencing homelessness in Los Angeles who suffer from serious mental illness. Ex. M (2020 PIT Count).

This is consistent with the County's statutory obligation to care for the indigent and those who cannot care for themselves due to mental illness or incapacitation. (*See*,

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

e.g., Cal. Welfare and Institutions Code § 17000;[22] *Hunt v. Superior Court*, 21 Cal.4th 984, 991 (1999) (Section 17000 imposes a "mandatory duty" on counties to relieve and support an indigent or incapacitated person).  These mental health services, when delivered appropriately, can have a real impact on addressing homelessness.  A recent policy brief by the California Policy Lab noted clients who were diagnosed with mental illness by the County's Department of Mental Health were enrolled in interim housing, rapid re-housing, or permanent supportive housing at nearly double the rates of those with no DMH history.  *See* Exhibit P (California Policy Lab, *Unsheltered in Los Angeles: Insights from Street Outreach Service Data*, February 24, 2021, p. 3).

The City is not aware of any evidence that the City intended Skid Row or any other section of the city to be a gathering place, voluntary or involuntary, for the mentally ill.  In fact, to help address and reverse the concentration of homeless people in the Skid Row area, the Los Angeles City Council voted in 2016 to formally reverse the policy of attempting to contain homelessness in Skid Row, and declared its intention to make services, facilities, and housing for people experiencing homeless accessible city-wide.  *See* Ex. N (Council File 16-0046).

In addition, for years, the Los Angeles City Attorney's Office has actively pursued prosecution of hospitals, skilled nursing, and other healthcare facilities engaged in patient dumping to ensure that all patients, especially those who are homeless and/or are suffering from mental health issues, are treated humanely and in compliance with appropriate medical discharge standards.  *See*, *e.g.*, *People v. Kaiser Foundation Hosp.*, et al., LASC No. BC362039) (filed Nov. 15, 2006); *People v. Pacifica Hosp. of the Valley*, LASC No. BC624832) (filed Jun. 22, 2016).  In particular, through these cases, the City Attorney has sought to combat the rise in instances of healthcare entities

---

[22] Cal. Welf. & Inst Code § 17000: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

illegally dumping patients with mental health issues in Skid Row.  *See*, *e.g.*, *People v. Glendale Adventist Med. Ctr.*, LASC No. BC555301 (filed Aug. 14, 2014).

> ***5.    The Court is trying to understand whether the City's policies have been deliberately indifferent to women who are homeless. Is there any evidence in records of the City that there has been consideration of the effects of homeless on women? Please produce any material where the problems suffered by women who are homeless has been discussed or considered with regard to Skid Row policy. Please also submit any evidence of the City's intent when establishing Skid Row to make it a gathering place for men, voluntarily or involuntarily.***

The City is committed to working to ensure gender and racial equality in access to services to address homelessness Citywide, including in Skid Row.  In response to studies such as the 2016 Report of the LAHSA Ad Hoc Committee on Women and Homelessness, which highlight the unique and diverse needs of women experiencing homelessness, the City is affirmatively exploring ways to address those needs.  For example, the City–in partnership with LAHSA, the County, the Downtown Women's Center, and other nonprofits–launched a pilot project in 2019 specifically dedicated to researching and addressing the needs of women, and particularly Black women, experiencing homelessness in Skid Row.  The City has invested $1.5 million into this project. *See* Dkt. 207, p. 3.  More recently, in September 2020, in response to the 2020 Point-in-Time Homeless Count which found that 28% of people experiencing homelessness on Skid Row are women, and specifically "[t]o address the needs of women in Skid Row Area," the City Council unanimously voted in favor of, and the Mayor approved, a motion to allocate $200,000 in HEAP funds to support the Downtown Women's Center's Health and Wellness program to provide meals to its clients.  *See* Exhibit Q (Council File 20-1219 Motion and Council Action).

Recognizing the unique needs of women experiencing homelessness, the City has created ABH sites dedicated to women, including the bridge housing in Council District

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

14 at the Downtown Women's Center in Skid Row, Casa Azul ABH in Council District 1 (dedicated to single women and families), and Gardner Library ABH in Council District 4. This summer, a psychiatric recuperative care center for unaccompanied women in Skid Row funded by the City and the County will open. And as discussed above, as a result of Mayor Garcetti extending three leases on PRK sites, in the last couple of weeks alone, 153 women from Skid Row have received shelter, with more unhoused women Angelenos to be sheltered in the weeks to come.

The City is also committed to helping to combat the trauma of domestic violence, which disproportionately impacts women and which frequently leads to homelessness. Among other programs, the City funds ten domestic violence agencies to provide shelter-based services for victims of domestic violence and human trafficking along with their families. In the City's FY 2020-21 Adopted Homeless Budget, funding was allocated to expand shelter operations that specifically address the needs of homeless domestic violence survivors. Ex. F, pp. 7-8. In addition, in response to the COVID-19 pandemic, which led to a spike in calls to law enforcement related to domestic violence, the City launched Project Safe Haven to provide shelter for victims of domestic violence, human trafficking, and sexual abuse. From April 2020 through February 2021, Project Safe Haven housed 3,000 survivors and successfully transitioned 97% of them into permanent housing. The City also funds two Family Justice Centers that provide legal, therapy, case management, homelessness, and related services on a walk-in basis.

Furthermore, in addition to the programs discussed above which address individuals and families in underserved communities, the City funds housing and health and wellness programs specifically for women experiencing homelessness. More broadly, the City also continues to explore ways to reduce gender inequities and alleviate challenges faced by women throughout the City, including in Skid Row.

## IV. CONCLUSION

The City appreciates the Court's continued efforts to explore solutions to the homelessness crisis facing the region, whether those solutions are on the ground or in the

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION

courtroom, and to work with the parties to facilitate a resolution of this case for the benefit of all.  The City will continue its efforts to address the needs of Angelenos experiencing homelessness or at risk of becoming homeless as summarized above, as it also looks for new and innovative ways to better address homelessness.  Therefore, it is unnecessary and beyond the permissible scope of the Court's powers to unilaterally impose a structural equitable remedy at this time.

DATED:  March 4, 2021                MICHAEL N. FEUER, City Attorney
                                     KATHLEEN A. KENEALY, Chief Deputy City Attorney
                                     SCOTT MARCUS, Senior Assistant City Attorney
                                     GABRIEL S. DERMER, Assistant City Attorney
                                     ARLENE N. HOANG, Deputy City Attorney
                                     JESSICA MARIANI, Deputy City Attorney

                                     By: /s/   Scott Marcus
                                     Scott Marcus, Senior Assistant City Attorney
                                     Counsel for Defendant City of Los Angeles

DEFENDANT CITY OF LOS ANGELES' BRIEF AND RESPONSES TO REQUESTS FOR INFORMATION