Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel:  (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Catholic Worker
and LA Community Action Network*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>                    Plaintiff(s),<br><br>            vs.<br><br>City of Los Angeles, et. al.<br><br>                    Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>INTERVENORS' BRIEF IN RESPONSE TO JANUARY 31, 2020 ORDER<br><br>Complaint Filed:  March 10, 2020 |

Intervenors Los Angeles Community Action Network (LA CAN) and Los Angeles Catholic Worker (LACW) submit this report in response to the Court's January 31 Minute Order (Dkt 203) and subsequent orders on February 3 and February 8, 2021 (Dkt 206 and 213).

## I.    INTERVENOR'S STATEMENT OF FACTS

The Court in its January 31 order requested the parties provide a statement of facts along with answers to various questions posed by the Court.  While the questions were primarily aimed at the Defendant City and County, who have access to information responsive to the Court's request, Intervenors provide the following additional facts which are relevant to remedies that have been raised by Plaintiffs and Defendant City of Los Angeles:

### a.  City's Use of Criminalization and Policing Against Unhoused Residents

1.     In the City of Los Angeles, when adjusted for population, Black adults were 5.5 times as likely as white adults and Latinx adults were 1.6 times as likely than white adults to be arrested and then cited and released for a non-traffic infraction, including quality of life offenses specifically targeted at people experiencing homelessness.[5]

2.     In 2019, although Black people make up only 7% of the population, they received 33 percent of the citations for Los Angeles Municipal Code Section 41.18(d), which prohibits sitting, sleeping or lying in public.[6]

3.     Black people received 63 percent of all citations for Los Angeles Municipal Code Section 41.18(a), which prohibits obstructing the sidewalk.

---

[5] Lawyers Committee for Civil Rights, "Cited for Being in Plain Sight," available at https://lccrsf.org/wp-content/uploads/LCCR_CA_Infraction_report_4WEB-1.pdf at 12.
[6] *Id.* at 16.

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

4.     In 2019, out of 26 Officer-Involved Shootings by the Los Angeles Police Department, six were against people experiencing homelessness.[7].

5.     In 2019, 34% of all non-categorical Use of Force incidents by the Los Angeles Police Department were against people experiencing homelessness.[8]

6.     In 2016, there was one houseless arrest for every two houseless people in the City of Los Angeles, which is 17 times the arrest rate among the total population of the city.[9]

7.     Failure to Appear constituted 22% of all charges of houseless arrests from January 2017 to June 2017.[10]

**b.  Cost of Interim Shelter Compared to Permanent Housing**

8.     In Los Angeles County, based on the 2020 Continuum of Care Shelter Count and Housing Inventory Count, there are 14,887 emergency shelter beds, 4,147 Transitional Shelter beds, and 125 Save Haven beds in the Los Angeles Continuum of Care (which excludes Pasadena and Glendale).[11]

9.     The current Measure HHH per-unit commitment is $132,569.[13]  On average, a unit built with Measure HHH funds is able to leverage the funding received to obtain $210,000 in additional funding from sources outside the City of Los Angeles.

---

[7] Los Angeles Police Department, 2019 Use of Force Year-End Review at 168.
[8] Los Angeles Police Department, 2019 Use of Force Year-End Review at 344.
[9] Million Dollar Hoods, "Policing the Houseless, Arrests by the LAPD (2012 to 2016)," 2017, *available at*
https://ucla.app.box.com/s/ilcgtin6u6lb4l7e3c77qwz29zq4b732
[10] Million Dollar Hoods, "Policing the houseless 2.0, Arrests by the LAPD (2012 to 2017)," 2017/.
[11] LAHSA 2020 Housing Inventory Count, available at
https://www.lahsa.org/homeless-count/hic/
[13] Measure HHH Pipeline Dashboard, available at
https://www.lamayor.org/summary-hhh-pipeline

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

10. The first Pallet Shelter project to open in Los Angeles cost $130,000.00 per unit.[14] According to Defendant City, the operating cost of a Pallet shelter is $45 per day.[15] The daily cost to operate other forms of City shelters can range from $60.00 per day for A Bridge Home sites[17] to $85.00 per day for Project Homekey.

