**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
ELDER LAW AND DISABILITY
RIGHTS CENTER
1535 E 17th Street, Suite 110
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org


**CAROL A. SOBEL** SBN 84483
**WESTON ROWLAND** SBN 327599
LAW OFFICE OF CAROL SOBEL
1158 26th Street, #552
Santa Monica, California 90403
T. 310 393 3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

**PAUL L. HOFFMAN** SBN  71244
**CATHERINE SWEETSER** SBN 271142
SCHONBRUN, SEPLOW, HARRIS &
   HOFFMAN & ZELDES
   11543 W. Olympic Blvd.
Los Angeles, California 90064
t.  310 396 7031
e. hoffpaul@aol.com
e. csweetser@sshhlaw.com

ATTORNEYS FOR INTERVENOR OCCW

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | Case No.: 2:20-cv-02291 DOC-KES <br><br> INTERVENOR ORANGE COUNTY CATHOLIC WORKER'S RESPONSE TO COURT ORDERS <br><br> Date: March 4, 2021 <br> Time: None <br> Ctrm: Ronald Reagan - 9D <br><br> Action filed:  March 10, 2020 |

Intervenor Orange County Catholic Worker ("OCCW") files this response to the Court's Orders regarding Equitable Remedies and Responses to Requests for Information regarding Minutes of In Chambers Order/Directive - no proceeding held, [Dkt. 205], Minutes of In Chambers Order/Directive - no proceeding held, [Dkt. 206], and Minutes of In Chambers Order/Directive - no proceeding held [Dkt. 213].

Intervenor OCCW focuses its response on the myth that shelters are a necessary, immediate and less expensive response to remove people experiencing homelessness from public areas. Intervenor also addresses the cost of criminalization.

The only realistic solution to address homelessness in Los Angeles is the availability of affordable housing options. As discussed below, housing is more effective and less costly than criminalization and temporary shelters. Also, it can be achieved as quickly, effectively and less expensively than temporary shelters, sanctioned encampments and other stop-gap measures.

Focusing on housing to meet the needs of people experiencing homelessness furthers the express goals of the Legislature in recent modifications to existing Housing Law and new measures enacted to address the increase in houselessness statewide, especially as it results from the failure of government entities to meet housing requirements in their respective communities.

## I.    THE CITY OF LOS ANGELES' HOUSING ELEMENT

The State of California mandates every city and county submit a General Plan to the State Housing and Community Development ("HCD") Department every 8 years and to submit interim updates. Gov. Code § 66685. The General Plan addresses multiple categories of development in the entity. As one of nine requirements in the General Plan, the City must include a "Housing Element," setting out a specific framework to meet the needs for housing seniors, individuals with disabilities, extremely low-income individuals and unhoused persons. These parallel

the categories of individuals documented as people experiencing homelessness in the annual Point-in-Time count required by the federal Housing and Urban Development ("HUD") agency.  If any of the required information is not submitted, the General Plan is not approved.

Without a General Plan accepted by the HCD, development projects in the City/County may not be authorized.[1]  Until recent amendments by the Legislature, this law had no real teeth and few denials or enforcement actions occurred for entities that were out of compliance with the Housing Element.

As part of the General Plan requirements, Regional Housing Needs Assessments ("RHNA") are set for every entity in the State.  The RHNA is mandated by State statute as part of the process of updating local housing elements of each General Plan.  In the 2013 General Plan submitted to HCD, the City of Los Angeles reported that it fell far short of the City's RHNA requirements set for the prior General Plan period.   For the current period – 2013-2021, the State agency set a RHNA of 20,427 "Very Low Income" for Los Angeles City.  As of the October 2020 filing, Los Angeles City reported completing 5,136 very low income (which includes "extremely low income") units, barely 25 percent of the goal set by the State. *See* Annual Progress Report: HCD Regional Housing Needs Allocation and Housing Elements; http://hcd.ca.gov/community-development/housing-element/index.shtml.

---

[1] Under revisions to the state housing law passed in 2017, the California Attorney General may bring an enforcement action to compel compliance.  The first lawsuit was filed against Huntington Beach for the failure to address affordable housing needs.  *See* www.ocregister.com/2019/01/25/gov-gavin-newsom.  Private parties may also sue for compliance. For example, a successful challenge was made to zoning restrictions in the City of San Clemente that effectively prohibited shelters in the city.  The Superior Court issued a writ preventing issuance of any development permits until the City was in compliance with the Housing Element requirements.  *See Emergency Shelter Coalition v. City of San Clemente*, Case Number: OCSC 30-201400758880. In the last session, the California Legislature strengthened enforcement mechanisms.

