Mark Ravis [137479]
David Martin [189755]
**LAW OFFICE OF MARK RAVIS &h ASSOC.**
26565 West Agoura Road, Suite 200
Calabasas, California 91302
Telephone: 310.295.4145
Fax: 310.388.5251

Attorneys for Non-Parties As *Amici Curiae,*
NAACP-Compton, CORE-California, Committee
For Safe Havens

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals, | Case No. 2:20-cv-02291 DOC (KESx) |
| Plaintiffs, | **BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS** |
| v. | |
| CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES

This brief is submitted on behalf of the National Association for the Advancement of Colored People – Compton Branch (NAACP-Compton), the Congress of Racial Equality – California (CORE-CA), and the Committee for Safe Havens (Committee).  Amici submit this brief to make their voices heard and seek justice through federal oversight and remediation.

It is respectfully requested that the Court allow these entities to act as *amici curiae* in this litigation so that they may continue to provide input to the Court.

## I.   INTRODUCTION

Majority-rule democracy has failed the African-American community in Los Angeles County.  This is glaringly evident in the crisis of homelessness.  County statistics show that African-Americans make of 8% of the general population in LA County and 42% of the homeless.[1]  Government has defaulted in its responsibility to the African-American community which has been disproportionately impacted by homelessness.  The disparate impact is evidence of discrimination in violation of Title VI of the Civil Rights Act of 1964.

The egregious disparity did not occur by accident.  It is the result of failed government policies. The facts speak for themselves. Therefore, issues of race are part and parcel of the homeless crisis and cannot be disregarded.

Homelessness in Los Angeles County is both a national disgrace and a major disaster for the County and City of Los Angeles.  Due to bureaucratic and political obstacles and a failure of effective leadership, the City and County are in default on their obligation to provide solutions consistent with the magnitude of the problem.  It is now time, even past time, for judicial intervention to demand solutions, set deadlines, monitor progress, and end practices that create disparate impact.

---

[1] Black, Homeless and Burdened by L.A.'s Legacy of Racism, NY Times, sources for the statistics from administrative records from the Los Angeles County Chief Executive Office for the fiscal year ending June 30, 2019.

BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-
CALIFORNIA, COMMITTEE FOR SAFE HAVENS

The world is watching to see if we have the character and mettle to resolve this disaster.  This brief acknowledges, as have other briefs, the out-of-control increase in homelessness in Los Angeles County and its disproportionate impact on the African-American community.  The liberty interests of disproportionately affected African-Americans as well as the liberty interests of business owners and the public are being violated by a continuation of the status quo.[2]

The spiraling increase in the number of homeless persons defines the problem.  The steps the City and County have taken have been insufficient as the bottom line numbers dramatically reveal.  The statistics are abysmal.  A County-wide emergency response is desperately needed equal to what would certainly happen if 60,000 to 80,000 persons from the Westside were homeless from a major earthquake.  With that in mind, this brief recommends a local "Marshall Plan", undertaken in earnest, similar to the one used to house and feed Europe after WWII.

A county-wide Marshall Plan, if executed correctly, will be a humane intervention that will protect the constitutional rights of both the homeless and the public.  It can also be a powerful stimulus to the local economy.  This is in every respect a public health and safety emergency.  But it is also an opportunity to show our best side, an opportunity for innovative solutions encompassing compassionate caring for those outside normal society by reason of inescapable poverty or disease.

This brief supports Plaintiff LA Alliance's request for Court intervention to bring an end to large populations of desperate people living on the streets and sidewalks, in freeway underpasses and parks.  The homeless should be provided for and the public areas returned to the public for its use and enjoyment.  Judicial intervention is necessary because the other branches of government have defaulted in their obligation to effectively respond in a manner required for the enormity of the problem.  The parties to this brief encourage the Court to order the formulation of

---

[2] A full Substantive Due Process/Equal Protection Analysis is not undertaken in the Brief.

**3**

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

1   reasonable solutions that protect the constitutional rights of all parties, and to

2   supervise the timely execution of those solutions.

3          Finally, the brief offers one possible "Marshall-Plan"-style solution to

4   significantly reduce the number of homeless persons in Los Angeles County.

5   **II.     THE PARTIES TO THIS BRIEF**

6          The National Association for the Advancement of Colored People (NAACP)

7   needs no introduction.  It is the historic home of many great civil rights leaders, such

8   as Thurgood Marshall.  The Compton Branch, with the approval of NAACP state and

9   national, is a proud party to this brief.  Similarly, the Congress of Racial Equality

10  (CORE) also needs no introduction.  It too was one of the pivotal organizations in the

11  forefront of yesterday's heroic civil rights struggles, such as the Montgomery Bus

12  Boycott and, made international headlines when three of its young student members

13  were hideously killed by white supremacists in Mississippi.

