SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN
RIGHTS, an unincorporated
association, JOSEPH BURK,
HARRY TASHDJIAN, KARYN
PINSKY, CHARLES MALOW,
CHARLES VAN SCOY, GEORGE
FREM, GARY WHITTER, and
LEANDRO SUAREZ, individuals,
Plaintiffs,

Plaintiffs,

v.

CITY OF LOS ANGELES, a
municipal entity; COUNTY OF LOS
ANGELES, a municipal entity; and
DOES 1 through 200 inclusive,
Defendants.,

Defendants.

CASE NO. 2:20-CV-02291-DOC-KES

Assigned to Judge David O. Carter

**PLAINTIFFS' NOTICE OF
MOTION AND MOTION FOR
PRELIMINARY INJUNCTION;
MEMORANDUM OF POINTS AND
AUTHORITIES**

*[concurrently filed with Declaration of
Elizabeth A. Mitchell in Support of
Motion; Declarations of LA Alliance
Members in Support of Motion, and
[Proposed] Order.]*

Complaint Filed: March 10, 2020

Hearing:
Date:      May 10, 2021
Time:      8:30 a.m.
Location:  Courtroom 9D
           411 West Fourth St.
           Santa Ana, CA 92701

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**TO THE COURT, PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** pursuant to Federal Rule of Civil Procedure 65, Plaintiffs LA ALLIANCE FOR HUMAN RIGHTS, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ ("Plaintiffs"), will and hereby do move for a preliminary injunction against Defendants CITY OF LOS ANGELES ("City") and COUNTY OF LOS ANGELES ("County") as further detailed in the included Memorandum of Points and Authorities.  This Motion is set for hearing on May 10, 2021 before the Honorable David O. Carter in the United States District Court, Central District of California, Western Division, located at 411 West Fourth Street, Courtroom 9D, Santa Ana, CA 92701-4516.  Plaintiffs seek an injunction requiring the following:

1.  No later than within 90 days, City and County to offer and if accepted to provide shelter or housing immediately to all PEH living in an area to be defined by the court, but no less than: between 3rd and 8th Street to the North and South and Alameda and Main to the East and West, or other relief as the Court deems appropriate given the widespread effects of Defendants policies.  City and County shall retain discretion to prioritize offers of shelter or housing among such residents on a rational basis consistent with applicable law.

2.  County shall, no later than within 90 days, offer all individuals within designated area under Paragraph 1 who are in need of special placement through Department of Mental Health or Department of Public Health, offer and if accepted provide appropriate emergency, interim, or permanent housing and treatment.

3.  City and County to adopt a plan within 30 days to ensure that the housing provided pursuant to Paragraph 1 not be concentrated in Containment Area. At least 50% of the housing offered must be

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

outside of the Containment Area.

4. If City and County contract with private organization to provide housing designated to satisfy Paragraph 1, the City and County shall:

o adopt mandatory, expedited time frames for the review and processing of all applications and approvals for new housing built to satisfy the obligations of paragraphs 1, including without limitation from the building and safety, planning, public works, transportation, fire and other departments.

o adopt mandatory, expedited time frames for any required inspections, utility hook-ups and connections.

o waive all permit, inspection and impact fees and any land dedication requirements, including without limitation planning processing fees, building permit fees, and utility connection fees.

o waive vehicle parking requirements; open space requirements; and minimum per unit lot area and floor area.

o provide, or shall arrange to be provided, government-owned land at a nominal price outside of Skid Row.  The land shall be zoned R3 or less restrictive.  The land shall be made available in all council and supervisorial districts, including unincorporated areas.  No discretionary approvals shall be required for the construction, assembly or placement on these lands of housing necessary to satisfy the obligations in Paragraph 1.

5. County to provide, or to fund third parties to provide, support services to homeless residents who accept the offer of housing.  County and City shall evenly split the cost of providing operational services.

6. Within 5 days, City and County to identify land owned by each entity respectively, totaling a minimum of 20 acres per entity, that may be utilized to support shelter or housing designated to satisfy obligations

in Paragraph 1.  The Court will consider these parcels in any seizure of property necessary to accomplish the goal of paragraph 1 if City and County are unable or unwilling to comply.

7.    After adequate alternative shelter is offered, City to clear sidewalks, public streets, and public places in the Designated Areas, consistent with the holdings of *Boise* and *Mitchell* and other applicable law.  Camping within the Designated Area shall be prohibited throughout the pendency of this injunction, consistent with the holdings of *Boise* and *Mitchell* and other applicable law.

8.    An audit of Proposition HHH funds, MHSA funds, Measure H services and provisions for operational efficacy, and LAHSA services and provisions for operational efficacy by a neutral third party, to be paid by City and County respectively.

9.    The Court to appoint a Special Master at City and County's expense to assist with the implementation of this order and to resolve disputes among the parties or other interested parties.

10.    An Order to Show Cause re extension of same or similar obligations to be imposed City- and/or County-wide due to affirmative policies and/or deliberate indifference by defendants which caused and/or exacerbated the homelessness crisis including but not limited to the ripple effects of Defendants policies in and around Skid Row.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

This motion is made following the conference of counsel pursuant to Local Rule 7-3 that took place on Monday, March 29, 2021. (*See* Declaration of Elizabeth Mitchell ¶ 8.)  This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Elizabeth A. Mitchell and exhibits attached thereto, the Declarations of LA Alliance members Reverend Andrew J. Bales, M.A.T., Hal Bastian, Mary Brannon, Joseph Burk, Maria Diaz, Gregory Gibson, Javier Gonzales, Ann Jackson, Wenzial Jarrell, Charles Malow, Karyn Pinsky, Lisa Rich, Mark Shinbane, Don Steier, Deisy Suarez, Leandro Suarez, Leandro Suarez, Harry Tashdijian, Charles Van Scoy, and Luis Zaldivar and exhibits attached thereto, the pleadings and records on file in this action, and any further oral or written documentation that may be provided to the Court as necessary or requested.

Dated: April 12, 2021

/s/ Matthew Donald Umhofer
SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)

*Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

# **TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ..................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 4

    A.   The City Created and Implemented a "Containment Policy" That Has Caused The Dangerous Conditions on Skid Row ................. 4

    B.   Defendants Concede That Systemic Racism Reflected in Their Policies Has Contributed To the Conditions in Skid Row ........... 6

    C.   Defendants Acknowledge that Their Housing Policies Have Contributed to The Homelessness Crisis ................................................ 7

    D.   The County's Policies of Centralizing Services in Skid Row and Failing to Provide Sufficient Mental Health Beds Has Contributed to This Crisis .............................................................. 8

    E.   The Containment Policy Continues To This Day ............................... 10

    F.   The Conditions on Skid Row Warrant Immediate Injunctive Relief .................................................................................................. 12

        1.   The Current Conditions On Skid Row Pose A Risk To Public Health ........................................................................... 12

        2.   Skid Row Is Unsafe .......................................................... 16

        3.   Skid Row Is Inaccessible for the Disabled ........................ 19

        4.   Defendants Have Acknowledged The Need For Immediate Action in Skid Row and Elsewhere ................ 20

    G.   Defendants Have Admitted and Demonstrated That They Are Unable To Solve Homelessness Unless Ordered To Do So ............... 20

        1.   Admissions by Representatives of Defendants ................... 20

        2.   Defendant City of Los Angeles Has Failed To Implement Proposition HHH in a Timely Fashion ........................... 22

        3.   Defendant County of Los Angeles Has Failed to Utilize Measure H and MHSA (Mental Health Services Act) Funds Effectively ........................................................................ 23

        4.   LAHSA, a Joint Powers Authority of Both City and County, Has Failed to Utilize Its Funds Effectively ................ 24

III. ARGUMENT:  THE COURT IS AUTHORIZED TO PROVIDE THE RELIEF REQUESTED ............................................................................. 25

    A.   Legal Standard for Granting A Preliminary Injunction ..................... 25

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

B.   Plaintiffs Are Likely To Succeed On The Merits ............................... 25

   1.   Plaintiffs Are Likely To Succeed On The Second Cause of Action for Violation of Mandatory Duty ................................... 25

   2.   Plaintiffs Are Likely To Succeed Under the Eleventh, Twelfth and Fourteenth Cause of Action for Violation of Due Process and Equal Protection .............................................. 28

   3.   LA Alliance Is Likely To Succeed on The Third Cause of Action for Public Nuisance and Fourth Cause of Action for Private Nuisance .................................................................... 30

      a.   Public Nuisance ................................................................ 30

      b.   Plaintiffs Will Also Meet the Elements of a Private Nuisance ........................................................................... 33

   4.   LA Alliance Is Likely To Succeed on The Eighth, Ninth, and Tenth Causes of Action for ADA-related Claims .............. 33

C.   Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of An Injunction and the Balance of Equity Tips in Favor of An Injunction ................................................................................. 35

IV.   CONCLUSION ........................................................................................ 36

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Barden v. City of Sacramento*,
   292 F.3d 1073 (9th Cir. 2002) ................................................................ 34

*Birke v. Oakwood Worldwide*,
   169 Cal. App. 4th 1540 (2009) .......................................................... 31, 32

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) ................................................................. 33

*City & County of San Francisco v. Superior Court*,
   57 Cal. App. 3d 44 (1976) ............................................................... 26, 27

*Clinton v. Cody*,
   H044030, 2019 WL 2004842 (Cal. Ct. App. May 7, 2019),
   *reh'g denied* (June 3, 2019), *review denied* (July 17, 2019) ................................ 27

*Cooke v. Superior Court*,
   213 Cal. App. 3d 401 (1989) ................................................................. 27

*County of Alameda v. State Board of Control*,
   14 Cal. App. 4th 1096 (1993) ............................................................... 26

*Crumbaker v. McLean County, Kentucky*,
   37 F. App'x 784 (6th Cir. 2002) ............................................................ 34

*Cupolo v. Bay Area Rapid Transit*,
   5 F. Supp. 2d 1078 (N.D. Cal. 1997) .................................................. 33, 35

*Department of Fish & Game v. Superior Court*,
   197 Cal. App. 4th 1323 (2011) .............................................................. 33

*Disney Enterprises, Inc. v. VidAngel*,
   869 F.3d 848 (9th Cir. 2017) ................................................................. 25

*Epic Games, Inc. v. Apple, Inc.*,
   Case No. 4:20-cv-05640-YGR,
   2020 WL 5993222 (N.D. Cal. Oct. 9, 2020) ........................................... 25

*Fry v. Napoleon Community Schools*,
   137 S. Ct. 743 (2017) ......................................................................... 34

*Harris v. Board of Supervisors*,
   366 F.3d 754 (9th Cir. 2004) ................................................................. 27

*Hernandez v. City of San Jose*,
   897 F.3d 1125 (9th Cir. 2018) ............................................................... 29

