SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals, | Case No. 2:20-cv-02291-DOC-KES |
| | Assigned to Judge David O. Carter |
| Plaintiffs, | **DECLARATIONS OF REVEREND ANDREW J. BALES, M.A.T., HAL BASTIAN, MARY BRANNON, JOSEPH BURK, MARIA DIAZ, GREGORY GIBSON, JAVIER GONZALES, ANN JACKSON, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, LISA RICH, MARK SHINBANE, DON STEIER, DEISY SUAREZ, LEANDRO SUAREZ, LEANDRO SUAREZ, HARRY TASHDIJIAN, CHARLES VAN SCOY, AND LUIS ZALDIVAR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 20 inclusive, | |
| Defendants. | |

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

2

# INDEX OF DECLARATIONS

3    **Title**

4    Declaration of Rev. Andrew J. Bales, M.A.T.

5    Declaration of Hal Bastian

6    Declaration of Mary Brannon

7    Declaration of Joseph Burk

8    Declaration of Maria Diaz

9    Declaration of Gregory Gibson

10   Declaration of Javier Gonzales

11   Declaration of Ann Jackson

12   Declaration of Wenzial Jarrell

13   Declaration of Charles Malow

14   Declaration of Karyn Pinsky

15   Declaration of Lisa Rich

16   Declaration of Mark Shinbane

17   Declaration of Don Steier

18   Declaration of Deisy Suarez

19   Declaration of Leandro Suarez

20   Declaration of Harry Tashdjian

21   Declaration of Charles Van Scoy

22   Declaration of Luis Zaldivar

23

24

25

26

27

28

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

2

## DECLARATION OF REV. ANDREW J. BALES, M.A.T.

I, Reverend Andrew J. Bales, M.A.T., state and declare as follows:

1.     I make this declaration based on my personal knowledge and information I have read and come to learn in my profession, except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.     I am president and chief executive officer ("CEO") of Union Rescue Mission ("URM"), located on Skid Row.  I have nearly 35 years of experience in community outreach and service to people experiencing homelessness, with the last 20 plus years focused on Skid Row.  As CEO of URM, my present focus is organizing and working with community partners to address the epidemic of homelessness in Los Angeles.  For the past 21 years, I have observed the conditions in which people experiencing homelessness in Skid Row are living.

3.     I believe that the City of Los Angeles ("City") and County of Los Angeles ("County") have established policies and taken action to contain and to concentrate people experiencing homelessness in Skid Row.  I base this belief on my personal experience and observations over the past several decades.  During this time, I have observed the following:

    a. Peace officers, hospitals and other care providers drop off people experiencing homelessness in Skid Row.

    b. The City and County concentrating in Skid Row services for people experiencing homelessness.  For example, I observed the City providing in Skid Row storage facilities for people experiencing homelessness, while delaying or not approving such storage facilities in other parts of the City.

    c. The City and County approving housing in Skid Row for people experiencing homelessness while objecting to and attempting to prevent similar housing in other parts of the City.

2

d. I have witnessed employees of the City and County and political leaders suffer personal and professional loss by standing up against and speaking out against this County and City policy of corralling and containment.

4. On April 8, 2021 my associate observed a fire in a tent that killed a person experiencing homelessness. Attached as **Exhibit A** is a picture taken today of the deceased. This was described in the media as a debris fire. A handicapped person like me was inside of this debris fire. This risk is not an isolated incident. I believe every person experiencing homelessness on Skid Row is at great risk of death from fire or other dangers.

5. There are more people devastated by homelessness in Los Angeles than ever, and there are fewer options for those people to obtain shelter than I have ever seen. With fewer shelter beds, a higher number of people devastated by homelessness, and deaths skyrocketing, we are far beyond any tipping point of an epidemic of homelessness.

6. The health condition of those experiencing homelessness is worsening. I have observed that the percentage of people experiencing homelessness who are chronically homeless is the highest I have seen, and is increasing. Because of the current horrible conditions and lack of resources for people experiencing homelessness in Los Angeles, people who may become temporarily homeless for economic reasons are increasingly becoming ill and chronically homeless. The crisis is as urgent as I have ever seen.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 9, 2021 at Los Angeles, California

Rev. Andrew J. Bales, M.A.T.

3

# EXHIBIT A



## DECLARATION OF HAL BASTIAN

I, Hal Bastian, state and declare as follows:

    1.    Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

    2.    I have been a commercial real estate professional in Los Angeles for 38 years, and have been one of the leaders of the Downtown Los Angeles Renaissance for the last 27 years.  I am a member of the LA Alliance for Human Rights.

    3.    Originally, I began working as a retail broker for Cushman & Wakefield in Downtown Los Angeles ("DTLA"), later transitioning to the role of leasing director for The Old Bank District – the first adaptive reuse project in DTLA that converted historical office buildings into loft apartments.  From 2001 to 2014, I served as the Director of Economic Development for the Downtown Center Business Improvement District (DCBID) and eventually became its Executive Vice President.  During my time working there, I facilitated the construction of over 22,000 housing units, led tours, and produced special events which recruited thousands of new residents and resulted in the construction of dozens of new commercial and mixed-use developments.  Through this position, we attracted over 300 new businesses to the downtown area, including Ralphs, Fresh Fare, Bottega Louie, and Whole Foods Market.

    4.    I personally live in the DTLA area near City Hall.  My home is within "Skid Row and Surrounding Area" identified in the *Mitchell v. City of Los Angeles* settlement.  Through my experiences as both a resident and a professional working for the betterment of Los Angeles, it has become clear that the actions and inaction of the City and County of Los Angeles have been a substantial factor in the current homelessness crisis.  The current response to a

number of federal lawsuits has coincided with a surge in homelessness and has affected the housed and homeless alike.

5.      Even before the Covid-19 pandemic, mental illness, an unprecedented homelessness epidemic, and ever-expanding encampments were causing massive detrimental effects on the quality of life for residents, workers, and visitors to DTLA.  It became a part of daily life to see persons experiencing severe mental issues and breakdowns, public defecation, or violent encounters on the sidewalks of our city.  These tragic events occurred in front of homes, in front of businesses, and in front of City Hall itself.  Worse yet, entire areas of DTLA are untraversable to most city residents due to rights-of-way being fully obstructed by the tents, property, and gatherings of homeless persons we now refer to as "encampments."  As a recovering drug addict and alcoholic, only recently celebrating my 20th year of sobriety ("There but for the grace of God, go I,") it saddens me to see my fellow people left to fight alone with their addictions and mental issues in the street.  Simply put, the state of our city is not alright.

6.      Sadly, these events have become so commonplace, such everyday occurrences, that they threaten to become DTLA's "new normal."  Already the residents of Los Angeles are familiar with the term encampment, with the unavailing nature of LAPD, with being shouted at, accosted on the street, and with maintaining their guard as they walk through public spaces.  Residents have become aware of the locations to avoid during certain times of day, conceding wide swaths of what used to be the public realm to the current circumstances. That is not alright.

7.      Every day, I walk my dog around the block near my home.  That block takes me within easy walking distance of both City Hall and the LAPD headquarters.  Nonetheless and despite my large stature, I have learned that I need to be vigilant at all times in case of attack or harassment.  Tragically, on

1   those walks, I frequently see my fellow people living, or more accurately

2   suffering, in squalid conditions on the street.  On my walks, I regularly see open

3   drug consumption and drug dealing.  With these encampments come rodents,

4   insects, and diseases which are more prevalent than ever in the area.  Frequently

5   facing these sights and sounds cause me serious distress and adversely affects my

6   quality of life.  Apart from these more dangerous conditions come a host of

7   symptoms which simply make life in the area less enjoyable, such as fecal matter

8   frequently found on the street and general squalor, conditions which would never

9   be permitted to persist in other, wealthier, parts of Los Angeles.  It deeply

10  saddens me to know that my fellow Angelenos are suffering on the street and

11  living in those conditions.  Unfortunately, we all are forced to deal with the

12  consequences of the City and County's decisions.

13        8.     Most frustrating is that the first step to solving these issues seems

14  eminently clear: have empathy and compassion for those forced to live on the

15  street, take every step available to shelter them all, and then return the public

16  space to the benefit of the *entire* community.  It shocks me that if we were to

17  have a natural disaster or major earthquake FEMA (the Federal Emergency

18  Management Agency) would likely be here within hours or days, able to provide

19  shelter to everyone currently living on the street.  Los Angeles has been going

20  through a disaster of equal scope and of its own making in slow motion for the

21  past 60 years, yet the City and County are unable or unwilling to do anything

22  about the state of affairs.  It is not alright.

23        9.     This lawsuit brought by the LA Alliance for Human Rights is

24  seemingly the only path forward to enable the City and County to overcome the

25  NIMBYism ("Not In My BackYard") which has stopped so much progress on

26  this issue.  All 15 council districts are necessary parts in solving this crisis, and

27  this action provides the basis for them all to get involved.  Now is the time for the

28  City and County to step up and make the necessary change for our community.

-3-

DECLARATION OF HAL BASTIAN

1   I declare under penalty of perjury under the laws of the State of California

2 that the foregoing is true and correct, and that this Declaration was executed this

3 2nd day of April 2021, at Los Angeles, California

4

5           Hal Bastian

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF HAL BASTIAN

## DECLARATION OF MARY BRANNON

I, Mary Brannon, state and declare as follows:

1.   Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.   I am sixty years old, and I have been living in a tent on Skid Row at the corner of Sixth Street and San Julian Street in Los Angeles for about a year. I am a member of LA Alliance for Human Rights.

3.   Previously, I lived with my dogs in a home on East 115th Street and South Avalon Boulevard. After someone burned it down last year, I came to Skid Row to find help, but also because there was nowhere else to go.

4.   I wanted help finding housing, but I ended up in a hotel on Skid Row where the hotel owner withheld my mail—including my Social Security checks—from me for months. Without the Social Security money, I could not pay rent, and was thrown out of the hotel.

5.   Ever since losing my space at the hotel, I have looked everywhere for temporary housing. Unfortunately, it seems like an impossible task. Without an address, I cannot receive what little income I had through my Social Security benefits. If offered a bed, I would take it without question.

6.   Living on the street has made my life unlivable. After a year of sleeping on the hard ground, my arms and back ache constantly. I caught pneumonia twice, which left me with severe, chronic breathing problems and a permanent wheeze. Furthermore, my blood pressure is very high due to the lack of sleep.

