MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Deputy City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-6952
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>        Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Filed Concurrently With:**<br>• **Request for Judicial Notice**<br>• **Declaration of Domingo Orosco**<br>• **Declaration of Miguel Grajeda**<br>• **Declaration of Jessica Mariani**<br><br>Date:  May 10, 2021<br>Time:  8:30 a.m.<br>Courtroom:  9D<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................. 1

II.     RELEVANT FACTUAL AND PROCEDURAL HISTORY ........................... 2

        A. The City's pre-litigation efforts to house unsheltered Angelenos............ 2

        B. Litigation was stayed between March 19, 2020 to April 13, 2021 ......... 3

        C. The City's continuing response to the homelessness crisis and the
           COVID-19 pandemic.................................................. 4

        D. The City exceeded its commitments made in the MOU with the County 5

        E. No evidence the City concentrates unhoused Angelenos in Skid Row or
           any other area........................................................ 5

III.    LEGAL STANDARD ........................................ 7

IV.     PLAINTIFFS LACK STANDING TO REQUEST THE PRELIMINARY
        INJUNCTION TO CHANGE CITY POLICIES ............................. 8

        A. Plaintiffs cannot establish this court has proper jurisdiction to issue the
           preliminary injunction they seek ............................................ 8

        B. The requested injunction would violate separation of powers and
           federalism principles.................................................. 10

        C. The evidentiary record is insufficient...................................... 13

        D. The requested injunction violates Rule 65(d)(1) ................................... 14

V.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ........ 14

        A. Plaintiffs' Eleventh, Twelfth and Fourteenth Claims for Relief Fail..... 15

            1.   Plaintiffs' procedural due process violation claim fails ................. 15

            2.   The State-Created Danger exception does not apply here.............. 16

        B. Plaintiffs are not likely to succeed on their ADA-related claims........... 19

            1.   Plaintiffs cannot establish they have been discriminated against by
                 the City by reason of their disabilities ............................................ 19

            2.   The temporary obstructions Plaintiffs complain of do not constitute
                 violations of the disability access laws .......................................... 20

i

3.   The City's sidewalks are accessible when viewed in their entirety……………………………………………………21

4.   Plaintiffs have not established a reasonable accommodation......... 23

C.   Plaintiffs are not likely to succeed on their nuisance claims.................. 24

1.   Plaintiffs' nuisance claims are barred by discretionary immunity and separation of powers .................................................. 24

2.   Plaintiffs cannot satisfy the elements of their nuisance claims ...... 25

3.   Plaintiffs cannot prevail on their public nuisance claim where no harm was specially injurious to them ................................ 27

D.   Even if Plaintiffs were likely to succeed on the merits, they have not shown entitlement to the specific relief requested .................................. 29

VI.    THE REMAINING *WINTER* FACTORS DO NOT SUPPORT INJUNCTIVE RELIEF ................................................ 32

VII.   RESPONSE TO NAACP AMICUS BRIEF .................................................. 33

VIII.  CONCLUSION................................................................ 35

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.A. v. Raymond,*
  2013 U.S. Dist. LEXIS 103459 (E.D. Cal. Jul. 22, 2013)..................................34

*Albright v. Oliver,*
  510 U.S. 266 (1994).........................................................................................15

*Allen v. Wright,*
  468 U.S. 737 (1984).........................................................................................10

*Anderson v. United States,*
  612 F.2d 1112 (9th Cir. 1979) ...........................................................................7

*Animal Lovers Volunteer Ass'n, Inc. v. Weinberger,*
  765 F.2d 937 (9th Cir. 1985) .............................................................................9

*ASARCO, Inc. v. Kadish,*
  490 U.S. 605 (1989).........................................................................................10

*Baker v. McCollan,*
  443 U.S. 137 (1979).........................................................................................15

*Barden v. City of Sacramento,*
  292 F. 3d 1073 (9th Cir. 2002) ........................................................................21

*Blackwell v. City & Cty. of San Francisco,*
  506 Fed. Appx. 585 (9th Cir. 2013)..................................................................22

*Brown v. Plata,*
  563 U.S. 493 (2011).........................................................................................12

*Citizens for Odor Nuisance Abatement v. City of San Diego,*
  8 Cal. App. 5th 350 (2017) ...............................................................25, 26, 27

*City & Cty. of San Francisco v. Barr,*
  965 F.3d 753 (9th Cir. 2020) ...........................................................................30

iii

*Cobine v. City of Eureka,*
  250 F. Supp. 3d 423 (N.D. Cal. 2017) ......................................................... 16, 17

*County of Santa Clara v. Superior Court,*
  50 Cal.4th 35 (2010) ................................................................................... 27

*Culinary Studios, Inc. v. Newsom,*
  2021 U.S. Dist. LEXIS 23755 (E.D. Cal. Feb. 5, 2021) ............................... 31

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .................................................................................. 8, 10

*Del Webb Communities, Inc. v. Partington,*
  652 F.3d 1145 (9th Cir. 2011) ....................................................................... 14

*Eastburn v. Reg'l Fire Protection Auth.,*
  31 Cal.4th 1175 (2003) ................................................................................. 26

*El Escorial Owners' Assn. v. DLC Plastering, Inc.,*
  154 Cal.App.4th 1337 (2007) ....................................................................... 26

*Ellerbee v. County of Los Angeles,*
  187 Cal.App.4th 1206 (2010) ....................................................................... 26

*Equity Lifestyle Props., Inc. v. County of San Luis Obispo,*
  548 F.3d 1184 (9th Cir. 2007) ........................................................................ 8

*Fair Hous. of Marin v. Combs,*
  285 F.3d 899 (9th Cir. 2002) ........................................................................ 10

*Fed. Election Comm'n v. Furgatch,*
  869 F.2d 1256 (9th Cir. 1989) ....................................................................... 14

*Freeman v. Pitts,*
  503 U.S. 467 (1992) ...................................................................................... 34

*Friends of H St. v. City of Sacramento,*
  20 Cal. App. 4th 152 (1993) ......................................................................... 25

*Garcia v. City of Los Angeles,*
  481 F.Supp.3d 1031 (C.D. Cal. Apr. 13, 2020) .............................................. 9

iv

*Garcia v. Google*,
    786 F. 3d 733 (9th Cir. 2015) ........................................................*passim*

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................33

*Guardians Ass'n v. Civil Serv. Comm'n*,
    463 U.S. 582 (1983) .......................................................................34

*Hellman v. La Cumbre Golf & Country Club*,
    6 Cal. App. 4th 1224 (1992) .........................................................27

*Hernandez v. City of San Jose*,
    897 F.3d 1125 (9th Cir. 2018) .......................................................17

*Herzberg v. County of Plumas*,
    133 Cal. App. 4th 1 (2005) ...........................................................30

*Hispanic Taco Vendors v. Pasco*,
    994 F.2d 676 (9th Cir. 1993) .........................................................34

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013).........................................................................9

*Humane Soc'y of the United States v. State Bd. of Equalization*,
    152 Cal. App. 4th 349 (2007) .......................................................30

*Johnson v. City of Seattle*,
    474 F.3d 634 (9th Cir. 2007) .........................................................17

*Jones v. City of Los Angeles*,
    444 F.3d 1118 (9th Cir. 2006) ...............................................8, 11, 12

*Juliana v. United States*,
    947 F.3d 1159 (9th Cir. 2020) .......................................................11

*Kokkonen v. Guardian Life Ins. Co. of America*,
    511 U.S. 375 (1994).........................................................................8

*Koll-Irvine Ctr. Prop. Owners Ass'n v. Cty. of Orange*,
    24 Cal. App. 4th 1036 (1994) .......................................................27

v

*Lau v. Nichols,*
   414 U.S. 563 (1974)..................................................................................34

*Lavan v. City of L.A.,*
   797 F. Supp. 2d 1005 (C.D. Cal. 2011), *affirmed* 693 F.3d 1022
   (9th Cir. 2012)...................................................................................8, 9

*Leer v. Murphy,*
   844 F.2d 628 (9th Cir. 1988) ...............................................................15

*Lewis v. Casey,*
   518 U.S. 343 (1996)........................................................................11, 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014)................................................................................9

*Linda R.S. v. Richard,*
   410 U.S. 614 (1973)..............................................................................10

*Los Angeles Coliseum Comm'n v. NFL,*
   634 F.2d 1197 (9th Cir. 1980) .............................................................32

*Loya v. Immigration & Naturalization Serv.,*
   583 F.2d 1110 (9th Cir. 1978) .......................................................18, 26

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992)................................................................................8

*M.S. v. Brown,*
   902 F.3d 1076 (9th Cir. 2018) .............................................................11

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997)................................................................................7

*McCormack v. Hiedeman,*
   694 F.3d 1004 (9th Cir. 2012) .............................................................29

*Midgett v. Tri-Ct. Metro. Transp. Dist. of Oregon,*
   254 F.3d 846 (9th Cir. 2001) ..................................................11, 23, 26

*Mitchell v. City of Los Angeles,*
   No. CV 16-01750 SJO (C.D. Cal. Apr. 13, 2016).......................8, 9, 23

vi

*Monell v. Dept. of Social Services*,
   436 U.S. 658 (1978)..................................................................15

*Montoya v. City of San Diego*,
   2021 U.S. Dist. LEXIS 52340 (S.D. Cal. Mar. 19, 2021)...........21, 23

*Munger v. City of Glasgow Police Dept.*,
   227 F.3d 1082 (9th Cir. 2000) ...................................................18

*Oki Am., Inc. v. Microtech Int'l, Inc.*,
   872 F.2d 312 (9th Cir. 1989) .....................................................13

*Patel v. Kent Sch. Dist.*,
   648 F.3d 965 (9th Cir. 2011) .....................................................17

*People v. Mason*,
   124 Cal. App. 3d 348 (1981) .....................................................29

*Portman v. Cty. of Santa Clara*,
   995 F.2d 898 (9th Cir. 1993) .....................................................16

*Rizzo v. Goode*,
   423 U.S. (1976)........................................................................11

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992)..................................................................33

*San Diego Gas & Elec. Co. v. Superior Court*,
   13 Cal. 4th 893 (1996)..............................................................26

*Sarfaty v. City of Los Angeles*,
   765 Fed. Appx. 280 (9th Cir. 2019).............................................21

