Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
1158 26th Street, #552
Santa Monica, California 90403
Telephone: (31) 393-3055
Email:  carolsobel@aol.com

Shayla Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 South Broadway
Los Angeles, CA  90003
Telephone: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
HOFFMAN & ZELDES, LLP**
9415 Culver Blvd., #115
Culver City, CA  90232
Telephone: (310) 396-0731
Email: catherine.sshhh@gmail.com

*Attorneys for Intervenors CANGRESS
and Los Angeles Catholic Worker*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL,. <br><br><br> Plaintiff(s), <br><br> v. <br><br> CITY OF LOS ANGELES, ET AL., <br><br><br> Defendant(s). <br><br><br><br> LOS ANGELES COMMUNITY ACTION NETWORK, LOS ANGELES CATHOLIC WORKER, AND ORANGE COUNTY CATHOLIC WORKER, <br> Intervenor(s) | CASE NO. 2:20-cv-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> [concurrently filed with Declarations of Gary Blasi, Daniel Flaming, Dr. Sam Tsemberis, and Sara Shortt] <br><br> Complaint Filed: March 10, 2020 <br><br> Hearing <br> Date:      May 10, 2021 <br> Time:      8:30 a.m. <br> Location:  Courtroom 9D <br>           411 West Fourth St., <br>           Santa Ana, CA 92701 |

### TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  LEGAL STANDARD......................................................................................... 2

III. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS BASED ON LOS ANGELES' ALLEGED CONTAINMENT POLICY ............................................................... 3

IV.  THE PROPOSED INJUNCTION IS AGAINST THE PUBLIC INTEREST ....................................................................................................... 9

V.   CONCLUSION ................................................................................................ 17

**INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531, 542 (1987). ................................................................... 12

*Bernhardt v. Los Angeles Cty.*,
  339 F.3d 920, 931–32 (9th Cir. 2003) ................................................ 12

*Garcia v. Google, Inc.*,
  786 F.3d 733, 740 (9th Cir. 2015) ........................................................ 4

*Hernandez v. City of San Jose*,
  897 F.3d 1125 (9th Cir. 2014) ............................................................... 9

*Huffman v. County of Los Angeles*,
  147 F.3d 1054, 1061 (9th Cir. 1998) ..................................................... 9

*Johnson v. City of Seattle*,
  474 F.3d 634, 641 (9th Cir. 2007) ......................................................... 9

*Lavan v. City of Los Angeles*,
  797 F.Supp.2d 1005 (C.D. Cal. 2011) ................................................... 8

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873, 879 (9th Cir. 2009) ..................................................... 4, 5

*Munger v. City of Glasgow Police Dept.*,
  227 F.3d 1082, 1086 (9th Cir. 2000) ..................................................... 9

*Pauluk v. Savage*,
  836 F.3d 1117, 1125 (9th Cir. 2016) ..................................................... 9

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
  636 F.3d 1150, 1162–63 (9th Cir. 2011) ............................................. 12

*Santa Cruz Homeless Union v. Bernal*,
  2021 WL 222005 (N.D. Cal. Jan. 20, 2021) ....................................... 10

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7, 20 (2008) ............................................................... 4, 12, 17

**STATE CASES**

*Plunkett v. City of Lakewood*,
  44 Cal. App. 3d 344, 347 (1975) ........................................................................ 10

*Redevelopment Agency v. Herrold*,
  86 Cal. App. 3d 1024, 102 (1978) ...................................................................... 10

**STATE STATUTES**

Cal. Health & Safety Code § 33500 ...................................................................... 10

## I.     INTRODUCTION

Plaintiffs LA Alliance and eight individual plaintiffs bring this motion for an order from this Court, requiring among other things, an order requiring the City in 90 days to "clear the sidewalk, public streets, and public spaces" of Skid Row, and keep those areas free of homeless encampments by requiring the City to enforce its anti-camping ban within the roughly 50 square blocks that make up the Skid Row neighborhood.  Plaintiffs' Notice of Motion and Motion for Preliminary Injunction (Notice) at iv.  In support of its motion, Plaintiffs tell a story of containment:  a specific and concerted strategy, orchestrated by the City and potentially the County of Los Angeles for decades, to keep poor, unhoused people in the Skid Row neighborhood of Los Angeles.

But as spelled out in detail below and in the declarations of experts who have worked in and around Skid Row for decades, there has been no policy of Containment since at least the 1980s; on the contrary, the City of Los Aneles has deployed significant resources to displace unhoused and poor people living in Skid Row. Despite those efforts, unhoused people remain in the neighborhood.  Now Plaintiffs seek a court order to accomplish what they had been unable to accomplish on their own:  the removal and erasure of unhoused people from Skid Row.

In addition to failing to provide sufficient evidence to prove the existence of a widespRead policy of containment, Plaintiffs fail to meet their burden of proving that an injunction of this magnitude is in the public interest. In fact, Plaintiffs put forth no argument whatsoever why the requested relief serves the public interest, or why Plaintiffs' proposed strategy for addressing the homelessness crisis is appropriate.

Far from not being in the public interest, as laid out below and and in the declarations submitted in opposition to Plaintiffs' motion, the relief requested in this motion would significantly the thousands of unhoused residents in Skid Row

who would be subjected to the City's actions in compliance with that order.  It would replicate many of the failed policies that led to the homelessness crisis in the first place, and it would also dramatically undermine efforts to bring unhoused residents inside.  *See* Declaration of Dr. Sam Tsemberis; Declaration of Gary Blasi; Declaration of Sara Shortt; Declaration of Daniel Flaming.

Plaintiffs attempt to convince this Court to substitute their judgment for the City and the County, but there is no basis for the Court to do so in this case.  On this record, Plaintiffs have failed to establish that they are likely to succeed on the merits of their claims, nor have they cleared the incredibly high bar for an injunction of the type they are seeking here.  It would be an abuse of discretion to find that Plaintiffs are entitled to a preliminary injunction, let alone order the broad relief requested here.

## II.     LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." A party seeking a preliminary injunction must make a "clear showing" that: (1) they are "likely to succeed on the merits," (2) "likely to suffer irreparable harm"; (3) "the balance of equities tips in [their] favor"; and (4) the injunction "is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The burden of making a clear showing for each of the factors rests with the moving party. *Id.*

Mandatory injunctions that require the party enjoined to "take action" like the one sought here "go[] well beyond simply maintaining the status quo *pendente lite*" and they are "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).  When faced with a request for a mandatory injunction, the "district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting

4

*Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)).  Mandatory injunctions should not issue in "doubtful cases." *Id*. (citing *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011).

### III.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS BASED ON LOS ANGELES'S ALLEGED CONTAINMENT POLICY

In its motion, Plaintiffs bring a number of claims against the City and County of Los Angeles, based on what they allege is a failure of the City and County to address this City's homelessness crisis, and in particular, what they allege is a decades-long policy of containment, which concentrated very poor individuals into a small area of downtown Los Angeles," Brief at 7.  They assert that this policy resulted in the violation of Plaintiffs' rights, and they argue that expansive court intervention "is required because the City and County have for decades, chosen, implemented, and enforced a policy of 'Containment' in which they have concentrated PEH in Skid Row."  Brief at 4.  According to Plaintiffs, the City has continued to pursue this policy, concentrating services and therefore poor people in the 50 block area east of Downtown Los Angeles for the last 45 years.

Each of Plaintiffs' substantive legal arguments in Plaintiffs' motion for preliminary injunction rely on the existence of this policy.  The City's affirmative act of creating this policy and continuing to implement it in Skid Row is a necessary factual predicate for each of Plaintiffs' claim.  *See e.g*., Brief at 29 (alleging in support of its state-created danger theory that Defendants adopt[ed] and implement[ed] policies that have created danger to Plaintiffs and PEH); Brief at 30 (basing procedural due process claims on the City's failure to provide process related to the containment policy);  Brief at p. 31, 32 (containment policy substantial factor in creating nuisance); Brief at 34, 35. ("containment policy placed disabled PEH in dangerous conditions where they were very likely to be harmed," in violation of the Americans with Disabilities Act).

Except that this "containment strategy" has not been the City's policy in Skid Row for decades. *See* Blasi Decl., ¶¶ 18-36. While the City adopted the Central Business District Redevelopment Plan in 1976, as part of that plan, the City incorporated the "Blue Book," a proposal drafted by advocates in Skid Row, including Jeff Dietrich, who founded Intervenor LA Catholic Worker. *Id*. at ¶ 28. The plan spoke of a "containment policy;" the main purpose of the compromise was to preserve thousands of units of affordable housing east of Downtown Los Angeles, which were already concentrated in the area and as Plaintiffs admit, would have been slated for demolition without the adoption of this agreement. *Id*. at ¶¶ 28-31. As a result of the adoption of the "Containment Policy," these affordable housing units were preserved and continue to serve as an invaluable source of affordable housing for low-income residents. *Id*. On the other hand, the City's strategy of policing only around the margins of Skid Row was temporary. Homelessness continued to grow beyond the boundaries of Skid Row. Within less than ten years, the City began yet again to push for the displacement of poor people and homeless residents from Skid Row. *Id*. To do so, it used both land use strategies and the deployment of significant law enforcement resources to enforce provisions of the LAMC municipal code. In fact, it has consistently sought to do what Plaintiffs seek an order compelling the City to do here: enforce provisions of the City's municipal code in order to displace unhoused people from Skid Row.

The most salient example of that policy was the Safer Cities Initiative, which the City launched in 2006. *See id*. ¶ 22. The initiative deployed LAPD officers into Skid Row to enforce quality of life ordinances. *Id*. Far from failing to enforce its laws as Plaintiffs allege, Brief at 12, SCI resulted in the issuance of 1,000 tickets and 750 arrests in Skid Row, per month, for minor offenses like jaywalking. SCI continued for years; the deployment was renamed RESET in or around 2016 but this specialized detail of LAPD officers continues to be deployed just in Skid Row.

6

Plaintiffs themselves concede that the Containment Strategy was officially repudiated more than five years ago with the passage of a city council motion calling for the distribution of resources throughout Los Angeles. *See* Brief at 6 (citing CF 16-0046 and accompanying motion).  Since then, the City adopted a Comprehensive Homelessness Strategy and launched the A Bridge Home shelter program, which has been successful in siting shelters throughout the City's 15 council districts.[1]  The first ABH shelters have all been built outside Skid Row. In fact, only two of the 30 ABH shelters constructed on in the works has been cited in Skid Row.  Similarly, the vast majority of Proposition HHH-funded affordable units are being constructed outside the boundaries of Skid Row.

Plaintiffs also fault the City for providing services to unhoused residents of Skid Row, suggesting that the provision of these services causes unhoused people to remain in Skid Row—Plaintiffs seem to suggest that these services are a sort of "attractive nuisance."[2]  Yet the history of these services belies their argument that the services caused people to come to Skid Row, rather than were provided simply to meet the needs of the population already there (and only after significant advocacy on behalf of people in Skid Row).  In fact, one of the services mentioned by Plaintiffs is storage for people's belongings; ironically, the Central City East Association itself created the facility to address the accumulation of property in Skid Row and ran the program for many years.[3]  And of course, Plaintiffs are

---

[1] *See* "A Bridge Home," available at https://www.lamayor.org/ABridgeHome, last accessed on April 19, 2021.

[2] Plaintiffs go so far as to fault the City for providing COVID-19 vaccines in order to prevent an outbreak of COVID-19 in Skid Row.  See Brief at Notably, the most significant outbreaks of COVID-19 occurred in congregate shelters, not in homeless encampments in Skid Row.

[3] Gale Holland, "Council Oks $3.7 million for skid row cleanup, valet cart storage," Los Angeles Times, May 13, 2014, available at

simply incorrect that the City has not provides storage facilities in other parts of the City: the CCEA storage model has been replicated around Los Angeles, and the City has opened storage facilities in at least San Pedro, Echo Park, El Pueblo, and North Hollywood.  The City is in the process of opening similar facilities in Council District 8 and identifying a location for a similar facility in Council District 4.  Therefore, while the provision of these services is a far cry from what is needed city-wide to meet the needs of unhoused residents both within Skid Row and throughout the City, the existence of these facilities further illustrates that Plaintiffs' merits arguments are built on faulty premises about the City's strategies in Skid Row.

Similarly, Plaintiffs contend that the City has not provided Skid Row with the same municipal services as other areas of Los Angeles.  While the City has undoubtedly failed to provide the types of services demanded by Intervenors and unhoused residents, such as toilets and routine trash services, the City certainly has provided significant "comprehensive cleanups" that displace unhoused residents. In fact, Skid Row is one of only two locations in Los Angeles that has a dedicated team conducting cleanups of homeless encampments. Unlike the vast majority of Los Angeles, which is subjected to sporadic street cleanings, teams operate four days a week, on a two week rotation.  Operation Healthy Streets began in Skid Row following the district court ruling in *Lavan v. City of Los Angeles*, 797 F.Supp.2d 1005 (C.D. Cal. 2011), and was dramatically expanded from a week-long cleanup once every two months to a four day a week deployment in June

https://www.latimes.com/local/lanow/la-me-ln-skid-row-cleanup-20140513-story.html.

2016, following the issuance of another preliminary injunction in *Mitchell v. City of Los Angeles*, 2:16-cv-01750-SJO-JPR (C.D. Cal).[4]

Plaintiffs' solipsistic and inaccurate recitation of the history and current conditions in Skid Row undermines Plaintiffs' entire motion. The premise that the City has pursued a Containment Policy is the factual predicate for each of Plaintiffs' legal arguments in favor of the motion for a Preliminary Injunction.

For example, Plaintiffs allege that the City has created dangerous conditions in Skid Row, which gives rise to a violation of Plaintiffs' substantive due process, based on a "state created danger theory." *See e.g., Munger v. City of Glasgow Police Dept*. 227 F.3d 1082, 1086 (9th Cir. 2000) (as a general rule, members of the public have no constitutional right to sue public employees who fail to protect them against harm inflicted by third parties, but recognizing the that there is an exception where "there is affirmative conduct on the part of the state in placing the Plaintiff in danger). But while Plaintiffs overwhelmingly trade in general tropes about the "dangers of Skid Row," the only affirmative act Plaintiffs identify is the creation of the Containment Policy in 1976, and even if such a policy existed, a general land use policy is not the kind of "affirmative act" that can "create an actual, particularized danger." *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2014).[5]

---

[4] Plaintiffs argue that the *Mitchell* settlement prevented the City from enforcing provisions of Los Angeles Municipal Code in Skid Row while it remained free to enforce those provisions elsewhere. However, since April 2020, the enforcement of the so-called "bulky item provision" has been the subject of an another injunction, issued in *Garcia v. City of Los Angeles*, 2:29-cv-06182-DSF-PLA (C.D. Cal.).

[5] On the other hand, what Plaintiffs are asking the Court to order here: the City to offer "shelter" to unhoused people and then "clear sidewalks, public streets and public areas" and prohibit camping in the designated areas, would

Similarly, with regards to its procedural due process claim, the Alliance contends to that "Defendants for 40 years repeatedly taken action to concentrate PEH in unsafe areas in Skid Row." Brief at 30.  Plaintiffs' argument appears to be that the Containment Policy was "implemented without proper procedures for the people affected by it." Brief at 30.  But the Containment Policy was part of a land use policy passed more than 40 years ago.[6]  As such, their due process challenge to the containment policy is little more than a challenge to the adoption of a land use policy, dressed up as a constitutional challenge.  And as with all land use challenges, there is a strict statute of limitations, which ran in 1976. *See* Cal. Health & Safety Code § 33500 ("The adoption or amendment of a redevelopment plan, or the findings or determinations of the relevant body, made before January 1, 2011, must be challenged within 90 days of that adoption, amendment, finding, or determination").[7]

Plaintiffs also identify this Containment Policy as the substantial factor causing the nuisances that Plaintiffs allege exist in Skid Row, Brief at p. 31, 3,

---

actually be analogous to the state-created dangers prevented by the Court in *Santa Cruz Homeless Union v. Bernal*, 2021 WL 222005 (N.D. Cal. Jan. 20, 2021) (granting preliminary injunction where the City placed unhoused residents at a known risk, including where, for example, local governments forcibly removed unhoused individuals, in violation of Centers for Disease Control guidelines that prevent the displacement of people living in homeless encampments to congregate shelters or into other communities).

[6] The Containment Policy adopted in 1976 was an amendment to the Central Business District Redevelopment Plan because it placed "limitations and controls" on "all matters involving the Central Business District Redevelopment Project[.]"

[7] The purpose behind such a narrow statute of limitations is simple:  it gives agencies clarity and certainty and prevent challenges after public funds have been spent and people and businesses have been relocated. *Redevelopment Agency v. Herrold*, 86 Cal. App. 3d 1024, 1029 (1978); *Plunkett v. City of Lakewood*, 44 Cal. App. 3d 344, 347 (1975).  Quite simply, it is to prevent what Plaintiffs purport to do here:  challenge the zoning decisions adopted 45 years ago.

even though the fact that a nuisance results from a discretionary policy decision undermines Plaintiffs' argument that it is entitled to judicial intervention to abate any possible nuisance. *See Friends of H St. v City of Sacramento*, 20 Cal.App.4th 152, 165 (1993) (refusing to rule on a nuisance claim because it stemmed from a policy decision related to the use of public spaces and holding that courts lack the authority to interfere with local legislative decisions such as traffic regulation and the use of streets). Finally, the with regards to the ADA claim, the Alliance argues that the "containment policy placed disabled PEH in dangerous conditions where they were very likely to be harmed." Brief at 34. *See also* Brief at 35 (further explain that the containment policy "deliberately placed mentally ill people in an area that causes and perpetuates mental illness, and it placed substance abusers in an area replete with the illegal trafficking of dangerous and addictive drug users"). Brief at 35.

Plaintiffs rest its claims for equitable relief in this case on a theory that the City and County have affirmatively created the harsh conditions in Skid Row as a result of a specific and purposeful Containment Policy; even if there were merit to any of these arguments, the fact that the City simply has not pursued a Containment Policy in Skid Row in decades underscores the lack of evidence and legal support for Plaintiffs' request for a preliminary injunction.

## IV.    THE PROPOSED INJUNCTION IS AGAINST THE PUBLIC INTEREST

Plaintiffs spend so much time discussing the impact of the homelessness crisis and the purported Containment Policy on LA Alliance's predominately housed members, that they fail to account for the fact that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." (internal citations omitted). Even if a party proves they are likely to succeed on the merits and will suffer irreparable harm, a Court considering a request for a preliminary injunction must still "balance the competing claims of injury [and] consider the effect on each party

of the granting or withholding" of the injunction. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Likewise, Court must also weigh its impact on the public interest, which "primarily addresses impact on non-parties rather than parties." *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931–32 (9th Cir. 2003) (internal quotation marks and citation omitted) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). This requirement "embodies the Supreme Court's direction that[,] in exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

Plaintiffs barely make reference to these other factors; yet, as with all of the *Winter* factors, the burden of demonstrating that the preliminary injunction is in the public interest falls on the moving party. *Winter*, 555 U.S. at 24. That is especially true where the request would have significant and widespread implications, as it would here: Plaintiffs ask this Court to grant an incredibly broad, mandatory injunction that would require the City and County to radically re-shift their priorities and practices away from a needs-based system of care and towards a location-based model of housing, and then deploy its police force to enforce an anti-camping ordinance against some of the most vulnerable members of the community. Plaintiffs fail to put forth any argument, let alone evidence to meet its burden of showing that such a dramatic encroachment into the provenance of the City and the County is warranted, let alone why such a broad injunction is in the public interest. This alone should defeat Plaintiffs' motion. *See Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1162–63 (9th Cir. 2011)

As Intervenors' experts explain, such a wide-reaching order would not serve the public interest; in fact, just the opposite. The requested relief would have a significant negative impact not only on people living in Skid Row, but also to those people experiencing homelessness outside of Skid Row, and the community as a

whole. While housing everyone currently living in Skid Row would be a laudable goal, the order sought by Plaintiffs is not aimed at achieving that goal; instead, it will elevate form over substance, offers of shelter over real housing solutions. And in doing so, it will undermine any progress currently being made towards actually finding housing solutions for people on Skid Row and throughout Los Angeles.

First, the requested order requires the City and County to only "offer and if accepted to provide shelter or housing" to each person on Skid Row. Notice of Motion at ii. An offer of shelter may be meaningless if it does not take into account the needs and priorities of people experiencing homelessness. *See* Flaming Decl., ¶¶ 13-14 (describing research into the unique needs of people experiencing homelessness), 15-18 (research into why a person may enter into a shelter); Shortt Decl., 16-17 (describing obstacles experienced by unhoused individuals seeking shelter).

Moreover, the proposed injunction presumes that individuals on Skid Row have not been offered or have not been in shelter before; however, as many of Plaintiffs' own declarants make clear, many individuals living on the streets in Skid Row have already been offered or even had places in shelter, yet they still remain on the street. *See e.g*., Decl. of May Brannon, ¶ 4 (previously lived in a hotel but was evicted after she was unable to pay rent); Decl. of Ann Jackson, ¶ 4 (previously housed at Downtown Women's Center but left because of conditions in the shelter); Decl. of Wenzial Jarrell, ¶ 10 (offered housing options but declining because of the conditions in the shelters). As explained by Sara Shortt, the former Director of the C3 outreach program in Skid Row, most people in Skid Row have been offered shelter in the past, but because "the shelter and temporary programs [their] clients used did nto provde exits from the street and into permanent housing." Instead, they observed a "churn" effect where people were offered various short term housing programs that did not necessarily result in something permanent." Shortt Decl., ¶ 11. Instead, it perpetuated a revolving door of

13

homelessness.  *See also* Flaming Decl., ¶ 18 (the most important reason people do not enter into shelter is that programs end without other alternatives for people experiencing homelessness).

An order requiring the City and County to spend 90 days offering shelter to people living in Skid Row would replicate this "churning" effect, and the requirement of an offer of "shelter" would likely be little more than a procedural speedbump, slowing down the rush towards criminalization.  It would result in very few people ending up housed, while detracting from other interventions that are more likely to result in housing placements.  Then, after ninety days, the City would be required to begin enforcing its anti-camping ban in Skid Row, which would result in either people being arrested or displaced from Skid Row into other communities. And such disruption would have longstanding negative consequences, undermining the any attempt or opportunity to provide real housing solutions to people living on the streets. Shortt Decl., ¶ 12 (explaining that this churn effect is counterproductive); *see also* Tsemberis Decl., ¶¶ 16-20.

Even if individuals do accept an "offer of shelter or housing," the requested injunction completely ignores the cyclical nature of homelessness, and in particular, the shelter system.  In fact Plaintiffs' own declarants illustrate this: individuals routinely cycle in and out of the shelter system because the interim housing system fails to offer a path to permanence, and most people in the shelter system wind up back on the streets. Only 16 percent of individuals in the City's A Bridge Home exit into permanent housing.  The lack of permanent housing options available following a shelter stay mean that individuals routinely move from temporary shelter to the street and back into shelter.  *See* Flaming Decl., ¶ 18. Requiring the City to clear Skid Row in 90 days by offering shelter will do little to disrupt this cycle: individuals will continue to cycle out of the shelter system back onto the streets.  That that occurs, people exiting the shelter system simply will not be able to return to Skid Row.  This may result in cleaner sidewalks, but it will not

help the people who once resided in Skid Row.  In fact, it will cause even further disruption to their lives, since they will be displaced further into the community, away from existing support systems.  Tsemberis Decl., ¶ 19, 21.  They would be displaced further, which is certainly not in their interest, nor in the public interest at large.

And of course, while Plaintiffs may contend that the clearing of Skid Row could be achieved without the deployment of law enforcement, the history of Skid Row suggests otherwise.  *See* Blasi Decl., ¶¶ 16-26; Shortt Decl., ¶¶ 18-25.  Moreover, Plaintiffs' motion is predicated on a perceived failure of law enforcement to enforce the municipal code in Skid Row; the City and County would certainly be unable to ensure compliance with a court order requiring it to "clear sidewalks, public street, and public places" in Skid row, or prohibit camping throughout the pendency of the injunction without the use of law enforcement. *See* Notice at iv.  This is particularly true, given that Plaintiffs' proposed preliminary injunction presumes that "there are a fixed number of homeless people living in Skid Row, and that if they are housed, sheltered or removed from the area, the homelessness problem would be solved."  Tsemberis Decl., ¶ 18.  However, as Dr. Tsemberis explains, "thousands of people are housed in LA County each year and still the numbers increase because the front door for people to fall into homelessness-the structural housing and economic problems remain the same." *See also* Flaming, Decl. ¶¶ 10-12 (explaining that, for every individual identified in the Point in Time count, 1.96 people are homeless in a given year).  Therefore, "clearing" Skid Row will not result in a reduction in homelessness; it will simply result in a reduction of people in Skid Row.

Coupling an offer of shelter with the threat of arrest can exacerbate existing mental health and trauma responses, which as Plaintiffs concede, are endemic among people experiencing homelessness.  The negative impact of criminalization has been documented for decades and likely has contributed to the significant

15

mental health issues experienced by people living in Skid Row. *See e.g.*, Shortt Decl., ¶ 23. Moreover, an order requiring the City to enforce its anti-camping ban would increase the number of interactions between unhoused individuals and law enforcement. These interactions can quickly escalate into the use of force by law enforcement—in 2019, fully one third of all use of force incidents committed by the Los Angeles Police Department involved a person experiencing homelessness.[8] Those interactions often have fatal consequences.[9] Plaintiffs do not, nor can they provide any explanation why an order requiring the City and County to adopt a policy long-repudiated by experts on mental health, housing, and homelessness, would be in the public interest.

Finally, nothing in the proposed order requires the City and County to create new housing or even new shelter resources to provide shelter to the individuals living on Skid Row; it simply requires the City and County to offer shelter and housing to those individuals that Plaintiffs view as causing a nuisance. Such a court order would undoubtedly result in the deprioritization of thousands of people outside of Skid Row, who would not be offered shelter as a result of the Court-mandated reorientation of resources away from a need-based model and towards meeting this mandatory order.

---

[8] Los Angeles Police Department, "Use of Force Year End Review, 2019," available at http://lapd-assets.lapdonline.org/assets/pdf/2019_uof_review.pdf.

[9] *Id.* For example, in 2015, Los Angeles Police officers shot and killed Charly 'Africa' Keunang in Skid Row; the LAPD was later found liable in a civil suit brought by Mr. Keunang's family. *See* Alene Tchekmedyian, "LAPD officers are found liable in skid row shooting death of Charly 'Africa' Keunang," May 10, 2018. Also in May 2015, LAPD officers shot and killed Brandon Glen, another young Black man who was houseless in Venice. In 2019, 23 percent of all officer-involved shootings involved people experiencing homelessness.

The request for a broad, sweeping mandatory injunction requires a significant showing that such an order is in the public interest. *See Winter*, 555 U.S. at 20. The effect of an order requiring the City to offer shelter or housing to and then clear Skid Row may result in less visible homelessness within the 50 square block area of Skid Row; but it certainly cannot be said to be in the best interest of the nonparties who are displaced or the rest of Los Angeles.

## V.     CONCLUSION

For the foregoing reasons, Intervenors oppose Plaintiffs' Motion for Preliminary Injunction.

Dated: April 19, 2021          Legal Aid Foundation of Los Angeles,

By: _____/s_____
        Shayla Myers
        Attorney for Intervenors


Law Offices of Carol Sobel

By: _____/s_____
        Carol Sobel
        Attorney for Intervenors