Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
1158 26th Street, #552
Santa Monica, California  90403
Telephone: (31) 393-3055
Email:  carolsobel@aol.com

Shayla Myers (SBN 264054)
**LEGAL AID FOUNDATION**
**OF LOS ANGELES**
7000 South Broadway
Los Angeles, CA  90003
Telephone: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCONBRUN SEPLOW HARRIS**
**& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Telephone: (310) 396-0731
Email: catherine.sshhh@gmail.com

*Attorneys for Intervenors CANGRESS*
*and Los Angeles Catholic Worker*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL,. <br><br> Plaintiff(s), <br><br> v. <br><br> CITY OF LOS ANGELES, ET AL., <br><br> Defendant(s). | CASE NO. 2:20-cv-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Gary L. Blasi of Los Angeles, California, declare:

1.      I am submitting this declaration in support of Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction (PI). I make this declaration based on my personal knowledge and information I have read and come to learn in my profession, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

**BACKGROUND**

2.      I am Professor of Law Emeritus at the UCLA School of Law, where I was a faculty member from 1991 to 2012. I have a master's degree in Political Science from Harvard University and a Bachelor of Arts in Political Science from the University of Oklahoma. After an apprenticeship at the Echo Park Community Law Office in Los Angeles, I passed the California bar exam in 1976.

3.      For the past 38 years, my research, work with students, pro bono legal and consulting work, and volunteer work with nonprofit organizations has focused on homelessness, especially in Los Angeles, including the causes of homelessness and public policies and laws that contribute either to its amelioration and reduction or to its aggravation.

4.      For the eight years before joining the law faculty at UCLA, my legal practice involved the coordination of litigation and policy advocacy on behalf of homeless individuals and families in Los Angeles County. Beginning as an attorney at the Legal Aid Foundation of Los Angeles (LAFLA) in 1993, I have spent hundreds of hours in Skid Row, interviewing both housed and homeless individuals, nearly all of them single adults. During this period, I was among the lawyers who represented unhoused people living on the streets of Skid Row in litigation against the City of Los Angeles as it pursued policies and practices to

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

aggressively police the unhoused population, especially people in encampments. Also beginning in 1983, I also became deeply involved in non-litigation policy development and advocacy regarding homelessness in Skid Row and elsewhere, as a leader of the Los Angeles Coalition on the Homeless (later, the Los Angeles Coalition to End Hunger and Homelessness), Homeless Health Care Los Angeles, and the National Coalition for the Homeless.

5.    Between 1987 and 1991, I was fully occupied with managing large scale litigation on behalf of unhoused people, primarily directed against the County of Los Angeles. In that context, I was frequently in Skid Row and continued to observe policing of unhoused people.

6.    After becoming a law professor in 1991, I worked with UCLA law students in clinical course projects dealing with particular problems in Skid Row, including policing and other criminal justice issues. My work was always based on information from both observations and interviews with homeless people and others.

7.    Since 2012, I have maintained an active research and pro bono consulting practice. A true and correct copy of my curriculum vitae is set forth in Exhibit 1.

8.    I have been asked by the Intervenors in this case to provide opinions about the Plaintiffs' Motion for Preliminary Injunction. I am not being compensated for the time I spend on this case, nor is any compensation to me contingent upon my opinions or the outcome of the case. The materials I have relied upon are set forth in the footnotes of this Declaration.

**SUMMARY**

9.    The admonition attributed to Hippocrates, "First, do no harm," is generally associated with medical practice, but it has much wider application. After having been deeply involved for 38 years in responding to the long-standing

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

crisis of homelessness in Los Angeles, particularly in Skid Row, I have learned that however bad things have become, they can always be made worse.

10. For reasons detailed below, despite the emotionally compelling presentation in Plaintiffs' PI Motion, the orders they seek from this Court will make the situation in Los Angles dramatically worse. Of course, whether it would be "worse" depends on one's perspective and interest. I believe that the orders sought would, at least in the short run, improve the appearance of the streets of Skid Row and greatly increase the market value of real estate in those 50 square blocks. However, based on my experience and research, it is my opinion that the relief requested by plaintiffs would also have the unintended consequence of (1) worsening the circumstances of the unsheltered homeless in Skid Row as well as the rest of the City, and (2) degrading the quality of life of both the housed and unhoused outside Skid Row. The requested relief would thus disserve the public interest, including the interests of the 4 million residents of the City of Los Angeles and the 6 million other residents of Los Angeles County, including the hundreds of thousands of Angelenos who are either now unhoused, or will be in the coming months as the COVID-19 related limitations on evictions begin to expire on July 1, 2021.

11. First, Plaintiffs' PI Motion sometimes glosses over the difference between shelter and housing, as if these were the same. They are not. Shelter entails the provision of a place to sleep for some hours each night, generally with no guarantee of being able to return the next night, with very little privacy, stability, or autonomy and very restricted ability to maintain possessions, a pet, an intimate relationship, or social connections: things that all humans require. Housing, even the most meagre housing, has none of these limitations. Thus, for very understandable reasons, many unhoused people will go to some lengths to maintain their privacy and autonomy and refuse an offer of shelter, but not of

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

housing. When the offer of shelter is combined with the threat of arrest if they remain in an encampment, they will move to a location where they believe the risks of arrest are lower.  Plaintiffs' Motion implicitly assumes this fact, arguing that the concentration of unhoused people in Skid Row results in part from a lack of policing in Skid Row that traces to a "containment zone" policy in 1976. As I explain in some detail below, encampments on Skid Row have continued to be the subject of intensive enforcement efforts over the last 45 years.

12.    Second, it is highly unlikely that the City and/or County would provide housing rather than shelter unless specifically ordered to do the former. Hotel and motel rooms, such as those provided through Project Roomkey and utilized for some of those in the recent removal of unhoused people from Echo Park, occupy a middle ground. Although they can be utilized as housing, with the limited time of stay, addition of strict curfews and no-visitor rules and other limitation on autonomy, such as not being given a key to their own room, they share some features of shelter that cause some unhoused people to move if forced to, but remain in a tent. More practically, unless the City and County are prepared to commandeer hotel or motel rooms (for which they are unlikely to be reimbursed by the federal government because the cost is determined much later), the number of available rooms is declining as the pandemic recedes.

13.    Third, if the City and County were ordered to provide housing to individuals living in Skid Row, intensified police enforcement would likely not be necessary to move people from the streets into housing. When people living in encampments are offered housing and believe the offer, in my experience, they are highly likely to accept it without any encouragement or force from a police officer. That was, for example, the case with the "Project 50" experiment conducted by the County of Los Angeles, in which nearly 100% of those offered real housing accepted the offer.

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

14.    Enforcement would, of course, still be necessary to ensure that, following the court-ordered clearing of Skid Row, the City continued to enforce the anti-camping ban against any of the more than 25,000 individuals remaining on the streets throughout the City and County of Los Angeles, or the thousands of individuals falling into homelessness each month did not enter Skid Row, seeking the services offered by the many service provides who would remain in Skid Row.

15.    Fourth, forcing unsheltered homeless people from encampments into overcrowded congregate shelters will slow the progress we are making in ending the COVID-19 pandemic, for reasons clearly explained by the Centers for Disease Control and Prevention (CDC).

16.    Fifth, the plaintiffs are asking this Court to impose the requested remedies during a time Los Angeles is facing a large increase in evictions, especially of families who will remain unhoused and in desperate need. In May, I published a study projecting that, absent massive intervention, 365,000 households in Los Angeles County will lose their housing this year, including 558,000 children.[1] Other estimates, including those from the Aspen Institute, were higher.[2] Thankfully, there has been significant intervention by all levels of government, including a moratorium on most evictions that expires June 30, 2021. However, the effectiveness of those interventions in reducing eviction cases filed July 1, 2021 and after, is highly uncertain. The injunction sought by the plaintiffs would force the City and the County to divert resources desperately needed to keep families

---

[1] Blasi, Gary (2020), UD Day:  Impending Evictions and Homelessness in Los Angeles.  UCLA: Luskin Institute on Inequality and Democracy, May 28, 2020, available at https://escholarship.org/uc/item/2gz6c8cv.

[2] Benfer, https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk Emily et al., August 7, 2020, The COVID-19 Eviction Crisis:  an Estimated 30-40 million People in America are at Risk, Aspen Institute, available at /

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

housed in order to force people currently in encampments into shelters. The injunction would also prevent individuals who are newly homeless from camping in Skid Row, artificially cutting off an area of the City that includes a significant number of social services, as Plaintiffs outline in their Preliminary Injunction motion. The numbers of unhoused persons in tents in Skid Row may decline, but the number of encampments would increase significantly in other areas of the City and County. That result would serve some private interests, but it cannot serve the public interest.

17.     According to the narrative presented to the Court in Plaintiffs' Motion, the current state of Skid Row is in large part the product of a deliberate policy and practice of "containment" of unhoused people in Skid Row that was enacted in 1976 and continues, at least in practice, to this day. Plaintiffs claim that this policy enacted 45 years ago is responsible for the concentration of shelter, housing and services for the homeless Skid Row that has attracted unhoused people to Skid Row. Plaintiffs also claim that Skid Row has long been and is now an "enforcement-free zone." (Plaintiffs' Motion at 2). Neither of those claims is correct. I address the "enforcement free zone" claim first.

### POLICING SKID ROW AND THE CONTAINMENT POLICY

18.     Whatever the policy and practice may have been before 1983, the City abandoned any pretense of maintaining an "enforcement free zone" after the population of Skid Row began to grow dramatically in that year, primarily because of an increase in the numbers of Black men coming into Skid Row. Thousands of people, most of them Black men, have been harassed, cited, or arrested by LAPD in Skid Row since 1983. Skid Row has been and continues to be the locus of some of the most intensive and focused policing ever conducted in Los Angeles. I have first-hand knowledge of the examples cited below.

---

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

19. In May 1985, police raided the residents of an encampment known as Justiceville, a self-organized encampment of about 60 people on a vacant private lot located directly behind what has long been known as the "Hippie Kitchen" at 6th and Gladys Street.[3] Attorneys negotiated with the City and LAPD the peaceful and nonviolent arrest of the12 Justiceville residents who intended to engage in civil disobedience and refuse orders to leave the property.[4] After their displacement from Justiceville, only a few residents were able to secure shelter that was safer and cleaner than that encampment. Many moved to other encampments outside Skid Row.

20. In February 1987, the City launched a much larger series of what the Los Angeles Times called "raids" on Skid Row encampments. As that newspaper reported at the time:

> "Los Angeles city officials said Wednesday that a series of Skid Row raids, initially described as a crime sweep, are, in fact, designed to rid the area of its numerous makeshift encampments of homeless people.
> . . .
> Los Angeles Deputy Mayor Grace Davis confirmed Wednesday night that the sweep, expected to focus on 10 homeless camps during the next two months, is meant to dismantle the makeshift settlements and help their inhabitants relocate in nearby shelters.
> . . .
> [CRA President James] Wood said the impetus for the sweep came from Central City East, a business group representing about 40 companies on Skid Row that for two years have been urging City Hall to take more aggressive action against crime and to clean up the area.

[3] Because that encampment had drawn significant media attention, no unannounced raid was conducted.

[4] See, Police Arrest 12 in Shutdown of 'Justiceville', Author: Clayton, Janet: Los Angeles Times, 10 May 1985:

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

. . .

As the same time, [Central City East Director Lauri] Flack acknowledged that Central City East is not receptive to the creation of new shelters in the area of Skid Row, between San Pedro and Alameda and 3rd and 7th streets, where most of members of the association are located. The group is urging the city to adopt a community plan for the area that would make it difficult to build any more low-cost residential hotels of the kind that currently house most of Skid Row's 11,000 to 12,000 residents.

. . .

The raids have provoked the ire of several social service providers, although they have involved no arrests. They contend that the sweep is pointless and ill-timed, coinciding, they say, with a diminishing supply of affordable Skid Row hotel rooms.

. . .

The Skid Row sweep began Tuesday morning as squad cars and sanitation trucks surrounded a small enclave at 6th Street and Stanford Avenue. It resumed Wednesday, targeting two locations, including a large camp on South Towne Avenue that is regarded as one of Skid Row's more law-abiding settlements.[5]

21.    The LAPD raid on the last encampment mentioned in the story above, on Towne Avenue, resulted in litigation against the City. A Los Angeles Superior Court judge in that case issued an injunction requiring the City to provide adequate notice to those in encampments before such "street cleaning" sweeps, to allow people to move their belongings to the other side of the street. Discovery in that case also revealed that the City's actual policy was to be anything but tolerant of unhoused people in the alleged "containment" zone.

**SAFER CITIES INITIATIVE OF 2006 AND BEYOND**

---

[5] *See* Clifford, Frank, "Raids Meant to Rid Skid Row of Its Homeless Encampments," Los Angeles Times, February 19, 1987.

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

22.     At UCLA School of Law, I developed and taught a clinical seminar called Fact Investigation in Complex Settings, in which I and twelve upper class law students who were spending 20 hours per week participated in intensive fact investigations. One was focused on the conduct and effects of the "Safer Cities Initiative" that the City and LAPD launched in Skid Row in September 2006. In the course of that investigation, my students and I obtained through the Public Records Act about 15,000 pages of documents and several computer databases. We also interviewed more than 200 people. The final result was a report, *Policing Our Way Out of Homelessness? The First Year of the Safer Cities Initiative on Skid Row*, published by the Inter-University Consortium Against Homelessness in 2007.[6] As detailed in that report, the Safer Cities Initiative (SCI) demonstrated that the actual policy of the City of Los Angeles toward the unhoused in Skid Row was about as far from "tolerant" as it is possible to get, marked by a concentration of police force likely exceeded only in a war zone. As became obvious through our investigation, the principal aim of the SCI was not to "contain" unhoused people in Skid Row, but to make their lives so miserable that they would leave Skid Row and go somewhere – anywhere—else. This was achieved by flooding the 50 square blocks of Skid Row with an additional 50 uniformed officers, plus the mounted police of the Metropolitan Division, and most of the undercover narcotics officers in the City. The first year cost of just the additional 50 LAPD officers in the 0.85 square miles of Skid Row exceeded the City's general fund budget for homeless shelter and services in the remaining 465 square miles in the City.

---

[6] *Policing Our Way Out of Homelessness? The First Year of the Safer Cities Initiative on Skid Row*, (hereafter UCLA Report) available at http://www.ced.berkeley.edu/downloads/pubs/faculty/wolch_2007_report-card-policing-homelessness.pdf.

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

23.     The prelude to the Safer Cities Initiative had begun in 2003, with a dramatic increase in arrests referred to the City Attorney for violation of LAMC 41.18(d), which made it a crime to "sit, lie or sleep" in public spaces, in an obvious targeting of unhoused persons. Between January 1, 2003 and March 4, 2004, LAPD made 1,474 arrests in Skid Row for violation of this section. The increased enforcement of 41.18(d) continued.  But in April 2006, the Ninth Circuit issued its opinion *in Jones v. City of Los Angeles,* 444 F 3d. 1118, 1138 (2006). As a result, the SCI could no longer easily rely, as they had intended, on Section 41.18(d) as the primary law enforcement tool. The tool they turned to instead was novel: pedestrian violations for jaywalking or traffic signal violations, the fine for which came to $159, which would almost certainly go unpaid, resulting in the issuance of an arrest warrant. The extraordinary density of police force assigned to Skid Row and inability of homeless people to escape police monitoring by staying home, meant that the likelihood of a subsequent encounter with an LAPD officer, a warrant check, and a trip to jail was very high. During this period, residents of Skid Row were between 48 and 69 times more likely to receive a pedestrian citation than residents of the rest of Los Angeles.[7] In an area with a total population, both housed and unhoused, of about 10,000 people, in the first 10 months of operation, officers assigned to SCI issued about 1,000 citations and made about 750 arrests per month. And it did appear, at least for a time, that the visible street-dwelling population of Skid Row declined, but only as the number of unhoused people living outside the boundaries of the Safer Cities Initiative, including La Placita and Pershing Square, also increased significantly.

---

[7] UCLA Report, p. 30

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

24.     Reviewing the evidence as to the effects of the SCI, Professor Alex Vitale of Brooklyn College summarized the results of the SCI as follows: "The SCI may have succeeded in displacing people from Skid Row, but it has not reduced homelessness. In fact, it has made it more difficult for many people to escape homelessness."[8]

25.     The Safer Cities Initiative in Skid Row did not end in 2006. Indeed, it continues to this day under either that or another name. For example, in 2015, LAPD commenced large scale sweeps in Skid Row. As described in the Los Angeles Times:

> [S]kid row people said in July that they noticed new signs ordering homeless people to store or remove their property. . . . "Warning notices" went up declaring that "all lodgings need to be moved off the sidewalk." The notices, under the heading "Safer Cities Initiative," also say: "When: Every day of the week, Sunday to Saturday including holidays. Where: The sidewalks of the Skid Row Area."[9]

26.     Police sweeps of encampments, both in Skid Row and elsewhere, have never stopped, although they have been limited to constitutional means by federal courts. Subject to those constraints, encampment sweeps have continued across the City, including Skid Row. Those constraints, however, come from the United States Constitution and not the "Containment Policy" of 1976.

---

[8] Alex S Vitale, 'The Safer Cities Initiative and the Removal of the Homeless: Reducing Crime or Promoting Gentrification on Los Angeles' Skid Row' (2010) *9 Criminology &Pub Pol'y* 867, 869.

[9] Gale Holland, "Homeless sweeps increasing?; LAPD says they're not, but advocates for homeless on skid row say otherwise," *Los Angeles Times*, Aug. 23, 2015, B3.

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**THE CONTAINMENT POLICY AND THE CONCENTRATION OF SERVICES IN SKID ROW**

27.     Plaintiffs' Motion asserts that the other major component of the "containment" policy is the City and County's unwarranted concentration of shelter, housing, services, and "amenities" in Skid Row. That concentration exists, but the causes of concentration are the reverse of those asserted by plaintiffs. The concentration of housing for the extremely poor in Skid Row, as compared to the rest of the City, is primarily the consequence of development history of Los Angeles dating back at least 100 years, long before the "containment policy," when private developers built a large number of low-cost SRO (single resident occupancy) hotels to rent to very low income people, primarily white men, who survived by means of day labor available in the area and, beginning in the 1930's, subsistence payments from General Relief from the County.

28.     The development future of Skid Row became a major issue in Los Angeles after the re-development of Bunker Hill, which displaced about 15,000 low-income renters. The goal of advocates for the extremely poor was to see that that destruction of cheap housing was not repeated in Skid Row.  The business and political elite looked east to Skid Row and saw not only an unpleasantness that was "too close" to the new development on Bunker Hill, but also the location of land on which to extend further development. Charles F. Elsesser of LAFLA, Jeff Dietrich of Intervenor Los Angeles Catholic Worker, and others looked at Skid Row and saw housing for which there was a desperate need.  The intervention of advocates for the unhoused, including those at LAFLA and the Los Angeles Catholic Worker, prevented the primary source of actual housing for the very poor in Skid Row - the SRO's - would have been demolished, as happened in virtually every other major city in the United States. The 1976 plan resulted from an

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

agreement that advocates and lawyers for the extremely poor would not obstruct further redevelopment to the east of Bunker Hill, provided the City and its Community Redevelopment Agency (CRA) would not demolish the SRO housing stock in Skid Row and would also support the creation of a non-profit, SRO Housing, Inc, that would rehabilitate some of the SRO's. Another non-profit, Skid Row Housing Trust, Inc., was later created by some of the same advocates out of frustration with the efforts of the CRA in this regard. Together, SRO Housing and Skid Row Housing Trust rehabilitated and still operate thousands of units of housing in Skid Row.

29.    The people who live in that housing are not homeless and are certainly not in encampments, either in Skid Row or anywhere else in the City. They are in housing in Skid Row, not because of a policy of "containment" but because the housing was already in place and full of people who would otherwise be homeless, and because the City and advocates agreed to preserve what housing stock for the extremely poor was already in Skid Row. Today, despite the often appalling appearance on its streets, Skid Row is a community with many long term residents in the SRO housing that was saved. While the City can certainly be criticized for its ineffectiveness in producing more interim and low-cost housing outside Skid Row, those failures have not been the result of the asserted containment policy. Those failures cannot be remedied by excluding housing from Skid Row.

30.    Beyond the SRO hotels, the largest private providers of shelter and temporary housing in Skid Row are the religiously affiliated missions that were also located in Skid Row long before 1976. The largest of these missions, the Union Rescue Mission (URM), was founded in 1891 near Second Street and Main Street, just outside the semi-official boundaries of Skid Row. It is true that URM was paid $6.5 million by the City's Community Redevelopment Agency (CRA) in to relocate in 1991 to its current location deeper into the heart of Skid Row, but all

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

the other missions were already there. The homelessness problem in Los Angeles would be far worse today if not for the bargain that was struck in 1976, leaving in place both the SRO housing and the missions.

31.     As for services for the unhoused in Skid Row, they have historically been located in Skid Row because that was where the need was located. For example, at least since the 1930's the only "safety net" program available to single adults without children has been General Relief. The largest concentration of people eligible for General Relief was for decades was located in Skid Row. For decades the processing of applications for General Relief were accepted at what was known as the Unattached Men's Center, at 811 E. 4th Place. The same work is still done at the same location in 2021, in what is now the Civic Center office of the County's Department of Public Social Services (DPSS). The welfare office was located there, and homeless men referred there, because of the concentration of potentially eligible people in the area and because the County provided temporary shelter to homeless people by giving them vouchers to use at the only hotels which would accept them, the SRO hotels in Skid Row.

32.     When I and others first sued the County about the General Relief program in 1983, those vouchers were worth $8.00 and successful applicants received $221 per month, which was enough to rent a room in Skid Row at the time. Unfortunately, the County's General Relief program still provides exactly the same dollar amount, $221 per month. That fact has far more to do with the numbers of homeless people on the streets of Skid Row than does the maintenance of the DPSS office on 4th Place for at least the past 50 years.

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed this 19th day of April 2021, at Los Angeles, California.

_____
Professor Gary L. Blasi

**DECLARATION OF PROFESSOR EMERITUS GARY L. BLASI IN SUPPORT OF INTERVENORS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Exhibit 1

April 2021

**Gary L. Blasi**

Professor of Law Emeritus

UCLA School of Law
385 Charles E. Young Dr. East
Los Angeles, CA  90095
(213) 304-4502
blasi@law.ucla.edu

Education & Certification

M.A., Harvard University, Political Science, 1969
B.A., University of Oklahoma, Political Science 1966
California bar exam, passed 1976

Fields of Specialization

Teaching: clinical teaching, public interest

Research: The causes of homelessness and how those causes are understood by researchers, policymakers, and the public, with a particular focus on the role of race in such attributions. Research also examines public policy, advocacy, and legal system engagement with homelessness. Extensive research regarding homelessness and responses to homelessness in Los Angeles. Research regarding factors contributing to extreme poverty and homelessness, including substandard K-12 school, employment discrimination, and implicit bias.

Employment

UCLA School of Law, 1991- (Emeritus, 2012)
Opportunity Under Law Initiative at the Public Counsel Law Center, Special Counsel, 2014-
Western Center on Law and Poverty, Of Counsel, 2015-2020
Stanford Law School, Visiting Professor of Law, 2002-2003
Legal Aid Foundation of Los Angeles, 1978-1991
  - Director, Homelessness Litigation Unit, 1984-1991
  - Co-Director, Eviction Defense Center, 1983-1984
  - Staff Attorney, 1978-1983
Partner, Smith, Blasi, Honig, Yavenditti and Smith, 1976-1978
Echo Park Community Law Office, Los Angeles, Apprentice and Law Clerk, 1971-1976

Other Current Experience

Housing Works, Board Member, 2015-, Vice President, 2019-

1

April 2021

Pathways Housing First Institute, Founding Member and Board Officer (Secretary), 2019-
Economic Roundtable, Board Member, 2018-

## Other Past Experience

UCLA Institute for Research on Labor and Employment, Acting Director, 2006-2007

~40 years of leadership positions in nonprofit organizations addressing homelessness and extreme poverty, including:
- National Coalition for the Homeless, President
- Homeless Health Care Los Angeles, President
- Los Angeles Coalition to End Hunger and Homelessness, President
- Comic Relief, Founding Board Member and Treasurer
- Vets Advocacy, Inc., Founding Board Member

## Awards & Fellowships

Earl Johnson Equal Justice Award, Western Center on Law and Poverty, 2016
California Lawyer of the Year, Public Interest (on behalf of homeless military veterans), 2016
California Lawyer of the Year, Public Interest (on behalf of homeless and indigent welfare recipients), 2015
Loren Miller Legal Services Award from the State Bar of California, 2013
Humanitarian Award, American Civil Liberties Union (ACLU) of Southern California, 2012
Graduate Prize Fellow, Harvard University
Woodrow Wilson Fellow, Harvard University
Carl Albert Award, University of Oklahoma
Lottinville Prize, University of Oklahoma

## Publications

### *Books*

Grading the School Accountability Report Card (with Neil Peretz, Andrea Luquetta and Gabriel Baca). UCLA/IDEA (2005).

### *Articles & Book Chapters*

*Housing Justice in the Time of COVID-19*, UCLA Luskin Institute on Inequality and Democracy (3-part report)

- *For the Crisis Yet to Come: Temporary Settlements in the Era of Evictions* (with Hilary Malson), July 21, 2020.

2

- *Hotel California: Housing the Crisis* (with Ananya Roy, Jonny Coleman, and Elana Eden), July 7, 2020.

- *UD Day: Impending Evictions and Homelessness in Los Angeles,* May 28, 2020.

System Justification Theory and Research: Implications for Law, Legal Advocacy, and Social Justice (with Jon Jost), in *Ideology, Psychology, and Law*, (edited by Jon Hanson, Oxford University Press, 2011).

Are Ideal Litigators White? Measuring the Myth of Colorblindness (with Nilanjana Dasgupta, Kumar Yogeeswaran, & Jerry Kang), 7 *Journal of Empirical Legal Studies* 886-915 (2010).

Do Antidiscrimination Regimes Discriminate? Processing Claims through Administrative and Legal 'Pyramids' and the Role of the Plaintiffs' Bar: A California Case Study (with Joseph W. Doherty), *UCLA School of Law Research Paper No. 10-25, 5th Annual Conference on Empirical Legal Studies Paper* (July 16, 2010).

The Los Angeles Taxi Workers Alliance (with Jackie Leavitt), in *Working for Justice: The L.A. Model of Organizing and Advocacy*, (edited by Ruth Milkman, Joshua Bloom and Victor Narro, Cornell University Press, 2010).

California Employment Discrimination Law and Its Enforcement: The Fair Employment and Housing Act at 50 (with Joseph Doherty), *UCLA School of Law Research Paper No. 10-06* (2010).

Framing Access to Justice: Beyond Perceived Justice for Individuals, 42 *Loyola Los Angeles Law Review* 913-48 (2009).

Lawyers, Clients and the "Third Person in the Room", 56 *UCLA Law Review Discourses* 1 (2008).

Grassroots Organizing, Social Movements, and the Right to High Quality Education (with Jeannie Oakes, John Rogers, and Martin Lipton), *Stanford Journal of Civil Rights and Civil Liberties* 339 (2008).

Default Discrimination: Law, Science, and Unintended Discrimination in the New Workplace, in *Behavioral Analyses of Workplace Discrimination*, (edited by G. Mitu Gulati and Michael Yelnosky, Kluwer, 2007).

System Justification Theory and Research: Implications for Law, Legal Advocacy, and Social Justice (with John T. Jost), 94 *California Law Review* 1119-68 (2006).

3

April 2021

Accountability for Adequate and Equitable Opportunities to Learn (with Jeannie Oakes and John Rogers), in *Holding Accountability Accountable: What Ought to Matter in Public Education*, (edited by Ken Sirotnick, Teachers College Press, 2004).

Fifty Years after Brown v. Board: Five Principles for Moving Ahead, 19 *Berkeley Women's Law Journal* 443-51 (2004). Reprinted in 15 *Berkeley La Raza Law Journal* 115-23 (2004); 2 *Asian Law Journal* 324 (2004); and 6 *African-American Law and Policy Report* 242 (2004).

How Much Access? How Much Justice?, 73 *Fordham Law Review* 865-81.

Advocacy Against the Stereotype: Lessons from Cognitive Psychology, 49 *UCLA Law Review* 1241-81 (2002). Reprinted in 18 *Civil Rights Litigation and Attorney Fees Annual Handbook* (edited by Steven Saltzman et. al., Clark Boardman Callaghan, 2002).

Reforming Educational Accountability, in *California Policy Options 2002*, (UCLA Anderson Forecast and UCLA School of Public Policy and Social Research, 2002).

Implementation of AB633: A Preliminary Assessment, A report for a Joint Committee of the Legislature, (2001).

Advocacy and Attribution: Shaping and Responding to Perceptions of the Causes of Homelessness, in 19 *St. Louis University Public Law Forum*, 207 (2000). Reprinted in *Representing the Poor and Homeless: Innovations in Advocacy* (edited by Sidney D. Watson, American Bar Association, Commission on Homelessness & Poverty, 2001). Reprinted in Race, Law and Society (edited by Ian Haney Lopez, 2017).

Creating a Program in Public Interest Law and Policy at a Public Law School: The UCLA Experiment, in *Educating for Justice: Social Values and Legal Education*, (edited by Jeremy Cooper and Louise Trubek, Dartmouth Press, 1997). Reissued 2018 by Routledge.

Teaching Lawyering as an Intellectual Project, 14 *Journal of Professional Legal Education* 65-75 (1997).

What Lawyers Know: Lawyering Expertise, Cognitive Science, and the Functions of Theory, 45 *Journal of Legal Education* 313-97 (1995).

And We Are Not Seen: Ideological and Political Barriers to Understanding Homelessness, 37 (4) *American Behavioral Scientist* 563-86 (1994).

What's a Theory For? Notes on Reconstructing Poverty Law Scholarship, 48 *University of Miami Law Review* 1063-97 (1994).

The "Homeless Seminar" at UCLA, 42 *Washington University Journal of Urban & Contemporary Law* 85-99 (1992).

April 2021

Litigation on Behalf of the Homeless (with James Preis), in *Homelessness: A National Perspective*, 309-21 (edited by Marjorie Robertson and Milton Greenblatt, Plenum, 1992). Reprinted in Homelessness A National Perspective (edited by Marjorie J. Robertson, Milton Greenblatt, 2013).

The Role of Legal Aid Organizations, in *Helping Homeless People, in Homelessness: A Prevention-Oriented Approach*, 299-308 (edited by Rene I. Jahiel, Johns Hopkins, 1992).

Governance, Program Control, and Authority (with Armand H. Levin et al.), in *Under the Safety Net: The Health and Social Welfare of the Homeless in the United States*, 263-74 (edited by Philip W. Brickner, Norton, 1990).

Social Policy and Social Science Research on Homelessness, 46 *Journal of Social Issues* 207-19 (1990).

Litigation Strategies for Addressing Bureaucratic Disentitlement, 16 *NYU Review of Law & Social Change* 591-603 (1988). Reprinted in 366 P*LI/LIT* 285 (1988).

Litigation on Behalf of the Homeless: Systematic Approaches, 31 *Washington University Journal of Urban & Contemporary Law* 137-42 (1987). Reprinted in 331 *PLI/LIT* 173 (1987).

Database Programs and Litigation Support, *Advocates Computer News* (Mar.-Apr. 1986).

Litigation Concerning Homeless People, 4 *St. Louis University Public Law Forum* 433-43 (1985).

The Case of the Unsued Tenant: Arrieta v. Mahon, 1 *California Real Property Law Journal* 27 (1983).


*Other Publications*

Legal Right to Shelter, *Los Angeles Lawyer*, Vol. 42. Issue 9, (December 2019), pp. 30-35.

2008 Report Card on Homelessness in Los Angeles. With Inter-University Consortium Against Homelessness (2008).

Did the Safer Cities Initiative in Skid Row Reduce Serious Crime? (with Forrest Stuart), *Research Report* (2008).

L.A.'s Homeless: A Progress Report (with Jennifer Wolch and Michael Dear), *Los Angeles Times* (June 22, 2008).

Stuck on Skid Row (with Philip F. Mangano), *Los Angeles Times* (October 29, 2007).

April 2021

Policing Our Way Out of Homelessness? The First Year of the Safer Cities Initiative on Skid Row, *Inter-University Consortium Against Homelessness* (2007)

Ending Homelessness in Los Angeles. With Inter-University Consortium Against Homelessness. (2007) and *A Reality-Based Approach to Ending Homelessness in Los Angeles*, January 30, 2007.

Five Steps to Get Out of Skid Row (with Michael Dear and Jennifer Wolch), *Los Angeles Times* (December 21, 2006).

Driving Poor: Taxi Drivers and the Regulation of the Taxi Industry in Los Angeles (with Jacqueline Leavitt), *Institute for Research on Labor and Employment* (2006).

The Trouble with the State's Exit Exam, *Sacramento Bee* (June 13, 2005).

8 Mile, *UCLA Magazine* 25-26 (Spring, 2004).

Far Along Yet Far From Equal, *Los Angeles Times* (January 11, 2004).

Evaluation of the Van Nuys Legal Self-Help Center Final Report (with UCLA Law School Empirical Research Group) (2001-02).

Let Jurors Complain and Courts Listen, *Los Angeles Times* (July 22, 2001).

If You've Seen Slums, You Know A Lot About Our Schools, *Los Angeles Times* at B9 (May 19, 2000).

Bill Smith: In Memoriam, 56 *National Law Guild Practitioner* 185-189 (2000).

Slum Conditions Affect All of Us, *Los Angeles Times* at B7 (Feb. 10, 1999).