Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Telephone: (31) 393-3055
Email:   carolsobel@aol.com

Shayla Myers (SBN 264054)
**LEGAL AID FOUNDATION OF LOS ANGELES**
7000 South Broadway
Los Angeles, CA  90003
Telephone: (213) 640-3983
Email:   smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCONBRUN SEPLOW HARRIS & HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA  90064
Telephone: (310) 396-0731
Email: catherine.sshhh@gmail.com

*Attorneys for Intervenors CANGRESS and Los Angeles Catholic Worker*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL,. <br><br> Plaintiff(s), <br><br> v. <br><br> CITY OF LOS ANGELES, ET AL., <br><br> Defendant(s). | CASE NO. 2:20-cv-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Complaint Filed: March 10, 2020 |

## DECLARATION OF SARA SHORTT, M.S.W.

DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION
FOR PRELIMINARY INJUNCTION

I, Sara Shortt, M.S.W., state and declare as follows:

1. I make this declaration based on my personal knowledge as well as information I have read and come to learn in my profession, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to the facts below in a court of law.

2. I have been retained by counsel for Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker to provide a declaration regarding the propriety and effectiveness of the proposed Preliminary Injunction sought by Plaintiffs in *LA Alliance for Human Rights, et al. V. City of Los Angeles*, CV-02291 DOC-KES. In preparation for the statements and opinions contained in my declaration, I reviewed Plaintiff's Notice of Motion and Motion for Preliminary Injunction in the above-referenced case, and the accompanying declarations submitted in support of the motion.

3. I received a Bachelor of Arts degree in Sociology from Lewis and Clark College in Portland, Oregon in 1992, then spent seven years working as a professional tenant organizer and community activist before obtaining my Master's in Social Work from San Francisco State University in 2002. I then spent more than two years as the Director of the Subsidized Housing Counseling Program at the Housing Rights Committee of San Francisco before assuming the position of the Committee's Executive Director, a position I held through December 2015.

4. I have received numerous recognitions and awards from community organizations advocating for housing rights; honors from the San Francisco Board of Supervisors for the work I have done in my field; and in 2009 received the Housing Justice Award from the National Housing Law Project. I also have been published in the L.A. Times and profiled in the San Francisco Chronicle.

5. Currently, I serve as Director of Public Policy and Community Organizing at Community Housing Partnership, a supportive housing provider that houses over 1,500 formerly homeless residents of the County of Los Angeles.

6. From 2016 to 2018, I served as director of the C3 (City, County, Community) program developed by The People Concern. The program was comprised of 24 staff divided

into multi-disciplinary teams providing services in LA's Skid Row neighborhood.  Staff included RNs, mental health clinicians, substance use counselors, and peer outreach workers provided by LAHSA, DMH, DHS, BHS and AmeriCorp.

*Scope and necessity of Skid Row services*

7.    The C3 program was an intensive outreach effort by qualified and credentialed experts, along with peers who have lived experience with homelessness.  Through the program, outreach was provided daily (Monday through Friday) to people experiencing homelessness on the streets on Skid Row. At the time I administered the program, there were 4 teams of 6 workers that each covered one "quadrant" of Skid Row.  Teams were able to become intimately familiar with their area and due to the consistent, daily field outreach they were well known and easily recognized by prospective clients.

8.    The program was an evidence-based, best practices model.  An unprecedented amount of resources were on the table, backed by strong government and community support and staffing that brought a high level of skills, experience, credentials, training and expertise. The C3 model was positioned to provide highly effective outreach outcomes due, in part, to the following:

a.    Multi-disciplinary teams of staff able to address an array of needs including not just housing but mental health, substance use, and other medical matters;

b.    Cooperation of City and County agencies, who could facilitate access to government resources, services and programs;

c.    Intensive focus on outreach to residents of Skid Row living outside, for the specific purpose of getting people into housing, sending staff onto the streets every day to work a small area of "turf" and truly get to know their clients and their needs;

d.    Time investment and physical access to Skid Row residents: C3 was unique in the world of outreach because it was able to take numerous repeated engagements over time to build trust with clients and reliably assess their needs. The fact that C3 staff could be persistent and provide continuous ongoing engagement with individuals greatly increased the

**DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

chances of getting them indoors.  The relatively fixed locations of tents and encampments also meant that people could be easily found and contacted.  Such reliable access is necessary for staff because there are multiple steps over time to the process of getting clients housed.

8.      As a result of the intensive engagement and connection with our clients in Skid Row, the C3 outreach teams were able to effectively move a number of people into permanent housing.  This type of outreach took time, but when we could place a person in a permanent situation, it ultimately meant they had a greater chance of staying housed.  We frequently placed people in housing throughout Los Angeles, not just in the Skid Row area.

9.      As the former director of a program that was equipped to deliver the most successful results in homeless outreach on Skid Row, I have many doubts about the efficacy of the Plaintiffs' proposed injunctive plan to move all homeless residents on Skid Row into housing or shelter within 90 days. I also have grave concerns about the consequences of the proposed enforcement measures.

10.      In my experience, most Skid row tent dwellers have already been offered, or already used, the same services proposed in the plan, yet we have not seen a major reduction of tents on Skid Row. The plan relies on an assumption that the simple answer to getting people housed is just to offer them services.  However, a significant portion of those living on the streets of Skid Row are not there because they have never interfaced with the homeless response system. In fact, many are there even though they already have, or even because of their interaction with housing and shelter programs in the past.  Through our own interviews with clients or when reviewing a client's history in the County's Homeless Management Information System (HMIS)[1] we very often found that they had utilized services in the past.  The clients were back out on the streets because those housing services (primarily either shelters or interim

[1]HMIS, an electronic system run by the Los Angeles Homeless Services Authority, tracks registered individuals who are experiencing or have experienced homelessness to facilitate consistent, holistic provision of services.  The system logs interactions logs services provided and interactions with service providers such as C3.

**DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

housing) were temporary, due to the well-documented shortage of permanent affordable housing available to those in extreme poverty,

11. Even were housing availability not a problem, the shelter and temporary housing programs our clients used did not provide exits from the streets and into permanent housing. What we observed was a "churn" effect where people were offered various short term housing programs that did not necessarily result in something permanent.

12. Short-term housing programs were not just ineffective; they were counter-productive. The "revolving-door" process that put the unhoused back out onto the streets after short-term housing expired posed an obstacle to inspiring interest in potential clients. People either knew firsthand, or from others around them, that after a month or two on a cot in a shelter, they would likely find themselves back out on the street. They did not feel it was worth it to leave the streets, just to return again shortly.

13. People aren't camped on Skid Row because they have not been offered shelter slots before. Shelter slots and short-term housing do not solve their problems. It is therefore wrong to assume that barraging the area with offers of shelter will lead to a significant decrease in tents.

14. It should also be noted that even within the proposed 90-day injunctive period, even many who might have accepted offers will have concluded their housing term and thus be back out on the streets by the time enforcement begins.

### *Availability and accessibility of shelter beds and housing*

15. Of course, we found that there are a portion of Skid Row tent residents who would be very happy to accept offers of shelters and temporary housing. We did our best to seek those people out and work aggressively to get them connected to a resource. We found it frequently very frustrating, however, since there simply were not enough resources available to all those who wanted them. Slots in shelters were limited and it was even more challenging to find a bed in interim housing. We were very often in a position of turning people away when they sought housing resources, or at least telling them they had to wait.

DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

16.     Even when beds were available, eligibility criteria and other barriers to admission posed further problems for getting people into these programs.  It was not as simple as matching a bed to a person in need.  For instance, sometimes a client would not have an ID, or needed a TB test. Other times they were missing necessary medical history documents or mental health records. And this was in the best of worlds.  C3 worked with some of the lowest-barrier programs and had the support and cooperation of government agencies who ran the relevant housing programs.

17.     Given my experience, it is hard to imagine an ability to provide housing and actually move in the thousands of people living on Skid Row's streets within 3 months.  It would take a very serious expansion of resources, a rapid development of housing programs, and an overhaul of eligibility and admissions policies and requirements to even come close to housing just the slice of people who are willing and ready to work with outreach workers.

*Consequences of criminalization*

18.     Based on my experience working in Skid Row and my other experience working with people to obtain housing, the biggest concern I have about Plaintiffs' proposed injunction is the provision that would require the City to enforce an anti-camping ban in Skid Row after all individuals in Skid Row have been offered housing.  Individuals who are displaced from Skid Row will almost certainly lose connection with services and providers in Skid Row.  This will make it far more difficult to keep in contact with a person to identify a housing opportunity that may be available for our client.

19.     The use of enforcement to shut out people from camping in Skid Row raises other concerns in terms of the impact of this kind of enforcement would have in terms of outreach workers' ability to house people living on Skid Row.  At C3, I witnessed two key ways in which interactions with the criminal justice system generally undermined people's chances to become housed, and lengthened their stay on the streets of Skid Row.

20.     Firstly, our teams came across people every day who had become homeless and were unable to leave the streets due to the fact that they had criminal records.  They were living

**DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

in tents, some for many years, because they were unable to obtain gainful employment that paid enough to afford rent in Los Angeles. Additionally, clients were denied assistance from housing programs due to arrests or convictions on their records.  If the goal is to get people out of homelessness, ticketing, citations and arrests will make it nearly impossible.

21.     Secondly, in countless cases we observed our clients receiving various "quality of life" citations while they were living on the streets.  These citations derailed our ability to get them housed.  Even if individuals were not arrested for the citations, they would frequently not know about court dates, lose their tickets in encampment cleanups, or in the elements, and they would miss their court dates.  When that would happen, the Court would issue a warrant for failure to appear, and often, our clients would be arrested because of those warrants.  In other instances, since people could not afford to pay the fines associated with the citations, courts would issue warrants that ended in jail time and criminal records for our clients. The records would then appear on background checks for housing and put them out of the running for available units.

22.     Another way our ability to house people was undermined was when important paperwork would be lost during sweeps or arrests (such as birth certificates or IDs), which were necessary to get into a housing unit.  Clients may have made it close to the end of a long process to get into a unit, only to have to go back to the end of line since they did not have their documents.

23.     Tickets, citations and sweeps are entirely antithetical to the goal of housing homeless people.  Simply put, the more our clients interfaced with law enforcement, the harder it became to house them.

24.     Huge numbers of people are living on the streets of Skid Row for the very reason that they have experienced law enforcement in the past. To believe that a plan that results in increased law enforcement interactions is to ignore this fact.

25.     From my experience, the proposed plan creates a situation where we set people up for failure and then penalize them when they fail.  Based on history, evidence, and experience, it is simply wrong to expect that 2,000 people can be housed from Skid Row in 90 days. This is an

**DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

impossible goal and should not be used as a threshold justifying the use of law enforcement in removing people's homes. If the ultimate goal is to end homelessness on Skid Row, this plan will not only be ineffective; it will produce the opposite effect.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 19, 2021, at Los Angeles, California.

Sara Shortt, M.S.W.

**DECLARATION OF SARA SHORTT IN SUPPORT OF INTERVENOR'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**