1   Carol A. Sobel (SBN 84483)
    **LAW OFFICE OF CAROL A. SOBEL**
2   1158 26ᵗʰ Street, #552
    Santa Monica, California  90403
3   Telephone: (31) 393-3055
    Email:  carolsobel@aol.com
4
5   Shayla Myers (SBN 264054)        Catherine Sweetser (SBN 271142)
    **LEGAL AID FOUNDATION**         **SCONBRUN SEPLOW HARRIS**
    **OF LOS ANGELES**               **& HOFFMAN, LLP**
6   7000 South Broadway              11543 W. Olympic Blvd.
    Los Angeles, CA  90003           Los Angeles, CA  90064
7   Telephone: (213) 640-3983        Telephone: (310) 396-0731
    Email: smyers@lafla.org          Email: catherine.sshhh@gmail.com
8
9   *Attorneys for Intervenors CANGRESS*
10  *and Los Angeles Catholic Worker*

11

12                    **UNITED STATES DISTRICT COURT**

13          **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

14

15

16  LA ALLIANCE FOR HUMAN          )   CASE NO. 2:20-cv-02291-DOC-KES
17  RIGHTS, ET AL,.                )
                                   )   Assigned to Judge David O. Carter
18                                 )
19              Plaintiff(s),      )
                                   )
20        v.                       )   **DECLARATION OF DANIEL**
                                   )   **FLAMING IN SUPPORT OF**
21  CITY OF LOS ANGELES, ET AL.,   )   **INTERVENORS' OPPOSITION**
                                   )   **TO PLAINTIFFS' MOTION FOR**
22                                 )   **PRELIMINARY INJUNCTION**
23              Defendant(s).      )   **AND EXHIBITS A-D**
                                   )
24                                 )
25                                 )
26                                 )
27                                 )
28                                 )

---

I, DANIEL FLAMING, declare:

1.  I am the President of the Economic Roundtable.  I have personal knowledge of the facts set forth below and, if called to testify to these facts, I could and would do so competently.

2.  The Economic Roundtable is a nonprofit urban research organization that creates *knowledge for the common good*. Our mission is to conduct research and implement programs that contribute to the sustainability of individuals and communities. The guiding values for carrying out our mission are:

    a.   *Knowledge:* Develop information as a force for systemic change and public good.

    b.   *Social Initiative:* Act to end unfair situations and empower marginalized and vulnerable individuals to live better lives.

    c.   *Open Access:* Provide immediate, free access to information without barriers.

    d.   *Stewardship:* Ensure that the public benefits from the resources available to and created by the Roundtable.

    e.   *Independence:* Act based on principles, mission and values.

3.  The Economic Roundtable carries out large-scale data analyses to identify actionable solutions to crucial social, economic and environmental problems facing communities, including affordable housing policy and homelessness. Our research findings are made available to public policy makers, affected communities and the general public.

4.  I have been with the Economic Roundtable since its inception.  From 1983 to 1991, the Economic Roundtable was a research group within Los Angeles County government. In 1991, the Board of Supervisors unanimously endorsed converting the Economic Roundtable into an independent research organization to work on social and economic problems. All of the Roundtable's work is linked to building a sustainable economy and inclusive communities.

5.  The Economic Roundtable maintains a website where its reports may be accessed.  The URL is economicrt.org

6.  My declaration addresses several areas of research by the Economic Roundtable that are relevant to the issues now before the Court.  These include:  1) the difficulty of accurately counting homeless residents; 2) the gap between point-in-time homeless counts and the annual number of individuals who experience homelessness; 3) the diversity of needs among homeless residents; and 4) explanations given by unsheltered residents of Skid Row for why they chose not to be in a shelter. What we have learned is summarized here and the full reports are attached.

### *Counting Homeless Residents*:

7.  The Economic Roundtable analyzed the accuracy of the annual homeless counts carried out by the Los Angeles Homeless Services Authority ("LAHSA") from 2007 through 2017 in a report titled, "*Who Counts: Assessing Accuracy of L.A.'s Homeless Count*."  The Report was issued in November, 2017.  I am a co-author of the Report.  A true and correct copy of the Report is submitted with my declaration at Exhibit A.

8.  The Report found that this effort, which is planned year-round, drawing on hundreds of staff and thousands of volunteers, produces estimates of the number of homeless residents and their attributes that have large

measurement errors. The count data is not reliable enough to be used for comparing the number or population composition of homeless residents from different years.

9. The relevant point is that it is very difficult to accurately count people who do not have fixed dwelling places, who may seek invisibility, and are off of the "data grid."  Consequently, using the count data to formulate a threshold point at which government officials could enforce criminal laws for people experiencing homelessness in public places – i.e., 60% of the Point-in-Time number "sheltered" – would set a level that is significantly below the actual number of people who are unhoused in Los Angeles at any one time and over the course of the year.  In addition, LAHSA's Point-in-Time results for 2019 and 2020 calculated annual increases of slightly more than 12 and 14 percent, respectively, of the number of people experiencing homelessness in the City of Los Angeles.  Given the number of individuals included as unhoused in the annual January count, this percentage translates to several thousand more individuals living on the streets each year.

### Gap between Point-in-Time and Annual Homeless Counts

10. Reliable estimates of the number of people who are homeless during a year and the amount of time that they spend homeless are important for evidence-based intervention. In the case of housing, the resource being allocated is static – beds and rooms in buildings – but the population is cumulative.

11. Our statistical model for converting the number of people who are homeless on a single night into the number of people who are homeless over the course of a year is described in a report titled, "*Estimating the Annual Size of the Homeless Population in Los Angeles Using Point-In-Time Data*."  This Report was issued in 2018.  A true and correct copy of the Report is submitted with my declaration at Exhibit B.  Although I am not a co-author

---

**DECLARATION OF DANIEL FLAMING IN SUPPORT OF INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

of this Report, in my role as president of the Economic Roundtable, I
reviewed the Report prior to its publication.

12. Two key findings in the Report support the proposition that the annual
homeless count is, as it describes, only a point in time and does not fully
capture the total number of individuals who will experience homelessness
throughout the year.   The first finding is that that for every homeless person
on a given night, 1.96 people are homeless over the course of a year.  The
second finding is that individuals spend an average of 7.1 months homeless
over the course of a year. This means that each homeless person in a point-
in-time count represents a need for 13.9 months of housing during the year.
On a given night, about half of the people experiencing homelessness have
been homeless for over a year. However, our model suggests that group only
accounts for a third of the annualized population. On the other hand, it is
likely that a quarter of the annualized population was homeless for only two
months or less.  As noted above, while the number of individuals
experiencing homeless at any one time varies greatly, the available shelter
beds are static.

### *Diversity of Needs among Homeless Residents*

13. Our research has also documented the wide diversity among people who are
dwelling in places not meant for human habitation. One-size-fits-all
solutions are counter-productive. There is diversity in age, gender, ethnicity,
education, household structure, duration of homelessness, employment
history, medical problems, justice system involvement, cause of
homelessness, and type of assistance being sought. This diversity is
documented in our report titled, "*Escape Routes: Meta-Analysis of
Homelessness in L.A*" issued on April 24, 2018.  I am a co-author of the

---

**DECLARATION OF DANIEL FLAMING IN SUPPORT OF INTERVENORS' OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Report.  A true and correct copy of the Report is submitted with my
declaration as Exhibit C.

14. Different groups of homeless residents need different types of help in order
to escape homelessness.  A recent evaluation of Los Angeles County's
homeless initiative found that that the growth in homelessness is from
persistently homeless individuals. The important implication of this finding
is that a growing number of homeless residents face significant barriers to
escaping homelessness and need substantive assistance rather than yet
another quick-fix response. This report is titled, "*LA County's Homeless
Initiative Annual Performance Evaluation: Year 4 Outcomes*."  A true and
correct copy of the Report is submitted with my declaration as Exhibit D.

### Reasons for Not Choosing to Reside in a Shelter

15. One of our early homeless research projects at the Economic Roundtable
was to survey individuals living on the sidewalks of Skid Row.  The results
of this survey are described in "*Homeless Workers: A Labor Market
Analysis*," published in 1997.  I am co-author of the Report.  A true and
correct copy of the Report is submitted with my declaration at Exhibit E.  I
believe that what we found is still applicable today.

16. One of the questions we asked in the tent-to-tent survey of people who had
chosen not to be in a shelter was, "When you have to choose between
staying on the street or try to enter a residential program, what things are
important?"

17. Homeless individuals identified the three factors that are most important
when choosing between staying on the street and trying to enter a residential
program: 1) Protecting their sense of dignity (very important to 81%), 2)
Personal safety (64%), 3) Being with friends (64%).

18. We also asked, "How important are the following reasons in explaining why homeless people go through programs for helping them get off the streets, but still return to Skid Row?" The most important reason was identified as a serious problem by 80% of the respondents: "Programs end without giving people money or a place to go."

19. To sum up the findings from our work that are applicable to alleviating homelessness in Skid Row are: 1) it is difficult to count the number of people who are homeless, 2) the need for housing is greater than the number of people counted on a single night, 3) needs are diverse and call for individualized rather than standardized interventions, and 4) interventions that do not respect individuals' dignity and provide long-term solutions are likely to be resisted.

I declare under penalty of perjury that the foregoing is true and correct. Executed April 18, 2021 at Los Angeles, California.


_____

DANIEL FLAMING

Exhibit A



# Who Counts?

## ASSESSING ACCURACY OF THE HOMELESS COUNT

November 2017



# Who Counts?

## Assessing Accuracy of the Homeless Count

November 2017

Economic Roundtable

Daniel Flaming

Patrick Burns

Underwritten by the Economic Roundtable

Report available at: www.economicrt.org

This report has been prepared by the Economic Roundtable, which assumes all
responsibility for its contents. Data, interpretations and conclusions contained in
this report are not necessarily those of any other organization.


This report can be downloaded from the Economic Roundtable web site:
www.economicrt.org


Follow us on Twitter @EconomicRT
Like us on Facebook.com/EconomicRT

# Table of Contents

I. Executive Summary.................................................................................................................1

II. Approach.............................................................................................................................7

    A. Accuracy......................................................................................................................8

    B. Benchmarks..................................................................................................................8

    C. Assumption...................................................................................................................8

    D. Objective.....................................................................................................................9

III. Year-to-Year Continuity.....................................................................................................11

    A. Steps in Producing the Homeless Count.............................................................................12

    B. Year-to-Year Continuity in the Annual Homeless Estimate.....................................................13

    C. Year-to-Year Continuity in the Street Count........................................................................15

    D. Year-to-Year Demographic Continuity...............................................................................16

    E. Year-to-Year Continuity in Homeless History......................................................................23

    F. Summary.....................................................................................................................24

IV. Comparability of the Homeless Count with Other Data.............................................................27

    A. Comparability of the Homeless Count with the Cash Aid Caseload of Destitute and Homeless Adults.........28

    B. Comparability of the Homeless Count of Children with School Counts of Homeless Students...........30

    C. Summary.....................................................................................................................33

V. Measurement Error...............................................................................................................35

    A. Errors Reported in the Count...........................................................................................36

    B. Standard Error and Confidence Interval in the 2017 Homeless Count........................................36

    C. Acknowledged Errors....................................................................................................36

    D. Unidentified Errors.......................................................................................................37

VI. Assessment and Recommendations ................................................................................................ 39

    A. Assessment of Accuracy ............................................................................................................... 40

    B. Recommendations ........................................................................................................................ 40

VII. End Notes ........................................................................................................................................... 45



# Executive Summary

## Overview

Within the past year, Los Angeles County and City voters approved $4.75 billion for services and housing to combat homelessness.[1] The Greater Los Angeles Homeless Count is crucial for identifying how this money should be used to help people escape homelessness.

The Count is an increasingly comprehensive effort to count and describe Los Angeles' homeless residents, but it is not yet sufficiently accurate to identify year-to-year changes in homelessness. Methodology that seemed reasonable when introduced in 2009 can now be seen to produce inconsistent estimates of the number of homeless residents and their attributes.

It is important to obtain more accurate and reliable information from the massive effort invested in the Count by volunteers, the Los Angeles Homeless Services Authority (LAHSA) and research collaborators. To be uncounted is to be unseen – to be left out of funding, planning and implementing programs to combat homelessness. To be helped, people experiencing homelessness must be seen and understood.

## Objective

This report views Greater Los Angeles Homeless Counts from 2007 through 2017 as a body of work rather than discrete annual snapshots and assesses the extent to which the Counts present a consistent body of evidence and the extent to which there are inconsistencies among Counts, or with other data, indicating a need to strengthen the Count methodology. The objective is to strengthen the reliability of the Count as a tool for understanding and combating homelessness.

## Review

Los Angeles Homeless Services Authority staff and the University of Southern California research team that is supporting the Homeless Count met with the Economic Roundtable to discuss this report and also provided written comments. All of the points raised have been addressed in this final version of the report.

## Assessment

The top level finding from this assessment is that the Homeless Count is valuable for providing a fresh picture of homelessness, but the Count data is not reliable enough to be used for comparing the number or population composition of homeless residents from different Counts. In addition, there are indications that the Homeless Counts have underestimated the number of people who are homeless.

Year-to-Year Comparability of Homeless Count Data

1. There does not appear to be reliable, year-to-year comparability in data produced through the Homeless Count. One source of this problem appears to be the demographic survey of unsheltered residents. A second source of discontinuity appears to be inconsistency in how the street count is carried out. The third source of discontinuity is lack of statistical tools for identifying and correcting *measurement error:* the difference between the Count and the actual number of homeless residents.

2. The demographic survey has been carried out through quasi-random selection of unsheltered homeless residents for interviews, and so has not provided a statistically reliable description of the homeless population. Nevertheless, it has been the only source of information for estimating the attributes and annual size of the unsheltered homeless population.

3. Since 2013, there has been a contradiction in Homeless Count reports between an increasing number of point-in-time homeless and a decreasing number of people homeless over the course of the year. This casts doubt on both the demographic survey and the formula for projecting annual homelessness. Aside from the accuracy of the demographic survey data, the formula used to project the annual homeless population has a shortcoming in that it does not account for people who exit homelessness after being homeless for more than one week but less than one year, and then are replaced by new entrants.

4. When information about the gender, ethnicity and age of the unsheltered homeless population from demographic surveys in different Homeless Counts is compared, there are large increases and decreases in the reported characteristics of the population that do not appear plausible. These shifts are even less plausible when compared to data for sheltered residents, which show very little year-to-year change in demographic characteristics.

5. From 2013 to 2016, vehicles steadily accounted for 30 percent of homeless sightings, then in 2017, the share increased to 36 percent – growing by a fifth from one year to the next. This followed special targeting of vehicles in 2017 as well as growth in the number of Homeless Count volunteers. This type of change in counting activity creates data discontinuities that are not corrected in year-to-year comparisons.

6. There are year-to-year discontinuities in the share of the unsheltered homeless population that is reported to be chronically homeless as well as the share that is reported to be homeless for the first time. These do not appear to correlate with any trends in the underlying causes of homelessness such as unemployment or poverty.

Comparability of Homeless Count with the General Relief Caseload and School Records of Homeless Students

1. The General Relief caseload includes only part of the homeless population, which suggests that this caseload is smaller than the actual point-in-time homeless population. However, over the five Homeless Counts from 2009 through 2016, the homeless segment of the General

Relief caseload plus homeless family members in other programs estimated to fit HUD's definition of homelessness have been an average of 82 percent larger than the population estimate from the Homeless Count. In addition, the two populations have had opposite trends of growth and decline. This raises uncertainty about the comparability of one Homeless Count to the next and their reliability as an indicator of whether the homeless population has grown or declined.

2. School data from 2016 shows large concentrations of homeless students in the San Gabriel Valley, Southeast/Gateway Cities, and Long Beach. This geographic distribution is significantly different from the distribution of homeless children reported in the 2016 Count, which was based on demographic survey data for only 103 children. There is a strong possibility that the Homeless Count identifies geographic concentrations of homeless children inaccurately.

## Recommendations

The core methodology for carrying out the Count has been unchanged since 2009. Progressively more effort and money has been invested in implementing the methodology, but the results still are not sufficiently accurate. These recommendations outline steps that should significantly improve the Count's accuracy by reducing *measurement error* through more careful and consistent procedures, and by obtaining additional types of information for calibrating and correcting *measurement error*.

New procedures for conducting the street count and demographic survey, volunteer training, and statistical methodology are needed to build on the accuracy already achieved in carrying out the Count and to strengthen the reliability and year-to-year consistency of the Counts.

The research burden for improving the accuracy and consistency of the Homeless Count should be shared by researchers in the region and local governmental agencies that serve homeless residents, rather than falling solely on LAHSA, whose primary task is grant and contract management.

### Street Count Improvements

1. Require Count volunteers to participate in more consistent, substantive training that includes standardized procedures for canvassing census tracts, assessing risks and making decisions about which areas to investigate.

2. Provide a suggested route on the maps that are given to both street count volunteers and teams that conduct the demographic survey, as is done in New York City, to ensure that the entirety of their area is covered once and only once.

3. Develop reliable, standardized procedures for determining whether vehicles are occupied by homeless individuals.

4. Maximize the number of enumeration teams in urbanized areas that walk rather than drive their routes.

5. Use mobile apps on cell phones in the street count and the demographic survey to document the GPS coordinates of each homeless contact.

6. Where possible, integrate the demographic survey as a uniformly random component of the street count. This includes the youth survey, an improved version of the family survey, the follow-on surveys recommended later, and possibly some components of the street count. New York City achieves this integration by combining the street count and demographic survey and carrying out both during the day.

## Demographic Survey Improvements

7. Increase the number of families with children that are reached by the demographic survey or make greater use of HMIS data about children in order to provide more reliable information about homeless children.

8. Carry out the demographic survey in a random sample of locations rather than in locations influenced by opportunity or convenience.

9. Support detailed analysis and widespread dissemination of information from the demographic survey that is operationally important for combating homelessness, for example, barriers to employment, health conditions, justice system involvement, and needed services, and maintain year-to-year consistency in questions asked.

10. Assess whether Homeless Management Information System (HMIS) data, which represents shelter residents, is more reliable than the demographic survey and if it should have a larger role in describing the total homeless population.

## Statistics and Data Analysis Improvements

11. Give the research organization working with the Count a fully independent and objective role in ensuring the data integrity of the Count rather than a secondary, supportive role.

12. Strengthen the integrity of the Count by identifying, quantifying and correcting *measurement error*. The *statistical* challenge is to describe the total homeless population based on a count that identifies only part of the population. To achieve greater accuracy, the research team guiding and analyzing the Count should include a knowledgeable statistician with expertise in enumerating hidden populations and sampling methodology.

13. Make it a primary goal of the Count to calibrate year-to-year comparability in population estimates and to identify likely causes for major shifts in the number or composition of the homeless population.

14. Develop a more complete sampling frame for the demographic survey that includes benchmarks for social attributes. A more comprehensive sampling frame for homeless residents will make it possible to target survey efforts to correspond with population characteristics as well as to assign more accurate weights to survey responses. The current sampling frame is based solely on two geographic categories: hotspot census tracts and all other census tracts. This is questionable because homelessness causes placelessness. Homeless individuals are less defined by geography than any other member of society. *Local researchers and government agencies that serve homeless residents should work with LAHSA to develop a complete and*

*accurate geographic and demographic profile of homeless residents, including household type, homeless history and type of dwelling.*

15. Use a "decoy" quality assurance mechanism in which researchers deploy adults throughout each area of the county, posing as homeless individuals during the street count, to check whether they are found and counted as visible homeless persons in order to produce an estimate of the proportion uncounted among homeless people on the streets. This could be implemented by having an outside research organization field several hundred decoy teams and determining whether they were counted by using GPS data sent by the volunteer enumeration teams or by equipping volunteers with devices that send a Bluetooth beacon that the decoys could detect. This method is used successfully in New York City and Toronto.

16. As an additional tool for quantifying the share of homeless persons who are not found by enumerators, conduct surveys at homeless provider locations in the days following the Count to determine whether individuals were counted. This method is used successfully in New York City and Philadelphia.

17. Survey a stratified sample of vehicles that may have homeless occupants to determine the proportion of different types of vehicles that serve as homeless dwellings.

18. Develop a more accurate statistical model for estimating the annual homeless population using a more detailed and complete breakout of population turnover among individuals who experience homelessness. This model should include descriptions of the attributes of individuals experiencing different durations of homelessness.

19. Use other data sources to assess the accuracy and completeness of the Homeless Count. This includes the number, location and attributes of persons receiving public assistance from the county who are identified as homeless, health care provider reports of services to homeless individuals, and school data about homeless students.



# Approach

## Accuracy

Homeless individuals are invisible in most public data. Lacking housing, they are off the residence-based data grid used, for example, by the Census Bureau. People experiencing homelessness must be seen to be helped. The Homeless Count is the primary effort to see and understand homelessness in Los Angeles. To be uncounted is to be unseen – to not count in funding, planning and implementing programs to combat homelessness.

The *accuracy* and *consistency* of the Count are important because the annual Count of homeless residents is widely publicized and viewed as a measure of success, or lack thereof, in the region's efforts to combat homelessness. In addition, the Homeless Count is important for showing the scale of homelessness and for revealing the demographic composition of the region's homeless population.

The key requirement for *accuracy* is producing Count data that closely matches the actual reality on the street. The key requirement for *consistency* is implementing the Count in a manner that will produce comparable results each year it is carried out.

## Benchmarks

The most readily available test of the accuracy of the Count is through comparing data from Counts conducted in different years and assessing whether changes from one Count to the next are plausible. Data from the demographic surveys lends itself best to cross-year comparisons, using information about demographic and homeless history characteristics. Cross-year comparisons in the types of homeless sightings in the street counts help assess reliability of numerical counts.   Finally, measures of homelessness provided by other sources of data support reliability cross-checks of numbers, geographical locations and demographics.

## Assumption

Unless there are major shifts in economic or social conditions, it is realistic to assume that there is year-to-year continuity in the character, scale and location of Los Angeles' homeless population, with incremental rather than abrupt change. Homelessness is the most extreme manifestation of poverty and is in large part an outcome of insufficient jobs, high housing costs, and failures to provide adequate care and opportunities for children and youth. It is reasonable to assume that homelessness is likely to fluctuate in tandem with incremental changes in these underlying causes.

Possibilities of large, abrupt shifts in the scope or character of homelessness should be corroborated by other sources of evidence before being accepted as real.

Homelessness is likely to fluctuate in tandem with lack of jobs, poverty, lack of affordable housing, and child neglect.

-----------------------------

## Objective

Homeless Counts are the most widely used and comprehensive sources of information about people experiencing homelessness. This report looks at Homeless Counts as a body of work rather than discrete annual snapshots of homelessness and it assesses the extent to which the Counts present a consistent body of evidence and the extent to which there are inconsistencies among Counts that indicate a need to strengthen the Count methodology. An enormous amount of effort is invested in the Count by volunteers, the Los Angeles Homeless Services Authority (LAHSA) and research collaborators, and the results are important to policy makers and the public. The objective of this report is to contribute to the effectiveness of the Count as a reliable tool for understanding and combating homelessness.



# Year-to-Year Continuity

## Steps in Producing the Homeless Count

Achieving an accurate Homeless Count is a very difficult task. There are risks of introducing errors at each step. The following is a broad brush description of steps in producing the Homeless Count:

1. Volunteer teams go out at night in an assigned geographic area and *count*, but do not approach, unsheltered homeless individuals, families and dwellings that are not suitable for human habitation but appear to be occupied. Dwellings include tents, make-shift shelters and vehicles in which the occupants often are not visible. These numbers are augmented through Counts by special teams in potentially dangerous or inhospitable locations such as under bridges and in river beds.

   Census tracts are broken out into two categories – *hotspots* and *non-hotspots*. Hotspot census tracts are ones where there is more homelessness activity and thus a larger number of homeless persons.

2. If the street count does not cover every census tract (as was the case until 2016), the number of people counted in each tract is weighted to make up for uncounted tracts. Results from hotspot and non-hotspot tracts are *weighted* separately, with results projected proportionately onto uncounted tracts in each of the two categories within each service planning area (SPA). For example if half of the non-hotspot tracts in a SPA were counted, the results from each counted tract would be doubled to account for the uncounted tracts.

3. A census of nearly all homeless individuals in temporary *shelters* is obtained. Since 2013, this information has been obtained from the Homeless Management Information System (HMIS) for the month of January. HMIS records provide information about both the number and demographic attributes of residents in publicly-funded shelters.

   HMIS records have provided information about 11,000 to 14,000 shelter residents in each of the three most recent Counts – a large body of data.

4. A *demographic survey* is conducted in a sample of census tracts to obtain information about the *attributes* of homeless individuals and families, including the number of occupants in different types of dwellings. This information is projected onto the street count estimate to describe the attributes of the unsheltered population.

   Information from the demographic survey about how long respondents have been homeless is used to estimate the size of the *annual* homeless population.

   In 2017, a separate *youth demographic survey* was carried out of unsheltered youth 18 to 24 years of age.

In each Count, the demographic survey has been a quasi-random opportunity survey, making it statistically unreliable for describing the larger homeless population. For it to be reliable it would have to mirror the characteristics of the total population.

The demographic survey has been a quasi-random opportunity survey, and so has not been reliably representative of the homeless population.

-----------------------------

Just as a cook can tell how a large pot of soup will taste by trying only a spoonful, it is possible to learn about a very large group of people by talking to a small number of them. This is achieved through a truly random sample because randomness is the key to mirroring the total population.

Despite its limitations, the demographic survey has been the only source of information for estimating the attributes of unsheltered homeless residents and annual size of the total population. As a consequence, there has been year-to-year unevenness in the population estimates from the Count.[2]

## Year-to-Year Continuity in the Annual Homeless Estimate

A population that experiences homelessness over an extended period of time is at risk of damaging emotional, medical, legal, financial, and social impacts. Understanding the composition of the homeless population and the likelihood that different subpopulations will either quickly escape homelessness or have extended experiences of homelessness is arguably more important than understanding the size of the point-in-time population.

Information from the demographic survey about how long people have been homeless and whether they are new arrivals in Los Angeles County is used to estimate the number of people who experienced homelessness over the year preceding the Homeless Count. The size of both the point-in-time and annual populations from 2007 through 2017 is shown in *Figure 1*.

The number of people projected to have been homeless over the past year as a ratio to each person in the in the point-in-time number from the Homeless Count is shown in *Figure 2*. This ratio ranges from a high of 5.1 people homeless

*The point-in-time homeless estimates increased from 2013 to 2017, but the projected annual homeless population decreased.*

----------------------------

**Figure 1: Point-in-Time Homeless Counts and Annual Projections**



*Sources: LAHSA homeless count methodology papers and homeless count reports 2007-2017. Weighted data shown.*

The contradiction of increasing point-in-time homeless and decreasing annual homeless casts doubt on the formula for projecting annual homelessness.

------------------------------

Figure 2: Number of People in the Annual Projection for Every Person in the Point-in-Time Count



*Sources: LAHSA homeless count methodology papers and homeless count reports 2007-2017. Weighted data shown.*

annually for every point-in time person in 2013 to a low of 2.2 annual homeless in the recent 2017 Count.

Intuitively one would expect to see the annual population increase when the point-in-time population increases. This is because a larger point-in-time estimate is likely to mean that more people have been made homeless. Based on the formula used to project the number of people who are homeless annually, more short-term homeless means more turnover (i.e. more people entering and exiting annual homelessness) and a larger annual population.[3]

*Figures 1* and *2* show that the point-in-time homeless estimates increased from 2013 to 2017, but the projected annual homeless population decreased over these four years. This raises a strong possibility that the demographic survey data used to make the annual projection was inconsistent from one year to the next and did not accurately describe the homeless population.

If the point-in-time has grown and annual homeless population has shrunk, as shown in *Figure 1,* the only explanation would be that the point-in-time population has grown because a much larger share of the population is chronically homeless. This kind of change in the homeless population mix with fewer people exiting homelessness, fewer new entrants and less short-term turnover would explain a shrinking annual population. However, this possibility seems unlikely and should be verified by other data sources before being accepted as a plausible explanation.

The contradiction of increasing point-in-time homelessness and decreasing annual homelessness casts doubt on both the demographic survey and the formula for projecting annual homelessness. Aside from the accuracy of the demographic survey data, the formula used to project the annual homeless population has a

shortcoming in that it does not account for people who exit homelessness after being homeless more than one week but less than one year, and then are replaced by new entrants.

Information from the demographic survey is also used to estimate the make-up of the point-in-time homeless population. This includes the number of veterans, children, chronically homeless individuals, and individuals with different types of trauma and disability. The inconsistency from one year to the next in information about the duration of homelessness indicates that other information from the demographic survey may also be inconsistent. The reported estimates of year-to-year change in the numbers of homeless veterans, children, youth, and chronically homeless persons could be unreliable.

## Year-to-Year Continuity in the Street Count

The homeless street count identifies individuals and families experiencing homelessness, as well as homeless dwellings in the form of tents, make-shift shelters, cars, vans, and campers or recreational vehicles. Trends from 2009 through 2017 in sighting these forms of homelessness are shown in *Figure 3*, with tents and shelters combined into one category and vehicles into another category.[4] Only 0.2 percent of street sightings are of homeless families, which are not shown.

The overall trend is that unsheltered individuals outdoors (e.g., on a bus bench) make up a decreasing share of homeless sightings; however, tents and make-shift shelters make up an increasing share.

Vehicle hotspots were targeted as a priority for the Homeless Count for the first time in 2017. This increased effort may well explain the increased vehicle count.[5]

Older parked vehicles without visible occupants are open to interpretation as to whether they are shelter for homeless persons or the property of a neighborhood resident.

------------------------------

**Figure 3: Breakout of Homeless Sightings in Street Count**



*Sources: LAHSA street counts 2009 to 2017. Data includes single individuals 18 years of age or older but does not include the 0.02 percent of sightings that are of homeless families. Unweighted street count data.*

Vehicles accounted for a steady 30 percent of homeless sightings from 2013 to 2016, then in 2017, the share of sightings that were vehicles increased to 36 percent – growing by a fifth from one year to the next.

Vehicle sightings have a significant impact on the Count. In 2017, each vehicle was counted as having an average of 1.8 inhabitants.[6] The increase in vehicles from 2016 to 2017 accounted for an increase of 3,360 people in the point-in-time Homeless Count.

There is very little training and no formal protocol for how volunteers carry out the street count. One of the authors participated in a volunteer group whose motto was, "when in doubt, count." This group reported a large number of vehicles as homeless dwellings even though no occupants were seen in any of the vehicles. In contrast, a volunteer in another part of Los Angeles reported seeing a large number of vehicles that were occupied. It is unclear to what extent there are similar patterns of vehicle occupancy across Los Angeles, to what extent enumerators have consistent count methodologies, and to what extent these practices are consistent from one year to the next.

It is possible that there was such a large single-year shift in the form of shelter occupied by homeless individuals, but this would be an abrupt departure in the trend from 2011–2016. However, this type of abrupt deviation from a multi-year trend may well be the result the new effort to target vehicles. It is open to interpretation whether older parked vehicles without visible occupants are shelter for homeless persons or the property of a neighborhood resident. In 2017, these judgment calls were applied to a larger share of homeless sightings because more effort was devoted to counting vehicles that appeared to be homeless dwellings.

## Year-to-Year Demographic Continuity

Comparisons of data from counts show the extent to which there is year-to-year continuity in the counts. Three types of data about the attributes of homeless residents are used for these comparisons: *1)* Unweighted information from the sample of respondents to the *demographic survey* of unsheltered people. Data from the demographic survey is presented in unweighted form because the survey is designed to be representative of the entire continuum of care. *2)* Complete information for the entire population of *shelter residents* from HMIS. *3)* Final weighted results from the *Homeless Count*. This information broken out by age, ethnicity and gender is shown in *Figures 4* to *12*.[7]

In the four most recent Homeless Counts, 2013 through 2017, the demographic profile of homeless residents has been produced by combining demographic information from HMIS records for *shelter residents* in the month of January with results from the demographic survey of the *unsheltered population*.

The 11,000 to 14,000 HMIS records for the sheltered population provided by HMIS has been estimated to represent only about a quarter of the total point-in-time homeless population.[8] During the same years, the demographic survey obtained responses from 3,200 to 5,800 unsheltered individuals in each Count year, who represented the unsheltered street count population, which has been

*There is more data describing the sheltered population than the street population, and it is more reliable because it is drawn from everyone rather than a quasi-random sample.*

--------------------------

estimated to represent about three-quarters of the point-in-time homeless population.

There is more data describing the sheltered population than the street population, and it is more reliable because it is drawn from the entire population rather than a quasi-random sample.

### Gender Continuity

Based on the demographic survey, the share of women in the unsheltered homeless population, shown in *Figure 4*, seesawed from one count to the next. It dropped from 31 percent in 2011 to 25 percent in 2013, then increased to 30 percent in 2015, then dropped to 25 percent in 2016, and then increased to 28 percent in 2017. These shifts represent thousands of women being included in or excluded from the population recognized as experiencing homelessness.[9]

In contrast, the share of females in the sheltered population varied by only 3 percentage points from 2013 to 2017, making up a third of shelter residents, as shown in *Figure 5*.

The gender composition for the total homeless population, both sheltered and unsheltered, shown in *Figure 6*, was produced by combining HMIS data for sheltered individuals with demographic survey data for the street population. Because the street population is estimated to account for about three-quarters of homeless persons, the demographic survey was the dominant influence in estimating the share of females in the overall homeless population.

The most noticeable influence of the demographic survey is the drop in the share of females in the total population from 34 percent in 2011 to 27 percent in 2013, and then the rebound in *Figure 6*, was produced by combining HMIS data for sheltered to 33 percent in 2015. It seems unlikely that the share of women in the homeless population would drop by a fifth from one count to the next, and then rebound in the following count. This may show a break in the year-to-year continuity and comparability of data from the demographic survey.

*It seems unlikely that the share of women in the homeless population would drop by a fifth from one count to the next, and then rebound in the following count.*

**Figure 4: Gender in Demographic Survey of Unsheltered Population –** *Unweighted*



*Sources: LAHSA demographic surveys 2007 to 2017. Unsheltered street population. Unweighted.*

**Figure 5: Gender in HMIS – Total Shelter Population**



*Source: LAHSA HMIS for January of 2013 to 2017. Complete shelter population.*

The ethnic makeup of the unsheltered street population has had abrupt changes from one year to the next in the demographic survey.

------------------------------

## Ethnic Continuity

The ethnic makeup of the unsheltered street population, as captured by the demographic survey, has had abrupt changes from one year to the next, as shown in *Figure 7*.[10]

Based on the demographic survey, in 2013, the share of *European Americans* shot up and *Latinos* plummeted. In 2015, *European Americans* dropped back down and

**Figure 6: Gender in Final Homeless Count Reports – *Weighted***



*Sources: LAHSA homeless count reports 2005 to 2017. Total homeless population. Weighted data.*

**Figure 7: Ethnicity in Demographic Survey of Unsheltered Population –** *Unweighted*



*Sources: LAHSA demographic surveys 2007 to 2017. Unsheltered street population. Unweighted.*

*Other Ethnicities* shot up. In 2016, *European Americans* shot back up, *Latinos* increased and *African Americans* plummeted.

In contrast, the ethnicity of the sheltered population shown in HMIS data has remained largely unchanged, as shown in *Figure 8*. From 2013 to 2017, the ethnic makeup of shelter residents did not vary by more than 2 percentage points for any group. This casts further doubt on the year-to-year ethnic changes shown by the demographic survey (*Figure 7*).

**Figure 8: Ethnicity in HMIS – Total Shelter Population**



*Source: LAHSA HMIS for January of 2013 to 2017. Complete shelter population.*

The ethnicity of the sheltered population shown in HMIS data has remained largely unchanged.

Figure 9: Ethnicity in Final Homeless Count Reports – *Weighted*



*Sources: LAHSA homeless count reports 2005 to 2017. Weighted data.*

The demographic surveys had the greatest influence on determining the ethnic composition of the total homeless population in the Homeless Count reports, as shown in *Figure 9*. Ethnic shifts reported for the overall population are a slightly muted version of the shifts reported by the demographic survey. This reflects the fact that the unsheltered population is estimated to make up about three-quarters of the total homeless population.

It seems unlikely that the presence of European Americans and Latinos swelled and then dropped dramatically from one count to the next, particularly when there were not corresponding changes among shelter residents or the general population. This may well show a break in the year-to-year continuity and comparability of data from the demographic survey.

## Age Continuity

One of the striking findings reported in the 2017 Homeless Count was that the number of homeless transition-age youth (18 to 24 years of age) had increased by 64 percent, from 3,447 youth in 2016 to 5,645 in 2017.[11]

Most of the reported growth was among unsheltered youth, who reportedly increased 73 percent, from 2,388 in 2016 to 4,122 in 2017.

Results from the demographic survey of unsheltered youth were treated as a random sample and projected onto unsurveyed census tracts. However, 98 percent of the surveys were collected in targeted hotspots where youth were expected to be found and thus were not random. The sampling results for the youth survey are shown in *Table 1* and discussed in more detail below.

It seems unlikely that the presence of European Americans and Latinos swelled and then dropped dramatically from one count to the next.

Table 1: Hotspots vs. Non-Hotspots in the 2017 Youth Demographic Survey

| Stratum Categories for Census Tract | Number of Census Tracts | Number of Tracts Surveyed | % of Tracts In Stratum Surveyed | % of All Tracts Surveyed | Number of Completed Surveys | % of All Completed Surveys | Weighted Value of Surveys |
|---|---|---|---|---|---|---|---|
| Drop-In Center | 20 | 17 | 85% | 4% | 102 | 13% | 107 |
| Focus group hotspot | 208 | 208 | 100% | 50% | 370 | 47% | 435 |
| 2016 street count hotspot | 164 | 126 | 77% | 30% | 128 | 16% | 1,612 |
| Skid Row | 4 | 4 | 100% | 1% | 8 | 1% | 25 |
| Venice | 11 | 11 | 100% | 3% | 109 | 14% | 119 |
| 2016 youth count hotspot | 58 | 41 | 71% | 10% | 56 | 7% | 1,470 |
| Non-hotspot | 1,695 | 8 | 0.5% | 2% | 14 | 2% | 489 |
| GRAND TOTAL | 2,160 | 415 | 19% | 100% | 787 | 100% | 4,257 |

*Source: LAHSA (August 8, 2017). Unsheltered Youth Count Final Sample Weights and Survey Count by Service Planning Area, 2017 Greater Los Angeles Homeless Count*

Every census tract was assigned to a survey category based on the type of evidence indicating that youth were likely to be found and 415 tracts were surveyed compared to only 292 tracts in 2016.[12] However 407 of the tracts surveyed were hotspots. Only 8 of the 1,695 non-hotspot tracts were surveyed. Only 2 percent of surveys came from youth in non-hotspot tracts, which cover over four-fifths of the continuum of care.[13]

With only 14 completed surveys, the data for estimating the number of youth in non-hotspot tracts was very scant.[14] However, the youth survey was used as a random sample survey with results that could be applied to the entire continuum of care, even though 98 percent of the tracts surveyed were targeted rather than randomly chosen.

Only 8 of the 1,695 non-hotspot census tracts were surveyed. Only 2% of surveys came from youth in tracts covering over 4/5 of the county.

-----------------------------

**Figure 10:** Age in Demographic Survey of Unsheltered Population – *Unweighted*



*Sources: LAHSA demographic surveys 2007 to 2011. Unsheltered street population 18+ years of age. Unweighted data.*

**Figure 11: Age in HMIS – Total Shelter Population**



*Source: LAHSA HMIS for January 2013-2017. Complete shelter population 18+ years of age.*

Youth 18 to 24 years of age are shown in unweighted demographic survey data in *Figure 10* to account for 9 percent of those surveyed in 2013, 5 percent in 2015, 1 percent in 2016, and 14 percent in 2017.[15]

 In contrast, HMIS data for almost the entire shelter population at the time of each Homeless Count shows that youth made up a steady 10 percent of shelter residents from 2015 through 2017. This can be seen in *Figure 11.* The abrupt increase in youth homelessness in the demographic survey is inconsistent with data for people in emergency shelters.

**Figure 12: Age in Final Homeless Count Reports – *Weighted***



*Sources: LAHSA homeless count reports 2005 to 2017. Weighted data.*

The abrupt increase in youth homelessness in the demographic survey is inconsistent with data for people in emergency shelters.

---------------------------

Youth were reported to account for 8 percent of the total homeless population in every Count from 2005 through 2016, and then in 2017, their share increased to 10 percent. The total homeless population shown in *Figure 12* includes both unsheltered people on the streets and people in shelters. The three age groups shown in the Homeless Count report were all reported to have grown from 2016 to 2017, so even though a large increase in the number of homeless youth was reported, this did not result in a large increase in their share of the homeless population.

The additional effort invested in identifying and canvassing hotspot tracts appears to have been a change in procedure that resulted identifying more homeless youth. It is clear that the 2017 youth count succeeded in identifying and interviewing more youth than in previous years. However, it may not have produced a reliable sample that could be used to project the presence of homeless youth throughout the continuum of care. Given the changes in how the survey was carried out it clearly did not produce results that could accurately be compared with the youth count from previous years.

HUD required a separate youth count in 2017. This stimulated increased effort to find, count and survey youth. The positive result was a more complete youth count. The apparent negative result was a break in continuity with previous youth count data. Because the framework for identifying statistical error in the count is based solely on the number of census tracts enumerated, the increased count produced by this increased effort was not flagged as a break in data continuity and a 64 percent increase in the number of homeless youth was reported.

*Sampling distortions are the most plausible explanation for the reported 64% increase in the number of homeless youth.*

## Year-to-Year Continuity in Homeless History

The share of the homeless population reported to be chronically homeless has varied from year to year in Homeless Count reports, as shown in *Figure 13*.[16] The

**Figure 13: Chronically Homeless as Percent of Unsheltered Homeless Population**



*Sources: LAHSA demographic surveys 2011 to 2017. Unsheltered street population 18+ years of age. Unweighted data.*

**Figure 14: First-Time Homeless vs. Previously Homeless**



*Sources: LAHSA demographic surveys 2007, 2009, 2013, 2015, 2016 and 2017. Data shows adults 18+ years of age and unweighted.*

rate shown in demographic surveys that provide this information has ranged from 28 to 39 percent.[17] This variation does not correspond with regional economic trends and is most likely the result of sampling inconsistencies in the populations surveyed in different years.

Six demographic surveys have collected information about whether respondents were homeless for the first time or whether they had experienced previous episodes of homelessness, as shown in *Figure 14*. The share reporting to be first-time homeless declined steadily from 72 percent in 2007 to 47 percent in 2013, held steady and dropped slightly to 46 percent in 2016, and then bounced back up to 57 percent in 2017. This is a 24 percent increase in the proportion of first-time homeless from 2016 to 2017.

Assuming that there has been an increase in homelessness since 2016, it would stand to reason that there would also be an increase in first-time homelessness. But it would be surprising if the proportion of first-time homeless increased 24 percent from one year to the next.

*It would be surprising if the proportion of first-time homeless increased 24% from one year to the next.*

## Summary

Six key findings about the year-to-year comparability of data from the Homeless Count are:

1.   The demographic survey has been a quasi-random opportunity survey, and so has not been a statistically reliable representative of the homeless population. Nevertheless, it has been the only source of information for estimating the attributes of the unsheltered homeless population and the size of the annual homeless population.

2. Since 2013, the Homeless Count reports show a contradiction between an increasing number of point-in-time homeless and a decreasing number of people homeless over the course of the year. This casts doubt on both the demographic survey and the formula for projecting annual homelessness. Aside from questions about the representativeness of the demographic survey data, the formula used to project the annual homeless population has a shortcoming in that it does not account for people who exit homelessness after being homeless for more than one week but less than one year, and then are replaced by new entrants.

3. When information in the demographic survey about the gender, ethnicity and age of unsheltered homeless population is compared from one year to the next, there are large up and down shifts in the reported makeup of the population that do not appear plausible. These shifts are even less plausible when compared to data for sheltered residents, which shows very little year-to-year change in the demographic characteristics of homeless residents.

4. There are year-to-year discontinuities in the share of the unsheltered homeless population reported to be chronically homeless as well as the share that is reported to be homeless for the first time.

5. From 2013 to 2016, vehicles steadily accounted for 30 percent of homeless sightings, then in 2017, the share increased to 36 percent – growing by a fifth from one year to the next. This abrupt deviation from a multi-year trend may well be the result of a change in Count methodology. There is very little training and no formal protocol for how volunteers carry out the street count.

6. There does not appear to be reliable year-to-year comparability in data produced through the Homeless Count. One source of this problem appears to be the demographic survey of unsheltered residents. A second source of discontinuity is likely to be inconsistency in how the street count is carried out in different census tracts during each Count. A third source of discontinuity could be changes over time in how the Count is implemented.



# Comparability of the Homeless Count with Other Data

## Comparability of the Homeless Count with the Cash Aid Caseload of Destitute and Homeless Adults

*There are risks of both under-counting and over-counting in estimating the size of the homeless population.*

There are risks of both under-counting and over-counting when estimating the size of the homeless population. Counts of visibly homeless individuals may miss unsheltered people who remain out of sight during the Counts. Homeless persons may not be visible because they are in places that are missed or that volunteer teams are unable to find. Moreover, the observations or interviews of enumerators may lead to measurement errors due to inaccuracies in information provided by respondents.

Roughly two-thirds of Los Angeles County's General Relief caseload is estimated to be homeless on a given day, nearly half have been continuously homeless for 12 months or more, and approximately 80 percent have had two or more episodes of homelessness.[18] This represents a population that substantially overlaps with the population enumerated in the Homeless Count. Recipients are mostly single adults 18 years of age and older who must be destitute (no more than $50 total in cash or bank account) to qualify for this aid and receive up to $221 a month is cash assistance along with food stamps.

The number of people homeless in each Count from 2005 through 2017 along with of the number of people in the General Relief caseload in January of each count year who are conservatively estimated to be homeless based on the size of the General Relief caseload is shown in *Figure 15*.[19]

**Figure 15: Homeless Count and General Relief Caseload**



*Sources: LAHSA homeless count population estimates 2005 to 2017 and Los Angeles County General Relief caseload, Department of Public Social Services, in January of each count year.*

The General Relief does not include at least *five* categories of homeless individuals. *1)* If individuals are assessed as being employable, the duration of their cash aid is limited to nine months in a 12-month period. After that they must wait three months to be eligible to re-enroll. *2)* Individuals who have been convicted of a drug felony in the past 20 years, are in violation of probation or parole are ineligible.[20] *3)* Undocumented immigrants are not eligible for benefits. *4)* Families with children are eligible for larger amounts of cash aid through the CalWORKs program, so they are not part of the General Relief caseload. *5)* Individuals who have short episodes of both acute poverty and homelessness are unlikely to be in the General Relief caseload because of the application processing time usually required before receiving benefits.

*Figure 15* shows the estimated number of homeless General Relief recipients (two-thirds of the caseload) plus homeless family members outside of the General Relief program – conservatively estimated as one homeless family member for every 10 homeless General Relief recipients.[21] No attempt is made to estimate the number of people in the other four categories outside of the General Relief program.

This is a crude but conservative approximation of the point-in-time homeless population. It is more useful for indicating the trend of growth or decline in the homeless population than it is as an accurate estimate of the total homeless population. Nevertheless, this caseload data is useful as a reference point in a confused landscape.

Over the five Homeless Counts from 2009 through 2016, the number of people estimated to be homeless based on two-thirds of the General Relief caseload plus another 10 percent in families has been an average of 82 percent larger than the population estimate from the Homeless Count. There is a strong possibility that these Homeless Counts under-estimated the size of the homeless population.

The number of volunteers and staff who carry out the count, and the number of census tracts that were enumerated has increased with each count. This increased resource capacity has led to more complete counts and may have contributed to the large increase in the estimated size of the homeless population in 2017. The 2017 Homeless Count was very close to the crude estimate based on the General Relief caseload: 57,794 vs. 56,583. It is not clear, however, that the increased size of the population estimate was accompanied by increased accuracy in information describing attributes of people experiencing homelessness.

The extensive overlap in the populations of the Homeless Count and the General Relief caseload suggests that the sizes of these two populations should rise and fall together. However, from 2007 through 2017, these two populations have changed in opposite directions. The General Relief caseload grew from 2007 to 2011, and has declined since then. By contrast, the homeless population estimates declined from 2007 to 2009, bottomed out through 2013, and have grown since then.

The fact that the direction of change in the Homeless Count differs widely from the direction of change in the means-tested General Relief program for impoverished and homeless unaccompanied adults raises additional uncertainties

> There is a strong possibility that the homeless counts have under-estimated the size of the homeless population.

about the comparability of one Homeless Count to the next and their reliability as an indicator of whether the homeless population has grown or declined.

## Comparability of the Homeless Count of Children with School Counts of Homeless Students

The California Department of Education collects data from each school about students in kindergarten through twelfth grade who are identified as homeless. A map displaying the number of homeless students at each Los Angeles County school is shown in *Figure 16*.[22]

**Figure 16: Number of Homeless K-12 Students by School 2015–2016**



*Source: California Department of Education.*

**Figure 17: Distribution of Homeless Children in LAHSA Estimates and School District Data 2015–2016**



*Sources: California Department of Education and LAHSA. Data shows children 0-17 years old in the homeless count and students in kindergarten through twelfth grade in school homeless data.*

The definition of homelessness used by schools is broader than the HUD definition used in Homeless Counts because it includes individuals who are couch surfing as well as individuals sleeping in places not meant for human habitation, whereas the HUD definition includes only the latter group. The Los Angeles County Office of Education estimates that 82 percent of students identified by schools as homeless are temporarily doubled up in housing that is not their own, such as houses of classmates and friends. Another 8 percent are temporarily unsheltered, while 5 percent are in shelters and the remaining 5 percent are in hotels or motels (presumably with homeless vouchers).[23]

This means that 18 percent of the 57,453 homeless students identified by Los Angeles County schools in the 2015–2016 school year are estimated to meet HUD's definition of homelessness. Despite the broader definition of homelessness used by schools, it is reasonable to expect the distribution of homeless children identified by schools to be similar to the distribution of children in the Homeless Count. And given that student data is a very large sample collected over the course of the year by schools across the county, whereas the Count data comes from a small demographic survey sample projected onto the street count plus shelter data, the school data is likely to be more reliable.

An average of only 46 children are represented in responses to each of the past seven demographic surveys. In 2017 the number of children increased to 149. It is important to continue this trend of increasing the amount of information about homeless children.

There are remarkably large differences between where homeless students are reported and where homeless children are identified in the homeless count.

----------------------------

The map of primary and secondary students identified as homeless in the 2015-2016 school year shows large concentrations of homeless children in the San Gabriel Valley, Southeast/Gateway Cities, and Long Beach. These are service planning areas (SPAs) 3, 7 and 8. There are also noticeable concentrations of homeless students in Inglewood, San Fernando and the high desert.

The share of homeless students identified in the 2015-2016 school year who are in each service planning area, along with the share of homeless children identified in the 2016 Homeless Count who are in each area is shown in *Figure 17*.

There are remarkably large differences between where homeless students are reported and where homeless children are identified in the Homeless Count. Based on school reports the Homeless Count identifies a *disproportionately small* number of homeless children in three SPAs.

1.  The largest difference is in the San Gabriel Valley SPA, which is home to 35 percent of all homeless students identified by schools but only 8 percent of children enumerated in the Homeless Count.

2.  Second is the East Los Angeles SPA, which accounts for 24 percent of homeless students but only 9 percent of homeless children in the Count.

3.  Third is the South Bay SPA, which accounts for 15 percent of reported homeless students but only 7 percent of children in the Count. The fact that the City of Long Beach is not part of LAHSA, and therefore not part of LAHSA's Count, may account for some or all of the South Bay gap.

The Homeless Count identifies a *disproportionately large* share of homeless children in three SPAs compared to school reports.

1.  The largest possible over-count is in the Metro Los Angeles SPA, which accounts for 22 percent of children in the count but only 3 percent of homeless students reported by schools.

2.  Second is the South Los Angeles SPA, which accounted for 20 percent of children in LAHSA's Count but only 7 percent of homeless students reported by schools.

3.  Third is the West Los Angeles SPA, which accounts for 9 percent of children in the Count but only 1 percent of homeless students reported by schools.

Children made up only about a tenth of the homeless population in LAHSA's 2016 Homeless Count, which used demographic survey data for a total of only 103 children in its projection that 3,490 children were homeless during the week of the Count compared to an estimated 10,321 homeless students identified by schools over the course of the school year that met HUD's definition of homelessness (18 percent of 57,337 total homeless students). Given that the school tally is an annual number and the Homeless Count is a point-in-time number, the absolute number of children projected from the Count may be reasonably accurate. The larger issue is that there is a strong possibility that the Homeless Count identifies the location of homeless children inaccurately.

There is a strong possibility that the homeless count identifies the location of homeless children inaccurately.

----------------------------

Children are the most vulnerable members of the homeless population, so a complete, accurate count of this age group, including where they are located, is important for prioritizing and targeting resources to combat homelessness.

## Summary

Five key findings about the comparability of data from the Homeless Count with the General Relief caseload and school records of homeless students are as follows:

1. The General Relief includes only part of the homeless population in its caseload. A conservative estimate of the number of homeless General Relief recipients plus homeless family members outside of the program was an average of 82 percent larger than the Homeless Counts from 2009 through 2016.

2. The 2017 Homeless Count was very close to the number of homeless based on the estimated number of homeless General Relief recipients plus family members outside of the program.

3. There is a strong possibility that the Homeless Counts from 2009 through 2016 underestimated the size of the homeless population.

4. The direction of growth and decline in the Homeless Count has been the opposite of the direction of change in the General Relief caseload from 2009 through 2017. This raises additional uncertainties about the comparability of one Homeless Count to the next and their reliability as an indicator of whether the homeless population has grown or declined.

5. There are large concentrations of homeless students in the San Gabriel Valley, Southeast Los Angeles, Gateway Cities, and Long Beach.

6. In 2016, the Homeless Count used demographic survey data for only 103 children to estimate the attributes and location of the unsheltered population of homeless children.

7. There is a strong possibility that the Homeless Count identifies the location of homeless children inaccurately.



# Measurement Error

## Errors Reported in the Count

From 2009 through 2017, the only possible errors identified in the Homeless Count have been the "*standard error*" and the "*confidence interval*."

*Standard error* is a statistical measure of the accuracy with which a sample represents a population. The extent to which an average value in the Homeless Count, for example, the percent of people estimated to be adults, deviates from the actual percent of the population that is adults, is the *standard error*.

The *confidence interval* describes the amount of uncertainty associated with the size of the Homeless Count. The *95% confidence interval* reported for the Count means that if the Homeless Count were repeated, 95 times out of 100 the Count would fall within the upper and lower bounds of the confidence interval. Another term for the *confidence interval* is *margin of error*.

## Standard Error and Confidence Interval in the 2017 Homeless Count

The 2017 Homeless Count reported a standard error of 0 for the 35,555 unsheltered adult individuals who were reported to be homeless. Similarly, the confidence interval was the exact amount of the Count – the upper and lower confidence intervals were both 35,555. [24]

*This is a claim of absolute precision in counting a large, mobile, often concealed population at night by thousands of untrained volunteers.*

The same level of absolute accuracy was reported for the 8,376 adults and 456 youth in shelters. The standard error was reported to be 0, and the upper and lower confidence intervals were identical with the Count estimates.[25]

Small standard errors and confidence intervals were reported for unsheltered adult family members and youth.

For the 1,210 *unsheltered adult family members*, a standard error of 30 adults and a confidence interval of plus or minus 58 adults was reported.[26]

For the 4,451 *unsheltered youth* 18 to 24 years of age, a standard error of 450 youth and a confidence interval of plus or minus 882 youth was reported.[27]

## Acknowledged Errors

From 2009 through 2017, the Homeless Counts have assumed that the *only* potential cause of error is if a census tract is not counted. Because there was a complete count of all census tracts in 2016 and 2017, this meant that there was *no error in the unsheltered street count* of adult individuals.

The homeless counts have assumed that the only potential cause of error is if a census tract is not counted.

------------------------------

In addition, because the Homeless Management Information System (HMIS) reported the number of unaccompanied youth and adults, this meant that there was *no error in the shelter count*.

The only possibility of error identified in the 2017 report was from unsheltered youth between the ages of 18 and 24 and unsheltered households with children, because these estimates came from projecting demographic survey data from a sample of census tracts onto the total street count. For the adult street count, "*no measurement error existed*."[28]

## Unidentified Errors

Confidence intervals and standard errors in the Count have been based on the number of census tracts counted as a share of the total number of census tracts in the continuum of care or a service planning area. This can lead to emphasizing quantity of data over quality of data, whereas the quality of data is more important than the quantity of data. Applying this principal to the Homeless Count, the reliability of data collected within census tracts is more important than the number of census tracts counted.

The existing methodology only accounts for uncertainty due to uncounted census tracts and does not adjust for differences between the reported count in each census tract and the actual number of homeless in that tract. The methodological reports for each Homeless Count from 2013 through 2017 have indicated that the only potential source of error in the street count is when enumeration is not carried out in a census tract, and that if every tract is counted, the possibility of error is eliminated.[29] This assumption is fundamentally flawed. The assertion made in Homeless Count reports that the estimates are perfectly accurate when all the census tracts are surveyed, despite clearly inconsistent results from one count to the next, indicates that better approaches are needed.

Types of *measurement error* that are not identified and corrected in the Homeless Count include:

1. *Discrepancies* within a given year or from one year to the next that result from inconsistency in the procedures used by the thousands of different volunteer teams.
   a. Whether they canvas every street in their assigned geographic area, and if not how canvassed streets are selected.
   b. Whether they investigate every alley, park and vacant lot.
   c. How they determine whether vehicles have homeless occupants.
   d. How they decide whether or not an individual on the sidewalk is homeless.
   e. Level of energy invested in identifying and counting specific subpopulations such as youth, veterans or children.
2. *Undercounts* of homeless individuals who are difficult to find.
   a. Individuals in abandoned buildings.
   b. Individuals in unpopulated areas without road access including

Quality of data is more important than quantity of data.

--------------------------

*Reliable procedures are needed to calibrate, control and correct measurement error.*

------------------------------

national parks, nature preserves and beaches.

c.   Individual sleeping on the roofs of buildings, in parking structures, behind walls, or in underground passages.

d.   Individuals sleeping in the interior of large institutions such as colleges, universities and churches.

e.   Individuals sleeping out of sight in structures that are not meant for human habitation including garden sheds, garages and storage units.

f.   Individuals sleeping at their place of work.

g.   Individuals sleeping in vehicles that are not dilapidated and not identified as a homeless dwelling or a vehicle that is concealed out of sight.

h.   Runaway youth who are minors and adverse to returning home or entering foster care.

3.   *Over-counts* of individuals whose homeless status is ambiguous or who are counted in more than one location.

a.   Individuals with unkempt appearance who are housed.

b.   Individuals who move between communities during the same night or from one night to the next and are counted more than once.

c.   Individuals who are riding public transportation throughout the Count night and are counted multiple times.

4.   *Inaccurate information* reported on the demographic survey and projected onto street count data.

a.   Children accompanying unsheltered adults who are not reported because their parents are anxious that the Department of Children and Family Services will remove them and place them in foster care.

b.   Under-reporting of stigmatizing information including criminal justice history, severe mental illness, substance abuse, chronic homelessness, and unemployment.

c.   Inaccurate reporting by individuals with cognitive impairments, including age, medical history, employment history, homeless history, and income.

The Homeless Count should be a credible tool for identifying the size, composition and needs of the homeless population, as well as for tracking change from one year to the next. Reliable procedures are needed to calibrate, control and correct measurement error.



# Assessment and Recommendations

## Assessment of Homeless Count Accuracy

This multi-year assessment of the Homeless Count finds evidence that the counts have not provided accurate and consistent estimates of the size and composition of the homeless population. Problems include:

1. The Homeless Count does not appear to provide reliable year-to-year continuity in information from the demographic survey about the composition of the homeless population in terms of age, ethnicity, gender, or homeless history.

2. The street count may fail to provide year-to-year continuity in the types of dwellings occupied by unsheltered homeless individuals.

3. Projections of the size of the annual homeless population appear to be inconsistent with the size of point-in-time estimates and to understate the size of the annual population.

4. Based on a comparison with the General Relief caseload, it appears that multi-year data from the Homeless Count may have shown the size of the homeless population to be increasing when it was decreasing and may have under-estimated the size of the homeless population.

5. Based on a comparison with school data for homeless students, it appears that the geographic distribution of children in the Homeless Count may be inaccurate.

6. The procedure used to quantify the size of possible errors in the Homeless Count is incomplete because it does not take into account the effect of measurement error and therefore significantly understates the scale of likely error in the Count.

The Homeless Count creates a picture of homelessness during a specific week in January. The quality of these pictures so far is comparable to a missing child's image with thick outlines, rough edges and minimal shading. The image is recognizable and informative but the resolution is too crude to measure crucial details of the image, or to measure change if two different images are overlaid.

## Recommendations

The core methodology for carrying out the Count has been unchanged since 2009. Progressively more effort and money has been invested in implementing the methodology, but the results are still not sufficiently accurate. These recommendations outline steps that should significantly improve the Count's accuracy by reducing *measurement error* through more careful and consistent procedures, and by obtaining additional types of information for calibrating and correcting *measurement error*.

New procedures for conducting the street count and demographic survey, volunteer training, and statistical methodology are needed to build on the accuracy already achieved in carrying out the Count and to strengthen the reliability and year-to-year consistency of the Counts.

The research burden for improving the accuracy and consistency of the Homeless Count should be shared by researchers in the region and local governmental agencies that serve homeless residents, rather than falling solely on LAHSA, whose primary task is grant and contract management.

### Street Count

1. Require Count volunteers to participate in consistent, substantive training.[30] The training should include standardized procedures for canvassing census tracts, assessing risks and making decisions about investigating areas such as alleys, parks, parking lots and vacant fields. An example might be to specify that when teams encounter an open area – park, vacant lot, parking lot – that extends 50 or more feet from the road, that they get out of their car and canvas the area on foot if it feels safe.

2. Provide a suggested route on the maps that are given to both street count volunteers and teams that conduct the demographic survey, as is done in New York. The suggested route would show the quickest way to cover a team's entire area and also serve to ensure that the entirety of their area is covered once, and only once. Software is available to produce census tract-level map routes on an automated basis.

3. Develop reliable, standardized procedures for determining whether vehicles are occupied by homeless individuals.

4. Maximize the number of enumeration teams in urbanized areas that walk rather than drive their routes. That way, someone sleeping or sitting on the sidewalk side of a parked car will be seen, whereas volunteers in a car might miss this person.

5. Use mobile apps on the cell phones of street count volunteers as well as individuals carrying out the demographic survey to document the GPS coordinates of each homeless sighting and each survey contact. This information could either augment or replace the current paper tallies, and would create a valuable database of the exact location of homeless sightings.

6. Where possible, integrate the demographic survey as a uniformly random component of the street count. This includes the youth survey, an improved version of the family survey, the follow-on surveys recommended later, and possibly some components of the street count. New York City achieves this integration by combining the street count and demographic survey and carrying out both during the day. This appears possible for some, but perhaps not all, components of the demographic survey. The biggest challenge is that in Los Angeles, the street count is carried out at night and the demographic survey of unsheltered adults is carried out during the day.[31]

### Demographic Survey

7. Increase the number of families with children that are reached by the demographic survey and explore making greater use of HMIS data regarding children in order to provide more reliable information about homeless children. From 2007 to 2017, an average of only 1 percent of demographic survey respondents have been children. In 2017, 219 children were included in the demographic survey, representing 3 percent of respondents. This was an improvement over the 103 children included in 2016, but still a small

sample. More reliable information about this vulnerable segment of the homeless population is needed.

8.  Carry out the demographic survey in a random sample of geographic locations without substituting selected locations based on convenience. The methods reports for every survey from 2009 through 2017 indicate that quasi-random methods were used. In order to reliably extrapolate results of the demographic survey onto the overall homeless population, it is essential that survey responses are obtained from a random sample.

9.  Support detailed analysis and widespread dissemination of information from the demographic survey that is operationally important for combating homelessness, for example, barriers to employment, health conditions, justice system involvement, and needed services. In addition, maintain year-to-year consistency in questions that provide valuable information. For example, questions about the circumstances of children who are not physically present with parents when they are interviewed have not been asked since 2009.

10. Assess whether HMIS data, which represents almost the entire universe of individuals and families in shelters, provides a more reliable population profile than the demographic survey and should have a role in describing the street population in addition to the sheltered population. This possibility should be explored because HMIS records provide information for roughly three times as many people as the demographic survey and has much less fluctuation from one count to the next.


## Statistics and Data Analysis

11. Give the research organization working with the Count a fully independent and objective role in ensuring the data integrity of the Count rather than a secondary, supportive role. There are multiple descriptions in methodology reports on the Homeless Counts from 2009 through 2017 of ad hoc modifications to sampling plans for both the street count and the demographic survey. Researchers should be empowered to protect and monitor data integrity. This includes the plan and procedures for collecting data, and the task of analyzing and explicating the data.

12. Strengthen the integrity of the Count by identifying, quantifying and correcting *measurement error*. Because the Homeless Count sets out to enumerate the entire population but is able to enumerate and survey only part of the part of the population, a complete and accurate Count is fundamentally a statistical problem. The fact that each methodology paper from 2013-2017 has stated that the only potential source of error in the street count is from uncounted census tracts, and that no methodology paper has ever recognized the pervasive risk of *measurement error*, demonstrates that there is a need for one or more qualified statisticians with expertise in enumerating hidden populations and sampling methodology. In addition, the continued use of a dated and inadequate formula for estimating the annual homeless population is further evidence of the need to strengthen the statistical tools used in the Count.

13. Make it a primary goal of the Count to calibrate year-to-year comparability in population estimates and to identify likely causes for major shifts in the number or composition of the homeless population. Prior to this report, there

has not been any public domain document that analyzed data continuity and comparability from one count to the next. This should be an ongoing component the work done be researchers supporting the count, and problems with data continuity and comparability should be identified and corrected.

14. Increase the sampling framework for the street count and demographic survey beyond the binary breakout of hotspot census tracts and all other census tracts. In 2017 this framework was expanded to include family hotspots and vehicle hotspots. However, this leaves most census tracts lumped together in the non-hotspot stratum even though there is wide variation among these tracts in level of homelessness. This is the first of several problems.

    The second problem is that the sampling frame is based solely on geographic categories: hotspot census tracts and all other census tracts. This is questionable because homelessness causes placelessness. Homeless individuals are less defined by geography than any other member of society.

    Third is a chicken-and-egg problem – an accurate profile of the homeless population is required to develop an accurate sampling frame, but the profile of the homeless population is imperfect and uncertain because it comes from surveys designed without an accurate sampling frame.

    The survey about payday loans to low-income workers that was carried out by The Pew Charitable Trusts is an example of a typical survey sampling frame.[32] The survey was designed, and responses weighted, to obtain proportionate representation of individuals based on age, gender, education, ethnicity, mode of telephone usage, and geography. The population profile came from the American Community Survey and information about telephone usage came from the National Health Interview Survey. Los Angeles lacks a comparable, reliable profile of its homeless population that can be used to develop a dependable sampling frame for the homeless count.

    *Local researchers and government agencies that serve homeless residents should work with LAHSA to develop a complete and accurate geographic and demographic profile of homeless residents, including household type, homeless history and type of dwelling.*

15. Use a "decoy" quality assurance mechanism in which an independent team of researchers deploy adults throughout each area of the county, posing as homeless adults during the street count, to check whether they are found and counted as visible homeless individuals. The distribution of decoys must replicate that of the homeless population. This decoy plant-capture approach has been used in New York City since 2005 and in Toronto, since 2009. This procedure is reported to have identified a 29 percent undercount in New York City's street count. In New York, independent researchers place teams of two decoys in a sample of areas to be counted by enumerators. To maintain the integrity of the quality assurance mechanism, neither enumerators nor those responsible for the Count know where decoys have been placed. Each decoy is given a unique identifier, which is conveyed to an enumerator when they are surveyed. Alternatively, the GPS capabilities of smartphones or Bluetooth beacons carried by enumeration teams and received by decoys could be used for a post-hoc comparison of the locations in which people are counted to where decoys were placed. The proportion of planted decoys who are uncounted will produce a probabilistic estimate of the proportion uncounted among homeless people on the streets.[33]

16. As an additional tool for quantifying the share of homeless persons who are not found by enumerators, conduct surveys at homeless provider locations in the days following the Count. HUD allows for surveying for up to seven days following the point-in-time night. Based on the experiences of New York and Philadelphia, post-Count surveys can be conducted for up to five days after the point-in-time Count night using a questionnaire designed specifically to determine whether respondents were counted. It might ask, for example, if they spent the night of the Count: on the streets, a bus, walking around, in a park, in a 24-hour store, restaurant or internet café, bank, or other private establishment, or in an abandoned building, stairwell, lobby, yard, squat, car, or similar place.[34]

17. Survey a stratified sample of vehicles that may have homeless occupants to determine whether the vehicles are used as dwellings. The sample can be drawn from blocks with higher numbers of citations that are indicative of individuals residing in vehicles. Examples include citations for overnight parking in areas where it is prohibited, parking when the street is scheduled to be cleaned, and having missing or expired vehicle registration. In addition, the American Community Survey provides census tract level data about number of households living in vans, RVs and other vehicles. The survey should be designed and conducted so as to determine the proportion of different types of vehicles − cars, vans and campers − with different types of appearance − new vs. old, maintained vs. dilapidated − that serve as homeless dwellings.

18. Develop a more accurate statistical model for estimating the annual homeless population using a more detailed and complete breakout of population turnover among individuals who experience homelessness. This model should include descriptions of the attributes of individuals experiencing different durations of homelessness.

19. Use other data sources to assess the accuracy and completeness of the Homeless Count. This includes the number, location and attributes of persons receiving public assistance from the county who are identified as homeless, health care provider reports of services to homeless individuals, and school data about homeless students. For example, public assistance programs obtain and verify much more information about individuals than is possible in the homeless count. Even though those programs, as well as schools, use a definition of homelessness that is broader than HUD's definition, it should be possible to calibrate the overlap of the populations they identify as homeless with HUD's definition and to use this additional information as a benchmark for, and possibly a supplement to, the Homeless Count.

# End Notes

[1] In November 2016, Los Angeles City voters approved Proposition HHH, a $1.2-billion bond measure to fund housing for people who are homeless and at risk of becoming homeless, and facilities that provide mental health care, addiction treatment, and other services. In March 2017, Los Angeles County voters approved Measure H, which will raise an estimated $355 annually for 10 years to fund mental health services, job counseling and substance abuse treatment; more outreach to homeless people on the streets; subsidies to rapidly re-house people who became homeless through job losses or other catastrophes; temporary "bridge" housing before people get permanent homes; emergency shelter beds; services for homeless young adults; help for people coming out of jail with no homes; and financial assistance and services for adults on the verge of homelessness.

[2] Each methodology paper from 2009 through 2017 has stated that the demographic surveys were not random. The citations for each paper are as follows:

- Survey Research Unit, Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2009 Greater Los Angeles Homeless Count Methodology* (November 30, 2009), p. 9.
- Survey Research Unit, Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2011 Greater Los Angeles Homeless Count Methodology* (October 2011), p. 15.
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2013 Greater Los Angeles Homeless Count Methodology* (December 2013), p. 11.
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2015 Greater Los Angeles Homeless Count Methodology* (August 2015), p. 10.
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2016 Greater Los Angeles Homeless Count Methodology* (August 2016), p. 9.
- Robin Cox and Benjamin F. Henwood, USC Suzanne Dworak-Peck School of Social Work, *2017 Los Angeles Continuum of Care Homeless Count Methodology Report* (September 2017), pp. 7 to 9. The report states that when interviewers could not identify any homeless adults in a census tract, they swapped it in the field for non-sampled census tracts that contained homeless adults.

[3] The formula used to project the annual homeless population is based on a methodology put forward by Martha R. Burt and Carol Wilkens in a 2005 report titled, *Estimating the Need: Projecting from Point-in-Time to Annual Estimates of the Number of Homeless People in a Community and Using this Information to Plan for Permanent Supportive Housing.* http://www.csh.org/wp-content/uploads/2013/08/Estimating-the-Need.pdf. LAHSA has used the formula since 2005, with several tweaks to replicate and then compile the estimates for sub populations.

The original formula is: **A + ((B x 51) * (1−C)) = annual estimate**
Where:

**A** = Point-in-time count of currently homeless people − including adults and children

**B** = number of currently homeless adults and children who 1) became homeless within last 7 days, whether for the first time or not, or 2) were already homeless, but just entered Los Angeles County within the past 7 days

**C** = proportion (expressed in decimals − i.e., 15% = .15) of currently homeless adults and children in **A** who have had a previous homeless episode within the past 12 months.

The first part of the formula, (B x 51), accounts for those who have been homeless in Los Angeles County for one week or less and assumes that a similar number of additional people will cycle into homelessness during each week of the year. The second part of the formula, (1−C), accounts for

people who will become homeless more than once during the year and therefore would be double-counted if they were not subtracted from the annual population.

The number of people becoming homeless each week, reduced by the number who have multiple homeless episodes, is added to the point-in-time count to produce the annual estimate. This method for projecting the annual population does not account for the annual turn-over of people who are homeless for a month, rather than a week, before exiting homelessness, or other increments of homelessness between one week and one year.

[4] The final weighted count includes adjustments to account for multiple occupants in tents and shelters as well as vehicles.

[5] Creation of a sampling stratum for vehicle hotspots is described in LAHSA's *2017 Los Angeles Continuum of Care Homeless County Methodology Report*, page 5: https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[6] These conversion factors for the number of inhabitants in each type of vehicle are derived from questions asked in the demographic survey about whether the respondents have resided in vehicles, whether it was as a family or as unaccompanied adults, and how many people were in the vehicle. This methodology is explained in LAHSA's *2017 Los Angeles Continuum of Care Homeless County Methodology Report*, pages 18 - 19: https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

| Type of Vehicle | Number Occupied by Individuals | Individual Weight | Number Occupied by Families | Family Weight | Average Weight per Vehicle |
|---|---|---|---|---|---|
| Car | 639 | 1.518 | 51 | 2.963 | 1.625 |
| Van | 277 | 1.772 | 6 | 3.458 | 1.808 |
| RV/Camper | 350 | 2.050 | 9 | 3.519 | 2.087 |
| ALL VEHICLES | 1,266 | 1.721 | 66 | 3.084 | 1.788 |

[7] Data from the demographic survey is presented in unweighted form because the survey is designed to be representative of census tracts throughout the continuum of care. The survey data is weighted when used to describe the population within service planning areas or other subareas of the continuum of care. The methodology papers for the counts refer to weighting survey data to account for nonrespondents, but these weights are not shown. The 2017 methodology paper states that "nonresponse after contact was very low." University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 7. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[8] HMIS do not provide complete demographic coverage for the shelter count because a small number emergency shelter providers do not receive LAHSA funding and do not participate in HMIS. As part of the Shelter Count, these providers are outreached to participate in and provide data for the Shelter Count.

[9] The comparison of year-to-year demographic attributes in Figures 4 – 12 shows the percent distribution of the population in each data source produced by the Count, rather than the absolute number of people enumerated. This makes it easier to compare results from each data source and reduces the visual distraction of variation in the size of different annual counts. The time scale on the bottom axis of each graph shows counts rather than years. Counts were conducted at two-year intervals from 2007 to 2015, and at one-year intervals from 2015 to 2017. The comparisons do not include the Margins of Error based on the number of tracts enumerated that were included in the report for each count.

[10] From 2009 through 2017, the demographic survey had separate questions for race and ethnicity. The ethnicity question asked respondents, "Do you identify yourself as Hispanic or Latino?" In 2017, follow-on questions were added for individuals who responded affirmatively, asking them to choose among the following options: Yes, Mexican, Mexican American, Chicano; Yes, Puerto Rican; Yes, Cuban; or, Yes, another Hispanic, Latino, or Spanish origin. The change introduced in 2017 was associated with only a slight increase in the percent of respondents who identified as Hispanic or Latino.

[11] LAHSA (2017), *2017 Greater Los Angeles Homeless Count - Data Summary, Los Angeles Continuum of Care*. https://www.lahsa.org/documents?id=1355-2017-homeless-count-los-angeles-continuum-of-care-results.pdf

[12] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 15. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[13] LAHSA's report (August 8, 2017), "*Unsheltered Youth Count Final Sample Weights and Survey Count by Service Planning Area*," shows that a total of 8 non-hotspot census tracts were surveyed.

[14] The Los Angeles Homeless Services Authority (LAHSA) reported that "the total unsheltered youth population for 2017 was estimated to be between 3,569 and 5,333. The mid-point of the range is 4,451. Margin of error is 882 (4,451-3,569=882)." https://www.lahsa.org/news?article=255-comparing-unsheltered-youth-count-2016-and-2017

LAHSA reported the 2016 unsheltered youth count to be 2,388 with a margin of error of 622. https://www.lahsa.org/documents?id=1556-comparison-unsheltered-youth-count-2016-2017-.pdf. This means that the estimated unsheltered youth count was between 1,766 and 3,010, with a midpoint of 2,388.

The 2017 data was weighted to extrapolate results from census tracts that were surveyed onto tracts that were not surveyed. LAHSA has provided a summary of that methodology: https://www.lahsa.org/documents?id=1557-youth-count-extrapolation-methodology-visual-explanation.pdf. Based on these estimates, LAHSA reported that the number of unsheltered youth, ages 18 to 24, increased 64 percent from 2016 to 2017. https://www.lahsa.org/documents?id=1355-2017-homeless-count-los-angeles-continuum-of-care-results.pdf

[15] Children 0 to 17 years of age are not shown because they made up only a very small of demographic survey records in most years: 1.0 percent in 2007, 0.5 percent in 2009, 0.3 percent in 2011, 1.4 percent in 2013, 0.2 percent in 2015, 1.7 percent in 2016, and 2.6 percent in 2017. The under-representation of children is a major deficiency in the demographic survey.

[16] The reported rate of chronic homelessness in 2013 is not shown because data from the 2013 demographic survey does not provide this information.

[17] Flags for chronic homelessness were coded by the Economic Roundtable for each demographic survey and HMIS record for all years based on the HUD's most recent definition of chronic homelessness, which was released in 2014 and took effect in 2016. This was done to provide data continuity in comparing the rates of chronic homelessness reported in each demographic survey. The new definition set the standard is more stringent than the previous standard. The previous definition was an individual with a disabling condition who either experienced homelessness for longer than a year, during which time the individual lived in a shelter, safe haven, or a place not meant for human habitation, or experienced homelessness four or more times in the last three years. The new definition specified that the four separate occasions in the last three years must have a combined duration of at least twelve months with a minimum seven day break between each homeless episode. HUD (2015), *Defining "Chronically Homeless" Final Rule*, https://www.hudexchange.info/course-content/defining-chronically-homeless-final-rule-webinar/Defining-Chronically-Homeless-Final-Rule-Webinar-Slides-2015-01-05.pdf

[18] In 2009, the rate of homelessness among General Relief recipients was estimated to be 60 percent. Los Angeles County Public Social Services Commission, *General Relief and the Homeless Population of Los Angeles County* (February 24, 2009). The rate of homelessness within the General Relief caseload is likely to be higher now given increases in housing costs and the unchanged maximum amount of cash aid provided by the program, $221 a month. The estimate that two-thirds of the current General Relief caseload is homeless is probably conservative.

[19] General Relief caseload data for January 2005 to 2015 is from Los Angeles County Department of Public Social Services, *Monthly Statistical Reports*: http://dpss.lacounty.gov/wps/portal/dpss/main/about-us/information-and-statistical-services/!ut/p/b0/04_Sj9CPykssy0xPLMnMz0vMAfGjzOLdDAwM3P2dgo3cfYBMR_8AJ2-vsEADk2AD_YJsR0UAq1Q9ig!!/. Data for 2016 and 2017 is from California Department of Social Services, *Table CA237CW16-17*: http://www.cdss.ca.gov/inforesources/Research-and-Data/Disability-Adult-Programs-Data-Tables/GR-237.

[20] Los Angeles County Department of Public Social Services, *General Relief Program Fact Sheet* (2014). http://file.lacounty.gov/SDSInter/dpss/237578_GENERALRELIEFProgramFactSheet(12-14).pdf

[21] The ratio of one homeless family member for every 10 unaccompanied homeless adults is derived from homeless demographic survey and HMIS data. This ratio varies widely in different datasets: 1:11.8 in 2017 HMIS, 1:8.8 in 2016 HMIS, 1:4.3 in 2017 demographic survey, and 1:12.6 in 2007 demographic survey.

[22] Data for homeless students was obtained through a special data download from the California Department of Education (CDE). *California Longitudinal Pupil Achievement Data System (CALPADS), Homeless K-12 Students per School, 2015-16 School Year*. Obtained fall 2017.

[23] Los Angeles County Office of Education, *Homeless Education Update, 2015-2016 School Year: LA County Homeless Student Count by Grade* (2016).

[24] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 65. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[25] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 21. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[26] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 63. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[27] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 67. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[28] University of Southern California (September 2017). *Los Angeles Continuum of Care Homeless Count Methodology Report*, page 21. https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

[29] Each methodology paper from 2013-2017 has stated that the only potential source of error in the street count is from uncounted census tracts. The citations for each paper are as follows:
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2013 Greater Los Angeles Homeless Count Methodology* (December 2013), p. A-3: Table titled "Number of CTs Needed in the Geographic Domain to Meet RSE Requirement" shows that if all tracts are counted there is 0 relative standard error.
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2015 Greater Los Angeles Homeless Count Methodology* (August 2015), p. A-2: Table titled "Number of CTs Needed in the Geographic Domain to Meet RSE Requirement" shows that if all tracts are counted there is 0 relative standard error.
- Department of Biostatistics, Gillings School of Global Public Health, University of North Carolina at Chapel Hill, *2016 Greater Los Angeles Homeless Count Methodology* (August 2016). Computation of the relative standard error based on the share of census tracts counted can be seen in pages C-2 to C-4 and E-2 to E-4.
- Robin Cox and Benjamin F. Henwood, USC Suzanne Dworak-Peck School of Social Work, *2017 Los Angeles Continuum of Care Homeless Count Methodology Report* (September 2017), p. 21.

[30] LAHSA's "*Pre-Count Training Video*" for the 2017 Homeless Count is accessible at: https://www.youtube.com/watch?v=NgCikIuNKIA, and the "*Volunteer Training Count Video*" is accessible at: https://www.youtube.com/watch?v=C8EtAJs4XL8 (accessed November 17, 2017).

[31] Information about integration of the count and demographic survey was provided by Dan Treglia, who helped design and implement research methodology for New York City's homeless count.

[32] The Pew Charitable Trusts (2012), *Social Science Research Solutions (SSRS) Omnibus Survey*, http://www.pewtrusts.org/~/media/assets/2012/07/19/pew_payday_lending_methodology.pdf

[33] Kim Hopper, Marybeth Shinn, Eugene Laska, Morris Meisner, and Joseph Wanderling, "Estimating Numbers of Unsheltered Homeless People Through Plant-Capture and Postcount Survey Methods," American Journal of Public Health, Am J Public Health (2008 August) 98(8): 1438–1442, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2446453/.

[34] For information about the methodology used in New York City for the post-count survey, see Kim Hopper and Marybeth Shinn, *op cit*.

Exhibit B

# Estimating the Annual Size of the Homeless Population in Los Angeles Using Point-in-Time Data





Jane Carlen

Economic Roundtable
A Public Benefit Research Organization
www.economicrt.org

This report has been prepared by the Economic Roundtable, which assumes all responsibility for its
contents. Data, interpretations and conclusions contained in this report are not necessarily those of
any other organization that supported or assisted this project.

This report and corresponding code can be downloaded from the Economic Roundtable website
http://www.economicrt.org. They are also available at the Economic Roundtable github repository
for this project: https://github.com/economicroundtable/homeless_LA.

Underwritten by the Economic Roundtable

*First release, August 2018*

**Abstract**

In this report we introduce a model-based framework for estimating the number of people who experience homelessness in Los Angeles over the course of a year based on point-in-time data. We refer to this as the annualized estimate of the population size. Unlike capture-recapture methods, this model is based on a single set of anonymous point-in-time data. This makes it viable for nearly all jurisdictions that conduct annual counts of their homeless population and gather basic information about the duration of homelessness within this population. In addition, it allows us to estimate the breakdown of the annualized population by duration of homelessness. A practical application of this is to quantify the distribution of homeless services needed to provide progressively more intensive levels of intervention for individuals with longer durations of homelessness. We incorporate measures of uncertainty in our final estimates, reflecting that demographic data is derived from a sample of the target population. As such, our model provides more complete information about the annualized population than the model developed by Burt and Wilkins (2005) that is currently in use in Los Angeles.

# Introduction

Every year Los Angeles invests significant resources, including mobilizing thousands of volunteers, to estimate the number of people experiencing homelessness on a given night. The annual Los Angeles Homeless Count, which includes information collected from sheltered and unsheltered people, is the primary tool for measuring the size and demographics of this population and how they have changed over time. This information is critical to understanding the growing need for emergency shelter, housing services, and other interventions. With the availability of hundreds of millions of dollars in funding annually for housing and supportive services, through the county's Measure H and the city's Measure HHH, this information becomes even more vital to policymakers.

The primary goal of the Homeless Count is to measure the population that is homeless on a given night. The resulting population size estimate, which has been in the ballpark of fifty thousand for the last two years, is often taken as the definitive size of the homeless population. It is the figure most widely reported in local media, and when it declines, as reported in 2018, it is considered evidence that resources are being deployed successfully.

However, the size of the point-in-time (PIT) population, the number of people who are homeless on a given night, may not always be the primary data point for policymakers. When planning for housing and other services that are provided on an extended basis it is equally important to know how many people experience homelessness over the entire period.

In this report we address the question of how to estimate the number of people who experience homelessness over the course of a year, the annualized estimate, based only on PIT data. To

1

do this we draw on survey data that describes how long individuals have been homeless and how many stints of homelessness they have recently experienced.

We present an estimation method that can be flexibly applied regardless of the time intervals in which these measurements were gathered. Our model also allows us to present our estimate within a range of plausible estimates, reflecting limitations of the sampling methodology. In addition, it enables us to not only estimate the annualized population size, but the distribution of time spent homeless within the whole population. This is extremely important for capturing the prevalence of short-term homelessness. Although chronic homelessness is often the face of homelessness in cities like Los Angeles, more people experience shorter stints of homelessness over the course of a year. Bringing this to the forefront highlights the precarious housing situations that too many Angelenos face.

Research to date on estimating the annualized homeless population based on PIT data is sparse. In fact, we found only the model of Burt and Wilkins (2005), the model currently used Los Angeles, designed specifically for this purpose.

Related research has been conducted on modeling durations of homelessness based on shelter data and demographic surveys. For example, Metraux and Culhane (1999) present an overview of methods to analyze the lengths of shelter stays using administrative data. This work contains examples of constructing survival curves and hazard curves to describe the distribution of lengths of stays of individuals in shelter, drawing on data from New York City. More generally, this line of inquiry falls under the active research field of survival analysis.

In the next section we present the nuts and bolts of the model of Burt and Wilkins (2005) and address some of its shortcomings.

## The Burt and Wilkins model

Although not widely publicized, the Los Angeles Homeless Services Authority (LAHSA) reports annualized estimates of the size of the homeless population and of many demographic subgroups. These estimates are calculated using the following model developed by Burt and Wilkins (2005).

$$Annualized\ estimate = A + 51 * B * (1 - C), \tag{1}$$

where $A$ is the PIT count of the homeless population, $B$ is the number of currently homeless people who became homeless in the counted area during the last week, and $C$ is the proportion of currently homeless people who had a previous homeless episode during the last year.

This formula accounts for the fact that more people become homeless each week. If we were to conduct a PIT count in the remaining 51 weeks of the year we would initially add $B$ people to the population estimate every week. But, according to the model, the proportion $C$ of them would have been counted during a previous week.

2

The use of a consistent proportion $C$ does not reflect that fact that if a new count were performed every week then only in the final week of the 52-week period would $C$ approximate the proportion of individuals who were previously counted. On the other hand, if we assume that previous episodes of homelessness in a year are uniformly distributed, then in the second week of the 52-week period the proportion of people previously counted would be $\frac{C}{52}$. Summing over 52 weekly counts, the annualized estimate would be calculated as follows.

$$Modified\ annualized\ estimate = A + B(1 - \frac{C}{52} + 1 - \frac{2*C}{52} + ... + 1 - \frac{51*C}{52})$$
$$= A + 51 * B * (1 - \frac{1}{2} * C). \qquad (2)$$

Thus, the original model in Equation (1) is an underestimate by $\frac{51}{2} * B * C$ of the annualized population, as compared to the revised estimate in Equation (2).

For example, in 2017 when $B$ was estimated to be 1,513 people[1] and $C$ to be 29.2 percent, the magnitude of underestimate was 11,264 or about ten percent.

In addition, the model introduces variability due to sampling of the unsheltered population. Although the Homeless Count attempts to count every person who is homeless on a given night, only a fraction of the unsheltered population completes demographic surveys. For example, in 2017 about 5,800 individual responses were gathered from unsheltered individuals containing information about their duration of homelessness. This represents about fifteen percent of the estimated PIT unsheltered population of 38,470 individuals. On the other hand, the survey of sheltered individuals is a near-complete census of the entire unsheltered population in a given time window, with a few minor exceptions such as domestic violence shelters.

While sampling is a necessary method for collecting data about any large and hard-to-reach population, it is important to relate the impact that it has on the precision of the resulting estimate. To illustrate this, let us make the simplifying assumptions that the true value of B is 1,000 for the unsheltered population and each individual's response is independent of others who are surveyed. Using the binomial distribution and the sampling parameters from above, our estimate of B has a 95 percent chance of being between 842 and 1,161. Our estimate of C has a 95 percent chance of being between 28.05 percent and 30.35 percent. Using our updated formula, we would expect that 95 percent of the time our derived annualized estimate would fall in the range from 111,611 to 125,352. This is a fairly wide range. Although the underlying estimate of measurement uncertainty is not perfect due to the simplifying assumptions, we advocate for presenting such a range to better reflect the data collection process.

Another weakness of the Burt and Wilkins (2005) model is that is it highly dependent on a single measurement, B, of the number of new entrants to homelessness in the previous week. Such a measure is impacted by the time of the month and clumping in reported durations

---

[1]This value of B is actually a composite estimate that we use for simplicity. In fact, since 2016 the annualized estimate calculated by LAHSA is a sum of seperate calculations for sheltered adults, sheltered youth, unsheltered adults, and unsheltered youth, where B and C are calculated for each sub-group.

of homelessness, among other factors. (Clumping in this context refers to the tendency to round off time estimates, such as if everyone who was homeless for about a week reports being homeless for one week. See Figure 1 for evidence of clumping.) The measurement of B is also sensitive to changes in data collection. For instance, in 2017 the youth-specific survey stopped asking questions about how long an individual was in Los Angeles County. Data from 2016 was therefore used to fill in missing pieces of the calculation (Cox et al. 2018).

The upshot of the sensitivity of the Burt and Wilkins model to sampling variation, measurement error and changes in data collection procedures is shown in the fluctuation of the annualized estimates. While estimates of the PIT homeless population in Los Angeles always increased in reported counts from 2011 to 2017, the annualized estimate has decreased in all but one year, as shown in Table 1. Part of the reason why there is such a large drop in the annualized estimate from 2016 to 2017 is that the method for calculating the length of stay in a shelter changed. In 2016, the length of stay in the shelter was used. In 2017, this length could be added to the length of stay in the prior living situation to determine whether the individual was homeless for a week or less (Cox et al. 2018).

Table 1: LAHSA PIT and annualized population estimates based on the Burt and Wilkins model for the Los Angeles CoC.

| Year | PIT Estimate | Annualized Estimate |
|------|--------------|---------------------|
| 2011 | 34622 | 120,072 |
| 2013 | 35524 | 187,119 |
| 2015 | 41174 | 162,769 |
| 2016 | 43854 | 156,431 |
| 2017 | 52442 | 107,094 |

A final shortcoming of the Burt and Wilkins model that we address is that that it does not account for potentially unobserved very short-term homeless populations. The proportion of people homeless for at most a week is an underestimate because it does not account for people who are homeless for only a few days but not at the time of the survey. They would drive up the value of B in the model, which means that the reported value of B is likely an underestimate.

One way to account for this would be to base the model on the number of newly homeless people in the last day rather than in the last week, but this single-day measure would be even more prone to measurement error and natural variability than B. A related concern is that people who have only been homeless for a very short time may be the most likely to be skipped over by people conducting demographic surveys, even if they are homeless when the survey is conducted. Although the count of the PIT unsheltered population occurs overnight, the demographic survey is conducted largely during the day, when it is more difficult to determine who is homeless. This would also lead to an underestimate of B.

Admittedly, this unobserved group is difficult to measure directly. It would require identifying people who experience very short stints of homelessness, who may or may not be homeless when the survey is implemented. It may be possible to estimate the size of this group using data from shelters, for which we have records over an entire month. However, that would

require gathering reliable information about individuals' destinations after leaving a shelter. In 2017 most of that data was missing.

For these reasons, we propose a model that leverages a much larger pool of information about durations of homelessness to make inferences about the size of the short-term homeless population. It reflects our assessment that the percentage of individuals in the PIT population who have been homeless for a given duration should in general decrease as the duration increases, barring strong seasonal effects, policy changes or shocks to the economy or housing market. For instance, the number of people who have been homeless for two months is a subset of those who were homeless for one month a month ago. Therefore, we expect the PIT two-month group to be smaller than the one-month group. Given the minimal seasonality in Los Angeles, we assume that population entry and exit rates are fairly stable throughout the year.

## Data

As mentioned above, annual Homeless Count data includes both the overnight count data used to estimate the size of the PIT population and demographic data that contains detailed information about a subset of the population. Throughout this report we use data that describes the Los Angeles Continuum of Care (CoC), which includes all of Los Angeles County except the cities of Pasadena, Glendale and Long Beach. If not otherwise specified, the data employed is from 2017, the most recent year for which we have demographic survey data.

The demographic data covers a wide array of topics, but the available variables depend on the year, whether the survey respondent was sheltered or unsheltered, and whether they were in the "youth" group (age 18-24). For our model, the most important variables are those describing time spent homeless. Specifically, we use the reported durations of current stints of homelessness and number of times homeless in the previous year or, if that is unavailable, three years. We find that the it is necessary to pre-process some of the information about durations of current stints, and we describe this process with the introduction of our model framework in the next section.

# Model Framework

The most important advancement of the estimating methodology we present below over the Burt and Wilkins model is that we first model the distribution of the lengths of current stints of homelessness. We then use this fit curve to calculate an annualized estimate and derive other valuable information about the distribution of time spent homeless among the annualized population.

5



Figure 1: Raw and smoothed distribution of duration of homelessness (2017).

# Smooth the duration data

Because of the clumping of survey responses mentioned previously, we must take steps to smooth the distribution of reported stint durations before modeling it. We restrict our attention to durations under a year as this is sufficient for our model, and detailed stint durations become less reliable for longer periods. Figure 1 shows the distribution of durations by month before and after this process. Before smoothing there are spikes in the distribution at one month, six months and nine months. This suggest a tendency for survey respondents to significantly round off the duration of their current stint of homelessness.

Accordingly, to smooth the data we first group the data into quarters of the year. We then fit a piecewise exponential distribution to each quarter. This agrees with our previous assumption that the likelihood of observing a certain stint duration decreases with its length. It also makes the simplifying assumption that exit rates from homelessness are constant within each quarter. Finally, the data is resampled from the piecewise distribution to reflect the natural variability in observed data. While we expect a decreasing curve overall, we know that in practice it will be spiky rather than smooth. The smoothed distribution shown in Figure 1 represents a single sample from the piecewise exponential, but we will ultimately draw on many samples to obtain our annualized estimate and measure uncertainty.

Note that this smoothing process was designed for our data, but it may not be optimal in all cases. In some cases this step may not even be necessary, for example if most homeless people are sheltered and duration data is carefully recorded rather than self-reported.

# Model the distribution of durations

The next step in our modeling process is to fit a curve to the smoothed data. The class of distribution we employ to do this conveys certain assumptions about exit rates from homelessness over time.

We focus our attention on two commonly used and easily interpretable distributions used in survival analysis, the exponential distribution and the Weibull, which encompasses the exponential distribution as a special case. The "memoryless" property of the exponential distribution implies consistent exit rates from homelessness from month to month. In other words, the chance that a person who is homeless finds housing or leaves the area does not change over time. Although this is probably not realistic, it may be a useful conservative assumption if no additional information is available.

The Weibull distribution can capture increasing, constant or decreasing exit rates from homelessness over time depending on its parameters. The most appropriate trend in exit rates will vary by jurisdiction. We can accordingly place bounds on the parameters when optimizing based on local conditions. For example, Metraux and Culhane (1999) note that in New York City some households stayed in a shelter until they received a subsidized housing placement, but this would not occur until at least 90 days into the episode and typically not until 9 months to a year had elapsed. This would impact exit rates in a non-intuitive way. In that case other classes of distributions or non-parametric curves may be called upon to fit the duration data.

In the absence of such programmatic considerations in Los Angeles, we believe that exit rates are likely to decrease over the course of a year. The longer one is homeless, the more likely he or she is to face health problems, social isolation, or involvement with the criminal justice system that can create a more permanent barrier to finding housing. Accordingly, we place an upper bound of one on the estimated shape parameter of the Weibull distribution, which forces exit rates to be constant or decreasing over time.

In addition, we continue to restrict our attention to durations of up to a year for the reasons given above. Accordingly, our parameters are optimized based on a truncated distribution of data between one day and less than a year. In future applications we can account for underrepresentation of very short-term homeless people in demographic survey data by further truncating the fit region to exclude very short durations. For simplicity, we have not done this here, but it may be a useful strategy for basing estimates on the most trustworthy data.

Figure 2 plots the estimated Weibull distribution curve against the background of smoothed duration data. We found during estimation that our data did not support our hypothesis of significantly decreasing exit rates over time. Given our pre-determined parameter bounds, this resulted in fit distributions to resampled data with constant or near constant exit rates. In the plot above, the shape and scale parameters of the estimated Weibull distribution are 1 and 1.853, implying a constant monthly exit rate of 16.5 percent.



Figure 2: Estimated Weibull distribution shown against the smoothed data it models (2017).

## Annualized estimate

We use our fit distribution to determine the number of newly homeless individuals in a single day or week more reliably than deriving this figure from survey responses. In fact, a benefit of our approach is that it is not tied to the time intervals in which the data was gathered. We adapt the formula in Equation (2) to accept as input a daily estimate of newly homeless people, $D$, instead of the weekly value (B) used by Burt and Wilkins.

$$Day\text{-}based\ annualized\ estimate = A + 364 * D * (1 - \frac{1}{2} * C). \tag{3}$$

We present the estimate based on this model in Table 2, along with a measure of uncertainty in our estimate.

## Uncertainty

Our annualized estimate deviates from the true value for several reasons, including:

- Demographic survey respondents are a sample of the target population.

- There is natural variation in daily entries and exits from homelessness despite long-term trends.

- Demographic surveys of unsheltered people may not be representative. One factor is the challenge of surveying people who have been homeless for only a few days.

We reflect these sources of measurement error in our estimates in several ways. First, we use bootstrapping – repeated resampling of demographic survey data – to capture the variation

8

due to sampling of the unsheltered population. Second, we resample from the resulting piecewise exponential fit of the duration data to capture natural variation over time. Lastly, we restrict the Weibull shape parameter to be less than one to ensure that the duration distribution curve is always decreasing. This captures the fact that we expect to find more people on their first night of homelessness on any given night than on their second, and so forth, which helps to account for undercounting. As mentioned above, we can further account for undercounting by tailoring our truncated distribution, though we did not employ that strategy here.

Applying these resampling techniques is roughly equivalent to gathering new hypothetical data sets under the same conditions that generated our observed data. Each resampled data set leads to new estimates of the annualized population, the number of new entrants to homelessness each day (D), and the PIT estimate of people whose current duration of homelessness is at most a week (B).

We repeated this resampling process 1,000 times. Table 2 illustrates the 5th percentile, 50th percentile (median), and 95th percentile values out of the 1,000 estimates. The median values are used as "point estimates," single values we present as estimates of the annualized population, D and B respectively. The spread between the 5th and 95th percentile values is a measure of the uncertainty in our point estimates. We find that the variation is not very large, so our estimates are fairly precise.

Table 2: Percentiles of repeated estimates of the annualized population, D and B.

|     | Annualized population | D   | B     |
| --- | --------------------- | --- | ----- |
| 5%  | 101,440               | 158 | 1,085 |
| 50% | 104,755               | 168 | 1,157 |
| 95% | 108,082               | 179 | 1,225 |

Our annualized population estimate of 104,755 shown in Table 2 differs from LAHSA's annualized estimate for 2017 by -2,339, and is well below LAHSA's three previously reported annualized estimates (see Table 1). We estimate B to be 1,157 and D to be 168. Multiplying our estimate of D by seven to make it a weekly estimate produces a value that is 22 higher than our estimate of B. This implies that using the snapshot measure B as a proxy for the number of new entrants to homelessness over the course of a week undercounts very short-term homeless people by 22 people per week. This was described earlier as a shortcoming of the Burt and Wilkins model, and our methodology allows us to quantify its impact.

# Annualized distribution of duration of homelessness

Modeling current stint durations not only allows us to estimate the annualized population. We can also estimate how long those in the annualized population have experienced homelessness. Below we compare the distribution of duration of homelessness in PIT data, i.e. the length of the stint when surveyed, to the distribution from annualized data, where duration can include PIT stint length and time spent homeless during the year.

Table 3: PIT versus annualized distribution of duration of homelessness based on one
simulation (2017). Duration for the annualized population may occur over several stints.

| Duration (months) | PIT total | PIT percent | Annualized total | Annualized percent |
|---|---|---|---|---|
| up to 1 | 4,522 | 9% | 10,626 | 10% |
| 1-2 | 3,778 | 7% | 8,604 | 8% |
| 2-3 | 3,156 | 6% | 8,475 | 8% |
| 3-4 | 2,636 | 5% | 7,215 | 7% |
| 4-5 | 2,202 | 4% | 6,514 | 6% |
| 5-6 | 1,840 | 4% | 5,474 | 5% |
| 6-7 | 1,537 | 3% | 4,883 | 5% |
| 7-8 | 1,284 | 2% | 4,183 | 4% |
| 8-9 | 1,072 | 2% | 3,458 | 3% |
| 9-10 | 896 | 2% | 3,040 | 3% |
| 10-11 | 748 | 1% | 2,492 | 2% |
| 11-12 | 625 | 1% | 2,173 | 2% |
| 12+ | 28,145 | 54% | 35,818 | 35% |
| total | 52,442 | | 102,955 | |

Table 3 shows that those who have been homeless for at least a year make up just over a
third of the annualized population, as opposed to over half of the PIT population. If the
shape parameter of the estimated Weibull distribution were estimated to be less than one,
implying decreasing exit rates over time, we would find this pattern to be even more stark,
and the annualized population to be significantly larger.

# Discussion

In this report we have presented a model-based framework for annualized population estima-
tion that builds on the model of Burt and Wilkins currently in use. Our method is more
stable, more flexible for use with different data sources, and provides greater information
about durations of homelessness experienced over the course of a year.

## Practical implications

Reliable estimates of time spent homeless during a year support an evidence-based interven-
tion framework. Understanding the prevalence of short-term versus persistent episodes of
homelessness enables accurate allocation of resources based on differing levels of need. The
prevailing approach to homelessness prevention and intervention is "progressive engagement."
This entails treating new entrants into homelessness with a light touch and providing pro-
gressively more intensive services as needed to help individuals reestablish themselves in
stable housing. The most intensive and costly intervention, permanent supportive housing,

10

is reserved for chronically homeless individuals for whom other interventions have failed. A population model, as shown in Figure 2, can be used to plan, budget and implement the range of services needed to help individuals with differing barriers to exiting homelessness.

# Recommendations

We recommend that the estimation method presented in this report be adopted.[2] Alternatively, if that is not feasible, based on the findings above we recommend several improvements to the Burt and Wilkins model that can easily be implemented:

- The formula adjustment shown in Equation (2).

- Use averages of B and C over the last two to three years instead of a single-year's estimate, applying the most up-to-date method for calculating each. This will reduce year-to-year fluctuations, and is appropriate since we do not expect major changes in either from one year to the next. (An exception might be if shelter or housing policy changes significantly.)

- Publish the formulas and data sources used to calculate B and C, noting which survey variables were used. This makes the causes of year-to-year fluctuations more transparent.

- Present annualized estimates with measures of uncertainty, even if they rely on simplifying assumptions. This can be accomplished using bootstrapping or the binomial distribution.

- Ensure that the information needed to calculate the variables in the model is gathered for both sheltered and unsheltered people. For example, both surveys should ask about the number of times one has been homeless in the last year, the total amount of time spent homeless, and whether the individual was in Los Angeles during that time. Currently, the intake questionnaire for sheltered people does not ask about the number of times an individual was homeless in the previous year, but only in the previous three years. To compensate, analysts "adjust the percentage homeless more than once in the past three years for the shelter population by the ratio of the one year to three year measure taken from the data in the youth and adult demographic surveys" (Cox et al. 2018). There are significant reported differences between the sheltered and unsheltered populations which suggest this introduces bias. For example, in 2017 the vast majority of unsheltered homeless people reported being homeless only one time in the past three years, whereas for the sheltered population this figure was similar to the number reporting multiple instances of homelessness. We refer the reader to explore this and other differences through our interactive data visualization tool on the Economic Roundtable website, https://economicrt.org/los-angeles-homelessness-data-dive-app/.

---

[2]The code and data used to create this report are available at the Economic Roundtable github repository: https://github.com/economicroundtable/homeless_LA/.

# Limitations and future work

Despite the advancements our method offers, there are many ways it can be improved upon in future work.

- The calculation of C could be adapted to specifically describe people whose current stint of homelessness has lasted a week or less. For simplicity and comparability with previous estimates we employed the estimate of C used by LAHSA. However, it seems to be biased. It is used to describe the likelihood that recently homeless individuals have already experienced homelessness during the annual period, yet it is based on the probability that anyone surveyed experienced homelessness during that time. Of course, those who have been homeless for a long time have no chance of a previous instance of homelessness during the year.

- Address seasonality of new entrants to homelessness. While it is somewhat reasonable to ignore seasonality in Los Angeles where outdoor sleeping is possible for nearly all of the year, many jurisdictions exhibit seasonality in the number of new entrants to homelessness and duration of stints of homelessness. To accurately extend our model to these jurisdictions would require knowledge of season effects in this context.

- Use our model framework to estimate annualized sub-populations. LAHSA provides annualized estimates for many sub-groups, and it would be interesting to apply our methodology to these groups and provide measures of uncertainty, especially for small sub-groups.

Finally, although we have attempted to correct for or measure the causes of error in our annualized estimate, there are deeper sources of error that we can do little about. Our annualized estimate depends on the PIT count, which is also subject to error. For example, the count is conducted by volunteers who may miss or miscount individuals. The multipliers used to count individuals in tents and vehicles are imperfect approximations. These issues are addressed in greater depth in Flaming and Burns (2017), and D. Smith and Smith (2018), for example. They affect both the Burt and Wilkins (2005) model and ours and are beyond the scope of this report.

# Acknowledgements

The estimation method presented in this report builds on the work of many volunteers who participated in the data dive that Economic Roundtable held with DataKind in July, 2018. At this event, over 40 data scientists in Los Angeles and San Francisco applied their skills to analyze Los Angeles Homeless Count data. We especially want to thank the members of the team that worked on annualized population size estimation: Harry Brisson, Po-Nien Chiang, Johanna He, Geovani Montoya, Bradley Rava, Mark Rodighiero, Giovanni Rosati, Sameer Soi, Fishu Wu, David Ami Wulf, and Tian Yang.

12

We are also indebted to the volunteer organizers with DataKind who made the data dive possible: Wade Fuller, William High, Abhishek Kapatker, Sonali Murarka, Stacey Ronaghan, and Haitham Shammaa.

# References

Burt, Martha R., and Carol Wilkins. 2005. "Estimating the Need: Projecting from Point-in-Time to Annual Estimates of the Number of Homeless People in a Community and Using This Information to Plan for Permanent Supportive Housing." Corporation for Supportive Housing. https://www.csh.org/wp-content/uploads/2013/08/Estimating-the-Need.pdf.

Cox, Robynn, Benjamin F. Henwood, Patricia St. Clair, and Jennifer Ailshire. 2018. "2017 Los Angeles Continuum of Care Homeless Count Methodology Report." University of Southern California.

Flaming, Daniel, and Patrick Burns. 2017. "Who Counts: Assessing Accuracy of L.A.'s Homeless Count." Economic Roundtable. https://economicrt.org/publication/who-counts/.

Metraux, Stephen, and Dennis P. Culhane. 1999. "Analyzing Shelter Stays and Shelter Stay Patterns Using Administrative Data: An Overview of Practical Methods." Homeless Data Users Conference #3. Washington, DC: US Department of Health; Human Services.

Smith, Dakota, and Doug Smith. 2018. "More Sidewalk Tents, but Fewer People Living in Them? The 2018 Homeless Count's New Math." *Los Angeles Times*, no. 15 (July). http://www.latimes.com/local/lanow/la-me-ln-homeless-count-analysis-20180711-story.html.

Exhibit C



# Escape Routes

META-ANALYSIS OF HOMELESSNESS IN L.A.

April 2018



# Escape Routes

Meta-Analysis of Homelessness in Los Angeles County

April 2018

Economic Roundtable

Daniel Flaming

Patrick Burns

Jane Carlen

Underwritten by
The Conrad N. Hilton Foundation

Report available at: www.economicrt.org

This report has been prepared by the Economic Roundtable, which assumes all responsibility for its contents. Data, interpretations and conclusions contained in this report are not necessarily those of any other organization.

This report can be downloaded from the Economic Roundtable web site: www.economicrt.org

Follow us on Twitter @EconomicRT
Like us on Facebook.com/EconomicRT

# Acknowledgements

We are grateful for information, ideas and critical suggestions that
have been generously provided by the following individuals:

Phil Ansel       Los Angeles County Chief Executive Office

Elizabeth Ben-Ishai       Los Angeles County Chief Executive Office

Gary Blasi       UCLA School of Law Emeritus

Corrin Buchanan       Los Angeles County Department of Health Services

Dennis P. Culhane       University of Pennsylvania's School of Social Policy & Practice

Irene Dyer       Los Angeles County Department of Health Services

Susan Flaming       All Saints Church Foster Care Project

Sarah Hunter       RAND Corporation

Andrea Iloulian       Conrad N. Hilton Foundation

Chris Ko       United Way of Greater Los Angeles

Stephen Metraux       U.S. Department of Veterans Affairs

Michael Nailat       United Way of Greater Los Angeles

Tommy Newman       United Way of Greater Los Angeles

William Nicholas       Los Angeles County Department of Public Health

Paul Simon       Los Angeles County Department of Public Health

Beth Steckler       Los Angeles County Second Supervisorial District

Max Stevens       Los Angeles County Chief Executive Office

Paul Tepper       Western Center on Law and Poverty

Yasmin Tong       Yasmin Tong Consulting

Halil Toros       Economic Roundtable

Dhakshike Wickrema       Los Angeles County Second Supervisorial District

# Table of Contents

I. Executive Summary......................................................................................................................1

II. Precarious Housing..................................................................................................................11

    A. Overview....................................................................................................................12

    B. Precarious Housing..................................................................................................13

    C. Unaffordable Housing..............................................................................................15

    D. Success in Avoiding Homelessness.........................................................................16

    E. Other Solutions besides Housing.............................................................................17

    F. Approach...................................................................................................................18

    G. Summary...................................................................................................................18

    G. Methodology.............................................................................................................20

III. Attributes of Homeless Residents..........................................................................................21

    A. Homeless Demographics...........................................................................................22

    B. Homeless Residents Compared to the Overall Population.......................................23

    C. New Entrants into Homelessness.............................................................................24

    D. Duration of Homelessness for the Point-in-Time Population...................................26

    E. Duration of Homelessness within the Annual Population.........................................27

    F. Method for Estimating the Annual Homeless Population.........................................30

    8. Summary...................................................................................................................31

IV. Entering and Exiting Homelessness.......................................................................................33

    A. Reasons for Homelessness.......................................................................................34

    B. Domestic Violence....................................................................................................36

    C. Age When First Homeless........................................................................................37

    E Types of Help Sought................................................................................................39

    D. Health Conditions.....................................................................................................39

    F. Summary...................................................................................................................41

V. Visible Homelessness..............................................................................................................43

    A. Street vs. Shelter......................................................................................................44

    B. Street Trends.............................................................................................................45

    C. Types of Street Dwellings.........................................................................................46

    D. Street Dwellings by Age...........................................................................................47

    E. Street Dwellings by Duration of Homelessness.......................................................48

    E. Homeless Encampments..........................................................................................49

    F. Summary...................................................................................................................52

VI. Justice System Involvement...................................................................................................55

    A. Rate of Justice System Involvement.........................................................................56

    B. Type of Justice System Involvement.........................................................................56

C. Recent Justice System Involvement..................................................................................................58

D. Crimes Against and by Homeless Residents..................................................................................59

E. Where Homeless-Involved Crimes Occur.......................................................................................62

F. Demographics of Homeless-Involved Victims and Suspects.......................................................64

G. Homeless-Involved Crime as a Share of All Crime......................................................................66

H. Summary.............................................................................................................................................66

## VII. Families and Children .............................................................................................................67

A. Homeless Parents and their Children..............................................................................................68

B. Foster Care History............................................................................................................................70

C. Pregnancy............................................................................................................................................71

D. Structure of Families.........................................................................................................................72

E. Age of Homeless Children.................................................................................................................73

F. Number of Children in Household....................................................................................................74

G. Homeless K-12 Students....................................................................................................................74

H. Summary.............................................................................................................................................78

## VIII. Work and Income ...................................................................................................................81

A. Employment Profile of Adults..........................................................................................................82

B. Employment Status Based on Parents' Age....................................................................................83

C. Employment Status Based on Children's Age.................................................................................83

D. Government Assistance......................................................................................................................84

E. Educational Attainment....................................................................................................................85

F. Monthly Income..................................................................................................................................86

G. Barriers to Employment ...................................................................................................................87

Discrimination..........................................................................................................................................88

Employment Intervention.......................................................................................................................88

H. Summary.............................................................................................................................................89

## IX. Chronic Homelessness .............................................................................................................91

A. Rate of Chronic Homelessness.........................................................................................................92

B. First-time Homeless vs Chronically Homeless...............................................................................93

C. Attributes that Differentiate Chronically Homeless Individuals.................................................94

D. Using Linked Administrative Records for Targeted Interventions..............................................94

E. Summary..............................................................................................................................................94

## X. Findings and Recommendations ..............................................................................................97

A. Key Findings........................................................................................................................................98

B. Efforts Already Underway.................................................................................................................98

C. Recommendations..............................................................................................................................99

D. Next Steps............................................................................................................................................100

## XI. End Notes ..................................................................................................................................103



# Executive Summary

## Objective

We can't navigate without a map. If we can't see the whole picture of homelessness, we can't begin to solve the problem. This meta-analysis brings together 26 point-in-time data sets to provide a single panoramic description of people without homes who are living in places not meant for human habitation. The objective is to identify the common reality underlying the data and provide a description that is more comprehensive and reliable than information from any single source.

## Escape Routes

The attributes of people experiencing homelessness change if they remain homeless. Poverty and inability to pay for housing may be the precipitating cause for first becoming homeless. Over time, however, social disconnection and legal, medical and behavioral health problems emerge as increasingly formidable barriers to escaping homelessness.

Chronic homelessness is the outcome of repeated system-wide failures to provide lasting help. To reduce the size of the chronically homeless population, it is necessary to reduce the number of people who have protracted and repeated episodes of homelessness. This requires system-wide engagement by the entire range of public and private service providers that touch or should touch the lives of individuals experiencing homelessness.

In addition to building affordable housing, the path for ending Los Angeles County's crisis of chronic homelessness is through identifying individuals with a high risk of becoming chronically homeless early after the onset of homelessness and intervening with coordinated system-wide assistance that supports a permanent exit from homelessness before the problem is catastrophic.

Homelessness results from a cascade of system-wide failures and requires system-wide engagement. The homelessness response system can't be the only system providing thoughtful, targeted interventions to individuals who fall into homelessness.

The pragmatic argument for early interventions such as employment is that they cost much less than the roughly $300,000 in subsidies required to make a housing unit permanently affordable for a formerly homeless person. If early interventions are accurately targeted on individuals who have a high risk of becoming chronically homeless, the avoided public costs will more than offset the cost of the intervention.

This is not to say that employment interventions are inexpensive. The package of system-wide services that are needed includes, but isn't limited to, temporary housing, temporary income maintenance, training, employment subsidies, child care, and transportation.

Greatly increasing the supply of permanently affordable housing continues to be crucial. Jobs and other early interventions must be parallel efforts that augment rather than divert resources from housing chronically homeless individuals.

Chronic homelessness is the outcome of repeated system-wide failures and requires system-wide engagement.

## Precarious Housing

A large population experiences short episodes of homelessness. Out of this larger population, some individuals' homeless episodes reoccur and grow longer, resulting in persistent homelessness.

Almost 600,000 Los Angeles County residents are in poverty and spend 90 percent or more of their income on housing. However, on any given day, over 90 percent of these extremely precariously housed individuals succeed in avoiding homelessness through employment, public assistance, housing support, help from friends and relatives, social services, and the generosity of people in their lives.

Each one percentage point increase in the success rate of precariously housed individuals avoiding homelessness will reduce the number of people who become homeless by at least 10 percent. This can be achieved by strengthening the tools precariously housed people already use to remain housed.

The large share of the homeless population that experiences homelessness for only a short period of time has important operational implications. There is more diversity among people experiencing homelessness and often greater capacity to achieve an exit than is commonly appreciated.

Looking at an annual population scenario, 48 percent of individuals are estimated to be homeless for one month or less, and there is a progressive decline in the number of people who remain homeless from one month to the next until the twelfth month, when the long-term homeless population balloons.

Further reducing the share of people who continue to be homeless from one month to the next is essential if we are to reduce the number of people who become stuck in chronic homelessness.

Even a ten percent increase in the monthly exit rates from homelessness could reduce the number of people who become persistently homeless by almost half.

Based on a scenario of the annual homeless population, our preliminary estimate is that 2,600 to 5,200 individuals fall into persistent homelessness each year. Many of these individuals also have disabilities, marking them as chronically homeless. Los Angeles County's current population of chronically homeless individuals is the cumulative outcome of many years of slow attrition into persistent homelessness.

Reducing chronic homelessness by increasing early and lasting exits from homelessness requires targeting the right interventions on the right individuals as quickly as possible.

## Attributes of Homeless Residents

African-American boys and girls 0 to 17 years of age are extremely over-represented among children experiencing homelessness. The rate of homelessness for African-American children is 10 times greater than the rate for Latino children and 13 times greater than the rate for European-American children. The ethnically disproportionate burden of homelessness among African-American adults begins in childhood.

> A 10% increase in monthly exit rates from homelessness would reduce the number of people who become persistently homeless by almost half.
> -----------------------------

The rate of homelessness for African-American children is 13 times greater than the rate for European-American children.

------------------------------

African-American men 45 to 54 years of age are 16 times more prevalent among homeless residents than in the overall population.

By far the most frequently given reason for homelessness is unemployment, lack of cash aid, and consequent lack of money—cited by 40 percent of individuals. A frequent compounding factor is breakdown of social connections. This includes family conflict, breakup, violence, and death.

Younger individuals and women are the most likely to identify social disconnection as a reason for being homeless. Over a third of homeless adults and over half of women report having experienced violence at the hands of someone close to them.

Across all age groups of unsheltered homeless adults 25 years of age and older, over a quarter said that their first homeless episode occurred when they were between 18 and 24 years of age, a quarter say it was when they were 25 to 34, and a fifth say it was when they were children.

However, the age profile for the onset of homelessness varies by the age of the respondent, with the onset shifting to older ages for respondents who are older. This suggests that for many individuals, even older individuals, the entry into homelessness has been recent.

When asked what kind of help they need to escape homelessness, individuals living on the street say that getting housing is the most important type of help, followed by transportation, public benefits, jobs, job training or education, and health care.

These priorities are largely consistent across ethnic and gender groups. The greatest divergence in priorities is about the importance of a job or job training and is based on age and length of time homeless. Developing skills and finding a job is very important for almost three-quarters of individuals 25 to 34 years of age and people who are homeless for the first time, but this priority diminishes with age and length of time homeless.

The condition of homelessness compounds the decreased vitality that often accompanies age, resulting in serious health problems among nearly three-quarters of older homeless persons. Serious health disorders are reported two and a half times more frequently by chronically homeless individuals than by first-time homeless. Serious mental illness is reported by over half of chronically homeless individuals versus a fifth of first-time homeless.

## Visible Homelessness

The most basic distinction in homeless dwelling places is between staying in a homeless shelter and residing on the street where one is visibly homeless. Reasons why homeless individuals may choose not reside in emergency shelters include the lack of lasting solutions at the end of the shelter stay, particularly a source of income or housing after people reached the time limit for their program.

Children are the most likely to find refuge in a homeless shelter, followed by women, and then by non-chronically homeless individuals. Among the one-fifth of children who are unsheltered, half reside in vehicles. This means that on a

given night, the dwellings for 10 percent of homeless children are something less secure than an emergency shelter or a vehicle.

The long-term trend in the dwellings occupied by unsheltered individuals is that persons sleeping on sidewalks make up a decreasing share of homeless sightings; and tents and makeshift shelters make up an increasing share. There is a progression that accompanies age in the increasing share of unsheltered individuals who occupy tents and makeshift shelters.

Sleeping on sidewalks and alleys is most prevalent among youth 18-24 years of age, accounting for almost half of the locations where unsheltered youth spend the night.

Roughly a third of unsheltered homeless individuals live in a vehicle. However, the rate of vehicle occupancy drops by over half among individuals who have been homeless 12 months or longer. This may well be because the substantial cost of vehicle ownership is compounded by lack of legal parking places, parking tickets and vehicle impoundment.

In most cases, vehicles are the best dwelling option for unsheltered individuals. It is beneficial and cost-effective to help homeless individuals retain their vehicles. This strategy includes providing legal places to park together with sanitary facilities for occupants of the vehicles. It can also include assistance in paying vehicle registration and maintenance costs.

## Justice System Involvement

One of the most consistent characteristics of homeless adults is a history of incarceration. Fifty-eight percent of unsheltered men 25 years of age or older and 42 percent of women report having been incarcerated. A third of reported stints of incarceration are in state prison and the other two-thirds in county jail.

Although three-quarters did not have juvenile records and the onset of involvement in the criminal justice system occurred as adults, adult incarceration foreshadows homelessness for half of men and a third of women.

Prolonged exposure to homelessness is associated with an increased rate of incarceration. The frequency of incarceration histories is a quarter again higher among chronically homeless men and half again higher among chronically homeless women than among those who are newly homeless.

Overall, homeless residents are involved in a very small share of crimes in the City of Los Angeles. They are suspects in roughly one out of 50 crimes and the victim in about one out of 100 crimes. The predominant type of police encounter for homeless residents has been loitering or sleeping in a public place, accounting for two-thirds of homeless arrests from 2010 through 2017.

Homeless residents' encounters with the police increase with age, peaking among individuals who are 45 to 54 years old. In contrast, non-homeless encounters with the police peak among individuals who are 25 to 34 years old and decrease thereafter. The higher frequency of justice system involvement among older homeless individuals appears to be associated with the duration of homelessness, since older people tend to have longer histories of homelessness.

Vehicles are the best dwelling option for unsheltered individuals.

----------------------------

Adult incarceration foreshadows homelessness.

----------------------------

This points to the importance of continuing and expanding interventions for homeless individuals while they are incarcerated and more readily accessible for services and discharge planning.

## Families and Children

Homeless families are fragile. Half of all homeless women and a third of men report that they have children. Nearly a tenth of all homeless individuals 18 years of age and older are accompanied by a child, this includes nearly a fifth of women and a quarter as many men. Others have children in institutional care, and still others have children who have reached adulthood.

For every one homeless parent accompanied by a child, 1.5 parents have a child in institutional care. This includes one parent who has a child in foster care and slightly less than one parent who has a child in juvenile detention. Because some parents have children in both forms of institutional care, the ratio is one to 1.5.

Homelessness and institutional care are linked across generations. One-seventh of all homeless adults and nearly one-third of homeless youth 18 to 24 years of age, report that they were in foster care.

Youth-led households, that is, parents 18 to 24 years of age, make up a quarter of all homeless households with children. The share of young women in this age range who say they are pregnant is a third as large as those how have a child with them. These young parents still have the hope and energy of youth, yet are faltering in their transition to adulthood. They are an especially important group to support in obtaining jobs, subsidized childcare, and other needed assistance.

More homeless families are divided than remain intact. Given that many youth in institutional care are not successful in building a path to self-sufficient adulthood and are at risk of becoming second- or third-generation homeless, there is an important public interest in strengthening these families. This includes supporting parents in obtaining and keeping jobs, addressing behavioral health needs, and, when needed, developing successful parenting skills.

## Work and Income

Efforts of homeless individuals to participate in the formal labor force are largely in the form of job seeking rather than job holding. The number of individuals looking for a job is four times greater than the number with a job.

Two-thirds of homeless adults report making efforts to generate an income, but as individuals age and are homeless for longer intervals, this effort shifts from the formal labor market to informal, economically marginal activities.

The major exceptions to this profile are young adults 18 to 24 years of age, parents with children, and individuals who have been homeless for three months or less. These three groups often overlap and are the low-hanging fruit for employment interventions.

Homeless workers rarely have full-time, year-round jobs, but if we annualize the monthly earnings of those who report having full-time work, their earnings are below the federal poverty threshold. Increasing the incomes of employable adults

*Parents 18 to 24 years of age, make up almost a quarter of all homeless households with children.*

through jobs that pay at least the minimum wage is needed as a primary strategy for addressing homelessness.

Almost three-quarters of homeless adults report having at least a high school degree and one-quarter report some level of college education. This level of educational attainment typically enables individuals to be part of the labor force and consistently earn an income.

Given the massive ethnic disparities in homelessness, any employment-based intervention must address the discrimination and isolation that are barriers to sustaining employment for many African Americans, particularly men.

The entry of most homeless adults into sustaining jobs will need to be facilitated by strong financial incentives for employers to hire them and help them master their jobs. Other essential components of an integrated employment intervention include temporary housing, child care, transportation, clothing, behavioral health care, and interim income maintenance while waiting for a paycheck.

Considering that many of the people who are most interested in employment are parents, the multi-generational costs to society when those parents are marginalized and lack stability builds a strong case for the cost-effectiveness of targeted employment interventions. There are similarly strong cases for young adults and recently homeless individuals with employment histories.

*The cost to society of a homeless family, including long-term adverse impacts on children, is likely to exceed the cost of underwriting jobs for parents.*

-----------------------------

## Chronic Homelessness

The rate of chronic homelessness is roughly 30 percent for the total the point-in-time homeless population, but is progressively higher for older individuals.

Distinctive attributes of chronically homeless individuals include far fewer who are living with companions, accompanied by children, working, or looking for work. Every reported health condition is two to three times more prevalent among chronically homeless individuals than among first-time homeless.

Justice system histories are more prevalent among chronically homeless individuals. Two-thirds of chronically homeless men and half of chronically homeless women have been incarcerated.

Even though unequal social conditions create disproportionately large groups of homeless African-Americans and men, there are similar rates of chronic homelessness within each homeless ethnic and gender group. The risk of becoming chronically homeless is shared equally by all homeless individuals.

## Efforts Already Underway

Most of the interventions recommended in this report are being piloted, but often as small scale, stand-alone efforts. To effectively combat chronic homelessness, interventions must be:

- Targeted to accurately prioritize individuals at high risk of chronic homelessness.

**Interventions must be targeted, system-wide and expanded to scale.**

------------------------------

- Integrated as system–wide responses rather than siloed in the homeless service provider system.
- Expanded to a scale that is proportional to the homeless crisis.

Los Angeles County's Office of Homeless Initiative identified the following initiatives that are already being implemented:

- *Prevention:* Housing retentions services are provided for families and individuals.

- *Vehicles and Hygiene Facilities:* Toilets and sinks have been deployed at four sites near encampments in unincorporated areas of the county and a pilot mobile shower program has been launched.

- *Homeless Families:* Family reunification housing subsidies are being provided.

- *Decriminalization:* The Sheriff has adopted a decriminalization policy and trained hundreds of officers in effective outreach and engagement strategies.

- *Youth:* Service coordination, rapid rehousing and crisis housing are being provided for transition age youth. Efforts are being made to avoid discharging foster and probation youth into homelessness.

- *Employment:* Efforts are underway to connect people experiencing homelessness with the workforce development system, provide subsidized employment, training, and job placement assistance. And individuals are being assisted in accessing their vital records.

- *Predictive Analytics:* The County is exploring analytic models to improve screening and targeting within the homeless service delivery system. Expanded data and information sharing will support efforts to link administrative records and more effectively target services.

The *Breaking Barriers* program in the County's Office of Diversion and Reentry is a system–wide effort that integrates health care and justice system resources. It provides case management, flexible housing and employment for jail inmates with mental health or substance use disorders. It has reduced recidivism and improved health outcomes by diverting inmates into community based treatment and supportive housing.

The County's *Subsidized Employment Program* for parents receiving cash aid pays parents' wages during their first six months in a job and should be targeted on homeless parents.

## Recommendations

**Develop and implement predictive analytic screening tools to prioritize and target interventions for new entrants into homelessness**

1. *Newly Homeless At Greatest Risk of Chronic Homelessness:* Increase early and lasting exits from homelessness by using system–based screening tools to analyze linked administrative records from public and publicly-funded agencies for individuals who are newly homeless to identify those who are

most likely to become chronically homeless and target them for immediate assistance.

2. *Ongoing, Real-Time Linking of Client Records*: Implement system-based screening programs using linked administrative records for healthcare, social services, homeless services, employment, and justice system involvement for individuals experiencing homelessness to identify newly homeless individuals who are at risk of chronic homelessness and prioritize them for targeted assistance. Use the Homeless Management Information System (HMIS) as a tool for informing service providers about individuals who have been prioritized for targeted interventions.

3. *Prevent Homelessness:* When a reliable predictive model has been developed, screen precariously housed clients who interface with County systems to identify those at greatest risk of entering homelessness.

4. *Homeless Children:* Investigate the long-term outcomes for children who experience homelessness and develop a reliable predictive model for identifying those at great risk of lasting harm.

## Integrate mainstream human service delivery organizations in combating homelessness

5. *System-Wide Engagement:* Integrate all mainstream housing, social service, health care, and employment organizations into integrated, comprehensive efforts to help homeless residents achieve permanent exits from homelessness.

## Provide targeted interventions

6. *Vehicles as Dwelling Places:* Help homeless individuals retain their vehicles by providing legal places to park together with hygiene facilities for occupants of the vehicles. In addition, provide cost-effective levels of financial assistance for paying vehicle registration and maintenance costs.

7. *Family Support:* Provide services for strengthening homeless families and equipping parents to care for and nurture their children, both those accompanying them and those in institutional care. This includes supporting parents in obtaining and keeping jobs, addressing behavioral health needs, and, where needed, developing successful parenting skills. Reducing risk for this group will provide multi-generational reductions in social service needs.

8. *Shelter for Parents and Children:* Provide immediate housing for homeless parents who are pregnant or accompanied by children and their families.

9. *Justice System Diversion:* Use arrests and incarceration as the last resort in responding to the life circumstances and actions of homeless individuals because arrest and incarceration increase the number of chronically homeless individuals. Expand already successful diversion programs into community based treatment and housing.

10. *Transition Age Youth:* Expand efforts to assist young adults 18 to 24 years of age experiencing homelessness, particularly those exiting foster care and juvenile detention. Needed services include skill development,

employment, child care, behavioral health services, and integration into positive social networks.

11. *Job Training:* Improve access and suitability of education and job training opportunities for homeless individuals seeking employment who lack the skills needed to obtain a job.

12. *Employment:* Expand current efforts to place individuals experiencing homelessness in jobs. Attentions should be focused on new entrants into homelessness, young adults, and individuals who are parents. Services should include subsidized employment, temporary housing, child care, mobile phones, bus passes, clothes suitable for job interviews, and assistance in obtaining identity documents. Federal and state funded employment programs should assume a central role in providing intensive and comprehensive employment services for homeless residents.

## Next Steps

This meta-analysis of information about homelessness experienced in Los Angeles County frames issues to be addressed through direct services as well as research. Chronic homelessness is a catastrophe and the result of multiple failures, both before and after the onset of homelessness. The next stage of Economic Roundtable research is focused on developing predictive analytic screening tools.

Linked administrative records from client contacts with public social service and law enforcement agencies are being used to identify and stop this cascade of failures. These linked records reveal the course of individuals' lives.

We are analyzing 15 years of linked records of individuals who experienced homelessness to identify factors associated with a high probability of becoming chronically homeless. These predictive factors can then be used to screen records of individuals who are newly homeless to identify those who are most likely to become chronically homeless and target them for immediate assistance.

The predictive screening tools will identify people for whom the escape route from homelessness costs less than the problem of remaining homeless.

These are homeless individuals likely to have high future costs for public services if there is not an intervention. They are also likely to have reductions in public costs after the intervention that offset the cost of the intervention. This type of predictive tool has already been developed to prioritize chronically homeless individuals for access to the scarce supply of permanent supportive housing. The new work will expand the array of evidence-driven interventions to include employment and services for foster youth.

Predictive screening tools will identify people for whom the escape route from homelessness costs less than the problem of remaining homeless.

-----------------------------



# Precarious Housing

## Overview

The attributes of people experiencing homelessness change if they remain homeless. Poverty and inability to pay for housing may be the precipitating cause for becoming homeless. Over time, however, social disconnection and health problems emerge as increasingly formidable barriers to escaping homelessness.

We put forward six broad themes in this report.

- *First*, the total population that experiences homelessness over the course of a year is far larger than the chronically homeless population.

- *Second,* increasing the already large number of people who quickly exit homelessness will stem the flow of people into chronic homelessness.

- *Third,* social, medical, legal, and economic wreckage accumulates on the path to chronic homelessness. This accumulation of new impediments makes it ever more difficult and costly to exit homelessness.

- *Fourth,* most homeless adults want to support themselves through work. This goal is strongest and most feasible among new entrants into homelessness, making it viable as an effective early intervention.

- *Fifth*, new screening tools are needed to differentiate among newly homeless individuals to identify those who are at high risk of going on to become chronically homeless and prioritize them for early intervention.

- *Sixth*, Homelessness results from system-wide failures and requires system-wide engagement. Homeless agencies can't solve this problem alone.

The different attributes of newly and long-term homeless individuals are described by Mitchell Katz: "There is no single reason that people become homeless.

**Figure 1: Number of Los Angeles County Families in Income Groups Based on Poverty Threshold**



*Source: American Community Survey Public Use Microdata Sample, County of Los Angeles, 2011-2015. Individuals in Group Quarters excluded. Data includes both families and one-person households, and represents income over the past year.*

However, it is useful to distinguish those whose homelessness is a function primarily of economic forces (typically the recently homeless) and those who have a range of mental health and addiction problems in addition to economic issues (typically the chronically homeless)."[1]

## Precarious Housing

Poverty is the seedbed of homelessness and the universal characteristic of individuals who are homeless. Roughly 484,000 families and one-person households in Los Angeles County live in poverty, as shown in *Figure 1*. This represents 15 percent of the 3,166,000 households in the county, after excluding individuals classified by the Census Bureau as living in group quarters–a category that includes homeless persons.[2]

Poverty is not a stable condition. Individuals with the lowest incomes experience more income volatility than individuals with higher incomes.[3] Volatility results from unstable employment and fluctuation in public benefits and other sources of support. Because their income is both small and unpredictable, many poor families have only a tenuous ability to meet continuing financial obligations such as rent payments.

Half of families in poverty spend 90% or more of their income on housing.

Figure 2: Percent of Income Spent for Housing by Family Income



*Source: American Community Survey Public Use Microdata Sample, County of Los Angeles, 2011-2015. Individuals in Group Quarters excluded. Data includes both renters and owners, and is for families and one-person households.*

In addition to poverty, high rental rates are a region-wide force contributing to housing unaffordability and homelessness in Los Angeles County.

The share of income that families in poverty, as well as those with higher incomes, spend on housing is shown in *Figure 2*. It is astounding and disturbing that half of families in poverty (48 percent) spend 90 percent or more of their income on housing. Even if these families receive food stamps (now called CalFresh) and have health coverage through Medi-Cal, spending nine-tenths of family income for shelter signifies a desperate effort to avoid homelessness.

This enormous strain to pay for housing is most prevalent among families in poverty. In the next highest income group, with incomes ranging from just-above poverty to twice the poverty threshold, 12 percent of families pay 90 percent or more of their income for housing. This share drops to four percent for families with incomes two to three times the poverty threshold, one percent for families with incomes three to four times the poverty threshold, and 0.2 percent for families with incomes five or more times the poverty threshold.

Almost a quarter of a million families and one-person households (231,000) are in poverty and spending 90 percent or more of their income for housing. There are over half a million individuals in these families and households (594,000 people). These precariously housed individuals are on the cusp of homelessness. Eviction may be as close as one missed rent payment. This may be followed by couch surfing with relatives or friends, and when hospitality is unavailable, living in a car, going into a shelter or living on the street. Individuals in poverty who had been paying 90 percent or more of their income for housing make up a significant share of the homeless population.

With over half a million impoverished people on the cusp of homelessness, it is realistic to anticipate that a significant share will become homeless.

**Figure 3: Household Structure and Age of Precariously Housed Individuals**



*Source: American Community Survey Public Use Microdata Sample, County of Los Angeles, 2011-2015. Individuals in Group Quarters excluded.*

**Figure 4: Employment Status of Precariously Housed Individuals by Age**



*Source: American Community Survey Public Use Microdata Sample, County of Los Angeles, 2011-2015. Individuals in Group Quarters excluded.*

With over half a million impoverished people on the cusp of homelessness, it is realistic to anticipate that a significant share will become homeless over the course of a year. The household structure and age of these individuals is shown in *Figure 3.* The largest share of households (41 percent) include children, 37 percent are single adults, and 22 percent include two or more adults.

A third of the individuals are children, 18 percent are 55 years of age or older, and half (49 percent) are working age (18–54).

Sixty percent of impoverished and precariously housed adults 25 to 54 years of age are employed or looking for work, as shown in *Figure 4.* Labor force participation among individuals 55 years of age and older drops sharply to 22 percent. Overall, a majority of near-homeless adults are attempting to support themselves through work.

## Unaffordable Housing

Unaffordable housing is equally the result lack of affordable and market rate housing and inadequate incomes. The homelessness we see today has grown out of a tangle of problems related to housing access.

Inability to afford housing is the result of an inadequate inventory of affordable housing, an insufficient number of jobs in the regional economy, and insufficient public income assistance to fill the gap between income and basic living costs. Half of the families in Los Angeles County (49 percent) are not burdened by the cost of their housing–they pay less than 30 percent of their income for housing. Most who are not cost-burdened have large enough incomes to make housing affordable. One-fifth of these unburdened households have owned their homes long enough to have paid off their mortgage.

60% of impoverished and precariously housed adults 25 to 54 years of age are employed or looking for work.

--------------------------------

Three region–wide forces have contributed to housing unaffordability and homelessness in Los Angeles County.

1. *Economic Restructuring*: Defense cutbacks in the early 1990s led to the collapse of Los Angeles County's aerospace industry and a net out-migration of 1.1 million residents. The county lost 400,000 aerospace jobs and apparel became the primary manufacturing sector. Aerospace paid middle-class wages to workers with high school diplomas. Apparel paid only half as much. This led to a hollowing out of the middle class and rapid income polarization that foreshadowed similar trends nationwide.

2. *Economic Stagnation*: In 2015, Los Angeles County finally recovered the number of jobs it had in its formal 1990 economy, but during that time the labor force grew 11 percent. There was and continues to be a scarcity of jobs in general, and particularly jobs that pay living wages.

3. *Lack of New Housing*: Weak household buying power (combined with expensive land and highly regulated land use) resulted in very low levels of housing construction. This contributed to housing prices that rose faster than incomes and a growing scarcity of affordable housing.

Two additional factors that are specific to homelessness contributed to the growth of homelessness:

4. *Emergency Services Available but Quarantined*: Compared to the rest of Southern California, Skid Row has long been a service-rich environment for the homeless. Cities throughout Southern California transported their homeless to Skid Row as a matter of policy. While services were available in Skid Row, exits from homelessness were scarce. It has been a contained environment. This began to change in 2014, when the county's Housing for Health program started offering permanent supportive housing to homeless individuals who were frequent patients in county health care system.

5. *Criminalization of Homelessness*: As homelessness grew, there was a distinct absence of solutions through housing or employment, and the primary governmental tool was police action to both contain homelessness and prevent permanent anchors in specific locations. Police citations for loitering or sleeping in a public place grew rapidly through 2013, and then were curtailed by litigation on behalf of the homeless. Justice system involvement further marginalized homeless individuals and created an added barrier to exiting homelessness.

These problems have contributed to a large population of aging, disabled homeless individuals and continue to contribute to a flow of new entrants into homelessness. Those least favored in this lottery of scarcity become chronically homeless.

## Success in Avoiding Homelessness

Los Angeles is the national epicenter of homelessness,[4] but, given how many people are precariously housed, it's remarkable that so few become homeless. In 2017, the estimated point-in-time homeless population in all communities of Los Angeles County was 57,794 people.[5] This represents about 10 percent of the population that is in poverty and spending 90 percent or more of their income for

housing. This is the seedbed of homelessness, although individuals with higher incomes and less rent burden also become homeless.

Using this impoverished population with extreme rent burden as a proxy for the overall population at risk of homelessness, we get a rough sense of the share of people at acute risk of homelessness who actually become homeless, and the payoff from achieving small increases in the share that succeeds in averting homelessness. Based on this conservative model that understates the number of people on the brink of homelessness, on a given day, over 90 percent of Los Angeles County's most vulnerable residents succeed against very difficult odds in remaining housed.

Given that there is at least a ten-to-one ratio in the number of people on the cusp of homelessness to the number who are actually homeless, increasing the rate of success in avoiding homelessness by 1 percentage point will reduce occurrences of homelessness by at least 10 percent. This can be achieved by augmenting the resources people already use to remain housed:

- *Employment*–most people are working or trying to find work.

- *Income Support*–many families receive cash aid and CalFresh.

- *Housing Support*–some people live in subsidized housing, others have landlords who tolerate late rent payments or minimize rent increases.

- *Personal Networks*–families and friends allow couch surfing.

- *Social Services*–individuals receive help in solving problems that are barriers to self-sufficiency or to remaining housed.

- *Kindness of Others*–caring individuals ranging from teachers to health providers to neighbors provide help.

> If 1% more precariously housed individuals avoid homelessness, the homeless population will shrink 10%.
>
> ------------------------------

## Other Solutions Besides Housing

While housing is clearly crucial, in the near-term, we will not build our way out of homelessness. We need other, less costly solutions, which come in the form of well-targeted early interventions. There are at least four reasons why housing is not feasible as the primary solution to homelessness.

*First*, housing for formerly homeless individuals is very costly. The monthly rent that a formerly homeless person receiving SSI benefits of $900 a month can afford to pay will amortize about $35,000 in mortgage costs, based on estimates by Yasmin Tong Consulting.[6] The remainder of the roughly $335,000 cost for building or purchasing that individual's housing unit must be subsidized.[7] This means that a subsidy of $5.25 billion is required to build enough housing for a point-in-time population of 17,500 chronically homeless individuals–the countywide estimate from the 2017 homeless count.[8] This does not include additional costs for supportive services.

*Second*, the population with top-priority needs for deeply subsidized housing is larger than just chronically homeless individuals, expanding the scope of financing and logistical challenges. Additional high-need groups include youth transitioning out of the foster care and juvenile justice systems, and homeless families with children.

*Third*, even when subsidy funds are available, as they are now from Los Angeles City Measure HHH, Los Angeles County Measure H, and California's "No Place Like Home" initiative, the pace of construction is slow because of neighborhood resistance to homeless housing projects.

*Fourth*, there is a steady flow of new individuals into chronic homelessness, continually adding to the point-in-time population in need of housing.

The alternative that will reduce some of the need for housing is to prevent individuals from becoming chronically homeless in the first place. This report identifies some of those opportunities.

## Approach

This report is a meta-analysis of 26 point-in-time data sets from 3 sources about homelessness in Los Angeles County. These data sets are listed in the following Methodology section. We looked for the common ground within these multiple snapshots of homeless residents to build a population profile based on corroborating evidence.

The primary source of information is homeless counts conducted by the Los Angeles Homeless Services Authority from 2005 to 2017, which provide 19 of the data sets we used. Demographic surveys of unsheltered individuals in the seven counts from 2007 through 2017 and more recently available Homeless Management Information System (HMIS) records for individuals in emergency shelters during the four counts from 2011 through 2017 were the most valuable sources of information. In an earlier report *(Who Counts?)* we discussed issues related to the year-to-year comparability of homeless count data.

Whenever possible we combined data from multiple years to increase the reliability of the data. This is important because there is significant variation from one count to the next in the profile of homeless residents provided by the demographic survey. It is also important because the demographic survey captures a larger share of chronically homeless individuals while HMIS data captures a larger share of families and children.

Our method of combining the data is described in the following Methodology section.

## Summary

Almost 600,000 Los Angeles County residents are in poverty and spend 90 percent or more of their income on housing. However, on any given day, over 90 percent of these extremely precariously housed individuals succeed in avoiding homelessness through employment, public assistance, housing support, help from friends and relatives, social services, and the generosity of people in their lives.

Each one percentage point increase in the success rate of precariously housed individuals avoiding homelessness will reduce the number of people who become homeless by at least 10 percent. This can be achieved by strengthening the tools precariously housed people already use to remain housed.

The largest share of households on the cusp of homelessness (41 percent) include children.

Sixty percent of impoverished and precariously housed adults 25 to 54 years of age are employed or looking for work. Employment is an important tool for preventing and ending homelessness.

Inability to afford housing is the result both of an inadequate inventory of affordable housing and an insufficient number of jobs in the regional economy that pay living wages. Three region-wide forces over the past three decades have contributed to the current state of housing unaffordability and homelessness in Los Angeles County: deindustrialization and the subsequent economic restructuring that hollowed out the middle class; 25 years of economic stagnation without job growth; and lack of new housing construction.

Two additional factors contributed to the growth of homelessness. Until recently, homelessness was quarantined in Skid Row, where emergency services were available but exits from homelessness were scarce. In addition, until recently, the primary governmental tool for addressing homelessness was police action to both contain homeless individuals and prevent permanent anchors in specific locations. Justice system involvement further marginalizes homeless individuals and creates an added barrier to exiting homelessness.

It is crucial to build affordable housing for homeless individuals, but this is only feasible as part of a broad strategy that includes effective early intervention for individuals at high risk of becoming chronically homeless. Limitations on housing include very high subsidy costs–as much as $300,000 per unit, neighborhood resistance to homeless housing projects, and a continuing flow of new individuals into chronic homelessness.

In parallel with building affordable housing, it is necessary to reduce the flow of new individuals into chronic homelessness. This can be achieved through systems-based tools that use records of individuals entering homelessness to identify those who are at high risk of becoming chronically homeless and targeting them for rapid, effective interventions, including employment.

# Methodology

This report draws on 26 data sources, 19 of which are from homeless counts conducted by the Los Angeles Homeless Services Authority (LAHSA) in 2005, 2007, 2009, 2011, 2013, 2015, 2016, and 2017. This includes street count data from all counts, demographic survey data for unsheltered persons from the seven most recent counts, and Homeless Management Information System (HMIS) data for sheltered persons from the four most recent counts. Results from these data sets are pooled in this report.

Other sources of information are: American Community Survey Public Use Microdata Samples for 2010-14 and 2011-15, U.S. Census American Community Survey 2015, Bureau of Sanitation, City of Los Angeles service requests 2016, Los Angeles Police Department Open Data web site, Los Angeles County Office of Education Homeless Education Update 2015-16, and California Department of Education Longitudinal Pupil Achievement Data System, Homeless K-12 Students per School 2015-16.

The most valuable source of information is the homeless counts conducted by LAHSA, however, there is significant variation among counts in attributes ascribed to the homeless population. This limitation is discussed in the Economic Roundtable report, *Who Counts? Assessing Accuracy of L.A.'s Homeless Count*, 2017, https://economicrt.org/publication/. This analysis addresses this problem by pooling data from multiple counts whenever possible, rather than relying on a single count. A strength of the homeless count data is that often the same variable and outcome definitions are used, or can be generated, across many data sets.

The purpose of this meta-analysis is to systematically combine relevant data from multiple sources to develop a unified description of the population experiencing homelessness that has greater reliability than data from a single source. The number of data sets that provide information about specific issues varies. There are differences in the information collected by the demographic survey and HMIS system, and changes from one count to the next in what data is collected. Throughout this report, all data sets that provide relevant and compatible information were used. Each chart in this report lists the data sources used.

The issue of how to weight data arises in pooling data from HMIS records for shelter residents with the demographic survey of the unsheltered population. Demographic survey data includes more chronically homeless individuals, while HMIS data includes more families and children. Together, the two sources of data provide a more complete and representative description of the homeless population. Whenever possible both demographic survey and HMIS data were used.

Beginning in 2013, there have been 11,000 to 14,000 HMIS records provided by HMIS for the sheltered population during the month of January in each count year, and 3,200 to 5,800 responses by unsheltered individuals to the demographic survey in each count.

Although the HMIS data represents a smaller population than the demographic survey of the street population, it is drawn from the entire population rather than the sample reached through the demographic survey. The analysis of homeless count data in the *"Who Counts?"* report showed that there is strong continuity from one count to the next in the HMIS data, but significant unexplained count-to-count fluctuation in the demographic survey data.

Unsheltered persons are estimated to make up roughly two-thirds of the point-in-time homeless population and sheltered persons one-third. The breakout of sheltered and unsheltered persons in 2009 to 2017 homeless counts was:

|             | 2009 | 2011 | 2013 | 2015 | 2016 | 2017 | Average |
|-------------|------|------|------|------|------|------|---------|
| **Unsheltered** | 67%  | 63%  | 64%  | 70%  | 73%  | 74%  | 69%     |
| **Sheltered**   | 33%  | 37%  | 36%  | 30%  | 27%  | 26%  | 31%     |

To combine demographic survey and HMIS data, we computed the average of the percentage distributions for records from counts in each of the two data sets with information about an issue, and then combined these two averages, giving 69 percent weight to the demographic survey average and 31 percent weight to HMIS average.

It is our assessment that results presented in the report are more representative when they include both HMIS and demographic survey data, and less susceptible to measurement error when based on multiple years of demographic survey data.



# Attributes of Homeless Residents

## Homeless Demographics

The average *age* distribution of sheltered and unsheltered individuals identified in homeless counts from 2013 through 2017 is shown in *Figure 5*.

The age profile of homeless individuals differs most from the age distribution of precariously housed individuals shown earlier in *Figure 3* in that there is a far smaller share of children (3 vs. 33 percent).

**Homeless families with children are difficult to identify and enumerate.**

This suggests that homeless families with children are difficult to identify and enumerate, and may make up a larger share of homeless persons than has been identified in homeless counts.

African–Americans are the largest *ethnic* group among homeless residents, making up an average of 44 percent of the population, as shown in *Figure 6*. Latinos are next largest (26 percent), followed by European–Americans (23 percent).

Other ethnicities including Asian–Americans, Native–Americans and individuals with multiple ethnic identities make up seven percent.

Males are the largest *gender* group, making up 70 percent of homeless residents, as shown in *Figure 7*. Females make up 29 percent, and transgender individuals one percent.

**Figure 5: Age of Homeless Individuals**



*Sources: Weighted average of LAHSA demographic surveys and HMIS data for 2013, 2015, 2016, and 2017.*

**Figure 6: Ethnicity of Homeless Individuals**



*Sources: Weighted average of LAHSA demographic surveys and HMIS data for 2013, 2015, 2016, and 2017.*

**Figure 7: Gender of Homeless Individuals**



*Sources: Weighted average of LAHSA demographic surveys and HMIS data for 2013, 2015, 2016, and 2017.*

## Homeless Residents Compared to the Overall Population

A composite demographic snapshot of Los Angeles County homeless residents compiled from homeless counts in 2007 through 2017 is shown in *Figure 8*. This multi-year average smooths out year-to-year fluctuation in the data to provide a profile of the point-in-time population identified and surveyed at the time of the annual count, which is compared to the overall population living in communities served by the Los Angeles Homeless Services Authority (LAHSA) Continuum of Care.[9] Both populations are broken out by ethnicity, gender and age.[10] Homeless count data probably under-reports homeless children, otherwise this multi-year composite profile plausibly represents people experiencing homelessness on a given day.[11]

The parity marker in *Figure 8* identifies the point at which the share of the homeless population accounted for by an ethnicity-gender-age group is the same as their share of the total population in Los Angeles County. Groups whose population share rises above this line are over-represented among people experiencing homelessness.

The most striking outcome shown in *Figure 8* is the over-representation of older African-American men among people experiencing homelessness. African-American men 45 to 54 years of age are 16 times more prevalent among homeless residents than in the overall population. Homeless African-American men 35 to 44 years of age are almost 10 times more prevalent and those 55 or older are almost 12 times more prevalent than in the overall population.

Latino men tend to be under-represented among homeless individuals, with their homeless rate increasing to parity (same share of the homeless population as of the

*African-American men 45 to 54 years of age are 16 times more prevalent among homeless residents than in the overall population.*

Figure 8: Ratio of Each Group's Share of the Homeless Population to their Share of the Total Population in LAHSA's Continuum of Care



*Sources: Weighted average of demographic surveys 2009-2017 and HMIS data 2013-2017; general population data is from the American Community Survey Public Use Microdata Sample, 2010-2014. Ethnic groups shown represent 83 percent of general population and 88 percent of homeless population.*

Figure 9: Ratio of Homeless Children to Total Population of Children by Ethnicity



*Sources: Weighted Average of 2017 demographic survey, and HMIS data 2013-2017; general population data is from the American Community Survey Public Use Microdata Sample, 2010-2014.*

overall population) among men 35 to 44 years of age or older and exceeding parity for men 45 years or older. The pattern is similar for European-American men, who exceed parity after 35 years of age and have a rate of homelessness that is almost double their share of the overall population for those 45 to 54 years old.

Men are more than twice as likely as women to experience homelessness. They make up 70 percent of the homeless population but just 49 percent of the general population—a ratio of 1.4, whereas women make up 51 percent of the general population and 29 percent of the homeless population—a ratio of 0.6.

Rates of homelessness are three times greater than parity for African-American women 18 to 34 years of age. This increases to four times parity by age 35 and over five times parity for women 45 to 54 years of age. Latinas have rates of homelessness that are half or less of parity. European-American women have slightly higher rates of homelessness, but their rates also remain below parity for all age groups.

Children identified in homeless counts make up a smaller share of the homeless population than of the overall population, but risk varies greatly based on ethnicity. African-American boys and girls 0 to 17 years of age are extremely over-represented among children experiencing homelessness, as shown in *Figure 9*. The rate of homelessness for African-American children is 10 times greater than the rate for Latino children and 16 times greater than the rate for European-American children.

The ethnically disproportionate burden of homelessness among African-American adults begins in childhood.

## New Entrants into Homelessness

Information about new entrants into homelessness and the length of time that people have been homeless is important for understanding the window of opportunity for intervening early after the onset of homelessness. Differing

*The ethnically disproportionate burden of homelessness among African American adults begins in childhood.*

**Figure 10: Percent Homeless for the First Time**



*Sources: Weighted average of demographic surveys 2013-2017 and HMIS data 2015-2016.*

durations of exposure to homelessness represent differing degrees of connection to the labor market, families, and possibilities for affording housing without deep public subsidies.

Forty-five percent of the individuals experiencing homelessness on a given day are estimated to be homeless for the first time, as shown in *Figure 10*. This estimate is based on four sources of data collected by LAHSA, which show variation around this average, ranging from a high of 60 percent to a low of 34 percent. These

**Figure 11: Months Homeless in Past 3 Years for <u>First-time Homeless</u> Shelter Residents**



*Sources: Average of LAHSA HMIS data for January 2015 and 2016. Data is for individuals residing in shelters who were homeless for the first time.*

49% of first-time homeless residents are estimated to be in their first month of homelessness.

variations are more likely to result from sampling differences and biases in self-reported data than changes in the composition of the homeless population, however they provide outside parameters for the proportion that is first-time homeless.

The two data sets with the most detailed breakouts of the duration of individuals' first homeless stint are from Homeless Management Information System (HMIS) data for 2015 and 2016. This information about the duration of homelessness is shown in *Figure 11*. By duration, we mean how long the homeless stint had lasted at the time the individual was interviewed rather than the total length of time that elapsed before the individual exited homelessness.

Thirteen percent of shelter residents who are homeless for the first time are reported to be in their first day of homelessness, 29 percent are in their first week, and 49 percent are in their first month.

Assuming that roughly half of the homeless individuals encountered in Los Angeles County are homeless for the first time, this means that on a given day, almost a quarter of all homeless individuals are in their first month, and one-eighth are in their first week, of homelessness.

## Duration of Homelessness for the Point-in-Time Population

Almost a third of homeless individuals finding refuge in homeless shelters have been homeless for three months or less during the past three years, as shown in *Figure 12*. Slightly more than a fifth have been homeless for 4 to 11 months. And almost half have been homeless for 12 or more months.

**Figure 12: Number of Months Homeless in the Past 3 Years for All Shelter Residents**



*Sources: Average of LAHSA HMIS data for January 2016 and 2017. Data is for individuals residing in shelters.*

**Figure 13: Duration of Current Homeless Episode of Unsheltered Individuals by Age**



*Sources: Average of LAHSA demographic surveys 2013, 2016, 2017. Data is for unsheltered individuals 18 and older.*

For unsheltered individuals, the duration of homelessness increases with age, as shown in *Figure 13*. Among homeless adults encountered on a given day who are 18 to 24 years of age, 31 percent are shown to have been homeless for one month or less. This proportion shrinks to 12 percent for individuals 55 years of age or older.

## Duration of Homelessness within the Annual Homeless Population

There is a strong suggestion in the data that many people experience short stints of homelessness and then manage to find an exit. This has important operational implications. It suggests that there is more diversity among people experiencing homelessness and often greater capacity to find an exit than is commonly appreciated. It also points to the challenge facing service providers in differentiating among clients whose needs and capacities often differ greatly.

An individual who is homeless for a year has 365 times more exposure to the public and to service providers than a person who is homeless for a day, and is more likely to be seen as the face of homelessness. Yet, there is a first day of homelessness for individuals who go on to become chronically homeless. There is far less social, medical and legal wreckage in their lives after a day than there is after a year, and greater likelihood that interventions less costly than permanently subsidized housing will enable them to escape homelessness.

It is critical to understand how many people experience short periods of homelessness over the course of a year. However, those who are homeless for only a short period of time are most difficult to enumerate through point-in-time

*There is a first day of homelessness for individuals who go on to become chronically homeless.*

**Table 1: Hypothetical Size and Composition of Annual Population Experiencing Homelessness Based on Applying Available Data to Point-in-Time Population of 50,000 Persons**

| Total Duration of Homelessness | Observed Percent Duration of Homelessness in Truncated HMIS Data | Estimated Percent of Each Monthly Cohort Exiting by End of Month | Percent of Annual Homeless Population | Number of People in Annual Homeless Population | Multiplier |
|---|---|---|---|---|---|
| 1 Month | 16% | 67% | 48% | 66,165 | 8.4 |
| 2 Months | 8% | 50% | 13% | 17,639 | 4.4 |
| 3 Months | 7% | 50% | 7% | 9,978 | 2.8 |
| 4 Months | 4% | 33% | 3% | 4,014 | 2.0 |
| 5 Months | 3% | 33% | 2% | 3,030 | 2.0 |
| 6 Months | 6% | 33% | 2% | 2,910 | 1.0 |
| 7 Months | 2% | 25% | 1% | 1,753 | 1.8 |
| 8 Months | 3% | 25% | 1% | 1,598 | 1.1 |
| 9 Months | 1.4% | 25% | 1% | 1,349 | 1.9 |
| 10 Months | 1.2% | 25% | 1% | 1,139 | 1.9 |
| 11 Months | 0.7% | 25% | 1% | 933 | 2.7 |
| 12+ Months | 48% | – | 19% | 26,452 | 1.1 |
| Total | 100% | – | 100% | 136,960 | – |

*Sources: Average of LAHSA HMIS data for January 2015 and 2016, and Economic Roundtable annual scenario.*

counts. Furthermore, nearly all available data on durations of homelessness is truncated, meaning that it conveys duration of homelessness only up to the time of data collection.

Given the importance of understanding the composition of the annual population that experiences homelessness, we have used the available data to construct a hypothetical estimate, which is shown in *Figure 14*. The annual homeless population is an estimate of the total number of people who are homeless for any period of time over the course of one year.

The population of shelter residents for whom information on duration of homelessness was available was broken out into monthly cohorts. The one-month cohort includes people who were homeless one month or less, the two-month cohort includes people who were homeless more than one month and up to two months, and so on. The 12-month cohort includes people who were homeless 12 or more months. Projections of the persistence of homelessness for each monthly cohort are shown in *Table 1*.

The most important result from this scenario is that 48 percent of the annual homeless population is projected to be homeless for one month or less.

**48% of the annual homeless population is projected to be homeless for one month or less.**

- - - - - - - - - - - - - - - - - - - - - - - - - - -

**Figure 14: <u>Annual</u> Homeless Population Scenario Based on Duration of Homelessness**



*Sources: Average of LAHSA HMIS data for January 2015 and 2016. Data is annualized based on population turnover for each monthly cohort. Each label shows total duration of homelessness and estimated percent of annual population.*

This estimate should be treated as a starting point for examining the larger question, and leaves much room for refinement. Important points regarding the interpretation and methodology of *Table 1* and *Figure 14* are explained in the accompanying box titled "Method for Estimating the Annual Homeless Population."

Our examination suggests that the short-term homeless population is likely to account for half of the population that experiences homelessness annually.

Column four of *Table 1* shows that there is a reduction in the size of each successive monthly cohort in the annual population until the 12+ months group, when it jumps back up. Based on this scenario, about 2,600 individuals fall into the ranks of the persistently homeless group (12+ months) each year.

If the scenario is adjusted to show lower monthly exit rates from homelessness closer to those identified in an earlier study using data from the New York shelter system,[12] the annual number of individuals becoming persistently homeless roughly doubles to about 5,200. In that case, about half of the annualized homeless population is homeless for two months or less. Our preliminary estimate is that 2,600 to 5,200 individuals become persistently homeless each year in Los Angeles County.

Recognizing that a portion of them will exit the persistently homeless group within several years, whether through housing or otherwise, this range is consistent with a 2017 estimate of 17,500 chronically homeless individuals in Los Angeles County. This group is the cumulative outcome of many years of slow

2,600 to 5,200 individuals become persistently homeless each year in Los Angeles County.

------------------------------

# Method for Estimating the Annual Homeless Population

The second column of *Table 1,* **Observed Percent Duration of Homelessness in Truncated HMIS Data**, contains the data presented in *Figure 12*, which is HMIS data on the total duration of homelessness that sheltered individuals have experienced in the preceding three years. The percentages by duration are very similar to the data presented in *Figure 13*, although *Figure 13* provides the duration of current stints of homelessness for unsheltered individuals in less precise time increments. Accordingly, the first column of *Table 1* can be interpreted in two ways. For sheltered individuals, it represents total amount of time homeless over the three years preceding the point-in-time estimate and the year following. For unsheltered individuals, it represents the total time in the current stint and year following the point-in-time estimate.

The **Percent Exited** rates in column three of *Table 1* express the chance that an individual with a certain total duration as given in column one is in their last month of homelessness for the annual period. These rates are estimated based on prior knowledge that an individual's chance of escaping homelessness decreases over the time, and very loosely based on the month-to-month attrition rates captured in *Figures 12* and *13*.

We stress that more accurate exit rates are needed to produce a verifiable estimate of the annual composition, including differentiation of rates for sheltered and unsheltered individuals. However, our approach allows us to explore the sensitivity of the annual composition to these exit rates. Examining these relationships more closely is a subject of future work.

The **Percent of Annual Homeless Population** in column four provides the estimate of the composition of the annual population.

The **Number of People in Annual Homeless Population** in column five is based on a point-in-time population size of 50,000, which is a round approximation of the 2017 estimate for Los Angeles County.

The **Multiplier** in column six provides the corresponding ratio of the annualized population to the point-in-time population. For example, if we observed 10,000 individuals whose current duration of homelessness has lasted for up to one month, we would expect 84,000 people with total duration of up to one month during the year. This reflects our proposition that some of each cohort of 10,000 would go on to two or more months of homelessness and some will exit homelessness during that month.

Another caveat is that there are at least two uncertainties that are not addressed by our methodology. *First*, the short-term homeless population is most likely to be unobserved, and we do not have reliable data to estimate the size of this unobserved population. If the short-term population is significantly underreported then it would account for an even larger share of the total. *Second*, we have not attempted to account for possible double-counting of individuals who have multiple short stints of homelessness. If the first uncertainty proved to be true it would lead to a larger annual population. On the other hand, if the second uncertainty proved to be true it would lead to a smaller annual population.

attrition into persistent homelessness. Many of these individuals also have disabilities, marking them as chronically homeless.

Efforts to address homelessness often focus on the costly and slow task of housing the chronically homeless cohort. The argument put forward in this report is that more effort needs to be invested in identifying and assisting individuals immediately after the onset of homelessness. It is essential to further reduce the share of people who remain homeless from one month to the next in order to reduce the number of people who become stuck in chronic homelessness.

Even a ten percent increase in the monthly exit rates from homelessness would reduce the number of people who become persistently homeless by almost half (47 percent), based on the estimates shown in *Table 1.*

## Summary

The population of impoverished and precariously housed differs most from the reported homeless population in that there is a far larger share of children (33 vs. 4 percent). This suggests that homeless families with children are difficult to identify and enumerate.

African-American boys and girls 0 to 17 years of age are extremely over-represented among children experiencing homelessness. The rate of homelessness for African-American children is 10 times greater than the rate for Latino children and 13 times greater than the rate for European-American children. The ethnically disproportionate burden of homelessness among African-American adults begins in childhood.

African-American men 45 to 54 years of age are 16 times more prevalent among homeless residents than in the overall population.

The large share of the homeless population that experiences homelessness for only a short period of time has important operational implications. There is more diversity among people experiencing homelessness and often greater capacity to achieve an exit than is commonly appreciated.

Looking at the annual population scenario, 48 percent of individuals are estimated to be homeless for one month or less and there is a progressive decline in the number of people who remain homeless from one month to the next until the twelfth month, when the long-term homeless population balloons.

Based on the annual homeless population scenario, our preliminary estimate is that 2,600 to 5,200 individuals fall into persistent homelessness each year. Many of these individuals also have disabilities, marking them as chronically homeless. Los Angeles County's current population of chronically homeless individuals is the cumulative outcome of many years of slow attrition into persistent homelessness.

Even a ten percent increase in the monthly exit rates from homelessness could reduce the number of people who become persistently homeless by almost half.

Greatly reducing the share of people who cross these monthly thresholds of continuing homelessness is essential if we are to reduce the number of people who become stuck in chronic homelessness.

A 10% increase in monthly exit rates from homelessness would reduce the number of people who become persistently homeless by almost half.

------------------------------

Reducing chronic homelessness by increasing early and lasting exits from homelessness requires targeting the right interventions on the right individuals as quickly as possible.

Future work by the Economic Roundtable will use longitudinal data about individuals who experienced homelessness to build screening tools for differentiating the risk of chronic homelessness among early entrants. The first two tools will identify high risk individuals who are candidates for employment interventions and high risk foster youth.



# Entering and Exiting Homelessness

## Reasons for Homelessness

The surveys conducted as part of the two most recent homeless counts asked a total of over 10,000 unsheltered adults what the main reasons were for loss of their housing. As shown in *Figure 15,* by far the most frequently given reason was unemployment and lack of money—cited by 40 percent of individuals. This factor—encompassing unemployment, lack of cash aid, acute poverty, and inability to pay for shelter—is identified more than twice as often as any other factor as the cause of homelessness.

Social disconnection–breakdown of ties with other people–is another primary reason given for homelessness. Seven reasons, cited by a total of 45 percent of individuals point to loss of personal connections with other people as leading to loss of housing:

- Conflicts with family or household members                19 percent
- Break-up, divorce, or separation                              16 percent
- No friends or family available                                   11 percent
- Death or illness of family member or child                   8 percent
- Domestic violence, parental abuse, partner abuse, dating violence, or stalking                                         5 percent

*The most frequently given reason for homelessness is unemployment and lack of money.*



Figure 15: Reasons Identified by Homeless Individuals for Their Loss of Housing

*Source: LAHSA, 2016 and 2017 demographic surveys, unweighted data. Respondents identified an average of two reasons, so total responses exceed 100 percent.*

**Figure 16: Social Disconnection as a Reason for Homelessness by Gender and Age**



*Sources: LAHSA, 2016 and 2017 demographic surveys, unweighted data.*

- Kicked out of home due to sexual orientation/ gender identity   2 percent
- Left or aged out of foster care   1 percent

Younger individuals are the most likely to identify one of the seven types of social disconnection listed as a reason for being homeless, as shown in *Figure 16*. Although the sample of responses was small, roughly three-quarters of youth gave a reason related to social disconnection as the cause of their homelessness.[13] Among individuals over 45 years of age, this reason drops to slightly under half. Women are more likely than men to identify loss or absence of human connections as the cause of homelessness. Among ethnic groups, Latinos are most likely and African-Americans least likely to offer this explanation.

Three reasons, cited by a total of 30 percent of individuals, identify health and behavioral health problems as reasons why for their homelessness, with only small variation among age, gender and ethnic groups:

- Problematic alcohol or drug use   17 percent
- Mental health issues   13 percent
- Medical, physical disability or illness   9 percent

Only 13 percent of individuals identified mental health problems as the reason why they became homeless. To the extent these self-assessments are accurate, this undercuts the often expressed view that mental illness is a pervasive cause of homelessness. It may be that for some people, mental health problems emerged or become more serious as a result of homelessness. Later in this report we show a higher self-reported rate of mental illness among long-term homeless.

Taken altogether, the explanations given by people for why they are homeless suggest that in addition to housing, solutions for combating homelessness include sustaining employment, human connections, and comprehensive health care.

*Young adults and women are most likely to identify social disconnection as the reason for homelessness.*

------------------------------

**Figure 17 Forms of Domestic Violence Experienced by Homeless Individuals**

Physical abuse — Female 40%, Male 26%
Neglect — Female 33%, Male 25%
Physical abuse by parent — Female 30%, Male 23%
Physical abuse by spouse — Female 29%, Male 11%
Sexual abuse — Female 29%, Male 11%
Sexual abuse by parent — Female 24%, Male 10%
Sexual abuse by spouse — Female 22%, Male 5%
Dating violence — Female 19%, Male 8%
Stalking — Female 18%, Male 10%
Any domestic violence — Female 55%, Male 35%

*Source: LAHSA, 2017 youth and adult demographic surveys. Unweighted data for individuals 18 years of age or older.*

## Domestic Violence

*55% of homeless women have experience violence at the hands of someone close to them.*

Thirty-seven percent of homeless individuals report experiencing violence at the hands of others. These traumas are much more frequent among women—55 percent report experiencing some form of violence or sexual abuse (excluding neglect), compared to 35 percent among men, as shown in *Figure 17*.

**Figure 18: Experiences of Domestic Violence by Gender and Age**



18-24 — Female 55%, Male 42%
25-34 — Female 55%, Male 31%
35-44 — Female 58%, Male 36%
45-54 — Female 56%, Male 28%
55+ — Female 48%, Male 24%

*Source: LAHSA, 2017 youth and adult demographic surveys, unweighted data.*

Histories of physical abuse by parents or a spouse are reported most frequently–by 40 percent of women and 20 percent of men. Neglect is next most frequent, reported by 33 percent of women and 25 percent of men. Sexual abuse is reported by 29 percent of women and 11 percent of men–the widest gender gap in the data.

Histories of domestic violence vary by age as well as gender, as shown in *Figure 18*. All of the forms of abuse except neglect that are shown in *Figure 17* are aggregated into an overall category of domestic violence, with frequency of occurrence broken out by age and gender in *Figure 18*.

Over half of women through age 54 report histories of domestic violence. In contrast, reports of domestic violence decrease among men as age increases, from 42 percent for 18 to 24 year-olds to 24 percent for men 55 years of age and older. Overall, the probability of traumatic histories of domestic violence is especially high among young adults.

## Age When First Homeless

The age when unsheltered homeless individuals said they were first homeless is broken out for four age groups in *Figure 19*. Across all age groups of respondents 25 years of age and older, the largest share (26 percent) said that their first homeless episode occurred when they were between 18 and 24 years of age, a quarter say it was when they were 25 to 34, and a fifth say it was when they were children.

However, the age profile for the onset of homelessness varies by the age of the respondent, with the onset shifting to older ages for respondents who are older. This suggests that for many individuals, even older individuals, the entry into homelessness has been recent.

> A quarter of homeless individuals say they became homeless when they were 18-24 years old.

**Figure 19: Age when First Homeless by Age of Unsheltered Homeless Respondents**



*Sources: LAHSA demographic surveys 2016 and 2017. Respondents 25+ years of age are included in the data. Some age cohorts do not total 100 percent because of rounding error.*

Among the youngest group of respondents (25 to 34 years old), almost half (43 percent reported having their first experience of homelessness when they were 18 to 24 years old, and a third (33 percent) when they were children 0 to 17 years of age. This adds up to over three-quarters (76 percent) who first became homeless when they were children or young adults.

Among the next age cohort (35 to 44 years old), over half (57 percent), report that they first became homeless when they were children or young adults. The remainder entered homeless in their mid-twenties to mid-forties.

Among the next age cohort (45 to 54 years old), under half (44 percent), report that they first became homeless when they were children or young adults, although 18 to 24 was still the peak age range for initiation into homelessness for this age cohort, as it was for the two younger cohorts. Another quarter entered homelessness when they were 25 to 34 years of age. The remainder entered homeless when they were in their mid-thirties or older.

Among the oldest age cohort (55 years of age and older), the largest share (30 percent) said they first became homeless when they were 45 years of age or older. Only a quarter (26 percent) said it was when they were children or young adults.

The peak ages of 18 to 34 for the onset of homelessness should be years when individuals find jobs and build work histories. But for over half of the homeless population they were years when they were destitute and unable to obtain shelter. Individuals who enter chronic homelessness in early adulthood may well have a lifetime of public dependency and lost productive potential. Additional public

**Figure 20: Types of Help That Are Very Important**



Getting housing is the most important type of help needed.

- - - - - - - - - - - - - - - - - - - - - - -

*Source: LAHSA 2017 demographic survey.*

**Figure 21: Percent Rating Access to a Job or Job Training as Very Important**



*Source: LAHSA 2017 demographic survey. Data is for unsheltered individuals 25 years of age or older.*

investments to help these individual establish a foothold in the labor market may very well be cost effective.

## Types of Help Sought

Homeless individuals on the street said that getting housing is the most important type of help they need, as shown in *Figure 20*. The other top five types of help that unsheltered individuals said were very important include: transportation (66 percent), public benefits (62 percent), jobs (60 percent), job training or education (54 percent), and health care (54 percent).

These priorities are largely consistent across ethnic and gender groups. The greatest divergence in priorities was about the importance of a job or job training and was based on age and length of time homeless, as shown in *Figure 21*. The importance of developing skills and finding a job diminishes with age and length of time homeless. Acquisition of skills and finding a job is very important for 72 percent of individuals 25 to 34 years of age and for 71 percent of people who are homeless for the first time, but was very important for only 53 percent of individuals 55 or older and 57 percent of individuals who are chronically homeless.

## Health Conditions

Over two-thirds of adults living on the streets reported in 2016 and 2017 that they had been diagnosed with one or more of the health conditions listed in *Figure 22*. Serious health conditions are reported two and a half times more frequently by chronically homeless individuals than by first-time homeless. Serious mental illness was reported most frequently (55 vs. 21 percent for chronic and first-time homeless, respectively).

Acquisition of skills and finding a job is very important for nearly ¾ of individuals 25 to 34 and people who are homeless for the first time.

------------------------------

**Figure 22: Health Conditions of Unsheltered Individuals by Homeless History**

| Condition | Chronically Homeless | First-time Homeless |
|---|---|---|
| Serious Mental Illness | 55% | 21% |
| Physical Disability | 39% | 16% |
| Chronic Physical Illness | 38% | 16% |
| Drug Abuse | 37% | 14% |
| Severe Depression | 33% | 16% |
| Alcohol Abuse | 31% | 17% |
| PTSD | 21% | 10% |
| Traumatic Brain Injury | 8% | 3% |
| Developmental Disability | 7% | 3% |
| AIDS/HIV | 3% | 1% |

*Source: LAHSA, 2016 and 2017 demographic surveys. Unweighted data for individuals 25 years of age and older.*

*Serious health conditions are reported 2½ times more frequently by chronically homeless individuals than by first-time homeless.*

Six other health conditions were reported by at least a fifth of chronically homeless individuals, with much lower prevalence rates among first-time homeless: physical disabilities 39 vs. 16 percent; chronic physical illness 38 vs. 16 percent; drug abuse 37 vs. 14 percent; severe depression 33 vs. 16 percent; alcohol abuse 31 vs. 17 percent; and post-traumatic stress disorder (PTSD) 21 vs. 10 percent.

It is not clear from this data to what extent health conditions contribute to, or are a consequence of, chronic homelessness. The next stage of research using longitudinal records will address that question. What is clear from this data is that disabling health conditions are a defining characteristic of chronically homeless individuals.

There is a small amount of variation in the prevalence of health conditions by gender and ethnicity, with slightly higher rates reported by men and European-Americans. The greatest variation is based on age, which is shown in *Figure 23*.

**Figure 23: Presence of Serious Health Conditions by Age**



| Age | Percent |
|---|---|
| 55+ | 74% |
| 45-54 | 72% |
| 35-44 | 67% |
| 25-34 | 62% |

*Source: LAHSA, 2016 and 2017 demographic surveys. Unweighted data for individuals 25 years of age and older.*

An average of 62 percent of individuals 25 to 34 years report having one or more serious health conditions. This rate increases to 74 percent among individuals 55 years of age or older. The condition of homelessness compounds the diminished vitality that often accompanies age, resulting in serious health problems among nearly three-quarters of older persons experiencing homelessness.

## Summary

By far the most frequently given reason for homelessness is unemployment, lack of cash aid, and consequent lack of money–cited by 40 percent of individuals. A frequent compounding factor is breakdown of social connections. This includes family conflict, breakup, violence, and death.

Younger individuals and women are the most likely to identify social disconnection as a reason for being homeless. Over a third of homeless adults and over half of women report having experienced violence at the hands of someone close to them.

Across all age groups of unsheltered homeless adults 25 years of age and older, over a quarter said that their first homeless episode occurred when they were between 18 and 24 years of age, a quarter say it was when they were 25 to 34, and a fifth say it was when they were children.

However, the age profile for the onset of homelessness varies by the age of the respondent, with the onset shifting to older ages for respondents who are older. This suggests that for many individuals, even older individuals, the entry into homelessness has been recent.

When asked what kind of help they need to escape homelessness, individuals living on the street say that getting housing is the most important type of help they need, followed by transportation, public benefits, jobs, job training or education, and health care.

These priorities are largely consistent across ethnic and gender groups. The greatest divergence in priorities was about the importance of a job or job training and was based on age and length of time homeless. The importance of developing skills and finding a job diminishes with age and length of time homeless. It was very important for almost three-quarters of individuals 25 to 34 years of age and people who are homeless for the first time

The condition of homelessness compounds the diminished vitality that often accompanies age, resulting in serious health problems among nearly three-quarters of older homeless persons. Serious health conditions are reported two and a half times more frequently by chronically homeless individuals than by first-time homeless. Serious mental illness was reported most frequently–by over half of chronically homeless individuals versus a fifth of first-time homeless.



# Visible Homelessness

## Street vs. Shelter

The most basic distinction in homeless dwelling places is between staying in shelter provided by a homeless service provider and residing on the street where one is visibly homeless. The 2017 Greater Los Angeles Homeless Count–conducted in January–estimated that on a given night, 25 percent of homeless individuals resided in shelters and 75 percent in a setting not meant for human habitation, as shown in *Figure 24.*[14]

Children are the most likely to find refuge in a homeless shelter (80 percent). Non-chronic homeless individuals are more likely than chronically homeless to reside in a shelter (34 vs. 6 percent), and women are more likely than men (36 vs. 21 percent). Ethnicity is the least variable characteristic, with the largest share of shelter residents found among African-Americans (30 percent) and the smallest share among European-Americans (20 percent).

A street survey of individuals residing on the sidewalks of Los Angeles's Skid Row asked what factors were most important when choosing between staying on the street and entering a shelter.[15]  The problems most frequently identified with

**80% of children find refuge in a homeless shelter.**

-------------------------------

**Figure 24: Shelter vs. Street in 2017**



*Source: LAHSA, 2017 Greater Los Angeles Homeless Count–Data Summary, Los Angeles Continuum of Care.*

shelter programs was that there was no source of income or housing after people reached the time limit for their program.

The affordable housing investments being made in Los Angeles County will make headway with the first problem by increasing the supply of permanent housing for people currently in shelters and on sidewalks. The second problem, of being unable to earn a livelihood, is receiving more attention, but much more is needed.

## Street Trends

Each homeless street count includes a street count that enumerates unsheltered homeless people on the streets as well as in homeless dwellings in the form of tents, make-shift shelters, cars, vans, and campers or recreational vehicles. Trends from 2009 through 2017 in sighting these forms of homelessness are shown in *Figure 25*, with tents and shelters combined into one category and vehicles into another category.

The overall trend is that unsheltered individuals outdoors (e.g., unsheltered on a sidewalk) make up a decreasing share of homeless sightings, and tents and make-shift shelters make up an increasing share.

Vehicles accounted for a steady 30 percent of homeless sightings from 2013 to 2016. However, in 2017, the share of sightings that were vehicles increased to 36 percent—a fifth more than in the previous year. Vehicle hotspots were targeted as a priority in the homeless count for the first time in 2017. This increased effort may explain the increased vehicle count, or there may have been a concurrent increase in vehicle occupancy.

*Tents and make-shift shelters make up an increasing share of homeless sightings.*

------------------------------

Figure 25: Breakout of Homeless Sightings in Street Count of Unsheltered Persons



*Sources: LAHSA street counts 2009 to 2017. Data includes single individuals 18 years of age or older but does not include the 0.02 percent of sightings that are of homeless families. Unweighted street count data.*

Sightings of dwellings have a significant impact on the size of the count. In 2017, vehicles, tents and shelters were each estimated to provide shelter for an average of 1.8 inhabitants.[16]

## Types of Street Dwellings

Almost three-quarters of unsheltered homeless individuals are found in plain sight. This includes the most common setting in which unsheltered individuals were sighted in the 2017 homeless count–outdoors on streets or sidewalks–completely unsheltered settings, accounting for 34 percent of homeless sightings, as shown in *Figure 26*. This was followed by tents, outdoor encampments and other makeshift shelters (24 percent). The third setting in plain sight is private vehicles–cars, trucks, vans, recreation vehicles, and campers (14 percent).

Slightly over a quarter of unsheltered residents are in less conspicuous locations. This includes bus and train stations, transit centers, airports, and outdoor locations that don't fit any other category (12 percent). The next most frequent type of secluded location is rustic settings including parks, beaches, campgrounds, woods, and riverbeds (10 percent). Least frequent were places in the built environment that are not meant for human habitation, including abandoned buildings, parking lots, under bridges and overpasses, unconverted garages, attics, and basements (6 percent).

Individuals living on the streets are increasingly occupying some form of shelter.

**Figure 26: Type of Street Dwelling in Past 30 Days**



*Source: LAHSA, 2017 demographic survey, unweighted data.*

The trends shown in *Figure 25* indicate that individuals living on the streets are increasingly occupying some form of shelter–a tent, vehicle or place under a bridge. A smaller share of individuals is sleeping on a sidewalk or in a doorway.

These dwellings on sidewalks, in parks, under bridges, and in vehicles on public streets are an unsanctioned form of urban homesteading. Individuals' urgent need to shelter themselves from the elements and achieve some measure of privacy places them in increasing conflict with the titleholder to the land, which often is the public.

## Street Dwellings by Age

There are noticeable differences in the type of dwelling that unsheltered individuals occupy based on age, as can be seen in *Figure 27*. There are few differences based on ethnicity or gender.

Half of unsheltered children live in vehicles. Unsuitable as a vehicle is for being a child's home, other unsheltered dwellings are more worrisome.

Children are much more likely than any other age group to reside in a shelter (80 percent, as shown earlier in *Figure 24*), and if not a shelter, a vehicle (half of the remaining 20 percent who are unsheltered, or 10 percent of all children). This means that on a given night, the dwellings of the remaining 10 percent of homeless children are something less secure than an emergency shelter or a vehicle.

The dwellings for 10% of homeless children are something less secure than an emergency shelter or a vehicle.

- - - - - - - - - - - - - - - - - - - - - - - - - -

**Figure 27: Where Unsheltered Individuals Spent Most of the Last 30 Nights, by Age**



*Source: LAHSA, 2017 demographic survey, unweighted data.*

**Figure 28: Where Unsheltered Individuals Spent the Last 30 Nights, by Months Homeless this Time**



*Source: LAHSA, 2017 demographic survey, unweighted data.*

The 2017 homeless count found that youth 18 to 24 years of age are more likely than any other age group to be found on a street, sidewalk or alley (44 percent vs. one-third of older individuals).

There is a progression that accompanies age in the increasing share of unsheltered individuals who occupy tents and makeshift shelters. The largest share is among unsheltered individuals 25 and older, with a quarter living in a tent, shelter, or outdoor encampment. An even larger share of this age group, a third, are found on a street, sidewalk or alley, but this is a smaller share than among younger groups.

## Street Dwellings by Duration of Homelessness

The dwellings unsheltered individuals are likely to occupy vary in similar ways based on how long and how many times they have been homeless, as shown in *Figures 28 and 29*. Individuals who have been homeless longer or more times are more likely to reside on a sidewalk or alley and less likely to reside in a vehicle.

The decreasing rate of vehicle occupancy among individuals who have been homeless longer or more often is important because vehicles are likely to be a more desirable dwelling place than a sidewalk, alley, freeway underpass, tent, or makeshift shelter. They also represent a financial asset for the individuals or family occupying the vehicle.

The decline in vehicle occupancy among longer-duration homeless individuals may be because individuals with vehicles are less likely to become long-term homeless, or it may be because it is difficult for homeless individuals to maintain ownership of vehicles. In addition to finding a safe and legal place to park, difficulties that homeless individuals with little if any income face as they seek to

*There is a progression that accompanies age in the increasing share of unsheltered individuals who occupy tents and makeshift shelters.*

**Figure 29: Where Unsheltered Individuals Spent the Last 30 Nights, by Number of Times Homeless**



*Source: LAHSA, 2017 demographic survey, unweighted data.*

retain their vehicles include lack of money to pay for maintenance, fuel, registration fees, parking tickets, and vehicle impoundment fees.

The substantial cost of vehicle ownership is compounded by lack of legal parking places, which can create large additional costs for parking tickets and vehicle impoundment.

In most cases, vehicles provide the best dwelling option for unsheltered individuals. Vehicles are usually weather-tight and provide greater security for individuals and their possessions than other types of unsheltered dwellings. Campers and RVs usually provide some of the amenities of a home, including beds.

Given the shortage of temporary shelter space and even greater shortage for permanently affordable housing, it is beneficial and cost-effective to help homeless individuals retain their vehicles. This includes providing legal places to park together with sanitary facilities for occupants of the vehicles.

## Homeless Encampments

Some people experiencing homelessness reside in encampments of tents and makeshift shelters constructed of tarps, cardboard, and other available materials. The location of these encampments shifts over time, moving in response to police enforcement, neighborhood concerns and city sanitation clean-ups. There were a total of 14,726 service requests made by Los Angeles residents in 2016 to report homeless encampments through the city's web site for requesting services (MyLA311). These requests are mapped in *Figure 30*. The background colors in the map show the percent of low-income residents, with incomes below 150 percent of the poverty threshold in the census tract.

The pattern that stands out is that homeless encampments are concentrated in low-income neighborhoods and unoccupied public spaces such as parks, freeway corridors, underpasses, and hillsides. Neighborhoods with the greatest numbers of homeless encampments include a large swath from Hollywood to Downtown Los

*It is beneficial and cost-effective to help homeless individuals retain their vehicles.*

------------------------------

**Figure 30: Homeless encampments in the City of Los Angeles, based upon MyLA311 Service Requests in 2016**



*Source: Bureau of Sanitation, City of Los Angeles service requests 2016. Data includes just Investigations of Homeless Encampments. Background colors show the percent of the population in each census tract with incomes under 150 percent of the poverty threshold.*

**Figure 31: Homeless Encampments in the City of Los Angeles, based upon MyLA311 Service Requests during 1st Quarter 2016 and the January 2016 LAHSA Homeless Street Count**



*Sources: Bureau of Sanitation, City of Los Angeles service requests, 2016, Investigations of Homeless Encampments. LAHSA, 2016 Greater Los Angeles Homeless Count, street count of tents and make-shift shelters. The number of these outdoor dwellings (ODD) in each census tract is shown by the background color.*

Homeless encampments are concentrated in low-income neighborhoods and unoccupied public spaces.

------------------------------

Angeles and South Los Angeles, with other clusters in Venice, North Hills-Raymer, Van Nuys, and San Pedro.

Homeless encampments reported through residents' requests for city services in the first quarter of 2016 are juxtaposed with the homeless street count of encampments in January 2016, in *Figure 31*. Street count results are represented by the colors of census tracts, which make up the background of the map. The number of encampments reported by residents is represented by the size of the blue circles on the map.

Hot spots based on both residents' requests for city services and results from the 2016 homeless count span from Hollywood through Downtown Los Angeles and South Los Angeles, as well as in the San Fernando Valley along the 405 freeway corridor, around the Sepulveda Basin Recreation Area, and along Van Nuys Boulevard. Other hot spots revealed in both data sources include the Sunland-Tujunga region, Pacific Palisades, Venice and the abandoned Manchester Square near LAX.

Areas that were hot spots based on service requests to the city about homeless encampments but *not* based on the 2016 Greater Los Angeles Homeless Count include Hollywood, the Fairfax-Miracle Mile-West Adams corridor, the Winnetka-Reseda neighborhoods, and the Eagle Rock-Highland Park-Montecito Heights neighborhoods. The divergence in these communities between reports by residents and results from the homeless count raises the possibility that the homeless count may have missed some encampment hot spots.

## Summary

The most basic distinction in homeless dwelling places is between staying in shelter provided by a homeless service provider and residing on the street where one is visibly homeless. Reasons why homeless individuals may choose not reside in an emergency shelter include the lack of lasting solutions at the end of the shelter stay, particularly a source of income or housing after people reached the time limit for their program.

Children are the most likely to find refuge in a homeless shelter, followed by women, and then by non-chronically homeless individuals.

Among the one-fifth of children who are unsheltered, half reside in vehicles. This means that on a given night, the dwellings for 10 percent of homeless children are something less secure than an emergency shelter or a vehicle.

The long-term trend in the dwellings occupied by unsheltered individuals is that persons sleeping on sidewalks make up a decreasing share of homeless sightings; and tents and makeshift shelters make up an increasing share. There is a progression that accompanies age in the increasing share of unsheltered individuals who occupy tents and makeshift shelters.

Sleeping on sidewalks and alleys is most prevalent among youth 18-24 years of age—accounting for almost half of the locations where unsheltered youth spend the night.

Homeless encampments are concentrated in low-income neighborhoods and unoccupied public spaces such as parks, freeway corridors, and hillsides.

Roughly a third of unsheltered homeless individuals live in a vehicle. However, the rate of vehicle occupancy drops by over half among individuals who have been homeless 12 months or longer. This may well be because the substantial cost of vehicle ownership is compounded by lack of legal parking places, parking tickets and vehicle impoundment.

In most cases, vehicles provide the best dwelling option for unsheltered individuals. It is beneficial and cost-effective to help homeless individuals retain their vehicles. This strategy includes providing legal places to park together with sanitary facilities for occupants of the vehicles. It can also include assistance in paying vehicle registration and maintenance costs.



# Justice System Involvement

**Figure 32: Justice System Involvement by Gender, Ethnicity and Age**



*Sources: Average of LAHSA demographic surveys 2016 and 2017. Data is for adults 25 years of age and older.*

## Rate of Justice System Involvement

One of the most consistent characteristics among homeless adults is a history of incarceration, as shown in *Figure 32*. Fifty-eight percent of homeless men 25 years of age or older and 42 percent of women report having been in jail or prison. These rates are self-reported and likely to be conservative because a criminal history is stigmatizing, making some people reluctant to disclose it. About a third of reported stints of incarceration are in state prison and the other two-thirds in county jail. The rates are largely consistent among all ethnicities and ages of men, as well as among women.

This information does not tell us whether incarceration preceded or followed homelessness, but the fact that the rates of incarceration are similar between European-Americans, who typically have lower risk of justice system involvement, and African-Americans, who typically have higher risk, suggests that it is a common outcome of homeless residents' destitution, desperation, placelessness, and exposure to scrutiny of all types. There appears to be a powerful, crosscutting interplay between homelessness, justice system attention, and incarceration that marginalizes individuals and further forecloses life options other than homelessness.

## Type of Justice System Involvement

Three percent of both women and men report having been on adult probation but not incarcerated. An additional 23 percent were both incarcerated and on probation.

A third of reported stints of incarceration are in state prison and the other two-thirds in county jail.

**Figure 33: Justice System Involvement of First-time vs Chronically Homeless**



*Sources: Average of LAHSA demographic surveys 2016 and 2017. Data is for adults 25 years of age and older.*

Three percent of men and one percent of women report having been on probation or in detention as a juvenile, but not involved in the justice system as adults. An additional 14 percent of men and 10 percent of women report having both juvenile and adult involvement in the justice system.

By comparing the rates of juvenile and adult involvement with the justice system, the data indicates that out of the 58 percent of men and 42 percent of women who have been incarcerated, three-quarters did not have juvenile records and the onset of involvement in the criminal justice system occurred as adults. This suggests that the condition of homelessness heightens exposure to the justice system and the risk of criminalization.

Comparing the incarceration rate of first-time homeless residents, who have short exposure to homelessness, to the rate of chronically homeless, who have extended exposure, offers some evidence about whether incarceration is a precursor to homelessness or an outcome that accompanies homelessness. This comparison is shown in *Figure 33*.

Half of men (51 percent) who are homeless for the first time have been incarcerated, suggesting that jail or prison preceded homelessness for these men, whereas two-thirds of chronically homeless men (65 percent) have been incarcerated. This indicates that incarceration frequently foreshadows homelessness, and that prolonged exposure to homelessness increases the rate of incarceration among men by 14 percentage points.

A third of women (34 percent) who are homeless for the first time have been incarcerated, whereas over half of chronically homeless women (52 percent) have been incarcerated. This indicates that prolonged exposure to homelessness

¾ of those incarcerated did not have juvenile records and criminal justice involvement began in adulthood.

--------------------------------

Prolonged exposure to homelessness increases the rate of incarceration among women by 53%.

------------------------------

increases the rate of incarceration among women by over half. The increase in post-homeless justice system involvement is far greater among women than among men.

This is a cycle for both women and men in which criminal justice involvement increases marginalization and risk of homelessness, and then homelessness brings attention from law enforcement and heightens the risk of conviction for criminal activity, even for individuals who previously have not been involved with the criminal justice system, resulting in further marginalization.

The "Safer Cities Initiative" was implemented in September 2006, bringing 50 additional police officers to Skid Row to address quality of life issues such as crosswalk violations, littering, loitering, and sleeping on the sidewalk.[17] This initiative ended in 2013 following a court ruling that it was unconstitutional.

The officers issued roughly 1,000 citations a month, bringing many homeless individuals under the purview of the justice system. This led to cascading consequences when minor citations led to probation, then to violation of the terms of probation because of, for example, failure to appear for drug testing, and then to felony charges. It is likely that these interventions had long-term impacts in extending the duration of homelessness among those who were cited or arrested and contributed to the level of chronic homelessness that exists today.

## Recent Justice System Involvement

In 2016 and 2017, 17 percent of unsheltered individuals on the street who were interviewed for the homeless count demographic survey reported that they had been released from jail or prison in the last 12 months, as shown in *Figure 34*.

Figure 34: Individuals Released from a Correctional Institution in the Past 12 Months



*Sources: LAHSA 2016 and 2017 demographic surveys. Unweighted data for individuals 25 years of age or older.*

Eighty-seven percent of these recently incarcerated and now homeless individuals reported they were homeless when they entered the correctional system.

Twenty-four percent of those incarcerated, or 4 percent of all respondents, were released as probationers under AB 109, which transferred responsibility for non-violent, non-serious, and non-sex offenders to county jails and probation departments.

Eighteen percent (3 percent of all respondents) were released or had reduced sentences under Proposition 47, which required misdemeanor sentencing instead of felony for crimes such as shoplifting and personal use of most illegal drugs.

## Crimes Against and By Homeless Residents

Los Angeles residents' encounters with the justice system while homeless are captured in police crime logs and arrest records, in addition to the court system. The county is policed by 45 different municipal law enforcement agencies, making it difficult to analyze data on these encounters across all jurisdictions. Fortunately, the Los Angeles Police Department—the nation's third largest police force—releases its crime log and arrest records online, which include indicators of homelessness. The status of homeless residents in these crime reports is as follows:

- Victim is homeless/transient                26 percent
- Suspect is homeless/transient              61 percent
- Both victim and suspect are homeless/transient    13 percent

Crime reports where the *victim* was homeless are compared with reports where the *suspect* was homeless, broken out by major categories of crime in *Figure 35*.[18]

**Crimes in which the victim was homeless accounted for 26% of all crimes involving homeless individuals.**



Figure 35: City of Los Angeles Crimes Where the Victim or Suspect was Homeless, by Type, 2010–17

*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site. M.O. Codes 1218 and 2004 identify crimes where the victim and/or suspect, respectively, is homeless.*

**Table 2: City of Los Angeles Crimes Reported, by Housing Status and Type of Crime**

| | Non-Homeless | Victim is homeless/ transient | Suspect is homeless/ transient | Victim and Suspect are both homeless/ transient |
|---|---|---|---|---|
| Larceny | 53% | 19% | 23% | 6% |
| Crimes against People | 33% | 79% | 54% | 92% |
| Property Crimes | 11% | 1% | 17% | 1% |
| Other Crimes | 3% | 0.5% | 6% | 1% |
| TOTAL | 100% | 100% | 100% | 100% |

*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site. M.O. Codes 1218 and 2004 identify crimes where the victim and/or suspect, respectively, is homeless.*

Crimes where homeless residents are the victim are overwhelmingly assaultive—crimes against the victim's body—(80 percent), diminishing their physical and mental wellbeing. The most common crimes against people include assault and battery, brandishing a weapon, rape, indecent exposure, resisting arrest, and homicide.

Larceny accounts for most of the remainder of reported crimes against homeless residents (19 percent), and includes robbery, burglary, shoplifting, stolen vehicles and bicycles, identity theft, purse snatching and pickpocketing. Crimes against the private property of homeless persons, including such offenses as vandalism and vehicle theft, are understandably rare (1 percent), given the limited private property that most possess.

Crimes where the *suspect* is believed to be homeless are more diverse. Crimes against people are the majority (54 percent), followed by larceny (23 percent). Property crimes are next with 17 percent of the total, and include trespassing, vandalism, arson, and illegal dumping. Other crimes make up the remaining six

> Crimes where L.A. homeless are the victim are overwhelmingly assaultive – crimes against the victim's body.

**Figure 36: Homeless-Involved Crimes Reported in the City of Los Angeles – as Victims and Suspects, 2010-2017**



*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site. M.O. Codes 1218 and 2004 identify crimes where the victim and/or suspect, respectively, is homeless. 2017 data is incomplete because of partial 4th quarter data.*

percent, and include violation of court orders, contempt of court, and other miscellaneous crimes.

Crimes committed by *non-homeless* individuals were more than twice as likely to entail larceny than if a *homeless* individual was involved, as shown in *Table 2*. Crimes where both the victim and suspect were homeless were overwhelmingly committed against people (92 percent), including assault and battery. Larceny between homeless residents accounted for only six percent of crimes where both victim and suspect were homeless.

The number of reported crimes against and by homeless residents from 2010 through 2017 is shown in *Figure 36*. Over this period, crimes in which the *victim* was homeless accounted for 26 percent of all crimes involving homeless individuals, and this type of crime increased 477 percent from 2010 to 2017.

Crimes in which just the *suspect* was homeless accounted for 61 percent of homeless-involved crimes and increased 1,092 percent. Crimes in which *both victim and suspect* were homeless accounted for 13 percent of homeless-involved crimes and increased 831 percent.

These marked increases may partly be explained by greater attention paid to homeless individuals as this population has increasingly spilled out of Skid Row and become visibly present in neighborhoods throughout Los Angeles. Another factor may be the increase in the number of homeless individuals, including the number who are chronically homeless.

Trends in the types of homeless-involved crimes reported and arrests made are shown in *Figure 37*. These are crimes in which homeless residents were the victim, suspect, or both.

> The predominant justice system encounter for homeless residents was loitering or sleeping in a public place.
>
> -------------------------

**Figure 37: Homeless-Involved Crimes Reported and Arrests Made in the City of Los Angeles – as Victims, Suspects or Arrestees by Type, 2010-2017**



*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site. The "Loiter/ Sleep in Public Places" category is from LAPD arrest data; all other categories are from LAPD Crime report data, in which homeless residents may be the victim, suspect, or both. 2017 data is incomplete because of partial 4th quarter data.*

Looking just at arrest data and leaving out crime report data, the predominant justice system encounter for homeless residents in Los Angeles was *loitering or sleeping in a public place*, accounting for 67 percent of homeless-involved arrests from 2010 through 2017.

*Crimes against people* were next, involving assault and battery, brandishing a weapon, rape, indecent exposure, resisting arrest, and homicide. These offenses accounted for 20 percent of homeless-involved crimes.

*Larceny* and *crimes against property*—offenses such as burglary, theft, arson, vandalism, and shoplifting—each accounted for 6 percent of homeless-involved crimes.

Arrests for *loitering or sleeping in public places* peaked in 2013, and the annual number had declined by nearly half in 2017. Homeless-involved *crimes against people* rose steadily from 2010 to 2017, with the annual number of reported offenses growing 671 percent.

**Homeless-involved crimes are most likely to occur outdoors.**

- - - - - - - - - - - - - - - - - - - - - - - - - -

## Where Homeless-Involved Crimes Occur

The type of premises in which homeless-involved as well as non-homeless-involved crimes occurred is shown in *Figure 38*. Homeless-involved crimes are more likely to occur outdoors in the streets, sidewalks, and alleyways of Los Angeles than non–homeless crimes (51 vs. 40 percent).

**Figure 38: Premise Where Crimes Occurred in the City of Los Angeles, by Housing Status**



*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site. M.O. Codes 1218 and 2004 identify crimes where the victim and/or suspect, respectively, is homeless.*

**Figure 39: Heat Map of Homeless–Involved Crimes Reported and Arrests in the City of Los Angeles – Victims, Suspects and Arrestees, 2010–2017**



*Source: Los Angeles Police Department. 2017. Crime and Arrest Data from 2010 to Present. Downloaded from the Los Angeles Open Data web site. This graphic uses merged records for homeless persons from the LAPD Crimes and Arrests data.*



Figure 40: Age of Persons Involved with Crimes in the City of Los Angeles – Victims, Suspects and Arrestees – by Housing Status

*Source: Los Angeles Police Department. 2017. Los Angeles Open Data web site.*

Non-homeless crimes are more likely to occur in residences, including single family homes, apartments, senior housing, than homeless-involved crimes (37 vs. 17 percent).

There is a noteworthy but smaller difference in the share of crimes that took place in retail shops, commercial buildings and industrial properties. These crimes accounted for 19 percent of homeless-involved offenses vs. 13 percent of non-homeless offenses.

Surprisingly, transit stations and vehicles—including buses, Metro rail trains, and other modes—accounted for a smaller share of homeless-involved crimes than of non-homeless crimes (3 vs. 5 percent).

The location of cumulative homeless-involved crimes and arrests from 2010 to 2017 is shown by a heat map of crime data in *Figure 39*. The greatest concentration of justice system encounters for residents experiencing homelessness is in downtown Los Angeles, radiating out from Skid Row to almost every neighborhood and corner of the city.

## Demographics of Homeless-Involved Victims and Suspects

Homeless residents' encounters with the police increase with age, peaking among individuals who are 45 to 54 years old. In contrast, non-homeless encounters with the police peak among individuals who are 25 to 34 years old and decrease thereafter. The higher frequency of justice system involvement among older homeless individuals appears to be associated with the duration of homelessness; older people have longer histories of homelessness. The age of both homeless and non-homeless persons in the City of Los Angeles who were involved with crimes, either as victims, suspects, or arrestees, is shown in *Figure 40*.

The age and gender of L.A. homeless residents who were involved with crimes as either victims, suspects, or arrestees are shown in *Figure 41*. The association of

Homeless encounters with the police peak among individuals 45 to 54 years old.

**Figure 41: Age and Sex of Homeless Residents Involved with Crimes in the City of Los Angeles – Victims, Suspects and Arrestees**



*Source: Los Angeles Police Department. 2017. City of Los Angeles Open Data web site.*

increasing age with increasing presence in crime data is true for both men and women through age 54. Involvement with crime drops off more sharply among women 55 years of age and older than among their male counterparts. A second thing that stands out is that a larger share women involved with crime are young–18 to 24 years old–than is the case for men (17 vs. 13 percent).

The ethnicity of persons in police records either as victims, suspects and arrestees is broken out by housing status in *Figure 42*. Compared to all crime victims and suspects, homeless African-Americans are over represented compared to housed African-Americans, 36 percent to 28 percent, respectively. Homeless European-Americans are also over represented, while all other ethnicity are underrepresented.

> A larger share of women involved with crime are young–18 to 24 years old–than is the case for men.

**Figure 42: Ethnicity of Persons Involved with Crimes in the City of Los Angeles – Victims, Suspects and Arrestees – by Housing Status**



*Source: Los Angeles Police Department. 2017. Crime and Arrest Data 2010 to 2017, Los Angeles Open Data web site.*

## Homeless-Involved Crime as a Share of All Crime

Crimes involving homeless individuals accounted for a small share of overall criminal activity in Los Angeles. From 2010 to 2017, the percent of total crimes involving homeless persons was:

- 0.4 percent      Victim was homeless/transient
- 0.9 percent      Suspect was homeless/transient
- 0.2 percent      Both victim and suspect were homeless/transient

As the size of the homeless population has increased, the share of all crimes that were homeless-involved has increased slightly. In the most recent period for which data is available, January through November 2017, the percent of total crimes involving homeless persons was:

- 0.8 percent      Victim is homeless/transient
- 2.5 percent      Suspect is homeless/transient
- 0.4 percent      Both victim and suspect are homeless/transient

## Summary

One of the most consistent characteristics of homeless adults is a history of incarceration. Fifty-eight percent of men 25 years of age or older and 42 percent of women report having been incarcerated. A third of reported stints of incarceration are in state prison and the other two-thirds in county jail.

Although three-quarters did not have juvenile records and the onset of involvement in the criminal justice system occurred as adults, adult incarceration foreshadows homelessness for half of men and a third of women.

Prolonged exposure to homelessness is associated with an increased rate of incarceration. The frequency of incarceration histories is a quarter again higher among chronically homeless men than among those who are newly homeless, and half again higher among chronically homeless women than among those who are newly homeless.

Homeless residents are suspects in roughly one out of 50 crimes, and the victim in about one out of 100 committed in the City of Los Angeles. The predominant type of police encounter for homeless residents in Los Angeles has been loitering or sleeping in a public place, accounting for two-thirds of homeless-arrests from 2010 through 2017.

Homeless residents' encounters with the police increase with age, peaking among individuals who are 45 to 54 years old. In contrast, non-homeless encounters with the police peak among individuals who are 25 to 34 years old and decrease thereafter. The higher frequency of justice system involvement among older homeless individuals appears to be associated with the duration of homelessness; older people have longer histories of homelessness.

This points to the importance of continuing and expanding interventions for homeless individuals while they are incarcerated and more readily accessible for services and discharge planning.



# Families and Children

## Homeless Parents and their Children

**Half of all homeless women and a third of homeless men report having children.**

---

Half of all homeless women (50 percent) and a third (32 percent) of men report that they have children, as shown in *Figure 43*.[19] But slightly less than one-in-ten (9 percent) are accompanied by a child. This includes 18 percent of women and 4 percent of men 18 years of age and older.

Among homeless women, Latinas are most likely to have and be accompanied by children (57 and 30 percent, respectively). African-American women are next most likely (49 and 18 percent, respectively). And then European-American women (43 and 11 percent, respectively). Just over a third (36 percent) of homeless women who have children are accompanied by children.

Among homeless men, African-Americans are the most likely to have children but very few are accompanied by children (35 and 3 percent, respectively). Latinos are next with a larger share accompanied by children (29 and 10 percent respectively). And then European-Americans (27 and 2 percent, respectively). Only 13 percent of homeless men who have children are accompanied by children.

A total of nine percent of homeless individuals 18 years of age and older report having a child in foster care and seven percent report having a child who is detained by the juvenile justice system, with a total of 14 percent having one or more children in one or both of these forms of institutional care, as shown in *Figure 44*.

The highest rates of foster care placement of children are for European-Americans (23 percent for women 25 to 34 years old and 21 percent for men 35 to 44 years old). The highest rates of incarcerated children are for African-American and European-American men (both 17 percent). Women have higher rates of children in foster care than men (11 vs. 7 percent), and identical rates of children in juvenile detention (7 percent).

**Figure 43: Adults who Have Children and are with Children**



*Sources: Average of LAHSA demographic surveys 2007 and 2009. Data shows adults 18 or more years of age.*

**Figure 44: Adults with Children in Foster Care or Incarcerated**



*Sources: Average of LAHSA demographic surveys 2007 and 2009. Data shows adults 18 or more years of age.*

When we look at the share of individuals who are parents who have children in foster care or juvenile detention (institutional care), rather than the share of all adults, we get a different picture. Twenty-two percent of both women and men who are parents have a child in foster care. Fifteen percent of women and 22 percent of men who are parents have a child in juvenile detention. It appears that homeless fathers pass on a higher risk than mothers that their children will become involved with the juvenile justice system.

Overall, 36 percent of homeless parents (rather than of all homeless adults) have a child in institutional care (37 percent of men and 32 percent of women).

Four percent of homeless adults have a child in institutional care but are not accompanied by a child, as shown in *Figure 45*. This includes six percent of women and three percent of men. This rate goes up to 12 percent for European-American women 25 to 34 years old and of African-American women 35 to 44

*36% of homeless parents have a child in institutional care.*

**Figure 45: Adults Accompanied by Child and/or with Child in Institutional Care**



*Sources: Average of LAHSA demographic surveys 2007, 2009. Data shows adults 18+ years. Institutional care is foster care or juvenile detention.*

years old. Narrowing homeless adults down to just those who are parents, 11 percent have a child in institutional care but are not accompanied by a child.

One percent of homeless adults are accompanied by a child and also have a child in institutional care. This rate goes up to 3 percent when we narrow the population down to just those who are parents.

Looking at information in all three graphs, for every one homeless parent who is accompanied by a child, there are three other adults who are parents but not accompanied by a child (some of these children have grown up and become adults). And for every parent accompanied by a child, 1.5 parents have a child in institutional care: one parent has a child in foster care and slightly less than one parent (84 percent of one parent) has a child in juvenile detention. Because some parents have children in both forms of institutional care, the ratio is one to 1.5.

Homeless families are fragile. More are divided than remain intact. Given that many youth in institutional care are not successful in building a path to self-sufficient adulthood and are at risk of becoming second- or third-generation homeless, there is an important public interest in strengthening these families. This includes supporting parents in obtaining and keeping jobs, addressing behavioral health needs, and, where needed, developing successful parenting skills.

*29% of homeless persons age 18-24 report that they were in foster care.*

------------------------------

## Foster Care History

It is noteworthy that the age range of 18 to 24, when the greatest number of people enter homelessness, was until recently the age at which youth emancipated

**Figure 46: Homeless Persons with Foster Care History**



*Sources: Weighted average of LAHSA demographic surveys 2009, 2013, 2015, 2016, 2017; HMIS data January 2015 and January 2016. Data is for individuals 18+ years of age.*

from the housing and social services provided by foster care and probation. Fifteen percent of all homeless persons 18 years of age or older, and 29 percent of individuals 18 to 24 years of age, report that they were in foster care, as shown in *Figure 46*.

Since 2012, youth who are in foster care when they reach the age of 18 are able to receive housing, funding, and support services for three extra years, as long as they go to school, work, attend a job-readiness program or have a medical condition that prevents them from meeting these requirements. Roughly 80 percent of eligible youth take advantage of these extended benefits.

However, even with continued care, many foster youth become homeless between 18 and 24 years of age. *Figure 46* draws on data from 2009 through 2017, and within this data there is no indication of a decline in the share of 18 to 24 year old homeless individuals who report a history of foster care. Furthermore, data for both sheltered and unsheltered individuals from 2005 through 2017 does not show a decline in the share of the homeless population that is 18 to 24 years of age.[20] Youth transitioning out of foster care continue to be at high risk of homelessness.

Only 0.76 percent of all children in Los Angeles County are the foster care system in a given year,[21] and roughly 1,200 youth who are 18 years of age or older leave the system each year.[22] Yet this small share of the roughly 10,000,000 people living in the county make up a disproportionately large share of the homeless population (15 percent). The circumstances that lead to being removed from an individual's family and the experience of being in foster care create a high risk of homelessness.

Questions that remain to be answered are how the age of entry into and exit from foster care, as well as the duration of foster care, affect risk of homelessness. We will address these questions in the next stages of research.

## Pregnancy

Five percent of women living without shelter on the streets report that they are pregnant, as shown in *Figure 47*. The share who are carrying a child is highest among young women 18 to 24 years of age with 15 percent reporting being

<div style="color: #8cb33a; font-size: large">15% of young women 18 to 24 years of age report being pregnant.</div>

----------------------------

**Figure 47: Percent of Unsheltered Women Who Are Currently Pregnant**



| Age Group | Percent |
|-----------|---------|
| 18-24 | 15% |
| 25-34 | 11% |
| 35-44 | 4% |
| 45-54 | 3% |
| All Women | 5% |

*Sources: LAHSA, 2009 and 2015 demographic surveys. Data is for unsheltered women 18 years of age and older.*

pregnant. The rate of pregnancies decreases to 11 percent among women 25 to 34 years of age, four percent among women 35 to 44 years of age, and three percent among women 45 years of age or older.

Given that an estimated 18 percent of women are accompanied by a child (shown earlier in *Figure 43*), the share of unsheltered women who are pregnant and expecting a child is almost a third as large as those how have a child with them.

## Structure of Families

Over three-quarters (77 percent) of homeless households with a child present also have a mother present, and slightly less than a quarter (23 percent) have a father present, as shown in *Figure 48*.[23]

The predominant household structure is a single adult mother (44 percent). The second most common mode is two-parent adult families, accounting for 15 percent of both female and male adult parents. The third most common mode is single youth–mothers, 18 to 24 years of age who head 12 percent of households with children.

Single and two-parent youth households make up almost a quarter (23 percent) of households with children. These young parents still have the hope and energy of youth, yet are faltering in their transition to adulthood. They are an especially important group to support in obtaining jobs, subsidized childcare, and other needed assistance.

**77% of homeless families have a mother present; 23% have a father present.**

Figure 48: Structure of Parenthood



*Sources: Average of Homeless Management Information System (HMIS) data for shelter residents in January 2013 and January 2016.*

**Figure 49: Age of Homeless Children**



*Sources: Average of HMIS data for January 2013 and January 2016.*

## Age of Homeless Children

The largest share of homeless children (33 percent) are four years of age or younger, as shown in *Figure 49*. Nearly two-thirds (63 percent) are under 10 years of age. As the age of children increases, they make up a progressively smaller share of children experiencing homelessness. This may be because their parents are also growing older and becoming better able to find means to obtain housing.

This downward trend in homelessness as children age appears to end when children reach legal adulthood at age 18. *Figure 19* showed that 18 to 24 years of age is the peak period for the onset of homelessness.

1/3 of homeless children are 0-4 years old and 2/3 are in households with 3+ children present.

**Figure 50: Number of Children in Household**



*Sources: Average of HMIS data for January 2013 and January 2016.*

The information in this report does not show the strength of the link between homeless experiences as a child and adult homelessness. We need to learn more about how the age and duration of homelessness among children affects the risk of adult homelessness.

## Number of Children in Household

The largest share of households with children have two children, but the largest share of children are in households with three children, as shown in *Figure 50*.

Nearly two-thirds (62 percent) of children are in households with three or more children, although nearly two-thirds (60 percent) of households with children have only one or two children.

Homeless families are often large and if they are provided with housing, many families need three or four bedroom homes.

## Homeless K-12 Students

Over 57,000 elementary and secondary school students in Los Angeles County experienced homelessness during the 2015-2016 academic year. Student records

**57,000 elementary and secondary students experienced homelessness in the 2015-2016 academic year.**



**Figure 51: Homeless K-12 Students**

| Grade | Count |
|-------|-------|
| Kindergarten | 5,487 |
| Grade 1 | 5,048 |
| Grade 2 | 5,324 |
| Grade 3 | 5,144 |
| Grade 4 | 5,076 |
| Grade 5 | 4,983 |
| Grade 6 | 4,479 |
| Grade 7 | 4,493 |
| Grade 8 | 4,525 |
| Grade 9 | 4,438 |
| Grade 10 | 4,538 |
| Grade 11 | 4,174 |
| Grade 12 | 4,066 |

*Source: Los Angeles County Office of Education (LACOE), Homeless Education Update: 2015-16 School Year.*

**Figure 52: Homeless K-12 Students by Nighttime Residence**



*Source: Los Angeles County Office of Education (LACOE), Homeless Education Update: 2015-16 School Year.*

collected by public and chartered schools, and reported to the California Department of Education show that homelessness is most prevalent among younger children, particularly in grades five and under, as shown in *Figure 51*.

The lower numbers of homeless students in middle schools and high schools may be attributable to dropping out of school, but we don't know how frequent this is.

The definition of homelessness for students in these school-reported data are individuals who lack a fixed, regular, and adequate nighttime residence.[24]  This is broader than the HUD definition used in homeless counts because it includes individuals who are couch surfing, whereas the HUD definition includes only individuals sleeping in places not meant for human habitation.

> 18% of homeless K-12 students fit HUD's definition of homelessness.

**Figure 53: Select Characteristics of Homeless K-12 Students**



*Source: Los Angeles County Office of Education (LACOE), Homeless Education Update: 2015-16 School Year.*

The Los Angeles County Office of Education reports that 82 percent of these homeless students are temporarily doubled up in housing that is not their own, such as at the houses of classmates and friends (*Figure 52*). Another eight percent are temporarily unsheltered, while five percent are in shelters and the remaining five percent are in hotels or motels (presumably with homeless vouchers).[25] The last three categories totaling 18 percent of homeless students are estimated to meet HUD's definition of homelessness.

Among these homeless K–12 students, the Office of Education reports that 67 percent have limited English proficiency (suggesting that many are Latino), 26 percent have documented disabilities, five percent are migrant youth, and two percent are unaccompanied youth (*Figure 53*).

Across Los Angeles County, the number of homeless students is likely to be higher than indicated above because private schools report this data to the state on only a limited basis. Additionally, some school-aged youth experiencing homelessness may not be enrolled in school, for example, runaway children. Lastly, the data for homeless students in public schools is incomplete because of

**Figure 54: Number of Homeless K-12 Students by School and Neighborhood Poverty Rate**



*Sources: California Department of Education, California Longitudinal Pupil Achievement Data System, Homeless K-12 Students per School, 2015-16 School Year, obtained fall 2017. U.S. Census American Community Survey 2015, Table B17001, Poverty Status in the Past 12 Months*

**Figure 55: Density of Homeless K-12 Students, per Census Block**



*Source: Economic Roundtable analysis; California Department of Education, California Longitudinal Pupil Achievement Data System, Homeless K-12 Students per School, 2015-16 School Year. School data in this map are distributed across school attendance areas, proportionately based upon the total block populations in the 2010 U.S. Census.*

non-reporting or late reporting, since some public schools do not appear in data on homeless students.

The geographic breakout of homeless students is based on the school that they attend. We assume that because of their limited financial resources and the likelihood of being temporarily doubling-up (couch surfing), they are likely to sleep nearby.

Large concentrations of homeless children are shown in the San Gabriel Valley, Southeast/Gateway Cities, South Los Angeles, and Long Beach in *Figures 54* and *55*. These cities are Service Planning Areas (SPAs) 3, 6, 7, and 8. There are also noticeable concentrations of homeless students in Inglewood, Pomona, Glendale, San Fernando and the Antelope Valley.

Each school's homeless student population is distributed across school attendance areas in *Figure 55* to map the density of homeless students per block. The San Gabriel Valley again shows a high concentration of homeless students.

Schools in the San Gabriel Valley report the most homeless students, 24% of the county total.

------------------------------

Figure 56: Distribution of Homeless Students by Service Planning Area (SPA) 2015–16



Sources: California Department of Education, California Longitudinal Pupil Achievement Data System, Homeless K-12 Students per School, 2015-16 School Year.

The share of homeless students identified in each Service Planning Area is shown in *Figure 56*. Schools in the San Gabriel Valley reported just under 20,000 students experiencing homelessness, or 35 percent of the county total. East Los Angeles had the next largest number, over 13,700 homeless students, or 24 percent of the county total. SPAs with the lowest reported numbers were West Los Angeles at just over 300 (one percent) and Metro Los Angeles at just over 1,500 (three percent).

Children made up only about a tenth of the homeless population in LAHSA's 2016 homeless count, which projected that 3,490 children were homeless during the week of the count compared to an estimated 10,321 homeless students identified by schools over the course of the school year that met HUD's definition of homelessness (18 percent of 57,337 total homeless students). Given that the school tally is an annual number and the homeless count is a point-in-time number, the absolute number of children projected from the count may be reasonably compatible with school numbers.

School data shows a different geographic distribution than the homeless count. Given that school data includes over 550 times more records of homeless children than were obtained in the 2016 street count, it is likely to provide the most reliable information about the location of homeless children.

## Summary

Half of all homeless women and a third of men report that they have children. Nearly a tenth of all homeless individuals 18 years of age and older are accompanied by a child, this includes nearly a fifth of women and a quarter as many men. Others have children in institutional care, and still others have children who have reached adulthood.

In addition to people who are already parents, one-in-twenty unsheltered women, including one-in-seven unsheltered women 18 to 24 years of age, report being

pregnant. The share of unsheltered women who are pregnant is almost a third as large as those how have a child with them.

For every one homeless parent accompanied by a child, 1.5 parents have a child in institutional care: one parent has a child in foster care and slightly less than one parent has a child in juvenile detention. Because some parents have children in both forms of institutional care, the ratio is one to 1.5.

Homelessness and institutional care are linked across generations. One-seventh of all homeless adults and nearly one-third of homeless youth 18 to 24 years of age, report that they were in foster care.

Youth-led households, that is, parents 18 to 24 years of age, make up almost a quarter of households with children. These young parents still have the hope and energy of youth, yet are faltering in their transition to adulthood. They are an especially important group to support in obtaining jobs, subsidized childcare, and other needed assistance.

Information from schools is valuable for identifying the communities in which children are homeless. Based on school reports for over 57,000 homeless elementary and secondary school students in Los Angeles County experiencing homelessness, a quarter of all homeless children reside in the San Gabriel Valley.

Homeless families are fragile. More are divided than remain intact. Given that many youth in institutional care are not successful in building a path to self-sufficient adulthood and are at risk of becoming second- or third-generation homeless, there is an important public interest in strengthening these families. This includes supporting parents in obtaining and keeping jobs, addressing behavioral health needs, and, where needed, developing successful parenting skills.



# Work and Income

## Employment Profile of Adults

The number looking for a job is four times greater than the number with a job.

-----------------------------

The employment profile of homeless adults in *Figure 57* shows that efforts to participate in the formal labor force are largely in the form of job seeking rather than job holding. The number of individuals looking for a job is four times greater than the number with a job.

The major exceptions to this overall profile are young adults 18 to 24 years of age with 59 percent engaged with the formal labor market, parents with children with 49 percent engaged, and individuals who have been homeless for three months or less with 40 percent engaged. These three groups often overlap and are the low-hanging fruit for employment interventions. Employment effort declines steadily with age and duration of homelessness.

Overall, only one percent of the population report having full-time jobs, three

**Figure 57: Employment Status of Unsheltered Homeless Adults**



*Sources: Average of LAHSA demographic surveys 2015, 2016 and 2017. Data shows adults 18 or more years of age.*

percent part-time jobs, three percent temporary or seasonal jobs, 23 percent are looking for work, 35 percent work informally doing such things as recycling and panhandling, and 34 percent do not report any form of work activity.

Roughly two-thirds of all homeless groups report making efforts to generate an income, but as individuals age and are homeless for longer intervals, this effort shifts from the formal labor market to informal, economically marginal activities for making money.

## Employment Status Based on Parents' Age

Two-thirds of homeless parents in shelters (64 percent) report that they are in the labor market, with 11 percent reporting full-time jobs, 10 percent part-time jobs, and 43 percent looking for work, as shown in *Figure 58*. Labor force participation rates are highest among the youngest parents and decrease with age. Actual employment rates are highest among parents 25 to 34 years of age, and include almost a quarter of this group (24 percent).

The cost to society of a homeless family, including possible long-term adverse impacts on children, may well exceed the cost of underwriting jobs for parents who want to work but are unemployed or at best marginally employed.

**Figure 58: Employment Status of Parents by Age of Parent**



*Source: HMIS data for January 2016.*

## Employment Status Based on Children's Age

The rate of job seeking and employment is highest among parents of the youngest children, as shown in *Figure 59*. Sixty-nine percent of parents of children 0 to 4 years of age are working or looking for work. This rate drops to 49 percent for parents of children 14 to 17 years of age. As children grow older, parents also grow older and their efforts to find work diminish, as shown in *Figure 58*. Given that the overall high level of effort by homeless parents to find employment, and the especially high effort by young parents of preschool children, subsidized childcare is needed to enable parents to hold jobs.



Figure 59: Employment Status of Parents by Age of Children

*Source: HMIS data for January 2016.*

## Government Assistance

31% of homeless individuals receive no government assistance.

In the absence of earned income, homeless individuals are dependent on government assistance for survival. Fifty-two percent of unsheltered individuals report receiving some type of public cash benefit, as shown in *Figure 60*. Monthly cash benefits include General Relief ($218 average), CalWORKS ($570 average), SSI or SSDI ($644 average), Social Security retirement ($40 minimum), and Unemployment Insurance ($173 minimum).[26]

Sixty percent of the individuals receiving cash benefits are aided by Los Angeles County's General Relief program, which provides a maximum grant of $221 a

Figure 60: Rate of Coverage by Government Assistance Programs



*Sources: Average of LAHSA demographic surveys 2016 and 2017. Unweighted data. Some individuals receive more than one type of benefit so total coverage shown exceeds 100 percent.*

  
month plus food stamps (CalFresh).

Los Angeles County provides General Relief benefits to a larger share of the indigent population than any other urban county in California, but the $221 maximum aid amount is small compared to the cost of housing and other basic necessities.[27] General Relief can make an important contribution to an integrated system-wide response to homelessness, but by itself is likely to be inadequate to support an exit from homelessness.

Seventeen percent of unsheltered individuals report receiving only non-cash public assistance in the form of food stamps (CalFresh) and/or Medicaid health insurance. The remaining 31 percent report that they do not receive benefits of any kind

Only one-fifth of unsheltered individuals are enrolled in a public assistance program providing cash benefits that might be sufficient to pay for housing. Possible paths for the other four-fifths to obtain a sustainable income include: *1)* qualifying for a SSI benefits if a disability that precludes employment can be documented, *2)* obtaining placement in permanent supportive housing that does not require a minimum rent amount, or *3)* obtaining employment.

## Educational Attainment

For most Los Angeles residents, the ages of 25 to 54 represent prime working years. The destitute condition of homeless residents in this age range represents a loss of productive potential.

**70% of homeless residents age 18+ reported having at least a high school degree.**

------------------------------



Figure 61: Highest Level of Education Completed



*Sources: Weighted average of LAHSA 2017 demographic survey and Homeless Management Information System (HMIS) data for shelter residents in January 2013. Data is for persons 18+ years of age.*

Over half (57 percent) of homeless individuals who are 18 years of age or older report having at least a high school degree and almost a quarter (24 percent) report some level of college education, as shown in *Figure 61*. These educational attainments typically enable individuals to be part of the labor force and consistently earn an income. It is important for homeless individuals and the entire community to support and restore this productive potential whenever possible.

## Monthly Income

The median monthly income for unsheltered homeless individuals 18 years of age and older is $236, slightly more than the maximum General Relief cash aid amount of $221, as shown in *Figure 62*.

The minimum wage in Los Angeles in 2017 was $12 an hour. Full-time work should bring about $2,000 a month in wages, which is more than double the income reported by individuals who said they were employed full-time. This suggest that the jobs held by homeless workers may often be "off the books."

Homeless workers rarely have year-round jobs, but if we annualize their monthly earnings based on a scenario of continuing employment, the part-time workers would have annual incomes of $5,736 and full-time workers would have incomes of $11,940.

The federal poverty threshold is currently $12,060 a year in income for one person. For two people it is $16,240, and it goes up roughly $4,200 for each additional person.[28]  The income of the typical homeless individuals with a full-

The typical monthly income for unsheltered individuals is $236.

**Figure 62: Monthly Income by Employment Status**



*Sources: Average of LAHSA demographic surveys 2016 and 2017. Data is for individuals 18+ years of age. Median monthly income from all sources is shown.*

time job is well below the poverty threshold.

Acute poverty is the most defining characteristic of people experiencing homelessness. The incomes of homeless residents explain why they are unable to obtain a place of their own to live, particularly given the high cost of living and of housing in Los Angeles County. Increasing the incomes of employable adults through jobs that pay at least the minimum wage is needed as a primary strategy for addressing homelessness.

## Barriers to Employment

The two most recent demographic surveys that were conducted as part of the homeless count asked unsheltered individuals to identify the barriers to getting stable work. The responses are shown in *Figure 63*.

The two most frequently identified barrier appear readily surmountable–transportation for commuting to work (42 percent) and clean clothes (41 percent).

Two barriers describe difficulty successfully competing for a job–unable to get interviewed (29 percent) and turned down after interview (25 percent).

Three barriers describe skill and experience limitations: lack experience (20 percent), gaps in employment (19 percent), and education requirements (15 percent).

*The barriers to employment identified most often are transportation and clean clothes.*

Figure 63: **Barriers to Getting Stable Work**



*Sources: Average of LAHSA demographic surveys 2016 and 2017. Unweighted data.*

Three barriers indicate fundamental obstacles to employment: physical health problems (10 percent), substance use problems (9 percent), and mental health problems (9 percent).

It is likely that some of these self-assessments underestimate actual barriers to obtaining sustaining employment. Nevertheless, many of the identified barriers are not permanent impediments, but rather logistical obstacles or needs for skill development that can feasibly be addressed.

## Discrimination

Given the massive ethnic disparities in homelessness, any employment-based intervention will have to address the discrimination and isolation that are barriers to sustaining employment for many African Americans, particularly men. One type of barrier is isolation from the informal social networks in which job opportunities are share by word of mouth or social media.

A large study of employment discrimination in California identified pervasive invisible obstacles to employment, especially for African Americans.[29] Many African-American men do not even get to the point of being subjected to either conscious or implicit discrimination because they are isolated from the informal networks that dominate hiring in many job markets.

Many individuals have no access to employment networks as a result of ethnicity, homeless status, justice system status, and family background. Their entry into the labor market will need to be facilitated by strong financial incentives for employers to hire them and assess their long-term productive potential.

## Employment Intervention

Most employment interventions will need to include wage subsidies, sometimes temporary and other times long-term. For some individuals the employment solution will need to be in the form of a subsidized public job. Whether private or public, the jobs that are provided will need to pay living wages that enable individuals to pay for housing.

The financial analysis that is part of developing the triage tool for targeting employment interventions includes looking at the public costs for both the individual and her or his children when employed, earning an income and housed compared to costs when unemployed and homeless. The amount of public costs that are avoided when employed can be seen as offsetting the cost for employment subsidies and other needed services.

Considering that many of the people who are most interested in employment are parents, the multi-generational costs to society when those parents are marginalized and lack stability builds a strong case for the cost-effectiveness of targeted employment subsidies. There is a similarly strong

case for young adults and recently homeless individuals with employment histories.

Other essential components of an integrated employment intervention include temporary housing, child care, transportation, clothing, behavioral health care, and interim income maintenance while waiting for a paycheck.

## Summary

Efforts to participate in the formal labor force are largely in the form of job seeking rather than job holding. The number of individuals looking for a job is four times greater than the number with a job.

Roughly two-thirds of all homeless groups report making efforts to generate an income, but as individuals age and are homeless for longer intervals, this effort shifts from the formal labor market to informal, economically marginal activities.

The major exceptions to this profile are young adults 18 to 24 years of age, parents with children, and individuals who have been homeless for three months or less. These three groups often overlap and are the low-hanging fruit for employment interventions.

Almost three-quarters of homeless adults report having at least a high school degree and one-quarter report some level of college education. This level of educational attainment typically enables individuals to be part of the labor force and consistently earn an income.

Los Angeles County provides General Relief benefits to a larger share of the indigent population than any other urban county in California, but the $221 maximum aid amount is small compared to the cost of housing and other basic necessities. General Relief can make an important contribution to an integrated system-wide response to homelessness, but by itself is likely to be inadequate to support an exit from homelessness.

The median monthly income reported by unsheltered adults is $236, slightly more than the maximum General Relief amount.

Only one-fifth of unsheltered individuals are enrolled in a public assistance program providing cash benefits that might be sufficient to pay for housing. Possible paths for the other four-fifths to obtain a sustainable income include: *1)* qualifying for a SSI benefits if a disability that precludes employment can be documented, *2)* obtaining placement in permanent supportive housing that does not require a minimum rent amount, or *3)* obtaining employment.

Homeless workers rarely have full-time, year-round jobs, but if we annualize the monthly earnings of those who report having full-time work, their earnings are below the federal poverty threshold. Increasing the incomes of employable adults through jobs that pay at least the minimum wage is needed as a primary strategy for addressing homelessness.

Given the massive ethnic disparities in homelessness, any employment-based intervention must address the discrimination and isolation that are barriers to sustaining employment for many African Americans, particularly men.

Opening a door to sustaining jobs for homeless adults will often require strong financial incentives for employers to hire them and help them master their jobs. Other essential components of an integrated employment intervention include temporary housing, child care, transportation, clothing, behavioral health care, and interim income maintenance while waiting for a paycheck.

Considering that many of the people who are most interested in employment are parents, the multi-generational costs to society when those parents are marginalized and lack stability builds a strong case for the cost-effectiveness of targeted employment interventions. There is a similarly strong case for young adults and recently homeless individuals with employment histories.



# Chronic Homelessness

## Rate of Chronic Homelessness

30% is a reasonable benchmark for chronic homelessness.

-----------------------------

Thirty percent of the point-in-time homeless population is estimated to be chronically homeless. The share of the homeless population reported to be chronically homeless has varied from year to year in homeless count data, as shown in *Figure 64*. The rate shown in demographic surveys of unsheltered individuals that provide this information has ranged from 28 to 39 percent.

Another source of differing data is from the Homeless Management Information System (HMIS) for individuals in shelters at the time of the count. HMIS data for January 2016 shows only 12 percent to be chronically homeless.

This variation does not correspond with regional economic trends and is most likely the result of sampling inconsistencies in the populations surveyed in different years.

The demographic surveys from the four most recent homeless counts show an average of 35 percent of the point-in-time population 18 years of age or older to be chronically homeless. When the 2016 HMIS data is included, the average drops to 30 percent. The demographic surveys appear to under-represent newly homeless individuals and shelter data appears to under-represent chronically homeless individuals. Given this, the 30 percent average is a reasonable benchmark for chronic homelessness.

**Figure 64: Chronically Homeless as Percent of Point-in-Time Homeless Population**



*Sources: "WEIGHTED AVERAGE" shown in chart is weighted average of LAHSA demographic surveys 2011, 2015, 2016, and 2017, and HMIS data 2016. Data is for individuals 18+ years of age.*

## First-time Homeless vs Chronically Homeless

Chronically homeless individuals look least like individuals who are homeless for the first time based on age, household structure and employment status, as shown in *Figure 65*. Rates of chronic homelessness increase with age whereas rates of new entrants into homelessness decrease with age. Far fewer chronically homeless individuals are part of families with children, or working or are looking for work.

Similar rates of chronic homelessness across homeless individuals in all ethnic and gender groups show that even though unequal social conditions propel more men and African-Americans into homelessness, once homeless, the risk that this will become a chronic condition is shared equally.

Once homeless, the risk of becoming *chronically homeless* is shared equally across all ethnic groups.

**Figure 65: Rates of First-time and Chronic Homelessness within Population Groups**



*Sources: Weighted average of LAHSA demographic surveys 2011, 2015, 2016, 2017; HMIS data January 2016. Data is for individuals 18+ years of age. Individuals who are neither first-time nor chronically homeless are not shown.*

Chronically homeless individuals have worse health, more frequent arrest histories, are more likely to live on the street, and less likely to seek employment.

------------------------------

## Attributes that Differentiate Chronically Homeless Individuals

Four major distinctions between chronically homeless individuals and new entrants into homelessness were identified earlier in this report:

1. Interest in developing skills and *finding a job* diminishes by the time people become chronically homeless. It is very important for 71 percent of people who are homeless for the first time, but only 57 percent of individuals who are chronically homeless (*Figure 21*).

2. Every reported *health* condition is two to three times more prevalent among chronically homeless individuals than among first-time homeless. Serious mental illness was reported most frequently–55 vs. 21 percent for chronic and first-time homeless, respectively (*Figure 22*).

3. Chronically homeless individuals are much less likely to find refuge in a *shelter* than non-chronically homeless individuals–6 vs. 34 percent. (*Figure 24*).

4. *Justice system* histories are more prevalent among chronically homeless individuals. Two-thirds of chronically homeless men (65 percent) and half of chronically homeless women (52 percent) have been incarcerated (*Figure 33*).

## Using Linked Administrative Records for Targeted Interventions

When individuals experience homelessness, they fall off the data grid because most information collected by public agencies is based on place of residence, for example, the Census Bureau. Individuals who are placeless are left out of these data. However, each encounter of a homeless person with a public agency is like the tip of an iceberg, offering a small glimpse of that individual. Connecting these dots provides a multi-dimensional picture of people experiencing homelessness.

Linked administrative records from client contacts with public agencies, including providers of homeless services health care, mental and behavioral health care, public assistance, child protective services, and the justice system, reveal the course of individuals' lives. In aggregate, these records can be used to identify factors associated with a high probability of becoming chronically homeless. These predictive factors can then be used to screen records of individuals who are newly homeless to identify those who are most likely to become chronically homeless and target them for immediate assistance.

Chronic homelessness is a catastrophe resulting from multiple failures, both before and after the onset of homelessness. Client records can be used to identify and stop this cascade of failures.

## Summary

The average rate of chronic homelessness within the point-in-time homeless population is 30 percent. Rates of chronic homelessness increase with age whereas rates of new entrants into homelessness decrease with age.

Far fewer chronically homeless individuals are part of families with children, or are working or looking for work. Every reported health condition is two to three

times more prevalent among chronically homeless individuals than among first-time homeless.

Justice system histories are more prevalent among chronically homeless individuals. Two-thirds of chronically homeless men and half of chronically homeless women have been incarcerated.

Similar rates of chronic homelessness across homeless individuals in all ethnic and gender groups show that even though unequal social conditions propel more men and African-Americans into homelessness, once homeless, the risk that this will become a chronic condition is shared equally.

Chronic homelessness is a catastrophe resulting from multiple failures, both before and after the onset of homelessness. Client records can be used to identify and stop this cascade of failures. Linked administrative records from client contacts with public agencies can be used to identify and help individuals who are most likely to become chronically homeless.



# Findings and Recommendations

## Key Findings

Six key findings in this report lead to twelve recommended actions for combating chronic homelessness. The findings are:

- *First*, the total population that experiences homelessness is far larger than the chronically homeless population and includes many people who have short episodes of homelessness.

- *Second,* increasing the already large number of people who quickly exit homelessness will dramatically stem the flow of people into chronic homelessness.

- *Third,* social, medical, legal, and economic wreckage accumulates on the path to chronic homelessness. This accumulation of new impediments makes it ever more difficult and costly to exit homelessness.

- *Fourth,* most homeless adults want to support themselves through work. This goal is strongest and most feasible among new entrants into homelessness, making it viable as an early intervention for escaping homelessness.

- *Fifth*, new screening tools are needed to differentiate among newly homeless individuals to identify those who are at high risk of going on to become chronically homeless and prioritize them for early intervention.

- *Sixth*, Homelessness results from system-wide failures and requires system-wide engagement. Homeless service providers can't solve this problem by themselves.

## Efforts Already Underway

Most of the interventions recommended in this report are being piloted, but often as small scale, stand-alone efforts. To effectively combat chronic homelessness, interventions must be:

- Targeted to accurately prioritize individuals at high risk of chronic homelessness.
- Integrated as system-wide responses rather than siloed in the homeless service provider system.
- Expanded to a scale that is proportional to the homeless crisis.

Los Angeles County's Office of Homeless Initiative identified the following initiatives that are already being implemented:

- *Prevention:* Housing retentions services are provided for families and individuals.

- *Vehicles and Hygiene Facilities:* Toilets and sinks have been deployed at four sites near encampments in unincorporated areas of the county and a pilot mobile shower program has been launched.

- *Homeless Families:* Family reunification housing subsidies are being provided.

- *Decriminalization:* The Sheriff has adopted a decriminalization policy and trained hundreds of officers in effective outreach and engagement strategies.

- *Youth:* Service coordination, rapid rehousing and crisis housing are being provided for transition age youth. Efforts are being made to avoid discharging foster and probation youth into homelessness.

- *Employment:* Efforts are underway to connect people experiencing homelessness with the workforce development system, provide subsidized employment, training, and job placement assistance. And individuals are being assisted in accessing their vital records.

- *Predictive Analytics:* The County is exploring analytic models to improve screening and targeting within the homeless service delivery system. Expanded data and information sharing will support efforts to link administrative records and more effectively target services.

The *Breaking Barriers* program in the County's Office of Diversion and Reentry is a system-wide effort that integrates health care and justice system resources. It provides case management, flexible housing and employment for jail inmates with mental health or substance use disorders. It has reduced recidivism and improved health outcomes by diverting inmates into community based treatment and supportive housing.

The County's *Subsidized Employment Program* for parents receiving CalWORKs cash aid (authorized under AB 74) pays parents' wages during their first six months in a job and could be targeted on homeless parents. The plan for this program that was submitted to the California Department of Social Services included a goal of placing 3,401 participants in jobs annually.[30]

## Recommendations

**Develop and implement predictive analytic screening tools to prioritize and target interventions for new entrants into homelessness**

1. *Newly Homeless At Greatest Risk of Chronic Homelessness:* Increase early and lasting exits from homelessness by using system-based screening tools to analyze linked administrative records from public and publicly-funded agencies for individuals who are newly homeless to identify those who are most likely to become chronically homeless and target them for immediate assistance.

2. *Ongoing, Real-Time Linking of Client Records*: Implement system-based screening programs using linked administrative records for healthcare, social services, homeless services, employment, and justice system involvement for individuals experiencing homelessness to identify newly homeless individuals who are at risk of chronic homelessness and prioritize them for targeted assistance. Use the Homeless Management

Information System (HMIS) as a tool for informing service providers about individuals who have been prioritized for targeted interventions.

3. *Prevent Homelessness:* When a reliable predictive model has been developed, screen precariously housed clients who interface with County systems to identify those at greatest risk of entering homelessness.

4. *Homeless Children:* Investigate the long-term outcomes for children who experience homelessness and develop a reliable predictive model for identifying those at great risk of lasting harm.

### Integrate mainstream human service delivery organizations in combating homelessness

5. *System-Wide Engagement:* Integrate all mainstream housing, social service, health care, and employment organizations into integrated, comprehensive efforts to help homeless residents achieve permanent exits from homelessness.

### Provide targeted interventions

6. *Vehicles as Dwelling Places:* Help homeless individuals retain their vehicles by providing legal places to park together with hygiene facilities for occupants of the vehicles. In addition, provide cost-effective levels of financial assistance for paying vehicle registration and maintenance costs.

7. *Family Support:* Provide services for strengthening homeless families and equipping parents to care for and nurture their children, both those accompanying them and those in institutional care. This includes supporting parents in obtaining and keeping jobs, addressing behavioral health needs, and, where needed, developing successful parenting skills. Reducing risk for this group will provide multi-generational reductions in social service needs.

8. *Shelter for Parents and Children:* Provide immediate housing for homeless parents who are pregnant or accompanied by children and their families.

9. *Justice System Diversion:* Use arrests and incarceration as the last resort in responding to the life circumstances and actions of homeless individuals because arrest and incarceration increase the number of chronically homeless individuals. Expand already successful diversion programs into community based treatment and housing.

10. *Transition Age Youth:* Expand efforts to assist young adults 18 to 24 years of age experiencing homelessness, particularly those exiting foster care and juvenile detention. Needed services include skill development, employment, child care, behavioral health services, and integration into positive social networks.

11. *Job Training:* Improve access and suitability of education and job training opportunities for homeless individuals seeking employment who lack the skills needed to obtain a job.

12. *Employment:* Expand current efforts to place individuals experiencing homelessness in jobs. Attentions should be focused on new entrants into homelessness, young adults, and individuals who are parents. Services

should include subsidized employment, temporary housing, child care, mobile phones, bus passes, clothes suitable for job interviews, and assistance in obtaining identity documents. Federal and state funded employment programs should assume a central role in providing intensive and comprehensive employment services for homeless residents.

# Next Steps

This meta-analysis of information about homelessness experienced in Los Angeles County frames issues to be addressed through direct services as well as research. Chronic homelessness is a catastrophe and the result of multiple failures, both before and after the onset of homelessness. The next stage of Economic Roundtable research is focused on developing predictive analytic screening tools.

Linked administrative records from client contacts with public social service and law enforcement agencies are being used to identify and stop this cascade of failures. These linked records reveal the course of individuals' lives.

We are analyzing 15 years of linked records of individuals who experienced homelessness to identify factors associated with a high probability of becoming chronically homeless. These predictive factors can then be used to screen records of individuals who are newly homeless to identify those who are most likely to become chronically homeless and target them for immediate assistance.

The predictive screening tools will identify people for whom the escape route from homelessness costs less than the problem of remaining homeless.

These are homeless individuals likely to have high future costs for public services if there is not an intervention. They are also likely to have reductions in public costs after the intervention that offset the cost of the intervention. This type of predictive tool has already been developed to prioritize chronically homeless individuals for access to the scarce supply of permanent supportive housing. The new work will expand the array of evidence-driven interventions to include employment and services for foster youth.

# End Notes

[1] *Journal of the American Medical Association*, 2017;318(23):2293-2294. https://jamanetwork.com/journals/jama/article-abstract/2661031?redirect=true

[2] The Census Bureau classifies two types of housing as group quarters. Institutional group quarters includes correctional facilities, nursing homes and hospitals. Non-institutional group quarters includes college dormitories, military barracks, group homes, missions and homeless shelters. https://www.census.gov/topics/income-poverty/poverty/guidance/group-quarters.html

[3] Morduch, Jonathan and Julie Siwicki (September 2017), "In and Out of Poverty: Poverty spells and income volatility in the U.S. Financial Diaries," *Social Service Review*, Volume 91, Number 3, https://www.journals.uchicago.edu/doi/abs/10.1086/694180

[4] U.S. Department of Housing and Urban Development (2017), *The 2017 Annual Homeless Assessment Report to Congress: Part 1*, Exhibit 2.9, page 29, shows Los Angeles County to have 47,082 total homeless individuals and New York City, the next largest, to have a total of 31,124 homeless individuals, https://www.hudexchange.info/resources/documents/2017-AHAR-Part-1.pdf

[5] Los Angeles Homeless Services Authority, *Homeless Count 2017 Los Angeles County Fact Sheet*, https://www.lahsa.org/documents?id=1715-homeless-count-2017-los-angeles-continuum-of-care-fact-sheet.pdf.

[6] The estimate that $900 a month in income will amortize approximately $35,000 in debt for building or purchasing a housing unit is based on information provided by Yasmin Tong Consulting, whose work in finance and development has produced over $1 billion in affordable housing:
- $300 a month for rent, $3,600 per year
- Interest rate on financing = 6 percent
- 15 year mortgage

[7] Yasmin Tong Consulting provided the estimate that affordable units in Los Angeles County typically cost about $335,000 to build. Wikipedia, *Star Apartments*, reports an even higher cost of $392,000 per unit in 2014 to build this housing complex for homeless individuals in downtown Los Angeles, https://en.wikipedia.org/wiki/Star_Apartments.

[8] Los Angeles Homeless Services Authority, *2017 Greater Los Angeles Homeless Count–Data Summary, Los Angeles County*, reports a chronically homeless population of 17,531 individuals, https://www.lahsa.org/documents?id=1353-homeless-count-2017-countywide-results.pdf

[9] The Los Angeles Homeless Services Authority Continuum of Care includes all of Los Angeles County except for the cities of Glendale, Long Beach and Pasadena.

[10] The population shown in the profile shown in represents 83 percent of the total Los Angeles County population residing in LASHA's continuum of care and 88 percent of the average homeless population in the 11 homeless data sources used to produce the homeless profile. Most of those left out of the profile are in smaller ethnic groups. Only the three largest ethnic groups are shown because when groups are further divided by gender and age, only a small number of people are represented in many of the subgroups. The six demographic surveys that are included in the data had an average of about 3,600 people in each survey. Smaller ethnic groups, including Asian Americans, Pacific Islanders, Native Americans, Alaskan Natives, and individuals with multiple ethnicities can be aggregated

into a single group, but because there are divergent trends among these different ethnicities, their overall average profile misrepresents many of them. Transgender individuals are not shown in the gender breakout because an average of only 29 transgender individuals were identified in each demographic survey, and further subdividing these individuals by age and ethnicity would create unreliable data because of the extremely small number of people in the subgroups.

[11] This composite profile uses data from the demographic survey, which is a quasi-random opportunity survey of homeless residents carried out separately from the homeless street count, as well as data from the Homeless Information Management System (HMIS) for individuals in homeless shelters during the month of January. It is not clear whether the demographic survey or HMIS data provides a more representative description of the total homeless population. The demographic survey is not random and therefore is not reliably representative. On the other hand, HMIS data captures the entire population of people in shelters, and therefore is representative of that population, but the sheltered population is self-selected in that not every homeless person chooses to use a shelter.

[12] Metraux, Stephen and Dennis P. Culhane (1999), *Analyzing Shelter Stays and Shelter Stay Patterns Using Administrative Data: An Overview of Practical Methods*, https://www.researchgate.net/publication/264838880_Analyzing_Shelter_Stays_and_Shelter_Stay_Patterns_Using_Administrative_Data_An_Overview_of_Practical_Methods

[13] The responses shown for individuals 18–24 years of age are based on a small sample: 18 respondents in the 2016 demographic survey. This questions was not asked in the 2017 youth demographic survey. There is a large margin of error with such a small sample.

[14] Where possible, this report aggregates homeless count data from multiple years rather than relying on data from a single year. This is because of fluctuation from one count to the next in the demographic distribution of the population, which appears to be the result of sampling error rather than actual population changes. However, only the 2017 count provides demographic estimates of the breakout of sheltered vs. unsheltered individuals, making it the best source for this data. This estimate requires combining information about sheltered persons from the Home Management Information System (HMIS) with weighted estimates of unsheltered residents projected based on the street count and the demographic survey. For a discussion of count-to-count demographic fluctuation, see: Economic Roundtable (2017), *Who Counts? Assessing Accuracy of the Homeless Count*, https://economicrt.org/publication/httpseconomicrt-orgwp-contentuploads201711who-counts-11-21-2017-pdf/. There has been continuing change from one count to the next in the shares of individuals who were sheltered vs. unsheltered and in the types of dwellings occupied by unsheltered individuals. For example, from 2016 to 2017, the share of unsheltered individuals who spent their nights on a street, sidewalk or alley dropped from 53 percent to 34 percent, with corresponding increases reported in 2017 in the share of unsheltered individuals occupying tents or makeshift shelters. Because 2017 data offers the most recent snapshot of the changing landscape of homeless dwellings, we did not merge that data with earlier counts, even though data from a single year may be less reliable than integrated data from multiple years.

[15] Economic Roundtable (1997), *Homeless Workers: A Labor Market Analysis*, https://economicrt.org/publication/homeless-workers-2/.

[16] These conversion factors for the number of inhabitants in each type of vehicle are derived from questions asked in the demographic survey about whether the respondents have resided in vehicles, whether it was as a family or as unaccompanied adults, and how many people were in the vehicle. This methodology is explained in LAHSA's *2017 Los Angeles Continuum of Care Homeless County Methodology Report*, pages 18–19: https://www.lahsa.org/documents?id=1645-2017-los-angeles-continuum-of-care-homeless-count-methodology-report.pdf.

| Type of Dwelling | Number Occupied by Individuals | Individual Weight | Number Occupied by Families | Family Weight | Average Weight per Dwelling |
|---|---|---|---|---|---|
| Car | 639 | 1.518 | 51 | 2.963 | 1.625 |
| Van | 277 | 1.772 | 6 | 3.458 | 1.808 |
| RV/Camper | 350 | 2.050 | 9 | 3.519 | 2.087 |
| ALL VEHICLES | 1,266 | 1.721 | 66 | 3.084 | 1.788 |
| Tent | 1,809 | 1.691 | 17 | 3.777 | 1.710 |
| Makeshift Shelter | 1,210 | 1.916 | 11 | 3.688 | 1.932 |
| TENTS/SHELTERS | 3,019 | 1.781 | 28 | 3.742 | 1.799 |
| ALL DWELLINGS | 4,285 | 1.763 | 94 | 3.280 | 1.796 |

[17] Blasi, Gary and Forrest Stuart (September 15, 2008), *Has the Safer Cities Initiative in Skid Row Reduced Serious Crime?* http://wraphome.org/wraparchives/downloads/safer_cities.pdf

[18] City of Los Angeles crime data from 2010 to 2017 downloaded from the Los Angeles Open Data web site: https://data.lacity.org/.

[19] This data is from the demographic surveys conducted by the Los Angeles Homeless Services Authority in 2007 and 2009 – the only years when these questions were asked.

[20] Economic Roundtable (2017), *Who Counts? Assessing Accuracy of the Homeless Count*, pp. 21-22, https://economicrt.org/publication/.

[21] Kidsdata, http://kidsdata.org/topic/20/fostercare/table#fmt=2493&loc=364&tf=84&sortColumnId=0&sortType=asc (accessed September 25, 2017).

[22] California Child Welfare Indicators Project, http://cssr.berkeley.edu/ucb_childwelfare/Exits.aspx?r=5 (accessed September 25, 2017).

[23] Data from the Homeless Management Information System (HMIS) was used to describe the structure of parenthood because this database include a far larger number of households with children than the demographic surveys.

[24] The California Department of Education's definition of homeless children and youths is as follows:   "The McKinney-Vento Act defines homeless children and youths as individuals who lack a fixed, regular, and adequate nighttime residence. This definition also includes:
- Children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason
- Children and youths who may be living in motels, hotels, trailer parks, shelters, or awaiting foster care placement
- Children and youths who have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings
- Children and youths who are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings, or
- Migratory children who qualify as homeless because they are children who are living in similar circumstances listed above

Source: https://www.cde.ca.gov/sp/hs/homelessdef.asp

[25] Los Angeles County Office of Education, *Homeless Education Update, 2015-2016 School Year: LA County Homeless Student Count by Grade* (2016).

[26] General Relief and CalWORKs average amounts are from Los Angeles County Department of Public Works, *DPSS at a Glance, February 2017,*

http://dpss.lacounty.gov/wps/portal/dpss. SSI/SSDI minimum amount is from Social
Security Administration Research, Statistics and Policy Analysis, *Table 3, Number of
recipients in state (by eligibility category, age, and receipt of OASDI benefits) and amount of
payments, by county, December 2016*, https://www.ssa.gov/policy/docs/statcomps/ssi_sc/.
Social Security minimum retirement benefit is from Social Security Administration,
*Primary Insurance Amount and Maximum Family Benefit, Effective for December 2017*,
https://www.ssa.gov/cgi-bin/smt.cgi. Unemployment insurance minimum amount is
from California Employment Development Department, with weekly minimum
converted to monthly equivalent,
http://www.edd.ca.gov/unemployment/Eligibility.htm.

[27] The maximum and average amount of monthly General Relief/Assistance benefits
provided by large urban California counties is shown below. Information about total
monthly benefits paid, average benefit amount and the caseload in January 2018 is from
the California Department of Social Services GR237 report,
http://www.cdss.ca.gov/inforesources/Research-and-Data/Disability-Adult-Programs-
Data-Tables/GR-237. The estimated size of the indigent adult population in each county
is from the American Community Survey Public Use Microdata Sample 2011-2015, based
on records for individuals who were 18 years of age or older, living alone or in group
quarters, with incomes that were 50 percent or less of the poverty threshold. This is a
conservative proxy for the actual size of the eligible population, but it provides a
consistent measure for indexing and comparing county coverage rates.

| County | Maximum Benefit Amount | Total Monthly Benefits Paid | Average Benefit Amount | Caseload January 2018 | Indigent Adult Population | Percentage of Indigent Population Covered |
|---|---|---|---|---|---|---|
| Alameda | $336 | $2,592,776 | $291 | 8,899 | 14,292 | 62% |
| Los Angeles | $221 | $15,614,058 | $182 | 85,802 | 93,444 | 92% |
| Orange | $317 | $1,129,414 | $277 | 4,070 | 21,117 | 19% |
| Sacramento | $271 | $1,022,007 | $215 | 4,754 | 14,707 | 32% |
| San Diego | $337 | $832,845 | $267 | 3,120 | 29,191 | 11% |
| San Francisco | $440 | $1,714,952 | $369 | 4,649 | 13,732 | 34% |
| Santa Clara | $343 | $603,595 | $163 | 3,701 | 12,092 | 31% |
| CALIFORNIA | | $25,962,590 | $203 | 127,889 | 322,449 | 40% |

[28] Federal Register (January 31, 2017). Health and Human Services Department Annual
Update of the HHS Poverty Guidelines,
https://www.federalregister.gov/documents/2017/01/31/2017-02076/annual-update-of-
the-hhs-poverty-guidelines.

[29] Blasi, Gary and Joseph W. Doherty, UCLA School of Law (2010), *California
Employment and Discrimination Law and Its Enforcement: The Fair Employment and Housing Act
at 50*,
https://law.ucla.edu/~/media/Files/UCLA/Law/Pages/Publications/CEN_RAN_PUB%
20FEHA.ashx

[30] Los Angeles County Department of Public Social Services (July 22, 2014), "Assembly
Bill (AB) 74 County Welfare Department (CWD) Expanded Subsidized Employment
(ESE) Plan," http://www.cdss.ca.gov/calworks/res/pdf/ESE_Plans/LA.pdf.

Exhibit D



# County of Los Angeles
# CHIEF EXECUTIVE OFFICE
Kenneth Hahn Hall of Administration
500 West Temple Street, Room 713, Los Angeles, California 90012
(213) 974-1101
http://ceo.lacounty.gov

FESIA A. DAVENPORT
Chief Executive Officer

February 22, 2021

Board of Supervisors
HILDA L. SOLIS
First District

HOLLY J. MITCHELL
Second District

SHEILA KUEHL
Third District

JANICE HAHN
Fourth District

KATHRYN BARGER
Fifth District

To:      Supervisor Hilda L. Solis, Chair
         Supervisor Holly J. Mitchell
         Supervisor Sheila Kuehl
         Supervisor Janice Hahn
         Supervisor Kathryn Barger

From:    Fesia A. Davenport
         Chief Executive Officer

## TRANSMITTING THE COUNTYWIDE HOMELESS INITIATIVE'S YEAR FOUR PERFORMANCE EVALUATION

This memo transmits the Countywide Homeless Initiative's (HI) Year Four performance evaluation, which details Fiscal Year (FY) 2019-20 outcomes and provides analysis of results associated with both HI-funded strategies and additional groups of services rendered through the County of Los Angeles' (County) broader homeless services system (Attachment I). The report is responsive to the Board's February 9, 2016 approval of the HI strategies mandating independent evaluation of the Initiative's outcomes and performance on an annual basis. The Year Four performance evaluation was prepared by Public Sector Analytics (PSA).

**The Third Year of Measure H and the First Quarter of the COVID-19 Pandemic**

Year Four of HI was the third year for which Measure H revenues were available to support the Initiative. PSA's performance evaluation captures roughly one quarter of results produced under the anomalous conditions imposed by the onset of the COVID-19 pandemic in March 2020.

**Permanent and Interim Housing Results Over Four Years**

HI and Measure H are critical to the County's homeless services capacities, but they are components within a larger homeless services system consisting of all providers and funding sources that drive overall housing placement results.

As shown in Attachment II, Figure 1, PSA's performance evaluation credits HI with four-year cumulative totals of 30,900 permanent housing placements, which account for 42.4 percent of the larger system's permanent placements over this period. PSA's performance evaluation additionally reports a cumulative total of 52,201 interim housing placements funded in whole

Each Supervisor
February 22, 2021
Page 2

or in part through HI, comprising roughly 60.9 percent of total systemwide interim placements over four years.

*Permanent Housing*

Measure H revenues funded all or part of the 9,857 permanent housing placements in Year Four of HI, a 2.4 percent increase over the previous year despite an 8.5 percent decline associated specifically with HI's Rapid Rehousing strategy. Growth in HI-supported placements has slowed in each of the previous two years, which underscores ongoing tightness in the supply of permanent housing. PSA reports a cumulative total of 25,050 Measure H-funded permanent housing placements in three years, accounting for 44.5 percent of systemwide placements over this period (See Attachment II, Figures 2 and 3).

*Interim Housing, Including Project Roomkey*

Safe distancing guidelines imposed in response to the COVID-19 pandemic compelled homeless services providers Countywide to decompress congregate shelter occupancy during the last 3.5 months of Year Four. This precipitated the first annual decline in HI-affiliated interim housing placements, but systemwide placements for the year exceeded the Year Three total by 4 percent.

In response to the COVID-19 pandemic, the County partnered with the State and Los Angeles Homeless Services Authority to administer Project Roomkey (PRK), which moved high-vulnerability homeless persons from the streets and shelters to safe distance interim housing provided in rooms at 37 participating motels and hotels across the County. PRK made shelter available to people experiencing homelessness who were at least 65 years of age and/or who had health conditions that put them at the highest risk of fatality in the event they became infected with coronavirus.

Measure H funding and the County's broad effort to strengthen the shelter system drove significant interim housing placement growth in Year Two and Year Three of HI. Systemwide placements in Year Three exceeded the pre-Measure H baseline total for Year One by approximately 153 percent. However, HI-affiliated interim housing consists primarily of congregate shelter, and the reduction in occupancies necessitated by the COVID-19 pandemic led to a 24.8 percent decrease in Measure H-supported placements in Year Four of the HI. (See Attachment II, Figures 4 and 5). Over three years, HI interim housing placements funded in whole or in part by Measure H account for 46,407 of 70,319 (66 percent) placements systemwide (See Attachment II, Figure 5).

Each Supervisor
February 22, 2021
Page 3

**Effective Performance in the Face of Significant Challenges**

The COVID-19 pandemic placed restrictions on services at the disposal of homeless service providers.  In the face of this challenge and a deepening homelessness crisis, however, outcomes reported in PSA's performance evaluation suggests HI has effectively coordinated the agencies administering the Countywide strategies.  In addition to the housing placement results discussed above, the main length of time individuals with records in the Homeless Management Information System remain homeless before they are permanently housed further declined on a systemwide basis in Year Four, and HI homelessness prevention efforts for individuals and families continued to expand.  Additionally, systemwide rates of return to homelessness after placement in permanent housing have fallen steadily over four years.

**Implications and Next Steps**

Although the size of the County's homeless population continued to grow in Year Four, PSA's analysis of homeless inflow-and-outflow notes that the crisis would be considerably worse in the absence of HI and Measure H.  The results presented in the Year Four HI performance evaluation underscore the critical importance of the Initiative to the County's homeless services system.  However, the continuing efforts to reverse and end the homelessness crisis must extend beyond the homeless services system and include other policy domains that can help generate the supply of affordable permanent housing required to meet the growing demand.

Should you have any questions concerning this matter, please contact me or Max Stevens, Principal Analyst, at (213) 253-5630 or mstevens@ceo.lacounty.gov.

FAD:JMN:TJM
WSK:MS:pa

Attachments

c:    Executive Office, Board of Supervisors
      County Counsel
      Sheriff
      Children and Family Services
      Health Services
      Mental Health
      Probation
      Public Health
      Public Social Services
      Workforce Development, Aging and Community Services
      Los Angeles Homeless Services Authority

# LA COUNTY'S HOMELESS INITIATIVE

Annual Performance Evaluation:
Year 4 Outcomes

**JANUARY 2021**

Halil Toros, PhD
Dennis Culhane, PhD
Stephen Metraux, PhD

**PUBLIC SECTOR ANALYTICS**

# TABLE OF CONTENTS

**Tables and Figures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . III

**Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . V

**Section 1: Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

1.1    The First Four Years of the Homeless Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

1.2    Measure H . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

1.3    Continuing Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

1.4    Project Roomkey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

1.5    Data Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

1.6    Organization of This Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

**Section 2: Macro-Level System Performance Measures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2.1    Macro-Measure 1: Length of Time Homeless from Initial Contact with Homeless Services System . . . . .8

2.2    Macro-Measure 2: Placements in Permanent Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

2.3    Macro-Measure 3: Returns to Homelessness Following a Permanent Housing Placement . . . . . . . . . . .12

2.4    Section Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

**Section 3: Meso-Level Program Performance Measures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

3.1    Meso-Measure 1: Number Prevented from Becoming Homeless or Being Discharged
into Homelessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

3.2    Meso-Measure 2: Number Who Are Placed in Interim Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

3.3    Meso-Measure 3: Number Placed in Permanent Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

3.4    Meso-Measure 4: Returns to Homelessness Following a Permanent Housing Placement . . . . . . . . .19

3.5    Section Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Section 4: Dynamics Of Homelessness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4.1    Annual Numbers of People Who Experience Homelessness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

4.2    Monthly Numbers of Homeless Persons  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.3    Quarterly Numbers of Entries and Exits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4.4    Trends and Patterns of Homelessness Episodes and Homeless Populations  . . . . . . . . . . . . . . . . . . 26

4.5    Policy Implications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Section 5: Pre-Post Evaluation of Health and Mental Health Outcomes** . . . . . . . . . . . . . . . . . . . . . . . . .29

5.1    Methodology And Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

5.2    Results  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  ▶  5.2.1    Health Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

  ▶  5.2.2    Mental Health Outcomes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

5.3    Section Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Section 6: Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

6.1    Macro, Meso, and Micro Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

6.2    New Topics  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

6.3    Hi and Homelessness in LA County: Looking Ahead. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF CONTENTS

**Appendix A: Micro-Level Strategy Performance Measures ........................................... 41**

A.1.   Topic A: Prevent Homelessness ................................................................................. 41

▶ A.1.1   Strategy A1: Homelessness Prevention For Families ...................................... 41

▶ A.1.2   Strategy A5: Homelessness Prevention For Individuals ................................... 43

A.2   Topic B: Subsidize Housing ........................................................................................ 43

▶ A.2.1   Strategy B1: Provide Subsidized Housing To Homeless Disabled Individuals Pursuing SSI ...... 43

▶ A.2.2   Strategy B3: Partner With Cities To Expand Rapid Rehousing ............................. 43

▶ A.2.3   Strategy B4: Facilitate Utilization Of Federal Housing Subsidies ......................... 43

▶ A.2.4   Strategy B7: Interim/Bridge Housing For Those Exiting Institutions ...................... 43

A.3   Topic C: Increase Income .......................................................................................... 44

▶ A.3.1   Strategy C2 And Strategy C7: Increase Employment For Homeless Adults ............... 44

▶ A.3.2   Strategy C4, C5 And C6: Countywide Supplemental Security/Social Security Disability Income and Veterans Benefits Advocacy ................................................. 45

A.4   Topic D: Provide Case Management Services ............................................................ 45

▶ A.4.1   Strategy D2: Expand Jail In-Reach ................................................................ 45

▶ A.4.2   Strategy D6: Criminal Record Clearing Project ............................................... 45

▶ A.4.3   Strategy D7: Permanent Supportive Housing .................................................. 46

A.5.   Topic E: Create A Coordinated System ...................................................................... 47

▶ A.5.1   Strategy E6: Countywide Outreach System .................................................... 47

▶ A.5.2   Strategy E7: Strengthen The Coordinated Entry System ................................... 47

▶ A.5.3   Strategy E8: Enhance The Emergency Shelter System ..................................... 47

▶ A.5.4   Strategy E14: Enhanced Services For Transition Aged Youth ............................. 48

A.6.   Topic F: Increase Affordable/Homeless Housing ....................................................... 48

▶ A.6.1   Strategy F1 Promote Regional Sb2 Compliance .............................................. 48

▶ A.6.2   Strategy F3: Support Inclusionary Zoning For Affordable Rental Units .................... 48

▶ A.6.3   Strategy F4: Strengthen The Coordinated Entry System ................................... 48

▶ A.6.4   Strategy F7: Affordable Housing for Homeless Households and Establish a One-Time Housing Innovation Fund ................................................................. 48

**Appendix B: Review of HI Evaluations ................................................................... 49**

B.1.   Study Design ............................................................................................................. 50

B.2   Study Findings .......................................................................................................... 52

▶ B.2.1.   Outcomes And Limitations of Available Administrative Data .............................. 52

▶ B.2.2.   Process Evaluation ................................................................................... 53

▶ B.2.3.   Best Practices ......................................................................................... 54

▶ B.2.4.   Other Findings ........................................................................................ 54

B.3.   Section Conclusion ................................................................................................... 55

**Appendix C: Technical Appendix .......................................................................... 56**

C.1   Methodology of Flow Analysis ................................................................................... 56

C.2.   Methodology and Data of the Outcome Evaluation ................................................... 58

C.3.   Statistical Tests of the Outcome Evaluation .............................................................. 59

# TABLES AND FIGURES

## Tables

Table B-1: Two Group T-Tests of Treatment Effect of DHS Outcomes for Three Placement Types . . . . . . . . . . . . . 49
Table B-2: Two Group T-Tests of Treatment Effect of DMH Outcomes for Three Placement Types . . . . . . . . . . . . 51
Table C-1: Evaluations of Specific Hi Strategies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
Table C-2: Summary of Research Questions for the HI Strategy Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## Figures

Figure 1-1: Annual HI PH and IH Placements and Year-Over-Year Increases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Figure 1-2: Annual Systemwide PH and IH Placements and Year-Over-Year Increases  . . . . . . . . . . . . . . . . . . . . . . .3
Figure 1-3: Measure H and Non-Measure H Shares of Systemwide PH and IH Placements . . . . . . . . . . . . . . . . . . . .4
Figure 2-1: Median Days Between Assessments and PH Placements by Placement Type  . . . . . . . . . . . . . . . . . . . . .9
Figure 2-2: Number of Permanent Placements Over 4 Years —
   Number of Persons in Adult and Family Households . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Figure 2-3: Number of Permanent Placements Over 4 Years — Number of Persons by Placement Type . . . . . . .11
Figure 2-4: Rates of Return to Homelessness Over 4 Years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Figure 2-5: Rates of Return to Homelessness Over 4 Years by Placement Type  . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
Figure 3-1: Number of Households and Individuals Prevented from Becoming Homeless . . . . . . . . . . . . . . . . . . . . .15
Figure 3-2: Number of Interim Placements Over 4 Years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
Figure 3-3: HI-Affiliated Interim Housing Placements Over 4 Years  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Figure 3-4: Number of HI-Affiliated Permanent Placements Over 4 Years. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
Figure 3-5: Rates of Return to Homelessness Over 4 Years by Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
Figure 4-1: Number of Homeless, Entries into and Exits From Homelessness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Figure 4-2: Monthly Number of Homeless Persons Receiving HMIS Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Figure 4-3: Monthly Number of Persistent Homeless Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Figure 4-4: Quarterly Number of New Entries and Re-Entries to HMIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Figure 4-5: Quarterly Number of Entries into and Exits From Homelessness in HMIS  . . . . . . . . . . . . . . . . . . . . . . 25
Figure 5-1: Average Number/Days of DHS Visits by Service Type — Treatment Group: RRH Placements . . . . . .31
Figure 5-2: Average Number/Days of DHS Visits by Service Type — Treatment Group: PSH Placements . . . . . 32
Figure 5-3: Average Number/Days of DHS Visits by Service Type — Treatment Group: IH Placements . . . . . . . 33
Figure 5-4: Average Number/Days of DHS Visits by Service Type — Treatment Group: RRH Placements. . . . . 34
Figure 5-5: Average Number/Days of DHS Visits by Service Type — Treatment Group: PSH Placements . . . . . 35
Figure 5-6: Average Number/Days of DHS Visits by Service Type — Treatment Group: IH Placements . . . . . . . 36
Figure A-1: Number of Households and Individuals Prevented from Becoming Homeless. . . . . . . . . . . . . . . . . . . . 42
Figure A-2: Individuals Enrolled in and Served by and Stayed in or Exited into Ph: B3 and B7 Programs  . . . . . . 43
Figure A-3: Individuals Enrolled in and Served by and Placed in Ph: D7 Program  . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Figure A-3: Individuals Enrolled in and Served by and Exited into Ph: E8 Program . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Figure C-1: Homelessness Episodes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Figure C-2: Match Rates of Study Samples Against DHS and DMH Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# LA County's Homeless Initiative

## Annual Performance Evaluation: Year 4 Outcomes

In February 2016, the Los Angeles County Board of Supervisors formally approved a comprehensive set of strategies creating the County Homeless Initiative (HI) to combat the County's homelessness crisis, allocating $100 million to this countywide effort. In March 2017, the County's electorate approved Measure H, a quarter-cent sales tax, which is projected to yield $355 million per annum for ten years to fund the HI strategies to combat the homeless crisis. Using both the HI framework and this funding, the County has established and/or expanded a range of client-centered services for persons who are homeless or at risk for homelessness. Structured to produce measurable outcomes, the strategies seek to (a) prevent homelessness, (b) expand subsidized housing, (c) increase income among those who are homeless or are at risk of becoming homeless, (d) enhance homeless case management and supportive services, (e) create a coordinated homelessness service system, and (f) expand affordable and homeless housing.

This report, focusing on outcomes data from Year 4 of the HI (July 1, 2019, through June 30, 2020), is the fourth in a series of annual reports that document and assess outcomes related to the HI based upon administrative records collected by three of the largest agencies serving homeless clients in the County—LAHSA, the LA County Department of Health Services (DHS), and the LA Department of Public Social Services (DPSS). The report falls into two parts. The first, consisting of Sections 2 and 3 and Appendix A, adds Year 4 data to the series of macro-, meso-, and micro-measures, thereby updating the analyses featured in the earlier reports of this series. The second part consists of Sections 3 and 4 and Appendix B, with each section examining HI outcomes from new perspectives.

Year 4 of the study period ends after June 2020, which means that it only captures the initial 3 or 4 months of the COVID-19 pandemic. This accounts for some of the dynamics in services provision in Year 4, especially in the reduced capacity to provide interim housing related to implementing distancing measures. This is highlighted in the relevant places for this report. The report also discusses broader impacts of the pandemic that will likely be more pronounced in the upcoming year.

## SECTIONS 2 AND 3 (WITH APPENDIX A) — MEASURING YEAR 4 PERFORMANCE

Year 4 outcomes are reported with the same three levels of performance measurement used in earlier years (see textbox).

---

**The Three Levels of Measurement within the HI Performance Evaluation Framework**

▸ Macro-Level System Metrics gauge the performance of LA County's overall homeless services system, inclusive of HI's strategic activity, i.e., Measure H—funded services, as well as services and benefits not directly associated with the HI but nevertheless important components in the overall range of support and care available to the County's homeless population (Section 2).

▸ Meso-level Program Metrics are aggregations of strategy-specific outcomes section and are largely focused on HI activities and services (Section 3).

▸ Micro-level Performance Metrics for each of the individual HI strategies provide the foundation for the higher-order macro- and meso-level results (Appendix A).

---

## EXECUTIVE SUMMARY

**Macro-Level Measures**

### Figure ES-1. Annual Systemwide PH and IH Placements and Year-over-Year Increases



Four Year Cumulative & De-Duplicated Placements
PH Total: 72,815
IH Total: 85,734

Section 2 of the report contains updated macro-level findings. These findings serve as a bellwether for the overall performance of the countywide homeless service delivery system. It includes the two-principal metrics of the HI (shown on Figure ES-1). **Over the first four years of the HI, the cumulative (unduplicated) systemwide exits to permanent housing from the overall homeless services system totaled 72,815 after four years, while systemwide interim housing (IH) placements totaled 85,734.**

---

**Macro-Level System Performance Measures Highlights**

▶ Overall, results for Year 4 reinforce a trend of ongoing, modest reductions in length of time homeless, driven by substantial reductions in length of time homeless for those placed in PSH, and more recent reductions for those with self-resolved exits to PH settings (Macro-Measure 1).

▶ Data for Year 4 extended a trend in which the numbers of persons, both in families and in adult households, placed in PH increased modestly from the previous year. This overall net increase belies a more uneven set of increases and decreases among people placed in specific categories of PH (Macro-Measure 2).

▶ Rates of return, which are consistently higher for PSH placements as compared to RRH placements, decreased from 15.4% (Year 1) to 9.8% (Year 4) (Macro-Measure 3).

---

Section 2 also presents further findings from the three macro measures, which are summarized in the text box. In all three macro-measures, the overall results in Year 4 are markedly better than those from the Year 1 HI review.

**Meso-Level Measures**

### Figure ES-2. Annual HI PH and IH Placements and Year-over-Year Increases



Four Year Cumulative & De-Duplicated Placements
PH Total: 30,900
IH Total: 52,201

Measure H funds became available in Year 2

Section 3 contains updated meso-level findings. Meso-level measures serve as the "headlines" of the HI. They bridge the overarching macro-measures presented in Section 2 and the strategy-specific micro-measures that are the basis of LA County's HI. While the macro-measures include outcomes associated with homeless-related services provided outside of the HI, the meso-level headline metrics are aggregations of strategy-specific outcomes (micro-level measures) and focus on HI activities and services.

The key finding from the meso-level measures feature the HI-specific IH and PH placements. Figure ES-2 shows that **HI strategies accounted, over the four-year period covered by the HI, for cumulative and unduplicated totals of 30,900 PH placements and 52,201 IH placements[1]. Comparing this to the corresponding numbers of people placed as reported in the macro-measures, HI (and Measure H) funded close to 45% of total PH placements. In addition, HI/H either completely or partially funded roughly 66% of IH placements over four years.**

The significance of Measure H funding is observed by how, between Years 1 and 4, HI-funded permanent housing placements increased by 5.5 times (from 4,583 to 25,050), and interim housing placements increased by almost six times (from 7,791 to 46,407).

[1]  HI-funded PH and IH placements shown in this evaluation are higher than those reflected in Year Four quarterly reporting for two reasons: The 8,509 Year Four PH placements shown in this report include 1,358 placements by the Department of Public Social Services (DPSS) B-1 program not previously reported in Year Four quarterly reporting because the appropriate service records were not yet available.  Similarly, the 14,005 Year Four IH placements shown here include placements administered by the Department of Public Health's Substance Abuse Prevention and Control program, the data for which were not available at the time the quarterly public reports were prepared.

## EXECUTIVE SUMMARY

---

**Meso-Level Program Performance Measures Highlights**

▸ In Year 4, the number of families assisted by the A1 strategy rose by approximately 50% from 1,003 in Year 3 to 1,498 and the number of individuals assisted by the A5 strategy expanded by 80% from 1,221 in Year 3 to 2,189.

▸ The decline in IH placements from 19,688 in Year 3 to 14,804 in Year 4 was caused mainly by the COVID-19 crisis. The County's Project Roomkey compensated for this decrease by placing almost 4,000 individuals in hotels and motels, and some of these homeless individuals would have been placed in interim housing.

▸ After increasing steadily over the first 3 years, B3 placements, which represent the large majority of all HI-affiliated permanent placements, dropped by 8.5% in Year 4, to 6,000 while total PH placements slightly increased reaching almost 10,000.

▸ Return to homelessness assistance within 6 months of placement to PH declined overall for the third straight year. This was mainly due to fewer people returning to homelessness assistance after placements in LAHSA-funded RRH programs.

As with the macro-level outcomes, key results from Section 3 are summarized in the text box.

### Micro-Level Measures

Micro-level measures are the specific performance outcomes developed for each individual HI strategy and provide the foundation of the higher-order (macro and meso) results. The specific findings for these measures are available in Appendix A.

## SECTIONS 4 AND 5 AND APPENDIX B – NEW STUDIES

With four years having passed since the initiation of HI, there is growing opportunity to assess dynamics related to homelessness and homeless services. This report includes three such studies.

---

**Key Findings –  Dynamics of Growth in Homeless Services and Changes in Population**

▸ The analysis of inflows and exits suggests that the growing census is primarily a result of increases in the persistently homeless subgroup. While there has been some increase in entries, most new entries to homelessness result in exits following relatively brief homeless spells.

### Dynamics of Homelessness

Section 5 presents a study that addresses the apparent paradox of why LA's homeless population, as per the annual point-in-time count, has grown by 13% in each of the past two years despite the expansion in LA's homeless services and the growth in funded exits from homelessness. The findings (see textbox) indicates that a focus on addressing persistent homelessness would have the greatest potential impact on the level of homelessness in LA. The planned growth of 10,000 PSH units over the next five years under Proposition HHH, with the first substantial number of units opening this year, holds some promise that significant progress can be made. Additional efforts to stabilize people at risk of persistent homelessness, and to prioritize existing resources towards housing them, could also contribute to a reduced census.

## EXECUTIVE SUMMARY

---

**Pre-Post Evaluation of Health and Mental Health Outcomes**

▶ Permanent supportive housing (PSH) and rapid rehousing (RRH) services significantly reduced general medical and mental health inpatient, emergency, and crisis services use among people placed, compared to both their own levels of services used preplacement and to the control group.

### Evaluating Impacts on Permanent and Interim Housing on Health and Mental Health Services Outcomes

Section 6 presents an assessment of the impact of PH placements on acute health care services in comparison to a matched control group. The findings (see text box) indicate there are reductions in services use associated with PSH and RRH placements that are not present with placements in interim housing. Indeed, service utilization appears to increase irrespective of the length of stay in interim housing. These results confirm that the benefits of HI programs extend beyond housing, with one substantial positive impact being reductions in the use of costly county-funded health and mental health services.

Appendix B features the third new study that synthesizes five evaluations that were commissioned by LA County to examine, key components of the HI. Each of these evaluations provides detailed accounts of the structure and functioning of these components: prevention, outreach, interim and bridge housing, PSH, and RRH. Each evaluation shows how HI resources expanded the services provided in these components, as well as key changes in how these services were implemented in conjunction with HI support. The evaluations show which features are effective and which need further attention; they are unable to extensively assess how the services have impacted homelessness in LA County beyond offering descriptive findings of services provided and people who have been served.

While the first two studies of this report highlight the potential for the administrative data used for the macro, meso, and micro measures to inform other aspects of the HI, the evaluations reviewed in Section 7 show the limitations of relying solely on these data in assessing the HI's impact on levels of homelessness in LA County.

---

**Impact of COVID-19 on HI**

▶ The continuing pandemic could have a negative impact on PH placements overall if HI funding is significantly diminished because of declining tax revenues. Furthermore, the continuing economic impact of the pandemic on incomes and rent arrears threatens to exacerbate demand for homelessness assistance. Demand for homelessness prevention is especially likely to grow amidst a pending wave of evictions.

**EXECUTIVE SUMMARY**

---

## CONCLUSION

Year 4 of HI continues to show progress in the placement of people experiencing homelessness in permanent housing. Growth in persistent homelessness, however, has resulted in a net increase in the PIT two years in a row. The opening of significant numbers of PSH unites under Proposition HHH over the next five years should substantially mitigate levels of persistent homelessness, as could expansions in programs to prevent persistence.

The health and economic conditions created by the COVID-19 pandemic will mean that funding for HI and expected levels of homelessness overall, in the current year and beyond, are uncertain, although continued investments in PH placements will have a clear and unambiguous positive impact on the people served.

One indicator of the impact of COVID-19 that was clearly captured in this report is the 25% decline in IH this year, representing approximately 5,000 people. This reduction has been offset by placements in Project Roomkey, the state initiative to house people at high risk of COVID-19 complications in hotels and motels. To the extent that Project Roomkey clients are exited from hotels and motels to housing, a commitment made by the County and LAHSA, this could result in a decline in the number of people experiencing homelessness this year, compared to what would otherwise be the case. The continuing pandemic crisis could lead to further Project Roomkey placements and exits to housing, including through conversion of some hotels and motels to permanent housing under Project Roomkey.

All these factors suggest that the coming year poses a number of uncertainties with respect to HI, homelessness assistance more generally, and overall levels of homelessness. A further challenge related to the changing nature of homeless services in response to the pandemic is the need to accommodate additional data sources besides those used for this report. Without incorporating the data collected on hotel and motel placements, including those under Project Roomkey, the reductions in longstanding services such as IH will present an incomplete picture of efforts to safely shelter people experiencing homelessness, and will inhibit comprehensive assessments of LA County's HI during a time when data should play an even more critical role in informing the evolving role of the strategies reviewed here.

**SECTION 1**

# Introduction

In February 2016, the Los Angeles County Board of Supervisors formally approved a comprehensive set of strategies creating the County Homeless Initiative (HI) to combat the County's homelessness crisis. With the creation of the HI and passage by voters of the landmark Measure H sales tax in March 2017, funding an estimated $355 million in services annually, the County has established and/or expanded a range of client-centered services for persons who are homeless or at risk for homelessness. Development of the HI strategies occurred through a collaborative process, which was coordinated by the CEO's HI and involved not only County but also non-County stakeholders, including cities, municipal leaders, community organizations, advocates, and concerned citizens. Structured to produce measurable outcomes, the strategies seek to (a) prevent homelessness, (b) expand subsidized housing, (c) increase income among those who are homeless or are at risk of becoming homeless, (d) enhance homeless case management and supportive services, (e) create a coordinated homelessness service system, and (f) expand affordable and homeless housing.

This is the fourth in a series of annual reports that document and assess outcomes related to the HI based upon administrative data collected through LA County and the Los Angeles Homeless Services Authority (LAHSA). As such, the report reflects a continuation of the analyses that have been performed in the earlier reports in this series, in which outcomes are framed within a series of macro-, meso-, and micro-measures. With another year of data and findings, in this report we continue to track the HI as it matures, and we assess various emerging trends. Additionally, with the availability of four years of data, as well as other evaluations that are targeted on specific aspects and strategies of HI, we have expanded this report beyond the macro-, meso-, and micro-measures to focus on three additional topics, each of which adds important dimensions to our understanding of the HI.

## 1.1  FIRST FOUR YEARS OF THE HOMELESS INITIATIVE

**Impact of HI Funding on Permanent and Intermediate Housing Placements**

▶ In its first four years, HI has funded over 42% of the 72,815 systemwide PH placements and roughly 60% of the 85,734 systemwide IH placements.

Figure 1-1 shows the in-year counts of Permanent Housing (PH) and Interim Housing (IH) placements in the first four years of the HI[2]:

### Figure 1-1. Annual HI PH and IH Placements and Year-over-Year Increases



Four Year Cumulative & De-Duplicated Placements
PH Total: 30,900
IH Total: 52,201

Measure H funds became available in Year 2

▶ As noted in the inset of the diagram, HI strategies account for a cumulative and unduplicated total of 30,900 PH placements and 52,201 IH placements.

▶ After more than doubling from 4,583 to 9,630 between Years 1 and 3, PH placements stayed almost at the same level as in Year 3 with a 2.3% increase to 9,857.

▶ HI-funded IH placements increased by approximately 150% between Years 1 and 3 but decreased by almost 25% to 14,804 in Year 4. The decline in IH placements in Year 4 was caused mainly by "decompression" measures in response to the COVID-19 pandemic. As described below, the County's Project Roomkey compensated for this decrease by placing almost 4,000 individuals in hotels and motels.

▶ While the Year 4 placement numbers do not show the substantial increases in PH and IH placements that were achieved in Year 2 and 3, HI strategies continued to place substantial number of homeless households in PH and IH.

---

[2] IH placement totals include all placements funded entirely or partially with HI resources. HI-funded PH and IH placements shown in this evaluation are higher than those reflected in Year Four quarterly reporting for two reasons: The 8,509 Year Four PH placements shown in this report include 1,358 placements by the Department of Public Social Services (DPSS) B-1 program not previously reported in Year Four quarterly reporting because the appropriate service records were not yet available.  Similarly, the 14,005 Year Four IH placements shown here include placements administered by the Department of Public Health's Substance Abuse Prevention and Control program, the data for which were not available at the time the quarterly public reports were prepared.

**SECTION 1**

HI resources, however, do not reflect the entirety of LA County's overall homelessness services system. The macro performance metrics discussed in this report reflect a systemwide perspective, encompassing and combining HI-funded outcomes, including PH placements, with outcomes from the County's homelessness services system more broadly. Figure 1-2 shows systemwide PH and IH placements, i.e., inclusive of but not limited to those funded with HI resources, in each of the first three years of the HI:

▸ Systemwide cumulative and unduplicated totals for PH and IH placements were 72,815 and 85,734, respectively.

▸ After staying stable during Years 2 and 3 at the 20,000 level, in Year 4 the PH placements increased by 7% to 21,710.

▸ IH placements reached almost 30,000 in Year 4, increasing slightly (4%) after increasing by approximately 30% in Years 2 and 3.

**Figure 1-2. Annual Systemwide PH and IH Placements and Year-over-Year Increases**



Four Year Cumulative & De-Duplicated Placements
PH Total: 72,815
IH Total: 85,734

Taken together, Figures 1-1 and 1-2 demonstrate the impact that the HI has had on the quantity of services available to those who are homeless or at risk of becoming homeless.

**1.2  MEASURE H**

In this report on HI outcomes, the distinction referenced between HI-funded outcomes and systemwide outcomes is also, at some key levels of measurement, a distinction between outcomes funded by Measure H revenues and outcomes inclusive of but not limited to those funded by Measure H.

In March 2017, voters resoundingly approved Measure H, the landmark ¼ percent County sales tax increase meant to create an ongoing revenue stream — an estimated $355 million per year for ten years — to fund homeless services, rental subsidies, and housing. The tax increase would provide funding for a comprehensive regional approach encompassing 21 interconnected strategies. These Measure H funds became fully available in Year 2 of the HI. In Year 1, the County had allocated $100 million to launch these strategies, and then continued to approve annual budgets thereafter, which by FY 2019-20 consisted of a $460 million spending plan that widened and intensified the County's fight against homelessness.

---

**HI Funding Impact and Point-in-Time (PIT) Count**

‣ Despite the significant increases in permanent and interim housing capacity related to Measure H resources (see previous section), LAHSA's 2020 PIT count showed a 13% increase in the size of the homeless population on a given night over the 2019 PIT count.

‣ Without the HI efforts, this PIT count increase would likely have been substantially higher.

---

**Figure 1-3. Measure H and non-Measure H Shares of Systemwide PH and IH Placements**

Cumulative and De-Duplicated Counts in Years 2, 3 and 4 of HI



Figure 1-3 shows both the Measure H and the non-Measure H shares of systemwide PH and IH placements for HI in Years 2 through 4. Year 1 was dropped from this figure as HI funds were not yet available. The cumulative counts reflect unduplicated counts over Years 2 through 4:

‣ There were 4,583 HI placements to PH in Year 1 (pre-Measure H; see Figure 1-1), and a cumulative total of 25,050 Measure H–funded PH placements in Years 2 through 4. This cumulative total represents a 5.5-fold increase over the Year 1 total.

‣ Cumulative HI-funded IH placements over three years of Measure H funding (Years 2 through 4) total 46,407. This reflects a six-fold increase relative to the baseline Year 1 total (7,791 placements; see Figure 1-1).

SECTION 1

▶ As of the end of Year 4, Measure H funds have accounted for 44.5% of cumulative PH placements and 66.0% of cumulative IH placements over the three years during which these revenues have been available.

## 1.3  CONTINUING CHALLENGES

This report shows the continuation of HI's strong performance in its fourth year. However, these gains were obscured by the continuing upward trend in the annual point-in-time (PIT) homeless counts conducted by LAHSA[3]. This creates a challenge of reconciling the significant expansion of the County's homelessness service system in conjunction with Measure H with the increase in the homeless population. Given the capacity increases in both permanent and interim housing established over the previous four years, the increase in the PIT count numbers highlighted how factors largely beyond the purview and control of the HI affect the scale and scope of the County's homeless crisis. In section 5, we look at this further and study the homeless numbers in the County with the help of a flow analysis. Based on this, we demonstrate how the rising scale of homelessness is attributable to a growing proportion of the homeless population that is becoming persistently homeless.

The inability of this growing group to escape homelessness is beyond the scope of this report. However, we can address here some macro issues that not only steadily produce new homeless households but also prevent these homeless households from escaping homelessness quickly and thereby cause them to become persistently homeless over time.

It is useful to frame discussions of the 2019 and 2020 homeless counts by comparing the year-over-year change in LA County against the change in other key California counties. Except for San Diego County, all other Counties show increases in their last two PIT counts.[4] Situating Los Angeles County's homeless crisis as part of a more general statewide problem is important in framing the significance of Measure H. That the growth of LAHSA's 2019 homeless count would have been higher in the absence of Measure H is, by extension, a key to the substance of communication with the public about the performance of the HI strategies. These concepts may be limited in their ability to immediately satisfy expectations of tangible and observable results, but for the concepts to have even limited resonance, the factors and dynamics upon which they are based must be clearly understood and identified.

Two factors are at the basis of the mechanism responsible for expanding the homeless population: housing affordability and systemic racism. The former is related to the supply of affordable housing, rents, and incomes. The latter leads to a disproportionate number of Black people becoming homeless In Los Angeles County, where 8% of the overall population is Black, but Black people represent 34% of those experiencing homelessness.[5]

The continued upward trend in the real estate market has driven rents to levels recognized as beyond affordability for increasingly large sections of working families and individuals. People who rely on safety net incomes, such as the aging, disabled, and unemployed populations, are particularly affected by these housing cost and supply pressures. As these market forces push rents out of alignment with renter incomes, they also exacerbate difficulties that public agencies experience in acquiring properties and land that can be used to develop affordable and homeless housing. As of 2019, Los Angeles County had a shortfall of approximately 517,000 affordable homes to meet current demand among renter households at or below 50% of Area Median Income. In addition, more than 550,000 households in Los Angeles County are severely rent-burdened, meaning that they spend more than half of their income on housing.[6]  In addition to an inadequate supply of affordable housing, wages in Los Angeles have not kept pace with rents, increasing the demand for this tight supply. A worker needs to earn $41.96 per hour — 2.8 times the minimum wage in the City of Los Angeles — to afford the average monthly asking rent of $2,182.[7]

---

[3]  The increase in LAHSA's 2020 PIT tally for LA County, at 66,436 persons, was up from 58,936 in 2019 and 52,765 in 2018.
[4]  See LAHSA 2019 and 2020 Los Angeles Homeless Count presentations.
[5]  See LAHSA 2020 Los Angeles Homeless Count presentation.
[6]  See California Housing Partnership (2020) Annual Affordable Housing Outcomes Report. Available at: https://chpc.net/resources/los-angeles-county-annual-affordable-housing-outcomes-report-2020/.
[7]  See LAHSA 2020 Los Angeles Homeless Count presentation.

**SECTION 1**

The net effect is an acceleration in homeless inflow, which includes the number of individuals and families becoming newly homeless from one year to the next and those households failing to exit after becoming homeless. The annual PIT homeless count increases when the pace of homeless inflow exceeds the homelessness service system's capacity to absorb and house those who become homeless.

As noted above, the factors responsible for fueling much of the inflow problem — systemic racism, housing supply, rents, and incomes — are beyond the homelessness policymaking domain. Since inflow is a key challenge that will continue to affect the County's efforts to combat homelessness and the outcomes produced through these efforts, we will return to this topic in section 5 and the conclusion, with the intention of identifying how and where the HI and the County's homelessness service system can potentially contribute to solutions.

> **HI Funding Impact and Point-in-Time (PIT) Count**
> ▶ Project Roomkey, by placing people in the homeless population who are particularly vulnerable to COVID-19 into hotel and motel rooms to facilitate isolating and practicing social distancing, seeks to reduce their likelihood of contracting COVID-19.
> ▶ Project Roomkey generated more than 4,000 available beds and by the end of Year 4, and has brought almost 4,000 people experiencing homelessness into hotel and motel sites.

## 1.4  PROJECT ROOMKEY

Another key challenge to the County's efforts to combat homelessness crisis is the COVID-19 pandemic that commenced in the second half of Year 4. The County took several initial measures to reduce the spread of COVID-19 by instituting a shelter at home order, implementing social distancing measures, and taking steps to protect vulnerable populations experiencing homelessness, who face higher risks of hospitalization and death if infected with COVID-19 because of their high rates of underlying health conditions.

In response to this pandemic, a major initiative of the County was Project Roomkey, which was a partnership with LAHSA, the State, and 37 private hotel and motel operators to secure beds for people experiencing homelessness who are highly vulnerable to complications if they become infected with COVID-19 — those who are over 65 and/or have chronic health conditions.

In addition to the launching of Project Roomkey, on May 12, 2020, the Board of Supervisors approved a motion directing LAHSA to work with partner agencies to develop a recovery plan for homelessness. The Recovery Plan includes strategies to facilitate permanent housing solutions over a three-year period and to increase homeless prevention efforts, including advocacy to strengthen tenant protections to keep people in their homes. These are the plan's major targets:

> ▶ Prevent anyone sheltered through Project Roomkey or any of the other COVID-19-response interim housing from returning to unsheltered homelessness;

> ▶ Move 15,000 of Los Angeles County's most vulnerable people experiencing homelessness into housing as rapidly as possible, in addition to the thousands that the Los Angeles homeless system already expects to house;

> ▶ Reduce inflow into homelessness by ensuring that upstream systems take measures to keep people in their homes and intensify prevention efforts; and

> ▶ Address racial equity, given that homelessness disproportionately impacts the Black population in Los Angeles and is expected to increase with COVID-19.

During the initial lease-up phase of fiscal year 2020-21 and contingent on available funding, up to 15,000 people would be moved into a "bridge" unit with deeply subsidized rents and varying levels of services depending on their needs. Once housed, participants will be continuously assessed and supported in exiting to permanent housing through several

**SECTION 1**

pathways, depending on their acuity of need. People with higher acuity will receive long-term support. Those with slightly lower acuities will receive a 15-month recovery rehousing subsidy with supportive services, or a 9-month recovery rehousing subsidy, or problem-solving and one-time financial assistance to promote exit into permanent housing. In addition to the rehousing component, the recovery plan promotes scaling up LAHSA-funded prevention programming by 50% and strengthening upstream prevention efforts, including tenant protections, to keep people in their homes.

LAHSA has projected that the COVID-19 Recovery Plan will cost $806.6 million over the next three fiscal years; $609.2 million of this total represents new costs over the three-fiscal year period. The County has allocated substantial funding for implementation of the Recovery Plan, but additional funding is needed from other levels of government to support full implementation of the Recovery Plan.

## 1.5  DATA SOURCES

Our analysis of HI performance and outcomes in Year 4 is informed by administrative records collected by two of the largest agencies serving the County's homeless population.

- ▶ The LA County DHS administers the County's publicly run network of hospitals and other medical facilities and services. In addition to health and medical services, DHS provides homelessness care and support through several programs. The DHS homelessness services included in this report's measures are recorded in the department's Comprehensive Health Accompaniment and Management Platform (CHAMP) system.

- ▶ The LAHSA is the coordinating agency over the Greater Los Angeles (GLA) Continuum of Care (CoC), which is a HUD jurisdiction that encompasses most of LA County. Services administered through LAHSA are recorded in the homeless management information system (HMIS) for the GLA CoC.[8]

Since all source data systems include clients with multiple IDs over the four years of HI implementation, a robust entity-resolution process was completed to assign unique IDs to all persons studied. After de-duplication of all clients in these records within and across the two agencies, selected performance measures were assessed using descriptive statistical methods.

## 1.6  ORGANIZATION OF THIS REPORT

In keeping with the approach taken in the performance evaluations for HI's first three years, our analysis of Year 4 moves from the homelessness service system overall, to the HI at an aggregated program level, to individual HI strategies:

- ▶ **Section 2** of this report focuses on the macro-level systemwide performance measures that aggregate outcomes associated with strategies and services funded through Measure H and the HI, as well as outcomes tied to activity not funded through Measure H/HI but nevertheless provided through the County's homelessness service system more generally.
- ▶ **Section 3** examines outcomes at the meso or program level, where HI strategies in common programmatic areas (inclusive of H- and non-H-funded activity) are aggregated in headline metrics.
- ▶ **Section 4** provides an assessment of homeless counts with a flow analysis, which analyzes monthly entries into and exits from homelessness using the HMIS data.
- ▶ **Section 5** provides a pre-post evaluation of health and mental health outcomes for households placed by HI using HMIS and DHS data.
- ▶ **Section 6** concludes with thoughts on outcomes examined in this report and provides policy recommendations.
- ▶ **Appendix A** provides a summary of the performance of selected individual HI strategies.
- ▶ **Appendix B** provides a review of recent evaluation studies on HI strategies within the context of this evaluation.
- ▶ **Appendix C** is the Technical Appendix providing additional technical details on sections 4 and 5.

---

[8]  The cities of Long Beach, Pasadena, and Glendale are outside the GLA CoC.  LAHSA made outcomes data on HUD-funded services for these cities available to us for this evaluation.

# Macro-Level System Performance Measures

The macro-level metrics covered in this section represent three key performance indicators for LA County's overall homelessness service system. This means that outcomes shown here transcend HI-related services to include all services and benefits provided by other supports and care available to the County's homeless population. As such, they are a bellwether for the overall performance of the countywide homeless service delivery system.

The outcomes reported in this section include those from the three previous years of results (reported in previous HI reports) as well as those outcomes from Year 4 (FY 2019—20). With each year of additional data, longitudinal trends will become more apparent. As with past reports, there are three macro-level performance measures:

  ▸ The duration between entering the homeless services system and exit to housing;
  ▸ The number of homeless households (both families and individuals) placed into housing; and
  ▸ Returns to homelessness following placement into housing.

---

**Macro-Level System Performance Measures Highlights**

▸ Overall, results for Year 4 reinforce a trend of ongoing, modest reductions in length of time homeless, driven by substantial reductions in length of time homeless for those placed in PSH, and more recent reductions for those with self-resolved exits to PH settings.

▸ Data for Year 4 extended a trend in which the numbers of persons, both in families and in adult households, placed in PH increased modestly from the previous year. This overall net increase belies a more uneven set of increases and decreases among people placed in specific categories of PH.

▸ Rates of return, which are consistently higher for PSH placements when compared to RRH placements, decreased from 15.4% in Year 1 to 9.8% in Year 4.

---

## 2.1 MACRO-MEASURE 1: LENGTH OF TIME HOMELESS FROM INITIAL CONTACT WITH THE HOMELESSNESS SERVICE SYSTEM

*Length of time homeless* is operationalized as the time from assessment to a placement in PH. Here three different types of placements are assessed: placements in PSH; residential move-ins with RRH assistance (people who moved into PH with or without an RRH subsidy); and other exits to PH through self-resolution and other means (private market rental, stable arrangements with family or friends, etc.) The data for this measure came from homeless services provided through providers who contributed services use data to the HMIS maintained by LAHSA. Services provided through DPSS and DHS were not included because assessment dates for the housing placements were not available.

**SECTION 2**

### Figure 2-1. Median Days Between Assessments and PH Placements by Placement Type



Year   ■ FY 2016–17   ■ FY 2017–18   ■ FY 2018–19   ■ FY 2019–20

Assessments and placements measured at the household level

Figure 2-1 shows the median times between assessment and placement measured at the household level. Only data from placements where an assessment date could be aligned with the placement were used for the length of homeless measures (assessment data were not available for all placement episodes):

▶ The combined median duration to placement was 84 days in Year 4, 2 days shorter than the 86-day median in Year 3 and 5 days shorter than the 89-day median in Year 1.

▶ The longest time between assessment and placement was for PSH placements, at 108 days. The number of average days from assessment to RRH placements and self-resolved exits to PH—77 and 82 days, respectively—is slightly less than the mean length for all placement types.

▶ The median duration to placement was 77 days for assessments with a VI-SPDAT score 9 or lower and 105 days for scores higher than 9 (not shown in figure). Those in the latter group would most likely receive a PSH placement, compared to the other two housing types.

Overall, results for Year 4 reinforce a trend of ongoing, modest reductions in this macro-measure, driven by substantial reductions in length of time homeless for those placed in PSH, and more recent reductions for those with self-resolved exits to PH settings.

### 2.2  MACRO-MEASURE 2: PLACEMENTS IN PERMANENT HOUSING

One of the central performance measures for a homeless services system is the number of exits to PH over a given year. This macro-measure tallies the number of exits to PH in Year 4, and compares this to the same macro-metric for prior years.

The data for this measure came from three sources. HMIS (maintained by LAHSA) tracks PH placements that occur in conjunction with individuals and families using homeless services, including placements in PSH, residential move-ins following RRH assistance, and other self-resolved PH placements (private market rental, stable arrangements with family or friends, etc.). Additional data come from DHS, which record PSH and RRH placements. Finally, data from DPSS record

## SECTION 2

the number of PH subsidies provided to homeless individuals pursuing Supplemental Security Income (SSI) through DPSS's General Relief Housing Subsidy and Case Management Program.

### Figure 2-2. Number of Permanent Placements over 4 Years

Number of Persons in Adult and Family Households



Family members are recorded only in HMIS data

Figures 2-2 and 2-3 show the findings of placements in PH. All numbers reflect unduplicated counts of placements in PH. If an exit from DHS was also recorded in HMIS, that placement is only shown under a DHS placement type.

Figure 2-2 demonstrates permanent placements for persons in adult households (i.e., no children present in households) and for family households (i.e., with children) separately as well as for all households:

▸ The number of people in all households exiting to PH placements increased from 20,262 to 21,710 between Years 3 and 4.

▸ In Year 4 there were 12,930 unduplicated people in adult households, and 8,780 people in family households who exited homelessness to PH destinations.[9]

▸ The number of people in adult households exiting to PH placements increased by almost 1,000 (8.4%) in Year 4. Correspondingly, the number of people in families exiting to PH increased by 444 (5.3%) in Year 4.

▸ The proportion of family members among all persons exiting to PH (40.4%) barely decreased in Year 4 after increasing from 33.8% to 41.1% between Years 1 and 3.

---

[9]  Family members are only recorded in HMIS data. In DHS data all persons are assumed to belong to adult households even though some may be in family households.

**Figure 2-3. Number of Permanent Placements over 4 Years**

Number of Persons by Placement Types



Figure 2-3 demonstrates the number of permanent placements for all persons, regardless of household type, broken down by placement type:

▸ Residential move-ins to RRH program and self-resolved exits (both tracked by LAHSA HMIS) were the program types with the highest number of PH exits. Each type of exit represented approximately one third of all people exiting to some form of PH. Neither had significant changes in numbers of people placed from Year 3 to Year 4.

▸ The largest increases were observed for LAHSA PSH placements, which 2,469 people received in Year 4 (an increase of 59.8%). Over 5,400 PSH placements were recorded by LAHSA and DHS combined in Year 4.

▸ DPSS B1 subsidy new referrals/enrollments and placements for General Relief participants, suspended from March 2018 to February 2019. After the suspension was lifted, DPSS added 1,358 new placements in Year 4. The increase in the number of people placed in this relatively small category corresponds to the size of the overall increase in the number of people placed into PH in Year 4.

▸ The Other/Veterans category reflects the placements of veteran homeless individuals in PH provided by US Department of Veteran Affairs and other placements (not recorded in HMIS), such as placements provided from the Los Angeles County Development Authority Housing Choice Voucher program.

Taken together, data for Year 4 extended a trend in which the numbers of persons, both in families and in adult households, placed in PH increased modestly from the previous year. This overall net increase belies a more uneven set of increases and decreases among people placed in specific categories of PH.

**SECTION 2**

## 2.3 MACRO-MEASURE 3: RETURNS TO HOMELESSNESS FOLLOWING A PERMANENT HOUSING PLACEMENT

The third and final macro performance measure is the proportion of individuals and families tallied in the system-level metric as exiting to PH who subsequently returned to homelessness. This measure of returns to homelessness indicates the degree to which exits to PH reflect successful and sustained exits. More specifically, we measured the proportion of exits to PH for homeless households (adult and family) in which they subsequently re-entered the homeless service system within 6 and 12 months after exiting. The data sources for this analysis were the same as those used to assess the numbers people exiting to PH in section 2.3.

*Return to homelessness* is operationalized as individuals and families leaving homelessness for a PH placement only to use homeless services again within 6 and 12 months of the placement, as recorded in HMIS. Household records included here are for those who exited in the first two quarters of the respective fiscal years, providing an opportunity to follow them for 6 and 12 months.

### Figure 2-4. Rates of Return to Homelessness over 4 Years

Returns within 6 and 12 Months of Permanent Placements



Total Permanent Placements - Denominators:

FY 2016–2017=9,263          FY 2017–2018=9,831
FY 2018–2019=9,986          FY 2019–2020=10,243

Figure 2-4 shows the rates of return to homelessness assistance. For each of the HI years, the PH placements examined were from those who exited in the first half of each year:

▸ After decreasing from 11.5% to 7.7% between Years 1 and 3, the 6-month return rate increased slightly to 7.8% in Year 4.

▸ Return rates over 12 months, which are only available for the first three years, dropped from 15.8% in Year 1 to 12.9% by Year 3.

## Figure 2-5. Rates of Return to Homelessness over 4 Years by Placement Years

Returns within 6 Months of Permanent Placements



Figure 2-5 illustrates the rates of return within six months by placement type:

- In Year 4, rates increased from 9% to 9.8% for PSH placements while decreasing from 9.3% to 7.7% for self-resolved exits.

- Rates of return, which are consistently higher for PSH placements when compared to RRH placements, decreased from 15.4% in Year 1 to 9.8% in Year 4.

## 2.4  SECTION CONCLUSION

Results from Year 4 were presented with results from the first three years for the three macro-level performance measures:

- A small net decrease (86 days to 84 days) in the median number of days between initial assessment and exit to permanent housing (macro-measure 1).

- Notable increases in the numbers of people in adult households (8.4%) and in family households (5.3%) exiting to PH placements (macro-measure 2).

- A slightly higher 6-month rate of return to homelessness (7.7% to 7.8%) (macro-measure 3).

Here, macro-measures 1 and 3 reflect a slight increase and a slight decrease from Year 3, with macro-measure 2 showing a more substantial, favorable outcome in Year 4. In all three macro-measures, the overall results in Year 4 are markedly better than those from the Year 1 HI review.

SECTION 3

# Meso-Level Program Performance Measures

Meso-level measures serve as the "headlines" of the HI. They bridge the overarching macro-measures presented in Section 2 and the strategy-specific micro-measures that are the basis of LA County's HI, which are summarized in the next section. While the macro-measures include outcomes associated with homeless-related services provided outside of the HI, the meso-level headline metrics are aggregations of strategy-specific outcomes (discussed in the next section) and are focused on HI activities and services.

This section presents outcomes for four meso-level measures for which outcomes were available in Year 4. As with the macro-level measures, having outcomes from earlier years provides a benchmark and comparison point for Year 4 outcomes presented here. Four meso-level measures are covered in this section:

▶ Number of persons/households prevented from becoming homeless or being discharged into homelessness;

▶ Number of persons/households placed in IH (e.g., shelter and bridge housing, transitional arrangements, housing for those in recuperative care, and residential services provided to persons receiving treatment for substance use disorders);

▶ Number of persons/households placed in PH, inclusive of subsidized and unsubsidized PH, RRH, and PSH; and

▶ Number of people/households who retained PH from date of placement.

---

**Meso-Level Program Performance Measures Highlights**

▶ In Year 4, the number of families assisted by the A1 strategy rose by approximately 50% from 1,003 in Year 3 to 1,498 and the number of individuals assisted by the A5 strategy expanded by 80% from 1,221 in Year 3 to 2,189.

▶ The decline in IH placements from 19,688 in Year 3 to 14,804 in Year 4 was caused mainly by the COVID-19 crisis. The County's Project Roomkey compensated for this decrease by placing almost 4,000 individuals in hotels and motels, and some of these homeless individuals would have been placed in interim housing.

▶ After increasing steadily over the first 3 years, B3 placements, which represent the large majority of all HI-affiliated permanent placements, dropped by 8.5% in Year 4, to 6,000 while total PH placements slightly increased reaching almost 10,000.

▶ Returns to homelessness assistance within 6 months of placement to PH declined overall for the third straight year. This was mainly due to fewer people returning to homelessness assistance after placements in LAHSA-funded RRH programs.

## SECTION 3

### 3.1  MESO-MEASURE 1: NUMBER PREVENTED FROM BECOMING HOMELESS OR BEING DISCHARGED INTO HOMELESSNESS

This headline measure counts households receiving prevention assistance in the wake of experiencing a housing emergency that met stated criteria for imminent risk of homelessness. Two of the five individual strategies, A1 (which directly addresses prevention of family homelessness) and A5 (which directly addresses prevention of individual homelessness), are summarized below based on LAHSA data.

**Figure 3-1. Number of Households and Individuals Prevented from Becoming Homeless**
A1 -  Households and A5 - Individuals



Figure 3-1 shows the number of households and individuals prevented from becoming homeless over the four years of HI. A5 results were not available for Year 1 because A5 was not implemented until February 2018. For each year, the figure shows three bars: the number of active participants, the number exiting the program, and the number (with percent of overall exits) of those exiting to PH destinations (the red bar height shows the PH exits and the label shows the percentage).

- The number of families assisted by the LAHSA A1 strategy continued to increase since Year 1 and rose by approximately 50% from 1,003 in Year 3 to 1,498 in Year 4.

- However, the number of A1 families exiting the program increased by only 10% — from 800 to 879 — in Year 4. Among the exiting families, the number that exited to permanent housing decreased slightly from Year 3 (from 709 to 693), reflecting a decreased proportion of exiting A1 families who went into PH (from 89% to 79%) in Year 4.

- In FY 2019-20, 2,189 individuals were assisted by the LAHSA A5 strategy, reflecting an expansion of almost 80% relative to Year 3. The number of individuals who exited the program also increased substantially, from 848 to 1,337.

- However, the proportion of individuals who exited the A5 program that retained (or made the transition into other) PH dropped from approximately 93% to 74%.

## 3.2  MESO-MEASURE 2: NUMBER WHO ARE PLACED IN INTERIM HOUSING

HI strategies providing IH services address the need for increasing the supply of safe temporary accommodations for those who otherwise have nowhere to spend the night. Ideally, the temporary orientation of these facilities means short stays and placements into longer-term housing arrangements.

The measures of two of the IH strategies, B7 (Interim/Bridge Housing for Those Exiting Institutions) and E8 (Enhance the Emergency Shelter System), are consolidated in this meso-level measure. Analysis of Strategies B7 and E8 draws on data from LAHSA/HMIS and DHS/CHAMP. The DPH placement number was provided by DPH and may include some of the persons served by LAHSA or DHS programs.

We present below the use of IH both systemwide and for only those households (single adults and families) that received IH through HI strategies.

### Figure 3-2. Number of Interim Placements over 4 Years

Number of Persons by Agency



Figure 3-2 shows all IH placement numbers in LA County. The table shows counts of unique individuals. If a person was served by both LAHSA and DHS, only the placement for DHS was included in the tallies.

▶ The total number of unduplicated systemwide IH placements continued to expand, with an increase of almost 4% from 28,771 in Year 3 to 29,913 in Year 4.

▶ While LAHSA-tracked placements decreased slightly by 1%, DHS placements increased by 18.2%.

## Figure 3-3. HI-Affiliated Interim Housing Placements over 4 Years



Number of Persons by Program

Figure 3-3 shows the number of persons who were served in IH facilities funded in whole or in part by Measure H. These persons were a subset of the unduplicated persons using IH in Figure 3-2.

▶ The number of individuals that were placed in IH facilities funded in whole or part by Measure H decreased by almost 25%, from 19,688 in Year 3 to 14,804.

  – The substantial decrease in HI-affiliated interim housing placements is mainly a result of a big drop in LAHSA E8 placements by about 5,500.

▶ The decline in IH placements in Year 4 was caused mainly by the COVID-19 crisis. The County's Project Roomkey compensated for this decrease by placing almost 4,000 individuals in hotels and motels, and some of these homeless individuals would have been placed in interim housing.

▶ While DHS B-7 placements slightly increased to 806 in Year 4 from 775 in Year 3, DHS E-8 placements decreased by almost half, from 830 to 458 due to the impact of the COVID-19.[10]

## 3.3  MESO-MEASURE 3: NUMBER PLACED IN PERMANENT HOUSING

This headline measure aggregates individuals and family members placed in PH across the PH HI strategies. The measure enables assessment of the extent to which HI-related efforts end homelessness for individuals and families through placements in RRH, PSH, and other subsidized and unsubsidized PH.

---

[10]  This is likely due in part to the focus of ensuring that the hospital discharges are a priority to maintain acute care capacity in case of a surge in COVID cases.  In addition, the E8 IH beds, which serve less acute individuals, tend to be in congregate settings.  Many congregate settings have decompressed to reduce the risks of COVID.  B7 IH sites tend to have many rooms with beds more spread apart.

Two HI strategies focused directly on PH — B3 (Partner with Cities to Expand RRH) and D7 (Provide Services and Rental Subsidies for PSH) — are consolidated below. In addition, the total number of placements of Strategy B1 (Provide Subsidized Housing to Homeless Disabled Individuals Pursuing SSI) is included, with data available from the quarterly HI report.[11] Analysis of Strategy B3 draws on data from LAHSA/HMIS and DHS/CHAMP, and of D7 on data in CHAMP.

### Figure 3-4. Number of HI-Affiliated Permanent Placements over 4 Years

Number of Persons Placed by Program



Figure 3-4 shows the number of persons placed in HI PH over four years.

- A total of 9,857 unduplicated family members and individuals were placed in HI PH in FY 2019-20, which reflects a 2.3% increase from Year 3.

- The largest increase was observed in Measure H-funded General Relief housing subsidies (DPSS B-1 program), which increased from 253 to 1,358 new subsidy issuances. Since new B1 subsidy referrals/enrollments were suspended between March 2018 and February 2019, Year 3 numbers were low, leading to a large increase in Year 4.

- DHS D7 placements increased by 12% to 2,409 from 2,150. To create better system alignment and support the need for increased targeting of families in the provision of RRH services, DHS tapered enrollments in Strategy B3 during Year Three and made almost no new enrollments in B3 in Year Four.

- After increasing steadily over the first three years, LAHSA B3 placements, which represent the large majority of all HI-affiliated permanent placements, dropped by 8.5% in Year 4, from 6,554 to 6,000.

---

[11]  Quarterly HI report #17 is available at: https://homeless.lacounty.gov/quarterly-reports/quarterly-report-17/.

## SECTION 3

---

### 3.4  MESO-MEASURE 4: RETURNS TO HOMELESSNESS FOLLOWING A PERMANENT PLACEMENT

The fourth and final meso performance measure is the degree to which individuals and family members returned to homelessness following an HI-funded permanent placement. This is a measure of successful and sustained exits. More specifically, we measured the proportion of exits to PH using HI-affiliated programs for homeless households (persons and family members) in which they subsequently re-entered the homelessness service system. *Return to homelessness* is operationalized as individuals and family members leaving homelessness for a PH placement only to use homeless services again within six months of the placement, as recorded in HMIS. Household records included here are for those who exited in the first two quarters of the respective fiscal years, providing an opportunity to follow them for six months.

### Figure 3-5. Rates of Return to Homelessness over 4 Years by Program

Returns within 6 Months of Permanent Placements



Figure 3-5 shows the number of persons who retained their HI-affiliated permanent housing placement for six months.

- ▸ The overall return rates decreased from a high of 9.2% in Year 2 to 6.6% in Year 4, which means that approximately 1 out of 15 placed persons returned to homelessness assistance within six months.

- ▸ The return rate was higher for the DHS D-7 program (8.2%) than the LAHSA B-3 program (5.9%), which dropped from 7.5% in Year 3. The latter program is substantially larger, however (see Figure 3-4), so the overall return rate is only modestly impacted by the higher DHS D-7 program rate.

## 3.5  SECTION CONCLUSION

Here are the overall trends among the four meso-measures:

▶ While the numbers of households (families and individuals) served under HI-funded prevention programs expanded substantially in Year 4, the magnitude of these increases has yet to be realized by proportionate increases in households that, after being assisted with the program, were able to avoid becoming homeless (meso-measure 1).

▶ The number of interim placements increased only slightly in Year 4, but this year's results were impacted by COVID-19-related policies that led to the "decompression" of IH facilities;  corresponding increases in hotel/motel placements, including those through Project Roomkey, are not included in these findings (meso-measure 2).

▶ The number of HI-affiliated permanent placements also increased slightly in Year 4. This slight decrease came despite more substantial decreases in the overall placements to PH through rapid rehousing programs (both through LAHSA-funded programs and DHS) (meso-measure 3).

▶ Returns to homelessness assistance within six months of placement to PH declined overall for the third straight year. This was mainly due to fewer people returning to homelessness assistance after placements in LAHSA-funded RRH programs and returns to homelessness assistance actually increased in DHS D7 programs (covering PSH programming) (meso-measure 4).

# Dynamics of Homelessness

The number of people experiencing homelessness at any point in time in Los Angeles County is counted annually every January. LAHSA's PIT count increased from 52,765 in 2018 to 58,936 in 2019, by almost 12%, and reached 66,436 in 2020, showing an additional increase of almost 13%. Not only is the magnitude of the County's homeless populations unacceptably high, but it has been increasing at a significant rate during the last three years.

Several factors behind the scale of the homeless population are mentioned in the first section, particularly the housing affordability crisis, which has generated over a half million severely rent-burdened households in Los Angeles. Despite an ongoing effort of the County's homelessness service system (Measure H and non—Measure H combined) which recorded over 20,000 PH placements in each of the last three fiscal years, factors outside the purview of the homelessness service system are too strong to slow the inflow.

In this section, we assess the dynamics of the homeless population over three years (2017—2019) within the homelessness service system to provide more insight into recent counts. The key policy question is whether additional action can be taken from within the system to mitigate the problem. Even if the broadened array of available services may not be able to sufficiently fully offset the flow of individuals and families into homelessness to yield year-over-year PIT count decreases, understanding these dynamics can be helpful in planning more effective homeless interventions and programs.

## 4.1  ANNUAL NUMBERS OF PEOPLE WHO EXPERIENCE HOMELESSNESS

We used the HMIS data provided by LAHSA for three years between 2017 and 2019. Calendar years were used instead of fiscal years to align our figures with LAHSA and PIT counts. However, our flow analysis is different from LAHSA's 2019 and 2020 homeless count presentations for two main reasons.[12] First, our estimations are based on HMIS records and only include homeless persons enrolled in any HMIS projects other than prevention programs. Hence, homeless households not enrolled in HMIS and captured in PIT counts are excluded in our analysis. Second, LAHSA's flow numbers are projections based on annualized estimates derived from January PIT counts and surveys.[13] Our estimations are not projections. They are based on micro data retrieved from HMIS by the end of the year. Hence, our estimates are not reconciled with LAHSA's flow numbers and intend to offer an alternative window to observe the changing dynamics of homelessness in Los Angeles.

The description of the methodology is presented in Appendix C, which shows the definitions and assumptions on calculating different homelessness measures. The data were processed extensively to produce an accurate depiction of homelessness durations based on their episodes recorded in HMIS.

---

[12]  See Greater Los Angeles Homeless Count, 2019 results available at: https://www.lahsa.org/documents?id=3437-2019-greater-los-angeles-homeless-count-presentation.pdf and Greater Los Angeles Homeless Count, 2019 results available at: https://www.lahsa.org/documents?id=4558-2020-greater-los-angeles-homeless-count-presentation.
[13]  For example, inflow number in 2019 is the difference between 2019 annualized estimate and 2019 PIT count and 2019 other exits to housing are residuals to align 2019 and 2020 PIT counts. See 2019 Los Angeles Continuum of Care Homeless Count, Methodology Report, July 2019, USC, pp. 16-17 available at: https://www.lahsa.org/documents?id=4016-hc2019-methodology-report

### SECTION 4

In any year, the homeless population in HMIS is composed of three groups:

▸ Homeless individuals who were already served in HMIS in the previous year and stayed homeless in HMIS this year, labeled as *previous carryover.*

▸ Homeless individuals who received HMIS services in the previous years and returned to HMIS this year, labeled as *re-entries.*

▸ Homeless individuals who received HMIS services for the first time this year, labeled as *new entries.*

Some of these homeless individuals exit HMIS during the year and the remaining stay homeless and become the carryover for the next year.

#### Figure 4-1. Number of Homeless, Entries into and Exits from Homelessness



Figure 4-1 shows the annual number of homeless persons, entries into, and exits from homelessness over three years following definitions described above and in section C.1 of Appendix C. Here are the main findings:

▸ The number of persons who receive HMIS services at any point in a year increased by almost 13% annually, from almost 73,000 in 2017 to 83,000 in 2018 and 94,000 in 2019.

▸ As expected, HMIS counts are lower than annualized PIT counts, because many unsheltered homeless individuals are not enrolled in HMIS. However,
— The rate of change is comparable to the PIT rate of change.
— Our comparable PIT count for January 2018 is over 40,000. Multiplying it by two (2018 LAHSA multiplier)[14] approximates our annualized 2018 count, which is 83,000.

---

[14]  See Henwood, B. F and Byrnes, K. (2018) 2018 Los Angeles Continuum of Care Homeless Count, USC. P.16.

## SECTION 4

▶ The number of persistent homeless persons more than doubled, from almost 16,000 to 35,500 between 2017 and 2019.
   — Persistent homelessness is defined as receiving HMIS services six or more months during the previous 12 months.

▶ The previous carryover group almost doubled, from 14,900 in 2017 to 26,700 in 2019.

▶ Re-entries into HMIS also increased significantly, from 11,100 to 18,200, or by 64% over three years.

▶ New entries into HMIS increased slightly, from almost 47,000 to 49,000, by 4%.

▶ Exits from HMIS also increased, from almost 44,000 to over 52,000, or by 18%.
   — Exits from homelessness includes permanent placements and unknown exits with no return to HMIS within next six months.

If we classify homelessness by duration, we observe two main groups of homeless individuals. One group is composed of those who enter and exit homelessness very quickly in their first episodes, likely with temporary but resolvable issues that contributed to their homelessness. The other group includes those individuals who are exposed to homelessness with longer and multiple episodes because of their multiple barriers to escape homelessness. In our analysis, we labeled as *persistently homeless* those who stayed homeless six months or more within the last 12 months. This is a larger group than the chronically homeless, which includes disabled individuals with even longer stays in homelessness.

The data show that for new entries into HMIS in 2018:

▶ Thirty percent exit HMIS after one short episode of less than one month's duration.

▶ Half of them stayed less than three months and two thirds stayed less than six months in HMIS.

▶ Only 14% of them experienced a second episode of homelessness in HMIS by the end of 2019.
▶ Approximately 30% of them became persistently homeless within the next two years.

Over the three years, we observe that:

▶ New entries into HMIS services stayed relatively stable close to 50,000 annually. However, their share in the HMIS homeless population decreased from 64% to 52%.

▶ In the meantime, the share of persistently homeless increased from 22% to 38%.

**SECTION 4**

4.2  MONTHLY NUMBERS OF HOMELESS PERSONS



**Figure 4-2. Monthly Number of Current Homeless Persons**



**Figure 4-3. Monthly Number of Persistent Homeless Persons**

Figure 4-2 shows the monthly number of homeless persons receiving HMIS services between 2017 and 2019:

▶ The number of homeless individuals received services in HMIS at least one day in a given month increased from approximately 16,500 in 2017 to 36,328 in 2020, or by 120%.

— The monthly numbers slowed in 2019, showing a small increase from almost 35,000 to 36,328 after peaking around 38,000 in August.

Figure 4-3 shows the monthly number of persistent homeless persons between 2017 and 2019:

▶ The number of persistent homeless more than tripled, from approximately 5,200 in January 2017 to over 18,000 in the summer of 2019 before dropping to 17,000 in December.

▶ Two thirds of the growth in the homeless population receiving HMIS services is driven by the growth in the persistently homeless population.

**SECTION 4**



Figure 4-4. Quarterly Number of New Entries and Re-Entries to HMIS

Figure 4-4 shows the quarterly number of new and re-entries into HMIS between 2017 and 2019. (we show quarterly numbers because monthly entries and exits reveal sharp fluctuations):

▶ Quarterly new entries into HMIS show a stable trend of around 12,000, with almost no increase over three years.

▶ Quarterly re-entries into HMIS within one year of an exit from receiving HMIS services also show a steady trend around 3,000 between 2017 and 2019.

Figure 4-5 shows the quarterly number of all entries into and exits from receiving HMIS services between 2017 and 2019:

▶ Quarterly, all entries into HMIS increased, from approximately 15,000 to 18,000 (almost 20%) between 2017 and 2019.
　　— As shown in Figure 4-1, entries increased because of accumulating re-entries over time.

▶ Entries into HMIS exceed exits from HMIS in every year, leading to the observed net growth in the population.

▶ Quarterly exits from receiving HMIS services showed some sharp fluctuations over three years. The overall trend was upward, showing an increase from 12,684 to 15,089, or almost 20%.

　　— The increase in exits was mostly due to exits with unknown destinations but no returns to HMIS within the next six months.



Figure 4-5. Quarterly Number of Entries into and Exits from Homelessness in HMIS

## 4.4  TRENDS AND PATTERNS OF HOMELESSNESS EPISODES AND HOMELESS POPULATIONS IN HMIS

**Findings Highlights**

▶ The number of persons recorded in HMIS as homeless at any point in a year increased by 13% annually, from 73,000 in 2017 to 94,000 in 2019.

▶ While new entries into HMIS stayed relatively stable at 50,000 annually, the number of persistently homeless persons more than doubled, from 16,000 to 35,500.

▶ Two thirds of the growth in homelessness is driven by the persistently homeless population.

▶ Entries into HMIS are consistently exceeding exits from HMIS, leading to a net growth in homeless population receiving HMIS services.

▶ The trend in exits from HMIS is upward, due to increased exits to "unknown destinations" with no returns to receiving services in HMIS within the next six months.

▶ Returns to homelessness assistance within 6 months of placement to PH declined overall for the third straight year. This was mainly due to fewer people returning to homelessness assistance after placements in LAHSA-funded RRH programs.

An analysis of HMIS data encompassing enrollments, placements, exits, and homeless services use over the last three years of HI implementation suggests a recurrent pattern that may offer guidance for inflow interventions. This pattern has the following characteristics, based on the data presented in this section:

▶ The annual number of homeless persons enrolled in HMIS has been increasing by an annual rate of 13%, which is comparable to the increase in the PIT counts.
— The annual homeless population receiving HMIS services increased from almost 73,000 to 94,000 over three years.

▶ The monthly homeless population receiving HMIS services at least one day in a given month also increased consistently, from 16,500 to 35,000, or by 112%.
— However, the rate of increase slowed down at the end of 2019, dropping from 38,000 in August to 35,000 in December, with only a small increase of 3% for the full year 2019.

▶ Both new entries (almost 50,000 annually or 12,500 quarterly) and re-entries (within one year of an exit from homelessness) into HMIS stayed stable over three years.

▶ Exits from receiving services in HMIS also increased, from almost 44,000 to over 52,000, or by 18%, but this increase was not enough to offset the increase in all entries into HMIS, which include new entries, re-entries, and previous carryover.
— The gap between entries into and exits from HMIS continued to grow, from almost 29,000 to 42,000, or by 44%. The quarterly gap varied in the range between 2,500 to 6,000.

As a result of these dynamics — a stable inflow of new entries into HMIS and increasing number of homeless persons in HMIS with earlier homeless experience (re-entries and previous carryover), and entries into HMIS exceeding exits from HMIS, we observe an increasing number of people in the persistently homeless group. The size of this group rose from almost 16,000 to 35,500 over three years, and its share of the total increased from 22% to 38%. Thirty percent of the annual increase between 2018 and 2019, from 83,000 to 94,000, was due to higher re-entries. The remaining 70% was because of the increase in previous carryover. These two groups explain the steady growth in persistent homelessness and homeless population receiving HMIS services.

SECTION 4

---

**Policy Implications Highlights**

▸ The data indicate that the increase in homelessness population receiving HMIS services is not attributed to a growing number of newly homeless households in HMIS, rather to people who are persistently homeless -- people with barriers who cannot exit homelessness on their own or who have repeated reentries.

▸ The County is expanding its permanent supportive housing capacity by 10,000 units by FY 2024-25. This expansion could place the most vulnerable households in housing, including persistently homeless individuals, potentially leading to a decrease in the number of homeless individuals.

▸ Returns to homelessness assistance within 6 months of placement to PH declined overall for the third straight year. This was mainly due to fewer people returning to homelessness assistance after placements in LAHSA-funded RRH programs.

---

## 4.5  POLICY IMPLICATIONS

These patterns and trends show that the number of homeless persons receiving HMIS services has been increasing, with a consistent and growing gap between entries and exits, which is called the exit gap. The key question is, what accounts for the continuing growth of the exit gap? Answering this question would provide some insight to policymakers for more effective interventions and policies. The data suggest that the recent increase in the number of homeless persons in HMIS is a result of the increasing number of people in the persistently homeless group.

Households who became homeless recently (new entries into HMIS) did not contribute to the increase directly by more than a few percentage points. However, with a stable inflow of new entries, the cumulative number of homeless persons receiving HMIS services is growing even though most new entries exit HMIS rapidly. As the observation period increases, with the same level of inflow, so does the number of homeless individuals who received HMIS services during the previous years. As some of them failed to exit homelessness because of various barriers, the number of re-entries into HMIS and previous carryover increased steadily, leading to a larger group of persistently homeless persons. These trends suggest that the increasing size of homelessness receiving HMIS services is not attributed to a growing number of newly homeless households but rather to those homeless households with barriers who either cannot exit homelessness and become persistent, or who become persistently homeless after several re-entries.

What are the policy implications of these observations? The exit gap is the balance of persons who need but do not receive PH assistance or placement. However, the nature of the unserved homeless population will be essential in determining how to advance beyond the exit gap. While the homelessness service system is providing effective interim and permanent housing arrangements so that the majority of newly homeless populations exit homelessness at a stable rate, the system fails to prevent some homeless households from becoming persistently homeless or to facilitate persistently homeless households in escaping homelessness at an acceptable rate.

As discussed earlier, factors beyond the control of the homelessness service system, such as the scale of rent-burdened households, are a direct outcome of the housing affordability crisis. These factors contribute to an increase in persistent homelessness by making it difficult to be permanently placed. However, the County's homelessness service system could potentially reduce the exit gap by intensively targeting the persistently homeless population.

The County has already been expanding its permanent supportive housing capacity, which is expected to increase from 732 in FY 2019-20 to 2,694 in FY 2020-21. The cumulative total will exceed 10,000 by FY 2024-25. This expansion could place the most vulnerable households in housing, including persistently homeless individuals, which should lead to a steady decrease in the number of homeless individuals.

Another positive observation is the decreasing rate of increase in the number of homeless households in 2019. If new entries stay at the current stable rate and exits continue to increase, we expect to observe a shrinking exit gap and a drop in the magnitude of the persistently homeless group. However, given the large scale of this group, the homelessness

SECTION 4

service system should undertake further interventions focusing on persistent homelessness.

One mode of intervention is amplifying the current expansion in PSH units by generating new resources or diverting resources from interim housing. Another intervention is effective targeting of homeless persons who are likely to become persistently homeless in the future and unlikely to return to homelessness after being placed in a PSH unit. Targeting can be conducted at the time of first contact with HMIS during the assessment process. Currently, the Coordinated Entry System targets the vulnerable households for different types of placements and service prioritization using VI-SPDAT scores. Targeting can be extended to persistently homeless households. It is critical to intervene with homeless households early enough to prevent them from becoming persistently homeless.

# Pre-Post Evaluation of Health and Mental Health Outcomes

In this section, we present a formal evaluation assessing the effects of several placement types on selected health and mental health measures. We measure the differences in service utilization rates for several health and mental health treatments of homeless persons before and after three placement types — RRH, PSH, and interim housing (IH). First, in section 5.1, we summarize the methodology and the data of the outcome evaluation. A more technical description is provided in section C.2 of the Technical Appendix C. In section 5.2, we present the results of the evaluation.

## 5.1  METHODOLOGY AND DATA

Experimental studies provide rigorous evidence for evaluating treatment impact by randomly assigning subjects to treatment and control groups. Randomization ensures that program participants (those in the treatment/experimental groups receiving the program/intervention) and non-participants (those in the control groups who do not receive the program/intervention) are equally matched on all relevant and knowable factors, and the treatment effect can be estimated from a direct comparison of the outcomes for the subjects in the two groups. However, when random assignment is impractical or unethical, quasi-experimental designs are often used to address the efficacy of the interventions. In observational studies, systematic differences can occur between the treated subjects and the control subjects. In order to address the potential presence of selection bias, statistical approaches are applied that can remove some of the effects of such bias when estimating the effect of a treatment. In this section, we applied propensity score matching (PSM), which is the most common methodology to control for pre-existing systematic differences.

Three treatment groups were built based upon placement records occurring in 2017:

▶ Homeless individuals who moved to a permanent destination from Rapid Rehousing in 2017.
▶ Homeless individuals who were placed in Permanent Supportive Housing in 2017.
▶ Homeless individuals who were placed in Interim Housing in 2017 and stayed in IH one month or longer in 2017.

We used three health and three mental health outcomes, which were measured within one year before and after placement dates in 2017:

▶ Health outcomes:
   — Emergency room visits
   — Outpatient visits
   — Inpatient stays

▶ Mental health outcomes:
   — Outpatient visits
   — Stabilization care treatment
   — Acute care inpatient stays

One-year pre and post time windows were started from the move-in date for RRH placements, the placement day for PSH placements, and the first day in IH in 2017 for IH placements. For control groups, the reference date was the first day of recorded homelessness (enrollment date in HMIS) in 2017.

## SECTION 5

Outcome evaluation was performed comparing pre and post treatment and control group average annual service durations for each service type, using two-grouped t-tests. The results of statistical tests are shown in section C.3 of Technical Appendix C. Three data sources were used for the evaluation:

- ▶ HMIS data for clients, placements, and characteristics of homeless individuals — used as covariates in PSM between 2016 and 2019
- ▶ DHS service and client data for service dates and types between 2016 and 2019
- ▶ DMH service and client data for service dates and types between 2016 and 2019

The sample sizes are equal for treatment and control groups, which are 3,690 for RRH placements, 2,530 for PSH placements, and 4,238 for IH placements.  Treatment and control groups includes all records whether they had matched DMH and/or DHS data. Health and mental health outcomes were calculated only for those with at least one DHS or DMH record during the observation period.[15]

## 5.2  RESULTS

This section presents the results of health and mental health outcomes, demonstrated for each placement type separately. We show the pre and post averages of service utilization by service types using bar charts. Statistical tests to measure the significance of treatment effects are shown in section C.2 of Appendix C.

### 5.2.1  Health Outcomes

Health outcomes are assessed for three different service types: emergency room visits, outpatient visits, and inpatient stays in DHS facilities. The metric is annual average number/days of visits. For emergency room and outpatient visits, the numbers of visits are measured, and number of visits is approximately equal to the number of days. For the inpatient stays, the number of days is measured.

---

**Policy Implications Highlights**

▶ **RRH:** People placed in rapid rehousing programs reduced their use of county administered health services, whereas services use increased in the control group.  The largest difference was observed for inpatient hospitalization, the most costly of county's health services.

▶ **PSH:** People placed in PSH had substantially fewer and shorter hospital stays, as compared to the control group.

▶ **IH:** Placement in interim housing was not associated with reduced use of health services; services use increased for both those placed in IH and the control group.

---

[15]   We run the outcome analysis for 2018 as well, but since the results were similar, we do not include it for simplicity. Similarly, pre-post comparisons within two years were not different from one-year comparisons and are not presented here. Match rates of study samples against DHS and DMH data is shown in Figure C-2 of Appendix C.



**Figure 5-1. Average Number/Days of DHS Visits by Service Type**
Treatment Group: RRH Placements

Figure 5-1 shows the health outcomes for RRH placements, which make up the treatment group. The pre (post) category measures the average number of visits within one year before (after) the RRH placement in 2017. As described in section 6.1, for the control group, pre and post measures are one-year windows before and after the first enrollment date in 2017. The results show that:

▸ For the treatment group, all service type utilizations declined after the RRH placement.

▸ In contrast, for the control group, all service type utilizations increased following the first recorded day of homelessness.

▸ The largest difference is observed for inpatient stays, which decreased by almost two days for the treatment group while increasing by almost 12 days for the control group.
— This finding shows how, following RRH placement, the use of this expensive mode of health care provision dropped while, for controls, these hospitalizations increased substantially over time.



**Figure 5-2. Average Number/Days of DHS Visits by Service Type**
Treatment Group: PSH Placements

In Figure 5-2, the treatment group includes individuals with PSH placements:

▶ For the treatment group, emergency room visits declined somewhat, and inpatient stays declined substantially after the PSH placement, while outpatient visits stayed almost the same.

▶ In contrast, for the control group, emergency room visits, and inpatient stays increased after the first enrollment in a homeless program. Outpatient visits stayed the same as in the treatment group.

▶ As in RRH placements. the biggest difference is observed for inpatient stays, which decreased by almost 12 days for the treatment group while increasing by almost two days for the control group.
  — In the absence of PSH placement, homeless individuals stay substantially longer in hospitals than those placed in PSH. This supports an association between PSH placements and reduced need for expensive inpatient services.



**Figure 5-3. Average Number/Days of DHS Visits by Service Type**
Treatment Group: IH Placements

In Figure 5-3, the treatment group includes individuals with IH placements for over 30 days in 2017[16]:

▶ For both groups, all service type utilization numbers increased.

▶ Even though the average number of inpatient days increased much more for the control group, in general, service utilization patterns did not differ greatly among the treatment and control groups.

▶ In results not shown in this figure, staying longer in interim housing does not seem to impact health outcomes relative to those who stay in IH for shorter time periods or do not stay in IH at all.

---

**Mental Health Outcomes Highlights**

▶ **RRH:** People placed in rapid rehousing programs reduced their use of county administered mental health services, whereas services use increased for the control group. The largest difference was observed for inpatient hospitalization, the most costly of county's health services.

▶ **PSH:** PSH placement was associated with a reduction in the use of acute mental health services, whereas the control group experienced an increase in services use.

▶ **IH:** Staying longer in IH is not associated with reduced use of mental health services compared to those who stay in IH for less time or to those who do not move into IH at all.

---

### 5.2.2  Mental Health Outcomes

Mental health outcomes are assessed for three different service types: crisis stabilization services, outpatient visits, and acute care inpatient stays in DMH facilities. The metric is annual average number/days of visits. For outpatient visits, the numbers of visits are measured. For the crisis stabilization services and acute care inpatient stays, the number of days is measured.

---

[16]  IH treatment and control groups exclude individuals with PSH and/or RRH placements in 2017 and 2018. There are a very small number of homeless persons included in the analysis who were placed in 2019—3 Percent of the treatment and 1 percent of the control group.

**SECTION 5**

**Figure 5-4. Average Number/Days of DMH Visits by Service Type**
Treatment Group: RRH Placements



Pre/Post ■ Pre ■ Post

Figure 5-4 shows the mental health outcomes for RRH placements, which make up the treatment group. The pre (post) category measures the average number/days of visits within one year before (after) the RRH placement in 2017.

▶ For the treatment group, all service type utilizations declined after the RRH placement.

▶ In contrast, for the control group, all service type utilizations increased following the first recorded day of homelessness.

▶ The largest difference is observed for acute care inpatient stays, which decreased by more than 11 days for the treatment group while increasing by 14 days for the control group.
  — In the absence of the RRH placement, the mental health care needs of homeless individuals with acute care needs increase significantly. RRH placements improve their mental health conditions rapidly.

**SECTION 5**



**Figure 5-5. Average Number/Days of DMH Visits by Service Type**
Treatment Group: PSH Placements

In Figure 5-5, the treatment group includes individuals with PSH placements.

▸ For the treatment group, crisis stabilization care and inpatient stays declined after the PSH placement, while outpatient visits stayed almost the same.

▸ In contrast, for the control group, all service type utilizations increased following the first recorded day of homelessness.

▸ As in RRH placements, the biggest difference is observed for acute care inpatient stays, which decreased by almost 17 days for the treatment group while increasing by more than 11 days for the control group.
 — In the absence of the PSH placement, acute mental care needs of homeless individuals increase significantly. On the other hand, acute care inpatient stays of those placed in PSH decrease substantially, and their mental health conditions improve.

### Figure 5-6. Average Number/Days of DMH Visits by Service Type
Treatment Group: IH Placements



In Figure 5-6, the treatment group includes individuals with IH placements for over 30 days in 2017:

▶ For both groups, crisis stabilization care and outpatient visits increased, while acute care inpatient stays decreased.

▶ In general, service utilization patterns did not differ among the treatment and control groups.

▶ Staying longer in IH does not seem to impact mental health outcomes relative to those staying in IH for less time or those who do not move into IH at all.

## 5.3  SECTION CONCLUSION

Many studies have shown that, in PSH and Housing First interventions, chronically homeless individuals experienced reduced psychiatric and medical inpatient hospitalizations and lower numbers of emergency room visits.[17] This evaluation supports these results:

▶ The largest differences were observed for inpatient hospitalizations. For individuals with RRH placements, days in inpatient settings decreased after placement, while they increased significantly for the control group. Similarly, for individuals placed in PSH, days in inpatient settings declined substantially, while they increased modestly for the control group.

---

[17]  Culhane, Dennis P., Metraux, Stephen, & Hadley, Trevor.  (2002). Public service reductions associated with placement of homeless persons with severe mental illness in supportive housing. *Housing Policy Debates* 13(1), 107-163; Henwood, Benjamin F., Dichter, Howard, Tynan, Robert, Boermer, Krista, & Fussaro, Adam (2015). Service use before and after the provision of scatter-site Housing First for chronically homeless individuals with severe alcohol use disorders. *International Journal of Drug Policy* 26: 883–886; Larimer, Mary E., Malone, Daniel K., Garner, Michelle D., Atkins, David C., Lonczak, Heather S., Ginzler, Joshua, Hobson, William G., & Marlatt, G. Alan. (2009). Health care and public service use and costs before and after provision of housing for chronically homeless persons with severe alcohol problems. *Journal of the American Medical Association* 301: 1349–1357; Ly, Angela, &  Latimer, Eric. (2015). Housing First impact on costs and associated cost offsets. *Canadian Journal of Psychiatry*  60: 275–287; McLaughlin, Thomas Chalmers. (2011). Using common themes: Cost-effectiveness of permanent supported housing for people with mental illness." *Research on Social Work Practice* 21: 404–411; Sadowski, Laura S., Kee, Romina A., Vander Weele, Tyler J., & Buchanan, David. (2009). Effect of a housing and case management program on emergency department visits and hospitalizations among chronically ill homeless adults: A randomized trial. *Journal of the American Medical Association* 301(17): 1771-1778.

## SECTION 5

▶ We observed modest declines in emergency room use for both RRH and PSH placements and in outpatient visits for PSH placements. In contrast, homeless individuals in control groups show moderate increases in emergency room use for both RRH and PSH placements and in outpatient visits for PSH placements.

▶ The largest differences in mental health services use were observed for days spent in acute inpatient hospital settings. For both RRH and PSH placements, acute care inpatient days decreased substantially, while increasing significantly for the comparable groups with no placement.

▶ Mental health outcomes showed a similar picture. For RRH placements, we observe declines for crisis stabilization care and outpatient visits, which increased for the control group. For PSH placements, we saw this contrast for crisis stabilization care, while outpatient visits increased for the control group but stayed the same for the treatment group.

▶ There were no significant differences for those placed in IH. All health and mental health services uses increased similarly for both treatment and control groups, implying that IH placements did not mitigate the need for health and mental health care.

These results show that placements in permanent housing reduced the use of both health and mental health services, as measured by service utilization in DHS and DMH facilities. The improvement is particularly significant observing the decline in the numbers of days spent in inpatient settings, which increased considerably in the absence of a PH placement. Having access to stable housing likely shortens hospital stays, as patients can discharge earlier and convalesce at home, or may obviate entirely the need for an inpatient stay. As a result, a person experiencing homelessness may be treated on an outpatient basis. Such a transfer of care modes is appropriate and may explain why outpatient services is the one care mode that had the smallest level of pre-post change among the PSH and RRH treatment groups.

Another striking finding is that, in contrast to the results associated with RRH and PSH placements, receiving an interim housing placement has little impact on the use of health and mental health services. Interim housing is not a form of permanent housing, and, in the service patterns observed here, those in the IH group instead resemble those in the homeless group. In this case, both the IH and control groups are in fact homeless.

# Conclusion

This report has continued the HI outcomes presented in the previous three reports in this series and expanded the focus of these reports by including three sections with new examinations of the dynamics of homelessness in LA County, and the impacts of homeless services that were established or expanded under HI. After the introduction, the next three sections add a fourth year of findings to the macro, meso, and micro-measures that have been at the heart of outcomes reporting related to the HI. The three additional sections examine homeless population dynamics, collateral use of health and mental health services, and five evaluation studies on HI components that were completed in the previous year. To conclude, we present an integrated summary and discussion of these findings as a basis for assessing their implications for HI and homelessness in Los Angeles.

## 6.1  MACRO, MESO, AND MICRO MEASURES

**Key Takeaway #1**

▸ The outcomes in Year 4 also either continued or consolidated the steady improvements in many areas as the services provided under the HI programs continued expanding capacity. Placements continue to be made in a timely matter, including an average of 108 days for PSH and 77 days for RR. Self-resolved exits to PH continue to average 82 days. Returns to homelessness overall remain low at 7.8% after six months.

Findings from Year 4 show that, for the third consecutive year, over 20,000 people experiencing homelessness exited homeless services to PH placements (macro-measure 2). Nearly 10,000 of these PH placements occurred within the purview of HI-supported initiatives (meso-measure 3). Looking at these PH placements over the last three years, 56,000 unduplicated people exited shelter stays to PH (both HI- and non-HI-funded), and 31,000 of these exits came under the auspices of HI-supported services.

Noteworthy also were IH placements, which declined 25% after significant year-over-year growth since FY 2016-17. Building IH capacity is a key component of reducing LA's large unsheltered population, and the onset of the COVID-19 pandemic, and the resulting need to "decompress" shelter facilities, has handed these efforts an additional challenge. The reduction in IH housing capacity in Year 4 is one of the first indicators of COVID-19's impact on LA's homeless services, and COVID-19 will almost certainly have a much larger impact on HI strategies in the upcoming Year 5. In addition, the rental unit vacancies in LA has been very low over the past couple of years making permanent housing opportunities harder to secure.  This has made the IH lengths of stay longer, thus reducing the number of IH beds that turn over.

## 6.2  NEW TOPICS

**Key Takeaway #2**

▸ The first two studies of this report highlight the potential for the administrative data used for the macro, meso, and micro measures to inform other aspects of the HI. In contrast, the evaluations reviewed in Appendix B show the limitations of relying solely on these data in assessing the impact of the HI on levels of homelessness in LA County.

## SECTION 6

With four years having passed since the initiation of HI, there is growing opportunity to assess dynamics related to homelessness and homeless services that stand to inform and improve homeless services structure and delivery under HI. This report includes three such studies.

In Section 4, the first study addresses the apparent paradox of why LA's homeless population, as per the annual point-in-time count, has grown by 13% in each of the past two years despite the expansion in LA's homeless services and the growth in funded exits from homelessness. Our analysis of inflows and exits suggests that the growing census is primarily a result of increases in the persistently homeless subgroup. While there has been some increase in the number of entries, most new entries to homelessness result in exits following relatively brief stays. A focus on addressing persistent homelessness therefore is likely to have the greatest potential impact on the level of homelessness in LA. The planned growth of 10,000 PSH units over the next five years under Proposition HHH, with the first substantial number of units opening this year, holds some promise that significant progress can be made. Additional efforts to stabilize people at risk of persistent homelessness, and to prioritize existing resources towards housing them, could also avert further accumulation of people in this subgroup, and contribute to a reduced census.

This year's report also included an assessment of the impact of PH placements on acute health care services in comparison to a matched control group (Section 5). The results indicate that PSH and RRH services significantly reduce general medical and mental health inpatient, emergency, and crisis services use among people placed, in compared to both their own levels of services used preplacement and to the control group. In contrast, placement in IH does not have an impact on health and mental health outcomes. Indeed, service needs appear to increase irrespective of the length of stay in IH. These results confirm that the benefits of HI programs extend beyond housing, with one substantial positive impact being reductions in the use of costly county-funded health and mental health services.

A third new study, included as Appendix B, is the synthesis of five evaluations that were commissioned by LA County to examine, in detail, key components of the HI. Each of these evaluations provides detailed accounts of the structure and functioning of these components — prevention, outreach, interim and bridge housing, PSH, and RRH — as they critically assess both outcomes and processes. Each evaluation shows how HI resources expanded the services provided in these components, as well as key changes in how these services were implemented in conjunction with HI support. While the evaluations show some specific features that are effective and others that need further attention, they are unable to extensively assess how the services have impacted homelessness in LA County beyond descriptive findings of services provided and people who have been served.

## 6.3  HI AND HOMELESSNESS IN LA COUNTY: LOOKING AHEAD

**Key Takeaway #3**
▸ Year 4 of HI continues to show progress in the placement of people experiencing homelessness in PH. Growth in persistent homelessness, however, has resulted in a net increase in the PIT two years in a row. The opening of significant numbers of PSH under Proposition H over the next five years should substantially mitigate levels of persistent homelessness.

The health and economic conditions created by the COVID-19 pandemic will mean that funding for HI and expected levels of homelessness overall, in the current year and beyond, are uncertain, although continued investments in PH placements will have a clear and unambiguous positive impact on the people served.

One indicator of the impact of the COVID-19 pandemic that was clearly captured in this report is the 25% decline in IH this year, representing approximately 5,000 people. The pandemic necessitated taking steps in shelters to reduce infection risk that resulted in "decompressed" shelter accommodations and reduced capacity. In the wake of this decompression, increasing placements of homeless households occurred in hotel and motel settings, and culminating with Project Roomkey, which is separate from HI initiatives. To the extent that Project Roomkey clients exit from hotels

and motels to housing, a commitment made by the County and LAHSA, this could result in a decline in the number of people experiencing homelessness this year. The continuing pandemic crisis could lead to further Project Roomkey placements and exits to housing, including through conversion of some hotels and motels to permanent housing.

However, the continuing pandemic could have a negative impact on PH placements overall if HI funding is significantly diminished because of declining tax revenues. Furthermore, the continuing economic impact of the pandemic on incomes and rent arrears threatens to exacerbate demand for homelessness assistance. Demand for homelessness prevention is especially likely to grow amidst a pending wave of evictions (subject to potential federal, state, and local actions which could mitigate pandemic-related evictions). All these factors suggest that the coming year poses a number of uncertainties with respect to HI, homelessness assistance more generally, and overall levels of homelessness.

A further challenge related to the changing nature of homeless services in response to the pandemic is the need to accommodate additional data sources. Data on hotel and motel placements, including those under Project Roomkey, need to be integrated with HMIS and other databases that collect records on homeless services, as the reductions in longstanding services such as IH will present a prominent yet incomplete picture of efforts to safely shelter people experiencing homelessness. This would then inhibit comprehensive assessments of LA County's HI during a time when data should play an even more critical role in informing the evolving role of the strategies reviewed here.

APPENDIX A

# Micro-Level Strategy Performance Measures

The performance outcomes developed for each of the individual HI strategies are the foundation of the higher-order (macro and meso) results presented in this document. When micro-data were not available, these strategies are assessed based on the County's quarterly reports. This section presents highlights of Year 4 outcomes from selected strategies, comparing them to Year 3 outcomes in six topic domains.

## A.1 TOPIC A: PREVENT HOMELESSNESS

**Summary of Micro Measure Outcomes for Topic A**

**TOPIC A: PREVENT HOMELESSNESS**

▸ The number of families served under Strategy A1 (Homelessness Prevention Program for Families) increased by 50% between Years 3 and 4, reaching almost 1,500, while the number of newly enrolled households doubled.

▸ The percentage of participant families that exited A1 and either retained their housing or moved into PH decreased from approximately 89% to 79%.

▸ Strategy A5 (Homeless Prevention Program for Individuals) expanded in Year 4. Active enrollments increased from 1,221 to 2,189, and new enrollments rose from 1,120 to 1,760.

▸ The proportion of participants that exited the program who managed either to retain their housing or move to PH decreased from 93% to 74%.

### APPENDIX A

Outcomes of these two strategies are shown in Figure A-1.

**Figure 4-1. Number of Households and Individuals Prevented from Becoming Homeless**
A1 -  Households and A5 - Individuals



#### A.1.1  A1: Homeless Prevention Program for Families

▸ For Strategy A1, in Year 4 active household enrollments increased from 1,003 to 1,498, and newly enrolled households increased from 688 to 1,327.

▸ The number of families that exited into PH stayed almost the same (from 709 in Year 3 to 693 in Year 4), but the proportion of participant families that exited the program who managed either to retain their housing or move to PH decreased from 89% to 79%.

---

**Summary of Micro Measure Outcomes for Topic B**

**TOPIC B: SUBSIDIZE HOUSING**

▸ After new enrollments were suspended from March 2018 until February 2019, in Year 4 the B1 program provided subsidized housing to 1,358 homeless disabled individuals pursuing SSI.

▸ Strategy B3 (Partner with Cities to Expand RRH) contracted in Year 4. The number of new enrollments dropped from 10,703 in Year 3 to 8,995, and the number of active participants declined from 20,950 to 19,297. The number of individuals and family members placed in PH also dropped, from 7,038 to 6,090, or 13%.

▸ Strategy B7 (Interim/Bridge Housing for Those Exiting Institutions) continued to expand. The number of active enrollments increased from 3,199 in Year 3 to 4,333, and the number of new enrollments rose from 2,589 to 3,865.

**A.1.2  A5: Homeless Prevention Program for Individuals**

▶ Like A1, strategy A5 expanded significantly in Year 4. Active enrollments increased from 1,221 to 2,189, and the number of new enrollments rose from 1,120 to 1,760.

▶ The number of individuals that exited into PH also increased from  Year 3 to Year 4 (from 788 to 992), but the proportion of participants that exited the program who managed either to retain their housing or move to PH decreased from 93% to 74%.

## A.2  TOPIC B: SUBSIDIZE HOUSING

Detailed outcomes were available for Strategies B3 and B7, and summary outcomes were available for Strategies B1 and B4:

**A.2.1  B1: Provide Subsidized Housing to Homeless Disabled Individuals Pursuing SSI**

▶ After new enrollments were suspended until February 2019, in Year 4 the B1 program provided subsidized housing to 1,358 homeless disabled individuals pursuing SSI. Numbers of people participating in B1 programs are shown in Figures 2-3 and 3-4.

▶ The number of B1 participants approved for SSI also increased from 117 to 210.

**A.2.2  B3: Partner with Cities to Expand Rapid Rehousing**



**Figure A-2. Individuals Enrolled in and Served by and Stayed in or Exited into PH**
B3 and B7 Programs

As shown in Figure A-2:

▶ In Year 4, this program contracted after expanding in the earlier years. The number of new enrollments dropped from 10,703 to 8,995, and the number of active participants declined from 20,950 to 19,297.

## APPENDIX A

---

▶ Similarly, the number of individuals and family members placed in PH also dropped, from 7,038 to 6,090 or 13%, because of sunsetting of the DHS B-3 program as shown in Figure 3-4.

▶ However, of B3 participants who secured housing with a RRH subsidy, number who remained in permanent housing upon exiting the RRH program more than doubled in Year 4 from 1,143 to 2,858. Only 168 B3 participants exited to other destinations upon exiting the RRH program.

### A.2.3  B4: Facilitate Utilization of Federal Housing Subsidies

▶ After showing a big expansion in Year 3, the program stabilized in Year 4:
  — The total amount of security deposits and move-in assistance stayed at almost $6 million.
  — The number of formerly homeless housed with B4 incentives increased from 2,120 to 2,277.
  — The number of units leased with B4 incentives increased from 1,863 to 2,425.
  — The amount of incentives provided to landlords stayed at almost $4.2 million, but the number of landlord requests to participate declined from 2,435 to 1,929.

### A.2.4  B7: Interim/Bridge Housing for Those Exiting Institutions

As shown in Figure A-2:

▶ In Year 4, the B7 program continued to grow. The number of active enrollments increased from 3,199 to 4,333, and the number of new enrollments rose from 2,589 to 3,865.

▶ The number of B7 participants who exited to a PH destination stayed at the same level, at 542.

▶ The distribution of the institutions through which individuals under B7 were served changed significantly relative to Year 3 (not in figure). The share of criminal justice institutions increased from 26% to almost 34%, and the share of substance abuse treatment centers increased from 28% to almost 33%.

---

**Summary of Micro Measure Outcomes for Topic C**

**TOPIC C: INCREASE INCOME**

▶ Under Strategies C2 (Increase Employment through Supporting Social Enterprise) and C7 (Subsidized Employment for Homeless Adults), the number of participants enrolled in transitional employment almost doubled, from 1,265 in Year 3 to 2,246 in Year 4.

▶ Participants enrolled in Strategy C4 (Countywide SSI Advocacy Program) increased from 11,499 to 16,888. Of the 16,888 enrollments in Year 4, 5,739 were newly enrolled during that year. The number of participants whose applications for SSI/Veterans' benefits were submitted increased from 1,382 to 2,168. The number of participants approved for SSI/Veterans' benefits more than doubled, from 346 to 839.

---

### A.3  TOPIC C: INCREASE INCOME

Summary outcomes were available for the following strategies:

### A.3.1  C2/C7: Increase Employment for Homeless Adults

▶ The program continued to expand in Year 4:
  — The number of participants enrolled in transitional employment almost doubled, from 1,265 to 2,246.
  — The number of participants placed in unsubsidized employment increased from 742 to 872, and the number of DPSS General Relief participants served rose from 215 to 562.

## APPENDIX A

### A.3.2  C4/C5/C6: Countywide SSI/Veterans Benefits Advocacy Program for People/Veterans/Inmates Experiencing Homelessness or at Risk of Homelessness

▶ Countywide Benefits Entitlement Services Teams programs expanded in Year 4:
  — The number of individuals currently enrolled increased from 11,499 to 16,888. Of the 16,888 enrollments in Year 4, 5,739 were newly enrolled during the year.
  — The number of participants whose applications for SSI/Veterans' benefits were submitted increased from 1,382 to 2,168. The number of participants approved for SSI/Veterans' benefits more than doubled, from 346 to 839.

### A.4  TOPIC D: PROVIDE CASE MANAGEMENT AND SERVICES

**Summary of Micro Measure Outcomes for Topic D**

**TOPIC D: PROVIDE CASE MANAGEMENT SERVICES**

▶ Inmates receiving jail in-reach services under Strategy D2 (Expansion of Jail In-reach) declined slightly, from 1,349 to 1,223.

▶ The number of homeless persons seeking to clear criminal histories under Strategy D6 (Criminal Record Clearing Project) increased from 2,780 to 4,163.

▶ PH placements associated with Strategy D7 (Provide Services and Rental Subsidies for PSH) continue to expand in Year 4. The number of new enrollments increased from 3,995 in Year 3 to 4,846. The number of active participants increased from 7,255 to 12,573. The number of placements in permanent housing increased from 2,150 to 2,409.

▶ The number of participants in existing PSH units that had insufficient supportive services (D7-Flex) who began receiving D7 intensive case management services to increase housing retention more than doubled in Year 4, from 803 to 1,885.

Summary outcomes were available for Strategies D2 and D6, and micro-data were used for Strategy D7:

### A.4.1  D2: Expansion of Jail In-reach

▶ The program was stable in Year 4 with small reductions:
  — The number of inmates who received services dropped slightly from 1,349 to 1,223, while the number of VI-SPDAT assessments stayed almost the same at 952.
  — The number of D2 participant inmates placed in bridge housing upon release decreased from 429 to 379 due to the impact of COVID-19.
  — The number of D2 participant inmates referred for General Relief and Medi-Cal application assistance increased from 63 to 124 and from 75 to 546, respectively.

### A.4.2  D6: Criminal Record Clearing Project

▶ In Year 4 the program continued to expand:
  — Petition filings for dismissal or reduction of criminal records by the Public Defender and City Attorney increased from 2,780 to 4,163.
▶ The number of petitions granted increased from 1,656 to 3,242.
▶ However, the number of homeless persons engaged decreased from 2,108 to 1,731.

## APPENDIX A

### A.4.3  D7: Provide Services and Rental Subsidies for PSH

**Figure A-3. Individuals Enrolled in and Served by and Placed in or Exited into PH**
D7 Program



▶ The program continued to expand in Year 4. The outcomes are shown in Figure A-3:
— The number of new enrollments increased from 3,995 to 4,846.
— The number of active participants increased from 7,255 to 12,573.
— The number of placements in permanent housing increased from 2,150 to 2,409.

▶ The number of participants in existing PSH units that had insufficient supportive services (D7-Flex) who began receiving D7 intensive case management services to increase housing retention more than doubled, from 803 to 1,885.

---

**A.5  TOPIC E: CREATE A COORDINATED SYSTEM**

**Summary of Micro Measure Outcomes for Topic E**
**TOPIC E: CREATE A COORDINATED SYSTEM**

▶ The number of individuals receiving services and/or referrals through Strategy E6 (Countywide Outreach System) continued to expand in Year 4. The number of individuals newly engaged increased from 10,905 to 14,005. The number of individuals who were placed in crisis or bridge housing more than doubled, from 1,468 to 3,093. However, the number of persons who were connected to services or who obtained referrals dropped from 17,673 to 15,419.

▶ The number of households assessed in the E7 (Strengthen the Coordinated Entry System) program increased from 27,116 to 22,538. Average length of time from assessment to housing match increased from 257 to 376 days, exceeding one year. Number of persons/households who increased their income rose slightly, from 7,093 to 7,404.

▶ Strategy E8 (Enhance the Emergency Shelter System) contracted significantly in Year 4. The number of new enrollments decreased from 17,759 to 12,503, and the number of active participants decreased from 22,362 to 18,129. The decline in IH placements in Year 4 was caused mainly by the COVID-19 crisis.

**APPENDIX A**

Micro-data were used for strategy E8, and summary outcomes were presented for three other strategies.

### A.5.1  E8: Enhance the Emergency Shelter System



Figure A-3. Individuals Enrolled in and Served by and Placed in or Exited into PH
D8 Program

▶ The program contracted in Year 4, as shown in Figure A-4:

— The number of new enrollments decreased from 17,759 to 12,503.
— The number of active participants decreased from 22,362 to 18,129.
— The number of participants exiting to permanent housing declined from 3,971 to 3,647, but the proportion of exits to permanent housing increased from 17.8 to 20.2 Percent
— The decline in IH placements in Year 4 was caused mainly by the COVID-19 crisis.

### A.5.2  E6: Countywide Outreach System

▶ The program expanded in Year 4:
— The number of individuals newly engaged increased from 10,905 to 14,005, increasing total engagements from 15,039 in Year 3 to 19,224 in Year 4.
— The number of persons who were connected to services or who obtained referrals dropped from 17,673 to 15,419. This decline is likely the results of the COVID-19 pandemic.
— The number of individuals who were placed in crisis or bridge housing doubled from 1,468 to 3,093, while placements in PH slightly declined from 757 to 699.

### A.5.3  E7: Strengthen the Coordinated Entry System

▶ Outcomes for the E7 strategy are as follows:
— The number of households assessed decreased from 27,116 to 22,538.
— Average length of time in days from assessment to housing match for those who had a housing match increased from 257 to 376 days, exceeding one year.
— The number of persons/households who increased their income increased slightly, from 7,093 to 7,404.

## APPENDIX A

### A.5.4  E14: Enhanced Services for Transition Aged Youth (TAY)

- ▶ Outcomes for the E14 strategy are as follows:
  - — The number of TAY youth who were assessed using the Next Step Tool decreased from 3,285 to 2,404.
  - — The percentage of participants who exited transitional housing to permanent housing destinations increased from 39 to 49.
  - — The number of children linked to appropriate educational programs rose from 1,811 to 2,389.

## A.6  TOPIC F: INCREASE AFFORDABLE/HOMELESS HOUSING

Many of the strategies under this topic operate on a systems level and are difficult to quantify on a person and services level, which is the primary focus of this report. Given this, no summary of findings (as was done for the first five topics) are presented here.

The selected outcomes are:

### A.6.1  F1: Promote Regional SB 2 Compliance

- ▶ The Regional Planning Commission approved the Interim and Supportive Housing Ordinance, which strengthens the County's compliance with SB 2.

### A.6.2  F3: Support for Inclusionary Zoning for Affordable Rental Units

- ▶ The Regional Planning Commission approved the Inclusionary Housing Ordinance.

### A.6.3  F4: Development of Second Dwelling Unit Pilot Project

- ▶ The Regional Planning Commission recommended approval of the updated Accessory Dwelling Unit (ADU) Ordinance to the Board of Supervisors.
  - — On August 4, 2020, the Board approved the ADU Ordinance and instructed County Counsel to prepare the final Ordinance for Board consideration.

- ▶ Following the final building permit approval of two ADUs through the pilot program, homeless tenants are expected to move into them by October 2020. Construction continues for the three-remaining new ADUs.

### A.6.4  F7: Preserve and Promote the Development of Affordable Housing for Homeless Households and Establish a One-time Housing Innovation Fund

- ▶ Kensington Campus project was completed. Construction of six projects that received Measure H allocations is continuing and expected to be completed in Years 5 and 6.

- ▶ The remaining four projects are in predevelopment, and construction is expected to start in Year 4.

- ▶ The Board authorized the Los Angeles County Development Authority to execute and administer contracts with the five winners of the Housing Innovation Challenge (HIC).
  - — The construction of two of the projects has already started.

APPENDIX B

# Review of HI Evaluations

HI funded five in-depth evaluations of key strategies in the plan to combat homelessness, and LA County contracted with four organizations to provide five reports that cover seven strategies (Table B-1). The evaluations all used a similar study design, and, while each one has a different strategy focus, themes and similarities across these evaluations can yield broader insights into the overall HI. In this section, we review these evaluations and present their findings and recommendations in an integrated framework.

**Table B-1: Evaluations of Specific HI Strategies**

| Title | Author | Strategy | Description |
|---|---|---|---|
| Evaluation of Los Angeles County Measure H-Funded Homelessness Prevention Strategies[18] | California Policy Lab (CPL) | A1 | Homeless Prevention Program for Families |
| | | A5 | Homeless Prevention Program for Individuals |
| Homeless Initiative Strategy E6: Countywide Outreach System Implementation Evaluation[19] | Resource Development Associates (RDA) | E6 | Countywide Outreach System |
| Evaluating the Effectiveness of Los Angeles County's Strategies to Expand and Enhance Interim Housing and Emergency Shelter Services[20] | Health Management Associates (HMA) | B7 | Interim/Bridge Housing for those Exiting Institutions |
| | | E8 | Enhance the Emergency Shelter System |
| Evaluation of Los Angeles County's Strategies to Expand and Enhance Rapid Rehousing Services for Multiple Populations[21] | Westat | B3 | Partner with Cities to Expand Rapid Rehousing |
| Evaluation of Los Angeles County's Strategies to Expand and Enhance Services Provided Through Permanent Supportive Housing[22] | Westat | D7 | Provide Services and Rental Subsidies for Permanent Supportive Housing |

[18]   A brief on CPL's A1/A5 evaluation is available at: https://www.capolicylab.org/wp-content/uploads/2020/05/Evaluation-of-LA-County-Measure-H-Funded-Prevention-Strategies.pdf; the full CPL A1/A5 evaluation is available at: https://homeless.lacounty.gov/wp-content/uploads/2020/02/cpl.prevention.011020.pdf.
[19]   RDA's E6 evaluation is available at: https://resourcedevelopment.net/wp-content/uploads/2020/04/rda.LAoutreach011020.pdf.
[20]   HMA's B7/E8 evaluation is available at: https://www.healthmanagement.com/wp-content/uploads/LA-County-Interim-and-Emergency-Housing-Evaluation-Report_Final_2-27-20.pdf.
[21]   Westat's D7 evaluation is available at: https://homeless.lacounty.gov/wp-content/uploads/2020/02/westat.rrh_.011020.pdf.
[22]   Westat's B3 evaluation is available at: https://homeless.lacounty.gov/wp-content/uploads/2020/02/westat.psh_.011020.pdf.

## APPENDIX B

Information on the strategies covered in these five evaluations is also included in previous sections of this report that cover meso-measures and micro-level strategies:

▶ The numbers of people gaining permanent housing, related to Strategies A1 and A5 (homelessness prevention for individuals and families, respectively), are included in subsection 3.1 (meso-measure 1) and are among the micro-level strategies reported in Appendix A.

▶ The number of outreach contacts, related to strategy E6, is reported in Section 4 among the micro-level strategy performance measures.

▶ The measures of Strategies B7 (Interim/Bridge Housing placements) and E8 (emergency shelter placements), and subsequent permanent housing exits from both, are components of meso- measure 2, which is reported in subsection 3.2. Specific outcomes for Strategies B7 and E8 are also reported in Appendix A among the micro-level strategy performance measures. See, in particular, Figures A-2 and A-4.

▶ Two HI strategies that are focused directly on PH — B3 (rapid rehousing) and D7 (permanent supportive housing) — are consolidated and presented as part of meso-measure 3, which is reported in subsection 3.3. Outcomes specific to Strategies B3 and D7 are also reported in Section 4 among the micro-level strategy performance measures. See, in particular, Figure A-2 (for B3) and Figure A-3 (for D7).

The meso- and micro-measure findings presented in this report are limited to basic outcomes, mostly related to program enrollment and exits or placements into permanent housing, while the evaluations examined in this section present a much deeper assessment of the programs operating under the auspices of these strategies.

## B.1  STUDY DESIGN

Each of the five evaluations has a similar study design in several respects. They all are primarily process evaluations, in which they focus on the implementation of the strategy, thereby addressing "who, what, where and when questions" (RDA report, p. 8). They also include research questions and findings that could be considered part of an outcome evaluation, but none of the reports draw any definitive conclusions about the outcomes they report.

All five evaluators were instructed to address the same overarching objectives for a given strategy:

▶ Objective 1. To establish what the available data and performance evaluation results suggest are the strategy's best practices and to identify practices and processes in need of being re-visited and re-worked.

▶ Objective 2: To reveal how persons working directly with the homeless population in the strategy define effectiveness and characterize the practices that the data suggest either bolster or impede strategy performance. Are their characterizations consistent with what the data show? If not, how do they understand the difference?

▶ Objective 3: To describe how specific funding sources affect the administration of a strategy and the capacity of strategy leads to deploy available resources effectively. To the extent that funding source restrictions create challenges in optimizing available resources, what are they, and are there steps that can be taken to minimize them?

▶ Objective 4: To detail instances in which strategy leads provide both services with Measure H funds and similar services not funded with these revenues. How does the administration of non-H-funded services and benefits differ from the administration of those funded with H dollars? What are the practical implications of this difference? Does the difference suggest that non-H-funded homeless services would benefit from adopting practices specific to the H-funded portion of the same services and/or vice versa? How much does the answer to this question depend on the non-H funding sources and restrictions involved?

## APPENDIX B

In addition, each of the evaluations poses research questions that are specific to their topic and approach (Table B-2). The evaluations all include at least one question looking at participant characteristics and outcomes, and otherwise focus on various aspects of the specific services system and the delivery of services. The emphasis in different evaluations includes means for improvement (CPL), services coordination (RDA), and systemic changes following the implementation of specific strategies (Westat, RDA). In contrast, the HMA evaluation contains research questions that focus on particular aspects of interim housing.

**Table B-2: Summary of Research Questions for the HI Strategy Evaluations**

| Evaluation | Research Questions |
|---|---|
| CPL (prevention) | 1. Who is being served by Strategies A1 and A5, and what is their housing status after exit? |
| | 2. How could Strategies A1 and A5 be improved, and how could scarce prevention funding be most efficiently prioritized? |
| | 3. Does prevention funded through Strategies A1 and A5 directly cause a reduction in inflows to homelessness? |
| RDA (outreach) | 1. How do systems-level factors impact the effective coordination of outreach services? |
| | 2. How do program-level factors impact the effective coordination of outreach services? |
| | 3. How do individual client services and/or experiences align to Strategy E6 objectives? |
| | Each of these questions has a number of sub-questions. |
| HMA (interim housing) | **Eight questions addressing** |
| | 1) differences in services delivery across providers; |
| | 2) bed rates; |
| | 3) differences in interim housing services by subpopulation; |
| | 4) quality of collaboration with collateral LA County services; |
| | 5) challenges hospitals face securing housing for inpatients/clients; |
| | 6) interim shelters and implementation of recovery-oriented principles; |
| | 7) barriers to transitioning from IH to PH; and |
| | 8) differences in outcomes among subpopulations. |
| Westat (two evaluations: RRH and PSH) | **Same overarching question for both evaluations:** How has Strategy (B3 or D7) affected the operation and outcomes of (rapid rehousing or inventory of permanent supportive housing) in Los Angeles County? Both evaluations also feature sub-questions: "Have there been changes in [various program elements]?" and "What are the sources of variation in these findings?" |

The methods and types of data used by all five evaluations are very similar. Each describes its study as a mix of qualitative and quantitative analyses. All collect and use data from stakeholder interviews, administrative data, and document review, and all except HMA collect data from focus groups. RDA researches best practices and evidence-based practices for outreach services, and HMA uses aggregated data from various county service providers. Only three evaluations (HMA and the two from Westat) include qualitative data (from focus groups) from people receiving services through HI.

## APPENDIX B

---

**B.2  STUDY FINDINGS**

All five evaluations present findings for the specific service types that were evaluated. The specific findings are available in the individual evaluation reports (see Table 7-1).  This review identifies various themes found across the evaluations — a task made more challenging by the different formats used by the different evaluations to report findings, and different emphases in the evaluations on specific aspects of the programmatic areas covered. Despite this, several overarching themes emerged.

### B.2.1  Outcomes and Limitations of Available Administrative Data

Outcomes data reporting in all five evaluations was limited by the available administrative data. All five evaluations used HMIS data. In addition, HMA and Westat both used CHAMP data, CPL used ELP data, and RDA used data from the Homeless Outreach Portal. Specific limitations to these data that were frequently mentioned included the incompleteness of the data, concerns about internal validity, and limited data fields.

All five evaluations included findings on demographics and services use, with some comparing services use across different demographic groups and over time. All analyses of administrative data were descriptive or used bivariate tests of difference.

General findings reported across evaluations included how HI strategies and support enabled substantial expansion of services and people served. Demographic analyses generally found that a diverse mix of households were served, and these reports did not highlight any problematic racial/ethnic disparities or biases. However, some service gaps and disparities were found.

Reporting outcomes in specific evaluations included these issues:

▸ CPL's evaluation of prevention programs noted that substantially fewer households that received financial assistance later experienced homelessness, compared to households that received prevention services other than financial assistance. It is unclear from these data, however, whether the outcomes differences were due to the financial assistance itself or to the circumstances of the households receiving the assistance.

▸ CPL's evaluation also noted that households identified as at-risk for homelessness based upon ELP administrative data overlapped only minimally with the largely self-referred households that sought assistance through prevention administered under Strategies A1 and A5. This suggests that a substantial segment of the target population for homeless prevention is not participating in HI-supported prevention programming.

▸ HMA, in its evaluation of interim housing and emergency shelter, reported that "significant differences were observed in the demographics and health status profiles of those examined for this evaluation in the duration of their stays in interim housing, in exiting to permanent housing, and in exiting to homelessness" (p. 10). However, they note that "interpretation of these differences may be difficult" (p. 33) and offer no guidance for addressing these differences.

▸ HMA (pp. 38-39) noted that interim housing and emergency shelter programs regularly used quantitative and qualitative data to "identify problems and make program improvements." More specifically, the evaluation reports that "many key informants look to data related to performance metrics reported and published quarterly such as time from entry to permanent placement, type of exit (negative versus positive), time from referral to placement, and vacancy rate as indicators of success." This overlaps with the outcomes reported in the evaluation, as exit outcomes are reported, while findings on time from referral to placement and vacancy rates are not. More generally, staff-driven initiatives to use data for improving program performance were reported only anecdotally.

## APPENDIX B

▸ Westat's evaluation of rapid rehousing reports that "the population served after Strategy B3 implementation show improvements in the documented rates at which households move into housing (50% compared to 41%) and the time it takes to move in (an average of 98 days compared to 109 days). At the same time, among those who move into housing, those served after Strategy B3 appear to remain enrolled longer before exiting compared with those served prior" (p. vii). Such outcomes are clearly central to assessing strategy performance, but "these findings need to be interpreted with caution given inconsistencies in the data" (p. vii).

▸ Outcomes for Westat's evaluation of permanent supportive housing report that "outcomes are not yet known for many of those served after Strategy D7, more than a third of whom were recently enrolled and still waiting to move into housing" (p. vii). Tracking outcomes for this evaluation were also substantially hampered by "lack of integration across data systems and incomplete data" (p. viii).

▸ Two evaluations (CPL and RDA) noted how lack of data precluded their undertaking analyses that might associate strategy implementation with reductions in homelessness, and each proposed means for how to assess this relationship should the prerequisite data become available. CPL noted that, although they found that about 1 in 10 households assisted with prevention services experienced subsequent homelessness, without a research design that provided a meaningful comparison group it was impossible to determine how many additional households among those assisted would have experienced homelessness without the assistance. RDA outlines a means by which future evaluations can "study relationships between E6 outreach service engagement (dosage) and exits to stable housing (outcomes)" (p. 8). To implement either approach would require substantial additional data collection to supplement existing administrative data.

Taken together, outcomes reported in the evaluations were limited because of the studies' reliance on data, mostly from administrative sources, that was already collected and that had limited data fields and, in some cases, notable quality issues. In none of the evaluations did the outcomes measures precede or guide the collection of the administrative data.

### B.2.2  Process Evaluation

All five evaluations devoted attention to examining processes related to implementing the strategies that were evaluated.

The overall charge to the evaluations from LA County, as reported by HMA (p. 11), included an examination of the processes by which HI funds impacted the delivery of services. Specifically, to what extent was HI funding able to optimize service delivery, and how did service delivery approaches of HI-funded programs differ from those of other programs that provided similar services? The evaluations reviewed here took different approaches to evaluating processes that, generally, were consistent with this framework but typically focused on more specific aspects of the strategies under examination.

The CPL evaluation found that, overall, Strategies A1 and A5 have led to expanded prevention efforts and that, under this overall strategy, providers were "practicing prevention in ways consistent with its design" (p. 20). CPL homed in on two fundamental elements of the process of administering prevention services: the use of a screening tool to determine need for prevention services and which prevention services would be provided; and going beyond self-referral to examine other means for identifying households at high risk for homelessness as part of increasing access to prevention programming for such households. This resulted in specific means for improving the efficiency of the screening tool and expanding the pool of beneficiaries of prevention services.

Of the five evaluations, RDA provides the most detailed examination of process in looking at a system that, under Strategy E6, has seen substantial expansion and reorganization of outreach services and the 200 programs providing such services under HI. Many of the findings, taken together, illustrated how E6 resources provided the means to provide a system structure that previously had little central organization or coordination.

## APPENDIX B

HMA noted the considerable administrative challenges involved in aligning different funding sources, including Strategies B7 and E8 resources, but found that providers were generally able to integrate these services to provide consistent interim housing and emergency shelter services. The most variation noted in the study came from the different services need required by different sub-populations that used this system. Beyond that, findings were focused on specific issues such as coordinating referrals from hospitals, implementing recovery-oriented principles, and establishing sufficient and consistent bed rates.

The two studies by Westat take similar approaches to assessing the process of providing RRH and PSH services. Both evaluations document how the funding provided substantial expansion in the availability of both services types and has facilitated systems in which there is increased guidance, training, and collaboration that lay groundwork for more coordinated and uniform service delivery. However, both evaluations note how high staff turnover and burnout hampers the quality of service delivery in both systems. The RRH evaluation noted considerable variation in program implementation and levels of provider discretion that facilitate inconsistent services delivery. Delivery of PSH services, in contrast, seems more focused on and uniform in the approach to providing case management support and moving clients to housing, though coordinating housing and services across different providers and geographies posed substantial challenges.

### B.2.3  Best Practices

Two evaluations in particular focus on the extent to which programs in a particular strategy implemented best practices. RDA, based upon a systematic review of the literature on best practices in the domain of homeless outreach services, concluded that "Strategy E6 has implemented outreach services that align with most best practices recognized by experts" (p. xv) and detail a list of specific best practices implemented by E6-supported programming. However, they also note an absence of system-wide quality measures that would facilitate a process whereby all individual outreach programs implement these best practices consistently across the system.

In the interim housing and emergency shelter evaluation, HMA uses available data and performance evaluation results to identify best practices used within the context of the strategies being evaluated. Particular focus was given to the increased supply of interim beds and access to shelters; the referral process that links DHS hospitals to recuperative care providers; and the implementation of various "low barrier" approaches. However, HMA also pointed out several processes that could potentially serve as best practices as needing improvement (p. vii).

Additionally, two studies assessed a widely recognized best practice involving the use of instruments to match program participants with corresponding services. CPL demonstrated the benefits of substantially revising and streamlining the instrument used to assess need for prevention services, and HMA suggested that the administration of the instrument used for referring participants to housing services impaired an accurate assessment of their need.

### B.2.4  Other Findings

Other topics were covered across two or more evaluations:

> ▸ *Collaboration and coordination.* There was a consensus that the implementation of the various HI strategies covered in these evaluations facilitated a greater degree of collaboration and coordination between various entities involved in the delivery of services and other involved entities. All of the studies featured system coordination and collaboration prominently among their findings and noted specific achievements in this area. There were also some specific instances noted where additional coordination and collaboration are needed, including coordinating legal services with homeless services (prevention); collaborations between homeless-serving agencies, law enforcement, and sanitation departments (outreach); and collaborations with substance abuse services (interim housing and emergency shelter).

▶ *Data collection.* As noted in subsection B.2.1, the limitations of available data circumscribed the ability of the evaluation reports to evaluate outcomes and impacts of the HI strategies. Westat's two evaluations (RRH and PSH) were particularly forthright in noting the need for improved data quality and integration across systems. One mitigating factor for this may be timing, as programs such as RRH and PSH require lead time to track program participation and length of housing tenure. Therefore, as the program matures the data quality will also improve. RDA's evaluation illustrates this as, in assessing outreach, their evaluation noted progress in the development of the Homeless Outreach Portal and improved data collection and sharing among outreach providers. Finally, HMA noted how interim housing and shelter providers were using data to assess performance in various areas.

▶ *Availability of permanent housing.* The lack of available and affordable permanent housing was a general theme across the evaluations as a structural factor, largely beyond the control of homeless services providers, that impeded successful outcomes. "Expectations for movement to permanent housing may be too high, given the lack of housing availability" (HRA, p. 43) is one clear example of how housing availability impacts homeless services. The two Westat evaluation studies each pointed out that the challenges around permanent housing availability make developing effective means of "landlord cultivation" a critical part of both RRH and PSH services.

## B.3  SECTION CONCLUSION

The tone of the evaluations toward the strategies and approaches they covered was generally positive and documented the benefits of increased resources that came with the strategies on services provision and coordination. Along with this, each evaluation had specific recommendations for measures that could improve services. Many of these recommendations derived from the findings covered in subsection B.2.

These evaluations were stronger on evaluating the processes involved in implementing the strategies than they were in documenting the outcomes with respect to their impact on reducing homelessness. The primary reason for this was the availability of data, discussed in subsection B.2.1, for informing outcomes evaluations and an evaluation structure that made new outcomes data collection unfeasible. At the extreme, this resulted in CPL dropping a key research question and concluding instead that:

An estimation of the impact of prevention on inflows is vital to tackling homelessness in Los Angeles County. In order to estimate the impact of prevention on inflows, the County should consider options for future evaluations that could estimate the impact of prevention and its components on inflows (p. 81).

Similar statements can be made with respect to key outcomes in other areas reviewed here, and a better understanding of the impact of HI strategies could be achieved if more extensive and better-quality data were collected as part of each strategy's implementation, or if subsequent evaluations had more resources (principally time and/or funding) to collect outcomes data specifically for the evaluation. Evaluating the HI strategies is clearly important, and as the HI matures it will be critical to have more information about outcomes to complement the body of information about processes that this initial set of evaluations provides.

APPENDIX C

# Technical Appendix

## C.1  METHODOLOGY OF FLOW ANALYSIS

In this section, we elaborate the methodology developed in section 5 to estimate monthly and annual numbers of flows into and out of homelessness. We used HMIS data for clients, projects, enrollments, exits and services from 2016 to 2020. The data behind these calculations represent monthly arrays of homelessness indicators for everyone recorded in HMIS. If a person enrolled in a homeless program in a month, the value of the array is 1. It is 0 otherwise. Each person has one or more homelessness episodes over time and each episode has a start and end date. The episode may end in a month or may extend over several months. If there are multiple entries and exits in a month, all these incidents are aggregated and shown as a single episode in that month. Even though it has some limitations, this approach operationalized the data effectively to assess the flows of dynamics. The entries, exits, re-entries and re-exits can be easily identified and monthly homelessness metrics like entries and exits as well as the total number of homeless in a month can be accurately estimated.

Figure A-1 shows the examples of several types of homelessness episodes. In the figure, blue circles show entries to homelessness (HMIS enrollments), green circles show permanent placements in HMIS, blue crosses show exits to homeless destinations, blue lines show homelessness episodes and green lines reflect placement episodes.
In our analysis, we used three categories as demonstrated in the figure:

▸ *Previous carryover* refers to the group that were already homeless—receiving HMIS services in the end of year 1 and stay homeless in year 2. It is a continuous episode basically showing that a person is homeless at least in December of year 1 and January of year two. The entry is in Year 1 or earlier.

▸ *Re-entries* refers to the group, who were homeless—receiving HMIS services in the previous years and returned to homelessness (HMIS) in year 2. A re-entry may also happen in year 2 when a person enters and exits homelessness (HMIS) and then re-enters later in that year.
  — However, to avoid double-counting, in annual estimates we ignore this type of re-entry and only count the first entry.

▸ *New entries* refer to the group who become homeless—receiving HMIS services for the first time in year 2, which may be observed in different modes. The most typical is the case when a person enrolled in HMIS for the first time like in an outreach project. The second example is the case when a homeless person placed in RRH or PSH at the time of enrollment, which is shown as a single point of homelessness because he/she was homeless at the time of placement. The third case occurs when a placement episode ends with an exit to a homeless destination. The final case is similar, but the placement episode ends with an enrollment in a homeless program in HMIS.

**APPENDIX C**

**Figure C-1: Homelessness Episodes**



Since the HMIS data is subject to various data quality problems, we made several assumptions and modifications to enhance the data for more accurate results. The most critical of these assumptions and enhancements are listed below:

▶ All homelessness prevention enrollments are excluded from the analysis.

▶ Many HMIS enrollments do not have an exit date. They are open-ended enrollments. Our approach fixes some of them like those separate outreach enrollments over multiple months with no exit dates. The person is shown homeless over all those months since there is an enrollment every month. We also made the following enhancements:
   — If an exit date is missing, we used service episodes to determine an exit date when service data is available for a person.
   — Otherwise, we used average program lengths to impute exit dates for each project type.

▶ If the project is a RRH or PSH project, we assume that the person is homeless at the time of placement so that that month is shown as a homeless month for that individual.

▶ If a person exits to a homeless destination, we assume the person stays homeless next 30 days, extending the known homeless episode by one month.

▶ If the exit destination is unknown (undeclared, missing or other), we tracked the person in HMIS for six months forward. If there is no new enrollment that exits are assumed as exits to a non-homeless destination. Otherwise, the exits are to homeless destinations.

APPENDIX C

▸ If there is a gap of one-month non-homelessness between two months in homelessness—receiving HMIS services, we assumed that the person is also homeless in the middle month.

Finally, we use an additional homelessness category which we call persistently homeless. This group refers to those households who were homeless—receiving HMIS services six months or more during the previous 12 months. This definition is a proxy for chronic homelessness and intends to show homeless persons who stay homeless for longer periods of time. Many of these become chronically homeless after staying persistently homeless.

Monthly calculations are the sum of all homeless categories like entries or re-entries by month for all homeless persons in the data. Annual calculations are the unique count of individuals who are homeless at least once each year. Previous carryover group is only used for annual calculations since it is not relevant for monthly numbers. Quarterly numbers are aggregations of monthly numbers.

Our methodology is subject to some limitations. The most critical is our definition of homelessness. We are restricted to the HMIS data, excluding any homeless person who does not engage in a homeless program in HMIS. Some of these may be part of the PIT count and some may be out of the HMIS and PIT count altogether. These groups are unknown. However, the analysis is consistent over years for a very large section of the homeless population in Los Angeles county and shows their dynamics effectively.

Second, a large proportion of exits in HMIS are either unknown or we observe an exit with an unknown destination. This limitation leads to an unknown but significant undercount of homelessness in the data. As noted above, we enhanced the data to minimize this limitation, but this undercount still exists and needs to be assessed further.

Finally, our analysis does not capture the short stints of homelessness, which are less than one month. Multiple stints are aggregated in a month. However, our purpose is to examine long-term dynamics, so this has limited impact on our analysis.

## C.2  METHODOLOGY AND DATA OF THE OUTCOME EVALUATION

To control for pre-existing systematic differences, the most commonly used methodology is propensity score matching (PSM). The propensity scores are used to account for confounding by matching control subjects to treated subjects.[23] PSM creates an output data set that contains a sample that has been adjusted by matching so that the distributions of the pre-enrollment variables are balanced between the treated and control groups. The process is initiated by generating a propensity score for each observation in the data set using a logistic regression model that includes all relevant covariates contributing to a participant's engagement in the program in question. The model estimates the probability of a person being in the treatment group for all individuals in the treatment and non-treatment groups. The propensity score would then be the predicted probability of participating in the program. After propensity scores are generated, a control group is constructed by matching participants to non-participants based on the distance difference in the propensity score of the participants and the controls, applying a matching algorithm. After the selection of control groups using propensity score matching, the treatment and control groups are compared to test whether all covariates are balanced. The validity of a propensity score model depends on how well it balances the measured variables between experimental and control subjects. After adequate variable balance has been achieved, an outcome analysis is performed, applying statistical tests as in a randomized study.

In section 5, for each treatment group, using PSM, we built control groups using several covariates available from HMIS, including demographics and disabilities. In addition, prior health and mental health service rates were balanced to minimize the baseline differences in service patterns. Control group observations were selected whose propensity scores lie in the region of common support for the propensity scores for observations in the treated and control groups. We used the greedy nearest neighbor matching approach, which selects the control observation whose propensity score is closest to that of the particular treated unit, in a manner that is sequential and without replacement. It does so by using the logit of the propensity score as

---

[23]  Guo, S., & Fraser, M. W. (2015). *Propensity score analysis: Statistical methods and applications.* 2nd ed. Sage; Rosenbaum, P. R., & Rubin, D. B. (1983). The central role of the propensity score in observational studies for causal effects. *Biometrika* 70, 41—55; Stone, C. A., & Tang, Y. (2013). Comparing propensity score methods in balancing covariates and recovering impact in small sample educational program evaluations. *Practical Assessment, Research and Evaluation* 18(13); Stuart, E. A. (2020). Matching methods for causal inference: A review and a look forward. *Statistical Science* 25:1—21.

## APPENDIX C

the matching metric and compares the closeness of two units within .25 caliper width. Variable balance assessment was performed using standardized mean differences between treatment and control groups. We attained a good balance between two groups for all covariates and conducted the outcome evaluation for health and mental health outcomes.[24]

Homeless individuals in treatment groups were matched against DHS and DMH client databases to link outcomes to placements using multi-tier fuzzy matching algorithms. The match rates for each group are shown in Figure C-2. The rates were slightly higher for treatment groups and the highest for the DMH treatment group, showing that almost half of the homeless individuals had a DMH service record. As expected, the match rates were the highest for persons placed in PSH.

### Figure C-2. Match Rates of Study Samples against DHS and DMH Data



Sample Sizes:
RRH=3,590; PSH=2,530; IH=4,238

## C.3  STATISTICAL TESTS OF THE OUTCOME EVALUATION

Outcome evaluation was performed comparing pre and post treatment and control group average annual service durations for each service type, using two-grouped t-tests. In this evaluation, t-tests show whether the utilization of selected services types is different across treatment and control groups to assess whether different placement types affect the use of health and mental health services.

Treatment effect results for health outcomes are shown in Table C-1. The table shows the results of two-group t-tests. The tested measure is the difference in means of service days between pre and post measures. If the test results are statistically significant, we conclude that there is an outcome difference due to the treatment (placement type). If the result is not statistically significant (NS), then we do not have support to accept that there was a treatment effect.

---

[24]  For PSM procedures see SAS *SAS/STAT 15.1 User's Guide, The PSMATCH Procedure,* 2018.  Accessed at: https://support.sas.com/documentation/onlinedoc/stat/151/psmatch.pdf.

## TABLE OF CONTENTS

**Table C-1: Two Group T-Tests of Treatment Effect of DHS Outcomes for Three Placement Types**

| Group | Service Type | RRH Mean | Pr>\|t\| | PSH Mean | Pr>\|t\| | IH Mean | Pr>\|t\| |
|---|---|---|---|---|---|---|---|
| Treatment | Emergency | -0.21 | 1% | -11.92 | 1% | 0.7 | 5% |
| Control | Emergency | 0.92 | | 1.63 | | 0.25 | |
| Treatment | Inpatient | -1.6 | 1% | -0.6 | 1% | 3.34 | NS |
| Control | Inpatient | 11.76 | | 0.43 | | 1.72 | |
| Treatment | Outpatient | -0.4 | 1% | 0.13 | NS | 0.49 | NS |
| Control | Outpatient | 0.68 | | 0 | | 0.11 | |

▸ For RRH placements, the pre-post differences were significantly different between treatment and control groups at the 1% significance level for all three service types.

▸ For PSH placements, the pre-post differences were significantly different between treatment and control groups at the 1% significance level for emergency visits and inpatient stays. There was no statistically significant difference for outpatient visits.

▸ For IH placements, the pre-post differences were significantly different between treatment and control groups at the 5% significance level, only for emergency visits (average visit numbers increased for both). Mean differences for other two service types were not statistically significant.

Treatment effect results for mental health outcomes are shown in Table C-2. As in Table C-1, the table shows the difference in means of service days between pre and post measures. If the test results are statistically significant, we conclude that there is an outcome difference due to the treatment (placement type). If the result is not statistically significant (NS), then we do not have support to accept that there was a treatment effect.

**Table C-2: Two Group T-Tests of Treatment Effect of DMH Outcomes for Three Placement Types**

| Group | Service Type | RRH Mean | Pr>\|t\| | PSH Mean | Pr>\|t\| | IH Mean | Pr>\|t\| |
|---|---|---|---|---|---|---|---|
| Treatment | Acute Inpatient | -11.38 | 5% | -16.88 | 5% | -3.55 | NS |
| Control | Acute Inpatient | 13.97 | | 9.45 | | -5.63 | |
| Treatment | Crisis Stab. | -0.55 | 1% | -0.45 | 1% | 0.73 | 1% |
| Control | Crisis Stab. | 1.17 | | 0.81 | | 0.2 | |
| Treatment | Outpatient | -1.61 | 1% | 0.29 | 5% | 5.31 | NS |
| Control | Outpatient | 3.92 | | -2 | | 4.68 | |

▸ For RRH placements, the pre-post differences were significantly different between treatment and control groups at the 1% significance level for crisis stabilization care and outpatient visits and at the 5% significance level for acute care inpatient stays.

▸ For PSH placements, the pre-post differences were significantly different between treatment and control groups at the 5% significance level for acute care inpatient stays and outpatient visits and at the 1% significance level for crisis stabilization care.

▸ For IH placements, the pre-post differences were significantly different between treatment and control groups only for crisis stabilization care, at the 1% significance level. Mean differences for the other two service types were not statistically significant.

**PUBLIC SECTOR ANALYTICS**

ATTACHMENT II

**Figure 1**
LOS ANGELES COUNTY
PERMANENT AND INTERIM HOUSING PLACEMENTS, SYSTEMWIDE
FY 2016-17 through FY 2019-20

Four-Year Cumulative
Permanent Housing Placements:
**72,815**



Four-Year Cumulative
Interim  Housing Placements:
**85,734**



Figure 2
ANNUAL HI PERMANENT HOUSING PLACEMENTS

Figure 3
CUMULATIVE SYSTEMWIDE
PERMANENT HOUSING PLACEMENT
Over Three Years of Measure H



Figure 4
ANNUAL  INTERIM HOUSING PLACEMENTS



Figure 5
CUMULATIVE SYSTEMWIDE
INTERIM HOUSING PLACEMENTS
Over Three Years of Measure H



Exhibit E

# HOMELESS WORKERS

## A Labor Market Analysis

**August 1997**

**ECONOMIC ROUNDTABLE**
*A Nonprofit, Public Policy Research Organization*

# HOMELESS WORKERS
## A Labor Market Analysis

*August 1997*

*prepared for the*
*LOS ANGELES HOMELESS SERVICES AUTHORITY*

Daniel Flaming, Ph.D.
Mark Drayse, Ph.D.

*project contributors:*
*Valdorsey Aaron - surveyor*
*Kaerensa Craft - survey data base*
*Mark Hall - surveyor*
*Theodore Hammond - data entry*
*William Johnson - counselor*
*Robin Law, Ph.D. - project design*
*Mike Reibel, Ph.D. - PUMS data extraction*
*California Employment Development Department*
*Labor Market Information Division*

*Economic Roundtable* • *A Non-Profit Public Strategy Research Organization*
*315 West Ninth Street, Suite 1209, Los Angeles, California 90015* • *(213) 892-8104*

# TABLE OF CONTENTS

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Approach to Using Census Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


HOMELESS PERSONS AND THE LABOR MARKET . . . . . . . . . . . . . . . . . . . 13

Profile of Homeless Workers in the 1990 Census . . . . . . . . . . . . . . . . . . . . 13
    Poverty, mobility, and marital status . . . . . . . . . . . . . . . . . . . . . . . 13
    Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Occupation and industry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Detachment from the labor market: characteristics of
        recent workers and long-term unemployed . . . . . . . . . . . . . . . 24
    Job characteristics of homeless persons who worked in 1989 . . . . . . . 29
Labor Market Disconnection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Job Availability and Turnover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39


HOMELESS JOB SEEKERS IN DOWNTOWN LOS ANGELES . . . . . . . . . . . . . 45

Profile of Homeless Job Seekers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
Long-Term Employment Outcomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Findings from Surveys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54


LIFE STORIES OF HOMELESS JOB SEEKERS . . . . . . . . . . . . . . . . . . . . . 63

Personal Sketches of Job Club Members . . . . . . . . . . . . . . . . . . . . . . . . 63
Carey's Personal Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68


CONCLUSIONS AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . 87
Tier I: Local Day-Labor Markets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
Tier II: Rehabilitation Resources for Strongly Motivated Individuals . . . . . . . . 89

Appendix A:        Filtering 1990 PUMS Data to Identify Homeless Cases . . . . 91
Appendix B:        Advice from Homeless Persons . . . . . . . . . . . . . . . . . . 95

# LIST OF GRAPHS

1    16 to 64 Years with Work History . . . . . . . . . . . . . . . . . . . . . . . . . . 14
2    Age Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
3    Ethnic Composition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
4    Educational Attainment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
5    Educational Attainment by Gender . . . . . . . . . . . . . . . . . . . . . . . . . 19
6    Educational Attainment by Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . 20
7    Occupation of Homeless Workers . . . . . . . . . . . . . . . . . . . . . . . . . 22
8    Industry of Homeless Workers . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
9    Characteristics of Recent Homeless Workers . . . . . . . . . . . . . . . . . . 25
10   Industry and Occupation of Recent Homeless Workers . . . . . . . . . . . 26
11   Characteristics of Long-Term Unemployed . . . . . . . . . . . . . . . . . . . 27
12   Industry and Occupation of Long-Term Unemployed . . . . . . . . . . . . . 28
13   Average Hourly Earnings in 1989 . . . . . . . . . . . . . . . . . . . . . . . . . 30
14   Usual Hours Worked per Week . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
15   Weeks Worked in 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
16   Total Hours Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
17   Wage and Salary Income in 1989 . . . . . . . . . . . . . . . . . . . . . . . . . 34
18   Number of Hours Worked per Week by Occupation . . . . . . . . . . . . . . 36
19   Number of Hours Worked per Week in 1989 and 1990 . . . . . . . . . . . 37
20   Change in Hours Worked by Homeless . . . . . . . . . . . . . . . . . . . . . . 38
21   LA County Openings in Low-Skill Jobs . . . . . . . . . . . . . . . . . . . . . . 41
22   LA County Job Openings Created by Turnover . . . . . . . . . . . . . . . . . 42
23   LA County Openings in Largest Specific Occupations . . . . . . . . . . . . 43
24   Employment History: Longest Job . . . . . . . . . . . . . . . . . . . . . . . . . 49
25   1993 Earnings of Downtown Homeless Job Seekers . . . . . . . . . . . . . 52
26   Annual Earnings by Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
27   Things Most Important to the Homeless if Choosing
          Between Street and Shelter . . . . . . . . . . . . . . . . . . . . . . . . 56
28   Most Important Things by Gender/Rehabilitation Experience . . . . . . . . 57
29   Most Important Things by Gender and Age . . . . . . . . . . . . . . . . . . . 58
30   Why People Return to Skid Row After Completing
          Rehabilitation Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
31   Why Programs Don't Succeed by Gender and Age . . . . . . . . . . . . . . 61

# *HOMELESS WORKERS*

## **EXECUTIVE SUMMARY**

For most working age homeless people, steady employment is the only feasible avenue to economic independence and a better life. In addition to enabling economic self-sufficiency, work constitutes the single most important link most individuals have with society, offering a foundation for reconnection with the larger community. Looking at homeless individuals in terms of their educational and employment backgrounds and capabilities for work, as well as identifying barriers to their reemployment, gives us a vantage point on the often bleak and intractable phenomenon of homelessness that is both hopeful and pragmatic.

In the absence of data that reliably enumerates Los Angeles County's homeless population, this report analyzes data from the four sources listed below to provide a partial, but we believe useful, profile of Los Angeles County's homeless workers and their labor market connections.

1. The Census Bureau's 1990 five-percent Public Use Microdata Sample (PUMS).

2. Case records and Unemployment Insurance wage and claims data obtained by the Economic Roundtable for 1,256 homeless job seekers served by downtown Los Angeles employment programs in 1991 and 1992.

3. An Economic Roundtable survey conducted in 1995 of 139 homeless individuals living on the streets of downtown Los Angeles.

4. Life stories of homeless individuals.

The principal data resource for this analysis was the Census Bureau's 1990 PUMS data set, which was used as a roughly representative sampling of homeless people.

## *Homeless Workers and the Labor Market*

Defining characteristics that distinguish homeless workers 16 to 64 years of age from the general county population in the same age range with work histories are that they are extremely poor, more mobile, and much less likely to be married. In the year prior to the census survey, 54

## 2   HOMELESS WORKERS

percent of homeless workers had incomes below 26 percent of the poverty level (i.e., less than
$1,613), compared to 4 percent of all working age individuals in the county with work histories.

Homeless workers were significantly younger than the Los Angeles County population, much
more likely to be African-American, and less likely to be latino, white, or Asian. A majority
of homeless workers had obtained a high school degree, and a significant number had some
college experience or a college degree. One in three homeless persons with a work history had
been employed in service or laborer occupations. Just over half of homeless workers had been
employed in professional services, retail, and construction industries.

Seventy-six percent of homeless workers were employed in 1989 or 1990, or both years. The
remaining 24 percent of homeless workers can be considered "long term unemployed". Recent
workers were more likely to be latino, and less likely to be white, significantly younger, and
better educated than the long-term unemployed. Homeless persons who worked in 1989 were
employed for the most part in low wage jobs. The average hourly earnings of homeless workers
in 1989 was $6.19, which is equivalent to an annual income of under $12,400. While most
homeless workers worked close to 40 hours per week in 1989, they worked an average of only
24 weeks. Thus, like many of the "working poor", homeless persons were more likely to have
worked full-time than part-time hours, but in high turnover, low-wage jobs.


### Labor Market Disconnection

The pervasive reality of homeless workers is that they are losing, or have lost, connection with
regular employment and opportunities to earn a livable income. The ratio of homeless workers
moving in a positive direction to workers moving in a negative direction at the time of the
census survey was roughly one to three; 22 percent were maintaining or increasing their labor
market connection while 78 percent were moving away from the labor market or had no labor
market connection at the time of the census survey.

If the total number of homeless individuals of working age are added to these figures, 31 percent
of whom have never worked, it can be estimated that at a given point in time, roughly 15
percent of homeless individuals of working age are maintaining or strengthening a work force
connection. Similarly, looking at the total population of working age homeless individuals,
including those with no work history, it can be estimated that 35 percent are moving away from
the labor market, working declining numbers of hours or having lost all work in the past year,
and 50 percent are in a state of stagnant unemployment, having never worked at all or
experiencing long-term joblessness. These ratios represent what is occurring at a given point
in time rather than the total balance of negative and positive outcomes among people who
experience homelessness at some time during the year.

## Job Availability and Turnover

There is evidence that a high percent of job openings in low-skill occupations in Los Angeles County are created by job turnover, suggesting that labor market disconnection among homeless workers is an interactive result of both job instability and instability in individual lives.  A frequently held image of the employment process is that individuals find jobs, successfully adjust to work requirements and become stably employed.  This image is contradicted by Employment Development Department data showing that 66 percent of the county's job openings in low skill occupations (jobs requiring less than one year of training) are the result of workers becoming separated from their jobs, or job turnover, rather than job growth.  The fact that two-thirds of low-skill job openings result from turnover means that employment in this sector of the labor market is not a matter of finding and keeping a job, but rather a matter of finding a succession of jobs.  Workers who are socially isolated and lack a family or social network to assist them in finding reemployment are at a disadvantage.

The annual number of openings projected through 1999 by the Employment Development in low-skill occupations, both from turnover and industry growth, is 72,948; 48,374 from turnover and 24,614 new jobs from industry growth.  The number of new jobs is sparse compared to the large number of unemployed and discouraged workers already in the county workforce and the large number of welfare recipients who will be seeking jobs as a result of welfare reform.

## Homeless Job Seekers in Downtown Los Angeles

An analysis of agency records for 1,256 homeless job seekers in downtown Los Angeles who participated in employment programs found that most individuals had previously demonstrated their ability to be contributing members of the economy.  Three-quarters (77 percent) had held jobs that lasted longer than one year, over half (54 percent) had held jobs that lasted longer than two years, and nearly one-third (30 percent) had held jobs lasting longer than five years.

Employment services provided for nearly all homeless job seekers consisted of rudimentary assistance in looking for a job rather than skill development or supportive services.  An ironic feature of job training programs is that more expensive service modalities such as long-term skill development and supportive services are more likely to go to low-risk clients who have a higher probability of producing positive outcomes for service providers and funders.  Those with the highest levels of need and risk, such as homeless job seekers, frequently receive short-term and comparatively superficial forms of employment assistance.

Only half of the job seekers (52 percent) received some form of public benefits to support themselves.  Even though homeless job seekers have critical needs for assistance in stabilizing

their lives and becoming reconnected with the mainstream of society, half (48 percent) had no visible means of support other than short-term assistance from homeless service providers.

## Long-Term Employment Outcomes

Information about long-term employment outcomes of homeless job seekers was obtained by linking Social Security numbers of clients served by downtown agencies with records from the State Unemployment Insurance data base maintained by the Employment Development Department to obtain information on employment and earnings of these clients one to two years after they had participated in an employment program.

Information about long-term employment outcomes for homeless job seekers is sobering. Once homeless, lasting employment is persistently elusive. Fifty-nine percent earned nothing and 70% earned less than $1,000 in annual income following their participation in an employment program and search for a new job. Less than 9 percent had annual earnings of $10,000 or more, which would reflect full-time employment at minimum wage. Factors that by themselves do not appear to have a significant impact on employment outcomes include age, gender, ethnicity, and duration of previous jobs. Factors that do appear related to differences in earnings include: education, occupation, and industry. The most significant of these factors is education, which opens doors to better paying jobs and industries with higher quality employment opportunities.

## Surveys of People Living on the Streets

Face-to-face interviews with 69 people living in the Crocker Street encampment conducted in 1995 found: (1) pervasive drug use in the encampment, (2) high levels of concern about personal safety, (3) strong interest in jobs — 84 percent said they would take a job that paid five dollars an hour to sweep streets — and (4) that drug rehabilitation services were available to them. These responses led to the question of why people who were concerned about their safety and wanted jobs were not utilizing available rehabilitation programs in the downtown area.

In a follow-on survey homeless individuals identified the five factors that are most important when choosing between staying on the street and trying to enter a residential program: (1) protecting their sense of dignity, (2) personal safety, (3) being with friends, (4) having the freedom to do what they want, and (5) finding ways to make money.

The five problems homeless individuals identify as being most important when asked why people go through programs for helping them get off the streets, but still return to Skid Row are, in

rank order: (1) there is no money or place to go after people complete programs, (2) people are dropped if they relapse, (3) it is hard to get into residential drug rehabilitation programs, (4) programs don't last long enough, (5) and programs don't offer all the needed services.

Respondents indicated that programs need to last much longer than the typical sixty to ninety days to really help people get off the streets. Fourteen to fifteen months was the average program duration identified as being needed to provide adequate support for building a new life. In addition, nearly four out of five respondents said programs should be located outside the downtown area.

## Life Stories of Homeless Individuals

A "job club" was organized to gain a clearer understanding of life experiences, individual perceptions, and actual successes and failures of homeless job seekers, as well as provide long-term help to participants. Today, of the seven most regular members of the club, three have jobs and two others found jobs but lost them. Some of the common themes that emerge from their life stories include:

1.  By the time they were young adults six of the seven individuals had made significant progress toward holding down jobs and becoming economically self sufficient, the driving force being the energy and optimism of youth. But liabilities carried forward from childhood overtook and derailed this progress.

2.  Six of the seven experienced long-term addiction and the seventh short-term addiction, all to crack cocaine.

3.  All seven have been socially isolated for most of their lives and have not had the support of normal social networks in attempting to solve problems of addiction and employment.

4.  Six of the seven have entered drug rehabilitation programs, experiencing multiple relapses, and four of them eventual success; the seventh has not entered a program.

5.  Six of the seven have employment histories, five of the seven have skills that qualify them for more than one occupation.

6.  There were infrequent windows of opportunity when individuals were ready to make a serious commitment to recover from addiction and find a job. These intervals of high motivation followed bottoming-out experiences such as incarceration. There were very few support systems to help individuals hold onto the clear thinking they did inside jail when they re-entered the daunting and lonely world outside jail gates. Similarly, it was

difficult for individuals to gain admission to a residential drug rehabilitation programs within the window of motivational opportunity if the bottoming-out occurred while they were on the streets.

## Conclusions and Recommendations

Many people who are homeless want to have jobs and have the ability to work productively. A smaller number not only want work but have summoned sufficient hope and commitment to make a serious effort at rebuilding their lives and gaining stable housing, employment and personal relationships. The operational implications of this two-tier perspective are that basic opportunities to work and earn survival resources should be available to all homeless individuals, and in-depth support for recovery and for long-term employment should be available if and when individuals are ready for a fundamental commitment to making a new start in their life.

Tier I is local day-labor markets. More than four out of five men and women living on downtown streets said they would accept jobs at minimum wages cleaning up streets. The social costs of failing to provide opportunities for gainful employment, and thereby the dignity of demonstrating one's worth, are high. Research conducted by California's Department of Alcohol and Drug Programs found that the average drug and alcohol abuser costs society over $32,000 a year. Basic decency as well as an intelligent understanding of our collective self interests leads us to provide jobs for people who are willing to work. We recommend that local day-labor markets be organized under public auspices to provide jobs for anyone willing to show up at an early hour and meet prevailing employment standards for sobriety and conscientious work efforts. If no private employers need their services, individuals should be entitled to public employment cleaning streets, parks, public buildings, or other useful community services.

Based on the value of minimum-wage earnings, individuals should have the opportunity to work for four or five hours per day, which would entitle them to vouchers for a night's lodging in a single room occupancy hotel or shelter that provides reasonable privacy and security for possessions, three meals, and a small amount of cash (perhaps $2.50 per day). Individuals who show up for jobs five days a week and work acceptably should be entitled to lodging in a room offering privacy and security for their belongings, and three meals a day, for a week. By paying primarily in vouchers rather than cash the demand for these jobs will largely be limited to the homeless and taxpayers will be reassured they are not paying for drugs or alcohol. Individuals who show themselves to be exceptionally good workers should be rewarded by opportunities for better jobs, more hours of work, training, or improved pay. This will enable some individuals, particularly those who are first-time homeless and cyclical homeless, to find a near-term exit from homelessness. Similarly, individuals with significant rehabilitation needs who demonstrate strong motivation should become candidates for Tier II assistance.

We recommend starting with one pilot day-labor market in downtown Los Angeles. This area has the region's largest concentration of homeless individuals as well as businesses that can use short-term workers, and public sector entities that can supervise individuals in doing work that benefits the public. After the program has been tested and refined, and is operating successfully it should be replicated in other urban nodes throughout the county where there are concentrations of homeless individuals. Public costs will include modest expenses for operating the day-labor markets, and costs not covered by private employers for voucher redemption payments to service providers for shelter and meals, and small cash payments to homeless workers.

Potential public revenue sources to pay for day-labor markets as well as Tier II programs include job training grants, state and federal demonstration grants, public works budgets, grants administered by the Los Angeles Homeless Services Authority, community redevelopment tax increment funds, city and county general funds, and (as a last resort) reallocation of a portion of the money currently going into General Relief.

Tier II is comprehensive rehabilitation and employment services for strongly motivated individuals. Most beds in homeless shelters and sleeping spots on streets are occupied by people whose passage into homelessness and subsequent rootlessness and placelessness has lasted longer than a year. Their journey into homelessness has taken time, and similarly the journey out and the process of extricating themselves from the damage done by homelessness takes time. In order to effectively help chronically homeless individuals, programs must offer adequate resources and duration of service to rebuild lasting, stable ties to the larger community. In addition, programs must become adept at recognizing, and acting within, that narrow window of motivational opportunity when individuals are strongly and purposefully determined to rebuild their lives. The central challenge in overcoming homelessness is reconnection of the individual with the larger community. This ultimately manifests itself through success in creating viable, lasting connections around work, housing and social relationships.

Homeless programs can lay the foundation for reconnection with society by respecting and engaging clients as individuals, listening to what they have learned through previous failures and how they recommend programs should be designed. Essential program ingredients for helping chronically homeless people become stabilized and productively employed include:

1.    Comprehensive, timely support when there is a window of strong commitment to making a serious effort at building a new life.

2.    Integrated services offering shelter, food, legal help, drug treatment, income maintenance, health services, personal counseling, development of affirming personal relationships, skill development (where necessary), and job placement.

## 8   HOMELESS WORKERS

3.    Effective employment, training and job placement services that:

- competently assess and respond to client needs and abilities

- develop individualized transition-to-work plans for each client

- channel clients' skills, interests and aptitudes into demand-occupations

- provide training and supportive services tailored to individual client needs

- combine classroom and on-the-job training

- ensure that clients have the skills and competencies employers require

- place workers with employers who offer stable employment

- provide ongoing post-placement support and counseling

4.    Innovative job creation strategies including public service, entrepreneurial programs and worker-owned cooperatives that make stable employment possible despite severe job shortages in the region and high turnover rates in low-skill jobs.

5.    Sustained help in the form of nine to twelve months of residential enrollment as well as case management strategies that set high standards for individuals yet maintain connections with them even if they relapse.

6.    Service delivery environments that replicate the strengths of healthy families, foster honest communication, respect the dignity of each individual and provide spiritual resources for building a new life.

# *HOMELESS WORKERS*

## Chapter 1

## OVERVIEW

For most working age homeless people, steady employment is the only feasible avenue to
economic independence and a better life. In addition to enabling economic self-sufficiency,
work constitutes the single most important link most individuals have with society, offering a
foundation for reconnection with the larger community. This report examines work histories and
capabilities of homeless individuals in Los Angeles County and offers recommendations for
making employment programs more effective in improving the difficult lives of homeless job
seekers and reducing the cost of their social dependency.

We may not recognize the stereotypical unkempt, dispirited and alienated homeless person as
a fellow worker, but most do have occupations, have held jobs, are at least high school
graduates, and do have many potentially productive years ahead of them. Looking at homeless
individuals in terms of their educational and employment backgrounds and capabilities for work,
as well as identifying barriers to their reemployment, gives us a vantage point on the often bleak
and intractable phenomenon of homelessness that is both hopeful and pragmatic.

In the absence of data that reliably enumerates Los Angeles County's homeless population, this
report analyzes data from the four sources listed below to provide a partial, but we believe
useful, profile of Los Angeles County's homeless workers and their labor market connections.

1.    The Census Bureau's 1990 five-percent Public Use Microdata Sample (PUMS).

2.    Case records and Unemployment Insurance wage and claims data obtained by the
      Economic Roundtable for 1,256 homeless job seekers served by downtown Los Angeles
      employment programs in 1991 and 1992.

3.    An Economic Roundtable survey conducted in 1995 of 139 homeless individuals living
      on the streets of downtown Los Angeles.

4.    Life stories of homeless individuals.

The principal data resource for this analysis was the Census Bureau's 1990 PUMS data set,
which was used as a roughly representative sampling of homeless people.

Case 2:20-cv-02291-DOC-KES  Document 276  Filed 04/20/21  Page 289 of 377  Page ID
#:7148

## APPROACH TO USING CENSUS DATA

The 1990 census significantly under-counted Los Angeles County's homeless population and was biased toward counting and interviewing homeless in known locations (e.g., shelters), as opposed to people sleeping on streets, under bridges, or in parked cars. The impact of this bias may be mitigated by the fact that most homeless people are highly mobile, with many individuals moving from the streets to shelters, and back to sleeping on the streets again. It is plausible that the sample captured by the census is roughly representative of the county's homeless population at the time of the census. Despite its limitations, this is the best data sample of which we are aware for describing the county's homeless. The core problem in using census data to describe homeless individuals is not the quality of data, rather it is the quantity of data. The PUMS data set is a particularly rich source of labor market information, and in the absence of other findings invalidating the value for PUMS for providing an approximate sampling of the county's homeless population we believe it provides valuable insights into employment histories and patterns of labor market disconnection among homeless individuals.

The PUMS data has a category which contains records of homeless (and other) people — "Noninstitutional Group Quarters". This data has two valuable characteristics: First, it provides complete records of individual respondents, containing all of the information obtained from the census long-form questionnaire. This makes it possible to identify multiple inter-related characteristics that typify homeless individuals. And, second, records of homeless individuals are part of a larger data set that covers the entire population of Los Angeles County, making it possible to analyze homeless workers within the context of the region's total workforce.

PUMS data also has at least two weaknesses that must be taken into account in using it to describe the homeless. First, the category of Noninstitutional Group Quarters contains nonhomeless individuals who must be filtered out, including students in dormitories, military personnel in barracks, and people in religious group quarters. And second, the category of Noninstitutional Group Quarters does not show family relationships among individuals. A careful filtering process (described in Appendix A) leaves a residual of 1,076 records representing a population of 21,992 individuals who can reasonably be presumed to be homeless.

There is reason to believe that this sample is approximately representative of Los Angeles County residents who were homeless at the time of the census survey in 1990, but it is important to note that there has not been an attempt to make it representative of the total population of people in the county who have been homeless at some point in their lives. The total population of people who have been homeless can be seen as having three subgroups: (1) people who had a one-time experience of homelessness because of aberrations in their circumstances that they were able to overcome; (2) people who are marginally housed and have periodic episodes of homelessness, perhaps associated with cycles of substance abuse or personal difficulty; and (3) people who are chronically homeless.

Given that the chronically homeless will occupy shelter beds or places on the sidewalk 365 days a year for many years, while the cyclically homeless may occupy those spots 60 to 90 days of the year, and the one-time homeless may occupy them for just 30 days, it is inevitable that the percent of "bed days" accounted for by the chronically homeless is higher than the percent they represent of the total population of people who have been homeless.  By attempting to survey all of the people who are homeless at a single point in time the census sample unavoidably includes a percent of the chronically homeless that is larger than their share of the total population of people who have been homeless.  The total population of homeless will have more people with sufficient strengths, skills and resources to escape homelessness than is reflected by the PUMS data.  The value of the PUMS data is for describing the homeless population needing help on any given day, which is weighted toward the chronically homeless.[1]

---

[1]Dennis P. Culhane and Randall Kuhn, "Patterns and Determinants of Shelter Utilization Among Single Adults in New York and Philadelphia: A Longitudinal Analysis of Homelessness," 1995, Annual Meeting of Eastern Sociological Association, Philadelphia, PA.  The authors identify three cohorts of homeless shelter users: (1) recent homeless who stay in shelters for fewer than 45 days within a two-year period, this group accounted for one-half of adult shelter users; (2) repeat homeless who were admitted to shelters four or more times in a two year period; and (3) long-term homeless who stayed in shelters 365 or more days in a two year period.  Findings indicate that one-half of men and one-third of women experienced readmission to shelters within two years of first admission.  The authors contrast this longitudinal analysis of the homeless population with "point-prevalence" analyses that look at the homeless population at a single point in time.  Their findings suggest that the total number of people who were homeless in a year was three times higher than the number counted at a single point in time.  Our thanks to Michael Neely, director of Homeless Outreach Program, for introducing us to this study.

Chapter 2

# Homeless Workers and the Labor Market

The PUMS homeless records include 827 cases, representing 17,578 individuals, who were between 16 and 64 years old.  Of these potential workers, 543 cases, representing 12,168 individuals, have work histories. These records showing work histories represent 69 percent of individuals of working age.  PUMS records include an additional 13 cases over 64 years of age with work histories.  The information that follows is drawn from this sample of 556 records representing 12,663 homeless individuals who have been part of the work force.

## PROFILE OF HOMELESS WORKERS

*1.    Poverty, Mobility and Marital Status (Graph 1)*

> *Defining characteristics that distinguish homeless workers 16 to 64 years of age from the general county population in the same age range with work histories are that they are extremely poor, more mobile, and much less likely to be married.*

- In the year prior to the census survey, 54 percent of homeless workers had incomes below 26 percent of the poverty level (i.e., less than $1,613), compared to 4 percent of all working age individuals in the county with work histories.  There is a very high probability that the percent of homeless workers in acute poverty was even higher in 1990 because labor force participation for these workers declined from 1989 to 1990.

- In the year prior to the census survey, 88 percent of all working age individuals in the county with work histories had incomes over the poverty level ($6,451 for a single person under 65), compared to 18 percent of homeless workers.  The most distinctive characteristic of homeless workers is extreme poverty.

- Homeless workers were significantly more likely to have moved in the past five years than the overall county work force (86 percent versus 55 percent).

- Most homeless workers lack connection with a nuclear family.  Sixty-one percent had never been married, another 23 percent were divorced or separated, and only 17 percent were married or widowed, compared to 55 percent of the total county work force.

**GRAPH 1**

# 16 TO 64 YEARS WITH WORK HISTORY-1990

## Homeless Vrs. All L.A. County Workers



2.     *Age (Graph 2)*

> *Homeless workers were significantly younger than the Los Angeles County population.*

- Fifty-six percent of homeless workers were under the age of 35, compared to 47 percent of persons in Los Angeles County who were at least 15 years of age.

- Only 19 percent of homeless workers were 45 years of age or older, compared to 35 percent of persons on Los Angeles County.

- The probable explanation for the younger age of the homeless is that the two major age-based entitlement programs, Supplemental Security Income (SSI) and Social Security, eliminate poverty (and thereby homelessness) among older workers.  It would clearly be in the public interest to achieve this outcome at an earlier age through employment and economic self-sufficiency rather than at a later age with significant reliance on taxpayer-funded SSI benefits.

3.     *Ethnicity (Graph 3)*

> *Homeless workers were much more likely to be African-American than the Los Angeles County population, and less likely to be latino, white, or Asian.*

- Thirty percent of homeless workers were African-American, compared to 11 percent of persons in Los Angeles County.

- Twenty-eight percent of homeless workers were latino, compared to 37 percent of persons in Los Angeles County.

- Thirty-five percent of homeless workers were white (non-latino), compared to 41 percent of persons in Los Angeles County.

- Five percent of homeless persons were Asian, compared to 10 percent of persons in Los Angeles County.

4.     *Education (Graphs 4-6)*

> *A majority of homeless workers had obtained a high school degree, and a significant number had some college experience or a college degree.*

- Sixty-one percent of homeless workers had obtained high school degrees, compared to 70 percent of persons in Los Angeles County who were at least 25 years of age.

**GRAPH 2**

# AGE COMPOSITION
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 3**

# ETHNIC COMPOSITION
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 4**

# EDUCATIONAL ATTAINMENT
## Homeless Workers in LA County



Homeless Workers        LA County (25 years and older)

Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 5**

# EDUCATIONAL ATTAINMENT BY GENDER
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 6**

# EDUCATIONAL ATTAINMENT BY ETHNICITY
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

- Twelve percent of homeless workers had obtained college degrees, compared to 30 percent of persons in Los Angeles County at least 25 years of age.

- Homeless female workers were more likely to have obtained high school and college degrees than homeless male workers. Seventy-one percent of women had obtained a high school degree compared to 58 percent of men. Eighteen percent of women had obtained a college degree compared to 9 percent of men.

- Whites were more likely to have obtained a college degree than blacks or latinos. Seventeen percent of whites had obtained a college degree, compared to 7 percent of latinos and 6 percent of blacks.

- Sixty-nine percent of both whites and blacks had obtained high school degrees, compared to only 38 percent of latinos.

## 5.    *Occupation and Industry (Graphs 7-8)*

*One in three homeless persons with a work history had been employed as service workers or laborers.  Just over half of homeless workers had been employed in professional services, retail, and construction industries.*

- Service occupations were the most common occupations of homeless workers, including cleaning and janitorial work, food service, and security guards. Twenty-two percent of homeless persons had been employed in service occupations, compared to 12 percent of the Los Angeles County workforce.

- Homeless workers were also highly concentrated in laboring occupations. Twelve percent of homeless workers had been laborers, compared to 4 percent of the Los Angeles County workforce.

- Homeless workers were somewhat more likely to have been employed in precision production, craft, and repair occupations than the Los Angeles County workforce.

- Homeless workers were much less likely to have been employed in administrative support, professional, and administrative and managerial occupations, and somewhat less likely to have been employed in operator and assembly occupations, than the Los Angeles County workforce.

- The professional services, retail, and construction industries employed the most homeless workers. Twenty-three percent of homeless workers had been employed in professional services industry, compared to 21 percent of the county workforce. Eighteen percent of

**GRAPH 7**

# OCCUPATION OF HOMELESS WORKERS
## Los Angeles County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 8**

# INDUSTRY OF HOMELESS WORKERS
## Los Angeles County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

24    HOMELESS WORKERS

homeless workers had been employed in the retail industry, compared to 15 percent of the county workforce.  Twelve percent of homeless persons had been employed in the construction industry, compared to 6 percent of the county workforce.

- Homeless workers were more likely to have been employed in business and repair services industries than the county workforce.  They were less likely to have been employed in manufacturing or finance, insurance, and real estate industries than the county workforce.

## 6.    Detachment from the Labor Market: Characteristics of Recent Workers and Long-Term Unemployed (Graphs 9-12)

*Seventy-six percent of homeless workers were employed in 1989 or 1990, or both years. The remaining 24 percent of homeless workers can be considered "long term unemployed".  There were significant differences between these groups of workers, with respect to ethnicity, age, marital status, education, industry, and occupation.*

- Recent workers were more likely to be latino, and less likely to be white, than the long-term unemployed. Of recent workers, 32 percent were latino, 32 percent were white, and 29 percent were black.  Of long-term unemployed, 43 percent were white, 35 percent were black, and 13 percent were latino.

- Recent workers were significantly younger than the long-term unemployed.  Sixty percent of recent workers were under 35 years of age, compared to 45 percent of long-term unemployed.  Sixteen percent of recent workers were 45 years of age or older, compared to 31 percent of long-term unemployed.

- Recent workers were more likely to be married than long-term unemployed.  Seventeen percent of recent workers were married, compared to 3 percent of long-term unemployed.

- Recent workers were better educated than long-term unemployed.  Sixty-four percent of recent workers held a high school degree, compared to 52 percent of long-term unemployed.  Twelve percent of recent workers had a college degree, compared to 9 percent of long-term unemployed.

- Recent workers were more likely to have been employed in laborer, sales, administrative support, and machine operator and fabricator occupations than long-term unemployed.

- Long-term unemployed were more likely to have been employed in service, transportation and material moving occupations than recent workers.

**GRAPH 9**

# CHARACTERISTICS OF HOMELESS WORKERS
## Recent Workers



**GRAPH 10**

# INDUSTRY AND OCCUPATION
## Recent Workers



**GRAPH 11**

# CHARACTERISTICS OF HOMELESS WORKERS
## Long-Term Unemployed



**GRAPH 12**

# INDUSTRY AND OCCUPATION
## Long-Term Unemployed



7.    *Job Characteristics of Homeless Persons who Worked in 1989 (Graphs 13-17)*

*Homeless persons who worked in 1989 were employed for the most part in low wage jobs.
The average hourly earnings of homeless workers in 1989 was $6.19, which is equivalent
to an annual income of under $12,400.  While most homeless workers worked close to
40 hours per week in 1989, they worked an average of only 24 weeks.  Thus, like many
of the "working poor", homeless persons were more likely to have worked full-time than
part-time hours, but in high turnover, low-wage jobs.*

- The average wage and salary annual income of homeless persons who worked in 1989
  was $5,041.  The average hourly income of homeless persons who worked in 1989 was
  $6.19.

- Average hourly earnings of white workers were $7.00, compared to $5.99 for latinos and
  $5.37 for blacks.  Males earned $6.30, and females earned $5.89 per hour.

- Persons who worked in precision production, craft, repair, and machine operator and
  fabricator occupations had average hourly earnings of $8.36 and $7.94 respectively.
  Persons who worked in administrative support, managerial, laborer, or sales occupations
  earned close to $5.00 per hour.  The highest hourly earnings were obtained by persons
  working in construction, business and repair services, transportation, communications,
  and utilities, and manufacturing industries.  The lowest wages were earned by persons
  in professional services and retail industries.

- There was no direct relation between education and average hourly earnings.  Homeless
  persons with a college degree and those without a high school degree received the highest
  earnings in 1989.  Although homeless persons with high school or college degrees stand
  a better chance of finding stable employment than those without at least a high school
  degree, as shown later in the discussion of post-program earnings of job seekers, many
  persons with degrees are currently homeless or at risk of becoming homeless.

- Age and earnings were not correlated.  Persons in the 35-54 age group — the prime
  wage-earning years — earned less than those in the 16-34 and 55 and older age groups.

- If we consider 2,000 annual hours to equal a full-time, full-year work schedule, homeless
  persons were employed an average of only 46 percent of a full schedule in 1989.  This
  is explained primarily by the low number of weeks worked.  Homeless persons worked
  an average of 37 hours per week in 1989, but worked an average of only 24 weeks.

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

**GRAPH 13**

# AVERAGE HOURLY EARNINGS IN 1989
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 14**

# USUAL HOURS WORKED PER WEEK
## Homeless Workers in LA County, 1989



Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 15**

# WEEKS WORKED IN 1989
## Homeless Workers in LA County



Number of Weeks Worked in 1989

Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 16**

# WEEKS WORKED IN 1989
## Homeless Workers in LA County



Source: US Department of Commerce, Bureau of the Census, 1990 Census

## LABOR MARKET DISCONNECTION

The process of disconnection from the labor market is shown sweeping across every occupation in Graph 18, which compares the average weekly hours worked in 1989 with those worked the week before the census survey in 1990 in each job family.  The pervasive reality of homeless workers is that they are losing, or have lost, connection with regular employment and opportunities to earn a livable income.  Machine operators, assemblers and inspectors, who have been heavily impacted by aerospace layoffs, had the greatest absolute loss of hours, losing an average of 28 working hours per week.  Mechanics and repairers, some of them likely to have been laid off because of defense downsizing, had the most extreme setbacks, losing 86 percent of the hours worked in 1989.  Workers in agricultural and related occupations (which offer very low pay) had the least severe setbacks, losing 29 percent of the hours they worked in 1989.

Profiles of the number of hours worked per week in 1989 and 1990 by the PUMS cohort, shown in Graph 19, show that the largest group in 1989 worked 40 hours, and the largest group in 1990 worked 0 hours, with the number of completely unemployed workers almost doubling in size between 1989 and 1990.  The change resembles a chain of workers pulled away from the labor market, with the number working full-time dropping 68 percent, a small number working part-time with a downward cascade toward fewer hours, and the number working no hours at all increasing by 82 percent.

A profile of the number of work losers, those with no change, and work gainers is shown in Graph 20.  The reader is reminded that the PUMS sample used for this study represents the county's homeless population at a single point in time and therefore includes more of the chronically homeless than are found in the total population of people who have been homeless at some point in their lives.  The changes in work force connection occurring among homeless workers at the time of the 1990 census survey can be summarized as follows:

- 26 percent were at bottom for at least two years, working no hours in either 1989 or the week before the census survey in 1990 (making up most of the spike with "0%" change in the middle of Graph 20[2]) — these were described earlier as the long-term unemployed;

- 52 percent were moving toward bottom, working fewer hours in 1990 than in 1989.  Three-fifths of this group lost forty hours per week of work, going from full-time employment to complete unemployment;

---

[2]In a small fraction of these cases individuals worked at some other point in 1990, creating a two percentage point divergence from the data shown in Graphs 11 and 12.

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

**GRAPH 17**

# TOTAL HOURS INDEX
## Homeless Workers in LA County



Total Hours Index (2000 Hours = 100)

Source: US Department of Commerce, Bureau of the Census, 1990 Census

**GRAPH 18**

# NUMBER OF HOURS WORKED PER WEEK

## L.A. County PUMS Data - 1990 Census



Graph based on 556 PUMS records representing 12,663 people (520 other records representing 9,086 people showed no work history)



GRAPH 19

# HOMELESS WORKERS IN L.A. COUNTY - 1990

Hours Worked Per Week in 1989 vrs 1990

Graph based on 556 PUMS records representing 12,663 people (520 other records representing 9,086 people showed no work history)



**GRAPH 20**

# CHANGE IN HOURS WORKED BY HOMELESS

## 1990 PUMS Records w/ Work History

Graph based on 556 PUMS records representing 12,663 people (520 other records representing 9,086 people showed no work history)

- 5 percent worked a constant number of hours in both 1989 and 1990 (accounting for about one-sixth of the "0%" change spike); and

- 17 percent worked more hours in 1990 than in 1989, strengthening their connection with work.

This suggests that the ratio of homeless workers moving in a positive direction to workers moving in a negative direction at the time of the census survey was roughly one to three; 22 percent were maintaining or increasing their labor market connection while 78 percent were moving away from the labor market or had no labor market connection at the time of the census survey.

If the total number of homeless individuals of working age are added to these figures, 31 percent of whom have never worked, it can be estimated that at a given point in time, roughly 15 percent of homeless individuals of working age are maintaining or strengthening a work force connection. Similarly, looking at the total population of working age homeless individuals, including those with no work history, it can be estimated that 35 percent are moving away from the labor market, working declining numbers of hours or having lost all work in the past year, and 50 percent are in a state of stagnant unemployment, having never worked at all or experiencing long-term joblessness. This profile is supported by the earlier finding that recent workers were significantly younger and long-term unemployed significantly older than the overall population of homeless workers. This would be accounted for by workers losing labor force connections and aging in the pool of long-term unemployed who predominantly fail to reconnect with jobs.

It should be remembered that these ratios represent what is occurring at a given point in time rather than the total balance of negative and positive outcomes among people who experience homelessness at some time during the year. The cross section of homeless workers captured by the census survey includes chronically homeless individuals who are experiencing multi-year episodes of declining employment or stagnant unemployment as well as cyclical and one-time homeless individuals who are experiencing short-term episodes of displacement followed by reconnection with permanent shelter and possibly jobs. These short-term episodes capped by positive outcomes are of shorter duration than experiences of chronic homelessness, and therefore occur more frequently within a given year relative to the number of episodes of chronic homelessness than is shown in the freeze-frame of census survey data.

## JOB AVAILABILITY AND TURNOVER

There is evidence that a high percent of job openings in low-skill occupations in Los Angeles County are created by job turnover, suggesting that labor market disconnection among homeless

40    HOMELESS WORKERS

workers is an interactive result of both job instability and instability in individual lives.   A
frequently held image of the employment process is that individuals find jobs, successfully adjust
to work requirements and become stably employed.  This image is contradicted by Employment
Development Department data showing that 66 percent of the county's job openings in low skill
occupations (jobs requiring less than one year of training) are the result of workers becoming
separated from their jobs, or job turnover, rather than job growth.  This information is shown
in Graph 21 for job families encompassing 1,760 Dictionary of Occupational Titles (DOT)
occupations requiring less than a year of training that are found in the county labor market.

A break-out of openings from job turnover in 65 low-skill DOT occupations with 200 or more
job openings expected per year in the county is shown in Graph 22, with the average percent
of openings in all 1,760 low-skill occupations accounted for by turnover shown at the bottom
of the graph.  Very few occupations offer protection against worker churning.  There are only
2 occupations in which fewer than 30 percent of openings are created by turnover and 23
occupations (including many of the largest) in which over 70 percent of openings come from
turnover.   Some of these jobs are actually declining in total number of workers, but high
turnover rates continue to create new openings.  The phenomenon of frequent job turnover is
also borne out by the earlier finding that when homeless workers have jobs they generally work
full time, but they only have jobs about half the time.

The fact that two-thirds of low-skill job openings result from turnover means that employment
in this sector of the labor market is not a matter of finding and keeping a job, but rather a matter
of finding a succession of jobs.  Workers who are socially isolated and lack a family or social
network to assist them in finding reemployment are at a disadvantage in this labor market.
Similarly, workers destabilized by personal, social and economic catastrophes may be unable to
extricate themselves from a downward spiral in which they become less and less employable in
a competitive labor market.

The annual number of openings projected through 1999 by the Employment Development in the
largest low-skill occupations, both from turnover and industry growth, are shown in Graph 23.
The total annual number of job openings projected for all 1,760 low-skill occupations is 72,948;
48,374 from turnover and 24,614 new jobs from industry growth.  The number of new jobs is
sparse compared to the large number of unemployed and discouraged workers already in the
county workforce (estimated to number 595,300 in 1996[3]), and the large number of welfare
recipients who will be seeking jobs as a result of welfare reform (possibly numbering 250,000[4]).

---

[3]Southern California Interuniversity Consortium on Homelessness and Poverty (Daniel Flaming, editor), "Jobs Welfare and Homelessness,"
July 1995, p. 7.

[4]Jennifer Wolch and Heidi Sommer, "Los Angeles in an Era of Welfare Reform: Implications for Poor People and Community Well-Being,"
commissioned by the Human Services Network, April 1997, p. i.

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

GRAPH 21

# LA Co OPENINGS IN LOW-SKILL JOBS
## Job Families for 1,760 Occupations



GRAPH 22

# LA Co JOB OPENINGS CREATED BY TURNOVER
## 200+ Openings/Yr.  &  <1 Yr. Training



% of Openings Resulting from Turnover

GRAPH 23

# LA COUNTY OPENINGS IN LOW-SKILL JOBS

## 200+ Openings/Yr.  &  <1 Yr. Training



Annual Job Openings Projected 1994-97

## 44    HOMELESS WORKERS

With increasing competition for scarce low-skill jobs as a result of welfare reform it may well become much more difficult for homeless job seekers to reconnect with the work force. Alternative strategies such as public sector employment and targeted job creation, including worker-owned cooperatives that offer both empowerment and self determination, may be needed to provide stable employment opportunities for many homeless workers.

Chapter 3

# Homeless Job Seekers in Downtown Los Angeles

## PROFILE OF HOMELESS JOB SEEKERS

The Economic Roundtable worked with fifteen homeless service providers to create a data base describing characteristics, skills and employment outcomes of homeless job seekers in downtown Los Angeles. The downtown area of Los Angeles was defined as the area bounded by the Santa Monica, Harbor and Hollywood freeways and the Los Angeles River. The agencies were:

> Catholic Charities
> Chrysalis
> Chicana Action Service Center
> Fred Jordan Mission
> Good Shepherd Center for Homeless Women
> Homeless Outreach Project
> Los Angeles Coalition to End Homelessness
> Los Angeles Mission
> Project New Hope
> Salvation Army Harbor Light Center
> Skid Row Development Corporation
> Shelter Partnership
> St Vincent de Paul Cardinal Manning Center
> Union Rescue Mission
> WorkNet Services

Participating agencies met to identify information they could provide from case records, assess the reliability of different types of information, and determine what would be most useful for understanding homeless job seekers. Participants agreed on sixteen data elements that are routinely collected by agencies, have reasonable reliability, and are most relevant to obtaining employment. The categories for information extracted from agency files for the 1,256 individuals who make up the data base are shown in the summary table on the following page.

Four agencies that offer employment services to large numbers of homeless job seekers agreed to provide information about clients they served in 1991 and 1992. Information was sought about clients from the downtown area who were actively seeking a job two to three years earlier

## SUMMARY OF DATA ON DOWNTOWN HOMELESS JOB SEEKERS
### 1,256 Cases

| | | | | | | |
|---|---|---|---|---|---|---|
| *Residence at Intake* | Transition House | 27% | | Harmony House | 1% | **Number of Cases with Data** |
| | Weingart Center | 23% | | Harbor Light | 1% | |
| | St. Vincent's Center | 8% | | Other Nonprofit | 3% | |
| | Los Angeles Mission | 2% | | SRO Hotel | 23% | |
| | Salvation Army | 1% | | Street Address | 10% | |
| | Union Rescue Mission | 1% | | Living on the Street | 1% | 1,247 |
| *Age* | <25  3% | | 35-44  45% | | 55+  8% | 882 |
| | 25-34  15% | | 45-54  30% | | | |
| *Gender* | Male  88% | | | Female  12% | | 813 |
| *Race* | Black/ African-American  72% | Latino  13% | White  11% | Asian, Native Am. Other  7% | | 789 |
| *Education* | Did not complete high school  16% | High school diploma or GED  46% | Some college (no Bach degree)  31% | 4-year college degree or more  7% | | 761 |
| *Vocational Training* | Some trade/business/voc. school  33% | | None  67% | | | 672 |
| *Incarceration History* | Has been incarcerated  23% | | No incarceration  77% | | | 684 |
| *Health Problems* | Physical  7% | Mental  2% | No health problems  91% | | | 692 |
| *Length on Skid Row* | Number of months:  1 = 52%  2 = 11% | 3  = 6%  4-12 = 17% | 13-24 = 5%  25+  = 8% | | | 593 |
| *Receiving Food Stamps or GR/ AFDC/ SSI/ SSDI* | Yes  52% | | No  48% | | | 688 |
| *Longest Time with One Employer* | Number of months:  1- 6  10%  7-12  13% | 13-24  23%  25-60  24% | 61-120  25%  121+  5% | | | 535 |
| *Found Job While Being Assisted by Agency* | Yes  40% | | No  60% | | | 1,256 |
| *Occupation of Placement Job* | Placement Occupation: | Security Guards  22% | Construction  3% | | | 497 |
| | | Helpers, Laborers  11% | Clerical  3% | | | |
| | | Sales  8% | Writers, Entertainers  3% | | | |
| | | Secretarial, Gen. Office  7% | Janitors  2% | | | |
| | | Vehicle Operators  5% | Production  2% | | | |
| | | Food Service  5% | Personal Services  2% | | | |
| | | Installers, Repairers  5% | Supervisors, Service  2% | | | |
| | | Social Service  3% | Middle Management  2% | | | |
| *Industry of Placement* | Placement Industry: | Construction  2% | Fin., Ins., Real. Est.  3% | | | 487 |
| | | Manufacturing  5% | Services  47% | | | |
| | | Transport., Utilities  4% | Health  7% | | | |
| | | Wholesale, Retail  15% | Government  3% | | | |
| *Security of Placement Job* | Perm. Full Time  75% | Perm PT  15% | Temp Full Time  4% | Temp PT  6% | | 458 |
| *Wage per Hour of Placement Job* | $4.25 or below 17% | $4.26 - 4.99  8% | $5.00 - 5.99  33% | | | 397 |
| | $6.00 - 6.99  16% | $7.00 - 9.99  17% | $10.00 - 14.99  8% | | | |
| | $15 plus  2% | | | | | |

Case 2:20-cv-02291-DOC-KES  Document 276  Filed 04/20/21  Page 326 of 377  Page ID
#:7185

so that there would be a significant follow-up interval in which to assess their employment outcomes. In every instance it was necessary to go through files one-by-one to extract information and enter it into the project database. This work was performed by the Economic Roundtable. Some of the information elements were more consistently available than others from client files. Out of the 1,256 files that were utilized, the information most readily available was whether the individual found a job while being helped by the agency (all 1,256 cases), and the information least available was hourly wage of placement jobs (397 cases).

Four basic criteria met by all individuals in this data set were: (1) the person was homeless and residing within the geographic boundaries of downtown Los Angeles identified earlier; (2) the person voluntarily applied for enrollment in an employment program; (3) a homeless service provider determined that the individual should be enrolled in its employment program; and (4) the person actively participated in the employment program. The predominant type of employment program operated by homeless service providers is a supported job search program in which clients are: (1) oriented to the world of work through classes on appropriate work attitudes and personal deportment in job interviews; (2) assisted in preparing a resume; (3) given information and resources for identifying job openings; (4) given access to a telephone for seeking job interviews, bus tokens for traveling to interviews, and clothing to wear to interviews; and given general encouragement and counseling by a job placement worker.

Over 95 percent of the job seekers in the data base received this form of short-term, inexpensive employment assistance. An ironic feature of job training programs is that more expensive service modalities such as long-term skill development and supportive services are more likely to go to low-risk clients who have a higher probability of producing positive outcomes for service providers and funders. Those with the highest levels of need and risk, such as homeless job seekers, frequently receive short-term and comparatively superficial forms of employment assistance.[5] For the most part this pattern of service availability is not determined by individual agencies but by regional and national policies regarding program design and resource allocation. The principal federal employment and training program, the Job Training Partnership Act, significantly under-serves homeless individuals.

The profile of homeless job seekers produced from this data base is consistent with the profile produced out of countywide 1990 PUMS data. Many of the job seekers had achieved a level of education normally associated with stable employment. Based on information provided by the downtown homeless, lack of education does not account for their unemployment and economic disenfranchisement. More than four-out-of-five (84 percent) had at least a high school diploma, and nearly two-out-of-five (38 percent) had at least some college education. Only 16 percent did not have a high school degree. And 7 percent had graduated from college. One-

---

[5]National Commission for Employment Policy, "Understanding Federal Training and Employment Programs," U.S. Government Printing Office, January 1995, pp. 22-26.

third of the job seekers indicated that they had received vocational training through a trade, business or vocational school.

Half of the job seekers (52 percent) received some form of public benefits to support themselves. Possible types of benefits included: General Relief, Food Stamps, Aid for Families with Dependent Children, Supplemental Security Income, Social Security Disability, or State Disability Insurance. Even though homeless job seekers have critical needs for assistance in stabilizing their lives and becoming reconnected with the mainstream of society, half (48 percent) had no visible means of support other than short-term assistance from homeless service providers.

Using agency case records it was possible to determine the duration of the longest job previously held by each of these job seekers, an important piece of information not available from standardized data sources. Agency records showed that most individuals had previously demonstrated their ability to be contributing members of the economy. Three-quarters (77 percent) had held jobs that lasted longer than one year, over half (54 percent) had held jobs that lasted longer than two years, and nearly one-third (30 percent) had held jobs lasting longer than five years, as shown in Graph 24.

Despite having above-average levels of education and long-duration work experience, only 40 percent of the job seekers found employment while being helped by an agency; 60% did not find employment. An apparent 60 percent unemployment rate among active job seekers with seemingly credible employment credentials suggests that the most significant barriers to employment are in areas of personal stability and intactness rather than job related skills. The downward spiral into homelessness is often associated with substance abuse, incarceration, social isolation and disconnection from families, and feelings of profound loss and hopelessness. Unfortunately, long-term, comprehensive services to stabilize individuals and support them while they build the foundation for a new life are generally not available in homeless programs.

More than one-fifth (22 percent) of the homeless job seekers who found employment took jobs as security guards. This was followed in frequency by 11 percent who took jobs as helpers or laborers, 8 percent who took jobs in sales, 7 percent who took secretarial jobs, 5 percent who took jobs as vehicle operators (drivers), 5 percent who took jobs in food service, and 5 percent who took jobs as mechanics or installers. Four percent found jobs as managers or supervisors, and 2 percent found jobs in precision production, engineering or professional-technical occupations.

Three-quarters of the individuals who became employed found jobs which they described as permanent and full time. Another 15 percent found permanent part time jobs, 4 percent found temporary full time jobs, and 6 percent found temporary part time jobs. Taken all together, 90 permanent of the individuals who became employed described their jobs as permanent, and only

GRAPH 24

# EMPLOYMENT HISTORY

## Homeless Job Seekers In Downtown L. A.



10 percent described their jobs as temporary.  These expectations of a permanent job stand in marked contrast to actual employment outcomes discussed in the next section.

The jobs which homeless individuals found tended to have low pay.  One-quarter accepted jobs paying under five dollars an hour.  One-third accepted jobs in the five dollar an hour range (at least five but less than six dollars an hour), and another third found jobs in the six to nine dollar an hour range (at least six but less than ten dollars an hour).  The top ten percent found jobs paying more than ten dollars an hour.

The average placement wage of individuals who found employment was $6.64 per hour.  At this average hourly rate, an individual working 2,000 hours a year would earn $13,280.  In contrast, the average annual wage of an employed person in Los Angeles County in 1991 was $26,981.[6] Even though this group of homeless job seekers had significant levels of education and in many cases substantial work histories, when they re-entered the labor market they commanded slightly less than half the earnings of an average working person in the regional labor market.

## LONG-TERM EMPLOYMENT OUTCOMES

Information available from agency records left may questions unanswered about the actual success of these individuals in making their jobs permanent.  Are job finders really on a path toward economic self sufficiency that is different from those who didn't find jobs, or are large segments of both groups part of a pool of casual laborers who are intermittently employed?  Did people who lost jobs find new ones?  What kinds of earning patterns did individuals experience?

Information about long-term employment outcomes was obtained by linking Social Security numbers of clients served by downtown agencies with records from the State Unemployment Insurance data base maintained by the Employment Development Department to obtain information on employment and earnings of these clients in 1993.  The case records for all 1,256 job seekers yielded 1,223 valid, unduplicated Social Security numbers which could be used to obtain information about how much, if any, income had been reported for the individual in 1993.

Information about long-term employment outcomes for homeless job seekers is sobering.  Once homeless, lasting employment is persistently elusive.  Fifty-nine percent earned nothing, and 70% earned less than $1,000 in annual income in 1993, following their participation in an employment program and search for a new job.  Stated another way, of the 40 percent of homeless job seekers who found work after participating in an employment program, only one-fourth found and held onto a full-time job.

---

[6] Derived from employment and payroll information released by U.S. Department of Commerce, Bureau of the Census, *County Business Patterns 1991 - California*, p. 78.

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

Although 75 percent of the homeless individuals who became employed (or 30 percent of all homeless job seekers) found jobs which they described as permanent and full time, less than 9 percent had annual earnings of $10,000 or more, which would reflect full-time employment at minimum wage, in 1993. A summary of earnings outcomes is shown in the table below and in Graph 25.

*Table 1*

**1993 Earnings of Homeless Job Seekers Served in Downtown Los Angeles in 1991-92**

| 1993 Income | Number Job Seekers | % Job Seekers | Cumulative % Job Seekers |
|---|---|---|---|
| $30,000+ | 3 | .25% | 100.00% |
| $25-29,999 | 7 | .57% | 99.75% |
| $20-24,999 | 8 | .65% | 99.18% |
| $15-19,999 | 26 | 2.13% | 98.53% |
| $10-14,999 | 64 | 5.23% | 96.40% |
| $5-9,999 | 104 | 8.50% | 91.17% |
| $2,5-4,999 | 83 | 6.79% | 82.67% |
| $1-2,499 | 72 | 5.89% | 75.88% |
| $1-999 | 134 | 10.96% | 69.99% |
| $0 | 722 | 59.04% | 59.04% |
| TOTAL | 1,223 | 100.00% | |

The central finding from reviewing annual earnings of downtown Los Angeles' homeless job seekers one to two years after they have participated in an employment program is that 91% failed to find a full time job and hang on to it. Factors that by themselves do not appear to have a significant impact on employment outcomes include age, gender, ethnicity, and duration of previous jobs. Factors that do appear related to differences in earnings include: education, occupation, and industry. The most significant of these factors is education, which opens doors to better paying jobs and industries with higher quality employment opportunities. A profile of earnings outcomes for subgroups with different levels of education is shown in Graph 26. What stands out most clearly in this graph is that individuals without a high school diploma have a higher rate of complete failure to earn any income than other groups.

It should be noted that one small program providing long-term rehabilitation and support services, but representing only 3 percent of the group of downtown homeless job seekers that were studied, had employment and earnings outcomes for its program graduates that were over

**GRAPH 25**

# 1993 EARNINGS OF HOMELESS JOB SEEKERS
## 1,223 Clients Served in Downtown L. A.



**GRAPH 26**

# ANNUAL EARNINGS BY EDUCATION
## Homeless Job Seekers - Downtown L.A.



twice as high as those of the overall study group. The dramatically superior outcomes of this small sample suggest that comprehensive, long-term services can significantly improve job finding and retention outcomes.

## FINDINGS FROM SURVEYS

In collaboration with the Southern California Inter-University Consortium on Homelessness and Poverty, the Economic Roundtable employed two homeless workers to conduct face-to-face interviews with 69 people living in the Crocker Street encampment in May 1995. Respondents reported: (1) pervasive drug use in the encampment, (2) high levels of concern about personal safety, (3) strong interest in jobs — 84 percent said they would take a job that paid five dollars an hour to sweep streets — and (4) that drug rehabilitation services were available to them. These responses led to the question of why people who were concerned about their safety and wanted jobs were not utilizing available rehabilitation programs in the downtown area.

A second survey instrument was prepared to investigate how homeless individuals explain under-utilization of some available services as well as the low rate of lasting change in the lives of people served by residential programs. The survey was again conducted through face-to-face interviews of people living on the street. The same two homeless interviewers conducted 139 interviews in May and early June of 1995. Women were over-sampled to obtain a reliable number of female respondents. Questions asked in this survey and a summary of responses are shown on the following page.

The five factors homeless individuals identify as being most important when choosing between staying on the street and trying to enter a residential program, ranked by importance, are: (1) protecting their sense of dignity, (2) personal safety, (3) being with friends, (4) having the freedom to do what they want, and (5) finding ways to make money. The ranking of these priorities by homeless respondents is shown in Graph 27. Concern about protecting personal dignity is a top priority for all groups, but significant differences in other priorities emerge when respondents are broken out by age, gender, and rehabilitation experience in Graphs 28 and 29.

- being with friends and being settled in one place are particularly important, respectively, for women and men with rehabilitation experience

- finding ways to make money is particularly important to people (especially men under 35) without rehabilitation experience

- feeling safe and secure is very important for women over 35

- finding and keeping a job is important for people with rehabilitation experience

# SERVICES FOR DOWNTOWN HOMELESS
## Summary of Responses 7/26/95 (n=139)

The Homeless Research Group is conducting a survey about services needed in downtown Los Angeles. We would appreciate it if you would take a few minutes to answer some questions.

1. Are you: 64% Male   36% Female 2. How old are you?   Average = 36 Years

3. When you have to choose between staying on the street or try to enter a residential program, what things are important?  Please rate how important the following things are to you:

|  | Not Important | Somewhat Important | Very Important |
|---|---|---|---|
| a. Protecting my sense of dignity | 9% | 10% | 81% |
| b. Finding a place where I feel secure about my personal safety | 13% | 20% | 66% |
| c. Being with friends and people I care about | 18% | 19% | 64% |
| d. Having the freedom to do what I want | 17% | 23% | 60% |
| e Finding ways to make money | 21% | 19% | 60% |
| f. Finding and keeping a job | 26% | 18% | 60% |
| g. Being able to live without using drugs or alcohol | 20% | 26% | 55% |
| h. Being able to keep my possessions | 23% | 32% | 45% |
| i. Having people accept me the way I am | 24% | 32% | 44% |
| j. Getting settled so that things are not always changing | 27% | 32% | 41% |
| k Being able to buy and use drugs | 57% | 23% | 20% |

4. How many times have you entered a residential program?  48% of respondents 1+ times

5. How important are the following reasons in explaining why homeless people go through programs for helping them get off the streets, but still return to Skid Row?  Please indicate how much of a problem each of the following factors is:

|  | Not a Problem | Sometimes a Problem | Serious Problem |
|---|---|---|---|
| a. Programs end without giving people money or a place to go | 7% | 13% | 80% |
| b. Programs do not keep working with people if they relapse and start using drugs again | 22% | 8% | 70% |
| c. People have to wait too long to get into residential drug treatment programs | 23% | 18% | 59% |
| d. Programs do not keep on helping people long enough | 37% | 10% | 53% |
| e. Programs do not offer all the services people need | 27% | 18% | 56% |
| f. Programs are not set-up to deal with serious drug problems | 41% | 24% | 55% |
| g. Programs have rules that are unreasonable or hypocritical | 17% | 37% | 47% |
| h. Programs do not support a person's sense of dignity and value | 11% | 48% | 40% |
| i. Staff do not really understand people and care about them | 22% | 39% | 39% |

6. For a program to really help people get off the streets, how long should it last?
Average: all respondents 14 months        Respondents with residential experience 15 months

Where should it be located? 21% Downtown L.A.   79% Outside Downtown

**GRAPH 27**

# THINGS MOST IMPORTANT TO THE HOMELESS IF CHOOSING BETWEEN STREET AND SHELTER



Survey of 139 homeless individuals living on the streets of downtown Los Angeles.  Conducted from 5/19/95 to 6/6/95.

**GRAPH 28**

# THINGS MOST IMPORTANT TO THE HOMELESS
## Gender and Rehabilitation Experience



% Rating Item Very Important

**GRAPH 29**

# THINGS MOST IMPORTANT TO THE HOMELESS
## Comparison of Gender/Age Subgroups



The five problems homeless individuals identify as being most important when asked why people go through programs for helping them get off the streets, but still return to Skid Row are, in rank order: (1) there is no money or place to go after people complete programs, (2) people are dropped if they relapse, (3) it is hard to get into residential drug rehabilitation programs, (4) programs don't last long enough, (5) and programs don't offer all the needed services. The ranking of these priorities is shown in Graph 30, with responses of those who had rehabilitation experience shown separately from those who have not attempted rehabilitation. Significant additional differences in the importance attributed to these problems emerge when respondents are broken out by age and gender in Graph 31. For example:

- women over 35 are particularly concerned that people are dropped if they relapse

- men and women with rehabilitation experience are particularly concerned that jobs and housing are not available to people after they complete programs

- men and women over 35 express higher levels of concern than younger people that programs do not support their sense of self worth

The need for more effective employment programs is underscored by the fact that all subgroups of people living on downtown streets said that the most important reason why programs do not succeed in helping homeless people get off the streets is that they end without giving people money or a place to go.

Another particularly important finding in the table summarizing survey responses is that programs need to be able to keep on working with people even if they relapse and start using drugs again. Downtown Los Angeles is a very slippery place for an addict; any progress people make is inevitably interspersed with failures.

One of the last question on the survey, that asked how long programs should last, elicited strong responses that programs need to last much longer than the typical sixty to ninety days to really help people get off the streets. Fourteen to fifteen months was the average program duration recommended by people living on the streets as needed to provide adequate support for building a new life. In addition, nearly four out of five respondents said programs should be located outside the downtown area.

**GRAPH 30**

# WHY PEOPLE RETURN TO SKID ROW AFTER COMPLETING REHABILITATION PROGRAMS





Survey of 139 homeless individuals living on the streets of downtown Los Angeles. Conducted from 5/19/95 to 6/6/95.

**GRAPH 31**

# WHY PROGRAMS DON'T SUCCEED
## Comparison of Gender/Age Subgroups



% Rating Factor as Serious Problem

Chapter 4

# Life Stories of Homeless Job Seekers

## JOB CLUB MEMBERS

It is all to easy for those who are housed and employed to see the homeless from an impersonal distance. Individual life stories of homeless job seekers give human form to the desperate and often tragic struggle of many homeless individuals to overcome adversity and share ordinary certainties about the goodness of life enjoyed by the mainstream of society.

The Economic Roundtable organized a "job club" which met as a group every Tuesday for lunch at Clifton's Cafeteria, with frequent additional individual meetings. The purpose was to gain a clearer understanding of life experiences, individual perceptions, and actual successes and failures of homeless job seekers, as well as provide long-term help to participants. These meetings provided an opportunity to build candid relationships as well as learn first-hand about the difficult struggles and frequent failures of members as they attempted to rebuild their lives. The job club met from May 24, 1994 through June 6, 1995. Contacts continue with club members through collect call from jails, hospitals and rehabilitation centers; assistance in taking messages from prospective employers and friends; job references; telephone calls about new jobs; and wedding invitations. Sketches of seven regular members of the job club, and the personally-told life story of the member who helped organize the club follow (all names have been changed).

| | |
|---|---|
| *Carey* | Founding member of the club, is 41 years old and has lingering anger over a prison term he served after a robbery victim wrongly identified him as the perpetrator. Carey has exceptional warmth and social grace. He was a construction worker at the Gas Company tower until his addiction got the upper hand. This project financed the start-up of a hand detailing and car wash business for Carey after persuading a judge to release him from jail. The project helped him achieve sobriety and found housing for him. His exceptional social skills and intelligence led to a viable business, but virtually all revenues went to drugs and the business folded after three months. It proved to be very problematic for a recovering addict to have money and be on the streets of downtown Los Angeles. Just before his most recent birthday Carey entered a rehabilitation program and has now been sober nine months — the longest period of sobriety since he was |

fourteen years old. Carey now lives with his aunt and is enrolled in college with
the goal of becoming a drug and alcohol counselor. His personal inventory of life
experiences and recovery efforts are told later in this chapter.

*Andre*      A former professional welder and automobile assembly worker for Chrysler, he
made a long descent into addiction and homelessness after his wife had a child by
another man. He learned about drug use as a child, watching his father shoot-up
heroin. Sobriety and a decision to start a new life came during a long stint in jail
for possession of drugs. His mother arranged for him to talk with his 12 year old
son, who was 2 years old the last time he saw him, while he was in jail. When
Andre got out of jail his mother arranged to get his badly decayed teeth repaired,
and put him on a train to Detroit to live with his brother. On the train he met
Rachel, a steam roller operator from Jackson, Michigan. Andre says, "she's all
right, she's sweet, she's treating me good." Andre married Rachel, got a job
welding pipe and tanks, and now owns his own car. Looking back on his time
on Skid Row in Los Angeles he says, "those drugs held me out there in California
— blew 12 years of my life."

*Kenneth*    A self described addict, married, thirty-one years old, grandfather, killed a
woman who was high on PCP in a previous job as a security guard. His dream
is to be a police officer. The project paid for him to become re-certified as a
security guard and helped him find housing. After becoming re-addicted and then
sober ("it was cardboard city or get sober") he found a job as a group home
counselor. When that job ended and he became re-addicted he moved into a
church based, long-term recovery program in Texas near his mother's home. He
is now holding down two security guard jobs, has purchased a car, has divorced
the woman who shared his addiction on Skid Row, and has plans to remarry.

*Brenda*     Kenneth's former wife and mother of five children by a previous marriage, is a
crack addict and a victim of childhood sexual abuse by her brother. She is a quiet
woman with a great deal of common sense but haunted by pain from both the past
and the present. While with Kenneth on Skid Row she supported them by
working as a prostitute, "not so as to do it in his face, but it was pretty hard for
him not to know about it." After entering rehabilitation she enrolled in a job
training program at the Abram Friedman occupational center. They found her to
be a very promising student but a crisis with Kenneth led her to leave the
program. She is still seen on Skid Row, at other times she stays with her
grandmother or her mother, who is raising her children and receiving her welfare
benefits. She is the only person in her family who is not illiterate. Her mother
hoped she would become a gospel singer, but her crack habit still holds sway over
her intellectual and vocal gifts. Her comment, "except for crazy people, nobody

is homeless because they don't have money.   The reason they're homeless is
because they spend their money on drugs."

*Marcus*          Also known as "Shorty", Marcus is said to have run a thriving drug business in
Philadelphia, where his wife is now a public defender.  He became the father of
a baby daughter, but left his family and enlisted in the Navy when his wife had
a second child by another man.  His daughter is now fourteen.  He received a
dishonorable discharge for going AWOL when he learned about his parents
divorce.  Wilma, his "wife," until the beginning of this year is several decades
older than his 35 years.  Marcus makes these comments about himself.

> I came from a middle class family.  My father was career Navy.  My
> mother worked for the National Cash Register Company before she
> went into social work, real social work — volunteering at homes for
> unwed mothers, senior citizens, and America's favorites the Boy and
> Girl Scouts.  This union produced two children.  I have an older sister,
> as well as another set of brothers and sisters by a woman my father
> wasn't married to.

> My family was dysfunctional.  My parents and their parents before
> them wanted a piece of the "American Dream."  My parents wanted
> their  children to have better lives than what they had.  "Better lives"
> is such an arbitrary outlook.  You basically have nothing to compare it
> with except your neighbors and peers.  People definitely are not
> interchangeable with one another.  My life and experiences are as
> different from your's as your's are from mine.

> One of my favorite phrases growing up was "Latch Key."  Being a
> "Latch Key" there were very few to call a friend.  In a way it made
> me independent and helped me understand the environment that is
> contained in a home to make it operate smoothly.  My parents believed
> in education and subsequently I went to school all year round.  I was
> an honor student.

> By the time I was thirteen I had found my niche in "counter culture."
> Being blessed with a mind that was and is logical, analytical and "buck
> wild" made for an interesting life.  At 16 I had my first brush with the
> law.  The state of North Carolina called it aggravated assault.

> I'm fiercely independent; the black knight who wants to wear the white
> hat.  A firm believer in romance and chivalry also knowing that it is a

dying minority. I think that my biggest faults are that I'm lackadaisical and appear to be aloof. I find that I don't value a lot of other people's opinions because I can pat my own self on the back; there's less blood that way. I have created my image of myself and brought it to life. Whatever you see of me that is what I am at that moment, but I am not rigid nor unforgiving, just cautious of the territory that I have staked as mine. When I am blessed to awaken in the morning and look at the "man in the mirror" I need to be able to look him in the eye. He is the one I must prove myself to, no other on this earth. Some days I awaken blessed, with mind strong and active. Other times I have days that I need prayer to make it through. I'm not deeply religious but I am mindful.

I've lived most of my life in a gray area — I was smart enough to dabble. When you're the dope man you have power. They bring you money, they bring you food, they bring you clothes, they bring you women. They look out for you. It's genocide for our people, but you can't live without money.

[Speaking of the past] There was gun play — you'd come home, put on your strap, go across town and shoot some people, and come back home. It was just part of life. It's bad to be old or be a child on these streets. Like in the animal kingdom, the old and the young are subject to being eaten. It's the nature of things.

I'm tired, I'm so very tired. I came here with a purpose because I was born, but after that there was nothing. I've been wandering all my life and I'm going home. I need to clean up my own business, I can't worry too much about fixing other people.

Marcus recently attempted to achieve a reconciliation with his father, a retired Navy man in Northern California. He took a job as a telemarketer in Fremont. After a falling out with his father he moved to San Diego and was placed in a data entry job by a temporary personnel agency. He is now in jail for possession of drugs.

*Wilma*    Wilma, until recently Marcus' "wife", is fifty-five years old and was recently released from a term in jail for larceny. She has high blood pressure and unspecified neurological problems. She previously worked as a clerk for the Los Angeles County Probation Department, a job she got through the CETA program. Her son lives on Skid Row, across the street across from the Midnight Mission.

When she was 15 years old she married a man who turned out to be an abusive alcoholic. She stayed with him until her children were grown, becoming "free" for the first time in her life when she was in her forties. Wilma's daughter, Jeanette, visits Skid Row to see her and when telephoned, at Wilma's request, to tell her that her mother was all right she said, "Any news is better than no news. She needs to get over this, she's still living in the past. She needs to let go of it." Last year Wilma was admitted to the County-USC Psychiatric Hospital. After her release her friends said that some of the person they had known before seemed to be missing — her anger as well as her will to live seemed diminished. She was subsequently arrested for shoplifting, spent three months in jail, and is now on probation. As a condition of her probation she is required to become employed but her prospects for finding a job seem poor.

*Raymond*    Raymond grew up in a military family. He is an intelligent man in his early thirties with an eye for opportunities, and occasional lapses in judgment. He completed two years of college as a chemistry major and was enrolled at Cal State Los Angeles last year when the financial aid program helping him was terminated. He worked in the post office from 1988 to 1992, and earned money on the side recycling cardboard. Raymond found what he called the "grand jubilee of all cardboard piles" and was loading his pickup when the sheriff deputies found him inside a cardboard factory and arrested him. He served six months in county jail, and became homeless after his release. Raymond has a remarkable memory — he can recall any telephone number he has seen and, for example, knows the names and telephone numbers of all the staff at all the shelters he has been in. He lost out on a job at a chemical factory because of high blood pressure but got a job as a security guard at Rancho Los Amigos Hospital. He earned enough money to get his old VW that had been stored at his sponsor's house running again, but then lost the car to a hit-and-run driver. Raymond has now moved on to a job as a technician making prosthetic devices.

Today, three of the seven job club members have jobs and two others found jobs but lost them. Some of the common themes that emerge from these life stories, giving human form to statistics about homeless job seekers include:

1.    By the time they were young adults six of the seven individuals had made significant progress toward holding down jobs and becoming economically self sufficient, the driving force being the energy and optimism of youth. But liabilities carried forward from childhood overtook and derailed this progress.

2.    Six of the seven experienced long-term addiction and the seventh short-term addiction, all to crack cocaine.

3.     All seven have been socially isolated for most of their lives and have not had the support of normal social networks in attempting to solve problems of addiction and employment.

4.     Six of the seven have entered drug rehabilitation programs, experiencing multiple relapses, and four of them eventual success; the seventh has not entered a program.

5.     Six of the seven have employment histories, five of the seven have skills that qualify them for more than one occupation.

6.     There were infrequent windows of opportunity when individuals were ready to make a serious commitment to recover from addiction and find a job.  These intervals of high motivation followed bottoming-out experiences such as incarceration.  There were very few support systems to help individuals hold onto the clear thinking they did inside jail when they re-entered the daunting and lonely world outside jail gates.  Similarly, it was difficult for individuals to gain admission to a residential drug rehabilitation programs within the window of motivational opportunity if the bottoming-out occurred while they were on the streets.


## CAREY'S PERSONAL INVENTORY

My name is Carey and this is my personal inventory.  One of the steps in my recovery is to make a searching and fearless moral inventory of myself to sort through the confusion and contradiction of my life.  I need to acknowledge that addiction had defeated me.  For the past five years addiction has kept me living homeless on the streets of downtown Los Angeles.  I made up my mind that I didn't want to die out on the streets.  One of the programs that I had gone to spoke of that, that addicts of our types, the only thing they have to look forward to is jails, institutions and death.  I looked back on my life and all I could see was addiction, jails and institutions, and there really wasn't anything left for me but death.  I made a conscious decision to remove myself from that.  This is the story of my life, my addiction and my recovery.

### Childhood

My trouble started back when I was fourteen or fifteen.  My childhood before that was okay.  I didn't have a lot of things other kids had, but I was a pretty happy kid I guess, even though my father was alcoholic.  My mother passed away when I was two.  There were nine children in our family altogether, but me and my younger brother were the only two by my father and we were separated from the rest of the family.  My aunt, who's my father's sister, felt that we would be better off with her and my father, so that's where we lived.  We moved out — they took us from the rest of the kids.

My aunts and uncles on my mother's side of the family were drug dealers, pimps and stuff like that. My aunt on my mother's side, all she did was sell drugs. When I was young, before I got into drugs, I didn't fit in when I went over to her house. That kind of made me feel stupid because if I didn't fit in with my family, who did I fit in with? It was kind of crazy. I think my sisters and brothers were influenced a lot by that life style. I can see that today. My aunt didn't like me and my little brother to be around that. To this day she thinks that they are the reason why me and my little brother use drugs. I told her "it's not their fault. Nobody put a pistol to my head and made me do anything. I did it by choice."

When we were very little, me and my younger brother, Reggie, used to fight a lot, and I mean we used to fight a *lot*. He didn't like what I was doing, I guess he just didn't like me because my father kind of favored me a little bit. One day he threw a skillet of grease on the floor and then told my father I did it. I got a whipping for that.

Later, Reggie started running with a different crowd than I was and he got into some trouble with the law. They sent him to juvenile. When he came out he had been lifting weights and he had gotten a lot bigger than he was. He socked me up pretty good there one day. As a matter of fact there are still hard feelings today — we don't lay hands on each other anymore but in the past he has really expressed his anger toward me with his fists.

I remember that from a very young age, even before I got baptized, I never liked violence and I never liked guns, and I hated bullies. That's the only thing there was in our neighborhood where we lived. I wouldn't even go outside and play. I'd just stay in the house and listen to music. My dad used to think I was weird, but I just didn't like going and playing with the other kids. I was scared because a lot of them were getting killed and stuff like that.

I never was able to see eye-to-eye with my father. His alcoholism made him dysfunctional. He tried to raise me and my little brother by himself. We were on welfare — it was rough. I wasn't able to do a lot of things I really wanted to do with him, like go fishing or stuff like that. He used to come home drunk sometimes and holler at me and my little brother. He'd get me out of bed, twist my arm, and tell me to bring him some water. Those kind of things stuck in my mind. It was ugly to me — that whole thing. But I did love my father.

I had seen people pick on my father when he was drinking. My father'd get so drunk he'd let people take advantage of him — take his money and stuff like that. It really bothered me. Regardless of what he did I really loved my father and I didn't want anything bad to happen to him — he was always on my mind. After school I'd go to the park or something like that, but if he was drinking I'd be worried — about where he was at or what he was doing. In those very rough neighborhoods where we were living it was pretty bad, people getting robbed, and he'd be drunk and out there by himself. I couldn't stay with him all the time to make sure no one was bothering him. It used to worry me when we'd be waiting for him to come home and I'd

be wondering whether he was going to make it or not. That made me pray a lot for him, I just prayed that no one would come and say that somebody had shot my father or stabbed him or robbed him or something like that. Especially I saw a lot of young people taking advantage of older people. I dreaded that. Actually, he was all I had right then. I used to pray that he would not die a violent death. I just thank God that he got through it.

I never did understand until I first was introduced to AA myself what he was going through. I don't know what my mother's death did to him, if it did anything, but he used to always tell me that I would never be the man that he was. I used to say to myself "all you do is drink a lot" but I never told him that, I just said it to myself. Turns out I wound up the same because I was addicted myself.

When I was a kid, me and my younger brother lived with our father and grandmother, and we had a niece named Lynne. Lynne is my oldest sister's daughter — she brought her over for us to baby sit, and we wound up fighting. Two little boys beating up on one little girl — that wasn't very nice. When my sister came to pick her up she had a black eye and a swollen lip. This was long before I even started using drugs, but in the book it tells me that I have to go back to everything, and that's something I've felt bad about for a long time.

When I was fourteen I started hanging with a pretty hip group. They used to go to parties and everything, and I started hanging out with them and I was introduced to wine. I used to drink a little wine and it gave me courage because I was afraid to talk to girls. A lot of times I was ashamed because other kids lived in houses and stuff like that. We lived in a house but it was way in the back on a dirt road and I thought it was kind of ugly. The house itself wasn't a very nice looking house. It was in the back of some apartments. We did have a side yard and a back yard but the house itself was really sitting at the end of a driveway. The people who lived in these apartments, which were on the side of it, their company would come and block the entrance with their cars. You couldn't even see the house, you had to walk to the back to get in.

Just before I started using, when I was about fourteen, I had a cousin named Linda. She was much older than I was. She lived in Orange County. She came down and she stayed with us for about three nights. She was the first girl that I ever had sex with. That happened three nights in a row, and we had sex a few times after that as well. I never told anybody about it, but for some strange reason or another I have felt in my later years that her mother had found out, because my father said something to me about it, and that really bothered me. Not to say that I was better, but it wasn't my idea for it to happen in the first place. But when it was offered I accepted, so I'm just as guilty as the other party. I don't see her anymore. I don't know where she is — probably living with her mother. This put me in a bad relationship with her mother, my mother's sister. I never did have the courage to tell her what really happened. I can look in her eyes and tell there is something lacking between us in our relationship. I really

never even went around my Aunt Marie that much, and to this day I hardly ever see her. But maybe, hopefully, in my recovery I'll find the courage to tell her what really happened. Linda, she's just an alcoholic, been an alcoholic ever since I've known her. Maybe I can find the courage to tell her that I'm sorry it happened, it wasn't right. But that is down the road, I guess — because I haven't seen her.

## Beginning of Addiction

I was pretty good in school. I went through elementary school with a breeze. And then I got to junior high school and I was introduced to alcohol. When I was introduced to alcohol it gave me something that I was looking for, and that was a shield. I could drink alcohol and forget about everything. By not feeling like a whole person I hid a lot of shame. In my addiction I did a lot of things that I wasn't very proud of, and doing those things kept me in my addiction — I didn't have the courage to face my problems.

I made it through junior high school, but my drinking progressed, and not only did it progress, I moved on to something else. I started taking pills. This friend I met introduced me to pills. I started taking then and I was in pretty deep. It didn't take very long till I didn't have to look for my friends to get high, I'd just get money and get high myself. And this was going on when I was at an early age. One of the friends I was hanging around with was in a car accident and got his leg cut off — he was loaded on pills.

I met this girl named Yvonne, she was a church-going girl, she was very nice. I used to go to church her. We didn't go too much to church when I was at home. During my upbringing we didn't go to church every Sunday or anything like that. But it was nice and I was looking for a change anyway, so I used to go to church with Yvonne and her folks every weekend. And I got baptized. The pastor at the church wanted me to be in the choir and everything. And I was all for that because I wanted to be wherever Yvonne was. Whenever we had an engagement or something big like that, where the choir had to perform, I wouldn't show up. I guess it had to do with the way I was living — I was too busy trying to hide things. I didn't feel that I fit in with the people at the church because they were living life on life's terms. Those were honest citizens. They used to go to work every day and all that stuff. Where I come from it just didn't fit. So I stopped going and Yvonne moved away.

That same year we moved to Orange County. My brother got into trouble with a group of people in our old neighborhood who had guns and my father moved quickly to a new neighborhood to get us, and especially Reggie, away from there. When I left L.A. I was going to Ralph J. Bunche. It was an all Black school. When we moved to Orange County I was all suddenly going to a school that had a few Latinos, a few Blacks and the rest were white. But it was truly an excellent school.

It was a culture shock, going to a whole different part of town with different people -- it was a shock to me. I got along with everybody, but I still didn't feel part of it. I wasn't gang-banging or anything like that, but because I came from a gang-related area I guess they probably thought that I was. A lot of times it got me in trouble because people would say things to me and I'd get all pissed-off. A lot of the white kids wouldn't even talk to me.

The class work was more advanced at Santa Ana Valley than it was in L.A. I guess I could have fitted in, I truly could have, had I been willing. But at that time I was drinking and using. Had I set that aside and really strived to fit in, I'm quite sure I could have. It wasn't that I didn't want to — but I was too much into my addiction. Being addicted I alienated myself. I started hanging around with the deadbeats, the ones who weren't doing anything, hanging around at the park. I guess I was bottled up in my own little world. I'm quite sure people wanted me to make it there but I guess I really wasn't ready.

My grades started dropping so they sent me to a continuation school. The continuation school was okay, I got along with everybody there. At the continuation school they make you go to school half a day and they put you in on-the-job-training the other half of the day. They had me at the Orange County purchasing department. I got along pretty good with the people there and they all liked me. So when I graduated I had a job at the Orange County purchasing department. That was real good coming right out of graduation and having a job with the county.

## First Job

I was still using and it was in my way. The more money I made the more partying I did. I had run into some friends from L.A. that had moved to Orange County. We'd get together on the weekends and we'd just drink and smoke weed, because there weren't many pills out there, we'd drink a lot, I mean a *lot*. I started drinking hard liquor — JB, rum, anything we could get our hands on. One day I was driving one of the county cars and I had a wreck. I had been drinking, too. They didn't get mad, though, they sent me home for a couple of days. But I was so embarrassed I didn't even feel like going back. So they sent someone to the house to get me. I went back to work, but I eventually wound up losing the job. I could see that they had really went out of their way for me but I just wasn't ready. I was too into my addiction.

My whole life centered around getting loaded, one way or the other. If people weren't getting loaded they weren't cool. I guess that's the insanity of it. If you don't cross this line then you're not in the clique. I crossed that imaginary line a long time ago in my addiction, because it stopped being a recreational thing and it started being a necessity.

For a while after I graduated from high school and got a job I stayed together with my older sisters and brothers. I moved out of the house I shared with my father and my little brother.

We hadn't stayed together at all but we were sisters and brothers, and we tried to make it work. They were into their drugs and they never would share any of their drugs with me, but I knew they were doing them and I had my own little problem. I was an alcoholic then. I was real deep into my alcoholism and I was smoking weed. I got the impression that they didn't really too much like me to be around when they were getting high because they felt I was going to ask them something, or I would do something stupid to make them look bad, because I was a fool, believe me. I used to do some real crazy things in my drinking. That's another relationship that I really need to work on because I see my sisters going through their addiction today. One of my sisters turned Jehovah Witness, I haven't seen her in at least fifteen years.

I used to get high by myself and they say that's bad. When I left work I'd go by the store and get myself a pint of rum and a coke and I would drink that just so I could feel okay. I was living with my sisters and my cousin and they didn't think that was cool, which I don't think it was either. But everyone else was getting high and this was my thing, alcohol was my thing. They used to smoke their weed and all this other stuff, but we didn't get high together a lot, because when we did I used to act the fool.

When we lived in Orange County my sisters said, "you get along good with people," because I felt very comfortable with anybody, even around white people. I worked at Buffums in the Laguna Hills Mall and I think I was the only Black who worked there. I got along real good with the people. A lot of them would invite me to their house and stuff like that. It was nice. I guess I probably could have done a lot had I not been drinking. I can't say I haven't had opportunities. I've always liked to read. I don't think there's a lot of people in my family that like to read except me. I'd pick up a book in a minute.

## Blackout Drinking

I was drinking rum. I brought a car and I only had that car for two weeks before I tore it up. I was a blackout drinker. They told me I had driven to L.A. to see my aunt. I had already drunk a whole pint of rum, and I brought another one and put it in my glove compartment. There was a girl in the car with me, her and her two kids and my cousin. Me and my cousin used to get high all the time. They told me that I went around a car at a stop sign and that I blew out a side of the Cadillac. After all that, with this lady in the car with me and her kids, the only thing that I could think about was trying to get my drink out of the glove compartment. That is the insanity part of it. My thinking told me that that's what I needed to do — to get my drink out of the glove compartment so I could settle my nerves. Thank God nobody was hurt. I had to get my car towed.

I was running away from responsibility — that was my main impulse, because I never went to see about that car. To this day I don't know what happened to it. They took it to the impound yard and that's where it stayed. I think the lady tried to sue me. I never answered any of her

letters.  I think her lawyer sent me a letter — I never answered it.

Fear has been one of my main trouble points.  I never was able to face my responsibility.  I was always, I thought, a pretty nice person.  I'm not stupid, but I never was responsible.  I'd make it to work, but when my drinking got to be too much I stopped going.  I just wouldn't face my responsibility.  My sister kicked me out of the house because I wasn't able to keep up my end of the rent.

## Addiction Takes Over

After staying in Orange County for six or seven years I moved back to L.A. in '78 and I started living with my aunt.  I got a job with the CETA program, working at Martin Luther King Hospital for two years as a radiology technician.  I started smoking PCP while I was there.  It wasn't good at all.  I wound up being in the emergency room at the same hospital where I working, while I was supposed to be on my way to work.  That was very embarrassing.  They didn't say a lot about it.  The guy who was the head of the department where I worked at, his name was Dr. Williams, he pulled me over and he talked to me.  He said, "you know what, you want to do a little something extra on the weekends?  I want you to come help me at my house."  So I used to go over to his house.  He was building a deck in his back yard and I helped him build it.  He used to give me forty dollars a day for doing that.  He thought that he was keeping me out of trouble, which he was, but I'd use the money to get drugs.  That was the bottom line.  After the two years was up they let me go because my performance wasn't really what they were looking for.

My aunt has always stuck by me and my little brother.  She tried to raise us the best as she could.  In my addiction I did some things to her that I really wasn't too proud of.  Out of all the people in my life I would say my aunt has been the closest to me.  She recognized I had a problem.  She was the first one to tell me, "look, you need some help.  Why don't you go to a program or something?"  I stole a VCR from her, I never stole any money from her but I did steal a VCR from her, and she wasn't really too happy about that.  She never called the police on me, although I believe that she was more or less afraid of me because of what I was doing.  She didn't know how far I would go.  When she saw that I had stole from her she wouldn't let me stay at her house, but she never did stop talking to me.  We always talked, we always had communications.  Right now, today, I think that one of the things I really enjoy the most is talking to her, and I let her know today where I am at in my recovery.  Actually she's the only one that I've got that honestly understands what I went through — what I'm going through — me being an addict and all.  She always told me "you'll get it together."  I talk to her as much as I can.  She's really in my corner.

My aunt knew what was going on, she said, "look, you know what — you need some help."  That's when I was first introduced to the work of AA, in 1980.  I took her advice, I went to a

program. I stayed in that program ninety days and when I got out of the program I went to sober living. I stayed in sober living for about ninety days. I stayed sober for six months. It felt good. I was taking care of my own business and everything without the use of alcohol or drugs. It really felt good. But they say you have to stop hanging around your old friends. For me this was pretty difficult because the people I used to get high with, well a lot of them were my family members — cousins and sisters and brothers. My cousins started hanging around and the next thing I knew I was getting loaded again.

I had to move out of the sober living home. My aunt really didn't want me to stay with her because she knew what I was doing then. So I started hanging around back and forth from my aunt's house to my cousins' house. They were smoking crack then and I started smoking crack. I don't know how I did it but I managed to get a job, a maintenance job. My aunt let me back in but it didn't last very long. Every time my cousins got paid, we'd spend our money on crack. It was miserable. I didn't like it, I didn't like what I was doing but I couldn't stop. I tried another program. I've been to four programs so far. Out of all the programs that I go to I always get something out of them. That's good, and it's finally sticking.

Needless to say, the second program didn't keep me sober. I never followed the instructions, I never read the book. I never applied the twelve-steps of AA to my life. I guess I just really wasn't ready for them anyway. So I continued to use and it got a little bad at my aunt's house. I eventually wound up moving to downtown L.A. This had to be around '83. I stayed downtown in L.A. a good four years. I wasn't using crack then, I was drinking. I was drinking a lot of wine, I guess I had turned into a wino. I eventually moved back, I started staying with my cousins.

## Penitentiary

I continued a very miserable existence until around 1988, when I went to the penitentiary for a robbery that I knew nothing about. A woman definitively identified me from police photographs as the person who robbed her. A couple of years earlier I had taken some change from a drunk and the police had photographs of me as a strong-arm robber. The lady said I pulled a gun on her, robbed her at gunpoint and hand-cuffed her to an elevator. The police twisted everything I said against me. My aunt and girlfriend vouched for me but the lady I.D.'d me in court. She was white, from Olancha, California, and she was staying at the Holiday Inn downtown. The man who robbed her impersonated a security guard. After he gained her confidence he offered to help her take her luggage to her room. When he was in the elevator with her he took out his gun and robbed her. She was with him about half an hour and had a chance to get a good look at him. When I was in jail I racked my brains trying to figure out why she identified me, because I'd never laid eyes on her before. I think maybe it had something to do with insurance.

I've never had anything to do with guns — I've always been afraid of them. I fought the case for eleven months and nineteen days. My father died while I was in jail. The only person who believed I was innocent was the public defender. She was a fighter. I also got the impression the prosecutor didn't think I was guilty, but he was just doing his job. We had a jury trial and there was a hung jury. Then we made the deal to give me probation. The judge told me, she didn't tell me directly but I heard her say, that if I got arrested for anything else they'd give me the seven years.

My father went into the hospital while I was in jail and I wasn't able to be there with him. He died and I had to go to the funeral in handcuffs, but I was too ashamed to stay for the service. I went to the funeral before everybody got there and I viewed the body and then the officers took me back to the jail. I got along okay with my father when he was sober, but we had drifted apart over the years. I wanted to make things up with him while he was still alive but I didn't get a chance to.

I got out and I went back to living with my girlfriend, I had a girl friend named Karen. Then my sister that lived in the valley, she came and got me. She was trying to help me, she said "Well, come on out to the valley and I'll help you get a job and everything." She didn't want to see me go back to jail. She knew I was using. So I went out there and I did something that I really never, ever talk about. The first night I was there she was sleeping and I ran into someone who gave me a hit and that set me off. I stole her VCR and her stereo. I went and sold it and I brought some crack because I wanted to use. I hate to say it but that's where this disease took me. I stayed away from her house for two days. I was only right around the corner staying in a field. It was summer and I was just wearing torn-off old jeans, some rubber thongs on my feet and an old tee shirt, camping out and smoking crack with those people.

I think one of her friends saw me. My sister called the police and took them over to where I was staying. When she saw me she came over and pounded me on the chest with her fists and said "how could you do that? You stole my VCR and stereo and left the door standing open in the middle of the night with me and the children asleep in the house. How could you do a thing like that to us? If your father knew what you were doing he would turn over in his grave." That really hurt me, what she said about my father. I was very ashamed of myself. The police took me to jail and when I went to court the judge gave me the seven years. So I did about forty-four months altogether.

When I got out of the pen in '91 they sent me to a half-way house. I had really made a vow to myself while I was in prison that I wouldn't use any more. Little good did it do. While I was in the half-way house I went to a construction school and I became a carpenter's apprentice. I started using again because people in the half-way house were selling it and I was getting paid every week. I started using again before I even got out of the half-way house.

When I left the half-way house I said to myself, "Well, I have a job and I'm making money."
My auntie, being the lady she is, knew that I needed help.  She asked me to stay at her house
while I worked, she knew I had just got a job.  But I told her "no" and moved back to
downtown L.A., and got me a room.  I was working in the Gas Company tower.  I had a job
installing cabinets and office partitions in the tower while they were building it.  That job lasted
three months, I couldn't hold it.  I've learnt that over the years.  I've never been able to hold
a job while I was using, and there's always been something.  If it wasn't alcohol it was pills,
or it was crack, or it was PCP.  It's always been something.

## Slipping into Homelessness

It got so bad I started leaving work at lunch time and I'd run down the street, because it wasn't
very far from the Skid Row area where I got my crack, and I'd get me some crack and come
back to work.  One day I wound up not even going back to the job — instead, I was doing  what
I do best, getting high.  I lost that job.

I was staying at the St. George Hotel right there on Third and Main.  From my room I could
look out the window and see the people living in the alley behind the Union Rescue Mission.
I thought that was pretty disgusting because up until that point I hadn't stayed in the street but
I seen these people camping out in tents and cardboard boxes and I said "damn, this is pretty
deep down up in here."  I even saw a pregnant girl down there.  But I used to go down there
and get my crack and go up to my room and smoke it.  Mind you, I'd lost my job by now.  I
wasn't able to keep up my rent.  I tried welfare.  It lasted for a little while but me being the
irresponsible person that I was I didn't keep that going very long.

So I moved into the Midnight Mission.  They have a room-and-board program for people.  You
just do a little work and you get to stay all night.  They fed you pretty good at the Midnight.
I worked in the kitchen and I used to get sandwiches, ham and egg or any kind of sandwich,
which you weren't allowed to take out of the mission.  I'd put them in my pocket, and after the
last meal was served I'd leave around six o'clock and I'd walk down Wall Street and sell them.
I turned the corner on Fourth and Wall and there were a lot of guys that used to hang out
between Fourth and Fifth on Wall — I knew they weren't leaving where they were at, they
weren't going to any missions to get food.  If you're living out of missions, sleeping on streets,
that's an all-day thing—standing in lines to get beds, meals, showers, clothes, and everything.
So I used to fix them sandwiches, pastries and stuff like that and take it over there and sell it
to them.  I'd make my money like that, which wasn't very much.  Other times I'd make it all
the way over to between Sixth and Seventh on Wall and sell the sandwiches there.

I was smoking crack at that time.  It was around Christmas and they were out there washing
windows and carrying peoples' luggage and I said, "well damn, what are they doing?"  I was
wondering, were they making any money?  I tried it myself and somebody tipped me a ten dollar

bill and I was hooked.  With my little hustle, selling sandwiches, I would be lucky if I came up with four dollars a day.  When I got a ten dollar tip, and I said " man, that is pretty good."

I got discharged from the Midnight.  It wasn't a spiritual program nor was it a rehabilitation program.  It was just a room-and-board.  If you come and do your job like you supposed to and are there on time they didn't mind what you do.  But I stayed out very late every night, sometimes all night.  They'd write this down every night, every time people'd come in and out.  The least little thing that went wrong — I think I was late for work one day — and then they told me that was it.  I guess they looked at my track record and they said "well, he's not doing very good anyway, he's in and out all night" — so they let me go.

## Living on the Street

Then I started hanging around on Wall Street.  It was really a last resort.  I met a friend of mine named Andre and he and I stayed together.  I washed windows, I fit in with the crew.  When I first saw them I didn't really think they were all that hot; it was not something that I wanted to do.  But out of all of the people I'd seen downtown they were the ones who were doing the most hustling.  That was money, and I was ready to smoke me some crack so I needed some money.  To me it sounded pretty good because I wasn't stealing anything from anybody and I wasn't hurting anybody, and I still had my money for my crack.  I stayed downtown and I lived outside, homeless.  I noticed there was a lot of little camps around there, so I just fell right on into it.  I didn't call home for at least a couple of years.  When I finally called my auntie they were a little mad at me because I hadn't called.  They said, "Why don't you at least call or something and let us know you're still alive?"

When I was camping-out downtown a friend told me I had a powerful drive to let myself go, to get away from a lot of pain underneath.  She said she thought I was hiding out behind a lot of fear that had to do with my mother dying when I was two and a lot of help I didn't get when I was growing up.

My existence went on and my friend, Andre, told me about a club he used to go to at night.  There were six or seven people that used to hustle over on Wall Street and at six o'clock or seven o'clock when the bus station closed everything was over with and you just had to get your boxes and go to sleep, or some people would try to find burglaries to do.  I wasn't really ready to go to sleep and I didn't want to do burglaries.  So Andre showed me where the club, a taxi-dancing place, was and we used to go over there every night, washing windows and keeping an eye on people's cars, and making money to get crack.  That got to be the thing to do for me.  I wound up over there every night for the better part of four or five years.  I got to know a lot of people that were working in the bank building across the street.  People tried to help me get on my feet and everything, but I wasn't ready, I really wasn't ready.  I'd make enough money to smoke me some crack all night.  Then I'd take my ass over to Wall Street, lay down on the

street, and wake up every morning broke.  It was okay for a while but then everything seemed to be a fool's paradise downtown.

To this day I can look at some of the things that I used to do and some of the places that I have went into and I can't figure out to save my life how I did it.  I was having fun, that's what I thought.  I didn't have any responsibilities, I didn't have to go here or be there, all I had to do was just smoke crack, do windows, hustle money, and it was cool.  Everybody there was sleeping on the street so I slept on the street too.  It lasted for years.  It seemed to me as though it lasted for a long, long time.

It took something more for me to see for myself what I had to do.  I knew I was doing bad, but it just really didn't matter to me then.  I had a pretty close friend of mine, named Nancy, and she O.D.'ed.  That kind of shocked me because I had just been talking to her a couple of days before and all of a sudden she was gone.  It got to be a problem.  It wasn't the drug, I simply can't lie, I like crack cocaine, I just don't like what I have to do to get it.  Not to mention, it was tearing my insides up too, it was really screwing my body up.

People used to ask me, "What do you do with your money?"  And I'd have to come up with some kind of lie.  I'd stay out there regardless of whether it was raining or what, I would be out there, saying I was "keeping an eye on peoples cars" and stuff like that.  It got to be pretty miserable.  It got to the point that people were really laughing at me.  They recognized my condition and it got embarrassing, it really was.  Sometimes people would come out of the building and wouldn't even say anything to me, and that really said a lot.

## A Moment of Clarity

I spent a lot of years putting irons in the wrong fires.  I got so sick and tired of going through the same shit, asking people for money all of the time.  In the past I've been afraid to succeed and because of that I've often sabotaged myself.  People downtown are either drinking or smoking too much — they are people with problems.  Only a few are really homeless because of not having any money and not being able to work.  The first step is detoxification.

Somewhere in my mind I always had this dream of how my life's supposed to be.  I honestly feel I can reach that if I just stay off crack or anything else, period.  I honestly feel in my heart that I can make it.  There are some things that I have to do first and what I'm doing now is one of them.  I have made up in my mind that I am going to go through with my recovery no matter what.  I don't care what happens, I'm going to stay sober.  If it means that I don't have a job or I don't have a car, or I don't have this or I don't have that, fine!  I don't want to go back to using drugs again because I already know what that's all about, I know what's going to happen.

I guess you might say I had a moment of clarity.  I had already been introduced to the work of

AA and I knew that I really didn't have to be doing what I was doing. For me to see these people now, doing what they are doing so diligently, and I was with them for most of my life, it seems ridiculous to me. These people are just throwing their lives away and they think it is cool, but I was doing the same thing without ceasing, I wasn't able to stop myself. Who am I to say what they are doing is foolish? This went on for years. I used to always tell myself, "oh, I'll get it together next week," and this went on for years — "I'll wait a little while longer, I'll straighten out then." But a little while longer never came, it just never came, until now. When it came it wasn't because of me, because I know today in and of myself, on my best day, all I do is get loaded. It had to be a divine intervention because Carey didn't know how to do anything but get loaded.

Finally I decided that whatever it takes for Carey to stay sober, then that's what I'm going to do. When I was introduced to the work of AA in 1980, they told me that I had to get a sponsor, they told me that I had to work the steps, and I didn't know what the hell they were talking about back then. But today I do and it isn't easy. In this book that I'm reading it says the only thing I have to look forward to is jails, institutions or death. And I've been to jails and institutions, so I guess the only thing left for me is death. I don't want to die on the streets addicted, an addict. My back's against the wall, but it is getting better. I don't know a whole lot about this program but I am willing, I am truly willing, I'm just really grateful that I'm not out there sleeping in a box on Wall Street, telling myself that it's okay when I know damn well it isn't. I'm trying and I pray every night.

## *Family*

We have family reunions now. I have nephews that I haven't seen since they were kids. One of them is twenty. My youngest brother, Reggie's sons, I haven't seen neither one of them since they were kids. I don't have any kids myself. I always wanted to be an example for my nieces and nephews, but I never was because I was into my addiction. Now that they're grown, they're not all on a bad path. Some of them are doing good. I have a niece that's working for the city now. And I have a nephew in the Navy, and another nephew that's in the Army. It's something that I feel I should have done. I will have to sit down and tell them what it was I was going through and maybe they'll understand, because as it stands now if I were to try to tell them something they'd probably just discard it and say "you never did anything." I haven't been to one of the family reunions yet because in my addiction I isolated myself. I wasn't ready to face that pain. All it would have took was for somebody to say, "what's you been doing?" and I would have probably just fell to pieces. I hid myself from my family.

Since I got out of the program this last time I've been visiting my relatives and talking to them. Some of them drink and stuff like that when I'm there, but it hasn't been a temptation for me. Last weekend I helped one of my sisters move her furniture to a new apartment and I had a chance hear about how she's doing. Every time I talk with one of my relatives they tell me that

they don't feel like the others like them, and that they feel cut off from the others. At this next family reunion I plan to tell them that this is not right, that it's not supposed to be like that in a family.

During the two years that I didn't call my aunt I kept telling myself "I better try to call because they don't know where I'm at but I know where they're at, and if I call one day and find somebody's gone then I'm going to really feel bad about it." I feel good that I did call because I'm very close to my aunt. She lives in a pretty rough neighborhood, she's living there by herself, but she takes care of herself. She doesn't go out, she's not a street person. I really want to be there for her because she's done a whole lot for me and my little brother. I'm looking forward to making my family reunion this year. I want to get in touch and expose some truths about myself so that maybe they'll understand. There's alcoholics and addicts in my family. Just now people in my family are starting to stay sober.

Today, my brother and I really don't see eye-to-eye, and that bothers me because I really love my little brother and I don't want to see anything bad happen to him. Every time I would tell Reggie "that's not right what you're doing," he would say "well who are you to tell me?" I guess justifiably so because I haven't been a very good example. He's a grown man now with a wife and two kids. He's still using drugs and stuff. He went to trial just a few weeks ago and was sentenced to seven years for possession of drugs with intent to sell.

My mom had me and my little brother — Reggie, we're Claburns and we're the youngest children. There's also Cottmans, Parks, and Bradleys — my mother had children by four different men. It's kind of screwed up. I've never seen a picture of my mother. I am going to try to find someone in my family who has a photograph of her.

I have an older brother, his name is Clarence, and he's been locked up in the penitentiary since at least '76 — it was after I graduated from high school. He got arrested for armed robbery-murder and they sentenced him to fifteen years to life. I think I went to see him once. This was during my addiction. My sisters would always tell me "why don't you go and see your brother" or "why don't you write your brother a letter?" But I never had time for that, I was always into my abuse. He called from prison one day and I talked to him. He said "man I think you're pretty chicken shit, you don't even want to come and see me." I had gone to see him once and that was it. Those words he said really stuck in my head. During that whole time he was in there I was afraid that he would one day get out and be angry with me. But he's out now and I've talked to him and he gave me a big hug. He's trying to get his life together, but I still haven't really had a chance to sit down and talk to him about what he's doing. That's another relationship that I really need to work on in time, because he's trying to get his life together too. I guess I kind of feel like I abandoned him. It's pretty rough, he spent the better part of sixteen or seventeen years in the penitentiary.

I have another sister Sharon, she's still drinking and I'd really just love to tell her "there's a better way, you don't have to do that." But our relationship has been so warped in the past, I don't even think she would really want to listen to me. I have a sister, Diane, she came to see me recently when I was in my program, she's the oldest. She gave me the impression she's a little bent out of shape because she felt that she should have set a better example when we were coming up. I kind of like told her, "look Diane, it's not your fault. We all have our problems. Everybody makes mistakes. We just really need to look past that and keep going."

I have a sister, Maxine, me and her were very close for a while when I was very young. She moved to Chicago, she stayed out there for a long time and I didn't communicate with her at all. She's the one I stole the VCR and a stereo from when I was in my addiction after I got out of jail. She told me some things that just really hurt, but we talk today. She's been sober five years now and she's a Christian. I really want to show that her I mean well, I told her I was going to give it back to her, and I will one day, with God's help I know I will. Me and my sisters still talk, except for Sandra, the one who's a Jehovah's Witness, it's been so long since I've seen her.

I have another brother, Charles. He's in jail and has been in jail for a year now or more. The life style that my sisters and brothers used to lead, after me and my little brother were taken away when my mother died, has led to a lot of pain in their lives.

## Building a New Life

Something that I really want is a greater God conscience. In the twelve-step book it says that drugs are only five percent of the problem, ninety-five percent of the problem is Carey. Things are looking a little better now. I'm still striving for that spirit within. I'm not experiencing what they say is the "sunlight of the spirit" because I have all this other junk in me I need to get out, and that's a job within itself. They say this program has three speeds and that's slow, slow and slow. I just have to really pray and do the things that I need to do when I need to do them, regardless of whether I want to or not.

I've been to four programs. The first program I went to I stayed sober six months and it was pretty good. The last program I went into was before '87. It has been a long time since I've decided to put myself back into the work of recovery. This last time, this very significant time in my life from 1991 until today, has been about getting my whole heart ready to take a chance one more time on trying to making some of my dreams come true.

I've always wanted to have a spiritual life. I always wanted to put God first. I always wanted to have a wife and kids and a family, and a very successful career. I always wanted that. This was in my heart but I never was able to see any big opening for me to go strive for that. I remember I was on probation in Orange County and the probation officer asked me, "what

would you like to do?" I told him, "I like music, maybe a sound engineer or something like that." I can't remember his exact words, but he gave me the impression that he didn't feel I would be able to do that. Well, I didn't pursue that career anyway, but he just didn't give me the impression I was able to do that.

My dream today is that I just want to stay sober, one day at a time. Possibly in the future I'll be able to put some kind of dream together for myself. I haven't really set up any long-term goals. I just have short-term goals, and one of them is to maintain my sobriety at all costs. That's what I'm going to do.

Out of all the difficulty that has happened I still believe that there is only one power that's going to bring me out of this. After going through what I went through, what really slapped me in the face was seeing my picture in that paper and the caption under my picture that said, "this is Carey with all his worldly possessions in a bucket." That slapped me in the face, it really did. My truth was catching up to me. Everybody who is successful believes in something that keeps them going, something greater than themselves. I've never had that. I always went on my own and every time I did I messed it up. I never knew how to deal with people, places and things. If people would reject me I wouldn't know how to deal with that, so I'd go medicate it with some alcohol or some drugs. I wasn't dealing with life on life's terms. This time when I came in I was ready to follow some instructions. A counselor told me, "Carey what you need to do is exactly what you need to do, when you need to do it, regardless of whether you want to do it or not." I've been doing that. I do what is in front of me. What is in front of me now is to learn as much as I can. I've learned a lot already, but it's the application, I haven't applied it. I'm going to a lot of twelve-step meetings and I'm being honest with myself, not with other people but with myself first. It really feels good not having to lie to anybody about anything. I'm really a baby, I'm learning how to live right now.

I'm not alone, I'm finding a lot of love. Sometimes if you have a problem or are feeling bad there's what you call post-acute withdrawal. I get up in the morning, I pray and go take me a shower, and I'm feeling pretty good, but when I get around a corner and thirty minutes later I've gone from a real high to a real, real low. That alone has caused many people to just leave, throw in the towel. There's reasons for all of it and I try to find out the answers today, I don't try to lean on my own understanding to try to figure it out.

I know it's going to be a struggle. Anybody can stay sober for ninety days, but when you get out there on the streets and you run into some of those old friends, which I don't plan to but you never know, there's a whole lot of triggers. It could be a girl with a big butt or an old friend with some money, anything could happen. I'm praying a lot, and to tell you the honest-to-God truth, I don't feel I'm going to use any more, I really don't. Regardless of where I go or whatever happens, I'm not going to use, regardless, I'm not going to use.

Since I left my residential rehabilitation program three months ago I've started college and commenced looking for a job. I'm now on welfare, which I don't like, but it'll do for now. I've also gotten a little eye opener. I got a ticket riding on the Metro Rail, and now I have to appear in court for that ticket. But I'm not all bent out of shape about it because it's in front of me, and I know as long as it's in front of me I can deal with it if I stay sober. I'm on probation because of some old outstanding warrants and probation violations. The judge looked favorably on the fact that I turned myself in and that I had been sober for six months, and gave me another year of probation. That was a blessing, because I had really expected that I would have to do about three months in jail to clear up my record.

The good thing about it is I don't feel bogged down. I do feel I do need to sit down and kind of sort some more things out, but maybe that'll come a little later. As of now I'm just doing whatever is in front of me. People tell me it's not that bad if you just go through it. Half the problem is over if you just suit up and show up, and I've been doing that on a daily basis. It's working, I feel pretty good. I know it's going to take a lot of effort for me to get through these classes at the college where I've enrolled, and I'm willing to do that.

As far as my sobriety is concerned, I have to put forth even more effort to work on my recovery, but then again, I'm not in a program anywhere where I can sit and deal with these issues all day long. I have needs to be met out here. I'm making meetings and I do pray a lot. I've also heard people say that's not enough, that a lot of them have tried to do the same but they relapsed. The things they told me to do were to get a sponsor, work the twelve steps, and go to meetings. As far as working the steps, I'm starting on the very first step, which is writing this story about my life, and telling what powerless means to me and how unmanageable my life had become.

I think I'm doing okay. I still have those sick-assed thoughts about using and drinking, but I just don't act on them today. There have been times where I'd think about these things and the next thing you know I'd be off and running, but I'm not doing that today. They told me this is a program for people who want it, not for people who need it, and today I want to live. I haven't used any alcohol or drugs for nine months now, which is the longest time that I've been sober since I was fourteen years old. I know it's not going to be easy, but it'll be okay. I honestly believe that in my heart.

## Earning a Living

I'm forty-one years old and I may look like a big, strong man but I'm really just a person full of fears. One of my fears is about having money in my pocket. I feel ready to work and I want to get a job, but I'm afraid of what may happen if I have money in my pocket that I could spend on drugs when I get one of those sick impulses.

Some fears I have to deal with are around trying to find employment. I've been trained for different jobs, but I haven't ever held onto any of them for very long. I learned how to bake in jail, and I learned how to repair small engines when I was in prison. Our small engine instructor, Mr. Washington, wanted to be cool with the inmates and brought in drugs for them to prove how hip he was. The last I heard he was an addict himself out on Venice Beach. I also got trained as a sheet metal technician, and I was a radiology technician and a carpenter's apprentice. Besides that I've had jobs in a nursery, doing building maintenance, tinting car windows, driving a delivery truck, conducting opinion surveys, and for a little while there I had my own car detailing business. Altogether I've worked for about seven years since I graduated from high school, the rest of the time I've been into my addiction or locked up.

In my past I've always been afraid of people, and I would imagine by me being sober now that fear just doesn't go away, it's just something that I have to deal with. I guess I'm very ashamed of my past, and therefore I'm reluctant to talk about it, especially to employers. There are a lot of huge time gaps in my employment history that do need to be addressed. Looking back, though, on the jobs I did have, I always did put forth a good effort. I do even remember the first job I had, they went out of their way to try to keep me, but I was too busy with my addiction so they had to let me go. It kind of lets me know I wasn't a bad employee, I just had a problem. Thanks to the grace of God that problem is behind me now, or it's where I can deal with it, or me and Him can deal with it.

I feel if I'm able to relate to people exactly how I feel without stumbling over my words — I do that a lot — I might put forth a positive image. A lot of times what I say and what I think are two different things, even though I try to say exactly what's on my mind, but it comes out wrong. I think that's an area I need to work on very much, especially my past — my employment record — and not lie about it. I think that if I can get to that point I'd be able to go and do an interview with a positive impact. That's something I will be working on. I do enjoy talking to people. But it scares me when people start asking questions like "were you ever convicted of a felony?" or "what were you doing between this date and this date?" A lot of times I've been driven to distort the truth. That's where I hit my stumbling blocks. I honestly feel that if I'm totally honest with whoever I interview with I'll probably come out a little bit better — by conveying where I'm at right now. It's something that I need to work on and I will be doing that.

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

Chapter 5

# Conclusions and Recommendations

Many people who are homeless want to have jobs and have the ability to work productively. A smaller number not only want work but have summoned sufficient hope and commitment to make a serious effort at rebuilding their lives and gaining stable housing, employment and personal relationships. The operational implications of this two-tier perspective are that basic opportunities to work and earn survival resources should be available to all homeless individuals, and in-depth support for recovery and for long-term employment should be available if and when individuals are ready to make a fundamental commitment to a new start in their life.

## TIER I: LOCAL DAY-LABOR MARKETS

Earlier we reported that more than four out of five men and women living on downtown streets said they would accept jobs at minimum wages cleaning up streets. The social costs of failing to provide opportunities for gainful employment, and thereby the dignity of demonstrating one's worth, are high. Research conducted by California's Department of Alcohol and Drug Programs found that the average drug and alcohol abuser costs society over $32,000 a year.[7] Basic decency as well as an intelligent understanding of our collective self interests leads us to provide jobs for people who are willing to work. We recommend that local day-labor markets[8] be organized under public auspices to provide jobs for anyone willing to show up at an early hour and meet prevailing employment standards for sobriety and conscientious work efforts. If no private employers need their services, individuals should be entitled to public employment cleaning streets, parks, public buildings, or other useful community services.

Based on the value of minimum-wage earnings, individuals should have the opportunity to work for four or five hours per day, which would entitle them to vouchers for a night's lodging in a single room occupancy hotel or shelter that provides reasonable privacy and security for

---

[7] State of California Department of Alcohol and Drug Programs, "Evaluating Recovery Services: The California Drug and Alcohol Treatment Assessment (CALDATA)", April 1994, pp. 63-65. Costs include: criminal justice system costs, victim losses, theft losses, health care utilization, lost legitimate earnings, and income transfers.

[8] The concept of day-labor markets is put forward by Christopher Jencks, "Housing the Homeless, *The New York Review*, May 12, 1994, pp. 44-45.

possessions, three meals, and a small amount of cash (perhaps $2.50 per day). Individuals who show up for jobs five days a week and work acceptably should be entitled to lodging in a room offering privacy and security for their belongings, and three meals a day, for a week. By paying primarily in vouchers rather than cash the demand for these jobs will largely be limited to the homeless and taxpayers will be reassured they are not paying for drugs or alcohol. Individuals who show themselves to be exceptionally good workers should be rewarded by opportunities for better jobs, more hours of work, training, or improved pay. This will enable some individuals, particularly those who are first-time homeless and cyclical homeless, to find a near-term exit from homelessness. Similarly, individuals with significant rehabilitation needs who demonstrate strong motivation should become candidates for Tier II assistance.

We recommend starting with one pilot day-labor market in downtown Los Angeles. This area has the region's largest concentration of homeless individuals as well as businesses that can use short-term workers, and public sector entities that can supervise individuals in doing work that benefits the public. The day-labor market should be a clearinghouse to match worker skills and abilities with employer needs. This will entail interviewing workers to identify and classify their occupational and experience backgrounds, and maintaining records of any assessments offered by employers of workers' performance. After the program has been tested and refined, and is operating successfully it should be replicated in other urban nodes throughout the county where there are concentrations of homeless individuals.[9] Public costs will include modest expenses for operating the day-labor markets, and costs not covered by private employers for voucher redemption payments to service providers for shelter and meals, and small cash payments to homeless workers.

Potential public revenue sources to pay for day-labor markets, as well as Tier II programs described below, include job training grants (which now under-serve the homeless), state and federal demonstration grants for housing and employment, public works budgets for maintaining public spaces, grants administered by the Los Angeles Homeless Services Authority, community redevelopment tax increment funds in redevelopment areas impacted by homelessness, and city and county general fund allocations. A last resort funding option is to utilize a portion of the money currently going into the county's beleaguered General Relief program.

General Relief was designed to provide basic support for destitute individuals with no means of survival, but grant amounts have been reduced to $212 a month (plus medical benefits and food stamps), which is not sufficient for minimal shelter and food, and there is an imminent likelihood that the duration of benefits will be reduced to four months. One job club member described the program as "a whole lot of changes for a little bit of nothing." Many General Relief recipients report that they experience the bureaucratic process of applying for and

---

[9] A useful map of first, second and third-order agglomerations of homeless shelters and services in Los Angeles County is provided by Jennifer Wolch and Michael Dear, "Malign Neglect: Homelessness in an American City," Josses-Bass Publishers, San Francisco, 1993, p. 174.

receiving benefits as personally demeaning, although many report positive experiences in performing the work assignments that are required of those receiving benefits. As it is currently structured there is a fundamental lack of coherence and purposefulness in the General Relief program — it appears to reach only half the homeless who need it, providing them with less-than-subsistence support, and soon is likely to assist them for only one-third of the year. Creation of day-labor markets that enable individuals who work to survive would give much needed rationality to region's system for delivering emergency aid and assisting people in exiting homelessness.

# TIER II:   REHABILITATION RESOURCES FOR STRONGLY MOTIVATED INDIVIDUALS

Most beds in homeless shelters and sleeping spots on streets are occupied by people whose passage into homelessness and subsequent rootlessness and placelessness has lasted longer than a year. Their journey into homelessness has taken time, and similarly the journey out and the process of extricating themselves from the damage done by homelessness takes time. In order to effectively help chronically homeless individuals, programs must offer adequate resources and duration of service to rebuild lasting, stable ties to the larger community. In addition, programs must become adept at recognizing, and acting within, that narrow window of motivation when individuals are strongly and purposefully determined to rebuild their lives. For most individuals on Skid Row, homelessness is not the result of a single problem or abrupt reversal of fortunes, but the culmination of multiple problems and life adversities. Similarly, the path out of homelessness requires not only motivation on the part of the individual but patient, sustained, individually-tailored, comprehensive support services that address the different dimensions of each individual's problems. The central challenge in overcoming homelessness is reconnection of the individual with the larger community. This ultimately manifests itself through success in creating viable, lasting connections around work, housing and social relationships.

Homeless programs can lay the foundation for reconnection with society by respecting and engaging clients as individuals, listening to what they have learned through previous failures and how they recommend programs should be designed. Essential program ingredients for helping chronically homeless people become stabilized and productively employed include:

1.      Comprehensive, timely support when there is a window of strong commitment to making a serious effort at building a new life.

2.      Integrated services offering shelter, food, legal help, drug treatment, income maintenance, health services, personal counseling, development of affirming personal relationships, skill development (where necessary), and job placement.

90    HOMELESS WORKERS

3.    Effective employment, training and job placement services that:
   - competently assess and respond to client needs and abilities
   - develop individualized transition-to-work plans for each client
   - channel clients' skills, interests and aptitudes into demand-occupations
   - provide training and supportive services tailored to individual client needs
   - combine classroom and on-the-job training
   - ensure that clients have the skills and competencies employers require
   - place workers with employers who offer stable employment
   - provide ongoing post-placement support and counseling

4.    Innovative job creation strategies including public service, entrepreneurial programs and worker-owned cooperatives that make stable employment possible despite severe job shortages in the region and high turnover rates in low-skill jobs.

5.    Sustained help in the form of nine to twelve months of residential enrollment as well as case management strategies that set high standards for individuals yet maintain connections with them even if they relapse.

6.    Service delivery environments that replicate the strengths of healthy families, foster honest communication, respect the dignity of each individual and provide spiritual resources for building a new life.

# Appendix A

## FILTERING 1990 PUMS DATA TO IDENTIFY HOMELESS CASES

The Bureau of the Census identified fourteen types of living arrangements that are classified as noninstitutional group quarters in Appendix B — "Definitions of Subject Characteristics" of its report entitled, "1990 Census of Population: Social and Economic Characteristics." A critical step in this project was to filter 1990 PUMS records of individuals in noninstitutional group quarters to remove nonhomeless cases and leave a residual representing homeless individuals. Two assumptions regarding income that underlie this filtering process are:

(1)     People exhaust all of their financial resources before becoming homeless, and therefore records showing current incomes over the poverty level were removed.

(2)     People can plunge from being employed and housed into homelessness within a year if a financial disaster occurs.

The fourteen types of living quarters that are included under the heading "Noninstitutional Group Quarters" and the method for filtering-out nonhomeless living arrangements are listed below.

**LIVING ARRANGEMENTS CLASSIFIED AS NONINSTITUTIONAL GROUP QUARTERS**

| Category | Method for Filtering-Out Non-homeless Cases |
|---|---|
| 1. **Rooming Houses** <br> Persons residing in rooming and boarding houses with 10 or more unrelated persons. | Isolate and remove cases showing employment at the time of the census survey and an income over the poverty level in 1989, plus anyone with an M.A. degree or higher. |
| 2. **Group Homes** <br> Includes "community-based homes" that provide care and supportive services. Such places include: <br> a. *community homes for the mentally ill* <br> b. *homes for the mentally retarded* <br> c. *homes for the physically handicapped* <br> d. *homes or halfway houses for drug/alcohol abuse* <br> Includes persons with no usual home elsewhere in places that provide community-based care and supportive services to persons suffering from a drug/alcohol addiction and to recovering alcoholics and drug abusers. | Same as above — some segments of this population have much in common with the homeless and at times may in fact be homeless. Dissimilar cases can be minimized by isolating and removing cases in which data on income or employment status indicates the individual has re-entered the workforce or has a steady source of income. |

92    HOMELESS WORKERS

**LIVING ARRANGEMENTS CLASSIFIED AS NONINSTITUTIONAL GROUP QUARTERS**

*Category*                                      *Method for Filtering-Out Non-homeless Cases*

e.  *maternity homes for unwed mothers*
Domestic care for unwed mothers;
nursing services are usually available.

f.  *other group homes*
Includes persons with no usual home
elsewhere in communes, foster care
homes, and job corps centers with 10 or
more unrelated persons.

3.  **Religious Group Quarters**                Isolate and remove cases in which the industry
Includes, primarily, group quarters for nuns    or occupation of employment indicates affiliation
teaching in parochial schools and for priests   with a religious institution and the individual has
living in rectories.  It also includes other    a B.A. degree or higher.
convents and monasteries, except those
associated with a general hospital or an
institution.

4.  **College Quarters Off Campus**             Isolate and remove cases of students 18 through
Places occupied exclusively by college          24 years of age, and any students 25 or older
students with 10 or more unrelated persons.     working more than half time or earning incomes
                                                over the poverty level.

5.  **College Dormitories**                     same as above

6.  **Military Quarters**                        Isolate and remove cases in which the industry of
Includes military personnel living in barracks   employment in 1989 was the military, and the
and dormitories on base, in transient quarters   military status code indicates the individual was
on base, and on military ships.                  on active duty at the time of the census survey.

7.  **Agriculture Workers' Dormitories**         Isolate and remove cases showing employment
Includes persons in migratory farm workers'      at the time of the census survey and an income
camps on farms, bunkhouses for ranch             over the poverty level in 1989.
hands, and other dormitories on farms, such
as those on "tree farms."

8.  **Other Workers' Dormitories**               same as above
Includes persons in construction workers'
camps, firehouse dormitories, job-training
camps, and nonfarm migratory workers'
camps (for example mining camps).

9.  **Emergency Shelters for Homeless Persons**  This group is the homeless residual intended to
**(with sleeping facilities)**                   remain in the sample after the filtering process is
Includes persons enumerated during the           complete.
"Shelter-and-Street-Night" operation.  This
category is divided into four classifications:

a.  *emergency shelters for homeless
persons (with sleeping facilities)*
Includes persons who stayed overnight
on March 20, 1990, in permanent and
temporary emergency housing, missions,

*Prepared by the Economic Roundtable — a Non-Profit, Public Strategy Research Organization*

| **LIVING ARRANGEMENTS CLASSIFIED AS NONINSTITUTIONAL GROUP QUARTERS** | |
| *Category* | *Method for Filtering-Out Non-homeless Cases* |
| hotels, and motels charging $12 or less; Salvation Army shelters, and hotels and motels used for homeless persons. | |
| b.  *shelters for runaway, neglected, and homeless children*<br>Includes shelters/group homes which provide temporary sleeping facilities for juveniles. | |
| c.  *visible in street locations* | |
| d.  *shelters for abused women (shelters against domestic violence or family crisis centers)*<br>Most shelters also provide care for children of abused women. | |
| 10. **Dormitories for Nurses and Interns in General and Military Hospitals**<br>Includes group quarters for nurses and other staff members.  It excludes patients. | Isolate and remove cases showing employment at the time of the census survey and an income over the poverty level in 1989, plus anyone with an M.A. degree or higher. |
| 11. **Crews of Maritime Vessels**<br>Includes officers, crew members, and passengers of maritime U.S. flag vessels. | same as above |
| 12. **Staff Residents in Institutions**<br>Includes staff residing in group quarters on institutional grounds who provide formally-authorized, supervised care or custody for the institutionalized population. | same as above |
| 13. **Other Nonhousehold Living Situations**<br>Includes persons with no usual home elsewhere at YMCAs, YWCAs, youth hostels, commercial and government-run campgrounds, campgrounds at racetracks, fairs, and carnivals, and similar transient sites. | same as above |
| 14. **Living Quarters for Victims of Natural Disasters**<br>Includes living quarters for persons temporarily displaced by natural disasters. | The 1990 Census for Los Angeles County did not identify any such temporary facilities. |

## Results of Filtering Process

Based on these premises, records showing 1989 incomes up to $40,000 but no current employment or other income were retained, including 47 records showing incomes between $18,000 and $40,000 in 1989 (these represented individuals who were unemployed at the time

94     HOMELESS WORKERS

of the census survey, had worked no hours in the preceding week and were less than 65 years old).

Beginning with 3,354 records of individuals in noninstitutional group quarters, the following twelve groups of records were filtered out:

(1)     23 individuals whose educational attainment included a Masters Degree or higher

(2)     44 individuals who had incomes over $40,000 in 1989

(3)     345 individuals who were employed at the time of the census survey and had earned incomes over the poverty level in 1989

(4)     25 individuals who were employed at the time of the census survey and had 1989 incomes other than from wages and salaries that were over the poverty level

(5)     382 individuals on active military duty at the time of the census survey

(6)     1,246 individuals who were enrolled as students at the time of the census survey (students were excepted from this filter and included in the homeless residual if they met the following criteria: 25 years or older, still undergraduates, income in 1989 was under the poverty level, and worked less than 20 hours per week in 1990)

(7)     16 employees of religious organizations with B.A. degrees or higher

(8)     8 cases with 1989 income over the poverty level from interest, dividends, or rental income

(9)     72 cases with Social Security income over the poverty level

(10)    15 cases with 1989 retirement income over the poverty level

(11)    19 individuals over 65 years of age with 1989 public assistance incomes over the poverty level

(12)    83 individuals with no children and public assistance income over the poverty level in 1989

The residual of 1,076 records remaining after this filtering process are assumed to be homeless. When multiplied by PUMS weighting factors these records represent 21,992 people, including 14,953 males and 7,039 females.

# APPENDIX B

The survey of homeless people living on the streets of downtown Los Angeles that was conducted in 1995 concluded with the following open-ended question:  *"What is the most important advice you would give about helping the homeless?"*  Answers given by homeless individuals after being asked this question are listed alphabetically below.

"Be honest to yourself"
"Be true to yourself"
"Build more hotels for the homeless so they can get off the street"
"Complete help"
"Continuing after care"
"Design programs that help people get jobs"
"Do for real about it and listen."
"Don't criticize"
"Don't look down on them and look at the real inner person"
"[Don't want to] live in the same area as drug users--stop the inflow of drugs--must use testing"
"Employ people who are empathetic to people"
"Find a home"
"Find support you need, address, phone number and employment"
"Get a job"
"Get a job"
"Get jobs"
"Get people away from downtown"
"Get them off the street and food"
"Give up more jobs"
"Go after your dreams"
"Go home"
"Help them find a job"
"Homeless must want to [help] self"
"Homeless need love -- employ them"
"Homeless services should work together"
"Humble yourself and build up"
"I am a recovering alcoholic- thank you"
"I don't know"
"If you need help, get help"
"It's up to the people, not the programs"
"Jobs and a place to stay"
"Jobs"

"Jobs"
"Jobs, food, residence"
"Keep trying"
"Keep trying"
"Make sure they have a place to stay when they leave a program"
"More clean clothes for them"
"More programs out of downtown area"
"Need a residence to live"
"Need more services for women"
"Need to be more strict"
"Nothing comes to a sleeper but a dream.  If you feel you've lost , you have!  You can always give-out, but never give up!"
"Once you relapse, you're gone no matter what the reason"
"Pray"
"Pray"
"Program staff are recovering just like the new person"
"Programs are there to get help"
"Programs aren't long enough nor do they offer enough support when people leave, like finding jobs"
"Programs don't have enough money to provide all the services needed"
"Programs need to be moved from downtown"
"Provide job training when you leave program"
"Put God first in your life"
"Reinstate GR so people can survive.  To prosper or fail within guidelines"
"Respect everyone"
"Respect them"
"Seek a hand-up, not a handout"
"Seek help"
"Some programs are too close to drug areas--move majority of programs out of drugs area"
"Stand, be heard and counted"
"Stay off drugs"
"Stay off drugs"
"Stay out of trouble"
"Stop drugs"
"Stop using drugs"
"Supply more places for people"
"Take the bitter with the sweet"
"The homeless are people too"
"The homeless need some input."
"The homeless network does not accommodate people without dysfunctions"
"The homeless should be able to stay in the buildings that are vacant"

"The programs don't last long enough"
"Think before you give.  Sometimes you make matters worse"
"To be strong"
"To know that we are people who have wants and needs"
"To stay off drugs and beer"
"To want to help him or herself first"
"Treat me with respect"
"Treat us with dignity"
"Try to help them see their greater selves and encourage them to rely on it!"
"Try to understand that we are all people"
"Understand that it could be you"
"We need affirmative action for blacks in downtown"
"We're not the problem we're made out to be."
"What happens to people who just loose their jobs?"
"Work with people after leaving programs"
"Working together"
"You have to have inner peace"
"You've got to help yourself first"