**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-(KESx)          Date:  April 20, 2021

Title: LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et al.

---

PRESENT:   THE HONORABLE DAVID O. CARTER, JUDGE

|  |  |
|---|---|
| Kelly Davis | Not Present |
| Courtroom Clerk | Court Reporter |
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| None Present | None Present |

---

**PROCEEDINGS: (IN CHAMBERS ORDER)**

See attachment for complete details.

MINUTES FORM 11                          Initials of Deputy Clerk: kd

# TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................2

    A. RACE .......................................................................................................................3

        *i. Historical Context* .............................................................................................*4*

        *ii. Organized Abandonment in Housing* ............................................................*20*

    B. PUBLIC STATEMENTS ON HOMELESSNESS .................................................32

    C. EMERGENCY POWERS FOR AN EMERGENCY SITUATION .......................37

    D. GOVERNMENT INACTION ...............................................................................40

    E. HEALTH AND SAFETY IMPACTS .....................................................................51

    F. GENDER ...............................................................................................................62

II. DISCUSSION .............................................................................................................66

    A. THE LIKELIHOOD OF SUCCESS ON THE MERITS SUPPORTS PRELIMINARY RELIEF .................67

        *i. Constitutional grounds* ...................................................................................*67*

        *ii. State law grounds* ..........................................................................................*86*

        *iii. Americans With Disabilities Act* ...................................................................*90*

    B. IRREPARABLE INJURY .......................................................................................92

    C. BALANCE OF EQUITIES.....................................................................................92

    D. PUBLIC INTEREST ..............................................................................................92

    E. HEARING .............................................................................................................94

III. AVAILABILITY OF EQUITABLE REMEDIES ...................................................95

    A. FACTUAL BASIS FOR IMMEDIATE RELIEF ...................................................95

    B. EQUITABLE POWER TO ISSUE RELIEF ..........................................................96

        *i. Constitutional Violations Provide Grounds for Equitable Relief* ...................*98*

        *ii. Statutory Violations Provide Grounds for the Court to Issue Equitable Relief* ...................*100*

        *iii. The Plata Case Guides This Court's Exercise of its Broad Equitable Authority* ...................*101*

        *iv. Courts' Equitable Authority in the Face of Government Budgetary Concerns* ...................*104*

IV. CONCLUSION: A WAY FORWARD ...................................................................105

V. PROVISIONS OF THE PRELIMINARY INJUNCTION ......................................105

## I.    INTRODUCTION

In the ebb of afternoon sunlight, young Americans looked at their former compatriots as adversaries as they advanced towards them. Young teenagers carried battle flags to rally upon in the chaos that would soon ensue. There is nothing free about freedom. It is borne from immense pain, suffering, and sacrifice. Our country has struggled since the Emancipation Proclamation to right the evil of slavery. One hundred and fifty-eight years ago, at the site of the bloodiest battle of the Civil War, Abraham Lincoln made a short and profound speech, exemplifying an unshakable moral commitment to end the abomination of slavery despite the terrible sacrifice of life.

> Now we are engaged in a great civil war, testing whether that nation or any nation so conceived and so dedicated, can long endure. We are met on a great battlefield of that war. We have come to dedicate a portion of that field as a final resting place for those who here gave their lives that that nation might live. . . .
>
> It is for us the living, rather, to be dedicated here to the unfinished work which they who fought here have thus far so nobly advanced. It is rather for us to be dedicated to the great task remaining before us— that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government, of the people, by the people, for the people, shall not perish from the earth.

The Civil War brought a formal end to the institution of slavery, but a century and a half after the Gettysburg Address, the "unfinished work" of which President Lincoln spoke remains woefully unfinished.

Here in Los Angeles, how did racism become embedded in the policies and structures of our new city? What if there was a conscious effort, a deliberate intent, a cowardice of inaction? Through redlining, containment, eminent domain, exclusionary zoning, and gentrification—designed to segregate and disenfranchise

2

communities of color—the City and County of Los Angeles created a legacy of entrenched structural racism. As shown most clearly in the present crisis of homelessness, the effects of structural racism continue to threaten the lives of people of color in Los Angeles.

Today, people of color, and Black people in particular, are vastly overrepresented in Los Angeles's homeless population. While Black people comprise only eight percent of Los Angeles's population, they make up 42% of its homeless population.[1] As of January 2020, the Los Angeles Homeless Services Authority reported that 21,509 Black people were without permanent housing in Los Angeles (LAHSA).[2] The current inaction on the part of the City and County of Los Angeles has allowed the harms of their racist legacy to continue unabated, leaving Black people—and especially Black women—effectively abandoned on the streets. Such governmental inertia has affected not only Black Angelenos, not only homeless Angelenos, but all Angelenos—of every race, gender identity, and social class. Virtually every citizen of Los Angeles has borne the impacts of the City and County's continued failure to meaningfully confront the crisis of homelessness. The time has come to redress these wrongs and finish another measure of our nation's unfinished work.

## A. RACE

"I want to be very clear," said Heidi Marston, Director of the Los Angeles Homeless Services Authority, "homelessness is a byproduct of racism. We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[3] A LAHSA report published in December of 2018 confirmed the Director's opinion, stating: "The impact of institutional and structural racism in education, criminal justice, housing, employment health care,

---

[1] Jugal K. Patel et al., *Black, Homeless and Burdened by L.A.'s Legacy of Racism*, N.Y. TIMES (Dec. 22, 2019), https://www.nytimes.com/interactive/2019/12/22/us/los-angeles-homeless-black-residents.html.
[2] Gale Holland, *Racism is the Reason Black People are Disproportionately Homeless in L.A., Report Shows*, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless.
[3] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

and access to opportunities cannot be denied: homelessness is a by-product of racism in America."[4]

The numbers squarely support LAHSA's findings. As mentioned previously, Black Angelenos are vastly overrepresented in the homeless population.[5] From 2016 to 2017, the city saw a 22% increase in the number of unhoused Black Angelenos.[6] Yet, in the same period, the number of white Angelenos experiencing homelessness decreased by 7%.[7] Further, racism in Los Angeles is far from simply black and white—Latinos make up at least 35% of the homeless population, a figure that likely undercounts the number of Latinos homeless.[8] The effects of decades-long structural and institutional racism resulting in unhoused populations has reached an apex that must be addressed.

### i.     Historical Context

According to the LAHSA, "Black people have been historically and systematically precluded from housing opportunities, including through redlining, exclusionary zoning, and other forms of discrimination codified by federal, state, and local law. While laws have changed, the effects of these previous policies are still pervasive."[9]

*Early Twentieth Century*

In the first half of the twentieth century, migrant workers were drawn to Los Angeles for seasonal industries and cheap lodging available in Los Angeles'

---

[4] L.A. HOMELESS SERVS. AUTH., REPORT AND RECOMMENDATIONS OF THE AD HOC COMMITTEE ON BLACK PEOPLE EXPERIENCING HOMELESSNESS 5 (2018), https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness [hereinafter LAHSA REPORT]; The report was published by a committee comprised of homeless and civil rights advocates, mental health service providers, representatives of city and county housing agencies, and staff representatives of elected offices, including the offices of Los Angeles Mayor Eric Garcetti, Los Angeles City Councilmember Marqueece Harris-Dawson, and Los Angeles County Supervisors Mark Ridley-Thomas and Sheila Kuehl.
[5] Patel et al, *supra* note 1.
[6] LAHSA REPORT, *supra* note 4, at 9.
[7] *Id*.
[8] Latinos are more likely to live outside of traditional homeless spaces, rely heavily on social networks, and use public services less often relative to other racial or ethnic groups. Melissa Chinchilla & Sonya Gabrielian, *Stemming the Rise of Latinx Homelessness: Lessons from Los Angeles County*, J. SOC. DISTRESS & THE HOMELESS (2019).
[9] LAHSA Report, *supra* note 4, at 7.

downtown neighborhood known today as "Skid Row."[10] Residents of Skid Row lived in inexpensive apartments, hotels, and lodging houses while homeless individuals unable to afford such housing sought areas outside of Skid Row where they could build permanent accommodations on undeveloped land.[11]

In 1910, the Housing Commission of the City of Los Angeles reported that nearly ten thousand individuals of over thirty nationalities resided in "house courts," a collection of wooden structures occupying a single lot.[12] The Commission deemed these courts to be threats to public health and abolished, demolished, or vacated nearly 200 courts between 1910 and 1913—leaving a racially and ethnically diverse group of Angelenos no option but to live in tents and abandoned train cars.[13]

The Great Depression exacerbated the lack of affordable housing among racially and ethnically diverse communities.[14] Communities of color were disproportionately impacted by employment cuts as compared to their white counterparts.[15] Unemployment for white Angelenos reached a high of 25% in 1933, whereas unemployment among Black Angelenos during the same period peaked at twice that rate.[16] This was a result of a racially segmented economy which largely restricted Black workers to service employment and unskilled manual labor—both industries that were curtailed by businesses and households to survive the Depression.[17]

Widespread unemployment during the depression overlapped with a steep increase in rents in segregated housing markets.[18] By 1930, state-enforced racially-restrictive covenants throughout Los Angeles prevented Black Angelenos from residing in all but a select few areas, thereby reducing the housing available and resulting, not surprisingly, in a sharp increase in rents in those areas.[19] The scarcity

---

[10] KIRSTEN MOORE SHEELEY ET AL., UCLA LUSKIN CTR. FOR HIST. AND POL'Y, THE MAKING OF A CRISIS: A HISTORY OF HOMELESSNESS IN LOS ANGELES (2021), https://luskincenter.history.ucla.edu/wp-content/uploads/sites/66/2021/01/LCHP-The-Making-of-A-Crisis-Report.pdf [hereinafter LUSKIN REPORT].
[11] Id.
[12] Id. at 8.
[13] Id.
[14] Id. at 9.
[15] Id.
[16] Id.
[17] Id.
[18] Id. at 10.
[19] Id.

of housing available to communities of color left many without alternatives, driving up the number of unhoused.

In 1928, Los Angeles city created the Municipal Service Bureau for Homeless Men in Skid Row ("the Service Bureau") to assist homeless men in Los Angeles by connecting them with philanthropic organizations that provided food and lodging.[20] But aid from such organizations was distributed selectively along racial lines.[21] Black Angelenos were limited to relief from Black community-operated and community-funded institutions.[22] The Service Bureau relied on organizations such as the Colored YMCA and YWCA, the Eastside Mothers' Home, and the Sojourner Truth Home, while organizations such as the "white" YWCA openly denied any assistance to homeless Black girls.[23] While other cities across the nation had established their own publicly operated shelters, Los Angeles instead relied on this segregated system to provide services.[24]

*Redlining*

In 1933, Congress formed the Home Owners' Loan Corporation ("HOLC") to curtail the foreclosure crisis driven by the Great Depression.[25] Congress hoped to help homeowners facing default on their mortgages, or those who otherwise would not be able to afford houses.[26] The HOLC was developed as a solution: a state-sponsored lending program that could issue mortgages.[27]

However, this access to homeownership was not extended equally. The HOLC reinforced racial segregation and diverted investment from minority neighborhoods by creating color-coded "residential safety maps" that indicated risk

---

[20] *Id.* at 11.

[21] *Id.* at 12.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 14. The city's intentional division of aid by racial lines is further evidenced by Los Angeles Commissioners' recommendations in 1931 in which they advised the Council to allocate separate pools of funding for (1) the homeless care of males and (2) "colored" homeless boys.

[25] Bruce Mitchell PhD. And Juan Franco, *HOLC "Redlining" Maps: The Persistent Structure of Segregation and Economic Inequality*, NATIONAL COMMUNITY REINVESTMENT COALITION, https://ncrc.org/wp-content/uploads/dlm_uploads/2018/02/NCRC-Research-HOLC-10.pdf

[26] Alejandra Borunda, *Racist Housing Policies Have Created Some Oppressively Hot Neighborhoods*, NATIONAL GEOGRAPHIC (Sept. 2, 2020), https://www.nationalgeographic.com/science/article/racist-housing-policies-created-some-oppressively-hot-neighborhoods

[27] *Id.*

levels for long-term real estate investment. Known today as "redlining," the safety maps categorized neighborhoods as "best," "still desirable," "declining," or "hazardous." Neighborhoods were categorized based on "favorable" and "detrimental" factors, such as the "threat of infiltration of foreign-born, negro, or lower grade population." Black and immigrant neighborhoods were repeatedly rated "hazardous" and outlined in red—creating a "state-sponsored system of segregation."[28] The rating system was widely used by HOLC, as well as private lending institutions, who denied residents in "redlined" neighborhoods access to loans or capital investment. The Federal Housing Administration ("FHA"), established in 1934, accelerated segregation by refusing to insure mortgages in and near Black neighborhoods.[29] The FHA even subsidized builders to construct entire subdivisions for white communities, so long as the homes were not sold to Black people.[30]

People living in redlined neighborhoods were restricted from these federally backed avenues of credit for decades.[31] This cycle of disinvestment blocked communities of color from the accumulation of intergenerational wealth that flowed in white neighborhoods due to government supported financial security in home ownership in areas with steady growth in property value.[32]

Federal housing policies by the HOLC and the FHA have created a lasting wealth gap. By the time the Fair Housing Act outlawed racial discrimination in housing in 1968, suburban homes had grown substantially in value.[33] Whereas white families enjoyed this growth in equity as financial security, Black families were blocked from this growth from the beginning.[34]

While a Black person today earns on average 60% of what their white counterpart earns, Black American wealth is only about five percent of white American wealth.[35]  Decades of depressed property values stemming from

---

[28] RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA 64 (2017); Terry Gross, *A 'Forgotten History' of How the U.S. Government Segregated America*, NPR, (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america.
[29] ROTHSTEIN, *supra* note 28, at 64.
[30] *Id.* at 64–65.
[31] Terry Gross, *A 'Forgotten History' of How the U.S. Government Segregated America*, NPR, (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america.
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

HOLC's "hazardous" labeling paved the way for present-day gentrification: it allowed white homeowners with growing equity to purchase devalued property in formerly redlined neighborhoods.[36]

The effects of these housing policies have consequences beyond a wealth gap. White Americans developed financial stability, and thus safety nets, that Black Americans were excluded from. Areas previously deemed "hazardous" remain segregated with larger Black and Latino populations, higher rates of poverty, lower life expectancy and substandard health outcomes stemming from structural disinvestment.[37] All of these factors shape Los Angeles housing insecurity in the Black community today.

*Post-World War II*

After World War II, policies relating to redlining, racial covenants, and public bank lending continued to exacerbate the growing racial wealth gap.[38] Los Angeles's "urban renewal" plans further entrenched systemic barriers to Black population's access to housing.[39] Data from the Los Angeles County Department of Charities in the 1950s show that despite Black men comprising only 5.2% of the county's adult male population, they comprised 17.45% of applicants seeking relief, and of the Black applicants, nearly 60% lacked shelter.[40] The very plans aimed to "renew" communities destroyed existing neighborhoods where communities of color resided.[41]

Single-room-occupancy hotels (SROs) provided a home to tenants who could only afford to pay rent by the month or by the week.[42] The low-cost temporary lodging was especially helpful for individuals on pensions, Social Security, or welfare programs who could not afford costs associated with long-term rental units, which normally required a security deposit and rent for the first

---

[36] MITCHELL & FRANCO, *supra* note 25.
[37] *Id*.
[38] *Id*. at 20.
[39] LUSKIN REPORT, *supra* note 10, at 21.
[40] *Id*. at 22.
[41] *Id*. at 21.
[42] Frederick M. Muir, *Bradley Proposes Skid Row Hotel Demolition*, L.A. TIMES (Mar. 10, 1989), https://www.latimes.com/archives/la-xpm-1989-03-10-me-1106-story.html.

and last month.[43] But as pressure rose to develop commercial viability of Downtown Los Angeles in the 1950s and 1960s, Los Angeles City began condemning SRO hotel buildings for falling below building code standards and ordered upgrades or demolition. [44] Consequently, the number of SRO hotel rooms in Skid Row was halved—dropping from 15,000 to 7,500 in under a decade.[45] The widespread demolition of SROs further decreased availability of extremely low-cost housing and displaced tenants to the street.[46]

Racial barriers to quality housing created disparate outcomes among Black and white people of the same economic class.[47] In 1970, Black Angelenos receiving welfare were twice as likely to identify housing as their "primary problem" as compared to their white and Latino/a counterparts.[48]

*Highways*

Los Angeles' highway infrastructure was built as and remains a driver of racial inequality.[49] Deborah Archer, national board president of the American Civil Liberties Union, writes: "The benefits and burdens of our transportation system—highways, roads, bridges, sidewalks, and public transit—have been planned, developed, and sustained to pull resources from Black communities that are subsequently deployed and invested to the benefit of predominantly white communities and their residents."[50]

Highways have long been utilized to segregate communities of color. Historian Richard Rothstein points as an example to the "Underwriting Manual" of the Federal Housing Administration, which recommended highways as a mechanism to separate Black neighborhoods from white neighborhoods. [51]

---

[43] *Id*.
[44] Benjamin Schneider, *CityLab University: Understanding Homelessness in America*, BLOOMBERG CITYLAB (July 6, 2020), https://www.bloomberg.com/news/features/2020-07-06/why-is-homelessness-such-a-problem-in-u-s-cities.
[45] JENNIFER WOLCH ET AL., ENDING HOMELESSNESS IN LOS ANGELES (2007),
http://www.ced.berkeley.edu/downloads/pubs/faculty/wolch_2007_ending-homelessness-los-angeles.pdf.
[46] Benjamin Schneider, *CityLab University: Understanding Homelessness in America*, BLOOMBERG CITYLAB (July 6, 2020), https://www.bloomberg.com/news/features/2020-07-06/why-is-homelessness-such-a-problem-in-u-s-cities.
[47] LUSKIN REPORT, *supra* note 10.
[48] *Id*.
[49] Deborah N. Archer, *Transportation Policy and the Underdevelopment of Black Communities*, 106 IOWA L. REV. (forthcoming 2021).
[50] *Id*. at *3.
[51] ROTHSTEIN, *supra* note 28, at 65–66.

In 1910, 36% of Black people in Los Angeles were homeowners, a notable percentage compared against 2.4% in New York City.[52] Racially diverse neighborhoods, such as Watts and Boyle Heights, flourished alongside the Red Car transit system, which connected Los Angeles through unsegregated means.[53] But Los Angeles swiftly undertook segregation efforts as its population grew from 320,000 in 1910 to 1.2 million in 1930.[54] As its Black population increased by tens of thousands, Los Angeles utilized racially restrictive covenants, redlining, and eminent domain to racially segregate neighborhoods.[55] An uptick in Ku Klux Klan violence further targeted Black families who resided in majority white neighborhoods—including widespread cross burnings, bombings, and drive-by shootings.[56] In Manhattan Beach, Los Angeles County employed eminent domain to take property from Black families and turn the land into a whites-only park.[57]

Yet, construction of the Los Angeles freeway was most effective in displacing Black families on a large scale.[58] Communities of color lacked political representation to defend against their neighborhoods being razed to make space for the freeway. In 1972, a plaintiff's attorney for a lawsuit opposing construction of the I-105 Freeway voiced how politicians faced less opposition from communities of color: "You'll recall, prior to this time, there was a proposed . . . east/west freeway north of the [I-105 Freeway], the Beverly Hills Freeway. That was defeated and eliminated from the map . . . the difference between the political clout of Beverly Hills and Watts, Willowbrook, Lynwood, Downey and Hawthorne is considerable . . . this was kind of a course of least resistance from Caltrans' perspective."[59] As stated, white communities such as Beverly Hills had the political willpower to derail highway construction through their neighborhoods.[60] Only 61% of Los Angeles' planned freeway network was constructed as a

---

[52] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.
[53] *Id*.
[54] *Id*.
[55] *Id*.
[56] *Id*.
[57] *Id*.
[58] *Id*.
[59] Joseph Di Mento et al, *Court Intervention, The Consent Decree, and The Century Freeway* II–37 (U.C. Transp. Ctr., Working Paper No. 381, 1991).
[60] *Id*.

consequence.[61] One of the most striking visualizations of the political willpower white communities had in successfully thwarting highway construction is in South Pasadena, where a glaring gap lies between Interstate 710 and State Route 710.[62]



*Fig. 1: The gap in Route 710*

Los Angeles employed eminent domain, the process by which governments seize private property for public use with payment of compensation, to seize more than 6,000 dwellings located in the freeway's path.[63] Devalued neighborhoods comprised mostly of communities of color were more cost-effective tracts of land for Los Angeles to acquire through eminent domain compared to majority white neighborhoods. Restricted to a limited number of neighborhoods allowing communities of color, non-white freeway evictees were forced to find housing in

---

[61] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.

[62] *Id*.

[63] Ray Hebert, *Century Freeway—When It's Born, An Era Will Die*, L.A. TIMES (June 22, 1986), https://www.latimes.com/archives/la-xpm-1986-06-22-me-20619-story.html.

11

already condensed, segregated areas of South and East Los Angeles, away from job centers and beset with freeway pollution.[64]

 "Race frequently explains which communities receive the benefits of our transportation system and infrastructure and which communities were forced to host the burdens," writes Archer.[65] Today, the legacy of racially motivated freeway construction burdens Los Angeles communities of color not only economically, but physically. Hazardous vehicle-related pollutants (e.g., diesel exhaust) are highly concentrated near major roadways, inducing respiratory ailments and mortality in high-traffic neighborhoods.[66] Because of the direct exposure to vehicle pollution, children in these communities face higher rates of asthma and cognitive decline.[67]

The fracturing of communities of color in Los Angeles and the subsequent overcrowding of neighborhoods open to Black families meant that city renewal plans impeded Black families from sharing in post-war white intergenerational wealth accumulation flowing from home ownership in neighborhoods with fixed growths in property values.[68] Overpopulation created a housing shortage that necessitated families to rent rather than purchase homes.[69] This cycle increased rental value, pushing out low-income families and resulting in housing insecurity for those who could not afford the higher rents.[70] Between 1970 and 1980, census data shows that the number of nonrelatives per household doubled in Compton, Florence-Graham, East Los Angeles, and other Black and Latino/a communities.[71] That number would double once more over the next decade.[72]

Despite Black Angelenos representing a disproportionate share of those experiencing unemployment and poverty in the city, a disproportionate share of

---

[64] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.
[65] Noel King, *A Brief History of How Racism Shaped Interstate Highways*, NPR (Apr. 7, 2021), https://www.npr.org/2021/04/07/984784455/a-brief-history-of-how-racism-shaped-interstate-highways.
[66] Douglas Houston et al., *Structural Disparities of Urban Traffic in Southern California: Implications for Vehicle-Related Air Pollution Exposure in Minority and High-Poverty Neighborhoods*, 26 J. Urb. Affs. 565, 565 (2004).
[67] Sarah Gibbens, *Air Pollution Robs Us of Our Smarts and Our Lungs*, NAT'L GEOGRAPHIC (Aug. 31, 2018), https://www.nationalgeographic.com/environment/article/news-air-quality-brain-cognitive-function.
[68] LUSKIN REPORT, *supra* note 10, at 22.
[69] Richard Rothstein, *Op-Ed: Why Los Angeles Is Still a Segregated City After All These Years*, L.A. TIMES (Aug. 2017), https://www.latimes.com/opinion/op-ed/la-oe-rothstein-segregated-housing-20170820-story.html.
[70] *Id.*
[71] LUSKIN REPORT, *supra* note 10, at 29.
[72] *Id.*

12

public and private services assisting the homeless continued to cater to older white individuals.[73] Indeed, the white male population continued to receive far more that its proportional share of homeless aid through the 1970s.[74]

*Containment Zone*

The city was content with misery as long as it was unseen. In 1976, the homeless population became spatially concentrated in the fifty-square-block "containment zone" of Skid Row.

Developers and businesses urged the City to adopt a "silver book" plan in 1972.[75] The plan sought to raze Skid Row and wholly transform the existing neighborhood by 1990.[76] Skid Row stakeholders raised concerns that razing Skid Row would disperse the homeless population and negatively affect downtown business.[77] The City, won over by this sentiment, instead adopted the alternative "Blue Book Plan," which sought to "contain" homeless people to maintain the pristineness of the business district. [78] The plan adopted a fifty-block "physical containment" zone designed to contain and perpetuate poverty. Text of the 1976 plan assuaged the city's fears that Skid Row would halt downtown revitalization plans by expanding further and deterring booming investment in Los Angeles' downtown:

> When the Skid Row resident enters the buffer, the psychological comfort of the familiar Skid Row environment will be lost; he will feel foreign and will not be inclined to travel far from the area of containment.

The containment zone became a place where the homeless, discharged patients with mental disabilities, and parolees came—or in some instances, were bussed and dropped—to find services. General Dogon, a Skid Row community organizer, describes the containment as a "warehouse zone"—"a warehouse is

---

[73] *Id*. at 23.
[74] *Id*.
[75] LUSKIN REPORT, *supra* note 10, at 26.
[76] *Id*.
[77] *Id*. at 27.
[78] *Id*.

13

where you store shit. So the idea was to push all of Los Angeles's unfavorable citizens into one area."[79] "Main Street is the dividing line between the haves and have-nots," says General Dogon, "you've got homeless people sleeping on one side of the street, and the loft buildings on the other side of the street." [80] Pete White, executive director and founder of the Los Angeles Community Action Network (LA CAN) described Skid Row as "a place borne out of the outgrowth of redlining, segregation, deindustrialization, the war on drugs, more aptly put, the war on black people, the war on the black community."[81]

Police force kept the homeless isolated, enhancing and embedding poverty within the 50-block area. The Los Angeles Police Department (LAPD) set up physical buffers to reduce movement past the Skid Row border and enforce containment.[82] Flood lights demarcated the border, disincentivizing homeless from straying outside the containment area.[83]

The City and advocates' containment policy entrenched poverty and fostered the three most unsafe neighborhoods in the nation today.[84] According to Forbes, "[t]he most dangerous neighborhood in America is in Los Angeles," two square blocks in the northern half of Skid Row.[85] The second most dangerous neighborhood within American borders is intertwined with the southern edge of Skid Row.[86] Finally, the nation's third most dangerous neighborhood is the southern half of Skid Row.[87]

"Skid Row is on the bottom of the totem pole of life here in America and is commonly known as the homeless capital of America. Whether someone has been here three hours or three decades, the subconscious thought processes are one in

---

[79] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[80] *Id.*

[81] Dkt. 218 at 86.

[82] LUSKIN REPORT, *supra* note 10, at 28.

[83] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[84] Laura Begley Bloom, *Crime in America: Study Reveals the 10 Most Unsafe Neighborhoods*, FORBES (Jan. 28, 2021), https://www.forbes.com/sites/laurabegleybloom/2021/01/28/the-10-most-dangerous-neighborhoods-in-america-its-not-where-you-think/?sh=6b61d13f341f.

[85] *Id.*

[86] *Id.*

[87] *Id.*

the same—to survive," says General Jeff Page, a prominent activist and community organizer of Skid Row.[88]

The containment policy—enacted to enable and contain poverty out of sight and out of mind—succeeded. "Los Angeles Police Department and the major non-profits both have a stranglehold on our community" says General Jeff.[89] There is "[n]o funding for 'positive programming,' which means every day there's *nothing* positive to do, so quite obviously negative things will happen and soon thereafter, handcuffs or a ride in the back of either an ambulance or a hearse."[90]

As the unhoused population exploded during the 1980s due to the crack epidemic, so too did the City's vigorous criminalization policies. By demarcating Skid Row as a concentration for rehabilitation services, the City created a centralized place where police could make sweeping arrests for minor drug offenses or crimes based on poverty (e.g. resting or sleeping on the sidewalk). The ensuing cycle of incarceration and homelessness—disproportionately targeting Black communities—has continued for decades.

In 2007, Los Angeles Police Department Chief William J. Bratton enacted the "broken windows" policing policy.[91] Under Chief Bratton's "Safer Cities Initiative," a task force of 50 officers entered Skid Row issuing citations and making arrests for infractions such as jaywalking, prostitution and littering.[92] The program ended shortly after a Los Angeles Police Department officer fatally shot a homeless person of color on Skid Row in 2015. "On skid row, the windows already were broken," Los Angeles City Attorney Feuer said, "we have a much deeper and more profound situation to deal with."[93]

City officials contend that they denounce "criminalizing" homelessness.[94] But data tells a different story. In 2011, 1 in 10 arrests citywide were of homeless

---

[88] Bianca Barragan, *General Jeff's Neighborhood Guide to LA's Skid Row*, CURBED LOS ANGELES (Apr. 12, 2016), https://la.curbed.com/2016/4/12/11405274/los-angeles-skid-row-neighborhood-guide.
[89] *Id.*
[90] *Id.*
[91] Gale Holland, *L.A. Leaders Are Crafting New Plan to Help Homeless on Skid Row*, L.A. TIMES (July 15, 2014), https://www.latimes.com/local/la-me-skid-row-police-20140716-story.html.
[92] *Id.*
[93] *Id.*
[94] *Id.* ("Our success will lie in taking a more progressive approach," said LAPD Capt. John McMahon).

people; in 2016, it was 1 in 6.[95] The Los Angeles Times reported that "Officers made 14,000 arrests of homeless people in the city in 2016, a 31% increase over 2011." [96] The rise occurred despite LAPD arrests decreasing by 15% that year. [97] "Two-thirds of those arrested were black or Latino, and the top five charges were for nonviolent or minor offenses."[98] Cloaked as less punitive, such measures entrench longstanding and systemic criminalization affecting Los Angeles' most vulnerable. Tickets fining $100 add up to as much as $300 once court fees are applied. [99] When tickets pile up, police arrest homeless people and put them in jail for failure to pay.[100] The result is a revolving door of debt and housing insecurity where a history of arrests bar individuals from housing and sustainable jobs. In a listening session conducted by LAHSA, a participant contributed "[i]f you are a Black Male, you are going to jail. If you are here on Skid Row and you are on this sidewalk, they are going to make obstacles for you."[101]

Today, redevelopment interests continue to threaten the preservation of Skid Row. Abutting Skid Row are thriving neighborhoods—namely the Arts District and Little Tokyo District. As these districts edge closer to the boundaries of containment, police presence within Skid Row grows stronger.[102] The devalued downtown property incentivizes luxury housing developers and businesses to advocate the city to rezone and divest from affordable housing and services. "Our collective voice is drowned out by numerous 'established voices' who dominate each and every conversation about a community they don't even live in," recounts General Jeff.[103] Another Skid Row resident, Craig R., remarked "they're planning on making billions of dollars on pushing us out, squeezing us out, or kicking us

---

[95] Gale Holland & Christine Zhang, *Huge Increase in Arrests of Homeless in L.A.—But Mostly for Minor Offenses*, L.A. TIMES (Feb. 4, 2018), https://www.latimes.com/local/politics/la-me-homeless-arrests-20180204-story.html.
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] LAHSA REPORT, supra note 4, at 24.
[102] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[103] Bianca Barragan, *General Jeff's Neighborhood Guide to LA's Skid Row*, CURBED LOS ANGELES (Apr. 12, 2016), https://la.curbed.com/2016/4/12/11405274/los-angeles-skid-row-neighborhood-guide.

out, meaning us the poor people, the disadvantaged people, the homeless, plus the residents of the neighborhood."[104]

For too long, Black individuals have not had an opportunity to share with the City and County the ways that structural racism in policy affects them. On April 7th 2020, at a status conference for the present case, General Jeff said, "[W]hen I look at Skid Row, the majority of the Skid Row population are African-American. You know, when we look at the homelessness in terms of Council Districts 8, 9, 10, . . . we can see that . . . there's . . . a strong African-American presence . . . and so there's significant issues because there's a racial undertone to this matter."[105] "We, more importantly, want to thank you," General Jeff continued, "for giving a voice to we, the people of Skid Row and of homelessness, because there's always been [] a long-standing issue of we, the people, not being able to have a seat at the decision-making table."[106] In a listening session conducted by Los Angeles County and reported by LAHSA, a Black Woman in West Adams echoed General Jeff's sentiment: "Sitting across the table of someone that looks like you, and at the very least can understand what it is like to experience the world the way you experience it, makes a huge difference. It opens you up to be more willing to support care. Until we get people that look like us in these positions, we are not going [to] be able [to] access it. It [is] not going to seem like something that is safe."[107] As the unhoused population grows, it has spilled out of the containment zone. "This may be the key to understanding homeless policy in Los Angeles over the last forty years: nothing happened until homelessness spilled over the boundaries of the 'containment' area and became visible and present in neighborhoods region-wide."[108]

*COVID-19*

The COVID-19 pandemic presented an unprecedented need for health measures and infectious disease control.[109] Governor Gavin Newsom directed an

---

[104] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[105] Dkt. 165 at 174.
[106] Dkt. 165 at 171.
[107] LAHSA REPORT, *supra* note 4, at 34.
[108] LUSKIN REPORT, *supra* note 10, at 56.
[109] *Id*. at 59.

initiative titled "Project Roomkey" in April 2020 to house 15,000 homeless Californians in hotel and motel rooms to protect unhoused individuals during the pandemic.[110] But a May report to the Board of Supervisors detailed that Project Roomkey rooms have been disproportionately made available to white homeless Angelenos—exacerbating the risks to a Black population that already disproportionately bears the harmful effects of the City and County's failure to address homelessness.[111] Between 365,000 and 495,000 households in Los Angeles County face imminent risk of eviction, most of whom are lower-income people of color, in particular Black Angelenos.[112] In Los Angeles County, homeless individuals are 50% more likely to die if they contract COVID-19, escalating the need for equal—if not increased—access to services. [113]

*Modern Implications*

The 2018 LAHSA report concluded that "racial bias [continues to] affect every aspect of a Black person's life, and it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness."[114]

"People in our community are houseless because of structural and institutional racism and gender inequality," said Monique Nowell, spokesperson for the Downtown Women's Action Coalition.[115] In a listening session conducted by LAHSA, a participant voiced the same: "[s]tructural racism is the issue here. Los Angeles doesn't acknowledge this. How can we have the conversation if we don't acknowledge we live in a racist Los Angeles?"[116]

Recent events have focused our attention on the existence of systemic racism in the City and County of Los Angeles. Nearly a century after seizing a Black family's oceanfront resort, the County of Los Angeles is reckoning with its racist

---

[110] *Id.*
[111] *Id.* at 60.
[112] *Id.* at ii.
[113] Benjamin Oreskes & Doug Smith, *L.A.'s Homeless Residents Are 50% More Likely to Die if They Get COVID. Now They're A Vaccine Priority*, L.A. TIMES (Mar. 12, 2021), https://www.latimes.com/homeless-housing/story/2021-03-12/la-homeless-50-percent-more-likely-die-covid.
[114] LAHSA REPORT, *supra* note 4, at 9.
[115] Dkt. 218 at 86.
[116] LAHSA REPORT, *supra* note 4, at 20.

employment of eminent domain. In 1912, a Black Angeleno named Willa Bruce purchased the first of two ocean lots in what would soon become the city of Manhattan Beach. Willa and her husband developed an oceanfront resort, which provided Black families with a lodge, café, and dance hall.[117] The resort was the first of its kind at a time when segregation often limited the access Black people had to the surf.[118] As more Black families purchased nearby property by the water, a Black community formed.[119] "They were pioneers. They came to California, bought property, enjoyed the beach, made money," remarked historian and author Alison Rose Jefferson.[120] But white neighbors grew hostile to the expansion of Black land ownership in the neighborhood. Black families found their tires slashed and the Ku Klux Klan purportedly set fire to a Black-owned home by lighting a mattress under its main deck.[121] Nearby Los Angeles Neighborhoods experienced similar violent hostility—Santa Monica was referred to as the "Inkwell" and a Black-owned Pacific Beach Club was torched the day before it was scheduled to open.[122]

By 1924, County officials had condemned and seized over two dozen Manhattan Beach properties through eminent domain, citing urgent need for a public park.[123] The Manhattan Beach "leaders used eminent domain to strip the couple of the land — as well as property belonging to several other Black families—in a move that, historical record shows, had racist motivations."[124] The Bruce family and three other Black families sued County officials on the basis of

---

[117] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.
[118] Hayley Munguia, *Property Transfer Could Be U.S. First*, ORANGE COUNTY REG. (Apr. 10, 2021), https://ocregister-ca-app.newsmemory.com/?publink=1681edced_1345d0e.
[119] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.
[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] Nancy Dillon, *Southern California City Wrongfully Seized Beach Resort from Black Family in 1924. Now County Wants to Return It*, N.Y. DAILY NEWS (Apr. 9, 2021), https://www.nydailynews.com/news/national/ny-los-angeles-county-plans-to-return-beach-land-to-black-family-after-century-20210409-hsnpkp4hv5erlhgmj3ynswgbc4-story.html.
[124] Hayley Munguia, *Property Transfer Could Be U.S. First*, ORANGE COUNTY REG. (Apr. 10, 2021), https://ocregister-ca-app.newsmemory.com/?publink=1681edced_1345d0e.

racial prejudice.[125]  The County ultimately paid them an amount far less than the property value and the Bruces were unable to purchase oceanfront land elsewhere.[126] After leaving the property vacant for decades, the County then turned the land into a whites-only park.[127]

Ninety-seven years later, Los Angeles County responded to its role in pushing out an entire Black community from Manhattan Beach, where Black residents today make up less than one percent of the population.[128] "I'm going to do whatever I can to right this wrong," said Los Angeles County Supervisor Janice Hahn, apologizing to the Bruce family and agreeing that the land should be returned.[129] "There's no doubt that this was such an injustice that was inflicted — not just on Charles and Willa Bruce, but generations of their descendants who almost certainly would be millionaires had they been allowed to keep that beachfront property."[130]

### ii.    Organized Abandonment in Housing

The term "affordable housing" encompasses the government's total effort to provide housing through public-private partnerships specifically designed to serve those who cannot afford market rents. In 1990, a federal law named the "National Affordable Housing Act" formalized "affordable housing" to mean privately owned, publicly subsidized housing. [131] "Public housing," alternatively, refers to housing wholly owned and administered by the government. The redevelopment of public housing to affordable housing has fixed reliance on private developers to prioritize the most vulnerable groups facing housing insecurity when building

[125] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.
[126] *Id*.
[127] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.
[128] Rosanna Xia, *A Tale of Two Reckonings: How Should Manhattan Beach Atone for Its Racist Past?*, L.A. TIMES (Mar. 28, 2021), https://www.latimes.com/california/story/2021-03-28/how-should-manhattan-beach-atone-racist-past.
[129] *Id*.
[130] *Id*.
[131] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

properties. Los Angeles is facing rising housing insecurity, demanding a critical evaluation of how affordable housing serves—or rather, fails to serve—our communities when compared to public housing.

*30 Years of "Affordability"*

The affordable housing public-private partnership model began in 1959, when the federal government offered below market interest rates to private developers to incentivize development of rental housing for individuals who could not afford housing at market rates but earned too much to qualify for public housing.[132] The partnership was at first limited to nonprofit developers, but for-profit builders lobbied for inclusion and drafted new programs with one percent effective interest rates, profit structures riddled with loopholes, and exit strategies. [133]

The exit strategies and profit structures are exemplified in one of the first apartments created under the affordable housing model—Concord Apartments in Pasadena, California. [134] Three years after purchasing the apartments, the owner of the building prepaid the subsidized mortgage, doubled tenants' rents, and moved to auction the building at a substantial profit. [135] Over 150 elderly tenants of the Concord Apartments filed suit against the owner to contest the increased rent and halt the sale, and eventually, the city of Pasadena purchased the land, ultimately safeguarding housing security and long-term affordability for the residents and stymieing the efforts of the for-profit developer.[136]

A 1973 report sponsored by the Department of Housing and Urban Development cited sweeping critiques of incentive schemes: "Private enterprise was 'getting rich' at the expense of low- and moderate-income families… The subsidies offered were not sufficient and did not aid the families who most needed them."[137] Despite these critiques, the Nixon administration issued a moratorium on public housing construction, entrenching the nation's reliance on private

---

[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.*

developers to provide affordable housing opportunities.[138] The following year, the Nixon administration distributed block grants for states to administer their own incentive programs—thereby reducing federal authority and increasing reliance on private developers.[139]

The Tax Reform Act of 1986 developed a tax credit system that is still in use today to incentivize private developers to build affordable housing. [140] The Low-Income Housing Tax Credit ("LIHTC") provides tax credits to developers to subsidize the acquisition, construction, and rehabilitation of affordable rental housing for low- and moderate-income tenants, so long as the developer agrees to income-targeted rents on a percentage of the apartments for 30 years. [141] "This is one of the most urgent problems with Affordable Housing: It expires[.]" writes Tracy Jeanne Rosenthal of the New Republic. [142] Indeed, affordability requirements have begun to expire on units created at the program's inception in 1987—creating housing insecurity for hundreds of thousands of families across the United States who cannot afford to pay market-rate rents.

Despite understanding the loopholes built into the affordable housing model from as early as 1988, national housing policy in 2021 remains reliant on the same private-public structure.

Nearly 9,000 units in Los Angeles bound by affordable housing covenants house up to 20,000 Angelenos in L.A. County and will expire within the next eight years. [143] Los Angeles City Councilmember Gil Cedillo noted that number of soon-to-expire covenants "wipes out whatever gains we make" in housing efforts.[144] Indeed, landlords across Los Angeles who hold property in areas with high or rising rents are not incentivized to maintain stabilized rents, meaning that upon expiration of the housing covenants, landlords will evict the tenants the program was meant to house.

---

[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*
[144] Anna Scott, *Thousands of Angelenos Will Have Fewer Affordable Housing Options As 'Covenants' Will Expire*, KCRW (Apr. 12, 2021), https://www.kcrw.com/news/shows/greater-la/affordable-housing-manhattan-beach-restitution-oc/rent-covenants-expiring-la.

*Accessible Housing*

Housing created under the affordable housing model is scarcely affordable for the average low-income renter. Thresholds of "affordable" rent are determined by a U.S. Department of Housing and Urban Development ("HUD") calculation of Area Median Income ("AMI")—meaning that rents are determined by the wealth of an entire county, rather than neighborhoods where housing is located. [145] In Los Angeles, a person making up to $63,100 a year, 80% of the AMI, will qualify as "low income."[146] Landlords in affordable housing complexes are thus more amenable to renting to tenants who fall within the higher tiers of "low income" eligibility so that the rents sustain the mortgage payments and loans, leaving those earning far less with little opportunity to obtain affordable housing.

Despite the fact that one quarter of the nation's tenant households—nearly 11 million tenants—qualify as "extremely low income," the overwhelming majority of affordable housing programs target higher income thresholds.[147] This bias entrenches structural racism within affordable housing because it excludes "extremely low income" tenants, who are disproportionately people of color.[148] The affordable housing model therefore perpetuates patterns of gentrification by pricing affordable housing in poorer neighborhoods at the higher threshold of eligibility standards, incentivizing an influx of higher-earning individuals and pushing out community residents who cannot meet the higher bracket affordable rent. Just as Angelenos of color were pushed out of their communities in the twentieth century due to redlining, exclusionary zoning, and eminent domain, the same structural eviction occurs today as the County and City prioritize affordable housing with 30-year covenants that target higher earning individuals over sustainable public housing initiatives for the most vulnerable in "extremely low income" brackets.

A Los Angeles resident who lives in an affordable housing unit set to expire soon called attention to a newly constructed Affordable Housing building in her community: "Affordable for who? I don't get how these politicians, how these

---

[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

people in power could say what is affordable is if [they're] not living in our situation, if [they're] not walking in our shoes." [149]

In addition to the building-based subsidies that landlords receive, many tenants also receive Section 8 vouchers.[150] Section 8 housing vouchers were created under the Housing and Community Development Act of 1978 to assist eligible low- and moderate-income families to rent housing in the private market. HUD's residency data reports that nearly 40% of LIHTC housing tenants receive Section 8 vouchers—though LIHTC itself costs $10.9 billion in tax revenue each year. [151]

Households receiving a Section 8 voucher pay 30% of their income as rent, the rest is subsidized by the Housing Authority and reimbursed by HUD. But access to Section 8 vouchers is scarce—the vouchers only serve one quarter of qualifying individuals. In fact, waitlists for Section 8 or the few remaining public housing units span more than ten years. [152] Tamara Meek, interviewed by the Los Angeles Times in 2017, first applied for a Section 8 housing voucher in 2004 when Los Angeles housing officials opened the waiting list to obtain the federal subsidy.[153] In the 13 years she waited for a housing voucher, she made temporary arrangements, such as sleeping on blankets in the back of a friend's kitchen. [154] During that time, Meek did not receive any subsidy, only a place on the waiting list alongside 300,000 applicants. [155] Federal input has not kept pace with rising poverty levels, and as a result, Section 8 vouchers mostly became available when someone relinquished theirs, most often because of their death. [156] In 2017, Los Angeles reopened the Section 8 housing list for the first time in 13 years—with an expected 600,000 individuals to apply. [157] Securing a place on the waiting list is not just based on income, but luck. A lottery system will determine which 20,000 of

---

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

[153] Doug Smith, *Up to 600,000 Expected to Apply When L.A. Reopens Section 8 Housing List This Month After 13 Years*, L.A. TIMES (Oct. 1, 2017), https://www.latimes.com/local/lanow/la-me-ln-section-8-waiting-list-20170922-htmlstory.html.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

the hundreds of thousands to apply will be added to the Section 8 waiting list. [158] And still, a coveted place on the waiting list entails an indeterminable wait. [159] In 2017, Douglas Guthrie, President and CEO of the Housing Authority of the City of Los Angeles, called attention to how the lack of access to the waiting list "expose[s] the tremendous need there is in Los Angeles for affordable housing."[160] Yet four years later, access remains out of reach.

The Housing Authority of Los Angeles County operates independently from the City and maintains a wait list for Section 8 housing that last opened in 2009, with 40,000 individuals as of 2017. [161] Leonardo Vilchis, cofounder of the L.A. Tenants Union, states that rather than turning to innovative solutions, reliance on the for-profit designed affordable housing model leaves us to "negotiate the terms of the community's defeat." [162] The homeless deaths resulting from housing insecurity is the "body count" of "relationships administered under the institution of private property," notes University of California, Los Angeles Professor Marques Vestal. [163]

The National Low Income Housing Coalition ("NLIHC") concluded in its 2021 annual report that low-income renters in the U.S. face a shortage of nearly seven million affordable and available rental homes.[164] For every 100 extremely low-income renter households in 2019, only 37 affordable homes are available. [165] The rising number of unhoused citizens is quickly outpacing the amount of truly affordable housing. [166] In response, the report cites the need for substantial and sustained investment in public housing and an expansion of the Housing Choice Voucher program to eligible households, among other measures. [167]

The existing data demonstrates how bipartisan policy to divest from public housing and invest in affordable housing has structurally burdened communities of

---

[158] *Id*.

[159] *Id*.

[160] *Id*.

[161] *Id*.

[162] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

[163] *Id*.

[164] Nat'l Low Income Hous. Coal., *NLIHC Releases 2021 Edition of The Gap, Finding Extremely Low-Income Renters Face Shortage of 7 Million Affordable and Available Homes* (Mar. 22, 2021), https://nlihc.org/resource/nlihc-releases-2021-edition-gap-finding-extremely-low-income-renters-face-shortage-7.

[165] *Id*.

[166] *Id*.

[167] *Id*.

color, while catering to households at the upper tier of the AMI category who are disproportionately white. Indeed, twenty five percent of all renter-households in the U.S., accounting for 10.8 million households, fall under the "extremely low income" threshold. [168] 7.6 million of those households devote more than half of their incomes on rent and utilities. [169] By incentivizing developers to invest in affordable housing directed to individuals with higher incomes, there is a severe shortage of housing for the lowest-income renters. [170] People of color are disproportionately affected by the shortage. The American Community Survey ("ACS") reported that nationally, 20% of Black households, 18% of American Indian or Alaska Native households, 14% of Latino households, and 10% of Asian households are extremely low-income renters. [171] By comparison, six percent of white non-Latino households are extremely low-income renters. [172]

     The economic and public health crisis caused by COVID-19 has made a desperate situation worse for low-income renters. In 2019, 54% of Black renters contributed more than half of their income to housing and utilities. That number has grown as COVID-19 economic and employment recovery remains slowest for communities of color, in particular women of color.[173] According to the Bureau of Labor Statistics unemployment data, the unemployment rate for Black women aged 20 and over is one-fourth higher than the national average of all Americans in that same age group, and for Latinas, the rate is nearly 50% higher than the national average. [174] Yet the housing policies of Los Angeles County and City exacerbate these structural inequalities by investing in affordable housing designed for a limited period of 30 years and targeting the higher tiers of eligible residents—leaving those in the lowest tier of eligibility with scarce options.[175]

     In some instances, housing discrimination in Los Angeles County is directed explicitly at Black people. In 2013, an investigation by the Civil Rights Division of the U.S. Department of Justice uncovered a pattern or practice of discriminatory

---

[168] *Id.*
[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] Caroline Modarressy-Tehrani, *Women of Color Hardest Hit By Pandemic Joblessness*, NBC NEWS (Aug. 1, 2020), https://www.nbcnews.com/news/us-news/women-color-hardest-hit-pandemic-joblessness-n1235585.
[174] *Id.*
[175] Indeed, with apologies to Sir Winston Churchill, from the perspective of those living on the streets of Los Angeles, it may seem that never have so many spent so much for such little benefit for so few.

practices against Black Angelenos by a Los Angeles County Sheriff's Department station.[176] In particular, the investigation found that Los Angeles County Sheriff deputies discriminated against Black Angelenos "by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act (FHA)."[177]

*Housing Element*

The County and City have the means and infrastructure to create truly affordable housing. A state-mandated plan called the "Housing Element," due by October, is one way that Los Angeles leaders can achieve immediate and sustainable change.[178] In 1969, the California legislature mandated that all cities and counties assess the state of housing availability and adopt a housing plan every 7–8 years to meet the housing needs of every economic sector of the community.[179] The plan, known as the "housing-element law," serves as a blueprint for how the city or county will develop land use and housing.[180] According to the California Department of Housing and Community Development, "California's housing-element law acknowledges that, in order for the private market to adequately address the housing needs and demand of Californians, local governments must adopt plans and regulatory systems that provide opportunities for (and do not unduly constrain), housing development."[181] The goals of the housing element are to ensure each jurisdiction is adjusting its policies to meet the rising housing needs of the community—in particular, by ensuring housing construction, reducing homelessness, and protecting tenants from displacement.

---

[176] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Just., to Sheriff Leroy D. Baca, L.A. Cty. Sheriff's Dep't (June 28, 2013), https://knock-la.com/wp-content/uploads/2021/03/DOJ-Findings-Letter-LASD-in-Antelope-Valley-June-28-2013.pdf.

[177] *Id*. at 5.

[178] Times Editorial Board, *Editorial: L.A. Can Begin to Solve its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.

[179] *Regional Housing Needs Allocation and Housing Elements*, CAL. DEP'T OF HOUS. & CMTY. DEV., https://www.hcd.ca.gov/community-development/housing-element/index.shtml (last visited Apr. 19, 2021).

[180] *Id*.

[181] *Id*.

The housing element law requires cities and counties to identify and assess adequate sites for housing in order to "affirmatively further fair housing."[182] An affirmative approach to fair housing under the law mandates several areas of analysis. Each locality must include "[a]n analysis of available federal, state, and local data and knowledge to identify integration and segregation patterns and trends, racially or ethnically concentrated areas of poverty, disparities in access to opportunity, and disproportionate housing needs within the jurisdiction, including displacement risk."[183] The analysis must contemplate plans to foster and maintain compliance with civil rights and fair housing laws and envision ways to replace segregated residential patterns with integrated and balance patterns.[184] Once issues are identified, an assessment of contributing factors is required, alongside the jurisdiction's housing priorities and goals.[185] Cities and counties must identify metrics and milestones to determine what fair housing results will be achieved.[186] Jurisdictions can implement plans by incentivizing new affordable housing and community revitalization, as well as initiatives to preserve existing affordable housing and protecting existing residents from displacement.[187]

Cities and counties must also create an inventory of land "suitable and available for residential development" throughout the community, including "vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet the locality's housing need for a designated income level."[188] Sites range from permanent housing units to interim shelters, such as rental units, factory-built housing, affordable accessory dwelling units (ADUs), mobile homes, and emergency shelters.[189] In particular, the law requires an analysis of governmental and nongovernmental constraints on maintenance, improvement, or development of housing, and the local efforts to remove such constraints.[190] Currently, 75% of the city's residential property is

---

[182] CAL. GOV'T CODE § 65583.
[183] Id.
[184] Id.
[185] Id.
[186] Id.
[187] Id.
[188] Id.
[189] Id.
[190] Id.

zoned for single-family zones.[191]  Without major rezoning initiatives, Los Angeles will continue to lack the infrastructure to meet the homelessness crisis and stem growing housing insecurity.[192]

In the 2013 Housing Element, the City laid out four goals. First, the City planned to create "a City where housing production and preservation result in an adequate supply of ownership and rental housing that is safe, healthy and affordable to people of all income levels, races, ages, and suitable for their various needs."[193] Second, the City aimed to provide "a City in which housing helps to create safe, livable and sustainable neighborhoods."[194] Third, the City set out to build "a City where there are housing opportunities for all without discrimination" and fourth, "a City committed to ending and preventing homelessness."[195] But in spite of these goals, Black Angelenos face barriers to homeownership and renting affordable housing units; disease runs rampant in garbage-ridden streets; and homelessness rates and homelessness deaths are at an all-time high. In short, nonfulfillment of the Housing Element goals has exacerbated the housing shortage crisis.

In February 2021, the Los Angeles Times Editorial Board ("Times Editorial Board") said that Los Angeles leaders are "clinging to development patterns born out of racist housing policies from the last century that perpetuate segregation and inequality today."[196] The Times Editorial Board noted that the longstanding resistance against density and development has impeded leaders' ability to create sufficient housing to meet the needs of its citizens.[197] Indeed, cities across California, such as Sacramento and Berkeley, are revising zoning laws in response to the housing crisis to permit apartments on land previously zoned only for single family residences.[198]  Los Angeles City Council President Nury Martinez has

---

[191] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.
[192] *Id.*
[193] L.A. DEP'T OF CITY PLANNING, HOUSING ELEMENT 2013–2021 (2013), https://planning.lacity.org/odocument/883be4c9-392f-46e5-996b-b734274da37d/Housing_Element_2013_-_2021_.pdf.
[194] *Id.*
[195] *Id.*
[196] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.
[197] *Id.*
[198] *Id.*

proposed including a measure on the upcoming ballot that would similarly update zoning rules. The proposed ballot states:

> The outdated zoning code [also] prevents the city from meeting the pressing and urgent demands it is faced with. The city has a critical lack of housing for all income levels, however the zoning code prevents new housing from being built in much of the city particularly in job and transit rich communities. An updated code will better allow the city to house its homeless population, take advantage of transit investments, and meet our state mandated Regional Housing Needs Assessment (RHNA) target of over 450,000 new homes by 2029.[199]

In October, Los Angeles must submit its updated Housing Element plan. It must identify land or properties that may be developed for 455,000 new units of housing, including 185,000 units for lower-income tenants. "Given the huge increase in units that L.A. needs to plan for," noted the Times Editorial Board, "the decisions leaders make this year on where to put these new homes will shape how the city grows over the coming decade—and determine whether Los Angeles can become a less segregated, more affordable and sustainable city."[200] The Housing Element plan presents a pivotal opportunity for the City and County to curtail structural racism by affirmatively promoting fair housing, as required under the law. But if new affordable housing is only concentrated in low-income communities where current zoning permits more dense structures, the City and County will not meet their responsibility to affirmatively promote fair housing. The Times Editorial Board challenged city officials to act to deconstruct structural racism in housing policy: "For the first time, Housing Element plans have to analyze housing inequality and try to reduce segregation and lack of opportunities in Black, Latino and lower-income communities. That means cities have to zone for more affordable housing in high-opportunity communities that have lots of jobs, good schools, transit stops, parks and other amenities. And if a city is going to put affordable housing developments in low-income communities, there has to

---

[199] Motion, Land Use Reform – Zoning Ballot Measure (Aug. 19, 2020), http://clkrep.lacity.org/onlinedocs/2020/20-1042_mot_08-19-2020.pdf.
[200] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.

be an accompanying investment in infrastructure, schools and services that help lift up those neighborhoods." [201]

A report by a coalition of housing, social justice, and environmental groups found that nearly half of newly constructed units in Los Angeles between 2012 to 2019 were in lower-income communities. [202] Yet 90% of the new construction during that period is unaffordable to working-class tenants in Los Angeles. [203] By concentrating new housing initiatives in lower-income communities, older buildings are razed and replaced by higher cost units, further decreasing the availability of affordable living for tenants in those communities and driving gentrification. [204] The Times Editorial Board advocated for city officials to change the course of housing scarcity in Los Angeles through its upcoming Housing Element plan:

> The Housing Element is the means by which L.A. leaders can enact more equitable development policies. The City Council and Garcetti could direct new development toward affluent, high-opportunity communities that have been traditionally closed to denser, more affordable housing. They could allow small apartment buildings, townhomes and bungalow courts in single-family neighborhoods. They could adopt tenant protections and discourage redevelopment of rent-stabilized apartments. They could incentivize developers to include more affordable units in their new buildings. They could streamline permitting so it's easier and cheaper to build much-needed homes for all income levels. It shouldn't take state intervention to force L.A. to do what's desperately needed. [205]

With rising housing insecurity and an increasing death rate of unhoused persons on the streets of Los Angeles, never has there been so urgent of a need to utilize the Housing Element to restructure and reform the housing needs of our citizens.

---

[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*

## B. PUBLIC STATEMENTS ON HOMELESSNESS

California Governor Gavin Newsom has recognized the housing crisis that has left hundreds of thousands of Californians on the streets. In his State of the State address to the California Legislature on February 19, 2020, Governor Newsom acknowledged that homelessness was a problem that had been growing for decades and was neglected or consciously set aside by past administrations. His words were a call to emergency action and an effort to provide the necessary resources to stop the loss of life and correct the inhumane conditions existing in the deprivation of humanity in homeless communities in California, thereby ensuring an acceptable quality of life for all. In Governor Newsom's words:

> Let's call it what it is, a disgrace, that the richest state in the richest nation—succeeding across so many sectors—is failing to properly house, heal, and humanely treat so many of its own people. Every day, the California Dream is dimmed by the wrenching reality of families, children and seniors living unfed on a concrete bed. Military veterans who wore the uniform of our country in a foreign land, abandoned here at home. LGBTQ youth fleeing abuse and rejection from their families and communities. Faces of despair. Failed by our country's leaders and our nation's institutions. As Californians, we pride ourselves on our unwavering sense of compassion and justice for humankind—but there's nothing compassionate about allowing fellow Californians to live on the streets, huddled in cars or makeshift encampments. And there's nothing just about sidewalks and street corners that aren't safe and clean for everybody. The problem has persisted for decades—caused by massive failures in our mental health system and disinvestment in our social safety net—exacerbated by widening income inequality and California's housing shortage. The hard truth is we ignored the problem. We turned away when it wasn't our sister, our brother, our neighbor, our friend. And when it was a loved one, help wasn't there. Most of us experienced homelessness as a pang of guilt, not a call to action. . . . It became normalized. Concentrated in skid rows and tent cities in big urban centers. Now it's no longer isolated. In fact, some of the most troubling increases have occurred in rural areas, in small towns, and remote parts of our state. No place is immune. No person untouched. And too often no one

32

wants to take responsibility. I've even heard local officials proclaim in public: it's not my problem. Servants of the public too busy pointing fingers to step up and help? That's shameful. The State of California can no longer treat homelessness and housing insecurity as someone else's problem, buried below other priorities which are easier to win or better suited for soundbites.[206]

Governor Newsom has turned his words into actions. In January 2019, the State of California sued the city of Huntington Beach for failing to comply with state housing laws in place to ensure the availability of affordable housing.[207] Later that year, $650 million in state funds were released directly to cities to address homelessness across the state.[208] Included in the state's 2020–21 budget was a 28-page overview of the Governor's homelessness plan.[209] At the beginning of the pandemic, in March 2020, an additional $150 million was directed to cities to protect Californians experiencing homelessness from COVID-19[210] and exempted the construction industry from his statewide stay-at-home order in recognition of the urgent need for housing projects to continue.[211] As an interim emergency response to the homelessness crisis, Governor Newsom also ordered the deployment of travel trailers to provide temporary housing for families experiencing homelessness.[212]

---

[206] Gov. Gavin Newsom, State of the State Address (Feb. 19, 2020), https://www.gov.ca.gov/2020/02/19/governor-newsom-delivers-state-of-the-state-address-on-homelessness/.

[207] Liam Dillon, *After Huntington Beach Lawsuit, Newsom Warns Cities He'll Continue Housing Law Crackdown*, L.A. TIMES (Feb. 19, 2019), https://www.latimes.com/politics/la-pol-ca-gavin-newsom-housing-cities-summit-20190219-story.html.

[208] Nicole Hayden, *Tired of Waiting for Federal Go-Ahead, California Gov. Newsom Releases Homeless Funding to Counties, Cities*, DESERT SUN (Dec. 4, 2019), https://www.desertsun.com/story/news/2019/12/04/california-gov-newsom-releases-homeless-funding-counties-and-cities/2610314001/.

[209] GABRIEL PETEK, LEGIS. ANALYST'S OFF., THE 2020–21 BUDGET: THE GOVERNOR'S HOMELESSNESS PLAN (2020), https://lao.ca.gov/Publications/Report/4152.

[210] *Governor Newsom Takes Emergency Actions & Authorizes $150 Million in Funding to Protect Homeless Californians from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Mar. 18, 2020), https://www.gov.ca.gov/2020/03/18/governor-newsom-takes-emergency-actions-authorizes-150-million-in-funding-to-protect-homeless-californians-from-covid-19/.

[211] Andrew Khouri, *As California Shelters at Home from Coronavirus, Construction of Housing Goes On*, L.A. TIMES (Mar. 21, 2020), https://www.latimes.com/homeless-housing/story/2020-03-21/coronavirus-construction-california-stay-at-home.

[212] *First Wave of Travel Trailers Delivered to South Los Angeles as Part of Emergency State Action on Homelessness*, OFF. OF GOV. GAVIN NEWSOM (Feb. 13, 2020), https://www.gov.ca.gov/2020/02/13/first-wave-of-travel-trailers-delivered-to-south-los-angeles-as-part-of-emergency-state-action-on-homelessness/.

In April 2020, the Governor set an initial goal of securing 15,000 rooms statewide through Project Roomkey, a program that deploys vacant motel rooms to serve as safe shelters for homeless individuals during the COVID-19 pandemic.[213] In November 2020, an additional $62 million of state funds were committed to counties across the state to continue providing shelter to Project Roomkey participants.[214] And in July 2020, Governor Newsom announced the availability of $600 million in funding for Project Homekey, an initiative to convert hotels, motels, vacant apartment buildings, and other properties into permanent, long-term housing for people experiencing or at risk of homelessness.[215] By the end of 2020, Project Homekey had consumed $846 million in state funds to purchase and subsidize 6,029 housing units statewide.[216]

But despite these state-led efforts, at least 1,383 people experiencing homelessness died on the streets of Los Angeles County in 2020, a figure that likely underestimates the true death toll.[217] As a direct result of local government inaction and inertia in the face of a rapidly escalating crisis, 165 homeless people died in January 2021 alone—a 75.5% increase compared to January 2020.[218] Each day, while the City and County of Los Angeles stand by, allowing bureaucracy to upstage the needs of their constituents, five more people experiencing homelessness die in Los Angeles County.[219] For years, "many efforts to build

---

[213] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/; Marisa Kendall, *How California Used COVID to Create Housing. A Top Newsom Adviser Weighs In*, MERCURY NEWS (Mar. 21, 2021), https://www.mercurynews.com/2021/03/21/how-california-used-covid-to-create-housing-a-top-newsom-adviser-weighs-in/.

[214] *Governor Newsom Announces Emergency Allocation of $62 Million to Local Governments to Protect People Living in Project Roomkey Hotels*, OFF. OF GOV. GAVIN NEWSOM (Nov. 16, 2020), https://www.gov.ca.gov/2020/11/16/governor-newsom-announces-emergency-allocation-of-62-million-to-local-governments-to-protect-people-living-in-project-roomkey-hotels/.

[215] *Governor Newsom Announces Release of $147 Million in Fourth Round of Homekey Awards*, OFF. OF GOV. GAVIN NEWSOM (Oct. 9, 2020), https://www.gov.ca.gov/2020/10/09/governor-newsom-announces-release-of-147-million-in-fourth-round-of-homekey-awards/.

[216] *Governor Newsom Announces Major Homekey Milestone: All 94 Sites Closing Escrow Ahead of Deadline*, OFF. OF GOV. GAVIN NEWSOM (Dec. 29, 2020), https://www.gov.ca.gov/2020/12/29/governor-newsom-announces-major-homekey-milestone-all-94-sites-closing-escrow-ahead-of-deadline/.

[217] Dkt. 241-1 at 1.

[218] *Id.*

[219] *Id.*

housing have been stymied by resistance at the local level — mayors, supervisors and their constituents."[220] This must stop now.

L.A.'s homeless population has been steadily increasing, according to data produced by LAHSA. In 2020, LAHSA reported a 12.7% increase in the rate of people experiencing homelessness in Los Angeles County and a 16.1% increase in the homelessness rate in the City of Los Angeles compared to 2019.[221] The COVID-19 pandemic has only exacerbated L.A.'s homelessness crisis. A recent report by the Economic Roundtable projects that the homelessness rate among working age adults in L.A. will increase by 86% by 2023 due to pandemic-related job losses.[222]

Throughout his nearly eight years as Mayor of Los Angeles, Eric Garcetti has publicly acknowledged the crisis created by the rising rates of homelessness in his city.

In his 2017 State of the City address, Mayor Garcetti said:

> In the last year, we campaigned for historic investments … and we won. Now, armed with the people of Los Angeles behind us, and new resources to propel us, it's time to deliver historic change. . . . I remember a time when homelessness was mostly concentrated in Skid Row. Today, there are people without shelter in just about every neighborhood. I am outraged when there are Angelenos who can't escape the cold rain. Horrified when someone who has worn our country's uniform is begging for change on the corner. I recently talked with a friend who told me her children have grown up seeing the tents in our communities — they think it's just a normal part of Los Angeles. . . . We can't accept that. We won't. . . . But the problem persists. That's why we wrote Measure HHH. That's why we fought hard to pass Measure H … so we could generate $355 million dollars a year to expand mental health, substance abuse, and employment services across the County—getting people off the streets, on track, and into homes of their very own. And thanks to the voters who passed it, we're going to more than

---

[220] Thomas Fuller, *California Governor Declares Homeless Crisis 'A Disgrace,'* N.Y. TIMES (Feb. 19, 2020), https://www.nytimes.com/2020/02/19/us/california-homeless.html.
[221] Dkt. 241-1 at 1.
[222] Dkt. 239 at 1 n.2.

triple our production of permanent supportive housing in the next two years.[223]

In his 2018 State of the City address, Mayor Garcetti said:

And people don't want to go to the other side of the city to sleep in it. Now that Measure H dollars are flowing, we can finally bring relief to people where they are. It's time for tents to come down in our neighborhoods. . . . This week, thanks to this City Council, we will put in place an emergency shelter crisis declaration — so that we can build shelters across L.A. as quickly as possible.[224]

And in 2019, Mayor Garcetti said:

Fighting homelessness is not for the faint of heart. This is tough work. And like you, I'm frustrated with any encampment on any sidewalk in our city. Too many of us still see tents in our neighborhoods … or a man sleeping on our corner who still hasn't gotten the help he needs. And I'm impatient … tired of how long it's taking to make a real dent in this crisis. But I am not, and we are not, turning away from this — we're pushing forward. And based on the evidence … the money that's been invested ... the new hires that have just been made … the time we've dedicated — I know that things will turn around. . . . So, yes: Some days I'm frustrated. But I'm passionate about this. There's no issue I work on more deeply than homelessness … and I can tell you this: we will get there. We will get there. . . . But I am here to tell you that in this coming year, we will start seeing a difference on our sidewalks and in our communities. We have nearly $5 billion dollars to spend on our work. . . . I see homelessness … public safety … equity … infrastructure … and so many other issues through the eyes of my 7-year-old daughter, Maya. What does Los Angeles look like to children in her generation now, as they're growing up? And how will it look when they're grown up, and starting their own families?[225]

---

[223] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2017), https://www.lamayor.org/state-city-2017.
[224] Eric Garcetti, Mayor of L.A., State of the City (Apr. 16, 2018), https://www.lamayor.org/SOTC2018.
[225] Eric Garcetti, Mayor of L.A., State of the City (Apr. 17, 2019), https://www.lamayor.org/state-city-2019.

And finally, in 2020, Mayor Garcetti averred that he had "called for a FEMA-level response to our homelessness crisis almost two years ago, and it took this virus to finally get the federal funding to begin to make it happen."[226] Despite acknowledgements by City and County officials, promises to the citizens of Los Angeles regarding the homelessness crisis have been made and broken year after year. Los Angeles City and County have never taken the most powerful step: declaring this an emergency.[227]

## C. EMERGENCY POWERS FOR AN EMERGENCY SITUATION

Los Angeles City Charter Sec. 231 and Los Angeles Administrative Code Sec. 8.22

> empower the Mayor of the City of Los Angeles to proclaim the existence or threatened existence of a local emergency when an occurrence which by reason of its magnitude is or is likely to become beyond the control of the normal services, personnel, equipment, and facilities of the regularly constituted branches and departments of the City government.[228]

To this day, Mayor Garcetti has not employed the emergency powers given to him by the City Charter despite overwhelming evidence that the magnitude of the homelessness crisis is "beyond the control of the normal services" of the City government. An emergency declaration under the City Charter would give the Mayor the power to "promulgate, issue and enforce rules, regulations, orders and directives which the [Mayor] considers necessary for the protection of life and property."[229] These rules would be effective immediately upon their issuance, allowing Mayor Garcetti to bypass the bureaucracy and eliminate the inefficiencies

---

[226] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2020), https://www.lamayor.org/SOTC2020.
[227] A "FEMA-level response" is not an emergency declaration. An emergency declaration allows the city to bypass bureaucracy. *See infra* Section C. Emergency Powers for an Emergency Situation.
[228] Dkt. 205 at 3.
[229] L.A. Charter, Sec. 8.29.

that currently stifle progress on homelessness—still, the Mayor has not acted, while other localities have.[230]

The City also has a second avenue for leveraging its emergency powers, but there, too, there seems to be a crisis on inaction. California State Government Code 8698–8698.2 gives counties and cities broad powers to declare a shelter crisis and provide emergency shelter and housing to the homeless during the duration of the state of emergency.[231] In 2015, Mayor Garcetti and Los Angeles City Council members introduced a motion to declare a state of emergency on homelessness "as it relates to a shelter crisis," but the motion was never acted upon.[232] The motion called L.A.'s homelessness crisis "unprecedented and growing" and said that the City was "facing a state of emergency," requiring "immediate action" and "immediate relief"—"extraordinary steps must be taken to make it build and locate a broad range of housing options; including temporary housing options, emergency shelters, and safe and legal parking areas for individuals who may live in their vehicles." [233] It further declared that "the City of Los Angeles should take full advantage of its emergency authority to provide and incentivize shelter to those whose lives and health are at risk by living on the streets." [234]

Commenting on the lack of movement eight weeks after the 2015 motion was first introduced, the Los Angeles Times Editorial Board wrote, "this whole process has been more of a turgid civics debate than an urgent response to a desperate situation."[235] Despite the City's acknowledgment that it had "willing partners at every level" and that the emergency "require[d] strong and immediate action by the city of Los Angeles," [236] the Times continued, "the supposed state of emergency proclaimed almost two months ago is looking increasingly look like a

---

[230] Other locales— including Portland, Oregon; Seattle and King County, Washington; and Hawaii—have declared states of emergency related to rising homelessness. Commenting on the decision to declare a state of emergency in his county, King County, Washington Executive Dow Constantine said, "[t]he persistent and growing phenomenon of homelessness—here and nationwide—is a human-made crisis, just as devastating to thousands as a flood or fire." J.B. Wogan, *Why Governments Declare a Homeless State of Emergency*, GOVERNING (Nov. 10, 2015), https://www.governing.com/archive/gov-when-cities-declare-a-homeless-state-of-emergency.html.
[231] Motion, State of Emergency – Homelessness and Poverty Housing (Sept. 22, 2015) [hereinafter 2015 Motion].
[232] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.
[233] 2015 Motion, *supra* note 231.
[234] *Id.*
[235] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.
[236] 2015 Motion, *supra* note 231.

farce and a waste of time" and concluded, "enough with the hype and the mere pretense of urgency."[237]

In the intervening years, the City eventually went on to declare a shelter crisis under the state code, but the shelter crisis declaration has proven to be nothing more than empty words.[238] Homeless individuals continue to die in record numbers; the homeless population continues to grow; and government inertia continues to plague already insufficient relief efforts. Six years after the words were written, the Times Editorial Board's proclamation that the shelter crisis declaration was a "farce and a waste of time" continue to ring true. It is clear that Mayor Garcetti can draw on his power to declare a local emergency under the Los Angeles City Charter in order to make progress towards solving the homelessness crisis.

In a September 2019 editorial in the Los Angeles Daily News, Los Angeles City Councilmember Joe Buscaino called on the California governor to declare a state of emergency on homelessness, writing: "In our response to the homelessness crisis, the city, the county, and the state are obeying every speed limit and stopping at every red light…. We need to give our dedicated civil servants the ability to respond to this emergency Code 3, just like cops and firefighters, and bypass the normal rules that add precious days, weeks, and months to contracting and construction timelines."[239] While the City has tried to shift responsibility onto the state for declaring an emergency, the real power remains with the Mayor and the City Council.

The global community has recognized the shameful plight of the richest state in one of the richest countries in the world while it languishes in indecision. UN Special Rapporteur on Extreme Poverty and Human Rights Philip Alston has called out Los Angeles for lagging behind other American cities in tackling homelessness.[240] Specifically addressing his visit to Skid Row and the attitudes of public authorities in Los Angeles, the Special Rapporteur wrote that "[r]ather than responding to homeless persons as affronts to the senses and to their

---

[237] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.
[238] L.A., CAL. ORDINANCE 185,490.
[239] Joe Buscaino, *It's Time to Declare a State of Emergency on Homelessness*, L.A. DAILY NEWS (Sept. 24, 2019), https://www.dailynews.com/2019/09/24/its-time-to-declare-a-state-of-emergency-on-homelessness-joe-buscaino/.
[240] Gale Holland, *U.N. Monitor Says L.A. Lags Behind Other Cities in Attacking Homelessness*, L.A. TIMES (Dec. 5, 2017), https://www.latimes.com/local/lanow/la-me-ln-un-monitor-skid-row-20171215-story.html.

neighborhoods, citizens and local authorities should see in their presence a tragic indictment of community and government policies."[241] The Special Rapporteur continued, commenting on the people he met in Skid Row who were "barely surviving" and concluding that "[h]omelessness on this scale is far from inevitable."[242] Leilani Farha, UN Special Rapporteur on Housing, also remarked that the homelessness crisis makes "you almost forget you're in Los Angeles."[243] The New York Times has reported that "[n]early half of all unsheltered people in the United States live in California, though the state accounts for just 12% of the U.S. population."

Still, calls for action have been met only with a persistent failure to muster political will, resulting in an abdication of the government's duty to protect its constituents.

### D. GOVERNMENT INACTION

Elected officials at both the state and local level have long been aware of L.A.'s urgent homelessness crisis. In recent court filings, the County of Los Angeles called homelessness "an extraordinarily complex problem that demands a multi-faceted approach and active, sustained collaboration" among government officials.[244] The City of Los Angeles acknowledged that the "crisis of homeless is among the great challenges facing our region"[245] In a 2019 interview, Mayor Garcetti referred to homelessness as "the humanitarian crisis of our lives,"[246] a characterization echoed by Hilda Solis, chair of the County Board of Supervisors, in 2020.[247] Heidi Marston, Executive Director of the Los Angeles Homeless

---

[241] *Statement on Visit to the USA, by Professor Philip Alston, United Nations Special Rapporteur on Extreme Poverty and Human Rights*, U.N. HUM. RTS. OFF. OF THE HIGH COMM'R (Dec. 15, 2017), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22533.

[242] *Id.*

[243] Charles David, *UN Housing Official Shocked by L.A.'s Homelessness*, CAPITAL & MAIN (Jan. 25, 2018), https://capitalandmain.com/united-nations-housing-official-shocked-los-angeles-homelessness-0125.

[244] Dkt. 235 at 6.

[245] Dkt. 242 at 1.

[246] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[247] *Innovative and Rapid Construction of Housing to Alleviate Homelessness to Launch at Former Jail Site*, HILDA SOLIS (Sept. 29, 2020), https://hildalsolis.org/innovative-and-rapid-construction-of-housing-to-alleviate-homelessness-to-launch-at-former-jail-site/.

Services Authority, has called homelessness "an emergency on our streets . . . [requiring] an emergency response."[248] And yet, City and County officials are content to pay soundbite lip service instead of declaring an emergency and taking steps to correct the problems that plague their communities.

California's homeless population has steadily risen since 2007.[249] The sharpest increase took place over the last two years, marking a 24.3% increase from 2018 to 2020.[250] A March 2021 federal report shows that California's homeless population increased by nearly seven percent in early 2020 to an estimated 161,548—months before COVID-19 emerged and the subsequent economic crisis hit the state.[251] Despite frequent acknowledgments of the emergency nature of homelessness in LA, City and County efforts to address the problem continue to be mired in corruption and plagued by a lack of transparency.

### i. No Functionality - Corruption, Bureaucracy, and Inadequacy

In February 2021, at the Los Angeles Business Council's Mayoral Housing, Transportation and Jobs Summit, city officials spoke about the inadequacy of current efforts to combat homelessness. City Councilmember Mike Bonin declared, "let's just be absolutely candid here—there's almost nobody in the city of Los Angeles, housed or unhoused, who would give what's happening in Los Angeles [anything] other than a failing grade."[252] Bonin further suggested that the structure of L.A.'s government was "not designed for a crisis of this proportion."[253] Fellow Councilmember Kevin de León continued, "By any objective measurement, the current status quo is dysfunctional, it's highly disjointed, the systems are completely misaligned."[254]

---

[248] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.
[249] Chris Nichols, *California's Homeless Population Rose 7% To 161,000 Ahead Of The Pandemic, New Report Finds*, CapRadio (Mar. 19, 2021), https://www.capradio.org/articles/2021/03/19/californias-homeless-population-rose-7-to-161000-ahead-of-the-pandemic-new-report-finds/.
[250] *Id*.
[251] *Id*.
[252] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YouTube (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[253] *Id*.
[254] *Id*.

The disconnect between politicians' public statements about the severity of this crisis and the actual efforts made to fund effective solutions is growing. Recent investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. In at least two separate instances with two different developers, reports indicate that developers of taxpayer-funded affordable housing projects have purchased properties before turning around and reselling those properties to themselves at higher prices in order to artificially inflate their project budgets and, in turn, the amount of public money that they receive. In the case of a partly renovated motel in L.A.'s Westlake neighborhood, developers were able to increase the project's budget by $8 million through this process of reselling.[255] According to reporting by KCRW, "most of the more than $30 million pumped into the renovation of this rundown motel has gone to its former owners, who, right before the sale, were sued by public interest attorneys for illegally evicting tenants."[256] In another case near Koreatown, a similar reselling process was used by a different developer to artificially inflate the budget by $6 million.[257]

These cases, of which there are almost certainly more to be discovered, indicate that the city has turned a blind eye to corruption as money is being siphoned off from funds that taxpayers voted to allocate to the homeless population.

The improper relationship between City Hall and real estate developers is neither isolated nor new. The FBI has been investigating possible corruption in City Hall since 2017, a probe that has led to the prosecution of real estate consultants, political fundraisers, and even, most notably, former Councilmember Jose Huizar, whose council district included Skid Row.[258] In June 2020, Huizar was arrested by federal agents for using his position to cover up illegal activities

---

[255] Anna Scott, *How a City-Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la.

[256] *Id*.

[257] *Id*.

[258] David Zahniser, Emily Alpert Reyes, & Joel Rubin, *L.A. City Councilman Jose Huizar charged in federal corruption probe*, L.A. TIMES (June 23, 2020) https://www.latimes.com/california/story/2020-06-23/jose-huizar-arrest-corruption-city-hall-fbi-investigation; Donna Evans, *$3.7 Million Plan Proposed to Clean Up Skid Row*, DT NEWS (Apr. 8, 2014) http://www.ladowntownnews.com/news/3-7-million-plan-proposed-to-clean-up-skid-row/article_e25e730a-bf51-11e3-ac54-0019bb2963f4.html.

such as accepting bribes from real estate developers,[259] and the Los Angeles Times has reported that "[i]nvestigators said Huizar reduced the amount of affordable housing required inside the development after receiving key financial benefits…."[260] The FBI investigation and subsequent arrests, indictments, and prosecutions makes clear that corruption inside City Hall is directly linked to the lack of affordable housing in the City and, by extension, the homelessness crisis.

At the February 2021 Mayoral Summit, Councilmember Mark Ridley-Thomas said, "We have to be smarter, we have to work harder, and we have to run a lot faster . . . If in fact we expect to make a difference over the next five years, it will require that which is conspicuously absent in this environment—and that is leadership . . . collective leadership."[261] Recognizing the purely symbolic nature of the collaboration between City Hall and the Board of Supervisors, Councilmember Ridley-Thomas continued, "we are overdue in terms of getting our act together."[262] Councilmember Ridley-Thomas' words echo an article on homelessness in the Los Angeles Times more than 30 years ago. In 1985, the Times wrote: "It is time for leadership from both the mayor's office and the county Board of Supervisors to pull all the players together in one room and lock the door until they have assigned tasks to start finding land and money for shelters, with deadlines for doing so. . ."[263]

## ii.   No Accountability - Missed Targets and Suspended Deadlines

---

[259] Libby Denkmann, *Timeline: Follow The FBI's Sweeping LA City Hall Corruption Investigation Through The Years*, LAIST (May 18, 2020), https://laist.com/2020/05/18/los-angeles-city-hall-fbi-corruption-investigation-timeline-englander-huizar.php.
[260] David Zahniser, *Downtown Developer Will Pay $1.2 Million in L.A. City Hall Corruption Case*, L.A. TIMES (Jan. 7, 2021), https://www.latimes.com/california/story/2021-01-07/downtown-developer-will-pay-1-2-million-in-l-a-city-hall-corruption-case.
[261] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[262] *Id.*
[263] *Help the Homeless*, L.A. TIMES (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.

Four years ago, Los Angeles voters passed Proposition HHH, a $1.2 billion bond to fund housing projects aimed at the city's homeless population.[264] After three years of missed deadlines, the first HHH project, providing just 62 housing units, opened in January 2020.[265] At the project's unveiling, the Mayor announced, "This year, we will see an opening of one of these about every three weeks. My calculations, next year it might be every two weeks or less."[266] Over a year later, just seven projects containing 489 total units, had been completed.[267] By then, the City was four years into a ten-year project, but progress lagged far behind projections.

"Where has this money gone?" asked Anna Scott of National Public Radio member station KCRW.[268] The initial public campaign for Proposition HHH planned for 10,000 housing units to be completed in 10 years, promising significant relief to the City's unhoused population. However, progress continues to lag behind promises. At the current rate, it will take nearly 30 years to build enough housing for over 66,000 people currently experiencing homelessness—an estimate that doesn't even account for the fact that the homelessness rate is growing exponentially every year.[269] Moreover, while the average cost of a custom home in L.A. starts at $350,000, more than 28% of Proposition HHH units in construction exceed $600,000 per unit.[270]

Ron Miller, Executive Secretary of the Los Angeles/Orange Counties Building and Construction Trades Council, was a major proponent of Proposition HHH, but recently questioned in a letter to Los Angeles City Attorney Mike Feuer why action has not been taken to quell the "abuses that seem to be occurring under HHH."[271] Miller referenced reports "alleging everything from fake not-for-profits

---

[264] Doug Smith, *It Took Three Years of Blown Deadlines, But L.A. Opens Its First Homeless Housing Project*, L.A. TIMES (Jan. 7, 2020), https://www.latimes.com/california/story/2020-01-07/homeless-housing-project-proposition-hhh-bond-measure.

[265] *Id.*

[266] *Id.*

[267] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

[268] Anna Scott, *How a City-Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la.

[269] Dkt. 239 at 23.

[270] *Id.*

[271] Letter from Ron Miller, Exec. Sec'y, L.A./Orange Cntys. Bldg. & Constr. Trades Council, to Mike Feuer, L.A. City Att'y (Dec. 17, 2020) [hereinafter Miller Letter].

to contractors with zero employees and multi-million dollar development fees, and lucrative guaranteed managements fees that support zero-risk development." [272] Miller asked City Attorney Feuer why "there has been virtually no general call to action to publicly disclose and discuss the amount of money that is being made by developers or needed background investigation on entities applying for HHH funding."[273] Even beyond the damage it's done to the homeless community and those facing housing insecurity, these issues are also hurting the construction community.

Los Angeles City Controller Ron Galperin has also highlighted the problems undergirding HHH projects. In an article for the Los Angeles Daily News on March 14, 2021, Galperin wrote:

> What's the problem with HHH? The projects are too expensive and too slow to make a meaningful difference for people living on our streets. As of this month, 489 bond-funded units are ready for occupancy and most others won't be finished until 2023, 2024 or later. While Los Angeles someday will see thousands of new units, it will be nowhere near enough to keep pace with the crisis in our neighborhoods.[274]

Examining the causes of the excessive delays and skyrocketing costs that have plagued HHH projects to date, Galperin went on:

> Spools of red tape and excessive development costs contributed to this mess. As Los Angeles Controller, the HHH ballot language mandates my office to audit the program's finances yearly, and the City Charter allows us to examine its performance. We found in 2019 and 2020 that the high cost of building permanent supportive housing had slowed HHH to a crawl. Having to cobble together money from multiple funding sources and a serpentine permitting process made it so that developers couldn't get their projects approved quickly. Instead of churning out units at $350,000 each as

---

[272] *Id.*
[273] *Id.*
[274] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

originally predicted, the average per unit cost is now $531,000 — with some
eclipsing $700,000. . . . If the City worked harder to bring costs down, it
could use more money to fund additional housing units and extend HHH's
reach.[275]

Further, even though Governor Newsom specifically exempted construction
work from his statewide stay-at-home orders, Mayor Garcetti ordered "all
benchmarks and deadlines pertaining to current HHH projects [to be] indefinitely
suspended" as of April 2020.[276] Without these deadlines, Los Angeles residents
have no way to hold the City accountable for its promises to create sustainable
solutions to homelessness. And this complete lack of accountability has
consequences—in the four years since Proposition HHH was passed, 5,814
homeless people have died on the streets of Los Angeles.[277] Homeless deaths have
increased to at least five deaths per day, and while the homeless have perished on
our streets, only 489 housing units have been produced in the four years of HHH
funding.

Proposition HHH provided funds to be used in three types of housing: 1)
supportive housing for homeless individuals where health and other services would
be provided, 2) temporary shelters and facilities, and 3) affordable housing.[278]
Nevertheless, the City "unilaterally decided to spend the vast majority of the
funding on supportive housing," allocating only five percent of the total
Proposition HHH budget to interim shelter and facilities projects.[279] The deadly
decision to prioritize long-term housing at the expense of committing funds to
interim shelters has caused few to be housed while tens of thousands of people are
left in the street. This allocation of resources has significantly benefited a relative
few and sentenced the vast majority of our homeless population to living under
circumstances that are clearly unacceptable in a civilized society. This decision
also caused the quality of life for all residents of the City and County to deteriorate
at an alarming rate.

City Controller Galperin recently called for a "pandemic pivot" in his recent
Los Angeles Daily News Article:

---

[275] *Id*.
[276] Dkt. 265 at 23.
[277] *Id*.
[278] Dkt. 239 at 21.
[279] *Id*.

Money set aside for questionable or excessively expensive projects should be reallocated to less costly and time-consuming plans. Until recently, there had been little openness to such ideas at City Hall, but two of L.A.'s newest Councilmembers have embraced my office's recommendations. They want the City to scrutinize troubled projects to see if a greater share of HHH funds can be used to build housing faster and cheaper. Building more interim housing to address immediate needs, and expanding the use of cheaper, faster permanent housing solutions to achieve long-term goals — like motel conversions and prefabricated and modular units — can and should be done through HHH. It's time for the City to do a pandemic pivot. The residents of Los Angeles, unhoused and housed, deserve a more flexible approach to homeless housing — one that gets people off the streets today and creates an even greater number of supportive units in the days to come.[280]

In a further effort to exacerbate this crisis, the City also announced in March 2021 that it would ramp down Project Roomkey, Governor Newsom's program to converted unused hotel rooms into temporary shelters for unhoused people during the COVID-19 pandemic.[281] Just a month earlier, in February 2021, the Los Angeles Business Council, representing 500 L.A. businesses and civic leaders, had urged the City to expand Project Roomkey to include 15,000 hotel rooms.[282] "Opportunities like this don't come along often. We must take full advantage of it," the Los Angeles Business Council (LABC) wrote to Mayor Garcetti.[283] "Thus, we urge you to act fast to explore options for renting vastly more hotel and motel

---

[280] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

[281] Elizabeth Chou, Expanding Project Roomkey to Shelter Homeless Angelenos 'Unfeasible,' LA County Officials Say, L.A. DAILY NEWS (Mar. 8, 2021), https://www.dailynews.com/2021/03/08/expanding-project-roomkey-to-shelter-homeless-angelenos-unfeasible-la-county-officials-say/; Benjamin Oreskes & Dakota Smith, *L.A. County Won't Expand Program to Shelter Homeless People in Hotels*, L.A. TIMES (Mar. 5, 2021), https://www.latimes.com/homeless-housing/story/2021-03-05/l-a-county-wont-expand-program-to-shelter-homeless-people-in-hotels.

[282] *L.A. Business Council Calls for Significant Expansion of Project Roomkey for Homeless*, L.A. DAILY NEWS (Feb. 20, 2021), https://www.dailynews.com/2021/02/20/l-a-business-council-calls-for-significant-expansion-of-project-roomkey-for-homeless/.

[283] *LABC Leaders Call on Mayor Garcetti and City Council to Pursue 15,000 Room Goal for Project Roomkey*, LABC (Feb. 19, 2021), https://labusinesscouncil.org/labc-leaders-call-on-mayor-garcetti-and-city-council-to-pursue-15000-room-goal-for-project-roomkey/.

rooms and bringing our unhoused Angelenos safely indoors."[284] City Attorney Mike Feuer also called himself a "strong supporter of the LABC's proposal today that there be 15,000 new beds under Project Roomkey."[285]

While the City cited budget constraints as the key factor in its decision, according to the Los Angeles Times, "local, state and federal officials say the city hasn't requested reimbursement from the Federal Emergency Management Agency (FEMA) for portions of the estimated $59 million it has spent on Project Roomkey" to date.[286] Shayla Myers, an attorney for the Legal Aid Foundation of Los Angeles has said, "there is federal money on the table—the literal FEMA response the mayor has been begging for, and yet the City has found excuse after excuse not to take advantage of it."[287] Mary Leslie, president of the Los Angeles Business Council, called the City's failure to apply for reimbursement despite their purported budget constraints "disturbing and inexcusable" and stated that the City's inaction is "costing the most vulnerable people their lives."[288] While under the Trump administration, the federal government reimbursed only 75% of costs under Project Roomkey, the Biden administration recently increased the reimbursement rate to 100%.[289]

In justifying the delayed reimbursement applications, City Administrative Officer Rich Llewellyn said, "essentially our billing department needs more assistance to get the money back."[290] In response, the Los Angeles Business Council said that "if it's really a matter of filling out paperwork, the LABC is perfectly willing to organize an army of volunteers to go down to City Hall."[291] With only 42% of local hotel rooms occupied on any given day, the City could use the FEMA reimbursement money to shelter tens of thousands of at-risk people living on the streets of L.A.[292]

---

[284] *Id.*

[285] *Id.*

[286] Benjamin Oreskes & Dakota Smith, *L.A. Is Entitled to Federal Aid to Put Homeless People in Hotels. It Hasn't Asked for Any Yet*, L.A. TIMES (Mar. 3, 2021), https://www.latimes.com/homeless-housing/story/2021-03-03/la-slow-submit-fema-aid-paperwork-homeless-hotels.

[287] *Id.*

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] *Id.*

[292] Adam Mahoney, *Occupy Hotel Rooms: Inside LA's New Push to Solve Homelessness*, GRIST (Mar. 10, 2021), https://grist.org/justice/fema-project-roomkey-homelessness-los-angeles/.

"Quite frankly, . . . our treasury usually has a balance of around 10-ish billion dollars," stated Los Angeles City Controller Ron Galperin on April 15, 2021. "There are ways that we can front the money for something," Galperin continued. Critiquing the standstill based on budget shortfalls, Galperin said "the point that I've made repeatedly to others in the City is that if the issue is cash flow . . . we can solve that cash flow issue. That should not be the impediment."[293]

### iii.   No Plan for the Future

In his 2020 State of the State address, California Governor Gavin Newsom declared, "the State of California can no longer treat homelessness and housing insecurity as someone else's problem, buried below other priorities which are easier to win or better suited for soundbites."[294] The Governor's efforts to address homelessness include deploying emergency mobile housing trailers for homeless families, securing FEMA reimbursement for Project Roomkey, and making available state property for homelessness solutions. Still, despite these efforts by the State to provide aid to the City and County, 165 homeless persons died in January 2021.[295] In February 2021, at least another 105 homeless people died in Los Angeles County.[296] A minimum of 270 homeless people have died in 2021—a 49% increase compared to this same time in 2020.[297] At a recent Court hearing in City Hall, General Jeff Page, a leading activist and Skid Row resident said, "[W]hen we think of City Hall, where we are right now, it's on the northwest corner of 1st and Main. The most northern corner of Skid Row is 3rd and Main, which is two blocks from here. And so, you know, we can actually look out the window and see homelessness out of every single direction—north, south, east, and west—of the building."[298]

---

[293] People's City Council – Los Angeles (@PplsCityCouncil), Twitter (Apr. 15, 2021, 6:33 PM), https://twitter.com/pplscitycouncil/status/1382869701852729348?s=21.
[294] Gov. Gavin Newsom, State of the State Address (Feb. 19, 2020), https://www.gov.ca.gov/2020/02/19/governor-newsom-delivers-state-of-the-state-address-on-homelessness/.
[295] Ethan Ward, *They Were Homeless, Now They're Dead*, CROSSTOWN (Feb. 10, 2021) https://xtown.la/2021/02/10/homeless-deaths-los-angeles/.
[296] Rev. Andy Bales (@abales), TWITTER (Mar. 8, 2021, 7:36 PM), https://twitter.com/abales/status/1369130010884198400.
[297] *Id*.
[298] Dkt. 165 at 172–73.

Despite Governor Newsom's warning against deprioritizing homelessness and the clear evidence of an exponentially growing crisis in Los Angeles, City Councilmember Mark Ridley-Thomas criticized City inaction at the February 2021 Mayoral Summit, saying, "the issue of homelessness is of insufficient importance to the decision makers in this region. Therefore, we have this languishing set of circumstances where we chase our tails, day in and day out, claiming that we're doing things."[299] Councilmember de Leon agreed: "We need a real plan—a north star."[300] He later continued, "There is a dissonance, there is a disconnection with the governmental rhetoric and what is happening on our streets every single day in Los Angeles."[301] While Defendants tout their commitment to "build 10,000 permanent supportive housing units" through Proposition HHH, the ongoing delays with Proposition HHH projects, failure to apply for FEMA funding, and ramp down of Project Roomkey demonstrate that the City and County lack the political courage to confront the fierce urgency of now, just when the citizens need solutions the most. With no clear plan of how to move forward, fellow Councilmember Mike Bonin echoed Ridley-Thomas: "The only way we can respond to this is . . . we need the Court's help."[302] Panel moderator Miguel Santana concluded: "I'm hoping that five years from now we're not having this conversation. I don't know about you, but I'm kind of tired of having it. But something tells me we are."[303]

On March 11, 2021, President Biden signed a historic $1.9 trillion COVID-19 relief bill that provided direct funding to states and cities. The City of Los Angeles was expected to receive $1.35 billion of that money, with $1.9 billion going to the County as a whole, leaving Mayor Garcetti "ecstatic."[304] Michael Weinstein, President of the AIDS Healthcare Foundation, commented on the potential uses of that money, saying "the federal money coming to Los Angeles presents a tremendous opportunity for L.A. to finally and meaningfully end our

---

[299] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[300] *Id.*
[301] *Id.*
[302] *Id.*
[303] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[304] David Zahniser, Dakota Smith & Julia Wick, *L.A. Expects to Receive $1.35 Billion from the Relief bBll. Garcetti Is 'Ecstatic'*, L.A. TIMES (Mar. 10, 2021), https://www.latimes.com/california/story/2021-03-10/federal-relief-cities-states-could-end-los-angeles-city-budget-crisis.

homeless crisis. However, we need Mayor Garcetti and the Council to act deliberately—and swiftly—to end the crisis here once and for all."[305] In June 2020, even before the influx of funding through Biden's COVID-19 relief bill, Heidi Marston, Executive Director of the Los Angeles Homeless Services Authority said: "We set the goal of rehousing 15,000 people, because that's the estimated number of people experiencing homelessness who are 65 or older, or who have an underlying health condition, making them highly susceptible to hospitalization or death should they contract COVID-19. This is about saving lives. We are not backing away from that number. We know how to house them. We need the resources from the city, county, state and federal government to do it."[306] Now, Los Angeles has the resources to rehouse 15,000 vulnerable people through Project Roomkey—instead, the City and County continue to abdicate their responsibility to protect their citizens.

## E. HEALTH AND SAFETY IMPACTS

### i.     Fires

It isn't just the unhoused community that feels the effects of this persistent government inaction. Rather, inertia has created a public safety crisis that touches the lives of every citizen of Los Angeles while the government remains indifferent amidst rising chaos. Firefighters of the Los Angeles Fire Department "are stunned by their own department's records, which show thousands more fires in 2020 than 2019, including more arsons and fires linked to homelessness."[307] The problem is growing worse. Fires are breaking out with distressing frequency, threatening both housed and unhoused populations. In 2020, fires related to homelessness increased

---

[305] Ged Kenslea, Homelessness: *AHF Tells City 'No More Excuses!' as L.A. Gets $1.35B in COVID Relief*, BUSINESSWIRE (Mar. 20, 2021), https://www.businesswire.com/news/home/20210320005012/en/Homelessness-AHF-Tells-City-%E2%80%98No-More-Excuses%21%E2%80%99-as-L.A.-Gets-1.35B-in-COVID-Relief.
[306] Doug Smith & Benjamin Oreskes, *As Efforts Collapse to Place Homeless in Hotels, L.A. Officials Propose New, $800-Million Plan*, L.A. TIMES (June 23, 2020), https://www.latimes.com/homeless-housing/story/2020-06-23/as-efforts-collapse-to-place-homeless-in-hotels-l-a-officials-propose-new-800-million-plan.
[307] Eric Leonard, *LAFD Reports a Staggering Rise in the Number of Fires, Outpacing Any Year in Recent Memory*, NBC L.A. (Oct. 9, 2020), https://www.nbclosangeles.com/investigations/fires-spike-45-in-city-of-los-angeles-data-shows/2442013/.

by 82% compared to 2019.[308] That figure is on pace to rise in 2021.[309] Particularly disturbing are records related to deliberately set fires affecting homeless individuals—which increased by 90% in 2020.[310] The fires stem from homeless-on-homeless violence, targeted attacks from outsiders, and fires individuals light to stay warm inside their tent.[311] In addition to the rise in deaths and injury, the fire destroys the temporary shelter unhoused individuals have, often sweeping up with it documents necessary to apply for housing and services.[312]

Adding a more personal angle to these facts and figures, Freddie, an unhoused Angeleno whose tent was destroyed by a targeted explosion in Echo Park, said: "I know it's not directed toward me as an individual," said Freddie, "but it is directed toward me as a homeless person."[313] As he read in his tent one Sunday evening, the last two sounds Freddie heard before the explosion were the roar of a car engine followed by a resounding boom that filled his tent with smoke and razed his shelter.[314] Taking stock of what remained of his tent, Freddie questioned whether there would be a larger police response or public outcry had the same attack been taken against a housed Angeleno.[315] "Why am I less of a person?" he asked.[316]

## ii. Increased Risk of Homeless Deaths

Unhoused persons who live on overpasses, underpasses, and along freeways are dying of transportation-related injuries and the public health risks inherent in living near freeways. A report by Los Angeles County shows that transportation-related injuries are the *third* most common cause of death among unhoused

---

[308] *More Than Half of Fires in LA at Start of 2021 Related to Homeless Encampments*, NBC L.A. (Jan. 14, 2021), https://www.nbclosangeles.com/on-air/ore-than-half-of-fires-in-la-at-start-of-2021-related-to-homeless-encampments/2506553/.
[309] James Queally, *Firecrackers. Molotov Cocktails. Fire Attacks Have Shaken L.A.'s Homeless Community*, L.A. TIMES (Oct. 18, 2019), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.
[310] Eric Leonard, *LAFD Reports a Staggering Rise in the Number of Fires, Outpacing Any Year in Recent Memory*, NBC L.A. (Oct. 9, 2020), https://www.nbclosangeles.com/investigations/fires-spike-45-in-city-of-los-angeles-data-shows/2442013/.
[311] James Queally, *Firecrackers. Molotov Cocktails. Fire Attacks Have Shaken L.A.'s Homeless Community*, L.A. TIMES (Oct. 18, 2019), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.
[312] *Id.*
[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] *Id.*

Angelenos.[317] In Los Angeles, a homeless individual is 11 times more likely to die from being struck by a vehicle or train than a housed individual is.[318] Many others die each year after falling from overpasses.

Encampments near freeways are "environmentally hazardous," says Gary Blasi, civil rights attorney and Professor of Law at University of California, Los Angeles.[319] In fact, diesel soot and other carcinogens in vehicle exhaust increase the risk of cancer;[320] chronic exposure also raises the risk of pre-term births, asthma, strokes, and reduced lung function;[321] and chronic exposure to microscopic air pollutants in vehicle exhaust are key contributors to deaths from heart disease among people living near traffic.[322]

The Los Angeles County report concluded: "Put simply, being homeless in LA County is becoming increasingly deadly."[323] Unhoused Angelenos near freeways are exposed to toxic pollution and a high probability of "hazardous waste concentrations of lead."[324] Areas within 300 yards of freeways are particularly vulnerable to the effects of pollution.[325]

---

[317] CTR. FOR HEALTH IMPACT EVALUATION, CTY. OF L.A. PUB. HEALTH, RECENT TRENDS IN MORTALITY RATES AND CAUSES OF DEATH AMONG PEOPLE EXPERIENCING HOMELESSNESS IN LOS ANGELES COUNTY (2019), http://www.publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf [hereinafter CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS].

[318] *Id.*

[319] HILARY MALSON & GARY BLASI, UCLA LUSKIN INST. ON INEQ. & DEMOCRACY, FOR THE CRISIS YET TO COME: TEMPORARY SETTLEMENTS IN THE ERA OF EVICTIONS (2020).

[320] Tony Barboza & Jon Schleuss, *L.A. Keeps Building Near Freeways, Even Though Living There Makes People Sick*, L.A. TIMES (Mar. 2, 2017), https://www.latimes.com/projects/la-me-freeway-pollution/.

[321] Tony Barboza, *Freeway Pollution Travels Farther Than We Thought. Here's How to Protect Yourself*, L.A. TIMES (Dec. 30, 2017), https://www.latimes.com/local/california/la-me-freeway-pollution-what-you-can-do-20171230-htmlstory.html.

[322] Tony Barboza, *California Scientists Link Tiny Particles in Car Exhaust to Heart Disease*, L.A. TIMES (Feb. 25, 2015), https://www.latimes.com/local/lanow/la-tiny-pollutants-linked-to-heart-disease-deaths-20150225-story.html.

[323] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.

[324] Dkt. 103-1 at 3.

[325] Ryan Carter, *Who Is Hit Hardest by Coronavirus in LA County? The Answer Is in the Air*, UCLA Study Says, L.A. DAILY NEWS (Apr. 15, 2021), https://www.dailynews.com/2021/04/15/who-is-hit-hardest-by-coronavirus-in-la-county-the-answer-is-in-the-air-ucla-study-says/



Around the 710 Freeway, each day the air is polluted by as many as 40,000 vehicles—many of which are heavy-duty semi trucks.[326] "All of these areas tend to have larger populations of Latinx and Black residents," said Dr. Michael Jerrett, a professor of environmental health sciences at UCLA's Fielding School of Public Health.[327] Dr. Jerrett led a study, alongside University of California, Berkeley and University of California, Merced, investigating why neighborhoods in Los Angeles County with the highest levels of pollution saw large spikes in COVID-19 deaths.[328] The study indicated that nitrogen dioxide in air pollution may raise the risk of COVID-19 infections and ultimately, deaths.[329]

The increase in record temperatures and high winds has also increased the risk of hypothermia among unhoused populations. According to the Center for

---

[326] *Id.*

[327] *Id.*

[328] *Id.*

[329] *Id.*

Disease Control, underlying health conditions, such as malnutrition or cardiovascular disease, in combination with lack of housing puts those experiencing homelessness at a higher risk of dying from hypothermia.[330] Contracting hypothermia is particularly risky when the temperature drops more than ten degrees in one day—a common occurrence in Los Angeles.[331] Since 2016, the Los Angeles County Medical Examiner-Coroner recorded more deaths of homeless individuals due to hypothermia than in New York and San Francisco, combined.[332] The lack of available housing for unhoused individuals leaves them no choice but to suffer the cold rains. In January of 2018, a 44-year-old man endured the rain outside of a business for two days until someone called 911.[333] The man was rushed to the hospital with a body temperature of 80.6 degrees—15 degrees less than the 95 degree benchmark necessitating hypothermia treatment. [334] The man did not survive. [335] Glenn Oura, a U.S. Air Force veteran who was formerly homeless, recalled sleeping outside in the bushes during a cold rainstorm, "I thought, 'if I die from hypothermia, how long will it take someone to find me?'"[336]

### iii.    Mental Health

Unintentional drug or alcohol overdose is the second leading cause of death among unhoused Angelenos.[337] Yet the current infrastructure lacks the necessary substance abuse and mental health support required to reduce these deaths. A substance use disorder is a mental disorder affecting a person's brain and behavior, leading to an individual's inability to control their use of substances such as legal or illegal drugs, alcohol, or medications. [338] According to the National Institute of Mental Health, approximately half of individuals who experience a substance use

---

[330] *Hypothermia-Related Deaths --- United States, 1999--2002 and 2005*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 17, 2006), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5510a5.htm.
[331] Gale Holland, *L.A. Has Great Weather, Yet More Homeless Die of the Cold Here Than in New York*, L.A. TIMES (Feb. 17, 2019), https://www.latimes.com/local/lanow/la-me-homeless-hypothermia-20190217-story.html.
[332] *Id.*
[333] *Id.*
[334] *Id.*
[335] *Id.*
[336] *Id.*
[337] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.
[338] *Substance Use and Co-Occurring Mental Disorders*, NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/topics/substance-use-and-mental-health/index.shtml (last revised Mar. 2021).

disorder during their lives also experience a co-occurring mental disorder and vice versa.[339] Thus, a comprehensive approach of care to mental health is critical.

The Los Angeles Homeless Services Authority estimates that 25% of all homeless adults in Los Angeles County have a serious mental illness that likely perpetuates their homelessness.[340] District Attorney of Los Angeles County George Gascón stated that "[t]he band-aid approach of incarcerating this population continues to be ineffective, extremely expensive, and it disproportionately impacts communities of color. Beyond the conditions on our streets, the clearest sign of the failure of this approach is the L.A. County Jail, which has the dubious distinction of doubling as the nation's largest mental health institution."[341]

On January 22, 2019, the Los Angeles County Board of Supervisors adopted a motion to address the shortage of mental health hospital beds in the County. In the motion, the Board cited research by mental health experts that concluded that the "minimum number of beds required to appropriately meet the need is 50 public mental health beds per 100,000 individuals. In Los Angeles County, there are only 22.7 beds per 100,000 individuals; and California has only 17.05 beds per 100,000 individuals."[342] The motion directed the Department of Mental Health to conduct assessments and draft a plan to increase the number of mental health beds, with a report due back to the Board in 120 days.

On October 29, 2019, the Department of Mental Health returned a report highlighting the persistent shortcomings of the County's mental health services. The 138-page report details the multitude of ways in which the County has failed to meet the mental health needs of its constituents. Drafters of the report conducted Service Area Advisory Committee (SAAC) meetings in which participants underscored the numerous service gaps and challenges. The SAAC meetings revealed "significant gaps in inpatient treatment beds, residential beds, shelter beds and respite homes across all ages," including an "estimate of 3,000 additional

---

[339] Id.

[340] JONATHAN E. SHERIN, DIR., CTY. OF L.A., DEP'T OF MENTAL HEALTH, ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS: BOARD OF SUPERVISORS MOTION RESPONSE 18 (2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf [hereinafter COUNTY MENTAL HEALTH BED REPORT].

[341] *George Gascon's Plan to Address LA County's Behavioral Health Crisis and Its Nexus to Homelessness*, GEORGE GASCON (Feb. 17, 2020), https://www.georgegascon.org/campaign-news/george-gascons-plan-to-address-la-countys-behavioral-health-crisis-and-its-nexus-to-homelessness/.

[342] Motion, Addressing the Shortage of Mental Health Hospital Beds (Jan. 22, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.

subacute beds needed."[343] This bed scarcity "result[s] in people being discharged to the street and perpetuating homelessness."[344] In some parts of the County, there is only one psychiatric inpatient provider, and countywide there are no children's inpatient psychiatric beds.[345] The report described access to care as "one of the biggest issues" and stated that any plan for improving access to care should address basic needs, including "food, shelter, [and] transportation."[346] Available services for people of color were also "disproportionately limited compared to services for the white population."[347]

The report also commented on the "even more limited treatment available for people with [substance use disorder, or 'SUD']." A "lack of equality between [mental health, or 'MH'] and SUD treatment" and "long delays in accessing inpatient care" is leaving homeless individuals across the County with scarce access to medically necessary treatment for substance abuse disorders. The report found that "because there are not enough beds and not enough transportation services, people go untreated."[348] Department of Public Health Substance Abuse Prevention and Control Division (SAPC) providers are also seeing gaps and challenges in service provision. In particular, "there is a need for services for clients who are dually diagnosed;" "gaps in the availability of…high-intensity residential treatment…and…medically monitored inpatient withdrawal management beds;" and "an insufficient number of beds in the detoxification level of care and residential withdrawal management."[349] The report concluded that "there is a disconnection between MH and SUD systems of care," and "there is a need for more collaboration with MH providers."[350]

The report found that "the availability of services does not seem to match the level of need in the service areas. There are services, but to access care you have to 'win the lottery,' have a chronic level of need that requires hospitalization, or become incarcerated. Mild cases become severe while people are trying to connect to care." Even when individuals are able to access one of the few mental health

[343] COUNTY MENTAL HEALTH BED REPORT, *supra* note 340, at 27, 94.
[344] *Id*. at 94.
[345] *Id*.
[346] *Id*. at 95.
[347] *Id*. at 98.
[348] *Id*. at 95–96.
[349] *Id*. at 100.
[350] *Id*.

57

beds across the County, "hospitals discharge too quickly in a triage mode," which is "one of the chief contributors to repeat hospitalizations and insufficient recovery."[351] A pattern has emerged of people being "discharged from hospitals with serious to severe medical/physical health needs without a discharge plan and referrals to recuperative care."[352] Linking back to housing, the report also found that "the community needs housing with supportive services or residential treatment…to address this problem."[353] The report further underscored what critics of the County have been saying for decades, which is that "gaps in coordination and communication between agencies…[are forcing patients to] navigate the service delivery system on their own."[354]

### iv. Public Health Impacts

As the number of unhoused persons living on the streets rises, so too does the spread of diseases unique to densely populated areas such as Skid Row.[355] Reverend Andrew Bales, CEO of the nonprofit homeless shelter and recovery program Union Rescue Mission (URM), lost part of his leg in 2014 after he came into contact with a flesh-eating disease in Skid Row.[356] Reverend Bales was volunteering there when a blister on his foot came into contact with human waste—at the time, there were only nine toilets for the 2,500 people living in the 50 square block area.[357] One week later, he had a 104-degree fever and his foot was covered in blood blisters.[358] His doctors soon determined it was necessary to remove his leg from his knee down.[359] "[T]he flesh-eating disease . . . consists of E-Coli, strep and staph," remarked Reverend Bales, "I've seen it in other people on the streets. I've seen people with a black thumb, losing a leg."[360]

---

[351] *Id.*

[352] *Id.* at 97.

[353] *Id.*

[354] *Id.*

[355] Audrey Conklin, *Meet Rev. Andy Bales — the Man Who Lost a Leg Serving the Victims of LA's Homeless Crisis*, THE STREAM (June 27, 2019), https://stream.org/meet-rev-andy-bales-the-man-who-lost-a-leg-serving-the-victims-of-las-homeless-crisis/.

[356] *Id.*

[357] *Id.*

[358] *Id.*

[359] *Id.*

[360] *Id.*

Skid Row bathrooms have long been stripped from residents at the whims of political will.[361] In 1992, the City installed dozens of portable toilets in Skid Row, but Mayor Tom Bradley soon halted funding.[362] An activist then coordinated six outdoor latrines for Christmas—only to have them hauled away by the mayor.[363] In 1994, the new Mayor Riordan put in two dozen portable toilets.[364] Only four years later, six were removed following protests.[365] Allegations of prostitution and drug use arose in 2006, prompting the City and then Mayor Villaraigosa to remove the remaining six toilets.[366] In 2012 and 2013, County officials warned of an immediate public health threat—moving the City to open nighttime access to mission bathrooms and install temporary bathrooms in Skid Row parks.[367] But the available facilities fell overwhelmingly short of the recommendation to avoid a public health crisis.[368] In fact, a 2017 community audit concluded that bathroom access in Skid Row fell below U.N. standards for Syrian refugee camps.[369] Following the audit, Mayor Garcetti installed six toilets and eight showers.[370] In 2019, when an estimated 36,000 homeless people lived across the city of LA, there were only 31 available city-operated public toilets—an average of more than 1,000 people sharing one toilet.[371]

Mayor Garcetti acknowledged the lack of toilets is and historically has been a crisis in Los Angeles, saying, "[w]e simultaneously have to clean up streets, clean up this crap, and build housing . . . And if I had the money to do all three, we wouldn't be in this place."[372] Even acknowledging the problem, the City did not commit to allocate money for public toilets in its upcoming city budget.[373] NBC

---

[361] Gale Holland, *L.A. Adds More Public Toilets as Homeless Crisis Grows*, L.A. TIMES (Dec. 5, 2017), https://www.latimes.com/local/lanow/la-me-skid-row-toilets-20171204-story.html.

[362] *Id.*

[363] *Id.*

[364] *Id.*

[365] *Id.*

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] *Id.*

[371] Times Editorial Board, Editorial: Why on Earth Is It So Hard to Put Out Toilets for L.A.'s Homeless?, L.A. TIMES (June 18, 2019), https://www.latimes.com/opinion/editorials/la-ed-homeless-public-toilets-20190618-story.html.

[372] Joel Grover & Amy Corral, *Homeless People Are Without Toilets and Going in the Streets. We Asked the Mayor of LA Why*, NBC L.A. (Feb. 19, 2020), https://www.nbclosangeles.com/investigations/homeless-people-are-without-toilets-and-going-in-the-streets-we-asked-the-mayor-of-la-why/2311759/.

[373] *Id.*

News further reported that "the City hauls away the mobile toilets at night, leaving the homeless no choice but to go on the streets." [374] If the homeless had access to shelter and housing, the lack of available public toilets would not be at issue.

There are many examples of uncommon diseases plaguing Skid Row— namely, hepatitis A, tuberculosis, typhus, and typhoid fever. [375] Our sister city of San Diego has seen firsthand the grave consequences of ignoring the pressing public health crisis that rampant homelessness creates and perpetuates. From 2016 to 2018, an outbreak of hepatitis A that cost the city more than $12 million, sickened nearly 600 San Diego residents and killed at least 20.[376] As part of its efforts to contain the outbreak, the city and county governments put up temporary shelters for the homeless.[377] Advocates such as Bob McElroy, who headed one of the organizations operating the new shelters, directly linked the outbreak with homelessness, saying "[t]he reality is, if you've got a place for people to be safe and have access to health care, you're just not going to have the kinds of sanitation issues you have with tent cities lining the streets."[378] Los Angeles City and County must take immediate action to avoid a similar outbreak in our streets.

Dr. Susan Partovi, a medical director for the non-profit Homeless Health Care Los Angeles, stated that the risk of disease is not because of the homeless individuals themselves, but because of the conditions they are forced to live in.[379] She pointed to a 2018 outbreak of typhus, which enters the bloodstream through fleas, ticks, or lice, as one key example of conditions fostering deadly disease.[380] The risks are exacerbated by the short supply of bathrooms and drinking water.[381]

---

[374] *Id*.

[375] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

[376] *San Diego Hepatis A Outbreak Ends After 2 Years*, ASSOCIATED PRESS (Oct. 30, 2018), https://apnews.com/article/cc40b8c476ef469ebdc2228772176b03.

[377] *Id*.

[378] *Id*.

[379] *Skid Row Doctor Says Health Risk Fear Over Homeless Isn't What it Seems*, NBC L.A. (Oct. 1, 2019), https://www.nbclosangeles.com/news/local/streets-of-shame/skid-row-doctor-homeless-help-disease-typhus/179055/.

[380] *Id*.

[381] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

Homeless individuals are not the only ones facing increased risk of contracting disease. In October of 2018, the Los Angeles County Department of Public Health declared an outbreak of typhus, citing Skid Row as a high-risk area for the disease. [382] Shortly after, a Los Angeles Police Department employee assigned to Skid Row became infected by Typhoid fever, and two other employees showed symptoms.[383] Elizabeth Greenwood, a Los Angeles deputy city attorney, then contracted typhus from a flea bite in her City Hall East office.[384] At a City Council meeting in February 2019, Councilmember Joe Buscaino said, "[r]ats are emblematic of how we lost control over the homeless trash and encampment issue. If we can't protect the greatest symbol of our own democracy—our own City Hall, if we can't protect our own staff from a medieval disease, then we should pack up and go home."[385]

The severity of the health hazards facing homeless communities underscores the need for prompt action by the County and City. "[W]e have 23,000 people who are living on our sidewalks and outside every day," stated Shayla Myers, attorney for the Legal Aid Foundation, "that constitutes a true and devastating public health emergency."[386]

### v.   Patient Dumping

Over the past two decades, Los Angeles hospitals have paid substantial civil penalties for "patient dumping" mentally disabled homeless individuals in Skid Row.[387] Videos of mentally ill patients in hospital gowns dropped at Skid Row incited outrage. [388] For instance, in 2009, College Hospital paid $1.6 million to settle a case in which 150 psychiatric hospital patients were released to Skid Row

---

[382] LA Public Health (@lapublichealth), TWITTER (Oct. 4, 2018, 10:01 AM), https://twitter.com/lapublichealth/status/1047894399730872321.

[383] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

[384] Samuel Braslow, *How the Homeless Ended Up Being Blamed for Typhus*, L.A. MAG. (Feb. 12, 2019), https://www.lamag.com/citythinkblog/typhus-los-angeles-homeless/.

[385] *Id.*

[386] *Id.*

[387] Joseph Serna & Richard Winton, *Hospital Accused of Dumping Patient in L.A.'s Skid Row to Pay $500,000*, L.A. TIMES (May 29, 2014), https://www.latimes.com/local/lanow/la-me-ln-sun-valley-patient-dumping-to-pay-20140529-story.html.

[388] *Id.*

over the course of two years.[389] In 2014, a van from the southern Los Angeles Tri-City Regional Medical Center, now Gardens Regional Hospital, drove over 20 miles to drop a 38-year old woman off in Skid Row.[390] The woman was left wearing a hospital gown with a note stating an 800 number and the definition of schizophrenia.[391] Such examples build upon a long history of "dumping" patients on the street, where it is nearly impossible to follow a treatment plan and increases a patient's likelihood of falling ill again or, as is frequently the case, die.

The City and County's inaction prompted the legislature to intervene. In 2019, California Governor Jerry Brown signed SB 1152.[392] The legislation requires hospitals to make sleeping arrangements for homeless patients with the goal of providing a handoff between the hospital and a homeless shelter.[393] Despite their clear recognition that patients were being dumped by the curbside, Los Angeles historically turned a blind eye to the plight of the city's most vulnerable until the State passed SB 1152.

## F. GENDER

While many of the health and safety impacts of the homelessness crisis in Los Angeles cut across various identities, impacting all Angelenos, it is important to highlight the unique impact that homelessness has on women. The current service provision model is failing to meet the specific needs of women, particularly unaccompanied women (meaning women who are not unhoused as part of a family unit), who comprise a fast-growing subgroup of the City's homeless population. According to LAHSA's 2020 Greater Los Angeles Homeless Count, 65% of women experiencing homelessness are unaccompanied, and 80% of all unaccompanied women are unsheltered. While federal, state, and local agencies have diligently worked to address the needs of other subgroups—including veterans, families, and youth—unaccompanied women are rarely identified as a

---

[389] Jon Regardie, *The Ugly History of Downtown Patient 'Dumping'*, DT News (July 9, 2018), http://www.ladowntownnews.com/news/the-ugly-history-of-downtown-patient-dumping/article_05fa6cea-8165-11e8-96aa-dbaced2025ed.html.
[390] Justin Klockzo, *Hospitals Are Dumping Mentally Ill Patients in Los Angeles' Skid Row*, VICE (June 21, 2016), https://www.vice.com/en/article/yvezpv/hospitals-are-dumping-mentally-ill-patients-in-los-angeles-skid-row.
[391] *Id*.
[392] Matt Tinoco, *LA County Hospitals Were Told To Stop 'Dumping' Homeless Patients, But Their Options Are Limited*, LAIST (Sept. 6, 2019), https://laist.com/2019/09/06/los-angeles-homeless-hospital-dumping-law-1152.php.
[393] *Id*.

subpopulation, resulting in a dearth of research on their needs and experiences. Becky Dennison, Executive Director of Venice Community Housing, has said, "there's not been any approach [by officials] that identifies, let alone prioritizes, gender," and Anne Miskey, CEO of the Downtown Women's Center, has said that most shelters are designed for men.

### i.  Rising Rates of Homelessness Among Women

According to LAHSA's Great Los Angeles Homeless Count, the number of women experiencing homelessness in the City increased 25% between 2019 and 2020. Further, the number of unhoused women has more than doubled since 2013, outpacing the increase among men in the same time period. These numbers are likely to be exacerbated by the COVID-19 pandemic, which has hit women-dominated industries like retail and hospitality particularly hard. According to the Bureau of Labor Statistics, the pandemic had caused 865,000 women to drop out of the labor force as of September 2020—a rate four times higher than the corresponding rate for men. With these increases, it is clear that the growing trend in the number of women living in the streets is unlikely to reverse any time soon, underscoring the pressing need for women-oriented solutions now. In 2020, the percentage of women aged 62 and up living in Skid Row increased by 20%.[394]

Among homeless women, women of color are significantly overrepresented, demonstrating the intersection of gender and structural racism. While Black women make up only nine percent of the total female population in LA, they are more than 30% of all unhoused women. As the Downtown Women's Action Coalition reported in its 2020 Women's Needs Assessment, "structural racism [is] the main driver" of Black women's overrepresentation in Skid Row.[395] Looking at death rates, Black women are similarly overrepresented, comprising 30% of all unhoused women who died on the streets of L.A. in 2019. Latinas make up 31% of the homeless female population, and white women make up just 22% of the

---

[394] DOWNTOWN WOMEN'S ACTION COAL. 2020 WOMEN'S NEEDS ASSESSMENT: A MESSAGE OF LOVE BY THE WOMEN OF SKID ROW 4 (2020), https://cangress.org/wp-content/uploads/2020/08/1596804237326_WOMEN%E2%80%99S-NEEDS-ASSESSMENT-final-layout-.pdf [hereinafter DWAC NEEDS ASSESSMENT].
[395] *Id.*

homeless female population.[396] Other marginalized identities are likewise overrepresented in the homeless community—while LGBT people make up only about five percent of the U.S. population overall, they make up 12% of Skid Row's homeless population.[397] The DWAC 2020 Women's Needs Assessment highlighted that "[t]here are no services for trans women in Skid Row."[398]

## ii.    Intersection of Gender-Based Violence and Homelessness

Domestic violence (DV), intimate partner violence (IPV), and sexual assault are all significant drivers of homelessness, as well as frequent consequences of living as an unhoused, unaccompanied woman on the streets of Los Angeles. Among women over the age of 25 experiencing homeless, the USC Price Center found that over half had experienced domestic or intimate partner violence, with rates higher among the unsheltered population compared to the sheltered population.[399] The Downtown Women's Center has also found that, in the past twelve months, more than 36% of homeless women experienced DV/IPV, and 27% experienced sexual assault.[400]

In a focus group on domestic violence and housing conducted by the Downtown Women's Center, one woman who currently resides in a domestic violence shelter felt that if she "wasn't beat up enough or [her] story wasn't good enough," she wouldn't be let into the shelter.[401] Other interviewees echoed that sentiment, saying "[i]f you don't have the bruises or bloody face, they're not going to believe you. If you don't have those, you're on your own."[402] Women living in shelters further detailed the stress of providers threatening to call the Department of Children and Family Services and have the women's children taken away, as a means of forcing the women into compliance with shelter rules.[403] While shelter

---

[396] USC PRICE CTR. FOR SOC. INNOVATION, CITY OF LOS ANGELES WOMEN'S HOUSING GAP ANALYSIS 5 (2019), https://www.downtownwomenscenter.org/wp-content/uploads/2019/12/Womens-Housing-Gaps-Analysis_Final.pdf [hereinafter USC PRICE REPORT].

[397] DWAC NEEDS ASSESSMENT, *supra* note 394, at 9.

[398] *Id*.

[399] USC PRICE REPORT, *supra* note 396, at 1.

[400] Leonora Camner, *The Housing Crisis Is a Women's Issue*, ABUNDANT HOUSING L.A. (Mar. 11, 2020), https://abundanthousingla.org/the-housing-crisis-is-a-womens-issue/.

[401] Downtown Women's Ctr., Domestic Violence and Homeless Services Coalition: Focus Groups Report 11 (2018), https://www.downtownwomenscenter.org/wp-content/uploads/2018/06/DVHSC-Focus-Group-Report.pdf.

[402] *Id*. at 13.

[403] *Id*. at 12.

expulsion might be a reasonable remedy for rules violation, expulsion and baseless family separation are two disparate forms of discipline.

The Downtown Women's Center has estimated that there are 2,435 more unsheltered individual women experiencing homeless than there are existing emergency shelter beds in programs that serve individual women. With demand for shelter outpacing supply, and with shelters being often inhospitable places for women even when they are available, it is no surprise that the number of unaccompanied women living in the streets continues to grow.

But life on the street as a woman is uniquely dangerous. A 2016 survey by the Downtown Women's Action Coalition found that nearly half of women living in Skid Row had been attacked in the previous 12 months.[404] A member of the Coalition reported "so many stories of the knife coming through the tent and ripping it open" and "women at the bus stop circled by men like sharks."[405] Of the women living in Skid Row, more than 60% are over the age of 50, a particularly vulnerable group considering that unhoused women have a lifespan that is, on average, nearly 35 years less than their housed counterparts.[406] Further, homeless individuals generally have a physiological age that is 10–20 years older than their actual age as a result of premature aging due to prolonged stress.[407]

The stories of unhoused unaccompanied women highlight the dire need for increased funding and tailored solutions to meet their needs. Discussing her life on the street with the Los Angeles Times, one woman reported the changes she tried to make to her physical appearance after being subjected to multiple violent attacks that left her with broken ribs and black eyes: "At the time, I had blonde hair down to the middle of my back. I cut my hair really short and started wearing clothes that looked like guys' clothes. I had to look like I'm a guy for my own safety."[408] Another woman echoed the first: "I have to watch over me, and it's hard. I have to watch my back in everything."[409] In a February 1, 2021 letter to Mayor Eric Garcetti, the Downtown Women's Action Coalition wrote: "Our community has been abandoned and left to die."[410]

---

[404] Gale Holland, *Attacked, Abused and Often Forgotten: Women Now Make Up 1 in 3 Homeless People in L.A. County*, L.A. TIMES (Oct. 28, 2016), https://www.latimes.com/projects/la-me-homeless-women/.
[405] *Id*.
[406] Dkt. 231 at 2; DWAC NEEDS ASSESSMENT, *supra* note 394, at 4.
[407] DWAC NEEDS ASSESSMENT, *supra* note 394, at 8.
[408] *Id*.
[409] *Id*.
[410] *An Open Letter to Mayor Garcetti*, LACAN (Feb. 1, 2021), https://cangress.org/dearmayorgarcetti/.

65

## II.    DISCUSSION

This Court cannot idly bear witness to preventable deaths. This ever-worsening public health and safety emergency demands immediate, life-saving action. The City and County of Los Angeles have shown themselves to be unable or unwilling to devise effective solutions to L.A.'s homelessness crisis. For the reasons discussed below, the Court must now do so.[411]

A district court may order injunctive relief on its own motion and is not restricted to ordering the relief requested by a party. *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014) (citing *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1150 (9th Cir. 2004)). A preliminary injunction is an "extraordinary remedy," requiring courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

For a court to issue a preliminary injunction, it must find that (1) there is a likelihood of success on the merits; (2) absent preliminary relief, irreparable harm is likely; (3) the balance of equities tips in favor of preliminary relief; and (4) an injunction is in the public interest. *See Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). Alternatively, an injunction can also be justified if there are "serious questions going to the merits" and the balance of hardships "tips sharply" in favor of injunction relief, "assuming the other two elements of the *Winter* test are met." *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). A "serious question" exists when there is "a fair chance of success on the merits." *See Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). The Ninth Circuit follows a "sliding scale" approach to the four preliminary injunction elements, such that "a stronger showing of one element may offset a weaker showing of another," as long as "irreparable harm is *likely*." *See Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *Cottrell*, 632 F.3d at 1131).

---

[411] The Court notes that Defendants have filed numerous objections to factual assertions in Plaintiffs' Motion. See Dkt. 271. As the present order does not rely on any of the information to which Defendants object, the Court need not rule on the objections.

## A. THE LIKELIHOOD OF SUCCESS ON THE MERITS SUPPORTS PRELIMINARY RELIEF

The threshold inquiry is whether plaintiffs have established a likelihood of success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Where plaintiffs seek a mandatory injunction, the plaintiffs must "establish that the law and facts *clearly favor* [their] position, not simply that [they] are likely to succeed." *Id*. Relief is treated as a mandatory injunction when it "orders a responsible party to 'take action.'" *Id*. (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 879 (9th Cir.2009)).

### i.     Constitutional grounds

*Brown v. Board of Education*

Throughout history, the legislative, executive, and judicial branches of our government have taken it upon themselves to remedy racial discrimination. These affirmative actions and equitable remedies arose from a recognition of the racism-entrenched in this country's history and its enduring legacy through the present day.

In the seminal case of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), the Supreme Court held that if the racially disparate impacts of a previous Equal Protection Clause violation persisted, the violating party had a responsibility of eradicating those impacts. Dealing with the desegregation of schools, the Court in *Swann* held that schools have not only the responsibility to desegregate, but also the responsibility to integrate. *Swann*, 402 U.S. at 15. The *Swann* decision came after *Brown v. Board of Education of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954) ("*Brown I*"), supplemented sub nom. *Brown v. Board of Education of Topeka, Kan.*, 349 U.S. 294 (1955) ("*Brown II*"), in which the Supreme Court addressed the impacts of the "separate but equal" laws. The Court discussed how "separate but equal" treatment culminated in "a feeling of inferiority as to [the Black students'] status in the community that may affect their hearts and minds in a way unlikely to ever be undone," and found that racial segregation in public schools is unconstitutional, even if segregated schools are otherwise equal in quality. *Brown*, 347 U.S. at 494–95.

The *Brown* Court ordered schools to desegregate "with all deliberate speed." *Brown II*, 349 U.S. at 301. In many school districts, however, a racial imbalance in student populations continued to exist despite desegregation. Beginning with *Swann*, the Court's line of post-*Brown* cases held that schools were responsible for remedying racial imbalance, even when such imbalance resulted from the selection of students based on geographic proximity to the school rather than racial segregation. *See Swann*, 402 U.S. 1. The Court found that this was necessary to ensure that schools would be properly integrated and that all students would receive equal educational opportunities, regardless of their race. *Id.*

*Swann* and its progeny further established that "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15. Indeed, as early as *Brown II*, the Supreme Court ruled that district courts have the power to order structural changes in school systems to integrate schools, such as "ordering the immediate admission of plaintiffs to schools previously attended only by white children." 349 U.S. at 300–01; *see also Swann,* 402 U.S. at 31 (affirming a district court's injunction requiring school board to implement plan to desegregate school district); *MillikenBradley*, 433 U.S. 267, 269 (1977) (upholding the equitable powers of a district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation"). The Court further found that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. " *United States v. Fordice*, 505 U.S. 717, 727–28 (1992). Similarly, the Supreme Court has recognized the equitable power of federal courts to order structural changes to remedy violations of unconstitutional due process. *See, e.g.*, *Hutto*, 437 U.S. at 683 (approving a district court's orders to change various prison practices and policies to remedy constitutional violations).

The above cases arose out of a recognition of a history entrenched in racial discrimination, the persistent present-day impacts of such discrimination, and a pressing need to remediate such impacts. In front of this Court today is a history similar to, and deeply intertwined with, the circumstances that gave rise to the above cases. The Court today addresses decades of racial discrimination that have

culminated in a Los Angeles homelessness crisis with a significant loss of life and deprivation of humanity—peaking at 1,383 deaths just last year.[412]

"I want to be very clear that homelessness is a byproduct of racism," stated LAHSA's Heidi Marston.[413] Racial discrimination and homelessness are interconnected issues going back decades into the history of Los Angeles. Beginning with the City of Los Angeles's decision to raze houses, resulting in an increased number homeless low-income people of color in the 1910s, continuing through state enforcement of racially restrictive covenants throughout Los Angeles in the 1930s, and postwar policies related to redlining, racial covenants, and public bank lending—over a century of racist policies have disproportionately impacted L.A.'s unhoused Black population.[414] "We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[415]

The City and County's actions have been, and remain, critical drivers of racial discrimination. In 1976, the homeless population became spatially concentrated in the fifty-square-block "containment zone" of Skid Row. The containment zone became a place where the homeless, discharged patients with mental disabilities, and parolees came—or in some instances, were bussed and dropped—to find services. General Dogon, a Skid Row community organizer, describes the containment as a "warehouse zone": "a warehouse is where you store shit. So the idea was to push all of Los Angeles's unfavorable citizens into one area."[416] "Main Street is the dividing line between the haves and have-nots," says General Dogon, where "you've got homeless people sleeping on one side of the street, and the loft buildings on the other side of the street."[417]

---

[412] Ethan Ward, *They Were Homeless, Now They're Dead*, CROSSTOWN (Feb. 10, 2021), https://xtown.la/2021/02/10/homeless-deaths-los-angeles/#:~:text=1%20deaths%20were%20no%20outliers,Department%20of%20Medical%20Examiner%2DCorone r.

[413] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020, 7:57), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[414] LUSKIN REPORT, *supra* note 10, at 7–20.

[415] *Id.*

[416] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[417] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

69

Police kept the homeless isolated, deepening and entrenching poverty within the 50-block area. The Los Angeles Police Department set up physical buffers to reduce movement past the Skid Row border and enforce containment.[418] Flood lights demarcated the border, disincentivizing the homeless from straying outside the containment area.[419]

Separately, in 2007, Los Angeles Police Department Chief William J. Bratton enacted a "broken windows" policing policy.[420] Under Chief Bratton's "Safer Cities Initiative", a task force of 50 officers entered Skid Row, issuing citations and making arrests for infractions such as jaywalking, prostitution, and littering.[421] The program ended shortly after a Los Angeles Police Department officer fatally shot a homeless person of color on Skid Row in 2015. "On Skid Row, the windows already were broken," Los Angeles City Attorney Feuer said, "we have a much deeper and more profound situation to deal with."[422]

In recent years, the City has attempted to address its homelessness crisis, but has been woefully inadequate in doing so. Four years ago, Los Angeles voters passed Proposition HHH, a $1.2 billion bond to fund housing projects aimed at the City's homeless population.[423] After three years of missed and suspended deadlines, the first HHH project, providing 62 housing units, opened in January 2020. *Id*. At the project's unveiling, the Mayor announced, "[t]his year, we will see an opening of one of these about every three weeks. My calculations, next year it might be every two weeks or less." Over a year later, only seven projects, containing just 489 total units, have been completed.[424]

Furthermore, investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. The City, worse yet, has turned a blind eye to this

---

[418] LUSKIN REPORT, *supra* note 10, at 28.

[419] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[420] Gale Holland, *L.A. Leaders Are Crafting New Plan to Help Homeless on Skid Row*, L.A. TIMES (July 15, 2014), https://www.latimes.com/local/la-me-skid-row-police-20140716-story.html.

[421] *Id*.

[422] *Id*.

[423] Doug Smith, *It Took Three Years of Blown Deadlines, But L.A. Opens Its First Homeless Housing Project*, L.A. TIMES (Jan. 7, 2020), https://www.latimes.com/california/story/2020-01-07/homeless-housing-project-proposition-hhh-bond-measure.

[424] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

corruption; funds that taxpayers voted to allocate to the homeless population are being siphoned away to line the pockets of corrupt individuals while the City sits by idly.[425] As the County espoused in its opposition, "the County spends hundreds of millions of dollars each year to provide housing and services." Dkt. 270 at 7. But where has that money gone and what has it achieved?

The 2018 LAHSA report concluded that "racial bias [continues to] affect[] every aspect of a Black person's life, and it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness."[426] Systemic inequity continues to disproportionately affect access to housing among communities of color. LAHSA reported, based on the 2017 Homeless Count, that the prevalence of Black people among the homeless population was highest in South Los Angeles and Metro Los Angeles, including Skid Row, where 68% and 49% of the homeless population identified as Black, respectively.[427]

Such disparities have long been recognized as severe constitutional violations—violations so corrosive to human life and dignity as to justify the sweeping exercise of a federal district court's equitable powers. Based on the Court's findings of these historical constitutional violations, a persisting legacy of racially disparate impacts—including a rising number of deaths, and the City and County's knowing failure to adequately address the issue despite numerous opportunities and resources to do so, this Court is pressed to grant an affirmative injunction ordering the City and County to actively remedy its homelessness crisis.

*State-Created Danger Doctrine*

While "the Fourteenth Amendment…generally does not confer any affirmative right to governmental aid," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011), the Supreme Court in *DeShaney* created an exception that imposes a duty to act when the government has created the dangerous conditions. *DeShaney*, 489 U.S. at 198–202. Interpreting the state-created danger exception, the Ninth Circuit has held that a state has a duty to act "when the state affirmatively places

---

[425] *See supra* notes 254–260.
[426] LAHSA REPORT, *supra* note 4, at 20.
[427] *Id*. at 15.

71

the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir.1996); *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989) (holding that deliberate indifference in the exercise of government power is within the Fourteenth Amendment's "purpose of redressing abuses of power by state officials").

      The first requirement under the state-created danger exception is an affirmative act by the state that creates or perpetuates dangerous circumstances. Here, there are no shortage of affirmative steps that the City and County have taken that have created or worsened the discriminatory homelessness regime that plagues Los Angeles today. Throughout most of the 20th century, the City and County of Los Angeles aggressively pursued an agenda of redlining and enforcing racially restrictive covenants that constrained the housing market for Black residents. When it came to the Black homeless community, the City of Los Angeles created the Municipal Service Bureau for Homeless Men in Skid Row, which allowed its partner philanthropic organizations to distribute aid selectively along racial lines. In a 2018 report, LAHSA concluded that "racial bias [continues to] affect every aspect of a Black person's life, and *it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness.*"[428] LAHSA itself has drawn a direct link between the discriminatory policies the state pursued in the past and the present disparate impact of that intentional discrimination against Black Angelenos. While this Court acknowledges that "disparate impact…is generally insufficient by itself to form the basis of a constitutional violation," this history of structural racism, spanning over a century, demonstrates that L.A.'s homelessness crisis, and in particular the impact of this crisis on the Black community, is a state-created disaster. Dkt. 269 at 34.

      The relevant inquiry here is whether "state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). In effect, this amounts to a "but for" test—we ask, but for a certain action by the state, would the plaintiff still be exposed to the same danger? While Defendants contend that "there is no causal connection" between the City and County's actions and the position that the homeless community finds itself in, the Court finds that there is little question that

---

[428] LAHSA Report, *supra* note 4, at 20 (emphasis added).

*but for* discriminatory policies, like redlining, that prevented Black residents from purchasing property and building intergenerational wealth, the Black community would be in a significantly different position today. Dkt. 269 at 8. Even apart from racially discriminatory policies, state actions—such as creating the containment zone that deteriorated into Skid Row as we know it today—have led to the entrenchment of poverty and contributed to the present homelessness crisis.

Even if this Court ignored the entire history of conscious decisions by the government that led to the creation of Skid Row and the rampant depravity before us today, there is still incontrovertible evidence that the danger of living on the streets—which led to 1,383 deaths last year alone—is state-made. The strongest evidence for a state-made danger is the deliberate, political choice to pursue the development of long-term supportive housing at the expense of interim shelters to get people off the streets in the near-term. As Plaintiffs pointed out in their brief, Proposition HHH—the $1.2 billion ballot initiative to create 10,000 housing units for the homeless—provided funding that could be used either for long-term supportive housing or for temporary shelters. Dkt 239 at 21. Nevertheless, the City and County "unilaterally" decided to focus on housing at the expense of shelter, even knowing that massive development delays were likely while people died in the streets. Over the four years since HHH's passage, a mere 489 housing units have been built, while over 5,000 people lost their lives in the streets due to a lack of shelter. The vast majority of those deaths were preventable. Defendants argue that "Plaintiffs have not established that any City official affirmatively placed Plaintiffs in danger they would otherwise not have been in," but pursuing housing at the expense of shelter, suspending HHH deadlines (and thereby evading accountability), and ramping down Project Roomkey despite the availability of federal funds to support it were all political choices that created this crisis. Without these choices, the death rate among L.A.'s homeless population would not be growing exponentially.

The second requirement under the state-created danger exception is the existence of a "known or obvious danger." "Deliberate indifference cases are by their nature highly fact-specific." *Patel*, 648 F.3d at 975. And the facts could not be clearer here. In 2020, 1,383 homeless people died on the streets of Los Angeles, and an estimated five more die each day. Homeless *women* in particular have shared horrific stories of attacks and assaults that have forced them to alter their appearances and conceal their femininity in order to survive. The average lifespan

73

of a homeless person in L.A. County is 51 years, compared to 73 years among the general population.[429]

There is no question that homelessness presents a grave danger to human life, and there is no question that this danger is known to the decisionmakers with the power to end this senseless loss of life. In a 2019 interview, Mayor Garcetti referred to homelessness as "the humanitarian crisis of our lives,"[430] a characterization echoed by Hilda Solis, chair of the County Board of Supervisors, in 2020.[431] Heidi Marston, Executive Director of LAHSA, has called homelessness "an emergency on our streets . . . [requiring] an emergency response."[432] City Councilmember Mike Bonin said at the Los Angeles Business Council's February 2021 Mayoral Housing, Transportation, and Jobs Summit that "there's almost nobody in the city of Los Angeles, housed or unhoused, who would give what's happening in Los Angeles [anything] other than a failing grade," and fellow Councilmember Kevin de León called the situation "dysfunctional" and "highly disjointed."[433] Neither the City nor the County of Los Angeles can deny their awareness of the unspeakable dangers homeless individuals face within their jurisdiction, or the gross inadequacy of current efforts to address that reality.

The final requirement under the state-created danger doctrine is that the state act with deliberate indifference to the danger. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410, (1997). The Ninth Circuit has held that the deliberate indifference standard is met when the Plaintiff proves that:

(1) there was an objectively substantial risk of harm; (2) the [state] was subjectively aware of facts from which an inference could be drawn that a

---

[429] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317, at 5.
[430] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.
[431] *Innovative and Rapid Construction of Housing to Alleviate Homelessness to Launch at Former Jail Site*, HILDA SOLIS (Sept. 29, 2020), https://hildalsolis.org/innovative-and-rapid-construction-of-housing-to-alleviate-homelessness-to-launch-at-former-jail-site/.
[432] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.
[433] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

substantial risk of serious harm existed; and (3) the [state] either actually drew that inference or a reasonable official would have been compelled to draw that inference. *Momox-Caselis v. Donohue*, 987 F.3d 835, 845 (9th Cir. 2021).

The first element, an objectively substantial risk of harm, is well-established and discussed above. The second and third elements, the state's subjective awareness of facts demonstrating danger and an inference that those facts would likely cause the danger, is likewise established above. The only question remaining is whether the government has "disregarded" the consequences of the long-standing policies that have perpetuated structural racism and the ways in which present corruption and a lack of coordination have led to an exponentially growing death rate. At the Los Angeles Business Council's Mayoral Summit, City Councilmember Mark Ridley-Thomas said "we have to be smarter, we have to work harder, and we have to run a lot faster. . ."[434] The inadequacy of governmental action in response to the life threatening conditions in the homeless communities is not new—in a 1985 Los Angeles Times article, the Times wrote: "It is time for leadership from both the mayor's office and the county Board of Supervisors to pull all the players together in one room and lock the door until they have assigned tasks to start finding land and money for shelters, with deadlines for doing so. . . ," underscoring the decades long inaction by the City and County in the face of tens of thousands of deaths.[435]

The Court therefore finds a strong likelihood that the City and County of Los Angeles are liable under the state-created danger doctrine, and that the law and facts clearly favor such a finding.

*Special Relationship Exception*

A second theory creating an affirmative duty under *DeShaney*—the special relationship exception—is also applicable. In addition to the exception for state-created danger discussed above, the Supreme Court in *DeShaney* created a second exception that imposed an affirmative duty to act when a state "takes a person into

---

[434] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YouTube (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[435] *Help the Homeless*, L.A. Times (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.

its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199–200. "The types of custody triggering the exception are 'incarceration, institutionalization, or *other similar restraint of personal liberty*.'" *Patel*, 648 F.3d at 973 (citing *DeShaney*, 489 U.S. at 200) (emphasis added). The state's constitutional duty arises "from the limitation which [the State] has imposed on his freedom." The inquiry turns on whether Los Angeles's lengthy history of discriminatory policies, aimed at containing homeless people in Skid Row, restrains the personal liberty of L.A.'s homeless population to such an extent as to trigger the state's affirmative duty to act under the Fourteenth Amendment. The Court finds this strongly likely to be the case. With the inception of the containment policy, enforced by the use of floodlights, physical barriers, and policing, the City effectively created such "restraints of personal liberty" as to establish a special relationship between the homeless population and the state, imposing an affirmative duty on the state to act to protect the rights of the homeless. The City is therefore likely to be liable for failing to meet the affirmative duty created by its restraint of the local homeless population.

The Court therefore finds a strong likelihood that Plaintiffs can succeed on a claim under the state-created danger doctrine, and that the law and facts clearly favor Plaintiffs' claims.

*Equal Protection – Severe Inaction Theory*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution proscribes state action that discriminates against a suspect class.[436] The Supreme Court has instructed lower courts to examine state action on a case-by-case basis, "sifting facts and weighing circumstances [so that] the nonobvious involvement of the State…[can] be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). As a guiding principle in cases scrutinizing state action, it is important to remember that the state action doctrine does not center around mere causation—instead, it is a way of recognizing and assigning *responsibility* for discriminatory conduct. "A state is responsible for the equal protection of its citizens, and allowing structural injustice

---

[436] U.S. Const. amend. XIV.

to continue is action for which the state is responsible."[437] Finally, contrasting the Equal Protection Clause with the other two clauses in the Fourteenth Amendment, constitutional law scholars have argued that "the Equal Protection Clause…is more difficult to classify as imposing solely a negative prohibition upon the state governments."[438]

There are several provisions of the Constitution that create affirmative duties. For example, the Fourth Amendment creates an affirmative duty on the part of the government to obtain a warrant before a search or arrest, and the Fifth Amendment places an affirmative duty on police with regard to the privilege against self-incrimination.[439] Indeed, *Marbury v. Madison*, one of the most seminal cases in American constitutional history, turns on how government inaction can violate an underlying affirmative duty to act.[440] In the context of the Fourteenth Amendment Equal Protection Clause, even a textualist reading supports the imposition of an affirmative duty to act. Where the Amendment reads, "nor shall any state…deny to any person within its jurisdiction the equal protection of the laws" the double negative implication of "not deny" can be literally interpreted to mean "to provide," rendering state inaction constitutionally impermissible.[441] Further, there is also an intratextual argument wherein the phrasing of the Equal Protection Clause ("[N]or shall any state…deny to any person within its jurisdiction the equal protection of the laws.") is contrasted with the phrasing of the Fourteenth Amendment Privileges and Immunities Clause ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States…."). [442] Indeed, shortly after the adoption of the Fourteenth Amendment, in 1870, Senator John Poole said in a congressional hearing, "[T]o say that [the state] shall not deny to any person the equal protection of the law it seems to me opens up a different branch of the subject. It shall not deny by acts of omissions…."[443] Constitutional law scholars have long opined that

---

[437] David M. Howard, *Rethinking State Inaction: An In-Depth Look at the State Action Doctrine in State and Lower Federal Courts*, 16 CONN. PUB. INTEREST L.J. 221, 255 (2017).
[438] Wilson R. Huhn, *The State Action Doctrine and the Principle of Democratic Choice*, 34 HOFSTRA L. REV. 1379, 1402 (2006).
[439] Erwin Chemerinsky, *Government Duty to Protect: Post-*DeShaney *Developments*, 19 TOURO L. REV. 679, 683 (2003).
[440] Marbury v. Madison, 5 U.S. 137 (1803).
[441] Howard, *supra* note 437, at 272–273.
[442] Huhn, *supra* note 438, at 1402–03.
[443] *Id*. at 1403.

"there is an affirmative obligation on the government to not only to [sic] treat citizens equally, but to protect its citizens from private violations of law that undermine[] their right to equality, even noting that failing to provide equal protection can come easily from inaction or from action."[444]

While it is not universally appropriate to imply an affirmative duty within the context of the Fourteenth Amendment, the Supreme Court in *United States v. Fordice* observed that *Brown v. Board of Education* mandated an "*affirmative duty* [on the state] to dismantle its prior dual education system." *United States v. Fordice*, 505 U.S. 717, 727–28 (1992) (emphasis added). The Court went on to say that "a State *does not discharge its constitutional obligations* until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation." *Id.* (emphasis added). In *Brown*, the analysis centered around the value of attending integrated schools. Here, Black people, and Black women in particular, are *dying* at exponentially higher rates than their white counterparts, and these disparate death rates can be directly traced to a history of structural racism and discrimination. As outlined above, and as evidenced both by statements from City Council members and the 1985 Los Angeles Times article detailing the lack of coordination between the County and the City, the Defendants have allowed themselves to become paralyzed, failing to muster the moral courage and political will to serve their homeless population. When state inaction has become so egregious, and the state so nonfunctional, as to create a death rate for Black people so disproportionate to their racial composition in the general population, the Court can only reach one conclusion—state inaction has become state action that is strongly likely in violation of the Equal Protection Clause.

The Court acknowledges that this conclusion advances equal protection jurisprudence, but it is wholly consistent with and flows naturally from analogous federal statutes, rulemakings, and executive actions. In 2015, the Obama administration promulgated a rule that required those city, state, and local entities who received federal funds for housing initiatives to "affirmatively further" the purposes of the Fair Housing Act.[445] The rule instructed these jurisdictions to "assess their concentrations…of disadvantaged populations and identify goals to

---

[444] *See* Howard, *supra* note 437.
[445] Rᴏᴛʜsᴛᴇɪɴ, *supra* note 28, at 200.

remedy segregated conditions."[446] If the state can be burdened by an affirmative duty to protect a statutorily created right, why should it not be burdened by an affirmative duty to protect a right provided for in the Constitution—the "supreme Law of the Land"?[447] The Supreme Court has commented that the Equal Protection Clause is an "essential part of the concept of a government of laws and not men," noting that it "is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people.'" *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667–68 (1966). Espousing the importance of the Fourteenth Amendment, the Court said "the words of the amendment . . . contain a necessary implication of a positive immunity, or right, . . . the right to exemption from unfriendly legislation . . . exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67—72, 21 L.Ed. 394; see also *State of Virginia v. Rives*, 1879, 100 U.S. 313, 318, 25 L.Ed. 667; *Ex parte Virginia*, 1879, 100 U.S. 339, 344—345, 25 L.Ed. 676. If the right to equal protection is so essential to American society and constitutional thought, then the law simply cannot permit the state to idly stand by and watch as its Black residents die at a disproportionate rate—especially when the state's political history of discrimination has led directly to the present crisis.

*Substantive Due Process*

The Court also finds that current City and County policies compound and perpetuate structural racism, threatening the integrity of Black families in Los Angeles and forcing a disproportionate number of Black families to go unhoused. Such structures of discrimination likely offend the Due Process Clause of the Fourteenth Amendment.

The Fourteenth Amendment provides, in relevant part, that no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause guarantees not only procedural protections, but also substantive rights, thereby "barring certain government actions regardless of the fairness of the procedures used to implement them."

---

[446] *Id.*
[447] U.S. Const. art. VI, cl. 2.

*Daniels v. Williams*, 474 U.S. 327, 331 (1986). Substantive due process accordingly "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 870 (9th Cir. 1988) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). The "shocks the conscience" standard is not subject to a rigid list of established elements. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory.") On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements." *Squadrito,* 152 F.3d 564, 570 (7th Cir. 1998).

As to whether substantive due process applies to the particular circumstances alleged, the "threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n. 8. The "touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), and the "exercise of power without any reasonable justification in the service of a legitimate governmental objective," *Lewis*, 523, U.S. at 846. The due process guarantee bars governmental conduct that violates the "decencies of civilized conduct," *Rochin v. California*, 342 U.S. 165, 173 (1952) interferes with rights "'implicit in the concept of ordered liberty[,]'" *id*. at 169, 72 S.Ct. 205 (quoting *Palko v. State of Conn*., 302 U.S. 319, 325 (1937)), or is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[.]" *Breithaumpt v. Abram*, 352 U.S. 432, 435 (1957). Accordingly, substantive due process protects against government power arbitrarily and oppressively exercised. *Daniels*, 474 U.S. at 331.

Finally, although the government is generally "not liable for its omissions," *Martinez v. City of Clovis*, 943 F.3d 1260, 1270–71 (9th Cir. 2019), a government is required to act when it has "affirmatively place[d]" its citizens "in danger by acting with deliberate indifference to a known or obvious danger," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (citations omitted).

Here, the question is whether the conduct attributed to the City and County violates unhoused families' substantive due process right to family integrity. It has long been settled that the liberty interest identified in the Fifth Amendment

provides a right to family integrity or to familial association. *See* U.S. Const. amend. V (stating no person shall "be deprived of life, liberty, or property, without due process of law."); *Quilloin v. Walcott*, 434 U.S. 246, 255, (1978) (stating "the relationship between parent and child is constitutionally protected."). Indeed, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Court. *Troxel v. Granville*, 530 U.S. 57, 65, (2000); *see also Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").

In *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149 (S.D. 2018), a California district court issued a class-wide injunction requiring the government to reunite minor children with their parents. There, the court found that the government had violated the parent-class-members' right to family integrity under the Due Process Clause by separating parents from their children at the U.S.-Mexico border for no legitimate governmental objective.[448] The district court cited to *Quilloin*, where the Supreme Court held that "[w]e have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness . . . ." 434 U.S. at 255, 98 S.Ct. 549.

In a similar case, *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs En't*, 319 F. Supp. 3d 491, 500–01 (D.D.C. 2018), a district court granted a preliminary injunction against the government, preventing it from separating families. There, the district court held that "substantial governmental burdens on family integrity are subject to strict scrutiny review, and they survive only if the burden is narrowly tailored to serve a compelling state interest." *Id*. (citing *Goings v. Court Servs. & Offender Supervision Agency*, 786 F.Supp.2d 48, 70 (D.D.C. 2011) (granting preliminary injunction where plaintiff's substantive due process claim premised on no-contact order prohibiting communication with his children likely would not survive strict scrutiny review); *see also Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d at 702 (holding that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests . . . including the

---

[448] *Id*.

rights to . . . direct the education and upbringing of one's children" (internal quotation marks and citations omitted)); *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983). The district court further explained that the government must make at least some showing of parental unfitness to establish a compelling governmental interest in violating the plaintiff's right to family integrity. *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 501.

The facts in our case are comparable to the separations of parent and child in *Ms. L*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018), *Quilloin*, 434 U.S. 246 (1978), and *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d 491 (D.D.C. 2018). In those cases, district courts found that the government violated the parents' substantive due process right when the government, as here, separated families for no legitimate governmental reason. The government can proffer no reason for its policies that have led to the separation of children from their parents.

Here, the City and County's discriminatory conduct has threatened the family integrity of the Black unhoused.[449] A disproportionate number of Black unhoused families directly stems from decades of systemic racism intended to segregate and disenfranchise the Black community. Indeed, as noted by the Los Angeles Homeless Services Authority, "Black people have been historically and systematically precluded from housing opportunities, including through redlining, exclusionary zoning, and other forms of discrimination codified by federal, state, and local law."[450] Despite acknowledgements of structural racism, the City and County perpetuate the devastating negative impact of such policies by compounding their effects.

The data squarely supports a finding that the city's current policies continue to drive homelessness in Black communities. As previously indicated, despite comprising only eight percent of the Los Angeles general population, Black Angelenos made up 42% of the homeless population.[451] "Homelessness is a byproduct of racism," said Heidi Marston, Director of LAHSA, "we continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their

---

[450] LAHSA REPORT, *supra* note 4, at 7.
[451] *Id*. at 9.

white counterparts."[452] Applied to the family context, this reality presents even graver consequences: the inability to safely protect one's child. Data from LAHSA's 2020 Greater Los Angeles Homeless Count shows that 5,988 Black persons are experiencing homelessness as part of family units.[453] This figure is more than *five times* the 952 white persons experiencing homelessness as part of family units.[454]

As mentioned above, City and County policies enacted against Black communities—in particular, redlining, eminent domain, and exclusionary zoning—removed and deprived Black families from their land, creating surges of housing insecurity over the past century.[455] However, while the number of unhoused Black individuals rises, the number of white unhoused individuals has decreased—demonstrating that current policies are compounding the explicitly racialized policies of the twentieth century.[456] In fact, the city's own data revealed this: between 2016 and 2017, the number of unhoused Black Angelenos increased by 22%, while the number of unhoused white Angelenos decreased by seven percent in the same time frame. [457] Yet the city remains deliberately indifferent to the rising number of Black Angelenos in danger.

The reality of the COVID-19 pandemic presents even graver consequences for unhoused Black families: the inability to protect one's child from infectious disease. Councilwoman Nury Martinez and Councilmember Mark Ridley-Thomas reported that "[m]ore than 269,000 K-12 students [are] currently experiencing, or on the brink of homelessness across California, enough to fill Dodger Stadium five times over. This is the picture of homelessness in Los Angeles today—a crisis that has been allowed to fester for decades, and has greatly worsened due to COVID-19."[458] Councilwoman Martinez and Councilmember Ridley-Thomas continued

---

[452] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.
[453] *HC2020 Family Households*, L.A. HOMELESS SERVS. AUTH. (Nov. 6, 2020), https://www.lahsa.org/documents?id=4978-hc2020-family-households.
[454] *Id*.
[455] LUSKIN REPORT, *supra* note 10, at 20.
[456] LAHSA REPORT, *supra* note 4, at 9.
[457] *Id*.
[458] Nury Martinez & Mark Ridley-Thomas, *Fighting COVID-19 Means Fighting the Cycle of Homelessness*, L.A. SENTINEL (Mar. 25, 2021), https://lasentinel.net/fighting-covid-19-means-fighting-the-cycle-of-homelessness.html.

that "the virus hits low-income communities and communities of color particularly hard, forcing many into homelessness at shocking rates."[459]

To protect unhoused individuals during the pandemic, Governor Gavin Newsom directed an initiative in April 2020 titled "Project Roomkey" to house 15,000 homeless unhoused Californians in hotel and motel rooms.[460] But a May 2020 report to the Board of Supervisors detailed that Project Roomkey rooms have been disproportionately extended to white homeless Angelenos—exacerbating the risks to unhoused Black families that already disproportionately bear the harmful effects of the city and county's failure to address homelessness. *Id*. at 60. In fact, COVID-19 mortality rates are higher for Black and Latino/a populations compared to mortality rates for white populations in California, escalating the need for equal—if not increased—access to services. *See id*. at 61.[461]

Most recently, the city's indefinite suspension of "all benchmarks and deadlines pertaining to current HHH projects" as of April 2020 further entrenched the marginalization of communities of color by abandoning once again the City's most vulnerable at the peak of a global crisis. Only 489 of the 10,000 promised housing units have been produced in the four years of HHH funding, leaving on the streets 1,255 unhoused Black individuals who are part of family units.[462] Such policies have become a vehicle for the continued subordination of communities of color. As Black families face housing insecurity at disproportionate rates, the risk of family separation increases.

In many instances, homeless children are separated from their parents and placed in foster care systems, where separation increases the mental trauma suffered by parent and child. Traumatic family separation affects the development of both cerebral activity and other organ systems.[463] This results in anxiety, post-traumatic stress disorder, and has been shown to lead to higher rates of poverty and food insecurity.[464] Unhoused Black families are thus punished not only by a lack of

---

[459] *Id*.
[460] LAHSA REPORT, *supra* note 4, at 9.
[461] "African Americans and Latinx account for 66 percent of COVID cases among people experiencing homelessness and 72 percent of the deaths as a result of COVID." Dkt 241-1 at 11.
[462] *See HC2020 Family Households,* L.A. HOMELESS SERVS. AUTH. (Nov. 6, 2020), https://www.lahsa.org/documents?id=4978-hc2020-family-households.
[463] Laura Santhanam, *How the Toxic Stress of Family Separation Can Harm a Child*, PBS (June 18, 2018), https://www.pbs.org/newshour/health/how-the-toxic-stress-of-family-separation-can-harm-a-child.
[464] *Id*.

affordable housing, but by the infliction of psychological and emotional trauma. The potential for lifelong trauma suffered by both the parent and child cannot be overstated.

Furthermore, Black children make up about seven percent of Los Angeles County's youth population, but about 24% of the children who receive services from the Los Angeles County Department of Children and Family Services (DCFS).[465] The lack of stability stemming from family separation and a lack of resources drives many children in foster care to fall behind their peers in educational settings and increases the risk of lasting behavioral issues. [466] The Alliance for Children's Rights reported that by the third grade, 80% of children in foster care have repeated a grade; only five percent of them are proficient in math; 75% of young women in foster care report at least one pregnancy by age 21 compared to only one third of their peers who are not in foster care; half of young men aging out of foster care have become fathers by the age of 21 compared to 19% of their peers who were not in foster care; nearly half of all children in foster care have learning disabilities or delays; only 58% of young people in foster care graduate from high school; only three percent graduate from college; and half of all young adults who age out of foster care end up homeless or incarcerated. [467] These traumas of family separation "shock[s] the conscience" and do not comport "with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

Los Angeles's homelessness crisis has created a cyclical pattern in which Black families are disproportionately uprooted from their community and separated upon experiencing homelessness, driving Black children into the Los Angeles foster care system. The cycle must end. The Due Process Clause does not permit such governmental misconduct causing Black families to disproportionately face homelessness and family separation.

It is clear to the Court that the Due Process Clause does not allow this kind of governmental misconduct. The Court is confident that this limited right to family integrity amongst unhoused Black families is "implicit in the concept of ordered liberty." *See Nunez*, 147 F.3d at 870. As the Supreme Court has held, rights arise not only from "ancient sources," but also "from a better informed

---

[465] *Id.*
[466] *Id.*

understanding of how constitutional imperatives define a liberty that remains urgent in our own era." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). The severe disparity between treatment of Black unhoused families compared to white unhoused families—to say nothing of the public health risks illuminated by the ongoing COVID-19 pandemic—present just such an urgent crisis and better inform the constitutional understanding of ordered liberty.

This practice of disrupting unhoused Black families' constitutional right to family integrity by compounding structural racism in present day policies is sufficient to find Plaintiffs have a likelihood of success on their due process claim. A practice of this sort implemented in this manner is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

### ii. State law grounds

The California Welfare and Institutions Code provides as follows:

> Every county and every city and county shall relieve and
> support all incompetent, poor, indigent persons, and those
> incapacitated by age, disease, or accident, lawfully resident
> therein, when such persons are not supported and relieved by
> their relatives or friends, by their own means, or by state
> hospitals or other state or private institutions.

Cal. Welf. & Inst. Code § 17000 (West 2020). This provision is intended "to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." *Id.* § 10000. Such aid and services shall be "provided promptly and humanely, with due regard for the preservation of family life," and on a non-discriminatory basis. *Id.* Courts have interpreted § 17000 as imposing requirements to both provide

86

"general assistance" and "subsistence medical care to the indigent." *Hunt v. Super. Ct.*, 21 Cal 4th 984, 1011–13 (1999); Dkt. 265 at 26.

The court in *Scates v. Rydingsword* interpreted § 17000 to mean that municipalities had discretion in determining which services to provide to homeless individuals. *Scates v. Rydingsword*, 229 Cal. App. 3d 1085, 1099 (1991). Defendants similarly argue that, in this case, "the County has *discretion* to determine how to discharge its obligations." Dkt. 270 at 22. The court in *Tailfeather v. Bd. of Supervisors*, however, held that medical care must, at a minimum, be "at a level which does not lead to unnecessary suffering or endanger life and health." *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1240 (1996). Given the epidemic levels of homelessness in the City and County of Los Angeles, it is clear that the City and County have failed to meet this duty. As LAHSA Executive Director Heidi Marston has stated, "housing is healthcare." Dkt. 265 at 27. The empirical evidence bears out the truth of this soundbite; there is a clear link between living on the street and experiencing adverse health outcomes. L.A.'s homeless population is dying in record numbers. Rare diseases run rampant in Skid Row, risking overflow into the rest of Los Angeles. Older individuals, especially older women, who are more at risk and in need of health services, are overrepresented on the streets of LA. The County has clearly failed to meet its minimum obligations under § 17000 to provide life-preserving, medically necessary services to the homeless.

Even outside of its inaction and inertia on the housing and shelter front, the County has also failed to meet its minimal duties to provide direct medical care that is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code § 14059.5(a). By the County's own admission, the current 22.7 mental health beds available per 100,000 individuals across the County comes nowhere close to the 50 public mental health beds per 100,000 individuals that leading mental health experts say is necessary to minimally meet the needs of the population. Dkt. 265 at 9. The 138-page report that the Department of Mental Health returned in January 2019 extensively documented the numerous gaps between community needs and available services, specifically highlighting the severity of the access problem when it came to mental health and detoxification beds. In December 2020, a year after the report was published, the Department of Mental Health produced a follow-on analysis that showed that while a pilot program sought to procure 500

87

beds across a two-year program, only 156 new beds were created in the first year.[468] The County, even as it recognizes the severity of the problems with its current service provision model, appears to be unwilling or unable to fulfill both the goals it sets for itself and the statutory minimums of § 17000.

The Court further finds the City of Los Angeles is likewise likely liable for violations of § 17000. For the last thirty-five years, there have been calls for the City and County of Los Angeles to work together to address the crisis of homelessness.[469] Twenty-five years ago, the California Supreme Court in *Tobe* found that these provisions of the Welfare and Institutions Code do not apply to cities *within* counties. *See Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1104 n.18 (1995). However, in the intervening decades, the institutional and financial landscape in this area has changed drastically in ways that neither the California Legislature nor the California Supreme Court could have reasonably foreseen, and the joint ventures long called for have taken robust form. As numerous programs and funding arrangements demonstrate, the formal jurisdictional divide between cities and counties under § 17000 has been substantially blurred, especially in the context of relieving homelessness. Consider the following examples:

In 2021, the City of Los Angeles contributed over $327 million to the Los Angeles Housing Services Authority ("LAHSA").[470] This past year, Governor Newsom and California's legislature pioneered Project Roomkey, which made $150 million in emergency COVID-19 aid for the homeless available directly to local governments such as the City of Los Angeles.[471] Project Roomkey allowed state and local governments to receive up to 75% cost-share reimbursement from

[468] JONATHAN E. SHERIN, DEP'T OF MENTAL HEALTH, ONE YEAR PROGRESS REPORT ON THE MOTION, "ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS II, (ITEM 9, AGENDA OF DECEMBER 3, 2019)" 2 (2020), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.
[469] "City and county governments traditionally have been wary of crossing jurisdictional lines, but this problem begs for the attention of both. The county has responsibility for welfare questions, and the city oversees many building and safety aspects involved in sheltering the homeless. It is time for leadership from both the mayor's office and the county Board of Supervisors . . . to start finding land and money for shelters, with set deadlines for doing so." *Help the Homeless*, L.A. TIMES (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.
[470] *State of Homelessness Presentation*, L.A. Homeless Servs. Auth. (2021), https://www.lahsa.org/documents?id=5196-state-of-homelessness-presentation.pdf.
[471] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/.

the Federal Emergency Management Agency ("FEMA") for hotel and motel rooms, including wraparound supports such as meals, security and custodial services.[472] In January, 2021, President Biden issued an executive order directing FEMA to raise that cost-share reimbursement to 100%.[473] Further, Project Roomkey tasked local governments like the City of Los Angeles with providing behavioral and health care services, identifying shelter or encampment residents for hotel isolation placements, and even transporting homeless people.[474]

In 2020, the U.S. Department of Housing and Urban Development ("HUD") allocated a total of $3.96 billion across Rounds 1 and 2 of the CARES Act Emergency Solutions Grant ("ESG").[475] ESG funds are to be used to "prepare for, and respond to the coronavirus pandemic (COVID-19) among individuals and families who are homeless or receiving homeless assistance."[476]  Across both rounds of ESG funding, the County of Los Angeles was allocated $69,050,943. At the same time, the City of Los Angeles was allocated more than double that amount - $183,598,812.[477]

As part of the Homeless Emergency Aid Program ("HEAP"), the City of Los Angeles was allocated $85,013,607.[478] LAHSA was further allocated another $81,000,000. At the direction of the City Council, the $85 million was directed to several initiatives, including $45 million to bridge housing; $20 million to Skid Row services, including temporary crisis and bridge housing, storage, hygiene programs, and reentry services for formerly incarcerated individuals; $11 million

---

[472] *Id.*

[473] Memorandum from Fesia A. Davenport on Project Roomkey Extensions and Expansion with 100% FEMA Reimbursement (Item No. 2, Agenda of February 9, 2021) (Mar. 2, 2021), http://file.lacounty.gov/SDSInter/bos/bc/1103505_3-2-21PRKExtension_Expansionwith100_FEMAReimbursement.pdf.

[474] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/.

[475] CARES Act Emergency Solutions Grant (ESG) Round 2 Funding Under COVID-19 Supplemental Appropriations (June 2020), https://www.hud.gov/sites/dfiles/CPD/documents/ESG_CARES_Act_Round_2_Allocation_Methodology_rev.pdf.

[476] *ESG-CV Award Letters Distributed*, HUD EXCHANGE (Apr. 7, 2020), https://www.hudexchange.info/news/esg-cv-award-letters-distributed/.

[477] CARES Act Emergency Solutions Grant (ESG) Round 2 Funding Under COVID-19 Supplemental Appropriations 5–7 (June 2020), https://www.hud.gov/sites/dfiles/CPD/documents/ESG_CARES_Act_Round_2_Allocation_Methodology_rev.pdf.

[478] Cal. Homeless Coordinating & Financing Council, SB 850 Overview 11, https://www.bcsh.ca.gov/hcfc/documents/hcfc_heap_powerpoint.pdf.

89

to general funding "to support homeless prevention and diversion programs, general homeless services, voluntary storage programs, emergency response, and hygiene services"; and $4 million "to invest in services for homeless youth or youth at risk of being homeless."[479]

In April 2021, HUD Secretary Marcia Fudge announced nearly $5 billion in new grants to state and local governments nationwide through the American Rescue Plan.[480] That funding is to be used for "rental assistance, the development of affordable housing and other services to help people experiencing or on the verge of homelessness."[481] Of that $5 billion, $99.9 million will flow directly to the City of Los Angeles, while another $32.6 million will flow to the County.[482]

It is well-established that the City receives funds directly from the state and federal government to be used for homeless initiatives. Further, it is clear that the City, on many occasions, has decided to use vast swaths of those funds to provide services to the homeless. Simply put, under the aegis of local, state, and federal initiatives, the City and County together have become jointly responsible for fulfilling the mandate of § 17000, at least as it pertains to confronting the crisis of homelessness. Therefore, the Court finds that the most reasonable interpretation of § 17000—the interpretation most in step with modern partnerships and funding arrangements between the City and County—is that it applies not only to counties alone, but to cities and counties when they undertake a joint venture directed to the goals of § 17000, such as a coordinated effort to alleviate homelessness in their jurisdictions. Thus, the Court finds that Plaintiffs are likely to succeed on the merits of a claim under Cal. Welf. & Inst. Code § 17000 both against the City and the County.

### iii.    Americans With Disabilities Act

Plaintiffs are also likely to succeed on the merits of a claim under the Americans with Disabilities Act (ADA). The ADA requires that individuals with disabilities be afforded "the full and equal enjoyment of the goods, services,

---

[479] *Putting New Resources to Work*, ERIC GARCETTI, https://www.lamayor.org/HEAP (last visited Apr. 20, 2021).
[480] Tracy Jan, *How Biden Stimulus Bill Will Target Homelessness*, WASH. POST (Apr. 8, 2021), https://www.washingtonpost.com/us-policy/2021/04/08/homeless-hud-marcia-fudge/.
[481] *Id.*
[482] American Rescue Plan Act HOME Supplemental Allocations, https://www.hud.gov/sites/dfiles/CPD/documents/HOME-ARP.pdf.

facilities, privileges, advantages, or accommodations of any place of public accommodation…" 42 U.S.C. § 12182(a). Public entities are required to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 35.133(a) (2011). Put differently, the ADA imposes an affirmative burden on public entities, such as the City and County of Los Angeles, to "make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)).

Because of the City and County's persistent inaction and inertia in creating shelter for the homeless, thousands of homeless individuals have erected tents that obstruct city sidewalks. To satisfy the ADA, public sidewalks must have at least 36 inches of passable sidewalk, and the City and County are responsible for ensuring that this requirement is met. 36 C.F.R. § 1191, app. D. § 403.5.1 (2014); *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013). Hundreds of city sidewalks, not only in Skid Row but across the City and County of Los Angeles, fail to meet the minimum requirements of the ADA due to the creation of homeless encampments. Again, it must be emphasized that these encampments—and the resulting ADA violations—are the outcome of decades of active policy choices and deliberate indifference on the part of the City and County. The Court thus finds that Plaintiffs are likely to succeed on an ADA claim under this theory.[483]

---

[483] Plaintiffs also present a second theory of liability under the ADA, which is that the City has violated the ADA by placing homeless individuals in "dangerous conditions where they are very likely to be harmed." Dkt. 265 at 34. Plaintiffs argue that the containment policy "deliberately placed substance abusers in an area replete with the illegal trafficking of dangerous and addictive drugs." Dkt. 265 at 35. To establish an ADA violation, a plaintiff must show that "1) she is a qualified individual with a disability; 2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and 3) such exclusion or discrimination was by reason of her disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Mental illness and addiction constitute disabilities within the bounds of the ADA. 42 U.S.C. § 12102; *Crumbaker v. McLean County, Ky.*, 37 F. App'x 784, 785 (6th Cir. 2002) ("A person addicted to illegal drugs is considered disabled within the meaning of the ADA if the drug addiction 'substantially limits one or more of the major life activities' of that person.'"). While the Court is sympathetic to Plaintiffs' argument that the City has created dangerous conditions in Skid Row for those suffering from mental illness or addiction, these actions do not constitute exclusion or discrimination with regard to public services as required to find an ADA violation. Thus, the Court finds that Plaintiffs are unlikely to succeed on an ADA claim under this theory.

Accordingly, the Court finds a sufficient likelihood of success on the merits of the state law grounds, and holds that the facts and law clearly warrant a preliminary injunction.

### B. IRREPARABLE INJURY

Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).

No harm could be more grave or irreparable than the loss of life. In 2020, 1,383 homeless people died on the streets of Los Angeles, and an estimated five more die each day. Furthermore, as explained above, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

### C. BALANCE OF EQUITIES

Turning to the third factor, "[t]o obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20). As with irreparable injury, when a plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

Again, as explained above, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

### D. PUBLIC INTEREST

The fourth and final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as here, 'the impact of an injunction reaches beyond

the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.'") To obtain the requested relief, "Plaintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'" *Id.* (quoting *Stormans*, 586 F.3d at 1139). "'Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'" *Id.* (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

As discussed above, Plaintiffs have demonstrated the likelihood of a violation of their constitutional rights, and thus have satisfied this factor.

Furthermore, the current state of the homelessness crisis in Los Angeles begs intervention. The City argues that granting this preliminary injunction would not be in the public's interest because it would "usurp the discretionary policy making decisions of the City's elected officials and impose mandatory duties." Dkt. 269 at 32. The Intervenors similarly state in their opposition that "Plaintiffs fail to put forth any argument, let alone evidence to meet its burden of showing that such a dramatic encroachment into the provenance of the City and the County is warranted, let alone why such a broad injunction is in the public interest." Dkt. 275 at 12. The Court, however, seeks to ensure accountability, and promote action where there has been historic inaction, by issuing a practical flexibility in its remedy. The City's inaction has had a deep, disparate, and deadly impact on the citizens of Los Angeles. And no public interest is more paramount than protecting the lives of our citizens.

Nor does the Court find reason to withhold a preliminary injunction in light of Mayor Garcetti's newly announced spending plan.[484] For one thing, the plurality of this budget will be drawn from funds allocated under Proposition HHH, which are already designated for homelessness relief. And as the Los Angeles Times notes, the City's efforts to combat homelessness have repeatedly fallen short of their stated goals.[485] For example, despite receiving state and federal funding for Project Roomkey, the City and County never managed to contract for

---

[484] *See* Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.
[485] *Id.*

even a third of the promised 15,000 hotel and motel rooms. After reaching a peak of 4177 operational rooms in August 2020, the program has steadily withered: as of April 12, 2021, only 2079 rooms were operational, 1693 of which were occupied—just over ten percent of the capacity originally promised. In spite of abundant funding drawn from local, state, and federal budgets, the City and County fell far short of their stated goal. This embarrassing performance does not inspire confidence, to say the least, in the City's new budget. From mishandling Project Roomkey to sinking $1.2 billion into the ever-delinquent Proposition HHH, Los Angeles has documented a long history of plans or budgets that have fallen short, year after year, as the homelessness crisis worsens.

The Court, therefore, finds no reason to believe that the City's new budget will be in any way adequate to meet the crisis of homelessness or overcome decades of intentional racism and deliberate indifference. For years—too many years—the homelessness epidemic in Los Angeles has only continued to worsen under the auspices of admirable intentions and impressive budgets. In the Court's view, this latest budget is no different.

Finally, as explained in our discussion of *Brown* and its progeny, constitutional violations as grave as those in front of the Court today give rise to "a district court's equitable powers to remedy past wrongs." *See Swann*, 402 U.S. at 15.

### E. HEARING

Finally, the Court acknowledges that it may appear unusual to issue a preliminary injunction without a hearing on the motion. In the Ninth Circuit, however, "there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing"; instead, the decision to hold a hearing is left to the sound discretion of the district court. *Softketeers, Inc. v. Regal W. Corp.*, 788 F. App'x 468, 469 (9th Cir. 2019) (citing *Int'l Molders' & Allied Workers' Loc. Union v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986)); *see also Nelson*, 799 F.2d at 555 (noting that the text of Rule 65(a) does not impose "a purely technical rule" requiring an evidentiary hearing on a preliminary injunction). "[I]f the facts are simple and little time would be taken, a court may be required to hold an evidentiary hearing on a motion for injunction." *State of Or.*, 913 F.2d 576, 582 (9th Cir. 1990) *cert. denied sub nom. Makah Indian Tribe v. United States,* 501 U.S.

1250, (1991). However, the Ninth Circuit has emphasized the lack of presumption in favor of evidentiary hearings "especially if the facts are complicated." *Id.*

The Court finds that no hearing is necessary at this juncture. While Defendants contend that "the evidentiary record is insufficient to support the drastic equitable relief [Plaintiffs] request," for over a year now, the Court has repeatedly held hearings in this case, allowing the parties, intervenors, and community representatives to voice their concerns, present evidence, and argue. Dkt. 269 at 13. In practical terms, the Court has already held 12 evidentiary hearings, and this preliminary injunction is rooted in the extensive factual record developed through these hearings. After numerous hearings and careful review of the motion and opposition, the Court finds it appropriate—in accordance with the emergency conditions of homelessness in Los Angeles—to grant preliminary injunctive relief without an additional hearing. To do so is consistent with Ninth Circuit precedent, the text and spirit of Rule 65, and the urgent need for relief this case presents.

## III.   AVAILABILITY OF EQUITABLE REMEDIES

### A. FACTUAL BASIS FOR IMMEDIATE RELIEF

Los Angeles is indisputably facing a homelessness crisis that merits immediate, emergency action. Los Angeles Mayor Eric Garcetti has called the homelessness crisis "the humanitarian crisis of our lives"[486] and has "called for a FEMA-level response to our homelessness crisis," drawing a comparison to the aftermath of the 1906 Great San Francisco Earthquake, which displaced more than 200,000 Californians.[487] He acknowledged the urgency of the situation, demanding that we "must respond like it's an earthquake – and do more, faster."[488] LAHSA

---

[486] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[487] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2020), https://www.lamayor.org/SOTC2020; *Rising to the Challenge: Helping Homeless Angelenos*, ERIC GARCETTI (June 11, 2019), https://www.lamayor.org/rising-challenge-helping-homeless-angelenos.

[488] Mayor Eric Garcetti (@MayorOfLA), FACEBOOK (June 12, 2019), https://www.facebook.com/MayorOfLA/posts/10157299485724806?comment_id=10157306801444806&reply_comment_id=10157308404509806.

Executive Director, Heidi Marston, has similarly recognized that "[w]e have an emergency on our streets and we need an emergency response."[489]

And as mentioned above, L.A. government officials have acknowledged that racism has impacted homelessness. "I want to be very clear that homelessness is a byproduct of racism," stated LAHSA's Heidi Marston.[490] "We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[491] As of January 2020, LAHSA reported that 21,509 Black people were without permanent housing in LA—a number that has likely increased as a result of the pandemic given COVID-19's significant impact on communities of color.[492]

Despite frequent acknowledgments of the emergency nature of homelessness in L.A.—an emergency borne unequally across racial lines—City and County efforts to address the problem have been wholly inadequate. Indeed, in the year since this litigation began, there has been a 32% increase in the number of homeless deaths compared to the previous year.[493] 713 homeless people died between March and July 2020 alone – more than double the number of units of housing built under Proposition HHH in the 4 years since it was passed.[494] Because the City and County have repeatedly failed to do so, the Court now finds it necessary, in the proper exercise of its equitable powers, to craft an immediate response to this unconscionable humanitarian crisis.

## B. EQUITABLE POWER TO ISSUE RELIEF

---

[489] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.

[490] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[491] *Id.*

[492] Gale Holland, Racism is the Reason Black People Are Disproportionately Homeless in L.A., Report Shows, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless.

[493] Jessica Goodheart, *Homeless Deaths in Los Angeles Rose by More than 30% in 2020*, CAPITAL & MAIN (Feb. 2, 2021), https://capitalandmain.com/homeless-deaths-in-los-angeles-rose-by-more-than-30-percent-in-2020-0202.

[494] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.

Under Article III of the Constitution, "[t]he judicial Power" of the federal courts "shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States[.]" U.S. Const., art. III, § 2.

While Defendants argue that "Article III precludes the Court from dictating how the City exercises its discretionary decision-making or spending to address issues arising out of homelessness," Dkt. 269 at 10, after a court identifies a right and a corresponding violation, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "In fashioning and effectuating the decrees, the courts will be guided by equitable principles." *Brown v. Bd. of Educ. of Topeka, Kans.*, 349 U.S. 294, 300 (1955). "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id*. As such, district courts have broad discretion to create comprehensive relief that addresses "each element contributing to the violation" at issue. *Hutto v. Finney*, 437 U.S. 678, 687 & n.9 (1978). The Court's equitable powers allow it to tailor relief to different circumstances, regardless of any procedural complexity. *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.").

A court may employ equitable powers as a means of enforcement to compel defendants to take certain steps to ensure compliance with constitutional mandates. *See Brown II*, 349 U.S. at 301 (instructing the district courts "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases"); *see also United States v. Fordice*, 505 U.S. 717, 727–28 (1992) (noting that *Brown v. Board of Education* and its progeny mandate an "affirmative duty to dismantle its prior dual education system," and that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation"). A district court is not bound by a plaintiff's prayer for relief and has broad discretion to determine a flexible remedy that balances the competing interests at stake. *See Brown v. Plata*, 563 U.S. 493, 538 (2011); *Lemon*, 411 U.S. at 200–01 (plurality op.).

The equitable powers of federal courts encompass injunctions that affect the rights of parties not before the court. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) (noting that a district court, "in exercising its equity powers," may enjoin conduct "outside its territorial jurisdiction") (citations omitted). In *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), the Supreme Court, addressing the validity of nationwide class relief, analyzed the principle of "complete relief," stating that nationwide classes are not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." 442 U.S. at 702. "Nationwide relief here is necessary to provide complete relief to the plaintiffs for the 'violation established.'" *District of Columbia v. U.S. Dep't of Agric.* 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (citing *Califano*, 442 U.S. at 702); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.").

As discussed below, courts often use these broad equitable powers to remedy constitutional and statutory violations by local governments. Notably, the Ninth Circuit has specifically upheld equitable relief in the context of equal protection and due process violations, in addition to statutory violations of the Americans with Disabilities Act and California Welfare and Institutions § 17000.

### i.   Constitutional Violations Provide Grounds for Equitable Relief

Courts have imposed structural equitable relief in order to remedy constitutional violations. *See Sierra Club v. Trump*, 963 F.3d 874, 888 (9th Cir. 2020) ("Certain provisions of the Constitution give rise to equitable causes of action. Such causes of action are most plainly available with respect to provisions conferring individual rights, such as the Establishment Clause or the Free Exercise Clause."); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 399 (1992) (Stevens, J. dissenting) ("When a district court determines, after a contested trial, that a state institution is guilty of a serious and persistent violation of the Federal Constitution, it typically fashions a remedy that is more intrusive than a simple order directing the defendants to cease and desist from their illegal conduct. A

98

district court has a duty to command a remedy that is effective, and it enjoys the broad equitable authority necessary to fulfill this obligation" (citations omitted).). Certainly, "the nature and scope of the remedy are to be determined by the violation." *Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000). "But where [] a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'" *Id*. (citation omitted).

The Supreme Court has established the clear authority of courts to issue mandatory injunctions that remedy constitutional violations, including equal protection violations, caused by state and local governmental agencies. In *Brown*, the Supreme Court ruled that courts had the power to order structural changes in school systems to desegregate schools, such as "ordering the immediate admission of plaintiffs to schools previously attended only by white children." *Brown II*, 349 U.S. at 300–01; *see also Swann,* 402 U.S. at 31 (affirming a district court's injunction requiring school board to implement plan to desegregate school district); *Milliken v. Bradley*, 433 U.S. 267, 269 (1977) (upholding the equitable powers of a district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation."). Similarly, the Supreme Court has recognized the equitable power of federal courts to order structural changes to remedy violations of unconstitutional due process. *See, e.g., Hutto*, 437 U.S. at 683 (approving a district court's orders to change various prison practices and policies to remedy constitutional violations).

In *Roman v. Wolf*, the Ninth Circuit affirmed in part the district court's issuance of a preliminary injunction that imposed a moratorium on an immigration and customs enforcement ("ICE") facility's receipt of new detainees, requiring specific sanitation measures, and ordering a reduction in the facility's population in light of the Covid-19 pandemic. 977 F.3d 935, 942 (9th Cir. 2020). The Ninth Circuit reasoned that "the district court had broad equitable authority to grant provisional relief to remedy a likely constitutional violation." *Id*. at 939. The circuit court continued that "[c]ourts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation," and "the district court's power to grant injunctive relief included the authority to order a reduction in population, if necessary to remedy a constitutional violation." *Id*. at 941–42. That is, district

courts have the flexibility to order measures that they determine necessary to "bring the conditions to a constitutionally adequate level." *Id*. at 945–46. Further, in "time-sensitive circumstances, the district court's authority to issue relief encompassed the authority to grant provisional relief 'to bring an ongoing violation to an immediate halt.'" *Id*. at 942 (citing *Hutto*, 437 U.S. at 687 n.9). The Ninth Circuit recognized that the district court made detailed factual findings to support the preliminary injunction and noted in approval that the district court left particular details to the government's discretion, such as how to achieve the requisite population reduction and which detainees to release, deport, or transfer. *Id*. at 939.

### ii. Statutory Violations Provide Grounds for the Court to Issue Equitable Relief

The power of district courts to compel government action also encompasses the redress of statutory violations. *See Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (stating that "[s]ystem-wide [injunctive] relief is required if the injury is the result of violations of a statute . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury.").

For example, in *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004), patients asserted an ADA claim against defendants including Los Angeles County, and sought a preliminary injunction seeking to bar the County from closing a rehabilitation center without providing plaintiffs with necessary medical and rehabilitative services elsewhere. The district court granted an injunction that barred the County from closing said rehabilitation center or reducing medical services until the County could guarantee that plaintiffs would receive comparable services from other healthcare providers in Los Angeles County. *Id.* at 993. In its deliberation, the district court considered the County's concerns of financial hardship, but was not persuaded of the County's claim that closing the center would save the County $58.6 million annually. *Id.* at 994. In affirming the district court, the Ninth Circuit held that "The district court did not abuse its discretion in

concluding that plaintiffs would suffer greater hardship absent preliminary relief than the County would suffer because of the injunction." *Id.* at 998–99. The Ninth Circuit noted that "the injunction does not mandate that the County keep [the rehabilitation center] open at any cost; rather, it requires the County to somehow, somewhere, continue to offer the services currently provided . . ." *Id.* at 999. The circuit court emphasized that when "[f]aced with [] a conflict between financial concerns and preventable human suffering, [the Ninth Circuit has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Id.* (*citing Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

In addition to remedying violations of federal statutes, district courts may also issue equitable relief to remedy to violations of state statutes. In *Harris v. Board of Supervisors*, a group of patients also sued the County to prevent its reduction of medical care at a hospital and closure of the same rehabilitation center in *Roddle*. 366 F.3d 754, 757 (9th Cir. 2004). The patients there brought their claims based on the California Welfare and Institutions Code §§ 10000, 17000 and 17001. *Id.* at 764. The district court issued a preliminary injunction, and the Ninth Circuit affirmed. *Id.* "A lack of funds is no defense to a county's obligation to provide statutorily required benefits." *Id.* (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413–14 (1989)).

### iii.    The *Plata* Case Guides This Court's Exercise of its Broad Equitable Authority

The Supreme Court's decision in *Brown v. Plata* upheld district courts' authority to use their equitable powers when necessary to address constitutional violations even where those powers shape local government's authority and impacts their budget. 563 U.S. 493 (2011).

*The Supreme Court in Brown v. Plata Recognized That Courts May Act Even If Their Orders Have a Budgetary Impact on Local Government*

In *Plata*, two consolidated class actions resulted in an order requiring California to drastically reduce its prison population. *See id.* In the first case, a district court found that Eighth Amendment rights had been violated when prisoners with serious mental disorders alleged inadequate mental health care due

101

to prison overcrowding. *Id.* at 506–07. In the second case, the State stipulated to a remedial injunction when prisoners with serious medical conditions brought similar claims. *Id.* at 507–08. When the State failed to comply with that injunction, the district court appointed a receiver to oversee remedial efforts. *Id.* Upon request from both groups of plaintiffs, a three-judge panel convened under the Prisoner Litigation Reform Act ("PLRA"), and the cases were consolidated. The panel entered a remedial order mandating a reduction of the State's prison population to 137.5% of design capacity within two years, when the prisons held "nearly double" their capacity at the time of trail. *Id.* at 501. Governor Brown appealed.

The Supreme Court affirmed the panel's ruling, holding that the PLRA authorizes "the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights." *Id.* at 502. The Court emphasized that "the law and the Constitution demand recognition of certain [] rights. . . . If government fails to fulfill [its] obligation, the courts have a responsibility to remedy the resulting [] violation." *Id.* at 510-11. In response to the State's concerns that the district court's order limited the State's authority to run its prisons, the Court noted that "[w]hile the order does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion . . . The order's limited scope is necessary to remedy a constitutional violation." *Id.* at 553. Accordingly, if a district court finds an ongoing Constitutional violation, it is obligated to impose a remedy, while budgetary and capacity concerns can be adequately addressed by the court by giving the party sufficient discretion in how to remedy the violation.

*The District Court Decisions Underlying the Plata Opinion Are Analogous to the Circumstances of This Case and Provide Support for Broad Judicial Relief*

The second case later consolidated in *Brown v. Plata* was originally filed in the Northern District in 2001. *Plata v. Schwarzenegger* ("*Schwarzenegger I*"), No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005). There, plaintiffs claimed that the State of California was providing constitutionally inadequate medical care at its state prisons. *Id.* at *1. Defendants agreed multiple times to take certain steps to address issues, first in a consent decree and then a stipulated order. *Id.* at *1–2. But, like the instant defendants, the State failed to take the necessary

102

action, "enact[ing] only very limited and piece-meal measures, with no prospect
for system-wide reform or restructuring." *Id*. at *26.

Following an evidentiary hearing, the court found that the defendants had
"fail[ed] to provide constitutionally adequate medical care" which "caused the
plaintiffs extreme harm." *Id*. at *3. The court then issued an order, establishing a
Receivership to take control of the medical delivery system of the prison system
from the defendants. *Id*. at *2.

The *Schwarzenegger I* court recognized that the case "present[ed] a textbook
example of how majoritarian political institutions sometimes fail to muster the will
to protect a disenfranchised, stigmatized, and unpopular subgroup of the
population." *Id*. at 32. The court emphasized:

> "This failure of political will, combined with a massive escalation in the rate
> of incarceration over the past few decades, has led to a serious and chronic
> abnegation of State responsibility for the basic medical needs of prisoners.
> This is a case where "the failure of the political bodies is so egregious and
> the demands for protection of constitutional rights [is] so importunate that
> there is no practical alternative to federal court intervention."

*Id*. (citation omitted). The *Schwarzenegger I* court reiterated the Ninth Circuit
principle that, "where federal constitutional rights have been traduced, principles
of restraint, including comity, separation of powers and pragmatic caution
dissolve." *Id*. at 24 (quoting *Stone v. City and County of San Francisco,* 968 F.2d
850, 861 (9th Cir.1992).

The court expanded the equitable remedy from *Schwarzenegger I* in a
subsequent case, directing the State of California "to transfer $250 million to the
Receiver in furtherance of the Receiver's work to remedy the undisputed and
ongoing constitutional inadequacies in the delivery of medical care in California's
prisons." *Plata v. Schwarzenegger* ("*Schwarzenegger II*"), No. C01-1351 TEH,
2008 WL 4847080, at *1 (N.D. Cal. Nov. 7, 2008). As discussed below, the
*Schwarzenegger II* court found that the defendant's arguments of budgetary
concerns could not "outweigh the human suffering and preventable and possibly
preventable deaths that will occur" if the defendants were granted a stay. *Id*. at *5.

103

iv.     Courts' Equitable Authority in the Face of Government
        Budgetary Concerns

There are financial considerations inherent to any equitable relief requiring action from a governmental entity; however, federal courts have an obligation to enforce the Constitution and the laws of its United States. In *Watson v. City of Memphis*, the Supreme Court observed that despite the city's argument that ordered desegregation may require unbudgeted funding, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." 373 U.S. 526, 537 (1963).

The Ninth Circuit has also addressed the weight of budgetary concerns in the context of equitable relief. In *Lopez*, the Ninth Circuit affirmed a district court order requiring the restoration of disability benefits to a substantial number of social security recipients. *Lopez*, 713 F.2d at 1432. The circuit court concluded that "physical and emotional suffering shown by plaintiffs . . . is far more compelling than the possibility of some administrative inconvenience or monetary loss to the government. . ." *Lopez*, 713 F.2d at 1437; *see also Rodde*, 357 F.3d at 999 (when "[f]aced with[ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor") (citing *Lopez*); *Harris*, 366 F.3d at 764–65 ("[a] lack of funds is no defense to a county's obligation to provide statutorily required benefits") (citing *Cooke*, 213 Cal. App. 3d at 413–14).

The court may also weigh certain circumstances against alleged financial consequences. In *Schwarzenegger II*, the court found that government arguments regarding financial hardship due to the court's injunction were "less compelling" when funding had already been allocated to the issue targeted by the court's order. *Schwarzenegger II*, 2008 WL 4847080, at *5. In *Rodde*, the Ninth Circuit affirmed a preliminary injunction barring a county from closing a hospital. *Rodde*, 357 F.3d 988. The circuit court considered how much the alleged $58.6 million annual cost of relief was offset by the savings caused by the relief, which would avoid costs caused by displaced patients seeking treatment elsewhere. *Rodde* 357 F.3d at 999 (9th Cir. 2004). The Ninth Circuit concluded that, "while it is unclear just how much financial hardship the district court's injunction creates for the County, it is apparent that the cost is lower than the County contends." *Id*.

## IV.    CONCLUSION: A WAY FORWARD

The devotion that Abraham Lincoln called for has not been met here.

For decades in Los Angeles, the desperation of its citizens has been met with a yawn. Each day, newspaper headlines bring forth different cities and communities calling for action. Meanwhile, politicians measure success by how much money they have raised to combat homelessness. Service providers with clipboards endlessly approach homeless individuals with services and promises to return, yet are unable to provide sufficient shelter or housing. Bureaucrats create statistics trumpeting their efficiency and success to the public. But none of this has led to accountability or solutions. As Councilmember Mark Ridley-Thomas remarked, "the issue of homelessness is of insufficient importance to the decision makers of this region. Therefore, we have this languishing set of circumstances where we chase our tails day in and day out claiming that we're doing things."[495]

There can be no defense to the indefensible. For all the declarations of success that we are fed, citizens themselves see the heartbreaking misery of the homeless and the degradation of their City and County. Los Angeles has lost its parks, beaches, schools, sidewalks, and highway systems due to the inaction of City and County officials who have left our homeless citizens with no other place to turn. All of the rhetoric, promises, plans, and budgeting cannot obscure the shameful reality of this crisis—that year after year, there are more homeless Angelenos, and year after year, more homeless Angelenos die on the streets.

Like Abraham Lincoln's call to action in his Gettysburg address, it is for us "to be dedicated here to the unfinished work which they who fought here have thus far nobly advanced." Let us pick up that flag, and have the courage of those who fought so long ago, to act so that we can become a better nation and people.

## V.    PROVISIONS OF THE PRELIMINARY INJUNCTION

In an attempt to balance the interim nature of a preliminary injunction with the emergency conditions created by the homelessness crisis, the Court hereby ORDERS the following:

---

[495] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

1. Accountability

    a. Pursuant to the Mayor's announcement[496] of a "justice budget"[497] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

    b. Within 90 days, conduct an audit of all funds received from local, state, and federal entities intended to aid the City and/or County of Los Angeles in solving or alleviating the problem of homelessness, including, but not limited to, Proposition HHH funds, MHSA funds, Measure H funds, and emergency relief from the state and federal government, including the American Rescue Plan and the Cares Act.

    c. Within 90 days, conduct investigations and prepare a report on all developers that are currently receiving funds from Proposition HHH; propose revised procedures for evaluating future applicants for Proposition HHH funds that would limit the possibility of funds being misused or wasted.

    d. Within 30 days, the County shall conduct an audit of any funds committed to mental health (MH) and substance use disorder (SUD) treatment.

       All above audits and background investigations must be completed by independent auditors and investigators, respectively. Parties are ORDERED to meet with Special Monitor/Master Michele Martinez within 10 days to receive her input regarding independent auditors and investigators.

2. Action

    a. *City- and County-Wide Actions*

---

[496] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[497] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.

   i. Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

   ii. The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

  iii. Within 30 days, the Los Angeles City Council Homelessness and Poverty Committee shall report back to the Court with specific actions to address 1) structural barriers (including but not limited to redlining, highway construction, eminent domain, and health exposure) that cause a disproportionate number of people of color to experience homelessness or housing insecurity; 2) solutions to the problem of extremely low income individuals being foreclosed from the affordable housing market in favor of higher-income individuals; and 3) the possibility of rezoning to accommodate more R3 (multi-family) zoning. The Committee is ordered to invite local non-governmental stakeholders (such as the NAACP, the Downtown Women's Action Coalition, and any additional groups that the Committee deems would be beneficial in this process) to participate in the production of the report.

  iv. Mayor Garcetti, the Los Angeles City Council, and Hilda Solis, Chair of the County Board of Supervisors, shall submit a report to the Court by April 27, 2021 at 8:00 a.m. to explain why an emergency declaration has not been issued.

   v. Within 30 days, the City and County shall prepare a report on the status of Projects Homekey and Roomkey, with a specific

focus on the geographic and racial distribution of project sites
and beneficiaries.

vi.  Within 30 days, with regard to MH and SUD beds, the County
shall report to the Court on the progress towards establishing
the 1,508 new sub-acute beds to accommodate the needs of the
non-jail population and an additional 1,418 new sub-acute beds
to accommodate those with substance abuse disorders being
diverted from jails.

b. *Actions Specific to Skid Row*

i.  Within no more than 90 days (i.e., on or before July 19, 2021),
the City and County must offer and if accepted provide shelter
or housing immediately to all unaccompanied women and
children living in Skid Row; within 120 days (i.e., on or before
August 18, 2021) to all families living in Skid Row; and within
180 days (i.e., on or before October 18, 2021) to the general
population living in Skid Row. Skid Row, originally defined as
the area between 3rd and 7th and Main to Alameda, will be
extended to the surrounding area, defined as 2nd to 8th and
Spring to Alameda. The City and County shall consult with the
Skid Row Advisory Council to identify the number of
unaccompanied women who are willing to move to shelters.

ii.  The County shall, no later than within 90 days (i.e., on or
before July 19, 2021), offer and if accepted provide to all
individuals within Skid Row who are in need of special
placement through the Department of Mental Health or
Department of Public Health appropriate emergency, interim, or
permanent housing and treatment services. The County shall
work with providers to build meaningful relationships with
homeless individuals to ensure that these individuals are fully
informed of their options for services, housing, and shelter.
Within ten days (i.e., on or before April 30, 2021), the County
shall provide to the Court a list of providers who are already

established in the area and who will be working in tandem with the County on these efforts.

iii. The County shall provide, or fund third parties to provide, support services to all homeless residents who accept the offer of housing. County and City shall evenly split the cost of providing operational services.

iv. The City and County shall prepare a plan that ensures the uplifting and enhancement of Skid Row without involuntarily displacing current residents to other parts of the City or County. Moving forward, the City and County are encouraged to develop a hyper-local approach with community-based organizations throughout each district, including the Skid Row Advisory Council.

c. *Other Actions*

i. After adequate shelter is offered, the Court will let stand any constitutional ordinance consistent with the holdings of *Boise* and *Mitchell*.

ii. The Court shall appoint a Special Monitor/Master, Michele Martinez, at the City and County's expense to assist with the implementation of this order and to resolve disputes among the parties or other interested parties. The City and County shall meet and confer with Special Monitor/Master Michele Martinez within three days to agree upon reasonable compensation.