MICHAEL N. FEUER, City Attorney (SBN 111529)
KATHLEEN A. KENEALY, Chief Deputy City Attorney (SBN 212289)
SCOTT MARCUS, Senior Assistant City Attorney (SBN 184980)
GABRIEL S. DERMER, Assistant City Attorney (SBN 229424)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>　　　　Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**EX PARTE APPLICATION OF DEFENDANT CITY OF LOS ANGELES TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**<br><br>**[Fed. R. Civ. P. 62(c); Fed. R. App. P. 8(a)]**<br><br>**[Filed concurrently with Declarations of Richard H. Llewellyn, Jr. and Scott Marcus]**<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

1

# EX PARTE APPLICATION

Defendant City of Los Angeles ("City") hereby applies ex parte for an order to stay the preliminary injunction entered by the court on April 20, 2021 (Dkt. 277) pending appeal.  Fed. R. Civ. P. 62(c) and Fed. R. App. P. 8(a).  Especially in light of the impending deadlines set by the court's order to comply with the injunction—including a "forthwith" order to escrow $1 billion and an order to create thousands of housing or shelter opportunities in 90 days—the City respectfully requests that the court rule on this motion as soon as possible.  The City is also filed a Notice of Appeal of the Preliminary Injunction [Dkt. 281] concurrently with this Motion, and it respectfully informs this court that if a stay is not issued by Monday April 26, 2021, the City intends to seek a stay from the Ninth Circuit court of Appeals.

Pursuant to Local Rule 7-19.1, on April 22, 2021 the City's counsel notified Plaintiffs, Defendant County of Los Angeles, and Intervenors of the City's intention to file the present ex parte application.  Counsel for Plaintiffs responded that they intend to oppose the application.  Counsel for the County responded that they support the application.  Counsel for the Intervenors all responded that they do **not** oppose the application.  Declaration of Scott Marcus.

The contact information for counsel is as follows:

**Counsel for Plaintiffs**
> SPERTUS, LANDES & UMHOFER, LLP
> Matthew Donald Umhofer
> mumhofer@spertuslaw.com
> Elizabeth A. Mitchell
> emitchell@spertuslaw.com
> 617 W. 7th Street, Suite 200, Los Angeles, California 90017
> (213) 205-6520

**Counsel for County of Los Angeles**

> Rodrigo A. Castro-Silva, County Counsel
> Lauren M. Black, Principal Deputy County Counsel
> lblack@counsel.lacounty.gov
> 500 West Temple Street, Suite 468, Los Angeles, CA 90012
> (213) 974-1830
>
> LOUIS R. MILLER
> smiller@millerbarondess.com
> MIRA HASHMALL
> mhashmall@millerbarondess.com
> MILLER BARONDESS, LLP
> 1999 Avenue of the Stars, Suite 1000
> Los Angeles, California 90067
> (310) 552-4400
>
> BYRON MCLAIN
> bmclain@foley.com
> FOLEY & LARDNER LLP
> 555 S. Flower Street, Suite 3300, Los Angeles, CA 90071
> 213-972-4500

**Counsel for Intervenors**

> Carol A. Sobel
> carolsobel@aol.com
> LAW OFFICE OF CAROL A. SOBEL
> 725 Arizona Ave., Santa Monica, California 90401
> (310) 393-3055
>
> Shayla R. Myers
> smyers@lafla.org
> LEGAL AID FOUNDATION OF LOS ANGELES
> 7000 S. Broadway, Los Angeles, CA 90003
> (213) 640-3983
>
> Catherine Sweetser
> catherine.sdshhh@gmail.com
> SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP
> 11543 W. Olympic Blvd., Los Angeles, CA 90064
> (310) 396-0731

3

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

1
2     This ex parte application is based upon the attached memorandum of points and
3  authorities and all the files and records in this case.
4  DATED: April 23, 2021
5
6                        MICHAEL N. FEUER, City Attorney
                         KATHLEEN A. KENEALY, Chief Deputy City Attorney
7                        SCOTT MARCUS, Senior Assistant City Attorney
                         GABRIEL S. DERMER, Assistant City Attorney
8                        ARLENE N. HOANG, Deputy City Attorney
                         ESSICA MARIANI, Deputy City Attorney
9
10
                         By:  */s/  Scott Marcus*
11                            SCOTT MARCUS
                              Senior Assistant City Attorney
12
                         Attorneys for Defendant CITY OF LOS ANGELES
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.     INTRODUCTION .........................................................................................1

II.    SUMMARY OF LITIGATION..................................................................4

    A. Plaintiffs' Complaint ...........................................................................4

    B. The case was stayed from March 19, 2020 to April 13, 2021........................5

    C. Plaintiffs' Preliminary Injunction Motion ........................................6

III.   STANDARD OF REVIEW TO ISSUE STAY PENDING APPEAL..................9

IV.    THE COURT SHOULD ISSUE A STAY BECAUSE THERE WAS A LACK OF NOTICE OF THE BASIS FOR THE INJUNCTION..................................9

V.     STAY IS APPROPRIATE BECAUSE THE CITY WILL LIKELY PREVAIL IN ITS APPEAL ......................................................................................12

    A. The City is likely to prevail on appeal of novel theories of law to which it never had an opportunity to respond........................................................12

        1.   No "special relationship" between or among anyone identified here gives rise to an affirmative right to aid..................................12

        2.   No law supports the theory that alleged "severe inaction" equals state action that violate equal protection ........................................14

        3.   The City has not interfered with any "familial relationship" between or among anyone in this litigation .................................14

    B. The City is likely to prevail in its appeal because there is no equal protection claim based on race to support the order.........................................15

    C. The City is likely to prevail on the "state-created danger" claim because this exception does not apply here..........................................................16

    D. The City is likely to prevail on the ADA claims .............................17

    E. The City is likely to prevail on the State law claim........................18

    F. The City is likely to prevail because the factual record relied upon by the court cannot support the injunction ..................................................18

VI.    THE CITY WILL SUSTAIN IRREPARABLE HARM WITHOUT A STAY ....20

VII.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST STRONGLY FAVOR A STAY .................................................................................21

VIII.  CONCLUSION.........................................................................................23

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ................................................................ 9

*Alliance for Wild Rockies v. Cottrell*,
   632 F3d 1127 (9th Cir. 2010) ............................................................ 20

*Armstrong v. Brown*,
   768 F.3d 975 ...................................................................................... 11

*Azurin v. Von Raab*,
   792 F.2d 914 (9th Cir. 1986) ......................................................... 22, 23

*Blackwell v. City & Cty. of San Francisco*,
   506 Fed. Appx. 585 (9th Cir. 2013) ................................................... 18

*Brown v. Board of Education of Topeka, Shawnee Cty., Kan.*,
   347 U.S. 483 (1954) ........................................................................... 16

*Brown v, Plata*,
   563 U.S. 493 .................................................................................... 11

*City & County of San Francisco v. United States Citizenship & Immigration Servs.*,
   944 F.3d 773 (9th Cir. 2019) ............................................................. 22

*Cobine v. City of Eureka*,
   250 F. Supp. 3d 423 (N.D. Cal. 2017) ................................................ 17

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ........................................................................... 13

*FTC v. Qualcomm Inc.*,
   935 F3d 752 (9th Cir. 2019) (per curiam) ...................................... 20, 21

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) (en banc) .............................................. 12

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018)...................................................................................... 15

*Hernandez v. City of San Jose*,
    897 F.3d 1125 (9th Cir. 2018) .......................................................................... 17

*Hilton v. Braunskill*,
    481 U.S. 770 (1987)........................................................................................... 9

*Hispanic Taco Vendors v. Pasco*,
    994 F.2d 676 (9th Cir. 1993) ............................................................................ 16

*Hunt v. Superior Court*,
    987 P.2d 705 (Cal. 1999) .................................................................................. 18

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enforcement*,
    319 F. Supp. 3d 491 (D.D.C. 2018).................................................................. 14

*L. v. U.S. Immigration & Customs Enforcement*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018)............................................................. 14

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ........................................................................ 9, 21

*Michael H. v. Gerald D.*,
    491 U.S. 110 (1989).......................................................................................... 14

*Montoya v. City of San Diego*,
    2021 U.S. Dist. LEXIS 52340 (S.D. Cal. Mar. 19, 2021) ................................ 18

*Munger v. City of Glasgow Police Dept.*,
    227 F.3d 1082 (9th Cir. 2000) .......................................................................... 17

*Nat. Res. Def. Council, Inc. v. Winter*,
    502 F.3d 859 (9th Cir. 2007) .............................................................................. 9

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................ 2, 9

*Pacific Radiation Oncology, LLC v. Queen's Medical Center*,
    810 F.3d 631 (9th Cir. 2015) ............................................................................ 10

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

*Patel v. Kent Sch. Dist.*,
   648 F.3d 965 (9th Cir. 2011) ....................................................... 12, 13, 17

*Penthouse International, Ltd. v. Barnes*,
   792 F.2d 943 (9th Cir. 1986) ................................................................. 10

*Quilloin v. Walcott*,
   434 U.S. 246 (1978) ............................................................................. 14

*Rizzo v. Goode*,
   423 U.S. 362 ....................................................................................... 11

*Rufo v. Inmates of Suffolk County Jail*,
   502 U.S. 367 (1992) ............................................................................. 15

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................... 14

*Swann v. Charlotte-Mecklenburg Board of Education*,
   402 U.S. 1 (1971) ................................................................................. 16

*Thomas v. County of Los Angeles*,
   978 F.2d 504 (9th Cir. 1992) ................................................................. 11

*Tobe v. City of Santa Ana*,
   892 P.2d 1145 (Cal. 1995) .................................................................... 18

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017) .......................................................................... 22

*United States v. Sineneng-Smith*,
   __U.S.__, 140 S.Ct. 1575 (2020) ................................................. 3, 15, 20

*Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*,
   114 F.3d 976 (9th Cir. 1997) ................................................................. 18

*Weitzman v. Stein*,
   897 F.2d 653 ....................................................................................... 10

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7, 129 S. Ct. 365 (2008) .......................................................... 20

8

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

**Statutes**

42 U.S.C. § 12132 ........................................................................................ 18

ADA ...................................................................................... 7, 11, 17, 18

California Welfare and Institutions Code Section 17000 ...................................... 4, 6, 18

**Other Authorities**

28 C.F.R. 25.150(a) ...................................................................................... 18

Fourteenth Amendment ........................................................................ 12, 13

Fed. R. Civ. P. 65(a) .................................................................................. 10

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3
4
5
6
7
8
9
10
11
12
13
14
15

Defendant City of Los Angeles ("City") appreciates that the court seeks to address homelessness in ways different than the City, through its elected officials and voter-approved propositions, has chosen to, because, as all parties and the court have acknowledged, homelessness in this region is truly a crisis.  But the existence of a crisis—even one as serious and complex as homelessness—does not obviate the rule of law.  The preliminary injunction should immediately be stayed so that the parties can properly litigate its validity and scope – which is extraordinary.  The City has yet even to answer the complaint in this action and there is virtually no evidence before the court which would support the sweeping rulings found in the preliminary injunction. Moreover, the nature of the relief the court seeks to impose invades the duties and powers of the elected officials of the City and implicates serious constitutional questions of due process and separation of powers.  At a minimum, additional time is needed so that the parties can address all these serious questions.

16
17
18
19
20
21

On April 20, 2021, this court issued a 110-page mandatory preliminary injunction order without a hearing and less than 24 hours after the Defendants and Intervenors filed their oppositions.  In the Order, the court found Plaintiffs were likely to succeed on legal claims they never propounded (many of which they would not have standing for had they done so) based on the court's own compilation of citations from sources outside this litigation.

22
23
24
25
26
27
28

Citing the amount the Mayor *proposes* to spend on homelessness in the *upcoming* fiscal year (commencing in July) in a budget yet to be ratified by the City Council (as required under the City Charter), the court ordered the City to escrow "forthwith" $1 billion—roughly 14% of the entire general fund City budget proposed by the Mayor for next fiscal year.  The court ordered a subcommittee of the City Council to identify and address "structural barriers . . . that cause a disproportionate number of people of color to experience homelessness" and solve for "the problem of extremely low income

1

individuals being foreclosed from the affordable housing market in favor of higher-income individuals"—even though the court itself acknowledged that many of those barriers and problems are beyond the City's control, and ordered the City's elected Controller to report on all land—not just City land, but *all* land—that is potentially available for use as housing or shelter for people experiencing homelessness.  Dkt. 277 at p. 106-107.

And the court ordered the City (along with Defendant County of Los Angeles ("County")) to provide shelter or housing to every person in the Skid Row area of downtown Los Angeles, with the first phase to be completed in the next 90 days, and the final phase to be completed in 180 days.

The City recognizes that this court exerted great effort in the drafting of this Order.  Nonetheless, the City respectfully yet urgently asks this court to stay enforcement of this Preliminary Injunction until it can be reviewed on appeal.  The City submits that if this Order remains enforceable while this appeal is pending, serious and irreparable harm will result.

The City submits that all of the factors this court must consider (*Nken v. Holder*, 556 U.S. 418, 434 (2009)) weigh in favor of a stay:

### (i)     Strong likelihood that the City will prevail on appeal, with serious legal questions at stake

There is a strong likelihood the City will prevail in its appeal from the Order for several reasons.  First, the Order finds the City liable for constitutional violations under legal theories that the Plaintiffs never raised—some of which the court admits it created anew for its ruling—so the City never had an opportunity to address these issues.  The court found, for example, that the City likely committed historical constitutional violations of the Equal Protection Clause resulting in "a persisting legacy of racially disparate impacts," yet Plaintiffs do not state an Equal Protection Clause claim based on race in the Complaint, nor did they rely upon an Equal Protection theory in their Motion for Preliminary Injunction.  Similarly, the court admits that it created a new "severe

inaction" theory under the Equal Protection Clause, and then held the City likely violated this newly created rule.  Far from being an impartial arbiter of the law, the court denied the City due process by issuing this Order without giving the City notice of and a chance to rebut these theories.

Second, the Order is premised upon "facts" far outside the record, many of which the City had no chance to respond to, and which do not support the conclusions drawn by the court.

In addition, the City argues that the Order should be stayed for the independent reason that it raises serious legal issues that should be reviewed by the Ninth Circuit before any injunction may be imposed.  The Order runs afoul of the role of federal courts, which is to be "passive instruments of government" that do not "look[] for wrongs to right" but instead "wait[s] for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties."  *United States v. Sineneng-Smith,* __U.S.__, 140 S.Ct. 1575, 1579 (2020).

**(ii)    The City will suffer irreparable harm without a Stay**

The Order imposes serious burdens on the City that will cause the City irreparable harm if not stayed immediately.  For example, the Order requires the City to escrow *one billion dollars* "forthwith."   But this Order means that $1 billion dollars of taxpayer money—roughly one seventh of the City's entire general fund budget that the Mayor proposed for the next fiscal year—cannot be used for City functions, including addressing homelessness, until some unknown date in the future when it is released under unknown criteria, which would impose serious and irreparable damage to the City.  Similarly, the Order prohibits transfers of all City land going forward; yet such a stoppage may increase the lack of housing for the homeless, thus defeating the very purpose of the Order.  Even with the court's post-hoc clarification that this part of the Order does not apply to projects in progress, it will still have a monumental impact on available housing.

These two factors (likelihood of success or serious legal questions, and irreparable harm) are the two most significant factors in determining whether to impose a Stay. But the remaining factors also favor a Stay.

### (iii)    The balance of equities and public interest favor a Stay

While the City recognizes the urgent and compelling nature of the homelessness crisis, the equities here weigh heavily in favor of a Stay. The court's mandatory injunction, rather than preserving the status quo pending litigation, commands the City to follow the court's direction in the management of its municipal affairs. The Order addresses harms not complained of in the Complaint—those of the business owner Plaintiffs who are troubled by homeless people in their area—and does so in ways that were even opposed by the public interest advocates whom this court allowed to intervene to give voice to the homeless people who are not parties to, but will be affected by, this litigation.

In sum, every factor weighs heavily in favor of a Stay, and a Stay should be granted pending appeal of the Preliminary Injunction.

## II.    SUMMARY OF LITIGATION

### A.    Plaintiffs' Complaint

On March 10, 2020, Plaintiffs initiated this lawsuit against the City and County premised on generalized grievances about the effects of homeless encampments on downtown business owners and residents, and their disapproval of the manner in which the Defendants allocate their resources to address the homelessness crisis.

Plaintiffs' Complaint acknowledges that the City has expended great efforts, money, and resources to address the homelessness crisis. *See., e.g.,* Dkt. 1, Compl., ¶ 74 ("Plaintiffs do not suggest the City and County are doing nothing; the amount of effort and resources that have been devoted to addressing this issue is considerable and admirable."). Yet, the Complaint nonetheless asserts fourteen claims, all but one of which (the claim for violation of a mandatory duty pursuant to California Welfare and Institutions Code section 17000) are asserted against the City.

**B.     The case was stayed from March 19, 2020 to April 13, 2021**

On March 17 and 18, 2020, the court allowed homeless rights advocates Orange County Catholic Worker, CANGRESS dba Los Angeles Community Action Network, and Los Angeles Catholic Worker (collectively, "Intervenors") to intervene in this action.  Dkt. 18, 29.

Just nine days after the complaint was filed, the court held an emergency status conference[1] on March 19, 2020, which the Mayor, the President of the City Council, the City Attorney, and other City officials all attended because the City agreed the parties had a unique opportunity to address the homelessness crisis, despite the legal and factual deficiencies of Plaintiffs' Complaint. The parties agreed to stay all proceedings and engage in mediation.  *See e.g.* Transcript of 3/19/20 Conference, Dkts. 39, 90.

While the stay was in effect, in May 2020, the court *sua sponte* issued a preliminary injunction that "individuals experiencing homelessness camped within 500 feet of an overpass, underpass, or ramp must be offered housing…and subsequently humanely relocated at least 500 feet away from such areas by no later than September 1, 2020." Dkt. 123 at 10.  The court vacated the injunction after the City and County reached their historic agreement by which the City agreed to create 6,700 beds by December 2021, memorialized in a Memorandum of Understanding ("MOU").  Dkt. 185-1.  The City has since exceeded its first set of obligations under the MOU, developing 5,467 new shelter solutions (more than the agreed-upon 5,300 beds) and 728 interventions pursuant to existing agreements with the County (more than the agreed-upon 700 beds), for a total 6,195 beds by the April 16, 2021, deadline.  Dkt. 267-1.

The stay was not lifted until April 13, 2021, in response to Plaintiffs' motion for

---

[1] Although the court convened multiple conferences during the stay to address issues such as the status of shelter interventions being created by the City, all were held prior to the Plaintiffs' filing of their motion for preliminary injunction (Dkt. 265), and none were evidentiary hearings with testimony from witnesses subject to direct or cross-examination.  *See* Dkt. 39, 90, 92, 94, 110, 112, 117, 162, 165, 181, 201, 218.

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

preliminary injunction, filed on April 12, 2021, and the County's motion for dismiss, filed on March 29, 2021. Dkt. 266.  Notably, the City has not yet filed a response to the Complaint, and no discovery has commenced.

### C.     Plaintiffs' Preliminary Injunction Motion

On April 12, 2021, Plaintiffs filed their motion for a preliminary injunction, which asked the court effectively to **become** the local homelessness authority and compel the City to take no less than 10 sweeping and affirmative steps, including to (1) provide shelter to every Angeleno in Skid Row within the next 90-180 days, 50% of which housing must be provided outside Skid Row; (2) reallocate 20 acres of City-owned land to be used for housing or provide the land to private developers at a nominal price and pursuant to a variety of terms dictated by Plaintiffs; and (3) enforce laws to clear – and keep clear – sidewalks, public streets, and public places without regard to any individual discretion. Dkt. 265 & 265-3.

Plaintiffs sought a preliminary injunctive against the City based on three theories.[2] The first theory was based on only two constitutional violations—the state-created danger doctrine (Dkt. 265 at 28:28-29:2) and procedural due process for "taking Plaintiffs' property values without giving notice and an opportunity to be heard (Dkt. 265, at 29:21-24 and 30:6-19).  While Plaintiffs dedicated a large portion of their brief to allegations that a since-rejected containment policy and systemic racism having contributed to the conditions on Skid Row, Plaintiffs did not actually move for relief under any Equal Protection theory.  Notably, Plaintiffs' motion did not present any argument the City created a special relationship with the homeless community; that the City's alleged severe inaction was actually state action in violation of the Equal Protection clause; or that the City violated unhoused black families' fundamental right to family integrity in a way akin to the substantive due process violations of children

---

[2] Plaintiffs moved on a fourth theory only against the County, their Second Claim for violation of mandatory duty under Welfare and Institutions Code § 17000.  Dkt. 265 at pp. 25-33.

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

separated from their parents at the U.S.-Mexico border.

Plaintiffs' second theory for preliminary injunctive relief was that Plaintiffs were likely to succeed on their ADA-related claims because the City's sidewalks in Skid Row are obstructed by homeless encampments in violation of the ADA. Dkt. 265 at 34:13-14. Finally, Plaintiffs moved for preliminary injunctive relief based on state law private and public nuisance claims (Id. at 30:20-33:10), which the court did not address in its Order.

On April 13, 2021, the court issued an order lifting the litigation stay, ordering the City and County to file oppositions by April 19, 2021, and noting that "[n]o reply will be required from Plaintiffs." Dkt. 266. On April 19, 2021, the City, the County, and the Intervenors all filed oppositions to Plaintiffs' preliminary injunction motion. *See* Dkts. 269-271, 273-275.

Less than 24 hours after the oppositions were filed, and without a hearing, the court issued its preliminary injunction order. Dkt. 277. This mandatory injunction requires the City to take a dozen affirmative and onerous steps in the next 180 days (with many obligations beginning immediately), many of which were not requested by Plaintiffs:

1) Place $1 billion in escrow forthwith;
2) Have two meetings with the court's unilaterally appointed Special Monitor/Master, the first of which must occur within 3 days to agree upon reasonable compensation, and the second of which must occur within 10 days to receive Special Monitor/Master Martinez' input regarding independent auditors and investigators;
3) Cease sales and transfers of "the over 14,000 City properties"[3] pending a court-ordered report by the City Controller.

---

[3] There is no evidence in the record that there are 14,000 City properties.

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

4) By 8:00 a.m. on April 27, 2021, the Mayor and City Council must submit a report to the court to explain why an emergency declaration has not been issued;

5) Within 30 days, the City Controller shall oversee the creation of a report on all land potentially available within each Council District for housing and sheltering persons experiencing homelessness;

6) Within 30 days, the City's Homelessness and Poverty Committee must report to the court specific actions to address: (1) structural barriers that cause a disproportionate number of people of color to experience homelessness or housing insecurity; (2) solutions to the problem of extremely low income individuals being foreclosed from the affordable housing market in favor of higher-income individuals; and (3) the possibility of rezoning to accommodate more R3 (multi-family) zoning;

7) Within 30 days, the City and County shall prepare a report on the status of Projects Homekey and Roomkey, with a specific focus on the geographic and racial distribution of project sites and beneficiaries;

8) Within 90 days, offer, and if accepted provide, shelter or housing to all unaccompanied women and children living in Skid Row (meaning the area between 2nd to 8th and Spring to Alameda);

9) Within 90 days: (1) conduct an audit of all funds received from local, state, and federal entities intended to aid the City in solving or alleviating the problem of homelessness; and (2) conduct investigations and report on all developers currently receiving funds from Proposition HHH, and propose revised procedures for evaluating future applicants for Proposition HHH funds that would limit the possibility of funds being misused or wasted;

10) Within 120 days offer, and if accepted provide, shelter or housing to all families living in Skid Row;

11) Within 180 days offer, and if accepted provide, shelter or housing to the general population living in Skid Row; and

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

12) Prepare a plan that ensures the uplifting and enhancement of Skid Row without involuntarily displacing current residents to other parts of the City or County.

Two days later, on April 22, 2021, the court clarified the Order as follows: "First the directives under "Accountability" and "City- and County- Wide Actions" pertains to all districts in the City and County and are not limited in any way to Skid Row. Second, the provision regarding the cessation of sales and transfers by lease or covenant under Section 2(a)(ii) does not apply to projects in progress as of the date of the order, April 20, 2021." Dkt. 279.

## III.    STANDARD OF REVIEW TO ISSUE STAY PENDING APPEAL

Supreme Court precedent has "distilled" the legal principles for issuing stays pending appeal into consideration of four factors: (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. at 434 (*quoting Hilton v. Braunskill*, 481 U.S. 770, 776, (1987)). "The first two factors of the traditional standard are the most critical." *Id.* In applying these factors, the Ninth Circuit employs a "sliding scale" approach. The factors are balanced such that a stronger showing of one element may offset a weaker showing of another. *Leiva-Perez v. Holder*, 640 F.3d 962, 964-66 (9th Cir. 2011). In other words, "the required degree of irreparable harm increases as the probability of success decreases." *Nat. Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007). *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) ("We first consider the government's showing on irreparable harm, then discuss the likelihood of success on the merits under the sliding scale approach").

## IV.    THE COURT SHOULD ISSUE A STAY BECAUSE THERE WAS A LACK OF NOTICE OF THE BASIS FOR THE INJUNCTION

While the law is clear that any ordered relief must bear a relationship to the issues raised by the pleadings, the differences among the causes of action asserted by the

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

Plaintiffs in their Complaint, the relief sought in their motion for preliminary injunction, and the injunctive relief this court ordered are stark.

In this case, the court issued injunctive relief to address issues it states implicate equal protection and due process concerns that were not pled in the Complaint nor raised in the motion for preliminary injunction. Similarly the Order requires the City to escrow one-seventh of its proposed budget and cease all land transfers, yet the City was never notified that such an Order was even contemplated; nowhere did Plaintiffs ask for $1 billion to be placed in escrow, or to cease all sales and transfers of City properties. Thus the City did not have notice or opportunity to respond to the ordered relief. Before a preliminary injunction may issue, the adverse party must receive notice. Fed. R. Civ. P. 65(a). "The purpose of this requirement is to give the opposing party a fair opportunity to oppose the motion for a preliminary injunction, and the court must allow that party sufficient time to marshal his evidence and present his arguments against the issuance of the injunction. Even if labeled merely a 'preservation order,' an order requiring a party, during the pendency of the litigation, to 'hold and retain' assets within his control is an injunction implicating due process concerns. Such an order cannot properly be entered without notice." *Weitzman v. Stein*, 897 F.2d 653, 657 (internal citations and quotations omitted).

In addition, "[a] court's equitable power lies only over the merits of the case or controversy before it. When a plaintiff seeks injunctive relief based on claims not pled in the compliant, the court does not have the authority to issue an injunction." *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 633, 636 (9th Cir. 2015).

In addition to the defects inherent in the extraordinary and sweeping nature of the injunction, the court should stay its order pending Ninth Circuit review because there is not a sufficient nexus between the order for injunctive relief and the allegations in the complaint. See, e.g., *Penthouse International, Ltd. v. Barnes*, 792 F.2d 943 (9th Cir. 1986) (district court abused its discretion ordering a remedy that was outside the scope

of the trial on the merits); *Thomas v. County of Los Angeles*, 978 F.2d 504, 508 (9ᵗʰ Cir. 1992) ("When the district court imposes a preliminary injunction on a state agency, a strong factual record is necessary; our review of the injunction must be more rigorous when we review an injunction again a state as opposed to a federal agency, since the Supreme Court requires a showing of an intentional and pervasive pattern of misconduct in order to enjoin a state agency.") (citing *Rizzo v. Goode*, 423 U.S. 362, 375).

In support of its claim that it has the power to order equitable relief on its own motion, the court cites *Brown v, Plata*, 563 U.S. 493.  Dkt. 277, p. 97.  However, the facts and procedural posture of that case are readily distinguishable.  In *Brown*, the court ordered the State of California to relieve overcrowding in the prison system only after the parties had litigated the issue for many years and come to many prior agreements on how to relieve overcrowding.  In addition, the State had begun to implement much of the relief the court ordered and to which the parties previously agreed.  *Id.* at 537-538.  Despite holding that the court had the power to fashion appropriate equitable relief, the *Brown* court noted that "courts should presume that state officials are in a better position to gauge how best to preserve public safety and balance competing correctional and law enforcement concerns.  The decision to leave details of implementation to the State's discretion protected public safety by leaving sensitive policy decisions to responsible and competent state officials."  *Id.* at 538.

*Armstrong v. Brown*, 768 F.3d 975, is also inapposite.  In that case, the plaintiff prisoners sought disability accommodations under the ADA.  The State filed a remedial plan for compliance and the court entered a permanent injunction based on the State's remedial plan.  Many years later, because the State was still out of compliance, the court modified the injunction.  The Ninth Circuit rejected the State's claim that it did not have notice or opportunity to be heard because the (1) court gave oral notice of its intent to modify the injunction, (2) the court invited oral argument at the hearing, and (3) the court gave the parties an opportunity to file a written brief on the issue, which the court considered before ruling.  *Id*. at 980.  By stark contrast, here the court went well beyond

11

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

the scope of the claims, arguments, and relief sought by the Plaintiffs, providing no notice to the City of its intent to do so, or any pre-Order opportunity for the City to respond.

## V.   STAY IS APPROPRIATE BECAUSE THE CITY WILL LIKELY PREVAIL IN ITS APPEAL

### A.   The City is likely to prevail on appeal of novel theories of law to which it never had an opportunity to respond

The court issued the injunction based on three never-before-asserted claims of constitutional violations: a "special relationship exception" violation of Fourteenth Amendment Due Process; a "severe inaction theory" under the Equal Protection Clause; and the fundamental and Substantive Due Process right to family integrity.  Dkt. 277, 75-86.  The City had no opportunity to address these new theories of constitutional law devised by the court and applied sua sponte in its preliminary injunction order.  It is difficult to imagine how Plaintiffs, as the party seeking the mandatory injunction, could have established "that the law and facts *clearly favor*" their position—as was their burden—when they didn't even advance three of the novel legal theories on which the court relied to grant the injunction.  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

More to the point, none of those three theories is legally tenable:  Plaintiffs could not have demonstrated a likelihood of prevailing on any of them had they been required to try, and the City is likely to prevail on the merits of whichever of Plaintiffs' claims the district court intended to support with those theories.  The City is entitled to a stay of the preliminary injunction while it vindicates its position on appeal.

### 1.   No "special relationship" between or among anyone identified here gives rise to an affirmative right to aid

"The Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir.

12

2011).  An exception to the rule exists "when a state 'takes a person into its custody and holds him there against his will,'" by "'incarceration, institutionalization, or other similar restraint of personal liberty.'"  *Id.* at 972 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).  This court held that Los Angeles has a "lengthy history of discriminatory policies, aimed at containing homeless people in Skid Row," which "restrains the personal liberty of L.A.'s homeless population to such an extent" as to trigger an affirmative duty on the City to act under the Fourteenth Amendment.  Dkt. 277 at 76.  Putting aside the extremely serious question why Plaintiffs would be entitled to an injunction imposing an affirmative duty on the City on behalf of third-party "homeless people in Skid Row" they do not represent, the case cited by the court shows plainly that no such affirmative duty exists here.

In *Patel*, a developmentally disabled student who was supposed to be supervised at all times by her teacher was instead allowed to go to the bathroom on her own.  648 F.3d at 969.  As a result of her teacher's lapse in attention, the student had sex with another student in the bathroom.  *Id.* at 969–70.  The student's mother sued the school district for violating a putative Fourteenth Amendment affirmative duty to her daughter.  *Id.* at 971.  In affirming summary judgment against the mother, the Ninth Circuit held that there was no special relationship even though the child was legally compelled to go to school and the school acted in loco parentis under state law while the child was there.  *Id.* at 972–73.

Here, Plaintiffs did not argue, nor did the court find, that the City legally compels homeless people to go to, and stay in, Skid Row, or that the City acts with the authority of a parent vis-à-vis people experiencing homelessness.  Whatever duty the court would force the City to undertake on their behalf, it is difficult to conceive that the court intends to hold that the City in the position to restrict the autonomy of a homeless person as if it were their parent—let alone their jailor, which may actually support a special relationship duty.  But that is precisely the conclusion that applying a special-relationship theory here would dictate.  *DeShaney*, 489 U.S. at 200.

**2.     No law supports the theory that alleged "severe inaction" equals state action that violate equal protection**

Next, the court opines that "a textualist reading" of the Fourteenth Amendment's Equal Protection Clause supports the notion that the City has an affirmative duty to act. Dkt. 277 at 77. The court parses the Amendment's text this way: the "the double negative implication of 'not deny' can literally be interpreted to mean 'to provide,'" thereby requiring a government to act. Dkt. 277 at 77. The only authority offered to support this interpretation is a law review article.

Imputing the sweeping affirmative obligations of its Order to the City based on this unprecedented constitutional theory not only has the ironic impact of denying the City due process—since the theory was raised for the first time in this litigation in the Order itself—but it sweeps far too broadly. Courts are supposed to be circumspect in creating new constitutional rights. *Michael H. v. Gerald D.*, 491 U.S. 110, 123 (1989).

**3.     The City has not interfered with any "familial relationship" between or among anyone in this litigation**

The last of the legal theories that the court generated and applied of its own initiative is that "conduct attributed to the City and County violates unhoused families' substantive due process right to family integrity." Dkt. 277, 80. Here, there is little need to move beyond the most obvious reason that this theory fails: absolutely nothing explains how Plaintiffs have standing to sue over—and get an injunction to remedy— violations of hypothetical third parties' family integrity. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–102 (1998) (a failure to demonstrate standing is fatal; a court should go no further). The cases the court identifies as "comparable"—*Quilloin v. Walcott*, 434 U.S. 246 (1978), *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enforcement*, 319 F. Supp. 3d 491 (D.D.C. 2018), and *L. v. U.S. Immigration & Customs Enforcement*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018)—are therefore *not* comparable in at least one dispositive respect. Each of them was brought by the people whose family integrity allegedly was disrupted by a government action. Not so here.

And that is enough to dispose of the theory entirely.

Even if that were not enough, the court did not cite any evidence that the City took any affirmative action that violated family integrity. Rather, it relies on references asserting that African Americans are overrepresented in both people experiencing homelessness in Los Angeles and in children in the County's foster care system—without explaining if or how one thing can or does lead to the other, and, even if they did, how the City is responsible for it such that the City must be compelled to remedy it in the manner of the court's choosing. Dkt. 277 at 84-85.

**B.    The City is likely to prevail in its appeal because there is no equal protection claim based on race to support the order**

The Plaintiffs do not allege an Equal Protection claim in their complaint, nor did they rely on a racial Equal Protection claim in their motion for preliminary injunction. The NAACP submitted an Amicus Brief in which it argued that the City was responsible to remedy homelessness, which it asserted was the result of racism. Although the law is well settled that a court's decision must be limited to the arguments made by the parties, not Amici (*United States v. Sineneng-Smith,* __U.S.__, 140 S.Ct. 1575, 1579 (2020)), this court adopted the NAACP's arguments wholesale, and found that the "historical constitutional violations" allowed this court to issue "an affirmative injunction ordering the City and County to actively remedy its homelessness crisis." Dkt. 277 p. 72. The City is likely to prevail in its appeal from the injunction on this basis.

Neither the NAACP nor this court identify a *specific* constitutional violation committed by the City to be remedied. Any use of equitable power must flow from, and be tailored to, a specific constitutional violation, not merely a desire to "disrupt the status quo." Dkt. 264, pp. 8-10. *See, e.g., Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) ("Failure of political will does not justify unconstitutional remedies.") (citation omitted); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992) ("Federal courts may not order States or local governments . . . to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated.")

And disparate impact, while a serious concern that must be addressed, is generally insufficient by itself to form the basis of a constitutional violation–especially where, as here, nothing in the record indicates ongoing, intentional, invidious discrimination targeting people experiencing homelessness based on race or other protected characteristics. *See*, e.g., *Hispanic Taco Vendors v. Pasco*, 994 F.2d 676, 680 (9th Cir. 1993) ("Here, however, the disproportionate impact of this ordinance does not approach the level of discrimination in cases where the Supreme Court has invalidated laws solely because of their impact.")

Both the statute and the cases cited by the NAACP and this court identified a specific, affirmative action by the governmental agency defendant that had a disparate impact among an identified racial group, thus triggering protection under Title VI; nothing of the sort has transpired here.  Indeed, this court primarily cites to *Brown v. Board of Education of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954) and *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), cases involving the purposeful exclusion of African-American children from schools attended by white children, and nothing of the sort has been litigated – much less addressed with any evidence or argument – in this case.  Thus, as is true with the rest of the injunction, the record does not support the court's sweeping conclusions on this point.

### C.     The City is likely to prevail on the "state-created danger" claim because this exception does not apply here

Plaintiffs are business owners who argue that they have been harmed by the homeless individuals that live near their businesses, which they label a "state-created danger."  This court's Order finds that homelessness is indeed the result of a state-created danger, although it reaches back into historical events from the turn of the century as its premise for this supposed danger.  The City has yet to answer the complaint.  Even so, both the Plaintiffs and this court are wrong.

The "state-created danger" doctrine is a limited deviation from the well-established rule that a public entity's failure to protect a plaintiff against bodily harm

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

inflicted by third-parties generally does not violate the guarantee of due process. *See Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 432-33 (N.D. Cal. 2017) (dismissing state-created danger claim where plaintiffs' allegations "[did] not confirm that the state action was the impetus that put Plaintiffs in an inherently dangerous situation."). This exception applies only where: (1) "there is 'affirmative conduct on the part of the state in placing the plaintiff in danger'" and (2) "the state acts with 'deliberate indifference' to a 'known or obvious danger.'" *See Patel*, 648 F.3d at 974.

First, the court premises its Order on a finding that people experiencing homeless have been placed in danger, not the Plaintiffs. Second, while Plaintiffs never allege, nor do they present any evidence, that the City ever took any affirmative action that restrained Plaintiffs' freedom to act on their own behalf by specifically directing the individual into a dangerous situation and eliminating other options by which the individual could have avoided that danger. *See Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018); *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082 (9th Cir. 2000). Third, there is no evidence or finding that the City acted with deliberate indifference towards the Plaintiffs sufficient to meet the stringent standard necessary for the state-created danger doctrine to apply.

Indeed, Plaintiffs themselves admit that the City has expended great efforts, money, and resources to address the homelessness crisis. *See* Dkt. 1, ¶ 2 ("The City and County combined spend over a billion dollars annually providing police, emergency, and support services to those living on the streets."); ¶ 18 ("Officials in both the County and City have gone to great lengths in the last couple years to address this crisis, and their efforts are impressive and commendable"), ¶ 74.

### D.     The City is likely to prevail on the ADA claims

The court incorrectly found that Plaintiffs were likely to succeed on their ADA claim because "[h]undreds of city sidewalks, not only in Skid Row but across the City and County of Los Angeles, fail to meet the minimum requirements of the ADA due to the creation of homeless encampments" which the court characterizes as "the outcome of

decades of active policy choices and deliberate indifference on the part of the City and County." Dkt. 265 at 91. But Plaintiffs did not and cannot establish the City discriminated against anyone solely by reason of their disabilities (42 U.S.C. § 12132; *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978-79 (9th Cir. 1997)), that the City's sidewalks are unpassable when viewed in their entirety (28 C.F.R. 25.150(a); *Blackwell v. City & Cty. of San Francisco*, 506 Fed. Appx. 585, 586 (9th Cir. 2013)), or that homeless people and their property are fixed architectural barriers creating accessibility violations that the ADA was intended to address. *See Montoya v. City of San Diego*, 2021 U.S. Dist. LEXIS 52340, at *24 (S.D. Cal. Mar. 19, 2021).

### E.    The City is likely to prevail on the State law claim

Cal. Wel. & Inst. Code § 17000 applies to (1) all counties and (2) the only "city and county" in the State: San Francisco. *Hunt v. Superior Court*, 987 P.2d 705 (Cal. 1999); *Tobe v. City of Santa Ana*, 892 P.2d 1145 (Cal. 1995). Section 17000 imposes no obligation on the City, as a matter of law.

Plaintiffs did not move for injunctive relief on their Section 17000 claim against the City. Dkt. 265 at pp. 25-33. However, the court found the Plaintiffs likely to succeed on a never-asserted claim the City violated Section 17000 because "the court finds that the most reasonable interpretation of § 17000 . . . is that it applies not only to counties alone, but to cities and counties when they undertake a joint venture directed to the goals of § 17000, such as a coordinated effort to alleviate homelessness in their jurisdictions." Dkt. 277, p, 90. The court thus reinterpreted Section 17000 contrary to its plain terms. The power to amend a statute lays with the Legislature, not the courts. Section 17000 provides no basis for injunctive relief against the City.

### F.    The City is likely to prevail because the factual record relied upon by the court cannot support the injunction

The court could not have concluded that the Plaintiffs were likely to succeed on the merits of their claims based on the factual "record" set forth in the Order. Oddly, the court did not rely upon or cite to any of the evidence submitted by Plaintiffs in

declarations in support of their motion, nor could it, as the Plaintiffs presented no evidence of the harm that the court sought to remedy—the plight of people experiencing homelessness, particularly people of color.  Dkt. 277, p 66, n. 411.  Instead, the court found its own "evidence" to support the preliminary injunction, primarily two reports issued by LAHSA (n.4) and the UCLA Luskin Center (n. 10), which were never submitted as evidence by any party, and were never subjected to any review, comment, criticism, or examination in this case.

These reports, moreover, do not demonstrate any harm to the Plaintiffs, as Plaintiffs do not allege that they are persons of color who are experiencing homelessness. These reports do state that homelessness is multi-faceted problem with several causes— and that one cannot separate out any one possible cause from another, and certainly cannot single out one actor—the City—as its sole cause.  Dkt. 277, p. 18 ("The 2018 LAHSA report concluded that 'racial bias [continues to] affect every aspect of a Black person's life, and *it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness*.'") (emphasis added).

To the extent these reports found fault among many actors, the court improperly ascribed all fault to the City (and County).  For example, the court found that *but for* the City's and County's discriminatory actions like redlining, there would be less homelessness among black Angelenos.  Dkt. 277, 72-73.  While the *federal* policy of redlining was certainly harmful (Id. at 6-7), no evidence was presented that the City or County played any role in redlining or was a "but for" cause of homelessness.

The remaining citations in the Order, many to newspaper articles and op-eds, are riddled with unsubstantiated allegations and opinions.  *See, e.g.*, Dkt. 277, p. 10 n. 52-58 (citing a 2020 opinion piece in the LA Times); p. 12, n. 69 (2017 *op-ed* from LA Times); p. 27, n. 178-181 (a statement from the Times Editorial Board); p. 38, n. 232, 235 (citing a different statement from the Times Editorial Board).  Worse, many of these alleged citations do not support the statements in the Order to which they refer, undermining the

court's conclusion that these "facts" demonstrate that the Plaintiffs are likely to succeed on the merits of their claims.

For example, the court says the City used eminent domain to seize 6,000 houses to build a freeway.  Dkt. 277, p. 11.  The cited source, however, makes clear that the State, not the City, seized those houses.  Id. at n. 63.  Regardless, the court goes on to cite the City's use of eminent domain to justify the injunction against the City.  Dkt. 277, p. 2. Again, this sweeping conclusion is not based on any litigation or evidence properly before the court.

### G.    Alternatively, this appeal raises significant legal issues that warrant a stay of this Order.

A stay is also appropriate where, as here, the case involves "serious legal questions."  *FTC v. Qualcomm Inc.*, 935 F3d 752, 755 (9th Cir. 2019) (per curiam); *Alliance for Wild Rockies v. Cottrell*, 632 F3d 1127, 1131-34 (9th Cir. 2010). The court's Order implicates a serious legal issue—nothing less than the proper role of federal courts in litigation.  In *Sineneng-Smith,* the court held that the Ninth Circuit had overstepped its role as neutral arbiter when it ignored the arguments made by a criminal defendant who was "represented by competent counsel," and instead invited three amici to brief issues that had not been raised by the parties, and proceeded to issue a decision based on an issue raised by amici, not the parties.  140 S. Ct. at 1580.  The Supreme Court reversed the Circuit's "takeover" of the appeal, explaining that courts should be "passive instruments of government" that do not "look[] for wrongs to right" but instead "wait for cases to come to [them], and when [cases arise] normally decide only questions presented by the parties."  *Id.*

## VI.    THE CITY WILL SUSTAIN IRREPARABLE HARM WITHOUT A STAY

In addition to showing a likelihood of success a petitioner seeking a stay pending appeal must show "that irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 375, (2008) (citations omitted).  The irreparable harm must be likely to occur during the period before

the appeal is decided. *Leiva-Perez*, 640 F.3d at 968; *FTC v. Qualcomm Inc.*, 935 F3d 752, 756 (9th Cir. 2019) (movant demonstrates probability of irreparable harm where injunction imposes fundamental business changes.)

Here, the City will be irreparably harmed if the Order is not stayed pending the outcome of the appeal.  Among other things, the City cannot comply with the Order requiring $1 billion be placed in escrow "forthwith" because the vast majority of the $1 billion is (a) not currently in the City's possession and (b) comes from sources that have specific restrictions and limitations on how the money can be spent.  Declaration of Richard H. Llewellyn, Jr., ¶¶ 9-16.  Thus, the City does not have $1 billion to place into an escrow account, and even if it did, the City could not do so without being in violation of the specific restrictions imposed on the City for the funds' use.

Furthermore, the Preliminary Injunction imposes multiple obligations on the City in incredibly short and unrealistic timeframes all of which are imminent.  Most notably, the City (along with the County) are ordered to create shelter and housing beds in 90 days for all unaccompanied women and children living in Skid Row, 120 days for all families living in Skid Row, and 180 days for the general population living in Skid Row. Dkt. 277, p. 109.  Accordingly, if the stay is not granted, the City will be forced to somehow site and fund thousands of new shelter beds or housing solutions, and potentially displace persons or otherwise move them against their best interests (as noted by the Intervenors in their Opposition to Plaintiffs' Motion for Preliminary Injunction and the supporting documents thereto).  Dkt. 275 and 276.  City properties, money, and other resources will further be tied-up and not available for other pressing City needs if the stay is not granted, resulting in the City suffering irreparable harm.

## VII.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST STRONGLY FAVOR A STAY

Although the likelihood of success on the merits and the irreparable harm that will be suffered by the moving party in the absence of a stay are the key inquiries in determining whether to issue a stay, a court will also consider "whether issuance of the

1    stay will substantially injure the other parties interested in the proceeding" and where the

2    public interest lies.  *See City & County of San Francisco v. United States Citizenship &*

3    *Immigration Servs.*, 944 F.3d 773, 789 (9th Cir. 2019); *see also Trump v. Int'l Refugee*

4    *Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("Before issuing a stay, '[i]t is

5    ultimately necessary…to balance the equities–to explore the relative harms to applicant

6    and respondent, as well as the interests of the public at large.").  Here, these factors

7    weigh strongly in favor of a stay of the Order.

8         Notably, the preliminary injunction requested by the Plaintiffs was opposed not

9    only by the City and County, but also by the Intervenors, who were permitted to

10   intervene to voice the interests of unhoused people. Dkt. 18, 29 (orders granting

11   applications to intervene), 275 (Intervenors' Opposition to Plaintiffs' Motion for

12   Preliminary Injunction).  In their opposition to Plaintiffs' motion, the Intervenors argued

13   that "such a wide-reaching order would not serve the public interest; in fact, just the

14   opposite." Dkt. 275 at 12:25-13:5.  Like the City and County, the Intervenors argued

15   that "Plaintiffs fail[ed] to put forth any argument, let alone evidence to meet its burden

16   of showing that such a dramatic encroachment into the provenance of the City and the

17   County is warranted, let alone why such a broad injunction is in the public interest."

18   Dkt. 275 at 12:19-22.  Intervenors' opposition to the injunction – and their non-

19   opposition to the City's request for a stay of the preliminary injunction pending appeal –

20   is significant and of particular relevance to balancing the hardships that would be faced

21   by parties interested in the proceeding absent a stay.

22        Any possible harm the Plaintiffs could articulate in the event a stay were issued

23   until the appeal can be resolved pales in comparison to the City's hardship if a stay were

24   not granted, given the mandatory nature of the Order, which drastically alters the status

25   quo and requires the City to take multiple, onerous actions in quick succession.  *See*

26   *Azurin v. Von Raab*, 792 F.2d 914, 915 (9th Cir. 1986) (granting stay pending appeal to

27   preserve status quo and prevent dissipation of the assets at issue).  In the absence of a

28   stay, the hardships faced by the City (and County and Intervenors) will be great,

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION

especially in light of the City's strong showing that the Preliminary Injunction was wrongfully issued – both because the Order far exceeded the court's authority and because the court incorrectly found that Plaintiffs are likely to succeed on the merits of their claims.  In contrast, in the event that the Preliminary Injunction Order were ultimately upheld, the only impact on Plaintiffs if a stay were granted until the City's and County's appeals can be resolved is a delay in enforcement of that Order.

Here, "[t]he issues presented on appeal are substantial and of public importance" and thus "[t]here is a clear public interest in their proper resolution." *See Azurin v. Von Raab*, 792 F.2d at 915.  Indeed, the issues on appeal concern the fundamental limits on a court's power to usurp discretion vested in local officials to respond to the complicated and multi-faceted regional homelessness crisis.

## VIII. CONCLUSION

For the reasons above, the City requests that the court issue a stay of the preliminary injunction pending appeal.  Due to the impending deadlines in the court's order, the City respectfully requests the court rule on this motion as soon as possible, and no later than April 24, 2021, at which time the City intends to seek a stay from the Ninth Circuit court of Appeals.

DATED: April 23, 2021

MICHAEL N. FEUER, City Attorney
KATHLEEN A. KENEALY, Chief Deputy City Attorney
SCOTT MARCUS, Senior Assistant City Attorney
GABRIEL S. DERMER, Assistant City Attorney
ARLENE N. HOANG, Deputy City Attorney
ESSICA MARIANI, Deputy City Attorney

By:  */s/  Scott Marcus*
     SCOTT MARCUS
     Senior Assistant City Attorney

Attorneys for Defendant CITY OF LOS ANGELES

DEFENDANT'S EX PARTE APPLICATION FOR STAY OF PRELIMINARY INJUNCTION