**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC (KESx)                              Date: April 25, 2021

Title: **LA ALLIANCE FOR HUMAN RIGHTS, et al v. CITY OF LOS ANGELES, et al**

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Deborah Lewman | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**   **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' EX PARTE APPLICATIONS TO STAY [282, 284]**

Before the Court is Defendant County's Ex Parte Application to Stay (Dkt. 282) and Defendant City's Ex Parte Application to Stay (Dkt. 284). The Court finds the matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7–15. Having reviewed the moving papers and considered the parties' arguments, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                                                 Initials of Deputy Clerk djl
CIVIL-GEN

**TABLE OF CONTENTS**

I. PROCEDURAL HISTORY .................................................................................................. 2

II. LEGAL STANDARD......................................................................................................... 2

III. STANDING ....................................................................................................................... 2

IV. LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................... 6

   A. IRREPARABLE HARM TO PLAINTIFFS ................................................................................ 6

   B. PUBLIC INTEREST ................................................................................................................ 6

   C. PRELIMINARY JUNCTION AS A MATTER OF LAW ............................................................. 7

      i. *State-Created Danger Doctrine* ................................................................................ 7

      ii. *Substantive Due Process* .......................................................................................... 7

      iii. *Brown v. Board of Education* ................................................................................... 8

      iv. *Cal. Welf. & Inst. Code § 17000* ............................................................................. 8

V. IRREPARABLE HARM ABSENT STAY .......................................................................... 8

VI. ISSUANCE OF STAY WILL SUBSTANTIALLY INJURE INTERESTED PARTIES ......................... 9

VII. PUBLIC INTEREST ........................................................................................................ 9

VIII. PROVISIONS OF THE STAY ....................................................................................... 10

   A. SKID ROW ......................................................................................................................... 10

   B. ACCOUNTABILITY OF FUNDS DEDICATED TO HOMELESSNESS ........................................... 11

   C. AVAILABILITY OF CITY PROPERTY .................................................................................. 13

      i. *Cessation of Transfer of Property* ......................................................................... 13

      ii. *Creation of Report on Property* ............................................................................. 13

I.  **Procedural History**

On April 20, 2021, the Court issued a preliminary injunction. Dkt. 277. Defendant County appealed this order on April 21, 2021. Dkt. 278. On April 23, 2021, Defendant City appealed this order, as did Intervenor Cangress. Dkt. 281; Dkt. 283. Also on April 23, 2021, Defendants County and City filed separate Ex Parte Applications to Stay. Dkts. 282, 284. Plaintiffs opposed the ex parte applications on April 24, 2021. Dkt. 285.

II.  **Legal Standard**

Supreme Court precedent has "distilled" the legal principles for issuing stays pending appeal into consideration of four factors: (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776, (1987)). "The first two factors of the traditional standard are the most critical." Id. In applying these factors, the Ninth Circuit employs a "sliding scale" approach. The factors are balanced such that a stronger showing of one element may offset a weaker showing of another. *Leiva-Perez v. Holder*, 640 F.3d 962, 964-66 (9th Cir. 2011). In other words, "the required degree of irreparable harm increases as the probability of success decreases." *Nat. Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007); *see Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) ("We first consider the government's showing on irreparable harm, then discuss the likelihood of success on the merits under the sliding scale approach").

III.  **Standing**

Defendants assert that the Plaintiffs lack standing because they cannot allege injuries to third parties—homeless persons on Skid Row—to support Article III standing for themselves. Dkt. 282 at 9–10; Dkt. 284 at 14. In response, Plaintiffs' point to their Declarations, Dkt. 265-2, that show that there is a plethora of homeless persons amongst the Plaintiffs. Dkt. 285 at 3.

Standing is an essential and unchanging part of the case-or-controversy requirement of Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–47 (2016), *as rev'd* (May 24, 2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992))

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

Defendants argue that Plaintiffs lack standing to bring the preliminary injunction in question. Dkt. 265; Dkt. 284 at 14. because injury to homeless persons is the basis for the preliminary injunction order, Dkt. 277, and "Plaintiffs are not [persons suffering homelessness]." Dkt. 282 at 10. As stated in the Declarations attached to the Plaintiffs' motion for preliminary injunction, however, there are numerous homeless persons amongst the Plaintiffs. *See, e.g.* Dkt 265-2, Declarations of Mary Brannon, Maria Diaz, Gregory Gibson, Javier Gonzales, Ann Jackson, Wenzial Jarrell, and Luis Zaldivar, all of whom are members of LA Alliance and are currently experiencing homelessness in and around Skid Row. The following examples, drawn from their declarations, demonstrate that Plaintiffs have carried their burden to show standing at this stage of the litigation.

"I did not go to war for our country to be afforded such sorry circumstances for self-sufficiency," states Wenzial Jarrell, a veteran who served for years in the Air Force before being injured in combat, a plaintiff to this suit, and a homeless person. *Id.* Jarrell suffers from post-traumatic stress disorder from years of serving in war, which has made it difficult for him to survive on the streets. *Id.* Since moving to Skid Row, however, Jarrell has realized that "service providers offer little to no substantive support for the people living in Skid Row." *Id.* Jarrell mentions how he found a 19-year-old girl who was blind, walking the streets of Skid Row; "[i]t was clear that she would be unable to survive there by herself." *Id.* He brought her to the county

services worker who told him that there was nothing they could do for the girl. *Id.* Jarrell prides himself on helping countless others to "get out of the black hole that is Skid Row." *Id.* Because there is nothing worse than "getting stuck in the system of Skid Row and finding you cannot escape." *Id.* Unfortunately, he himself has not been able to escape the system. Concluding his declaration, Jarrell states that he "would jump at [a] chance" for stable housing, a chance for life. *Id.* "The world doesn't know how bad it really is to live on Skid Row. I know I am more likely to die because I live on Skid Row. It is a desperate situation." *Id.*

"L.A.'s public services are not just inefficient—they are killing us," says Gregory Gibson, a plaintiff to this suit who has suffered homelessness for the past 15 years. *Id.* While dealing with the difficulties of living on the street, he says, "we fight for necessities like identification and housing." "Drug use is rampant because it is an escape from reality," Gibson continues. "I never did drugs before becoming homeless, but now I do them just to deal with the pain of living on the street." *Id.* Gibson laments that "[t]ackling issues through public services is so difficult that, in the fixing one problem, ten more pop up." *Id.* Gibson concludes his statement with a cry for help. *Id.* "I want to break this vicious cycle of living on the streets, fighting for survival;" "I need help." *Id.*

"I have lived on Skid Row for five years" and "have seen a number of young women harassed, attacked, raped, and ultimately succumb to drug addiction due to the conditions of Skid Row," states Maria Diaz, a homeless woman and a plaintiff to this suit. *Id.* Diaz states that it is women like her who suffer the most on Skid Row. "Harassment of women in Skid row is a certainty, and they need to learn fast how to deal with the constant onslaught of issues they will face." *Id.* Furthermore, "[p]eople are always trying to sell drugs, steal belongings, or just hassle those trying to make it through this troubling time." *Id.* She wishes that resources were "more accessible to those living on the street because [she believes] the first step in escaping homelessness is finding a safe and stable place to rebuild your life." *Id.*

"I . . . experienced much violence and fear after moving here," states Mary Brannon, a plaintiff to this suit and a sixty-year-old woman suffering homelessness in Skid Row. *Id.* "I am scared," Brannon continues; "every day on the streets hurts more." When she reached out to authorities for help, Brannon was told that she "must wait six months to be assigned a caseworker," and "not a single City or County employee offered [her] a room through Project Roomkey." *Id.*

"Originally, I was sent to Skid Row by a judge to participate in a program . . . but the decision ended up putting me in the epicenter of the homeless crisis," asserts Ann Jackson, a plaintiff to this suit and a woman who has suffered homelessness on Skid Row for the past eight years. *Id.* "The stress of my life in Skid Row caused me to have a stroke 18 months ago," she continues. *Id.* Because of this stroke and her case manager's unhelpfulness, Jackson states that she has "not been able to obtain the section 8 housing that [she is] entitled to." *Id.* Jackson prays to the Court for relief, stating, "I desperately want to change and to get housing away from Skid Row where I can put my life back together and recover from my stroke in safety." *Id.*

"The circumstances of Skid Row actively harm people's chances of escaping a life of homelessness," states Javier Gonzales, a plaintiff to this suit and a homeless person. *Id.* "Robberies and assaults are a part of daily life," he asserts. *Id.* Gonzales is forced to take amphetamines to stay awake "during the most dangerous hours." *Id.* The lack of services to house himself or maintain his condition, Gibson continues, "has essentially trapped [him] at Skid Row." *Id.* In his prayer for relief, Gibson says that "what those on Skid Row need isn't sympathy, pandering, or handouts, but access to the resources to get ourselves back on our feet." *Id.*

"I have been living on Skid Row for approximately the last 25 years," states Luis Zaldivar, a plaintiff to this suit and a homeless person. *Id.* "I have seen murders, arson, gang activity, and violent attacks," Zaldivar continues. *Id.* "The crime seems to be getting worse, and there are more people than I have ever seen living on the street. I worry that the longer I stay, the more likely I am to become a victim." *Id.*

These are a few of the numerous realities laid out in Plaintiffs' declarations. *See generally id.* In Plaintiffs' own words, Plaintiffs "are current and formerly unhoused individuals, residents, community members, businesses, non-profit, and service providers all coming together to fight against what has become the accepted standard of death and despair in Los Angeles." Dkt. 285 at 3; Dkt. 265-2. Plaintiffs therefore have shown that they have suffered injury-in-fact. And as laid out in detail in the Court's preliminary injunction order (Dkt. 277) Plaintiffs' injuries are fairly traceable to the challenged conduct of the City and County, and are likely to be redressed by a favorable judicial decision.

Plaintiffs have fulfilled their burden of establishing standing.

### IV.     Likelihood of Success on the Merits

#### A. Irreparable Harm to Plaintiffs

The Defendants argue that the Plaintiffs cannot show irreparable harm, and therefore cannot satisfy the requirements of a preliminary injunction. Dkt. 282 at 20.

An injunction requires a showing that irreparable harm will likely result without the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (finding that plaintiffs must show that "irreparable injury is likely in the absence of an injunction"). Defendants argue that the irreparable harm must be to the plaintiffs and not to third parties, i.e. homeless persons. Dkt. 282 at 20–21. The Plaintiffs, however, do consist of homeless persons. As stated in the Declarations attached to the Plaintiffs' motion for preliminary injunction, there are numerous homeless persons amongst the Plaintiffs. *See, e.g.* Dkt 265-2, Declarations of Mary Brannon, Maria Diaz, Gregory Gibson, Javier Gonzales, Ann Jackson, Wenzial Jarrell, and Luis Zaldivar, all of whom are members of LA Alliance and are currently experiencing homelessness in and around Skid Row.

And there is clear irreparable harm to these Plaintiffs—"[b]y the time briefing is finished in Defendants' interlocutory appeal, 385 people will have perished." Dkt. 285 at 2. There can be no harm more grave or irreparable than the loss of life, and with each passing day, five homeless persons die in Skid Row.

#### B. Public Interest

Similarly, Defendants argue that the Plaintiffs have made no showing of public interest, to meet the standard for a preliminary injunction. As mentioned in the Court's preliminary injunction order, however, the "public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution," and the constitutional rights of homeless persons—who are a part of the Plaintiffs—are being violated. Dkt. 277 at 93.

### C. Preliminary Junction as a Matter of Law

#### i. *State-Created Danger Doctrine*

The Defendants argue that a lengthy history of structural racism defined by deliberately discriminatory state acts like redlining and eminent domain does not constitute a state-created danger. Dkt. 284 at 16–17 . As the Court stated in its preliminary injunction, "[e]ven if this Court ignored the entire history of conscious decisions by the government that led to the creation of Skid Row and the rampant depravity before us today, there is still incontrovertible evidence that the danger of living on the streets . . . is state-made." Dkt. 277 at 73. The Court went on to say that "pursuing housing at the expense of shelter, suspending HHH deadlines (and thereby evading accountability), and ramping down Project Roomkey despite the availability of federal funds to support it were all political choices that created this crisis." *Id*. It is clear that the Court did not base its state-created danger doctrine decision solely, or even primarily, on a history of structural racism.

#### ii. *Substantive Due Process*

Defendants assert that the right to family integrity is reviewed under rational basis review. The Supreme Court has held that "the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."[1] Under substantive due process, courts review intrusions on fundamental rights under strict scrutiny. Many family-related issues have been considered fundamental rights. *See Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1928); *Loving v. Virginia*, 388 U.S. 1, 12 (1967). Furthermore, there is a constitutional right to live together with one's family, and this right is not limited to the nuclear family. "If a State were to attempt to force the breakup of a natural family . . . I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.'" *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63 (1977) (J. Stewart, concurring). Given the numerous opinions finding that rights related to the family should be afforded strict scrutiny

---

[1] *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality).

as fundamental rights, the Court disagrees with Defendants' argument that they should instead be afforded mere rational basis review.

### iii. Brown v. Board of Education

Defendants argue that the Court's reference to *Brown* is improper and that the Court itself, previously, recognized this. Dkt. 282 at 18. Defendants quote the Court stating that the constitutional violations in *Brown* were of a different sort. *Id.* This, however, is only a part of the Court's statement. To be precise the Court stated that *Brown* represented constitutional violations of a different sort, but "increasingly it is obvious that the impact of homelessness on communities of color is so immense that to call it other than intentional is to ask the Court to blind itself to apparent reality." Dkt. 205 at 4.

### iv. Cal. Welf. & Inst. Code § 17000

Defendants argue that they are not liable under Cal. Welf & Inst. Code § 17000 because § 17000 imposes a discretionary rather than a mandatory duty of care. As stated in its preliminary injunction, the Court agrees with Defendants that Defendants have discretion in discharging their obligations under § 17000. Dkt. 277 at 87. However, the Defendants' arguments fail in that that discretion is not limitless. There are certain minimum standards that Defendants must meet in order to meet the burden imposed by § 17000. To hold otherwise and to say that Defendants have absolute freedom to act, or not act, as they see fit in meeting the needs of indigent constituents would be to render §17000 moot. The Court declines to do so.

## V.    Irreparable Harm Absent Stay

Defendants argue that the preliminary injunction harms the Defendants irreparably because it interferes with government function and imposes burdens. Dkt. 282 at 22; Dkt 284 at 20–21. The Court, however, has not interfered with any government function. Rather, the Court has set up goal posts for the purpose of accountability. Accountability measures are not irreparable harms.

8

## VI. Issuance of Stay Will Substantially Injure Interested Parties

Defendants argue that the issuance of a stay would not injure any interested parties. Dkt. 282 at 23–24; Dkt. 284 at 21–22. Not so. As previously mentioned, there are numerous homeless persons amongst the Plaintiffs. The Court has previously found that five homeless Angelenos die on our streets each day. Dkt. 241-1 at 1. This is not to mention the litany of health issues caused by the forced proximity of Homeless to pollution. *See* Dkt. 103-1 at 3. Therefore, the Court finds that at the very least, some parties will be harmed by the issuance of a stay.

## VII. Public Interest

Similarly, the Defendants argue that the public interest favors a stay. Dkt. 282 at 25; Dkt. 284 at 21–23. Defendants continue that the relief would have a significantly negative impact on the homeless Angelenos in Skid Row, because the relief calls for interim shelter over "real housing solutions." Dkt. 282 at 25. The Court disagrees.

As emphasized previously, the Court's preliminary injunction calls for both interim shelter and long-term housing. Homeless Angelenos cannot be left to die while long-term housing is in progress—no harm could be more grave or irreparable than the loss of life. Accordingly, the Court finds that the public interest requires both the short- and long-term relief provided for in the preliminary injunction.

## VIII. Provisions of the Stay

The Court has carefully considered the parties' Applications to Stay Pending Appeal. The Court recognizes the need for flexibility in determining the best way forward to help the homeless population.

The failure of settlement negotiations over the last few months has been a source of concern for the Court. The City and County continue to squabble over financial responsibility for addressing the homelessness crisis. Monetary commitments alone do not fulfill the parties' obligations to their constituents. As action and accountability continue to stagnate, the homeless population and number of deaths increase.

The Court believes that increasing the availability of long-term housing is critical, and we cannot let our homeless die in the streets while we build it. The Court thus welcomes any effort to provide temporary relief while simultaneously building abundant and sustainable long-term housing.

The Court invites the Mayor of Los Angeles and the Chairman of the County Board of Supervisors to meet with the Court pursuant to settlement discussions. Without a global settlement, the Court will continue to impose its April 20, 2021 preliminary injunction, subject to certain modifications in response to the City and County's Applications to Stay Pending Appeal (Dkts. 282, 284):

### A. Skid Row

With respect to Skid Row, the Court is mindful of the impact that decompression of Skid Row would have on neighboring districts and has DENIED without prejudice Plaintiffs' request for 50% decompression. Rather, the Court's order mandates that the City *offer* housing options to Skid Row residents within 90 days in the case of unaccompanied women and children; within 120 days in the case of families; and within 180 days in the case of the general population. The Court notes that under the terms of the preliminary injunction, while the City is ordered to *offer* housing options on this timeline, Skid Row residents are not required to accept and may decline these offers.

Therefore, the Court DENIES the request to stay with respect to this provision.

### B. Accountability of Funds Dedicated to Homelessness

On April 20, 2021, the Court ordered the following:

> Pursuant to the Mayor's announcement[2] of a 'justice budget'[3] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

Dkt. 277 at 106.

The Court included this provision in response to the City's "justice budget," which purportedly allocated $1 billion to address the homelessness crisis, including an unused $164 million dedicated to homeless relief that remains available as a roll-over from the previous year's budget. Rather than directing the City's homelessness spending, the Court's order for escrow was intended to make certain that this promised money would in fact be set aside for homelessness. Reports have alleged that the distribution of Proposition HHH funds has been corrupted by "everything from fake not-for-profits to contractors with zero employees and multi-million dollar development fees, and lucrative guaranteed management fees that support zero-risk development."[4] Repeated concerns such as this are the basis for the Court's ordered audits.

Further, City Controller Ron Galperin cited a balance of "10-ish billion dollars available in the City treasury" and stated that "the point I've made repeatedly to others in the City is that if the issue is cash flow . . . we can solve that cash flow issue. That should not be the impediment."[5] The Court was troubled by the apparent incongruity between the available "cash flow" and the severe conditions of homelessness in Los Angeles. The Court was also concerned

---

[2] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[3] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.

[4] Letter from Ron Miller, Exec. Sec'y, L.A./Orange Cntys. Bldg. & Constr. Trades Council, to Mike Feuer, L.A. City Att'y (Dec. 17, 2020).

[5] People's City Council – Los Angeles (@PplsCityCouncil), TWITTER (Apr. 15, 2021, 6:33 PM), https://twitter.com/pplscitycouncil/status/1382869701852729348?s=21.

by the City's failure to apply for 100% reimbursement from FEMA for funds spent on Project Roomkey in light of purported budget concerns.

However, on April 21, 2021, the City represented that the billion dollars allocated for homelessness in the justice budget is not available to put in escrow.[6] Los Angeles City Administrative Officer Richard Llewellyn further stated that "the great majority of these funds are not currently in the City's possession."[7] Given this new information, the Court agrees that a modification of this provision is appropriate. Therefore, the Court STAYS provision 1(a) of the preliminary injunction for 60 days in order to hear testimony from the City regarding details of the $1 billion and asks the parties to create a *Binding Commitment and Implementation Plan* (the "Plan"):

1. The City shall draft the Plan within 60 days to ensure that the full $1 billion is spent city-wide.
2. The Plan shall provide the Court with a detailed breakdown of funding sources, uses, objectives, methods, and means so that the Court can monitor the Plan's implementation.
3. The Plan shall further provide specific information about the number of homeless individuals who will be housed and by when.
4. The Plan shall also provide details on the 89 pending projects with timeframes for completion and move-in dates.
5. Finally, the Plan shall provide details on how the funding will be used to address racial disparities in housing and homelessness.
6. The objectives and deadlines established in response to items 3 through 5 above shall be binding on the City.

---

[6] Christopher Weber, *Judge Orders LA to Offer Shelter for Homeless on Skid Row*, YAHOO! NEWS (Apr. 20, 2021), https://www.yahoo.com/news/judge-orders-la-offer-shelter-213848366.html. *But see* Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.
[7] Dkt. 284-1, ¶ 10 (Richard H. Llewellyn, Jr. Declaration).

### C. Availability of City Property

#### i. Cessation of Transfer of Property

On April 20, 2021, the Court ordered the following:

> The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

Dkt. 277 at 107.

The Court will not impede any progress toward programs the City is proposing to help homelessness, including Proposition HHH. In a clarifying order issued last week, the Court emphasized that the Court's order will not apply to projects that are already in progress.[8] To ensure no further confusion regarding what qualifies as projects in progress, the Court hereby STAYS provision 2(a)(ii) of the preliminary injunction until May 27, 2021, when an evidentiary hearing will be held to determine what properties exist and are available for homelessness relief.

#### ii. Creation of Report on Property

On April 20, 2021, the Court also ordered the following:

> Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

Dkt. 277 at 107. This order was based on the City's report to the Court that "[t]he City Controller [Ron Galperin] compiled a list of nearly 14,000 properties in the City owned by six major public entities, including over 7,500 properties owned by the City." Dkt. 149 at 6. The City maintained

---

[8] *See* Dkt. 279 ("Second, the provision regarding the cessation of sales and transfers by lease or covenant under Section 2(a)(ii) does not apply to projects in progress as of the date of the order, April 20, 2021.").

that "the City does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 8.

The Court was deeply troubled that despite the City's representation of access to over 14,000 properties, the City committed not one of these properties to building additional long-term sustainable housing or interim housing.[9] The City explained that these conclusions are based on a process of "constant evaluation"; however, this "constant evaluation" has constantly led to no options for housing.

As mentioned above, the Court recognizes a need for all housing options, including long-term housing. The property identified in the ordered report must be used for both long-term and interim housing. The alternative is to leave our homeless no place but the sidewalks while we build long-term units. There is no plan brought before this Court to accommodate all 66,000 homeless individuals in long-term housing, at a cost of $531,000 per unit.[10] Such a plan would cost in excess of $30 billion. Further, while long-term housing is vital, its construction is long-term, and the interim period has lasted decades. Accountability cannot always be on the horizon—people are dying on the streets now.

Therefore, given the urgent need to understand the inventory of available properties, the Court DENIES the request to stay with respect to this provision.

The Court DENIES the City and County's Applications to Stay the remaining provisions of the Court's April 20, 2021 preliminary injunction.

Finally, the Court SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. At the hearing, the Court will receive evidence as to what properties are available for homelessness relief, as detailed in section VII(C)(i) above. In addition, the City and County have requested to be heard concerning the Court's findings on structural racism in its April 20, 2021 preliminary injunction. At the May 27, 2021 hearing, the Court will therefore receive testimony from the City and County on these findings. The Court additionally invites all interested parties to notify the Court if they would also like to be heard in this regard. The Court hereby SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. IT IS SO ORDERED.

---

[9] The City stated that it "does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 6, 8.
[10] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/.