**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | | |
|---|---|---|
| L.A. ALLIANCE FOR HUMAN RIGHTS, et al., | ) ) ) | |
| PLAINTIFFS, | ) ) | Case No. |
| vs. | ) ) | CV 20-02291-DOC |
| CITY OF LOS ANGELES, et al., | ) ) ) | |
| DEFENDANTS. | ) ) | PAGES 1 TO 61 |

**REPORTER'S TRANSCRIPT OF**
**STATUS CONFERENCE**
**WEDNESDAY, MAY 26, 2021**
**10:01 A.M.**
**LOS ANGELES, CALIFORNIA**

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFFS:**

> SPERTUS LANDES & UMHOFER, LLP
> BY:  ELIZABETH ANNE MITCHELL
> 617 West 7th Street
> Suite 200
> Los Angeles, California 90017

> SPERTUS LANDES & UMHOFER, LLP
> BY:  MATTHEW DONALD UMHOFER
> 1990 South Bundy Drive
> Suite 705
> Los Angeles, California 90025

**FOR DEFENDANT CITY OF LOS ANGELES:**

> LOS ANGELES CITY ATTORNEY'S OFFICE
> BY:  SCOTT D. MARCUS
> BY:  JESSICA MARIANI
> 200 North Main Street
> 7th Floor, Room 675
> Los Angeles, California 90012

**FOR DEFENDANT COUNTY OF LOS ANGELES:**

> MILLER BARONDESS, LLP
> BY:  LOUIS R. MILLER
> BY:  JENNIFER MIRA HASHMALL
> 1999 Avenue of the Stars
> Suite 1000
> Los Angeles, California 90067

**FOR THE INTERVENORS LOS ANGELES CATHOLIC WORKER, ORANGE COUNTY CATHOLIC WORKER AND LOS ANGELES COMMUNITY ACTION NETWORK:**

> LAW OFFICE OF CAROL A. SOBEL
> BY:  CAROL A. SOBEL
> 1158 26th Street
> Suite 552
> Santa Monica, California 90403

**APPEARANCES OF COUNSEL CONTINUED:**

**FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:**

    LEGAL AID FOUNDATION OF LOS ANGELES
    BY:  SHAYLA RENEE MYERS
    7000 South Broadway
    Los Angeles, California 90003

Also Present:

    Honorable Andre Birotte
    Special Master Michele Martinez

**LOS ANGELES, CALIFORNIA; WEDNESDAY, MAY 26, 2021**

**10:01 A.M.**

**---**

THE COURT:  First, good morning.  Let's get started.  Judge Birotte is going to join us in a few moments.  He's in his chambers at the present time.

We will call the court to order in First Alliance -- or L.A. Alliance for Human Rights versus City of Los Angeles and the County of Los Angeles, 20-2291.  Then, counsel, sometimes I will refer to you by your first name.  No disrespect is intended, but I know you so well that I am in a habit of doing that.  Let's begin with the City and appearance by the City, please.

MR. MARCUS:  Good morning, Your Honor.

Scott Marcus on behalf of the City of Los Angeles.

THE COURT:  All right.  And on behalf of the County?

MR. MILLER:  Good morning, Your Honor.

Skip Miller and my partner Mira Hashmall on behalf of the County.

THE COURT:  Thank you.  And on behalf of the intervenors?

MS. MYERS:  Good morning, Your Honor.

Shayla Myers on behalf of Los Angeles Catholic Worker and L.A. Community Action Network.

MS. SOBEL:  Good morning, Your Honor.

Carol Sobel on behalf of the Orange County Catholic Worker, the Los Angeles County Catholic Worker, and --

THE COURT:  Just remain seated.  Have a seat. Pull the microphone closer.  Please don't stand.  It's not necessary.

MS. SOBEL:  Carol Sobel on behalf of the Orange County Catholic Worker, the Los Angeles County Catholic Worker.

THE COURT:  And on behalf of the plaintiffs?

MS. MITCHELL:  Good morning, Your Honor.

Elizabeth Mitchell on behalf of plaintiffs along with Matthew Umhofer.

THE COURT:  I want to take a few moments and retrace by using the projection, the beginning of this opportunity for all of us with the May 22nd, 2020, preliminary injunction, which is docket 123 for your records.  And if you would be so kind to project that document up and then turn to page 11, please.

Under the provisions of the preliminary injunction, the Court had stated an order that individuals experiencing homelessness encamped within 500 feet of an overpass, underpass, or ramp must be offered housing as

described below and subsequently and humanely relocated at least 500 feet away from such areas by no later than September 1st, 2020, which was footnote 6.

As a part of this humane relocation effort and to promote the underlying public health and safety goals, the City of Los Angeles and the County of Los Angeles must provide shelter or alternative housing options such as government encampments following the existing Veterans Affairs model, safe parking sites, or hotel and motel rooms contracted following the Project Roomkey model to individuals experiencing homelessness.

In addition to the foregoing examples, the Court is open to receiving any suggestions from the parties for reasonable alternative housing options.

Footnote 6, to remind all of the parties, because many of you literally are not reading the Court's orders apparently, stated that the requirements of 500 feet is taken from the City of Los Angeles Department of City Planning which reports that, quote, "Air pollution studies indicate a strong link between chronic exposure to vehicle exhaust and particulate matter from roads and freeways and elevated risk of adverse health impacts.  Areas located within 500 feet of a freeway are known to experience the greatest concentration of fine and ultrafine particulate matter, PM, and a pollutant implicated in asthma and other health conditions," end of

quote, the City of Los Angeles Department of City Planning Freeway Adjacent Advisory Notice Zoning Information, file No. 2427@1, 2018.

Then the Court set out a series of criteria. Now, you have to remember, in those days my law clerks and I were working trying to set out what we thought were a series of humane criteria.  And I had been told repeatedly, starting clear back with the matters three years before, that the life of a homeless person was decreased an average of 23 years. Sometimes that information varied coming from Ms. Sobel at the time and Ms. Weitzman at the time to 20 years to 25 years, but that was a rough estimate.  And although it supposedly caught many of you by surprise, the Court disagrees with that.

I had indicated on the record, if you look back in March and April, that, if you brought a matter to the federal court stating that there was a decrease significantly in life expectancy, how could you expect a federal court not to act?  Number two, the City, nor County, never provided permits. So I will say to each of you as counsel, show me the permit or give the Court the permit that states that it is safe for people to live under or adjacent to a freeway against your own ordinances, and the Court would be happy to consider that, and we can bring all sorts of things to bear in terms of housing under freeways.  I have never seen that.

So now I am respectfully asking you are you

willing to bring such a permit to me, Mr. Marcus?  Is the City willing to bring the Court a permit to allow people to inhabit underneath the freeway system?  And remember, I grew up in Oakland with the 880 Freeway collapse that killed hundreds of people.  So please tell me that the City is prepared to bring the Court a permit.  You can remain seated.  And that just requires a yes or no.

MR. MARCUS:  Your Honor, I can't answer that "yes" or "no."  I apologize.

THE COURT:  Why?

MR. MARCUS:  Well, a few things, Your Honor.  First of all, as I believe the City has indicated in prior pleadings to this Court, the 500-foot requirement is not a prohibition against occupancy.  It requires additional maintenance to be done, additional types of filters to be installed.

THE COURT:  Well, let's assume that can be accomplished because you're accomplishing that on 16th and Maple because I have driven by it.  Are you saying that it is acceptable to the City that people live underneath freeways?

MR. MARCUS:  No, Your Honor.  No.

THE COURT:  Are you acceptable -- are you stating to the Court that it is acceptable that they live on overpasses?

MR. MARCUS:  No.

9

THE COURT:  Is it acceptable that they live on underpasses?

MR. MARCUS:  No.

THE COURT:  Then with the decrease of 23 years on the average, why would the Court condone this?

MR. MARCUS:  Your Honor, the City isn't condoning this either.  The City --

THE COURT:  No.  Just a moment.  Yes, you are. Why would the Court condone it?  In other words, if you bring me statistics or the intervenors bring me statistics about decreased life expectancy -- and, by the way, the third leading cause of death versus heart attack.  Second is overdose of narcotics or use and consumption of alcoholism.  The third leading cause of death is getting hit by a car.  The Court can't control narcotics, and I can't control heart attacks. Now, concerning the third leading cause of death, why would the Court condone this?

MR. MARCUS:  Your Honor, I want to make a distinction between living under a freeway, under an overpass, on top of an overpass versus living near a freeway because I think that is an important distinction.

THE COURT:  How about your access and egress? Let's include those also because your homeless are encamped along those as well.

MR. MARCUS:  Yes.  I understand that and the City

agrees with that, Your Honor.

Again, the requirement, the state law allows for residences within 20 feet of a freeway.  That is the state law.  I'm not aware of a city ordinance that requires anything different.  So state law allows living quarters within 20 feet of a freeway.  That's state law.

THE COURT:  Look at footnote 6 on page 11, please.  And put that up for -- Alexa, would you put that up?  You can step over to the screen and read your own ordinance if you would like to.

MR. MARCUS:  As I indicated, Your Honor, the 500-foot restriction that I believe is from Building and Safety requires additional things to be put into that residence to prevent against this particular matter.  It doesn't prevent the building of residences within 500 feet.

THE COURT:  We understand that.

MR. MARCUS:  It allows the residences to be built within 500 feet with additional requirements.  State law prohibits living within 20 feet.  That is my understanding.

THE COURT:  All right.  The first thing that I required in this initial injunction was that all shelters and alternate housing options must be configured with adequate physical space to allow the sheltered individuals to maintain the minimum recommended social distance of six feet to mitigate the transmission of SARS or COVID.  Later on the CDC

implemented 12 feet.

The second was all shelters and alternative housing options must have adequate hygiene facilities such as handwashing stations and showers.

The third was all shelters and alternate housing options must have qualified staff where upon intake test each homeless individual for communicable diseases and other health conditions. And I stated that the Court may consider revising this aspect of the preliminary injunction in the future depending upon the state of COVID-19 pandemic.

The fourth was, if any individual experiencing homelessness tests positive for COVID-19, that the individual must be sheltered in the facility in which they can be individually isolated until they recover.

The fifth was that all shelters and alternative housing options must be staffed by security as necessary to ensure the safety of the homeless person sheltered therein.

Judge Birotte is joining us.

And the sixth was, before beginning the process of clearing overpasses, underpasses, and ramps, all homeless individuals living in the vicinity must be given advance notice of at least ten days. Such notice shall include information about available shelters and alternative housing options in that council district or supervisorial district.

Now, in the past in the 17 clearances that the

Court has been personally involved with, that has always been at least two weeks, 14 days.  I think it looks like 21 days would be fine.  30 days.  There is no magic to that number, quite frankly.  The goal in the past has been to flood that area with mental health, detox, and offer those in a concentrated form rather than the year-long process that seems to be going on in Los Angeles and, therefore, flooding that with the necessary services which seems to have worked fairly well.

At a minimum, the interim period between notice and relocation, social workers -- and this is No. 7.  So we all read it together because most of you aren't reading these orders, frankly.  At a minimum, in the interim period between notice and relocation, social workers, mental health workers, and LAHSA authorities shall reach out -- that is not may.  That is not might.  That is shall.  That is an order -- shall reach out to noticed individuals experiencing homelessness to provide services and to facilitate the transition to shelter.  The Court also encourages such outreach to occur as early as possible even before notice is given.

The eighth was the City and County of Los Angeles may not relocate individuals experiencing homelessness in the given council district or supervisorial district until such notice is given and after the City of Los Angeles and/or County of Los Angeles provides adequate alternative shelter for all

individuals experiencing homelessness in that council district or supervisorial district.  After these conditions are met, the City of Los Angeles and County of Los Angeles will be allowed to enforce anti-camping laws in that council district or supervisorial district within 500 feet of overpasses, underpasses, and ramps located.  This process helps to ensure that these individuals are being moved to safer locations.  To be clear, while an individual experiencing homelessness cannot be ordered to enter a shelter facility, they must be given that option and, if they decline, can then be ordered to relocate at least 500 feet away from an overpass, underpass, or ramp.  If during the humane relocation process a social worker, mental health worker, law enforcement officer, or other qualified person that encounters an individual experiencing COVID-19 symptoms, such individual should be referred to an individual testing and quarantine process such as, but not limited to, Project Roomkey.  If all of the above requirements are met, then relocation in these limited areas would be fully compliant with *Martin versus Boise*.

As they begin efforts to comply with this preliminary injunction, the City of Los Angeles and County of Los Angeles are responsible for disentangling which entity has the authority over the subject locations and the relevant funding mechanisms.

Let me stop for a moment and state to you at that

point CalTrans was called to the Court's attention and they have never been voluntarily or involuntarily enjoined in this lawsuit although every one of your council members and three of your members of the board have complained about CalTrans's response up to this point and their interaction with both the City and the County.

The Court is hopeful that this initial limited action will assist the parties moving forward as they work to overcome years of bureaucratic inertia and develop humane solutions in the best interests of both individuals experiencing homelessness and the general public.  Indeed, the parties' efforts to provide emergency shelter and services since the onset of COVID-19 crisis present a stark contrast to the characteristic inaction that has persisted for years with respect to homelessness in the greater Los Angeles area.

The Court is concerned, however, that, as the COVID-19 pandemic subsides, the present momentum will be lost to longstanding disputes over funding and jurisdictional authority.  The most recent filings by the City and County of Los Angeles, quoted at length above, already demonstrate a resurgence of the quarreling and deadlock surrounding the issues of homelessness.

I'm reading from page 12 of docket 123 filed on May 22nd, 2020.

And, finally, the Court concluded,

notwithstanding the failure of the parties to reach an agreement on the terms and conditions of a settlement, the Court, based on input from both the City and County, elected officials, as well as plaintiffs and intervenors, finds the decision makers are fully aware of the crisis created by homelessness in our communities and are dedicated to formulating solutions that will not only improve the living conditions of our homeless population but also enhance the opportunities for the general public to enjoy the benefits that will result from enlightened approach to addressing these issues.  All parties have the same goal in mind.  Their differences lie in the route to be followed in achieving that goal.  The Court is confident a global solution to the homelessness crisis will be found while the parties take the initial step of remedying the emergency health hazards targeted by this injunction.

A short time after that, the parties approached the Court and entered into settlement discussions which led to a request by the Court to withdraw this preliminary injunction, and I did that in good faith.  So historically let's walk through this for a moment and see where we were.

Without those confidential communications coming in, many of those calls came into my home, others in private conversations.  Judge Birotte was involved imminently and was the architect I think of this with my compliments.

So if you would put up the seven pages or the seven paragraphs.

Now, in deciding to work with you, the Court took a risk. And that is, when Courts say something, we should usually mean it, and we should follow through with it. We're not politicians. What we mean should have some weight, and not that politicians shouldn't have weight, but occasionally things change.

In good faith, you entered into a binding agreement and term sheet, and it's dated June 16th, and you will find it at docket 136. Now, let me remind you, when you entered into this binding term sheet, you represented to -- and I will name the names if you want to -- members of the board and council that you will have an MOU within two weeks. Let me repeat that. Two weeks.

Mr. Marcus, how long did that take to get an MOU?

MR. MARCUS: I believe the MOU was signed in October.

THE COURT: Four months?

MR. MARCUS: Roughly, yes.

THE COURT: Mr. Miller, how long did that take?

MR. MILLER: Sounds right, Your Honor.

THE COURT: About four months?

MR. MILLER: Yes.

THE COURT: So you can understand the Court being

a little concerned about the representation of two weeks and four months.

So let's go through your binding term sheet. First, you agreed that the City agrees to provide 6,700 beds within 18 months to house or shelter PEH living within 500 feet of freeway overpasses, underpasses, and ramps within the City of Los Angeles and then to give priority to providing housing or shelter to PEH 65 plus within the City of Los Angeles and other vulnerable PEH within the City of Los Angeles.

The schedule will be as follows:  New beds, not existing agreements, 6,000; 5,300 within ten months; a bonus of $8 million if ten-month target date met; 700 within 18 months. And then you agreed to the beds in the existing agreements of 700 beds within ten months.  In other words, those projects that were already in progress.

Now, at that time we then moved to a total of 6,700 beds established within 18 months.  5,300 of the 6,700 beds will be new beds -- circle that for a moment in red -- and will be created within ten months and 700 additional new beds created within 18 months.  Must be beds not previously captured.

Circle that for a moment.

In any agreement or plan between the City and County, 700 of the 6,000 beds created within ten months may be beds previously captured in an agreement or planned between the

City and County;

Paragraph 2, to assist in funding services for the 6,000 new beds, County shall pay City up to $60 million per year for five years.  In the first year, the County shall pay the City $53 million; 17 million -- or 17.66 million on September 1st, 2020; 17.67 million on January 1st, 2021; and 17.67 million on April 1st, 2021.  In the second through fifth years, the County shall pay the City $60 million on July 1st.  However, if 6,000 new beds have not been created by the July 1st payment date, the County can prorate payment equal to $10,000 per new bed that exists or will open within 60 days of the payment date.

The funding under this agreement is exclusive, and the County will continue to allocate Measure H funding by public -- by Service Planning Area, SPA, based on LAHSA's homeless count and, where applicable, to homeless population estimate consistent with the board policy;

Third, the County will pay to the City a one-time bonus of $8 million if the 5,300 new-bed target is reached within ten months from the execution of the agreement; and,

Fourth, the County will take action to provide a package of mainstream services for PEH residing in facilities established by the City pursuant to this agreement;

Fifth, the agreement is subject to the court approval, monitoring, and enforcement; and,

Sixth, the agreement is subject to the City and County approval;

Finally, paragraph 7.  If the parties will -- the parties will submit this term sheet to the Court upon approval of this term sheet by the City and County.  The parties will respectfully request the Court to entertain an oral motion coupled with a joint stipulation from the City and County that the preliminary injunction dated May 27, 2020, will be vacated without prejudice subject to the Court's later consideration of reinstatement of the preliminary injunction should the parties fail to comply with the terms identified above.

It's apparent to the Court that many of you have forgotten the original provisions by the Court in my initial injunctive relief, and it's apparent to the Court that there has been no permit forthcoming from the City or the County concerning having people sleep under the freeway system.

So now I want to turn to the last part of some slides I had compiled for a moment.  I want to go to the Academy Awards for a moment.  51.  I want to show you apparently what you're capable of doing.

And I invite Heidi to come up for a moment or any representative of LAHSA.  And just be comfortable, Heidi.  Have a seat in the chair if you would like to or the lectern.  You can sit in the extra chair if you want to or go to the lectern.

I want to show you your overpasses and

underpasses -- strike that -- your overpasses leading up to the Academy Awards for a moment.

So if I can see 52. This is on the way to the Academy Awards, and I represent to you that this was clogged with homeless tents a short time before the Academy Awards. If you don't know that, then you don't know Los Angeles, and you're not walking around your own community. This was cleared somehow.

53, another photograph taking a look down the 101. You can see the overpasses, and this is near the old federal court.

54, been cleared.

55, looking down also at the clearances. I'm sorry. Looking up now, up the 101. The overpass is not cleared which is just a short distance from the access and the egress to the Academy Awards.

56, this is kind of a panoramic view. This shows your old federal courthouse. It shows the pristine clean sidewalks.

Now go to 57 for a moment. Just walk up two overpasses. Those two overpasses being the cleared overpasses for the Academy Awards, and this is what you will find on the other overpasses.

58 is the next overpass up.

59, 60, 61, 62. We will stop there for a moment.

So on behalf of LAHSA, I'm curious and, quite frankly, interested in how you were able to accomplish this. What was offered, how you humanely did this because these are cleared overpasses without one single tent. And this is what we would hope to see because I didn't see or hear of any arrests. So in a sense you got compliments from the Court. How did you accomplish this?

MS. MARSTON: Your Honor, for the Academy Awards, the area -- the surrounding areas were actually closed prior to the Academy Awards. So leading up to the event itself, LAHSA conducted outreach, told the clients in the area that at a particular date the area would be closed off for the Academy Awards. There were offers of shelter made for those who wanted it. But the alternative was that folks left and went to other areas.

THE COURT: Pete, come on in and have a seat.

Let me ask you something. You said it was closed off and that was a lot to absorb. Who made that decision?

MS. MARSTON: I believe the City of L.A. and the Academy Awards make those decisions.

THE COURT: Who? Give me a name.

MS. MARSTON: I'm not clear on who made --

THE COURT: Well, see, I'm used to dealing with that. The mystical Wizard of Oz. Who? Martinez? Mayor Garcetti? A bureaucrat? Who?

MS. MARSTON:  I'm not clear who closes the streets.  My understanding on -- in situations like this where we have big events --

THE COURT:  I'm sorry.  You don't know, do you?

MS. MARSTON:  No.  I don't know who makes the decisions.

THE COURT:  But somebody had to make that decision above your pay grade.

MS. MARSTON:  Correct.  We were just conducting the outreach and providing notification.

THE COURT:  So I want to get this straight.  You actually started outreach before this area was closed, in good faith offering things to the homeless folks along these overpasses and this area leading to the Academy Awards; correct?

MS. MARSTON:  Correct.

THE COURT:  What did you offer?

MS. MARSTON:  There were options.  So there were shelter options provided to folks, but there was also just the expectation setting that on this particular date at this particular time you're not going to be able to be here.  So you can take these options or you can go somewhere else.

THE COURT:  So somebody basically said to these folks, look, we're offering you something, but if you don't get off these overpasses -- basically you're going to have to get

off of the overpasses.  Who made that decision?

MS. MARSTON:  I'm not clear who makes the decision.  My understanding, it's a collaborative effort between LAPD, the Academy Awards.  But that is a City function.

THE COURT:  I'm going to joke with you.  It sounds like the Wizard of Oz again.  Pull back the curtain.  We don't know.  But somebody had to make that over and above your position; correct?

MS. MARSTON:  Correct.

THE COURT:  So in summary then, why did we cover up this humanity and inhumanity to the very people in Hollywood who have a heart who might, seeing this, be the most capable and able public figures, whether they're basketball players or football players or Academy Awards, why do we cover this over? And who made that decision?

MS. MARSTON:  LAHSA does not make that decision.

THE COURT:  I know that.

MS. MARSTON:  I'm not clear.  I believe that it is a combination of the City of L.A. and the Academy Awards.

THE COURT:  Watch me.  See that?  I got it. LAHSA is not responsible.

MS. MARSTON:  No.

THE COURT:  Who?

Let me turn to the city attorney.  Who made that decision?  Who wanted to take this inhumanity and pretend that

it wasn't there when we probably have one of the most caring industries in the world with really good people in Hollywood who might want to do something about this?  Did you make that decision?

MR. MARCUS:  Your Honor, I do not know who made the decision.

THE COURT:  Mr. Miller, who made that decision?

MR. MILLER:  I don't know, Your Honor.

THE COURT:  Is there any way we can find out?

MR. MARCUS:  Yes, Your Honor.  I can find out for you who made that decision to temporarily close those streets at that time.  I can find out for you.

THE COURT:  Okay.  Now, if we can do that and you have entered into an agreement which we will discuss in a few moments, why can't that humanely be done on these overpasses, underpasses and along the freeway?  Why can't those resources be devoted if we have the third leading cause of death caused by automobiles?

Now I'm going to show you some pictures of your overpasses and underpasses.  In fact, we went by them this morning about 7:00 o'clock.  If we can do this for Hollywood, why can't we do this for Curren Price's district or Kevin DeLeon's district?  And who is making these decisions?

Mr. Marcus?

MR. MARCUS:  Your Honor, the City can and is

making efforts to relocate people away from freeways pursuant to the MOU that was going to be discussed today.

THE COURT:  We're going to discuss that in just a moment.  We might have a disagreement about that.

MR. MARCUS:  Understood.

THE COURT:  Okay.  But we were certainly able to bat what I call 100 percent for the Academy Awards, weren't we?  Completely clear.  Mr. Marcus, agreed?

MR. MARCUS:  Yes, Your Honor.  For the temporary closure it does appear that we were able to relocate every individual that was there.

THE COURT:  And you did this even during COVID-19; is that correct?

MR. MARCUS:  If it was during this year's Academy Awards, then yes.

THE COURT:  Well, when was it?

MR. MARCUS:  I didn't take the pictures, Your Honor.  I'm taking your words that that was from this year's.  So, yes, that was during COVID.

THE COURT:  Just a moment.  You don't agree -- you don't know that these overpasses were cleared?  Is that what you're saying to me?

MR. MARCUS:  Your Honor, I was not there at that time at that location.  I'm not saying it's incorrect.  Yes, obviously that's what the pictures show, Your Honor.  I can't

speak to something that I didn't personally observe.  But, yes, if it was during this year's Academy Awards, then, yes, this was done during COVID.

THE COURT:  Heidi, were these cleared?  Are these accurate pictures so we can help Mr. Marcus?

MS. MARSTON:  There was temporary closure of these locations during the Academy Awards which was during COVID.

THE COURT:  Okay.  Would you be kind enough, Ellie -- I'm going to switch for a moment, and I'm going to take Curren Price's letter to the court next which I had docketed, and it would be on slide 33.

You know, up until the time that the County informed the Court that it was going to unilaterally bring a Motion to Dismiss, you had given me permission to talk to folks.  I immediately ceased talking to people after that.  I think my last engagement was two days later with Miguel Santana and Fred Ali to keep that, and after that I have not communicated with any of you.

This is a letter dated March 22nd, 2021, that is on the docket.

"Dear Judge Carter.  Thank you for taking the time to meet with my staff so many times over the last year. We appreciate your hands-on approach to this case and your willingness to come to our district to see firsthand the

struggles and challenges facing our community.  Our homeless neighbors are suffering, and while we are doing our best to build as many beds as possible as quickly as possible, we still have much work ahead of us.  To solve this crisis, we need not only the City but the County, LAHSA, and other service providers in the state to play their part.

"I am writing this letter in particular to the State's role, specifically CalTrans" -- and we will get to the $12 million by Governor Newsom in just a moment -- or 12 billion.  I'm sorry.  And the 1.5 billion from CalTrans along with another 13 billion that has already been expended in the last three years tomorrow.  "There's a large population of homeless individuals living near the freeways, and as is sometimes the case in my district on the freeways, I am attaching some photos to illustrate my concern.  These individuals are facing an immediate threat to their health and safety as well as the safety of those around them.  We need the cooperation of CalTrans to assure we can make contact with these individuals and move them to a safe location.

"It would be helpful for the City to have an agreement with CalTrans in regards to how we can coordinate our outreach efforts and provide cleaning to an area once an individual has been moved into a housing solution.

"I welcome your feedback and assistance in this matter.  Curren Price."

Okay.  34.  35.  36.  37.  38.  Now, this lady, by the way, is on your egress, and she worries about being raped.  So she maintains this as cars whiz by because she believes it will be safe there because of the volume of traffic getting on the freeway.  So she's consciously chosen this as safe haven for herself, and that is the egress for the 110.

Next.  Next one.  Next one.  Next one.  Next one. Next one.

Now, this is a lady you will meet in the residential area -- and Shayla Myers knows this area well, as well as I do, Shayla.  But this is a lady who is a private citizen who comes out every morning to clean up in front of her house.  And these are residential areas right across the street in Curren Price's district.  This is a poor neighborhood. These folks are suffering just as much as the west side of Los Angeles is suffering.  In fact, more so.

Next.  Next.  Fires are breaking out.  Next. Next.  Next.  Next.  More fires.  This area was cleaned and finally fenced.

And I am going to challenge all of you to get out of your offices and start walking around your own community and take a look at this firsthand instead of being lawyers coming into my court who haven't seen this.  Next.  Okay.

Back to you, LAHSA.  Heidi, why can't these freeway overpasses and underpasses and these areas be cleared

with humanity -- humanely?

MS. MARSTON:  Your Honor, they certainly can be. The efforts that we have been focusing on are just the priority locations that --

THE COURT:  The Academy Awards.  I'm joking with you.

MS. MARSTON:  So the Academy Awards, the communication that LAHSA received was that the areas needed to be temporarily closed off for security reasons.

THE COURT:  From who?

MS. MARSTON:  From the City of L.A.

THE COURT:  Who?

MS. MARSTON:  Our communication was from the mayor's office, I believe.

THE COURT:  Who?

MS. MARSTON:  Who at the mayor's office?

THE COURT:  Yes.

MS. MARSTON:  I believe --

THE COURT:  I sound like an owl.  Who?

MS. MARSTON:  I believe it was the Deputy Mayor Che as well as the Unified Homeless Response Center.

THE COURT:  The name?

MS. MARSTON:  Che.  But Brian Buchner is the lead of the Unified Homeless Response Center and coordinates that.

THE COURT:  I want to compliment you.  That took five minutes to get a name.  I'm just joking with you.  We have a name.

All right.  Now we're going to go back for just a moment, and I'm going to be calling upon Mr. Miller in just a moment.

Would you go to slide 19, and I think I have got this memorized.  Go to docket -- all of you can pull this up, docket 267-1.  It's page 205 for our record.  It's City of Los Angeles Quarterly Status Report pursuant to the MOU docket 267.  Let's all read this together because in a moment it's going to require higher math.

So, Mr. Miller, get your pen out.  I'm going to walk you through this.

On the first page you're going to see interim housing.  If you go from No. 1 all the way through to page 20 -- if you put that up, Alexa, next page, page 20 -- you will see 2,200 personally added by this Court numerous times.  So interim housing you can put down 2,200 up to this report by the City.  Then go from line 34 down to line 39, and if you add up those lines, you will see 451 permanent supportive housing.

Now go back down one more line, and you will see Homekey starting at line 40 all the way down to line 48 -- and turn the page one more time, Alexa, to 21 -- if you look at line 49, if you add up 40 through 49, you will come out with

1,464 Roomkey.

Now, Mr. Miller, go down to line 59. All rapid rehousing shared housing, 644. For a moment I want you to pay particular attention to that rapid rehousing 644 because Ms. Sobel got very excited when all of you were in front of the Court and represented there would be up to 3,000 rapid rehousing. I've got that on the record. I didn't capture her excitement, but she was very excited about that.

Now go down to safe parking from lines 60 through 70, and you will find 258. Turn the page, and then we go back to interim again. We have 428 from line 70 to 75, and from line 76 to 81 we have 300 of permanent supportive housing.

Now, to make that easy, if you turn over to 23, we start to combine these on two sheets for you, Mr. Miller. And in a moment -- just flash 24 to him also, Alexa, so he can see that. I'm going to walk you through this very slowly.

I want you to look for a moment at line 28. So if you go back, Alexa and Ellie, to slide 28, I want you to see on line 28 CD-14, which is interim housing, 1060 North Vignes Street.

Mr. Miller, what is that location?

MR. MILLER: Interim housing on Vignes.

THE COURT: Right. But what is it?

MR. MILLER: I don't know. I haven't been there.

THE COURT: I know. Well, Hilda Solis was kind

enough to personally take the Court there.

MR. MILLER:  Right.

THE COURT:  This was boarded by the Board of Supervisors in October, and this is the site of 232 that I especially paid a compliment to the Board of Supervisors about because they constructed this by December 28 of last year.  In my last order, if you read it, I particularly noted and complimented the board in accomplishing this.  This is all county land, all county funding.

And, Mr. Marcus, why is this being listed as a credit to the City when the County has paid for the 232?

MR. MARCUS:  Your Honor, the City and the County actually worked collaboratively on the bit --

THE COURT:  No.  No.  You may work together, but this was represented to me by the chairman of the board who was then not the chair that this was all county funding, all county property, and the only way that they were able to get it through was because of the County's efforts.  I see the City though counting this in your statistics.

MR. MARCUS:  With agreement from the County, Your Honor, because the City is actually providing the funding for the services at these locations.  It was built on county property with county funds, but it is actually the City paying for all the services at these beds.  And the City and County worked out an agreement that it would count towards the 5,300.

That has all been part of their collaboration between the City and the County that has been going on since the term sheet has been signed.

THE COURT:  Okay.  Let's go along the way.  I want to make sure that the County is -- Mr. Miller, do you agree to that?

MR. MILLER:  Yes.  I think that is correct, Your Honor.

THE COURT:  Okay.  We will count that then as a credit.

MR. MILLER:  Yes.

THE COURT:  Excellent.  In fact, I'm glad.

Now I want you to go to 644 rehousing on slide 24.  Now I want you to go to line 59.  Do you see that?

I want to make sure, Mr. Miller, you are tracking it.  If not, don't worry.  We will slow down.

MR. MILLER:  I've got it, Your Honor.

THE COURT:  Now, I want you to turn with the help of my law clerks to the next slide, 25.  I want you to go to item No. 1.  I'm going to read that.  The verse says, CD all.  Project type rapid rehousing shared housing which is what had all of us excited.  3,000 rapid rehousing.  Scattered sites and then number of beds.

Do you see the 3,000?  Yes or no.

MR. MILLER:  Yes.

THE COURT:  Now, trace over and tell me how many individuals have been served.

MR. MILLER:  Let me look at it.  Looks like 385.

THE COURT:  Out of 3,000.  Is that right, Mr. Miller?

MR. MILLER:  It's not clear.  It looks like there's a number of other --

THE COURT:  We will get to those individually.  I just want to see if you agree that --

MR. MILLER:  That's what it says, 385.

THE COURT:  Well, who made up these numbers?  This is what the Court is receiving; so I am going to rely upon it.  I see 385.  Don't you?

MR. MILLER:  Yeah.

THE COURT:  Okay.  Now turn back to slide 24 for a moment.  Go back to line 59.  It says, rapid rehousing, doesn't it?  Mr. Miller, look at that screen.

MR. MILLER:  Yes.  I see it, Your Honor.

THE COURT:  How many does it say?

MR. MILLER:  644.

THE COURT:  Okay.  What does it say after that?  In process?

MR. MILLER:  Yes.

THE COURT:  What does that mean?

MR. MILLER:  It must mean it's in the works.

THE COURT:  Why would the Court then count 644 in the total represented to it by the City?

MR. MILLER:  Good question.

THE COURT:  Why don't you step over and talk to Mr. Marcus.  He probably has the answer.

MR. MILLER:  I would like to know when it's done.

THE COURT:  I would too.

MR. MARCUS:  Your Honor, if I can try to explain. And I do have Meg Barkley who is the homeless coordinator here from the CAO's office who can correct me if I'm wrong.

These two numbers represent slightly different things as the title of the documents represent.  So the 3,000 rapid rehousing beds is what is in the plan for the entire term of the MOU which, as you know, we have until December.

THE COURT:  You only have 700 more beds.  You're supposed to complete about -- 5,300 plus 700 by today's date. Look at your agreement again.

MR. MARCUS:  We did.

THE COURT:  You have 700 more -- no, you haven't. You have 700 more beds that you have latitude for 18 months. Now, before you say you did, be very, very careful.

MR. MARCUS:  I am, Your Honor.  We have been submitting quarterly reports from the very beginning.  The City has been 100 percent transparent --

THE COURT:  No.  No.  No.  No.  I'm not listening

to lawyers now.  I'm going to do this again.  Why are you counting 644?

MR. MARCUS:  The 644 beds, Your Honor, as I understand it, represents rapid rehousing beds that were open and occupiable as of April 16, 2021.  That is a different number than the 3,000 that we were hoping to have all in total, and it's also a different number than the 385 individuals who have been served by the 644 beds that were open and occupiable as of that date.

THE COURT:  Would you go to slide 28 for just a moment.

Now, Mr. Miller, this is going to take a lot of concentration.

MR. MILLER:  I will do my best, Your Honor.

THE COURT:  When you go back to the original agreement between you and the City, what was the first priority?  It's in paragraph one.

MR. MILLER:  6,000 new beds.

THE COURT:  Excellent.  By what date?  If you add the two together, although it's convoluted, 6,000 new beds within ten months.  700 additional within 18 months.  But I will let you figure that out, and you make the statement for the record so I don't have to.

MR. MILLER:  What is the question, Your Honor?

THE COURT:  I want your statement, not mine,

although I think I have this memorized now, that within ten months, however you equate this, there's supposed to be 6,000 new beds within ten months and 700 additional within 18 months.

MR. MILLER:  Right.

THE COURT:  Is that correct?

MR. MILLER:  That is what it says.

THE COURT:  Okay.  And now go back to your agreement with the City, and tell me the priority, and see if you agree that the first priority are to be freeway overpasses and underpasses.  The second priority is to be 65 plus.

MR. MILLER:  Right.

THE COURT:  And we both agree, because of CDC, the Court is not going to have any movement.  In fact, we want those beds filled.  So I'm not going to quibble over whether we put 65-year-olds in or whether we put freeway overpasses in.  I don't really care at that point.  I just want those beds filled.

MR. MILLER:  Right.

THE COURT:  Now look down at line 103, and tell me how many PEH within 500 feet -- how many individuals on your overpasses, underpasses have been served within 500 feet.

MR. MILLER:  According to this document, within 500 feet of freeways, 396 people.

THE COURT:  Okay.  396 people out of the representation by Heidi and LAHSA that we had about 3,000 to

3,100 people living under or over overpasses and within 500 feet.

Now I want you to look at the second priority. And, by the way, this was in negotiations with Martinez and MRT.  The next one is 65 years and older; right?

MR. MILLER:  Right.

THE COURT:  What is the number?

MR. MILLER:  601.

THE COURT:  Now I want you to go over to other PEH not prioritized in the agreement, 1,343.  Could you please explain to me, when you're the ones who reached the agreement of 65-year-old overpasses and underpasses and ask me to withdraw my preliminary injunction, how we're coming up with 1,343 other people when we seem to be with rather low numbers for our 65-year-olds and our overpasses and underpasses and if that's the agreement that all of you reached.

MR. MILLER:  You know, Your Honor, I can't explain that column.  I didn't prepare this document.

THE COURT:  Let me turn to Mr. Marcus then.  Will you explain this to me?

MR. MARCUS:  Yes, Your Honor.  The City has created the 5,300 new beds and the 700 existing beds by that deadline, and we have conducted outreach at hundreds of encampments including 77 encampments by freeways.  The outreach to the encampment, however and unfortunately, doesn't always

result in that person taking that offer of shelter on that day. And so rather than leave beds empty, LAHSA service providers make sure that as many beds as can be filled are filled.

THE COURT:  Well, if we have 3,000 people over and under freeways and we have always been concerned with the 65-year-olds and over, because of course we get 100 percent now of FEMA money back, why do we only have 396?  We do it for the Academy Awards.  Why do we only have 396?

MR. MARCUS:  It's not an equal comparison, Your Honor.  As I was saying, the service providers work with the individual council offices to target outreach at the encampments that are a target that have been part of the City's list the entire time to fill the beds that the City has been creating which has also been on the council plans which we have been submitting to the Court on a quarterly basis.  However, as we know, an offer of shelter doesn't always necessarily mean the person will take the shelter.

THE COURT:  Turn to slide 30, would you, so Mr. Marcus will have his memory refreshed.

If you go down to this docket which is your filing document, docket 123, would you be kind enough, because I'm getting tired of reading, to read line 20 through 23.

MR. MARCUS:  "Identify and activate exits for the approximately 3,000 people brought into emergency city shelter settings," open parenthesis, "recreation centers and

city-funded Project Roomkey hotels," close parenthesis, "over the course of 120 days."

THE COURT:  And then the second paragraph.

MR. MARCUS:  "Create additional shelter beds and locations for the relocation of approximately 3,100 people who live under freeway overpasses and underpasses in the City of Los Angeles in the subsequent 180 days while ensuring that the sheltering or housing of any such person does not supersede the placement of someone who is assessed by the public."

THE COURT:  All right.  Now, I want you to go back to the Roomkey hotels for just a moment.  I'm going to represent to you that on slide 23 and 24, so you can see them, there's 1,464 Roomkey hotel rooms.

Do you see that?

MR. MARCUS:  Yes.

THE COURT:  Okay.  Now, we know that the Biden Administration has moved from 75 percent reimbursement to 100 percent with FEMA; is that correct?

MR. MARCUS:  That is my understanding, yes.

THE COURT:  Is that correct or not?

MR. MARCUS:  That is my understanding that that announcement was made, yes.

THE COURT:  I used to teach police officers how to testify, and I'm going to joke with you a little bit.  To the best of my recollection, see, that never gets you accused

of perjury.  To the best of my understanding.

Are you getting reimbursed 100 percent from the Biden Administration?

MR. MARCUS:  We have applied for reimbursement. We have not received the money back yet.

THE COURT:  You haven't gotten it applied yet. It's 100 percent, though, if you get it back; right?

MR. MARCUS:  Yes.  And the application has been made for approximately 54 million so far for Project Roomkey, and additional applications are pending.

THE COURT:  Just a moment.  If you don't know it, you're over 100 million.  Go check your records.  When I wrote my opinion, you were at 61 million and climbing.  You're over 100 million right now.  Do you know that?

MR. MARCUS:  Yes.  I'm talking about the applications that have actually been put in and submitted to FEMA.

THE COURT:  I understand that, but I'm not going to let you do that for a moment.  I'm going to tell you that you're over 100 million, and I want you to disagree with me. In other words, regardless of what you have applied for, you have got well over $100 million right now out there that you could request.

Am I wrong?

MR. MARCUS:  I don't believe, Your Honor -- I do

not believe you are wrong, and I believe those subsequent applications are in the process.

THE COURT:  And I understand the fine line you are drawing so we don't quibble.  Judge, we have only applied for 51 million, so what we'd like to tell you on the record is 51 million.  And I'm saying to you, Mr. Marcus, that, whether you have applied or not, you've got well over 100 million at the present time and climbing.

MR. MARCUS:  And our intention is to apply for all of it, Your Honor.

THE COURT:  I'm saying you have well over $100 million you can apply for, can't you?

MR. MARCUS:  Yes.  And I believe we are applying for it.  Yes.  That's my point.

THE COURT:  I'm absolutely clear.  I know that you say you are applying for it.  I'm going to say it again. You have well over 100 million, don't you?  I know you want to get into the record, and you will.  Golly gosh, we are applying for it.  I understand that.  But you have well over $100 million out there, don't you?

MR. MARCUS:  I believe that is yes.

THE COURT:  Okay.  Now, in First Alliance's document that they filed with the Court, they raised an interesting issue.  If you are applying -- Mr. Miller, pay attention.

MR. MILLER:  Yes, Your Honor.

THE COURT:  If you're applying for $100 million, should that be returned to the County?

MR. MARCUS:  No, Your Honor.

THE COURT:  Why?

MR. MARCUS:  Well, first, Your Honor, we don't have the money back.

THE COURT:  Just a moment.  Let's just assume that the Biden Administration is in good faith and you get 50 million back, if you want to quibble, or $100 million back. Is this what you intended in the agreement?

MR. MARCUS:  Your Honor, the agreement always envisioned both the City and the County leveraging whatever money we can get from whatever funds.  There's city, county, state, and federal money going into both the construction and the services for the beds that are being created.  The City has put up front all the money for -- almost all the money for the building, and any money that we get reimbursed is going to go right back into addressing homelessness in some way.

But the plaintiffs weren't part of the negotiation of the MOU and aren't parties to it, and they don't understand the negotiations and discussions that did go on and are continuing to go on between the City and the County to effectuate the MOU.

THE COURT:  Well, your negotiations have broken

down.  You don't have negotiations, from my understanding, concerning an agreement.  Remember, you're only here because you haven't been able in good faith to reach an agreement between the County and the City holistically for an omnibus agreement.  That's why you're here, and that is why the Court is so involved.

So let's go back to this.  Mr. Miller.

MR. MILLER:  Yes?

THE COURT:  Do you agree?  Have you gotten your money out of this bargain?  Is this what you bargained for?  Because this is going to go on for four years.

MR. MILLER:  Your Honor, we are conducting an audit.  We are looking at all these issues now.  I don't have a definitive answer from the audit.  I think we will have the results in -- I think I'm told in July.  I mean, we're --

THE COURT:  We're going to raise that tomorrow.  Tomorrow you can expect to see Elaine Howle stating that there's been $13 billion extended in the last three years throughout the state in which Los Angeles has received an incredible amount of money.  You're going to see some charge that we'll put up so that you're forewarned about tomorrow about the governor pledging $12 billion plus another 1.5 billion for CalTrans.  You're going to see some projections, just in this Court's humble effort, of Proposition J between 300 million and 900 million depending upon what the offsets

are.  There's some discussion going on.  You're going to see 2.6 billion expended just in the last 24 months.

So tomorrow we are going to be talking a lot about money and audits.  We won't get into it today, but tomorrow is going to be quite a day.

My question is very simple.  As of March 2021, the City had failed to request in excess of 100 million from FEMA, and today the representation by Mr. Marcus is -- you requested how much money?

MR. MARCUS:  I believe 54 million for Project Roomkey, and there are additional sums that were requested in additional programs.  There's a report that was filed by the CAO's office I believe last week publicly.  I can make it available to the Court.

THE COURT:  That's between the two of you.  Remember, you're only here because you can't reach an agreement.

And then the Court well knows and you well know that, in total though of the 54 million that you finally filed for, that you're well in excess of 100 million right now total figure.  You just haven't applied for the other 60 million approximately.  And even though the Federal Government has increased the percentage to 100 percent through September of 2021, it's interesting to the Court that the County is in the position of financing this in a sense.  And if this was

intended by the County, the Court is going to remain silent.

Mr. Miller?

MR. MILLER:  What is the question?  I'm sorry, Your Honor.

THE COURT:  Well, is this your intent, to finance the City in this way?  It has been argued this is double recovery.

MR. MILLER:  Roomkey is a County --

THE COURT:  Is this your intent?  Is this the agreement you entered into, and if so, I am going to remain silent.  You will spend your money this way.

MR. MILLER:  No.

THE COURT:  Okay.  I really appreciate this, and I want to put that on the record.  This is the first nonconvoluted answer I think I have gotten today.

MR. MILLER:  Roomkey is a County --

THE COURT:  Hold on.  The answer is no, and we both know it.

MR. MILLER:  All right.

THE COURT:  We both know it, so let's quit dancing now.

MR. MILLER:  All right.

THE COURT:  All right.  I'm going to say to you that, instead of being critical, you have a wonderful opportunity -- and I want to compliment Supervisor Barger for

being here.  Your presence is always appreciated.  You have a wonderful opportunity.

Our whole goal is to increase housing or shelter. And the way that this money is used is it's obvious -- and Mr. Miller answered the question succinctly -- that this was never intended for a double recovery.  Why aren't we taking this money that you're getting back -- and the Court has no concern whether you put it into shelter or supportive housing. But why aren't we taking this hundred million dollars in addition to it and putting it right back into something that benefits the homeless in the community?  Because right now it could be argued that you're pocketing this regardless of your representation.

What are you going to do with that hundred million, Mr. Marcus?  What is your plan?

MR. MARCUS:  Your Honor, again, we disagree that it is double recovery.  We have fronted the costs for a lot of the Roomkey and other interventions that we have funded through this MOU, and that money is coming back to the City to reimburse it for that and to then be put back into homeless interventions.

There's been no issue or concern of going forward in this MOU so far.  We have created the interventions, actually exceeded the number of interventions that were required in April.  We hope to do the same in December.  We

have provided all information to the Court and to the public and to the County.  The County's auditor-controller is working with our CAO's office to do an audit.  If they come up with any issues, we will work through them.

THE COURT:  I have already ordered an audit.  It is appreciated, but if you look at my order, I have already ordered an audit.  That is due within, I think, 90 days.

Okay.  I'm going to turn this over to the parties.  If everybody is happy with this agreement, I have nothing further to say.  But this is going to go on for four more years, Mr. Miller.  It's your county money.  So if you want to talk, make some phone calls or whatever because now you represent the county.  When you speak to me, you speak on behalf of each member of the Board of Supervisors.

MR. MILLER:  Correct.

THE COURT:  Why don't you take a few moments to look at this and talk to whomever.  This isn't just this year. It goes on for four more years.

MR. MILLER:  It's a lot of money, and obviously we are very committed -- the County is very committed --

THE COURT:  That is a political speech now.  Are you in favor of this agreement?  Is this the way you envision it being implemented?  Is the County getting their money out of this?

MR. MILLER:  I think so now.  I'm waiting for the

audit in July, but I think so.

THE COURT:  Okay.  Then, counsel, this may be a very short hearing today.  Tomorrow will be much longer.  Trust me.  So I will go to the intervenors or First Alliance or any member of the public who wants to comment.

MS. MITCHELL:  We would like to, Your Honor.

THE COURT:  Please.  And just have a seat so all the parties can hear you.

MS. MITCHELL:  The concern in recognizing that plaintiffs were not part of this agreement, it was between the County and the City and the Court --

THE COURT:  For the public benefit.

MS. MITCHELL:  For the public benefit.

THE COURT:  I withdrew the preliminary injunction for the public benefit to let the parties work together.  So this isn't just an agreement between the City and the County. I have got provision 7 that says I can withdraw this at any time if I don't think the public is benefiting.

MS. MITCHELL:  Thank you, Your Honor.  And we would agree.  And I want to reiterate what we said originally in our brief in that the tremendous cooperation that was required to establish the beds that were established is commendable, and we're not quibbling with that.

But there are some concerns that we raised in our brief that still remain, and that is the double counting of the

Roomkey beds.  That is a concern I think for public interest. There is the lack of accountability on the rapid rehousing beds, and, frankly, the fact that only 396 people near freeways were served by this agreement is a huge concern.

The entire purpose behind the preliminary injunction originally was to address the danger and the health risks of individuals near the freeway.  So the fact we only have 396 individuals served and nobody humanely relocated does not serve the original intent of both the -- the agreement between the parties as well as the original preliminary injunction.

When you have -- I was kind of going back and looking at the prior hearings in this case, and I pulled up the November 2020 hearing where this was discussed quite a bit. And we specifically had a conversation myself, Mr. Miller, I think Ms. Marston, Mr. Marcus, and the Court, Ms. Martinez, we were all talking about what is the purpose behind the beds?  We all agreed that the sort of 3,000 were for folks in and around freeways and that the remaining, my question was, is that going to be used for the rec center exits and Project Roomkey exits because the big concern is we didn't want people exiting these institutions without getting housing.  Everybody agreed that was the intent with this 6,700 beds was, one, 3,000 for the individuals near freeways and then 3,000 for Project Roomkey and rec center exits.

Now, we recognize that Roomkey was extended, and that's wonderful, and we're not suggesting that it shouldn't have been certainly. But the fact that we still only have 396 people in and near freeways to me not only seems like a material breach of the agreement between the parties and the Court but also is not within the public interest because, as the Court noted, you do still have significant danger to those individuals.

So as a member may be speaking for the public interests, it's still a significant concern for the plaintiffs. All three of these issues we raised. Not just the freeway issue but also the lack of accountability in rapid rehousing and these 1,500 Roomkey beds which still appeared to us to be double counted. It's our position that those 1,500 Roomkey beds should be in addition to but not part of this MOU.

THE COURT: Okay. I'm sorry. Shayla Myer or Carol Sobel -- and pardon me for referring to you by first name, but if you have any thoughts, I'm throwing it open to you.

MS. MYERS: We have nothing to add at this point, Your Honor.

THE COURT: Thank you.

SPECIAL MASTER MARTINEZ: Thank you, Judge Carter. Michele Martinez, special master.

Out of the 6,195 beds, it seems that 5,895

beds -- if you can clarify because it says only 300 are permanent.  So 5,895, are any of those beds permanent, or are they just temporary in nature which means that, when Project Roomkey ends, the rapid rehousing or safe, where would these people go?

MR. MARCUS:  So yes.  Some of --

SPECIAL MASTER MARTINEZ:  You have a five-year agreement.  So currently only 300 will go into permanent housing.

MR. MARCUS:  As of April 16, that is correct. There are some beds that are being used for this MOU such as Project Roomkey which are expected to end at some point.  Those beds will be replaced with other beds so that there will be a constant 6,000 beds open and occupiable for every year of the agreement.  That is part of the ongoing auditing process that we are engaged in with the auditing-controller.

But, yes, every bed that might disappear for whatever reason, whether it's a Roomkey or whatever, will be replaced by a one-to-one bed, yes.

SPECIAL MASTER MARTINEZ:  Fantastic.  Thank you.

THE COURT:  Can you put up May 27th for just one moment?  I want to jump to Elaine Howle for just a minute. This will pave the way tomorrow for discussion because, remember, I'm not an auditor.  I think I know the difference between a forensic audit and a placement audit.  But, frankly,

your questions to my special master have been, let's say, less than helpful in terms of your understanding.

So I just want to take Elaine Howle for just a moment to give you a preview for tomorrow and put up a little chart for a second. I'm not accurate. This is just a judge and law clerks working off of public documents that you filed, et cetera.

MR. MILLER: Judge, when you get a chance, I wanted to ask you about tomorrow and what we're going to do.

THE COURT: I'm asking you in just a moment to take a look at this, and then I will engage you, Skip, and we will have a conversation. You have quite a day for you tomorrow.

This comes from your auditor-controller. This is just the beginning of what we're going to show you tomorrow when you tell me, Heidi, that you can't take on 65-year-olds and the freeway at the same time, you don't have enough resources. Or a year ago you told me that, to be fair.

MS. MARSTON: At the time, yes.

THE COURT: Let's just take -- California has spent $13 billion in just the last three years on the massive homelessness problem. This is a quote from her. 13 billion. The auditors have said the approach to dealing with homelessness is so fragmented and incomplete it actually hinders efforts at getting people into the stable housing.

Now, tomorrow I'm going to show you that you have spent over $2.6 billion in the last 24 months and ask you what the results of that is.  I'm going to show you 662 million just from HUD alone.  I will talk to you about Proposition J tomorrow.  Then I will talk to you about Governor Newsom's promise about 12 billion plus 1.5 additional, and I'm going to tell you you're working on $30 billion.  And I'm asking you, hey, where is the permanent housing if we're going there?  I'm going to ask you tomorrow what you have to show for this.

And by the way, there may be a tremendous amount. Don't get me wrong.  Services out there may be super.  These young people out there are working very hard.  By the same token, this is your state auditor.

And I'm asking you why you think that the Court is going to let you conduct your own audit and change my order of an independent audit.  So when we're talking about modifications tomorrow, I think it's going to be a very, very interesting day because I'm going to say that you've got all the money at your disposal.  You don't have much accountability.

And that's what I'm going to be asking you about tomorrow and taking you through some really concise -- now, some of your committee members may decide not to be present tomorrow.  So be it.  I'm going to be asking where they are because, otherwise, my records stand in terms of my opinion

because, by their nonappearance, you have validated structural racism.

SPECIAL MASTER MARTINEZ:  Just one more clarifying question for the County specifically.  I just want to make sure that the County is satisfied with the current agreement and progress thus far.  I know you have an audit that should be done by July, but just to state for the record, we want to make sure that the County is satisfied with the current agreement and progress.

MR. MILLER:  Yes.

THE COURT:  Okay.  If I disagreed with you and found that you had not met this agreement, I think there would be two concerns that this Court has.  One, I don't want any possibility of shelter or housing not being provided in terms of any potential movement, especially with CDC because I think that is inhumane.

Number two, I'm really wondering why these additional amounts that you're going to receive back for the 1,464 aren't put into additional housing because in a sense it could be argued it is double counting.  Not only did you get the County's money, but that money should have been used for additional housing.  Therefore, I may have a strong disagreement with your position, Mr. Marcus, that there should be an additional 1,464 constructed and that this money was always intended for new beds.

So do I act under paragraph 7 today?  I don't think so.  I think I wait a little while, but I don't know that I'm waiting for 18 months.  So I would suggest that, since the audit that I ordered is due in -- Ellie, would you look that up for me?  We have the date.

THE LAW CLERK:  This will take a minute.

THE COURT:  Yeah.  There is an administrative stay until June 15th.  I wrote down the specific date. July 19th.

Now, I can't help but feel that, before the Court issued this order, that there wasn't an audit in place.  I can't help speculate that this audit is only occurring because the Court's ordered you into an audit situation.  So, therefore, you're trying to control your own future through some audit.  And I'm not certain that is independent or not.

And in conversing with my special master, you have been very obtuse about that.  Why would I trust your internal audit over my order?

MR. MILLER:  Your Honor, the auditor-controller is a separate department, independent department with -- within the County.  I dealt with them over the years.  They are independent.  They're not self-serving.  They know what they're doing.  They are very experienced, and I have great confidence in them, quite frankly.

THE COURT:  What happens if the Court partially

did -- no disagreement.  But why wouldn't Elaine Howle be taking a look at this from the state level and seeing where the State's money is going?  In other words, there the State has a really strong interest in ferreting out accountability.

MR. MILLER:  Good question.

THE COURT:  Well, answer it then.

MR. MILLER:  I can't answer for her.  If she wanted to do an audit, if the State wanted to do an audit --

THE COURT:  No.  Not the State.  In other words, the Court, depending upon the administrative stay or not, I could be requesting this of the state.  I could go outside to an independent auditor if I wanted to.  But if I wanted to save money and I really believed in that independence, Elaine Howle stood up -- and she's been very critical of the State.  I have no doubt that she might be very precise in her audit.  It is in the State's interest to find where this money is going.

MR. MILLER:  Yeah.  That's a possibility.

THE COURT:  Something to think about is why are we even discussing this?  Why isn't there a complete willingness on the County's part for a completely transparent audit by somebody you're not choosing but by somebody that the Court also has confidence in that's outside your daily work?  Why wouldn't you be accepting to that and we can take that issue off the 9th Circuit's plate?

MR. MILLER:  I'm not saying no to that as a general proposition.

THE COURT:  Are you saying yes?

MR. MILLER:  No.  I'm not saying yes.  I don't have that authority either.

THE COURT:  Just a moment.  You speak for the board.  You told me that.

MR. MILLER:  Pardon me?

THE COURT:  You speak for the board.  You told me that.

MR. MILLER:  Yes.  The board is our client.

THE COURT:  Are you agreeing to an independent audit and agreeing to Elaine Howle to take a look at this money?

MR. MILLER:  I don't have that authority, and the answer is, no, I'm not agreeing to that at this point in time. I do not have that authority.  All I'm saying is the auditor-controller of the County is independent.  I think it would be reinventing the wheel to go outside.  I don't think it's necessary.  They are --

THE COURT:  I'm going to show you some -- let's leave this until tomorrow.  It's going to be an interesting day I think.

MR. MILLER:  That's fine.

THE COURT:  Yeah.

SPECIAL MASTER MARTINEZ:  Special Master Martinez.  One more clarifying point, Mr. Miller.

MR. MILLER:  Sure.

SPECIAL MASTER MARTINEZ:  The current audit that you're speaking about is specifically for the freeway agreement that is currently being done by your auditor-controller whomever that person is from the County.  Is that a true statement?  Yes or no.

MR. MILLER:  Yes.

SPECIAL MASTER MARTINEZ:  Great.  Thank you.

THE COURT:  It will be much more expansive tomorrow then, Mr. Miller.  Trust me.

MR. MILLER:  What is tomorrow going to look like?

THE COURT:  I don't know.  I'm going to be here at 9:00 o'clock.

MR. MILLER:  Okay.

THE COURT:  We'll see who shows up.

MR. MILLER:  We will be here.

THE COURT:  All right.  Then, back to any of you.  If not, let's make this a short day because tomorrow is going to be a long day.

Mr. Miller?

MR. MILLER:  No.  I'm good, Your Honor.

THE COURT:  Mr. Marcus?

MR. MARCUS:  Nothing further, thank you.

THE COURT:  Shayla or Carol?

MS. MYERS:  No, Your Honor.

THE COURT:  First Alliance?

Thank you very much.  We are in recess.  We will see you tomorrow.

MR. MILLER:  Thank you, Your Honor.

(Proceedings concluded at 11:24 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  27TH  DAY OF MAY, 2021.


/S/ MIRANDA ALGORRI

MIRANDA ALGORRI, CSR NO. 12743, CRR
FEDERAL OFFICIAL COURT REPORTER