**MONITOR'S INTERIM REPORT
AND EXHIBIT 1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, CALIFORNIA, *et al.* <br><br> Defendants | Case No.: 12-cv-00551 FMO (PJWx) <br><br><br> **MONITOR'S INTERIM REPORT** |

The Monitor submits this report to apprise the Court of the possible effect of orders issued in another case pending in the Central District on implementation of the Judgment in the instant case approving the Corrected Settlement Agreement ("Judgment"). Am. J. Pursuant to Corrected Settlement Agreement by and Between City of Los Angeles and Pls., ECF No. 608 (Dec. 13, 2017). Pursuant to the Judgment, Defendant City of Los Angeles ("City") committed to construct or rehabilitate 4,000 units of subsidized housing for individuals with physical disabilities, including "permanent supportive housing" for homeless persons with such disabilities, by 2026 and to take other actions to remedy discrimination against individuals with disabilities alleged by Plaintiffs in their 2012 complaint.

After several years of very limited progress in meeting its obligations under the Judgment, the Court issued an order in December 2019 that galvanized the City to appoint new top leadership at the City's Housing and Community Investment Department ("HCIDLA") and to work effectively to catch up and prepare for renewed construction and retrofitting after pandemic restrictions are lifted. However, on April 20, 2021, the court in *LA Alliance for Human Rights v. City of Los Angeles* ("*Alliance*"), issued a preliminary injunction that would divert funds from permanent supportive housing for individuals and families experiencing homelessness to temporary shelters for homeless people. No. LA CV 20-02291-DOC-(KESx), 2021 WL 1546235 (C.D. Cal. Apr. 20, 2021) (Carter, J.). The Monitor is concerned that diversion of these funds will thwart measures the Court has taken to get implementation of the Judgment back on track.

**I. Statement of the Case**

Prior to the Court's hearing on December 12, 2019, the City missed many deadlines, under-funded and understaffed implementation, relied on an architectural accessibility expert who was dilatory and used incorrect standards, failed to create an effective implementation infrastructure, and had not produced any subsidized housing certified as accessible to persons with mobility or sensory disabilities. *See* Monitor's

Semi-Annual Report for Reporting Period of January 1, 2019, Through June 31, 2019, ECF No. 634 (August 15, 2019). On December 19, 2019, the Court issued an order that the Court would impose sanctions if the City did not speed up implementation and expanded the Monitor's duties to include expeditiously deciding disputes between the Parties and otherwise facilitating implementation of the Judgment. *See* Order Re: Further Proceedings 3:17-4, ECF No. 663 (December 19, 2019).

As previously reported to the Court, the Monitor and the Parties specified efforts during the pandemic that the City would take to address problems that had hobbled implementation to be ready for expedited implementation once pandemic social distancing and other restrictions were lifted. *See generally* Monitor's Suppl. Report, ECF No. 679 (April 15, 2020). These actions during the ongoing pandemic included preconstruction activities such as committing funds for new construction of developments, including significant funds for new construction from Proposition HHH. That Proposition was passed by Los Angeles City voters in November, 2016, to issue bonds to construct or rehabilitate subsidized housing and temporary shelters for homeless individuals and families. *See* Los Angeles, CAL., Proposition HHH (2016), https://ballotpedia.org/Los_Angeles,_California,_Homelessness_Reduction_and_Prevention_Housing,_and_Facilities_Bond_Issue,_Measure_HHH. The City has also expedited other preconstruction activities on projects with HHH and other funding sources to better to implement the Judgment.

Assisted by the Monitor's decisions and with new HCIDLA leadership in place, the City has taken the following effective steps to overcome prior infrastructure failures:

- replacing the City's architectural accessibility expert with a firm that has the knowledge, experience, and capacity to expedite surveys and other accessibility oversight;

- doubling the staffing of the Accessible Housing Program ("AcHP"), HCIDLA's arm for implementing the Judgment and creating an effective management structure for implementation;
- improving the Internet Registry to facilitate more convenient applications and filling of accessible units and assisting and training the staff of the Los Angeles Homeless Services Authority ("LAHSA") to fill supportive housing units with homeless individuals through LAHSA's process and to allow homeless individuals with disabilities to also utilize the HCIDLA's Internet Registry to obtain housing;
- readying for approval by the Monitor the long-delayed Monitoring, Compliance, and Enforcement Plan ("MCE Plan") to ensure that owners and property managers of subsidized housing developments treat tenants with disabilities on a nondiscriminatory basis; and
- working diligently to develop a Comprehensive Database to replace ad hoc reporting to track construction and retrofitting and other implementation activity.

*See* Monitor's Semi-Annual Report for Reporting Period July 1, 2020 through December 31, 2020 1-6, ECF No. 689 (February 16, 2021). In addition, according to HCIDLA, the City has authorized occupancy of 11 projects with 703 total units, of which 105 are accessible units whose residents include 90 formerly homeless people with disabilities.

The *Alliance* case concerns the provision of temporary shelters for people experiencing homelessness in the City and County of Los Angeles ("City"). On April 20, 2021, the *Alliance* court issued a preliminary injunction ("PI Order") ordering, among other things, that the City put one billion dollars into escrow, audit all local, state, and federal funds received by the City to address homelessness, and report on the use of HHH funds. *Alliance*, 2021 WL 1546235, at *60. After the City informed the Court that HHH

funds were either already committed or not yet in the possession of the City, *see generally*, Declaration of Richard H. Llewellyn, Jr., in Support of Defendant City of Los Angeles' Ex Parte Request for Stay of Preliminary Injunction, *LA Alliance for Human Rights v. City of Los Angeles*, No. LA CV 20-02291-DOC-(KESx) (9th Cir. filed Apr. 20, 2021), ECF No. 284-1, the *Alliance* court stayed the escrow requirement of the PI Order for 60 days to hear further testimony. Am. Order Granting in Part and Denying in Part Defs.' Ex Parte Appls. to Stay, *Alliance*, No. LA CV 20-02291-DOC-(KESx) at 12, ECF No. 287. The *Alliance* court has set an additional hearing to consider further relief on May 27, 2021. *Id.* at 14. According to HCIDLA, the *Alliance* court has required that the City submit information on pending subsidized housing projects including HHH pending projects. The City and County have appealed the PI Order and the Ninth Circuit has stayed the Order pending review. Order, *Alliance*, No. LA CV 20-02291-DOC-(KESx) at 4, ECF No. 304.

The *Alliance* court did not mention that, as discussed below, the HHH-funded projects are covered by this Court's Judgment and that the City committed HHH funds for the purpose of satisfying the Judgment and orders of this Court. Nor is it certain that the *Alliance* court was aware of this Court's Judgment.

In light of the ongoing *Alliance* litigation, the City's HHH projects are at risk.

**II. The City's Commitment of HHH Funds to Build Housing for Homeless Individuals and Families**

The HHH projects are necessary for the City to meet its obligations under the Judgment because they constitute a substantial proportion of the 4,000 accessible units the City is required by the Judgment to produce.

HCIDLA's March 2021 summary of developments shows the following HHH projects in various stages of commitment:

- Seven developments with 489 total units have been placed in service;

- 46 developments with 2,888 total units have closed construction financing or are in construction;
- 10 developments with 589 total units are targeted for construction financing by end of spring 2021;
- 31 developments with 1,951 total units are targeted to close construction financing by the end of 2021; and
- 31 developments with 2,114 total units are targeted to to close construction financing by the end of 2022.

*See* HCIDLA, HHH Summary, 125 HHH Projects (8,031 Total Units) (Mar. 22, 2021) (Ex. 1 hereto). HCIDLA has explained to the Monitor that the City has already provided several rounds of financial approvals, including final approvals by the City Council, for most of the projects before their scheduled construction financing target dates in 2021 and 2022 in the above last two categories of developments.

The average HHH subsidy is $135,000 per unit on the HHH Summary. *See id*. The total cost of the 125 projects is thus approximately $1.08 billion ($135,000 x 8,031). These HHH developments should yield between 1,205 and 2,008 accessible units of permanent supportive housing. These HHH units therefore account for fully 30 percent (1,205/8,031) to 50 percent (2,008/8,031) of the 4,000 units of housing for individuals with disabilities required by the Judgment.[1]

These 125 HHH-assisted projects using fully 90 percent of available HHH funds ($1.08 billion/$1.20 billion) demonstrate the City's commitment to expedite implementation of the Judgment's 4,000 accessible unit objective.

---

[1] HCIDLA has explained to the Monitor that the precise number of accessible units will depend on the other funding sources used in each development and how recent intervening state mandates are applied that require a greater number of accessible units in new construction than the Judgment.

A substantial number of homeless individuals have mobility and sensory (vision and hearing) disabilities that qualify them for the accessible units required by the Judgment. According to LAHSA, the homeless count in 2020 for the City of Los Angeles was 41,290 of whom 6,955 were individuals with physical disabilities, The proportion of the homeless population with physical disabilities was therefore 19 percent (6,955/41,290). See https://www.lahsa.org/documents?id=4680-2020-greater-los-angeles-homeless-count-city-of-los-angeles.

While there is need for both permanent housing and temporary shelters to address homelessness, the City's commitment of one source of funds, Proposition HHH, to build supportive housing to meet its obligations to implement the Judgment is appropriate. The City gives developers early financial backing to make it easier to attract funding from other sources to go forward with projects for homeless housing that otherwise might not go forward at all, according to HCIDLA. Leveraging HHH funds in combination with other funding sources makes HHH dollars for housing go further, increasing the number of units that can be produced to satisfy the Judgment's accessible unit requirement.

Moreover, judicially noticeable social science evidence shows that permanent supportive housing is efficacious compared to the usual care of homeless individuals, such as temporary shelters. *See, e.g.*, Tim Aubry *et al.*, *Effectiveness of Permanent Supportive Housing and Income Assistance Interventions for Homeless Individuals in High-Income Countries: a Systemic Review*, 5 Lancet Public Health 342 (2020), https://www.thelancet.com/action/showPdf?pii=S2468-2667%2820%2930055-4 (meta-analysis of 15 studies in the United States and Canada finding that: "Permanent supportive housing increased long-term (6 year) housing stability for participants with moderate needs . . . and high support needs . . . when compared with usual social services." (*id*)); Maria C. Raven *et al.*, *A Randomized Trial of Permanent Supportive Housing for Chronically Homeless Persons with High Use of Publicly Funded Services*, 55 Health Services Review 797 (2020), https://doi.org/10.1111/1475-6773.13553 (multi-

year UCSF study of a Santa Clara County intervention in which chronically homeless individuals with high mental health needs and substance abuse problems placed in permanent supportive housing had better outcomes than a control group of homeless individuals provided usual care consisting of temporary shelter and other social services).

### III. Conclusion

The instant case is at a critical juncture with the City preparing with great effectiveness to make up for its prior failure to produce accessible housing units as soon as pandemic restrictions are lifted. No small part of these efforts is the City's commitment of HHH funds to build permanent supportive housing, which will constitute a substantial proportion of the 4,000 units the Judgment requires the City to produce by 2026.

The Monitor will continue to report to the Court and the Parties on the proceedings in the *Alliance* case, as they may affect implementation of the Court's Judgment.

Respectfully submitted,

Dated: May 25, 2021

/s/ Bill Lann Lee
Bill Lann Lee
Court Monitor



# HHH Summary

## 125 HHH Projects (8,031 Total Units)

**In service**
**7** HHH Projects
489 total units

+

**Closed financing or in construction**
**46** HHH & Housing Challenge Projects
2,888 total units

+

**By spring 2021**
**10** HHH & Housing Challenge Projects
589 total units targeted to close construction financing by end of spring 2021

+

**By end of 2021**
**31** HHH & Housing Challenge Projects
1,951 total units targeted to close construction financing by end of 2021

+

**By end of 2022**
**31** HHH & Housing Challenge Projects
2,114 total units targeted to close construction financing by end of 2022

Average HHH subsidy $135,000 per unit.

Exhibit 1

HCIDLA - 3/22/2021