**EXHIBIT 5**

```
 1                  UNITED STATES DISTRICT COURT

 2         CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3           HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

 4

 5   L.A. ALLIANCE FOR HUMAN RIGHTS,      )
     et al.,                              )
 6                                        )
                         Plaintiffs,      )
 7                                        )
         vs.                              )           Case No.
 8                                        )  CV 20-2291 DOC (KESx)
     CITY OF LOS ANGELES, et al.,         )
 9                                        )
                         Defendants.      )
10   _____ )

11

12             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                      STATUS CONFERENCE
13               THURSDAY, MAY 27, 2021
                         9:02 A.M.
14               LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23     MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, ROOM 4455
              LOS ANGELES, CALIFORNIA  90012
25                    (213) 894-2305
```

1　　　　　　　　　　**APPEARANCES OF COUNSEL:**

2

3　**FOR THE PLAINTIFFS:**

4　　　SPERTUS, LANDES & UMHOFER, LLP
　　　　BY:　ELIZABETH A. MITCHELL
5　　　　　　Attorney at Law
　　　　617 West 7th Street, Suite 200
6　　　Los Angeles, California　90017
　　　　(213) 205-6520
7
　　　　SPERTUS, LANDES & UMHOFER, LLP
8　　　BY:　MATTHEW D. UMHOFER
　　　　　　Attorney at Law
9　　　1990 South Bundy Drive, Suite 705
　　　　Los Angeles, California　90025
10　　(310) 826-4700

11

12　**FOR THE DEFENDANT CITY OF LOS ANGELES:**

13　　LOS ANGELES CITY ATTORNEY'S OFFICE
　　　　BY:　SCOTT D. MARCUS
14　　BY:　JESSICA MARIANI
　　　　　　Deputy City Attorneys
15　　200 North Main Street
　　　　Los Angeles, California　90012
16　　(213) 978-8216

17

18　**FOR THE DEFENDANT COUNTY OF LOS ANGELES:**

19　　MILLER BARONDESS, LLP
　　　　BY:　LOUIS R. MILLER
20　　BY:　JENNIFER MIRA HASHMALL
　　　　　　Attorneys at Law
21　　1999 Avenue of the Stars, Suite 1000
　　　　Los Angeles, California　90067
22　　(310) 552-4400

23

24

25

**UNITED STATES DISTRICT COURT**

1    APPEARANCES OF COUNSEL, CONTINUED:

2

3    FOR THE INTERVENORS ORANGE COUNTY CATHOLIC WORKER, LOS ANGELES
     CATHOLIC WORKER, AND LOS ANGELES COMMUNITY ACTION NETWORK:

4

5        LEGAL AID FOUNDATION OF LOS ANGELES
         BY:   SHAYLA R. MYERS

6            Attorney at Law
         7000 South Broadway
         Los Angeles, California  90003

7        (213) 640-3983

8        ELDER LAW & DISABILITY RIGHTS CENTER
         BY:   BROOKE A. WEITZMAN

9            Attorney at Law
         1535 East 17th Street, Suite 110

10       Santa Ana, California  92705
         (714) 617-5353

11

         LAW OFFICE OF CAROL A. SOBEL

12       BY:   CAROL A. SOBEL
             Attorney at Law

13       1158 26th Street, Suite 552
         Santa Monica, California  90403

14       (310) 393-3055

15

16   ALSO PRESENT:

17       HONORABLE ANDRÉ BIROTTE, JR., United States District Judge
         SPECIAL MASTER MICHELE MARTINEZ

18

19

20

21

22

23

24

25

```
 1              THURSDAY, MAY 27, 2021; 9:02 A.M.

 2                    LOS ANGELES, CALIFORNIA

 3                           -oOo-

 4         THE COURT:  First of all, good morning.  And I hope

 5  all of you are well.  And it's 9:00 o'clock or a little after,

 6  so let's get started.

 7         We'll call the case to order once again,

 8  L.A. Alliance for Human Rights versus the City of Los Angeles,

 9  County of Los Angeles, Case No. 20-02291.

10         And for the court reporter, if I speak too

11  quickly --

12         THE REPORTER:  Yes, Your Honor.  Thank you.

13         THE COURT:  This morning, we have a number of

14  elected officials who have other committee meetings today.  And

15  so I'd like to change the order that we've proposed as a

16  courtesy to them so they can be on about their committee

17  meetings, et cetera.

18         It's an honor today to have the Chair of the

19  Los Angeles Board of Supervisors present, Hilda Solis.

20         If you would be so kind.  And we welcome you today.

21  Good morning.

22         SUPERVISOR SOLIS:  Thank you.

23         Am I permitted to remove my mask?

24         THE COURT:  Please.

25         SUPERVISOR SOLIS:  Thank you.  Good morning.
```

```
1              THE COURT:  Have you been vaccinated?

2              SUPERVISOR SOLIS:  Thank you.  Good morning.

3              THE COURT:  Have you been vaccinated?

4              SUPERVISOR SOLIS:  Yes, I have.

5              THE COURT:  Excellent.  Okay.

6              SUPERVISOR SOLIS:  Definitely.

7              THE COURT:  It's not a political statement, but get

8    your vaccine.

9              SUPERVISOR SOLIS:  Right.  Thank you.

10             Thank you very much, Honorable Judge Carter, for

11   elevating the history of structural racism.

12             Am I too high?  I'm going to -- I don't want to

13   appear as though I'm screaming.

14             THE COURT:  Well, we've got two law clerks also.

15   And if you'd help the Chair at any time, please.

16             SUPERVISOR SOLIS:  Yes.  Thank you.

17             THE COURT:  Thank you.

18             SUPERVISOR SOLIS:  Okay.  Well, once again, thank

19   you, Honorable Judge Carter, for allowing us to be here today

20   to testify and elevating the history of structural racism and

21   its impacts on the homeless crisis here in this preliminary

22   injunction.  I'm here to address this important issue and know

23   our counsel will also address any legal arguments presented in

24   the case.

25             And as Chair of the L.A. County Board of
```

1 Supervisors, I want to acknowledge this very historic injustice

2 that we know must be corrected. Past trauma has to be

3 addressed, an oppressive system must be destructed in order to

4 tackle the region's homelessness crisis.

5      The County of Los Angeles, as you know, is committed

6 to addressing the underlying structural and systemic factors

7 which have, in my opinion, contributed to disproportionate

8 rates of communities of color experiencing homelessness in

9 Los Angeles. And that's why I have personally led the call for

10 a "Care First, Jails Last" approach to justice reform and

11 resolving our homeless crisis.

12      We're prioritizing building out a much needed system

13 of care for the most vulnerable communities in Los Angeles

14 County and are supporting various initiatives that will

15 drastically reduce the pipeline that feeds into homelessness

16 and, all too well, mass incarceration.

17      And I'd like to highlight, if I might, two projects

18 in my own district that I hope will underscore the Board's

19 "Care First, Jails Last" approach.

20      In fact, the Hilda L. Solis Care First Village which

21 you toured in its inception --

22      THE COURT: Right.

23      SUPERVISOR SOLIS: -- which opened recently in April

24 of 2021, it provides interim housing that would have been a

25 staging area, as you know, a parking lot for the construction

 1  of a new jail.  It will now house 232 individuals and provide

 2  wraparound supportive services on site.  The cost of that

 3  project was $51 million in terms of using CARES Act money in

 4  addition to $6 million that I put in of my own discretionary

 5  funding.

 6          I thought that it could be done quickly, and I had

 7  the support, unanimous support of the Board to do that.  And I

 8  really want to commend the County for doing that.

 9          The project, as you know, was built in record time,

10  six months -- it's unheard of, even for the county -- and will

11  eventually be converted to permanent housing to ensure

12  long-term housing solutions for our residents.

13          Of the individuals currently living on site,

14  62 percent are either black or Latinx and 68 percent are

15  individuals who are chronically homeless or who have had

16  serious mental health concerns and who would be eligible for

17  permanent supportive housing.

18          The model is showing what it means to realize care

19  first and jail last.  I am hopeful that the County can

20  replicate this approach and serve as a model to build permanent

21  housing, as we need to serve the needs of our most vulnerable

22  unhoused neighbors.

23          In addition, I want to mention the LAC+USC

24  Restorative Care Village which is scheduled to open in the fall

25  of 2021.  It will provide 96 clinical enriched interim housing

1  beds with on-site nursing support, help oversight, case

2  management, and connection to permanent housing and serve those

3  who have been discharged from the county health facilities and

4  facing unstable housing conditions.

5           It will also host an additional 64 beds as part of

6  an intensive treatment program for individuals being discharged

7  from county hospital, the psychiatric emergency services,

8  inpatient psychiatric units, and mental health urgent care

9  centers.  So we're really talking about the very same

10 population that we're addressing here today.

11          There are other community and government efforts to

12 develop more projects like these utilizing county- and

13 city-owned properties in areas neighboring the Care First

14 Village surrounding the Men's Central Jail.  And we are trying

15 to tie these efforts together in a partnership not just with

16 the City but also with our other partners.

17          For example, we're looking at creating a Restorative

18 Justice Village master planning project which is already

19 beginning -- in its beginning stages now.  It will include the

20 participation of Homeboy Industries, who's also helping us

21 address incarceration and homelessness, as well as

22 The California Endowment.

23          So we, in fact, envision seeing a master planning

24 project that will better leverage and coordinate all of our

25 available county assets as well as hopefully the city, I'm

```
 1   sure, as well as other social justice programs and providing
 2   employment opportunities as well as affordable housing, low
 3   income, and for homeless individuals as well.
 4          Through this master plan, we'll be able to serve the
 5   needs of the chronically homeless and formerly incarcerated
 6   individuals in the area, particularly those who may be cycling
 7   between homelessness and incarceration.
 8          I have also supported interim housing sites for
 9   women and families.  And I wanted to mention this -- I believe
10   I may have brought it up the last time I spoke before you --
11   and it's a partnership with a group called The Whole Child.
12   Their site is in Echo Park, and it serves women in Skid Row and
13   their families.
14          And we have undertaken that project now for more
15   than a year.  And it deals with single mothers and young
16   children fleeing domestic violence.
17          And I want to mention that recently I welcomed the
18   opportunity to work with the Downtown Women's Center in
19   planning for housing for all women and families on Skid Row and
20   will be authoring a motion that I'll bring before the Board of
21   Supervisors to help provide county resources that will help
22   bring about a plan and hopefully with some good output.
23          In collaboration with the City of Los Angeles, we've
24   transformed, also, a parking lot on county-owned property.
25   It's known as the H. Claude Hudson Comprehensive Health Center.
```

1   And it is a city-run bridge home facility.  We partnered with

2   Curren Price to do this I believe almost two-and-a-half years

3   ago.  There are 100 beds there in a heavily impacted area.  The

4   unique facility also provides residents to house their pets

5   there, which is something that we know is very important for

6   our homeless.

7           These are just a few examples of our County's

8   ongoing commitment to help address homelessness.

9           My office is also exploring new and innovative ways

10  of addressing homelessness, one which includes repurposing the

11  historic Los Angeles County General Hospital to provide

12  low-income housing and community services, not just in the

13  Boyle Heights area but also expanding the use potentially of

14  the Project Homekey program to provide quick interim and

15  permanent housing.

16          And I'm deeply committed to continuing the work

17  addressing the underlying structural and systemic factors that

18  brought us to this crisis.  By centering the voices of

19  community advocates and people experiencing homelessness, I'm

20  confident that the County, the City, and our partners, both

21  public and private, and stakeholders can effectively address

22  the impacts regarding racism and helping us overcome

23  homelessness in the County of Los Angeles.

24          Thank you.

25          THE COURT:  As the Chair, I want to thank you for

 1    your appearance today.  And I want to personally thank you for

 2    giving me a tour so early at the site.

 3              I follow the minutes of almost every board or

 4    council meeting that I can.  And when credit is due, I want to

 5    make certain I pay credit.

 6              You approved this site in October.  You had it

 7    mostly completed by December 28th and 29th.  I know that there

 8    have been a few issues along the way getting it up and running.

 9    So instead of looking at anything negative, I want to say that

10    that's very positive.  And, in fact, I tried to note that in

11    the Court order that I sent out, calling all parties' attention

12    to this effort.  I've seen structures go up in 28 days.  I've

13    seen them go up in 15 days.  And I saw your efforts with county

14    land and county financing.

15              I also follow your statements, so I'm going to read

16    a statement that you just made.  This is by you co-authoring a

17    motion by Sheila Kuehl.  It involves naloxone.

18              Would you put up Slide 68 for a moment?

19              And much of what you've said today you also

20    encapsulated at the board meeting.  Quote -- you co-authored

21    the motion.  It involved the issue of racial justice.

22              You said, quote, "This issue disproportionately

23    impacts black and Latinx residents.  And in our efforts to

24    address these racial inequities, community-based efforts like

25    overdose prevention programming and increased access to

1  naloxone will help reduce deaths by overdose by training

2  homeless service providers and people experiencing homelessness

3  for situations in which an overdose may occur."

4          That's beyond the scope of the hearing today.  But

5  what I was impressed with was your recognition and the Board's

6  recognition of the inequities involved historically.

7          And so I wanted you to know that I'm reading,

8  following, and I compliment you.

9          The second thing is I'd ask for your help, very

10 humbly.  When Courts make orders, we're not very flexible.  We

11 have to wait until the next case or controversy or something

12 comes before us.  But we also have to be aware and grow and

13 realize that we have to change and accommodate because this is

14 a fast-moving and difficult area for everybody.

15         There's a controversy going on right now between

16 long-term supportive housing and shelter.  And I'll tell you

17 everything's on the table.  What I'm looking for is a balance.

18         The help I need is if we can have long-term housing,

19 that is the ultimate solution.  I need also some balance in the

20 short-term getting thousands of people off the street and out

21 of this dangerous situation and the unsanitary conditions.  And

22 from my view, with no patience at all, that should have been

23 done long ago.

24         So instead of going backwards and chiding public

25 officials, I'm humbly asking for you to think about -- not make

1 a commitment today because you don't have the other board

2 members present. But are we going to balance that? The *Boise*

3 case talks about shelter. They never wrote about housing. If

4 the Ninth Circuit says it's housing, this Court will follow

5 gladly. Long-term sustainable housing, it may be the absolute

6 answer. But they wrote about shelter. So it's a political

7 decision so far about housing.

8         SUPERVISOR SOLIS: Right.

9         THE COURT: I'd like to see that balanced, though.

10 How do we accomplish -- literally when Councilman de León and I

11 walked down the street and had women coming up saying that

12 they've been raped, they're sexually getting abused -- and I'm

13 terrified about the rains coming. I'm absolutely -- I want you

14 to hear this. I'm absolutely down on my knees -- this is about

15 complete humbleness -- of how we're going to get this number of

16 people.

17         So I've concocted an order. And what it basically

18 says is the City and the County, within 90 days, women are

19 coming off the street. It's a narrower -- I've got a

20 geographical area, it's as narrow as I can focus that, starting

21 with women, and I gave it 90 days.

22         I've seen the City and the County come back with

23 nothing in terms of an agreement, nothing in terms of any

24 modification. I've also seen the County withdraw or not become

25 involved in any discussions with the City. And if you're not

**UNITED STATES DISTRICT COURT**

```
 1    aware of that, I can make a pretty good record about that.  I
 2    call it stonewalling, frankly.
 3            So you're here because the City and the County
 4    cannot reach those kinds of agreements, and that's going to
 5    cause this Court to be very diligent.  So now you hear my fear.
 6    Why women first?  The most vulnerable.
 7            And I don't know what Councilman de León is going to
 8    be saying.  But I know that when I walk down the street, it is
 9    beyond any civilized society.  And I go to Afghanistan and
10    Pakistan and Syria, on the border up there.  And I'll tell you
11    and I'll show you pictures that those refugee camps are so much
12    better than what I'm seeing on Skid Row.  There's no excuse.
13            So I'm humbly saying if you can't reach an
14    agreement, then I'm going to remain very diligent in this.  And
15    I see absolutely no reason why we can't start with getting
16    women off the street, I mean as of today.  And I see no reason
17    why we can't follow with families.  And then if there's some
18    accommodation with the males -- and by the way, I'm a male so
19    we're not picking on men right now.
20            But I've given it 180 days.  And I'll say to you I
21    believe you're fighting for the heart and soul of the City
22    right now as an elected official.  The Court's got a very small
23    role to play in this.  And so if you and the City can't turn
24    this around, you're going to give that to the Court to make
25    that effort.  And I'm hoping you can, but I haven't seen that
```

**UNITED STATES DISTRICT COURT**

```
 1   good faith bargaining going on.

 2              And I lay that right humbly at the feet of the Board

 3   and I lay that at the feet of the City because we need an

 4   omnibus agreement far beyond Skid Row.  Skid Row is the

 5   epicenter.  It's the beginning.  But this whole city is crying

 6   for help right now.

 7              So my order does the following, it tries to take a

 8   geographical area to begin with, that's the epicenter, with

 9   huge racial disproportionality, start in a narrowly tailored

10   fashion with women.  And by the way, that's voluntary.  It's

11   not forced.  That's voluntary.  But nobody's reading my order,

12   apparently.  They're just in an echo chamber right now of the

13   same old bitterness that's gone on between the parties for

14   years.

15              I want a hard but local approach.  I put in my order

16   I wanted a community approach so they were involved.  Some of

17   the community leaders, for instance, want Urban Alchemy, I

18   think.  Correct?  Fine.

19              So if you can help, you know, the phone is open,

20   et cetera, with Michele Martinez and me at any time.  But I'm

21   telling you, I'm down for the count on this one.  Okay?

22              SUPERVISOR SOLIS:  I have no doubt, Judge.

23              THE COURT:  Yeah, please don't doubt me on this.

24              SUPERVISOR SOLIS:  No, I don't.

25              THE COURT:  This is it.  Unless the City turns now,
```

```
 1   we're going back to decades of the same bickering and nonsense
 2   that's gone on for years and years and years.  Because nothing
 3   was accomplished of significance in terms of starting down the
 4   road.
 5          And I know individuals were serviced, but I'm going
 6   to get into some facts and figures and not keep you today --
 7   because I'm really concerned that you've gotten information or
 8   not gotten information from your internal staff, through no
 9   fault of the Board -- and I'm going to put some documents up
10   today and ask some very difficult questions.  But I don't care
11   to keep you here for that.  Okay?  Skip can inform you what our
12   conversations are.
13          So hopefully I'm looking for a political solution.
14   But if you're not capable -- and I don't mean you personally
15   but the Board and the City getting together and coming up with
16   something for the benefit of this city, then the Court's going
17   to be very diligent on this.
18          Okay.  I want to humbly thank you for all of your
19   courtesy presented to me.  And I'm sorry I've cut off all the
20   conversation once the County unilaterally decided to litigate.
21   That's why the phone calls stopped between us.  It was no
22   discourtesy.  I just stopped communicating with everybody.
23          Thank you very much.
24          Do you have any questions?  Do you have any
25   questions?
```

```
1              Just humbly thank you for being here.

2              SUPERVISOR SOLIS:  Thank you, Judge Carter.  I do

3    want to say that -- and I'm glad that you are reading things

4    that we are talking about.

5              THE COURT:  Oh, I'm following you.

6              SUPERVISOR SOLIS:  And have been.  And we're going

7    to continue to do that.  And we're going to strive to make sure

8    that we provide the most adequate services for the most

9    vulnerable.

10             THE COURT:  Yeah.

11             SUPERVISOR SOLIS:  And as I said earlier, we're

12   going to work with the Women's Center, Downtown Women's Center

13   and have been.  And now people are stepping up and they're

14   putting -- putting things away that typically would have been a

15   barrier.  And people are talking more.  And I think that's

16   what's happening right now.

17             And we know the urgency of now.  I know the urgency

18   of now.  And we -- you and I have had those conversations even

19   beyond just what's happening in Skid Row but around the

20   San Gabriel Valley, southeast and East Los Angeles.

21             THE COURT:  What I'm afraid of is persons unlike you

22   aren't going down there.  I'm concerned about, for instance,

23   the council or Kevin de León as the councilperson that sees it

24   every day.  But John Lee may have a co-equal vote out in the

25   Valley as one of 15 councilmembers.  And, therefore, he may in
```

1　good faith not see what's occurring down there but has the same

2　one vote.

3　　　　　And so I'm not seeing our elected officials down

4　there.  So I want to compliment you.  So you, Kathryn Barger

5　have been down there.  Thank you.  But until you see it, you

6　can't believe it.  I don't even think my counsel, many of them

7　in this room, have been down there, which is shocking to me.

8　　　　　SUPERVISOR SOLIS:  Well, I'm encouraged by the

9　traction that we are finally seeing.  It may be slow paced for

10　some.

11　　　　　But I think we were very fortunate to be able to

12　take opportunity when there was a crisis.  And the opportunity

13　was to be able to draw down monies from the federal government

14　and the state that had not been made available.  It had some

15　flexibility, and we were able to push forward on some immediate

16　projects.  Some have been in the queue for a while, but we

17　could jump-start them.  That's my hope moving forward, that we

18　can continue to move on that trajectory and work with you and

19　everyone concerned.  So --

20　　　　　THE COURT:  Here's two more concerns, I just humbly

21　ask you because I'm getting older.  Maybe I'm not here in ten

22　years.  Okay?

23　　　　　First of all, I'm fearful of what I call the three-

24　and five-year plans because when a politician proposes that,

25　oftentimes they're not around to take responsibility for what

```
 1   they've said.
 2          So if you're entering into good faith agreements, I
 3   would simply ask for milestones along the way so we can try to
 4   meet that.  And you've got flexibility on my part.  I don't
 5   expect perfection.  But the inertia that's occurred is
 6   absolutely devastating and is causing an untold amount of loss
 7   of life needlessly, in my opinion.  And that's where I draw the
 8   line.
 9          The second thing is the money and accountability.
10   Today, without keeping you, we're going to get into some facts
11   that involve the county and providers and just ask some
12   questions about audits, et cetera, and what I don't even know
13   the Board knew.  And if my suppositions are wrong, I'm going to
14   put it right up on the board so everybody could see it.
15          I'm encouraging you to stay if you'd like to, but
16   I'm encouraging you not to stay.  Your counsel can inform you.
17          SUPERVISOR SOLIS:  Thank you.
18          THE COURT:  But I'm really, really concerned about
19   that money and the accountability of that money because I don't
20   believe any longer that money is the issue.  We've got the
21   money.
22          And number two, the pilot programs.  What you did is
23   exemplary over at that site.  I need 200 of those.  And not I
24   personally but the city and the county need 200 of those.  So
25   every time a pilot project starts, not you but I'm watching
```

```
 1   everybody circle and point to the pilot project.  And that
 2   needs to be expanded.
 3           And so if we can do that with long-term supportive
 4   housing, I'm the first to step forward and says good.
 5           SUPERVISOR SOLIS:  I hope so.
 6           THE COURT:  If you can do it with $30 billion, hey,
 7   I'm for it.  But in the meantime, how do you get people off the
 8   street awaiting that so they're not living in a cardboard box?
 9   And that's where I think we're having the push and shove, back
10   and forth because I'm not willing to wait any longer watching
11   people lay in the rain, especially women and kids.  I'm going
12   to show some slides today.
13           Okay.  Humbly thank you.
14           SUPERVISOR SOLIS:  Thank you very much.
15           THE COURT:  Pleasure.
16           SUPERVISOR SOLIS:  All of you, thank you.
17           THE COURT:  And please, if you're around today, I
18   think Skip is going to be calling you pretty quickly.  In fact,
19   I can guarantee it.
20           SUPERVISOR SOLIS:  Thank you.  Appreciate it.
21           THE COURT:  Okay.  Councilman, please.
22           And, Supervisor, what you have to be concerned about
23   is I'm afraid that housing first, which is a great model,
24   became housing only.  I need some balance.  That's what I'm
25   asking for.
```

1         COUNCILMAN DE LEÓN:  Good morning.

2         THE COURT:  Kevin de León, Councilman Kevin de León.

3         Good morning.  And I'm sorry we're not communicating

4  anymore.  I want to personally apologize to you.  I cut off all

5  the phone calls as soon as the County unilaterally filed.

6         COUNCILMAN DE LEÓN:  That's quite okay.  I felt like

7  a jilted lover, you know.

8         THE COURT:  Well, 5:30 calls don't work anymore.

9  You were midnight calls.

10        COUNCILMAN DE LEÓN:  Oh, the midnight calls.  But

11  that's okay.

12        Your Honor, the Honorable Judge André Birotte,

13  Special Master Michele Martinez, I want to thank you very much

14  for allowing me to spend a few moments here this morning and to

15  share a few thoughts.

16        Now, let me -- let me cut to the chase.  Decades of

17  willful ignorance on behalf of the City and County of

18  Los Angeles has brought us to this moment where tens of

19  thousands of people spend their days as well as their nights on

20  the streets and sidewalks.

21        Now, I use the word "willful" because our unhoused

22  community in the concentration of both men and women,

23  especially young children, and entire families who now find

24  themselves on Skid Row is no accident.

25        We know that this neighborhood was designed to be an

```
 1    open air prison, established through a collective effort of
 2    public officials, politicians, at both the county and city
 3    levels, who worked out a containment plan for marginalized
 4    people but, in particular, people of color.
 5            Homelessness services, housing services, and
 6    shelters were concentrated in Skid Row.  The City turned law
 7    enforcement into de facto prison guards who patrol the border
 8    of Skid Row to make sure that this shameful reality stayed
 9    hidden.
10            To those who found themselves having to cross the
11    border into Skid Row searching for help and finding hell
12    instead, it was more of just the same -- institutional racism
13    layered on top of structural racism, designed as -- or I should
14    say disguised as solutions.
15            Today you'd be hard-pressed to find a neighborhood
16    in Los Angeles that isn't, isn't dealing with the reality of
17    this humanitarian crisis.
18            Now, City Council District No. 14, City 14, along
19    with the geographical locations of County Board Supervisor
20    Hilda Solis and newly elected County Board Supervisor
21    Holly Mitchell, we have the unenviable distinction of having
22    the largest unhoused population not only in the city of
23    Los Angeles or the county but nearly every city in California,
24    including Long Beach, my hometown of San Diego, Oakland, and
25    San Jose.
```

1    Worse still, my district has more unhouseds than the

2    cities of Phoenix, Houston, and Chicago, the fifth, fourth, and

3    third largest cities in America.  I did compare apples to

4    apples, a municipality with another municipality, but rather a

5    city council district or, perhaps for those from the East

6    Coast, a ward with the entire homeless population of a city.

7    Now, let me be clear, the state of homelessness in

8    our city today is not for a lack of trying to end it.  And we

9    are making progress.  My staff has been aggressively conducting

10   outreach work on our streets to give people a roof over their

11   heads, focusing especially on women and children in Skid Row,

12   and making great strides in housing people through Project

13   Homekey.

14   Now, in the last six months alone, we have built, we

15   have bought, and we have leased or put into a pipeline more

16   than 1,000 units of homeless housing across every region of my

17   district, from downtown L.A. and Skid Row to Boyle Heights

18   incidental and northeast L.A.  And that's not counting the 500

19   Project Roomkey rooms in my district which have helped people

20   from all over the city transition from living on the street to

21   finding permanent housing.

22   Now, we are moving forward with tiny villages and as

23   many -- as many neighborhoods as possible.  We're taking

24   advantage of scattered housing model.  Three weeks ago, I led a

25   nighttime march right here in Skid Row with my colleague,

1   Assemblymember Miguel Santiago, leaders from LACAN, the
2   Downtown Women's Center, Skid Row Housing Trust, and so many
3   others.  We marched in unison late at night to demand that the
4   State invest $20 billion in funding for homelessness statewide,
5   knowing that we would receive the largest of that amount of
6   money.
7           I was encouraged when in the following week our
8   governor, Governor Gavin Newsom, announced a plan to invest a
9   minimum threshold of $12 billion over the next two years.  I'm
10  encouraged but cautiously optimistic.  We still need to make
11  significant changes in the way we develop housing to make sure
12  we can leverage those dollars to get the best value and the
13  volume to meet the immense challenge that we face.
14          Now, you're going to get a lot of folks come before
15  you, including myself, who want to give you a portrait, a
16  snapshot in reality of the progress that we've made.  But we
17  can't do this in a very incrementalist way and we can't
18  piecemeal our way through this.
19          If we have 41,000 living on our streets today,
20  60,000 in the County of L.A., if every elected official from
21  every corner of this county comes to you in an incrementalist
22  way without an overarching strategic goal of how we land this
23  plane -- to house and provide dignity, whether it's short-term
24  non-congregate shelter or the permanent housing solutions that
25  our folks so desperately need, we need an overall plan.  We

25

```
1    just can't come in here and say I've done this in this
2    neighborhood, I've done this in that neighborhood.
3            THE COURT:  Let's add safe parking also, let's add
4    shared housing to that, let's put everything on the table as
5    well.
6            COUNCILMAN DE LEÓN:  Everything has to be on the
7    table.
8            THE COURT:  Including motel rooms, hotel rooms.
9            COUNCILMAN DE LEÓN:  Everything.  Everything that
10   provides a roof, you know.
11           And I know there is a debate.  You made that very
12   clear, you know, the reality between short term and long term.
13   They're not inclusive or exclusive of each other.  They're not
14   incompatible.  They're conclusive with each other for the
15   short-term needs that our residents throughout the city,
16   throughout the county, but in particular here in Skid Row need
17   to protect themselves from the elements, to protect themselves
18   from violent crimes in the short term; being very prudent in
19   how we invest fiscally to get the most bang for the buck so we
20   don't blow all of our money to the deep concerns, the real
21   concerns of advocates; that we make the major gargantuan
22   financial investments on the short term, only to be left with
23   no money in our pockets for the long-term investment.
24           That's why I moved quickly after taking office in
25   October, October 15th -- as you all know, I took office
```

1  early -- to introduce a far-reaching plan to jump-start our

2  City's response to its housing needs.

3         City 14's plan A Way Home aims to establish an

4  overarching 25-by-25 goal of developing 25,000 housing units by

5  the year 2025.  Because -- let me underscore and emphasize the

6  following -- we have a lot of smart folks in this room, a lot

7  of smart folks all going to testify before all of you.

8         Without a North Star and a vicious goal and timeline

9  for us to chase and accomplish, we will continue to find

10  ourselves here year after year, talking about the urgency of

11  responding to this crisis but with little to show for our

12  efforts.  Again, we cannot adhere to incrementalism when we

13  have people dying on our streets every single day.

14         This amount of time for hedging or playing at the

15  margins, we must have the political courage to take measured

16  risks in the name of saving lives and ending homelessness as we

17  know it today in Los Angeles.  We should be negotiating, quite

18  frankly, a way forward with the Court where we can establish an

19  overarching goal and meet specific benchmarks.

20         Now, this may sound ironic, perhaps a little

21  counterintuitive.  This is not a legal issue.  This is not a

22  legal issue.  Quite frankly, I would submit to the Court the

23  more the lawyers get involved across the board, the bigger the

24  problem is going to be.

25         This is a political issue.  And to date, the elected

1    officials at every level, not just city and county, but our

2    state legislature and our members of Congress as well and the

3    Senate have failed dramatically to step up to the plate

4    collectively, to communicate, to coordinate, and to provide the

5    necessary resources so we can put a roof over their heads.

6            Now, we all know and we've heard this said time and

7    time again if we had an earthquake here and we had 30-, 40,000

8    people living on the streets today, we would move heaven and

9    earth and move mountains and FEMA would be here and we would be

10   intervening.  But we have this slow death that occurs every

11   single day on our streets.

12           Instead, we're pouring city resources into

13   litigation, into a litigation merry-go-round that ultimately

14   yields, quite frankly, nothing for the unhoused women and

15   children who are suffering right outside.  Irrespective of any

16   decision of the Appellate Court, we still own this problem.

17           I think you get to go home, have a nice glass of

18   wine or a cup of tea with your wife --

19           THE COURT:  No, because --

20           COUNCILMAN DE LEÓN:  We own this.

21           THE COURT:  No, no.  Just a moment.  If the Court

22   stays this matter -- they will either allow this Court to

23   proceed with the injunction or overturn the injunction.  But

24   then we're right back in a trial situation, we're going to set

25   the trial.  And then if the City and County aren't liable,

1   there's no issue.  If the City and County are liable, then the

2   Court, once again, is right back to where we are right now.

3          COUNCILMAN DE LEÓN:  And that's what I called,

4   Your Honor, the litigation merry-go-round, right there.

5          For the record, I know firsthand the struggle of

6   housing insecurity and living on the edge of homelessness.

7   Growing up with a -- a -- a mother who's -- was a single

8   immigrant mother with a third grade education, we rented rooms

9   and basements, and our toilet and shower was an outhouse in the

10  backyard.  We didn't live in the country.  We didn't live in a

11  rural area.  We lived on 16th Street near downtown San Diego,

12  adjacent to an alley in an urban environment.

13         Our landlord would come calling once a month,

14  banging on the door and shouting at my mother, demanding the

15  rents.  And I can remember being terrified, quite frankly being

16  very embarrassed too, being very embarrassed of the situation,

17  not knowing if my mother who worked her fingers to the bone was

18  able to scrape enough money to pay that rent.  The rent was

19  due.  There's -- unquestionably, the rent was due.  But we just

20  simply didn't have that rent.  So that insecurity of not

21  knowing if you're going to have a roof over your head, no one

22  deserves to live like that.

23         That's why I'm working so hard and why I probably

24  sound like such a broken record at this point to accelerate

25  City 14's response to this crisis.

1      Decades ago, it was a collective effort that created

2  Skid Row and only a collective effort can reverse it.  That's

3  the City, the County Board of Supervisors, the governor, the

4  legislature, and federal leaders working together, something

5  that may be innovative, groundbreaking.  It's about

6  communication and talking with each other.  And quite frankly,

7  there's not enough conversations, even within the city family

8  of Los Angeles.

9      I thank you once again, Judge Carter, for the role

10 that you have played, you know, once again, Judge Birotte,

11 Special Master Martinez, for giving my district and especially

12 Skid Row a seat at the table with this ongoing conversation.

13      Thank you very much.

14      THE COURT:  Well, you and I have walked down the

15 street so many times in Skid Row along with community leaders

16 and advocates.  Can you briefly describe just the plight of the

17 women who have come up and talked to us along the way?

18      COUNCILMAN DE LEÓN:  We have walked in the middle of

19 the night, during the afternoons, early mornings, under hot,

20 sweltering --

21      THE COURT:  Just a moment.  If you have one more

22 minute, I'm going to put up a slide in just a moment and have

23 you check my financials for a moment across the state.  Give me

24 one minute.

25      I'm sorry.

```
 1              COUNCILMAN DE LEÓN:  We have been there together
 2    when we've had torrential rain.  And we have seen many women
 3    huddled together, scared, exposed to the elements.  We have
 4    seen rats the size of alley cats.
 5              THE COURT:  I'm going to show them today.
 6              COUNCILMAN DE LEÓN:  And we have had many women who
 7    have said very clearly -- we have engaged, we have talked.  We
 8    have women come up and say, "If you give me a room, I will take
 9    it in a heartbeat."
10              THE COURT:  I want everybody to hear that.  A simple
11    room, just give me a room for the night even.
12              COUNCILMAN DE LEÓN:  So, I mean, there's -- you
13    know, aside from anecdotal, experiencing evidence -- obviously
14    we have enough empirical evidence to know that if we offer the
15    type of roof that they need over their head, short, long term,
16    they will take it.
17              And the very fact that we have so many women is
18    morally reprehensible, that women who -- who had children,
19    women who raised us, women who protected us, women who clothed
20    us, women who fed us find themselves in a situation where they
21    have very little dignity and respect.  And the response from
22    government -- again, at all levels -- has been underwhelming,
23    to say the least.
24              THE COURT:  I'm concerned that all of us, including
25    the Court, have taken a position about what we can't do.  We
```

**UNITED STATES DISTRICT COURT**

1    are so used to a mindset of this just can't be done.  That

2    scenario has to change, even in a small way.  And Skid Row is

3    not a small way, but Skid Row could be the genesis of something

4    for the entire city; although, I'm treating Skid Row

5    significantly different than other parts and I'll explain that

6    later.

7              Could I put up the first slide for a moment?

8              Chairwoman, as a member of the board, these are

9    rough figures.  And I know nobody's reading 109 pages.  Okay?

10   I wanted to get to 200.  I'm just kidding you.  But the one

11   thing I want to start with are just some rough figures because

12   I've ordered the City to do certain things.  And I know that

13   they believe that there's a stay, et cetera.  But I'm warning

14   the City and the County that if the Circuit has me go forward,

15   these times are going to put you under a lot of pressure

16   because I'm not changing them.

17             So I'm actually going to start with some rough

18   figures for a second, just this -- this is just the Court and

19   three law clerks and two externs just looking at public

20   documents for a moment.

21             And call me on this because I'm going to demand this

22   from the City and the County in more finite terms.  But about

23   $13 billion in the last three years --

24             And could you put up Elaine Howle's statement for

25   just a moment?

1       This isn't the Court.  "California has spent
2  $13 billion in just the last three years on the massive
3  homelessness problem.  The auditor said that the approach to
4  dealing with homelessness is so fragmented and incomplete, it
5  actually hinders efforts at getting people into stable
6  housing."
7       Now, I understand that that 13 billion is statewide,
8  but we also understand that a tremendous amount of money came
9  to all of us in Los Angeles County.  Now, hold on.  That's
10 $13 billion in three years.
11      If I could go back to the first slide again.
12      We know HHH has $1.2 billion over 10 years.  And
13 it's arguable whether it's 480 homes or 483 homes or maybe just
14 north of that now, but we're building out in four years.  Let's
15 say 500 HHH so far.  I stayed that portion of my order to make
16 sure I didn't interfere with anything concerning HHH at the
17 present time.  But you'd have to be a little dense not to know
18 that the Court's looking at parking lots, at motel rooms and
19 everything else because if we moved into the next step, the
20 Court might be looking at a far different scenario in terms of
21 commandeering.
22      Now I want you to go down to Measure H funds,
23 $3.5 billion.  That's a rough estimate over 10 years because
24 originally we were going to generate that amount of money.  And
25 in 2017, 2018, Mr. Miller, how much Measure H was generated?

1   216 million.  Excellent.  What was the under on that?  It was

2   about one-third.  So about $140 million was generated,

3   approximately, in 2017, 2018.

4          I'm going to show you a couple of slides in a moment

5   because I'm deeply concerned about what information the Board

6   is getting in good faith to vote on in just a moment.

7          Let's move down.  Proposition J has a lot of

8   controversy.  It hasn't wrapped up yet, but it's got a

9   controversy going between the advocates, et cetera, and the

10   City.  And the advocates will estimate about 900 billion -- oh,

11   strike that -- 900 million per year.  The City will come back

12   and say about 300 million.  And there's a huge -- 300 million?

13          SPECIAL MASTER MARTINEZ:  The County, Measure H.

14          THE COURT:  I mean -- I said -- yeah, Measure H.

15          There's a discrepancy going on between what it's

16   going to generate, whether it's 300 million or 900 million.

17          Now, Governor Newsom just made an extraordinary

18   pledge.  It's $12 billion.  But it's not over three years, it's

19   over five years.  So in one way of looking at this, if we've

20   had $13 billion in the last three years according to

21   Elaine Howle, now we've got $12 billion over five years.  And I

22   know locally you've been asking for $20 billion.

23          But the Governor also kicked in 1.5 billion for

24   additional Caltrans.

25          All right.  Could you go to Slide No. -- and I

```
 1    expect this to come from the County and the City.  This is just
 2    rough figuring, and I can be called on this at any time.  But
 3    I'm going to put it up on the board.
 4          And would you turn to Slide No. 7 and follow this
 5    closely.  I'm going to go into HUD funding for a moment.  And
 6    this is the last 24 months.
 7          If you look at the right-hand column, about
 8    $662 million just out of HUD funding.  Now we've got LAHSA,
 9    we've got L.A. City, L.A. County; rough figures, 495.  And then
10    you've got some overlap, but about $2.6 billion have been
11    expended over the last 24 months.  So what it means is we're
12    already at a billion-dollar budget that the Mayor's proposed
13    for a long, long period of time.  There's nothing shocking
14    about this.  It's a good faith effort.
15          All right.  Go back for just a moment.  On the city
16    level, how much unexpended funds for homelessness were
17    unexpended last year?  In other words, instead of saying that
18    we don't have money, how much money did you have left over last
19    year that was designated for homeless that you didn't even
20    spend?
21          I'm speaking to you.
22          MR. MARCUS:  Scott Marcus for the record on behalf
23    of the City of Los Angeles.
24          Your Honor, my understanding from the budget is
25    there was approximately $150 million from last year that was
```

1    rolled into the current budget to be expended this year.

2            THE COURT:  Exactly.  Look down at the bottom line.

3            SPECIAL MASTER MARTINEZ:  160.

4            THE COURT:  160.  So excellent.  You're very close.

5            So I keep wondering if we have a money problem and

6    not an accounting problem.  And now I'm going to walk you

7    through something very complicated and I'm going to start

8    asking you some tough questions because I've got an order out

9    there demanding an accounting from the City and the County.

10           All right.  Could you turn to No. 9.  And this is a

11   letter in good faith that the Board received on February 14th,

12   2020.  And in this good faith letter that we received, it says

13   that Strategy B -- and what's strategy B?  Section 8.  Okay?

14   And rent.

15           Okay.  Go to No. 9.  You have that up now?  9.

16           Okay.  Now, pay close attention because this is

17   going to get complicated and it's going to lead to some

18   questions that, as the chairperson, you can answer and, as the

19   councilman, you can answer.  And I wish Mark Ridley-Thomas or

20   the Mayor were here.  I'd like them to answer it or whoever.

21           But let's read together.  "Strategy B, Measure H

22   funding," which is really the county, "to support LACDA's

23   homeless incentive program which offers monetary incentives to

24   encourage landlords to rent their available units to homeless

25   Section 8 voucher holders."  It actually -- B4 does more than

 1    that, by the way.  That's a quick summary of it.

 2              Now, this is artfully worded.  Only lawyers can make

 3    this up.  Are you ready?

 4              "However" -- and wherever you see "however" with a

 5    comma, watch out.  "However, we identified opportunities" -- I

 6    want you to circle the word "opportunities."  Pardon the

 7    expression, that means you screwed up -- "where LACDA can

 8    improve and strengthen controls over strategy B4 measures.  For

 9    example, LACDA could not readily provide the detailed

10    supporting documentation for their July through September 2018

11    performance data."

12              So as you look through these documents, you'll find

13    that there's a snap audit that takes place in July through

14    September of a very limited number of providers.  And

15    eventually, I'm going to ask you, as you read through these

16    documents with me, Mr. Miller, since you're the county in

17    Measure A, some very difficult questions about data that was

18    retained or not retained or ever given to the Board for their

19    consideration.  So follow this closely.

20              Now, I want you to turn the page to Slide 10 for a

21    moment because when I first came to this court, General Jeff

22    came up and said this is a homeless industrial complex, that

23    this money isn't hitting the streets, that the providers,

24    et cetera, aren't providing.  And Shayla Myers has come back on

25    a number of conversations and said, yes, they are, they're

 1    doing a good job.

 2          So I want to look at the first box.  And it says

 3    right where the 1 is -- and I'm going to read it because it's

 4    small print.  "During our review, LACDA," which, of course, is

 5    Los Angeles County Development Authority, "could not readily

 6    provide the detailed supporting documentation for their July

 7    through September 2018 performance data.  Specifically, LACDA

 8    did not maintain point-in-time details for the reporting

 9    period, i.e., and instead maintained realtime running totals."

10    Well, what does that mean?

11          Mr. Miller, what's the difference between realtime

12    running totals and point-in-time?

13          MR. MILLER:  I don't have a clue, Your Honor.

14          THE COURT:  Well, hypothetically, point-in-time

15    might be I submit something to you with dates, a bill, and it

16    tells me what that bill's for.  And realtime might just be a

17    compilation of a running total, if you will, of bills that

18    mount.  So I bill 100,000, I bill 150,000.  But I'm going to be

19    asking you in this audit in just a moment -- because I'm not an

20    expert, I'm just going to point out some details for you.

21          MR. MILLER:  I'm not an expert on the audit either.

22          THE COURT:  Well, that's okay.  We'll struggle

23    through this.  We both went to UCLA; right?

24          MR. MILLER:  Right.

25          THE COURT:  All right.  Here we go.

1        Now, what happens is that there's a recommendation,

2    your auditor did a good job.  It says "increased risk of

3    inaccurate and/or unsupported performance data."

4        Now, turn the page for a moment.  And No. 2 on

5    Slide 11, "We noted that LACDA does not require the PHAs to

6    provide supporting documentation, such as detailed accounting

7    records, at the time the quarterly expenditure reports are

8    submitted."

9        And then if you read carefully, they went back to

10   your two largest providers who hadn't supplied the

11   documentation.  And this is really a fuzzy line.  It can be

12   read two ways, that your provider actually supplied the

13   documentation and LACDA was able to put it together; but it

14   could be read a different way, that providers didn't have the

15   documentation and LACDA had to construct this themselves.  And

16   what's the bottom line?  Increased risk of inaccurate and/or

17   inappropriate financial reporting.

18       Now, as the chairperson, I sincerely -- I'm going to

19   speculate that the Board even knows about that.  But I want you

20   to remember the following:  July through September of 2018.

21   Right?

22       So, Mr. Miller, if you'd be helpful, could I borrow

23   you with no affront?  Could you write down 216 million right up

24   here for me?  2017 to 2018, just 216 million.

25       MR. MILLER:  Sure, Your Honor.

1          THE COURT:  Okay.  Thank you for your help.

2          MR. MILLER:  No problem.  216 million.

3          THE COURT:  216 million.  That's your Measure H.

4          The implementation date, if you look off on the

5   right-hand corner, is a year and two months later.  So in this

6   snap audit, what our bureaucracy is discovering is, oops, we've

7   got a problem in terms of inaccurate and not supported data.

8   But we're going to take a year and two months to implement

9   that.  And if you look at the right-hand corner of both the

10  former documents --

11          And flip them back, Alexa, so they can see it.

12          -- we implement in October of 2019.  So one year and

13  three months later.

14          Now, in the meantime -- and this is going to get

15  complicated -- I want you to turn to Slide 15 for a moment.

16  And if you can track this, you're going to unlock -- because

17  some of these providers are just excellent, by the way.  Some

18  of them may not be supplying you any data at all.

19          I want you to go down to 15, and I want you to find

20  the third bullet point down.

21          For context, in 2017 through 2018, the total

22  allocation was $216 million and underexpenditures were

23  33 percent.  So if you take your 216 and you roughly take a

24  third away, you've got about $140 million of Measure H funds

25  flowing through in 2017 to 2018.  Okay?  Because --

1          So, Skip, could you do me another favor?  Could you

2   just write in parentheses about 140 million.

3          Now, after you do that, I want you to walk down

4   through these minutes -- apparently I don't have a life, so I

5   read all this stuff because it's public documents -- and I want

6   you to go down -- one, two, three, four, five -- six bullet

7   points.  And you're going to see Measure H revenue for fiscal

8   year 2018 to 2019 is 398 million.  And it exceeded our initial

9   projection that year of $350 million.

10         But we have a deduction here.  And if you go all the

11  way up, you'll find a deduction of $58 million in

12  underspending.

13         So really, our Measure H that we actually expended

14  that year, Skip, is 340 million.  So do me a favor.  Put down

15  2018 through 2019, put down the initial figure of 398 million

16  and then the actual figure, because we didn't spend all that,

17  of 340 million.

18         Now go down to the bullet point right below it and

19  you'll see it is projected that fiscal year 2019 to 2020

20  Measure H revenue will also equal 398 million.  We

21  undercounted -- Alexa, what? -- 500-million something after the

22  deductions?

23         I'll have you gather this for me because I'm not an

24  accountant.  But you really had about 503 million, we think,

25  that came in, but that's going to be subject to the audit you

1  present to me.  And you had an underage, and we think that you

2  had about 340 million that you actually expended that year.

3          So, Skip, just rough figures, take 398 -- well, it's

4  really 503.  And I'm sorry, it should be about 440 million.

5  But we'll just take these figures that come from the County,

6  we'll take 398 and we'll under-represent this for you at about

7  340 million.  Well, we think it's 440 million, a year more.

8  Okay?  Got all that?

9          MR. MILLER:  No, I don't.  I'm sorry.

10         THE COURT:  You want me to come down and do it?

11         MR. MILLER:  Um, I --

12         THE COURT:  Okay.  Skip, 2017 to 2018, 216 million.

13         MR. MILLER:  Okay.

14         THE COURT:  2018 to 2019, I want you to put in --

15  398 million minus 58 million -- 340 million in Measure H.

16         MR. MILLER:  Okay.  58, the difference is 58.

17         THE COURT:  Now, 2019 to 2020, you can take the

18  County's figures but they're under-represented, 398 million.

19  You're really about 503 million, but we'll take their figures.

20         MR. MILLER:  Okay.

21         THE COURT:  Okay.  I want you to go -- and we're

22  almost done -- to Slide 12 for a moment and look at LACDA's

23  response.  Because on January 22nd of 2020, without the Board

24  knowing, in my opinion, information came back as follows:

25          There's an agreement between LACDA and the providers

```
 1   that from now on we're going to have printed on the report to
 2   ensure that the reporting period reflects the point and time
 3   details that correlates with their data.  Someone could read
 4   that as bills being handed in without dates, not able to match
 5   up the project; and, number two, that the providers are
 6   retaining the data that is never going over to LACDA.
 7           And therefore, Skip, when you keep calling my
 8   Special Master, that's the very thing that Michele is demanding
 9   from you that apparently you're not absorbing.
10           In this audit, I'm also asking -- and not documents
11   now flowing in.  This better freeze at this point.  There could
12   be speculation that LACDA didn't get the underlying data, that
13   this data is being retained by the providers and only through a
14   spot audit with two of the providers is this being
15   recommended -- or being noted with literally tens and tens and
16   tens of providers out there.  Now, I don't know that, but
17   that's one of the things I'm asking for in the audit.
18           MR. MILLER:  I hope --
19           THE COURT:  And Michele's made that clear to you and
20   your associate.
21           MR. MILLER:  Yes.
22           THE COURT:  And the response we got back was it's
23   something new.  It's not new.  And that's an order by the
24   Court, unless the Ninth Circuit stays me.  There has to be
25   accounting here.
```

 1          I believe that after this, the Board then got the

 2   February 20th letter.  And the Board in good faith for the

 3   first time saw this and saw the attachments and probably didn't

 4   think much of it with all the volume going on and the random

 5   audit back in July through September of 1968.  But the spot

 6   audit doesn't show any data.  It doesn't even show dates.  It

 7   doesn't even show that LACDA got the information because LACDA

 8   is trying to reach back to the provider to construct it.

 9          Now, 99 percent of your providers are probably doing

10   just a great job and can justify it.  So it's not an

11   accusation.

12          So the complement is if this has been rectified

13   going forward, this is a good lesson for all of us.  So let's

14   move forward in good faith with our providers, supplying this

15   data.  But if not, we've got about $600 million that flowed

16   through with no accounting.  And that seems to match with what

17   Elaine Howle is saying because if you would now turn back to

18   the state level and you would turn back to Slide 5 -- and let's

19   read this together.

20          "The state does not track the funding it provides to

21   combat homelessness."  Let me repeat that in case any of you

22   missed that.  "The state does not track the funding it provides

23   to combat homelessness, which could perhaps be the biggest

24   problem of all.  There is no single state entity that

25   comprehensively tracks the sources of funding, the intended

44

 1    uses, or related expenditures for these programs, nor does the

 2    state," quote, "track how much funding is available to spend

 3    towards addressing homelessness statewide."

 4              Look, forget the past.  But if this was a problem

 5    then, just make certain that now that this data is coming into

 6    LACDA from our providers in good faith with a correct date and

 7    time so we can match up what they're doing, so we can have

 8    milestones and accountability here, because the argument could

 9    be made about 600 million or more flow through with no

10    accountability, no tracking.

11              Now, I don't know.  So, Skip, I'm going to work with

12    you on that, hopefully as soon as the stay is lifted.  But if

13    they lift that stay, you've got about 30 days to get this

14    information together for me because I'm not backing off my

15    dates.  Okay?  They're going to have to stay it permanently, in

16    other words.  So I'm putting you on fair notice.  I would be

17    working on it now, hopefully.

18              Okay.  If all of you have absorbed that, I want to

19    compliment you.  Okay?  You've got to really read through the

20    records.

21              And I'm going to challenge you all also to do one

22    more thing.  Go back through and show the Court and your

23    client, the Board of Supervisors, where any person, from

24    Phil Ansell down, ever notified our Board up to February 20th

25    that this data was missing.  I can't find it.  And I want you

 1  to verify that.

 2           So in short, 2017, 2018, do we have records or not?

 3  2017 up to July/September, we know on the spot audit we don't

 4  have it.  We don't even implement now for a year and three

 5  months later.  So we've got one year, two years this

 6  pass-through.  It doesn't even come to the Board's attention

 7  until an inter-memo between the offices on January 22nd and

 8  finally to the Board on February 20th of 2020.

 9           All right.  Thank you.

10           COUNCILMAN DE LEÓN:  Let me just add one last final

11  point.

12           THE COURT:  So money is not the problem in this

13  Court's opinion right now.  Okay?

14           MR. MILLER:  Your Honor, can I make a request that

15  we have all these slides part of the record so that I can look

16  at this stuff?

17           THE COURT:  Absolutely.  In fact, I've got more if

18  you want.

19           MR. MILLER:  I think -- I think we'll take what we

20  have so far.

21           THE COURT:  Skip, lots more.  Because it's not an

22  accusation.

23           Hey, look, I can humbly be wrong.  But when you read

24  this, it doesn't look like there's any accounting going on.

25  There's no match-up with the providers.  I think your providers

1 are honest.  The demand should have been made by the County

2 under Measure H about where this money was going, and our Board

3 should have been notified years before, if --

4 　　　　　MR. MILLER:  Okay.  Well, all I want is these

5 slides.

6 　　　　　THE COURT:  Get together with Michele.  We've been

7 calling back and forth.  In the beginning, let's say not quite

8 the response we'd like.  We'd like to work with you.

9 　　　　　MR. MILLER:  Okay.

10 　　　　　THE COURT:  Okay.

11 　　　　　MR. MILLER:  Thank you.

12 　　　　　THE COURT:  Okay.

13 　　　　　COUNCILMAN DE LEÓN:  Your Honor, if I may --

14 　　　　　THE COURT:  Please.

15 　　　　　COUNCILMAN DE LEÓN:  -- I do have to get back to

16 work.

17 　　　　　Let me just say in conclusion that I think that the

18 exercise that we just went through --

19 　　　　　THE COURT:  That's not an exercise.

20 　　　　　COUNCILMAN DE LEÓN:  What I mean, it is highly

21 informative because past performance informs future outcomes.

22 And I really want to underscore that.  Past performance with

23 taxpayer dollars informs future outcomes.

24 　　　　　And, quite frankly, I am scared to death that the

25 minimum proposal from our Governor Gavin Newsom at $12

```
 1   billion -- legislative leaders have the ability to negotiate a
 2   higher price point, 12, 14, 16, 18, $20 billion.  That is part
 3   of the negotiating.  That's what I was a part of when I was
 4   leader of our California State Senate.
 5          But if we do receive a minimum threshold of
 6   $20 billion from the state, what we just witnessed right now at
 7   every level of government, county and city, it scares me to
 8   death because, again, let me underscore again that past
 9   performance with taxpayer dollars will inform the future
10   outcomes.
11          Therefore, when I took office -- and I'm not an
12   expert on housing, I'm not an expert on homelessness.  You
13   know, my expertise is, quite frankly, on energy and climate and
14   immigration.  I found out that dollars that have been utilized
15   are highly inefficient, highly wasteful to the point that you
16   quoted General Jeff with the homeless industrial complex, very
17   powerful players at every level that have a stake in this.
18   And, quite frankly, I've seen the bureaucracies here in
19   Los Angeles that makes the DMV look like a well-oiled machine.
20          And if you have the same structure, the status quo
21   of the same players, political and not elected, receiving
22   dollars to deal with the 60,000-plus and the 40,000-plus we
23   have in the city, you know, it's a recipe ripe for disaster.
24   We're going to have to make very deep structural changes.
25          And one thing I'll say is -- and I will applaud, you
```

know, Hilda Solis, the Hilda Solis Care Village in terms of

building it, in terms of efficiency, a price point that is

relatively less expensive than the traditional projects that

we've created, even among the nonprofit housing, you know,

organizations who in Sacramento just killed the bill from

Assemblymember Miguel Santiago that will allow that very same

model to be utilized and duplicated and scaled up.

THE COURT:  Yeah.  By the way, let's keep going with

Measure HHH.  There's no -- let's complete this.  But I'm

looking for something desperately from both of you and from the

City and County by agreement so the Court doesn't have to say

let's be quite as diligent.

If it's an agreement between the two of you with

milestones -- and let's start someplace.  And so I've chosen

the epicenter that has the most racial disparity, women to

start with, then families, and tailor it as narrowly as I

possibly can.  And if that works, I'm treating Skid Row

completely separate because I'm worried about gentrification.

I want this to be voluntary.  I wrote that into my order.

Although, we're going to get into a discussion today, I think,

about another provision.  And we'd like to work with you on

this, frankly.

COUNCILMAN DE LEÓN:  We will.  And, Your Honor, I

will, rest assured, this week be calling, you know, Supervisor

Hilda Solis and she'll call me.

 1          THE COURT:  And I won't ask why the County didn't

 2   participate in this.  I'll leave this to the attorneys.  But

 3   I'm going to bear down on this a little bit with Judge Birotte

 4   sitting right here available to you.  But we've gotten no call.

 5   We've just gotten stonewalling.  And so for the benefit of the

 6   citizens of this great county and city, you should be talking

 7   to each other.  And that's not happening.  That's not

 8   acceptable.

 9          COUNCILMAN DE LEÓN:  I agree.  The more we talk, the

10   less the lawyers talk, the better, you know, at the end of the

11   day, you know, quite frankly.

12          MR. MILLER:  Amen.

13          COUNCILMAN DE LEÓN:  With that --

14          THE COURT:  Thank you.

15          COUNCILMAN DE LEÓN:  -- thank you very much,

16   Your Honor.  Thank you.

17          THE COURT:  I want to thank both of you.

18          And these aren't accusations yet.  And I could be

19   absolutely wrong.  But when you read these documents, I'm

20   really concerned about the data that you got -- the information

21   you didn't get, quite frankly.  It's pretty well laid out.

22          Okay.  All right.  I want to invite Ron Galperin to

23   come up for just a moment and then I want to turn --

24          SPECIAL MASTER MARTINEZ:  Representative.

25   Representative, yes, Judge.  The representative.

1    MR. MARCUS:  Yes, Your Honor.  We have the chief of

2  staff of the Controller's Office.

3    THE COURT:  Yeah.  I'd appreciate it if you'd place

4  a call to Ron Galperin as a courtesy to the Court.

5    MR. MARCUS:  If I can have a moment to speak with

6  the chief of staff.

7    THE COURT:  Certainly.

8    MR. MARCUS:  Thank you.

9    THE COURT:  This is his audit, his name, and I would

10  appreciate that courtesy.  And I can wait all day if you want

11  to.

12    MR. MARCUS:  Do you want -- did you want to hear

13  from the chief of staff first, Your Honor?

14    THE COURT:  No.

15    UNIDENTIFIED SPEAKER:  That's fine.  We can call

16  him.

17    THE COURT:  He's an independent body, an independent

18  agency, I'd appreciate hearing from him.  This was on notice

19  today.  I was specific about his appearance.

20    UNIDENTIFIED SPEAKER:  Certainly.

21    THE COURT:  All right.  Thank you.

22    We'll go on to a couple of other -- you're going to

23  help me, Ms. Myers, because you had a concern over HIPAA before

24  when we were down in Skid Row.  And I respect that.

25    I'm going to show some photos that do not comply

```
 1   with HIPAA and then you're going to -- because nobody is going
 2   to take a photograph of what I'm about to show.  Understood?
 3   But then you're going to work with my clerks and you're going
 4   to cover up, just like we did the other day, three photos that
 5   we think is a concern about HIPAA.  But I'm not going to
 6   dehumanize this.  And I know you're objecting to this, but I
 7   want people to see the agony.
 8            MS. MYERS:  Your Honor, can I just clarify what our
 9   objection is related to HIPAA?  Because I just don't -- I don't
10   want it misrepresented in the record.
11            Our objection to HIPAA was that it was the
12   Department of Mental Health, which is a service provider,
13   presenting information about individuals who are in the care of
14   the Department of Mental Health which would be a HIPAA
15   violation.
16            THE COURT:  All right.  Thank you.
17            MS. MYERS:  HIPAA obviously does not ban the Federal
18   Court, but we do think privacy and decorum is appropriate for
19   people who are not participating in these court proceedings.
20            THE COURT:  I do too.  That's why we'll take off the
21   eyes for any docketing, et cetera.  In other words, I'll have
22   you blank it out, but I'm going to show these in court over
23   your objection.
24            Slide 15.  Most of you haven't come down to
25   Skid Row.  Many of the attorneys appearing in this court today
```

```
 1   haven't journeyed down there, at least other than maybe a
 2   drive-by.  So it's just a lady.  She wants housing.
 3          Next one.  We didn't wake her up.  Now, you may have
 4   grown used to it, but I haven't grown used to this.  I don't
 5   see how anybody could get used to this.
 6          Next one.  This is in front of the Downtown Women's
 7   Center.  And by the way, I'll say for the record I think
 8   they're doing a terrific job; although, we've had some
 9   disagreements.  That doesn't concern the Court because these
10   are women lining up in the morning.
11          Now, they can only take in so many women.  But along
12   the front of the Women's Center, there are tents where the
13   women congregate and cluster for protection.  And I don't care
14   what's said in my court by advocates or by you as counsel.
15   When you talk to these women individually, they want a room.
16          All right.  28.  I didn't take the face of this
17   lady.  She just got off the phone -- plane from Hawaii.
18   Because I'm wearing a coat and tie, she apparently thinks I'm
19   some kind of official and she walks up and says, "Where's my
20   housing?"  I mean, literally fresh off the plane, going to
21   Skid Row with her child, absolutely vulnerable with no place to
22   stay.  If that doesn't break your heart, you just don't have a
23   soul.
24          29.  I've shown this before.  This is the rain.
25   I've got a multitude of these.  This is hypothermia.  And we
```

```
 1   can't even get started with women on Skid Row?  You've got to
 2   be kidding me.
 3            Next one.  I call her grandma.  She is the sweetest
 4   little lady, Spanish speaking.  You'd fall in love with this
 5   little lady.  Pastor Don -- and by the way, if you don't know
 6   it, Kevin de León got her a room.  They split the cost,
 7   1400 bucks out of their pocket personally.
 8            31.  Just another shot of the Downtown Women's
 9   Center, doing a terrific job, by the way.  I'll put that on the
10   record.  Women lining up in the morning.  They just can't
11   accommodate the need down there.
12            And by the way, if the community gets involved --
13   and they've told me that the City was going to not be
14   cooperative -- and I'll leave that on the table for a moment --
15   on a particular evening.  But there are so many women down
16   there that could just use even one night or ten nights in a
17   hotel room, just getting a shower, getting cleaned up.  If they
18   want to return to the street, their choice.  But for God's
19   sake, break the cycle.
20            Number 32, tents in front of the Women's Center.
21   These are the women who camp in front of the Women's Center for
22   protection.  Let me repeat that.  These are solid women up and
23   down that street.  I dare you to talk to any one of them.  And
24   any one of them will specifically tell you, "Judge, I'm getting
25   assaulted out here.  I've been raped.  We cling together for
```

1  safety." I just ask you how -- and I include "we." How do we

2  as the Court and you as the City and County allow this to

3  happen and then say that this is going to continue on for the

4  decades it's been going on? This has to turn now or it's never

5  going to turn.

6          All right. 33. This is one of the advocates,

7  terrific lady. This is just another group gathering in the

8  rain of women.

9          34. Now, I didn't blow this up, but I want you to

10  look down. There are four women in that photo alone. You have

11  no idea how many women are on Skid Row, a huge number. I

12  thought it was down to the teens or 20 percent. No, it's way

13  up there. I don't know if it's 35 percent or what. But I'm

14  going to hear from Amy in just a few moments for Downtown

15  Women's Center because I just got your document. And thank you

16  so much.

17          I showed this clear back in March, No. 35, a woman

18  just crawling on the street. Police officer is going to help

19  her up in just a moment. Here she is. And, of course, her

20  face needs to be blocked out.

21          Okay. 37. I sent these to Carol Sobel all one day.

22  These are my rat pictures I sent you when we still talked. Oh,

23  you remember them because you wrote me an e-mail. I'll show

24  you the e-mail.

25          38. You're going to condone that as a City and

1  County?  You have no excuses.

2  　　　　39.  More rats.  There's a big one over there by the

3  Coke bottle.  I mean, he is on the move.  By the way, there's a

4  whole family coming out of that tent.  So maybe some of you

5  lawyers should get down there and take a look around.

6  　　　　This is not my photo.  It's not any of your photos.

7  It's not Michele's photos.  It's not General Jeff's.  It's

8  nobody's photos.  This comes out of actually one of your

9  magazines.  I think it's *Box* or something.  So this lady's face

10  was already exposed.  But, Shayla, if you want to cover it up,

11  that's fine.  I don't care.

12  　　　　All right.  Take a look at this, 41, for a moment.

13  Kevin and I walked down that street, and I think we talked to

14  minimally seven women.  I represent to you that if the

15  councilman was here, he would share with you every one of those

16  women wanted to go into shelter for some limited period of

17  time.  We didn't define it.  Someone heard about Roomkey.  They

18  just wanted to get off the street.

19  　　　　44.  There's your feeding line.  Blow that up and

20  see how many women are in it.

21  　　　　43.  Now, we're going to blank out both faces or one

22  face if you want.  These streets, many of them are impassable.

23  People walk on the streets.  The ADA is almost a joke down

24  there.  So as we, as judges, write our orders about ADA, the

25  sidewalks are not passable, especially in the summertime.

```
 1   Everybody's in the streets.
 2             And by the way, that's part of the merchant problem
 3   for putting up fences and rock gardens.  And somebody's got to
 4   say that because you've been bickering so long that you're
 5   afraid to say it.
 6             Okay.  44.  Two ladies.
 7             45.  Just more women.
 8             46.  This is a lady.  She's shrouded and she's cold
 9   and she's just walking away.  If her ultimate is to live in a
10   box on the street, that's exactly what's happening because
11   somehow there has to be some ability to get folks off the
12   street while we build out these long-term shelters and get
13   these services.  So we need some balance.  And I'm afraid that
14   it got out of balance.  That's what part of my opinion was
15   about.
16             Okay.  Thank you very much.
17             His chief of staff, he'll be here at 11:45?
18             UNIDENTIFIED SPEAKER:  Correct, sir.
19             THE COURT:  That's fine.  And thank him for the
20   courtesy.  He's an independent elected official.
21             I'm just going to turn to Skid Row for a moment
22   because there's been a lot about fire recently.  Oh, up in the
23   Palisades, everybody's very concerned now because a fire broke
24   out.  And there's a huge statistical number of fires in the
25   cities, but those have been existing quite a while.  It's just
```

```
 1   that the community seems to be waking up.
 2           But I just want to show you what's happening on
 3   Skid Row.  Because the Palisades fire gets attention.  But
 4   what's happening down in our communities down here also?  I
 5   mean, does it take the west side to wake up?  Because this is
 6   happening down in Curren Price's district, in Kevin de León's
 7   district, in Gil Cedillo's, in Buscaino's district, Marqueece's
 8   district.
 9           Next one, 50.
10           51.  These are your sidewalks.
11           52.  I just wanted to include a guy for a change.
12           53.
13           54.  These are typical.  I dare you to challenge me
14   on it, I dare you to go down yourself.
15           55.
16           56.  This is on the outskirts of Skid Row, by the
17   way.  This is Skid Row, it's over by the 10.  But this is back
18   in Skid Row.
19           57, 58, 59, 60.
20           I wanted to throw in a guy, 61.  See him in the
21   middle of the street.
22           All right.  The County wanted to be heard in light
23   of my opinion on structural racism.
24           So, Mr. Miller, structural racism.
25           MR. MILLER:  Okay, Your Honor.  I have a number of
```

```
 1   things I'd like to address with the Court, if it's all right
 2   with Your Honor.
 3           Your Honor raised -- you know, we had this agreement
 4   at the beginning of the case before I even got involved that --
 5           THE COURT:  No, this is on structural racism.  This
 6   is why we're having this hearing today.
 7           MR. MILLER:  But I have a question, if it's all
 8   right if I ask the question.
 9           And Your Honor commented that Your Honor hasn't been
10   talking to anybody since the litigation was activated.
11           THE COURT:  No, that's not true.  I told you
12   yesterday I completed a number of conversations that week and
13   the following week with Fred Ali and Miguel Santana.  I also
14   have been getting some e-mails from different people because I
15   tried to balance both sides, conservative and liberal.  I was
16   given a list of names by some of the advocates, some others by
17   others.
18           MR. MILLER:  That's not where I'm going.  I'm not
19   going there.  I'm not asking Your Honor what you've been doing.
20           THE COURT:  I cut that off as quickly as possible.
21   Now everything goes through Michele Martinez.
22           MR. MILLER:  My suggestion -- I have a suggestion
23   for the Court's consideration.  I think -- that's all I'm
24   trying to do.  And I understand the Court's not going to have
25   ex parte communications regarding litigation.  Of course.  That
```

```
 1    makes a lot of sense.

 2              But Your Honor's also referenced the possibility of

 3    the parties, you know, getting together and having a discussion

 4    perhaps with Judge Birotte, perhaps directly regarding

 5    settlement.  And I'm wondering if we could bifurcate those

 6    issues, no ex parte communications regarding litigation.  But

 7    if we wanted to have ex parte communications with Judge Birotte

 8    or even with yourself, Your Honor, if we could do that

 9    regarding settlement.  That's my question to you.

10              THE COURT:  We would not only welcome that, we think

11    that that's the proper role of the City and the County, to

12    eventually reach agreements along with the advocates and the

13    plaintiffs that far transcend my order concerning Skid Row and

14    my other orders.  But we need to hear that both of you are

15    willing to do that because I thought that we were in that

16    process when the County unilaterally filed and stopped that

17    process.

18              MR. MILLER:  The County didn't unilaterally file.

19    We received a notice from the plaintiffs that they were moving

20    for an injunction.  They activated the litigation.

21              THE COURT:  I see.

22              MR. MILLER:  Not the County.  When we received that

23    notice, we said, okay, we're now going to assert our legal

24    position.

25              THE COURT:  Just a moment.  You're absolutely right.
```

```
 1   My apologies.
 2               MR. MILLER:  So --
 3               THE COURT:  It's always good when a Court
 4   apologizes.  You're absolutely right.
 5               MR. MILLER:  I'll accept that.  Your Honor --
 6               THE COURT:  Okay.  Now, look at me for a moment.  Do
 7   you really want to enter into good faith settlement
 8   discussions?
 9               MR. MILLER:  I think that's what's appropriate,
10   yeah.
11               THE COURT:  Okay.
12               MR. MILLER:  I do.  You know, I kind of agree
13   with --
14               THE COURT:  Let me turn to your colleague next door.
15               SPECIAL MASTER MARTINEZ:  Mr. Marcus.
16               THE COURT:  No, I know who he is.
17               MR. MILLER:  I agree with the comments --
18   Your Honor, I agree with the comments that homelessness and the
19   homeless problem is a massive problem.  Okay?  Racism -- I'm
20   not going to debate racism, structural racism.  I'm not going
21   to debate that.  We didn't ask for a hearing on that.  I would
22   never sit here and say there's no such thing as structural
23   racism in this country.  That's not -- that's not our position.
24               THE COURT:  Then let me turn --
25               MR. MILLER:  Our position -- part of it's -- you
```

```
 1   know, we're in court, it's a legal issue.  But like the
 2   councilman said, the legal issue is one thing.  Solving
 3   homelessness, addressing homelessness is entirely different.
 4            THE COURT:  Yeah.
 5            MR. MILLER:  It's a totally different issue, though.
 6   Okay?  And our legal position is that that's something for the
 7   elected officials, not for the Court to do.
 8            THE COURT:  If you will step up on the public's
 9   benefit -- but the Court's not going to let this death spiral
10   continue and that's why the Court has stepped in.  And that's
11   for the Circuit to decide.  But look where we're at tactically.
12   Now, let's have a blunt conversation.
13            MR. MILLER:  Right.
14            THE COURT:  The Circuit upholds me and I move
15   forward and that injunction is lifted on the administrative
16   30 days.  That's one option.
17            Number two, they say, no, Judge Carter, not now,
18   administrative stay.  In fact, they even overturn my ruling.
19   Now we're going to trial, aren't we?  If you prevail, you have
20   no problem; but if you don't prevail, we just wasted about six
21   months to nine months and we're right back in the situation
22   because I'm the presiding judge facing these same issues nine
23   months from now.
24            MR. MILLER:  I -- I totally get where you're coming
25   from.
```

```
 1              THE COURT:  How many more are dead?

 2              MR. MILLER:  I totally get it.

 3              THE COURT:  Okay.

 4              MR. MILLER:  I saw the pictures.  I mean, the whole

 5    thing is -- I've been to Skid Row.  I've walked down there.  I

 6    haven't been with Your Honor, but I've been with other people.

 7    It's heartbreaking.  I totally agree with all that.

 8              And I get where you're coming from, I respect where

 9    you're coming from, the County respects where you're coming

10    from, the Board understands.  It's just that you've got to

11    decouple -- the legal position is this is something for the

12    elected officials, for government to resolve.

13              Courts address cases and controversies.  Okay?

14    There's not a single allegation in this Complaint about racism,

15    nothing.  So we don't really have a dispute, according to the

16    pleadings in this record, about racism.  They didn't even plead

17    it.

18              I'm not saying it's not an issue.  Your Honor

19    certainly spent a lot of time in the injunction addressing it.

20    It's a big issue in this country, we all know that.  This

21    country is a melting pot.  And right now, it's not melting too

22    well together.

23              But our position is really simple.  We're not going

24    to -- we're not going to put on witnesses.  We're not going to

25    argue about whether there's structural racism.  From a legal
```

```
 1   position -- and here I am, I'm not addressing homelessness.
 2   I'm just here to address -- just addressing the legality.
 3          From a legal position, we don't have -- we don't
 4   have a case or controversy.  We have a political question.
 5   Speaker after speaker has acknowledged this is a political
 6   issue.  It's not something the Courts get involved in typically
 7   or hardly ever.  There's ample precedence saying no.  It's not
 8   a Court function, and that's our position.
 9          What I would like to see done -- and I -- I'm trying
10   to be completely forthright and honest with Your Honor.  From
11   my perspective, there should be a settlement conference, there
12   should be a resolution of Skid Row, there should be a
13   resolution of homelessness in the county.  And it should be
14   between the City Council, Mayor, Board of Supervisors, and the
15   experts in this area, including perhaps Your Honor because
16   Your Honor's obviously developed a lot of expertise.
17          But legally, I don't see it.  I don't see it getting
18   resolved legally.  I don't see -- I don't see a preliminary
19   injunction accomplishing anything, quite frankly.  And I
20   understand Your Honor has the power of the Federal Court.  You
21   could order us to do audits.  But that's not really
22   Your Honor's role.
23          The real role here of a Court is to try to decide
24   the case between us.  And we're 100 -- in my opinion, my humble
25   opinion, we're 100 percent right on the merits.  Okay?  They
```

```
 1   have not pleaded proper claims against the County at all.

 2           So that is, um -- that's our position, but don't --

 3   don't mistake it for the County not wanting to resolve this

 4   issue.  We do.  We're working on it.

 5           Part of the reason we submitted the, uh -- you know,

 6   the very foot-and-a-half tall stack of documents and request

 7   for judicial notice, both in support of the motion to dismiss

 8   and the preliminary injunction, is we wanted to show Your Honor

 9   what the County's been doing.  The County is delivering

10   services.  You heard it from the Supervisor.  It's not -- I'm

11   not saying we've solved the problem, I'm not saying it's

12   perfect, but we're all over it.  We're spending a lot of time

13   and money and resources.  We have 11 county departments that

14   are working on homelessness across the board.

15           So that's our position.  Can we do more?  Every day

16   we try.  And I would submit it on that basis, Your Honor.

17   That's our position.

18           Thank you.

19           THE COURT:  Thank you.

20           Let me turn to the City.  The County has tossed out

21   the request to enter settlement negotiations.  What's your

22   position?  Because Judge Birotte and I are available, we always

23   have been.  But we're not going to do that unless there's some

24   enthusiasm involved and some meaningfulness to this.

25           MR. MARCUS:  Scott Marcus for the City.
```

1    Your Honor, we're all in favor of that.  The City's

2  been reaching out to the County for the last six months

3  attempting to do settlement discussions.  The leadership of the

4  City Council sent a letter to the leadership of the Board of

5  Supervisors inviting them to a meeting.  My understanding is

6  that meeting has been set.  And we're hoping it's going to be

7  the beginnings of the settlement discussions that we have been

8  wanting to have all along.

9    MR. MILLER:  Your Honor, could I speak for a minute?

10 My opinion?  City sounds willing.  I know the County is

11 willing.  You know, I know where the Board is coming from.  The

12 Board really would like to make more and more progress, make

13 even a much bigger dent in this issue.

14    In some ways, I think homelessness is intractable.

15 There are some people that aren't going to leave the street no

16 matter what.  And that's just the way it is.

17    But put that aside, I would suggest, my idea is that

18 Your Honor and Judge Birotte help facilitate the settlement

19 talks.  Your Honor and Judge Birotte have developed tremendous

20 expertise and depth.  And you do have the power of the Federal

21 Court behind you.  And I think that would be -- I think that

22 would be conducive to hopefully getting something done.

23    I think it's much better than -- I agree with the

24 councilman, I agree with the board member, I think it's a lot

25 better than litigating.  I mean, these are really interesting,

```
 1    heavy-duty legal issues.  But the real issue is homelessness,
 2    not winning in court.  That's how I see it.
 3              THE COURT:  L.A. Alliance?
 4              MR. UMHOFER:  Thank you, Your Honor.
 5              Mr. Miller's proposal is welcomed.  I know he's new
 6    to the case, and I know that he doesn't necessarily understand
 7    that there have been efforts at settlement for quite some time.
 8    And as the City pointed out, there have been efforts in the
 9    last six months since Mr. Miller's firm arrived in the case to
10    get settlement underway.  And the County has, let's say,
11    demurred on that point.
12              And I've had conversations directly with Mr. Miller,
13    and there's been no discussion of settlement.  So this is a new
14    and welcomed overture from the County.  And we are at the ready
15    and have been for the last year since this case began to engage
16    in meaningful settlement discussions to come up with a global
17    resolution to this humanitarian crisis.
18              THE COURT:  In my remedy section, you'll notice that
19    I treated Skid Row as its own unique entity.  I carved out a
20    section.  I don't think most of you are reading these orders,
21    quite frankly.  But in that, I encouraged a hyperlocal
22    approach.
23              So besides the intervenors -- by name, Shayla Myers
24    and Carol Sobel -- I've come to believe that the Valley has
25    nothing to do with the issues confronting Skid Row in terms of
```

1    gentrification, police sweeps, et cetera.  When you talk about

2    the two, this one size that fits all has been a real problem in

3    terms of maybe trying to reach an agreement.

4           And so if you read that order carefully, you'll see

5    that I carved out a section just for Skid Row and included a

6    hyperlocal approach and wanted the community involved because

7    some of the input, for instance, is specific.  I've known for a

8    while, we were given input that they liked Urban Alchemy.  Why

9    not?  I'm not an advocate for them.  It could be PATH, it could

10   be VOA, et cetera.

11          I know there's been a lot of talk about trailers.

12   I -- you know, if we put the trailer thing for a moment.  I'm

13   going to ask a couple more tough questions.  And that is a long

14   delay if you can reach a settlement for the benefit of the

15   entire city.  Why this?  Play that, this video.  This is --

16   you've got 50 or 60 million trailers that have been donated to

17   VOA that have been sitting around that we could use in the

18   interim period of time while we build out HHH housing, for

19   goodness sake.

20          Play it.  Just play it for a moment.

21          (Recording played.)

22          THE COURT:  The next slide because I want to show

23   you why these are so valuable for a moment.

24          Okay.  These are trailers set up in one of your

25   councilperson's district.

1    And the next one.  That's a play area for children.

2    And the next one.  Are these kids worth it?  You bet

3    they are, between living in a box and living in a trailer in an

4    interim period of time.

5    Now we're going to take out these kids' eyes -- or

6    black it out, I mean, so they can give it to the Circuit.  But

7    I'm going to make a complete record, and we'll send this up to

8    the Circuit.  They need to see this.

9    Mr. Miller, I'm not going to challenge you, but you

10   went dark for a number of months.  You say that you were

11   willing to negotiate, but that's not the input that came back

12   to Judge Birotte, to me, to my Special Master.  It's not the

13   input that L.A. Alliance is giving us nor the City.

14   MR. MILLER:  I'll give you the input that I told

15   them.  I didn't go dark as such.  What I said was you sued

16   us -- this lawsuit is a Skid Row lawsuit by property owners in

17   Skid Row and sued the County.  And the theory of the lawsuit is

18   that we provide concentrated services within Skid Row.  Well,

19   guilty.  We do provide concentrated services in Skid Row

20   because there's a lot of homeless that needs services in

21   Skid Row.  It's not a violation of the law to do that.

22   These are not our sidewalks.  They're city

23   sidewalks.  We provide services.  We take care of people.  You

24   know, we deliver as the health officer through various county

25   departments and administer to people in Skid Row.  And that's

```
 1   what I've explained to them.

 2              We don't need a lawsuit to tell us to deliver

 3   services.  Okay?  We're going to do it no matter whether

 4   there's a lawsuit or not.  We're going to continue doing it,

 5   and we're going to do what we can do, what we -- what we are

 6   obligated to do.  That's our -- that's our legal duty under the

 7   Welfare & Institutions Code and so forth.

 8              So I explained that to them.  It's not a question of

 9   going dark.  It's a question of, like, what do you want from

10   us?  You sue us because we deliver too many services in a

11   concentrated area where there are a lot of people that need it.

12   Well, pardon me, I don't think that's a basis for a lawsuit,

13   Your Honor.

14              So as far as settlement is concerned, yes, we want

15   to resolve -- we don't like being in lawsuits.  The County

16   doesn't like being in lawsuits.  We'd like to help be part of

17   the solution for Skid Row.  We think we're delivering valuable

18   services there.  And if there's more that we can do as part of

19   a resolution, that's fine.

20              I've never gone dark.  I've always been open.  I've

21   called them.  I've had discussions with them.  I'm not new to

22   the case.  I've been on this case for over a year now.

23              I remember the first meeting when COVID was starting

24   at the -- at the hotel, the -- I think it was the Alexandria

25   Hotel.  So I'm not new to the case.  I'm into the case.  We're
```

**UNITED STATES DISTRICT COURT**

```
 1    very, very focused on getting it resolved.

 2              Litigation -- I've said this now five times.

 3    Litigation doesn't help people who need help.  It just helps

 4    lawyers and it keeps judges busy.  And that's not -- that's

 5    not --

 6              THE COURT:  Well, I've got 400 other cases.  I'm

 7    busy enough.  Don't worry about me.

 8              MR. MILLER:  Yeah, I'm sure.  I've got a number of

 9    other cases too, believe me.

10              So, Your Honor, we're totally open to be part of the

11    solution, but it's got to be realistic.  Okay?  It's got to

12    take into account that we're delivering now.  So what more do

13    you want?  And we don't have an open checkbook.

14              THE COURT:  The Special Master would like to talk to

15    you for just a moment.

16              SPECIAL MASTER MARTINEZ:  Mr. Miller, thank you for

17    your comments.

18              Quick question because you said you want resolution

19    and coordination and collaboration with the City of

20    Los Angeles.

21              In my conversations, the City of Los Angeles has

22    produced -- and they showed us yesterday the 6,000-plus beds

23    that they produced through the Freeway Agreement.  As we know,

24    today -- and maybe I'm wrong, and I'm not an expert -- but

25    there are various beds that have been produced that there are
```

 1    no services being provided.  So you have an empty bed because
 2    they can't get the services from the County.
 3            At the end of the day, if the City and County can
 4    come together and the City is providing its bed, can the County
 5    move forward with the City to provide those services?  I don't
 6    think that's a big ask of the City.
 7            MR. MILLER:  I think we agreed in the MOU to provide
 8    what's called mainstream services.  So the answer is yes, of
 9    course.
10            SPECIAL MASTER MARTINEZ:  Fantastic.  Thank you.
11            THE COURT:  One of the bloggers, Meghann Cuniff, and
12    the *Los Angeles Times* also on one of their accounts actually
13    put forth the negotiations taking place between the two of you.
14    Judge Birotte and I were somewhat shocked.  We didn't know what
15    you two were negotiating, if at all.  And this involved the
16    City and L.A. Alliance, not the County.  You weren't involved.
17            So if this is really good faith and not just my way
18    or the highway, then it's worth our efforts.  But if this is
19    the same, you know, years of haggling back and forth between
20    the City and the County, I've made my position clear in what
21    this Court intends.  And so --
22            MR. MILLER:  I think Your Honor's made your -- the
23    Court very clear.  I would agree with that.
24            THE COURT:  Okay.  We're going to take a number of
25    other speakers, then, because -- and we'll come back to it.  So

```
 1   all of you talk informally.  And the intervenors get involved
 2   also, the Skid Row Advisory Council as well because I do intend
 3   to lean more and more on local communities.
 4            And to suggest that that's the place that we should
 5   be starting -- because Los Angeles is so big that this
 6   wonderful mosaic doesn't have commonality, once again, between
 7   John Lee's district or even Krekorian's district and Skid Row.
 8   Skid Row is its own unique entity.  That's one reason why I
 9   denied the effort to disperse the 50 percent out of Skid Row
10   and scatter them.  And there's a gentrification problem and
11   there's a policing problem down there.
12            MR. MILLER:  Your Honor, there's one other thing
13   that I wanted --
14            THE COURT:  How hard are you willing to work?  Are
15   you willing to work this weekend?
16            MR. MILLER:  Pardon me?
17            THE COURT:  Are you willing to work this weekend so
18   we know if this is just puffery or serious?
19            MR. MILLER:  All I do is work.
20            THE COURT:  Good.  Then that means you're willing to
21   work this weekend.  Is that right?
22            MR. MILLER:  I'm available whenever my --
23            THE COURT:  Well, where's Mr. Feuer?
24            MR. MILLER:  -- client wants me.
25            Your Honor, I just want to make one other thing
```

1    clear.  This is really important to the Board and to the

2    County, and that is the County -- and Supervisor Solis said

3    it -- firmly and strongly believes in care first.

4              THE COURT:  Then why aren't you getting this done on

5    behalf of the City, both the City and the County, as well as

6    the plaintiffs because, quite frankly, while the Court's going

7    to remain diligent -- and I'm taking my position now

8    strongly -- this ultimately rests with you.  And your inability

9    to reach an agreement is harming the City and it's harming its

10   population and homeless, period.  And this has been going on

11   too long.

12             Now I'll turn to Marcus for a moment.  Is the City

13   serious about this or is this just puffery?

14             MR. MARCUS:  Your Honor, the City has been serious

15   about this for months.  As I indicated, we engaged in many

16   negotiations with the plaintiffs.  We reached out to the County

17   on several occasions.  We now understand that the County is

18   reaching back.  We're excited about the possibility.

19             THE COURT:  And when would these settlement

20   negotiations begin?  Because as soon as everybody leaves,

21   people seem to have amnesia.  When would these settlement

22   negotiations begin?

23             MR. MARCUS:  The City is ready whenever the County

24   is, Your Honor.

25             THE COURT:  If not now, when?

```
 1              MR. MILLER:  Well, I just heard --

 2              THE COURT:  When would these settlement negotiations

 3    begin?

 4              MR. MILLER:  I just heard that the councilmembers

 5    and supervisors have arranged a meeting.  I just heard that

 6    from Mr. Marcus.  I did not know that.

 7              Is that correct?

 8              MR. MARCUS:  Yes.  I believe the meeting's been

 9    scheduled sometime the first week in June.

10              THE COURT:  No.  That's not serious.

11              MR. MARCUS:  Those are the dates that we got from

12    the County, Your Honor.

13              THE COURT:  But they'll take their lead oftentimes

14    from lawyers.  And you're going to be intimately involved in

15    these discussions.  In fact, you may be even driving these

16    discussions or non-discussions with the advice you give your

17    clients.

18              Okay.  Let's leave that on the table for now and

19    we'll see.

20              All right.  Then we're going to go back to

21    structural racism.  And when Mr. Galperin gets here, we'll --

22    we'll stop for just a moment.

23              We've had a number of letters -- and I'd like to

24    start with the Downtown Women's Center, with Amy for a

25    moment -- you were kind enough to submit to the Court this
```

75

 1   morning, and I also received your letter.  So if you'd like to

 2   come forward, please, make whatever comments you'd like to.

 3   But this was the request concerning racial -- I'm sorry,

 4   structural racism and the Court's opinion concerning that.  So

 5   please.

 6          MS. TURK:  Good morning.  Honorable Judge Carter and

 7   Special Master Michele Martinez, thank you so much for the

 8   opportunity to address you today.  I'm Amy Turk, the CEO of the

 9   Downtown Women's Center.

10          For over 43 years, the Downtown Women's Center has

11   been dedicated exclusively to serving unhoused women in the

12   Skid Row community and beyond.  At the heart of what we do is

13   listen.  We listen to women's voices, opinions, and

14   perspectives.

15          By hearing and heeding the voices of women in

16   Skid Row, we have been taking responsibility to address

17   homelessness, equitably and effectively.  This is how we have

18   become a social service provider that women can trust.

19          Judge Carter, in your April 20th injunction, you

20   powerfully called attention to the needs of unaccompanied women

21   and domestic violence survivors and specifically those who live

22   unsheltered in Skid Row.  And we are so glad that you did.  And

23   we are so glad that you have a firsthand experience of the

24   plight of people living in the Skid Row community.

25          Unaccompanied women and domestic violence survivors

1   have long been invisible to policymakers and have largely

2   slipped through the cracks of underfunded programs.

3   Unaccompanied women, women experiencing homelessness without

4   children, or other dependents make up 65 percent of all

5   unhoused women in Los Angeles.

6           Your injunction also makes clear that homelessness

7   is disproportionately endured by black women which reflects the

8   racism, engendered inequalities that have for too long been at

9   the heart of Los Angeles; that black women are upward of

10  60 percent of all women in Skid Row is simply unacceptable.

11          And that is why we are proud to stand before you,

12  the assembled government leaders and our fellow service

13  providers, to formally introduce Downtown Women's Center's --

14  Downtown Women's Center's Every Woman Housed Action Plan.

15          With your support --

16          (Telephonic interruption.)

17          THE COURT:  Carol, it's okay.  Don't worry about it.

18          Just a minute, Amy.  Just hang on.

19          (Pause in the proceedings.)

20          THE COURT:  Carol, it's not going to bother anybody,

21  so come on right back.  Okay?

22          Amy, go ahead.  Sorry.

23          MS. TURK:  To introduce our plan, the Downtown

24  Women's Center's Every Woman Housed Action Plan.  With your

25  support, Judge Carter, and that of the City, County, and

```
1    community partners, we can permanently end homelessness for

2    600 women and 55 families who are unsheltered in Skid Row today

3    as counted in the last homeless count.

4          The proposal also centers regional coordination and

5    builds up preexisting systems in the way that we have been

6    ending homelessness for women for decades that have also been

7    developed with local and regional partners for over the past

8    several years.

9          The Every Woman Housed Action Plan consists of

10   both -- and let me emphasize -- short-term responses that will

11   immediately eliminate the potential for additional death and

12   suffering on the streets and the long-term solutions necessary

13   to ensure that these women remain housed and fully supported

14   with necessary services.

15         So here is our plan.  Downtown Women's Center will

16   expand our Skid Row access center to include mobile outreach

17   that will triage and intake women each day in partnership with

18   community-based organizations and City and County outreach

19   teams.

20         From there, with the assistance of the City and

21   County, the plan requires 200 landlords for women already

22   enrolled in Downtown Women's Center's funded housing program.

23   These women could move into apartments tomorrow.  Finding a

24   willing landlord is rather challenging.

25         THE COURT:  Amy, could you stop and just explain
```

```
 1    that to me a little bit more slowly, and that is 200 landlords,
 2    women already enrolled, and they could move in tomorrow.  So
 3    help me.  And I apologize.  When I don't understand something,
 4    I want to humbly ask.
 5              MS. TURK:  Sure.
 6              We have a number of contracts, including Rapid
 7    Rehousing contracts, Housing for Health, which is paid through
 8    Measure H.  We have a federal contract to house domestic
 9    violence survivors in a Rapid Rehousing model.  We have about
10    six different contracts, different funders.
11              THE COURT:  Amy, are they located in the Skid Row
12    area or close by so people, if they have community, aren't
13    being displaced?
14              MS. TURK:  Right.  Yes.
15              THE COURT:  In other words, they don't have to make
16    the hard choice of, you know, I've got to move ten miles away.
17    In other words, a woman might have -- you might have space for
18    200 women, landlord available, in or very close to the Skid Row
19    community.
20              MS. TURK:  You know, it's really about the woman's
21    choice of where she wants to live permanently.
22              THE COURT:  Okay.
23              MS. TURK:  So if it is available in Skid Row and
24    that's comfortable to her, that's fine.
25              THE COURT:  Okay.
```

1          MS. TURK:  May I proceed?

2          In addition, linkages, we need 100 mental health and

3  substance use treatment beds so that when we do outreach, we

4  know that those will be some of the needs of women living in

5  Skid Row.  And to have immediate access to that level of

6  inpatient treatment can support them.

7          THE COURT:  And, Amy, once again, if there's detox

8  needed or mental health, I don't need to know location, but is

9  that somewhat centralized so Ron Sherin -- or Jon Sherin can

10  get his resources there?  Because he's having a difficult time

11  going, you know, tent to tent throughout the city.

12          MS. TURK:  Right.  And these treatment beds could be

13  in existing facilities right now and we could help with

14  transportation to get women there.  I'm not asking to, like,

15  build us a Downtown Women's Center or anything.

16          THE COURT:  Okay.

17          MS. TURK:  An additional 200 interim housing beds

18  possibly to the conversion of unused commercial space or

19  hotels.  And then, most critically, an expansion of our housing

20  justice program.  This was piloted last year as Project 100.

21  And this can permanently house the 300 that would be placed in

22  treatment beds and interim housing.  So for those that we're

23  placing into short-term responses, we have a pathway into a

24  long-term permanent solution.

25          THE COURT:  Okay.  Amy, let me stop you.  There's

```
 1    been a little bit of conflict in the past over Project 100 and

 2    some of the community leaders.  Explain to me what -- I've

 3    heard from the community.  I'd like to hear from you about

 4    Project 100.

 5              MS. TURK:  Yes.  This came about after Downtown

 6    Women's Center's involvement in both ad hoc committees

 7    facilitated by LAHSA, the women experiencing homelessness

 8    committee back in -- what was that? -- 2016 and the black

 9    people experiencing homelessness.

10              In bringing all those recommendations of those

11    reports together, the Mayor's Office approached us to find a

12    way to offer housing that's in a more culturally responsive

13    manner and ensures that black women in particular stay housed.

14              The reports at the time showed that black women were

15    finding permanent housing proportionate to their experience of

16    homelessness, but they were more likely to fall out of

17    homelessness.

18              And so we have sat at the table with women with

19    those experiences from the beginning of the creation of this

20    model, and we have found permanent housing for 57 of the women

21    that have been enrolled in the program.

22              THE COURT:  Now, let me stop you for just a moment.

23    I'm really concerned about the rain.  What drew part of my

24    order concerning these time periods, whether I'm right or wrong

25    about those, was just seeing the -- I don't even know the word
```

1  for it concerning the rain -- women just standing there, let

2  alone men.  You have to see it to believe it.  And when you do,

3  if you're not moved by it, you completely just lost your soul.

4         My bottom line is I don't know if it's 90 days or

5  120 days, but I'm not backing away from this order.  Can you

6  help get women off the street in 90 to 120 days?  And if so,

7  walk that through me.  Or at least be able to offer them

8  something, even if it's an interim basis and they decide, I

9  don't like it, I'm going to go back and live in a box, just

10 break the cycle.  What can you do?

11        MS. TURK:  So the plan involves -- you know, we do

12 need help finding landlords.  And we could move the women that

13 are enrolled in our program -- we're calling landlords all the

14 time.  But I do believe there could be more City and County and

15 political support to raise awareness to the landlords to

16 provide -- to raise awareness about the incentives that exist

17 for landlords.  And for those women, we could resolve it within

18 the next couple weeks.

19        With easier access to interim beds -- you know,

20 after you brought awareness in January -- at the January

21 hearing, that drove more Project Roomkey beds for women.  And

22 in partnership with LACAN and other outreach programs through

23 the county and through LAHSA, we placed -- don't totally quote

24 my numbers here -- about 150 women in The Grand, in the

25 Wayfare -- or the Wayfarer, in the new beds that

1    Councilmember de León supported at the Weingart Center.  And

2    the Mayor's Office also helped Downtown Women's Center reopen

3    Project Roomkey.  And we have 56 women in that Project Roomkey

4    right now.

5         THE COURT:  Okay.

6         MS. TURK:  So that happened within about two, three

7    weeks after the hearing and served quite a few.  Additionally,

8    Councilmember de León's office provided support to SRO Housing

9    which then resulted in them taking the applications of women

10   that we had applied for permanent housing for.

11        THE COURT:  How many women do you think -- and I'm

12   going to ask Shayla Meyers this in just a moment as well.  How

13   many women do you think are on Skid Row?

14        MS. TURK:  The last homeless count showed 600 and

15   that's including the people who identify as trans women.

16        THE COURT:  Okay.  About 600 women.  And of course,

17   all of those are --

18        MS. TURK:  Unhoused.

19        THE COURT:  Unhoused.

20        MS. TURK:  Of course, there are some women living in

21   shelters in Skid Row.

22        THE COURT:  Okay.  And, of course, all of those may

23   have -- they may have a partner and would not want to go into

24   housing.  There may be other reasons, et cetera, but about 600.

25        MS. TURK:  Correct.

```
 1              THE COURT:  Okay.  All right.  Please continue.
 2              MS. TURK:  So again, through this multi-pronged
 3     approach of outreach and intake, short-term responses and
 4     long-term solutions, and between Downtown Women's Center's
 5     existing resources and additional resources provided by the
 6     City and County, Every Woman Housed, the plan, can shelter --
 7     more to your question here -- 400 women in 180 days and
 8     permanently end homelessness for 600 women while providing
 9     ongoing housing retention services throughout the next two
10     years.
11              Excitingly, Councilmember Kevin de León has already
12     provided a year's worth of funding for the long-term solutions
13     part of the plan.  And as you heard this morning, the County
14     Board of Supervisors' Chair Solis is filing a motion to further
15     explore partnerships and funding resources.
16              We believe that this plan is a historic opportunity
17     for us to end women's homelessness in Skid Row in a way that
18     centers the needs and experiences of these women and without
19     the threat of re-traumatization or further marginalization.
20              That concludes my comments.
21              THE COURT:  Amy, thank you very much.  Just a
22     moment.
23              Michele.
24              SPECIAL MASTER MARTINEZ:  Just one quick question,
25     Ms. Turk.  You mentioned the 180 days that you would be able to
```

```
 1   house 400 women.  What's the duration as -- we all know and you
 2   also -- you've supported long-term housing.  So this is interim
 3   housing.  Do you have a plan or have you spoken to the
 4   councilmember about ensuring that those folks, those 400 women,
 5   get transitioned into permanent housing and what that time
 6   frame would be?
 7           MS. TURK:  Yes.  So the main question here is:
 8   Where could this interim housing be?  The conversations I've
 9   had with our electeds, de León and Solis's office is helping us
10   identify where those beds could be.  And de León has been
11   providing the funding for the permanent housing for the women
12   once they're ready to move from interim housing into permanent
13   housing.
14           SPECIAL MASTER MARTINEZ:  But what's the duration?
15   Do you have --
16           MS. TURK:  Yes.  I think, you know, part of any
17   delay would be the setup, if we were to set up a new interim
18   housing, a new hotel.  It wouldn't be a delay, but it would
19   take some time in the setup.
20           And then placing women could happen within, you
21   know -- it takes -- you know, for example, when we were moving
22   women back into Project Roomkey, we could take about 10 to 12 a
23   day, after making sure they qualified for the -- the FEMA
24   intake.  And some of them wanted to see the unit first, so we
25   would drive them there.  And then, you know, they might come
```

 1  back for their belongings.

 2          So it does take time.  But I do think we can get at

 3  least 400 better situated in 180 days.  And then if we had

 4  immediate landlords, then it wouldn't take that much longer

 5  after those 180 days to get them permanently housed.

 6          THE COURT:  Okay.  I beg you, that if this was going

 7  to work -- which I believe genuinely that you believe this and

 8  I hope it works -- that we get started; in other words, that

 9  400 in 180 days.  But you hear me, Amy, I'm terrified of the

10  rain from what I saw.

11          MS. TURK:  Yes.  Well, and the heat, too, sir.  And

12  thankfully more funding has been provided for cooling centers.

13  I believe there are four now slotted to be set up in the

14  Skid Row community.  I'm not a part of that, but I read it in

15  public documents.

16          THE COURT:  Amy, thank you very, very much.

17  Appreciate it.

18          Could I have Lee Raagas from Skid Row Housing Trust

19  who also is here and submitted a letter.

20          And so, Lee, if you'd like to come up.  It's a

21  pleasure meeting you.

22          MS. RAAGAS:  Nice to meet you, too.

23          I want to start by echoing a lot of the statements

24  that have already been said and thank the Court, to you,

25  Judge Carter, Judge Birotte, and Special Master Martinez, for

1    bringing awareness to this.

2           Our perspective was a little bit different in the

3    letter that we shared with the Court.  And it was really to

4    make sure that one of the largest permanent supportive housing

5    providers showed the support and urgency of making sure that

6    there was more options in housing, that short term, balanced

7    with the long-term need, was being supported by organizations

8    like ours and also partnering with other organizations like

9    ours.

10          We did have an opportunity to talk to a lot of the

11   CEOs in the community and really wanted to make sure that our

12   voice was heard, that funding being disbursed and deployed to

13   shelters, interim housing, whatever is necessary and needed so

14   that people come off the street while developers could develop

15   the units to transition them into permanent supportive housing

16   was very key and critical for us to make sure that we voice

17   that support.

18          In addition to that, addressing the systemic racism

19   and the female issues that are in Skid Row.  There is a lot of

20   statistical analysis, there's a lot of information and numbers

21   that are being referenced.  And along with Amy, we're here to

22   make sure that we articulate that those statistics, those

23   numbers are real.

24          We have -- Skid Row Housing Trust has about 700,

25   approximately 700 women residents in our permanent supportive

```
 1   housing community.  We are building more developments and to

 2   ensure the velocity and urgency that this Court kind of brought

 3   attention to as well as what we are experiencing in realtime in

 4   a pre-COVID, during COVID, and post-COVID time.  We are

 5   entering into joint ventures with other partners so that

 6   preexisting housing stock or unit stock can be leveraged.

 7              We are targeting about 300, approximately 300 units

 8   that we want to carve out and provide for women in some of

 9   those joint venture structures around Skid Row.  We believe

10   that we can get that done in about 60 to 90 days.  We are

11   working with a private partner of ours to do that.

12              THE COURT:  Lee, just let me interrupt you.  Do any

13   of those overlap with the discussion Amy had with us?

14              MS. RAAGAS:  They do not overlap.

15              THE COURT:  So besides the 400 that Amy's looking

16   at, you know, starting, 300 maybe additional that you --

17              MS. RAAGAS:  Correct.

18              THE COURT:  And walk me through that again, Lee, for

19   one moment.  How -- when you say targeted around Skid Row,

20   there's a concern in Skid Row that the community would be

21   displaced.  There's a huge concern about gentrification.  And I

22   think the fear would be that a woman's given the option of

23   taking housing but she's told that the housing is over in, you

24   know --

25              SPECIAL MASTER MARTINEZ:  Arcadia.
```

```
 1              THE COURT:  Yeah, Arcadia.  Thank you.  Where's
 2   Arcadia?  I'm just kidding.  Okay.  I got it.  Arcadia.  They
 3   just had some tiny homes put in, I saw.
 4              Describe, not specifically, but are they in
 5   Skid Row?  Around Skid Row?
 6              MS. RAAGAS:  Yes.  About 100 of them are in
 7   Skid Row.  So 25 of our 27 properties are actually in Skid Row.
 8   And some of the joint venture partnerships that we were trying
 9   to rapidly deploy is a block north of Skid Row.
10              THE COURT:  Okay.  This is not to chide.  It's going
11   to sound like I am, so let me apologize because as soon as I
12   say that, it sounds like I'm chiding you.
13              Why hasn't that occurred before?  In other words,
14   why is it taking some injunctive relief by a Federal Court to
15   have, I mean, this good faith response?  What's happening here?
16              MS. RAAGAS:  On the communities?
17              THE COURT:  On your part.  In other words, if we had
18   these 300 units that we're targeting, where are -- where were
19   we in this process?
20              MS. RAAGAS:  So we, as Skid Row Housing Trust, as a
21   developer, we do -- we do develop permanent supportive housing,
22   and 100 of the 300 is in our active portfolio now.
23              THE COURT:  Okay.  Just a moment.  Let me write that
24   down.  So 100 is in asset portfolio now.
25              MS. RAAGAS:  Correct.
```

1              THE COURT:  Okay.

2              MS. RAAGAS:  And the new model that we were pursuing

3     happened, I think, about two to three months into COVID.  Kind

4     of echoing and talking about the concerns that you brought up

5     is:  What is the community going to look like in a post-COVID

6     world and how can we produce more units outside of the

7     traditional mechanism that could bring them online faster?

8              In that joint venture initiative, we tried to

9     solicit the private side or other housing stock to dedicate to

10    interim, transitional, permanent, whatever it was, whatever

11    could pencil or whatever could be structured or whatever could

12    be subsidized.  And we were successful in that about four or

13    five months ago.  So we are in the final phases of that and

14    we're hoping to repeat that model because that's something that

15    is within our control.

16             So as we're developing, we also wanted to find new

17    opportunities, new structures while also providing support to

18    our other community leaders, like LACAN, like Weingart, like,

19    you know, Downtown Women's Center, including all of the

20    shelters and missions and saying if there is a pot of funding,

21    how can -- how can it get distributed equally among all of us

22    so that we can solve the challenge and rising challenge in

23    Skid Row.

24             THE COURT:  Excellent.  Excellent.

25             Do you have questions?

```
 1              SPECIAL MASTER MARTINEZ:  Lee, a quick question.
 2   Judge Carter spoke about the potential conversations that folks
 3   have had on Skid Row in regards to gentrification,
 4   displacement.  Have you had the opportunity to speak to
 5   business owners within the Skid Row area to find partnerships
 6   there?
 7              We know that there are a lot of property owners.
 8   The City and County may not own a lot of land on Skid Row, but
 9   there are private property owners.  Have there been
10   conversations being had about partnering with them so that we
11   ensure that there isn't displacement?
12              And obviously, there are going to be some folks in
13   Skid Row that want to move out of Skid Row.  Right?  But we
14   want to make sure that those options are provided and that we
15   do everything we can to ensure that if there is housing
16   available within Skid Row and there's private partners that are
17   willing to partner with folks like yourselves, that should be
18   opened and brought to the table.
19              MS. RAAGAS:  Yes.  So there's -- there's a couple of
20   things to unpack there, is there are ongoing conversations with
21   business owners.  If they're property owners, that could be
22   converted, you know, to us.  Those take a little bit longer
23   because typically it's legacy ownership.  But those are ongoing
24   discussions.
25              From a business operator, it's very interesting
```

 1    because that was in the position papers as well.  You know, not

 2    only are we, along with, you know, the community compatriots of

 3    ours is -- yeah, we're business owners as well.  You know, we

 4    manage assets, we do portfolio management, we have case

 5    managers doing services.

 6            And I really, really respect and honor the

 7    perspective that you brought, you know, on the rights of women

 8    because there are also women employees.  You know, there are

 9    also women residents that are -- they are housed, but they are

10    experiencing similar -- similar stories to what you shared

11    because of the rising concentration that's occurring.

12            So it was -- like, you know, just using Skid Row

13    Housing Trust or LACAN or Downtown Women's Center, we are a

14    service provider.  We are a business operator.  We are

15    committed to the community.  So there's a lot of different

16    lenses that we want to share with the Court, that we want to

17    share with those listening to us, you know.

18            So those ongoing conversations do occur, but there's

19    also -- that's one of the reasons why we also try to become a

20    little innovative because the initial conversations prior,

21    actually, to this ruling which -- which was embraced because of

22    the urgency it brought to it.  The urgency was being discussed

23    in the community already because we were trying to play out

24    what the scenarios were going to be in a post-COVID world.

25            We were in that community.  Like, we didn't get to

1    leave.  We didn't get to self-isolate, you know.  We saw the

2    increase in women.  We -- we can subjectively support that

3    information.  We can objectively support that information, you

4    know.

5              And then when you have more women, you have

6    different types of crime.  And when those crimes happen, like

7    the assaults and rapes that you mentioned, now you have

8    increased trauma that you need programs and services for, even

9    when you do get them housed.

10             So we want to go as far upstream as possible and get

11   everyone as quickly off the streets.  We want them to be

12   indigenous in Skid Row if they want to be.  We want to transfer

13   them if they don't want to be.  And then we also want to do

14   some kind of calculation, which I was really excited to see the

15   analysis that was done, you know, financially because there's a

16   little bit of forecasting that's needed as well.

17             You know, so there's 6,000 individuals on the street

18   right now.  What's the female-male split?  How long have they

19   been on the street?  Can interim housing help them so they

20   don't land in permanent supportive housing?

21             And as a permanent supportive housing developer, we

22   want to be around for those that need us in the future.  But if

23   it's anyone's goal, it would probably be organizations like

24   ours that if you don't develop more PSH, it means we're solving

25   homelessness, you know.  So we encourage that mindset and that

```
 1    perspective as well.

 2              SPECIAL MASTER MARTINEZ:  Thank you.

 3              MS. RAAGAS:  Thank you very much.  Thank you for the

 4    time.

 5              THE COURT:  Yeah.  It's enlightening and, quite

 6    frankly, refreshing.  Thank you.

 7              MS. RAAGAS:  Thank you.

 8              THE COURT:  Jeff, do you feel comfortable now and,

 9    if not, wait?  Or Shayla or Carol or Brooke?

10              GENERAL JEFF:  I always feel comfortable,

11    Your Honor.

12              THE COURTROOM DEPUTY:  We need a break.

13              THE COURT:  Okay.  My clerk just said we need a

14    break.  That means we need a break.

15              Thank you.  So listen, we'll come back in

16    15 minutes.  Fair enough?  There's restrooms downstairs.  See

17    everybody in 15 minutes.

18              (Break taken.)

19              THE COURT:  We're going back in session.

20              We'd like to call upon Manny Abascal, if he'd be so

21    kind, as the next speaker.  And General Jeff was kind enough to

22    delay for just a moment.

23              First of all, good morning.

24              MR. ABASCAL:  Good morning, Your Honor.

25              THE COURT:  Nice to see you.
```

1     MR. ABASCAL:  Thanks very much for allowing me to

2  speak today.

3          Just as background, I represent Union Rescue

4  Mission, a friend of the Court in this matter.  Also

5  personally, this is a matter that's very important to me.  I

6  chair the Board of Martin Luther King Hospital, a Safety Net

7  hospital in south L.A., that treats hundreds, thousands of

8  homeless patients every year.  And we've been doing that since

9  we opened six years ago.

10          So, of course, the issue is near and dear to my

11  client who's been serving the homeless and Skid Row for over a

12  century and then to myself and all the people at MLK who we

13  serve, the underserved.

14          I would strongly encourage, Your Honor, for the

15  parties to reach a settlement and that's what I'd like to

16  address today.  I'm thrilled to hear Mr. Miller say that the

17  County is interested in settlement.

18          I've worked with the County for 11 years.  I know

19  how great the people are at the County, how skilled they are at

20  serving the underserved.  We deal with them every day at the

21  hospital.  And I'm thrilled to hear that the City's interested

22  as well.

23          We have put together a settlement proposal that I

24  have circulated to various people at the City and the County.

25  It's just a proposal from us with no pride of authorship, just

 1    would hopefully be a basis for discussion for the parties.  And
 2    I'd like to briefly describe it.

 3            Your Honor, I think this litigation provides really
 4    an opportunity for the two agencies, the City and County, to do
 5    something they've struggled to do for some time, which is to
 6    collaborate on this issue of homelessness.  So the litigation
 7    is a terrific opportunity where the City and County could set
 8    goals, establish responsibilities for each other, and then have
 9    a mechanism, when there's impediments to progress, to have
10    those impediments solved.  And that would be through the court
11    process.

12            So our proposal, if I could describe it briefly --
13    and I'm happy to circulate it to anybody in the courtroom, to
14    the Court, to Judge Birotte, to the Special Master.  Our
15    proposal would call for a one-to-one ratio of temporary housing
16    and permanent supportive housing.  And the reason for that is
17    we need to have the long-term housing that provides dignity to
18    people and that is a permanent solution.  But that's taking
19    time, years, and people don't have that time.  They're dying.

20            So in the meantime, while this is being built and
21    while there are reforms being put in place to bring it to the
22    market faster, we would have some shelter opportunities made
23    available more immediately.

24            We want it to be clear, it's one-to-one because we
25    don't want the temporary shelters to be the permanent answer.

1    THE COURT:  Right.

2    MR. ABASCAL:  We would ask that the most vulnerable

3    be prioritized.  We very much respect the Freeway order, the

4    Skid Row order, and we understand the reasons for that.  But I

5    think what could be improved is to have a countywide focus on

6    the most vulnerable, those that are ill, those that are

7    elderly, those that are subject to violence could get what they

8    need right away, regardless of geography.

9    Our proposal would recognize the legislative

10   autonomy of the City and the County, so it sets really

11   high-level goals -- this many beds, this much permanent

12   supportive housing over this period of time.  But it's up to

13   them to decide and the experts to decide in what form.

14   THE COURT:  And would you restate that to me one

15   more time.  I want to make sure I heard that correctly.

16   MR. ABASCAL:  Yes.  The proposal we want the parties

17   to think about is for the City and County to set high-level

18   goals in terms of the amount of beds, shelters, and permanent

19   supportive housing over a set period of time.  But I'll give

20   them discretion to decide in what form, whether that be

21   sanctioning encampments, whether it be tiny houses, let the

22   experts decide what is the most feasible to do right away and

23   respecting their legislative autonomy but holding them

24   accountable so that the parties agree on what they think they

25   can accomplish and set those goals and have to come in and

```
 1    report every quarter.  That would be either to a joint monitor
 2    that they could select that would report to the Court or
 3    directly to the Court.
 4          So we suggested having a monitor in place that could
 5    help, you know, resolve the smaller issues and then, if
 6    necessary, then go to the Court for larger issues if a monitor
 7    can't resolve it.
 8          We'd also propose that they look at improving the
 9    process for permanent supportive housing and re-looking at the
10    way it's financed, why it takes so long, why it takes so long
11    to get approvals but not wait, you know, for the -- for those
12    blue ribbon reports to be finished but to get meaningful
13    progress now.
14          The proposal also advocates for not re-allocating
15    any HHH money or H money.  And the reason for that, Your Honor,
16    is that there are a lot of non-profits that have entered into
17    contracts that are in the process of building things and it
18    would be very disruptive to them.
19          Now, maybe the money wasn't spent in the most
20    efficient way, maybe the deal could have been cut differently.
21    But there are deals in place that are making progress.  It may
22    be slow, it maybe could be faster, but they're making progress
23    and to re-allocate the money to disrupt -- not just existing
24    deals but future deals because investors coming in can say,
25    well, I'll sign here but if it could be upset and the money
```

 1    could be taken away later, there would be less of an incentive.

 2           And finally, I would say that our proposal has no

 3    enforcement mechanism.  We do not believe that people should be

 4    prosecuted for being poor.  And I'm not going to advocate for

 5    any enforcement.  Now, I understand that may be part of the

 6    conversation from some of the parties, but we would not support

 7    any enforcement of camping laws or other laws for someone who's

 8    poor and just can't afford to live anywhere else.

 9           I have no pride over this proposal.  It's something

10    that we thought would be important to put on paper, send to the

11    parties, and have them start talking about it.  I think if they

12    want to change it, that's terrific.  If they have a better

13    idea, that's great.  But what I think is not excusable is to

14    not discuss it.  You know, to just continue litigation for

15    years and years on this issue can only be distracting and

16    damaging.

17           And I think getting to a deal, making progress,

18    solving the problem, and using this court process and

19    Your Honor's commitment to the issue and genuine concern to the

20    issue -- you know, using you, Your Honor, to help facilitate

21    progress, solve problems and keep everyone on track is the way

22    to go.

23           So I could view this as a historic opportunity to

24    really make change.  I can say it's a very challenging issue.

25    This is harder than looking back, harder than building a

1   Safety -- new Safety Net hospital, I really do think it is.

2   Because as hard as it was to build our hospital, we have one

3   partner, the County.  You know, we didn't have to work with the

4   City and the County and multiple different City organizations.

5   We didn't have that much.  We had some politics but not as much

6   as is involved in this issue.

7           So it's a challenging issue.  And that's why I think

8   this is a unique and historic opportunity because we have a

9   mechanism that will force collaboration among the City and the

10  County, a mechanism to create goals and to maintain progress

11  because if there's not progress, then Your Honor's gavel can

12  make sure that the problems are solved and the progress

13  continues.

14          So I really encourage -- I'm speaking here,

15  Your Honor, to the parties.  I use this opportunity to try to

16  get to a solution.  And I think it will make a historic impact

17  on the City and the County.

18          THE COURT:  Thank you.

19          Michele, do you have any questions?

20          SPECIAL MASTER MARTINEZ:  No questions.

21          THE COURT:  Thank you very much.

22          Let me compliment a number of things first.  I've

23  heard about so many three- to five-year projects.  And I'm

24  going to joke with you, but it means the person making that

25  proposal is now out of office and not responsible.

1          I love this idea of milestones along the way because

2     then the person making that proposal is responsible during

3     their political term, whether it's two years, four years,

4     whoever we're dealing with.

5          Second, I love the informality of trying to resolve

6     this through some process that avoids litigation because

7     everything changes.  This is such a dynamic process that a

8     Court's ruling today is the law of the land for awhile until

9     the next litigation comes in ten years later and so we're

10    stuck, in a sense, with no movement until a case or controversy

11    comes before us.

12         And so this opportunity to work together, you know,

13    in terms of that problem-solving along the way maybe solved

14    eight out of ten, nine out of ten, or six out of ten.  But

15    whatever, it's so much better than the adversarial process, at

16    least I think, with homelessness.  And it allows us to make an

17    effort and make mistakes.  And unless everybody in this room is

18    willing to try and sometimes make mistakes, we're not going to

19    accomplish anything.  It's the recognition of those mistakes

20    and backing up on them and making it right.

21              (Pause in the proceedings.)

22              THE COURT:  You've given this -- you've given this

23    to the parties, but I would be humbled if you would give this

24    proposal to us.

25              MR. ABASCAL:  We'll file it today, Your Honor.

1        THE COURT:  And I'd file it on the docket.  I know

2   when we started entering into the negotiations a year ago --

3   quite frankly, I want them transparent.  At that time, people

4   on behalf of the City objected to it.

5        MR. ABASCAL:  We'll file it this afternoon,

6   Your Honor.

7        THE COURT:  Okay.  And I appreciate it.  And then

8   we'll see where that leads, acquiescence or not or agreement.

9   Because there's going to be a lot of modifications, I'm sure, a

10  lot of back and forth.  This has been going on for decades.

11        Manny, unless it happens now, I'm just afraid we're

12  going to read about this in the papers ten years from now,

13  going on and on and on.  It's been going on for decades.  And

14  it's exacerbating itself to the point that I'm getting very

15  concerned that whatever the Court's involvement is, that it

16  can't possibly replace an agreement by the parties on behalf of

17  the city.  It's the best mechanism in a sense.

18        But with the death spiral rate -- you're hearing me,

19  I hope, loud and clear -- there's just no way that this Court

20  is going to become complicit in what's happening in this

21  present structure, Manny.  And by now, understanding this, I'm

22  not willing to buy into the parties' present positions when

23  this amount of death is occurring and this amount of

24  degradation.

25        So I humbly thank you very much for being here.

 1          MR. ABASCAL:  Thank you, Your Honor.  Thank you very

 2   much for allowing me to speak.

 3          THE COURT:  Ron Galperin?

 4          MR. MARCUS:  Can I have a moment, Your Honor?

 5          THE COURT:  Certainly.

 6          And, Marcus, through no embarrassment, he said be

 7   here at 11:45.  But if he's not here, we'll wait.  I just

 8   didn't want to get in the middle of talking with General Jeff

 9   and then an interruption and he says he has to go someplace.

10          MR. MARCUS:  I understand.  I'm just checking.

11          THE COURT:  And, Jeff, thank you for being so

12   patient.  I really very humbly appreciate it.

13          And are there any other members of the public who

14   wish to speak in terms of structural racism?

15          Now, Pastor Cue, let me come right back to you, just

16   a moment.  Okay?

17          MR. MARCUS:  Not yet, Your Honor.  I'm sorry.  He's

18   not here yet.

19          THE COURT:  Well, then, General Jeff -- and we're

20   not going to interrupt you.  Ron can wait for awhile.  Please.

21          And then, Pastor Cue, if you'd like to speak next

22   right after Jeff.

23          Good morning.

24          GENERAL JEFF:  Good morning, Your Honor.  Thank you

25   for the opportunity to speak, to be a part of this process.  I

      1    also want to acknowledge the Honorable -- Honorable Birotte and

      2    Special Master Martinez.

      3            My name is General Jeff.  I am speaking in this

      4    capacity of -- as spokesperson for the Skid Row Advisory

      5    Council.

      6            Heavy is my heart.  Just so that we all can put this

      7    in proper context, we are two days from the one-year -- two

      8    days after the one-year anniversary of George Floyd's murder.

      9    So racial injustice should have been heavy on our hearts two

     10    days ago and it should also continue to this day.

     11            Before I begin, I want to speak to a couple of

     12    things that I heard while sitting in the back of the audience

     13    of this courtroom.

     14            Special Master, when speaking to the CEO of Skid Row

     15    Housing Trust, nonchalantly mentioned, made reference to people

     16    in Skid Row who just simply may not want to live there and that

     17    should be a viable option, which is all understandable.

     18            As a Skid Row community leader for 15 years now,

     19    that line of logic is absolutely problematic for us because if

     20    Skid Row is this healthy and vibrant community, why would

     21    anybody want to leave?  Why would anybody not want to live

     22    there, which automatically means the conditions that Skid Row

     23    is in right now are not sufficient enough if people want to get

     24    the heck out of there.

     25            So rather than embrace a mindset where, oh, it's

**UNITED STATES DISTRICT COURT**

 1   okay, we fully understand that people want to leave, the
 2   mindset should be the exact opposite, more needs to be done in
 3   Skid Row so that people will want to stay.
 4           Also, too, mentioned earlier today county counsel
 5   with this smug arrogance, like we've done -- we've done all we
 6   can do.  What more can we do?  We're providing the services.
 7           According to LAHSA's own homeless count at face
 8   value, there's double-digit entries in homelessness every year
 9   for at least the last five years, if not longer.  And I've
10   never seen any paperwork or any data statistics where the
11   County has services that they provide, have reflected to
12   provide double-digit entries in their services, specifically in
13   the Skid Row area.
14           So when you say, "What more can we do?" hell, talk
15   to the -- excuse my language because I'm very passionate about
16   this -- come talk to the Skid Row Advisory Council or other
17   Skid Row community leaders, which there are many numerous
18   Skid Row Advisory Council members in the audience right now, in
19   attendance right now.  We're not hard to find.
20           If you really want to have answers to those
21   questions of what more you can do, oh, trust and believe
22   there's a whole heck of a lot more that you can do, both the
23   City and the County.
24           And also, while -- the county counsel has also said,
25   oh, they don't want to argue institutional racism.  Well, guess

 1  what, the Skid Row Advisory Council does.  Because when you
 2  look at Federal Judge David O. Carter's 110-page preliminary
 3  injunction, housing is the secondary issue that needs to be
 4  discussed.  The primary issue is this systemic racism and
 5  systemic oppression that how conveniently both the City and the
 6  County are -- are just conveniently ignoring, as if the
 7  insulting of black people for generations doesn't matter or
 8  it's convenient to just not speak on it.
 9         Well, the Skid Row Advisory Council's going to speak
10  on it.  And so in response to Judge Carter's 110-page
11  preliminary injunction, we, the Skid Row Advisory Council,
12  issued a response, which I'll read into the record now.
13         I read from a letter with the letterhead of Skid Row
14  Advisory Council, dated May 6th, 2021.  It's addressed to
15  Federal Judge David O. Carter, City of Los Angeles, County of
16  Los Angeles, and Los Angeles Police Department.
17         "In light of the intricately detailed, in-depth
18  historical analysis within the 110-page preliminary injunction
19  issued recently by Federal Judge David O. Carter which clearly
20  identifies the roles both the City of L.A. and the County of
21  L.A. played in masterminding structures of racism through
22  policies, laws, ordinances, and more that all combined to
23  create a web of deceit, bias, and prejudice against black
24  individuals and families that have continued for generations
25  across the city and county, can be directly attributed as the

1    main component in the widespread systemic racism, housing

2    discrimination, systemic oppression, and more which all have

3    greatly contributed to the black homeless epidemic in Skid Row

4    and across the City and County of L.A.  Our official Skid Row

5    Advisory Council's response is as follow:

6          "Because of the intentional egregious and malicious

7    acts towards black Angelenos, the Skid Row Advisory Council

8    DEMANDS an acknowledgment of said acts and a public apology

9    from both the City of Los Angeles and the County of L.A. prior

10   to any attempts to convene a working relationship in any

11   capacity as so ordered by Federal Judge Carter in his

12   preliminary injunction.

13         "How can the Skid Row Advisory Council sit across

14   the table from both the City of L.A. and the County of L.A. in

15   efforts to create housing solutions when both the City and the

16   County played significant roles in the oppressive containment

17   of black homeless people in Skid Row?

18         "Similarly, we DEMAND an apology from the

19   Los Angeles Police Department for the generations of

20   'containment-style' policing towards black homeless people in

21   Skid Row as LAPD's way to keep a unified front regarding the

22   daily distribution of systemic racist agendas against black

23   people in Skid Row.

24         "It is the position of the Skid Row Advisory Council

25   that the true reason both the City and County of L.A. filed for

1   stays against said preliminary injunction so quickly is solely

2   because each of these government entities attempted to create a

3   diversion that would take the focus completely away from all of

4   the many systemic racist and systemic oppressive acts

5   identified by Federal Judge Carter in his masterful work with

6   his preliminary injunction."

7           Props to his law clerks too.

8           "It must be noted that neither the City nor County

9   even attempted to be appalled by Federal Judge Carter's

10  findings.  Just a total ignoring of arguably thee most

11  compelling presentations of undisputed proof of systemic

12  racism, systemic oppression, and more in our lifetime at the

13  hands of a network of cohorts all connected to both the City

14  and County of L.A.

15          "How can all other Angelenos remain silent at this

16  time?  In an era where people of all creeds and colors, all

17  walks of life have bonded together to 'take it to the streets'

18  and shout 'Black Lives Matter' at the top of their lungs, yet

19  the widespread silence on these issues directly affecting black

20  homelessness is eerily deafening.

21          "How then can black homeless people in Skid Row even

22  consider a court-ordered offer of housing from the very

23  entities whose systemic racist and systemic oppressive tactics

24  led them on a downward spiral by design to begin with?

25              "The amount of trauma is beyond measure and at this

1    point beyond a simple public apology (even though we still want

2    it!)

3            "Before any efforts to move forward can materialize,

4    both the City and County, as well as the LAPD, MUST first move

5    forward with efforts to heal all the trauma they've caused

6    black homeless people across L.A.

7            "It must also be stated that any attempts to

8    'decompress' Skid Row's residency of black homeless people by

9    any measure is also an attempt to undermine Skid Row's black

10   population in the form of gentrification of which then falls

11   directly in line with the aforementioned systemic racist and

12   systemic oppressive tactics that have continuously plagued

13   black residents of Skid Row for generations.  Any additional

14   tactics which appear identical or even similar to

15   criminalization and/or displacement MUST be immediately

16   eradicated and frowned upon by the Courts, followed by the

17   implementation of additional protections by the Court in order

18   of protecting black homeless individuals and families from the

19   collective systemic racist and systemic oppressive wrath of

20   both the City of L.A. and the County of L.A.

21           "The Skid Row Advisory Council strongly believes

22   that all of the aforementioned issues MUST be addressed prior

23   to any discussions regarding housing of any nature.

24           "To completely omit the Skid Row Advisory Council's

25   DEMANDS to appropriately address the widespread systemic racism

1  and systemic oppression by both the City of L.A. and the County

2  of L.A. prior to any other actions would be akin to completely

3  ignoring the 'generational rape' of the black community.

4          "With vigor," signed by the Skid Row Advisory

5  Council, General Jeff, spokesperson.

6          And I want to say that, Your Honor, not -- not one

7  person within the city of Los Angeles high-ranking, rank and

8  file, or other has even attempted to contact the Skid Row

9  Advisory Council with any efforts to try to address this letter

10 which, again, was addressed directly to them.  And now we're

11 talking about the 15 members of the city council,

12 Mayor Garcetti, City Attorney Mike Feuer, any of their staff,

13 we have not heard from anybody within the City of Los Angeles.

14          Now, as far as the County of Los Angeles, I hold

15 this letter in my hand, we did hear from the Chair of the Board

16 of Supervisors, Supervisor Hilda Solis.  And I will not read

17 her entire letter into the record.  I will allow her to do that

18 or someone from the County to do that on her behalf if that is

19 what they wish to do.

20          THE COURT:  I'm filing all of these letters as well

21 on the docket for the Circuit.  So if you want to submit that

22 in response to your letter, I'll file that on the docket with

23 it.

24          GENERAL JEFF:  Thank you, Your Honor.  But for now,

25 what I do want to read is a portion of the letter, which exists

1    in my hand, is a Board of Supervisors, County of Los Angeles

2    letterhead, Hilda Solis, Chair, Board of Supervisors,

3    Supervisor First District, dated May 10th, 2021.

4            "Dear Skid Row Advisory Council:

5            "Thank you for your letter and your continued

6    leadership in righting the wrongs that have brought us to our

7    current homelessness crisis.  As Chair of the Board of

8    Supervisors, I want to acknowledge that historic harms must be

9    corrected, past trauma must be addressed, and oppressive

10   systems must be deconstructed.  The County is committed to

11   participating with the Skid Row Advisory Council and

12   communities of color across the county to address the

13   underlying structural and systemic factors which have

14   contributed to disproportionate rates of black people

15   experiencing homelessness in Los Angeles."

16           And there are three additional paragraphs.  And

17   again, you know, we will allow the County to speak to that

18   themselves.  But this is the only communication that the

19   Skid Row Advisory Council has received from anyone from the

20   County.

21           And so, again, it is paramount that while both the

22   City and the County, even the plaintiffs -- it's convenient for

23   them to negotiate or have -- express their desire to enter into

24   settlement talks about housing options when Your Honor -- your

25   110-page preliminary injunction, the majority of it speaks to

1    systemic racism and systemic oppression.  And we're not talking

2    about just ideology.  We're talking about specific policies by

3    name, specifically including the Skid Row containment zone.

4             So again, while county counsel has this smug

5    arrogance about all these services they're providing to

6    Skid Row, yeah, it's a part of the Skid Row containment zone.

7    You play the part.  That was basically a semi-confession that

8    the County has played a part in it, along with all the other

9    missions and so-called social service providers.

10            We need to audit the social service providers as

11   well if we're going to audit.  Let's keep it going.  Let's get

12   to it because the problem is -- and I want to thank you,

13   Your Honor, for acknowledging that I myself coined the term the

14   "homeless industrial complex" because the poverty pimping of

15   these said non-profits and government entities is alive and

16   well in this very room today.

17            And we can look to that as examples because of the

18   minimal efforts that both the City and the County are speaking

19   to which, like, there's this minimal obligation to -- to

20   address homelessness.  When we have, you know, tens of

21   thousands of homeless folks, we don't have solutions at a

22   significant enough rate that it would make sense to equate to

23   any type of sense of urgency, the necessary sense of urgency

24   needed to significantly reduce the double-digit increase of

25   homelessness.

```
 1              And I don't know what -- what more needs to happen.
 2     You know, we applaud, you know, Your Honor's efforts to light
 3     fire to the feet of both the City and the County to get them to
 4     do more.  But to have this smug arrogance as if they're doing
 5     something -- all I know is the death ratio on Skid Row
 6     pre-COVID was two-to-one and now it's arguably four- or
 7     five-to-one.  Where's that data?  You know, let's get -- if we
 8     want to play the data game, well, let's really play the data
 9     game.
10              And so, you know, I don't want to go on and on
11     because there's so much that I can, like, lay out right now.
12     But I strongly feel, as well as the rest of the Skid Row
13     Advisory Council, that a public apology is in order, a public
14     acknowledgment of all these policies -- and we're talking about
15     housing discrimination, redlining, exclusionary zoning,
16     systemic racism, systemic oppression at the hands of the City
17     of Los Angeles and the County of Los Angeles, which they don't
18     want to even argue, which is basically an admission that --
19     that it stands.
20              And because it stands, that means for generations --
21     and I'm a homegrown Angeleno.  I was born here.  I've got
22     family here.  My aunts and uncles, you know, still live here,
23     died here, have struggled to own -- for homeownership.  And
24     now, to find out through Judge Carter's 110-page preliminary
25     injunction, it wasn't us.  Stop victim blaming.  It wasn't
```

1    black people's fault.  It was the -- the undermining of -- by

2    the -- at the hands of the City of Los Angeles and the County

3    of Los Angeles.

4           So before we can get started and talk about housing

5    solutions and tiny homes and padded homes, somebody needs to

6    owe black people an apology publicly, a public acknowledgment

7    of all the -- all these failed policies.

8           And I close with this, it's just gotten to the point

9    where we understand the status quo.  We understand that the

10    existence of one homeless person creates jobs.  We understand

11    that homelessness widespread across the City of Los Angeles and

12    across the County of Los Angeles has created jobs for

13    practically everybody in this very courtroom.  So now it's

14    about doing the -- the bare minimum just to keep the jobs going

15    for them, yet we're dying on these streets.

16           So it's clear that the status quo can now be called

17    a racist quo.  And I pound the podium and wave my -- wag my

18    finger at each and every one of you in disgust.  You ought to

19    be ashamed of yourselves.

20           Thank you for your time.  Nothing further.

21           THE COURT:  General Jeff, we're going to file that

22    response --

23           SPECIAL MASTER MARTINEZ:  It's already been filed.

24           THE COURT:  It's already been filed, Kelly?

25           SPECIAL MASTER MARTINEZ:  It's already been filed.

```
1            THE COURT:  The response from the County?

2            SPECIAL MASTER MARTINEZ:  The Hilda Solis?

3            THE COURT:  Hilda Solis.  We're going to file that.

4   Your letter, as well as everybody who wrote to the Court, is

5   already filed on the docket.  If you would like that response,

6   we can talk to --

7            Skip Miller, that came from Hilda Solis.  You're

8   aware of that?

9            MR. MILLER:  Yes.

10           THE COURT:  Why don't we file that response.

11           MR. MILLER:  That's fine.

12           THE COURT:  Okay.  We'll have that filed also.

13  Thank you.

14           GENERAL JEFF:  Thank you, Your Honor.

15           THE COURT:  Pastor Cue.

16           PASTOR CUE:  Good afternoon, Your Honor.

17           As it relates to institutional racism, it still

18  persists even today.  Who died disproportionately during

19  COVID-19?  If you really want to know about institutional

20  racism, just look around the room.

21           I'm going to let one of my other folks from the

22  community explain what I mean when I say "look around the

23  room."

24           With the cost of housing rising to astronomical

25  levels, who's left out?  It doesn't take a rocket scientist to
```

```
 1   know that institutional racism exists.  Who can afford housing
 2   in Los Angeles?  And we know that housing has increased even
 3   more during COVID-19.  Some people can afford it.  They say
 4   that generational poverty cannot be inherited but that
 5   generational wealth can be inherited.  I find that interesting.
 6         Look at how many people are being pushed out of
 7   housing each and every day.  They're not falling into
 8   homelessness, by the way.  They're being pushed into
 9   homelessness because they're continually being pushed into
10   homelessness without a solution in sight.  And the culprit is
11   still institutional racism.
12         They refuse to house people by any means necessary,
13   excluding enforcement.  And that is due to systemic racism.
14   The fact that there's no robust solution in place to house our
15   people with respect and dignity and equity.  You see, tiny
16   homes may be a solution to getting people off the street but it
17   does not address the root problem.
18         Some people's urgency is to get people off the
19   street as quick as possible.  Our urgency is to get people
20   housed as quick as possible because, see, the urgency to get
21   people off the street as quick as possible can fall into this
22   idea of getting people out of sight and out of mind as soon as
23   possible.  But we know that if you get people out of sight and
24   out of mind, oftentimes housing becomes out of mind because
25   that's the way institutional racism works.
```

1    We know that during World War II that black folks

2    were free.  And I'm talking about institutional racism.  I'm

3    going to show you from 19 -- from the 1940s till 2021 how

4    institutional racism works.

5    We know that in the 1940s black folks who had been

6    enslaved were migrating from the south, to the north and the

7    west, moving into South Central, fleeing lynching,

8    institutional racism, fleeing lynching.

9    By the way, it was legal for police to -- we call it

10   slave catchers, to go get folks who were free and bring them

11   back.  Right?

12   Fleeing institutional racism.  They moved into

13   Los Angeles, into South Central.  And at the same time, the

14   same system that was lynching our people -- they say if you go

15   to our institutions today, our educational institutions, these

16   people were fleeing because they were looking for jobs.  But

17   they forgot that they were fleeing lynching.  And so we tell

18   half of the story.

19   But at the same time, in 1942 or in the 1940s during

20   World War II, the Japanese were unjustly evicted from their

21   homes in Little Tokyo right down the street.  And the black

22   folks who were in South Central migrated down Central Avenue --

23   come on, somebody, I didn't come to preach today, but I will --

24   migrated down Central Avenue to occupy those buildings that the

25   Japanese were evicted from unjustly, I might add.  And three

```
 1   years later, four years later, Japanese came back.  It was
 2   called Brownsville when black folks moved there.  Japanese came
 3   back.
 4          And so the dominant culture said to black folks,
 5   "You got to move out."  We know that Skid Row -- some of those
 6   folks ended up in Skid Row even in the 1940s.
 7          It's the same system.  The system has not changed.
 8   The system has given us the outcome, the exact outcome it was
 9   designed to give us.  It is not broken, but it is flawed by
10   design.  And the flaw is institutional racism.
11          Come on, somebody.  Stay with me now.
12          You see, more people are being pushed into
13   houselessness because the system keeps giving us the same
14   outcome.  And when the Mayor had the opportunity to respond to
15   the negative -- negative outcomes of COVID-19 on black and
16   brown communities, you know what he did?  Institutional Racism
17   101.  He cut all other city services and gave the LAPD or
18   wanted to give the LAPD a $200 million raise.  Institutional
19   racism at work.
20          Because logic would tell me or my moral compass as a
21   pastor would tell me, well, we need to take care of the grocery
22   store workers because those are the folks I saw during
23   COVID-19.  I was happy to see them, the delivery workers, those
24   who delivered my food.  Come on, somebody, I wish I could
25   preach.
```

1    But instead, we keep doing the same thing with law

2  enforcement we're doing with homelessness.  We respond to the

3  system.  We respond to the inadequate system.  We respond to

4  the system that is flawed by racism with more racism.

5    Now, I'm not the only expert on race --

6  institutional racism because, by experience -- we should have

7  had some scholars up in this joint, some black scholars to

8  really tell y'all about institutional racism, those who are in

9  our brightest institutions, HBCUs and all of those institutions

10  to tell us about racism.  But maybe some of you guys have read

11  about it somewhere.

12    You see, it is a privilege to be dismissive about

13  institutional racism.  It's a privilege because it means you

14  don't see it.  No, you see it.  It just means you don't feel

15  it.  That's why it's a privilege, because you don't feel it.

16    And so the thought hasn't left me, the same way we

17  deal with houselessness and homelessness is the same way we

18  deal with everything else.  We respond to crime.  We respond to

19  homelessness.  But we are not willing to abolish and dismantle

20  the systems that cause it.

21    We respond to it, but we're not willing to go

22  upstream and say who's putting Moses in the water and Pharaoh's

23  daughter has to fish him out of the river.  We're not asking

24  that question.  We only want to keep fishing, find creative

25  ways to fish Moses out of the water.  We don't want to go

1    upstream to stop Pharaoh from putting Moses in the water to

2    begin with because if we do that, that means we're going to

3    have to deal with the institution.  And some of us are so -- we

4    love the institution so much, we can't imagine anything outside

5    of it.

6            You're not going to deal with houselessness with

7    enforcement.  The only way we're going to deal with

8    houselessness, we need an immediate and a long-term solution.

9    Because when I drive around L.A., we don't have a housing

10   shortage, we have an institution of racism problem.  Because if

11   I go to South Park and I got 3 grand, I guarantee you I can get

12   a loft.

13           That's it.

14           THE COURT:  Pastor Cue, thank you.

15           There was an article written recently, Pastor Cue,

16   the community and the advocates and the parties in the

17   *Los Angeles Times*.  And I had hoped that Mark Ridley-Thomas

18   would be here today as head of the homeless and poverty

19   committee.  It's a fascinating article.  I haven't been able to

20   delve in behind that article as I was able to delve in when we

21   wrote this opinion.

22           By the way, ask my law clerks how late they were up

23   because they didn't literally sleep for --

24           THE LAW CLERK:  Days, days.

25           THE COURT:  They went all night.  Trust me, we read

**UNITED STATES DISTRICT COURT**

```
 1    every exhibit each one of you submitted to us, the three law
 2    clerks, two externs.  And they didn't sleep.
 3              It's a fascinating article about PPP.  It's a
 4    fascinating article about the -- and I don't know if Doug wrote
 5    it or Ben, I'm not sure.  I've got my notes right here, and I
 6    don't want to be discourteous and turn my back and get the
 7    notes.  But I -- it's about the ratio of PPP loans, two to four
 8    to one.
 9              PASTOR CUE:  Uh-huh.
10              THE COURT:  And white business establishments and
11    the criteria that if you're a minority, usually having a sole
12    business, you couldn't apply because you didn't have X number
13    of employees.
14              PASTOR CUE:  That's right.
15              THE COURT:  So that came out after my opinion that
16    I'd hoped to discuss with Mark Ridley-Thomas or Mr. Feuer -- or
17    Mr. Feuer or the Mayor or anybody else that chose to be here
18    today.
19              Going forward, what does that look like?  I mean,
20    can Wells Fargo take that position?  I didn't say Wells Fargo,
21    did I?  But I did.  Wells Fargo.  Because when you read that,
22    it's a continuation and it talks about the same issues that
23    seem to be historic.
24              I'll leave that on the table.  And I don't want to
25    read from my notes, but I commend it to you.  And I'm going to
```

1  look behind that and see what their data is at some point

2  because it's compelling that it's happening right now.

3       PASTOR CUE:  And, Judge, if I may, we are addicted

4  as a society to the negative outcomes of our system because we

5  keep doing these counts every year, we keep looking at all

6  these inequities, oh, brown folks are dying at a

7  disproportionate, alarming rate.  And we're addicted because we

8  never do anything to mitigate those issues.

9       THE COURT:  I want to thank you.

10      And Ron Galperin -- I saw Ron walk in, I believe,

11  and --

12      SPECIAL MASTER MARTINEZ:  Yes, he's to the right.

13      THE COURT:  Thank you for joining us.  It's a

14  pleasure to have you.

15      I've been reading and I'm going to refer you,

16  instead of asking you to make a statement, to two documents

17  you've already published.  You'll have them memorized.  And if

18  you don't, I'll put them up on the board for you.

19      I certainly don't know where this journey goes from

20  this point forward.  But a large part of this will lie in the

21  elected officials' hands eventually because a true settlement

22  is the agreement that will bring the County and the City in

23  perpetuities to something meaningful along with the parties.

24      You've got a 2019 report that you made as Controller

25  called "The High Cost of Homeless Housing, Review of

1    Proposition HHH," 2019.  It's fascinating.  And another report

2    that you put out, "Meeting the Moment:  An Action Plan to

3    Advance Proposition HHH," 2020, City of Los Angeles, Controller

4    Ron Galperin.

5            And I heard a fascinating proposal today earlier by

6    Councilman Abascal about a one-to-one ratio, et cetera.  He's

7    going to submit that to the Court and to Judge Birotte and to

8    the Special Master, which I'm fascinated.  I take no position

9    on that because that's a negotiating portion for the parties,

10   but it's fascinating.  And it's good to see the community

11   getting involved.

12           I want to turn to 19.  And up there, it talks about

13   what we already know, about a $1.2 billion amount and 10,000

14   supportive housing units.  And at the time, I noted that there

15   were 114 projects across Los Angeles to provide at that time

16   5,873 supportive units for homeless residents and another 1,767

17   for affordable units.

18           And 19 of those projects were under construction and

19   two were scheduled when you wrote the report to open in the

20   coming months.  And it was clear that the City's HHH program is

21   not keeping pace with the growing demand for supportive housing

22   and shelter.  According to the greater Los Angeles homeless

23   count at that time, the City has increased by 40 percent to

24   more than 36,000 people.

25           There's currently lack of clarity, you stated,

1  surrounding the City's goal for the number of supportive

2  housing units to be built using HHH funds.  And we already

3  received letters from the union president saying that there was

4  a lot of concern on the union's part about bidding, et cetera.

5  That's unrelated to your report.

6          And the high costs and slower-than-expected

7  predevelopment construction timelines have significantly

8  hindered the City's ability to achieve the ballot measure's

9  intentions.

10          And then you went through some statistics.

11  $350,000, to remind you, for a small studio or one-bedroom unit

12  and 414,000 for a larger unit as projected in 2016, a median

13  cost of about 531,000 per unit today.  More than 1,000 HHH

14  units are projected to exceed 600,000 with one project topping

15  700,000.

16          What was fascinating to me besides this was when we

17  turned to the second page -- so if you go to page 20.  And I

18  want to tell you that I don't want to have her have this on

19  record but judges make mistakes.  And I formed a -- an opinion

20  before I was talking to the union president.

21          SPECIAL MASTER MARTINEZ:  Ron Miller.

22          THE COURT:  Ron Miller and others.

23          SPECIAL MASTER MARTINEZ:  And Robbie Hunter.

24          THE COURT:  And Robbie Hunter, yeah.  I had come to

25  believe that the high cost in housing was the land.  And so

1  what I had done as part of the remedy section is you'd have to

2  be foolish to see if the Court wasn't exploring commandeering

3  city property.

4         And I had reached out at that time and written a

5  section saying, you know, lay out all the city property you

6  have.  And I didn't know how far that would go, whether the

7  parties were going to control this, if I had to think about a

8  receivership, where this was going.  I didn't know where the

9  journey would take me, but I know I'd drawn a line in terms of

10  a death rate now.

11         It was fascinating reading this.  The cost of

12  building many of these units exceeds the median sale price of a

13  market rate condominium in the city of Los Angeles and a

14  single-family home in Los Angeles County.

15         So Question 1 -- and don't answer it -- why don't we

16  just buy -- I'm not joking.  If this is market rate and we can

17  turn people in to housing immediately and we can get the

18  funding out of the Biden Administration, why aren't we just

19  buying instead of developing and getting people off more

20  quickly?  That's Question 1.  And I'm not being facetious about

21  that.

22         And No. 2, this is what I didn't understand.  And I

23  humbly say this to you and thank you.  An unusually high 35 to

24  40 percent of costs are so-called soft costs, development fees,

25  consultants, financing compared to just 11 percent for actual

```
 1   land costs.
 2            Ron, I have it backwards.  I would have told you six
 3   months ago that I initially had the impression that 40 percent
 4   were land costs.  And I knew that there was a bureaucratic
 5   factor in there.  I didn't know how much.  And I knew there was
 6   a development take, if you will, some kind of profit.
 7            Is that correct, 40 percent in these development
 8   fees?
 9            CONTROLLER GALPERIN:  It's not every single project
10   has that kind of high soft cost.
11            THE COURT:  Okay.
12            CONTROLLER GALPERIN:  You've identified projects
13   that do.  And you have to look at the reasons why this occurs.
14   The City of Los Angeles provides part of the financing for
15   these projects, but they also very much depend also on private
16   financing.  They may have money that comes from state funds or
17   from tax credits that are put into the deal.
18            And the more different factors that you have and the
19   more levels of approval that you need, the longer that it
20   takes.  And I've spoken to many of these developers who report
21   that it can take -- and we know that it can take three to six
22   years to get something done.  The carrying costs on three to
23   six years in terms of interest, in terms of everything else can
24   be crushing and can kill a deal, truth be told.
25            THE COURT:  And I'm going to turn in a moment to the
```

```
 1   next year's report because you actually state that in your next
 2   audit.
 3           We were told and we don't know by --
 4           Who's the state president?  Hunter?
 5           SPECIAL MASTER MARTINEZ:  Robbie Hunter.
 6           THE COURT:  Robbie Hunter.
 7           SPECIAL MASTER MARTINEZ:  From the Building Trades.
 8           THE COURT:  From Building Trades.
 9           SPECIAL MASTER MARTINEZ:  State.
10           THE COURT:  State.
11           You know, Judge, if we could get union folks back to
12   work, if we could put 600 shovels in the ground, if we could
13   undertake, you know, a real Renaissance in building, our costs
14   are about 15 to 20 percent.  That's our wage.  But we on the
15   union side get blamed for these, you know, exorbitant costs.
16           I was stunned when I read this because I saw it was
17   Michele Martinez when she was the Vice Mayor of Santa Ana do
18   something that I had never seen before or since, and that was
19   she gathered all that bureaucracy in Santa Ana and literally
20   put them in the complex courtroom next door to mine and it was
21   a bloodbath.  I walked out because there was a lot of tough
22   talk.
23           But one of the things that they decided was this,
24   that they would take the permit issuer and have them sit at a
25   chair at the building site.  And so what happened when they had
```

1    a problem, they walked up and said, "Hi, permit issuer, here's

2    what we'd like you to sign off.  I know you've done this wrong.

3    Go back and correct it."  And they went over there and

4    corrected it and came back.

5            And one of the things that occurred was that there

6    was a speed in implementation to that that stopped that

7    paperwork going into an office where it disappeared for three

8    days or three months or three years and that product just

9    moved.

10           When you said development fees, I understand that.

11   Consultants, I understand that.  Financing, I think I

12   understand.  What lowers that cost figure?  What lowers that

13   percentage?

14           CONTROLLER GALPERIN:  Well, I think that we really

15   need, first of all, to bring together not just city officials

16   but also those from the state that are very much involved in

17   this process.  That's the first.

18           The second -- and I don't know whether the Court has

19   had an opportunity to speak with some of the developers who

20   were actually doing this project, these projects, and I have on

21   numerous occasions.  And they also can provide often a laundry

22   list of the ways in which the process has been slowed down and,

23   in fact, stymied.

24           And we've been talking about this for many, many

25   years in the City of Los Angeles, both in terms of planning, in

```
 1   terms of building and safety, in terms of the financing that is
 2   involved from other sources.
 3           But bringing all these parties together, I think,
 4   could be a very productive endeavor if done in the right way.
 5   Moreover, I think talking to some of the -- some of these
 6   developers -- mind you, some of them are making some very good
 7   money doing this, but they also have their own frustrations
 8   about the length of the process.
 9           THE COURT:  We're going to turn to the 2020 report
10   for just a moment.  We're actually going to put it up, at least
11   the first two pages.
12           And on page -- or No. 22 -- this is going to take
13   some higher math.  Okay?  You'll see there are 5,522 supportive
14   units and now 1,557.  So watch.
15           If you would go back, ask my wonderful clerks, to
16   Slide No. 19.  And if we could take the figure you tossed out
17   to us, you had 5,873 supportive units in 2019, but we've
18   decreased to 5,522 units.  And that's 351 units.  That's a lot
19   of units in a year.  And when I take my affordable housing, we
20   come out with well over 500 units between affordable and
21   supportive that have just gone down from our original 10,000.
22   What's happening?  Because we went from 10,000 down to 7,000
23   down to -- we keep moving down.
24           And what I'm afraid of is this, Ron.  You go to
25   Home Depot at all?
```

1     CONTROLLER GALPERIN:  I love going there.

2     THE COURT:  Yeah.  Cost of plywood, two-and-a-half

3 times to three times right now.  Building is up.  And so when

4 I'm looking at these figures today, I'm terrified that as we

5 try to get housing out there, that I'm going to see a decrease

6 in these numbers next year and even the next year and so what's

7 being presented today in good faith to me by the City and the

8 County is going to turn out to be fiction.  And I'm concerned

9 that we all wake up ten years from now -- and Proposition HHH,

10 which is a great program if we can do it, and we're not going

11 to be anywhere near the 5,000-some-odd-hundred that we have

12 today because we're already plummeting downward.

13     Help me.  Am I wrong?  Will the cost of the building

14 materials not affect our future?

15     CONTROLLER GALPERIN:  Absolutely.  Look, I'm not an

16 economist, nor am I a construction expert.  But I think we all

17 know that costs increase.  Time is not necessarily on our side.

18 And certainly, the cost of construction materials, we know, has

19 increased significantly.  The cost of land has increased

20 significantly in Los Angeles just even over the last year, even

21 amidst the COVID crisis that we have.  So the longer that it

22 takes to do, the more expensive it becomes.

23     THE COURT:  Okay.

24     CONTROLLER GALPERIN:  And a concern of mine, which

25 was laid out in these audits and which still remains to be the

```
1    case, is that HHH provided us for up to $1.2 billion in bonding
2    capacity.  We've only issued at this point $362 million of
3    those bonds.  We haven't spent all of that yet.  And there is,
4    as part of the Mayor's budget, a plan to, in fact, issue more
5    bonds and spend more of that money.  That's a good thing.  But
6    we have to find ways, I believe, to speed this process up.
7              THE COURT:  Okay.  The next page -- oh, I'm sorry.
8    The bottom of page -- I'm going to say 22.
9              And then, Ellie and Alexa, we're going to flip to
10   23.
11             "COVID-19's impact on these already lengthy
12   timelines is not clear but will certainly extend them.  And it
13   is possible that some projects in the pipeline today may never
14   come to fruition."  It's that last portion I'm interested in.
15   Help me with what you were stating there.
16             CONTROLLER GALPERIN:  Well, because these projects
17   depend on multiple financing sources, that can take a very long
18   time and sometimes those financing sources may not come
19   through.  And if that happens, we -- we provide a -- a
20   preliminary commitment to fund a certain amount of money for
21   these projects, but that's also based on other, as it were,
22   ducks being lined up.  Sometimes they are and sometimes they
23   are not.
24             And one of the things that I've really been wanting
25   tremendously to see is the -- the outliers in terms of time and
```

**UNITED STATES DISTRICT COURT**

```
 1    also a realistic assessment of are there some that may be
 2    having problems in terms of ever coming to fruition and is
 3    there an opportunity to perhaps look at repurposing some of
 4    that money.
 5           I'm not suggesting that we pull the rug out from
 6    under projects that are, in fact, underway, even ones that may
 7    be cost outliers.  But we do need to look realistically at
 8    whether there's some projects that are just having a little bit
 9    too much difficulty coming to fruition.
10           THE COURT:  When I requested an audit -- I'm sorry,
11    ordered an audit, I'm not particularly interested in a
12    placement audit.  I was particularly interested in what we were
13    seeing before you got here and the possibility that
14    documentation wasn't being submitted and not through the City,
15    through the County with Measure H that would document what the
16    provider was doing.  That didn't mean skulduggery.  It just
17    meant you need documentation, you need to show us a date, you
18    need to show us what you're doing and that way we can see what
19    you're doing and what the milestone should be, et cetera.
20           But there are two things that occurred.  And one is
21    that, in my opinion, I stayed away from the Huizar matter
22    because I didn't like the idea of Judge Walter presiding on
23    Huizar and Judge Carter writing on the opinions, so I just
24    alluded to it someplace in the opinion.
25           But I was really concerned about two incidences that
```

```
 1    I think you called to our attention and one was what I call a
 2    buyback.  One was for $6 million and then it turned around and
 3    the person with HHH purchased it for 12 and then 8 and 8, I
 4    think.  And you can find at your convenience that portion in
 5    our opinion.
 6            I don't want to undertake, you know, a goose chase
 7    over $14 million.  But by the same token, if we've got a
 8    problem, then I need a forensic audit.  And I trust you
 9    immensely, but I need to find out if this is more than just
10    these two incidences that were picked up in the press and that
11    we looked at.
12            Do you have any thoughts or comments about that?
13    Because I can limit these audits.  I'm pretty flexible about
14    that.  I know one thing, I am concerned about Measure H and I'm
15    somewhat not concerned about your position in terms of
16    placement.  I'm concerned about the forensics out there with
17    HHH.
18            And I don't want to kill the golden goose.  In other
19    words, I want to complete that, I want to see those projects go
20    through, and I want the solidarity of your investors to have --
21    so I drew back on that.  I stayed that portion of my opinion to
22    make certain.
23            But you can also see, I'm also thinking if this
24    keeps spinning up, am I going to be in the position eventually
25    of seriously looking at a receivership?  Am I going to have to
```

```
1    be in the position eventually of looking at city land or
2    hotels?
3                And I thought Mr. Barham was going to be here
4    because I wanted, once again, to hear how much the City has
5    contributed to the hotels in terms of tax opportunities and
6    breaks and whether that shouldn't, in fact, be retrieved -- and
7    it shouldn't have been retrieved, quite frankly, during
8    COVID-19.
9                So I don't know if everybody needs to stay at the
10   Ritz-Carlton.  And I did get a little concerned about, you
11   know, what's the fair value of that, if the Ritz-Carlton came
12   back and said, well, it's $485 per night.  But everything's on
13   the table for me.  I mean everything.
14               So let's talk about land for a moment.  I got the
15   silliest response from the City a federal judge could ever ask
16   for last summer about, golly gosh, Judge, we just don't have
17   any land.  And I can read it to you, but it's embarrassing.
18               But Ms. Sobel jumped up and said, you know, we've
19   got 15- to 17,000 pieces of property, you know, city-owned.
20   And when you first hear that drama, that sounds like an awful
21   lot, Ron.
22               At the same time, I'm being confronted with the
23   promise from Caltrans that we have 300 pieces of property that
24   the City is going to get -- you know, here we are, City -- and
25   then they have to explain to me that we're down to 21 and then
```

1    down to 18 and down to three and down to none.  So you could

2    think what I'm thinking.  I can't spell the word, but you'll

3    get it.

4           So I'm watching this -- this go on with these

5    promises of 300 pieces of property and Caltrans is in here with

6    the drama of explaining how they're entering into leases.  And

7    it turns out to be nothing, zero.  I need your help.

8           First of all, I would think that if the City and the

9    County are going to enter into these good faith negotiations

10   that they think -- that they're telling us about, then we will

11   want geographical dispersion.  We wouldn't want to download

12   into Skid Row, nor would we want to disperse.  We'd want to

13   build it up.

14          Number two, we had a whole struggle over Los Angeles

15   Street which gave everybody a heart attack apparently because

16   we might put with equality something up on Los Angeles Street

17   instead of Skid Row for a change, a particular piece of

18   property.  Folks pushed back on it.

19          Do I have some geographical dispersity?  Because I

20   was told you had 81, approximately, pieces of property that you

21   were looking at.  So help me.  I don't need the exact locations

22   right now, I trust you.

23          CONTROLLER GALPERIN:  Well, let me address a number

24   of things that you just brought up, if I may.

25          First of all, you began by discussing a particular

1    example of a property and some transactions that had happened

2    in connection thereto.  And I don't believe that that is

3    necessarily indicative of other transactions that have happened

4    regarding these properties, but certainly we can look further

5    into this.

6              Now, mind you, we have auditors and the best

7    anywhere, I might add, but we also have limiting -- limited

8    auditing resources, not a lot of people who can actually do

9    this.  So we have to choose what it is that we're going to

10   invest our time in.  And right now, we're investing a lot of

11   that time specifically in terms of identifying potential

12   properties.

13             I will come back to that in one second.

14             You also mentioned the issue of hotels.  And I had

15   actually issued a report specifically on this issue and about

16   close to $1 billion in various, dare I say, tax breaks -- it

17   depends on how you actually characterize it -- that were given

18   to some of the largest hotel projects.

19             The argument is that they needed these projects in

20   order to be feasible.  And there is other consultants that are

21   hired to come up with a feasibility gap.  And if there's a

22   feasibility gap and they make that case, then the City helped

23   to fill that feasibility gap.

24             But I do think that for some of those projects,

25   there is nothing wrong.  And it's, in fact, appropriate to look

1    at whether there may be some opportunities to say are there

2    ways to give back, especially in this time where we face the, I

3    believe, existentialist crisis of Los Angeles, which is what

4    we're here for, which is the crisis of homelessness on our

5    streets.

6           As to land, this has, of course, always been a great

7    interest of mine.  And even before becoming Controller, I -- I

8    was a real estate attorney, among other things.  And so this

9    was of great interest.

10          And it was shocking to me years ago that there was

11   no list of all the properties the City owned.  And so we sought

12   to put it together from a variety of different sources.  We

13   came up with the property panel, as you know, which identifies

14   properties owned by a number of different jurisdictions,

15   including the City of L.A., about 7700.  Although, at our

16   latest count, it's actually perhaps closer to 8100.

17          Now, having said that, let's be honest about what

18   many of these properties are.  Some of them are medians, some

19   of them are inaccessible hillside properties, some of them are

20   municipal buildings, are parks, and some of them are other

21   kinds of facilities the City uses that are not at all

22   appropriate for -- for the kinds of uses that we are discussing

23   here.

24          But I have long believed that there are a variety of

25   them that could be used for perhaps interim or more permanent

1    purposes when it comes to housing or -- or some other use that

2    can be helpful with this crisis.

3         Let me just briefly tell you the sources which we

4    are trying to gather information from right now as we seek to

5    take all those large number of properties and actually make

6    sense of them.

7         We have our own property panel, as I mentioned, but

8    there are many different sources of this information.  And

9    putting them all together is no small task, including GSD,

10   which is our General Services Department, the CAO's office, the

11   AssetWorks system of the City.  We're consulting with brokerage

12   firms, uh, with, um, our emergency management department, with

13   rec and parks, council offices, the Mayor's office, looking at

14   prior reports, and also some work that was done by the Mayor's

15   Bloomberg team a number of years ago.

16        And what I've also found is that there are many

17   cooks that have been in this kitchen at various times.  Among

18   them, looking at some of the entities that have had a role in

19   this -- again, the CAO, the Housing + Community Investment

20   Department, there's a Property Working Group, an asset

21   management team, an Integrated Asset Services division, a

22   Roadmap Working Group, the AssetWorks database.  And I'm not

23   even sure that that is the full list.

24        But what we're trying to do is to actually gather

25   information from all these disparate sources, all of which are

**UNITED STATES DISTRICT COURT**

1    well-intentioned and have worked on these issues at various

2    times.  But I think that there is a real opportunity to look at

3    this.

4           And then the third component is the vetting process.

5    And we're not really in my office equipped to do that

6    comprehensive vetting.  But some of the issues, of course, that

7    are going to have to be looked at when it comes to properties

8    are what are the current and contemplated uses.  There are also

9    restrictions of ADA, fire department, pollution, the FAA, the

10    Coastal Commission, power lines, access to water and power,

11    proximity to services and transportation.  Some of these

12    properties are owned by proprietary departments that we don't

13    necessarily have a right to use, even though they are part of

14    the City of Los Angeles.

15           So we're trying to take all of those things into

16    account so that we can come up with a somewhat, hopefully,

17    intelligent list of properties that are the best targets for

18    looking into for the uses that are the exact ones that you are

19    contemplating.

20           THE COURT:  I'm going to pause for a moment because

21    I haven't asked the City, while these witnesses are here, if

22    you'd like to present any evidence concerning structural racism

23    or the lack thereof.  In other words, I've spoken to the County

24    about this.  Now I'm speaking to the City.

25           MR. MARCUS:  Thank you, Your Honor.  Scott Marcus

```
 1    for the City.
 2              No, the City does not intend to present any
 3    evidence.  The City did not request a hearing -- contrary to
 4    how it was described in the amended stay order, the City did
 5    not request a hearing on the findings.  The City pointed out
 6    the lack of opportunity to discuss the evidence or the law upon
 7    which the Court based its order was one of the flaws of the
 8    order, and that's one of the bases for the appeal.
 9              THE COURT:  Do you have any questions, by the City
10    or the County, of the Controller?  Or the advocates.  And I
11    apologize.
12              MR. MILLER:  No questions for the County,
13    Your Honor.
14              THE COURT:  Shayla Myers, Brooke, any questions of
15    the Controller?
16              MS. WEITZMAN:  No, Your Honor.
17              THE COURT:  Because it's like The Rocky Horror
18    Picture Show.  We started to hear a year and three months ago
19    with the statement there were 15,000 pieces of property, and we
20    started with the 300 Caltrans properties at that time.
21              And, L.A. Alliance, do you have any questions?
22              MS. MITCHELL:  Excuse me, Your Honor?
23              THE COURT:  Do you have any questions of the
24    Controller?
25              MS. MITCHELL:  No.
```

1   THE COURT:  Do any of you have any questions of any

2   other witnesses that have appeared here today?  Manny Abascal,

3   I see you're still here.  General Jeff's here.  Pastor Cue is

4   here.  I think everybody's still here.

5   MR. UMHOFER:  No.  No.

6   THE COURT:  Okay.  I think the last thing that --

7   well, amongst many things that struck me about your report is

8   I'm wondering how far I need to go outside the system in

9   ordering an audit.  And I'm not too certain I need to go very

10  far outside the system in dealing with you.

11  In other words, you may have that capability of

12  undertaking a forensic audit, just -- just for transparency, to

13  make sure that HHH is moving along and that we don't have any

14  future concerns.

15  CONTROLLER GALPERIN:  Let me add, by the way, that

16  we are doing annual audits of HHH because those are actually

17  provided for and required by the language of the measure.

18  THE COURT:  I saw that.  I wasn't certain, though,

19  if those were placement audits.  And I believe that they were

20  placement audits at the time and not forensic audits.

21  SPECIAL MASTER MARTINEZ:  Program audits.

22  THE COURT:  I mean program, I'm sorry.  Placement --

23  I'm sorry.  Program audits.  My apologies.

24  CONTROLLER GALPERIN:  Well, they are somewhat of a

25  hybrid between a financial audit and a performance audit, as we

```
 1  might call it.
 2          And again, there's limitations to the amount of
 3  resources that we have to look in-depth at each and every
 4  single property.  But we've tried to do our best to look at
 5  both the finances and what the results may be.
 6          THE COURT:  Okay.  Let's wait to see what happens
 7  with the administrative stay or if the parties reach a
 8  settlement in this matter in the interim period of time.  But
 9  we'll get back with you to discuss that thoughtfully and how we
10  save resources and get the best information.
11          I don't have anything further.
12          Judge, do you?
13          THE HONORABLE JUDGE BIROTTE:  No.
14          THE COURT:  Do you?
15          SPECIAL MASTER MARTINEZ:  No.
16          THE COURT:  I want to thank you very much.
17          CONTROLLER GALPERIN:  My thanks to the Court as
18  well.  Thank you.
19          THE COURT:  Thank you.
20          Oh.  And one last thing before you go.  Yes, I did
21  have one more, just one more little underline that I had
22  forgotten.
23          It's in the 2020 -- it would be on page 23.  The
24  last thing I noticed was -- well, we went from 10.8 percent --
25  and it's going to be in the third full paragraph.  We went from
```

```
1    10.8 percent in our 2019 audit to units costing more than
2    $600,000 to 28. -- I think I'm doing that by memory --
3    28.5 percent.  It tripled in terms of our units costing 600,000
4    or more in one year.
5              What happened?
6              CONTROLLER GALPERIN:  Well, of course, costs only
7    increased with everything, as we know.  And there are, of
8    course, concerns about inflationary pressures right now,
9    particularly on building materials.  And we're already seeing
10   that manifest.  But this is why I have been undertaking these
11   audits and doing so on an annual basis so that everybody can
12   see what these numbers are.
13             I do think that we could accomplish a great deal
14   with much better coordination between the City and other
15   government and other entities that are a part of the financing
16   and approval process.  I think that we could accomplish things
17   by yet further seeking to streamline approval processes within
18   the City of Los Angeles.
19             And I think we also have to examine what it is that
20   we are building, the paradigm.  There are many different
21   paradigms in terms of what gets created and in terms of what
22   kind of spaces they have and square footage and so much more,
23   what are some ways that we can examine the paradigms that we've
24   created and are there ways to do it more cost effectively and
25   more -- more expeditiously.
```

1      You asked the question, actually, very early on
2  about simply buying properties and why not just do that.  And
3  the reality is, as we know, the real estate market is pretty
4  hot in Los Angeles right now.  There's not a huge amount that
5  is available.  Moreover, there's certainly not much that's
6  available that is vacant that we would then be able to house
7  people who are not already housed, which is why there is an
8  important imperative to create more units.
9      But we also have to look at how we in the interim
10  can find imperfect solutions, dare I say, to at least save
11  lives and to help get people off the street and into whatever
12  may be the next stage to hopefully improve the current state of
13  affairs.
14      THE COURT:  I'm always curious when -- what the
15  square footage is and the dollar cost.  So I look at Zillow.
16  And I see a house on the market, it's X dollars per square
17  foot.  When I look at Skid Row in particular and especially the
18  timeline I've got concerning this rain, I don't assume there
19  are a lot of three-bedroom homes down there that I've seen.  I
20  haven't seen any.
21      What in particular with Skid Row gets people into
22  shelter or housing or housing and shelter down there on this
23  timeline that I've set?  In other words, give me some advice.
24  What do I do if I'm not willing to countenance or be complicit
25  any longer in this -- these conditions?

1             CONTROLLER GALPERIN:  Well, I believe that you and

2 this Court have previously listed a number of different options

3 and options that have been discussed among various people

4 within our city and within our county.  Because let's be

5 honest, we don't have all of the permanent supportive housing

6 units today that are actually needed.  And they're going to

7 take quite a bit of time in order to create.

8           And even if all the HHH units are finished tomorrow,

9 which we know is not happening, that still is not going to be

10 enough; although, it certainly makes a dent and changes lives

11 in very meaningful ways.

12           I think we have to better understand, first of all,

13 what do we mean by "permanent" and what do we mean by

14 "supportive."  Different people need a different sense of

15 permanency.  Different people need different levels of

16 supportive services.  And the first priority, it seems to me,

17 is:  How do you get people from our sidewalks into something

18 better?

19           I know there's been a lot of discussion and I happen

20 to be very supportive of this, for safe tenting and safe

21 parking areas, for areas of trailers, for shed housing, for

22 other kinds of ways in which we can help to transition people

23 off the streets more quickly.

24           I'll be the first one to say that I think we know

25 there are multiple problems related thereto and multiple

 1  difficulties.  But when I see what is happening in terms of the

 2  tragedy that has unfolded on our streets and the number of

 3  people who are dying and who are getting worse and worse on a

 4  daily basis, I think that even some of these more temporary

 5  solutions can be an improvement, especially when really coupled

 6  with services, when coupled with showers, when coupled with

 7  bathrooms, laundry services, all of those things.

 8       I mean, I think about myself.  If I had to go even

 9  just a couple of days, any of us in this room, a couple of days

10  without the opportunity to just take a basic shower or to be

11  able to launder one's clothes, what would that do for our

12  mental state.  It would be devastating.  And there are people

13  who have been dealing with this for years.

14       So I think there are some really humane and

15  expeditious ways that we can at least make things better.

16       THE COURT:  Let me take Skid Row for a moment

17  because when I walk around, I see lots of buildings.  In fact,

18  a lot of vacant buildings, frankly.

19       I want to pick on John Lee's district again or -- a

20  lot more land out in the Valley, what appears to be.  Skid Row,

21  if you had something interim, how do you turn that into

22  something permanent?

23       In other words, what I saw with the tiny homes was

24  almost a joke.  It was starting with, oh, here's a tiny home

25  and $140,000.  Well, what the City did is they tacked in all of

1  the long-term costs and built up the cost of the tiny home to

2  $140,000.  Now it's 70,000 or working south very quickly.

3         But in a sense, I liked the concept because if you

4  got an interim structure in and you did get the plumbing and

5  electrical in and you could take that same site and then

6  convert it, you know, into 3-D homes or whatever, that's the

7  best of all -- both worlds because we're not duplicating that

8  infrastructure.

9         But I'm feeling like Skid Row, when I'm treating it

10  almost like its own city in my remedy section, that I've got an

11  entirely different problem.  And there, it is building up where

12  I call it almost condos in a sense within buildings.  And I

13  don't know what the cost of a square foot is, I don't know if I

14  care if the money is there from the Government.

15         Help me with that.  How do we invigorate, let's say,

16  enhance Skid Row without scattering folks?

17         CONTROLLER GALPERIN:  Well, I'm not an expert on

18  development, nor will I claim to be an expert on what's

19  happening in Skid Row.  And, of course, there's a long history

20  of what has transpired in what we call Skid Row which, of

21  course, has really grown over the course of the last couple of

22  years.

23         But certainly, as you correctly state, there is not

24  a lot of land there.  There's not a lot of parking lots there.

25  There's not a lot of empty space.  It's about how it is that we

```
 1   can take what might be there and hopefully repurpose it in some
 2   fashion and in a way that will be saving lives.
 3          And that's looking not just at properties that are
 4   owned by any particular government entity; although, that's a
 5   very important component of it.  But there's also plenty of
 6   properties that are owned by the private sector.  And are there
 7   ways that we can make it desirable for them to do something?
 8          There are many property owners down there also that
 9   are very concerned about what has occurred.  Their own property
10   values have been impacted.  They're having trouble getting
11   tenants in many cases.  So perhaps they may be more amenable
12   today than they might have been in a year or two years past in
13   terms of what -- what might go into a property that they might
14   own.
15          THE COURT:  I promise, last question.
16          I watched in various parts of the city the influx of
17   trailers that came in in so many different locations that we
18   visited, hundreds of trailers, initially marshalled out in the
19   Valley and different places.  And then they went in for
20   COVID-19.  And a lot of infrastructure went in there, but it
21   went in inexpensively.
22          I was surprised at the cost of getting the
23   electrical and sewage in, compared to what I was seeing with
24   even these interim tiny homes.  They were so much more
25   expensive.
```

```
 1              And the second thing is I was wondering why, once we
 2   had them in this location for COVID-19, we were tearing all of
 3   that down, putting trailers up on a hill and not just leaving
 4   those trailers as they were out in the Valley at different
 5   locations for the homeless.
 6              Were you part of that decision-making process, or do
 7   you -- can you enlighten me on this?
 8              CONTROLLER GALPERIN:  That's not a decision-making
 9   process that I was part of.  And there's certainly a number of
10   locations where that has occurred.  I don't know how
11   appropriate those are or aren't for transitioning into
12   something else.
13              THE COURT:  Just a moment.  They were good enough
14   for COVID --
15              CONTROLLER GALPERIN:  There were a lot of
16   trailers --
17              THE COURT:  Hold on.  They were good enough for
18   COVID-19 and they went up really quick.  And I saw the sewage
19   and I saw the lights and it looked terrific.  And then it got
20   torn down.  And I'm thinking, well, why not homeless?
21              CONTROLLER GALPERIN:  Well, that's something
22   certainly that we have not had the opportunity to look at in my
23   office.
24              THE COURT:  Okay.  So you're not part of that
25   process.
```

```
 1               CONTROLLER GALPERIN:  We have not been part of that
 2   process; although, I think it's certainly worth looking into.
 3               THE COURT:  Okay.  I want to thank you very much for
 4   your appearance today.  Very much appreciate it.
 5               CONTROLLER GALPERIN:  Thank you so very much,
 6   Your Honor.
 7               THE COURT:  Now, Counsel, any other questions?
 8   Questions?
 9               MR. MILLER:  No.
10               THE COURT:  Questions?
11               MR. UMHOFER:  No.
12               THE COURT:  Questions?  Okay.
13               CONTROLLER GALPERIN:  Thank you.
14               THE COURT:  Well, give us one minute, then.
15               (Pause in the proceedings.)
16               THE COURT:  Ellie, Alexa -- I'm checking with my
17   esteemed law clerks to make certain I'm done.
18               Let me turn to L.A. Alliance.  Questions or anything
19   you'd like to say, address the Court, any concerns?  This is
20   your opportunity.  And then I'll turn to each of the parties.
21               MR. UMHOFER:  Nothing further from the plaintiffs,
22   Your Honor.
23               THE COURT:  Let me turn to the City.  Marcus, on
24   your behalf.
25               MR. MARCUS:  Nothing further from the City,
```

1    Your Honor.

2            THE COURT:  Skip, on your behalf, the County.

3            MR. MILLER:  Your Honor, I think my partner,

4    Ms. Hashmall, wants to just clarify one point.

5            MS. HASHMALL:  Good afternoon, Your Honor.

6            THE COURT:  Good afternoon.

7            MS. HASHMALL:  Mira Hashmall for the County.

8            I just wanted to sort of make sure that I was --

9    clarified a conversation we were having earlier about the

10   audits and your injunction order.

11           THE COURT:  We'll discuss that with my Special

12   Master.  She's had a number of conversations.  They've been

13   just satisfactory so far.  Why don't we have that private

14   conversation.  Thank you.

15           MS. HASHMALL:  Okay.  Thank you, Your Honor.

16           THE COURT:  Let me turn to Shayla Myers or Brooke or

17   Carol or all three.

18           MS. MYERS:  Your Honor, I just want to say just one

19   thing because I think there's been a fair amount of

20   conversation today, first of all, about structural racism and,

21   second of all, about a settlement agreement.

22           And we just want to be very, very clear.  We talk

23   about where this case came from and where this case is going;

24   that we are not, if this case continues down this path, in any

25   way addressing the structural racism that Your Honor

 1   identified, that Pastor Cue spoke incredibly eloquently about

 2   today in this courtroom.

 3         This case -- and we have to be clear about Skid Row

 4   and the history of Skid Row.  We have to be clear about what

 5   containment policies have meant in the city of Los Angeles.

 6   And we have to be clear of the implications of what both the

 7   Court's injunction means and also what the proposals that are

 8   on the table to settle this agreement mean for the people of

 9   Skid Row, for the people who have been disproportionately

10   impacted by the City and County's history of structural racism

11   that continues today.

12         This case was brought last year by property owners

13   in Skid Row to address what every case in Skid Row has been

14   about, which is the visible impact of homelessness on property

15   owners in Skid Row.

16         This case is not about eliminating the wrongs of

17   structural racism.  It is at its worst a demand to continue the

18   racist policies that got us here in the first place.

19         This case, when we look at it as reflected in the

20   pleadings, take issue with Skid Row and the impact on property

21   owners.  This case and the plaintiffs take issue with the

22   impact of homelessness by discussing the impact on landlords

23   and property owners.  It does not talk about the impacts of

24   structural racism on the people who are disproportionately

25   impacted.

1     This case is -- to the extent that Your Honor

2 addressed structural racism in its preliminary injunction, we

3 just want to be clear that structural racism and the impacts

4 of -- on Skid Row are not reflected in the plaintiffs' factual

5 allegations and that the history of Skid Row and the history of

6 the containment policy in Skid Row is the history -- is about

7 gentrification and nothing more.

8     When we talk disparagingly about a containment

9 policy that was adopted in 1976, it was to preserve the largest

10 stock of affordable housing that exists in the city of

11 Los Angeles.

12     When Your Honor listens to Skid Row Housing Trust

13 and SRO Housing, those entities exist because in 1976 the City

14 of Los Angeles agreed to preserve affordable housing in

15 Skid Row.

16     That is what the containment policy was about.  It

17 was about preserving affordable housing, which is why today the

18 largest stock of affordable housing that exists in Los Angeles

19 exists in Skid Row.  That is the history of Skid Row, that is

20 the history of containment, and that is what we have to talk

21 about when we are talking about Skid Row.

22     We also have to understand that when this Court

23 orders and when the plaintiffs ask for the clearing of

24 Skid Row, we are not talking about eliminating structural

25 racism.  We are talking about continuing the policies that got

 1     us here in the first place.

 2            It should not come as a surprise to anyone, let

 3     alone this Court and certainly not to the intervenors, that

 4     nine days after the Court issued its preliminary injunction,

 5     there was an announcement that one of the representative

 6     members of the L.A. Alliance for Human Rights, Larry Rauch, is

 7     the principal land owner of a $2.4 billion property development

 8     in the heart of Skid Row.

 9            This case is about gentrification.  It has always

10     been about gentrification.

11            I want to talk just briefly about the settlement

12     discussions.

13            The intervenors have been willing to come to the

14     table since the beginning.  I believe everyone who has been in

15     the room has heard us say it as the representatives, has heard

16     our clients, the intervenors say that we are willing to come to

17     any table that is willing to discuss housing and true and

18     honest solutions to the City's affordable housing crisis.

19            But the conversations to date have never been about

20     that.  The conversations in this case about settlement have

21     focused on enforcement.  And when the last settlement

22     conversations broke down in September, they broke down because

23     the conversation could not move beyond enforcement.

24            This case is not about structural racism, but it

25     does not mean that a settlement agreement that looks deeply at

```
 1   addressing these issues could not start to address some of the
 2   issues that Your Honor has sought to identify.  But the reality
 3   is if we continue down this path, we will be re-inscribing the
 4   racist policies that have for so long defined this City.  We
 5   will be doing nothing to address them.
 6             THE COURT:  Give us just one moment.
 7             (Pause in the proceedings.)
 8             THE COURT:  We're going to conclude in just a moment
 9   with our best wishes towards all of the parties.
10             SPECIAL MASTER MARTINEZ:  Carol wishes to speak.
11             THE COURT:  Oh, I'm sorry.  My apologies.  I saw
12   Shayla and -- Carol, please, I'm sorry.
13             MS. SOBEL:  That's okay.  I just wanted to echo --
14             THE COURT:  And would you move the mic closer,
15   Carol?  You don't have to stand, just so we can hear.
16             MS. SOBEL:  Okay.  Yes.
17             And, Your Honor, Pete White, who is the intervenor
18   from L.A. County, would also like to address the Court.
19             But let me just say quickly that it -- the proposal
20   that has been put on the floor, the proposal that has been
21   discussed by the Court, I agree fully with Shayla Myers that it
22   will just further institutional racism and structural racism.
23   But more importantly, it will use up the money that is
24   available probably once in our lifetime to create real
25   solutions about housing in this city.
```

1        The evidence -- and this is, you know, the Lawson

2   study.  This is Ron Galperin's study.  No one -- almost no one

3   moves from shelters to housing in this city because there is no

4   housing.

5        And if the Court wants to look at the recent report

6   put out by Sage about south L.A., the property being built up

7   by the corporate -- being bought up by all the corporate

8   owners.  And if you look back to 2008 and the property bought

9   up by One West Bank, we don't have private property owners

10  anymore here.  We have corporate owners.

11        I know that you had a long discussion earlier about

12  finding landlords.  We cannot find landlords who will take

13  Section 8 housing.

14        And I know that Councilmember Cedillo has attempted

15  to and has successfully negotiated some extensions of these

16  Section 8 housing.  But we knew in L.A., we knew in 2013 at

17  least -- that was the last time we filed the general plan --

18  that there were going to be close to 20,000 units of Section 8

19  housing that would expire by last year.

20        And that means that that is -- that subsidized

21  housing is no longer available.  That is really critical in a

22  city where there is a ten-year waiting list for subsidized

23  housing.

24        So all of these things have to be considered.  And

25  just putting people in shelters will waste money, will

1   demoralize people, will contribute to the deterioration of an

2   unhoused population, and will not reach real solutions.  We

3   have this opportunity now.

4           I would just add one other thing.  When Ms. Myers

5   talked about the 1976 order, in 1986, Mayor Bradley issued a

6   moratorium on the destruction of low-income units on Skid Row.

7   Despite that, there was no enforcement of that.  So by the time

8   that the *Jones* case was filed, just 16 years later, we had

9   lost -- I believe it was close to half of the previous

10  affordable units on Skid Row because no one paid attention to

11  the moratorium.

12          When we -- around the time that we filed *Jones*, the

13  Cecil and the Bristol became available.  They are two very

14  large tourist hotels, 1,000 units, I think, in one or the

15  other.  And the County Board of Supervisors, the person who was

16  then over that district, did not want to buy them, buy either

17  one of them because homelessness was viewed as a black problem

18  in Los Angeles.

19          And that is just furthering the racism that has

20  affected this -- impacted this issue throughout Los Angeles's

21  long history.  So I think that we need to think about those

22  things.

23          I'm not going to go into what happened with the

24  Metro and the gentrification and the destruction of stable

25  communities of color in this city.  You can't ignore that.  But

1   I'm just trying to deal with the last ten years of the City's

2   policies.

3           What Ms. Myers raises about that development project

4   is really critical because what has happened throughout this

5   city, not just Skid Row, throughout this city is the issuance

6   of permits to redevelop in once stable communities of color,

7   taking out those units.  We have a huge -- you know, a lot of

8   these places were large green spaces.  So there is a lot of

9   land there.  And we have high-end developers coming in, they're

10  close to Metro stops now.  Those are not going to the people

11  who lived in those communities for years.  Those are going to

12  the upper-class white people who now think it's fashionable to

13  move into the Crenshaw District.

14          So I think that we need to -- you know, if we want a

15  real solution, we need to understand what the problem is.

16          THE COURT:  I'll let Pete White come forward.  And I

17  apologize.  I didn't realize -- I saw you, but I didn't know if

18  you were speaking or not.

19          MR. WHITE:  No apologies necessary.

20          Thank you for this opportunity.  And I'm going to

21  strive for brevity here.  But thank you for this opportunity to

22  address the Court, Judge Carter, Judge Birotte, and Special

23  Master Martinez.

24          I think one of the things -- I think one of the

25  problems in conversations like this is that there is an

1   assumption when we use terms like "structural racism" and

2   "racists" and "racist attitudes," that we all believe we are

3   talking about the same thing.  Right?

4           So just to be clear about what we're talking about

5   when we're talking about structural racism, we're talking about

6   a system in which public policies, institutional practices,

7   cultural representations, and other norms work in various and

8   often reinforcing ways to perpetuate racial group inequity.

9   We're talking about a system.  We're talking about policies and

10  cultural representations.  It's not something that a few people

11  choose to do or institutions choose to practice.  Instead, it's

12  been a feature of the socioeconomic and political systems in

13  which we exist.

14          And so when I hear the city and the county counsel

15  flippantly say, well, structural racism isn't in the pleadings,

16  it's all in the pleadings.  It's mired, it's inextricable.

17          But we have to be careful because it has become

18  quite easy to acknowledge structural racism.  We hear it every

19  day from every podium, from every hall of power, we heard it

20  this morning from county supervisors.  And I think it creates a

21  problem for county counsel and city counsel when the Mayor

22  comes out and says we are responsible or we acknowledge the

23  role of structural racism.

24          However, acknowledgment without action simply adds

25  to the trauma and harm experienced by the victims.  So as

1    quickly as someone sits up here and says, oh, yeah, it exists

2    and does nothing about it, it further victimizes and

3    re-entrenches the system.

4          I've sat uncomfortably in this room all day

5    listening to filibusters enshroud responses to the reality of

6    structural racism because the portraits that adorn the walls of

7    this courtroom serve as a stark reminder of how structural

8    racism has flourished and remained a feature of socioeconomic,

9    legal, and political systems.

10          Gary Blasi reminds us that the law represents the

11    voices of those in power.  Everyone in this courtroom who's

12    talking about the situations and the issues and those in power

13    aren't folks who look like me.  And we, we are far -- we have

14    far enough resilience to do that.

15          The remedies offered -- let me just say this.  The

16    remedies offered continue to center whiteness and a nexus to

17    criminalization reinforcing said structural racism.  Tool sheds

18    and parking lots, masquerading as housing and whose perimeters

19    are patrolled by the police is a carceral arrangement rooted in

20    structural racism.

21          Assertions that people are service-resistant and

22    don't want housing is as racist as the welfare queen tropes and

23    are dangled for public consumption to destroy the already

24    meager minuscule safety nets.  And it's also a tenet of

25    structural racism.

```
 1              There continues to be little conversation about
 2      repair.
 3              If we look to Evanston, Illinois, recently admitted
 4      the role of -- here we go, Illinois recently admitted the role
 5      of structural racism in housing.  And as a way to begin to
 6      repair the harm, they've offered $25,000 to those black
 7      families that can prove that they were -- that they once lived
 8      in the communities before they were forced out.
 9              So we continue to play these games and we continue
10      to run away from terms, but we need to get to repair.  We need
11      to talk about what repair looks like.  And it's not tent
12      villages because we're worth more than that.  It's not pallet
13      sheds because we're worth more than that.  It's not enforcement
14      zones -- right? -- that takes us back to segregated communities
15      and gated communities because we're worth more than that.
16              Let's get to what we're really talking about here.
17              Thank you, Your Honor.
18              THE COURT:  All right.  Thank you very much.
19              You wanted to respond on behalf of L.A. Alliance --
20              MS. MITCHELL:  Yes.  Thank you, Your Honor.
21              THE COURT:  -- to Ms. Myers.
22              MS. MITCHELL:  Yeah.  I just wanted to clarify the
23      record because there's just been a lot about us both in the
24      media and here today about the Skid Row property owners and
25      it's just brought by Skid Row property owners.  And it's,
```

1    frankly, not true.

2         There are property owners, there are mom-and-pop

3    shops, there are residents.  We have individuals who are

4    currently living in Skid Row in wheelchairs that can't go

5    outside of their home because it's completely covered.  There

6    are people that have been attacked, victims of crime.  You have

7    moms who can't walk in the street with strollers.

8         I mean, we really -- the L.A. Alliance filed this

9    case and continues to represent a very broad spectrum of

10   individuals that are looking for a balanced approach, not

11   enforcement, not sweeping people off of the sidewalks but

12   increasing housing, building both interim emergency permanent

13   beds by the thousands as well as wraparound services, which is

14   where the County comes in, as well as regulation of public

15   spaces.  All three of those have to work together.

16        And we want to be very clear because somehow being a

17   property owner is -- is -- you know, we're sort of portrayed as

18   these greedy individuals.  But the reality is every single

19   person in this community, rich or poor, has been affected by

20   this crisis.  I mean, you certainly -- people dying on the

21   street.  We represent currently unhoused individuals living in

22   Skid Row who are desperate to get out of Skid Row because of

23   the devastation and the travesty that they experience on a

24   daily basis.

25        So to say that what we're trying to do is just sweep

```
 1   people off of the risers, this is somehow perpetuating systemic
 2   racism by what we are trying to do I think is nonsensical.
 3   People are trying to live right now.  And that is the
 4   devastation that we see in Skid Row.
 5        And I think, actually, I want to echo what Mr. White
 6   just said, who is one of the intervenors in this case, is that
 7   while structural racism was not identified by phrase in our
 8   Complaint, it is implicit throughout the Complaint.  And, in
 9   fact, the facts of structural racism that we have heard today
10   are undisputed by the City and the County as a cause for the
11   issues identified in the Complaint.
12        So we just want to be very clear about what our
13   goals are.  Certainly, we're not here to talk about
14   confidential settlement discussions.  We're not permitted to do
15   that, despite the fact that The Times published some of it
16   without context.
17        But what is needed and what we feel that the Court
18   has found is a balance of both permanent and temporary
19   solutions, as well as regulations of public spaces that are
20   best for the entire community and saves the most lives and ends
21   this devastation that we see on the streets on a daily basis.
22        THE COURT:  Let's wish you all well in this journey.
23        And once the County -- or the notice of preliminary
24   injunction the County filed, we've tried to cease all
25   discussion with all of you, going back to the, you know, more
```

```
 1   traditional role where you gave us our faith and trust to talk
 2   to whatever list of people you decided to.  I choose not to
 3   from this point forward.
 4           But I would ask, if we do have permission, to speak
 5   to you if it's involving settlement.  In other words, if it's a
 6   call that comes in, do I have permission to talk to you about
 7   potential issues involving settlement if you're so inclined?
 8   And if not, that's fine.
 9           The second thing is, before I even take that step or
10   Judge Birotte, the reason we were having the conversation is
11   you have to generate it to us.  We want to know that you're
12   really serious in terms of picking up the phone call, that this
13   just isn't a huff and puff spontaneous diatribe on your part
14   that you're playing public games with, that you aren't willing
15   to enter into a settlement conference.
16           And if you are and you generate that, we're wide
17   open, night and days, Saturdays, Sundays.  You know my hours.
18   We'll talk to you until we've exhausted every possibility.
19   Because I do believe this, the Court's going to stay diligent
20   and involved.  And I've drawn that line now, it is the rainy
21   season.  I'm telling you that and I'm not budging on that.
22   There's too much death out there.  And it's women and families
23   and eventually it's Skid Row.  And that's it.
24           So take it up to the Ninth Circuit.  But when you do
25   that, regardless of what the Ninth Circuit does, it's coming
```

1    back to my court eventually.  And the question is:  In what

2    form and then how long?

3           And eventually -- you control this -- the Court's

4    only involved because you couldn't reach an agreement, an

5    omnibus agreement on behalf of all the citizens -- the

6    homeless, the public.  And therefore, the Court will stay

7    involved until -- or if you do, or we're heading for

8    litigation.  And I wish you the best on this journey.

9           But, Judge Birotte, are you available so I have that

10   confirmation?

11          THE HONORABLE JUDGE BIROTTE:  If the parties want to

12   talk, I'm available.  But it has to be -- sorry.  But it has to

13   be a sincere effort.  I mean, I'll stay up all day or night.

14   I've done it before.  But if it's just basically we're doing

15   everything we can, there's not much more to do, that's probably

16   not going to be a productive conversation.

17          THE COURT:  Yeah.

18          Michele?

19          SPECIAL MASTER MARTINEZ:  I concur with

20   Judge Birotte.

21          I think -- and I just want to state this for the

22   record, Judge Carter.  I've been volunteering my time as a

23   Special Master for a year and five months, not because I enjoy

24   hanging out with Judge Carter and Judge Birotte.  It's because

25   it's the right thing to do.  As a former elected official, I

 1  did all I possibly could in my hometown.

 2          And the reality is this, there comes a moment in

 3  time when you put humanity first.  We are all humans.  And so

 4  when he asked if I would help, I said yes.  And so I continue

 5  to say yes because it's the right thing to do.

 6          And I will end with this, that if the County and

 7  City are not willing to move past the bickering as it pertains

 8  to mainstream services and/or housing folks and it only stems

 9  in conversation on criminalization, I think we're not going to

10  move past the ability to help those that I think everyone in

11  this room wishes to help.

12          And at the end of the day, whether I remain as a

13  Special Master or not, I think it's important for you all to

14  understand that the work that all of you are doing -- good,

15  bad, or indifferent -- and whatever group thinks that the

16  City's doing the right thing or the County's not doing the

17  right thing or doing the right thing, the reality is this,

18  there are people dying on the streets every single day in the

19  city of Los Angeles and in this entire region.  And we have to

20  ask ourselves this question:  Are we willing to do what's right

21  for the people that are unhoused or are we not?

22          Thank you, Judge.

23          THE COURT:  Well, you hold the future of the city in

24  your hands.  And if you don't reach an agreement that's an

25  omnibus and expand this citywide and countywide, unfortunately

**UNITED STATES DISTRICT COURT**

1    that's a real mark of failure on all of our parts.  This is if

2    not now, when; and if not us, who?

3           So I wish you the best.  And Judge Birotte and

4    Michele and I stand at your beck and call.

5           Court's in recess.

6           (Pause in the proceedings.)

7           THE COURT:  The Court wants to apologize to Mira --

8    the Court wants to apologize to Mira.  I was just informed of

9    the following.

10          SPECIAL MASTER MARTINEZ:  Yes.  That Skip Miller's

11   office did contact me and said they would check with their

12   clients in regards to the audit.  And so I wanted to make that

13   very clear.

14          THE COURT:  So you have my public apology on the

15   record.  I didn't know that.

16          MS. HASHMALL:  Thank you, Your Honor.

17          (Proceedings concluded at 1:33 p.m.)

18

19

20

21

22

23

24

25

1 **CERTIFICATE OF OFFICIAL REPORTER**

2

3 COUNTY OF LOS ANGELES   )
                          )
4 STATE OF CALIFORNIA      )

5

6         I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7 REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8 CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9 TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10 IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11 REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12 THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13 REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17         DATED THIS 30TH DAY OF MAY, 2021.

18

19

20              /S/ MYRA L. PONCE

21     _____
       MYRA L. PONCE, CSR NO. 11544, CRR, RDR
22          FEDERAL OFFICIAL COURT REPORTER

23

24

25