SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, a non-profit corporation, JOSEPH BURK; GEORGE FREM, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, LEANDRO SUAREZ, HARRY TASHDJIAN, CHARLES VAN SCOY and GARY WHITTER, individuals, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive, Defendants., <br><br> Defendants. | CASE NO. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **DECLARATION OF ELIZABETH A. MITCHELL IN SUPPORT OF MOTION FOR LEAVE TO FILE AMENDED AND SUPPLEMENTAL COMPLAINT; AND EXHIBIT A** <br><br> **Hearing: November 29, 2021** <br> **Time:    10:00am** <br> **Court:   350 W. 1st Street** <br> **         Los Angeles, CA 90012** |

DECLARATION OF ELIZABETH A. MITCHELL IN SUPPORT OF PLAINTIFFS MOTION
FOR LEAVE TO FILE AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## **DECLARATION OF ELIZABETH MITCHELL**

I, Elizabeth A. Mitchell, state and declare as follows:

1. I am attorney licensed to practice in the state of California and admitted to practice before this court. I make this declaration of my own personal knowledge and could and would so testify if called.

2. I met and conferred with counsel for defendant City of Los Angeles on October 12, and intervenors LACAN, OCCW, and LACW on October 14. Both City and Intervenors indicated they would likely not oppose this motion, but could not stipulate because a motion was needed under Rule 15(d).

3. Counsel for defendant County of Los Angeles refused to meet and confer until they saw a copy of the proposed amended complaint, which is not required under the rules. As a courtesy, the proposed amended complaint was provided to the County on Monday October 25, 2019. No meet and confer took place, but the County has since indicated they will likely not oppose this motion.

4. Attached hereto as Exhibit A is a true and correct copy of the Amended and Supplemental Complaint Plaintiffs seek leave to file.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed this 29th day of October, 2021, at Los Angeles, California.

_____
Elizabeth A. Mitchell

DECLARATION OF ELIZABETH A. MITCHELL IN SUPPORT OF PLAINTIFFS MOTION
FOR LEAVE TO FILE AMENDED AND SUPPLEMENTAL COMPLAINT

Exhibit A

1  SPERTUS, LANDES & UMHOFER, LLP
   Matthew Donald Umhofer (SBN 206607)
2  Elizabeth A. Mitchell (SBN 251139)
   617 W. 7th Street, Suite 200
3  Los Angeles, California 90017
   Telephone: (213) 205-6520
4  Facsimile: (213) 205-6521
   mumhofer@spertuslaw.com
5  emitchell@spertuslaw.com

6
   *Attorneys for Plaintiffs*
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  LA ALLIANCE FOR HUMAN                Case No. 2:20-cv-02291
    RIGHTS, a non-profit corporation,
12  JOSEPH BURK, GEORGE FREM,            **[PROPOSED] AMENDED AND**
    WENZIAL JARRELL, CHARLES             **SUPPLEMENTAL COMPLAINT**
13  MALOW, KARYN PINSKY,                 **FOR:**
    LEANDRO SUAREZ, HARRY
14  TASHDJIAN, CHARLES VAN               **(1) Negligence**
    SCOY, and GARY WHITTER,              **(2) Violation of Mandatory Duty**
15  individuals,                         **(Cal. Gov't Code § 815.6; Welf.**
                                         **& Inst. Code § 17000)**
16          Plaintiffs,                  **(3) Violation of Cal. Civ. Code §**
                                         **3490, *et seq*.**
17      v.                               **(4) Violation of Cal. Civ. Code §**
                                         **3501 *et seq*.**
18  CITY OF LOS ANGELES, a               **(5) Inverse Condemnation/Violation**
    municipal entity; COUNTY OF LOS      **of Art. I § 19 of California**
19  ANGELES, a municipal entity; and     **Constitution**
    DOES 1 through 200 inclusive,        **(6) Waste of Public Funds and**
20                                       **Resources (Cal. Civ. Proc. Code**
            Defendants.                  **§ 526a)**
21                                       **(7) Violation of California Disabled**
                                         **Persons Act (Cal. Civ. Code § 54,**
22                                       ***et seq*.)**
                                         **(8) Violation of TITLE II of the**
23                                       **Americans with Disabilities Act,**
                                         **42 U.S.C. §§ 12131 *et seq*.**
24                                       **(9) Violation of Section 504 of the**
                                         **Rehabilitation Act, 29 U.S.C. §§**
25                                       **791 *et seq*.**
                                         **(10)  Violation of Due Process and**
26                                       **Equal Protection (42 U.S.C. §**
                                         **1983; U.S. Const. amend.**
27                                       **V/XIV)**
                                         **(11)  Violation of Due Process –**
28                                       **State Created Danger Doctrine**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(42 U.S.C. § 1983; U.S. Const. amend XIV)**

**(12)  Uncompensated Taking (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)**

**(13)  Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. §1983)**

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

**INTRODUCTION**

1.   Nearly two years after this case was filed, and after hundreds of millions of dollars have poured into Los Angeles through federal and state pandemic relief, the devastation on the streets and the impact on both the housed and unhoused communities have only gotten worse.  LA Alliance for Human Rights—of which both housed and unhoused are members—and Plaintiffs named herein filed this lawsuit to change the trajectory of the homelessness for the benefit of both communities.

2.   The mortality rate of homeless individuals who die on the streets has leapt to *five per day*.  That's equivalent to a 9/11 event every two years, or a Sandy Hook school shooting once a week.  The 2020 point-in-time (PIT) count showed 66,436 persons experiencing homelessness in Los Angeles County (a rise of 12.7% from 2019), 41,290 of whom live in the City of Los Angeles (16.1% increase).[1]  This is in addition to 12 and 14 percent respective increases from the year before[2] and doesn't include the wave of people who have lost their jobs or otherwise become homeless due to Covid-19 because the 2021 PIT count was cancelled.  Using the 2020 PIT numbers, there has been an increase in homelessness by approximately 60% since 2013 in both City and County, with the numbers of unsheltered homeless *doubling*.[3]  With the eviction moratorium expiring and Project Roomkey winding down, the numbers are likely to reach over 100,000 by next year.

---

[1] Los Angeles Homeless Services Authority ("LAHSA"), *2020 Greater Los Angeles Homeless Count Results* (Sept. 3, 2020), *https*://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.

[2] LAHSA, *2019 Greater Los Angeles Homeless Count* – Data Summary Total Point-In-Time Homeless Population by Geographic Areas (June 16, 2020), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

[3] Los Angeles Almanac, *Homelessness in Los Angeles County 2020*, http://www.laalmanac.com/social/so14.php (last visited Oct. 21, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

3.     Plaintiffs filed this case to provide the City of Los Angeles (the "City") and County of Los Angeles (the "County") an opportunity to make a different choice—to work together under the auspices of this Court to overcome the finger-pointing and paralysis that have plagued this issue for decades.  For a year, City and County politicians paraded to Court, professing a desire to end this crisis, and work with plaintiffs and the Court to reach a global resolution.  The City and County have had every opportunity to reach a global resolution and take urgent action on the burgeoning human crisis of homelessness.  Instead, the City and County continue their antics of blame-shifting and in-fighting over comprehensive solutions.

4.     Despite admitting that it is blatantly failing to provide sufficient treatment, the County claims it is doing "enough" and "doing its job" but the streets tell a different story: the mentally ill visibly suffer in intersections, parks, and sidewalks.  Even the antiquated conservatorship laws can't work as they were meant to when there is nowhere for conserved persons to go.  Without medical supervision, the most severely affected cannot hold jobs or housing, and are left to wander and fend for themselves in a horrific cycle of degradation.  And the number of those suffering has climbed with the increased prevalence of illegal narcotics, which are being used to self-medicate or are the cause of the mental decline in the first place.  Available drug treatment beds are likewise woefully unobtainable while the drug addiction crisis rages, and our communities are ravaged.  The County's silos of care make it nearly impossible for anyone with a comorbidity (that is, suffering from more than one ailment—for example mental illness and drug addiction, which often go hand-in-hand) to obtain help.  Los Angeles is one of only two counties in the state that does not have an integrated administration to address individuals suffering with both mental health and substance use disorders.  This is particularly bad news given that a recent California Policy Lab study reported 50% of unsheltered individuals suffer from

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

4

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

a trimorbidity of physical health, mental health, *and* substance abuse conditions.[4]
The County has the obligation to provide for indigent mental and public health,
and is woefully failing in its obligations.

5. Meanwhile the City, who has the primary land-use obligation to its
constituents, struggles—and fails—to balance the needs of the housed and
unhoused. The near-exclusive focus on building permanent supportive housing
through Proposition HHH ("HHH") in the last five years has led to lethal under-
funding of emergency and interim shelter solutions which has in turn left
thousands to decline and die on the streets without support from County services.
Those individuals in turn, without services or shelter, languish and decline,
ultimately requiring increased long-term services as a result of unnecessary years
spent subject to the horrors of the street.

6. Through this litigation, as a result of an agreement reached between
the City and County in what all parties hoped was a sign of future cooperation, an
additional 9,633 beds have been funded according to a recent court filing, with
shared operating costs and provision of mainstream services.[5] 1,100 of these
beds were already in the works through the Mayor's "A Bridge Housing"
program, 834 of these beds are permanent supportive housing projects which had
been long-planned, and an undefined number (likely over one thousand) are
"rapid rehousing" vouchers which don't add to the bed inventory (but do help
prevent homelessness). Still, this agreement undisputedly added thousands of
much-needed interim beds to the inventory. Yet while this agreement was a
welcome departure from the City and County's historical squabbling over

---

[4] Janey Rountree, Nathan Less, & Austin Lyke, *Health Conditions Among
Unsheltered Adults in the U.S.* 4, California Policy Lab (Oct. 2019), available at
https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-
Among-Unsheltered-Adults-in-the-U.S.pdf.
[5] Def. City of Los Angeles' Quarterly Status Report Pursuant to the Mem.
of Understanding Between the Cty. of Los Angeles and the City of Los Angeles
at 64-71, ECF No. 342.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

responsibility and blame, and a needed infusion of interim shelter opportunities, it still did not lead to a comprehensive agreement which would relieve the suffering on the streets in a meaningful way.  Shelter remains unattainable for most, services are inaccessible for most, and streets are unbearable for all.

7.     Homeless encampments are entrenched throughout the City and County.  With increased population density, unlimited property accumulation has fostered a proliferation of flea-infested rats and other vermin, which are largely responsible for the recent outbreaks of medieval diseases.  Large items obstruct the free passage and use of the streets and sidewalks.  Encampments have brought with them rampant drug sales and use, which in turn provide a platform for violent assaults and property crimes.  Crime both on and by homeless residents has intensified.[6]  A homeless individual is eight times more likely to be a victim or suspect of a crime than a housed person.  In the City of Los Angeles, 42 crimes involving homeless individuals are reported per day, over half of which are violent.  80-90% of crimes reported at a homeless encampment are violent.[7]  To date in Central Bureau Homicide (which encompasses Skid Row area), 40% of the homicides thus far this year have been "transient-related" both as suspects and victims.[8]

---

[6] Joel Grover & Amy Corral, *A Homeless Man Punched Two People in the Face, But Was Cited and Released*, NBC Los Angeles, (Nov. 11, 2019, 4:00 PM), https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html; Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC Los Angeles (Dec. 10, 2018, 4:52 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, Los Angeles Magazine (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homeless-crime/.

[7] Sophie Flay & Grace Manthey, *What is really going on with homeless crime? We crunched the numbers*, ABC Eyewitness News, https://abc7.com/feature/homeless-crime-los-angeles-data-response/10827722/ (last visited Oct. 21, 2021).

[8] Kevin Rector, *On front lines of L.A.'s homicide spike, these detectives race to solve mounting caseloads,* https://www.latimes.com/california/story/2021-10-22/l-a-homicide-detectives-face-mounting-caseloads (Oct. 22, 2021).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

8.     The multiplication of makeshift structures, garbage, human waste, and other detritus has created circumstances throughout the City that are crippling for local businesses, unlivable for residents, and deadly for those on the streets.  The environmental impact from power-washing human waste and used needles into our oceans is unassessed and untold.  Together the City and County spend over a billion dollars annually providing police, emergency, and support services to those living on the streets.  And still, the tragedy unfolds.

9.     As mental health affliction and drug addiction rates have risen over the last several decades, so has the cost of housing.  Support structures for those on the streets have been stretched to the breaking point by burgeoning demands and insufficient funding by local, state, and federal governments.  The population of people experiencing homelessness has nearly doubled since 2012 while sustainable short- and long-term solutions have been in short supply.  Los Angeles County Department of Public Health has repeatedly warned the City that basic hygiene services are needed to maintain public health in or near homeless encampments—but those critical services have been in short supply.[9]  With the start of the pandemic, there was a tremendous push to place bathrooms and sanitation stations near encampments to maintain hygiene, but those are rarely serviced and are now down to only 1/3 of their previous number at a time when homelessness continues to increase.[10]

10.    Homeless advocates have put pressure on the City and County for years to permit public camping, allow the accumulation of piles of personal property on the streets, and generally make it more comfortable for people to live on the streets.  But street-living is by no means more "comfortable," because of

---

[9] Matt Stiles, *As Homeless Crisis Worsens in L.A., The County Leans On City Officials To Act*, Los Angeles Times (June 8, 2019, 5:04 PM), https://www.latimes.com/local/lanow/la-me-homeless-county-letter-20190608-story.html.

[10] Lexis-Olivier Ray, *City Reverses Decision to Remove Washing Stations From Encampments Following L.A. Taco Investigation,* L.A. Taco (Aug. 5, 2021) https://www.lataco.com/bathroom-stations-encampments-la-city/.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

significant health issues and inherent danger involved in being unsheltered. Enforcement of homeless-related crimes has been reduced, or in some cases eliminated, in the name of compassion.  But allowing people to die on the streets isn't compassionate; it's cruel.

11.    The massive build-up of property and tents has made the sidewalks unpassable: Karyn Pinsky must walk with her young son in a stroller in the middle of traffic.  The Inner-City Arts Center must hire security to walk with students and staff to and from campus.  Business owners have suffered as well—customers cannot access stores and are declining to patronize them due to conditions on the streets, and business owners are spending hundreds of thousands of dollars on increased sanitation and security measures and cannot maintain employees.  Joseph Burk has lost tenants and hundreds of thousands of dollars in client accounts.  Residents and workers throughout the area are confronted daily by disease, illicit drug sales and use, prostitution, and general filth and squalor.  People are openly using drugs, urinating, and defecating in public.  And while blocked sidewalks negatively affect the entire community, none are impacted as negatively as those using mobility devices such as Charles Van Scoy and Leandro Suarez, who cannot step down off the curb and walk around the blockage but instead are prevented from accessing entire areas of their community.

12.    Residential and commercial buildings alike have endured fires from homeless camps, where makeshift heaters are used to keep people warm, open air fires are used to cook food, utility wiring is tampered with to provide electricity, and arsons arise out of drug or property disputes.[11]  Businesses are being dropped

---

[11] James Queally, *Firecrackers. Molotov cocktails. Fire attacks have shaken L.A.'s homeless community*, Los Angeles Times (Oct. 18, 2019, 7:00 AM), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire; Joel Grover & Amy Corral, *Los Angeles Homeless Illegally Use Fire Hydrants to Fill Water Balloons, Bathe, Shave*, NBC Los Angeles (Aug. 23,

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

by insurance companies because of the fire risk associated with homeless encampments next to their buildings.[12]  Shockingly, more than 50% of the fires responded to by Los Angeles Fire Department are homeless related, and one-third of those are intentionally started (arson).

13.    The frequency of criminal conduct has increased so dramatically in some areas that law enforcement officials can respond only to the most egregious crimes—and often only after serious damage has been done.  And those who are experiencing homelessness pay the highest price for this lawlessness.  Violent assaults at encampments have doubled and robberies have increased 144%.[13]  As Rev. Andy Bales of Union Rescue Mission notes, "The crime on Skid Row has skyrocketed . . .we used to have a rare occurrence of shootings.  Now we have them every week.  People are suffering from robberies, rape, hunger, the cold or heat – you name it.  I don't know if there's a place anyone can suffer more.  It's an absolute disaster."  [14] Year after year, assaults against homeless victims have increased, as the number of vulnerable subject to predators increases.  In 2020 nearly 20% of homicides in Los Angeles were on unhoused individuals.[15]  Crime involving homeless individuals (as either victim or suspect) is 8% of the crime in Los Angeles (11% of violent crime), but homeless people only make up about

---

2019, 5:11 PM), https://www.nbclosangeles.com/investigations/Los-Angeles-Homeless-Illegally-Use-Fire-Hydrants-to-Fill-Water-Balloons-Bathe-Shave-558051461.html.

[12] Joel Grover & Amy Corral, *Your Insurance Is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[13] Ethan Ward, *Crime at tent encampments rises during the pandemic year*, Crosstown (May 4, 2021), https://xtown.la/2021/05/04/crime-homeless-individuals/.

[14] *Id.*

[15] Eric Leonard, *LA's Staggering Murder Rate Linked to Gang Shootings and Violence Against Homeless*, NBC Los Angeles (Nov. 23, 2020, 8:01 PM), https://www.nbclosangeles.com/news/local/las-staggering-murder-rate-linked-to-gang-shootings-and-violence-against-homeless/2469360/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

9

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  1% percent of the population.  Random violent attacks by unhoused individuals

2  have increased significantly, often due to drug consumption.[16]

3      14.    Humans living on the streets and in their cars have no regular access

4  to sanitation facilities, so trash and human waste end up in public spaces and

5  ultimately our oceans.  Businesses are regularly cleaning used syringes out of

6  their drains; an untold number are washed into our waterways.  The

7  environmental impact of the homelessness crisis was recently underscored in a

8  letter from the Environmental Protection Agency.[17]  Yet the governmental

9  policies and inaction that perpetuate these pollutants continue unabated.

10     15.    The City of LA's Bureau of Sanitation regularly power-washes

11  streets, sidewalks, and other public spaces that have been occupied by

12  unsheltered individuals; but those clean-ups cost millions of dollars and are

13  ineffective in proactively addressing the crisis.[18]  In 2018, it cost over $35 million

14  to conduct almost 15,000 clean-ups of homeless encampments, yet the ultimate

15  benefits both to the encampment residents and to surrounding community are

16  minimal at best.  The residents of the encampments are permitted to retain most

17  of their belongings (health hazards included) back to the exact same area after the

18  clean-up is conducted.  Trash and human waste are often permitted to remain or

19  are pushed into surrounding streets.  *Id*.  The City's 2019-2020 budget increased

20

21

22

23     [16] *LAPD Says Random, Violent Attacks By Unhoused Residents Are on The*

24  *Rise*, CBS Los Angeles (May 19, 2021, 11:32 PM), https://losangeles.cbslocal.com/2021/05/19/lapd-says-random-violent-attacks-by-unhoused-residents-are-on-the-rise/.

25     [17] Letter from Andrew Wheeler, Administrator, U.S. Environmental

26  Protection Agency, to Gavin C. Newsom, Governor of California (Sept. 26, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

27     [18] Joel Grover & Amy Corral, *Homeless Encampment Cleanups: Are*

28  *Millions of Tax Dollars Being Wasted?*, NBC Los Angeles (May 13, 2019, 8:44 AM), https://www.nbclosangeles.com/news/local/Los-Angeles-Homeless-Encampments-Tent-City-Trash-Garbage-Waste-Cleanup-509849151.html.

10

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

funding for these programs by $6.45 million and the 2021-2022 budget for these programs is even higher.[19]

16.    Even including the 2,000 beds in the Mayor's A Bridge Home program (of which approximately 1,400 are currently open), and the approximately 5,000 beds added through the City/County agreement last year (80% of which are open), it is still insufficient to get ahead of the problem of 28,852 individuals living unsheltered on the streets of Los Angeles.  And does nothing to incentivize those who choose to be on the streets to come inside.  An additional burden is placed on the defendants by many of the smaller neighboring municipalities, which have done very little to address their own crises and instead rely on the City and County to pick up their slack.  Yet instead of addressing these issues head-on, defendants maintain their inadequate trajectory: "[A]n average of 207 people exit homelessness every day—while 227 people become homeless."[20]  The problem continues to outpace the solutions.

17.    Proposition HHH, a $1.2 billion City project, is now expected to net only 5,730 supportive units and 1,376 affordable units, at a staggering cost of an average of $578,339 *per bed.*[21]  As the City Controller noted, "The projects are too expensive and too slow to make a meaningful difference for people living on our streets."[22]  Likewise Measure H—a county-wide tax increase that was originally estimated to net $355 million in homeless-relief funding available per

---

[19] Emily Alpert Reyes & Benjamin Oreskes, *L.A. expands cleanup teams for homeless encampments, vowing to be 'less reactive'*, Los Angeles Times (June 28, 2019, 1:18 PM), https://www.latimes.com/local/lanow/la-me-ln-homeless-encampment-cleanups-plan-20190628-story.html; CITY OF LOS ANGELES, DETAIL OF DEPARTMENT PROGRAMS: SUPPLEMENT TO THE 2021-22 ADOPTED BUDGET VOLUME 346 (July 2021),https://cao.lacity.org/budget21-22/2021-22%20White%20Book%20-%20Volume%202.pdf.

[20] *See* LAHSA, *supra* note 1, https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-resultsx.

[21] Los Angeles Mayor, *Summary of the HHH Pipeline*, https://www.lamayor.org/summary-hhh-pipeline (last visited Oct. 21, 2021).

[22] Ron Galperin, *It's time for Los Angeles to pivot on HHH: Ron Galperin*, Los Angeles Daily News (Mar. 14, 2021, 12:32 AM), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

year—is spread so thin it serves more to feed the County's own bureaucracy than to make any significant dent in the crisis.[23]

    18.    Despite the magnitude of the problem, there is hope.  Steps could be taken to provide safe sleeping spaces for the entire homeless population for a fraction of the funds currently devoted the homelessness crisis.  Reno recently build an emergency and transitional shelter community which holds 600 beds at the cost of only $11,203 per bed and was built in less than 60 days.[24]  Union Rescue Mission built a Sprung structure (large membrane tent) in a matter of months—the single tent houses more than 100 people at a cost of only $10,000 per bed (including a six-month stay, security, and social services).[25]  The City has actually utilized this same structure in several places—yet for a variety of reasons, the City's cost was quadruple Union Rescue Missions', at $42,000 per bed.[26]  In Hawaii, the city of Honolulu is putting up large military-grade inflatable tents in select parks to quickly and effectively provide shelter when the demand exceeds supply, at a cost of $6,000 per bed which also includes a 90-day stay, security, and social services.[27]  Tiny houses are being used in Seattle for

[23] LAHSA, *LAHSA Releases 2019 Housing Inventory Count* (Sept. 19, 2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-inventory-count ("On our present course, it will take far too long to build far too few units of housing to effectively end this crisis" – Peter Lynn, executive director LAHSA).
[24] Renard Decl. at 1, LA Alliance for Human Rights v. City of Los Angeles, ECF 13-2, Case No. 21-55395.
[25] Rev. Andy Bales and J. Michael Arnold, *When it Comes to Homelessness, We Must Do More and We Must Do it Now*, Los Angeles Downtown News (Aug. 5, 2019), http://www.ladowntownnews.com/opinion/when-it-comes-to-homelessness-we-must-do-more-and/article_6b08711a-b57e-11e9-850e-670a231aefa4.html.
[26] Joel Grover and Amy Corral, *Inside the Massive Tent That Might be a Partial Solution Homelessness in LA,* NBC Los Angeles (Sept. 11, 2019, 1:45 PM), https://www.nbclosangeles.com/news/local/los-angeles-la-homeless-encampments-sprung-tents-shelter-skid-row/1965408/.
[27] Dan Nakaso, *Pilot project aimed at reducing Oahu's homeless will start in Waipahu*, Star Advertiser (Oct. 20, 2019, 5:28 PM), https://www.staradvertiser.com/2019/10/20/hawaii-news/pilot-project-aimed-at-reducing-oahus-homeless-will-start-in-waipahu/; Allyson Blair, *Giant inflatable tents for the homeless could be coming to a park near you*, Hawaii News Now

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1 $6,000 to $10,000 per house to create micro-villages as bridge housing.[28]  Entire

2 kits can be purchased to house a family of 4 in a large tent complete with

3 furniture, refrigerator, heater, and electrical generator for a little more than

4 $2,000 ($500 per bed).[29]  Large "festival" tents that can be purchased for $400

5 are being used by the city of Modesto to address its own homelessness crisis.[30]

6 3D printed 400-square foot homes can be built in less than 24 hours and cost only

7 $4,000 to construct.[31]  Connect Homes produces fully integrated off-the-grid

8 modular shelters for $20,000 to $30,000 per bed, with two-story options to

9 densify.[32]  Pallet shelters, small "tiny home" type emergency structures which

10 can be built in less than an hour, only cost approximately $8,000 per two-bed unit

11 but the City of Los Angeles spent an astonishing $130,000 to place them due to

12 over-engineering and over-regulation; comparatively Sonoma County spent only

---

[28] (Nov. 27, 2018), https://www.hawaiinewsnow.com/2018/11/28/giant-inflatable-tents-homeless-could-be-coming-an-oahu-park-near-you/; Ashley Mizuo, *Honolulu opens short-term homeless shelter in Wahiawa*, The Honolulu Star-Advertiser (May 14, 2021) https://www.yahoo.com/entertainment/honolulu-opens-short-term-homeless-161100501.html.

[28] *See* Sharon Lee, *Tiny House Villages in Seattle: An Efficient Response to Our Homelessness Crisis*, SHELTERFORCE: The Original Voice of Community Development (Mar. 15, 2019), Shareselfhelp.org/about-share-the-self-help-and-recovery-exchange/history-vision-share-the-self-help-and-recovery-exchange/.

[29] Relief ShelterKits, *Relief Tents: Concept Designs*, https://www.relieftents.com/relief-tents/shelterkit-living-supportkit/ (last visited Oct. 22, 2021).

[30] Kevin Valine, *Modesto homeless camp is filling up, but officials adapt to find room for more*, The Modesto Bee (May 13, 2019, 4:58 PM), https://www.modbee.com/news/local/article230345544.html.

[31] Aria Bendix, *These 3D-printed homes can be built for less than $4,000 in just 24 hours*, Business Insider (Mar. 12, 2019, 2:09 PM), https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9; Sharon Jayson, *3-D-pringed homes a concept turns into something solid*, The Washington Post (Mar. 6, 2020, 3:00 AM), https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html.

[32] Connect Shelters, https://www.connect-shelters.com/ (last visited Oct. 21, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

$21,817 per unit, the City of Riverside spent only $17,000 per cabin, and Tacoma only $12,000, all for the same structure.[33]

19. Using the average $10,000-per-bed number and extrapolating, it would cost roughly $289 million to provide a bed for every unsheltered person in the City; fortunately there is close to that amount ($233 million) of unallocated funds remaining in the Proposition HHH budget which even the City Controller agrees should be redirected to low cost interim housing.[34] Even more funds ($339 million) are currently dedicated to projects which are in pre-development, meaning they have not yet even started building.[35] Beyond the City of Los Angeles, it would take only an extra $172 million to provide a bed for every unsheltered person in the rest of the County.[36] That's only one-third of the Measure H budget for just a single year (it's a ten-year program).[37] Combined, it is less than one-eighth of the nearly $4 billion received by defendants for Covid-19 relief in the last two years, less than half of the $1,117,844,849 received by the City and County in Department of Housing and Urban Development ("HUD") and state funding in 2019 and 2020 for homelessness relief, and doesn't make a dent in the City and County's combined 2021-2022 general budgets of $47.4 billion. "Money is not necessarily the issue, it's about leadership."[38]

---

[33] Doug Smith, *$130,0000 for an 8-foot-by-8-foot shed? That's what L.A. is paying in a bid to house the homeless*, Los Angeles Times (Dec. 12, 2020, 5:51 PM), https://www.latimes.com/california/story/2020-12-12/los-angeles-tiny-homes-homeless.

[34] *See* Galperin, *supra* note 21, https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/.

[35] *See* Los Angeles Mayor, *supra* note 20, https://www.lamayor.org/summary-hhh-pipeline.

[36] *See* LAHSA, *supra* note 2, https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

[37] *Fiscal Year 2020-21 Measure H and Homeless Housing, Assistance and Prevention (HHAP) Funding Recommendations (All Affected) (3 VOTES)*, (Sept. 15, 2020) https://homeless.lacounty.gov/wp-content/uploads/2020/11/9-15-20-Measure-H-Final-Approved-Brd-Ltr.pdf.

[38] H'rg Transcript, March 19, 2020, ECF No. 39, at 33:8-9.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

14

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

20. And there are places to put these kinds of shelters. Hundreds of acres adjacent to LAX are owned and controlled by the City and could support thousands of beds.[39] Under Title V of the McKinney-Vento Homeless Assistance Act[40], the federal government is obligated to lease or deed underutilized federal property to local governments for the specific purpose of homeless assistance, such as the abandoned Federal Aviation Administration (FAA) building in Hawthorne.[41] The County's General Hospital (LAC+USC) Building, with 1.5 million square feet of space in the heart of East L.A., has been vacant for over a decade—the County at one point considered utilizing it for homeless assistance but is now evaluating it as a "mixed use" property.[42] 83 acres of County-owned property exist at the old County "poor farm," Rancho Los Amigos, a brilliant 19th-century solution whereby homeless housing and medical care was combined with a working farm to both feed the residents and sell for profit to support the project.[43] The unused acreage has been approved for a new County office-park

---

[39] Rob Eshman, *Opinion: Imagine if L.A. put the same effort into housing the homeless that it does Olympic athletes*, Los Angeles Times: Opinion (Nov. 10, 2019, 4:00 AM), https://www.latimes.com/opinion/story/2019-11-10/homeless-crisis-housing-2028-olympics-los-angeles.

[40] 42 U.S.C. § 11411.

[41] Jeff Stein, *Trump officials tour unused FAA facility in California in search for place to relocate homeless people*, The Washington Post (Sept. 11, 2019, 5:49 PM), https://www.washingtonpost.com/business/2019/09/12/trump-officials-tour-unused-faa-facility-california-search-place-relocate-homeless-people/.

[42] Jacqueline Ramírez, *Second community meeting explores future of former County Hospital*, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/; Alex Medina, *Community meeting to explore former County Hospital re-use*, Boyle Heights Beat (June 12, 2019), https://boyleheightsbeat.com/community-meeting-to-explore-former-county-hospital-re-use/.

[43] *See* Historic American Buildings Survey, *Los Angeles County Poor Farm (Rancho Los Amigos, Los Angeles County) Rancho Los Amigos Medical Center*, http://lcweb2.loc.gov/master/pnp/habshaer/ca/ca3500/ca3509/data/ca3509data.pdf (last visited Oct. 21, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

rather than repurpose it for its original intent.[44]  The County owns over 200 acres of the Los Angeles County Fairgrounds ("Fairplex") in Pomona which, while currently leased to the non-profit Los Angeles County Fair Association, may be negotiated to support shelters.  The L.A. City Controller has identified 13,948 separate properties within the City owned by various public entities, many of which are vacant or underutilized.[45]  Even small lots could support pallet houses individual tents, or "tiny home" communities with shared bathroom facilities. Plaintiffs have identified 166.58 acres of usable City- or County-owned property that could quickly be used for these very projects.[46]

21.    Board-and-care facilities—which offer housing, meals, and basic assistance for those who need supportive care—are closing all over California at rapid rates because it is becoming economically infeasible to remain open.[47]  This has resulted in thousands of individuals becoming homeless in Los Angeles County in the last few years—and without such supportive care, their conditions inevitably decline.  Those same facilities—which are paid only $35 per-night-

---

[44] Steven Sharp, *Historic Rancho Los Amigos Campus Slated for Redevelopment*, URBANIZE Los Angeles (June 24, 2020, 9:55 AM), https://urbanize.city/la/post/historic-rancho-los-amigos-campus-slated-redevelopment.

[45] Los Angeles City Controller, *Publicly-Owned Properties*, https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited Mar. 9, 2020); Los Angeles City Controller, *Property Panel: A guide to publicly-owned properties in the City of Los Angeles*, https://lacontroller.maps.arcgis.com/apps/Cascade/index.html?appid=b6d7907c1 18d4ea2a1dd96bc0425633d (last visited Mar. 9, 2020); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM), https://therealdeal.com/la/2019/05/28/despite-housing-crisis-la-lags-in-building-on-its-own-sprawling-land-portfolio/.

[46] Mitchell Decl. Ex. D, at 104, ECF No. 239-1.

[47] Jocelyn Wiener, *Overlooked mental health "catastrophe:" Vanishing board-and-care-homes leave residents with few options*, CalMatters: Projects (Apr. 15, 2019), https://calmatters.org/projects/board-and-care-homes-closing-in-california-mental-health-crisis/; *Loss of Board and Care Facilities is at Crisis Level: Undermines California Counties' Efforts to Support Individuals with Serious Mental Illness, Older Adults and Persons with Disabilities at Risk of Homelessness*, Steinberg Institute, County of Los Angles, County Behavioral Health Directors Association,https://namisantaclara.org/wp-content/uploads/2020/11/Loss-of-Board-and-Care-Facilities-is-at-Crisis-Level-2.28.20.pdf (last visited Oct. 21, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

per-guest by government entities—could be subsidized by the City and County (known as "patch funding") to prevent closures and encourage more to open.  No infrastructure would need to be built, and the property owners would have greater financial incentive to stay open or open anew to provide beds, meals, and basic care.  Similarly, the shared/collaborative housing model supported by organizations like SHARE!, Haaven, and others, boasts zero infrastructure costs with the added benefit of self-sustenance after a one-time $4,000-per-bed investment.[48]

22.    For decades, the City and County have failed to dedicate the necessary funds or build the infrastructure to support the significant numbers of unhoused persons.  This failure of public will has been exacerbated by recent legal decisions, including *Martin v. City of Boise*, in which the Ninth Circuit held, "'[S]o long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters,' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'"  *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (alterations in original omitted) (citation omitted), *cert. denied*, 140 S. Ct. 674 (2019).  In December 2019, the Supreme Court declined to take up the *Martin* case on review.  Despite the sweeping ruling in *Martin*, and huge increase in numbers of unsheltered in the City and County, neither entity has been able to pivot their strategy to address the decision, and the crisis has increased exponentially.  This has had a profoundly negative affect on both the homeless community and Los Angeles as a whole.

23.    While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way.  The *only* way to address this crisis with the urgency it deserves is an emergency response—providing immediate shelter for all, increasing necessary outreach, services, and treatment, and abating the

---

[48] *See* para. 70 *infra*.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

degradation of our cities and communities, for the good of everyone.  The City saw the success of this very model at multiple locations in Los Angeles so far, including, *inter alia*, the Venice Boardwalk, Echo Park (though the clearance could have been handled more effectively), McArthur Park, Rose/Penmar, and CD11 underpasses.  It can be done cheaply, quickly, and compassionately, and it must be done now.[49]

# I.    JURISDICTION AND VENUE

24.    This action is brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act (42 USC §§12131 *et seq*.) ("ADA"), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq*.) ("Section 504"), and the Fifth, and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

25.    This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

26.    All of the actions and omissions complained of occurred in the Central District of California.  Therefore, venue is proper in this District.  28 U.S.C. §1331.

# II.    GENERAL ALLEGATIONS

27.    Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants and Does 1-20 inclusive was the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[49] Plaintiffs file this amended complaint after the Ninth Circuit vacated this Court's April 20, 2021 preliminary injunction.  Specifically the Ninth Circuit noted a delta between the Court's order and Plaintiffs' allegations and facts: Plaintiffs had not demonstrated evidence that Plaintiffs and members of the Alliance are Black because Plaintiffs had not moved on any issues that were based on race, had no unsheltered homeless individuals named in the original complaint, had not alleged existence of a Special Relationship or shown they are confined to Skid Row, or were deprived of medically necessary care.  Plaintiffs have amended this complaint to add Wenzial Jarrell, an unsheltered Black man living in Skid Row, as a Plaintiff, and added a number of named Alliance members who are also unsheltered and persons of color.  Plaintiffs have supplemented their Equal Protection, Due Process allegations and 17000 claims to address the Ninth Circuit's concerns.

18

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

agent, employee, and co-conspirator of each of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment, in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants.

28.     All causes of action brought under California law are for equitable and injunctive relief only.  Therefore, no tort claim was necessary prior to filing this suit.  *See* Cal. Gov. Code § 905 (West, 2019); *Qwest Commc'ns Corp. v. City of Berkeley,* 146 F. Supp. 2d 1081 (N.D. Cal. 2001); *Hart v. County of Alameda*, 76 Cal. App. 4th 766 (1999).

29.     Each paragraph of this Complaint is expressly incorporated into each cause of action set forth below.

## III.     FACTUAL ALLEGATIONS

## A.     History of Homeless Treatment in Los Angeles

30.     What is now known as Skid Row began in the late 1800s as a concentration of day-rate hotels, bars, and brothels catering to the "rail riders" (transients riding the trains) due to its proximity to where the trains terminated at Los Angeles.[50]  Service providers like the Union Rescue Mission opened their doors to help the indigent who congregated there.  Decades later, when the 1970s, brought a push for "de-institutionalization" of those suffering from mental illnesses, Skid Row became a beacon of hope for those needing services and shelter.[51]  At the same time, DTLA experienced an economic resurgence and developers began restoring the Skid Row area.  Activists (fearful of losing housing) and downtown interests (fearful of homeless individuals wandering into

---

[50] Sebastin Kempkens, *L.A.'s Homelessness Crisis: How Did We Get Here?*, LA Weekly (Nov. 21, 2018), https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/; *99% Invisible: The Containment Plan*, Radiotopia (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/; Union Rescue Mission, *About Skid Row*, https://urm.org/about/faqs/about-skid-row/ (last visited Mar. 9, 2020).
[51] *See* Kempkens, *supra* note 50, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the wealthier areas), together, pushed back and fought for a policy of "containment" with the goal of centralizing missions, charities, and other homeless services within the 50-square block area, encouraging "undesirable population elements" to stay within the boundaries, in return for an agreement with the City to keep redevelopment out of it.[52]

31.   The drafters of the Containment Policy were concerned that PEH and other "undesirables" could spread to other parts of the City; to combat this "people problem" the City implemented

> a **containment approach** that starts by defining an area in which Skid Row activities would be allowed, but outside of which no disruptive Skid Row activity would be tolerated . . . new borders were drawn that define a potential area of containment that would pull Skid Row activities away from other land uses without significant relocation of housing.

(Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. A at 143, ECF 265-1.) (emphasis added).  The "containment approach" had four pillars to it: (a) "a deliberate control of housing stock, its allocation and location" to condense the homeless within a smaller area of downtown Los Angeles, (b) businesses catering to Skid Row "undesirables" would be discouraged outside of the containment area, (c) services to the homeless would be centralized in the area of containment to keep the homeless there, and (d) "amenities" that attract the homeless, such as parks and public restrooms, would be centralized in the contained area.  *Id*.  The Containment Policy (the "Containment" or "Policy") included specific maps that defined where "undesirables" would be concentrated, and also included "buffers" to further isolate the "undesirables" from others.  *Id*.  This appalling Containment Policy remained until it was formally denounced in 2016, but in fact the Policy persists to this day.

---

[52] Rich Connell, *SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating*, Los Angeles Times (Aug. 5, 1985, 12:00 AM), https://www.latimes.com/archives/la-xpm-1985-08-05-me-3525-story.html; 99% Invisible, *supra* note 47, https://99percentinvisible.org/episode/the-containment-plan/.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

32.     The 1980s and 1990s, with the crack epidemic and simultaneous cuts to the welfare system, brought in true and enduring homelessness, with encampments springing up on sidewalks and criminals preying on the vulnerable.[53]  Then-mayor Tom Bradley opened an urban campground along the L.A. River, but it was soon closed due to terrible living conditions.  At various times groups have placed portable toilets in key encampment locations, only to have the city remove them when they became magnets for prostitution and drug use.  In the early 1990s, as a settlement of litigation between the City and County, Los Angeles Homeless Services Authority ("LAHSA"), a joint-powers authority, was created to oversee the City and County's homeless response.  The aim was more accountability, but ultimately it has resulted in an accountability deficit.

33.     That deficit is particularly apparent in the litigious history of two Los Angeles Municipal Code provisions ("L.A.M.C."), section 41.18 and section 56.11, that regulate behavior in public rights-of-way.  Section 41.18(d) has recently been amended to prohibit sitting, sleeping, or lying in public rights of way in sensitive areas or other areas marked by signage but only after full consideration and vote by City Council in every single area designated as such and only, for non-sensitive areas, after proof of serious injury, crime, or fires.[54]  56.11 prohibits, among other things, storage of "excess personal property" meaning property which cumulatively exceeds 60 gallons in a public area.[55]

---

[53] *See* Kempkens, *supra* note 50, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

[54] LOS ANGELES MUN. CODE ("LAMC") 41.18 (2021), https://clkrep.lacity.org/onlinedocs/2020/20-1376-S1_ord_draft_7-02-21.pdf.

[55] LAMC 56.11 was amended in 2016 in direct response to *Lavan v. City of Los Angeles*, discussed *infra*.  Its express stated purpose was to "balance the needs of the residents and public at large to access clean and sanitary public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited of personal property in public areas."  Unsurprisingly, unhappy activists have challenged the new amendment, first as applied to those living in Skid Row (*Mitchell v. City of Los Angeles*, 16-CV-01750 SJO JPR) and now city-wide (*Garcia v. City of Los Angeles*, 2:19-CV-06182 DSF PLA).  The *Garcia* court issued an injunction against its enforcement, recently upheld by the Ninth Circuit.  *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir., Sept. 2, 2021).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

21

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

34.     In 2006, the City settled a case brought by several activists, *Jones v. City of Los Angeles*, agreeing not to enforce Section 41.18(d)'s then-restrictions on tents and people sleeping in public areas between the hours of 9 p.m. and 6 a.m.  As part of the agreement, the parties concurred that a published court decision would be de-published and would no longer be binding authority. According to the *Los Angeles Times*, "The [Jones] agreement set the stage for today's encampment explosion."[56]  And ironically, the de-published *Jones* decision was still oft-cited by districts courts and resurrected in the 2018 published decision of *Martin v. City of Boise*.

35.     In 2011, the Ninth Circuit upheld an injunction in *Lavan v. City of Los Angeles* that prohibited the City from seizing unattended property without notice absent objectively reasonable belief that it is abandoned, evidence of crime, contraband, or presents an "immediate threat to public health or safety." Unfortunately, it is difficult to determine when property is "abandoned" as opposed to momentarily "unattended" when there are tens of thousands of people living unsheltered in our public spaces.  The result is a massive build-up of property, which harbors significant health and safety risks that mostly go undetected until too late.

36.     Eight years after the Ninth Circuit upheld the *Lavan* injunction, the City entered into a settlement in the case of *Mitchell v. City of Los Angeles*. Under the terms of that settlement, the City bound its own hands in agreeing to significantly limit the enforcement of L.A.M.C. Section 56.11, permitting the accumulation of personal property beyond the code section's limits, and relegating enforcement to only certain bulky items such as couches, mattresses,

---

[56] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, Los Angeles Times (June 5, 2019, 11:10 AM), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html ( "'We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter,' said Westside Councilman Mike Bonin.").

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

refrigerators, and wooden pallets within a designated area known as "Skid Row and surrounding areas."  The *Mitchell* agreement has led to a sharp decline in health and safety for housed and unhoused alike not just in Skid Row but throughout downtown.  The agreement promotes and authorizes violation of a valid city ordinance and suffers from significant legal flaws.  *League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) ("A federal consent decree or settlement agreement cannot be a means for state officials to evade state law.").  The *Mitchell* agreement is set to expire in 2022, but the implication of expiration is unclear given the *Garcia* restrictions.  And it is unclear why, after litigating this issue for decades, the City cannot manage to draft an ordinance that is workable, practical, and will pass constitutional muster.

37.   *Mitchell* was settled in the wake of the sweeping Ninth Circuit decision addressing homeless regulation: *Martin v. City of Boise*, based almost entirely on the reasoning published (then de-published) in *Jones*.  *Martin* held that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters" a person may not be prosecuted for sitting, lying, or sleeping in public.  *Martin*, 920 F.3d at 617 (original alterations omitted) (citation omitted).  The language in *Martin* does not provide clear guidance for cities struggling with sizable homeless populations—in some passages, *Martin* suggests that there must be enough beds for <u>everyone</u> before <u>anyone</u> is cited for sleeping on a sidewalk, while other aspects of *Martin* indicate that <u>individuals</u> "who do have access to adequate temporary shelter" but "choose not to use it" may be prosecuted without reference to the community.  *Id.* at n.8.

38.   Regardless of how *Martin* is interpreted, its clear effect is to tie enforcement of public regulation ordinances to the provision of shelter.  And most people agree that the balanced approach is exactly that: provision of safe, humane, dignified, and healthy shelters with a path out of homelessness, along

23

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

with regulation of our public spaces.  But instead the City's and County's approach to the *Martin* decision has been a lack of both shelters and regulation.

39.     While homelessness has now exploded beyond the boundaries of Skid Row—resulting in public outcry at encampments, crime, and squalor in neighborhoods which previously could ignore the devastation—the most heavily impacted area is still without a doubt the area of Containment.  City and County policies continue to concentrate persons experiencing homelessness in Skid Row, creating horribly dangerous conditions for unhoused individuals and others living in the area.  Affordable housing and services are still heavily concentrated in Skid Row, while development of these housing or services in other areas can take years, even for by-right projects.  To this day, Skid Row is an enforcement-free zone, effectively exempt from laws against drug use and sales, weapons trafficking, human trafficking, gang activity, and public intoxication; reinforcing the concentration of human tragedy in a half-square-mile area, while other areas thrive.

40.     The most obvious and overt example of the continuing Containment Policy is the DTLA2040 plan, recently approved by the Planning Commission and formally recommended to City Council, again with significant advocacy and support from groups like Los Angeles Community Action Network (LACAN).[57] In creating the new plan for Downtown Los Angeles, the City created an entirely new zoning designation just for the Skid Row area, permitting *only* homeless housing developments.  This the only such area zoned for this specific purpose in the entire City and County (and in fact the nation).  This plan re-codifies the Containment Policy and flies in the face of decades of research demonstrating the harmful effects of centralizing poverty.[58]  Under both Federal and California law,

[57] Department of City Planning Recommendation Report (June 17, 2021), https://planning.lacity.org/odocument/04ca2a68-c5fd-4a26-90c2-812891l0239f7/DRAFT_DTLA_CPC_Staff_Recommendation_Report.pdf.

[58] *See, e.g. Understanding Neighborhood Effects of Concentrated Poverty*, Office of Policy Development and Research (Winter 2011), https://www.huduser.gov/portal/periodicals/em/winter11/highlight2.html.

24

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

cities are required to "Affirmatively Further Fair Housing" which includes "Replacing Segregated Living Patterns with Truly Integrated and Balanced Living Patterns" and "Transforming Racially and Ethnically Concentrated Areas of Poverty (R/ECAP) into Areas of Opportunity" such as providing "economic development strategies," "prioritizing investment," and "promoting mixed-income development coupled with strong anti-displacement protections."[59] Instead the DTLA2040 plan maintains the segregated living pattern of Skid Row and reinforces the most racially and ethnically concentrated area of poverty in the entire county (and likely the nation). Because of the Containment Policy, there has been an obvious disinvestment in the area with extremely limited or no access to grocery stores, pharmacies, drug stores, restaurants, transit, retail, and job opportunities, and an abundance of crime, violence, fires, death, and disease. With DTLA2040 the Containment Policy is reinforced, and homeless people are corralled and contained into a specified area of the city where they are effectively abandoned.

41.     Defendants have acknowledged repeatedly that racist policies and practices have contributed to the conditions on Skid Row. "Even as far back as the Great Depression, services for the homeless in Los Angeles were concentrated on Skid Row" segregated by race.[60] By the 1950s, African Americans were overrepresented among general relief applicants (5.2% of the adult male population, but 17.45% of applicants), and 60% lacked shelter.[61] Moreover, according to the Luskin Center:

_____

[59] California Department of Housing and Community Development, *Affirmatively Furthering Fair Housing Guidance for All Public Entities and for Housing Elements* 4, 17 (Apr. 2021), https://www.hcd.ca.gov/community-development/affh/docs/affh_document_final_4-27-2021.pdf.

[60] Kirsten Moore Sheeley, et al., *The Making of a Crisis: A History of Homelessness in Los Angeles*, UCLA: LUSKIN CENTER FOR HISTORY AND POLICY, Jan. 2021, at 13-14, https://luskincenter.history.ucla.edu/wp-content/uploads/sites/66/2021/01/LCHP-The-Making-of-A-Crisis-Report.pdf. ("The Luskin Report").

[61] *Id.* at 22.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

A 1970 report on Aid to Families with Dependent Children (AFDC) beneficiaries (nearly all of them women) found that Black welfare clients and applicants in Los Angeles were 50% more likely than their white and Hispanic counterparts to identify housing as their "primary problem."  This statistic suggests that race-specific barriers to quality housing were producing disparate outcomes among people of the same economic class.[62]

One of the biggest factors affecting the wealth accumulation in Black families is the inability to purchase a home "in neighborhoods with steady increase in property values" due to the various federal, state, and local policies preventing Black ownership in post-war Los Angeles.[63]  The LAHSA Ad Hoc Committee on Black People Experiencing Homelessness found that "[t]he impact of institutional and structural racism in education, criminal justice, housing, employment, health care, and access to opportunities cannot be denied: homelessness is a by-product of racism in America."[64]  "As a result of the vestiges of redlining and exclusionary zoning, Los Angeles County ranks as one of the most segregated metropolitan areas in the United States."[65]  "Black people are dramatically overrepresented in the population experiencing homelessness, when compared to their representation among the overall population in Los Angeles County."[66]

42.     Heidi Marston, executive director of LAHSA, described the City's racist "redlining" policy in the 2021 LAHSA Homelessness Town Hall: "Policy choices and underinvestment brought us to where we are today. . . [A] government map [of Los Angeles] . . . from 1939. . . shows how our government blocked black communities and black families from home ownership in a

---

[62] *Id.* at 22.

[63] *Id.*

[64] LAHSA, *REPORT AND RECOMMENDATIONS OF THE AD HOC COMMITTEE ON BLACK PEOPLE EXPERIENCING HOMELESSNESS*, Dec. 2018, at 5, https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness.

[65] *Id.* at 19.

[66] *Id.* at 14.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

practice called redlining."[67]  Ms. Marston further acknowledged that "[i]nstitutional and structural racism play a key role in homelessness" and "[a]mong all of the new people enrolled in services last year, 35% of clients were black which is a critical measure for us because we know that black people are 8% of the county population and 34% of the population experiencing homelessness, again, because of legacies of systemic racism and discrimination that are still being dismantled."[68]

43.     Between the redlining policies of early Los Angeles—which systematically thwarted wealth accumulation by Black Angelenos—and the Containment Policy of Skid Row, which concentrated very poor individuals into a small area of downtown Los Angeles, the City nearly ensured that Skid Row would have a disproportionately high African American unhoused population. Indeed, the 1970s Containment Policy specifically acknowledged that Skid Row was at the time "experiencing a very rapid increase in its Black population."  The make-up of the unhoused population of Skid Row as of the 2019 PIT count was 57% Black/African American, 25% Hispanic/Latino, and 13% White.[69]  Yet Defendants have perpetuated the plight of those in Skid Row, even while acknowledging the disproportionate impact on racial minorities *as a result of their actions*.  And Defendants have continued to adopt those same policies, knowing their actions would continue to disproportionately impact people of color.  The chart below from the LAHSA Ad Hoc Committee on Black People Experiencing Homelessness demonstrates the disproportionately significant percentage of Black people experiencing homelessness in Los Angeles compared to the relatively small percentage of the population.

[67] LAHSA, 2021 State of Homelessness Town Hall Recording at 17:15 (Mar. 19, 2021), https://www.youtube.com/watch?v=Cu1WqTwBUiU).
[68] *Id.*
[69] LAHSA, *HOMELESS COUNT 2019 SKID ROW DATA SUMMARY*, https://www.lahsa.org/documents?id=3527-hc2019-skid-row-data-summary.pdf (last visited Oct. 21, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT



Sources: Homeless population data represent estimates from the 2017 Greater Los Angeles Homeless Count for the Los Angeles Continuum of Care (LA CoC). General population data taken from the U.S. Census Bureau's American Community Survey: 5-Year Estimates for Los Angeles County.

44.     The lack of affordable housing in Los Angeles is one of the drivers of homelessness.  In 2015, the City declared a housing emergency and in 2018 the County did as well and both remain in place.  *See* Sept. 22 Motion (we "face an emergency today that requires strong and immediate action by the City of Los Angeles."); Resolution of the Board of Supervisors of the County of Los Angeles Declaring a Shelter Crisis, October 30, 2018.  The City and the County have done little to produce housing in the very low- or low-income categories.  For example, in the last reporting period by the County (all unincorporated areas), from 2014 to 2019 it produced a paltry 891 units of very low and low income housing in an unincorporated area of over 1 million residents.  In fact, in the entire unincorporated county only 6,157 housing units in total were produced. Los Angeles is now ranked as the most unaffordable city in the country, with over 60% of tenants paying more than 30% of their household income for rent and over 30% of tenants severely rent-burdened, paying more than 50% of their income for rent.  Both City and County have failed to meet their housing requirements for very low, low, and moderate-income permits.  The County only permitted 22.5% of its required very low-income projects, 24.1% of its low-

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

income projects, 14% of its moderate-income projects, and 190.2% of its above-moderate income projects.  The City has permitted 34.3% of its required "very-low-income" permits, 30% of "low-income" units, 6% of "moderate-income" permits, and 298% of "above-moderate-income" permits.  This was an intentional, affirmative choice made year-after-year by Defendants, knowing the implications on people experiencing homelessness and the disproportionate impact on Black Angelenos.

45.     The impact of structural racism and the City and County's housing policies, both of which have caused and contributed to the burgeoning crisis, is accurately described in the Court's preliminary injunction order, ECF No. 277, issued April 20, 2021, attached hereto as Exhibit A and incorporated herein.

**B.    Crime and Fire Incidents Have Rocketed**

46.     The crisis of so many unsheltered individuals in a wealthy City is a tragedy in and of itself.  But the tragedy has been exacerbated by a severe spike in crime both on and by homeless persons, particularly in violent attacks.[70]  Los Angeles Police Department ("LAPD") citywide data from 2016 to 2020 shows a 200% increase in crime against persons experiencing homelessness,[71] and an increase of 354% of suspects experiencing homelessness.  The top three crimes reported for both suspects and victims experiencing homelessness were assault with a deadly weapon, battery, and robbery.[72]

47.     Drugs are being sold and used openly on streets and sidewalks.  Public urination and defection have become the norm.  LA Metro spent $36

---

[70] Leonard, *supra* note 6, https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Matthew, *supra* note 6, https://www.lamag.com/citythinkblog/homeless-crime/.

[71] It must be noted this statistic is only available for persons who *reported* the crime; an untold number of crimes are perpetrated on persons experiencing homelessness which go unreported because the victim lacks agency, awareness, hope, or fears retribution.

[72] Nisha Venkat, *LA's homeless crime epidemic*, Crosstown (June 23, 2020), https://xtown.la/2020/06/23/homeless-crime-los-angeles/.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

million on a bike-share program, but those bikes go missing daily and many have been recovered, repainted or otherwise vandalized, in homeless encampments throughout the city.[73]  As the ranks of the desperate and downtrodden have grown exponentially in Skid Row and throughout the City and County, and quality-of-life laws are left unenforced, public order has deteriorated.

48.    In addressing the rise in crime within the homeless community, one City official accurately noted, "[T]here are certainly tensions that are rising within the homeless population. . . the connective tissue between them all is the increase in the concentration.  As the homeless encampments increase, so do fights over territory, over property, over intangibles, as well as domestic violence."[74]  "Personal Security Tips" have been given to County employees walking to and from civil and mental health courts, advising them "remain vigilant," "travel in numbers," and "drive in a middle or left lane" due to the criminal element rising out of surrounding homeless encampments.

49.    Crime against homeless women in particular has become a "crisis within a crisis" with 60 percent of homeless women reporting violence in the last year and 25 percent experiencing it "often" or "always."[75]  More than a quarter have experienced sexual assault in the last twelve months, and 37 percent report having experienced domestic violence in the same time period.[76]

[73] David Goldstein, *Goldstein Investigation: Hundreds Of Taxpayer-Funded Metro Bikes Stolen, Stripped*, CBS Los Angeles (Nov. 7, 2019, 11:59 PM), https://losangeles.cbslocal.com/2019/11/07/goldstein-investigation-taxpayer-funded-metro-bikes-stolen-stripped/.

[74] *See* Queally, *supra* note 10, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[75] Elijah Chiland, *For women, 'living on the streets in Los Angeles is dangerous and traumatic'*, Curbed Los Angeles (Jan. 30, 2020, 2:25 PM), https://la.curbed.com/2020/1/30/21115700/downtown-womens-center-homeless-report.

[76] Downtown Women's Center, 2019 Los Angeles City Women's Needs Assessment, https://www.downtownwomenscenter.org/wp-content/uploads/2020/01/DWC-2019-Los-Angeles-Womens-Needs-Assessment.pdf (last visited Mar. 9, 2020).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

50.    As crime has increased, so have fires.  There were 2,500 fires just involving the homeless community in Los Angeles in 2018, which is double the number of such fires in 2017.[77]  That number jumped to 3,285 in 2019 and 6,151 in 2020.[78]  53.87 percent of all fires in the City of Los Angeles are homeless-related; nearly 20 percent of all fires in the city are homeless-related arson fires. This represents a 245 percent increase in all homeless-related fires and 240 percent increase in all homeless-related arson fires since 2018.[79]  The industrial buildings and businesses downtown regularly experience fires from adjacent encampments, whether from heaters, food preparation, or arson.  Businesses are being dropped by insurance companies because of the fire risks due to the homeless living on their sidewalks.[80]  Fire hydrants are being repurposed by homeless for drinking, bathing, and washing clothes and personal items, compromising fire-readiness and putting an untold number of lives and structures at greater risk in the event of a fire.[81]  There have been no observable efforts to curb the use of open flames, despite fire code provisions that prohibit them and the frequent use of open flames in homeless encampments.[82]  In fact, the *Mitchell* settlement specifically permits violations of the fire code by allowing "open-flame cooking devices" as long as they have fuel containers under a certain size. *See* Stipulated Order of Dismissal at 11, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 SJO (JPRx) (C.D. Cal. May 31, 2019), ECF No. 119.

---

[77] *See* Queally, *supra* note 10, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[78] Mitchell Decl. Ex. C, at 188, ECF No. 265-1.

[79] *Id.*

[80] Joel Grover and Amy Corral, *Your Insurance is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[81] Joel Grover and Amy Corral, *Firefighters Lose Critical Tool to Battle Rise in Homeless Fires*, NBC Los Angeles (July 22, 2019, 3:17 PM), https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html.

[82] *Id.*

31

51.   Fires originating in homeless encampments are now a regular occurrence in Los Angeles County.  One of the most destructive fires in Los Angeles over the last 10 years, the Skirball Fire, was caused by a cooking fire at a homeless encampment in the hills of Bel Air in 2017—which caused thousands to evacuate and destroyed several houses.[83]  In July 2019, a fire broke out in a homeless encampment in the Sepulveda Basin, where homeless residents report they put out "multiple fires daily," burning 6 acres and destroying the encampment.[84]  One building in Venice, recently vacated by SNAP, Inc. (formerly Snapchat) burned to the ground due to the adjacent encampments; the building owner (Benjamin Schonbrun of Schonbrun, Seplow, Harris, Hoffman & Zeldes, LLP), represented by Stephen Yagman, is suing the City of Los Angeles for "permit[ting] the encampment to exist."[85]

## C.   Public Health is Compromised

52.   Beyond crime and fire, the homelessness crisis presents a pressing public health predicament.  The Covid-19 pandemic drew attention to the inability of the unsheltered community to maintain a sanitary environment without regular access to restrooms or running water, and the potential health implications for the rest of the housed community.  But even before Covid existed, homelessness created significant health hazards.  The accumulation of property and food storage in tents by homeless individuals has made Skid Row and other areas hotbeds for flea-infested rats and other disease-carrying vermin,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[83] Gale Holland, Laura J. Nelson, et al., *Fire at a homeless encampment sparked Bel-Air blaze that destroyed homes, officials say*, Los Angeles Times (Dec. 12, 2017, 5:55 PM), https://www.latimes.com/local/lanow/la-me-skirball-fire-cause-20171212-story.html.

[84] Ariella Plachta and Elizabeth Chou, *A Sepulveda basin encampment fire left dozens of homeless people displaced but service providers have little to offer them*, Los Angeles Daily News (July 31, 2019, 1:23 PM), https://www.dailynews.com/2019/07/31/a-sepulveda-basin-encampment-fire-left-dozens-of-homeless-people-displaced-but-service-providers-have-little-to-offer-them/.

[85] *Schonbrun v. Snap, Inc. et. al*, No. 21-cv-07189-VAP-MRW.

32

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

making some areas nearly unlivable.[86]  Los Angeles has declared Skid Row a "typhus zone" and at least one Deputy City Attorney has contracted typhus apparently from the conditions surrounding her office building in Downtown Los Angeles.[87]  LAPD Officers working Central Division downtown contracted typhoid fever, caused by contamination of human fecal matter.[88]  LA City was cited by Cal/OSHA for the homeless encampments outside City Hall East for exposing its workers to trash and bodily fluids.[89]  The United Nations noted "Los Angeles failed to meet even the minimum standards the United Nations High Commissioner for Refugees sets for refugee camps in the Syrian Arab Republic and other emergency situations."[90]  The City Controller reported that in 2017 City officials had removed 8 tons of solid waste, including 40 pounds of urine and feces from homeless encampments in **one** cleanup of **one** encampment.[91]  Los Angeles Sanitation (LASAN) estimated that its program, Operation Healthy Streets, cleared an average of 5 tons of solid waste *per day* at encampments in the City.  *Id.*

---

[86] Lauren Fruen, *Collapse of a City That's Lost Control: Shocking New Pictures From Downtown LA Capture The Huge Problem it Faces With Trash and Rats Amid Fear of Typhoid Fever Outbreak Among LAPD*, Daily Mail and Associated Press, (June 2, 2019, 2:03 PM), https://www.dailymail.co.uk/news/article-7095533/Pictures-downtown-LA-capture-problem-faces-trash-tries-rodents.html.

[87] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, Los Angeles Times, (Feb. 9, 2019, 5:45 PM), https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-story.html.

[88] Jaclyn Cosgrove, *LAPD employee contracts bacteria that causes typhoid fever*, Los Angeles Times, (May 29, 2019, 8:44 PM), https://www.latimes.com/local/lanow/la-me-ln-lapd-typhoid-fever-20190529-story.html.

[89] California News Wire Services, *State Slaps City Of LA Over Unsanitary Conditions*, Los Angeles, CA Patch.com (Aug. 16, 2019, 1:31 PM), https://patch.com/california/los-angeles/state-slaps-city-la-over-unsanitary-conditions.

[90] Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/125/30/PDF/G1812530.pdf.

[91] Ron Galperin, Los Angeles City Controller, *Report on Homeless Encampments*, Office of the Controller (Sept. 27, 2017), https://lacontroller.org/audits-and-reports/homeless-encampments/.

33

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

53.     In addition to the societal implications associated with unsanitary conditions related to unsheltered homelessness, it has been well-documented that the physical and mental health of unsheltered persons is significantly worse than those of their sheltered or housed counterparts.[92]  According to a report from the Los Angeles County Department of Public Health ("DPH"), homeless-related deaths doubled from 2013 to 2018.[93]  On average, a homeless person in Los Angeles will die 22 years earlier than the general population.[94]  Importantly, the report noted:

> A principal finding is that the overall homeless mortality rate has steadily increased over the past six years.  This means that increases in the number of homeless deaths recently reported in the media cannot be attributed solely to the fact that the total number of homeless people has also been increasing.  **Put simply, being homeless in LA County is becoming increasingly deadly.**[95]

///
///
///
///
///
///
///

---

[92] Adeline M. Nyamathi and Barbara Leake, et al., *Sheltered versus nonsheltered homeless women*, J. Gen. Intern. Med. vol. 15, issue 8, at pp. 565-72 (Aug. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495574/; Janey Rountree, Nathan Hess, and Austin Lyke, *Health Conditions Among Unsheltered Adults in the U.S.*, California Policy Lab (October 2019), https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[93] County of Los Angeles, Public Health, Center for Health Impact Evaluation, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (October 2019), http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf.

[94] *Id*. at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

[95] *Id*. (emphasis added).

34

54. Dr. Barbara Ferrer, director of DPH conceded: "Homeless people are in fact dying at a higher rate because they're homeless."[96] Meaning, while the PIT count increases year-after-year, the mortality rate of the unsheltered population is increasing at an even faster rate. Below is a chart of the homeless deaths over the last seven years:



55. Yet in New York City, where the number of people experiencing homelessness is high but the rate of *unsheltered* homelessness is low (5 percent compared to Los Angeles' 75 percent), the mortality rates of homeless persons compared to general population low-income adults is nearly identical.[97] Unsheltered homelessness both causes and exacerbates physical and mental health problems.[98]

[96] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.
[97] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based Assessment of the Health of Homeless Families in New York City, 2001–2003*, American Journal of Public Health (Sept. 20, 2011), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.
[98] County of Los Angeles, *supra* note 88, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations*, The Lancet, vol. 382, issue 9953, pp.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

35

56.   Los Angeles County has recognized this, and in 2012 the Department of Health Services launched a program called Housing for Health, observing "[a]ccess to community based housing options is an important element of our evolving county healthcare system, particularly in response to the homelessness crisis."[99]  A study conducted by the RAND Corporation on the first 890 participants enrolled found that the cost of providing health care per participant decreased by 40 percent (from an average of $38,146 to $15,358) because there was less need for the patients to access the system.[100]

**D.    Crowded and Blocked Sidewalks Put Everyone at Risk**

57.   The homelessness crisis has also impeded the use of a critical element of city life: sidewalks.  Municipalities have an obligation to keep sidewalks clear for use by the public.  The City itself recognized this in its Motion to Dismiss filed in the ongoing litigation in *Garcia v. City of Los Angeles*:

> Sidewalks serve numerous functions and implicate a myriad of individual interests.  Children on field trips, persons with disabilities, mail carriers with delivery carts, free-speech demonstrators, shop owners, travelers, and the many thousands of other persons that live, work, and visit Los Angeles—all have legitimate claims to use these narrow strips of public property.  As courts have long recognized, "[t]he public is entitled to the free and unobstructed use of the entire streets and sidewalks . . ." *Vanderhurst* v. *Tholcke*, 113 Cal. 147, 152 (1896).  To balance among the many, often competing uses, cities

1529-40  (Oct. 25, 2014), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-6/fulltext.
[99] Health Services of Los Angeles County, *Housing for Health,* http://dhs.lacounty.gov/wps/portal/dhs/housingforhealth (last visited Mar. 9, 2020).
[100] Sarah B. Hunter, *Housing for Health; Los Angeles County's Department of health Tackles Homelessness with an Innovative Housing Program That Saves Money,* The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-health-los-angeles-countys-department-of.html (Notably the County experienced a net savings of 20% even taking the costs of housing into consideration (from an average of $38,146 per participant to $30,646). Of course, this number doesn't take into consideration the additional savings from other departments such as reduced law enforcement contacts.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

36

have been designated as trustees of these public spaces. In this capacity, they have not only the power but "the *duty* to keep their communities' streets open and available for movement of people and property." *Schneider v. State*, 308 U.S. 147, 160-61 (1939) (emphasis added); *see also Smith v. Corp. of Wash.*, 61 U.S. (20 How.) 135, 146 (1858); Cal. Gov. Code § 37359 ("the legislative body having control of any property owned or controlled by the city may at any time withdraw…or limit the access or use in area or time or in any other reasonable manner deemed necessary.").

Def. City of Los Angeles' Mot. to Dismiss Suppl. Compl. at 2, *Garcia v. City of Los Angeles,* Case No.: 2:19-cv-6182-DSF-PLA (C.D. Cal. Oct. 21, 2019), ECF No. 22.

58.     While it is true that public sidewalks exist for the benefit of all—and blocked sidewalks harm everyone who needs to use them and cannot, the harm felt by all members of society is not identical.  Free and clear sidewalks are critical for individuals using mobility devices like walkers and wheelchairs. Wheelchair users cannot simply step down off a curb and walk around to the other side of a tent; instead entire areas of the City are unavailable to wheelchair or walker assisted Angelenos seeking to traverse the streets.  Public sidewalks and the maintenance thereof constitutes a "program, service, or activity within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973."[101]  Municipalities have an obligation to ensure that public sidewalks are usable and compliant with ADA requirements, such as providing a minimum of 36 inches of clearance for wheelchair users, yet the City regularly ignores its obligations and fails to provide such clearance.

59.     Encampments throughout the City and County block sidewalks and public rights-of-way.  Local governments, as acknowledged by the City, have an obligation to balance the needs of all citizens to access sidewalks, particularly for those with disabilities who have no alternative like stepping around a blockage.

---

[101] *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

The City acknowledged this yet again in its latest iteration of LAMC 41.18(a)(1) (making it a crime to sit, lie, sleep, or store, use, maintain, or place personal property "in a manner that impedes passage, as provided by the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 328 (1990), as amended from time to time."). Yet the City is consistently failing to ensure the minimum clearance (36 inches) under the ADA. As a result, disabled persons in wheelchairs such as plaintiffs Charles Van Scoy and Leandro Suarez must choose daily whether to stay in their homes or traverse the middle of the street with oncoming traffic.

60. The prevalent and virtually permanent nature of these encampments which are unimpeded by any meaningful City enforcement or cleanup efforts despite notice to the City, reflects an unambiguous official City policy to permit usurpation of public sidewalks in certain areas. For example, on Venice Boulevard under the 405 freeway, a large-scale encampment has been allowed to persist for years. City workers have actively encouraged homeless persons in nearby areas to move to this encampment. In the Skid Row area, as part of the *Mitchell v. City of Los Angeles* settlement, the City agreed to allow nearly unlimited property accumulation on the public sidewalks while providing little comfort to the ADA-based concerns regarding the navigational impediments to those with disabilities. In an ongoing effort to make City sidewalks more accessible, city workers in Skid Row ironically move encampments to create cutouts for disabled access, and then immediately permit encampments to return fully blocking the very sidewalk they just purportedly made more accessible. The freeway overpasses near the Los Angeles Civic Center are now so packed that it is difficult for an able-bodied individual to walk past without stepping in the street, and impossible for those who need the assistance of wheelchairs and walkers.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

61.     The sidewalk problem directly affects businesses that are accessed by sidewalks.  This prevents disabled customers from reaching businesses, but also deters able-bodied customers who seek to access their businesses or abandon some businesses in favor of more accessible ones.  Businesses are collectively spending hundreds of thousands of dollars on increased sanitation and security measures while struggling to maintain employees and tenants.  Both business owners and residents of the area are thus subject to substantial and unreasonable interference with their enjoyment of their property.  Indeed, the streets and sidewalks of Skid Row have been rendered unusable because of human waste, garbage, and encampments that the City has allowed to persist.

## F.  **Environmental Impact**

62.     The unhealthiness of the homelessness crisis extends to the environment.  There appears to be no environmental impact study of the kind of widespread and systemic homelessness in Los Angeles.  Yet all indications show the impact has been significant.[102]  Every day, businesses and residents find used needles in their drains, on sidewalks, and in gutters.  Los Angeles County has far more unsheltered people than Orange County, and officials there recovered over 14,000 hypodermic needles, plus over 5,000 pounds of "hazardous waste" including human waste, and toxic chemicals such as propane, pesticides, solvents, and paint during a clean-up of a homeless encampment in the Santa Ana Riverbed consisting of approximately 700 people.[103]  While City sanitation workers are deployed to identify and discard toxic waste, only 30 teams are

[102] Courtenay White, *Environmental Impacts of Homeless Encampments in the Guadalupe River Riparian Zone*, School of Environment and Sustainability, Royal Roads University (Jan. 9, 2014), https://viurrspace.ca/bitstream/handle/10170/665/white_courtenay.pdf?sequence=1&isAllowed=y.

[103] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste cleared from Orange County riverbed homeless encampment*, Los Angeles Times (Mar. 10, 2018, 4:30 PM), https://www.latimes.com/local/lanow/la-me-ln-riverbed-debris-20180310-story.html.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

working to cover 500 square miles, missing countless numbers of needles, human waste, and other toxic substances making its way into our ecosystems.

63.     The Environmental Protection Agency recognized this issue in a letter addressed to Governor Gavin Newsom:

> The EPA is aware of the growing homelessness crisis developing in major California cities, including Los Angeles and San Francisco, and the impact of this crisis on the environment.  Indeed, press reports indicate that "piles of human feces" on sidewalks and streets in these cities are becoming all too common.  The EPA is concerned about the potential water quality impacts from pathogens and other contaminants from untreated human waste entering nearby waters.  San Francisco, Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[104]

64.     Thousands of people camp in or near the Los Angeles River basin, without access to toilets and sanitation services.  The amount of related toxic and human waste making its way into our environment is, upon information and belief, substantial, but its full scope is unknown.[105]  The Ballona Wetlands have been ravaged by nearby encampments through raw sewage dumps, needles, and fires.[106]

65.     The power-washing scheme takes place daily throughout the City and uses likely millions of gallons of water yearly to clean refuse and filth from the streets and into our drains and ultimately, oceans.  In a city and state facing water shortages, just on the other side of a devastating eight-year drought, such

---

[104] Letter to Governor Gavin C. Newsom from Andrew R. Wheeler, September 26, 2019, https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

[105] Anna Almendrala, *Fecal Bacteria in California Waterways Increases With Homelessness crisis*, CaliforniaHealthline.org (Jan. 6, 2020), https://californiahealthline.org/news/fecal-bacteria-in-californias-waterways-increases-with-homeless-crisis/.

[106] Erika D. Smith, *Trash, needles and fire. He's watching homelessness destroy the Ballona Wetlands*, Los Angeles Times (June 17, 2021, 5:00 AM), https://www.latimes.com/california/story/2021-06-17/hes-watching-la-homelessness-destroy-ballona-wetlands.

40

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

water usage, particularly without any kind of review taking place, is shameful
and ultimately threatening to the water systems of the City and County.

66.    The environmental impact of fires arising out of homelessness is
also of great concern.  Fires originating in homeless encampments are not just a
potential threat—they have actually destroyed thousands of acres of brush and
wildlife.  The sweeping footprints of the City and County of Los Angeles
encompass vast amounts of undeveloped land, full of dry brush and other readily
combustible material.  Such areas are an attractive location for many homeless
persons wishing to reside "off the grid" and the combination of propane-fueled
cooking fires and bootlegged electricity in untended conditions is a recipe for,
and indeed has already resulted in, massively destructive fires.

## G.    Property Values and Businesses are Affected

67.    Another casualty of the homelessness crisis is the value of property
and businesses.  Downtown Los Angeles has experienced a renaissance over the
last 20 years with loft conversions, hundreds of new restaurants, and until
recently over three million square feet of office space under construction.[107]  That
renaissance is now in jeopardy due to the homelessness crisis.  Businesses are
suffering and property values have been affected.  The average apartment
occupancy rate, rent pricing, number of sales, and sale price per square foot
downtown have all decreased from 2018 numbers correlating with a rise in
homelessness at the same time.  Businesses throughout Los Angeles, such as
Desuar Spa on 5th Street, owned by Deisy Suarez, and Exclusive Motors on
Venice Boulevard, owned by George Frem, both described *infra*, have customers
declining to utilize their services due to nearby encampments.

---

[107] Vivian Marino, *Revitalization Projects Reawaken Downtown Los Angeles*, The New York Times (Mar. 5, 2019),
https://www.nytimes.com/2019/03/05/business/revitalization-projects-reawaken-downtown-los-angeles.html; Andrea Lo, *How downtown Los Angeles made a stunning comeback*, CNN.com (Feb. 16, 2017, 3:50 PM),
https://www.cnn.com/2017/02/15/architecture/downtown-la-revival/index.html.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

68.     Nowhere is the impact felt more strongly than on Skid Row itself, where encampments are visibly choking out local property owners and businesses.  Plaintiff Joseph Burk can no longer maintain tenants in his building and production companies are declining to work there due to the surrounding environment.  He has been trying to sell the property but the offers he receives have been less than half of what other comparable properties receive in neighboring areas.  Even the low offers he has accepted have dropped out of escrow due to concerns about the area.  He has been trying to rent the property, but no one will rent it.  He and his wife had been living there, but due to the conditions on the sidewalk outside his home, it is unlivable.  He is now saddled with what should be a valuable building that is near-impossible to sell, rent, live in, or use for business purposes—all due to conditions outside his property that are beyond his control, but *are* directly within the City's control.

69.     Alliance member Lisa Rich's family has owned commercial property in the Skid Row area for decades, but she is now having to heavily discount the rents she charges, repair at least one building damaged by fires at a cost of $80,000, and pay four times her prior premiums for fire insurance.  These burdens have her considering abandoning all financial dealings in the area.  Alliance member Mark Shinbane has difficulty hiring and retaining employees, has had to replace doors and fences, has to clean the perimeter of the building multiple times per day, and has had to hire additional staff to handle cleaning and maintenance, all at economic cost.  Plaintiff Harry Tashdjian has been forced to spend over $100,000 on upgraded fire and security systems and pest control just in the last few years while simultaneously losing customers due to the property's surroundings.

**H.     The Homelessness Crisis Harms Society**

70.     The City and County have basic obligations to its citizens, all its citizens, to preserve the public health, to ensure a semblance of law and order,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

and to maintain public areas and infrastructure for the use and enjoyment of all its residents. Yet the homelessness crisis persists and threatens all of these: general public welfare and health threatened by disease, rats, and toxic waste permeating public areas. Law and public order are being threatened by the increased crime both on and by homeless individuals, driven by rampant drug addiction and its concomitant gang and property-related crimes. Unchecked waste and disease affect the sheltered and unsheltered alike living in or near these areas.

71.     The County, as the provider of last resort, has the additional obligation to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident . . . when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Cal. Welf. & Inst. Code §17000. The purpose animating Section 17000 is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." Cal. Welf. & Inst. Code §10000. Yet the "incompetent, poor, [and] indigent persons" are not being relieved and supported, nor is "protection, care, and assistance" being given to those who desperately need it. The result is readily observable: squalor, lawlessness, disease, and death.

I.     **Crucial Funds that Could Alleviate this Man-Made Disaster are Tragically Misspent and Misdirected**

72.     The challenges presented by the homelessness crisis persist despite massive expenditures of taxpayer dollars. For the 2020-2021 fiscal year, the City of Los Angeles has approved nearly $1 billion to be used towards homelessness relief, which at first glance represents almost 10% of the City's $11 billion budget and a nearly 500% increase from the $176 million budgeted to address

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

homelessness in 2019-2020.[108]  However, with $281 million dedicated from federal Covid-19 relief, $362 million from Proposition HHH funds, and $150 million dedicated from unused funds the year before, the increase isn't nearly as stark as it seems at first glance, as "only" $162 million comes from the general fund.  Still, with nearly $1 billion dedicated in a single year, Los Angeles could realistically provide a bed for every unsheltered person on the streets, immediately alleviating the suffering and human tragedy unfolding today.  But rather than dedicate the funds to *saving lives*, the City is dedicating $362 million to only 89 permanent supportive housing projects, $200 million for "affordable housing, homeless prevention, eviction defense, and other homeless services," and the rest to a spattering of other increased services.  This is not the "FEMA-style" response all leaders agree is necessary to finally get ahead of the crisis and cannot possibly achieve the ostensible goal for which it is being apportioned.

73.     In 2016, City residents voted overwhelmingly to increase their property taxes and issue general obligation bonds to generate a total of $1.2 billion over a ten-year period with the claimed goal of building 10,000 units of Permanent Supportive Housing ("PSH").[109]  The City of Los Angeles has now

---

[108] *MAYOR GARCETTI SIGNS 2021-2022 BUDGET*, Los Angeles Mayor (June 2, 2021) https://www.lamayor.org/mayor-garcetti-signs-2021-2022-budget; City of Los Angeles, Budget Summary (2019-2020), http://cao.lacity.org/budget19-20/2019-20Budget_Summary.pdf.
[109] The Proposition HHH ballot described it thus:

> To provide safe, clean affordable housing for the homeless and for those in danger of becoming homeless, such as battered women and their children, veterans, seniors, foster youth, and the disabled; and provide facilities to increase access to mental health care, drug and alcohol treatment, and other services; shall the City of Los Angeles issue $1,200,000,000 in general obligation bonds, with citizen oversight and annual financial audits?

City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

allocated most of that $1.2 billion, for a slated total of "5,873 supportive units for homeless residents and another 1,767 affordable units" presumably for low-income (but not yet homeless) persons.[110]  Those numbers are down to 5,730 and 1,376 respectively.[111]  While permanent housing is certainly a valuable piece of the puzzle, the median cost of HHH housing is now an astonishing $573,339 per unit, greater than many market-rate homes for sale in Los Angeles County.  "An unusually high 35 to 40 percent of costs are so-called 'soft costs' (development fees, consultants, financing, etc.) compared to just 11 percent for actual land costs."[112]  Part of the high cost is due to the "elongated approval and construction timelines"—three to six years—which is "plainly out of step with the City's urgent need to bring tens of thousands of people off the streets and into housing."[113]  The purpose of HHH was to provide a significant solution to address the increasing homelessness crisis.  Yet for less than a quarter of the $1.2 billion price tag, the City of Los Angeles could provide a bed for every unsheltered Angeleno.[114]  Instead, year after year, the PIT count has increased and to date, over five years since Proposition HHH was passed, only 1,002 PSH units have been opened.  In focusing almost exclusively on permanent supportive housing, a solution which should be part of the equation but alone takes too long, is too expensive, and provides less than 20 percent of the beds actually needed, the City has wasted its best opportunity to address this crisis and failed to use the

---

[110] Ron Galperin, LA Controller, *High Cost of Homeless Housing: Review of Proposition HHH*, (Oct. 8, 2019), https://lacontroller.org/wp-content/uploads/2019/10/The-High-Cost-of-Homeless-Housing_Review-of-Prop-HHH_10.8.19.pdf.

[111] *See* Los Angeles Mayor, *supra* note 20, https://www.lamayor.org/summary-hhh-pipeline.

[112] *Id.*

[113] *Id.*

[114] HHH is funded using General Obligation (G.O.) bonds, which are limited by the California Constitution to fund "the acquisition or improvement of real property."  Cal. Const. art. 13A § 1(b)(2).  The phrase "acquisition or improvement of real property" is not defined by legal authority.  There are many options presented herein which could easily fall within this category, including tiny home structures, 3D printed homes, or modification of existing structures such as the abandoned L.A. County hospital.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

funds in a manner that would accomplish its stated goal as promised to the voters in 2016.  And in doing so has, in fact, created and extended the crisis.

74.    While most of the HHH money has been committed (though many have not even broken ground yet), there have been several opportunities to pivot strategies and claw-back some of the funding.  For example, on December 10, 2019, LA City Council voted to give an extension to several developers who have missed deadlines.[115]  That extension represented $225 Million that could have been pulled back from Permanent Supportive Housing and used to provide shelter for approximately **20,000** homeless individuals. As it is, these projects only fund **410 units**, of which 284 are slated for supportive housing for chronic homeless and 126 for low-income families.

75.    According to the City's Prop HHH Progress website, $966,614,712 of the $1.2 billion has been "committed" which leaves **$233,385,288** that could be immediately utilized for emergency and interim shelter opportunities.[116]  Of the funds that have been "committed," $338,969,943 million is for projects in the "predevelopment" stage meaning letters of commitment have been issued but no final contract has been signed.[117]

76.    The ballot language on Proposition HHH explicitly provided that approved funds would be made available for three types of housing: (a)

---

[115] City of Los Angeles, City Clerk, LACityClerk Connect, Council File: 17-0090-S2, https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=17-0090-S2 (last visited Mar. 9, 2020).

[116] Los Angeles Housing and Community Investment Department ("LAHCID"), HHH Progress (Feb. 23, 2021), https://hcidla2.lacity.org/housing/hhh-progress; LAHCID, Proposition HHH Developments Summary (Feb. 24, 2021), https://hcidla2.lacity.org/housing/prop-hhh-developments-summary.  *But see* Ron Galperin, LA Controller, Meeting the Moment: An Action Plan to Advance Prop. HHH (Sept. 9, 2020), https://lacontroller.org/audits-and-reports/hhhactionplan/ issued by the City Controller September 9, 2020 which noted that $1.17 billion had been committed, and only $30 million remained unallocated.  The City should provide accurate updated numbers so the Court may determine the funds available.

[117] LAHCID, HHH Progress, *supra* note 115, https://hcidla2.lacity.org/housing/hhh-progress.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

supportive housing for homeless individuals where services such as health care, mental health, and substance use treatment may be provided, (b) temporary shelters and facilities, such as storage and showers, and (c) affordable housing (up to 20% of bond funds).[118]  The ballot measure required that at least 80 percent of HHH funds be used on supportive housing, shelters and facilities and affordable housing, but it did not specify how to distribute funds between those categories.[119]  The City unilaterally decided to spend the vast majority of the funding on supportive housing and virtually nothing on temporary shelters.[120]  As of September 2020, only $58 million—a mere 5% of total Proposition HHH funds had been allocated to interim shelter and facilities projects.  Of the shelters funded by Proposition HHH, the overwhelming majority of the projects (19 of 24) were mere renovations to existing shelters and facilities rather than new construction, providing only 196 additional shelter beds.  The almost exclusive focus on permanent supportive housing in lieu of a balanced approach that also funds shelter beds is contrary to the language of the proposition passed by voters.

77.     Five years have passed since the passage of Proposition HHH and very little housing has been built.  Only 16 projects, containing 1,002 units, have been completed.  There are additional approved projects with 5,730 supportive

---

[118] Los Angeles, California, Homelessness Reduction and Prevention Housing, and Facilities Bond Issue, Measure HHH (November 2016), https://ballotpedia.org/Los_Angeles,_California,_Homelessness_Reduction_and_Prevention_Housing,_and_Facilities_Bond_Issue,_Measure_HHH_(November_2016).

[119] *Id.*

[120] Galperin, *supra* note 22; (*see also* Hr'g Tr. 99:25-100:5, Feb. 4, 2021 (Meg Barclay: "[W]e made a recommendation to discontinue the facilities program in order to—because we were not getting a lot of applications for new beds and because we wanted to make sure that the Measure was focused on permit units which, as you know, is the permanent solution to homelessness.") and 100:14-20 ("So, it wasn't that the City's focus was not on assisting facilities, we just chose to—the recommendation that was approved by Council and the Mayor was to focus Proposition HHH on permanent housing and the permanent solution for people and to use other resources to significantly expand the amount of shelter that was available in the community.")).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

and 1,376 non-supportive units in the pipeline.[121]  As of September 2020, only 19 percent of the units remaining in the HHH development pipeline will be completed by January 1, 2022, and only 43 percent of total units are scheduled to be completed by January 1, 2023.[122]  It is highly unlikely that all projects will be completed by 2025, with the average project timeline ranging between three and six years.[123]  Even with 7,227 units in the pipeline, if the City were to construct housing at its current rate, it would take nearly 30 years to build enough housing for all those currently experiencing homelessness.  By then tens of thousands more will become homeless, suffer, and die on the streets as a result of this poor planning.

78.    Proposition HHH housing is also very expensive – higher than market rate housing.  The median price to construct a Proposition HHH unit in Los Angeles is $578,339.  More than 28 percent of units in construction exceed $600,000 per unit and nearly 33 percent of units in pre-development are projected to exceed the same cost threshold.  For one development project in particular, pre-development costs exceeded $76 million.  *Id.*  Indeed, the City's Comprehensive Homelessness Strategy (January 2016) estimated that the cost of building each studio/one-bedroom unit would be $350,000, and the cost of a two-bedroom unit or larger would be $414,000.[124]  The average cost to build a custom home in Los Angeles starts at $350,000.[125]  At this rate, more individuals will

---

[121] LAHCID, HHH Progress, *supra* note 115, https://hcidla2.lacity.org/housing/hhh-progress.

[122] Galperin, *supra* note 22, https://lacontroller.org/audits-and-reports/hhhactionplan/.

[123] *Id.*

[124] Ron Galperin, LA Controller, High Cost of Housing: Review of Proposition HHH, (Oct. 8, 2019), https://lacontroller.org/wp-content/uploads/2019/10/The-High-Cost-of-Homeless-Housing_Review-of-Prop-HHH_10.8.19.pdf.

[125] *See e.g.* Pacific Green Homes, How Much Does it Cost to Build a House in Los Angeles?, https://www.pacificgreenhomesinc.com/new-home-construction/how-much-does-it-cost-to-build-a-house-in-los-angeles/#:~:text=The%20relative%20scarcity%20of%20vacant,only%20goes%20up%20from%20there (last visited Mar. 3, 2021).

48

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

become homeless than will be able to occupy the permanent units as they come online.

79.    Comparatively, interim shelters, such as Tiny Home villages, cost significantly less (although still astronomically higher in Los Angeles than other jurisdictions), provide a "calming sense of order," hot meals, laundry, restrooms, showers, and most importantly "mak[e] an impact on homelessness, changing lives in a humane and concrete way."

80.    In April, 2020, all benchmarks and deadlines pertaining to current HHH projects were indefinitely suspended.[126]  Traditionally under Proposition HHH a project is given a commitment letter and two years to obtain the rest of the funding (the pre-development phase); upon a project obtaining full funding, it may commence with certain deadlines and benchmarks.  However, the Mayor of Los Angeles, using his emergency powers, unilaterally suspended all deadlines including site control, schedule of performance, and funding commitments.  The Mayor's order came directly after the State of California specifically exempted construction workers and financial institutions from the stay-at-home order as "essential workers."  So there was no reason for this across-the-board tolling of all dates and deadlines, and there certainly is no reason for the order to be continuing to this day.[127]  The result of this unilateral, indefinite order is zero accountability for any deadlines in the pipeline, zero accountability for the production of any housing units in construction, and zero accountability for the over $700 million sitting in the city's coffers collecting dust.  This is an absolute waste of a massive amount of money that could be used to save lives.

---

[126] *See* Mitchell Decl. Ex. B, ECF 239-1.
[127] *See* Mitchell Decl., Ex. C, a report generated on February 12, 2021, ECF 239-1.  The "U" column is labeled "HHH Commitment Expiration Date Plus Tolling Order" with an end date of February 12 (i.e. the date the report was generated).  To Plaintiffs knowledge, the tolling did not end on February 12, 2021, that date was used because it was the date the report was generated.  This demonstrates unambiguously that tolling of all deadlines is still ongoing, and the Proposition HHH Oversight Committee is aware of said tolling yet still it continues.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

81.     Since the passage of Proposition HHH, the number of unhoused people in the City of Los Angeles has ballooned from 28,464 to at least 41,290, an explosion of nearly 70 percent.[128]  While permanent supportive housing is an important component within the broader plan to address homelessness, it cannot be the only solution: at its current cost and pace, thousands will suffer and die, and thousands more will deteriorate—becoming increasingly drug dependent and mentally ill—before any housing from Proposition HHH becomes realistically available.  Peter Lynn, former executive director of LAHSA, has observed that "[o]n our present course, it will take far too long to build far too few units of housing to effectively end this crisis."[129]  **Indeed, in the five years since Proposition HHH was passed, 1,002 units have been built and *5,786 people have died on the streets of Los Angeles*.**

82.     Another source of waste is found in the City's encampment clean-up strategy.  In July 2019 the City Council approved an increase of $6.45 million on top of $26.5 million already in the budget for both noticed and "rapid response" clean-ups consisting of Sanitation workers and LAPD Officers responding to particular areas of homeless encampments, having camp residents move their property, process what is left (dumping literally thousands of tons of needles and toxic waste yearly), and then permitting the same encampments to return to the same location.[130]  The cycle repeats itself with no ultimate change or real net

---

[128] LAHSA, 2016 Homeless Count Results Los Angeles County and LA Continuum of Care (updated May 10, 2016), https://www.lahsa.org/documents?id=1294-2016-homeless-count-results.pdf.  *See also* LAHSA, 2020 Greater Los Angeles Homeless Count Results (last updated Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.

[129] LAHSA, LAHSA Releases 2019 Housing Inventory Count (last updated Oct. 1, 2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-inventory-count&ref=policy.

[130] City of Los Angeles, Mayor Eric Garcetti, *Mayor Garcetti Announces New Plan to Deploy New Sanitation Teams, Deliver Services to Homeless Encampments* (June 19, 2019), https://www.lamayor.org/mayor-garcetti-announces-new-plan-deploy-new-sanitation-teams-deliver-services-homeless-encampments.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

positive benefit for the campers or society.  As one person noted about the plan: "This, while well-intentioned, is housekeeping service for encampments."[131] Mayor Garcetti apparently agrees this program is a waste: "We can't sweep or move homelessness away. . . We're not going to wash down sidewalks one day, only to see an encampment return the next, and people not helped.  It doesn't get any single person off the street with that strategy."[132]  While having unfettered access to the streets *requires* comprehensive clean-ups to reduce the litany of public health issues associated with street homelessness, there's no version of success in the plan, only wheel-spinning.

83.    The County also faces tough questions about its management of homelessness-related funds.  This fiscal year, the County passed a $36.2 billion budget for this fiscal year, which includes an estimated $465,090,000 raised by Measure H dedicated to addressing homelessness.  Measure H was described as a tax voted for by county residents in 2017 to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults."[133]  This amount is wholly separate from, and in addition to, the significant percentage of County funds allotted to departments to address issues of homelessness, including those housed and treated in County jails, emergency treatment and transport, Department of

---

[131] Emily Alpert Reyes, *L.A. could overhaul how homeless encampments are cleaned*, Los Angeles Times (June 19, 2019, 3:00 AM), https://www.latimes.com/local/lanow/la-me-ln-homeless-encampment-cleanup-dumping-bathrooms-trash-20190619-story.html.

[132] Aaron Schrank, *LA seeks permanent solution to homeless encampments*, Marketplace (Apr. 26, 2018), https://www.marketplace.org/2018/04/26/la-seeks-permanent-solution-homeless-encampments/.

[133] County of Los Angeles, *LA County budget process concludes with adoption of $36.1 billion supplemental budget* (2019-2020), https://lacounty.gov/budget/; Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H, Ballotpedia.org (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_Services_and_Prevention,_Measure_H_(March_2017)

51

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  Mental Health, LA County Fire Department, medical treatment through various

2  hospitals and treatment centers, and criminal prosecution and defense costs, not

3  to mention funding General Relief and other myriad social services.

4      84.    Since the passage of Measure H and its concomitant additional

5  hundreds of millions of dollars for housing and services, the homeless population

6  in LA County has **risen** from 57,794 to 66,436 (a 13 percent increase).  The

7  problem is outpacing the solution and the County has failed to utilize the funds in

8  a manner that would effectuate the goal.[134]  This extra tax produced over $500

9  million in Fiscal Year 2019-2020, and is implemented across 47 separate

10  goals.[135]  A substantial portion of these funds are wasted through a failure to

11  spend the funds or spending them in ways that are inherently wasteful, such as

12  paying for capacity of beds rather than utilization.

13      85.    Solutions exist that would meet the articulated program goals of

14  Measure H and Proposition HHH in a time- and cost-effective manner, including

15  Sprung structures (already being used in many places in Los Angeles), military-

16  grade inflatable tents (being utilized in Honolulu), pallet shelters (being used in

17  Sacramento), and festival tents (utilized in Modesto), discussed in para. 18 *supra*.

18  Board and care facilities could be utilized as bridge shelters.  The City of Seattle

19  has created small "villages" of tiny houses which don't require a lot of property

20  (6,000 to 30,000 square feet) and can be built in a matter of months, with

21  building cost of $1,500-$7,500 per unit (depending on utility connections) and

---

[134] County of Los Angeles, *County develops action plan for homelessness prevention* (Dec. 16, 2019), https://homeless.lacounty.gov/news/county-develops-action-plan-for-homelessness-prevention/ (approximately 133 people per day are finding some sort of housing, while an estimate 150 people per day are entering homelessness); Erika D. Smith, *In 2019, homelessness truly felt like a crisis in every corner of L.A.*, Los Angeles Times (Dec. 20, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-12-10/homeless-housing-crisis-los-angeles.

[135] 2019-20 Actual Measure H Expenditures, (October 9, 2020), https://homeless.lacounty.gov/wp-content/uploads/2020/10/COAB-Measure-H-19-20-AC-Close-Out.pdf; Approved Strategies to Combat Homelessness, Los Angeles County Homeless Initiative (February 2016), https://homeless.lacounty.gov/wp-content/uploads/2018/07/HI-Report-Approved2.pdf.

52

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

run on an annual budget of $3,000-$7,000 depending on services provided.[136]
Hundreds of smaller properties throughout the City and County of Los Angeles
fit the bill and could be utilized in a large-scale way to provide an "enhanced
shelter" option.[137]

86.     One of the most promising solutions to this crisis already exists in
the form of collaborative housing, yet LAHSA refuses to refer homeless persons
to the program, calling it "undignified" because it houses two to a room (like
college dormitories or sober living facilities), and doesn't permit alcohol and
drug use within the houses (even though LAHSA purports to encourage a life
style of recovery).[138]  SHARE! collaborative housing provides affordable
permanent supportive housing in single-family houses and duplexes throughout
Los Angeles County.  It utilizes a shared housing model, wherein existing single
family homes are purchased or leased, or new homes or duplexes are constructed,
the home is furnished with low-cost basic furniture, and persons are housed two-
to-a-room forming a sense of community and kinship, and supported by peer
advocate counselors.  Residents pay rent averaging $600 per month (sufficiently
low that it is covered by supplemental security income ("SSI"), social security
disability insurance ("SSDI"), or low-wage jobs with enough left over for food
and other basics of life); no security deposit is required and all bedding, cleaning

---

[136] Lee, *supra* note 28, https://shelterforce.org/2019/03/15/tiny-house-
villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/. .

[137]Examples cited in one private study include 3.6 acres of empty, county-
owned property located at Soto and E. Cesar Chavez, 13.5 acres of underutilized
county-owned property located at Adams and Grand, 1.3 acres of empty state-
owned property at 1616 Maple Ave, 20,000 square feet of City-owned property at
5800 S. Figueroa Street, a 15,000 square foot empty lot located at 2301 San
Pedro Street, 1.4 acres of unoccupied city-owned property at 4521 Browne Ave.,
a combined 3 acres of city and county owned property at Alpine and Spring in
Chinatown, 2.7 acres of city-owned property at 9413 S. Spring, and 8 useable
acres adjacent to Hope Gardens Family Center in Sylmar which is unable to
expand due to conditional use permits.

[138] SHARE!, Mission & History, https://shareselfhelp.org/about-share-the-
self-help-and-recovery-exchange/history-vision-share-the-self-help-and-
recovery-exchange/ (last visited Oct. 22, 2021).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

53

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

supplies, and utilities are provided.  It costs roughly $4,000 per person to get started, and thereafter is self-sustaining; no infrastructure is required as it relies on existing homes for sale or rent (over 30,000 currently listed in the County).  A proposal was made to the LA City Council in October of 2017 to house and provide peer services to 2,000 people for the minimal cost of $8 million.  This evidence-based program for chronically and other homeless individuals with proven outcomes of success has yet to be funded.

87.     Another promising option is 3D-printed homes, built in Austin, Texas and Tabasco, Mexico, which come in various square foot models (400-800 square feet), cost around $4,000 per unit, and take only 24 hours to build.[139]  The company that innovated this model is willing to sell their upgraded printer, the Vulcan II, which would expedite building and potentially reduce costs.  More land is needed than some of the more temporary options described *supra*, and several hundred acres of land are available in less populated areas of the City and County.  When paired with wrap-around services, and transportation to facilitate job accessibility, the County and City could develop nearly self-sustaining communities that have been successful in other cities.[140]

88.     Utilizing any of the options described in the preceding paragraphs, or a combination thereof, in a large-scale manner would be an effective way of spending taxpayer funds that would actually accomplish the goals identified by the programs.  Yet still the City and County focus on funding exorbitantly expensive PSH units and wasting taxpayer dollars on "housekeeping services" for encampments, neither of which are addressing the immediate crisis on the ground.  And the County spends massive amounts on a host of programs that,

---

[139] Jayson, *supra* note 31, https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html; Aria Bendix, *supra* note 31, https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9.

[140] *See* Mobile Loaves & Fishes, *Community First! Village,* https://mlf.org/community-first/ (last visited Oct. 22, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    while positive, lack focus and fail to solve the most pressing problems presented

2    by the homelessness crisis.

3        89.    In addition, the County has failed to meet its statutory obligation to

4    provide appropriate mental health services.  The County Board of Supervisors

5    recognizes the "minimum number of beds required to appropriately meet the

6    [community's mental health] need is 50 public mental health beds per 100,000

7    individuals.  In Los Angeles County there are only 22.7 beds per 100,000

8    individuals."[141]  In response, the Department of Mental Health (DMH) conducted

9    an investigation and identified "significant gaps in inpatient treatment beds,

10   residential beds, shelter beds, and respite homes across all ages" including an

11   "estimate of 3,000 additional subacute beds needed," "significant gaps in

12   assisting people when they are leaving inpatient care, especially for those with

13   co-occurring disorders," "no SUD (substance use disorder) residential treatment

14   for all ages," "no local children's inpatient psychiatric beds," "not enough

15   inpatient beds for patients eligible for conservatorship…with waiting periods of

16   up to a year to access secure inpatient care, resulting in people being discharged

17   to the street and perpetuating homelessness."[142]  In short, courts are reticent to

18   declare a person conserved because there's nowhere for them to go, and the

19   system designed to address these issues is massively overburdened.  At Olive

20   View Hospital in north Los Angeles County, the 72-hour crisis ward at times has

21   over half of its 16 beds dedicated to patients waiting up to a year for a residential

22   inpatient bed, leaving only a handful of other beds available for emergency 5150

23

24       [141]Motion By Supervisors Kathryn Barger and Hilda Solis, *Addressing the Shortage of Mental Health Hospital Beds* (Jan. 22, 2019),

25   http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.; *see also* E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental

26   Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

27       [142] Jonathan E. Sherin, *REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF JANUARY 22, 2019)*, Department of Mental Health 30, 134 (Oct. 29, 2019),

28   http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

holds; Olive View is the only crisis facility in north Los Angeles County and meant to serve millions of people.  If a person is brought in while in crisis but there are no beds for them, often they are released back on the street.  This dynamic repeats itself throughout Los Angeles.  The report goes on to document "limited access to urgent care for MH (mental health), SUD and services to people with co-occurring disorders at all levels of care," "MH and SUD treatment is not integrated" (the so-called "silos of care"), and "to access care you have to 'win the lottery,' have a chronic level of need that requires hospitalization, or become incarcerated.  **Mild cases become severe while people are trying to connect to care.**"[143]  Critically: "A lack of housing options contributes to homelessness."[144]  As of December, 2020, only 156 of the proposed (minimal pilot) 500 additional beds had been procured.[145]

90.     As of 2019 the County had almost $1 billion in funds allocated to it through the Mental Health Services Act, and while there has been some expenditure since, there has been no clarity about how much remains in the fund unspent.[146]  The County points to the state's antiquated and restrictive conservatorship laws and the Federal government's refusal to permit Medicaid finances for mental health beds for facilities of more than 16 beds, both of which likely need to be addressed.  Yet even under the existing scheme, help would be available to those who desperately need it, were there sufficient capacity at all levels.  Local courts could conserve many severely mentally ill persons were there sufficient beds available.  The blame for insufficient placement rests squarely on the County's shoulders.  And people suffering from very serious

---

[143] *Id*. at 135.
[144] *Id*. at 141.
[145] *Id*. at 180-85.
[146] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.

56

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

mental diseases decline living on the street instead, many of whom pay the ultimate price.[147]

91.     Both the County and City have hundreds of millions of dollars in emergency funds to be used for disaster relief.  This homelessness crisis is nothing short of a disaster, with thousands of casualties and massive collateral consequences, yet emergency funds remain untapped.

92.     Together, the County and City fund LAHSA, which has been totally ineffective at stemming the growing tide of homelessness.  Among LAHSA's shortcomings is the failure to move people up and out from emergency shelters and bridge shelters to permanent housing.[148]  One woman at the Downtown Women's Center has been there for five years as she waits for housing; unfortunately those deemed "sickest" get priority for housing and women like her who are more capable of caring for themselves get pushed down the list.  The agency has been so disorganized, it apparently just discovered 3,000 units they "didn't know about" in their system.[149]  An audit conducted by LA City Controller Ron Galperin found LAHSA outreach workers fell far short of their goals, placing only 4% of people assessed into permanent housing and 14% into shelters, only 6% for SUD treatment and only 4% for mental health treatment.[150]

## J.     Neither City nor County Has Proffered Workable Comprehensive Solutions

---

[147] Dennis McDougal, *Op-Ed: My daughter was murdered, but it was misguided mental health laws that put her in danger,* Los Angeles Times (Jan. 26, 2020, 3:00 AM), https://www.latimes.com/opinion/story/2020-01-26/i-hope-police-catch-my-daughters-killer-but-i-know-her-mental-illness-also-played-a-role-in-her-death.

[148] Matt Tinoco, *A Bridge to Where? Few Exit LA's 'Temporary' Homeless Shelters For Permanent Housing,* LAist (Aug. 24, 2020, 3:51 PM), https://laist.com/news/bridge-home-los-angeles-garcetti-result.

[149] Elijah Chiland, *Agency responsible for housing LA's homeless discovers 3,000 units it 'didn't know about,* Curbed Los Angeles (Feb. 20, 2020), https://la.curbed.com/2020/2/20/21145578/lahsa-units-housing-housing.

[150] Ron Galperin, *Strategy on the Streets: Improving Los Angeles Homeless Services Authority's Outreach Program,* Ron Galperin LA Controller (Aug. 28, 2019), https://lacontroller.org/audits-and-reports/strategy-on-the-streets/#1566867736032-c107d667-baf7.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

93.     While the City and County have made some effort to address this crisis, they are at best scattered and neither has developed comprehensive plans needed to change the deadly trajectory.  The County mapping tool shows 2,525 interim beds "in the pipeline" (including Project Roomkey beds), which includes beds within the City of Los Angeles and other locations), and 10,089 supportive housing units "in the pipeline" (the majority of which are funded through HHH and will not be ready for another several years).[151]  That is less than 15,000 new beds becoming available when there are more than 48,000 people in the County without a safe place to sleep on a nightly basis.  Many of those "pipeline" beds that won't be available for years, while those on the street that do not self-resolve deteriorate and ultimately require permanent supportive housing when, had they gotten off the street sooner, they likely would not have.  The City and County are both creating *and* perpetuating the problem.

94.     Plaintiffs do not suggest the City and County are doing nothing; the amount of effort and resources devoted to addressing this issue is significant.  But the actual result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such efforts and resources, because each is being used in ways that will never solve the problem.

95.     And so the crisis continues and accelerates, with little hope of a City- or County-driven solution.  Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs are suffering under the weight of an urgent crisis.  Plaintiffs are left with no choice but to resort to the courts for relief.

## IV.  THE PARTIES

---

[151] County of Los Angeles, Los Angeles County Homelessness & Housing Map: A Data Driven GIS Map of Interim and Supportive Housing (Dec. 12, 2019), https://storymaps.arcgis.com/stories/400d7b75f18747c4ae1ad22d662781a3.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

## PLAINTIFFS AND INDIVIDUALIZED HARMS

96.    **LA ALLIANCE FOR HUMAN RIGHTS** (the "Alliance") is an incorporated non-profit membership association consisting of a broad coalition of Los Angeles stakeholders who understand that homelessness in LA is a human rights crisis and are working towards solutions to address the crisis and its related impact on health and safety issues throughout the region.  Each of its members is a resident of Los Angeles City and/or Los Angeles County, and pays municipal taxes to each.  All individual plaintiffs herein are members of the Alliance. Additionally, the following individuals are representative of the membership:

a.    **MARIA DIAZ** is a Hispanic unsheltered woman living in a tent in Skid Row, where she has been for the last 5 years.  After serious family issues at home, she came to Skid Row to try and find shelter.  To survive on the streets, Ms. Diaz has relied heavily on her faith, and the network of friends she has established on Skid Row.  This social network has helped Ms. Diaz avoid depression and drug abuse and it has also helped keep her safe.  Over the past five years, Ms. Diaz has regularly witnessed individuals selling drugs, stealing belongings, and hassling individuals for no apparent reason.  She has also seen a number of young women harassed, attacked, raped, and ultimately succumb to drug addictions due to the conditions of Skid Row.  Harassment for women on Skid Row is a certainty, and Ms. Diaz herself has experienced it.  For these reasons, Ms. Diaz feels threatened and wants to find shelter.

But finding shelter has been difficult for Ms. Diaz.  Upon her arrival at Skid Row, Maria did not find the support she expected from the City and County. In fact, the City and County provided such little assistance that Ms. Diaz relied exclusively on her personal network on Skid Row for resources and assistance to apply for housing.  She has been matched with housing in the past, but it was in Skid Row; she did not want to take it because she is scared of being stuck in the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

area.  This would leave her sequestered in a region where she faces the greatest threat of harm and relapse into a life on Skid Row.

Ms. Diaz remains homeless today, living in a tent on Skid Row.  She is anxious to secure treatment, housing, and a job.  She has applied for housing to the DREAM center and is waiting to hear if it has been approved.  She is also seeking treatment and job.

b.    **CHESTINA EVANS** is a Black woman who has lived on Skid Row for the past two to three months.  Ms. Evans has been mostly homeless after aging out of the foster care system thirteen years ago.  She did not have access to any transitional program and did not have any resources or know where to go, so she found herself homeless fighting for survival.  Ms. Evans left the bay area for Skid Row because she believed there was more opportunity to receive resources and exit homelessness on Skid Row.

Living on the streets in Skid Row has been incredibly hard for Ms. Evans.  She is frequently assaulted and attacked.  Just a couple nights ago, after returning from staying with a friend, Ms. Evans was attacked by a homeless man.  He wrongly accused her of taking his belonging and hit her hard in the face, knocking her onto the ground.  Ms. Evans doesn't feel she has any recourse; calling the police will have little consequence since they rarely do anything about attacks on Skid Row.  It is incidents like this that make Ms. Evans fear leaving her area.  Ms. Evans has also been sexually assaulted while living on Skid Row by men who prey on women by themselves.  Her time on the streets has resulted in severe mental health issues.  She suffers from depression, anxiety, uncontrolled anger and fear, and paranoia.  Perhaps most taxing is that despite whatever internal turmoil she feels, Ms. Evans feels like she cannot break down or address her emotions because showing weakness on the streets puts her life in danger.  Ms. Evans has sought help for her mental health issues but continues to be stone-walled.  It took her a month to see a therapist, and now she must wait

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

until December to see a psychiatrist.  She doesn't know if she can make it that long.  The long waits aren't helping, and no one seems to care.  She takes illegal narcotics to try to treat her mental issues and to stay up all night because she fears attacks at night.

Ms. Evans has been in two shelters.  She first stayed at the Union Rescue Mission but left for Weingart Center where she shared a room with another woman.  She was asked to leave following an altercation with her roommate.  Ms. Evans and her roommate argued over her roommate's continued use of drugs in their shared living space, as well as her use of loud music at all hours.  She would love an opportunity to stay at another shelter, but fears that without addressing her underlying mental health issues she won't be successful.  She will have to walk away because she can't control herself and will get in trouble.  She needs a place where she can also address her ongoing serious mental health issues at the same time.  Ms. Evans' experience living on the streets has caused her physical and mental harm.

c.    **SHINAE OWSLEY** is a Black woman recently homeless and unsheltered in Skid Row.  She is originally from South Central and after high school attended California State Dominguez Hills.  Unfortunately, her mental health issues lead to drug abuse, which led to prison.  Ten years ago, Ms. Owsley was released from prison.  Following her release, Ms. Owsley began receiving SSI for her anxiety and other mental health concerns.  Ms. Owsley is a hard worker and seeks to get off SSI soon.  And she recognizes that having reliable shelter is essential to this goal.  Ms. Owsley has had a difficult time living on Skid Row.  She is sexually harassed by men regularly and was recently attacked by another female.  She witnesses crime and violence daily and is terrified of living in the streets.  She wants to get clean and sober, but it is impossible to do so while living unsheltered in Skid Row.  She needs help but has no idea where to start.  Over the past three years, not a single social worker or County or City

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

worker has approached Ms. Owsley offering to assist her in obtaining services or housing.  If she the opportunity for shelter anywhere, she would jump at that opportunity.

d.   **CHRISTOPHER ROPER** is a Black man living in Skid Row.  He has been homeless for two years.  He first began experiencing homelessness when he lost his job and was unable to pay his rent.  Before living in Skid Row he lived in Long Beach, Santa Monica, and Venice.  He eventually made his way to Skid Row because he knew resources for those experiencing homelessness were supposed to be available there, like food and showers.  Homelessness has been hard for Mr. Roper physically and mentally.  He does not have a tent and sleeps directly on the street, exposed to the elements.  He is freezing during the winter and it affects his health.  Living on Skid Row has exacerbated a pre-existing brain injury, which he first suffered in 1992.  A side effect of that trauma is a shortened memory, which has only worsened since living in Skid Row.  He can't keep track of his paperwork and loses things often, which makes it more difficult to get shelter and services.  Mr. Roper also suffers from depression and anxiety which is so much worse in Skid Row due to the horrific environment.  He tries to stay away from the violence and fires, but he sees it often.  He is hopeful that the Department of Mental Health will help him find housing, and if given the opportunity to enter a shelter, would take it immediately.

e.   **DONALD SHAW** has lived in or near Skid Row for the last 25 years.  He was in and out of jail for much of that time but has been free, clean, and sober since 2013.  He is now the residential manager of security at the Midnight Mission (the "Mission"), located at 601 San Pedro Street, in the heart of Skid Row, where he lives and oversees a one-year drug and alcohol program that helps 150 men get clean each year.  While working as the assistant manager, he became the liaison between the Mission and the LAPD.  He represented the

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Mission at all LAPD meetings. In attending these meetings, he began to understand the challenges the LAPD has in the Skid Row area, and he informed the LAPD how concerned the Mission's security team was about the hazards personal property created outside the Mission particularly to those trying to get clean and sober. He also asked LAPD officers multiple times if they could help get people to move their possessions off the Mission's walls or keep their property from blocking entrances. The officers seemed sympathetic to his plight but explained there was nothing the LAPD could or is allowed to do to alleviate such conditions.

When he walks to work, he is forced to walk in the street due to the blocked sidewalks, and as a result, he was nearly hit twice by passing cars. He has also witnessed and experienced the significant increase in drugs and violence in Skid Row over the last several years arising out of the increase in unsheltered homeless persons living in encampments on the sidewalks in the area. The conditions surrounding Mr. Shaw and those at the Mission are such that going out at night is too big a risk, so he doesn't.

f. **GALVESTER GAULDING** has struggled with drug and alcohol abuse for the past 20 years, and in 2005 became homeless and ended up in jail due to drug-related issues. From 2007 to 2008, he lived in a halfway house, and, during this time, started attending meetings and battling his addiction, constantly alternating between rehab and the hospital. Mr. Gaulding suffers from both mental and physical health issues, including bipolar disorder, severe depression, and hypertension. The time he spent without regular shelter exacerbated those issues: he rarely was able to sleep more than a few hours at a time, he was exposed to the heat in summer and the cold and rain in winter. He took illegal drugs to self-medicate, both for his mental health issues and to cope with the stress of living on the streets; the narcotics further intensified his chronic illnesses. It wasn't until he finally entered the Union Rescue Mission

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

63

approximately two years ago that he began to heal: he was able to sleep without fear of attack or exposure to the elements and began to take his medication regularly.  But he will never be the same.

When he arrived at the Mission, he was told that if he finished the one-year drug and alcohol program, they would give him the resources he needed to find a place to live.  He was successful and received a Section 8 voucher for permanent housing.  But the only available housing was on Skid Row, which is rife with conditions which threaten his sobriety and safety.  He was terrified to take the offered housing on Skid Row and waited an extra year until he was finally able to find housing out of the area.  He received his keys and moved in February of 2020.

While living in Skid Row, he was physically attacked, witnessed multiple stabbings, and saw multiple dead bodies.  As a former addict who has struggled with this disease for his entire life, it was nearly impossible to stay clean on Skid Row; he mostly chose to avoid going outside at all because the moment he did, someone offered him drugs.

g.     **KYLE HARPT** is formerly homeless and on July 5, 2016, he enrolled in a program at Midnight Mission.  He came to the Mission because of the facilities and the programs it offered and stayed at the Mission for a year and a half.  He has remained sober since then.  After graduating from the Mission, he moved to 5th and Main Street, adjacent to Skid Row.  He began to see the dire circumstances afflicting Skid Row on a daily basis, and was fearful of the increase in violence, unchecked drug use, and exploding sanitation and disease problems that continue to plague the area.  Concerned for his health, he got various vaccinations, including the vaccine for Hepatitis A.

Mr. Harpt observed people openly using drugs on the street and the prevalent absence of police enforcement.  Walking down the street, he has seen people smoking meth out of glass pipes or smoking crack, and he is regularly

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

64

accosted by individuals offering to sell him drugs.  Mr. Harpt observed no effort by city officials, including the police, to stem this flagrant use of drugs.

From 2016-2019 he worked at the Mission doing data base work.  To avoid dangerous areas and altercations in Skid Row, Mr. Harpt used a set path well out of his way to get to and from work.  A couple years ago, he was robbed outside of his house in broad daylight—the offender pulled a knife and stole his bicycle.  This incident and the violent altercations he observed on the streets of Skid Row caused Mr. Harpt to fear for his own safety.  In late 2019 Mr. Harpt changed jobs and left the area; he would like to return to downtown if conditions change for the better.

h.  **MILTON MILES SMITH** is a sixty-year-old unhoused Black male living in Skid Row.  Mr. Smith was born and raised in the Hollywood area.  Mr. Smith has been living in Skid Row since 2018 after being released from prison.  After initially becoming homeless, Milton went to The Center in Hollywood.  He met his friend Albert Albarran at The Center.  They eventually made their way to Skid Row together to try to get housing.  Mr. Smith is on SSI.  While in prison, Mr. Smith was attacked, and his lung almost collapsed.

Mr. Smith has several mental health issues including post-traumatic stress disorder, schizophrenia, paranoia, anxiety and a learning disability.  He occasionally stays with Albert who has an SRO at the Rainbow Apartments which specializes in housing for special needs individuals.  He cannot stay with Albert full time because it is for single people only and he is not supposed to have guests.  When he does not stay with Albert, he looks for friends on Skid Row that may allow him to stay in their tent or he sleeps on the street.  Mr. Smith is scared every day that he is forced to stay on the streets.  He is afraid that if he sleeps at night he will be killed.  He sometimes takes drugs to deal with the stress and to keep himself awake, but he does not like using drugs and is trying to stop.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   Mr. Smith is currently waiting to be placed in an SRO. He was previously

2   matched for housing, but the outreach worker failed to contact him to let him

3   know he had been placed. As a result, his housing was given away. Mr. Smith

4   made the effort to find housing for himself and for Albert. No one has offered

5   Mr. Smith help to find housing or a spot in a shelter. Mr. Smith lives in constant

6   fear on Skid Row. He and Mr. Albarran are frequently attacked or harassed for

7   being gay. If given the opportunity to enter a shelter, Mr. Smith would take it

8   immediately. He is terrified that he will be killed in Skid Row due to the

9   violence and crime if he does not get into shelter soon.

10      i.    **ALBERT ALBARRAN** is a Hispanic male currently living

11   in an SRO called Rainbow Apartments, located in Skid Row. His friend, Milton

12   Miles Smith, helped him apply for and secure this housing. Albert was

13   previously homeless. He met his friend Mr. Smith at The Center in Hollywood,

14   they both eventually came to Skid Row because there are more opportunities for

15   housing in this area. He does not feel safe living in Skid Row and wants to leave

16   but does not have an opportunity anywhere else.

17      Mr. Albarran has several physical issues that began after he was hit by a

18   car when he was fifteen years old. He suffered a traumatic brain injury which has

19   resulted in a short-term memory issue and has a metal rod in his leg. This

20   memory problem increases his danger living in Skid Row, as Mr. Albarran often

21   forgets what street he lives on and is terrorized by gangs and violent drug users in

22   the area. The stress of living in Skid Row has also made his short-term memory

23   issue worse. Mr. Albarran suffers from depression, post-traumatic stress

24   disorder, and anxiety. Despite these physical and mental problems, Mr. Albarran

25   was cut-off from mental health services because he was deemed "too high-

26   functioning."

27      j.    **BOB SMILAND** is the former President and chief executive

28   officer of Inner-City Arts—a non-profit organization dedicated to providing

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

66

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

elementary, middle, and high school students instruction in a range of subject areas within the visual, performing, and media arts.  The organization serves almost 10,000 students per year and is open 6 days a week from 7:30 a.m. to 9:30 p.m.  As the CEO and President, he was directly responsible for the safety of the students and staff.  He both lived and worked in the Skid Row area.  The increase in squalor, disease, and violence over the last several years threatened not only his personal well-being, but that of his co-workers, and the hundreds of students he worked with daily.  Bob was born and raised in Los Angeles, and dedicated his life to the betterment of the City; unfortunately, the unbridled crime, squalor, violence, disease, and death he encountered over the last few years was too much for him to tolerate.  He recently resigned his position and left the city.

Mr. Smiland's apartment building, which houses 53 residents, experienced at least one break-in a week, and neither he nor his visitors could safely leave their cars parked on the street overnight, as cars left overnight were frequently vandalized.  Ambulances appeared at all times of the day and night outside the building, and the last several years brought an increase of gun shots, and other violent noises in the area.

The explosion in the number of tents, people, and personal belongings stored on the sidewalks in the area created regular blockades, preventing Inner-City Arts staff and students from walking to the school.  Because of this blockade, those staff members that rely on the 7th and San Pedro bus stop, roughly 6 blocks away, were forced to walk in the street the entire way.  Staff members no longer walked to work out of fear that they would be attacked.  It was no longer safe for students to walk between their schools alone—they had to be escorted by staff members of the Central City East Association.  Mr. Smiland—an imposing man at 6 feet, 5 inches—did not feel safe walking the 40 yards from the school to the post office during the day.  Each time he made this

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

walk, he was confronted by multiple people whose conduct posed a threat to his safety.

Inner-City Arts experienced a sharp increase in vandalization.  Graffiti, once a rare occurrence, appeared weekly on the organization's buildings.  There was a sharp rise in break-ins to the campus over the past few years which were a major safety concern for the school, its staff, and its students.  Because of the increased danger, violence, and vandalization, the school's security costs rose from minimal to over $80,000 per year.  The school was forced to install a fence for protection, a large capital expense that impeded the carefully designed architectural aesthetic of the property.  These expenses diverted resources away from the core work of the organization.

Mr. Smiland was subjected to violence, garbage, narcotics use, offensive odors and sounds, forced to walk in the middle of the street, and lacked police enforcement of the laws protecting his safety and security, different from individuals living and working outside of this geographic area and not subject to these same conditions at the same rate.  This unfair, unequal treatment funneled these problems into the area where he lived and worked, increasing the homeless population density and exacerbating existing problems.

k. **MARK SHINBANE** is the President and part-owner of Ore-Cal Corporation which is a family-owned business in the Skid Row area.  He has also been the Chairman of Central City East Association (CCEA) for several years.  Ore-Cal Corporation is an international seafood importer, processor, and distributor.  It is a second-generation family-owned-business and they have owned property in the general area since 1961.  Ore-Cal has been located on 634 Crocker Street since 1971.  Four years ago, Crocker Street and other streets in that vicinity—such as 6th Street, 7th Street and Towne Avenue—were clear.  Mr. Shinbane recalls small homeless encampments west of San Pedro Street on San

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Julian Street and Wall Street in the past, but personal possessions were generally kept contained, crime was generally addressed, and the sidewalks were usable.

In 2016, immediately after the injunction issued in *Mitchell v. City of Los Angeles*, the neighborhood surrounding Ore-Cal rapidly filled with tents and encampments, inundating the area, which coincided with an increase in violence and an inability to traverse the sidewalks.  Individuals loiter at all times of the day, and the growing encampments block sidewalks, doorways, driveways, and streets.  Mr. Shinbane regularly observes open drug use and people walking in a perpetual drug-induced state, and bodies lying on the sidewalks or doorways near his building.  There has been an increase of used needles on the streets, sidewalks, and inside drains located on the business' property.

Mr. Shinbane's conversations with LAPD officers and detectives in the area indicate that gang members are supplying narcotics to homeless individuals in the vicinity.  Mr. Shinbane and his employees now deal with the inability to traverse the sidewalks.  Encampments often block sidewalks, doorways, driveways, and streets.  Illegal entry onto their property, car break-ins, and thefts are now a common occurrence.

Ore-Cal and its employees are subject to an increased risk of fire because of the encampment fires that surround the property.  This danger is made worse by the huge quantities of trash and debris that litter their street and surrounding neighborhood.  These conditions have made it difficult to hire new workers and they have lost many well-qualified candidates (approximately 30%) due to the nature of the neighborhood and environment.  This makes the hiring process longer, and more difficult than it ever used to be.

To combat some of the deteriorating conditions, Mr. Shinbane's business has completely fenced its property to prevent individuals from camping on their grounds and to keep the used needles from the rampant narcotics use from being fed into their exterior drains. Mr. Shinbane was forced to replace roll up doors

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

and add sections of fence due to individuals constantly urinating on them, a cost of $25,000.

Ore-Cal has also had to significantly increase its exterior maintenance by washing and sanitizing the perimeter of their facility daily.  In some cases, it is necessary to clean multiple times a day to maintain cleanliness.  He now spends $15,000 a year—a new expense—on supplies and staff dedicated to maintaining the perimeter and external areas of their facility.

His company's property has appeared in footage taken by a reporter for a local television affiliate that accurately depicts the conditions in Skid Row.  (*See* Chris Cristi, *L.A.'s homeless: Aerial tour of Skid Row, epicenter of crisis*, ABC7.com (June 13, 2019), https://abc7.com/society/las-homeless-aerial-tour-of-skid-row-epicenter-of-crisis/5344680/.)  The video shows mounds of trash with tents, structures, and other property completely blocking sidewalks and spilling into the streets at the corner of 6th and Crocker, just yards away from the Ore-Cal building.  He frequently hears police or ambulance sirens, sees drugs being sold or used, and sees human beings walking around in a drug-induced haze or completely passed out in the streets or gutters.

Mr. Shinbane has observed no meaningful efforts by the City to address these issues and has noted a lack of law enforcement activity in the area surrounding his business despite the prevailing state of lawlessness.

l.   **HAL BASTIAN,** a commercial real estate professional in Los Angeles for 38 years, has been one of the leaders of the Downtown Los Angeles Renaissance for the last 27 years.  He began working as a retail broker for Cushman & Wakefield in Downtown Los Angeles in 1994.  He later transitioned to the role of leasing director for The Old Bank District—the first adaptive reuse project in downtown that converted historical office buildings into loft apartments.  From 2001 to 2014, he served as the Director of Economic Development for the Downtown Center Business Improvement District

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

(DCBID), and eventually, its Executive Vice President.  During this time, Mr. Bastian facilitated the construction of over 22,000 housing units, leading tours and producing special events that recruited thousands of new residents and resulted in the construction of dozens of new commercial and mixed-used developments, and attracting over 300 new businesses to the downtown area, including Ralphs, Fresh Fare, Bottega Louie and Whole Foods Market.  He lives in Downtown Los Angeles.

Mr. Bastian's extensive experience in Downtown Los Angeles has made it clear to him that both action and inaction by the City has been a substantial contributing factor in the current homelessness crisis.  In particular, the City's response to a series of federal lawsuits has coincided with this crisis, which affects the homeless and housed alike, and he joins this lawsuit to bring about a substantial change in the deteriorating conditions of Downtown Los Angeles.

m.    **LISA RICH** owns several buildings in Skid Row, which she rents out to various businesses.  Her family has been running the properties for over 40 years and has brought significant numbers of jobs to the area.  Over the past several years, the number of homeless persons on the sidewalk in front of the buildings has dramatically increased, as has the amount of personal possessions.  Frequently, tents and belongings block the sidewalks for days at a time, bringing with them refuse, criminal activity, and unhygienic conditions.  At times, the buildup of property has physically prevented tenants and patrons from accessing the buildings.  Tenants have complained and requested rent reductions due to the effect the homeless encampments are having on their business.  Recently a mobile lab engaged by her environmental consultants refused to come to the properties due to the danger of the area.

Ms. Rich attempted twice to contact LAPD for assistance in moving the property but received no help.  When she asked why LAPD had not moved homeless persons or their property, she was informed that there was nothing

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

71

LAPD could do.  After learning the City would not help, Ms. Rich attempted to install fencing around some of her higher risk properties to keep tents from being propped directly against the buildings.  But the City warned her that the fencing was unlawful and would lead to fines.  Before she could remove the fencing at issue, an unknown person or entity removed the chain link, and tents returned, gathering around the bare fence poles.

In late 2017, a fire at a homeless encampment burned out of control and set one of Ms. Rich's buildings on fire.  The blaze significantly damaged the building's offices and electrical system, requiring more than $80,000 worth of repairs.  The fire and repair process disrupted her tenant's business for significant time.  At her next policy renewal period, her fire insurer refused to renew the policy covering <u>all</u> of her buildings, claiming her buildings could no longer be insured because of the risks posed by the adjacent homeless encampments.  Ms. Rich then approached 24 other insurers—of those, 23 insurers outright refused to insure her buildings at any rate.  Eventually, one insurer offered to cover her buildings at a premium more than four times her original rate.  As a result of these developments, she is actively considering selling her family's business and abandoning the Skid Row area.

n.  **DEISY SUAREZ** is a resident of and business owner in Downtown Los Angeles.  She lives and works on 5th Street ("5th") and Broadway Street ("Broadway").  Ms. Suarez is also the proud mother of two young children..  Due to the violence and disease surrounding the encampments throughout downtown, Ms. Suarez fears for her and her children's safety each time they leave their home.  In fact, this fear has become almost paralyzing, often preventing Ms. Suarez from leaving the building by foot.

Given her children's young age, Ms. Suarez uses a stroller when traveling by foot.  The increase in homeless persons and their property on the streets hinders Ms. Suarez's ability to freely travel the public sidewalks and regularly

puts her and her children's lives in danger.  She finds it difficult to travel 3rd
Street and Main Street, between 7th and 8th Street along Maple Street, along the
east side of Los Angeles Street between Winston and 5th Street, between 5th and
6th Street on Los Angeles Street, and along Main Street between 6th and 7th
Street.

Some of these routes are blocked by street vendors who become extremely
aggressive, and whose belongings and "shops" take up the entire sidewalk.  On
other streets, tents and personal belongings fill the sidewalk, making it difficult or
impossible for a person with a stroller or someone in a wheelchair to pass.  When
she asks individuals to move themselves or their belongings so that she can use
the sidewalk, she is often met with aggression.  As a result, Ms. Suarez is
frequently forced to walk, with her children in their strollers, in the street with
moving cars, to reach her destination because the streets are blocked with
individuals and belongings.  As a mother of young children, Ms. Suarez feels
extremely vulnerable walking on the streets.

Ms. Suarez's business has been negatively impacted by the homeless crisis
in Downtown Los Angeles.  She owns Desuar Spa, a day spa, in the same
building where she and her family live.  At least a few times a month, she and her
staff receive phone calls from clients canceling their appointments because they
are afraid of getting out of the car or walking to the building.  The hotel
concierges at the Intercontinental and the Weston have expressed safety concerns
for guests looking to visit the day spa.  Sometimes, there are individuals asleep
on the sidewalk in front her business, making it difficult, and unnerving for
individuals to enter the building.  The increase in homeless persons living and
sleeping outside of her business has made it difficult for her to retain staff.
Multiple staff members have quit as a direct result of frightening interactions
with the homeless individuals.  And Ms. Suarez has struggled to recruit new staff
members because of the danger the location of the spa poses.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

73

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

97.    **JOSEPH BURK** owns an historic building utilized for a company he created called Location 606, Inc.  His property is primarily rented for film, television, commercial and music video production.  Until 2017, he rented part of the property to tenants, but since then, due to the conditions in the area, he could not find a tenant to occupy the property and moved in along with his wife.  After his wife became pregnant with their child earlier this year, they decided to move out of the property for their safety and mental well-being.  Mr. Burk is regularly at the property and remains apprised of and impacted by the situation, and the challenges it presents, surrounding his property.

98.    He pays property taxes but cannot use the public sidewalks around his own property.  Mr. Burk's residence became unlivable due to surrounding conditions, and his business has been destroyed.  Production companies have stopped using his building for film shoots, and he has gotten countless rejection emails and letters citing the conditions around his property.  He has lost hundreds of thousands of dollars because production companies cannot use Mr. Burk's property because they need accessible driveways and sidewalks for heavy equipment, lighting and sound items, and costume trucks, and the exits and entrances to his property are often fully blocked by shelters and possessions.  On at least one occasion when his property was to be used for filming, the crew was unable to bring their equipment inside his building and demanded its money back.  His property has been on the market for years without an acceptable offer, and he has experienced a significant decline in his own quality of life because of the increased filth, violence, and drug use in the surrounding areas.

99.    Over the past three years, Mr. Burk has received the following communications from production companies considering his property for filming:

a.    October 11, 2016 email: "After driving past your place on 6th and Crocker yesterday I can no longer present your property for upcoming

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

commercial shoots.  The homeless condition directly around your property is out of control and I wouldn't feel safe bringing any film crew into that area."

b.      October 24, 2016 email: "Sorry the scout left before going inside to see your space today.  He told me that when he showed up, he could barely walk down the street because there were so many homeless tents and people around.  He said it would be a nightmare to try and film there and didn't want to put the option in front of the director.  Also, wouldn't be appealing to bring the client there due to all the homeless people."

c.      February 7, 2017 email: "Thank you for showing [interested client] your place.  She really liked it.  But she is concerned about the neighborhood because her show has a big star attached.  Thanks again."

d.      June 27, 2017 email: "When the location manager showed up with the director, his instant reaction was 'I won't shoot here, because I won't get out of the car[.]'  Due to the severity of the homelessness in your area, I fear you are losing out on a lot of shoots.  I know it[']s out of your hands, but thanks for all your help today."

100.     From 2003 to 2017, two full-time tenants, a married couple, lived in the building, but they moved out due to the declining quality of life arising out of the homelessness crisis.  The amount of noise and trash coming from the encampments had become too much for them.  The wife was harassed repeatedly, and the husband had his bike stolen numerous times.  People would (and still do) urinate and defecate on the property's fence, which would run down toward the front door.  The tenants frequently came across used needles which were left behind from people in the encampments and called 911 several times to report individuals overdosing on drugs.

101.     Since those tenants moved out, Mr. Burk has struggled to find a full-time tenant for the property.  People are not interested in renting his property as a home or living space because of the surrounding area.  LAPD officers have

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

told Mr. Burk that they have been instructed by their superiors not to ask the homeless to move their belongings from the sidewalks or from his property. Because of this, when he has asked people to move their belongings from blocking the entrance to his home, he has been threatened, spit on, and verbally attacked.  Weekly, he witnesses public sex, prostitution, and/or nudity on 6th Street and Crocker Street.  His security cameras often catch violent encounters, including shootings and other murders, right across the street from the building.

102.     The building across from him has caught on fire from a homeless encampment's open flame five times in the last year.  He was dropped by several insurance companies and was declined new insurance on multiple occasions.  He was without insurance for two months before he finally found a non-admitted insurance company to insure his property, at significantly higher cost than buildings in other areas of Downtown.  He has difficulty receiving mail or packages.  The mail carrier will not deliver his mail if his mailbox is blocked and will not get out of his truck to deliver mail or packages to his front door because he has said it is not safe.  He regularly receives his neighbors' mail because the carrier simply chooses the mailbox that is not blocked that day to put the entire block's mail in.  If everyone's mailboxes are blocked, mail is not delivered. Food delivery services will no longer deliver food to his property after dark. Rideshare drivers such as Lyft or Uber refuse to pick up or drop off there.

103.     Every day he finds used needles on the sidewalks and on his property.  Clothes and trash are thrown over his fence and onto his property daily. On days when the sidewalks around his property are clear, support groups use the sidewalk to hand out food and clothing which results in mounds of trash being left behind.  His property fence is regularly used a restroom since there are minimal facilities for the number of people living in front of his property.  He must make sure the urine and feces are washed off his property on a daily basis. The unmanaged urine and feces on his property, as well as the rat and bug

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

infestations, create significant health risk.  His fence has been damaged from people pushing large bulky items, such as a couch and a refrigerator, against it and tying tents and tarps to it.  Most days he cannot use the sidewalk around his building and the entrances to his property have been blocked by debris.

104.    In February 2020, his wife saw a dead body on the sidewalk outside of his property when he was leaving for work.  She now suffers from ongoing trauma every time she sees a person laying on the sidewalk near the property because she assumes they are not alive.  The conditions around his property have worsened beyond his control, and he can no longer invite friends or family to his property, or reasonably enjoy and use his property.

105.    Mr. Burk has been trying to sell the property since early 2018. There have been several interested buyers, yet the property has not sold, as the conditions surrounding the building and the recent and widely reported typhus and hepatitis outbreaks in the area have scared off potential buyers.  His property has dropped out of escrow multiple times.  All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reason they would not purchase the property.

106.    For example, on January 17, 2018, he received an email from a potential buyer stating, in part, "Just wondering how you're planning to sell it when the homeless are 3 tents deep all around that.  I know that DTLA is working on the problem but isn't the skid row development company super close? . . . [W]hat precautions and what actions can be taken regarding the sidewalks around the property as owners[,] if we were to buy it?"  The email also included a text message screen shot from a potential buyer stating, "Thanks for letting me know about the sidewalk directly around the building.  I just know that it will make it awfully hard for pedestrians to walk over from the arts district . . . if no one will venture over because the rest of the surrounding streets look like a scene from Mad Max then that could be a hiccup."

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

107.   In 2018, the City of Los Angeles inquired about acquisition of Mr. Burk's property.  The City would not tell him why they were interested in his property, but in January 2019, he found out from an article in the *Los Angeles Times* that the City was looking to turn his property into a Homeless Hygiene Center.  The City has not made an offer on the property but has made matters worse by releasing his address to the public.

108.   Mr. Burk spoke to some young men who told him they came to Skid Row from the Valley because they knew they could pitch a tent, buy and use drugs, without any repercussions.  To be clear, they were not homeless, they were simply capitalizing on the drug-haven Skid Row has become.  This is just one example of the "attractive nuisance" of Skid Row as a result of the City and County's current lax enforcement policies.

109.   The homelessness crisis right outside Mr. Burk's building is heartbreaking, but what is even more heartbreaking is that the City is allowing it to get worse.

110.   **GEORGE FREM** owns a luxury auto-shop in Mar Vista California, which primarily services high-end vehicles.  In 2015, a few homeless individuals, and others who were not homeless but pretended to be to sell narcotics, set up tents under the 405 freeway adjacent to his business.  Since then, the population of the encampment has continually increased, and he currently estimates that more than 80 people live there.  The residents have brought a variety of goods with them including tents, mattresses, wardrobes, and more.  The encampment effectively fully covered the sidewalk on one side of the road then spread to cover the Culver City side for the last two years.  Mr. Frem now sees drug use, prostitution, violence, and public indecency on a regular basis.  He estimates over 80 people living under and near the bridge.

111.   The City conducts weekly sanitary cleanups of the camp.  When they do so, the City announces that any property left within a designated zone

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

will be considered abandoned and disposed of accordingly.  This leaves the unsheltered residents no choice but to move themselves and all of their belongings to the area immediately outside of the cleanup area and directly in front of Mr. Frem's business.  Additionally, a few times a week LAHSA representatives set up a mobile help desk, food giveaway station, and/or mobile shower station (where the City built a special mobile shower drainage system) directly in front of Mr. Frem's business, resulting in lines of people on the sidewalk for hours as they wait for the showers to be available.  When this occurs, customers frequently question whether their vehicles are safe in the lot and whether they will be stored inside overnight.  Mr. Frem used to clean the area himself, paying for private companies to pick up trash and litter, and security to patrol the area, but was admonished by the City to stop doing so or face fines and criminal penalties himself.

112.   There have been shootings under the bridge multiple times, at least three were caught on Mr. Frem's security video: July 26, 2018, April 1, 2019, and October 14, 2020.  In just the last year there have been seven separate fires under or near the bridge: October 28, 2020, December 27, 2020, January 20, 2021, April 16, 2021, April 29, 2021, May 10, 2021, and May 22, 2021.  Below is a single photograph that shows the horror and danger to life and property when people live, cook, and try to warm themselves in places not made for human habitation.  That risk grows even greater when considering the criminal element that preys on the vulnerable and often, sadly, intentionally light fires in revenge or madness:

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

113.    Before the encampment was in place in 2015, Mr. Frem received significant business from studios wanting to rent his location or other auto shops who would sub-contract to him for repairs.  The encampment and related activity, especially the presence of homeless persons immediately outside of the property, caused those shops to doubt the safety of their vehicles while at Mr. Frem's shop, and has caused them to stop using him for sub-contract work.  Prior to 2015, Mr. Frem would get significant walk-in business from his prime location on a major arterial road, but now long-time customers tell Mr. Frem that they do not feel safe picking up their vehicles late at night and potential customers turn away when they see the conditions outside of the shop.

114.    This has decreased the number of service orders the shop has every year since the encampment arose.  Before the encampment was in place, Mr. Frem's shop consistently showed an increase of repair orders and performed over 1000 repairs per year.  But, because of the City's policies effectively maintaining and promoting the camp, the numbers have declined year on year, and now, the shop draws less than 50% of repair order jobs compared to 2013.  The City's

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

homelessness policies have caused serious economic damage to Mr. Frem's business and have effectively destroyed the value of his enterprise.

115.   **WENZIAL JARRELL** is a Black male who has been homeless and living on Skid Row for the past several years.  Before becoming homeless, Mr. Jarrell served in the Air Force, including 8 years in Iraq, before getting injured in combat.  As a result of his service, he now suffers from post-traumatic stress disorder ("PTSD"), which adversely effects his ability to survive on the streets and acquire services.  Living on the streets with his issues is incredibly difficult. The area is violent, he hears gun shots often and it triggers his PTSD. He has physical injuries as a result of his service which are exacerbated by living on the street.

116.   Mr. Jarrell came to Skid Row after the death of his first wife because he was told he could find housing and services there.  But Mr. Jarrell has yet to receive either housing or services.  In fact, the health benefits, general relief, and food stamps he received upon his arrival have stopped because who he thought was a County worker asked him to sign a contract, and his identity was subsequently stolen.  The other promised services also remain elusive.  The process for obtaining services he needs like SSI, general relief, and mental health treatment is arduous and he is frequently told to wait, come back later, or that he must contact someone different.  These complications to getting services are incredibly frustrating and due to his PTSD causes him to withdraw, preventing him from completing the application process and frustrating his prior efforts.  He is eligible for SSI and a veteran affairs ("VA") pension, but due to his identity theft issues he hasn't been able to work through the barriers to receiving it.  He often feels hopeless and like it is not even worth trying.  For months at a time, he accepts that he will never leave Skid Row and find a better life for him and his second wife, with whom he shares a tent.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

117.   Mr. Jarrell's search for help has been further complicated by how functional he is and how well he has adapted to being homeless.  In his experience, services are reserved for those suffering from severe addiction or mental or physical health issues.  He finds he is not "homeless enough" or "sick enough" and gets put in the back of the line for help.  Because he can manage his often-debilitating PTSD and does not have a severe drug addiction or physical health issue, he has a much harder time getting help.  Mr. Jarrell is frustrated that the City's and County's focus is on those in the direst circumstances, leaving him, and many others like him, who are most likely to escape homelessness, without help or services.

118.   Mr. Jarrell has witnessed first-hand how hard it can be to obtain services even when a person visibly needs help.  For example, Mr. Jarrell once came across a 19-year-old girl who was blind, walking the streets of Skid Row.  It was clear to Mr. Jarrell that she would not be able to survive on Skid Row, so he brought her to a county social worker that he knows.  The county services worker initially told him there was nothing they could do for the girl.  Mr. Jarrell demanded to speak with the county manager's supervisor and subsequently learned that the worker was incorrect and should have been providing help to the girl.  For Mr. Jarrell, this experience demonstrates two things.  First, that many homeless people on Skid Row are unable to attain the services they need due to their own limitations and the complicated system that the City and County have designed.  Second the workers running these systems are often barriers rather than facilitators of the care that individuals living on Skid Row needs.

119.   Mr. Jarrell was living on Skid Row during the Covid-19 crisis.  It was months before anyone from the city informed Mr. Jarrell and others about the pandemic or how to protect themselves.  As a result, Covid-19 moved quickly through the homeless population while little to no aid was offered.  He saw many people sick, coughing, and even dying.  As a population, they felt ignored, and it

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

was clear that the rate of sickness and death far exceeded what was being reported.  This experience exemplified how little the City and County care about a population that is already struggling just to survive.

120.   These examples paint a picture of what life on Skid Row is like. Services are regularly denied or terminated for unreasonable or unrelated issues. The workers responsible for this irrational behavior are not held accountable, sweeping the issues under the rug to avoid blame and responsibility.  Individuals, like Mr. Jarrell, were directed to Skid Row with promises of assistance and services, but instead they are turned away and abandoned; left to get worse instead of better.

121.   The services that are provided (frequently by private organizations) fail to stop homelessness itself.  While Mr. Jarrell appreciates the food, clothes, tents, and other provisions provided, these items do little to help him get off the streets.  While these provisions make life on the street more comfortable, it does not provide a stable housing environment.

122.   He has tried sleeping in congregate shelters when he's been able to get a bed, but due to his experiences in Iraq, his PTSD worsens when he is surrounded by large numbers of people.  A couple times he has been able to find individual housing, but it's only for single people and he does not want to be separated from his wife who he cares for, and who cares for him.  And under no circumstances will he leave his wife alone in Skid Row.  It is far too dangerous.

123.   Mr. Jarrell is a selfless, caring individual who works hard to help others get out of the black hole that is Skid Row.  He prioritizes helping those who he thinks clearly do not belong, or should have a home to go back to, because he does not want them to get attacked or left to fend for themselves. According to Mr. Jarrell, there is nothing worse than getting stuck in the system of Skid Row and realizing you cannot escape.  If he were able to get a stable housing environment with any semblance of personal space, he would jump at

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

83

the opportunity.  Mr. Jarrell knows he is more likely to die because he lives on Skid Row.

124.  **CHARLES MALOW** has been living at Union Rescue Mission, within the Skid Row area, since 2012.  Prior to 2008, he worked as a garage door installer for 29 years, and from 2000 to 2006 he worked part-time as a security guard.  He became homeless in 2008 when the economy crashed.  From 2010 to 2012, he lived on the streets of Glendora, California.  In the winter of 2011 and 2012, he stayed at a Glendora Winter Shelter and then decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.  When he first arrived at URM in 2012, police officers would come by in the morning, and wake-up the people sleeping on the streets.  They were required to pack up their belongings and stow them, so the sidewalks were not blocked. This also allowed illegal activity such as narcotics and weapons sales to be more easily discovered and therefore addressed.  At that time, there were no tents in front of URM.

125.  For about five years, Mr. Malow has been an Ambassador at URM. The Ambassador program allows a small group of men to live at URM indefinitely.  Since living at URM, he has worked at Home Depot and in URM's janitorial department, known as the EVS team.  He knows that diseases such as typhus have made a resurgence on Skid Row, and this makes him extremely concerned that his work with the EVS team puts him at greater risk of contracting a disease.

126.  In the last several years Mr. Malow has seen a big increase in the volume of tents and belongings on the streets.  This has greatly affected his daily life.  He has observed a dramatic increase in the rodent problem on Skid Row and has seen rats running in and out of tents when he sweeps the sidewalks and gutters outside of URM.  A major cause of this rodent problem is the volume of trash disposed of on the streets—because individuals living on the streets throw

84

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

food and trash in the streets, rats have more than enough food to flourish.  There has also been a huge increase in the amount of human feces on the street which carries with it the significant risk of disease, not to mention the odors.

127.    There is absolutely no room to walk on the sidewalk, so if he leaves URM, Mr. Malow is forced to walk in the street.  Even in places where he could physically walk between the encampment and the wall, he still must walk on the streets or risk violent confrontation from people who accuse him of invading their "space."  When he leaves URM, he must plan his route carefully even if traveling by public transportation.  Due to an increase in crime, including narcotics sales and violent activity, he must use a car service to get back from the metro or bus station after visiting his mother in Anaheim.  He always has the car drop him off directly in front of URM to avoid dangerous encounters on the street.

128.    Mr. Malow does not leave URM between the hours of 4 p.m. and 6 a.m., because he is concerned for his safety on the streets.  When he does leave, he is incessantly approached and offered illegal drugs for sale.  He regularly sees people just outside his home using illegal narcotics in the form of pills or smoking or injecting themselves.  He sees people lying motionless in gutters, often without clothes or shoes, and is constantly looking to see if that person is dead or merely unconscious from drugs or alcohol.  As a person who has struggled with drug and alcohol use, it is particularly painful to watch and experience.

129.    The excessive build-up of tents and debris over the last few years is directly responsible for this significant increase in crime because it allows criminals to operate in relative anonymity.  This increase in debris, tents, and personal items on the streets also makes it impossible for health and safety workers to identify public health risks, causing disease and unsafe conditions to spread right outside his home.  As a formerly homeless individual, Malow knows first-hand the difficulties that come from living on the street and is deeply

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

85

troubled by both the City's actions and inaction in the face of the homelessness crisis.

130.   **KARYN PINSKY** works in DTLA and lives there with her husband and their young son.  She and her husband moved to DTLA in 2010 because they were drawn to the architecture, history, and walkability of the area.  Unhoused individuals have always been present near their home, but in far fewer numbers.  In 2010, the only tents west of Skid Row were on Broadway, and they were erected every night and removed shortly after sunrise.  From 2010 to 2016, Ms. Pinsky and her husband, and later her son, were able to enjoy many wonderful features of DTLA—they regularly walked their dog along Main Street, and they felt comfortable walking to the many wonderful establishments and restaurants that were nearby.

131.   All this has changed dramatically over the past several years as the homelessness crisis has deepened.  Now, due to many recent experiences and the crime and concentration levels in Downtown, Ms. Pinsky is fearful that either she or her son will be the subject of some random act of violence.  Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards her because she thought Ms. Pinsky was "judging" her—only when her husband and others intervened was the situation defused.  On another occasion, her husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it.  Earlier this year, a homeless man seated outside a café on 6th Street near Broadway, a block from their house, randomly pushed a stranger into the street in front of an oncoming bus.  The man was struck by the bus and ultimately died.  Another neighbor on a different floor was attacked in the middle of the night by someone who gained access through a fire escape window.  Now, as a result, she no longer feels safe sleeping with her window cracked even a little at night because of its proximity to the fire escape.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

132.   Sexual assaults on women also have increased significantly in the last several years, and as a result, Ms. Pinsky is terrified of being assaulted while running errands or just walking to or from a restaurant.  The conditions immediately surrounding their home have gotten so dangerous that neither she nor her husband will leave the house by foot at all.  They drive into the garage and stay in their home; if they need to run errands, they drive.  She does not walk at all, due to the violent criminals that are using the tents as cover immediately outside her building.  She once was able to take her son to enjoy the various activities Downtown Los Angeles offers, like the library story time, parks such as Pershing Square, and museums.  Now they avoid those altogether.  Family and friends are so fearful of the disease and violence in the area that they will no longer come to visit Ms. Pinsky.  The area was not always like this, but the City's failure to address this crisis in a way that is balanced for both the housed and unhoused communities has fundamentally altered the neighborhood and her experience of it.  Ms. Pinsky has been greatly affected and has a very real interest in remediating this issue insofar as her quality of life and basic enjoyment of her property has been severely diminished.  At the same time, she also has compassion and empathy for those on the streets who are subject to the assaults (particularly women), the elements, the drug pushers, the gang members, the rats, filth, and disease.  For Ms. Pinsky, this is no way for a society to treat its most helpless members.

133.   **LEANDRO SUAREZ** is recently retired chief petty officer ("CPO") in the United States Navy and served for over 24 years.  He resides with his sister, Deisy Suarez, at 5th and Broadway four days of the week.  While stationed off the coast of Southern California, he was involved in an accident involving a Navy jet which resulted in the amputation of his right leg and his left big toe.  It took him nearly two years to be healthy enough to use a prosthetic leg.  He also suffers from lower back problems and problems with his toes, knees, and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

87

feet.  Currently, he can only walk for five to eight minutes at a time with the assistance of two crutches.  Because of his limited mobility with the prosthetic, CPO Suarez relies on an electric wheelchair for most daily activities, *e.g.* walking the dog, grocery shopping, running errands, or going "long" distances.

134.    Navigating the streets of Downtown Los Angeles is nearly impossible for CPO Suarez, and he is often confined on his block at 5th and Broadway.  The swelling number of persons living on the streets with their possessions severely limit Mr. Suarez's ability to travel by wheelchair throughout DTLA.

135.    Streets that contain businesses with outdoor patios, chairs, or other decorative materials pose a particularly difficult problem for CPO Suarez.  While the law requires businesses to ensure a certain portion of the sidewalk remain clear, homeless persons openly camp in front of these establishments, effectively blocking the entire sidewalk.  CPO Suarez cannot get around these persons, and because he is in a wheelchair, he must go back to the corner so he can use the ramp to access the street and cross to the other side.  This is a laborious, time-consuming, and dangerous process.  And the constant backtracking limits CPO Suarez's ability to travel within the city because his wheelchair is not made for long distances.

136.    When CPO Suarez asks homeless persons to move themselves or their belongings, they often become aggressive with him, demanding that he prove he "owns the sidewalk," or that he give them cigarettes or other paraphernalia as a "tax."  More often than not, people simply refuse to move, again, forcing Mr. Suarez to find a curb, cross to the other side of the street, and hope that there will be enough public walkway for his wheelchair to fit through so that he can complete a simple errand, task, or outing.

137.    The buildup of goods and persons on the streets prevents CPO Suarez from freely traveling throughout the city.  He is limited in the distance

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

and the places he can travel because his electric wheelchair has a limited battery life.  When streets are blocked with property and people, CPO Suarez is forced to find a different, unobstructed, route to his destination.  And sometimes, because CPO Suarez's wheelchair has limited battery life, he is prevented from even reaching his destination.  In fact, at times the idea of traveling outside is so daunting that Mr. Suarez is forced to remain indoors.

138.   CPO Suarez's difficulties are exacerbated when construction projects limit the sidewalk further.  A construction project between 4th and 5th Street has made it is nearly impossible for CPO Suarez to travel down Broadway because while a makeshift walkway exists, the walkway is often blocked by homeless persons or their property.  CPO Suarez's request that the individuals move is often rebuffed, preventing him from descending down the ramp or having full and free access to public sidewalks or the ability to travel the streets.

139.   CPO Suarez regularly endures verbal abuse from the individuals he asks to move so that he can access the public walkway.  Already physically vulnerable, this constant beratement has left CPO Suarez fearful of traveling outside.

140.   **HARRY TASHDJIAN** owns an upholstery supply business in the industrial area of DTLA, and the property surrounding the business location.  Mr. Tashdjian's building typically houses millions of dollars' worth of inventory. When he purchased the building in 2013, tents were not allowed on the streets during the day.  Because his business operates during traditional business hours, he believed that the location would not hinder business, which generally has between 70 and 100 will-call orders per day through which customers order product and then come into the business shop to pick it up.

141.   In mid-2016, Mr. Tashdjian saw an immediate increase in tents on the streets and sidewalks outside of his business.  Today, tents occupy the sidewalks at all hours, and it is difficult for him and his customers to access his

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

business due to the piles of property and people loitering on the sidewalk and in the street.  Customers constantly tell him how difficult it is to get into the building or the adjacent parking lot without hitting people.  Mr. Tashdjian has been repeatedly told that customers prefer to do business with competitors to avoid the hassle and inconvenience of trying to access his store.

142.  Vendors from all over the world—Italy, Germany, United Kingdom, China, etc.—visit Mr. Tashdjian's shop and express shock and dismay that such horrendous conditions exist in Los Angeles.  His business is now at a much greater risk for vandalism, violence, and fire damage.  Homeless individuals frequently urinate into or onto his building or the adjacent parking lot, and there has been an increase in graffiti on his building.  The number of tents immediately outside of his building puts his business at risk of fire damage—indeed, the fire department responds at least once a year to a tent fire that has started immediately outside his building.  Sometimes it is an innocent accident from an open flame; other times, it is intentional due to some drug dealers' disagreement.  His security cameras have recorded these acts of arson.

143.  The conditions surrounding his property have cost Mr. Tashdjian a great deal of money.  Because of the immediate fire danger posed by the tents outside his building, he has been forced to upgrade his fire monitoring system which cost approximately $40,000.  He has also had to spend approximately $37,000 on a new security surveillance system to protect the building.  The LAPD frequently seeks footage caught on this security system during investigations.  Theft is also a major concern—pallets are constantly stolen from their building and car batteries are frequently stolen from inside people's cars.

144.  There has also been a significant uptick in the population of rats surrounding his building, and as a result, rat feces coat all three fences surrounding his property.  To address the increase in fecal matter on his property, as well as the proliferation in cockroaches, he has hired a pest control company

and had the health department visit the property multiple times.  The gate surrounding his property has been repeatedly damaged, costing him thousands of dollars in repairs.

145.   Over the last few years, as the City and County have permitted the homelessness crisis to grow, the risk to his property from fire damage and vandalism has increased exponentially—the business constantly replaces gates and other property, cleans the facilities, and sometimes pays security to safeguard its property.  They have had to spend over $100,000 in upgrades to their system and increased monitoring and pest control just as a result of the increased homeless persons and property in the area.  Mr. Tashdjian and his employees cannot walk anywhere in the area and are constantly subject to risk of disease due to the putrid conditions outside the business.

146.   The City and the County have offered no assistance to Mr. Tashdjian and have taken no steps to address the impact of the homelessness crisis on his business or to enforce the laws that are broken daily in the area around his business.

147.   **GARY WHITTER** has been homeless on and off in the Los Angeles area for the last 13 years.  He struggles with alcoholism, depression, bipolar disorder, chronic back pain, and hypertension.  While he was living on the streets, he would sleep wrapped up in a blanket, usually on hard cement or a blanket.  He could not get more than an hour or two of sleep at a time because of fear of attacks, noise, people asking him to move, physical pain, or exposure to the elements.  Sleep deprivation caused his mental state to spiral, exacerbating his depression, bipolar, and hypertension conditions.  The hard sleeping conditions and constantly carrying all his belongings everywhere he went lead to severe back pain.

148.   The stress of the stigma of being homeless was also significant, adding to his depression and hypertension.  As hard as he tried, he understood

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

91

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

that he always looked and smelled terrible.  It was impossible to keep his hygiene up and as a result he was constantly sick.  Due to his unpredictable living and sleeping conditions, he lacked regular medical and dental care.  He frequently encountered persons attempting to scam him or victimize him in some way.  All of this caused his mental and physical state to further decline.

149.   In the middle of March 2019, he entered into a program at the Union Rescue Mission, and has now been there for almost a year.  He is able to get a full night's sleep which has significantly increased his mental stability and reduced his hypertension.  Sleeping on a bed, and not having to carry his worldly possessions on his back has helped his back pain tremendously and he can move uninhibited which has itself improved his mental stability and hypertension.  He now has regular access to medical and mental health clinics, and his mental and physical health has improved markedly.  This is the third time he has been through Union Rescue Mission's program and he is unsure about what will happen in the future once he graduates.  He is aware that permanent housing is difficult to find, but he is fearful of living on Skid Row or returning to living on the streets.

150.   Staying on Skid Row has its own dangers.  He often has to walk in the street because the sidewalks are completely blocked with tents and possessions.  Even when there is room to walk on the sidewalk, he often must walk in the street anyway or risk harassment for walking in a person's "backyard" (the area in front of the tent).  Other than walking to Rite-Aid to pick up his prescriptions or to the Department of Public Social Services office to get his General Relief check, he stays inside because he is too afraid to leave the building.  At night he can hear gunshots and sirens all night long, and on the roof, it isn't uncommon to witness people getting attacked on the street, including women getting beaten or raped.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

151.   **CHARLES VAN SCOY** lives at Union Rescue Mission and has been homeless or lived in shelters at various points in time over the last three decades.  Sometime after 2010, he moved to Long Beach Rescue Mission, where he lived for two or three years.  He has been living at the URM for four years and is part of its Ambassador program.

152.   Due to various illnesses, Mr. Van Scoy is confined to a wheelchair. He depends on Access Services ("Access"), Los Angeles County's Paratransit program, when traveling further distances within the city.  Sometimes Access is available to him, but sometimes it is not—it is a limited program and he is regularly in danger of losing qualification for its services.  Because of the build-up of tents and personal property on the sidewalks, it is presently impossible for Mr. Van Scoy to navigate the sidewalks surrounding the URM, and so he must choose every day to stay inside or risk traversing busy streets in a wheelchair and risking accident and injury—indeed, the risk is even greater for him on the streets because the massive amounts of trash and property (and sometimes unconscious bodies) in the gutters require him to edge closer to the center of the streets. When he tries to run errands, such as travel to the drugstore or market, he is not able to do so due to the blocked sidewalks in every direction.  When he asks people to move their belongings on the sidewalk to make a path for his 32-inch wheelchair, he is met with threats and aggression, so he doesn't even ask anymore.  He cannot traverse the sidewalks in the half-square mile around his property.  He would like to be able to go outside for exercise, or to go to the market or drug store independently, but has to rely on Access Services to go anywhere.  Access Services typically parks half-way down the block at an entrance ramp but often the way there is blocked, so he is unable to even get to his transportation which is necessary to get to frequent doctors appointments.  He has missed important doctors' appointments and meetings because it is so difficult for him to move along public sidewalks.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

153.   Every time Mr. Van Scoy leaves URM, people approach him to buy or sell drugs.  As a recovering addict, it feels like walking into a firestorm.  So many of the tents and enclosures are used by gang members to sell drugs and weapons that people who come to Skid Row looking for services frequently find themselves targets for drug pushers.

154.   Mr. Van Scoy has observed that the increase in debris on the streets has been accompanied by a rodent infestation that carries with it the high risk of disease.  The lack of sanitation and accumulation of trash and human waste have made the streets increasingly dangerous for him, particularly because of his significant health issues and compromised immune system.  He knows of one individual who came into contact with human feces and developed an infection that led to the amputation of a leg.  Van Scoy's medical conditions make him particularly vulnerable to the spread of bacteria and disease.

155.   All these circumstances combine to render Mr. Van Scoy a prisoner in his own home.

## DEFENDANTS

156.   **CITY OF LOS ANGELES** ("City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued. The departments of the City include the Los Angeles Department of Public Works with its various sub-departments include the Los Angeles Department of Sanitation (LASAN), and the Los Angeles Police Department (LAPD).

157.   **COUNTY OF LOS ANGELES** ("County") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.  The departments of the County include but are not limited to the Los Angeles Sheriff's Department (LASD), the Department of Mental Health (DMH), the Department of Public Health (DPH), and the Department of Public Social Services (DPSS).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

158. The **CITY** and **COUNTY** jointly fund, manage, and administer the Los Angeles Homeless Service Authority (LAHSA), an independent joint powers authority. According to its website, "LAHSA is the lead agency in the Los Angeles Continuum of Care, which is the regional planning body that coordinates housing and services for homeless families and individuals in Los Angeles County. LAHSA coordinates and manages over $300 million annually in federal, state, county, and city funds for programs that provide shelter, housing, and services to people experiencing homelessness."[152]

159. Does 1 through 200, inclusive, are persons, entities, government bodies, municipal employees, the names and identifies of which are currently unknown.

## V. CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Negligence
### (Against all Defendants)

160. Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 159 of this Complaint as though set forth fully herein.

161. Defendants, by and through their agents and employees and under a theory of *respondeat superior*, have sole right and responsibility to control, maintain, and keep safe and clean the public and public-right-of-way areas in the City and unincorporated parts of the County, including parks, sidewalks, streets, public buildings, and certain undeveloped areas such as alongside freeways and other transportation routes, and to make and enforce laws assuring the public health and safety thereof for its citizens and their guests. Among other things, Defendants have the duty to maintain these areas in a manner which does not

---

[152] LAHSA, *About LAHSA*, https://www.lahsa.org/about (last visited Oct. 22, 2021).

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

unreasonably interfere with the free passage or use by plaintiffs, and which addresses and alleviates conditions which are harmful to health, or indecent or offensive to the senses, and which create a fire hazard or permit crime to occur unabated including the illegal sale of controlled substances.

162.   As controlling law makes clear, "The public is entitled to the free and unobstructed use of the entire streets and sidewalks. . ." *Vanderhurst*, 113 Cal. at 152.  Indeed, municipalities have "the duty to keep their communities' streets open and available for movement of people and property."  *Schneider*, 308 U.S. at 160-61.  The City of Los Angeles admits it has the duty to keep sidewalks open for the public.

163.   In 2016, the City sponsored and supported a ballot measure which promised to "provide safe, clean affordable housing for the homeless, and … to provide facilities to increase access to mental health care, drug, and alcohol treatment and other services" if its citizens authorized the issuance of $1,200,000,000 in general obligation bonds for that purpose.[153]  Proposition HHH passed overwhelmingly and became law in 2017, thereby obligating and creating a duty of the City to implement it in a manner to achieve its purposes.

164.   In 2017, the County sponsored a ballot measure which promised to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults" if its citizens authorized a ¼ cent sales tax for ten years to be used for that purpose.  Proposition H passed overwhelmingly and became law,

---

[153] City of Los Angeles, City Clerk, Voter Information Pamphlet at 7 (Nov. 8, 2016), http://clerk.cityofla.acsitefactory.com/sites/g/files/wph606/f/2016%20November%20County%20WEB_English.pdf.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

thereby obligating the County to implement it in a manner to achieve its purposes.

165.    Defendants and their agents have breached their duty to its citizens, including and specifically to plaintiffs and Alliance members, and each plaintiff and Alliance member has suffered damages as a result, as described more fully *supra*.  The bases of this cause of action is the conduct, acts, and omissions of individual responsible officials, including Does 1-150, inclusive, based on the theory of *respondeat superior*.

166.    Plaintiffs seek no damages hereunder and seek equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

## SECOND CAUSE OF ACTION
### Violation of Mandatory Duty
### Cal. Gov't Code § 815.6; Welf & Inst. Code § 17000
### (Against Defendant County of Los Angeles)

167.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 166 of this Complaint as though set forth fully herein.

168.    Defendant County of Los Angeles is liable under California Government Code section 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide medical care for the indigent. California Welfare and Institutions Code section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

97

169.   Section 10000 clarifies and defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed.   It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code.   That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

Cal. Welf. & Inst. Code § 10000.

170.   Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents. . . promptly and humanely." *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996).  This means counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health." *Id.* at 1240.  The California Supreme Court has held that "subsistence medical services" must be provided. *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely.") (citation omitted).  Counties have an obligation to provide "medically necessary care, not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted).  That includes care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014 (citing *Cooke v. Superior Court*, 213 Cal. App. 3d 401, 413-15 (1989)).  Importantly, a county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight." *Fuchino v. Edwards-Buckley*, 196 Cal. App. 4th 1128, 1134 (2011) (citation

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

98

omitted).  "Medically necessary" for adults is defined in California Welfare & Institutions Code section 14059.5(a): "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain."  Cal. Welf. & Inst. Code § 14059.5(a).

171.   Given the above-described facts and circumstances, and significant studies, statistics, and reports including those set forth *supra*, and other such evidence as may be provided, it cannot be doubted that a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death.  As Dr. Barbara Ferrer, director of the LA County Department of Public Health, admitted: "Homeless people are in fact dying at a higher rate because they're homeless."[154]  Recognizing this, the LA County Department of Health Services has implemented limited program to provide housing as part of its larger healthcare obligation which has been wildly successful.  But unfortunately, it has not gone far enough to address the homeless crisis, which is ravaging the city and county, such that over 48,000 persons remain unsheltered in the County as of January 2019.

172.   Basic shelter is "medically necessary" insofar as it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain" and the City and County's failure to provide the same to its homeless population constitutes a breach of its duty under California Welfare & Institution Code Sections 17000 and 10000.  Plaintiffs allege that provision of shelter, in and of itself, would alleviate significant physical and mental health issues and prevent existing or pre-existing physical

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[154] Flores, *supra* note 91, https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

and mental health issues from worsening.  In other words, the beds themselves
are medically necessary.

173.    Plaintiffs, and each of them, have been damaged by the County's
failure to provide beds, as described in detail *supra*.

174.    Plaintiffs seek no damages hereunder and submit this claim for
equitable and injunctive relief only.  As such neither the City nor County are
entitled to any claims of immunity pursuant Cal. Gov. Code § 814.

## THIRD CAUSE OF ACTION

## Violation of Cal. Civ. Code § 3490, *et seq*.  (Public Nuisance)

## (Against all Defendants)

175.    Plaintiffs re-allege and incorporate herein by this reference each and
every allegation set forth in paragraphs 1 through 174 of this Complaint as
though set forth fully herein.

176.    California has defined nuisance as

> [a]nything which is injurious to health, including, but not
> limited to, the illegal sale of controlled substances, or is
> indecent or offensive to the senses, or an obstruction to
> the free use of property, so as to interfere with the
> comfortable enjoyment of life or property, or unlawfully
> obstructs the free passage or use, in the customary
> manner, of any navigable lake, or river, bay, stream,
> canal, or basin, or any public park, square, street, or
> highway, is a nuisance.

Cal. Civ. Code § 3479.

177.    A nuisance cause of action "is plainly aimed at protecting the public
from the hazards created by public nuisances*." People v. ConAgra Grocery
Prod. Co*., 17 Cal. App. 5th 51, 136 (2017).  In addition to health and safety
hazards, "[a] reduction in property values caused by activities on a . . . piece of
land, and an assault on the senses by noise, dust, and odors, are just the kinds of
harm that common law suits to abate a nuisance are designed to redress*." Solid
Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505
(7th Cir. 1996).  A public nuisance is the substantial and unreasonable

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

100

interference with a public right. *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938-39 (1996).

178.   As described above, the City, by its failure to maintain the public property under its control, and to enforce the laws requiring the same, is perpetuating and facilitating nuisance violations.

179.   All Plaintiffs have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or room rented; each have suffered and continue to be threatened with respect to their health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, and encampments outside their property.

180.   Each plaintiff and Alliance member has been damaged in his or her own right, in a manner specially injurious to him or herself.  No plaintiff or Alliance member consented to defendants' conduct.

## FOURTH CAUSE OF ACTION

### Violation of Cal. Civ. Code § 3501, *et seq*. (Private Nuisance)

### (Against all Defendants)

181.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 180 of this Complaint as though set forth fully herein.

182.   Each Plaintiff and Alliance member identified owns, leases, occupies, or otherwise controls all or a portion of the home or business identified. By Defendants' actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

183.   Defendants' conduct has been and is intentional and unreasonable, unintentional but negligent or reckless, and/or the condition permitted to exist

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

101

was the result of abnormally dangerous activity which substantially interfered with each plaintiff's and Alliance member's use or enjoyment of his or her land that an ordinary person would reasonably be annoyed or disturbed by.  No plaintiff or Alliance member consented to Defendants' conduct; each was harmed, Defendants' conduct was a substantial factor in causing the harm, and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

184.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

## FIFTH CAUSE OF ACTION
## Inverse Condemnation/Cal. Const. art. I § 19
## (Plaintiffs Alliance, Burk, and Frem against City)

185.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 184 of this Complaint as though set forth fully herein.

186.   California Constitution, article I § 19 provides in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  The actions by the City have limited, damaged, and/or burdened the owners' property and/or business so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

///

///

///

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# SIXTH CAUSE OF ACTION

## Waste of Public Funds and Resources

## Cal. Civ. Proc. Code § 526a

## (Against All Defendants)

187.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 186 of this Complaint as though set forth fully herein.

188.   California Code of Civil Procedure section 526a permits private individuals or entities to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency."

189.   Plaintiffs and Alliance members, each of them, are residents of the City of Los Angeles and/or County of Los Angeles and/or own property and/or businesses therein and pay income tax, sales tax, property tax, and/or business license taxes and therefore having standing to bring an action under section 526a.

190.   As described more fully *supra*, taxpayer funds have been misused and wasted by the City and County of Los Angeles, such they are incapable of achieving the ostensible goal of addressing the homelessness crisis in any significant way, much less "ending" it.  Such expenditures, particularly when taken in the aggregate, cost several factors more than alternative available measures which are demonstrably effective in addressing the crisis.

191.   Proposition HHH and Measure H were promoted and passed by the electorate to address the homelessness crisis in a comprehensive and effective way.  Instead, homelessness has steadily increased in this City and County.

192.   As detailed above the City and the County have spent enormous amounts of public funds on the homelessness crisis in ways that have had little or no effect on the crisis, and thereby wasted those public funds.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

193.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

### SEVENTH CAUSE OF ACTION

### Violation of California Disabled Persons Act

### Cal. Civ. Code § 54, *et seq*

### (Plaintiffs Van Scoy and Suarez Against Defendant City and County)

194.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 193 of this Complaint as though set forth fully herein.

195.   California's Disabled Persons Act codifies requirements that ensure equal and full access to individuals with disabilities.  That Act provides, in part:

> Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places.

Cal. Civ. Code § 54 (a).

> Individuals with disabilities shall be entitled to full and equal access, as other members of the general public, to accommodations, advantages, facilities, medical facilities, including hospitals, clinics, and physicians' offices . . . and other places to which the general public is invited, subject only to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons.

Cal. Civ. Code § 54.1(a)(1).

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

196.   As detailed above, Plaintiffs Charles Van Scoy and Leandro Suarez are individuals with disabilities as defined by the Disabled Persons Act, and are being denied full and equal access to places to which the general public is invited, including "free and full use" of public sidewalks, by the policies and practices of the City of Los Angeles, including its failure to regularly maintain its sidewalks in a manner which permits wheelchair-bound individuals "full and free use" thereof.

197.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such neither the City nor County are entitled to any claims of immunity pursuant to California Government Code section 814.

## EIGHTH CAUSE OF ACTION

### Violation of Title II of the Americans with Disabilities Act

### 42 U.S.C. § 12131, *et seq*.

### (Plaintiffs Van Scoy and Suarez against Defendants City and County)

198.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 197 of this Complaint as though set forth fully herein.

199.   The Americans with Disabilities Act ("ADA") provides that people with disabilities be afforded "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation …"  42 U.S.C. § 12182(a).  Further, the ADA ensures that transportation facilities are constructed to a set of standards that ensures accessibility for the disabled.  Sidewalks are the most common element of transportation infrastructure, yet if they are not accessible, they pose great challenges and dangers to anyone in a wheelchair or who has other mobility restrictions.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

105

200.   Sidewalks are subject to the access requirements of Title II of the ADA and § 504 of the Rehabilitation Act.  42 U.S.C. § 12101(1); *Willits*, 925 F. Supp. 2d at 1093 ("Any public sidewalk over which the City of Los Angeles has responsibility to inspect and notify property owners of repair needs is a 'program, service, or activity' within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973."). Accordingly, sidewalk width requirements ensure that sidewalks are accessible for use by wheelchair-bound individuals.

201.   The minimum width for an ADA-compliant sidewalk is 36 inches. 36 C.F.R. § 1191, app. D, § 403.5.1 (2014) ("the clear width of walking surfaces shall be 36 inches (915 mm) minimum").  Where obstructions such as telephone poles, traffic signal cabinets, or other utilities exist, the sidewalk must be constructed to allow the minimum width requirement of 36 inches between the edge of the obstruction and the edge of the sidewalk.  *Id*.  "A public entity shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part."  28 C.F.R § 35.133(a) (2011).

202.   Throughout Los Angeles, the City and County are failing to uphold their obligations to maintain clear and accessible sidewalks and public rights-of-way for its disabled residents and visitors, resulting in regular violations of the Americans with Disabilities Act.  These ADA violations are obvious and known to the City and County both through its own inspections and various reports of blocked sidewalks due to encampments through its own reporting mechanisms, such as 311.  Defendants and its agents and employees have failed and continue to fail to provide reasonable accommodations for disabled persons using public sidewalks.

203.   Defendants are obligated to operate the "service, program, or activity" "so that . . ., when viewed in its entirety, it is readily accessible to and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

106

useable by individuals with disabilities.  28 C.F.R. § 35.150(a) (2012).  Yet when "viewed in its entirety" public rights-of-way are not provided by Defendants to be "readily accessible to and useable" by individuals bound to wheelchairs.

204.   The discrimination and denial of access to the City's rights-of-way for persons with disabilities is the direct result of Defendants' policies and practices of deliberately permitting encampments to proliferate, particularly in certain areas such as Skid Row or on Venice Blvd under the 405 freeway, and the failure to adopt or implement any adequate procedure for regularly inspecting and maintaining the pedestrian rights-of-way clear of obstructions.

205.   As a direct and proximate result of the aforementioned acts, including but not limited to Defendants' deliberate indifference to the violation of Mr. Van Scoy and CPO Suarez's federally protected rights, both have suffered pain, humiliation, hardship, anxiety, indignity, and severe mental and emotional anguish.  This causes each of them to be deprived of their independence and prevents each from accessing the services and benefits of public establishments.

206.   Pursuant to 42 U.S.C. § 12133, Plaintiffs Van Scoy and Suarez are entitled to recover compensatory damages and reasonable attorneys' fees and costs incurred in bringing this action.

## NINTH CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act

### 29 U.S.C. § 791 *et seq.*

### (Plaintiffs Van Scoy and Suarez against Defendants City and County)

207.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 206 of this Complaint as though set forth fully herein.

208.   Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "[N]o otherwise qualified individual with a disability. . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

107

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . .” 29 U.S.C. § 794(a) (2016).

209.   Plaintiffs are otherwise qualified to participate in the services, programs, or activities that are provided to individuals in the City.  The City is a recipient of federal financial assistance and therefore subject to Section 504. Upon information and belief, Defendants and their agents and employees have and continue to violate Section 504 of the Rehabilitation Act by excluding Plaintiffs Van Scoy and Suarez from participation in, denying them the benefits of, and subjecting them to discrimination regarding the benefits and services involved in utilizing public rights-of-way based solely on their disability

210.   Upon information and belief, said discrimination occurred with deliberate intent and/or reckless disregard of Plaintiffs’ rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys’ fees in bringing this action.

### TENTH CAUSE OF ACTION
### Violation of Due Process and Equal Protection
### 42 U.S.C. § 1983; U.S. Const. amend. V/XIV
### (Against all Defendants)

211.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 210 of this Complaint as though set forth fully herein.

212.   Defendants, by enforcing the law in some areas and declining to enforce the law in others, and by abdicating their duties under the law, have arbitrarily determined where homeless encampments may or may not be located and what communities should be affected, without following their own respective procedures and in violation of both state and federal law.  This has placed a disproportionate burden on some persons, communities, and businesses over others with intent to discriminate based upon geography.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

213.   Upon information and belief, City and County officials have within the last year affirmatively notified and/or instructed homeless individuals that some areas (for example, Skid Row, certain areas in Venice, or under the 405 freeway) were locations where camps would be allowed to exist and persist.  This policy of allowing encampments in some areas and not others without review, public comment, vote, or other appropriate process is in direct violation of the Fifth and Fourteenth Amendments' prohibitions against deprivation without due process and unequal protection of the law.  When the City entered into the *Mitchell* settlement providing for the foregoing it agreed by its very terms, and implicitly, to treat a segment of the population (those living, working, and owning property within the "Designated Area" known as Skid Row and the surrounding blocks), including many Plaintiffs herein differently than those outside the "Designated Area."  The City had no rational basis for doing so.

214.   The homelessness crisis undisputedly has a disparate impact on Black and Brown communities.  African Americans make up 38-42% of the homeless population yet represent just 8% of the total population of Los Angeles. The City and County have repeatedly made affirmative decisions and adopted policies and laws which has furthered this disparate treatment, knowing the result would have a  continued and intensified disparate impact.  Here the discrimination is so blatant and invidious as to infer improper discriminatory intent by race.

215.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

## ELEVENTH CAUSE OF ACTION

**Violation of Due Process Clause (State-Created Danger and Special
Relationship Doctrines)**

**42 U.S.C. § 1983; U.S. Const. Amend. 14**

**(All Plaintiffs against All Defendants)**

216.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 215 of this Complaint as though set forth fully herein.

217.   By the acts and omissions described above, Defendants have affirmatively created or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result.  The City and County created danger to them and others like them by adopting and maintaining various policies and laws coalescing in a strategy to contain homeless people in Skid Row which specifically endangered Plaintiffs and were deliberately indifferent thereto.  The City and County created a further danger by focusing nearly exclusively on so-called permanent housing options without balancing interim and emergency needs, which could not ever meet the ostensible goal, and caused more people to remain unsheltered, exacerbating or causing significant mental and physical decline at such a rate that outpaces the building and provision of such units.

218.   Further, the City and County have an affirmative duty to act under the Special Relationship Doctrine due to the restraint on personal liberty exercised to draw in and contain homeless individuals in and near Skid Row. Moreover, the City and County have, in all the ways described heretofore caused and/or exacerbated homelessness, have acknowledged and recognized the role each has played in the crisis, acknowledged and recognized the vulnerability of

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

unhoused individuals to both the criminal and natural elements, and have accepted and assumed responsibility to act to protect the rights of unhoused Plaintiffs and Alliance members, and others similarly situated.

219.   Defendants knew or should have known that their acts or omissions specifically endangered Plaintiffs and were deliberately indifferent thereto.

## TWELFTH CAUSE OF ACTION

### Uncompensated Taking

### 42.   U.S.C. § 1983; U.S. Const. Amend. V/XIV

### (Plaintiffs Alliance, Burk, and Frem Against City)

220.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 219 of this Complaint as though set forth fully herein.

221.   The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment is applied to the states through the Fourteenth Amendment.  *Chicago, Burlington, & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897).  The actions by the City, as described in detail *supra,* have limited, damaged, and/or burdened the property owners' so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

222.   Upon information and belief, this was done with deliberate intent and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

# THIRTEENTH CAUSE OF ACTION

## Municipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)

## (Against All Defendants)

223.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 222 of this Complaint as though set forth fully herein.

224.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendants City of Los Angeles and County of Los Angeles and their respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the City and County of Los Angeles.

225.   The actions and inactions of the City of Los Angeles and County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

226.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as more fully set forth below.

## VI.    PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.    Injunctive/equitable relief in a manner to be determined by law;

2.    As to the federal claims and claims under the California constitution only, compensatory damages and other special, general and consequential damages according to proof;

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT

3.     An award of costs of suit, including attorneys' fees; and

4.     Such other and further relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.


Dated: October 29, 2021                    */s/ Elizabeth A. Mitchell*
                                           SPERTUS, LANDES & UMHOFER, LLP
                                           Matthew Donald Umhofer (SBN 206607)
                                           Elizabeth A. Mitchell (SBN 251139)

                                           *Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

[PROPOSED] AMENDED AND SUPPLEMENTAL COMPLAINT