UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., ) | CASE NO: 2:20-CV-02291-DOC-KES |
| ) | |
| ) | CIVIL |
| Plaintiffs, ) | |
| ) | Santa Ana, California |
| vs. ) | |
| ) | Monday, January 24, 2022 |
| CITY OF LOS ANGELES, ET AL., ) | |
| ) | (8:47 a.m. to 9:07 a.m.) |
| Defendants. ) | (9:16 a.m. to 9:47 a.m.) |
| | (9:49 a.m. to 9:58 a.m.) |

CITY OF LOS ANGELES' MOTION TO DISMISS CASE,
CITY OF LOS ANGELES' MOTION TO DISMISS FAC
[DKT.NOS.369,370]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**            SEE PAGE 2

Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Karlen Dubon

Law Clerks:                Sarah Beller / Shaiba Rather

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         Spertus Landes & Umhofer, LLP
                         617 West 7th Street, Suite 200
                         Los Angeles, CA 90017
                         213-205-6520


                         MATTHEW D.  UMHOFER, ESQ.
                         Spertus Landes & Umhofer, LLP
                         1990 S. Bundy Drive, Suite 705
                         Los Angeles, CA 90025
                         310-826-4700


For Defendants:          SCOTT D. MARCUS, ESQ.
                         ARLENE N. HOANG, ESQ.
                         RYAN SALSIG, ESQ.
                         Los Angeles City Attorney's Office
                         200 North Main Street
                         7th Floor, Room 675
                         Los Angeles, CA 90012
                         213-978-7558


                         LOUIS R. "SKIP" MILLER, ESQ.
                         JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400


For Advocates:           SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


                         CAROL A. SOBEL, ESQ.
                         Law Office of Carol A. Sobel
                         1158 26th Street, Suite 552
                         Santa Monica, CA 90403
                         310-393-3055


                         BROOKE A. WEITZMAN, ESQ.
                         Elder Law & Disability Rights Center
                         1535 East 17th Street
                         Suite 110
                         Santa Ana, CA 92705
                         714-617-5353

1      **Santa Ana, California; Monday, January 24, 2022; 8:47 a.m.**

2                          **(Remote appearances)**

3                            **(Call to Order)**

4          **THE COURT:**  We're on the record.

5              First of all I can see I think all of you.  Hopefully

6      you can see and hear me; if you can't, would you just waive so

7      I know that I'm --

8          **(Gestures made)**

9              Great.  Thank you so much.

10             Well first of all, I hope all of you are well and

11     your families are well in this period of time.

12             We'll call the case to order, it's 20-02291,

13     LA Alliance for Human Rights versus the City and County of Los

14     Angeles.

15             And could I begin with a formal introduction please,

16     on the record by the Plaintiffs?

17         **MS. MITCHELL:**  Good morning, Your Honor.  Elizabeth

18     Mitchell, Spertus Landes Umhofer, along with Matt Umhofer, both

19     here on behalf of Plaintiff.

20         **THE COURT:**  Thank you.  And on behalf of the City of

21     Los Angeles, please?

22         **MR. MARCUS:**  Good morning, Your Honor.  Scott Marcus

23     from the Los Angeles City Attorney's Office on behalf of

24     Defendant City of Los Angeles.

25         **THE COURT:**  All right, thank you.

**4**

1          And on behalf of the County of Los Angeles, please?

2          **MR. MILLER:**  Good morning, Your Honor.  Skip Miller

3   and Mira Hash -- Hashmall for the County.

4          **THE COURT:**  All right and good morning.

5          And on behalf of the Advocates please?

6          **MS. MYERS:**  (Glitch in audio) ...behalf of Intervenor

7   Los Angeles Community Action Network and Los Angeles (glitch in

8   audio) Worker.

9          **THE COURT:**  I'm sorry.  Could you repeat that?  It

10  was muffled and it was broken.

11         **MS. MYERS:**  Sure.  Shayla Myers on behalf of

12  Los Angeles Community Action Network and Los Angeles Catholic

13  Worker, Intervenors.

14         **THE COURT:**  All right.  Thank you and that was clear.

15         **MS. SOBEL:**  Carol Sobel on behalf of the Los Angeles

16  Intervenors and along with Brooke Weitzman on behalf of Orange

17  County Catholic Worker.

18         **THE COURT:**  All right.  Thank you.

19         These are Motions to Dismiss; and so first, Counsel,

20  on behalf of the City, your argument please?

21         **MR. MARCUS:**  Thank you, Your Honor.  I believe that

22  the -- and let me also note, Arlene Hoang and Ryan Salsig also

23  from the City Attorney's Office are present today with you.

24         Your Honor, we believe that the City has laid out

25  clearly in its moving papers that the Plaintiffs have not

1  properly stated a cause of action.  They do not have standing.

2  They do not allege specific injuries to specific plaintiffs.

3  They do not properly state, either in equal protection or a due

4  process claim.  There is no state-created danger.  The fact

5  that the City and/or the County decide to locate services in a

6  certain area, does not create a state-created danger any more

7  than it does when a court decides to place a courthouse in a

8  certain area and make all of its litigants go to that

9  courthouse.  There is no valid federal cause of action here.

10          This is a political lawsuit.  They disagree with the

11  way that the City and the County are handling a particular

12  policy.  If they want to change that policy, their remedy is at

13  the ballot box or by running for office.  It is not here in a

14  federal courthouse.

15          **THE COURT:**  All right.  Thank you.  And Mr. Marcus,

16  does that conclude your initial argument?

17          **MR. MARCUS:**  Unless the Court  has specific

18  questions, yes.

19          **THE COURT:**  And then on behalf of the County of Los

20  Angeles, please?

21          **MR. MILLER:**  Yes, Your Honor, Skip Miller.

22          I do have some things I want to say to amplify what's

23  in our brief.  I'm not going to be repetitive.

24          First of all, we appreciate where the Plaintiffs are

25  coming from, okay?  We all recognize and want to do something

1    and want to do more about people experiencing homelessness so

2    we have no quibble with the motive and the desire to improve

3    the situation.

4           The problem is is that we're in a court of law.  The

5    lawsuit -- this lawsuit started -- was started by a bunch of

6    property owners in skid row.  And then when the Court said,

7    "You don't have standing, that's not enough, you can't assert a

8    lot of these claims," they went out and they signed up some

9    homeless people.

10          And the core, the absolute bottom line core of their

11   argument is on page 1 of their brief -- at least as to the

12   County.  They say (quote/unquote):  "The County of Los Angeles

13   has not done enough."

14          Well, I'm not sure you can ever do enough until the

15   problem is completely fixed and gone but the County is doing a

16   tremendous amount.  And it's not a violation of law for the

17   legislature, the executive branch, to not do enough in the eyes

18   of some of its citizens, okay?  That's not -- that's not a

19   constitutional violation, there's nothing wrong with it.  The

20   fact that we haven't done enough isn't the issue.  We shouldn't

21   be in court over that.

22          We've done a massive amount.  We summarized a lot of

23   it in the Request for Judicial Notice.  It's not in dispute.

24   Even the lawsuit acknowledges that the County of Los Angeles

25   has spent tremendous, hundreds of millions, billions of dollars

1    in resources on homelessness.  It's not an issue.  And we're

2    doing more and it's ongoing and it's continuous.  Okay?  So

3    none of that is in dispute.

4         We don't belong in this lawsuit as a defendant.  We

5    didn't do anything wrong.  We're trying to fix the problem;

6    we're not breaking the law.

7         So that's kind of the overarching theme of this whole

8    situation and I don't think there's any real dispute about it.

9    So let me drill down a little bit more.

10        This is a skid row lawsuit.  Skid row is in the City

11   of Los Angeles.  And I know the City is doing tremendous --

12   making tremendous efforts in taking all kinds of steps as well.

13   The problems they're asking to address are, We want the City's

14   street cleared, we want -- you know, we don't want to have to

15   walk over people living in the streets and so forth.  Okay,

16   those are city streets.  And as I said, I acknowledge the City

17   is doing a -- making yeoman's effort to work on it.

18        All we do in skid row on these city streets is

19   deliver services and they're admittedly -- again, the complaint

20   says this in several places -- they're extensive, our services

21   are extensive, they're ongoing.  There's no such thing as

22   perfection in this business but they're good, and we shouldn't

23   be defending a lawsuit, we should all be working arm in arm and

24   spending resources on the people that need the services, that

25   need, you know, that need the homes, that need the shelter, not

1   on lawyers.  That's frankly where we're coming from.

2            There are, you know, allegations, sweeping

3   allegations about due process violations, equal protection

4   violations, they're entirely conclusory, okay?  We're the

5   County of Los Angeles.  We're a subdivision of the State.

6   We're doing what we can do.  We're doing everything we can do

7   and more.

8            We've moved thousands of people -- it's all in the

9   RJN -- thousands of people off the streets.  And the problem is

10  is that they're human beings and each one of them requires

11  being dealt with and it's not an easy situation.  I mean some

12  people can't afford housing.  Some people have mental problems.

13  Some people have drug abuse problems.  And we're on it, we're

14  dealing with it.

15           So my pitch to the Court is to take a quick -- take

16  an in-depth -- not a quick look -- an in-depth look.  The

17  allegations of wrongdoing are entirely conclusory.

18           I think basically what they did, Your Honor, is they

19  took your Preliminary Injunction Order, which was quite an

20  order, and they just tried to fashion their lawsuit around your

21  order and I don't think that works, frankly.  The order has

22  been overturned.  There have to be concrete, specific

23  allegations, pleadings of violations of law, and all they have

24  are conclusions.  So I would submit it to Your Honor on that

25  basis.

1      You know, we think the case should be dismissed.  The

2  Court obviously would retain jurisdiction over the Freeway

3  Agreement.  We're working on the audit.  That's in the process

4  right now.  We're not suggesting that that aspect of the case

5  be dismissed; but otherwise, the County of Los Angeles

6  didn't -- there's no wrongdoing, there's no constitutional

7  violation traceable to the County or anything the County did.

8  To the contrary, we're doing everything we can to address the

9  issues, the problems, improve the situations, deliver service

10  to people.  So I would submit it to Your Honor on that basis.

11      **THE COURT:**  All right.  Thank you, Mr. Miller.  Does

12  that conclude your opening argument?

13      **MR. MILLER:**  It does, Your Honor.

14      **THE COURT:**  All right.  And although the Intervenors

15  aren't technically a party, they are from the Court's

16  viewpoint.  So I wanted to have an opportunity for the

17  Intervenors to speak as well.

18      So Shayla Myers or Carol Sobel or Brooke Weitzman?

19  **(Pause)**

20      **MS. MYERS:**  Sorry, Your Honor.  We had to communicate

21  about who would be speaking on that.

22      Obviously we do not join the City or the County's

23  Motions to Dismiss on any particular matters.  We do think that

24  there's a place for the Court when it comes to unhoused

25  individuals asserting their rights before the Court to ensure

1  that their rights are vindicated, but we don't think that this

2  is the proper vehicle to do so or for the reasons articulated

3  related to the sufficiency of the pleadings.  Obviously we

4  joined the appeal to the Ninth Circuit related to some of the

5  concerns in the allegations that were alleged by the

6  LA Alliance in the initial pleading.

7          But we would also say that to the extent that the

8  LA Alliance is seeking remedies on behalf of property owners

9  related to the homelessness crisis, obviously we don't think

10 that the remedies that they seeking are appropriate, and that

11 has been our concern throughout this litigation, that the

12 litigation on behalf of property owners will lead to the

13 displacement and further criminalization of unhoused residents

14 at a time when the City and the County need to be investing in

15 long-term solutions.

16         And those concerns continue with the Second

17 Amended -- or with the First Amended Complaint and the

18 Supplemental Complaint.  We don't think that has been fixed.

19 And we also think that there are considerable concerns related

20 to standing and with the property owners raising the particular

21 complaints they are raising in the allegations.

22         **THE COURT:**  All right.  Thank you.

23         Let me turn then to the plaintiffs, First Alliance

24 [sic].

25         **MS. MITCHELL:**  Thank you, Your Honor.

1          I'm going to echo what Mr. Marcus said.  And really

2    I'm going to assume that the Court has read the moving papers,

3    the opposition papers, the reply papers.

4          I will note that the City had --

5          **THE COURT:**  Just a moment.  Let me represent to all

6    of you, I've read them twice.

7          **MS. MITCHELL:**  Thank you, Your Honor, I believe it.

8          **THE COURT:**  Okay, all right.  Thank you.

9          **MS. MITCHELL:**  The City did have a different attorney

10   I think writing the replies and the moving papers, and there

11   were several arguments that were raised for the first time in

12   the reply that were not raised in the moving papers so to those

13   I would object.

14         But I think largely what we want to do

15   here -- understanding that the Court has read these papers

16   twice -- I don't want to repeat any of these arguments -- is

17   really take a step back and look at the 10,000 foot perspective

18   that we have been talking about because the question that we're

19   sitting -- the reason that we're here in the courtroom is

20   really to try to answer the one question of whether the City

21   and the County are legally unaccountable for the misconduct

22   identified in the complaint.

23         And I recognize that the Intervenors don't seem to

24   think that property owners have rights and that's their

25   position.  Our position is property owners, community members,

1    residents, unhoused members, everybody has their own rights,

2    both constitutional and statutory, that we have identified

3    ad nauseum in our papers and they deserve to be vindicated.

4            But the question really is, are the City and the

5    County immune?  Is it enough -- to Mr. Miller's point -- that

6    the County is doing a lot, it's spending a lot of money.  But

7    when -- you know, we're moving a wheel so fast and going

8    nowhere and people are still dying, is that sufficient?

9            So the 2021 death numbers just came out last week, if

10   the Court has seen them.  I think the number was 1,641 people

11   that died homeless, that we know of, on the streets of Los

12   Angeles last year and that was just in 2021.  That was about

13   18 months after we had multiple City and County officials come

14   parading before this Court pledging allegiance, essentially, to

15   Your Honor; and saying, "We going to do more, we're going to

16   work together, we're going to come to comprehensive solutions.

17   We care so much about homeless issues and the community and

18   making this better," and have done virtually nothing in that

19   regard except for the Freeway Agreement.  There still is no

20   comprehensive solution.

21           You have Mr. Miller saying, "Oh, we should be

22   spending money on solving this problem and not on lawyers."  I

23   agree.  I don't know how much money they're spending on lawyers

24   but I agree that it's too much because had we reached these

25   comprehensive settlement agreements as everybody indicated they

1    wanted to do 18 months ago, we wouldn't be here spending as

2    much money.

3         No comprehensive solutions we have seen.  No

4    comprehensive agreement between the City and County.  We are

5    still fighting over whether, you know, sufficient beds are

6    created when they're both pointing at each other.  So what

7    you're seeing is a continued systemic failure.  You're seeing a

8    continued choice by the City and the County to repeat the same

9    failures that we have seen for the last four years and that is

10   on behalf of the unhoused and the housed.

11        And I think Intervenor's point and Mr. Miller's

12   point, offensively, frankly, is that the Alliance went out and

13   got themselves some homeless people is just frankly false.

14   From the beginning we had unhoused individuals contacting

15   members of the Alliance and leaders of the Alliance saying, How

16   can we participate in this because we are being left out

17   because the current homeless advocates that call themselves

18   "homeless advocates" are not actually advocating for us.

19        And so we adopted -- which was not the original,

20   certainly not in the original complaint, a whole number and

21   host of folks that are living in skid row unhoused and

22   unrepresented and that's how the Alliance became representative

23   of all individuals, both housed and unhoused, both sitting here

24   saying the City and the County are failing us, are failing in

25   their constitutional and statutory obligations.

1          So if the Court has questions about the pleadings,

2   about the sufficiency of the pleadings, where the City's new

3   arguments are that we could possibly address if the Court has

4   questions, I am happy to do so but I'm also at this point

5   willing to just step back and rely on the papers that we have

6   submitted and just really understanding that when people are

7   dying and instead folks are arguing about Mr. Miller's point,

8   stepping over people in the gutter wrenches, I think that we

9   have been doing this wrong.  We're looking at it the wrong way.

10  And really the question needs to be, are the City and County

11  legally unaccountable for their actions and is there a place

12  for the Court in this?

13          So with that, we'll submit, Your Honor.

14          **THE COURT:**  All right.  Then the responsive argument

15  by the City?

16          **MR. MARCUS:**  Thank you, Your Honor.

17          Your Honor, I think Ms. Mitchell explained exactly

18  why this case should be dismissed.  It's not a violation of the

19  law for the City and the County to have not reached a

20  comprehensive agreement that she wants.  It is not a violation

21  of the law for the politicians that she alleges has broken

22  their promises.  The issue isn't whether or not the City or the

23  County are immune; the question is, what specific misconduct,

24  that specific constitutional violation has been alleged in this

25  First Amended Complaint?  The answer is none.  They disagree

1   with the policy decisions made by the policy makers.  That is

2   not the basis for a constitutional lawsuit, that is the basis

3   for lobbying or bringing in other people.  This is a political

4   question, not a legal question.

5          She argues that we should be held accountable for the

6   misconduct but they don't specifically allege what that

7   misconduct is.  What specific constitutional violation was

8   committed by the City?  They've had two opportunities to make

9   those allegations, they have failed on both accounts.

10          The case should be dismissed and dismissed with

11   prejudice.

12          **THE COURT:**  Let me turn back to the County.

13          **MR. MILLER:**  Yeah, you know, obviously I agree with

14   the City Attorney so I'm not going to reiterate that.

15          There is one thing I want to say for the record.

16          We are working together.  City and County are working

17   together so -- we did the freeway deal together, we're working

18   on the audit together, and on a level and in areas that I don't

19   have anything to do with, quite frankly.

20          **THE COURT:**  I'm sorry you broke up.  Mr. Miller --

21          **MR. MILLER:**  Beyond my --

22          **THE COURT:**  Mr. Miller, could you restate that?  You

23   broke up.  I heard "working with the audit --

24          **MR. MILLER:**  Sure.

25          **THE COURT:**  -- together" and then there was an

1    interruption.

2           **MR. MILLER:**  Okay.  On many levels, above my

3    paygrade, Your Honor, the County and the City are working

4    together, they are meeting, they are interacting, and they're

5    doing -- they're spending, you know, there's more resources

6    apparently available from the federal government and the state

7    government, and they are deploying those resources so there's a

8    lot of work in unison and in cooperation.  And I want to make

9    that clear for the record.  You know, Counsel said that they're

10   not and they are.

11          Other than that, I would submit it on the papers.  I

12   think it is, as much as -- quite frankly, as much as I respect

13   this Court and where this Court's coming from, and the

14   Plaintiffs, I respect them and where they're coming from.  I

15   just don't -- you know, courts adjudicate disputes and I don't

16   see this as a dispute that belongs in court.  It's really

17   something that has to be dealt with and solved through the

18   legislature, executive.  In the County, we don't have a mayor,

19   we have a chair of the board supervisor so we have a combined

20   legislative executive branch and they're working on it; they're

21   all over it, as is the CEO and the bureaucracy below the board

22   of supervisors.  And I don't think any of that's in dispute.

23          All I'm hearing from the Plaintiffs' counsel is,

24   "You're not doing enough, you're not taking care of skid row."

25   Well we are.  And you know, there's a whole county outside of

1  skid row; it's not just skid row and the City is working hard

2  in skid row.  So I would submit it on that basis, Your Honor.

3          And if Your Honor has any questions, I mean this

4  is -- you know, it's a very tough problem, a defining problem I

5  think in our area.  And I think it's on the way to a resolution

6  but it's not going to be fast and it's not going to be easy.

7  That's my take on it.

8          **THE COURT:**  All right.  Would you give me one moment

9  please and I'll be back with you in about five to 10 minutes.

10          **MR. MILLER:**  Thank you, Your Honor.

11          **THE COURT:**  Thank you so much.

12      **(Court in recess from 9:07 a.m. to 9:16 a.m.)**

13          **THE COURT:**  First of all, thank you for your

14  patience.  We're back on the record.  All of the parties are

15  present but I'd like to make certain that all of you are back

16  visual on the screen.  You have two more for just a moment.  I

17  think, Ryan -- there we are.

18          Okay, just a couple questions.  If you're working on

19  an omnibus agreement or an agreement that's to be presented to

20  the Court to work with you, then do you want me to write the

21  dispositive decision in this matter at this time or do you want

22  to wait for the presentation of an agreement if you are, in

23  fact, negotiating an agreement?

24          Mr. Miller?

25          **MR. MILLER:**  Yes, Your Honor.  We are working on an

1   omnibus agreement.  We've been in discussions with the City

2   about it.  We have not finalized the term sheet yet.  When we

3   do, assuming I get to go ahead for my clients which I

4   anticipate, we'll present it -- we're going to present it to

5   the City first.  We are working closely with the City.

6          And then once we're in unison, if and when we can

7   reach agreement with the City, then we will present it to the

8   Plaintiffs.  Quite frankly, we'd like to improve the situation

9   on Skid Row.  We see this as a -- it's not just a lawsuit.

10  Skid Row is a problem and the County is well aware of it.  The

11  City is well aware of it.  And that's where we are but I

12  haven't -- I don't have authority yet to give the specific

13  terms to the City and that's where it is.

14         So as far as -- quite frankly, as far as a

15  dispositive motion is concerned, I don't think it's going to

16  matter.  I think we're going to do it anyway.  I think that we

17  -- there are some issues on Skid Row, serious issues, which I

18  think the Court has addressed in the past that have to be

19  rectified and we're going forward, lawsuit or no lawsuit, to

20  address people experiencing illnesses.

21         So that's what -- that's my response -- that's the

22  best response I can give Your Honor to your question.

23         **THE COURT:**  Well, let me pause for just a moment.

24  It took quite a while for the MOU to come into existence after

25  the freeway agreement.  It was represented to the Court it

1  would be weeks and it turned out to be almost four to five

2  months.  And I'm hopeful that in an omnibus agreement that

3  would be good and probably not perfect that if it was

4  forthcoming that after the City and the County resolve any

5  historic differences that apparently go back decades that at

6  that time, the Court would be a medium to approach -- or have

7  you approach First Alliance and/or the Intervenors and both.

8           But I've heard numerous rumors and without disclosing

9  the -- some of the settlement discussions, all of you know that

10 the phone is open concerning settlement.  But having heard this

11 for quite a period of time, I do raise the issue of whether

12 this is going to become a fact other than an aspiration with

13 the passage of time.

14          And so I know, Mr. Miller and Mr. Marcus, that you

15 probably don't have timelines from your client or clients but I

16 wish you did because, otherwise, I'm concerned about the

17 inertia.  So I toss this out to you.  The Court's ready and

18 willing to listen to any omnibus agreement agreed to initiated

19 by the City and the County because of this historic schism

20 between you and that I hope to be a mediator and reach out to

21 the First Alliance or to have you reach out to First Alliance

22 and the Intervenors.

23          Is there any time period in which this might be

24 presented to the Court?

25          **MR. MILLER:**  I'd have to talk to my people.  Your

1    Honor, I don't --

2          THE COURT:  I've got all day.

3          MR. MILLER:  Yeah.  I don't have -- I don't know.  We

4    are definitely working on it.  We're working on the specifics.

5    I mean, we have a draft.  I have to talk to my people.  I'm not

6    -- as I said, I'm just a lawyer.  I'm not directly in the loop

7    on everything that's going on between -- frankly, I doubt if

8    Mr. Marcus is either.  I mean, we're just lawyers litigating

9    this case.

10          These discussions are going on between our homeless

11   people in the CEO's office and their counterparts at the City.

12   As I said before, I'm not --

13          THE COURT:  In one of the newspaper articles,

14   Mr. Marcus and Mr. Miller, from the *Los Angeles Times*, I

15   believe -- and I'm doing this from memory -- someone had leaked

16   some of the alleged provisions that were initially agreed to.

17   Are you aware of that article?

18          MR. MARCUS:  Your Honor, this is Scott Marcus on

19   behalf of the City.  I'm not going to get into any specifics

20   about discussions going on between the City and the County.  I

21   think it'd be inappropriate to do it in court at this time.

22          THE COURT:  All right, sure.

23          MR. MARCUS:  To Mr. Miller's point, our principals

24   are meeting.  They are discussing.  They are working towards a

25   deal.  I don't have a specific timeline for that deal.  If we

1    do think the Court can be of assistance in its offer to resolve

2    or mediate any dispute or help us in discussions with any of

3    the other parties, we will certainly reach out but we're also

4    mindful of the admonition the Court gave earlier which is we

5    don't want to come to you until we have something real to bring

6    to you.  We don't want to come to you prematurely.  And we --

7            **THE COURT:**  Let me ask, Mr. Marcus and Mr. Miller,

8    you seem to be the initial linchpin to an agreement because of

9    the decades of dispute between the City and the County.  And

10   I've been mulling over if or when the Court would intercede and

11   request or order a mandatory settlement conference.

12            And I think that for a long period of time there's

13   been a discussion about State involvement and money seems to --

14   at least from my reading -- to be flowing from the State and

15   from the Governor.  You've oftentimes spoken to me about the

16   Federal government's involvement or noninvolvement, frankly.

17   And this is either going to get resolved by litigation

18   potentially or by agreement.  In other words, there has to be

19   some kind of resolution eventually in this human tragedy.

20            One of the interesting things that's happened is --

21   I'm not a central authority like the mayor or the governor or

22   the chairman of the board but there's always been discussion

23   amongst all of us about the difficulty involving homelessness

24   and that this is a regional problem and probably a State

25   problem.

1            The Court has started to be the recipient of most of

2    the newly filed cases including Santa Barbara, et cetera.  And

3    my colleagues have been kind enough to refer them to me and

4    it's appreciated.  So we have basically one court.  There's --

5    it's not totally unified but it now reaches Santa Barbara in

6    terms of litigation and Los Angeles and Orange County.

7            I've been mulling for while if it would be worthwhile

8    calling upon the State that the City and County have been

9    interested in involving in a holistic way and into a mediation

10   session that would minimally involve the State and why the

11   Federal government wouldn't be invited to attend also.  They

12   are a key player in this but they're not only a key player in

13   terms of money.  They're a key player in terms of some of the

14   property that's available.

15           So as you folks from the County and City have been

16   leaned on, the Federal Government certainly may have some

17   responsibility here but they've never been joined in the

18   lawsuit.  And I've heard this early on, Mr. Marcus, from you

19   and early on, Mr. Miller, from you.  That goes back quite a

20   while about the Federal government and the State involvement.

21           I'm not going to do that yet.  I need some phone

22   calls from you, Mr. Miller.  We can always talk about

23   settlement.  And you, Mr. Marcus, we can always talk about

24   settlement.  The phone is open.  And, Ms. Sobel and Jayla

25   Meyers and First Alliance, the one agreement we've had is we

 1   can always talk about settlement.

 2           But I'm going to ask both the City and the County

 3   respectively -- you've told me about the expenditures.  Is it

 4   confirmed that 1,640 people died last year who are homeless?

 5   And I'd like to hear from the Intervenors because Jayla Meyers

 6   has consistently told me since my first meeting with her 18

 7   months or so ago that this is an undercount.  In other words,

 8   these statistics aren't the statistics that really account for

 9   people in hospitals, et cetera, who aren't being counted.

10           But can I confirm that with each of you that 1,640

11   people is the official count of this county?  Mr. Miller?

12           **MR. MILLER:**  I don't know.  I don't have that

13   information --

14           **THE COURT:**  Mr. Marcus?

15           **MR. MILLER:**  -- at least not right now.

16           **THE COURT:**  Mr. Marcus?

17           **MR. MARCUS:**  I don't know either, Your Honor.  I

18   don't have any reason to doubt Ms. Mitchell's citation of the

19   article but I don't know for a fact if that's true.

20           **THE COURT:**  Well, let's find out because you are the

21   City and the County.  So you would have the best information.

22           Ms. Mitchell?

23           **MS. MITCHELL:**  Yeah.  I'll call a number and I'll get

24   it to everybody.  I think it was -- 1,641 was the number.

25           **THE COURT:**  And where did you obtain that

1    information?

2         **MS. MITCHELL:**  I will pull it right now and I will

3    put it in the Chatbox.

4         **THE COURT:**  Okay.  Could I see that for a moment?

5    And while you're doing that, could I talk to Shayla Myers or

6    Carol Sobel?  Because my relationship with Carol Sobel goes

7    back even further than Shayla Myers.

8         Ms. Sobel, you've always told me to watch out from

9    the inception of our professional relationship that these

10   counts are undercounted.  And so I don't know that 1,640 is an

11   accurate figure.  I don't know if it's an undercount.  And I'd

12   like to have a better explanation from you or Ms. Meyers if

13   this is an undercount and if so, why you feel that 1,641 is not

14   necessarily accurate or it is accurate.  So either one of you,

15   please.  Maybe Ms. Sobel.

16        **MS. SOBEL:**  Well, Your Honor, let me just say that I

17   believe the information was in the *L.A. Times* and the story in

18   the *L.A. Times* about a week or so ago.  And I think I'm going

19   to defer in part to Shayla Myers on this.

20        **THE COURT:**  Okay.

21        **MS. SOBEL:**  I do want to say one thing though that

22   concerns me and I'm not attempting to blow this up.  As you

23   know, Your Honor, I spend a lot of time focused on these

24   issues.  If we are talking about a comprehensive way to address

25   the issue of homelessness in the region and in the country and

1    in the state, it can't be limited to what happens on Skid Row.

2    It really can't be because that is just the most public

3    manifestation of a problem.

4           And I -- the County and the City have been working

5    together.  We all know that because we've passed Prop H and

6    Prop H and HHH or whichever one was about -- which was about

7    the other type of legislation.  And so there are those efforts.

8    But if you don't take into consideration the scope of the

9    problem when you're trying to come up with these solutions, you

10   are never going to be able to address them.

11          And I think back to the report that caused us to

12   bring the *Jones* case back two decades ago now.  It's almost 20

13   full years.  And it was a report by the *Economic Roundtable*

14   that said to the City of Los Angeles, if you do not cut off the

15   feeder pools for homelessness, you will never address your

16   problem.

17          And the feeder pools have never been cut off.  That

18   isn't to say that you don't address the problems of people on

19   Skid Row but if we can't walk and chew gum at the same time,

20   this is just moving around shells.

21          **THE COURT:**  Ms. Meyers, can I confirm this 1,641?  Is

22   that an accurate number or is it low?

23          **MR. MARCUS:**  As we understand it, that's the number

24   that's been released from the Department of Public Health.  I

25   do think one thing that's important to keep in mind with the

1   number that Ms. Mitchell put forward is that that number

2   accounts for both people who are perishing who are still on the

3   streets as well as people who are in emergency shelters and

4   particularly congregate shelters.

5          I think that often is a part of what gets lost when

6   we're talking about homelessness is that homelessness includes

7   people who are in emergency shelters.  And a significant number

8   of people who are continuing to perish in emergency shelters,

9   they are still homeless and in order to get out of that count,

10  they need to become housed.  Obviously, the solution to

11  homelessness is housing and so people who are in emergency

12  shelters still are contributing to that number.

13         And the other reality about this is that there is a

14  significant COVID crisis in Los Angeles that people who are

15  experiencing homelessness are continuing to experience and that

16  is accounting for the vast increase in the number of people who

17  are dying on our streets and in our congregate shelters.

18         But one of the reasons why we speak to the question

19  about whether or not it's an undercount of an over-count is

20  that it doesn't take into account the long-term health

21  implications for people who are experiencing homelessness who

22  are on the streets but also who are in emergency shelters who

23  are disconnected from the resources that they need to survive

24  on the streets.

25         That's one of the reasons why Intervenors joined this

1   lawsuit is because a lot of the remedies that are being sought

2   in this case and a lot of the remedies that the City has been

3   in agreement with the L.A. Alliance on are criminalization of

4   homelessness and those kinds of things the Department of Public

5   Health and the U.S. Inter Council of Homelessness, Department

6   of Housing and Urban Development have all agreed contribute to

7   the increases of mortality that we're seeing on the streets and

8   in our shelters.

9          **THE COURT:**  The last question, Ms. Sobel and

10  Ms. Myers, that I have in this area is, does this include

11  homeless who die in hospitals?  In other words, I'm at Hoag

12  Hospital or I'm at Providence, I'm homeless, I pass away.  My

13  understanding in our settlement discussions -- or at least past

14  litigation -- is that this does not include a large number of

15  homeless that aren't counted who actually die in a hospital.

16  It includes those on the street and in shelters.

17         So let me turn for a moment to Mr. Marcus.  If you

18  have that answer, I'd appreciate it.  And then I want to turn

19  to Mr. Miller.

20         **MR. MARCUS:**  I'm sorry, Your Honor.  I don't know

21  that answer.

22         **THE COURT:**  Mr. Miller?

23         **MR. MILLER:**  I don't know, Judge.

24         **THE COURT:**  Okay.  Ms. Myers?

25         **MS. MYERS:**  I couldn't say definitively, Your Honor.

1          **THE COURT:**  All right.  My past experience --

2          **MS. SOBEL:**  And I don't know the answer.

3          **THE COURT:**  Yeah, my past experience -- and I may be

4    incorrect and I'm subject to correction by any of you -- is

5    that these numbers that are accounted for are homeless who die

6    on the streets or in shelter, that they are not the homeless

7    who are dying in the hospitals which raises the count

8    substantially.  And if I'm wrong, please correct me.  All

9    right.

10          All right.  For the City and the County, just a

11   couple questions.  You say you've taken reasonable efforts --

12   and I'm not here to chide you.  I'm here hopefully to ask just

13   a couple questions about those efforts.

14          Have your efforts been reasonable from your

15   perspective, not in just money which is constantly spoken about

16   but in results and that is concerning the sidewalks,

17   Mr. Marcus?  Because in the briefing, you went from Skid Row

18   and pointed out the 5,000 miles of sidewalk and took this

19   citywide.  And I believe that all of you would agree that in an

20   omnibus settlement, if we could possibly reach that, should be

21   citywide and countywide and hopefully even regional-wide.

22          But, Mr. Marcus, have the sidewalks been alleviated?

23          **MR. MARCUS:**  Your Honor, I wouldn't say that they've

24   been alleviated. I would say that the City is doing its best to

25   deal with the sidewalks within the confines of the Constitution

1   and adhering to the rights in the Constitution with respect to

2   the people who are residing on the streets.

3           **THE COURT:**  Public schools --

4           **MR. MARCUS:**  We're doing the best we can.  We're

5   doing as much as we can --

6           **THE COURT:**  Okay.

7           **MR. MARCUS:**  -- but I wouldn't say we've -- we

8   certainly haven't solved the problem yet but we are working

9   towards the problem every chance we have.

10          **THE COURT:**  Public school areas, Mr. Marcus?

11          **MR. MARCUS:**  Public school areas --

12          **THE COURT:**  Reasonable efforts?

13          **MR. MARCUS:**  Yes, Your Honor.  I think we have done

14  what we can do, again, within the confines of the law.

15          **THE COURT:**  Okay.  Fire hazard areas.  The Court

16  wrote about the huge increase in the number of fires.

17  Reasonable efforts by the City?

18          **MR. MARCUS:**  Yes, Your Honor.  I think we addressed

19  those areas, again, as best we can with the resources that we

20  have.  Public safety is always the number one concern of the

21  City when it's dealing with these issues.  Is it a perfect

22  response?  No.  Is it a good response or reasonable response?

23  Yes, it is.

24          **THE COURT:**  Okay.  And I assume that your answer then

25  would be the same concerning parks and beaches?

1          **MR. MARCUS:**  Yes.

2          **THE COURT:**  Okay.  Is there any recourse for property

3     owners, Mr. Miller, who have proper -- or have property

4     physically damaged?  Mr. Miller?

5          **MR. MILLER:**  Yeah, I -- yeah, there's recourse

6     against the people that caused the damage, I suppose.  Sure.

7          **THE COURT:**  Mr. Marcus?

8          **MR. MILLER:**  In this context, no, there's no recourse

9     against Government --

10          **THE COURT:**  Okay.

11          **MR. MILLER:**  -- for something that some individual

12     does to cause damage to a property owner.  No, the recourse is

13     not against Government, Your Honor.

14          **THE COURT:**  Okay.  And, Mr. Marcus?

15          **MR. MARCUS:**  I agree with that, Your Honor.  The City

16     is certainly responsible for damages it may cause or that its

17     employees may cause but it is not responsible for damages

18     caused by third parties.  The City is not a wholesale insurer

19     of the property of all of its -- of all the people within the

20     city.  If it's something we've caused, we'll pay for that

21     damage.  If it's something somebody else has caused, that's not

22     the City's responsibility.

23          **THE COURT:**  Is there anything that any of the parties

24     would like to comment upon before the Court decides this issue

25     that might bring a meaningful mediation session between the

1     parties that extends far beyond Skid Row and far beyond the --

2     well, quite frankly, much of this may have gone citywide in the

3     complaint because of the ADA provisions and nuisance

4     provisions.

5          But is there anything that the Court can do on your

6     behalf that would cause a meaningful and timely discussion

7     because many of those proposals that were leaked to the *Los*

8     *Angeles Times* without comment were very interesting to the

9     Court and I think very interesting to all of you.

10         And it appeared that you -- the parties may have been

11    a long ways towards some kind of resolution and you may not

12    have but this is now six or seven months old and so if there is

13    something meaningful the Court could do, I'd like to work with

14    you on that.  If not, then I'm ready to decide these issues.

15         So, Mr. Marcus.

16         **MR. MARCUS:**  Thank you, Your Honor.  Again, I don't

17    think --

18         **THE COURT:**  That -- by the way, Mr. Marcus, that

19    includes inviting the Governor if you need it.  In other words,

20    if we're really talking about regionalization, let's really

21    reach out.  Let's be bold.  That includes real regionalization

22    here and a holistic solution with the County.  So I'm sorry for

23    interrupting you.

24         **MR. MARCUS:**  I -- no problem and I appreciate the

25    comments, Your Honor.  As I stated before, I don't think it's

1  appropriate to get into the specifics of the negotiations that

2  are going on currently.  I will tell you, however, that the

3  City does not consider this a Skid Row problem.  The City does

4  not consider a viable solution to be limited to Skid Row.  So

5  if that is the Court's concern, it need not be concerned.

6          **THE COURT:**  Uh-huh.  And, Mr. Miller?

7          **MR. MILLER:**  I don't think we should get into

8  specifics.  I mean, we're working on a proposal regarding Skid

9  Row and that's, frankly, how I see this lawsuit.  Obviously,

10  the problem of people experiencing homelessness is countywide,

11  statewide, country-wide beyond just Skid Row.

12          So that's something -- my view of the whole

13  settlement thing is that if Your Honor orders the Federal

14  government or the State government in, it will just make it

15  more difficult, more complicated.

16          I would start small, so to speak --

17          **THE COURT:**  Okay.

18          **MR. MILLER:**  -- with the City and the County and see

19  if we can get on the same page.  And then I think what I would

20  suggest, what I would recommend is that we go to the Plaintiffs

21  and we engage with them and we definitely will want to engage

22  with the Court in my opinion and get the Court's help maybe

23  through a mediation.  That's how I view it but I would not

24  inject other parties into this process at this point in time.

25          **THE COURT:**  Okay.

1          **MR. MILLER:**  I just think it will bog down.

2          **THE COURT:**  All right.

3          **MR. MILLER:**  I mean, the other thing I would say,

4    Your Honor -- I said this before.  We're doing -- the City and

5    the County are doing a tremendous amount anyway regardless of

6    this lawsuit.  The lawsuit is -- it's interesting and it's got

7    a lot of challenging issues in it and so forth but we're going

8    forward on a very substantial scale.

9          I was just looking at some of the materials that we

10   submitted in support of the request for judicial notice.  I

11   mean, Measure H has injected $350 million per year -- and I'm

12   not just referring to the money.  And the numbers we have, I

13   think it's responsible for putting 72,000 people into permanent

14   housing since it began in 2017 and more than 92,000 homeless

15   people into interim housing.

16         So we're marching forward, lawsuit or no lawsuit.

17   And I'd like to resolve the lawsuit, as I said before, and as

18   much as I like litigating and I like being before Your Honor's

19   court and so forth, I'd rather see the money spent on these

20   people that need it.  And that's where our efforts should be.

21   We have Room Key that was successful.  It began as one thing

22   and then it morphed into another thing.  There's more money

23   forthcoming.

24         One thing I'm concerned about, Your Honor, I'm told

25   that the substantial money -- COVID money from the Government

1  cannot be used to settle a lawsuit.  COVID money is supposed to

2  be used for COVID-related reasons and I think COVID has

3  obviously been rampant in the homeless community.  So I think

4  it can be used to a certain degree for that but it's not money

5  that can be earmarked for settling a lawsuit.  So I want to be

6  very careful about that.  We don't want to jeopardize that

7  money.

8          THE COURT:  Okay.  So my takeaway is that the sooner

9  we reach an omnibus agreement or the sooner we have an

10  adversarial process if the case was not dismissed or portions

11  were dismissed and portions went forward, the better for

12  everyone?

13          MR. MARCUS:  Yes.

14          THE COURT:  Okay.

15          MR. MARCUS:  I certainly agree with that.

16          THE COURT:  Second, the only thing I am concerned

17  about is while the case you say is focused on Skid Row, it

18  seems that this has been expanded to the County and a lot of

19  general services as well as the ADA and nuisance claims that

20  far exceed Skid Row, that this case has now somewhat expanded

21  to the City and to the County and is not just geographically

22  located in Skid Row but I'll look at that and write about that.

23          Could I have one more moment with your indulgence?

24  And I'll be right back with you and I think --

25          MS. MITCHELL:  Your Honor.

1          **THE COURT:**  Yes, please.

2          **MS. MITCHELL:**  Before you go, I did email the links

3     because there is no Chatbox option and the statistic is 1,612.

4     I had misspoke.

5          **THE COURT:**  Thank you.

6          **MS. MITCHELL:**  So that email link is in your inbox.

7          **THE COURT:**  Thank you very much, 1612.  And by the

8     way, I've talked to the City and the County briefly.  I

9     neglected First Alliance.  Do you have any comment?

10          **MS. MITCHELL:**  No, Your Honor.  And I would say --

11          **THE COURT:**  In other words, would mediation be

12     helpful at this time or not?

13          **MS. MITCHELL:**  I'll submit, Your Honor.

14          **THE COURT:**  I'm sorry?

15          **MS. MITCHELL:**  No, Your Honor.  I mean, I'm listening

16     to the back-and-forth.  I agree that I think this case has gone

17     beyond Skid Row.  Certainly, Skid Row is sort of the epicenter

18     of homelessness in the entire country.  So to that extent, Skid

19     Row is the worst example but I would agree that it has expanded

20     beyond Skid Row to the extent it was ever focused on Skid Row.

21          **THE COURT:**  Uh-huh.  And all of you should know also

22     I have a series of cases involving recreational vehicles both

23     in Los Angeles and Santa Barbara that are before the Court that

24     have not been joined with you at the present time.

25          Would mediation be helpful or not, Ms. Mitchell?

1           **MS. MITCHELL:**  I think it absolutely would be

2  helpful.  I've been told for months now that there is an

3  agreement that is happening at some point or there's

4  conversations between the City and the County that are

5  happening, that I would be presented with something.  I haven't

6  seen anything.  I recognize the contents thereof.  If I had

7  seen anything, it would be, obviously, confidential but I

8  haven't seen anything.  So it does make sense to me to get

9  everybody in the room and figure out what's going on.  So I

10  would say for us, it would be helpful, yes.

11          **THE COURT:**  All right.  Give me one moment then.

12          And would you put me on mute for just a moment,

13  Karlen?

14      **(A recess is taken from 9:47 a.m. to 9:49 a.m.)**

15          **THE COURT:**  Since you're already talking and

16  apparently have been talking quite a while, I'm going to reach

17  out to Mr. Miller, the phone's open.  And Mr. Marcus, the

18  phone's open.  And First Alliance and the Intervenors, the

19  phone is always open for settlement purposes.

20          But I'm going to call for a mandatory mediation

21  session in this matter.  And I want to give time courtesy to

22  the County and to the City to continue on in good faith those

23  private discussions that you've been having for quite some

24  time.

25          And, therefore, I'm going to suggest that it takes

1    place sometime in the middle of February.  So you can get back

2    to your respective chairpersons of the board as well as the

3    board members and to the president of the council and the

4    council members.

5            And I'm wondering what the week of February 16th --

6    that's a Tuesday -- looks like or the following week which

7    would be, what, the 23rd, Karlen, Tuesday?

8            **THE CLERK:**  The next is the 22nd of February.

9            **THE COURT:**  The 22nd or the -- that's a Tuesday?

10   Thanks, Karlen.

11           Or the 22nd.  And this would me a mandatory

12   settlement conference because this cries out for either an

13   omnibus solution or a decision by the Court simply ending the

14   case or going forward with litigation.  Eventually, my belief

15   is the same as yours, Mr. Miller.  Somehow this has to

16   eventually resolve.  It's a question when --

17           **MR. MILLER:**  Yeah.

18           **THE COURT:**  -- and it's one of those cases that by

19   litigation will still have to end up in some agreement at some

20   point or at least a good-faith discussion.

21           And so I'm going to say either one of those dates and

22   if the 16th is too quick, Mr. Miller or Mr. Marcus, then I'll

23   schedule this on the 22nd because you have a body to go to to

24   talk to about this.  But this will be mandatory.  This will not

25   be discretionary.  It will take place in Los Angeles and

1  subject to COVID, if the court's open, we'll have it there.  If

2  it's not open, we'll have it at another location.

3          **MR. MILLER:**  Your Honor, I'm supposed to start a

4  trial in front of Judge Walter on the 22nd.  I don't know if

5  it's going to go or not.  It's a crazy case but I -- it's

6  probably going to go.  So that's going to be a problem --

7          **THE COURT:**  Is the 16th then --

8          **MR. MILLER:**  -- it's going to be a problem for me.

9          **THE COURT:**  Mr. Miller, is the 16th a better day?

10 This is going to be mandatory.  So I'm just being courteous and

11 reach out.  I think all of us are inundated with cases right

12 now.

13         Mr. Marcus?

14         **MR. MILLER:**  Well, the trial is set for the 22nd

15 right now.

16         **THE COURT:**  So is the 16th a better date?

17         **MR. MILLER:**  Yeah.  I mean, I'll be getting ready for

18 trial but --

19         **THE COURT:**  Mr. Marcus?

20         **MR. MILLER:**  -- all I do is work anyway.

21         **THE COURT:**  Yeah.  Mr. Marcus?

22         **MR. MARCUS:**  Your Honor, without checking the

23 calendars with the principals that I expect will need to be

24 present at the mandatory settlement conference, I couldn't

25 comment as to which day is better than the other.

1          **THE COURT:**  Okay.  Ms. Mitchell?

2          **MS. MITCHELL:**  Is the Court referring to the 15th

3   which is a Tuesday or the 16th which is a Wednesday?

4          **THE COURT:**  I meant to have that on a Tuesday.  Is

5   Tuesday the 15th of February?  My apologies.

6          **MS. MITCHELL:**  Correct.  It's the 15th.

7          **THE COURT:**  I'm off a day.  I can have it either day,

8   Wednesday or Tuesday.

9          **MS. MITCHELL:**  Any of those dates, 15th, 16th or the

10  following week work for me, Your Honor.

11         **THE COURT:**  Okay.  For the Intervenors, Ms. Myers?

12         **MS. MYERS:**  Either of those days is fine with me,

13  Your Honor.

14         **THE COURT:**  Either of those.

15         I think that, Mr. Miller and Mr. Marcos, you really

16  hold the keys to this matter because initially it has to be

17  resolved between the City and the County on some of these

18  traditional issues that have occurred.  And so once again, I'm

19  humbly asking each of you which is the best date because you

20  have to go to the president of the council and you have to go

21  to the chairman of the board.

22         **MR. MILLER:**  Your Honor, I don't think we need a

23  mandatory mediation with the City.  We're having very

24  productive, good progress, good rapport.  That's the report I

25  get back at least.

1          **THE COURT:**  Okay.

2          **MR. MILLER:**  I don't think we need that.  I think

3    what we've got to do is just -- Mr. Marcus and I just have to

4    bring it to a conclusion and that's where we're headed --

5          **THE COURT:**  Yes, you do.

6          **MR. MILLER:**  -- and then we'll bring it to the

7    Plaintiffs.  The Plaintiffs will say "Yes" or "No" and if the

8    Plaintiffs say, no, this isn't going to do it for us, then I

9    think we do -- we will need a mediation.

10         **THE COURT:**  But we need some timeframe.  This has

11   been going on so long, frankly, Mr. Miller, with the belief

12   that we were moving forward in some manner, even a rejection or

13   an acceptance.  It's been going on too long and as you say,

14   it's time to either resolve this or to move forward.

15         So I'm going to set this for February 22nd.  I think

16   your matter is in front of Judge Walter.  I'll work with Judge

17   Walter if you're in litigation.  We'll have to do something

18   else.  But -- or I can set it the 15th, your choice.

19         **MR. MILLER:**  Well, I don't want to -- I'm the lead

20   counsel in this -- it's a big case.

21         **THE COURT:**  I know but now I'm asking for a --

22   Mr. Miller, now I'm asking for a decision.  I hear the

23   problems.  Which date?

24         **MR. MILLER:**  15th, Your Honor.

25         **THE COURT:**  Let's do this.  I'm going to set this so

41

1    that a colleague isn't inconvenienced for Tuesday, February

2    15th, mandatory settlement conference.  And I'm going to watch

3    the COVID rate obviously.  Unfortunately -- or fortunately,

4    that may have to be by Zoom with some of the folks.  Otherwise,

5    it may be in person.  I'm going to reach out to Judge Birotte

6    so I build a wall.

7            And I would suggest that by February 10th, hopefully,

8    that would give you enough time, Mr. Miller and Mr. Marcus, to

9    consult and see if there's a possibility of reaching that

10   initial agreement between the City and the County before the

11   mandatory settlement conference takes place.

12           If that's settled, then that may change the timeline.

13   If you come to the Court and represent that those issues have

14   been settled, then we may move that back a week or so or a

15   month or whatever we need in this period of time to try to have

16   a meaningful settlement conference.  And that may then call for

17   private negotiation without Judge Birotte or this Court being

18   involved and initially reaching out without the Court's

19   involvement to First Alliance and to the Intervenors.

20           So the 10th appears to the Court to be a reasonable

21   date.  If all of you stipulate to different dates, I will

22   certainly accept those but the mandatory settlement conference

23   now will take place on February 15th and I'll hold these

24   motions in abeyance.

25           All right.  Counsel, I want to thank you very much

1  for your courtesy.  I hope all of you are well.  I hope your

2  families are well and all those who you associate with are

3  well.  Good day.

4       **(Proceeding adjourned at 9:58 a.m.)**

43

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>January 24, 2022</u>

Signed                                              Dated


*TONI HUDSON, TRANSCRIBER*