RODRIGO A. CASTRO-SILVA (SBN 185251), *County Counsel*
rcastro-silva@counsel.lacounty.gov
LAUREN M. BLACK (SBN 192302), *Assistant County Counsel*
ANA WAI-KWAN LAI (State Bar No. 257931), *Senior Deputy County Counsel*
500 West Temple Street, Suite 468
Los Angeles, California 90012
Tel.: (213) 974-1830 | Fax: (213) 626-7446

LOUIS R. MILLER (SBN 54141)
smiller@millerbarondess.com
MIRA HASHMALL (SBN 216842)
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel.: (310) 552-4400 | Fax: (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | CASE NO. 2:20-cv-02291 DOC-KES<br><br>**NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS**<br><br>Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400  FAX:(310) 552-8400

556797.9

**TO THE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

At an emergency status conference conducted on March 19, 2020, the Court requested that the Parties consent to *ex parte* communications between and/or among the Court, other judicial officers in the Central District of California, the Parties (including Intervenors), and relevant non-parties, such as state and local government leaders.  (*See* **Exhibit A** (Tr. of March 19, 2020 Status Conf. at 7:24– 8:20, 109:8– 112:3, ECF No. 39).)  At the time, the Parties (including Intervenors) agreed to permit *ex parte* communications.  (*Id.* at 117:1–22.)

This action is now entering its third year.  While the County will continue to pursue settlement, the County believes this litigation should return to the normal process and that there should be no more *ex parte* communications with the Court pursuant to Local Rule of Court 83-2.5 for the Central District of California.

When the aforementioned *ex parte* communication agreement was reached on March 19, 2020, the Court suggested that "if [the Parties] get to litigation," an appropriate course in light of the prior *ex parte* communications would be to solicit the involvement of other "judges who can litigate" the matter, in contrast to this Court's more involved role that justified the need for *ex parte* communications.  (*Id.* at 111:10–11.)

Thus, at the outset of this case two years ago, the Court recognized the importance of this issue, as follows:

> And you've got to trust me in those *ex parte* conversations.  Because they're going to be more valuable,  I hope, than litigation.  And if you get to litigation,  I've got great judges who can litigate.  And they can probably be much more collaborative than even I am.  (*Id.* at 111:7–12.)

The Court's statement above is consistent with 28 U.S.C. § 455(a), which requires recusal "in any proceeding in which [a judge's] impartiality might reasonably be questioned."  *Preston v. United States*, 923 F.2d 731, 734 (9th Cir.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS  SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  1991); *see, e.g.*, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861

2  (1988) (courts must "take the steps necessary to maintain public confidence in the

3  impartiality of the judiciary").

4      We are now in litigation, so based on the foregoing we request that the

5  Court assign this case to another Judge for the purpose of litigation.

6      **PLEASE TAKE NOTICE** that Defendant County of Los Angeles, by and

7  through its counsel of record, hereby withdraws its consent to the Court's *ex parte*

8  communications in the above-captioned matter.

9

10  DATED:  March 25, 2022          MILLER BARONDESS, LLP

11

12

13                                  By:

14                                     Louis R. Miller
                                       Attorneys for Defendant
15                                     COUNTY OF LOS ANGELES

16

17

18

19

20

21

22

23

24

25

26

27

28

556797.9

NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS

# Exhibit A

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, an unincorporated Association, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER, and LEANDRO SUAREZ, individuals, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, a Municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Certified Transcript**

Case No.
2:20-cv-02291 DOC (KES)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
STATUS CONFERENCE
THURSDAY, MARCH 19, 2020
10:00 A.M.
LOS ANGELES, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CA 90012-4565
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4           SPERTUS LANDES & UMHOFER LLP
             BY:  MATTHEW DONALD UMHOFER, ESQ.
 5               ELIZABETH ANNE MITCHELL, ATTORNEY AT LAW
             617 West 7th Street
 6           Suite 200
             Los Angeles, California 90017
 7           213-205-6520

 8   FOR THE DEFENDANT CITY OF LOS ANGELES:

 9           LOS ANGELES CITY ATTORNEY'S OFFICE
             BY:  SCOTT D. MARCUS, ESQ.
10           200 North Main Street
             7th Floor, Room 675
11           Los Angeles, California 90012
             213-978-7558
12
     FOR THE DEFENDANT COUNTY OF LOS ANGELES:
13
             FOLEY & LARDNER LLP
14           BY:  BYRON J. McLAIN, ESQ.
             555 South Flower Street
15           Suite 3300
             Los Angeles, California 90071-2411
16           213-972-4500

17   FOR THE INTERVENOR ORANGE COUNTY CATHOLIC WORKER:

18           CAROL A. SOBEL LAW OFFICES
             BY:  CAROL A. SOBEL, ATTORNEY AT LAW
19           725 Arizona Avenue
             Suite 300
20           Santa Monica, California 90401
             310-393-3055
21

22

23

24

25
```

```
1              APPEARANCES OF COUNSEL:
                     (Continued:)
2

3    FOR THE INTERVENOR LOS ANGELES CATHOLIC WORKER:

4              SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
               BY:  CATHERINE ELIZABETH SWEETSER, ATTORNEY AT LAW
5              11543 West Olympic Boulevard
               Los Angeles, California 90064
6              310-396-0731

7    FOR THE LEGAL AID FOUNDATION OF LOS ANGELES ON
     BEHALF OF INTERVENOR L.A. CATHOLIC WORKER AND LOS ANGELES
8    COMMUNITY ACTION NETWORK:

9              LEGAL AID FOUNDATION OF LOS ANGELES
               BY:  SHAYLA RENEE MYERS, ATTORNEY AT LAW
10             7000 South Broadway
               Los Angeles, California 90003
11             213-640-3983

12   ALSO PRESENT:

13             Honorable Judge Andre Birotte, Federal Judge

14             Honorable Judge Philip S. Gutierrez, Federal Judge

15             Honorable Judge James Smith - Special Master

16             Thomas Fawn - Senior Assistant County Counsel, County
               of Los Angeles
17
               Brooke Weitzman - Intervenor Orange County Catholic
18             Worker

19             Scott Marcus - Los Angeles City Attorney's Office

20             Jessica Mariani - Los Angeles City Attorney's Office

21             Mike Feuer - Los Angeles City Attorney's Office

22             Kevin de Leon - Los Angeles City Council

23

24

25
```

UNITED STATES DISTRICT COURT

4

```
1              APPEARANCES OF COUNSEL:
                      (Continued:)
2

3    ALSO PRESENT:

4          Michele Martinez - Chief Dot Connector

5          Juan Garza - Mayor of Bellflower

6          Miguel A. Pulido - Mayor of Santa Ana

7          Yvette Ahlstrom - Elimination Foundation

8          Paul Cho - Elimination Foundation

9          Paul Leon - CEO of Elimination Foundation

10         Gary Kranker - Whittier City Attorney

11         Joe Vinatieri - Mayor of Whittier

12         Kathryn Barger - Los Angeles County Supervisor

13         Heidi Marsdon - Interim LAHSA

14         Aleen Langton - LAHSA

15         Nury Martinez - Los Angeles City Council President

16         Ken Price

17         Jackie Lacey - Los Angeles County District Attorney

18         Robert Cartwright - Assistant Los Angeles County
           Counsel
19
           Gabriel Dermer - Los Angeles City Attorney's Office
20
           Brandon Young - Manatt, Phelps & Phillips
21

22

23

24

25
```

```
 1                        APPEARANCES:
                          (Continued:)
 2

 3    ALSO PRESENT:

 4           Byron McLain - Foley & Lardner

 5           Rodrigo Castro-Silva - Los Angeles County Counsel

 6           Mark Ridley-Thomas - Los Angeles County Supervisor

 7           Michel Moore - Los Angeles Police Chief

 8           Ralph Terrazas - Los Angeles Fire Chief

 9           Commissioner Kenneth Hodder - The Salvation Army

10           Lieutenant Colonel John Chamness - The Salvation Army

11           Miguel Santiago - California Assemblyman

12           Bill Taormina

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

                    **LOS ANGELES, CALIFORNIA; THURSDAY, MARCH 19, 2020**

 1

 2                                    **10:00 A.M.**

 3                                     - - -

 4              THE COURT:  Well, first, good morning.  If you would

10:00AM 5   try to find a seat and be as distant as you can from normally

 6   our wonderful and collegial executive and legislature and court

 7   family, it would be appreciated.

 8              So it's a huge courtroom.  We planned it that way.

 9   But if you can get six feet apart, we would actually appreciate

10:00AM 10  it.  Okay?  There's plenty of room.  That's not quite six feet,

11   but we're working on it.  Okay.  And there's -- we tried to

12   supply sanitary, you know, for you as best we can.

13              A couple of general thoughts.  I'm going to get

14   right into business.  And for counsel, I'm calling the matter

10:00AM 15  of *L.A. First Alliance for Human Rights versus City of*

16   *Los Angeles*.  But believe it or not, I don't even want your

17   appearances at this time, although I'm going to spend a good

18   part of the day with you.  We're going to get our elected

19   officials back doing what they do best in this critical time.

10:01AM 20  That's making good decisions on all of our part.

21              And although we've called you together concerning

22   the homeless, whatever happens concerning the homeless

23   community, they're not a socially acceptable distance right

24   now, and I think we're all on the same page collaboratively,

10:01AM 25  and that is, you know, if we can do something through your good

1    graces, and if the Court can be of a benefit and not a

2    hindrance in this matter, then we're working together,

3    hopefully saving time.

4         The other thing is this is eventually,

10:01AM 5    unfortunately, going to probably affect our citizens who are

6    able to socially distance, which our homeless community is not.

7    If it breaks out in the homeless community, I don't think any

8    of the socially distanced community is going to be safe in any

9    way, shape, or form.  And from whatever I read, this may come

10:01AM 10   in waves over a long period of time.  So at some point most of

11   us are going to be exposed and hopefully survive.

12        I'm not going to stand on further ado.  I'm going to

13   call on Mayor Garcetti.  I'm going to call you Eric from now

14   on.  Okay?  I'm Dave or whoever you want to call me when you're

10:02AM 15   done.

16        And Kathryn Barger, I'm going to call on you next.

17        And then we've got a little bit of a program.  Let

18   me give you an overlay.  With transparency, we're going to talk

19   about our phone call last night, who was on it, and I'm going

10:02AM 20   to ask at the end of the day for the plaintiffs' and defense

21   counsel -- and by the way, you can use your cell phones at any

22   time.  Okay?  Keep those conversations going.  Because I don't

23   want to hold another one of these.

24        But I'm going to ask the parties, if eventually you

10:02AM 25   trust this Court or another member of the Court as the other

```
 1   community that we've been involved in has trusted us, I need
 2   the following from you.  If not a settlement, I need the
 3   ability to reach out in an ex parte situation and make a call
 4   to Eric or to Kathryn or to you or to you, but share that
10:02AM 5   transparently and get you together as a court family as we work
 6   together, because together we accomplished a tremendous amount
 7   before.  But if I don't have that ex parte ability to
 8   communicate, I can't hold these kinds of meetings timely enough
 9   for this wave that's about to hit us.  The same thing, that
10:03AM 10  means you have to trust me.
11          We can do it in two ways.  You can enter into a
12   temporary settlement for a month setting out those parameters
13   or three months but not -- certainly not a consent decree and
14   not over a period of time.  These issues have to be worked out.
10:03AM 15         So at the end of the day I'm going to spend quite a
16   bit of time with you, but we're getting folks on the way.
17          So, Mayor Garcetti, the lectern is yours.  You can
18   remain seated.  If you have notes, you can go to the lectern.
19   There's --
10:03AM 20         MAYOR GARCETTI:  What's best for you?  Is it best
21   for me to go there?
22          THE COURT:  Whatever is good for you.
23          MAYOR GARCETTI:  I'll go up there.
24          THE COURT:  I think our goal is the same.  Let's get
10:03AM 25  collaborative.  If the courts can help you, let's save some
```

```
 1    lives as fast as we can.
 2            MAYOR GARCETTI:  Thank you so much, Your Honor.  And
 3    it's great to be here at the first convening of the
 4    Judge Carter Fan Club meeting, Los Angeles chapter.
 5            THE COURT:  Tell me that in a couple weeks.
 6            MAYOR GARCETTI:  Yeah, exactly.  Appreciate you and
 7    appreciate the energy you've brought to the most pressing
 8    humanitarian crisis of our time, certainly in Southern
 9    California, across California, and too much of America.
10            As you're well aware, overlaid on this right now is
11    the most existential crisis we have, which is the coronavirus
12    spread and COVID-19.  And I want to thank Kathryn Barger and
13    our County and our other fellow mayors, not just in the County
14    of Los Angeles but across the counties of Southern California,
15    for really acting more as a single organism that I've ever seen
16    in my life.  When it comes to homelessness, I think it's a
17    pretty fitting model, too, that it's about breaking down all
18    the boundaries that have separated us, all those borders that
19    distinguish us.
20            But we're in the midst of a global emergency
21    unprecedented in recent modern history.  We know that the novel
22    Coronavirus is now in 150 different countries of the world.
23    It's only a matter of time before every corner of the globe has
24    it.
25            And I think there's considerable fear and anxiety,
```

10:03AM  5
10:04AM 10
10:04AM 15
10:04AM 20
10:04AM 25

1 especially for those of us who have a deep caring for those who

2 are not only the most vulnerable but the most susceptible; most

3 vulnerable because they're much more likely to have underlying

4 health conditions which the public health officials, of course,

10:05AM 5 tell us makes them more likely to die, and most susceptible

6 because of the way they're living right now and where they're

7 clustered together.

8         So the City and the County have been working around

9 the clock really hand in glove in a County that already has

10:05AM 10 good relationships between City and County.  I know that's not

11 always the case.  But here we do, and it's been even closer.

12 But we know that our homeless neighbors that are out there

13 today with the underlying health conditions that I described

14 and living in environments that put them at a higher risk, we

10:05AM 15 have a special obligation.

16         So let me thank you for letting me go back to the

17 rest of the work shortly.  But between testing, bed capacity,

18 restrictions on people's movements right now, closures of

19 businesses, this is one of the five, I would say, equal pillars

10:05AM 20 of our fight right now against coronavirus and its spread.

21         We had the first death of somebody who is homeless

22 in Northern California from COVID-19.  We have no confirmed

23 cases here of anybody homeless.  But we know, of course, like

24 all of us that the actual number of cases is dozens above -- by

10:06AM 25 a factor of dozens above what we are officially reporting.

1          So to protect the unhoused population during this

2     public health emergency, at the beginning of this I asked my

3     team to start drawing up what sort of plans we could do in this

4     emergency.  And I want to be clear, I took that direction first

10:06AM  5     from Dr. Barbara Ferrer.  Really had some pushes back and forth

6     about what is the public health advice and -- because there was

7     some service providers, others who said, "No, maybe keeping

8     people on the street is better."  She has been, at least with

9     me, and I think the county's direction has been crystal clear,

10:06AM 10     that this is best prevented and treated indoors, not outdoors.

11     That's the first principle.

12          And so the City of Los Angeles, I asked what would

13     it take for us to take decisive action, to be not looking at

14     dozens as we usually do when we celebrate the opening of a

10:06AM 15     shelter or even hundreds but thousands of people off of our

16     streets.

17          So we're increasing in advance of that outreach

18     together LAHSA, the City, the County, and other cities to

19     educate those Angelenos experiencing homelessness about the

10:07AM 20     disease.  They, like anybody who is housed, want to save their

21     lives and want to be healthy.  When people ask, "How are you

22     going to get them off the streets?" everybody wants to care for

23     themselves, whether they are lucky enough to be in housing or

24     not.

10:07AM 25          And so we added critical resources right away.  I

1    think there's over 250 new handwashing stations already

2    deployed, another 60 on the way or deployed as well for a total

3    of 310.  120 mobile bathrooms on the way in addition to the

4    many mobile bathrooms that we put up in encampment sites months

10:07AM 5    before this as well.

6             And these interventions may sound basic, but whether

7    it's that or continuing street sweeping even as we relax

8    ticketing for that, these things are critical to public health

9    around and in encampments as well to improve hygiene, to

10:07AM 10   flatten the curve of local infections, and to prepare the

11   County and the health system better for the onslaught of beds

12   that will be taken.

13            And, also, in coordination with the County, we've

14   made plans to isolate and quarantine unhoused individuals,

10:08AM 15   either at and/or away from shelters.  Nobody will go into a

16   shelter who's exhibiting those symptoms.  That vetting will

17   happen with County public health officials before anybody

18   boards a bus and is transported to these areas.

19            And our preparation to isolate and quarantine

10:08AM 20   unhoused patients is happening several levels of government.

21   County led, as of yesterday -- or two days ago, excuse me, 34

22   RVs have been placed by the County for isolation units for

23   COVID-confirmed cases.  124 motel rooms have been acquired by

24   the County for symptomatic COVID-unconfirmed cases.

10:08AM 25            And the County, with assistance from the City, has

13

```
     1    been engaging hotel and motel owners who are about to go out of
     2    business, so it's actually a good time to help them and help
     3    this crisis, to begin designating rooms with bathrooms with
     4    quarantine and isolation.
10:08AM  5         To be clear, the County has to do that
     6    simultaneously for housed people and unhoused people.  But
     7    there's no discrimination on that, and the highest priority
     8    goes to those most at risk.  That is disproportionately going
     9    to help those who are unhoused given their underlying health
10:09AM 10    conditions.
    11         Second, city-led efforts, we've acquired 50 pallet
    12    shelters that will be delivered Friday.  We got 50 of, I think,
    13    the last 75 left in America from this company.  We're looking
    14    at the potential placement of these pallet shelters in parking
10:09AM 15    lots in City Council District 13, Mitch O'Farrell, who asked if
    16    we could put them there.  We're considering them for quarantine
    17    and isolation use.  So, if somebody has symptoms, immediately
    18    be able to take them into essentially their own housing, almost
    19    like a mini-home for them to be able to be in for the period of
10:09AM 20    quarantine and then take the direction from public health.
    21         One of the reasons we were advised by public health
    22    also to look at this with proper spacing using the 35 tenets of
    23    the CDC's recommendations for homeless shelters is because --
    24    everything from making sure people are head to toe properly
10:09AM 25    spaced, we're looking at whether there can be even partitions.
```

1    But we took that advice because the public health officials

2    said this is a place where we can monitor better.  We cannot

3    monitor very well on the street.  Of course, this is right now

4    voluntary.

10:10AM 5         And we know that our homeless neighbors, like the

6    rest of us, are safer and healthier when they're indoors.  So

7    I've exercised my emergency authority under the City Charter

8    and our administrative code to extend the winter shelter period

9    which would be ending just next week on March 21st until this

10:10AM 10   crisis is over.  So indefinitely.

11        THE COURT:  Okay.

12        MAYOR GARCETTI:  And then a couple last notes.  Over

13   the past 19 months before this crisis hit, we had been part of

14   a historic surge of bridge-housing shelters.  These are

10:10AM 15   shelters that have your own little area, pets, partners,

16   possessions, all those things can come in, low barrier.  You

17   stay there.  You're not kicked out during the day.

18        So today we have 12 of those open with 813 beds.  We

19   had 14 due to open by July 1st.  And I can tell you we're

10:10AM 20   pressing the accelerator on that so that we will have over

21   2,200 beds that didn't exist just 18 months ago on top of our

22   plans to take 1600 people, we believe, or have capacity for

23   1600 people by the end of this weekend.

24        Think about that.  18 months to get 2200.  When this

10:11AM 25   happens, it will be in four or five days, 1,600 additional

1  beds.  And then a second phase will go to 29 additional

2  recreation centers and have a full capacity when we're done of

3  6,006 beds.

4         So we're working to identify with LAHSA who's

10:11AM 5  prioritized the 4,000 most vulnerable folks that are in their

6  system to make sure that we're making the contact with them and

7  offering these beds to them first.  This will make it easier

8  for the at-risk population to practice safe social distancing,

9  to remain visible to outreach workers who are focused on

10:11AM 10  getting them crucial services.

11         And we'll also work to relocate vulnerable Angelenos

12  indoors into low barrier congregate settings.  So this isn't

13  just something that we'll probably be doing over the long term

14  for those that are unhoused.  As our hospital beds are

10:11AM 15  overwhelmed, we can expect that those of us that live in

16  housing will need to go to those low barrier settings as well

17  and isolation in hotels, motels, et cetera, if they cannot stay

18  at home in a safe space.

19         And with our partners at LAHSA, as I mentioned, this

10:12AM 20  is really -- I want to thank our rec and parks, our emergency

21  operations center -- I've never seen this before -- and the Red

22  Cross, we have obtained, you know, 6,000 beds -- actually 7,000

23  cots, all the blankets.  We've put in the orders for everything

24  we need for sanitation.  Not every rec center is equal.  They

10:12AM 25  don't all have showers.  But our Department of Transportation

1  buses will take people for their showers to those rec centers

2  that have them if they're staying at one that doesn't.  And

3  this will be paid for through City dollars, state aid, and

4  federal dollars, we believe, through FEMA reimbursements now

10:12AM  5  that I've mobilized emergency workers.

6  So this means together with the existing shelters

7  and ones opening, we can bring 7,000 unhoused Angelenos off the

8  streets and into emergency housing.

9  One last note, which is not about COVID but is, I

10:12AM 10  think, very important, up and down the state, Mayor Pulido and

11  I are part of the big 13 mayors, we've been talking every

12  single night, and we appreciated the contact as well from you

13  last night.  We need to plan for the moment this crisis winds

14  down to make sure that folks that we bring in aren't just

10:13AM 15  thrown back out on the streets.

16  THE COURT:  Right.

17  MAYOR GARCETTI:  And whether that federal aid will

18  be there, whether the state dollars that have been promised

19  from the legislature and Governor Newsom yesterday can be used

10:13AM 20  for that, we're going to have to look everywhere, but this is

21  an opportunity to not let this crisis go to waste and to say

22  not only did we save lives during this crisis, but we finally

23  healed those lives and brought people home.

24  So I'm encouraged that that money is coming.  It's

10:13AM 25  $100 million directly to local governments and $50 million in

```
  1   trailers and to lease rooms in hotels and motels.  And whether
  2   it's leads you've given us from North Dakota, oil and gas
  3   employee housing, whether it is the trailers, the tiny homes,
  4   we have to look all over to be able to make sure at a time of
10:13AM  5   scarce resources that we can make this happen.
  6          So in closing, let me say as the mayor of
  7   Los Angeles, I can assure the Court that the City is committed
  8   before this crisis, during this crisis, and after this crisis
  9   to doing everything that we can to listen and to bring together
10:14AM 10   a coalition of folks.  You never make 100 percent of people
 11   happy.
 12          THE COURT:  Right.
 13          MAYOR GARCETTI:  But for those who will say, "You're
 14   never doing anything right," and for those who say, "I never
10:14AM 15   want anything in my neighborhood," there is a huge wide berth
 16   in between of, I think, you've seen in our actions and our
 17   willingness to stand up on both sides to be able to say let's
 18   keep moving forward.
 19          Never stop listening to people no matter how they
10:14AM 20   communicate, because often there's kernels of truth to what
 21   everybody is saying.  But we're very excited.  Your
 22   coalition-building powers are part of this and your wide
 23   shoulders, as you said, to be able to say from a federal court
 24   perspective that this needs to keep going.  I would only ask
10:14AM 25   that of you, help us keep momentum, help us keep momentum, help
```

18

```
 1    us keep momentum.  These are trying days for our city, but we
 2    will get through them together.
 3            THE COURT:  Don't go away.  And I can't tell you how
 4    much you're appreciated.  Let's have a conversation
10:14AM  5    transparently.  And I'm not going to allow counsel to enter
 6    into this.
 7            MAYOR GARCETTI:  Okay.
 8            THE COURT:  It's just -- it's a very complimentary
 9    conversation, by the way.
10:15AM 10            First of all, I want all counsel to know that we
11    started ex parte communications immediately when a wonderful
12    colleague of mine, Steve Wolfson, and I had a conversation last
13    Friday.  This was actually Judge Wolfson's case.  We go back
14    for many, many years.  We had a collegial conversation about
10:15AM 15    who's going to take this case.  And so let me tell you how this
16    ended up.  And by the way, if you get rid of me, it's no
17    problem at all.
18            MAYOR GARCETTI:  We don't want that.
19            THE COURT:  First of all, in Orange County we had
10:15AM 20    what's perceived to be a modicum of success.  And I want to lay
21    out how that was to the parties so we discuss this later on.
22    First of all, *Boise* is a decent and good case, but when
23    Judge Berzon wrote this, you can read *Boise* as requiring 100
24    percent.
10:15AM 25            So let's say we have 35- to 38,000 homeless in
```

19

```
 1   Los Angeles with Juan Garza, the president of the League of
 2   Cities will tell me we have probably another 20,000 in the
 3   surrounding cities.  Well, Boise could be read that we take
 4   100 percent of that, Mayor, and we say you have to build 38,000
 5   shelters.
 6           I'm not certain if I'm going against Boise, but in
 7   working with Carol and Brooke down in our part of the world and
 8   other folks who are involved on the plaintiff and defendant's
 9   side, we came together and came up with this thought and idea;
10   that all of your homeless aren't going to go into shelters.  In
11   fact, some are going to avoid it.  Whether they're using
12   narcotics, et cetera, you're not going to save every soul,
13   although we're going to try.
14           And, therefore, in the Santa Ana River we had
15   this -- and you need to hear why we're at these numbers.  We
16   took the unheard of step of walking down the river before it
17   was cleared, and there weren't a thousand people on the river,
18   there were about 1400.  And when we put out two-weeks' notice,
19   we saw people walking away.
20           So in a good faith, the plaintiffs' counsel came and
21   said to us, "Look, the number is about 81 percent because we
22   have 1,000 people on the river and 810 wanted shelter."  There
23   was also a different number, and that is for weeks 3- or 400
24   people had walked away.  So I took the lowest number.  That's
25   the first time I thought I was in trouble with one of the
```

20

 1    parties.  I took the 60 percent.  So, therefore, it was, in a

 2    sense, a defendant's number at the time.  And we held pretty

 3    close to 60 percent in the 11 or 12 encampments that we've gone

 4    out.

10:17AM  5          Now, I want to tell you and share with you how many

 6    mistakes I've made and how many times I've tried to back up and

 7    get it right.  It's very humbling.  I didn't recognize the

 8    number of women.  I didn't recognize the number of people who

 9    had lost their homes.  I didn't recognize the number of

10:17AM 10   veterans.  I probably started off with the perception that most

11    of these were criminals.  But what I found was a huge degree of

12    mental illness.  And I found an awful lot of people who had

13    lost their homes from UCI -- UCI students and dock workers and,

14    I'll name it, Disneyland workers and Angel workers and just

10:17AM 15   good people out there also.

16          And then the multitude, I also found, quite frankly,

17    that most of those were homegrown.  They didn't come from

18    Los Angeles or from another state, they came from Orange

19    County.  And I was surprised.

10:18AM 20          That's why the 60 percent number.  And what I find

21    fault with me about is this:  If I write an order, you folks

22    are stuck with that for ten years.  That's a federal order, and

23    some other case has to go along with that; otherwise, you have

24    this order.  So I've taken a 60 percent figure, right or wrong.

10:18AM 25          But in working with my cities -- and I'll tell you

about the L.A. supervisor in just a moment also, because you've been very helpful with this -- what we're finding is that we're holding not only to about 60 percent of the number, but what happens in a year, Mayor, if you and the supervisor have been successful and you've swept your city and the people who want to go into shelter have gone into shelter?  And now we're done to 30 percent.

I shouldn't be at that 60 percent.  I need you to come back to me working together and say, "You know, Dave, we're about 30 to 40 percent we're showing in this last year, and we don't need 30 to 40 percent emergency shelter.  It's badly spent money."  So, therefore, I want that continuing interplay in negotiations so we're spending your money wisely and quickly from the Court's perspective and you don't have that hindsight of our wisdom that you're stuck with as a bright line duty.  So that's what I'm offering back to you.  That collaboration is absolutely critical that our courts are flexible.

Second, I want to introduce you to two wonderful colleagues.  Well, first of all, Judge Smith who's been with me from the beginning, he's my former friend because he's probably given over $1.5 million of free time that he would normally charge, so I call him my former friend.

But Andre Birotte, who is my colleague, and Phil Gutierrez, would you folks stand up.  I personally asked these

22

```
 1   jurists to become involved.  And in the finishing colloquy I
 2   have with the mayor, Phil, if you have any questions, just
 3   blurt them out.  Fair enough?  Okay.
 4        We only have jurisdiction over three cases.  18
 5   other cases have come in voluntarily who were never going to be
 6   sued and held up their hand and said, "Judge, I want to be
 7   sued," because they want to be tucked under the federal
 8   umbrella, and they wanted to know going forward what they could
 9   do, not what they couldn't do.  Because the end result working
10   all together, we came up with some parameter and some ability
11   to move forward.  Because otherwise, it's a chilling effect.
12   And it's a chilling effect that five or six judges are making a
13   decision, because which judge's decision do you start playing
14   to?  So you are always chilled.
15        I think our courts are offering you a real
16   opportunity for collaboration from our point of view and a real
17   good discussion with both these parties later today to try to
18   either reach a negotiation or hammer one out that will give us
19   all some guidelines so you're not chilled in any way and you do
20   that in record time.
21        I think the last thing I'd say is that the reason
22   you came to me was, frankly, we're negotiating with 16 other
23   cities in Los Angeles at the present time.  It's a slow walk,
24   but Bellflower has settled.  We were just talking to Whittier
25   today, not quite certain where they're at, but I think they're
```

23

```
 1    the next ones up.  And I'll say to Joe -- Mayor Joe is here.  I
 2    just know Joe by "Joe" because we call each other all the time.
 3         But there's 14 or 15 other cities who have been into
 4    my chambers.  And what's happening is this is starting to speed
10:21AM 5    along.  So whatever happens in Downtown L.A., we've got to be
 6    careful with our surrounding cities, which you well know, which
 7    is why Juan Garza is here, and a lot of other mayors who wanted
 8    to come that we turned away because we didn't want over 50.
 9    Because if, in fact, folks migrate, they're going to go out to
10:21AM 10   your residential areas, your surrounding cities.  So whatever
11    we're doing, hopefully we're containing it here, we're getting
12    some things to you much needed.
13         Finally, let me say this:  You've done a fabulous
14    job.  Judges aren't supposed to say that.  Thank you very much.
10:21AM 15        MAYOR GARCETTI:  Thank you.
16        THE COURT:  And the next thing I would say to you is
17    this:  I think you're going to see us in a few moments, and
18    your staff can make the decision because I want to get you out
19    of here, along with the supervisor, if you leave somebody to
10:21AM 20   listen to this presentation, I think we're going to be able to
21    augment, if you choose, a huge amount of resources.
22         Now, let me disclose to all parties, I can't tell
23    you the number of phone calls, but I'll tell you the last one.
24    They got my home number through some colleagues.  I got a call
10:22AM 25   at 8:15.  I thought it was just Rusty Bailey, the mayor of
```

```
 1   Riverside, who we've talked, but it was the mayor from
 2   Los Angeles, Stockton, Oakland, San Diego --
 3              MAYOR GARCETTI:  The 13 most popular cities.
 4              THE COURT:  -- 13, yeah, all on the phone.  And I
10:22AM  5   thought --
 6              MAYOR GARCETTI:  Your Honor, I didn't call because I
 7   don't know what these rules are, I'm not a lawyer, but
 8   Mayor Pulido brought him in.
 9              THE COURT:  So I want to disclose to the parties
10:22AM 10   that that's the way I've got to be able to operate.  If the
11   mayors want to call me individually or collectively, or
12   Kathryn, you want to call me, I have to have that ability or I
13   can't function.  And just go litigate, which is wasteful.  We
14   need to hammer this out.
10:22AM 15              So at the end of the day, you have got to give me
16   that consent or just go litigate.  The phone's open to you,
17   period.
18              MAYOR GARCETTI:  Thank you.
19              THE COURT:  And I think this:  I think that your
10:22AM 20   cities are going to come running with consent decrees and tuck
21   under the federal umbrella, but they need help.  We're paying
22   attention, and we should, to Los Angeles and San Francisco.
23   It's our smaller cities right now who don't have that financial
24   backing but the supervisors, quite frankly, have been very
10:23AM 25   helpful in getting.
```

25

```
 1              Janice Hahn and your colleague and you, Kathryn,
 2    have stepped forward and tried to step forward with funding.
 3    But they need a funding source also, and we need to get that
 4    message out to the governor who, by the way, had his staff on
 5    the phone at 10:00 o'clock after the call.
 6              Lastly, help me, I've got 14 to 20 percent of folks
 7    out there who have done nothing with women who have to dress up
 8    over the top of their head.
 9              Jimmy, what time did we go out in the morning?  What
10    time did we appear on the scene?
11              JUDGE SMITH:  4:30, 4:45, 5:30.
12              THE COURT:  4:30 a.m. because your homeless are
13    moving.  They're not working on County hours or my hours.
14    They're moving at 4:30.  And by 6:00 o'clock you're not finding
15    the homeless.  They're scattering.
16              So what are we going to do with that 14 to 20
17    percent who are truly bipolar when we closed our mental
18    hospitals, who I can't put inside a shelter because they'll
19    tear it apart and they've done absolutely nothing wrong?  And
20    that I'm going to ask you -- and I think Gavin's fully on board
21    with our conversations last night, so I'm paying compliments
22    today, I think he's recognizing that whether it's Norwalk,
23    Fairview, Sonoma, those hospitals have to be opened up in some
24    form to contain these people.  I want to ask your help because
25    I've been on that bandwagon from day one.
```

10:23AM (lines 5, 10, 15)
10:24AM (lines 20, 25)

1    And number two, if we get these for the local folks

2    here in the state of California, maybe we're not getting people

3    shipped in off Princess Cruise -- I'm just kidding you -- but

4    we need those facilities anyway for our own state, and we're

10:24AM 5    going to have to have them sooner or later.  Sooner is better.

6    I'm going to ask you to leave a staff member here.

7    MAYOR GARCETTI:  Yes.

8    THE COURT:  I want to compliment you on these motel

9    rooms.  I have the personal opinion that they're transitory,

10:24AM 10    but their transitional in the sense -- and I think we're going

11    to be able to offer you 20,000 units really quick out of

12    North Dakota.  And if anybody doesn't like them, I'm going to

13    invite today, give me a better solution.  Show me the pop-up

14    tents that are supposed to be coming, show me the spring tents,

10:25AM 15    tell me why the price is wrong, et cetera.  And if you don't

16    like this alternative, just give me an alternative.

17    Number two, Michelle Martinez in Santa Ana hammered

18    out and knocked down all of the barriers because she put a

19    building inspector onsite.  So when we went for a permit, we

10:25AM 20    didn't go into an office and wait for a good person who was

21    doing their job to take 24 to 36 hours or two weeks.  They're

22    well-intentioned people.  But I'm encouraging you, if we get

23    some trucks down here that we're going to talk about, we've got

24    40 trucks ready to roll, if you'd like it.

10:25AM 25    The last thing I'll disclose to counsel is this:  If

```
 1    L.A. doesn't want it, Dave, you're the mayor of Stanton, you
 2    want some?  Joe, you want some out in Anaheim?  Sure.  I just
 3    got off the phone with Harry Sidhu.  He wants some.
 4            Here's my concern:  Can we transition these trailers
 5    fast enough to help our Los Angeles community?  Because if
 6    we're going to a hookup with a sewer system and you can't
 7    accomplish it quickly, as I said to the mayors last night, we
 8    can't wait with that valuable resource.  I want to get them up
 9    to Oakland for the governor or whatever.  And so, therefore,
10    please leave somebody here for this presentation.
11            MAYOR GARCETTI:  We'll have somebody here
12    throughout.  And if you'll permit me 15 seconds, we appreciate
13    that.  Our goal, also, is not to have an order but to have a
14    collaboration.
15            THE COURT:  Exactly.
16            MAYOR GARCETTI:  Second, the flexibility we greatly
17    appreciate.  And know that even though I was presenting on our
18    plan amidst this crisis, you will hear from the City what we're
19    doing -- permanent housing, special services, working with
20    veterans -- which I know is near and dear to our hearts, and
21    we've reduced by 80 percent in this city.
22            There's a lot of other aspects of this that I know
23    will be in the larger case, but you asked us to come today
24    because of COVID-19.
25            THE COURT:  Yeah.
```

28

1          MAYOR GARCETTI:  And Council President Nury Martinez

2     is here representing incredible City Council.

3          THE COURT:  Right.

4          MAYOR GARCETTI:  Beautiful leadership.  And we'd

10:26AM 5     love other cities to be involved if they want to be in this.

6     So we are not in any way -- we know that this problem has no

7     borders, and the solutions need to have no borders as well.  We

8     very much appreciate you.

9          THE COURT:  Okay.  Mayor, just a moment.

10:27AM 10          Jimmy, any thoughts?  Any thoughts on your part?

11          JUDGE SMITH:  No.

12          THE COURT:  Okay.  Let's do this:  I have no

13     jurisdiction right now.  Understand?

14          MAYOR GARCETTI:  Yes.

10:27AM 15          THE COURT:  The defendants are here by choice.  They

16     haven't even been served.  But I couldn't wait for the 60 days

17     and the answer.  So you were invited today.  I really

18     appreciate your courtesy.  I promise that we're going to have

19     uniformity back from the courts from all of us as colleagues

10:27AM 20     trying to be cooperative and collaborative within reason as we

21     talk to the parties today to get some reasonableness, which is

22     why I have allowed the intervention on the plaintiffs' side of

23     every potential plaintiff we can get here, because there will

24     be disputes between the plaintiffs, and they're going to have

10:27AM 25     to come to some agreement basically to give us some guidance.

```
 1   Fair enough?
 2              MAYOR GARCETTI:  Thank you.
 3              THE COURT:  Okay.  We can work together.
 4              MAYOR GARCETTI:  My sister, I'm sitting down.
 5   You're smart to do that.
 6              THE COURT:  And Mayor, listen, would you designate
 7   somebody by name, because I'd like to be able to call you as
 8   early as tonight and as late as tomorrow morning.
 9              MAYOR GARCETTI:  Could you stay?
10              THE COURT:  Okay.  Could one of you stay --
11              MAYOR GARCETTI:  So Christina Miller, who's deputy
12   mayor of City Homelessness Initiatives, our first deputy mayor,
13   and my deputy chief of staff, one of them will always be here.
14              THE COURT:  Perfect.  Let's get you back.  That way
15   you're reporting back to the mayor, not through my eyes
16   tonight.  And we'll talk as early as tonight or as late as
17   tomorrow.  Okay?  But you're reporting back through your eyes.
18   And I want you to listen to this presentation and keep
19   asking -- we're not necessarily in favor or disfavor of what
20   you're about to hear, but what else is out there.  And if we
21   can get 20- and maybe 30,000 units down here -- we got 40
22   trucks up there ready to roll.  It depends upon how fast we can
23   sequence.  And if we can't, then just tell me.  Let's get these
24   up to Oakland if they're interested with some of the other
25   mayors.  Okay?  Fair enough?
```

```
 1              Mayor, I can't thank you enough.  Stay as long or as
 2    little as you'd like.  You're socially distanced.  Go take good
 3    care of yourself and make great decisions for us.
 4              Kathryn, please.
 5              MS. BARGER:  Thank you.  First of all, I want to
 6    thank Mayor Garcetti, because this is about all hands on deck.
 7              THE COURT:  Yeah.
 8              MS. BARGER:  And while L.A. city is probably ground
 9    zero for where the greatest number of homeless are located, the
10    impact it has throughout all of L.A. County -- Whittier,
11    Bellflower, Pasadena -- it's still really a humanitarian
12    crisis.  And I view being in this court today not as
13    adversarial, but actually, I think we're all on the same page.
14              THE COURT:  We are.
15              MS. BARGER:  And the plaintiffs, quite frankly, have
16    been in our office, and we've talked to them, and we wanted to
17    work toward addressing this issue.  So I don't view this as us
18    against them because we're all in this together.  And working
19    with all of our 87 other cities along with L.A. city is what
20    L.A. County is committed to do.
21              And I believe that the challenges that we have
22    before us as it relates to the Coronavirus are going to present
23    opportunities.  Because while we're looking right now short
24    term and we've got 2,000 isolation beds set aside, 4200 County
25    property beds also ready to go right now, and we're moving that
```

10:28AM  5
10:29AM 10
10:29AM 15
10:29AM 20
10:30AM 25

```
 1   out.  And our team at the County will really outline what
 2   exactly our plan is for the Coronavirus.  But this is only the
 3   beginning of what we are doing.
 4          And as Mayor Garcetti said last night, I watch every
 5   briefing you have every night.  But what is being done at the
 6   City level and the County level was already in the works.
 7   Coronavirus just accelerated and actually broke down barriers
 8   that we recognize were in place, whether it be CEQA and/or
 9   other issues that, quite frankly, given this virus, we have to
10   think outside the box and recognize that asking for permission
11   is not necessary -- sorry, lawyers -- but we're going to ask
12   for forgiveness because we have to get this done and we have
13   got to get it down now.  And we recognize that prevention is
14   the key.
15          And to your point, the homeless population is very
16   good at moving early morning and are oftentimes invisible.  And
17   we need to be aggressive in how we do outreach.
18   Sheriff Villanueva has got his host team boots on the ground
19   out there working very aggressively to try to convince people
20   to come in.  Because many of them do not understand how at risk
21   they are right now.  And many do not understand what this
22   Coronavirus means or could mean.
23          And so when we hear the number of one death already
24   amongst the homeless, my biggest concern is that that is going
25   to rise because we all know that healthwise they are
```

10:30AM  5
10:30AM 10
10:31AM 15
10:31AM 20
10:31AM 25

```
 1   compromised.  They are not in the best of health.  And we know

 2   that the studies show that the elderly and those with

 3   compromised immune systems are at greatest risk.

 4         And when we talk about slowing the spread, it's done

 5   so that we do not overwhelm our hospitals.  Because right now,

 6   you know, what's keeping me up at night is making sure that we

 7   have the inventory of beds across the County should we need

 8   them, especially the ICU beds, for those that are going to be

 9   presenting themselves in the emergency rooms.

10         So, you know, Judge Carter, I have admired the work

11   you did in Orange County, and you keep saying it's going to

12   change.  It won't change.  Because I know where your heart is,

13   and I know where my fellow colleagues on the board of

14   supervisors' heart is, and that is we have to do better.

15         And Measure H gave us an opportunity to put new

16   money into addressing the homeless population.  So money really

17   prior to the Coronavirus wasn't our issue.  Post Coronavirus it

18   may be because we don't know what the implication is going to

19   be as it relates to jobs that are being lost, people that are

20   presenting themselves as possibly homeless.

21         I know we did exactly what the City did in terms of

22   eviction notices and putting a stay on that because that is

23   another issue for those that can't pay.  We're trying to get

24   the ones that are currently on the street off the street.  God

25   forbid we add more.  So we are looking at that, and we don't
```

10:32AM (line 5)
10:32AM (line 10)
10:32AM (line 15)
10:33AM (line 20)
10:33AM (line 25)

33

```
 1   know what the implication would be financially.

 2            But prior to this, Measure H provided us with an

 3   infusion of money.  We projected 355 million.  In fact, it came

 4   in over 400 million thanks to the hard work of people like

 5   Supervisor Mark Ridley-Thomas, who saw this as a crisis long

 6   before we even came into this court, long before you were

 7   dealing with the Orange County.

 8            So I know that money is not necessarily the issue,

 9   it's about leadership.  And I will tell you that I know in my

10   cities -- and I look at Juan Garza.  Is he here?  You keep

11   saying "Juan."

12            THE COURT:  He is.  Come on, Juan.  Come on up here.

13            MS. BARGER:  Okay.  There he is.  I look at people

14   like Juan Garza, who I had the honor of meeting last year and

15   heard him speak, and listened to his vision about wanting to

16   understand who the homeless are.  And then I flash forward,

17   read about how he's entered into the consent decree within

18   Bellflower to address the homeless within his population --

19            THE COURT:  Kathryn, on May 5th, Bellflower got

20   swept.

21            MS. BARGER:  Yeah -- no, but I mean -- my point

22   being Bellflower was ahead of the curve as it relates to

23   recognizing that they could do it if given the opportunity, but

24   they actually wanted to enter into the consent decree to give

25   them coverage so that they could be compassionate.  Because
```

1  it's not about criminalizing the homeless, but also being firm.

2  And I know Whittier is looking at doing the same.

3  We have an opportunity, both the plaintiffs, the

4  counties, and the cities to get this right.  And I am

10:35AM  5  committed, along with my colleagues.  And you referenced

6  Supervisor Janice Hahn who took a lot of heat for pushing to

7  San Pedro.  But what I tell people is they're already in our

8  community.  If left to their own device, not great neighbors.

9  But if provided the supportive services and the help that they

10:35AM 10  need, I'd be proud to have them as my neighbor.

11  So as a board, we are committed to moving forward,

12  Your Honor.  And I want you to know that, again, I don't view

13  the people that got us here today in an adversarial way.  In

14  fact, I admire their courage for stepping forward and saying,

10:35AM 15  "We want to be a part of the solution as well."

16  Because you will in the end be a part of the

17  solution, because it's going to be a give and take and it's

18  going to impact neighborhoods and people that you may know that

19  are going to say, "We want you to fix it.  But by the way, do

10:35AM 20  it over there, don't do it over here," which I'm sure

21  Mayor Garcetti's heard, I'm sure a lot of my colleagues have

22  heard that are elected officials.

23  So we have to have the political will and the

24  leadership to get it done.  And we're going to be looking to

10:36AM 25  you, Judge Carter, to help us navigate those waters.  So thank

```
 1   you for having us here today.
 2        THE COURT:  Well, thank you.  And let me be a safe
 3   forum because I've got heroes and heroines out there, and our
 4   job is to create that for you as elected officials and let you
 5   proceed as quickly as possible without being an impediment.
 6        Now I'm going to ask the following of you
 7   specifically:  You're so well thought of in so many circles, so
 8   I'm going to toss out some names, Robert O'Brien, okay, and Joe
 9   Grogan, they're a phone call away.  All right?
10        You know that I went back -- Ben Cardin wanted to
11   come out and see our program.  I went back to DC because nobody
12   cares about a federal judge in DC or most places, by the way,
13   but certainly not in DC.  And that was too big a story having
14   him come out.  If they're going to produce, this is the
15   collaborative effort, but I'm going to be asking the tough
16   questions in the future on behalf of our city, and that is if
17   they're going to produce and help you, maybe you can't say it,
18   but I can.  So right now, love to all, best wishes,
19   collaborative effect.  But the federal government, if they're
20   going to step up, Mayor, and they're not, this is going to be a
21   much different session in the future.  Okay?  And that's not a
22   threat, that's just a promise.
23        Now, sharpen your pencils.  You don't have to stay.
24   You've got decisions to make.  But in a moment we're going to
25   try to give you a presentation because since Steve was kind
```

```
 1    enough to accede to me taking this case, I think folks have

 2    been working night and day.  I don't know many folks who have

 3    slept since last Friday.

 4           And we're going to see if there's 20,000 to 30,000

 5    units that you're interested in and how you would sequence them

 6    and what permitting would take place, et cetera, and how

 7    quickly.  Because if not, then let's get on the phone.  I want

 8    you to have my number.  Okay?  If I can't communicate with you,

 9    then -- and I don't want the whole public to know it, because

10    I'm going to make a transcript, and I'm going to ship it out to

11    everybody.  We're going to get a transcript out because we had

12    to limit this today.  But you've got to be able to call me, and

13    I've got to be able to call you.

14           But most importantly, Andre Birotte is a great

15    admirer of you.  Judge Birotte speaks nothing but praise.  I'd

16    like you to coordinate with Andre Birotte and work though him

17    on all occasions, okay, that are possible.  You've always got

18    my number.  But we're such close friends.  Okay.

19           Now, I want to show you one picture on the way out.

20           Eddie, put up a picture of someplace called Georgia.

21    And I want to show you what our country can do.  So anybody

22    tells us that they can't build a shelter within 28 days, then

23    go talk to Michelle Martinez or the mayor in Anaheim --

24           MAYOR PULIDO:  And Santa Ana.

25           THE COURT:  And Santa Ana, yeah.  Thanks, Miguel.
```

```
        1          -- and go talk to Michelle Martinez.  They put a
        2   shelter up in 28 days.  Anaheim matched them.  And right now
        3   you're looking at America.  This is a place called Georgia
        4   right after the war, right after the debacle called genocide
10:39AM 5   had taken place.  And this is South Ascension coming across the
        6   border into Georgia.
        7          By the way, this gentleman was born a short place
        8   from here.  That's your money.  They may call it UN money, but
        9   that's United States money, and these were put up overnight by
10:39AM 10  USAID.  So anybody who tells you from the federal or state
       11   government that America can't do this, well, I'll just show
       12   them this picture.
       13          Now, would you take me over to where I just sat in
       14   Saipan.  They got hit by a god-awful typhoon.  It destroyed it.
10:39AM 15  If you don't like those kind of shelters, then I'm all for
       16   tents.  Because if we're going to get them off the street, it's
       17   not going to be pretty.  Some people are going to get hurt.
       18   But we're trying to move as many people as quickly and save
       19   their lives.
10:39AM 20          And they're not going to be the optimum conditions,
       21   plaintiffs' counsel.  They're not going to have all the ADA.
       22   We're going to try.  We don't want a paraplegic on the second
       23   floor of a motel without whatever, an elevator.  And so we're
       24   going to try.  But this is not going to be perfect.  In fact,
10:40AM 25  don't let the --
```

1          What is it, Jim?  Get a --

2          JUDGE SMITH:  Don't let the perfect be the enemy of

3    the good.

4          THE COURT:  Yeah.  So if we're going to move, then

10:40AM 5    there's going to be a lot of criticism for everybody.  Well,

6    these are tents.  Guess what, they've been going to school now

7    for five and a half months over there, and these kids are going

8    to be going to school over there in these tents for probably

9    another year and a half to two years.

10:40AM 10          If a country is doing that this quickly and we've

11   got a crisis involving death on Skid Row -- hey, tents, I love

12   tents.  So you're not getting any pushback from this court or

13   from my colleagues in terms of getting structure up because I'm

14   going to say this:  We are losing more people right now to

10:40AM 15   hypothermia, pneumonia, and other disease than possibly this

16   COVID crisis is going to cause in increased deaths.

17          In Orange County alone, we've lost 240 without the

18   crisis hitting.  Well, God help us, I hope it doesn't add

19   substantially.  But with those kinds of numbers, if you could

10:41AM 20   give me these in every city in Orange County and Riverside and

21   Los Angeles immediately -- so if you don't like the following

22   presentation, great, I'm going to ask everybody what's better.

23          So without further ado, Paul Leon, come up here, and

24   I'm going to get a pencil and step off of the bench, and we're

10:41AM 25   going to get numbers.  And you're going to start taking down

1    numbers for me.  Because if this doesn't make sense, tell me

2    what does.

3         Eric, thank you.  I'll call you tonight.

4         MR. LEON:  Good morning.  My name is Paul Leon.  I

10:41AM  5    am a public health nurse and CEO of Elimination Foundation.

6    And we currently are working in Orange County, L.A. County, and

7    Inland Empire.

8         So Judge Carter asked me to present real quickly on

9    what we were doing prior to COVID-19 hitting, and that was we

10:42AM  10    ran recuperative care, medical recuperative care.  We're the

11    largest recuperative care currently in the nation.  And we had

12    already started looking at supply and emergency housing, bridge

13    housing, and then permanent supportive housing.

14         And about a month ago, Mr. Ken Rice [sic] came to us

10:42AM  15    with these units.  We had already talked to him about

16    purchasing these units at cost.  They were in North Dakota, and

17    they were assembled for oil derricks and oil derrick workers.

18    When we saw these units, we realized that we could not only

19    assemble them quickly, but they could serve as recuperative

10:42AM  20    care medical respite units for our clients that were homeless

21    and were really increasing.

22         You could see the beds are complete.  They come with

23    all the soft items needed to run.  You know, they can be

24    stacked.  They could get here -- they could start coming.  They

10:43AM  25    have full kitchens that could be set up.  And they could also

1   be assembled and serve 300 meals three times a day.

2           We -- they can be configured any way.  They have

3   full washrooms.  And on the right you'll see they have complete

4   generator systems if they need to be brought in and they can't

10:43AM 5   be hooked up to a grid.  Full-on washing machines, pretty much

6   everything similar to -- these are the generators -- to what

7   we're doing now.

8           Now, again, these are at cost.  It's a

9   public/private partnership that we were going to do in

10:44AM 10  Orange County, and our nonprofit was going to bring in 78 beds

11  as a stepdown facility for COVID-19.  So we had already talked

12  to Ken about having them on the way.  And, again, we could go

13  over the prices with you.

14          My colleague in just a second -- these are the

10:44AM 15  Caltrans places that we identified that we were already looking

16  at putting LifeArk -- and I'll show you LifeArk in a second --

17  but we were already looking at acquiring some of these places

18  in L.A., Orange County, and we were already on our way to

19  filling out the applications to put up LifeArk.

10:44AM 20          And, again, LifeArk, for those of you who don't

21  know, Mayor Garcetti's office had a challenge for innovative

22  housing.  We actually won that housing challenge.  And we won

23  the challenge for services.  LifeArk, again, will take a little

24  bit longer to set up, about 90 days.  90 days to six months.

10:45AM 25          The first facility is going to be set up --

```
  1              Paul, is that Monterey Park?
  2              THE COURT:  No, no, too long.  Move on.
  3              MR. LEON:  Okay.  So, again, these are the units.
  4   We could have 7,000 of the first units here in 90 days to six
  5   months max.  So, again, Judge Carter wanted us to present.
  6              THE COURT:  You presented that.  Still too long.
  7              MR. LEON:  7,000 beds, 11,000 per bed, and that's a
  8   total of 4,648 units.  We showed you the Caltrans sites that
  9   we're able to apply to put them on that.
 10              As far as services, both Elimination Foundation,
 11   Salvation Army, we in Orange County run probably the two
 12   biggest shelters, and we have capacity to scale up.
 13              THE COURT:  Okay.  Now, let's have a conversation.
 14   That's excellent for the long term.  But our conversation was
 15   also about 1.9 million --
 16              Come on up, Ken.
 17              -- about 1.9 million for 70 beds.  Right, Paul?  No,
 18   Paul, stay there.  About 1.9 million for 70 bedrooms; right?
 19              MR. LEON:  Yes.
 20              THE COURT:  But on my discussion, and I want all of
 21   you to be clear, I don't care if these are purchased or not.
 22   You could put up tents.  You could put up Tuff Sheds if you
 23   could save lives.  But the end result is that if you double
 24   bunk these, then you move from 70 to 140.
 25              And the problem facing us right now is we don't know
```

10:47AM 5

the standard.  Can 50 of us assemble under the present
guidelines or shortly are we at 10?  And so, therefore,
wherever we're doing, we need the flexibility to make certain
we're not spending money and backing up and having to do it
again.

            The next thing is we need these now, which is why
I'm going to call on Kevin De Leon in just a moment.  And so I
want to talk about what we could do now as we transition in,
because if Los Angeles can't absorb this, then, Joe, I want a
couple hundred out in Whittier.  Dave, in Stanton, I want 100
out there.  In Anaheim, Harry wants some.  I think Mayor Silva
is here.  But I want to give this opportunity, if it is an
opportunity, right here because we're the most impacted in
Los Angeles.  So let's see if this makes sense monetarily.  And
if it doesn't, okay.

            So if we -- remember, I can't add, so you're going
to help me in the audience.  Are you ready for this?  And
multiply.  How many trucks can you use for transportation?  And
I informed you my dad was a long-haul truck driver.  How many
trucks can you put on the road?

            MR. PRICE:  Right now I have a commitment for 240.

            THE COURT:  Trucks?

            MR. PRICE:  Trucks.

            THE COURT:  Okay.  On each truck, I'm going to call
one of these units of 70 bedrooms holding 140 people -- what do

43

```
 1   you want to call this?
 2              MR. PRICE:  That's a facility.
 3              THE COURT:  A facility.
 4              So I want to just take 40 trucks.  And would
 5   somebody multiply for me in the audience 40 times 140 and tell
 6   me what the answer is.
 7              UNIDENTIFIED SPEAKER:  5,600.
 8              THE COURT:  5,600.
 9              Now, when the Saudis got in a fight with Russia over
10   oil prices -- if you're not broke by now, something's wrong --
11   but it went down into the 50s, and now if you check, it's in
12   the high 30s or low 20s.  He's having to stash these up in
13   Canada probably.
14              So you say you're selling at cost, I don't know.
15   Check it out.  Not in favor or disfavor, but if that's the
16   case --
17              Eddie, start flipping up the first photo of what one
18   of these looks like.
19              Without the bureaucracy of well-intentioned permits
20   and going into offices, if you put 40 trucks on the road, Ken,
21   how quick could you have them here?
22              MR. PRICE:  We've worked it out for the 70-bed
23   facility --
24              THE COURT:  Not set up.  Just how soon can you get
25   to the outskirts of L.A.?
```

10:48AM (line 5)
10:49AM (line 10)
10:49AM (line 15)
10:49AM (line 20)
10:49AM (line 25)

44

|  | 1 | MR. PRICE: A little less than a week. |
|---|---|---|
|  | 2 | THE COURT: Okay. Let's say eight days to be sure, |
|  | 3 | a little more. As we put up these pictures -- |
|  | 4 | And blow that up, Eddie, if you can. |
| 10:50AM | 5 | Let's go to the interior of what one of these looks |
|  | 6 | like. Because, folks, I'll represent I haven't seen these in |
|  | 7 | person. I'm only giving you alternatives about adding to a |
|  | 8 | supply, if we can add to the supply, and then getting a cost |
|  | 9 | figure and seeing if we can beat that cost figure or negotiate |
| 10:50AM | 10 | it or do something else as an alternative instead of what are |
|  | 11 | we going to do next. So all I'm doing is laying out for you a |
|  | 12 | possibility that I don't necessarily subscribe to. |
|  | 13 | Let's just start with 40 trucks; right? Eight days. |
|  | 14 | 5,600 -- what do we call them? Bedrooms? |
| 10:50AM | 15 | UNIDENTIFIED SPEAKER: Facilities. |
|  | 16 | THE COURT: Facilities? Well, whatever they are. |
|  | 17 | Is that 5,600 if I double-bunk those rooms? |
|  | 18 | MR. PRICE: We're looking at -- right now I think we |
|  | 19 | have nine facilities on the offer. The first unit is the |
| 10:51AM | 20 | 70-bed complex. |
|  | 21 | THE COURT: Right. We're right here. |
|  | 22 | MR. PRICE: And that we can have -- |
|  | 23 | THE COURT: 140 capacity. |
|  | 24 | MR. PRICE: That we can have here and operational in |
| 10:51AM | 25 | three weeks. |

1    THE COURT:  So if we -- now, not operational because

2  the City is about to help you.  Part of the problem with

3  operation is are these the four units that operate off of a

4  septic tank where we don't have to hook into a main sewer line,

10:51AM 5  and that's 640 you can supply that I know about?  Or are these

6  units that we have to hook into a sewer line?

7    MR. PRICE:  This unit is built to connect into the

8  local utilities.

9    THE COURT:  Okay.  In a sewer line or electricity.

10:51AM 10  So the question would become for the mayor and the City, where

11  do they go and how many do you want, if you even want these?

12  And how do we shorten that permit process and do it as the City

13  of Santa Ana just did it, that is, put an inspector onsite with

14  these and sign off as we go, because every time we had to go

10:52AM 15  back to the office in my cities in Orange County, it took a

16  long time because folks were doing what they were supposed to

17  be doing.  But when we got them out in the street, we were able

18  to build shelters in 28 days.  Okay?

19    How many of these do you have?

10:52AM 20    MR. PRICE:  Right now I've set aside for Paul 20,000

21  beds.

22    THE COURT:  How many do you and Paul have under

23  contract that he's trying to tie you up with?

24    MR. LEON:  4,000.

10:52AM 25    THE COURT:  4,000.  So if I had a population in

```
 1    Los Angeles, according to "Los Angeles Times" -- and who's here
 2    from the "Times"?  Anybody?  Yeah.  So you wrote in yesterday's
 3    article 38- to 37,000 homeless people in Los Angeles.  That's
 4    what you said.  I'll read it to you.  And if I took 60 percent
10:53AM 5    of that, what's that?
 6              UNIDENTIFIED SPEAKER:  I'm sorry?
 7              THE COURT:  What's 60 percent of 37,000?
 8              UNIDENTIFIED SPEAKER:  I didn't write it.
 9              THE COURT:  How much?  25,000.  25,000.  So at
10:53AM 10    60 percent, you've already got 4,000, and you have it under
11    contract.
12              MR. LEON:  For Orange County.
13              THE COURT:  For Orange County, right.  But I might
14    be asking you -- well, we'll see.  You got it under contract;
10:53AM 15    right?  Yeah, show me the money.  Put up your contract for me.
16              MR. LEON:  We actually don't own it, but we have the
17    purchase agreements.
18              THE COURT:  You agree?  You've got a purchase
19    agreement?
10:53AM 20              MR. PRICE:  We have a purchase agreement.
21              THE COURT:  So I won't have to do the drama of
22    putting up the contract.  We can believe that.  Okay.
23              Now, that's going to leave -- what's your capacity
24    here?  You said 20,000?
10:53AM 25              MR. PRICE:  We have set aside 20-.
```

```
  1              THE COURT:  20,000?

  2              MR. PRICE:  Since this hit, we're getting demands

  3    from all across the country now.

  4              THE COURT:  Exactly.  So if you're going to jump on

10:54AM  5    this, you better jump on it if it's being true to cost, because

  6    otherwise, in our discussion with the mayors last night, we're

  7    quite willing to ship them right up to Oakland as we dawdle and

  8    discuss this and try to get perfect instead of good.

  9              Because my input to the governor and staff last

10:54AM 10    night was as follows:  If we can't absorb them here in

 11    Los Angeles with a need, we're not going to wait for

 12    Los Angeles.  We're going to get them up to Oakland, et cetera.

 13    So you got first opportunity or nonopportunity.  And the longer

 14    you take -- and by the way, it's okay to reject it.  In other

10:54AM 15    words, if it doesn't fit, just tell me no and let somebody else

 16    take a shot at it.  But you have got about 24 hours to make up

 17    your mind.  And we're going to do that today.  Back to your

 18    office.  And I'm going to stay here until I get it.  Fair

 19    enough?

10:54AM 20              Now, Eddie, what are my court hours?

 21              MR. NUGENT:  We've been on the record until 1:30 in

 22    the morning.

 23              THE COURT:  1:30 in the morning, no problem.  I'll

 24    just sit here.

10:55AM 25              So I believe that we're collaborative, but I also
```

48

```
 1   believe that when we get back to our offices, we have got a
 2   thousand things to do.  And just tell me you don't want them.
 3   Because 13 other mayors were on the line last night, right,
 4   Miguel?  Miguel's gone.  Yeah.  But, Joe, et cetera, and other
 5   folks.  Kevin, you said you wanted some.  Come on up for a
 6   moment.  Kevin, come on up.  Don't be shy.  How many you want?
 7   If the price is right.
 8              MR. DE LEON:  We'll negotiate.  One thing I want to
 9   make sure it's clear, these are not just beds.  When these
10   facilities drop in, you have a full commercial kitchen.  We
11   have one complex that is 330 beds.  It has a full commercial
12   kitchen that will serve breakfast, lunch, and dinner for over
13   700 people a day.
14              THE COURT:  Eddie, show them the kitchen.
15              Now, remember, this may be pie in the sky.  Okay?
16   Just tell me what else you got going that's better, or even
17   less better, whatever that means, that you think is acceptable.
18              MR. DE LEON:  These all have laundry facilities.
19   They all have dining halls.  They all have commissaries.  We
20   have meeting rooms.  We have treatment rooms.  We have
21   examination rooms.  We have boardrooms.  We have fitness
22   centers that can work as rehab centers.
23              THE COURT:  So for the mayor, the Board, we
24   obviously have an opportunity far beyond homelessness.  We
25   actually have an opportunity in this crisis to set up, if you
```

49

```
 1   will, intake centers and isolation centers in the same module.

 2   Now that's a lot different than a motel room that we're putting

 3   folks in and asking a doctor to go to.

 4           And the question is how fast in talking to City

 5   Manager Rick from Santa Monica yesterday, he said, "Watch out,

 6   Judge, because we may not be able to sequence these fast

 7   enough."  And if we can't sequence these fast enough, then I

 8   think that there's a general agreement that we don't want to

 9   wait while they sit there for a period of time because then

10   another city can use them.

11           So my last question is I want to do some fancy

12   calculations, okay.  I calculated that 140 into 1.9 million is

13   how much?  Would somebody calculate that for me in the

14   audience?

15           "L.A. Times," you're doing real well.  How much?

16           UNIDENTIFIED SPEAKER:  It's about 13.5, Judge.

17           THE COURT:  I would know the answer, but we'll see

18   how he does.  13,500.  Okay.  Good.

19           All right.  13,500 to serve one homeless person in a

20   two-person separated --

21           I'll be right with you, I promise you.

22           -- separated unit.  So you don't have to worry about

23   whether there's 10 or 50 as the CDC gives direction to us.  And

24   they haven't given direction yet.

25           Hold on, I'll get to you.  But if I let you in, I
```

50

```
 1    let everybody in.  So hold on.
 2             Now take what's the cost of 27,000 units or -- or
 3    27,000 people on the streets of Los Angeles?  In other words,
 4    if you supplied 60 percent of the 37- or 38,000, I want
10:58AM 5  everybody in this room to come up with a bottom-line number
 6    that should scare the heck out of us.
 7             MS. SOBEL:  The current budget, it is around 50
 8    million just for the cleanups.
 9             THE COURT:  Okay.  Just hold on.  I just want to
10:58AM 10 know what these units are going to cost for a moment.  Come on.
11             UNIDENTIFIED SPEAKER:  350 million.
12             UNIDENTIFIED SPEAKER:  350 million, Your Honor.
13             THE COURT:  350.  Do it again.  Remember, we're
14    double-bunking.  So really, one module of 70 is 140; right?  So
10:59AM 15 how many modules do we need?  140 into 27,000, let's say,
16    times -- and we'll take the smaller modules because they get
17    less expensive, the larger modules --
18             And you've got much larger modules; right?
19             UNIDENTIFIED SPEAKER:  Up to 1800 beds.
10:59AM 20     THE COURT:  So let's get the worst figure possible.
21    Do it one more time.  You may be right.
22             UNIDENTIFIED SPEAKER:  It's around 340 million.
23             THE COURT:  Okay.  340 million.  That's our bottom
24    line with other costs, of course, with hookup.  Now that's a
11:00AM 25 scary number, but at least it's a number to work with; right?
```

```
     1    That's a number to decide if there's a more quicker -- if

     2    there's a quicker, more economical, more humane way.  But

     3    eventually, you're going to go to some kind of transitional or

     4    long-term supportive housing.  And what I'm suggesting is this

11:00AM 5  may be the jump right now with the crisis that gets you into

     6    one bedroom, two people per bedroom, et cetera.  But law

     7    enforcement's here and I'd like to speak to LAPD.

     8              UNIDENTIFIED SPEAKER:  Chief Moore is here.

     9              THE COURT:  Chief, thank you.  The first concern

11:00AM 10  would be, Chief, hey, why am I putting a bunch of folks into a

    11    room where I can't see them?  I can't see them.  Because I've

    12    got these folks coming in and some are using narcotics who want

    13    shelter.  And so at least in our part of the world, we were

    14    putting them into larger rooms for supervision until they gave

11:01AM 15  us some degree of, let's say, of getting off of narcotics for

    16    those who were on narcotics or psychiatric issues.

    17              So our experience was we put you into a little bit

    18    larger facility, or tried to, and then you kind of earned your

    19    way out because law enforcement couldn't see unless they were

11:01AM 20  in more of a dormitory style.  And we don't know if we're going

    21    to 10 or 50 yet.  CDC hasn't told us that yet.

    22              And, number two, you've got a tough call to make,

    23    and I really respect you, and that is, do you even want these

    24    folks in jail if they're loitering, et cetera, or they're going

11:01AM 25  to carry the Coronavirus in, and my guess is that's the last
```

52

1    thing you want to do.

2           CHIEF MOORE:  Well, Your Honor, thank you for the

3    opportunity to appear before you.  And I appreciate your energy

4    and even more importantly your authority on this critical

11:01AM 5 issue.  This is an organization as a local government that is

6    trying to work feverishly to provide needed services for

7    individuals that are in -- terribly at risk, and this pandemic

8    is only amplifying the crisis that we have before us.  And

9    frankly, this is also an organization of County and City

11:02AM 10 officials that have worked tirelessly in order to get through

11   red tape and bureaucracy and seemingly endless counts of

12   obstacles.

13          And I'm -- it's my hope by being here today that I'm

14   witnessing an opportunity to break through that, and that

11:02AM 15 you'll have the authority and the ability to actually allow us

16   to work in a common-sense manner that can provide shelter for

17   those that are in need as well as care and treatment for people

18   who are experiencing mental health crises, substance abuse

19   problems, and that the complexity of this is not simply the

11:02AM 20 establishment of a large shelter or individual beds.  But the

21   real care of this is not the construction of the units, but

22   also the augmenting it with staffing that can provide.

23          The worst-case scenario is a barrack setting with

24   law enforcement on gun post, looking at this population as if

11:03AM 25 it's somehow an offender or somehow the enemy.  The best-case

53

```
        1   scenario is mental health workers, medical personnel, outreach
        2   and engagement of social workers that are present 24/7, 365.
        3   That has been a challenge for this region and it is across
        4   America.
11:03AM 5           So I look forward to you working with us in this
        6   coalition, working in support of our joint endeavor here, which
        7   is to provide affordable, realistic, resilient housing
        8   immediately for people who are in crisis because they're in an
        9   environment in a public setting that exposes them to this
11:03AM 10  Coronavirus as only the latest chapter of the risk to their
        11  safety and their welfare.
        12          And so, secondly, as is perhaps is a moment that can
        13  transition us into a more lasting solution, I -- we all share
        14  that ambition.  But as law enforcement, what I would first ask
11:03AM 15  is that we find the means to build and locate and establish
        16  immediate shelters so that we have ample opportunity for people
        17  who are willing or able to provide, then to take advantage of
        18  that shelter.
        19          THE COURT:  Absolutely.  In other words, let's get
11:04AM 20  folks under shelter as quickly as possible, supervise them as
        21  best we can.
        22          Okay.  A couple things.  This won't work unless it
        23  works for law enforcement.  It's just as simple as that.  And
        24  historically, when I started, the cities wanted to sweep the
11:04AM 25  City from a law enforcement perspective, but we didn't have the
```

54

same kind of help, impetus, and push.  I don't think people
really cared about that as much in the community.  That's
transitioning now because the community is terrified of this
COVID-19.  So health has really risen to the top of the ladder.

11:04AM 5          I want you to tell me and educate me what the best
scenario for law enforcement is and repeat that to me.  So if
we were going down, let's say, Broadway, and we were cleaning
encampments and we just started -- I mean, street to street --
you took in a thousand people, tell me the module that you'd
11:05AM 10 like that initial thousand people, what that module would look
like for you.

12          CHIEF MOORE:  Well, the worst-case scenario is the
one you just described.  The clearing of streets by law
enforcement in Los Angeles would, in my view, as a professional
11:05AM 15 of nearly four decades of service, lose the very trust of the
community in which we're attempting to maintain.

17          THE COURT:  Everybody hear that?

18          Now, here's what I got from the governor's office.
They're right on board.  They're expecting that they may get
11:05AM 20 from CDC as of 10:00 o'clock last night in the conversation,
"Hey, hold these encampments in place because the scattering is
going to cause chaos and mayhem.  And, Judge, what do you think
about that?"

24          I said, well, I would never interfere with the input
11:05AM 25 of a professional like CDC, but why aren't we increasing, then,

55

```
        1   the health of these people in that very area by supplying these

        2   tents or trailers or whatever you decide because they're not

        3   social distancing themselves now, Chief, they're all rubbing

        4   elbows and using subway and I don't care about our social

11:06AM  5   distancing.  It's just not going to work in the gate-guarded

        6   communities even.  So I'm right on board with you.

        7            CHIEF MOORE:  So we join with you, the -- the

        8   sheltering system, the 13 that are being established starting

        9   tomorrow as part of a 42 overall outreach effort will also have

11:06AM 10   challenges in regards to social distancing.  And I do not

       11   intend for LAPD to be the enforcers of social distancing.

       12   We're not carrying tape measures around nor do we expect to use

       13   them.

       14            THE COURT:  Listen closely as we discuss these

11:06AM 15   trailers or tents today from your perspective.  And jump in at

       16   any time because this must work for law enforcement in the

       17   community and the citizens.  Because although we're focusing on

       18   homelessness, it's really the whole community.  Okay?

       19            UNIDENTIFIED SPEAKER:  Yes.

11:07AM 20            THE COURT:  Any input, just step forward.  All

       21   right?

       22            Okay, Ken, we're almost done.  So there's your price

       23   tag.  Are you going to flimflam us and negotiate and drive that

       24   price up or are you going to hold your word --

11:07AM 25            CHIEF MOORE:  Excuse me, Your Honor.  I'm going to
```

56

```
 1   excuse myself.
 2              THE COURT:  -- to that cost?
 3              CHIEF MOORE:  Your Honor, absent other direction or
 4   desire, I'm going to excuse myself.  I do have staff here --
 5              THE COURT:  Excellent.
 6              CHIEF MOORE:  -- that will continue to monitor this
 7   and be a party to our efforts.
 8              THE COURT:  And by the way, you'll have my phone
 9   number.
10              CHIEF MOORE:  Very good, sir.
11              THE COURT:  And I'll reach out.
12              So Ken, here, now we're going to test you.  I get
13   input as of two days ago that we're going to go with cost.
14   You're going to stay with cost?
15              MR. PRICE:  Yes.
16              THE COURT:  Okay.  There's the commitment.  He's not
17   going to flimflam you or raise it.  Those were the numbers that
18   we were given.  Take it or leave it or take a portion of it,
19   but please let the governor, let me, and let other people know
20   what our needs are in Los Angeles.  And please let us work
21   together from the City perspective if we can sequence these in,
22   if you want some of these, Kevin, quickly enough so that we're
23   not wasting time by either finding professionals who we don't
24   have to get in here, because then let's get some up to Oakland
25   and help the governor.  Okay?  Let's not let them sit for six
```

The time markers in the left margin: 11:07AM (line 5), 11:07AM (line 10), 11:07AM (line 15), 11:07AM (line 20), 11:08AM (line 25).

```
     1   months.
     2           Now, anybody in the audience, this is -- come on
     3   down.  You tell me and give me a better price for units of this
     4   type.
11:08AM 5         MS. SOBEL:  I have a question.
     6           THE COURT:  Okay.  Now, hang on, Carol, I promise
     7   you you'll have all day and night.  I want to hear from the
     8   audience.  I want to even hear from the press.  You guys are
     9   covering this, and gals.  Give me a better price.
11:08AM 10          Okay.  Then either go with trailers or they come
    11   back with some alternative or cheaper solution.  Tell me why
    12   it's better.  Tell me why hotel rooms are going to work.  While
    13   they might in the interim, how in the heck are we going to
    14   eventually service those hotel rooms with professionals going
11:08AM 15  place to place?  And aren't we wasting money in the long run by
    16   not having transitional and long-term supportive centers that
    17   we need anyway?  So for God's sake, if the governor's helpful
    18   and going to give away money, and if President Trump -- can
    19   somebody get him on the line?  No, call Joe Grogan.  I tried
11:09AM 20  this morning.  I'm not kidding you.  Call him.  Then if they're
    21   serious about this, then let's take advantage of this god-awful
    22   situation and do something.
    23          So, Ken, I'm going to come back to you.  Anything
    24   else you want to say?  Because you got about 30 more seconds.
11:09AM 25  You did great.
```

58

```
 1              MR. PRICE:  Oh, I just think this is a full-service
 2    offering.  So you're not just throwing people into beds, you're
 3    getting them fed, you're making them secure, you're getting
 4    them treatment all on-site.  So this is a total solution, not
11:09AM  5    just a throw-them-in-a-bed solution.
 6              UNIDENTIFIED SPEAKER:  Ken, what's your last name?
 7              MR. PRICE:  Price.
 8              THE COURT:  Okay.  Paul.
 9              And by the way, we've got lots of photos.  I'm
11:09AM 10    not -- trust me, I'm going to remain a judge for the rest of my
11    life.  I don't care if you take it or not.  Just give me a
12    better alternative that works better for Los Angeles.  Ears
13    open.
14              Carol, you had one question?
11:10AM 15              MS. SOBEL:  One question.  Can we tell what the
16    square footage of each unit is?
17              MR. LEON:  Yes.  We have that.  We've got it.  We
18    have the footprint.
19              But I want to just clarify, Judge, that we're the
11:10AM 20    service providers.  So although Ken seems like a nice guy, we
21    said this is the price.  We've got to show its at cost because
22    we have contracts with DHS, L.A. Care, Orange County Health
23    Care Agency.  We're already at the front line and our beds
24    are -- DHS cleared some out because they're going to bring some
11:10AM 25    other people to our recuperative cares, but we've already been
```

59

```
  1   in contact with hospitals.  We anticipate by the weekend
  2   they're going to be full.
  3          And I used to be a critical care director at
  4   Saddleback and Orange County.  I already know their biggest
11:10AM 5   need right now is to clear the people that are healthy.  And
  6   this could be an option.  LifeArk could be an option.  Because
  7   this is going to be for months, to clear the hospital so then
  8   they can really use their ICU beds.  So far we've sent about 50
  9   people that we deemed -- and remember, we're medical
11:11AM 10  personnel -- that we deemed are significant.  They met the
 11   criteria.  And probably about 40 of them came back roughly as
 12   nonCOVID-19.  So it's just a huge problem we're going to have
 13   continuing forward.
 14          And as a provider, we're seeing both those as the
11:11AM 15  immediate answer to -- that we really need.  We're telling as a
 16   provider that not only can we use them now moving forward,
 17   December, January next year, we would have needed similar units
 18   like this to house, you know, roughly, give or take, 16,000 in
 19   L.A. and about 10,000 in Orange County.  So --
11:12AM 20         THE COURT:  Thank you very much.  In fact, there are
 21   schematics of the space, et cetera.  Remember, I don't care if
 22   you accept these or reject them.  Just make a decision, and
 23   then let's move on, if you want some of these or not.
 24          So now I want to turn to Nury Martinez.  You're the
11:12AM 25  council president.  It's a pleasure.  I wanted to --
```

60

1    And thank you for letting me get that presentation

2  on.

3    Let me turn to you.

4    MS. MARTINEZ:  Thank you very much, Judge.  One

11:12AM 5  thing about me, and I hope through this whole process you and I

6  can become friends, I don't mince words and I'm very direct in

7  terms of not only what I believe the leadership of this council

8  is trying to do with this homeless crisis, but also to give you

9  an indication of how our neighborhoods and our communities are

11:12AM 10  heavily impacted by this crisis that's been going over the last

11  couple of years.

12    And so for me, I think the mayor has already covered

13  what the City is doing.  These -- two days ago when we had a

14  council meeting, we appropriated $20 million for our COVID-19

11:13AM 15  crisis.  Over the last couple of years through the commitment

16  of this council and the voters of the City, we voted on

17  Measure HHH, which you are well aware about, and we have now --

18  our goal is to build almost 10,000 units of housing.  I want to

19  say that 10 out of the 15 council districts have already met,

11:13AM 20  if not exceeded the 222 pledge, which basically we took 10,000

21  units of housing, divided it by 15, and that was our pledge to

22  at least build 222 units of housing in each council district.

23    I am adamant -- and I don't mince words -- I am

24  adamant that all communities need to provide a homeless

11:13AM 25  solution.  Historically, some parts of our city have not shared

1  the same responsibility and we are overwhelmed.  Particularly,

2  those communities or districts -- communities of color and

3  districts that -- who have historically have had to deal with

4  environmental justice issues.  Basically, every and any other

11:14AM 5  facility that no one else wanted in the City, it gets built in

6  these communities.  So if we are going to do this, we need to

7  do it fair and we need to do it equitable for everyone to share

8  in the responsibility.

9       We are in an era of NIMBYism, and I have to say that

11:14AM 10  my colleagues on the City Council have dealt with opposition,

11  with community pushback, and they have stood up to some of

12  those oppositions and moved forward with some of these

13  permanent supporting housing projects and their district.  That

14  needs to be recognized.  We need to do more of that and we need

11:14AM 15  to ensure that as a city, we're committed to doing this and

16  sharing the responsibility of solving this crisis.  You know,

17  it's a decent thing to do and we're up to the obligations to

18  make sure that we fulfill those commitments.

19       THE COURT:  I want to thank you.  And that equitable

11:14AM 20  responsibility is critical.  No community can feel that they're

21  being disproportionately harmed.  By the same token, if

22  everybody does whatever they've got there, then if one

23  community has more, that's the problem.  If another community

24  has less, that may be good for that community.  But unless they

11:15AM 25  cooperate, there's going to be an unintended consequence of

```
          1   migration for some of these communities who so far have felt

          2   relatively distant, and we're seeing that in some portions of

          3   Orange County where there's been an influx towards our beaches

          4   and some other locations that have been unintended by some of

11:15AM   5   those communities that didn't step up as quickly, let's say, as

          6   others.

          7             MS. MARTINEZ:  That's correct.

          8             THE COURT:  And so I want to thank you.

          9             I want to turn really quickly to The Salvation Army.

11:15AM  10             MS. MARTINEZ:  One more thing, Judge, if I may.  I

         11   know that Chief Terrazas is also here in the audience --

         12             THE COURT:  Oh, thank you.

         13             MS. MARTINEZ:  -- from our fire department.  They

         14   need to get back to deal with our Coronavirus crisis --

11:15AM  15             THE COURT:  Chief, I want to recognize you --

         16             MS. MARTINEZ:  -- so I want to recognize him if he

         17   has anything.

         18             Chief, do you want to come up?  Because I know our

         19   first responders are heavily being impacted by this crisis, and

11:16AM  20   I want to recognize him and give him the ability to be able to

         21   go back to work because I know you have a full plate.

         22             THE COURT:  Chief, we're getting you back to work

         23   right now.

         24             MS. MARTINEZ:  Thank you, sir.

11:16AM  25             CHIEF TERRAZAS:  Thank you, President Martinez.
```

UNITED STATES DISTRICT COURT

63

```
  1    Thank you, Your Honor, for allowing me to be here.
  2            I think public safety has an important role in this
  3    whole effort.  Just to give you an idea of the numbers that we
  4    deal with on a regular basis, we run 1350 emergency incidents
11:16AM 5  every 24 hours in the City of Los Angeles.  Of that 1350, about
  6    11 percent is to our homeless population.  We transport about
  7    600 people to the hospital every 24 hours.  Of that number, we
  8    transport about 14 percent of our homeless population to the
  9    hospitals.
11:16AM 10          I think bringing the homeless into shelters is going
 11    to help us.  They're going to be protected from the elements.
 12    They're going to be congregated together instead of spread out
 13    throughout the city.  And we should have a healthcare component
 14    on-site at these shelters so we can catch these issues, these
11:17AM 15  medical emergencies while they're still minor.  So we're here
 16    to do whatever is necessary to support the effort.
 17            THE COURT:  And we're going to extend that courtesy
 18    back from the bench.  I don't want you to be chilled.  I think
 19    you're the first responders and it's amazing that I'm capable
11:17AM 20  of social distancing.  I'm privileged and lucky and fortunate,
 21    but that homeless population isn't.  And guess who's responding
 22    to it?
 23            CHIEF TERRAZAS:  We are, Your Honor.
 24            THE COURT:  Yeah, just like the military, you're
11:17AM 25  right on the front line.
```

64

                CHIEF TERRAZAS:  Yes, sir.

                THE COURT:  And so, you know, anything that we can

do, you've got that pledge right back.  We're not going to be

an obstacle.  We're going to give you hopefully a parameter so

so the plaintiffs and defendants here can operate in good faith

within that parameter, and you get the necessary nonimpediment

and nonchilling effect just immediately.  Okay.  And the same

thing to the police chief.

                But I want to follow with Kevin De Leon for just a

moment because he's got a -- and I apologize to The Salvation

Army because he's got the most impacted area, which you

commonly refer to as Skid Row.  So Kevin?

                CHIEF TERRAZAS:  Yes, sir.  Am I excused,

Your Honor, or would you like me to --

                THE COURT:  Listen.  A long time ago.  I humbly

can't thank you enough.  You've got really important things to

do.  Let me hammer this out with the plaintiffs and defendants

later tonight.

                CHIEF TERRAZAS:  Yes, sir.

                THE COURT:  And phone's open, okay?

                CHIEF TERRAZAS:  Thank you very much.

                THE COURT:  Pleasure.

                CHIEF TERRAZAS:  Thank you.

                MR. DE LEON:  Thank you very much, Judge David

Carter, Judge Birotte, as well as the fellow judges here

         1    present today, I want to thank everyone who's had the
         2    opportunity to present to you.
         3          Judge Carter, it was indeed an honor and pleasure,
         4    quite a kick, actually, a few years ago to work with you and
11:18AM  5    the dilemma in Orange County with regards to the housing
         6    homeless crisis.  But it was a real honor -- it was a real
         7    honor, once again, to touch base with you again.
         8          I am a senate president emeritus of the California
         9    State Senate.  I am an aspirant to say that hopefully sometime
11:19AM 10    soon within the next few weeks I can call myself council
        11    member-elect of CD 14.  And CD 14 is also the epicenter of the
        12    homelessness crisis not in the City of Los Angeles, but
        13    actually in the United States of America.  There's not one city
        14    in America that can claim the most number of unhoused
11:19AM 15    individuals, any particular geographical area, than Skid Row
        16    specifically in CD 14.  If we walk out this U.S. federal
        17    building, this beautiful brand-new federal building, just down
        18    the street past Little Tokyo, we will be in Skid Row, and it's
        19    unlike anything we have ever seen there.  In fact, let me say
11:19AM 20    this --
        21          THE COURT:  In fact, you're going to take me down
        22    there, aren't you?
        23          MR. DE LEON:  We're going to go together.
        24          THE COURT:  That's right.
11:19AM 25          MR. DE LEON:  And you said you wanted to go at 4:00

 1   or 5:00 in the morning, so...

 2          Let me say that a few months ago I took some family

 3   members down to Skid Row purposefully.  And as we were driving,

 4   my family members said, who are not from Los Angeles --

 5          **(Speaking in Spanish.)**

 6          "This cannot be.  This is incredible.  This is the

 7   City of Los Angeles."  Which to another relative in the van

 8   said --

 9          **(Speaking in Spanish.)**

10          "This looks like the third world."

11          To another family member corrected that family

12   member and said, "That's an insult to Third World nations to

13   say something like this.  In one of the wealthiest cities,

14   clearly in the wealthiest state, in the wealthiest nation in

15   the world, obviously, this leaves an indelible mark of shame

16   and it wounds our civic pride as Angelenos, as Californians,

17   and as Americans.  And I think as Kathy Barger, who just said a

18   few moments ago before she left, "This is all hands on deck."

19          I appreciate our great mayor, Eric Garcetti, who I

20   know him and his staff have been on this 24/7 as well as our

21   new council president, Nury Martinez.  And before I want to

22   just share a few -- just a couple minutes, but I do want to

23   emphasize what Council President Nury Martinez just mentioned a

24   few moments ago.

25          This is about equity.  And those communities that

```
 1   have been disproportionately impacted by poverty, lack of
 2   parks, lack of open space, a dearth of supermarkets, fresh
 3   food, freeways, deep-entrenched poverty, gentrification
 4   displacement, these communities also to -- through Council
11:21AM 5   President Nury Martinez's comments have to be treated through
 6   the lens of equity, and how we distribute this issue throughout
 7   the City and County of Los Angeles.  So therefore, I say it is
 8   all hands on deck.
 9        Let me say the following, Judge Carter, is one is --
11:21AM 10   and I think it was mentioned here a few moments ago.  This is
11   about leadership and accountability.  And the reason why I say
12   leadership and accountability is that taxpayer dollars are
13   finite.  HHH, I'm the author of "No Place Like Home."  That's
14   $2 billion that are coming down the pipeline to build permanent
11:22AM 15   housing solutions.  Those are finite dollars.
16        It is ultimately up to the citizens of the City, the
17   County, and the state of California to make that determination
18   if, in fact, they'll continue to fund housing programs.  We
19   need value to get volume because the crisis that we have.  You
11:22AM 20   cannot have extraordinary amounts of dollars being spent,
21   therefore, politically, you have an electorate saying if we're
22   spending 500-, 600-, $700,000 per unit on permanent housing
23   solutions, I can't afford to purchase with a great FICO score
24   with any capital to put down as a down payment to get into a
11:22AM 25   condominium or a townhouse.
```

68

```
      1              So you run the risk of alienating the electorate.
      2    Because as mayors know, as our great council member Nury
      3    Martinez, and our Mayor Eric Garcetti knows, budgets are tied
      4    up for fire and police, Department of Transportation, city
11:23AM 5    parks, after-school programs, and so forth.  So your wiggle
      6    room is limited to nonexistent.  Therefore, you have to go to
      7    the electorate to ask for money, whether it's a government
      8    bond, whether it's an enhancement on a tax revenue.
      9              And if the electorate themselves are saying, "I'm
11:23AM 10   done, that's it," then we're going to be in a heap of trouble,
      11   even more so, than the current situation today.
      12             I would differ with regards to the chief when he
      13   said -- when he described the worst-case scenario.  The
      14   worst-case scenario is what is happening today present in
11:23AM 15   realtime.  That is the worst-case scenario.  We have tens of
      16   thousands of men and women, increasingly children, who are
      17   living on our streets every single night.
      18             To that, I want to say the following:  The question
      19   is, can we build what I authored, Senate Bill 100 RPS,
11:24AM 20   Renewable Portfolio Standard, which clearly says to utility
      21   companies you must by a certain year have X amount procurement
      22   of renewable energy.  I think for leadership and
      23   accountability, and to have the teeth that's built in, city
      24   governments throughout California, especially in Southern
11:24AM 25   California, have to have a legal mandate.  We will build X
```

1    amount of housing units, and the question is by when.

2              THE COURT:  By when.  Okay.

3              MR. DE LEON:  How many units and by when which is

4    absolutely critical.  Because if we don't have the legal teeth,

11:24AM 5    then we'll be in litigation after litigation after litigation.

6    The *Boise* decision, the *Mitchell* decision, all of these

7    lawsuits that are coming down the pipeline today right now.  If

8    we're all hands on deck by using the money that we have today

9    in the most prudent manner, we can resolve this crisis.

11:24AM 10             THE COURT:  And let me share something with you.

11   One of the best things that's happened through the settlements

12   and the consent decrees with the 21 cities is that in 18

13   months, we've had two issues that were resolved by Judge Smith

14   that took 15 to 30 minutes each.  And that wasn't necessarily

11:25AM 15   satisfactory to all parties, but we have absolutely flattened

16   the litigation.  That is money that you can be spending that

17   normally goes out for litigation purposes that's devastating

18   and, quite frankly, could be better spent in other ways.

19             So that's one of the good things.  Maybe a city

11:25AM 20   attorney or law firm might not be as appreciative of that, but

21   we have flattened the litigation in our part of the world.  And

22   it's caused two things, our ability to move forward.

23             Kevin, hypothetically, I'm going to offer you 4,000

24   trailers.

11:25AM 25             MR. DE LEON:  I will say this --

         1          THE COURT:  No, hold on.  Hypothetically, I want you

         2    to walk me through that.  How are you going to get the permits?

         3    How are you going to hook them up?  And how long would it --

         4    and you don't have these answers yet, so you don't have to

11:25AM  5    respond today, but are you interested?

         6          MR. DE LEON:  I am absolutely interested.  I don't

         7    have the legal or political authority to accept these units,

         8    but I do have the moral authority as a constituent of CD 14 and

         9    as a constituent --

11:26AM 10          THE COURT:  So if we can get them here

        11    hypothetically in seven days and without the City's help, if it

        12    took 30, 60, 90 days to hook up, but hypothetically, if my dad

        13    were still alive and he got in his long-haul rig and he drove

        14    down here -- see, he used to go from Portland to Detroit down

11:26AM 15    to L.A. to deliver cars -- back to see mom and me, and made

        16    that circle.  Okay?  So North Dakota, no big deal.

        17          All right.  Now, you arrive with 4,000 units out

        18    here at the -- either the train station or you arrive -- if

        19    they're overland.  I think it's become a real problem in terms

11:26AM 20    of well-intended bureaucracy because we take it to an office,

        21    the person does a good job looking at it, but the one miracle

        22    that I saw with Michele Martinez in Santa Ana and Anaheim and

        23    the rest of these cities was they actually took that

        24    inspectorate and put it right on-site.  And it didn't go to an

11:27AM 25    office.  They signed off as they went if it was appropriate.

```
         1    And if not, they corrected it.  That's the realtime action we
         2    need because this doesn't have to take 90 days.
         3            And that's why I kind of rudely, and I apologize to
         4    Ken and Paul, cut them off when I said 90 days is too much.
11:27AM  5    Because we've talked about a much shorter period, if we get the
         6    cooperation of the City, because we watched it work before.  So
         7    it's nothing new.  We're not inventing something.  We've just
         8    sat there and watched the time cut in two-thirds, just slashed.
         9            MR. DE LEON:  Well, I would say, Judge Carter, in
11:27AM 10    that I think that city/local governments have to identify
        11    city-owned real estate portfolio assets that are
        12    underappreciated, undervalued, underused.  So those are real
        13    estate locations where we can immediately --
        14            THE COURT:  Okay.
11:27AM 15            MR. DE LEON:  -- find the housings.  And
        16    specifically, I think when it comes to planning departments, we
        17    have to cut the red tape and roll out the red carpet.
        18            THE COURT:  I have to depend upon you to do that.  I
        19    don't want to tell folks the date we're going out there.  Call
11:27AM 20    me at home again.
        21            MR. DE LEON:  I'll give you a call.
        22            THE COURT:  Okay.  4:30, 5:00, 5:00 o'clock, and
        23    we're out there; right?
        24            MR. DE LEON:  We'll do it together.
11:28AM 25            THE COURT:  In a very short period.  Because I don't
```

```
         1    want the press with us or anybody else.  We'll just quietly go
         2    out there.
         3              MR. DE LEON:  We'll go out there in cognito.
         4              THE COURT:  By the way, I used to be here in the
11:28AM  5    Mexican Mafia case for two years so I used to run down through
         6    Skid Row every day.  So I know it.  I just want to relook at it
         7    again.  I wasn't -- haven't been there for a while.
         8              MR. DE LEON:  Okay.
         9              THE COURT:  Kevin, thank you very much.
11:28AM 10              MR. DE LEON:  Thank you very much.
        11              THE COURT:  Give me a call.
        12              MR. DE LEON:  Just one last -- I will take those
        13    units right there, as many as we can --
        14              THE COURT:  Okay.
11:28AM 15              MR. DE LEON:  -- for CD 14 at least.
        16              THE COURT:  Okay.  Then we'll work out the
        17    sequencing and stuff.
        18              MR. DE LEON:  Okay.
        19              THE COURT:  Fair enough, Kevin.  Thanks a lot.
11:28AM 20              Okay.  I want to call on Salvation Army for a
        21    moment.  General, you've come down.  I know you don't go by
        22    "general," I just promoted you.  Thank you.  Introduce yourself
        23    to the audience really quick, tell me your capacity, and then
        24    get back to the front line as a first responder.
11:28AM 25              COMMISSIONER HODDER:  Thank you very much, Your
```

73

```
        1   Honor.  It's a privilege to appear before you today.  My name
        2   is Commissioner Kenneth Hodder.  I'm privileged to serve as the
        3   territorial commander for The Salvation Army USA Western
        4   Territory, all of its operations from the eastern border of
11:28AM 5   Colorado to Guam and Saipan.
        6            I'm accompanied today by Lieutenant Colonel John
        7   Chamness, who is the divisional commander for the California
        8   South Division, and by Captain Nursen Keyston (phonetic) with
        9   whom I know you had the opportunity to work when you were doing
11:29AM 10  your fine work in Orange County.
        11           Your Honor, as you know, The Salvation Army has been
        12  passionate about the issue of homelessness since its founding
        13  in 1865.  We have 155 years of experience in this area.  It is
        14  at the very core of what The Salvation Army does.  In the last
11:29AM 15  few years, of course, we've hit an explosion in this problem.
        16  We determined, therefore, last year that we were going to
        17  double our capacity to improve the lives of the homeless around
        18  the Western United States within five years.
        19           THE COURT:  Now, just a moment.  My colleagues in
11:29AM 20  Portland, Seattle, and San Francisco are very interested in
        21  what's happening in court today.
        22           COMMISSIONER HODDER:  Yes, sir.
        23           THE COURT:  So you're about to speak far beyond
        24  Los Angeles for a moment.  There's a network of judges out
11:29AM 25  there who want to be, let's say, helpful.  And that may be best
```

**UNITED STATES DISTRICT COURT**

1  in a collaborative sense, as long as it's within reason and the

2  parties being involved, instead of you guessing what we're

3  about to do a year from now.  Can you add to this capacity?

4  You've heard today some representations that were made, you've

11:30AM 5  heard the issues and problems about sequencing, et cetera.  Can

6  you add to the capacity in Los Angeles?  And if so, tell me

7  how.

8          COMMISSIONER HODDER:  Your Honor, within 24 hours,

9  we can add 80,000 square feet of facility available in Bell for

11:30AM 10  triage purposes.  Within 24 hours under your direction, we'll

11  have an additional 27 properties which are closed Salvation

12  Army thrift stores.  By instruction, I closed all of them

13  yesterday and repurposed them for purposes of serving the

14  homeless and those who are vulnerable in the Coronavirus

11:30AM 15  crisis.

16          THE COURT:  Okay.  Repeat that very quickly.  And

17  then Mike and certainly our district attorney, Jackie, I'd like

18  to call on you.  I'll get you back on the front lines.

19          Okay.  I want you to repeat that.

11:30AM 20          COMMISSIONER HODDER:  Certainly, sir.  Subject to

21  appropriate governmental approvals and the necessary funding,

22  we can make available 80,000 square feet in Bell for purposes

23  of indoor sheltering, for isolation purposes, or for triage.

24  In 24 hours, we can also make two of our camps available in the

11:31AM 25  Calabasas area that will provide recuperative recovery care and

75

```
 1  it will also provide isolation services for those who perhaps
 2  have already tested positive for Coronavirus, again, within 24
 3  hours.
 4          We have more than 60 properties here in Los Angeles
11:31AM 5  County that The Salvation Army will make available for any use
 6  that any municipality feels is most appropriate to respond to
 7  the crisis.  We can have all of those ready in 24 hours.  Store
 8  personnel that have been working in Salvation Army stores will
 9  be available to provide additional personnel.
11:31AM 10          THE COURT:  So you're going to switch those out of
11  the stores into the field?
12          COMMISSIONER HODDER:  Yes, sir.  We'll just bring
13  them right in.  And all of those facilities, sir, will be led
14  by trained Salvation Army officers.
11:32AM 15          THE COURT:  Okay.  You've done an outstanding job in
16  Anaheim, first, is where we've been working with you.  And on
17  every occasion, I want to pay a compliment to you.  The
18  homeless have actually come to believe that you're one of the
19  premiere, if not primary programs, that they tend to stay in.
11:32AM 20  And that's quite frankly because of some of your rules and
21  rigidity, which they're not rejecting.
22          Now, I want to walk through this again.  80,000
23  square feet.  Give me specifics.  Who do you need to talk to?
24  What do you need?  How do you get this up and running?
11:32AM 25          COMMISSIONER HODDER:  We would like to work through
```

UNITED STATES DISTRICT COURT

```
 1    LAHSA so as to --
 2               THE COURT:  Hold on.  Where's LAHSA?
 3               UNIDENTIFIED SPEAKER:  Right here.
 4               THE COURT:  Thank you.  Come on up.  LAHSA's coming
11:32AM  5    up.  There she is.  Hold on.  Have we have a chance to talk
 6    yet?  And that's not fault finding because I want to see a big
 7    hug -- just kidding you.  Get six feet apart.
 8               COMMISSIONER HODDER:  It's a pleasure to meet her
 9    this morning.
11:32AM 10               THE COURT:  Well, there's no problem.  That's why
11    we're here.  Say hi to each other.
12               COMMISSIONER HODDER:  Good morning.
13               UNIDENTIFIED SPEAKER:  Good morning.
14               THE COURT:  Good.  Now give each other your phone
11:33AM 15    numbers.  Write down your phone number.  Write down your phone
16    number for each other.
17               COMMISSIONER HODDER:  We will, indeed.
18               THE COURT:  Yeah, right now.  Good.  Now exchange
19    the phone number.  Now, hold on.
11:33AM 20               So we don't know when, but I would love to be able
21    to go out and see these 80,000 feet, so would you and so would
22    the public, although they can't go, operational; right.
23               COMMISSIONER HODDER:  Yes, sir.  At the present time
24    on that site, we already have one of the largest shelters in
11:33AM 25    L.A. County.  The Bell --
```

```
         1          THE COURT:  I know about it.  Harry Pregerson, I
         2  think, was involved.
         3          COMMISSIONER HODDER:  Yes, sir.
         4          THE COURT:  Yeah, he took me down there years ago
11:33AM  5  and I wish Harry was with us now.  He would be a fabulous
         6  asset.
         7          Okay.  I don't know what you have to do and I'm not
         8  going to take the time to hammer that out.  But I would like to
         9  get back to you not in a huge setting like this, but on a phone
11:33AM 10  call.  Okay?  If I could be of help, great.  If I can't be of
        11  help, get me out of the way.  In other words, you don't need a
        12  lookie-loo coming in and interfering with professionals.
        13  You're on the front line shooting bullets right now.
        14          But by the same token, I'm going to be asking why
11:34AM 15  that isn't up and running.  And so I don't want to get into the
        16  particulars, I don't have time.  I need my first responders
        17  back.  But the next meeting will be why isn't this up and
        18  running?  And I want names of why it's not.  Okay?  But today,
        19  we're all happy.  Next time, I'm not sure we're happy.  Okay.
11:34AM 20          Now, what else are you going to do for us?  You've
        21  got 80,000 feet.  I want to hear the next one.
        22          COMMISSIONER HODDER:  Next place, sir, would be the
        23  repurposing of all of our closed Salvation Army thrift stores.
        24  We will be ready to clear those out so as to make them
11:34AM 25  available for --
```

78

```
 1            THE COURT:  Give me an idea of capacity.  In other
 2    words, what am I talking about?  Am I talking about a hundred
 3    people or am I talking about a thousand people?  A rough
 4    guesstimate.  And I'm not holding you to exactness, but tell
 5    Eric and his staff what kind of capacity we have out here in
 6    our communities.
 7            COMMISSIONER HODDER:  Each store would have
 8    approximately 12- to 15,000 square feet of area.
 9            THE COURT:  Wow.  Time out.  Now, if you made that
10    available and I was in a smaller city like La Puente or
11    Rosemead or hypothetically some city who might have come in,
12    and I don't have any money and I heard that I could get a
13    Salvation Army site that I formerly couldn't afford, then I
14    need to go to somebody for provider services, because in the
15    past our smaller cities are afraid to put in a building,
16    because after they spend their 1 or 2 million -- right, Joe? --
17    out in Whittier or 3 million, they have no guarantee of
18    provider services, so they're searching for 1.5 or $1.2 million
19    each of the succeeding years.  They can't get started.
20            If you could do that, the end result would be a lot
21    of these cities would now cut their costs in half, and they
22    just have to go back to whomever for provider services.  I
23    mean, that would be a huge benefit to kick start these for the
24    cities because you're everywhere.  I drop off stuff at
25    Salvation Army a lot of times.  So does my wife.
```

Case 2:20-cv-02291-DOC-KES Document 894-3 Filed 03/08/25 Page 83 of 114 Page ID #:11570

```
 1              Okay.  So how do we get these locations?  How do we
 2    know at least in the Southern California area, let's just say
 3    Los Angeles, let's say the southern cities of Los Angeles or
 4    the valley, I don't care, how can we get these sites to LAHSA,
 5    and then how could we coordinate --
 6              Where's Juan Garza?  Juan?
 7              -- how could we coordinate as the president of the
 8    League of Cities --
 9              Come on up.
10              -- and how could we coordinate, Nury, through your
11    agencies getting our cities, these individually scattered small
12    cities who have a hard time, together with these potential
13    sites that they're offering for free and maybe even some
14    professional intake help because we're transitioning -- you
15    know, Salvation Army, I mean, this -- if this worked, this
16    would be a godsend.  You'd have immediate structures up and
17    ready to go with some kind of professional.  Even if we don't
18    have the nursing staff we need, it's better than what's
19    happening now.
20              MS. MARTINEZ:  Do you have a number of Salvation
21    Army stores?  How many are there?  Do you know where they're
22    located?
23              COMMISSIONER HODDER:  In Los Angeles County we have
24    17.  In Orange County we have 10.  We have approximately -- and
25    speaking to those in Portland and Seattle, we have about
```

80

```
 1   another 100 stores that would be available.

 2          THE COURT:  I'll be on the phone with my colleagues

 3   after this up in Portland and Seattle.  But right now, 17 L.A.?

 4          COMMISSIONER HODDER:  17 L.A.

11:37AM 5          THE COURT:  And we can give those designations to

 6   Nury?

 7          MS. MARTINEZ:  17 L.A. City or L.A. County?

 8          COMMISSIONER HODDER:  They're L.A. County.

 9          THE COURT:  That's why I've got Juan up here also on

11:37AM 10  behalf of the cities.  We need to find out where these are.

11   And if we can really transition these into dropping off, you

12   know, things for the folks and transition these, we'd have 17

13   new locations.

14          I don't care whether we call it city or -- cities or

11:37AM 15  the Downtown L.A. area, it's got to be a benefit to all of us

16   in breaking down these barriers; right?

17          COMMISSIONER HODDER:  Yes, sir.

18          THE COURT:  Now, how do we get what you want to call

19   a tickle date, what I call a drop-dead date where we just don't

11:37AM 20  talk about it but we're responsible by phone or in person in a

21   much smaller group getting back together in a timeline that

22   either gives us a yes or a no?  How do we make that progress?

23          Okay.  Time out.  Go talk about that for a moment.

24   The next presentation, come back with a plan in a few moments

11:38AM 25  about some schematic of getting us together in a time frame
```

81

that's reasonable to make that kind of decision so we don't go
back to our offices and just kind of, you know, do our job, but
we don't get together.  There's a wonderful corner.  Stay six
feet apart or jump in there with the press.  They'll love that.

11:38AM    COMMISSIONER HODDER:  Thank you, Your Honor.  We
will do so.

   THE COURT:  Okay.  Here we go.

   Okay.  District Attorney Jackie and whatever you'd
like to say, please.

11:38AM    MS. LACEY:  Thank you.  First of all, just from an
entertainment point of view, it's great to see a federal judge
cut elected officials off.  I've never smiled so much.

   THE COURT:  Well, usually my attorneys cut me off,
and so --

11:38AM    MS. LACEY:  Only you can do that, so that's really
good, because you're making people get to the point.

   Here's just a brief thing I want to say.  Does the
340 million number include services?  Because without
services --

11:38AM    THE COURT:  Great.  I don't think it does.

   MS. LACEY:  I don't think it does either.

   THE COURT:  Hold on.  But Paul and Ken, come on up
here.

   Jackie, let's get those answers.  That's a great
11:38AM question.  I didn't think it does.  Just what's the bottom line

82

```
        1   to get X amount?  If we can't afford it, can we do half of it?
        2           MS. LACEY:  Right, Your Honor, because we don't need
        3   a timeshare presentation.  We need to get down to brass tacks.
        4           THE COURT:  Let's find out.  There they are.  What's
11:39AM 5   real and what's not?
        6           MR. LEON:  So our services, we are already working
        7   with DHS.  We're just looking for capacity.  And so we already
        8   provide services.  So they're already paid for in different,
        9   you know, venues by different contracts.
11:39AM 10          So the problem that we have is that we have clients
       11   or patients that are funded, but we don't have anywhere to put
       12   them or for our nurses and our case managers to work.  So...
       13          THE COURT:  So the funding -- I keep hearing,
       14   Jackie, that we've actually got the funding out there.
11:39AM 15          MS. LACEY:  Yeah.
       16          THE COURT:  What we don't have is let's get together
       17   because we're so large, quite frankly and, you know --
       18          THE WITNESS:  Right.  Right.  My next question is
       19   will they house people who are infected?
11:39AM 20          THE COURT:  Well, let's find out.
       21          MS. LACEY:  That's fine.
       22          THE COURT:  Because that's one of the things I like
       23   about the trailers is that we can separate out with the
       24   trailers so I could use them for two purposes.
11:39AM 25          MS. LACEY:  Right.
```

**UNITED STATES DISTRICT COURT**

83

         1          THE COURT:  Not homelessness, but I could also get

         2    those over to the medical community where we were sorting out.

         3    And maybe we had one trailer with OVID [sic] whatever, and I

         4    also like the fact that we weren't putting 10 or 15 people in

11:40AM  5    the same room whenever CDC gives us direction.

         6          MS. LACEY:  Right.

         7          THE COURT:  Can somebody call CDC and get some

         8    direction?  I'm just kidding.

         9          MR. LEON:  They can be converted any way.  And

11:40AM 10    they're actually perfect because the fact that you could use it

        11    isolation, we could do triage, we could break them apart.

        12          THE COURT:  Yeah.  Come on up.

        13          MR. LEON:  And again, they're temporary.  However,

        14    once they're done, we can continue to use them in different

11:40AM 15    capacities.  That's the difference from having just a trailer.

        16    They're temporary.  And then we already have permanent

        17    supportive housing coming in the back of ours.

        18          THE COURT:  Jackie, I promise you, it's a lot of

        19    money, but the money really isn't the problem.

11:40AM 20          MS. LACEY:  Right.  No, I agree.

        21          THE COURT:  Long term it's not really the money,

        22    believe it or not.

        23          MS. LACEY:  Well, so is it the RFP process?  Can

        24    these things be done --

11:40AM 25          THE COURT:  Well, let's find out, Jackie.  Hold on.


**UNITED STATES DISTRICT COURT**

84

```
 1    Come on back up here.
 2            MS. LACEY:  The request for proposal, does it have
 3    to be competitive bidding for the City to accept?
 4            THE COURT:  Mike, do we have to spend a whole lot of
11:41AM 5    time spending out for 30 people -- you know, 30 days or 60 days
 6    while people die?
 7            MR. FEUER:  In the emergency, competitive bidding is
 8    not required.
 9            THE COURT:  Bingo.
11:41AM 10           Jackie, see what I mean?  We've got an answer now.
 11   Mike is not going to stand in our way with competitive bidding
 12   because we've got an emergency so we don't have to take that
 13   normal 30-, 60-day timeline.
 14           Mike, thanks.
11:41AM 15           MS. LACEY:  Right.  Right.  So hypothetically
 16   speaking, let's say L.A. County was getting ready to release a
 17   certain percentage of inmates in response to this emergency.
 18   Okay?  Some of those people are going to be homeless.  So we're
 19   getting them out of the jail.  Will we be able to get them into
11:41AM 20   some of this housing?  Is there going to be housing set aside
 21   for the justice involved?
 22           THE COURT:  Great question.  That's why I asked the
 23   police chief to come over today.  Look, they've got a tough
 24   decision to make, and that's a decision I'd love to hear
11:41AM 25   between you and the police chief, and I don't want to put you
```

```
 1   on the spot.
 2              MS. LACEY:  Right.
 3              THE COURT:  Because as the jails are down loaded
 4   because they're worried about taking in a COVID-19, by the same
 5   token, where are they going to go?
 6              MS. LACEY:  That's right.
 7              THE COURT:  And then the public's going to say, and
 8   they should, "Hey, I've got all these homeless running around
 9   down here."  And by the way, you downloaded the jails, and why
10   aren't they in jail because they're loitering, camping,
11   defecating and, by the way, committing some robberies and
12   shooting some dope?  And now the police chiefs is really in a
13   tough bind as he's trying to keep his jail population pure.
14              Come on up, representative.
15              MR. LEON:  I just want to mention that --
16              THE COURT:  Hold on.  Hold on.  Hold on.
17              Jackie --
18              Hold on.  Hold on.  Wait.  Paul, you got it.
19              So, Jackie, that's a really hard, tough question.
20   And the second thing is the courts.  Hey, are the courts going
21   to do, what I would think from the plaintiffs' perspective,
22   what I call a turnaround?  If somebody was arrested and they,
23   you know, were loitering or being homeless, then the end result
24   is if we had these old loitering laws, do you really take them
25   into custody for two days and let them out?
```

86

```
 1              MS. LACEY:  No.

 2              THE COURT:  See, the courts are going to have a very

 3    difficult -- because I used to be a state court judge.  Jim was

 4    my presiding judge.  We're going to have a very tough problem

11:43AM  5    back, Phil, on the state court side if we were still there.

 6    Andre, you know, we're going to turn these people right back?

 7    I mean, it's a heck of a problem.  So I leave that to the

 8    professionals because I don't have the answer to that.

 9              MS. LACEY:  Right.  So like I said, hypothetically

11:43AM 10    speaking, there may actually be more homeless people next week

11    out there, so...

12              THE COURT:  Absolutely, with no place to go, by the

13    way.

14              MS. LACEY:  So as a prosecutor who's concerned about

11:43AM 15    public safety, I would love it if these people had someplace to

16    live because that would cut down on them being rearrested.

17              THE COURT:  Have you asked the police how many

18    they're going to release?

19              MS. LACEY:  We're working on it.

11:43AM 20              THE COURT:  No, just go ask her.  She knows.  Just

21    step over and ask her.  No.  Quietly, not in front of me.

22              MS. LACEY:  She doesn't represent the sheriff.

23              UNIDENTIFIED SPEAKER:  I don't represent the

24    sheriff, Your Honor.  So the police only have a very short

11:43AM 25    term, and then they go into County jail.
```

**UNITED STATES DISTRICT COURT**

87

1          THE COURT:  Oh, and you're not the County?

2          UNIDENTIFIED SPEAKER:  Sorry.

3          MS. LACEY:  Right.  Yeah.

4          THE COURT:  Is the County here?

11:44AM  5          MS. LACEY:  So I think the sheriff might have a rep

6     here.  But I know they've identified 2,000 people who are in

7     there are nonserious, nonviolent that may be able to be

8     released.  So we're talking about that now.  So in terms of --

9          THE COURT:  Jackie, I'm going to leave that alone

11:44AM 10    for the time being.  Because I -- that's something to you

11    uniquely and there's -- you'll have to work out.

12          MS. LACEY:  Right.  Right.  Exactly.  So my only

13    comment is we just need to ask more questions.

14          THE COURT:  Get back and do your job.  But thank you

11:44AM 15    for the courtesy.  Okay?

16          And let me turn -- because I'm going to conclude

17    court in just a moment -- to Mike.  You've been very patient

18    with me.  Thank you for that wisdom concerning the emergency

19    and not having to go through an RFP.

11:44AM 20          And then, Bill, I want to get to you for a moment,

21    and then we're going to disband court.

22          MR. FEUER:  Your Honor, thank you very much for

23    convening this extraordinary session today.  As the Court

24    probably knows, I came to public life having directed that side

11:44AM 25    of legal services that provides free legal work to tens of

1    thousands of people.  And we emphasized for the first time in

2    the history of the organization reaching out to homeless

3    people.  I also served as a state legislature and a city

4    council member.

11:45AM 5         The roles there are different than the role I occupy

6    here, but the values remain the same.  So our office has a

7    program which is focused on in the "L.A. Times" over the

8    weekend that -- where we send a nurse, a substance abuse

9    expert, a mental health expert, and formerly incarcerated

11:45AM 10   caseworkers to the street to locations where homelessness and

11   drug possession offenses intersect to direct people to services

12   before they commit an offense.

13        We have a program we competed for and won a grant to

14   take over the County's homeless court program.  So we now have

11:45AM 15   convened dozens and dozens and dozens of sessions where we help

16   people, principally homeless people, eliminate outstanding

17   fines and citations and warrants in exchange for them agreeing

18   to connect to services to lift them out of homelessness.

19        We have been very aggressive on what's called

11:46AM 20   patient dumping, unlawful discharge of homeless patients to the

21   street, not only going after --

22             THE COURT:  Just a moment.  Thank you.

23             MR. FEUER:  For what it's worth, the principal goal

24   we have is not to be punitive.  The goal is to change medical

11:46AM 25   facility protocols so that no homeless patient is ever

89

1 unlawfully discharged.  And now we're collaborating with the

2 hospital association to achieve that.

3          We have a program in conjunction with the public

4 defender in courts where the offenders have serious mental

11:46AM 5 health issues to divert them immediately in a collaborative way

6 working across the lines of prosecutor and defense counsel to

7 get people the services they need rather than have them

8 languish in an incarcerated setting.

9          I could go on a number of very important programs,

11:46AM 10 many of which transcend the traditional role of a city

11 attorney.  But the crisis demands, as you pointed out, that we

12 transcend our traditional roles.  So for purposes --

13          THE COURT:  By the way, Mike, as uncomfortable as it

14 is, it's uncomfortable, in coming out of these traditional

11:46AM 15 roles, everybody's going to have to get uncomfortable in this

16 process.

17          MR. FEUER:  The least comfortable people are people

18 who have Coronavirus and/or homeless at the same time, the

19 numbers for which we do not know at this moment.

11:47AM 20          So -- but for today, the Court's focus today is on

21 the intersection between Coronavirus and homelessness.  And

22 it's not as though I stand here with a ready solution to deal

23 with that confluence, but I do want to say that our office has

24 been deeply involved in both collaboration with the mayor's

11:47AM 25 office and the City Council on an array of emergency measures.

90

                    We continue to be there for this particular purpose:
          To eliminate where possible impediments to action, to be sure
          that rules that may otherwise seem appropriate, if they can be
          circumvented in order to achieve the result of getting services
11:47AM   to people who desperately need them, we will try to find a way
          to do that.  Our role is in this crisis, with regard to our
          partners on the policy-making side, to get to the point of
          providing services as rapidly as possible with as few
          impediments as possible.

11:48AM           And so in addition to the outreach programs we
          engage in on the affirmative side to try to lift people out of
          homelessness in our purely legal capacity as the lawyers for
          the City Council and the mayor, we're going to working as we
          did over the past weekend day and night.

11:48AM           So, Your Honor, having said that, if you have
          requests of me and of my office --

                    THE COURT:  I'm making one right now.

                    MR. FEUER:  Yeah.

                    THE COURT:  In the past, historically, I'm really
11:48AM   good at telling you what you did wrong two years from now
          because I've got the hindsight and the wisdom of looking back
          at people who are struggling on the front line making tough
          decisions and making value choices that actually the courts
          might not agree with.

11:48AM           This whole scenario is changing in realtime because

UNITED STATES DISTRICT COURT

```
 1   if you wait for the courts, we have a chilling effect on you.
 2   You don't know what injunctive relief we're going to assign.
 3   You don't know what we're going to do.  You haven't seen the
 4   parties get together this afternoon.
11:49AM  5            I'm going to toss back to you that we need to be
 6   more helpful in going forward in this new dynamic so that the
 7   parties and the Court hammer out and get together with you so
 8   that you don't have a chilling effect.  You can move forward.
 9   You know what you can do within reason and you have input about
11:49AM 10   that.
11            And if you wait, Mike, that the problem's going to
12   be -- that the Courts are going -- or at least this Court's
13   going to have to change its shallow thinking to some degree and
14   be a little bit more listening to both parties, but a little
11:49AM 15   bit more demanding on them to really get together for the
16   public good and hammer this out and take off the litigation.
17            And I will pay a compliment to plaintiffs on both
18   sides.  I was told that -- and I told plaintiffs' counsel when
19   you go down the riverbed in L.A., we're going to have 20 1983
11:49AM 20   cases.  There's going to be a battle going on and a couple of
21   my litigants down in Orange County.  He said, "No, Judge,
22   there's not going to be."
23            And what they did is actually put down their sword,
24   and they went into the tents.  They got out in front of the
11:50AM 25   health workers followed by the police.  We didn't have one
```

92

incident in five days.  Let me repeat that.  I was astounded

and absolutely wrong.  And it was a great lesson about a

cooperative effort when the council finally got together.

Because unless they can get together today, I'm going to go

11:50AM  back to Orange County and do what I do best, and that is deal

with my cities down there.  But in a few moments, I'm going to

ask them if they want us involved, fine.  If they don't, just

go litigate and have a great day.

          So I think if we're still involved, we're going to

11:50AM  be getting together, but probably by phone, because I'm not

going to have another big tent meeting like this.  In fact,

knowing now, you know, we limited it to 50.  Let's get you back

to work.  Okay?

          MR. FEUER:  No, we'll trade you -- we'll trade cell

11:50AM  phone numbers, Your Honor.

          THE COURT:  Yeah.  Then they got to give me

permission and you permission to talk and trust, and then I'll

disclose to you what we're saying.  And we have to do that in

realtime, Mike.

11:50AM          MR. FEUER:  Yeah.  And let me conclude with this --

          THE COURT:  Oh, and I'll give you Judge Smith's

number.  No, I'm just kidding.

          MR. FEUER:  I already know Judge Birotte's phone

number.  And Judge Gutierrez is trying to shield his phone

11:51AM  number from me.

93

 1    THE COURT:  Let me give you both of them, then.
 2    MR. FEUER:  There you go.  But seriously for a
 3 second, the one -- you know, a couple key revelations that
 4 emerge from a conversation as broad as this.  One is there
 5 needs to be region-wide collaboration because homeless people
 6 don't know where the boundary is between Beverly Hills and
 7 Los Angeles and so on; right?
 8    THE COURT:  Right.
 9    MR. FEUER:  And region-wide sharing of obligation as
10 well.  You know, Ms. Martinez alluded to the importance within
11 the City of Los Angeles of shared commitments across council
12 district lines, across neighborhood lines.  The same argument
13 pertain with even more force with regard to the cities in the
14 broader region here, and that's going to require several
15 things.
16    And one thing is, as I conclude here, with regard to
17 the various proposals for -- I'll call them putting beds on the
18 street right now -- we do have to work collaboratively in the
19 larger system including with the state and ideally the federal
20 government, because if you crossed out $340 million for those
21 beds, for example, I have no idea what the service provision
22 costs are associated with that, let alone -- what the mayor's
23 office is doing right now is redirecting staff members from
24 throughout the City whose roles have been changed --
25    THE COURT:  Right.

94

1          MR. FEUER:  -- because of the emergency and putting

2     them for the first time in settings to assist homeless people.

3          THE COURT:  And we just heard that about the

4     Salvation Army which I didn't know until I heard this

11:52AM 5     presentation.

6          MR. FEUER:  Right.  But there is going to be a need

7     to assure that there is a supply of people to provide the

8     services of the police chief and what others have said are

9     necessary concomitants of this location of this housing.

11:52AM 10          So let's -- if we're going to think about working

11     together across jurisdictional lines, it has to be with real

12     common sense in a practical way, saying what's real in terms of

13     actually delivering an array of services in a setting that's

14     helping --

11:53AM 15          THE COURT:  Hold on.

16          Come on up, Salvation Army.  If you've had a

17     meeting.

18          Mike --

19          MR. FEUER:  Ken and I are law school classmates.

11:53AM 20          THE COURT:  No, I know.  But, folks, come on down

21     from LAHSA, whatever -- whoever wants to participate.  Colonel,

22     Captain, come on up.

23          Now, hold on, Mike.

24          Let's find out real quick, what's our solution here?

11:53AM 25     How are we doing?

```
         1              COMMISSIONER HODDER:  Based upon the conversations
         2    we've been having, Your Honor, we will have a final plan in
         3    place by Tuesday.
         4              THE COURT:  Excellent.  And who do I call to verify
11:53AM  5    that?  I believe you.
         6              COMMISSIONER HODDER:  The man here (indicating).
         7              THE COURT:  Okay.  So I'll see you in my court
         8    Tuesday at what time?
         9              UNIDENTIFIED SPEAKER:  What time do you want me?
11:53AM 10              THE COURT:  No.  You know my hours.  5:00 in the
        11    morning, 10:00 o'clock?  You name the time.
        12              UNIDENTIFIED SPEAKER:  10:00 a.m.
        13              THE COURT:  I'll see you at 10:00 a.m. along with
        14    the captain.  Fair enough.  Now, you don't have to drive all
11:53AM 15    the way down.  We'll get you by phone.  I'm not trying to get
        16    folks down.  Okay?  I just want to know that if we're setting
        17    dates, that those are kind of dates that we're really working
        18    towards.  So thank you.  Every day, everything -- we have 17
        19    maybe, places.
11:54AM 20              UNIDENTIFIED SPEAKER:  Yes, sir.
        21              THE COURT:  Wow.  Yeah, I can't tell you how much --
        22              Michele, isn't that going to help our cities?  Yeah.
        23              Juan -- I mean, Nury, isn't that going to help our
        24    cities?
11:54AM 25              MS. MARTINEZ:  Absolutely.
```

96

```
            1          THE COURT:  No matter how you call it.  And if

            2    they're going to transition, I mean, just -- that was worth it

            3    for me to drive down just today to hear that.  I had no idea

            4    about that.  I had no idea when I talked to you by phone and

11:54AM     5    asked you to come down that you were in the process of actually

            6    taking Salvation Army personnel and willing to give up your

            7    storefront and the drop-offs, which by the way, I'm still going

            8    to do, okay.  But then transition those folks into people

            9    trying to help.  We just now need to get to the medical folks.

11:54AM    10    Let's work on that, because maybe we can get our healthy folks

           11    in there.

           12          And so for the mayor's office, you're hearing

           13    something I never heard.  This is a gift.  And if it's

           14    happening in Los Angeles, you know -- so we need their number

11:54AM    15    also; right?  We certainly need Nury's number; right?  We're

           16    going to need the litigants.  We're going to have to talk about

           17    this today as we run with it.  I know there are problems, but

           18    you just overcame those problems.  Thank you.  They're not now

           19    problems.  There are no problems.  All right.  Good.

11:55AM    20          MR. FEUER:  Can I ask a question?  Just for my

           21    edification --

           22          Ken, good to see you.  Is -- are you offering these

           23    locations free of charge to the City, or would there be some

           24    compensation you'd be asking for?

11:55AM    25          COMMISSIONER HODDER:  We are asking for no rent of
```

```
 1    any kind.
 2              THE COURT:  Hold on.
 3              Did you hear that, everybody?
 4              MS. SOBEL:  Zero rent.
 5              THE COURT:  Zero rent.
 6              COMMISSIONER HODDER:  We would ask for assistance in
 7    operational funding, but no rent.
 8              THE COURT:  Sure.  That's fair enough.  And Carol's
 9    saying that that's really high, but we'll get it lower; right?
10              COMMISSIONER HODDER:  We're willing to work with all
11    involved.
12              THE COURT:  Okay.  So at least we can get the
13    establishments which we didn't have before.  And wherever the
14    negotiations are now, it's over the servicing, Carol, that's
15    going to take place.  And so you might say it's too high, and
16    you might say it's too low, and you might say we're not going
17    to pay for it, but at least we have something we never had
18    before, and that is 17 different locations with personnel.
19    That's worth just having this meeting in and of itself.
20              Okay.  Mike, get back to work.  Thanks.  Blessing.
21              UNIDENTIFIED SPEAKER:  Judge, can we be excused or
22    would you --
23              THE COURT:  Oh, no, absolutely.  Get back and do
24    what you do best.
25              Nury, do you want -- do you need to go?
```

Time stamps in left margin: 11:55AM (lines 5, 10, 15), 11:56AM (lines 20, 25).

```
         1              MS. MARTINEZ:  Yeah, I need to leave.

         2              THE COURT:  Yeah, please.  Don't stand up in the

         3    gallery.  Just walk out.  We have got just a few more

         4    presentations, and I'm going to disband also.

11:56AM  5              MS. MARTINEZ:  Thank you, Judge.

         6              THE COURT:  Thank you very much.

         7              Okay.  Mayor, I'm going to -- Mayor Joe -- and I

         8    just know Mayor Joe as Mayor Joe.  So, Mayor, would you

         9    introduce yourself on behalf of Whittier.

11:56AM 10              And by the way, I expressed some -- I got it.  I

        11    expressed -- where's Miguel?  Ask Miguel to come up.

        12              Miguel, my apologies.  Where's Miguel?  Yeah, come

        13    on up here.

        14              Join with the mayor.  He's going to be just a

11:56AM 15    moment, Miguel.  I saw you.  I thought you'd left.  Come on up

        16    or just a moment.

        17              But, Joe, tell me your thoughts in a couple minutes.

        18    Then I want to talk to Miguel.

        19              MAYOR VINATIERI:  Your Honor, thank you very much.

11:57AM 20    I'm in court all the time.  This is an -- I've never seen a

        21    court hearing like this.  Thank you.  There is hope.  I'm

        22    hearing hope this morning.  And thank you that the Court's

        23    making something happen, that there's accountability.  That's

        24    very important.

11:57AM 25              I'm Joe Vinatieri.  I'm the mayor of the City of
```

99

```
  1   Whittier.  We have 88,000 people.  We've been talking about
  2   L.A. County and the City of Los Angeles.  We're a small city,
  3   somewhat small, 80,000 in Southeast L.A. County, and we border
  4   Orange County.  We also have --
11:57AM  5        THE COURT:  Thanks again, Mike.  And, Nury, thank
  6   you very much.  And tell your staff thank you.
  7        MAYOR VINATIERI:  As you know, we have 231 homeless,
  8   and we've done our City Net survey.  There are three things I
  9   just want to say.  The City of Whittier, we have the City
11:57AM 10   council-approved settlement agreement has been sent to
 11   plaintiffs' counsel.
 12        THE COURT:  Let me say this in complete
 13   transparency.  I expressed frustration with both of you out in
 14   the hallway.  My apologies.  This just arrived last night.  So
11:58AM 15   although the council's approved it, I put you both in a
 16   position of making the decision, and I think I growled.  My
 17   apologies to both of you.  Isn't that nice to hear apologize?
 18   I apologize.  But I was growling at both of you.
 19        She needs time to look at that.  So we probably have
11:58AM 20   a good chance of a settlement that we could have put on record
 21   today or modification, Carol, if you looked at it and didn't
 22   see something you like.  But it's not fair to you to lay out
 23   that settlement now.  But I know that Whittier is going to
 24   settle.  And I know that, Carol, whatever those modifications
11:58AM 25   is, we'll get back in a reasonable period of time.  But I don't
```

```
  1   expect you to stress over that today.  She got that last night,
  2   okay?
  3              MAYOR VINATIERI:  We are very motivated, Your Honor,
  4   and to join with the City of Bellflower and the other cities in
11:58AM 5   Los Angeles County, the smaller cities.
  6              Secondly, we're very concerned, of course, about the
  7   mental health aspects of what is going on.  There's been lots
  8   of discussion.  And you've talked about Fairview and Costa
  9   Mesa, Metropolitan State Hospital in Norwalk.  From our
11:59AM 10   perspective, at least in the southeast area, and with the
 11   governor's order relative to state facilities, we're working
 12   with Juan Garza, and we're hopeful of getting here very shortly
 13   with the City of Norwalk and talk about how we can work some
 14   things through because you have lots of space, and I saw it, I
11:59AM 15   think, indicated on one of the screens we saw just earlier.
 16              So we think it's very important for the regional
 17   approach to homelessness to make things happen that way also.
 18              THE COURT:  Eddie, you want to put up Fairview?
 19              MAYOR VINATIERI:  Yeah.  We had all those, I think,
11:59AM 20   various properties that are properties within Los Angeles
 21   County.
 22              THE COURT:  Now, a lot of the cities have expressed
 23   this.  So, Joe, here's what I need.  And I would -- I know my
 24   colleagues may be interested.  And, in fact, I think Andre or
11:59AM 25   Phil orchestrated all of this.  And I want to thank you for
```

```
      1   bearing with me for so long just humbly as colleagues.  So

      2   appreciative.

      3            I've been on the bandwagon about what do I do with

      4   that 10 to 14 percent and some people say 20 percent of just

12:00PM  5   the poor people out there who are just so schizophrenic and

      6   bipolar.  Guess what, they got downloaded a long time ago.  And

      7   the governor's not going to bring them onboard.  Maybe you

      8   ought to know that.  So we're sharing courts --

      9            It's all my -- my fault.  Would you get on the

12:00PM 10   phone, just apologize.  Doing my best.  It's L.A.; right.

     11            She's been expressing that a long time.  If the

     12   governor is going to open them, great.  And if he's not, just

     13   tell us that, bottom line.

     14            MAYOR VINATIERI:  We're going to find out.  We're

12:00PM 15   working on it.  It needs to be done.  It's a major issue in

     16   Whittier.  I know it is everywhere else.

     17            THE COURT:  But if we're not going to put it -- if

     18   we're not going to put them on the grounds at Norwalk or

     19   Fairview or Sonoma or whatever, hey, just bottom line it, maybe

12:00PM 20   you sell it, maybe you do something else.  But right now we

     21   have got to find a way to get those 10 or 14 or 20 percent off

     22   those streets because I can't get them into a shelter.  And I'm

     23   watching them close so --

     24            MAYOR VINATIERI:  It's a major issue in our

12:01PM 25   jurisdiction.
```

```
 1              THE COURT:  Okay.  Let me talk jointly with the
 2     assembly person.  So would you introduce yourself.  By the way,
 3     I disclosed to both parties that members of the California
 4     Assembly called, they got on FaceTime, I think there was six or
12:01PM 5     seven of us, maybe more dropping by.  I was in court.  And we
 6     had a conversation about you being here.  So I want that fully
 7     disclosed to the parties that I didn't wait for this meeting
 8     today to take place.
 9              MR. SANTIAGO:  And I want to thank you, Judge.
12:01PM 10     We're here at your discretion to expedite and facilitate
11     anything that we can do.  I know the questions that you had
12     asked at the time were what sort of funds had the state
13     expended and what sort of ideas or facilities do we have.
14              I don't want to take the Court's time -- too much of
12:01PM 15     your time.  But I do want to say I want to thank you for making
16     this happen because I think otherwise we'd be waiting a little
17     bit longer to get some of this stuff online.  In terms of state
18     dollars, those that expended had already had been HEAP dollars,
19     and they're close to about 86 million for L.A. city continuum
12:02PM 20     of care.  About 81 million HAP dollars, to my knowledge, have
21     not been expended but will be released.
22              THE COURT:  How much?
23              MR. SANTIAGO:  So it's my knowledge that the -- for
24     this region alone, about 81 million to the continuums of care,
12:02PM 25     about 118 million to the City, and L.A. County about 194
```

```
 1    million.  If I have erred, I will correct myself to you.
 2                 THE COURT:  Don't worry.  It's a good faith.  Okay.
 3                 MR. SANTIAGO:  It is.  We were jotting this down.
 4                 And when the governor asked us for -- about
12:02PM 5    authority, we passed $1 billion in emergency funding that gave
 6    the governor the authority to use at his discretion.
 7                 A day ago yesterday, as you know, the governor
 8    released $150 million.  Of that approximately 19 million is
 9    going to the City of Los Angeles and to the region, these are
12:03PM 10   approximate numbers, 37 million to the region in total.  So we
11   expect that money to be used as fast as possible.
12                 THE COURT:  Now, let me tell you the content of the
13   conversation without the -- with the governor's office last
14   night.  The governor's not on the phone.  I don't think it's
12:03PM 15   good that we communicate.  But I told them that the Court was
16   going to be very supportive if I had jurisdiction over this
17   case in terms of moving forward.
18                 But the one thing was going to be absolute
19   consistency, and that is that I was going to ask the tough
12:03PM 20   question and, I didn't want them to feel slighted as everybody
21   left with a very warm hospitable phone call about 10:00 last
22   night, that I wasn't going to say time and time again what we
23   were going to do with that 10, 14, or 20 percent of these
24   hopeless schizophrenic/bipolar men and women who have done
12:04PM 25   absolutely nothing wrong.  And so you don't have the answer to
```

```
 1   that.
 2           MR. SANTIAGO:  But I think you should ask the tough
 3   questions because it will force immediate action.
 4           THE COURT:  Oh, I am.  And I'm going to trust you to
 5   take that back to the governor's office, to Williams.  Okay?
 6           MR. SANTIAGO:  I will.
 7           THE COURT:  Okay.  Real quick.  I mean, please.
 8           MR. SANTIAGO:  I will call.  Absolutely.
 9           THE COURT:  And I'm wide open tonight for another
10   phone call because we -- we said we would get on the phone with
11   his chief, et cetera, and they know that I'm asking that tough
12   question again, why aren't these hospitals open?  If not, what
13   are you going to do with this percentage of people that are in
14   our cities that the co-op person just can't cope with?
15           MR. SANTIAGO:  I will note, Judge, if I may, that
16   the governor took an extraordinary step to -- in exempting CEQA
17   for emergency shelters.
18           THE COURT:  I was very complimentary last night
19   about that, both for municipality --
20           MR. SANTIAGO:  That was my bill so I know very well
21   about it.  But to local municipalities, it really does cut down
22   the time that they need to go through that process.  So that --
23   and L.A. already has that.  But for other municipalities up and
24   down the stat for the region, they no longer have to wait for
25   that.
```

```
 1          I would ask you as another piece to take a look at,
 2   too, would be the conservatorship or Lanterman Act
 3   conversations.
 4          THE COURT:  Right.
12:05PM 5          MR. SANTIAGO:  Because there are going to be a
 6   series of populations who are going to be hard to press to get
 7   off the street.  But I would ask the Court in a future late,
 8   maybe take a look at that as well.
 9          THE COURT:  Other than, you know, having this
12:05PM 10   pulpit, that's the legislative function.  I understand that.  I
 11   can growl.  But I have no power in a sense to implement what
 12   you can implement.  But I don't care whether it's Norwalk or
 13   Fairview or Sonoma or whatever, we seem to have the federal
 14   government on one occasion saying that we can bring people off
12:05PM 15   the Princess Cruise, and I'm just wondering when I saw that why
 16   aren't we handling our own California people who we have to
 17   deal with at some point anyway and providing those services
 18   that are so needed?
 19          Because every police chief tells me, "You know,
12:06PM 20   Judge, if I could get 10 or 15 people just out of my community
 21   who are just bipolar and schizophrenic and they've done nothing
 22   wrong, I take my violence level down.  I take" -- I leave that
 23   with you.  But next session I'm going to be asking the same
 24   question.  So please tell Darrel that.  Please convey that to
12:06PM 25   the governor.  And I'll convey that tonight.
```

```
 1                MR. SANTIAGO:  I will make that call when I leave
 2     here.
 3                THE REPORTER:  Excuse me, can I have your
 4     appearance.
12:06PM 5          MR. SANTIAGO:  Sure.  Miguel Santiago.
 6                THE COURT:  Okay.  Thank you very much.  All right.
 7     And I appreciate your patience.  I love Sharon Quirk-Silva.
 8     I -- would you apologize, and I'll text her later on.  I just
 9     had Los Angeles folks I wanted to get to immediately.  So no
12:06PM 10    disrespect intended.
11                So, Joe, do you want any of these trailers?
12                MAYOR VINATIERI:  Yes, Your Honor.
13                Just one last thing.  Trailers, looks great.  I
14     haven't talked to my council about it.
12:06PM 15         THE COURT:  Right.
16                MAYOR VINATIERI:  But the mayor of Whittier wants to
17     make it happen.  So put us in line.
18                THE COURT:  Okay.  So check the price.  I mean, get
19     involved.  If you don't want them, fine.  I don't care.  But if
12:07PM 20    they are of any value, so be it.  If they're not, just reject
21     them.  I don't care.  You know, we can get tents.  We can get
22     other trailers, et cetera.  I just want to come up with
23     something concrete, Joe, that's on the table.  If people don't
24     like it, reject it, but if it's going to go, then make it go.
12:07PM 25    Okay?  And if you want some of these and L.A. doesn't want
```

```
     1   them, let's feed them out to Oakland, let's get them over to
     2   Whittier.
     3            MAYOR VINATIERI:  My suspicion is with this
     4   information that you've elicited today, I think there will be a
12:07PM 5   lot of people interested.
     6            THE COURT:  Oh, I've gotten calls.  In fact, we
     7   asked some mayors not to come who are going to make the same
     8   statement, that they wanted these trailers.
     9            Michele, you've been extraordinary helpful as usual.
12:07PM 10           Bill, I invite you to come up for a moment.
    11           And I want to thank Miguel and Christine for
    12   remaining also.
    13           MR. TAORMINA:  Good afternoon, sir.
    14           THE COURT:  Hi, Bill.
12:07PM 15           MR. TAORMINA:  Bill Taormina.  I am here to add to
    16   your arsenal to avoid anarchy.  I'm from the private sector.
    17   I'm not an elected official, nor will I ever be one.  I need 90
    18   seconds of the Court's time.
    19           THE COURT:  Take it.
12:08PM 20           MR. TAORMINA:  I need six points to tell to you
    21   right now.
    22           Number one, I'm the private sector.  I represent
    23   numerous families in Orange and Los Angeles County that are
    24   ready to move forward on this.  We are a catalyst.  We are a
12:08PM 25   catalyst to make action.  We are not driven by profit.  We are
```

```
 1   driven by the preservation of the quality of life and life
 2   itself.
 3            Point two, the funding is ready.  We need zero
 4   dollars from any government.  We are ready to buy these
 5   trailers today.  In a moment I'm going to hand my credit card
 6   to Mr. Price for whatever deposit he wants.  We're going to tie
 7   these trailers up today.
 8            Number three, logistics, the shipping and the
 9   installation is ready.  We are ready to move forward.
10            Number four, our nonprofit operators are sitting in
11   the front row.  They're ready to move forward.
12            Number five, what we need -- the gentleman from
13   Whittier just said we need locations.  We need government
14   property.  We need private property.  We need -- we just need
15   locations.  We need to break a few rules relative to zoning and
16   land entitlements.  That should be easy because your other
17   choice is anarchy.  Let's be honest here.  This thing is out of
18   control and we need to fix it.
19            Point six, this is a solution for both homelessness
20   and to control this virus.  Thank you for your time.  I'm going
21   to hand my --
22            THE COURT:  Oh, no, don't go away.  I love this
23   credit card.  Could I -- no, I'm just kidding.
24            MR. TAORMINA:  It has unlimited credit amount, and
25   I'm here to give this to Mr. Price.  I'm going to walk back
```

1    there and hand him my business card and the credit card number

2    is on the back.  And I'm dead serious.

3                    THE COURT:  By the way, I know his worth, and he has

4    got a substantial limit, trust me.

12:09PM 5             MR. TAORMINA:  It doesn't matter.  It's time for

6    action.  Thanks to you for this Court for making it happen.  So

7    let's do it.

8                    THE COURT:  Okay.  Now, here is a strong ally for

9    some portion of the plaintiffs.  They're your business

12:09PM 10   community.  In my part of the world, before I came to this part

11   of the world and now I'm part of our world here in Los Angeles,

12   I may be getting a shelter up here, okay, I'm going to start

13   living up here thanks to Judge Carney and his being so gracious

14   about maybe getting me some hotel space -- he's what I call the

12:10PM 15   police league side.  He's what I call the business side.

16                    If you don't know who he is -- and by the way some

17   of the other major families, who he's going to probably

18   privately disclose to you, trust me, he's probably very much in

19   line with the First Alliance Group, because I perceive you as

12:10PM 20   more business oriented in a sense than maybe some of the other

21   groups that might be -- there's going to be an accord.

22                    So he's speaking your language.  Okay?  In fact, he

23   actually sued the railroads to clean up the mess on the

24   railroads behind his multiple properties.  So talk to him.

12:10PM 25   Okay.

1          Bill, I want to thank you for stepping up.  I had no

2    idea you were going to do that.  I'm actually a little stunned.

3          Okay.  I'm ready to suspend this Court except for my

4    esteemed and incredibly wonderful counsel.  And here's the

12:11PM 5    bottom line.  You've heard today -- and I've asked nothing of

6    you -- if you want the Court not to be involved, that's just

7    great.  We will litigate for the next ten years, and I could

8    care less.

9          And Andre and -- Birotte, thank you for being here

12:11PM 10   for this wonderful opportunity to meet all these good folks.

11         But if you want us involved, we can give you a

12   shelter and parameter to operate within, I hope, with a lot of

13   disagreements on occasion, a lot of disagreements on occasion.

14   Okay?  But the point is we moved forward in our part of the

12:11PM 15   world to an extent that I never expected before I got involved.

16   It's not been pretty.  It's not been perfect.  People have

17   gotten hurt.  But by God we moved forward.

18         And I know that we can move forward on this.  So you

19   tell me what time you want me to be back here.  I'm going to go

12:11PM 20   walk around and get a cup of coffee for a moment and visit with

21   some of the folks who've remained, just because they're friends

22   and I'd like to meet some of the other people in the audience

23   who have been so patiently sitting here with us that I haven't

24   had a chance to talk to.

12:12PM 25         If you want the Court involved, I want you to tell

me that, but you have to give me the following or I won't be

involved:  One, I must be able not to gather a group like this

again.  I have to be able to reach out to Eric.  I have to get

on the phone with the governor's office tonight.  I've got to

12:12PM  be able to talk to Bill about trailers or call Ken, you know,

and Paul.  I've got to be able to talk to Carol.  I've got to

be able talk to you.  And you've got to trust me in those

ex parte conversations.  Because they're going to be more

valuable, I hope, than litigation.

12:12PM         And if you get to litigation, I've got great judges

who can litigate.  And they can probably be much more

collaborative than even I am.  So I'm reaching out to you

choosing two of what I think are the finest colleagues that I

could possibly find on the bench to participate in this,

12:12PM  because you should have a tremendous -- you should have a

tremendous sense of confidence that when you talk about people

like Judge Birotte -- in fact, our entire bench here and

Judge Gutierrez, that you're talking about people that are the

middle of the road, that don't have an axe to grind, liberal or

12:13PM  conservative or however you toss those silly labels around, who

will get down to work with you, and by God, we're going to get

criticized for the lives we didn't save.  We're never going to

be accountable or known for the lives we did save.

        But you have got a chance for us to save an awful

12:13PM  lot of lives.  And if we act quickly -- and if not, we came

        1   here for the homelessness and COVID, right, the community right

        2   now distancing themselves who have that benefit, and God bless

        3   them.  Thank you.  It's coming.  It's just going to delay.

        4          So what time would you like me to meet?  Because

12:13PM 5   you're going to be ordered to meet and confer.

        6          Carol, you've been through this before.  Okay?  And

        7   you know that I have to be able to communicate with you early

        8   in the morning or late at night and share with the other side.

        9   And I've made a lot of mistakes.

12:13PM 10         But you have got to give me an answer today.  And

       11   I'm going to sit here until I get "yes" or "no."  And then

       12   you're going to sign up and you're going to give me some

       13   limited jurisdiction for a limited period of time so you're not

       14   trapped.  Because I don't want a three-year consent decree.  I

12:14PM 15  don't want a settlement.  You don't even have to call it a

       16   settlement.  You just have to call it an agreement of some kind

       17   so you're not trapped.  And then let's get going.  Okay?

       18         Now --

       19         MR. UMHOFER:  Your Honor, we want you involved.

12:14PM 20        THE COURT:  Wait, wait, wait.  Not so fast.  You

       21   talk to those people over there, and you talk to the defendants

       22   sitting there.  They're not here, et cetera.  Get on the phone.

       23   But I'm going to sit here until I get an answer "yes" or "no."

       24   Okay?

12:14PM 25        So get together.  I'll be back at what time?  How

```
       1   about 1:30?  Because she's got some defendants here also.  I

       2   mean, you need to have a conference back in that room, just

       3   like Salvation Army.  Be certain -- because I'm a complete

       4   nightmare.  Smiling, but I'm a nightmare.

12:14PM 5           MR. UMHOFER:  It's the nightmare we need, Your

       6   Honor.

       7           THE COURT:  Well, we'll see.  Okay.  So 1:30 then.

       8           For all you folks outside, let me come out and just

       9   humbly thank you for a moment because you've stayed and sat

12:14PM 10  through this.

      11           (Lunch recess from 12:14 p.m. to 3:08 p.m.)

      12           THE COURT:  We're on the record.  We're on the

      13   record.  We're on the record.

      14           And now I will have the parties identify themselves.

03:08PM 15  So just please identify who you are and who you represent.

      16           MR. UMHOFER:  Good afternoon, Your Honor.  Matthew

      17   Umhofer on behalf of the plaintiffs.  With me at counsel table

      18   is Elizabeth Mitchell.  We're both with the law firm of

      19   Spertus, Landes & Umhofer.

03:09PM 20          THE COURT:  Just introduce -- I know both of you

      21   gentlemen, but let me make a record of who's here.

      22           MR. FAWN:  Yes.  Thomas Fawn, senior assistant

      23   county counsel on behalf of the County of Los Angeles.

      24           MR. CARTWRIGHT:  Bob Cartwright, assistant county

03:09PM 25  counsel on behalf of the County of Los Angeles.
```

```
 1              THE COURT:  Thank you.  Let's go down -- well, let
 2    me see.  Let's take the other plaintiffs, in a sense.
 3    Plaintiffs.
 4              MS. WEITZMAN:  Brooke Weitzman on behalf of
03:09PM 5    intervenor Orange County Catholic Worker.
 6              MS. SOBEL:  Carol Sobel on behalf of intervenor
 7    Orange County Catholic Worker and also on behalf of intervenor
 8    Los Angeles Catholic Worker and Los Angeles Community Action
 9    Network.
03:09PM 10             MS. MYERS:  Shayla Myers with the Legal Aid
11    Foundation of Los Angeles on behalf of intervenor L.A. Catholic
12    Worker and Los Angeles Community Action Network.
13             MS. SWEETSER:  Catherine Sweetser on behalf of all
14    intervenors.
03:10PM 15             THE COURT:  Now, for the other parties, I want it
16    clear that the parties who are about to identify themselves
17    were invited to come to the court, because the Court had no
18    legal ability to order you into court.  So please.
19             MR. CASTRO-SILVA:  Thank you, Your Honor.  Rodrigo
03:10PM 20    Castro-Silva for the County of Los Angeles.  I'm from the
21    Office of County Counsel.
22             MR. MCLAIN:  Byron McLain on behalf of Los Angeles
23    County from Foley & Lardner.
24             MR. YOUNG:  Brandon Young on behalf of the County of
03:10PM 25    Los Angeles from the law firm of Manatt, Phelps & Phillips.
```

```
 1              MR. DERMER:  Gabriel Dermer from the Los Angeles
 2    City Attorney's Office on behalf of the defendant City of
 3    Los Angeles.
 4              MR. MARCUS:  Scott Marcus from the Los Angeles City
 5    Attorney's Office on behalf of the City of Los Angeles.
 6              THE COURT:  First, there's an agreement that we will
 7    convene next Tuesday at --
 8              MR. UMHOFER:  10:00 in the morning.
 9              UNIDENTIFIED SPEAKER:  10:00 a.m.
10              THE COURT:  -- 10:00 a.m.  Not p.m., 10:00 a.m.  At
11    the location of?
12              MR. UMHOFER:  The Alexandria Building in Pershing
13    Square.  We'll provide details to all the parties and the
14    Court.
15              THE COURT:  And it's my intent to exclude the public
16    but not the press because I'm going to make the same order, and
17    I'm not quite certain how I'm going to control that, you
18    understand, in an outside facility.  So one of the things I
19    want you to take into account is I can control excluding the
20    public in the court, but that's because of the emergency health
21    issue.  So we're going to try this, though, next week at this
22    location to see if it works.  I think we can control it.
23              Is that correct, Counsel?
24              MS. MITCHELL:  Yes.  The address is 501 South
25    Spring.
```

1           THE COURT:  501 South Spring.

2           JUDGE SMITH:  It seems to me it's not a problem.  If

3    it's a private-owned building, you have the right to exclude

4    anybody.  If you decide that you're not going to let the public

03:12PM 5    in, it's not a court order, it's the parties.  If other parties

6    don't want to participate under those circumstances, that's

7    their decision.

8           MR. UMHOFER:  Right.  And, Your Honor, in the

9    interim, should I put the agreement that we talked about off

03:12PM 10   the record on the record; that is, the agreement to suspend

11   litigation deadlines and things along those lines?

12          MS. MITCHELL:  The original agreement when we first

13   came into the court this afternoon, Your Honor.

14          MR. UMHOFER:  So, Your Honor, I'll put this on the

03:12PM 15   record.  The parties during lunch --

16          THE COURT:  Oh, I'm sorry.  Put that on the record

17   for me.  I thought we were back in the settlements.

18          MR. UMHOFER:  No, no, no, no.  I apologize.

19          So we have a limited agreement that we reached over

03:12PM 20   the -- over the lunch break.  That agreement was to suspend

21   litigation deadlines, including the 21 days that the City and

22   County have to respond, because they have been served, so it's

23   21, not 60, to permit the Court and the parties to engage in

24   settlement discussions and in efforts to address the underlying

03:13PM 25   problems that occasioned this hearing today.

```
          1              The parties have no objection to the Court's
          2     ex parte communications with other relevant parties.  And at
          3     the service of trying to get both resolution and action on the
          4     underlying issues of the Coronavirus and the homelessness
03:13PM   5     crisis, the parties stand ready to support and assist the
          6     Court.  And the parties have no objection to the involvement of
          7     Judges Birotte and Gutierrez in the process.
          8              MS. SOBEL:  And Judge Smith.
          9              MR. UMHOFER:  And Judge Smith as well.
03:14PM  10              THE COURT:  Who's earning nothing.
         11              MR. UMHOFER:  Yes.  Yes.
         12              THE COURT:  Would you state who you are and if this
         13     is acceptable as stated by counsel.
         14              MR. CASTRO-SILVA:  So this is Rodrigo Castro-Silva
03:14PM  15     on behalf of the County of Los Angeles.  We're in agreement.
         16              MR. MARCUS:  On behalf of the City of Los Angeles,
         17     this is Scott Marcus from the City Attorney's Office, that's
         18     acceptable.
         19              MS. MYERS:  On behalf of the intervenors LA CAN and
03:14PM  20     LA Catholic Worker, that's acceptable.
         21              MS. SOBEL:  And on behalf of intervenor Orange
         22     County Catholic Worker, that is acceptable.
         23              MR. UMHOFER:  Your Honor, one more thing, Mr. McLain
         24     just pointed out to me that -- we just wanted to make it
03:14PM  25     clear -- I think the Court has already issued orders on this
```

```
     1   point that the intervenors are allowed to -- or their motions
     2   to intervene have been granted and that they're allowed to --
     3              THE COURT:  And the other motion you brought to me
     4   is --
03:14PM 5              MR. UMHOFER:  Well, we haven't brought any other
     6   motions.  They've all been over there.
     7              THE COURT:  Okay.  Let's anticipate two things, and
     8   that is, we're trying to give access to the public through the
     9   press.  And you've heard that we're going to start with
03:15PM 10  transparency until it's called to my attention that there's a
    11   reason for going in camera.  But you're different entities.
    12   You're the printed press.  Then we might have the audio or
    13   radio station, and then we might have the television.
    14              The difficulty is in federal court with our rules,
03:15PM 15  we would not allow television.  And what I can't have is moving
    16   off-site and then perceiving that I'm treating one area of the
    17   public access television unfairly.  I think that they would be
    18   saying, "Golly, gosh, what's happening here?"  But I'm not
    19   really comfortable having a televised off-site because it's
03:15PM 20  violating our local rules.
    21              I need to go to my chief judge here.  I need to have
    22   a court meeting to abrogate those rules.  And there's just no
    23   way to do that.  The judges are all over the place and they're
    24   not going to have a special meeting in that regard.  So help
03:15PM 25  me.
```

1      MS. SOBEL:  I have a suggestion to amend the
2  stipulation or add to it, which is that because of the court
3  closures for dealing with the pandemic, that the parties agree
4  that meetings that are scheduled with the Court off-site are to
03:16PM 5  be held under the same rules as if the meeting were occurring
6  in the federal courthouse.
7      THE COURT:  I think my colleagues would appreciate
8  that.
9      MR. UMHOFER:  No objection.
03:16PM 10      THE COURT:  Because we're not going against our
11  time-honored rules otherwise.
12      MR. UMHOFER:  No objection.
13      THE COURT:  Would that be acceptable, Counsel?
14      MR. UMHOFER:  No objection.
03:16PM 15      THE COURT:  Counsel, acceptable?
16      **(Counsel collectively responded "No objection.")**
17      THE COURT:  I think that will allow us to honor the
18  decorum and the tradition of the federal court regardless.  But
19  I'll have to get an explanation from some of you folks who can
03:16PM 20  come in from the printed press about what's happened here.
21  Because if I was the television station, I'd be concerned and
22  wonder why I would be treated differently.  But those are the
23  federal rules.
24      Is there anything else today?  Otherwise, I want to
03:16PM 25  thank you very much and see you next Tuesday at 10:00 o'clock.

1        (Proceedings concluded at 3:16 p.m.)

2                    --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3   COUNTY OF LOS ANGELES    )
                             )
4   STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, in and for the United States District Court for

7   the Central District of California, do hereby certify that

8   pursuant to Section 753, Title 28, United States Code that the

9   foregoing is a true and correct transcript of the

10  stenographically reported proceedings held in the

11  above-entitled matter and that the transcript page format is in

12  conformance with the regulations of the Judicial Conference of

13  the United States.

14

15  *Date:  March 20, 2020*

16

17

18

19                           */S/ DEBBIE HINO-SPAAN*
                             _____

20                           *Debbie Hino-Spaan, CSR No. 7953*
                             *Federal Official Court Reporter*
21

22

23

24

25

**<u>CERTIFICATE OF SERVICE</u>**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of .  My business address is 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA 90067.

On March 25, 2022, I served true copies of the following document(s) described as:

**NOTICE OF WITHDRAWAL OF CONSENT TO EX PARTE COMMUNICATIONS**

on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on March 25, 2022, at Los Angeles, California.

Brian Binns

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

556797.9

126

**SERVICE LIST**
*LA Alliance for Human Rights, et al. v. City of Los Angeles, et al.*
**Case No. 2:20-cv-02291**

Matthew Donald Umhofer
Elizabeth A. Mitchell
SPERTUS, LANDES & UMHOFER, LLP
617 West 7th Street, Suite 200
Los Angeles, CA 90017

Attorneys for Plaintiffs
*LA ALLIANCE FOR HUMAN RIGHTS, JOSEPH BURK, HARRY TASHDJIAN, KARYN PINSKY, CHARLES MALOW, CHARLES VAN SCOY, GEORGE FREM, GARY WHITTER and LEANDRO SUAREZ*

Telephone:  213-205-6520
Facsimile:   213-205-6521
Email: matthew@spertuslaw.com;
emitchell@spertuslaw.com;
jon@spertuslaw.com;
calendaring@spertuslaw.com

Rodrigo A. Castro-Silva, County Counsel
Lauren M. Black, Assistant County Counsel
Ana Wai-Kwan Lai, Senior Deputy County Counsel
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 468
Los Angeles, CA 90012

Attorneys for Defendant
*COUNTY OF LOS ANGELES*

Telephone:  213-974-1830
Facsimile:   213-626-7446
Email:
rcastro-silva@counsel.lacounty.gov;
lblack@counsel.lacounty.gov;
alai@counsel.lacounty.gov

Byron J. McLain
FOLEY & LARDNER, LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071

Attorneys for Defendant
*COUNTY OF LOS ANGELES*

Telephone:  310-972-4500
Facsimile:   213-486-0065
Email: bmclain@foley.com

| | |
|---|---|
| Scott D. Marcus, Senior Assistant City Attorney | Attorneys for Defendant *CITY OF LOS ANGELES* |
| Arlene N. Hoang, Deputy City Attorney | |
| Jessica Mariani, Deputy City Attorney | Telephone:  213-978-6952 |
| Ryan Salsig, Deputy City Attorney | Facsimile:   213-978-7011 |
| LOS ANGELES CITY ATTORNEY'S OFFICE | Email: scott.marcus@lacity.org; arlene.hoang@lacity.org; |
| 200 North Main Street, City Hall East, 6th Floor | jessica.mariani@lacity.org; ryan.salsig@lacity.org |
| Los Angeles, CA 90012 | |
| | |
| Brooke Alyson Weitzman | Attorneys for Intervenor *ORANGE COUNTY CATHOLIC WORKER* |
| William R. Wise | |
| ELDER LAW AND DISABILITY RIGHTS CENTER | |
| 1535 East 17th Street, Suite 110 | Telephone:  714-617-5353 |
| Santa Ana, CA 92705 | Email: bweitzman@eldrcenter.org; bwise@eldrcenter.org |
| | |
| Paul L. Hoffman | Attorneys for Intervenors *ORANGE COUNTY CATHOLIC WORKER, LOS ANGELES COMMUNITY ACTION NETWORK, LOS ANGELES CATHOLIC WORKER and CANGRESS* |
| Catherine E. Sweetser | |
| SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP | |
| 11543 West Olympic Boulevard | |
| Los Angeles, CA 90064 | |
| | Telephone:  310-396-0731 |
| | Facsimile:   310-399-7040 |
| | Email: hoffpaul@aol.com; csweetser@sshhlaw.com |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

556797.9

NOTICE OF WITHDRAWAL OF CONSENT TO *EX PARTE* COMMUNICATIONS

1  Carol A. Sobel                          Attorneys for Intervenors
2  Weston C. Rowland                       *LOS ANGELES COMMUNITY*
   LAW OFFICE OF CAROL SOBEL               *ACTION NETWORK, LOS ANGELES*
3  725 Arizona Avenue, Suite 300           *CATHOLIC WORKER, ORANGE*
   Santa Monica, CA 90401                  *COUNTY CATHOLIC WORKER and*
4                                          *CANGRESS*
5
6                                          Telephone:   310-393-3055
                                           Facsimile:    310-451-3858
7                                          Email: carolsobellaw@gmail.com;
                                           rowland.weston@gmail.com
8
9  Shayla R. Myers                         Attorneys for Intervenors
   LEGAL AID FOUNDATION OF LOS             *LOS ANGELES COMMUNITY*
10 ANGELES                                 *ACTION NETWORK, LOS ANGELES*
   7000 South Broadway                     *CATHOLIC WORKER and CANGRESS*
11 Los Angeles, CA 90003
12
                                           Telephone:   213-640-3983
13                                         Facsimile:    213-640-3988
                                           Email: smyers@lafla.org
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400