```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                   (WESTERN DIVISION - LOS ANGELES)
```

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-CV-02291-DOC-KES |
| | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Santa Ana, California |
| vs. | ) | |
| | ) | Thursday, December 16, 2021 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | ( 9:10 a.m. to  9:40 a.m.) |
| Defendants. | ) | (10:01 a.m. to 10:54 a.m.) |

```
                       STATUS CONFERENCE

           BEFORE THE HONORABLE DAVID O. CARTER
             AND THE HONORABLE ANDRE BIROTTE,
               UNITED STATES DISTRICT JUDGES
```

**APPEARANCES:**            SEE PAGE 2


Court Reporter:            Recorded; CourtSmart


Courtroom Deputy:          Kelly Davis


Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


**Proceedings recorded by electronic sound recording; transcript produced by transcription service.**

2

<u>APPEARANCES</u>:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         Spertus Landes & Umhofer, LLP
                         617 West 7th Street, Suite 200
                         Los Angeles, CA 90017
                         213-205-6520


                         MATTHEW D.  UMHOFER, ESQ.
                         Spertus Landes & Umhofer, LLP
                         1990 S. Bundy Drive, Suite 705
                         Los Angeles, CA 90025
                         310-826-4700

For Defendants:          SCOTT D. MARCUS, ESQ.
                         Los Angeles City Attorney's Office
                         200 North Main Street
                         7th Floor, Room 675
                         Los Angeles, CA 90012
                         213-978-7558


                         LOUIS R. "SKIP" MILLER, ESQ.
                         JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

For Advocates:           SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983

**3**

1    <u>Santa Ana, California; Thursday, December 16, 2021; 9:10 a.m.</u>

2                              <u>Call to Order</u>

3         **THE COURT:**  I hope all of you are doing well, and I

4    apologize -- oh, have a seat.  Thank you for the courtesy.  And

5    very much appreciated, but not necessary.

6         Judge Birotte, would you -- no, no.  Come on up

7    because I want to talk to you.

8         And Michele, would you join me on the other side?

9    There's going to be some -- some things that you may

10   collectively decide to join in, too, after the settlement.

11        Pardon the late start.  The CourtSmart wasn't working

12   this morning, but today I'd like to get formal appearances on

13   behalf of the City, the County, the intervenors, and the

14   plaintiffs in this matter.  Let's begin with the plaintiffs.

15        **MR. UMHOFER:**  Good morning, Your Honor.  Matthew

16   Umhofer and Elizabeth Mitchell on behalf of the LA Alliance.

17        **THE COURT:**  My pleasure.  Just remain seated if you

18   would.

19        **MR. UMHOFER:**  Yes, Your Honor.

20        **THE COURT:**  And then counsel, on behalf of the

21   County?  You can remain seated; it's fine.

22        **MR. MILLER:**  Thank you, Your Honor.  Skip Miller and

23   Mira Hashmall for the County of L.A.

24        **THE COURT:**  Thank you.

25        **MR. MARCUS:**  Scott Marcus for the City of Los

**EXCEPTIONAL REPORTING SERVICES, INC**

**4**

1    Angeles.

2              **THE COURT:**  All righty.  Any intervenors?

3              **MS. MYERS:**  Shayla Myers on behalf of intervenors,

4    Los Angeles Community Action Network and Los Angeles Catholic

5    Worker.

6              **THE COURT:**  Well, as you present today, please keep

7    in mind our Covid precautions.  As a reminder, I know all of

8    you have done this, but masks on at all times.

9              And if you're not speaking, just remain seated.  And

10   in fact, socially distance yourself as best you can out in the

11   audience.

12             For those presenting today, you're more than welcome,

13   with no affront to the Court, to remain seated to use the

14   microphone.  You don't have to use the lectern, so you're not

15   interchanging, you know, one piece of apparatus.

16             And after you speak, I've requested all counsel in my

17   court to just use the antibacterial wipes in the area that

18   you're seated at, either at the podium or mike stand, so that

19   next counsel doesn't have to do that.

20             Also, please remove the mike used cover after you

21   speak so that the next presenter, if you do use that lectern,

22   or anybody from the audience does, can put a new one on before

23   they present.

24             Now, we really appreciate your cooperation.  These

25   precautions have allowed us, quite frankly, to come back

1   together as a group instead of by Zoom.

2          According to the binding term sheet and MOU, the

3   County agreed to pay the City a one-time bonus of $8 million if

4   5,300 new beds were open and occupiable by April 16th, 2021.

5          The City reported to this Court that by April 6th of

6   2021, it had created 5,603 new open and occupiable beds, thus

7   putting it over the threshold.

8          My understanding is, and I appreciate the courtesy of

9   counsel and their input prior to today's hearing, but in now

10   unverifiable documents, that the Los Angeles County

11   auditor/controller then conducted an audit to verify on a

12   sample basis whether the City had met that threshold.  This is

13   Exhibit C.

14          And do we have that capability, Kelly, to start

15   putting up some of these documents now?  Do we have that

16   capability up on the projection screen?  The court was not

17   functioning earlier.

18          And Kelly, could you ask somebody from MIS to come up

19   and make sure that this court is operational?

20          Well, it's my understanding that the Los Angeles

21   County auditor/controller then conducted an audit to verify on

22   a sample basis whether the City had met that threshold.

23          And once again, this is Exhibit C to the parties'

24   supplemental briefing at Docket 373.

25          And in a few moments, I'd like you to help me.  And

1   I'd like the parties to walk through the three findings made by

2   the auditor.  I'd like to hear in a few moments, Mr. Miller,

3   from the County first, if you'd be so kind, and then the City.

4           And my understanding is that the audit sampled 1,106

5   beds.  In Finding Number 1, the auditor found that 307, or 28

6   percent of those beds, were not open nor occupiable by April

7   16th, 2021.

8           In Finding 2, the auditor also concluded that 267, or

9   24 percent of the beds, were not supported by adequate

10  documentation to support their status as open and occupiable by

11  April 16th, 2021.

12          So, in total, the auditor took some issue, or issue

13  with 52 percent, or 574 of the sample beds.  Thus, the auditor

14  has no issue, I believe, with 532 of those beds.

15          Additionally, the audit also reviewed the 736 beds

16  categorized as rapid rehousing beds.  And I remember how

17  pleased and excited we were when this resolution was reached

18  that the rapid rehousing was coming before us because it was a

19  quick way to get people off the street.

20          In Finding Number 3, the audit sample, we believe, in

21  trying to read these documents, samples or only sampled five of

22  the rapid rehousing bed claims, but concluded that the City had

23  not provided adequate documentation.

24          The auditor states, "However, the City could not

25  provide adequate documentation to demonstrate they provided the

1    rapid rehousing beds as claimed".

2            With respect to standards and procedures, the auditor

3    stated:

4            "The City needs to develop written standards and

5            procedures to ensure they appropriately comply with

6            the terms of the MOU, and maintain adequate

7            supporting documentation.  The City either reported

8            inaccurate information or could not provide adequate

9            documentation to support their claims."

10           "Therefore, a minimum -- at a minimum, the City

11           should develop written standards and procedures."

12           The auditor then continues:

13           "The City must also require staff and supervisors to

14    maintain documentation of their process, and require an audit

15    trail of key events that were practical."

16           The impact is that there's an "increased risk that

17    inaccurate information will continue being reported if

18    standards and procedures are not developed and implemented".

19           Also, Mr. Miller, in your comments to the Court, and

20    to Judge Birotte, my Special Master, I'd appreciate some

21    comment about Los Vignes (phonetic), and I may be

22    mispronouncing that because I proudly went out with the

23    Chairman of the Board of Supervisors and was extraordinarily

24    complimentary about the implementation of the quickness from

25    October to December of the construction.  And in fact, heaped

1  lavish praise on the fact that I believed that especially

2  during the rainy season that this was opening up to homeless,

3  and from all indications it wasn't open.

4          And in the front of the Court, we'll go back to check

5  the records, but I think representations were made, and I

6  believe it was that we had 220 occupiable spaces and more being

7  built.

8          So, hopefully I'm not being foolish about this, but I

9  feel a little bit foolish, and I'd really like to hear an

10  explanation.

11         So, Mr. Miller, I'll turn this over to you and the

12  County for any comments.

13         **MR. MILLER:**  I don't --

14         **THE COURT:**  You can remain seated.

15         **MR. MILLER:**  -- yeah.  I don't know the exact status

16  of Vignes.

17         **THE COURT:**  I'm sorry?

18         **MR. MILLER:**  I do not know the status -- the exact

19  status of Vignes.  I would have to consult with my client --

20         **THE COURT:**  It's also in the auditor's report.  And

21  if you look in Appendix C, you'll see it, commented upon.

22         And let's retrace this.  I was personally taken on a

23  tour sometime in early December.  It was in construction.

24  (Indisc.) was extraordinarily gracious and kind.  You were not

25  present.

1          It appeared that this site was going up in record

2     time because it was County land; you didn't have that 40

3     percent of bureaucratic overhead.

4          It was -- the impression, I think, in the last

5     hearings in May when I, quite frankly, was very concerned about

6     the accounting in those two years, 2017 to 2019, if you recall

7     on the County's part, where this money had gone without

8     accounting, which was part of the genesis of my order in the

9     preliminary injunction, for the City and County to have

10    accounting and report to the Court, apparently this facility

11    was not open during the time period that we had these hearings.

12         And if you don't have information, so be it.  But my

13    understanding in reading the report is that it hadn't opened

14    until minimally April.

15         Now, why don't we focus on the audit first, if you

16    have no information about this and the three findings, and the

17    lectern is yours.

18              **MR. MILLER:**  Okay.

19              **THE CLERK:**  You need to use the microphone.

20              **MR. MILLER:**  I can make inquiry.  I have my client

21    here, Your Honor, and I can make inquiry of the exact status of

22    Vignes and when it opened.  I just personally don't know.

23              **THE COURT:**  Well, why don't we focus on then the

24    audit if you don't know.

25              **MR. MILLER:**  Okay.

1          THE COURT:  I've got specific areas and --

2          MR. MILLER:  Okay.

3          THE COURT:  -- your opportunity to explain what's

4   occurring here, and then the City.

5          MR. MILLER:  Okay.  Well, as far as the County is

6   concerned, we think the audit speaks for itself.  We did the

7   sample audit.  We have the findings that are -- Your Honor just

8   recited.  And we don't think the bonus is due.  I mean, that's

9   -- that's our position.

10         THE COURT:  Okay.

11         MR. MILLER:  I brought a representative from the

12  auditor/controller's office here today, if Your Honor has any

13  questions of that individual, but I think it's pretty clear on

14  its face that, you know, they didn't qualify for the bonus.

15         We're in discussions.  You know, they -- the City

16  disagrees.  We're in discussions.  We're open to hearing their

17  point of view toward a resolution, but that is where we stand

18  right now.

19         THE COURT:  I think the concern of the Court isn't

20  whether you exchange the $8 million.  It was the hope for a

21  break in the inertia that we were going to produce 5,300 new

22  units, counting 700 that were already, you know, in play.

23         How that expanded was the goal to get people off the

24  street to break this inertia.  I'm having a hard time

25  quantifying now how many units have actually been produced, and

1    whether the City has met this goal.  And you've sent a real

2    warning to the Court in this document.  And thank you.

3              **MR. MILLER:**  Uh-huh.

4              **THE COURT:**  But if you were satisfied, you would have

5    paid this $8 million bonus --

6              **MR. MILLER:**  Right.

7              **THE COURT:**  -- which is why I asked in my filing for

8    you to produce transparently now this audit from the

9    auditor/controller.

10             **MR. MILLER:**  Right.

11             **THE COURT:**  I'm not certain whether the City has or

12   has not met this goal.  I'm not certain what number has

13   actually been produced in terms of rapid housing.  It's

14   arguable that 52 percent hasn't been produced or more.

15             If that's so, then we could potentially be back to

16   that seventh paragraph, where you have not invited the Court,

17   but I think we have our roles reversed in that regard.  I think

18   I've got the ultimate power to hold an OSC in re whether

19   there's a breach of disagreement, and then have a hearing in

20   that matter.

21             So, I don't think it's your invitation to the Court,

22   and I'm looking for guidance with your wisdom right now about

23   whether the City is in compliance or not, because this was the

24   agreement with Judge Birotte, the Court, and in good faith, I

25   backed away from that preliminary injunction, but I'm happy to

1    reschedule it.  I'm happy to hold a hearing.  I'm looking for

2    guidance from you now, and then I'll turn to the City.

3               **MR. MILLER:**  Our position, Your Honor, is we're not

4    -- we're not declaring a breach of contract.

5               **THE COURT:**  It's not yours to eventually declare.

6               **MR. MILLER:**  We, you know, we focused -- the

7    auditor/controller focused, in the audit, just on the bonus.

8    We are not in a position now where we're saying the City has

9    breached the contract.

10              There -- obviously there are some questions, and

11   they're raised in the audit, but I'm not prepared to say

12   they're in breach.  That's not our position.

13              **THE COURT:**  In Paragraph 7, it gives the Court this

14   power to, after having entered into a good faith negotiation

15   with Judge Birotte in this agreement -- and then we know the

16   MOU took four months after that, it was supposed to take a week

17   or so -- that it really doesn't matter whether you or the City

18   declares it's a breach.  The Court has the power to bring this

19   to a hearing.

20              **MR. MILLER:**  Yeah.

21              **THE COURT:**  And this time I would bring it to an

22   evidentiary hearing, not a sua sponte draft, and we would have

23   that hearing.  So, you'd have all the due process in the world.

24              And I'm looking to you for guidance if that's

25   necessary or not, because whether you declare a breach or not,

1    the ultimate power rests with the Court pursuant to those seven

2    paragraphs, especially Paragraph 7.

3              **MR. MILLER:**  I understand that, Your Honor, and I'm

4    not in a position to say whether there's been a breach or not.

5    I would -- I would defer to the City.  I mean --

6              **THE COURT:**  Okay.  All right.

7              **MR. MILLER:**  -- the whole point of this report was to

8    update the Court on compliance as of today is the anniversary

9    date --

10             **THE COURT:**  The point --

11             **MR. MILLER:**  -- for the 6,700 beds.

12             **THE COURT:**  -- the point of this was to have 6,700

13   beds --

14             **MR. MILLER:**  Yeah.

15             **THE COURT:**  -- in place and operational.

16             **MR. MILLER:**  Right.  Correct.

17             **THE COURT:**  And so, regardless of the squabble

18   between the City and the County, the benefit should be to the

19   citizens of this City and the homeless.

20             **MR. MILLER:**  Right.

21             **THE COURT:**  And so, the machinations between the two

22   of you, ultimately the power lays with the Court.  It does not

23   lay with you.

24             **MR. MILLER:**  Understand.

25             **THE COURT:**  And if I am suspicious that you haven't

1    breached this, then I will have an OSC concerning breach of the

2    agreement, and we'll have a hearing so we'll comply with the

3    Ninth Circuit's guidance.

4            So, I'm going to turn to the City for a moment for

5    their comments.  And Mister -- and you can remain seated also.

6    Just pull that closer, Mr. Marcus.

7            **MR. MARCUS:**  Thank you, Your Honor.

8            Your Honor, as of today, as our joint status report

9    states, the City has created over 7,200 new shelter beds or

10   shelter interventions within the 18 months for the MOU.

11           So, we've exceeded the goal of the 6,700 beds that we

12   were required to make.

13           **THE COURT:**  Why haven't you gotten the $8 million

14   then from the County?

15           **MR. MARCUS:**  Because the City and the County have a

16   disagreement as to which beds should count as of that April

17   16th date, and what type of documentation is necessary to

18   establish those beds for the auditor/controller's benefit.

19           As Mr. Miller indicated, the audit was completed.  We

20   also included for the Court to see, the City's response to the

21   audit.  The County and the City are still in discussions to try

22   to resolve this issue between ourselves over the bonus, but the

23   bonus is just a, in my opinion, a minor point.

24           The more important point, and the point that the City

25   wants to establish because it is not in breach, the most

1 important point is the City built the beds that it promised to

2 build, and in fact, built more of them than it promised to

3 build over the life of the 18 months for the MOU.

4        **THE COURT:**  Okay.  Then why haven't you received the

5 $8 million?

6        **MR. MARCUS:**  Well, Your Honor, as I indicated, the

7 auditor/controller has a different opinion from the City as to

8 which beds should count, and which ones shouldn't; whether it's

9 the Vignes site, because we were told that it was open and

10 occupiable by the County, but then the County said it made a

11 mistake, whether it's the certain rapid rehousing beds that the

12 auditor/controller wanted to see checks, actual checks, that

13 were cashed to the -- to the landlords, which is not always the

14 way that a -- those cashed checks aren't necessarily available

15 at the time, but we did have the leases to show that these were

16 -- where the people were able to go, meaning open and

17 occupiable doesn't have to mean occupied.

18        It's those types of differences that the City and the

19 County are working through.

20        **MR. MILLER:**  Judge, can I add to?

21        The deal was that the bonus would be payable if there

22 were 5,300 beds --

23        **THE COURT:**  Right.

24        **MR. MILLER:**  -- as of -- by April 16th.  Okay?  Our

25 conclusion is that they didn't qualify for that --

1          **THE COURT:**  Right.

2          **MR. MILLER:**  -- by April 16th.  This is December

3    16th, and the question is now, and I don't think it's a minor

4    point, but I think it's an important point that, the critical

5    point is, have they complied with the open -- because I agree.

6    Beds are more important than money.

7          **THE COURT:**  Right.

8          **MR. MILLER:**  That's where people, you know, have to

9    sleep and live and so forth.

10          So, the question is, have they -- has the City put on

11    6,700 beds or more as of today?  That's what it comes down to.

12          And, you know, we, from where I sit, I hear them

13    saying they have.  I have no reason to dispute that now, and

14    we'll look at that.  We're going to, you know, we'll study that

15    and so forth, but it sounds like -- it sounds like what I'm

16    hearing from counsel is that they have.

17       **(Pause)**

18          **THE COURT:**  Do you have the ability to put up

19    Document 136?

20          Is the MIS person here?  Think you can put up, if we

21    can, Kelly, Paragraph 7?

22       **(Pause)**

23          **THE COURT:**  So, let's walk through this as we put

24    this up, Mr. Miller and Mr. Marcus, and for Alliance and

25    Shayla.

1          The complete transparency when I came here after

2   numerous hearings, the greatest foe that I believe was inertia.

3   Although I spent miniscule amounts of time on different

4   locations, it was a learning process for me.  So, Los Angeles

5   Street and the parking lot, along the freeway with that parking

6   lot, was really an experimentation.  Going out to Bob

7   Blumenfield's District, it was just an effort to demonstrate

8   that we could do this without law enforcement.  That's why the

9   Court got so involved.

10          This City had talked for a long time about this

11  struggle between law enforcement, non-law enforcement, so the

12  Court actually went out there with Michele and Pastor Don

13  (phonetic), and Judge Birotte on occasion.

14          And it was just a humble attempt to try to

15  demonstrate that you probably didn't need law enforcement.  And

16  Bob Blumenfield pulled that off very graciously.

17          Fifty-nine people out of 61 went into shelter within

18  14 days.  We didn't have a year period of time like had took

19  place down in Venice, with constantly going to a tent.  It

20  allowed the City to focus, and the County to focus their

21  resources in a two-week period of time.  So, it was very

22  economical.

23          So, to retrace the history of this, what Dr. Sharon

24  (phonetic) had said, "Look, I can't go from tent to tent in

25  Wilmington, and then out to Venice and back.  I don't have

1   those resources, but if you give us a two-week period of time,

2   we can focus within those two weeks".

3          And for the County, it was a wonderful opportunity

4   because you got your folks down there, and they did a terrific

5   job.  Terrific job.  That's because we had two weeks, and we

6   could focus.

7          And I know the City is now struggling.  What do we do

8   with public space, if in fact we have an area like an underpass

9   cleared or a park?  And I leave that to the City.  Those are

10  tough calls.

11         We knew that we'd already been through 17 encampments

12  and 4,200 people, and Carol (phonetic) -- so, we just walked in

13  and I don't recall an arrest.  I don't recall we had to do that

14  because the advocates were -- at least on the riverbed.  There

15  was the threat, but it was an attempt because what we found and

16  believed in our group was inertia.

17         And the City had to start thinking, and the County,

18  about tens of thousands of people; not hundreds of people.

19  Because whether its HHH or not, the problem had become that we

20  weren't dealing with what I call "D-Day".  We were out there

21  with one fishing hook, quite frankly, and the City really

22  needed tens of thousands to raise its perspective and horizon,

23  because the death rate was so great.

24         And I don't think the Court would have got involved

25  just because of bulky items on the street.  It was the death

1    rate.  And it's still spiraling.

2            In Paragraph 7, I stopped the preliminary injunction

3    at both of your requests because of the good faith

4    representation that you would create these bed spaces.  And we

5    could have sent it to the Circuit a lot earlier, probably with

6    a reversal.

7            But in good faith, the Court can vacate this and can

8    reinstate when you fail to comply with the terms of this

9    agreement.  And if you haven't reached this agreement, then I'm

10   looking to you for wisdom about what I should do.

11           And I want your input because the other letter you

12   submitted to me is that August letter that shows that this has

13   been going on a long period of time, and so we're about five

14   months into these discussions that are ongoing between the City

15   and the County, and I really need your wisdom, Skip.  What --

16   I'm sorry.  Mr. Miller.

17           Should I wait?  Should I have a hearing with

18   transparency?

19           And this time we will have a hearing.  I won't run a

20   sua sponte.  We'll have a week or two hearing, and have both

21   sides put on the evidence, and that way maybe we can actually

22   find out if these figures are fact or fiction, because on the

23   face of it, it looks like there's a 52 percent noncompliance.

24           All I care is that you get the bed spaces up.  And

25   you don't know that right now.  And I don't either.  And the

1   City represents to me, and why should I believe any of it?

2          MR. MILLER:  Well --

3          THE COURT:  Where's my good faith and trust here in

4   backing off this preliminary injunction and turning this over

5   to the parties if you haven't met this agreement?

6          MR. MILLER:  -- we have an audit, sample audit as of

7   April 16th.  Okay?  So, if we're going to do a hearing on

8   compliance with the agreement and the 6,700 beds --

9          THE COURT:  I haven't said we're going to.  I'm

10  looking for wisdom right now.

11         MR. MILLER:  -- we -- we would have to do another

12  audit.

13         THE COURT:  Yes, you would.

14         MR. MILLER:  Yeah, that's what we would have to do.

15         THE COURT:  And we have then complete transparency,

16  and we'd have a hearing.

17         MR. MILLER:  Yeah.  We'd have to do another audit.

18         THE COURT:  And we'd actually know the numbers.

19         MR. MILLER:  That's my opinion.

20         THE COURT:  I've got the power to do that sua sponte.

21  I'm going to -- looking to you and the City for wisdom to see

22  -- because it's always better if you can work it out as the

23  parties.  The Court would always want for that.  But based on

24  this documentation, I don't know what I'm waiting for.

25                It's the same concern I had in a different focus last

1   May when I asked the County repeatedly, and you found yourself

2   in the position of the explanation of where the money was going

3   from 2017 to 2019.  That doesn't need any comment, but I was

4   concerned about, you know, the auditing.

5          And here, the City also though believes that they've

6   been misled.

7          So, if you have no further wisdom, we'll turn to

8   Marcus --

9          **MR. MILLER:**  Well --

10          **THE COURT:**  -- but you two might have a meet and

11   confer and decide what advice you'd like to give to the Court,

12   because then you do leave me in the position of deciding it.

13          And by the way, I will do something to get some

14   transparency on this.

15          **MR. MILLER:**  -- I understand, Your Honor.  I have to

16   -- I want to add, we have no reason to disbelieve the numbers

17   that the City and the City Attorney have put in the report to

18   the Court now.

19          We don't, you know, I don't know for sure one way or

20   another whether they're accurate, but I accept them on good

21   faith, subject to an audit.

22          **THE COURT:**  And if we undertake that, then shouldn't

23   we have a hearing?  Shouldn't this be completely transparent?

24   And if you met these numbers, even a little bit late, I'm going

25   to praise you.

1          **MR. MILLER:**  I -- I -- if we're going to do a

2    hearing, I think we need to do an audit first.

3          **THE COURT:**  I do, too.  And I think it should be

4    public and transparent, and I think if we go down that road,

5    then it should be scheduled in February or whatever to give the

6    parties time, because all I care about is that you actually

7    produce these units.  I don't care about the squabble.

8          So, let me turn to Marcus.  Counsel, your thoughts on

9    behalf of the City.

10         **MR. MARCUS:**  Your Honor, the City is confident that

11   it has built the beds that it says it has built.  We're happy

12   to provide the documentation to prove that, whether it's to the

13   County as an audit or to the Court as part of a hearing.

14         **THE COURT:**  Okay.

15         **MR. MARCUS:**  But to the point, the first point that

16   the Court raised, the City certainly doesn't believe that we're

17   in breach of the agreement.  We believe we have complied.  We

18   believe we can prove we have complied.

19         **THE COURT:**  Uh-huh.

20         **MR. MARCUS:**  We're still discussing with the County

21   the issue of the bonus, but again, to us, that's a minor issue,

22   not the major issue.

23         **THE COURT:**  That's been going on since August though,

24   hasn't it?  In other words, this discussion has been going on

25   for five months.

1          **MR. MARCUS:**  Well, I actually don't think it has

2   been, just to be clear, just because the audit itself --

3          **THE COURT:**  August, September.

4          **MR. MARCUS:**  -- took place and the audit, even the

5   initial results, I don't think, were made available to the City

6   until maybe September or October.

7          So, the discussion has only been going on for a

8   couple of months, but I understand the Court's point.

9          **THE COURT:**  No, just a moment.

10         Shaiba, Sarah, would you join me for just a minute?

11     **(Court confers with law clerks)**

12         **THE COURT:**  We're going to pull up a document for you

13   dated in August.  I suggest you go back and look at your own

14   records.

15         We're having technology issues, so we're having

16   trouble pulling things up on this Elmo.  So, we're going to

17   take a recess so you can view what we're talking about.

18         And were we even able to bring up Document 136,

19   Sarah, Shaiba?

20         **THE CLERK:**  Yes.

21         **THE COURT:**  We were able at least to do that.

22         Okay, counsel, we're going to take about a 15-minute

23   recess and ask our MIS people to come up.

24         **MR. MARCUS:**  Okay.

25         **THE COURT:**  Why don't you meet and confer for a

 1   moment and have a conference?

 2       **(Recess was taken from 9:40 to 10:01 a.m.)**

 3           **THE COURT:**  Okay.  Well thank you.  I think we've got

 4   all of the equipment finally operating.  And I apologize for

 5   the inability to have this courtroom up and running.  Judge

 6   Birotte.

 7           **JUDGE BIROTTE:**  Good I guess some morning.  Good

 8   morning.  I -- just a couple follow-up questions.  I guess I'll

 9   start with the County.

10           I guess I'm -- maybe I'm a little confused, and I'm

11   just trying to understand the County's position.  You're

12   withholding the $8 million.  But are you saying the beds were

13   not made or just not made within the requisite time period?

14           **MR. MILLER:**  Not within the requisite time period.

15           **JUDGE BIROTTE:**  Okay.  And then related to that --

16   well, okay, let me ask the City.  Do you disagree with that?

17           **MR. MARCUS:**  On some of the beds, yes, we do.

18           **JUDGE BIROTTE:**  Okay.

19           **MR. MARCUS:**  On some of the beds we did agree that

20   they were not available at that time.  But we believe that the

21   number of beds  available, open and occupiable, as of April

22   16th was over 5300.

23           **JUDGE BIROTTE:**  So you -- which satisfies the

24   agreement.

25           **MR. MARCUS:**  Correct.

1          **JUDGE BIROTTE:**  Right.  So then I guess going back to

2   the County, I guess what I'm confused about is are you trying

3   to have it both ways in the sense that on the one hand you're

4   saying, we're not saying it's a breach, but you're not giving

5   up the money.

6          And to me hearing that, if you're not giving up the

7   money, you're suggesting that the City hasn't met the terms of

8   the agreement, which suggests to me that the City's in breach.

9   And that's why I think, you know, it puts the Court in this

10   position that what is the County -- the question of what is the

11   County's position.

12          My concern quite frankly hearing the discussion is

13   that this is more sort of sabre rattling just for the sake of

14   sabre rattling.

15          As you pointed out earlier, the ultimate objective is

16   to make sure that there are beds for people who need them,

17   okay?  And if there are, to me, mission accomplished.

18          I get the terms of this agreement.  But it strikes me

19   that the County's trying to straddle both sides of it.  Either

20   they're there or they're not.  And so I guess that's a question

21   that I don't know if you need to answer right now.

22          But that's where the Court's concern is because I

23   think you could envision a scenario where the Court's saying --

24   where the Court says, the County's not giving up the $8

25   million, so they're saying there's a breach.  Paragraph seven

1    of the agreement says if there's a breach, then I have to do

2    something.

3              But so that's one issue that I think needs to be sort

4    of --

5              **THE COURT:**  Let me add one thing, and that is go back

6    to your August letter from LAHSA and from Heidi when she's

7    talking about 763 rapid rehousing.  Now, it's 753 as it turns

8    out.  There's a ten-bed disparity which I'm not concerned

9    about.

10             But you've been in discussions about this with

11   LAHSA's help, thank goodness for LAHSA, since August.  So this

12   idea is when do these discussions end -- Judge Birotte.

13             **JUDGE BIROTTE:**  No, and I guess that leads me to

14   another point that makes me concerned and with a question of,

15   does this whatever you want to call it, dispute or

16   disagreement, is this part of a -- does this portend the future

17   of this litigation in the sense that the City says, we think

18   we've done it?

19             Admittedly, Mr. Miller, you've said I think, you

20   know, there may be some terminology disagreements, but it ties

21   into an important point.  It looks like the -- at a minimum the

22   auditor is raising a lot of concerns about the documentation

23   necessary for these beds and interventions.

24             And perhaps naively I would have thought those kind

25   of things could and should have been worked out between the

1  City and the County.  And I guess I'm disappointed: (a) that it

2  hasn't been worked out; (b) what it was raised back in whenever

3  this audit was done, there hasn't been a meeting of the minds;

4  and I guess (c) the fact that we're here today and there's

5  still not that meeting of the minds.

6       And so we're spending a lot of time away from the

7  fundamental issue of providing these beds.

8       **THE COURT:**  Do you fully understand that when we're

9  talking about 6,000, this is an opening?  And what I'm

10  concerned about is victory being declared over 6,000 beds.

11  We've got 66,000 people out.  This is a beginning.

12       And if I can't get accurate numbers here -- and I

13  don't know those, that's why I'm asking you.

14       Or if I have some doubts whether we even have the

15  5700 beds or the timeliness of that, then this is just the

16  beginning of the road map of why we're here, from my opinion.

17  It's not 6,000 and going home.  This is the beginning.

18       And this effort on all of our parts is -- should be

19  gained -- Skip, Marcus, towards, I mean, really 66,000 plus

20  whenever the new count comes out.  And if we can't accomplish

21  this and I can't get accurate figures, then I've got to do

22  something.

23       **MR. MILLER:**  Can I respond?

24       **THE COURT:**  Okay.  And I'm not threatening.  I'm just

25  saying that I'm turning that over --

1          **MR. MILLER:**  I understand.

2          **THE COURT:**  -- to you both.  I'm hoping that the City

3   and the County come to agreement, give us wisdom, give us

4   milestones, etcetera.  But if you don't, then the Court will

5   and has to do something.  And I don't want to do that

6   precipitously, but as you know I'm apparently --

7          **MR. MILLER:**  Sure.

8          **THE COURT:**  -- capable of doing that.

9          **MR. MILLER:**  Sure.  Let me --

10         **THE COURT:**  So --

11         **MR. MILLER:**  -- respond if I can.  The April 16th,

12  the bonus payable, if 5300 beds were put on by April 16th was

13  an incentive to expedite.  That's what that was about.  Do it

14  faster and we'll give you extra money, okay?

15         Our audit indicated that that was not accomplished by

16  April 16th.  They didn't do it fast enough to get the incentive

17  bonus.

18         **THE COURT:**  Skip, did you even have the 5300?

19  Because when you look down at Ron's report here, 52 percent of

20  those are questionable, whatever that means.  His audit's about

21  1,100 of the high risk, okay?  He's got 32 percent and 20 --

22  he's got about 52 percent in there.  And it's probably not 52

23  percent short.

24         But when you read between the lines, on the rapid

25  rehousing, the sampling's --

1          **MR. MILLER:**  Sure.

2          **THE COURT:**  -- only five.  Now let me repeat that.

3   Out of 735 rapid rehousing, Ron took five.

4          **MS. SPEAKER:**  The County auditor, Judge, not Ron.

5          **THE COURT:**  Yeah, well, the County -- I'm -- the

6   County auditor.  My apologies, the County auditor.

7          Five.  Now, that may be adequate from your

8   standpoint.  But it causes me a lot of problems because I'm not

9   sure that there's 735.  I can't go to the intervenors if we

10  were involved in an agreement --

11         **MR. MILLER:**  Yeah.

12         **THE COURT:**  -- and say in good faith, look, you've

13  got 735 rapid rehousing places.  How do they know?

14         **MR. MILLER:**  I --

15         **THE COURT:**  How do I know that that's accurate?

16         **MR. MILLER:**  I totally get where you're coming from.

17  I understand.

18         **THE COURT:**  Okay.

19         **MR. MILLER:**  I really do understand.  This is

20  December 16th.  And the Court wants to know, Judge Birotte,

21  Judge Carter wants to know have -- has the contract been

22  complied with.  That's the essential thing.  Have the beds been

23  put on.

24         Our plan is to do another audit for contract

25  compliance.  We want to make sure -- the County wants to make

```
1    sure that its money --

2              THE COURT:  Right.

3              MR. MILLER:  -- is going to -- you know, is going to

4    beds, --

5              THE COURT:  Right.

6              MR. MILLER:  -- is going to good usage.  It's a lot

7    of money.  We're paying a lot of money.

8              So we plan to do an audit.  I have the principal

9    auditor here in court.  His name is Tom Wood.  I talked to him

10   during the break.

11             The plan was to do a follow-up audit of compliance of

12   December 16th, probably starting after the end of the fiscal

13   year this summer, next summer.  Now, we can move that up if

14   necessary.  But --

15             THE COURT:  It's raining, for God's sakes.  I mean, I

16   don't know how we break this inertia.  But 6,000 is a beginning

17   point.  It's not an ending --

18             MR. MILLER:  Right.

19             THE COURT:  -- point.  And we're acting like the

20   6,000 is a great victory.  It's not.  It was only designed to

21   break this inertia because this city was in complete inertia,

22   in my opinion.  People were afraid to even make a decision

23   because they might make a mistake.

24             Skip, this has got to get stepped up, and quick.  And

25   when you talk to me about next summer, I don't know what I'm
```

 1    going to do but I know I'm not waiting until next summer.

 2            **MR. MILLER:**  I got that.  I got that.

 3            **THE COURT:**  Okay.  It's raining outside.

 4            **MR. MILLER:**  I understand that.  And we can

 5    accelerate that, and we will.

 6            But what happened as of April 16th is not necessarily

 7    portend, non-compliance, or a breach as of December 16th.

 8    That's my only point.

 9            **THE COURT:**  Okay.

10            **MR. MILLER:**  We want this contract complied with more

11    than anybody in the world.  That's where my client's coming

12    from.  The Court wants it, we want it.  We want to get the

13    people off the streets, out of -- away from the freeways, into

14    beds.

15            So, you know, we -- we'll do a follow-up audit and

16    we'll figure it out.

17            **JUDGE BIROTTE:**  And --

18            **MR. MILLER:**  And --

19            **JUDGE BIROTTE:**  -- I guess I'll ask both Mr. Miller

20    and Mr. Marcus.  Have there been a meeting of the smarter minds

21    of the auditors from both the City and the County so that they

22    understand what each other or what the County's looking for?

23    Has there been such a meeting or is that not protocol or --

24            **MR. MARCUS:**  No.  There have been several meetings.

25    We -- the CAO's office for the City of Los Angeles was working

1    collaboratively with the auditor controller.  They met several

2    -- after the initial findings or initial conclusions by the

3    auditor, there were several meetings.  There was more

4    documentation provided.  We -- they allowed us to speak at the

5    audit committee where the report itself was noted and filed for

6    the record.

7            And as I indicated, my understanding is there

8    continue to be discussions because the ultimate decision of

9    whether the bonus is to be paid would ultimately come I think

10   from the board of supervisors.  And they haven't made that

11   decision yet.  So we're still working towards a meeting of the

12   minds on these issues.

13           **JUDGE BIROTTE:**  And how long do we think that will

14   take?  I guess, I mean, are we going to be fighting about this

15   in the -- well, I know where Judge Carter stands on this but is

16   this going to go on for another four, five, six months as the

17   auditors try to fight about what is, you know, adequate sample

18   size, what is the population?  I mean that's what I'm trying to

19   understand.

20           **MR. MARCUS:**  No.  And I get that.  I'm --

21           **THE COURT:**  Just a moment, just a moment.  And,

22   Sarah, would you pull up the August 16th letter to show how

23   long this has been going on?  Because you got input from LAHSA

24   clear back on August from Heidi about these 735 spaces.  So

25   it's been five months.

**EXCEPTIONAL REPORTING SERVICES, INC**

1         **MR. MARCUS:**  But, Judge Birotte, if I could address

2  your point.  The fact that the City and the County continue to

3  meet and confer on the bonus issue is a side issue for us.

4  We've built the beds.  That's the important thing.  The beds

5  are there --

6         **JUDGE BIROTTE:**  Well, but, okay.  So if I could just

7  stop you there.

8         **MR. MARCUS:**  Sure.

9         **JUDGE BIROTTE:**  Mr. Miller, you agree that all the

10  beds have been built.

11         **MR. MILLER:**  I don't know.  We have to audit.

12         **THE COURT:**  That's right.

13         **JUDGE BIROTTE:**  But --

14         **MR. MILLER:**  I don't know.

15         **JUDGE BIROTTE:**  So the April audit didn't determine

16  that.

17         **MR. MILLER:**  No.  The April audit did not determine

18  that, that's correct.

19         **THE COURT:**  That's right.

20         **MR. MILLER:**  The April audit only determined whether

21  5300 beds, not 6,700, 5300 had been put on by April 16th.

22         **JUDGE BIROTTE:**  And that audio included that it had

23  not been put on by April 16th.

24         **MR. MILLER:**  Correct.

25         **JUDGE BIROTTE:**  And the --

1          **MR. MILLER:**  That's correct.

2          **JUDGE BIROTTE:**  -- City agrees with that assessment

3   or not.  I just want to make sure I understand.  I --

4          **MR. MARCUS:**  We do not agree with that assessment.

5          **JUDGE BIROTTE:**  Right.

6          **MR. MARCUS:**  The -- we think, and we think we can

7   prove, that we had the 5300 beds, new beds, open and occupiable

8   as of the April 16th date.

9          **JUDGE BIROTTE:**  Got it.

10          **MR. MARCUS:**  The County takes the position that

11  certain of those beds were open and occupiable but after --

12          **JUDGE BIROTTE:**  Okay.

13          **MR. MARCUS:**  -- the April 16th date.  So it's more of

14  a timing issue than a number --

15          **JUDGE BIROTTE:**  Well, okay, I --

16          **MR. MARCUS:**  -- of beds issue.

17          **JUDGE BIROTTE:**  Okay.  All right.

18          **MR. MILLER:**  It's a timing -- you want to know my

19  opinion on what we should do?  For what it's worth.

20          **JUDGE BIROTTE:**  Yes.

21          **MR. MILLER:**  I think we should do an audit for

22  contract compliance, 6,700 beds, were they online by today.

23  That's what I think should be done.

24          **THE COURT:**  Okay.

25          **MR. MILLER:**  So you know, one way or another we know.

1          **THE COURT:**  And let's say the Court was willing to

2     work with you, that I'm not -- the whole goal is getting these

3     beds in place, okay?

4          **MR. MILLER:**  Right.

5          **THE COURT:**  My concern is that we drag along from

6     August to today's date, and then we're talking about next

7     summer.

8          So what I'm trying to weigh is whether I'm going to

9     act sua sponte and put this on for a hearing pursuant to

10    provision number seven, and with complete transparency force

11    this issue in February or give you additional time in good

12    faith.

13         And we can't get a time period or an agreement from

14    the two of you about what that audit would look like because I

15    don't know that you've got 5300.  I don't know that you reached

16    that goal.  You need to show me that.

17         **MR. MILLER:**  It's actually 6700.

18         **THE COURT:**  And -- I know.  The 735, I want to know

19    that if our sampling's going to be five, I mean, that's my

20    sampling, how do I go to good faith and enter into some

21    agreements with the intervenors and with credibility say, you

22    know, look, the City has produced 735 rapid rehousing?  What --

23    show me how I prove that.  I can't.  So it's my credibility on

24    the line.

25         So I'm going to leave that to you.  But I think that,

36

1    Judge Birotte, why don't you continue on then?  We'll turn it

2    over.

3          **JUDGE BIROTTE:**  I think those are all my questions.

4    I just wanted to make sure I understood where it was at least

5    confusing me what the reflected positions are of the parties.

6          And I guess I want to emphasize, I mean, just one of

7    the themes that came out at least to me was this issue about

8    documentation.

9          And I would hope, you know, as you move on, that the

10   parties can come to some meeting of the minds; because if this

11   litigation's going to go on as I anticipate, I don't -- you

12   know, these things seem to be sort of unforced errors or

13   unnecessary sort of roadblocks that we're spending a lot of

14   time on as opposed to trying to get these beds.

15         And I'm not -- it's not a criticism of the auditors

16   or the -- I mean, I have some understanding of sort of, you

17   know, the process of -- that goes on with respect to audits.

18         And but I guess I was just thinking when you're

19   talking auditor to auditor, one would think that there could be

20   a quicker resolution as to what is the right documentation to

21   make sure that there's adequate accountability on both sides so

22   that we don't have to spend a lot of time on this.

23         **THE COURT:**  Judge Birotte and I could get down to

24   specifics today, and we could go through this audit with you.

25   But we would be at a disadvantage.  And it would be unfair to

1    you, you would be at a disadvantage.

2            So finding one, the auditor found 307, 28 percent of

3    those beds were not open or occupiable by April 16th, 2021.

4    Let's just say that they were open by July.  Whether you pay

5    the $8,000 or $8 million or not, you'd probably have my

6    acquiescence, complete flexibility.  We got them built.

7            The auditor also concluded that 267 of the 24 percent

8    of those beds were not supported by adequate documentation.  If

9    you got them built, I would leave that squabble to the two of

10   you.  I just have to know that they're built.

11           And besides those beds, out of that 1,100 sample,

12   what had me really energized was rapid rehousing because it got

13   people off the street quickly while we tried to get long-term

14   housing, interim housing, whatever that debate was.

15           But we only have a sampling of five.  I don't have

16   any verification of what those numbers of rapid rehousing are.

17   And I will eventually rely upon LAHSA and Heidi for that.

18           But here's what causes me concern.  Quote -- these

19   aren't my words.  Right from this audit.  "However, the City

20   could not provide adequate documentation to demonstrate that

21   they provided the rapid rehousing beds as claimed."

22           When I read that, it raises red flags that those beds

23   were even produced.

24           Second:  The City needs to develop written standards

25   and procedures to ensure they appropriately comply with the

1    terms of the MOU and maintain adequate supporting

2    documentation.  That's why I included an audit in that

3    preliminary injunction.

4          Because the Governor is making noises that he's doing

5    his job out there by giving money to local government.  He's

6    now created a board to monitor this.  But he's expressed

7    concern about local government and the documentation.  And I'll

8    pull those articles if you'd like.

9          "The City either reported inaccurate information or

10   could not provide adequate documentation to support their

11   claims."  I don't know which (indisc.) is.

12         At a minimum quote, unquote, the City should develop

13   written standards and procedures.  "Again, the City must also

14   require staff and supervisors to maintain documentation of

15   their process and require an audit trail of key events where

16   practical."  Those aren't my words.

17         The impact is that:  "there is an increased risk of

18   inaccurate, incorrect information will continue being reported

19   if standards and procedures are not developed."  That's all I

20   care about.

21         Look, whatever happened in the past is gone.  It

22   can't be rectified.  I just care about going forward.  If

23   there's really good faith that whatever these costs are,

24   they're transparent, we know what they are, we can make good

25   decisions, that we've got accurate information.  And I don't

1    feel -- not through willfulness -- I'm just not getting

2    accurate information.  I don't know how to read this.

3           Now, Michele, do you have a comment?  I'm going to

4    turn this over to the Plaintiffs in this matter and then to the

5    intervenors for a moment, if you have any comments.  Then we're

6    going to recess and I'll decide what to do.

7           **MS. SPEAKER:**  Sure, thank you, Your Honor.

8           It seems to me when you are -- have a county with I

9    think this fiscal year the budget was something like $32

10   billion and we're squabbling over $8 million, I think that

11   we're kind of going back to that analogy that the Court has

12   used about two billionaires fighting over the cost of a

13   hamburger while someone starves out in the street.

14          So I think not being able to get accurate

15   information, not cooperating, when you have this (indisc.)

16   property that was actually the County's property,

17   miscommunicating to the City the amounts and the City's relying

18   on that, and the County's dinging on them.  I mean, it just

19   seems like a lot of bureaucracy that's happening back and forth

20   honestly over $8 million.

21          And then the audit costs how much money and how much

22   have we spent trying to verify all this.

23          So I think it's just another example of the County

24   and the City's kind of tripping over their own feet and not

25   really focusing on what the significant issue is, which is

1    getting beds out, getting cooperation, knocking through this

2    bureaucracy as much as possible.  So that's our main concern.

3            I mean, there are other issues about whether these

4    beds are being offered to freeway folks, why they're -- the

5    beds are being offered to people that aren't in the agreement.

6    I think these are all things that we can talk about.  But I

7    really think the high level point here is to the Court's point,

8    two millionaires arguing over the cost of a hamburger.

9            And when you're talking about trying to do the most

10   good and making sure the beds are open, I think the City really

11   has worked very hard to get these beds open.  And the idea that

12   the County is withholding $8 million because audits show that

13   five beds may not have had a proof of check where as opposed to

14   a lease information, that kind of thing, it just seems like

15   there could be a lot more cooperation here.  And I think we'll

16   leave it at that, Your Honor.

17           **THE COURT:**  Okay.  For the intervenors, either Shayla

18   Myer (sic) or Carol Sobel.

19           **MS. MYERS:**  Your Honor, I think we have been

20   struggling throughout the course of this litigation and

21   throughout the course of the settlement agreement to make heads

22   or tails of the City's documentation related to the beds that

23   have come online.  I think we're struggling in the same way

24   Your Honor is, in the same way Judge Birotte is related to

25   these numbers.  I think our frustration comes from Mr. Marcus's

**EXCEPTIONAL REPORTING SERVICES, INC**

41

1     representation of the City building beds related to this.

2          From our perspective, much of what's going into this

3     agreement is accounting.  It's about finding different ways to

4     count beds as opposed to actually addressing the underlying

5     issues, which is that there are 500,000 too few affordable

6     units, and the City is nowhere near addressing the affordable

7     housing crisis that is causing what is happening on the

8     streets.

9          We don't think adding additional emergency shelters

10    is going to solve the problem.

11         But certainly the ways in which the City and County

12    are fighting over the accounting of what is happening on the

13    streets is problematic.

14         We have separate questions about the City's

15    accounting towards the 5300.  Some of it is echoed in the

16    County's auditing.  We were happy to see that some of the

17    concerns that we have about the ways in which the City has

18    counted beds is reflected in that audit.  But we have separate

19    questions.

20         From our perspective I think it would be helpful to

21    have a meet-and-confer amongst all of the parties related to

22    some of these questions, to have the opportunity to ask some of

23    those questions.

24         But, again, all of this is a fight about accounting.

25    And what we don't want is we don't want the City to continue to

1    be able to use these proceedings as an opportunity to tell a

2    narrative of progress that we don't think is reflected in our

3    clients' lives.

4          **THE COURT:**  So just trade with me.  Don't, because

5    (indisc.) --

6          **MS. MARTINEZ:**  Thank you, Judge Carter.

7          So I have a few questions.  And if we can get my

8    slides up?  As a special master, it's my responsibility to

9    ensure that what the Court is being provided by parties and/or

10   going to observe and ensuring that, you know, the issues at

11   hand are being handled.

12         And so I've had the opportunity to pretty visit

13   almost the entire highway system.  And I recently as well went

14   and observed for myself.  And so I'm not here to dispute yay or

15   nay if the City produced those beds or not.

16         But based on what the audit controller is indicating

17   and what I seen being out there firsthand, I have a question

18   for the City and then for the County.  The -- for the question

19   for the City would be what percentage of those beds that you

20   all have produced actually went to those folks?  And forget

21   about the underpasses.  Just say overhead the -- and 500 feet

22   from a freeway.

23         **MR. MARCUS:**  In the I believe it's Exhibit A to the

24   joint report that we submitted, I believe that we, from

25   information from LAHSA and the service providers, indicated

**43**

1   that roughly 2800 persons living within 500 feet of freeways

2   were serviced by the 6700 new units that were built.

3          **MS. MARTINEZ:**  Great.  Because in some of the

4   information that you also have provided, which some of the

5   targeted areas, in particular to council districts, what caught

6   my eye was that council districts two, three, four, and seven I

7   think, specifically Paul Krekorian and Bob Blumenfield.

8          And as you all are aware, we started off with Bob

9   Blumenfield when we focused this -- on this agreement.

10         It seemed like very little interventions were put on

11  that report.  And I'm not sure if you guys used other funding

12  instead of this funding to address on that issue.  There were

13  those folks that were near the highway or 500 feet or

14  underpasses.

15         And so if I could get some clarification because when

16  you look at those interventions that you mentioned, it seems

17  it's very heavy in district one and district nine, which

18  district one is Council Member Cedillo and district nine is

19  Curren Price.

20         **MR. MARCUS:**  We have representatives from both

21  council district two and council district three here if you'd

22  like to hear directly from them.

23         **MS. MARTINEZ:**  Most certainly, if that's okay, Judge

24  Carter.  Yes.  Yeah, right before I put my slides up.  Thank

25  you.  And I think we have from Councilmember Krekorian's office

**44**

 1   coming.

 2          **MR. MARCUS:**  Yes, that's correct.

 3          **MS. MARTINEZ:**  Karo, good to see you.

 4          **MR. TOROSSIAN:**  Good morning.  Karo Torossian, Chief

 5   of Staff to Councilmember Krekorian.  I'm joined by Lorraine

 6   Diaz, our District Director and our Homeless Services

 7   Coordinator for our office.

 8          Judge, since the time we toured three empty lots,

 9   those are now housing hundreds of people that are now in tiny

10   home villages.  Each and every one of those lots that we

11   toured, we made happen as a reality.

12          On top of that, we have two additional bridge

13   homesites, one of them we toured during that was under

14   construction.  Both of those are open.

15          On top of that, we have our homeless services

16   navigation center in our district.  We have built -- sorry.

17          **MS. SPEAKER:**  Go for it.

18          **MR. TOROSSIAN:**  Lost my notes so I'll borrow

19   Lorraine's.

20          So we've built out over 600 beds just in our district

21   in this timeframe, since the time that you guys visited that

22   site.  And it took a couple more months than we -- than you

23   would have liked, Judge.  You said by Christmas and it is by

24   Christmas.  Unfortunately, the year over.  But still there are

25   people living in those beds right now.

1          We -- what we had done is we have focused on the

2    areas around our freeway encampments but also the areas around

3    the services that we're providing.  That's two part.

4          One, because we've made a commitment to the

5    neighborhoods that if you allow these services in your area,

6    we're going to be working to enhance the services in your area

7    also.

8          Secondly, we've heard a lot from the unhoused

9    individuals that are in our tiny homes that are asking for the

10   areas around their tiny home villages to be cleared up because

11   they don't want the -- to be lured back into that lifestyle of

12   drug and alcohol abuse or the lifestyle of homelessness.

13         So they have personally asked us to clean up the

14   areas around their tiny homes from encampment so that they

15   don't have to have that struggle as they're trying to recover

16   from the services that they have.

17         So we have offered with the numbers of beds we

18   have -- we've asked LAHSA and we've actually gone out there

19   with LAHSA outreach workers and also others to offer a bed to

20   everybody in council district two that's experiencing

21   homelessness.  We have focused on the overpass and underpasses

22   but -- and the freeway encampment areas.  But we have extended

23   that offer to everybody in our council district.

24         We do have a few photos that we can have added to the

25   record of underpasses.  One of the worst ones we've had which

EXCEPTIONAL REPORTING SERVICES, INC

1    had also some of the highest crime numbers was Lankershim.

2    Everybody in Lankershim got offered a bed.  You see the before

3    and afters of Lankershim.

4              The second one is Moorpark underpass, also a thing.

5    Everyone got offered a bed.  Those are now cleared out.

6              The third one is Strathern Park West.  It's a park

7    that runs along the freeway.  Everyone got offered a bed.  We

8    built a tiny home right near there that most of them moved in.

9    It is much cleaner and much better than the before and afters.

10             There are a couple stragglers that decided to hang

11   around there still that know the rules.  And when the State's

12   out there, they'll move off State property and onto County

13   property or City property, and vice versa.  So we haven't been

14   able to 100 percent address those encampments but we have

15   offered them all the beds.

16             At the same time, we are -- we have the -- we have 27

17   rapid rehousing that have gone to people in our district.

18             We have a Project Homekey that's opening in January

19   in our district.

20             We have a second Project Homekey site that we're in

21   negotiations right now to purchase.  I --

22             And then we have multiple permanent supportive

23   housing projects that are in construction right now.  I think

24   two of them have recently topped off to their top four so they

25   -- in the next quarter of next year, we'll have a couple of

1    those open, too.

2              So we are providing the services there.

3              The -- it doesn't come without challenges there.

4    We've run into hiccups throughout the way.  But we have been

5    working to provide these.  The hiccups actually come sometimes

6    is coordinating services amongst different agencies.

7              Unfortunately there was a woman living along Tuxford

8    near the Five Freeway who asked for help because she said she

9    had homicidal thoughts.  We reached out to E6 teams, we reached

10   out to the mental health teams, asking for services for this

11   individual.  It took some time before those resources went out

12   there.  And when they did, they couldn't find her because she

13   was in jail because she had --

14             **MS. MARTINEZ:**  Karo, are those mainstream services

15   that the County's supposed to provide as it pertains to your

16   council district in regards to the clear-ups of the three areas

17   that you currently gave me?

18             **MR. TOROSSIAN:**  The three areas the City resources

19   work together to do the clean-ups with LAHSA, and service

20   providers offer the beds.  But at the same time we had our

21   sanitation and other teams there to help actually do the

22   cleaning up.

23             **MS. MARTINEZ:**  Great.  Thank you.

24             **THE COURT:**  Thank you.

25             **MS. MARTINEZ:**  Great.  If we can now have Keith.  And

1    I -- anyone else with you, Keith, from Councilmember

2    Blumenfield's district?  I see the chief of staff I think.

3    Yes?

4              **MR. SPEAKER:**  Good morning, Judge Carter, Birotte,

5    Michele.  We're going to talk briefly about our 41-18 locations

6    as relates to sheltering folks who are homeless in CD-3.

7              So Councilmember Blumenfield is taking a deliberative

8    and methodical approach to the implementation of the 41-18

9    designations.

10             In council district three, there are 26 designated

11   locations.  And as of December 1st, three of those locations

12   are in effect.  They include the Corbin underpass, the De Soto

13   underpass, and the Winnetka Recreational Center.

14             In preparation for this, council staff are engaging

15   in an intensive outreach campaign and developing housing plans

16   for those individuals that are encamped at these locations.

17   And we're doing this in partnership with LAHSA and other local

18   nonprofit organizations.

19             This involves partnerships on two innovative pilot

20   programs that address the needs of those living unsheltered in

21   CD-3.

22             The first pilot is a voluntary storage program using

23   commercially available public storage units to store personal

24   belongings of those who are willing to take shelter.

25             Working with the nonprofit About My Father's

1    Business, or AMFB, the individual receives assistance packing

2    and transporting their belongings to a storage facility where

3    they have access to it during the facility's business hours.

4           Now, the rental fee is paid for by AMFB via

5    partnership with Councilmember Blumenfield.

6           The crucial part of our strategy, because there are

7    many people who are willing to accept housing but they don't

8    want to leave their belongings on the sidewalk, is that

9    providing storage, we've removed that barrier that could have

10   otherwise been an obstacle to housing.

11          And it also addresses and solves the problem for

12   people who've accepted interim housing from having to store

13   their property on the public right-of-way.

14          **MS. MARTINEZ:**  Keith, I just want to make sure that,

15   you know, I mentioned 41-18.  We're not here about --

16   specifically about that.  We're here about the freeway

17   agreement.  And so is that pilot project applied to the freeway

18   agreement?  If not, yeah, we could have a conversation --

19          **MR. SPEAKER:**  Yes, ma'am.

20          **MS. MARTINEZ:**  -- another time on that.  But I want

21   to be very specific --

22          **MR. SPEAKER:**  Yes, ma'am.

23          **MS. MARTINEZ:**  -- about the interventions as it

24   pertains to Councilman Blumenfield's district regarding this

25   agreement here.

1          **MR. SPEAKER:**  Yes, ma'am.  It's all related to those

2    specific -- these locations are related to that agreement, and

3    they all address underpasses which are the locations stipulated

4    in the MOU.

5          **MS. MARTINEZ:**  Great, thank you.  Just wanted to put

6    that for the record.

7          Yes, Judge Carter?

8          **THE COURT:**  Simple question.  If I drove back out to

9    Corbet (phonetic) today, what would I find?

10          **MR. SPEAKER:**  Sir, if you went back out to Corbin

11    today, it would look like this.  It's completely clear.

12          **THE COURT:**  Okay.

13          **MR. SPEAKER:**  It's -- believe it's been submitted to

14    the Court.  There are no people living beneath the underpasses

15    on either side.  And it is fear of -- free of any --

16          **THE COURT:**  Okay.

17          **MR. SPEAKER:**  -- obstructions or debris.

18          **THE COURT:**  Okay.  All right.  Thank you.

19          **MR. SPEAKER:**  Yes, sir.

20          **THE COURT:**  Michele, back to you.  Who else do you

21    want?

22          **MS. SPEAKER:**  Move on and do the shared housing

23    pilot.

24          **MS. MARTINEZ:**  Thank you, Keith.

25          **MR. SPEAKER:**  Okay, thank you.

1          **THE COURT:**  Is there anything else?

2          **MS. MARTINEZ:**  No.  So I wanted us to get the slides

3     up.  There's obviously been tremendous progress in some of

4     these council districts that we just heard.  But last week I

5     had the opportunity to go out.

6          And so when I asked Mr. Scott Marcus how many folks

7     have been served or asked if they needed shelter, those that

8     were to stay on the overpasses and 500 feet away, I'm going to

9     -- and as I told Judge Carter, I'm going to bypass the

10    underpasses.

11         And I know there's been a lot of progress.  But with

12    the current rains, I'm just -- I kind of ignored that at that

13    moment in time during my pass.  But I did take some pictures

14    that I wanted us to highlight very quickly.

15         And we're starting off with Venice Boulevard.  At the

16    time we had met Councilmember Bonin, I want to say five, six

17    months ago, there was efforts being made by LAHSA to get that

18    area specifically cleared.  And so it was my impression as I

19    was going over there that it would be clear, right, because

20    there was a lot of work and effort being done with LAHSA and

21    Councilmember Blumenfield.  Sorry, Councilmember Bonin.

22         And last week, which was on a Saturday, that's what I

23    saw under the underpass.

24         **MR. MARCUS:**  Special Master, I actually have

25    representatives from Councilmember Bonin's office here if you'd

1   like to hear from her while you're looking at these photos.

2       **MS. MARTINEZ:**   That would be fantastic, yes.  So I

3   would just love to get an update from Councilmember Bonin's

4   staff really quickly on this since they are here.  And I'm glad

5   that they are here.  If they just can talk us through the court

6   here.

7       When they started under this underpass -- and what

8   happened?  I know they were working with LAHSA, but it seemed

9   like there was little progress being made, and just wanting to

10   get an understanding of that.

11       **MS. SPEAKER:**   Yeah, thank you, Your Honor.  My name

12   is Hannah (phonetic).  I'm with Councilmember Bonin's office,

13   and I'm joined by our Deputy Chief of Staff Krista this

14   morning.

15       Our -- I'll start off with some of the statistics I

16   received from LAHSA about housing placement.  So at that

17   location, since the beginning of the roadmap program, eight

18   people have been permanently housed.

19       There have been a total of 557 contacts.  That

20   includes duplicative contacts.  But distinct contacts, 157.

21       Currently 33 people have been placed in interim

22   housing since the beginning.  And my records show there's nine

23   individuals at the encampment.

24       We do have consistent sanitation services on our side

25   of that part of the boulevard.  As you probably remember, half

**53**

1    of it's Culver City, half is LA.  So we'll focus on the

2    northern side.

3            So I'll -- you know, individuals repopulate these

4    locations.  We've been deploying LAPD and sanitation resources

5    on a consistent basis with our full cleanups --

6            **MS. MARTINEZ:**  Just very quick question because you

7    heard from Councilmember Blumenfield and Councilmember

8    Krekorian's district, those for the most part, that they

9    cleared up those -- they remain clear.  Can you just give me an

10   indication why you think that's not happening in Councilmember

11   Bonin's district?

12           **MS. SPEAKER:**  You know, I think we're providing -- I

13   don't know exactly how consistently they're providing those

14   resources.  Frankly, I don't have as clear of an answer for you

15   on that question.

16           **MS. MARTINEZ:**  No problem.  Please proceed.

17           **MS. SPEAKER:**  Yeah.  So that's the data I think that

18   is most significant from that location.

19           **THE COURT:**  Have you been out there personally?

20           **MS. SPEAKER:**  Yes.

21           **THE COURT:**  How recently?

22           **MS. SPEAKER:**  I was out there last week actually, at

23   the end.  And I --

24           **THE COURT:**  Is this what you saw?

25           **MS. SPEAKER:**  It's similar to what I saw, yes.

**54**

1          **THE COURT:**  Why?

2          **MS. SPEAKER:**  I mean, I think the reality is, is

3    we're -- it's clear we're not deploying the exact amount of

4    sanitation resources that are needed.  But -- oops, sorry

5    (indisc.) --

6          **THE COURT:**  Just simple question, simple answer.  I'm

7    losing track of time, but six or seven months ago I personally

8    went out there.  LAHSA was there cleaning up, Tex (phonetic)

9    was there.  He's the gentleman who ran ten of these tents,

10   charged money for them.

11         Across the street is Maurice who used to know General

12   Jeff.

13         I'm watching, literally sitting on that sidewalk,

14   vehicles pulling up and selling narcotics, not knowing I'm a

15   Federal judge.  There is no change that I'm seeing in six or

16   seven months.  Why?

17         **MS. SPEAKER:**  (No audible response)

18         **THE COURT:**  All the statistics, put it away.  Why?

19         **MS. SPEAKER:**  People continue to move into that

20   location.

21         **THE COURT:**  No.  They're the same people.  On the

22   corner is the guy with the 64-inch TV running on a generator.

23   Same guy.  Across the street is Oobla (phonetic) --

24         **MS. MARTINEZ:**  Bobbo (phonetic), Ben --

25         **THE COURT:**  Oh, yeah.

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **MS. MARTINEZ:**  -- Bobo (phonetic), yeah.

2          **THE COURT:**  Yeah.  Same people.  These are almost

3    permanent structures.  Look at them.  These are not transients.

4    Why?

5          **MS. SPEAKER:**  At one point it was clear, right after

6    the roadmap team had made those placements.  And I don't have a

7    by-name list in front of me about who stays there and then who

8    returns back.  I'm happy to ask LAHSA about that.

9          **THE COURT:**  Okay.  All right, thank you.

10          **MS. MARTINEZ:**  Well Heidi's here, we'll ask her.  But

11    thank you, we greatly appreciate it.

12          Can we move towards, yeah, the rest of the slides?

13    Thank you.

14          So this was Saturday afternoon in downtown.  And if

15    I'm not mistaken, Mr. Scott Marcus, this is on Beaudry

16    (phonetic) I think it is.  Is that CD-1, Gil Cedillo's

17    district, or is that someone else's district?

18          **MR. MARCUS:**  I have to confess I don't know if

19    Beaudry is in CD-1 or not.

20          **MS. MARTINEZ:**  I want to say it is Cedillo's.  But,

21    again, me, too.  I'm not like a total expert yet on all the

22    boundaries.

23          But this is literally off of Beaudry and the highway

24    here.  And the last time I was out there, which was six, seven

25    months ago, I too asked and some of the same folks are still

1     there.

2          And one of the questions that I did ask was any

3     shelter provided by any government entity, nonprofit.  And for

4     the most part, what they've said, that the only folks that they

5     saw there were Caltrans.

6          And one of the guys, he actually had a Caltrans

7     jersey.  I don't know if he was part of the new program or not

8     but he had said that no housing had been offered to himself,

9     and he was not aware to anyone else in that encampment area.

10         Next.  This is CD-9.  That was the other high

11    concentration area where work has been done and interventions

12    have been made based under this freeway agreement which is

13    Councilmember Price's district.

14         We have seen improvements.  But we did go back down

15    and I -- what I would say to you all, what I had -- what I saw

16    in this was a decrease in encampments but a major increase in

17    recreational vehicles.  So that -- and then obviously this was

18    the first time that we saw this much wiring.  And, again, it's

19    because there are a ton of recreational vehicles that have made

20    it to that specific area.

21         And the last question that I would just say here,

22    this is -- remains -- and remains clear here, this was an

23    encampment that was filled and it was clear.  And so I wanted

24    to show Judge Carter and his clerks and you all here today that

25    there was progress.

1          But this specific location, and we're probably not

2     going to know whose council district so I won't ask you,

3     Mr. Marcus, but this is at the Hollenbeck Park.  And then

4     there's a freeway there.

5          And so as you're getting off the freeway, you can't

6     see that there's encampments, but there's a wall.  And over the

7     wall there are several encampments, and then you have the park.

8     What I observed is that those folks that are encamping, they're

9     staying away from the park, and it seems that they have a lot

10    of respect for that residential area and they want to be in a

11    safe space.

12         And spoke to them and that was certainly the case.

13    There -- these folks work.  These folks, they said they wanted

14    to ensure that people get to play in the park.

15         But one of the things that I wanted to share with you

16    all, and I'm not sure if this is the only picture that you have

17    or the video that I had.  So there's the fence.  And it goes

18    all the way down so you're covered by that massive wall where

19    the highway is.

20         But there has -- on this part, it seems there's been

21    a major increase.  So the further out and the higher the wall

22    goes, there's been a major increase in encampments there versus

23    where it was initially at the front of -- so they kind of

24    moved.

25         So to -- so I just wanted to get some clarification

1    specifically with -- if there were inner -- any interventions

2    in this council district, were folks just relocated or asked to

3    go to the back and/or were they provided shelter?

4            Because I will say that those folks, I did speak to a

5    gentleman, and he said that Project Room Key had been provided

6    to them at the Grand, and many of them were accepting it.  And

7    he was there to continue to tell others that somebody was going

8    to come the following week to provide more opportunities.

9            But I just wanted to indicate here to the Court and

10   to the City that there's been a -- that increase of encampments

11   has gone way to the far end of that park.

12           And I think that's the last slide.

13           **MS. SPEAKER:**  Yes.

14           **MS. MARTINEZ:**  Yes.  And so, Judge Carter, Judge

15   Birotte, I just wanted to highlight those specific areas.  You

16   know, I seen those for myself.

17           And so the next just question that I have, since the

18   County has, you know, done this sample audit in just of a

19   thousand or so beds and are moving towards doing a

20   comprehensive audit on all beds, and I know that the auditor is

21   just getting documentation for the City.

22           The question is, Mr. Marcus, and to the County, will

23   you -- how will you validate and verify just beyond

24   documentation that those beds were provided or not?  Will there

25   be any real time kind of visits of those particular new beds so

1    that we know for sure that those beds were produced?

2         I know with the rapid rehousing there's issues in

3    regards to documentation that the County -- that the auditor

4    said it wasn't enough, the standard is not there.

5         And so how would we be able to know, how would the

6    Court know today that those beds were done in real time, that

7    they actually exist, versus documentation?

8         **MR. MARCUS:**  Your Honor, the City is happy to bring

9    the auditor controller to each and every one of those beds if

10   that's how the auditor controller wants to conduct his audit.

11        **THE COURT:**  There's the question (indisc.) the City,

12   the County, the Plaintiffs give the Court guidance.  But if you

13   can't, and if I'm hearing the passage of time, from August to

14   today for instance, and the concern going back and forth and

15   what I consider this much of the problem, then I'm concerned

16   that the Court is going to take some action.  And I'm being

17   very transparent about that.

18        I agree with you, Skip, an audit has to be conducted.

19   But when I hear July, it's way too long.  And you know I'm

20   really concerned about the rainy season.  I just don't know

21   what these stats are going to show even with the last rain.

22        **MR. MILLER:**  Your Honor, can I --

23        **THE COURT:**  So do I then use my powers and schedule

24   this for an OSC in re breach of an agreement?  Because I'm not

25   going to hold contempt.  I'm not -- we're going to set a

60

1    record, okay, we're going to have a hearing.

2           And maybe everybody will comply by that time, and

3    then you're going to have my praise.  Late, so what, we got it

4    done, okay?

5           But I'm not willing to work on your time schedules

6    anymore.  They're just too long and too many people are dying.

7           **MR. MILLER:**  Your Honor, what I was saying was that

8    was the plan.  I'm not saying we won't move that up and

9    accelerate it.  We will.

10          **THE COURT:**  Okay.  So do I set this then for an OSC

11   in re breach of an agreement, hope for the best, maybe we don't

12   even have that hearing but maybe we do have that hearing with

13   transparency, that we have that right here in court, people can

14   be produced, we can get the accurate numbers?

15          And then if the City is in contempt, so be it.  If

16   it's not in contempt, or the County, so be it.

17          **MR. MILLER:**  We'll take -- we'll do -- it will be a

18   sample audit, a lot of sampling, a lot of, you know, there'll

19   be a lot of examination.  There will be some visits to beds to

20   verify, absolutely.

21          **THE COURT:**  Sure.

22          **MR. MILLER:**  It will take three to four months.

23          **THE COURT:**  Why?

24          **MR. MILLER:**  Because that's what I'm told it'll take.

25          **THE COURT:**  By whom?

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **MR. MILLER:**  You know, the auditor -- that's what the

2   -- the auditor controller told me that during the break.  It'll

3   take three to four months.  They want to do it right, they want

4   to do it comprehensively.  They want to -- the sample to be

5   representative.

6          **THE COURT:**  Okay.

7          **MR. MILLER:**  So --

8          **THE COURT:**  With this kind of quite frankly not too

9   subtle threat, could you accomplish that voluntarily?  In other

10  words, could I come up with some accurate numbers that the

11  Plaintiffs and the Intervenors are privy to so they have some

12  confidence in these produced units?

13         **MR. MILLER:**  Yeah.  That's the plan.

14         **THE COURT:**  Is there any forbearance that I could

15  use, quite frankly, rather than exercising that power, and get

16  all of you folks together?

17         And by the way, I know that there's been an

18  occasional discussion about an agreement.  And I've said this

19  to each one of you privately, except the Intervenors.  If you

20  do bring an agreement to the Court, it's going to have to be

21  meaningful.  And we've had this discussion.

22         I'm not going to sign off on an agreement that's a

23  piece of paper in three to five years where somebody then comes

24  long past our lifetime and says, we failed.  And that's one of

25  the suspicions I've had about three and five-year plans without

62

1     meaningful milestones.

2             So if you do bring the Court in good faith an

3     agreement, I'm going to cooperate with you.  But it's going to

4     have to have meaningful milestones because the Court's not

5     going to sign off on any agreement that can't be monitored just

6     like this.

7             And we can ask questions.  But I'll work with you.

8     Judge Birotte will work with you.  We're not inflexible in that

9     regard.

10            But just a piece of paper saying we've agreed,

11    etcetera, without milestones won't be acceptable to the Court.

12            All right.  Now, is there anything further?  If not,

13    I think that we've spent enough time today.  And I'll -- I

14    think I'll invite Marcus, you, Skip, Plaintiffs and Intervenors

15    to meet informally at any time with Judge Birotte.

16            I'm going to do something within the next couple

17    weeks.  But I'd appreciate that input.  Okay.

18            **MR. MILLER:**  Okay.

19            **THE COURT:**  And I appreciate knowing what meaningful

20    time periods you have to accomplish what we're trying to do.

21            And, finally, just I implore you, start raising your

22    sights.  We started with 16th and Maple with a couple hundred

23    lots.  That wasn't the target -- or units.

24            We then moved over to Los Angeles.  That was just a

25    learning process for me.

1          Six thousand is just the beginning.  Los Virgenes

2     (phonetic), I haven't pressed you on that but it's just a

3     concern to me when I think it's open in the rainy season and I

4     find out it doesn't even open until April or May.  And I'm

5     sitting here as a judge believing that this unit's been opened.

6     Pretty embarrassing.

7          So we'll work with you, but it's got to be meaningful

8     time periods.  Fair enough?

9          **MR. MILLER:**  Yes, Your Honor.

10          **THE COURT:**  Fair enough?

11          **MR. SPEAKER:**  Yes.

12          **THE COURT:**  And we'll show some flexibility on our

13     part.

14          But, number two, it's not that I distrust what you

15     believe, because I think you believe it.  I distrust these

16     figures right now.

17          And so what I'm afraid of is that this meeting's

18     going to pass with this impression.  Well, we built it and it's

19     late.  No, no.  It's do you even have the numbers?  I'm

20     struggling the same way (indisc.) struggling and Carol reading

21     these numbers.

22          And so I'm at the beginning.  I'm not accepting that

23     you have these numbers.  And it's right in your auditor's

24     declaration.  So I leave you with these words.  Increased risk

25     that inaccurate and incorrect information will continue being

**64**

1    reported if standards and procedures are not developed and

2    implemented.  And that's I hope (indisc.) on the last occasion

3    with the County and the message today with the City.

4           Whatever this money is that's coming, it's got to be

5    accountable.  We've got to know if we're making mistakes, how

6    is it being spent, what we can do with it.

7           In Schedule B I think it is you've got a hundred

8    thousand -- $109,728 per unit in new construction in paragraph

9    two.

10          If you go down to paragraph four, you've got a six-

11   month interim period of time for already established interim

12   housing that runs out to $9,072 for six months.

13          But you can start seeing the way that money's spent,

14   we can start making, you know, good faith decisions on what

15   that balance should be and from your perspective, in terms of

16   interim housing versus long-term housing.

17          But we've got to just got to move these numbers up.

18   We can't be producing for hundreds or even a couple thousand.

19   We've got to start thinking tens and tens of thousands, and

20   we've got to do it quickly.  I'm going to leave that to you

21   initially.

22          Now, do you have any questions of me (indisc.) Judge

23   Birotte, do you have any further comment?  Michele, do you?

24          All right.  Would you call Judge Birotte informally,

25   talk to him about maybe some scheduling so I don't act without

1   your guidance.

2           But you know I'm obviously thinking about at least an

3   SOC in re withdrawing the agreement for breach of an agreement

4   and putting pressure on everybody to produce accuracy.  I don't

5   want to do that precipitously.

6           But for goodness sakes, as we all enjoy the holidays

7   -- and happy holidays to all of you folks in this room here,

8   your wonderful families.  I hope all of you are doing well,

9   especially in this COVID crisis time.

10          But out there for all of our collective failure,

11  including the Court's, we've got so many people out there that

12  are just so desperate.

13          And I think if anyone of us walked down the streets

14  or just got out there, it would change our hearts forever just

15  in terms of the mission that all of us in this room are really

16  duty bound to fulfill.  So maybe we can work collectively on

17  that.

18          **MR. MILLER:**  Yes, Your Honor.

19          **THE COURT:**  Okay.  Let's really try.  And if we can

20  get a meaningful agreement, let's get there.  And if we can't,

21  then it's headed towards litigation and the bickering,

22  etcetera.

23          But in the long run, something's got to happen here.

24  Let's break this inertia.

25          **(Clerk/Judge confer)**

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **THE COURT:**  (Indisc.) representatives here.  You can

2    contact us individually.  We don't want to take any more of

3    your time today, okay?

4          All right.  Then we're in recess.  Thank you very

5    much.

6      **(This proceeding was adjourned at 10:54 a.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    __April 4, 2022__

        Signed                                        Dated


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC