Thomas A. Myers (Cal. SBN 176008)
E-Mail: tom.myers@ahf.org
Jonathan M. Eisenberg (Cal. SBN 184162)
E-Mail: jonathan.eisenberg@ahf.org
AIDS HEALTHCARE FOUNDATION
6255 West Sunset Blvd., 21st Flr.
Los Angeles, CA  90028
Tel.: (323) 860-5200
Fax: (323) 467-8450
*Attorneys for Non-Party* AIDS
HEALTHCARE FOUNDATION

## UNITED STATES DISTRICT COURT,

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, a non-profit corporation; JOSEPH BURK; GEORGE FREM; WENZIAL JARRELL; CHARLES MALOW; KARYN PINSKY; LEANDRO SUAREZ; HARRY TASHDJIAN; CHARLES VAN SCOY; and GARY WHITTER, individuals;<br><br>                    Plaintiffs,<br><br>     vs.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200, inclusive,<br><br>                    Defendants. | Case No. 2:20-CV-02291<br><br>**OPPOSITION OF NON-PARTY AIDS HEALTHCARE FOUNDATION TO PROPOSED PARTIAL SETTLEMENT OF CASE** |

Upon the express invitation of this Court for this case (see "Civil Minutes – General" (Dkt. No. 423 (May 20, 2022))), Non-Party AIDS Healthcare Foundation ("AHF") submits the following statement opposing the May 19, 2022, proposed settlement agreement between Plaintiff LA Alliance for Human Rights ("LA

Alliance") and Defendant City of Los Angeles (the "City"), excluding Defendant County of Los Angeles (the "County").

## INTRODUCTION

For two reasons explained in detail below, the Court should not approve the proposed settlement agreement between LA Alliance and the City, at least until the proposal is modified substantially.  First, the proposed settlement relies too much on temporary shelters as opposed to permanent housing for people experiencing homelessness, dooming the settlement to failure.  It is easy to foresee that the people purportedly being helped will end up back on the streets, and then subjected to sanctions for living there.  Second, the fraction of people experiencing homelessness for which the City is responsible is much too low compared to the scope of the problem of homelessness, and to the City's capacity to address the problem.

## ARGUMENT

## I.    The Proposed Settlement Agreement Gives the City Too Much Discretion to Offer Ineffective Temporary Shelter to People Experiencing Homelessness

At an Internet page about this lawsuit, LA Alliance asks and answers a question about the litigation's objectives:  "We are seeking a legally enforceable mandate whereby the community provides beds and services to those ready, willing, and able to accept shelter.  At the same time, living in public spaces is forbidden and laws are enforced.  […]Options exist for less than $10,000 per bed." *Get the Facts* (emphasis added), available at https://www.la-alliance.org/get_the_facts (last visited May 23, 2022).  As can be seen, LA Alliance's focus is on providing inexpensive, temporary shelter to people experiencing homelessness.  Meanwhile, in this case's "Amended and Supplemental Complaint [Etc.]," LA Alliance criticizes the City's "near-exclusive focus on building permanent supportive housing," which supposedly "has led to

lethal underfunding of emergency and interim shelter solutions…"  (Dkt. No. 361 (Nov. 1, 2011); ¶ 5 (emphasis added).)  In sum, for people experiencing homelessness in this County, LA Alliance emphasizes temporary solutions, with permanent housing downplayed because of alleged high per-unit development costs and long construction times.  (¶¶ 18, 72, 73, 85.)

It follows that, in LA Alliance's proposed settlement with the City, the City would "create a [r]equired [n]umber of <u>housing or shelter</u> solutions," not just permanent housing, to accommodate an as-yet-unknown fraction of unhoused people living within City boundaries.  ("Settlement Agreement" (Dkt. No. 421-1 (May 19, 2022)) at 10 (emphasis added); accord, "Settlement Proposal Term Sheet" (Dkt. No. 408-1 (Apr. 1, 2022)) at 1.)  "The City may <u>choose</u>, at its <u>sole discretion</u>, <u>any</u> housing or <u>shelter</u> solution, including but not limited to tiny homes, shared housing, purchased or master leased apartments, hotels/motels, or other buildings, <u>congregate shelters</u>, permanent supportive housing, rental assistance/rapid rehousing, family reunification, <u>sprung structures or tents</u>, <u>safe parking</u>, <u>safe sleeping/camping</u>, and <u>interim housing</u>, (including A Bridge Home <u>beds</u>)…."  (Settlement Agreement, *supra*, at 10 (emphasis added); accord Settlement Proposal Term Sheet, *supra*, at 1.)[1]  In short, under the proposed settlement agreement, it would seem to be acceptable for the City to offer <u>only</u> interim or temporary shelters, and zero permanent housing.

Online, LA Alliance bemoans that the City and the County supposedly "keep trying the same solutions and getting the same results."  *We Sued the City and County to End the Homeless Crisis.  Join Us*, available at https://www.la-alliance.org (last visited May 23, 2022).  It is ironic that LA Alliance levels that critique, because LA Alliance's proposed solution – forcing unhoused people into mass shelters, parking lots, camping spaces, or giant tents, to avoid being

---

[1] AHF does not oppose and, indeed, supports, many or most of these listed solutions, in appropriate circumstances.

convicted of living in public spaces – is already known to fail. *See, e.g.*, Sara K. Rankin, "Hiding Homelessness:  The Transcarceration of Homelessness," 109 *Calif. L. Rev.* 559, 591-94, 600-02 (2021) (analyzing failure of this same approach in Seattle, WA, and San Diego, CA); Jason M. Ward, et al., "Recent Trends Among the Unsheltered in Three Los Angeles Neighborhoods:  An Interim Report on the Los Angeles Longitudinal Enumeration and Demographic Survey (LA Leads) Project," *RAND Corp. Research Report* 22 (2022) (reporting survey results of 50 percent or fewer of unsheltered persons being willing to accept safe camping, shared housing, or group shelter); Rina Palta, "Here's What It Would Cost to Shelter Every Homeless Person – And Why LA Will Never Do It," *LAist* (Jun. 22, 2018) ("Shelters, ideally, are not just cots opened up for the night in a church cafeteria (though we do have some of those in LA).  …The overarching goal here is to get people off the streets permanently and then move towards preventing more people from falling into homelessness in the first place.  If the city and county were to devote the majority, if not entirety, of their resources to shelters, that plan goes away."); Laurie Ball Cooper and Ana Vohryzek, "Rethinking Rapid Re-Housing:  Toward Sustainable Housing for Homeless Populations," 19 *U. Penn. J. L. & Soc. Change* 307 (2015) (finding that even post-shelter "rapid re-housing" eventually fails most people who have experienced homelessness; advocating for solutions that are instead "long-term").

In contrast, implementation of a well-known alternative approach called "Housing First" surely would be effective.

Housing First refers to homelessness intervention programs that prioritize providing <u>permanent</u> housing to people experiencing homelessness, ending their homelessness, and serving as a platform from which they can improve their quality of life.  Housing First reflects the reality that people need basic necessities like food, sleep,

and a stable place to live before attending to any secondary issues

such as budgeting properly or addressing substance use issues.

Rankin, *supra*, 109 *Cal. L. Rev.* at 569 n.2 (emphasis added).  As the California Legislature already has determined, "Housing First is an evidence-based model of ending all types of homelessness and is the most effective approach to ending chronic homelessness.  The federal government recognizes that Housing First yields high housing retention rates, low returns to homelessness, and significant reductions in crisis or institutional care."  2016 Cal. Legis. Serv. Ch. 847, § 1(a) (West).  "No emergency-shelter intervention solves the underlying problem of homelessness like stable, permanent housing does – and the latter does so more humanely and cost-effectively."  Rankin, *supra*, 109 *Cal. L. Rev.* at 602.  "Ultimately, Housing First[…]is proven to be a successful and cost-effective alternative to both unsheltered homelessness and the shelter system."  Brigid Kelly, "Building a Radical Shift in Policy:  Modifying the Relationship Between Cities and Neighbors Experiencing Unsheltered Homelessness," 40 *Minn. J. L. & Ineq.* 177, 192-93 (2022); *see also* Gary Blasi, "Legal Right to Shelter:  The Current Right-to-Housing Debate Often Fails to Note that for Many Years Indigent Californians Had a Right to Housing," *Los Angeles Lawyer* 30, 33 n.44 (Dec. 2019) (noting success of County Housing First program); Lloyd Pendleton, "The Housing First Approach to Homelessness," *TED* (2018), available at https://www.youtube.com/watch?v=5nys6iebjHw (last visited May 24, 2022); Palta, *supra* ("Studies, and L.A.'s own numbers show that shelters that do provide services and conform to higher quality standards are more successful at getting people into permanent homes."); Terrence McCoy, "The Surprisingly Simple Way Utah Solved Chronic Homelessness and Saved Millions," *Wash. Post* (Apr. 17, 2015) (reporting on Utah's successful implementation of Housing First); Ward, *supra*, at 22 (reporting survey results of 77 percent or higher of unsheltered persons being willing to accept permanent stay in hotel or motel setting, supporting

housing, or shelter or hotel with private room); National Alliance to End Homelessness, *Housing First* (Mar. 2022), at https://homelesshub.ca/resource/national-alliance-end-homelessness-housing-first#:~:text=National%20Alliance%20to%20End%20Homelessness%3A%20Housing%20First%20Housing,possible%20%E2%80%93%20and%20then%20providing%20services%20as%20needed. (last visited May 23, 2022).

It is easy to predict that unless the City is required ultimately to offer permanent housing to the vast majority of people experiencing homelessness, before they may be cited for living in public spaces, the settlement agreement will not help most people experiencing homelessness stop living on the streets, and will not alleviate problems that these people may cause or encourage because they are living on the streets.[2]

## II. The City of Los Angeles Should Be Required to Offer Housing to All People Experiencing Homelessness within City Boundaries

In this case's Amended and Supplemental Complaint, LA Alliance acknowledges that nearly two-thirds of (41,290 out of 66,436) people experiencing homelessness in the County live within the City. (¶ 2.) Moreover, the City "has the primary land-use obligation to its constituents" (¶ 5), whereas "[t]he County has the obligation to provide for indigent mental and public health" (¶ 4).[3]

Yet the proposed settlement agreement would obligate the City to create shelter and/or housing for only a presently unknown but very likely a small

[2] AHF acknowledges the importance for people experiencing homelessness of temporary shelters – to be deployed on the way to providing permanent housing. See, e.g., Mark Horvath, "It's Not Housing First or Shelters. It's Housing First AND Shelters!," *HuffPost Impact* (Jan. 3, 2014).
[3] The City has both a Housing Department and a Housing Authority. The County lacks any agency devoted to housing exclusively, although the Community Development Authority operates housing programs.

fraction of people experiencing homelessness in the City. The specific obligation is as follows:

> The City agrees to create a [r]equired [n]umber of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Appropriate PEH within the City based on LAHSA's 2022 Point in Time count.

(Settlement Agreement, *supra*, at 10; accord Settlement Proposal Term Sheet, *supra*, at 1.) And "City Shelter Appropriate" is defined to mean any "PEH," meaning "person experiencing homelessness," who

> (A) does not have a severe mental illness, and/or
>
> (B) is not chronically homeless and has
>
> (i) a substance use disorder, or
>
> (ii) a chronic physical illness or disability requiring the need for professional care and support, such that the individual (a) is unable to perform activities of daily living, including bathing, dressing, grooming, toileting, transferring between bed and chair, and feeding oneself, and/or (b) lacks medical and/or mental health care decision-making capacity, and/or (c) is a danger to themselves or others.
>
> PEH who meet the definition of City Shelter Appropriate are typically, but not always, those with low- or medium-acuity needs according to accepted industry standards….

(Settlement Agreement, *supra*, at 7-8; accord Settlement Proposal Term Sheet, *supra*, at 1.)

It is estimated that 20-to-25 percent of homeless people in the United States have some form of severe mental illness. National Coalition for the Homeless, *Mental Illness and Homelessness* (Jul. 2009), available at https://www.nationalhomeless.org/factsheets/Mental_Illness.pdf (last visited

May 23, 2022).  And 10-to-15 percent of people experiencing homelessness are considered chronically homeless.  Center for Evidence-based Solutions to Homelessness, *Chronic Homelessness* (Apr. 2018), available at www.evidenceonhomelessness.com/topic/chronic-homelessness/#:~:text=Chronic%20Homelessness%20As%20our%20understanding%20of%20homelessness%20has,to%2015%20percent%20of%20people%20who%20experience%20homelessness (last visited May 23, 2022). Up to 50 percent or more of people experiencing homelessness have substance-use disorders.  Erin J. Stringfellow, et al., "Substance Use Among Persons with Homeless Experience in Primary Care," 37 *Substance Abuse* 534, 535 (Oct.-Dec. 2016).  And up to 50 percent or more of people experiencing homelessness have at least one chronic health condition. Harper Sutherland, et al., "Health Conditions among Individuals with a History of Homelessness Research Brief," *ASPE Research Brief* (Feb. 28, 2021), available at https://aspe.hhs.gov/reports/health-conditions-among-individuals-history-homelessness-research-brief-0 (last visited May 23, 2022).

Absolving the City of responsibility for helping to house people who are experiencing homelessness within the City and who have the above-described characteristics, and assigning the City responsibility for helping only 60 percent of the remaining homeless people, means that the City would bear responsibility for, at most, less than 30 percent of people who are experiencing homelessness within the City.[4]  The City would bear no responsibility for, at minimum, the other

---

[4] The 30-percent figure is based on the conservative assumption that every person experiencing homelessness within the City has all the above-described characteristics.  In reality, many homeless people have none, a few, or only some of those characteristics.  Therefore, the percentage of local homeless people for which the City would have responsibility, because homeless people with certain characteristics are excluded, is surely significantly below 30 percent.

approximately 50,000 or more people experiencing homelessness in the County, including the City.

Especially given the greater expertise and jurisdiction of the City compared to the County in providing housing, it would be unjust to assign the (non-settling) County several multiples more homeless people to try to house or to shelter, compared to the number of homeless people that the City will be obligated to try to house or to shelter.

## CONCLUSION

For the foregoing reasons, the Court should not approve the proposed settlement between LA Alliance and the City, unless the settlement is modified to promote the Housing First model and to require the City to provide housing to many more people experiencing homelessness locally.

Dated: May 24, 2022                    By: *Jonathan M. Eisenberg*

Thomas A. Myers
Jonathan M. Eisenberg
*Attorneys for Non-Party* AIDS
HEALTHCARE FOUNDATION