DAWYN R. HARRISON, *Acting County Counsel* (State Bar No. 173855)
dharrison@counsel.lacounty.gov
JENNIFER A.D. LEHMAN, *Assistant County Counsel* (State Bar No. 191477)
jlehman@counsel.lacounty.gov
ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (State Bar No. 257931)
alai@counsel.lacounty.gov
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:   (213) 974-1830
Facsimile:   (213) 626-7446

LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
MIRA HASHMALL (State Bar No. 216842)
mhashmall@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:   (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> Defendants. | **CASE NO. 2:20-cv-02291 DOC (KES)** <br><br> **THE COUNTY OF LOS ANGELES' RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES** <br><br> Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.   OVERVIEW OF THE PROPOSED SETTLEMENT ..................................... 2

III.  THE SETTLEMENT CANNOT BE APPROVED UNLESS IT IS FAIR, ADEQUATE, AND REASONABLE ...................................................... 4

IV.   THE SETTLEMENT PREJUDGES THE ONGOING CASE ......................... 5

V.    THE PROPOSED SETTLEMENT MATERIALLY MISSTATES THE COUNTY'S SIGNIFICANT AID FOR PEH ...................................................... 7

      A.    The County's Ongoing Work To Address Homelessness ...................... 8

      B.    The County's Fiscal Year 2022-23 Budget Proposal ........................... 10

      C.    The Board's Adoption Of The Blue Ribbon Commission's Recommendations ................................................................................. 11

i

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*E.E.O.C. v. Pan Am. World Airways, Inc.*,
    897 F.2d 1499 (9th Cir. 1990)......................................................................5

*E.E.O.C. v. Waffle House, Inc.*,
    534 U.S. 279 (2002) ....................................................................................5

*LA All. for Human Rights v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021)....................................................................6, 7

*Thompson v. Enomoto*,
    815 F.2d 1323 (9th Cir. 1987).....................................................................5

*United States v. Oregon*,
    913 F.2d 576 (9th Cir. 1990)....................................................................4, 5

*Waller v. Fin. Corp. of Am.*,
    828 F.2d 579 (9th Cir. 1987).......................................................................5


**STATE STATUTES**

Cal. Welf. & Inst. Code § 17000 .......................................................................7


**FEDERAL RULES**

Fed. R. Civ. P. 41(a)(1).....................................................................................4


**OTHER AUTHORITIES**

U.S. Const. art. III.............................................................................................6

ii

## I.    **INTRODUCTION**

The County of Los Angeles (the "County") respectfully submits this response to the settlement agreement that has been submitted to the Court for approval between and among LA Alliance for Human Rights ("Alliance"), eight of the nine individual Plaintiffs, and the City of Los Angeles (the "City").

The County has long shared the Plaintiffs' and the Court's interest in solving the homelessness crisis and has always believed those solutions should take place outside of litigation.  It is the County's hope that, if the Court approves the City's proposed settlement agreement, it will bring needed relief to people experiencing homelessness ("PEH").  As Plaintiffs' Amended and Supplemental Complaint ("First Amended Complaint") acknowledged, it is the City "who has the primary land-use obligation" with respect to the area's PEH (FAC ¶ 5), although the County has been a frequent partner to the City in providing aid.  For example, in this very case, in a historic Memorandum of Understanding ("MOU"), the County agreed to provide up to $300 million in funds and more in services toward the City's creation of 6,700 beds or shelter opportunities to house high-risk PEH.

A settlement agreement reflects the obligations of the parties who agree to it. Here, however, in addition to describing the obligations of Plaintiffs and the City, the proposed settlement agreement improperly seeks to impose nearly two and a half pages of supposed "County Obligations," even though the County is not a party to the agreement.  These "responsibilities" have no basis in law, and the Settling Parties make no effort to identify one.  The Court cannot approve a private agreement between Plaintiffs and the City that imposes "responsibilities" on the County, without usurping the role of the Legislature in determining the County's fiscal and social policies.  Nor can the Court properly determine the County's "obligations" under the guise of entering a consent decree between other parties. This would be entirely improper, and an egregious violation of due process of law.

The "obligations" and "responsibilities" assigned to the County in the

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

proposed agreement are also a distraction from the myriad ways the County has committed to addressing homelessness, including dedicating countless hours and billions of dollars to housing, shelter, services and other resources for PEH. In the last fiscal year alone, 20,477 people received permanent housing, and 26,760 people received interim housing, in the County. The County's proposed budget for the next fiscal year includes $532.6 million in additional funding to combat homelessness, and the County is actively working to ensure those funds are used in the most efficient and effective ways possible.

## II.    OVERVIEW OF THE PROPOSED SETTLEMENT

Plaintiffs filed this lawsuit against the City and County allegedly "to change the trajectory of the homelessness [crisis]" in Los Angeles. (FAC ¶ 1.) Early in their 226-paragraph, 100-page, First Amended Complaint (Dkt. # 361), Plaintiffs call particular attention to "the mentally ill visibly suffer[ing] in intersections, parks, and sidewalks" and "the increased prevalence of illegal narcotics" among PEH. (FAC ¶ 4.) Plaintiffs also allege that "the most heavily impacted area is still without a doubt" Skid Row, which comprises a half-square-mile area in the City near Downtown Los Angeles, where most of the individual Plaintiffs live and/or work. (*Id.* ¶ 39.) Yet, the proposed settlement agreement falls woefully short of aiding the very PEH to which Plaintiffs call attention.

The proposed settlement agreement is between Alliance, eight of the nine individual Plaintiffs, and the City. Under the proposed settlement, the City agrees, within five years, to create sufficient housing or shelter to accommodate 60% of "unsheltered City Shelter Appropriate PEH within the City," which the Agreement defines as PEH who "do[] not have a severe mental illness, and/or" are "not chronically homeless" and have neither "a substance use disorder" or "chronic physical illness or disability requiring the need for professional medical care and support." (Agmt §§ 1.4, 3.1.)

Plaintiffs and the City have agreed to wait for the results of the 2022

homeless Point-In-Time count to confirm the number of new beds/shelter opportunities the City is required to build under the settlement.  However, the County shares the concerns expressed by the objectors that this limitation appears to exclude a large number of the most vulnerable PEH.  For example, according to the 2020 Point-In-Time data, which was cited in Plaintiffs' motion for a preliminary injunction (Dkt. # 265 at 21 & n. 21), 38% of PEH in Skid Row had a serious mental illness,[1] 40% of PEH in Skid Row were characterized as chronically homeless, 35% had a substance use disorder, 26% had a physical disability, and 18% had a developmental disability.  The vast majority of the chronically homeless individuals were unsheltered.

It is vague, at best, how many PEH will benefit from this agreement.  At worst, it appears that the PEH most in need of shelter may not benefit at all.  The City has stated that the 60% goal is in addition to the 6,700 beds it has already created under the historic MOU with the County.  (Tr. of May 20, 2022 Hr'g at 11:19–23.)  However, the proposed agreement allows the City to count toward its settlement obligation the HHH pipeline beds it already committed to building, which calls into question what additional benefit PEH will gain from the agreement.  City Council President Nury Martinez has said, "[t]he city has committed to building a minimum of 14,000 beds and has over 13,000 beds in process already."[2]  The City has an obligation to prove to this Court that recounting these beds towards its "commitment" under the settlement agreement is not illusory.

This is consistent with the agreement's specification that the City has sole

---

[1] 2020 Greater Los Angeles Homeless Count – Skid Row, https://www.lahsa.org/documents?id=4700-2020-greater-los-angeles-homeless-countskid-row.

[2] *See* John Antszak, "Los Angeles Agrees to Settle Lawsuit Over Homeless Crisis," US NEWS (April 1, 2022), https://www.usnews.com/news/best-states/california/articles/2022-04-01/los-angeles-agrees-to-settle-lawsuit-over-homeless-crisis.

565290.6

3

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

discretion to determine the kind of housing or shelter to build to fulfill that obligation.  Other than the pipeline beds the City committed to prior to and independent of the settlement, the agreement appears to contemplate that the City will predominantly focus on interim housing or shelters (such as shared housing, congregate shelters, sprung structures or tents, safe parking, safe sleeping/camping, and A Bridge Home beds) rather than permanent supportive housing.  (*Id.* § 3.2)

Last, further clarification is needed as to whether Plaintiffs believe this settlement affects or narrows the claims that they have asserted in this litigation. Plaintiffs have stated that they intend to file a Second Amended Complaint if the Court approves their settlement with the City, but the settlement agreement does not resolve all of Plaintiffs' claims against the City.  Plaintiff Gary Whitter is not a party to the settlement agreement.  (Agmt n.3.)  The Court previously indicated it was inclined to grant Plaintiffs leave to amend because the amended pleading "will narrow the issues and focus on the county" (Tr. at 18:19–22), but, at this time, Plaintiffs have not proffered a proposed amended pleading, and the agreement is unclear as to whether Mr. Whitter's lack of participation means the City will remain a defendant in this litigation.

## III.   THE SETTLEMENT CANNOT BE APPROVED UNLESS IT IS FAIR, ADEQUATE, AND REASONABLE

Plaintiffs do not need a court order to voluntarily dismiss their claims against the City.  *See* Fed. R. Civ. P. 41(a)(1).  To obtain judicial oversight and jurisdiction over that settlement, as Plaintiffs seek, the Court must enter a consent decree. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) ("a settlement agreement subject to continued judicial policing" is "[a] consent decree" (citation omitted)). To do so, the Court has an independent obligation to confirm the agreement is "fundamentally fair, adequate and reasonable" and "conform[s] to applicable laws." *Id.* at 580-81.  Where, as here, the requested consent decree "affects the public interest or third parties" that "did *not* participate in negotiating," the Court has a

"heightened responsibility . . . to protect those interests." *Id.* at 581; *see also Waller v. Fin. Corp. of Am.*, 828 F.2d 579, 583 (9th Cir. 1987) (a non-settling defendant has standing to object to a settlement entered into by other parties if it will suffer some formal legal prejudice as a result).

## IV.   THE SETTLEMENT PREJUDGES THE ONGOING CASE

"It is fundamental to our notions of due process that a consent decree cannot prejudice the rights of a third party who fails to consent to it." *E.E.O.C. v. Pan Am. World Airways, Inc.*, 897 F.2d 1499, 1506 (9th Cir. 1990). The Court should not enter Plaintiffs' proposed order because the settlement includes several pages imposing purported "obligations" and "responsibilities" on the County, which is not a party to the agreement. (*See* Agmt § 9.) This would be entirely improper and illegal—a violation of due process of law. *See Pan Am.*, 897 F.2d at 1506 (a consent decree that prejudiced the rights of non-settling parties violates "deep-rooted historic tradition that everyone should have his own day in court" (citation omitted)).

As a non-settling party, the County is not bound by any agreement between the Plaintiffs and the City. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). It would violate this well-settled principle for the Court to enter an order that, on its face, assigns legal obligations to the County that were only "agree[d]" to by the Settling Parties in a contract to which the County is not a signatory. (Agmt § 9); *see Thompson v. Enomoto*, 815 F.2d 1323, 1326 (9th Cir. 1987) (holding a consent decree is a kind of injunction, which are orders "enforceable by contempt, and designed to accord or protect 'some or all of the substantive relief sought by a complaint'" (citation omitted)).

Entering the proposed settlement raises acute concerns because the alleged "responsibilities" run contrary to the County's legal arguments in this litigation, including those set forth in its fully briefed Motion to Dismiss the First Amended

Complaint.  (Dkt. # 370.)  The Court cannot enter the settlement as drafted without pre-judging the existence of the County's "obligations" described therein, which the County is disputing in the ongoing case, and which the County contends have no merit.

For example, all of Plaintiffs' claims against the County are based on the County's alleged failure to house PEH in or near Skid Row, and the County has argued those claims must be dismissed because Skid Row is within the incorporated territory of the City and under its exclusive jurisdiction.  However, the settlement declares it to be the County's responsibility to provide services and/or housing to PEH in the City who have a severe mental illness and/or are chronically homeless and suffer from a substance abuse disorder or chronic disability, including Skid Row.  (*See* Agmt § 1.4 (defining "City Shelter Appropriate" PEH); *id.* § 9 (the "County responsibilities include, but are not limited to . . . [p]roviding housing and treatment services for all unsheltered PEH within the City who are not City Shelter Appropriate").  There is no legal basis for this; the County has no general responsibility to provide housing or mental health services under Welfare and Institutions Code section 17000.

To issue the settlement as a consent decree would also be inconsistent with a keystone argument in the County's pending motion, that the Plaintiffs have not met their burden of establishing Article III standing.  (*Id.* at 13–15); *see LA All. for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956-57 (9th Cir. 2021) (*Alliance*) (a plaintiff must demonstrate Article III standing to obtain injunctive relief).  Entering a consent decree, including one that purports to define the County's obligations as including Skid Row, would give the appearance that the Court had already resolved the merits of the Plaintiffs' claims against the County before the County has been able to undertake any discovery.

The absence of factual support for the settlement's proffered "responsibilities" of the County is particularly troubling because some of them were

565290.6

6

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

lifted directly from the Court's April 2021 preliminary injunction order, which the Ninth Circuit Court of Appeals reversed on the grounds that the Court had impermissibly "relied on its own independent research and cited material not subject to judicial notice." *Alliance*, 14 F.4th at 957; (*see* FAC ¶¶ 89, 167–74 (alleging that "the County has failed to meet its statutory obligation" under California Welfare & Institutions Code ("WIC") section 17000 "to provide appropriate mental health services," which Plaintiffs insist includes shelter); Dkt. 277 at 87 ("the County has also failed to meet its minimal duties" under the WIC because "the County comes nowhere close to . . . 50 public mental health beds per 100,000 individuals"); Agmt § 9 (the "County responsibilities include, but are not limited to . . . [r]equiring a minimum of 50 mental health beds per 100,000 people in the County").)  There has still been no evidentiary development that would support a finding that the County has the obligations that have been assigned to it by the Settling Parties.

If the Court approves the settlement, it should remove section 9 and make clear in its order that the agreement between the Plaintiffs and the City has no bearing on the County's case or any of the County's defenses.  The Plaintiffs and the City have stated that it is their intent to resolve their case "without any admission of fault, liability, or wrongdoing."  (Agmt at 2.)  It is imperative that the County is likewise entitled to continue its defense unprejudiced by their settlement.

## V.    THE PROPOSED SETTLEMENT MATERIALLY MISSTATES THE COUNTY'S SIGNIFICANT AID FOR PEH

The "County Obligations" section of the proposed settlement not only improperly seeks to bind a non-settling party, it also suffers from the same fatal flaw as all of Plaintiffs' claims—it improperly seeks to usurp the County's legislative authority by dictating County policy.

Moreover, the City and Plaintiffs' agreement that they will "ensur[e] the County meets its obligations to provide adequate services to PEH" and "foster[] County-developed or County-funded housing, shelters, and treatment services,"

necessarily implies that the County is not already doing this work. (*See* ECF No. 429-1 at 10.) Nothing could be further from the truth. As set forth in the County's Motion to Dismiss and corresponding Request for Judicial Notice, the County's commitment to combatting homelessness and serving PEH is undisputed, well-documented, and massive. (*See* ECF Nos. 370-1, 371, 371-1.)

### A.     The County's Ongoing Work To Address Homelessness

On August 17, 2015, the County Board of Supervisors ("Board") launched the Homeless Initiative; and, on February 9, 2016, the Board approved nearly $100 million in funding to implement 47 strategies recommended by the Homeless Initiative to (a) prevent homelessness, (b) expand subsidized housing, (c) increase income among those who are homeless or are at risk of becoming homeless, (d) enhance homeless case management and supportive services, (e) create a coordinated homelessness service system, and (f) expand affordable and homeless housing. (Appendix of Evidence ("AOE") Exs. 1-2.) All 47 strategies have now been fully or partially implemented. (*Id*. Ex. 6.)

Since its enactment in March 2017, Measure H has also successfully generated hundreds of millions of dollars annually and provides an ongoing revenue stream to fund the County's work to address the homeless crisis. (*Id*. Exs. 3, 4, 6.) Indeed, Measure H has been credited for "accelerat[ing]" the critical work of the Homeless Initiative to "improve the lives of individuals and families experiencing homelessness." (*Id*. Ex. 6.)

The County has continued to expand its efforts to combat homelessness in recent years and currently funds a variety of housing and services to individuals and families experiencing homelessness, formerly homeless, or at risk of homelessness. (*Id.* Ex. 5.) Among other things, these programs and services include: (1) rapid re-housing; (2) Multidisciplinary and Homeless Outreach & Mobile Engagement teams that provide outreach and engagement; (3) housing assistance, including cash subsidies, legal services, eviction prevention, and other tenant-related assistance;

565290.6

8

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

and (4) assistance for current and formerly incarcerated individuals.  (*Id.* Exs. 5, 7.)

In addition to the services it was already providing, and the expanded services it is contributing pursuant to the MOU, the County has also been working diligently to house and shelter PEH.  The Homeless Initiative reported that since the passage of Measure H in 2017, the County's homeless services system had placed nearly 81,000 people in permanent housing and 110,000 people in interim housing.[3] Between November 2012 and March 2021, the Housing for Health division of the County Department of Health Services housed 18,444 clients who are homeless and who have complex medical and behavioral health conditions in permanent supportive housing.  (AOE Ex. 8.)  This includes 4,415 people placed in existing permanent supportive housing and 14,029 placed in new permanent supportive housing.  (*Id.*)

The County has also been working to develop long-term strategies to tackle the complex problem of homelessness, while simultaneously pursuing innovative interim solutions.  (*See, e.g.*, Exs. 10–12.)  For example, on September 15, 2021, the Board approved the creation of a taskforce to coordinate and effectuate a comprehensive community-based prevention services system, informed by an equity-centered framework, to improve the lives of the most vulnerable County residents, including PEH.  (*Id.* Ex. 13).  At the same time, the Board also approved an additional $34 million in funding for Project Roomkey in fiscal year 2021-22. (*Id.*)  And on November 2, 2021, the Board authorized another $10 million in funding for cities and local Councils of Governments in need of supportive services at interim housing sites.  (*Id.* Ex. 14.)

Through Project Homekey, the County has received over $100 million from the State to acquire 10 properties for use as housing for PEH.  Nine of the 10

---

[3] Homeless Initiative Impact Dashboard, https://homeless.lacounty.gov/dashboard-2/.

9

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

properties are currently operating as interim housing and will be converted to permanent supportive housing beginning in 2023. To date, nearly 1,500 PEH have been served at the County's Homekey sites.[4] Although Project Homekey was originally conceived in July 2020 as a way to provide housing for PEH who were impacted by COVID-19, the State subsequently announced the availability of an additional $250 million in funding for Homekey. The County has since applied to the State for additional grants to support the acquisition of several new properties. The County has already received awards for at least 12 new projects, including a 40-room housing facility located in Boyle Heights that the County intends to use to provide interim housing for transition aged youth experiencing or at-risk of homelessness. (*Id.*)

In total, for fiscal year 2021-22, the County approved over *$1 billion* in its fight against homelessness, including one-time grants from state and federal entities. Half of this money is going towards creating approximately 11,000 beds for PEH (including those created pursuant to the MOU). The remainder went towards services, including homelessness prevention, outreach and engagement services, interim and permanent housing services, employment services, justice reform for PEH, and services relating to transition-age youth.

**B.     The County's Fiscal Year 2022-23 Budget Proposal**

On April 19, 2022, the County's Chief Executive Office ("CEO") submitted its recommended budget for fiscal year 2022-23 to the Board, which identified the County's top priority as its fight against homelessness, with "extensive investments" in mental health services, supportive services, and a wide range of housing programs. (AOE Ex. 16 at 1.)

The recommended budget includes $532.6 million to fund Homeless Initiative

---

[4] *See* April 19, 2022 Motion by Supervisor Hilda L. Solis, *available at* http://file.lacounty.gov/SDSInter/bos/supdocs/168208.pdf.

565290.6

10

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

strategies focused on prevention, outreach, interim housing, permanent housing, and supportive services to serve people at risk of or experiencing homelessness. (*Id*. at 5-6; Ex. 19, Encl. 1 at 6.) In addition, the County has allocated funding for the following: (1) $4.3 million to augment homeless mental healthcare teams, enhance crisis intervention, and provide transportation; (2) $1.2 million for treatment authorization, care coordination, and service navigation for the most intensive mental health services; (3) $3.9 million to establish mobile clinics to provide medical care to PEH in the County; (4) $26.6 million for the development and preservation of affordable housing; and (5) $15.1 million to the Department of Public Social Services to cover projected expenditures by Los Angeles Homeless Services Authority ("LAHSA"). (AOE Ex. 16 at 5-6.)

The budget also reflects the County's many other goals to address homelessness, including continuing its collaboration with justice partners and community-based organizations to reduce the number of PEH by promoting local resources and assisting with referrals to homelessness assistance programs (*id*. at 7.1); coordinating the prioritization of housing and services (*id*. at 32.1); and partnering with cities, service providers, philanthropy and faith-based organizations, and the business community in an effort to develop and implement innovative solutions to combat homelessness (*id*.).

## C.   The Board's Adoption Of The Blue Ribbon Commission's Recommendations

The County is also actively working with its partners to carefully examine how best to allocate the hundreds of millions of dollars it has committed to fighting homelessness. On July 27, 2021, the Board created a Blue Ribbon Commission on Homelessness (the "Commission") to research and analyze various homelessness governance reports, study models from across the nation, and provide feedback on the most relevant and effective models, with the intention of implementing reform to help solve the homelessness crisis in the County. (AOE Ex. 9.)

565290.6

11

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

On March 30, 2022, after hundreds of hours of research and hundreds of interviews with stakeholders, the Commission published its Governance Report (the "Report") and delivered it to the Board.  (*Id.* Ex. 15.)  The Report highlighted several "key concerns" for addressing the homelessness crisis, including, among others, the need to act with urgency and develop flexible solutions; the need to improve communication and focus on diversity, equity, and inclusion; and the need to increase support for small service providers in order to build capacity.  (*Id.* at 5, 8-12.)

In response to these and other concerns, the Report delineated seven recommendations to the Board, including: (1) creating an appropriately-resourced County entity to cut across County departments and take charge to ensure the departments are working together; (2) establishing a local solutions fund within Measure H to allocate amounts to smaller cities and unincorporated areas within the County; (3) simplifying and streamlining LAHSA to lead rehousing efforts in light of the new entity formation; (4) consolidating the LAHSA Commission, Continuum of Care ("CoC") Board, and Coordinated Entry Systems Policy Council into a single entity; (5) improving LAHSA's operations by defining its decision-making responsibilities and ensuring it has the appropriate staff and expertise to manage its budget of over $700 million and staff of over 600 employees through the creation of an "Ops Team"; (6) requiring access to, sharing of, and tracking of data, conducting comprehensive reports on how monies are spent, and developing common definitions and metrics to measure success; and (7) creating a forum for convening decision-makers from across the region to set goals and discuss policy, funding, fundraising, initiatives, and resources.  (*Id.* at 7, 13-27.)  On May 3, 2022, the Board voted to adopt all seven recommendations.  (*Id.* Ex. 18.)

The County's commitment to combatting homelessness cannot be disputed.  It has already allocated $527 million for Homeless Initiative services for the current fiscal year, and is poised to allocate hundreds of millions of dollars in additional

565290.6

12

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES

funding for fiscal year 2022-23.  By adopting the Commission's recommendations, the Board has also demonstrated its resolve to look critically at how those funds should be allocated and to ensure that its significant resources are used efficiently to develop meaningful and effective solutions to address the homelessness crisis and support PEH.

The County recognizes there is more work to be done and is committed to continuing to partner with the City and other stakeholders to do that important work. But it is not appropriate for the Court to approve a Settlement Agreement between Plaintiffs and the City that seeks to define the County's obligations and dictate its policy choices.

DATED:  May 31, 2022                MILLER BARONDESS, LLP


By:      /s/ Louis R. Miller
        LOUIS R. MILLER
        Attorneys for Defendant
        COUNTY OF LOS ANGELES

565290.6

13

THE COUNTY'S RESPONSE TO SETTLEMENT BETWEEN PLAINTIFFS AND CITY OF LOS ANGELES