1  Carol A. Sobel (SBN 84483)
2  **LAW OFFICE OF CAROL A. SOBEL**
   725 Arizona Ave.
3  Santa Monica, California 90401
   Tel:  (31) 393-3055
4  Email: carolsobel@aol.com

5

6  Shayla R. Myers (SBN 264054)        Catherine Sweetser (SBN 271142)
   **LEGAL AID FOUNDATION**            **SCHONBRUN SEPLOW HARRIS**
7  **OF LOS ANGELES**                  **& HOFFMAN, LLP**
   7000 S. Broadway                    11543 W. Olympic Blvd.
8  Los Angeles, CA 90003               Los Angeles, CA 90064
9  Tel: (213) 640-3983                 Tel:  (310) 396-0731
   Email: smyers@lafla.org             Email: catherine.sdshhh@gmail.com
10

11 *Attorneys for Intervenors Los Angeles*
12 *Community Action Network and Los Angeles*
   *Catholic Worker*
13

14              **UNITED STATES DISTRICT COURT**

15      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

16

17                                  )  CASE NO. 20-CV-02291-DOC-KES
                                    )
18 LA ALLIANCE FOR HUMAN           )  Hon. David O. Carter
   RIGHTS, et al.                   )  Courtroom 1
19              Plaintiff(s),       )
                                    )
20      vs.                         )  DECLARATION OF SHAYLA MYERS
                                    )  IN SUPPORT OF INTERVENORS'
21 City of Los Angeles, et. al.     )  OBJECTIONS TO THE PROPOSED
                                    )  STIPULATED ORDER OF DISMISSAL
22              Defendant(s).        )
                                    )  Date: June 11, 2022
23                                  )  Time: 9:00 a.m.
                                    )
24                                  )
                                    )
25                                  )  Complaint Filed:  March 10, 2020
                                    )
26                                  )
                                    )
27                                  )
                                    )
28 ─────────────────────────────── )

*Additional Counsel*

**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
ELDER LAW AND DISABILITY
RIGHTS CENTER
1535 E 17th Street, Suite 110
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

*Attorneys for Orange County Catholic Worker*

2

# DECLARATION OF SHAYLA MYERS

1.      My name is Shayla Myers. I am counsel of record for Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker.  I have personal knowledge of the facts contained in this declaration, and if called to testify, I could and would testify competently as to the truth of the facts in this declaration.

2.      On May 10, 2022, when I learned that the LA Alliance case had been agendized by the City Council in closed session, I emailed counsel for Plaintiffs and counsel for the City inquire about the timing of the settlement and briefing on the approval of the agreement, including meeting and conferring pursuant to Local Rule 7.3.  I requested the City and Plaintiffs provide us with a copy of the agreement to facilitate the meet and confer.  Neither party even acknowledged the communication.

3.      At the end of the business day on  May 19, 2022, the day before Plaintiffs' and the City's deadline to submit the final agreement, Scott Marcus, counsel for the City, responded to my May 10, 2022 email, stating that "[t]he City is not obligated to meet and confer pursuant to Rule 7.3 because the City is not filing a motion. Rather, the City and Plaintiffs are filing a joint stipulation to dismiss the City from this action because the City has settled with the Plaintiffs."

4.      At 9:46 p.m., Plaintiffs filed a notice of lodging and lodged a document titled a "[Proposed] Stipulated Order of Dismissal under Federal Rule of Civil Procedure .  This was the first time Intervenors received a copy of the proposed order.

5.      Attached as Exhibit A are true and correct pages from the transcript of the hearing conducted in this case on May 20, 2022.

6.      Attached as Exhibit B is a true and correct copy of the report by Keep LA Housed entitled "We're Not Going Back:  Recommendations for Countywide Post-Pandemic Tenant Protections in Los Angeles," released on May 10, 2022.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 31, 2022 at Los Angeles, California.

                 /s/ Shayla Myers

# EXHIBIT A

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4   LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
    et al.,                       )                        (KESx)
5                                 )
            Plaintiff,            ) Los Angeles, California
6                                 )
    vs.                           ) Friday, May 20, 2022
7                                 )
    CITY OF LOS ANGELES, et al.,  ) (9:41 a.m. to 10:01 a.m.)
8                                 )
            Defendants.           )
9   _____)

10

11          TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT/
                        SCHEDULING CONFERENCE
12            BEFORE THE HONORABLE DAVID O. CARTER
                    UNITED STATES DISTRICT JUDGE
13

14
    Appearances:                   See next page.
15
    Court Reporter:                Recorded; CourtSmart
16
    Courtroom Deputy:              Karlen Dubon
17
    Transcribed by:                Jordan Keilty
18                                 Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
19                                 Lakeside, California 92040
                                   (858) 453-7590
20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

```
                                                                       2
 1  APPEARANCES:

 2  For the Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                                 Spertus, Landes & Umhofer, LLP
 3                               617 West 7th Street, Suite 200
                                 Los Angeles, California 90017
 4                               (213) 205-6520

 5                               MATTHEW D. UMHOFER, ESQ.
                                 Spertus, Landes & Umhofer, LLP
 6                               1990 South Bundy Drive
                                 Suite 705
 7                               Los Angeles, California 90025
                                 (310) 826-4722
 8
    For the City of Los Angeles:  SCOTT D. MARCUS, ESQ.
 9                               Los Angeles City Attorney's
                                   Office
10                               200 North Main Street
                                 7th Floor, Room 675
11                               Los Angeles, California 90012
                                 (213) 978-8216
12
    For the County of Los        LOUIS "SKIP" MILLER, ESQ.
13    Angeles:                   Miller Barondess, LLP
                                 1999 Avenue of the Stars
14                               Suite 1000
                                 Los Angeles, California 90067
15                               (310) 552-8400

16                               ANA WAI-KWAN LAI, ESQ.
                                 Los Angeles County Counsel
17                                 Office
                                 350 South Figueroa Street
18                               Suite 601
                                 Los Angeles, California 90071
19                               (213) 974-0061

20  For the Intervenors Los      SHAYLA R. MYERS, ESQ.
      Angeles Community Action   Legal Aid Foundation of
21    Network & Los Angeles        Los Angeles
      Catholic Worker:           7000 South Broadway
22                               Los Angeles, California 90003
                                 (213) 640-3983
23

24

25
```

3

```
 1  APPEARANCES:  (Cont'd.)

 2  For the Intervenors Orange      CAROL A. SOBEL, ESQ.
       County Catholic Worker,      1158 26th Street, Suite 552
 3     Los Angeles Catholic         Santa Monica, California 90403
       Worker & the County of       (310) 393-3055
 4     Los Angeles:

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

1  a notice of settlement that was filed on the docket; did

2  Counsel have any comments?  Otherwise I propose to set the

3  following dates, and that is a filing of objections or

4  concerns on the date of May 31st, responses on June 3rd,

5  hearing scheduled for June 9th.

6         The mediators and I have not had a thoughtful

7  discussion about this, because it was received last evening,

8  with no criticism of the Court, but I've read it twice now,

9  but we need to have a more meaningful discussion amongst us.

10        All right.  Those will be the dates set then; any

11 comments by the Plaintiffs at this time?

12        MS. MITCHELL:  No, your Honor.  I'm just checking

13 the dates real quick on my calendar, but it should be fine.

14        MR. MILLER:  Your Honor, I haven't had a chance to

15 read it -- read it through.  I just looked at it briefly.

16 It looked, procedurally, improper.  This looks like a

17 consent decree with court supervision over a period of five

18 years.  It obviously affects the public interest and it's

19 filed as a Rule 41 dismissal.  I think they have to make a

20 motion and it has to come before your Honor, like any other

21 consent decree.

22        THE COURT:  Uh-huh.  And it may on the date that

23 I've sent on June 9th, Counsel.  Thank you.

24        Those will be the dates then.  Oppositions and

25 concerns May 31st, responses June 3rd, hearing on June 9th.

10

1  that the numbers that they represented were inaccurate.  But

2  those are the issues that the county raised, and I know the

3  county is addressing that.

4        THE COURT:  Okay.  Just a moment.

5     (Court conferring with clerk.)

6        THE COURT:  And before Judge Birotte leaves, he

7  has another hearing, I want to think the mediators,

8  regardless of whether the Court eventually approves or

9  disapproves the settlement, I know how hard they've worked,

10  along with the parties in numerous sessions.  So Judge

11  Birotte, just my personal appreciation for your hard work

12  and to Michelle Martinez for the many hours.

13     (Court conferring with clerk.)

14        THE COURT:  A couple of questions I'm going to be

15  asking the mediators later in the settlement discussion, so

16  I'm transparent with you, is whether these numbers based on

17  the new count have any double counting with the 6000 beds

18  created and the new beds proposed in the settlement

19  agreement.  Those funds were separately set forth to the

20  6000 -- let's say 6800 beds -- money was exchanged.  Those

21  should be separate and apart from whatever the settlement

22  agreement is.

23        And so therefore, we've had an issue in the past

24  that was raised, over a year and half ago, with LACA

25  (phonetic), in terms of my concern with double counting.

11

1          And so I put all of you on notice that when you

2    respond to the Court -- have a seat, Mr. Marcus, we'll give

3    you plenty of time -- when you respond to the Court, make

4    certain that there's no double counting between those 6000.

5    Those are separate and apart.  (Indiscernible) funds and if

6    there are going to be units moved in HHH over to this county

7    or not.

8          So those are just some -- the two questions I'd be

9    raising and I want to alert you to that, so I know what the

10   actual numbers are.  Beyond that, I have no further comment.

11         Now, Mr. Marcus, I'm sorry.

12         MR. MARCUS:  Your Honor, I was -- I can address

13   the first issue here --

14         THE COURT:  You can, or you can wait until the

15   response.  It's up to you.  If you'd like to now, that's

16   fine.

17         MR. MARCUS:  Let me do it now.

18         THE COURT:  Sure.

19         MR. MARCUS:  And we can do it in the written

20   response, but the Court is correct that the 6700 beds,

21   created under the MOU, are separate and apart from the new

22   beds to be created under the settlement agreement between

23   the city and the Alliance.

24         THE COURT:  Thank you.  And I've only read over

25   this twice, once last evening and once this morning, so I

15

1          MR. MARCUS:  Thank you, your Honor.  Nothing
2 further from the city.

3          THE COURT:  All right.  Now the county, please.

4          MR. MILLER:  Thank you, your Honor.

5          First of all, the bonus is not $10,000,000, it's
6 $8,000,000.

7          THE COURT:  Thank you, $8,000,000.

8          MR. MILLER:  $8,000,000.  And there was an
9 extensive --

10          THE COURT:  There's a 20-percent -- I'm just
11 joking.

12          MR. MILLER:  There was an extensive report, which
13 we've given the city, why they didn't meet the timing
14 requirements, so -- and that's an issue between the county
15 and the city and we're dealing with it.

16          THE COURT:  Uh-huh.  Yeah.

17          MR. MILLER:  So I wanted to say that.

18          The only thing that I have, your Honor, is we're
19 not part of the settlement.  We're still open to settling,
20 but we're not part of the settlement between the Plaintiffs
21 and the city.

22          We need to get the case going.  We'd like your
23 Honor to set, you know, to start the Rule 26 process.

24          THE COURT:  Uh-huh.

25          MR. MILLER:  We filed something to that effect.

*Echo Reporting, Inc.*

17

1        THE COURT:  I appreciate you bringing that to my
2  attention, because we've tried to bring all of those cases
3  in today.  Mr. (indiscernible) has been filing profusely.
4  So we've brought all of those cases in front of us at 1:30
5  to sort them out and if there has been settlements, I'd like
6  to know about that.
7        MS. SOBEL:  If I can add one thing, your Honor?
8  The -- Mr. Cook's case is ongoing.  The other two cases,
9  (indiscernible) in which was Myers was counsel with the ACLU
10 and Shellenberg (phonetic) in which my office was counsel,
11 are completed.
12       THE COURT:  I'd appreciate your attendance then at
13 1:30.  It's not ordered, but it would be helpful, because
14 right now we have a plethora of cases out there and in light
15 of what your position is, you might want to be a party to
16 that at 1:30.
17       MS. MYERS:  Your Honor, if I can just -- just add
18 one point of clarification, as well.
19       I know you characterized the case in front of
20 Judge Fischer as the bulky item case.  Obviously that case
21 preceded this litigation.  The bulky item issues are -- have
22 largely been resolved by the Ninth Circuit.
23       THE COURT:  That's right.
24       MS. MYERS:  The case is significantly broader than
25 that and actually challenges the city's unconstitutional

18

1  practices of seizing and destroying people's property, not

2  just bulky items.  I just want to make sure that the record

3  is clear.  I think there has been some work by -- in parties

4  of this case to limit the issues that are at stake in that

5  case, but obviously it's significantly broader.  That case

6  is, as I said, filed much previous to this case and has been

7  fairly substantially litigated by the City of Los Angeles.

8  There are a number of pending motions in that case, so --

9        THE COURT:  And obviously, that's not within the

10  Court's jurisdiction and my record is that I haven't

11  requested or brought that case into my purview.

12        MS. MYERS:  In light that the parties raised that

13  that was a related case when they filed this case.

14        THE COURT:  Okay.  Now, in response to the county.

15  If I won't approve the settlement, then the cases remain in

16  its present position, we'll decide the present motions to

17  dismiss and I will put you on a fast track at that time,

18  which (indiscernible) expect.

19        If the settlement is approved, then the Plaintiff

20  has brought a motion for relief to amend, which in all

21  likelihood, I will grant, which will narrow the issues and

22  focus on the county.

23        Then there will be a scheduling conference,

24  because those motions then remain in abeyance.  Of course

25  there will be an answer by the county, but once again, I

19

1  will put you on a fast track much quicker than all of you

2  expect.

3          So this case will move expeditiously, but what I

4  don't want is, if the settlement is not approved, what I

5  don't want is a split in the cases at this point.  If the

6  settlement is approved, then of course you have by right the

7  ability to amend, and if so that will narrow the issues with

8  the county.  The answer would be filed, scheduling

9  conference for trial, motions for dismiss.  You'll be fast

10 tracked, trust me.  In fact, you'll learn to appreciate how

11 fast you'll be in trial.

12          MS. MITCHELL:  Thank you, your Honor.

13          THE COURT:  All right.  Now --

14          MS. SOBEL:  Your Honor --

15          MR. MILLER:  One more question.

16          THE COURT:  Now we have a whole participation

17 group going.  Here we go.  I'm going to turn to the

18 Plaintiffs first.

19          MS. MITCHELL:  That's exactly what we're looking

20 for, your Honor.  Thank you.

21          THE COURT:  Oh believe me, you'll be surprised.

22          Mr. Marcus?

23          MR. MARCUS:  Nothing from the city.

24          THE COURT:  Mr. Miller?

25          MR. MILLER:  What time on the 9th?

20

1          THE COURT:  I like to start at 7:00, but people

2    have a heart attack over that, so how about 9:00 o'clock;

3    does that work for everybody?

4          MR. MILLER:  Sure.

5          THE COURT:  9:00 o'clock, is that comfortable?  I

6    know Ms. Sobel has been coming to Los -- or Orange County at

7    9:00 o'clock, so I appreciate it.

8          Ms. Myers, comfortable?

9          MS. MYERS:  That's fine, your Honor.

10          THE COURT:  All right.  9:00 o'clock.

11          And once again, we assume we have this department,

12    but I never know until two days before.  And so we saw the

13    MIS problems today and I want to thank MIS for getting that

14    resolved.

15          If there's nothing further --

16          MS. MYERS:  I have one issue with the scheduling

17    order, your Honor.

18          I understand the county has (indiscernible)

19    discovery that LA Alliance has been unwilling to respond to

20    and I would just say, we would ask for relief to -- for the

21    parties who are interested in doing so, to be able to

22    conduct limited discovery on a question of standing.

23    Obviously, that was raised by the parties in -- the motions

24    that are still pending.  It raised by the Ninth Circuit.

25    It's certainly an issue, in terms of your Honor's approval

21

1  of the consent decree.  There hasn't been any opportunity to

2  do any discovery related to standing that's obviously at

3  issue for a case where the parties are seeking

4  (indiscernible) rules of continuing jurisdiction by the

5  court to enforce that order.

6          THE COURT:  You can brief on that, but those are

7  the dates I've set for the present time.

8          All right.  Is there anything further?

9      (No response.)

10         THE COURT:  All right.  You're invited then at

11 1:30.  We're in recess.  Thank you for your courtesy.

12         (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Jordan Keilty                          5/20/2022
     Transcriber                               Date
6
     FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
     /s/L.L. Francisco
9    L.L. Francisco, President
     Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

# EXHIBIT B



## We're Not Going Back: Recommendations for Countywide Post-Pandemic Tenant Protections in Los Angeles

### May 10, 2022

### I.    Introduction

On January 25, 2022, the Los Angeles County Board of Supervisors directed County Departments to report back on "lessons learned during the pandemic related to tenant protections and recommendations on opportunities to strengthen the County's permanent protections, and assist incorporated cities in adopting their own permanent tenant protections."[1] This effort presents a critical opportunity to address long-standing challenges that Los Angeles County tenants have faced regarding housing stability, housing affordability, and enforcement of tenant protections and habitability standards. While we are still in the midst of the pandemic and emergency protections should remain in place for the remainder of the emergency, we acknowledge that the County must be prepared for an eventual end to the state of emergency. But an end to emergency protections should not mean a return to a pre-pandemic world where thousands of low-income tenants faced eviction each year, paid an unsustainable amount of income to rent, and perpetually lived on the brink of homelessness. These issues disproportionately affect tenants of color, contributing to a widening racial wealth gap. We must recognize that the status quo prior to the pandemic was not acceptable and use the lessons from this crisis to build a more just, healthy, and equitable Los Angeles County.

**We must emerge from this crisis with a stronger, uniform countywide framework for tenant protections. All tenants across Los Angeles County have a right to affordable, secure, and habitable housing free from harassment and discrimination. We demand an LA Tenant Bill of Rights for all tenants in Los Angeles County:**

- ✔ Rent stabilization to the maximum extent allowed by state law
- ✔ Universal just cause eviction protections
- ✔ Limitations on evictions for failure to pay rent
- ✔ Relocation assistance for tenants displaced for no fault of their own
- ✔ Effective tenant anti-harassment protections
- ✔ Safeguards when landlords attempt to buyout tenants
- ✔ Codified right to counsel for tenants facing eviction
- ✔ Strong proactive code enforcement
- ✔ Removal of discriminatory barriers to housing access

---

[1] Board of Supervisors of the County of Los Angeles, *Statement of Proceedings* (Jan. 25, 2022) Item 5, http://file.lacounty.gov/SDSInter/bos/sop/1119222_012522.pdf.

The Board of Supervisors has the power to lead a countywide Tenant Bill of Rights. Although the Board has enacted just cause protections and a rent stabilization ordinance for unincorporated areas, the Board can enact and strengthen other permanent tenant protection policies. In addition, to help protect tenants in incorporated cities, the Board can take actions to ensure that incorporated cities adopt the policies in the LA Tenant Bill of Rights.

## II.    Emergency eviction protections have reduced evictions without causing undue hardship for landlords

Before state, local, and federal governments adopted emergency eviction protections in response to the COVID-19 pandemic, eviction lawsuits were distressingly common. Data shows that since 2010 there has been an average of 171,733 evictions filed annually in California. Los Angeles County accounts for approximately 33% of those filings. In 2019, landlords filed 40,572 evictions against tenants in Los Angeles County.[2] Based on analysis of formal filing rates versus informal evictions, it is likely that several times as many renter households faced eviction through informal processes.[3] During the pandemic, emergency protections limited evictions for failure to pay and on no-fault grounds, dramatically reducing the number of evictions filed. In Los Angeles County, the number of evictions filed was reduced by 67.4%.[4]

The emergency protections during the pandemic, while imperfect, have proven effective at reducing the number of evictions and have not caused significant long-term hardship for landlords. According to recent analysis by JP Morgan Chase, landlords across the country recovered short term rental revenue losses by mid 2020 and, overall, experienced higher cash flows during the pandemic years than years prior.[5] Moreover, in Los Angeles County, landlords experiencing financial hardship due to the pandemic could receive partial property tax deferment; mortgage and rent relief; and access to foreclosure prevention, dispute resolution, small claims, and real estate fraud assistance.[6] And residential property values have increased substantially during the pandemic, adding to the wealth of many landlords.[7]

---

[2] Los Angeles Superior Court data collected and maintained by Kyle Nelson for LA Renters' Right to Counsel Coalition.

[3] Utilizing Mathew Desmond's analysis of evictions at the Eviction Lab, we assume for every formal eviction there are five informal evictions. Gromis, A., & Desmond, M., *Estimating the Prevalence of Eviction in the United States: New Data from the 2017 American Housing Survey* (2021) *Cityscape*, *23*(2), 279–290.

[4] Footnote 2, *supra*.

[5] Demsas, J., *The landlords are (largely) all right* (Nov. 4, 2021) Vox, https://www.vox.com/2021/11/4/22759224/landlords-rent-relief-eviction-moratorium-cash-balance-covid-19.

[6] Los Angeles County Treasurer and Tax Collector, *BOARD MOTION JANUARY 25, 2022, AGENDA ITEM NO. 5 – REPORT BACK – PROPERTY TAX PAYMENT FORGIVENESS* (Feb. 8, 2022) http://file.lacounty.gov/SDSInter/bos/supdocs/165821.pdf (summarizing property tax deferment options and other resources for landlords).

[7] *See* S&P Dow Jones Indices LLC, S&P/Case-Shiller CA-Los Angeles Home Price Index [LXXRSA], Federal Reserve Economic Data, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/LXXRSA, [retrieved May 9, 2022].

The reduction in evictions during the pandemic—despite unprecedented economic and public health impacts on low income communities—was accomplished through several interrelated local, state and federal policies, including emergency eviction protections largely prohibiting "no-fault" evictions and evictions for failure to pay for tenants impacted by COVID-19; converting some financial obligations of tenants to consumer debt; preventing the issuance of summonses for eviction cases by the courts; strengthening anti-harassment measures; placing limits on rent increases; and expanding tenant education, legal services, outreach and emergency rental assistance. Elected leaders at all levels of government recognized the need to prevent evictions during the pandemic and local, state, and federal restrictions on evictions for failure to pay were enacted.[8] There was a broad recognition that tenants who could not pay rent because they became ill, or lost income due to necessary public health measures, should not be evicted. While these measures were far from perfect, and many tenants were subjected to unnecessary uncertainty and hardship due to the lack of a total ban on evictions or equitable measures to completely resolve rent debt, these emergency measures did effectively reduce the number of evictions and meaningfully prevent homelessness for renters.[9] In states that did not adopt restrictions on eviction for failure to pay, the majority of non-payment evictions were for relatively small amounts of money. In one study, in all jurisdictions examined, the majority of cases filed during the pandemic were for less than $1,643.[10]

One of the most important aspects of the County's emergency eviction protections is that the protections apply to incorporated jurisdictions under the County's emergency authority granted by the California Emergency Services Act.[11] As illustrated by Table 1, this expanded authority protected millions of tenants throughout the pandemic, including over **2.7 million**

---

[8] *See, e.g.,* Coronavirus Aid, Relief, and Economic Security ("CARES") Act (15 U.S.C.A. § 9058), H.R.748, 116th Cong. § 4024 (2020); Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292 (Sept. 4, 2020) (extended by Pub. L. 116-260, § 502 (Dec. 27, 2020), extended by 86 Fed. Reg. 8020 (Feb. 3, 2021), extended by 86 Fed. Reg. 16731 (April 1, 2021), invalidated by *Alabama Association of Realtors v. Department of Health and Human Services*, 21A23 (Aug. 26, 2021)) ("CDC Eviction Moratorium"); Cal. Rules of Court, Emergency Rule 1 (adopted April 6, 2020, rescinded Sept. 1, 2020); Cal. Assem. Bill 3088 (2021-2022 Reg. Sess.) Sept. 1, 2020; Cal. Sen. Bill 91 (2021-2022 Reg. Sess.) Jan. 29, 2021; Cal. Assem. Bill 832 (2021-2022 Reg. Sess.) June 28, 2021; Cal. Assem. Bill 2179 (2021-2022 Reg. Sess.) March 31, 2022; Los Angeles Mun. Code § 44.99 et seq. (Temporary Protection of Tenants During COVID-19 Pandemic); Resolution of the Board of Supervisors of the County of Los Angeles Further Amending and Restating the County of Los Angeles COVID-19 Tenant Protections Resolution (Jan. 25, 2022).

[9] Despite the emergency protections, a significant number of eviction cases were filed and tenants were evicted during the pandemic. For example, 24,699 evictions were filed between March 2020 and March 2022. While most evictions do not require a sheriff lockout, there were nonetheless 13,780 lockouts between March 2020 and September 2021, according to Los Angeles Sheriff's Department data. Los Angeles Superior Court and Los Angeles Sheriff's Department Lockout Data (2021) collected and maintained by Kyle Nelson for LA Renters' Right to Counsel Coalition.

[10] Louis, R., Durana, A., & Hepburn, P., *Preliminary Analysis: Eviction Claim Amounts During the COVID-19 Pandemic* (Aug. 27, 2020) Eviction Lab, https://evictionlab.org/covid-eviction-claims/.

[11] Cal. Gov. Code § 8634 ("During a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property…."); *see also* 62 Ops. Cal. Atty. Gen. 701, 701 (1979) ("Cities within a county are bound by county rules and regulations adopted by the county pursuant to section 8634 of the Government Code during a county proclaimed emergency….").

tenants who are not covered by any local eviction protection or rent regulations.[12] When the County's emergency eviction protections eventually expire, these tenants will be extremely vulnerable to displacement.

| Jurisdiction | Number of Tenants |
|---|---|
| Los Angeles County, California | 5,077,757 |
| City of Los Angeles (RSO) | 1,666,119 |
| Santa Monica city, California | 59,395 |
| West Hollywood city, California | 28,960 |
| Culver City city, California | 17,386 |
| Beverly Hills city, California | 17,330 |
| Inglewood city, California | 66,172 |
| Maywood city, California | 19,449 |
| Baldwin Park city, California | 32,131 |
| Unincorporated areas | 400,124 |
| Remainder (no local protections) | 2,770,691 |

Table 1: Tenants in Los Angeles County jurisdictions with local tenant protections that are substantially more protective than state law. Remainder is the number of tenants not covered by such local protections. Estimates based on ACS 2019 5-year data. Estimate for tenants in RSO units in the City of Los Angeles based on RSO unit data from LAHD available at https://housing.lacity.org/RSO and ACS household size and vacancy rate estimates.

An increase in the number of evictions of tenants in incorporated cities, spurred by the expiration of the County's emergency eviction protections, could have significant fiscal impacts on the County. Preventing eviction and promoting housing stability creates considerable municipal savings. For example, an independent study of Los Angeles County finds that for each dollar the County invests in legal representation for tenants facing eviction, it could receive $4.80 in costs avoided or revenue generated.[13] The same study found that the City of Los Angeles would receive $3.48 in costs avoided or revenue generated for every dollar invested in tenant right to counsel in eviction.[14] Similar studies in New York, Philadelphia, and Baltimore demonstrate that protecting tenants and promoting housing stability generate significant savings.[15] On the other hand, housing insecurity spurred by evictions increases public costs related to shelter and housing programs, school funding, health care, child welfare, and more.

---

[12] For example, approximately 28% of rental units in the the City of Los Angeles are not covered by the city's Rent Stabilization Ordinance and just cause eviction protections to properties. (Calculated using data from the Los Angeles Housing Department and the American Community Survey 2019 5-year estimate of renter occupied household. *See* Los Angeles Housing Dept., *Report Dashboard for RSO*, https://housing.lacity.org/rso [retrieved May 9, 2022]; US Census Bureau, *American Community Survey*, https://www.census.gov/programs-surveys/acs [retrieved May 9, 2022].) Based on the authors' review, the vast majority of cities in Los Angeles County do not have any local tenant protections.

[13] STOUT, *Cost-Benefit Analysis of Providing a Right to Counsel to Tenants in Eviction Proceedings* (Dec. 10, 2019) (hereinafter STOUT (2019)), p. 8.

[14] *Ibid.*

[15] *See* STOUT, *Eviction Right to Counsel Resources*, https://www.stout.com/en/services/transformative-change-consulting/eviction-right-to-counsel-resources [retrieved May 9, 2022].

Many of these increased expenses will be borne by the County, even if the eviction takes place in an incorporated city.

When evictions take place on a large scale, the effects are felt beyond the family being evicted; eviction becomes a social problem that destabilizes the community. Workers who experience displacement are 20% more likely to lose their jobs compared to workers who do not experience displacement.[16] Eviction not only adversely affects unemployed and employed tenants' job prospects, but also the potential future earnings of children.[17] In Massachusetts, the cost burden for state-supported services that an individual experiencing homelessness acquires is $9,372 greater per year than someone who has stable housing.[18] Preserving housing stability through permanent tenant protections saves public dollars for Los Angeles County.

When the County's emergency protections expire, low-income tenants that experience illness or loss of income due to COVID-19–or any other reason–will be at risk of eviction if they cannot pay their rent in full and on time. Even two years into the pandemic, low-income tenants continue to struggle to pay rent. As of April 2022, 12% of renter households in the Los Angeles Metropolitan Area were "not at all confident" that they could pay their next month's rent on time.[19] Evictions fuel the homelessness crisis; as we house and shelter people experiencing homelessness, others continue to replace them. The Los Angeles County homelessness count continues to rise and over half of those surveyed experiencing homelessness for the first time report financial crisis as the cause.[20] Los Angeles County should build upon the precedent set by pandemic-related tenant protections and ensure we never go back to a status quo where temporary illness or income disruption leads one to lose their home and possibly experience homelessness.

Without action, Los Angeles County faces increased wealth disparities and displacement following the hardships of the pandemic. While most property owners were shielded from the worst economic impacts of the pandemic and grew their wealth as land values increased,[21] low-income tenants were most financially impacted, lost family members that were wage earners and care providers to the virus, and are now saddled with unresolved rent debt and shadow debt.[22] The County's recovery efforts must address the racial, economic, and social disparities

---

[16] Desmond, M., *Unaffordable America: Poverty, housing, and eviction* (Mar. 2015) Institute for Research on Poverty.

[17] *Ibid.*

[18] Wood-Boyle, L., *Facing Eviction: Homelessness Prevention for Low-Income Tenant Households* (Dec. 1, 2014) Federal Reserve Bank of Boston.

[19] U.S. Census Bureau, *Household Pulse Survey, Week 44* (Mar. 30-Apr. 11, 2022), Housing Table 2b, Los Angeles-Long Beach-Anaheim, CA Metropolitan Area, https://www2.census.gov/programs-surveys/demo/tables/hhp/2022/wk44/housing2b_week44.xlsx.

[20] Los Angeles County Homeless Services Authority, *2020 Greater Los Angeles Homeless Count Results* (Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results&ref=hc.

[21] *See* JPMorgan Chase & Co., *How did landlords fare during COVID?* (Oct. 2021), Figure 2, https://www.jpmorganchase.com/institute/research/household-debt/how-did-landlords-fare-during-covid.

[22] Reina, V. & Goldstein, S., Housing Initiative at Penn, *An Early Analysis of the California COVID-19 Rental Relief Program* (July 2021), https://www.housinginitiative.org/uploads/1/3/2/9/132946414/hip_carr_7.9_final.pdf (nearly

that have been magnified by the pandemic. Advancing a countywide Tenant Bill of Rights is a step toward mitigating those harms and addressing underlying structural racism in the housing market, and should be a cornerstone of the County's recovery actions.

### III.   The County should build on lessons learned during the pandemic and strengthen permanent tenant protections, creating an LA Tenant Bill of Rights

We must not return to a world of fewer tenant protections and less housing security after the pandemic. All tenants in Los Angeles have a right to affordable, secure, and habitable housing free from harassment and discrimination. We demand a countywide LA Tenant Bill of Rights to preserve critical protections that have effectively prevented eviction and displacement over the last two years and enable the County to address long-standing challenges regarding housing stability, housing affordability, and enforcement of tenant protections and habitability standards. The LA Tenant Bill of Rights, as described below, is a set of proven policies – many of which the Board of Supervisors has already adopted for unincorporated areas – that protect tenants from eviction, displacement, homelessness, and violations of their rights. The LA Tenant Bill of Rights includes:

- ✔ Rent stabilization to the maximum extent allowed by state law
- ✔ Universal just cause eviction protections
- ✔ Limitations on evictions for failure to pay rent
- ✔ Relocation assistance for tenants displaced for no fault of their own
- ✔ Effective tenant anti-harassment protections
- ✔ Safeguards when landlords attempt to buy out tenants
- ✔ Codified right to counsel for tenants facing eviction
- ✔ Strong proactive code enforcement
- ✔ Removal of discriminatory barriers to housing access

The Board of Supervisors has already adopted several of these policies for unincorporated areas, including a just cause and rent stabilization ordinance, tenant buyout protections, anti-harassment provisions, and studying measures for stronger code enforcement. Below are recommendations on how the Board can strengthen policies to adopt the full LA Tenant Bill of Rights for unincorporated areas.

### A.   Limitations on evictions for failure to pay rent

Without the local emergency eviction protections, tenants can be legally evicted from their homes for missing *any* portion of their monthly rent that remains unpaid after the expiration of a three day notice.[23] This draconian law does not care if the tenant is only short by one dollar, does not care if the tenant is able to pay the unpaid rent between the expiration of the notice and the Unlawful Detainer trial, and does not care if the tenant is waiting on rental assistance to help

---

30% of rental assistance applicants took on additional "shadow" debt to pay for housing, at an average of $3.050 per family).
[23] Cal. Code of Civil Proc. § 1161(2).

cover their arrears. There are no exceptions for tenants that fall ill or unexpectedly lose income. Any unpaid rent can result in eviction.

During the pandemic, temporary changes to local, state and federal law acknowledged that tenants should not be evicted if they were unable to pay rent because they became ill with COVID-19, were unable to work because of needed public health measures, or were otherwise unable to pay rent due to the pandemic.[24] And unprecedented rental assistance programs relieved the burden from landlords. These were lifesaving measures that prevented countless evictions. Fundamentally, these protections separated the legal question of whether a tenant contractually owes money to their landlord from the legal consequence of losing one's home–allowing missed rent to be addressed through emergency rental assistance programs, voluntary repayment agreements, or small claims court rather than eviction courts. But the COVID-19 pandemic was not the first time that tenants struggled to pay rent because they fell ill, experienced an unexpected loss of income, or faced some other unforeseen or unavoidable circumstances. These scenarios are common and would often lead to a household being evicted.

The emergency measures adopted during the pandemic have demonstrated that limits on evictions for failure to pay dramatically reduce the number of evictions filed and that such limits can be implemented so as not to cause undue hardship for landlords. The County should adopt a modified form of these protections on a permanent basis to ensure that tenants do not lose their homes just because they missed a small amount of rent. Eviction is an extraordinary legal remedy and should be reserved for extraordinary circumstances - not as a debt collection tool to recover relatively small sums.[25]

Specifically, we recommend that the Board amend County Code section 8.52.090 so that failure to pay rent is only cause for termination if the tenant fails to pay for multiple months such that the amount exceeds the jurisdictional threshold of $10,000 for small claims court. Tenants should have a reasonable amount of time to repay missed rent, after which the landlord may collect the rent as a contractual obligation either through small claims court, civil court, or other civil collection. In short, the tenant would still owe this money, but failing to pay relatively small amounts would not be grounds for eviction and these cases would be handled in small claims court rather than eviction court, in the same way other debts under this amount are treated under the law.

Reasonable limits on evictions for failure to pay will dramatically increase housing stability for low-income tenants without creating an undue burden on landlords. Over a third of adults in the United States report that they would need to borrow money or sell something in

---

[24] See footnote 8, *supra*.

[25] For example, Small Claims Court provides an accessible venue for parties to resolve disputes and recover amounts up to $10,000 without needing an attorney. *See* California Department of Consumer Affairs, *The Small Claims Court: A Guide to its Practical Use*, https://www.dca.ca.gov/publications/small_claims/small_claims.pdf.

order to cover an unexpected $400 expense.[26] Common situations that can lead to eviction can often be remedied by allowing tenants time to get back on their feet. However, the existing social safety nets that would help tenants cover unpaid rent do not provide relief within the 3 day window state law requires to avoid eviction. For example, if a tenant unexpectedly loses their job, it may take several weeks to receive unemployment insurance - but benefits are backdated to the date of application, which would allow tenants to repay rent owed to their landlord.[27] However, under the current rules, if an eviction is filed against a tenant in this situation, they lose the right to repay their rent obligation and remain in their housing,[28] and eviction judges are prohibited from awarding landlords unpaid rent without displacing the tenant.[29] By increasing the monetary threshold for eviction for nonpayment, tenants that experience a temporary loss of income or unexpected expense will be far less likely to lose their housing and landlords will ultimately be made whole through voluntary repayment or small claims court judgment.

Eviction regulations should also work in coordination with rental assistance for low-income tenants and mortgage assistance for small landlords who are at risk of foreclosure to support tenants and landlords experiencing financial hardship. This rental and mortgage assistance should be conditioned on an agreement that the tenant will not be evicted, and should be in addition to other forms of relief the County has provided to property owners, such as foreclosure prevention services and waiver of penalties for failure to pay property taxes on time for owners experiencing financial hardship.

The County has the legal authority to regulate substantive grounds for eviction, including removing certain reasons as grounds for eviction. The County's own Rent Stabilization Ordinance already regulates such substantive grounds.[30] California courts have consistently ruled that local jurisdictions have the power to regulate eviction, so long as the regulations are substantive in nature, rather than procedural.[31] In addition, the state COVID-19 Tenant Relief Act of 2020 implicitly acknowledges a local jurisdiction's power to regulate evictions based on failure to pay rent.[32]

Cities across the country have also begun to adopt similar measures to restrict evictions for nonpayment of rent. For example, the District of Columbia recently banned evictions in

---

[26] Board of Governors of the Federal Reserve System, *The Fed—Report on the Economic Well-Being of U.S. Households in 2020—May 2021—Dealing with Unexpected Expenses* (May 19, 2021), https://www.federalreserve.gov/publications/2021-economic-well-being-of-us-households-in-2020-dealing-with-unexpected-expenses.htm.
[27] California Employment Development Department, *Unemployment Insurance – After You Apply* (Feb. 17, 2022), https://edd.ca.gov/en/Unemployment/After_you_Filed [retrieved May 9, 2022] ("It takes at least three weeks to process a claim for unemployment benefits and issue payment to most eligible workers.").
[28] Cal. Code of Civil Proc. § 1161(2).
[29] Cal. Code of Civil Proc. § 1179 (allowing a judge to prevent forfeiture in cases of hardship only if the tenant has made full payment of rent).
[30] Los Angeles County Code § 8.52.090.
[31] *See Tri Cty. Apartment Ass'n v. City of Mt. View*, 196 Cal. App. 3d 1283 (1987), *S.F. Apartment Ass'n v. City & Cty. of S.F.*, 20 Cal. App. 5th 510 (2018).
[32] Cal. Code of Civil Proc. § 1179.05(b).

situations where the tenant owes less than $600.[33] The San Francisco Board of Supervisors voted to require an additional 10 day cure period before landlords can file evictions for many reasons, including nonpayment of rent.[34] The American Bar Association has also called for policies to allow tenants more time to repay missed rent in its "Ten Guidelines for Residential Eviction Laws."[35] The County can build on this momentum and adopt a model policy to prohibit evictions based on nonpayment of relatively small amounts of money, paired with tenant support services, such as access to counsel and educational resources, rental assistance programs for tenants, and mortgage relief programs for landlords.

### B. Codify enhanced tenant anti-harassment protections

Landlord harassment contributes to tenant displacement, gentrification, residential instability, and homelessness. Even if a tenant is not facing eviction in court, they may still face harassment, including coercion to leave their home without court process through tactics such as refusal to make repairs, utility shut offs, and/or illegal lockouts. Recent data suggests that tenants in the City of Los Angeles faced increased landlord harassment and illegal lockouts during the pandemic. Landlord harassment remains an issue for tenants as communities continue to recover from the effects of the pandemic. In 2021, an estimated 500 or more tenants experience landlord harassment in the city Los Angeles each month.[36]

The County strengthened tenant anti-harassment protections in its emergency protections by including additional examples of prohibited activities. The emergency resolution states that "[t]hese Protections shall survive this Resolution,"[37] but the County should now codify these protections within its existing tenant anti-harassment ordinance (Los Angeles County Code § 8.52.130). Both the currently codified protections and the emergency protections include lists of prohibited activity. While the two lists are substantially similar, the County should merge them and resolve any disparities in favor of providing the greatest number of protections. This would include retaining the protection currently in the County Code against landlords communicating with tenants in their non-primary language in order to harass, and removing the "bad faith"

---

[33] District of Columbia Official Code § 16-1501(b) ("The person aggrieved shall not file a complaint seeking restitution of possession pursuant to this section for nonpayment of rent in an amount less than $600. Nothing in this subsection shall prevent the person aggrieved from filing a complaint to recover the amount owed.").

[34] San Francisco Admin. Code § 37.9(o).

[35] American Bar Association, *Ten Guidelines For Residential Eviction Laws* (Feb. 2022), https://www.americanbar.org/content/dam/aba/directories/policy/midyear-2022/612-midyear-2022.pdf

[36] Cantong. J., *Landlord Harassment & Illegal Eviction* (Feb. 28, 2022) Neighborhood Data for Social Change, USC Price Center for Social Innovation, at Table: Landlord/Tenant Dispute Calls by Month, 2010-2021, https://usc-ndsc-wordpress.azurewebsites.net/landlord-harassment-illegal-eviction/. *See also,* Dillon, L. & Poston, B., *Despite protections, landlords seek to evict tenants in Black and Latino areas of South L.A.* (June 18, 2020) Los Angeles Times, https://www.latimes.com/homeless-housing/story/2020-06-18/despite-protections-landlords-attempting-to-evict-tenants-in-south-l-a-black-and-latino-neighborhoods-data-shows.

[37] Resolution of the Board of Supervisors of the County of Los Angeles Further Amending and Restating the County of Los Angeles COVID-19 Tenant Protections Resolution (Jan. 25, 2022), § IX (Harassment and Retaliation Protections).

requirement currently in the County Code for certain landlord behaviors to be actionable. Tenant Anti-Harassment protections should additionally include protection from harassment for outstanding rental debt as well as additional penalties for harassment of a tenant with a pending or approved rental assistance application.

### C.  Codified right to counsel for tenants at risk of eviction

In order to ensure tenants are not unjustly evicted, the County should follow the recommendations of the Right to Counsel Coalition and codify the right to counsel for tenants at risk of eviction. Right to counsel should be a codified tenant right for low-income renters (household income of 80% of AMI or less) in the form of outreach, education, and free legal representation in eviction actions. If this is not a codified right, access to legal representation will be subject to increases and decreases of funding in response to political ebbs and flows. Further, a permanent, codified right is more likely to be known and understood by tenants than a mere program; consequently, more tenants will not only have access to, but also take advantage of the legal services available. Without representation, the data paints a clear picture of the inevitable outcome: tenant protections will go unenforced and tenants remain unprotected. Yet, where tenants have a right to counsel, data shows that evictions decrease. In New York City, where there is such a law, 86% of renters facing eviction that receive legal representation get to stay in their homes, and the eviction filing rate decreased by 30%.[38]

Right to Counsel, as found by independent studies, is highly cost-effective homelessness prevention. A study of proposed right to counsel programs in Los Angeles found that, for every $1 invested, the program would generate returns of approximately $4.80 to the County of Los Angeles.[39] The analysis found that this return on investment would be generated primarily by the avoidance of public costs related to shelter and housing programs, school funding, health care and foster care, and that a right to counsel program could provide numerous additional, unquantifiable benefits in terms of tenant health, education, employment, and more.[40] To utilize the Right to Counsel resource effectively, the County should additionally require that tenants are notified about the availability of legal representation and education at all possible intervention points, including whenever a notice of termination is served.[41]

---

[38] Office of Civil Justice, New York City Department of Social Services/Human Resources Administration, *Annual Report* (2020) at p. 23, https://www1.nyc.gov/assets/hra/downloads/pdf/services/civiljustice/OCJ_Annual_Report_2020.pdf.
[39] STOUT (2019), *supra*, at p. 8.
[40] *Id.*, at p. 93.
[41] For example, the Los Angeles County Department of Consumer and Business Affairs is already required to be notified of all notices of termination served, and could send information to the affected tenants. *See* Los Angeles County Code § 8.52.090(B)(4).

### D. Relocation assistance for tenants displaced for no fault of their own, including due to unaffordable rent increases

All tenants should have access to relocation assistance when they are required to move for no fault of their own. In unincorporated areas, the Board has adopted relocation assistance as part of its just cause protections.[42] When a tenant is being evicted for a no-fault just cause reason, such as an owner move-in, tenants are entitled to relocation assistance at an amount set by the County.[43] However, there is a loophole that allows tenants in units not covered by the County's rent regulations to be forced out through large rent increases and receive no relocation assistance. While the County cannot prevent rent increases in units ineligible for rent stabilization under Costa-Hawkins, the County can do more to protect the tenants living in these units.

Requiring landlords to provide tenants financial assistance if the tenant is displaced due to a large rent increase will greatly increase the likelihood that displaced tenants find adequate housing and can avoid homelessness. For example, if a landlord issues a rent increase above the amount allowed by the County's Rent Stabilization Ordinance, the tenant household would have two options: 1) accept and pay the increased rent, or 2) terminate their tenancy and request financial assistance from the landlord to relocate. Tenants would need to notify the landlord of their need for assistance within a reasonable time and, if the landlord does not rescind or reduce the rent increase, the landlord would be required to pay the tenant relocation assistance. This type of policy has been adopted in other jurisdictions for units not covered by rent stabilization, including the Cities of Long Beach[44] and Baldwin Park,[45] and the County has already studied the policy in response to a board motion.[46] This policy would mitigate the harm caused to tenants from having to move due to large rent increases and significantly increase the likelihood that a tenant successfully finds replacement housing. The policy would not cause an undue burden on landlords, as the annual rent increases allowed under the rent stabilization ordinance generally allow landlords a fair return. Requiring landlords to pay financial assistance to tenants in non-rent stabilized units who are displaced by large rent increases will meaningfully increase the housing stability for the **over 60%** of tenants in unincorporated areas that do not live in units covered by the County's rent stabilization ordinance.[47]

---

[42] Los Angeles County Code § 8.52.110.

[43] County of Los Angeles Department of Consumer and Business Affairs, *Relocation Assistance FAQs* (Sept. 17, 2021), https://dcba.lacounty.gov/wp-content/uploads/2021/09/Relocation-Assistance-FAQ-9.17.21.pdf.

[44] City of Long Beach Ordinance No. ORD-19-0014 (adopted June 11, 2019), https://library.municode.com/ca/long_beach/ordinances/municipal_code?nodeId=962139 (repealed by City of Long Beach Ordinance No. ORD-19-0035 (adopted Dec. 10, 2019), https://library.municode.com/ca/long_beach/ordinances/municipal_code?nodeId=995716).

[45] Baldwin Park Code of Ords. § 129.11(d)(5) (applies within 18 months of a change in property ownership).

[46] County of Los Angeles Department of Consumer and Business Affairs, *Analysis for Economic Displacement Assistance (Item No. 10, Agenda of September 10, 2019)* (Oct. 1, 2020), http://file.lacounty.gov/SDSInter/bos/supdocs/140418.pdf.

[47] Estimate based on American Community Survey 2019 5-yr data for number of renters in buildings with only one unit. *See* US Census Bureau, *American Community Survey*, Table B25033, https://www.census.gov/programs-surveys/acs [retrieved May 9, 2022].)

### E.   Strong proactive code enforcement[48]

Substandard housing is prevalent in unincorporated Los Angeles County with strong concentrations in underserved communities like South and East Los Angeles. Substandard housing has detrimental effects on the health and safety of tenants. Communities where housing is riddled with mold, pest infestations, and other habitability issues have higher rates of asthma and other respiratory illnesses, especially in children.

On April 5, 2022, the Board of Supervisors unanimously adopted a motion to study Rental Housing Habitability and Rent Escrow Account Programs.[49] Consistent with and in response to this motion, the County should implement a proactive code enforcement system centralized under a single program in order to foster clear understanding of County department roles and responsibilities and increase efficiency for code violation resolutions. This Rental Housing Habitability program should include best practices from the Los Angeles Housing Department's Systematic Code Enforcement Program (SCEP), the Rent Escrow Account Program (REAP), and the Tenant Habitability Plan (THP), and learn from the challenges in implementation and enforcement. Other code enforcement tools like health and safety receiverships—which are historically underutilized in Los Angeles, despite being an immediate and effective tool to eradicate slum housing and motivate compliance downstream from negligent property owners—should be integrated into the program. In particularly egregious cases of slum housing and non-compliance, there should be opportunities for acquisition of such properties by community land trusts and mission-based affordable housing providers.

### F.   Removal of discriminatory barriers to housing access

A comprehensive approach to the housing crisis and our recovery must also include policies which address challenges to renters accessing new housing. Enacting policies which ensure access to prospective housing for renters, while allowing landlords to evaluate tenants based on appropriate factors, helps stabilize communities and prevent discrimination.

Landlord screening practices have expanded in recent years to require tenants to submit a range of personal information, much of which is not relevant to the question of whether the applicant can afford to pay the rent. For example, landlords often rely on the use of credit reports to assess whether an applicant will be a good tenant, but numerous studies have shown racial disparities in credit scores due to centuries of discrimination that have contributed to a wide wealth gap between racial groups.[50] Further, credit reports include information other than a

---

[48] *See generally* Strategic Actions for a Just Economy, *Recommendations to Improve Los Angeles County's Residential Code Enforcement* (Apr. 2021), https://www.saje.net/wp-content/uploads/2022/05/L.A.-County-Code-Enforcement-Final-Recommendations-.pdf.
[49] Board of Supervisors of the County of Los Angeles, *Statement of Proceedings* (Apr. 5, 2022) Item 5, http://file.lacounty.gov/SDSInter/bos/sop/1122935_040522.pdf.
[50] *See* National Consumer Law Center, *Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination* (May 2016), https://www.nclc.org/images/pdf/credit_discrimination/Past_Imperfect050616.pdf (citing to several studies).

tenant's income and history of rent payments, including other debt records that could be erroneous. Much of the information in a credit report is not relevant to a tenant's ability to afford housing. Similarly, many landlords require tenants to disclose whether an eviction has been filed against them, without asking whether the tenant may have ultimately won the eviction case. Finally, criminal records screening has become a standard practice which creates a barrier for many housing applicants despite strong evidence that stable housing reduces recidivism and many records are simply not indicative of whether someone will be a good tenant.

These arbitrary and discriminatory screening practices make it harder for vulnerable tenants, and in particular Black and brown tenants, to secure the housing they need, cause many tenants to expend considerable resources repeatedly applying for housing, and make our communities less safe by compounding our challenges with respect to housing insecurity. In addition, despite existing source of income discrimination protections, these barriers continue to stand in the way of Section 8 voucher holders accessing housing to exit homelessness.[51]

As we emerge from the pandemic, these concerns are increased by the fact that many struggling tenants made use of emergency eviction protections or rental assistance, which were put in place in recognition of the way COVID suddenly impacted millions of tenants' ability to make rent and stay housed. We must not now allow those tenants to be punished for making use of these resources, and must ensure that screening practices are reasonably related to whether a renter will be a suitable tenant; we simply cannot afford to allow tenants to be denied housing based on discriminatory factors or the increased homelessness which will result from allowing such practices to continue. The City of Los Angeles has introduced a package of Fair Access for Renters policies,[52] and the County has an opportunity to lead by doing the same.

IV.   **The County should ensure that incorporated cities adopt policies in the LA Tenant Bill of Rights so that every tenant in the county has minimum, universal tenant protections and the support to enforce them**

For the foreseeable future, COVID-19 will continue to pose a serious public health threat and cause significant economic disruptions. The County's emergency eviction protections should remain in effect to protect tenants that cannot pay rent. Nonetheless, we acknowledge that the County must begin taking steps to prepare for the eventual expiration of its emergency eviction protections. The expiration of the County's state of emergency will not only affect unincorporated areas, but incorporated cities as well.

---

[51] *See* Wagner, D., *As Landlords Intensify Tenant Background Checks, Some Lawmakers Want New Limits On Screening* (May 2, 2022) LAist, https://laist.com/news/housing-homelessness/los-angeles-la-renter-tenant-screening-credit-score-check-landlord-voucher-income-housing-apartments-bonin-ramn-city-council-rental-access-ordinance.

[52] Los Angeles City Council Motion No. 22-0265 (Mar. 9, 2022), https://clkrep.lacity.org/onlinedocs/2022/22-0265_mot_3-08-22.pdf; Los Angeles City Council Motion No. 22-0279 (Mar. 9, 2022), https://clkrep.lacity.org/onlinedocs/2022/22-0279_mot_3-09-22.pdf; Los Angeles City Council Motion No. 22-0280 (Mar. 9, 2022), https://clkrep.lacity.org/onlinedocs/2022/22-0280_mot_3-09-22.pdf.

During the COVID-19 pandemic, many cities in the County relied on the County's emergency actions to protect tenants from eviction. Some cities let their own local emergency protections expire, opting to follow the County's protections. But when the County's protections expire, many tenants across the county will suddenly lose protections that have kept them housed in the past two years. Over 2.7 million tenants in the county are not covered by any local eviction protections or rent regulations. Before the Board allows the emergency protections to expire, it should encourage and support every city in Los Angeles County to adopt the basic, universal set of tenant protections included in the LA Tenant Bill of Rights. Some cities in the County have already started adopting components of the LA Tenant Bill of Rights in recent years, including Baldwin Park[53], Bell Gardens,[54] Cudahy[55], Culver City[56], Inglewood[57], and the City of Los Angeles.[58] And, this November, voters in the City of Pasadena will consider a measure to adopt rent stabilization and universal just cause protections.[59]

To help protect tenants in incorporated cities, **the Board should explore all available options to encourage incorporated cities to adopt the policies in the LA Tenant Bill of Rights.** Tenants in cities that do not have local tenant protections are more likely to be involuntarily displaced or become unhoused.[60] When tenants are displaced or become unhoused, there are spillover costs imposed on the County related to shelter and housing programs, health care, child welfare, and more.[61] For all of these reasons, the Board has an interest in *strongly* encouraging incorporated cities to adopt local tenant protections.

The Board could encourage cities to adopt the LA Tenant Bill of Rights as follows:

- **Encourage cities to adopt the County's tenant protection ordinances and enforce these ordinances through a service agreement with the County.**[62] Cities should be able to adopt the County's tenant protection ordinances and contract with County departments to provide administrative services, fee collection, and enforcement. The County should

---

[53] Baldwin Park Code of Ords. § 129 (rent stabilization; just cause eviction protections; relocation assistance for no-fault evictions, including large rent increases).
[54] April 11, 2022 Regular Meeting of the City of Bell Gardens City Council, Agenda Item #13, https://agenda.bellgardens.org/AgendaPublic/DisplayAgendaPDF.ashx?MeetingID=510 (directing city staff to prepare a rent stabilization and just cause eviction ordinance).
[55] Cudahy Mun. Code § 5.12 (obligation of landlords to notify the City prior to an eviction).
[56] Culver City Mun. Code § 15.09.200 et seq. (rent stabilization; just cause eviction protections; relocation assistance for no-fault evictions).
[57] Inglewood Mun. Code Article 10 (rent stabilization; just cause eviction protections; relocation assistance for no-fault evictions).
[58] *See, for ex.,* Los Angeles Mun. Code Chapter IV, Article 5.3 (Tenant Anti-Harassment Ordinance)
[59] Coleman, A., *Sufficient Signatures for Rent Control Initiative Are Verified to Put Measure on Ballot* (May 9, 2022) Pasadena Now, https://www.pasadenanow.com/main/sufficient-signatures-for-rent-control-initiative-are-verified-to-put-measure-on-ballot.
[60] Nelson, K., Garboden, P., McCabe, B. J., & Rosen, E., *Evictions: The Comparative Analysis Problem* (Mar. 4, 2021) Housing Policy Debate, *31*(3–5), 696–716, https://doi.org/10.1080/10511482.2020.1867883.
[61] STOUT (2019), *supra*, at p. 30.
[62] The County's cannabis facilities regulations include such a provision. Los Angeles County Code § 11.37.220.

secure funding to address any startup costs for cities. This will lower the barrier for smaller cities to enact tenant protections, streamline enforcement, and improve awareness among tenants and landlords by having uniform regulations across jurisdictions.

● **Explore accounting for costs caused by housing instability when setting prices for service agreements with cities that lack local tenant protections.** The County already provides a wide variety of services to cities on a contract basis. Research demonstrates that protecting tenants from eviction results in considerable cost savings, including for services such as foster care, healthcare and other services for those experiencing homelessness, and school funding.[63] The County should consider whether the costs created by weak tenant protections should be accounted for in service agreements with cities without local tenant protections.

● **Consider conditioning certain contract services on the city adopting local tenant protections**. The County provides numerous services on a contract basis to many cities in the county. The County should consider whether provision of some of these services should be conditioned on the city adopting local tenant protections if this can be done without causing harm to residents.

● **Condition, or embed incentives within, County funding sources to encourage cities to adopt local tenant protections.** The County could explore conditioning certain funding for cities on the city adopting local tenant protections, in order to reflect the increased County-borne costs which are incurred in the absence of those protections.

● **Explore whether any taxing entities that the County has influence over should remit a portion of revenue to jurisdictions that have adopted local tenant protections.** This will ensure that existing discretionary tax revenue is spent in jurisdictions that share the County's goals of ending homelessness and providing stable homes to tenants and account for the added costs created by a lack of local tenant protections.

V.     **Conclusion**

For too long, Los Angeles County tenants have experienced vastly different rights and protections depending on where in the County they live. The pandemic has demonstrated the fundamental flaws in our eviction system, as well as the merits of protecting vulnerable tenants countywide from harassment, housing insecurity, and eviction with a uniform set of policies. We must not falter in our commitment to protecting tenants for the duration of the public health emergency, and we must seize on the lessons learned during the pandemic to advance a more uniform, equitable and just set of housing policies for the future. The County's direction for a report back on lessons learned and a longer-term set of eviction protections presents that opportunity.

---

[63] STOUT (2019), *supra*, at p. 8.

Throughout the pandemic, local jurisdictions have relied on the County's leadership to protect renters from preventable eviction, inappropriate rent increases, and violations of their tenants' rights. As we plan for a post-pandemic world, we must address the inequities which have caused uneven impacts of the pandemic and our preexisting housing crisis on low-income tenants and communities of color, and we call for a Tenant Bill of Rights to be advanced throughout the County to ensure that all tenants, regardless of which city or neighborhood they live in, have equal protection against eviction, unaffordable rent increases, and violation of their rights.

*For more information, please contact:*
Maria Lopez, Keep LA Housed Campaign Coordinator
mariaguadalupe@innercitystruggle.org

*Keep LA Housed Steering Committee:*
Alliance of Californians for Community Empowerment
Community Power Collective
Eastside LEADS
Inner City Law Center
InnerCity Struggle
Legal Aid Foundation of Los Angeles
Public Counsel
Strategic Actions for a Just Economy
Tenants Together