1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4 LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
   et al.,                       )                        (KESx)
5                                )
              Plaintiffs,        ) Los Angeles, California
6                                )
   vs.                           ) Thursday, June 9, 2022
7                                )
   CITY OF LOS ANGELES, et al.,  ) (9:20 a.m. to 11:38 a.m.)
8                                )
              Defendants.        )
9 _____)

10

11   TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT OBJECTIONS/
                      SCHEDULING CONFERENCE
12           BEFORE THE HONORABLE DAVID O. CARTER
                 UNITED STATES DISTRICT JUDGE
13

14

Appearances:                    See next page.
15
Court Reporter:                 Recorded; CourtSmart
16
Courtroom Deputy:               Karlen Dubon
17
Transcribed by:                 Jordan Keilty
18                               Echo Reporting, Inc.
                                 9711 Cactus Street, Suite B
19                               Lakeside, California 92040
                                 (858) 453-7590
20

21

22

23

24
Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

APPEARANCES:

For the Plaintiffs:             ELIZABETH A. MITCHELL, ESQ.
                                Spertus, Landes & Umhofer, LLP
                                617 West 7th Street, Suite 200
                                Los Angeles, California 90017
                                (213) 205-6520

                                MATTHEW D. UMHOFER, ESQ.
                                Spertus, Landes & Umhofer, LLP
                                1990 South Bundy Drive
                                Suite 705
                                Los Angeles, California 90025
                                (310) 826-4722

For the City of Los Angeles:    SCOTT D. MARCUS, ESQ.
                                ARLENE N. HOANG, ESQ.
                                JESSICA MARIANA, ESQ.
                                GITA O'NEILL, ESQ.
                                Los Angeles City Attorney's
                                  Office
                                200 North Main Street
                                7th Floor, Room 675
                                Los Angeles, California 90012
                                (213) 978-8216

For the County of Los           LOUIS "SKIP" MILLER, ESQ.
  Angeles:                      JENNIFER HASHMALL, ESQ.
                                Miller Barondess, LLP
                                1999 Avenue of the Stars
                                Suite 1000
                                Los Angeles, California 90067
                                (310) 552-8400

                                ANA WAI-KWAN LAI, ESQ.
                                Los Angeles County Counsel
                                  Office
                                350 South Figueroa Street
                                Suite 601
                                Los Angeles, California 90071
                                (213) 974-0061

3

APPEARANCES:  (Cont'd.):

For the County of Los                AMIE S. PARK, ESQ.
  Angeles:                           LAUREN BLACK, ESQ.
                                     Los Angeles County Counsel
                                       Office
                                     500 West Temple Street
                                     6th Floor
                                     Los Angeles, California 90012
                                     (213) 626-2105

                                     BRANDON YOUNG, ESQ.
                                     Manatt Phelps & Phillips, LLP
                                     2049 Century Park East
                                     Suite 1700
                                     Los Angeles, California 90067
                                     (310) 312-4181

                                     BYRON J. MCLAIN, ESQ.
                                     Foley & Lardner, LLP
                                     555 South Flower Street
                                     Suite 3300
                                     Los Angeles, California 90071
                                     (213) 972-4500

                                     EMILY A. RODRIGUEZ-SANCHIRICO,
                                       ESQ.
                                     Wilkie Farr & Gallagher, LLP
                                     2029 Century Park East
                                     Suite 3400
                                     Los Angeles, California 90067
                                     (310) 855-3106

For the Intervenors Los              SHAYLA R. MYERS, ESQ.
  Angeles Community Action           Legal Aid Foundation of
  Network & Los Angeles                Los Angeles
  Catholic Worker:                   7000 South Broadway
                                     Los Angeles, California 90003
                                     (213) 640-3983

For the Intervenors Orange           CAROL A. SOBEL, ESQ.
  County Catholic Worker,            WESTON C. ROLAND, ESQ.
  Los Angeles Catholic               Law Office of Carol A. Sobel
  Workers & the County of            1158 26th Street, Suite 552
  Los Angeles:                       Santa Monica, California 90403
                                     (310) 393-3055

4

1   APPEARANCES:  (Cont'd.)

2   For the Intervenors Orange     CATHERINE E. SWEETSER, ESQ.
    County Catholic Worker,      Schonbrun Seplow Harris
3     Los Angeles Catholic       Hoffman & Zelders, LLP
    Workers & the County of    9415 Culver Boulevard
4     Los Angeles:              Suite 115
                         Culver City, California
5                          (310) 396-0731

6                          BROOKE A. WEITZMAN, ESQ.
                         WILLIAM R. WISE, JR., ESQ.
7                          Elder Law and Disability
                           Rights Center
8                          1535 East 17th Street
                         Suite 110
9                          Santa Ana, California 92705
                         (714) 617-5353
10

11                          PAUL L. HOFFMAN, ESQ.
                         Schonbrun Seplow Harris
12                            Hoffman & Zeldes, LLP
                         200 Pier Avenue, Suite 226
13                          Hermosa Beach, California
                           90254
14                          (310) 717-7373

15

16

17

18

19

20

21

22

23

24

25

5

1    Los Angeles, California; Thursday, June 9, 2022 9:20 a.m.

2                            --o0o--

3                        (Call to Order)

4            THE COURT:  Then, we're in session on case number

5    20-02291, entitled LA Alliance for Human Rights, et al.

6    versus Plaintiff, City of Los Angeles, a municipal entity.

7            We'll be a little bit more formal today.  So, I

8    would like the appearances beginning with the respective

9    parties.  And let me begin with Plaintiffs' counsel, please.

10           MS. MITCHELL:  Good morning, your Honor.

11   Elizabeth Mitchell and Matt Umhofer on behalf of Plaintiffs.

12           THE COURT:  Thank you.

13           Let me turn to the City, please.

14           MR. MARCUS:  Good morning, your Honor.  Scott

15   Marcus on behalf of the City of Los Angeles.

16           THE COURT:  All right.  Thank you.

17           And let me turn to the County.

18           MR. MILLER:  Good morning, your Honor.  Skip

19   Miller and Mira Hashmall on behalf of the County of L.A.

20           THE COURT:  And the Intervenors, please.

21           MS. SOBEL:  Good morning, your Honor.  Carol Sobel

22   on behalf of all of the Intervenors.

23           MS. MYERS:  And Shayla Myers on behalf of

24   Intervenor Los Angeles Community Action Network and Los

25   Angeles Catholic Worker.

6

1          THE COURT:  I represent to you I've read the

2  briefing on numbers occasions.  I may have a few questions,

3  but at the beginning of this process, I'd like to hear from

4  the Intervenors to begin with.  You had substantial

5  concerns, and I'd like you to address the Court concerning

6  those.

7          MS. MYERS:  Thank you, your Honor.  Shayla Myers

8  on behalf of the Intervenors.  I don't think it's an

9  exaggeration to say that we have substantial concerns with

10 this gentleman agreement.

11          From the beginning of this case, the LA Alliance

12 and the City of Los Angeles have sought from this Court an

13 order that would allow the City to enforce an anti-camping

14 ban in the City of Los Angeles.  They have not been quiet

15 about that, and two years after this case was -- was filed,

16 that's the agreement that was presented to the Court.

17 Certainly not surprised that that's the agreement that was

18 presented to the Court.

19          THE COURT:  A little slower.

20          MS. MYERS:  We're not surprised that that's the

21 settlement agreement that was presented to the Court, but

22 this Court simply does not have jurisdiction to enter that

23 settlement agreement.

24          We want to be clear about what Intervenors'

25 objections are in this case because I think both the LA

7

1 Alliance and the City have attempted to present our

2 objections as something other than they are.

3         Part of the City and the Intervene -- or in the

4 Plaintiffs' agreement provides for the creation of shelter

5 beds.

6         THE COURT:  Just a little slower.

7         MS. MYERS:  Part of the agreement provides for the

8 creation of shelter beds, housing solutions.  And, while it

9 is certainly the case that Intervenors have significant

10 policy objections to that, we do not think that it will

11 address the homelessness crisis.  We do not believe that the

12 City is actually committing to do more than is already in

13 the pipeline, and we do not believe that the agreement

14 provides the type of certainty that an agreement like this

15 should provide about the City's obligations in exchange for

16 this Court's approval.

17         But those aren't the -- those aren't the arguments

18 that we're making here today from a legal standpoint.  What

19 we are arguing today with regards -- is with regards to

20 sections four and sections five of the settlement agreement.

21 And, in those provisions, the City of Los Angeles and the LA

22 Alliance are attempting to gain this Court's approval for

23 enforcement of ordinances that are not challenged in the

24 court, that no one on the LA Alliance side has standing to

25 challenge.  There are no allegations that there's been any

8

1 enforcement that they could challenge. And, your Honor,

2 they're seeking pre-enforcement approval for ordinances that

3 haven't even been written, and there's certainly no basis

4 under Article 3 for the Court to enter an agreement like

5 this.

6 We do want to raise a couple of specific

7 arguments. First of all, procedurally, we just want to say

8 the City and the LA Alliance made the choice not to file a

9 motion for approval. So, any arguments that they raised for

10 the first time on reply we think are waived, and they simply

11 didn't give us an opportunity to respond to them.

12 They also failed to put forth any evidence in

13 support of the agreement. The LA Alliance puts forth a

14 number of statements about the -- the agreements -- a

15 similar agreement in Orange County but puts forth absolutely

16 no evidence in support of that. And I know my co-counsel,

17 Ms. Sobel, is going to address that. But we just want to be

18 clear that the record is devoid of any factual support

19 related to this.

20 I do want to make one quick point about the -- the

21 fight that seems to be going on in the pleadings -- or in

22 the papers about what this agreement is called. We refer to

23 it as a consent decree, as does the County.

24 The City has taken the position, as has the LA

25 Alliance that it's not a consent decree. I think that

9

1 issue, your Honor, is a red herring.  The City doesn't

2 explain why they take objection to the term "consent decree"

3 and actually go so far as to say if your Honor finds it to

4 be a consent decree, they want the opportunity to reconsider

5 the agreement.

6       The consent decree is -- is not a term of art.  It

7 simply means a settlement agreement with judicial approval.

8 That's exactly what they're seeking here.  So, this is a

9 consent decree.  And the City hasn't put forth any argument

10 to suggest why there's a problem with referring to it as a

11 consent decree.

12       We want to -- I want to just make a couple of

13 points about the substance of the agreement itself, as I

14 said, with regards to Section 3.  From a legal standpoint,

15 we don't object to it.  But, obviously, with regards to

16 Section 4 and Section 5, we have significant -- a

17 significant objections.

18       The City of Los Angeles and the LA Alliance are

19 asking for not only approval of an agreement for which there

20 is no standing, they are asking for continued jurisdiction

21 for this Court for five years to enforce an agreement over

22 which the Court does not have standing.  They're asking for

23 continuing jurisdiction from the Federal Court to enforce a

24 provision that says that the City may enforce public safety

25 regulations throughout Los Angeles once it reaches a

10

1    condition precedent.  But there is no basis and Article 3

2    standing for such an agreement.

3           The LA Alliance argues that provisions and

4    guardrails in the settlement agreement provide for the Court

5    to have continuing jurisdiction.  The City makes the same

6    argument.  They suggest that because objections can be

7    raised later on, that the Court should continue to have

8    jurisdiction over this.  But the reality is who is allowed

9    to make the objections in this case is limited entirely to

10   the LA Alliance and the City of Los Angeles related to an

11   enforcement -- to the enforcement of an ordinance that both

12   the City and the LA Alliance have been advocating since this

13   case started should be enforced.  Because of that, there is

14   simply no case or controversy between the City and the LA

15   Alliance over which this Court has jurisdiction.

16          And then I just want to make a couple of other

17   points to address some of the representations that the City

18   made related to the specifics of the agreement.

19          Your Honor, we took issue with the term "creates

20   housing".  And I think --

21          THE COURT:  Repeat that slowly.

22          MS. MYERS:  We took issue with and raised concerns

23   about the agreement and the fact that it says that the City

24   must create housing and shelter beds.

25          THE COURT:  Is that page nine, the last paragraph

11

1  on page nine of Docket 438?  Look at that to make certain

2  that that's what you're referring to.

3  　　　　　MS. MYERS:  Do you mean as -- as opposed to the

4  City's objections?

5  　　　　　THE COURT:  Docket 438, look at page nine, the

6  last paragraph.  You'll see some numbers there, 9,000,

7  approximately 1,000, and that's one of the areas that this

8  issue's raised in as well as what does it mean to create --

9  and when there's in "the pipeline".

10  　　　　　MS. MYERS:  Sure.  And, your Honor, I think we're

11  making a --

12  　　　　　THE COURT:  Respond to my question now.  Is that

13  the correct area that you're looking at?

14  　　　　　MS. MYERS:  No.  I'm looking -- I am looking at

15  that, but I'm making a different argument.  That is where

16  the City purports to address our argument, but I think they

17  misrepresent what our argument actually is.

18  　　　　　So, there's a number of issues that we think would

19  raise concerns for your Honor related to -- to approving the

20  settlement agreement that we raised.  The first is -- is the

21  issue of creates.  There's no doubt that Section 3 of the

22  agreement requires that the City of Los Angeles create

23  housing and shelter solutions.  But, again, the term

24  "create" is not defined.  The agreement suggests that they

25  can count shelter beds and other housing solutions that are

12

1   funded entirely by third parties.  So, there's no threshold

2   participation for which the City gets to count a bed towards

3   the threshold.  There's absolutely nothing.  So, the City

4   could fund a plane ticket home for an individual, and that

5   would count towards the 60 percent, and I think that's

6   explicit in the agreement.

7           Your Honor, we're making a second agreement -- a

8   second argument, though, related to the use of the term

9   "create" as it relates to Section 4 of the agreement, which

10  is where the Court -- where the parties refer to having

11  shelter beds, and I think this is where the City's papers

12  misrepresent what our argument is.

13          Section 3 requires the City to create a threshold

14  number of housing solutions.  It's a floor, not a ceiling.

15  And, again, if that were where the agreement stopped, we may

16  think it's bad policy, but we wouldn't be here.  But Section

17  3 speaks to creating.  Section 4, which is the section that

18  speaks to enforcement, does not make reference to the beds

19  that are created under Section 3.  It simply says when they

20  have enough shelter beds to reach 60 percent of the

21  unsheltered population.

22          The lack of parallel construction there leaves

23  open the suggestion -- and -- and we have seen -- and I

24  think your Honor raised these concerns.  We've seen the ways

25  in which those terms can be manipulated.

13

1          THE COURT:  Excuse me a moment.  Slower.

2          MS. MYERS:  We've seen the way those terms can be

3    manipulated by -- by the parties when seeking judicial

4    approval for things.

5          So, the City -- the City and the LA Alliance say

6    when the City has enough shelter beds, which doesn't

7    preclude counting the existing shelter beds, including the

8    6700 beds that were created as a result of the agreement

9    between the City and the County.  When the City has enough

10   shelter beds, then it can enforce the order.

11         So, that's the argument that we're making.  That's

12   the argument that the City did not address, and we don't

13   think on the face of the settlement agreement they actually

14   can address because that -- that ambiguity is really

15   significant, your Honor.

16         And then I also just want to make another point

17   related to the 60 percent, and I think -- Ms. Sobel is going

18   to address this more in detail, but I just want to make this

19   point related to the 60 percent as a number.

20         The LA Alliance and the City of Los Angeles keep

21   saying this is like the Orange County Catholic Worker case.

22   It's -- because it provides that the City may enforce public

23   safety ordinances upon the creation of beds for 60 percent

24   of the population.  It's not actually like the Orange County

25   Catholic Worker case insomuch as the City has made

14

1  significant mathematical calculations that reduced the

2  number far below the 60 percent threshold that was set based

3  on a factual record in the Orange County Catholic Worker.

4  And, your Honor, the City -- the City concedes that point in

5  its objections.

6          So, the 60 percent -- the 60 percent number is 60

7  percent of the unsheltered population that is City shelter

8  appropriate.  And by the City's own calculation, that

9  reduces the number of people within that 60 percent by

10 roughly 9,000 is our understanding.

11         But, the City then concedes, as they must based on

12 disability law, that it's not that they're not going to

13 provide shelter beds and offers of shelter to people they

14 deem City shelter inappropriate.  Not offering shelter beds

15 would be a blatant violation of -- of anti-discrimination

16 law.

17         So, the City says, We're going to offer shelter

18 beds to that 60 -- to those individuals who are City shelter

19 inappropriate, but we're just not going to count them to get

20 to our threshold.  So, that's a significant reduction that I

21 think the parties aren't conceding to as they talk about the

22 settlement agreements, but it actually makes it

23 substantially different from the numbers that were at issue

24 in the Orange County Catholic Worker case.  And then, your

25 Honor, of course, there is the issue of the homeless count.

15

1  The fact that the City and the -- the City and the

2  Plaintiffs want to be bound by a homeless count that is

3  being calculated this year I think speaks volumes about what

4  -- about the ways in which they view this 60 percent

5  threshold.  As we put in our papers, there's significant

6  evidence that the housing -- that the housing -- or, I'm

7  sorry -- the homeless count number may go down as a result

8  of tenant protections that have been in place for the past

9  two years --

10           THE COURT:  Just a little slower.

11           MS. MYERS:  -- with no indication whatsoever, your

12  Honor, that those tenant protections are going to be in

13  place going forward.

14           We don't know what the homeless count number is.

15  It's possible the City actually does know what the homeless

16  count number is.  It's possible they know what the top line

17  number is and that they know that the number is going to go

18  down and that they've already met their 60 percent threshold

19  in some of the council districts.  We have no idea.  But

20  approving the agreement and holding the City to that number

21  for five years and approving enforcement is simply

22  unreasonable.

23           But, of course, your Honor, all of those points

24  are beside the point that the Intervenors are really

25  stressing here.  The City of Los Angeles wants to walk out

16

1  of this courtroom with an agreement and with an order signed

2  by your Honor that says that they can enforce Los Angeles

3  Municipal Code 4118.  That's what the agreement says.

4         4118 is not at issue in this case.  There's no one

5  on the Plaintiffs' side that has been arrested, even alleged

6  that they have been subject to enforcement under Los Angeles

7  Municipal Code 4118.  And yet the agreement that they handed

8  you today says explicitly that you're entering an order that

9  says that they may enforce it and that the only -- the only

10 entities that have the ability to challenge that going

11 forward are the very parties who believe that Los Angeles

12 Municipal Code 4118 should be enforced.

13         THE COURT:  On page five, if you'd look at that,

14 the City proposes to make certain that you have the right to

15 sue.  In other words, one of the things that I read in your

16 response was that you were concerned that you were being

17 shut out and precluded from future lawsuits.

18         The City represents and tells the Court that I can

19 even modify this so that you always have access to the

20 courts.  How do you respond to page five?

21         MS. MYERS:  It's not simply, your Honor, about the

22 Intervenors' ability to sue.  It's about -- as you know,

23 Intervenors are here on behalf -- Los Angeles Community

24 Action Network is here on behalf of their members.

25         THE COURT:  How are they precluded from bringing a

1   suit?  The City is -- and the Court would be reluctant to

2   adopt and take away your ability to sue.  One of the values

3   of the Orange County settlements were that there was still

4   access to suit, but it decreased the number of lawsuits.  It

5   decreased because of the informal ability of Judge Smith,

6   Michel Martinez and others to intervene.  And, quite

7   frankly, there's no representation that there's not going to

8   be access to the courts when I read this, from the City's

9   perspective.  And my past dealings in this, the benefit to

10  this was that we took away a huge amount of the lawsuits, in

11  fact, two within the last month that would have cost

12  millions of dollars.

13          So, I'm having trouble with that argument, and I

14  want to say that to you.

15          MS. MYERS:  But, your Honor, it's not the Federal

16  Court's role to take away legitimate lawsuits and

17  opportunities for individuals to come into the court in a

18  case where the issues were not raised.  And I think that is

19  a fundamental difference that I think the LA Alliance and

20  the City have just never addressed.  LA Alliance does not

21  sit in the same shoes as Orange County Catholic Worker

22  because no one in Orange County Catholic -- because no one

23  in the LA Alliance has standing to challenge the Municipal

24  Codes.  And the City doesn't stand in the shoes of Orange

25  County, Santa Ana, Anaheim, any of the other municipalities

18

1   because they're asking for not only a pre-enforcement.

2   They're not enforcing the Municipal Code.  That wasn't why

3   this lawsuit was brought was to challenge those Municipal

4   Codes.

5           They're asking for an ordinance that permits them

6   to enforce some unknown ordinance that is not even

7   referenced in the pleadings, that hasn't even been passed

8   yet, your Honor.  And that's -- that's the problem is that

9   it's continued jurisdiction for this Court to oversee the

10  enforcement of ordinances that have never been drafted, let

11  alone have been enforced.  And it's simply not right, nor

12  does the Court have Article 3 standing for that.

13          And, your Honor, I just want to say the -- the

14  last point that I will make related to this.  As you point

15  out, as drafted, there are no guardrails to protect

16  intervenors.  There are no guardrails at all to -- to

17  dictate how this agreement should be enforced going forward

18  five years into the future.  There's no guardrails to

19  prevent the City of Los Angeles or the LA Alliance from

20  making the arguments that this agreement doesn't mean

21  exactly what it says, i.e., that they may enforce these

22  ordinances.  They're asking for a Federal Court to approve

23  this ordinance saying that they may enforce the ordinance

24  without any clarification whatsoever that at the end of the

25  day, what this really is is an agreement that the LA

19

Alliance will drop the case in exchange for an agreement
that they -- they will not sue going forward.  No third
party can be bound by this at all, and the fact that it
exists in this agreement and it's unenforceable gives
another justification for why it's unfair, unequitable and
unreasonable for the Court to enforce going forward.

And I think that that's -- at the end of the day,
that is the critical aspect of the settlement agreement is
that there is no case or controversy between the LA Alliance
and the City of Los Angeles that would give rise to this
type of agreement.

And the only last thing that I will say, your
Honor, is that both the Intervenors and the -- and the City
sprinkled in -- did not actually make arguments about this
but sprinkled in the fact that the Intervenors had not filed
a complaint in intervention or an answer in intervention.

THE COURT:  No, no, slower.  I want you to repeat
that, slowly.  Okay.

MS. MYERS:  Both the -- both the Plaintiff in the
-- in a footnote and the City in its factual statement
sprinkle in the fact that the Intervenors did not file a
complaint nor answer an intervention.  That's a technical
deficit that we believe the Court already addressed by
granting intervention.  The purpose of it is to spell out
the basis of intervention.  The order issued by the Court

20

1  spells out explicitly the basis for standing and

2  intervention.  So, it's a technical deficit that's already

3  been addressed, and they waived in the past two years any

4  suggestion that this is a problem, and they waived it by not

5  raising it in the first instance and raising it only in a

6  factual statement in the reply.

7          But, in the interests of caution, to the extent

8  that your Honor feels that a pleading would be necessary at

9  this point, we're happy to file one.

10          THE COURT:  I may be back to you with questions

11  but not at the present time.

12          MS. MYERS:  Thank you, your Honor.

13          THE COURT:  Ms. Sobel.

14          MS. SOBEL:  I'm going to try to be brief, which is

15  hard for me to do.

16          Following up on -- on Ms. Myers' argument about

17  there not being set time goals, et cetera, for the Court's

18  information, it took 13 years for the City of Los Angeles to

19  meet the settlement in Jones.  And during that time

20  period --

21          THE COURT:  Took 13 years?

22          MS. SOBEL:  Thirteen years to -- to -- to get

23  1,250 units of permanent supportive housing, half of

24  which --

25          THE COURT:  Would you repeat that more slowly?

21

1          MS. SOBEL:  So, the settlement was 1,250 units.

2          THE COURT:  Just a moment.  One thousand two

3  hundred and fifty units in <u>Jones</u>, and it took 13 years.

4          MS. SOBEL:  It took 13 years, and they didn't --

5  they were allowed to count private entities, and they were

6  allowed to count -- half the units could be outside of Skid

7  Row.  Still, it took 13 years.  And, quite frankly, your

8  Honor, where it took the most time was on Skid Row.  And

9  part of the problem -- and I'm -- I'm -- you know, I can

10  send the Court the letters that I sent to the Housing

11  Committee and to Mayor Garcetti and others over --

12          THE COURT:  Just make the representation.  I

13  believe you.

14          MS. SOBEL:  Okay.  Part of the problem is that the

15  City counted units that previously existed or that had been

16  downgraded, and the reason that we had this measure is

17  because there is another lawsuit against the City, the

18  <u>Wiggins</u> case, to maintain the housing stock in downtown Los

19  Angeles.  Legal Aid brought the case, and they have been to

20  court many times since 2006 when the <u>Wiggins</u> agreement was

21  put into place because the City has repeatedly attempted to

22  allow developers to take out low-cost housing on skid row.

23  So, that's number one.

24          Number two, I have a different understanding of

25  the Orange County settlement than the Court does about the

22

1   access to sue.  There was only an access to sue with two

2   specific entities, because we could not agree on the terms,

3   and they insisted on wanting to do enforcement at an earlier

4   time.  So, there is -- as the Court knows, there was a

5   cutout with Stanton, and we are now in litigation with

6   Stanton in State Court.  There was a cutout with Costa Mesa,

7   and Costa Mesa has stopped the policy that we were

8   challenging, which was the lawyering policy in particular.

9          We have threatened to sue Santa Ana, which has not

10  a single shelter bed at present, even --

11         THE COURT:  Yes, they do.  They moved 78 people in

12  on Monday, and they now have 28 families moved in yesterday,

13  and there are over 100 today.

14         MS. SOBEL:  Okay.

15         THE COURT:  Carnegie is open.

16         MS. SOBEL:  Okay.  And in our agreement with Santa

17  Ana, they were supposed to have 450 units because 250 were

18  going to be at Yale Street.

19         THE COURT:  They have 125 at Yale.  They have 200

20  with a capacity of 400 at the new Carnegie Shelter.  Plus,

21  they have additional space.

22         MS. SOBEL:  Okay.

23         THE COURT:  They're way over their count.

24         MS. SOBEL:  Well, they're not way over their

25  count, your Honor.

23

1          THE COURT:  Counsel, they're way over their count.

2          MS. SOBEL:  But here's the issue, your Honor.  For

3  five years, they've been under their count, four years.  And

4  they've had no beds whatsoever.  So, I just want to make

5  that clear, because in Orange County, the point in time

6  count was something referenced by Ms. Mitchell in her -- in

7  her reply papers.  Everyone in Orange County who looked at

8  the point in time count has different views about it, and

9  there is a significant view that the point in time count is

10  down in Orange County for a couple of reasons, one of which

11  is that they had fewer people to go out and count people.

12  If you don't have people to count people, you're not going

13  to count people.  So, that was one.

14          Two, the difference between the 2022 point in time

15  count in Orange County and the 2019 point in time count is

16  almost exactly equal to the number of people Father Kriz

17  documented as dying.  So, it isn't -- you know, I don't

18  think that our goal in trying to address homelessness is to

19  have death -- you know, attrition by death as a solution to

20  this issue.

21          And then I -- I want to be really clear.  We have

22  been from the outset clear that the 60 percent number was

23  not something we supported.  We supported it originally when

24  the Court asked us to agree to it for a test with Anaheim.

25  It was to be a short-term test.  It has now become

24

1  institutionalized.

2        When the Court and the special master came to

3  speak with Intervenors before the first hearing in this

4  matter and the special master raised the 60 percent number,

5  frankly, I cut her off and said we will never accept the 60

6  percent number and especially not in Los Angeles, because

7  here's what happened on the point in time count.  Several

8  council people conduct -- had sweeps in their district the

9  week or so before the point in time count so that people

10 would be moved out and they would have a lower threshold

11 number.  Where did those people go?  They went to a

12 different council district, and those numbers went up in

13 that council district.

14        So, when we take 60 percent and we apply it as if

15 this were 15 fiefdoms rather than a city, we wind up with

16 all of this artificial construct about who can -- who can

17 reach 60 percent and then start enforcement in their area,

18 and that is particularly problematic for this -- for this

19 City.

20        So, I think those are the -- the major points that

21 I wanted to -- to raise with the Court, and I know that the

22 Court in the Orange County hearing this week raised with my

23 co-counsel, Ms. Weitzman, that we don't have an agreement in

24 Huntington Beach.

25        The Court -- well, the -- the reason we don't have

25

1 the agreement in Huntington Beach is we will not accept 60

2 percent anymore.  So, thank you, your Honor.

3          THE COURT:  Thank you.  I may have questions but

4 not at this time.

5          Mr. Miller on behalf -- or co-counsel on behalf of

6 the County.

7          MR. MILLER:  Good morning, your Honor.  I'll be

8 brief.  I have a couple of points that I want to raise.

9 We're in an interesting position.  The County's in an

10 interesting position.  We don't think there's any Article 3

11 jurisdiction at all.  We think we're -- you know, this is a

12 -- this is a big issue, big problem, and we're devoting

13 tremendous amount of resources and effort to address it.

14          So, that's -- that's where we are at the outset.

15 I read the agreement -- the settlement agreement through.

16 There are some parts of it I just didn't understand, and I

17 -- and I read some of the commentary about it.  It seems

18 acknowledged that the 60 percent threshold is going to hit

19 approximately 14 -- 14,000 beds.

20          THE COURT:  I heard 14,000 to 16,000, right?

21          MR. MILLER:  Fourteen to sixteen.  And it seems

22 acknowledged by Council President Martinez.  She made the

23 statement -- and it's in the briefs -- that the -- the beds

24 that are subject to the agreement are already committed, or

25 most of them.  Thirteen, fourteen thousand of them are

26

1  already committed.  So, I don't understand, and I -- you

2  know, I'm in favor of settlements.  We'd like to settle this

3  case.  We -- you know, frankly, we have a mediation set for

4  Monday, for your Honor's information.  But I don't

5  understand how you can make an agreement to do something

6  that's already been committed that you have to do, and --

7  and then there was a payment of a million eight in legal

8  fees.

9          So, I just don't understand that, and I guess your

10 Honor probably saw that and is going to -- going to address

11 that.  So, that's one issue.

12         The other issue is that we raised --

13         THE COURT:  And what did you want the Court to

14 address about the 1.8 million?

15         MR. MILLER:  Well, it just -- it seems like an

16 agreement to commit to something that's already been

17 committed to, plus the payment of a million eight of legal

18 fees that it just -- I don't understand it.  It -- it

19 doesn't make a lot of sense to me.  I don't want to throw

20 stones on their settlement.  We'd like all this litigation

21 to be settled.  We'd like the money to be spent on, you

22 know, helping people that live in the streets and getting

23 shelter, not on lawyers.  That's our position.  That's --

24 that's where the County's coming from.  I just don't

25 understand how you can enter into an agreement based on a

27

1  commitment you've previously made.  It seems illusory or

2  lacking in consideration.

3         The other issue that I wanted to talk about, your

4  Honor, is I read the -- the agreement, and it -- in page 10,

5  paragraph nine, it talks about County obligations.  The

6  County is obligated to do all these things.  The County is

7  obviously not a party to this settlement agreement.  Our

8  position is that the County is more than meeting its

9  obligations.  So, it doesn't seem to be an appropriate part

10  of the settlement or an appropriate thing for the parties to

11  do to try to define or address obligations of the County.

12  We're not part of this deal.  So, I would like to see that

13  paragraph nine excised.

14         If they want to -- you know, if the Alliance and

15  the City want to talk about things and they want to work

16  with the County and so forth, we're -- our door is open.

17  You know, we're willing to listen.  We've been talking to

18  them.  As I said before, we have a media -- another

19  mediation on Monday.  We'd like very much to get out of this

20  litigation, as much as I like being in your Honor's court,

21  not in this lawsuit.

22         So, I don't think paragraph nine belongs in this

23  deal at all, and I'm concerned that if the Court were to

24  approve it, approve the settlement with paragraph nine in

25  it, there would be some kind of a determination of the

1  County's "obligations", and that would be totally
2  inappropriate.  So, we would ask that that -- you know, that
3  be clarified.
4          That's -- that's pretty much all I have, your
5  Honor.  We don't -- the Board of Supervisors wants to work
6  on homelessness and helping people that are homeless and
7  living -- living in the streets and need services, need
8  shelter, and that's where we're coming from.  So, I would --
9  I would submit it on that basis and thank you, your Honor.
10         THE COURT:  Thank you very much.  I have no
11  particular preference in response.  So, if the Plaintiffs
12  are comfortable and then the City.
13         MS. MITCHELL:  Thank you, your Honor.
14         We don't have a whole lot of response because
15  there wasn't a whole lot said that wasn't in the objection
16  papers already.
17         THE COURT:  But cover that.  In other words, I
18  want to hear full argument today.
19         MS. MITCHELL:  Thank you.  So, Ms. -- Ms. Myers
20  said, as she was standing up here today, she would not be
21  here from a legal perspective or have legal objections if
22  certain things were true.  But, in her mind, they're not.
23  And the implication of that statement is if those things are
24  true, she would not have a legal argument.  And, so, as we
25  pointed out in our papers, those things are, in fact, true.

29

1  And I think one of the problems is Ms. Myers, as I

2  understand it, is reading ambiguities into the agreement

3  that, one, don't actually exist and, two, can be clarified

4  in other ways.  And one of those discussions is what beds,

5  what creating -- creating beds means as opposed to having

6  beds, and that is a particular concern.

7          That's not a reason to deny the objection.  That's

8  a reason to clarify what creating versus having means.  And

9  I think that we have been very clear.  I think the agreement

10 has been very clear.  The City has been very clear in their

11 response to that objection that they intended to create beds

12 for 60 percent of the unsheltered population for whom the

13 City can reasonably assist, and we have gone back and forth

14 and back and forth on what that definition means, and we're

15 reasonably specific, as specific as can be I think in a 27-

16 page document, what that means.  And, certainly, we expect

17 over the next five years for that to be further, I think,

18 defined as we end up, you know, addressing problems that

19 exist, but that's not a reason to deny the settlement on the

20 front end.  It's a reason to continue to work out problems

21 on the back end.

22          One of the other issues that was raised was the

23 2022 calculation, and this is something that the City

24 certainly addressed, but I think everybody except for this

25 argument here today, expects the 2022 count to actually

30

1  increase.  It has increased in every other jurisdiction that

2  has released a 2022 pit count so far that I have seen except

3  for Orange County, which has seen a 17 percent decrease,

4  which I think, frankly, speaks volumes about the success of

5  this program that we have agreed to enter into.

6         So, the argument I think is that we intentionally

7  didn't use the 2020 count because it's going to be higher

8  based on the tenant protections.  But I think in reality, we

9  expect the 2022 count to be higher than the 2020 count.

10 And, regardless of those expectations which at this point my

11 understanding is nobody knows, and I think certainly Mr.

12 Marcus can clarify that.  We certainly don't know.  But it

13 makes more sense to use today's count than the count from

14 two years ago or the count from 2023 or 2024, 2025, because

15 that results in a shifting target, not only for the City but

16 for the Court and for the Plaintiffs if we have to

17 continuously reassess.

18        Yes, your Honor?

19        THE COURT:  If you're right about that, then I

20 would say to the Intervenors, the County, to you and the

21 City that that argument has virtue for the following reason.

22        If we all believe that the count's going up, it

23 increases the responsibility under this agreement for the

24 City to go up in the number of beds.

25        MS. MITCHELL:  That's correct.

1          THE COURT:  And if you go backwards to 2019, you

2     would put yourself in a position where, frankly, this Court

3     would feel uncomfortable with an old number.  Now, if the

4     number goes down, that might be different.  And my question

5     is why haven't we gotten that count in Los Angeles?  We

6     virtually have that count in most other counties.

7          MS. MITCHELL:  I would inquire that of the City

8     and the County, but --

9          THE COURT:  Why ask LAHSA that?

10          MS. MITCHELL:  Yeah.  My understanding is that

11     LAHSA last year took a lot of time -- excuse me -- in 2020

12     took a lot of time.  They didn't release it until the end of

13     June.  And I think, frankly, because the Executive Director

14     recently resigned, there's more complications, but I'm going

15     to have to defer to the City and County and LAHSA on that

16     issue.  So, I don't know if we can do that now or you'd like

17     me to keep going, your Honor.

18          THE COURT:  I want you to be continuous in your

19     argument.  And then if I have questions -- and I apologize

20     for breaking in.

21          MS. MITCHELL:  Thank you, your Honor.

22          So, I think one of the most significant issues for

23     us to address, us being the Plaintiffs, is the standing

24     argument, because that has been raised over and over and

25     over again.  And I think there's a couple of different

32

1   issues here.  One is standing to bring the lawsuit in the

2   first place, which has already been litigated, and one is

3   standing to enter into this agreement.

4          So, I think on the front end I want to clear up

5   some -- some misunderstanding about why we brought this

6   lawsuit in the first place.  There's a lot that has been

7   stated about the LA Alliance's whole goal is just to get to

8   enforcement, and that's just patently untrue, your Honor.

9   We have been very clear.  You can look at the original

10  complaint, Judge.  You can look at the first amended and

11  supplemental complaint and all of our argument.  It is --

12  the goal has never been to get to enforcement.  And, in

13  fact, if that was the sole goal of what we have been trying

14  to achieve, it would be a failure by this agreement because

15  this agreement does not require enforcement.  This agreement

16  permits enforcement if certain things are met.  And we can

17  talk about that in a second, but I just wanted to be very

18  clear.  The goal has always been to mirror the Orange County

19  settlement that was reached, and I'll talk about the 60

20  percent issue in a second, but we -- in looking at this, it

21  was a very balanced approach.  And that is something the LA

22  Alliance has always been fighting for, has always said and

23  its members have been aggrieved by and damaged by, including

24  its unhoused members, of which there are several, is the

25  lack of shelter beds as well as the lack of regulation of

33

1   public spaces as well as the lack of services, including

2   mental health treatment and substance use treatment.  Job --

3   I mean, job training, we can talk about all of those

4   services.  But that has always been the three-pronged

5   approach of the Alliance, and this agreement achieves two of

6   those.

7          So, as far as the increase in shelter, that is the

8   number one goal, and that has been one of the main pillars

9   of this litigation.  And, in fact, your Honor, in the reply,

10  we quoted the main purpose and the intent, which I would

11  like to read into the record at this moment if the Court is

12  looking for a continuous argument.

13         In the first amended and supplemental complaint,

14  on page 23, Plaintiffs state:

15             "While this is not a natural

16             disaster, it is a disaster nonetheless,

17             and it should be treated that way.  The

18             only way to address this crisis with the

19             urgency it deserves is an emergency

20             response providing immediate shelter for

21             all, increasing necessary outreach

22             services and treatment and abating the

23             degradation of our cities and

24             communities for the good of everyone."

25         That has been our goal from the beginning.  That

34

1   is the goal that is to some extent at least as possible

2   achieved with the City.  Obviously, the case against the

3   County for services and treatment continues.

4          But, because the issue of standing has been

5   raised, I want to address both of those issues.  So, one, if

6   we're talking about standing to bring this lawsuit, that

7   issue has already been litigated.  The County has brought

8   this issue.  The City has brought this issue.  This

9   honorable Court found for Plaintiffs already, that

10  Plaintiffs did, in fact, have standing when the original

11  motions to dismiss were litigated.

12         There's no reason to continue litigating that

13  issue again with the County, certainly not with the City at

14  this point.

15         So, as far as standing to bring this, I think the

16  issue has been very clear what our -- what our intent is,

17  what our obligation is, and what we are achieving by this.

18  Now, Los Angeles Community Action Network and other

19  Intervenors that are objecting have a sole goal.  They --

20  they challenge these on certain bases, right.  It is almost

21  always, when we're talking about these sweeps as opposed to

22  property, when we're talking about sweeps under 4118 and

23  other similar ordinances, it's always them challenging the

24  ordinance directly.  They're -- it's not the only way to

25  achieve standing in this case, right.  With this balanced

35

approach, which is what we have been arguing for from the

beginning, it is both the -- both the lack of enforcement

and the lack of beds that has been an issue.  They are two

of the three things that we have been attempting to achieve,

right, is this balanced approach for the community as well

as for the unhoused community, who are desperate for shelter

and for assistance, and I hear that almost on a daily basis,

"I just need help."  This agreement will give the help that

we are so desperate for in Los Angeles.

            As far as what the -- let me look at my notes,

your Honor, if I can have a moment.  Oh, the as of yet

written ordinances.  This is another issue that we addressed

in our reply, but this -- this agreement is not doing, as

the Intervenor suggests, requesting the Court to approve

some as of yet unwritten ordinances.  That's not what this

is.  This is saying in one -- one way in which the City may

be addressing the lack of public regulation at the moment,

which is what we see and which is one of the main pillars of

this agreement, is by enforcing public regulation

ordinances.  And once it hits the 60 percent, which I

promised I would address in a minute, and I will, that it

may proceed with public regulation ordinances and with

enforcement thereof but prior to doing so, must notify the

Plaintiffs, must notify the Court, and, so, we will

understand exactly what is being done.  But it also doesn't

36

1  prevent anybody from challenging those ordinances.  It

2  doesn't prevent anybody from filing suit.  I do expect such

3  lawsuits may be related to this case and to this Court given

4  this significant case and given the Court's prior statements

5  thereon, but there -- it doesn't prevent anybody from moving

6  in and filing lawsuits or by having standing to do so.

7           And I think one of the other issues that I said I

8  wanted to address was the 60 percent number.  I recognize

9  Ms. Sobel indicated they don't agree to 60 percent.  They've

10 never agreed to 60 percent, and I understand that and

11 recognize that.  But what I did is I went back when we were

12 looking at the 60 percent approach, and I talked to a number

13 of individuals who came from various cities that have used

14 this 60 percent number, and I want to be very clear why we

15 -- we, the LA Alliance, were comfortable with the 60 percent

16 number.

17          So, one of the things we did, talked to a number

18 of cities and said, Hey, I understand you're using this 60

19 percent approach.  And the 60 percent approach is not as has

20 been understood by some people and has been represented by

21 some people that 60 percent of the people get offered

22 shelter and everybody else gets arrested.  That's clearly

23 not what the Court has agreed to and what we've suggested or

24 what the City has agreed to.

25          Any person prior to any type of enforcement or any

37

type of enforcement of -- of these sweeps, one, has to be given an option to vacate the premises or an opportunity for appropriate and adequate shelter or housing.

So, not a single person under this agreement would ever face enforcement unless that was first met, unless offers were first met.

Now, as I understand it, this 60 percent number has been successful in a number of municipalities. And I want to talk about Bellflower and Whittier specifically because I think they were the two most recent ones to enter into this agreement. And I talked to two of the civic leaders there as well as the City Manager, and what I was told is that 60 percent across the board has been a very successful number, with about 40 percent of the individuals choosing not to enter into shelter, choosing to reunite with family, which I think should be applauded as a blessing and not a reason to object to this agreement, frankly, but has -- a variety of things, reunite with family, migrate, any number of things. But approximately 40 percent were not interested in shelter for one reason or another, and approximately 60 percent or less were.

So, in some jurisdictions, they were even closing beds because they no longer needed them anymore. And it was a very successful number, one that has been used across the board successfully. Therefore, we were comfortable. I

38

think the Court was comfortable, and the City was
comfortable in using the 60 percent as the appropriate
number.

And I'll let the City address the objections to
the City appropriate shelter, but what that is designed to
do is simply explain the -- and, as the -- as the City has
-- has said, the -- the on the boots on the streets reality
of what the City can reasonably do and reasonably offer
without -- for people that don't need clinical beds.  But,
for people that need clinical beds, they're going to need
more assistance than the City can reasonably offer.

And I think one other thing, just to address the
County's argument, this 14,000 to 16,000 beds that's been
the approximate.  I actually think it will be more than that
because I think that we'll see the 2022 count go up
significantly, both by anecdotal evidence and by what I hear
from service providers.  But, whatever that number ends up
being, the only beds that are in the pipeline right now --
and I think there's between 10,000 and 11,000 beds, most of
them or a lot of them, particularly in the last few years,
have been added to the stat as a result of this litigation.

The City voted two years ago to enter into
settlement negotiations with Plaintiffs and with this Court
and with Intervenors with the County.  And at that point,
you had several council members start actively moving to hit

39

those numbers.  And, because of that, we have an increase in
stock I think particularly for the 1500 interim beds, which
is exciting and should be lauded.

       Now, one concern I do have and I think the City
will address is the permanent housing beds.  To the extent
that is permanent supportive housing, that's obviously going
to go to individuals that have significant mental health,
drug dependency issues, physical disability issues, people
that need supportive housing, in which case, you have
shelter beds opening up and individuals should be offered
those shelter beds.  So, I don't think it's a problem as
people move through the system.  It should be applauded.

       I think that's it, your Honor.  I'm happy to
address any other issues that have come up.

       THE COURT:  I may have questions later, but thank
you.

       MS. MITCHELL:  Thank you, your Honor.

       THE COURT:  All right.  Counsel, are you
comfortable turning to the City or do you need a recess or
you're ready?

       MR. MARCUS:  It's up to the Court.  I'm happy to
go forward.

       THE COURT:  Please, let's go forward.

       MR. MARCUS:  I agree, your Honor, that the
objections stated here today are essentially nothing new.  I

40

think the City and the Plaintiffs have addressed the bulk of
them in their papers, but I will highlight a few issues, and
I will try not to duplicate or repeat anything Ms. Mitchell
said.  I think she addressed the majority of them.

It's interesting that Ms. Sobel references the
Jones settlement here because Jones, in very many ways, is
similar to this settlement.  It is an agreement by the City
to limit its enforcement of certain public rights of way
ordinances, regulations until it constructs certain number
of beds.  That's essentially what the City is agreeing to do
here with the Plaintiffs.

Now, Ms. Sobel may have buyer's remorse with that
particular agreement, but that is not a legal challenge to
the agreement, and the City here and the Plaintiffs here are
doing nothing more than what Ms. Sobel and the City did in
Jones.

The issue of the count, your Honor, is -- is one
that I agree with the Court's statements.  It would not be
appropriate for us to use the 2020 count numbers.  Those are
old numbers.  The City agreed to bind itself to whatever the
2022 count is before it gets released.  I don't know what
those numbers are.  We don't know what those numbers are.

THE COURT:  But the expectation is on all parties'
parts, in the briefing at least, that those numbers are
going to go up.  And that's why I was pleased to see you

41

take the 2022 count, because if you took the 2019 or 2020 count, then in a sense you wouldn't have the present numbers that would be appropriate.

MR. MARCUS:  That's right, your Honor.  And -- and --

THE COURT:  It's actually detrimental to the City in a -- in a sense to take the 2022 count.

MR. MARCUS:  We agree.  And -- and we can only rely on the numbers provided to us by LAHSA.  It's not the City's.  It's not the County's.  This is LAHSA's count. We're agreeing to be bound by the third party, LAHSA's, count, whatever that may be.  And if it's a whole lot more, then we're committing to a whole lot more.  If it's a little bit more, then we're committing to a little bit more.  But the important thing is the City is committing to build the number of beds that is needed, whatever that number may be.

What we cannot do, as Ms. Mitchell referenced, is have a rolling commitment.  What the City is doing, as any party does when they settle a lawsuit, is buy certainty. Litigation doesn't have certainty.  Litigation has risks. Settlements have certainty.  The City is agreeing to build the required number of beds, whatever that number may be, in the 2022 count.  That is a certainty that the City is bargaining for in this agreement.  And if the -- if, as the Intervenor suggests, there should be a rolling commitment

42

1  when the '23 count comes out, when the '24 count comes out,

2  the City has lost the certainty that is bargained for, and

3  that is not what the agreement states, which is why the

4  agreement sticks with the 2022 count.

5          And, to say that we are -- that there's no new

6  commitment here is -- is simply false.  There are beds that

7  are currently being contemplated in the pipeline, as we call

8  it.  That number of beds, again, needs to be built.  We are

9  going to create those beds because we need to create as many

10 beds as we can.  As has been stated, this is a floor, not a

11 ceiling.  But whatever number comes out of the 2022 count

12 and whatever calculation we make in consultation with the

13 Plaintiffs, approved by this Court, for the required number,

14 those are the number of beds that the City is going to

15 create.  And that's what our commitment is.  We're

16 committing to build that number of beds and get out of the

17 risks of litigation, as any party does in the settlement

18 agreement.

19         Lastly, the County's complaint about paragraph

20 nine of the settlement agreement, it's very clear in the

21 agreement throughout that the agreement is binding on the

22 Plaintiffs and on the City.  It does not bind the County.

23 It does not bind the Intervenors.  They are not party to it.

24         Paragraph nine is a statement, a joint statement

25 of what the City and the Plaintiffs believe the County

43

should be doing.  We are hoping that the City -- excuse me.
We are hoping that the County steps up to that statement of
principles, either in mediation or a settlement agreement or
as a result of this litigation or just on their own, because
it's the right thing to do.  But that's all that that is.
It's a statement of what we think the County should do.  And
if the County wants to join this agreement, we are happy to
have them.  And if a -- a mediation or future settlement
discussions result in such a larger better agreement, we
will bring that to the Court to supersede this one.  But
right now, you have a firm commitment from the City to build
a certain number of beds in five years under this settlement
agreement, not a consent decree, settlement agreement.

        (Pause.)

            MR. MILLER:  Could I be heard again, your Honor,
at some point?

            THE COURT:  Briefly.

            MR. MILLER:  Very briefly, your Honor.  The reason
I asked to be heard, your Honor, I just haven't heard an
answer to my question.  We put in -- quote in our brief from
City Council President Martinez, "The City has committed to
building a minimum of 14,000 beds and has over 13,000 beds
in process already."  And we cite, you know, where she said
that.

            I have not heard anything from Alliance or from

44

1  the City answering my question, and it's a question because

2  I don't know.  How can you have a settlement agreement that

3  requires you to commit to something that you've already

4  committed to?  It seems like a charade.  It just doesn't

5  seem real, and I would like an answer to that issue.  I

6  mean, we want this to work as much as anybody.  We're

7  working very hard on the issue, but it -- it doesn't seem

8  like -- it seems -- it seems paper thin.  Maybe there's

9  another thousand beds, maybe not, depending on the count.

10            If they've already committed to 14,000 beds, as

11  City Council President Martinez says, then what are we

12  getting out of this deal?  They're getting a million eight

13  in legal fees, the Alliance is.  What is the City getting

14  for this commitment?  I don't -- I have not heard an answer

15  this morning at all, and that's the point I wanted to make.

16            Thank you.

17            MS. MYERS:  Your Honor, Intervenors would also

18  like to be heard briefly on just a few specific points.

19            THE COURT:  All right.  Briefly.

20            MS. MYERS:  And I'll try and speak more slowly.  I

21  want to -- I want to address the 2022 homeless count issue

22  because I think that's -- that's been raised by both

23  parties.  It's been raised by your Honor.

24            We appreciate the City's desire for certainty

25  relative to Section 3 of the agreement, and we don't raise

45

1  the objection related to the homeless count numbers with

2  regards to Section 3.  As I said earlier, as we said in our

3  -- in our papers and I reiterated just to -- to make the

4  point clear because I think there's been some misstatements

5  about our papers, if the LA Alliance and the City of Los

6  Angeles want to reach an agreement that provides that the LA

7  Alliance will dismiss the case upon the creation of a

8  certain number of beds, we may object that it's bad policy,

9  that it's not going to do much.  We may be in agreement with

10 AIDS Healthcare Foundation, a lot of service providers, the

11 LA Times, a lot of other people who think this agreement

12 won't do any good, but they can enter into it.  They can use

13 the 2022 count, whether it goes up, whether it goes down,

14 whether it stays exactly the same.  That's not our

15 objection.

16        Our objection is that the City is attempting to

17 get a court approval to enforce public space regulations

18 five years into the future for 60 percent of the shelter

19 beds, for 60 percent of the population based on a count that

20 was done in 2022.

21        That -- your Honor, the constitutional rights of

22 unhoused people related to the enforcement of ordinances

23 against them is not static.  This idea that the City can

24 enter into an agreement today to build a certain number of

25 shelter beds and, in exchange, get certainty about the

46

1   enforcement of ordinances five years from now based on that

2   number is not -- is not contemplated under the Eight

3   Amendment.  It's not contemplated under existing Ninth

4   Circuit and Supreme Court precedence, and it's certainly not

5   within the Court's jurisdiction.  But we want to be clear

6   that's the objection that we're raising is the use of that

7   2022 number to calibrate enforcement for some period into

8   the future.

9            The other thing -- the other point that I want to

10  make is that Plaintiffs misstate the agreement with regards

11  to who must be notified when certain trigger points are

12  made.  The -- Ms. Mitchell stated that the Plaintiffs and

13  the Court must be notified.  That's not accurate, your

14  Honor.  The agreement explicitly states that the Plaintiffs

15  must be notified, and that's our problem in part with this

16  -- with this agreement.  Putting aside the standing issue --

17  and we want to be clear, when we say standing, it's what we

18  briefed in the papers.  It's not just LA Alliance's

19  standing.  It's also the standing Article 3 ripeness.

20           With regards to this agreement, everything is

21  between the LA Alliance and the City.  For example, section

22  five, Milestones and Deadlines, the City will share with

23  Plaintiffs the City's plans for encampment engagement,

24  cleaning and reduction in each council district, only

25  Plaintiffs.  The City and -- the City and Plaintiffs have

47

set up an agreement where they can -- where they can talk
about third parties' constitutional rights in private and
only if the Plaintiffs disagree with that, the Plaintiffs,
who have staked their claim on arguing that the Court is too
protective of unhoused people's constitutional rights, only
if Plaintiffs disagree do those issues become -- come in
front of the Court.  And only then is there a contemplation
of whether or not there's any disruption to the heart of
this agreement, to be explicitly clear, is permission to
enforce public safety regulations.

          And then the last -- one of the -- just two more
quick points, your Honor.  LA Alliance says they talked to
City managers about how well the enforcement is going
related to the 60 percent rule.  And I think, your Honor,
just -- just to point a fine point on it, that's exactly the
problem here.  The LA Alliance spoke to the City about
whether or not agreements related to unhoused people's
constitutional rights were going well.  And when the City
said it was going fine, that was enough for them.  The LA
Alliance is standing in the shoes and aligning itself with
the City, which is exactly what they're doing here.  They're
aligning themselves with the City to reach an agreement
related to unhoused people's constitutional rights.

          There is no case or controversy related to where
the LA Alliance stands and where the City of Los Angeles

48

1   stands relative to the enforcement of the -- the Municipal

2   Code violations.

3            And then the -- the final point that I will make

4   is that this is not <u>Jones</u>, your Honor.  This is not <u>Jones v.</u>

5   <u>The City of Los Angeles</u>.  <u>Jones</u> was brought by unhoused

6   individuals to challenge the constitutionality of the City's

7   anti-camping ban.  And Ms. Sobel can say this better than I

8   can, but I will just say that the <u>Jones</u> agreement prohibited

9   the City of Los Angeles from enforcing an anti-camping ban

10  based on a lawsuit that was brought with standing pursuant

11  to Article 3 to actually challenge that, similar to <u>The</u>

12  <u>Orange County Catholic Worker</u> case.  Standing is real, your

13  Honor.  The requirement that there be a case or controversy

14  and the requirement that there be an actual injury is to

15  ensure that what is happening here is not -- is not

16  permitted by the courts.  It cannot be the case that

17  advocates for an ordinance can walk into court and agree

18  with the City, who are also advocates of that ordinance,

19  that the City, under certain circumstances, can enforce that

20  ordinance against third parties, including Intervenors, when

21  there are significant constitutional issues at stake.  This

22  is not <u>Jones</u>.  This is not <u>The Orange County Catholic</u>

23  <u>Worker</u>.  This is not <u>Mitchell v. City of Los Angeles</u>.  This

24  is a very different case.  That matters -- the procedural

25  posture of this case matters, and we just want to make that

49

1  point clear given what the -- what the City and what the LA

2  Alliance had invoked in their positions.

3          Thank you.

4          THE COURT:  I'm going to turn back so that there's

5  equality in terms of the argument.  And, so, I'm going to

6  turn back to the Plaintiffs and then the City, and then this

7  is concluded.

8          MS. MITCHELL:  Thank you, your Honor.

9          I agree that this is not <u>Jones</u> because this is not

10  going to take 13,000 -- 13,000 -- this isn't going to take

11  13 years to build the beds.  We have in -- in this agreement

12  a deadline-driven schedule which cannot, obviously, be

13  established until the 2022 count is out, which we are still

14  waiting for.  But the agreement has been reached to the 8th

15  of June.  This agreement was reached back in April as we

16  worked out the details.  But we're still waiting for the

17  2022 count.  So the deadlines and milestones aren't in this

18  agreement.  But, certainly, we anticipate the agreement may

19  be amended to include the deadlines and milestones.  But it

20  is very clear that this cannot take 13 years to accomplish.

21          And, to address Mr. Miller's points, if -- if the

22  Court looks at what is in the pipeline currently, you have,

23  again, less than 11,000 beds.  I recognize that Council

24  President may have misspoke when she said 13,000 beds.  But

25  you have less than 11,000 beds currently in the pipeline.

50

1 And, again, we expect this number to increase to over 16,000

2 beds that the City is committing to.  I would anticipate

3 more like 18,000 or higher.

4           I'm happy to address the -- the financial issue if

5 the Court is interested in that at all.  It is certainly

6 less than half of what we have invested in this case, and it

7 is in par with what other advocates have been paid in these

8 1988 fee cases.  It's not anything that is unusual.  But if

9 the Court has concerns, I'm happy to address them.

10          I think we have said we've beat standing to death

11 at this point.  We have brought a clear lawsuit with

12 standing.  I think that it is certainly under some people's

13 skin that we represent businesses, community members, as

14 well as unhoused individuals who are all interested in

15 pushing these balanced solutions, balanced solutions that

16 work for all cities and communities.  I'm not going to beat

17 that issue to death, but because we represent both unhoused

18 individuals as well as businesses who are all interested in

19 the buildup of shelter and the agreement thereon, I think

20 has been a source of frustration, and we recognize that.

21 But it doesn't take the standing issue away.  If the Court

22 would like more answers on that, we're happy to answer that,

23 but it does not -- I mean, I think we've beat this issue to

24 death at this point.

25          So, I think with that, I will sit down, your

51

1   Honor, unless the Court has additional questions.

2           THE COURT:  Thank you.

3           On behalf of the City, Mr. Marcus?

4           MR. MARCUS:  Thank you, your Honor.  Let me

5   address just two points, one from the County and one from

6   the Intervenors.

7           With respect to the County's reference to Council

8   President Martinez's comments, and with all respect to Ms.

9   Mitchell, the Council President never misspeaks.  She did,

10  however, estimate a number.

11          THE COURT:  She did what?

12          MR. MARCUS:  She estimated a number.  She guessed.

13  When the 2022 count comes out, we'll know what the real

14  number is, but --

15          THE COURT:  And if we're right, if it's going up,

16  you're going to have an additional commitment?  In other

17  words, I'm pleased with the virtuousness of that because if

18  you'd brought me the 2019 or 2020 count, my first question

19  would be why.

20          MR. MARCUS:  And that would --

21          THE COURT:  So, it's got to be the 2022 count, and

22  I think we can all expect it's going up.

23          MR. MARCUS:  Right.  And which is why the 2020

24  count was never a consideration.

25          THE COURT:  Right.

52

1      MR. MARCUS:  With respect to the Intervenors'

2 concerns about future ordinances relating to regulation of

3 public rights of way, as the Intervenors stated in their own

4 papers and as the City has stated in its own papers, nothing

5 in this agreement binds or precludes someone from bringing a

6 legal challenge to some future ordinance, whether a facial

7 challenge or an as-applied challenge.

8           So, the argument that this agreement is somehow

9 going to grant cart blanche to the City to ride roughshod

10 over constitutional rights of people experiencing

11 homelessness is simply false.

12           And, with that, if the Court has any other

13 questions, the City Submits.

14      THE COURT:  No, other than to thank all of you and

15 to make a couple of brief comments and then a recess, but

16 this will be resolved one way or the other today.

17           First of all, you should all compliment yourselves

18 in terms of dealing with this inhumanity because my

19 impression was, right or wrong, when I came here that

20 whatever was happening was not working, that whether it was

21 Jones and 1250 bed spaces in 13 years, with the ever-

22 increasing death rate, with the single-digit but then

23 double-digit rise in homelessness, that whatever the

24 solutions or nonsolutions have been for the last literally

25 20 to 30 years, have landed on all of your laps.

53

1          And if you go back to the April of 2020

2   transcripts and bother looking at it, you'll see that the

3   Court had made the same statement at that time, that if not

4   us, who and if not now, when.  And you can read that in the

5   transcript.  Nothing's changed.  It's fallen on your laps.

6          The second thing I would generally say is that

7   this -- my impression is that this suit started primarily

8   with Skid Row and the Downtown business community.  I want

9   to compliment you because it's now morphed into the entire

10  City and the entire County, which means we have to deal with

11  it.  We're no longer dealing with it in a piecemeal way

12  because now it involves finally the City and the County.

13  So, I'm pleased to see you're entering into additional

14  negotiations on June 13th, however those turn out.  And

15  you're an integral part of this.

16          Third, I'll remind you that this is a judicially

17  created doctrine.  The City Council and the legislature did

18  not bring Boise.  The Ninth Circuit did.  And in that Ninth

19  Circuit opinion, it says "shelter".  And if you can find

20  anything about housing, I want you to quote that to me.

21  It's shelter.  And if it was housing, this Court would

22  enforce housing.

23          But the debate that's taken place has been what

24  does shelter mean, and the Ninth Circuit left that

25  undefined.  So, that ended up being a political decision

*Echo Reporting, Inc.*

54

1  from a housing first model, which was a policy decision, to

2  shelter or to some mix.  And when I was able to communicate

3  with all of you previously, I had warned you that when a

4  Federal Court makes a decision, whether it's <u>Jones</u> or

5  <u>Mitchell</u> or this case, you are stuck with our decision for

6  10 or 15 years until that decision comes back or that same

7  area comes back in front of court.  In other words, we've

8  frozen you.  And it seems to me in the issue of homelessness

9  and house -- houselessness, that there has to be a

10  tremendous amount of flexibility on all of our parts, and we

11  have to be unafraid to make the attempt and sometimes make

12  the mistake and just back up and try to get it right,

13  whatever that is.

14         So, from the Intervenors' standpoint, you are a

15  housing-first model.  From the City's standpoint, there's a

16  growing recognition that there has to be some balance and

17  that there has to be shelter to move thousands of people,

18  and this Court has been critical of HHH.  The reason for

19  that is that so few units were produced at such a great cost

20  that even if that was the best model, we weren't dealing

21  with thousands of people, we were dealing with hundreds of

22  people.  And, so, therefore, the City literally entered into

23  a period of inertia, stagnation, and then not only did it

24  hurt the homeless, it hurt the citizens.

25         So, from the beginning, when I was able to speak

55

1   to both of you, there was no secret that this Court was

2   seeking, when I was actively involved anyway, a better

3   balance.  And if you could produce a housing-first model and

4   if you had 10,000 units, I couldn't be more complimentary.

5            But what has happened is that the costs have risen

6   now to minimally 630,000 to 800,000 dollars a unit.  And,

7   so, we are treating the very few, if you will, and leaving

8   thousands and thousands and thousands of people out on the

9   street.

10            The next thing is, generally speaking, before I

11   come back with a few questions, I became sensitized because

12   of Michele Martinez and other advocates in Orange County,

13   including Brooke Weitzman.  And the blessing was taking me

14   out to communities and realizing that the homeless impact

15   our lesser income areas as much or more than our wealthy

16   areas.  All of you in this room, regardless of any complaint

17   about salary, can probably fly to Europe.  But if you'll

18   come with me on occasion -- and I know you don't like to get

19   up at 4:30 or 5:00 o'clock in the morning, you'll find that

20   our impoverished communities are the most effected, Curren

21   Price's district, Gil Cedillo district, Marqueece Dawson's

22   district, Buscaino's district, Kevin de Leon's district.

23   They can't use their parks.  Yet, because of the power of

24   those who have a voice over those that don't have a voice,

25   we focus on a place like San Vincente.  And when that human

56

1   cry takes place, there seems to be a reaction, which is

2   good, and this Court has constantly asked myself, without

3   asking any of you but being pretty blunt about it, why?  Was

4   it only because of access to City Hall?  Was it only because

5   somebody was affronted because they drove down the west side

6   of Los Angeles?  Was it only because Venice or the L.A.

7   Times decided to go out and cover the Sheriff?  But where

8   the hell was everybody out in Curren's district or Kevin de

9   Leon's district?

10          And I have to tell you I really got concerned with

11  a lot of you folks who wouldn't even come out with us early

12  in the morning.  And, quite frankly, some of you lost a lot

13  of credibility because you just wouldn't come out to the

14  sites.

15          Now, I say that generally because there's

16  exceptions.  There are people who work in the community.

17  This isn't aimed at the Intervenors.  So, therefore, when I

18  came to this City -- and now I'm a citizen.  I'm spending

19  more time here than you can imagine -- you were frozen.

20  There was inertia, an ever spiraling death rate, and why

21  would the Court accept that?  Why would this Court want to

22  become complicit or any court become complicit?  And that's

23  caused quite a bit of controversy from unorthodoxy to

24  whatever.  But if that problem's before you, I don't see how

25  a court or any of us can act with comfort.

57

1          Now, the other day I said to Brooke Weitzman

2    something in a settlement conference that you weren't

3    involved in.  A young lady that we found housing for -- and

4    this is street-by-street fighting.  This is door by door.

5    If we're going to get involved in this business, you will

6    never be successful because no matter what you do today,

7    you'll drive down the street, and you'll see a woman who's

8    babbling or a man running into the street.  You will never

9    be 100 percent successful.  You just -- we just have to be

10   more successful.

11          I have pushed you as hard as I possibly could.  I

12   hope I have affronted every one of you on occasion.  I've

13   literally said to Shayla and I'll say this, I said "I think

14   you're killing people."  I've said to the -- on the other

15   side, "What are you doing?  This involves humanity across

16   the City," to the Plaintiffs.  The Court's constantly said

17   to the City "Quit dabbling in bits and pieces around the

18   City," and the County, "Quit dabbling in bits and pieces."

19   So, if you want to settle with some small portion, the Court

20   doesn't want to spend the time on X amount.  I want to spend

21   the time on the whole amount because it's no solution in

22   this piecemeal wacamole approach.

23          Back to I compliment you.  You're finally there.

24   You're talking about the City.  I want to thank you, thank

25   the City Attorney, thank the Mayor.  You're finally talking

58

about the City.  And one of the valuations we made with complete transparency was you were too big and too dysfunctional to ever get a citywide settlement to begin with.  You're really 15 different cities out there with 15 different cities.  It's the mosaic of this City.  And, so, therefore, that's why we went district to district to talk to every single councilperson to try to learn what is so unique about Monica Rodriguez versus Gil Cedillo versus Curren Price versus Marqueece, and it was an amazing education.

So, I end this part of this kind of from the heart talk to you to say you should be complimented that you're finally at the place as the City and maybe the County of taking this on in a holistic manner.  Where you end up in terms of shelter or where you end up in terms of housing first I could care less.  Just do it.  And you haven't done it.

Now, this may present an opportunity, depending on your responses in a few moments.  This settlement is far from perfect.  This settlement will not, if I approve it, solve homelessness.

So, the first point is that in the past, a lot of politicians have made a lot of promises, most of those broken, and they tend to be aspirational, "If you elect me, I will do the following."  And once elected, four years,

59

what's the number of new housing units that are going to be produced?  Let me repeat that.  That's a really simple question.  Am I dealing with 3,000, 4,000, 14,000?  Because the press has popularly picked up that 14,000 to 16,000 units are going to be produced.

The problem, Marcus, that we got into it between you and Skip and the County with the 6700 was how we were going to count those, you know, what was in the pipeline, were we going to count one in the pipeline because we got a permit?  Were we going to cause -- were we going to count that because a nail was driven into the wall?  It took four months to reach an MOU just on that.  So, I don't want to get caught on the back side of this tentatively even thinking about approving a settlement unless it has some meaningful number.

By the same token, you're the Plaintiff.  You're taking on what the Government should be doing.  Why don't you have the right to settle?  Why is it your responsibility to continue on gratis regardless of the complaint about your fee and take on the burden if you choose to settle.  And if you had produced one new unit, why would the Court intervene and interfere with that?

All right.  The second general area is the $1,800,000 is ridiculous.  That is a low figure for the services you've performed, and I'll put that on the record.

60

1 And, Mr. Miller, just produce your paycheck.  And I'm going

2 to say that to you bluntly.  When I hear that argument, I'm

3 affronted by it, frankly.  Just put on the table your

4 contract with the County, along with all of your associates.

5 So, as far as the $1,800,000, happy to accept that number.

6 If that's the agreement between you and the City, I have no

7 concern and no complaint.  Understood?

8          The last area is one of money.  I think Elizabeth

9 Chou, I'm not sure, the last article I read, kind of valued

10 this at $3 billion.  That's a number just thrown out by the

11 press.  What -- what is the value of this settlement,

12 because I can't imagine a court turning down a $3 billion

13 settlement if you move forward on this.  But if this is di

14 minimus and we're just borrowing money from something else,

15 I'd like to hear how much money we're borrowing.  So, I'm

16 not concerned about double counting anymore, and I'll say to

17 LAHSA I got flimflammed by LAHSA to begin with in this

18 double counting and you read those transcripts way back

19 when, and that caused a lot of concern on my part in terms

20 of credibility.

21          We don't have double counting here.  We have 6700.

22 You're representing you're producing new beds.  What you

23 really have is what I call a drawing off of funds

24 potentially from HHH.  And, so, when I was thinking about

25 this, I was saying, Well, why can't we incentivize HHH.  If

61

1  you haven't built the units, you might have a narrow window

2  of time to get these in the pipeline, and let's get you

3  going, and maybe that's a good thing.  So, get me another

4  thousand real quick.  Don't wait until year seven or eight.

5  If you really want these in the pipeline to be counted,

6  let's see the developers step up and do it and the City

7  bureaucracy do it.  Maybe that's a good thing.

8          So, I'll ask the City and I'll ask the Plaintiffs,

9  what's the value of this lawsuit in money?  And step over

10 and have a conference with each other.  That's an order.

11 See if you can come up with a unified number because from

12 the press I read about $3 billion.  I don't know that that's

13 true.  What's the money value?

14         MR. MARCUS:  Your Honor, can I have a moment?

15         THE COURT:  Sure.  And I'm not holding you to the,

16 you know, 100 million mark, but I'd like to kind of have an

17 idea of what we're dealing with.  And you can bring -- I

18 certainly know you.  Come on -- you can come forward, ma'am.

19 What's the estimate here?

20     (Pause.)

21         THE COURT:  Matt, it's good to see you.  Just

22 identify yourself.

23         MR. SZABO:  Sure.  Matt Szabo, City Administrative

24 Law --

25         THE COURT:  And it's a pleasure to have you here,

62

1  by the way.

2          MR. SZABO:  Yeah.  Thank you very much.

3          THE COURT:  What's the value of this?

4          MR. SZABO:  So, we --

5          THE COURT:  I don't know if I'd walk away from 100

6  million.  I don't know if I want to walk away from 3

7  billion.

8          MR. SZABO:  So, we made a -- a rough estimate.

9  That 2.4 billion to 3 billion dollar figure that you read in

10 the Times was --

11         THE COURT:  No.  I read -- I read it from Arosky

12 (phonetic).  I read it from Susan Shelley, and I read it

13 from Elizabeth Chou.  So, any time you get three members of

14 the press together, it must be credible.

15         MR. SZABO:  Right.  Yeah, it -- it was discussed

16 when the -- when the proposed settlement was announced.

17         THE COURT:  Okay.  How did we come up with that

18 number?

19         MR. SZABO:  We came up with that number based on

20 -- there is a -- an average amount of either subsidy for a

21 permanent housing or the actual cost of capital for shelter

22 plus the cost of ongoing services that would be required for

23 each of those.  We -- we looked at what was in the pipeline

24 and as -- as was stated and is stated in the papers, we've

25 -- we estimate that there is between permanent housing and

63

1   shelter a capacity for the City to stand up about 11,000 new

2   units, most of which are permanent.

3           THE COURT:  Okay.

4           MR. SZABO:  And, so, we took the -- what we would

5   be required to subsidize for those 11,000, and then we

6   project it out.  If we needed to do 14,000 units, it would

7   be about 2.4.  If we needed to do  16,000 units, it would be

8   about 3 billion in subsidy and service cost.

9           THE COURT:  Matt, I can't thank you enough.  A

10  couple more questions.  Don't go away.

11          MR. SZABO:  Sit down or --

12          THE COURT:  No.

13          MR. SZABO:  Okay.

14          THE COURT:  What does "in the pipeline" mean?  I

15  got in this debate over the 6700, and the County would say

16  X, and the City would say Y.  And, finally, they worked it

17  out, and if they both say that we produced 6700 units, I'm

18  going to accept that.  But what does "in the pipeline" mean?

19          MR. SZABO:  So, what in the -- "in the pipeline"

20  means is identified projects, projects that have gone

21  through some initial approval.  So, we have a site.  We have

22  a site plan.  We have a rough order of magnitude on the cost

23  of the construction of that project.

24          THE COURT:  Um-hmm.

25          MR. SZABO:  It may not be -- we may not have laid

64

1   out one brick yet or one -- you know, dug at a foundation

2   yet, but we have some idea, and we have some commitment that

3   dollars will be found.  Now, I do want to make an important

4   point, Judge.  In the -- in the documents that you have in

5   front of you, we identified 9400 units of permanent housing

6   that --

7          THE COURT:  Yeah.  It's on page nine.

8          MR. SZABO:  -- that we view -- that we are saying

9   are in the pipeline.  That does not mean, contrary to Mr.

10  Miller's comments, that it's just stuff that's already

11  there, certainly not.  Almost a thousand of those units are

12  permanent housing units that we are going to establish

13  through the State Home Key Program.

14         THE COURT:  Okay.

15         MR. SZABO:  And that is going to require -- those

16  thousand units are going to require the City to come up with

17  over $200 million of match.  And that Home Key Program, by

18  the way, the reason that we're willing to invest that much

19  is that it is an acquisition program of already existing

20  units.  So, we don't have to wait the four plus years, as

21  you had pointed out, to build from the ground up.

22         Do we know where all that money's going to come

23  from?  No.  But the City is willing --

24         THE COURT:  Well, if you're successful, the

25  Governor seems to have a surplus.

65

1          MR. SZABO:  Well --

2          THE COURT:  And I notice Ms. Fudge came by

3   recently.  So I'm sure she has a lot of money she'd like to

4   give you.

5          MR. SZABO:  True, true.  But it still is going to

6   require about a 50/50 match.  And -- and the City is

7   committing on that program to -- to come up with $230

8   million that hasn't been planned for.  So, we're going to

9   make that stretch commitment because we have an opportunity

10  to get a thousand units of housing up this year.  So, we're

11  going to do that, without -- and it's not something that my

12  office does often is to make recommendations to counsel to

13  make commitments without having secured the funding to make

14  good on those commitments, but we're willing to do it

15  because of the nature of the emergency.

16         THE COURT:  Matt, one more question.  I read some

17  place when I could do a lot of investigation that the Mayor

18  had touted and the Council had touted about 7200 units

19  eventually out of the 10,000 from HHH.  And yet I look at

20  the controller, Galperin, and he's got about 1400 units

21  completed in almost five or six years now.

22         This is not double counting, but there's going to

23  be a complaint from the housing first model that funds are

24  being moved from HHH over potentially to shelter.  I don't

25  think that the Court is going to become involved in that.  I

66

think that that's a function for the elected officials to
decide what the appropriate balance is.  You just have a
rising death rate.  Hopefully and aspirationally I would say
to you that I hope you get as much shelter as quickly as
possible to try to get people out of the rain or out of the
heat.  But, by the same token, nobody wants to give up on
housing first, but I think that's best for the elected
officials to decide that balance.

        The third thing is that I'll say to the
Intervenors, I don't read this agreement the way you do.
And, in fact, on page -- and, Sarah, I want you to help me.
I think it's page five, isn't it?  Yeah, page five at the
last paragraph.  I don't think it needs clarification.
You're -- you're stating that enforcing the terms to which
the settling parties have agreed and nothing affects any
rights of the County or the Intervenors or any other party.
So, if somebody wants to sue the City, I would be concerned
if you came to me with a settlement as a class action and
you were binding all people in the future.

        Here, I think we've had historically a reduction
when we've entered into these kinds of agreements with
litigation and saved our cities, 25 cities, huge amounts of
money.  That's all I can represent to you.  But as far as
taking away the right of the Intervenors to file a lawsuit,
if 4118 was amended, et cetera, I think they're perfectly

67

1 able to do that, and I see no reason why the Court would

2 preclude that.

3         Now, if you're of a different impression, either

4 on behalf of the Plaintiffs or the City, I'd like to hear

5 that, but the Court doesn't intend to take away any

6 constitutional right to sue by the Intervenors.  They can

7 file tomorrow or any other group can, but I will say to you

8 as a practical matter we've absolutely flattened the

9 litigation in Orange County.

10        The third thing I'll say to you is I'm pleased to

11 see the 17 percent reduction in Orange County, but that is

12 not being held up as a bright shining light on the hill for

13 Los Angeles.  We're a different community.  But, by the same

14 token, there seems to be an effort -- an increasing effort

15 to get people off the street in the thousands right now

16 instead of just the hundreds and it appears to me that we've

17 been catering to the perfect, and we haven't been able to

18 accomplish the good.

19        So, Matt, take it back to your council, take back

20 to your Mayor my compliments because we've moved from a

21 small lawsuit citywide, and it's bold, and I hope that

22 you're successful in your mediation.  I wish you the best,

23 Mr. Miller.

24        I want to go talk to my law clerks for a moment.

25        MS. SOBEL:  Your Honor, may I just --

68

1          THE COURT:  No.  I'm speaking now.  You're

2   listening.  I've given the courtesy to all the parties.

3   We're done now.

4          About $3 billion, Matt, on the table?  I just want

5   to make sure I'm hearing this.

6          MR. SZABO:  Depending on the number of units,

7   sir --

8          THE COURT:  Matt, about $3 billion on the table?

9          MR. SZABO:  Up to $3 billion.

10         THE COURT:  Okay.  About.  Okay.

11         MR. SZABO:  Yes.

12         THE COURT:  Give or take $100 million, but okay.

13  About 14 to 16 thousand new units depending upon our 2022

14  count?

15         MR. SZABO:  Depending up the count, that's --

16  that's correct.  And we will --

17         THE COURT:  Okay.

18         MR. SZABO:  And we will provide that information.

19         THE COURT:  And here's what I've been weighing.

20  I've heard more promises broken than you can possibly

21  imagine.  And, so, therefore, I don't care what a politician

22  says.  But one of the points that you made in this agreement

23  was that this was something concrete that the Plaintiffs

24  finally have as an agreement.  And the question I had late

25  at night was what I care for, was it a thousand new units or

1 14 to 16 thousand new units and when would the Court step in

2 and put a stop to that.  So, as long as there's counting,

3 its not final.  I won't sign this or even consider it unless

4 there's a monitor and you've already stated that there's

5 going to be a monitor.  Right?  I'll point to the -- Sarah,

6 help me, what page?

7          MS. MITCHELL:  Correct, your Honor.

8          THE COURT:  Counsel, point out the page.  I'll

9 just read it to you.

10          MR. MARCUS:  Your Honor, the parties stipulate

11 that the Court --

12          THE COURT:  No, I know.

13          MR. MARCUS:  -- has jurisdiction.

14          THE COURT:  I'm going to read it, though.  I'll

15 find it.

16          Secondly, there's been a lot of criticism about

17 one district getting turned against the other district.  So,

18 let's be completely transparent about that.  I would hope

19 that the City is able to balance out the needs of our more

20 impacted districts, the Curren Price, the de Leons, the

21 Buscainos, the Marqueece Dawson, with the less impacted

22 districts -- and I include Bonin in that impacted district

23 -- because it wouldn't be fair on the 60 percent to have

24 these, you know, huge districts unless you have some

25 equitable distribution of funds to the districts that need

70

1  this the most.  I have to leave that to you, but that's why

2  I need the monitor.  Fair enough?

3          MR. SZABO:  Correct.  And we will be regularly

4  reporting publically on --

5          THE COURT:  Right.

6          MR. SZABO:  -- the funding available for each of

7  the projects in each of the districts.

8          THE COURT:  I'm -- I'm appointing Michele

9  Martinez.  You gave me that ability, and I think you all

10 trust her, although she's growled at you on occasion.

11 You've each called her over the -- the years and talked to

12 her.  But if you have an objection, I'm happy to appoint the

13 law firm.  Do you know what they're going to charge?  Try a

14 thousand dollars an hour with three associates, two senior

15 partners, catching up with this, and you'll be over a

16 million to a million point five just like that.

17         Sit down.  Somehow, you have to work out some

18 compensation with her because she's done working for free.

19 She's been doing this out of the goodness of her heart for

20 three years because she really believes, is one of the few

21 virtuous people who's been involved in this.  So, you're

22 going to go work out some kind of compensation.  She's going

23 to get involved, but I've encouraged her to do the

24 following, not to become involved with you for over more

25 than one year.  If you're not living up to your promises,

71

 1  there's no reason for that frustration.  She's going to have

 2  to step away from a private practice of some type, and those

 3  negotiations I think should be Judge Brotte with Michele

 4  Martinez.

 5          So, I'd like to see, Scott, you for a moment,

 6  Elizabeth, you for a moment.  Let's sit down and talk about

 7  that in the back, initially out of my presence, but then if

 8  I need to intervene.  But come up with some amount that's

 9  reasonable and compensates her for the private practice.

10          I would suggest to you that she work no more than

11  two years, with the option of her stepping away or if you

12  have dissatisfaction with her after one year and then

13  supplementing her with another monitor by agreement if that

14  occurs.  That way, you're not bound to a particular monitor

15  for five years.  Now, if you come up with a different

16  agreement, that's fine.  Okay.

17          And, finally, Matt, let's talk about the 60

18  percent with you and the Intervenors, because there's a lot

19  of concern on Ms. Sobel's part.  I'm not arguing with you,

20  but I'm going to go back to the very beginning of this.  We

21  started trying to imagine the flexibility with a riverbed

22  with 1400 people on it, not a couple hundred people across

23  but 1400 people, and how are we going to clear that.  And,

24  trust me, Orange County had no plan.  They can tell you they

25  had a plan, and the Court laid an injunction on the Sheriff

72

and on the County and stopped it.  And pretty soon, the
first plan was, Gee, Judge, maybe we're going to come in
with some blue shirts, some newly trained kids out of
college that, quite frankly, were learning on the job.  And
where are we going to put them?  And, so, the Board of
Supervisors came up with 400 motel rooms.  You know how
long?  Thirty days.  Totally inadequate.  Thirty days.

But walking down the river each day with Ms. Sobel
and with Brooke, it was readily apparent that we had about
801 people ready to take shelter.  In fact, there were more
than that.  So, where does this 60 percent come from?  It's
an aspirational meaningless number in a sense.  It could be
50 percent.  It could be 70 percent.  But you need to
understand the basis of it, whether you agree with it or
not.

Carol, Ms. Sobel, took the decent and good
position, Judge, this should be 80 percent, 80 percent.  And
the County took the position of, No, this should be 60
percent, because what you're really dealing with is you
started with about 13 to 14 hundred people, but as the signs
went up, people started walking away.  So, if you have a
thousand people left on the river, which we did, and 801
seat shelter, Carol Sobel's right.  That should be about 80
percent, right?  But what happens if you have 1300 people on
the river and three or four hundred of them have walked away

73

1  because they're never going to accept shelter?  So, that's

2  how we came up with the 60 percent.  Okay.

3       The second thing is we always had 60 percent plus

4  one.  It wasn't a 60 percent.  It was if we got to 60

5  percent, we were supposed to stop and build the additional

6  shelters so that nobody was going into an enforcement

7  situation, whatever that meant.  But in your document, you

8  have said much more holistically than Orange County and

9  maybe much more humanely that you're not going to enforce

10  this unless a person's offered shelter, and you put that in

11  writing.

12       So, it seems to me that as long as we continue to

13  work together, this Court's going to turn from poking and

14  trying to work with you, quite frankly, but I can only do

15  that through a monitor.

16       And, lastly, I agree with you, Mr. Miller.  I read

17  this agreement.  This seems to be a binding attempt or a

18  good faith effort between the City and the Plaintiffs.  But

19  all of those provisions don't apply to you.  I'm not

20  adopting those.  Those seem to be aspirational, and I don't

21  think that that's the essence of the agreement.  It seems to

22  be a public statement.  You'll litigate that or you'll

23  settle that, et cetera, but I -- I'm not binding myself in

24  the agreement to anything that reflects on the County.

25  That's for future litigation or future settlement.  Seems to

74

1  be a cry out to the County.  I'll leave that in your good

2  hands.

3          Now, I'm not accepting any more input, Counsel.

4  I'll be back with you in about 15 minutes at the most, and

5  I'll have a decision for you one way or the other.  Thank

6  you.

7          (Proceedings recessed briefly.)

8          THE COURT:  On the record.  All the parties are

9  present.  I want to thank you.

10         This Court's inclined to approve the settlement.

11 I'm tentatively approving the settlement now, but I'm going

12 to issue a written order by next week to more address some

13 of the issues raised today.

14         I want to thank all of you for your attendance.

15         We're in recess.

16         (Proceedings concluded.)

17

18

19

20

21

22

23

24

25

75

1          I certify the foregoing is a correct transcript

2     from the electronic sound recording of the proceedings in

3     the above-entitled matter.

4

5     /s/Jordan Keilty                    6/11/2022
      Transcriber                         Date
6
      FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
      /s/L.L. Francisco
9     L.L. Francisco, President
      Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25