SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
mumhofer@spertuslaw.com
emitchell@spertuslaw.com

*Attorneys for Plaintiffs LA ALLIANCE, JOSEPH BURK, GEORGE FREM, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, AND HARRY TASHDJIAN*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, a non-profit corporation, JOSEPH BURK, GEORGE FREM, WENZIAL JARRELL, CHARLES MALOW, KARYN PINSKY, LEANDRO SUAREZ, HARRY TASHDJIAN, CHARLES VAN SCOY, and GARY WHITTER, individuals,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF LOS ANGELES, a municipal entity; COUNTY OF LOS ANGELES, a municipal entity; and DOES 1 through 200 inclusive,<br><br>        Defendants. | Case No. 2:20-cv-02291<br><br>**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR:**<br><br>**(1) Violation of Mandatory Duty (Cal. Gov't Code § 815.6; Welf. & Inst. Code § 17000)**<br>**(2) Violation of Cal. Civ. Code § 3490, *et seq.*; 3501, *et seq.***<br>**(3) Inverse Condemnation/Violation of Art. I § 19 of California Constitution**<br>**(4) Waste of Public Funds and Resources (Cal. Civ. Proc. Code § 526a)**<br>**(5) Violation of Due Process and Equal Protection (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)**<br>**(6) Violation of Due Process – State Created Danger Doctrine (42 U.S.C. § 1983; U.S. Const. amend XIV)**<br>**(7) Uncompensated Taking (42 U.S.C. § 1983; U.S. Const. amend. V/XIV)** |

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

**INTRODUCTION**

1.      Over two years after this case was filed, and after hundreds of millions of dollars have poured into Los Angeles through federal and state pandemic relief, the devastation on the streets and the impact on both the housed and unhoused communities have only gotten worse.  LA Alliance for Human Rights—of which both housed and unhoused are members—and Plaintiffs named herein filed this lawsuit to change the trajectory of the homelessness for the benefit of both communities.

2.      In the face of this lawsuit challenging its handling of the homeless crisis, the City has stepped up—it has agreed to provide shelter and housing to thousands of desperate people living on the street on a judicially-enforced, deadline-driven schedule, while at the same time increasing street engagement and meeting milestones for encampment reduction across the City.  This means relief is coming for both those suffering on the streets, as well as businesses and residents throughout the City facing the fallout from the crisis: crime, fire, disease, blocked sidewalks, and unusable public spaces.  But what the City cannot do is exactly what the County is statutorily required to do: provide services and treatment to unsheltered persons suffering under the crushing weight of drug addiction and mental illness.  The County is sadly, horrifically failing in this responsibility, resulting in thousands of the most vulnerable deteriorating on the sidewalks, beaches, and under overpasses. Unless the County steps up as the City has and fulfills its obligations to provide services to those experiencing homelessness, a comprehensive solution to the homelessness crisis will remain unrealized.

3.      Legal counsel maintains the County is "doing everything possible to address homelessness" and that "[a]ny assertion that the county has failed on this

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

obligation is utterly baseless."[1]  Yet County Supervisor Kathryn Barger has candidly and commendably admitted: "[W]hat we're doing in LA County is failing.  Our rising homeless count numbers prove that.  The tents that line our streets prove that.  Thousands of individuals in distress prove that.  We have more than a hundred public, community-based, faith-based, and non-profit organizations dedicated to providing services to people experiencing homelessness, and millions of Measure H dollars in our coffers to fund the work, but our region continues to fall short."[2]

4.     Supervisor Barger is right: the mortality rate of people experiencing homelessness who die on the streets has leapt to *5.5 per day*.[3]  The last point-in-time count numbers that have been released (2020) showed 66,436 persons experiencing homelessness in Los Angeles County (a rise of 12.7 percent from 2019), 41,290 of whom live in the City of Los Angeles (16.1 percent increase).[4] This is in addition to 12 and 14 percent respective increases from the year before.[5] Using the 2020 PIT numbers, there has been an increase in homelessness by approximately 60 percent since 2013 in both City and County, with the numbers of unsheltered homeless *doubling*.[6]  And the rates of mortality for the unhoused are increasing faster than the numbers of unhoused themselves.  Dr.

---

[1] https://www.latimes.com/homeless-housing/story/2022-04-01/los-angeles-homeless-lawsuit-settlement-judge-carter

[2] https://kathrynbarger.lacounty.gov/barger-and-stakeholders-respond-to-recommendations-from-blue-ribbon-commission-on-homelessness/

[3] County of Los Angeles, Public Health, *Mortality among People Experiencing Homelessness in Los Angeles County: One Year Before and After the Start of the COVID-19 Pandemic* (April 2022), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf

[4] Los Angeles Homeless Services Authority ("LAHSA"), *2020 Greater Los Angeles Homeless Count Results* (Sept. 3, 2020), https://www.lahsa.org/news?article=726-2020-greater-los-angeles-homeless-count-results.

[5] LAHSA, *2019 Greater Los Angeles Homeless Count* – Data Summary Total Point-In-Time Homeless Population by Geographic Areas (June 16, 2020), https://www.lahsa.org/documents?id=3467-2019-greater-los-angeles-homeless-count-total-point-in-time-homeless-population-by-geographic-areas.pdf.

[6] Los Angeles Almanac, *Homelessness in Los Angeles County 2020*, http://www.laalmanac.com/social/so14.php (last visited June 22, 2022).

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Barbara Ferrer, director of DPH admits: "Homeless people are in fact dying at a higher rate because they're homeless."[7]

5.      The streets tell a sad story: the mentally ill and addicted visibly suffer in intersections, parks, and sidewalks.  Without medical supervision or treatment, the most severely affected cannot hold jobs or housing, and are left to wander and fend for themselves in a horrific cycle of degradation.  And the number of those suffering has climbed with the increased prevalence of illegal narcotics, which are being used to self-medicate or are the cause of the mental decline in the first place.  Available drug treatment beds are woefully unobtainable while the drug addiction crisis rages, and our communities are ravaged.  The County's silos of care make it nearly impossible for anyone with a comorbidity (that is, suffering from more than one ailment—for example mental illness and drug addiction) to obtain help.  Los Angeles is one of only two counties in the state that does not have an integrated administration to address individuals suffering with both mental health and substance use disorders.  This is particularly bad news given that a recent California Policy Lab study reported 50 percent of unsheltered individuals suffer from a *trimorbidity* of physical health, mental health, *and* substance abuse conditions.[8]  The County has the obligation to provide for indigent and low-income mental and public healthcare and is woefully failing in its obligations.

6.      For years, the City struggled—and failed—to balance the needs of the housed and unhoused.  The near-exclusive focus on building permanent supportive housing through Proposition HHH ("HHH") in the last five years has led to lethal under-funding of emergency and interim shelter solutions which has

---

[7] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[8] Janey Rountree, Nathan Less, & Austin Lyke, *Health Conditions Among Unsheltered Adults in the U.S.* 4, California Policy Lab (Oct. 2019), https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1    in turn left thousands to decline and die on the streets without support from

2    County services.  Those individuals in turn, without services or shelter, languish

3    and decline, ultimately requiring increased long-term services as a result of

4    unnecessary years spent subject to the horrors of the street.

5        7.    As a result of an early, partial agreement reached in this case

6    between the City and County, in what all parties hoped was a sign of future

7    cooperation, an additional 9,633 beds have been funded according to a recent

8    court filing, with shared operating costs and provision of mainstream services.[9]

9    1,100 of these beds were already in the works through the Mayor's "A Bridge

10   Housing" program, 834 of these beds are permanent supportive housing projects

11   which had been long-planned, and an undefined number (likely over one

12   thousand) are "rapid rehousing" vouchers which don't add to the bed inventory

13   (but do help prevent homelessness).  Still, this agreement undisputedly added

14   thousands of much-needed interim beds to the inventory.  Yet while this

15   agreement was a welcome departure from the City and County's historical

16   squabbling over responsibility and blame, and a needed infusion of interim

17   shelter opportunities, it still did not lead to a comprehensive agreement which

18   would relieve the suffering on the streets in a meaningful way.  Shelter remains

19   unattainable for most, services are inaccessible for most, and streets are

20   unbearable for all.

21       8.    In a further effort to back away from the County's liability, counsel

22   repeatedly claims "This is a Skid Row lawsuit.  Skid Row is in the city of L.A.

23   Skid Row is the focal point of this whole lawsuit." But this has never been only

24   about Skid Row: Skid Row is the epicenter of homelessness—and not just

25   homelessness, but in unhoused drug addiction and mental illness—in the United

26

27

28       [9] Def. City of Los Angeles' Quarterly Status Report Pursuant to the Mem.
     of Understanding Between the County of Los Angeles and the City of Los
     Angeles at 64-71, ECF No. 342.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

States, but the crisis has spread beyond the confines of Skid Row and into every corner in Los Angeles.

9. Homeless encampments are entrenched throughout the City and County. With increased population density, unlimited property accumulation has fostered a proliferation of flea-infested rats and other vermin, which are largely responsible for the recent outbreaks of medieval diseases. Large items obstruct the free passage and use of the streets and sidewalks. Encampments have brought with them rampant drug sales and use, which in turn provide a platform for violent assaults and property crimes. Crime both on and by homeless residents has intensified.[10] A homeless individual is eight times more likely to be a victim or suspect of a crime than a housed person. In the City of Los Angeles, 42 crimes involving homeless individuals are reported per day, over half of which are violent. 80-90 percent of crimes reported at a homeless encampment are violent.[11] In Central Bureau Homicide (which encompasses Skid Row area), 40 percent of the homicides as of October, 2021 have been "transient-related" both as suspects and victims.[12]

10. The multiplication of makeshift structures, garbage, human waste, and other detritus has created circumstances throughout the City and County that

---

[10] Joel Grover & Amy Corral, *A Homeless Man Punched Two People in the Face, But Was Cited and Released*, NBC Los Angeles, (Nov. 13, 2019, 1:10 PM), https://www.nbclosangeles.com/news/local/hollywood-violent-homeless-attacks-increase-video-564682831.html; Eric Leonard, *Homeless Crime Jumps Nearly 50 Percent in Los Angeles, LAPD Says*, NBC Los Angeles (Dec. 10, 2018, 8:19 PM), https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Zoie Matthew, *Crimes Against the Homeless Have Risen, and Advocates are Searching for Answers*, Los Angeles Magazine (Oct. 15, 2019), https://www.lamag.com/citythinkblog/homeless-crime/

[11] Sophie Flay & Grace Manthey, *What is really going on with homeless crime? We crunched the numbers*, ABC Eyewitness News, https://abc7.com/feature/homeless-crime-los-angeles-data-response/10827722/ (last visited June 22, 2022).

[12] Kevin Rector, *On front lines of L.A.'s homicide spike, these detectives race to solve mounting caseloads* (Oct. 22, 2021, 5:00 AM), https://www.latimes.com/california/story/2021-10-22/l-a-homicide-detectives-face-mounting-caseloads.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

are crippling for local businesses, unlivable for residents, and deadly for those on the streets. The environmental impact from power-washing human waste and used needles into our oceans is unassessed and untold. Together the City and County spend over a billion dollars annually providing police, emergency, and support services to those living on the streets. And still, the tragedy unfolds.

11. As mental health affliction and drug addiction rates have soared over the last several decades, so has the cost of housing. Support structures for those on the streets have been stretched to the breaking point by burgeoning demands and insufficient funding by local, state, and federal governments. The population of people experiencing homelessness has nearly doubled since 2012 while sustainable short- and long-term solutions have been in short supply. Los Angeles County Department of Public Health has repeatedly warned the City that basic hygiene services are needed to maintain public health in or near homeless encampments—but those critical services have been in short supply.[13] With the start of the pandemic, there was a tremendous push to place bathrooms and sanitation stations near encampments to maintain hygiene, but those are rarely serviced and are now down to only 1/3 of their previous number at a time when homelessness continues to increase.[14]

12. Advocates have pressured the City and County for years to permit public camping, allow the accumulation of personal property on the streets, and generally make it more comfortable for people to live on the streets. But street-living is by no means more "comfortable," because of significant health issues and inherent danger involved in being unsheltered. Enforcement of homeless-related crimes has been reduced, or in some cases eliminated, in the name of

---

[13] Matt Stiles, *As Homeless Crisis Worsens in L.A., The County Leans On City Officials To Act*, Los Angeles Times (June 8, 2019, 5:04 PM), https://www.latimes.com/local/lanow/la-me-homeless-county-letter-20190608-story.html.

[14] Lexis-Olivier Ray, *City Reverses Decision to Remove Washing Stations From Encampments Following L.A. Taco Investigation,* L.A. Taco (Aug. 5, 2021), https://www.lataco.com/bathroom-stations-encampments-la-city/.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

7

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

compassion.  But allowing people to die on the streets isn't compassionate; it's cruel.

13.     The massive build-up of property and tents has made sidewalks unpassable.  Business owners have suffered as well—customers cannot access stores and are declining to patronize them due to conditions on the streets, and business owners are spending hundreds of thousands of dollars on increased sanitation and security measures and cannot maintain employees.  Residents and workers throughout the Skid Row area are confronted daily by disease, illicit drug sales and use, prostitution, and general filth and squalor.  People are openly using drugs, urinating, and defecating in public.

14.     Residential and commercial buildings alike have endured fires from homeless camps, where makeshift heaters are used to keep people warm, open air fires are used to cook food, utility wiring is tampered with to provide electricity, and arsons arise out of drug or property disputes.[15]  Businesses are losing insurance because of the fire risk associated with homeless encampments next to their buildings.[16]  Shockingly, more than 50 percent of the fires responded to by Los Angeles Fire Department are homeless-related, and one-third of those are intentionally started (arson).

15.     The frequency of criminal conduct has increased so dramatically in some areas that law enforcement officials can respond only to the most egregious crimes—and often only after serious damage has been done.  And those who are

---

[15] James Queally, *Firecrackers. Molotov cocktails. Fire attacks have shaken L.A.'s homeless community*, Los Angeles Times (Oct. 18, 2019, 7:00 AM), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire; Joel Grover & Amy Corral, *Los Angeles Homeless Illegally Use Fire Hydrants to Fill Water Balloons, Bathe, Shave*, NBC Los Angeles (Aug. 24, 2019, 1:00 AM), https://www.nbclosangeles.com/investigations/Los-Angeles-Homeless-Illegally-Use-Fire-Hydrants-to-Fill-Water-Balloons-Bathe-Shave-558051461.html.

[16] Joel Grover & Amy Corral, *Your Insurance Is Canceled Because of Homeless Tent Fires*, NBC Los Angeles (Sept. 23, 2019, 8:39 AM), https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

8

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

experiencing homelessness pay the highest price for this lawlessness.  Violent assaults at encampments have doubled and robberies have increased 144 percent.[17]  As Rev. Andy Bales of Union Rescue Mission notes, "The crime on Skid Row has skyrocketed . . . we used to have a rare occurrence of shootings.  Now we have them every week.  People are suffering from robberies, rape, hunger, the cold or heat – you name it.  I don't know if there's a place anyone can suffer more.  It's an absolute disaster." [18] Year after year, assaults against homeless victims have increased, as the number of vulnerable subject to predators increases.  In 2020, nearly 20 percent of homicides in Los Angeles were on unhoused individuals.[19]  Crime involving homeless individuals (as either victim or suspect) is 8 percent of the crime in Los Angeles (11 percent of violent crime), but homeless people only make up about 1 percent percent of the population.  Random violent attacks by unhoused individuals have increased significantly, often due to drug consumption.[20]  Starbucks just this week announced closure of several of its stores, citing safety concerns for its customers and employees.[21]

16.     Humans living on the streets and in their cars have no regular access to sanitation facilities, so trash and human waste end up in public spaces and ultimately our oceans.  Businesses are regularly cleaning used syringes out of

---

[17] Ethan Ward, *Crime at tent encampments rises during the pandemic year*, Crosstown (May 4, 2021), https://xtown.la/2021/05/04/crime-homeless-individuals/.

[18] *Id.*

[19] Eric Leonard, *LA's Staggering Murder Rate Linked to Gang Shootings and Violence Against Homeless*, NBC Los Angeles (Nov. 23, 2020, 8:01 PM), https://www.nbclosangeles.com/news/local/las-staggering-murder-rate-linked-to-gang-shootings-and-violence-against-homeless/2469360/.

[20] *LAPD Says Random, Violent Attacks By Unhoused Residents Are on The Rise*, CBS Los Angeles (May 19, 2021, 11:32 PM), https://losangeles.cbslocal.com/2021/05/19/lapd-says-random-violent-attacks-by-unhoused-residents-are-on-the-rise/.

[21] Christian Martinez, *Starbucks to close six Los Angeles-are stores it calls 'unsafe to continue to operate'*, Los Angeles Times (July 12, 2022, 6:34 PM), https://www.latimes.com/california/story/2022-07-12/starbucks-to-close-six-los-angeles-stores-10-others-around-country-due-to-safety-issues.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

their drains; an untold number are washed into our waterways.  The environmental impact of the homelessness crisis was recently underscored in a letter from the Environmental Protection Agency.[22]  Yet the governmental policies and inaction that perpetuate these pollutants continue unabated.

17.  Measure H—a county-wide tax increase that was originally estimated to net $355 million in homeless-relief funding available per year but now brings in over half a billion dollars yearly—is spread so thin it serves more to feed the County's own bureaucracy than to make any significant dent in the crisis.[23]  And the original focus of the measure—supporting the City's HHH projects and providing increased intensive services and treatment—isn't even mentioned in its annual budget.  Meanwhile the County does the bare minimum to support the Department of Mental Health, which in turn is holding somewhere between $500 million and a billion dollars in its account unspent.

18.  Despite the magnitude of the problem, a major course correction can be made without breaking municipal budgets.  Steps could be taken to provide safe sleeping spaces for the entire homeless population for a fraction of the funds currently devoted to the homelessness crisis—if the City and County were to work together.  Reno recently build an emergency and transitional shelter community in less than 60 days that holds 600 beds at the cost of only $11,203 per bed .[24]  Union Rescue Mission built a Sprung structure (a large membrane tent) in a matter of months—the single tent houses more than 100 people at a cost of only $10,000 per bed (including a six-month stay, security, and social

---

[22] Letter from Andrew Wheeler, Administrator, U.S. Environmental Protection Agency, to Gavin C. Newsom, Governor of California (Sept. 26, 2019), https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

[23] LAHSA, *LAHSA Releases 2019 Housing Inventory Count* (Sept. 19, 2019), https://www.lahsa.org/news?article=584-lahsa-releases-2019-housing-inventory-count ("On our present course, it will take far too long to build far too few units of housing to effectively end this crisis." – Peter Lynn, executive director LAHSA).

[24] Renard Decl. at 1, LA Alliance for Human Rights v. City of Los Angeles, Case No. 21-55395, ECF 13-2.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

services).[25]  The City has actually utilized this same structure in several places—yet the City's cost was <u>quadruple</u> Union Rescue Missions', at $42,000 per bed.[26] In Hawaii, the city of Honolulu is putting up large military-grade inflatable tents in select parks to quickly and effectively provide shelter when the demand exceeds supply, at a cost of $6,000 per bed which also includes a 90-day stay, security, and social services.[27]  Tiny houses are being used in Seattle for $6,000 to $10,000 per house to create micro-villages as bridge housing.[28]  Entire kits can be purchased to house a family of 4 in a large tent complete with furniture, refrigerator, heater, and electrical generator for a little more than $2,000 ($500 per bed).[29]  Large tents that can be purchased for $400 are being used by the city of Modesto to address its own homelessness crisis.[30]  3D printed 400-square foot

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[25] Rev. Andy Bales and J. Michael Arnold, *When it Comes to Homelessness, We Must Do More and We Must Do it Now*, Los Angeles Downtown News (Aug. 5, 2019), http://www.ladowntownnews.com/opinion/when-it-comes-to-homelessness-we-must-do-more-and/article_6b08711a-b57e-11e9-850e-670a231aefa4.html.

[26] Joel Grover and Amy Corral, *Inside the Massive Tent That Might be a Partial Solution Homelessness in LA,* NBC Los Angeles (Sept. 18, 2019, 11:55 AM), https://www.nbclosangeles.com/news/local/los-angeles-la-homeless-encampments-sprung-tents-shelter-skid-row/1965408/.

[27] Dan Nakaso, *Pilot project aimed at reducing Oahu's homeless will start in Waipahu*, Star Advertiser (Oct. 20, 2019, 5:28 PM), https://www.staradvertiser.com/2019/10/20/hawaii-news/pilot-project-aimed-at-reducing-oahus-homeless-will-start-in-waipahu/; Allyson Blair, *Giant inflatable tents for the homeless could be coming to a park near you*, Hawaii News Now (Nov. 27, 2018, 3:19 PM), https://www.hawaiinewsnow.com/2018/11/28/giant-inflatable-tents-homeless-could-be-coming-an-oahu-park-near-you/; Ashley Mizuo, *Honolulu opens short-term homeless shelter in Wahiawa,* The Honolulu Star-Advertiser (May 14, 2021), https://www.yahoo.com/entertainment/honolulu-opens-short-term-homeless-161100501.html.

[28] *See* Sharon Lee, *Tiny House Villages in Seattle: An Efficient Response to Our Homelessness Crisis*, SHELTERFORCE: The Original Voice of Community Development (Mar. 15, 2019), https://shelterforce.org/2019/03/15/tiny-house-villages-in-seattle-an-efficient-response-to-our-homelessness-crisis/.

[29] Relief ShelterKits, *Relief Tents: Concept Designs*, https://www.relieftents.com/relief-tents/shelterkit-living-supportkit/ (last visited June 22, 2022).

[30] Kevin Valine, *Modesto homeless camp is filling up, but officials adapt to find room for more*, The Modesto Bee (May 13, 2019, 4:58 PM), https://www.modbee.com/news/local/article230345544.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

homes can be built in less than 24 hours and cost only $4,000 to construct.[31] Connect Homes produces fully integrated off-the-grid modular shelters for $20,000 to $30,000 per bed, with two-story options to densify.[32]  Pallet shelters, small "tiny home" type emergency structures which can be built in less than an hour, only cost approximately $8,000 per two-bed unit, but the City of Los Angeles spent an astonishing $130,000 to place such units due to over-engineering and over-regulation; comparatively Sonoma County spent only $21,817 per unit, the City of Riverside spent only $17,000 per cabin, and Tacoma only $12,000, all for the same structure.[33]

19.   The County's General Hospital (LAC+USC) Building, with 1.5 million square feet of space in the heart of East L.A., has been vacant for over a decade—the County at one point considered utilizing it for homeless assistance but is now evaluating it as a "mixed use" property.[34]  83 acres of County-owned property exist at the old County "poor farm," Rancho Los Amigos, a brilliant 19th-century solution whereby homeless housing and medical care was combined with a working farm to both feed the residents and sell for profit to support the

---

[31] Aria Bendix, *These 3D-printed homes can be built for less than $4,000 in just 24 hours*, Business Insider (Mar. 12, 2019, 2:09 PM), https://www.businessinsider.com/3d-homes-that-take-24-hours-and-less-than-4000-to-print-2018-9; Sharon Jayson, *3-D-pringed homes a concept turns into something solid*, The Washington Post (Mar. 6, 2020, 6:00 AM), https://www.washingtonpost.com/realestate/3d-printed-homes-a-concept-turns-into-something-solid/2020/03/05/61c8b0d2-36e4-11ea-bf30-ad313e4ec754_story.html.

[32] Connect Shelters, https://www.connect-shelters.com/ (last visited June 22, 2022).

[33] Doug Smith, *$130,0000 for an 8-foot-by-8-foot shed? That's what L.A. is paying in a bid to house the homeless*, Los Angeles Times (Dec. 12, 2020, 5:51 PM), https://www.latimes.com/california/story/2020-12-12/los-angeles-tiny-homes-homeless.

[34] Jacqueline Ramírez, *Second community meeting explores future of former County Hospital*, Boyle Heights Beat (Sept. 18, 2019), https://boyleheightsbeat.com/second-community-meeting-explores-future-of-former-county-hospital/; Alex Medina, *Community meeting to explore former County Hospital re-use*, Boyle Heights Beat (June 12, 2019), https://boyleheightsbeat.com/community-meeting-to-explore-former-county-hospital-re-use/.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

project.[35]  The unused acreage has been approved for a new County office-park rather than repurpose it for its original intent.[36]  The County owns over 200 acres of the Los Angeles County Fairgrounds ("Fairplex") in Pomona which, while currently leased to the non-profit Los Angeles County Fair Association, may be negotiated to support shelters.  The L.A. City Controller has identified 13,948 separate properties within the City owned by various public entities, many of which are vacant or underutilized.[37]  Even small lots could support pallet houses individual tents, or "tiny home" communities with shared bathroom facilities. Plaintiffs have identified 166.58 acres of usable City- or County-owned property that could quickly be used for these very projects.[38]

20.    Board-and-care facilities—which offer housing, meals, and basic assistance for those who need supportive care—are closing all over California at rapid rates because it is becoming economically infeasible to remain open.[39]

---

[35] *See* Historic American Buildings Survey, *Los Angeles County Poor Farm (Rancho Los Amigos, Los Angeles County) Rancho Los Amigos Medical Center*, http://lcweb2.loc.gov/master/pnp/habshaer/ca/ca3500/ca3509/data/ca3509data.pdf (last visited June 22, 2022).

[36] Steven Sharp, *Historic Rancho Los Amigos Campus Slated for Redevelopment*, URBANIZE Los Angeles (June 24, 2020, 9:55 AM), https://urbanize.city/la/post/historic-rancho-los-amigos-campus-slated-redevelopment.

[37] Los Angeles City Controller, *Publicly-Owned Properties*, https://controllerdata.lacity.org/dataset/Publicly-Owned-Properties/bawf-ixme/data (last visited June 22, 2022); Los Angeles City Controller, *Property Panel: A guide to publicly-owned properties in the City of Los Angeles*, https://lacontroller.maps.arcgis.com/apps/Cascade/index.html?appid=b6d7907c118d4ea2a1dd96bc0425633d (last visited June 22, 2022); Natalie Hoberman, *Despite housing crisis, LA lags in building its own sprawling land portfolio*, TheRealDeal (May 28, 2019, 1:00 PM), https://therealdeal.com/la/2019/05/28/despite-housing-crisis-la-lags-in-building-on-its-own-sprawling-land-portfolio/.

[38] Mitchell Decl. Ex. D, at 104, ECF No. 239-1.

[39] Jocelyn Wiener, *Overlooked mental health "catastrophe:" Vanishing board-and-care-homes leave residents with few options*, CalMatters: Projects (Apr. 15, 2019), https://calmatters.org/projects/board-and-care-homes-closing-in-california-mental-health-crisis/; *Loss of Board and Care Facilities is at Crisis Level: Undermines California Counties' Efforts to Support Individuals with Serious Mental Illness, Older Adults and Persons with Disabilities at Risk of Homelessness*, Steinberg Institute, County of Los Angles, County Behavioral

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

"Los Angeles County has lost more than 1,200 board and care placements for people with mental illness since 2016."[40] The recent LA Times article cites higher statistics, with 1,687 beds for persons with serious mental illness closing since 2016.[41] Those facilities—which are paid only $40 per-night-per-guest by government entities—could be subsidized by the County (known as "patch funding") to prevent closures and encourage more to open. No infrastructure need be built, and the property owners would have greater financial incentive to stay open or open anew to provide beds, meals, and basic care. Similarly, the shared/collaborative housing model supported by organizations like SHARE!, Haaven, and others, boasts zero infrastructure costs with the added benefit of self-sustenance after a one-time $4,000-per-bed investment.[42]

21.     While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way. The *only* way to address this crisis with the urgency it deserves is an emergency response—providing immediate shelter for all, increasing necessary outreach, services, and treatment, and abating the degradation of our cities and communities, for the good of everyone. The City saw the success of this very model at multiple locations in Los Angeles so far, including, *inter alia*, the Venice Boardwalk, Echo Park (though the clearance could have been handled far better), McArthur Park, Rose/Penmar, and CD 3

---

Health Directors Association, https://namisantaclara.org/wp-content/uploads/2020/11/Loss-of-Board-and-Care-Facilities-is-at-Crisis-Level-2.28.20.pdf (last visited June 22, 2022).

[40] Letter from Ann Sewill, General Manager, Los Angeles Housing Department, to City Counsel, February 4, 2022, https://clkrep.lacity.org/onlinedocs/2020/20-1203_misc_2-4-22.pdf.

[41] Lila Seidman, *Homes for people with severe mental illness are rapidly closing. Will help come fast enough?* Los Angeles Times (July 12, 2022, 4:00 AM), https://www.latimes.com/california/story/2022-07-12/board-and-cares-closing-amid-homelessness-crisis-los-angeles-county.

[42] *See* para. 70 *infra*.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

underpasses.  It can be done effectively, quickly, and compassionately, and it must be done now.[43]

# I.   JURISDICTION AND VENUE

22.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments of the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

23.     This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

24.     All of the actions and omissions complained of occurred in the Central District of California.  Therefore, venue is proper in this District.  28 U.S.C. §1331.

# II.   GENERAL ALLEGATIONS

25.     Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, Defendant County and Does 1-200 inclusive were the agent, employee, and co-conspirator of each of the remaining Defendants, and in participating in the acts alleged in this Complaint, acted within the scope of such agency and employment, in furtherance of the conspiracy, and with the permission and consent of the co-conspirator Defendants.

26.     All causes of action brought under California statutory law are for equitable and injunctive relief only.  Therefore, no tort claim was necessary prior

---

[43] Plaintiffs file this amended complaint after the Ninth Circuit vacated this Court's April 20, 2021 preliminary injunction.  Specifically the Ninth Circuit noted a delta between the Court's order and Plaintiffs' allegations and facts: Plaintiffs had not demonstrated evidence that Plaintiffs and members of the Alliance are Black because Plaintiffs had not moved on any issues that were based on race, had no unsheltered homeless individuals named in the original complaint, had not alleged existence of a Special Relationship or shown they are confined to Skid Row, or were deprived of medically necessary care.  Plaintiffs have amended this complaint to add Wenzial Jarrell, an unsheltered Black man living in Skid Row, as a Plaintiff, and added a number of named Alliance members who are also unsheltered and persons of color.  Plaintiffs have supplemented their Equal Protection, Due Process allegations and 17000 claims to address the Ninth Circuit's concerns.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

to filing this suit.  *See* Cal. Gov. Code § 905 (West 2019); *Qwest Commc'ns Corp. v. City of Berkeley,* 146 F. Supp. 2d 1081 (N.D. Cal. 2001); *Hart v. County of Alameda*, 76 Cal. App. 4th 766 (1999). For the single cause of action for damages brought under the California Constitution, a Tort Claim was filed July 15, 2022. When and if the claim is rejected, Plaintiffs may seek to amend this complaint to so-allege if necessary.

27.   Each paragraph of this Complaint is expressly incorporated into each cause of action set forth below.

## III.  FACTUAL ALLEGATIONS

### A.   History of Homeless Treatment in Los Angeles

28.   What is now known as Skid Row began in the late 1800s as a concentration of day-rate hotels, bars, and brothels catering to the "rail riders" (transients riding the trains) due to its proximity to where the trains terminated at Los Angeles.[44]  Service providers like the Union Rescue Mission opened their doors to help the indigent who congregated there.  Decades later, when the 1970s, brought a push for "de-institutionalization" of those suffering from mental illnesses, Skid Row became a beacon of hope for those needing services and shelter.[45]  At the same time, Downtown LA experienced an economic resurgence and developers began restoring the Skid Row area.  Activists (fearful of losing housing) and downtown interests (fearful of homeless individuals wandering into the wealthier areas), together, pushed back and fought for a policy of "containment" with the goal of centralizing missions, charities, and other homeless services within the 50-square block area, encouraging "undesirable

---

[44] Sebastin Kempkens, *L.A.'s Homelessness Crisis: How Did We Get Here?*, LA Weekly (Nov. 21, 2018), https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/; *99% Invisible: The Containment Plan*, Radiotopia (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/; Union Rescue Mission, *About Skid Row*, https://urm.org/about/faqs/about-skid-row/ (last visited Mar. 9, 2020).
[45] *See* Kempkens, *supra* note 48, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

population elements" to stay within the boundaries, in return for an agreement with the City to keep redevelopment out of it.[46]

29.   The drafters of the Containment Policy were concerned that PEH and other "undesirables" could spread to other parts of the City; to combat this "people problem" the City implemented

> a **containment approach** that starts by defining an area in which Skid Row activities would be allowed, but outside of which no disruptive Skid Row activity would be tolerated . . . new borders were drawn that define a potential area of containment that would pull Skid Row activities away from other land uses without significant relocation of housing.

(Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. A at 143, ECF 265-1.) (emphasis added).  The "containment approach" had four pillars to it: (a) "a deliberate control of housing stock, its allocation and location" to condense the homeless within a smaller area of downtown Los Angeles, (b) businesses catering to Skid Row "undesirables" would be discouraged outside of the containment area, (c) services to the homeless would be centralized in the area of containment to keep the homeless there, and (d) "amenities" that attract the homeless, such as parks and public restrooms, would be centralized in the contained area.  *Id*.  The Containment Policy (the "Containment" or "Policy") included specific maps that defined where "undesirables" would be concentrated, and also included "buffers" to further isolate the "undesirables" from others.  *Id*.  The County contributed to and benefited from Containment by concentrating its statutorily-required social services within the Containment Zone.  In this way it drew in those who were in the greatest need into the Containment Zone where they were effectively prevented from leaving.   This appalling Containment Policy remained until it

---

[46] Rich Connell, *SKID ROW: 'Containment Strategy' of Aiding Residents, Easing Impact on Business District Is Slow and Frustrating*, Los Angeles Times (Aug. 5, 1985, 12:00 AM), https://www.latimes.com/archives/la-xpm-1985-08-05-me-3525-story.html; 99% Invisible, *Episode 279:The Containment Plan*, (Oct. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

was formally denounced in 2016, but in fact the Policy persists to this day, as evidenced by the new DTLA2040 plan.

30.    The 1980s and 1990s, with the crack epidemic and simultaneous cuts to the welfare system, brought in true and enduring homelessness, with encampments springing up on sidewalks and criminals preying on the vulnerable.[47]  Then-mayor Tom Bradley opened an urban campground along the L.A. River, but it was soon closed due to terrible living conditions.  At various times groups have placed portable toilets in key encampment locations, only to have the city remove them when they became magnets for prostitution and drug use.  In the early 1990s, as a settlement of litigation between the City and County, Los Angeles Homeless Services Authority ("LAHSA"), a joint-powers authority, was created to oversee the City and County's homeless response.  The aim was more accountability, but ultimately it has resulted in an accountability deficit.

31.    That deficit is particularly apparent in the litigious history of two Los Angeles Municipal Code provisions ("L.A.M.C."), section 41.18 and section 56.11, that regulate behavior in public rights-of-way.  Section 41.18(d) has recently been amended to prohibit sitting, sleeping, or lying in public rights of way in sensitive areas or other areas marked by signage but only after full consideration and vote by City Council in every single area designated as such and only, for non-sensitive areas, after proof of serious injury, crime, or fires.[48]  LAMC section 56.11 prohibits, among other things, storage of "excess personal property" meaning property which cumulatively exceeds 60 gallons in a public area.[49]

---

[47] *See* Kempkens, *supra* note 48, https://www.laweekly.com/l-a-s-homelessness-crisis-how-did-we-get-here/.
[48] LOS ANGELES MUN. CODE ("LAMC") 41.18 (2021), https://clkrep.lacity.org/onlinedocs/2020/20-1376-S1_ord_draft_7-02-21.pdf.
[49] LAMC 56.11 was amended in 2016 in direct response to *Lavan v. City of Los Angeles*, discussed *infra*.  Its express stated purpose was to "balance the needs of the residents and public at large to access clean and sanitary public areas

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

32.     In 2006, the City settled a case brought by several activists, *Jones v. City of Los Angeles*, agreeing not to enforce section 41.18(d)'s then-restrictions on tents and people sleeping in public areas between the hours of 9 p.m. and 6 a.m.  As part of the agreement, the parties concurred that a published court decision would be de-published and would no longer be binding authority. According to the *Los Angeles Times*, "The [Jones] agreement set the stage for today's encampment explosion."[50]  And ironically, the de-published *Jones* decision was still oft-cited by districts courts and resurrected in the 2018 published decision of *Martin v. City of Boise*.

33.     In 2012, the Ninth Circuit upheld an injunction in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), that prohibited the City from seizing unattended property without notice absent objectively reasonable belief that it is abandoned, evidence of crime, contraband, or presents an "immediate threat to public health or safety." *Id*. at 1026. Unfortunately, it is difficult to determine when property is "abandoned" as opposed to momentarily "unattended" when there are tens of thousands of people living unsheltered in our public spaces.  The result is a massive build-up of property, which harbors significant health and safety risks that mostly go undetected until too late.

---

consistent with the intended uses for the public areas with the needs of the individuals, who have no other alternatives for the storage of personal property, to retain access to a limited of personal property in public areas." LAMC § 56.11. Unsurprisingly, unhappy activists have challenged the new amendment, first as applied to those living in Skid Row (*Mitchell v. City of Los Angeles,* Case No. CV 16-01750, 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016) and now city-wide (*Garcia v. City of Los Angeles*, 19-CV-06182).  The *Garcia* court issued an injunction against its enforcement, recently upheld by the Ninth Circuit.  *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. Sept. 2, 2021).  56.11 was recently amended to refer only to "personal property" and eliminated the 60-gallon requirement.

[50] Gale Holland, *Why L.A. County's homelessness crisis has been decades in the making*, Los Angeles Times (June 5, 2019, 11:10 AM), https://www.latimes.com/local/california/la-me-ln-homeless-housing-crisis-count-history-skid-row-20190605-story.html ("'We are dealing with historical consequences of bad decisions made 10 years ago to guarantee a right to sidewalks instead of a right to shelter,' said Westside Councilman Mike Bonin.").

19
SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

34. Eight years after the Ninth Circuit upheld the *Lavan* injunction, the City entered into a settlement in the case of *Mitchell v. City of Los Angeles*. Under the terms of that settlement, the City bound its own hands in agreeing to significantly limit the enforcement of LAMC section 56.11, permitting the accumulation of personal property beyond the code section's limits, and relegating enforcement to only certain bulky items such as couches, mattresses, refrigerators, and wooden pallets within a designated area known as "Skid Row and surrounding areas" (thus increasing the boundaries of what was traditionally considered Skid Row). The *Mitchell* agreement led to a sharp decline in health and safety for housed and unhoused alike not just in Skid Row but throughout downtown.  The *Mitchell* agreement has expired, but the court in *Garcia* enjoined the City of Los Angeles in similar fashion.  It is unclear why, after litigating this issue for decades, the City cannot manage to draft an ordinance that is workable, practical, and will pass constitutional muster.

35. *Mitchell* was settled in the wake of the sweeping Ninth Circuit decision addressing homeless regulation: *Martin v. City of Boise*, based almost entirely on the reasoning published (then de-published) in *Jones*.  *Martin* held that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters" a person may not be prosecuted for sitting, lying, or sleeping in public.  *Martin*, 920 F.3d at 617 (original alterations omitted) (citation omitted).  The language in *Martin* does not provide clear guidance for cities struggling with sizable homeless populations—in some passages, *Martin* suggests that there must be enough beds for everyone before anyone is cited for sleeping on a sidewalk, while other aspects of *Martin* indicate that individuals "who *do* have access to adequate temporary shelter" but "choose not to use it" may be prosecuted without reference to the community.  *Id.* at n.8.

36. Regardless of how *Martin* is interpreted, its clear effect is to tie enforcement of public regulation ordinances to the provision of shelter.  And

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

most people agree that the balanced approach is exactly that: provision of safe,
humane, dignified, and healthy shelters with a path out of homelessness, along
with regulation of our public spaces.  But instead, the City's and County's
approach to the *Martin* decision has been a lack of both shelters and regulation.

37.      While homelessness has now exploded beyond the boundaries of
Skid Row—resulting in public outcry at encampments, crime, and squalor in
neighborhoods which previously could ignore the devastation—the most heavily
impacted area is still without a doubt the area of Containment.  City and County
policies continue to concentrate persons experiencing homelessness in Skid Row,
creating horribly dangerous conditions for unhoused individuals and others living
in the area.  Affordable housing and services are still heavily concentrated in Skid
Row, while development of these housing or services in other areas can take
years, even for by-right projects.  To this day, Skid Row is an enforcement-free
zone, effectively exempt from laws against drug use and sales, weapons
trafficking, human trafficking, gang activity, and public intoxication; reinforcing
the concentration of human tragedy in a half-square-mile area.

38.      The most obvious and overt example of the continuing Containment
Policy is the DTLA2040 plan, recently approved by the Planning Commission
and formally recommended to City Council, again with significant advocacy and
support from groups like Los Angeles Community Action Network (LACAN).[51]
In creating the new plan for Downtown Los Angeles, the City created an entirely
new zoning designation just for the Skid Row area, permitting *only* homeless
housing developments.  This the only such area zoned for this specific purpose in
the entire City and County (and in fact the nation).  This plan re-codifies the
Containment Policy and flies in the face of decades of research demonstrating the

---

[51] Department of City Planning Recommendation Report (June 17, 2021),
https://planning.lacity.org/odocument/04ca2a68-c5fd-4a26-90c2-
8128910239f7/DRAFT_DTLA_CPC_Staff_Recommendation_Report.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

harmful effects of centralizing poverty.[52] Under both Federal and California law, cities are required to "Affirmatively Further Fair Housing" which includes "Replacing Segregated Living Patterns with Truly Integrated and Balanced Living Patterns" and "Transforming Racially and Ethnically Concentrated Areas of Poverty (R/ECAP) into Areas of Opportunity" such as providing "economic development strategies," "prioritizing investment," and "promoting mixed-income development coupled with strong anti-displacement protections."[53] Instead the DTLA2040 plan maintains the segregated living pattern of Skid Row and reinforces the most racially and ethnically concentrated area of poverty in the entire county (and likely the nation). Because of the Containment Policy, there has been an obvious disinvestment in the area with extremely limited or no access to grocery stores, pharmacies, drug stores, restaurants, transit, retail, and job opportunities, and an abundance of crime, violence, fires, death, and disease. With DTLA2040 the Containment Policy is reinforced, and homeless people are corralled and contained into a specified area of the city where they are effectively abandoned.

39.    The lack of affordable housing in Los Angeles is no doubt one of the drivers of homelessness. In 2015, the City declared a housing emergency and in 2018 the County did as well and both remain in place. *See* Sept. 22 Motion (we "face an emergency today that requires strong and immediate action by the City of Los Angeles.")[54]; Resolution of the Board of Supervisors of the County of Los Angeles Declaring a Shelter Crisis, October 30, 2018. The County has done little

---

[52] *See, e.g.* Understanding Neighborhood Effects of Concentrated Poverty, Office of Policy Development and Research (Winter 2011), https://www.huduser.gov/portal/periodicals/em/winter11/highlight2.html.

[53] California Department of Housing and Community Development, Affirmatively Furthering Fair Housing Guidance for All Public Entities and for Housing Elements 4, 17 (Apr. 2021), https://www.hcd.ca.gov/community-development/affh/docs/affh_document_final_4-27-2021.pdf.

[54] City Councilmembers Gilbert Cedillo and Mike Bonin, Motion: State of Emergency (Sept. 22, 2015), https://clkrep.lacity.org/onlinedocs/2015/15-1138_mot_09-22-2015.pdf

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

to facilitate the needed expansion housing in the very low- or low-income categories. For example, in the last reporting period by the County (all unincorporated areas), from 2014 to 2019 it produced a paltry 891 units of very low- and low-income housing in an unincorporated area of over 1 million residents. In fact, in the entire unincorporated county only 6,157 housing units in total were produced. Los Angeles is now ranked as the most unaffordable city in the country, with over 60 percent of tenants paying more than 30 percent of their household income for rent and over 30 percent of tenants severely rent-burdened, paying more than 50 percent of their income for rent. Both City and County have failed to meet their housing requirements for very low, low, and moderate-income permits. The County only permitted 22.5 percent of its required very low-income projects, 24.1 percent of its low-income projects, 14 percent of its moderate-income projects, and 190.2 percent of its above-moderate income projects. This was an intentional, affirmative choice made year-after-year, knowing the implications on people experiencing homelessness and the disproportionate impact on Black Angelenos.

**B.** **Crime and Fire Incidents Have Rocketed**

40. The crisis of so many unsheltered individuals in a wealthy City and County is a tragedy in and of itself. But the tragedy has been exacerbated by a severe spike in crime both on and by homeless persons, particularly in violent attacks.[55] Los Angeles Police Department ("LAPD") citywide data from 2016 to 2020 shows a 200 percent increase in crime against persons experiencing homelessness,[56] and an increase of 354 percent of suspects experiencing

---

[55] Leonard, *supra* note 7, https://www.nbclosangeles.com/news/local/LAPD-Reports-Spike-in-Homeless-Crime-502407861.html; Matthew, *supra* note 7, https://www.lamag.com/citythinkblog/homeless-crime/.

[56] It must be noted this statistic is only available for persons who *reported* the crime; an untold number of crimes are perpetrated on persons experiencing homelessness which go unreported because the victim lacks agency, awareness, hope, or fears retribution.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

homelessness.  The top three crimes reported for both suspects and victims experiencing homelessness were assault with a deadly weapon, battery, and robbery.[57]

41.    In addressing the rise in crime within the homeless community, one City official accurately noted, "[T]here are certainly tensions that are rising within the homeless population. . . the connective tissue between them all is the increase in the concentration.  As the homeless encampments increase, so do fights over territory, over property, over intangibles, as well as domestic violence."[58]  "Personal Security Tips" have been given to County employees walking to and from civil and mental health courts, advising them "remain vigilant," "travel in numbers," and "drive in a middle or left lane" due to the criminal element rising out of surrounding homeless encampments.

42.    Crime against homeless women in particular has become a "crisis within a crisis" with 60 percent of homeless women reporting violence in the last year and 25 percent experiencing it "often" or "always."[59]  More than a quarter have experienced sexual assault in the last twelve months, and 37 percent report having experienced domestic violence in the same time period.[60]

43.    As crime has increased, so have fires.  There were 2,500 fires just involving the homeless community in Los Angeles in 2018, which is double the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[57] Nisha Venkat, *LA's homeless crime epidemic*, Crosstown (June 23, 2020), https://xtown.la/2020/06/23/homeless-crime-los-angeles/.

[58] *See* Queally, *supra* note 12, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[59] Elijah Chiland, *For women, 'living on the streets in Los Angeles is dangerous and traumatic'*, Curbed Los Angeles (Jan. 30, 2020, 2:25 PM), https://la.curbed.com/2020/1/30/21115700/downtown-womens-center-homeless-report.

[60] Downtown Women's Center, 2019 Los Angeles City Women's Needs Assessment, https://www.downtownwomenscenter.org/wp-content/uploads/2020/01/DWC-2019-Los-Angeles-Womens-Needs-Assessment.pdf (last visited June 22, 2022).

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

number of such fires in 2017.[61]  That number jumped to 3,285 in 2019 and 6,151 in 2020.[62]  53.87 percent of all fires in the City of Los Angeles are homeless-related; nearly 20 percent of all fires in the city are homeless-related arson fires. This represents a 245 percent increase in all homeless-related fires and 240 percent increase in all homeless-related arson fires since 2018.[63]  The industrial buildings and businesses downtown regularly experience fires from adjacent encampments, whether from heaters, food preparation, or arson.  Businesses are being dropped by insurance companies because of the fire risks due to the homeless living on their sidewalks.[64]  Fire hydrants are being repurposed by homeless individuals for drinking, bathing, and washing clothes and personal items, compromising fire-readiness and putting an untold number of lives and structures at greater risk in the event of a fire.[65]  There have been no observable efforts to curb the use of open flames, despite fire code provisions that prohibit them and the frequent use of open flames in homeless encampments.[66]  In fact, the *Mitchell* settlement specifically permits violations of the fire code by allowing "open-flame cooking devices" as long as they have fuel containers under a certain size.  *See* Stipulated Order of Dismissal at 11, *Mitchell v. City of Los Angeles*, Case No. CV16-01750 (C.D. Cal. May 31, 2019), ECF No. 119.

44.    Fires originating in homeless encampments are now a regular occurrence in Los Angeles County.  One of the most destructive fires in Los Angeles over the last 10 years, the Skirball Fire, was caused by a cooking fire at a

---

[61] *See* Queally, *supra* note 12, https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[62] Mitchell Decl. Ex. C, at 188, ECF No. 265-1.

[63] *Id.*

[64] Grover, *supra* note 13, https://www.nbclosangeles.com/news/local/LA-Homeless-Encampment-Fires-Insurance-Rates-Tents-Homelessness-561145811.html.

[65] Joel Grover and Amy Corral, *Firefighters Lose Critical Tool to Battle Rise in Homeless Fires*, NBC Los Angeles (July 25, 2019, 10:53 AM), https://www.nbclosangeles.com/investigations/Firefighters-Lose-Critical-Tool-to-Battle-Rise-in-Homeless-Fires-513057481.html.

[66] *Id.*

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    homeless encampment in the hills of Bel Air in 2017—which caused thousands
2    to evacuate and destroyed several houses.[67]  In July 2019, a fire broke out in a
3    homeless encampment in the Sepulveda Basin, where homeless residents report
4    they put out "multiple fires daily," burning 6 acres and destroying the
5    encampment.[68]  This unchecked chaos in the County is directly linked to and as a
6    result of the County's failure to address homelessness system-wide.

7    **C.    Public Health is Compromised**

8        45.    Beyond crime and fire, the homelessness crisis presents a pressing
9    public health predicament.  The Covid-19 pandemic drew attention to the
10   inability of the unsheltered community to maintain a sanitary environment
11   without regular access to restrooms or running water, and the potential health
12   implications for the rest of the housed community.  But even before Covid
13   existed, homelessness created significant health hazards.  The accumulation of
14   property and food storage in tents by homeless individuals has made Skid Row
15   and other areas hotbeds for flea-infested rats and other disease-carrying vermin,
16   making some areas nearly unlivable.[69]  Los Angeles declared Skid Row a "typhus
17   zone" and at least one Deputy City Attorney contracted typhus apparently from

18
19
20

21   [67] Gale Holland, Laura J. Nelson, et al., *Fire at a homeless encampment*
22   *sparked Bel-Air blaze that destroyed homes, officials say*, Los Angeles Times
     (Dec. 12, 2017, 5:55 PM), https://www.latimes.com/local/lanow/la-me-skirball-
23   fire-cause-20171212-story.html.
     [68] Ariella Plachta and Elizabeth Chou, *A Sepulveda basin encampment fire*
24   *left dozens of homeless people displaced but service providers have little to offer*
     *them*, Los Angeles Daily News (May 2, 2020, 11:01 AM),
25   https://www.dailynews.com/2019/07/31/a-sepulveda-basin-encampment-fire-left-
     dozens-of-homeless-people-displaced-but-service-providers-have-little-to-offer-
26   them/.
     [69] Lauren Fruen, *Collapse of a City That's Lost Control: Shocking New*
27   *Pictures From Downtown LA Capture The Huge Problem it Faces With Trash*
     *and Rats Amid Fear of Typhoid Fever Outbreak Among LAPD*, Daily Mail and
28   Associated Press, (June 2, 2019, 1:32 PM),
     https://www.dailymail.co.uk/news/article-7095533/Pictures-downtown-LA-
     capture-problem-faces-trash-tries-rodents.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the conditions surrounding her office building in Downtown Los Angeles.[70] LAPD Officers working Central Division downtown contracted typhoid fever, caused by contamination of human fecal matter.[71]  The United Nations noted "Los Angeles failed to meet even the minimum standards the United Nations High Commissioner for Refugees sets for refugee camps in the Syrian Arab Republic and other emergency situations."[72]  The City Controller reported that in 2017 City officials had removed 8 tons of solid waste, including 40 pounds of urine and feces from homeless encampments in **one** cleanup of **one** encampment.[73]  Los Angeles Sanitation (LASAN) estimated that its program, Operation Healthy Streets, cleared an average of 5 tons of solid waste *per day* at encampments in the City.[74]  While shelter is a good start to move people inside, without services and treatment many of those for whom shelter isn't an option continue the unhealthy behaviors on the street.

46.    In addition to the societal implications associated with unsanitary conditions related to unsheltered homelessness, it has been well-documented that the physical and mental health of unsheltered persons is significantly worse than those of their sheltered or housed counterparts.[75]  According to a report from the

---

[70] Harriet Ryan, *'Absolutely terrifying': Deputy city attorney says she contracted typhus at City Hall*, Los Angeles Times, (Feb. 9, 2019, 5:45 PM), https://www.latimes.com/local/lanow/la-me-ln-city-hall-typhus-20190209-story.html.

[71] Jaclyn Cosgrove, *LAPD employee contracts bacteria that causes typhoid fever,* Los Angeles Times, *(*May 29, 2019, 8:44 PM), https://www.latimes.com/local/lanow/la-me-ln-lapd-typhoid-fever-20190529-story.html.

[72] Report of the Special Rapporteur on extreme poverty and human rights on his mission to the United States of America, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/125/30/PDF/G1812530.pdf.

[73] Ron Galperin, Los Angeles City Controller, *Report on Homeless Encampments*, Office of the Controller (Sept. 27, 2017), https://lacontroller.org/audits-and-reports/homeless-encampments/.

[74] *Id.*

[75] Adeline M. Nyamathi and Barbara Leake, et al., *Sheltered versus nonsheltered homeless women*, J. Gen. Intern. Med. vol. 15, issue 8, at pp. 565-72 (Aug. 2000), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495574/;

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Los Angeles County Department of Public Health ("DPH"), homeless-related deaths have nearly tripled from 2014 to 2021.[76]  On average, a homeless person in Los Angeles will die 22 years earlier than the general population.[77]  An earlier homeless mortality report noted:

> A principal finding is that the overall homeless mortality rate has steadily increased over the past six years.  This means that increases in the number of homeless deaths recently reported in the media cannot be attributed solely to the fact that the total number of homeless people has also been increasing.  **Put simply, being homeless in LA County is becoming increasingly deadly.[78]**

47.    Dr. Barbara Ferrer, director of DPH conceded: "Homeless people are in fact dying at a higher rate because they're homeless."[79]  Meaning, while the PIT count increases year-after-year, the mortality rate of the unsheltered population is increasing at an even faster rate.  Below is a chart of both homeless deaths and *rates* of homeless deaths over the last several years, both of which are increasing.  Alarmingly, the deaths of people experiencing homelessness jumped 56 percent in one year, reflected by the most recent calculations.  Even removing Covid-related deaths, the increase was a shocking 42 percent.[80]

---

Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[76] County of Los Angeles, Public Health, *Mortality among People Experiencing Homelessness in Los Angeles County: One Year Before and After the Start of the COVID-19 Pandemic* (April 2022), http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

[77] County of Los Angeles, Public Health, Center for Health Impact Evaluation, *Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County* (October 2019), http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf at 5 ("The average age at death was 51 among the homeless and 73 among the general population.").

[78] *Id.* (emphasis added).

[79] Jessica Flores, *Homeless deaths in LA County doubled between 2013 and 2018*, Curbed Los Angeles (Oct. 30, 2019, 3:50 PM), https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

[80] County of Los Angeles, Public Health, *supra* note 79, http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711



Figure A: LA County PEH Deaths and Mortality Rates, 2014-2020

48.    Yet in New York City, where the number of people experiencing homelessness is high but the rate of *unsheltered* homelessness is low (5 percent compared to Los Angeles' 75 percent), the mortality rates of homeless persons compared to general population low-income adults is nearly identical.[81] Where "[m]ortality is a key health indicator" and unsheltered homeless die at a significantly faster rate than persons experience homelessness who are at least sheltered, there is no doubt unsheltered homelessness both causes and exacerbates physical and mental health problems.[82]

[81] Bonnie D. Kerker, PhD, Jay Bainbridge, PhD, et al., *A Population-Based Assessment of the Health of Homeless Families in New York City, 2001–2003*, American Journal of Public Health (Sept. 20, 2011), https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2010.193102.

[82] County of Los Angeles, *supra* note 80, http://publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf; Seena Fazel, MD, John R. Geddes, MD, et al., *The health of homeless*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

49.    Los Angeles County has acknowledged this, and in 2012 the Department of Health Services launched a program called Housing for Health, observing "[a]ccess to community based housing options is an important element of our evolving county healthcare system, particularly in response to the homelessness crisis."[83]  A study conducted by the RAND Corporation on the first 890 participants enrolled found that the cost of providing health care per participant decreased by 40 percent (from an average of $38,146 to $15,358) because there was less need for the patients to access the system.[84]

## D.    Crowded and Blocked Sidewalks Put Everyone at Risk

50.    The homelessness crisis has also impeded the use of a critical element of city life: sidewalks.  While it is true that public sidewalks exist for the benefit of all—and blocked sidewalks harm everyone who needs to use them and cannot, the harm felt by all members of society is not identical.  Free and clear sidewalks are critical for individuals using mobility devices like walkers and wheelchairs.  Municipalities have an obligation to ensure that public sidewalks are usable and compliant with ADA requirements, such as providing a minimum of 36 inches of clearance for wheelchair users, yet the City had regularly ignored its obligations and failed to provide such clearance.  Encampments throughout

---

*people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations*, The Lancet, vol. 382, issue 9953, pp. 1529-40  (Oct. 25, 2014), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(14)61132-6/fulltext; County of Los Angeles, *supra* note 79, http://publichealth.lacounty.gov/chie/reports/Homeless_Mortality_Report_2022.pdf.

[83] Health Services of Los Angeles County, *Housing for Health,* https://dhs.lacounty.gov/lacusc/our-services/housing/ (last visited June 23, 2022).

[84] Sarah B. Hunter, Housing for Health; Los Angeles County's Department of health Tackles Homelessness with an Innovative Housing Program That Saves Money, The Rand Blog (Jan. 18, 2018), https://www.rand.org/blog/2018/01/housing-for-health-los-angeles-countys-department-of.html (Notably the County experienced a net savings of 20% even taking the costs of housing into consideration (from an average of $38,146 per participant to $30,646). Of course, this number doesn't take into consideration the additional savings from other departments such as reduced law enforcement contacts.

1  the City and County block sidewalks and public rights-of-way.  Those

2  encampments will be significantly reduced under this new agreement.

3  **E.** **Environmental Impact**

4        51.      The unhealthiness of the homelessness crisis extends to the

5  environment.  There appears to be no environmental impact study of the kind of

6  widespread and systemic homelessness in Los Angeles.  Yet all indications show

7  the impact has been significant.[85]  Every day, businesses and residents find used

8  needles in their drains, on sidewalks, and in gutters.  Los Angeles County has far

9  more unsheltered people than Orange County, and officials there recovered over

10  14,000 hypodermic needles, plus over 5,000 pounds of "hazardous waste"

11  including human waste, and toxic chemicals such as propane, pesticides,

12  solvents, and paint during a clean-up of a homeless encampment in the Santa Ana

13  Riverbed consisting of approximately 1400 people. [86]  While City sanitation

14  workers are deployed to identify and discard toxic waste, only 30 teams are

15  working to cover 500 square miles,  human waste, and other toxic substances is

16  regularly making its way into our ecosystems.

17        52.      The Environmental Protection Agency recognized this issue in a

18  letter addressed to Governor Gavin Newsom:

19           The EPA is aware of the growing homelessness crisis
            developing in major California cities, including Los
20           Angeles and San Francisco, and the impact of this crisis
            on the environment.  Indeed, press reports indicate that
21           "piles of human feces" on sidewalks and streets in these
            cities are becoming all too common.  The EPA is
22           concerned about the potential water quality impacts
            from pathogens and other contaminants from untreated
23           human waste entering nearby waters.  San Francisco,

24

25        [85] Courtenay White, *Environmental Impacts of Homeless Encampments in
    the Guadalupe River Riparian Zone*, School of Environment and Sustainability,
    Royal Roads University (Nov. 19, 2013),
26  https://viurrspace.ca/bitstream/handle/10170/665/white_courtenay.pdf?sequence=
    1&isAllowed=y.
27        [86] Anh Do, *'Eye-popping' number of hypodermic needles, pounds of waste
    cleared from Orange County riverbed homeless encampment*, Los Angeles Times
28  (Mar. 10, 2018, 4:30 PM), https://www.latimes.com/local/lanow/la-me-ln-
    riverbed-debris-20180310-story.html.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

31

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

> Los Angeles and the state do not appear to be acting with urgency to mitigate the risks to human health and the environment that may result from the homelessness crisis.[87]

53.    Thousands of people camp in or near the Los Angeles River basin, without access to toilets and sanitation services.  The amount of related toxic and human waste making its way into our environment is, upon information and belief, substantial, but its full scope is unknown.[88]  The Ballona Wetlands have been ravaged by nearby encampments through raw sewage dumps, needles, and fires.[89]

54.    The environmental impact of fires arising out of homelessness is also of great concern.  Fires originating in homeless encampments are not just a potential threat—they have actually destroyed thousands of acres of brush and wildlife.  The sweeping footprints of the County of Los Angeles encompass vast amounts of undeveloped land, full of dry brush and other readily combustible material.  Such areas are an attractive location for many people experiencing homelessness wishing to reside "off the grid" and the combination of propane-fueled cooking fires and bootlegged electricity in untended conditions is a recipe for, and indeed has already resulted in, massively destructive fires.

## F.    Property Values and Businesses are Affected

55.    Another casualty of the homelessness crisis is the value of property and businesses.  Downtown Los Angeles has experienced a renaissance over the last 20 years with loft conversions, hundreds of new restaurants, and until

---

[87] Letter to Governor Gavin C. Newsom from Andrew R. Wheeler, September 26, 2019, https://www.epa.gov/sites/production/files/2019-09/documents/9.26.19_letter-epa.pdf.

[88] Anna Almendrala, *Fecal Bacteria in California Waterways Increases With Homelessness crisis*, CaliforniaHealthline.org (Jan. 6, 2020), https://californiahealthline.org/news/fecal-bacteria-in-californias-waterways-increases-with-homeless-crisis/.

[89] Erika D. Smith, *Trash, needles and fire. He's watching homelessness destroy the Ballona Wetlands*, Los Angeles Times (June 17, 2021, 5:00 AM), https://www.latimes.com/california/story/2021-06-17/hes-watching-la-homelessness-destroy-ballona-wetlands.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

recently over 3,000,000 square feet of office space under construction.[90]  That renaissance is now in jeopardy due to the homelessness crisis.  Businesses are suffering and property values have been affected.  The average apartment occupancy rate, rent pricing, number of sales, and sale price per square foot downtown have all decreased from 2018 numbers correlating with a rise in homelessness at the same time.  Businesses throughout Los Angeles, such as Desuar Spa on 5th Street, owned by Deisy Suarez, and Exclusive Motors on Venice Boulevard, owned by George Frem, both described *infra*, have customers declining to utilize their services due to nearby encampments.  A recent article describes in detail Venice's inability to keep pace with the property market due in large part to the homelessness crisis.[91]

56.     Nowhere is the impact felt more strongly than on Skid Row itself, where encampments are visibly choking out local property owners and businesses.  Plaintiff Joseph Burk can no longer maintain tenants in his building and production companies are declining to work there due to the surrounding environment.  He has been trying to sell the property but the offers he receives have been less than half of what other comparable properties receive in neighboring areas and even then buyers have dropped out of escrow due to concerns about the area.  He has been trying to rent the property, but no one will rent it.  He and his wife had been living there, but due to the conditions on the sidewalk outside his home, it is unlivable.  He is now saddled with what should be a valuable building that is near-impossible to sell, rent, live in, or use for

---

[90] Vivian Marino, *Revitalization Projects Reawaken Downtown Los Angeles*, The New York Times (Mar. 5, 2019), https://www.nytimes.com/2019/03/05/business/revitalization-projects-reawaken-downtown-los-angeles.html; Andrea Lo, *How downtown Los Angeles made a stunning comeback*, CNN.com (Feb. 16, 2017, 9:09 PM), https://www.cnn.com/2017/02/15/architecture/downtown-la-revival/index.html.

[91] Katy McLaughlin, *The Venice Real-Estate Market Is Unstoppable No More*, The Wall Street Journal (Mar. 4, 2021, 12:45 PM), https://www.wsj.com/articles/the-venice-real-estate-market-is-unstoppable-no-more-11614879936

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

business purposes—all due to conditions outside his property that are beyond his control, but *are* directly within the City's control.

57.     Alliance member Lisa Rich's family has owned commercial property in the Skid Row area for decades, but she is now having to heavily discount the rents she charges, repair at least one building damaged by fires at a cost of $80,000, and pay four times her prior premiums for fire insurance.  These burdens have her considering abandoning all financial dealings in the area. Alliance member Mark Shinbane has difficulty hiring and retaining employees, has had to replace doors and fences, has to clean the perimeter of the building multiple times per day, and has had to hire additional staff to handle cleaning and maintenance, all at economic cost.  Plaintiff Harry Tashdjian has been forced to spend over $100,000 on upgraded fire and security systems and pest control just in the last few years while simultaneously losing customers due to the property's surroundings.

## G.     The Homelessness Crisis Harms Society

58.     The County, as the provider of last resort, has the obligation to "relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident . . . when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."  Cal. Welf. & Inst. Code § 17000.  The purpose animating section 17000 is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed."  Cal. Welf. & Inst. Code § 10000.  The County is also the entity who oversees and implements Medi-Cal and now CalAIM and is under the obligation to provide mental and physical healthcare to all who qualify for MediCal (which is just about everyone who is experiencing homeless) but fails to do so.  The "incompetent, poor, [and]

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

34

indigent persons" are not being relieved and supported, nor is "protection, care, and assistance" being given to those who desperately need it.  The result is readily observable: squalor, lawlessness, disease, and death.

**H.** **The County is Wasting Crucial Funds that Could Alleviate this Man-Made Disaster**

59.     The County has squandered massive amounts of homelessness-related funds, using its substantial revenue from Measure H and state and federal funds together to fund homeless-relief projects which have no chance of achieving the goal for which they are intended.   For the 2022-2023 fiscal year, the County is proposing a $38.5 billion budget, which includes a $532.6 million "Homeless Initiative" spending plan, $466 million of which comes from Measure H, and another $65.86 million came from the state.  Measure H was described as a tax voted for by county residents in 2017 to "fund mental health, substance abuse treatment, health care, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals, and other homeless adults."[92]  Of the 12 areas of homeless support articulated by Measure H and approved by the voters, LA County is unilaterally choosing to spend nearly all of its substantial funds (73.4 percent) on permanent and interim housing, and very little on anything else.  The LA County Homeless Initiative—which plans for and spends Measure H dollars—describes the focus of the spending plan as one "that significantly expands permanent and interim housing solutions and increasing funding for

---

[92]Los Angeles County, California, Sales Tax for Homeless Services and Prevention, Measure H, Ballotpedia.org (March 2017), https://ballotpedia.org/Los_Angeles_County,_California,_Sales_Tax_for_Homeless_Services_and_Prevention,_Measure_H_(March_2017).

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

local cities."[93]  Yet that's not what the voters approved: "mental health, substance use treatment, healthcare, education, and job training" don't even make an appearance on the County's Homeless Initiative budget, which instead includes line-items like "justice reform" which are not found in the voter-approved ballot. The Final Adopted Budget of the Department of Mental Health for FY 2021-2022 reported only $12.3 million of its allotted funds coming from Measure H which represents only 0.4 percent of DMH's budget, and only 2.3 percent of Measure H funds.  And there is nothing at all about substance abuse treatment. Measure H promised the voters real, significant services in specific areas that the public saw as valuable; once the County had the initiative locked, it took those dollars and used them for whatever *it* wanted to.  Such a bait-and-switch is not only unlawful, but also an anathema to our democratic process.

60.    Los Angeles County's Department of Mental Health (DMH) is also quite literally leaving money on the table by failing to apply for reimbursement for Mental Health Medi-Cal Administrative Activities (MH-MAA).  Alameda County was able to increase its receipt of these funds by millions of dollars, whereas Los Angeles County's claims actually decreased in the 2019-2020 year, barely taking advantage of this fee-for-service opportunity.[94]

61.    And of DMH's $3 billion budget, only 1 percent comes from the County itself, with the remaining funds coming from various taxes and grants. That 1 percent is the absolute minimum the County must do as a "maintenance of effort" to continue to receive state and federal funds.  Which means out of the County's nearly $40 billion general fund budget, only 0.1 percent is dedicated to

---

[93] The Los Angeles County Homeless Initiative, $532.6M Homeless Initiative Spending Plan for FY 2022-23 (May 17, 2022), https://homeless.lacounty.gov/news/la-county-prepares-to-intensify-and-refocus-its-fight-against-homelessness-as-board-of-supervisors-approves-532-6m-spending-plan-for-fy-2022-23/.

[94] Claudia Boyd-Barrett, *As Need for Mental Health Care Surges, A Funding Program Remains Underused*, California Health Report (Feb. 9, 2021), https://www.calhealthreport.org/2021/02/09/as-need-for-mental-health-care-surges-a-funding-program-remains-underused/

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the Department of Mental Health.  Given the massive crisis and lip-service desire to address that crisis, that sort of spending is both shameful and constitutionally deficient.

62.  Since the passage of Measure H and its concomitant additional hundreds of millions of dollars for housing and services, the homeless population in LA County has **risen** from 57,794 to 66,436 (a 13 percent increase, as of the 2020 point-in-time count).  The problem is outpacing the solution and the County has failed to utilize the funds in a manner that would effectuate the goal. [95]

## I.  LA County Is Failing to Meet its Statutory Mandate, Directly Resulting in the Death and Destruction on the Street of Los Angeles

63.  The County has failed to meet its statutory obligation to properly administer and provide mental and healthcare services.[96]  Outreach workers and service providers report that drug rehabilitation treatment and accessible and appropriate mental health services are nearly impossible to come by.  This is catastrophic news in light of California Policy Lab's finding that 78 percent report mental health conditions and 75 percent report substance conditions.[97]

64.  The County Board of Supervisors recognizes the "minimum number of beds required to appropriately meet the [community's mental health] need is

---

[95] County of Los Angeles, *County develops action plan for homelessness prevention* (Dec. 16, 2019), https://homeless.lacounty.gov/news/county-develops-action-plan-for-homelessness-prevention/ (approximately 133 people per day are finding some sort of housing, while an estimate 150 people per day are entering homelessness); Erika D. Smith, *In 2019, homelessness truly felt like a crisis in every corner of L.A.*, Los Angeles Times (Dec. 20, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-12-10/homeless-housing-crisis-los-angeles.

[96] *See* Cal. Welf. & Inst. Code § 13000-13008; 14000 *et seq.*, 5600 *et seq.*, and 17000 *et seq.*

[97] *See* Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  50 public mental health beds per 100,000 individuals.  In Los Angeles County

2  there are only 22.7 beds per 100,000 individuals."[98]

3       65.    The Department of Mental Health (DMH) conducted an

4  investigation and issued a report that summarized the capacity issue:

> [There is a] serious deficit in LA County's mental
> health system of care. Our system is not delivering
> enough highquality mental health hospital services to
> meet the need, and the effects of this deficit are dire:
>     • The Department of Health Services' psychiatric
> emergency rooms are severely overcrowded, with
> patients sometimes having to stay several days while
> they wait for a hospital bed.
>     • On any given day, four to five thousand
> individuals with serious mental illness and often
> cooccurring substance use disorder are incarcerated in
> LA County justice systems and need care. Many of
> their incarcerations could have been prevented entirely
> had they received needed treatment.
>     • Roughly 25 percent of adult homeless
> individuals in LA County have a serious mental illness
> and need care. These individuals often cycle in and out
> of hospitals and justice systems without ever being put
> on a sustainable path to recovery.
>     • Readmission rates at our mental health
> hospitals are far too high. According to a recent
> analysis by an outside consultant, our Medi-Cal fee-for-
> service hospital network in LA County has an average
> 30-day readmission rate of 37.8 percent. The national
> average is closer to 20 percent.
>     • Too many clients are getting stuck in our
> hospitals because there aren't enough post-hospital beds
> and services. Waitlists to transition to the next level of
> care are long and getting longer, especially for hospital
> clients on a mental health (LPS) conservatorship.
> Special populations, such as those who are currently or
> formerly justice-involved, those with co-occurring
> substance use disorder or co-morbid physical health
> conditions, those older than 65, and the
> developmentally disabled, are especially difficult to
> place.
>     [. . .]
>     These experts come from different backgrounds
> and parts of the system, and they didn't always agree on

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

---

[98]Motion By Supervisors Kathryn Barger and Hilda Solis, *Addressing the Shortage of Mental Health Hospital Beds* (Jan. 22, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf; *see also* E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

the nuances of the problems or ideal solutions to address them. But there was general agreement on three things:
        • There is indeed a shortage of mental health hospital services for those who truly need them.
        • Creating new hospital beds is unlikely, on its own, to resolve this shortage.
        • The only way we can sustainably address this problem is to look at the whole system of mental health beds and services, including those that play a role prior, during, and after hospital stays, and address all of the factors (e.g. capacity and service quality) across this continuum which in combination act to constrain the availability of mental health hospital beds.

66.    The report went on to identify "significant gaps in inpatient treatment beds, residential beds, shelter beds, and respite homes across all ages" including an "estimate of 3,000 additional subacute beds needed," "significant gaps in assisting people when they are leaving inpatient care, especially for those with co-occurring disorders," "no SUD (substance use disorder) residential treatment for all ages," "no local children's inpatient psychiatric beds," "not enough inpatient beds for patients eligible for conservatorship…with waiting periods of up to a year to access secure inpatient care, resulting in people being discharged to the street and perpetuating homelessness."[99]

67.    Because of this considerable shortage, courts are unable to declare many persons conserved because there's nowhere for them to go, and the system designed to address these issues is massively overburdened.  At Olive View Hospital in north Los Angeles County, the 72-hour crisis ward often has over half of its 16 beds dedicated to patients waiting up to a year for a residential inpatient bed, leaving only a handful of other beds available for emergency 5150 holds; Olive View is the only crisis facility in north Los Angeles County and meant to serve millions of people.  If a person is brought in while in crisis but there are no

---

[99] Jonathan E. Sherin, *Report Response to Addressing the Shortage of Mental Health Hospital Beds (Item 8, Agenda of January 22, 2019)*, Department of Mental Health 30, 134 (Oct. 29, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

beds for them, often they are released back on the street.  This dynamic repeats itself throughout Los Angeles.  The report goes on to document "limited access to urgent care for MH (mental health), SUD and services to people with co-occurring disorders at all levels of care," "MH and SUD treatment is not integrated" (the so-called "silos of care"), and "to access care you have to 'win the lottery,' have a chronic level of need that requires hospitalization, or become incarcerated.  **Mild cases become severe while people are trying to connect to care.**"[100]  Critically: "A lack of housing options contributes to homelessness."[101]  As of December, 2020, only 156 of the proposed (minimal pilot) 500 additional beds had been procured.[102]

68.    As of 2018 the County had almost $1 billion in unused funds allocated to it through the Mental Health Services Act (MHSA), and while there has been some expenditure since, there has been no clarity about how much remains in the fund unspent. [103]  According to data released earlier this year from the Mental Health Services Oversight and Accountability Commission—an entity run by the State of California—Los Angeles County's MHSA account closing balance at the end of the FY 2020-2021 year was $1,040,422,091.[104]  The County of Los Angeles identified the remaining funds at the end of the 2021-2022 fiscal year to be $537,463,000 plus a canceled obligated fund balance of $361,513,000 for a total of $898,976,000.[105] Of course some of that might be encumbered, which is unreported, but however the pie is sliced the resulting conclusion is the

---

[100] *Id*. at 135.
[101] *Id*. at 141.
[102] *Id*. at 180-85.
[103] Thomas Curwen, *With an epidemic of mental illness on the streets, counties struggle to spend huge cash reserves*, Los Angeles Times (Aug. 19, 2018, 5:00 AM), https://www.latimes.com/local/california/la-me-mhsa-unspent-balance-20180819-story.html.
[104] Mental Health Services Oversight and Accountability Commission, Fiscal Transparency Dashboard, https://mhsoac.ca.gov/transparency-suite/fiscal-transparency-dashboard/.
[105] County of Los Angeles, 2022-2021 Recommended Budget, Volume Two (April 2022), https://ceo.lacounty.gov/wp-content/uploads/2022/04/2022-23-Recommended-Budget-Volume-II-Final-with-AC-Edit-Online-Version.pdf.

40

same: there are hundreds of millions of dollars available specifically for mental health treatment and residential facilities, yet year-after-year the County fails to utilize these funds for their intended purpose.  And that money goes to waste while those desperate for treatment get sicker on the street.

69.     The County points to the state's antiquated and restrictive conservatorship laws and the Federal government's refusal to permit Medicaid finances for mental health beds for facilities of more than 16 beds, both of which need to be addressed.  Yet even under the existing scheme, help would be available to those who desperately need it, were there is sufficient capacity at all levels.  Local courts could conserve many severely mentally ill persons who are unable to care for themselves, were there sufficient beds available.  The blame for insufficient placement rests squarely on the County's shoulders. And people suffering from very serious mental diseases decline, living on the street instead, many of whom pay the ultimate price.[106]

70.     Together, the County and City fund LAHSA, which has been totally ineffective at stemming the growing tide of homelessness.  LAHSA takes direction from the City and the County.  Among LAHSA's shortcomings is the failure to move people up and out from emergency shelters and bridge shelters to permanent housing.  The agency has been so disorganized, it apparently recently discovered 3,000 units they "didn't know about" in their system.[107]  An audit conducted by LA City Controller Ron Galperin found LAHSA outreach workers fell far short of their goals, placing only 4 percent of people assessed into

---

[106] Dennis McDougal, *Op-Ed: My daughter was murdered, but it was misguided mental health laws that put her in danger,* Los Angeles Times (Jan. 26, 2020, 3:00 AM), https://www.latimes.com/opinion/story/2020-01-26/i-hope-police-catch-my-daughters-killer-but-i-know-her-mental-illness-also-played-a-role-in-her-death.

[107] Elijah Chiland, *Agency responsible for housing LA's homeless discovers 3,000 units it 'didn't know about*, Curbed Los Angeles (Feb. 20, 2020, 2:25 PM), https://la.curbed.com/2020/2/20/21145578/lahsa-units-homeless-housing.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

permanent housing and 14 percent into shelters, only 6 percent for SUD treatment and only 4 percent for mental health treatment.[108]

## J.   The County Has Not Proffered Workable Comprehensive Solutions

71.   The State of California has transferred the responsibility for the social safety net directly onto the County's shoulders, and provides money to accomplish that obligation.  Indeed, the County spends vast sums of money but the result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such exorbitant expenditures, because the funds are being used in ways that will never solve nor even substantively address the problem.

72.   And so the crisis continues and accelerates, with little hope of a resolution.  Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs are suffering under the weight of an urgent crisis. Plaintiffs are left with no choice but to resort to the courts for relief.

## K.   The City Has Stepped Up But the County Refuses To Do the Same

73.   Plaintiffs filed this case in March, 2020, with the goal of aligning City and County efforts into one comprehensive approach to unsheltered homelessness in a manner which would at minimum triage the crisis to help people off the street and stay off the street, for the health and safety of both the housed and unhoused communities.

74.   After two years, the City is now making significant efforts to ameliorate this crisis by entering into an agreement with the Plaintiffs to rapidly provide shelter and housing for the unhoused which is desperately needed, and judicial supervision for five years to make certain that goal is realized.  It has also

[108] Ron Galperin, LA Controller, *Strategy on the Streets: Improving Los Angeles Homeless Services Authority's Outreach Program*, Ron Galperin LA Controller (Aug. 28, 2019), https://lacontroller.org/audits-and-reports/strategy-on-the-streets/#1566867736032-c107d667-baf7.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

agreed to deadlines and mandates for creation of shelter and housing, as well as encampment engagement, cleaning, and reduction.

75.    However, providing housing alone without supportive services to assist people experiencing homelessness address any underlying issues that caused or resulted from the person's homelessness, is not going to help the person stay housed.  And some services—in particular clinical services such as mental health and drug rehabilitation treatment—are the sole province of the County and represent the most significant need for the homeless population.

76.    As noted previously, California Policy Lab has reported that 78 percent of unsheltered individuals suffer from mental health conditions, and 75 percent suffer from substance use, compared to 50 percent and 13 percent sheltered individuals respectively.[109]  Recently the Policy Lab cross-referenced records between LAHSA and DMH to discover that a full 10 percent of individuals who were unsheltered between 2019-2020 had been diagnosed with Psychotic Spectrum Disorder in the prior five years, and another 7 percent had been diagnosed with a serious mental illness.[110]  The LA Times reports that 67 percent of homeless individuals suffer from mental illness or a substance disorder.[111]  Addressing these two issues is crucial for helping people who have experienced homelessness to become healthy again.  And only the County can do so.

77.    Substance Use Disorder has been the number one driver of homeless deaths since the County Coroner's Office began tracking the issue. In the 2020-

[109] *See* Rountree, *supra* note 8, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

[110] Colin Caprara, Dean Obermank, et al., *Serious Mental Illness among People who are Unsheltered in Los Angeles*, California Policy Lab (May 2022), https://www.capolicylab.org/wp- /uploads/2022/05/Serious-Mental-Illness-Among-People-who-are- content Unsheltered-in-Los-Angeles.pdf.

[111] Doug Smith, Benjamin Oreskes, *Are many homeless people in L.A. mentally ill? New findings back the public's perception*, Los Angeles Times (Oct. 7, 2019, 3:00 AM), https://www.latimes.com/california/story/2019-10-07/homeless-population-mental-illness-disability.

43

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

2021 year (the latest Homeless Mortality Report to be released), homeless deaths surged 56 percent compared to the year before.  Overdose deaths increased by a shocking 78 percent.  County Supervisor Hilda Solis noted "The findings in this report reflect a true state of emergency on the streets across our County.  In a civil society, it is unacceptable for any of us to not be profoundly disturbed by the shocking needs documented in this year's homeless mortality report."[112] Yet no one at the County—including Supervisor Solis—has responded as if in an emergency.  Instead, it's business as usual.

78.    The County has the obligation to provide for mental health and substance use disorder treatment as mandated by California Welfare and Institutions Code sections 5600 *et seq*., 13000 *et seq.*, 14000 *et seq.* and 17000, all of which together require counties to provide comprehensive residential and non-residential mental health and substance use treatment.  Yet the County fails to do its job at every step.

79.    As Council President Martinez noted during the press conference announcing the City/LA Alliance settlement: "Mental healthcare, substance abuse treatment, outpatient rehab beds. That is the county's responsibility. We need you. We can't do this alone, and quite frankly, we shouldn't have to. . . . We need to prevent people from falling into homelessness because right now we're in triage mode.  We need to focus on how to prevent the people from ending up on our streets. People need help. People need services, and that's how you fix the crisis. And what good is building housing if you can't provide the services that people need? The county is the one with the $3 billion mental health department. What good is that if you're not using it to help the most vulnerable, those that are living in our streets with mental health issues?"  And as Councilmember DeLeon

---

[112] Christian Martinez, Rong-Gong Lin II, *L.A. County homeless deaths surged 56% in pandemic's first year. Overdoses are largely to blame*, Los Angeles Times (Apr. 22, 2022, 7:06 PM), https://www.latimes.com/california/story/2022-04-22/la-county-homeless-deaths-surge-pandemic-overdoses.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

summarized: "Those individuals suffering from severe mental illnesses and substance abuse will be the sole responsibility of the County because they always have been the sole responsibility of L.A. County."

80.     The picture that results is undeniable: the County has the obligation to provide mental health and substance use disorder treatment, it has the resources to do so, and its leaders have acknowledged it is failing in its obligation to provide that treatment and related services, and because of its abject failure, there is desperation and devastation on the streets.

## IV.  THE PARTIES
## PLAINTIFFS AND INDIVIDUALIZED HARMS

81.     **LA ALLIANCE FOR HUMAN RIGHTS** (the "Alliance") is an incorporated non-profit membership association consisting of a broad coalition of Los Angeles stakeholders who understand that homelessness in LA is a human rights crisis and are working towards solutions to address the crisis and its related impact on health and safety issues throughout the region.  Each of its members is a resident of Los Angeles City which is within Los Angeles County.  All individual plaintiffs herein are members of the Alliance and the following are representative of the membership:

a.     **MARIA DIAZ** is a Hispanic woman who was until recently living in a tent in Skid Row, where she had been for the last 5 years.  Over the past five years, Ms. Diaz regularly witnessed individuals selling drugs, stealing belongings, and attacking others for no apparent reason.  She has also seen a number of young women harassed, attacked, raped, and ultimately succumb to drug addictions due to the conditions of Skid Row.  Harassment for women on Skid Row is a certainty, and Ms. Diaz herself experienced it.  The trauma she has experienced while living on skid row has caused her pain, suffering, and psychological damage.

Spertus, Landes & Unhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

b.   **CHESTINA EVANS** is a Black woman who has lived on Skid Row for over a year.   Ms. Evans has been mostly homeless after aging out of the foster care system.  She did not have access to any transitional program and did not have any resources or know where to go, so she found herself homeless fighting for survival.  Ms. Evans left the bay area for Skid Row because she believed there was more opportunity to receive resources and exit homelessness on Skid Row.

Living on the streets in Skid Row has been incredibly hard for Ms. Evans. She is frequently assaulted and attacked.  Soon after arriving in Skid Row, Ms. Evans was attacked by a homeless man.  He wrongly accused her of taking his belonging and hit her hard in the face, knocking her onto the ground.  Ms. Evans doesn't feel she has any recourse; calling the police will have little consequence since they rarely do anything about attacks on Skid Row.  Ms. Evans has also been sexually assaulted while living on Skid Row by men who prey on women. Her time on the streets has exacerbated her severe mental health issues.  She suffers from depression, anxiety, uncontrolled anger and fear, and paranoia. Perhaps most taxing is that despite whatever internal turmoil she feels, Ms. Evans feels like she cannot break down or address her emotions because showing weakness on the streets puts her life in danger.  Ms. Evans has sought help for her mental health issues but continues to be stone-walled.  She has accessed Department of Mental Health, but the wait times between appointments makes them completely useless.  She needs a place where she can go that will address her mental health issues while inside.  She does not think her mental health issues can possibly be addressed while living on the street.  She takes illegal narcotics to try to treat her mental issues and to stay up all night because she fears attacks at night.  Her behavior is erratic and unpredictable due to her mental illness and drug use.

Ms. Evans has been in two shelters. She first stayed at the Union Rescue Mission but left for Weingart Center where she shared a room with another woman. She was asked to leave following an altercation with her roommate. Ms. Evans and her roommate argued over her roommate's continued use of drugs in their shared living space, as well as her use of loud music at all hours. At the time she was trying to stop taking drugs, and her roommate's continued use of narcotics made that impossible. She has been told she has a "dual diagnosis" of serious mental illness and drug addiction, but she doesn't even remember which one came first. She would love an opportunity to stay at another shelter, but she knows that without addressing her underlying mental health issues she won't be successful. She can't control herself and will get in trouble. She needs a place where she can also address her ongoing serious mental health issues at the same time. Ms. Evans' experience living on the streets has caused her physical, emotional, and mental harm.

c.    **SHINAE OWSLEY** is a Black woman recently homeless and unsheltered in Skid Row. She is originally from South Central and after high school attended California State Dominguez Hills. Unfortunately, her serious mental health issues lead to drug abuse, which led to prison. Ten years ago, Ms. Owsley was released from prison. Following her release, Ms. Owsley began receiving SSI for her anxiety and other mental health concerns. Ms. Owsley is a hard worker and seeks to get off SSI soon. And she recognizes that having reliable shelter is essential to this goal. Ms. Owsley has had a difficult time living on Skid Row. She is sexually harassed by men regularly and was recently attacked by another female. She witnesses crime and violence daily and is terrified of living in the streets. She wants to get clean and sober, but it is impossible to do so while living unsheltered in Skid Row. She needs help but has no idea where to start. Since she has lived on Skid Row, not a single social worker or County or City worker has approached Ms. Owsley offering to assist

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

her in obtaining services or housing.  If she had the opportunity for shelter anywhere, she would jump at that opportunity.  But she knows that she desperately needs treatment as well.

d.     **CHRISTOPHER ROPER** is a Black man living in Skid Row.  He has been homeless for two years.  He has a traumatic brain injury, so it is hard to keep a job.  He first began experiencing homelessness when he lost his job and was unable to pay his rent.  Before living in Skid Row he lived in Long Beach, Santa Monica, and Venice.  He eventually made his way to Skid Row because he knew resources for those experiencing homelessness were supposed to be available there, like food and showers.  Homelessness has been hard for Mr. Roper physically and mentally.  He does not have a tent and sleeps directly on the street, exposed to the elements.  He is freezing during the winter and it affects his health.  Living on Skid Row has exacerbated his brain injury, which he first suffered in 1992.  A side effect of that trauma is a shortened memory, which has only worsened since living in Skid Row.  He can't keep track of his paperwork and loses things often, which makes it more difficult to get shelter and services.  But there is no one to help him.  Mr. Roper also suffers from depression and anxiety which is so much worse in Skid Row due to the horrific environment.  He tries to stay away from the violence and fires, but he sees it often.  He is hopeful that the Department of Mental Health will help him find housing, so he keeps asking but is told it isn't available.

e.     **MILTON MILES SMITH** is a sixty-year-old unhoused Black male living in Skid Row.  Mr. Smith was born and raised in the Hollywood area.  Mr. Smith has been living in Skid Row since 2018 after being released from prison.  After initially becoming homeless, Milton went to The Center in Hollywood.  He met his friend Albert Albarran at The Center.  They eventually made their way to Skid Row together to try to get housing.  Mr. Smith is on SSI. While in prison, Mr. Smith was attacked, and his lung almost collapsed.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    Mr. Smith has several mental health issues including post-traumatic stress

2    disorder, schizophrenia, paranoia, anxiety, and a learning disability.   He is scared

3    every day that he is forced to stay on the streets.  He is afraid that if he sleeps at

4    night he will be killed.  He sometimes takes drugs to deal with the stress and to

5    keep himself awake, but he does not like using drugs and is trying to stop.  It's

6    impossible for him to address his substance use disorder or mental health issues

7    while unhoused in Skid Row.

8    f.    **ALBERT ALBARRAN** is a Hispanic male currently living

9    in an SRO called Rainbow Apartments, located in Skid Row.  His friend, Milton

10    Miles Smith, helped him apply for and secure this housing.  Albert was

11    previously homeless.  He met his friend Mr. Smith at The Center in Hollywood,

12    they both eventually came to Skid Row because there are more opportunities for

13    housing in this area.  He does not feel safe living in Skid Row and wants to leave

14    but does not have an opportunity anywhere else.

15    Mr. Albarran has several physical issues that began after he was hit by a

16    car when he was fifteen years old.  He suffered a traumatic brain injury which has

17    resulted in a short-term memory issue and has a metal rod in his leg.  This

18    memory problem increases his danger living in Skid Row, as Mr. Albarran often

19    forgets what street he lives on and is terrorized by gangs and violent drug users in

20    the area.  The stress of living in Skid Row has also made his short-term memory

21    issue worse.  Mr. Albarran suffers from depression, post-traumatic stress

22    disorder, and anxiety.  Despite these physical and mental problems, Mr. Albarran

23    was cut-off from mental health services because he was deemed "too high-

24    functioning."

25    g.    **MARK SHINBANE** is the President and part-owner of Ore-

26    Cal Corporation which is a family-owned business in the Skid Row area.  He has

27    also been the Chairman of Central City East Association (CCEA) for several

28    years.  Ore-Cal Corporation is an international seafood importer, processor, and

distributor.  It is a second-generation family-owned-business and they have owned property in the general area since 1961.  Ore-Cal has been located on 634 Crocker Street since 1971.  Four years ago, Crocker Street and other streets in that vicinity—such as 6th Street, 7th Street and Towne Avenue—were clear.  Mr. Shinbane recalls small homeless encampments west of San Pedro Street on San Julian Street and Wall Street in the past, but personal possessions were generally kept contained, crime was generally addressed, and the sidewalks were usable.

In 2016, immediately after the injunction issued in *Mitchell v. City of Los Angeles*, the neighborhood surrounding Ore-Cal rapidly filled with tents and encampments, inundating the area, which coincided with an increase in violence and an inability to traverse the sidewalks.  Individuals loiter at all times of the day, and the encampments block sidewalks, doorways, driveways, and streets.  Mr. Shinbane regularly observes open drug use and people walking in a perpetual drug-induced state, and bodies lying on the sidewalks or doorways near his building.  There has been an increase of used needles on the streets, sidewalks, and inside drains located on the business' property.

Mr. Shinbane's conversations with LAPD officers and detectives in the area indicate that gang members are supplying narcotics to homeless individuals in the vicinity.  Mr. Shinbane and his employees now deal with the inability to traverse the sidewalks.  Encampments often block sidewalks, doorways, driveways, and streets.  Illegal entry onto their property, car break-ins, and thefts are now a common occurrence.

Ore-Cal and its employees are subject to an increased risk of fire because of the encampment fires that surround the property.  This danger is made worse by the huge quantities of trash and debris that litter their street and surrounding neighborhood.  These conditions have made it difficult to hire new workers and they have lost many well-qualified candidates (approximately 30 percent) due to

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the nature of the neighborhood and environment.  This makes the hiring process longer, and more difficult than it ever used to be.

To combat some of the deteriorating conditions, Mr. Shinbane's business has completely fenced its property to prevent individuals from camping on their grounds and to keep the used needles from the rampant narcotics use from being fed into their exterior drains. Mr. Shinbane was forced to replace roll up doors and add sections of fence due to individuals constantly urinating on them, a cost of $25,000.

Ore-Cal has also had to significantly increase its exterior maintenance by washing and sanitizing the perimeter of their facility daily.  In some cases, it is necessary to clean multiple times a day to maintain cleanliness.  He now spends $15,000 a year—a new expense—on supplies and staff dedicated to maintaining the perimeter and external areas of their facility.

h.   **HAL BASTIAN,** a commercial real estate professional in Los Angeles for 38 years and has been one of the leaders of the Downtown Los Angeles Renaissance for the last 27 years.  From 2001 to 2014, he served as the Director of Economic Development for the Downtown Center Business Improvement District (DCBID), and eventually, its Executive Vice President. During this time, Mr. Bastian facilitated the construction of over 22,000 housing units, leading tours and producing special events that recruited thousands of new residents and resulted in the construction of dozens of new commercial and mixed-used developments, and attracting over 300 new businesses to the downtown area, including Ralphs, Fresh Fare, Bottega Louie and Whole Foods Market.  He lives in Downtown Los Angeles.

Mr. Bastian's extensive experience in Downtown Los Angeles has made it clear to him that both action and inaction by the City has been a substantial contributing factor in the current homelessness crisis.  In particular, the City's response to a series of federal lawsuits has coincided with this crisis, which

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

affects the homeless and housed alike, and he joins this lawsuit to bring about a substantial change in the deteriorating conditions of Downtown Los Angeles.

      i.    **LISA RICH** owns several buildings in Skid Row, which she rents out to various businesses.  Her family has been running the properties for over 40 years and has brought significant numbers of jobs to the area.  Over the past several years, the number of homeless persons on the sidewalk in front of the buildings has dramatically increased, as has the amount of personal possessions.  Frequently, tents and belongings block the sidewalks for days at a time, bringing with them refuse, criminal activity, and unhygienic conditions.  At times, the buildup of property has physically prevented tenants and patrons from accessing the buildings.  Tenants have complained and requested rent reductions due to the effect the homeless encampments are having on their business.  Recently a mobile lab engaged by her environmental consultants refused to come to the properties due to the danger of the area.

Ms. Rich attempted twice to contact LAPD for assistance in moving the property but received no help.  When she asked why LAPD had not moved homeless persons or their property, she was informed that there was nothing LAPD could do.  After learning the City would not help, Ms. Rich attempted to install fencing around some of her higher risk properties to keep tents from being propped directly against the buildings.  But the City warned her that the fencing was unlawful and would lead to fines.  Before she could remove the fencing at issue, an unknown person or entity removed the chain link, and tents returned, gathering around the bare fence poles.

In late 2017, a fire at a homeless encampment burned out of control and set one of Ms. Rich's buildings on fire.  The blaze significantly damaged the building's offices and electrical system, requiring more than $80,000 worth of repairs.  The fire and repair process disrupted her tenant's business for significant time.  At her next policy renewal period, her fire insurer refused to renew the

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

policy covering <u>all</u> of her buildings, claiming her buildings could no longer be insured because of the risks posed by the adjacent homeless encampments.  Ms. Rich then approached 24 other insurers—of those, 23 insurers outright refused to insure her buildings at any rate.  Eventually, one insurer offered to cover her buildings at a premium more than four times her original rate.  As a result of these developments, she is actively considering selling her family's business and abandoning the Skid Row area.

j.    **Robert P.**[113] is an unsheltered Black man living in Skid Row. He was born in Los Angeles, California, and prior to becoming homeless had a successful career, and had a family and a house in Carson.  He lost his job due to downsizing, and ended up holding a number of dead-end jobs and eventually lost his home.  After several brushes with the law, made worse by his mental illness, he became homeless and came to live on the streets of Skid Row.  He has been diagnosed with paranoid schizophrenia and has been told he has "dual diagnosis" of paranoid schizophrenia and substance use disorder.

His mental health issues are a defining point of his homelessness.  He needs more than just shelter; he needs shelter and treatment. He is afraid that going into a shelter without receiving proper treatment, would result in him hurting someone or himself. He suffers from anger issues that he cannot control and that build up and eventually explode.  He has tried to seek help but the institutions that provide the much-needed services, including mental health treatment and drug rehabilitation treatment, had to close due to lack of financial support.  Without proper medications, he tries to treat his mental illness with alcohol or other drugs that he can get.

Despite his own serious issues, he goes out of his way to help other people, especially unsheltered women who are vulnerable and in severe danger in Skid

---

[113] Robert's full last name has been redacted for privacy due to the public nature of this filing.

Row.  When volunteers distribute donations and hygiene products, he asks for products for women first because he finds they are largely ignored.  Mr. Porcha's schizophrenia makes being homeless more difficult, as interacting with people is hard for him.  He believes that people are involved in conspiracies and that they are watching him.  Mr. Porcha would like to obtain housing, but he knows that he would not be successful without treatment.  He will "regress" which he describes as all his issues facing him at once.

82.  **JOSEPH BURK** owns a significant building utilized for a company he created called Location 606, Inc.  His property is primarily rented for film, television, commercial and music video production.  Until 2017, he rented part of the property to tenants, but since then, due to the conditions in the area, he could not find a tenant to occupy the property and moved in along with his wife.  After his wife became pregnant with their child, they decided to move out of the property for their safety and mental well-being.  Mr. Burk is regularly at the property and remains apprised of and impacted by the situation, and the challenges it presents, surrounding his property.

83.  He pays property taxes but cannot use the public sidewalks around his own property.  Mr. Burk's residence became unlivable due to surrounding conditions, and his business has been destroyed.  Production companies have stopped using his building for film shoots, and he has gotten countless rejection emails and letters citing the conditions around his property.  He has lost hundreds of thousands of dollars because production companies cannot use Mr. Burk's property because they need accessible driveways and sidewalks for heavy equipment, lighting and sound items, and costume trucks, and the exits and entrances to his property are often fully blocked by shelters and possessions.  On at least one occasion when his property was to be used for filming, the crew was unable to bring their equipment inside his building and demanded its money back.  His property has been on the market for years without an acceptable offer,

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

and he has experienced a significant decline in his own quality of life because of the increased filth, violence, and drug use in the surrounding areas.

84.     Since his tenants moved out, Mr. Burk has struggled to find a full-time tenant for the property.  People are not interested in renting his property as a home or living space because of the surrounding area.  LAPD officers have told Mr. Burk that they have been instructed by their superiors not to ask homeless individuals to move their belongings from the sidewalks or from his property.  Because of this, when he has asked people to move their belongings from blocking the entrance to his home, he has been threatened, spit on, and verbally attacked.  Weekly, he witnesses public sex, prostitution, and/or nudity on 6th Street and Crocker Street.  His security cameras often catch violent encounters, including shootings and other murders, right across the street from the building.  In the last two months his property was broken into with thousands in equipment stolen, he has paid more money to upgrade his system, and had another attempted break-in but the new alarms, barricaded doors, and additional security camera thwarted the theft. Recently a man from an adjacent tent random began throwing bricks at his building which broke 6 windows.  On Sunday July 3, 2022, a person was murdered in a tent across the street by rival drug dealers.  On July 6, 2022, a woman who sleeps outside his property was beaten and robbed, including her new wheelchair.  There is no end to the atrocities committed and experienced right outside his door.

85.     The building across from him has caught on fire from a homeless encampment's open flame five times in the last year.  He was dropped by several insurance companies and was declined new insurance on multiple occasions.  He was without insurance for two months before he finally found a non-admitted insurance company to insure his property, at significantly higher cost than buildings in other areas of Downtown.  He has difficulty receiving mail or packages.  The mail carrier will not deliver his mail if his mailbox is blocked and

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

will not get out of his truck to deliver mail or packages to his front door because he has said it is not safe.  Food delivery services will no longer deliver food to his property after dark.  Rideshare drivers such as Lyft or Uber refuse to pick up or drop off there.

86.    Every day he finds used needles on the sidewalks and on his property.  Clothes and trash are thrown over his fence and onto his property daily.  On days when the sidewalks around his property are clear, support groups use the sidewalk to hand out food and clothing which results in mounds of trash being left behind.  His property fence is regularly used as a restroom since there are minimal facilities for the number of people living in front of his property.  He must make sure the urine and feces are washed off his property on a daily basis.  The unmanaged urine and feces on his property, as well as the rat and bug infestations, create significant health risk.  His fence has been damaged from people pushing large bulky items, such as a couch and a refrigerator, against it and tying tents and tarps to it.  Most days he cannot use the sidewalk around his building and the entrances to his property have been blocked by debris.

87.    The conditions around his property have worsened beyond his control, and he can no longer invite friends or family to his property, or reasonably enjoy and use his property.

88.    Mr. Burk has been trying to sell the property since early 2018.  There have been several interested buyers, yet the property has not sold, as the conditions surrounding the building and the recent and widely reported typhus and hepatitis outbreaks in the area have scared off potential buyers.  His property has dropped out of escrow multiple times.  All potential buyers have cited the dangerous conditions on the surrounding streets and sidewalks as the reason they would not purchase the property.

89.    **GEORGE FREM** owns a luxury auto-shop in Mar Vista California, which primarily services high-end vehicles.  In 2015, a few homeless individuals,

56

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

and others who were not homeless but pretended to be to sell narcotics, set up tents under the 405 freeway adjacent to his business.  Since then, the population of the encampment has continually increased, and he currently estimates that more than 80 people live there.  The residents have brought a variety of goods with them including tents, mattresses, wardrobes, and more.  The encampment effectively fully covers the sidewalk on one side of the road, and the other side of the same street—controlled by Culver City—is now completely blocked as well.  Mr. Frem now sees drug use, prostitution, violence, and public indecency on a regular basis.

90.    Additionally, a few times a week LAHSA representatives set up a mobile help desk, food giveaway station, and/or mobile shower station (where the City built a special mobile shower drainage system) directly in front of Mr. Frem's business, resulting in lines of people on the sidewalk for hours as they wait for the showers to be available.  When this occurs, customers frequently question whether their vehicles are safe in the lot and whether they will be stored inside overnight.

91.    There have been shootings under the bridge multiple times, at least three were caught on Mr. Frem's security video: July 26, 2018, April 1, 2019, and October 14, 2020.  In just the last two years there have been seven separate fires under or near the bridge: October 28, 2020, December 27, 2020, January 20, 2021, April 16, 2021, April 29, 2021, May 10, 2021, and May 22, 2021.  Below is a single photograph that shows the horror and danger to life and property when people live, cook, and try to warm themselves in places not made for human habitation.  That risk grows even greater when considering the criminal element that preys on the vulnerable and often, sadly, intentionally light fires in revenge or madness:



92.     Before the encampment was in place in 2015, Mr. Frem received significant business from studios wanting to rent his location or other auto shops who would sub-contract to him for repairs.  The encampment and related activity caused those shops to doubt the safety of their vehicles while at Mr. Frem's shop, and has caused them to stop using him for sub-contract work.  Prior to 2015, Mr. Frem would get significant walk-in business from his prime location on a major arterial road, but now long-time customers tell Mr. Frem that they do not feel safe picking up their vehicles late at night and potential customers turn away when they see the conditions outside of the shop.

93.     This has decreased the number of service orders the shop has every year since the encampment arose.  Before the encampment was in place, Mr. Frem's shop consistently showed an increase of repair orders and performed over 1000 repairs per year.  But the numbers have declined year on year, and now, the shop draws less than 50 percent of repair order jobs compared to 2013.

94.     **WENZIAL JARRELL** is a Black man who has been homeless and living on Skid Row for the past several years.  Prior to becoming homeless, Mr.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Jarrell served in the Air Force, including 8 years in Iraq, before getting injured in combat.  As a result of his service, he now suffers from post-traumatic stress disorder ("PTSD"), which causes him great distress and prevents him from entering a congregate shelter where he cannot be around a lot of people.  Living on the streets with his issues is incredibly difficult.  The area is violent, he hears gun shots often and it triggers his PTSD. He has physical injuries as a result of his service which are exacerbated by living on the street.

95.     Mr. Jarrell came to Skid Row after the death of his first wife because he was told he could find housing and services there.  But Mr. Jarrell has yet to receive either housing or services. The health benefits, general relief, and food stamps he received upon his arrival stopped because a person who he thought was a County worker asked him to sign a contract, and his identity was subsequently stolen.  The process for obtaining services he needs like SSI, general relief, and mental health treatment is arduous and he is frequently told to wait, come back later, or that he must contact someone different.  These complications to getting services are incredibly frustrating and due to his PTSD causes him to withdraw, preventing him from completing the application process and frustrating his prior efforts.  He is eligible for SSI and a veteran affairs ("VA") pension, but due to his identity theft issues he hasn't been able to work through the barriers to receiving it.  He often feels hopeless and like it is not even worth trying.  For months at a time, he accepts that he will never leave Skid Row and find a better life for him and his second wife, with whom he shares a tent.

96.     Mr. Jarrell's search for help has been further complicated by how functional he is and how well he has adapted to being homeless.  In his experience, services are reserved for those suffering from severe addiction or mental or physical health issues.  He finds he is not "homeless enough" or "sick enough" and gets put in the back of the line for help.  Because he can manage his often-debilitating PTSD and does not have a severe drug addiction or physical

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

health issue, he has a much harder time getting help.  Mr. Jarrell is frustrated that the City's and County's focus is on those in the direst circumstances, leaving him, and many others like him, who are most likely to escape homelessness, without help or services.

97.     Mr. Jarrell has witnessed first-hand how hard it can be to obtain services even when a person visibly needs help.  For example, Mr. Jarrell once came across a 19-year-old girl who was blind, walking the streets of Skid Row. It was clear to Mr. Jarrell that she would not be able to survive on Skid Row, so he brought her to a county social worker that he knows.  The county services worker initially told him there was nothing they could do for the girl.  Mr. Jarrell demanded to speak with the county manager's supervisor and subsequently learned that the worker was incorrect and should have been providing help to the girl.  For Mr. Jarrell, this experience demonstrates two things.  First, that many homeless people on Skid Row are unable to attain the services they need due to their own limitations and the complicated system that the City and County have designed.  Second the workers running these systems are often barriers rather than facilitators of the care that individuals living on Skid Row need.

98.     Mr. Jarrell was living on Skid Row during the Covid-19 crisis.  It was months before anyone from the city informed Mr. Jarrell and others about the pandemic or how to protect themselves.  As a result, Covid-19 moved quickly through the homeless population while little to no aid was offered.  He saw many people sick, coughing, and even dying.  As a population, they felt ignored, and it was clear that the rate of sickness and death far exceeded what was being reported.  This experience exemplified how little the City and County care about a population that is already struggling just to survive.

99.     These examples paint a picture of what life on Skid Row is like. Services are regularly denied or terminated for unreasonable or unrelated issues. The workers responsible for this irrational behavior are not held accountable,

sweeping the issues under the rug to avoid blame and responsibility. Individuals, like Mr. Jarrell, were directed to Skid Row with promises of assistance and services, but instead they are turned away and abandoned; left to get worse instead of better.

100.    The services that are provided (frequently by private organizations) fail to stop homelessness itself. While Mr. Jarrell appreciates the food, clothes, tents, and other provisions provided, these items do little to help him get off the streets. While these provisions make life on the street more comfortable, they do not provide a stable housing environment.

101.    He has tried sleeping in congregate shelters when he's been able to get a bed, but due to his experiences in Iraq, his PTSD worsens when he is surrounded by large numbers of people. A couple times he has been able to find individual housing, but it's only for single people and he does not want to be separated from his wife who he cares for, and who cares for him. And under no circumstances will he leave his wife alone in Skid Row. It is far too dangerous.

102.    Mr. Jarrell is a selfless, caring individual who works hard to help others get out of the black hole that is Skid Row. He prioritizes helping those who he thinks clearly do not belong, or should have a home to go back to, because he does not want them to get attacked or left to fend for themselves. According to Mr. Jarrell, there is nothing worse than getting stuck in the system of Skid Row and realizing you cannot escape. If he were able to get a stable housing environment with any semblance of personal space, he would jump at the opportunity, but it needs to come with mental health treatment or he will not be successful. Mr. Jarrell knows he is more likely to die because he lives on Skid Row.

103.    **CHARLES MALOW** has been living at Union Rescue Mission, within the Skid Row area, since 2012. Prior to 2008, he worked as a garage door installer for 29 years, and from 2000 to 2006 he worked part-time as a security

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

guard.  He became homeless in 2008 when the economy crashed.  From 2010 to 2012, he lived on the streets of Glendora, California.  In the winter of 2011 and 2012, he stayed at a Glendora Winter Shelter and then decided to seek help at the Union Rescue Mission ("URM") located on 545 San Pedro St., Los Angeles, CA 90013.  When he first arrived at URM in 2012, police officers would come by in the morning, and wake-up the people sleeping on the streets.  They were required to pack up their belongings and stow them, so the sidewalks were not blocked.  This also allowed illegal activity such as narcotics and weapons sales to be more easily discovered and therefore addressed.  At that time, there were no tents in front of URM.

104.    For about five years, Mr. Malow has been an Ambassador at URM.  The Ambassador program allows a small group of men to live at URM indefinitely.  Since living at URM, he has worked at Home Depot and in URM's janitorial department, known as the EVS team.  He knows that diseases such as typhus have made a resurgence on Skid Row, and this makes him extremely concerned that his work with the EVS team puts him at greater risk of contracting a disease.

105.    In the last several years Mr. Malow has seen a big increase in the volume of tents and belongings on the streets.  This has greatly affected his daily life.  He has observed a dramatic increase in the rodent problem on Skid Row and has seen rats running in and out of tents when he sweeps the sidewalks and gutters outside of URM.  A major cause of this rodent problem is the volume of trash disposed of on the streets—because individuals living on the streets throw food and trash in the streets, rats have more than enough food to flourish.  There has also been a huge increase in the amount of human feces on the street which carries with it the significant risk of disease, not to mention the odors.

106.    There is absolutely no room to walk on the sidewalk, so if he leaves URM, Mr. Malow is forced to walk in the street.  Even in places where he could

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

physically walk between the encampment and the wall, he still must walk on the streets or risk violent confrontation from people who accuse him of invading their "space." When he leaves URM, he must plan his route carefully even if traveling by public transportation. Due to an increase in crime, including narcotics sales and violent activity, he must use a car service to get back from the metro or bus station after visiting his mother in Anaheim. He always has the car drop him off directly in front of URM to avoid dangerous encounters on the street.

107.   Mr. Malow does not leave URM between the hours of 4 p.m. and 6 a.m., because he is concerned for his safety on the streets. When he does leave, he is incessantly approached and offered illegal drugs for sale. He regularly sees people just outside his home using illegal narcotics in the form of pills or smoking or injecting themselves. He sees people lying motionless in gutters, often without clothes or shoes, and is constantly looking to see if that person is dead or merely unconscious from drugs or alcohol. As a person who has struggled with drug and alcohol use, it is particularly painful to watch and experience.

108.   The excessive build-up of tents and debris over the last few years is directly responsible for this significant increase in crime because it allows criminals to operate in relative anonymity. This increase in debris, tents, and personal items on the streets also makes it impossible for health and safety workers to identify public health risks, causing disease and unsafe conditions to spread right outside his home. As a formerly homeless individual, Malow knows first-hand the difficulties that come from living on the street and is deeply troubled by both the City and County's actions and inaction in the face of the homelessness crisis.

109.   **KARYN PINSKY** works in DTLA and lives there with her husband and their young son. She and her husband moved to DTLA in 2010 because they were drawn to the architecture, history, and walkability of the area. Unhoused

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

individuals have always been present near their home, but in far fewer numbers. In 2010, the only tents west of Skid Row were on Broadway, and they were erected every night and removed shortly after sunrise. From 2010 to 2016, Ms. Pinsky and her husband, and later her son, were able to enjoy many wonderful features of DTLA—they regularly walked their dog along Main Street, and they felt comfortable walking to the many wonderful establishments and restaurants that were nearby.

110.   All this has changed dramatically over the past several years as the homelessness crisis has deepened. Now, due to many recent experiences and the crime and concentration levels in Downtown, Ms. Pinsky is fearful that either she or her son will be the subject of some random act of violence. Once, while sitting outside at a café on Spring Street, a homeless woman screamed and became violent towards her because she thought Ms. Pinsky was "judging" her—only when her husband and others intervened was the situation defused. On another occasion, her husband saw the aftermath of a violent encounter between a neighbor and a homeless, mentally ill individual—the individual hit their neighbor in the face with a 2x4 that had a nail in it. Earlier this year, a homeless man seated outside a café on 6th Street near Broadway, a block from their house, randomly pushed a stranger into the street in front of an oncoming bus. The man was struck by the bus and ultimately died. Another neighbor on a different floor was attacked in the middle of the night by someone who gained access through a fire escape window. Now, as a result, she no longer feels safe sleeping with her window cracked even a little at night because of its proximity to the fire escape.

111.   Sexual assaults on women also have increased significantly in the last several years, and as a result, Ms. Pinsky is terrified of being assaulted while running errands or just walking to or from a restaurant. The conditions immediately surrounding their home have gotten so dangerous that neither she nor her husband will leave the house by foot at all. They drive into the garage

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

64

and stay in their home; if they need to run errands, they drive. She does not walk at all, due to the violent criminals that are using the tents as cover immediately outside her building. She once was able to take her son to enjoy the various activities Downtown Los Angeles offers, like the library story time, parks such as Pershing Square, and museums. Now they avoid those altogether. Family and friends are so fearful of the disease and violence in the area that they will no longer come to visit Ms. Pinsky. The area was not always like this, but the City's failure to address this crisis in a way that is balanced for both the housed and unhoused communities has fundamentally altered the neighborhood and her experience of it. Ms. Pinsky has been greatly affected and has a very real interest in remediating this issue insofar as her quality of life and basic enjoyment of her property have been severely diminished. At the same time, she also has compassion and empathy for those on the streets who are subject to the assaults (particularly women), the elements, the drug pushers, the gang members, the rats, filth, and disease. For Ms. Pinsky, this is no way for a society to treat its most helpless members.

112. **HARRY TASHDJIAN** owns an upholstery supply business in the industrial area of DTLA, and the property surrounding the business location. Mr. Tashdjian's building typically houses millions of dollars' worth of inventory. When he purchased the building in 2013, tents were not allowed on the streets during the day. Because his business operates during traditional business hours, he believed that the location would not hinder business, which generally has between 70 and 100 will-call orders per day through which customers order product and then come into the business shop to pick it up.

113. In mid-2016, Mr. Tashdjian saw an immediate increase in tents on the streets and sidewalks outside of his business. Today, tents occupy the sidewalks at all hours, and it is difficult for him and his customers to access his business due to the piles of property and people loitering on the sidewalk and in

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the street.  Customers constantly tell him how difficult it is to get into the building or the adjacent parking lot without hitting people.  Mr. Tashdjian has been repeatedly told that customers prefer to do business with competitors to avoid the hassle and inconvenience of trying to access his store.

114.    Vendors from all over the world—Italy, Germany, United Kingdom, China, etc.—visit Mr. Tashdjian's shop and express shock and dismay that such horrendous conditions exist in Los Angeles.  His business is now at a much greater risk for vandalism, violence, and fire damage.  Homeless individuals frequently urinate into or onto his building or the adjacent parking lot, and there has been an increase in graffiti on his building.  The number of tents immediately outside of his building puts his business at risk of fire damage—indeed, the fire department responds at least once a year to a tent fire that has started immediately outside his building.  Sometimes it is an innocent accident from an open flame; other times, it is intentional due to some drug dealers' disagreement.  His security cameras have recorded these acts of arson.

115.    The conditions surrounding his property have cost Mr. Tashdjian a great deal of money.  Because of the immediate fire danger posed by the tents outside his building, he has been forced to upgrade his fire monitoring system which cost approximately $40,000.  He has also had to spend approximately $37,000 on a new security surveillance system to protect the building.  The LAPD frequently seeks footage caught on this security system during investigations.  Theft is also a major concern—pallets are constantly stolen from their building and car batteries are frequently stolen from inside people's cars.

116.    There has also been a significant uptick in the population of rats surrounding his building, and as a result, rat feces coat all three fences surrounding his property.  To address the increase in fecal matter on his property, as well as the proliferation in cockroaches, he has hired a pest control company and had the health department visit the property multiple times.  The gate

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

1   surrounding his property has been repeatedly damaged, costing him thousands of

2   dollars in repairs.

3       117.    Over the last few years, as the City and County have permitted the

4   homelessness crisis to grow, the risk to his property from fire damage and

5   vandalism has increased exponentially—the business constantly replaces gates

6   and other property, cleans the facilities, and sometimes pays security to safeguard

7   its property.  His business has had to spend over $100,000 in upgrades to their

8   system and increased monitoring and pest control just as a result of the increased

9   homeless persons and property in the area.  Mr. Tashdjian and his employees

10  cannot walk anywhere in the area and are constantly subject to risk of disease due

11  to the putrid conditions outside the business.

12      118.    The City and the County have offered no assistance to Mr. Tashdjian

13  and have taken no steps to address the impact of the homelessness crisis on his

14  business or to enforce the laws that are broken daily in the area around his

15  business.

16                              **DEFENDANTS**

17      119.    **COUNTY OF LOS ANGELES** ("County") is a municipal entity

18  existing under the laws of the State of California, with the capacity to sue and be

19  sued.  The departments of the County include but are not limited to the Los

20  Angeles Sheriff's Department (LASD), the Department of Mental Health

21  (DMH), the Department of Public Health (DPH), and the Department of Public

22  Social Services (DPSS).

23      120.    The **COUNTY**, along with the City of Los Angeles, jointly funds,

24  manages, and administers the Los Angeles Homeless Service Authority

25  (LAHSA), an independent joint powers authority.  According to its website,

26  "LAHSA is the lead agency in the Los Angeles Continuum of Care, which is the

27  regional planning body that coordinates housing and services for homeless

28  families and individuals in Los Angeles County.  LAHSA coordinates and

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

manages over $300 million annually in federal, state, county, and city funds for programs that provide shelter, housing, and services to people experiencing homelessness."[114]

121.   Does 1 through 200, inclusive, are persons, entities, government bodies, municipal employees, the names and identifies of which are currently unknown.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Mandatory Duty

### Cal. Gov't Code § 815.6; Welf & Inst. Code §§5600 *et seq*, 13000 *et seq*, 14000 *et seq.,* 17000

122.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 121 of this Complaint as though set forth fully herein.

123.   Defendant County of Los Angeles is liable under California Government Code section 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide mental health and medical care for the indigent and those eligible for Medi-Cal.

124.   According to the California Welfare and Institutions Code section 5600.1, "[t]he mission of California's mental health system shall be to enable persons  experiencing severe and disabling mental illnesses… to access services and programs that assist them, in a manner tailored to each individual, to better control their illness, to achieve their personal goals, and to develop skills and supports leading to their living the most constructive and satisfying lives possible in the least restrictive available settings.  Under California Welfare and Institutions Code 5600.3, counties have an obligation to use their mental health

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

[114] LAHSA, *About LAHSA*, https://www.lahsa.org/about (last visited June 23, 2022).

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

"to the extent resources are available" to treat "homeless persons who are mentally ill." Cal. Welf. and Inst. Code §§ 5600.3(b)(4)(A). The minimum array of services that must be offered to this target population are: (a) precrisis and crisis services, (b) assessment, (c) comprehensive evaluation and assessment, (d) an individual service plan, (e) medication education and management, (f) case management, (g) twenty-four hour treatment services, (h) rehabilitation and support services, (i) vocation rehabilitation, and (j) residential services. Welf. and Inst. Code § 5600.5. Additionally they should be offered: services for homeless persons, and group services Welf. and Inst. Code § 5600.4 (k)-(j). Each of these sections provides the caveat that such services must be offered "to the extent resources are available." But resources *are* available. As detailed *supra*, the County has hundreds of millions of dollars sitting in its MHSA fund, a $40 **billion** budget (of which only 0.1 percent funds the department of mental health, the minimum necessary to receive state and federal funds), and hundreds of millions of dollars in Measure H funds which told voters it would go towards "mental health" but fails to do so in any meaningful way. And the County is quite literally leaving money on the table by not applying for reimbursable costs from the federal government.

125. Under Welfare and Institutions Code sections 13000 *et seq.* and 14000*, et seq*. Medi-Cal services must be provided by Counties, or cause to be provided by counties, for all services that are "medically necessary" which is defined as "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code § 14059.5(a). For Med-Cal members who are under 21 years of age, this includes any service "necessary to correct or ameliorate health conditions, including

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

"behavioral health conditions."[115]  For members over the age of 21, this means provision of specialty mental health services "who have significant impairment or reasonable probability of functional deterioration due to a diagnosed or suspected mental health disorder."[116] Counties must "provide or arrange for the provision" of, *inter alia*, evaluation, testing, drug therapy, medication, and psychiatric consultations.[117] Counties must also provide "psychiatric inpatient hospital services and psychiatric health facility services" where the member has a "[s]ignificant impairment" defined as "distress, disability, or dysfunction in social, occupational, or other important activities" or "a reasonable probability of significant deterioration in an important area of life functioning" and a "diagnosed" or "suspected" mental health disorder.[118]  Its obligations for members under the age of 21 are even higher.[119]  Additionally, Counties, as the provider and administrator of Medi-Cal also has the obligation to provide substance use treatment, including residential treatment and inpatient services "when medically necessary" after evaluation and diagnosis.[120]  And Counties

---

[115] Memorandum from Dana Durham, Chief of the Managed Care Quality and Monitoring Division of the State of California-Health and Human Services, Department of Health Care Services on Medi-Cal Managed Care Health Plan Responsibilities for Non-Specialty Mental Health Services to All MediCal Managed Care Health Plans (Apr. 8, 2022), https://www.dhcs.ca.gov/formsandpubs/Documents/MMCDAPLsandPolicyLetters/APL2022/APL22-006.pdf.

[116] *Id.*

[117] *Id.*

[118] Memorandum from Shaina Zurlin, Medi-Cal Behavior Health of the State of California Health and Human Services, Department of Health Care Services on Criteria for beneficiary access to Specialty Mental Health Services (SMHS), medical necessity and other coverage requirements to California Alliance of Child and Family Services, *et al.* (Dec. 10, 2021), https://www.dhcs.ca.gov/Documents/BHIN-21-073-Criteria-for-Beneficiary-to-Specialty-MHS-Medical-Necessity-and-Other-Coverage-Req.pdf.

[119] *Id.*

[120] Memorandum from Shaina Zurlin, Medi-Cal Behavior Health of the State of California Health and Human Services, Department of Health Care Services on Drug Medi-Cal Organized Delivery System (DMC-ODS) Requirements for the Period of 2022 – 2026 to california Alliance of Child and Family Services, *et al.* (Dec. 17, 2021), https://www.dhcs.ca.gov/Documents/BHIN-21-075-DMC-ODS-Requirements-for-the-Period-2022-2026.pdf.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

have an obligation to "undertake outreach efforts to beneficiaries" to maintain contact information and ensure continued enrollment. Cal. Welf. & Inst. Code § 14005.36.

126. In addition to its obligations as the provider and administrator of Medi-Cal, California Welfare and Institutions Code section 17000 provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

127. Section 10000 clarifies and defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of ancestry, marital status, political affiliation, or any characteristic listed or defined in Section 11135 of the Government Code. That aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.

Cal. Welf. & Inst. Code § 10000.

128. Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents . . . promptly and humanely." *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996). This means counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health." *Id.* at 1240. The California Supreme Court has held that "subsistence medical services" must be provided. *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

71

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely.") Counties have an obligation to provide "'medically necessary care,' not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (citation omitted).  That includes care "sufficient to avoid substantial pain and infection." *Hunt*, 21 Cal. 4th at 1014.  Importantly, a county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight." *Fuchino v. Edwards-Buckley*, 196 Cal. App. 4th 1128, 1134 (2011) (citation omitted).

129.   Given the facts and circumstances, and significant studies, statistics, and reports including those set forth *supra*, and other such evidence as may be provided, it cannot be doubted that a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death. As Dr. Barbara Ferrer, director of the LA County Department of Public Health, admitted: "Homeless people are in fact dying at a higher rate because they're homeless."[121]  Recognizing this, the LA County Department of Health Services has implemented limited program to provide housing as part of its larger healthcare obligation which has been wildly successful.  But unfortunately, it has not gone far enough to address the homeless crisis, which is ravaging the city and county, such that over 48,000 persons remain unsheltered in the County as of January 2019.

130.   Basic shelter is "medically necessary" insofar as it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain" and the County's failure to provide the same to its homeless population constitutes a breach of its duty under California Welfare & Institution Code sections 17000 and 10000.  Plaintiffs allege that

---

[121] Flores, *supra* note 82, https://la.curbed.com/2019/10/30/20940369/homeless-deaths-los-angeles-county.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

provision of shelter, in and of itself, would alleviate significant physical and mental health issues and prevent existing or pre-existing physical and mental health issues from worsening.  In other words, the beds themselves are medically necessary.

131.    Mental Health and Substance Use Disorder Treatment is further "medically necessary" and the failure to provide such treatment, particularly residentially treatment for those for whom shelter is not practically available to them because of their serious mental health or substance use disorder, in any reasonably accessible manner is a violation of the County's obligation under the Welfare & Institution Code.

132.    Defendant County is undoubtedly failing to provide the necessary mental health and substance use treatment, both outpatient and inpatient. Plaintiffs, and each of them, have been damaged by the County's failure to provide shelter and treatment, as described in detail *supra*.

## SECOND CAUSE OF ACTION

### Nuisance (Public and Private)

133.    Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 132 of this Complaint as though set forth fully herein.

134.    California has defined nuisance as

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479.

135.    As described above, the County, by its failure to provide the housing and services necessary to assist people experiencing homelessness, including

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

73

plaintiffs named herein, is perpetuating and facilitating nuisance violations. The Plaintiff and Alliance members own, lease, occupy, or otherwise control all or a portion of the home or business identified. By Defendant County's actions and inactions, it has created a condition or permitted a condition to exist that is harmful to the health, indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and constitutes a fire hazard, as described *supra*.

136.  All Plaintiffs who own or rent property have experienced a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or room rented; each have suffered and continue to be threatened with respect to their health and welfare, by reason of the constant threat of disease and the experience of human waste, trash, and encampments outside their property.

137.  Defendant's conduct has been and is intentional and unreasonable, unintentional but negligent or reckless, and/or the condition permitted to exist was the result of abnormally dangerous activity which substantially interfered with each individual's use or enjoyment of his or her land that an ordinary person would reasonably be annoyed or disturbed by. No plaintiff or Alliance member consented to Defendants' conduct; each was harmed, Defendants' conduct was a substantial factor in causing the harm, and the seriousness of the harm outweighs any public benefit of such conduct (which is none). Each plaintiff and Alliance member has been damaged in his or her own right, in a manner specially injurious to him or herself.

138.  Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only. As such the County is not entitled to any claims of immunity pursuant to California Government Code section 814.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

### THIRD CAUSE OF ACTION

### Inverse Condemnation/Cal. Const. art. I § 19

### (Plaintiffs Alliance, Burk, Tashdjian, and Frem)

139.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 138 of this Complaint as though set forth fully herein.

140.   California Constitution, article I § 19 provides in relevant part: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."  The actions by the County in failing to treat those with mental illness and substance use disorder, and/or provide the necessary social services as required by law, have limited, damaged, and/or burdened the owners' property and/or business so substantially they rise to the level of a regulatory taking, yet no compensation has been provided.

141.   Plaintiffs seek compensation according to each of their separate damages, in addition to injunctive relief and any other relief accorded to Plaintiffs as appropriate in this case.

### FOURTH CAUSE OF ACTION

### Waste of Public Funds and Resources

### Cal. Civ. Proc. Code § 526a

142.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 141 of this Complaint as though set forth fully herein.

143.   California Code of Civil Procedure section 526a permits private individuals or entities to bring an action to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency."

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

144.   Plaintiffs and Alliance members, each of them, are residents of the County of Los Angeles and/or own property and/or businesses therein and pay income tax, sales tax, property tax, and/or business license taxes and therefore having standing to bring an action under section 526a.  Payment of these taxes have been significant, and a hardship, but Plaintiffs continue to do so.  In particular payment of Measure H's quarter-cent sales tax has impacted business and quality of life, but Plaintiffs continue to do so.

145.   As described more fully *supra*, taxpayer funds have been misused and wasted by the County of Los Angeles, such they are incapable of achieving the ostensible goal of addressing the homelessness crisis in any significant way, much less "ending" it.  Such expenditures, particularly when taken in the aggregate, cost several factors more than alternative available measures which are demonstrably effective in addressing the crisis.

146.   Measure H was promoted as complimentary to the City's Proposition HHH, and passed by the electorate to address the homelessness crisis to provide mostly services in a comprehensive and effective way.  Instead, the County uses its dollars mostly to fund housing, and the promised services are nowhere to be found.  And homelessness has steadily increased in the County.

147.   Hundreds of millions of dollars sits unused in the County's MHSA account while the mentally ill—for whom the special tax was created—go untreated on the street.  The County Mental health department is unsupported and underfunded by the County, and the County's MH-MAA reimbursement rates remains far too low.  As further detailed *supra*, the County has spent enormous amounts of public funds on the homelessness crisis in ways that have had little or no effect on the crisis, and thereby wasted those public funds.

148.   Plaintiffs seek no damages hereunder and submit this claim for equitable and injunctive relief only.  As such the County is not entitled to any claims of immunity pursuant to California Government Code section 814.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

76

# FIFTH CAUSE OF ACTION

## Violation of Statutorily-Created Liberty Interest

## 42 U.S.C. § 1983; U.S. Const. amend. V/XIV

149.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 148 of this Complaint as though set forth fully herein.

150.   As described in detail *supra*, the County has numerous statutory obligations which require it to provide health, mental health, and substance use disorder services and treatment, including inpatient, residential, and outpatient treatment, and shelter where medically necessary.

151.   Through these statutes, the State of California has created a liberty interest in adequate and available substance use disorder treatment, mental health treatment and shelter.  These statutes set forth substantive predicates to govern official decision-making and contain explicitly mandatory language, are mandatory, and place substantive limitations on official discretion.

152.   Moreover, the County has intentionally and explicitly accepted responsibility for providing services and treatment to persons experiencing homelessness and has created specific taxes and holds specific accounts for such a person as detailed *supra*.

153.   The County of Los Angeles, by depriving Plaintiffs of their liberty interest in mandatory care contemplated under the aforementioned statutes and by failing to offer or provide a reasonable means by which persons experiencing homelessness in need of such care may seek or receive it, has violated the Due Process clause of the United States Constitution.

154.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant County of Los Angeles and its respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

77

unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the County of Los Angeles.

155.   The actions and inactions of the County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

156.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

## SIXTH CAUSE OF ACTION

### Violation of Due Process Clause (State-Created Danger Doctrines)

### 42 U.S.C. § 1983; U.S. Const. Amend. 14

157.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 156 of this Complaint as though set forth fully herein.

158.   By the acts and omissions described above, Defendant has affirmatively created and/or increased the risk that Plaintiffs would be exposed to dangerous conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed as a result.  The County created and/or contributed to the danger to them and others like them by adopting and maintaining various policies and laws, including but not limited to concentrating services in known dangerous areas, coalescing in a strategy to contain homeless people in Skid Row which specifically endangered Plaintiffs and were deliberately indifferent thereto.  The County created a further danger by focusing nearly exclusively on so-called permanent housing options without balancing interim and emergency needs, which could not ever meet the ostensible goal, and caused more people to remain unsheltered, exacerbating or causing significant mental and physical decline at such a rate that outpaces the building and provision of such units.

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

159.   Defendant knew or should have known that its acts or omissions specifically endangered Plaintiffs and were deliberately indifferent thereto.

160.   Plaintiffs are informed, believe and allege that, at all times herein mentioned, Defendant County of Los Angeles and its respective agents, with deliberate indifference, and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Plaintiffs, engaged in the unconstitutional conduct and omissions set forth above, all pursuant to policy, procedure, or customs held by the County of Los Angeles.

161.   The actions and inactions of the County of Los Angeles were known or should have been known to the policy makers responsible for that agency and occurred with deliberate indifference to the constitutional violations set forth above, and/or to the strong likelihood that constitutional rights would be violated as a result of its customs and/or policies.

162.   Plaintiffs seek an award of compensatory damages, injunctive relief, and the cost of attorneys' fees in bringing this action.

### SEVENTH CAUSE OF ACTION

### Uncompensated Taking

### U.S.C. § 1983; U.S. Const. Amend. V/XIV

### (Plaintiffs Alliance, Burk, Tashdjian, and Frem)

163.   Plaintiffs re-allege and incorporate herein by this reference each and every allegation set forth in paragraphs 1 through 161 of this Complaint as though set forth fully herein.

164.   The Fifth Amendment mandates, in relevant part, that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment is applied to the states through the Fourteenth Amendment.  *Chicago, Burlington, & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897).  The actions by the County, as described in detail *supra,* have limited, damaged, and/or burdened the property owners' so

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

79

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

1    substantially they rise to the level of a regulatory taking, yet no compensation has

2    been provided.

3        165.    Upon information and belief, this was done with deliberate intent

4    and/or reckless disregard of Plaintiffs' rights.  Plaintiffs seek an award of

5    compensatory damages, injunctive relief, and the cost of attorneys' fees in

6    bringing this action.

7        166.    Plaintiffs are informed, believe and allege that, at all times herein

8    mentioned, Defendant County of Los Angeles and its respective agents, with

9    deliberate indifference, and conscious and reckless disregard to the safety,

10   security, and constitutional and statutory rights of Plaintiffs, engaged in the

11   unconstitutional conduct and omissions set forth above, all pursuant to policy,

12   procedure, or customs held by the County of Los Angeles.

13       167.    The actions and inactions of the County of Los Angeles were known

14   or should have been known to the policy makers responsible for that agency and

15   occurred with deliberate indifference to the constitutional violations set forth

16   above, and/or to the strong likelihood that constitutional rights would be violated

17   as a result of its customs and/or policies.

18       168.    Plaintiffs seek an award of compensatory damages, injunctive relief,

19   and the cost of attorneys' fees in bringing this action.

20   ### VI.  PRAYER FOR RELIEF

21       Plaintiffs pray for judgment against Defendant as follows:

22       1.    Injunctive/equitable relief in a manner to be determined by law;

23       2.    As to the federal claims and claims under the California constitution

24   only, compensatory damages and other special, general and consequential

25   damages according to proof;

26       3.    An award of costs of suit, including attorneys' fees; and

27       4.    Such other and further relief as this Court deems just and proper.

28

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

# VII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Dated: July 15, 2022

*/s/ Elizabeth A. Mitchell*
SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
*Attorneys for Plaintiffs*

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

81

SECOND AMENDED AND SUPPLEMENTAL COMPLAINT