DAWYN R. HARRISON, *Interim County Counsel* (SBN 173855)
JENNIFER A. D. LEHMAN, *Assistant County Counsel* (SBN 191477)
jlehman@counsel.lacounty.gov
ANA WAI-KWAN LAI, *Senior Deputy County Counsel* (SBN 257931)
OFFICE OF COUNTY COUNSEL
500 West Temple Street, Suite 468
Los Angeles, California 90012
Telephone:  (213) 974-1830
Facsimile:   (213) 626-7446

LOUIS R. MILLER (SBN 54141)
MIRA HASHMALL (SBN 216842)
mhashmall@millerbaronlbdess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 552-4400
Facsimile:   (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>              Defendants. | **CASE NO. 2:20-cv-02291 DOC (KES)**<br><br>**COUNTY OF LOS ANGELES'**<br>**STATEMENT IN SUPPORT OF**<br>**SETTLEMENT**<br><br>Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

589781.13

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................5

II. THIS SETTLEMENT WILL PROVIDE SIGNIFICANT RELIEF TO PEOPLE EXPERIENCING HOMELESSNESS ...................................7

    A. Support For Plaintiffs' Settlement With The City (§ D.1).....................7

    B. High Acuity Beds (§ D.2) .................................................................8

    C. New Mental Health/Substance Use Disorder Beds (§ D.3) ...................9

    D. Increased MDTs/HOME Teams (§§ D.4-5)............................................9

    E. Land Partnership; Additional Funding (§§ D.6–7) ..............................10

    F. Reporting Obligations; Continuing Jurisdiction (§§ C, P.1.ii) .............10

III. THE COUNTY IS COMMITTED TO AMELIORATING HOMELESSNESS BEYOND THIS LITIGATION.......................................11

IV. THE COURT SHOULD APPROVE THE PARTIES' JOINT STIPULATION TO DISMISS THIS ACTION WITH PREJUDICE ...........17

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Ahern v. Cent. Pac. Freight Lines,*
    846 F.2d 47 (9th Cir. 1988) ................................................................................7

*Alvarado v. Table Mountain Rancheria,*
    509 F.3d 1008 (9th Cir. 2007) ..........................................................................18

*Bridgeport Music, Inc. v. London Music, U.K.,*
    345 F. Supp. 2d 836 (M.D. Tenn. 2004) ..........................................................17

*Century Mfg. Co., Inc. v. Cent. Transp. Int'l, Inc.,*
    209 F.R.D. 647 (D. Mass. 2002) ......................................................................17

*Frew ex rel. Frew v. Hawkins,*
    540 U.S. 431 (2004) ..........................................................................................18

*Gardiner v. A.H. Robins Co., Inc.,*
    747 F.2d 1180 (8th Cir. 1984) ..........................................................................17

*Horne v. Flores,*
    557 U.S. 433 (2009) ..........................................................................................18

*In re Smith,*
    926 F.2d 1027 (11th Cir. 1991) ........................................................................17

*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland,*
    478 U.S. 501 (1986) ..........................................................................................17

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.,*
    688 F.2d 615 (9th Cir. 1982) ..............................................................................7

*Smoot v. Fox,*
    340 F.2d 301 (6th Cir. 1964) ............................................................................17

### FEDERAL RULES

C.D. Cal. Loc. R. 41-1 .................................................................................................5

C.D. Cal. Loc. R. 41-5 .................................................................................................5

C.D. Cal. Loc. R. 41-6 .................................................................................................5

Fed. R. Civ. P. 12(b)(2) ...............................................................................................5

Fed. R. Civ. P. 12(b)(6) ...............................................................................................5

3

Fed. R. Civ. P. 41(a)(1)(A) ...................................................................................5

Fed. R. Civ. P. 41(a)(2) ..................................................................................5, 17

Fed. R. Civ. P. 41(b) ...........................................................................................5

# I.     **INTRODUCTION**

Defendant County of Los Angeles (the "County") and Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow, and George Frem (collectively, "Plaintiffs") seek approval of their Rule 41(a)(2) stipulation for voluntary dismissal with prejudice pursuant to an executed settlement agreement.  The settlement fully resolves this litigation and will bring much-needed additional resources to people experiencing homelessness ("PEH") within the City and County of Los Angeles.[1]  There is no legal basis to disapprove the stipulation.  All parties want it.  Nobody has objected.  And there is no prejudice to anyone.  And this settlement is on top of everything else the County is doing—and will continue to do—to address homelessness.

The stipulation is the culmination of a historic settlement that brings together the twin pillars of local government—the City of Los Angeles (the "City") and County of Los Angeles—in an expanded collaboration to address the homelessness crisis.  It follows over two and a half years of litigation, including, among other things, three complaints [Dkt. 1, 361, 454]; two motions to dismiss [Dkt. 256, 370]; a preliminary injunction and interlocutory appeal therefrom [Dkt. 283-1, 352]; countless settlement conferences and court hearings; and the landmark 2020 deal between the City and County to create and support 6,700 units for PEH living near

---

[1] Plaintiff Gary Whitter did not join the settlement.  Mr. Whitter has been non-communicative for many months, causing Plaintiffs' counsel to withdraw from representation.  [Dkt. 450, 458.]  The County filed a Rule 12(b)(2) and (b)(6) motion to dismiss Mr. Whitter's claims that remains pending [Dkt. 370], and the County and the City of Los Angeles—which independently reached a settlement with all Plaintiffs but Mr. Whitter [Dkt. 429]—have also moved for an order to show cause seeking the involuntary dismissal of Mr. Whitter's claims pursuant to Rule 41(b) and Local Rules 41-1, 41-5, and 41-6 [Dkt. 469].  It is only because the parties are unable to obtain Mr. Whitter's consent, and the County previously filed an answer [Dkt. 320], that Plaintiffs cannot dismiss their claims against the County without a court order.  Fed. R. Civ. P. 41(a)(1)(A).

freeways, along with other vulnerable, unsheltered individuals at the highest risk from COVID-19 (the "freeway deal") [Dkt. 136, 185-1].

In granting an earlier stipulation to dismiss the City due to its separate settlement with Plaintiffs, the Court observed that "[t]he parties have been aggressively litigating" this case and, even before any discovery, have "generated a voluminous record." [Dkt. 445.] The Court also remarked that the parties have been engaging in arm's-length settlement negotiations since June 2020. [*Id.*; *see also* Dkt. 133, 141, 170, 179, 184, 388, 394, 395, 397, 401 (notices of settlement conferences).] This case is not a class action; but, nevertheless, the Court invited comments [Dkt. 473], and no party or non-party objected to the stipulation to dismiss the County, nor the terms of the parties' settlement.

As explained herein, Plaintiffs, the County, and the City all support the global resolution reached. In fact, this settlement—whereby the County is agreeing to provide services to the thousands of beds in the City settlement (and a lot more)—is critical to effectuate the City settlement. Without the County providing services, the City's beds will not receive services and will not effectively serve the homeless.

The settlement also complements the County's substantial work outside of this litigation to aid PEH: Over the last five years, the County has placed nearly 85,000 people in permanent housing, including 34,000 people (40%) with funding from Measure H.[2] Meanwhile, the County placed nearly 115,000 people in interim housing, including 60,000 people (53%) through Measure H.[3] During the same period, the County prevented more than 22,000 people from becoming homeless in the first place, including nearly 7,000 people (31%) who received assistance through Measure H.

---

[2] Homeless Initiative Impact Dashboard, https://homeless.lacounty.gov/impact-dashboard/

[3] *Id.*

6

1    The parties respectfully request that the Court approve the stipulation and
2  enter an order dismissing Plaintiffs' claims against the County with prejudice. [*See*
3  Dkt. 468-2 (proposed order granting stipulation).]

4  **II.    THIS SETTLEMENT WILL PROVIDE SIGNIFICANT RELIEF TO**
5  **PEOPLE EXPERIENCING HOMELESSNESS**

6    There is a well-recognized public policy in favor of settlements, which
7  conserve judicial and party resources. *See Ahern v. Cent. Pac. Freight Lines*, 846
8  F.2d 47, 48 (9th Cir. 1988) ("The Ninth Circuit is firmly 'committed to the rule that
9  the law favors and encourages compromise settlements.'" (citation omitted)); *accord*
10  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 625
11  (9th Cir. 1982). The settlement will meaningfully address the homelessness crisis
12  by expanding on the County and City's existing partnership and providing targeted
13  aid and necessary support for Plaintiffs' settlement with the City.

14  **A.    Support For Plaintiffs' Settlement With The City (§ D.1)**

15    This litigation has prompted the County and City to collaborate on an
16  unprecedented level to lift people out of homelessness permanently—first through
17  the freeway deal and now through this settlement.

18    Under the freeway deal, as outlined in the June 2020 Memorandum of
19  Understanding [Dkt. 136, 185], the County agreed to earmark $53 million for the
20  first year and $60 million for the following four years—for a total of $293 million—
21  to provide essential supportive services at 6,700 housing sites that the City
22  committed for the most vulnerable PEH, those residing under freeway overpasses
23  and those 65 years or older. The deal also includes benefits assistance and services,
24  including treatment for mental health and substance use disorders ("SUD"),
25  administered by the County Departments of Public Social Services, Health Services,
26  Mental Health, and Public Health.

27    This settlement goes further. The County is committing to fund a suite of
28  wraparound services at the interim and permanent housing units created by the City

1   pursuant to its settlement with Plaintiffs through the end of the 2026–2027 fiscal

2   year. [*See* Dkt. 421 (City settlement).]  Social/service workers will visit the housing

3   units created by the City to connect eligible residents with available benefits to

4   which they are entitled, including public assistance (i.e., General Relief, CalFresh,

5   Medi-Cal, Social Security Income, Social Security Disability Insurance, and

6   veterans' benefits) and mental health and SUD treatment (i.e., education, screening,

7   linkage/referrals, transportation, early intervention workshops, and more).

8          The County's support for the City settlement is a critical aspect of the

9   agreement.  Indeed, without the County's support under this settlement, the City's

10  deal will not successfully address the needs of persons experiencing homelessness.

11  Only the combination of shelter *and* supportive services will bring meaningful relief

12  to PEH and help them transition out of homelessness.

13         **B.    High Acuity Beds (§ D.2)**

14         The settlement would also commit the County to expend considerable

15  resources to house high-acuity PEH in the City.

16         PEH face varying levels of acuity depending on their duration of

17  homelessness, number and severity of co-occurring conditions, and community

18  network support.  "High acuity" PEH are often considered the hardest to house due

19  to health needs that require daily assistance and management, may interfere with

20  employment opportunities, and otherwise make accessing resources more

21  challenging.  As a consequence, high-acuity PEH frequently suffer from long-term

22  homelessness.

23         For fiscal year 2022–2023, the County's $532.6 million budget for the

24  Homeless Initiative[4] will fund 5,000 interim housing beds for PEH, including over

25

26  [4] The Los Angeles County Homeless Initiative $532.6M Homeless Initiative
    Spending Plan for FY 2022-23 (May 17, 2022),

27  https://homeless.lacounty.gov/news/la-county-prepares-to-intensify-and-refocus-its-

28  fight-against-homelessness-as-board-of-supervisors-approves-532-6m-spending-

589781.13                              8

1,600 beds for PEH who are high acuity. The County has agreed that eligible PEH who are residents of the City will now have exclusive or prioritized use of high service need interim housing beds in the City, instead of relying on eligibility and availability—a big improvement. This addresses a critical gap in the new shelter provided for under Plaintiffs' settlement with the City.

**C.    New Mental Health/Substance Use Disorder Beds (§ D.3)**

Another issue of importance in the settlement is providing for PEH with mental health and/or SUD. As part of the settlement, the County is funding 300 new mental health/substance use disorder beds to serve people experiencing homelessness. These beds are in addition to the County's existing supply of approximately 8,600 mental health/substance use disorder beds. The County is working with relevant departments with subject matter expertise to determine the exact ratio of new mental health and SUD beds that will be created under the settlement.

**D.    Increased MDTs/HOME Teams (§§ D.4-5)**

Per the settlement, the County will also expand the number of Multi-Disciplinary Teams ("MDTs") in the City from 22 to 34 and the number of Homeless Outreach & Mobile Engagement ("HOME") teams from 5.5 to 10. Under the agreement, the increase in MDT and HOME teams would include approximately 120 new staff members—a 50 to 80 percent increase from current numbers. The number of new teams is proportionate to the population of PEH as determined by

---

plan-for-fy-2022-23/.

The County Board of Supervisors ("Board") launched the Homeless Initiative in 2015. The Homeless Initiative is the County's central coordinating body responsible for expanding and enhancing services for PEH and works closely with County outreach teams, as well as the Los Angeles Homeless Services Authority, a joint powers authority of the County and the City that provides a continuum of programs, housing, and services to prevent and end homelessness.

1 the latest Point In Time count. The County has also agreed to reallocate MDTs to
2 ensure there is at least one team per City Council District.

3      MDTs are comprised of a health professional, mental health specialist,
4 substance abuse counselor, case manager, and someone with lived experience with
5 homelessness, who provide outreach and engagement seven days a week to connect
6 PEH with complex health and/or behavioral conditions to housing, supportive
7 services, and sources of income.  The HOME teams are similarly field-based and
8 provide outreach and engagement services to PEH who have a serious mental
9 illness, with the goal of linking them to ongoing mental health services and
10 permanent housing to disrupt the cycle of chronic homelessness.  In the last two
11 years, from June 2020 through July 2022, County outreach teams engaged 31,433
12 individuals who had not been contacted before.

13      With this settlement, the County will be able to expand that capacity to reach
14 even more individuals needing help.

15     **E.**    **Land Partnership; Additional Funding (§§ D.6–7)**

16      The settlement also contains other provisions that allow for additional
17 investments and partnerships.  The County has agreed to make land owned by the
18 County available to the City to create new interim or permanent supportive housing
19 units.  This provision reflects the County's ongoing strategy of collaborating with
20 local jurisdictions like the City to identify new housing sites.  Moreover, the County
21 has committed to working with the City to identify and apply for additional state or
22 federal funding for mental health and SUD treatment, to improve access and clinical
23 treatment for County residents suffering from such disorders.  These provisions are
24 intentionally flexible to allow the County to respond to evolving need and capitalize
25 on new opportunities.

26     **F.**    **Reporting Obligations; Continuing Jurisdiction (§§ C, P.1.ii)**

27      To ensure Plaintiffs have visibility into the County's fulfillment of its
28 obligations over the term of the settlement, the agreement contains detailed

reporting requirements that the County must provide on a quarterly basis.  These reporting requirements ensure that Plaintiffs have the ability to promptly invoke the dispute resolution provisions set forth in the agreement to enforce the settlement.  Those dispute resolution provisions include this Court's continuing jurisdiction, in its discretion, over any contract action that arises concerning the County's compliance with the settlement.

The County committed $236 million through fiscal year 2026–2027 to implement this settlement, in addition to the hundreds of millions spent by the County annually outside of, and in addition to, this lawsuit.  Thus, the $236 million does not include the costs of new mental health and/or SUD beds, the totality of the County's provision of County services and benefits to PEH, or the value of County land made available to the City for housing/shelter projects.  And the County prioritized execution of these terms—so much so that it has moved forward with key terms while the lawsuit remains pending.

## III.   THE COUNTY IS COMMITTED TO AMELIORATING HOMELESSNESS BEYOND THIS LITIGATION

The terms of the settlement agreement between Plaintiffs and the County complement the County's significant work outside of this litigation to address the homelessness crisis—often and increasingly in concert with the City.

For example, separate from the settlement, the Board created a Blue Ribbon Commission on Homelessness (the "Commission") to research and analyze various homelessness governance reports, study models from across the nation, and provide feedback to implement reform to help solve the homelessness crisis in the County.[5]

On March 30, 2022, after hundreds of hours of research and interviews with

---

[5] Statement of Proceedings of the Regular Meeting of the Board of Supervisors of the County of Los Angeles (July 27, 2021), http://file.lacounty.gov/SDSInter/bos/sop/1110950_072721.pdf

stakeholders, the Commission published its Governance Report (the "Report") and
delivered it to the Board.  The Report highlighted several "key concerns" for
addressing the homelessness crisis, including the need to act with urgency and
develop flexible solutions; to improve communication and focus on diversity,
equity, and inclusion; and to increase support for small service providers in order to
build capacity.

In response to these and other concerns, the Report delineated seven
recommendations to the Board, which included renewing and restarting
relationships with other cities and councils of government.[6]  In May 2022, the Board
voted to adopt all seven recommendations.

The County is investing unprecedented resources to mount a massive and
urgent response to the crisis in collaboration with cities across the region as well as
the federal and state governments.  A landmark $600 million Homeless Initiative
budget for the 2023–2024 fiscal year has been proposed for the Board's
consideration on January 24, 2023.[7]  This budget reflects the findings from a three-
month, bilingual engagement process in which the Homeless Initiative solicited
input from providers, people with lived experience, subject matter experts, the
public, and other municipalities on the most important things the County can do to
improve its homeless services system.  The new budget allocates $267 million
towards permanent housing and $181 million towards interim housing, in addition to

---

[6] Blue Ribbon Commission on Homelessness Governance Report (Mar. 30, 2022),
https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-
b43e949b70a2/c15b378d-d10e-46aa-a6cc-
7102043aa708/BRCH%20Homelessness%20Report%20%28033022%20Adopted%
29%20%28Final%29.pdf

[7] Los Angeles County Homeless Initiative FY 2023-24 Budget (Dec. 8, 2022),
https://homeless.lacounty.gov/fy-2023-24-draft-
budget/#:~:text=After%20extensive%20community%20and%20stakeholder,for%20
fiscal%20year%202023%2D24.

1   funding services to prevent homelessness, transition PEH out of homelessness, and

2   prevent a return to homelessness.[8]

3        The budget also reflects a new framework to end homelessness that prioritizes

4   the most at-risk households for prevention services; focuses on rehousing the

5   persistently underserved PEH (those who require ongoing, resource-heavy

6   intervention); and, consistent with the Commission's recommendations, strengthens

7   collaborations with nearby municipalities (including encouraging resource pooling

8   to develop more housing).  As explained above, there is evidence that the Homeless

9   Initiative's strategies are working.

10       The County's work extends to the most vulnerable PEH.  The interim housing

11  funded by Measure H includes specialized housing for victims of domestic violence,

12  PEH healing from illness or injury, and PEH in treatment for SUD.[9]  The County

13  has budgeted $175.7 million for permanent supportive housing for individuals who

14  have experienced chronic homelessness and have disabilities, chronic medical

15  conditions, and/or behavioral health conditions (including mental health and

16  SUD).[10]

17       The County Department of Health Services partners with the Sheriff's

18  Department to link PEH in jail facilities to County services.[11]  In addition, the

19  County has contributed millions of dollars to providing a package of mainstream

20  services to PEH residing in facilities established by the City pursuant to the City-

21  County freeway deal, including on-site outreach and engagement, benefits

22  _____

23  [8] *Id.*

24  [9] Los Angeles County Homeless Initiative Drafty FY 2023-24 Funding

25  Recommendations (Dec. 8, 2022), https://homeless.lacounty.gov/wp-
    content/uploads/2022/12/DRAFT-BOS-Homeless-Deps-2023-24-Funding-Recs.pdf.

26

27  [10] *Id.*

28  [11] *Id.*

1  assistance, as well as mental health and SUD services.  [Dkt. 136, 203, 254, 341,
2  364.]

3        In December 2022, the newly elected leaders of the City and County took
4  even further action to strengthen their coordination of housing and services for PEH.
5  Following a meeting with the Chair of the County Board and the County Chief
6  Executive Office, the newly elected Mayor of Los Angeles declared homelessness a
7  state of emergency and outlined a united approach to homelessness that aims to
8  accelerate and lower the cost of building affordable housing and temporary
9  housing.[12]  Among other things, the declaration directs the City to coordinate its
10 efforts to address homelessness with the County, the State of California, and the
11 federal government, including by embedding County staff in the City's emergency
12 operations center and alongside City departments.[13]

13       On December 20, 2022, the Mayor likewise attended a Board meeting where
14 the County Board, including new County Supervisor Lindsey Horvath from
15 supervisorial district 3, approved a motion to support the City in its state of
16 emergency.  The Board motion directs County personnel to work with outreach
17 teams and interim housing providers in the City to assess and connect unsheltered
18 PEH and PEH in City interim housing to County services to which they are eligible
19 (such as mental health counseling, substance abuse counseling, housing navigation,
20 Medi-Cal enrollment, and domestic violence services).[14]  The County has also
21 instructed the Homeless Initiative to ensure its programs and services support the

22 _____

23 [12] Mayor Karen Bass Declares a State of Emergency on Homelessness (Dec. 12,
   2022), https://mayor.lacity.gov/news/mayor-karen-bass-declares-state-emergency-
24 homelessness.

25 [13] *Id.*

26
27 [14] Motion by Supervisor Janice Hahn, County Support of the City of Los Angeles in
   their State of Emergency (Dec. 20, 2022),
28 https://file.lacounty.gov/SDSInter/bos/supdocs/175851.pdf.

1   City's emergency declaration, paving the way to redirect County staff as needed.[15]

2   The Board expressed its willingness to extend similar support to any other cities that

3   build housing and shelter for PEH.

4        Speaking at the December 20 Board meeting, the Mayor described her

5   declaration and the Board's motion as the County and City "lock[ing] arms" in a

6   "new emergency approach to homelessness, to ensure [the City's] efforts to bring

7   people inside are matched with [the County's] experts and resources in healthcare,

8   mental health, substance abuse, public health, and other social services."[16]  The

9   Mayor emphasized that "the only effective approach to this crisis is one that is

10  unified and comprehensive, and is only possible with a deep partnership between the

11  City and the County, that would represent a new direction and a new hope for Los

12  Angeles and the unincorporated communities and the 87 other cities in the

13  County."[17]  The Board members echoed the Mayor's sentiments, with Supervisor

14  Horvath reiterating that she not only endorsed the Board's motion to support the

15  City in its state of emergency, but believed "we have to work together to solve our

16  homelessness crisis, City and County," and strongly wanted to "create meaningful

17  power and expediency[] in terms of how [the County] can support the mayor and the

18  City in de-siloing [its] own efforts."[18]

19       Shortly thereafter, on January 10, 2022, the Board unanimously approved a

20  motion likewise proclaiming a local emergency on homelessness.  (*See* Exhibit 1

21

22

---

23  [15] *Id.*

24  [16] Los Angeles County Board of Supervisors Board Meeting Transcript at 21:9–
25  22:18 (Dec. 20, 2022),
    https://file.lacounty.gov/SDSInter/bos/sop/transcripts/1135008_122022.pdf
26
27  [17] *Id.* at 22:21–23:2.

28  [18] *Id.* at 34: 8–11, 36:19–21, 37:9–11.

[Board Motion].)[19]  The Board motion acknowledges that "[t]he reasons individuals become unhoused are complicated and often multifaceted," and reiterates the need for a "coordinated effort between cities and the county" to "be able to effectively address homelessness" because "each entity is responsible for different aspects of the solution." (*Id.*)  The local emergency declaration will arm the County with "additional tools to accelerate and expand its response through the Homeless Initiative and in collaboration with our city partners," including "accelerated hiring of additional employees to address homelessness and mental health, the more effective and efficient use of funds, an expedited procurement of critical items, a faster and more streamlined creation of housing, expanded services, and the ability to request additional resources from the State and Federal governments." (*Id.*)  In addition to declaring a local emergency, the motion directs County staff to expedite procurement and contracting processes for materials and services, fast track hiring, accelerate efforts to create more housing and licensed beds and, and identify funding that can be directed to housing and services. (*Id.*)

The County's homeless services system is subject to significant accountability measures that have been in place for years.  The Homeless Initiative reports quarterly to the Board on the impacts of Measure H and the implementation of its strategies.  The same ordinance that placed Measure H on the ballot also created a Citizens' Oversight Advisory Board, which meets regularly and performs audits of Measure H expenditures.  County departments that administer services for PEH are also subject to detailed auditing and accounting requirements, and the County's emergency declaration calls for a report back in six months on the effectiveness of the effort. (*Id.*)

---

[19] Additional amendments to the motion were read into the record at the meeting, a transcript of which has not been certified as of the date of this filing but will be made available at: https://lacounty.gov/government/board-of-supervisors/statement-of-proceedings/

1
2
IV. **THE COURT SHOULD APPROVE THE PARTIES' JOINT
STIPULATION TO DISMISS THIS ACTION WITH PREJUDICE**

3        There is no legal basis for the Court to deny the parties' request for dismissal

4   with prejudice. *See Smoot v. Fox*, 340 F.2d 301, 303 (6th Cir. 1964) (granting

5   petition for writ of mandamus, directing district court to grant plaintiff's Rule

6   41(a)(2) motion for dismissal with prejudice); *Century Mfg. Co., Inc. v. Cent.*

7   *Transp. Int'l, Inc.*, 209 F.R.D. 647, 648 (D. Mass. 2002) (where parties have moved

8   to dismiss third-party complaint with prejudice under Rule 41(a)(2), "courts have

9   found that they are without discretion, and must grant the motion"); *Bridgeport*

10  *Music, Inc. v. London Music, U.K.*, 345 F. Supp. 2d 836, 841 (M.D. Tenn. 2004)

11  (abuse of discretion to refuse to grant Rule 41(a)(2) dismissal with prejudice).

12       The court likewise lacks authority to "approve" or impose terms and

13  conditions on the settlement agreement underlying the parties' stipulation to

14  dismiss. *See In re Smith*, 926 F.2d 1027, 1029-30 (11th Cir. 1991) (granting writ of

15  mandamus, directing district court to vacate order disapproving settlement

16  agreement "based on the 'unrepresented interests' of Florida taxpayers"); *Gardiner*

17  *v. A.H. Robins Co., Inc.*, 747 F.2d 1180, 1185-88 (8th Cir. 1984) (district court had

18  no authority to approve settlement agreement underlying stipulated dismissal).

19       By design and the intention of the parties, the dismissal order will *not*

20  function as a consent decree. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO*

21  *C.L.C. v. City of Cleveland*, 478 U.S. 501, 519, 522 (1986) (court cannot enter a

22  consent decree to which a party has not consented, and "it is the parties' agreement

23  that serves as the source of the court's authority to enter any judgment at all").  The

24  order is a stipulated dismissal that incorporates a consensual settlement agreement.

25  It provides for the court to retain ancillary jurisdiction *only* if there is a breach of the

26  agreement and only in the manner prescribed by the parties.  (Agmt. ¶ P (specific

27  performance as the only available relief); *Alvarado v. Table Mountain Rancheria*,

28  509 F.3d 1008, 1017-18 (9th Cir. 2007) (party seeking enforcement of the

1   settlement agreement must allege a violation of the agreement to establish ancillary
2   jurisdiction).

3         In this way, the agreement carefully balances the parties' mutual desire for an
4   effective judicial enforcement mechanism, while avoiding the type of long-term
5   decree and judicial supervision that raises "sensitive federalism concerns" (*Horne v.*
6   *Flores*, 557 U.S. 433, 448 (2009)) and risks improperly depriving state officeholders
7   of "their designated legislative and executive powers." *Frew ex rel. Frew v.*
8   *Hawkins*, 540 U.S. 431, 441 (2004).

9         The parties respectfully request that the District Court approve the parties'
10  joint stipulation to dismiss this action with prejudice, incorporating the settlement
11  agreement as written.

12

13  DATED:  January 13, 2023          MILLER BARONDESS, LLP

14

15

16                                     By:  _____
17                                          LOUIS R. MILLER
                                            Attorneys for Defendant
18                                          COUNTY OF LOS ANGELES

19

20

21

22

23

24

25

26

27

28

589781.13

# EXHIBIT 1

AGN. NO.

**MOTION BY SUPERVISORS LINDSEY P. HORVATH**                January 10, 2023
**AND KATHRYN BARGER**

<u>**Proclamation of a Local Emergency for Homelessness in the County of Los Angeles**</u>

As of early 2022, Los Angeles County had 69,144 unhoused residents, including 70% (48,548) that were unsheltered, the highest number of unsheltered persons in the Country. This crisis is not new and has significantly accelerated over the last decade. Since 2015, the number of unhoused individuals in Los Angeles County has increased by 55%, from 44,359 to 69,144.  The residents of Los Angeles County see this crisis play out daily and desire an effective and compassionate solution.

The reasons individuals become unhoused are complicated and often multifaceted.  Those that become unhoused are frequently rent-burdened, live paycheck-to-paycheck, and many report suffering from serious mental illness or substance abuse issues.  One-time events such as job loss, medical incidents, significant unforeseen costs, and no-fault evictions, also often lead individuals to become unhoused. Because the reasons individuals become unhoused are complicated and multifaceted, the approach

- MORE -

<u>MOTION</u>

SOLIS            _____

MITCHELL        _____

HORVATH         _____

BARGER          _____

HAHN            _____

to assisting them must be the same.  This approach requires the commitment of both local cities and the County, because each entity is responsible for different aspects of the solution with the County primarily responsible for mental health, general health, and social services.

On July 27, 2021, the Board of Supervisors (Board) approved a motion by Supervisors Kathryn Barger and Hilda L. Solis, to create a Blue-Ribbon Commission on Homelessness (BRCH) to assess existing structures and systems and provide recommendations on reforms to help Los Angeles County and its 88 cities solve homelessness. At the time, Supervisor Barger stated: "Homelessness is a major crisis affecting our communities at every level and it's time for sweeping changes to the system. This Blue-Ribbon Commission will be critical to help the County, in partnership with our 88 cities, identify the reforms and changes needed and to move forward with actions that can finally help our vulnerable residents who are suffering on the streets."

The BRCH outlined a variety of recommendations with many of them focused on the restructuring of the governance response to homelessness with a focus on simplification, urgency, and equity.  Generally, the BRCH recommend establishing a single County entity to lead the response to homelessness; establishing multi-year funding for local jurisdictions; streamlining and improving Los Angeles Homeless Services Authority (LAHSA) operations; simplifying the governance of the Greater Los Angeles Continuum of Care; utilizing data and metrics; and creating an executive-level action team.  These recommendations were designed to streamline and expediate the response to homelessness and were adopted by the Board of Supervisors on May 3, 2022.

On December 12, 2022, Los Angeles Mayor Karen Bass declared a local

emergency, in the City of Los Angeles, to address homelessness.  In response to Mayor Bass's emergency declaration, Supervisor Janice Hahn introduced a motion on December 20, 2022, to provide County support for the City of Los Angeles' emergency declaration.  This motion directed key County staff to work with the City of Los Angeles to implement their emergency declaration.  Additionally, on December 21, 2022, Long Beach Mayor Rex Richardson asked Long Beach city officials to draft an emergency declaration on homelessness, stating that "the crisis that we have requires us to move faster and with urgency." The Long Beach City Council will hold a vote on their emergency declaration on January 10, 2023.  Together the cities of Los Angeles and Long Beach represent nearly one-half of the population of Los Angeles County, but two-thirds of the unhoused population.  While Los Angeles and Long Beach represent the two largest cities in Los Angeles County, many other smaller cities in the County are also struggling to address homelessness. These smaller cities can permit new affordable housing in their jurisdictions through their land use powers, but in many cases rely on the County for funding and homelessness services.  Without a coordinated effort between cities and the County we will not be able to effectively address homelessness.

Los Angeles County has experienced other emergencies over the decades, including earthquakes, wildland fires, civil unrest, and the COVID-19 pandemic.  Each of these emergencies were unique and required different responses.  Homelessness is a specific and prolonged emergency that is impacting more individuals than other emergencies.  For example, the Northridge earthquake, one of the most significant local emergencies in recent history, killed approximately 60 individuals and displaced between 20,000-25,000 persons from their homes.  By comparison, there are currently 69,000

unhoused individuals living in Los Angeles County, with nearly 2,000 of them passing away each year, which has been the status quo for several years.

These unfortunate numbers and trends are not acceptable as the status quo.  The County of Los Angeles, as a major provider of services to unhoused individuals, must also proclaim a local emergency, in order to accelerate the response to homelessness throughout the County.

Los Angeles County may proclaim a local emergency when there is the "existence of conditions of disaster, or of extreme peril to the safety of persons and property within the territorial limits of the County," and when these conditions "are or are likely to be beyond the control of the services, personnel, equipment, and facilities of the County and require the combined forces of other political subdivisions to combat."  Homelessness meets these requirements for a local emergency.  Conditions of extreme peril to the safety of persons exist on the basis of pervasive and pernicious homelessness in Los Angeles County.  In this regard, 69,000 individuals are presently unhoused in the County, and critically 2,000 of those unhoused individuals die each year. Additionally, solving homelessness is beyond the scope of County resources.  Homelessness is a complicated and multifaceted issue that requires, among other things, the development of new affordable housing, including land-use policy decisions to permit such housing, which is a function of cities and of the County in unincorporated areas.  The provision of services for unhoused individuals requires substantial County resources, in coordination with cities. Coordination, collaboration, and the combined forces of different jurisdictions are imperatively needed to combat the current conditions of homelessness.  For these reasons it is necessary for Los Angeles County to proclaim a local emergency regarding

homelessness.

The County provides critical services to unhoused individuals, including general health, mental health, and substance abuse treatment services.  Additionally, the County oversees significant portions of the criminal justice system.   All of these services are an important part of the overall response to homelessness.  Many of these services, provided by LAHSA and paid for by Measure H, have been working effectively; over the last four years more than 20,000 unhoused individuals have been placed into housing each year with nearly 90% remaining in housing.  However, at the same time, tens of thousands of new individuals have become unhoused.   While we have many solutions that are working, the scale and speed at which these solutions are being implemented needs to be expanded and expedited, respectively.

Proclaiming a local emergency to address this critical crisis will provide the County with additional tools to accelerate and expand its response through the Homeless Initiative and in collaboration with our city partners. These additional tools include, accelerated hiring of additional employees to address homelessness and mental health, the more effective and efficient use of funds, an expedited procurement of critical items, a faster and more streamlined creation of housing, expanded services, and the ability to request additional resources from the State and Federal governments.   Initiatives to reduce vacancies in key County service departments will be critical to accelerating the response to homelessness, as detailed in a recent Los Angeles Times article titled "*Burned Out LA County Mental Health Workers Weigh Options*". [1] The proposed emergency proclamation is intended to facilitate and expedite County hiring by

---

[1] Burned out L.A. County mental health workers weigh options - Los Angeles Times (latimes.com)

potentially offering bonuses, special step placements, higher salary schedules, and loan repayment programs.

The Chief Executive Office-Homeless Initiative (CEO-HI) is the central coordinating body for Los Angeles County's ongoing effort to expand and enhance services for people experiencing homelessness or at risk of becoming homeless. Under the new CEO-HI framework, adopted by the Board in May 2022, CEO-HI's efforts are driven by five actions - coordination, prevention, connection, housing, and stability through work with three key partners - the rehousing system, mainstream County government systems, and partnerships with cities and Councils of Governments (COGs). The response to other declared emergencies, such as natural disasters, would typically be led by the OEM, however, the CEO-HI is best suited to lead the overall coordination of the emergency response for this declaration.

**WE, THEREFORE, MOVE** that the Board of Supervisors:

1. Proclaim a local emergency for homelessness in the County of Los Angeles.  This proclamation of local emergency shall remain in effect until its termination is proclaimed by the Board.

2. Approve and execute the attached proclamation of existence of local emergency for homelessness in the County of Los Angeles.

3. Direct the Chief Executive Office (CEO), Homeless Initiative (HI), and Office of Emergency Management (OEM), and all other County Departments to take necessary steps for the protection of life, health, and safety of people experiencing homelessness in the County of Los Angeles including:

   a. <u>Contracting and Procurement</u>: Leveraging the lessons learned during the

COVID-19 pandemic, direct the CEO and relevant County Departments to take appropriate steps to expedite the procurement and contracting processes for materials, equipment, and services necessary to respond rapidly to the homelessness crisis.

b. <u>Hiring</u>: Direct the Department of Human Resources and relevant County Departments to expedite recruitment and hiring for positions necessary to respond to the homelessness crisis including any actions needed to quickly reduce vacancy levels for positions providing mental health, substance use disorder, health, and case management services directly to people experiencing homelessness.

c. <u>Housing</u>: Direct CEO-HI and relevant County Departments to accelerate timelines for the creation of licensed beds, interim housing, and permanent housing for people experiencing homelessness and placement of clients in these housing resources, increase funding for local rental subsidies, and coordinate with local cities regarding the construction of permanent supportive housing (including funding).

d. <u>Services</u>: Direct CEO-HI and relevant County Departments to work directly with outreach teams and interim housing providers to provide accelerated access to mainstream County services, including but not limited to the Department of Mental Health (DMH), the Department of Public Health-Substance Use Prevention and Control (DPH-SAPC), the Department of Health Services (DHS), the Department of Public Social Services (DPSS), and the Department of Children and Family Services (DCFS), to sheltered and unsheltered people

experiencing homelessness Countywide.

   e.  <u>Spending</u>: Direct CEO and all relevant County Departments to identify strategic uses of restricted funding in order to alleviate the crisis among unhoused individuals and any State and Federal legislative relief required to use restricted funding as proposed and report back to the Board in 60 days on all available options.

   f.  <u>Communication and Outreach</u>:  Direct the CEO, HI, OEM, and Countywide Communications to develop and implement a communication plan to interact with Los Angeles County cities and the public on the local emergency proclamation, including how the County will coordinate and work with cities, and how solutions will be implemented.

4.  Direct CEO-HI to lead the overall coordination of the emergency response and to coordinate efforts with the State and Federal governments, and the cities within the County.  Direct the CEO to report back in 14 days with the authorities needed, and requisite changes to implement the foregoing.

5.  Direct CEO to enable the HI to immediately assume a leadership role in managing the local emergency proclamation until the County entity responsible for homelessness is finalized and concurrently establish the infrastructure to maintain the efforts initiated under this local emergency proclamation.  Report back to the Board in 21 days on necessary organizational changes, and resources required.

6.  Direct the CEO to report back in six months with an update on the local emergency proclamation, including data demonstrating the effectiveness of County efforts and if the efforts should in any way be modified.

7.  Direct the CEO to report back in one year regarding whether the local emergency proclamation should be terminated, extended, or modified. Such recommendations shall be supported by data demonstrating the effectiveness of County efforts.

8.  Direct the CEO-HI to develop a process for providing periodic reporting (at a minimum quarterly) to the Board on the expenditure of Measure H funds, in order to more accurately assess the effectiveness of the use of Measure H funds in conjunction with the local emergency proclamation and the overall coordinated response to homelessness.

S:JL/Proclamation of a Local Emergency for Homelessness in the County of Los Angeles

**PROCLAMATION OF EXISTENCE OF A LOCAL EMERGENCY FOR HOMELESSNESS BY THE LOS ANGELES COUNTY BOARD OF SUPERVISORS**

**WHEREAS,** Chapter 2.68 of the Los Angeles County Code provides that the Los Angeles County Board of Supervisors (Board) may proclaim the existence of a "local emergency," as defined in Government Code section 8558(c), in pertinent part, as follows: "'[l]ocal emergency' means the duly proclaimed existence of conditions of disaster or of extreme peril to the safety of persons and property within the territorial limits of a county . . . caused by conditions such as air pollution, fire, flood, storm, epidemic, riot, drought, cyberterrorism, sudden and severe energy shortage, deenergization event . . . plant or animal infestation or disease . . . or an earthquake, or other conditions . . . which are or are likely to be beyond the control of the services, personnel, equipment, and facilities of that political subdivision and require the combined forces of other political subdivisions to combat . . . ."; and

**WHEREAS,** as of January 10, 2023, conditions of extreme peril to the safety of persons exist on the basis of pervasive and pernicious homelessness in Los Angeles County. In this regard, 69,000 individuals are presently unhoused in the County, and critically 2,000 of those unhoused individuals pass away each year. Additionally, solving homelessness is beyond the scope of County resources.  Homelessness is a complicated and multifaceted issue that requires, among other things, the development of new affordable housing, including land use policy decisions to permit such housing. The provision of services for unhoused individuals requires substantial County resources, in coordination with cities. Coordination, collaboration, and the combined forces of different jurisdictions are imperatively needed to combat the current conditions of homelessness; and

**WHEREAS,** the mobilization of local resources, and the ability to coordinate interagency response, accelerate procurement of vital supplies, and use mutual aid, will be critical to successfully responding to the homelessness emergency; and

**WHEREAS,** these conditions warrant and necessitate that the County proclaim the existence of a local emergency.

**NOW, THEREFORE, THE BOARD FINDS THAT** conditions of extreme peril to the safety of persons exist on the basis of pervasive and pernicious homelessness in Los Angeles County within the meaning of Government Code section 8558(c), and such conditions are or will likely be beyond the control of the services, personnel, equipment, and facilities of the County, and require the combined forces of other political subdivisions to combat; and

**IT IS HEREBY ORDERED AND PROCLAIMED** by the Board that a local emergency exists in the County; and

**IT IS FURTHER ORDERED AND PROCLAIMED** that, during the existence of said local emergency, the powers, functions, and duties of the emergency organization of the County shall be those prescribed by State law, by ordinances, and resolutions of the County.

The foregoing proclamation was, on the 10th day of January 2023, adopted by the Board of Supervisors of the County of Los Angeles and ex officio the governing body of all other special assessment and taxing districts, agencies, and authorities for which said Board so acts.

BOARD OF SUPERVISORS OF THE
COUNTY OF LOS ANGELES

By _____
                    Chair

APPROVED AS TO FORM

DAWYN R. HARRISON
Interim County Counsel

By: _____
        Deputy

CELIA ZAVALA
Executive Officer
Board of Supervisors

By: _____
        Deputy

HOA.103975173.1