# EXHIBIT C

EXHIBIT C - Page 55

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel:  (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker*

*Additional Counsel Listed Below*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>        Plaintiff(s),<br><br>    vs.<br><br>City of Los Angeles, et. al.<br><br>        Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>INTERVENORS' OBJECTIONS TO PLAINTIFFS' AND DEFENDANT CITY OF LOS ANGELES'S STIPULATED ORDER OF DISMISSAL<br><br>Date: June 11, 2022<br>Time: 9:00 a.m.<br><br>Complaint Filed:  March 10, 2020 |

1

_ INTERVENOR'S OBJECTIONS TO PROPOSED ORDER OF DISMISSAL

**EXHIBIT C - Page 56**

*Additional Counsel*

**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
ELDER LAW AND DISABILITY
RIGHTS CENTER
1535 E 17th Street, Suite 110
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

*Attorneys for Orange County Catholic Worker*

2

**Intervenors' Objections to Proposed Order of Dismissal**

**EXHIBIT C - Page 57**

## **Table of Contents**

I.   INTRODUCTION .................................................................................................1

II.  FACTUAL AND PROCEDURAL BACKGROUND.......................................2

III.   LEGAL STANDARD.......................................................................................5

   a.   The "Stipulated Order" is a Consent Decree ....................................................5

   b.   Legal Standard for Entering Orders That Maintain Jurisdiction to Enforce Settlement Agreements (or Consent Degrees).........................................................5

IV.   ARGUMENT ....................................................................................................7

   a.   The Court Lacks Jurisdiction to Approve the Consent Decree .......................7

   b.   The Proposed Consent Decree Impermissibly Infringes on the Rights of Third Parties, Including Intervenor.......................................................................13

   c.   The Proposed Agreement Is Procedurally Unfair Because Section Four Was Not Negotiated at Arms Length...........................................................................16

   d.   The Settlement Agreement Allows Discrimination on the Basis of Disability in Violation of the Federal and State Anti-Discrimination Law .........................17

   e.   The Settlement Agreement is Incomprehensible and Too Vague to be Enforceable ........................................................................................................20

V.  CONCLUSION ...............................................................................................24

i

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 58

## <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936) ..........................12

*Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of*
    *Health and Human Resources*, 532 U.S. 598 (2001) ...........................................5

*Baker v. Carr*, 369 U.S. 186 (1962) ......................................................................11

*Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) ................6, 20

*E.E.O.C. v. Pan Am. World Airways, Inc.,* 897 F.2d 1499 (9th Cir. 1990) ...........14

*Garcia v. City of Los Angeles*, 2:19-cv-06182-DSF-PLA .......................................8

*Hansberry v. Lee*, 311 U.S. 32 (1940) ...................................................................14

*LA Alliance for Human Rights v. City of Los Angeles,*
    14 F.4th 947 (9th Cir. 2021) ..............................................................................12

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
    478 U.S. 501 (1986) ...........................................................6, 7, 10, 11, 13

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) ........................................9, 12

*Martin v. Wilks*, 490 U.S. 755 (1989) .....................................................................6

*Mitchell v. City of Los Angeles*, 16-CV-01760-SJO (JPR) ....................................15

*Moore v. Charlottte-Mecklenburg Board of Education,* 402 U.S. 47 (1971) ........11

*Orange County Catholic Worker v. County of Orange,* 18-CV-00155-DOC-JDE ..2

*Perkins v. City of Chicago Heights*, 47 F.3d 212 (7th Cir. 1995) ..........................19

*Raines v. Byrd*, 521 U.S. 811 (1997) ......................................................................11

*San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996) .........9

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984) ...................................................6, 7

*Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350 (9th Cir.1990) .....6,

*Sierra Club v. McCarthy*, 2015 WL 889142, at *5 (N.D.Cal., 2015) ....................16

*Sierra Club v. North Dakota*, 868 F.3d 1062 (9th Cir. 2017) ...............................13

*Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) ..10,12

*U.S. v. City of Miami*, 664 F.2d 435 (5th Cir. 1981) ...............................................6.

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 59

*U.S. v. Colorado*, 937 F.2d 505 (10th Cir. 1991) ......................................................16

*U.S. v. Montrose Chem. Corp. of Ca.,* 50 F.3d 741 (9th Cir. 1995) .......................,5

*U.S. v. New York City Housing Authority,* 347 F. Supp.3d. 182

  (S.D.N.Y. 2018) ......................................................................................................21

*U.S. v. State of Or.*, 913 F.3d 576 (9th Cir. 1990) ...............................5, 6,7,16, 17

*U.S. v. Telluride Co.*, 849 F. Supp. 1400 (D.Colo.1994) .......................................16

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983).................................................5

**Federal Statutes**

29 U.S.C. § 794(a) .....................................................................................................19

42 U.S.C. § 3604(f)(1)...............................................................................................18

42 U.S.C. § 12131 .....................................................................................................18

**State Statutes**

Cal. Civ. Code §§ 51 et seq 2 ....................................................................................19

Cal. Gov't Code § 11135(b) .......................................................................................19

Cal. Gov't Code  § 12926.1 ........................................................................................19

**Ordinances**

Los Angeles Municipal Code, Chapter IV, Article 1, Disorderly Conduct,

  Places and Publications............................................................................................8

Los Angeles Municipal Code, Chapter V, Article 6,

  Public Hazards.........................................................................................................8

Los Angeles Municipal Code Section 41.18 ...............................................................9

Los Angeles Municipal Code Section 51.03 ..............................................................19

Los Angeles Municipal Code Section 56.11 ...............................................................8

**Rules**

Fed. R. Civ. Pro. 24 ...................................................................................................13

iii

---

**Intervenors' Objections to Proposed Order of Dismissal**

**EXHIBIT C - Page 60**

## I.     INTRODUCTION

The City of Los Angeles, which has been repeatedly enjoined by federal courts from violating the constitutional rights of people experiencing homelessness, and a private group of property owners and residents, who have long decried these court decisions and brought this case in part to undermine those rulings, have now reached an agreement that, unsurprisingly, attempts to obtain judicial approval to do just that. Intevenors Los Angeles Community Action Network (LA CAN), LA Catholic Worker, and Orange County Catholic Worker object to the Court's entry of the proposed "stipulated order of dismissal."  The agreement, which was negotiated only by the City and the Plaintiffs, to the exclusion of all other parties to the case, purports to trade the creation of an as-of-yet undetermined number of shelter beds, by an as-of-yet undetermined deadline, for this Court's permission to enforce as-of-yet unwritten and otherwise undefined regulations and ordinances against unhoused residents, including LA CAN members intervenors, none of whom are parties to this agreement.

As outlined below, this agreement cannot be approved by this Court. The agreement runs afoul of numerous requirements that must be met before a court can enter a consent decree.  First, and most importantly, the agreement does not fall within the Court's subject matter jurisdiction. Plaintiffs do not have standing to seek the relief proposed in the agreement, the basis for the relief is too hypothetical and abstract, and there is no case or controversy between the parties that would give the Court jurisdiction to enter the proposed agreement.  Second, the agreement impermissibly impacts the rights of third parties who are not a party to the agreement, and relatedly, the agreement is procedurally unfair because the parties' agreement was not forged as part of an adversarial proceeding.  Third, the agreement runs afoul of federal, state, and even local disability law.  And finally, the agreement is so vague and ambiguous that it would effectively be unenforceable if it was entered as drafted.  For all of these reasons, the agreement as drafted cannot be approved by the Court.

1

---

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 61

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The LA Alliance filed this lawsuit in March 2020, after reaching out to the City because it believed the parties "interests [were] aligned" and the City may be a "willing party" to the suit because "[i]mpact litigation can go far in providing political cover or breaking down barriers to get things done."  Request for Judicial Notice (RJN), Exh. 1.  Within three months, the LA Alliance filed this lawsuit, alleging claims for public and private nuisance and related constitutional violations.  Dkt. 1.  Plaintiffs "sought out" this Court to preside over the litigation[1] and although Plaintiffs did not bring any constitutional challenges to the enforcement of quality of life ordinances or even, at that point, represent people experiencing homelessness, they still related the case to *Orange County Catholic Worker, et al. v. County of Orange*, 18-CV-00155-DOC-JDE ("OCCW"), asserting that it was appropriate given the Court's experience in deciding issues such as "the sufficiency of number of beds needed to resume enforcement of certain quality of life laws under *Martin v. Boise.*"  Dkt. 10 at 3.

Almost immediately after the case was filed, Orange County Catholic Worker, Los Angeles Community Action Network, and Los Angeles Catholic Worker moved to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) as well as under 24(b).The Court granted both motions.  *See* Dkt. 18 (granting Orange County Catholic Worker's motion to intervene); Dkt. 29 (granting Los Angeles Catholic Worker and Los Angeles Community Action Network's (LA CAN)'s motion to intervene).  In granting LA CAN and LA Catholic Worker's motion, the Court found that LA CAN's unhoused members "have a protectable interest to be free from

[1]Oreskes, Benjamin, Alpert Reyes, Emily, and Smith, Doug, "Judge Orders L.A. city and count ot offer shelter to everyone on skid row by fall," LA Times, April 20. 2021, available at https://www.latimes.com/homeless-housing/story/2021-04-20/judge-carter-la-city-county-shelter-skid-row-homeless-fall.  Instead of relating the case to other litigation already filed against the City of Los Angeles related to the enforcement of "public space regulations,".  Neither the City nor the County objected to the relation.

2

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 62

increased enforcement and the violation of their constitutional rights," and that there was "no other representation of unsheltered homeless people in Los Angeles, who are most likely to be impacted by any proposed remedies in this case." Dkt. 29 at 4, n. 1.

Even before the defendants were served, this Court began holding hearings related to homelessness and COVID-19, and in the course of those hearings, the parties immediately agreed to stay litigation and enter into settlement negotiations. *See* Dkt. 39 at 116. From the beginning, those negotiations focused on setting a threshold number of housing and shelter units that the City would need to create in order for the City to be obtain the Court's blessing to begin enforcing "quality of life" offenses like anti-camping bans; and in doing so, circumvent existing litigation and prevent future litigation. *See e.g.,* Dkt. 39 at 69 (describing the 60% threshold and discussing how consent decrees entered in other cities related to the Orange County litigation had "absolutely flattened the litigation"). Although Intervenors attempted to participate in the settlement negotiations to advocate for policy solutions that would address the homelessness crisis, Intervenors objected to the parties' attempt to use the litigation to secure judicial permission to enforce quality of life ordinances that were not actually before the Court or to undermine judicial rulings that protected unhoused people's constitutional rights. Intervenors were quickly excluded from negotiations between the City and the Plaintiffs. Even after the parties were ordered to attend mandatory settlement conferences earlier this year, the negotiations between Plaintiffs and the City remained behind closed doors.

On April 1, 2022, Intervenors learned that the City and Plaintiffs had reached a settlement agreement, only after the parties announced an invitation-only press conference at City Hall. Intervenors were excluded from even attending, and unlike every other closed door press conference held during COVID-19, the City did not even live-stream the press conference on its social media channels. That afternoon, the City filed a "term sheet" related to the proposed settlement. *See* Dkt. 408-1.

3

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 63

On May 10, 2022, after the City Council agenized the case for another closed session, Intervenors reached out to Plaintiffs and the City to inquire about the timing of the settlement and briefing on the approval of the agreement, including meeting and conferring pursuant to Local Rule 7.3.  *See* Myers Dec. ¶ 2. Neither party even acknowledged the communication for over a week.  At the end of the day on May 19, 2022, the day before Plaintiffs' and the City's deadline to submit the final agreement, counsel for the City responded that the were not obligated to even meet and confer with Intervenors and would not be filing a motion seeking approval; instead, the parties would simply be stipulating for the dismissal of the City from the case.  *Id.,* ¶ 3.  At 9:46 p.m., Plaintiffs filed a notice of lodging and lodged a document titled a "[Proposed] Stipulated Order of Dismissal under Federal Rule of Civil Procedure .  *See* Dkt. 421, 421-1 ("Agreement").  This was the first time Intervenors received a copy of the proposed order or settlement agreement  *Id.* ¶ 4.

Just as the City and Plaintiffs had telegraphed when the case was filed over two years ago, the agreement mirrors the settlement agreements in the Orange County litigation, even though the facts, legal claims, and basis for Article III jurisdiction in this case do not.  The proposed agreement provides that 1) the City "agrees to create a Required Number of housing or shelter solutions, which is equal to . . .  the shelter and/or capacity shelter solutions needed to accommodate sixty percent of the unsheltered City Shelter appropriate PEH within the City based on LAHSA's 2022 Point in Time Count" and 2) "once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter appropriate PEH" in a given council district or citywide, the agreement gives the City permission to enforce "public space regulations and ordinances" throughout the district or the city.  Agreement at 5, 6, 7. Under the agreement, this Court retains jurisdiction to both enforce the agreement and to provide oversight over its implementation. Agreement at 4.  Section 4.2 and 4.3 provide a mechanism for Plaintiffs, and only Plaintiffs, to challenge the City's

4

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 64

determination that it may enforce "public space regulations and ordinances." Agreement at 7, 8.

### III.   LEGAL STANDARD

#### a.  The "Stipulated Order" is a Consent Decree

Regardless of the name given to it by the parties, the "[Proposed] Stipulated Order of Dismissal," lodged by Plaintiffs on May 19, 2022 is a consent decree. "A consent decree is 'essentially a settlement agreement subject to judicial policing,'" *United States v. State of Or.*, 913 F.3d 576, 580 (9th Cir. 1990) quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).  The parties request this Court, as a condition of dismissal, to incorporate the settlement into the "order of dismissal," Dkt. 421-1 at 2, and to "retain[] exclusive jurisdiction" for five years to enforce it. *See e.g.*, *Oregon*, 913 F.3d at 580 (noting that "[c]onsent decrees are often designed to be carried out over a number of years").  The agreement also gives the Court significant oversight of the City's compliance with the order. *See e.g.,* Agreement at 4 (providing that the Court will maintain continuing jurisdiction to "oversee and enforce" the agreement, including to appoint "at its sole discretion" a Special Mater responsible for "overseeing and Enforcing this Agreement); 11 and 12 (creating a mechanism for the Court to approve the City's implementation of "public space regulations and ordinances" in a given City Council District or City-wide); 18 (giving the Court oversight over whether the consent decree conflicts with orders issued by other courts); 23 (giving the Court oversight to decide disputes between the parties).  These are hallmarks of a consent decree, judicial approval and ongoing judicial oversight, are present in the agreement. *See Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 n. 7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees").

#### b.  Legal Standard for Entering Orders That Maintain Jurisdiction to Enforce Settlement Agreements (or Consent Degrees)

Because the parties request the Court enter an order incorporating the terms of the settlement and retain jurisdiction to enforce it (i.e., enter a consent decree), the

5

Intervenors' Objections to Proposed Order of Dismissal

EXHIBIT C - Page 65

Court may not simply "rubber stamp" the agreement, *U.S. v. Montrose Chem. Corp. of Ca.,* 50 F.3d 741, 747 (9th Cir. 1995) or enter the order of dismissal without reviewing the terms of the agreement. "[A] federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) (citations and quotations omitted)).  Because the parties are requesting the court retain jurisdiction to enforce the terms of the agreement and oversee its implementation, the proposed agreement must "spring from and serve to resolve a dispute within the court's subject matter jurisdiction.  Furthermore, consistent with this requirement, the consent decree must come within the general scope of the case made by the pleadings." *Id*.

If the agreement falls within the Court's Article III jurisdiction, the Court must still determine that the decree is "fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir.1990). *See also Martin v. Wilks*, 490 U.S. 755, 787 n. 26 (1989) (J. Stevens, dissenting) ("The court reviews the consent decree to determine whether it is lawful, reasonable, and equitable.").  When determining whether an agreement is fair, the Court must look at both substantive fairness and procedural fairness, including ensuring that the "consent decree was the product of good faith, arms-length negotiations." *Oregon*, 913 F.3d at 581 (citing *United States v. City of Miami*, 664 F.2d 435, 439, 441 (5th Cir. 1981)(en banc)(per curiam)(Rubin, J., concurring).  Moreover, "a district court may not approve a consent decree that 'conflicts with or violates' an applicable statute." *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (quoting *Local 93*, 478 U.S. at 526).  *See also SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984)(citing *Miami*, 664 F.2d at 435 with approval) ("because it is a form of judgment, a consent decree must conform to applicable laws").

Finally, as is the case here, "a consent decree that affects the public interest or third parties imposes a heightened responsibility on the court to protect those interests,"

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 66

and while the decree must not be "in the public's *best* interest," the Ninth Circuit has been clear that "this requirement is intended to protect those who did *not* participate in negotiating the compromise." *Oregon*, 913 F.2d at 581 (internal citations omitted) (emphasis in original); *cf Randolph*, 736 F.2d at 529 (affirming that consent decrees must be in the public interest but remanding after the denial of an agreement because the District Court set too high a standard for its review).

## IV.   ARGUMENT

### a.  The Court Lacks Jurisdiction to Approve the Consent Decree

Because federal courts are courts of limited jurisdiction, a court that maintains jurisdiction over a settlement agreement may do so only when the agreement falls within the Court's limited jurisdiction.  As the Supreme Court held in *Local No. 93*, a "consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction."  \478 U.S. at 525 (internal citation omitted).

Despite this longstanding rule, the City and Plaintiffs seek judicial approval of a provision of the agreement that explicitly grants permission to the City to implement and enforce undefined and theoretical municipal ordinances against third parties (including Intervenor's members), in a case where no one has alleged that the City is actually enforcing the ordinances, and certainly not that the City has enforced or even threatened enforcement of any regulations or ordinances against any of the Plaintiffs.[2] There is no basis under Article III for doing so.

Section Four of the Agreement purports to give the City permission to implement and enforce euphemistically-entitled "public space regulations and

---

[2] It remains an open question whether Plaintiffs even have standing to bring any claims on behalf of anyone experiencing homelessness.  Both the City and the County raised the question of Plaintiffs' standing in Motions to Dismiss that were filed in January 2022 and which are currently pending before this Court.  The County requested permission to begin discovery, and Intervenors requested the Court allow the parties to do limited discovery regarding Plaintiffs' standing before filing objections to the proposed consent decree.  Both requests were denied.  *See* Myers Decl., Exh. A.

7

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 67

ordinances" against people experiencing homelessness. The settlement states that, following the creation of some currently unknown number of "shelter or housing solutions," which includes congregate shelter beds, family unification, and safe camping sites, the City "may implement and enforce public space regulations and ordinances" first in individual council districts and then throughout the City, "as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside." Agreement at 5, 6. For a number of reasons, this section does not relate to or revolve a dispute within the subject matter of the Court, and therefore, the agreement cannot be approved.

As an initial matter, the term "public space regulations and ordinances" is meaningless. Although the settlement agreement has a defined terms section, the agreement does not spell out what this term means, let alone what provisions of the municipal code constitute "public space regulations and ordinances." As the City is quick to point out, the City has a whole host of municipal ordinances that fit this description.[3] *See e.g.,* Request for Judicial Notice (RJN), Exh 2, Los Angeles Municipal Code (LAMC) Chapter IV, Article 1, Disorderly Conduct, Places and Publications; RJN, Exh. 3, LAMC Chapter V, Article 6, Public Hazards. Certainly the agreement cannot be read as limiting the enforcement of these ordinances until the City builds the "Required Number" of shelter beds. Yet the agreement provided no further hint in the language of the settlement agreement about which public space regulations

---

[3] As the parties and this Court are aware, one of the City's public space regulations, Los Angeles Municipal Code Section 56.11, is the subject of other federal litigation pending in this district. That litigation, *Garcia v. City of Los Angeles*, 2: 2:19-cv-06182-DSF-PLA, was filed almost a year before this case and neither the City nor Plaintiffs identified that case as related. This court has repeatedly made clear that the ordinance at issue in *Garcia* and the challenges to that ordinance do not fall within this Court's jurisdiction, *see e.g.*, Myers Decl., Exh A at 18. Yet the draft agreement is written so broadly that it could be interpreted as including LAMC 56.11 in the broad grant of approval of the enforcement of "public space regulations and ordinances."

8

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 68

are government by the agreement.   And the First Amended and Supplemental Complaint provides no clear guidance either, because the lawsuit does not challenge the enforcement of any of these regulations.   In fact, it does not challenge the enforcement of *any* regulation or ordinance.

Even if the undefined term is read in the context of this case to apply narrowly to quality of life offenses that target people experiencing homelessness, the City's ability to enforce "public space regulations and ordinances" does not fall within the court's subject matter jurisdiction because no plaintiff in this case alleges they were subjected to enforcement of any "public space regulation and ordinances."   This includes the current version of LAMC 41.18, which is one specific ordinance that the agreement references.   The agreement refers to this as a "time/manner/place regulation" (ostensibly distinguishing it from other "public space regulations and ordinances" that can be enforced at any time) and with no factual or legal support, gives judicial approval of the ordinance and its enforcement.  *See* Agreement at 7, 8 (stating that LAMC 41.18 (and all other time/manner/place restrictions) "may be enforced immediately and without such notice at any time").

Yet, unlike the Orange County litigation upon which the settlement is modeled, this case was not brought by people who were subjected to enforcement of the "challenged" municipal code. None of the plaintiffs in this case challenge the enforcement of LAMC 41.18, nor do any of the Plaintiffs have standing to do so.  None of the plaintiffs allege that LAMC 41.18 was enforced against them or even that they were at risk of having the ordinance enforced against them—a requirement for standing to bring a federal challenge regarding the enforceability of the ordinance.  *See San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996) ("the mere existence of a statute  . . . is not sufficient to create a case or controversy within the meaning of Article III").  *See also Martin v. City of Boise*, 920 F.3d 584, 608-09 (9th Cir. 2019) (Plaintiffs have standing to challenge the enforcement of an ordinance only when the ordinance has been enforced against them or Plaintiffs have alleged an

9

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 69

intention to engage in a course of conduct arguably affected by a constitutional interest, but proscribed by a statute, and "there exist[ed] a credible threat of prosecution thereunder"). In fact, there is only one mention of LAMC 41.18 in Plaintiffs' sprawling 113 page Amended and Supplemental Complaint. *See* Dkt. 361 at ¶ 33. Far from challenging 41.18 and arguing that it cannot be enforced, Plaintiffs argue that LAMC 41.18 *must* be enforced.

As for the rest of Section Four, to the extent that the phrase "public regulations and ordinances" is a euphemism for a ban on camping or "sitting, sleeping, lying in the public right of way" and the agreement intends to settle when and under what conditions such a ban can be enforced, this too is far outside the Court's jurisdiction in this case. Not only do Plaintiffs not have standing to bring a challenge that could result in this agreement, no one in Los Angles has such standing. No one has been subjected to enforcement or threat of enforcement for the simple reason that there is currently no such ordinance in the Municipal Code. The parties are seeking approval from the Court to enforce ordinances that have not even been written yet. Judicial approval now of a theoretical ordinance that could be drafted in the future cannot possibly be said to "spring from and serve to resolve a dispute within the court's subject matter jurisdiction" *Local No. 93*, 478 U.S. at 521. The court has no subject matter jurisdiction because no challenge to the ordinance would be even remotely ripe for review. Such a challenge would definitionally be "hypothetical and abstract," *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (holding that the challenge to an actual ordinance on the books was not ripe when there was no threat of enforcement). Nothing in Article III gives the Court jurisdiction to give its judicial stamp of approval for the enforcement of an ordinance that does not exist.

Approval of this provision is also outside the Court's Article III jurisdiction because no party to this agreement is actually contending that the City *cannot* enforce these provisions, such that a settlement term that allows the City to do so based on its

10

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 70

fulfillment of a condition precedent resolves an actual dispute.  Far from arguing that the municipal codes are unconstitutional or otherwise unenforceable, Plaintiffs allege instead that the City has not enforced ordinances against people experiencing homelessness.  *See e.g.*, Dkt. 361 at 33-37, 59-60.  Plaintiffs argue not only that the City can enforce these regulations, but also that they must. The City likewise agrees that it should be able to enforce these ordinances.  The only disagreement between the parties is the extent to which the City has discretion to enforce the ordinances.  But the proposed agreement does not resolve that dispute.  The agreement states explicitly that the City may "at its sole discretion" enforce the "public space regulations and ordinances."  Agreement at 7, 8.  The only work the provision in the settlement does is give judicial approval to a position that both the Plaintiffs and the City share: the City may enforce "public space regulations and ordinances" against people experiencing homelessness. There is simply no "case or controversy" between the parties to this agreement as to whether the City can enforce any public space regulations. *See Moore v. Charlottte-Mecklenburg Board of Education,* 402 U.S. 47, 47-48 (1971) (dismissing a case before the Court where both parties argue that a statute was constitutional because there was no "case or controversy" under Article III).  Absent a "case or controversy," this provision does not fall within the Court's subject matter jurisdiction, which is required of any agreement for which the parties seek judicial approval and enforcement. *Local No. 93*, 478 U.S. at 521.

The requirement that there be an actual dispute between the parties is a foundational principal of Federal Court jurisdiction. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies").  That is no more true than when the dispute rises to the level of constitutional significance, as it does here. *See Baker v. Carr*, 369 U.S. 186, 204 (1962) (question of standing in constitutional questions is whether parties "alleged such a personal stake in the outcome of the controversy as to assure that concrete

11

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 71

adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

Both Plaintiffs and the City contend that the Ninth Circuit's decision in *Martin v. Boise*, 920 F.3d 584 (9th Cir. 2019) is internally inconsistent and fails to provide sufficient guidance regarding when and under what circumstances the City may enforce a ban on camping in public. Plaintiffs criticized the Ninth Circuit decision for its failure to "provide clear guidance for cities struggling with sizable homeless populations." *See* Dkt. 361 at 23; *see also LA Alliance for Human Rights v. City of Los Angeles,* 14 F.4th 947, 953 n. 7 (9th Cir. 2021) (noting that Plaintiffs "take issue with our holding *in Martin v. City of Boise* that municipalities cannot 'prosecute people criminally for sleeping outside on public property when those people have no home o rother shelter to go to'"). This is the exact same critique offered by the City of Los Angeles of the decision. *See* RJN, Exh. 6, Brief of Amicus Curiae, City of Los Angeles, in Support of Grant of Petition for Certiorari, *Boise v. Martin*, 19-247 at 3 (seeking Supreme Court review because "*Boise* does not give that requisite guidance"). But the parties' view that the decision lacks clarity does not give the parties standing to enter into a settlement that determines when the ordinance can be enforced, let alone to seek approval and ongoing enforcement of that agreement by this Court. That is simply not the role of the federal court. "The Court will not pass upon the constitutionality of legislation in a friendly nonadversary proceeding because to decide such questions is legitimate only in the last resort, and as necessity in the determination of real, earnest, and vital controversy between individuals." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346 (1936) (Brandeis J., concurring*).* Nor will the Court "anticipate a question of constitutional law in advance of the necessity of deciding it." *Id; see also Thomas,* 220 F.3d at 1139. Here, signing the settlement agreement would grant permission to the City to enforce an ordinance that has not even been drafted, let alone before the ordinance has been enforced, simply because the advocates of the ordinance

12

---

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 72

asked the Court to do so. That has never been the proper role of the federal court, and it is not the Court's role here.

### b. The Proposed Consent Decree Impermissibly Infringes on the Rights of Third Parties, Including Intervenor

The City and Plaintiffs also cannot use the promise of a judicial imprimatur on their agreement as a bargaining chip where, as here, the principle purpose of the agreement is to enforce an ordinance against third parties and third parties alone. Parties do not have the authority to enter into agreements that impact the rights of third parties, especially against the objection of those parties, yet that is exactly what the parties are attempting to do here. The agreement directly impacts people experiencing homelessness who, under this agreement, would be subjected to court-sanctioned enforcement of "public space regulations and ordinances." This includes intervenor LA CAN, which was granted intervention in this case precisely because enforcement of ordinances would impact their members' rights. There can be no greater interest at stake than the liberty interests that are implicated by this agreement.

The direct impact on third parties' rights makes this case different from other cases in which courts have held that an intervenor cannot prevent the parties from entering into an agreement and dismissing a defendant. For example, in *Local No. 93*, the Supreme Court held that an intervenor could not prevent plaintiffs and defendants from settling a case or preventing the Court from entering a consent decree because the agreement did not implicate their rights. Similarly, in *Sierra Club v. North Dakota*, 868 F.3d 1062, 1067 (9th Cir. 2017), the court approved a consent decree over the objections of intervenors because "[n]owhere in the Consent Decree are the States' claims or grievances identified or even referenced." The Ninth Circuit was very clear that the agreement was effectively a nonsuit between Plaintiffs and defendants, and the parties to the agreement went out of their way to clarify that it would not implicate the rights of third parties or intervenors. *Id.*

Here, on the other hand, the paties have done just the opposite. The stated purpose of Section Four of the proposed agreement is to implicate third party interests,

13

---

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 73

including Intervenors.  The agreement literally states that, upon the creation of an unspecified number of shelter and housing "solutions," the City may enforce "public space regulations and ordinances," which as discussed above will almost certainly mean anti-camping ordinances. These ordinances will be enforced exclusively against third parties, including members of LA CAN.  *See* Dkt. 26. What is worse, there is no suggestion that the business owners and residents who are the Plaintiffs in this case will be subjected to the enforcement that Plaintiffs so readily agree can occur.

To be sure, under current Ninth Circuit and Supreme Court precedent, this agreement cannot be used to preclude individuals, including Intervenors, from challenging any ordinances or enforcement regimes the City attempts to implement pursuant to this agreement.  *See E.E.O.C. v. Pan Am. World Airways, Inc.,* 897 F.2d 1499, 1506 (9th Cir. 1990) ("It is fundamental to our notions of due process that a consent decree cannot prejudice the rights of a third party who fails to consent to it"); *Local No. 93* ("A court's approval of a consent decree between some of the parties…cannot dispose of the valid claims of nonconsenting intervenors"). In fact, the actions taken by Plaintiffs and the City closely resemble the facts in *Hansberry v. Lee*, 311 U.S. 32 (1940), in which white homeowners obtained a judgment validating a racially-restrictive covenant, and the Supreme Court held that Black homeowners who were not a party to the case were not bound by the agreement because  giving preclusive effect to such an agreement would violate Black homeowners' due process rights.  311 U.S. at 35 ("Apart from the opportunities it would afford for the fraudulent and collusive sacrifice of the rights of absent parties, we think that the representation in this case no more satisfies the requirements of due process than a trial by a judicial officer who is in such a situation that he may have an interest in the outcome of the litigation in conflict with that of the litigants").  Likewise here, an agreement between property owners and residents and the City of Los Angeles that an ordinance is enforceable, cannot be construed as actually binding on individuals who could otherwise challenge the ordinances (once drafted) that may be enforced against them.

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 74

But just as racially-restrictive covenants, though unenforceable, are still harmful, the fact that the provision of the agreement would be unenforceable in court if challenged by the targets of the City's enforcement, does not render the provision harmless.  On the contrary, it underscores why the inclusion of this term is patently unfair, unequal, and unreasonable. Even though decades of Supreme Court precedent have clarified that a provision like this is unenforceable against third parties, the provision was not simply drafted as a private agreement between two parties.  In fact, nothing in the agreement acknowledges that the provision explicitly allowing the City to enforce theoretical anti-camping ordinances in the future is nothing more than an agreement that Plaintiffs, and only the Plaintiffs, will not challenge the City's enforcement of an anti-camping ban if the City reaches its goal. Nor does any part of the agreement suggest that this is the Court's intention either.

In fact, from the beginning, the parties have been clear that it is their intent to enter into this agreement *because* it will stifle future litigation by people experiencing homelessness, who are subjected to enforcement of the City's ordinances.  *See* e.g., Dkt. 39 at 69 (Council member Kevin De Leon discussing the need for a settlement that can prevent future litigation like *Boise* and *Mitchell v. City of Los Angeles*); Dkt. 94 at 13-15 (Council member Buscaino criticizing court rulings protecting unhoused people's civil rights and notifying the Court that the City Council had agreed to enter into settlement negotiations to obtain a court-approved settlement agreement in order to "stop this endless cycle of litigation" by people experiencing homelessness); RJN, Exh. 4 (post by Council Member Blumenfield on his official council website explaining that "Judge Carter offered [that] . . . [a]s a federal judge he can settle the pending court case by helping forge a consent decree, a negotiated settlement that would supersede all of the prior court rulings" and that the "legally binding bargain" that would exchange shelter beds for "the ability to enforce anti-camping, bulky item removal, and other laws").

15

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 75

Moreover, the agreement is purposefully drafted to give the City the greatest possible protection against challenges by individuals actually impacted by the ordinances in the future. That is the very purpose of continuing court oversight over the agreement. The agreement sets up a mechanism by which the Court will continue to oversee the enforcement of any ordinances drafted in the future, consistent with this agreement. *See* Agreement at 7, 8 (outlining the procedure for the City to begin enforcing ordinances after the City has met the Required Number of shelter beds in a given district or city-wide). Under the enforcement mechanism created by the parties, Plaintiffs (and only Plaintiffs) are notified of the City's plan to begin enforcement, and they alone may object or simply let enforcement begin. If they do not object, the City can proceed with enforcement, with the full approval of this Court. Only if Plaintiffs choose to object, will the Court have an opportunity to provide any oversight, but even then, the oversight is limited only to whether the City has met its obligation under the agreement. Of course, the LA Alliance has made it explicitly clear that their goal is for the City to be able to enforce anti-camping ordinances; the parties have effectively set up a system by which the proverbial fox is the only one guarding the henhouse, and the rights of people experiencing homelessness are left in the hands of a group of property owners and residents who have long decried the Federal Court's protection of those rights. This is unreasonable, unequitable, and unfair, and on this ground alone, the agreement cannot be approved.

### c. The Proposed Agreement Is Procedurally Unfair Because Section Four Was Not Negotiated at Arms Length

Consent degrees must not only be substantively fair and reasonable, they must be procedurally fair as well. "With regard to procedural fairness, courts determine whether the negotiation process was fair and full of adversarial *vigor." Sierra Club v. McCarthy*, 2015 WL 889142, at *5 (N.D.Cal., 2015) (quoting *United States v. Telluride Co.*, 849 F.Supp. 1400, 1402 (D.Colo.1994) (citations and internal quotations omitted). The "district court must ensure that the agreement is not ... a product of collusion . . . ," *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir.1991) and only

16

---

**EXHIBIT C - Page 76**

"if the decree was the product of good faith, arms-length negotiations" is the agreement entitled to deference. *Oregon,* 913 F.2d at 581.

In this case, the unreasonableness and lack of fairness of Section Four of the agreement is underscored by parties' negotiation of the terms of the settlement in this case. From the beginning, the City and Plaintiffs expressed agreement that this case could be used as a vehicle to enter into court-approved consent decree that would allow the City to enforce a camping ban if the City provided shelter to sixty percent of the City's homeless population, and the value of that agreement would be to supercede prior settlement agreements and stifle litigation in the future. Intervenors, who were parties to earlier litigation and whose rights the Court had already found would be impacted by any increase in enforcement, were excluded from these negotiations. The purpose of this agreement was, as both Plaintiffs, City Council members, and the Court made clear, to supercede prior litigation and to stifle future litigation by people experiencing homelessness. The parties agreed at the outset of the litigation what the end result should be. Although the City and Plaintiffs may have disagreed on the margins about other provisions in the agreement, for example, exactly how to calculate the Required Number or the amount of money the City would pay Plaintiffs for bringing this case, the parties' fundamental goals were aligned from the outset of this litigation. This agreement is not entitled to deference. *Oregon*, 913 F.2d at 581.

### d. The Settlement Agreement Allows Discrimination on the Basis of Disability in Violation of the Federal and State Anti-Discrimination Law

In an attempt to force the County of Los Angeles, which is not a party to this agreement, to take on the obligation of providing services to PEH with disabilities (and what appears to be an attempt to decrease the number of shelter and housing solutions the City must provide while still maintaining the "60%" threshold, Plaintiffs and the City have created a new term of art: "City Shelter Appropriate," which excludes from the City's 60% obligation, anyone who 1) has a serious mental illness, 2) is chronically homeless and has a substance use disorder; or 3) is chronically homeless and have a

17

Intervenors' Objections to Proposed Order of Dismissal

EXHIBIT C - Page 77

chronic physical illness or disability requiring the need for professional medical care and support to perform various activities of daily life.

The settlement agreement clarifies that "the fact that an individual….is not included in the definition of City Shelter Appropriate, will not preclude the City from making an offer of shelter or housing to that individual if the City can reasonably assist that individual." Settlement at 8-9. While this is an improvement from the term sheet filed on April 1, 2022, which provided simply that the City would not provide housing or shelter to individuals who were not "City Shelter Appropriate,"—a provision that is patently illegal under numerous federal and state anti-discrimination statutes and the City's own municipal code—the provision that appears in the parties' final settlement agreement still runs afoul of these statutes. [4]

First, the agreement still purports to allow the City to refuse to offer shelter or housing based on a person's disabilities. Specifically, the agreement states that a person's disability will not preclude the City from making an offer of shelter or housing only "if the City can reasonably assist that individual." Settlement at 8-9. But this turns disability law on its head, suggesting that the City may withhold an offer of shelter, housing, or other assistance because a person has a disability if the City determines it cannot "reasonably assist" the individual, as opposed to what is actually required by anti-discrimination laws, namely to offer housing and services without consideration of a person's disability. The Americans with Disabilities Act, the Fair Housing Act, and state law requires the City to provide housing to people with disabilities without regard for their disabilities. *See e.g.,* 42 U.S.C. § 3604(f)(1)

---

[4] Page 11 of the settlement agreement states that "City will continue to offer shelter or housing to City Shelter Appropriate PEH within the City." To the extent this provision evidences the City's practice or intent to provide housing or services only to people experiencing homelessness that do not "have a severe mental illness" and/or "is not chronically homeless and has a substance abuse disorder" or "a chronic physical illness or disability requiring the need for professional medical care and support…," this would violate state and federal law. *See infra* note 5.

18

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 78

(making it illegal to "discriminate against any person . . . in the provision of services of facilities" or to "make unavailable . . . a dwelling . . . because of a handicap"); 42 U.S.C. § 12131 (prohibiting entities from "exclud[ing] from participation in or [denying] the benefits of services, programs, or activities of a public entity," including withholding "aid, benefits, and services" like transitional and emergency shelters and public accommodations, 29 C.F.R. § 35.310); 29 U.S.C. § 794(a) (preventing individuals with disabilities from "be[ing] excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . solely by reason of her or his disability"); Ca. Gov't Code Gov. Code §§ 12920, 12927, 12955 (Ca. Fair Employment and Housing Act); Ca. Gov't Code §11135(b) (incorporating ADA protections for state-funded programs); Ca. Civ. Code §§ 51 *et seq.* The ADA and state disability law requires the City to make reasonable accommodations and modifications to its programs to ensure an individual has equal access to services; none of these laws allow the City to withhold services if the City determines it cannot reasonably assist an individual because of their disability.

Second, the agreement provides that "accommodations shall be made for those who qualify as disabled under the Americans with Disabilities Act," but this ignores the fact that the definition of disability under state law is broader than federal law. *See* Cal. Gov't Code § 12926.1 (explicitly stating that the definition of disability is broader than under federal law and that "[t]his distinction is intended to result in broader coverage under the law of this state than under" the ADA); Cal. Gov't Code 11135(b) (incorporating stronger provisions under state law). Accommodating only those individuals with disabilities under the ADA, as the agreement expressly provides, excludes individuals who meet the definition under state, but not federal law.

The Court cannot approve a settlement agreement, where, as here, the terms of the agreement allows one party to simply disregard its obligation under otherwise valid laws. *Conservation Northwest,* 715 F.3d at 1188 (reversing a district court's decision

19

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 79

to approve a consent decree which allowed the defendant to promulgate regulations in violation of law); *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) ("While parties can settle their litigation with consent decrees, they cannot agree to disregard valid state laws") (internal quotations removed). That is particularly true where, as here, the laws the agreement runs afoul of is the very statutory regime that gave rise to the litigation. *See Conservation Northwest*, 715 F.3d at 1188.

### e. The Settlement Agreement is Incomprehensible and Too Vague to be Enforceable

Finally, the settlement agreement contains a number of provisions that, as drafted, undermine the enforceability of the agreement. As discussed above, the agreement includes two major substantive provisions:  Section 3 that requires the City to create a Required number of housing or shelter solutions and Section 4 that allows the City to enforce "public space regulations and ordinances" when there are enough beds or units in any given district or city-wide. The agreement appears at first blush to maintain the basic framework of the settlement agreement adopted by numerous cities in the Orange County homelessness litigation:  the creation of enough shelter and housing for 60% of the City's unsheltered "City Shelter appropriate" homeless population, in exchange for the ability to enforce a City's anti-camping ban.  Yet the parties here also made changes on the margins of the agreement that significantly undermine both the enforceability and the reasonableness of the agreement. Whether these changes were made because the agreement was not negotiated at arms length or because the parties were less interested in creating housing than they were in obtaining permission to enforce the City's camping ban, or for some other reason entirely, the end result is the same:  the key provisions of the agreement are so vague that the agreement is effectively a nullity before it is even approved.

### i. The agreement is vague and ambiguous as to key terms, making enforceability impossible

Although the settlement agreement is 27 pages and contains a definitions section, many of the provisions contain terms that are undefined.  The ambiguity left

20

---

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 80

by these terms renders the agreement so vague and ambiguous that it would be impossible for the Court, Plaintiffs, or anyone else to hold the City to any obligation to create an appreciable amount of new housing or shelter.

First, the agreement states that "[t] City agrees to create a Required Number of housing or shelter solutions." Settlement 10. The agreement, however, contains no explanation of what it means for the City to "create" an intervention. The agreement provides no threshold level of City involvement to count a unit towards the Required Number. The ambiguity of the term is elucidated further by section 3.2, which provides that "[t]he housing or shelter solutions may be government- and/or privately-funded. . . ." By including "privately-funded" housing and shelter solutions, it begs the question what role, if any, the City must have in a "solution" in order for it to count towards the Required Number. It also suggests there is no standards by which the Court can judge whether the City has fulfilled its obligations under the agreement. *See United States v. New York City Housing Authority,* 347 F.Supp.3d. 182 (S.D.N.Y. 2018) (declining to enter a consent decree when the terms were too vague to be enforceable).

Similarly, the agreement speaks to the euphemistically-named "housing or shelter solution," but it provides no guidance as to what constitutes a "solution." Section 3.2 is explicit that the City has "sole discretion" to choose what it counts as a "solution" and includes a non-exhaustive list of options, including "permanent supportive housing" and "tiny homes," but also family reunification, shared housing, and rental assistance. By allowing the City to count minor subsidies (like family unification expenses), the City could fulfill its obligation by funding the least effective, least expensive interventions possible, and there is no basis for holding the City accountable if this is what it decides to do.

### ii. The agreement's lack of parallel construction between Sections 3 and 4 could allow the City to count existing beds towards the threshold for enforcement

This is not the only ambiguity in the agreement. Although Section 3 speaks to the City's obligation to "create" the Required Number of housing or shelter

EXHIBIT C - Page 81

"solutions," the enforcement provisions in Sections 4.2 and 4.3 provides that the City may begin enforcement of the City's anti-camping ordinances "once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number." The difference between having a Required Number of shelter beds and creating new shelter beds to meet the Required Number is significant, given that each council district already has shelter beds, including those beds created under the Freeway agreement. The difference in language between Section 3 and Section 4 leaves open the possibility that the City could count existing shelter beds or housing units towards the number of shelter beds needed to reach the 60% threshold.

Of course, such an interpretation of the agreement would be incredibly disengenous, since the vast majority of these beds are already occupied by *sheltered* PEH, who are excluded from the Required Number because that number is based only on *unsheltered* PEH. Such an interpretation of the agreement would allow the City to count the "housing and shelter solutions" that currently exist towards the 60% threshold, without counting the people who currently occupy them. Yet the language of the agreement, as drafted, allows for such an interpretation.

Even if the agreement is to be understood as counting only the new "housing and shelter solutions" created pursuant to Section 3 of the agreement towards the 60% threshold in Section 4, there is nothing in the agreement that requires the City to maintain the number of shelter beds throughout Los Angeles that currently exist. If the City closes shelters, which it may do under the agreement (and in some instances, must do because of ground lease restrictions related to the creation of ABH beds), there is no obligation for the City to replace those beds, since existing beds are not counted towards the Required Number. This is highly problematic, since the vast majority of those beds are occupied by PEH, but are not included in the baseline number, which counts only "unsheltered" PEH.

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 82

In either event, the agreement is drafted in such a way that could allow the City to count existing shelter beds towards the 60% threshold for enforcement or remove the beds without accounting for increases in the number of PEH in its base calculations.

### iii. Likely pandemic-related impacts on the 2022 Homeless Count render the use of the count unreasonable

The parties' definition of the Required Number of beds is, at first glance, an attempt to align the an attempt to align this agreement with other settlement agreements entered into as part of the Orange County litigation, but in this case, the parties made numerous adjustments to the 60% threshold, which significant decrease the City's obligation to provide shelter and housing "solutions." What will likely prove to be the most significant impact on threshold number is the parties' agreement to tie the baseline number to the 2022 homeless count, and to use that number for the next five years. As an initial matter, it is unreasonable for the City to tie the enforcement of a camping ban to a static number based on a count of people experiencing homelessness during a three day period in January 2022, for five years into the future. The number of people experiencing homelessness is an dynamic number, to say nothing of the fact that the PIT count is an imperfect approximation of the number of people experiencing homelessness.

Even if it were a good approximation, the number of PEH has gone up almost every year for the past decade. A fixed Required Number will not take into account any increases in homelessness that will occur in the next five years. This problem is exacerbated by the fact that the parties have chosen to use the 2022 point in time count (which has yet to be released), given that, for the past two years, the City and the world have been dealing with the COVID-19 pandemic. And in response to the pandemic, there have been  unprecedented eviction protections in place, including eviction moratoria in both the City and County of Los Angeles. As a direct result of these eviction protections, one of the largest drivers of people entering homelessness, evictions, have decreased dramatically--in 2019, there were  40,572 evictions filed in Los Angeles Superior Court; in 2021, the number was reduced by more than 65 percent.

23

---

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 83

Myers Decl., Exh. B at p. 2.  And the formal filing of unlawful detainer actions constitute only a fraction of the number of people who actually leave their units, either because of self-evictions, lockouts, etc.  Research has shown that for every person facing a formal eviction, more than five people leave their homes as a result of more informal evictions.  *Id.* (citing Gromis, A., & Desmond, M., Estimating the Prevalence of Eviction in the United States: New Data from the 2017 American Housing Survey (2021) Cityscape, 23(2), 279–290.) Given the protections in place, which not only prevented filings, but in Los Angeles County, prevented the service of an eviction notice, it is likely that the significant decrease in formal evictions signifies a far more significant decrease in people becoming homeless, since there is little disagreement that evictions are one of the largest drivers of homelessness in Los Angeles County.

This likely decrease, which may be reflected in the 2022 PIT Count, will not be replicated in subsequent years if the COVID-19 protections are allowed to sunset.  Once eviction protections are removed, the rates of homelessness will likely return to pre-pandemic numbers.  The 2022 PIT count will prove to be a significant deviation from the City's rate of homelessness, yet it will remain the baseline for the next five years.

## V.    CONCLUSION

For the foregoing reasons, Intervenors object to the proposed consent decree submitted by Plaintiffs and the City of Los Angeles and respectfully request this Court decline to enter the parties' order, as requested.

Dated: May 31, 2022                 Respectfully submitted,
                                    Legal Aid Foundation of Los Angeles
                                    Schonbrun Seplow Harris & Hoffman LLP
                                    Law Office of Carol A. Sobel
                                    Elder Law & Disability Rights Center


                                         /s/ Shayla Myers
                                    Attorneys for Intervenors

24

**Intervenors' Objections to Proposed Order of Dismissal**

EXHIBIT C - Page 84