# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
et al.,                       )                        (KESx)
                              )
          Plaintiffs,         ) Los Angeles, California
                              )
vs.                           ) Thursday, June 9, 2022
                              )
CITY OF LOS ANGELES, et al.,  ) (9:20 a.m. to 11:38 a.m.)
                              )
          Defendants.         )
_____)


TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT OBJECTIONS/
SCHEDULING CONFERENCE
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE


Appearances:                  See next page.

Court Reporter:               Recorded; CourtSmart

Courtroom Deputy:             Karlen Dubon

Transcribed by:               Jordan Keilty
                              Echo Reporting, Inc.
                              9711 Cactus Street, Suite B
                              Lakeside, California 92040
                              (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             617 West 7th Street, Suite 200
                             Los Angeles, California 90017
                             (213) 205-6520

                             MATTHEW D. UMHOFER, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             1990 South Bundy Drive
                             Suite 705
                             Los Angeles, California 90025
                             (310) 826-4722

For the City of Los Angeles: SCOTT D. MARCUS, ESQ.
                             ARLENE N. HOANG, ESQ.
                             JESSICA MARIANA, ESQ.
                             GITA O'NEILL, ESQ.
                             Los Angeles City Attorney's
                               Office
                             200 North Main Street
                             7th Floor, Room 675
                             Los Angeles, California 90012
                             (213) 978-8216

For the County of Los        LOUIS "SKIP" MILLER, ESQ.
  Angeles:                   JENNIFER HASHMALL, ESQ.
                             Miller Barondess, LLP
                             1999 Avenue of the Stars
                             Suite 1000
                             Los Angeles, California 90067
                             (310) 552-8400

                             ANA WAI-KWAN LAI, ESQ.
                             Los Angeles County Counsel
                               Office
                             350 South Figueroa Street
                             Suite 601
                             Los Angeles, California 90071
                             (213) 974-0061

*Echo Reporting, Inc.*

3

APPEARANCES:   (Cont'd.):

For the County of Los                AMIE S. PARK, ESQ.
  Angeles:                           LAUREN BLACK, ESQ.
                                     Los Angeles County Counsel
                                       Office
                                     500 West Temple Street
                                     6th Floor
                                     Los Angeles, California 90012
                                     (213) 626-2105

                                     BRANDON YOUNG, ESQ.
                                     Manatt Phelps & Phillips, LLP
                                     2049 Century Park East
                                     Suite 1700
                                     Los Angeles, California 90067
                                     (310) 312-4181

                                     BYRON J. MCLAIN, ESQ.
                                     Foley & Lardner, LLP
                                     555 South Flower Street
                                     Suite 3300
                                     Los Angeles, California 90071
                                     (213) 972-4500

                                     EMILY A. RODRIGUEZ-SANCHIRICO,
                                       ESQ.
                                     Wilkie Farr & Gallagher, LLP
                                     2029 Century Park East
                                     Suite 3400
                                     Los Angeles, California 90067
                                     (310) 855-3106

For the Intervenors Los              SHAYLA R. MYERS, ESQ.
  Angeles Community Action           Legal Aid Foundation of
  Network & Los Angeles                Los Angeles
  Catholic Worker:                   7000 South Broadway
                                     Los Angeles, California 90003
                                     (213) 640-3983

For the Intervenors Orange           CAROL A. SOBEL, ESQ.
  County Catholic Worker,            WESTON C. ROLAND, ESQ.
  Los Angeles Catholic               Law Office of Carol A. Sobel
  Workers & the County of            1158 26th Street, Suite 552
  Los Angeles:                       Santa Monica, California 90403
                                     (310) 393-3055

4

APPEARANCES:   (Cont'd.)

For the Intervenors Orange      CATHERINE E. SWEETSER, ESQ.
   County Catholic Worker,      Schonbrun Seplow Harris
   Los Angeles Catholic         Hoffman & Zelders, LLP
   Workers & the County of      9415 Culver Boulevard
   Los Angeles:                 Suite 115
                                Culver City, California
                                (310) 396-0731

                                BROOKE A. WEITZMAN, ESQ.
                                WILLIAM R. WISE, JR., ESQ.
                                Elder Law and Disability
                                   Rights Center
                                1535 East 17th Street
                                Suite 110
                                Santa Ana, California 92705
                                (714) 617-5353

                                PAUL L. HOFFMAN, ESQ.
                                Schonbrun Seplow Harris
                                   Hoffman & Zeldes, LLP
                                200 Pier Avenue, Suite 226
                                Hermosa Beach, California
                                   90254
                                (310) 717-7373

*Echo Reporting, Inc.*

EXHIBIT D - Page 89

5

 Los Angeles, California; Thursday, June 9, 2022 9:20 a.m.

--o0o--

(Call to Order)

THE COURT: Then, we're in session on case number 20-02291, entitled LA Alliance for Human Rights, et al. versus Plaintiff, City of Los Angeles, a municipal entity.

We'll be a little bit more formal today. So, I would like the appearances beginning with the respective parties. And let me begin with Plaintiffs' counsel, please.

MS. MITCHELL: Good morning, your Honor. Elizabeth Mitchell and Matt Umhofer on behalf of Plaintiffs.

THE COURT: Thank you.

Let me turn to the City, please.

MR. MARCUS: Good morning, your Honor. Scott Marcus on behalf of the City of Los Angeles.

THE COURT: All right. Thank you.

And let me turn to the County.

MR. MILLER: Good morning, your Honor. Skip Miller and Mira Hashmall on behalf of the County of L.A.

THE COURT: And the Intervenors, please.

MS. SOBEL: Good morning, your Honor. Carol Sobel on behalf of all of the Intervenors.

MS. MYERS: And Shayla Myers on behalf of Intervenor Los Angeles Community Action Network and Los Angeles Catholic Worker.

*Echo Reporting, Inc.*

6

THE COURT:  I represent to you I've read the briefing on numbers occasions.  I may have a few questions, but at the beginning of this process, I'd like to hear from the Intervenors to begin with.  You had substantial concerns, and I'd like you to address the Court concerning those.

MS. MYERS:  Thank you, your Honor.  Shayla Myers on behalf of the Intervenors.  I don't think it's an exaggeration to say that we have substantial concerns with this gentleman agreement.

From the beginning of this case, the LA Alliance and the City of Los Angeles have sought from this Court an order that would allow the City to enforce an anti-camping ban in the City of Los Angeles.  They have not been quiet about that, and two years after this case was -- was filed, that's the agreement that was presented to the Court.  Certainly not surprised that that's the agreement that was presented to the Court.

THE COURT:  A little slower.

MS. MYERS:  We're not surprised that that's the settlement agreement that was presented to the Court, but this Court simply does not have jurisdiction to enter that settlement agreement.

We want to be clear about what Intervenors' objections are in this case because I think both the LA

7

Alliance and the City have attempted to present our objections as something other than they are.

Part of the City and the Intervene -- or in the Plaintiffs' agreement provides for the creation of shelter beds.

THE COURT:  Just a little slower.

MS. MYERS:  Part of the agreement provides for the creation of shelter beds, housing solutions.  And, while it is certainly the case that Intervenors have significant policy objections to that, we do not think that it will address the homelessness crisis.  We do not believe that the City is actually committing to do more than is already in the pipeline, and we do not believe that the agreement provides the type of certainty that an agreement like this should provide about the City's obligations in exchange for this Court's approval.

But those aren't the -- those aren't the arguments that we're making here today from a legal standpoint.  What we are arguing today with regards -- is with regards to sections four and sections five of the settlement agreement. And, in those provisions, the City of Los Angeles and the LA Alliance are attempting to gain this Court's approval for enforcement of ordinances that are not challenged in the court, that no one on the LA Alliance side has standing to challenge.  There are no allegations that there's been any

8

enforcement that they could challenge.  And, your Honor, they're seeking pre-enforcement approval for ordinances that haven't even been written, and there's certainly no basis under Article 3 for the Court to enter an agreement like this.

We do want to raise a couple of specific arguments.  First of all, procedurally, we just want to say the City and the LA Alliance made the choice not to file a motion for approval.  So, any arguments that they raised for the first time on reply we think are waived, and they simply didn't give us an opportunity to respond to them.

They also failed to put forth any evidence in support of the agreement.  The LA Alliance puts forth a number of statements about the -- the agreements -- a similar agreement in Orange County but puts forth absolutely no evidence in support of that.  And I know my co-counsel, Ms. Sobel, is going to address that.  But we just want to be clear that the record is devoid of any factual support related to this.

I do want to make one quick point about the -- the fight that seems to be going on in the pleadings -- or in the papers about what this agreement is called.  We refer to it as a consent decree, as does the County.

The City has taken the position, as has the LA Alliance that it's not a consent decree.  I think that

EXHIBIT D - Page 93

9

issue, your Honor, is a red herring.  The City doesn't explain why they take objection to the term "consent decree" and actually go so far as to say if your Honor finds it to be a consent decree, they want the opportunity to reconsider the agreement.

The consent decree is -- is not a term of art.  It simply means a settlement agreement with judicial approval.  That's exactly what they're seeking here.  So, this is a consent decree.  And the City hasn't put forth any argument to suggest why there's a problem with referring to it as a consent decree.

We want to -- I want to just make a couple of points about the substance of the agreement itself, as I said, with regards to Section 3.  From a legal standpoint, we don't object to it.  But, obviously, with regards to Section 4 and Section 5, we have significant -- a significant objections.

The City of Los Angeles and the LA Alliance are asking for not only approval of an agreement for which there is no standing, they are asking for continued jurisdiction for this Court for five years to enforce an agreement over which the Court does not have standing.  They're asking for continuing jurisdiction from the Federal Court to enforce a provision that says that the City may enforce public safety regulations throughout Los Angeles once it reaches a

*Echo Reporting, Inc.*

10

condition precedent.  But there is no basis and Article 3 standing for such an agreement.

The LA Alliance argues that provisions and guardrails in the settlement agreement provide for the Court to have continuing jurisdiction.  The City makes the same argument.  They suggest that because objections can be raised later on, that the Court should continue to have jurisdiction over this.  But the reality is who is allowed to make the objections in this case is limited entirely to the LA Alliance and the City of Los Angeles related to an enforcement -- to the enforcement of an ordinance that both the City and the LA Alliance have been advocating since this case started should be enforced.  Because of that, there is simply no case or controversy between the City and the LA Alliance over which this Court has jurisdiction.

And then I just want to make a couple of other points to address some of the representations that the City made related to the specifics of the agreement.

Your Honor, we took issue with the term "creates housing".  And I think --

THE COURT:  Repeat that slowly.

MS. MYERS:  We took issue with and raised concerns about the agreement and the fact that it says that the City must create housing and shelter beds.

THE COURT:  Is that page nine, the last paragraph

*Echo Reporting, Inc.*

11

on page nine of Docket 438?  Look at that to make certain that that's what you're referring to.

MS. MYERS:  Do you mean as -- as opposed to the City's objections?

THE COURT:  Docket 438, look at page nine, the last paragraph.  You'll see some numbers there, 9,000, approximately 1,000, and that's one of the areas that this issue's raised in as well as what does it mean to create -- and when there's in "the pipeline".

MS. MYERS:  Sure.  And, your Honor, I think we're making a --

THE COURT:  Respond to my question now.  Is that the correct area that you're looking at?

MS. MYERS:  No.  I'm looking -- I am looking at that, but I'm making a different argument.  That is where the City purports to address our argument, but I think they misrepresent what our argument actually is.

So, there's a number of issues that we think would raise concerns for your Honor related to -- to approving the settlement agreement that we raised.  The first is -- is the issue of creates.  There's no doubt that Section 3 of the agreement requires that the City of Los Angeles create housing and shelter solutions.  But, again, the term "create" is not defined.  The agreement suggests that they can count shelter beds and other housing solutions that are

*Echo Reporting, Inc.*

12

funded entirely by third parties.  So, there's no threshold participation for which the City gets to count a bed towards the threshold.  There's absolutely nothing.  So, the City could fund a plane ticket home for an individual, and that would count towards the 60 percent, and I think that's explicit in the agreement.

Your Honor, we're making a second agreement -- a second argument, though, related to the use of the term "create" as it relates to Section 4 of the agreement, which is where the Court -- where the parties refer to having shelter beds, and I think this is where the City's papers misrepresent what our argument is.

Section 3 requires the City to create a threshold number of housing solutions.  It's a floor, not a ceiling.  And, again, if that were where the agreement stopped, we may think it's bad policy, but we wouldn't be here.  But Section 3 speaks to creating.  Section 4, which is the section that speaks to enforcement, does not make reference to the beds that are created under Section 3.  It simply says when they have enough shelter beds to reach 60 percent of the unsheltered population.

The lack of parallel construction there leaves open the suggestion -- and -- and we have seen -- and I think your Honor raised these concerns.  We've seen the ways in which those terms can be manipulated.

*Echo Reporting, Inc.*

13

THE COURT:  Excuse me a moment.  Slower.

MS. MYERS:  We've seen the way those terms can be manipulated by -- by the parties when seeking judicial approval for things.

So, the City -- the City and the LA Alliance say when the City has enough shelter beds, which doesn't preclude counting the existing shelter beds, including the 6700 beds that were created as a result of the agreement between the City and the County.  When the City has enough shelter beds, then it can enforce the order.

So, that's the argument that we're making.  That's the argument that the City did not address, and we don't think on the face of the settlement agreement they actually can address because that -- that ambiguity is really significant, your Honor.

And then I also just want to make another point related to the 60 percent, and I think -- Ms. Sobel is going to address this more in detail, but I just want to make this point related to the 60 percent as a number.

The LA Alliance and the City of Los Angeles keep saying this is like the Orange County Catholic Worker case. It's -- because it provides that the City may enforce public safety ordinances upon the creation of beds for 60 percent of the population.  It's not actually like the Orange County Catholic Worker case insomuch as the City has made

*Echo Reporting, Inc.*

14

significant mathematical calculations that reduced the number far below the 60 percent threshold that was set based on a factual record in the <u>Orange County Catholic Worker</u>. And, your Honor, the City -- the City concedes that point in its objections.

So, the 60 percent -- the 60 percent number is 60 percent of the unsheltered population that is City shelter appropriate.  And by the City's own calculation, that reduces the number of people within that 60 percent by roughly 9,000 is our understanding.

But, the City then concedes, as they must based on disability law, that it's not that they're not going to provide shelter beds and offers of shelter to people they deem City shelter inappropriate.  Not offering shelter beds would be a blatant violation of -- of anti-discrimination law.

So, the City says, We're going to offer shelter beds to that 60 -- to those individuals who are City shelter inappropriate, but we're just not going to count them to get to our threshold.  So, that's a significant reduction that I think the parties aren't conceding to as they talk about the settlement agreements, but it actually makes it substantially different from the numbers that were at issue in the <u>Orange County Catholic Worker</u> case.  And then, your Honor, of course, there is the issue of the homeless count.

*Echo Reporting, Inc.*

15

The fact that the City and the -- the City and the Plaintiffs want to be bound by a homeless count that is being calculated this year I think speaks volumes about what -- about the ways in which they view this 60 percent threshold.  As we put in our papers, there's significant evidence that the housing -- that the housing -- or, I'm sorry -- the homeless count number may go down as a result of tenant protections that have been in place for the past two years --

THE COURT:  Just a little slower.

MS. MYERS:  -- with no indication whatsoever, your Honor, that those tenant protections are going to be in place going forward.

We don't know what the homeless count number is. It's possible the City actually does know what the homeless count number is.  It's possible they know what the top line number is and that they know that the number is going to go down and that they've already met their 60 percent threshold in some of the council districts.  We have no idea.  But approving the agreement and holding the City to that number for five years and approving enforcement is simply unreasonable.

But, of course, your Honor, all of those points are beside the point that the Intervenors are really stressing here.  The City of Los Angeles wants to walk out

16

of this courtroom with an agreement and with an order signed by your Honor that says that they can enforce Los Angeles Municipal Code 4118.  That's what the agreement says.

4118 is not at issue in this case.  There's no one on the Plaintiffs' side that has been arrested, even alleged that they have been subject to enforcement under Los Angeles Municipal Code 4118.  And yet the agreement that they handed you today says explicitly that you're entering an order that says that they may enforce it and that the only -- the only entities that have the ability to challenge that going forward are the very parties who believe that Los Angeles Municipal Code 4118 should be enforced.

THE COURT:  On page five, if you'd look at that, the City proposes to make certain that you have the right to sue.  In other words, one of the things that I read in your response was that you were concerned that you were being shut out and precluded from future lawsuits.

The City represents and tells the Court that I can even modify this so that you always have access to the courts.  How do you respond to page five?

MS. MYERS:  It's not simply, your Honor, about the Intervenors' ability to sue.  It's about -- as you know, Intervenors are here on behalf -- Los Angeles Community Action Network is here on behalf of their members.

THE COURT:  How are they precluded from bringing a

*Echo Reporting, Inc.*

17

suit?  The City is -- and the Court would be reluctant to adopt and take away your ability to sue.  One of the values of the Orange County settlements were that there was still access to suit, but it decreased the number of lawsuits.  It decreased because of the informal ability of Judge Smith, Michel Martinez and others to intervene.  And, quite frankly, there's no representation that there's not going to be access to the courts when I read this, from the City's perspective.  And my past dealings in this, the benefit to this was that we took away a huge amount of the lawsuits, in fact, two within the last month that would have cost millions of dollars.

So, I'm having trouble with that argument, and I want to say that to you.

MS. MYERS:  But, your Honor, it's not the Federal Court's role to take away legitimate lawsuits and opportunities for individuals to come into the court in a case where the issues were not raised.  And I think that is a fundamental difference that I think the LA Alliance and the City have just never addressed.  LA Alliance does not sit in the same shoes as Orange County Catholic Worker because no one in Orange County Catholic -- because no one in the LA Alliance has standing to challenge the Municipal Codes.  And the City doesn't stand in the shoes of Orange County, Santa Ana, Anaheim, any of the other municipalities

18

because they're asking for not only a pre-enforcement. They're not enforcing the Municipal Code.  That wasn't why this lawsuit was brought was to challenge those Municipal Codes.

They're asking for an ordinance that permits them to enforce some unknown ordinance that is not even referenced in the pleadings, that hasn't even been passed yet, your Honor.  And that's -- that's the problem is that it's continued jurisdiction for this Court to oversee the enforcement of ordinances that have never been drafted, let alone have been enforced.  And it's simply not right, nor does the Court have Article 3 standing for that.

And, your Honor, I just want to say the -- the last point that I will make related to this.  As you point out, as drafted, there are no guardrails to protect intervenors.  There are no guardrails at all to -- to dictate how this agreement should be enforced going forward five years into the future.  There's no guardrails to prevent the City of Los Angeles or the LA Alliance from making the arguments that this agreement doesn't mean exactly what it says, i.e., that they may enforce these ordinances.  They're asking for a Federal Court to approve this ordinance saying that they may enforce the ordinance without any clarification whatsoever that at the end of the day, what this really is is an agreement that the LA

*Echo Reporting, Inc.*

19

Alliance will drop the case in exchange for an agreement that they -- they will not sue going forward.  No third party can be bound by this at all, and the fact that it exists in this agreement and it's unenforceable gives another justification for why it's unfair, unequitable and unreasonable for the Court to enforce going forward.

And I think that that's -- at the end of the day, that is the critical aspect of the settlement agreement is that there is no case or controversy between the LA Alliance and the City of Los Angeles that would give rise to this type of agreement.

And the only last thing that I will say, your Honor, is that both the Intervenors and the -- and the City sprinkled in -- did not actually make arguments about this but sprinkled in the fact that the Intervenors had not filed a complaint in intervention or an answer in intervention.

THE COURT:  No, no, slower.  I want you to repeat that, slowly.  Okay.

MS. MYERS:  Both the -- both the Plaintiff in the -- in a footnote and the City in its factual statement sprinkle in the fact that the Intervenors did not file a complaint nor answer an intervention.  That's a technical deficit that we believe the Court already addressed by granting intervention.  The purpose of it is to spell out the basis of intervention.  The order issued by the Court

20

spells out explicitly the basis for standing and intervention.  So, it's a technical deficit that's already been addressed, and they waived in the past two years any suggestion that this is a problem, and they waived it by not raising it in the first instance and raising it only in a factual statement in the reply.

But, in the interests of caution, to the extent that your Honor feels that a pleading would be necessary at this point, we're happy to file one.

THE COURT:  I may be back to you with questions but not at the present time.

MS. MYERS:  Thank you, your Honor.

THE COURT:  Ms. Sobel.

MS. SOBEL:  I'm going to try to be brief, which is hard for me to do.

Following up on -- on Ms. Myers' argument about there not being set time goals, et cetera, for the Court's information, it took 13 years for the City of Los Angeles to meet the settlement in Jones.  And during that time period --

THE COURT:  Took 13 years?

MS. SOBEL:  Thirteen years to -- to -- to get 1,250 units of permanent supportive housing, half of which --

THE COURT:  Would you repeat that more slowly?

*Echo Reporting, Inc.*

**EXHIBIT D - Page 105**

21

MS. SOBEL:  So, the settlement was 1,250 units.

THE COURT:  Just a moment.  One thousand two hundred and fifty units in Jones, and it took 13 years.

MS. SOBEL:  It took 13 years, and they didn't -- they were allowed to count private entities, and they were allowed to count -- half the units could be outside of Skid Row.  Still, it took 13 years.  And, quite frankly, your Honor, where it took the most time was on Skid Row.  And part of the problem -- and I'm -- I'm -- you know, I can send the Court the letters that I sent to the Housing Committee and to Mayor Garcetti and others over --

THE COURT:  Just make the representation.  I believe you.

MS. SOBEL:  Okay.  Part of the problem is that the City counted units that previously existed or that had been downgraded, and the reason that we had this measure is because there is another lawsuit against the City, the Wiggins case, to maintain the housing stock in downtown Los Angeles.  Legal Aid brought the case, and they have been to court many times since 2006 when the Wiggins agreement was put into place because the City has repeatedly attempted to allow developers to take out low-cost housing on skid row. So, that's number one.

Number two, I have a different understanding of the Orange County settlement than the Court does about the

*Echo Reporting, Inc.*

22

access to sue.  There was only an access to sue with two specific entities, because we could not agree on the terms, and they insisted on wanting to do enforcement at an earlier time.  So, there is -- as the Court knows, there was a cutout with Stanton, and we are now in litigation with Stanton in State Court.  There was a cutout with Costa Mesa, and Costa Mesa has stopped the policy that we were challenging, which was the lawyering policy in particular.

We have threatened to sue Santa Ana, which has not a single shelter bed at present, even --

THE COURT:  Yes, they do.  They moved 78 people in on Monday, and they now have 28 families moved in yesterday, and there are over 100 today.

MS. SOBEL:  Okay.

THE COURT:  Carnegie is open.

MS. SOBEL:  Okay.  And in our agreement with Santa Ana, they were supposed to have 450 units because 250 were going to be at Yale Street.

THE COURT:  They have 125 at Yale.  They have 200 with a capacity of 400 at the new Carnegie Shelter.  Plus, they have additional space.

MS. SOBEL:  Okay.

THE COURT:  They're way over their count.

MS. SOBEL:  Well, they're not way over their count, your Honor.

23

THE COURT:  Counsel, they're way over their count.

MS. SOBEL:  But here's the issue, your Honor.  For five years, they've been under their count, four years.  And they've had no beds whatsoever.  So, I just want to make that clear, because in Orange County, the point in time count was something referenced by Ms. Mitchell in her -- in her reply papers.  Everyone in Orange County who looked at the point in time count has different views about it, and there is a significant view that the point in time count is down in Orange County for a couple of reasons, one of which is that they had fewer people to go out and count people. If you don't have people to count people, you're not going to count people.  So, that was one.

Two, the difference between the 2022 point in time count in Orange County and the 2019 point in time count is almost exactly equal to the number of people Father Kriz documented as dying.  So, it isn't -- you know, I don't think that our goal in trying to address homelessness is to have death -- you know, attrition by death as a solution to this issue.

And then I -- I want to be really clear.  We have been from the outset clear that the 60 percent number was not something we supported.  We supported it originally when the Court asked us to agree to it for a test with Anaheim. It was to be a short-term test.  It has now become

**EXHIBIT D - Page 108**

24

institutionalized.

When the Court and the special master came to speak with Intervenors before the first hearing in this matter and the special master raised the 60 percent number, frankly, I cut her off and said we will never accept the 60 percent number and especially not in Los Angeles, because here's what happened on the point in time count.  Several council people conduct -- had sweeps in their district the week or so before the point in time count so that people would be moved out and they would have a lower threshold number.  Where did those people go?  They went to a different council district, and those numbers went up in that council district.

So, when we take 60 percent and we apply it as if this were 15 fiefdoms rather than a city, we wind up with all of this artificial construct about who can -- who can reach 60 percent and then start enforcement in their area, and that is particularly problematic for this -- for this City.

So, I think those are the -- the major points that I wanted to -- to raise with the Court, and I know that the Court in the Orange County hearing this week raised with my co-counsel, Ms. Weitzman, that we don't have an agreement in Huntington Beach.

The Court -- well, the -- the reason we don't have

25

the agreement in Huntington Beach is we will not accept 60 percent anymore. So, thank you, your Honor.

THE COURT: Thank you. I may have questions but not at this time.

Mr. Miller on behalf -- or co-counsel on behalf of the County.

MR. MILLER: Good morning, your Honor. I'll be brief. I have a couple of points that I want to raise. We're in an interesting position. The County's in an interesting position. We don't think there's any Article 3 jurisdiction at all. We think we're -- you know, this is a -- this is a big issue, big problem, and we're devoting tremendous amount of resources and effort to address it.

So, that's -- that's where we are at the outset. I read the agreement -- the settlement agreement through. There are some parts of it I just didn't understand, and I -- and I read some of the commentary about it. It seems acknowledged that the 60 percent threshold is going to hit approximately 14 -- 14,000 beds.

THE COURT: I heard 14,000 to 16,000, right?

MR. MILLER: Fourteen to sixteen. And it seems acknowledged by Council President Martinez. She made the statement -- and it's in the briefs -- that the -- the beds that are subject to the agreement are already committed, or most of them. Thirteen, fourteen thousand of them are

26

already committed.  So, I don't understand, and I -- you know, I'm in favor of settlements.  We'd like to settle this case.  We -- you know, frankly, we have a mediation set for Monday, for your Honor's information.  But I don't understand how you can make an agreement to do something that's already been committed that you have to do, and -- and then there was a payment of a million eight in legal fees.

So, I just don't understand that, and I guess your Honor probably saw that and is going to -- going to address that.  So, that's one issue.

The other issue is that we raised --

THE COURT:  And what did you want the Court to address about the 1.8 million?

MR. MILLER:  Well, it just -- it seems like an agreement to commit to something that's already been committed to, plus the payment of a million eight of legal fees that it just -- I don't understand it.  It -- it doesn't make a lot of sense to me.  I don't want to throw stones on their settlement.  We'd like all this litigation to be settled.  We'd like the money to be spent on, you know, helping people that live in the streets and getting shelter, not on lawyers.  That's our position.  That's -- that's where the County's coming from.  I just don't understand how you can enter into an agreement based on a

*Echo Reporting, Inc.*

27

commitment you've previously made.  It seems illusory or lacking in consideration.

The other issue that I wanted to talk about, your Honor, is I read the -- the agreement, and it -- in page 10, paragraph nine, it talks about County obligations.  The County is obligated to do all these things.  The County is obviously not a party to this settlement agreement.  Our position is that the County is more than meeting its obligations.  So, it doesn't seem to be an appropriate part of the settlement or an appropriate thing for the parties to do to try to define or address obligations of the County.  We're not part of this deal.  So, I would like to see that paragraph nine excised.

If they want to -- you know, if the Alliance and the City want to talk about things and they want to work with the County and so forth, we're -- our door is open.  You know, we're willing to listen.  We've been talking to them.  As I said before, we have a media -- another mediation on Monday.  We'd like very much to get out of this litigation, as much as I like being in your Honor's court, not in this lawsuit.

So, I don't think paragraph nine belongs in this deal at all, and I'm concerned that if the Court were to approve it, approve the settlement with paragraph nine in it, there would be some kind of a determination of the

EXHIBIT D - Page 112

28

County's "obligations", and that would be totally inappropriate. So, we would ask that that -- you know, that be clarified.

That's -- that's pretty much all I have, your Honor. We don't -- the Board of Supervisors wants to work on homelessness and helping people that are homeless and living -- living in the streets and need services, need shelter, and that's where we're coming from. So, I would -- I would submit it on that basis and thank you, your Honor.

THE COURT: Thank you very much. I have no particular preference in response. So, if the Plaintiffs are comfortable and then the City.

MS. MITCHELL: Thank you, your Honor.

We don't have a whole lot of response because there wasn't a whole lot said that wasn't in the objection papers already.

THE COURT: But cover that. In other words, I want to hear full argument today.

MS. MITCHELL: Thank you. So, Ms. -- Ms. Myers said, as she was standing up here today, she would not be here from a legal perspective or have legal objections if certain things were true. But, in her mind, they're not. And the implication of that statement is if those things are true, she would not have a legal argument. And, so, as we pointed out in our papers, those things are, in fact, true.

29

And I think one of the problems is Ms. Myers, as I understand it, is reading ambiguities into the agreement that, one, don't actually exist and, two, can be clarified in other ways. And one of those discussions is what beds, what creating -- creating beds means as opposed to having beds, and that is a particular concern.

That's not a reason to deny the objection. That's a reason to clarify what creating versus having means. And I think that we have been very clear. I think the agreement has been very clear. The City has been very clear in their response to that objection that they intended to create beds for 60 percent of the unsheltered population for whom the City can reasonably assist, and we have gone back and forth and back and forth on what that definition means, and we're reasonably specific, as specific as can be I think in a 27-page document, what that means. And, certainly, we expect over the next five years for that to be further, I think, defined as we end up, you know, addressing problems that exist, but that's not a reason to deny the settlement on the front end. It's a reason to continue to work out problems on the back end.

One of the other issues that was raised was the 2022 calculation, and this is something that the City certainly addressed, but I think everybody except for this argument here today, expects the 2022 count to actually

*Echo Reporting, Inc.*

30

increase.  It has increased in every other jurisdiction that has released a 2022 pit count so far that I have seen except for Orange County, which has seen a 17 percent decrease, which I think, frankly, speaks volumes about the success of this program that we have agreed to enter into.

So, the argument I think is that we intentionally didn't use the 2020 count because it's going to be higher based on the tenant protections.  But I think in reality, we expect the 2022 count to be higher than the 2020 count.  And, regardless of those expectations which at this point my understanding is nobody knows, and I think certainly Mr. Marcus can clarify that.  We certainly don't know.  But it makes more sense to use today's count than the count from two years ago or the count from 2023 or 2024, 2025, because that results in a shifting target, not only for the City but for the Court and for the Plaintiffs if we have to continuously reassess.

Yes, your Honor?

THE COURT:  If you're right about that, then I would say to the Intervenors, the County, to you and the City that that argument has virtue for the following reason.

If we all believe that the count's going up, it increases the responsibility under this agreement for the City to go up in the number of beds.

MS. MITCHELL:  That's correct.

**EXHIBIT D - Page 115**

31

THE COURT:  And if you go backwards to 2019, you would put yourself in a position where, frankly, this Court would feel uncomfortable with an old number.  Now, if the number goes down, that might be different.  And my question is why haven't we gotten that count in Los Angeles?  We virtually have that count in most other counties.

MS. MITCHELL:  I would inquire that of the City and the County, but --

THE COURT:  Why ask LAHSA that?

MS. MITCHELL:  Yeah.  My understanding is that LAHSA last year took a lot of time -- excuse me -- in 2020 took a lot of time.  They didn't release it until the end of June.  And I think, frankly, because the Executive Director recently resigned, there's more complications, but I'm going to have to defer to the City and County and LAHSA on that issue.  So, I don't know if we can do that now or you'd like me to keep going, your Honor.

THE COURT:  I want you to be continuous in your argument.  And then if I have questions -- and I apologize for breaking in.

MS. MITCHELL:  Thank you, your Honor.

So, I think one of the most significant issues for us to address, us being the Plaintiffs, is the standing argument, because that has been raised over and over and over again.  And I think there's a couple of different

32

issues here.  One is standing to bring the lawsuit in the first place, which has already been litigated, and one is standing to enter into this agreement.

So, I think on the front end I want to clear up some -- some misunderstanding about why we brought this lawsuit in the first place.  There's a lot that has been stated about the LA Alliance's whole goal is just to get to enforcement, and that's just patently untrue, your Honor.  We have been very clear.  You can look at the original complaint, Judge.  You can look at the first amended and supplemental complaint and all of our argument.  It is -- the goal has never been to get to enforcement.  And, in fact, if that was the sole goal of what we have been trying to achieve, it would be a failure by this agreement because this agreement does not require enforcement.  This agreement permits enforcement if certain things are met.  And we can talk about that in a second, but I just wanted to be very clear.  The goal has always been to mirror the Orange County settlement that was reached, and I'll talk about the 60 percent issue in a second, but we -- in looking at this, it was a very balanced approach.  And that is something the LA Alliance has always been fighting for, has always said and its members have been aggrieved by and damaged by, including its unhoused members, of which there are several, is the lack of shelter beds as well as the lack of regulation of

*Echo Reporting, Inc.*

33

public spaces as well as the lack of services, including mental health treatment and substance use treatment.  Job -- I mean, job training, we can talk about all of those services.  But that has always been the three-pronged approach of the Alliance, and this agreement achieves two of those.

So, as far as the increase in shelter, that is the number one goal, and that has been one of the main pillars of this litigation.  And, in fact, your Honor, in the reply, we quoted the main purpose and the intent, which I would like to read into the record at this moment if the Court is looking for a continuous argument.

In the first amended and supplemental complaint, on page 23, Plaintiffs state:

"While this is not a natural disaster, it is a disaster nonetheless, and it should be treated that way.  The only way to address this crisis with the urgency it deserves is an emergency response providing immediate shelter for all, increasing necessary outreach services and treatment and abating the degradation of our cities and communities for the good of everyone."

That has been our goal from the beginning.  That

**EXHIBIT D - Page 118**

34

is the goal that is to some extent at least as possible achieved with the City.  Obviously, the case against the County for services and treatment continues.

But, because the issue of standing has been raised, I want to address both of those issues.  So, one, if we're talking about standing to bring this lawsuit, that issue has already been litigated.  The County has brought this issue.  The City has brought this issue.  This honorable Court found for Plaintiffs already, that Plaintiffs did, in fact, have standing when the original motions to dismiss were litigated.

There's no reason to continue litigating that issue again with the County, certainly not with the City at this point.

So, as far as standing to bring this, I think the issue has been very clear what our -- what our intent is, what our obligation is, and what we are achieving by this.  Now, Los Angeles Community Action Network and other Intervenors that are objecting have a sole goal.  They -- they challenge these on certain bases, right.  It is almost always, when we're talking about these sweeps as opposed to property, when we're talking about sweeps under 4118 and other similar ordinances, it's always them challenging the ordinance directly.  They're -- it's not the only way to achieve standing in this case, right.  With this balanced

**EXHIBIT D - Page 119**

35

approach, which is what we have been arguing for from the beginning, it is both the -- both the lack of enforcement and the lack of beds that has been an issue.  They are two of the three things that we have been attempting to achieve, right, is this balanced approach for the community as well as for the unhoused community, who are desperate for shelter and for assistance, and I hear that almost on a daily basis, "I just need help."  This agreement will give the help that we are so desperate for in Los Angeles.

As far as what the -- let me look at my notes, your Honor, if I can have a moment.  Oh, the as of yet written ordinances.  This is another issue that we addressed in our reply, but this -- this agreement is not doing, as the Intervenor suggests, requesting the Court to approve some as of yet unwritten ordinances.  That's not what this is.  This is saying in one -- one way in which the City may be addressing the lack of public regulation at the moment, which is what we see and which is one of the main pillars of this agreement, is by enforcing public regulation ordinances.  And once it hits the 60 percent, which I promised I would address in a minute, and I will, that it may proceed with public regulation ordinances and with enforcement thereof but prior to doing so, must notify the Plaintiffs, must notify the Court, and, so, we will understand exactly what is being done.  But it also doesn't

**EXHIBIT D - Page 120**

36

prevent anybody from challenging those ordinances.  It doesn't prevent anybody from filing suit.  I do expect such lawsuits may be related to this case and to this Court given this significant case and given the Court's prior statements thereon, but there -- it doesn't prevent anybody from moving in and filing lawsuits or by having standing to do so.

And I think one of the other issues that I said I wanted to address was the 60 percent number.  I recognize Ms. Sobel indicated they don't agree to 60 percent.  They've never agreed to 60 percent, and I understand that and recognize that.  But what I did is I went back when we were looking at the 60 percent approach, and I talked to a number of individuals who came from various cities that have used this 60 percent number, and I want to be very clear why we -- we, the LA Alliance, were comfortable with the 60 percent number.

So, one of the things we did, talked to a number of cities and said, Hey, I understand you're using this 60 percent approach.  And the 60 percent approach is not as has been understood by some people and has been represented by some people that 60 percent of the people get offered shelter and everybody else gets arrested.  That's clearly not what the Court has agreed to and what we've suggested or what the City has agreed to.

Any person prior to any type of enforcement or any

37

type of enforcement of -- of these sweeps, one, has to be given an option to vacate the premises or an opportunity for appropriate and adequate shelter or housing.

So, not a single person under this agreement would ever face enforcement unless that was first met, unless offers were first met.

Now, as I understand it, this 60 percent number has been successful in a number of municipalities.  And I want to talk about Bellflower and Whittier specifically because I think they were the two most recent ones to enter into this agreement.  And I talked to two of the civic leaders there as well as the City Manager, and what I was told is that 60 percent across the board has been a very successful number, with about 40 percent of the individuals choosing not to enter into shelter, choosing to reunite with family, which I think should be applauded as a blessing and not a reason to object to this agreement, frankly, but has -- a variety of things, reunite with family, migrate, any number of things.  But approximately 40 percent were not interested in shelter for one reason or another, and approximately 60 percent or less were.

So, in some jurisdictions, they were even closing beds because they no longer needed them anymore.  And it was a very successful number, one that has been used across the board successfully.  Therefore, we were comfortable.  I

*Echo Reporting, Inc.*

38

think the Court was comfortable, and the City was comfortable in using the 60 percent as the appropriate number.

And I'll let the City address the objections to the City appropriate shelter, but what that is designed to do is simply explain the -- and, as the -- as the City has -- has said, the -- the on the boots on the streets reality of what the City can reasonably do and reasonably offer without -- for people that don't need clinical beds.  But, for people that need clinical beds, they're going to need more assistance than the City can reasonably offer.

And I think one other thing, just to address the County's argument, this 14,000 to 16,000 beds that's been the approximate.  I actually think it will be more than that because I think that we'll see the 2022 count go up significantly, both by anecdotal evidence and by what I hear from service providers.  But, whatever that number ends up being, the only beds that are in the pipeline right now -- and I think there's between 10,000 and 11,000 beds, most of them or a lot of them, particularly in the last few years, have been added to the stat as a result of this litigation.

The City voted two years ago to enter into settlement negotiations with Plaintiffs and with this Court and with Intervenors with the County.  And at that point, you had several council members start actively moving to hit

39

those numbers.  And, because of that, we have an increase in stock I think particularly for the 1500 interim beds, which is exciting and should be lauded.

Now, one concern I do have and I think the City will address is the permanent housing beds.  To the extent that is permanent supportive housing, that's obviously going to go to individuals that have significant mental health, drug dependency issues, physical disability issues, people that need supportive housing, in which case, you have shelter beds opening up and individuals should be offered those shelter beds.  So, I don't think it's a problem as people move through the system.  It should be applauded.

I think that's it, your Honor.  I'm happy to address any other issues that have come up.

THE COURT:  I may have questions later, but thank you.

MS. MITCHELL:  Thank you, your Honor.

THE COURT:  All right.  Counsel, are you comfortable turning to the City or do you need a recess or you're ready?

MR. MARCUS:  It's up to the Court.  I'm happy to go forward.

THE COURT:  Please, let's go forward.

MR. MARCUS:  I agree, your Honor, that the objections stated here today are essentially nothing new.  I

*Echo Reporting, Inc.*

40

think the City and the Plaintiffs have addressed the bulk of them in their papers, but I will highlight a few issues, and I will try not to duplicate or repeat anything Ms. Mitchell said.  I think she addressed the majority of them.

It's interesting that Ms. Sobel references the Jones settlement here because Jones, in very many ways, is similar to this settlement.  It is an agreement by the City to limit its enforcement of certain public rights of way ordinances, regulations until it constructs certain number of beds.  That's essentially what the City is agreeing to do here with the Plaintiffs.

Now, Ms. Sobel may have buyer's remorse with that particular agreement, but that is not a legal challenge to the agreement, and the City here and the Plaintiffs here are doing nothing more than what Ms. Sobel and the City did in Jones.

The issue of the count, your Honor, is -- is one that I agree with the Court's statements.  It would not be appropriate for us to use the 2020 count numbers.  Those are old numbers.  The City agreed to bind itself to whatever the 2022 count is before it gets released.  I don't know what those numbers are.  We don't know what those numbers are.

THE COURT:  But the expectation is on all parties' parts, in the briefing at least, that those numbers are going to go up.  And that's why I was pleased to see you

41

take the 2022 count, because if you took the 2019 or 2020 count, then in a sense you wouldn't have the present numbers that would be appropriate.

MR. MARCUS:  That's right, your Honor.  And -- and --

THE COURT:  It's actually detrimental to the City in a -- in a sense to take the 2022 count.

MR. MARCUS:  We agree.  And -- and we can only rely on the numbers provided to us by LAHSA.  It's not the City's.  It's not the County's.  This is LAHSA's count. We're agreeing to be bound by the third party, LAHSA's, count, whatever that may be.  And if it's a whole lot more, then we're committing to a whole lot more.  If it's a little bit more, then we're committing to a little bit more.  But the important thing is the City is committing to build the number of beds that is needed, whatever that number may be.

What we cannot do, as Ms. Mitchell referenced, is have a rolling commitment.  What the City is doing, as any party does when they settle a lawsuit, is buy certainty. Litigation doesn't have certainty.  Litigation has risks. Settlements have certainty.  The City is agreeing to build the required number of beds, whatever that number may be, in the 2022 count.  That is a certainty that the City is bargaining for in this agreement.  And if the -- if, as the Intervenor suggests, there should be a rolling commitment

42

when the '23 count comes out, when the '24 count comes out, the City has lost the certainty that is bargained for, and that is not what the agreement states, which is why the agreement sticks with the 2022 count.

And, to say that we are -- that there's no new commitment here is -- is simply false.  There are beds that are currently being contemplated in the pipeline, as we call it.  That number of beds, again, needs to be built.  We are going to create those beds because we need to create as many beds as we can.  As has been stated, this is a floor, not a ceiling.  But whatever number comes out of the 2022 count and whatever calculation we make in consultation with the Plaintiffs, approved by this Court, for the required number, those are the number of beds that the City is going to create.  And that's what our commitment is.  We're committing to build that number of beds and get out of the risks of litigation, as any party does in the settlement agreement.

Lastly, the County's complaint about paragraph nine of the settlement agreement, it's very clear in the agreement throughout that the agreement is binding on the Plaintiffs and on the City.  It does not bind the County. It does not bind the Intervenors.  They are not party to it.

Paragraph nine is a statement, a joint statement of what the City and the Plaintiffs believe the County

**EXHIBIT D - Page 127**

43

should be doing.  We are hoping that the City -- excuse me. We are hoping that the County steps up to that statement of principles, either in mediation or a settlement agreement or as a result of this litigation or just on their own, because it's the right thing to do.  But that's all that that is. It's a statement of what we think the County should do.  And if the County wants to join this agreement, we are happy to have them.  And if a -- a mediation or future settlement discussions result in such a larger better agreement, we will bring that to the Court to supersede this one.  But right now, you have a firm commitment from the City to build a certain number of beds in five years under this settlement agreement, not a consent decree, settlement agreement.

(Pause.)

MR. MILLER:  Could I be heard again, your Honor, at some point?

THE COURT:  Briefly.

MR. MILLER:  Very briefly, your Honor.  The reason I asked to be heard, your Honor, I just haven't heard an answer to my question.  We put in -- quote in our brief from City Council President Martinez, "The City has committed to building a minimum of 14,000 beds and has over 13,000 beds in process already."  And we cite, you know, where she said that.

I have not heard anything from Alliance or from

**EXHIBIT D - Page 128**

44

the City answering my question, and it's a question because I don't know.  How can you have a settlement agreement that requires you to commit to something that you've already committed to?  It seems like a charade.  It just doesn't seem real, and I would like an answer to that issue.  I mean, we want this to work as much as anybody.  We're working very hard on the issue, but it -- it doesn't seem like -- it seems -- it seems paper thin.  Maybe there's another thousand beds, maybe not, depending on the count.

If they've already committed to 14,000 beds, as City Council President Martinez says, then what are we getting out of this deal?  They're getting a million eight in legal fees, the Alliance is.  What is the City getting for this commitment?  I don't -- I have not heard an answer this morning at all, and that's the point I wanted to make.

Thank you.

MS. MYERS:  Your Honor, Intervenors would also like to be heard briefly on just a few specific points.

THE COURT:  All right.  Briefly.

MS. MYERS:  And I'll try and speak more slowly.  I want to -- I want to address the 2022 homeless count issue because I think that's -- that's been raised by both parties.  It's been raised by your Honor.

We appreciate the City's desire for certainty relative to Section 3 of the agreement, and we don't raise

*Echo Reporting, Inc.*

45

the objection related to the homeless count numbers with regards to Section 3. As I said earlier, as we said in our -- in our papers and I reiterated just to -- to make the point clear because I think there's been some misstatements about our papers, if the LA Alliance and the City of Los Angeles want to reach an agreement that provides that the LA Alliance will dismiss the case upon the creation of a certain number of beds, we may object that it's bad policy, that it's not going to do much. We may be in agreement with AIDS Healthcare Foundation, a lot of service providers, the LA Times, a lot of other people who think this agreement won't do any good, but they can enter into it. They can use the 2022 count, whether it goes up, whether it goes down, whether it stays exactly the same. That's not our objection.

Our objection is that the City is attempting to get a court approval to enforce public space regulations five years into the future for 60 percent of the shelter beds, for 60 percent of the population based on a count that was done in 2022.

That -- your Honor, the constitutional rights of unhoused people related to the enforcement of ordinances against them is not static. This idea that the City can enter into an agreement today to build a certain number of shelter beds and, in exchange, get certainty about the

*Echo Reporting, Inc.*

46

enforcement of ordinances five years from now based on that number is not -- is not contemplated under the Eight Amendment.  It's not contemplated under existing Ninth Circuit and Supreme Court precedence, and it's certainly not within the Court's jurisdiction.  But we want to be clear that's the objection that we're raising is the use of that 2022 number to calibrate enforcement for some period into the future.

The other thing -- the other point that I want to make is that Plaintiffs misstate the agreement with regards to who must be notified when certain trigger points are made.  The -- Ms. Mitchell stated that the Plaintiffs and the Court must be notified.  That's not accurate, your Honor.  The agreement explicitly states that the Plaintiffs must be notified, and that's our problem in part with this -- with this agreement.  Putting aside the standing issue -- and we want to be clear, when we say standing, it's what we briefed in the papers.  It's not just LA Alliance's standing.  It's also the standing Article 3 ripeness.

With regards to this agreement, everything is between the LA Alliance and the City.  For example, section five, Milestones and Deadlines, the City will share with Plaintiffs the City's plans for encampment engagement, cleaning and reduction in each council district, only Plaintiffs.  The City and -- the City and Plaintiffs have

*Echo Reporting, Inc.*

47

set up an agreement where they can -- where they can talk about third parties' constitutional rights in private and only if the Plaintiffs disagree with that, the Plaintiffs, who have staked their claim on arguing that the Court is too protective of unhoused people's constitutional rights, only if Plaintiffs disagree do those issues become -- come in front of the Court.  And only then is there a contemplation of whether or not there's any disruption to the heart of this agreement, to be explicitly clear, is permission to enforce public safety regulations.

And then the last -- one of the -- just two more quick points, your Honor.  LA Alliance says they talked to City managers about how well the enforcement is going related to the 60 percent rule.  And I think, your Honor, just -- just to point a fine point on it, that's exactly the problem here.  The LA Alliance spoke to the City about whether or not agreements related to unhoused people's constitutional rights were going well.  And when the City said it was going fine, that was enough for them.  The LA Alliance is standing in the shoes and aligning itself with the City, which is exactly what they're doing here.  They're aligning themselves with the City to reach an agreement related to unhoused people's constitutional rights.

There is no case or controversy related to where the LA Alliance stands and where the City of Los Angeles

*Echo Reporting, Inc.*

48

stands relative to the enforcement of the -- the Municipal Code violations.

And then the -- the final point that I will make is that this is not Jones, your Honor.  This is not Jones v. The City of Los Angeles.  Jones was brought by unhoused individuals to challenge the constitutionality of the City's anti-camping ban.  And Ms. Sobel can say this better than I can, but I will just say that the Jones agreement prohibited the City of Los Angeles from enforcing an anti-camping ban based on a lawsuit that was brought with standing pursuant to Article 3 to actually challenge that, similar to The Orange County Catholic Worker case.  Standing is real, your Honor.  The requirement that there be a case or controversy and the requirement that there be an actual injury is to ensure that what is happening here is not -- is not permitted by the courts.  It cannot be the case that advocates for an ordinance can walk into court and agree with the City, who are also advocates of that ordinance, that the City, under certain circumstances, can enforce that ordinance against third parties, including Intervenors, when there are significant constitutional issues at stake.  This is not Jones.  This is not The Orange County Catholic Worker.  This is not Mitchell v. City of Los Angeles.  This is a very different case.  That matters -- the procedural posture of this case matters, and we just want to make that

**EXHIBIT D - Page 133**

49

point clear given what the -- what the City and what the LA Alliance had invoked in their positions.

Thank you.

THE COURT:  I'm going to turn back so that there's equality in terms of the argument.  And, so, I'm going to turn back to the Plaintiffs and then the City, and then this is concluded.

MS. MITCHELL:  Thank you, your Honor.

I agree that this is not <u>Jones</u> because this is not going to take 13,000 -- 13,000 -- this isn't going to take 13 years to build the beds.  We have in -- in this agreement a deadline-driven schedule which cannot, obviously, be established until the 2022 count is out, which we are still waiting for.  But the agreement has been reached to the 8th of June.  This agreement was reached back in April as we worked out the details.  But we're still waiting for the 2022 count.  So the deadlines and milestones aren't in this agreement.  But, certainly, we anticipate the agreement may be amended to include the deadlines and milestones.  But it is very clear that this cannot take 13 years to accomplish.

And, to address Mr. Miller's points, if -- if the Court looks at what is in the pipeline currently, you have, again, less than 11,000 beds.  I recognize that Council President may have misspoke when she said 13,000 beds.  But you have less than 11,000 beds currently in the pipeline.

50

And, again, we expect this number to increase to over 16,000 beds that the City is committing to.  I would anticipate more like 18,000 or higher.

I'm happy to address the -- the financial issue if the Court is interested in that at all.  It is certainly less than half of what we have invested in this case, and it is in par with what other advocates have been paid in these 1988 fee cases.  It's not anything that is unusual.  But if the Court has concerns, I'm happy to address them.

I think we have said we've beat standing to death at this point.  We have brought a clear lawsuit with standing.  I think that it is certainly under some people's skin that we represent businesses, community members, as well as unhoused individuals who are all interested in pushing these balanced solutions, balanced solutions that work for all cities and communities.  I'm not going to beat that issue to death, but because we represent both unhoused individuals as well as businesses who are all interested in the buildup of shelter and the agreement thereon, I think has been a source of frustration, and we recognize that.  But it doesn't take the standing issue away.  If the Court would like more answers on that, we're happy to answer that, but it does not -- I mean, I think we've beat this issue to death at this point.

So, I think with that, I will sit down, your

*Echo Reporting, Inc.*

**EXHIBIT D - Page 135**

51

Honor, unless the Court has additional questions.

THE COURT:  Thank you.

On behalf of the City, Mr. Marcus?

MR. MARCUS:  Thank you, your Honor.  Let me address just two points, one from the County and one from the Intervenors.

With respect to the County's reference to Council President Martinez's comments, and with all respect to Ms. Mitchell, the Council President never misspeaks.  She did, however, estimate a number.

THE COURT:  She did what?

MR. MARCUS:  She estimated a number.  She guessed. When the 2022 count comes out, we'll know what the real number is, but --

THE COURT:  And if we're right, if it's going up, you're going to have an additional commitment?  In other words, I'm pleased with the virtuousness of that because if you'd brought me the 2019 or 2020 count, my first question would be why.

MR. MARCUS:  And that would --

THE COURT:  So, it's got to be the 2022 count, and I think we can all expect it's going up.

MR. MARCUS:  Right.  And which is why the 2020 count was never a consideration.

THE COURT:  Right.

EXHIBIT D - Page 136

52

MR. MARCUS:  With respect to the Intervenors' concerns about future ordinances relating to regulation of public rights of way, as the Intervenors stated in their own papers and as the City has stated in its own papers, nothing in this agreement binds or precludes someone from bringing a legal challenge to some future ordinance, whether a facial challenge or an as-applied challenge.

So, the argument that this agreement is somehow going to grant cart blanche to the City to ride roughshod over constitutional rights of people experiencing homelessness is simply false.

And, with that, if the Court has any other questions, the City Submits.

THE COURT:  No, other than to thank all of you and to make a couple of brief comments and then a recess, but this will be resolved one way or the other today.

First of all, you should all compliment yourselves in terms of dealing with this inhumanity because my impression was, right or wrong, when I came here that whatever was happening was not working, that whether it was Jones and 1250 bed spaces in 13 years, with the ever-increasing death rate, with the single-digit but then double-digit rise in homelessness, that whatever the solutions or nonsolutions have been for the last literally 20 to 30 years, have landed on all of your laps.

**EXHIBIT D - Page 137**

53

And if you go back to the April of 2020 transcripts and bother looking at it, you'll see that the Court had made the same statement at that time, that if not us, who and if not now, when. And you can read that in the transcript. Nothing's changed. It's fallen on your laps.

The second thing I would generally say is that this -- my impression is that this suit started primarily with Skid Row and the Downtown business community. I want to compliment you because it's now morphed into the entire City and the entire County, which means we have to deal with it. We're no longer dealing with it in a piecemeal way because now it involves finally the City and the County. So, I'm pleased to see you're entering into additional negotiations on June 13th, however those turn out. And you're an integral part of this.

Third, I'll remind you that this is a judicially created doctrine. The City Council and the legislature did not bring Boise. The Ninth Circuit did. And in that Ninth Circuit opinion, it says "shelter". And if you can find anything about housing, I want you to quote that to me. It's shelter. And if it was housing, this Court would enforce housing.

But the debate that's taken place has been what does shelter mean, and the Ninth Circuit left that undefined. So, that ended up being a political decision

54

from a housing first model, which was a policy decision, to shelter or to some mix.  And when I was able to communicate with all of you previously, I had warned you that when a Federal Court makes a decision, whether it's Jones or Mitchell or this case, you are stuck with our decision for 10 or 15 years until that decision comes back or that same area comes back in front of court.  In other words, we've frozen you.  And it seems to me in the issue of homelessness and house -- houselessness, that there has to be a tremendous amount of flexibility on all of our parts, and we have to be unafraid to make the attempt and sometimes make the mistake and just back up and try to get it right, whatever that is.

So, from the Intervenors' standpoint, you are a housing-first model.  From the City's standpoint, there's a growing recognition that there has to be some balance and that there has to be shelter to move thousands of people, and this Court has been critical of HHH.  The reason for that is that so few units were produced at such a great cost that even if that was the best model, we weren't dealing with thousands of people, we were dealing with hundreds of people.  And, so, therefore, the City literally entered into a period of inertia, stagnation, and then not only did it hurt the homeless, it hurt the citizens.

So, from the beginning, when I was able to speak

55

to both of you, there was no secret that this Court was seeking, when I was actively involved anyway, a better balance.  And if you could produce a housing-first model and if you had 10,000 units, I couldn't be more complimentary.

But what has happened is that the costs have risen now to minimally 630,000 to 800,000 dollars a unit.  And, so, we are treating the very few, if you will, and leaving thousands and thousands and thousands of people out on the street.

The next thing is, generally speaking, before I come back with a few questions, I became sensitized because of Michele Martinez and other advocates in Orange County, including Brooke Weitzman.  And the blessing was taking me out to communities and realizing that the homeless impact our lesser income areas as much or more than our wealthy areas.  All of you in this room, regardless of any complaint about salary, can probably fly to Europe.  But if you'll come with me on occasion -- and I know you don't like to get up at 4:30 or 5:00 o'clock in the morning, you'll find that our impoverished communities are the most effected, Curren Price's district, Gil Cedillo district, Marqueece Dawson's district, Buscaino's district, Kevin de Leon's district.  They can't use their parks.  Yet, because of the power of those who have a voice over those that don't have a voice, we focus on a place like San Vincente.  And when that human

**EXHIBIT D - Page 140**

56

cry takes place, there seems to be a reaction, which is good, and this Court has constantly asked myself, without asking any of you but being pretty blunt about it, why?  Was it only because of access to City Hall?  Was it only because somebody was affronted because they drove down the west side of Los Angeles?  Was it only because Venice or the L.A. Times decided to go out and cover the Sheriff?  But where the hell was everybody out in Curren's district or Kevin de Leon's district?

And I have to tell you I really got concerned with a lot of you folks who wouldn't even come out with us early in the morning.  And, quite frankly, some of you lost a lot of credibility because you just wouldn't come out to the sites.

Now, I say that generally because there's exceptions.  There are people who work in the community.  This isn't aimed at the Intervenors.  So, therefore, when I came to this City -- and now I'm a citizen.  I'm spending more time here than you can imagine -- you were frozen.  There was inertia, an ever spiraling death rate, and why would the Court accept that?  Why would this Court want to become complicit or any court become complicit?  And that's caused quite a bit of controversy from unorthodoxy to whatever.  But if that problem's before you, I don't see how a court or any of us can act with comfort.

**EXHIBIT D - Page 141**

57

Now, the other day I said to Brooke Weitzman something in a settlement conference that you weren't involved in.  A young lady that we found housing for -- and this is street-by-street fighting.  This is door by door. If we're going to get involved in this business, you will never be successful because no matter what you do today, you'll drive down the street, and you'll see a woman who's babbling or a man running into the street.  You will never be 100 percent successful.  You just -- we just have to be more successful.

I have pushed you as hard as I possibly could.  I hope I have affronted every one of you on occasion.  I've literally said to Shayla and I'll say this, I said "I think you're killing people."  I've said to the -- on the other side, "What are you doing?  This involves humanity across the City," to the Plaintiffs.  The Court's constantly said to the City "Quit dabbling in bits and pieces around the City," and the County, "Quit dabbling in bits and pieces." So, if you want to settle with some small portion, the Court doesn't want to spend the time on X amount.  I want to spend the time on the whole amount because it's no solution in this piecemeal wacamole approach.

Back to I compliment you.  You're finally there. You're talking about the City.  I want to thank you, thank the City Attorney, thank the Mayor.  You're finally talking

58

about the City.  And one of the valuations we made with complete transparency was you were too big and too dysfunctional to ever get a citywide settlement to begin with.  You're really 15 different cities out there with 15 different cities.  It's the mosaic of this City.  And, so, therefore, that's why we went district to district to talk to every single councilperson to try to learn what is so unique about Monica Rodriguez versus Gil Cedillo versus Curren Price versus Marqueece, and it was an amazing education.

So, I end this part of this kind of from the heart talk to you to say you should be complimented that you're finally at the place as the City and maybe the County of taking this on in a holistic manner.  Where you end up in terms of shelter or where you end up in terms of housing first I could care less.  Just do it.  And you haven't done it.

Now, this may present an opportunity, depending on your responses in a few moments.  This settlement is far from perfect.  This settlement will not, if I approve it, solve homelessness.

So, the first point is that in the past, a lot of politicians have made a lot of promises, most of those broken, and they tend to be aspirational, "If you elect me, I will do the following."  And once elected, four years,

**EXHIBIT D - Page 143**

59

what's the number of new housing units that are going to be produced?  Let me repeat that.  That's a really simple question.  Am I dealing with 3,000, 4,000, 14,000?  Because the press has popularly picked up that 14,000 to 16,000 units are going to be produced.

The problem, Marcus, that we got into it between you and Skip and the County with the 6700 was how we were going to count those, you know, what was in the pipeline, were we going to count one in the pipeline because we got a permit?  Were we going to cause -- were we going to count that because a nail was driven into the wall?  It took four months to reach an MOU just on that.  So, I don't want to get caught on the back side of this tentatively even thinking about approving a settlement unless it has some meaningful number.

By the same token, you're the Plaintiff.  You're taking on what the Government should be doing.  Why don't you have the right to settle?  Why is it your responsibility to continue on gratis regardless of the complaint about your fee and take on the burden if you choose to settle.  And if you had produced one new unit, why would the Court intervene and interfere with that?

All right.  The second general area is the $1,800,000 is ridiculous.  That is a low figure for the services you've performed, and I'll put that on the record.

60

And, Mr. Miller, just produce your paycheck. And I'm going to say that to you bluntly. When I hear that argument, I'm affronted by it, frankly. Just put on the table your contract with the County, along with all of your associates. So, as far as the $1,800,000, happy to accept that number. If that's the agreement between you and the City, I have no concern and no complaint. Understood?

The last area is one of money. I think Elizabeth Chou, I'm not sure, the last article I read, kind of valued this at $3 billion. That's a number just thrown out by the press. What -- what is the value of this settlement, because I can't imagine a court turning down a $3 billion settlement if you move forward on this. But if this is di minimus and we're just borrowing money from something else, I'd like to hear how much money we're borrowing. So, I'm not concerned about double counting anymore, and I'll say to LAHSA I got flimflammed by LAHSA to begin with in this double counting and you read those transcripts way back when, and that caused a lot of concern on my part in terms of credibility.

We don't have double counting here. We have 6700. You're representing you're producing new beds. What you really have is what I call a drawing off of funds potentially from HHH. And, so, when I was thinking about this, I was saying, Well, why can't we incentivize HHH. If

*Echo Reporting, Inc.*

**EXHIBIT D - Page 145**

61

you haven't built the units, you might have a narrow window of time to get these in the pipeline, and let's get you going, and maybe that's a good thing.  So, get me another thousand real quick.  Don't wait until year seven or eight. If you really want these in the pipeline to be counted, let's see the developers step up and do it and the City bureaucracy do it.  Maybe that's a good thing.

So, I'll ask the City and I'll ask the Plaintiffs, what's the value of this lawsuit in money?  And step over and have a conference with each other.  That's an order. See if you can come up with a unified number because from the press I read about $3 billion.  I don't know that that's true.  What's the money value?

MR. MARCUS:  Your Honor, can I have a moment?

THE COURT:  Sure.  And I'm not holding you to the, you know, 100 million mark, but I'd like to kind of have an idea of what we're dealing with.  And you can bring -- I certainly know you.  Come on -- you can come forward, ma'am. What's the estimate here?

(Pause.)

THE COURT:  Matt, it's good to see you.  Just identify yourself.

MR. SZABO:  Sure.  Matt Szabo, City Administrative Law --

THE COURT:  And it's a pleasure to have you here,

*Echo Reporting, Inc.*

**EXHIBIT D - Page 146**

62

by the way.

MR. SZABO:  Yeah.  Thank you very much.

THE COURT:  What's the value of this?

MR. SZABO:  So, we --

THE COURT:  I don't know if I'd walk away from 100 million.  I don't know if I want to walk away from 3 billion.

MR. SZABO:  So, we made a -- a rough estimate.  That 2.4 billion to 3 billion dollar figure that you read in the Times was --

THE COURT:  No.  I read -- I read it from Arosky (phonetic).  I read it from Susan Shelley, and I read it from Elizabeth Chou.  So, any time you get three members of the press together, it must be credible.

MR. SZABO:  Right.  Yeah, it -- it was discussed when the -- when the proposed settlement was announced.

THE COURT:  Okay.  How did we come up with that number?

MR. SZABO:  We came up with that number based on -- there is a -- an average amount of either subsidy for a permanent housing or the actual cost of capital for shelter plus the cost of ongoing services that would be required for each of those.  We -- we looked at what was in the pipeline and as -- as was stated and is stated in the papers, we've -- we estimate that there is between permanent housing and

**EXHIBIT D - Page 147**

63

shelter a capacity for the City to stand up about 11,000 new units, most of which are permanent.

THE COURT:  Okay.

MR. SZABO:  And, so, we took the -- what we would be required to subsidize for those 11,000, and then we project it out.  If we needed to do 14,000 units, it would be about 2.4.  If we needed to do  16,000 units, it would be about 3 billion in subsidy and service cost.

THE COURT:  Matt, I can't thank you enough.  A couple more questions.  Don't go away.

MR. SZABO:  Sit down or --

THE COURT:  No.

MR. SZABO:  Okay.

THE COURT:  What does "in the pipeline" mean?  I got in this debate over the 6700, and the County would say X, and the City would say Y.  And, finally, they worked it out, and if they both say that we produced 6700 units, I'm going to accept that.  But what does "in the pipeline" mean?

MR. SZABO:  So, what in the -- "in the pipeline" means is identified projects, projects that have gone through some initial approval.  So, we have a site.  We have a site plan.  We have a rough order of magnitude on the cost of the construction of that project.

THE COURT:  Um-hmm.

MR. SZABO:  It may not be -- we may not have laid

**EXHIBIT D - Page 148**

64

out one brick yet or one -- you know, dug at a foundation yet, but we have some idea, and we have some commitment that dollars will be found.  Now, I do want to make an important point, Judge.  In the -- in the documents that you have in front of you, we identified 9400 units of permanent housing that --

THE COURT:  Yeah.  It's on page nine.

MR. SZABO:  -- that we view -- that we are saying are in the pipeline.  That does not mean, contrary to Mr. Miller's comments, that it's just stuff that's already there, certainly not.  Almost a thousand of those units are permanent housing units that we are going to establish through the State Home Key Program.

THE COURT:  Okay.

MR. SZABO:  And that is going to require -- those thousand units are going to require the City to come up with over $200 million of match.  And that Home Key Program, by the way, the reason that we're willing to invest that much is that it is an acquisition program of already existing units.  So, we don't have to wait the four plus years, as you had pointed out, to build from the ground up.

Do we know where all that money's going to come from?  No.  But the City is willing --

THE COURT:  Well, if you're successful, the Governor seems to have a surplus.

65

MR. SZABO:  Well --

THE COURT:  And I notice Ms. Fudge came by recently.  So I'm sure she has a lot of money she'd like to give you.

MR. SZABO:  True, true.  But it still is going to require about a 50/50 match.  And -- and the City is committing on that program to -- to come up with $230 million that hasn't been planned for.  So, we're going to make that stretch commitment because we have an opportunity to get a thousand units of housing up this year.  So, we're going to do that, without -- and it's not something that my office does often is to make recommendations to counsel to make commitments without having secured the funding to make good on those commitments, but we're willing to do it because of the nature of the emergency.

THE COURT:  Matt, one more question.  I read some place when I could do a lot of investigation that the Mayor had touted and the Council had touted about 7200 units eventually out of the 10,000 from HHH.  And yet I look at the controller, Galperin, and he's got about 1400 units completed in almost five or six years now.

This is not double counting, but there's going to be a complaint from the housing first model that funds are being moved from HHH over potentially to shelter.  I don't think that the Court is going to become involved in that.  I

*Echo Reporting, Inc.*

66

think that that's a function for the elected officials to decide what the appropriate balance is.  You just have a rising death rate.  Hopefully and aspirationally I would say to you that I hope you get as much shelter as quickly as possible to try to get people out of the rain or out of the heat.  But, by the same token, nobody wants to give up on housing first, but I think that's best for the elected officials to decide that balance.

The third thing is that I'll say to the Intervenors, I don't read this agreement the way you do. And, in fact, on page -- and, Sarah, I want you to help me. I think it's page five, isn't it?  Yeah, page five at the last paragraph.  I don't think it needs clarification. You're -- you're stating that enforcing the terms to which the settling parties have agreed and nothing affects any rights of the County or the Intervenors or any other party. So, if somebody wants to sue the City, I would be concerned if you came to me with a settlement as a class action and you were binding all people in the future.

Here, I think we've had historically a reduction when we've entered into these kinds of agreements with litigation and saved our cities, 25 cities, huge amounts of money.  That's all I can represent to you.  But as far as taking away the right of the Intervenors to file a lawsuit, if 4118 was amended, et cetera, I think they're perfectly

67

able to do that, and I see no reason why the Court would preclude that.

Now, if you're of a different impression, either on behalf of the Plaintiffs or the City, I'd like to hear that, but the Court doesn't intend to take away any constitutional right to sue by the Intervenors.  They can file tomorrow or any other group can, but I will say to you as a practical matter we've absolutely flattened the litigation in Orange County.

The third thing I'll say to you is I'm pleased to see the 17 percent reduction in Orange County, but that is not being held up as a bright shining light on the hill for Los Angeles.  We're a different community.  But, by the same token, there seems to be an effort -- an increasing effort to get people off the street in the thousands right now instead of just the hundreds and it appears to me that we've been catering to the perfect, and we haven't been able to accomplish the good.

So, Matt, take it back to your council, take back to your Mayor my compliments because we've moved from a small lawsuit citywide, and it's bold, and I hope that you're successful in your mediation.  I wish you the best, Mr. Miller.

I want to go talk to my law clerks for a moment.

MS. SOBEL:  Your Honor, may I just --

68

THE COURT:  No.  I'm speaking now.  You're listening.  I've given the courtesy to all the parties. We're done now.

About $3 billion, Matt, on the table?  I just want to make sure I'm hearing this.

MR. SZABO:  Depending on the number of units, sir --

THE COURT:  Matt, about $3 billion on the table?

MR. SZABO:  Up to $3 billion.

THE COURT:  Okay.  About.  Okay.

MR. SZABO:  Yes.

THE COURT:  Give or take $100 million, but okay. About 14 to 16 thousand new units depending upon our 2022 count?

MR. SZABO:  Depending up the count, that's -- that's correct.  And we will --

THE COURT:  Okay.

MR. SZABO:  And we will provide that information.

THE COURT:  And here's what I've been weighing. I've heard more promises broken than you can possibly imagine.  And, so, therefore, I don't care what a politician says.  But one of the points that you made in this agreement was that this was something concrete that the Plaintiffs finally have as an agreement.  And the question I had late at night was what I care for, was it a thousand new units or

**EXHIBIT D - Page 153**

69

14 to 16 thousand new units and when would the Court step in and put a stop to that.  So, as long as there's counting, its not final.  I won't sign this or even consider it unless there's a monitor and you've already stated that there's going to be a monitor.  Right?  I'll point to the -- Sarah, help me, what page?

            MS. MITCHELL:  Correct, your Honor.

            THE COURT:  Counsel, point out the page.  I'll just read it to you.

            MR. MARCUS:  Your Honor, the parties stipulate that the Court --

            THE COURT:  No, I know.

            MR. MARCUS:  -- has jurisdiction.

            THE COURT:  I'm going to read it, though.  I'll find it.

            Secondly, there's been a lot of criticism about one district getting turned against the other district.  So, let's be completely transparent about that.  I would hope that the City is able to balance out the needs of our more impacted districts, the Curren Price, the de Leons, the Buscainos, the Marqueece Dawson, with the less impacted districts -- and I include Bonin in that impacted district -- because it wouldn't be fair on the 60 percent to have these, you know, huge districts unless you have some equitable distribution of funds to the districts that need

*Echo Reporting, Inc.*

70

this the most.  I have to leave that to you, but that's why I need the monitor.  Fair enough?

MR. SZABO:  Correct.  And we will be regularly reporting publically on --

THE COURT:  Right.

MR. SZABO:  -- the funding available for each of the projects in each of the districts.

THE COURT:  I'm -- I'm appointing Michele Martinez.  You gave me that ability, and I think you all trust her, although she's growled at you on occasion.  You've each called her over the -- the years and talked to her.  But if you have an objection, I'm happy to appoint the law firm.  Do you know what they're going to charge?  Try a thousand dollars an hour with three associates, two senior partners, catching up with this, and you'll be over a million to a million point five just like that.

Sit down.  Somehow, you have to work out some compensation with her because she's done working for free. She's been doing this out of the goodness of her heart for three years because she really believes, is one of the few virtuous people who's been involved in this.  So, you're going to go work out some kind of compensation.  She's going to get involved, but I've encouraged her to do the following, not to become involved with you for over more than one year.  If you're not living up to your promises,

71

there's no reason for that frustration.  She's going to have to step away from a private practice of some type, and those negotiations I think should be Judge Brotte with Michele Martinez.

So, I'd like to see, Scott, you for a moment, Elizabeth, you for a moment.  Let's sit down and talk about that in the back, initially out of my presence, but then if I need to intervene.  But come up with some amount that's reasonable and compensates her for the private practice.

I would suggest to you that she work no more than two years, with the option of her stepping away or if you have dissatisfaction with her after one year and then supplementing her with another monitor by agreement if that occurs.  That way, you're not bound to a particular monitor for five years.  Now, if you come up with a different agreement, that's fine.  Okay.

And, finally, Matt, let's talk about the 60 percent with you and the Intervenors, because there's a lot of concern on Ms. Sobel's part.  I'm not arguing with you, but I'm going to go back to the very beginning of this.  We started trying to imagine the flexibility with a riverbed with 1400 people on it, not a couple hundred people across but 1400 people, and how are we going to clear that.  And, trust me, Orange County had no plan.  They can tell you they had a plan, and the Court laid an injunction on the Sheriff

72

and on the County and stopped it.  And pretty soon, the first plan was, Gee, Judge, maybe we're going to come in with some blue shirts, some newly trained kids out of college that, quite frankly, were learning on the job.  And where are we going to put them?  And, so, the Board of Supervisors came up with 400 motel rooms.  You know how long?  Thirty days.  Totally inadequate.  Thirty days.

But walking down the river each day with Ms. Sobel and with Brooke, it was readily apparent that we had about 801 people ready to take shelter.  In fact, there were more than that.  So, where does this 60 percent come from?  It's an aspirational meaningless number in a sense.  It could be 50 percent.  It could be 70 percent.  But you need to understand the basis of it, whether you agree with it or not.

Carol, Ms. Sobel, took the decent and good position, Judge, this should be 80 percent, 80 percent.  And the County took the position of, No, this should be 60 percent, because what you're really dealing with is you started with about 13 to 14 hundred people, but as the signs went up, people started walking away.  So, if you have a thousand people left on the river, which we did, and 801 seat shelter, Carol Sobel's right.  That should be about 80 percent, right?  But what happens if you have 1300 people on the river and three or four hundred of them have walked away

**EXHIBIT D - Page 157**

73

because they're never going to accept shelter?  So, that's how we came up with the 60 percent.  Okay.

The second thing is we always had 60 percent plus one.  It wasn't a 60 percent.  It was if we got to 60 percent, we were supposed to stop and build the additional shelters so that nobody was going into an enforcement situation, whatever that meant.  But in your document, you have said much more holistically than Orange County and maybe much more humanely that you're not going to enforce this unless a person's offered shelter, and you put that in writing.

So, it seems to me that as long as we continue to work together, this Court's going to turn from poking and trying to work with you, quite frankly, but I can only do that through a monitor.

And, lastly, I agree with you, Mr. Miller.  I read this agreement.  This seems to be a binding attempt or a good faith effort between the City and the Plaintiffs.  But all of those provisions don't apply to you.  I'm not adopting those.  Those seem to be aspirational, and I don't think that that's the essence of the agreement.  It seems to be a public statement.  You'll litigate that or you'll settle that, et cetera, but I -- I'm not binding myself in the agreement to anything that reflects on the County. That's for future litigation or future settlement.  Seems to

74

be a cry out to the County.  I'll leave that in your good hands.

Now, I'm not accepting any more input, Counsel. I'll be back with you in about 15 minutes at the most, and I'll have a decision for you one way or the other.  Thank you.

(Proceedings recessed briefly.)

THE COURT:  On the record.  All the parties are present.  I want to thank you.

This Court's inclined to approve the settlement. I'm tentatively approving the settlement now, but I'm going to issue a written order by next week to more address some of the issues raised today.

I want to thank all of you for your attendance.

We're in recess.

(Proceedings concluded.)

75

I certify the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                    6/11/2022
Transcriber                         Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*