# EXHIBIT I

EXHIBIT I - Page 193

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC
et al.,                       )                        (KESx)
                             )
          Plaintiffs,        ) Los Angeles, California
                             )
vs.                          ) Monday, November 14, 2022
                             )
CITY OF LOS ANGELES, et al., ) (9:03 a.m. to 9:48 a.m.)
                             )
          Defendants.        )
_____)


TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT AGREEMENT
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE


| | |
|---|---|
| Appearances: | See next page. |
| Court Reporter: | Courtsmart |
| Courtroom Deputy: | Karlen Dubon |
| Transcribed by: | Jordan Keilty |
| | Echo Reporting, Inc. |
| | 9711 Cactus Street, Suite B |
| | Lakeside, California 92040 |
| | (858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

EXHIBIT I - Page 194

2

APPEARANCES:

For the Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             617 West 7th Street, Suite 200
                             Los Angeles, California 90017
                             (213) 205-6520

For the City of Los Angeles: SCOTT D. MARCUS, ESQ.
                             Los Angeles City Attorney's
                               Office
                             200 North Main Street
                             7th Floor, Room 675
                             Los Angeles, California 90012
                             (213) 978-8216

For the County of Los        LOUIS "SKIP" MILLER, ESQ.
   Angeles:                  JENNIFER MIRA HASHMALL, ESQ.
                             Miller Barondess, LLP
                             1999 Avenue of the Stars
                             Suite 1000
                             Los Angeles, California 90067
                             (310) 552-8400

For Los Angeles Catholic     SHAYLA RENEE MYERS, ESQ.
   Worker:                   Legal Aid Foundation of Los
                               Angeles
                             7000 South Broadway
                             Los Angeles, California 90003
                             (213) 640-3983

EXHIBIT I - Page 195

3

Los Angeles, California; Monday, November 14, 2022 9:03 a.m.

--o0o--

(Call to Order)

THE COURT:  All right.  We're on the record in the matter of First Alliance versus the County.

And, Counsel, if you'd be kind enough to make your appearances and, first, good morning to each of you.

MR. MARCUS:  Go ahead.

MS. MITCHELL:  Good morning, your Honor.  Elizabeth Mitchell on behalf of Plaintiffs.  My co-counsel, Matt Umhofer, is at another hearing.  He will be here shortly.

THE COURT:  I'd like to wait for him.  How soon?

MS. MITCHELL:  It's -- he's in a hearing right now.  I don't know.  We can -- I think he -- he asked me to go ahead and proceed without him.

THE COURT:  Okay.  Fine.

Counsel on behalf of the City then?

MR. MARCUS:  Scott Marcus on behalf of the City of Los Angeles.

THE COURT:  And on behalf of the County?

MR. MILLER:  Good morning, your Honor.  Skip Miller and Mira Hashmall for the County.

THE COURT:  Thank you.  Good morning.

Have a seat please, and thank you for your

*Echo Reporting, Inc.*

EXHIBIT I - Page 196

4

courtesy.

Ms. Myers, on behalf of the Intervenors.

MS. MYERS:  Shayla Myers on behalf of the Intervenors.  Thank you.

THE COURT:  All right.  Thank you very much, Counsel.

There's a tentative settlement before the Court. I'm welcome to hear any input beginning with any of the parties.

MR. MILLER:  I'll start, your Honor, if that's all right.  Thank you, your Honor.  I guess the first thing I'd -- I'd ask the Court is there any particular concern or question the Court may have?

THE COURT:  I'd like to listen to the parties first.

MR. MILLER:  Okay.  I'll -- I'll be relatively brief.  No objections.  This was thoroughly negotiated over a long period of time.  It's a very substantial settlement. The -- to me, the most important component -- there are several components which pretty much speak for themselves, but the most important thing is following the City's settlement and the provision therein to build I think it's around 14,000 new beds, we engaged, re-engaged, continue to engage with the City because our services at the County are critical to building those beds.  In other words, these two

**EXHIBIT I - Page 197**

5

settlements really go hand in glove, and that's a major component.  It's something that we're stepping up to do. We're going to fund a suite of wraparound services for the 14,000 new interim beds and shelter.  The services will include public assistance, welfare, mental health, substance use disorder, advocacy benefits.  It's all spelled out in the agreement.

So, we're -- we're happy to do that.  That's what we do.  That's what the County does, and we're stepping up.

And then the other terms are also equally, you know, close, if not equally significant.  We're providing access to -- directly to City homeless people for high-acuity beds.  We're providing 400 new mental health substance use -- substance use disorder beds.  We're increasing the number of multi-disciplinary and home teams. We're furthering our partnership to find land to build shelter on.  And, so, it's a very substantial, heavily negotiated deal.

And, your Honor, I want to say it's in addition to everything else the County's doing.  This settlement of this lawsuit is -- is important.  It's a milestone.  It's an indicia of cooperation between these two entities, the City and the County.  But we're continuing with everything else. We're continuing with the -- the shelter.  We're continuing with the Measure H and all the other things that are outside

6

of this lawsuit.  None of that is being abated.  And any -- or affected in any way, shape, or form.

So, that's an overview of the settlement itself. As far as the agreement provides for specific milestones, which we have every intention of meeting.  The County meets its obligations.  We're going to report quarterly to the Court.  There's a mechanism for enforcement, which I don't think will ever be necessary, but it's -- it's spelled out in there, and I'm sure if there's any issue, that the Plaintiffs will utilize that enforcement mechanism.  And this Court has continuing jurisdiction for purposes of enforcement over a period of five years.

So, on that basis, your Honor, I would submit that the -- the settlement is -- it's good.  It's good for -- it's good for homeless people.  It's better than spending money on litigation, okay, which is a major driver of that. And we would ask that the Court approval the dismissal.  We have to get the Court's approval of the dismissal because an answer was filed, and under the Rule -- under -- under Rule 41, once an answer's filed, the Court has to grant approval. I don't think there's any basis to deny the approval.  I mean, the only basis would be if there's prejudice to the Defendant, like if we had a summary judgment motion pending or something like that and the Plaintiff tried to sneak in a -- a dismissal.

**EXHIBIT I - Page 199**

7

We have a consensual settlement agreement.  So, there -- there shouldn't be any issue at all about that. So, on that basis, your Honor, I would submit it subject to any questions or concerns the Court may have.

THE COURT:  Mr. Miller, thank you very much.

MS. MITCHELL:  Thank you.

THE COURT:  On behalf of the City, any comments?

MR. MARCUS:  Thank you, your Honor.  Scott Marcus for the City.  It's interesting.  The Court may remember when the City and the Plaintiffs reached a resolution, the County voiced strong objections to our settlement, and Mr. Miller stood up in court here trying to convince you not to grant the order of dismissal at that time.

The City is happy to see, however, that the County has stepped up with this settlement agreement.  We are happy to see that the County is committing to providing the necessary services to deal with the homeless issue in a -- in a manner enforceable by this Court.  So, the City has no objections.

THE COURT:  All right.  Thank you very much.

Ms. Myers on behalf of the Intervenors, do you have any comments?

MS. MYERS:  Your Honor, as we said in our statement of nonobjection, we don't object to the substance of the settlement agreement at all.  We think that to the

8

extent that the County is providing services, that's incredibly important, and we -- I do just want to make just a quick reference to the games that the City and the County and the Plaintiffs seem to be playing with what the Court is actually entering in this instance.

As Mr. Marcus pointed out, as did Mr. Miller, the City, the County and the Plaintiffs are asking for the Court to keep continuing jurisdiction to enforce the settlement agreement.  That is effectively a consent decree, and, therefore, the standard for approving a consent decree is what applies here.

We do not object, though, to any of the substance of it, just with the ways in which the parties are attempting to frame what's going on in the court today.  So, thank you.

THE COURT:  Thank you, Ms. Myers.

And counsel on behalf of the Plaintiff?

MS. MITCHELL:  Thank you and good morning, your Honor.

THE COURT:  Good morning.

MS. MITCHELL:  This -- this settlement was reached after months and really years of negotiation.  It -- it really is a triangular agreement.  We had the Plaintiff/City agreement earlier.  We had -- this is now the Plaintiff/County agreement, and the City and the County have

9

their own separate agreement which largely tracks what we're doing here today.

There -- there is no doubt in Plaintiffs' mind that the County can and should do more. But, given the significant concessions that have been made, the cooperation between the City and the County that we have not seen in the past, which is largely addressed by this agreement and given the necessity of the -- the supportive services here to support the City agreement and the projects that are being built, we believe that this is a very good deal.

I'm happy to address any other -- any other concerns that the Court has now or in the future.

THE COURT: All right. I want to thank you very much.

Any comments from any persons in the audience who are interested parties in this matter?

(No response.)

THE COURT: All right. Counsel, give me a -- a few moments, and I'll be back with possibly some questions that I think you can readily answer for me. The ELMO's working. So, if you have a copy of the settlement agreement, it might be easy to put that up when I ask these questions. Okay.

MR. MILLER: Judge, there is -- there is one other issue. That is the -- there's a -- we're going to need a

**EXHIBIT I - Page 202**

10

dismissal of one of the Plaintiffs, Gary Whitter.

THE COURT:  Okay.  Got that.

MR. MILLER:  He's the guy who's in the wind.

THE COURT:  Thank you.

MR. MILLER:  Okay.

(Proceedings recessed briefly.)

THE COURT:  Mr. Umhofer, is he -- in other words, I don't want to be discourteous, but he's more than welcome. If you need me to wait a few moments, I'm happy to.

Also, Carol Sabel, if she wanted -- or Sobel, if she wanted to be present or Brooke.  Shayla?

MS. MYERS:  I don't believe --

THE COURT:  Okay.  No problem.  I'm happy to go forward, but I want to pay that courtesy to Brooke and Carol and Matt if he wants to be here.  Okay.

(Pause.)

THE COURT:  Okay.  I represent to you I can't count the number of times that I have read both the initial City settlement agreement, reread it, as well as the initial City settlement agreement, reread it, as well as the tentative agreement between the two of you.  So, bear with me.

It should not be the burden of private citizens to sue their local elected representatives as First Alliance has done in this case.  Only in times of desperation, anger,

*Echo Reporting, Inc.*

EXHIBIT I - Page 203

11

hopelessness, do lawsuits strike or come forth such as this case, and this case has expanded from what I viewed initially as a downtown, Skid Row, geographical lawsuit that now is a citywide lawsuit and a countywide lawsuit.  And, therefore, this Court's perspective has changed along the way.

If I were to believe it was born out of desperation and fury from decades of neglect -- it's a beautiful vibrant city, and it's been crying out for relief for citizens for a long time.

Somehow, even in the settlement discussions but long before, the homeless are spoken of as a separate group. Some say they are all addicted or all mentally ill or drug abusers or criminals, and others categorize homeless as the evicted, poor, beaten abused women, children living on our streets or huddled in cars, workers who cannot afford the City of Los Angeles.  And the truth is that the homeless are all of us, and they and us cannot put them into these echo chambers of oneness.

I've watched the City and the County over the last two and a half years perform their duty and work well together occasionally when self-interest was the motivator. I've watched the clearing of routes to the Academy Awards a short distance from here, the homeless swept from the highways to the World Cup, and I have no doubts that this

12

City will clear, by force if necessary, for the Olympic Games in 2028.  And I'd ask you to ask the question I've been asking myself is if these efforts can't -- are taking place, why aren't they taking place in these interim periods of time on behalf of the entire City instead of these specialized occasions.  Massive budgets through public trusts were created, but the results have been disappointing.  I have no criticism of the initial pioneers who at least tried.  Better for them to have tried and fallen short than the fear and hopelessness that has brought forth the inertia that this Court witnessed.

I'm the first to admit that this Court has done unorthodox things that are rightfully subject to debate and criticism.  The creation of a freeway overpass and underpass injunctive order, an injunctive order requiring and ordering sequenced shelter and mandates for women and children first in Skid Row, followed by the entire Row within 90 to 180 days.  I'm please, though, and now I want to turn the corner with you.

I'm pleased that the 6,000 shelters were created. You've represented to me those have been created.  I've taken that at face value.  I'm pleased that the City moved forward with the 12 to 14 thousand units, and I'd like that conveyed back to the City Attorney, Mr. Feuer.

But these injunctions and settlements, from this

13

Court's perspective, were just the beginning, and I'll be the first to tell you now I've always believed that they were inadequate. I have to share with you transparently that I thought it was irresponsible on my part, though, not to accept meaningful efforts by the City to try to turn that corner with your budget limitations and turn down the two to three billion dollars that was being represented to the Court that the City was going to spend. I thought it was irresponsible of the Court to turn from perfect and not accept the good in those efforts by the City.

And, so, I'm the first to tell you publically and privately that I have always believed that the City's settlement was inadequate to resolve the homeless problem in Los Angeles, but it was a meaningful genuine effort between First alliance and the City to move forward. And, so, I didn't want to turn down 12 to 14 thousand new units. I didn't want to turn down your two to three million dollars. But we all know that it's a mark on the way hopefully to even more that -- whether it's Rick Caruso or Karen Bass, whoever that next Mayor is, fulfills their campaign promises to move it forward in a much more substantial way than these settlements.

The settlement requested today would ask for the Court's blessing and signature and approval, and I watched the Youtube of your meeting at City Hall. And, first, there

*Echo Reporting, Inc.*

**EXHIBIT I - Page 206**

14

was the statement made by politicians that there was $750 million that came from this settlement.  I'd ask you to ask yourselves is that true, because in the same breath that there's $750 million, $500 million of that were already committed H funds.  It wasn't new money.  And, so, the calculation that I came out with was there was about $256 to $257 million by the County, which is substantial.

The second question that I'd ask you in terms of can we do better is that the shelter and housing architecturally in this divided bureaucracy and area of responsibility is the City's, but this is not completely accurate.  When we're dealing with mental illness, when we're dealing with drug rehabilitation, when we're dealing with transitional youth and minors under our government agency care, then the responsibility is the County's.  And six years ago when I started with Carol Sobel, who I truly wish was here today, and Brook Weitzman, I've constantly been quoted a figure that 40 percent of the homeless that you deal with on the streets, Judge, will be narcotics addicted, that needs rehab centers or will have mental illness or a combination of both.  Now, as an aside, that doesn't account need for couples beds, dogs, caring, animals, et cetera, being a support group for the homeless, which has nothing to do right now with what I'm about to say to you about these 300 beds.

15

If it's estimated on the City's part, Scott, that 12,000 people are coming in and we're going to achieve that goal working together, then 40 percent or take even a lower number of 12,000, and I'm taking the lowest number, hoping for 14,000, but taking the lowest number, it's about 4800 people.  I'm going to ask if 300 beds resolves that need for mental illness on our streets.  I'm going to ask you to ask that question of yourselves and ask yourselves can we do better.

The second thing is what are we doing with the remaining 12,000 minus 42,000, which is about 30,000 people that we're leaving on the streets?  They haven't been adequately serviced.  Where does this agreement lead with 300 promised beds, by the way, sequenced over two years, in terms of dealing with this tragedy on the streets and the spiraling death rate?

I want to applaud you, Skip, because I think you're right.  The City and the County have a newfound spirit of working together.  That's partially through your efforts.

But, with that breakthrough, we now have newly elected leaders, and none of us know if it's Karen Bass or Rick Caruso as we sit in court today.  We have a brand new council in the sense that many members are returning, but many members -- it's like the Supreme Court.  You change one

**EXHIBIT I - Page 208**

16

member, you change the entire court.  Will these newly elected leaders feel confident in this document, this settlement created by an old administration?  Are they going to feel comfortable being tied to a settlement agreement that they didn't have any part in?  Because the political promises have raised from 15,000 units with Karen Bass to 30,000 units with Rick Caruso.  Who knows what reality is?  It's ranged from declaring an emergency and, if you recall, the Court wrote in February of 2021 asking the City to declare an emergency.  Both candidates now seem to be willing to finally declare an emergency.  Those are incredibly important steps.

And a lot of these provisions in the agreement are aspirational.  I know that they're taken in good faith.  I'd like to turn that corner in terms of trust, but if they're aspirational, then I need to know that this new mayor is committed to going forward for four years and that this new council and that the board president, the chairperson, Hawley, is willing to go forward in four years because you're right, these are absolutely intertwined.

And, finally, I want to turn back to you, Scott.  In the City settlement, there's accountability.  You created a monitoring provision.  It didn't leave the Court at the whim of not being able to check either the good faith accuracy or just the accuracy by having a monitor.  They

17

gave me the confidence that I could spot check, et cetera, and know that those numbers were credible.  I took that as a tremendous breakthrough in terms of the trust between us because there it seems that you were not only giving the Court the power to monitor but you were absolutely accepting accountability, and that's what I -- what I perceived for so long was missing in all of these aspirational promises that were being made to the public and to the Court.  And, therefore, I was heartened by the provision of the monitoring.  Here in the County agreement, I won't go further, but I'm just going to ask can't we do much better in terms of accountability if you look at provision number nine?

         Now, Elizabeth, I want to turn to you for a moment.  Look, it's not fair.  If I turn down this agreement, you and your firm are grossly underpaid.  Let me put that on the record . I won't go further with that, but you are grossly underpaid from moving from a downtown to a citywide lawsuit, and it cannot be your responsibility to take on future pro bono efforts that the County may be responsible for.  So, I'm going to ask you this.  I'm not prepared to endorse this agreement today.  I really believe that we can do much better.  I really believe that most of these provisions should have already been enacted, I mean, just immediately without a settlement agreement.  I really

*Echo Reporting, Inc.*

EXHIBIT I - Page 210

18

believe that the two of you are working together and should have been working together 30 years ago.  So, maybe this lawsuit brought us to this point, but I want to look the mayor in the eye and the chairman and get some kind of -- not through counsel, Skip, but no denigration at all, but some kind of, you know, good faith relationship where I know going forward I've got the present administration onboard with what they may perceive to be an outdated agreement that is not beneficial to the new administration and the City. In other words, we need to try and make this better if we can.  And then if we can't, I'll be faced with a tough decision.

So, I'm not prepared to endorse this today.  I'm going to suggest to you the following.  I think that through December, we still have that transitional time with a new mayor, a new council, but the same board members as I understand it, subject to one.  I understand there's a very close race out there.  I have no comment politically, but change one member of the board, you'll potentially change the board.

I'd like to see those new administrations in place in January with their swearing-in ceremonies, et cetera. But I'd like to schedule this sometime the third week in January.  I'd like to put this on hold.  I'd like to see what the mayor's input is, the council's input is, what the

*Echo Reporting, Inc.*

**EXHIBIT I - Page 211**

19

relationship is with the chair and with the board.  And, so, my unwillingness to endorse this right now is simply this. I'd ask you to institute these measures in good faith, Skip, right now, for the benefit of the City.

And, number two, I'd like to schedule another meeting some place in the third week of January, but I'll look at the schedule for both the board and I'll look at the schedule for the council, and I'd like them to go through their ceremonial inductions and their administration to be in place.

All right.  I have nothing further today except to thank all of you.

Michelle, do you have anything further?

(No response.)

THE COURT:  All right.  Then we're in recess. Thank you very much.

(Proceedings concluded.)

20

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                       11/17/2022
Transcriber                            Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*

**EXHIBIT I - Page 213**