# EXHIBIT L

EXHIBIT L - Page 246

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. LA CV 20-02291-DOC-
et al.,                       )                       (KESx)
                              )
          Plaintiffs,         )
                              )
vs.                           ) Los Angeles, California
                              )
CITY OF LOS ANGELES, et al.,  ) Tuesday, January 17, 2023
                              )
          Defendants.         ) (9:05 a.m. to 10:52 a.m.)
_____)


TRANSCRIPT OF PRESENTATION OF FINAL SETTLEMENT
OBJECTIONS/STATUS CONFERENCE
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE


Appearances:                  See next page.

Court Reporter:               Recorded; CourtSmart

Courtroom Deputy:             Karlen Dubon

Transcribed by:               Jordan Keilty
                              Echo Reporting, Inc.
                              9711 Cactus Street, Suite B
                              Lakeside, California 92040
                              (858) 453-7590

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Echo Reporting, Inc.*

EXHIBIT L - Page 247

2

APPEARANCES:

For the Plaintiffs:                ELIZABETH A.  MITCHELL, ESQ.
                                   Spertus Landes & Umhofer, LLP
                                   617 West 7th Street, Suite 200
                                   Los Angeles, California 90017
                                   (213) 205-6520

                                   MATTHEW D. UMHOFER, ESQ.
                                   Spertus, Landes & Umhofer, LLP
                                   1990 South Bundy Drive
                                   Suite 705
                                   Los Angeles, California 90025
                                   (310) 826-4700

For the City of Los Angeles:       SCOTT D. MARCUS, ESQ.
                                   Los Angeles City Attorney's
                                     Office
                                   200 North Main Street
                                   7th Floor, Room 675
                                   Los Angeles, California 90012
                                   (213) 978-7558

For the County of Los              JENNIFER MIRA HASHMALL, ESQ.
  Los Angeles:                     LOUIS R. MILLER, ESQ.
                                   Miller Barondess, LLP
                                   1999 Avenue of the Stars
                                   Suite 1000
                                   Los Angeles, California 90067
                                   (310) 552-4400

*Echo Reporting, Inc.*

**EXHIBIT L - Page 248**

3

Los Angeles, California; Tuesday, January 17, 2023 9:05 a.m.

--o0o--

(Call to Order)

THE CLERK:  Now calling item number one case number LA CV 20-2291, LA Alliance for Human Rights, et al, versus the City of Los Angeles, et al.

Counsel, please stand and state your appearances.

MR. UMHOFER:  Good morning, your Honor.  Matthew Umhofer and Elizabeth Mitchell on behalf of the Plaintiffs.

MS. MITCHELL:  Good morning, your Honor.

MR. MILLER:  Good morning, your Honor.  Skip Miller and Mira Hashmall for the County of L.A.  And I'd like the record to reflect that two of the supervisors are here today, the Chair, Janice Hahn, and Supervisor Hilda Solis.

THE COURT:  I'm going to publicly thank them in just a moment.

MR. MOON:  Good morning, your Honor.  Adrian D. Moon offering glory to the Almighty Creator in the mighty name of Jesus Christ, the Messiah.  I believe I'm a Defendant Intervenor, but you haven't --

THE COURT:  Mr. Moon, you are more than welcome. I'd like you to be seated in the audience.

MR. MOON:  Thank you, your Honor.

THE COURT:  Mr. Moon, I'd like you to be seated in

*Echo Reporting, Inc.*

EXHIBIT L - Page 249

4

the audience.

MR. MOON:  I can't appear in --

THE COURT:  I'd like you to be seated in the audience immediately.  Thank you.  You've caused past disruptions.  I'm aware of that, but you're more than welcome to be here.  Have the gentleman seated in the audience.

MR. MOON:  I --

THE COURT:  You're welcome to be here.

MR. MOON:  -- can --

THE COURT:  Otherwise I'm going to remove you, sir.

MR. MOON:  -- make an appearance.

THE COURT:  Thank you very much.  Mr. Moon, you're going to be welcome at all times, but I'm going to invite you not to speak today.

(Pause.)

THE COURT:  First of all, good morning.  I want to thank all of you for being here, and I want to specially recognize Mayor Bass.  Mayor Bass, good morning.  Very gracious of you.

MAYOR BASS:  Good morning.

THE COURT:  Also, City County present, Paul Krekorian.  Paul, I'd like to thank you for being here as well.  Very gracious of you.

**EXHIBIT L - Page 250**

5

And Supervisor Cho, a member of the Board, Supervisor Janice Hahn, it's a pleasure to see all of you again.  And, also, Hilda Solis, Supervisor, it's a pleasure to see you.  Monica Rodriguez, it's a pleasure to see you. Matt Szabo.

And are there any other Council persons present that I may have neglected or that I can't see through the screens, and other members of the Board of Supervisors?

Okay.  Let me begin on a very positive note, and that is your courtesy in attending today was a request by the Court, but I do believe it's a strong commitment on each of you parts, and, once again, a hopeful willingness to solve this homeless crisis.

For the sake of transparency, I'm going to document -- docket the comments I'm about to make today in the record as well as the transcript.  There'll be no recording.  Only the Chief Judge of the District can make that waiver, and that is not being made.

There's a number of screens in front of you today, and I'm going to make some initial comments and invite comments by the elected officials but first the attorneys in a few moments.

This case was first filed in March of 2020 by LA Alliance, a nonprofit organization consisting of a broad coalition of Los Angeles stakeholders, including unhoused

*Echo Reporting, Inc.*

**EXHIBIT L - Page 251**

6

individuals, property owners, small businesses, and eventually larger businesses in the downtown area.  It has since grown into a much larger lawsuit.  And at the time of the second amended complaint, LA Alliance stated in their amended and supplemental complaint in paragraph 94 that:

> "The homeless crisis continues and accelerates with little hope of a city or county-driven solution because of the painful results of current policies and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it.  The Plaintiffs are suffering under the weight of an urgent crisis.  The Plaintiffs are left with no choice but to resort to the courts for relief."

This Court recognizes that it should not be the burden of private citizens to sue their elected representatives, and only in times of desperation, anger and hopelessness are lawsuits such as this filed.  Apparently this lawsuit came before the Court out of desperation and fury over decades of neglect and inaction.

But through this litigation, the Plaintiffs and the City of Los Angeles entered into a settlement agreement in the summer of 2022 without the County joining in.  This

EXHIBIT L - Page 252

7

agreement by the City was commendable in a number of ways. It contained approximately 24 provisions, each of which had detailed subdivisions and specifically defined terms.  The agreement promised two to three billion dollars to accommodate the 12 to 14 thousand people on the streets.  It was comprehensive and extensive and, notably, held the City accountable by providing that the Court maintain "continuing jurisdiction" to oversee and enforce this settlement agreement which included monitoring.

Could this agreement have gone further?  In November I stated, yes, it could.  It did not solve homelessness, and absolutely, it could have gone further. But -- and there's much more that needs to be done obviously to address the spiraling crisis on our streets.

This Court recognized that this agreement alone would not sole homelessness.  In fact, Plaintiffs, LA Alliance, and the City, recognized the same when they referenced the County's responsibilities and "agreed to cooperate in assuring the County meets its obligations of, among other things, requiring a minimum of 50 mental health beds per 100,000 people in the County or more, as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of inpatient treatment."

That's in the City's settlement agreement, Docket

**EXHIBIT L - Page 253**

8

421-1 at page 11.

In October of 2022, the County filed their settlement proposal.  The terms of the agreement, as I made clear in the last hearing, simply fell short of the County's statutory obligations and the very reason that this lawsuit was filed in the first place, and I asked the simple question, "Could we do better?"  I did not outright reject that agreement at that time, hoping that there would be an additional agreement coming before the Court.

You're back here present, and you're making commendable and initial efforts to confront this crisis.  These may be successful or nonsuccessful, but it appears that you've broken the inertia and, as such, whether the resulting efforts are short term or long term remains to be seen, but your efforts are being made in good faith to break down some of the barriers of antagonism and noncooperation between the City of Los Angeles and the County of Board of Supervisors which apparently goes back decades.

You've declared an emergency.  Last week the County Board of Supervisors, through Chairperson Hahn, joined you, and hopefully this will cut bureaucracy cost and lead to increased housing.  So, I start with all -- all of you with a compliment today.

But Mayor Bass has pledged to accommodate 17 homeless persons within her first year of office.  This is a

**EXHIBIT L - Page 254**

9

monumental undertaking, Mayor.  It's bold, and it's needed. And the settlement reached between the City of Los Angeles and LA Alliance eventually would accommodate 12 to 14 thousand individuals over a five-year period.  It's hoped, Mayor, that the City Council through you and the President, Paul Krekorian, will go at a much greater pace of this agreement entered into before you were in office by LA Alliance and the City of Los Angeles.

It's repeatedly been represented to this Court that 40 percent of the homeless population suffers from mental illness or substance abuse or a combination of both. This started with Carol Sobel's representations to me, Brooke Weitzman's representations, and your representations to me.  So, when we talk for just the next few moments, I want you to keep that 40 percent figure in mind.

The division of responsibility for mental health and substance abuse falls to two County agencies.  The Los Angeles County Department of Mental Health, DMH, with interim -- with an interim Director, Lisa Wong, has the responsibility for the County's mental health needs.

The Los Angeles County Department of Public Health, under the direction of Barbara Ferrer, has responsibility for substance abuse.  Please keep that in mind in the next few moments.

So, Dale, if you'd be kind enough to put up on the

*Echo Reporting, Inc.*

EXHIBIT L - Page 255

10

screen page four of the County proposal for a moment.  And I can't see that screen, but is it on the -- is it up, Dale?

UNIDENTIFIED SPEAKER:  You don't see it?

THE COURT:  No.  On my screen, I can see the --

MR. UMHOFER:  We're seeing -- we're seeing something on this screen which is I think what you want, your Honor and -- and something different on the screens in front of us.

THE COURT:  Yeah.  We tried to arrange the screens, but this is -- would be the County proposal page four, paragraph three.  That would be on this screen, correct?

So, folks in the audience, it may be difficult to see, and I don't know what you're seeing.  You're seeing -- you're seeing a split screen.  In a moment we're going to put other documents on the screens closest to you.  So, don't pay attention to those for a moment.  It is this screen over here.

Okay.  And I'm going to invite the Mayor to come closer.  I really wish you would so you can see this.  I know you as Hilda and Janice.  For goodness sakes, Supervisors, please come forward so you can actually see this.  And, as the President, Paul Krekorian, it's just critical.  I'd like to get this into the leaders' hands and, quite frankly, have the leaders of our community, so that I

11

know you're really getting the information that you need.

Okay.  So, in front of you should be page four of the proposed County settlement.

Paul, can you see that?  Hilda, can you see that? And, Hilda, by the way, my apologies.  I couldn't talk to you.  I had to go through the formality because that permission was withdrawn.  Also, I had a Chairperson at the time, Holly, who was the Chair.  So, I didn't have a chance to sit down.  I know you called.  I returned.  I couldn't talk.  The County hasn't given me permission to.  If that's lifted at any time, I'd love to -- I'd love to engage you in conversation.  But right now I've got a blanket over me.

Okay.  In the County's proposal at page four, paragraph three:

"Mental health substance use disorder beds:  The County states that 'By the end of Fiscal Year 2023/2024'" -- which would be June 30th of 2024 -- "'the County shall develop 300 additional substance use and mental health beds according to the greatest need as solely determined by the County.'"

Now, those are my handwritten notes.  I hope that that reflects what I'm seeing on the screen.  You have to

12

follow this closely for a moment.

I'm being offered 300 beds, but notice that those beds are divided between two different agencies.  So, is this 150 with Public Health, is this 150 with Mental Health?  And I'm just going to assume for a moment and give all the credit and say all 300 hypothetically are going to go to mental health.  Let's just take the best scenario for all of us in the room.

Now, if you go to the screen and put up the first page of the DMH report, which is Doctor Robert Sherin's report, Director of DMH, to the Los Angeles County Board of Supervisors -- it should be October 2019, and that I should be able to see on my screen Diella (phonetic).

(Pause.)

THE COURT:  You just had it up a moment ago, so -- and, folks, bear with us because we've been trying through the miracles of modern electronics, which I don't understand, to set this up for you, and it's been hard.  But I really want you to see what's happening here and then help the Court to see if you can further help our citizens.

It would just be page to begin with.  I want to verify what you're looking at right now.  It's actually the second amended complaint.  It's in a footnote it's a public document, and on the first page it refers to the report by Doctor Jonathan Sherin, Mental Health 2019 to the Board of

13

Supervisors.

Now, if you go to page four -- and we should be on page four of the same report. Now, Doctor Sherin clear back in 2019, wanted to start a pilot project. And his pilot project he wants to start is for 500 beds. He's very wise. What he's saying is I want 500 beds of acute and subacute. And I, Doctor Sherin, want to be able to vary those beds because I recognize that somebody might be acute for a week or two -- and that's for all the people. You understand this. But I might go into a subacute category. So, I, Doctor Sherin, want to be able to mix and match these, and I want a pilot program.

Now, if you'd go to page 20 on the screen and drop down to the second paragraph. Now, in addition, he wants 3,000 subacute beds at the time. He wants 500 plus 3,000. And what he's saying is, because of the Mercer Report that's been submitted to the Board, we need 3,000 new subacute beds, and these are in addition to the 500 pilot program beds going between acute and subacute for the homeless population. And in just a moment he's going to further break that down for the Board.

So, go to page 27. I hope I have this memorized. I want you to go to paragraph nine, Diella, and we should see a quote at the bottom:

"The estimate of 3,000 additional

14

subacute beds needed, for example, is

under the status quo scenario."

In other words, in 2019, where most of these factors remain the same -- this is dealing with our 13 or more percent increase.

So, now, whether we're dealing, Mayor Bass, with either your efforts regarding the 17,000 individuals or the present agreement that I've approved between the City and LA Alliance, where we have 12 to 14 thousand beds, the County offer may fall far short.

So, would you put up page six on the screen Diella.  And, so, it's not the Judge making this up, to quote from Doctor Sherin:

"Roughly 25 percent of adult homeless individuals in L.A. have serious mental illness and need care."

And remember the 40 percent figure?  That potentially was mental illness and substance abuse or a combination of both.  But here Doctor Sherin is getting us the statistic of 25 percent.  All right.  We're almost there.

How can this Court approve and accommodate the need for 25 percent of May Bass's figure, which is approximately 4,250 beds, for those suffering from mental severe illness or accommodate even 25 percent of the City's

15

agreement figure, which is 3,200 beds, when the Court's being offered 300 beds and asked to sign off on a settlement agreement.  I don't see how this could lead to any success, Mayor Bass, other than clearing out encampments.  The human factor leaves us the people who desperately need it are sitting on the street crying for help, and our citizens aren't protected.

Now, Doctor Sherin's recommendation to the Board in 2019 is cited in paragraph 89, LA Alliance, at their first amended and supplemental complaint.  So, if you'd be so kind, Diella, put up paragraph 89, and I'm going to show you internally why LA Alliance's figures are absolutely correct.

"In addition, the County has failed
to meet its statutory obligation to
provide appropriate mental health
services."

Well, that's for litigation.  This is a statement by the Plaintiff, okay.  But:

"The County Board of Supervisors
recognizes the minimum number of beds
required to appropriately meet the
community mental health need is 50
public mental health beds per 100
thousand individuals."

16

And that's right in the Mercer Report.  It's right in the County documents submitted to the Board in 2019.

"In Los Angeles County, there are only 22.7 beds per 100,000 individuals."

Now, take the County of about 4 million to 500 million people, and you'll find out that these internal factors absolutely overlay Doctor Sherin.  We've got about minimally 2500 beds if you reach the 50 per thousand from the 22.7, and Doctor Sherin's saying about 3,000 beds.

"In response, the Department of Mental Health, DMH, conducted an investigation and identified an estimate of 3,000 additional subacute beds needed.  As of December 2020, only 156 of the proposed minimal pilot of the 500 additional beds had been procured."

In the County's statement in support of its settlement agreement which was filed on Friday -- and I doubt that many of you read it.  It was filed late.  We spent the weekend with it -- the County states that its 300 beds are in -- "in addition to the County's existing supply of approximately 8,600 mental health substance abuse disorder beds."  That's Docket 5149, but there's no cite for the source of this number to the Court, and that's what your litigation's all about.  There's no audit at the present

*Echo Reporting, Inc.*

**EXHIBIT L - Page 262**

17

time.

I'm concerned about accountability, and I'm further concerned that the agreement lacks concrete milestones and accountability.

The question of government accountability has been a driving force of this lawsuit and, again, as stated by LA Alliance in the first amended complaint, for example -- and go to paragraph 17, Measure H, Diella:

"A countywide increase that was originally estimated to net $355 million in homeless relief funding available per year is spread so thin it serves more to feed the County's own bureaucracy than to make any significant debt in the crisis."

Well, that's a litigator talking. Disregard that for just a moment, but don't disregard the amount of Measure H funds plus the additional moneys that we all know are coming in. And, if we're successful, there's going to be more money. So, it's really a chance to reset and restart for all of us.

In paragraph 83:

"The County faces tough questions about its management of homeless related funds. This fiscal year, the County

18

passed a $36.2 billion budget for this fiscal year, which includes an estimated $465,090,000 raised by Measure H dedicated to addressing homelessness. Measure H was described as a tax voted for by County residents in 2017 to fund mental health/substance abuse treatment, healthcare, education, job training, rental subsidies, emergency and affordable housing, transportation, outreach, prevention, and supportive services for homeless children, families, foster youth, veterans, battered women, seniors, disabled individuals and other homeless individuals."

This amount is wholly separate from and in addition to the significant percentage of County funds allotted to departments to address issues of homelessness, including those housed and treated in County jails, emergency treatment and transport, Department of Mental Health, L.A. County Fire Department, medical treatment through various hospitals and treatment centers, and criminal prosecution and defense costs, not to mention funding the general relief and other myriad social

**EXHIBIT L - Page 264**

19

services."

Paragraph 84:

"Since the passage of Measure H and its concomitant additional hundreds of millions of dollars for housing and services, the homeless population in L.A. County has risen from 57,794 to 66,436."

And we know it's -- it's greater than that.  It's up to 69,000 some.

"The problem is outpacing the solution, and the County has failed to utilize the funds in a manner that would effectuate the goal."

Paragraph 94:

"The amount of effort and resources devoted to addressing this issue is significant, but the actual result is an astonishing lack of progress in addressing the crisis and continued expansion of the crisis despite such efforts and resources, because each is being used in ways that will never solve the problem."

Now, these were the Plaintiffs' allegations when

20

the lawsuit was filed.  The County settlement as written now is that the terms are not subject to independent enforcement or monitoring, and this is going to be my bottom line before I will ever consider accepting a settlement in just a few moments.

This point is laid out in the County's settlement agreement, and the County once again pressed this point to the Court in the filing on Friday afternoon.

What's happening out there is a crisis of all times, the public safety crisis, a health crisis, a humanitarian crisis for the homeless, for residents, and for our police and Sheriff's Department personnel who respond to calls and are put in a dangerous position when forced to respond to circumstances that are not theirs to handle. They are not psychiatrists.  They are not mental health professionals, and the homeless are put in the same dangerous position.

But because the settlement as written is really a private settlement, I want to stress that for a moment. This is portrayed to the Court as a private settlement with no judicial oversight, no accounting, no monitoring, and the L.A. City gave the Court that trust to at least monitor. L.A. City gave the Court that trust, and the Court gave you that trust back so that we had a check and balance and that we were able to accommodate each other along the way.

*Echo Reporting, Inc.*

EXHIBIT L - Page 266

21

This requires no -- no judicial approval.  And if you've reached a private settlement, I'm forced to dismiss this case because this is a private settlement between the parties.

So, I'll turn to Plaintiffs LA Council first.  I wanted to give you time.  Now, have a seat for a moment, ma'am.

In November I sent a message.  I don't think it was heard by many first of all.  I pointed specifically to paragraph nine.  I was specific and warned you and Mr. Miller about that paragraph.  I tried to point out the inadequacies, and I've received nothing in the interim period of time.  So, I'm going to put you on the spot.

After careful consideration and the Court raising these concerns after the last hearing to today, do you agree with the settlement, and is this in the best interests of the City of Los Angeles?

MR. UMHOFER:  Thank you, your Honor.  Almost three years ago now, we brought this case --

THE COURT:  Why don't you just sit down and use the microphone.

MR. UMHOFER:  That's fine, your Honor.

THE COURT:  That way we can hear you.

MR. UMHOFER:  Almost three years ago now we brought this case because the City and the County weren't

*Echo Reporting, Inc.*

EXHIBIT L - Page 267

22

working together on this issue.  We wanted this case not to be a fight but an opportunity for the City and the County to come together finally on this with judicial supervision.

THE COURT:  There's no judicial supervision in this settlement.

MR. UMHOFER:  There is.  So, if you look, your Honor, under the terms, the --

THE COURT:  No, under those terms -- Matt, I'm going to be very direct with you.  It's getting played both ways.  Judge, sign off on this.  There's no monitoring. We're going to write you a report every three months. Absolutely worthless.

MR. UMHOFER:  Your Honor, I -- it's -- let's focus on that, because I think this is really important.  This is what we insisted on.  We insisted on this Court having continued ability to enforce this agreement.  It's on -- on page 2(a)(1), subject to the requirements of (a)(2), with the -- and subject to the Court's continuing enforcement in accordance with Section (p) of this agreement, and Section (p), as we go down to that section, has specific reference to whenever the parties -- so, if we go down to Section (p)(1)(2), judicial enforcement section, there's a dispute resolution process.  Any claiming party can come to this Court and seek enforcement of anything in this agreement. That's five years of this -- this party here being able to

23

bring to the Court any issues that arise.

Now, I want to add to that.

THE COURT:  So, let's be clear then.  This is a consent decree.

MR. UMHOFER:  So, your Honor --

THE COURT:  It can only be one of two things, a contractual agreement between the two of you or a consent decree.  In other words, you can't put a tuxedo on a pig. What is this?

MR. UMHOFER:  We had this discussion with the City agreement.  Everybody wants to use different terms.  It is what it says it is.

THE COURT:  Is it a consent degree or is it a private contractual agreement, Matt?

MR. UMHOFER:  Your Honor, I don't have the definition of a consent decree in mind.  But you and I are aligned in one thing, that for the next five years, this Court can go through this entire agreement, all the commitments made, including, by the way, your Honor, several pieces that -- that the Court didn't mention, including we got specifically in paragraph seven of Section (d) a specific acknowledgment by the County that they have responsibilities under federal and state law to provide clinical treatment to people suffering from serious mental illness and substance abuse, substance use disorders,

*Echo Reporting, Inc.*

EXHIBIT L - Page 269

24

including persons experiencing homelessness.

Now, your Honor, what that means is that for the next five years, this Court can hold the County to that, ask hard questions.  We can ask hard questions.

THE COURT:  What's my sanctioning power, Matt?  Right now you're writing me a report every three months.  What's my power of accountability here?

MR. UMHOFER:  The Court has its inherent power to enforce this agreement.

THE COURT:  No.  I'm going to get resistance, Matt, because somebody will point back to this agreement and say, "Judge, in paragraph nine, we just get to write you a report.  You have no sanctioning power."

MR. UMHOFER:  But that's not true, because the continuing enforcement of this agreement is explicit --

THE COURT:  Okay.

MR. UMHOFER:  -- in the agreement.  So, I just -- so, I -- but, your Honor, if I could speak to a few more -- a few more pieces here.

THE COURT:  And I'd like to know about this ability with 300 beds, Matt, divided out between the public health and the mental health, how we're going to accommodate 25 percent of just the mental health needs from our street.  Are you in agreement with this?

MR. UMHOFER:  Your Honor, we believe and have

25

believed from the beginning that what Mr. Sherin's report called for is what is needed.  That's what we pushed for in this --

THE COURT:  So, I'm asking the question.  You're not answering it.  Is this an adequate settlement to accommodate that number of mentally severe -- serious mentally ill people on the street?  You put this in your paragraph 89, Matt.

MR. UMHOFER:  I understand, your Honor.  And my -- my direct answer to that is it's not enough, but this is a good deal, and I will tell you why this is still a good deal, okay, because I think it's really important for -- the mental health piece was something we pushed very hard for, and this is -- we didn't want to stop here.  Okay.  I want to be very clear about that.  But, when we worked through this issue with the City and the County -- and you'll hear from the City.  Matt Szabo is here.  I think he can articulate very effectively, along with the County as well and Mayor Bass and the Supervisors as well, Ms. Solis, and -- and Supervisor Solis and Supervisor Hahn.

I think it's really important to focus on the fact that the City -- we finally brought the City and the County together --

THE COURT:  And, Matt, just a moment.  Why does a lawsuit have to bring the City and the County together?

26

Most of this agreement is simply aspirational.  It's a promise to do something in the future.  Why did we have to get to this point, including the creation of loss, quite frankly, to stop the bickering between the County and the City?  And why should I trust that I don't lose Mayor Bass some day, I don't lose Janice Hahn, I don't lose Hilda Solis, all of which who I have great admiration for and things change?  Why am I going to buy into a settlement based upon personal relationships?  Where are my milestones and goals?  Where is my guarantee in this, Matt?

MR. UMHOFER:  Milestones and goals are set forth in the County's obligations.

THE COURT:  No, they're not, Matt.  Look at the proposal.  Go back to paragraph three.  Go back to paragraph four.  Go back to your own complaint.  There's a minimum of 3,000 to 3,500 acute and subacute beds who should be out there as of 2019, and they're offering me 300.

MR. UMHOFER:  Your Honor, I think the bed numbers are better, and I want the County to speak to this.  I think the -- the bed --

THE COURT:  I want you to speak to it.  You brought this lawsuit.

MR. UMHOFER:  You're right, your Honor.  We did.

THE COURT:  Three hundred beds out of 25 percent, are you going to take that position, Matt?  And, if so, I

*Echo Reporting, Inc.*

EXHIBIT L - Page 272

27

really want to hear that.

MR. UMHOFER:  There are more beds underneath that 300, your Honor.

THE COURT:  I don't see that, Matt.

MR. UMHOFER:  There -- I'm -- what I'm telling you is that they exist.

THE COURT:  Where?

MR. UMHOFER:  It's not in the -- it's not here because this is the additional commitment that the County is making.  So, your Honor, I -- but I -- I --

THE COURT:  I can't force you to proceed.  I know that there's a $2 million fee that's going to be awarded.  Quite frankly, I think that's a di minimus amount.  You probably deserve three or four times the amount of that fee, but I'm having a tremendously difficult time with accepting your representation that this is good for the citizens of Los Angeles.

MR. UMHOFER:  Your Honor, I'll let Ms. Mitchell speak because she --

THE COURT:  No.  I think I'm going to turn now to the City.  I've heard you.

On behalf of the City?

MR. MARCUS:  Good morning, your Honor.  Scott Marcus --

THE COURT:  Have a seat for a moment, Scott, so we

28

can hear you.

MR. MARCUS:  Good morning, your Honor.  Thank you.  As you know, the City is not a party to this particular agreement between the County and the LA Alliance.  But, as we indicated earlier today, a lot has happened since this agreement was reached back in the fall or summer of last year.  The City has a new Mayor.  The City has a new Council President.  There is a new Board comprised at the -- at the County with a new Chair.

THE COURT:  And is your position going to be that these 300 bed spaces are adequate to accommodate the 17,000 people, 25 percent who are SMI, severely mentally ill, or are we setting Mayor Bass up for failure right at the beginning?

MR. MARCUS:  Again, your Honor, the City is not a party to this agreement.

THE COURT:  Okay.  Then you'll remain silent then.

Mayor Bass, I'll -- I didn't want to put -- between you and the County because maybe I need to be the one, but I don't want to spoil the relationship.  So, let me repeat to you and Janice Hahn, I really appreciate that all of you are getting together.  I recognize that.  I don't want to cause harm to that relationship.  But, by the same token, I don't see how you can possibly be successful, and I'm not willing to accept an aspirational promise after 30

29

years of bickering.  So, I see right in the own report, Mayor, 3,000 to 3500.  I'm going to say you fall short, still applaud you, a thousand but not 300, 1500 but not 300.

So, if you want to speak, so be it.  If Janice Hahn wants to speak for the Board, so be it.  But I really don't want to hear from the attorneys now.  I want to hear from the leadership.  So, if you want to, Paul Krekorian, you're the President.  You don't have to say a word.  I don't want to put you on the spot, but I'm having a very difficult time with this agreement on behalf of the citizens of Los Angeles.

MAYOR BASS:  Your Honor, first, I -- I would appreciate the opportunity if we had to speak to you in chambers privately.

THE COURT:  If you'd like to.  If we can make progress -- you know that you and I are very much attuned, and I've been attuned with Janice in the past and with Hilda.  I've got a great amount of respect for you.  But I'm taking the attorneys out of this now.  And if you want to speak to me, I want to speak to you as leaders, and I want to speak to you without the attorneys, and I'd like to include Paul Krekorian, and that has to be stipulated to, and I want to speak to the leadership first before I include -- allow LA Alliance and the Intervenors.

Before we do that -- Mr. Miller, sit down -- I'd

30

like to speak to the Intervenors for just a moment.

Ultimately, I pointed you -- and we've had some disagreements over shelter and housing. I understand that. We'll always be in disagreement over that mix, et cetera. But this involves a Court's great concern of how do we accommodate the SMI on the street if Mayor Bass is really going to undertake 17,000 or even fall short with 15,000 or even if we take the agreement of 12,000. The inhumanitarian problem that occurs is I don't see how we're matching that with provider services, getting more robustness out of our providers, quite frankly, and the money is there if we're successful. The Governor's trying to step up if we're successful. I just don't see why we can't be, and I think it's a real reset with the last election, with no denigration of the past administration, but it's like changing the Supreme Court. One new Justice changes the Court. We've got a chance to reset this, we really do, on behalf of these citizens.

Explain to me how 300 beds divided between the public health and mental health accommodates 25 percent of 17,000 people. Just a couple of sentences.

MS. SOBEL: I mean no disrespect, but that's an unfair question.

THE COURT: Okay. We're done. Thank you very much, and I won't put you on the spot because I'm trying not

31

to get any disagreement between the County and the City as they've entered into this relationship.  So, if you want to speak to me privately, then I want a waiver from LA Alliance.

MR. UMHOFER:  Your Honor, subject to our ability to --

THE COURT:  Do I have that waiver to speak to the leadership of this County and the City?

MR. UMHOFER:  You do have --

THE COURT:  Mr. Miller, do I have that accommodation?

MR. MILLER:  I would like to speak and answer some of the questions.

THE COURT:  I'm not interested right now.  I want to speak to the leadership.  Thank you very much.

MR. MILLER:  Subject to my statement the other lawyers got to talk, I would greatly appreciate just a couple of --

THE COURT:  Mr. Miller, thank you.

MR. MILLER:  Can I?

THE COURT:  Please.

MR. MILLER:  Okay.  Thank you, your Honor.  I'll be very -- I'll be brief.

THE COURT:  Brief.

MR. MILLER:  First of all, I want to thank your

32

Honor and thank this Court --

THE COURT:  Have a seat.

MR. MILLER:  -- for bringing this massive problem to the fore.

THE COURT:  You and I have had this discussion before, Mr. Miller.  This isn't the first time.

MR. MILLER:  Yes.  I just want to say that.  Thank you.  Okay.

As far as the 8600 beds -- as far as the 300 beds, there are 8600 -- and I apologize.  We -- your Honor raised this issue before.  So, what we did from the last hearing, we went around to figure out how many additional beds there are, subacute, acute beds for substance abuse and -- and for mental health.  And I have a spreadsheet.  I didn't -- we're not winging it.  We're not coming up with 8600.  I have a spreadsheet with addresses and locations of the 8600 that are already on the books.  And this is -- this is the real thing, and I'll give it to the Court.  I probably should have attached it to our brief.

But the 300 is on top of the 8600 that are already out there.  So, that's 8900.  It's not enough --

THE COURT:  You can't -- Mr. Miller, you can't accommodate right now with the 8600, even if that figure is correct, and I think that there's a lot of litigation behind that figure and counting, quite frankly.  And you're

33

offering 300 for 17,000 people.

MR. MILLER:  No.  There's 8600.  We're offering 300 more, and I have the details and the locations, the specifics of that.  It's not enough, but --

THE COURT:  Show me your proposal.  Show me that proposal.

MR. MILLER:  I agree it's not enough.  If I can hand this up to your Honor --

THE COURT:  So, if we can do better, then, are you going to waive and let me talk with the leadership of this County and the City?

MR. MILLER:  I am, but I want to finish what I have to say.

THE COURT:  All right.  Finish.

MR. MILLER:  I want to just clarify, and then I'm going to waive, yes, your Honor.  It's fine.

The other point I want to --

THE COURT:  And are you going to permanently waive since the County withdrew the permission of me to talk, for instance, when Hilda Solis calls my home?  I couldn't respond to her.  I had to be discourteous and refer her. When Janice calls my home, can I speak to her?  Can I get that waiver back from the County so that we can have some good conversations literally at midnight if we want to?

MR. MILLER:  If it's all right with Janice Hahn

34

and Hilda Solis, it's fine with me.

THE COURT: You're the one that withdrew this on behalf of the County. Are you revoking that?

MR. MILLER: I'm revoking it if that's what my clients --

THE COURT: For all purposes? Then go talk to your clients for a moment.

MR. MILLER: Okay. Can I --

THE COURT: No. Go talk to your clients for a moment. That's an order. Go talk to your clients. I want to do this one at a time.

MR. MILLER: All right.

UNIDENTIFIED SPEAKER: Your Honor --

MR. MILLER: Okay.

UNIDENTIFIED SPEAKER: -- to talk to --

MR. MILLER: They said okay.

THE COURT: Okay.

MR. MILLER: I revoke it.

THE COURT: So, Janice, if you call the house, I'm happy to talk to you and vice versa. And, Hilda, if you call -- but I'll always go to the Chairperson of the Board first, Hilda, which is why I was afraid to talk to you. Now, you and I have had two meetings already. The phone is open and vice versa. Okay.

All right. Now, finish your --

**EXHIBIT L - Page 280**

35

MR. MILLER: Okay. One other point, your Honor. I thank the Court for -- you know, for instigating, having us all coalesce.

My other point -- I have two other points. We're never going to be able to do enough. The County acknowledges that.

THE COURT: I -- I --

MR. MILLER: The Court's right, okay. It's a massive problem. It's an intractable problem. It's going to take time, and the County -- you'll hear it directly from the policy makers, the elected officials, they're all over it. They're doing a lot more than the settlement of just this lawsuit.

THE COURT: Show me in the proposal you gave me where that is.

MR. MILLER: They'll tell you.

THE COURT: Show me in that proposal that you submitted to the Court with no additional conferences, no communication, where that is.

MR. MILLER: It's -- we set forth in our brief the additional things we're doing.

THE COURT: That's not part of the settlement submitted to the Court for my signature.

MR. MILLER: No, it's not part of the settlement. It's being done above and beyond the settlement of this

EXHIBIT L - Page 281

36

case.  There's only so much a court can do.  The -- the -- the County, the City, the elected officials have a responsibility above and beyond just this lawsuit.

Now, let me -- let me just last point, your Honor.  Then I'll sit down and your Honor can talk to my clients directly.  As far as enforcement and supervision, I'm going to read directly page nine, subparagraph (ii).  It's entitled "Judicial Enforcement."  It says:

"If, after exhausting the dispute resolution procedures described above the claiming party still alleges the responding party" -- that's us, the County -- "is in breach of the agreement, the claiming party may file a notice of breach and request for judicial enforcement" -- by your Honor -- "judicial enforcement in the District Court to remedy such alleged breach."
And this is the key part:
"The District Court retains jurisdiction at its discretion" --
That means your Honor obviously retains jurisdiction in case it doesn't go away for purposes of enforcement.
"The District Court retains

**EXHIBIT L - Page 282**

37

jurisdiction at its discretion for

purposes of enforcing this agreement

until the end of Fiscal Year 2026/2027,

i.e., June 30th, 2027."

So, for the next four and a half years, if we don't do -- by the way, the County's going to meet its commitments.  The County of Los Angeles doesn't breach contracts.  We're going to do what we say we're going to do.  But if -- if we don't, we're going to be hauled into court before your Honor, and we're going to have to perform.  I'm quite sure this Court will -- will order it.

So, to say that there's on accountability or no enforcement mechanism is incorrect.  There is.  And it's before Judge Carter, and everybody in this courtroom knows that Judge Carter doesn't mess around.

So, on that basis, your Honor, I'm going to -- I'm going to file -- I have to redact some of the addresses of some of these beds for privacy, but I'm going to file this -- the detail behind the 8600 beds that are already the acute mental health and the substance abuse beds.  They're already out there, not enough, but it's a lot more than 300.

THE COURT:  Okay.  I tried to send a gentle signal last time about this paragraph nine, and without monitoring and accountability to the Court, this is dead on arrival.  That's my bottom line.

*Echo Reporting, Inc.*

**EXHIBIT L - Page 283**

38

Now, eventually, we can talk about the bed space. I need your wisdom in terms of how that's divided out. I'd like to get Doctor Sherin involved again or whoever you choose. I'd like to work with you and increase this, and I'm not asking for the perfect. I'm just asking for the good, but I know that 300 bed spaces is not it.

And we've got a reset right now with the new Mayor, the new Chairperson, and you weren't part of this agreement when it was signed, and yet you're bearing the responsibility. And I feel that we're setting up the citizens of Los Angeles for a tremendous letdown in our mental health area with the most severe on the street and all those entities that I named.

And, so, if I have to be the bad judge and turn this down, I'm going to turn this down, I minimally have to have the same provisions as the City or don't bring this agreement to me. And that is I want monitoring, and I want accountability, and I want it to the Court, and you can call it whatever you want to, a consent decree or not, but I want that responsibility and trust that the City gave me back from the Count. And, if not, then you'll have to enter into a private contractual agreement. You bear the responsibility of that, and you can get around me, quite frankly. You can take me out of the lawsuit, but I will now participate in something that I don't have power to actually

39

monitor and hold people accountable for. The Governor's saying it and everybody else is saying it now for decades.

All right. Now, I'm going to come back to you. You chose not to speak. I would like to speak to the Chairperson for the Board, the Mayor. You can accommodate, but no counsel are present by waiver. If you want to bring Supervisor Solis, that's fine. If you want to bring Monica Rodriguez, Paul, that's fine. But you're the person. And I think -- if there's another Council -- but I leave that to you as President of the L.A. Council. Okay. I'll see you in chambers. Thank you.

MS. MYERS: Your Honor, before you -- the Intervenors were not given an opportunity to speak, and we've not withdrawn our objection to --

THE COURT: I understand.

MS. MYERS: I just want to be explicitly clear on the record that the Intervenors withdrew consent to ex parte communications, have never been asked to nor have we waived that. We are concerned with the lack of transparency that continues to exist related to the --

THE COURT: Yeah. I -- Shayla, I am too. In other words, you and I have had some disagreements, but we've been able to talk to each other, and I've been able to talk to the City. And even though we disagree, we know what those disagreements are. The County is the one that

**EXHIBIT L - Page 285**

40

withdrew this ability for me to talk, okay, about this. And, so, therefore, this has to be a waiver for all time so I can literally have these conversations along the way. That's what I'm hearing so far.

So, Folks, come on back, and let me extend my hospitality. But we'll be as transparent as we can now with the public.

(Proceedings recessed briefly.)

THE COURT: Thank you for your courtesy.

After our discussions in chambers, the parties have represented to the Court that they're willing to renegotiate the terms, including accountability and monitoring, but I'm going to turn that over to -- to Mayor Bass initially for her comments.

MAYOR BASS: First of all, Judge, let me just thank you for giving us the opportunity to meet with you in your chambers. And, essentially, what our request is is that the City and the County have 90 days. We do think that the word that you used describes it in essence, which is a reset. We think this is a new day. We think that the stars are aligning in a way that we haven't seen before and that we have the potential to align each level of government.

And, so, for example, the Biden administration announced a month ago that they want to reduce homelessness by 25 percent in the nation in the next two years. We

**EXHIBIT L - Page 286**

41

appeal to them that if you simply address homelessness in Los Angeles and in California, you can meet your national goal. The President responded by sending Susan Rice, Ambassador Susan Rice, the Head of the Domestic Policy Council, here on Friday, and she is examining including Los Angeles in their first cohort, which would result in a memorandum of understanding in the next couple of months.

Governor Newsom reached out to Chair Hahn and myself to see if Los Angeles would be willing to be one of the first cohorts in the CARE Court, and I know that the Board of Supervisors will be discussing that today. But there is the potential there to really increase the number of mental health beds. We will make the case to the Governor that -- that if we are in the cohort, that has to come with resources. But we also know that one of the reasons why the County is not able to access resources that they have is because of the entanglement caused by Proposition 63, but now is the time to examine that so that the County actually can increase the number of beds significantly.

So, the bottom line is that we feel if we had 90 days, we could come back with a much better agreement. The County and the City are working hand in glove right now. We believe that that will continue. We have new leadership in our City Council, new leadership at the Board, and in the

42

Mayor's office, and we would like that opportunity.

THE COURT:  Thank you, Mayor.

Let me turn to the Superwoman -- Supervisor and Chairwoman of the --

MAYOR BASS:  I kind of like superwoman.

THE COURT:  Superwoman is a great title.

MAYOR BASS:  I like that.

SUPERVISOR HAHN:  Thank you, Judge Carter, for bringing us together this morning.  And I echo everything that my -- my friend, my former colleague in Congress, the new Mayor of Los Angeles said.  It is a new day.  We are pressing the reset button on -- on addressing the homelessness crisis in Los Angeles County.

It breaks my heart that we still have close to 70,000 people who are sleeping on our streets.  I woke up in the middle of the night freezing in my own house and with my own blankets on my bed, and I thought surely there is someone who is not going to make it last night who is sleeping on our streets.  So, it breaks my heart that -- that we had to have a lawsuit on behalf of the most vulnerable in our County and City to get us to this point. But here we are, and it is a new day.

I have a feeling that we are going to work differently from this day forward because, honestly, I believe what we've been trying all these years has not

*Echo Reporting, Inc.*

EXHIBIT L - Page 288

43

worked, and will -- will this settlement of this agreement get us there?  You know, it is in the right direction, and we want to solve this problem.  The hearts and souls of the three women sitting here and one good man are with you, Judge Carter, in taking this in a different direction.

And, to that, also, you know, Karen Bass on day one of -- of her mayorship declared a state of emergency. The County of Los Angeles last Tuesday unanimously voted to declare a state of emergency for this crisis.  I think that speaks volumes of where we are and what we want to do differently, and we concur -- well, Janice Hahn and -- and Hilda Solis -- we have three other colleagues that we hope will agree, but we concur that the County's new language in an agreement would mirror the provisions for monitoring that the City of Los Angeles agreement has in theirs.

We want accountability.  We want transparency.  I believe it is about relationships, and that's what we have. But you made a good point, what if these relationships don't exist in the future?  But I think this is going to be successful because of our relationships, both at the state level, the federal level, and between the City and the County.

Thank you.

THE COURT:  Supervisor, thank you.

Let me turn to the one good man known, member of

44

the Council President, Mr. Paul Krekorian.

MR. KREKORIAN:  Thank you very much, Judge.  And thank you for your diligence throughout this process.  I think it's remarkable how much progress has been made since the time this litigation was filed until today.  And what you're seeing today here is accelerating that progress even more.  This is a time of new leadership, of new resources, of new commitments by both the City and the County and, hopefully, our partners at other levels of government soon.  And, so, I think that what Supervisor Hahn just described is important in moving forward to ensure that the relationship between the County and the City remains unified in this is to have unified accountability, you know, in -- in this settlement agreement as well with -- with your Honor.

So, that makes complete sense to me with the 90-day extension.  I can assure you that the Council, as well as our Mayor, will use that time vigorously to try to work with our -- our friends and colleagues at the County to -- to make sure that we have workable solutions that will be even better than what's on the table before us today.  So, for that, I thank you, your Honor.

THE COURT:  Well, thank you.  Let me turn to First Alliance.

MS. MITCHELL:  Thank you, your Honor.  So --

THE COURT:  I said First Alliance.  I mean LA

*Echo Reporting, Inc.*

EXHIBIT L - Page 290

45

Alliance.

MS. MITCHELL:  That's okay.  We --

THE COURT:  No.  Thirty years ago I had a case called First Alliance, which has nothing to do with this. So, LA Alliance.  My apologies.

MS. MITCHELL:  Thank you, your Honor.  You've been calling us First Alliance for three years.

THE COURT:  For a long time, yeah.

MS. MITCHELL:  I just respond to it automatically.

Thank you, your Honor.  We appreciate this.  I think highlighting these deficiencies has been eye opening I think for -- for a lot of folks.  We have -- have been pushing for 3,000 plus beds this entire time, mental health beds.  And, to get us there, I'm excited to be able to work with what seems like a newly invigored government on the other side.  So, we're very excited to see what progress we can make in 90 days.  I think the accountability piece is absolutely key, without sacrificing the support for city projects and things that -- that we all know and agree is absolutely necessary.

So, we're excited.  We agree to the 90 days.  We are happy to agree to ex parte communications across the board so that we can really see the progress being made and being able to talk very clearly and directly I think is -- is very appropriate in the circumstance.  So -- so, we agree

**EXHIBIT L - Page 291**

46

to that continuance if the Court is in agreement as well.

THE COURT:  I'm -- as I expressed to you in chambers and I express to you now transparently in open court, I'm excited about this possibility, very complimentary the willing to renegotiate and at least relook at this agreement.  I agree it's time to reset, and we have a wonderful opportunity here on behalf of all of the citizens, the homeless, the community, the police, everyone, and let's seize it.

So, let's go in good faith.  And, with your permission, instead of setting a specific date today, why don't I reach out through Michelle Martinez and Judge Birotte to Mercedes and all of you folks about a convenient date instead of arbitrarily setting one.  That way, in case there's other business, et cetera, we're not having to reset those dates, and we'll do that within the next week with Alliance and the Intervenors.

And, Ms. Sobel, please be here also on that date. I need you.  Okay.

MS. SOBEL:  (Indiscernible).

THE COURT:  Oh, never mind.  Okay.

MS. SOBEL:  Oh, no, no.  I'm so sorry, your Honor. I didn't hear the -- the --

THE COURT:  We're going to set this in 90 days. So, we're going to be reaching out to you and Shayla also.

47

MS. SOBEL:  Thank you, your Honor.

THE COURT:  All right.  For all that, let's not waste any more time in terms of going back to the Council, and I saw a number of other council members here.  So, extend my best wishes to the Council also.

UNIDENTIFIED SPEAKER:  Thank you, your Honor.

THE COURT:  And, Michelle, a couple of things, because I wasn't in the room for part of the --

UNIDENTIFIED SPEAKER:  I may just comment very briefly, we also would like for the State and the County to allow ex parte communications to allow for ex parte communications --

THE COURT:  Oh, I want to be absolutely certain of this as discussed, and that's having to come to you.  Do I have the ability to go back to ex parte communications, et cetera, and I want to know that on the County's part because the County was the one that withdrew this.

MR. MILLER:  Yes, your Honor, you do.

THE COURT:  Across the board.

MR. MILLER:  We agree.

THE COURT:  Across the board?

MR. MILLER:  Yes.

THE COURT:  And the phone's open.  Okay.

MR. MILLER:  The phone is open.

THE COURT:  The phone is open.  Fair enough.

*Echo Reporting, Inc.*

**EXHIBIT L - Page 293**

48

Okay.

MR. MILLER:  Likewise, my clients, the Chair of the Board of Supervisors said yes.

THE COURT:  Okay.  All right.

All right.  Then, is there anything further?

(No response.)

THE COURT:  Thank you very much.  Go have a wonderful day.  Let's get this done.

ALL:  Thank you, your Honor.

(Proceedings concluded.)

I certify that the foregoing is a correct

*Echo Reporting, Inc.*

EXHIBIT L - Page 294

49

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.


/s/Jordan Keilty                    1/20/2023
Transcriber                         Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*

EXHIBIT L - Page 295