# EXHIBIT M

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No: 2:20-cv-02291-DOC-KES                    Date: January 17, 2023

Title:   LA ALLIANCE FOR HUMAN RIGHTS ET AL. V. CITY OF LOS ANGELES ET AL.

PRESENT:   THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

| Damon Berry | Court Smart |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| Elizabeth Mitchell | Scott Marcus |
| Matthew Umhofer | Jennifer Mira Hashmall |
| | Louis "Skip" Miller |

**PROCEEDINGS:**          **HEARING REGARDING COUNTY SETTLEMENT AGREEMENT [485]**

Hearing held in Los Angeles First Street Federal Courthouse, Courtroom 5B. The Court recognizes the presence of Mayor Karen Bass, Los Angeles City Council President Paul Krekorian, and Chairwoman of the Board of Supervisors Janice Hahn. Also present is Judge Andre Birotte, Special Master Michele Martinez, and counsel for intervenor.

The Court made comments, documented below, in open court regarding the County Settlement Agreement (Dkt. 485). Mayor Bass, joined in by Chairwoman Hahn and City Council President Krekorian, subsequently requested a private conference, in which Judge Birotte and Special Master Martinez were present. Plaintiffs also participated.

Following the conference, the parties represented in open court that, in light of the new leadership at the city and county level, they wish to further meet and confer to review and amend the terms of the County Settlement Agreement, particularly in relation to the number of mental health beds and monitoring. The parties requested, and the Court granted, an additional 90 days to do so. The Court's scheduling order is forthcoming.

**Comments regarding the County Settlement Agreement**

The Court recognizes that it should not be the burden of private citizens to sue their elected representatives. Only in times of desperation, anger, and hopelessness are

**EXHIBIT M - Page 297**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                    Date: January 17, 2023
                                                                              Page 2

lawsuits such as this filed. And this lawsuit was filed out of desperation and fury from decades of neglect and inaction.

This case was first filed in March 2020 by L.A. Alliance—a non-profit organization consisting of a broad coalition of Los Angeles stakeholders, including unhoused individuals, property owners, and small businesses. At the time, L.A. Alliance stated in their Amended and Supplemental Complaint that the homelessness crisis "continues and accelerates, with little hope of a City- or County-driven solution. Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs are suffering under the weight of an urgent crisis. Plaintiffs are left with no choice but to resort to the courts for relief." ("Am. & Suppl. Compl.") (Dkt. 361) ¶ 94.

> 95.    And so the crisis continues and accelerates, with little hope of a City- or County-driven solution. Because of the painful results of current policies, and because of the lack of political and bureaucratic will to undertake effective and proven means to combat it, the Plaintiffs are suffering under the weight of an urgent crisis. Plaintiffs are left with no choice but to resort to the courts for relief.

Through this litigation, Plaintiffs and the City of Los Angeles entered into a settlement agreement in the summer of 2022, without the County joining in. ("City Settlement Agreement") (Dkt. 421-1). The City Settlement Agreement was commendable in a number of ways. It contained approximately 24 provisions, each of which had detailed subdivisions and specifically defined terms. The City promised 2-3 billion dollars to accommodate 12,000 to 14,000 people on the streets.

The City Settlement Agreement was comprehensive and extensive and, notably, held the City accountable by providing that the Court maintain "continuing jurisdiction to oversee and enforce this Settlement Agreement," which included monitoring. City Settlement Agreement § 2.

But there is much more that needs to be done to address the spiraling crisis on our streets. The Court recognized that the City Settlement Agreement alone would not solve homelessness. In fact, Plaintiffs LA Alliance and the City recognized the same when they referenced the County's responsibilities and "agree[d] to cooperate in ensuring the County meets its obligations" of—among other things— "[r]equiring a minimum of 50 mental health beds per 100,000 people in the County, or more as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of available inpatient treatment." City Settlement Agreement § 11.

**EXHIBIT M - Page 298**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: January 17, 2023
                                                                              Page 3

In October 2022, the County filed their settlement agreement ("County Settlement Agreement") (Dkt. 485). The terms of the agreement, as the Court made clear in the last hearing, simply fell short of the County's statutory obligations and the reason that this lawsuit was filed in the first place.

As the newly elected mayor, Mayor Bass is present and making commendable and initial efforts to confront this crisis. These may or may not be successful, and whether the resulting effects are short-term or long-term remain to be seen. But it appears that the inertia is being broken. Efforts are being made in good faith to break down the decades of antagonism and non-cooperation between the City of Los Angeles and the County Board of Supervisors. Mayor Bass declared a state of emergency and, last week, the County Board of Supervisors followed. Hopefully, this will cut bureaucracy, costs, and lead to increased housing.

Mayor Bass also pledged to accommodate 17,000 homeless persons within her first year of office. This is a monumental undertaking. The City Settlement Agreement eventually would accommodate 12,000-14,000 individuals over a five-year period. It is hoped that Mayor Bass and the City Council succeed at a much greater pace than the City Settlement Agreement anticipated.

It has repeatedly been represented to the Court that about 40% of the homeless population suffers from mental illness or substance abuse, or a combination of both. *See e.g.*, County's Response to City Settlement Agreement, Ex. 19, *Homeless Initiative Funding Letter* (Dkt. 433-19).

Case 2:20-cv-02291-DOC-KES   Document 433-19   Filed 05/31/22   Page 17 of 28   Page ID #:13948

ENCLOSURE 2

Los Angeles County HHAP Round 3 Local Action Plan Selected Tables

| Table 1. Landscape Analysis of Needs and Demographics | | |
|---|---|---|
| | **People Experiencing Homelessness** | **Source and Date Timeframe of Data** |
| **Population and Living Situations** | | |
| TOTAL # OF PEOPLE EXPERIENCING HOMELESSNESS | 63,706 | HUD 2020 PIT Count |
| # of People Who are **Sheltered** (ES, TH, SH) | 17,616 | HUD 2020 PIT Count |
| # of People Who are **Unsheltered** | 46,090 | HUD 2020 PIT Count |
| **Household Composition** | | |
| # of Households **without Children** | 51,290 | HUD 2020 PIT Count |
| # of Households with **At Least 1 Adult & 1 Child** | 3,907 | HUD 2020 PIT Count |
| # of Households with **Only Children** | 589 | HUD 2020 PIT Count |
| **Sub-Populations and Other Characteristics** | | |
| # of Adults Who are Experiencing **Chronic Homelessness** | 24,482 | HUD 2020 PIT Count |
| # of Adults Who are Experiencing **Significant Mental Illness** | 14,125 | HUD 2020 PIT Count |
| # of Adults Who are Experiencing **Substance Abuse** Disorders | 15,203 | HUD 2020 PIT Count |

This division of responsibility for mental health and substance abuse falls to two County agencies. The Los Angeles County Department of Mental Health (DMH), with

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: January 17, 2023
                                                                                     Page 4

interim director Lisa Wong, has responsibility for the County's mental health needs. The Los Angeles County Department of Public Health, under the direction of Dr. Barbara Ferrer, has responsibility for substance abuse.

In the County's proposal, the County states that "[b]y the end of fiscal year 2023/2024 (i.e., June 30, 2024), the County shall develop 300 additional substance use and mental health beds according to the greatest need as solely determined by the County." County Settlement Agreement § 3.

D.  **County's Obligations**:

1.  **Support for Plaintiffs' Settlement with the City**:

i.  From fiscal year 2022/2023 through fiscal year 2026/2027, the County shall fund and provide supportive services for interim housing and permanent supportive housing units financed by the City as part of the City Settlement, as units are developed by the City and become occupiable, in an amount to be determined solely by County and City in their respective discretion. These supportive services shall include, but shall not be limited to, "mainstream" services including public assistance programs, mental health services, substance use disorder services, and benefits advocacy services to clients who meet eligibility criteria for these services.

ii.  The County shall provide City-funded outreach teams with access to Department of Mental Health ("DMH"), Department of Health Services ("DHS"), Department of Public Social Services ("DPSS"), and Department of Public Health ("DPH") services directly and through coordination with Multi-Disciplinary Teams ("MDTs") and Homeless Outreach & Mobile Engagement ("HOME") teams assigned within the City.

iii.  The Parties acknowledge that the County does not support the enforcement component of the City's street engagement strategy and no funding or services from the County or any County department or affiliated agency committed herein will be used to support the City's street engagement strategy.

2.  **Beds Available to County Outreach Teams**: Throughout the term of this Agreement, the County shall make reasonable best efforts to ensure County outreach teams (including the increased MDT and HOME teams referenced above) have access to County Homeless Initiative-funded high service need interim housing beds for PEH in the City, and that those beds shall either be exclusively for use by, or prioritize, PEH in the City.

3.  **Mental Health/Substance Use Disorder Beds**: By the end of fiscal year 2023/2024 (i.e., June 30, 2024), the County shall develop 300 additional substance use and mental health beds according to the greatest need as solely determined by the County.

In the County's Statement in Support of its Settlement Agreement, filed this past Friday, the County states that its 300 beds "are in addition to the County's existing supply of approximately 8,600 mental health/substance use disorder beds." County Statement in Support of Settlement Agreement ("County Statement") (Dkt. 514), at 9. The County does not cite a source for this "8,600" number.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: January 17, 2023
                                                  Page 5

In 2019, Dr. Jonathan Sherin, Director of DMH, submitted to the Los Angeles County Board of Supervisors a 178-page report addressing the shortage of mental health hospital beds in L.A. County. Jonathan E. Sherin, REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF JANUARY 22, 2019), Department of Mental Health (Oct. 29, 2019) ("Report"), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.



**DEPARTMENT OF MENTAL HEALTH**
hope. recovery. wellbeing.

JONATHAN E. SHERIN, M.D., Ph.D.
Director

Curley L. Bonds, M.D.
Chief Medical Officer
Clinical Operations

Gregory C. Polk, M.P.A.
Chief Deputy Director
Administrative Operations

October 29, 2019

TO:         Supervisor Janice Hahn, Chair
            Supervisor Hilda L. Solis
            Supervisor Mark Ridley-Thomas
            Supervisor Sheila Kuehl
            Supervisor Kathryn Barger

FROM:       Jonathan E. Sherin, M.D., Ph.D.
            Director

SUBJECT:    REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF
            MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF
            JANUARY 22, 2019)

On January 22, 2019, the Board of Supervisors (Board) directed the Department of Mental Health (DMH), in coordination with Chief Executive Office (CEO), the Sheriff's Department, and the Health Departments, to assess how to address the shortage of mental health hospital beds in Los Angeles County. DMH was directed to provide the Board with a report to include the following information:

a. A plan for the creation of mental health hospital beds to include potential sites, funding options, patient population, and all other pertinent details;
b. The current and future need for mental health hospital beds that support the jail population;
c. An assessment of all contracted mental health hospital beds and make recommendations that allow the County to maintain and/or increase the number of beds available; and
d. An assessment of the current and future need for stepdown mental health beds and services, and draft a plan for the creation of both directly operated and contracted stepdown beds and services.

The attached report "Addressing the Shortage of Mental Health Hospital Beds" serves to fulfill the directives of the Board. In addition, we have attached a separate relevant report developed by an outside consultant, Mercer Health & Benefits LLC. This Mercer report assesses needs in Los Angeles County's mental health and substance use disorder

550 S. VERMONT AVENUE, LOS ANGELES, CA 90020 | HTTP://DMH.LACOUNTY.GOV | (213) 738-4601

**EXHIBIT M - Page 301**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: January 17, 2023
                                                                    Page 6

The Report is cited in the Amended and Supplemental Complaint. *See* Am. & Suppl. Compl. ¶ 89 & n. 142.

while positive, lack focus and fail to solve the most pressing problems presented by the homelessness crisis.

89.    In addition, the County has failed to meet its statutory obligation to provide appropriate mental health services. The County Board of Supervisors recognizes the "minimum number of beds required to appropriately meet the [community's mental health] need is 50 public mental health beds per 100,000 individuals. In Los Angeles County there are only 22.7 beds per 100,000 individuals."[141] In response, the Department of Mental Health (DMH) conducted an investigation and identified "significant gaps in inpatient treatment beds, residential beds, shelter beds, and respite homes across all ages" including an "estimate of 3,000 additional subacute beds needed," "significant gaps in assisting people when they are leaving inpatient care, especially for those with co-occurring disorders," "no SUD (substance use disorder) residential treatment for all ages," "no local children's inpatient psychiatric beds," "not enough inpatient beds for patients eligible for conservatorship…with waiting periods of up to a year to access secure inpatient care, resulting in people being discharged to the street and perpetuating homelessness."[142] In short, courts are reticent to declare a person conserved because there's nowhere for them to go, and the system designed to address these issues is massively overburdened. At Olive View Hospital in north Los Angeles County, the 72-hour crisis ward at times has over half of its 16 beds dedicated to patients waiting up to a year for a residential inpatient bed, leaving only a handful of other beds available for emergency 5150

---

[141] Motion By Supervisors Kathryn Barger and Hilda Solis, *Addressing the Shortage of Mental Health Hospital Beds* (Jan. 22, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.; *see also* E. Fuller Torrey, M.D., Kurt Entsminger, J.D., et al., *The Shortage of Public Hospital Beds for Mentally Ill Persons: A Report of the Treatment Advocacy Center*, Mental Illness Policy.org (2004-2005), https://mentalillnesspolicy.org/imd/shortage-hospital-beds.html.
[142] Jonathan E. Sherin, *REPORT RESPONSE TO ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS (ITEM 8, AGENDA OF JANUARY 22, 2019)*, Department of Mental Health 30, 134 (Oct. 29, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                        Date: January 17, 2023
                                                                                                        Page 7

Dr. Sherin concluded and recommended to the Board of Supervisors in 2019 a pilot program of 500 state-licensed mental health beds mixed between acute and subacute. Report at 4.

> Recommended Actions for the Board of Supervisors
> To help us move quickly to begin implementing the recommended system changes detailed throughout this report, the Department of Mental Health (DMH) is recommending that the Board of Supervisors take the following actions:
>
> 1. Authorize the Director of the Department of Mental Health (DMH), or his designee, to conduct a pilot to expand mental health bed capacity and improve existing capacity in the DMH network, within the following parameters:
>     a. The pilot will last for two years from the date of Board approval; and
>     b. DMH will seek to procure up to 500 State-licensed, approved, or exempt mental health beds of whichever type and mix will help meet the needs of the DMH network, derived through contracting for additional beds using DMH available ongoing funding.

Dr. Sherin also stated the "need to develop nearly 3,000 new subacute beds. And if there are unmet needs of the homeless population which are not reflected in these estimates, we may need to develop more subacute beds." Report at 20.

> Thus, if current resource and utilization patterns among the non-jail population with SMI persist, and if we are able to increase diversion of the jail population with SMI to the theoretical maximum, the Mercer and ODR analyses suggest we may need to develop nearly 3,000 new subacute beds. And if there are unmet needs for subacute care among the homeless population which are not reflected in these estimates, we may need to develop even more subacute beds.

Dr. Sherin once again stated in the Report: "The estimate of 3,000 additional subacute beds needed, for example, is under the status quo scenario where most of these factors remain the same." Report at 27.

> The estimate of 3,000 additional subacute beds needed, for example, is under the status quo scenario where most of these factors remain the same. However, if we can improve these factors, we would likely need fewer subacute beds.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                   Date: January 17, 2023
                                                                              Page 8

Moreover, Dr. Sherin found that "[r]oughly 25% of adult homeless individuals in LA County have a serious mental illness and need care." Report at 6.

> - The Department of Health Services' psychiatric emergency rooms are severely overcrowded, with patients sometimes having to stay several days while they wait for a hospital bed.
> - On any given day, four to five thousand individuals with serious mental illness and often co-occurring substance use disorder are incarcerated in LA County justice systems and need care. Many of their incarcerations could have been prevented entirely had they received needed treatment.
> - Roughly 25% of adult homeless individuals in LA County have a serious mental illness and need care. These individuals often cycle in and out of hospitals and justice systems without ever being put on a sustainable path to recovery.

Whether we're dealing with Mayor Bass's efforts to accommodate 17,000 individuals or the agreement between LA Alliance and the City of Los Angeles to accommodate 12,800 individuals, the County's offer falls short.

How can 300 beds accommodate the need for 25% of Mayor Bass's figure—which is approximately 4,250 beds for those suffering from severe mental illness? Or accommodate 25% of the City Agreement's figure—which is 3,200 beds? Moreover, the County's offer of 300 beds is over two years and is meant to cover *both* mental health and substance abuse needs.

The Court is concerned that the County Settlement Agreement lacks concrete milestones and accountability. The question of government accountability was first raised by Plaintiffs and has been a driving force of this lawsuit. *See* Am. & Suppl. Compl. ¶ 17 ("Measure H . . . is spread so thin it serves more to feed the County's own bureaucracy than to make any significant dent in the crisis."), *id.* ¶ 83 ("The County also faces tough questions about its management of homelessness-related funds."); *id.* ¶ 84 ("The problem is outpacing the solution and the County has failed to utilize the funds in a manner that would effectuate the goal."); *id.* ¶ 94 ("[T]he actual result is an astonishing lack of progress in addressing the crisis, and continued expansion of the crisis despite such efforts and resources, because each is being used in ways that will never solve the problem.").

The County Settlement Agreement—as it's written now—is a private settlement. *See* County Settlement Agreement § 9(P)(ii) (providing that, in the event of "breach of this Agreement, the Claiming Party may file a notice of breach and request for judicial enforcement in the District Court to remedy such alleged breach."). The County has since made clear that the terms are not subject to independent enforcement by the Court. *See* County Statement at 17–18.

**EXHIBIT M - Page 304**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                          Date: January 17, 2023
                                                                          Page 9

  What is happening out there is a crisis of all kinds—a public safety crisis, a health crisis, and a humanitarian crisis—for the homeless, for residents, and for the police and sheriff department personnel who are put in a dangerous position when forced to respond to circumstances that are not theirs to handle. They are not psychiatrists; they are not mental health professionals.

  At the hearing,[1] the parties represented to the Court that, in light of the new leadership at the city and county level, they wish to further meet and confer to review and amend the proposed settlement agreement between the County and Plaintiffs. The parties requested, and the Court granted, an additional 90 days to do so.

|                          :          58          |
| :--- |
| Initials of Deputy Clerk: DBE |

---

[1] A transcript of these proceedings has been ordered and will be docketed when available.