# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

LA ALLIANCE FOR HUMAN RIGHTS, )
et al., )
                           )
              Plaintiffs, )
                           )
        vs. ) No. LA CV 20-022291-DOC
                           )
CITY OF LOS ANGELES, et al., )
                           )
           Defendants. )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Thursday, April 20, 2023

Wil S. Wilcox, CSR 9178
Official U.S. District Court Reporter
350 West 1st Street
Los Angeles, California 90012
wil.wilcox@gmail.com

2

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF LA ALLIANCE FOR HUMAN RIGHTS:

Elizabeth Anne Mitchell, Attorney at Law
Umhofer, Mitchell and King LLP
11766 Wilshire Boulevard, Suite 900
Los Angeles, CA 90025
213-394-7979
Fax: 213-529-1027
Email: elizabeth@umklaw.com

Matthew Donald Umhofer, Attorney at Law
Umhofer, Mitchell and King LLP
11766 Wilshire Boulevard, Suite 900
Los Angeles, CA 90025
213-394-7979
Fax: 213-529-1027
Email: matthew@umklaw.com

FOR THE DEFENDANT CITY OF LOS ANGELES:

Arlene Nancy Hoang
Los Angeles City Attorneys Office
City Hall East
200 North Main Street Room 675
Los Angeles, CA 90012
213-978-6952
Fax: 213-978-7011
Email: arlene.hoang@lacity.org

Scott D. Marcus
Los Angeles City Attorneys Office
200 North Main Street 7th Floor Room 675
Los Angeles, CA 90012
213-978-7558
Fax: 213-978-8216
Email: scott.marcus@lacity.org

FOR THE DEFENDANT COUNTY OF LOS ANGELES:

Jennifer Mira Hashmall, Attorney at Law
Miller Barondess LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, CA 90067
310-552-4400
Email: mhashmall@millerbarondess.com

3

Appearances (Continued):

FOR THE DEFENDANT COUNTY OF LOS ANGELES:

        Ana Wai-Kwan Lai
        Los Angeles County Counsel Office
        350 South Figueroa Street Suite 601
        Los Angeles, CA 90071
        213-974-0061
        Fax: 213-617-6785
        Email: alai@counsel.lacounty.gov

INTERVENOR LOS ANGELES CATHOLIC WORKER:

        Shayla Renee Myers
        Legal Aid Foundation of Los Angeles
        7000 S Broadway
        Los Angeles, CA 90003
        213-640-3983
        Fax: 213-640-3988
        Email: smyers@lafla.org

INTERVENOR CANGRESS:

        Carol A. Sobel, Attorney at Law
        Law Office of Carol A. Sobel
        1158 26th Street Suite 552
        Santa Monica, CA 90403
        310-393-3055
        Email: carolsobellaw@gmail.com


ALSO PRESENT:

        Supervisor Janice Hahn

        Supervisor Lindsey Horvath

        Paul Krekorian, Acting Mayor

        Dave Michaelson, Counsel for the Mayor

        Cheri Todoroff, Director

        Special Master Michele Martinez
        Daniel Conway, LA Alliance

4

LOS ANGELES, CA.; THURSDAY, APRIL 20, 2023; 9:09 AM

-oOo-

THE COURT:  We're on the record.  First of all, once again, good morning.

And Deb, are you okay?  Okay.  If there's any issues at all, just stop me.

COURT REPORTER:  Wil is writing, Your Honor.

THE COURT:  Thank you very much.

And I'd like to begin with the appearance of the parties with a little bit more formality today.  And that is, on behalf of the Plaintiff, Ms. Mitchell and Matt, would introduce yourselves, please, for the record.

MS. MITCHELL:  Elizabeth Mitchell on behalf of LA Alliance.  With us is also Daniel Conway, representing LA Alliance for Human Rights today as well as the individual Plaintiffs.  And we have Matthew Umhofer here as well.

THE COURT:  Thank you very much.  It's a pleasure.

And Chairwoman Hahn, would you begin, and then whoever's with you.  And I know the names, but I need a good record.  And then I want to recognize the president.

MS. HAHN:  Yes.  Good morning, Judge Carter.  I'm Supervisor Janice Hahn, and I'm currently the chair of the Los Angeles County Board of Supervisors.

And here's our newest supervisor.

MS. HORVATH:  Good morning, Your Honor.

5

THE COURT:  Good morning.

MS. HORVATH:  Lindsey Horvath, I am the newest supervisor for the 3rd District, vice chair of the board.

THE COURT:  It's a pleasure to meet you.

MS. HORVATH:  Nice to meet you.

MS. LAI:  Good morning, Your Honor.  Ana Lai here on behalf of the County of Los Angeles from county counsel.

THE COURT:  Thank you.  It's a pleasure.

MS. HASHMALL:  Good morning, Your Honor. Mira Hashmall here from Miller Barondess for the County of Los Angeles.

THE COURT:  It's a pleasure.  Nice to see you again.

I'm honored to have you here once again, President of Los Angeles Council.  And I understand from my clerks that you're the acting mayor today.

MR. KREKORIAN:  As of the moment, yes, Your Honor.

THE COURT:  It's a pleasure.

MR. KREKORIAN:  I'm wearing both hats.  It's good to be with you.

THE COURT:  It's good to be with you.

And also, this is Paul Krekorian, acting mayor today in the absence of Mayor Hahn.

The Intervenors, please.  And I mean -- I'm sorry, Mayor Bass.  We gave you two positions today, Mayor Bass.

6

(Laughter.)

MR. KREKORIAN:  And, of course, in addition to Mr. Marcus, Dave Michaelson is here as counsel for the mayor.

THE COURT:  It's a pleasure.  And you're more than welcome to come up and join us closer at any time with participation.

Okay.  Any other council members here who might be recognized?

MS. MYERS:  Yes, Your Honor.  Shayla Myers from the Legal Aid Foundation of Los Angeles on behalf of the Intervenors, Los Angeles Community Action Network and Los Angeles Catholic Worker.

THE COURT:  It's a pleasure.

And Ms. Sobel.

MS. SOBEL:  Carol Sobel on behalf of all of the Intervenors.

MS. HAHN:  Judge, I forgot to introduce Cheri Todoroff, who is the director of our Homeless Initiative.

THE COURT:  It's a pleasure.  You're more than welcome to approach any of your clients or consult with them at any time during the process.

MS. HAHN:  Thank you.

THE COURT:  First, I want to express the

appreciation for the numerous mediation and continued mediation efforts of Special Master Michele Martinez who's here today and Judge André Birotte.

It's been 90 days since I last saw you when the parties asked for a continuance.  Mayor Bass wanted to talk to President Biden and all the parties in agreement that they wanted this 90 days to discuss the matter.  So your courtesy is appreciated in attending today.  And I hope you got through the security downstairs.  I didn't get a last -- I didn't get the call till the last moment.  So I waived the searches, except there are no weapons allowed.

And for the -- if there are press members here, you are more than welcome to use a computer.  Apparently, there was some confusion last time.  It's my understanding that your generation doesn't write cursively anymore.

(Laughter.)

THE COURT:  I'm just kidding you.  But use the computer, but please don't take pictures and no recording.  But beyond that, you're than welcome to use the computer.

We return today after the parties requested this 90-day continuance for the hearing held on January 17th, 2023.  And at that hearing, the Court considered the County's proposed settlement agreement submitted October of 2022, which, for my record, is Docket 485.

The Court traced the history of this litigation

8

and the state of homelessness in Los Angeles pursuant to Docket 518, and Mayor Karen Bass, Chairwoman Janice Hahn and City Council President Paul Krekorian were present on behalf of the City and County of Los Angeles.

After the Court made comments, the parties subsequently requested a private conference in which Judge Birotte and Special Master Martinez were present.  The Court was not.  Plaintiffs also participated.

And following that conference, the parties represented in open court that in light of the new leadership at the city and county level, they will meet and confer to review and amend the terms of the County's settlement agreement, particularly in relation to the number of mental health beds and monitoring, which is also contained in Docket 518.

And the parties requested and the Court granted an additional 90 days to do so.  And on April 18th, 2023, after a request for an extension of time, which the Court granted two days ago, during the evening hours, the parties submitted an addendum to the proposed settlement agreement at Docket 533.

I represent to you I've read all of your documents and gone over them thoroughly during the evening hours. We've spent the last 48 hours nonstop since those were filed.

9

For the purposes of transparency, the Court will make available the transcript of today's proceedings after court today.  And in recognizing City Council President Paul Krekorian as a representative and the acting mayor of Los Angeles, Mr. Krekorian, the first question is to you.

Is the City of Los Angeles satisfied with the terms of the proposed settlement?

MR. KREKORIAN:  Well, thank you, Your Honor.  And let me say first how satisfied the City of Los Angeles is in our new relationship with the County and how important it is that we continue to work together locking arms, as Mayor Bass and Chair Hahn declared during the State of the City this week.

And that was, I think, a monumental change in this relationship.  And I think the settlement agreement reflects certainly significant progress since the last time that we were here.  And thanks to Your Honor's intervention, the increase in the number of beds that are being proposed in the settlement agreement are welcome and will make a difference.

If the question is will this be sufficient to meet the moment, I think the answer has to be "no."  The addition of a thousand beds over the course of three and a half years means an addition of fewer than one bed a day, which likely

10

won't even keep up with the increase in demand.

The additional 450 vouchers that are provided under the settlement agreement, I have concerns about because of the fact that they are for RCFEs and adult care facilities, and there's no guarantee that those facilities will even be available to be used.

It is, as I understand it, the trend in that area of care that RCFEs are actually tending to close now, rather than open new facilities.

So and that's not within the County's control, of course. But it is a question that we as -- we collectively have to address, whether there will be sufficient capacity to be able to use those vouchers.

So I'm concerned that while this definitely shows progress and it's consistent with the progress that we've made in this relationship, if you're asking me whether this will be a transformative agreement, it will not be. It will an incremental improvement. But I can't see that this, standing by itself, will meet the needs that we have now for the seriously mentally ill.

That's not to say that we will not continue to do this work. And I have -- I'm absolutely confident in all five supervisors' commitment to this work and commitment to working with the City and commitment to expanding significantly the capacity that's available for those who

11

are in need of mental health care.

This agreement simply is, I hope, only one small part of that larger effort.  In my view, it's hard to image that the claims presented by the Plaintiffs are sufficiently met by the settlement.

THE COURT:  Okay.

MR. KREKORIAN:  The Plaintiffs have a different view, apparently.  But I think if we -- if we are going to meet this moment, it's going to take transformative change, and this agreement does not reflect transformative change.

THE COURT:  I may come back to you in just a moment.

I'm going to turn to the Interveners and then I'll turn back to the respective parties with the proposed settlement.

So either Ms. Myers or Ms. Sobel, if you care to enter into this discussion; if not, I'll move on.

MS. MYERS:  Sure, Your Honor.

THE COURT:  And the same question that I've asked the council president.

MS. MYERS:  Yeah.  Obviously, and we just want to be clear on the record, that the Intervenors had no part in the negotiations of any the settlements and agreements in this.  Despite the Intervenors always being willing to come the table, the LA Alliance and the -- and the County and the

12

City made the decision to do that without the presence of homeless service organizations at the table.  So just to be clear on that, the first time we saw this was the same time the Court saw this.

THE COURT:  About 7:00 or 8:00 on Wednesday night?

MS. MYERS:  Yeah.  And --

THE COURT:  I'm sorry.  On Tuesday night.

MS. SPEAKER:  I mean, obviously, I agree with Council President Krekorian that this is not sufficient to solve the problem.  Obviously, no resources that are available in the County or the City right now are available to solve this problem.  I think the County's commitment matches the City of Los Angeles's commitment, though, and the settlement that was put forward months and months ago approved by this Court.

I think it is very clear that the City Council, in approving their settlement that was present, in no way met the moment.  And so I think it's challenging to sit here and attempt to hold the County responsible for a different standard than the City was held in committing largely resources that were already committed by the City of Los Angeles to build shelter beds and housing.

The reality is, is the City of Los Angeles's agreement to build approximately 12,000 new beds was only 60 percent of an exclusion of the population that I think

13

the County is struggling to provide services to.

THE COURT:  And another 40 percent of substance and mental health.

MS. SPEAKER:  Exactly, Your Honor.  And it's not just excluding the 40 percent.  I think it's excluding people with mental health issues and substance abuse issues from the number, and then taking 60 percent of that number.

In no way is that meeting the moment we're in.  I think President Krekorian made it clear last year that he was meeting the moment as it was last year.  We're in a very different time.  And certainly, the settlement agreement, which Interveners objected to strenuously, in no way met that moment because it locked in time the point in time count from a year ago.

So the reality is, this case is not going to solve homelessness.  I think Your Honor has been clear about that.  I think the council has been clear about that.  I think the board of supervisors have been clear about that.  I think the press has been clear about that.  I think the public has been clear about that.  You cannot solve homelessness through litigation.  What you can do is you can solve it through dramatic political leadership and those sorts of things.

I think this settlement agreement, while it is by no means perfect, certainly matches the commitment that the

14

City of Los Angeles made last year.  And I think it's a --
it's a reasonable response under the circumstances to the
need, and it certainly matches the commitment to increase
the number of beds.  It's not going to solve the problem.
This problem is not going to be solved in this courthouse.
So that's the Intervenors' position on that.

The last thing that I want to express, though, is
the Intervenors' ongoing concern with the lack of
transparency with these proceedings related to the public.
The reality is, much of the -- much of the process in this
case has been pulled back into the back chambers of this
courthouse through ex parte communications, which the
Interveners continue to object to.

The reality is, these are incredibly important
issues that deserve public airing.  They deserve public
communications.  Whether it's about the enforcement of
Los Angeles Municipal Code 41.18, whether it's about the
city street strategies, whether it's about the increase in
beds, those sorts of things.

We have a political process and groups like the
Interveners and all of the other organizations and unhoused
folks deserve a right and the ability to participate in that
process.  When everything is being shoe-horned into
monitoring through a special master or through procedures
that are outside of the political process, it takes away the

15

political accountability.  And we continue to have significant concerns with that.

That's all I would say at this point.  Thank you.

THE COURT:  I may have some questions back to you in just a moment.

MS. SPEAKER:  Yes, Your Honor.

THE COURT:  Ms. Sobel.  And would you pull the microphone just a little bit closer because we are on CourtSmart.

MS. SOBEL:  I fully agree with Council President Krekorian that this doesn't meet the moment.  I think it's incredibly disappointing.

It's almost exactly 20 years ago that I filed the *Jones* case.  And, to me, it is just remarkable that we are talking about a settlement that is anchored in a threat still of criminalization, that we have not moved forward, that it took the City 16 years -- not 16 years -- 13 years to build -- to increase the available beds for people who were unhoused to 1250, and that included private builders.

There is no -- the focus of the City is wrong. It's been wrong since the beginning.  It was wrong when the economic roundtable told them 20 years ago that they needed to do certain things to cut off the feeder pools into homelessness.  And we are now at a point where the feeder pools are increasing at a rate that is far greater than

16

anything the City can imagine.

I'm not suggesting that this isn't it a resolvable problem; I believe it is.  But is not resolvable through expanding shelter beds.

THE COURT:  All right.  Let me turn to either -- it doesn't matter -- either LA Alliance or to the County. Because this is really centered over the County, not the City at this time.

MS. MITCHELL:  I'm happy to talk, Your Honor.

THE COURT:  So Ms. Mitchell.

MS. MITCHELL:  Here, I'll go ahead and move up here since there's a microphone.

We don't disagree with Ms. Myers that this has never been about solving homelessness.  It's always been about addressing the immediate crisis on the street.  The emergency needs to be addressed.

And when we filed this back in 2020, were going the speed of a turtle, right.  We were -- we were focused exclusively on permanent supportive housing.  All of our resources were going to permanent supportive housing.  And the County, to be quite frank, was floundering through Measure H, was not matching any of that.

And so we filed this to say we need to re-divert some of those resources to immediate crisis control. Because as the crisis spins out of control further and

17

further and further down the rabbit hole, more and more people are dying, more and more people are getting sick, right.  We have to fill that basin.

You cannot treat a broken leg on a surgeon's table without treating the gunshot wound first.  And we've always said we first have to address the gunshot wound.  Let's address the crisis on the street, and then we can talk about the long-term issues.  And that's what this has always been about.  And I think that the City did a great job stepping that up last year, which is what the settlement was.

This year what we're looking at right now, this agreement, I think is largely -- the forest is being lost for the trees, Your Honor.

We don't disagree that 1500 beds is not going to solve this.  I don't think the County disagrees that 1500 beds is not going to solve this, right.  We probably are looking at this point maybe 8,000 beds.  If we're talking about mental health, if we're talking about substance use disorder, if we're talking about board and care patches, that's probably what we're looking at.

But I think the County will also say the resources are not available, and the County can do what the County can do.  And in stepping up to 1500 beds, it's five times better than we've ever seen before.  And so something like that is significant, and should be observed.

But what I want to do is take a step back from just the bed count, because we've been so focused on the bed count, and look at the rest of the agreement.  Because that's why LA Alliance ultimately agreed to this.  And I'm looking at the agreement right now.  But that's why LA Alliance ultimately agreed to this.  It was not because of the bed count, which has gotten significantly better.  And thank you to, Your Honor, for -- for putting that pressure on.  There's no doubt about that.

But if you look at the shelter agreements, you look at the services agreements, you look at the home teams, you look at all of that crisis that's being stepped up, we cannot discount that.

We entered into this agreement because, frankly, the City told us that's what the City needs.  And I want to look at the shelter projects that are being stood up right now, all of the Project Roomkey and the Project Homekey, they're being stood up right now.  There is no shelter agreement that's in place, Your Honor.

For eight months, the City has been doing this, and the County has been coming alongside without a shelter agreement.  And all the Court has to do is walk into these projects to see the problem with that.  You have people that are going into these projects with mental illness, with drug addiction, that are not being assessed for days, weeks,

19

months that are not getting services --

THE COURT:  Let me help you.  I am in those projects.

MS. MITCHELL:  So Your Honor understands.  There is no services agreement with those projects.

And so when we entered into this agreement with the City last year, we knew that, and we were all concerned about that.  But the City stepped up and did it anyway because they needed to meet the moment.  And the County is ready to partner with the City on that.  And that is too much of an emergency to throw out the window.

So when you look at all of the rest of it, you look at the high-needs beds that are actually being addressed, the number's not in here, but I'm told it's about 1,000 beds, that are being produced, unlicensed, high-needs beds that the City is being given access to as they're going through this encampment reduction process.

THE COURT:  The numbers are in the addendum.

MS. MITCHELL:  No, Your Honor.  The high-needs beds.  I'm talking about the unlicensed, high-needs beds.

THE COURT:  Oh, I'm sorry.  Thank you.

MS. MITCHELL:  So if you look at this in the totality, and you look at the dramatic situation we have on the streets now, that is why we signed off on this.  That is why we agree to it.  And that is why we continue to push for

20

it, saying not only is this a good agreement for what it is, but it needed to have been done eight months ago.  It needed to have been done six months ago.  And here we are in April, watching these projects flounder.

And I'm hearing it from service providers.  I'm hearing it from residents, about the crisis that we're facing right now.  And we can't keep going.

Because sure, we can fight, Your Honor.  And I'm happy to fight.  The Court has always known that.  We have done a lot of business together in the past.  But what you're looking at, at that point, is three years down the road, Ninth Circuit arguments, and how bad is the crisis going to be then?

So from our perspective -- and I can't speak to the County's perspective, I'll let the County do that about whether there's the sufficient funding available and that kind of thing.  But from the Alliance's perspective, we need to be clear that we need to move forward now.  We cannot keep waiting and letting the perfect be the enemy of the good.  So we've heard that a lot in this court.  And this is what we're trying not to do here.

So with that, I will step back.  I'm happy to answer any questions that the Court has.

THE COURT:  And I may come back to you as well.

Also to either Matt Umhofer or Darryl -- I'm sorry

21

Daniel.  My apologies.  I know that the mayor of Sacramento was down here for a while also participating.

Let me turn to any of you as counsel or the chairman of the board.  But the first question I have, regardless, is to Chairwoman Hahn.

And first of all, let me continually express my appreciation in terms of your leadership or attempted leadership throughout the process.

In Section A2 of this proposal -- and somebody's going to help put that in front of you.  You shouldn't have to do that.

MS. HAHN:  Thank you, Your Honor.

THE COURT:  You've got lots of staff here.

Proposal, Settlement Proposal 2A, if you put that in front of the Supervisor.

MS. HAHN:  I see it.

THE COURT:  The effectiveness of this agreement is expressly subject to and contingent upon approval by the County's approval of settlement process, including by the Los Angeles County Claims Board and the County Board of Supervisors and by approval of the individual Plaintiffs.

You'll find that at Docket, for my record, 533-1 at 7, Section A2.

When does the County Board of Supervisors plan to hold its public meeting regarding the approval of this

22

proposed settlement agreement?

MS. HAHN:  Your Honor, my understanding is that we would be approving that at our next -- if it's signed off today by you, Judge Carter, then we would officially approve it at our next open County Board of Supervisors meeting.

THE COURT:  Let me -- in my 25 years on the federal bench dealing with the SEC, the FTC, any government agency, this Court has never approved a settlement until the parties have signed off on that settlement.  Let me repeat that.

So what I find unique in this is that you don't have an approved settlement from your parties on the County's side, and you're asking the Court, then, to sign off on no vote.

The second thing is, when I look at this proposed settlement, I'm somewhat stunned in terms of who has signed this settlement.  If I'm dealing with the principals, I expect your name on the settlement.  I expect you to be responsible, not somebody who is able counsel in the County Counsel's office signing off so in the future, if something goes sideways, elected officials can then take the position that the signatures were with a very competent attorney.

Now, hold on.

I'm going to express some concerns so you can respond to them when I take the bench in just a moment.

23

Excuse me.

You seek dismissal with prejudice of Plaintiffs' claims against the County pursuant to Federal Rule of Civil Procedure 41(a)(2).  And 41(a)(2) provides that "An action may be dismissed on terms that the court considers proper," quote, unquote.

And I've got some questions and some concerns, and I want you to discuss those amongst yourselves in just a moment.

First, in this proposal, there is still, in my opinion, subject to your arguments, no oversight.  I stated, and I was clear, at the last hearing that this is just another document, aspirational that we're chasing in three or four years, as many of my colleagues have had to do in other consent decrees -- and this is not a consent decree; I know, transparently, that the board is concerned about that wording.  You don't have to say that, but I know that.

So if you'd be so kind, Diali, Julian, would you put up the terms and conditions of the settlement with the City.  And I'm going to point out stark differences.  And I said last time -- and I think I used the word "dead on arrival."

This is the City settlement.  This is where the City trusts the Court to work with the City in good faith -- and if you noticed, I haven't interfered with Mayor Bass at

all.  In fact, we've had a number of meetings.  She's got the latitude to carry out her program.  The Court's not going to be an obstacle unless there's a constitutional violation.  No intermeddling.  A working relationship, hopefully.

This is what the City gives the Court.  And I give them back the same trust.

The parties agree that the duration of the agreement shall be five years.

And by the way, in the future, I'm going to be concerned about five years because any time I see a five-year agreement, I'm absolutely concerned now because the politicians who made that agreement are now out of office and don't have to respond to it.  So I'm concerned.

But in five years, during which point the Court shall have continuing jurisdiction to oversee -- circle that for a moment -- and enforce the settlement agreement.

Now, if you'd be so kind, would you put up the City -- or the County, this is the County's proposal.

You give me absolutely no oversight, and you give me no enforcement.  Your proposal is reporting the County shall file reports regarding its progress in meeting its obligations under this agreement quarterly.

That means that if I sign off on this agreement, I'm simply getting a quarterly report with absolutely no

power of oversight, monitoring to hold you to your milestones and representations.  I'm giving you the credibility of the federal court to go out to the public and ask for more monies without any accountability.

The judicial enforcement, if after exhausting the dispute resolution -- and this only pertains to dispute resolution.  Your main portion is nine.

Procedures described in section P1I, the claiming party still alleges the responding party is in breach of this agreement.  The claiming party may file a notice of breach and request for judicial enforcement of the district court to remedy such breach.

That's just a contractual breach.  So I see a huge difference and tried to put everybody on notice concerning this at the last hearing.  And I used -- I think I used the dramatic words of "dead on arrival."  I apologize for the drama involved in that, but I don't in terms of the meeting. I don't see any remedy to this so far.

Let me then turn to accountability for just a moment.  If you turn to the next section.  And these are my concerns in the early morning hours with my law clerks.

And I want to thank each of you humbly for the incredible hours you're keeping.

When I come back, I want you to respond to accountability.  And I have grave concerns about this.

26

The question of the government accountability was first raised -- and by the way, for Mr. Umhofer and for you, Ms. Mitchell, I have nothing but praise.

In fact, in bringing this lawsuit, it did cause a breaking of absolute inertia in the city.  And at some point, I don't think you bargained -- and I'm joking with you -- to go citywide and now countywide.  I don't know that that was ever your original -- but in a sense, you've acted as a buffer, and the County has been fortunate and so is the City, because this has become the center of the litigation including Venice Homeowners who came into court, issues involving recreational trailers.

And once this lawsuit either settles or goes to litigation or whatever happens, there's nothing that precludes a multitude of lawsuits coming forward.  And that's what this Court's been trying to avoid to center these lawsuits amongst the judges here, so seven different judges didn't decide the same or related issues in the same way.

And at least when we started we were successful with that.  I'm worried about this turning into massive litigation, spread out to the court again, more lawsuits Chairwoman, than you could possibly imagine.  Back to the good old days of the Wild West with how do you govern not knowing what the federal court's going to do.  But let's get

some parameter.

So in a sense, this has protected you from lawsuits.  But if this settles or goes to litigation or whatever, you're back right in what I call the litigation. And it may not be you, Mr. Umhofer.  It may be an entirely different firm or three different firms or four different issues.

So accountability.  First of all, you stated in your complaint:  "Measure H is spread so thin that it serves more to feed the County's own bureaucracy than to make any significant dent in the crisis," end of quote.

You go on to say that the County also faces tough questions about its management of homelessness-related issues.  The other point at the last hearing is the problem is outpacing the solution, and the County has failed to utilize the funds in a manner that would effectuate the goal.

The next was the actual result is an astonishing lack of progress at addressing the crisis, continuing expansion of the crisis despite such efforts and resources because each being used in ways that will never solve the problem.

I understand that the Court cannot exercise its jurisdiction to enforce terms that are against the public policy and public interest.  And I've stated that at the

28

last hearing so you know I'm absolutely consistent in this, and your counsel heard this.

Could you put up that portion on Page 4 for a moment.  I want to read this to him.

Quote, from the last hearing:  "But because the settlement as written is really a private settlement, I want to stress that for a moment, this is portrayed to the Court as a private settlement with no judicial oversight, no accounting, no monitoring, and the LA City gave the Court that trust to at least monitor.  LA City gave the Court that trust, and the Court gave you that trust back so that we had a check and balance and that we're able to accommodate each other along the way."

And the next paragraph that I pulled out just so they can address.

This requires no judicial approval.

In other words, I understand that you can settle without me.  You can withdraw the complaint.  But you are asking the Court to put my approval on this.  And by implication, then, it can go to the taxpayers as approval with the Court's blessings, in a sense.

And what is astounding to me is that whatever this matter is, and I want to compliment the County for moving from the 300 to the 1500.  I want to compliment you again.  That's progress.

29

But my decision today is based upon not whether you've made some progress, but is that enough.  And so I want to go back to what I said at the last hearing like a "Rocky Horror Picture Show" and do this one more time.

You are going to develop 1000 additional mental health substance, disorder use -- or disorder beds, as well as 450 subsidy beds in adult residential facilities.  This adds additional beds, and it sets up those milestones in the settlement.  However, I'm concerned that the numbers may fall far short.  And when I come back after that recess, because I want to go over my notes, I'd like you to pull up Dr. Sherin.

Go to Page 5 for a moment.

And I want to remind you what our own mental health director said in 2019.  And we can up pull up the first page again.

And Dr. Sherin said:  The Mercer and ODR analysis suggests we may need to develop nearly 3,000 new subacute beds.  And if there are unmet needs for subacute care among the homeless population which are not reflected in these estimates, we may need to develop even more subacute beds. And while some uncertainty is unacceptable -- or is acceptable, inaction is not.  The problems mentioned throughout this report due to a lack of post-hospital beds and services are real and serious.

Now, go back and read those reports.  I'm falling asleep reading these reports.  And he also had a project of 500.  And instead of 500, the County, if you read carefully, only came forward with 167.  This is in 2019, folks.  This is four years ago.

And so what I'm astounded about on one hand is I pay you the compliment of moving forward.  And I pay you the compliment again and again.

This 1500 shouldn't even be negotiable between you.  This shouldn't even be a bargaining chip between the two of you.  The County should have done this years ago without even coming in front of the federal court.  And yet, this is used as a bargaining chip of 1500 beds out of 3,000 needed, out of 167 beds given out of 1500.

For goodness sakes, this comes from your own mental health director.  Now, Kathryn Barger, who you know I have great respect for, I want to put that on the record, she made a statement couple of days ago.  She said 39 percent.  Go back and read her own statement in the press.  39 percent of the folks out there have severe mental health issues and/or substance abuse or a combination.

I asked the question last time, and I ask you to address it again.  If Mayor Bass is going to fulfill her commitment of 17,000 off the street, and if we have a 40 percent substance abuse and particularly mental health

problem, you do the math.  Is that 300 beds that you initially offered to me?  Is that 1500 beds that you initially offered now?  You do the math.  I don't have to.

If you just take the agreement that we entered into between the City and the Court of 12,000 to 14,000, take any number in between, is 40 percent of that 300 initially offered to the Court or 1500?  Excuse me.  I'm sorry.

Go back and read your own report.  It's in the footnote in the briefing that I wrote to you.  It's at Page 20.  It's your own shortage of mental health hospital beds in the LA County.  And that has not been addressed in this.

So today you need much more than the 3,000 beds.  So it's less than half of what was even proposed four years ago, and your population has grown disproportionally.

Finally, this accountability issue.  We held a hearing, if you remember, in April of 2021.  And we got into some really, really finite concerns about where's the money going, $13 billion thus far.

The governor seems committed.  I'm not a politician.  But if -- I took note that in the best of times with a $100 billion budget, he put in a lot of money; and in the worst of times, when he doesn't have the budget, he's still putting in the money for homelessness.  In fact, he's

32

looking for some kind of success.

But despite the huge amounts of public spending, our numbers keep rising and the conditions on the ground appear to get even worse.  And I'm wondering where the accountability is here.

So I'm going to joke with you -- sit down.  Thank you.  I'll address you, I promise you.  I'll give you all the courtesy in the world in just a moment, I promise you.  But not when I'm speaking.  And I won't interrupt you.

I'm going to joke with you.  I don't think you would want me on this case.  And the reason for that is if I'm going to sign off on this, I have to have accountability.  Let me repeat that.  I have to have accountability to sign off on this.

At least not looking over your shoulder, but making certain that the representations you make are not once again aspirational.

Because while I may trust you implicitly, Chairwoman Hahn, and I put that on the record, I don't know who your successor is.  And I don't trust that process.

And finally, could you put up a couple pictures that I just took.  You know, I don't live down there at Skid Row, but I get down there.

And it's nice to have Pete White here, I want to recognize you.

33

And there's two people I want to pay tribute today.  And along the journey, I think I've talked to what, Michele, 400 to 600 people?  At least.

One of those is ^Tom LaBonge, a former Mr. LA. And Tom -- you don't know this, but he was secretly behind the scenes when I could talk to anybody, helping the Court immensely.  I've got some pictures of him driving down the riverbed.  Incredible memories of some the great people I've met on this journey.

And Tom said something very wise I didn't understand.  "Judge, the board of supervisors will only do what the board of supervisors is made to do."

And how many times did he repeat that to us, Michele?  Forever.

Now, I don't know if that's true or not.  But it seems to me when we start with 300 and we get to 1500, that we keep doing kind of the bare minimum along the way.  And then we have a press conference.

And the second thing is -- well, who I call the mayor and that is -- well, a very wise man came into my court, and he one time described this as "the homeless industrial complex."  And I don't know if that's true or not.  It's a dramatic word.

But he said one thing to me.  He said, "Judge, why don't you take a walk with me, and let me show you my area."

34

And I think that's the first time I'd met Pete White, who's here.  And I think that's the -- Pastor Q followed.  "And now I don't go with you because you're an advocate in this matter."

So I want to put up two pictures a week or so ago. And these are two little girls coming out of the rescue mission on the way to school with a guard.  And you have to ask, what are they doing there?

And if you put up the next picture.  This guy is just walking down the street, shivering with hypothermia. That's gangrene.

And then the next picture.  So I took off his face -- take off his face.  Go up there.  Boom.  No.  Remove his face.  Thank you.  My apologies.  I thought we'd edited that out.  He's going to lose his foot.

My problem is that we, as elected officials, and the Court -- I blame myself -- we're not getting down there. And it makes me wonder -- and I toss this back to you with no criticism of Dr. Adam.  She's terrific.  $438,000.

When you get up here and address me and you tell me you don't have money, I will never go in the LAHSA offices again in a downtown hotel with that kind of rent. And so don't throw the lack of money at me from the County's perspective.  And don't throw this budget of now $800 million at me as "We don't have money."

35

And I do agree with the former director.  I'm really concerned about the president of the United States earning less than the LASA director.  And twice as much a federal court judge, by the way, so I'm envious.  I'm joking with you, but not.  How we justify that in dealing with poverty.  And how we also justify the low wage for these wonderful kids going out to the street, paying that kind of staff salary.

So when you address me, be careful if we get into a discussion of how money is being spent.  Because I think the county has, with a $43.5 billion budget, a lot more potentially that you could contribute.

And my tough call is this.  I don't want to deter you.  I'm willing to settle for the good and not the perfect.  I've got grave reservations if this is the good.

So I'm going to take a recess for just a moment.  And we'll be back in about 20 minutes.  I want to look at some more notes.  Thank you.  The court will be in recess.

(Recess taken.)

THE COURT:  We're back on the record.  All parties are present.  Thank you for your courtesy.

All right.  One more time around, then.  And I promise you I'll be with you, but not in that order.

On behalf of the City of Los Angeles, do you have any further comments, Mr. Councilperson -- or

36

President Krekorian?

MR. KREKORIAN:  The one thing I do want to say, which I'm -- I apologize that I didn't say earlier, is I really want to stress, especially Chair Hahn's leadership that she demonstrated in the last hearing and throughout this process in moving the ball forward.

THE COURT:  And let me echo that and join you. And, in fact, I'll represent that we had a conversation literally in an airport and from your office recently.  So I commend her as well, trying to move this forward.

MR. KREKORIAN:  None of this would have happened without the persistent advocacy that she has demonstrated throughout.  And I didn't want to leave that unsaid in my comments earlier.

And I want to, again, just stress that I think as a number of the speakers had mentioned and I want to reiterate too, this is a tiny slice of the discussion that we're having as a society, and certainly between the City and the County.  So I didn't want to overemphasize.  I was trying to respond to your question, Your Honor.  But there's much to do that will continue -- and that work will continue regardless of what the parties agree to today.

THE COURT:  Okay.  Good.  Then I think the Interveners were next.  And if you have anything you would like to add.

37

MS. MYERS:  No, Your Honor.  I think we made our comments previously.

THE COURT:  Okay.  Then I think LA Alliance was next.  Anything you'd like to add?

MR. UMHOFER:  Matthew Umhofer, Your Honor, for the Alliance.

I want to just focus on one piece that I understand to be the Court's central concern, which is enforcement.

THE COURT:  No.  I have three pieces.  Accountability, in terms of money.  "Enforcement" is a bad word.  You can call it "oversight."  But how -- and, quite frankly, this reporting to the Court, which is nonsensical.

MR. UMHOFER:  And so, Your Honor, my view is that -- I'm just using the language in the agreement -- enforcement encompasses -- I mean enforcement in my discussion of enforcement to encompass all of those things.

And all I would to, Your Honor, is point out that when the Court says that there is no enforcement, that there is no accountability, that's not consistent with the agreement that we've entered into.

THE COURT:  Then just restate the exact provisions in the City agreement with the County, and we might be getting someplace.  And I told you that before.  I couldn't have been more clear.

38

MR. UMHOFER:  I understand that, Your Honor.  And we pushed for that.  We did push for that.

THE COURT:  I know you did.  And I'm not -- once again, let me commend you.

Let me commend all the parties here.

In fact, I represented to Janice Hahn that I'd like to be not a thorn in your side, but I'd like to join together at some point, all of us would.  But I've got some grave concerns when I put my signature on this.  By the way, none of your signatures are on this as politicians.  And then we go out to the public and ask for more money or more bond issue, and the federal court is now being fronted as approving this.

No.  You come to me.  And you come to me with your signatures on this -- not from counsel -- so that we know two or three or five years from now if there's a failure, who exactly we point to.  And that's some of the gamesmanship that I've objected to and stated that privately, and now I'm saying that publicly.  Step up and put your names on these documents and be responsible.

Now, that has nothing to do with you.

But, no.  You give me the exact language that the City had in terms of oversight and enforcement because I'm not going to get into a gray channeling area five years from now, arguing about what the Court's powers are.  Because the

39

one thing I hope the parties understand is I will hold them accountable.  I will do that gently.  I will work with them. Mayor Bass may not get to 17,000, she may get to 12,000. Guess what.  She's trying.  She's trying.  Good enough.  I'm not getting that same thing from the County.

And you have been unsuccessful in getting that language.  Thank you for trying.

MR. UMHOFER:  Your Honor, let me point to the language we did have, which we are satisfied with.  Which is P, Subsection 11, Subsection 2, which is the Judicial Enforcement Provision.  That provision empowers this Court -- if I could just finish, Your Honor.

THE COURT:  You can.

MR. UMHOFER:  I really appreciate it.

That provision empowers this Court to enforce this agreement.  And then if you go up to Section D, which is the county's obligations.  Those are meaningful obligations all the way through support to the City's agreement.  Very detailed.  And you go all the way down, that includes the number of beds we have here.

And without this agreement, the Court has no ability to enforce the County's efforts with any bed.  We're just in litigation for the next year or two or three.  And meanwhile, we don't have a floor set on what a floor -- and let's all call it a floor -- for what the county needs to do

40

on mental health and substance use disorder.

THE COURT:  Well, maybe the public needs the transparency if we can't reach a decent settlement concerning discovery about where these funds went.  Maybe the public needs to have a voice transparently in terms of the number of beds that are made.  What is wrong with litigation.

Now, I've been trying to settle this, as well as Judge Birotte, into the frustration level --

How many evenings, Michele?  I can't even count them.

And when I'm clear about what the Court expects on the last hearing, I'm not bargaining with the parties on this.  I said I need the same provisions.  Everybody heard that.  And you've chosen to ignore it.

MR. UMHOFER:  Well, Plaintiffs definitely didn't ignore it, Your Honor.

The final thing I would say on this, Your Honor, is in terms of transparency, there are two paths here.  One, is litigation where money that could be spent in more productive ways is spent on litigation, which we're not afraid of.

THE COURT:  I've got ways you can cut back the budget.  You want to hear them?  I'm just joking with you, but I'm not.  I pointed out a couple of them right to begin

41

with.

MR. UMHOFER:  I understand, Your Honor.

But litigation doesn't end with this settlement. You have the extended period of enforcing this agreement with full transparency.

You can still demand accountability and transparency about the spending of the County and the City on these issues.  Going backwards, the Court can look through, in great detail, what's under the County's obligations and continue to push the County even where there isn't a number.

The Court can bring the County in here and ask them if they're doing everything they can do on these issues and continue to shine a light with full transparency, with being held accountable by the media and by the different parties in this case, by the Special Master who's overseeing the City agreement.  And the City agreement is particularly referenced here in this agreement.  So you have a special master who's actually monitoring many of the terms of this agreement already under the City, which the County has an obligation, under this agreement, to support.

And that is why we think that there is sufficient -- we wouldn't have signed off on this if we didn't believe that the Court had sufficient purchase to be able to continue to shine a light on this issue, to continue

42

to bring transparency to this issue and continue to push the County beyond even the minimums that they are agreeing to in this agreement that --

THE COURT:  I respect that, Matt.  But I don't intend to shine a light on this issue.  I intend to have people live up to their word when they sign a document.  I intend to have the ability for accountability.  And I intend to not have all of these aspirational pledges that build public confidence, only to find out three or four years or five years later that we failed.

So you and I both know you made a magnificent effort, and I'll put that on the record.  But we know that there was a failure to reach an agreement.  I know that the County's concerned about just the word "consent decree."  Who wouldn't be?

But we've had so many consent decrees that are absolutely meaningless with federal courts trying to change and what that means three and four years into litigation.  There's going to be absolute clarity here.  You get me that same paragraph that the City had, oversight and enforcement, let's talk.

But until then, I said it before, and I'm not bargaining with you, I meant it.

MR. UMHOFER:  I understand, Your Honor.

THE COURT:  Okay.  Thank you very much for your

43

courtesy.

And now, uninterrupted, I promise you, on behalf of the County.  And it's a pleasure.  And just reintroduce yourself.  And I'm sorry for telling you to sit down abruptly, but that's my pet peeve.

MS. HASHMALL:  Thank you, Your Honor. Mira Hashmall for the County.

I want to start with echoing what I think everyone in this room has agreed is an undeniable truth. Homelessness is not going to be solved in any courtroom; this one, or in any other courthouse.  It is an issue that requires coordination from our elected officials, our community leaders, and our subject matter experts.

The other undeniable truth is that what the County is doing on homelessness goes far beyond any settlement with the Plaintiffs, any settlement with the City.  It is a significant commitment, hundreds and hundreds of millions dollars spent annually to address this crisis.

We had a binding settlement agreement with the Plaintiffs in October.  And we came before Your Honor, and you asked the County to do more.  And our County leadership stepped up, and we did more.  And we now have an addendum, a binding settlement agreement between these parties, that provides significant new resources, a thousand new mental health and substance abuse disorder beds, 450 subsidies for

44

facilities that we call board and care, in shorthand.

But what they are, are residential facilities for individuals who are on the brink of potentially falling into homelessness. And the enhanced services that those resources will provide are going to incentivize those facilities to stay open, motivate additional providers to do that work.

That is on top of the significant wraparound services, the mental health, the social services that are going to be there for the city and supporting the City's settlement.

And, Your Honor, just to be clear, the County is already doing that work. Our enhanced outreach teams are there side by side with helping the City bring individuals inside safe.

Our County teams are coordinating with the providers at those new city shelters, and they are also available and reaching out and connecting individuals to the services they need, whether it's through DPSS to get financial resources or mental health to get medical and mental health care.

This is on top of outreach teams, both home and multidisciplinary teams, that are making a difference every day.

And, in addition, this agreement, this binding

45

agreement between these parties provides for the County to make property available for new development.  We all know that the need for more housing is at the core of this issue for the City and the County.  And working together to get more funding.  Yes, this is a significant financial commitment.

The County already, in connection with the City and County MOU, devoted nearly $300 million to providing new resources, 6700 beds for individuals near the freeways, and seniors experiencing homelessness.  When you add this settlement, the binding settlement reached with the Plaintiff, that's over $850 million in additional resources.

And make no mistake, that this settlement -- I want to clarify, these terms were approved by the board. They stand by this agreement.  They stand by the County's commitment in connection with this settlement as well as everything the County is doing on homelessness.

It's not typical for elected officials to sign settlement agreements.  I didn't see any City officials sign the City Plaintiff settlement agreement that the Court approved.  But that doesn't mean that they don't stand behind it, because they do.

Now, you've referenced accountability, Your Honor. The County is accountable to the public and to this Court and to its constituents.  And that's why this agreement

46

builds in significant reporting obligations.  That transparency is available to every Angeleno who'd like to see where the County resources are working and the change that's being made.

And we do not believe the Court would ever be called upon to address a failure by the County under this agreement because the County is going to do the work.  But if that ever happens, the Court is authorized to enforce this settlement agreement.  And that is exactly, I think, the Court's concern:  Will the county do what its agreed to do?  Yes, is the answer.  But so, too, does this provision provide a mechanism for the Court to enforce those obligations if they're not met.

And so the parties have now several times jointly requested that this matter be dismissed with prejudice pursuant to the settlement.  And I want to reiterate that request again.  And also to reiterate this is just a small piece of the puzzle, and the County is continuing to work outside of this settlement before this case, during this case, and after this case.

So for all those reasons, Your Honor, we do request that the Court approve the request for dismissal submitted by the parties.  And, again, never doubt that the County intends to live up to these obligations and to keep doing more.

THE COURT:  I'm never going to question your credibility.  Understood?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  I'm going to read something back you that you filed.  And the Docket No. is 553-1 -- I'm sorry 514 at 17.

"It provides for the Court to retain ancillary jurisdiction only if there is a breach of the agreement and only in the manner prescribed by the parties."

That directly contradicts what you just stated.

MS. HASHMALL:  No, Your Honor.  Respectfully, I don't think it does.  This settlement has robust terms that provide for new additional county resources, support for the City Plaintiff settlement, outreach teams, a thousand new mental health and substance disorder beds, 450 new opportunities to support board and care placements and additional provisions, all subject to reporting and all subject to the Court's enforcement if those provisions aren't met.  That is accountability, Your Honor.  That is transparency.  And that is part of the County's commitment to publicly report its successes to the entire community on a regular basis pursuant to the settlement terms.

THE COURT:  All right.  Counsel, thank you very much.

MS. HASHMALL:  Thank you, Your Honor.

48

THE COURT:  Well, first let me say that I neglected, because I got a little bit choked up, but I want to mention General Jeff for a moment.  In the same breath as Tom LaBonge, two entirely different individuals amongst the 400 to 600 people.  And I just really had a lot of faith.  I have to tell you, he said there was a homeless industrial complex.  He literally took me around and I watched the double counting going on.  And I'll say it.

Be careful how you spend your money because these figures of 22,000 are fictional.  Go down to the Wellesley Clinic.  Go down and sit some places and watch people check in and sign up.  And the folks are doing a great job down there.  But that person, after they signed up, goes next door because they just didn't get service fast enough or they're having a mental episode.

So you, in good faith, believe you've got 22,000 or 24,000.  No, you don't.  You've got sign-ups down there.  And sometimes multiple times.

So the second thing is, we went through this whole double counting with the freeway of Paul Remembers, et cetera, not with the City, but a whole set of double counting going on.

And I just caution you in the future, although it's none of my business, watch the Skid Row Housing Trust.  If 2,000 people are now coming out, are we now going to

49

count 2,000 people going in and claiming that against the 17,000 in the future?  I'm just -- not my concern.  But just tossing out to you how much fiction is out there when we throw out these numbers to the public.  And that's causing me grave concern, signing a document with the federal court's preemptor and signature on this.

Well, then the public believes that the federal court is signing off in a document it believes, and we're out asking for a new bond money, which I hope you do.  I'd love to be supportive of that.  But I've got grave, grave concerns that the federal court's going to sign off on a document such as this, and then have that as one of the many reasons that the public should vote for increased taxes, when I'm not seeing the accountability.  And by the way, neither is the governor.  Let me repeat that.  I think he's looking for success right now.

So with General Jeff, it was really a journey.  I didn't have to take the police into the community.  And I just want to pay tribute to Tom LaBonge and General Jeff, not to signal out any others of the 4 to 600, but I've got tell you, if you have faith and confidence, those were two really good representatives of the respective communities out there.  And for whatever agreements or disagreements, there was complete transparency and candidness between us.

I'm not deminimizing your argument concerning the

50

funds devoted by the County.  Understood?  I'll put that on the record.

But I did raise a couple thoughts about this homeless industrial complex.  And that phraseology is well taken.  It's not hitting the streets.  Let me repeat that. And it's not hitting the streets in the degree that the public is paying this money.  And there is not the accountability out there.  And that's been repeatedly said by the state treasurer.  And I can read those reports back to you, but you sat through that, and you know it.

So the Court recognizes that this is not a class action settlement.  And the terms of settlement are contingent upon the public's very approval through the board.  But as the board I know is aware, it's meetings regarding approval of this agreement must be consistent with the published constitutional rights and the Brown Act's requirement that the board provide quote, "an opportunity for public comment on each specific agenda item as it's taken up," end of quote.

I agree with the Intervenors' concerns.  I'm not going to decline to assert the public power or the public's power in this regard in terms of transparency and putting this before the public for approval or not by the board.

But the settlement agreement unequivocally states that its terms are contingent on the board's approval, not

51

the Court's.  And that's a Docket 485-1 at 2.

The's effectiveness of this agreement is expressly subject to and contingent upon approval by the County's approval of settlement process, including by the Los Angeles County Claims Board and/or the County Board of Supervisors and by approval of the individual Plaintiffs.  Whether it's Mayor Bass or the settlement for the 12- to 14,000 or the freeway settlement for 6,000 individuals, that number alone, that 17,000, is of a concern.

And it's hard if there's 40 percent of our mental and substance abuse folks, at least 25 percent of those being severely mentally impaired, it really highlights, I think, the County's lack of substantial and satisfactory action in this matter.

And I convey back to my friends and colleagues on the board, you have the power to reduce the number of deaths.  You have the power to improve inhumane conditions on our streets.  And you have the power to safeguard the public.  And I don't believe that this is commensurate with the City settlement at all.

And by the County not using this power, the proposal for settlement lacks significant measures to hold accountable the enormous amounts of public funds being spent.  And I find that this lack of oversight and accountability harms the public interest.

EXHIBIT D - Page 121

52

And Matt, you said it yourself, you didn't personally fail, but that procedural morass you've gotten the Court into interpretation applies if you bring a breach to the Court.  It does not give the oversight and enforcement powers as set forth in the City agreement.

So I think that the subtlety of this from what I heard on the County's argument is, Judge, you know if you don't approve this, somehow all of this 1500's going to disappear.

Judge, if you don't approve this settlement agreement, gosh, what are we going do with this thousand beds?

You had a duty back in 2019 to get 3,000 of these beds on.  And that implied concern or threat on your part that somehow you're not going to settle and back out of the 1500 beds that you already have on power, shame on you if you do that.  Those beds should have been given right now without bargaining with human lives as a bargaining chip in a settlement, and that 1500 should be an agreement whether you have an agreement or not that should have been done yesterday, let alone today.

So any implication that a nonability to settle takes away those 1500 beds, shame on you.  And I mean that. You get those 1500 beds on the table whether the Court approves this or not, and you quit using this as a

53

bargaining chip in human lives.  And I find that affronting, quite frankly.

So finally, I'll make the legal ruling in this matter.  What the Court does today in no way takes away from the proposed private agreement already given to the public. And I recognize that the County has committed, and I'll say it again, at least 1450 beds, and, once again, thank you for the progress.

But I further recognize that the parties can reach this agreement even without the Court's approval.  You can get me out of the case.  You can have me not watching you anymore.  You can have me not pushing you.  You can have me not holding you accountable.  And you can go back to litigating with a lot more lawsuits in the future.

But today, however, because the County's settlement terms are improper and against the public interest, and I quote that, and because the board has not signed off, I'm going to deny the parties' stipulation.  I'm now lifting the stay in this matter.  I am reinstating these proceedings at this time.

Defendant's deadline to respond to Plaintiff's second amended complaint is due in two weeks on May 3rd, 2023.

I'm going to set a scheduling conference on this matter on May 9th of 2023, and at that time, set this matter

54

for litigation.  And I'll discuss those dates with you.

I want to humbly thank you again.  I want to thank you for the phone calls, reaching out, the communication, at least with you, and at least one other member of the board. Whether we agree or disagree, we need that kind of communication.  And I humbly thank you.

I want to thank all of you for your patience.  I leave that now to your best devices.  The Court's now in recess.

(At 10:40 a.m. proceedings were adjourned.)

--oOo--

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  April 21, 2023

/S/    WIL S. WILCOX

U.S. COURT REPORTER
CSR NO. 9178

COURT REPORTER: [1] 4/7
MR. KREKORIAN: [7]
MR. UMHOFER: [8]
MS. HAHN: [6]
MS. HASHMALL: [5] 5/9 43/6 47/3 47/11 47/25
MS. HORVATH: [3] 4/25 5/2 5/5
MS. LAI: [1]   5/6
MS. MITCHELL: [6]
MS. MYERS: [5]   6/10 11/18 11/21 12/6 37/1
MS. SOBEL: [2]   6/16 15/10
MS. SPEAKER: [3] 12/8 13/4 15/6
THE COURT: [47]

**$**

$100 [1]   31/23
$100 billion [1] 31/23
$13 [1]   31/20
$13 billion [1]   31/20
$300 [1]   45/8
$300 million [1]   45/8
$43.5 [1]   35/11
$43.5 billion [1] 35/11
$438,000 [1]   34/19
$800 [1]   34/25
$800 million [1] 34/25
$850 [1]   45/12
$850 million [1] 45/12

**-**

--oOo [1]   54/11
-oOo [1]   4/2

**/**

/S [1]   55/15

**0**

0061 [1]   3/5

**1**

1,000 [1]   19/15
1000 [1]   29/5
1027 [2]   2/6 2/10

10:40 [1]   54/10
11 [1]   39/10
1158 [1]   3/14
11766 [2]   2/4 2/8
12 [1]   51/7
12,000 [3]   12/24 31/5 39/3
1250 [1]   15/19
13 years [1]   15/17
14,000 [2]   31/5 51/7
1450 [1]   53/7
1500 [14]
1500's [1]   52/8
16 years [2]   15/17 15/17
167 [2]   30/4 30/14
17 [1]   47/6
17,000 [4]   30/24 39/3 49/2 51/9
17th [1]   7/21
18th [1]   8/17
1st [1]   1/22

**2**

2,000 [2]   48/25 49/1
20 [3]   1/16 4/1 31/11
20 minutes [1]   35/17
20 years [2]   15/13 15/22
20-022291-DOC [1]   1/8
200 [2]   2/14 2/18
2019 [3]   29/15 30/4 52/13
2020 [1]   16/17
2021 [1]   31/18
2022 [1]   7/24
2023 [7]
21 [1]   55/12
2121 [1]   2/23
213-394-7979 [2]   2/5 2/9
213-529-1027 [2]   2/6 2/10
213-617-6785 [1]   3/5
213-640-3983 [1]   3/10
213-640-3988 [1]   3/10
213-974-0061 [1]   3/5
213-978-6952 [1]   2/15
213-978-7011 [1]   2/16
213-978-7558 [1]   2/19
213-978-8216 [1]   2/20
22,000 [2]   48/10 48/16

24,000 [1]   48/17
25 percent [1]   51/11
25 years [1]   22/6
2600 [1]   2/23
26th [1]   3/14
28 [1]   55/6
2A [1]   21/14

**3**

3,000 [4]   29/18 30/13 31/14 52/13
300 [4]   28/24 31/1 31/6 33/16
3055 [1]   3/15
310-393-3055 [1]   3/15
310-552-4400 [1]   2/24
350 [2]   1/22 3/4
39 percent [2]   30/19 30/20
3983 [1]   3/10
3988 [1]   3/10
3rd [1]   53/22
3rd District [1]   5/3

**4**

40 percent [5]   13/2 13/5 30/25 31/6 51/10
400 [2]   33/3 48/5
41 [2]   23/4 23/4
41.18 [1]   14/17
4400 [1]   2/24
450 [4]   10/2 29/7 43/25 47/15
48 hours [1]   8/24
485 [1]   7/24
485-1 [1]   51/1

**5**

500 [2]   30/3 30/3
514 [1]   47/6
518 [2]   8/2 8/15
533 [1]   8/21
533-1 [1]   21/22
552 [1]   3/14
553-1 [1]   47/5

**6**

6,000 [1]   51/8
60 percent [2]   12/25 13/7
600 [3]   33/3 48/5 49/20
601 [1]   3/4
6700 [1]   45/9

**6**

675 [2]   2/14 2/18
6785 [1]   3/5
6952 [1]   2/15

**7**

7000 [1]   3/9
7011 [1]   2/16
753 [1]   55/5
7558 [1]   2/19
7979 [2]   2/5 2/9
7:00 [1]   12/5
7th [1]   2/18

**8**

8,000 [1]   17/17
8216 [1]   2/20
8:00 [1]   12/5

**9**

90 days [3]   7/4 7/7
 8/17
90-day [1]   7/21
900 [2]   2/4 2/8
90003 [1]   3/9
90012 [3]   1/22 2/15
 2/19
90025 [2]   2/5 2/9
90067 [1]   2/24
90071 [1]   3/4
90403 [1]   3/14
9178 [2]   1/21 55/16
9:09 [1]   4/1
9th [1]   53/25

**A**

a.m [1]   54/10
A2 [2]   21/9 21/23
ability [3]   14/22
 39/22 42/7
above [1]   55/8
above-entitled [1]
 55/8
abruptly [1]   43/5
absence [1]   5/23
absolute [2]   26/5
 42/19
absolutely [6]
abuse [5]   13/6 30/21
 30/25 43/25 51/11
acceptable [1]   29/23
access [1]   19/16
accommodate [1]   28/12

accountability [19]
accountable [5]   39/2
 41/15 45/24 51/23
 53/13
accounting [1]   28/9
Act's [1]   50/16
acted [1]   26/8
acting [4]   3/20 5/16
 5/22 9/5
action [4]   6/12 23/4
 50/12 51/14
Adam [1]   34/19
add [3]   36/25 37/4
 45/10
addendum [3]   8/20
 19/18 43/22
addiction [1]   18/25
addition [4]   6/2 9/23
 9/25 44/25
address [10]
adds [1]   29/8
adjourned [1]   54/10
adult [2]   10/4 29/7
advocacy [1]   36/12
advocate [1]   34/3
affronting [1]   53/1
afraid [1]   40/22
after court [1]   9/3
agency [1]   22/8
agenda [1]   50/18
agreement [65]
agreements [5]   11/23
 18/10 18/11 45/19
 49/23
Aid [2]   3/8 6/11
airing [1]   14/15
airport [1]   36/9
al [2]   1/6 1/9
alai [1]   3/6
alleges [1]   25/9
ALLIANCE [11]
Alliance's [1]   20/17
allowed [1]   7/11
almost [1]   15/13
alone [2]   51/8 52/21
alongside [1]   18/21
although [1]   48/23
amend [1]   8/12
amended [1]   53/22
amongst [3]   23/8
 26/17 48/4
amounts [2]   32/2
 51/23

Ana [2]   3/3 5/6
Ana Lai [1]   5/6
analysis [1]   29/17
anchored [1]   15/15
ancillary [1]   47/7
André [1]   7/3
Angeleno [1]   46/2
ANGELES [37]
Angeles's [2]   12/13
 12/23
Anne [1]   2/3
annually [1]   43/18
answer [3]   9/23 20/23
 46/11
anymore [2]   7/15
 53/12
apologies [2]   21/1
 34/14
apologize [2]   25/16
 36/3
appearance [1]   4/9
APPEARANCES [2]   1/23
 3/1
applies [1]   52/3
appreciate [1]   39/14
appreciated [1]   7/8
appreciation [2]   7/1
 21/7
approach [1]   6/22
approval [15]
approve [4]   22/4
 46/22 52/8 52/10
approved [5]   12/15
 22/8 22/12 45/14
 45/21
approves [1]   52/25
approving [3]   12/17
 22/3 38/13
April [6]
April 18th [1]   8/17
area [3]   10/7 33/25
 38/24
aren't [1]   47/19
arguing [1]   38/25
argument [2]   49/25
 52/7
arguments [2]   20/12
 23/11
Arlene [1]   2/13
arlene.hoang [1]   2/16
arms [1]   9/12
arrival [2]   23/22
 25/16

## A

asleep [1]  30/2
aspirational [3]
 23/13 32/17 42/8
assert [1]  50/21
assessed [1]  18/25
astonishing [1]  27/18
astounded [1]  30/6
astounding [1]  28/22
attempt [1]  12/19
attempted [1]  21/7
attending [1]  7/8
attorney [5]  2/3 2/7
 2/22 3/13 22/22
Attorneys [2]  2/13
 2/18
authorized [1]  46/8
Avenue [1]  2/23
avoid [1]  26/16

## B

backwards [1]  41/8
balance [1]  28/12
ball [1]  36/6
bare [1]  33/17
bargained [1]  26/6
bargaining [7]
Barger [1]  30/16
Barondess [2]  2/23
 5/10
basin [1]  17/3
basis [1]  47/22
Bass [9]
bed [5]  9/25 18/2
 18/2 18/7 39/22
beds [42]
behind [2]  33/5 45/22
bench [2]  22/7 22/25
beyond [3]  7/19 42/2
 43/15
Biden [1]  7/6
billion [3]  31/20
 31/23 35/11
binding [4]  43/19
 43/23 44/25 45/11
Birotte [3]  7/3 8/7
 40/9
blame [1]  34/17
blessings [1]  28/21
board [24]
board's [1]  50/25
bond [2]  38/12 49/9
Boom [1]  34/13

Boulevard [2]  2/4 2/8
breach [6]
breath [1]  48/3
briefing [1]  31/10
brink [1]  44/3
Broadway [1]  3/9
broken [1]  17/4
Brown [1]  50/16
budget [5]  31/23
 31/24 34/24 35/11
 40/24
buffer [1]  26/9
build [4]  12/22 12/24
 15/18 42/8
builders [1]  15/19
builds [1]  46/1
bureaucracy [1]  27/10
business [2]  20/10
 48/24

## C

CA [9]
CALIFORNIA [3]  1/2
 1/15 1/22
candidness [1]  49/24
CANGRESS [1]  3/12
capacity [2]  10/12
 10/25
careful [2]  35/9 48/9
carefully [1]  30/3
Carol [3]  3/13 3/13
 6/16
Carol Sobel [1]  6/16
carolsobellaw [1]
 3/15
carry [1]  24/2
CARTER [3]  1/4 4/21
 22/4
CATHOLIC [2]  3/7 6/13
caution [1]  48/23
center [2]  26/10
 26/16
centered [1]  16/7
central [2]  1/2 37/8
CERTIFICATE [1]  55/2
certify [1]  55/5
cetera [1]  48/21
chair [4]  4/22 5/3
 9/13 36/4
Chair Hahn [1]  9/13
Chair Hahn's [1]  36/4
chairman [1]  21/4
Chairwoman [5]  4/18

 8/2 21/5 26/23 32/19
Chairwoman Hahn [3]
 4/18 21/5 32/19
Chairwoman Janice Hahn
 [1]  8/2
challenging [1]  12/18
chambers [1]  14/11
channeling [1]  38/24
chasing [1]  23/13
Cheri [2]  3/22 6/19
Cheri Todoroff [2]
 3/22 6/19
chip [4]  30/10 30/13
 52/18 53/1
choked [1]  48/2
chosen [1]  40/15
circle [1]  24/16
Circuit [1]  20/12
circumstances [1]
 14/2
city [66]
City Council President
 Paul Krekorian [1]
 9/4
City's [2]  39/18
 44/10
citywide [1]  26/7
Civil [1]  23/3
claiming [3]  25/8
 25/10 49/1
claims [4]  11/4 21/20
 23/3 51/5
clarify [1]  45/14
clarity [1]  42/19
class [1]  50/11
clear [14]
clerks [2]  5/16 25/21
clients [1]  6/22
Clinic [1]  48/11
close [1]  10/8
closer [2]  6/6 15/8
Code [2]  14/17 55/6
Code 41.18 [1]  14/17
colleagues [2]  23/14
 51/15
collectively [1]
 10/11
combination [1]  30/21
commend [3]  36/10
 38/4 38/5
commensurate [1]
 51/19
comment [1]  50/18

**C**

comments [4]   8/5 35/25 36/14 37/2
commitment [12]
committed [3]   12/21 31/21 53/6
committing [1]   12/20
communication [2]   54/3 54/6
communications [2]   14/12 14/16
communities [1]   49/22
community [4]   6/12 43/13 47/21 49/18
competent [1]   22/22
complaint [3]   27/9 28/18 53/22
complete [1]   49/24
complex [3]   33/22 48/7 50/4
compliment [4]   28/23 28/24 30/7 30/8
computer [3]   7/13 7/18 7/19
concern [7]
concerns [10]
conditions [3]   23/19 32/3 51/17
confer [1]   8/12
conference [5]   8/6 8/9 33/18 53/24 55/10
confidence [2]   42/9 49/21
confident [1]   10/22
conformance [1]   55/9
confusion [1]   7/14
connecting [1]   44/18
connection [2]   45/7 45/16
consent [4]   23/15 23/15 42/14 42/16
consistent [4]   10/15 28/1 37/20 50/15
constituents [1]   45/25
constitutional [2]   24/3 50/16
consult [1]   6/22
contained [1]   8/15
contingent [4]   21/18 50/13 50/25 51/3
continually [1]   21/6
continuance [2]   7/5

7/21
continued [2]   3/1 7/1
continuing [3]   24/16 27/19 46/18
contractual [1]   25/13
contradicts [1]   47/10
contribute [1]   35/12
control [3]   10/10 16/24 16/25
convey [1]   51/15
Conway [2]   3/23 4/14
coordinating [1]   44/16
coordination [1]   43/12
core [1]   45/3
council [9]
Council President Krekorian [1]   15/11
Councilperson [1]   35/25
Counsel's [1]   22/20
counsel.lacounty.gov [1]   3/6
count [6]
county [74]
County Claims [1]   21/20
county's [20]
countywide [1]   26/7
court [65]
court's [13]
courtesy [4]   7/8 32/8 35/21 43/1
courthouse [3]   14/5 14/12 43/11
courtroom [1]   43/10
courts [1]   42/17
CourtSmart [1]   15/9
credibility [2]   25/3 47/2
criminalization [1]   15/16
crisis [11]
criticism [1]   34/19
CSR [2]   1/21 55/16
cursively [1]   7/15
cut [2]   15/23 40/23
CV [1]   1/8

**D**

Daniel [3]   3/23 4/14 21/1

Darryl [1]   20/25
Dave [2]   3/21 6/3
DAVID [1]   1/4
dead [2]   23/21 25/16
deadline [1]   53/21
deaths [1]   51/17
Deb [1]   4/5
decent [1]   40/3
decide [1]   26/18
decision [2]   12/1 29/1
declared [1]   9/13
decline [1]   50/21
decree [2]   23/15 42/14
decrees [2]   23/15 42/16
DEFENDANT [3]   2/12 2/21 3/2
Defendant's [1]   53/21
Defendants [1]   1/10
demand [2]   10/1 41/6
deminimizing [1]   49/25
demonstrated [2]   36/5 36/12
dent [1]   27/11
deny [1]   53/18
deserve [3]   14/15 14/15 14/22
despite [3]   11/24 27/20 32/2
detail [1]   41/9
detailed [1]   39/19
deter [1]   35/13
develop [3]   29/5 29/18 29/21
development [1]   45/2
devices [1]   54/8
devoted [2]   45/8 50/1
Diali [1]   23/18
difference [3]   9/21 25/14 44/23
differences [1]   23/20
director [6]
disagree [3]   16/13 17/14 54/5
disagreements [1]   49/23
disagrees [1]   17/15
disappointing [1]   15/12
discount [1]   18/13

**D**

**discovery [1]**   40/4
**discussion [4]**   11/17
 35/10 36/17 37/17
**dismissal [2]**   23/2
 46/22
**dismissed [2]**   23/5
 46/15
**disorder [6]**
**disproportionally [1]**
 31/16
**dispute [2]**   25/6 25/6
**district [5]**   1/1 1/2
 1/21 5/3 25/11
**divert [1]**   16/23
**DIVISION [1]**   1/3
**DOC [1]**   1/8
**Docket [7]**
**Docket 485 [1]**   7/24
**Docket 518 [2]**   8/2
 8/15
**Docket 533 [1]**   8/21
**document [5]**   23/13
 42/6 49/5 49/8 49/12
**documents [2]**   8/22
 38/20
**dollars [1]**   43/18
**Donald [1]**   2/7
**double [3]**   48/8 48/20
 48/21
**doubt [2]**   18/9 46/23
**downstairs [1]**   7/9
**downtown [1]**   34/22
**DPSS [1]**   44/19
**Dr. [3]**   29/12 29/17
 34/19
**Dr. Adam [1]**   34/19
**Dr. Sherin [2]**   29/12
 29/17
**drama [1]**   25/17
**dramatic [4]**   13/22
 19/23 25/16 33/23
**drug [1]**   18/24
**duration [1]**   24/8
**duty [1]**   52/13
**dying [1]**   17/2

**E**

**early [1]**   25/21
**earning [1]**   35/3
**East [1]**   2/14
**echo [1]**   36/7
**echoing [1]**   43/8

**economic [1]**   15/22
**edited [1]**   34/14
**effectiveness [2]**
 21/17 51/2
**effectuate [1]**   27/16
**effort [2]**   11/3 42/12
**efforts [3]**   7/2 27/20
 39/22
**eight [2]**   18/20 20/2
**eight months [2]**
 18/20 20/2
**elected [4]**   22/21
 34/16 43/12 45/18
**elizabeth [3]**   2/3 2/6
 4/13
**Email [8]**
**emergency [2]**   16/16
 19/11
**empowers [2]**   39/11
 39/15
**encampment [1]**   19/17
**encompass [1]**   37/17
**encompasses [1]**   37/16
**enemy [1]**   20/19
**enforce [6]**
**enforcement [15]**
**enforcing [1]**   41/4
**enhanced [2]**   44/4
 44/13
**enormous [1]**   51/23
**enter [1]**   11/17
**entirely [2]**   27/5
 48/4
**entitled [1]**   55/8
**envious [1]**   35/4
**episode [1]**   48/15
**especially [1]**   36/4
**estimates [1]**   29/21
**et [3]**   1/6 1/9 48/21
**et al [1]**   1/6
**et cetera [1]**   48/21
**evening [2]**   8/19 8/23
**evenings [1]**   40/10
**everybody [2]**   25/14
 40/14
**everyone [1]**   43/8
**ex [1]**   14/12
**ex parte [1]**   14/12
**excluding [2]**   13/5
 13/5
**exclusion [1]**   12/25
**exclusively [1]**   16/19
**Excuse [2]**   23/1 31/7

**exercise [1]**   27/23
**exhausting [1]**   25/5
**expanding [2]**   10/24
 16/4
**expansion [1]**   27/20
**experts [1]**   43/13
**express [4]**   6/25 14/7
 21/6 22/24
**expressly [2]**   21/18
 51/2
**extended [1]**   41/4
**extension [1]**   8/18

**F**

**face [3]**   34/13 34/13
 34/14
**faces [1]**   27/12
**facilities [7]**
**facing [1]**   20/7
**fact [6]**
**fail [1]**   52/2
**failed [2]**   27/15
 42/10
**failure [3]**   38/16
 42/13 46/6
**faith [4]**   23/24 48/5
 48/16 49/21
**fall [1]**   29/10
**falling [2]**   30/1 44/3
**fast [1]**   48/14
**Fax [6]**
**federal [11]**
**feed [1]**   27/10
**feeder [2]**   15/23
 15/24
**fewer [1]**   9/25
**fiction [1]**   49/3
**fictional [1]**   48/10
**fight [2]**   20/8 20/9
**Figueroa [1]**   3/4
**figures [1]**   48/10
**file [2]**   24/22 25/10
**fill [1]**   17/3
**final [1]**   40/18
**finally [3]**   31/17
 32/21 53/3
**financial [2]**   44/20
 45/5
**finish [1]**   39/12
**finite [1]**   31/19
**firms [1]**   27/6
**five years [6]**
**five-year [1]**   24/12

**F**

floor [4]   2/18 39/24 39/24 39/25
flounder [1]   20/4
floundering [1]   16/21
focus [2]   15/20 37/7
focused [2]   16/18 18/2
folks [5]   14/22 30/4 30/20 48/12 51/11
foot [1]   34/15
footnote [1]   31/10
foregoing [1]   55/6
forest [1]   17/12
forgot [1]   6/18
formality [1]   4/10
format [1]   55/9
former [2]   33/4 35/1
fortunate [1]   26/9
Foundation [2]   3/8 6/11
four years [5]   23/14 30/5 31/15 42/9 42/18
frank [1]   16/21
frankly [3]   18/14 37/13 53/2
freeway [2]   48/20 51/8
freeways [1]   45/9
friends [1]   51/15
front [3]   21/10 21/15 30/12
frustration [1]   40/9
FTC [1]   22/7
fulfill [1]   30/23
funding [2]   20/16 45/5
funds [4]   27/16 40/4 50/1 51/23

**G**

gamesmanship [1] 38/18
gangrene [1]   34/11
General [3]   48/3 49/17 49/19
General Jeff [3]   48/3 49/17 49/19
generation [1]   7/15
gently [1]   39/2
girls [1]   34/6
gives [1]   24/6
gmail.com [2]   1/23

3/15
goal [1]   27/17
goodness [1]   30/15
gosh [1]   52/11
gotten [2]   18/7 52/2
govern [1]   26/24
government [2]   22/7 26/1
governor [2]   31/21 49/15
granted [2]   8/16 8/18
grave [6]
gray [1]   38/24
great [5]   17/9 30/17 33/8 41/9 48/12
greater [1]   15/25
ground [1]   32/3
groups [1]   14/20
grown [1]   31/16
guarantee [1]   10/5
guard [1]   34/7
gunshot [2]   17/5 17/6

**H**

Hahn [9]
Hahn's [1]   36/4
half years [1]   9/24
Hall [1]   2/14
happy [3]   16/9 20/9 20/22
harms [1]   51/25
Hashmall [3]   2/22 5/10 43/7
hats [1]   5/19
health [17]
hearing [13]
here's [1]   4/24
hereby [1]   55/5
high-needs [4]   19/13 19/15 19/19 19/20
highlights [1]   51/12
history [1]   7/25
hitting [2]   50/5 50/6
Hoang [1]   2/13
hold [6]
holding [1]   53/13
home [2]   18/11 44/22
Homekey [1]   18/17
homeless [6]
homelessness [12]
homelessness-related [1]   27/13
Homeowners [1]   26/11

HON [1]   1/4
Honor [41]
Honor's [1]   9/18
honored [1]   5/14
hope [4]   7/8 11/2 39/1 49/9
hopefully [1]   24/5
horned [1]   14/23
Horror [1]   29/4
Horvath [2]   3/19 5/2
hospital [2]   29/24 31/11
hotel [1]   34/22
hours [5]   8/19 8/23 8/24 25/21 25/23
housing [5]   12/22 16/19 16/20 45/3 48/24
huge [2]   25/13 32/2
human [5]   1/6 2/2 4/15 52/18 53/1
humbly [3]   25/22 54/2 54/6
hundreds [2]   43/17 43/17
hypothermia [1]   34/10

**I**

I'd [6]
I'll [14]
I'm [70]
I've [14]
ignore [2]   40/15 40/17
ill [1]   10/20
illness [1]   18/24
image [1]   11/3
imagine [2]   16/1 26/23
immediate [2]   16/15 16/24
immensely [1]   33/7
impaired [1]   51/12
implication [2]   28/20 52/22
implicitly [1]   32/18
implied [1]   52/14
improper [1]   53/16
improve [1]   51/17
improvement [1]   10/18
inaction [1]   29/23
incentivize [1]   44/5
increase [5]   9/19

**I**

increase... [4]    10/1
 14/3 14/18 15/18
increased [1]    49/13
increasing [1]    15/25
incredible [2]    25/23
 33/8
incredibly [2]    14/14
 15/12
incremental [1]    10/18
individual [3]    4/15
 21/21 51/6
individuals [6]
industrial [3]    33/22
 48/6 50/4
inertia [1]    26/5
inhumane [1]    51/17
initially [3]    31/2
 31/3 31/7
Initiative [1]    6/20
instead [1]    30/3
intend [4]    42/5 42/5
 42/7 42/7
intends [1]    46/24
interest [3]    27/25
 51/25 53/17
interfered [1]    23/25
intermeddling [1]
 24/4
interpretation [1]
 52/3
interrupt [1]    32/9
Interveners [5]    11/13
 13/12 14/13 14/21
 36/24
INTERVENOR [2]    3/7
 3/12
Intervenors [5]    5/24
 6/12 6/17 11/22 11/24
Intervenors' [3]    14/6
 14/8 50/20
intervention [1]    9/18
introduce [2]    4/12
 6/18
issue [7]
issues [12]
item [1]    50/18

**J**

Janice [4]    3/18 4/22
 8/2 38/6
January [1]    7/21
January 17th [1]    7/21

**Jeff [3]**    48/3 49/17
 49/19
Jennifer [1]    2/22
job [2]    17/9 48/12
join [3]    6/6 36/7
 38/7
jointly [1]    46/14
joke [2]    32/6 32/10
joking [3]    26/6 35/4
 40/24
Jones [1]    15/14
journey [3]    33/2 33/9
 49/17
judge [12]
Judge André Birotte
 [1]    7/3
Judge Birotte [2]    8/7
 40/9
Judge Carter [2]    4/21
 22/4
judges [2]    26/17
 26/18
judicial [6]
Julian [1]    23/18
jurisdiction [3]
 24/16 27/24 47/8
justify [2]    35/5 35/6

**K**

Karen [1]    8/2
Kathryn [1]    30/16
Kathryn Barger [1]
 30/16
kidding [1]    7/17
kids [1]    35/7
King [2]    2/4 2/8
knowing [1]    26/25
Krekorian [9]
Kwan [1]    3/3

**L**

LA [15]
LA Alliance [5]    4/14
 4/15 18/4 18/6 37/3
LA County [1]    31/12
LaBonge [3]    33/4 48/4
 49/19
lacity.org [2]    2/16
 2/20
lack [6]
lacks [1]    51/22
lafla.org [1]    3/11
LAHSA [1]    34/21
Lai [2]    3/3 5/6

language [4]    37/15
 38/22 39/7 39/9
largely [2]    12/20
 17/12
larger [1]    11/3
LASA [1]    35/3
latitude [1]    24/2
Laughter [2]    6/1 7/16
law [6]
lawsuit [2]    26/4
 26/13
lawsuits [5]    26/15
 26/17 26/22 27/3
 53/14
leaders [1]    43/13
leadership [6]
leg [1]    17/4
legal [3]    3/8 6/11
 53/3
letting [1]    20/19
lifting [1]    53/19
light [4]    8/10 41/14
 41/25 42/5
Lindsey [2]    3/19 5/2
Lindsey Horvath [1]
 5/2
literally [2]    36/9
 48/7
litigating [1]    53/14
litigation [14]
LLP [3]    2/4 2/8 2/23
locked [1]    13/13
locking [1]    9/12
long-term [1]    17/8
LOS [39]
Los Angeles [18]
Los Angeles's [2]
 12/13 12/23
love [1]    49/10

**M**

magnificent [1]    42/11
main [3]    2/14 2/18
 25/7
man [1]    33/20
management [1]    27/13
manner [2]    27/16 47/9
Marcus [2]    2/17 6/3
Martinez [3]    3/23 7/2
 8/7
massive [1]    26/21
master [6]
matches [3]    12/13

**M**

matches... [2]    13/25 14/3
matching [1]    16/22
math [2]    31/1 31/3
Matt [4]    4/11 20/25 42/4 52/1
Matt Umhofer [1]    20/25
matter [12]
matthew [4]    2/7 2/10 4/16 37/5
May 3rd [1]    53/22
May 9th [1]    53/25
mayor [18]
Mayor Bass [7]
Mayor Hahn [1]    5/23
Mayor Karen Bass [1]    8/2
meaningful [1]    39/17
meaningless [1]    42/17
meanwhile [1]    39/24
Measure [2]    16/22 27/9
Measure H [2]    16/22 27/9
measures [1]    51/22
mechanism [1]    46/12
media [1]    41/15
mediation [2]    7/1 7/2
medical [1]    44/20
meeting [6]
meetings [2]    24/1 50/14
member [1]    54/4
members [2]    6/8 7/12
memories [1]    33/8
mental [20]
mentally [2]    10/20 51/12
Mercer [1]    29/17
mhashmall [1]    2/25
Michaelson [2]    3/21 6/3
Michele [5]    3/23 7/2 33/3 33/14 40/10
microphone [2]    15/8 16/12
milestones [2]    25/2 29/8
Miller [2]    2/23 5/10
millerbarondess.com [1]    2/25

million [3]    34/25 45/8 45/12
millions [1]    43/18
millions dollars [1]    43/18
minimum [1]    33/17
minimums [1]    42/2
Mira [3]    2/22 5/10 43/7
Mira Hashmall [2]    5/10 43/7
mission [1]    34/7
mistake [1]    45/13
Mitchell [7]
moment [22]
Monica [1]    3/14
monies [1]    25/4
monitor [1]    28/10
monitoring [5]    8/14 14/24 25/1 28/9 41/19
months [6]
monumental [1]    9/15
morass [1]    52/2
motivate [1]    44/6
MOU [1]    45/8
Mr. [6]
Mr. Councilperson [1]    35/25
Mr. Krekorian [1]    9/5
Mr. LA [1]    33/4
Mr. Marcus [1]    6/3
Mr. Umhofer [2]    26/2 27/5
Ms [1]    11/16
Ms. [7]
Ms. Mitchell [3]    4/11 16/10 26/3
Ms. Myers [1]    16/13
Ms. Sobel [3]    6/15 11/16 15/7
multidisciplinary [1]    44/23
multiple [1]    48/18
multitude [1]    26/15
Municipal [1]    14/17
Myers [4]    3/8 6/10 11/16 16/13

**N**

Nancy [1]    2/13
near [1]    45/9
nearly [2]    29/18 45/8
neglected [1]    48/2

negotiable [1]    30/9
negotiations [1]    11/23
neither [1]    49/15
Network [1]    6/12
newest [2]    4/24 5/2
nice [3]    5/5 5/12 32/24
nine [1]    25/7
Ninth [1]    20/12
Ninth Circuit [1]    20/12
nonability [1]    52/22
none [3]    36/11 38/10 48/24
nonsensical [1]    37/13
nonstop [1]    8/24
North [2]    2/14 2/18
notice [2]    25/10 25/14
noticed [1]    23/25
number [13]
number's [1]    19/14
numbers [4]    19/18 29/9 32/3 49/4
numerous [1]    7/1

**O**

object [1]    14/13
objected [2]    13/12 38/18
obligation [1]    41/21
obligations [7]
observed [1]    17/25
obstacle [1]    24/3
October [2]    7/23 43/20
ODR [1]    29/17
office [7]
offices [1]    34/22
Official [1]    1/21
officially [1]    22/4
officials [5]    22/21 34/16 43/12 45/18 45/19
Oh [1]    19/21
ongoing [1]    14/8
oOo [2]    4/2 54/11
open [4]    8/10 10/9 22/5 44/6
opinion [1]    23/11
opportunities [1]    47/16

**O**

opportunity [1]    50/17
order [1]    35/23
organizations [2]
 12/2 14/21
original [1]    26/8
outpacing [1]    27/15
outreach [3]    44/13
 44/22 47/14
overemphasize [1]
 36/19
oversee [1]    24/16
overseeing [1]    41/16
oversight [9]

**P**

P1I [1]    25/8
page [5]    28/3 29/13
 29/16 31/11 55/9
Page 20 [1]    31/11
Page 4 [1]    28/3
Page 5 [1]    29/13
paragraph [2]    28/14
 42/20
parameter [1]    27/1
part [4]    11/3 11/22
 47/20 52/14
parte [1]    14/12
participate [1]    14/22
participated [1]    8/8
participating [1]
 21/2
participation [1]    6/7
parties [24]
parties' [1]    53/18
partner [1]    19/10
party [3]    25/9 25/9
 25/10
Pastor [1]    34/2
Pastor Q [1]    34/2
patches [1]    17/19
paths [1]    40/19
patience [1]    54/7
Paul [5]    3/20 5/22
 8/3 9/4 48/20
pay [4]    30/7 30/7
 33/1 49/19
peeve [1]    43/5
people [13]
perfect [3]    13/25
 20/19 35/15
period [1]    41/4
permanent [2]    16/19

 16/20
persistent [1]    36/12
person [1]    48/13
perspective [4]    20/14
 20/15 20/17 34/24
pertains [1]    25/6
pet [1]    43/5
Pete [2]    32/24 34/1
Pete White [1]    34/1
phone [1]    54/3
phraseology [1]    50/4
picture [3]    29/4 34/9
 34/12
pictures [4]    7/18
 32/21 33/7 34/5
piece [2]    37/7 46/18
pieces [1]    37/10
place [1]    18/19
placements [1]    47/16
PLAINTIFF [5]    2/2
 4/11 45/12 45/20
 47/14
Plaintiff's [1]    53/21
Plaintiffs [10]
Plaintiffs' [1]    23/2
plan [1]    21/24
pleasure [9]
pledges [1]    42/8
point [13]
police [1]    49/18
policy [1]    27/25
political [4]    13/22
 14/20 14/25 15/1
politician [1]    31/22
politicians [2]    24/13
 38/10
pools [2]    15/23 15/25
population [3]    12/25
 29/20 31/16
portrayed [1]    28/7
position [2]    14/6
 22/21
positions [1]    5/25
post [1]    29/24
post-hospital [1]
 29/24
potentially [2]    35/12
 44/3
poverty [1]    35/6
power [8]
powers [2]    38/25 52/5
praise [1]    26/3
precludes [1]    26/15

preemptor [1]    49/6
prejudice [2]    23/2
 46/15
prescribed [1]    47/9
presence [1]    12/1
present [5]    3/17 8/3
 8/7 12/17 35/21
president [11]
President Biden [1]
 7/6
President Krekorian
 [3]    12/9 13/9 36/1
President of [1]    5/15
President Paul [1]
 8/3
PRESIDING [1]    1/4
press [4]    7/12 13/19
 30/20 33/18
pressure [1]    18/9
principals [1]    22/17
private [5]    8/6 15/19
 28/6 28/8 53/5
privately [1]    38/19
problem [10]
problems [1]    29/23
procedural [1]    52/2
Procedure [1]    23/4
Procedure 41 [1]    23/4
procedures [2]    14/24
 25/8
proceedings [6]
process [11]
productive [1]    40/21
program [1]    24/2
progress [8]
project [3]    18/17
 18/17 30/2
Project Homekey [1]
 18/17
projects [6]
promise [4]    32/7 32/8
 35/23 43/2
proper [1]    23/5
property [1]    45/2
proposal [7]
Proposal 2A [1]    21/14
proposed [9]
protected [1]    27/2
providers [3]    20/5
 44/6 44/17
provision [4]    39/11
 39/11 39/15 46/11
provisions [4]    37/22

**P**

provisions... [3]
40/14 47/17 47/18
public [26]
public's [2]   50/13
50/21
publicly [2]   38/19
47/21
published [1]   50/16
pull [3]   15/7 29/11
29/15
pulled [2]   14/11
28/14
purchase [1]   41/24
purposes [1]   9/1
pursuant [5]   8/1 23/3
46/16 47/22 55/5
push [4]   19/25 38/2
41/10 42/1
pushed [1]   38/2
pushing [1]   53/12
puzzle [1]   46/18

**Q**

quarterly [2]   24/23
24/25
question [9]
questions [4]   15/4
20/23 23/7 27/13
quit [1]   52/25
quote [6]

**R**

rabbit [1]   17/1
raise [1]   50/3
raised [1]   26/2
rate [1]   15/25
RCFEs [2]   10/4 10/8
re [1]   16/23
re-divert [1]   16/23
reach [3]   40/3 42/13
53/9
reached [1]   45/11
reaching [2]   44/18
54/3
ready [1]   19/10
reality [4]   12/23
13/15 14/10 14/14
recently [1]   36/9
recess [5]   29/10
35/16 35/18 35/19
54/9
recognize [4]   4/20

32/25 53/6 53/9
recognized [1]   6/9
recognizes [1]   50/11
recognizing [1]   9/3
record [11]
recording [1]   7/18
recreational [1]
26/12
reduce [1]   51/16
reduction [1]   19/17
referenced [2]   41/18
45/23
reflect [1]   11/10
reflected [1]   29/20
reflects [1]   9/16
regular [1]   47/22
regulations [1]   55/10
reinstating [1]   53/19
reintroduce [1]   43/3
reiterate [3]   36/17
46/16 46/17
relation [1]   8/13
relationship [4]   9/11
9/16 10/16 24/4
remarkable [1]   15/14
remedy [2]   25/12
25/18
remind [1]   29/14
Remove [1]   34/13
Renee [1]   3/8
report [4]   24/25
29/24 31/9 47/21
Reporter [2]   1/21
55/16
REPORTER'S [1]   1/14
reporting [4]   24/21
37/13 46/1 47/17
reports [4]   24/22
30/1 30/2 50/9
representations [2]
25/2 32/16
representative [1]
9/4
representatives [1]
49/22
request [5]   8/18
25/11 46/17 46/22
46/22
requested [4]   7/20
8/6 8/16 46/15
requirement [1]   50/17
rescue [1]   34/6
reservations [1]

35/15
residential [2]   29/7
44/2
residents [1]   20/6
resolution [2]   25/6
25/7
resolvable [2]   16/2
16/3
resources [13]
Respectfully [1]
47/11
respective [2]   11/14
49/22
response [1]   14/2
rest [2]   18/3 19/12
restate [1]   37/22
result [1]   27/18
retain [1]   47/7
return [1]   7/20
review [1]   8/12
rights [4]   1/6 2/2
4/15 50/16
rising [1]   32/3
riverbed [1]   33/8
road [1]   20/12
robust [1]   47/12
Rocky [1]   29/4
room [3]   2/14 2/18
43/9
Roomkey [1]   18/17
roundtable [1]   15/22
Row [2]   32/23 48/24
Rule [1]   23/3
ruling [1]   53/3

**S**

Sacramento [1]   21/1
safe [1]   44/15
safeguard [1]   51/18
sakes [1]   30/15
salary [1]   35/8
Santa [1]   3/14
sat [1]   50/10
satisfactory [1]
51/13
satisfied [3]   9/7
9/10 39/9
scenes [1]   33/6
scheduling [1]   53/24
school [1]   34/7
Scott [1]   2/17
scott.marcus [1]   2/20
searches [1]   7/11

S

SEC [1]   22/7
second [4]   22/15 33/19 48/19 53/22
secretly [1]   33/5
section [6]
Section A2 [2]   21/9 21/23
Section D [1]   39/16
security [1]   7/9
seek [1]   23/2
seniors [1]   45/10
sense [3]   26/8 27/2 28/21
serious [1]   29/25
seriously [1]   10/20
serves [1]   27/9
service [3]   12/2 20/5 48/14
services [9]
settle [5]   28/17 35/14 40/8 52/15 52/22
settlement [61]
settlements [1]   11/23
settles [2]   26/13 27/3
seven [1]   26/17
severe [1]   30/20
severely [1]   51/12
shall [3]   24/9 24/16 24/22
shame [2]   52/16 52/23
Shayla [2]   3/8 6/10
Shayla Myers [1]   6/10
shelter [6]
shelters [1]   44/17
Sherin [2]   29/12 29/17
shine [3]   41/14 41/25 42/5
shivering [1]   34/10
shoe [1]   14/23
shoe-horned [1]   14/23
short [1]   29/10
shortage [1]   31/11
shorthand [1]   44/1
shoulder [1]   32/15
sick [1]   17/2
side [4]   22/13 38/7 44/14 44/14
sideways [1]   22/21
sign [10]

sign-ups [1]   48/17
signal [1]   49/20
signature [2]   38/9 49/6
signatures [3]   22/22 38/10 38/15
signed [7]
situation [1]   19/23
six months [1]   20/3
Skid [2]   32/23 48/24
Skid Row [1]   32/23
slice [1]   36/17
small [2]   11/2 46/17
smyers [1]   3/11
Sobel [6]
social [1]   44/9
society [1]   36/18
solution [1]   27/15
solve [9]
solved [2]   14/5 43/10
solving [1]   16/14
somebody's [1]   21/9
someplace [1]   37/24
sorts [2]   13/22 14/19
South [1]   3/4
speakers [1]   36/16
special [6]
Special Master Martinez [1]   8/7
specific [1]   50/18
speed [1]   16/18
spend [1]   48/9
spending [2]   32/2 41/7
spent [6]
spins [1]   16/25
spread [2]   26/22 27/9
staff [2]   21/13 35/8
stand [3]   45/15 45/15 45/21
standard [1]   12/20
standing [1]   10/19
stark [1]   23/20
Stars [1]   2/23
state [3]   8/1 9/13 50/9
stated [5]   23/11 27/8 27/25 38/18 47/10
statement [2]   30/18 30/19
states [5]   1/1 35/2 50/24 55/6 55/10
stay [2]   44/6 53/19

stenographically [1]   55/7
step [3]   18/1 20/22 38/19
stepped [3]   18/12 19/8 43/22
stepping [2]   17/9 17/23
stipulation [1]   53/18
stood [2]   18/16 18/18
strategies [1]   14/18
street [11]
streets [4]   19/24 50/5 50/6 51/18
strenuously [1]   13/12
stress [3]   28/7 36/4 36/15
struggling [1]   13/1
stunned [1]   22/16
subacute [3]   29/18 29/19 29/21
submitted [3]   7/23 8/20 46/23
Subsection [2]   39/10 39/10
Subsection 11 [1]   39/10
Subsection 2 [1]   39/10
subsidies [1]   43/25
subsidy [1]   29/7
substance [10]
substantial [1]   51/13
subtlety [1]   52/6
success [2]   32/1 49/16
successes [1]   47/21
successful [1]   26/20
successor [1]   32/20
sufficient [6]
sufficiently [1]   11/4
suggesting [1]   16/2
suggests [1]   29/18
Suite [5]   2/4 2/8 2/23 3/4 3/14
supervisor [6]
Supervisor Janice Hahn [1]   4/22
supervisors [8]
supervisors' [1]   10/23
support [4]   39/18 41/21 47/13 47/16

**S**

supporting [1]    44/10
supportive [3]    16/19
 16/20 49/10
surgeon's [1]    17/4

**T**

table [4]    11/25 12/2
 17/4 52/24
taxes [1]    49/13
taxpayers [1]    28/20
teams [6]
tending [1]    10/8
term [1]    17/8
terms [20]
terrific [1]    34/19
thank [25]
thanks [1]    9/18
The's [1]    51/2
thin [1]    27/9
thorn [1]    38/7
thoroughly [1]    8/23
thought [1]    34/14
thoughts [1]    50/3
thousand [4]    9/24
 43/24 47/14 52/11
threat [2]    15/15
 52/14
three years [1]    20/11
throw [4]    19/11 34/23
 34/24 49/4
Thursday [2]    1/16 4/1
thus [1]    31/20
till [1]    7/10
time [20]
times [6]
tiny [1]    36/17
Title [1]    55/6
today's [1]    9/2
Todoroff [2]    3/22
 6/19
Tom [5]    33/4 33/5
 33/10 48/4 49/19
Tom LaBonge [2]    33/4
 48/4
toss [1]    34/18
tossing [1]    49/3
totality [1]    19/23
tough [2]    27/12 35/13
traced [1]    7/25
trailers [1]    26/12
transcript [4]    1/14
 9/2 55/7 55/9

transformative [3]
 10/17 11/9 11/10
transparency [12]
transparently [2]
 23/16 40/5
treasurer [1]    50/9
treat [1]    17/4
treating [1]    17/5
trees [1]    17/13
trend [1]    10/7
tribute [2]    33/1
 49/19
trust [7]
trusts [1]    23/24
truth [2]    43/9 43/14
Tuesday [1]    12/7
turning [1]    26/21
turtle [1]    16/18
twice [1]    35/3
two days [1]    8/19
two weeks [1]    53/22
typical [1]    45/18

**U**

U.S [2]    1/21 55/16
ultimately [2]    18/4
 18/6
Umhofer [8]
umklaw.com [2]    2/6
 2/10
unacceptable [1]
 29/22
uncertainty [1]    29/22
undeniable [2]    43/9
 43/14
understanding [2]
 7/14 22/2
unequivocally [1]
 50/24
unhoused [2]    14/21
 15/19
uninterrupted [1]
 43/2
unique [1]    22/11
UNITED [4]    1/1 35/2
 55/6 55/10
unless [1]    24/3
unlicensed [2]    19/15
 19/20
unmet [1]    29/19
unquote [1]    23/6
unsaid [1]    36/13
unsuccessful [1]    39/6

ups [1]    48/17
us [6]
utilize [1]    27/16

**V**

Venice [1]    26/11
vice [1]    5/3
violation [1]    24/4
voice [1]    40/5
vote [2]    22/14 49/13
vouchers [2]    10/2
 10/13
vs [1]    1/8

**W**

wage [1]    35/6
Wai [1]    3/3
Wai-Kwan [1]    3/3
waived [1]    7/10
walk [2]    18/22 33/25
walking [1]    34/10
watch [2]    48/11 48/24
watched [1]    48/7
watching [2]    20/4
 53/11
we'd [1]    34/14
weapons [1]    7/11
wearing [1]    5/19
Wednesday [1]    12/5
welcome [5]    6/6 6/22
 7/13 7/19 9/20
Wellesley [1]    48/10
West [2]    1/22 26/24
WESTERN [1]    1/3
where's [1]    31/19
White [2]    32/24 34/1
who'd [1]    46/2
who's [4]    7/2 34/1
 41/16 41/19
whoever's [1]    4/19
Wil [3]    1/21 4/7
 55/15
wil.wilcox [1]    1/23
Wilcox [2]    1/21 55/15
Wild [1]    26/24
will make [1]    9/2
willing [2]    11/24
 35/14
Wilshire [2]    2/4 2/8
window [1]    19/11
wise [2]    33/10 33/20
withdraw [1]    28/18
wonder [1]    34/18
wonderful [1]    35/7

**W**

**wondering [1]**   32/4
**WORKER [2]**   3/7 6/13
**world [1]**   32/8
**worried [1]**   26/21
**worse [1]**   32/4
**worst [1]**   31/24
**wound [2]**   17/5 17/6
**wraparound [1]**   44/8

**Y**

**you'd [3]**   23/18 24/18
 37/4