# EXHIBIT 2

EXHIBIT 2 - Page 32



# DEPARTMENT OF MENTAL HEALTH
## hope. recovery. wellbeing.

**JONATHAN E. SHERIN, M.D., Ph.D.**
Director

**Gregory C. Polk, M.P.A.**
Chief Deputy Director

**Curley L. Bonds, M.D.**
Chief Medical Officer

**Lisa H. Wong, Psy.D.**
Senior Deputy Director

July 3, 2021

TO:      Supervisor Hilda L. Solis, Chair
Supervisor Holly J. Mitchell
Supervisor Sheila Kuehl
Supervisor Janice Hahn
Supervisor Kathryn Barger

FROM:   Jonathan E. Sherin, M.D., Ph.D.
Director

SUBJECT:  **REPORT RESPONSE ON DISRUPTING THE CYCLE OF CHRONIC HOMELESSNESS-DMH HOMELESS OUTREACH AND MOBILE ENGAGEMENT (HOME) TEAM PILOT (ITEM 12, AGENDA OF JUNE 23, 2020)**

## Purpose

On June 23, 2020, the Board of Supervisors (Board) directed the Department of Mental Health (DMH) to provide a preliminary report back on progress related to the motion "Disrupting the Cycle of Chronic Homelessness-DMH Homeless Outreach and Mobile Engagement (HOME) Team" on October 9, 2020, and a final report on July 1, 2021. The motion allowed for the creation of a targeted and recovery-centered pathway to facilitate conservatorship proceedings on an outpatient basis. The aim of DMH's pilot project is to provide treatment, housing, and support for unsheltered residents of Los Angeles County (County) who suffer with serious mental illness.

## Background

On September 10, 2019, the Board approved the directives set forth in the motion, "Disrupting the Cycle of Chronic Homelessness in Los Angeles County." The motion directed County departments to re-examine the County's immediate ability, through treatment interventions, to disrupt the inhumane cycle of chronic homelessness, incarceration, and hospitalization of individuals suffering from serious mental illness.

**EXHIBIT 2 - Page 33**

Each Supervisor
July 3, 2021
Page 2

As part of this effort, DMH proposed a pilot project to engage and provide treatment interventions to people experiencing homelessness and living with serious mental illness through its eight HOME teams.  Strategically placed throughout the County, the HOME teams are multidisciplinary treatment teams that include Mental Health Psychiatrists, Mental Health Counselors, Psychiatric Nurses, Psychiatric Social Workers, Substance Abuse Counselors, Medical Case Workers, and Peers.  All staff are field-based and provide intensive outreach and engagement as well as access to various resources including treatment and housing.

In October 2020, DMH submitted the preliminary report, "Report Response Disrupting The Cycle of Chronic Homelessness-DMH Homeless Outreach and Mobile Engagement (Home) Team Pilot (Item 12, Agenda of June 23, 2020)."  The preliminary report provided an update on the progress of implementing the HOME Outpatient Conservatorship pilot, including successes and challenges identified along the way.  The following final report will discuss the outcomes of the pilot program to date and recommendations for next steps.

**Implementation Update**

The HOME Outpatient Conservatorship pilot period ended on June 30, 2021.  Over the course of the pilot implementation (June 23, 2020-June 30, 2021), the pilot committee established two pathways for clients engaged with HOME to receive court-appointed guardian support.  The two methods include HOME's collaboration solely with the Office of the Public Guardian (OPG) and those in which HOME and OPG collaborate with acute hospitals.

Pathway 1:  Outpatient – HOME team refers for conservatorship investigation, provides a testifying psychiatrist and facilitates placement.

Pathway 2:  Co-Pilot – HOME or hospital psychiatrist refers for conservatorship investigation; HOME psychiatrist testifies in conservatorship proceedings; and HOME team facilitates placement.

In addition to the above pathways, referrals were submitted through the traditional in- patient process, which may include HOME involvement.

Traditional:  Hospital psychiatrist refers for conservatorship investigation and testifies in the conservatorship proceedings; hospital or HOME facilities placement depending on level of care; and HOME remains engaged with client in the event conservatorship is not established or conservatorship terminates at a future date.

EXHIBIT 2 - Page 34

Each Supervisor
July 3, 2021
Page 3

While the preliminary plan was to initiate one petition in each supervisorial district, there was a clear need for this level of care beyond the established target number. From July 29, 2020, to June 30, 2021, 41 individuals were presented to the Outpatient Conservatorship pilot committee for consideration; 31 were accepted. Nine individuals were determined to be inappropriate for the pilot for the following reasons:

1. Did not meet gravely disabled (GD) criteria (1);
2. Accepted full service partnership (FSP) services (3);
3. Ordered to Assisted Outpatient Services (AOT) (1);
4. More appropriate for probate conservatorship (1);
5. Ordered to restoration training after being deemed incompetent to stand trial (due to mental illness) for a misdemeanor offense (1);
6. Unable to locate (1); and
7. Individual's medical vs. mental health status has yet to be determined (1).

A total of 14 conservators were appointed: 12 OPG, and two family members. Nine additional petitions have been filed and are pending court hearings. For additional details on client demographics and pilot pathways, see Appendix A.

**Continue outreaching, engaging and providing treatment interventions as well as other resources as indicated to people experiencing homelessness who are seriously mentally ill within the community.**

The HOME team continues to engage in treatment interventions for persons with severe mental illness in concert with the larger Countywide Homeless Outreach Strategy E6 teams. Services include mental health assessment, intensive case management, rehabilitation, medication support, psychiatric nursing, substance abuse interventions, and crisis intervention. Since the implementation of the pilot, HOME has identified potential candidates through direct outreach and engagement attempts, referrals from E6 generalist teams and additional referrals from community partners. To aide care coordination, HOME developed a new referral protocol to better align with the program's revised mission and pilot population (i.e. individuals with severe mental illness and associated functional impairment). Training on the HOME target population and referral procedures was provided to E6 outreach teams and will be revisited bi-annually during the Countywide Street Outreach training. Since the start of the pandemic, HOME has also been involved in the provision of triage services in multiple interim housing sites directly related to the LA Alliance settlement agreement.

**EXHIBIT 2 - Page 35**

Each Supervisor
July 3, 2021
Page 4

**Apply for Lanterman-Petris-Short (LPS) Act temporary conservatorship and/or LPS conservatorship outside the hospital for those homeless individuals considered gravely disabled and living in the streets and to continue their engagement after the individual is placed on a hold.**

Over the course of the pilot period, the committee deemed 16 candidates appropriate to initiate the investigation for conservatorship on an outpatient basis. These individuals presented to the committee were unwilling and/or unable to accept assistance with their basic needs of food, clothing, or shelter. A subset of these individuals had no observable physical health condition warranting emergency/acute inpatient treatment and were able to complete the entire process without hospitalization. Some required short-term psychiatric hospitalization, and HOME continued engagement after they were placed on a hold. Of these individuals, 11 conservators (OPG) were appointed by the court (with 4 cases contested), 2 accepted treatment on a voluntary basis, 1 did not meet GD criteria, and there are 2 cases with court hearings pending. Five of the individuals for whom a conservator was appointed were housed in sub-acute or adult residential care settings; one required acute stabilization before long term placement could be coordinated. Six cases are pending (includes contested cases), with placement to be determined.

**Consult with inpatient treatment teams caring for individuals experiencing homelessness for whom an LPS conservatorship has been filed in the hospital in order to assist that inpatient treatment team in determining whether or not the patient must continue his/her inpatient stay while the conservatorship process is initiated.**

The second level of pilot participants were individuals where the HOME team collaborated with an acute psychiatric facility to initiate a referral to the OPG. These individuals required acute stabilization, and in many cases, had physical health problems requiring medical attention. HOME provided evidentiary testimony in court proceedings and assisted with transfers to lower levels of care after an LPS conservator was appointed, thereby preventing extended hospital stays. There were 15 individuals identified for the pilot who met these criteria. Of these, 10 conservators were appointed (8 OPG and 2 family members). Six of the 10 conservatees were transferred to sub-acute or residential care settings subsequent to conservator appointment and four are awaiting transfer. All remain housed, engaged in treatment, and the OPG has established (or is establishing) necessary financial and medical benefits. Of the remaining 5, 2 conservatorships were contested, and 1 case was dismissed. The remaining 2 are awaiting their initial hearing dates.

**EXHIBIT 2 - Page 36**

Each Supervisor
July 3, 2021
Page 5

**Summary Findings**

Overall, the pilot project presented a success for HOME and the OPG, in that the respective programs were able to successfully intervene, mitigate suffering, and provide care for some of the most vulnerable and impaired residents of Los Angeles County.  The effort clearly demonstrated that there are multiple pathways to compel mental health treatment when deemed appropriate and that in some cases, while it may be necessary to require treatment, it is not a forgone conclusion that locked placement of any type (i.e., acute or sub-acute) is necessary to achieve this end.  Further, the pilot illustrated the power of collaboration when our internal and external partners engage in a targeted fashion.

Multiple assets were harnessed to make the outpatient conservatorship pilot project successful.  To scale up the pilot, the following resources need to be acquired, maintained and/or expanded:

- Additional staff members for HOME and OPG;
- Alternative strategies to engage when hospitalization is warranted;
- Access to street medicine, including mobile laboratory capability;
- Access to court hearings and public defender via WebEx (e.g., for proposed pilot clients who are unable, due to their mental health conditions, to participate in the court process through technology or in person);
- Increased FSP capacity; and
- Increased placement opportunities for persons with serious mental illness (SMI):
  - Subacute beds;
  - Subacute + Skilled Nursing;
  - Enriched Residential Services (ERS);
  - Adult Residential Facilities (ARF);
  - Permanent Supportive Housing (PSH); and
  - Interim Housing.

**Need to Address Significant Staff Shortages and Ongoing Funding**

Funded by Mental Health Services Act (MHSA) one-time funds, HOME is comprised of nine multi-disciplinary teams across the County, totaling 131 staff.  The program has recently experienced increased demands for staff time and resources to provide outreach, engagement and triage services in approximately 300 interim housing sites, intensive homeless encampment interventions, and other special projects assigned secondary to the LA Alliance lawsuit.  While multi-disciplinary in design, throughout the pilot period HOME had only one dedicated psychiatrist for the entire County, and due to funding challenges and an inability to request hiring exemptions for these critical positions, the program has 29 vacancies that cannot be filled at this time.  Psychiatrists play a critical

**EXHIBIT 2 - Page 37**

Each Supervisor
July 3, 2021
Page 6

role in the initiation of OPG investigation and throughout the conservatorship proceedings. All HOME staff are key in engagement, assessment, treatment, and placement of persons with SMI. In the absence of ongoing funding and staffing expansion, HOME is unable to sustain or scale the pilot while attending to its primary mission and responding to increased demands for service. The pilot has demonstrated that initiation of an outpatient conservatorship for one individual requires extensive labor and staff time for intensive interventions, planning, court appearances, and follow-up.

OPG continues to experience high deputy public guardian vacancy rates that cannot be filled due to a lack of ongoing funding and corresponding inability to request hiring exemptions for these critical positions. OPG is funded by realignment and County General Fund monies. No additional funds have been allocated to expand operations. The number of investigations that can be performed by OPG will be limited to the investigation capacity of the currently assigned deputy. Demands for investigations will likely increase, and as more conservatorships are established, appointed caseloads will increase. Expansion of the program will be dependent on OPG's ability to fill vacant positions at the newly reclassified levels in the Deputy Public Guardian series.

**Maintain weekly outpatient conservatorship case conferencing group to create and facilitate robust collaborations with a high degree of accountability across sectors (outreach, hospital, law enforcement, housing) and produce rapid responses to solve client care challenges.**

Closely related to the issue of staff shortages and program consistency is the need to replicate the multi-sector weekly outpatient conservatorship case conference group across the service areas. This group has been a critical component to pilot implementation. Continuing or scaling the outpatient conservatorship model would require ongoing weekly discussions with key team members central to collaboration and problem solving client, logistic and resource challenges. At present, the coordination meeting consists of a significant number of key partners/leaders (See Appendix on Partnerships) to address issues of assessment, investigation, placement (acute, sub-acute, other), medical transports, public safety, testimony, and medical concerns, etc. Sustaining the pilot even in a conservative fashion will require staffing increases for HOME and OPG. Below is the recommended staffing pattern for conservative sustainability of the work performed in the HOME pilot:

### Office of the Public Guardian
- 3 Case Investigators;
- 2 Case Management Deputies; and
- 1 County Counsel.

**EXHIBIT 2 - Page 38**

Each Supervisor
July 3, 2021
Page 7

**Homeless Outreach and Mobile Engagement**
- 4 Psychiatrists;
- 2 Registered Nurses; and
- 3 Psychiatric Social Workers.

The proposed staffing pattern does not include requisite support staff to carry out the administrative functions associated with the added workload on these divisions.

**Alternative Strategies to Engage When Hospitalization is Warranted**

A particular area of difficulty during the pilot period, with the HOME program and other intensive psychiatric teams in general, is how to support the transport of individuals who are in need of involuntary treatment secondary to a LPS 5150 or conservatorship powers, when the identified individual is resistant to transport. At this time, the HOME team staff have no formal training for hands on intervention when an individual is unwilling to get on a medical gurney. One consideration would be to explore appropriate training for HOME team staff in this area and/or to integrate suitable non-clinical staff into the HOME staffing pattern specifically for this purpose. HOME and OPG are also engaging County Counsel and our law enforcement partners to identify strategies that will permit the engagement of law enforcement in the process.

**Need to Establish Medical Partnerships**

Due to the prevalence of complex medical issues, there is a definitive need for medical partnerships and procedures to obtain appropriate medical care and/or clearance (e.g., COVID testing, chest x-ray, blood work, etc.). These partnerships are necessary in outpatient clinics, hospital emergency rooms, and field settings. During the pilot period, HOME engaged the street medicine resources and County hospital emergency rooms. Should this type of intervention continue, it would be beneficial to establish formal agreements to work together on such cases and/or to establish similar mobile health capacity dedicated to the HOME teams.

For additional details on the importance of specialized staffing and cross-sector partnerships to serve these complex clients (see Appendix B).

**Alternative Methods For Court Proceedings Or Engagement W/Public Defender**

One of the most unique challenges faced by the pilot committee was that of navigating court appearances and/or client meetings with their Public Defenders. The pandemic presented unprecedented and welcomed opportunities in this area. Due to the need for social distancing, mental health court proceedings were conducted via WebEx video

**EXHIBIT 2 - Page 39**

Each Supervisor
July 3, 2021
Page 8

conferencing.  We were fortunate in that the vast majority of trials were decided by the mental health judge, with one jury trial pending. Conducting court hearings and interactions with Public Defenders for persons experiencing homelessness with severe impairments related to psychosis requires creativity and flexibility on the part of all members of the judicial system.  The ability to utilize video conferencing for this population increased access to court proceedings and the same is true for access to Public Defenders.  Should HOME and OPG continue with outpatient investigations, a formal protocol and/or agreements with the court and the Public Defender to maintain, and/or establish standardized procedures for video conferencing and/or field visits or other creative strategies for this unique population is strongly recommended.

For additional details on the challenges presented by mental health court processes (see Appendix C).

## Need for Increased Capacity in Full Service Partnership (FSP) Programs

One of the stated objectives of the pilot project is to have the HOME team transition the prospective conservatee to a dedicated psychiatric treatment team.  We anticipate that many of the clients presented to the pilot project will be appropriate for FSP; however, demand for this level of care outweighs program capacity at this time.  Should HOME and OPG continue with outpatient conservatorships beyond the pilot period, it would be essential to expand FSP capacity to ensure adequate care and continuity following conservator appointments.

## Need to Identify and Reserve Appropriate Housing

Once the temporary conservatorship petition is approved by the court, or when the permanent conservatorship is appointed, we must have accessible and appropriate housing opportunities for all conservatees.  Since every case is different, there would need to be a broad range of housing resources available, including non-acute treatment beds (both locked and unlocked), residential care, permanent supportive housing, and when appropriate for transitional periods, interim housing that has the capacity to work with this client population.

For additional details on the housing needs and gaps experienced by individuals served by the pilot (see Appendix D).

## Successes

While time and staff intensive, the Outpatient Conservatorship pilot has demonstrated that pursuit of a conservatorship outside of an inpatient hospital setting is possible.  The pilot has shown that some cases can be done completely on the streets on an outpatient

**EXHIBIT 2 - Page 40**

Each Supervisor
July 3, 2021
Page 9

basis.  The pilot has been instrumental in bringing some of our legal entity providers to the table to assist in the placement of clients.  Their flexibility and willingness to engage clients when only temporary powers of conservatorship exist has been critical to our ability to move clients from hospital settings, rather than having them languish waiting for the conservatorship process to be completed.

Client outcomes have been dramatic.  Clients homeless for years are now housed and in treatment.  In some cases, reunification with family was accomplished.

The use of the HOME team psychiatrist to testify in the LPS court hearings has proven to be very effective.  Through months of engagement and continued involvement with the client during their hospital and temporary conservatorship status, testimony has been strengthened and has put OPG and County Counsel in a better position to prove these cases beyond a reasonable doubt.

## **Challenges**

As stated above, the court process for obtaining a conservatorship has been challenging. This pilot project recognizes the critical need to ensure anyone considered for conservatorship is afforded their right to counsel and participation in the court process. For clients resistant to all attempts of engagement, treatment or housing services, voluntarily participating in the court process is not likely.  Conservatorship cases established from an inpatient setting are naturally set up for participation in court – the client is in an acute locked setting and can be brought to court either through technology or via medical transport.  Unfortunately, there is no similar contained manner to compel participation in the LPS court process in an outpatient setting, but failure to ensure participation can result in a conservatorship petition being dismissed.

The time and effort to coordinate the outreach, engagement, conservatorship process (including court appearances), as well as placement efforts, has been greater than originally planned. The pilot project has demonstrated the critical function of the psychiatrist in order for the process to be successful while street psychiatry remains a relatively new specialization.  DMH would benefit from added resources to train, recruit, and hire psychiatrists who are prepared and motivated to do this work.

By far, the most pressing need concerning the lifesaving work done during the outpatient conservatorship pilot is identification of continued funding for HOME, OPG, appropriate housing, and longitudinal care required for this vulnerable population.  If approved, the recent state budget request submitted by Senator Henry Stern will allocate $100 million to support 1,000 HOME/OPG clients over a 3-year period.   While not ongoing, this budget addition will provide a runway for LA County to ramp up this innovative care first approach for homeless individuals impaired with severe mental illness.

**EXHIBIT 2 - Page 41**

Each Supervisor
July 3, 2021
Page 10


If you have any questions, please contact La Tina Jackson, Deputy Director, at (818) 610-6717 or ljackson@dmh.lacounty.gov.

JES:CB:LJ:CD:jl

Attachments

c:  Executive Office, Board of Supervisors
    Chief Executive Office

**EXHIBIT 2 - Page 42**



**DMH+UCLA Public Mental Health Partnership**

### Appendix A: Outpatient Conservatorship Pilot Partnerships

The Outpatient Conservatorship Pilot relied on partnerships with 43 providers to render individualized services for the program's vulnerable and complex individuals.

**5** Partners



***Street Teams, Medical Cinics, Urgent Care Centers***

*Downtown Mental Health, Exodus Urgent Care Center, Keck Street Medicine, LA Christian, Saban Clinic*

**Outpatient Medical Clearance**

**4** Partners



***Hospital ERs***

*Cedar Sinai, Harbor UCLA, LAC + USC, Olive View Medical Center*

**Hospital Medical Clearance**

**9** Partners

***In-Patient Hospitalization***

*Augustus Hawkins, College Hospital, Gateways, Harbor UCLA, LAC + USC, Las Encinas, Olive View Medical Center, UCLA, West LA VA*

**Acute Stabilization**

**2** Partners

***Crisis Residential, Physicatric Health Facilities***

*Exodus CRTP, Exodus PHF*

**Temporary Stepdown Facilities**

**6** Partners

***Mental Health Rehabilitation Centers, Skilled Nursing Facilities (Special Treatment Program)***

*Colonial Care Center, Community Care Center, La Paz Gerosychiatric Center, Laurel Park IMD, Meadowbrook BHC, Olive Vista BHC*

**Subacute Facilities**

**9** Partners

***Enriched Residential Services, Enriched Residential Care***

*Bay Breeze B&C, Beverly Hills Senior Care, Normandie Village, Parkview B&C, Percy Village, Reese B&C, Rosecrans Villa, Sunland Manor, Wilshire Vista Manor*

**Enriched Residential Facilities**

**3** Partners

***Permanent Supportive Housing, Motels***

*Arlington Apartments, Project Room Key, Various Motels*

**Unlicensed Facilities**

**6** Partners



***Emergency Services***

*Los Angeles Fire Department (LAFD); Los Angeles Police Depatment (LAPD): Hollywood, Metro, Santa Monica; Sheriff RAMP: Bellflower, Altadena*

**Law Enforcement Teams**

 **UCLA**

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 43**



**DMH + UCLA Public Mental Health Partnership**

### Appendix B: The Outpatient Conservatorship Pilot Client Demographics & Pathways

---

**Key Takeaways**

- The Pilot committee discussed 41 individuals, referred 32 for conservatorship, petitioned 29, and conserved 17 as of May 31, 2021.
- Black Angelenos are overrepresented in LA County's homeless population and among individuals served by the Pilot.
- The Pilot was successful in prioritizing highly vulnerable individuals unable to meet their basic needs.

---

First, we outline the number of clients the Outpatient Conservatorship Pilot Committee processed between July 1, 2020 – May 31, 2021. Second, we describe the client demographics and supervisorial districts in which these individuals were located. Third, we illustrate the vulnerability of the clients supported by the Outpatient Conservatorship Pilot through a validated and reliable measure, the Vulnerability Assessment Tool (VAT). Last, we conclude with case studies illustrating the various pilot pathways.

## I.    Total clients processed through the Outpatient Conservatorship Pilot and its various pathways

The Outpatient Conservatorship Pilot exceeded its initial goal of exploring 1 individual from each of the 5 Los Angeles County Supervisorial Districts for outpatient LPS conservatorship. Between July 1, 2020 – May 31, 2021, the Outpatient Conservatorship Pilot Committee discussed 41 total individuals for potential referral to the Office of Public Guardian (OPG) for Lanterman-Petris-Short (LPS) Conservatorship.

Of these 41 individuals, 32 were referred to OPG for investigation, 29 met criteria and had petitions for conservatorship filed, and as of May 31, 2020, 17 individuals were conserved through three (3) different pathways.

Nine individuals were conserved *via* the Co-Pilot pathway, in which the client was seen by a HOME Team

```
NUMBER DISCUSSED = 41
    │
    │──────────→  NOT REFERRED = 9
    ↓
NUMBER REFERRED = 32
    │
    │──────────→  NOT RECOMMENDED = 3
    │             - Did not meet criteria: 1
    │             - Engaged in voluntary care: 2
    ↓
NUMBER PETITIONED = 29
    │
    │──────────→  NUMBER DISMISSED = 1
    │──────────→  NUMBER PENDING = 11
    ↓
NUMBER CONSERVED = 17
- Co-pilot: 9
- Outpatient: 7
- Traditional: 1
```

psychiatrist in the community and hospitalized for grave disability. From the hospital,



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 44**



**DMH + UCLA Public Mental Health Partnership**

either HOME or the hospital referred the client to OPG for investigation. The HOME team psychiatrist testified in Mental Health Court and facilitated client placement.

Seven individuals were conserved *via* the Outpatient pathway, in which the client was seen and referred by a HOME team psychiatrist in the community. The HOME team psychiatrist testified in Mental Health Court and facilitated client placement.

One individual was conserved *via* the Traditional pathway, in which the client was a client of the HOME team, but not actively under the care of a HOME team psychiatrist. The HOME team facilitated a hospitalization, and the hospital referred the client to OPG for investigation. The hospital psychiatrist testified in Mental Health Court and facilitated client placement.

## II.    Client Demographics: Race, Gender, and Age

Black or African American individuals are markedly overrepresented among individuals experiencing homelessness in Los Angeles County, a trend mirrored and increasingly so in the Outpatient Conservatorship Pilot. According to the 2020 Greater Los Angeles Homeless Count, 7.9% of the Los Angeles County population are Black or African American, yet Black or African Americans represent 33.7% of the homeless population. In the Outpatient Conservatorship Pilot, Black or African Americans represented 41% of the clients discussed (n=17).

Males are also over-represented in the Los Angeles County homeless population, and the Outpatient Conservatorship Pilot saw a similar trend. According to the latest census data, Males are 49.3% of the population in Los Angeles County, but were 67.2% of the homeless population, and 66% of the Outpatient Conservatorship Pilot clients discussed.







pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**EXHIBIT 2 - Page 45**



**DMH + UCLA Public Mental Health Partnership**



**Age Breakdown**
N=41

- 75-84: 2%
- 65-74: 15%
- 55-64: 17%
- 45-54: 15%
- 35-44: 27%
- 25-34: 24%

### III.    The Vulnerability of Clients Supported by the Outpatient Conservatorship Pilot

The Outpatient Conservatorship Pilot utilized a valid and reliable rating scale to measure the relative vulnerability of individuals experiencing homelessness, the Vulnerability Assessment Tool (VAT; Ginzler & DeVita, 2010). The VAT:

- Includes 10 domains measuring functioning, health, and other specific characteristics relevant to personal safety.
- Scores fall into 3 categories, the higher the score, the more vulnerable an individual is to continued instability:
  - VAT score under 22 indicates a "less vulnerable individual"
  - VAT score between 23 - 28 indicates a "moderately vulnerable individual"
  - VAT score above 29 indicates a "highly vulnerable individual"
- Scores indicate risk of victimization, self-harm, morbidity and mortality due to inability to meet basic needs and to progress without substantial support.

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 46**

## DMH+UCLA Public Mental Health Partnership



The average score of those assessed by the VAT was 33, with 86% falling into the VAT criteria for "highly vulnerable individual."

The pilot referred the more vulnerable individuals through its various pathways.

The Co-pilot pathway facilitated the most vulnerable clients given their need for initial and immediate hospitalization for acute reasons.

Key VAT domains of severe challenge included Meeting Basic Needs, Mental Health, Survival Skills, Organization/Orientation, and Social Behaviors.



In addition to a diagnosis of a psychotic disorder (e.g., schizophrenia, schizoaffective disorder), individuals presented to the Outpatient Conservatorship Pilot Committee frequently demonstrated:

- Co-occurring substance use, e.g., Methamphetamines, Alcohol, Nicotine, Marijuana, Opioids
- Severe, persistent, or life-threatening physical health conditions, e.g., HIV, Extremity Infections & Gangrene, Atrial Fibrillation, Wheelchair-Dependence, Traumatic Brain Injury, Pulmonary Embolism

### IV.    Client Case Studies Illustrating the Various Outpatient Conservatorship Pilot Pathways

We review 4 cases. First, an individual who was discussed for the Outpatient Conservatorship Pilot then engaged in voluntary care. Second, an individual who was conserved completely from the community via the Outpatient pathway. Third, an



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

Public Partnership for Wellbeing

**EXHIBIT 2 - Page 47**

**DMH + UCLA** Public Mental Health Partnership

individual who was hospitalized and conserved via the Co-pilot pathway. Last, an individual who was hospitalized and conserved via the Traditional pathway.

**Case Study 1: Client was Discussed by Outpatient Conservatorship Pilot Committee, Made Progress, and Decided to Stay in the Community until Housed.**

| Refer | Clinical | Legal | Placement |
|---|---|---|---|
| 40-year-old female diagnosed with Schizophrenia with an extensive in-patient mental health history. Found nestled in a bundle of blankets by a 7-11, aggressive, denying services, and often robbed. | HOME Team anticipated requiring hospitalization, but client engaged in street psychiatry and outpatient medical clearance. HOME Team linked client to housing resources. | Client presented to Outpatient Conservatorship Committee on 8/25/20, referred to OPG for conservatorship on 9/16/20, and LPS conservatorship was not recommended on 11/20/21 based on clinical progress. | Client was matched to permanent supportive housing Arlington Apartments on 11/10/21. Client was offered interim housing, but she elected to stay in the community with HOME team support until her move-in date on 4/26/21. |

**Case Study 2: Client was Conserved from the Community *via* the Outpatient Pathway in 2.5 Weeks.**

| Refer | Clinical | Legal | Placement |
|---|---|---|---|
| 66-year-old male diagnosed with Schizophrenia was found in DTLA surrounded by trash and rotten food. Client was trapped by his delusions and hallucinations: the buildings told him he could not leave. | Client was open to oral and injectable medication but was still gravely disabled despite intervention. Client engaged in outpatient medical clearance and received a new medical diagnosis: Atrial Fibrillation. | Client was presented to Outpatient Conservatorship Committee and referred to OPG on 1/26/21. Temporary conservatorship was signed on 2/3/21, client was conserved on 2/16/21 with Power 12 for his medical condition. | Client was recommended for Enriched Residential Services and placed temporarily in Project Room Key while waiting for placement. Client moved into his facility on 2/8/21. |



Public Partnership for Wellbeing

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**EXHIBIT 2 - Page 48**



**DMH+UCLA** Public Mental Health Partnership

**Case Study 3: Client was Rescued from Vehicle, Hospitalized, Reunited with Family, and Conserved *via* the Co-Pilot Pathway in 3 Weeks.**

| Refer | Clinical | Legal | Placement |
|---|---|---|---|
| 40-year-old female diagnosed with Schizoaffective Bipolar Type has been psychotic, paranoid, and experiencing vehicular homelessness. Client was found non-responsive in van, surrounded by feces and granola bars. | Client was broken out of her car in partnership with LAFD, medically cleared at Cedar Sinai, Transferred to Las Encinas where she was engaged in in-patient treatment. | Client was presented to Outpatient Conservatorship Committee on 1/19/21 and referred to OPG on 1/22/21. Temporary conservatorship was signed on 1/27/21, client was conserved on 2/16/21. Client family serves as private conservator. | Client was recommended for locked setting and was placed on 2/12/21. |

**Case Study 4: Client was Hospitalized, Connected to VA Benefits, and Conserved *via* the Traditional Pathway.**

| Refer | Clinical | Legal | Placement |
|---|---|---|---|
| 62-year-old female diagnosed with Psychotic Disorder has been delusional, depressed, and lived at a supermarket parking lot. Client's leg demonstrated significant swelling but refused examination. | Client refused mental, physical, and housing services. Hospitalized at Harbor UCLA on 10/20/20, discovered service history 11/6/20, connected to Veteran Affairs 11/17/20, transferred to West LA VA 11/18/20. | Client was presented to Outpatient Conservatorship Committee on 10/13/20 and referred to OPG on 1/22/21. Temporary conservatorship was signed on 12/10/20, client was conserved on 12/29/20. | Client was recommended for locked setting and was placed on 2/22/21. |

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

Public Partnership for Wellbeing

**EXHIBIT 2 - Page 49**



**DMH+UCLA Public Mental Health Partnership**

**Appendix C: Importance of Specialized Staffing and Cross-Sector Partnerships**

---

**Key Takeaways**

- Outpatient conservatorship requires specialized staffing given clients' severe impairment due to a mental illness.
- Dedicated HOME psychiatrists are needed to identify gravely disabled individuals, stabilize clients using street treatment, effect a 5150 hold when indicated, testify and participate in Mental Health Court processes, and minimize time in acute settings.
- Outpatient conservatorship requires support from street medicine and from law enforcement or other personnel authorized to physically assist individuals in unsafe situations.

---

Regarding the need of specialized staffing to continue and support the Outpatient Conservatorship Pilot, we first outline client characteristics to illustrate their complex needs. Second, we review the unique impact of dedicated HOME Team psychiatrists. Third, we describe the need for increased hands-on support by law enforcement or other authorized personnel. Lasty, we share team input on the need for increased street medicine partnerships.

## I.    Client Characteristics Require Specialized Staffing

Clients presented to the Outpatient Conservatorship Pilot Committee experienced severe and enduring risks to their health and safety due to mental health conditions. Follow-up interviews with clients conserved through the pilot, occurring an average of 150 days after presentation to the Outpatient Conservatorship Pilot Committee, demonstrated that these individuals' inability to care for basic needs persisted.

- All clients interviewed (n=5) gave reports of their life while unsheltered that did not reconcile with reality
    - "I always lived with my grandma." [Interviewer: I thought you were sleeping on the street when you were at Hollywood and Vine. Is that right?] "No." (P01)
    - [You were living on the streets, right?] "I was living in a hotel, but I was just kicking … that day on the street and the psychiatrist took a picture," resulting in conservatorship. (P08)
- All clients lacked an ability to acknowledge physical health dangers experienced while unsheltered
    - [The fact that your legs had gotten so bad is one of the reasons that you came into the medical center.] "Well, yeah, they were afraid of infection. They didn't want to be infected with what I was infected. But I think I was all right." (P09)
    - [*Client had a gangrenous leg wound*] [So, did you have a wound? Was it in your leg? You had an infection. Is that right?] "No." [No. That's wrong?



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 50**



**DMH+UCLA Public Mental Health Partnership**

No, you didn't have a wound?] "No." [No problem or pain?] "No." [Was there anything on your leg?] "No." (P01)

- All clients' beliefs persisted despite months of treatment
    - o "I'm in the Marine Corps." [Interviewer: You're a Marine now?] "As a General." [Wow.] "They were bringing the battleships in and they came and seen me. They found out I'm General for the Marine Corps with the FBI, II-FBI….So I flew with them from Gladys Park, Los Angeles." (P06)

These clients' cognitive challenges were pervasive and enduring despite months of treatment. This indicates that they could not have been persuaded to access services or housing voluntarily while unsheltered.

Given these clients' complex needs, three staffing and partnership issues substantially impacted implementation of the Outcome Conservatorship pilot: HOME psychiatrists, law enforcement, and street medicine services.

## II.    HOME Psychiatrists

Street psychiatry improved the efficiency and effectiveness of the Outpatient Conservatorship pilot. For instance, HOME teams that worked with a dedicated HOME psychiatrist were better able to identify individuals that the Outpatient Conservatorship Pilot Committee agreed needed referral for conservatorship.

- Among clients seen by a HOME team with a dedicated psychiatrist (n=25), 100% of those presented to the Outpatient Conservatorship Pilot Committee were referred
- Among clients seen by a HOME team without a dedicated psychiatrist (n=16), 44% of those presented to the Outpatient Conservatorship Pilot Committee were referred

In addition, clients served by a HOME team with a dedicated psychiatrist experienced a much more rapid disposition. The presence of a HOME psychiatrist shortened the time between presentation to the Outpatient Conservatorship Pilot Committee and referral for conservatorship by five-fold.

LOS ANGELES COUNTY **DEPARTMENT OF MENTAL HEALTH** hope. recovery. wellbeing.    **UCLA**    pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 51**



**DMH + UCLA Public Mental Health Partnership**



Mental Health Court requires testimony by a psychiatrist. Street psychiatrists also facilitated court processes by representing the client's baseline.

*One of the things that happens in conservatorship court is if the client can give a plan that makes sense, often this judge will say, 'Well, they have a plan. I'm not going to conserve.' But [a HOME psychiatrist] is out there all the time and he sees that the client can give you a wonderful plan and has no ability or interest in carrying out that plan at all …. any of the doctors from HOME who are going to be testifying, they are out there witnessing it and they can say, 'We've heard Jane talk about this plan for the past six months and Jane has not moved from this spot.' (ID18)*

Engagement by street psychiatry lessened the time required in locked acute settings.

*[The pilot process] probably shaves off ... about three weeks off the hospitalization … [The hospital] received a patient who's already been evaluated … and we're halfway through the conservatorship with a court date that's perhaps one or two weeks later. So that … shortens the length of stay. In addition, it probably saves the hospital staff maybe a couple of hours of court time. (ID29)*

In addition to streamlining access to needed conservatorship, street psychiatry supported all clients while unsheltered. The ability to stabilize was seen as a benefit:

*Stabilization is the big one. [As a result of the pilot], they assign a field psychiatrist, a very rare thing, to be able to maybe even do medication stabilization in the field, which is huge. (ID13)*



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 52**



**DMH+UCLA Public Mental Health Partnership**

Street psychiatry also facilitated management of crises.

*Having a psychiatrist gives a more robust background if and when you have to do an involuntary psychiatric hold, compared to a police officer or compared to the social worker. It's just the reality of how it is.* (ID13)

### III.    Law Enforcement or Similarly Authorized Partner

Staff participating in the pilot described the need for a partner able to physically assist a vulnerable individual out of an unsafe situation, such as by assisting the individual onto a gurney to be transported for urgently needed services.

*I can't deescalate or put my hands on a client that is dying and needs help, which is what we need law enforcement to do in the least—not to hurt anybody, but to get them on the gurney.* (ID17)

*We really do need police assistance. We don't need a severe use of force, but we do need them to put hands on to help us get them to the gurney …. even getting those folks to court without any assistance from law enforcement is going to be very, very difficult.* (ID18)

*She refused to get on the gurney. And we stood there for hours with PD trying to convince her to get on the gurney. No one was willing to put hands on her to help her get on the gurney … And it wasn't until a week later … that the SMART team … was able to and put the hold in place and get her transported to the hospital.* (ID10)

### IV.    Street Medicine Partnerships

Pilot staff believed it should be possible to obtain needed medical clearance while an individual was one the street.

*Can we get labs on the streets instead of having to take the person to some place? Do we really need to send them through the hospital route even if it just means the ER for medical clearance?* (ID02)

To access needed medical care, some outreach teams developed new partnerships, with variable success.

*[Pilot staff have had to] approach outpatient clinics to get some of the nursing interventions done, and there's sometimes resistance because outpatient nurses feel like, "Well, this isn't our patient. Why are we doing this?" So, I think that we have to get more staffing resources dedicated for it to be sustainable.* (ID24)

Pilot partners for outpatient medical clearance have included Downtown Mental Health, Exodus Urgent Care Center, Keck Street Medicine, LA Cristian, and Saban Clinic.



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**EXHIBIT 2 - Page 53**



## DMH+UCLA Public Mental Health Partnership

**Appendix D: Challenges Presented by Mental Health Court Processes during the Outpatient Conservatorship Pilot**

---

**Key Takeaways**

- Outpatient conservatorship requires the continued availability of tele-testimony to meet the needs of unsheltered gravely disabled individuals.
- Inflexibility of Mental Health Court practices and court delays in responding to urgent situations are at odds with the needs of unsheltered gravely disabled individuals.

---

First, we describe the learning and progress in collaboration with Mental Health Court. Second, we narrate the persistent challenges in collaboration with Mental Health Court.

## I.    Learning and Progress in Collaboration with Mental Health Court

The Outpatient Conservatorship Pilot Committee succeeded in implementing a critical tool to facilitate court processes: the use of WebEx tele-testimony for unsheltered individuals.





Mental Health Court established stringent requirements for the use of tele-testimony, including separate devices for each participant, an external microphone, and adequate framing of persons such that they are in full view of the court. Links to the court proceeding were to be provided to and accessed only by parties involved.



> *"The week of the hearing we actually had somebody from our Central Information Office Bureau come out to kind of set up a mock tripod and laptop and audio just to improve the hearing, because in our first trial with him the audio was really poor and the court and Public Defender were very concerned about that. So we were able to do that."* (ID14)

Tele-testimony obviates the need for compelling transport to court, enables clients to participate in court processes from the community, and provides the best opportunity for clients to access advocacy that can protect their rights.

Outpatient Conservatorship Pilot Committee and HOME team members learned a tremendous amount about Mental Health Court processes as a result of the pilot. Areas of learning included:

### A.  Lanterman-Petris-Short (LPS) Conservatorship process as a whole
- LPS conservatorship eligibility, timeline, powers, and services
- Probate conservatorship eligibility, timeline, powers, and services



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 54**



**DMH + UCLA Public Mental Health Partnership**

- Temporary vs. permanent LPS conservatorship processes
- Capacity or Riese hearings and powers
- Tensions between due process and best interest views in court proceedings
- The so-called "black robe" effect and its occasional influence on client care

**B. Rules of evidence and hearsay**
- Cross examination and appeal processes
- Role of psychiatrists as sole LPS legal experts
- Processes for case preparation by the HOME psychiatrist for purposes of testimony in initial hearings, writ hearings, limited submission hearings, and other proceedings
- The role of court-appointed doctors in the conservatorship process
- Supplemental testimony guidelines for use by HOME social workers and outreach workers

**C. Powers and limitations of the conservatorship process**
- Management of conservatorship for individuals without documentation
- Process of establishing benefits for conserved individuals
- Management of medical conditions for conserved individuals

> *The holy trinity of the pilot is the HOME Team with street psychiatry, Public Guardian with County Counsel, and ICD combined with the Housing and Job Division. So you have the legal piece, you have the treatment piece and you have the placement piece, which is a beautiful collaboration which I'm surprised that it's happening so late. But to have these open lines of communication with these three departments is great because everybody is at the table and you can get stuff happening really, really quickly.* (ID03)

## II.   Persistent Challenges in Collaborating with Mental Health Court

Despite the innovations introduced to the court process such as tele-testimony, in several other ways Mental Health Court did not adjust to meet the needs of those it served.

41% percent of individuals presented to the Outpatient Conservatorship Pilot Committee were Black, and 66% percent were people of color. This finding indicates the intersection of decades of well-documented disproportionate impacts on communities of color in Los Angeles of a lack of equitable access to housing, employment, justice, and physical and mental health services.

Many Outpatient Conservatorship Pilot Committee members and staff indicated that the complicated and slow mental health court processes were particularly inappropriate to the needs of their clients and presented the most intransigent challenges, further disadvantaging this vulnerable group.



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 55**

**DMH + UCLA Public Mental Health Partnership**

Court processes were described as the primary obstacle to effective implementation of the aims of the Pilot. Court inflexibility, delays, and lack of familiarity with the fact that unsheltered individuals with severe mental illness cannot routinely access emergency services.

> *It feels like a lot of the obstacles that we encounter are that the courts are unwilling to be flexible.* (ID14)

> *As DMH is attempting ... to make conservatorship more accessible ... the mental health court is pulling in the other direction. [Over my career], it's never been more difficult to initiate a conservatorship through the mental health court ... it used to take the hospitals – from filing an application to a conservatorship verdict – it used to be very consistently three weeks. Now it's very consistently seven to nine weeks.* (ID29)

### A. Working with Mental Health Court Staff

Pilot committee members and staff described the inflexibility of the court and its personnel as sharply contrasting with the HOME philosophy of meeting clients "where they are at." For instance, the Public Defenders do not typically go to see clients in hospitals or on the street. Simultaneously, transportation to attend court proceedings was not made available to unsheltered individuals. This undermined client protections.

> *Now that someone [going through the conservatorship process] is on the streets, how do we connect them to those entities that will help them protect their constitutional rights?* (ID02)

> *When they're in the hospital they get transported to court and they meet their Public Defender in court .... And then how do we actually get a client to court if we have to get them to court? It's one thing if they're in an acute hospital and the hospital personnel takes them. It's another thing to try and get cooperation, or even compliance, with someone who is chronically homeless.* (ID02)

> *The pivot that we have to do now ... is to reach out to the Public Defender's office and say this is the nature of the population that we work with so can we ... it a standard that the Public Defender goes in the field with the team or that the Public Defender is willing to engage with the client, their client, over webcam?* (ID28)

In another case, pilot staff suspected their calls were not being returned because a client had changed his mind and wanted to enter a submission for conservatorship.

### B. Delays

Rather than expedite pilot cases as emergencies, delays were common. They occurred for a variety of reasons. Court proceedings could be pushed forward by at least 1-2 months per occurrence.

1. ***In order to await evaluation by a court-appointed doctor.***
   Time from initial hearing to court trial due to client contestation: 64 days



pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 56**



## DMH+UCLA Public Mental Health Partnership

Request by Public Defender for evaluation by court-appointed doctor: 69 days

2. ***In response to a client declining to engage in hearings or trials.***
   Time from initial hearing to court trial: 62 days
   Continuation ordered due to client declination to engage: 70 days

3. ***If clients contest the conservatorship.***
   Time from initial hearing to conservatorship trial in case of contestation: average 52 days (range: 29 – 70 days)

4. ***In response to a client's jury trial request.***
   Time from initial hearing to jury trial: 136 days

Sometimes, Outpatient Conservatorship Pilot Committee members and staff suspected that delays were motivated to minimize the need for conservatorship:

> *Public defenders are generally of the belief that if they just delay – their goal is to avoid conservatorship, is to preserve self-determination of their clients – they believe that if they just delay, then their clients will have a longer period of treatment in the hospital and improve to the point where conservatorship possibly is no longer [available].* (ID29)

Other times, pilot committee members and staff believed delays were tolerated because Mental Health Court staff assumed hospitals were available to keep clients safe while their cases progressed, though hospital resources were difficult or impossible for pilot clients to access.

### C. Mental Health Experience and Training

Pilot staff also suspected that Mental Health Court staff lacked direct and sustained experience working with individuals with the severe cognitive and functional impairments of individuals experiencing grave disability.

- Mental Health Court expectations included that clients express comprehension of the choice between complex court proceedings like a hearing *versus* a trial.
  - Yet many clients served by the Outpatient Conservatorship pilot did not acknowledge they were homeless or denied the presence of a life-threatening infection
- Mental Health Court expectations included that the client be served documents and communicate preferences to a Public Defender.
  - Yet clients did not believe they had a mental illness, could not communicate (i.e., catatonia), or held delusional beliefs (e.g., a member of special military forces)

LOS ANGELES COUNTY DEPARTMENT OF MENTAL HEALTH
hope. recovery. wellbeing.    UCLA

Public Partnership for Wellbeing

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

EXHIBIT 2 - Page 57



**DMH+UCLA Public Mental Health Partnership**

Some clients with severe impairments in insight and self-care were unable to be referred for conservatorship due to strict requirements by Mental Health Court, which included previous use of mental health services.

*One of the people that we have referred, due to severe mental illness, he's very stuck in his way of thinking and not accepting anything. I do think he's in this category of folks that we should be targeting. However, he hasn't debilitated to the point where they feel that he, the court, would not grant the conservatorship. So we're having to essentially wait until he gets a little bit more in the range of who we can conserve .... [it is] like watching a plant slowly wilt, right? It's not dead but it's going to slowly wilt and you're watching this happen and you have to wait.* (ID15)

*We're going to re-present that case [previously declined by pilot committee] and somebody needs to give me a better understanding of why [the case could not be referred for conservatorship] because this person doesn't have something built up in IBHIS, we're just going to let him languish on the streets. That's not good enough* (ID05)

pmhp@mednet.ucla.edu
https://pmhp.ucla.edu

**Public Partnership for Wellbeing**

**EXHIBIT 2 - Page 58**