# EXHIBIT 36

**EXHIBIT 36 - Page 1529**





**EXECUTIVE OFFICE**

BOARD OF SUPERVISORS
**COUNTY OF LOS ANGELES**

# Blue Ribbon Commission on Homelessness Governance Report

## Adopted March 30, 2022

  

**EXHIBIT 36 - Page 1530**



March 30, 2022

Dear Supervisors,

As a result of the growing humanitarian crisis of homelessness and related systemic dysfunction, the Los Angeles County Board of Supervisors established the Blue Ribbon Commission on Homelessness (BRCH) on July 27, 2021. Recognizing a difference of opinions, our mission was to conduct a comprehensive study of LAHSA's governance structure by reviewing existing reports and prior recommendations, as well as thoroughly identifying and analyzing the challenges inherent in the existing system as a whole. Our goal was to provide a factually compelling report and actionable recommendations reflecting the urgency for refined governance models that can deliver improved and accelerated results incorporating the diverse needs of the region, its 88 cities, and the unincorporated areas of the County.

We are thankful for the opportunity to co-chair the BRCH. Our diverse Commissioners represented the County, the Contract Cities Association, and Councils of Governments. They included current and former elected officials, service providers, and current LAHSA Commissioners.

Over the past six months—through an extensive series of meetings, presentations, interviews, and listening sessions—we received testimony from hundreds of individuals representing cities, Councils of Government, County departments, unincorporated jurisdictions, school districts, faith-based organizations, persons with lived expertise, service providers, subject matter experts, homeless service systems leaders from around the nation, and authors of prior governance reports reviewing the current system's strengths and weaknesses. The BRCH took great care to ensure that the underrepresented voices of the Black, Latinx, LGBTQI+, foster youth, and senior communities were heard.

Repeatedly and overwhelmingly, we heard from stakeholders who want reform and demand immediate action. Based on the clear and urgent need for systems change, following months of deliberation and discussion, the BRCH unanimously approved the following seven (7) recommendations:

1. Create a County entity and identify a leader that can unify the work product of various agencies and eliminate existing silos to create a more transparent and effective response that fully incorporates mainstream systems.

2. Renew and re-start relationships with cities and Councils of Government by establishing a multi-year local solutions fund available for jurisdictions that will commit to providing in-kind or matching contributions for the development of service programs and/or housing.

3. Streamline LAHSA by re-focusing the authority back on its primary role as lead of the Greater Los Angeles Continuum of Care (CoC), and transition away from providing direct services in order for the above-recommended County entity to coordinate immediate access to direct services. In the interim, maintain the current number of seats on the LAHSA Commission but change who sits in them (e.g., County department heads, those with lived expertise, Councils of Governments, or city representatives).

**EXHIBIT 36 - Page 1531**

**4** Simplify CoC governance into one cohesive board by beginning the process to consolidate the LAHSA Commission, CoC Board, and Coordinated Entry System Policy Council into a single decision-making entity.

**5** Improve LAHSA's operations immediately by, among other recommendations, embedding an "Ops Team" to maximize LAHSA's internal effectiveness.

**6** Demand data and metrics excellence by requiring data sharing between cities, the County, and LAHSA. Define and implement metrics of success, track equity goals, and establish tools for accountability. Develop formulas for tracking, in a more comprehensive manner, Measure H funding and other funds supporting people experiencing homelessness.

**7** Establish an executive-level action team to drive urgently needed reforms, discuss issues of common interest, and facilitate data development and sharing.

As the economic hardships of the pandemic and global health crisis continue to challenge our region with a disproportionate impact on our most vulnerable, we continue to see an increase in the number of people experiencing homelessness. This growth cannot be ignored. The status quo is no longer acceptable.

We, representing the collective voices of those who presented to the BRCH or were interviewed by Commission staff, endorse a necessary restructuring that focuses on simplification, urgency, and equity in order to save individuals' and families' lives. These recommendations are supported by those voices. We believe their implementation will advance the goal of ending homelessness, as well as create a more equitable, inclusive, transparent, and accountable system.

We thank our fellow Commissioners for the unique expertise and background each brought to this process as well as for their commitment to the mission. With our work completed, we strongly encourage the Board of Supervisors to embrace and promptly act upon these recommendations, set big goals for ending homelessness, and instill accountability at all levels of engagement to achieve them.

With gratitude,

Sarah Dusseault
Christian Horvath
Co-Chairs, Blue Ribbon Commission on Homelessness

**EXHIBIT 36 - Page 1532**

## Commissioners

**Sarah Dusseault**

*Co-Chair, Appointed by County Supervisor Hilda Solis, First District*

**Christian Horvath**

*Co-Chair, Appointed by Councils of Government*

**LaCheryl Porter**

*Appointed by County Supervisor Holly J. Mitchell, Second District*

**Wendy Greuel**

*Appointed by County Supervisor Sheila Kuehl, Third District*

**Vanessa Sedano**

*Appointed by County Supervisor Janice Hahn, Fourth District*

**Theane Evangelis, Esq.**

*Appointed by County Supervisor Kathryn Barger, Fifth District*

**Marcel Rodarte**

*Appointed by Contract Cities Association*

**Becky A. Shevlin**

*Appointed by Councils of Government*

## Staff

**Mary C. Wickham, Esq.**

*Blue Ribbon Commission on Homelessness, Executive Director*

**Amie S. Park, Esq.**

*Blue Ribbon Commission on Homelessness, Deputy Executive Director*

**Phyllis Marshall, Esq.**

*Chief Legislative Counsel, Office of County Counsel*

**Brandon D. Young, Esq.**

*Manatt, Phelps & Phillips, LLP*

**EXHIBIT 36 - Page 1533**



# A Roadmap to Reading Our Report

There is a voluminous amount of information in the space that surrounds homelessness and the governance of our homeless services delivery system. Our Report reflects the breadth of analysis, commentary, and information brought before our Commission. Given this, below is a roadmap of how our Report is organized to orient the reader.

**1** The **Executive Summary** synthesizes, at a high level, how we approached fact-finding, the Key Concerns that arose from our proceedings, and after months of deliberations, the unanimously approved Recommendations that we submit for consideration and action by the Board of Supervisors. The Executive Summary begins at *page 3* of this Report.

**2** Appended to the Executive Summary, we provide a more **detailed overview** of the **Key Concerns** raised before the Blue Ribbon Commission on Homelessness (BRCH), supported by the voices that best represent those concerns, as well as a more detailed overview of the **Recommendations** in this Report. Key Concerns begin at Addendum A of the Executive Summary, starting at *page 8* of this Report. Our detailed Recommendations begin at Addendum B of the Executive Summary, starting at *page 13* of this Report.

**3** In Recommendation Briefs Nos. 1-7, we lay out a **specific and actionable path forward for each recommendation**, identifying: (i) the voices of our stakeholders; (ii) the concerns that they expressed; (iii) our specific and actionable recommendations for consideration by the Board of Supervisors; and (iv) an initial implementation framework for those recommendations selected by the Board of Supervisors.  Our Recommendation Briefs provide commentary and background for each of the recommendations but may not necessarily reflect the opinion of any particular Commissioner. The Recommendation Briefs start at *page 29* of the Report.

**4** The Report includes three reference attachments, collecting relevant correspondence from the City of Los Angeles; a cross-reference guide comparing the Board's July 27, 2021 Motion creating the Blue Ribbon Commission on Homelessness with the due diligence and fact-finding process conducted by the Commission; and a summary of selected federal and state laws and other legislative developments relating to people experiencing homelessness. These attachments start at *page 76* of the Report.

**EXHIBIT 36 - Page 1534**

# Acknowledgments

We would like to acknowledge the following stakeholders, many of whom lent their voices to this Report. In addition to the individuals and organizations identified below, we would like to express our gratitude to the County's Chief Executive Office, the Executive Office of the Board of Supervisors and its Commission Services staff, the Office of County Counsel, the various County departments that worked with our Commission, and the Los Angeles Homeless Services Authority and its executive staff, without whose support this effort would not have been realized. We also thank the members of the public who participated in our proceedings and others throughout the Greater Los Angeles region, who shared their insights and expertise with the Blue Ribbon Commission on Homelessness.

## I. Community Organizations and Service Providers

### 1. Alliance for Children's Rights

Sarah Clifton, Esq., Transition Age Youth (TAY) Program Manager

Sarah Manimalethu, Esq., Senior Policy Attorney

### 2. Ascencia

Laura Duncan, Executive Director

Camille Guerrero, Director of Development

### 3. Bridge to Home

Peggy Edwards, Board Member

Mike Foley, Former Executive Director

### 4. Downtown Women's Center

Amy Turk, Chief Executive Officer

### 5. Faith Collaborative to End Homelessness

Steven Yu, Co-Chair

Allyson Crosby, Co-Chair

Dan Davidson, Lead Pastor

Amara Ononiwu, Member

### 6. Family Promise of Santa Clarita

Dr. Roché Vermaak, Executive Director

### 7. Foothill Unity Center

Tashera Taylor, Chief Executive Officer

Raina Martinez, Chief Development Officer

Julie Swayze, Capital Campaign Manager

Nan Lee, Grant Writer/Consultant

### 8. Harbor Interfaith Services

Shari Weaver, Director of the Coordinated Entry System

### 9. Helpline Youth Counseling

Jeff Farber, Executive Director

Cristina Ramirez, Director of Homeless Services

### 10. Hollywood 4WRD

Kerry Morrison, Board Member

Brittney Weissman, Executive Director

### 11. Hope of the Valley

Ken Craft, President, Founder and Chief Executive Officer

### 12. HOPICS

Veronica Lewis, Director

### 13. Imagine L.A.

Jill Bauman, President, Founder and Chief Executive Officer

### 14. Laundry Truck LA

Angelica Naccarati, Program Manager

### 15. LA Family Housing

Stephanie Klasky-Gamer, President and Chief Executive Officer

Kris Freed, Chief Programs Officer

### 16. LA Voice

Beatriz Sandoval, Community Organizer

### 17. Los Angeles LGBT Center

Kris Nameth, Director of Programs

Lisa Phillips, LMFT Director of Youth Services

Kiera Pollock, LCSW, Director of Senior Services

### 18. McCarty Memorial Christian Church

Pastor Eddie Anderson, Head Pastor

### 19. Mental Health of America of Los Angeles

Christina Miller, Ph.D., President and Chief Executive Officer

### 20. National Alliance to End Homelessness

Jerry Jones, National Field Director

### 21. Neighborhood Legal Services of Los Angeles County

Yvonne E. Mariajimenez, Esq., President and Chief Executive Officer

### 22. PATH

Jennifer Hark Dietz, Chief Executive Officer

### 23. Penny Lane Centers

Maura Johnson, Director of Housing

### 24. The People Concern

John Maceri, Chief Executive Officer

**EXHIBIT 36 - Page 1535**

### 25. Public Counsel

Rachel Stein, Esq., Supervising Staff Attorney, Children's Rights

### 26. Samuel Dixon Family Health Center

Philip Solomon, Chief Executive Officer

### 27. SCHARP

Jack Barbour, M.D., Chief Executive Officer

### 28. The Shower of Hope

Mel Tillekeratne, Executive Director and Co-Founder

### 29. St. James Episcopal Church

Margaret Ecker, RN, MS, Lead Volunteer, St. James Soup Kitchen and Shower Project

### 30. St. Joseph Center

Va Lecia Adams, President and Chief Executive Officer

### 31. St. Margaret's Center Catholic Charities

Mary Agnes Erlandson, Center Director Catholic Charities of LA
Jonathan Said, Homeless Services Manager

### 32. Sycamores

Samuel G. Gonzales, M.A. LMFT, Vice President, Business Development

### 33. Union Station Homeless Services

Anne Miskey, Chief Executive Officer

Shawn Morrissey, Senior Director of Advocacy and Community Engagement

Alexis Boothby, Chief Program Officer and Director of Adult Services

Sarah Hoppmeyer, Director of Supportive Housing and Youth Coordinator

Raji Shivshanker, Director of Outreach and Access

### 34. Upward Bound House

Christine Glasco, President and Chief Executive Officer

### 35. Volunteers of America Los Angeles

Reggie Clark, Program Manager

### 36. Weingart Center

Senator Kevin Murray (Ret.), President and Chief Executive Officer

### 37. Wellnest LA

Charlene Dimas-Peinado, President and Chief Executive Officer

### 38. Whole Child

Constanza Pachon, Chief Executive Officer

## II. City of Los Angeles

### 39. Office of Councilmember Bob Blumenfield, District Three

Councilmember Bob Blumenfield
Jenny Portillo, Deputy District Director
Semee Park, Senior Legislative Deputy

### 40. Office of Councilmember Nithya Raman, District Four

Councilmember Nithya Raman
Sarah Tanberg, Senior Homelessness Deputy
Josh Nuni, Legislative Director

### 41. Office of Council District Ten

Karly Katona, Chief of Staff and Care Taker
Dhakshike Wickrema, Senior Deputy for Homelessness and Housing

### 42. Office of the Chief Legislative Analyst

John Wickham, Legislative Analyst

## III. County of Los Angeles Authorities, Commissions, and Departments

### 43. First Supervisorial District, Supervisor Hilda Solis

Cindy Chen, J.D., Chief of Staff
Daniella Urbina, Housing and Homelessness Deputy

### 44. Second Supervisorial District, Supervisor Holly Mitchell

Fredericka McGee, Esq., Chief of Staff
Isela Gracian, Senior Deputy, Homelessness and Housing

### 45. Third Supervisorial District, Supervisor Sheila Kuehl

Lisa Mandel, Esq., Chief of Staff
Rachael Simon, Housing and Homelessness Deputy

### 46. Fourth Supervisorial District, Supervisor Janice Hahn

Gerardo Pineda, Chief of Staff
Mark Baucum, Chief Strategist, Senior Budget Deputy
Ivan Sulic, Housing and Homelessness Deputy

### 47. Fifth Supervisorial District, Supervisor Kathryn Barger

Anna Mouradian, Chief Deputy
Anders Corey, Health Deputy
Tyler Cash, Homelessness Deputy

### 48. Auditor-Controller

Arlene Barrera, Auditor-Controller

### 49. Black People Experiencing Homelessness Steering Committee

### 50. Chief Executive Office of Los Angeles

Fesia Davenport, Chief Executive Officer
Matt McGloin, Senior Assistant CEO, County Budget Officer
Mason Matthews, Senior Manager

**EXHIBIT 36 - Page 1536**

David Seidenfeld, Manager
Michael Martinez, Principal Analyst

### 51. *Chief Executive Office, Anti-Racism, Diversity, and Inclusion Initiative Unit*

D'Artagnan Scorza, Ph.D., Executive Director of Racial Equity

### 52. *Chief Executive Office, Center for Strategic Partnerships*

Kate Anderson, Director
Lisa Watson, Principal Consultant, Family Housing and Transition Age Youth Housing

### 53. *Chief Executive Office, Homeless Initiative*

Cheri Todoroff, Interim Executive Director

### 54. *Department of Children and Family Services*

Bobby Cagle, Director (Formerly)

### 55. *Department of County Counsel*

Rodrigo Castro-Silva, Esq., County Counsel
Tom Faughnan, Esq., Senior Assistant County Counsel
Lauren Black, Esq., Assistant County Counsel
Ana Lai, Esq., Principal Deputy County Counsel
Aleen Langton, Esq., Principal Deputy County Counsel
Amy Naamani, Esq., Principal Deputy County Counsel
Norayr Zurabyan, Esq., Senior Deputy County Counsel

### 56. *Department of Health Services*

Christina Ghaly, M.D., Director
Clemens Hong, M.D., Acting Deputy Director, Community Programs
Sarah Mahin, Director of Housing for Health
Heidi Behforouz, M.D., Medical Director, Housing for Health
Libby Boyce, Senior Director of Programs, Housing for Health
Leepi Shimkhada, Senior Director of Housing and Services, Housing for Health
Rohini Khanna, Co-Deputy Director, Office of Diversion and Reentry

### 57. *Department of Mental Health*

Jonathan Sherin, M.D., Ph.D., Director
Maria Funk, Ph.D., Deputy Director, Housing and Job Development Division
La Tina Jackson, LCSW, Deputy Director, Countywide Engagement Division

### 58. *Department of Military and Veterans Affairs*

Brigadier General Ruth Wong, U.S. Air Force (Ret.), Director
George Dixon, U.S. Army (Ret.), Supervisor of Veterans Services

### 59. *Department of Public Health*

Barbara Ferrer, Ph.D., MPH, M.Ed., Director
John Connolly, Ph.D., M.S.Ed., Chief Strategist

Gary Tsai, M.D., Director, Substance Abuse Prevention and Control

### 60. *Department of Public Social Services*

Antonia Jiménez, Director
La Shonda Diggs, Division Chief
Luther Evans Jr., Division Chief
Roxana Molina, Division Chief
Lisa Hayes, Emergency Management Coordinator

### 61. *Department of Public Works*

Mark Pestrella, Director
Angela George-Moody, Chief Deputy Director
Rossana D'Antonio, Deputy Director
Caroline Hernandez, Assistant Deputy Director
Matthew Frary, Principal Engineer
Sandra Torres, Secretary
Jesse Juarros, Chief Information Officer

### 62. *Department of Regional Planning*

Amy Bodek, Director
Connie Chung, Assistant Administrator

### 63. *Los Angeles County Development Authority*

Emilio Salas, Executive Director

### 64. *Los Angeles Sheriff's Department – Homeless Outreach Services Team*

Geoffrey Deedrick, Lieutenant

### 65. *Women and Girls Initiative*

Abbe Land, Executive Director
Marissa Ayala, Policy Fellow/Contractor

### 66. *Youth Commission*

Alex Furtado, Commissioner
Alain Datcher, Executive Director

## IV. Los Angeles Homeless Services Authority (LAHSA)

### 67. *LAHSA Commission*

Jacqueline Waggoner, Chair, Appointed by Supervisor Mark Ridley-Thomas; Reappointed by Supervisor Holly Mitchell
Sarah Dusseault, Appointed by Supervisor Hilda Solis
Noah Farkas, Appointed by Supervisor Sheila Kuehl
Andy Bales, Appointed by Supervisor Barger
Irene Muro, Appointed by Supervisor Hahn
Wendy Greuel, Appointed by Mayor Garcetti
Kelli Bernard, Appointed by Mayor Garcetti
Mitch Kamin, Appointed by Mayor Garcetti
Booker Pearson, Appointed by Mayor Antonio Villaraigosa
Kelvin Sauls, Appointed by Mayor Antonio Villaraigosa

**EXHIBIT 36 - Page 1537**

### 68. LAHSA Executive Team

Heidi Marston, Executive Director

Jayanthi Daniel, Executive Management Officer

Kristina Dixon, Chief Financial & Administration Officer

Molly Rysman, Chief Programs Officer

Emily Vaughn Henry, Deputy Chief Information Officer

Meredith Berkson, Director of Systems and Planning

Daniel Fisher, Acting Director of Contract and Procurement

Clifton Trotter, Director of Equity

Steven Rocha, Manager – HMIS

### 69. LAHSA's Lived Experience Advisory Board

Tiffany Duvernay-Smith, Advisory Group Coordinator

## V. Councils of Government, Cities, School Districts, and Unincorporated Areas

### 70. City of Arcadia

Dominic Lazzaretto, City Manager

Sara Somogyi, Director of Recreation and Community Services

### 71. City of Azusa

Robert Gonzales, Mayor

Sergio Gonzalez, City Manager

### 72. City of Bellflower

Victor Sanchez, Councilmember

Sonny Santa Ines, Councilmember

Jeff Stewart, City Manager

### 73. City of Beverly Hills

Julian Gold, M.D., Councilmember

George Chavez, City Manager

Nancy Hunt-Coffey, Assistant City Manager

Stephanie Harris, Community Services Manager/Management Analyst

Jenny Rogers, Director of Community Services

Abbey Tenn, Policy and Management

Cindy Owens, Policy and Management Analyst

Rachel Evans, Interim Human Resources Administrator

### 74. City of Compton

Michael L. Antwine II, Assistant City Manager

Kimberly McKenzie, Homeless Services Liaison and Training Director

### 75. City of Covina

Chris Marcarello, City Manager

Angel Carrillo, Deputy City Manager

Alana Spector, Management Analyst, Housing Division

Alice Leung, Management Analyst Trainee, Housing Division

Ric Walczak, Captain, Covina Police Department

### 76. Culver City

Göran Eriksson, Councilmember

Helen Chin, Assistant to City Manager on Homelessness

### 77. City of El Monte

Alma Martinez, City Manager

### 78. City of Gardena

Rodney Tanaka, Councilmember

### 79. City of Glendora

Adam Raymond, City Manager

Moises Lopez, Assistant City Manager

### 80. City of Hermosa Beach

Suja Lowenthal, City Manager

### 81. City of Inglewood

Roberto Chavez, HUD Programs Manager

Lori Jones, Grants Coordinator

### 82. City of La Verne

Bob Russi, City Manager

### 83. City of Lawndale

Robert Pullen-Miles, Mayor

Raylette Felton, Assistant City Manager

Michael Reyes, Director of Municipal Services

### 84. City of Monrovia

Dylan Feik, City Manager

### 85. City of Monterey Park

Shadene Womack, Navigator and Coordinator for Outreach and Housing

Lt. Bob Hung, Neighborhood Engagement Team/Police Department

Brenda Iglesias, Sgt. Neighborhood Engagement Team/Police Department

### 86. City of Norwalk

Jennifer Perez, Mayor (rotating seat), Councilmember

Jesus Gomez, City Manager

Richard Rojas, Deputy City Manager

### 87. City of Palmdale

Mike Miller, Director of Neighborhood Services

Sophia Reyes, Housing Coordinator, Housing Division

### 88. City of Pasadena

William Huang, Executive Director, Department of Housing

### 89. City of Pomona

Benita DeFrank, Director of Neighborhood Services

Donyielle Holley, Homeless Services Supervisor

**EXHIBIT 36 - Page 1538**

**90.** *City of San Dimas*

Chris Constantin, City Manager

Brad McKinney, Assistant City Manager

Ann Garcia, Senior Management Analyst

**91.** *City of Santa Clarita*

Michael Villegas, Community Preservation Manager and Homeless Liaison

**92.** *City of Santa Monica*

Setareh Yavari, Division Manager and Staff Liaison

Margaret Willis, Human Services Administrator

Jen Kim, Senior Analyst

**93.** *City of South El Monte*

Rachel Barbosa, City Manager

Rene Salas, Deputy City Manager

Richard Corral, Homeless Services Coordinator

**94.** *City of Torrance*

Viet Hoang, Deputy City Manager

**95.** *City of West Hollywood*

Corri Planck, Strategic Initiatives Manager

Elizabeth Anderson, Strategic Initiatives Program Administrator

**96.** *City of Whittier*

Shannon Delong, Assistant City Manager

Jessica Martinez, Councilmember

**97.** *Gateway Cities Council of Governments*

Gilbert Saldate, Homelessness Program Manager

**98.** *Hacienda Heights Improvement Association (HHIA)*

Scott Martin, President

Geri Kleinpell, Board Member

Ted Chang, Board Member

Randy Black, Treasurer

Eleanor Haan, Secretary/Membership Co-Chair

Adriana Quiñones, Board Member

**99.** *Hacienda La Puente Unified School District*

Dr. Alfonso Jimenez, Superintendent

Dr. Judy Fancher, Assistant Superintendent

Martha Calderon, Equity and Access Director

**100.** *Rowland Heights Community Coordinating Council*

Cary Chen, President

**101.** *San Gabriel Valley Council of Governments*

Marisa Creter, Executive Director

Caitlin Sims, Principal Management Analyst

**102.** *South Bay Cities Council of Governments*

Ronson Chu, Senior Project Manager, Homeless Services

**103.** *South Whittier School District*

Dr. Gary Gonzales, Superintendent

Dr. Reanna Mendoza, Director of Investment, Engagement

Brenda Venegas, Community Liaison

## VI. People with Lived Experience

**104.** Marqees Banks

**105.** Amaris Davy

**106.** Battee Dawn

**107.** Theyah Kia Dupclay

**108.** Debra Gatlin

**109.** Eric Gray

**110.** Martin Holguin

**111.** Al Palacio

**112.** Theodore Patton

**113.** Suzette Shaw

**114.** Reba Stevens

**115.** Jasper Thomas

**116.** Zue Villareal

**117.** Orlando Ward

**118.** Ronald Williams

## VII. Governance Models in Other Jurisdictions

**119.** *Destination: Home (Santa Clara County, CA)*

Jennifer Loving, Chief Executive Officer

**120.** *Glendale Continuum of Care*

Onnig Bulanikian, Director of Community Services and Parks

Arsine Isayan, Interim Manager of Homeless Services

**121.** *Long Beach Continuum of Care*

Kelly Colopy, Director of Health and Human Services

Paul Duncan, Homeless Services Bureau Manager

**122.** *Los Angeles Metropolitan Transportation Authority*

Stephanie Wiggins, Chief Executive Officer

Nicole Englund, Chief of Staff

Bernice Tato, Senior Administrative Analyst/Scheduler (Interim)

Collette Langston, Board Clerk

**123.** *New York City Continuum of Care*

Kristen Mitchell, Associate Commissioner, Homeless Policy and Innovation, NYC

Department of Social Services; Co-Chair, NYC CoC Steering Committee

Jha'asryel-Akquil Bishop, Co-Chair, NYC CoC Steering Committee

Emma Cathell, Senior Administrative Analyst, NYC Department of Social Services

**124.** *Pasadena Continuum of Care*

Jennifer O'Reilly-Jones, Homeless Programs Coordinator

**EXHIBIT 36 - Page 1539**

**125. *San Diego Continuum of Care***

Tamera Kohler, Chief Executive Officer and Board Member

**126. *San Diego Housing Commission***

Lisa Jones, Executive Vice President of Strategic Initiatives

**127. *San Francisco, Department of Homelessness and Supportive Housing***

Shireen McSpadden, Executive Director

Chris Block, Director of Rehousing

**128. *Santa Clara County Continuum of Care***

Kathryn Kaminski, Deputy Director, Office of Supportive Housing, County of Santa Clara

Michaela Lewis, Lead Deputy Counsel

**129. *Seattle/King County, Washington***

Peter Lynn, Chief Program Homeless Officer, King County Regional Housing Authority

Anne Martens, Director of External Affairs and Communications Coordinator

Helen Howell, Deputy Chief Executive Officer

Naomi Mariscal, Payroll Specialist

**130. *Southern California Association of Governments***

Kome Ajise, Executive Director

Javiera Cartagena, Director of Government and Public Affairs

**131. *South Coast Air Quality Management District***

Bayron Gilchrist, General Counsel

Barbara Baird, Chief Deputy Counsel

Sheri Hanizavareh, Senior Deputy District Counsel

**132. *Ventura County Continuum of Care***

Tara Carruth, Director

**133. *The Way Home (Houston/Harris County, Fort Bend County, Montgomery County, TX)***

Matt White, Senior Associate, Housing Innovations

## VIII. Other

**134. *United States Department of Housing and Urban Development***

William Snow, Senior Program Specialist

**135. *American Roundtable to Abolish Homelessness***

Philip Mangano, President and Chief Executive Officer

**136. *Caltrans***

Alisa Becerra, Public Affairs Specialist and Statewide Lead on Homelessness

Jeff Newman, Chief of Staff, District Seven (LA County and Ventura County)

**137. *Center on Budget and Policy Priorities***

Ann Oliva, Visiting Senior Fellow

**138. *Committee for Greater LA***

Miguel Santana, Chair

Dr. Raphael Sonenshein, Executive Director, Pat Brown Institute for Public Affairs, California State University, Los Angeles

Robin Engel, President and Founder, Star Insights

**139. *Hilton Foundation***

Andrea Iloulian, Deputy Director of Legacy Initiatives

Seyron Foo, Advocacy Strategies

**140.** Dennis Culhane, Professor at University of Pennsylvania, University of Pennsylvania, School of Social Policy & Practice (primary expertise in the area of homelessness and assisted housing policy)

**141.** Mark Johnston, Consultant, Mark Johnston Consulting; formerly HUD, Deputy Assistant Secretary for Special Needs

**142.** Vince Kane, Director, Wilmington VA Medical Hospital, Director of the Veterans Health Administration's National Center on Homelessness Among Veterans (Emeritus)

**143. *Hub for Urban Initiatives***

Joe Colletti, Ph.D., Chief Executive Officer

**144. *Los Angeles Area Chamber of Commerce***

Maria Salinas, President and Chief Executive Officer

**145. *Measure H Citizens' Oversight Advisory Board***

Christine Margiotta, Executive Director, Chair

**146. *State of California – Business, Consumer Services, and Housing Agency***

Homeless Coordinating and Financing Council

Julie Lo, Executive Officer

Cody Zeger, Director of Policy

**147. *State of California – Housing California***

Chris Martin, Policy Director

**148. *United Way***

Chris Ko, Vice President, Impact and Strategy

Carter Hewgley, Director of Homeless Initiatives

Eric Ares, Senior Manager, Homeless Systems Change

**EXHIBIT 36 - Page 1540**

# Table of Contents

"Voices" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Addendum A (Key Concerns) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1.  Urgency Needed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2.  Need For Flexibility and Nimbleness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3.  Diversity, Equity, and Inclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  System Voids (No City or County Lead Entities) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

5.  Measure H – Local Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6.  LAHSA Conundrum: LAHSA's Authority, or Lack Thereof . . . . . . . . . . . . . . . . . . . . . . . 9

7.  What Should the Role of LAHSA Be? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8.  LAHSA's Internal Governance Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9.  Operational Challenges within LAHSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10. Data Collection, Access, and Sharing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

11. Ineffective Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

12. Lack of Capacity-Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13. Coordinated Entry System Policy Council . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Addendum B (Recommendations) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1.  Create a County Entity and Identify a County Leader . . . . . . . . . . . . . . . . . . . . . . . . . 13

2.  Measure H – Local Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.  Streamlined LAHSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4.  Continuum of Care Governance (Modify CoC Leadership) . . . . . . . . . . . . . . . . . . . . . . 22

5.  Improve LAHSA's Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

6.  Data and Metrics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7.  Executive-Level Action Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**EXHIBIT 36 - Page 1541**

Recommendation Brief No. 1: County Entity and Leader . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Recommendation Brief No. 2: Measure H / Local Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Recommendation Brief No. 3: The Role and Governance of LAHSA . . . . . . . . . . . . . . . . . . . . . . . . . 41

Recommendation Brief No. 4: Continuum of Care Governance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Recommendation Brief No. 5: Internal Operations At LAHSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Recommendation Brief No. 6: Data and Metrics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Recommendation Brief No. 7: Executive-Level Action Team . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Attachment 1: City of Los Angeles Letter Dated September 8, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . 76

Attachment 2: Board Motion Cross-Reference Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Attachment 3: Relevant Legal And Legislative Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Report Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

EXHIBIT 36 - Page 1542

# Voices

All too often, the voices of people experiencing homelessness and the stakeholders working tirelessly in our homeless services delivery system go unheard. These voices guide our Report and have identified repeating themes, including: the need to act with urgency; build trust in our programs and agencies; enhance diversity, equity, and inclusion; listen to the voice of lived expertise; fill system voids wherever they may be; foster local innovation and build upon regional strength; simplify and streamline our system; bring accountability through better governance; provide access to data; and ensure transparency. These voices tell us—

"It's time for **sweeping changes** to the system. The **status quo, as it stands, is no longer working** and the **one-size-fits-all approach has failed** many communities and those languishing out on the streets."

– Supervisor Kathryn Barger, statement at Board of Supervisors Regular Meeting, July 27, 2021

"We can no **longer talk about equality** and empowerment **while enforcing inequities**."

– Suzette Shaw (Homeless Advocate with Lived Expertise), Survey Tool feedback, March 3, 2022

"**County departments are siloed and don't coordinate** well to support a consistent, systemic response to homelessness."

– John Maceri (CEO, The People Concern), interview with BRCH staff, October 18, 2021

"**Too many things have been layered on LAHSA** and there needs to be a more collaborative approach with other key stakeholders."

– Vince Kane (Former Director, Veterans Health Administration's National Center on Homelessness Among Veterans), interview with BRCH staff, October 5, 2021

"**LA is the most complex [Continuum of Care** for homelessness services] in America **as a result of the Joint Powers Agreement** and the huge geographic coverage of the continuum as well as the number of local jurisdictions within it."

– Mark Johnston (former Acting Assistant Secretary for Community Planning and Development and former Deputy Assistant Secretary for Special Needs, U.S. Department of Housing and Urban Development (HUD); Principal, Mark Johnston Consulting), interview with BRCH staff, October 5, 2021

"We **need to change something** because the way we have been doing things isn't working or isn't working fast enough. **Something has to be done differently going forward.**"

– Supervisor Janice Hahn, Supervisorial District 4

"There are **lots of ways to fall into homelessness**; as such, there **should be lots of ways to fall out** of homelessness."

– Miguel Santana (Chair, Committee for Greater LA) and Raphael J. Sonenshein (Executive Director, Pat Brown Institute for Public Affairs, California State University, Los Angeles), interview with BRCH staff, September 27, 2021

**EXHIBIT 36 - Page 1543**

**"We're partners** in doing this work and recognize that **there are changes that need to be made** and really want to be a partner in making that happen."

– Heidi Marston (Executive Director, LAHSA), presentation at BRCH Regular Meeting, March 2, 2022

**"For too long**, we have had a homeless services **system** that **under-represents** a **majority** of the jurisdictions in Los Angeles County. We **need a system that supports cities who are stepping up** to serve their unhoused residents. By working together with all 88 cities in the County, we can ensure that people experiencing homelessness, regardless of where they live in the County, can access the resources needed to get off the streets."

– Supervisor Hilda Solis, Supervisorial District 1

**"[R]esidents **don't feel they are getting 'their' fair share** of Measure H."

– Mike Miller (Director of Neighborhood Services, City of Palmdale) and Sophia Reyes (Housing Coordinator, City of Palmdale), interview with BRCH staff, December 20, 2021

"Any **recommendations** we adopt to improve our services to the unhoused **must** have as their **goal demonstrated success** in moving people from the street to housing and **keeping them housed**. Anything else is superfluous."

– Supervisor Shelia Kuehl, Supervisorial District 3

**"You can't fix what you can't measure**, and we really need better measurement tools and better data and access to that data. **It is incredibly frustrating** … We need a system with the ability to track and measure someone's individual success."

– Councilmember Bob Blumenfield (Council District 3, City of Los Angeles), presentation at BRCH Regular Meeting, March 9, 2022

"We **do whatever it takes** regarding our approach to homelessness."

– Jennifer Loving (CEO, Destination: Home), interview with BRCH staff, January 24, 2022

"Clearly, **we have a humanitarian crisis** in Los Angeles County . . . . it's an issue that absolutely **must be taken on in an aggressive manner**—I would say a more aggressive manner than we're doing."

– Jonathan E. Sherin, M.D., Ph.D. (Director, County Department of Mental Health), presentation at BRCH Regular Meeting, November 17, 2021

**"The streets cannot be the waiting room** for permanent housing."

– Ken Craft (President, Founder, and CEO, Hope of the Valley Rescue Mission), interview with BRCH staff, October 19, 2021

**"I know what it's like to have nowhere to go."**

– Reba Stevens (Mental Health and Homeless Advocate with Lived Expertise), presentation at BRCH Regular Meeting, November 3, 2021

EXHIBIT 36 - Page 1544

# Executive Summary

## A. Our Charge

Sparked by those who have called for an end to homelessness, on July 27, 2021, the Board of Supervisors ("Board") established the Blue Ribbon Commission on Homelessness ("BRCH")[2]. In its motion creating our Commission, the Board charged us to:

- "[R]esearch and analyze various homelessness governance reports, studying models from across the nation";

- Provide "feedback to the Board regarding the most relevant and effective models, with the intention of implementing reform to help solve the homelessness crisis in Los Angeles County";

- "[P]rovide a report that includes recommendations for a new governance model that is appropriate for Los Angeles County (addressing the existing Joint Powers Authority) – incorporating the diverse needs of the region, its 88 cities, and the Unincorporated Communities which the Board of Supervisors directly represents";

- Provide a report that "reflect[s] the various legal and legislative issues that are impacting homelessness policy";

- Provide a report and recommendations that "seek to enhance accountability, transparency, and inclusivity"; and

- "[I]nclude recommendations on how cities, Councils of Government, or regional representatives could be incorporated into an effective governance structure to address the homelessness crisis."

In response, we embarked on the first public, commission-directed process, authorized and created by the Board, to study homelessness governance. Through an extensive series of meetings, presentations, interviews, and other listening sessions, we heard from approximately 280 individuals, including representatives from cities, Councils of Government, County departments, unincorporated communities, and school districts; persons with lived expertise; service providers; subject-matter experts; leaders of homeless service systems from across the country; and authors of prior governance reports reviewing the strengths and weaknesses of our system.[3] The BRCH also ensured that the voices of the Black, Latinx, LGBTQI+, foster youth, and senior communities were heard. Finally, the BRCH reviewed and considered thousands of pages of documentation, all of which are publicly available at BRCH.lacounty.gov.

Our Report reflects the courageous voices and sentiments expressed by those committed[4] to giving their time to reflect on the good and bad of our system, shares information concerning systems in other cities and counties, and opines on the most effective path forward. These voices should resonate across the region. In this spirit, and recognizing no magic formula exists to end homelessness, we offer a list of pragmatic, commonsense recommendations—unanimously approved by our commission—for the Board to consider and to act on.

## B. Key Concerns

Over the course of six months of testimony and hundreds of interviews, we heard accounts of innovation, inspiration, and resilience. The commitment of our community to confront homelessness is clear. We have many ingredients for success.

However, our stakeholders described a system under tremendous strain and one that requires "sweeping changes." The voices of the system lamented that key government entities and service providers too often operate in silos rather than as an integrated network. There is role confusion among these entities, and as a result, they are hampered in supporting people experiencing homelessness. We also received feedback that without reforming the current mission, philosophy, and organizational structure of the Los Angeles Homeless Services Authority ("LAHSA" or the "Authority") and the system as a whole, we will constrain future efforts to address homelessness.

We heard from stakeholders yearning for a system that is more open to different approaches and philosophies to housing, for innovative approaches to address the urgent need for shelter such as triage communities, prepared to aggressively utilize faith-based organizations to bring people off our streets, and able to provide better systems for

3   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1545

families experiencing homelessness and for veterans, especially in cases where entitlements for these communities do not rest within the purview of LAHSA. Stakeholders also called for a system that communicates better: demanding "system navigators," 24/7 responses to urgent needs, inclusion of our faith-based organizations, and improved outreach systems. These stakeholders want a nimble system that is better able to address urgent issues effectively, comprehensively, and timely.

We heard from stakeholders from underrepresented communities, mindful of how equity, diversity, and inclusion must be central to governance decisions. We learned that Black and Latinx people make up the highest percentage of people experiencing homelessness, yet are rarely included fully in governance. Likewise, the LGBTQI+ community shared how important tools to house people experiencing homelessness fail to consider the unique experiences of the LGBTQI+ and senior communities. Foster youth, who are predominately Black and Latinx, told us of their struggles accessing housing and services. Overall, we heard how gaps in our data tracking impacts our ability to develop equitable policies, and if we are not tracking data, we cannot combat racism in housing or elsewhere.

We learned how our region's homelessness ecosystem is not where it needs to and must be. The governing bodies of the County of Los Angeles and the City of Los Angeles have turned to LAHSA for many matters related to homelessness. At times, LAHSA has risen to the challenge. For example, during the COVID-19 pandemic, LAHSA was instrumental in reducing the impact the pandemic could have had on people experiencing homelessness.

But LAHSA's decision-making authority is limited by design, with little or no authority over funding, prevention, housing acquisition, substance abuse and mental health treatment, among other issues. We refer to this as the LAHSA "conundrum." This conundrum has led many to be confused as to LAHSA's role, creating a great deal of consternation for stakeholders. These stakeholders also question whether the roles the County, the City, and LAHSA play today should be the same roles that they are asked to play tomorrow.

Further, we learned how our region lacks vital infrastructure in both the County of Los Angeles and the City of Los Angeles. While many County and City departments touch homelessness, none are dedicated exclusively to serving people experiencing homelessness nor able to cut across silos to provide leadership across agencies. Similarly, more must be done to bridge our mainstream and homeless services delivery systems, which is crucial to maximizing resources from federal and state sources. These factors, coupled with a web of sometimes inconsistent and poorly communicated policies and practices, leave LAHSA, service providers, community groups, other cities in the region, and other stakeholders feeling devalued, unheard, and frustrated.

For their part, cities commented on the need for more access to Measure H funding to facilitate the development of local solutions. The City of Los Angeles takes the position that Measure H "should not be subject to an allocation scheme to draw money away from the parts of the County where it's needed most." Other cities do not necessarily disagree. However, these cities are concerned that access to Measure H funds is too restricted, limiting opportunities for them to develop local solutions. A balance must be struck because the system is only as strong as our weakest link. Smaller cities must be able to take responsibility for people experiencing homelessness in their neighborhoods with the support of the County, but regional goals focused on equity must also be served.

We also learned that there is a general misunderstanding across the region over the Measure H funding process. Measure H funds are largely dedicated to ongoing programs, and while there are opportunities for public input, participation in the input process is, perhaps, lower than it should be. The Board of Supervisors determines how Measure H funds are allocated among LAHSA and County departments, relying on a complicated allocation method involving 51 different homeless strategies that beg for consolidation, some of which are under evaluation. Accordingly, stakeholders are demanding that the Measure H funding process be simplified.

We rarely heard a defense of the current homelessness governance system. Rather, key concerns emerged, including, but not limited to, those summarized below.

EXHIBIT 36 - Page 1546

## Key Concerns

| | | |
|---|---|---|
| **1** | **Urgency Needed** | The region is in crisis, but the system serving persons experiencing homelessness is not set up to operate in crisis mode. |
| **2** | **Need for Flexibility and Nimbleness** | There are many ways into homelessness, and there need to be many ways out. |
| **3** | **Diversity, Equity, and Inclusion** | Decision-makers need to do more than give lip service to diversity, equity, and inclusion. |
| **4** | **System Voids (No City or County Lead Entities)** | There is no County or City department or authority exclusively responsible for leading on homelessness. |
| **5** | **Measure H – Local Solutions** | Not enough is being done with Measure H—our region's local sales tax that generates monies for homeless service delivery—to spur local innovation and utilize local government as a tool to serve persons experiencing homelessness. |
| **6** | **LAHSA "Conundrum": LAHSA's Authority, or Lack Thereof** | LAHSA, as a decision-making body, is flawed, perhaps by design. Material governance decisions for issues such as funding, prevention, housing acquisition, substance abuse, and mental health are made outside of LAHSA. |
| **7** | **What Should the Role of LAHSA Be?** | Driven by an influx of funds, LAHSA's core functions expanded beyond its organizational capacity, and it struggles to meet demand. Given this, the role LAHSA plays should ultimately dictate how the organization is to be governed. |
| **8** | **LAHSA's Internal Governance Challenges** | There are too many governing bodies within LAHSA (e.g., LAHSA Commission, CoC Board, CES Policy Council) without clear lines of authority as to final decision-making. |
| **9** | **Operational Challenges within LAHSA** | The many people interviewed or who presented to the Commission take issue with (i) whether LAHSA is ensuring that its executive team has the depth, resources, and support to operate an organization of its size and complexity, (ii) the lack of strong relationships with cities outside the City of Los Angeles, (iii) ad hoc or counterproductive outreach practices, and (iv) contracting practices. |
| **10** | **Data Collection, Access, and Sharing** | Decision-making system wide must be more data driven. |
| **11** | **Ineffective Communications** | While no government entity is perfect, cities, COGs, unincorporated areas, service providers, and members of the public perceive LAHSA as ineffective communicators and severely lacking in "customer service." |
| **12** | **Lack of Capacity-Building** | The current system does not do enough to support small providers, which discourages capacity-building. |
| **13** | **Coordinated Entry System Policy Council** | The Coordinated Entry System (CES) Policy Council, the body within our system that determines policies for services and bed prioritization, is making important decisions that impact our system, yet many do not even know it exists, or its members and the public do not know the full scope of its authority. |

*Please see Addendum A to this Executive Summary for additional details.*

5   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1547**

# C. The Path Forward: Our Recommendations

No single person or entity is to blame for the situation we find ourselves in. In fact, numerous stakeholders in the Los Angeles homelessness system work tirelessly every day to support our unhoused population and address homelessness. Also, no region embraces innovation, reform, and evolution more than Los Angeles, as evidenced by passage of both Measure H in the County and Measure HHH in the City of Los Angeles.

However, the voices woven throughout this Report tell us that we have not evolved at the pace required to meet the vast needs on our streets and that the time is now to channel our uniquely Los Angeles attitude and mindset to spur reform, evolution, innovation, and, most importantly, more action. Now is the time to reject the status quo and bring new life, new ideas, and new partners into the arena to support those that work to improve our system every day. The voices of our system urge us to:

- Embrace wholeheartedly a whatever-it-takes attitude to tackle the many issues that impact homelessness and to end homelessness.

- Turn the page on a one-size-fits-all approach, recognize there are as many ways out of homelessness as there are into homelessness, and acknowledge that "the streets cannot be the waiting room for permanent housing."

- Establish a lead County entity on homelessness, directly accountable to the Board of Supervisors, with the ability to cut across County departments and take charge to ensure that all system partners are working together and to lead on homelessness prevention, rehousing, housing acquisition, access to medical care, and access to urgent services (e.g., 24/7 outreach and housing services, including on weekends, from a single-point-of-contact phone number) in a sustainable way.

- Pivot to a region-wide approach that allows for and incorporates local solutions by partnering with cities and service providers more directly because homelessness demands both a regional response and flexibility for solutions tailored to the needs of a given community.

- Allow for the various philosophies and approaches identified to address homelessness to coexist in our ecosystem, since, after all, we are "the largest and most complex CoC [Continuum of Care] in the country."

- Replace rigid decision-making with flexibility, lumbering administrative practices and policies with nimbleness, and gridlock in governance with clarity and momentum.

- Demand that equity, diversity, and inclusion be woven into the fabric of homelessness system governance; improve data collection, analysis, and collaborative research to better understand and track issues affecting underrepresented communities; incorporate equity principles into decision-making; and align our system with the County's anti-racism policy agenda.

- Strike a balance between dedicating funds where people experiencing homelessness reside and allowing regions to receive funding, to develop leadership infrastructure, and to innovate. We need to seed capacity.

In short, we need to move toward a system where the sum is greater than its parts and take pragmatic action designed for immediate implementation. Nothing short of a comprehensive approach—with reforming LAHSA, the County, the City of Los Angeles, other cities, service providers, and community stakeholders—will lead to the creation of a comprehensive governance structure essential for decision-making to occur at the appropriate level and pace throughout the region.

Given this, and in accordance with the directive of the Board's July 27, 2021 Motion, we ask the Board to consider the recommendations summarized below. After months of deliberations and discussions, each recommendation has the unanimous support of the BRCH.

EXHIBIT 36 - Page 1548

## Summary of Recommendations

| | | |
|---|---|---|
| **1** | **Create County Entity and Identify County Leader** | • Create County entity with responsible charge, accountability, and authority over homelessness<br>• Establish inter-county workgroups<br>• Establish subregional leadership infrastructure |
| **2** | **Measure H / Local Solutions** | • Establish a "local solutions" fund within Measure H using an algorithm or funded at an amount to be defined by the Board for jurisdictions that will make a commitment to provide in-kind or matching contributions for the development of service programs and housing |
| **3** | **Streamlined LAHSA** | • Role: Focus as CoC (Rehousing) Lead<br>• Governance: Maintain number of seats (10) on LAHSA Commission but change who sits in them (e.g., department heads, lived expertise representative, COG or cities representative) |
| **4** | **Continuum of Care Governance ("Modify CoC Leadership")** | • Consolidate LAHSA Commission, CoC Board, and CES Policy Council into single board consistent with best practices and efficiencies<br>• Prior to consolidating various boards, appoint County Department heads to CES Policy Council |
| **5** | **Improve LAHSA's Operations** | • Define decision-making responsibilities and embed Ops Team to improve LAHSA's operations |
| **6** | **Data and Metrics** | • Require access to, sharing of, and tracking of data and define success |
| **7** | **Executive-Level Action Team** | • Create a forum for Executive-Level Action Team |

If the Board acts on our recommendations, it would generate momentum and begin the necessary reforms. And we should do so with urgency, yet recognizing that no harm be done to the people experiencing homelessness and those serving them.

*Please see Addendum B to this Executive Summary for further details.*

## D. Conclusion[*]

There is a lot of work to do. Issues such as prevention, diversion, social justice, land use, housing, and economic development policies, which are not addressed in this Report given the scope of the Board's motion creating our commission, require further analysis and focus. But, when it comes to governance, reform is possible. We urge the Board of Supervisors to act on our recommendations. Our recommendations are not a panacea for homelessness, but the recommendations reflect bold, collective goals that, working together, we can achieve. We can do better. We must do better. We owe that to the people experiencing homelessness in our community.

*The issues that affect our homelessness services delivery system go beyond this Report and our charge, which, as directed by the Board, focused on issues of governance. This Report addresses the first phase of what could be a multi-phase process for improving our system. Depending on the Board's action with respect to this Report, the next phase could address issues including the specific parameters surrounding our recommendations with a view toward the vast array of other issues that impact the delivery of homeless services in the County, including prevention, funding, housing, land use, and equity. All of these topics could benefit from further study.

**EXHIBIT 36 - Page 1549**

# Addendum A (Key Concerns)

Key Concerns emerged from the information presented to the BRCH. These insights are discussed below.

## 1  Urgency Needed[5]

There is a humanitarian crisis on our streets. We are in crisis, but the system serving people experiencing homelessness is not set up to operate in crisis mode. As a system, we tend to be too reactive, addressing the most pressing problem, one at a time. This has resulted in creating administrative structures, starting programs, and allocating resources with no overall perspective or alignment. As these reactive solutions multiply, initial problems become obscured, and workable solutions are difficult, if not impossible, to identify within the resulting maze. LA-HOP—the region's homelessness outreach request portal—is just one example. Intervention times are too slow given technological, funding, and resource allocation policies, and the lack of coordination among stakeholders. As a result, outreach remains fractured within a larger system.

> "We are in a crisis—but the system does not operate in crisis mode—the system does not have an urgent response."
>
> – John Maceri (CEO, The People Concern), interview with BRCH staff, October 18, 2021

> "Homelessness is like a box of crayons that represent the various situations or need . . . so we need all options and the ability to address our unique situations in our community."
>
> – Mike Miller (Director of Neighborhood Services, City of Palmdale) and Sophia Reyes (Housing Coordinator, City of Palmdale), interview with BRCH staff, December 20, 2021

## 2  Need for Flexibility and Nimbleness[6]

There are many ways into homelessness, and there should be many ways out. For instance, our region should embrace all forms of housing, outreach, and service delivery for people experiencing homelessness, encompassing a multimodal approach. The system is too rigid, there are too many bureaucratic hurdles, and some within the system are too protective of their own turf. This negatively impacts our ability to provide people experiencing homelessness with housing and services.

## 3  Diversity, Equity, and Inclusion[7]

Decision-makers need to make consistent and focused efforts to achieve diversity, equity, and inclusion. For example, Black/African Americans comprise 8.3 percent of the County's population, 18 percent of homelessness population experiencing substance-use disorder, and 33.3 percent of the County's homeless population. Latinx people experiencing homelessness are the fastest-growing homeless population. Yet, no Black/African Americans or Latinx persons with lived expertise serve on the LAHSA Commission. Those with the authority to appoint, should be mindful that our governance must be designed *and implemented* to ensure fair, equity-driven outcomes. In addition, governance boards must be more diverse and inclusive, with greater roles at the leadership table for Black, Latinx, foster youth, and LGBTQI+ persons with lived expertise or who are experiencing homelessness.

> "When we're talking about equity, racial equity and not just equality, we're thinking about the ways in which we can approach the needs of individuals, pay attention to the differences that exist within our communities, and acknowledge that people are starting from different places."
>
> – D'Artagnan Scorza (Executive Director of Racial Equity, Chief Executive Office, Anti-Racism, Diversity, and Inclusion Initiative), presentation at BRCH Regular Meeting, September 22, 2021

EXHIBIT 36 - Page 1550

## 4 System Voids (No City or County Lead Entities)[8]

There is no County department or authority exclusively responsible for leading on homelessness. No department or authority is operating and coordinating homelessness services (e.g., coordination of funds, data sharing, various departments, and staff). Nor is there a department or entity responsible for developing the infrastructure needed to cultivate subregional leadership for cities, Councils of Government ("COGs"), and unincorporated communities. The Los Angeles County Homeless Initiative ("CEO-HI") is a vital part of the County's homeless-response strategy, but not truly empowered to cut across County departments and agencies—and take charge—to lead on homelessness when crises demand.

> "There is currently no single County Department or office responsible for compelling County Departments to work together on Homeless Initiatives."
>
> – Jonathan E. Sherin (Director, Department of Mental Health), interview with BRCH staff, September 14, 2021

Existing departments are busy addressing their primary duties and are not responsible for working to solve joint or multi-departmental problems touching homelessness on their own initiative. Problems go unaddressed unless public complaints, negative media attention, or recommendations from outside bodies compel action (or reaction). There needs to be a center point authorized to lead and to work across County entities to connect mainstream services to the homeless services delivery system. Similarly, there needs to be a leader charged with eliminating the policies and practices that are destructive to client-oriented services, impede innovation, and stifle efforts at self-improvement.

The City experiences similar issues and could take similar steps.

## 5 Measure H – Local Solutions[9]

Much more can be accomplished with Measure H—our region's local sales tax that generates monies for homeless service delivery—to spur local innovation and utilize local government as a tool to serve people experiencing homelessness. Many local governments expressed frustration in not having direct access to Measure H funds so they could do more to address their unhoused populations. These stakeholders recognize that the majority of Measure H dollars should be directed to those parts of the region most impacted by homelessness, but they are frustrated that they have little to no access or information regarding how or whether Measure H funds are being used in their cities. Due to a lack of data, cities, COGs, and unincorporated areas understandably conclude that they are not receiving their "fair share" of Measure H funds.

> "A little bit [of Measure H] goes a long way."
>
> – Adam Raymond (City Manager, City of Glendora) and Moises Lopez (Assistant City Manager, City of Glendora), presentation at BRCH Regular Meeting, November 3, 2021

Nearly all of the cities that came before the BRCH made clear that their residents will not support the renewal of Measure H unless there is greater local access to Measure H funding, which should be of great concern to the region. These cities also want systems that track how Measure H funds are used in each city. The Board of Supervisors—as the body responsible for deciding how Measure H funds are allocated—has the opportunity to answer the call of cities and COGs to inject local solutions and flexibility into Measure H.

## 6 LAHSA Conundrum: LAHSA's Authority, or Lack Thereof[10]

LAHSA is challenged as a decision-making body, perhaps by design. Material governance decisions are made outside of LAHSA. For example, decisions over funding and related policy are made by the governing bodies of the parties to the LAHSA Joint Powers Agreement ("JPA") (i.e., the County and the City) or other levels of government (i.e., federal and state). This leaves the LAHSA Commission with a role largely relegated to the awarding of contracts and hiring and firing of the Executive Director.



9    Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1551**

To begin to resolve the conundrum facing LAHSA, the County and City would need to relinquish authority to LAHSA for decisions over funding and related policy. However, this begs the question as to whether there is a willingness to cede authority. And even if LAHSA could accommodate such authority, LAHSA does not control County and City departments or the myriad of other factors which impact homelessness, such as prevention, access to care, land use policy, housing availability, or law enforcement, all of which limit LAHSA's ability to lead and implement systemwide reform. This conundrum informs the role LAHSA might play and raises the question of whether current expectations of what LAHSA can or should do are reasonable.

> "Generally, … interviewees … expressed concern that LAHSA did not have the political support, independence, or governance structure in place to actually make them successful in [the role as system administrator]."
>
> – Ann Oliva (Vice President for Housing Policy, Center on Budget and Policy Priorities), presentation at BRCH Special Meeting, October 6, 2021

### 7   What Should the Role of LAHSA Be?[11]

In 1993, the County and City created LAHSA primarily to coordinate specific joint County and City programs concerning homelessness. In 1995, LAHSA's role expanded to serve as the lead entity for our region's Continuum of Care ("CoC"), an organizational construct required by the U.S. Department of Housing and Urban Development ("HUD") for the local disbursement of federal monies earmarked for programs that serve people experiencing homelessness. In 2017, LAHSA's role expanded again with the passage of Measure H, and LAHSA was charged with overseeing nearly $250 million annually in local funds for homeless service programs.

> "When LAHSA started growing, they were so focused with growing that they lost sight of what their purpose was."
>
> – Adam Raymond (City Manager, City of Glendora) and Moises Lopez (Assistant City Manager, City of Glendora), interview with BRCH staff, October 21, 2021

Driven by an influx of funds, LAHSA's core functions expanded beyond its organizational capacity, and LAHSA, understandably, struggles to meet the demand. While some attribute these issues to LAHSA losing sight of its purpose, LAHSA's view is that the expectations placed on LAHSA by the County and City expanded, and LAHSA was required to try and respond.[12] The role LAHSA plays should ultimately dictate how the organization is governed.

### 8   LAHSA's Internal Governance Challenges[13]

LAHSA faces its own internal governance challenges. There are too many governing bodies within LAHSA (e.g., LAHSA Commission, CoC Board, Coordinated Entry System ("CES") Policy Council) without clear lines of authority as to final decision-making. Members of those bodies do not know when they are decision-makers or serving in an advisory capacity. Similar issues exist between the LAHSA Commission and the LAHSA Office of Executive Director. This is concerning and creates a risk that the public processes necessary for decisions of systemwide impact are not invoked when they should be. For this reason, many conclude that we need a better drawing of lines of authority within LAHSA, its executives, and various governing boards.

> "Many folks that were interviewed sort of pointed to overlapping or unclear lines of authority for various governing bodies.… [Members of these bodies wanted] to refine where they had authority to make decisions or where they were acting in an advisory role. That particular lack of role clarity really caused confusion and frustration for community stakeholders because they weren't sure who to hold accountable for certain decisions.…"
>
> – Ann Oliva (Vice President for Housing Policy, Center on Budget and Policy Priorities), presentation at BRCH Special Meeting, October 6, 2021

Blue Ribbon Commission on Homelessness Governance Report   10

**EXHIBIT 36 - Page 1552**

### 9 Operational Challenges within LAHSA

The many people interviewed or who presented to the BRCH take issue with the following:

**(1) Executive staff.**[14] Many believe LAHSA needs to ensure that its executive team has the depth, resources, and support to operate an organization of its size and complexity (i.e., an organization with an annual budget over $700 million and with over 600 staff), whatever its role is or might be.

> "There is a lack of strategy at LAHSA, and they operate in crisis mode and tend to take action and make decisions that are reactive in nature that have not been comprehensively thought out."
>
> – Veronica Lewis (Director, HOPICS), interview with BRCH staff, October 14, 2021

**(2) Relationship building.**[15] There is a perception that LAHSA does not have strong relationships with cities other than the City of Los Angeles, and therefore cannot be appropriately responsive to those cities. Further, COGs feel that they have little or no voice within LAHSA.

**(3) Outreach.**[16] There is a belief among stakeholders that outreach to people experiencing homelessness is too ad hoc, informal, uncoordinated, and lacking central leadership. Service providers expressed concern about LAHSA operating outreach teams, placing provider organizations in an awkward position of pursuing funding in competition with the same governmental agency disbursing those funds.

**(4) Contracting.**[17] LAHSA's contracting process is perceived as too complicated, inflexible, and slow, discouraging or preventing service providers and cities from working with LAHSA or forcing service providers and cities to work without a contract or timely payment. A tremendous amount of time and personnel are devoted to redundant and burdensome processes that do little to actually support people experiencing homelessness. It is uncertain whether efforts to improve this system will bring about the results demanded by service providers, cities, and other stakeholders.

LAHSA has or is actively taking steps to address these issues, yet perceptions of operational challenges—fair or not—continue to persist, raising the question as to what the County and other stakeholders can do to help support and drive further reform within LAHSA.

### 10 Data Collection, Access, and Sharing[18]

Decision-making systemwide must be more data-driven. Our service providers, as well as other stakeholders, tell us that effective and timely data collection, dissemination, and analysis are foundational to a responsive service delivery system. Without access to and sharing of data, we prevent stakeholders from delivering optimal results. Further, we are not doing enough to track data, track results, communicate outcomes, and break down walls that limit information sharing.

> "Another way to potentially better engage cities would be to provide easy access to countywide data that's broken down to a local level. This would help demonstrate local needs gaps and services, local impacts and help cities improve their ability to communicate these regional resources."
>
> – Margaret Willis (Human Services Administrator, City of Santa Monica), presentation at BRCH Regular Meeting, January 19, 2022

11   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1553**

### 11  Ineffective Communications[19]

Cities, COGs, unincorporated areas, service providers, and members of the public perceive LAHSA as ineffective communicators and severely lacking in customer service. Similar to operational issues, LAHSA is making improvements in this regard. However, for some stakeholders, these efforts are either not happening fast enough or could be enhanced with the appropriate levels of support.

> "Internal struggle with communication [at LAHSA] makes it difficult to get things done."
>
> – Donyielle Holley (Homeless Programs Supervisor, City of Pomona), interview with BRCH staff, October 18, 2021

### 12  Lack of Capacity-Building[20]

The current system does not do enough to support small providers, which discourages innovation and capacity-building. In addition, the faith-based community is underutilized and not fully integrated into the existing homeless services and governance system. Finally, service providers that lead service planning areas (SPAs) are not uniformly effective in providing sufficient guidance, access, and other forms of technical assistance to cities, COGs, unincorporated areas, smaller providers, and faith-based organizations.

> "[I]t is in LAHSA's self-interest to work with very large nonprofits—NGOs really. But the need for grassroots and emerging nonprofits is crucial to meeting the need. This conflict needs to be resolved."
>
> – Mike Foley (former Executive Director, Bridge to Home), interview with BRCH staff, October 29, 2021

### 13  Coordinated Entry System Policy Council[21]

The CES Policy Council, the body within our system charged with developing policies for services and bed prioritization, is making important decisions that impact our system. For example, the CES Policy Council, is the "policy oversight entity" for the Greater Los Angeles Coordinated Entry System.[22] LAHSA presents the Council as "the governing body" of the Coordinated Entry System.[23] Yet many do not even know that the CES Policy Council exists, who its members are, or the full scope of its authority. Some question whether this body, as opposed to others within LAHSA, should be in any position to oversee or govern regional policies for services and bed prioritization.[24]

> "There are parts of this system that have authority, but they do not have accountability to the system. The prime example here is a CES Policy Council, which has the ability to set policies that affect how people experiencing homelessness are placed into housing. But those policies are not reviewed by the LAHSA Commission, by the COC, by the COC Board, by the Supervisors, by any elected city council, including the Los Angeles City Council."
>
> – John Wickham (Legislative Analyst, City of Los Angeles), presentation at BRCH Regular Meeting, January 19, 2022

**EXHIBIT 36 - Page 1554**

# Addendum B (Recommendations)

The recommendations discussed below, unanimously approved, if acted on, would reform our homeless services delivery system, generate momentum, and bring the change demanded.

### 1  Create a County Entity and Identify a County Leader

**a. Create a County Entity with Responsible Charge, Accountability, and Authority over Homelessness**

Our comprehensive review of the homeless services ecosystem in the region supports the strong need for an appropriately resourced lead County entity on homelessness, directly accountable to the Board of Supervisors, with the ability to cut across County departments and take charge to ensure that all system partners are working together. This entity does not need to be large, nor should it result in a new, lumbering bureaucracy.

As envisioned, the entity could lead on homelessness with a focus on prevention; rehousing; housing acquisition; accountability for timely contracting and payments; access to health care, including mental health and substance-use disorder treatment; and access to urgent services (e.g., 24/7 outreach and housing services, including on weekends, from a single-point-of-contact phone number) in a sustainable way. The County, in coordination with its various partners including LAHSA, would need to identify the specific departments that should participate in each working group. Moving toward a robust working-group model could facilitate a more comprehensive melding between mainstream and homelessness services, which would fill a void that currently exists within the County.

The entity would also lead in planning; departmental oversight and coordination; incorporating equity principles in the work performed by stakeholders; aligning our system with the County's anti-racism policy agenda; assuming a level of responsibility for the County's services system for families experiencing homelessness and veterans; regional communications and education; convening cities, COGs, and working groups; defining metrics and tracking and interpreting data in partnership with LAHSA; funding; and providing services to effectively serve people experiencing homelessness, among other duties. Similarly, the entity could be responsible for actively developing policy recommendations for the Board's consideration. There is no single County department or subdepartment dedicated to driving policy, operational improvements, and systems change with respect to homelessness. Consequently, the machinery of the County is not operating optimally in its efforts to address homelessness.

In addition, the County entity could address other system voids. For instance, the work of the entity could include, among other things, a "Centralized Housing Acquisition Unit" focused on centralizing regional efforts to securing housing units for people experiencing homelessness and taking a leading role in developing opportunities for master leasing and shared housing, similar to a successful model in Houston, Texas.

**EXHIBIT 36 - Page 1555**

## Recommendation: County Entity & Leader

Focus on Prevention, Rehousing, Housing Acquisition, Accountability for Timely Contracting and Payments, Access to Medical Care (e.g., Mental Health, SUD), and Access to Urgent Services (e.g., outreach, 24/7, one-number call, weekend work)



Board of Supervisors

1 Antelope Valley  2 SFV  3 SGV  4 Metro LA
5 West LA  6 South LA  7 East LA  8 South Bay

**Houston-model with LA characteristics**

**Standing work groups convened, coordinated, reporting to leader to support policy creation and implementation**

- Higher Levels of Care
- Access to Treatment
- Encampment Closures
- Discharge Planning
- Criminal Justice System
- Prevention & Diversion

**Goal: Establish stronger bridge between mainstream services and homelessness services delivery programs (e.g., MHSA, CalAIM, No Place Like Home, Housing for Health)**

**Regional Committees**
(Boundaries by SPAs or COGs)

**County Entity & Leader**

**Inter-County Work Groups**

*Note: Not intended to replace LAHSA*

**Measure H**
(e.g., current CEO-HI role)

**Inter-County Ops**
(e.g., data sharing, leveraging funding, etc.)

**Centralized Housing Acquisition Unit**

**Continuum of Services Coordinator**
(IH, PSH, Outreach)

**Convenor**
(e.g., Regional Committees, Inter-County Work Groups)

EXHIBIT 36 - Page 1556

This entity is not intended to reshuffle the existing deck. As illustrated above, the entity would be the leader on all issues associated with homelessness and would perform functions more expansive than those currently performed by CEO-HI, an office within the Chief Executive Office, largely responsible for administering the Measure H budget recommendations process and related policy. CEO-HI has performed ably in this work, and the County entity should build off expertise within CEO-HI. But CEO-HI is not at the level of an independent County department or authority. The crisis on our streets demands an entity with more authority.

The form, function, and cost of the entity are, respectfully, questions for the Board of Supervisors, CEO, and others within the County to address. The answers are beyond the scope of the Board motion and expertise of a time-limited commission such as ours. That said, there are many options for the Board to consider, including (i) a new County joint powers authority; (ii) a new County department; (iii) empowering or elevating existing departments or subdepartments; or (iv) the creation of a multidisciplinary entity similar to the County's Office of Emergency Management.

We recommend looking to CEO for further guidance. CEO successfully manages a budget of over $38 billion annually, supports the operations of 35 different County departments, has deep experience in and a proven track record of incubating and launching startup offices or units, and therefore, has the organizational insight and wherewithal to help guide the creation of a County entity.

Without an empowered, centralized internal entity, the County will continue to forfeit its ability to benefit from the sum of its parts and to draw upon the knowledge, skills, energy, and innovation of other stakeholders within and outside of the County. The City should follow suit.

## Recommendation & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • Create an entity with responsible charge, accountability, and authority over homelessness within the County, with a focus on: <br>   – Prevention <br>   – Rehousing <br>   – Housing acquisition <br>   – Access to medical care, including care for mental health and substance abuse disorders <br>   – Ensure accountability for timely contracting and payments <br>   – Urgent access to services (e.g., 24/7 outreach and housing services, including on weekends, from a single-point-of-contact phone number) <br>     – Services must be sustainable over a long period <br> • Identify County Leader <br>   – Not intended to "reshuffle deck" <br>   – Not intended to create new bureaucracy <br> • Establish Inter-County Workgroups <br> • Establish Subregional Leadership Infrastructure (e.g., Regional Committees) |
| **Actions Needed** | Unilateral Board actions. <br><br> City Council actions (if City were to establish its own department). <br><br> *See* Recommendation Brief No. 1 (detailed steps to implement). |

**EXHIBIT 36 - Page 1557**

**b. Inter-County Work Groups**

To support this County entity, we propose establishing standing work groups convened, coordinated, and led by the County entity to support policy creation and implementation within the County and LAHSA. This arrangement would track a similar model implemented in Houston, Texas, depicted below, where the entity charged with ending homelessness convenes stakeholders to develop goals, policy, and implementation plans across systems in the areas of Higher Levels of Care, Access to Treatment, Encampment Closures, Discharge Planning, Criminal Justice System, and Prevention & Diversion.



The County entity would coordinate work groups already existing within the County and related County resources, such as the Alternatives to Incarceration Initiative and the Office of Diversion and Reentry, and align those groups with a new model. Such reforms could prove especially impactful in the areas of mental health and substance-use disorder treatment and ensuring bed availability and access across our homeless services delivery system. For example, there is a 62 percent daily utilization rate for contracted substance-use disorder beds.[25] Work groups, if organized, could address this unacceptable situation with the urgency that it demands.

### c. Subregional Leadership Infrastructure

The County also needs to develop a subregional leadership infrastructure to allow more involvement and coordination with cities and unincorporated areas. Some of this work has been done in parts of the County where service providers have actively worked to convene local government, but the practice is not widespread and not all attempts to develop formal infrastructure are equal.

We recommend the creation of regional committees, organized in a manner determined by the region, with local elected officials or their designees for each city sitting on each committee. The regional committees could be a first step in developing subregional leadership across the County. At the discretion of the Board, the committees could receive grants to fund local initiatives within their constituent cities or unincorporated areas. The committees could also be a forum for coordination, feedback, and input regarding issues of subregional import such as the annual Measure H funding process and CoC matters. The County entity would be responsible for convening and organizing regional committees.



**Recommendation: Subregional Leadership**

**Subregional Leadership**

**Regional Committees**

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Antelope Valley | SFV | SGV | Metro LA | West LA | South LA | East LA | South Bay |

- Governance determined at discretion of the region
- Boundaries determined by SPA or COG
- Forum for input
- Authorize some level of funding discretion (e.g., receive grants to fund local initiatives)

17   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1559**

## 2 Measure H – Local Solutions

### a. Establish a Local Solutions Fund within Measure H Using an Algorithm or Funded at an Amount to Be Defined by the Board

Based on the feedback we received, an immediate local return mechanism must be built into Measure H. The City of Los Angeles takes the position that Measure H "should not be subject to an allocation scheme to draw money away from the parts of the County where it's needed most." The cities that came before the BRCH do not disagree, but they also assert that more should be done to deliver some portion of Measure H funds to cities and unincorporated areas because "a little bit goes a long way." This reflects the evolving sentiment of many cities that may have eschewed programs to support people experiencing homelessness in the past, but are now more than willing to lean in and support the system.

Accordingly, we recommend the County establish a "local solutions" fund within Measure H, using an algorithm or funded at an amount to be defined by the Board, to provide resources to local governments, including unincorporated areas, cities, and COGs, that will make a commitment to provide in-kind or matching contributions for the development of service programs and housing and to share data. Similar innovation programs have been created in the past. However, cities are asking for greater levels of funding and an ongoing commitment from the County. For its part, the County should ensure regular reporting on outcomes to ensure monies are well-spent and goals—local, regional, or otherwise—are achieved.

Any such program should not detract from or take dollars away from the successful work done by our stakeholders, and we must ensure that diversity, equity, and inclusion remain at the forefront of any local solutions program. The BRCH acknowledges this will be a challenge, but also heard testimony regarding funding opportunities from the State or within the expansion of Medicare reimbursement that the County should leverage. (A role for the proposed County entity could be to maximize funding opportunities across the system.) Further, without some local solution program, public support for an extension of Measure H could diminish, and absence renewal of Measure H, our system could experience a significant curtailment in services.

---

### Recommendation: Measure H / Local Solutions

| Concerns | Recommendation |
|---|---|
| • Measure H does not include a "local return"<br>• COG "Innovation Funding"<br>  – FY 2019-20 ($6 million)<br>  – FY 2021-22 ($5 million)<br>  – FY 2022-23 ($10 million) (proposed)<br>• Homeless Plan Implementation Grant<br>  – FY 2018-19 ($9 million)<br>  – FY 2021-22 ($1 million) | • **"Local solutions"** Fund<br>  – **Identify monies** available to fund an ongoing (i.e., **multi-year**) initiative at levels greater than existing local programs<br>    – Amounts or formula to be determined by Board<br>  – **Establish new opportunities** for the disbursement of local initiative fund<br>  – Make available to jurisdictions that will make a commitment to provide **in-kind or matching contributions** for the development of service programs and housing and to share data |

EXHIBIT 36 - Page 1560

## Recommendation & Actions Needed

| Recommendation | This is a unanimous recommendation that could be acted on irrespective of other actions taken by the Board. |
|---|---|
| Primary Components | • In order to improve and create relationships with cities and COGs, establish a multi-year "local solutions" fund within Measure H<br><br>• Use an algorithm or fund at an amount to be defined by the Board<br><br>• Make available to jurisdictions that will make a commitment to provide in-kind or matching contributions for the development of service programs and housing and to share data<br><br>• Any local solutions program should not detract from or take dollars away from the successful work done by our stakeholders, and should ensure equity |
| Actions Needed | Unilateral Board actions.<br><br>*See* Recommendation Brief No. 2 (detailed steps to implement). |

## 3  Streamlined LAHSA

### a. Role: Focus as CoC (Rehousing) Lead

The Board could consider taking steps toward streamlining or simplifying LAHSA. We envision and recommend a renewed LAHSA, focused on its role as our regional CoC (rehousing) lead. This would give LAHSA the latitude it needs to improve our CoC in many areas, including data access, sharing, and collection.

We recommend that LAHSA transition away from providing direct services such as outreach, with respect to programs funded by County monies. The County entity could coordinate urgent access to direct services, centralize dispatch for outreach, enhance after-hours response teams, and eliminate duplicative outreach teams. Service providers could also assume outreach functions. To the extent LAHSA outreach teams serve unincorporated areas, any transition will need to ensure coverage and not reduce system capacity. The County has unilateral authority to make this happen with respect to funds provided by the County without implicating the LAHSA JPA through its allocation of Measure H funding for LAHSA. During the 2021-22 fiscal year, approximately $10 million was allocated by the County for direct services provided by LAHSA.

As an additional part of streamlining LAHSA's role, the County—through Board action—should begin the process of studying the reallocation of certain Measure H strategies between LAHSA and the County entity. Of course, the transition of Measure H strategies to the County entity would need to proceed in a manner that does not disrupt service delivery to people experiencing homelessness, does not undercut successful programs operated by service providers, or increase administrative burdens in contracting or payment to stakeholders. Each of these considerations are relevant to the ultimate allocation of strategies.[26] In addition, the County entity should enable additional funds to be distributed more directly to service providers and local communities.

**EXHIBIT 36 - Page 1561**

## Recommendation: Streamlined LAHSA



## Recommendation & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • LAHSA to transition away from direct services in order for County entity to coordinate urgent access to direct services<br>• Study allocation of certain Measure H funds between LAHSA, County Departments, and County entity<br>  – Should not disrupt service delivery or undercut successful programs<br>• Focus on role as CoC (rehousing) lead (e.g., PIT, HMIS, annual application, etc.) |
| **Actions Needed** | Unilateral Board actions for County-specific actions concerning Measure H.<br>Any further streamlining of LAHSA requires City Council participation as to City-specific actions.<br>*See* Recommendation Brief. No. 3 (detailed steps to implement). |

**EXHIBIT 36 - Page 1562**

**b. Governance: Maintain the Number of Seats on the LAHSA Commission but Change Who Sits in Them (e.g., department heads, lived expertise representative, representative from COGs or cities)**

The LAHSA Commission consists of 10 members, with five members appointed by the City and five members appointed by the County. The Board can unilaterally decide who sits in its five County-appointed seats.

Relevant here, the County could appoint department heads to the LAHSA Commission so government executives responsible for housing, mental health, or health services (e.g., the County Director of Mental Health), or representing a County homelessness entity, are actively engaged in LAHSA's decision-making. The County can also provide COGs or other cities with an appointment to allow for better input from cities outside of the City of Los Angeles. Finally, adding persons with lived expertise could offer valuable perspectives and may make the LAHSA Commission more representative of the people it serves. The City could also appoint its own department heads and executives.

Reforming the composition of the LAHSA Commission should be viewed as an interim step prior to the consolidation of the various governance boards that sit within LAHSA, as in Recommendation No. 4 (Modify CoC Leadership) below.



## Recommendation: Streamlined LAHSA

### Role

CoC Board • CES Policy Council • LAHSA Commission
Executive Director — XXXXX / XXXXX
CoC
Annual Application • HMIS • PIT • Coordinated Entry System • Data

### Governance

Maintain number of seats (10) on LAHSA Commission but change who sits in them (e.g., department heads, lived expertise representative, COG or cities representative)

[Recommended interim action prior to LAHSA Commission-CoC Board-CES Policy Council consolidation]

Green: No JPA/CoC Amendment Required
Red: JPA/CoC Amendment Required

## Recommendation & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • Maintain the current number of seats (10) on the LAHSA Commission, but change who sits in them (e.g., county department heads, lived expertise, COGs or cities)<br>• Intended as an interim action prior to LAHSA Commission-CoC Board-CES Policy Council consolidation (Recommendation No. 4) |
| **Actions Needed** | Unilateral Board actions for County-controlled seats.<br>Unilateral City Council actions for City-controlled seats.<br>*See* Recommendation Brief No. 3 (detailed steps to implement). |

**EXHIBIT 36 - Page 1563**

 **Continuum of Care Governance (Modify CoC Leadership)**

**a. Consolidate LAHSA Commission, CoC Board, and CES Policy Council into a Single Board**

In most CoCs, CoC boards are the final decision-making authority with respect to all CoC matters, consistent with federal law. Our region is an outlier because we have a CoC board that LAHSA regards as "advisory"[27] to the LAHSA Commission and, therefore, not positioned as a final decision-maker on issues relating to the CoC. We also have the CES Policy Council that is vested with autonomy and the authority to make final decisions over CoC matters such as bed prioritization policies,[28] yet also regarded as advisory to the LAHSA Commission.[29]

The existence of so many "decision-makers" with a lack of clarity as to when decisions are advisory begs the question as to their need, creates confusion among members of these bodies as to who is in charge, and makes it difficult for the public and elected officials to hold any decision-maker accountable. Because LAHSA and the CoC are ostensibly independent from the County, perhaps the most the Board of Supervisors can do in the short term is work through County-appointed LAHSA commissioners to initiate a process to consolidate the various boards that sit within LAHSA and the CoC.

We recommend the Board direct County-appointed LAHSA commissioners to initiate action to consolidate the LAHSA Commission, CoC Board, and CES Policy Council into a single body, perhaps within the LAHSA Commission, and report back on how the County could support consolidation. Any future consolidated board should be in line with best practices and efficiencies.

LAHSA "does not support collapsing the Commission, CoC Board and CES policy council."[30] Depending on the extent and contours of streamlining the various governing boards, JPA amendments, amendments to the region's CoC Charter, ratification of any CoC charter changes, and coordination with HUD and other officials may be necessary.

Further, the County needs to evaluate the appropriate size and composition of a single board, and to do so in accordance with HUD regulations and the restrictions in the LAHSA Joint Powers Agreement governing the size and composition of the LAHSA Commission. A single board should be developed with a focus on equity and should include members from other cities, COGs, persons with lived expertise, persons with subject-matter expertise, business representatives, and FBO representation. This could also include representation from transition-age youth, family, and senior communities.

While consolidating these various bodies could be pursued, it should be done concurrent with, and not in place of, other reforms that can be implemented in the short term. The Board cannot unilaterally direct consolidation. To initiate action, a majority of the LAHSA Commission would need to agree, requiring at least one City-appointed LAHSA commissioner to agree to a transition toward consolidation. Further, amendment of the LAHSA JPA and CoC Charter may be required for consolidation if, for example, other system stakeholders demand increasing the number of seats on the LAHSA Commission or if a 10-member body would be overwhelmed with balancing the responsibilities currently delegated to each member of the LAHSA Commission, CoC Board, and CES Policy Council.

**EXHIBIT 36 - Page 1564**

## Recommendation: Consolidate Governance Bodies into Single Board



### LAHSA Commission

### CoC Board
(not referenced in JPA)

### CES Policy Council
(not referenced in JPA)

## Single Board

## Recommendation & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous stand-alone recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • Begin process to consolidate LAHSA Commission, CoC Board, and Coordinated Entry System Policy Council into a single board <br>    – Process would include analysis of proper evaluation of size, composition, and equity <br>    – Single board would include but not be limited to cities, COG, lived expertise, subject matter expertise, business, FBO representation <br> • In the interim, appoint County Department Heads to CES Policy Council <br>    – Should not be justification to avoid collapsing boards |
| **Action Needed** | Majority vote (e.g., six of 10 members) of the LAHSA Commission. <br><br> Amendment of the LAHSA JPA and CoC Charter may be required for consolidation. <br><br> *See* Recommendation Brief No. 4 (detailed steps to implement). |

EXHIBIT 36 - Page 1565

**b. Prior to Consolidating Various Boards within LAHSA and the Greater Los Angeles Continuum of Care, Appoint County Department Heads to the CES Policy Council**

As an interim step, during the period prior to consolidating the LAHSA Commission, CoC Board, and CES Policy Council into a single board, we recommend the Board of Supervisors direct department heads to sit on the CES Policy Council. The Department of Children and Family Services, Department of Health Services, Department of Public Social Services, and the Los Angeles County Development Authority participate on the Council, but their seats are occupied by mid-level executives. Having department heads sit on the Council would foster a cross-pollination among department heads, the County, and the CoC, and would provide a more direct line of communication between elected officials and the CES Policy Council.

Such an action can be taken immediately and unilaterally by the Board of Supervisors. However, we wish to emphasize that this recommendation should not be a justification to delay or avoid consolidating the various governing boards that sit within LAHSA and the CoC. Accordingly, the period of time during which department heads participate on the CES Policy Council should be flexible. Given the importance of the issues being decided by the CES Policy Council, such as the development of bed prioritization policies, this action has the potential for significant impact.

## 5 Improve LAHSA's Operations

More could be done to enable the success of LAHSA, as summarized below. However, similar to consolidating the LAHSA Commission, CoC Board, and CES Policy Council into one body, perhaps the most the Board of Supervisors can do immediately is work through County-appointed LAHSA commissioners to implement this recommendation. To initiate action, a majority of the LAHSA Commission would need to agree, requiring at least one City-appointed LAHSA commissioner to agree.

**a. Define Decision-Making Responsibilities and Embed an Ops Team to Improve LAHSA's Operations**

Some observe that LAHSA does not have the necessary role definition among its governing boards and leadership to realize its potential, nor the resources and expertise to manage the demands of its stakeholders. LAHSA's operational issues are not new but have become far more prominent since the passage of Measure H in 2017.

To improve its operations, we recommend that clearer lines be drawn to delineate the authority between the LAHSA Commission and the Office of Executive Director. There are few, if any, formally established written patterns or precedents as to when the Office of Executive Director must bring policy issues to the LAHSA Commission for decision-making. The LAHSA Commission does not function as a traditional voting body. For example, we learned that its commissioners are not in the regular practice of bringing forward motions to vote on subject matter within their jurisdiction.[31]

The Office of Executive Director, for better or worse, has some latitude to make policy decisions of importance without involving the LAHSA Commission. This may be appropriate when the decision at issue is one that does not have systemwide ramifications or, as we saw during the COVID-19 pandemic, when urgent action is needed. However, when the Office of Executive Director is called to make unilateral decisions of systemwide import, the consensus-building that the LAHSA Commission is required to undertake and the public forum in which actions should be taken are lost. This hurts the system overall.

There are also similar issues with decision-making among various boards within LAHSA. As noted above, there are many boards and decision-makers within LAHSA and the CoC with confusing and sometimes conflicting or misunderstood lines of authority. Better defining decision-making responsibilities among these bodies is also crucial.

In addition, LAHSA needs to ensure it has the appropriate staff and expertise to manage a budget of over $700 million and a staff of over 600 employees. To improve overall operations, we recommend the creation of an "Ops Team" of experts embedded in LAHSA to make operationally focused recommendations and partner on reforms within LAHSA. This team should focus on, but not be limited to, defining decision-making responsibilities;

**EXHIBIT 36 - Page 1566**

ensuring that LAHSA's executive team has the depth, resources, and support to operate an organization of the size and complexity of LAHSA; supporting ongoing efforts to improve contracting operations; streamlining procurement processes; improving payment systems; supporting ongoing efforts to ensure that providers are paid on time or provided with technical assistance; improving communications; and ensuring more outreach work is performed on weekends and holidays with existing or added resources.[32]

The Board cannot unilaterally direct this recommendation due to the design of LAHSA. For instance, there is no clear path to identify to whom the Ops Team would answer, how LAHSA would reconcile conflicts if the City disagrees with recommendations or directives issued by the Ops Team, or how recommendations would be implemented (e.g., whether the recommendations would require approval of the City, County, LAHSA Commission, no governing partner, or some or none of the above). These issues would need to be worked through.

## Recommendation & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a stand-alone recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • Define decision-making responsibilities including but not limited to the LAHSA Commission, the LAHSA Executive Director, the various boards within LAHSA and the CoC, and other entities<br>• Embed Ops Team to improve LAHSA's Operations, focused on—<br>  – Contracting<br>  – Procurement<br>  – Payment systems<br>  – Technical assistance<br>  – Improving communications<br>  – Weekend work<br>  – Ensuring LAHSA's executive team has the depth, resources, and support to operate an organization of the size and complexity of LAHSA |
| **Action Needed** | Board action to support an "Ops Team" embedded in LAHSA to improve LAHSA's operations.<br><br>Board/City actions to direct an Ops Team to define roles and responsibilities between the LAHSA Commission and LAHSA Executive Director.<br><br>Majority vote (e.g., six of 10 members) of the LAHSA Commission to implement and monitor.<br><br>*See* Recommendation Brief No. 5 (detailed steps to implement). |

## 6 Data and Metrics

### a. Require Access to, Sharing of, and Tracking of Data and Define Success

To facilitate good policy decisions, we recommend the Board and LAHSA take steps to ensure greater access to data, such as by providing cities access to data maintained within our region's Homeless Information Management System (HMIS) to better inform the efficiency of programs and services offered. This should be accomplished through the development of policies and guidelines that provide access to data and define when and how that data can be used. Likewise, we should establish and implement quality standards for data input, sharing, access, and reporting, to the extent compliant with law, as a means to safeguard the privacy and accuracy of data. This will require the support of the majority of the LAHSA Commission members, and to the extent this work is underway within LAHSA, ensure that our region capitalizes on those efforts.

25    Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1567**

In addition, we urge the Board to require the sharing of data within County departments, between cities, the County, and LAHSA. There is no need to maintain artificial barriers to data sharing within the County and across the region. However, absent a County entity that is responsible for leading on homelessness, there is no entity within the County that is working daily to ensure a free flow of data. Any data sharing should also comply with applicable law.

The region also needs comprehensive and regular data-driven reports on how monies are used to serve people experiencing homelessness, including how federal, state, and local funds, such as CoC, Mental Health Services Act, and Measure H dollars, are spent by the County and LAHSA in each city, and whether those funds result in successful outcomes, with a focus on equity. This information is also relevant to the long-term design of any local solutions program within Measure H. The County entity and LAHSA would need to develop systems for tracking and publishing this data as well as communicating the data to decision-makers and stakeholders.

Finally, it is absolutely essential that we develop and implement common definitions of and metrics for success and tools for accountability in partnership with LAHSA so that LAHSA and the County evaluate and communicate success in the same way systemwide. This effort is also vital to ensure that we are tracking data and outcomes in a way that allows our system to combat racism and design equitable policies.



**Recommendation: Data and Metrics**

**Increase** — Increase **access** to data

**Adopt** — Adopt policies to **enhance and require data sharing** and break down barriers to data sharing

**Define** — Define **metrics of "success"** of Measure H-funded programs other funding sources

**Develop** — Develop **formulas for tracking**
- Collection/spending Measure H funds by department at city-by-city level
- Collection and spending of all funds on a systemwide funding to determine where received funds are spent

EXHIBIT 36 - Page 1568

## Recommendations & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous stand-alone recommendation that could be acted on irrespective of other actions taken by the Board. |
| **Primary Components** | • Require data sharing<br>    – HMIS access<br>    – Between County departments<br>    – Between cities, County, and LAHSA<br>• Establish and implement quality standards for data input, sharing, access, and reporting, to the extent compliant with law, as a means to safeguard the privacy and accuracy of data<br>• Define and implement metrics of success and tools for accountability<br>• Develop formulas for tracking—<br>    – Measure H funds by County Department at city level<br>    – Use of all funds systemwide<br>    – Metrics through an equity lens |
| **Actions Needed** | Unilateral Board actions for County-specific actions.<br>Majority vote (e.g., six of 10 members) of the LAHSA Commission.<br>*See* Recommendation Brief No. 6 (detailed steps to implement). |

## 7 Executive-Level Action Team

### a. Create a Forum for Executive-Level Action

Our system lacks a forum for convening decision-makers and thought leaders from across the region to discuss goal-setting, policy, funding, fundraising, philanthropic initiatives, operations, data, equity, and the "fair share" of resources. We support the concept of an executive-level team that would be responsible for convening decision-makers and thought leaders, and urge the Board to do the same. Proposals in reports such as The Committee for Greater LA's "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles" call for the creation of "The Center" as a "Home Base of the Community-Wide Commitment to Addressing Homelessness in Los Angeles."[33] Any such entity could work with but not serve in the place of a County entity.

Building on the concept proposed by the Committee for Greater LA, we envision that any centering body would include the State. We also envision that the body lead in generating a surge of resources, lead in transition as other changes are implemented such as those within the purview of the County entity or LAHSA, and play a leading role in identifying issues and solutions regarding homelessness. Further, such a body would drive reforms requiring urgency, discuss issues of common interest, and facilitate data development and sharing. To date, neither the County nor City has formally expressed support for an executive-level action team, but at the same time, neither has opposed the concept. The County should lead the way on standing up a body of this nature.

27  Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1569**

## Recommendation: Executive-Level Action Team

### Team of Decision-Makers

- City, County, Other Cities, State (e.g., Mayor, Council President, BOS Chair, BOS Member, Chair Appointee, COG appointee(s), representative of Governor)

### Advisory Committee

- E.g., LAHSA, HCID, DMH, DHS, new County homelessness leader, CEO-ARDI, lived expertise, service providers, philanthropy, academia, business community, education system, veterans

### Forum

- Convened by third-party nonprofit, County leader, City, or State

### Focus on common interests relating to:

- Urgency
- Policy
- Funding
- Operations
- Diversity, Equity, Inclusion
- "Fair Share"



**Executive-Level Action Team**

**Board could direct County to negotiate and enter into with City of L.A. and other stakeholders an MOU concerning formal meeting schedule**

## Recommendations & Actions Needed

| | |
|---|---|
| **Recommendation** | This is a unanimous stand-alone recommendation that could be acted on irrespective of other actions taken by the Board |
| **Primary Components** | - County to support "Centering" forum<br>- Decision-makers to convene<br>- Intended to—<br>    – Drive reforms requiring urgency<br>    – Discuss issues of common interest<br>    – Facilitate data development and sharing |
| **Actions Needed** | Endorse the concept of "The Center" or an entity like it, and invite the City of Los Angeles, other cities, and other decision-makers to participate.<br>*See* Recommendation Brief No. 7 (detailed steps to implement). |

**EXHIBIT 36 - Page 1570**



# Recommendation Brief No. 1: County Entity and Leader

29 Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1571

**1** **Voices**

> "We **need a central coordinating entity within the County** (and a County CoC) authorized by the Board to make recommendations to the Board that are actionable across County Departments and the Region."
>
> – Jonathan E. Sherin (Director, Department of Mental Health), interview with BRCH staff, September 14, 2021

> "There's no doubt that coordinating within the County family can only lead to better outcomes.** But . . . you need a strong leader, you need a visionary . . . you need someone who can bring all of these entities together, who's strong enough to develop the mission, who's strong enough to run these projects, bring the people to the table, and say how do we get this done right?"
>
> – Antonia Jimenez (Director, Department of Social Services), presentation at BRCH Regular Meeting, February 2, 2022

> "**Leadership of the region's homeless-ness crisis must be shared** across all 88 cities as well as the County BOS."
>
> – Alisa Osunfunke Orduna (Member, LAHSA, Black People Experiencing Homelessness Steering Committee), interview with BRCH staff, January 31, 2022[34]

> "**County departments are siloed and don't coordinate** well to support a consistent, systemic response to homelessness"
>
> – John Maceri (CEO, The People Concern), interview with BRCH staff, October 18, 2021

**2** **Concerns**

In many ways, our homelessness delivery system is confronted with the problem of fragmented decision-making. Within the County, several departments—including the Departments of Public Health, Mental Health, Health Services, Children and Family Services, Public Social Services, Public Works, Planning, Military and Veterans Affairs, the Sheriff, and the Los Angeles County Development Authority—have offices, programs, operational leads, or divisions serving people experiencing homelessness, yet are not always acting in concert with each other.

In addition, CEO-HI is a part of the County's homelessness response. CEO-HI's primary role is to recommend how County homelessness funds are allocated along Board-approved homelessness strategies and related policy. However, aside from that role, its responsibilities are relatively limited. It is not a stand-alone entity on equal footing with other County departments and entities involved with the County's response to homelessness, nor does it have the authority to oversee, coordinate, or monitor those departments and entities. CEO-HI is not at the level of an independent County department or authority.

There is no countywide entity whose sole focus is to lead on homelessness and to serve people experiencing homelessness on an integrated and daily basis. In addition, there is no single entity dedicated to driving policy, operational improvements, and systems change. Consequently, the machinery of the County is not operating optimally in its efforts to address homelessness.

As discussed below, with the establishment of a countywide entity with responsible charge, accountability, and authority over homelessness within the County, County departments could improve communications; develop interagency integrated or strategic planning to improve outcomes; combine funding resources; better utilize Measure H funds' share data or centralize data management; and bring more formality, leadership, and standards for outreach. Such an entity could also convene other cities and foster collaboration and community engagement, provide technical assistance, ensure better contracting, and engage in specific intergovernmental advocacy for homelessness issues.

**EXHIBIT 36 - Page 1572**

### 3 Recommendations

**a. Establish a County Entity Dedicated to Homeless Service Delivery**

We recommend the Board establish an entity with the authority to lead on homelessness in the County, including prevention; rehousing; housing acquisition; accountability for timely contracting and payments; access to health care, including mental health and substance-use disorder treatment; and access to urgent services (e.g., 24/7 outreach and housing services, including on weekends, from a single-point-of-contact phone number) in a sustainable way. This entity is not intended to reshuffle the existing deck or simply create a lumbering bureaucracy.

The head of the entity would report directly to the Board, and the entity could be directly accountable for:

- Provision of homelessness-related services, policy implementation, and strategic planning on behalf of the County, in partnership with LAHSA, with a focus on homelessness prevention; rehousing; housing acquisition; accountability for timely contracting and payments; access to health care, including mental health and substance-use disorder treatment; and access to urgent services (e.g., 24/7 outreach and housing services, including on weekends, from a single-point-of-contact phone number);

- Oversight over Measure H funds, assuming the role currently played by CEO-HI should the Board deem appropriate, and including those Measure H funds currently administered by LAHSA earmarked for outreach, interim housing, and permanent supportive housing, should the Board elect to shift administration of those funds away from LAHSA to the entity now or in the future;

- Oversight over implementation of Board-approved homelessness initiative strategies, including establishing metrics to inform the County's annual planning and budget allocation process, providing the Board with recommendations for program improvements, and discontinuing unsuccessful practices (e.g., overreliance on the use of the point-in-time count to distribute Measure H funds);

- Leading countywide outreach efforts, including, in collaboration with the Department of Mental Health and the Department of Health Services, coordinating and setting standards for outreach to people experiencing homelessness and coordinating that effort among various non-County governmental departments;

- Incorporating equity principles in the work performed by stakeholders and aligning our system with the County's anti-racism policy agenda;

- Assuming a level of responsibility for the County's services system for families experiencing homelessness and veterans;

- Convening, coordinating, and leading work groups to support implementation and policy creation within County systems and LAHSA (see Recommendation Brief No. 1, Section 3(b) below for additional details);

- Developing, in partnership with regional agencies including the Los Angeles County Development Authority and LAHSA, other housing authorities, cities, and the private sector, a "Centralized Housing Acquisition Unit" responsible for landlord and property management relationship-building, centralizing the identification of available housing units, coordinating incentive programs to secure units, developing opportunities for master leasing and shared housing, and coordinating with related efforts region-wide;

- Lead on County coordination, focused on: (i) ensuring interdepartmental coordination between the County entity and other County departments; (ii) developing and implementing external and internal policies to guide the County's response to homelessness for issues such as funding, data, and staff; and (iii) actively developing policy recommendations for the Board's consideration;

- Developing and staffing system navigators for local governments to foster collaboration on local solutions to homelessness, to engage and educate stakeholders, and to provide technical assistance;

**EXHIBIT 36 - Page 1573**

- Developing subregional leadership bodies to be responsive to the individual needs of the City of Los Angeles, other cities, COGs, and unincorporated communities and to solicit input to inform the Measure H budgeting process, among other initiatives;

- Identifying, lobbying for, and ensuring that funding streams other than Measure H are created and expanded to fund programs to serve people experiencing homelessness, so that Measure H funds are not being used to support services that could be paid with other funding streams;

- Convening the Faith Collaborative to End Homelessness, which consists of faith leaders, homelessness liaisons, and leads from various County agencies and elected offices, to better utilize the resources of the faith-based community;

- Exploring the County's role in the region's CoC with, among others, HUD, and evaluating whether the current CoC is best serving the needs of the region and its stakeholders; and

- Tracking the spending of all funds dedicated to homelessness systemwide, and applying an equity lens to the metrics that drive the policies affecting people experiencing homelessness.

The City could follow suit and create a sister entity.

The form, function, and cost of the entity are factors to be addressed by the Board of Supervisors and CEO. There are several options to organize a County entity. For instance, under the County Charter, the Board has the authority to create a new County department. Alternatively, the County could enter into a joint powers agreement with another entity such as LACDA and form a stand-alone authority. The entity would then share any powers common to the County and LACDA.[35] With a County department or a new JPA, the Board could have direct control over its expenditures and functions. Another option could be the creation of a multidisciplinary entity similar to the County's Office of Emergency Management, with a lead office, department, or subdepartment, responsible for centralizing, coordinating, and implementing the County's homelessness response strategies.

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Within three months of the Board's receipt of this Report: (i) determine the form of the County entity; and (ii) appoint a team for a period of 24-36 months to start-up the entity. The entity could take the form of a department, joint powers authority, or multidisciplinary entity similar to the County's Office of Emergency Management, with a lead office, department, or subdepartment responsible for centralizing, coordinating, and implementing the County's homelessness response strategies.** | • **Pro:** The creation of a County entity fills a void that currently exists in our system. The County needs an entity charged with oversight of and responsibility for homelessness-related services. <br> • **Pro:** A County entity would be the vehicle to bring about sustained and comprehensive reform as to homelessness within the County and provide a center point for other departments, Board offices, other municipalities, LAHSA, service providers, philanthropy, and the public to address the regional homelessness crisis. <br> • **Pro:** The governance authority is clear—it rests with the Board, facilitating timely and direct decision-making. <br> • **Pro:** The County entity is envisioned to perform functions more expansive than the functions performed by CEO-HI. Currently, CEO-HI's role is focused on administering the funding process for County homelessness initiatives and related policy. <br> • **Pro:** A start-up team should be appointed as an interim step so work can begin immediately as the County moves to put in place a longer-term entity. <br> • **Pro/Con:** An investment of time and funding will be needed to support a longer-term entity, although the final form of the entity could reduce its cost. |

**EXHIBIT 36 - Page 1574**

| | |
|---|---|
| **2** **Board Motion: Define the duties of the County entity, including:** <ul><li>Duties relating to homelessness prevention, rehousing, housing acquisition, accountability for timely contracting and payments, access to health care, and access to urgent services;</li><li>Oversight of Measure H funds and outcomes;</li><li>Contract management;</li><li>Centralized data management across County departments;</li><li>Providing technical assistance and expanding provider capacity;</li><li>Budget planning;</li><li>Evaluation of HI strategies;</li><li>Convening of stakeholders and subregional leadership bodies;</li><li>Strategy and policy development; and</li><li>Oversight of continuum of services (e.g., interim housing, permanent supportive housing, outreach).</li></ul> | <ul><li>**Pro:** A clearly defined portfolio of responsibilities will position the County entity to quickly respond to crises and move the County out of reactive mode.</li><li>**Pro:** At the direction of the Board, the duties of the County entity could evolve over time to meet the demands of the overall homeless services delivery system.</li><li>**Pro/Con:** The Board should be mindful that any role that the County entity might play should avoid creating duplicative missions, work, and practices, and avoid placing additional administrative burdens on stakeholders.</li></ul> |
| **3** **Board Motion: Direct the County entity to meet and confer with the City of Los Angeles and other cities to facilitate closer collaboration.** | <ul><li>**Pro:** With respect to the City of Los Angeles, it would be mutually beneficial if the County and City mirror each other by creating new entities.</li><li>**Pro:** The County, the City, and other cities would benefit from clearer lines of communication and governance from the County and City.</li><li>**Pro:** Even if the City does not create an entity, the County entity will be a single point of contact for the City.</li></ul> |
| **4** **Board Motion: Direct the County entity to review, consider, and implement the strategies that are currently in development to integrate the faith-based community into the County's overall response to homelessness. Strategies are expected to be published by or around May 2022.**[36] | <ul><li>**Pro:** The County entity is positioned to lead the integration of faith-based homeless services into the County's homeless services delivery system.</li></ul> |

## b. Inter-County Work Groups

We propose the creation of standing work groups convened, coordinated, and led by the County entity to support policy creation and implementation within County systems and LAHSA. This arrangement would follow a similar model in Houston, Texas, where the region convenes stakeholders to develop goals, policy, and implementation plans across systems in the areas of Higher Levels of Care, Access to Treatment, Encampment Closures, Discharge Planning, Criminal Justice System, and Prevention & Diversion. The County, in coordination with its various partners including LAHSA, would need to identify the specific departments that should participate in each working group.

**EXHIBIT 36 - Page 1575**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1**   **Board Motion: Direct and authorize the County entity to convene work groups based on the Houston model to include various departments, service providers, and other stakeholders to meet at least quarterly.** | • **Pro:** There is no current infrastructure within the County exclusively accountable to the Board on the issue of homelessness, with the authority to routinely convene decision-makers to develop policy and plan or implement Board-approved strategies across the homeless services delivery system.<br><br>• **Pro:** The creation of work groups will focus cross-system policy development and implementation. |

### c. Establish Subregional Leadership Infrastructure

Relationships between the County, unincorporated areas, and cities in the region are crucial to the homeless services delivery system. The community must be recognized and valued as partners. The County can re-establish its relationships with other local governments by increasing the transparency of its decision-making, budgetary, and evaluation processes and by providing a forum for education, communication, and solicitation of local input.

To accomplish these aims, the entity could convene regional committees, organized in the manner determined by the region, with local elected officials or their designees for each city. The geographic organization for each committee could be drawn along SPA or COG boundaries. The entity would be responsible for convening the committees, perhaps in partnership with a third-party facilitator. Some of this work has been done in parts of the County where service providers have actively worked to convene local government, but the practice is not widespread.

The regional committees could be a first step in developing subregional leadership bodies across the County. At the discretion of the Board, the committees could receive grants to fund local initiatives within their constituent cities or unincorporated areas. This type of funding could be complementary to or part of any local solutions fund designed and administered by the County, as described in Recommendation Brief No. 2 below. The committees could also be a forum for feedback and input with respect to items such as the annual Measure H funding process.

**EXHIBIT 36 - Page 1576**

## Steps to Implement

| Actions | Pros/Cons |
| --- | --- |
| **1** **Board Motion: Direct and authorize the County entity to convene regional committees of elected officials from unincorporated areas and cities, with boundaries defined by SPA or COG, and an internal governance structure to be determined by each committee.** | • **Pro:** There is no current infrastructure within the County to support subregional leadership within the homelessness governance system.<br><br>• **Pro:** Regional committees would provide forums for feedback and input with respect to the annual Measure H funding process, among other items. |
| **2** **Board Motion: Direct the County entity to select a neutral, third-party facilitator to work with regional committees to facilitate communications and assist with systems planning and developing local strategic plans for homelessness.** | • **Pro/Con:** A third-party facilitator could help develop goals and plans for implementation across stakeholders within the County. |
| **3** **Board Motion: Direct the County entity to convene regional committees to solicit input with respect to the allocation or use of Measure H funds for any local solutions, initiatives, or funds.** | • See above. |

35   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1577**



# Recommendation Brief No. 2:
# Measure H / Local Solutions

EXHIBIT 36 - Page 1578

##  Voices

> "There are **strings attached to Measure H funding; no local preferences are allowed**; local jurisdictions are not allowed to house their homeless first…."
>
> – Adam Raymond (City Manager, City of Glendora) and Moises Lopez (Assistant City Manager, City of Glendora), interview with BRCH staff, October 21, 2021

> "We used general fund money to build a shelter, because **if we took Measure H money, we would not be allowed to prioritize City residents** experiencing homelessness."
>
> – Councilmember Jessica Martinez (City of Whittier) and Shannon Delong (Assistant City Manager, City of Whittier), interview with BRCH staff, December 6, 2021

> "The **community doesn't see tangible Measure H impact** … By securing multiyear contracts with funding allocations, the City can stand up bigger projects that show the positive impact of Measure H."
>
> – Corri Planck (Strategic Initiatives Manager, City of West Hollywood) and Elizabeth Anderson (Strategic Initiatives Program Administrator City of West Hollywood), interview with BRCH staff, October 15, 2021

> "**Residents don't feel they are getting 'their' fair share** of Measure H."
>
> – Mike Miller (Director of Neighborhood Services, City of Palmdale) and Sophia Reyes (Housing Coordinator, City of Palmdale), interview with BRCH staff, December 20, 2021

> "A **little bit [of Measure H] goes a long way.**"
>
> – Adam Raymond (City Manager, City of Glendora) and Moises Lopez (Assistant City Manager, City of Glendora), presentation at BRCH Regular Meeting, November 3, 2021.[37]

> "**Local solutions** need to be **allowed**."
>
> – Dylan Feik (City Manager, City of Monrovia), interview with BRCH staff, October 27, 2021

## Concerns

On March 7, 2017, voters in Los Angeles County approved Measure H, an unprecedented investment in our regional homelessness services delivery system. The measure, which authorized a $0.25 sales tax collected countywide, sunsets in 2027 unless renewed by the voters. In the most recent fiscal year (2021-22), Measure H generated approximately $454.8 million. On average, Measure H generates $355 million annually.

The Measure H ordinance is applicable in the incorporated and unincorporated areas. However, unlike other recent tax measures approved by County voters, such as Measure W and Metro Measure M, Measure H has no local return, and the communities across the region do not share in the Measure H dollars as a matter of right. Cities and COGs criticize Measure H as not providing cities their "fair share." Further, some note that there is inadequate data for cities to determine whether Measure H programs are combating homelessness effectively in their jurisdictions.

Over the course of the past six months, the BRCH has heard from many cities across the region over their frustration in not having direct access to Measure H dollars. To access Measure H dollars, cities are often required to contract through the COG for their region or the lead service provider in their SPA. For most of the cities we heard from, the process to secure Measure H funds is overly burdensome and bureaucratic, rendering it ineffective. The lack of any local return formula also frustrates the cities. Notably, leaders in the cities we spoke to do not dispute

37   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1579**

that most of the Measure H dollars should be directed to those parts of the region most impacted by homelessness. Nevertheless, most commented that their cities could benefit tremendously from receiving some percentage of local return, commenting that "a little goes a long way."

For example, in early 2021, Bridge to Home (BTH), the only homeless shelter in the Santa Clarita Valley, needed $210,000 in funding to facilitate its move to a new, temporary location that would allow the City of Santa Clarita to reopen its Newhall Community Center while providing sufficient time for the construction of a new, permanent shelter. Despite generating over $26 million in Measure H funds, Santa Clarita could not quickly access those funds. The City was asked to follow an extensive funding application process despite the immediate need for shelter funds. As a result, the Santa Clarita City Council was forced to donate $100,000 to BTH and the County stepped in with an additional $110,000 to fund the project.

Another example involved the City of Culver City. Culver City identified a facility to serve as both an interim housing and permanent housing option. Culver City needed $4.91 million annually to operate the facility yet did not have direct access to Measure H dollars. Culver City has generated over $18 million in Measure H dollars since 2017 and received $596,456 in funding, a return of less than 5 percent over five years. While Culver City would not reject full funding to operate the facility, it was primarily interested in obtaining *some* level of support, whatever it might be. However, there was no clear access to Measure H dollars. Ultimately, and not without difficulty, funds came from another source in the amount of $1.764 million over five years to be applied for permanent housing. Had Measure H funds been immediately available, Culver City could have stood up the facility sooner, possibly creating momentum and interest throughout the west side for similar projects.

Adding to the frustration, Measure H funds are allocated through an elaborate funding process that involves the consideration of 51 Board-approved strategies. Those strategies, which were first devised in February 2016 and supported by a $100 million County investment prior to the passage of Measure H, have only recently been reevaluated. On April 20, 2021, the Board called for a reassessment of the strategies to address the evolving homeless crisis, which is currently underway. CEO-HI is leading the effort to reevaluate the County's homelessness strategies.

As of the 2021-22 fiscal year, Measure H provides funding for approximately 17 strategies, with the largest investments in permanent supportive housing, interim housing, and outreach. Measure H funds for these initiatives are largely divided between County departments (primarily the Departments of Public Health, Mental Health, Health Services, and Public Social Services) and LAHSA, with County departments receiving funds to service people experiencing homelessness who require higher levels of care and LAHSA charged with serving the balance.

When the County departments and LAHSA receive their respective allocation of the Measure H dollars, those dollars have already gone through a five-month approval process at the Board-level, including: two rounds of public comments; the release of draft funding recommendations; a public webinar; and interagency coordination among County departments, agencies, and LAHSA. Public participation in the funding recommendation process has either waned or remained stagnant, which is cause for concern. By the time LAHSA receives Measure H dollars, much, if not all, of the decision-making concerning how those dollars are to be spent has been made by the Board of Supervisors.

County departments and LAHSA use Measure H dollars to fund homelessness-related services across the County, often through service provider networks utilizing an extensive contracting process. However, a significant portion of Measure H funds is allocated for interim housing and permanent supportive housing initiatives and requires ongoing funding. Thus, to the extent there is discretion to begin with, the discretion is shrinking as Measure H evolves into a funding source to sustain existing contracts and programs.

**EXHIBIT 36 - Page 1580**

 **Recommendations**

Many perceive the homelessness system as too inflexible to address the needs of local communities and people experiencing homelessness. Not enough is being done to foster innovation, and current policies are, at times, too focused on one-size-fits-all approaches. In many cases, local governments or COGs are better suited to address homelessness—they know their residents and institutions that can bring support to bear. The region needs to be more opportunistic and aggressive in leveraging the resources, ingenuity, and compassion of local governments. As discussed below, a renewed focus on local solutions is part of the answer.

### a. "Local Solutions" Fund

We recommend that the County establish a local solutions fund within Measure H to provide resources to local governments, including unincorporated areas, cities, and COGs, that, for example, will make a commitment to provide in-kind or matching contributions for the development of service programs and housing and to share data. Local governments should be included in the development and operation of solutions to address homelessness, and we believe they are willing to accept that responsibility.

County Code 4.73.040(C) provides that "[r]evenues from the retail transactions and use tax may be awarded as grants to public agencies and non-profit organizations to address the causes and effects of homelessness, consistent with this Chapter," subject to Board-approved "policies and procedures for the solicitation and award of such grants." Accordingly, there is a mechanism built into Measure H to provide innovative grants to public agencies.

Cities should be encouraged to develop creative, locally driven approaches to address homelessness and apply to the County for disbursement of available funds. However, while the local solutions program should be viewed—and funded—as a mechanism to support the local return of Measure H funds, the program should not come at the expense of weakening the current homeless services delivery system. The County should ensure regular reporting on outcomes to ensure monies are well-spent and goals—local, regional, or otherwise—are achieved. It is not the intent of the BRCH to defund or reduce funding for existing programs successfully operated by providers. Equally important, any funding program must ensure equity and apply equity principles to its design and administration.[38]

Similar innovation funds have been created in the past, but the amounts are small. And to be successful, such funds require the County's ongoing commitment. Further, the tracking of Measure H funds on a city-by-city basis is not clear, publicly known, or used to determine local solutions funding for programs that currently exist. Based on the feedback we received, without a local return mechanism and better tracking of how Measure H funds are distributed on a city-by-city basis, Measure H may not receive the regional support needed for its renewal.

**EXHIBIT 36 - Page 1581**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Direct the CEO to identify monies available to fund an ongoing (i.e., multiyear) local solutions fund using an algorithm or funded at an amount to be defined by the Board.** | • **Pro:** Creating such a program will allow stakeholders in other cities and unincorporated areas to develop local solutions, especially where a little money may go a long way.<br>• **Pro:** Granting other cities and unincorporated areas more access to funds could strengthen support for the renewal of Measure H.<br>• **Pro/Con:** The County will need to strike a balance between supporting a local solutions fund and existing programs funded by Measure H and equity.<br>• **Pro/Con:** Measure H funds are limited, so care must be taken to ensure that any local solutions fund does not result in the curtailment of successful programs. |
| **2** **Board Motion: Direct the County entity, in partnership with third-party subject-matter experts, to conduct an overall systemwide review of Measure H for the express and limited purpose of identifying common goals and metrics that could be used to determine the success of Measure H-funded programs.** | • **Pro/Con:** To use Measure H funds effectively, we need to know whether current and future investments yield optimal outcomes. However, we do not have adequate data and metrics to best inform decision-making.<br>• **Pro:** Engaging in an exercise to define metrics of success could allow the County to direct Measure H dollars away from unsuccessful programs and toward, among other initiatives, a local solutions fund. |
| **3** **Board Motion: Direct the CEO to develop formulas for tracking the spending of Measure H funds by County departments and LAHSA on a city-by-city basis.** | • **Pro:** The County must first understand how Measure H funds are spent in cities. This information should also be used to inform the annual budget for a local solutions fund. However, we do not have adequate data and metrics to best inform decision-making.<br>• **Pro:** The public demands a tracking of how Measure H funds are spent in each city. |

**EXHIBIT 36 - Page 1582**



# Recommendation Brief No. 3: The Role and Governance of LAHSA

41   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1583**

## A. The Role of LAHSA

### 1  Voices

"**Who is LAHSA?** LAHSA wants to do **too many things**."

– Reba Stevens (Mental Health and Homeless Advocate with Lived Expertise), interview with BRCH staff, October 14, 2021

"**LAHSA [is] pulled in all different ways** . . . and their mandate is too broad. This inevitably **leads to mission creep and a lack of focus** on core business component(s)."

– Christine Glasco (President and CEO, Upward Bound House), interview with BRCH staff, December 2, 2021

"The vast social, political, and programming **demands on LAHSA create incompatible mission creep**, rendering the agency overstretched and unable to achieve consistent quality."

– Mike Foley (former Executive Director, Bridge to Home), interview with BRCH staff, October 29, 2021

"It is **challenging that LAHSA also serves as a direct service outreach provider**; it sets providers up to compete for funding with them and [creates] situations that **distract LAHSA from their core functions** as a Continuum of Care lead."

– Amy Turk (CEO, Downtown Women's Center), interview with BRCH staff, October 13, 2021

"**If LAHSA's duties were limited, LAHSA could expand their duties** and model data analysis through the use of evolving cutting-edge technology, e.g., improving homeless counts and integrating data for analysis into By-Name Lists, CES, and HMIS for local planning and policy purposes."

– Joe Colletti (CEO, Hub for Urban Initiatives), interview with BRCH staff, October 18, 2021

"Much like a major corporation splits in order to unlock the power of its parts, it appears the time has come to break up LAHSA to better empower leaders and secure better outcomes."

– Mike Foley (former Executive Director, Bridge to Home), interview with BRCH staff, October 29, 2021

"But LAHSA's **challenges are not temporary**."

– Mike Foley (former Executive Director, Bridge to Home), presentation at BRCH Regular Meeting, November 17, 2021[39]

**EXHIBIT 36 - Page 1584**

##  2 Concerns

The overwhelming consensus is that too many responsibilities have been layered on LAHSA without an adequate scale-up process, and its governance structure cannot accommodate its ever-expanding role. LAHSA has seen dramatic growth in the past 28 years, but most of that growth occurred recently, beginning in 2017 with the passage of Measure H.

In 1993, the County and City created LAHSA to coordinate the operation of then-existing homelessness services and administer the spending of funds relating to homelessness. At its inception, LAHSA had a relatively limited role, focused primarily on the administration of very specific homelessness programs and the coordination and administration of those programs.

In 1995, the landscape changed on the heels of the McKinney-Vento Homeless Assistance Act of 1987, a federal law that provides federal funds for homeless programs. In response, HUD created its CoC program as a means to disburse federal funds. The region identified LAHSA as the lead agency of the Greater Los Angeles CoC. In that capacity, LAHSA became—and to this day remains—responsible for coordinating the application, disbursement, and monitoring of certain federal homelessness dollars and plays a role as our rehousing lead for what many describe as the most complicated CoC in the country.

In 2017, County voters approved Measure H, resulting in another fundamental change to LAHSA. Specifically, LAHSA now administers nearly $250 million annually in Measure H funds on behalf of the County to provide services or beds for permanent supportive housing, interim housing, and outreach. LAHSA also acts as a service provider in the field of outreach, employing over 200 outreach workers directly, and it holds itself out as a "systems administrator."[40] One consultant noted "the growth in staff [alone] has been sizable," finding a 252 percent increase in staff from 2015 to 2020,[41] causing LAHSA to grow from an organization of fewer than 150 employees to one employing over 600.

Many have commented that LAHSA has struggled in its expanded role. As a region, we need to decide whether LAHSA is going to be an entity that only deals with largely administrative matters surrounding the disbursement of federal funds and rehousing, as originally designed, or an entity that is a service provider, policymaker, advocate, and contracting agent that administers federal, state, and local funds, all in one. If LAHSA is to engage in all lines of business, some question whether LAHSA, as it exists today, is designed to handle an operation of the complexity and size those roles demand.

## 3 Recommendations

Determining the role LAHSA should play is a critical gating question that must be resolved before questions surrounding governance are answered. The BRCH recommends that LAHSA's role be streamlined to focus on serving as our regional CoC and rehousing lead and transition away from direct services in order to make way for County partners in this space.[42] That said, below, we outline options for the role LAHSA could play, ranging from a LAHSA that: (i) refocuses LAHSA in a streamlined form, (ii) maintains LAHSA in its current role, or (iii) results in the County's withdrawal from the LAHSA JPA, dissolving LAHSA in its current form.

### a. Streamlined LAHSA

The role of a regional CoC and rehousing lead is an important one—and a role that can, and we believe should, be the primary focus of LAHSA. As our CoC/rehousing lead, LAHSA is responsible for:

- Administering a process to plan for, ***develop, and submit a common application*** for federal funding of homeless programs under the McKinney-Vento Homeless Assistance Act;

- ***Managing the region's HMIS***,[43] an "online database that enables organizations to collect client-level, systemwide information on the services they provide to people experiencing homelessness and those who are at risk of homelessness"[44];

43   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1585**

- Determining *policy for the region's coordinated entry system*, which establishes how people experiencing homelessness are rehoused and prioritized using CoC-funded beds and services[45]; and

- *Administering Los Angeles' point-in-time count*, an annual survey recording the number of people experiencing homelessness in the region at a specific point in time pursuant to federal protocols, which is an important input for securing federal funds.

The Greater Los Angeles CoC is larger than many states. For a complex region like ours, the work involved as a CoC lead requires more than what most states take on. LAHSA has performed this work but does so under the strain of new responsibilities and duties it was not originally designed to perform. LAHSA can return to its role as CoC lead, focusing on federal programs and the administration of those programs. With a more manageable, limited portfolio, stakeholders could better understand the purpose and role of LAHSA and, therefore, set realistic expectations for LAHSA.

A more focused LAHSA could bring better results. For example, LAHSA will be able to focus on ensuring that federal funding opportunities are best aligned with state and local funding streams, and work with federal, state, and local partners to make that happen. LAHSA could also seek changes to federal requirements that make it difficult to house people in Los Angeles. Similarly, given its administration of HMIS, LAHSA could better position itself as a data-driven operation, serving as a hub for and providing access to data for governments, nonprofits, and other system partners, which could add value to the overall system.

In order to streamline, we also recommend that LAHSA transition away from providing direct services such as outreach. Many find that LAHSA's current role as an outreach provider is counterproductive because LAHSA pays above-market rates that the providers cannot, thereby weakening our provider networks. The County entity, as opposed to LAHSA, could coordinate urgent access to direct services, centralize dispatch for outreach, enhance after-hours response teams, and eliminate duplicative outreach teams. The County has unilateral authority to make this happen without implicating the LAHSA JPA through its allocation of Measure H funding for LAHSA.

The transition away from direct services is not intended to impede, nor can it impede, the discretion of the City to fund LAHSA as it deems fit. However, should the role of LAHSA become more streamlined, and if the City were to create a single entity responsible for matters relating to homelessness, the City may seek to reevaluate which tasks should be executed by LAHSA and which should not.

As a final part of streamlining LAHSA's role, the County—through Board action—should begin the process of studying the reallocation of Measure H strategies between LAHSA and the County entity. As a starting point, the County would need to determine which Measure H funds are best administered by the County versus LAHSA. Of course, the transition of Measure H strategies to the County entity would need to proceed in a manner that does not disrupt service delivery to people experiencing homelessness, does not undercut successful programs operated by service providers, or increase administrative burdens in contracting or payment to stakeholders. Each of these considerations are relevant to the ultimate allocation of strategies.

The County entity could spearhead the review of Measure H strategy allocation in coordination with LAHSA, although LAHSA "does not agree with recommendations around reallocation of all Measure H" about of a concern over "contracts, burden on service provider and significant system impact which would result in delayed progress towards reducing homelessness."[46] Currently, LAHSA administers approximately half of all Measure H funds. And to be clear, as noted above, any study of the allocation of strategies would need to consider contracting, administrative burdens, and protecting successful programs.

**EXHIBIT 36 - Page 1586**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Direct the County entity to study the allocation of Measure H strategies between the County and LAHSA.** | • **Pro/Con:** This information would facilitate the streamlining of LAHSA to serve as CoC lead and reduce the burden posed by the additional responsibilities associated with the continuum of services funded by Measure H (e.g., interim housing, permanent supportive housing, and outreach).<br><br>• **Pro/Con:** The transition of Measure H strategies to the County entity would need to proceed in a manner that does not disrupt service delivery to people experiencing homelessness, does not undercut successful programs operated by service providers, or increase administrative burdens in contracting or payment to stakeholders. Each of these considerations are relevant to the ultimate allocation of strategies. |
| **2** **Board Motion: End Measure H funding to LAHSA for direct services.** | • **Pro/Con:** This begins the process of moving LAHSA away from its outreach role, thereby empowering nonprofits and other service providers to build more capacity with respect to outreach without counterproductive competition from LAHSA.<br><br>• **Pro/Con:** To the extent LAHSA provides direct services in unincorporated areas or any hard to serve areas, the County will need to ensure the transition from direct services does not reduce system capacity. |
| **3** **Board Motion: Direct the County entity to develop a transition plan for Measure H strategies that are shifted to the County, if any.** | • **Pro/Con:** For Measure H strategies that may shift to the County, a transition plan is necessary to ensure that there is no interruption in services provided to people experiencing homelessness. |

### b. Current LAHSA (*No Vote Taken*)

*(Not Supported by the Blue Ribbon Commission on Homelessness)*

We heard stakeholders describing the problems facing LAHSA as growing pains. Some stakeholders believe that if LAHSA is given time to adjust to its growth, it will ultimately succeed, suggesting that LAHSA could continue to wear many hats in its roles as a CoC lead, administrator of its share of Measure H funds, provider of direct outreach services, and self-styled "system administrator."

On the other hand, many stakeholders have a contrary view. From their perspective, LAHSA is doing too much, it is not a well-run organization, and it will forever be constrained by its lack of authority, including the inability to make final decisions of critical import, such as funding and related policy decisions (see Recommendation Brief No. 3, Section B(2), below for additional details). Changing the structure of LAHSA is no small task. The County and City would need to relinquish their respective control over funding and related policy to truly empower the organization. And while the County could cede authority, as discussed below, the testimony before the BRCH weighed in favor of streamlining LAHSA.

EXHIBIT 36 - Page 1587

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board/City Council Motion: Relinquish to LAHSA final decision-making authority currently exercised by the County and City with respect to funding and related policy decisions.** | • **Pro/Con:** For LAHSA to be a true "system administrator" with full decision-making authority, the County and City would need to cede authority to LAHSA for final decision-making on funding and similar decisions. However, before such an action should be taken, the County and City need to decide whether LAHSA is the entity best suited to serve as the system administrator for our region.<br><br>• **Pro/Con:** The likelihood that the County and City will truly cede authority for funding and similar decisions is uncertain at best.<br><br>• **Pro/Con:** Even if the County and City cede authority, unless other changes are made, LAHSA will continue to face issues because it does not represent other cities, and LAHSA cannot control County or City departments. |

### c. Dissolve LAHSA: Withdraw from LAHSA Joint Powers Agreement (*No Vote Taken*)

*(Not Supported by the Blue Ribbon Commission on Homelessness)*

In its motion creating the BRCH, the Board of Supervisors directed the BRCH to "explore the process of renegotiating and/or the implications of withdrawal from the LAHSA Joint Powers Agreement."[47]

Renegotiating the LAHSA JPA is complicated. Any change to the JPA requires an amendment to the agreement between the County and City. Either the County or City must provide 30 days' written notice to the LAHSA Executive Director and to the City or County, respectively, to initiate the amendment negotiation process.[48] No amendment can be made that is contrary to any contract or grant from the federal or state government if such a contract or grant was previously approved by the County or City.[49] To the extent there are changes to LAHSA that affect the operation, governance, or structure of the regional CoC, the regional charter governing the CoC may also require amendment and approval from HUD, injecting another party into the potential renegotiation.

Further, there are structural problems with how LAHSA is actually governed that a renegotiation of legal documents may not remedy. As discussed below, the County and City would need to relinquish authority over issues such as funding to empower LAHSA and its governing body to decide matters relating to homelessness, without the input of the County or City. Any such shift would constitute a sea change. There would also need to be a cultural shift to recognize this change. As such, the more practical approach might be to transition LAHSA to a streamlined design.

While the act of terminating the LAHSA JPA is less complicated, dealing with the aftermath of that action would present challenges. Either the City or County may unilaterally terminate the JPA, which would ultimately result in the dissolution of LAHSA (i.e., a joint powers authority cannot continue to exist if it does not have more than one member). To initiate the termination process, the County or City must provide the LAHSA Executive Director and the nonterminating party with 180 days' (six months') written notice.[50] All remaining property, including money, would be divided and distributed in proportion to the respective contributions of the County and City, unless otherwise required by law, contract, or other action.[51] However, no termination may be made that is contrary to any contract or grant from the federal or state government if such a contract or grant was previously approved by the County or City.

**EXHIBIT 36 - Page 1588**

As a practical matter, extensive negotiations between the County and City of Los Angeles seem likely, given the size and scale of LAHSA and its operations. A negotiation of this magnitude by two parties would be difficult. The time spent on this effort would impact time and resources spent on addressing the multitude of issues that make up the current humanitarian crisis, all of which warrant immediate attention and would be negatively impacted during a protracted negotiation period with an uncertain outcome. For this reason, any withdrawal from the JPA would need to occur concurrent with other changes to the overall system and should not take center stage at the expense of serving people experiencing homelessness.

The wind-down of LAHSA, according to HUD officials, could take approximately two to four years.[52] The purpose of the wind-down would be to identify and designate a new entity as CoC lead to replace LAHSA or create multiple CoCs with different CoC leads. LAHSA would continue to exist as a bridge to the new CoC lead or a new system of CoCs during the wind-down process. Regardless of how this process unfolds, the region would want to take steps to safeguard funding from HUD and the State so that such funding continues to flow into Los Angeles at current or similar levels.

Whether, as some have suggested, the region should shift from a unified CoC to a network of smaller CoCs is an interesting question. The answer will require conversations with HUD, the County, the City, LAHSA, and other cities. During the course of our research in seeking to answer this question, we spoke with CoCs and current and former HUD officials familiar with CoCs in New York, Houston, Santa Clara County, San Francisco, Atlanta, Seattle, San Diego, Glendale, Long Beach, and Pasadena and discovered some important principles that govern CoCs.

- Funding is limited, and the use of funds is restricted.

- The purpose of CoCs is prescribed by HUD regulations to focus on discrete tasks such as the annual application for funds, monitoring of federally funded contracts, oversight of the CoC's HMIS, administration of an annual point-in-time count, and development of policies for coordinated entry into the CoC's homeless services and housing programs.

- The vast majority of CoC funds are allocated for ongoing purposes with limited opportunities to increase funding.

- The organization of CoCs is malleable. Certain regions have multiple CoCs, while others, like Los Angeles, have unified CoCs. There is also the potential for a large, unified CoC that sets minimum standards but delegates certain responsibilities to regional hubs that are part of the unified CoC.

Regardless of how many CoCs a region has or how CoCs are organized, HUD funds available to the CoC or CoCs usually remain the same. However, since federal funds tend to flow to where the gravity of the homelessness problem is greatest, the CoC with the greatest need (i.e., the largest number of people experiencing homelessness) is likely to receive a greater share of limited funds, resulting in other CoCs receiving a smaller share.

EXHIBIT 36 - Page 1589

## Overview of Selected CoCs

| Los Angeles | |
|---|---|
| **Lead** | Joint Powers Authority |
| **Scope** | "[P]romote communitywide commitment to the goal of ending homelessness; provide funding for efforts by nonprofit providers, states, and local governments to quickly rehouse homeless individuals (including unaccompanied youth) and families while minimizing the trauma and dislocation caused to homeless individuals, families, and communities by homelessness; promote access to and effective utilization of mainstream programs by homeless individuals and families; and optimize self-sufficiency among individuals and families experiencing homelessness." |
| **Size** | 17 members |
| **Composition** | Board members include "[n]o more than eight (8) SPA representatives" and "[n]o more than nine (9) at-large representatives" from faith-based organizations, public housing agencies, advocates, mental health agencies, school districts, hospitals, universities, law enforcement, etc.; at least one member with lived experience |
| **Terms** | Not addressed |

| New York | |
|---|---|
| **Lead** | City-County Department |
| **Scope** | "The Steering Committee provides leadership and oversight to ensure the CoC carries out its mission and meets all HUD mandates and requirements. The responsibilities of the Steering Committee include, but are not limited to, operational oversight of the CoC, setting policy priorities, and monitoring CoC project performance." |
| **Size** | 17 members (Steering Committee) |
| **Composition** | Board members from government departments (4), nonprofits (3), with lived experience (4), at-large (2), and "coalition" (4) Advisory committee forthcoming to include CoC Board co-chairs; federal, state, and local government; nonprofits; philanthropy; those with lived experience; and those with "unique" expertise |
| **Terms** | 2 years/term with no term limits |

| Santa Clara | |
|---|---|
| **Lead** | County Department |
| **Scope** | (1) "Strategic Direction," which includes "setting strategic priorities regarding affordable housing and homelessness, providing oversight and strategic direction for CoC activities (including fiscal oversight and programmatic activities), and providing resources to support strategic priorities, to make long-term systemic changes, and to implement an effective system of care"; (2) "System Performance," which includes "[e]nsuring that the CoC is effective in ending and preventing homelessness, meets HUD requirements, and maximizes local, State, Federal and private resources"; and (3) "CoC Oversight." |
| **Size** | 4 ex-officio members, 3-7 at-large members |
| **Composition** | Ex-officio board members from County, City of San Jose, County Housing Authority, and County-supported nonprofit (Destination: Home); at-large board members include those with lived experience and at least 2 service providers |
| **Terms** | Standing terms for ex-officio members; 2 years/term for at-large members; no term limits |

**EXHIBIT 36 - Page 1590**

| Long Beach | |
|---|---|
| Lead | City Department |
| Scope | "Establish, approve, maintain, and update policies for the Long Beach CoC"; "Establish and support the development of plans to address homelessness in the region"; "Establish and maintain systemwide funding strategies to end and prevent homelessness"; "[S]upport the Department of Health and Human Services, Homeless Services Division as the HMIS lead, CES lead, and the Collaborative Applicant for the HUD CoC Program." |
| Size | 17 members |
| Composition | Board members from Council-appointed committee that includes members from nonprofits, the business community, veterans, those working in mental health, housing advocates, and those with lived experience |
| Terms | 3 years/term, with 2 terms max |

| Pasadena | |
|---|---|
| Lead | City Department |
| Scope | "Among its specified duties, the Pasadena Partnership Board is tasked with overseeing the Collaborative Application for the CoC [and] provid[ing] input into the planning, performance management, HMIS administration, and annual grant submission performed by the Pasadena Partnership. One of the Pasadena Partnership Board's primary responsibilities is the ranking and review of all new and renewal projects to be included in the CoC Application as well as making recommendations for reallocations." |
| Size | 7 voting board members, 1 nonvoting member |
| Composition | Board members from nonprofits, faith-based organizations, business community, those with lived experience, legal aid, City (nonvoting) |
| Terms | 3 years/term, with no term limits |

In looking at LAHSA, or any other CoC lead, no model is compelling. In determining how best to organize a CoC or system of CoCs for a region, the factors to consider include:

- **Cost/benefit:** A cost-benefit analysis that balances, among other things, the value of autonomy against the funds that our region would receive to serve people experiencing homelessness. Smaller CoCs may have more autonomy with simpler governance but may not receive the same level of funding compared to participants in a larger CoC.

- **CoC lead:** In some cases, CoCs are led by county or city governments, nonprofits, or organizations comprising counties and cities together. Our region would need to consider the architecture of any CoC lead. However, we did not see any material benefit or detriment based on the composition of a specific type of CoC lead.

- **Other factors:** One jurisdiction's CoC may be more effective than another's for a variety of reasons: there are fewer local governments (e.g., San Francisco, Atlanta); the state has laws that support a right to shelter and funding to support it (e.g., New York); a jurisdiction may allow and empower an entity other than the CoC lead to convene executive-level stakeholders (e.g., Santa Clara County); the jurisdiction is willing to depoliticize decision-making with respect to goal setting (e.g., Houston); and the jurisdiction has a smaller population of people experiencing homelessness (e.g., Glendale, Long Beach, and Pasadena).

Each of these factors would be important for our region to consider.

49   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1591

## Withdrawal from JPA

**Issues to address**

- New CoC lead or new CoCs (e.g., County CoC, City CoC, other cities CoC)
- Division of property and other assets
- Sharing of HMIS
- Prevent or mitigate loss of federal and state funds
- Other?

**County CoC?**

**Other Cities CoC?**

**Withdrawal from JPA (2-4 years)**

**City of L.A. CoC?**

**Federal CoC Program Funds = Approx. $150 million**

**# of CoCs**

**EXHIBIT 36 - Page 1592**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Direct County Counsel, in partnership with the County entity, to issue notice to the City to terminate the LAHSA JPA.** | • **Pro/Con:** Initiates a two-to-four-year process for wind-down and termination of LAHSA.<br>• **Pro/Con:** The County and City will need to transition to a new services delivery system without LAHSA, which has benefits and challenges. |
| **2** **Board Motion: Direct County Counsel, in partnership with the County entity, to (i) determine the effective date for the termination of LAHSA; (ii) distribute the assets of LAHSA between the County and City; and (iii) minimize or prevent the loss of braided funding.** | • **Pro/Con:** Negotiations will be needed for an orderly wind-down of affairs, including the distribution of assets and other issues as they may arise during the wind-down of LAHSA. |
| **3** **Board Motion: Direct the County entity to work with HUD, stakeholders, and cities in the region, including the City of Los Angeles, to (i) designate a new lead agency, such as the County, a nonprofit, or other entity, for the region's CoC or (ii) disband the current CoC into multiple CoCs across the region with different lead agencies.** | • See above.<br>• **Pro/Con:** If the region were to transition to multiple CoCs, that transition would be reduced to divvying up a set amount of funds, which may not bring more funds to the region. The more CoCs the region has, the less money each individual CoC will have. |

## B. LAHSA'S Governance

**4**  **Voices**

> "There is a **governance structure** around homelessness. It has a lot of **fundamental problems**….[I]t is built around an agency, LAHSA, which reports equally to the City and County of Los Angeles. When it was set up originally, that was an awkward relationship. That has continued to be an awkward relationship…."
>
> – Miguel Santana, (Chair, Committee for Greater LA) and Raphael J. Sonenshein (Executive Director, Pat Brown Institute for Public Affairs, California State University, Los Angeles), presentation at BRCH Regular Meeting, November 17, 2021

> **"[I]n practice, LAHSA is an organization with a lot of responsibility but no real authority."**
>
> – John Maceri (CEO, The People Concern), presentation at BRCH Regular Meeting, November 17, 2021

> **"LAHSA is pushed and pulled in numerous political directions constantly."**
>
> – Mike Foley (former Executive Director, Bridge to Home), presentation at BRCH Regular Meeting, November 17, 2021[53]

 51   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1593**

 **5** **Concerns**

LAHSA, as a decision-making body, has challenges, perhaps by design. Chief among the issues is that "neither the City nor the County ever fully delegated decision-making power on homelessness/re-housing assistance to LAHSA."[54] Likewise, LAHSA and its governing commission, do not—and cannot—control other County and City departments responsible for serving people experiencing homelessness, nor does LAHSA control funding, land use policy, housing, prevention, law enforcement, or other policy areas impacting our homelessness response.

LAHSA was created by agreement of the County and the City under a JPA. Pursuant to the JPA, LAHSA "shall be governed" by its commission, a 10-person appointed body, not accountable to the electorate, with five seats appointed by the County Board of Supervisors and five appointed by the Mayor of the City of Los Angeles, confirmed by the City Council.[55] Each commissioner serves at the pleasure of its appointing power for three-year terms, and neither the County nor City may opine on the selection of commissioners of the other party. Members sometimes sit beyond their appointed terms, there are no term limits or criteria for commissioner qualifications, and occasionally, seats are left unfilled.

The LAHSA Commission ostensibly oversees "a public entity separate and apart from the entities of the parties to this Agreement, which is capable of exercising independent powers."[56] That entity, LAHSA, is vested with the authority to exercise "powers common to the Parties to this Agreement [i.e., the County and the City] to provide homeless programs and services and other related social services to assist those persons in the community who are eligible to receive those services." Thus, on its face, the authority of LAHSA (and by extension, the LAHSA Commission) is broadly prescribed.

However, LAHSA's authority—and the authority of the LAHSA Commission—could be fairly described as illusory. While the LAHSA Commission may play a role in determining contract recipients for homeless funds given to LAHSA, many material governance decisions are made outside of LAHSA. For example, funding decisions are made outside of LAHSA and its commission, and in turn, governance occurs at federal, state, County, or City levels, but not within LAHSA itself. The LAHSA JPA even acknowledges that the County and City, not LAHSA or the LAHSA Commission, "shall review the proposed budget [of LAHSA] and present final funding recommendations for adoption by *the governing body of each Party* [i.e., the County and the City]."[57]

LAHSA's governance issues have existed since its inception, ensuring that the County and the City retain their independent decision-making ability and not relinquish it to LAHSA or the LAHSA Commission. LAHSA is torn between two power centers and is further divided by different priorities and agendas. Consequently, LAHSA's difficulties in performing as a system administrator has been attributed to its "limited ability to govern itself due to the terms of the Joint Powers Agreement."[58]

For the region to begin to resolve the LAHSA conundrum, the County and City would need to relinquish authority to LAHSA for decisions over funding and related policy. But even in that case, funding may not give LAHSA authority over region-wide prevention, housing acquisition, and mental health and substance-use disorder treatment policies, among other issues. This conundrum informs the role LAHSA might play and raises the question of whether current expectations of what LAHSA can or should do are reasonable. Stakeholders also question whether the roles the County, the City, and LAHSA play today should be the same roles that they are asked to play tomorrow.

**EXHIBIT 36 - Page 1594**

## 6 Recommendations

The increased role and size of the Authority, along with concomitant increases in people experiencing homelessness, have amplified the governance challenges that predate the current humanitarian crisis our region faces. With respect to LAHSA, two spheres of governance need to be considered: (1) governance of LAHSA itself as a joint powers authority through the LAHSA Commission, and (2) governance of the CoC, of which LAHSA is the lead entity for our region. Below, we begin with governance options for the LAHSA Commission, recognizing that the governance of LAHSA depends on the role it plays. In Recommendation Brief No. 4, we discuss governance options for the CoC.

### a. Maintain the Number of Seats on the LAHSA Commission, but Change Who Sits in Them (e.g., department heads, lived expertise representative, COG or cities representative)

The LAHSA JPA says nothing with respect to the selection criteria for LAHSA commissioners, with the exception that at least one commissioner selected by the City "represent the business interests in the downtown area."[59] With respect to the selection of commissioners by the County, the Board can unilaterally decide who will occupy its five County-appointed seats. Traditionally, each Supervisorial District has selected one commissioner. However, this is not a formal requirement of the JPA. As such, the Board could change the composition of the LAHSA Commission by appointing different types of commissioners.

As to the involvement of new officials on the LAHSA Commission, their knowledge could improve coordination and decision-making. The County could appoint department heads to the LAHSA Commission so government executives responsible for housing, mental health, and health services (e.g., the Director of Mental Health) are actively engaged in LAHSA's decision-making. The head of the County entity could also sit on the LAHSA Commission. Department heads have better access to elected officials, which could guide decision-making in a way that is more efficient, more well-rounded, and better informed than what currently exists. Likewise, members with lived expertise or representatives from COGs could provide a unique perspective into our system and how policy is made, allowing for equity.

Care should be taken in determining who should sit on the LAHSA Commission. While the Commission may benefit from some change, other changes may have little consequence. For example, having elected officials sit on the LAHSA Commission is intriguing, but the reality is there may not be enough for those officials to actually do when governance of the overall system still sits outside of LAHSA. The LAHSA Commission has limited authority in many areas important to homeless housing and services. The decisions that the LAHSA Commission does make are constrained by obligations to provide funding to service providers that administer ongoing programs, such as interim housing and permanent supportive housing initiatives. To compound matters, as more local funds, particularly Measure H funds, are used to sustain ongoing services for these initiatives, there will be even less for the LAHSA Commission to do.

For instance, elected officials at the County and City vote on and approve funding at Board and Council levels, independent of each other. If elected officials were to join the LAHSA Commission, they would simply sit on a commission to administer funds for uses that (i) have been predetermined by the federal or state government or (ii) the selected members have already voted on (at the City or County level) and may not be empowered to deviate from in their respective capacities.

The City of Los Angeles provides a good example. Not every councilmember would be able to sit on the LAHSA Commission. If a councilmember disagrees with a decision made by the Council, that councilmember cannot change a Council decision simply by sitting on the LAHSA Commission. Thus, we end where we started: unless there is a sea change and delegation of authority from local government to LAHSA, changing the composition of the LAHSA Commission will not result in significant changes. Consequently, given the structural challenges inherent in LAHSA's design, a case could be made that there is limited value in adding elected officials to the LAHSA Commission. It could be akin to "rearranging the deck chairs on the Titanic."[60]

EXHIBIT 36 - Page 1595

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1**  **Board Motion: Appoint new members (e.g., department heads, lived expertise representative, COG or cities' representative) to the five County-controlled seats on the LAHSA Commission.** | • **Pro:** Appointments to the County-controlled LAHSA Commission seats could be made unilaterally.<br><br>• **Con:** Without reciprocity between the County and City with respect to commission membership, the quality and experience of commissioners could become unbalanced and compromised. |
| **2**  **Mayor of Los Angeles: Appoint new members (e.g., department heads, lived expertise representative, COG or cities' representative) to the five City-controlled seats on the LAHSA Commission, subject to confirmation by the City Council.** | • See above. |
| **3**  **Board/City Council Motion: If the County and City seek to establish uniform qualifications across all 10 seats of the LAHSA Commission, the County and City will need to amend the LAHSA JPA.** | • **Pro:** The County and City could improve the effectiveness, equity, and accountability of the LAHSA Commission by developing uniform criteria for the selection of members.<br><br>• **Pro/Con:** Without a JPA amendment, the parties would have no guidelines for ensuring the qualifications of LAHSA commissioners are uniform.<br><br>• **Pro/Con:** It likely would take a considerable amount of time to negotiate changes to the JPA, and with it, the composition of the LAHSA Commission. |

### b. Add Seats to LAHSA Commission to Create a Regional Panel of Elected Officials (No Vote Taken) (Not Supported by the Blue Ribbon Commission on Homelessness)

The Board directed the BRCH to review "regional governance" models, such as the Los Angeles Metropolitan Transportation Authority ("Metro"). Metro was created by state statute.[61] The Metro Board has 13 members, 12 of whom are voting members:

• Five members from the Board of Supervisors;

• Three representatives from the City of Los Angeles (including the Mayor of Los Angeles and two Mayor-appointed individuals, one of which must be a councilmember);

• Four members, each representing sectors in North Los Angeles County/San Fernando Valley, the Southwest Corridor, San Gabriel Valley, and Southeast Long Beach (with the League of California Cities defining the sectors);[62] and

• One nonvoting representative appointed by the Governor.

The majority of the Metro Board members are elected officials. In contrast, the LAHSA Commission is an appointed body, none of whose members are elected officials, represent subregions, or are appointed by the Governor. Accordingly, a regional panel of elected officials, perhaps inspired by Metro, would better represent the interests of the region, especially if LAHSA continues to wear many hats or evolves into the system administrator it aspires to be.

**EXHIBIT 36 - Page 1596**

## Selection of members

### LA County & City of LA

- 5 BOS members
- Mayor of the City of L.A.
- 2 members appointed by the Mayor
  - 1 member required to be City Councilmember
  - 1 member can be member of the public

### Other Cities

- 4 members, either a mayor or city council, from:
  - North County/SFV (1x)
  - Southwest Corridor (1x)
  - San Gabriel Valley (1x)
  - Southeast Long Beach (1x)
- Members selected by City Selection Committee
  - Requires vote of committee members representing a majority of the population, except City of Los Angeles

### Other

- 1 nonvoting member appointed by the Governor

---

Some note a shift to a Metro-style board would "require a heavy political lift"[63] that would not necessarily bring about the meaningful impact the overall system demands. A true paradigm shift would require relinquishment of control over decisions such as funding, requiring the County and City to "cede a degree of power."[64] In addition, both the Board of Supervisors and the City Council would have to agree on the specifics to restructure the LAHSA Commission and amend the LAHSA Joint Powers Agreement. The time and effort required to negotiate and make these changes might not yield material improvements. Even if the paradigm shift were to occur, the restrictions on authority that come with state and federal funding would remain, calling into question whether transitioning to a board with elected officials would be worthwhile.

Other regional entities, such as the South Coast Air Quality Management District and the Los Angeles County Sanitation Districts, who were interviewed by staff or presented to the BRCH face similar issues. None offer a model that is compelling or solves the fundamental governance conundrum that LAHSA faces.

EXHIBIT 36 - Page 1597

|  | Sanitation District | Metro | AQMD |
|---|---|---|---|
| **Statutory Authority** | Health & Safety Code § 4700 *et seq.* | Public Utilities Code § 130050 | Health & Safety Code § 40420 *et seq.* |
| **County Members** | BOS Chair is a member of each sanitation district<br><br>In certain small districts, BOS member overlapping with the supervisorial district may have seat | 1 appointed by each member of the County Board of Supervisors | 4 county supervisors representing LA, Orange, Riverside, and San Bernardino counties |
| **LA City Members** | LA City Mayor or their alternate is a member of each sanitation district overlapping with the City | 3 appointed by the Mayor of the City of Los Angeles (Mayor and appointees) | 1 City of Los Angeles representative, selected by the Mayor |
| **Other Cities' Members (Summary)** | Other cities' mayors are members of each sanitation district overlapping with their cities | 4 members, each of whom shall be a mayor or city councilperson<br><br>Appointed by a City Selection Committee by and from geographic areas of the County (Gateway, South Bay, SGV, Glendale) | 5 representatives from other cities (2 from LA County, 1 each from Orange, Riverside, and San Bernardino counties, determined by a City Selection Committee) |
| **State Representatives** | None | 1 nonvoting member appointed by the Governor | 3 state representatives (1 each selected by the Governor, Speaker of the Assembly, and Senate Rules Committee) |

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board/City Council Motion: Direct staff to negotiate an amendment to the LAHSA JPA to (i) expand the LAHSA Commission; (ii) determine the qualifications and composition of commissioners (e.g., elected officials and state representatives); and (iii) determine the formula for the election of members outside the City of Los Angeles (e.g., other cities, COGs, unincorporated areas).** | • **Pro:** The involvement of elected officials and the Governor has obvious benefits because it elevates governance to an appropriate level of decision-makers.<br>• **Pro/Con:** The LAHSA Commission would include regional representation from elected officials and cities.<br>• **Con:** Regardless of the LAHSA Commission's composition, LAHSA will still lack control over County and City departments responsible for housing and homelessness services.<br>• **Pro/Con:** Significant time commitment to negotiate when benefits are unknown. |
| **2** **Board/City Council Motion: Relinquish to LAHSA final decision-making authority currently exercised by the County and City with respect to funding and related policy decisions.** | • **Pro/Con:** The advantage of an expanded board of elected officials is only realized if it is coupled with final decision-making authority over issues like funding. Absent such authority, decision-making on issues of import would continue to remain outside of LAHSA.<br>• **Con:** Governance at federal and state levels will continue to remain outside of LAHSA. |

Blue Ribbon Commission on Homelessness Governance Report   56

EXHIBIT 36 - Page 1598



# Recommendation Brief No. 4: Continuum of Care Governance

57   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1599

**1  Voices**

"LA is the **most complex CoC in America** as a result of the Joint Powers Agreement and the huge geographic coverage of the continuum as well as the number of local jurisdictions within it."

– Mark Johnston (Principal, Mark Johnston Consulting), interview with BRCH staff, October 5, 2021

"There are **parts** of this system that have authority, **but they do not have accountability to the system**…. On the **other hand**, there are parts of the system that are **held accountable** for what's going on, even **when they have no authority**."

– John Wickham (Legislative Analyst, City of Los Angeles), presentation at BRCH Regular Meeting, January 19, 2022

"The prime **example here is a CES Policy Council**, which has the ability to set policies that affect how people experiencing homelessness are placed into housing. But those **policies are not reviewed** by the LAHSA Commission, by the CoC, by the CoC Board, by the Supervisors, by any elected city council, including the Los Angeles city council. So, there is authority to set these policies, but there's **no independent review** of those policies."

– John Wickham (Legislative Analyst, City of Los Angeles), presentation at BRCH Regular Meeting, January 19, 2022

"Many folks that were interviewed sort of pointed to **overlapping or unclear lines of authority for various governing bodies** […] That **particular lack of role clarity really caused confusion** and frustration for community stakeholders because they weren't sure who to hold accountable for certain decisions."

– Ann Oliva (Vice President for Housing Policy, Center on Budget and Policy Priorities), presentation at BRCH Special Meeting, October 6, 2021

"**Appoint County Department Heads** to CES Policy Council."

– Theodore Patton (Member, LAHSA Lived Experience Advisory Board), interview with BRCH staff, March 3, 2022

"[T]he **Continuum of Care Board wasn't completely sure what they had the authority** to make decisions on, or final decisions on, or what they had to send up to the LAHSA Commission for final decisions. The **CES Policy Council kind of had the same set of concerns** […Members of these bodies wanted] to **refine where they had authority** to make decisions or where they were acting in an advisory role."

– Ann Oliva (Vice President for Housing Policy, Center on Budget and Policy Priorities), presentation at BRCH Special Meeting, October 6, 2021

**EXHIBIT 36 - Page 1600**

 **Concerns**

LAHSA is also plagued by internal governance conflicts between the LAHSA Commission and its separate CoC Board and CES Policy Council, responsible for oversight of the Greater Los Angeles CoC. A "lack of clarity exists even for members of these bodies—they are unsure when they are the final decision-makers versus when they are acting in an advisory capacity."[65] In fact, the creation of the BRCH was motivated by a "concurrence that LAHSA should seek to establish role clarity by working with LAHSA's Governing Commission"[66] and its various boards "to determine when they are acting in an advisory capacity and when they are acting as workgroups establishing recommendations on specific policies and program areas."[67]

LAHSA has evolved into a catchall for all things homelessness. While created in 1993 to coordinate the operation of then-existing homelessness services and administer the spending of funds relating to homelessness, in 1995, LAHSA became the lead agency for our region's CoC and a CoC Board was subsequently created in accordance with federal law in 2012. While, in other jurisdictions, the CoC Board is the final decision-making authority over matters jurisdictional to the CoC, in Greater Los Angeles, according to LAHSA, the CoC Board acts as an "advisory body" to the LAHSA Commission.[68] These overlapping bodies appear to exist for no reason other than the fact that the LAHSA Commission existed chronologically (1993) before the creation of the CoC program (1995) and the creation of the CoC Board (2012).

For its part, the LAHSA CoC Board, to the extent it is making decisions at all, plays a limited role in CoC matters compared to other jurisdictions. In addition, our system has a third decision-making body: the CES Policy Council, which is the "policy oversight entity for CES."[69] LAHSA presents the Council as "the governing body" of CES.[70] Composed largely of lead agency service providers, CoCs, mid-level managers from the County and City, philanthropy, housing authorities, and others, the CES Policy Council establishes policies and procedures for a centralized or coordinated entry system, which includes regional policies for significant issues like bed and service prioritization.[71] The CES Policy Council makes unilateral decisions of system import, yet many are not aware of its existence. It is but another governance body with little direct accountability to the Board of Supervisors, the City Council, other elected bodies, or even the LAHSA Commission.

## 3 Recommendations

### a. Consolidate LAHSA Commission, CoC Board, and CES Policy Council into a Single Board

Our region is an outlier because we have a CoC Board that is not positioned as the final decision-maker over all CoC matters, and CoC matters are further complicated by boards that were created after the County and City formed LAHSA and, therefore, are not included in the LAHSA JPA. Instead, we have a CES Policy Council that makes final decisions on, among other things, bed prioritization policies, as opposed to the CoC Board or the LAHSA Commission. Incredibly, the LAHSA Commission, Board of Supervisors, Los Angeles City Council, and other elected officials are only peripherally involved, if at all, in the decisions made by the CoC Board and CES Policy Council.[72] The existence of so many boards beg the question of whether they are all necessary.

**EXHIBIT 36 - Page 1601**

## LAHSA Governance



**1** **LAHSA Commission**

**2** **CoC Board**

**3** **CES Policy Council**

*Not referenced in JPA*

> "Many interviewees pointed to **overlapping or unclear lines of authority** for various governing bodies as a challenge. This **lack of clarity exists even for members of these bodies** – they are unsure when they are the final decision-makers versus when they are acting in an advisory capacity."
>
> (A. Oliva, p. 7)

Consolidating the LAHSA Commission, CoC Board, and CES Policy Council may reduce confusion among commissioners, LAHSA, and other stakeholders as to final decision-making authority and streamline governance related to CoC matters. However, this may take time to accomplish. Depending on the extent and contours of streamlining the various governing boards, JPA amendments, amendments to the region's CoC Charter, and coordination with HUD and other officials may be necessary. For instance, federal regulations[73] require the CoC Board "[b]e representative of the relevant organizations and of projects serving homeless subpopulations" and "[i]nclude at least one homeless or formerly homeless individual," neither of which is currently true of the LAHSA Commission and may require an expansion of the LAHSA Commission or the establishment of uniform requirements for commissioners. Thus, while consolidating these various bodies could be pursued, it should be done concurrent with, and not in place of, other reforms that can be implemented in the short term. Further, any future consolidated board should be in line with best practices and efficiencies.

**EXHIBIT 36 - Page 1602**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Direct County-appointed LAHSA Commissioners to initiate process to consolidate the LAHSA Commission, CoC Board, and CES Policy Council into a single body and report back to the County with respect to how the County could support this process (e.g., amend the LAHSA JPA).** | • **Pro:** Consolidation of the LAHSA Commission, CoC Board, and CES Policy Council may streamline operations and avoid confusion over who has final decision-making authority. <br><br> • **Pro/Con:** This would result in the consolidation of authority, which creates issues of equity and fair representation. Any new board should be in line with best practices and efficiencies. <br><br> • **Pro/Con:** To initiate action, a majority of the LAHSA Commission would need to agree, requiring at least one City-appointed LAHSA Commissioner to agree to pursue the consolidation of the CoC Board and CES Policy Council into the LAHSA Commission. <br><br> • **Pro/Con:** Amendment of the LAHSA JPA and CoC Charter may be required for consolidation if, for example, HUD or other system stakeholders demand increasing the number of seats on the LAHSA Commission. <br><br> • **Pro/Con:** Any amendment to the LAHSA JPA or CoC Charter could be time-consuming and involve the negotiation or approval of the County, City, other cities, and HUD, with no certainty as to what the final result might be. <br><br> • **Pro/Con:** To change the CoC Charter, a majority of the "representative membership" of the CoC, which could include some number up to 55 distinct stakeholders, would need to reach agreement. <br><br> • **Con:** A single board of 10 members may not be representative of the region, and a consolidated board could be overwhelmed with balancing the responsibilities currently delegated to the LAHSA Commission, CoC Board, and CES Policy Council. |

### b. Prior to Consolidating the Various Boards within LAHSA and the Greater Los Angeles Continuum of Care, Appoint County Department Heads to the CES Policy Council

In the interim period, prior to consolidating the LAHSA Commission, CoC Board, and CES Policy Council into one board, we recommend that the County change who sits on the CES Policy Council. Such an approach could be implemented immediately and have immediate impact, given the importance of issues being decided by the CES Policy Council as to the use of acuity assessment tools and bed prioritization policies.

61    Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1603**

## CEC Policy Council

### Authority

- CoC designated the CES Policy Council as the "**policy oversight entity** for CES" (CoC Charter Art. 4(B))
- LAHSA advertises the Council as "the **governing body**" of CES (CES Policy Process)
  - "[G]uiding strategic policy development"
  - "Supporting implementation through alignment of practice and resources"
  - "Monitoring"

### Membership

- **23 members**
  - Service Providers (6X)
  - Local CoCs (4x)
  - Lived Experience (2x)
  - County DCFS, DMH, DPSS
  - City Housing Dept.
  - Dept. of Veterans Affairs
  - Public Housing Authority (3x)
  - Other: Domestic Violence Rep; Housing Developer; Philanthropy (1x); United Way

### Other

- According to LAHSA, the CES Policy Council is "**advisory**" to the LAHSA Commission (see LAHSA Presentation, 10/6/21)
- CES Policy Council not required by federal law and unique to Los Angeles
- Established under CoC Charter

The County has several seats on the CES Policy Council, representing the interests of the Departments of Children and Family Services, Health Services, Mental Health, Public Health, Public Social Services, and the Los Angeles County Development Authority. Those seats are currently occupied by persons who are not directly accountable to the Board of Supervisors. Having department heads sit on the Council would foster a cross-pollination among department heads, the County, and the CoC and provide a more direct line of communication between elected officials and the CES Policy Council. In addition, the City and service providers could follow suit by appointing higher-level executives to the Council, which could be done without changing the CoC Charter or LAHSA JPA.

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Appoint the Directors of Children and Family Services, Health Services, Mental Health, Public Health, Public Social Services, and the Executive Director of the Los Angeles County Development Authority to replace current department representatives on the CES Policy Council, and direct the head of the County entity to also occupy a seat on the CES Policy Council.** | **Pro:** Persons directly accountable to the Board of Supervisors, such as department heads, should sit on the CES Policy Council, given the issues that body decides as to coordinated entry. <br><br> **Pro:** The input of department heads with broader perspectives could bring more transparency to CES policy decision-making, resulting in a more philosophically balanced approach that incorporates multimodal solutions. <br><br> **Pro:** The proposed change, at least with respect to the involvement of the Directors of Children and Family Services, Health Services, Mental Health, Public Health, and Public Social Services, and the Executive Director of the Los Angeles County Development Authority, can occur through unilateral County action. <br><br> **Con:** The head of the County entity would also need to have a seat on the CES Policy Council. Since this would require the addition of a new seat, it is not entirely clear what steps the County would need to take to ensure that the County entity is represented on the Council. |

**EXHIBIT 36 - Page 1604**



# Recommendation Brief No. 5:
# Internal Operations at LAHSA

63   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1605

### 1 Voices

"One significant challenge is that **LAHSA has so many staff but no direct person to speak** with the providers about particular concerns that arise. Many times, these **concerns are discussed in meetings**, and the staff member hosting the meeting cannot respond to the concern, will defer to management and **then there is no follow-up**."

– Shari Weaver (Director of CES, Harbor Interfaith), interview with BRCH staff, December 14, 2021

"Takes 6/7 months to get contracts done with LAHSA for 12-month contract, and service providers are not being paid during that time. Payments from LAHSA take too long."

– Christine Glasco (President and CEO, Upward Bound House), interview with BRCH staff, December 2, 2021

"The **Strike Team** approach is another area I would like to see **focus**. The work we do and the people in need don't stop com[ing in on] the weekend. **We need services 7 days a week**."

– Eric Gray (Member, LAHSA Lived Experience Advisory Board), interview with BRCH staff, March 3, 2022

"The main problem in LAHSA is that there is a **fear of making mistakes**. All the energy goes to reviewing contracts; LAHSA is triple-reading contracts, **resulting in higher administrative costs**."

– Jerry Jones (National Field Director, National Alliance to End Homelessness), interview with BRCH staff, October 8, 2021

"**Disconnect between LAHSA and cities** and what LAHSA's role [is] in cities."

– Adam Raymond (City Manager, City of Glendora) and Moises Lopez (Assistant City Manager, City of Glendora), interview with BRCH staff, October 21, 2021

"**Improvements in communication are always welcomed** and needed within this system; not all information flows as it should. Also,- more efforts need to be put on contracting . . . ."

– Eric Gray (Member, LAHSA Lived Experience Advisory Board), interview with BRCH staff, March 3, 2022[74]

### 2 Concerns

Those who work, collaborate, or contract with LAHSA perceive LAHSA as overwhelmed with operational issues despite multiple attempts to improve in recent years. Some observe that LAHSA did and does not have the necessary role definition among its governing boards and leadership to be effective nor the resources and expertise to manage the demands of its stakeholders. LAHSA's operational issues are not new but have become far more prominent since the passage of Measure H in 2017.

There are few, if any, formally established written patterns or precedents as to when the Office of Executive Director must bring policy issues to the LAHSA Commission to make a decision. The LAHSA Commission does not

**EXHIBIT 36 - Page 1606**

function as a traditional voting body. For example, we learned that its commissioners are not in the regular practice of bringing forward motions to vote on subject matters within their jurisdiction.

The Office of Executive Director, for better or worse, appears to have some latitude to make policy decisions of importance without involving the LAHSA Commission. This may be appropriate when the decision at issue is one that does not have systemwide ramifications or, as we saw during the COVID-19 pandemic, when urgent action is needed. However, when the Office of Executive Director is called to make unilateral decisions of systemwide import, the consensus-building that the LAHSA Commission is required to undertake and the public forum in which actions should be taken are lost. Two examples are pertinent—

First, the Office of Executive Director makes decisions such approving pay increases for outreach workers and other staff. The Office of Executive Director has authority to make operational decisions, and some may fairly conclude that these decisions are operational. However, there is a question as whether to such decisions should be made by the office, particularly in the area of outreach. The LAHSA Commission needs to decide and define when vetting of issues is appropriate in collaboration with the Office of Executive Director, and those lines of authority must be recorded, understood, communicated, and adhered to. Absent established precedent or clear lines of authority, decision-making and the role of the LAHSA Commission could result in confusion. The lack of consistency or clarity, in this case or others, is hardly an effective model for governance.

Second, the Office of Executive Director is a driving force in developing HMIS and data access policies for cities with limited input from the LAHSA Commission, despite the impact of these decisions. On one hand, HMIS policies should be determined and vetted through the CoC Board since the board is ostensibly responsible for HMIS issues jurisdictional to that board. On the other hand, LAHSA also informed the BRCH that the CoC Board is "advisory" to the LAHSA Commission,[75] making it unclear as to who is in charge, when they are in charge, and ultimately, how such decisions are made. The resulting confusion hurts the system overall.

There are also similar issues with decision-making among various boards within LAHSA. As noted above, there are many boards and decision-makers within LAHSA and the CoC with confusing, and sometimes conflicting or misunderstood lines of authority. Better defining decision-making responsibilities among these bodies is crucial.

LAHSA needs to ensure it has the appropriate staff and expertise to manage a budget of over $700 million and a staff of over 600 employees and, as part of that effort, streamline its business processes. For example, in interviews, leaders commented that LAHSA could benefit from more resources to improve its contracting. We heard testimony that LAHSA could also benefit from a management audit and a review to determine, for instance, how to better provide services on weekends. Embedding an Ops Team into executive-level operations, composed of objective persons familiar with County and City operations and funding, as well as persons with business and contract management expertise, could advance these aims.

### 3  Recommendations

#### a. Define Decision-Making Responsibilities

To improve its operations, we recommend that clearer lines be drawn to delineate the authorities of the LAHSA Commission, the Office of Executive Director, and the various governing boards within LAHSA and the Greater Los Angeles CoC. No organization can be effective when these lines are blurred.

**EXHIBIT 36 - Page 1607**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1**   **Board/City Council Motion: Direct written policies defining the respective decision-making responsibilities of the LAHSA Commission, the Executive Director, and the various governance boards that sit within LAHSA.** | • **Pro:** Until lines of authority are more clearly delineated, inconsistency will continue to be the rule regarding who is making decisions, when they should be made, and who is ultimately accountable.<br><br>• **Con:** The adoption of any policy defining the roles within LAHSA rests on the approval of a majority of the LAHSA Commission, requiring the consent of at least one City-appointed LAHSA Commissioner. Further, implementation and adherence to any policies cannot be controlled by the County or City in their individual capacities. |

### b. Embed Ops Team to Improve LAHSA's Operations

Some observe that LAHSA did not have the necessary resources and expertise to manage the demands of its stakeholders as it grew. The growing need to respond to its many external demands left little time for LAHSA to work on truly building itself as an enterprise and running efficiently.

LAHSA's operational issues are not new but have compounded and become far more prominent since the passage of Measure H in 2017. In the subsequent five years, LAHSA has had several opportunities to course-correct and implement the reforms necessary to resolve what seem to be endemic operational issues. While that work is ongoing, to be more business-minded, LAHSA could benefit from an embedded team of experts to make recommendations and direct reforms within LAHSA, which could include the following:

- Ensure the *executive team has the depth, resources, and support* to operate an organization of the size and complexity of LAHSA;

- Support ongoing efforts to improve contracting operations;

- Streamline *procurement* processes;

- Improve the *payment systems*, and support ongoing efforts to ensure that providers are paid on time or provided with technical assistance in preparing payment requests;

- Create procedures to ensure *accurate handling of available monies* in real time;

- Improve *communications* overall, including downstream, within and among LAHSA's teams and service providers; and

- Implement operational improvements to ensure more outreach work is performed on *weekends*.

**EXHIBIT 36 - Page 1608**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1**   **Board Motion: Fund the creation of an "Ops Team," embedded in LAHSA, to improve LAHSA's operations.** | • **Pro:** LAHSA could benefit from an embedded team of experts to direct changes within LAHSA to improve operations.<br><br>• **Pro:** Engaging sophisticated personnel, including those with demonstrated business experience, could yield better outcomes for LAHSA with respect to issues that have historically plagued LAHSA, such as payment delays, staff turnover, contracting, and communications.<br><br>• **Con:** It is not clear how the County could implement changes that are ultimately within the purview of LAHSA.<br><br>• **Con:** The Board could earmark funds to support this action and condition the payment of County funds on LAHSA's acceptance of directives issued by the Ops Team. |

**EXHIBIT 36 - Page 1609**



# Recommendation Brief No. 6:
# Data and Metrics

EXHIBIT 36 - Page 1610

**1  Voices**

"**Access to data is important** because the CoC needs data to understand where needs are, how well existing interventions are working, and determine where funding should be targeted in the future."

– William Snow (Senior Program Specialist, HUD), interview with BRCH staff, October 12, 2021

"**We need data; data really needs to be the driver of systems decisions.** Hands down, how we collect data, who is held accountable to that data, is really key."

– Stephanie Klasky-Gamer (President and Chief Executive Officer, LA Family Housing) and Kris Freed (Chief Programs Officer, LA Family Housing), presentation at BRCH Regular Meeting, December 15, 2021

"The **City does not receive regular reports/data** on the [services] provided or individuals served in our city."

– Councilmember Jessica Martinez (City of Whittier) and Shannon Delong (Assistant City Manager, City of Whittier), interview with BRCH staff, December 6, 2021

"We don't have the access to HMIS that we need. We have limited access [and] **can't populate HMIS with our local homeless**."

– Chris Marcarello (City Manager, City of Covina) et al., interview with BRCH staff, October 21, 2021

"Another **way to potentially better engage cities would be to provide easy access to countywide data** that's broken down to a local level."

– Margaret Willis (Human Services Administrator, City of Santa Monica), presentation at BRCH Regular Meeting, January 19, 2022[76]

**2  Concerns**

Governance reports predating this one have remarked that our system is not where it needs to be with respect to data. While this can mean different things to different people, common concerns cut across these reports and were supported by the voices we heard in developing our Report.

First, access to data is limited if it exists at all. Cities cannot directly access HMIS data, which inhibits their ability to serve local people experiencing homelessness. More evolved systems navigate this issue through a greater willingness to permit access to data while safeguarding confidentiality and applying data protection policies using contracts. Our system has not reached this level of maturity. We learned of instances where, for example, LAHSA would not provide certain cities direct access to HMIS data, based on unwritten or to-be-written policies.

Second, our system does not share data across County departments, which prevents these departments from capitalizing on existing resources, funding opportunities, and information relevant to decision-making. In the absence of a single County entity charged with breaking down barriers to data sharing, these issues will persist. However, to be clear, the County is not the only entity that has data-sharing problems, as these issues exist within LAHSA and other cities too. The issues surrounding the sharing of data must be resolved and addressed daily across all entities in our system if the system is to best serve people experiencing homelessness.

EXHIBIT 36 - Page 1611

Third, adding to the problems we face, the BRCH discovered a lack of any commonly accepted metrics that help inform how we define success. For instance, while there have been numerous audits to ensure that Measure H funds are spent for their allocated purpose, there have been few, if any, reviews of whether Measure H-funded programs are successful. All too often, we focus on avoiding curtailments for existing programs without critically evaluating whether those programs are best serving people experiencing homelessness. This is also true of non-Measure H funds. The result is a disconnect between what our agencies report as success and what we see on our streets. This disconnect undermines the credibility of our government and nonprofit partners that are responsible for spending funds earmarked for serving people experiencing homelessness.

Fourth, designing systems in which decision-making and resource allocation are data-driven is a best practice that our system does not employ. For example, although the County tracks the dollar amount of Measure H funds each city generates and the amounts it receives from local, state, or federal sources, there is little information on how each city spends these funds. Again, using Measure H as an example, as we understand it, the County does not track how Measure H funds are spent. We have similar issues with respect to how federal and state funds, such as CoC and Mental Health Services Act funds, are spent. Stakeholders cannot make decisions, nor can the public trust our system, if we do not better track the use of funds.

### 3 Recommendations

**Require Access to Data, Sharing of Data, and Tracking of Data, and Define Metrics for Success**

To make good policy decisions, there needs to be greater access to data, such as providing HMIS access to cities and, in general, requiring sharing of data within County departments and the system at large. We recommend the following:

- Given that data access is paramount to sound decision-making, we must develop clear and practical guidelines that govern when and how cities can access and share data. Such guidelines must be developed transparently and by consensus of governing bodies such as the LAHSA Commission, as opposed to policies driven by staff and enforced through contracts or similar agreements.

- The County entity should be responsible for breaking down barriers to data sharing within and across departments. The entity should also work with LAHSA and other cities to remove any data-sharing barriers. This is too important to ignore.

- Establish and implement quality standards for data input, sharing, access, and reporting, to the extent compliant with law, as a means to safeguard the privacy and accuracy of data.

Our region also needs comprehensive and regular reviews of how monies are used to serve people experiencing homelessness. Local governments and voters should be informed as to how funds are spent, including how Measure H funds are used to serve people experiencing homelessness in a given city. Tracking is also valuable because how much local governments receive in local, state, and federal funds, even if indirectly through services provided by the County and LAHSA, is relevant to the design of any future local solutions fund. The County entity and LAHSA need to develop systems for tracking and publishing this data and communicating the data to decision-makers and stakeholders.

Finally, it is absolutely essential that we develop and implement metrics for success. County departments should apply common standards and formulas to determine whether programs are successful. Those common definitions and metrics should also be developed in partnership with LAHSA so that it and the County evaluate and communicate success the same way systemwide. Further, metrics and data policies will be developed with a lens toward equity.

EXHIBIT 36 - Page 1612

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1** **Board Motion: Direct the County entity and LAHSA to develop clear and practical guidelines to govern when cities can access data maintained by the County or (in the case of the HMIS) LAHSA and direct such agencies to enforce those guidelines through contracts or similar agreements.** | • **Pro:** Supports the philosophy that cities should be able to access data on residents experiencing homelessness.<br>• **Con:** It will be difficult for the County to exercise authority to ensure that LAHSA implements and monitors policies permitting access to data unless the County elects to leverage its authority over funding toward this end. |
| **2** **Board Motion: Direct the County entity, in partnership with third-party subject matter experts as needed, to conduct an overall systemwide review of funds earmarked for homeless services delivery, including Measure H, for the express and limited purpose of identifying common goals and metrics that could be used to determine the success of such programs.** | • **Pro:** The region needs comprehensive and regular data-driven reports on how monies are used to serve people experiencing homelessness. This information is important to build public trust and equip stakeholders with the information they need to help form better public policy. |
| **3** **Board Motion: Direct the CEO to develop formulas for tracking the spending of funds earmarked for serving people experiencing homelessness, including Measure H funds, by County departments and LAHSA on a city-by-city basis.** | • See above. |
| **4** **Board Motion: Direct the County entity to annually report on outcomes associated with programs supported by funds earmarked for homeless services and align the allocation of such funds with programs that are successful.** | • **Pro:** An annual review of programs and outcomes should inform funding decisions. Successful programs should receive continued funding, and unsuccessful programs should be reevaluated. |

**EXHIBIT 36 - Page 1613**



# Recommendation Brief No. 7: Executive-Level Action Team

EXHIBIT 36 - Page 1614

## ① Voices

"The problem is **there's a hole in the system**. I wasn't used to it. I've actually never seen an issue like that where there's a hole in the center of the system. There is no center to the homelessness policy debate."

– Miguel Santana (Chair, Committee for Greater LA) and Raphael J. Sonenshein (Executive Director, Pat Brown Institute for Public Affairs, California State University, Los Angeles), presentation at BRCH Regular Meeting, November 17, 2021

"There are centers all over the place. It's as if **there's a number of planets but no sun**. And they're floating around—they're free-floating, and you may notice that a lot of the best ideas just get repeated over and over again in conversations because people are kind of spinning their wheels. **You're always spinning the wheels when there's no magnetic force in the middle**."

– Miguel Santana (Chair, Committee for Greater LA) and Raphael J. Sonenshein (Executive Director, Pat Brown Institute for Public Affairs, California State University, Los Angeles), presentation at BRCH Regular Meeting, November 17, 2021

"There was also this feeling [by interviewees] that because there is a **lack of clear direction around the system** as a whole, it put LAHSA in an untenable position especially between the City [of Los Angeles] and the County, **when there is a lack of agreement between the City and County on policy or budget-related issues**."

– Ann Oliva (Vice President for Housing Policy, Center on Budget and Policy Priorities), presentation at BRCH Special Meeting, October 6, 2021

## ② Concerns

Our region struggles with articulating a region-wide mission or philosophy to address homelessness, causing observers to note that "LA's public sector entities still lack a shared set of quantifiable goals and a consensus on the mission and scale of the work specific to addressing the region's homeless population."[77] There is a need to "[a]lign authority and responsibility so that those with the power to drive reform are held responsible."[78]

## 3. Recommendations

### a. Support the Development of an Action Team of Executive-Level Decision-Makers from across the Region to Discuss Items of Common Interest

On May 19, 2021, the Committee for Greater LA published *We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles*, calling for the creation of *The Center* as a "Home Base of the Community-Wide Commitment to Addressing Homelessness in Los Angeles."[79] We support the concept of an executive-level action team—a centering forum—similar to The Center, that would be responsible for convening decision-makers across the region to discuss issues of common interest such as driving reforms requiring urgency, goal-setting, policy, funding, fundraising, philanthropic initiatives, operations, data development and sharing, equity, and the "fair sharing" of resources.

73    Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1615**

The composition of a regional convening body could follow the recommendations of The Committee for Greater LA or, as an alternative, focus on the following decision-makers:

- Mayor of Los Angeles;

- Los Angeles City Council President;

- Chair of the Board of Supervisors;

- Additional Board of Supervisors member;

- Board Chair appointee;

- COG appointee(s); and

- Representative of the Governor.

In addition, to support the work of an executive-level team, there should also be an advisory committee, comprising operational leads, including:

- LAHSA;

- Department heads (e.g., the General Manager of the City of Los Angeles Housing Department; the County's Director of Mental Health, Director of Health Services, and Executive Director of Racial Equity; and the heads of any County or City homeless entities);

- Member(s) representing the community of persons with lived expertise;

- Member(s) representing service providers;

- Member(s) representing philanthropy;

- Member(s) representing academia;

- Member(s) representing the business community; and

- Member(s) representing education systems.

The County entity, the City of Los Angeles, or the State could convene decision-makers or, as suggested by the Committee for Greater LA, such an advisory committee could be convened by philanthropy, and funded by philanthropy and private revenue sources.

While a centering body or executive-level action team would not have formal powers over the County, City, or LAHSA, there is a need to bring policy makers and stakeholders from across the region together in a collaborative forum to identify and discuss issues and solutions regarding homelessness. We also envision that the body lead in generating a surge of resources, lead in transition as other changes are implemented, and lead in identifying issues and solutions regarding homelessness. Further, such a body would drive reforms requiring urgency, discuss issues of common interest, and facilitate data development and sharing.

To date, neither the County nor City has formally expressed support for an executive-level action team, but at the same time, neither has opposed the concept. The County should lead the way on standing up a body of this nature.

**EXHIBIT 36 - Page 1616**

## Steps to Implement

| Actions | Pros/Cons |
|---|---|
| **1 Board Resolution: Endorse the concept of *The Center* or an entity like it, and invite the City of Los Angeles, other cities, and other decision-makers to participate.** | • **Pro:** Board action could generate the momentum necessary to garner the support of others, ultimately resulting in the launching of The Center or a similar entity. <br><br> • **Pro:** The Center, or an entity like it, could be a complementary piece to the County entity. <br><br> • **Pro:** The Center, or an entity like it, could help the new County entity develop goals and metrics to determine the success of Measure H-funded programs. <br><br> • **Pro:** In the future, there may be an opportunity to formally memorialize the establishment of a collaborative forum through the execution of an MOU. |

**EXHIBIT 36 - Page 1617**



# Attachment 1:
# City of Los Angeles Letter Dated
# September 8, 2021

**EXHIBIT 36 - Page 1618**



September 8, 2021

Dear Ms. Zavala:

We write to you regarding the Board of Supervisors' recent vote to establish a Blue-Ribbon Commission on Homelessness, which would create a new body composed of 12 members, four of whom would be appointed by representatives of the City of Los Angeles.

It is not news that Los Angeles County is the epicenter of our state's homelessness crisis — and when it comes to confronting homelessness, nothing could be more important than continued close collaboration between the City and County governments. For 30 years, the Los Angeles Homeless Services Authority has existed to facilitate that partnership, and played a critical role in delivering services and administering funding. We have built on this model with strong collaboration through Proposition HHH and Measure H to deliver the services and permanent housing that we know are the only ways to end this crisis once and for all.

While we have made strides, it is abundantly clear that much more must be done — and that includes modernizing existing systems and more quickly implementing urgently-needed reforms. To that end, there have been no less than four separate reports on LAHSA's governance structure issued in the last year, with each including recommendations on creating more effective coordination between the City and County to deliver resources that our unhoused residents desperately need.

The alliance between our governments is critical and indispensable — and the goals that can only be reached through our partnership are more urgent than ever. We strongly believe that we cannot afford to stall progress for another six months by creating yet another commission and report to tell us what we already know: that we must move faster with added focus on making an immediate difference — in both the lives of people who do not have a roof over their heads, and the communities that have borne the brunt of a humanitarian crisis that will intensify if we do not act with the purpose and urgency that it demands. It is for these reasons that we will not be appointing members to the Blue-Ribbon Commission.

Instead, it is our belief that the magnitude of street-level homelessness requires immediate action. Our collective energies should be focused on the timely alignment

200 N. SPRING STREET, LOS ANGELES, CA 90012 (213) 978-0600

**EXHIBIT 36 - Page 1619**

and urgent coordination of our efforts — including providing housing, shelter, and critical mental health and public health services in order to bring immediate relief to those living on the streets. Delaying effective service delivery would be inhumane. Fortunately, conversations between the County's Chief Executive Officer and our City Administrative Officer and Chief Legislative Analyst are underway, and we trust those discussions will be productive. Thank you for your partnership on this important issue.


Sincerely,


ERIC GARCETTI
Mayor

NURY MARTINEZ
Council President


Cc.    The Honorable Fesia Davenport, Chief Executive Officer, Los Angeles County
       Mary Wickham, Executive Director, Los Angeles County Blue-Ribbon
       Commission on Homelessness
       Matt Szabo, City Administrative Officer
       Sharon Tso, Chief Legislative Analyst




200 N. SPRING STREET, LOS ANGELES, CA 90012 (213) 978-0600



# Attachment 2:
# Board Motion
# Cross-Reference Index

EXHIBIT 36 - Page 1621

# Comparison of Board Motion to Blue Ribbon Commission on Homelessness Proceedings



On July 27, 2021 the Board of Supervisors established the Blue Ribbon Commission on Homelessness (BRCH) and directed the BRCH to do the following:

## 1. Research and analyze various homelessness governance reports, studying models from across the nation, and providing feedback to the Board regarding the most relevant and effective models with the intention of implementing reform to help solve the homelessness crisis in Los Angeles County.

### Prior Governance Reports

Center on Budget and Policy Priorities, Ann Oliva, Visiting Senior Fellow, "Los Angeles Housing Services Authority: Report on Governance" (February 24, 2021).

City of Los Angeles, Office of the Chief Legislative Analyst, John Wickham, Legislative Analyst, "Los Angeles Homeless Services Authority Governance" (May 4, 2021) and "Outreach Engagement Framework" (August 31, 2021).

County of Los Angeles, Arlene Barrera, Auditor-Controller, and Cheri Todoroff, Interim Director, CEO-HI, "Revisiting the Los Angeles Homeless Services Authority's Structure and Function" (March 2, 2021).

Committee for Greater LA, Miguel Santana, Chair, The Committee for Greater Los Angeles, and Raphael J. Sonenshein, Ph.D., Executive Director, Pat Brown Institute for Public Affairs California State Los Angeles, "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles" (May 19, 2021).

### Other Jurisdictions

Glendale CoC

King County Regional Housing Authority (Seattle/King County, Washington)

Long Beach CoC

Pasadena CoC

Santa Clara CoC

Destination: Home (Santa Clara County, California)

Los Angeles County Development Authority

Los Angeles County Sanitation Districts

New York City Continuum of Care

San Diego Continuum of Care

San Diego Housing Commission

San Francisco, Department of Homelessness and Supportive Housing

Southern California Association of Governments

South Coast Air Quality Management District

Ventura County Continuum of Care

The Way Home (Houston/Harris County, Fort Bend County, Montgomery County, Texas)

**U.S. Department of Housing and Urban Development**

U.S. Department of Housing and Urban Development (HUD), William Snow, Senior Program Specialist, Office of Special Needs Assistance Programs

## 2. Provide a report that includes recommendations for a new governance model that is appropriate for Los Angeles County (addressing the existing Joint Powers Authority) - incorporating the diverse needs of the region and its 88 cities, and the Unincorporated Communities which the Board of Supervisors directly represents.

*See* Report at Executive Summary, Addendum B, Recommendation Nos. 1-7; see also Report at Recommendation Brief Nos. 1-7.

**EXHIBIT 36 - Page 1622**

### 3. This report should reflect the various legal and legislative issues that are impacting homelessness policy.

*See* Report at Attachment 4; see also Report at Recommendation Brief Nos. 1, 3.

### 4. The report should include recommendations on how cities, Councils of Government, or regional representatives could be incorporated into an effective governance structure to address the homelessness crisis.

*See* Report at Executive Summary; Addendum B, Recommendation Nos. 1(c), 2, 3, 4, 6, and 7; see also Report at Recommendation Brief Nos. 1-4, 6-7.

### 5. Presentations made to the BRCH to help inform its work should include, but not be limited to, the following:

**a. County Counsel, in conjunction with CEO-HI, shall provide a briefing and presentation to the BRCH on the existing Joint Powers Agreement, its powers, limitations, and the fiscal and operational implications of the County's renegotiation and/or withdrawal from the Joint Powers Agreement.**

September 22, 2021 – Joint Powers Agreement, Presentation by Office of the County Counsel, Aleen Langton, Principal Deputy County Counsel, and Ana Lai, Senior Deputy County Counsel.

December 1, 2021 – Fiscal and operational implications of County's renegotiation of or withdrawal from the Joint Powers Agreement, Presentation by Brandon D. Young, Partner, Manatt, Phelps & Phillips, LLP.

January 12, 2022 – Fiscal and operational implications of County's renegotiation of or withdrawal from the Joint Powers Agreement, Presentation by Brandon D. Young, Partner, Manatt, Phelps & Phillips, LLP.

**b. CEO-HI, in conjunction with LAHSA and the Measure H Citizen's Advisory Board, shall provide a briefing and presentation to the BRCH on the homeless strategies currently funded by Measure H. This briefing should include a breakdown of the contracts to homeless service providers and examine the scope of/ limitations of Measure H funding.**

October 20, 2021 – Measure H, Presentation by CEO, Matt McGloin, Senior Assistant CEO, County Budget Officer Mason Matthews, Senior Manager, David Seidenfeld, Manager, and Michael Martinez, Principal Analyst.

October 20, 2021 – Measure H, Presentation by CEO-HI Cheri Todoroff, Interim Executive Director, and Measure H Citizens Advisory Board, Christine Margiotta, Chair.

November 3, 2021 – Measure H, Presentation by Department of Mental Health, Maria Funk, Deputy Director, Housing and Job Development Division.

November 3, 2021 – Measure H, Presentation by LAHSA, Molly Rysman, Chief Programs Office, and Kristina Dixon, Chief Financial Officer.

December 8, 2021 – Funding and Budget for Homeless Governance, Presentation by Brandon D. Young, Partner, Manatt, Phelps & Phillips, LLP.

February 16, 2022 – Homeless Initiative Strategy Re-Assessment, Presentation by CEO-HI, Cheri Todoroff, Interim Executive Director.

**c. Feedback from city representatives from each Supervisorial District on their local experience in addressing homelessness and access to Measure H funding.**

**Supervisorial District 1**

Azusa

Covina

Hacienda Heights Improvement Association (Unincorporated)

Hacienda La Puente School District

La Verne (portion)

Monterey Park

Pomona

Rowland Heights Community Coordinating Council (Unincorporated)

South El Monte

Whittier (portion)

**Supervisorial District 2**

Compton

Culver City

Gardena

**EXHIBIT 36 - Page 1623**

Hermosa Beach

Inglewood

Lawndale

**Supervisorial District 3**

Beverly Hills

Santa Monica

West Hollywood

**Supervisorial District 4**

Bellflower

Lakewood

Norwalk

South Whittier School District

Torrance

Whittier

**Supervisorial District 5**

Arcadia

Glendora

Lancaster

Monrovia

Palmdale

Pasadena

Santa Clarita

San Dimas

**Councils of Governments**

Gateway Cities Council of Governments

San Gabriel Valley Council of Governments

South Bay Cities Council of Governments

**d. Feedback from service providers from each SPA, including barriers and challenges they have experienced in serving people experiencing homelessness.**

Alliance for Children's Rights (All SPAs)

Ascencia (All SPAs)

Downtown Women's Center (SPA 4)

Family Promise of Santa Clarita Valley (SPA 2)

Foothill Unity Center (SPA 3)

Harbor Interfaith (SPA 8)

Helpline Youth Counseling (SPAs 7 and 8)

Hope of the Valley (SPAs 1 and 2)

HOPICS (SPA 6)

Imagine LA (SPAs 2, 4, 5, and 6)

LA Family Housing (SPA 2)

LA LGBT Center (SPA 4)

LA Voice (SPAs 3, 4, 5, 6, 7, 8)

Laundry Truck LA (SPA 4)

McCarty Memorial Christian Church (SPA 6)

Neighborhood Legal Services (All SPAs)

PATH (SPAs 4, 7, 8)

Penny Lane Centers (SPAs 1 and 2)

The People Concern (SPAs 4 and 5)

Public Counsel (All SPAs)

Samuel Dixon Family Health Center, Inc. (SPA 2)

SCHARP (SPA 6)

Showers of Hope (SPAs 3-8)

St. James Episcopal, Margaret Ecker, RN, MS, Lead Volunteer (Located in SPA 4)

St. Joseph Center (SPAs 1, 5, 6)

St. Margaret's Center (SPA 8)

Sycamores (SPA 3)

Union Station Homeless Services (SPA 3)

Upward Bound House (SPAs 5, 6)

Volunteers of America Los Angeles (SPAs 3-8)

Weingart Center (SPA 4)

The Whole Child (SPA 7)

Wellnest LA (SPAs 4, 6)

**e. Feedback from the Department of Regional Planning, Department of Public Works, and Los Angeles County Development Authority on approaches to strengthen collaboration and efforts to streamline increased affordable housing.**

January 5, 2022 – Department of Regional Planning, Amy Bodek, Director; Department of Public Works, Angela George-Moody, Chief Deputy Director; and Los Angeles County Development Authority, Emilio Salas, Executive Director

EXHIBIT 36 - Page 1624

**f. Feedback from the Department of Mental Health and Department of Public Health on approaches to increase access to and improve the effectiveness of substance abuse services.**

November 17, 2021 – Department of Mental Health, Jonathan Sherin, M.D., Ph.D., Director and Department of Health Services, Gary Tsai, M.D., Director, Substance Abuse Prevention

## Further, LAHSA and CEO-HI presented to the Blue Ribbon Commission on the following dates:

**LAHSA**

September 22, 2021 – Overview, discussion, and appropriate action on Landscape of Homelessness

October 6, 2021 – Overview, Discussion, and Action on the Los Angeles Homeless Services Authority's Background, Governance, Duties and Functions, and Strengths and Challenges

November 3, 2021 – Presentation and Discussion on Measure H:

- Background
- How Money Is Collected and Allocated, Including Homeless Strategies Currently Funded by Measure H
- Breakdown of Contracts and Scope/Limitations of Measure H Funding

February 9, 2022 – Public forum for discussion with invited guests

March 2, 2022 – Updates from the Los Angeles Homeless Services Authority – Heidi Marston, Executive Director

**CEO-HI**

September 22, 2021 – Overview, discussion, and appropriate action on Landscape of Homelessness

October 20, 2021 – Presentation and discussion on the County of Los Angeles' Report on Los Angeles Homeless Services Authority's Governance

October 20, 2021 – Presentation and Discussion on Measure H:

- Background
- How Money Is Collected and Allocated, Including Homeless Strategies Currently Funded by Measure H
- Breakdown of Contracts and Scope/Limitations of Measure H Funding

February 9, 2022 – Public forum for discussion with invited guests

February 16, 2022 – Presentation by the Chief Executive Office on the Homeless Initiative Strategies – Cheri Todoroff, Director, Chief Executive Office, Homeless Initiative

83   Blue Ribbon Commission on Homelessness Governance Report

**EXHIBIT 36 - Page 1625**



# Attachment 3:
# Relevant Legal and Legislative Developments

EXHIBIT 36 - Page 1626

The following is a high-level summary of selected federal and state laws and other legislative developments relating to people experiencing homelessness, focused on the most relevant programs relating to homeless assistance and laws that are frequently discussed relating to homelessness. For the sake of brevity, certain state laws, decisions, and other legislative developments are not provided here.

# I. Federal

## A. Notable Laws

### 1. McKinney-Vento Homeless Assistance Act; The Homeless Emergency Assistance and Rapid Transition to Housing Act

The McKinney-Vento Homeless Assistance Act of 1987, as amended by the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, consolidated three separate homeless assistance programs administered by HUD—the Supportive Housing Program, the Shelter Plus Care Program, and the Moderate Rehabilitation/Single Room Occupancy Program—into a single grant program: the CoC program. The HEARTH Act also codified into law the CoC planning process, a long-standing part of HUD's application process to assist people experiencing homelessness by providing greater coordination in responding to their needs.

### 2. Emergency Solutions Grants Program

The federal Emergency Solutions Grants (ESG) program, which was revised under the HEARTH Act, provides funding to: (i) engage homeless individuals and families living on the street; (ii) improve the number and quality of emergency shelters for homeless individuals and families; (iii) help operate these shelters; (iv) provide essential services to shelter residents; (v) rapidly rehouse homeless individuals and families; and (vi) prevent families and individuals from becoming homeless. Beneficiaries for outreach, emergency shelter, and essential services must meet certain eligibility criteria.

### 3. Martin v. City of Boise

In *Martin v. City of Boise*, 920 F. 3d 584 (9th Cir. 2019), the Ninth Circuit held that the Cruel and Unusual Punishments Clause of the Eighth Amendment to the U.S. Constitution bars governments from enforcing laws prohibiting camping or sleeping in public against people experiencing homelessness where shelter is not "practically available" in a "jurisdiction."

# II. State

## A. Notable Laws

### 1. Lanterman-Petris-Short Act

The Lanterman-Petris-Short (LPS) Act generally permits local government to involuntarily commit mentally ill people experiencing homelessness. Involuntary commitment includes the following confinement periods: 72 hours, 14 days, 30 days, and 180 days. At each step, the government must satisfy different standards to detain and hold individuals, with the most permissible standard—applying to 72-hour hold periods—requiring that there be probable cause that, as a result of a mental health disorder, an individual "is a danger to others, or to himself or herself, or gravely disabled."[80]

### 2. Mental Health Services Act

In November 2004, California voters passed Proposition 63, the Mental Health Services Act (MHSA), a tax on high-income individuals, with proceeds providing funding for the California community mental health system to "prevent mental illness from becoming severe and disabling." The MHSA supports various prevention and early intervention programs, including programs for Community Services and Supports, which include direct mental health services and supports for children, youth, adults, and older adults.

**EXHIBIT 36 - Page 1627**

### 3. No Place Like Home Act of 2018

On July 1, 2016, Governor Jerry Brown signed SB 1206, the No Place Like Home Act of 2018 (NPLH), which dedicated up to $2 billion in bond proceeds to invest in the development of permanent supportive housing for persons who are in need of mental health services and are experiencing homelessness or chronic homelessness or who are at risk of chronic homelessness. Under the NPLH Program, funds may be used to acquire, design, construct, rehabilitate, or preserve permanent supportive housing for persons who are experiencing homelessness or chronic homelessness or who are at risk of chronic homelessness, and who are in need of mental health services. The bonds are repaid by funding from the MHSA.

### 4. The California Emergency Services Act

The California Emergency Services Act (ESA) is the main state law regarding the declaration of a state of emergency (SOE). The ESA gives the Governor and local governments the power to declare an SOE in (i) conditions of "extreme peril" (ii) so as to mitigate the effects of an emergency (iii) in order to protect property, health, and safety. Relevant here, the Governor may: (i) suspend laws, regulations, or state policies if strict compliance would "prevent, hinder, or delay the mitigation of the effects of the emergency"; (ii) commandeer or acquire property; (iii) make expenditures from any "legally available" fund; and (iv) direct state agencies to address the emergency. Upon a declaration of a local emergency, the County "may promulgate orders and regulations necessary to provide for the protection of life and property," such as curfews.

### 5. Shelter Crisis Law

Local government may declare a *shelter crisis* upon a finding that: (i) a significant number of persons within the County are without the ability to obtain shelter, and (ii) the situation has resulted in a threat to the health and safety of those persons. Gov. Code §8698(d). The Governor may also declare a Shelter Crisis on the same grounds. The Shelter Crisis law permits the County to open "public facilities" to the homeless.[81] Public facilities include parks, schools, and vacant or underutilized facilities that are owned, operated, leased, or maintained, or any combination thereof, by the County.

### 6. Welfare and Institutions Code Section 17000

Welfare and Institutions Code Section 17000 requires that "[e]very county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." In general, counties must provide: (i) financial support to the indigent as an option of last resort, intended to meet the "minimum subsistence needs" of the indigent; and (ii) "subsistence medical care," meaning "medical services necessary for the treatment of acute life and limb threatening conditions and emergency medical services."

## B. Recent State Law Changes

### 1. AB 101 (2019): Low-Barrier Navigation Centers

AB 101 requires local jurisdictions to permit *by right* the development of low-barrier navigation centers, subject to certain requirements. The law defines a *low-barrier navigation center* as a "Housing First, low-barrier, service-enriched shelter focused on moving people into permanent housing that provides temporary living facilities while case managers connect individuals experiencing homelessness to income, public benefits, health services, shelter, and housing."[82] Because low-barrier navigation centers must comply with Housing First, shelter operators may not require preconditions for entry, allowing for a greater number of individuals to be served through newly developed shelters.

### 2. AB 1188 (2019): Tenants; Temporary Housing for Homeless

AB 1188 creates a legal framework allowing a tenant, with the written approval of the owner or landlord, to take in a person who is at risk of homelessness. It includes a number of protections for both the landlord and tenant, including the ability for the tenant to remove the person at risk of homelessness on short notice.

**EXHIBIT 36 - Page 1628**

### 3. AB 1197 (2019): CEQA Exemption for Supportive Housing and Emergency Shelters

AB 1197 exempts from CEQA, until January 1, 2025, any action taken by certain local public agencies to convey, lease, or encumber land or provide financial assistance in furtherance of providing emergency shelters or supportive housing in the City of Los Angeles.

### 4. AB 27 (2021): Homeless Children and Youths and Unaccompanied Youths

AB 27 requires local educational agencies to ensure that each school within the local agency identifies all homeless children and youths and unaccompanied youths, and will create regional Technical Assistance Centers (TACs) to identify and connect students to services.

### 5. AB 362 (2021): Homeless Shelters: Safety Regulations

AB 362 sets habitability standards for homeless shelters and prohibits shelters with habitability violations from accessing state and federal funds.

### 6. AB 977 (2021): Homeless Program Data Reporting: Homeless Management Information System

AB 977 requires that as of January 1, 2023, "a grantee or entity operating specified state homelessness programs" align certain state data reporting requirements with federal Homeless Management Information System ("HMIS") data standards. The law extends to several state homelessness programs, including Project Homekey, Housing for a Healthy California, and the CalWORKs Housing Support Program, and all state homelessness programs that commence on or after July 1, 2021, among others.

### 7. AB 1220 (2021) California Interagency Council on Homelessness

AB 1220 revamped the State's Homeless Coordinating and Financing Council. Among other requirements, AB 1220 requires state agencies that administer homeless programs to: (i) participate in council workgroups, task forces, or similar and to provide the Council with relevant information regarding state homelessness programs; and (ii) collaborate with the Council and adopt guidelines and regulations to incorporate "core components of Housing First."

## C. Emerging Legal and Legislative Issues

### 1. Community Assistance, Recovery, and Empowerment (CARE) Initiative

On March 3, 2022, Governor Newsom proposed creating mental health courts that would mandate the provision of services to homeless people with severe behavioral and addiction disorders. Under the plan, which requires approval by the Legislature, all counties would set up a mental health branch in civil court and provide treatment to those in need of care. Persons would be obligated to accept the care or risk criminal charges, if pending, and if care is not accepted, they would be subject to being held in psychiatric programs involuntarily, or lengthier conservatorships.

### 2. Selected Pending Legislation

#### a. AB 1816: Reentry Housing

AB 1816 would create a competitive Reentry Housing & Workforce Development Grant Program to fund evidence-based housing, support services, and workforce development programs for people who were formerly incarcerated in state prisons and who are experiencing or are at risk of homelessness.

#### b. AB 1961: Statewide Affordable Housing Database

AB 1961 would require the Department of Housing and Community Development to create a statewide database of affordable housing listings, information, and applications, in coordination with state and local partners.

#### c. AB 2324: Homelessness Action Authority: County of Los Angeles

AB 2324 would authorize the creation of the "Homelessness Action Authority," a joint powers authority, by the County of Los Angeles, the City of Los Angeles, and any other city within the jurisdiction of the County, with the purpose of funding housing to assist the homeless population and persons and families of extremely low, very low, and low income within the County. The mayor of the City of Los Angeles and the Chair of the Los Angeles County Board of Supervisors, would serve on the authority's board of directors as ex officio cochairs.

**EXHIBIT 36 - Page 1629**

The authority would exercise land use authority over the property it owns, oversee the administration of social service programs administered by the County, issue bonds, acquire land through eminent domain, and fund the planning and construction of housing. Also, AB 2324 would require that the authority be a recipient of new state and federal funding designated for combating homelessness in the County and a "conduit" to review and approve homelessness projects and program proposals from public agencies, nonprofit organizations, and private entities.

### d. AB 2325: California Coordinated Homelessness Response Act

AB 2325 would expand on the California Interagency Council on Homelessness by creating a funders workgroup within the Council to enhance coordination among the agencies that fund homelessness programs.

### e. AB 2817: Housing California Challenge Program

AB 2817 would create the "Housing California Challenge Program," which would authorize the Health and Human Services Agency to provide rental assistance to people experiencing homelessness, and to provide grants to local jurisdictions and service providers to connect people to housing and rental assistance.

### f. AB 1615: Former Foster Youth Housing

AB 1615 would lengthen the duration of the Transitional Housing Program-Plus from 24 to 36 months and raise the upper age limit from 23 to 24 for all youth in the program. The bill would also align California's Housing Navigators Program (HNP) with federal Housing Choice Voucher programs, by increasing the upper age limit for HNP from 21 to 24.

### g. AB 2547: Housing Stabilization to Prevent and End Homelessness Among Older Adults and People with Disabilities Act

AB 2547 would require the California Department of Aging to create and administer the Housing Stabilization to Prevent and End Homelessness Among Older Adults and People with Disabilities Program. The department would need to offer competitive grants to nonprofit community-based organizations, CoCs, and public housing authorities to administer a housing subsidy program for older adults and persons with a disability who are either experiencing or at risk of homelessness.

EXHIBIT 36 - Page 1630



# Report Endnotes

EXHIBIT 36 - Page 1631

[1]The Board Motion creating the BRCH states, "The mission of BRCH shall be to conduct a comprehensive study of LAHSA's Governance structure by reviewing existing reports and recommendations, identify and analyze the challenges inherent to the existing system." The Board directed the BRCH "to provide recommendations to change and improve [the] efficiency" of LAHSA and the homeless services delivery system generally. Accordingly, while the Board Motion does not direct the BRCH to identify steps for implementation of our recommendations, given the substantial testimony, interviews, research, and related diligence involved with the development of this Report, we also include an implementation framework in each Recommendation Brief to assist the Board in operationalizing the BRCH recommendations.

[2]There are 12 seats on the BRCH, eight of which were filled, with the remainder left vacant at the election of the City of Los Angeles. Nonetheless, the BRCH commissioners or staff independently invited each City Council member to present to the BRCH as well as representatives from the Mayor's Office, the Chief Legislative Analyst, and the Chief Administrative Officer to speak on or off the record, as each deemed appropriate. Two councilmembers agreed to present to the BRCH publicly—Councilmember Bob Blumenfield and Councilmember Nitya Raman. Members of the Los Angeles City Council and the Mayor of Los Angeles also submitted written comments to the draft BRCH recommendations of March 9, 2022. We thank each and every representative from the City of Los Angeles who came forward for their participation in this process.

[3]During this process, we heard directly from the Los Angeles Homeless Authority; persons with lived expertise; service providers; leaders in diversity, equity, and inclusion; officials from the U.S. Department of Housing and Urban Development; elected officials; cities from across the region; the City of Los Angeles; representatives from the unincorporated areas; councils of government (COGs); continuums of care (CoCs) from across the country; County department heads; the County's Chief Executive Officer (CEO) and representatives from the Homeless Initiative; the County Counsel and lawyers from the Office of the County Counsel; each author of the five other reports that studied the governance issue; and service planning area (SPA) leads and other decision-makers; among others. To the extent stakeholders did not present to the BRCH, stakeholders were interviewed by a team of two to six individuals, all of whom are lawyers with extensive backgrounds in public sector service and in social service and homelessness issues, as well as in research and writing. The interviews were largely conducted remotely due to the constraints of the COVID-19 pandemic, and each team member took notes independent of the other; notes were compared and reconciled, and a daily report of notes was produced. Staff engaged in this same process for every individual contributing to the Report. Further, to the extent statements or quotes appear in the Report, staff vetted,

back through the interviewee, any statement attributed to them in this Report to ensure accuracy and willingness to have their statement in the Report. If an interviewee was not comfortable with a statement, desired to edit the statement, or requested that we not use their statement, the BRCH honored that request. Please see Attachment 3 for further details concerning BRCH's information-gathering process. Testimony and presentation materials can be found at https://brch.lacounty.gov/.

[4]In attempting to fulfill our assigned duties to investigate the impediments to reform, the BRCH ran into a roadblock. Over the past many months, the BRCH and its staff had the privilege of interviewing hundreds of persons. Many of them were comfortable lending their voice to the Report, but others were not. Unfortunately, certain key stakeholders interviewed would not go on the record publicly with the views they shared with us privately, out of concern over how other players in the system may perceive those statements. Their voices will not be publicly heard, and that, of course, raises other concerns over the culture of our system.

[5]BRCH meeting, presentation by Corri Planck, Strategic Initiatives Manager, and Elizabeth Anderson, Strategic Initiatives Program Administrator, City of West Hollywood, January 19, 2022 ("The city has a long-standing homeless concern line that people can call to request outreach services. And we have not been able to retire that number since the creation of LA-HOP, because the timeliness of the response is not satisfactory for our community.").

[6]Interview with Senator Kevin Murray (Ret.), President and CEO, *Weingart Center*, October 5, 2021 ("[We] [n]eed a multi-modal approach to housing."); COG meeting, Gilbert Saldate, Homelessness Program Manager, Gateway Cities COG, October 4, 2021 ("There should not be a one-size-fits-all approach."); Interview with Santa Monica, October 26, 2021 ("Creating inflexible guidelines that every city is expected to fit their services/programs into creates a disincentive for cities to participate in funding/siting/developing solutions."); Interview with Adam Raymond, City Manager, and Moises Lopez, Asst. City Manager, Glendora, October 12, 2021 ("There are strings attached to Measure H funding, no local preferences are allowed, local jurisdictions are not allowed to house their homeless first, LAHSA won't fund that. LAHSA philosophy is a one-size-fits-all approach and not block by block, but they don't have a scorecard, and what is the recidivism rate?"); Interview with Michael Reyes, Director of Municipal Services, Lawndale, December 14, 2021 ("I think LAHSA needs to redirect their focus on offering services to those individuals that are most willing to accept services, rather than on those that LAHSA feels are most in need. I think this will make for easier intake of the homeless."); BRCH meeting, presentation by Marisa Creter, Executive Director, SGV COG, October 20, 2021 ("[I]n our cities, when you're dealing with … 100 people experiencing homelessness, you're able to much more

**EXHIBIT 36 - Page 1632**

customize what you're going to do to meet the specific needs of those individuals.").

[7]Latinx Homelessness in Los Angeles, Melissa Chinchilla, et al., Homelessness Policy Research Institute, 2020 ("Latinx people experiencing homelessness, a rapidly growing population, accounted for 36% of the homeless population in the Los Angeles Continuum of Care in 2019."); Interview with Reba Stevens, Mental Health and Homeless Advocate with Lived Experience, October 14, 2021 ("Look at LAHSA's Advisory Bodies: CES Policy Council, Regional Homeless Advisory Council, Lived Experience Advisory Board, Continuum of Care Board as well as their leadership team. There is no Black man at the table, when there are 22K+ homeless Black men."); Interview with Rev. Eddie Anderson, McCarty Memorial Christian Church, October 28, 2021 ("For many Black people, church is the first line of defense."); Interview with Lisa Phillips, Director of Youth Services, and Kris Nameth, Director of Programs, LGBT Center, December 3, 2021 ("LGBTQ youth are at more than double the risk of homelessness compared to non-LGBTQ peers. Black youth who identify as LGBTQ have some of the highest rates of homelessness (Voices of Youth Count)."); Interview with Lisa Phillips, Director of Youth Services, and Kris Nameth, Director of Programs, LGBT Center, December 3, 2021 ("There is no County funding for youth-specific outreach."); BRCH meeting, presentation by Gary Tsai, M.D., Director, Substance Abuse Prevention and Control, County of Los Angeles Department of Public Health, November 17, 2021 ("Black/African Americans are underrepresented while Whites and Latinx are over-represented among homeless SUD clients compared to the PEH population in LAC. Black/African American is 8.3% of [the] LA County population, 33.3% of the homeless population in LA County, [and] 18% of homeless SUD clients."); see also Los Angeles Homelessness Authority, Report and Recommendations of the Ad Hoc Committee on Black People Experiencing Homelessness, 2018, https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness (last accessed Mar. 25, 2022).

[8]See also Interview with Jon Sherin, M.D., Director, Department of Mental Health, September 14, 2021 ("We need a central coordinating entity within the County (and a County CoC) authorized by the Board to make recommendations to the Board that are actionable across County Departments and the Region."); Interview with Bobby Cagle, Former Director, Department of Children and Family Services, September 21, 2021 ("DCFS works with CEO-HI and LAHSA, and there needs to be improvement in collaboration from the top."); Interview with Amy Bodek, Director, Department of Regional Planning, September 20, 2021 ("There needs to be coordination among LAHSA and County Departments. For example, LAHSA funded shelters that had zoning violations in the unincorporated areas—they did not check with DRP before setting up the shelter."); Interview with John Maceri,

CEO, The People Concern, October 18, 2021 ("County departments are siloed and don't coordinate well to support a consistent, systemic response to homelessness."); Interview with Alliance for Children's Rights, October 15, 2021 ("Lack of interdepartmental cooperation creates barriers for foster youth/TAY to get access to services. The current culture of siloed departments creates unnecessary delays and difficulty for youth trying to access the resources they need to be successful in navigating the realities of independence."); Interview with Jill Bauman, President, Founder, and CEO, Imagine LA, November 30, 2021 ("There is no coordinated focus, clear strategic measures of success, or dedicated impact-driven funding or leadership from LAHSA, the City, or the County to end family homelessness in Los Angeles."); BRCH meeting, presentation by Margaret Willis, Human Services Administrator, Santa Monica, January 19, 2022 ("Lack of coordination is a huge barrier to progress and synergy, especially in the implementation of state and regional policies. For example, we have experienced a disconnect between what we hear from LAHSA or County departments about what resources are available and then how they are actually implemented regionally."); Survey Report from Alisa Osunfunke Orduna, MPIA, MA, PhD, Member, Black People Experiencing Homelessness Steering Committee, January 31, 2022 ("Leadership of the region's homelessness crisis must be shared across all 88 cities as well as the County BOS.").

[9]See also BRCH meeting, presentation by Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, City of Glendora, November 3, 2021 ("Cities had to fund, and through alternative means (other than Measure H), its own staff and programs to try to help address some of the homelessness challenges .... Each city is unique, the challenges are unique. We truly understand and want to help."); BRCH meeting, presentation by Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, City of Glendora, November 3, 2021 ("A little bit [of Measure H] goes a long way."); COG meeting, Gilbert Saldate, Homelessness Program Manager, Gateway Cities COG, October 4, 2021 ("Measure H opened my eyes about how much money was generated in the cities, frustration with CEO and LAHSA, within the 47 CEO-HI strategies not being enough for cities. More fairness in funding for local solutions [is needed]."); Interview with Donyielle Holley, Homeless Programs Supervisor, Pomona, October 18, 2021 ("Need for better communication between County and cities—get their input, become partners to find local solutions."); Interview with West Hollywood, October 15, 2021 ("The community doesn't see tangible Measure H impact in West Hollywood. By securing multiyear contracts with funding allocations, the City can stand up bigger projects that show the positive impact of Measure H."); Interview with Santa Monica, October 26, 2021 ("Creating inflexible guidelines that every city is expected to fit their services/programs into creates a disincentive for cities to participate in funding/siting/developing solutions."); Interview with Sergio

91   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1633

Gonzalez, City Manager, Azusa, November 15, 2021 ("We estimate that the San Gabriel Valley has generated about $250 million since the adoption of Measure H and has received only a fraction back. We had to apply for competitive grants to get funding to deal with the homeless impacts facing our city."); Interview with Sergio Gonzalez, City Manager, Azusa, November 15, 2021 ("We continue to advocate for a 'direct return' similar to Measures R, A, and C for transportation and infrastructure purposes. The majority of the funds generated by Measure H should go directly back to cities (where funds are generated) because that's where the impacts are felt the most."); Interview with Michael Villegas, Community Preservation Manager and Homeless Liaison, Santa Clarita, December 6, 2021 ("Santa Clarita generated about $26 million in Measure H and [has] not seen much in return. We don't expect full return but have only received less than $1 million."); Interview with Lawndale, December 14, 2021 ("The City has not been able to receive information from LAHSA, PATH, or the COG regarding the allocation of the Measure H funds used toward addressing homeless[ness] in the Lawndale community."); Interview with Helen Chin, Assistant to the City Manager on Homelessness, Culver City, December 2, 2021 ("Due to the inability of cities to carry Measure H dollars from year to year, one-time and non-recurring grant funding isn't enough to meaningfully fund the operating or capital costs of interim or permanent supportive housing programs.").

[10]*See also* BRCH meeting, presentation by Ann Oliva, Vice President for Housing Policy, Center on Budget and Policy Priorities, October 6, 2021 ("There was also this feeling [by interviewees] that because there is a lack of clear direction around the system as a whole, it put LAHSA in an untenable position, especially between the City [of Los Angeles] and the County, when there is a lack of agreement between the City and County on policy or budget-related issues."); Interview with Christine Glasco, President and CEO, Upward Bound House, December 2, 2021 ("LAHSA [is] pulled in all different ways ... and their mandate is too broad. This inevitably leads to mission creep and a lack of focus on core business component(s)."); Interview with Mike Foley, former Executive Director, Bridge to Home, October 29, 2021 ("The vast social, political, and programming demands on LAHSA create incompatible mission creep, rendering the agency overstretched and unable to achieve consistent quality."); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("The need to respond to its many external demands seems to leave little time for LAHSA to work on truly building itself as an enterprise and run efficiently."); BRCH meeting, presentation by Mike Foley, former Executive Director, Bridge to Home, November 17, 2021 ("LAHSA is pushed and pulled in numerous political directions constantly.").

[11]*See also* Interview with Reba Stevens, Mental Health and Homeless Advocate with Lived Experience, October 14, 2021 ("LAHSA controls too much; they are the matcher, funder, and provider. LAHSA should be an administrator and monitor

only!"); Interview with Veronica Lewis, Director, HOPICS, October 14, 2021 ("LAHSA is not effective in performing their core function of Grants Administration, and that has a dire consequence for providers' cash flow, operations, and confidence in LAHSA's ability to lead our system."); Interview with Christine Glasco, President and CEO, Upward Bound House, December 2, 2021 ("LAHSA governance needs to be looked at from the top. Need to reexamine and give LAHSA a very defined role to become technical assistance to County and City and have electeds at the table."); Interview with Shari Weaver, Director of CES, Harbor Interfaith, December 14, 2021 ("LAHSA has too many staff working to build the CES System—good people, but too many different ideas. We need a system that focuses on continuity and consistency. Leads need clear direction to share with subcontractors."); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("LAHSA has too many hats to wear, too many bosses with competing priorities to answer to. They have to be a service provider, grant administrator, policy designer, and advocacy leader all at once."); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("LAHSA became an almost billion-dollar enterprise in a very short time. It did not have the benefit to plan its growth and [in an orderly way] bring the necessary resources and expertise to manage all the demands of its stakeholders."); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("LAHSA needs to rethink its business model, decide what it really wants to be good at and focus its energy on that. Being the funding administrator should be its priority; roll out contracted programs and pay service providers on time, institute a procurement process that fosters system continuity and builds on successful initiatives, have a more accurate handle on available monies in real time, and improve communications downstream within its teams."); Interview with Christine Glasco, President and CEO, Upward Bound House, December 2, 2021 ("LAHSA [is] pulled in all different ways ... and their mandate is too broad. This inevitably leads to mission creep and a lack of focus on core business component(s).").

[12]*See* Report on LAHSA Opportunities for Advancing Racial Equity, October-March 2021 at 19 (stating "The Staff is ready to change, but it is currently unclear if the institution as a whole is prepared to, or actually can take action in deep and meaningful ways. The pressures from outside entities, especially from LA City and LA County, are real and demanding, and create a circular pattern of harmful organizational behavior internally. Although leaders within LAHSA want to champion the organization and position it in the forefront of excellence in the national homeless services sector, LAHSA's organizational goals and priorities take a backseat to those that are being developed and forced by external bodies (LAHSA Commission, Ad Hoc Committees, etc.). The directives given from the Commission create disorganization and shift the roles of Employees who were focusing on one thing and now how to place responsibility on another goal").

**EXHIBIT 36 - Page 1634**

[13]*See also* also BRCH meeting, presentation by Antonia Jimenez, Director, Department of Social Services, February 2, 2022 ("I think the way LAHSA is created, it's kind of designed to fail ..., because you have all of these points of people, some from the City, some from the County. Who is the executive director of LAHSA really responsible to?"); BRCH meeting, presentation by Ann Oliva, Vice President for Housing Policy, Center on Budget and Policy Priorities, October 6, 2021 ("Many folks that were interviewed sort of pointed to overlapping or unclear lines of authority for various governing bodies ... the Continuum of Care Board wasn't completely sure what they had the authority to make decisions on, or final decisions on, or what they had to send up to the LAHSA Commission for final decisions. The CES Policy Council kind of had the same set of concerns .... [Members of these bodies wanted] to refine where they had authority to make decisions or where they were acting in an advisory role. That lack of role clarity really caused confusion and frustration for community stakeholders because they weren't sure who to hold accountable for certain decisions ...."); Interview with Shari Weaver, Director of CES, Harbor Interfaith, December 14, 2021 ("One significant challenge is that LAHSA has so many staff but no direct person to speak with the providers about particular concerns that arise. Many times, these concerns are discussed in meetings, and the staff member hosting the meeting cannot respond to the concern, will defer to management, and then there is no follow-up.").

[14]Interview with Mike Foley, former Executive Director, Bridge to Home, October 29, 2021 ("Need a Director of Operations who focuses solely on operational functions related to measurable outcomes.").

[15]Interview with Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, Glendora, October 12, 2021 ("Disconnect between LAHSA and cities and what LAHSA's role is in cities."); Interview with Scott Martin, President, Hacienda Heights Innovation Association, November 6, 2021 ("Need someone lower than the Supervisor's Office in the County to access regional representation so that the money can be better allocated to the unincorporated areas."); Interview with South Whittier School District, November 30, 2021 ("There should be a committed person or individual that actually works with school districts to find solutions."); BRCH meeting, presentation by Donyielle Holley, Homeless Program Supervisor, City of Pomona, November 17, 2021 ("It surprises me that most of the communication [with LAHSA] is done through formal emails. Let's continue to build better partnerships between LAHSA and the sub recipients, including our cities, and our housing authorities. Let's plan together and partner together.").

[16]Interview with Veronica Lewis, Director, HOPICS, October 14, 2021 ("LAHSA's outreach teams are the least effective."); Interview with Reba Stevens, Mental Health and Homeless Advocate with Lived Experience, October 14, 2021 ("LAHSA

should be an administrator and monitor of services only. LAHSA should not be the funder and provider of services. This is truly a conflict of interest."); Interview with Department of Military and Veterans Affairs Brigadier General Ruth Wong, U.S. Air Force (Ret.), Director, and George Dixon, U.S. Army (Ret.), Supervisor of Veteran Services, January 4, 2022. ("In order for the Department of Military and Veterans Affairs to work with veterans experiencing homelessness, as well as veterans exiting the jails with nowhere to go, we need outreach workers assigned to this specific group."); Interview with, Michael Villegas, Community Preservation Manager and Homeless Liaison, Santa Clarita, December 6, 2021 ("Hard to get LAHSA outreach in Santa Clarita even when there is someone that agrees to services. The City provides staff to coordinate with LAHSA; however, LAHSA says they'll try to get out and usually do not."); Interview with Jeff Farber, Executive Director, Harbor Youth Counseling, October 21, 2021 ("LAHSA competes with the non-profits in the outreach worker space and LAHSA pays more money, so many of the nonprofit workers leave and go to work for LAHSA."); Interview with Mary Agnes Erlandson, Center Director, and Jonathan Said, Homeless Services Manager, St. Margaret's Center Catholic Charities, January 25, 2022 ("LAHSA as a service provider creates competition, and it's hard to compete with LAHSA."); BRCH meeting, presentation by LA Family Housing, December 15, 2021 ("[T]here are many staff that get trained and supported at the nonprofit provider level and then get recruited away by the public agencies, whether it's Department of Health Services or LAHSA, who have public benefits, public salaries, that we can't compete with. We are dependent on contracts with these public agencies, so it's been a real challenge when the same agency [with whom] we have a contract is able to recruit our staff away because our contracts don't let us pay them.").

[17]Interview with Veronica Lewis, Director, HOPICS, October 14, 2021 ("No one person at LAHSA handles your contract; there are 7-8 people involved. County DHS contracts are less strenuous than LAHSA contracts *in many regards*. DHS [Housing for Health] contracts are clearer with detailed guidance related to budgeting and billing, and there is a program manager assigned to you. LAHSA's focus is not on grant administration, which is their core function; it is disorganized, chaotic, with no strategy in place."); Interview with Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, Glendora, October 12, 2021 ("Entered into contract with LAHSA and took 19 months to get reimbursement funds."); Interview with Dr. Jack Barbour, Chief Executive Officer, SCHARP, November 9, 2021 ("Found contracting with LAHSA was very dated, specifically the administrative time, payments were late, etc. Also, [speaking] as a LAHSA subcontractor, by the time the amounts were allocated to the subcontractors, they did not cover costs."); Interview with Dr. Roché Vermaak, Executive Director, Family Promise of Santa Clarita, October 13, 2021 ("Family Promise

93   Blue Ribbon Commission on Homelessness Governance Report

EXHIBIT 36 - Page 1635

has 3 staff members. The Executive Director researches and writes grants and doesn't have the bandwidth, experience, and resources to apply for and, if successful, manage LAHSA contracts. It is much easier to apply for grants that do not require excessive application and grant management time and resources."); Interview with Christine Glasco, President and CEO, Upward Bound House, December 2, 2021 ("Takes 6/7 months to get contracts done with LAHSA for 12-month contract, and service providers are not being paid during that time. Payments from LAHSA take too long."); Interview with Foothill Unity Center, December 6, 2021 ("As a qualified bidder, there should be a direct route to access funding to enable service providers to expedite addressing the homeless crisis in each of the SPAs."); Interview with Laura Duncan, Executive Director, and Camille Guerrero, Director of Development, Ascencia, December 14, 2021 ("Approved to contract with LAHSA, but have not had direct contract with LAHSA since 2015/2016 because we were too small and could not deal with LAHSA's slow pay."); Interview with Laura Duncan, Executive Director, and Camille Guerrero, Director of Development, Ascencia, December 14, 2021 ("One of the huge issues with LAHSA is the flow for receiving payment from them.").

[18]*See also* Interview with Marisa Creter, Executive Director, SGV COG, October 4, 2021 ("Cities don't have access to HMIS [data]."); Interview with Covina, October 21, 2021 ("We don't have the access to HMIS that we need; we have limited access [and] can't populate HMIS with our local homeless."); Interview with Youth Commission, December 7, 2021 ("LAHSA has several advisory boards, including those led by youth. Those groups should be the first to inform and review data reported to ensure that it is accurate, appropriate, and relevant to the communities most impacted."); Interview with Mayor Robert Pullens-Miles, Raylette Felton, Assistant City Manager, Michael Reyes, Director of Municipal Services, Lawndale, December 14, 2021 ("The City has not been able to obtain data regarding the successes of LAHSA, PATH, [and] efforts as it relates to addressing homelessness, including what is used to gauge/quantify success (how is success measured?)."); Interview with Mayor Robert Pullens-Miles, Raylette Felton, Assistant City Manager, Michael Reyes, Director of Municipal Services, Lawndale, December 14, 2021 ("The City has not been able to receive information from LAHSA, PATH, or the COG regarding the allocation of the Measure H funds used [to] addressing homeless[ness] in the Lawndale community."); Interview with Jennifer Hark Dietz, CEO, PATH, January 6, 2021 ("LAHSA has data to show trends with people who are experiencing homelessness, e.g., increase in adults and youth. It would be very beneficial to figure out a system to share and use this data on a regular basis. The data impacts design and program implementation."); Interview with Bobby Cagle, Former Director, Department of Children and Family Services, September 21, 2021 ("Lack of data sharing prevents DPSS from continuing to track foster youth once they age out.").

[19]*See also* Interview with Covina, October 21, 2021 ("Difficulty in connecting directly with LAHSA; have to go through SPA lead."); Interview with Foothill Unity Center, December 6, 2021 ("[Speaking as] a qualified bidder [with LAHSA], ... (o)ur roles should include increased conversations with LAHSA to strategize and to determine what is needed in our SPAs.").

[20]Interview with Jeff Farber, Executive Director, Harbor Youth Counseling, October 12, 2021 ("It is very challenging for the smaller and faith-based providers to contract with LAHSA because of insurance requirements and other things that make it too expensive. Insurance requirements are uniform and not adjusted based on the size of the entity."); Interview with Jeff Farber, Executive Director, Harbor Youth Counseling, October 12, 2021 ("Contracting workshops are not offered by LAHSA."); Interview with Covina, October 21, 2021 ("Smaller providers can't compete on LAHSA's contracts even though the smaller providers are amazing."); Interview with Mike Foley, former Executive Director, Bridge to Home, October 29, 2021 ("In order to limit the amount of contract and payment detail, it is in LAHSA's self-interest to work with very large nonprofits—NGOs really. But the need for grassroots and emerging nonprofits is crucial to meeting the need. This conflict needs to be resolved. This primarily harms communities outside metropolitan areas, and a regional funding approach is necessary right away."); Interview with Dr. Jack Barbour, Chief Executive Officer, SCHARP, November 9, 2021 ("Found contracting with LAHSA was very dated, specifically the administrative time, payments were late, etc. Also, [speaking] as a LAHSA subcontractor, by the time the amounts were allocated to the subcontractors, they did not cover costs."); Interview with Dr. Roché Vermaak, Executive Director, Family Promise of Santa Clarita, October 13, 2021 ("Family Promise has 3 staff members. The Executive Director researches and writes grants and doesn't have the bandwidth, experience, and resources to apply and, if successful, manage LAHSA contracts. It is much easier to apply for grants that do not require excessive application and grant management time and resources."); Interview with Maura Johnson, Director of Housing, Penny Lane Centers, October 21, 2021 ("LAHSA payments have been delayed, particularly around the time of contract renewals. The delay requires contractors to upfront all of the staffing and other expenses, which over 2-3 months for us totals about $1-$2M; this delay is particularly problematic for nonprofits, some of which are out many millions of dollars before they can bill under their new contracts.").

[21]*See also* BRCH meeting, presentation by John Wickham, Legislative Analyst, City of Los Angeles, January 19, 2022 ("There are parts of this system that have authority, but they do not have accountability to the system. The prime example here is a CES Policy Council, which has the ability to set policies that affect how people experiencing homelessness are placed into housing. But those policies are not reviewed by the LAHSA Commission, by the COC, by the COC Board,

EXHIBIT 36 - Page 1636

by the Supervisors, by any elected city council, including the Los Angeles City Council. So, there is authority to set these policies, but there's no independent review of those policies. On the other hand, there are parts of the system that are held accountable for what's going on even when they have no authority."); Interview with Alliance for Children's Rights, October 15, 2021 ("LAHSA's assessment tools don't accurately reflect the significant challenges experienced by transition-age youth, creating a barrier for youth to receive housing. There should be a specific priority designation for TAY."); Interview with Margaret Ecker, RN, MS, Lead Volunteer, St. James Soup Kitchen and Shower Project, St. James Episcopal Church, October 26, 2021 ("FBOs should have access to CES and HMIS so they can understand a person's history and better counsel those they serve. Without access to CES, church staff cannot easily know if someone has been assessed, and without a CES score, help is hard to access."); Interview with Santa Monica, October 26, 2021 ("LAHSA is unable to provide information about who/how many people ... locally are on the CES list waiting for housing. We have also not been able to get regular reports on the number/disposition of LA-HOP requests from local ZIP codes."); Interview with Bobby Cagle, Former Director, Department of Children and Family Services, September 21, 2021 ("Current CES [is] not helpful for foster youth.").

[22]CoC Charter, Art. 4(B), Sec. 3(B).

[23]See CES Policy Process at https://www.lahsa.org/news?article=332-the-ces-policy-development-process&ref=ces (last accessed Mar. 23, 2022).

[24]See, e.g., CES Policy Process at https://www.lahsa.org/news?article=332-the-ces-policy-development-process&ref=ces (last accessed Mar. 21, 2022); CoC Charter, Art. 4, Sec. 3(B); Appendix A to the Los Angeles Continuum of Care Governance Charter, titled "Assignment of Continuum of Care Responsibilities."

[25]BRCH meeting, presentation by Gary Tsai, M.D., Director, Substance Abuse Prevention and Control, County of Los Angeles Department of Public Health, November 17, 2021, at Slide 22.

[26]According to LAHSA, it "does not support a streamlined role of COC only given its nature as a Joint Powers authority. LAHSA administering Measure H is a necessary element as it allows other funding sources to supplement gaps/shortages in Measure H. Continuity of services and flexible funding for providers must be the focus. Adding another contract administrator (county entity) would increase complexity and create an ever greater administrative burden on service providers." See H. Marston Comments to BRCH Report dated March 28, 2022.

[27]See LAHSA Presentation to Blue Ribbon Commission of Homelessness dated October 6, 2021, at Slide 7 (CoC Board as advisory to LAHSA Commission), Slide 8 (CES Policy Council as advisory to LAHSA Commission).

[28]See, e.g., CES Policy Process at https://www.lahsa.org/news?article=332-the-ces-policy-development-process&ref=ces (last accessed Mar. 21, 2022); CoC Charter, Art. 4(B); Appendix A to the Los Angeles Continuum of Care Governance Charter, titled "Assignment of Continuum of Care Responsibilities."

[29]See LAHSA Presentation to Blue Ribbon Commission of Homelessness dated October 6, 2021, at Slide 7 (CoC Board as advisory to LAHSA Commission), Slide 8 (CES Policy Council as advisory to LAHSA Commission).

[30]See H. Marston Comments to BRCH Report dated March 28, 2022 ("LAHSA does not support collapsing the Commission, CoC Board and CES policy council. This recommendation would require amendments to the JPA and the CoC Charter. Any change to the CoC Charter requires ratification by the full CoC membership").

[31]More than one person familiar with the practices of LAHSA has stated that the LAHSA Commission is not in the practice of bringing forward motions for action.

[32]To the extent that the ability to perform weekend work and 24/7 outreach depends on allocation resource, the Ops Team could assist with an analysis of resources to determine appropriate program changes.

[33]Presentation titled "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles," Miguel Santana, Chair, The Committee for Greater Los Angeles, and Raphael J. Sonenshein, Ph.D., Executive Director, Pat Brown Institute for Public Affairs, California State Los Angeles, November 17, 2021, Slide 6 (recommending "The Center" as a "Home Base of the Community-Wide Commitment to Addressing Homelessness in Los Angeles," with a portfolio for determining "Strategic Planning," "Measurable Outcomes," "Accountability and Mutual Assistance," and "Policy and Intergovernmental Relations").

[34]See also Interview, The Committee for Greater LA, September 27, 2021 ("No central location, and every entity involved will only look through the lens they are familiar with— but this does not work with homelessness."); Interview, Alliance for Children's Rights, October 15, 2021 ("Lack of interdepartmental cooperation creates barriers for foster youth/TAY to get access to services. The current culture of siloed departments creates unnecessary delays and difficulty for youth trying to access the resources they need to be successful in navigating the realities of independence."); BRCH meeting, presentation by Scott Martin, President, Hacienda Heights Improvement Association, January 12, 2022 ("We [unincorporated areas] need proper representation and . . . access to an individual who is not part of or tied to a Supervisor's Office. I don't want to speak to LAHSA, who is

**EXHIBIT 36 - Page 1637**

then going to contact the field deputy, who might be assigned to a supervisor's office to find out that maybe that isn't as important as something else that's coming up.")

[35]In 2018, the Board formally merged the County's Housing Authority and Community Development Commission and rebranded the entity as LACDA. See County Code Ch. 2.58. The Health & Safety Code creates and establishes development commissions in each community; in turn, development commissions are authorized to also operate a community's redevelopment agency or its redevelopment agency and housing authority under a single operating authority and "for the purpose of exercising any other powers regarding community development which the legislative body of a community may desire to delegate . . . subject to such conditions as may be imposed by the legislative body." See Health & Saf. Code § 34112.

[36]On January 5, 2021, the Board of Supervisors adopted a motion directing CEO-HI to procure a consultant or consultants for at least six months to, among other things, "develop a strategy to fully integrate the faith community into homelessness solutions across the County." On December 17, 2021, CEO-HI reported that by "May 31, 2022, the CEO-HI will report back to the Board on the status of the work of the FCEH and the consultant to support efforts to promote faith community involvement in the countywide movement to prevent and combat homelessness."

[37]See also Interview with Donyielle Holley, Homeless Programs Supervisor, City of Pomona, October 18, 2021 ("Need for better communication between County and cities—get their input; become partners to find local solutions."); BRCH meeting, presentation by Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, City of Glendora, November 3, 2021 ("Cities had to fund, and through alternative means (other than Measure H), its own staff and programs to try to help address some of the homelessness challenges . . . . Each city is unique, the challenges are unique. We truly understand and want to help."); Interview, City of Santa Monica, October 26, 2021 ("Creating inflexible guidelines that every city is expected to fit their services/programs into creates a disincentive for cities to participate in funding/siting/developing solutions."); Interview with Mike Miller, Director of Neighborhood Services, and Sophia Reyes, Housing Coordinator, City of Palmdale, December 20, 2022 ("Homelessness is 'like' a box of crayons 'that represent the various situation or need; it's not just black and white,' so we need all options 'and the ability to address our unique situations in our community.'"); Interview with Marisa Creter, Executive Director, SGV COG, October 4, 2021 ("There is no local return for Measure H, and there should be. COGs should receive Measure H revenue."); Interview with Helen Chin, Assistant to the City Manager on Homelessness, Culver City, December 2, 2021 ("[O]ne-time and nonrecurring grant funding isn't enough to meaningfully fund the operating or capital costs of interim or permanent supportive housing

programs."); COG meeting, Gilbert Saldate, Homelessness Program Manager, Gateway Cities COG, October 4, 2021 ("More fairness in funding for local solutions.").

[38]LAHSA adds that "A local solutions fund must also come with a comprehensive/regional plan for homelessness that is developed as a region with sponsorship from elected officials at the City and county." See H. Marston Comments to BRCH Report dated March 28, 2022.

[39]See also Interview with William Snow, Senior Program Specialist, HUD, October 12, 2021 ("Pragmatism vs. Philosophy: A core issue for LAHSA is to determine if they are going to be an entity that only deals with administrative matters or an entity that deals with administrative and policy matters."); Interview with Adam Raymond, City Manager, and Moises Lopez, Assistant City Manager, City of Glendora, October 21, 2021 ("When LAHSA started growing, they were so focused with growing they lost sight of what their purpose was."); Interview with Vince Kane, Former Director, Veterans Health Administration's National Center on Homelessness Among Veterans, October 5, 2021 ("Too many things have been layered on LAHSA, and there needs to be a more collaborative approach with other key stakeholders."); Interview with Mark Johnston, Principal, Mark Johnston Consulting, October 5, 2021 ("LA is the most complex CoC in America as a result of the Joint Powers Agreement and the huge geographic coverage of the continuum as well as the number of local jurisdictions within it."); Interview with Veronica Lewis, Director, HOPICS, October 14, 2021 ("LAHSA is not effective in performing their core function of Grants Administration, and that has a dire consequence for providers' cash flow, operations, and confidence in LAHSA's ability to lead our system."); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("LAHSA has too many hats to wear, too many bosses with competing priorities to answer to. They have to be a service provider, grant administrator, policy designer, and advocacy leader all at once."); Interview with Veronica Lewis, Director, HOPICS, October 14, 2021 ("LAHSA's outreach teams are the least effective."); Interview with Peggy Edwards, Consultant, Population Change Institute; Board Member, Bridge to Home; and Board Member, Measure H Citizens' Oversight Advisory Board, October 18, 2021 ("LAHSA is both a funder, administrator, and service provider. As a service provider, LAHSA creates conflict because they are competing for staff.").

[40]See LAHSA Presentation to Blue Ribbon Commission of Homelessness dated October 6, 2021, at Slide 3.

[41]Oliva, Ann. Los Angeles Homeless Services Authority: Report on Governance, February 2021, at 2-3.

[42]As noted above, LAHSA "does not support a streamlined role of COC only given its nature as a Joint Powers authority. LAHSA administering Measure H is a necessary element as it allows other funding sources to supplement gaps/shortages

**EXHIBIT 36 - Page 1638**

in Measure H. Continuity of services and flexible funding for providers must be the focus. Adding another contract administrator (county entity) would increase complexity and create an ever greater administrative burden on service providers." *See* H. Marston Comments to BRCH Report dated March 28, 2022.

[43]*See* 24 C.F.R. § 578.7.

[44]*See What Is the Homeless Management Information System?*, LAHSA, https://www.lahsa.org/hmis/about (last accessed November 15, 2021).

[45]*See* 24 C.F.R. § 578.7 (noting that "[t]he Continuum must develop a specific policy to guide the operation of the centralized or coordinated assessment system on how its system will address the needs of individuals and families who are fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, or stalking, but who are seeking shelter or services from nonvictim service providers").

[46]*See* H. Marston Comments to BRCH Report dated March 28, 2022 ("LAHSA does not agree with recommendations around reallocation of all Measure H for reasons noted above re: contracts, burden on service provider and significant system impact which would result in delayed progress towards reducing homelessness").

[47]*See* Board Motion dated July 27, 2021 at 4, Para. 3(a).

[48]*See* LAHSA JPA at Sec. 3(b)(1)-(2).

[49]*See* LAHSA JPA at Sec. 3(a)(1)-(2).

[50]*See* LAHSA JPA at Sec. 3(b)(2).

[51]*Id.*

[52]*See also* Interview with William Snow, Senior Program Specialist, HUD, October 12, 2021.

[53]*See also* BRCH meeting, presentation by Ann Oliva, Vice President for Housing Policy, Center on Budget and Policy Priorities, October 6, 2021 ("Generally . . . interviewees . . . expressed concern that LAHSA did not have the political support, independence, or the governance structure in place to actually make them successful."); BRCH meeting, presentation by Antonia Jimenez, Director, Department of Social Services, February 2, 2022 ("I think the way LAHSA is created, it's kind of designed to fail . . . , because you have all of these points of people, some from the city, some from the County. Who is the executive director of LAHSA really responsible to?"); Interview with Constanza Pachon, CEO, Whole Child, October 28, 2021 ("The need to respond to its many external demands seems to leave little time for LAHSA to work on truly building itself as an enterprise and run[ning] efficiently.").

[54]Oliva, Ann, Los Angeles Homeless Services Authority: Report on Governance, February 2021, at 2.

[55]*See* LAHSA JPA at Sec. 4(c)(1).

[56]*See* LAHSA JPA at Sec. 1.

[57]*See* LAHSA JPA at Sec. 11(c).

[58]Oliva, Ann. Los Angeles Homeless Services Authority: Report on Governance, February 2021, at 2.

[59]*See* LAHSA JPA at Sec. 4(c)(1).

[60]https://www.latimes.com/homeless-housing/story/2020-03-02/homeless-authority-los-angeles-restructure (last accessed March 23, 2022).

[61]Pub. Util. Code §§ 130050 *et seq.*

[62]Every city within a sector is "entitled to vote to nominate one or more candidates from that sector for consideration for appointment by the Los Angeles County City Selection Committee." *See* Pub. Util. Code § 130051. A city's vote is "weighted in the same proportion that its population bears to the total population of all cities within the sector." *Id.*

[63]*See* https://www.latimes.com/homeless-housing/story/2020-03-02/homeless-authority-los-angeles-restructure (last accessed Mar. 23, 2022).

[64]*Id.*

[65]Oliva, Ann. Los Angeles Homeless Services Authority: Report on Governance, February 2021, at 12.

[66]*See* Board Motion dated July 27, 2021, at 2.

[67]*Id.*

[68]*See* Appendix A to the Los Angeles Continuum of Care Governance Charter, titled "Assignment of Continuum of Care Responsibilities"; *see also* LAHSA Presentation to Blue Ribbon Commission of Homelessness dated October 6, 2021, at Slides 7-8.

[69]CoC Charter, Art. 4(B), Sec. 3(B).

[70]*See* CES Policy Process at https://www.lahsa.org/news?article=332-the-ces-policy-development-process&ref=ces (last accessed Mar. 23, 2022).

[71]*See*, e.g., CES Policy Process at https://www.lahsa.org/news?article=332-the-ces-policy-development-process&ref=ces (last accessed Mar. 21, 2022); CoC Charter, Art. 4(B), Sec. 3(B); Appendix A to the Los Angeles Continuum of Care Governance Charter, titled "Assignment of Continuum of Care Responsibilities."

EXHIBIT 36 - Page 1639

[72]Appendix A to the Los Angeles Continuum of Care Governance Charter, titled "Assignment of Continuum of Care Responsibilities."

[73]*See* 24 C.F.R. § 578.5.

[74]*See also* Interview with Dr. Jack Barbour, Chief Executive Officer, SCHARP, November 9, 2021 ("Found contracting with LAHSA was very dated, specifically the administrative time, payments were late, etc."); Interview with Jeff Farber, Executive Director, Harbor Youth Counseling, October 12, 2021 ("It is very challenging for the smaller and faith-based providers to contract with LAHSA because of insurance requirements and other things that make it too expensive. Insurance requirements are uniform and not adjusted based on the size of the entity."); Interview with Maura Johnson, Director of Housing, Penny Lane Centers, October 21, 2021 ("LAHSA payments have been delayed, particularly around the time of contract renewals . . .. [T]his delay is particularly problematic for nonprofits, some of which are out many millions of dollars before they can bill under their new contracts."); Interview with Mike Foley, former Executive Director, Bridge to Home, October 29, 2021 ("In order to limit the amount of contract and payment detail, it is in LAHSA's self-interest to work with very large nonprofits—NGOs really. But the need for grassroots and emerging nonprofits is crucial to meeting the need."); BRCH meeting, presentation by Donyielle Holley, Homeless Program Supervisor, City of Pomona, November 17, 2021 ("It surprises me that most of the communication [with LAHSA] is done through formal emails. Let's continue to build better partnerships between LAHSA and the sub recipients, including our cities, and our housing authorities. Let's plan together and partner together."); Interview with Department of Military and Veterans Affairs Brigadier General Ruth Wong, U.S. Air Force (Ret.), Director, and George Dixon, U.S. Army (Ret.), Supervisor of Veteran Services, January 4, 2022 ("In order for the Department of Military and Veterans Affairs to work with veterans experiencing homelessness, as well as veterans exiting the jails with nowhere to go, we need outreach workers assigned to this specific group."); Interview with Michael Villegas, Community Preservation Manager and Homeless Liaison, City of Santa Clarita, December 6, 2021 ("Hard to get LAHSA outreach in Santa Clarita even when there is someone that agrees to services. The City provides staff to coordinate with LAHSA; however, LAHSA says they'll try to get out and usually do not."); Interview with Jeff Farber, Executive Director, Harbor Youth Counseling, October 21, 2021 ("LAHSA competes with the nonprofits in the outreach worker space, and LAHSA pays more money so many of the nonprofit workers leave and go to work for LAHSA.").

[75]*See* LAHSA Presentation to Blue Ribbon Commission of Homelessness dated October 6, 2021, at Slide 7 (CoC Board as advisory to LAHSA Commission).

[76]Interview with Mayor Robert Pullens-Miles; Raylette Felton, Assistant City Manager; Michael Reyes, Director of Municipal Services, Lawndale, December 14, 2021 ("The City has not been able to receive information from LAHSA, PATH, or the COG regarding the allocation of the Measure H funds used toward addressing homeless in the Lawndale community."); Interview with Bobby Cagle, Former Director, Department of Children and Family Services, September 21, 2021 ("Lack of data sharing prevents DPSS from continuing to track foster youth once they age out."); Interview with Department of Military and Veterans Affairs Brigadier General Ruth Wong, U.S. Air Force (Ret.), Director; and George Dixon, U.S. Army (Ret.), Supervisor of Veteran Services, January 4, 2022. ("The red tape preventing County departments [from] sharing information creates a lag in helping veterans."); Interview with Marisa Creter, Executive Director, SGV COG, October 20, 2021 ("Cities don't have access to HMIS [data]."); Interview with Monterey Park, November 18, 2021 ("No access to HMIS— hardest/biggest fight with LAHSA."); Interview with LA Family Housing, October 22, 2021 ("We believe that LAHSA needs to make data-driven decisions and, in order to do so, needs to enhance their data team.").

[77]Committee for Greater LA, "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles," p. vii.

[78]Committee for Greater LA, "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles," p. 6.

[79]Presentation, "We're Not Giving Up: A Plan for Homelessness Governance in Los Angeles," Miguel Santana, Chair, The Committee for Greater Los Angeles, and Raphael J. Sonenshein, Ph.D., Executive Director, Pat Brown Institute for Public Affairs, California State, Los Angeles, November 17, 2021, Slide 6 (recommending "The Center" as a "Home Base of the Community-Wide Commitment to Addressing Homelessness in Los Angeles," with a portfolio for determining "Strategic Planning," "Measurable Outcomes," "Accountability and Mutual Assistance," and "Policy and Intergovernmental Relations").

[80]*See* Welf. & Inst. Code §5150.

[81]Gov. Code §8698.1.

[82]Gov. Code §§65660(a); 65660(b); 65662.

**EXHIBIT 36 - Page 1640**

Please visit **brch.lacounty.gov** for more information.

**EXHIBIT 36 - Page 1641**