UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

LA ALLIANCE FOR HUMAN RIGHTS, et.)
al.,                             )
                                 )
            Plaintiffs,          )
                                 )
        vs.                      )   2:20-CV-2291-DOC
                                 )
CITY OF LOS ANGELES, et al.,     )
                                 )
            Defendants.          )
_____  )

REPORTER'S TRANSCRIPT OF HEARING

Los Angeles, California

Tuesday, June 6, 2023

_____

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here:  www.amydiazfedreporter.com*

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

APPEARANCES OF COUNSEL:

For the Plaintiffs:

                UMHOFER, MITCHELL & KING LLP
                By:  Elizabeth Mitchell, Attorney at Law
                    Matthew Umhofer, Attorney at Law
                11766 Wilshire Boulevard, Suite 900
                Los Angeles, California 90025

For the Defendants:

                MILLER BARONDESS, LLP
                By:  Mira Hashmall, Attorney at Law
                2121 Avenue of the Stars, 26th Floor
                Los Angeles, California 90067

                LEGAL AID FOUNDATION OF LOS ANGELES
                By:  Shayla Myers, Attorney at Law
                7000 South Broadway
                Los Angeles, California 90003

                LAW OFFICE OF CAROL A. SOBEL
                By:  Carol Sobel, Attorney at Law
                1158 26th Street, Suite 552
                Santa Monica, California 90403

THE CLERK: Calling item one, LACV-20-2291-DOC, LA Alliance For Human Rights, et al., vs. City of Los Angeles, et al.

Counsel, please state your appearances.

THE COURT: Thank you. Let me compliment the clerk of the court at the beginning. That is a wonderful formal opening. Normally I don't have that. It's relatively informal. So let me just compliment you and thank you.

Good morning. If you would make appearances on behalf of the plaintiff, please.

MR. UMHOFER: Good morning. Matthew Umhofer and Ms. Mitchell on behalf of the plaintiffs.

THE COURT: It's a pleasure.

And on behalf of the defense, please.

MS. HASHMALL: Good morning. Mira Hashmall for the County.

THE COURT: Pleasure.

MS. MYERS: Good morning, Your Honor. Shayla Myers on behalf of the Intervenors.

THE COURT: Pleasure.

Then we'll hear arguments at this time, and of course begin with the County. These are your moving papers. And make a full presentation, and then if I have questions, I'll come back to you. There will also be two rounds. So after your opening, there will be a second opportunity.

MS. HASHMALL:  Thank you, Your Honor.

And I'm not going to repeat what is in the papers, obviously this issue has been thoroughly briefed, but I do want to hit what I think are the most important threshold issues that dictate that the motion should be granted.  And that is because after three years, and specific guidance from the Ninth Circuit, the plaintiffs are still unable to plead facts sufficient to establish the threshold question before any Federal Court, and that is whether the Court has jurisdiction to resolve the case.

And here, underpinning the motion to dismiss, and fundamental to the defects in the pleading, is the Separation of Powers Doctrine, and the lack of standing.

You cannot take a kitchen sink approach.  You must plead specific facts to establish that each plaintiff has standing as to each claim for relief.

And despite multiple rounds of prior pleadings, specific direction from the Ninth Circuit, the plaintiffs are unable to meet that burden.

And indeed, now three years later in their opposition they are trying to change on the fly their causes of action, their theories of relief, seeking amendment when trial is set in November.  And for all those reasons they, by their own pleadings, have demonstrated an inability to cure these defects.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

I would like to walk the Court through it.  In order to plead the constitutional claims, the basis for potential federal question jurisdiction, they must establish a constitutional deprivation, a substantive due process violation, to support the 1983 claim.

They simply haven't met their burden.  There is no constitutional right to housing.  They do not allege any facts, even viewed in the most favorable light, that could demonstrate deliberate indifference.

At the core, the plaintiffs disagree with policy decisions made by elected officials.  That is not a grounds for a claim, and it is certainly not the basis for alleging a constitutional violation.

And the courts have been clear about this, you've got to have a legally-protected right underpinning your 1983 claim.

We briefed what was pled.  And in the opposition, for the very first time, they changed their theory and claimed that it was a property interest that is the basis for their constitutional claim.  But the law says that that won't work.  *Regents vs. University of Michigan* makes clear that you cannot claim a property interest derived from state law to satisfy your pleading burden in the context of this 1983 claim.

And that is particularly true here where the state

statutes that they are grasping at, some that are not even referenced in their pleading, create substantial discretion in the government actor on how to fulfill its obligations. And they cannot use a court to dictate that discretion. And they cannot establish a legally-protected right.

The other reason the constitutional theories fail, Your Honor, is because there is no state-created danger that is anywhere close to the recognized case law.

They cannot point to any affirmative act by the County exposing the plaintiffs to danger that they would not otherwise face.

It's really a theory based on omission. And the case law doesn't support it as a viable claim. This is not akin to pushing civilians into a rabid crowd, or blocking exit from a dangerous protest.

These are arguments about how millions and millions and millions of dollars by the County has been spent to address the needs of the unhoused population, and a disagreement about those policy priorities. That is not a state-created danger. It's not a basis for jurisdiction or a claim for relief. Particularly because they cannot tie any action by the County to a particularized danger caused to the plaintiffs. And each category of plaintiff must demonstrate for themselves standing, actual injury, and a connection, a direct connection to an action by the County, whether it's

their unhoused plaintiffs, their formerly unhoused plaintiffs, their property owner plaintiffs, or their rental plaintiffs, some of whom don't even stay in the Skid Row area of the City of Los Angeles.  None of them can point to any action by the County that can constitute deliberate indifference.

The next federal claim is --

THE COURT:  Excuse me for just a moment.

Thank you.  Please continue.

MS. HASHMALL:  The next claim, and I think this one speaks volumes, is an instance where the plaintiffs have just swapped the County out for the City on takings and inverse condemnation claims, ignoring the reality that none of the plaintiffs claim to be in the unincorporated areas of the County.

So *Iqbal* and *Twombly* require specific facts; not broad brush allegations.  You can't just change names of defendants and purport to plead a viable claim for relief.  And they simply haven't done so here as it relates to the County.

They've got no standing, and no basis to claim either theory of takings or inverse condemnation.  And the law is squarely against them on that.

As it relates to the state law claims, again, you cannot use a Federal Court to dictate the exercise of

discretion by state actors, particularly where they cannot point to a statute that creates a mandatory duty owed to the plaintiffs that could support a claim for relief under state law.

The cases have examined the statutes that plaintiffs have invoked, whether it's WIC 17000 or some of the other statutes, again referenced for the very first time in the opposition, but never pled in their pleading, despite multiple rounds of amendments.  And they simply are not a basis for a claim for relief because there is no mandatory duty created, and there is no violation of an obligation owed to these plaintiffs by the County.

The nuisance claim again doesn't work.  They don't claim any action relating to the County in an unincorporated area that would give rise to a nuisance claim.  And it appears they think the unhoused population in the Skid Row area creates a nuisance.  It's an interesting theory from an organization that purports to represent that same community.  But in any event, it's not a basis for suing the County.

The taxpayer waste claim is squarely against Supreme Court precedent.  You cannot base a waste claim on a challenge on how the government is spending money, particularly when it's undisputed that the County has spent hundreds of millions of dollars, and housed tens of thousands of individuals in connection with its homeless programs.

Our conduct is not only legal, it's substantially addressing this crisis.  And I think we all agree, while there could be more done, nitpicking and challenging the use of those resources is not the basis for a waste claim as a matter of law.

Finally, because these are discretionary decisions entrusted to our elected officials, they have immunity for the exercise of that discretion.  The state law claims fail as a matter of law because of those immunities, particularly when plaintiffs have made no secret that they would like a sweeping injunction from the Court dictating policy and budgetary priorities of a government entity.  And that is squarely within the immunity jurisprudence of the appellate courts of the State of California.

I don't want to bury the lead, because the threshold issue of standing has not and cannot be cured.  We are not raising this issue for the first time.  We have raised it in various aspects of the pleadings in connection with this case, and the Ninth Circuit specifically identified those defects.

Despite all that guidance, and despite three years and multiple amendments, plaintiffs cannot plead standing.  And they don't even try to differentiate between their various plaintiffs.  All the plaintiffs are suing everybody on every claim.  The Federal Courts require more on Rule 12.

For all those reasons, Your Honor, I respectfully request that you grant the motion.

THE COURT:  Counsel, thank you.

Counsel on behalf of the Intervenors.

MS. MYERS:  Thank you, Your Honor.  Shayla Myers on behalf of the Intervenors.

I'm only going to take just a minute, because we have obviously joined the County in the motion to dismiss, just on a limited number of arguments, particularly with regard to the standing arguments, the arguments regarding takings, and the arguments related to the nuisance claims.

And the Intervenors raise those particular claims and join the County's arguments, and add our own additional arguments related to those claims, because we think it's important to note that those are the claims brought explicitly by property owners against unhoused -- against the County of Los Angeles for the actions of unhoused individuals in Skid Row.

The takings claims, as well as the nuisance claims, are predicated on actions that the property owners, including developers in the Skid Row area, who have investment-backed expectations -- and to be clear, that is plaintiffs' own words -- investment-backed expectations related to their property, that the County is creating a takings issue, as well as allowing nuisance to exist in Skid Row related to the

actions of unhoused individuals.

There is no basis for relief that property owners can seek against a government entity for the actions of third-parties, and in particular, for the actions of unhoused individuals in public spaces.

This is a broad and sweeping expansion of an expectation of property interests in public spaces in Skid Row.

This is not, to be clear, the first time that claims like this have been brought by property owners against the County or the City of Los Angeles because of the actions of unhoused individuals.  This case was previously brought in *Venice Stakeholders Association vs. City and County of Los Angeles* in State Court.  It was summarily dismissed on a summary judgment motion.

When other federal courts have considered these actions, they have summarily dismissed these claims.  Causes of action against city and county entities for failure to enforce laws cannot lie, cannot lie under state nuisance law, and they cannot lie under takings claims, or in Federal Court under nuisance.

The plaintiffs simply do not have standing to bring these types of claims against the City, and certainly not against the County of Los Angeles for the actions of unhoused individuals.

I think, as the County points out, it's significant that a group that purports to be the LA Alliance, and represent unhoused individuals, are representing property owners explicitly for the actions of unhoused individuals, many of which have been constitutionally protected by this Court, the Ninth Circuit and the Supreme Court in cases brought by the Intervenors and others, and in fact, in the cases that gave rise to this litigation.

These claims particularly are an attempt to undermine court protections that exist.  And the plaintiffs simply have not alleged allegations that give rise to those causes of action, and certainly cannot seek the relief that they are seeking, which, to be clear, is a mandate for the County to enforce laws that do not exist on the county books against plaintiffs in this case.

So again, we would join on those particular points.

Thank you, Your Honor.

THE COURT:  Thank you.

On behalf of the LA Alliance, please?

MS. MITCHELL:  Thank you, Your Honor.

I am not going to get up here and rehash old issues.

As plaintiff for county noted, a lot of these issues that the County brings up, and some of the standing issues that the Intervenors bring up, have already been litigated, and have already been decided by this Court.  So there is no

need for us to go back through them.  They are the law of the case.

These issues that County brings up regarding the Ninth Circuit order largely had to do with standing on race-based claims, which are not at issue here.  And these enforcement-related claims that Intervenor brings up, are also at issue here.  Nobody is suggesting that the County enforce any laws, other than the ones of their own making, which have nothing to do with police, but have to do with the statutorily-created benefits, which they are failing to provide.

So regarding the case or controversy, we would refer to the Court to ECF 551.  That is regarding whether or not there is a case or controversy issue because of the alleged settlement agreement that did not make its way into an order.

And then regarding the standing issues, we would refer the Court to ECF number 300, where the Court specifically concluded that both for the housed and unhoused individuals, plaintiffs have alleged sufficient standing.

So we are not going to go back through that, especially because nothing that the Ninth Circuit raised is in play here, nor does it affect the prior motions to dismiss.  Because these have been litigated ad nauseam, we will not repeat the cases here.

The one issue that the County does bring up which is

new, because it is a new claim that plaintiffs brought last year in the Second Amended Supplemental Complaint, is the due process cause of action.

Now, there are several red herrings that are raised --

THE COURT:  Which is which cause of action?

MS. MITCHELL:  The due process, the state-created interest cause of action.

THE COURT:  Okay.  Thank you.

MS. MITCHELL:  The County makes a really big deal of us noting that this is most likely a property interest and not a liberty interest.

Now, it's important to note out that none of the factual allegations have changed.  Nobody is suggesting that there was a scrivener's error on any of the factual allegations.  The factual allegations have always been that plaintiffs are entitled to and are not receiving statutorily given interests.

Now, the law on this is undeniable.  It is axiomatic that that is a property interest.  The case on that -- and because this was raised for the first time on reply, I'm giving the Court the cite -- this is *Board of Regents of State Colleges vs. Roth*, R-o-t-h, 408 U.S. 564.  And it is black letter law, and has been for 50 years in this country. And in fact, one of the cases cited by the County cites to

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

this very case for the distinction between liberty and property interests, Your Honor.

And that case specifically states, "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it, he must have more than a unilateral expectation of it, and he must instead have a legitimate claim of entitlement to it."

This is not a new statement of law.  And so the fact that we took a look at this and said, oh, our claims are actually -- and we intended to bring them as property rights, as opposed to liberty rights -- although I do think there is an argument that it could certainly fit into both -- that is not surprising, it is not different.  There was no analysis of the actual facts done by the County about this at all.

And so even when we pointed it out, there was still no analysis done by the County at all.  All of the cases cited by the County in the reply are still liberty interest cases.

Now, the standard under that, both liberty and property, are nearly identical.  There is no interest.  The big question is whether the State has, in fact, created the interest, whether that interest exists, and whether the plaintiffs have an expectation, or a reasonable expectation of right to them.

So we think that certainly it can fall under either

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

substantive due process, or procedural due process.  And there is substantial overlap between those two in the Supreme Court orders.  And so there is no need to really define which one of those it falls into today, although I'm happy to have that discussion separately if the Court is interested.

The -- I think the real important thing is whether there is a statutorily-created interest.  It's what the County briefs significantly, we spent four or five pages in the opposition, and I would refer the Court to that.

But I do think that it is crucial to look at under *Roth,* the property evaluation, whether there is a legitimate or a reasonable expectation of receipt of the benefit.

And looking at pages 8 to 11 of the opposition, plaintiffs identify statute after statute after statute which provides that expectation of benefit.  5600 MHSA, which is also known as Prop 63, 17000 all provide sufficient language themselves to find that entitlement.

But CalAIM, which is ignored completely by the County in both the opposition and in the reply, despite us citing it both in our -- excuse me -- by the County in their motion and reply -- despite us citing it both in the Complaint and in the opposition, I think it's crucial to point this out, because there is no world in which this could be described as not an entitlement to this benefit.

The statement which is cited in our opposition, "A

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

county mental health plan shall provide covered specialty mental health services to recipients who have a significant impairment, including a diagnosed or suspected mental health disorder."

So that statement that "the County shall provide" is really not subject to interpretation.  The Mental Health Services Act, MHSA, also identifies very specific entitlement to services that are not being met.

So the question, I think, setting aside sort of the straw man arguments, and the obfuscation that we are seeing consistently, is really the fundamental question here:  Does the County have the obligation to treat seriously mentally ill homeless individuals, and those suffering from a substance use disorder?  That is the question.  And that is the question that the County avoids time after time after time.

So turning to the state-created danger, Your Honor. There are only two real arguments that are identified there. The one is whether there is a particularized danger to an individual, or whether there is any affirmative conduct by the County.

So regarding the particularized danger, they cite a single case, *Sinclair*, which is a newer case out of the Ninth Circuit dealing with this issue, but it does not stand for which the proposition -- for the proposition for which the

County cites it.  It does not stand for the proposition that an individual must have the particularized danger, and it cannot apply to a group of individuals.  In fact, *Sinclair* itself cites several cases where a group of individuals were subject to that danger.

One of the cases cited by *Sinclair* is a case *Hunters Capital*, which specifically denied a motion to dismiss because those individuals lived or owned property, as opposed to voluntarily entering this occupied zone during the riots up in Seattle a couple of years ago.  And so when you have that particularized danger can apply to individuals if they did not voluntarily place themselves there.  That has been our argument from the beginning.

And then the affirmative conduct, Your Honor, we have itemized over and over on -- and we did it again individually on page 12 of the opposition, but I want to point out one of the statements from the reply, which we think is so crucial and so applicable here, the statement by the County, "These cases" -- referring to the collection of state-created danger cases -- "These cases involve egregious abuse by power -- abuse of power by a state official who exercised their authority to affirmatively force an individual into a dangerous situation where injury is foreseeable."

And that is exactly what we have alleged.  That is

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

what we are talking about.  And that is what is repeatedly alleged in the Complaint.

Now, turning to the takings, nuisance, mandatory duty, negligence, taxpayer waste, all of this has been litigated previously.  The Court has ruled on it previously. I will only raise a couple newer issues that were raised.

So one of the things the County keeps saying is that they could not have been involved in a taking because this is in the City and not in the County.

But what the County is failing to recognize is the significant role that regulatory takings do have in the takings clause, both in the Constitution and under state law, and under state constitution.

So just because you are not -- you are sort of in the land use jurisdiction of the City has nothing to do with a regulatory taking.  Because someone who lives in Skid Row is subject to city regulations, county regulations, State of California regulations, and federal regulations.  And any one of those could constitute a taking if it is a regulatory taking.

And one of the cases that they cite, *Cedar Point Nursery*, which we also refer to, talks a lot about the Penn Central factors for a regulatory taking.  In fact, I think it cites it something like 23 times when I did a Control F for it in the *Cedar Point* case.

And those specifically refer to -- and we can talk about this because it was one of the things that the Intervenors were particularly interested in -- that a regulatory taking, you must examine the regulation's economic impact, the extent of interference with investment-backed expectations, and the character of the governmental action. And that certainly can occur by a third-party. That was the point of *Cedar Point*.

And these takings cases are pretty clear when there is a regulatory taking, there does not have to be a physical invasion by the County in order to take effect. And that is what we have alleged.

There is no irony, Your Honor, here in what the Alliance is trying to do. The Alliance has from the beginning represented a broad swath of the community, all frustrated and shocked and dismayed at where the City and the County has been going.

So the takings claim is only applicable to the property owners, there is no doubt about that. We are not suggesting otherwise. But we are also not fighting our own plaintiffs. There is no suggestion that that is occurring.

The issue, Your Honor, is the unbelievable regulation, or the lack of regulation, failing to meet its own obligations that is causing the mass destruction on the street.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And we -- when you look at individuals who do not have control of their own faculties, whose fault is that? And that is what we really are talking about. And that is really when you look at the causation issue, I think that is the fundamental claim.

But when you have a clear failure by an entity who has an obligation to provide help to people, which it is not providing, is it people who are under the influence of drugs, who have schizophrenia, who are paranoid, who are bipolar, who are manic, who are self-treating because they are in dire straits, is it their fault that chaos is ensuing? Or is it the people who have an obligation to take care of them, to provide the services and treatment and benefits that they are not providing which is failing them? That has always been the question.

And so there is no hypocrisy here, as they want to suggest over and over and over. It is all a confluence of problems that the County has created.

The nuisance, the mandatory duty, the negligence claims all track previous claims, the previous order that the Court has issued. And we would refer the Court to, again, to ECF number 300.

The only other thing I think is relevant that is talking about -- to talk about here is the waste claim. In the reply, plaintiffs cite a case -- and I'm going to

pronounce it chia-tello, C-h-i-a-t-e-l-l-o, it does not stand for the proposition that only an illegal ordinance survives a waste claim.

*Chiatello* lists a litany of items which may be waste, including useless expenditure of funds that is incapable of achieving the ostensible goal. And then it goes on to state, "Whatever else waste may or may not be, it is unquestionably waste for a government to budget or spend money administering an illegal ordinance."

Whether the funds here are legal or illegal, I think we have alleged both, I think is yet to be determined in discovery, and perhaps an issue for summary judgment or trial.

But there is no doubt that all of this can constitute waste. And here, we certainly have met that standard.

And I think just looking at statutory immunity, there is nothing new, nothing interesting in their claim, frankly, that is worth talking about. And we would refer going back to ECF number 300 once again for that analysis, Your Honor.

So unless there are further questions by this Court that I can answer, I'm happy to take my seat.

THE COURT: All right. Thank you very much.

And response, please, by the County?

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

MS. HASHMALL:  Your Honor, it's telling that even now in oral argument, we are hearing amendments to the pleading, theories that are not in the Complaint, theories that are not even in the opposition brief that are being said for the first time here in oral argument.

The law of the case doctrine does not apply to any prior ruling on a prior pleading, particularly because our briefing in connection with this motion addresses the allegations in the operative pleading, and identifies, again, repeated deficiencies that the plaintiffs have not and cannot cure; and indeed, they don't even attempt to.

This issue with regards to the fundamental basis for being in Federal Court, whether they can establish a Section 1983 claim, the threshold, the requirement for subject matter jurisdiction, cannot be satisfied.

They call it a scrivener's error that they pled a liberty interest to support their claim.  In the opposition, they switched to a property interest, because all of the jurisprudence under the liberty cases show they cannot plead a viable claim.

But the Property Interest Doctrine provides them no refuge.  And that is because they cannot plead a property interest sufficient to establish that constitutional claim.

We hear, and the Court has told, that *Board of Regents vs. Roth*, that is the answer.  Counsel has suggested

that when they can show a legitimate claim of entitlement under state law, then that is enough.  That meets the due process pleading.

But I don't see in the briefs, and I didn't hear today, any actual reference to any specific claim of entitlement.  And the problem gets worse when you start to look at the disparate categories of the plaintiffs.  Is the property owner claiming to have schizophrenia untreated and unavailable for the resources of the County?  Is the resident who is a renter claiming they've got a substance abuse disorder, that they have been unable to obtain treatment under the indigent medical care plans of the County?  I don't hear it.  I don't see it.  And they admit it's a requirement they simply can't meet.

I'm also told now for the first time, oh, we can be substantive due process.  It can be procedural.  It can be anything I want it to be.  Well, that is not appropriate on Rule 12.  Particularly, because procedural due process has a well-developed body of case law.  No allegation within this pleading satisfies that claim.

We are told you don't need to decide it today. Apparently, they don't even need to define it today.  But today is the day where the Court has to examine this pleading, and conclude whether they have pled specific facts to meet the heightened burden established by the Supreme

Court in *Iqbal*.  They simply haven't.

And they concede on one hand that they need a statutorily-created interest, an expectation of the receipt of a benefit, but they don't plead it.  They don't establish that every plaintiff, every single plaintiff, had some right under the MHSA not satisfied, or some right under WIC 17000, a safety net for only the most dire and indigent.  A property owner in Skid Row is going to claim that they had a WIC 17000 entitlement not satisfied?  It doesn't satisfy the face test.  It does not meet the pleading standard.

CalAIM, again, doesn't work.  Their plaintiffs don't plead facts to suggest any eligibility, entitlement or deprivation.  You cannot just gloss over due process pleading requirements in Federal Court.  It doesn't work.

None of their plaintiffs are claiming to have been diagnosed with severe mental illness.  None of their plaintiffs are claiming that they have an untreated substance abuse disorder.  Rhetoric does not satisfy their burden, Your Honor.

The State-Created Danger Doctrine, again, they cannot plead, and have not even attempted to identify a particularized danger caused by the County.

I think I heard counsel acknowledge that they've got to establish that they did not voluntarily place themselves in the position that they say is the basis for their claim.

And yet, I don't -- I don't hear any suggestion that the County made anyone move to any particular area of the City of LA, or decide to own property in any specific neighborhood.

There is no connection to their allegations, and any actual action by the County, to create a danger recognized under the federal cases.

You have to affirmatively force that individual into the dangerous situation.  They haven't pled it, and they cannot.

You are told, Your Honor, that the takings claim is fine, it's a regulatory taking now.  Well, I think the name sort of makes obvious, they've got to plead a regulation that they allege is causing a significant injury that would be categorized as a taking under federal law.  I haven't heard a single regulation, not in the pleading, not in the opposition, not in the oral amendments here today, none.

So calling it regulatory doesn't do enough.  You have to actually plead the regulation you are alleging has affected a taking.  They have not.  They cannot.

I guess the theory of lack of regulation is a taking, but that would be a first, Your Honor.  This is not the case to recognize new theories of constitutional claims.

As it relates to waste, they say it doesn't require a legality, that they can just plead a waste claim, because they claim that this -- the action of the entity has no

public benefit.  They cannot credibly allege the hundreds and millions of dollars the County spends annually to provide resources, housing and support, has no public benefit.  They have not and cannot credibly allege that theory of waste.

Finally, as it relates to the state law claims, I did not hear any answer to the deficiency as it relates to a mandatory duty by the County that was violated to the plaintiffs.

I did not hear, and I still do not see in the pleading, any basis for a nuisance claim in a jurisdiction where they concede it's not within the County's authority to regulate.

I did not see in the pleading, and I did not hear today, any suggestion that the statutes that they are invoking divest the entity of discretion on how to meet its obligations under state law.  They cannot and they have not pled it.

So unless the Court has questions, Your Honor, I'll submit.

THE COURT:  And, counsel, I thank you, counsel.

Counsel on behalf of the Intervenors.

MS. MYERS:  Thank you, Your Honor.  Shayla Myers on behalf of Intervenors.

And I just want to make one minor point, and that's regarding the takings claim, as well as the nuisance claim.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

But particularly with regard to the taking claim, we want to echo the County's concern that the plaintiffs have failed to identify any regulations that would give rise to this crisis, have failed to identify anything that would constitute a regulatory taking; and instead, fall time and time again on the actions of unhoused individuals in Skid Row to justify the relief that they are seeking in this case.

The Federal Rules of Civil Procedure require notice pleadings to both guide the litigation, as well as guide discovery in this case.  And I think that that is an incredibly important point to make at this point as the parties race towards a trial.

The purpose of the Complaint is to give rise to an understanding about what this case is about.  Plaintiffs are litigating the impacts of homelessness; and in particular, the impacts of constitutional rights protected for unhoused people on property owners in Skid Row.  They are not identifying specific actions taken by the County that would constitute a regulatory taking, or would constitute nuisance claims.

That is opening up -- that has the potential to give rise to something that is completely untenable, as we think about this case going forward, thinking about discovery and trial, which is no direction whatsoever in terms of what the allegations are about what the County has actually done, and

what the impacts are.  And instead, threaten to turn this case into the impacts of unhoused people on property owners.  We are very concerned about that.  And we are concerned about the ways in which the pleadings, as they are currently drafted, perpetuate that.

The purpose of notice pleading, obviously, Your Honor, is to have causes of action that are cognizable.  And with regard to the takings and nuisance, they simply are not in this case.

Thank you.

THE COURT:  All right, thank you, counsel.

On behalf of LA Alliance, your response.

MS. MITCHELL:  Just briefly, Your Honor.

Regarding the substantive due process and procedural due process, the cases speak to both issues.  So it's not that we are being wishy washy, we are not going back and forth, it's that the cases themselves, particularly the Supreme Court authority, *Roth* and others who discuss these issues, substantive versus procedural due process, actually do speak to both issues.  So we are not bouncing back and forth.

As far as all of these allegations that we haven't made any regulations clear, that we haven't cited any statutory authority, I mean, I think not only have we done that ad nauseam throughout the Complaint, but we did it in

the opposition.  And in fact, I even quoted it here today.  So I just don't think there is any basis.

I think with that, we'll submit, Your Honor.

THE COURT:  All right.  Thank you.

I'll go back and relook, obviously, and rethink Document Number 300, where the Court had responded to many of these arguments previously, and give that a fresh look.

But I want to ask you one question about the State-Created Danger Doctrine.

Unrelated to you, but by way of example, in the separate proceeding where the County is not involved, there is an issue before the Court concerning bins, and a direction to take unhoused property and house them, or take that property exclusively to Skid Row.

Ms. Sobel, you and I faced that very issue in an unrelated matter that your colleagues may not be aware of in Orange County, where in the clearance of the riverbed with those thousand to 1400 people, the County of Orange had designated a warehouse in Lake Forest 17 miles away.

MS. SOBEL: 26.

THE COURT:  22 miles away?

MS. SOBEL: 26.

THE COURT:  26 miles away.  I'm sorry.

And on some occasions gave the unhoused a one-way bus ticket, and other occasions gave them no bus ticket.  And

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

that was always in controversy, and I never made a definitive finding about that.

So historically in a state-created doctrine, that may involve the City and not the County. But by analogy, the question I want to ask all of you is this: Is the containment policy that historically existed that floods literally one area, and I forget if that is Council District 14 or 15, which is Skid Row, a state-created danger?

And so let me rephrase that in a more simple way. Many studies say that that's by block one of the three most dangerous areas in America. Yet, we've had a historic containment policy in this city that encouraged, literally with floodlights and barriers, not only the movement, but the containment within that zone.

Is that a state-created danger?

And I'll turn to the County first.

MS. HASHMALL: Thank you, Your Honor.

There has been no allegation --

THE COURT: Is that a state-created danger?

MS. HASHMALL: The containment policy that has been referenced in these proceedings has nothing to do with the County of Los Angeles.

THE COURT: I understand that. Well --

MS. HASHMALL: That is the first --

THE COURT: Just a moment. Maybe. Maybe. I'm

going to ask you the question, you can respond.  If you choose not to, that is fine.

MS. HASHMALL:  So that is my first response, that the containment policy has no connection to the County --

THE COURT:  Um-hum.

MS. HASHMALL:  -- my client; therefore, not a basis for a claim against it, one.

Two, I think it's a reference to a city issue from decades ago.  And so there would be a huge problem with connecting that policy from 50-plus years ago to these plaintiffs who have to plead an actual injury now.

And even then, the state-created danger requires an affirmative act particularly directed at the plaintiffs, and deliberate indifference.

And so I -- I just don't see --

THE COURT:  All right.  Thank you.

MS. HASHMALL:  -- under any pleading standard that satisfying it.

THE COURT:  For the Intervenors?

MS. MYERS:  First of all, Your Honor, I just want to say with regards to the three most dangerous areas that you cite to that was cited by the plaintiffs, but when you look at the underlying study, those citations actually speak volumes about the plaintiffs' claims.

The basis for the determination that the three most

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

dangerous neighborhoods in the country are in Skid Row is based on poverty, and poverty alone.

Those studies are some of the most racist studies that have been done with regards to the ways in which crime and poverty intersect.  There is no question that Skid Row is one of the most poverty stricken areas in Los Angeles.  There is no doubt about that.  And that that is the result of the containment -- the, quote, containment policy.

But to be clear, the containment policy was about the preservation of affordable housing.  The affordable housing, Your Honor, that you cited to from *Skid Row Housing Trust*, *SRO Housing* and others, that have in some ways stopped some of the devastation that occurred as a result of the type of gentrification that plaintiffs have been advocating for.

And, in fact, plaintiffs in their Complaint actually criticize the zoning policies that are -- that were just passed by the City Council as part of their state-created danger theory, which is the Downtown 2020 Plan, which just passed, and continue to preserve affordable housing in Skid Row.  Because the plaintiffs have been fighting against those zoning policies.

And, Your Honor, those are the types of zoning policies that constitute the so-called containment policy.  I would be remiss if I did not note that LA Catholic Worker is an intervenor in this case.  And Jeff Dietrich, the founder

of LA Catholic Worker, in his work at LA Catholic Worker, was one of the drafters of the Blue Plan, which gave rise to the, quote, containment policy that the plaintiffs cite to as causing the state-created danger in Skid Row.

We would say that, no, absolutely not, this, quote, containment policy cannot give rise to a state-created danger policy for one specific reason:  You cannot say that the creation and preservation of affordable housing in Skid Row gives rise to state-created danger for the very purpose that doing something positive, creating permanent housing, cannot be juxtaposed with plaintiffs' allegation that the failure to create shelter instead of permanent housing is a state-created danger.

You cannot say that one policy is better than another for purposes of affordable housing, or for purposes of a state-created danger theory.

Effectively, plaintiffs' argument in this case with regards to state-created danger is the, quote, containment policy preserving housing gave rise to a state-created danger in Skid Row.  There is absolutely no basis for that allegation.

And lastly, I would say, Your Honor, with regards to the idea of floodlights and barriers may have existed in the containment plan that was drafted -- the, quote, containment plan that was drafted, however, that ignores the intervening

Safer Cities initiative which occurred in the 1990s. It ignores the reset policy that continues in Skid Row today that effectively displace unhoused people from Skid Row through the flooding of LAPD officers to the Skid Row area; and therefore, an intervening policy that undermines the initial allegation of state-created danger disrupts the proximate cause which is necessary for purposes of a state-created danger theory.

So it's Intervenor's position that, no, allegations related to floodlights cannot give rise to a state-created danger theory in this case.

MS. SOBEL: And, Your Honor, if I can add a little bit to that?

Ms. Myers is correct that the City was trying to preserve property. So 1986, Mayor Bradley issues an order preventing the destruction of low income properties in the Skid Row and downtown area. And by the time the *Jones* case is filed in 2003, one-half of those protected properties have been destroyed.

So if they are doing state-created danger, they are not doing a really good job of containment.

The *Wiggins* case, which Ms. Myers' office filed, was to protect the property that had not yet been destroyed. They have been back in court multiple times, as the City continues to give approvals to destroy more property, more

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

low income property.  So again, they are not doing a really good job.

And then, you know, Your Honor talks about the floodlights.  You can take a look at Venice --

THE COURT:  And the barriers.

MS. SOBEL:  And the barriers.

Take a look at Venice.  They are not doing floodlights.  They are doing some barriers.  They are doing fences.  So anywhere there is an encampment, people are being dislocated, and the public area is being fenced off from anybody's use.  That occurred in West LA, as well.

So it doesn't seem to fit with an idea that the City is taking affirmative steps to create the state-created danger, as it is defined by the plaintiffs in this case.

THE COURT:  I think I can echo at least a portion of what you said.  And that is in Bonner District and the Mar Vista District, that wasn't clear.  That was fenced, basically.

MS. SOBEL:  Well, Venice Dell is being fenced tomorrow after a care plus with no offer of inside safe or other housing really, and that is Traci Park.  And that will be like I think the second or third property in Venice since she took office that has been fenced off, public property fenced off.

THE COURT:  In terms of this state-created danger,

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

because I have written in all of the other areas previously in Document 300, I'll go back and look at those again, but whatever this containment policy is, Skid Row is disproportionately racial, and that is even over four times the number of minority black residents.

Did this containment policy, which was state sanctioned, lead to that racial disparity?

MS. SOBEL:  I think that gentrification throughout the City has led to that racial disparity.

THE COURT:  So your answer is no?

MS. SOBEL:  My answer is no on the racial disparity. I don't think -- I think that there is a gentrification issue, and a --

THE COURT:  How did it turn from historically, then, a melting pot, at least from the history you have given me in your own briefing, to primarily a minority, black minority, if this is a state-created containment policy.

MS. SOBEL:  I think it's moving to a primarily brown minority at this point, Your Honor.  The numbers are shifting.

THE COURT:  You want to walk down with me again?  I disagree with you.  Strongly disagree with you.

All right.  Your answer, counsel?

MS. MYERS:  I mean, Your Honor, are you speaking about the --

THE COURT:  I'm speaking about the racial disparity in Skid Row, and whether this was a state-created danger.

MS. MYERS:  Your Honor, I think the reality is the state-created danger problem, as we have articulated, is not a cognizable state-created danger.

THE COURT:  I understand that.  So the containment had nothing to do with this, is that what I'm hearing?

MS. MYERS:  Your Honor, we dispute that the containment policy exists because of the actions, including those of the plaintiffs, many of the plaintiffs identified as part of their role in the Central City East Association, the business improvement district, to displace individuals from Skid Row oftentimes through the seizure and destruction of their property, as alleged in other lawsuits against them, through the hiring of -- previously through the hiring of armed security guards, through the use of the law enforcement and the role of law enforcement, that actually in Skid Row there has been concerted effort to displace unhoused individuals from Skid Row for the last 20 years.

And we would also note that many of the -- many of the practices that Ms. Sobel note, fences, those types of things, are actually being done by private businessowners in Skid Row that are -- that are forcing individuals to be more concentrated on various streets.  That is evident on 4th and Town, with -- it's evident throughout Skid Row.

And so the types of actions that Your Honor is speaking to --

THE COURT:  I can't disagree with you.  In fact, I think I agree that that is occurring.

But originally, those appear to be property owners in a sense putting up these types of barriers, probably in reaction to what they perceive as the --

MS. SOBEL:  Your Honor, I believe that --

THE COURT:  Just a moment.

But those property owners didn't, at least historically from at least the UCLA studies, that you both relied upon and referred to me, in fact, really start this process, as you argue.

In fact, not the present intervenors, but at least -- well, I won't name the names -- but some of the early genesis came from actually the advocates for Skid Row concerning this containment policy.  And we all know that.

So instead of finger pointing, it was really a joint city, county and intervenor -- I don't want to say intervenor.

MS. MYERS:  Fair, Your Honor.

THE COURT:  It was a coalescence of this containment idea.  And it substantially changed the racial population, regardless of what you think today, into a predominantly minority population.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

And I respectfully disagree with you, Ms. Sobel, it is predominantly black.  I was down there two weeks ago.  If you want to take a census, you can walk with me again.

MS. SOBEL:  If I may?

According to a number of reports from the government entities in the *LA Times*, the number of Latinos who make up the unhoused population in LA is now approaching 45 percent.

THE COURT:  Oh, absolutely.  In Los Angeles, in fact, my greatest homeless population by number is Latino.  It's not black.

But the disparity of 4 to 1 is so disproportionately black.  So I have no disagreement city-wide -- hear me out now -- I have no disagreement city-wide that the greatest number of homeless are now Latino.  Absolutely.

In fact, I'm wondering why I don't inject another intervenor group that also represents the Latino community for balance here.  But disproportionately, if you are disagreeing it's 4 to 1, by proportion with the 9 to 11 percent black population, it's up to 32 to 36 percent black homeless, which is hugely disproportional in terms of the number of Hispanic or Latino on the street.

MS. SOBEL:  It is.  But I don't think it's the containment policy.  I think it is the larger gentrification.

THE COURT:  Then what created the change in race from what I will say a melting pot, and primarily at one time

Caucasian, into this concentration of minority people in Skid Row who are primarily black?

MS. SOBEL:  A lot of it is gentrification.  People aren't gentrifying Brentwood, they are gentrifying South Central LA.

THE COURT:  But is it the encouragement, for instance, to move people, or to encourage people to go into this containment zone?

And by the way, we are going to face this in the VA. There is another case now before the Court, and that is the VA.  And you have to wonder where the intake is coming from. Is Skid Row even aware if you are a veteran that the VA may be opening up facilities?  So, I mean, what is the reach out to veterans on Skid Row, for instance, do you know?  I'm going to find out.  But, now, hold on for a moment.  What is the reach out to veterans on Skid Row?  Do they even know that the VA is opening, or are we going to service people from the West Side of Los Angeles in Venice?

MS. SOBEL:  I don't know the answer --

THE COURT:  Well, we'll bring that up with the Secretary of Veteran's Affairs maybe, about just getting some equality in terms of how we are going to treat our -- that has nothing to do with you, but it's a great concern to me when I see this disparity, and one racial group in this containment zone.

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

MS. SOBEL:  Your Honor, if I may?

I think, you know, I did some litigation in the past on this issue when I represented day laborers.  There is an overlying issue for the Latino population in Los Angeles, which is why they are not public on Skid Row or in other places, many of them are not documented, and so they don't go to those places.  And I've worked with the day labor organizations and other groups.  And, you know, we are talking about people who are not -- who are fearful of any contact with law enforcement, because they believe they are going to get -- they are going to get deported.

And I think that -- or at least taken into custody -- and I think that that raises the issue that Your Honor has talked about often when we have been in Orange County, is that we have to consider what the different criteria are, what the different characteristics are of the homeless population -- people who are experiencing homelessness.  Is it women who are domestic violence victims?  Is it people who come from communities where we just put in a Metro site, and then we are building transit-related housing, and all we are doing is pushing this out?  Is it people who lived in the areas in the Sage Report?

THE COURT:  Or is it setting up a containment zone, which is state sponsored and encouraged, which leads to this racial disparity?

Now, you have given me a whole bunch of analogies that I may agree with, but I also can't close my eyes to the huge disparity on Skid Row, and the change in population since the 1970s, in particular.

MS. SOBEL:  Yeah.

THE COURT:  Okay.

All right.  I want to hear from the LA Alliance.  Is this state-created danger or not?

MS. MITCHELL:  Your Honor, it's clearly a state-created danger.  We've alleged that from the very beginning.  We have pled that multiple times.

And it certainly has a disproportionate impact when you look at Skid Row, in particular, where people are drawn to it.  And I think the Court's example of storing people's property, but putting it, you know -- taking it I think from the West Side into Skid Row, which is bringing people from the West Side into Skid Row.

You also have individuals, and we've said this from the beginning, and several of our plaintiffs who will tell you, Your Honor, that they stay in the area because that is where their social services are.  They can't leave and then come back, and then leave and then come back.

And so you have people in the area looking for housing, looking for shelter, looking for social services, looking for mental health, and none of it's available to

them.

So even though originally, maybe 50 years ago this was a defined containment policy, and it was in face only subtracted thereafter, that doesn't change what it is and how people are intentionally drawn to and kept in this centralization of poverty.  And that is exactly what it is.

It is -- when you centralize poverty, and you centralize the desperation of people that are looking for help, then you inevitably have a spike in violence, and in crime and in crisis.  And that is what we are looking at repeatedly.

And it was historically the Intervenors, right?  LA CAN, I think, among others, in addition to the City and the County that kind of made the devil's deal.  That said, look, give us a place to be.  If you are not going to give us anywhere else, give us a place to be, and we'll stay there. And that was the deal that was struck, that is unlawful, and that was done 50 years ago.  And that is, in substance, still in existence today.

So I don't think that there is any doubt.  And I think certainly the disproportionate impact has been well-documented.

MS. SOBEL:  Your Honor, I want to respond to the smear of my clients, if I may?

They didn't even exist until about 20 years ago.  So

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

the devil's deal is with these developers and these property owners, and not with LA CAN.  And that is really just outrageous.

MS. MITCHELL:  I apologize.  I thought that that is what was said.  And I was just repeating that.  If that is not what was said, my understanding from what the discussion just was, was that 50 years ago LA CAN was involved in that.

MS. SOBEL:   LA CAN didn't exist.

THE COURT:  It doesn't matter if LA CAN was or not.

First of all, this is a good exorcism, or whatever.  So don't mind the passion between the parties.

MS. SOBEL:  It was Mayor --

THE COURT:  Just a moment now.  Just a moment.  Thank you.

This was directed towards the City and the County, it wasn't directed towards LA CAN.  So let's take LA CAN out of it.  This is the City and the County.

I haven't heard a satisfactory answer from either party.  So what I'm going to do is the following:  How long would it take to have a transcript of these proceedings transcribed?  The Clerk of the Court corrected me, and that is I need to make a record on each occasion making that specific request, apparently.

So I'm requesting that this be prepared, you know, at your convenience, but if it could be before the weekend, I

would really appreciate it, but not demanding, okay?

The second thing is I've asked the Clerk of the Court to waive all of these Pacer fees.  I'm really concerned that these people on Skid Row who are interested didn't have access to this, because they had to pay.  And I'm waiving these fees.

I'm also publishing, and going to start putting all of these transcripts on the public websites.  $5 or $7 is an awful lot of money to the folks down there.  And they deserve the right, if they want to, the folks down there have the right to read this without going and paying the Federal Court a $7 fee.  And I hope you will all join me in that, just so we can have access to the public.

So far we have been starting to publish this on a website, but it's hard to get to, and you have to understand the procedure to get on that website to get a free copy.  But I've been concerned about this for a long time.

And we talked to the folks down there, an awful lot of folks are interested in seeing what is happening in court, and they can't get here, quite frankly.  That is Don and Rick, and a whole bunch of people that are out there who really care to read this, and just can't get here.

So we are going to be in recess.  If I need you, I'm going to call you back into session as early as next week. I'm going to look at ECF 300.  I'll look at that with a fresh

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

look.  I've already decided many of these issues, including standing.  I'll go back and look at it again for you, and make certain I feel the same way, or differently, and reverse myself if I'm wrong.

I also want to look specifically at the state-created danger issue.  It's new, it's novel.  Quite frankly, I'm in a quandary about it right now.

All right.  We are in recess.  I want to thank you for your courtesy, but be available next week if I need you.

(Thereupon, the Court was in recess.)

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

----------------------------

Amy C. Diaz, RPR, CRR                    June 6, 2023

S/  Amy Diaz