# EXHIBIT B

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILDEARTH GUARDIANS; WESTERN WATERSHEDS PROJECT; KETTLE RANGE CONSERVATION GROUP, <br> *Plaintiffs-Appellants,* <br><br> v. <br><br> UNITED STATES FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester; RODNEY SMOLDON, Forest Supervisor, <br> *Defendants-Appellees,* <br><br> DIAMOND M RANCH, a Washington General Partnership, <br> *Intervenor-Defendant-Appellee.* | No. 21-35936 <br><br> D.C. No. 2:20-cv-00223-RMP <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Rosanna Malouf Peterson, District Judge, Presiding

Argued and Submitted October 7, 2022
Portland, Oregon

Filed June 14, 2023

**Exhibit B**
**Page 78**

2            WILDEARTH GUARDIANS V. USFS

Before:  John B. Owens and Eric D. Miller, Circuit Judges,
and Dean D. Pregerson,[*] District Judge.

Opinion by Judge Miller

## SUMMARY[**]

### Standing / Environmental Law

The panel affirmed the district court's dismissal for lack of standing of an action brought by three environmental organizations against the United States Forest Service, challenging livestock grazing decisions in the Colville National Forest in Eastern Washington.

Plaintiffs alleged that the grazing decisions would lead to an increase in the number of wolf attacks on livestock, which in turn would cause the Washington Department of Fish and Wildlife to kill more wolves.  The Department is permitted under Washington law to "authorize the removal or killing of wildlife that is destroying or injuring property, or when it is necessary for wildlife management or research."  Wash. Rev. Code Ann. § 17.12.240(1).

To establish Article III standing, a plaintiff must show it has suffered an injury in fact, the injury is fairly traceable to the challenged action of the defendant, and it is likely that

---

[*] The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the injury will be redressed by a favorable decision. The Service did not dispute that plaintiffs had a concrete interest in the welfare of gray wolves in the Colville National Forest. The key issues were whether any injury to the wolves would be caused by allegedly unlawful conduct of the Service and whether a change in that conduct would redress that injury.

Here, the claimed injury arose from the actions of a third party that is two steps removed from the Service. The Service does not kill wolves, nor does it regulate those that do. It regulates livestock grazing, but plaintiffs do not object to grazing in itself. Rather, plaintiffs object to grazing because it may lead to depredations, which may in turn lead the Department to consider and in some cases exercise its discretion to lethally remove wolves.

Plaintiffs alleged that many of their injuries involved procedural rights, such as those created by the National Environmental Policy Act. The panel held that the causation and redressability requirements are relaxed for procedural claims in the sense that a plaintiff need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps. But a plaintiff still must show a likelihood that the challenged action, if ultimately taken, would threaten a plaintiff's interests. The panel held that plaintiffs had not shown that the Service exerted the requisite effect on the Department's conduct. Because wolves in Eastern Washington are not federally protected, the Service has no authority to require the Department to do anything before it kills a wolf. Nor does the Service participate in lethal removals.

Accordingly, the panel held that plaintiffs lacked standing to assert their claims against the Service. The lethal

**Exhibit B**
**Page 80**

4        WILDEARTH GUARDIANS V. USFS

removal of wolves cannot be fairly traced to the Service's livestock grazing decisions, and a remedy that required the Service to make different grazing decisions would not redress the harm.

## COUNSEL

Jennifer Schwartz (argued), Law Office of Jennifer R. Schwartz, Portland, Oregon; Lauren M. Rule, Advocates for the West, Portland, Oregon; Talasi B. Brooks, Western Watersheds Project, Boise, Idaho; for Plaintiffs-Appellants.

Robert P. Stockman (argued), Andrew C. Mergen, Kevin McArdle, and Michelle Spatz, Attorneys; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Washington, D.C.; Emma Hamilton, Attorney; Environment and Natural Resources Division, United States Department of Justice; Denver, Colorado; Shaun M. Pettigrew, NOAA/Damage Assessment, Seattle, Washington; for Defendants-Appellees.

Chris A. Montgomery, Montgomery Law Firm, Colville, Washington, for Intervenor-Defendant-Appellee.

Dominic M. Carollo, Carollo Law Group LLC, Roseburg, Oregon, for Amicus Curiae Washington Cattleman's Association.

# OPINION

MILLER, Circuit Judge:

When gray wolves prey on livestock in Washington State, the Washington Department of Fish and Wildlife may—or may not—kill the wolves involved: Under state law, the decision whether to do so is committed to the Department's discretion. The United States Forest Service oversees livestock grazing in the Colville National Forest in Eastern Washington, but it does not regulate or participate in the killing of wolves by the Department. Environmental organizations concerned about the wolves sued the Forest Service challenging its grazing decisions. They allege that those decisions will lead to an increase in the number of wolf attacks on livestock, which in turn will cause the Department to kill more wolves. The district court dismissed the lawsuit for lack of standing. We affirm.

I

The gray wolf was once widespread throughout North America, including almost all of Washington. Habitat loss and killing by humans reduced the population, and by the 1930s wolves had been extirpated from Washington. Eventually, the gray wolf was listed as an endangered species throughout most of the lower 48 States. Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607 (Mar. 9, 1978).

In the early 2000s, gray wolves began to repopulate Washington. In 2009, the Northern Rocky Mountain wolf population, which includes the wolves in Eastern Washington, was removed from the federal list of

**Exhibit B**
**Page 82**

endangered species. Endangered and Threatened Wildlife and Plants; Final Rule to Identify the Northern Rocky Mountain Population of Gray Wolf as a Distinct Population Segment and to Revise the List of Endangered and Threatened Wildlife, 74 Fed. Reg. 15,123 (Apr. 2, 2009); *see Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1228 (D. Mont. 2010) (setting aside the delisting decision); Department of Defense and Full-Year Continuing Appropriations Act, 2011 § 1713, Pub. L. No. 112-10, 125 Stat. 38, 150 (reinstating the delisting decision).

Although gray wolves in Eastern Washington are no longer an endangered species under federal law, the State continues to designate them as endangered. Wash. Admin. Code § 220-610-010. Washington law generally prohibits killing endangered species, but it permits the Department of Fish and Wildlife to "authorize the removal or killing of wildlife that is destroying or injuring property, or when it is necessary for wildlife management or research." Wash. Rev. Code Ann. § 77.12.240(1); *see id.* § 77.15.120(1).

The Department has adopted a plan to promote the recovery of gray wolves. *See* Wash. Admin. Code § 220-610-110 ¶ 11.1. A stated goal of the plan is to "[m]anage wolf-livestock conflicts in a way that minimizes livestock losses, while at the same time not negatively impacting the recovery or long-term perpetuation of a sustainable wolf population." The plan lays out circumstances in which the Department may kill wolves to stop repeated depredations on livestock. Killing wolves—which the Department refers to as "lethal removal"—is acceptable under the plan "if it is documented that livestock have clearly been killed by wolves, non-lethal methods have been tried but failed to resolve the conflict, depredations are likely to continue, and there is no evidence of intentional feeding or unnatural

attraction of wolves by the livestock owner." The Department evaluates the need for lethal removal "on a case-specific basis, with management decisions based on pack history and size, pattern of depredations, number of livestock killed, state listed status of wolves, extent of proactive management measures being used on the property, and other considerations." In 2019, the Department killed nine wolves in Washington.

This case involves the Colville National Forest, which covers portions of Ferry, Stevens, and Pend Oreille Counties in Eastern Washington. The Forest Service controls uses of forest land, including for livestock grazing, through a forest plan. 16 U.S.C. § 1604(a), (e). The Service implements the plan by issuing permits to livestock owners that authorize grazing in specified areas. 43 U.S.C. § 1752(a).

In 2019, the Service revised its plan for the Colville National Forest. In response, three environmental organizations—WildEarth Guardians, Western Watersheds Project, and Kettle Range Conservation Group (collectively, WildEarth)—brought this lawsuit against the Service. WildEarth asserted claims under the National Environmental Policy Act of 1969 (NEPA), Pub. L. No. 91-190, 83 Stat. 852 (1970), and the National Forest Management Act of 1976 (NFMA), Pub. L. No. 94-588, 90 Stat. 2949. According to the complaint, the Service violated those statutes by failing to consider "modifying grazing management in order to mitigate recurring wolf-livestock conflicts that result in the lethal removal of wolves from the Colville National Forest." In addition to challenging the 2019 forest plan as a whole, the complaint also alleged that a specific authorization issued under that plan—the 2020 grazing authorization issued to Diamond M Ranch—was

unlawful because it lacked sufficient measures for reducing wolf-livestock conflicts.

On cross-motions for summary judgment, the district court granted summary judgment to the Service. It held that WildEarth lacked Article III standing to bring its claims. The district court reasoned that WildEarth had not shown that a favorable decision would redress its injury because "the lethal removal of gray wolves is the prerogative of the [Department], a third party not before the Court."

WildEarth appeals. For its part, the Service challenges the district court's decision to strike a document that describes the Department's protocol for responding to conflicts between wolves and livestock. Because the protocol is reflected elsewhere in the record, it is unnecessary for us to consider the document, and we proceed without it. *See Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir. 1996).

II

Article III of the Constitution gives federal courts the power to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2. Courts have "long understood that constitutional phrase to require that a case embody a genuine, live dispute between adverse parties." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). The doctrine of standing helps ensure the necessary adversarial dispute. To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

**Exhibit B**
**Page 85**

decision." *Association of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)); *see California v. Texas*, 141 S. Ct. 2104, 2113 (2021).

The plaintiff has the burden of establishing standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Thus, at the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element." *Center for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018). We review Article III standing de novo. *Save Bull Trout v. Williams*, 51 F.4th 1101, 1105 (9th Cir. 2022).

The Forest Service does not dispute that WildEarth has a concrete interest in the welfare of gray wolves in the Colville National Forest. WildEarth says that its members "gain aesthetic enjoyment from observing . . . and studying wild wolves" in the forest, and that they "have engaged in these activities in the past, and intend to do so again in the near future." Harm to the wolves therefore inflicts an injury on WildEarth's members, satisfying the first component of the standing test. *See Lujan*, 504 U.S. at 562–63 ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").

The key issues in this case are whether any injury to the wolves would be caused by the allegedly unlawful conduct of the Service, and, correspondingly, whether a change in that conduct would redress that injury. Federal courts may "act only to redress injury that fairly can be traced to the

challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). For that reason, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).

Here, the claimed injury arises from the actions of a third party that is two steps removed from the Service. The Service does not kill wolves, nor does it regulate those who do. It regulates livestock grazing, but WildEarth does not object to grazing in itself. Rather, WildEarth objects to grazing because it may lead to depredations, which may in turn lead the Department of Fish and Wildlife to consider and in some cases exercise its discretion to lethally remove wolves. Lethal removal, the direct cause of WildEarth's injury, is not regulated by the Service.

WildEarth emphasizes that many of its claims involve procedural rights, such as those created by NEPA. It relies on cases in which we have held that when a plaintiff alleges a "procedural injury"—including the failure to comply with NEPA—"the causation and redressability requirements are relaxed." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) (quoting *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)); *see also Navajo Nation v. Department of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (noting that when a plaintiff alleges a procedural injury, the "'normal standards for . . . [the] immediacy' of the injury are relaxed" (alterations in original) (quoting *Lujan*, 504 U.S. at 572 n.7)).

But the causation and redressability requirements are "relaxed" for procedural claims only in the sense that a plaintiff "need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps." *Export-Import Bank*, 894 F.3d at 1012; *see Lujan*, 504 U.S. at 572 n.7. "Because 'NEPA itself does not mandate particular results, but simply prescribes the necessary process' by which an agency considers the impact of its proposed action on the environment," it would make little sense to say that a plaintiff could challenge an agency's failure to comply with NEPA only by showing that compliance would necessarily have led to a different decision. *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1013 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Even so, a "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). A plaintiff still must show "a likelihood that the challenged action, if ultimately taken, would threaten a plaintiff's interests." *Navajo Nation*, 876 F.3d at 1161. And even for procedural claims, when "an 'asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed' to demonstrate causation and redressability." *Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1013 (quoting *Lujan*, 504 U.S. at 562); *see Food & Water Watch v. USDA*, 1 F.4th 1112, 1116 n.2 (D.C. Cir. 2021) ("The relaxation of redressability standards for procedural injuries . . . applies only to the Agency's actions, not to third parties not before the court.").

"Where an essential element of standing depends on the reaction of a third party to the requested government action

or inaction, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made.'" *Export-Import Bank*, 894 F.3d at 1012 (quoting *Lujan*, 504 U.S. at 562). A plaintiff can do so by showing that the defendant's action exerts a "determinative or coercive effect" on the third-party conduct that directly causes the injury. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) ("An indirect theory of traceability requires that the government cajole, coerce, command."). More specifically, the defendant's action could have such an effect if the defendant had "clear regulatory authority over the third party who more directly caused the plaintiff's injury" or was "an integral participant in a third-party's allegedly harmful action." *Export-Import Bank*, 894 F.3d at 1013.

WildEarth has not shown that the Service exerts the requisite effect on the Department's conduct. As we have explained, the Forest Service does not regulate lethal removals. Because wolves in Eastern Washington are not federally protected, the Service has no authority to require the Department to do anything before killing a wolf.

Nor does the Service participate in lethal removals. WildEarth argues that the Service's grazing decisions are "at least a substantial factor motivating" the Department's decisions to remove wolves. *Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015) (quoting *Mendia v. Garcia*, 768 F.3d 1009, 1013 (9th Cir. 2014)). But in fact, the Department defines its own lethal removal criteria, and it assesses the need for lethal removal case-by-case, "based on pack history and size, pattern of depredations, number of livestock killed, state listed status of wolves, extent of proactive management measures being used on the property, and other considerations." Those considerations do not

include the Service's actions. And if the Department concludes that lethal removal is warranted, the agency carries out any wolf killings without the involvement of the Service.

WildEarth relies on various cases in which plaintiffs established standing to challenge government action even though the injury was inflicted by a third party, but in many of those cases, the governmental defendant had authority to regulate the third party. For example, in *Center for Biological Diversity v. United States Fish & Wildlife Service*, the Fish and Wildlife Service executed an agreement with third parties about groundwater pumping, and the terms of that agreement allegedly injured the plaintiff's concrete interest in an endangered fish. 807 F.3d 1031, 1044 (9th Cir. 2015). Although the injury was caused by the actions of third parties (pumping groundwater), the plaintiffs had standing to sue the Fish and Wildlife Service because the Service had authority to regulate those actions through its agreement with the third parties. *See id.* Similarly, in *Idaho Conservation League v. Mumma*, the plaintiffs had standing to challenge the decision of the Forest Service not to exercise its authority to recommend designating forest areas as wilderness, directly harming the plaintiffs' recreational interest in undisturbed nature. 956 F.2d 1508, 1517–18 (9th Cir. 1992). The injury was caused by development carried out by third parties, but the Forest Service regulated whether that development could occur. *See id.* at 1518.

In the other cases on which WildEarth relies, the defendant participated in the third party's harmful conduct. For example, in *Western Watersheds Project v. Grimm*, we recognized standing when the federal agency defendant killed gray wolves in Idaho at the direction of a third-party

state agency. 921 F.3d 1141, 1148–49 (9th Cir. 2019). Similarly, in *WildEarth Guardians v. United States Department of Agriculture*, we recognized standing when the federal agency defendant and the State of Nevada worked together to lethally remove coyotes and ravens. 795 F.3d 1148, 1156–59 (9th Cir. 2015). The Forest Service's role here does not compare. The Service does not participate in the lethal removal of wolves in the Colville National Forest in any capacity.

Because the Forest Service does not regulate or participate in lethal removal, we cannot say the agency has a "determinative or coercive effect" on the harmful conduct of the Department of Fish and Wildlife. *Bennett*, 520 U.S. at 169. The Department inflicts the injury of its own accord. So the lethal removal of wolves cannot fairly be traced to the Service's livestock grazing decisions, and a remedy that required the Service to make different grazing decisions would not redress the harm. Because the injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," WildEarth lacks standing to assert its claims against the Service. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

**AFFIRMED.**