11. The Payment Standards for a Housing Choice Voucher (Section 8) for the Housing Authority of the City of Los Angeles (HACLA), the highest amount of rent the Housing Authority will allow for a current unit, is as follows[18]:

| Bedroom Size | Payment Standard |
| --- | --- |
| SRO | $1,026 |
| 0 | $1,369 |
| 1 | $1,765 |
| 2 | $2,263 |
| 3 | $2,735 |
| 4 | $2,982 |
| 5 | $3,429 |
| 6 | $3,876 |

---

[14] https://www.latimes.com/california/story/2020-12-12/los-angeles-tiny-homes-homeless.
[15] *See* Dkt. 149, City Report in Response to Docket 143.
[17] *See e.g.*, Report from the CAO to City Council, https://clkrep.lacity.org/onlinedocs/2018/18-0628_rpt_CAO_05-06-2019.pdfon HEAP funding (daily cost to operate Schrader, Pacific, Western, and Lafayette is $60.00 per day).
[18] HACLA, Section 8 Payment Standards, available at Home.hacla.org/abouts8

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

## II.    THE COURT'S AUTHORITY TO ORDER STRUCTURAL RELIEF

The Court requested the parties brief this Court on the "outer limits of the Court's structural equitable remedy power in these circumstance." Dkt. 205. As an initial matter, litigation in this case remains stayed, pursuant to an agreement of the parties in March 2020.  Pursuant to this agreement, the parties agreed to work towards settlement, and allowed ex parte communications in furtherance of settlement.  Because litigation has been stayed, the parties have not even filed responsive pleadings.  There has been no development of legal theories upon which to base equitable relief, nor has there been factual development in support of specific remedies.  To the extent this Court has the power to issue injunctive or other forms of equitable relief, based on the factual development and legal theories put forth by the parties in the course of litigation, any relief ordered by the Court must be consistent with the allegations in the complaint, the Plaintiff or requesting party must have Article III standing to seek prospective relief; *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020); and the moving party must demonstrate that they have a right and that right has been been violated, *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).

## III.    REMEDIES THAT PRIORITIZE INTERIM SHELTER WILL NOT SOLVE HOMELESSNESS OR ADDRESS STRUCTURAL ISSUES RAISED BY THIS COURT

The Court, in its January 31, February 3, and February 8, 2020 orders as well as at the February 4, 2020 hearing, raised concerns about the extent to which a history of racism in Los Angeles has contributed to the homelessness crisis.  *See e.g.*, Dkt. 208.  Although the questions posed by this Court have not been raised by Plaintiffs (nor would they have standing to do so), the impact of the policies currently advanced by Defendant City of Los Angeles in response to this litigation and the relief sought by Plaintiffs implicate the concerns raised by this Court.

### c. The Role of Racism in Shaping the Current Housing Crisis

The effect of structural racism and its role in the creation of the current homelessness crisis been well-documented for decades.  Black people are significantly overrepresented among people experiencing homelessness in Los Angeles.  Although Black people make up 8.9% of the population in the City of Los Angeles,[19] they constitute 38% of all people experiencing homeless.  A Black person is more than 4 times as likely to be homeless in Los Angeles than their white counterpart.

In 2018, LAHSA created the Ad Hoc Committee on Black People Experiencing Homelessness to review and document the role of structural racism in creating the current housing crisis and the needed reforms to begin to address its widespread impacts. The antecedents to homelessness identified by the Ad Hoc Committee and elsewhere include deep and pervasive racism in every facet of society.[20]  Racist housing policies that date back to the creation of Los Angeles have led to segregated communities and a lack of homeownership and the accumulation of generational wealth, which has in turn resulted in significantly greater housing precarity among communities of color and especially Black communities.  Continued and widespread institutional biases upstream and mainstream systems continue to contribute to housing insecurity and a disproportionate number of Black people experiencing homelessness.  Other drivers of homelessness include but are not limited to discrimination in housing and employment, which contributes to higher rates of unemployment and lower wages, mass incarceration, and overrepresentation in the Child Welfare System all contribute to the vastly disproportionate number of Black people experiencing homelessness in Los Angeles.

---

[19] https://www.census.gov/quickfacts/losangelescitycalifornia#qf-headnote-a
[20] Report and Recommendations of the Ad Hoc Committee on Black People Experiencing Homelessness, December 2018, available at https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness.

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

### b. A Shift Towards Interim Housing without Corresponding Permanent Housing Will Exacerbate Existing Racial Inequality

Much of the discussion in this litigation has focused on emergency or temporary shelter to solve the City's homelessness crisis, including a request by this Court to address whether approved Measure HHH funds could be clawed back from permanent housing solutions to fund emergency shelter beds.[21]

Aside from the question of whether Measure HHH funds could be used to fund emergency shelter beds, investment in interim shelter system reinscribes the structural racism that created the homelessness crisis in the first place, particularly, where, as here, moving towards interim housing means moving away from permanent housing solutions.

The City's interim and permanent housing systems do not operate independently of one another. Because interim shelter beds are intended to be temporary, individuals residing in interim shelters are still considered homeless. Bridge housing is designed to be "a model of temporary housing that . . . is designed to help residents stabilize their lives, move on to permanent housing, and stay off the streets for good."[22] Therefore, the success of the interim housing program relies on the existence of permanent housing, into which individuals can exit. If there is an imbalance between the number of permanent housing and interim housing beds, then individuals in interim housing will either exit back into street homelessness or remain in the interim housing bed, to the exclusion of another person on the street. When that occurs, it both undercuts the efficiency of the interim housing system and the financial viability of the intervention, since interim shelters are more costly to operate than almost any other form of housing.

---

[21] The arguments against doing so have been articulated elsewhere, *see e.g.*, Letter from SCANPH to Judge Carter; Letter from Inner City Law Center to Judge Carter, February 12, 2021. Intervenors agree with and incorporate by reference those arguments here.

[22] Mayor of Los Angeles, "A Bridge Home," available at lamayor.org/ABridgeHome

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

There is currently insufficient permanent housing for the system's interim housing to operate effectively or efficiently. According to a 2020 LAHSA Homeless Services Systems Analysis,[23] a balanced system of housing across Los Angeles would include 42,112 permanent supportive housing units, 13,710 rapid rehousing slots, and 10,950 interim housing units.  At the time of the report, there were only 19,990 supportive housing units, 8,399 rapid rehousing units, and 7,132 interim housing units.[24]

In 2020, there were 3,511 interim housing units currently in the pipeline.  This left an unmet need of just 307 interim housing units to meet the current need in a balanced system.  As a result of the agreement in this case between the City and County, the City is slated to exceed the number of interim beds needed.  On the other hand, there remains over 20,000 too few permanent units to meet the need.  If there were sufficient exits into permanent housing from the current interim shelter beds, there would be sufficient interim shelter beds to address the current homelessness crisis.

Instead, most individuals who exit the City's interim or bridge housing programs do not exit into permanent housing.  According to LAHSA, 2,751 individuals have enrolled in the City's A Bridge Home shelter that report data, since the program began in 2018.  Of those participants, 1920 have exited the program.  Only 297 participants who have left, or 15.5% have exited ABH shelters into permanent housing solutions.  1,623 have exited to either another temporary situation or onto the street.[25]  The average length of stay for a participant is 130 days.

---

[23] Homeless Services System Analysis:  Envisioning an Optimal System in Los Angeles, March 2020, available at https://www.lahsa.org/documents?id=4311-homeless-services-system-analysis-envisioning-an-optimal-system-in-los-angeles at 22.
[24] *Id.*
[25] LAHSA, A Bridge Home Dashboard, available at https://www.lahsa.org/data?id=50-a-bridge-home

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

Because there are so few exits from interim housing to permanent housing, interim housing does not offer a solution to the City's housing crisis.  Nor does it provide a remedy to the structural racism that created the crisis in the first place.  Instead, the expansion of an interim housing system with few to no opportunities to exit the system into permanence means the creation of a two-tiered housing system, in which one system offers housing and the concomitant autonomy, privacy, and stability, while the other offers only shelter, with little privacy, no stability, and no permanence.  Notably, individuals in the shelter system are overwhelmingly people of color and significantly, more than four times likely to be Black.[26]

### c.  The City's Current Model of Interim Shelter and Criminalization perpetuates the cycle of homelessness

The disparities that step from the interim housing system are exacerbated by the City's expansion of policing and criminalization of people experiencing homelessness along with the creation of interim shelters.  One signature component of the City's ABH shelter program is the creation of Special Enforcement and Cleaning Zones around many of these shelters, including new shelters that are opening up in satisfaction of the agreement between the City and County in this case to fund new shelter beds.

When the City launched the A Bridge Home interim shelter program to create new City-owned temporary homeless shelters in each City Council district in Los Angles, the City promised that, if a shelter was built in a neighborhood, it would result in a decrease in the amount of homeless encampments surrounding the new ABH sites, and the City would then be able to "restore spaces previously occupied by encampments."  However, none of the shelters had enough beds to provide shelter to all residents of the City.  In fact, none of the shelters had enough beds

---

[26] LAHSA, 2020 Greater Los Angeles Homeless Count at 4.  *See also* Report and Recommendation of the Ad Hoc Committee on Black People Experiencing Homelessness at 16 (noting that unhoused people who are Black are more likely to reside in interim shelters that people in other race groups (31% compared to 24%).

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

even for the number of unhoused residents already living in the neighborhood surrounding the new ABH.

As a result, the City could not achieve its objective of reducing the number of encampments around a given site through the creation of shelter beds alone. Therefore, as it had done myriad other times in the recent past, the City opted to use law enforcement and sanitation to address the evidence of visible homelessness.  To do so, the City launched a new law enforcement strategy for the area around the ABHs:  the creation of Special Enforcement and Cleaning Zones (SECZ).  The explicit goal of this new strategy was to augment the impact of the ABH to reduce the number of encampments in neighborhoods that "accepted these shelters" by increasing the deployment of law enforcement and sanitation services to the area, and to require individuals to leave the area more frequently

This strategy of containment in the shelters and banishment around the shelters is similar to the 1976 Containment strategy, which created the modern-day Skid Row.[27]  Like the Containment strategy in Downtown Los Angeles, the City's new enforcement strategy was created as a compromise, to quell resistance from property owners and housed residents who "may be reluctant to embrace the opening of a Temporary Housing Shelter in their neighborhood due to the fear of spill-over encampments and sidewalk blockages."  As with the Skid Row containment strategy, this strategy relies on individuals who are unhoused staying in designated areas (in the case of Skid Row, it was the 50 block area of Skid Row, in the case of the ABH shelters, it is the shelter itself).  The containment is enforced by a buffer zone, which is heavily policed and regulated.

---

[27] *See* "The Making of a Crisis:  A History of Homelessness in Los Angeles," UCLA Luskin Center for History and Policy at 26-29 (describing the creation of the Skid Row Containment Zone with the adoption of the Blue Book in 1976: "By relocating soup kitchens, missions, and the like inside the fifty-block containment zone and investing CRA funds in the improvement and development of affordable housing in the same area, the city sought to prevent the expansion of the Skid Row homeless population.")

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**

Just as the containment strategy in 1976 failed because the need was greater than the space allowed, the current strategy of containment and banishment failed to address the signs of visible homelessness, particularly in the immediate area outside the zone.  And just as the post-containment period let to a rapid expansion of criminalization against people experiencing homelessness,[28] the failure of the initial containment strategy with the SECZs is leading to the expansion of criminalization:  in this case, a proposed amendment to the municipal code that would make it illegal to camp outside the shelters.

The use of criminalization and policing against people experiencing homelessness has disproportionate impacted Black people and people of color.[29]  By coupling enforcement strategies and the expansion of criminalization with the expansion of interim housing, this further exacerbates the negative impact of strategies that focus on interim housing as opposed to permanent housing.

Dated: March 4, 2021                    Respectfully submitted,

Legal Aid Foundation of Los Angeles

_____/s/ Shayla Myers_____
Attorneys for Intervenors

Law Office of Carol A. Sobel

_____/s/ Carol A. Sobel_____
Attorneys for Intervenors

[28] *Id.*
[29] "Cited in Plain Sight" *supra* note 5 at 16.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

11

**LOS ANGELES INTERVENORS' RESPONSE TO JANUARY 31 ORDER**