The RHNA goals for 2021-2028 are being finalized currently.  The announced numbers require the City of Los Angeles to create a total of close to 500,000 units of housing to meet the needs of residents at the required income levels.  Specifically, the City must create 456,643 new housing units in the next cycle, of which almost 116,000 must be extremely and very low-income units and 69,000 must be low income units.  https://scag.ca.gov/sites/main/files/file-attachments/6th-cycle-rhna-proposed-final-allocation-plan.pdf?1614023284.

In the General Plan adopted by the City in 2013, the City reported that it had met only 41 percent of the Regional Housing Needs Assessment (RHNA) set for Los Angeles in the prior period and that approximately 83 percent of what was approved was for market rate units.  HousingElement_20140321.pdf (lacity.org) at 5-4.  Reviewing the prior period goals, the report also noted that "[t]he policies and objectives under this area were largely found to be adequate in their approach to preventing and ending homelessness."  *Id.* at 5-11.  This was an extraordinary and deliberate misrepresentation of the reality of housing needs in the City.

At about the same time, in the 2103 General Plan submitted to and approved by the State, the City set an objective to: "Add 500 units annually to the City of Los Angeles affordable housing stock; 30% of units to be Permanent Supportive Housing (PSH)."  *Id.* at 6-18.  These numbers were unrealistic then and even more so now.  With the passage of Prop H, the total number of new PSH inventory over 10 years was initially to create 10,000 units, more likely now a final number of approximately 7,000 units.  Over the course of a decade, Prop H will produce only about half of the annual PSH units represented as necessary in the 2013 General Plan, when the total number of unhoused persons was far less than it is now.  Even though these projections bear no relationship to the actual needs of the City, the City Council ratified this baseless representation when it voted to approve the General Plan.

When the 2013 General Plan was submitted, the Point-in-Time Count put the number of persons experiencing homelessness in the Los Angeles region at more than 58,000 people, an increase of almost 11 percent over the prior point-in-time count.[2] https://documents.lahsa.org/planning/homelesscount/2013/HC13-Results-LACounty-COC.pdf at p.4.  The 2020 Count put the number of unhoused persons at more than 66,000.  The number is expected to increase dramatically as a result of the pandemic and continued pressures on the housing market.

The final 2021 General Plan is due in a few months.  The new Plan resets the time to object and challenge the City's compliance with this State mandate.

## II.     THE COST OF HOUSING VERSUS SHELTERS

### A.     Rent Costs in Los Angeles

The majority of unhoused persons in the region cannot afford even low rents, despite the fact that they work, or receive government subsidies based on age or disability.  The median monthly residential rent in Los Angeles County CA was $1,577 in 2019; the average gross rent in Los Angeles County was $1,627 in 2019.  http://www.census.gov/programs-surveys/acs.  For someone who works a minimum wage job for 35 hours a week, the monthly pre-tax income is $2,100.  On an annual basis, this is just barely above the category of "extremely low" for a single person based on August 2020 HUD benefit eligibility for Los Angeles.  Ex. A.

According to the Los Angeles Housing and Community Investment Department (LAHCID), the allowable portion of after-tax income at this level for a single person for rent on a subsidized one-bedroom apartment is $593 a month. *Id.* To paraphrase President Biden, no one should work a full week and have to live in a shelter.

---

[2] LAHSA has changed the methodology for the PIT count several times, resulting in fluctuation in the annual counts.

4

Rent remains out of reach for many in Los Angeles. Under a recently enacted state law capping rent increases, the base allowable rise is at 5 percent a year, plus COLA. For Los Angeles last year, that came to slightly more than 8 percent. By comparison, at the same time the total increase in Social Security benefits for 2020 was 1.6 percent. *See* blog.ssa.gov/social-security-benefits-increase. This is a significant factor in homelessness in Los Angeles, which saw a nearly 20 percent increase in the number of unhoused seniors in 2020.

**B.     The Cost of Shelters**

**1.  the cost of emergency shelters**

Los Angeles spent approximately $50,000 for each bed in the first three Bridge Home shelters opened by the City. The initial outlay for the Shrader facility in Hollywood was $3.3 million, or $45,833 for each of 72 beds. https://www.latimes.com/local/lanow/la-me-ln-homeless-shelter-hollywood-20190 416-story.html. Similarly, initial costs for the El Pueblo shelter near Olvera Street were $2.4 million, or $53,333 for each of 45 beds. *See*, https://www.latimes.com/local/lanow/la-me-ln-bridge-home-homeless-20180905-s tory.html. A "sprung structure" tent shelter on the West Los Angeles Veterans' Administration campus cost approximately $5 million, or $50,000 each for 100 beds), https://11thdistrict.com/news/bridge-housing-to-open-at-west-la-va-campus/. For Project 50, a "housing first" alternative discussed below, there was no similar up front outlay to create the facility. Moreover, the Court is familiar with modular facilities that provide individual housing units. They could be placed on the same public property used for congregate shelters at a lower cost.

**2.  the daily reimbursement from LAHSA per person**

The current reimbursement from LAHSA per person in a shelter is approximately $60 a day, or $1800 month. *See* Ex. B (contract for Gardner Street).

The math is easy: for a couple, the reimbursement is $3600 a month and, for a family of three, it is $5600 a month.  The simple fact is that the cost of maintaining someone in a shelter is far greater than providing rent for a small apartment, especially for couples and families.  In locations that can accommodate two people in a unit – such as a one-bedroom apartment or a motel room – it would be about half the cost of providing shelter space for those individuals.  Moreover, a placement other than a shelter responds to the need for a trauma-informed care environment for a significant percentage of people experiencing homelessness, whether it is because of the emotional stress of losing a safety net, losing a job, losing one's health, or the trauma of domestic violence, sexual assault and other abusive events.

## 2. the ever-expanding shelter numbers

The reality in Los Angeles is that most people who move from the streets to a shelter never advance to more secure housing. The likelihood of moving from a drop-in shelter to housing is about 5 percent and from a Bridge Home shelter the likelihood is now down to about 15 percent.[3]   So, if people are not transitioning out of shelters in significant numbers and the number of unhoused individuals continues to increase at more than 12 percent a year, more and more temporary shelters are needed.

According to an estimate by the Los Angeles Homeless Services Authority ("LAHSA") in 2017, building sufficient "no-barrier" shelters to house everyone experiencing homelessness would require opening approximately 200 facilities.  In 2017, LAHSA estimated the cost of creating shelters for everyone living unhoused would be approximately $1.1 billion for the initial outlay and annual operating costs of almost $400 million.  That analysis premised capacity based on cots and mats  in close proximity to each other, before the necessity arose to "socially distance" in response to a deadly pandemic.

[3] Report to the City of Los Angeles Homelessness and Poverty Committee An Interim Housing-Based Framework for an Emergency Response to Homelessness June 18, 2018.

Mayor Garcetti announced the Bridge Home program, with an initial goal to open 15 shelters – one in each Council district – for a total capacity of 1500 people. The plan was to close these facilities after three years, which would be later this year for the first location at El Pueblo. https://www.lamayor.org/ (FAQ).  As of August 2020, $187 million was spent on this program for a total of 1,766 beds open in 22 facilities.  http://laist.com/2020/08/24/bridge-home-los-angeles-garcetti-result.php.  As of November 2020, the City's website listed 27 City Bridge Home projects completed or in progress.  https://www.lamayor.org/ABridgeHome.

Although the goal of Bridge Housing was to move individuals to more permanent situation within about 3 months, without appropriate housing available, the actual achievements are dismal.  In its first two years of operation, the Bridge shelter at El Pueblo moved only 35 people to permanent housing of 117 total residents, a rate of less than 30 percent.  Overall, in the first two years of the other Bridge shelters operated by PATH, only 24% of residents have moved to permanent housing,  (Schrader – 26%; YWCA – 23.7%; Casa Azul – 20.6%).  *See* https://laist.com/2020/08/24/bridge-home-los-angeles-garcetti-result.php.  For all Bridge shelters in the program, the results as of November 2020 were lower, with only 15 percent of approximately 1500 participants moving to permanent housing.  "Garcetti's A Bridge Home homeless program has mixed results - Los Angeles Times (latimes.com)"   https://www.latimes.com/homeless-housing/story/2020-11-20/garcetti-a-bridge-home-homeless-program-offers-mixed-results.

Shelters are a dead-end at a cost that is no less than stable housing.

## C.    CRIMINALIZATION COSTS MORE THAN HOUSING

The costs of criminalization also far outweigh the costs of housing with no positive outcome for homelessness.  According to a report issued by the Million Dollar Hoods project at UCLA, the cost of putting a person in jail for the night in the City of Los Angeles is $229.  **Map Room - Million Dollar Hoods (ucla.edu)**.

Arresting individuals for quality-of-life offenses is nothing more than a revolving door between the jail cell and the sidewalk.

### D.    PROJECT 50: A SUCCESSFUL "HOUSING FIRST" MODEL

If the goal is to develop solutions to one of the most challenging and intersectional issues facing the region, Los Angeles knows what works to address homelessness in a cost effective manner.  In 2008, the County instituted Project 50, a pilot program based on the "Housing First" model that identified and prioritized the 50 unhoused individuals on Skid Row most at risk of dying in the coming year because of comorbidities and the effects of living on the street.  Each individual was placed in a unit operated by the Skid Row Housing Trust and provided supportive services.  The total cost of the project was slightly more than $3 million over two years, an average of $30,000 annually for each participant.  The program was a success beyond expectation as almost every person remained in their placements and thrived.

A 2015 analysis of the program issued by the USC Price Center for Social Innovation determined that there was a net savings of $200,000 from the program. Project 50: The Cost Effectiveness of the Permanent Supportive Housing Model in the Skid Row Section of Los Angeles County - Price Center for Social Innovation (usc.edu) ("Price Report").[4]  In addition, the Price Report detailed reductions in costs attributed to unhoused persons in key categories.  The conclusion of the Price Report begs the question why the Project 50 plan was not continued and expanded when its

---

[4] A 2009 report by the Economic Roundtable studied a larger sample and reached a similar conclusion about cost savings.  It found that the costs of 297 matched individuals in supportive housing generated $605 in average public costs, compared to $2,897 for those who were homeless. *See* Daniel Flaming, et al, *Where We Sleep:  Costs when Homeless and Housing in Los Angeles* (2009) at 28, https://economicrt.org/wp-content/uploads/2009/11/Where_We_Sleep_2009.pdf

results were so positive.[5]   Because of the cost-savings from housing people and providing services where they reside, rather than in emergencies on the street, the program  more than paid for itself, so the initial outlay does not justify rejecting this approach.[6]   The Report's conclusion says it all, succinctly.

> The qualitative findings presented in this study complement the analysis of cost avoidance, suggesting that the services and care provided through Project 50 not only enabled the County to avoid larger service costs but also have been effective in helping participants rebuild their lives and become reintegrated into society. Taken together, the quantitative and qualitative analyses of the program indicate that Project 50's deployment of permanent supportive housing – i.e. housing plus integrated services and intensive case management – amounts to a homelessness prevention strategy that is both humane and fiscally prudent.

Price Report, p.24.

If placing people in housing is the most effective response for those unhoused individuals who live with disabilities – and some, admittedly, with substance abuse – it is difficult to comprehend why it is not the most effective response for those who lose housing through job loss, inadequate income, domestic violence, illness, job loss. There is no reason why the same approach would not work for supportive housing units that are not PSH.

If the barrier to housing is that private landlords do not want to rent to people with Section 8, VASH or other subsidies, the City and County can master lease buildings.  This will overcome landlord opposition to renting to people with past negative marks on their record from criminal charges, UD actions and credit

---

[5] Intervenor's counsel believes that some public officials may have considered the cost outlay to great, despite the documented savings on budget categories such as emergency medical services.

[6] *See also* University of Pennsylvania, Actionable Intelligence for Social Policy, *Project 50: Ending Chronic Homelessness with Permanent Supportive Housing and Integrated Data Systems* (2015), https://www.aisp.upenn.edu/wp-content/uploads/2020/01/IDS_ExamplesOfIDSBenefit_LaCounty_Project50.pdf.

9

problems.  If the barrier to the program is the availability of units that meet current federal and state requirements for PSH funds, the City and County should first maximize placements for persons who do not meet the eligibility for PSH while they seek legislative amendments to modify more restrictive PSH requirements, at least on an emergency basis so that the money anticipated in the immediate future from the current federal administration and state funding can be used most effectively.

People in shelters are still counted as homeless; people in housing are not.

Dated: March 4, 2021                    Respectfully submitted,

                                        ELDER LAW & DISABILITY RIGHTS CENTER
                                        LAW OFFICE OF CAROL A. SOBEL
                                        SCHONBRUN, SEPLOW, HARRIS, HOFFMAN &
                                             ZELDES


                                        _____/s/   Carol A. Sobel_____
                                        By: CAROL A. SOBEL
                                        Attorneys for Intervenor OCCW

10