14         The remaining party to this brief, the Committee for Safe Havens

15  ("Committee"), is comprised of voluntary non-partisan professionals from the private

16  sector. The group consists of medical professionals, attorneys, engineering and

17  architectural firms, a health care finance expert, the President of CORE-California

18  who is the former President of the Los Angeles Human Rights Commission as well as

19  a federal government budget expert, a licensed private investigator, all working

20  together gratis.  Some Committee members have experience with building large-scale

21  housing in China and knowledge of housing solutions in parts of South America and

22  can share their international experience.  [Declarations of Lincoln Chan, Lucas

23  Giordano, Dennis Lockard].

24         The Committee has met weekly for approximately seven months, considered

25  various options, made a site visit to a possible location for appropriate development.

26  The plan suggested infra in Section V is one option respectfully presented for

27  consideration.

28

**4**

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-
CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

1
2
3

**III.** **HISTORICAL RACISM CREATED THE DISPROPORTIONATE IMPACT OF HOMELESSNESS ON THE AFRICAN-AMERICAN POPULATION**

4
5
6
7
8
9
10

Racism is an inescapable part of United States and Los Angeles history. African-Americans were not welcomed to this country as immigrants seeking a new and better life. They were commodity imports subjected to centuries of mistreatment, the effects of which we still see today. Many households in South Los Angeles border on poverty and many are on the verge of homelessness, especially in the wake of pandemic layoffs. Black Los Angeles has been ignored compared to other communities in Los Angeles County.

11
12
13
14
15
16
17

For example, taking Watts in particular which is home to an uncountable number of people living on the streets, there are few banks, no large supermarket until very recently, and no sit-down restaurants beside fast-food establishments. The area has been marginalized politically and economically and the same is true for other sections of South Los Angeles. This did not happen by accident. It is the legacy of racially discriminatory policies, such as redlining or highlighting most of South Los Angeles as undesirable for investment.

18
19
20
21
22
23
24

When manufacturing jobs departed Los Angeles in the 1970's and 1980's, jobs became especially scarce for African-Americans. Job scarcity and increasingly harsh criminal law penalties disrupted family life and foreclosed opportunity for advancement in the black community. Depression and desperation became an accepted part of daily life and have significantly fueled gang violence and crime. Government policies, including a lack of effective remedial plans, of past centuries contributed to the homelessness disaster.

25
26
27
28

Even though tremendous progress has been made in race relations since the heydays of the Civil Rights movement in the 1950s and 1960s, there is still much to be done. While we are not responsible for the racist policies of our forefathers, we are left with the mess and we need to clean it up rather than pass it on to our children. We must

**5**

provide housing, shelter, and the necessary wrap-around services for the homeless immediately as these are life and death concerns.  This is an emergency situation, particularly for disparately affected African-Americans.  We need leadership willing and able to inspire the public to engage in a massive remedial effort.

Policies designed to remediate the homeless emergency should incorporate economic relief for oppressed communities to the greatest extent possible.  The plan set forth below incorporates features that will provide jobs, training, and other forms of economic relief.  Those most adversely affected by homelessness respectfully request that their voices be heard in the formulation of solutions.

The parties to this brief also recognize, like the plaintiffs in this case, the liberty interests not only of the homeless but also of business owners to conduct business unobstructed by people living on the sidewalks and streets fronting their establishments. And, of course, there is the liberty interest of the general public to freely and safely navigate the streets, sidewalks, parks, and other public locations that they pay for with their tax dollars.  All of these interests are important and must be considered and addressed in remedial plans.

## IV.   THE OUTRAGEOUS EXPENDITURES OF PAST HOUSING PROGRAMS

It is almost inconceivable that providing a bed for a homeless individual would cost $300,000 to $500,000.   [Declarations of Lincoln Chan and Lucas Giordano]. Where in the world has the money gone?  The exorbitant cost of past programs has been well documented in other briefs and in the press and need not be regurgitated here. Suffice it to say that billions of dollars have been spent over the past twenty years and only a few thousand people have been removed from the streets.

The amount of money raised by Proposition HHH and the amount of state and federal grants should have taken care of the housing needs for all of the county's homeless population.  It is argued that emergency housing should be much more reasonably priced if government would make available large tracks of unused, currently

non-productive land and engage in a good-faith effort for emergency relaxation of certain building code requirements.  [Declarations of Lincoln Chan, Lucas Giordino].

## V.    LEGAL AUTHORITY FOR COURT INTERVENTION

The Committee, NAACP-Compton, and CORE-California contend that the Court has enormous authority to intervene to protect the constitutional rights of the homeless population and the affected business owners who are actual plaintiffs in this suit.  *Swann v. Charlotte-Mecklenburg Bd. Of Ed.,* 402 U.S. 493, 538 (2011).  Referring to efforts to desegregate schools in North Carolina consistent with its landmark case of Brown v. Board of Education, 347 U.S. 483 (1954), the Supreme Court in Swann held:

> If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked.  Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breath and flexibility are inherent in equitable remedies.

*Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, at 15.

The Swann Court continued:

> However, a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right.  The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution….
>
> As with any equity case, the nature of the violation determines the scope of the remedy.  In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system.

*Id.* at 16.

The rationale of *Swann* applies to the case at bar.  Here, government efforts to significantly reduce the homeless population in Los Angeles County have failed as

**7**

1   evidenced by the fact that the homeless population has not decreased but has

2   consistently increased over the past twenty years with a disparate impact on the

3   African-American community.  The question of whether this failure is a form of

4   unlawful housing discrimination should be considered.

5       The case of *Brown v. Plata, et al.*, 563 U.S. 493 (2011) is also instructive.  In

6   *Brown*, the Supreme Court upheld a three-judge district court order directing

7   California to remedy two ongoing violations of the Cruel and Unusual Punishment

8   Clause by significantly reducing the prison population.  The district court placed a

9   court-mandated limit on California's prison population.

10      *Brown v. Plata* was a 5/4 decision and Justice Alito, joined by Chief Justice

11  Roberts, wrote a powerful dissent attacking as errors the factual basis of the proposed

12  remedy, the attempt to attack the general problem of overcrowding, and the breath of

13  the remedy itself.  However, Alito and Roberts did not dispute the authority of the

14  district court to order a remedial plan: "If the three-judge court had not made these

15  errors, it is entirely possible that an adequate but less drastic remedial plan could have

16  been crafted." *Id.* at 574.

17      Taking *Swann* and *Plata* together, it is argued that, in the present case, the

18  Court has authority to order and approve remedial plans to correct constitutional

19  violations and monitor the implementation of those plans.

20      Moreover, allowing the status quo to continue with its disparate impact on

21  African-Americans is a violation of Title VI of the Civil Rights Act of 1964 which

22  prohibits discrimination against minority populations.  Specifically, it provides that

23  "[n]o person in the United States shall, on the ground of race, color, or national origin,

24  be excluded from participation in, be denied the benefits of, or be subjected to

25  discrimination under any program or activity receiving Federal financial assistance."

26  42 U.S.C. §2000d.

27      As outlined in the Department of Justice's Title VI guidance, "recipient" refers

28  to any "political subdivision, any public or private agency, institution, or

**8**

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-
CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

1   organization…to whom Federal finance assistance is extended, directly or through

2   another recipient" for any program. DOJ Title VI Manual, note 5, Sec. V at 13.

3        While Title VI prohibits intentional discrimination, the Department of Justice

4   has promulgated regulations that prohibit actions that have a discriminatory impact on

5   people of color.  These regulations provide that a recipient of federal funds may not

6   "utilize criteria or methods of administration which have the effect of subjecting

7   [individuals] to discrimination…or have the effect of defeating or substantially

8   impairing accomplishment of the objectives of the program" with respect to minority

9   populations.  28 C.F.R. §42.104(b)(2).  In so doing, the DOJ prohibits recipients of its

10  funds from engaging in disparate-impact discrimination—regardless of intent. *Lau v.*

11  *Nichols, 414 U.S. 563, 568 (1974); see also Guardians Ass'n v. Civil Serv. Comm'n,*

12  *463 U.S. 582, 592 (1983)* (noting, "under these circumstances, it must be concluded

13  that Title VI reaches unintentional, disparate-impact discrimination as well as

14  deliberate racial discrimination.").

15       Thus, the reach of Title VI is broad.  It covers not only the particular items

16  funded by federal dollars but *all* of the operations of any entity receiving federal

17  funding.  DOJ Title VI Manual, note 5, Sec. 5 at 24.  When the U.S. Supreme Court

18  construed this coverage narrowly, Congress re-affirmed Title VI's "institution-wide

19  coverage," explaining that "eliminating discrimination from institutions which receive

20  financial assistance [can] only be accomplished if civil rights statutes [are] given the

21  broadest interpretation." Civil Rights Restoration Act of 1987 ("CRRA").  The CRRA

22  was pasted to restore broad interpretations, consistent with original congressional

23  intent, and to reverse the Supreme Court's narrow ruling in in *Grove City College v.*

24  *Bel, 465 U.S. 555 (1984).*   Thus, when recipients agree to accept federal funds, they

25  are bound by Title VI's, and its accompanying regulations, prohibiting discrimination.

26  It is beyond dispute that the City and County of Los Angeles receive federal financial

27  assistance.

28

**9**

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-
CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

In the instant case the Court can invoke equal protection, substantive due process, Title VI, or the holdings in *Swann* and *Plata* to disrupt the status quo. However, the Court is clearly walking on a tight rope. Whether a decision coming from a panel of judges would successfully insulate the Court's orders from attack is unclear. Nonetheless, demonstration of community input, especially from communities most heavily impacted by homelessness, is likely to be very helpful.

Finally, this Court's involvement is consistent with President Biden's Executive Order 1 signed on January 20, 2021:

> Equal opportunity is the bedrock of American democracy, and our diversity is one of our country's greatest strengths. But for too many, the American Dream remains out of reach. Entrenched disparities in our laws and public policies, and in our public and private institutions, have often denied that equal opportunity to individuals and communities. Our country faces converging economic, health, and climate crises that have exposed and exacerbated inequities, while a historic movement for justice has highlighted the unbearable human costs of systemic racism. Our nation deserves an ambitious whole-of-government equity agenda that matches the scale of opportunities and challenges we face.
>
> It is therefore the policy of my Administration that the Federal Government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality. Affirmatively advancing equity, civil rights, racial justice, and equal opportunity is the responsibility

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

of the whole of our Government.

Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, January 20, 2021.

Accordingly, it is time for the Federal government to provide major additional assistance in the form of increased financial support for the City and County earmarked exclusively for the homeless emergency.  In addition, the Federal government may be able to assist with donations of land for construction as well as assistance from the Army Corps of Engineers for major construction assistance.

## VI.  <u>HIGHLIGHTS OF POSSIBLE "MARSHALL PLANS" FOR THE CITY & COUNTY OF LOS ANGELES</u>

The plan outlined here is not intended to replace existing programs but is intended to supplement them.  The broad concepts are:

The establishment of Safe Havens, each to accommodate 10,000 to 20,000 persons;

(1) Government entities (County, City, State, or Federal) to make large parcels of unused public land available to the Safe Haven Program at a nominal cost or no cost;

(2) The construction of housing units at costs 75 to 80 percent lower than has been the norm.  Construction would be of pre-fab and/or containers and would be done with expedited permitting and waivers without compromising safety.  Construction to be completed in months, not years.

(3) It is envisioned that public-private partnerships could be utilized to assist with funding.  Provisions to be made for private contractors to recoup costs plus a profit by way of tax incentives or rental payments.

(4) The site would involve rapid construction of large warehouses where materials could be stored and assembled.  Unskilled labor from the homeless

**11**

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

population could be used for many tasks, without compromising safety, under the expert supervision of contractors and engineers;

(5) Housing units could be assembled in hours;

(6) Facilities for the provision of administrative services and wrap-around social services and health care would be erected on site.  This would allow the services to be in close proximity to those in need;

(7) Nearly all residents would be eligible for Medi-Cal.  Contracts would be executed with local health care facilities, including hospitals to provide various levels of medical and psychiatric care.  This would be a major economic boon to these institutions whose facilities are often underutilized. [Declaration of Dennis Lockard].

(8) The completed site would be administered by professional administrators from the City and County, also creating a major economic stimulus for that community.

(9) Food and other supplies would be preferentially purchased from the community in which the site is located.

(10)   Residents would receive training and be employed on site and receive payment for their services.

(11)   Alternatively, large-scale military-type barracks could rapidly and cheaply be constructed instead of pre-fab or container housing. Administrative and out-patient medical buildings could be rapidly constructed.  Even military tents could be used for housing multiple people and this type of facility would be very cheap to put into place.

(12)   The Army Corps of Engineers could be enlisted to assist with construction.  All of the construction could be done in months and could include a job training component.

For a more detailed analysis see the attached Declarations of Lincoln Chan (engineer) and Lucas Giordino (architect) attached hereto.

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS**

## VII.   CONCLUSION

Due to the shameful disparate impact of homelessness on the African-American community, this brief is submitted in an effort to make the voices of that community heard and to seek justice through federal oversight and remediation.  Race-conscious remedial steps are both necessary and appropriate.  These could include massive job training programs as a component of major construction projects.  Nipping at the margins of such a massive problem, which is the status quo approach, will no longer suffice, particularly for African-Americans.  A large-scale solution involving various governments should be ordered proposed by local government without further delay. Solutions should address the need for resources and job training in the African-American community.

The constitutional rights of business owners, the public, and the homeless are all being violated by a continuation of the status quo.  Constitutional liberty interests of all parties pursuant to substantive due process as well as equal protection principles and federal statutory rights are at stake.  The parties to this brief and ready, willing, and able to assist in any manner requested.

Dated:   April 10, 2021                          By:   /s/ Mark Ravis
                                                 Mark Ravis, Attorney for
                                                 NAACP-Compton, CORE-CA,
                                                 Committee for Safe Havens

**BRIEF ON BEHALF OF AMICI CURIAE NAACP-COMPTON, CORE-CALIFORNIA, COMMITTEE FOR SAFE HAVENS**