*Hunt v. Superior Court*,
   21 Cal. 4th 984 (1999) ....................................................................... 26

*Kennedy v. City of Ridgefield*,
   439 F.3d 1055 (9th Cir. 2006) .......................................................... 28, 29

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

*Kentucky Department of Corrections v. Thompson*,
490 U.S. 454 (1989)..................................................................... 29

*Lavan v. City of Los Angeles*,
693 F.3d 1022 (9th Cir. 2012) .................................................... 30

*Lovell v. Chandler*,
303 F.3d 1039 (9th Cir. 2002) .................................................... 34

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) ..................................................................... 28

*Santa Cruz Homeless v. Bernal*,
---F. Supp. 3d----, Case No. 20-cv-09425-SVK,
2021 WL 222005 (N.D. Cal. Jan. 20, 2021)............................... 29

*Scates v. Rydingsword*,
229 Cal. App. 3d 1085 (1991) .............................................. 27, 28

*Schneider v. State*,
308 U.S. 147 (1939)..................................................................... 32

*Sullivan v. Vallejo City Unified School District*,
731 F. Supp. 947 (E.D. Cal. 1990) ............................................. 35

*Tailfeather v. Board of Supervisors*,
48 Cal. App. 4th 1223 (1996) ............................................... 26, 27

*Tesoro Refining & Marketing Co. LLC v. City of Long Beach*,
334 F. Supp. 3d 1031 (2017) ...................................................... 32

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993)....................................................................... 29

*Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .................................................... 25

*Willits v. City of Los Angeles*,
925 F. Supp. 2d 1089 (C.D. Cal. 2013) ..................................... 34

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008)................................................................... 25, 29

*Wood v. Ostrander*,
879 F.2d 583 (9th Cir. 1989) ...................................................... 29

*Zukle v. Regents of University of California*,
166 F.3d 1041 (9th Cir. 1999) .................................................... 33

**STATUTES**

42 U.S.C. § 1983.............................................................................. 28

42 U.S.C. § 12101(3)....................................................................... 33

42 U.S.C. § 12102............................................................................ 34

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

i

42 U.S.C. § 12182(a) ................................................................................. 33

California Civil Code § 3479.................................................................... 30

California Government Code § 815.6....................................................... 26

California Welfare & Institutions Code § 5600........................................ 9

California Welfare & Institutions Code § 10000..................................... 26

California Welfare & Institutions Code § 14059.5(a) ....................... 26, 27

California Welfare & Institutions Code § 17000............................... 26, 27

**RULES**

Federal Rule of Civil Procedure 65 ......................................................... 25

Federal Rule of Evidence 801(d)(2) ......................................................... 1

California Rules of Court 8.1105, 8.1110, 8.1115 .................................. 27

**REGULATIONS**

28 C.F.R. § 35.130(b)(7) (2016)............................................................. 34

28 C.F.R § 35.133(a) (2011).................................................................... 34

36 C.F.R. § 1191 (2013) .......................................................................... 34

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 821C (1979)........................................ 32

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On April 7, 2021, an elderly disabled man—who was confined to a wheelchair and took fentanyl to manage his chronic pain—burned to death, unable to escape the fire that engulfed his tent on Towne Avenue in Skid Row.  His charred corpse remained on the sidewalk for hours, a testament to decades of intentional actions and deliberate indifference by the City and County.

Today, five more human beings on the streets of Los Angeles will die. Tomorrow, five more.  From the time this motion is filed until the hearing takes place, 140 more unsheltered persons will perish.  This is no accident, no act of God.  This is a consequence of choices—choices made by the City and County, which have admitted repeatedly *that they have caused this crisis* and are unable to fix it.  Heidi Marston, Executive Director of LAHSA[1], stated recently as follows:

> "We can end homelessness and how do we know this?  **Because we created it.**  Policy choices and underinvestment brought us to where we are today."[2]

The catastrophe created by the City and County traces its roots to 1976, when the City formally adopted a policy of "Physical Containment" whereby poor, disabled, mentally ill and other marginalized people who were suffering or at risk of suffering homelessness would be "contained" inside the delineated borders of Skid Row.  (*See* Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. A at 134.)  In chilling language, the Policy sought the "elimination of the people problem" by relocating and concentrating into a small, contained area the "undesirables" who were "bums, derelicts, drunks and mentally unstable persons" that made other people "uncomfortable" and "tarnish[ed]" the image of Los Angeles.  (*Id*. at 134-37.)

---

[1] Los Angeles Homeless Services Authority ("LAHSA") exists as a Joint Powers Authority of the City and County of Los Angeles.  Statements by Heidi Marston constitute Admissions under Federal Rule of Evidence 801(d)(2).
[2] LAHSA, 2021 State of Homelessness Town Hall Recording at 17:28 (Mar. 19, 2021), https://www.youtube.com/watch?v=Cu1WqTwBUiU (emphasis added).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

The Policy was concerned that PEH and other "undesirables" could spread to other parts of the City; to combat this "people problem" the City implemented

> a **containment approach** that starts by defining an area in which Skid Row activities would be allowed, but outside of which no disruptive Skid Row activity would be tolerated . . . new borders were drawn that define a potential area of containment that would pull Skid Row activities away from other land uses without significant relocation of housing.

*Id*. at 139 (emphasis added).  The "containment approach" had four pillars to it:  (a) "a deliberate control of housing stock, its allocation and location" to condense the homeless within a smaller area of downtown Los Angeles, (b) businesses catering to Skid Row "undesirables" would be discouraged outside of the containment area, (c) services to the homeless would be centralized in the area of containment to keep the homeless there, and (d) "amenities" that attract the homeless, such as parks and public restrooms, would be centralized in the contained area.  *Id*.  The Policy included specific maps that defined where "undesirables" would be concentrated, and also included "buffers" to further isolate the "undesirables" from others.  *Id*.

This appalling Containment Policy remained until it was formally denounced in 2016, but in fact the Policy persists to this day.  City and County policies continue to concentrate PEH in Skid Row, creating horribly dangerous conditions for PEH and others living in the area. Affordable housing and services needed by PEH are still concentrated in Skid Row, while the City and County simultaneously oppose development of such housing or other services in other areas.  To this day, Skid Row is an enforcement-free zone, effectively exempt from laws against anti-camping, prostitution, drug use and sales, and public intoxication, reinforcing the concentration of human tragedy in a one-square-mile area, while other areas thrive.  Indeed, just days ago, law enforcement cleared an encampment in Echo Park, only to relocate several PEH to Skid Row, powerfully portraying the persistence of the Policy.

Plaintiffs filed this case over a year ago to put an end to the and provide the City and County an opportunity to make a different choice—to work together under

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

the auspices of this Court to overcome the finger-pointing and paralysis that have

plagued this issue for decades.  For a year, City and County politicians have paraded

to Court, professed a desire to end this crisis and work with the plaintiffs and the

Court to reach a global resolution.  Plaintiffs and the Court have provided the City and

the County every opportunity to reach a global resolution and take urgent action on

the burgeoning human crisis of homelessness.  Yet one year later, the City and County

continue to choose blame-shifting and in-fighting over urgent action.

As the City and the County dither, the conditions on Skid Row descend to

depths that fail to meet even the standards of international refugee camps.[3]  As of

2020, there were approximately 2,093 people living unsheltered on the streets of Skid

Row, an increase of over 20 percent from 2019.[4]  One out of every three people in

Skid Row experience homelessness, whereas in Los Angeles County one out of every

152 are unhoused.[5]  Skid Row has the highest crime rate in the United States, and

people living there face infectious disease and other health risks.

Due to Covid-19, the homeless count for 2021 was canceled which means the

deaths and devastation in Skid Row will go unreported, unrecognized, and untreated.

What is known—and undisputed—is people who live and work in and around Skid

Row are facing increasingly dangerous conditions from crime, fire risk, and disease.

Every day that goes by without addressing this manmade disaster is one more day

thousands risk their lives.  The risk of imminent harm to housed LA Alliance

members that live and work in Skid Row, like Joe Burk, Charles Malow, and Harry

---

[3] United Nations, General Assembly, Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, http://undocs.org/A/HRC/38/33/ADD.1 (last visited Apr. 10, 2021).
[4] LAHSA, 2020 Greater Los Angeles Homeless Count – Skid Row, https://www.lahsa.org/documents?id=4700-2020-greater-los-angeles-homeless-count-skid-row (last visited Apr. 10, 2021).
[5] Midnight Mission, Statistics to Know About Skid Row, https://www.midnightmission.org/our-services/healthy-living/ (last visited April 9, 2021); Homelessness in Los Angeles County 2020, Los Angeles Almanac, http://www.laalmanac.com/social/so14.php (last visited Apr. 10, 2021); County of Los Angeles, Statistics, https://lacounty.gov/government/geography-statistics/statistics/#1481130319389-8a1c0344-8add (last visited on Apr. 10, 2021).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

3

Tashdjian, or unhoused members on the streets like Wenzial Jarell or Javier Gonzalez is also without dispute: their mere geographic presence puts them at immediate risk of death, disease, and bodily harm.  It is past time the City and County account for their role in causing, exacerbating, and continuing this crisis.

Unable to induce the City and the County to do the right thing, and unwilling to countenance a continuation of their offensive containment policy, the Plaintiffs are left with no choice but seek urgent action from the Court in the form of a preliminary injunction obligating the City and the County to provide *at a minimum* housing and essential services immediately to more than 2,000 unsheltered persons experiencing homelessness ("PEH") in the area known as Skid Row, specifically the approximately 50 blocks between 3rd and 7th Street to the North and South and Alameda and Main to the East and West.  The injunction is required because the City and County have, for decades, chosen, implemented, and enforced a policy of "Containment" in which they have concentrated PEH in Skid Row and subjected them and others to dangerous conditions, for decades.  The ripple effect of this treacherous policy has reached into every corner of Los Angeles County.

City councilmember Mike Bonin has stated that City and County need to be compelled by a court to solve the problem because they are incapable of solving it themselves. Plaintiffs agree, but in absence of a consent decree seek immediate action through this motion for preliminary injunction.

## II.    FACTUAL BACKGROUND
### A.    The City Created and Implemented a "Containment Policy" That Has Caused The Dangerous Conditions on Skid Row

The over-concentration of PEH in Skid Row is the direct result of years of concerted and deliberate government policy going back to at least 1976.  In 1976, the Los Angeles City Council adopted a plan to redevelop portions of downtown Los Angeles.  Initially the Committee for Central City Planning intended to raze Skid Row, disperse the homeless population, and redevelop the area according to the "Silver Book plan."  Certain Skid Row stakeholders raised concerns that the dispersed

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

4

homeless population would annoy others areas and negatively affect business, while some service providers were concerned such a plan would leave the indigent without a place to go.[6]  The City, won over by NIMBY sentiment and activist persuasion, instead adopted the alternative "Blue Book Plan," which sought to "contain" homeless people in a small portion of downtown.  (Mitchell Decl. Ex. B.)

The Containment Policy sought to contain "undesirable population elements" within the bounds of a defined area.  (Mitchell Decl. Ex. A, at 141.)  The policy was concerned that these "undesirables" would "disrupt other communities" and be "detrimental to future development of Central City Los Angeles."  (*Id.* at 136.)  Using maps and field checks, the Plan drew "new borders . . . that define a potential area of containment that would pull Skid Row activities away from other land uses without significant relocation of housing."  (*Id.* at 139.)  The plan also proposed "strong edges" that would "serve as buffers between Skid Row and the rest of the Central City.  (*Id.* at 142.)  The City sought to "harden" these boundaries by "locking of garbage cans," "brightly lighting streets now used for sleeping," and ominously "police discouragement."  (*Id.*)  Maps were used to illustrate the strategy:

 

This policy continued for an astonishing 40 years until 2016 when a member of the

---

[6] Forrest Daniel Stuart, Policing Rock Bottom: Regulation, Rehabilitation, and Resistance on Skid Row 55 (2012), https://escholarship.org/content/qt85v32637/qt85v32637.pdf?t=nru1jl.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

City Council, formally put forward a motion for the City to rescind the "failed policy of containment."[7]  The City adopted the motion, recognizing the distinction between "[the] proportion of services available to homeless individuals citywide versus where those individuals live, given that recent data indicates that 85 percent of the homeless population lives outside of downtown, but that services have historically been centered in the downtown Skid Row area."[8]  The City has recognized that "Containment" has animated the City's homelessness approach for decades such that it must be reversed and replaced with new "guiding principles."  (*Id*.)

### B. Defendants Concede That Systemic Racism Reflected in Their Policies Has Contributed To the Conditions in Skid Row

Defendants have acknowledged repeatedly that racist policies and practices have contributed to the conditions on Skid Row.  In 2018, the Los Angeles County Ad Hoc Committee on Black People Experiencing Homelessness found that "[t]he impact of institutional and structural racism in education, criminal justice, housing, employment, health care, and access to opportunities cannot be denied: homelessness is a by-product of racism in America."[9]  "As a result of the vestiges of redlining and exclusionary zoning, Los Angeles County ranks as one of the most segregated metropolitan areas in the United States."  (*Id.* at 19.)  "Black people are dramatically overrepresented in the population experiencing homelessness, when compared to their representation among the overall population in Los Angeles County."  (*Id.* at 14.)  The mayor and multiple City councilmembers agreed with the conclusions of this report.

---

[7] Motion by councilmember Jose Huizar, Homelessness, and Poverty Committee, Los Angeles City Council, Council, File: 18-0628, (Jan 12, 2016), https://clkrep.lacity.org/onlinedocs/2016/16-0046_mot_01-12-2016.pdf.

[8] *Establishment of Guiding Principles/Reverse Policy of Containment/Comprehensive Homeless Strategy,* Los Angeles City Council, Council, File: 16-0046 (Feb. 24, 2016), https://clkrep.lacity.org/onlinedocs/2016/16-0046_rpt_hp_2-24-16.pdf.  Adopted March 15, 2016, https://clkrep.lacity.org/onlinedocs/2016/16-0046_CA_03-16-2016.pdf.

[9] LAHSA, Report and Recommendations of the Ad Hoc Committee on Black People Experiencing Homelessness at 5 (Dec. 2018), https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Ms. Marston described the City's racist "redlining" policy in the 2021 LAHSA Homelessness Town Hall: "Policy choices and underinvestment brought us to where we are today. . . [A] government map [of Los Angeles] . . . from 1939. . . shows how our government blocked black communities and black families from home ownership in a practice called redlining." (17:15.) Ms. Marston further acknowledged that "[i]nstitutional and structural racism play a key role in homelessness" and "[a]mong all of the new people enrolled in services last year, 35% of clients were black which is a critical measure for us because we know that black people are 8% of the county population and 34% of the population experiencing homelessness, again, because of legacies of systemic racism and discrimination that are still being dismantled." (*Id*.)

Between the redlining policies of early Los Angeles—which systematically thwarted wealth accumulation by Black Angelenos—and the "Containment" policy of Skid Row, which concentrated very poor individuals into a small area of downtown Los Angeles, the City all but ensured that Skid Row would have a disproportionately high African American unhoused population. Indeed, the Containment Plan specifically acknowledged that Skid Row was at the time "experiencing a very rapid increase in its Black population." (Mitchell Decl. Ex. A, at 147.) Yet Defendants have perpetuated the plight of those in Skid Row, even while acknowledging the disproportionate impact on racial minorities *as a result of their actions*.

## C. Defendants Acknowledge that Their Housing Policies Have Contributed to The Homelessness Crisis

It is undisputed that the lack of affordable housing in Los Angeles is one of the drivers of homelessness. In 2015, the City declared a housing and shelter emergency and the County did the same in 2018—both remain in place.[10] Yet the City and the County have done little to provide housing in the very low- or low-income categories since then. Los Angeles County has only met 9 percent of its 7-year Regional

---

[10]City of Los Angeles Declaration of State of Emergency, September 22, 2015; Resolution of the Board of Supervisors of the County of Los Angeles Declaring a Shelter Crisis, October 30, 2018.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Housing Need Allocation for very low-income housing, 5 percent of its goal for low-income housing and only 0.4 percent of its goal for moderate income housing.[11]   Los Angeles is now ranked as the most unaffordable city in the country, with over 60 percent of tenants paying more than 30 percent of their household income for rent and over 30 percent of tenants severely rent-burdened, paying more than 50 percent of their income for rent.[12]   City councilmembers acknowledge that there is a "critical lack of housing for all income levels."[13]   Defendants admit that they caused this housing shortage through their policies, actions and inactions:

> [f]or decades, federal, and state, and local policies have restricted housing development, they drove up the prices of housing, and they've marginalized communities of color.  And the result?  In Los Angeles county, we have roughly the same number of housing units today with a population of 10 million people, as we did when our population was 6 million people. We know that homelessness rises when the median rents in a region exceed the median income by about 22%.  And in LA, the median rent is about half, 46.7%, of median income.

(LAHSA, 2021 Town Hall at 19:00.)

### D.   The County's Policies of Centralizing Services in Skid Row and Failing to Provide Sufficient Mental Health Beds Has Contributed to This Crisis

While the policies of Containment and Redlining are the City's, the County also bears the blame for the crisis on Skid Row.  It has knowingly placed its most vulnerable residents—very poor, mentally ill, disabled, recently incarcerated—directly in harm's way by concentrating its services in the Skid Row area.  The 1976 Blue Book acknowledges this paradigm:

> The extent to which the Department of Public Social Services (DPSS) funnels men into Skid Row must be determined before talk

---

[11] 2020 Los Angeles County Annual Affordable Housing Outcomes Report at 63, Table 34) (Apr. 30, 2020), https://1p08d91kd0c03rlxhmhtydpr-wpengine.netdna-ssl.com/wp-content/uploads/2020/07/2020-Los-Angeles-County-Affordable-Housing-Outcomes-Report.pdf.
[12] Homelessness and Affordable Housing, https://cd13.lacity.org/homelessness-and-affordable-housing#:~:text=Unfortunately%2C%20Los%20Angeles%20is%20now,of%20their%20income%20for%20rent (last visited Apr. 10, 2021).
[13] Land Use Reform – Zoning Ballot Measure, Los Angeles City Council Record 20-1042 (Aug. 19, 2020), https://clkrep.lacity.org/onlinedocs/2020/20-1042_mot_08-19-2020.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

8

of decreasing the Skid Row population can proceed.  Unattached
single men from the entire county are sent to DPSS for food stamps
and general relief.  That fact alone may be sufficient to introduce
some persons to the Skid Row lifestyle, but add the fat that many
men are given rent vouchers for rooms in Skid Row hotels, and the
possibility that DPSS is adding to the problem becomes apparent.

The County continues to concentrate services in the Skid Row area, including

Mental Health, Social Services, Public Health, housing, food programs, and recently

critical, Covid-19 injections.  (Steier Decl. ¶ 12.)  Men and women who are released

from County Jail and have no place to go are released directly onto Skid Row.  (Steier

Decl.  ¶ 14; Zaldivar Decl. ¶ 3) ("I have been in and out of prison and county jail, but I

have always been released back onto Skid Row.")

According to UCLA's California Policy Lab, 78 percent of unsheltered

homeless individuals suffer from mental illness.[14]  While some of the blame for this

lies with the state and federal governments, the County of Los Angeles has the

responsibility to provide inpatient mental health care to the indigent.  Cal. Welf. &

Inst. Code 5600 *et seq.*  It is admittedly and undoubtedly failing in that obligation.  On

January 22, 2019 the LA County Board of Supervisors adopted a motion reading:

"According to leading mental health experts, **the minimum number of beds**

**required to appropriately meet the need is 50 public mental health beds per**

**100,000 individuals.  In Los Angeles County, there are only 22.7 beds per 100,000**

**individuals** . . . ."[15] The resultant report documented a litany of inadequacies across

the mental health spectrum including to the homeless population:

Our system is not delivering enough high-quality mental health
hospital services to meet the need, and the effects of this deficit are
dire . . . Roughly 25% of adult homeless individuals in LA County
have a serious mental illness and need care. These individuals
often cycle in and out of hospitals and justice systems without ever

[14] Janey Rountree, et al., Health Conditions Among Unsheltered Adults in the
U.S. (October 2019), https://www.capolicylab.org/wp-
content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-
U.S.pdf.
[15] Addressing the Shortage of Mental Health Hospital Beds (Jan. 22, 2019),
http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

being put on a sustainable path to recovery.[16]

This failure is particularly egregious considering the apparent hundreds of millions unspent dollars in the County's MHSA (Mental Health Services Act) fund.[17] The impact of the County's failure to provide enough mental health beds is disastrous on Skid Row:  with over 2,000 unsheltered individuals living in 50 square blocks, using the County's 25 percent figure, at least 500 of individuals in the small half-mile area have a serious mental illness and are not receiving the care they need.

### E.    The Containment Policy Continues To This Day

Despite lip-service reversal in policy, the Containment Policy and its effects continue to this day.  Development of SROs, emergency housing, and other housing for PEH has been concentrated in Skid Row for years.[18]  (Steier Decl. ¶ 12; Bales Decl. at ¶ 3(b),(c).)  For example, the City and County have approved hundreds of storage bins in Skid Row for homeless residents but have rejected similar projects in San Pedro and other parts of the City and County.[19]  The City and County have approved massive affordable housing projects in Skid Row while refusing to approve such projects in other areas.[20]

---

[16] Addressing the Shortage of Mental Health Hospital Beds: Board of Supervisors Motion Response (Oct. 29, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf; *see also*, Bill Melugin, *Undercover on Skid Row;* Fox News (Dec. 15, 2019), https://www.foxla.com/news/undercover-on-skid-row-fox-11-embeds-with-county-mental-health-team-to-expose-broken-system.

[17] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.

[18] Ellen Reese et al., '*Weak-Center' Gentrification and the Contradictions of Containment: Deconcentrating Poverty in Downtown Los Angeles*, 34.2 Intl' J. Urb. and Reg'l Rsch. 310, 316-17 (2010), https://eprints.soton.ac.uk/156315/1/IJURR_final.pdf.

[19] Saul Gonzalez, *Inside LA's storage facility for homeless people*, KCRW, (Feb. 18, 2016) https://www.kcrw.com/news/articles/inside-las-storage-facility-for-homeless-people; Donna Littlejohn, *San Pedro meeting erupts over homeless storage center*, Daily Breeze (Oct. 5, 2016), https://www.dailybreeze.com/2016/10/05/san-pedro-meeting-erupts-over-homeless-storage-center/.

[20] Tina Daunt, *LA County awards $57M to 5 affordable housing projects* (Jan. 9, 2020), https://therealdeal.com/la/2020/01/09/la-county-awards-57m-to-5-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Homeless individuals travel to and reside in Skid Row because the government agencies with which they interact are located there.  (*See* Jarrell Decl. ¶ 4 ("I came [to Skid Row] because I was told this is where I need to come to get housing and services."); Jackson Decl. ¶ 2 ("I was sent to Skid Row by a judge to participate in a program with the Downtown Women's Center near the corner of San Pedro and 5th"); Diaz Decl. ¶  2  ("I came to Skid Row to try to find shelter");  Jarrell Decl. ¶ 4 ("I came [to Skid Row] because I was told this is where I need to come to get housing and services").) There also remains an over-concentration of PEH in Skid Row with no attempts to correct that over-concentration.  In 2020, there were 2,093 unsheltered PEH in 2,054 unsheltered households on Skid Row, representing 20 percent and 24 percent increases respectively.[21]  This represents 40 PEH per square block and over 4,000 per square mile.  In contrast, the County has approximately 14 PEH per square mile and the City has 82 PEH per square mile.[22]  Of those unsheltered in Skid Row, 1,301 were experiencing chronic homelessness. (*See* fn. 11.)

The City and County are enforcing laws outside of Skid Row, but not inside Skid Row, which further reinforces containment in the area, and subjects those residing within Skid Row to increased crime and squalor.   In the *Mitchell* settlement the City has foregone enforcement of certain provisions of the Los Angeles Municipal Code (LAMC) intended to maintain clean and clear sidewalks and streets.[23]   In other

---

affordable-housing-projects/; Libby Denkmann, *LA City Councilman Jose Huizar on why he opposes a homeless housing project in Boyle Heights* (Aug. 17, 2017) 89.3KPCC, https://www.scpr.org/programs/take-two/2017/08/17/58642/l-a-city-councilman-jose-huizar-on-why-he-opposes/; *See also* fn. 24.

[21] 2020 Greater Los Angeles Homeless Count – Skid Row, https://www.lahsa.org/documents?id=4700-2020-greater-los-angeles-homeless-count-skid-row.

[22] 2020 Homeless Count LA County Data Summary, https://www.lahsa.org/documents?id=4698-2020-homeless-count-la-county-data-summary; 2020 Greater Los Angeles Homeless Count – City of Los Angeles, https://www.lahsa.org/documents?id=4680-2020-greater-los-angeles-homeless-count-city-of-los-angeles.

[23] Nicholas Slayton, *Council Votes To Settle* Mitchell *Case And Limit Property Seizures On Skid Row,* L.A. Downtown News (Mar. 6, 2019), http://www.ladowntownnews.com/news/council-votes-to-settle-mitchell-case-and-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

areas of the city anti-drug and anti-prostitution laws are enforced; within the containment area open drug use and sales and blatant prostitution are completely ignored. (Steier Decl. ¶ 13.)  Street clean-ups and targeted encampment reduction occurs elsewhere in the City, including the Echo Park closure and the Rose/Penmar "Encampment to Home" effort, but never in Skid Row.  (*Id.*)

It is well documented that the County Sheriff, LAPD and public hospitals for many years transported PEH to Skid Row from other parts of the county.[24]  When City and County workers release PEH from their care, they drop them off in the Skid Row area.  (Bales Decl. ¶ 3.) ("Peace officers, hospitals and other care providers drop [PEH] in Skid Row.").  Even as recently as a few weeks ago PEH from Echo Park were relocated to Skid Row.[25]  Yet at the same time, individuals are given no housing opportunities outside the area.  (*See, e.g.* Diaz Decl., ¶ 6-7; Jackson Decl. ¶ 8.)

**F.**   **The Conditions on Skid Row Warrant Immediate Injunctive Relief**

1.   *The Current Conditions On Skid Row Pose A Risk To Public Health*

Although the conditions are now at their worst, they have persisted for years. In 2013, Skid Row suffered an outbreak of tuberculosis.[26]  In 2018, Skid Row suffered an outbreak of flea-borne typhus.[27]  In 2019, Skid Row suffered an outbreak of

Spertus, Landes & Umhofer, LLP

1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

limit-property-seizures-on-skid-row/article_a27bc6a8a-4076-11e9-b1df-070c6d75e026.html.

[24] Jon Regardie, *The End of the Andy Smith Era* (Mar. 31, 2008), Downtown Los Angeles News, http://www.ladowntownnews.com/news/the-end-of-the-andy-smith-era/article_490fc960-283d-599c-a749-b8138443ab26.html;

[25] CBSLA Staff, *Protesters Clash With Police Over Shutdown Of Echo Park Lake Homeless Camps, 182 Arrested* (Mar. 26, 2021), CBS Los Angeles, https://losangeles.cbslocal.com/2021/03/26/la-shutting-down-echo-park-lake-indefinitely-homeless-camps-being-cleared-out/.

[26] Los Angeles Department of Public Health, *The Los Angeles Department of Public Health Response to Community Concerns About Active Tuberculosis (TB) Disease Among the Homeless* (March 4, 2013), http://publichealth.lacounty.gov/docs/TB.InfoSheet.3.4.13.pdf).

[27] Los Angeles County Department of Public Health, *LAC DPH Health Alert: Outbreak of Flea-Borne Typhus in Downtown Los Angeles* (Oct. 4, 2018), http://publichealth.lacounty.gov/eprp/Health%20Alerts/LAHAN%20Typhus%2010.4.18%20final.pdf.

12

Hepatitis A.[28]  In 2019, an LAPD employee assigned to Skid Row became infected with typhoid fever, and a Deputy City Attorney contracted Typhus at City Hall.[29] Andy Bales, CEO of Union Rescue Mission ("URM") now uses a wheelchair after losing his leg to a flesh-eating disease he contracted while aiding the homeless in Skid Row.[30]  Mr. Bales recounted how he "had a 104 [degree] temperature[,] [b]lood poisoning throughout my body and my foot had gaping wounds. I never walked again after leaving the hospital, my leg crumbled to the point I had to have it removed." *Id*. Mr. Bales had his second leg amputated in March 2021, yet continues to run URM. Infectious diseases are prevalent among all PEH in the County.[31]

The conditions in Skid Row are not sanitary.  The City Controller reported that in 2017 City officials had removed 8 tons of solid waste, including 40 pounds of urine and feces from homeless encampments in **one** cleanup of **one** encampment.[32]  Los Angeles Sanitation (LASAN) estimated that its program, Operation Healthy Streets, cleared an average of 5 tons of solid waste *per day* at encampments in the City.  *Id.* Appallingly, those clean-up operations have not resumed since being put on hold in early 2020 due to the pandemic.  (Steier Decl. ¶ 15.)

[28] Press Release, Los Angeles County Department of Public Health, *LA County Public Health Officials Work to Improve Sanitation and Living Conditions for Persons Experiencing Homelessness*, (June 12, 2019), http://publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2050.

[29] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus And Other Diseases is Growing*, USA Today (July 10, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

[30] Calliste Weitenberg, *Inside one of America's biggest homeless shelters as it braces for the coronavirus*, SBS Dateline, (Jul. 4, 2020), https://www.sbs.com.au/news/dateline/inside-one-of-america-s-biggest-homeless-shelters-as-it-braces-for-the-coronavirus.

[31] Nicholas, W., *Measure H: Preventing and Reducing Homelessness in Los Angeles County – A Health Impact Assessment*, Los Angeles County Department of Public Health, Health Impact Evaluation Center (Feb. 2017), http://www.publichealth.lacounty.gov/chie/reports/Measure_H_HIA_Final.pdf (reporting disease rates among PEH of 50 times normal).

[32] Ron Galperin, Los Angeles City Controller, *Report on Homeless Encampments*, Office of the Controller (Sept. 27, 2017), https://lacontroller.org/audits-and-reports/homeless-encampments/.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP

PEH in Skid Row suffer horrible health conditions. (Gibson Decl. ¶ 6 (life on the streets has given him hernias, insomnia, and extreme joint pain); Jackson Decl. ¶ 6 ("The stress of life in Skid Row caused me to have a stroke 18 months ago.").) Approximately 78 percent of homeless individuals in the county have a mental illness.[33] Tragically, suicide remains one of the top five leading causes of death among PEH.[34]   On average, a homeless person in Los Angeles will die 22 years earlier than the general population.[35]   The report noted:

> A principal finding is that the overall homeless mortality rate has steadily increased over the past six years.  This means that increases in the number of homeless deaths recently reported in the media cannot be attributed solely to the fact that the total number of homeless people has also been increasing.  **Put simply, being homeless in LA County is becoming increasingly deadly.**[36]

Dr. Barbara Ferrer, director of LA County Department of Public Health conceded: "Homeless people are in fact dying at a higher rate because they're homeless."[37]  Yet in New York City, where the number of people experiencing homelessness is high (91,897 persons) but the rate of *unsheltered* homelessness is low (5 percent compared to Los Angeles' 75 percent), the mortality rates of homeless persons compared to general population low-income adults is nearly identical.[38] Unsheltered homelessness both causes and exacerbates physical and mental health

---

[33] *See* fn. 15.

[34] Recent Trends In Mortality Rates And Causes of Death Among People Experiencing Homelessness In Los Angeles County, Center for Health Impact Evaluation (October 2019), http://www.publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

[35] *Id.* at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

[36] *Id.* (emphasis added).

[37] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[38] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based Assessment of the Health of Homeless Families in New York City, 2001–2003*, American Journal of Public Health (Sept. 20, 2011), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

problems.[39]  LA County admits:

> Poor health is a major cause of homelessness, **and homelessness
> itself leads to poor health**. . . . **Homelessness can exacerbate
> chronic physical and mental health conditions** or contribute to
> debilitating substance abuse problems. . . Environmental
> exposures, communicable disease exposures, lack of access to
> preventive care and medical treatment, and lack of access to proper
> nutrition and sleep all contribute to high rates of poor health
> among homeless persons.  **Strikingly, the average life expectancy
> of homeless people is estimated to be almost 30 years shorter
> than the general population**. [40]

Recognizing the need for housing as healthcare, the County launched a program
called Housing for Health."[41] A study conducted by the RAND Corporation on the
first 890 participants enrolled found that the cost of providing health care per
participant decreased by 40 percent (from an average of $38,146 to $15,358) because
there was less need for the patients to access the system.[42]

Residents of Skid Row report appalling and worsening conditions, including
growing numbers of PEH living in tents on sidewalks and streets filled with
widespread and increasing rats, vermin, and human feces on the street. (Malow Decl.
¶¶ 9-11.)  Gregory Gibson knows of at least 10 people who have died on Skid Row in
a recent two-week period. (Gibson Decl. ¶ 8.)  Maria Diaz has seen a number of

---

[39] Recent Trends In Mortality Rates And Causes of Death Among People
Experiencing Homelessness In Los Angeles County, Center for Health Impact
Evaluation (October 2019),
http://www.publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Fi
nal.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless people
in high-income countries: descriptive epidemiology, health consequences, and clinical
and policy recommendations*, The Lancet, vol. 382, issue 9953, pp. 1529-40 (Oct. 25,
2014), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-
6/fulltext; *see also* fn.8.
[40] Housing and Health in Los Angeles County, Los Angeles County Dept. of
Public Health (February 2015),
http://publichealth.lacounty.gov/ha/reports/LAHealthBrief2011/HousingHealth/SD_H
ousing_Fs.pdf.
[41] Health Services of Los Angeles County, *Housing for Health,*
http://dhs.lacounty.gov/wps/portal/dhs/housingforhealth (last visited Apr. 10, 2021).
[42] Sarah B. Hunter, *Housing for Health; Los Angeles County's Department of
health Tackles Homelessness with an Innovative Housing Program That Saves Money*,
The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-
health-los-angeles-countys-department-of.html (Notably the County experienced a net
savings of 20 percent even taking the costs of housing into consideration (from an
average of $38,146 per participant to $30,646)).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

young women "harassed, attacked, raped, and ultimately succumb to drug addictions due to the conditions of Skid Row." (Diaz Decl. ¶¶ 4,5; *see also* Zaldivar Decl. ¶¶ 7-11; Gibson Decl. ¶¶ 6, 9; Jarrell Decl. ¶¶ 7-8.)

Defendants concentrate PEH in a contained area with insufficient housing opportunities, fail to enforce the law in that area in part because the courts have prevented them from doing so due to the lack of housing (which the defendants admit they created), which in turn subjects the individuals in the area to dire health and safety risks. As a member of the City Council admitted in reaction to the *Mitchell* settlement, the City "treat[s] Skid Row and Downtown different than the rest of the city" and "allows the condition to worsen for [the] population of people experiencing homelessness."[43] This is the continued policy of containment and abandonment.

### 2. *Skid Row Is Unsafe*

Today, Skid Row holds the title for the number one *and* number two most dangerous neighborhoods in the entire United States with a combined average violent crime rate of over 300 violent crimes per 1,000 residents; the area adjacent to Skid Row is number three.[44] Skid Row's homeless residents are frequently victimized by gang members. Charlene, a homeless woman living in Skid Row told NBC that she did not even understand what a gang was until she came to Skid Row, pronouncing that homeless people have been "raped and abused."[45] LAPD Officer Deon Joseph told NBC that the police are "unable to do much because of the tents." (*Id.*) "We can't see it, we can't stop it,"… "[t]hey have the ability of hiding in plain sight." (*Id.*)

LAPD data shows that crimes against homeless victims have risen exponentially in recent years. From 2018 to 2019 alone there was an increase of 33

---

[43] *See* fn. 23.
[44] Laura Bloom, *Crime In America: Study Reveals The 10 Most Unsafe Neighborhoods*, Forbes (Jan 28, 2021), https://www.forbes.com/sites/laurabegleybloom/2021/01/28/the-10-most-dangerous-neighborhoods-in-america-its-not-where-you-think/?sh=475accfb341f.
[45] Lolita Lopez, *Gangs of LA on Skid Row*, NBC L.A. (Mar. 19, 2018, 3:05 PM), https://www.nbclosangeles.com/news/gangs-of-la-on-skid-row/167805/.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

percent in homicides against a homeless victim in Central Bureau, despite the citywide rate rising only 5 percent.[46]  Violent crime against the homeless rose by 18.9 percent and property crimes rose by a staggering 43.8 percent.  (*Id.*)  Violent Crimes with a homeless suspect rose 48.1 percent in Central Division (22.5 percent citywide) and property crimes with an identified homeless suspect rose 27.9 percent in Central Division (18 percent citywide).  Homicides in Central Division with an identified homeless suspect increased by 175 percent from 2018 to 2019.  (*Id*; Steier Decl. ¶ 16.)

Violence against homeless women is particularly acute.  Approximately 60 percent of homeless women reported being the victim of violence in the past year and a gut-wrenching 25 percent experiencing violence "often" or "always."  L.A. has also seen an explosion of sexual violence against the homeless as reflected by the 200 percent increase from 2017 to 2019 in homeless rape victims.[47]  Maria Diaz has seen young women "harassed, attacked, [and] raped."  (Diaz Decl. ¶ 5.)

The risk of death, injury, or serious property damage due to fires cannot be overstated.  The Los Angeles City Fire Department reported that in 2020, there were 6,151 homeless related fires, 2,242 of which were arson fires.  (Mitchell Decl. Ex. C.) Homeless-related fires made up **53.87 percent of all fires in the entire City**, with homeless-related arson fires making up 19.64 percent of all fires in the City of Los Angeles.  (Mitchell Decl. Ex. D.)  This represents a 245 percent increase in all homeless related fires and 240 percent increase in all homeless-related arson fires since 2018.  *Id.*[48]  Skid Row Residents encounter daily fire risks, exacerbated by the

---

[46] Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC L.A. (Dec. 10, 2018, 4:52 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, L.A. Mag. (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homelesscrime/.
[47] Eric Leonard, Sexual Violence on Skid Row Has Spiked, Data Shows, NBC News (Feb. 22, 2020), https://www.nbclosangeles.com/on-air/sexual-violence-on-skid-row-has-spiked-data-says/2319055/.
[48] *See also* Comments of Fire Chief Terrazas, https://lacity.granicus.com/MediaPlayer.php?view_id=103&clip_id=20553&meta_id=

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700/ FACSIMILE 310-826-4711

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   City and County's current refusal to provide sanitation services to these areas.[49]

2   (Steier Decl. ¶ 17.)  Business owners are losing fire insurance due to this increase, and

3   even when they can get coverage it is at several times the cost.  (*See, e.g.*, Tashdjian

4   Decl. ¶¶ 5, 6; Rich Decl. ¶¶ 6-8.)  Below is a picture of the man who died in the fire

5   on Skid Row April 7th, after being unable to escape his tent in time due to his

6   physical disability. The picture is gruesome and unsettling, and Plaintiffs hesitated to

7   include it in this brief for that reason, but the horrific truth is that five people just like

8   him will die each day in Los Angeles County this year and the parties need to see and

9   address head-on this devastation.



17   There are many individual stories that illustrate the dangers of living in Skid

18   Row.  Residents of Skid Row have reported increased crimes against persons and

19   property.  Mark Shinbane, who has owned property in the Skid Row neighborhood for

20   twenty years, reported increased "violence with both homeless (as victims and

21   perpetrators) and gang members."  (Decl. of Mark Shinbane ¶ 8.)

22       Every day I hear police or ambulance sirens, fights, yelling, and
23       complaints by employees about some new incident. Every day I
         endure the odor of urine, feces, and rotting filth. Every day I see
         drugs being sold or used, see human beings walking around like

24   _____

25   432376 (39:50) (Arson "is a growing problem, it is going to continue as long as we
     have homelessness out in the streets" and "won't go away until we deal with the

26   homelessness issue.")The LAFD is a distinct entity from the Los Angeles County Fire
     Department (LACFD).  Unlike LAFD, the County does not track the numbers of fires

27   involving PEH.  Thus the information provided by the County to this Court on March
     4, 2021 is not as accurate as the data from the City.

28   [49] Joel Grover, *Garbage Piles Up Near Homeless Encampments,* NBC L.A.
     (Feb. 6, 2020), https://www.nbclosangeles.com/investigations/los-angeles-
     homeless-garcetti-money/2304634/.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

zombies or passed out in gutters in a drug-induced coma. Every day, I am subject to risk of disease, assault, or fire. Every day I risk my own health and safety, and that of my family, just to come to work.

(*Id.* at ¶ 18.)

### 3.   *Skid Row Is Inaccessible for the Disabled*

Many of the PEH in Skid Row suffer from mental illness, substance abuse or other physical disabilities.  One of the many tragedies of the Containment Policy is that it forced many disabled people to live in conditions without appropriate accommodations—mentally ill people were put in an environment that Defendants admit perpetuates mental illness; substance abusers are put in an environment where illegal substances are prolific; physically disabled people are put in an environment where the sidewalks and streets are blocked by tents and trash; people with health conditions are put in an environment where disease is rampant.  Attached to the Mitchell declaration are pictures of Skid Row illustrating the blocked sidewalks— often on both sides of the street—making it impossible for individuals in wheelchairs to traverse anywhere but the middle of the street.  As Mike Bonin put it succinctly: "We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter."[50]

Charles Van Scoy lives at Union Rescue Mission and is confined to a wheelchair due to health issues.  Van Scoy ¶ 3.  He is effectively trapped in his home because he is unable to travel down the many streets which are blocked by property or homeless persons.  *Id.* at ¶¶ 4-6.  Similarly, Leonardo Suarez is a resident who lives nearby and relies on a wheelchair due to a jet accident while he was serving in the navy. Suarez Decl.  ¶¶ 3-11.  Even when he is able to travel down some streets, he is frequently required to double back and detour to find a traversable route.  *Id.*  While he is traveling through Skid Row, he is subjected to harassment by individuals such as

---

[50] Why L.A. County's homelessness crisis has been decades in the making, LA Times (June 06, 2019), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

requesting that he pay them to allow him to pass.  *Id.*

> 4.    *Defendants Have Acknowledged The Need For Immediate Action in Skid Row and Elsewhere*

Defendants have for years acknowledged that the conditions on Skid Row warrant immediate, emergency relief, but the relief has not come.  On his mayoral website, Mayor Eric Garcetti admits that he bears responsibility for the response to the homelessness crisis:  "[a]s [] mayor, I take full responsibility for our response to this crisis. We must respond like it's an earthquake — and do more, faster."[51]  Councilman Joe Buscaino "called for a state of emergency last year, and it has taken us clearly a state of emergency to move on these solutions."  (ECF No. 94 at 15.)  Los Angeles City Attorney Mike Feuer noted that "we all can agree that as long as there are unhoused people on our streets, all of us need to be acting with urgency and intensity and impatience."  (ECF No. 218 at 60.)  County Supervisor Hilda Solis acknowledge the "true state of emergency on the streets of our community."[52]

**G.    Defendants Have Admitted and Demonstrated That They Are Unable To Solve Homelessness Unless Ordered To Do So**

> 1.    *Admissions by Representatives of Defendants*

Members of the City Council and County Board of Supervisors agree that their dysfunction, failure to cooperate, finger-pointing, and inaction have been ineffective. The Mayor likened the City's homelessness efforts to picking up the feces left behind by horses in the Rose Parade, suggesting that other governmental agencies were the cause of homelessness but the City was forced to clean it up.[53]  Yet as far back as 2015, the City Council acknowledged that it had "broad powers to address

---

[51] Mayor Eric Garcetti, https://www.lamayor.org/HomelessnessCausesAndResponses (last visited Apr. 10, 2021).

[52] Press Release, Los Angeles County Department of Public Health, *Deaths Increase Among Homelessness, Drug Overdose is the Leading Cause with Greatest Income County Homeless Mortality Prevention Initiative Places Renewed Emphasis on Drug-Related Deaths*, (Jan 7, 2021), http://publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2900.

[53] Los Angeles Mayor Eric Garcetti Gives His Views on Homelessness at 1:30, (Sept. 24, 2020), https://www.youtube.com/watch?v=MjzEXwlWfw0&t=6s

20

---

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[homelessness], and it is not using those powers."[54]  Former City councilmember David Ryu stated, "I've been working within our current structure and it is flawed, it is broken. This humanitarian crisis needs a FEMA-like response."[55]

> More recently, in this litigation, Councilman Kevin De Leon stated:
> Homelessness is a moral and humanitarian crisis, and the complex system of services in Los Angeles are misaligned. They're out of sync. . . . the fact remains that the lack of cohesion between our government bodies and intermingled policies has failed to deliver the tangible results we need….The reason I believe we're here today is not about last Friday, it's about the dysfunction of our systems. But short term solutions at the end of the day will not address the issues behind the homelessness crisis and make the change every unhoused Angeleno deserves.

(ECF No. 218 at 16-17.)  Councilman De Leon admitted an injunction may be appropriate: "[I] understand if the Court finds it reasonable that the governmental officials, and just as importantly if not more importantly, bureaucratic officials cannot work together in a collective effort with a sense of urgency to bring about the respect and dignity that many of our unhoused individuals deserve today."  (*Id.* at 19-20.) Los Angeles County Supervisor Kathryn Barger has noted that "[o]ur current approach to building housing is unsustainable, unaffordable and inefficient."[56]

LAHSA has acknowledged that there is "too much decisionmaking, resource allocation, and [the] prioritization of homeless populations remains fragmented." (ECF No. 248 at 14.)  A controller audit found LAHSA to have missed 7 out of 9 goals in 2019 despite doubling its staff, and in 2020, the LA County Board of Supervisors voted to consider restructuring LAHSA due to its stagnant governance

---

[54] Motion for State of Emergency by Gilbert Cedillo and Mike Bonin, Los Angeles City Council, Homelessness and Poverty Department, (Sept. 22, 2015).
[55] David Zahniser, Emily Alpert Reyes, *L.A. mayor should get 'emergency powers' to decide where homeless housing goes, plan says*, Los Angeles Times (Nov. 15, 2019), https://www.latimes.com/california/story/2019-11-15/los-angeles-homelessness-proposal.
[56] *Barger calls for urgent homelessness housing and increased accountability*, https://kathrynbarger.lacounty.gov/barger-calls-for-urgent-homelessness-housing-and-increased-accountability/ (last visited Apr. 1, 2021).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

21

model.[57]  Supervisor Janice Hahn suggested that LAHSA cannot effectively address
the full scope of homelessness: "The bureaucracy that is there has not been flexible
enough to grow and change and adapt."[58]  City councilman Mike Bonin has conceded
that a "Consent Decree is the appropriate level of intervention and cooperation"
required to address this crisis.  (ECF No. 218 at 78.)  Further:

> [B]ecause of the very nature of government…[t]hat system is
> just fundamentally not designed to meet the level of crisis we
> are in. That type of system is very good at addressing problems.
> It is not good at addressing a crisis of tens of thousands of
> people on the streets everywhere and encampments for people
> dying a day… we have not engaged in a coordinated
> assault…[i]t's just a fundamental inherent systemic lack of
> coordination.

(*Id*. at 75-77.)  These public statements are just a few examples of what people in the
homeless services arena have acknowledged for years and what Defendants know to
be true—with the finger-pointing among the City, County, LAHSA, and even between
elected officials and bureaucrats—nothing will change until they are ordered to do so.

2.   *Defendant City of Los Angeles Has Failed To Implement
Proposition HHH in a Timely Fashion*

In 2016, Los Angeles City taxpayers approved $1.2 billion in funding through
Proposition HHH for shelter and homeless housing, yet in past five years the City has
accomplished very little.  Virtually all of the money has been targeted at expensive
housing at over $550,000 per unit, even though the private sector is building
unsubsidized housing at $250,000 per unit, and provided no money for new shelters
that would save lives immediately.[59]  Yet even this dubious policy decision has not
been implemented with any haste – as of March 2021 only 489 units have been built

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[57] Contributing Editor, *L.A. County Board Votes to Consider Restructuring
Homeless Services Agency*, mynewsLA.com (Sept. 1, 2020),
https://mynewsla.com/business/2020/09/01/l-a-county-board-votes-to-consider-
restructuring-homeless-services-agency/.

[58] Elizabeth Marcellino, *LA County shakes up structure, function of homeless
aid* (Feb. 12, 2020, 8:22 AM), https://www.dailynews.com/2020/02/11/la-county-
shakes-up-structure-function-of-homeless-aid/.

[59] *See* fn. 33.

22

while in that same time, 5,814 homeless people have died.[60]  Hundreds, if not thousands, of those individuals would be alive today if that money had been spent as taxpayers requested on immediate shelters that would save lives. (*See* ECF No. 239, incorporated herein by reference, pp. 20-24.)

The City Controller, Ron Galperin, has noted that Proposition HHH is "falling short" as there is not enough housing completed or being built to "move the needle for disadvantaged communities and most others experiencing homelessness in the City."[61] Despite the Proposition passing almost five years ago, most HHH projects are still in the pre-development phase, and the projected units of supportive housing has fallen from 10,000 to only 5,100.  (*Id.*)  The Controller recommended that the City should find other ways to use any remaining funds under Proposition HHH to "deliver faster and less expensive projects, while also reviewing the most expensive projects in pre-development to see what can be done to reduce costs."  (*Id.*)

Shockingly, the Mayor has suspended all deadlines for Proposition HHH projects *indefinitely* despite construction always being considered essential during the pandemic, leaving hundreds of millions of dollars untapped while thousands languish in the street.[62] Rampant fraud, waste, and abuse is reported and ignored.[63]

3. *Defendant County of Los Angeles Has Failed to Utilize Measure H and MHSA (Mental Health Services Act) Funds Effectively*

Measure H was a 2017 voter-approved LA County quarter-cent sales tax to fund "mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach,

---

[60] Andy Bales, *It's time for a shelter-first policy to address Los Angeles' homelessness crisis,* https://www.dailynews.com/2021/04/11/its-time-for-a-shelter-first-policy-to-address-los-angeles-homelessness-crisis/.
[61] Meeting the Moment: An Action Plan to Advance Prop. HHH, LA Controller, https://lacontroller.org/audits-and-reports/hhhactionplan/ (last visited Apr. 10, 2021).
[62] *See* ECF No. 239, incorporated herein by reference, pp. 23-24.
[63] How a city-funded homeless housing project became a sink hole for public money, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la; *See also* Mitchell Decl. Ex. F.

23

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

prevention and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults" for a 10-year period.[64]  This extra tax produced over $500 million in Fiscal Year 2019-2020, and is implemented across 47 separate goals.[65]  Since the passage of Measure H and its concomitant additional hundreds of millions of dollars for housing and services, the homeless population in LA County has **risen** from 57,794 to 66,436 (a 13 percent increase).  Some audits of individual strategies have taken place, but Measure H has never been subject to a full audit of operational effectiveness and the strategies operate without measurable goals and outcomes.[66]

4. *LAHSA, a Joint Powers Authority of Both City and County, Has Failed to Utilize Its Funds Effectively*

In 2019, LA City Controller Ron Galperin conducted an audit of LAHSA's city-funded outreach programs and found "deep operational failures."[67]  Only 14 percent of PEH contacted were placed into interim housing, 4 percent of PEH assessed were placed into permanent housing, 6 percent of individuals with a substance abuse disorder obtained treatment, 4 percent of those with mental health needs obtained treatment, and LAHSA refused to even address whether their program data was complete and accurate.[68]  Rather than improving on the areas of clear failure, LAHSA

---

[64] Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H (March 2017), Ballotpedia (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_S ervices_and_Prevention,_Measure_H.

[65] 2019-20 Actual Measure H Expenditures, (October 9, 2020), https://homeless.lacounty.gov/wp-content/uploads/2020/10/COAB-Measure-H-19-20-AC-Close-Out.pdf; Approved Strategies to Combat Homelessness, Los Angeles County Homeless Initiative (February 2016), https://homeless.lacounty.gov/wp-content/uploads/2018/07/HI-Report-Approved2.pdf.

[66] Measure H Citizens' Oversight Advisory Board, Los Angeles County Homeless Initiative, https://homeless.lacounty.gov/oversight/ (last visited on April 10, 2021).

[67] Scathing new audit finds deep operational failures at L.A.'s top homeless outreach agency, LA Times (August 27, 2019), https://www.latimes.com/california/story/2019-08-27/homeless-audit-lahsa-outreach-performance ("Quite frankly, they are [setting a] pretty low bar to begin with.  If you can't meet the low bar, that's a problem.") (alteration in original)

[68] Strategy on the Streets: Improving LAHSA's Outreach Program, LA Controller (August 28, 2019), https://lacontroller.org/audits-and-reports/strategy-on-the-street.

24

rebuffed the criticism and defended its failing operations.[69]  A Measure H audit was

completed, but focused "primarily on evaluating LAHSA's internal controls over their

performance reporting" and validating 2018-2019 performance data.[70] A full audit of

LAHSA operational efficacy has never been done.

## III.   ARGUMENT:   THE COURT IS AUTHORIZED TO PROVIDE THE RELIEF REQUESTED

### A.   Legal Standard for Granting A Preliminary Injunction

Federal Rule of Civil Procedure 65 provides for the issuance of a preliminary

injunction upon a showing that the party seeking the injunction (1) is likely to succeed

on the merits, (2) is likely to suffer irreparable harm in the absence of preliminary

relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public

interest.  *Disney Enters., Inc. v. VidAngel*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  A preliminary injunction

will alternatively issue if the moving party can demonstrate (1) "serious questions

going to the merits" and (2) that "the balance of hardships tips sharply in the

[movant's] favor," provided that the second and fourth Winter factors are also

satisfied.  *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011); *Epic

Games, Inc. v. Apple, Inc.*, 2020 WL 5993222, at *6 (N.D. Cal. Oct. 9, 2020).

### B.   Plaintiffs Are Likely To Succeed On The Merits
  1.   *Plaintiffs Are Likely To Succeed On The Second Cause of Action for Violation of Mandatory Duty*

---

[69] Statement from LAHSA on Los Angeles Cotnroller's Report on Homeless Outreach, LAHSA (August 28, 2019), https://www.lahsa.org/news?article=575-statement-on-los-angeles-controller-s-report-on-homeless-outreach; Heidi Marston, who was not yet executive director, rightfully pointed out at least some of the failure had to do with lack of shelter and housing: **"We have 30,000 people who have said to us: 'Yes, we want resources.  Yes, we want shelter.' But yet we don't have anything to offer them."** Doug Smith, *Scathing new audit finds deep operational failures at L.A.'s top homeless outreach agency*, LA Times (Aug. 28, 2019, 4:05 PM), https://www.latimes.com/california/story/2019-08-27/homeless-audit-lahsa-outreach-performance.

[70] Letter from Arlene Barrera, Auditor-Controller (August 26, 2020), https://homeless.lacounty.gov/wp-content/uploads/2020/08/2020-8-26-Los-Angeles-Homeless-Services-Authority-Homeless-Initiative-Measure-H-Strategies-Performance-Data-Validation-and-Limited-Internal-Controls-Review.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

25

Plaintiffs are likely to establish that the County is in violation of California Government Code § 815.6 and Welfare & Institutions Code § 17000 ("Section 17000") by failing to provide medically necessary care to PEH in Los Angeles. Section 17000 mandates that counties provide support to "all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident" when such persons are not otherwise supported.  Cal. Welf. & Inst. Code § 17000.  The purpose of this section is "to provide for protection, care, and assistance to the people of the state in need thereof," to provide "appropriate aid and services to all of its needy and distressed . . . promptly and humanely . . . as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society."  Cal. Welf. & Inst. Code § 10000.  Courts have clarified that Section 17000 creates two separate obligations: (a) provision of "general assistance" in terms of financial or in-kind relief and (b) provision of subsistence medical care to the indigent.  *Hunt v. Super. Ct.,* 21 Cal. 4th 984, 1011-13 (1999).

Counties must provide medical care "at a level which does not lead to unnecessary suffering or endanger life and health."  *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1240 (1996).  This mandate includes subsistence medical services and medically necessary services which are defined as those "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst. Code § 14059.5(a); *see also Hunt v. Super. Ct.* (1999), 21 Cal. 4th 984, 1014-15; *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993).  Though Section 17000 provides municipalities discretion in discharging its obligations, that discretion is limited: it "must be exercised in a manner that is consistent with—and that furthers the objectives of" Section 17000.  *Hunt*, 21 Cal. 4th at 991.

If the County fails to meet this obligation, a court "must intervene to enforce compliance."  *City & County of San Francisco v. Super. Ct.*, 57 Cal. App. 3d 44, 50 (1976).  For example, in *Cooke v. Superior Court* the court found that the County of

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

San Diego was required to provide indigent residents with dental care sufficient to remedy substantial pain and infection.  213 Cal. App. 3d 401, 413-14 (1989).  In *Harris v. Board of Supervisors,* the Ninth Circuit affirmed the district court's grant of a preliminary injunction under Section 17000 requiring Los Angeles County to continue to provide beds at two hospitals where the county had intended to reduce capacity, finding that eliminating the beds would violate Section 17000.  366 F.3d 754, 765 (9th Cir. 2004); *see also San Francisco v. Super. Ct.*, 57 Cal. App. 3d at 50.

As LAHSA's executive director, Ms. Marston, has announced, "housing is healthcare."  (LAHSA 2021 Homelessness Town Hall at 11:50.) This is particularly true in Skid Row, where Defendants have contained PEH, many if not most of whom are disabled, in a Contained Area that is dangerous to people suffering their conditions.  The County has an obligation to provide housing to PEH in Skid Row if the alternatives are conditions that put PEH at risk for their lives or risking "significant illness," "significant disability," or "severe pain."  Cal. Welf. & Inst. Code § 14059.5(a).  The County and City cannot dispute, and in fact their representatives acknowledge, that the conditions in the Contained Area of Skid Row "lead to unnecessary suffering or endanger life and health," *Tailfeather*, 48 Cal. App. 4th at 1241, in violation of Section 17000.

The City and County have previously cited *Scates v. Rydingsword*, 229 Cal. App. 3d 1085, 1099, (1991), *reh'g denied and opinion modified* (May 31, 1991) and *Clinton v. Cody*, 2019 WL 2004842, at *9 (Cal. Ct. App. May 7, 2019), *reh'g denied* (June 3, 2019), *review denied* (July 17, 2019), for the proposition that the Welfare Code does not require a municipality to provide housing to homeless individuals.  Neither of those decisions applies here.

In *Clinton*—an unreported, nonbinding case that cannot be cited under Cal. Rules of Court 8.1105, 8.1110, 8.1115—the plaintiffs produced no evidence, cited to no studies, and had no Defendant admissions conceding that "housing is healthcare." Moreover, the limited request by Plaintiffs (for now) does not involve "the general

27

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    need" for housing—rather, it involves dangerous conditions in a Contained Area

2    created by Defendants that Defendants acknowledge pose an imminent risk to the

3    health and safety of both the housed and unhoused in the area.

4         *Scates* is similarly inconsequential because it rests upon the County's obligation

5    for general relief and does not address the County's obligation to provide health care.

6    And while the *Scates* court noted that the Welfare Code gave municipalities discretion

7    in what services to provide homeless individuals and permitted cuts in services to

8    PEH, there was no substantial evidence in *Scates* that government policy encouraged

9    and helped create the dangerous and unhealthy conditions that exist in Skid Row.

10   *Scates*, then, does not control here.

11        The County has admitted that homelessness both causes and exacerbates

12   physical and mental illness.  The County has admitted that individuals are dying

13   *because* they are homeless.  Comparing New York's homeless mortality rate to Los

14   Angeles' homeless mortality rate leaves no doubt that unsheltered homelessness *in*

15   *and of itself* leads to death, not to mention pain, suffering, and disease.  The County's

16   failure to provide sufficient housing and services for mentally ill persons, as the

17   County itself has admitted, is alone sufficient for this Court to find a violation of

18   mandatory duty under the Welfare and Institutions Code.

19            2.    *Plaintiffs Are Likely To Succeed Under the Eleventh, Twelfth and*
                    *Fourteenth Cause of Action for Violation of Due Process and*
20                  *Equal Protection*

21        The City and County are liable under 42 U.S.C. § 1983 where, through a policy

22   or custom, they violate a person's constitutional rights.  *Monell v. Dep't of Soc. Servs.*,

23   436 U.S. 658, 690-91 (1978).  The Ninth Circuit has recognized the constitutional

24   right, under the Due Process clause, to be free from state-created danger.  *Kennedy v.*

25   *City of Ridgefield*, 439 F.3d 1055, 1061-62 (9th Cir. 2006).  When a state or local

26   official acts to place a person in a situation of known danger, with deliberate

27   ignorance towards their person or physical safety, the state violates due process.  *Id.*

28        Defendants have violated Due Process under the Fifth and Fourteenth

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

28

Amendment by adopting and implementing policies that have created danger to

Plaintiffs and PEH.  Courts have recently recognized that a municipality's policy that

places PEH in danger can violate due process and merit injunctive relief.  In *Santa*

*Cruz Homeless v. Bernal*, ---F. Supp. 3d----, 2021 WL 222005 (N.D. Cal. Jan. 20,

2021), the court took judicial notice of the COVID-19 pandemic and granted homeless

plaintiffs' preliminary injunction to halt the closure of two parks where the plaintiffs

were camping.  The Court held that by closing the parks without an alternate shelter,

the State would place residents in a more vulnerable situation and in greater danger.

*Id*. at 17-18.  Here the facts are much more compelling because Defendants' policies

created incredible danger for those in and around the Containment area.  There is a

long line of cases in which courts have held public entities liable for creating

dangerous conditions.  *See, e.g., Hernandez v. City of San Jose*, 897 F.3d 1125, 1137

(9th Cir. 2018) (police officers affirmatively placed political rally attendees in danger

by requiring attendees to exit the rally into a crowd of known violent protestors);

*Kennedy v. Ridgefield City*, 439 F.3d 1055, 1067 (9th Cir. 2006) (officer knew an

aggressor was violent and told aggressor of the victim's allegations against him after

promising the victim to alert her before doing so); *Wood v. Ostrander*, 879 F.2d 583,

590 (9th Cir. 1989) (officer arrested and impounded the car of an intoxicated driver,

leaving the passenger alone in the middle of the night in a high crime area where she

was later assaulted while trying to get home).

The City and County have also violated procedural due process under the Fifth

and Fourteenth Amendments by unilaterally abdicating responsibility for basic

municipal functions to great private expense, thereby infringing on the interests of

residents without due process.  Under the doctrine of procedural due process,

Defendants may not interfere with a liberty or property interest without following

constitutionally sufficient procedures.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454,

460 (1989).  Such procedures require at a minimum "notice and an opportunity to be

heard before the Government deprives them of property."  *United States v. James*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

*Daniel Good Real Prop*., 510 U.S. 43, 48 (1993).  Procedural due process arguments have underpinned preliminary injunctions, particularly in the removal of homeless individual's items.  *See, e.g., Lavan v. City of Los Angeles*, 693 F.3d 1022, 1033 (9th Cir. 2012) (holding the city had to comport with the Fourteenth Amendment's Due Process Clause when confiscating homeless person's belongings).

Here, Defendants have for 40 years repeatedly taken action to concentrate PEH in unsafe areas in Skid Row.  This policy has been implemented without proper procedures for the people affected by it, thus depriving them of their property.  For example, Joseph Burk cannot find tenants or otherwise use or sell his property due to the dangerous conditions in the Containment area.  (Burk Dec. ¶ 6.)  Used needles and fecal matter fill gutters and accumulate on Mark Shinbane's property.  He routinely spends hundreds of thousands of dollars a year attempting to keep some semblance of sanitation only for the waste to invariably return.  (Shinbane Dec ¶¶ 13-17.)  Harry Tashdjian has been forced to routinely repair parts of his building which are affected by out-of-control fires, urination and feces, and frequent graffiti.  (Tashdjian Decl. ¶¶ 5-6.) A homeless person recently scaled the fence of his business stealing a forklift and crashed it through his gates.  (*Id.*)  Forcing residents to pay for basic municipal services, after depreciating their property values through City and County policy of containment, is economically equivalent to exacting a taking upon these residents.

> 3. *LA Alliance Is Likely To Succeed on The Third Cause of Action for Public Nuisance and Fourth Cause of Action for Private Nuisance*

> a. <u>Public Nuisance</u>

Nuisance provides further support for injunctive relief.  A Nuisance is "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of . . . any public park, square, street, or highway."  Cal. Civ. Code § 3479.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

To prevail on a public nuisance claim, LA Alliance must show: (1) the City and County have created a condition that is harmful to the property owners or renters, so as to interfere with their comfortable enjoyment of life or property; (2) the condition has affected a substantial number of people at the same time; (3) an ordinary person would be reasonably annoyed or disturbed by the condition; (4) the seriousness of the harm outweighs the social utility of the City or County's conduct; (5) LA Alliance never consented to this conduct; (6) LA Alliance suffered harm that was different from the type of harm suffered by the general public; and (7) the City and County's conduct was a substantial factor in causing LA Alliance's harm. *See Birke v. Oakwood Worldwide*, 169 Cal. App. 4th 1540, 1548 (2009). Here, all elements are met and LA Alliance would likely prevail on the merits of a Public Nuisance claim.

The first five elements are undisputed –the City and County have acknowledged the dire impact homelessness is having on the Containment area. *See* Part III, *supra*. Defendants' actions have led to the buildup of encampments on sidewalks around LA Alliance members' property. These encampments are preventing LA Alliance members from reasonably enjoying the use of the their property. (*See* Tashdjian Decl. ¶ 3 ("tents occupy the sidewalks at all hours, and it is difficult for me and, more importantly, my customers to access my business. . ."); L. Suarez Decl. ¶ 7 ("The buildup of goods and persons on the streets prevents me from freely traveling throughout the area."); Rich Decl. ¶ 3 ("the buildup of property physically prevents tenants and patrons from accessing the buildings."); D. Suarez Decl. ¶ 3; Burke Dec. ¶ 3.) Second, these encampments are affecting a substantial number of people throughout the Skid Row area. (*Id.*) Third, any ordinary person would be reasonably annoyed or disturbed by the conditions of the encampments around LA Alliance members' properties. (*See, e.g.*, Burke Decl. ¶ 13 (his tenants moved out because of "physical and mental health reasons" and because the "amount of noise and trash coming from the encampments had become too much for them").) Elements four and five are easily met because there is zero utility gained from having encampments

31

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

obstructing sidewalks throughout the Designated Areas and members of LA Alliance never consented to such conditions.

Sixth, LA Alliance members' harm resulting from encampments "is normally different in kind from that suffered by other members of the public." *Birke*, 169 Cal. App. 4th at 1550 (citing Rest.2d Torts, § 821C, com. d, p. 96.).  Indeed, LA Alliance members have suffered, among other things: (1) increased health risks; (2) a reduction in property value; (3) increased insurance costs due to the fire risks associated with encampments; and (4) additional cleanup costs associated with the encampments. (*See* Burke Decl. ¶ 14, (stating that "any attempts to lease or sell [his] [p]roperty have been futile because of the conditions surrounding it"); *id.* ¶ 17 (stating that the "unmanaged urine and feces surround [his] [p]roperty, as well as the rat and bug infestations, create a significant health risk); Rich. Decl. ¶¶ 6, 7 (she was required to spend nearly $90,000 for damage caused by encampments and pay four times her prior fire insurance rate); *see also* Tashdjian Decl. ¶¶ 6-7, 10.)  LA Alliance members endure harm that is normally different in kind from that suffered by other members of the public.  *See, e.g. Tesoro Ref. & Mktg. Co. LLC v. City of Long Beach*, 334 F. Supp. 3d 1031, 1055 (2017) (plaintiffs' expenses to cleanup and remediate was unique to plaintiffs and sufficient to support a public nuisance theory).

Finally, the seventh element – whether the Defendants' conduct was a substantial factor in causing the harm – is also well documented and acknowledged by Defendants themselves.  Importantly the "substantial factor" test for nuisance may be met by a *failure to act* when the defendant has a duty to take a positive action to prevent or abate the interference.  *See Birke*, 169 Cal. 4th at 1552-53 (2009) (finding that as the plaintiff's landlord, defendant had a duty to maintain its premises in a reasonably safe condition).  Here, in addition to their intentional conduct through the Containment Policy, the City had "a duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated." *Schneider v. State*, 308 U.S. 147, 160-61 (1939).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

32

b.   <u>Plaintiffs Will Also Meet the Elements of a Private Nuisance</u>

To establish a private nuisance, LA Alliance need only prove the following three elements in addition to those of a public nuisance: (1) LA Alliance members owned, leased, occupied or controlled real property; (2) that defendants' conduct interfered with LA Alliance members' use of their property; and that (3) LA Alliance members were harmed.  *See Dep't of Fish & Game v. Super. Ct.*, 197 Cal. App. 4th 1323, 1352 (2011).  All three additional elements are easily met.  Several members of LA Alliance own property in the Designated Areas, the Containment Policy interfered with their use of property, and they suffered harm.  (Rich. Decl. ¶¶ 6, 7; Tashdjian Decl. ¶¶ 6-7, 10.)

4.   *LA Alliance Is Likely To Succeed on The Eighth, Ninth, and Tenth Causes of Action for ADA-related Claims*

Plaintiffs are likely to establish that the City is in violation of the Americans with Disabilities Act ("ADA") by enacting policies that place disabled people in conditions where they are likely to be harmed.[71]  The ADA requires that individuals with disabilities be afforded "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . ."  42 U.S.C. § 12182(a).  Title II of the ADA was enacted to address "discrimination against individuals with disabilities" in "critical areas" such as "public accommodations."  42 U.S.C. § 12101(3).  Under the ADA, the Containment Policy puts disabled PEH and residents at risk.  The ADA's "antidiscrimination mandate requires that facilities be readily accessible to and usable by individuals with disabilities."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (internal citations omitted).  Public entities are required to "maintain in operable

---

[71] Courts apply the same analysis in determining violations of the ADA to Section 504 of the Rehabilitation Act ("Sec. 504") and California Disabled Persons Act ("CDPA") claims.  *See Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999) (Because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act . . . courts have applied the same analysis to claims brought under both statutes[.]"); *See also Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1083 (N.D. Cal. 1997).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R § 35.133(a) (2011).  Title II therefore "requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)).  To establish a violation under Title II of the ADA, a plaintiff must show that: "(1) she is a qualified individual with a disability; (2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, [sic] and (3) such exclusion or discrimination was by reason of her disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (citation omitted).  Plaintiffs are likely to succeed on the merits of their ADA, Sec. 504, and CDPA claims.

The City has violated the ADA in Skid Row by failing to ensure that the public sidewalks are clear and accessible.  Public sidewalks are subject to the access requirements of Title II and Sec. 504.  *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002).  To satisfy the ADA, public sidewalks must have at least "36 inches . . . minimum" clearance, or passable sidewalk. 36 C.F.R. § 1191, app. D, § 403.5.1 (2014) The City is responsible for ensuring sidewalks within its jurisdiction are passable for all its residents to meet the requirements of the ADA.  *See Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013).  The sidewalks in Skid Row are not accessible due to the accumulation of personal property and piles of hazardous waste. (Mitchell Decl. Ex. E.)

The ADA violation in Skid Row, however, is far more pervasive than the City's treacherous sidewalks.  The Containment Policy placed disabled PEH in dangerous conditions where they are very likely to be harmed.  Mental illness and substance addiction are recognized disabilities.  42 U.S.C. § 12102; *Crumbaker v. McLean County, Ky.*, 37 F. App'x 784, 785 (6th Cir. 2002) ("A person addicted to illegal drugs is considered disabled within the meaning of the ADA if the drug addiction

34

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION

'substantially limits one or more of the major life activities' of that person."). Here, the Containment Policy deliberately placed mentally ill people in an area that causes and perpetuates mental illness, and it placed substance abusers in an area replete with the illegal trafficking of dangerous and addictive drugs.

The City's conduct has caused harm to both disabled PEH and others in the Containment Area. Plaintiffs are entitled to a preliminary injunction under the ADA because the injury to a disabled person's dignity that results from discrimination is sufficient to establish irreparable harm. *See Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 961 (E.D. Cal. 1990) (injury to the ability to function as an independent person constitutes irreparable injury); *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) ("Injuries to individual dignity and deprivations of civil rights constitute irreparable injury."). And for those in wheelchairs or other assisted transportation devices, the blocked sidewalks put them in physical danger of having to travel in the middle of the street.

## C. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of An Injunction and the Balance of Equity Tips in Favor of An Injunction

Defendants cannot dispute that the conditions in Skid Row are causing irreparable harm and require urgent action. They have admitted this repeatedly for years. This Court has recognized the "danger to life and dignity of the homeless to the people of Los Angeles by [the City and County's] apparent abdication of responsibility by local authorities to keep the streets safe and passable." (ECF No. 205.) This Court has also rightfully recognized that it "cannot allow the paralysis of the political process to continue to endanger the lives of homeless and the safety of the communities in which they reside." (*Id*.)

Councilmember Bonin has said publicly what nearly all Defendants acknowledge in private – that meaningful change will not happen on homelessness unless the City and County are ordered to take action and to cooperate.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY
INJUNCTION

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## IV.   **CONCLUSION**

The City and the County are in a crisis of their own making.  Their illegal and unconstitutional Containment Policy has created unbearable conditions for thousands of persons in Skid Row and beyond.  Because the City and the County created this human crisis, and because they refuse to take the urgent action necessary to protect people from the consequences of this crisis, the Court must step in.  The Court has underscored the gravity of the situation and afforded the City and County ample time to come to terms on a comprehensive approach to this unfolding tragedy.  But the City and the County continue to quibble while people perish on the streets.  Because the policies chosen by the City and the County created this crisis, and because they refuse to take the steps necessary to solve it, Plaintiffs request that the Court issue this injunction.


Dated: April 12, 2021                    */s/ Matthew Donald Umhofer*
                                    SPERTUS, LANDES & UMHOFER, LLP
                                    Matthew Donald Umhofer (SBN 206607)
                                    Elizabeth A. Mitchell (SBN 251139)

                                    *Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA  90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

36