7.   I also experienced much violence and fear after moving here. Sleeping on the street in a tent is a very unsecure position to be in. I have a lot of anxiety and fear when going to sleep at night; I always check to make sure no one is lurking around before allowing myself to sleep. I am worried someone will

-1-

1 │ take advantage of me and hurt me while I sleep. Just last month, two women,

2 │ who regularly harass me, attacked me.

3 │       8.      I am scared, and although I try to maintain both my physical and

4 │ mental health, every day on the streets hurts more. Not long after coming to Skid

5 │ Row, I called around to find a caseworker to help me with my mental health

6 │ problems, but they told me I must wait six months to be assigned a case worker.

7 │       9.      During these calls, not a single City or County employee offered me

8 │ a room through Project Roomkey, but I would really love one. I just want my

9 │ own home again, where I can live with my dogs, who I miss so much.  I have

10 │ mental health issues, which I try to manage, but it is getting so much worse being

11 │ on the street.  I need someplace to rest my head and body that is not a block of

12 │ concrete.

13 │

14 │

15 │ ///

16 │

17 │ ///

18 │

19 │ ///

20 │

21 │ ///

22 │

23 │ ///

24 │

25 │ ///

26 │

27 │ ///

28 │

-2-

DECLARATION OF MARY BRANNON

1       I declare under penalty of perjury under the laws of the State of California

2 that the foregoing is true and correct, and that this Declaration was executed this

3 8th day of April, 2021, at Los Angeles, California.

4

5                      Mary Brannon

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

DECLARATION OF MARY BRANNON

# DECLARATION OF JOSEPH BURK

I, Joseph Burk, state and declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am the owner of a building in downtown Los Angeles, located at 606 E. 6th Street, Los Angeles, CA 90021 (the "Property").  I lived at the Property from 2001 to January 2021.

3.      The increased squalor and buildup of property and trash immediately outside my Property has threatened the well-being of myself, my family, and my business.  After my wife, who moved into the Property with me in 2018, became pregnant with our child, we decided to move out of the Property for our safety and mental well-being.

4.      I purchased the Property in 2001 under a company I created called Location 606, Inc.  Since then, the Property has been used for residential and commercial purposes.  My Property is primarily rented for film, television, commercial and music video production.  I also use the Property to produce television shows.  Until 2017, I rented part of the Property to tenants; however due to the conditions surrounding the Property, I can no longer get a tenant to occupy the Property.

5.      I pay property taxes to the City of Los Angeles and cannot use the sidewalks around my own Property.  The environment around my Property has become unlivable and my business, and the reputation of my business, has been destroyed.

6.      Production companies have stopped using my Property for shoots due to the poor conditions in the area.  These companies have cited the incessant loud music emanating from tents, heaps of trash littering the streets, and the obstruction of sidewalks as reasons they no longer wish to film on my Property.  For example,

most companies will have heavy equipment they need to bring into my Property on wheels, but are unable to access my Property or use the sidewalks to roll their equipment.  On at least one occasion, the film crew was never able to bring their equipment inside at all and demanded their money back.

7.     On October 11, 2016, I received the following e-mail from an agent with a huge international shoe brand: "After driving past your place on 6th and Crocker yesterday, I can no longer present your property for upcoming shoots. The homeless condition directly around your property is out of control and I wouldn't feel safe bringing any film crew into that area."

8.     On October 24, 2016, I received an email from another local production company stating, "Sorry the scout left before going inside to see your space today.  He told me that when he showed up, he could barely walk down the street [be]cause there were so many homeless tents and people around.  He said it would be a nightmare to try and film there and didn't want to put the option in front of the director.  Also, wouldn't be appealing to bring the client there due to all the homeless people."

9.     On February 7, 2017, I received an email from an individual who had hoped to use my property for a Fox TV Pilot.  The e-mail stated, "thank you for showing [interested client] your place.  She really liked it.  But she is concerned about the neighborhood because her show has a big star attached.  Thanks again."

10.    On June 27, 2017, another potential client refused to work on our property.  The email noted, "When the location manager showed up with the director, his instant reaction was "I won't shoot here, because I won't get out of the car[.]' Due to the severity of the homelessness in your area, I fear you are losing out on a lot of shoots.  I know it[']s out of your hands, but thanks for all your help today."

11.    In addition to its commercial use, and in compliance with the artist-in-residence ordinance, I lived at the Property from 2001 to January 2021.  My wife

1   also lived at the Property from 2018 to January 2021.

2       12.    From 2003-2017, I had two full-time tenants, a married couple.  In

3   2003, when they first moved in, there were no tents on the sidewalks.  By 2017,

4   when the tenants moved out, they could barely walk down the sidewalks.

5       13.    The tenants moved out of the Property in 2017 due to safety, physical

6   and mental health reasons directly associated with the declining neighborhood.

7   The amount of noise and trash coming from the encampments had become too

8   much for them.  The wife was harassed a few times and the husband had his bike

9   stolen numerous times.  People would urinate and defecate on the Property's fence,

10  which would run down towards their front door.  The tenants frequently came

11  across used needles, left behind from people in the encampments and were calling

12  public safety officials to help individuals overdosing on drugs.

13      14.    Since those tenants moved out, I have struggled to find a full-time

14  tenant for the Property.  People are not interested in renting my Property as a home

15  or living space because of the surrounding area.

16      15.    Every day I find used needles on the sidewalks and on my Property.

17  Clothes and trash are thrown over my Property fence and onto my Property on a

18  daily basis.  On days when the sidewalks around my Property are cleared by law

19  enforcement, support groups use the sidewalk to handout food and clothing, which

20  results in  mounds of trash being left behind.

21      16.    My Property fence is regularly used as a restroom since there are

22  minimal facilities for the number of people living in front of my Property.  I have

23  to make sure the urine and feces is washed off from my Property on a daily basis.

24      17.    The unmanaged urine and feces surrounding my Property, as well as

25  the rat and bug infestations, creates significant health risk.

26      18.    My Property fence has been damaged from people pushing large

27  bulky items, such as a couch and a refrigerator, against it and tying tents and tarps

28  to it.  Most days, I cannot use the sidewalk surrounding my Property and the

1    entrances to my Property have been blocked by debris.

2        19.    Law enforcement has told me that they cannot ask the homeless to

3    move their belonging from the sidewalks or from my Property.  Because of this,

4    when I have asked people to move their belongings from blocking the entrance to

5    my home, I have been threatened, spit on and verbally attacked.

6        20.    On or around February 2020, my wife saw a dead person's body on

7    the sidewalk outside of the Property when she was leaving to work.  She now

8    suffers from ongoing trauma every time she sees a person laying on the sidewalk

9    near our Property because she assumes they are not alive.

10       21.    Weekly, I witness public sex, prostitution and/or nudity on 6th street

11   and Crocket street.

12       22.    My Property gates on Crocker Street and Sixth Street are constantly

13   getting blocked by tents or property.  The amount of debris blocking my gates has

14   intensified since Los Angeles Sanitation stopped cleaning the sidewalks around my

15   Property.

16       23.    The conditions around my Property have worsened beyond my control

17   and because of the increasing hazards I can no longer invite friends or family over

18   to my Property.  I cannot reasonably enjoy and use my Property.  My quality of life

19   has suffered immeasurably.

20       24.    When I purchased the Property in 2001, the sidewalks were clear.

21   Today, the street near my Property is unsafe, it is unsanitary, and the abundance of

22   personal belongings restricts access in and out of my Property.

23       25.    The street lights are constantly out along 6th street due to homeless

24   people tapping the light poles to run power and extension cords to their tents.

25   There is even one homeless group that is using an industrial sized generator to

26   power their tents across the street from my Property, which causes a loud noise and

27   releases a foul odor, that I can hear and smell from my Property.

28       26.    Insurance on my Property is significantly higher than on properties in

other areas due to the increased danger surrounding me daily.  Since 2018, three buildings across from my Property have caught on fire from homeless encampment open flames.  Additionally, several buildings down the street recently caught on fire for the same reason.

27.     My insurance company recently dropped my coverage due to the high risk associated with the homeless encampments and recent encampment fires. After weeks of getting denied by admitted insurance companies, I finally was approved by a non-admitted insurance company.  However, I now pay five times what I was paying before, which was already higher than what other properties in other areas have to pay.

28.     I have difficulty receiving mail or packages.  The postman will not deliver my mail if my mailbox is blocked and will not get out of his truck to deliver mail or packages to my front door because he has said it is not safe.  I regularly get my neighbor's mail because the postman simply chooses the mailbox that is not blocked that day to put the entire block's mail in.  If everyone's mailbox is blocked, mail is not delivered.

29.     Food delivery services, including LA Café, will no longer deliver food to my property after dark.  Rideshare drivers, such as Lyft or Uber, have refused to pick us up and drop us off.

30.     Any attempts to lease or sell my Property have been futile because of the conditions surrounding it.

31.     The recent and widely reported Typhus and Hepatitis outbreaks in the area have made potential buyers avoid viewing my listed Property.

32.     My Property has been listed as "For Sale" since the beginning of 2018.  Despite having numerous interested buyers, the Property has not sold.  All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reasons they would not purchase the Property.

33.     On January 17, 2018, I received an email from a potential buyer

stating, in part, "Just wondering how you're planning to sell it when the homeless are 3 tents deep all around that.  I know that DTLA is working on the problem but isn't the skid row development company super close? . . . [W]hat precautions and what actions can be taken regarding the sidewalks around the property as owners[,] if we were to buy it?"  The email also includes a text message screen shot from a potential buyer stating, "Thanks for letting me know about the sidewalk directly around the building.  I just know that it will make it awfully hard for pedestrians to walk over from the arts district . . . if no one will venture over because the rest of the surrounding streets look like a scene from Mad Max then that could be a hiccup."

34.     On January 20, 2018, I received an email from a potential buyer stating that his client was "worried about the homeless people around [the] property, because his kid will [be] living there too, so he [has] changed his mind to buy another property . . . ."

35.     On October 16, 2018, I received an email from one agent stating, "Our client arrived early & saw police & other non desirable elements[.]  [T]hat pressure prompted him to call & say he is no longer interested."

36.     In 2018, the City of Los Angeles inquired into the acquisition of my Property.  The City would not tell me why they were interested in my Property.

37.     In January 2019, I found out from an article in the *Los Angeles Times* that the City was looking to turn my Property into a Homeless Hygiene Center.  The City has not made an offer on my Property but has released my address to the public.  This has confused me and my clients.

38.     On May 2, 2019, I received an email from a potential client saying, "When I google mapped it (the property) it shows a major tent city around the property, is there any update on what the scene is?"

39.     On May 21, 2019, I received an email from a potential buyer stating, "Personally I think this property is great and has huge potential!  But I believe my

1   client is just worried that the homeless issues won't be t[aken] care [of] soon

2   enough and it could cause some problem[s] for the business he's going to do in

3   there."

4       40.     On May 26, 2019, an email from another potential buyer revealed,

5   "After a lot of research and thought we have decided to pass on the property.  Even

6   though we love the building, I believe the price is too high for us at the moment.

7   We believe skid row will not change fast enough to really be able to invest there at

8   the moment."

9       41.     I recently spoke to some young men around my Property who told me

10  they came to Skid Row from the Valley because they knew they could pitch a tent,

11  buy and use drugs, without any repercussions.  To be clear, they are not homeless,

12  they were simply capitalizing on the drug-haven Skid Row has become.

13      42.     The situation surrounding my Property has gotten remarkably worse

14  in the last three years, both in terms of the concentration of homeless people and

15  incredible build-up of property, debris, rotting food, and human waste.  In fact, I

16  have had to hire and pay someone to go to my Property daily to clean the trash off

17  the immediate sidewalk around my Property, spray off urine or feces, and remove

18  abandoned property and throw it away into my dumpster.  The person that I have

19  hired also knows a lot of the homeless in the area and will ask them to move their

20  tents from the front of my Property – sometimes this works, sometimes it doesn't.

21  This is a significant cost that I have had to incur in order to maintain cleanliness

22  around my Property.  If I did not have someone cleaning these sidewalks around

23  my Property daily, they would be completely filled with tents and debris.  Indeed,

24  if one were to look across the street or even next door to my Property – areas that I

25  have not paid someone to clean, they would see a concentration of tents that have

26  been there for years and continue to grow.  I know the situation will only decline

27  further.

28      43.     I have suffered both in terms of my economic interests in my Property

1    and also in the basic use and enjoyment of my Property.  I cannot go outside and

2    walk around the neighborhood.  Because I fear for my safety, I even have to drive

3    down the street to restaurants or grocery stores.  Illegal drug use and street

4    prostitution are rampant around my Property.  I cannot open my windows at my

5    Property due to the loud sounds and terrible odors day and night.

6        44.     The homeless crisis right outside my Property is heartbreaking.  I

7    purchased my Property approximately 20 years ago because it was a unique

8    building with significant potential.  However, over the past two decades, the

9    situation in the surrounding area has gotten so bad that my pregnant wife and I

10    have had to move out of my Property for our safety and well-being.

11        I declare under penalty of perjury under the laws of the United States of

12    America that the foregoing is true and correct.

13

14        Executed on February 10, 2021 at Los Angeles, California.

15    _____

16    Joseph Burk

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF MARIA DIAZ

I, Maria Diaz, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.  I am a member of LA Alliance for Human Rights.

2.      I have lived on Skid Row for 5 years now.  I came to Skid Row after serious family issues prevented me from living at home.  I had no other place to go, so I came to Skid Row to try to find shelter.  I have been one of the lucky ones to have a tent for my entire stay on Skid Row.

3.      I have been extremely fortunate that God has supported me through my time in Skid Row.  That has enabled me to make close social connections with others and build a kind of support network that has helped me survive.  I don't know how anyone would survive Skid Row by themselves.  I have seen many people living here succumb to the dangers of depression and overdose because there are insufficient services to assist them.  Without my friends I know that I would likely become another one of the tragic victims of Skid Row.

4.      Unfortunately, a number of people living on Skid Row are unwilling to help each other, and in fact, they work to actively cause trouble with those just looking to survive.  People are always trying to sell drugs, steal belongings, or just hassle those trying to make it through this troubling time.  These people are one of my primary reasons for wanting to leave Skid Row and find permanent housing elsewhere.

5.      This is even more of a problem for women and young girls, who frequently suffer the most in Skid Row.  Harassment for women in Skid Row is a certainty, and they need to learn fast how to deal with the constant onslaught of issues they will face.  I have seen a number of young women harassed, attacked,

1   raped, and ultimately succumb to drug addictions due to the conditions of Skid
2   Row.

3       6.      For these reasons it has taken me nearly 5 years to build up the
4   network, resources, and confidence to apply for housing.  I wish that process was
5   easier and more accessible to those living on the street because I believe the first
6   step in escaping homelessness is finding a safe and stable place to rebuild your
7   life.  I feel that I shouldn't have needed to build up a network of people to keep
8   myself alive before feeling able to apply to a private group for housing.  It feels
9   strange to me that the City and County themselves have not made more efforts to
10  both provide and organize the process for people living on Skid Row to receive
11  housing.  Further the housing provided by the City and County which does
12  appear reasonably available is located on Skid Row, the epicenter of issues for
13  those trying to escape homelessness.   This is unacceptable as it leaves vulnerable
14  people sequestered in a region where they face the greatest threat of harm and
15  relapse into a life on Skid Row.

16      7.      As of yet, I have been left waiting to learn if my application for
17  housing with the DREAM Center has been approved.  I hope to be approved so
18  that I can finally begin to rebuild my life away from the environment which has
19  caused me so much harm.  At the same time, I worry for those who I have helped
20  and who have helped me.  I desperately want for them to be able to escape Skid
21  Row as well and not feel that I have abandoned them to the dangers there.

22

23

24

25

26

27

28

DECLARATION OF MARIA DIAZ

1        I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  11 day of March, 2021, at Los Angeles, California.

4

5                        MARIA DIAZ

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARIA DIAZ

### DECLARATION OF GREGORY GIBSON

I, Gregory Gibson, state and declare as follows:

1.    Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.    I have been homeless, living on Skid Row in Los Angeles for about 15 years, apart from some time spent in jail. I was born in New York. I also lived in Germany from the age of 9 to 17, when I moved back to New York then eventually made my way to California.  I am a member of LA Alliance for Human Rights.

3.    I was incarcerated in Northern California for several years.  When they released me on parole in 2012, the penitentiary officer gave me twenty-five dollars instead of the customary $200.  The penitentiary also failed to provide me with a California Identification Card ("CAL-ID") when I was released. The CAL-ID Program is meant to streamline access to services such as medical and housing by providing offenders with a valid ID.  Without it, I could not prove my identity.

4.    I came to Los Angeles for the opportunities in this city. After searching for a job that would support me, I passed through the interview process for a sales clerk position at a business located in the Westwood area of L.A. but was later released because I could not produce identification.  Without my I.D., I could not find a job. I applied for one position with a restaurant supply company, one with a grocery store, and many others. Every time, they turned me away. Even though I have a High School education, no one will hire me without official documentation.

5.    I tried to solve this critical issue myself.  First, I went to a Department of Motor Vehicles office here in L.A. to request a new driver's license; they told me my files were lost. I could not apply for a new one without a

-1-

DECLARATION OF GREGORY GIBSON

Social Security Number or identification.  I went to the L.A. Department of Public Social Services ("DPSS") to request assistance with obtaining (1) an I.D., (2) housing, and (3) financial support. The county employees at DPSS did not help me obtain an I.D. and told me to return the next day for a bed. After I returned the next day, they told me to come back in three weeks for a bed. Then, three weeks later, they told me the bed was not available.  After several rounds of trying to figure out my identification and social security situation, and trying and failing to get a bed of my own, I just gave up.

6.      Living on the streets is mentally and physically exhausting. I have hernias and trouble sleeping. Even if I could find work, my knees and ligaments are in so much pain that it is hard to move. It is also impossible to sleep—people scream and fight late into the night.  My whole life is basic survival.  I need services. I am open to assistance, but the City and County turn me away.

7.      Tackling issues through public services is so difficult that, in the process of fixing one problem, ten more pop up.  L.A.'s public services are not just inefficient—they are killing us. While we fight for necessities like identification and housing, we deal with the difficulties of living on the street.

8.      Drug use is rampant because it is an escape from reality, and there is nothing else to do. I never did drugs before becoming homeless, but now I do them just to deal with the pain of living on the street.  If I walk down the street, people will invite me to "take a hit." Fentanyl-laced drugs are everywhere. The problem is so pervasive that at least 10 people I know died in the past two weeks alone.

9.      Ultimately, I want to obtain my I.D., find housing, and apply for Social Security.  I want to break this vicious cycle of living on the streets, fighting for survival.  My physical and mental health are deteriorating, and I need help.

-2-

DECLARATION OF GREGORY GIBSON

1       I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  1st day of April, 2021 at Los Angeles, California.

Gregory Gibson

-3-

DECLARATION OF GREGORY GIBSON

## DECLARATION OF JAVIER GONZALES

I, Javier Gonzales, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.  I am a member of LA Alliance for Human Rights.

2.      I came to Skid Row because I knew some people living here and felt I needed a support network to survive.  Since then, I've been trying to get myself back together and housed from Skid Row.  My focus has always been on getting myself together and dealing with the unfortunate circumstances around me.  I always explain to people that what those on Skid Row need isn't sympathy, pandering, or handouts, but access to the resources to get ourselves back on our feet.

3.      The circumstances of Skid Row actively harm people's chances of escaping a life of homelessness.  Robberies and assaults are a part of daily life with items being stolen from my personal property whenever I am not monitoring them.

4.      Due to the frequent robberies and assaults, I was forced to turn to amphetamines to keep myself awake during the most dangerous hours.  If I allowed myself to fall asleep during the nighttime hours, myself or my belongings were under constant threat of attack.  Amphetamines allowed me to stay alert and defend myself until the morning when violence is much less likely. I frequently observe homeless persons turning to drugs to cope with the circumstances of Skid Row.

5.      Regardless of my efforts, belongings and especially my identification were frequently stolen from me.  This blocked me from accessing a number of the services I needed to survive on let alone escape Skid Row.

-1-

6.     When I have been able to save enough money to try and attain housing, my appearance and status as "homeless" caused those housing opportunities to fall through.  On two occasions I have applied to residences where I had the funds to pay the listed rent.  However, both landlords denied my applications because of my lack of credit history or because of my appearance. These residences were both in unsafe areas and not desirable properties, yet I was still prevented from moving off the street.  The lack of services to house myself or maintain my condition has essentially trapped me at Skid Row for the time being.

7.     The constant pressure and conditions of Skid Row have also caused me severe emotional stress.  Whenever I sleep now it feels as though there is a phantom assailant or burglar lurking near me.  This frequently interrupts my sleep and causes what sleep I do get to be restless.  However, this is a necessary state for survival in the current conditions of Skid Row.

8.     I would be excited for any opportunity with housing that comes from a trusted source like the City or County.  The housing would need to provide safety to allow me to sleep properly and re-stabilize my life.

DECLARATION OF JAVIER GONZALES

1        I declare under penalty of perjury under the laws of the State of California

2    that the foregoing is true and correct, and that this Declaration was executed this

3    31st day of March, 2021 at Los Angeles, California.

4

5    _____

      JAVIER GONZALES

6

7        3-51-2021

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

DECLARATION OF JAVIER GONZALES

## DECLARATION OF ANN JACKSON

I, Ann Jackson, state and declare as follows:

1. Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2. I have lived on skid row for the past 8 years. Originally, I was sent to Skid Row by a judge to participate in a program with the Downtown Women's Center near the corner of San Pedro and 5th. I believe that I was sent there to rehabilitate myself, but the decision ended up putting me in the epicenter of the homeless crisis. I am a member of LA Alliance for Human Rights.

3. I lived at the Women's Center for several years, but during that time, the conditions at the Women's Center worsened and worsened. I noticed several issues with the available housing such as bug infestations, broken and dangerous fixtures, and filth everywhere leading to extremely unhygienic conditions. When I reported these issues, they did nothing to help. This left me to live in squalid conditions which actively prevented me from full rehabilitation.

4. The worsening situation made the Women's Center practically uninhabitable for me and led me to return to living on the street in Skid Row. Compared to living in the Women's Center, on Skid Row I am able to exercise some control over my surroundings and protect my personal property from theft.

5. My LAHSA counselor/case manager has been entirely unhelpful in alleviating any issues or finding me any type of housing. I consistently went to them with problems and found them as unhelpful and hostile as the Women's Center staff. I'm not sure if this was because she was simply overburdened or was just uninterested in offering me support. At least, she seemed unable to appreciate why the situation at the Women's Center was so untenable.

6. The stress of my life in Skid Row caused me to have a stroke 18 months ago. I was provided treatment, but I still experience numerous lingering

-1-

DECLARATION OF ANN JACKSON

effects, such as slurred speech and a vulnerability to other medical conditions like the current pandemic Covid-19.  I can see conditions on skid row getting worse every day: there are more people desperate for help but unable to find it.

7.     Because of the stroke and my case manager's unhelpfulness I have not been able to obtain the section 8 housing that I am entitled to.  Whenever I try and speak to anyone about receiving services, they cannot understand me, and my case manager does not advocate for me to receive housing.

8.     This has left me to fend for myself in a tent on the street, which is largely preferable to the situation I faced at the Women's Center.  Surviving on the street has harmed me both physically and mentally.  I am frequently ill and forced to live in unhygienic conditions.  Narcotics are everywhere, and I end up turning to drugs because there is little else that allows me to avoid the negativity omnipresent on Skid Row.  I desperately want change and to get housing away from Skid Row where I can put my life back together and recover from my stroke in safety.  However, despite pursuing the options available to the best of my abilities I have been unable to reach that goal.

///

///

///

///

///

-2-

DECLARATION OF ANN JACKSON

1        I declare under penalty of perjury under the laws of the State of California

2   that the foregoing is true and correct, and that this Declaration was executed this

3   1st day of April, 2021 at Los Angeles, California.

4

5                            Ann Jackson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF WENZIAL JARRELL</u>

I, Wenzial Jarrell, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.  I am a member of the LA Alliance for Human Rights.

2.      I came to Skid Row over two years ago.  Before I became homeless, I served in the Air Force, including for 8 years in Iraq, before I was injured during combat.  Unfortunately, I suffer from post-traumatic stress disorder due to my service, and this has adverse effects on my ability to both survive on the street and acquire services.

3.      I came to California because my wife passed in Bellflower, California.  After her passing, her family wanted nothing to do with me.  This left me to fend for myself in California, and I ended up on Skid Row.  I came here because I was told this is where I need to come to get housing and services.  Originally, I was receiving health benefits and food stamps but stopped receiving them after a County worker asked me to sign a contract.

4.      Since coming to Skid Row, I have found that service providers offer little to no substantive support for the people living on Skid Row.  Whenever I apply for services of any kind it seems that I am constantly told to wait, come back later, or go to someone different meaning attaining any service becomes a multi-day arduous task.  The complications of this process are so severe that my PTSD frequently prevents me from completing the process and frustrating all of my prior efforts.

5.      Additionally, I believe that these services are only trying to help those with severe addiction, mental or physical health issues rather than all homeless people.  The limited focus causes many of the homeless on Skid Row to receive zero services because they don't look "homeless enough" for service

-1-

DECLARATION OF WENZIAL JARRELL

providers to pay them any mind.  This has perverse incentives where the people most likely to escape homelessness are the ones to receive the least help, which causes those same people to deteriorate mentally and physically.

6.     However, even if you visibly need assistance, services are still hard to attain.  For example, I found a 19-year-old girl who was blind walking the streets of Skid Row.  It was clear that she would be unable to survive there by herself due to her condition.  I brought her to the county services worker and initially they told me there was nothing they could do for her.  I demanded to speak to the worker's manager who informed me that the worker was incorrect and should have been providing the girl services.  This experience demonstrates two things.  Firstly, that many homeless people on Skid Row are unable to attain the services they need due to their own limitations and the complicated system that the City and County have designed.  Second the workers running these systems are barriers rather than facilitators of the care that Skid Row needs.

7.     Recently during the Covid-19 crisis Mayor Garcetti ignored how bad it is on Skid Row.  No one even informed us about the pandemic or how we could protect ourselves for many months.  This caused the illness to move quickly through the homeless population, and little to no aid was offered.  We were ignored, and I could see many more people were sick and dying than was reported in the media.  It really displayed how little the City and County care about the people just trying to survive.

8.     My experiences exemplify living on Skid Row.  Many small issues occur everyday where services are denied to those in need or benefits are cut off for unreasonable and unrelated things.  Then, those workers sweep the issues under the rug so that they can avoid blame and responsibility for not doing their jobs.  Many people came to Skid Row in search of assistance, but instead they are turned away and abandoned.  Those people then stay in the streets and get worse instead of better.

DECLARATION OF WENZIAL JARRELL

9.      The situation is worsened because the services that are provided (frequently by private groups) do nothing to stop homelessness itself.  I appreciate the food, clothes, tents, and other provisions provided to us. Unfortunately, they are frequently of poor quality or used beyond repair.  But, the more important issue is that the items provided do nothing to help people actually escape homelessness.  It is more comfortable to live on the street in a tent with fresh blankets, but it will not do the necessary job of providing a stable housing environment to let you escape life on the street.

10.     Sadly, the housing which is provided by the City and County is frequently in so poor a state that it as bad as life on the street.  When I have been offered and investigated the extremely limited housing options available, I have found them bedbug ridden with rodents, cockroaches, and drug residue present on many surfaces.  Or, I have been offered a place to sleep on the floor inside of a shelter which is an unreliable place to stay with strict requirements.  I did not go to war for our country to be afforded such sorry circumstances for self-sufficiency.  One complication for me is that my PTSD worsens when I am cooped up with large numbers of people.  This has prevented me from accessing some of the shelters which crowds in many homeless persons as if it were a barracks.

11.     I pride myself on helping others get out of the black hole that is Skid Row.  Whenever I see someone who I know doesn't belong there, who should have a home to go back to, I prioritize helping them get out, because I know that if they don't they are liable to be attacked and left to fend for themselves.  The worst thing that can happened is getting stuck in the system of Skid Row and finding you cannot escape.  If I were able to get a stable housing environment with any semblance of personal space, then I would jump at the chance.  The world doesn't know how bad it really is to live on Skid Row.  I know I am more likely to die because I live on Skid Row.  It is a desperate situation.

DECLARATION OF WENZIAL JARRELL

1        I declare under penalty of perjury under the laws of the State of California

2    that the foregoing is true and correct, and that this Declaration was executed this

3    1st day of April, 2021, at Los Angeles, California.

4

5    _____
     Wenzial Jarrell

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

DECLARATION OF WENZIAL JARRELL

## DECLARATION OF CHARLES MALOW

I, Charles Malow, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath. I am a member of LA Alliance for Human Rights.

2.      I live in Union Rescue Mission, within the roughly one-square mile known as "Skid Row."  The increase in debris, tents, and personal property on the streets over the last several years prohibits my movement along the streets and puts my life in danger.  The rampant spread of obscure diseases puts my health in danger.  And the increase in violence prohibits me from leaving my home after dark.

3.      I was born on April 6, 1955.  Prior to 2008, I worked as a garage door installer for 29 years.  And from 2000-2006 I worked part-time as a security guard. I became homeless in 2010 when the economy slowed down and I was evicted from my apartment.

4.      From about May 6, 2010, to March 16, 2012, I lived on the streets of Glendora, California.  In the winter of 2011 and 2012, I stayed at a Glendora Winter Shelter.  During this time, I decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.

5.      When I first arrived at URM in 2012, police officers use to come by in the morning, and wake-up the people sleeping on the streets. They were required to pack up their belongings and stow them, so the sidewalks were not blocked. This also permitted illegal activity such as narcotics and weapons sales to be more easily discovered and therefore suppressed.  At that time, there were no tents in front of URM.

-1-

DECLARATION OF CHARLES MALOW

6.     I am now an Ambassador at URM.  I have been an Ambassador for a little over four years.  The Ambassador program allows a small group of men to live at URM indefinitely.

7.     Since living at URM, I have worked at Home Depot and for URM's janitorial department, known as the EVS team.  The EVS team is responsible for janitorial services and sanitation of the facilities, including the restrooms.  I am now retired, on Social Security, and volunteer 20 hours a week in the EVS department.

8.     I am aware that diseases such as Typhus have made a resurgence on Skid Row.  COVID-19 has also been rampant both in URM and in Skid Row.  This makes me extremely concerned that my work with the EVS team puts me at greater risk of contracting a disease.

9.     In 2016 I noticed a big increase in the volume of tents and belongings on the streets.  This has greatly impacted my daily life.  I have seen a huge growth in the rodent problem on Skid Row.  Now, Skid Row is infested with rodents.  I have seen rats running in and out of tents when I sweep the sidewalks and gutters outside of URM.  A large contributor to this rodent problem is the volume of trash disposed of on the streets.  Because individuals living on the streets throw food and trash in the streets, rats have more than enough food to survive.

10.     There has also been a huge increase in the amount of human feces on the street which carries with it the significant risk of disease, not to mention the odors.

11.     There is absolutely no room to walk on the sidewalk, so if I leave URM I am forced to walk in the street.  Even in places where I could physically walk between the encampment and the wall, I still must walk on the streets or risk violent confrontation from people who accuse me of invading their "space."

-2-

DECLARATION OF CHARLES MALOW

12.     When I leave URM, I must plan my route carefully even if traveling by public transportation.  Due to an increase in crime, including narcotics sales and violent activity, I must use a car service to get back from the metro or bus station after visiting my mother in Anaheim.  I always have the car drop me off directly in front of URM to avoid dangerous encounters on the street.

13.     I do not leave URM between the hours of 4pm and 6am. I am confined to URM during these hours because I am concerned for my safety. When I do leave, I am constantly approached and offered illegal drugs for sale. I regularly see people just outside my home using illegal narcotics in the form of pills, or smoking, or injecting them in front of me. I see people laying motionless in gutters, often without clothes or shoes, and am constantly looking to see if that person is dead or merely unconscious from drugs or alcohol.  As a person who has struggled with drug and alcohol use in the past, it is particularly painful to watch and experience.

14.     The build-up of property over the last few years is directly responsible for this significant increase in crime because it allows criminals to operate in relative anonymity. The build-up of property also makes it impossible for health and safety workers to identify public health risks, causing disease and unsafe conditions to spread right outside my home.

15.     As a formerly homeless individual, I know first-hand the difficulties that come from living on the street.  It is my strong desire to help those who are still homeless find their path out. But subjecting them to squalor and disease does not help them, but only makes life unbearable for everyone.

-3-

DECLARATION OF CHARLES MALOW

1     I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  *31* day of March, 2021 at Los Angeles, California.

4

5                                              Charles Malow

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

DECLARATION OF CHARLES MALOW

## DECLARATION OF KARYN PINSKY

I, Karyn Pinsky, state and declare as follows:

1.     Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.     I work and live-in downtown Los Angeles ("DTLA") with my husband and our three-year-old son.  Both where I work and my home are within the "Designated Area" as defined by the *Mitchell v. City of Los Angeles* settlement which effectively expanded Skid Row beyond its traditional borders.  I am a member of the LA Alliance for Human Rights.

3.     My husband and I originally moved to DTLA in 2010 because we were drawn to the architecture, history, and walkability of the area.  People experiencing homelessness were always present near our home, but in far fewer numbers.  In 2010, the only tents west of Skid Row were on Broadway, and they were erected every night and removed shortly after sunrise.  I understood this was a result of a compromise between the City and activists in the *Jones* case.  It would make more sense to me to provide people shelter than this arrangement, for the benefit of the unsheltered and the entire community.

4.     From 2010 to 2016, my husband and I were able to enjoy many wonderful features of DTLA—we regularly walked our dog along Main Street, left our windows open at night, and felt comfortable walking to the many wonderful establishments and restaurants in the city.  In 2015 we were lucky to bring our son into the world and were so excited to raise him in DTLA.  We looked forward to bringing him to the many parks, showing him the wonderful buildings, visit the museums or Disney Opera House, and take him to the many multicultural markets around the city.

5.     Unfortunately, all of this has changed dramatically over the past several years as the homelessness crisis has deepened.  Before the Covid-19

-1-

DECLARATION OF KARYN PINSKY

pandemic, when I walked outside, I feared that either my son or I would be the subject of some random act of violence.  This fear reflected the dangerous encounters I or my husband experienced with individuals on the streets.

6.     Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards me because she thought I was "judging" her—only when my husband and others intervened was the situation defused.  If they hadn't, I am confident I would have been attacked.

7.     On another occasion, my husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it.  Another neighbor was attacked in the middle of the night by someone who gained access through a fire escape window.  These are just some examples of the many acts I have witnessed and of which I am aware; I no longer feel safe sleeping with my window cracked even a little at night because of its proximity to the fire escape.

8.     Just last year, a homeless man seated outside a café on 6th Street near Broadway, a block from our house, randomly pushed a stranger into the street in front of an oncoming bus.  The man was struck by the bus and died.

9.     Sexual assaults on women also have increased significantly in the last several years, and as a result, I am terrified of being assaulted while running errands or just walking to or from a restaurant.

10.     The culmination of these experiences led me to fear being on the streets of the city I live in, and since the onset of the Covid-19 pandemic, the state of the homelessness crisis has worsened significantly, even in comparison to the recent years.  Because foot traffic has decreased significantly on the streets of Los Angeles the tenuous balance between maintaining the right of way for the public and the expansion of the encampments has been eroded.  Now, encampments have spread farther than they ever have before.  Main Street around 5th and 6th, a block away from one of the highest concentrations of

DECLARATION OF KARYN PINSKY

residential units in DTLA, has been overcome by tents, trash, and discarded property, which it never was before. Additionally, the structures which are appearing are more robust and permanent that ever before. What may have been a solitary tent a few years ago has transformed into a mess of tarps, poles, ground coverings, and people that don't seem to have anywhere else to go. My heart aches for them, as many of them need help but the City and County seem unable or unwilling to help them. At the same time, there is a definite criminal element that is included that threatens the entire community (particularly the unhoused). Alongside that expansion in scale and scope of the homeless encampments came an increase in the number of rodents, discarded syringes, fecal matter, and other items which impinge on my family's enjoyment of the area and more importantly my family's wellbeing.

11.    I frequently track the crime rate from neighborhood watch programs, such as Citizen, and have noticed that crime in these areas has gone up commensurately with the homeless encampments' expansion. Where before I may have gotten one or two notifications about crime in my area a day, I am now inundated with notices all day long. The crisis is getting worse, and I fear daily for my family's wellbeing.

12.    We are now forced to walk our dog on the roof of our building instead of along the streets for fear of assault or harassment at any hour of the day. Whenever we leave our home, we confine ourselves to a vehicle until we reach our destination which we ensure has protected parking areas to prevent theft or other harmful interactions. My son is too young to receive a Covid-19 vaccine, and we worry that being in public exposes him to infection because of the lack of social distancing and person protective gear used by individuals in camps. This concern extends to the many diseases or infections that my son could catch from the state of the streets. Even when homeless persons or their property are not present on the street, I avoid taking my son outside at all because

DECLARATION OF KARYN PINSKY

1  I am afraid that he will contract one of the many diseases that are plaguing the
2  area—Covid-19, typhus, tuberculosis, typhoid, hepatitis, or the plague. To avoid
3  disease and violence, I have stopped allowing my son to play at the park at
4  Spring Street Park, in Pershing Square and stopped taking him to Story Time at
5  the Central Library, activities he enjoyed but are no longer safe.  To avoid any
6  chance of passing something to my son my husband and I have also stopped
7  walking the streets entirely.

8        13.    Family and friends are so fearful of the disease and violence in the
9  area that they will no longer come to visit me. The area was not always like this,
10  but the City's failure to limit the goods accumulated on sidewalks or remove
11  tents during the day has fundamentally altered the neighborhood and my family's
12  experience of it.  I have been greatly affected and have a very real interest in
13  remediating this issue as my quality of life and basic enjoyment of my property
14  has been severely diminished.  I understand that life on the street is extremely
15  challenging.  I can imagine how bad it must be for individuals living in these
16  encampments given the effect these issues have had on my life.  Homeless
17  persons (particularly women) are subjected to the assaults, the elements, the drug
18  pushers, the gang members, the rats, the filth, and the disease.  This is no way for
19  a society to treat its most helpless members and the City and County need to step
20  up and make change for all of us.

21

22  I declare under penalty of perjury under the laws of the State of California that
23  the foregoing is true and correct, and that this Declaration was executed this _11th_
24  day of April at Los Angeles, California.

25

26  Karyn Pinsky

27

28

DECLARATION OF KARYN PINSKY

# DECLARATION OF LISA RICH

I, Lisa Rich, state and declare as follows:

1.     Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.     I own several buildings in Skid Row, which I rent out to various businesses.  My family has been running the properties for over 40 years and has brought significant numbers of jobs to the area.  Over the past several years, the number of homeless persons on the sidewalk in front of the buildings has dramatically increased, as has the quantity of their personal property.  Frequently, tents and belongings block the sidewalks for days at a time, bringing with them refuse, criminal activity, and unhygienic conditions.

3.     The situation continues to worsen and is certainly at its highest ever level now during the Covid-19 crisis.  At times, the buildup of property physically prevents tenants and patrons from accessing the buildings.  Tenants frequently complain and request rent reductions due to the effect the homeless encampments are having on their business.  In turn, the situation on Skid Row has done immense harm to my business.

4.     I have attempted twice to contact LAPD for assistance in moving the immense amount of accumulated property, but LAPD did not provide any help. When I asked why the LAPD would not move homeless persons or their property, I was informed that there was nothing LAPD could or would do.  After learning the City, the County, and the LAPD had chosen not to assist the property owners and businesses in Skid Row, I attempted to do my best to help my tenants avoid the dangerous situation posed by the homeless encampments.  To do this I installed some fencing around some higher risk properties to keep tents from being propped directly against the buildings.  These fences did little more than create a small one foot spacing between the walls of the building and the

accumulated property of homeless persons.  However, as if a kind of grand irony, the City, after choosing to themselves do nothing about the issue of hazards to the properties, warned me that the fencing was unlawful, unpermitted, and would lead to me receiving fines.  Before I could remove the fencing at issue, an unknown person or entity removed the chain link, and the tents returned, gathering around the bare fence poles.

5.     Recently, the Los Angeles Department of Water & Power ("DWP") requested one of my tenants to take photos of their meter readings and send it to them instead of DWP doing it themselves because a large number of tents had been erected near the meter, and the DWP employee did not feel safe checking the meter themselves.  The DWP representative threatened that if the tenant failed to properly provide the information from his meter the City would turn of his water and power.  Yet, the City would not provide any means for my tenant to safely access the meter.  Only after I involved Council District 14's office, the Business Industrial District, and Estela Lopez were we able to clear up the situation between DWP and my tenant.  It is ludicrous that businesses are forced to do the job of City actors, under threat of losing essential utilities, when the City itself caused and perpetuates this crisis.  The City feels it unsafe for their workers to perform routine tasks, but the City also refuses to make it safe for businesses or the members of the Los Angeles community who work there.

6.     A few years ago, my concerns about safety were realized when a campfire at a homeless encampment burned out of control and set one of my buildings ablaze.  The fire significantly damaged the building's offices and electrical system, requiring nearly $90,000 worth of repairs.  The fire and repair process disrupted my tenant's business for significant time.

7.     Adding salt to the wound, at the next policy renewal period, my fire insurer refused to renew the policy covering all of my buildings, claiming the buildings were no longer insurable because of the risks of fire and other damage

DECLARATION OF LISA RICH

posed by the homeless encampments surrounding the buildings.  My insurance
agent then approached 27 other insurers—of those, 26 insurers outright refused to
insure my buildings at any rate due to the concerns about fire or other damage
posed by the encampments.  Eventually, a single insurer offered to cover my
buildings but at a premium more than four times my original rate.

8.     Since that incident, the number of fires on Skid Row has drastically
increased.  I have heard of different out-of-control fires which have damaged
other buildings in Skid Row.  On April 10, 2021, just this weekend, there was
another fire outside one of my buildings.  Luckily, it appears that the building
escaped any serious damage; however, it was observable from the scene that a
massive amount of property had accumulated and was then burned.  Photos of the
aftermath are attached as Exhibit A.  There is no doubt in my mind, that many
Skid Row businesses are facing similar threats of fire, an increase in their costs
reflecting the likelihood of damage from homeless persons, and difficulties
securing basic services from the City, the County, and the LAPD.  I am aware
that some tent fires are accidents, but some are set intentionally in retribution.
People have been seriously hurt and injured because of these fires, and it is only a
matter of time before one of my tenants is hurt or killed.  We need immediate
assistance to address this catastrophe.

9.     As a result of these developments, I have been forced to consider
selling my family's business and abandoning the Skid Row area.  I hope that the
City and County will do something to help the ever-escalating number of
homeless persons and amount property accumulating on Skid Row.  Otherwise,
the businesses and residents will be forced to close or move due to the increasing
costs of doing business, which would have the unfortunate effect of entrenching
Skid Row as a location wholly abandoned by the City and County.

1     I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  12th day of April at Los Angeles, California.

Lisa Rich

DECLARATION OF LISA RICH

# EXHIBIT A







# DECLARATION OF MARK SHINBANE

I, Mark Shinbane, state and declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am the President of Ore-Cal Corporation located downtown at 634 Crocker St., Los Angeles, CA 90021.  Ore-Cal Corporation is an international seafood importer, processor and distributor.  It is a second-generation family owned-business and we have owned property in the general area since 1961.  Ore-Cal has been located on 634 Crocker Street since 1971.

3.      Four years ago, Crocker Street and other streets in our vicinity – such as 6th Street, 7th Street and Towne Avenue – were free of encampments.  There were small homeless encampments west of San Pedro Street on San Julian Street and Wall Street.  Property was generally kept contained, crime was generally addressed, and the sidewalks were usable.

4.      Starting around 2016, Crocker Street, 6th Street, 7th Street and Town Avenue became a haven for homeless individuals.  Very rapidly, the streets filled with tents and encampments, inundating the area.

5.      Since then, we have faced an increase in violence and an inability to traverse the sidewalks.  Individuals are always loitering, and encampments often block sidewalks, doorways, driveways, and streets.

6.      There is now rampant and obvious drug use and its associated side effects include people walking in a perpetual drug-induced state and bodies lying on the sidewalks or doorways near our business.  There has been an increase of used needles on the streets, sidewalks, and inside drains located on our property.

7.      Based on conversations with LAPD Officers and Detectives in the area, I am aware that gang members are supplying narcotics to homeless individuals right outside our business.

8.     There has been an increase in violence with both homeless (as victims and perpetrators) and gang members.  My employees and transportation drivers have been threatened by homeless individuals.  Illegal entry onto our property, car break-ins, and thefts have increased in frequency.

9.     My property and business are at an increased risk of fire because of the encampment fires that surround the property.  This danger is made worse by the huge quantities of trash and debris that litter our street and surrounding neighborhood.

10.     The conditions of the street are worsening and there has been a significant increase in rats and vermin as well as urine and feces in our gutters and on our property.

11.     These conditions have made it extremely difficult to hire new workers, and we have lost many well qualified candidates due to the unpleasant neighborhood and environment.

12.     I have had at least 10 candidates for administrative or managerial roles decline an offer because of concern for their safety or the conditions in the area.  Approximately 25-40% of candidates decline offers or interviews based solely on the location.  This never used to be the case.

13.     In order to combat some of the deteriorating conditions, we have completely fenced in our property to prevent individuals from camping on our grounds and to keep the used needles from being fed into our exterior drains from the rampant narcotics use.

14.     I was forced to replace roll up doors and add sections of fence due to individuals constantly urinating on them, a cost of $25,000.

15.     Additionally, I have had to significantly increase our exterior maintenance by washing and sanitizing the perimeter of our facility daily.  In some cases, we have to clean multiple times a day, in order to maintain cleanliness.  I spend $5,000 a year – a cost I did not previously have – on maintaining the

1  perimeter of the property.

2      16.    In fact, one staff member now dedicates 25% of his time to

3  maintaining the perimeter and external areas of our facility.  This cost is around

4  $10,000 per year.

5      17.    I invite the court to watch the following footage:

6  https://abc7.com/society/las-homeless-aerial-tour-of-skid-row-epicenter-of-

7  crisis/5344680/

8      This is a video that was taken on June 13, 2019 by Chris Christi and posted

9  on ABC7.com with his commentary.  Based on my own knowledge and

10  experience, it accurately depict the conditions on Skid Row that day.  Specifically,

11  at 0:32-1:00 the video shows the corner of 6th and Crocker within a couple

12  hundred feet of the building.  The video shows mounds of trash with tents,

13  structures, and other property completely blocking sidewalks and spilling into the

14  streets.

15      18.    Every day I hear police or ambulance sirens, fights, yelling, and

16  complaints by employees about some new incident.  Every day I endure the odor of

17  urine, feces, and rotting filth.  Every day I see drugs being sold or used, see human

18  beings walking around like zombies or passed out in gutters in a drug-induced

19  coma.  Every day, I am subject to risk of disease, assault, or fire.  Every day I risk

20  my own health and safety, and that of my family, just to come to work.

21      19.    The Covid pandemic has made things worse.  Operation Healthy

22  Streets ("OHS"), an initiative implemented by the City to clean and disinfect the

23  sidewalks, has been put on hold.  Without LA Sanitation spraying down the

24  sidewalks as part of OHS, there has been a significant increase in trash and debris

25  piling up.

26      20.    I declare under penalty of perjury under the laws of the United States

27  of America that the foregoing is true and correct.

28

1

2    Executed on February 15, 2021 at Los Angeles, California.

3

4         Mark Shinbane

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

## DECLARATION OF DONALD STEIER

I, Donald Steier, do state and declare as follows:

1. My name is Don Steier. I make this declaration under oath, and could and would so testify if called.

2. I am the Chairperson for the LA Alliance for Human Rights ("LA Alliance"), an unincorporated association formed in 2019 to find ways to compel action by the City and County to address the humanitarian crisis on our streets. LA Alliance consists of residents, small businesses, non-profits, service providers, community leaders, employees, and current and formerly homeless individuals—both sheltered and unsheltered—who support a balanced solution for the community by increasing beds and services, and ensuring clean and safe streets for everyone. There is no formal roster of membership, and anyone can join by signing up on the website.

3. I am an attorney licensed to practice in California since 1974. I served with the Los Angeles District Attorney's office during the 1970s, after which I left to enter into private practice.

4. In 1985 I incorporated Central City East Association (CCEA), a property owners association focused on the Skid Row area. I have served as CCEA's General Counsel continuously since that time. CCEA has managed the Downtown Industrial Business Improvement District (BID) since 1999. The BID provides maintenance and security services for the downtown industrial district which includes the Skid Row area. The Skid Row area is approximately 50 square blocks, and only consists of a 0.4 mile area in downtown Los Angeles.

5. As a result of my position as General Counsel, I have been visiting the Skid Row area very regularly for the past 35 years. I have spent some part of almost every day in communication with the organization personnel. I have received almost weekly updates, log entries, videos, and photographs of the activities in the area. The security logs are prepared by the BID security personnel, which I review.

6.      During the past 35 years I have appeared before the LA City Council, various Council Committees, and have met with most of the relevant public officials in office at the time.  I have been familiar with any significant municipal legislation impacting the Skid Row area during those 35 years.  In 1985 I testified before the LA Planning Commission to advocate against the "Containment Policy" in the Skid Row/Industrial District.

7.      I have represented CCEA in all litigation in which the organization has been involved.  I have been involved in litigation involving homeless issues during the past including suits brought by Legal Aid of Los Angeles, and the ACLU.  I have watched the Skid Row area decline tremendously in the last several years, in no small part because of the myriad lawsuits brought against the City and County.  The conditions on Skid Row are the worst they have ever been, and those that suffer the most are those left on the street without help.  Often when there is a crisis—for example a fire, or violent attack—BID security personnel are the first ones on the scene and attempting to help.  But the BIDs small security staff is ill equipped to deal with the death and misery in the Skid Row area today.

8.      Fires occur in the Skid Row area nearly every day, and sometimes sadly someone is inside.  On April 7, 2021 an elderly disabled man—who was confined to a wheelchair and took fentanyl to manage his chronic pain—burned to death, unable to escape the fire that engulfed his tent on Towne Avenue in Skid Row.  BID security was on scene prior to any fire department personnel, and attempted to put the fire out but was unsuccessful.

9.      In 1976 the City adopted the "Blue Book Plan" which effected a policy of "Containment" within the Skid Row area—effectively trying to "contain" the "people problem" so neighboring communities would remain unaffected.  At the same time the County concentrated the majority of its social services within the Skid Row area, most notably Department of Public Social Services, which brought individuals from outside the area into the area and often provided vouchers for people to stay in the

2

DECLARATION OF DON STEIER

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

hotels and SROs (single room occupancy) within Skid Row.  The combination of these two efforts effectively brought the poorest and most vulnerable from the entire community into the Skid Row area, and then kept them there.

10.   As the homelessness crisis grew in the 1980s and 1990s, and notably with the explosion of the drug market, the City and County offered insufficient relief in terms of shelter beds, drug rehabilitation, law enforcement, and mental health assistance.

11.   In 2016 former City Councilmember Jose Huizar introduced a motion to rescind the "failed policy of containment" acknowledging the discrepancy between "[the] proportion of services available to homeless individuals citywide versus where those individuals live, given that recent data indicates that 85 percent of the homeless population lives outside of downtown, but that services have historically been centered in the downtown Skid Row area."   The motion passed 14-0, but nothing has changed.

12.   Despite the City's formal dis-adoption, the Containment Policy is still in practice today.  The County continues to concentrate services in the Skid Row area, including Mental Health, Social Services, Public Health, housing, food programs, and recently critical, Covid-19 injections.   Development of SROs (single room occupancy), emergency housing, and other housing for persons experiencing homelessness (PEH) has been concentrated in Skid Row for years.  The City provides storage bins in Skid Row for PEH, but attempts to provide similar projects in other places of the City have been rejected.   LA County-funded services, including Social Services, continued to be concentrated in Skid Row.

13.   The City is enforcing laws outside of Sid Row, but not inside Skid Row which further supports "containment" in the area, and also subjects those residing within Skid Row to increased crime and squalor.   For example, in the *Mitchell* settlement the City has foregone enforcement of certain provisions of the Los Angeles Municipal Code (LAMC) intended to maintain clean and clear sidewalks and

3

DECLARATION OF DON STEIER

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

streets.   In other areas of the city anti-drug and anti-prostitution laws are enforced; within the containment area open drug use and sales and blatant prostitution are completely ignored.  Street clean-ups and targeted encampment reduction with offers of shelter for entire areas occurs elsewhere in the City, including the Echo Park closure and the Rose/Penmar "Encampment to Home" effort, but never Skid Row.

14.     The County regularly releases inmates who have no home to go back to, directly from their main facility downtown, just a few blocks from Skid Row.  With the concentration of services, and continued "containment" policy, those recently-incarcerated individuals head directly to Skid Row.  Often those individuals have acute physical or mental health concerns but are released anyway.

15.     At the start of the pandemic, City Council voted to stop basic encampment clean-ups, including sanitizing sidewalks and removal of trash and human waste.  Comprehensive cleanings have resumed in other places in the City, but not in Skid Row.  Trash, needles, human waste, and food have accumulated in and around encampments in Skid Row for over a year in the name of "health safety."

16.     Increasingly PEH are both suspects and victims in criminal activity.  In reviewing the 2020 Central Division crime statistics, the difference between homeless-related crime in Central Division (where Skid Row is most located) and the rest of the city is stark.  From 2018 to 2019 there was an increase of 33 percent in homicides against a homeless victim in Central Bureau, despite the citywide rate rising only 5 percent.  Violent crimes with an identified homeless suspect rose 48.1 percent in Central Division from 2019-2020 (22.5 percent citywide) and property crimes with an identified homeless suspect rose 27.9 percent in Central Division (18 percent citywide).  Homicides in Central Division with an identified homeless suspect increased by 175 percent from 2018 to 2019.

17.     Residents of the Skid Row area encounter daily fire risks, made worse by the City and County's current refusal to provide sanitation services to these areas.

4

DECLARATION OF DON STEIER

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1      I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct, and that this Declaration was executed

3 this 12th day of April 2021, at Los Angeles, California.

4

5

6      Donald Steier

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DON STEIER

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## DECLARATION OF DEISY SUAREZ

I, Deisy Suarez, do state and declare as follows:

1.     I am a resident of and business owner in downtown Los Angeles. I live and work on 5th Street ("5th") and Broadway Street ("Broadway"). I am a proud mother of two young children. Due to the violence and disease surrounding the encampments throughout downtown, I fear for our safety each time we leave our home. When I first moved here there was some presence of persons experiencing homelessness downtown, but it was nothing like it is now. Encampments have expanded and so has the property occupying the streets. In fact, the crisis has become so bad that the fear has become almost paralyzing, often preventing me from leaving the building by foot.

2.     Given my children's young age, I use a stroller when traveling on foot. The increase in homeless persons and their property on the streets hinders my ability to freely travel the public sidewalks with the stroller and it regularly puts my children's lives in danger. I find it extremely difficult to traverse 3rd Street and Main Street, between 7th and 8th Street along Maple Street, along the east side of Los Angeles Street between Winston and 5th Street, between 5th and 6th Street on Los Angeles Street, and along Main Street between 6th and 7th Street.

3.     Some of these routes are blocked by street vendors who become extremely aggressive when I come near them. Their belongings or "shops" take up the entire sidewalk, and on other streets, tents and personal belongings fill the sidewalk, making it difficult or impossible for a person with a stroller or someone in a wheelchair to pass. When I ask individuals to move themselves or their belongings so that I and my children can pass by, I'm often met with outright aggression. Occasionally, the aggression begins before I even ask them to move. As a result, I am frequently forced to walk, with my children in their strollers, in the street imperiled by moving cars, trucks, and cyclists, to reach our destination because the streets are blocked by individuals and their belongings. As the mother of young

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

children, the situation makes me feel extremely vulnerable walking on the streets, and I certainly would never feel comfortable with my children playing anywhere outside of my home, including downtown's public spaces, even if they were monitored.

4.     My business has also been negatively impacted by the homeless crisis in Downtown Los Angeles.  I own Desuar Spa, a day spa that is located in the same building where my family lives.  At least a few times a month, my staff and I receive phone calls from clients canceling their appointments because they are afraid of getting out of the car or walking to the building.  The hotel concierges at the Intercontinental and the Weston have expressed safety concerns for guests looking to visit the day spa.  Sometimes, there are individuals asleep on the sidewalk in front of my business, making it difficult, and unnerving for individuals to enter the building. The increase in homeless persons living and sleeping outside of my business has made it difficult for me to retain staff.  Multiple staff members have quit as a direct result of frightening interactions with homeless individuals.  And, I have struggled to recruit new staff members because of the danger the location of the spa poses.

5.     Apart from the dangers, the general conditions of the street have deteriorated significantly in recent years.  Alongside the encampments, rodents, trash, and filth, including fecal matter, have become common sightings when I try and move about downtown.  This has made downtown much more unsightly, unclean, and off putting in recent years.  No doubt these conditions also affect customer's opinions of my business and the ability for me to attract new customers.  I have seen the crisis getting so much worse in the last year, with more persons experiencing homelessness than ever before; it is heartbreaking to see so many people in crisis.

//
//
//
//
//

2

DECLARATION OF DEISY SUAREZ

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct, and that this Declaration was

3   executed this 12th day of April 2021, in Los Angeles, California.

4

5

6   
Deisy Suarez

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# **DECLARATION OF LEANDRO SUAREZ**

I, Leandro Suarez, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.      I was a chief petty officer ("CPO") in the United States Navy and served for over 23 years, retiring in 2020.  I normally live with my sister, Deisy Suarez, at Fifth Street and Broadway four days of the week.  I am a member of the LA Alliance for Human Rights.

3.      While stationed off the coast of Southern California, I was involved in an accident that resulted in the amputation of my right leg and my left big toe. After nearly two years I was healthy enough to use a prosthetic leg, but I still suffer from lower back problems and problems with my toes, knees, and feet. Currently, I can manage walk for five to eight minutes at a time with the assistance of two crutches before needing to sit down. Because of my limited mobility with the prosthetic, I rely on an electric wheelchair for most of my daily activities e.g., walking the dog, grocery shopping, or going "long" distances.

4.      Navigating the streets of Downtown Los Angeles is nearly impossible for me, and I am often confined to my block at Fifth and Broadway. The swelling number of persons living on the streets with their possessions severely limit my ability to travel by wheelchair throughout downtown Los Angeles.  I cannot traverse most of the sidewalks within the area known as "Skid Row".

5.      In the best of times, streets that contain businesses with outdoor patios, chairs, or other decorative materials pose a particularly difficult problem for me.  The law requires businesses to ensure a certain portion of the sidewalk remain clear.  Unfortunately, homeless persons openly camp in front of these establishments, effectively blocking the entire sidewalk.  This leaves no space for

me to move on the sidewalk in my wheelchair, so I have to double back and find an alternate route to my destination.  Occasionally, this means going back to the corner and traveling on the other side of the street.  However, frequently, especially since the Covid-19 epidemic and the City's apparent decision not to ask any tents to move even to provide access, both sides of the street are blocked forcing me to find completely alternate streets to use. This is a laborious, time-consuming, and dangerous process. And the constant backtracking limits my ability to travel within the city because my wheelchair is not made for long distances.  But my only other choice to travel in the middle of the street, often against oncoming traffic.

6.      Originally when I encountered this issue, I would ask the individuals to move themselves or their belongings.  They often became aggressive with me, demanding that I prove I "own the sidewalk," or that I give them cigarettes or other items as a "tax" for moving.  More often than not, people simply refused to move or even acknowledge my presence at all, again, forcing me to find a curb, cross to the other side of the street, and hope that there will be enough public walkway for my wheelchair to fit through so that I can complete a simple errand, task, or outing.

7.      The buildup of goods and persons on the streets prevents me from freely traveling throughout the area.  I am limited in the distance and the places I can travel because my electric wheelchair has a limited battery life.  Streets being blocked with property and people forces me to constantly adapt my route.  Because I cannot be certain about how far I will need to travel or how long it will take me to reach a destination I am limited in where I attempt to travel.  And sometimes I am prevented from even reaching my destination.  This leads me to avoid leaving the home on many occasions to prevent the frustration and inconvenience of traveling the city streets.

DECLARATION OF LEANDRO SUAREZ

8.      My difficulties are exacerbated when construction projects limit the sidewalk further because while a makeshift walkway usually exists, the walkway is often blocked by homeless persons or their property.  Similar to other situations, my requests that the individuals move are often rebuffed, preventing me from descending down the ramp or having full and free access to public sidewalks or the ability to travel the streets.

9.      Since the Covid-19 pandemic this situation has worsened dramatically.  Previously the immense amount of foot traffic or open businesses through certain areas of downtown effectively prevented homeless encampments from moving in.  While these areas were in use by large numbers of people or in use by a business, homeless individuals had less space and time to setup tents and the City had an incentive to keep foot traffic moving.  Now that the streets have been practically empty of workers and tourists and many businesses have closed, encampments have further encroached onto the already limited public walkways. Encampments have also become much more entrenched than they were previously.  It is not uncommon to see full makeshift structures featuring metal or wood walls, support beams, and carpeting or other flooring alongside the usual tarps and tents.  In many cases it would now be impossible for these individuals to move their property so I could pass even if asked.  It now feels impossible for me to traverse the sidewalks.

10.     For example, the parking lot near Main Street and Los Angeles Street used to allow for shoppers to park and access the shopping near Union Station.  Now the entire area is blocked off by a massive encampment.  There is no longer anyway for me to pass, and even if I could, I would not feel safe enough to do so.

11.     With this recent expansion it appears that many homeless persons feel that they have more ownership of the area where they are encamped.  The City and County's inaction with respect to these individuals has led them to

DECLARATION OF LEANDRO SUAREZ

believe that they have a right to live on the sidewalk by occupying a section of sidewalk for a long period of time.  This has made them more defensive and increased the verbal abuse I already received from many individuals when I attempt to travel down public walkways.  Frequently now, homeless persons seek to engage in a conversation which is occasionally benign and frequently hostile. I now have a greater fear that I will be berated or attacked merely for traveling outside and avoid as many interactions as possible.

12.     Additionally, with the expansion of the encampments has come an expansion of the trash, disease, and filth on the sidewalks of our city.  This includes rodents, insects, and human waste.   Apart from the sidewalk being physically blockaded these conditions make me feel unsafe to travel the streets for fear of contracting an illness.    The conditions that the City has allowed to become commonplace are intolerable and severely detract from the basic enjoyment of my life.  I feel I am trapped within my home.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Declaration was executed this 10th day of April at Los Angeles, California.

_____
Leandro Suarez

-4-

DECLARATION OF LEANDRO SUAREZ

## DECLARATION OF HARRY TASHDJIAN

I, Harry Tashdjian, state and declare as follows:

1.     Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.  I am a member of LA Alliance for Human Rights.

2.     I own an upholstery supply in the industrial area of downtown Los Angeles ("DTLA"), and the property surrounding the business.  My building typically houses millions of dollars worth of inventory.  When I purchased the building in 2013, tents were not allowed on the streets during the day and the City and County would enforce the law.  Because my business operates during traditional business hours, I believed that the location would not hinder my business, despite regularly having between 70 and 100 will-call orders per day where customers come into my business to pick up their purchases.

3.     In mid-2016, I saw an immediate increase in the number and size of tents on the streets and sidewalks outside of my business.  This trend of escalating encampments and increasing amounts of property accumulating on sidewalks continues to this day.  Now, tents occupy the sidewalks at all hours, and it is difficult for me and, more importantly, my customers to access my business due to the piles of property and people loitering on the sidewalk and in the street.  My customers constantly tell me how difficult it is to get into the building or the adjacent parking lot without hitting people or being harassed.  I have been repeatedly told by customers that they prefer to do business with my competitors solely to avoid the hassle and inconvenience of trying to access my store.

4.     Vendors from all over the world—Italy, Germany, the United Kingdom, China, etc.—visit my shop and express their shock and dismay that such horrendous and inhumane conditions exist in Los Angeles.  My business is

-1-

DECLARATION OF HARRY TASHDJIAN

1  now at a much greater risk for vandalism, violence, fire damage, and complete
2  loss due to the County and City's decision to do nothing about the homelessness
3  crisis.
4       5.    Homeless individuals frequently urinate into or onto my building or
5  the adjacent parking lot.  Graffiti has become a constant issue affecting my
6  property.  The number of tents immediately outside of the building puts my
7  business at risk of fire damage—indeed, the fire department responds at least
8  once a month to a tent fire that has started immediately outside my building.
9  Recently several tent fires have scorched the walls of my building and gates
10 charring the surfaces, destroying the paint, and requiring expensive repairs.
11 Sometimes, it is an innocent accident from an open flame; other times, it is
12 intentional due to some drug dealers' disagreement or other violent interaction.
13 My security system has caught these arsons on camera, and the LAPD frequently
14 asks me for my footage when they actually investigate what happened.
15      6.    These tent fires have caused many insurers to either completely drop
16 my business insurance or otherwise steeply increase their rates to cover my
17 business and building.  The homeless encampments and the City's s decision to
18 do nothing about them prevent my business from accessing a competitive market
19 rate for building insurance.  Many insurers who we seek quotes simply tell us we
20 are uninsurable.  Instead, I am forced to use the limited set of insurers who are
21 willing to accept the high risk presented by Skid Row and charge
22 commensurately higher rates, further cutting into the profitability and viability of
23 my business.  The number of fires has been increasing in the last few months,
24 and it is only a matter of time before I, one of my employees, or one of my
25 customers is seriously injured or killed in one of these fires.  The risk is
26 immediate.
27      7.    Theft is also a major concern—pallets are constantly stolen from the
28 building and car batteries are frequently stolen from inside people's cars.

DECLARATION OF HARRY TASHDJIAN

1  Additionally, this year a forklift was stolen from my business.  An individual
2  jumped the fence, started a non-operational forklift, and smashed through the
3  twelve-foot front gate while fleeing the property in the forklift.  Fortunately,
4  LAPD was able to find the forklift, but unfortunately, the damage was so severe
5  that it was essentially a write off and the gates were completely destroyed.  Even
6  worse, because the building insurance is considered so high risk due to fires, my
7  insurance provided no payment for the loss and my business had to cover the
8  damage itself nearly $20,000.  Unsurprisingly, the culprit had no funds to cover
9  the damage he caused.

10         8.     There has also been a significant uptick in the population of rodents
11  surrounding the building, and as a result, rat feces coat all three fences
12  surrounding my property.  To address the increase in fecal matter on my
13  property, as well as the proliferation of cockroaches and other insects, I have
14  hired a pest control company and had the health department visit the property
15  multiple times.  Additionally, the gate and other surrounding fencing have been
16  repeatedly damaged, costing me thousands of dollars in repairs.

17         9.     Altogether, the conditions surrounding my property have cost me a
18  great deal of money.  Because of the immediate fire danger posed by the tents
19  outside my building, I have been forced to upgrade the fire monitoring system
20  which cost approximately $40,000.  I have had to spend approximately $37,000
21  on a new security surveillance system to protect the building.  I have had to
22  spend over $100,000 in upgrades to my system and increased monitoring and
23  pest control just as a result of the increased number of homeless persons and
24  property in the area.

25         10.    Over the last few years, as the City and County have permitted the
26  homelessness crisis to grow, the risk to my property from fire damage and
27  vandalism has increased exponentially—the business constantly replaces gates
28  and other property, cleans the facilities, and pays private security to safeguard its

-3-

DECLARATION OF HARRY TASHDJIAN

1  property.  My employees and I cannot walk anywhere in the area and are

2  constantly subject to the risk of disease due to the putrid conditions outside the

3  business.  The City and the County have offered no assistance to me and have

4  taken no steps to address the impact of the homelessness crisis on my business or

5  to enforce the laws that are broken daily in the area.

6      I declare under penalty of perjury under the laws of the State of California

7  that the foregoing is true and correct, and that this Declaration was executed this

8  3rd day of April 2021, at Los Angeles, California.

9

10                                          Harry Tashdjian

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

DECLARATION OF HARRY TASHDJIAN

## DECLARATION OF CHARLES VAN SCOY

I, Charles Van Scoy, state and declare as follows:

1.      Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.      I was born on March 27, 1955.  I have been homeless or lived in shelters at various points in time over the last few decades. Sometime after 2010 I moved Long Beach Rescue Mission ("LBRM"), where I lived for two or three years.  I now live in in the Union Rescue Mission (URM) located on 545 San Pedro St., Los Angeles, CA 90013. I have been living at URM for three years and am part of their Ambassador program.

3.      Due to various illnesses, I am confined to a wheelchair.  As a result, I depend on Access Services, Los Angeles County's Paratransit program, when traveling further distances within the city.

4.      The buildup of tents, personal belongings, people, and debris on the public sidewalks prevent me from traveling on the sidewalks.  And, because the sidewalks are obstructed, I can only travel to the Access pick-up spot immediately outside of URM.  If I try to travel anywhere else, I would be required to travel in the middle of the street and risk death or serious bodily injury.

5.      I do not feel safe traveling on the streets.  People on the streets are constantly asking to buy drugs or attempting to sell drugs to me and others.

6.      The increase in debris on the streets has led to a rodent infestation. Every night I see rats running around on the streets next to URM.  The build-up of tents and personal belongings on the public sidewalks greatly interferes with any traveling outside of my home, and the increase in violence on the streets of the Skid Row prevent me from leaving my home at all after dusk.

-1-

DECLARATION OF CHARLES VAN SCOY

1      I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  1st day of April, 2021, at Los Angeles, California.

4

5                      */s/ Signed with Permission; unable to sign personally*

                         Charles Van Scoy

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CHARLES VAN SCOY

## DECLARATION OF LUIS ZALDIVAR

I, Luis Zaldivar, state and declare as follows:

1.     Except as otherwise stated, I have personal and firsthand knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto under oath.

2.     I have been living on Skid Row for approximately the last 25 years. I immigrated to America from Cuba with my family. Originally my family moved together to Pomona.  However, I became homeless about a year after my divorce in 1983 when I had nowhere else to live.

3.     During my many years on Skid Row, I have been in and out of prison and county jail, but I have always been released back onto Skid Row.  I am currently on parole; the parole office I need access to is on Alameda St.

4.     I used to receive social security, but since I was released from custody I haven't been eligible to receive social security because there's confusion with my birthdate, which apparently doesn't match my social security information.  I think the problem may have been caused because my personal property, likely including my social security information, was stolen while I was in prison, and my items were left on the street.

5.     It has been extremely hard to survive since I have lost any form of benefits.  I am left to ask for handouts from friends and other persons attempting to survive on the street because I get no help from the government.   Frequently when I seek services, I'm asked if I have the appropriate paperwork, which changes depending on the service and who is at the counter that day.  It is also difficult because I cannot read or write, so I don't understand what documents are necessary, and I am afraid to leave my things behind while seeking services because of theft or fire risk.

6.     This situation has made it extremely hard to survive on the street and has had adverse effects on my health.  Currently I have blood sugar issues,

1  high blood pressure, and high degrees of back pain all caused by my life on the

2  street.  I have lost count of the number of pills I have been prescribed, and

3  because I cannot read or write, I am unable to interpret how doctors have asked

4  me to take my medication.

5          7.        Additionally, I have undergone bouts of depression due to the living

6  conditions in Skid Row.  I used to use cocaine just to escape, but I am clean and

7  sober now, and looking for help.

8          8.        Living on Skid Row is very dangerous.  I have seen murders, arson,

9  gang activity, and violent attacks.  The crime seems to be getting worse, and

10  there are more people than I have ever seen living on the streets.  I worry that the

11  longer I stay, the more likely I am to become a victim.

12          9.        The circumstances are so bad that I would take any housing offered

13  to me even if it just meant having only a shower and a toilet.  Being illiterate has

14  prevented me from applying to many services because I do not understand the

15  normal application processes and nobody with the City or County has indicated

16  an alternate method of application that I could use.

17          10.      The longer I stay on Skid Row I know it is more likely I will die

18  either from violence or health issues from being on the street.  I am asking for

19  help.

20

21

22

23

24

25

26

27

28

-2-

1       I declare under penalty of perjury under the laws of the State of California

2  that the foregoing is true and correct, and that this Declaration was executed this

3  _31_ day of March, 2021 at Los Angeles, California.

4

5                                 LUIS ZALDIVAR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF LUIS ZALDIVAR