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)..................................................................14

*Simon v. E. Kentucky Welfare Rights Org.*,
   426 U.S. 26 (1976).....................................................................8

*Siskiyou Lumber & Merc. Co. v. Rostel*,
   121 Cal. 511 (1989) ..................................................................28

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

*Soto v. Los Angeles Cty. Flood Control Dist.*,
   2016 U.S. Dist. LEXIS 197210 (C.D. Cal. May 24, 2016)..........................22, 23

*Steinle v. City & County of San Francisco*,
   919 F.3d 1154 (9th Cir. 2019) ...................................................................24

*Sumner Peck Ranch, Inc. v. Bureau of Reclamation*,
   823 F. Supp. 715 (E.D. Cal. 1993) ...........................................................24

*Sundance v. Municipal Court*,
   42 Cal. 3d 1101 (1986) ..............................................................................31

*Taylor v. Buff*,
   172 Cal. App. 3d 384 (1985) ..............................................................24, 25

*Tennessee v. Lane*,
   541 U.S. 509 (2004)...................................................................................23

*Tesoro Ref. & Mktg. Co. LLC v. City of Long Beach*,
   334 F. Supp. 3d 1031 (C.D. Cal. 2017)....................................................29

*Thomas v. County of Los Angeles*,
   978 F.2d 504 (9th Cir. 1992) ....................................................................14

*Thornton v. City of St. Helens*,
   425 F.3d 1158 (9th Cir. 2005) ..................................................................31

*Tobe v. City of Santa Ana*,
   9 Cal. 4th 1069 (1995) ..............................................................................15

*Turner v. City & County of San Francisco*,
   892 F. Supp. 1197 (N.D. Cal. 2012) .........................................................30

*Union Pac. R. Co. v. Mower*,
   219 F.3d 1069 (9th Cir. 2000) ..................................................................14

*United States v. Lazarenko*,
   476 F.3d 642 (9th Cir. 2007) .....................................................................9

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953)...................................................................................18

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY
INJUNCTION

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982).................................................................................9, 10

*Venuto v. Owens-Corning Fiberglas Corp.*,
    22 Cal. App. 3d 116 (1971) ...................................................................27

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................10

*Wash. Envtl. Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) .................................................................8

*Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*,
    114 F. 3d 976 (9th Cir. 1997) .................................................................19

*Willits v. City of Los Angeles*,
    925 F. Supp. 2d 1089 (C.D. Cal. 2013) .................................................21

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................7, 14, 32

*Zukle v. Regents of the Univ. of Cal.*,
    166 F.3d 1041 (9th Cir. 1999) ................................................................23

**Statutes**

42 U.S.C. Section 1983...................................................................................15, 16

Americans with Disabilities Act .................................................................*passim*

Cal. Civ. Code § 54(c) ........................................................................................24

Cal. Civ. Code § 3493 .........................................................................................27

Cal. Gov. Code §§ 820.2 and 815.2(b) ..............................................................25

Cal. Welf. & Inst. Code § 17000 ........................................................................15

Cal. Civ. Proc. Code § 526a...........................................................................30, 31

California Disabled Persons Act.........................................................................24

Los Angeles Administrative Code §§ 2.1, 2.5 and 2.7 ......................................14

ix

Rehabilitation Act Section 504 ..................................................................19, 20, 24

**Other Authorities**

28 C.F.R. § 35.150(a)(3) ..........................................................................21, 23

28 C.F.R. §42.104(b)(2) ....................................................................................34

U.S. Const., Fifth Amendment..........................................................................15

U.S. Const., Fourteenth Amendment ...........................................................15, 34

Fed. R. Evid. 801(d)(2)(D) ..............................................................................13

Rule 65(d)(1)......................................................................................................14

## I.     INTRODUCTION

The homelessness crisis is among the greatest challenges facing our region, both in complexity and severity, and much more must be done to address its many facets and underlying causes. As Plaintiffs point out, many elected officers and other officials of Defendant City of Los Angeles ("City") have publicly acknowledged as much. The City has made progress in addressing homelessness—including initiatives to create permanent supportive housing through Proposition HHH, interim housing through A Bridge Home, and creating over 6,000 new housing solutions within 10 months of entering a Memorandum of Understanding ("MOU") with the County of Los Angeles (Dkt. 185). The City remains committed to continuing to collaborate with Defendant County of Los Angeles ("County") and other stakeholders to provide more housing and shelter to Angelenos experiencing homelessness, to improve the lives of all who remain unsheltered, and, at the same time, to ensure the rights of all Angelenos to enjoy clean, accessible, and sanitary public areas. However, Plaintiffs' attempt to invoke the power of this Court to address the crisis – through an overbroad and unmanageable preliminary injunction which (a) they lack standing to assert, (b) would improperly usurp the role of local government and its elected officials, and (c) fundamentally cannot redress the complex causes of this crisis – is neither legally permissible nor appropriate.

Indeed, Plaintiffs confront insurmountable legal hurdles–both procedural and substantive–that bar the drastic Court intervention they seek. As a threshold matter, Plaintiffs cannot meet their burden to establish Article III standing for their requested relief because, even assuming they could meet the other elements of standing, the drastic court intervention they seek would trample on fundamental principles of federalism and separation of powers, is beyond that which the Court has the power to issue at this stage in the litigation, and is not based on substantiated evidence. Moreover, Plaintiffs have not carried their heavy burden to establish that they are likely to succeed on the merits of their procedural due process and the state-created danger claims, ADA-related claims, or state law nuisance claims, nor have Plaintiffs established that the overbroad and intrusive mandatory injunction they seek is appropriately tailored to any alleged harm arising from those claims.

If Plaintiffs could ever establish they were entitled to some injunctive relief, which they have not demonstrated in their motion, they certainly cannot show entitlement to the extraordinary relief they seek now. Rather than a typical preliminary injunction seeking to preserve the status quo pending resolution of the litigation, Plaintiffs are asking the Court effectively to **become** the local authority and compel the City to take no less than 10 affirmative steps, including (1) provide shelter to every Angeleno in Skid Row within the next 90 days, 50% of which housing must be provided outside Skid Row, thereby ordering the City to displace people against their will; (2) reallocate 20 acres of City-owned land to be used for housing or provide the land to private developers at a nominal price and pursuant to a variety of terms dictated by Plaintiffs; and (3) enforce laws to clear – and keep clear – sidewalks, public streets, and public places without regard to any individual discretion.

Every day our homeless crisis persists degrades our City, with profound impact on both unhoused and housed Angelenos. The City shares Plaintiffs' goal of urgently responding to this crisis with concrete action in addition to what the City has done so far. But for multiple, independent reasons, Plaintiffs cannot satisfy the prerequisites to injunctive relief, and the extraordinary remedies they seek are far beyond the permissible scope of what this Court can provide at this stage in this litigation.

## II.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

### A.    The City's pre-litigation efforts to house unsheltered Angelenos

In February 2016, the City adopted its Comprehensive Homeless Strategy[1] (a strategy developed in coordination with the County's Homeless Initiative and approved by the County in February 2016 as well). The City's Strategy identified creation of affordable and permanent supportive housing as the key component to address the region's increasing numbers of homeless people. The Strategy cited and relied upon studies that demonstrated that well-operated supportive housing had a high success rate in keeping people housed.

---

[1] The full Strategy document can be accessed at
http://clkrep.lacity.org/onlinedocs/2015/15-1138-s1_misc_03-21-2016.pdf

1    The primary measure created by the City to fund the construction of permanent
2 supportive housing was Proposition HHH, a voter-approved general obligation bond
3 measured passed in 2016. Through Proposition HHH, the City committed $1.2 billion to
4 build 10,000 permanent supportive housing units over 10 years as a permanent solution
5 to the homelessness crisis, and the City has expended extraordinary efforts to make over
6 7,000 units ready for occupancy in the next 3 years at an average loan commitment of
7 $134,000 per unit.[2] But these more permanent solutions take time, so the City also
8 identified and developed temporary housing solutions for unsheltered Angelenos. That is
9 why in 2018, the City initiated the A Bridge Home (ABH) shelter program to create 222
10 shelter beds in *each* of the 15 Council Districts (3,330 beds in total). The City currently
11 has 28 ABH shelters open providing 2,126 beds in 14 Council Districts.[3]

12    The City continues to explore and implement a mix of temporary shelter and
13 housing solutions to serve a diverse homeless population. The City continues to do so
14 despite its financial condition: the City's proposed budget for Fiscal Year 2020-2021
15 forces it to reduce expenditures to cover almost $600 million in projected lost revenue,
16 but still commits over $429 million to housing and services for persons experiencing
17 homelessness. And the Mayor has proposed even more funding–$800 million–to address
18 homelessness in Fiscal Year 2021-2022.[4]

**B.     Litigation was stayed between March 19, 2020 to April 13, 2021**

20    On March 10, 2020, Plaintiffs initiated this lawsuit. The Court scheduled an
21 emergency status conference on March 19, 2020, which the Mayor, the President of the
22 City Council, the City Attorney, and other City officials all attended because the City
23 agreed the parties had a unique opportunity to address the homelessness crisis, despite

---

[2] City of Los Angeles Housing and Community Investment Department, Proposition
HHH Progress Report, March 2021. https://hcidla2.lacity.org/housing/hhh-progress.

[3] *See* the ABH Project Dashboard at https://www.lamayor.org/ABridgeHome.

[4]  *See* Exhibit B to Declaration of Jessica Mariani.

the legal and factual deficiencies of Plaintiffs' Complaint. The parties agreed to immediately stay all proceedings and engage in mediation. *See e.g.* Transcript of 3/19/20 Conference, Dkts. 39, 90. The stay was lifted on April 13, 2021 in response to Plaintiffs' motion for preliminary injunction and the County's motion for dismiss. Dkt. 266. Notably, the City has not filed a response to the Complaint, no discovery has commenced, and the City remains committed to discussions to resolve these issues.

### C.     The City's continuing response to the homelessness crisis and the COVID-19 pandemic

Since the national, state, and local COVID-19 emergencies were declared in March 2020, the City has engaged in numerous, extraordinary efforts to assist unsheltered Angelenos, which included: creating 1,027 beds in 24 recreation centers throughout the City which provided emergency shelter to approximately 2,200 individuals, along with, on-site showers, food, medical care, mental health services, pet care, art therapy, and case management; providing 1,273 rooms in 300 State-issued trailers and 6 hotels; extending the Winter Shelter program from the usual March 31, 2020 close date to remain open continuously during this pandemic; providing more than 30,000 wellness checks at homeless encampments across the City; administering over 12,000 COVID-19 field tests; and expanding hygiene services with additional portable restrooms and hand-washing stations deployed Citywide, as well as contracting with 9 YMCA facilities that have provided over 40,000 showers since March 2020.

The City has also worked to take advantage of the State's Project Roomkey ("PRK") and continues to participate in Project Homekey. The City has extended leases of certain PRK sites to provide shelter to over 1,200 people experiencing homelessness, and is working to expand the program further by identifying additional properties to provide more rooms to unhoused Angelenos.

Furthermore, according to LAHSA, 25,036 people experiencing homelessness were placed in interim or emergency shelters in the City in 2020, including 1,441 people in Skid Row. Of the 25,036 individuals placed in interim or emergency shelters in the

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

City in 2020, 3,733 people exited to permanent housing, and 4,690 entered transitional housing placements. Dkt. 242-9. Furthermore, to help prevent sheltered Angelenos from becoming unsheltered, the City enacted Ordinances to protect against evictions (Ordinance No. 186606), and rent increases in Rent Stabilization Ordinance properties (Ordinance No. 186607) during COVID-19.

### D.      The City exceeded its commitments made in the MOU with the County

All these extraordinary actions taken by the City are in addition to the City fulfilling its commitment to create 6,700 beds within 18 months of signing the binding term sheet with the County in June 2020, which was later memorialized in a MOU (Dkt. 185-1). The City has developed 5,467 new shelter solutions (more than the agreed-upon 5,300 beds) and 728 interventions that were pursuant to existing agreements with the County (more than the agreed-upon 700 beds), for a total 6,195 beds. Dkt. 267-1.

Although all would agree that much more must be done, it is indisputable that both prior to and since the commencement of this litigation, the City and its leaders have provided more housing and shelter to unhoused Angelenos than ever before and continue to work to improve the lives of those who remain unsheltered.

### E.      No evidence the City concentrates unhoused Angelenos in Skid Row or any other area

Plaintiffs assert improperly, and without legitimate evidence, that persons experiencing homelessness were intentionally gathered in Skid Row with the goal of discriminating against racial minorities. A recent report by the UCLA Luskin Center for History and Policy detailed the various policy decisions that led to the consolidation of services for homeless people in Skid Row, which go back nearly a century.[5] The majority of the time those policies were in place—whether made by city, county, state, or federal agencies, or by non-profit or community organizations—Skid Row was

---

[5] The full Report by the UCLA Luskin Center can be accessed at https://luskincenter.history.ucla.edu/2021/02/10/lchp-releases-report-on-the-history-of-homelessness-in-los-angeles/.

overwhelmingly white and male.[6]

There is evidence that a policy to contain persons experiencing homelessness and the services those people rely upon in Skid Row was adopted in the 1970s. According to the UCLA Luskin Center report, this policy was adopted in response to proposals to eliminate Skid Row and transform the area as part of a larger revitalization of downtown, which could have had the effect of dispersing people experiencing homelessness more broadly across the city. This policy was adopted based on recommendations of experts on and service providers for homeless issues. See Dkt. 265-1, pp. 107, 143 of 255. But, as the report notes, this effect happened anyway, as the region experienced ever increasing numbers of people becoming homeless. Indeed, while the Luskin Center's report concluded that historical and institutional racism in housing and employment led to the current racial disparity in homelessness, the report did not cite any evidence the City intended Skid Row or any other section of the city to be a gathering place, voluntary or involuntary, for racial minorities.

More recently, to help address and reverse the concentration of homeless people in Skid Row, the Los Angeles City Council voted in 2016 to formally reverse the policy of attempting to contain homelessness in Skid Row, and declared its intention to make services, facilities, and housing for people experiencing homeless accessible city-wide. Dkt. 242-14. Indeed, the City has done so by promoting HHH and ABH shelters throughout the City, not just in Skid Row. The City has also taken a progressive approach to preventing homelessness and has been a national leader in legislation to address racial disparity in the root causes of homelessness. The City outlined many of its efforts and programs in Dkt. 242, incorporated herein by reference.

The City continues to explore ways to alleviate issues experienced by racial

---

[6] For example, the County's only facility for single men seeking general relief was located in Skid Row, so any time a single man applied for general relief at any other office in Pomona, Burbank, San Pedro, or Pasadena, he was referred downtown. See Exhibit A to Declaration of Elizabeth Mitchell [Dkt. 265-1], pg. 43 of 255.

minorities and unsheltered Angelenos throughout the City, including in Skid Row.
Among other things, the Mayor's Office has a director dedicated to issues on Skid Row
within its Homeless Initiatives Office and the City recently set up a Civil + Human
Rights and Equity Department. The City continues to work deliberately and
innovatively, both on its own and with its regional partners, to address the racial
inequities that exist among people experiencing homelessness in Los Angeles.

## III.  LEGAL STANDARD

A preliminary injunction issued prior to a trial on the merits and final judgment is
"an extraordinary remedy that may only be awarded upon a clear showing that the
plaintiff is entitled to such relief" and is "never awarded as of right." *Winter v. Natural
Resources Defense Council, Inc.*, 555 U.S. 7, 22-23 (2008); *see also Mazurek v.
Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary
injunction is an extraordinary and drastic remedy, one that should not be granted unless
the movant, by a clear showing, carries the burden of persuasion."). To obtain
preliminary injunctive relief, the moving party must make a "clear showing" that (1) it is
likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of
the preliminary relief; (3) the balance of equities tip in its favor; and (4) an injunction is
in the public interest. *See Winter*, 555 U.S. at 20.

The injunction Plaintiffs seek here is a "particularly disfavored" mandatory
injunction, one that will disturb, rather than maintain, the status quo by forcing the City
to take no less than 10 affirmative steps. *See* Not. of Mot., iii-iv & Proposed Order.
Plaintiffs' burden, therefore, is "doubly demanding" and they are not entitled to their
requested injunctive relief unless they show that the law and facts *clearly favor* their
position, not simply that they are likely to succeed. *Garcia v. Google*, 786 F. 3d 733, 740
(9th Cir. 2015); *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1979).

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

## IV.  PLAINTIFFS LACK STANDING TO REQUEST THE PRELIMINARY INJUNCTION TO CHANGE CITY POLICIES

### A.  Plaintiffs cannot establish this court has proper jurisdiction to issue the preliminary injunction they seek

"Federal courts are courts of limited jurisdiction" and they are presumed to lack jurisdiction unless the plaintiffs affirmatively establish their standing to pursue each claim and each form of relief they seek, including injunctive relief. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006). The jurisdictional question of standing precedes, and does not require, analysis of the merits of Plaintiffs' claims. *Equity Lifestyle Props., Inc. v. County of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2007).

To establish Article III standing, Plaintiffs must establish, as the "irreducible constitutional minimum," all the following:  (1) that they suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Here, Plaintiffs have not established standing for the preliminary injunction they seek – nor can they – because there is no causal connection or redressability. To demonstrate a causal connection, Plaintiffs must establish that their injuries are "fairly traced" to the City's actions and not resulting from the independent action of some third party not before the court. *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).[7]

---

[7] Indeed, Plaintiffs repeatedly cite to the City's failure to enforce its anti-camping laws and its laws concerning property against unsheltered Angelenos, citing to the "myriad of lawsuits" brought against the City on these issues. *See e.g.*, Declaration of Donald Steier, Dkt. 265-2, ¶ 7. Yet Plaintiffs conspicuously omit that in each lawsuit—*Jones, Lavan, Mitchell,* and *Garcia*—the federal district court issued orders preventing the City from engaging in the very enforcement Plaintiffs ask this Court to impose. *See Jones v. City of*

Further, "even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474-475 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499-500 (1975)). The Supreme Court confirmed that such cases do not present "cases" or "controversies" under Article III and are barred for constitutional reasons. *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 127, n.3 (2014).

In addition, Plaintiffs must also meet the prudential standing requirements. "Prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *United States v. Lazarenko*, 476 F.3d 642, 649-50 (9th Cir. 2007) (internal citation omitted). "A litigant 'raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy.'" *Hollingsworth v. Perry*, 570 U.S. 693, 705-06 (2013) (citations omitted). This principle applies to organizational Plaintiff LA Alliance, as well as to the individual Plaintiffs. *Animal Lovers Volunteer Ass'n, Inc. v. Weinberger*, 765 F.2d 937, 938 (9th Cir. 1985) ("A mere assertion of organizational interest in a problem, unaccompanied by allegations of actual injury to

---

*Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006); *Lavan v. City of L.A.,* 797 F. Supp. 2d 1005 (C.D. Cal. 2011), *affirmed* 693 F.3d 1022 (9th Cir. 2012); *Mitchell v. City of Los Angeles*, No. CV 16-01750 SJO (GJSx), Dkt. No. 51 (C.D. Cal. Apr. 13, 2016); *Garcia v. City of Los Angeles*, 481 F.Supp.3d 1031 (C.D. Cal. Apr. 13, 2020). The enforcement Plaintiffs seek to have this Court compel the City to undertake will likely be subject to similar future lawsuits and (potentially contradictory) court orders.

1  members of the organization, is not enough to establish standing.").[8]

2  Here, Plaintiffs' motion and entire case are premised on generalized grievances

3  that the City is not doing enough—or at least not doing what Plaintiffs want the City to

4  do—to solve homelessness, cleanup homeless encampments, and enforce public right-

5  of-way ordinances against the homeless. But it is well established "a private citizen lacks

6  a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda*

7  *R.S. v. Richard*, 410 U.S. 614, 619 (1973); *and see Allen v. Wright*, 468 U.S. 737, 754

8  (1984) ("[An] asserted right to have the Government act in accordance with law is not

9  sufficient, standing alone, to confer jurisdiction on a federal court.")

10  Moreover, Article III precludes the Court from dictating how the City exercises its

11  discretionary decision-making or spending to address issues arising out of homelessness.

12  *DaimlerChrysler*, 547 U.S. at 346; *Allen*, 468 U.S. at 760 ("'[a] federal court . . . is not

13  the proper forum to press' general complaints about the way in which government goes

14  about its business.") The City's response to the homeless crisis is a quintessential

15  example of an issue of wide public significance deemed nonjusticiable under Article III

16  because it is better addressed in the representative branches, not the courts. *Valley*

17  *Forge*, 454 U.S. at 474-475; *Warth*, 422 U.S. at 500. "Article III requires more than a

18  desire to vindicate value interests." *Diamond*, 476 U.S. at 66; *see also ASARCO, Inc. v.*

19  *Kadish*, 490 U.S. 605, 616 (1989) (rejecting injuries based on "observation of conduct

20  with which one disagrees" as sufficient to confer standing). While Plaintiffs may

21  disagree with the City's discretionary decisions, they lack standing to challenge them in

22  the courts; their remedy lies at the polling places and legislatures.

**B.    The requested injunction would violate separation of powers and
federalism principles**

25  Plaintiffs cannot establish redressability because the Court lacks the power to

---

[8] Because Plaintiff LA Alliance has not demonstrated (1) that the City's actions have frustrated its mission; and (2) that it has spent resources counteracting that frustration, it lacks standing. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).

issue the requested injunctive relief. *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("Even where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief.") (citations omitted). Here, Plaintiffs request overly broad and intrusive injunctive relief that would violate the doctrines of federalism and separation of powers, which act as constraints on a court's power to issue injunctive relief. *See Lewis v. Casey*, 518 U.S. 343, 385 (1996) (Thomas, J., concurring); *see also Juliana v. United States*, 947 F.3d 1159, 1172, 1175 (9th Cir. 2020) (directing dismissal of case on redressability grounds where plaintiffs sought declaratory and injunctive relief to address climate change by compelling the executive and legislative branches to reduce fossil fuels and harmful emissions because such relief was not within the power of an Article III court).

The Ninth Circuit and Supreme Court have consistently recognized that "a federal court must exercise restraint when a plaintiff seeks to enjoin any non-federal government agency, be it local or state." *Midgett v. Tri-Ct. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 851 (9th Cir. 2001); *see also Rizzo v. Goode*, 423 U.S. at 380 (noting that "principles of federalism…have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments") (1976); *Lewis*, 518 U.S. at 362-63 (district court failed to accord adequate deference to state prison authorities where it imposed system wide remedial injunction that "was inordinately – indeed, wildly – intrusive" and failed to give prison officials primary responsibility for devising a remedy). Government has traditionally been afforded the "widest latitude in the dispatch of its own internal affairs" and, accordingly, politically accountable local officials are owed significant deference in shaping policies to deal with complex social issues. *Rizzo*, 423 U.S. 362 at 380. The City has the right to dispatch its own internal, municipal affairs and the Court cannot encroach upon City Council's and Mayor's discretion and functions. *Jones v. City of L.A.*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated by settlement*, *Jones v. City of L.A.*, 505 F.3d 1006 (9th Cir. 2007). Indeed, the

Ninth Circuit has specifically advised on the boundaries of the federal courts' power to address the homelessness crisis, noting that while federal courts have power to prevent enforcement of unconstitutional ordinances (which Plaintiffs do not allege here), federal courts cannot dictate the precise way the City should address the homelessness crisis:

> "We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless. [Citation]. We do not desire to encroach on the legislative and executive functions reserved to the City Council and the Mayor of Los Angeles. There is obviously a 'homeless problem' in the City of Los Angeles, which the City is free to address in any way that it sees fit, consistent with the constitutional principles we have articulated."

*Jones v. City of L.A.*, 444 F.3d 1118, 1138 (9th Cir. 2006).

Ignoring these sound principles, Plaintiffs are requesting injunctive relief that runs afoul of the doctrines of federalism and separation of powers by asking the Court to insert itself into the political branch's daily running of the City's affairs, and to usurp the discretion of the City's elected officials to continue responding to the complex homelessness crisis, as well as other crises that draw on local resources—such as COVID-19 and the current budget crisis facing the City. [9] The "inordinately – indeed wildly – intrusive" and overbroad sweeping injunction Plaintiffs seek is the kind consistently overturned on the grounds of federalism and separation of powers, especially at this stage in this litigation. *See e.g., Lewis*, 518 U.S. at 363.

These doctrines arguably apply with even greater force here, where Plaintiffs admit there is no single cause of the current regional homelessness crisis, nor a single

---

[9] Even where the Supreme Court has authorized broad structural injunctive relief, the Court has cautioned that the choice of the means by which they achieve the ultimate result should be left to the local officials. *See e.g., Brown v. Plata,* 563 U.S. 493, 501 (2011) ("The order leaves the choice of means to reduce overcrowding to the discretion of state officials."); *Lewis,* 518 U.S. at 362-63 (praising the *Bounds* court as having "scrupulously respected the limits on [its] role" when it "'charged the Department of Correction with the task of devising a Constitutionally sound program' to assure inmate access to the courts" rather than "thrusting itself into prison administration").

action, agency, or official that can be ordered to fix it. Rather, the complexities of the regional homelessness crisis, and the associated competing interests highlighted by this lawsuit, demand a collaborative response together with other governmental entities, including the County, which has unique legal responsibility, expertise, and funding to provide services to help individuals experiencing homelessness, and to protect individuals from falling into homelessness in the first place. *See* Mot. at pp. 25-28; *see also, e.g.,* Dkt. Nos. 257-5 ("Fiscal Year 2020-21 Measure H and Homeless Housing, Assistance and Prevention (HHAP) Funding Recommendations"), 257-17 (listing County's Departments, including Mental Health, with programs serving people experiencing homelessness). Given these constraints on the Court's powers, the Court cannot issue the requested injunction and, thus, Plaintiffs cannot establish redressability.

## C.    The evidentiary record is insufficient

Plaintiffs' motion should not be granted for the additional reason that the evidentiary record is insufficient to support the drastic equitable relief they request. Instead of an evidentiary record, Plaintiffs' motion relies heavily on citations to sources such as news articles and position papers containing opinions, innuendo, and other unsubstantiated allegations, which cannot form the basis of equitable relief. Plaintiffs also repeatedly—and falsely—attempt to attribute comments made by LAHSA to the City as "party admissions." Contrary to Plaintiffs' unsupported assertion (Mot. 1 n.1), they do not qualify as party admissions because LAHSA is a separate legal entity and not a party to this lawsuit. *See* Exhibit A to Declaration of Jessica Mariani.[10]  Likewise, Plaintiffs' motion cites to public comments made by individual Councilmembers, which are also not admissions of the City because official City policy can only be enacted by a vote of a quorum of all fifteen members of the City Council. *See* Los Angeles

---

[10] Plaintiffs do not even attempt to establish the statements constitute "party admissions." Fed. R. Evid. 801(d)(2)(D); *Oki Am., Inc. v. Microtech Int'l, Inc.,* 872 F.2d 312, 314 (9th Cir. 1989) (proponent of the evidence must demonstrate statements were made by the City's agent "concerning a matter within the scope of the agency or employment, made during the existence of the relationship.").

Administrative Code §§ 2.1, 2.5 and 2.7, Exhibit 2 to the City's Request for Judicial Notice ("RJN"). The lack of real evidence undermines Plaintiffs' motion and precludes the requested relief. *See e.g., Thomas v. County of Los Angeles*, 978 F.2d 504, 508-509 (9th Cir. 1992) (injunction improperly entered without finding of fact or resolving serious factual disputes).

### D.   The requested injunction violates Rule 65(d)(1)

The injunctive relief proposed by Plaintiffs is not nearly specific enough to meet the requirements of Rule 65(d)(1), which requires that an injunction both "state its terms specifically" and "describe in reasonable detail… the act or acts restrained or required." Fed. R. Civ. Proc. 65(d)(1); *see also Schmidt v. Lessard*, 414 U.S. 473, 475 (1974) (noting that "the specificity provisions of Rule 65(d) are no mere technical requirements"). A vague injunction is an invalid one. *See, e.g., Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) (injunction prohibiting home inspections from using "illegal, unlicensed and false practices" is "too vague to be enforceable"); *Union Pac. R. Co. v. Mower,* 219 F.3d 1069, 1077 (9th Cir. 2000) (injunction prohibiting disclosure of "confidential" information "does not even come close to satisfying Rule 65's specificity requirements"); *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989) (injunction prohibiting "future similar violations" of a statute was impermissibly vague).

## V.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Even if Plaintiffs could overcome the procedural hurdles outlined above, Plaintiffs would not be entitled to the injunctive relief they seek because they are not likely to succeed on the merits of their claims, which the Ninth Circuit has labeled the most important *Winter* factor. *See Garcia.*, 786 F.3d 733 at 740.  As set forth below, Plaintiffs are unlikely to succeed on any of the three theories of claims on which they move for a preliminary injunction against the City: (1) their Eleventh, Twelfth and Fourteenth Claims for violation of procedural due process and state-created danger doctrine; (2) their Eighth, Ninth, and Tenth ADA-related claims; and (3) their Third and Fourth

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Claims for state law nuisance.[11] And Plaintiffs certainly cannot show that the law and facts *clearly* favor intrusive mandatory injunctive relief that alters, rather than preserves, the status quo pending the outcome of this litigation. *See Garcia*, 786 F.3d 733 at 740.

## A.    Plaintiffs' Eleventh, Twelfth and Fourteenth Claims for Relief Fail

Plaintiffs' request for injunctive relief pursuant to their Eleventh, Twelfth and Fourteenth constitutional claims under 42 U.S.C. Section 1983 and *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), lacks merit. "Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)); *Monell*, 436 U.S. at 691.[12] Thus, "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker*, 443 U.S. at 146.

As explained below, Plaintiffs have not demonstrated that the City has deprived them of any constitutional interest.

### 1.    Plaintiffs' procedural due process violation claim fails

Plaintiffs are not likely to succeed on their Eleventh Claim for a procedural due process violation. The essence of Plaintiffs' argument is the City violated Plaintiffs' due process rights under the Fifth and Fourteenth Amendments because City policies

---

[11] Plaintiffs move on a fourth theory, their second claim for violation of mandatory duty under Welfare and Institutions Code § 17000, only against the County. Mot. at pp. 25-33. Section 17000 only imposes obligations on the County, and cannot support any relief against the City. *See* Welf. & Inst. Code, § 17000-17001.5; *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1104 n.18 (1995).

[12] Because Plaintiffs' Fourteenth claim for relief is not a legally viable standalone claim, it necessarily fails.

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

addressing persons experiencing homelessness resulted in Plaintiffs' property values depreciating without giving them notice and an opportunity to be heard on the "taking" of their property. (Motion, Dkt. 265, at 29:21-24 and 30:6-19.)

To obtain relief on Section 1983 claims based upon procedural due process, the plaintiff must establish the existence of "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). Significantly, Plaintiffs do not present any admissible evidence the City took affirmative action to deprive them of their property values. Rather, Plaintiffs contend third parties – *not the City* –damaged their property. Nor can Plaintiffs rely on any alleged policy of containment in Skid Row that existed in 1976—which was expressly denounced by the City in 2016, as Plaintiffs concede—to support an alleged violation of their constitutional rights. Dkt. 265, 2:15-16; *see also* Dkt 242-14. Indeed, Plaintiffs have not provided evidence of any affirmative conduct by the City since 2016 supporting containment within Skid Row. To the contrary, the City has made deliberate and significant advances in opening housing interventions and providing services for people experiencing homelessness throughout the City. For all these reasons, Plaintiffs are not likely to succeed on their procedural due process violation claim.

### 2.   The State-Created Danger exception does not apply here

Plaintiffs are not likely to succeed on their Twelfth Claim because the "state-created danger" doctrine does not apply here. The "state-created danger" doctrine is a limited deviation from the well-established rule that a public entity's omission or failure to protect a plaintiff against bodily harm inflicted by third-parties generally does not violate the guarantee of due process. *See Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 432-33 (N.D. Cal. 2017) (dismissing state-created danger claim where plaintiffs' allegations "[did] not confirm that the state action was the impetus that put Plaintiffs in an inherently dangerous situation."). This narrow exception applies only where: (1) "there is 'affirmative conduct on the part of the state in placing the plaintiff in danger'"

1    and (2) "the state acts with 'deliberate indifference' to a 'known or obvious danger.'"

2    *See Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011). To meet the first prong, a

3    plaintiff must point to state conduct that "affirmatively place[s] the plaintiff in a position

4    of danger,' that is, where the state action creates or exposes an individual to a danger

5    which he or she would not have otherwise faced." *Cobine*, 250 F. Supp. 3d at 432; *see*

6    *also Johnson v. City of Seattle*, 474 F.3d 634, 641 (9th Cir. 2007) (rejecting plaintiffs'

7    state-created danger claim because city's decision to switch from aggressive crowd

8    control operations plan to more passive plan for Mardi Gras celebration was not

9    affirmative conduct and did not place plaintiffs in any worse position than they would

10   have been in had the police not devised an operational plan whatsoever). For the second

11   prong, the "deliberate indifference" standard is "a stringent standard of fault, requiring

12   proof that a municipal actor disregarded a known or obvious consequence of his action."

13   *Id.* at 432-33; *see also Patel*, 648 F.3d at 974-76 ("mere negligence–or even gross

14   negligence–is not enough for deliberate indifference.").

15         Plaintiffs have not established that any City official affirmatively placed Plaintiffs

16   in danger they would otherwise not have been in, much less that any City official or

17   employee acted with deliberate indifference sufficient to meet the stringent standard of

18   fault necessary for the state-created danger doctrine to apply. Plaintiffs claim that they

19   have been harmed by homeless individuals engaging in activities (either lawful or

20   unlawful) in the Skid Row area where they live and/or work. Mot. at 3:20-4:3. But

21   Plaintiffs do not allege, nor do they present any evidence, that the City has taken any

22   affirmative action that required Plaintiffs to live or work in Skid Row where they

23   allegedly were harmed. Rather, where Plaintiffs choose to live or work is entirely up

24   them. Plaintiffs thus have not and cannot establish the City created a state-created danger

25   by restraining Plaintiffs' freedom to act on their own behalf by specifically directing the

26   individual into a dangerous situation and eliminating other options by which the

27   individual could have avoided that danger. *See Hernandez v. City of San Jose*, 897 F.3d

28   1125 (9th Cir. 2018) (Trump supporters stated claim of state-created danger when police

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

allowed them to exit rally in only one direction towards counter-protesters the police knew were violent, and did not allow the supporters any other direction of travel by which they could have protected themselves); *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082 (9th Cir. 2000) (when police ejected intoxicated man in only t-shirt and jeans from a bar at night in subfreezing temperature, refused to let him get into his car, and went looking for him afterwards, it was indisputable that the officers placed him "in a more dangerous position than the one in which they found him").

Nor can Plaintiffs rely on past policies of containment to suggest that non-party homeless individuals, whom they do not represent, may have been placed in greater danger than if they had not been subjected to such a policy. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations"); *Loya v. Immigration & Naturalization Serv.*, 583 F.2d 1110, 1114 (9th Cir. 1978) ("Injunctive relief is designed to deter future misdeeds, not to punish for past conduct.") (citations omitted).

Plaintiffs also do not provide evidence to support a finding of deliberate indifference on the part of the City. Indeed, any assertion of deliberate indifference on the part of the City is utterly negated by Plaintiffs' acknowledgement that the City has expended great efforts, money, and resources to address the homelessness crisis. *See* Dkt. 1, ¶ 2 ("The City and County combined spend over a billion dollars annually providing police, emergency, and support services to those living on the streets."); ¶ 18 ("Officials in both the County and City have gone to great lengths in the last couple years to address this crisis, and their efforts are impressive and commendable"), ¶ 74 ("Plaintiffs do not suggest the City and County are doing nothing; the amount of effort and resources that have been devoted to addressing this issue is considerable and admirable."). Far from alleging – much less establishing through competent evidence – any deliberate indifference on the part of the City, all Plaintiffs have alleged is that the City's extensive efforts, which Plaintiffs concede are "considerable," "admirable," "impressive" and commendable," have not resulted in the change they wish to see in

solving the exceptionally challenging and complex homelessness crisis. Dkt. 1, ¶¶ 18, 74. This is a far cry from meeting the "stringent standard of fault" necessary to hold the City liable under the state-created danger doctrine.

### B. Plaintiffs are not likely to succeed on their ADA-related claims

Nor are Plaintiffs likely to succeed on their Eighth, Ninth, and Tenth ADA-related claims, which all suffer from numerous fundamental deficiencies. Plaintiffs cannot establish the City has discriminated against them solely by reason of their disabilities, and instead seek to use the ADA as a tool to address more generalized grievances about the City's policy towards homeless people and their property on sidewalks. Such grievances about policy decisions are not what the ADA is intended to apply to, and in any event, the City's sidewalks are passable when viewed in their entirety (as they must be), and Plaintiffs have not proposed a reasonable accommodation.

#### 1. Plaintiffs cannot establish they have been discriminated against by the City by reason of their disabilities

In order to succeed on their claims under Title II of the ADA and the Rehabilitation Act, Plaintiffs must establish that they are qualified individuals with disabilities who were either excluded from participation in or denied a benefit, or were discriminated against by the City solely by reason of their disability. *See* 42 U.S.C. § 12132; *see Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F. 3d 976, 978-79 (9th Cir. 1997). Here, Plaintiffs have not sufficiently alleged, much less established evidence demonstrating, actionable discrimination by the City "solely by reason of disability" because they have not shown the two disabled plaintiffs (or any people with disabilities) are uniquely injured *solely because of their disability*, which is an essential requirement of an ADA claim. *See Weinreich*, 114 F. 3d at 978-79 ("A plaintiff proceeding under Title II of the ADA must, similar to a section 504 plaintiff, prove that the exclusion from participation in the program was 'solely by reason of disability.'").

Indeed, to the contrary, Plaintiffs contend "[t]he City's conduct has caused harm *to both disabled PEH and others* in the Containment Area" (Mot. at 45:5-6 (emphasis

added)), and Plaintiffs affirmatively allege and submit evidence indicating that the sidewalks are *equally* blocked for *all* residents. *See e.g.,* Dkt. 1, ¶ 2 ("Large items obstruct the free passage and use of the streets and sidewalks."); Dkt. 1, ¶ 5 ("The massive build-up of property and tents has made the sidewalks unpassable."); Declaration of Hal Bastian, ¶ 5 ("entire areas of DTLA are untraversable to most city residents due to rights-of-way being fully obstructed by the tents, property, and gatherings of homeless persons we now refer to as 'encampments.'"); Declaration of Deisy Suarez, ¶ 2 ("The increase in homeless persons and their property on the streets hinders my ability to freely travel the public sidewalks with the stroller and it regularly puts my children's lives in danger."); Declaration of Harry Tashdjian, ¶ 3 ("Now, tents occupy the sidewalks at all hours, and it is difficult for me and, more importantly, my customers to access my business due to the piles of property and people loitering on the sidewalk and in the street."). Instead of making a showing that the blocked sidewalks are more burdensome to the disabled plaintiffs than to anyone else, Plaintiffs affirmatively allege that the sidewalks are equally burdensome to other plaintiffs such as mothers with children in strollers. *See e.g.,* Dkt. 1, ¶ 5 (noting that a non-disabled plaintiff "Karyn Pinsky must walk with her young son in a stroller in the middle of traffic. The Inner-City Arts Center must hire security to walk with students and staff to and from campus."); Dkt. 1, ¶ 45 ("Disabled persons in wheelchairs such as plaintiffs Charles Van Scoy and Leandro Suarez must choose daily whether to stay in their homes or walk into the middle of the street with oncoming traffic. *Mothers with young children in strollers, like plaintiffs Deisy Suarez and Karyn Pinksy, do the same.*") (emphasis added). Plaintiffs' claims and evidence are, therefore, insufficient to even state a viable claim under the ADA, and certainly cannot, and do not, establish a likelihood of success.

## 2. The temporary obstructions Plaintiffs complain of do not constitute violations of the disability access laws

Temporary obstructions such as those Plaintiffs complain of, including human beings and their personal property, are not the type of fixed architectural barriers

addressable as possible ADA accessibility violations. *See Montoya v. City of San Diego*, 2021 U.S. Dist. LEXIS 52340, at *24 (S.D. Cal. Mar. 19, 2021) (denying preliminary injunction based on alleged sidewalk obstructions from dockless scooters and bikes on multiple grounds, including that the plaintiffs did not demonstrate that "dockless vehicles can be considered architectural barriers of the kind the ADA and its companion state statutes are meant to target."). Indeed, the regulatory language Plaintiffs cite to indicates that public entities are required to "maintain in operable working condition ***those features of facilities and equipment*** that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." Mot. 33:23-34:3 (citing 28 C.F.R. §35.133(a)(2011)) (emphasis added). The two cases Plaintiffs cite likewise focus on fixed architectural barriers permanently affixed to the sidewalks themselves, not on temporary obstructions caused by homeless individuals putting themselves or their belongings on sidewalks. *Barden v. City of Sacramento*, 292 F. 3d 1073, 1077 (9th Cir. 2002) (confirming requirement to construct curb ramps); *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013) (alleging failure to construct curb ramps, sidewalks, crosswalks, pedestrian crossings, and other walkways in compliance with disability access standards). Moreover, if the Court were to find that the temporary obstructions from homeless individuals and their belongings are the type of barriers to which the ADA applies, then the *Willits* settlement would preclude Plaintiffs' claim for injunctive relief because it is based on the same set of facts, *i.e.,* that disabled individuals in wheelchairs have trouble maneuvering sidewalks. *See Sarfaty v. City of Los Angeles*, 765 Fed. Appx. 280, 281 (9th Cir. 2019); *see also* Declaration of Leandro Suarez, ¶ 4 ("The swelling number of persons living on the streets with their possessions severely limit my ability to travel by wheelchair throughout downtown Los Angeles").

     **3.**    **The City's sidewalks are accessible when viewed in their entirety**

     A public entity is required to maintain existing facilities, including sidewalks built before January 26, 1992, in a way that ensures they are readily accessible to, and usable by, individuals with disabilities *when viewed in their entirety*. *See* 28 C.F.R. 35.150(a);

*see also Soto v. Los Angeles Cty. Flood Control Dist.*, 2016 U.S. Dist. LEXIS 197210, at *13 (C.D. Cal. May 24, 2016) ("a public entity is only required to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.") (citation omitted); *Blackwell v. City & Cty. of San Francisco*, 506 Fed. Appx. 585, 586 (9th Cir. 2013) (affirming summary judgment for San Francisco related to sidewalks built before January 26, 1992, which were "existing facilities"). Here, Plaintiffs have made no allegations nor presented any evidence that the sidewalks they are focused on in the Designated Area, which lies in the City's downtown historic core, were built after January 1992 such that they are not "existing facilities."

Moreover, the City does regulate its vast system of sidewalks for compliance with the ADA, including in Plaintiffs' "Designated Area," through enforcement of LAMC 56.11, a City ordinance that, among other things, authorizes the City to remove personal property that impedes ADA access. *See* Ex. 1 to RJN (L.A.M.C. § 56.11(3)(d)) ("[w]ithout prior notice, the City may move and may immediately impound any Personal Property, whether Attended or Unattended, Stored in a Public Area in such a manner that it does not allow for passage as required by the ADA."); Declaration of Domingo Orosco ("Orosco Decl."), ¶ 5.[13] The City has taken reasonable actions – both in enacting LAMC 56.11 and in subsequently enforcing it – to ensure that individuals with disabilities (and indeed all residents) can access the City's sidewalks and other public rights of ways, consistent with the ADA.[14] What Plaintiffs are really asking this Court to

---

[13] *See* City's Request for Judicial Notice, Ex 1 [LAMC 56.11(1)] (stating the City enacted 56.11 "to balance the needs of the residents and public at large to access clean and sanitary public areas consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited amount of personal property in public areas.").

[14] The *Mitchell* settlement does not prevent the City from enforcing L.A.M.C. section 56.11(3)(d), and is available at: https://ecf.cacd.uscourts.gov/doc1/031130749322; Dkt. 119, USDC, C.D. Cal. Case No. CV 16-01750 SJO (JPRx).

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

do is order the City to immediately and constantly remove *every* obstruction created by third-parties on *every* sidewalk of the approximately 25 miles of sidewalks in the Designated Area to ensure that the ADA (and LAMC 56.11(3)(d)) are enforced 100% of the time.[15] Grajeda Dec. ¶ 6. Not only would that be an impossible undertaking, but, more importantly, it is not the legal standard to which the City can be held. *See e.g., Midgett v. Tri-County Metro. Transp. Dist.*, 254 F.3d at 849 ("The regulations implementing the ADA do not contemplate perfect service…"); *Soto v. Los Angeles Cty. Flood Control Dist.*, 2016 U.S. Dist. LEXIS 197210, at *13 (noting that "the relevant question [therein was] not whether <u>each</u> Bike Path entry point is accessible, but whether, <u>viewed in its entirety</u>, the Bike Path can be entered and used by persons with disabilities. Therefore, the Bike Path could, in theory, comply with Title II even if certain entry points were inaccessible."); *Montoya v. City of San Diego*, 2021 U.S. Dist. LEXIS 52340, at *24-25 (denying preliminary injunction based on sidewalk obstructions from dockless scooters and bikes because, among other reasons, "the court [was] not convinced that Plaintiffs have demonstrated that they will succeed in showing that they have been denied meaningful access to the City's sidewalks when it considers the 5,000 miles of sidewalks the City has to maintain in relation to the number of Plaintiffs' 'documented obstructions.'").

        **4.**        **Plaintiffs have not established a reasonable accommodation**

Finally, a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity *or in undue financial and administrative burdens.*" 28 C.F.R. § 35.150(a)(3); *see also Tennessee v. Lane*, 541 U.S. 509, 532 (2004). Plaintiffs bear the burden of establishing "the existence of a reasonable accommodation" that would enable them to participate in the program, service, or activity at issue. *See Zukle v. Regents of the Univ. of Cal.*, 166

---

[15] This would be an even more herculean task City-wide, as the City's sidewalks stretch over more than 9,000 miles in length and cover an area of approximately 11 square miles. Declaration of Miguel Grajeda ("Grajeda Decl."), ¶ 6.

F.3d 1041, 1046 (9th Cir. 1999). Here, Plaintiffs have not shown that the City has failed to take reasonable measures to accommodate individuals with disabilities to navigate public sidewalks. Indeed, unlike in *Cohen v. City of Culver City*, where the City failed to take simple, modest, and low-cost measures to accommodate persons who relied on curb ramps, the evidence here shows that the City already takes reasonable measures to ensure access to sidewalks for individuals with disabilities, by enforcing LAMC 56.11(3)(d), and that it would not be feasible to keep every single portion of the City's expansive sidewalk system clear of any obstructions 100% of the time. *See* Grajeda Decl. ¶¶ 5, 6; *see also* Orosco Decl. ¶ 4

For all these reasons, Plaintiffs are unlikely to succeed on their Eighth, Ninth and Tenth claims for violation of the ADA and Section 504 of the Rehabilitation Act.[16]

### C. Plaintiffs are not likely to succeed on their nuisance claims

Plaintiffs are not likely to succeed on any private or public nuisance theory.

### 1. Plaintiffs' nuisance claims are barred by discretionary immunity and separation of powers

As a threshold matter, Plaintiffs' state-law nuisance claims against the City must fail as a matter of law because the City's policy decisions to address the homelessness crisis – including whether, where, and when to enforce anti-lodging laws and perform cleanups, and how funds in the City's budget should be allocated – are discretionary decisions, which are immune from liability under state law. Cal. Gov. Code §§ 820.2 and 815.2(b); *see also Steinle v. City & County of San Francisco*, 919 F.3d 1154, 1162 (9th Cir. 2019); *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F. Supp. 715, 726 (E.D. Cal. 1993) (dismissing nuisance claim with prejudice on discretionary immunity ground). "A governmental decision involving essentially political considerations is regarded as 'discretionary' and thus immune from liability." *Taylor v.*

---

[16] Plaintiffs' Eighth claim for violation of the California Disabled Persons Act, which is based on the same conduct, similarly fails for the same reasons. *See* Cal. Civ. Code § 54(c) (a violation of the ADA is a violation under California's Disabled Persons Act).

*Buff*, 172 Cal. App. 3d 384, 390 (1985). As the Court in *Taylor* indicated, discretionary
political decision-making includes questions of budgetary and fiscal policy, allocation of
available resources according to variable priorities of need, and choices between
competing plans for accomplishing approved objectives. *Id.* Plaintiffs seek to allegedly
abate a nuisance by ordering the City to use its discretion in a particular manner – *i.e.*, by
dictating where to build housing and how much, and when and how to clear
encampments from sidewalks. Mot. at 31:14-15. Because the City cannot be compelled
to act in any particular manner with respect to its discretionary decisions, Plaintiffs'
nuisance claims necessarily fail as a matter of law.

 The statutory immunity for discretionary governmental decisions is grounded in
the separation of powers doctrine, which is yet another bar to Plaintiffs' nuisance claims.
*See Citizens for Odor Nuisance Abatement v. City of San Diego*, 8 Cal. App. 5th 350,
366 (2017) (court could not compel the City to use its discretion in a particular manner);
*Friends of H St. v. City of Sacramento*, 20 Cal. App. 4th 152, 159 (1993) (affirming
denial of injunction to abate alleged public nuisance causing noise, decreased property
values, and litter on separation of powers grounds because injunction would have
necessarily involved "a legislative function beyond [court's] power to control"). There is
no actionable nuisance claim against the City here, and instead, as the court explained in
*Citizens for Odor Nuisance Abatement*, "any resolution likely lies in the political
sphere…courts are comparatively ill situated to solve this type of problem." *Id.* at 366.

 **2.**   **Plaintiffs cannot satisfy the elements of their nuisance claims**

 Even if Plaintiffs' nuisance claims were not barred by discretionary immunity and
the separation of powers doctrine, Plaintiffs cannot satisfy the elements of such claims.

 The essence of Plaintiffs' nuisance claims is that the City is negligent in its
handling of the homeless crisis. But a negligence claim presented in the garb of a
nuisance claim cannot be considered apart from the negligence allegations. *See El
Escorial Owners' Assn. v. DLC Plastering, Inc.*, 154 Cal.App.4th 1337, 1348-49 (2007)
(where negligence and nuisance causes of action rely on the same facts about lack of due

care, the nuisance claim is a negligence claim). And Plaintiffs cannot succeed on a negligence claim against the City both because the City is immune (as discussed above) and because the law precludes a common law negligence action (styled as a nuisance claim) against the City. *Eastburn v. Reg'l Fire Protection Auth.*, 31 Cal.4th 1175, 1183 (2003) (tort liability of a public entity cannot be based solely on general common law negligence); *Ellerbee v. County of Los Angeles,* 187 Cal.App.4th 1206, 1214 (2010).

In addition, as Plaintiffs acknowledge, to prevail on a public or private nuisance theory, the City's conduct must be a substantial factor causing Plaintiffs' claimed harm. *Citizens*, 8 Cal. App. 5th at 361-66; *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996) (defendant's private nuisance must have caused plaintiffs to suffer substantial and unreasonable actual damage). Plaintiffs rely on a historical "containment policy" that Plaintiffs concede was renounced by the City in 2016, which thus poses no imminent risk of future harm, and therefore cannot support prospective injunctive relief. *See Loya,* 583 F.2d at 1114 ("Injunctive relief is designed to deter future misdeeds, not to punish for past conduct.") (citations omitted); *Midgett,* 254 F.3d at 850 (affirming denial of injunction where evidence at most showed past violations). Indeed, the only argument Plaintiffs offer in attempting to show they will succeed on the merits of their private nuisance claim confirms Plaintiffs are relying solely on *past* harm from a *past* policy. *See* Mot. at 33:7-9 ("Several members of LA Alliance own property in the Designated Areas, the Containment Policy interfered with their use of property, and they suffered harm.").

To the extent Plaintiffs' nuisance claims could be characterized as relying on any current conduct, it is that the City allegedly allows homeless encampments to exist in Skid Row in breach of an alleged duty to "keep their communities' streets open and available for movement of people and property." Mot. at 32:26-28. However, a general "duty" to maintain sidewalks does not equate to "a duty to take a positive action to prevent or abate the interference" which Plaintiffs concede there must be in order to hold a defendant liable in the nuisance context for an alleged "failure to act." *See* Mot. 32:21-

25. Moreover, even assuming the City has a duty to clear streets and sidewalks, Plaintiffs acknowledge that the City spends substantial money and resources to fulfill that duty by clearing sidewalks pursuant to LAMC 56.11. *See* Dkt. 1, ¶¶ 2, 9. The City cannot be held liable for a public nuisance where the City has taken reasonable efforts to address encampments blocking sidewalks, even if the City has not been entirely successful in keeping its vast sidewalk system consistently clear of any obstructions. *Citizens*, 8 Cal. App. 5th at 364-65 (plaintiffs could not establish public nuisance based on city's failure to act, where city had made efforts to address alleged nuisance from sea lion waste odor, even though city's efforts were not entirely successful and plaintiffs pointed to more effective alternative methods).

Finally, Plaintiffs claim they have experienced "dangerous conditions, for decades." *See* Mot. at 4:12-15. The alleged long-term existence of nuisance conditions further undermines Plaintiffs' ability to obtain injunctive relief on that basis. *See Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1231 (1992) (affirming dismissal of nuisance claim where alleged nuisance had existed for decades before plaintiffs purchased their property).

### 3. Plaintiffs cannot prevail on their public nuisance claim where no harm was specially injurious to them

In order to prevail on a public nuisance theory, Plaintiffs have to show that the alleged nuisance was "specially injurious" to them, which they cannot do. Cal. Civ. Code § 3493; *see also County of Santa Clara v. Superior Court*, 50 Cal.4th 35, 55 (2010). In order to meet the "specially injurious" requirement, "[t]he damage suffered must be different in kind and not merely in degree from that suffered by other members of the public." *Koll-Irvine Ctr. Prop. Owners Ass'n v. Cty. of Orange*, 24 Cal. App. 4th 1036, 1040 (1994); *see also Venuto v. Owens-Corning Fiberglas Corp.*, 22 Cal. App. 3d 116, 125 (1971) (holding plaintiffs' alleged damage did not constitute a public nuisance where harm was not of a different kind, even if it was a different degree, than that suffered by the general public). Plaintiffs cannot make the requisite showing of a special

injury to them different in kind because this contradicts the entire thrust of their Complaint, which is that the same kind of alleged nuisance conditions affect *everyone* in Skid Row (and indeed, throughout the County), including both housed and unhoused residents, business owners, and even those who only work in the area in the same way. *See e.g.,* Dkt. 1, ¶ 58; Mot. at 2:17-19 ("City and County policies continue to concentrate PEH in Skid Row, creating horribly dangerous conditions for PEH and others living in the area."), 3:17-19 ("What is known – and undisputed – is people who live and work in and around Skid Row are facing increasingly dangerous conditions from crime, fire risk, and disease."), 13:1-2 (describing disease outbreaks impacting those who work in Skid Row). Indeed, declarations from non-Plaintiffs complain of the same kinds of harm as Plaintiffs. *See e.g.,* Bastian Decl., ¶ 5 ("Even before the Covid-19 pandemic, mental illness, an unprecedented homelessness epidemic, and ever-expanding encampments were causing massive detrimental effects on the quality of life for residents, workers, and visitors to DTLA. It became a part of daily life to see persons experiencing severe mental issues and breakdowns, public defecation, or violent encounters on the sidewalks of our city."). While Plaintiffs affirmatively contend that health, crime, and fire risks are suffered by all in Skid Row (Mot. 3:13-18), thus negating any special injury of that kind, Plaintiffs attempt to argue they have suffered a different kind of injury because they incurred monetary impacts, including "a reduction in property value," "increased insurance costs due to the fire risks associated with encampments," and "additional cleanup costs associated with the encampments." Mot. at 32:3-18. However, Plaintiffs have not carried their burden to establish – because they cannot – that harms felt by Plaintiffs are not also felt (even if to a lesser degree) by others in the Skid Row area, and indeed others situated near encampments throughout the County. *Siskiyou Lumber & Merc. Co. v. Rostel*, 121 Cal. 511, 513 (1989) (harm from increasing cost of insurance, depreciating market value, and higher risk from fire, "are not elements of damage which give a right of action to the aggrieved party. They constitute a detriment, incident to the right of owning and enjoying property in a city or town and for which there is no

redress.").

Plaintiffs' contentions are thus distinguishable from those in the only case cited by Plaintiffs in support of their theory, *Tesoro*; in that case, the court denied a motion to dismiss – without considering evidence – because the plaintiff corporation had sufficiently alleged that only it, and not the public at large, had spent money to decontaminate its site where defendants dumped hazardous waste. *See Tesoro Ref. & Mktg. Co. LLC v. City of Long Beach*, 334 F. Supp. 3d 1031, 1052 (C.D. Cal. 2017). In contrast, here, Plaintiffs' allegations indicate that all residents and business owners in Skid Row experience the same property depreciation and increased insurance and cleanup costs. *See* Mot. at 3:13-18.

For all these reasons, Plaintiffs are not likely to succeed on their nuisance claims, and in no event could their nuisance claims support the overbroad injunction they seek. *See People v. Mason*, 124 Cal. App. 3d 348 (1981) (reversing overbroad public nuisance injunction restraining defendants from allowing any audible noise outside boundaries of their property, rather than only proscribing conduct calculated to cause injury to residents of the subdivision whose complaints provide the basis of the complaint).

### D. Even if Plaintiffs were likely to succeed on the merits, they have not shown entitlement to the specific relief requested

Even if Plaintiffs could show a likelihood of success on the merits of any of the three groups of claims on which they seek this injunction, Plaintiffs have made no effort to explain which claim or theory supports which component of their requested relief, in complete disregard of the principle that equitable relief can only be issued to correct the specific identified violation, and must be limited to the nature and scope of that violation. *See McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("Injunctive relief is an extraordinary remedy" and "must be tailored to remedy the specific harm alleged"); *see also City & Cty. of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." (citations omitted). For example, Plaintiffs offer no explanation which

1   alleged violation of their rights would entitle them to an order compelling the City to

2   provide housing for non-party homeless Angelenos Plaintiffs do not represent.

3        Likewise, Plaintiffs' motion does not articulate any legal basis to support their

4   request for an audit of the City's Proposition HHH funds. Plaintiffs do not rely on their

5   Sixth Claim for violation of California Code of Civil Procedure section 526a in their

6   motion, and even if they did, they are unlikely to succeed on that claim, even if they

7   were found to have standing to assert it.[17] California courts have consistently refused to

8   apply Section 526a to principally "political" issues, and maintain that section 526a

9   "should not be used to invade, supersede, or even intrude upon the discretion invested in

10  the legislative and executive branches of government." *Humane Soc'y of the United

11  States v. State Bd. of Equalization*, 152 Cal. App. 4th 349, 356 (2007). Cognizant of this

12  limitation, courts require that "[i]n order to obtain injunctive relief in an action brought

13  under Code of Civil Procedure section 526a, the taxpayer must establish that the

14  expenditure of public funds which he seeks to enjoin is *illegal*." *Herzberg v. County of

15  Plumas*, 133 Cal. App. 4th 1, 23-24 (2005) (emphasis added). Here, Plaintiffs only assert

16  that "[r]ampant fraud, waste, and abuse is reported and ignored", without any evidence

17  beyond an uncorroborated news article. *See* Mot. 23:17. Plaintiffs are not entitled to the

18  requested audit of Proposition HHH funds because they cannot meet the high bar to

19  show that the expenditure of HHH funds is illegal, but rather, at most, Plaintiffs

20  complain that, in their opinion, the funds should be used in a different way, *i.e.*, for

21  interim shelter instead of for permanent supportive housing.[18] *See* Mot. 22:18-21. This is

22

23  [17] Even if Plaintiffs had standing to assert a section 526a claim in state court, that does

24  not automatically confer Article III standing. *See e.g., Turner v. City & County of San

25  Francisco*, 892 F. Supp. 1197 (N.D. Cal. 2012) (plaintiff lacked Article III standing to
    assert § 526a claim because "[a]lthough the statute is subject to permissive standing

26  requirements in state court, in federal court a plaintiff must satisfy Article III standing.").

27  [18] While the City agrees with Plaintiffs' goal of building housing faster, Plaintiffs'
    contention that HHH-funded permanent supportive housing has not been built fast

28  enough (Mot. at pp. 22-23) cannot be characterized as a claim of alleged illegal

1   a quintessential example of a discretionary (and, in this case, voter-approved)

2   expenditure of funds that cannot be enjoined pursuant to section 526a. *See Sundance v.*

3   *Municipal Court*, 42 Cal. 3d 1101, 1139 (1986).

4          Similarly, while Plaintiffs dedicate a large portion of their brief to making

5   allegations concerning a historic containment policy and systemic racism, they only

6   reference equal protection in a heading without any supporting argument, and do not

7   move for relief on equal protection grounds. Nor could Plaintiffs rely on their Eleventh

8   Claim for violation of the Equal Protection Clause because Plaintiffs did not, and cannot,

9   show they are likely to succeed on the merits. The essence of Plaintiffs' claim is that the

10  City is allowing encampments in some areas of the City (Skid Row, Venice and the 405

11  freeway) but not others. *See e.g.*, Dkt. 1, ¶ 186. But Plaintiffs fail to demonstrate the City

12  acted with an intent or purpose to discriminate against a suspect class of which they are a

13  part (*Thornton v. City of St. Helens*, 425 F.3d 1158, 1167-67 (9th Cir. 2005)) or that

14  geographical location constitutes a suspect class. Indeed, physical location is not a

15  suspect classification, and is thus subject to rational basis review. *See Culinary Studios,*

16  *Inc. v. Newsom*, 2021 U.S. Dist. LEXIS 23755, at *14 (E.D. Cal. Feb. 5, 2021) (holding

17  that public health orders treating similarly situated businesses differently based on

18  physical location do not implicate a suspect classification and survive rational basis

19  review). Plaintiffs' Equal Protection claim does not and cannot support any relief.

20         In short, the injunctive relief sought is beyond the scope of the claims on which

21  Plaintiffs move, and is thus lacking any support whatsoever in Plaintiffs' motion.

22

23

24  _____

25  expenditure of money, and thus cannot support a section 526a claim. Moreover,
    Plaintiffs have submitted no evidence – because there is none – to support their

26  mischaracterization that "taxpayers requested" Proposition HHH funds be spent "on
    immediate shelters that would save lives" (Mot. 23:2-4). The voter materials simply

27  made no such promise, and instead authorized the City to issue $1.2 billion in general
    obligation bonds to be spent on either interim or permanent supportive housing. *See* Dkt

28  242-10.

1   **VI.    THE REMAINING *WINTER* FACTORS DO NOT SUPPORT**
2           **INJUNCTIVE RELIEF**

3           Given Plaintiffs' failure to carry their heavy burden to show they are likely to

4   succeed on the merits, the Court need not analyze the remaining *Winter* factors. *Garcia,*

5   786 F. 3d at 740 ("The first factor under *Winter* is the most important – likely success on

6   the merits. [citations] Because it is a threshold inquiry, when 'a plaintiff has failed to

7   show the likelihood of success on the merits, we need not consider the remaining three

8   [*Winter* elements].'").

9           However, should the Court engage in an analysis of the remaining factors, they do

10  not support injunctive relief. Plaintiffs cannot establish an imminent risk of future

11  irreparable harm given that many of their asserted harms, such as depreciation of

12  property value and increased insurance and cleanup costs, are monetary in nature and

13  thus are compensable by a damages award. *See Los Angeles Coliseum Comm'n v. NFL*,

14  634 F.2d 1197, 1202 (9th Cir. 1980). To the extent Plaintiffs could establish non-

15  monetary harms, such as increased risk of public health, the injunction they seek is

16  entirely based on speculative, inadmissible conjucture, and a plaintiff

17  must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive

18  relief. *L.A. Coliseum*, 634 F.2d at 1201.

19          Furthermore, Plaintiffs have not established that the balance of equities tips in

20  favor of granting injunctive relief or that the preliminary injunction would serve the

21  interests of the public, or even the interests of the third-party unhoused Angelenos on

22  whose behalf Plaintiffs claim to act (although they have no standing to do so). There is

23  no basis on which to conclude that persons experiencing homelessness in Skid Row

24  would prefer to relocate to other areas of the City (since neither the City nor this court

25  could force such relocation) or be placed in interim shelter as opposed to other, more

26  permanent forms of housing. It is not in the public's interest for Plaintiffs and the court

27  to usurp the discretionary, policy making decisions of the City's elected officials and

28  impose mandatory duties on the City (and the heavy financial burdens that accompany

1  them) that are woefully flawed and may not in the best interest of all involved.

2       While the City shares Plaintiffs' goal of providing more housing and assistance to

3  persons experiencing homelessness, the appropriate solution is for the City to continue

4  working with its partners—including the County, State, and Federal governments, along

5  with other non-profit and non-governmental agencies—to develop effective strategies to

6  do so. The preliminary injunction Plaintiffs seek is not a constitutionally permissible or

7  effective means of advancing those goals, and it should be rejected.

8  **VII.   RESPONSE TO NAACP AMICUS BRIEF**

9       The City appreciates the assistance to the Court offered by Amici Curiae

10  NAACP–Compton, Core–California, and Committee for Safe Havens, and welcomes

11  their input and collaboration in addressing homelessness and its disproportionate effect

12  on African Americans. In their Brief, Amici argue "the Court has authority to order and

13  approve remedial plans to correct constitutional violations" evident in the "glaring"

14  racially disproportionate impact of homelessness in Los Angeles County. Dkt. 264, pp.

15  1-2, 7-8. Amici then propose such a plan—a local "Marshall Plan"—to correct and

16  protect the constitutional rights of the homeless and the public. Dkt. 264, pp. 3, 11-12.

17       Amici's brief demonstrates why using the Court's equitable powers to solve the

18  homelessness crisis is both ill-timed at this stage in the litigation and ill-suited to the

19  task. First, while correctly stating that a court can remedy constitutional violations when

20  appropriate in a case (and citing the same cases cited by City in its Brief Re Equitable

21  Remedies [Dkt. 242]), Amici do not identify a specific constitutional violation

22  committed by the City to be remedied. Rather, Amici asserts that the disparate impact of

23  homelessness on African Americans is sufficient to trigger the use of judicial authority

24  to "disrupt the status quo." Dkt. 264, pp. 8-10. But any use of equitable power must flow

25  from, and be tailored to, a specific constitutional violation, not merely a desire to disrupt

26  the status quo. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("Failure of political will

27  does not justify unconstitutional remedies.") (citation omitted); *Rufo v. Inmates of

28  Suffolk County Jail*, 502 U.S. 367, 389 (1992) ("Federal courts may not order States or

local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated."); *Freeman v. Pitts*, 503 U.S. 467, 489 (1992) ("[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation."). And disparate impact, while a serious concern that must be addressed,[19] is generally insufficient by itself to form the basis of a constitutional violation–especially where, as here, there is nothing in the record to indicate ongoing, intentional, invidious discrimination targeting people experiencing homelessness based on race or other protected characteristics. *See*, e.g., *Hispanic Taco Vendors v. Pasco*, 994 F.2d 676, 680 (9th Cir. 1993) ("Here, however, the disproportionate impact of this ordinance does not approach the level of discrimination in cases where the Supreme Court has invalidated laws solely because of their impact."); *see also A.A. v. Raymond*, 2013 U.S. Dist. LEXIS 103459, at *59 (E.D. Cal. Jul. 22, 2013) (denying preliminary injunction where plaintiffs were unlikely to succeed on merits of their Fourteenth Amendment equal protection claim where they had insufficient evidence to show intentional discrimination, despite evidence of disparate impact on racial minorities). Both the statute and the cases cited by Amici identified a specific, affirmative action by the governmental agency defendant that had a disparate impact among an identified racial group, thus triggering protection under Title VI. *See Lau v. Nichols*, 414 U.S. 563, 568 (1974) (school system discriminated against Chinese-speaking students by failing to provide bilingual education); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 592 (1983) (police department administered exams for appointments that were not job-related but had a discriminatory impact on minorities). But neither Amici nor Plaintiffs identify any specific "criteria or methods of administration" in how the City is addressing homelessness today "which have the effect of subjecting individuals to discrimination."  28 C.F.R. §42.104(b)(2).

 As for Amici's proposed "Marshall Plan" remedy, it contains worthwhile ideas

---

[19] The City is working to address racial inequalities in the effects on homelessness. *See, e.g.*, Dkt. 242, pp. 32-39

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

that should be part of a policy discussion devoted to a comprehensive, regional strategy enacted by the City, County, and other relevant government entities to address homelessness. But Amici's plan (and Plaintiffs' proposed Order) go far beyond the legitimate boundaries of the Court's equitable powers. For example, Amici's plan (like Plaintiffs') requires "[g]overnment entities (County, City, State, or Federal) to make large parcels of unused public land available to the Safe Haven Program at a nominal cost or no cost."  Dkt. 264, p. 11; *see also id*. ("Accordingly, it is time for the Federal government to provide major additional assistance in the form of increased financial support for the City and County earmarked exclusively for the homeless emergency."). This Court does not have jurisdiction over the State or Federal governments–who are not parties to this case–and cannot order such relief. Nor does it have jurisdiction to force private entities to form partnerships to fund housing (*Id.* at p. 11), or local health care facilities and hospitals to execute contracts to provide necessary care. Dkt. 264, p. 12.

## VIII.  CONCLUSION

For the foregoing reasons, and for any reasons that may arise at the hearing on this matter, Plaintiffs' motion for preliminary injunctive relief should be denied.

DATED:  April 19, 2021

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Deputy City Attorney
SCOTT MARCUS, Senior Assistant City Attorney
GABRIEL S. DERMER, Assistant City Attorney
ARLENE N. HOANG, Deputy City Attorney
JESSICA MARIANI, Deputy City Attorney

By: /s/ Jessica Mariani
Jessica Mariani, Deputy City Attorney
Counsel for Defendant City of Los Angeles

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION