UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, )  Case No. LA CV 20-02291-DOC-
et al.,                       )                        (KESx)
                              )
          Plaintiffs,         )
                              )
vs.                           )  Los Angeles, California
                              )
CITY OF LOS ANGELES, et al.,  )  Monday, August 28, 2023
                              )
          Defendants.         )  (8:55 a.m. to 12:12 p.m.)
_____)

TRANSCRIPT OF STATUS CONFERENCE MOTION
TO INTERVENE BY MOVANT PAUL BORING [608]
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                  See next page.

Court Reporter:               Recorded; CourtSmart

Courtroom Deputy:             Karlen Dubon

Transcribed by:               Jordan Keilty
                              Echo Reporting, Inc.
                              9711 Cactus Street, Suite B
                              Lakeside, California 92040
                              (858) 453-7590

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiffs:          ELIZABETH A.  MITCHELL, ESQ.
                             Spertus Landes & Umhofer, LLP
                             617 West 7th Street, Suite 200
                             Los Angeles, California 90017
                             (213) 205-6520

                             MATTHEW D. UMHOFER, ESQ.
                             Spertus, Landes & Umhofer, LLP
                             1990 South Bundy Drive
                             Suite 705
                             Los Angeles, California 90025
                             (310) 826-4700

                             CARA ARNOLD, ESQ.

For the Defendants:          JENNIFER MIRA HASHMALL, ESQ.
                             Miller Barondess, LLP
                             2121 Avenue of the Stars
                             Suite 2600
                             Los Angeles, California 90067
                             (310) 552-4400

For the Intervenors:         SHAYLA RENEE MYERS, ESQ.
                             Legal Aid Foundation of Los
                               Angeles
                             7000 South Broadway
                             Los Angeles, California 90003
                             (213) 640-3983

For Paul Boring:             STEPHEN YAGMAN, ESQ.
                             Yagman & Reichmann, LLP
                             333 Washington Boulevard
                             Venice Beach, California
                               90292
                             (310) 452-3200

3

Los Angeles, California; Monday, August 28, 2023 8:55 a.m.

--o0o--

(Call to Order)

THE COURT: And, Mr. Yagman, also you're here on the motion to intervene. Why don't you come up and be seated, probably down at this end. With the opposition that's been filed, you probably want to separate yourself a little bit from the parties.

All right. So, Counsel, let's begin with your appearances.

MS. HASHMALL: Good morning. Mira Hashmall for the County of Los Angeles.

THE COURT: Good morning.

MS. MITCHELL: Good morning, your Honor. Elizabeth Mitchell, Matthew Umhofer, and Cara Arnold, on behalf of the Plaintiffs.

THE COURT: Pleasure. Pleasure.

MS. MYERS: Good morning, your Honor. Shayla Myers on behalf of the Intervenors.

THE COURT: Pleasure.

Mr. Yagman? Just have a seat. Pretend it's State Court for a moment. Sit down. Pull your chair closer. Take the microphone in your hand, and move it towards you. Now, now we can hear you.

MR. YAGMAN: Good morning, your Honor. Stephen

4

Yagman for the proposed Intervenors Paul Boring, et al.

THE COURT:  I received this motion for intervention concerning Mr. Yagman, and I choose at the present time not to take that motion at the beginning of our discussion between LA Alliance, the Intervenors, and the County.

Mr. Yagman, I want you to closely listen, see if you still want to bring this motion or not, but I'm going to delay that to later today.  Okay.  Now, you may after this discussion decide you really don't want to bring the motion to the Court.  I have no idea what I'm going to do, but much of what I do depends upon what I'm about to hear today.

All right.  I'm going to listen to anything that any of you want to bring up before I say anything.  So, counsel on behalf of the County or LA Alliance, and then I've got a number of things to talk to you about, but I want to pay you the courtesy and reverse this and have you speak to the Court.

There are a number of complaints, your documents, et cetera.  So, on either side.

MS. MITCHELL:  Your Honor, there are a couple of things pending.  We can talk about discovery.  We can talk about --

THE COURT:  We're going to.

MS. MITCHELL:  -- there is also a stipulation.

5

THE COURT:  We're going to talk about discovery. We're going to talk about stipulations.  We're going to talk about Docket 600 and settlement.  We're going to talk about nine people being deposed.  We're going to talk about all of those things today.  I'm just giving you the latitude throughout the day to discuss anything you want to first.

MS. MITCHELL:  There's -- unless my co-counsel has something, I -- I have nothing.  I think we're happy with where the papers are at, and we can answer questions if the Court has them.

THE COURT:  Okay.  On behalf of the County.

MS. HASHMALL:  Thank you, your Honor.  The parties have been working diligently on a very accelerated time frame, and the reason that we submitted the stipulation is because we do think that we would all benefit for a little -- with a little bit more time.

THE COURT:  Sure.

MS. HASHMALL:  It's two-pronged.  The parties are re-engaging in settlement discussions and at the same time working through really a mountain of discovery issues, depositions, documents, and it's -- it's been diligently progressing.

THE COURT:  Okay.

MS. HASHMALL:  But I think we all agree that more time would be necessary and appropriate to get a case like

6

this ready for trial.

THE COURT:  Okay.  Fair enough.  Thank you.

Ms. Myers, anything that you'd like?

MS. MYERS:  No.  I mean, the only thing that I would echo is that given the importance of these issues, allowing the parties sufficient time to develop the record seems critical, especially given what I imagine the space that these -- the airing of these issues will take up and the public conversation in Los Angeles.

THE COURT:  There'd been a complaint in the past that you haven't been involved.  Are you able to be involved in these discussions?

MS. MYERS:  We certainly have been involved in he discovery process, your Honor.

THE COURT:  All right.

(Pause.)

THE COURT:  Do you have access to the docket?  In other words, if I say Docket 600, can you pull that docket up?  Because you're going to need it today.  If I say 603, can you pull that docket up?  If I say 613 or 614, can you pull those dockets up?

MS. MITCHELL:  I believe so, your Honor.

THE COURT:  I want to make sure because it's going to be very important to you that you have access to what I'm about to take you throughout.  And, if not, I'll get MIS up

here.  I'll help you with that.  I'll take a recess, but you're going to need to follow these dockets and trace them.

And, Mr. Yagman, you're going to need to make some notes.

MS. MITCHELL:  Your Honor, there is an Internet access issue with the Court's Internet.  I'm not able to connect.  I'm trying to --

THE COURT:  We'll get MIS up there for you then.  Okay.

Are you okay?  Are you on Internet?

MS. MYERS:  No, your Honor.  I also am unable to connect to the Internet.

THE COURT:  Somebody's coming to your aid right now.  Okay.  I'll take a recess for just a moment.

(Proceedings recessed briefly.)

THE COURT:  -- wanted to pay him the courtesy of being heard, but he's got separate litigation in front of the Court right now.

Ms. Myers, LA Alliance, the County, previously the City, who settled, I was concerned when I took this case that -- that one of the benefits that the City had at least was that it kept the case from fragmenting because in the past -- and you were involved in the discussions, Ms. Mitchell, Mr. -- I'm not sure, Counsel on behalf of the County, that you were involved.

8

One of the things and efforts was to hope to decrease the litigation between the various entities that wanted to sue, including Venice and something or other. There were just a multitude of lawsuits ballooning.  And, as such, I was worried that we wouldn't have any centralization where Ms. Myers, County, City, LA Alliance, you could come to one place, that you would continue just to fragment across the board.

Mr. Yagman's position is that -- and he's been told in his lawsuit that LA Alliance and your case has first priority to me, that if other lawsuits came into it from Venice homeowners, et cetera, that were before the Court, which the Court put off, it took away the ability for all of you to resolve on behalf of the City, eventually which you did, but potentially the County in the future because you have all of these little strings.  And one of the things that we've been able successfully to do in another county was we literally flattened the litigation to almost zero. We started working for settlements, and you can go to Brook Weitzman and ask because I'm on her speed dial at 11:00 o'clock at night.  I kid you not.  She's a terrific advocate.  But we resolved an awful lot of things just informally that's been to the benefit of her client.

And the one thing I'd say to -- to all of you is that, regardless of the litigation, when you get into this

9

involving homeless people, first of all, you don't know in the future that your client even exists. They're moving. It's hard, Ms. Myers, for you to keep track of some of the folks. Some of the folks it's not, but one of the things that Ms. Weitzman and Tom Sobol were able to do was to center that litigation, and I -- I think it's worked very well, but you'd have to talk to them and see how that's working for them. They may disagree, but -- the second thing is we decreased the number of lawsuits significantly, but behind the scenes, we probably settled through good faith efforts over City's a -- minimally 8 to 10 lawsuits, minimally, which would have been significant.

Now, it may be that one or more of the parties enjoyed the litigation -- and I'm just joking, but I'm not -- and fragmented with multiple lawsuits coming in. But I think if we could keep that centralized with LA Alliance as the leader, because you're the first out of the box, and you've expanded from Skid Row in the Business District now to city wide and county wide. Mr. Yagman's been told that, and that's why you've seen his papers, that he's now moved to intervene. And my guess is is he's made a very wise tactical decision to try to intervene at this point.

I don't know what I'm going to do about that, but a lot of this depends upon what you folks are about to tell me today.

10

Second, if this is just a request to have these discovery disputes not resolved, then I've got a different viewpoint about trial dates.  In other words, if I'm just dealing with these same concerns that you've raised in February, I have no interest in working with you in that regard.  But if you're making some meaningful progress, you need to share that with me today.

For instance, you have nine depositions supposedly taking place in September.  I'm going to ask you about them in just a moment.  That's why I want you to have these docket numbers.

So, is this up and running from MIS?  Do you guys -- do you have -- do you have access yet?

MS. MYERS:  No, your Honor.

THE COURT:  Well, I promise you we'll get it because you can't follow what I'm about to say unless you have it.

The third thing is the document 600 that you don't have yet -- so, I'll come down and start so we don't waste time.

(Pause.)

THE COURT:  Okay.  This is Document 600, and it's the stipulation that you've reached regarding discovery, and on page one -- actually, page three of four, in paragraph four, you state that the moving party will submit joint

11

statement to the Court via email, and the clerk will file it on the docket because the part -- because the parties cannot file a motion without selecting a hearing date.

I'm going to change that. I want to make certain that what you're filing is not something that we're missing if Karlen's out, for instance. So, from now on, you'll file it on the docket. That will save me filing it on the docket, because I've been trying to keep up with your filings, and I hope that I've caught up, and if I haven't, tell me. Okay.

All right. Docket 603 -- there's a concern that I want you to raise today because there's been a concern about this discovery and whether the Court was to examine 1 through 3, 4, and 6. And, yet, the way that this was presented to me was a holistic discovery dispute that I believe covered every one of the 21 different areas you submitted to me.

I'm not inclined to change my rulings, but I am inclined to listen to you today. But in this document, on page three, Plaintiff LA Alliance For Human Rights and Defendant County of Los Angeles hereby submit this joint statement regarding discovery dispute, and then you go on to list 21 of those. And, yet, in the preamble, the County was asking for 1 through 3, 4, and 6. And I want you to make a record about your concern -- there seems to be a concern

12

about apex.  The Court doesn't get to the apex issues until it's exhausted good faith discovery between the two of you. But I do expect that that's going to be in front of the Court at some point.  And if I grant that, I want to make certain we pick the trial date so that we're not needlessly running in a member of the Board of Supervisors.

Docket 604 is the Court's discovery order.  On August 7th, in Docket 606, at page two -- when the Court read this -- the parties have multiple discovery disputes pending, which have either been the subject of a court order or about which the parties are meeting and conferring.

I -- I agree.  There must be a number of disputes. But what I'm not going to have is this simply delayed in abeyance for two or three months and then we go through this again if I do grant this continuance.

Number three, I had no idea what was about to happen.  So, I literally cleared my calendar in November. Let me repeat that.  I moved a lot of civil and criminal cases based upon not my dates.  These are dates I adopted at your request.  I'm willing to do that again, but that's quite a task when I take civil mattes or I advance criminal matters where the parties are angling by a couple of weeks. That's quite a project on our part.  So, if we pick a future date, that's the day it's going, and I need to make certain where we are with discovery.

13

All right.  Okay.  Document 609 -- Karlen, how are we doing downstairs with connecting these folks?

THE CLERK:  He just updated me that they're working on it.  They're resetting it.

THE COURT:  Okay.  Well, tell him to -- I want you to go to 609, and I'm going to take a recess so you can catch up.  I think your factual rendition is absolutely correct.

I'm going to be bluntly asking, Ms. Myers, if you represent the Intervenors in this matter and you're signing off at a request for 300 bed spaces and acquiescing to this, thinking this litigation is a waste, I'm perplexed by it, and I'm going to tell you that bluntly on the record.

You represent the homeless.  And, because the Court refused that, at least we moved to 1,000, which is totally inadequate.  How do you as an Intervenor justify being willing to settle for 300 bed spaces?  And I'm going to come back.  I've got a number of questions, okay.  I know you think that the litigation is a waste of time, but I'm really concerned.  I'm going to leave you on this case. Don't worry about that.  But 300 bed spaces?  At least the County, in good faith, believes that they've tripled that to 1,000.  You know that I feel that's completely inadequate. I think all of you know the magic place that the Court might be willing to get involved in.

14

But, if you're intervening, we're certainly not at 300, and we're certainly not at 1,000.  So, there's going to be conflict.  So, as you look to LA Alliance, the question's going to be can you two work together for the benefit of the homeless.

All right.  Now, I'm going to go to some pages here.

(Pause.)

THE COURT:  Ms. Hashmall, I agree with you.  On page five of eight, I think you've accurately quoted:

"Whereas May 9th" --

This is Document 609.

"At the May 9th, 2023 hearing, the Court indicated that it was flexible about the trial schedule and that a trial date in 2024 might be the best date."

I agree with you.  One -- one reason was when we looked at November 6, we've got Thanksgiving.  So, we get -- I have no idea whether you're going to be with us two weeks or two months.  You've got Thanksgiving in there.  You've got the Jewish and Christian holidays in there.  I've never been able to hold a jury between Christmas and New Year's.  And over Thanksgiving, everybody wants to get away.  So, I always adopted this date thinking -- all right.  Document

15

609, page four, line 25.

"Whereas there are currently more than nine fact witness depositions, six of whom are in dispute" --

Now, what's that telling the Court?  That's telling me that you've got major problems that I'm not aware of that I'm just delaying until January.  I want to hear who those nine witnesses are and which six are in dispute.

(Pause.)

THE COURT:  Okay.  Who are the nine?

MS. HASHMALL:  Your Honor, I've asked my colleague, Lauren Brody, to come in.

THE COURT:  It's nice -- it's a pleasure to see you.  Okay.  Who are the nine?

MS. MITCHELL:  So, there are three names --

THE COURT:  No, no.  I want names now.

MS. MITCHELL:  Okay.  Harry Tashdjian.

THE COURT:  Who?  Just a moment.

MS. MITCHELL:  Harry.

THE COURT:  H-A-R-R-Y?

MS. MITCHELL:  T-A-S-H --

THE COURT:  C-A-S-H --

MS. MITCHELL:  T as in Tom --

THE COURT:  Okay.

MS. MITCHELL:  A-S-H.

16

THE COURT:  S-H.  Thank you.

MS. MITCHELL:  D-J-I-A-N.

THE COURT:  D-J --

MS. MITCHELL:  Tashdjian, D-J-I-A-N.  I believe it's an Armenian name.

THE COURT:  Could be Georgian.  Just came back from Batumi, Georgia.  Could be Georgian.

All right.  Who is he?

MS. MITCHELL:  He's one of the named Plaintiffs, your Honor.

THE COURT:  Hmm?

MS. MITCHELL:  He's a named Plaintiff.

THE COURT:  Okay.

MS. MITCHELL:  He is not in dispute.

THE COURT:  Has he been deposed?

MS. MITCHELL:  Not yet.

THE COURT:  Do you want him deposed?

MS. HASHMALL:  Yes, your Honor.

THE COURT:  Okay. When is the date for deposition going to take place?  I'm just joking with you, but I'm not.  My guess is -- and I'm going to embarrass you.  You probably don't have a date for deposition right now.  No, that's fine.  I'm not going to press you on that, but you can see what I'm thinking.  It just all gets kicked over to January, et cetera, and then another request for continuance.  No.

17

Who's your second witness -- or who's your second deposition?

MS. MITCHELL: Joe -- Joseph Burk, B-U-R-K.

THE COURT: I don't have -- who's that?

MS. MITCHELL: He is a named Plaintiff. He's also not in dispute.

THE COURT: Has he been deposed -- strike that. Has he been deposed?

MS. MITCHELL: He has not yet been deposed.

THE COURT: Do you have a date?

MS. MITCHELL: No.

THE COURT: Third?

MS. MITCHELL: Wenzial Jarrell.

THE COURT: W-A-Y-N?

MS. MITCHELL: W-E-N --

THE COURT: W-E-N --

MS. MITCHELL: -- Z-I-A-L.

THE COURT: -- Z-I-A-L.

MS. MITCHELL: Last name Jarrell, J-A-R-R-E-L-L.

THE COURT: Excellent. Thank you. Named Plaintiff?

MS. MITCHELL: Yes.

THE COURT: Deposed yet?

MS. MITCHELL: Not yet.

THE COURT: Date set yet?

18

MS. MITCHELL:  Not yet, your Honor.

THE COURT:  All right.  Well, let me stop with those three.  Is there any difficulty in deposing these three, any disputes between the two of you?

MS. MITCHELL:  No, your Honor.

THE COURT:  Okay.  Fourth?

MS. MITCHELL:  Jamie Paige.

THE COURT:  J-A-M-I-E?

MS. MITCHELL:  Yes.  Last name P-A-I-G-E.

THE COURT:   -- U-E (sic).  Thank you.  And who's that?

MS. MITCHELL:  She is a former member of the Board of Directors of LA Alliance.

THE COURT:  Board of Directors of who?

MS. MITCHELL:  LA Alliance.

THE COURT:  Okay.  And I'm going to assume no deposition date yet?

MS. MITCHELL:  No deposition date, your Honor.

THE COURT:  Okay.  Any disagreement about this person being deposed?

MS. MITCHELL:  Yes.

THE COURT:  What's the difficulty?

MS. MITCHELL:  Yes, your Honor.

THE COURT:  Okay.  What's the difficulty?

MS. MITCHELL:  The County is far beyond their 10

19

deposition limit at this point.  We have not agreed to go beyond the 10 deposition limit.

THE COURT:  Okay.  Now, just a moment.  Then we need to raise that today if you have a request to go beyond 10 depositions.  Fair enough?  Okay.  Ten deposition limit.

Who's your fifth?

MS. MITCHELL:  John Steier, S-T-E-I-E-R.

THE COURT:  All right.  And who's that?

MS. MITCHELL:  He's the Chair of the Board of Super -- he's the Chair of the Board of Directors of LA Alliance.

THE COURT:  Okay.  And the difficulty, beyond the 10?

MS. MITCHELL:  Yes, your Honor.

THE COURT:  Okay.  Beyond the 10.

Number six?

MS. MITCHELL:  Daniel Conway.

THE COURT:  I know who that is from your past.

MS. MITCHELL:  Yes, your Honor.

THE COURT:  Okay.  Okay.

MS. MITCHELL:  Paul Webster.

THE COURT:  And, for the record, who's Paul Webster?

MS. MITCHELL:  Paul Webster is he Executive Director of LA Alliance.

20

THE COURT:  Okay.  Got it.  Who else?

MS. MITCHELL:  Howard Rubinroit, R-U-B-I-N-R-O-I-T.

THE COURT:  Okay.  And who, help me.

MS. MITCHELL:  Rubinroit, oh, he's a former member of the Board of Directors of LA Alliance.

THE COURT:  Okay.

MS. MITCHELL:  And then the final one is Larry Rauch.

THE COURT:  And help me with the spelling.

MS. MITCHELL:  I think it's R-A-U-C-H.  I don't have it off the top of my head.

THE COURT:  That's close enough.  And first name Larry?

MS. MITCHELL:  Larry.

THE COURT:  Who is that?

MS. MITCHELL:  I don't -- well, he's a former member of LA Alliance.

THE COURT:  Former.  Okay.  I'm just going to assume that those deposition times haven't been set yet.

MS. MITCHELL:  That's right, your Honor.  And, in addition to going beyond the 10k, it's also redundant and unnecessary.

THE COURT:  Okay.  So, that's one of the disputes then?

MS. MITCHELL:  Yes.

THE COURT:  Now, just a moment.  Eight FRCB 30(b)(6) witnesses, who are they?

MS. MITCHELL:  If I could have a moment, your Honor?

(Pause.)

MS. MITCHELL:  Oh, is there an additional one? Did I miss --

UNIDENTIFIED SPEAKER:  Karyn Pinsky.  I can't remember if she's a named Plaintiff or a representative member.

THE COURT:  Just help me with the spelling.

UNIDENTIFIED SPEAKER:  K-A-R-Y-N P-I-N-S-K-Y.

THE COURT:  And what's -- I've got the Karyn. Slowly for the last one again.

UNIDENTIFIED SPEAKER:  P-I-N-S-K-Y.

THE COURT:  S-K-Y, Tinsky?

UNIDENTIFIED SPEAKER:  Pinsky.

THE COURT:  Pinsky, P, okay.  Thank you.  All right.

All right.  Let's go to the eight.  You'll find this in Document 9.  It's going to be on the five of eight, be labeled at page four, though, in line 26.  Who are the eight?

MS. MITCHELL:  Your Honor, before we go to the

22

30(b)(6) witnesses, there are additional depositions, and that goes to the apex witness issue.

THE COURT:  Oh.  Okay.

MS. MITCHELL:  That -- that we intend to notice, but there is a standing objection.

THE COURT:  No, I'm going to get to all that.  Trust me.  I've spent days with your record.

MS. MITCHELL:  Okay.

THE COURT:  Okay.  Trust me.  I can delay the 30(b)(6) for a moment.  Okay.  All right.  So, I'll put this document off to the side other than, for the first time, on August 17th, on page five -- and pardon the yellow underlining.  It's mine -- on page five, line 14:

"Whereas the settling parties have also resumed settlement negotiations and are in discussions about a further addendum to the settlement agreement, including discussions about potentially appointing a monitor for the settlement agreement."

When that was filed, Judge Birotte had no notice of any settlement.  Michelle Martinez had no notice of any settlement negotiations.  Judge Birotte's available if you need him.  We've talked.  He did inform me that LA Alliance had reached out to him.  That was the substance of our

23

conversation, but that was five days ago.

If you need more time and it's meaningful at the end of the day, I'm inclined to grant that. But if it's not meaningful, I need to know that because we're just back in the same position, whether I have an Intervenor or not, and additional, et cetera, if we're going to litigation I'm not sure.

All right. Docket 612 -- Karlen, how are they doing down there?

THE CLERK: No update yet. I'll check, Judge.

THE COURT: It's not your responsibility, but thank you. Okay.

All right. This is where I've got grave concerns about the representations each of you are making to me, and I'm getting from one side that everything's proceeding smoothly and from the other side it's not proceeding smoothly at all, and I'm going to set my record and then have you respond because somebody's, quite frankly, not being candid.

Document 612, page three, which is page three of four:

"The parties exchanged search terms
and custodians on August 11th and again
on August 13 in an effort to narrow and
clarify Plaintiffs' RFPs and hopefully

24

eliminate the concerns underlying the County's objections and motion.  The County is currently working conducting the searches and returning hit items for the revised search terms and custodians the parties have been discussing."

All right.  Document 613, County's statement to the Court:

"First, the request that this Court amend and limit the scope of the order for RFPs 4 and 6, the only RFPs that were before the Court."

I disagree that those were the only RFPs before the Court.

"Second, the Court agreed with the County and denied Plaintiffs' motion as to three of the five disputed RFPs."

Correct.

"However, the order went far beyond the dispute presented in the RFPs 1 through 4 and 6."

So, I want you to make your record today so you have a good record.

"The RFPs were not before the Court.  The County was never given an

25

opportunity to be heard on any of its objections to these RFPs."

The concern is with HIPAA.  That's why I ordered you to meet and confer.  Anybody knows that HIPAA is protected, and that's what you were to sort out, which was why you were supposed to have a meet and confer, and that's obvious.

There's a discovery disproportionate, but that's why you were to meet and confer concerning the search terms and try to narrow that before each of you did, before I got a special master involved or started charging money to do that for you.  I was giving you that opportunity to save some money.  If you can't do it, I will.  That will be Daniel Gary, by the way.  He's in New York.

Page eight, paragraph 28, lines 27, which is document -- or page 15 of 141.  Document is 613 on the Court's calendar.  It reads:

"The County is already negotiating a list of search terms and custodians with counsel for Alliance regarding the request."

A tremendous amount of what the Court's decisions are going to be based upon today is asking you where you stand with those requests and how quickly that's moving and if you've narrowed your search terms or you're going to be

26

ordered to meet and confer and come back at 3:00 o'clock or 9:00 o'clock tonight.

All right.  Now, here we get into Document 614. This is LA Alliance's opposition to response by the County.

"Plaintiffs have specifically and repeatedly represented that no personal or individual health information of any parties, third parties is being sought."

I would think that that's an easy thing to work out between the two of you.  Obviously HIPAA applies.

Line 13:

"Plaintiffs notified Defendant County of their intention to seek communications from the Board of Supervisors and certain department heads to which the County indicated its intention to object and refused to provide such communications."

I want to hear more about that because all of a sudden, folks, we're going to get very very transparent now on behalf of the public.  Unless there is something going on between the two of you, transparency now is going to be the rule of the day.  But, obviously, not with exceptions like HIPAA.

Page three of six, Document 614, line one:

27

"However, it has since become clear the County has withheld all communications, not just those of the supervisors.  Moreover, the objection in support of the County's refusal to provide 'any' communications are identical to the ones made in support of the County's refusal to produce supervisor and senior staff communication, and Defendants offer no further argument in support of the position that they have not previously articulated.  After the orders, the parties met and conferred on August 9th."

Now, that's not in the prior filing that I read. I read August 11th.

"Regarding both the RFPs on which the parties were ordered to meet and confer, Plaintiff suggested limiting factors to narrow the scope of the request, but the County declined to adopt any of the limiting factors or suggest any alternative limitations that would be acceptable."

28

Now, that's where my antenna's going up.  If I've got these kinds of disputes, why am I granting a continuance to go through these again in January, other than maybe it's just a better trial date?  Maybe it just makes more sense.  So, today I want to find out where you're at.

Line 21:

"The County has not yet provided a hit list on any proposed search terms despite being sent over a week ago."

Now, wait a minute.  This document was filed on August 21st, but I've got an earlier document telling me that everybody's working well on these search terms from the County.  Which is it?  Not now.  You're going to have a lot of questions to respond to.  Why am I getting two different variations?

Page four of six, Document 614, page four, line 22:

"Every single factor weighs in favor of disclosure."

Now, I can go over these with you, but I'll telegraph it for you.  The importance of the issues cannot be overstated.  For goodness sakes, losing six homeless people dead a day, I can't overstate the travesty.

"Two, the amount in controversy involves billions of dollars, over $20

29

billion."

Where is the accountability?

"Three, the County's in sole possession of this information."

It appears so, unless the State has it.  I'm wondering why you haven't reached out to Newsom, but we'll keep it at this level to begin with.

The County's budget for 2020 is $43 billion.  It cannot claim poverty.  Well, the City's about 11.8, by the way, just so you know.

And the summary is:

"Whatever undue burden Plaintiffs' RFPs places on these officials necessarily pale in comparison to the undue burden of more medical, psychiatric, or substance abuse disorders that the chronically homeless bear."

The problem is I don't have a gauge yet of the depth of information.  And, so, I don't know if February is even a reasonable date or if a later date's even appropriate, and that's what I need to find out, because I won't move this case again if I -- if I continue it now. So, be very certain when you meet and confer what our dates are going to be if I move this.  And I'm not representing I

30

am yet.

All right.  The last page, page six, line 10:

"And to the extent Defendant needs additional assurance or needs to amend the existing protective order to include reference to and compliance with additional laws, of course, Plaintiffs are willing to do so."

This is something I expected you to work out in good faith.  Anybody can do this.  And if I have to put a special master in charge, I will.  I don't want to.

"The Defendant cannot hide behind laws," et cetera.

That's -- line 17:

"Defendant has had months to run searches and work with Plaintiffs on these document productions but has, instead, failed to produce or apparently even review any responsive communications to date."

And yet in prior documents, I get this wonderful notation that everybody's working well together, that you've narrowed the search terms.

Okay.  I'll let you explain it to me.  I will get this up and running.  I'm going to turn it back to you, but

31

I'm not representing that I'm going to continue this matter at the present time.  I'm not going to represent or take this motion to intervene until I hear -- if you two want to meet and confer, here's what I expect.

I want to know if this discovery's really moving forward.  I want to know dates and times.  I want to know if the County's still taking the position that nobody's going to be deposed from your standpoint or there's good arguments, for instance, in the apex.  Apex is way too early to even consider the Board of Supervisors.  We need to exhaust other discovery means first.  But if there's a pushback and you're not getting that minimalization, then I need to make a record.  Now, I'm going to tell you something.  Look up a case involving Rupert Murdoch called NDA -- I forget the case.  I can get it to you.  It's a shaggy dog story about a hacker named Karnick (phonetic).  And what had happened in those days was that -- and I get the two mixed up, but I think Murdoch owned DirecTV.  That initially NDX had -- or allegedly, Rupert was hacking into Canal Plus.  And what was occurring was that they were basically in a sense able to hack in and distribute this, especially England, Europe, and parts of the United States.  And pirates would go online and sell these to anybody who wanted to go online.

Then, when that was discovered allegedly -- but

32

eventually the jury found him by court -- but what the Defendants did was they simply put the code on the Internet so anybody could get on the Internet and decipher that code. And, so, what it did is it hurt the business because it -- it let any of us get onto this streaming service, and we could get this for free.

By the way, an engineer was murdered in Berlin over this. There were hackers in Romania, Bulgaria, Israel, Russia, Canada, and DirecTV said at that time, Judge, you have no jurisdiction. My thought was I've got adverse inferences. When there's noncompliance with discovery, the Defendants found themselves very quickly in the opposition of an adverse inference from the Court that they had this information and wouldn't turn it over. That is devastating.

Guess what? Seventeen of those 21 hackers showed up voluntarily. So, I didn't have to issue that adverse inference except for the four Russians.

So, this Court has power in terms of noncompliance with my discovery order. So, I want that clear to both parties. And I'm not afraid to use it.

Okay. Now, you're going to be ordered to meet and confer. I want to give you that opportunity before you respond. I'm going to take a recess because I want to go get a cup of coffee for a moment.

And can you help us with the Internet?

33

UNIDENTIFIED SPEAKER:  Yes, sir.

THE COURT:  Okay.  Put it on so we can have a thoughtful discussion.  I'll meet you in 15 minutes.  Thank you, Counsel.

ALL:  Thank you, your Honor.

(Proceedings recessed briefly.)

THE COURT:  This is Daniel Gary.  And, Daniel, what we've got -- and I'm sure you know who he is.  I've worked with him on the Orange County oil spill cases and a number of other issues.  He's one of our country's foremost expert in cyber, et cetera.  I've got him on the phone.

Daniel, here's the situation.  I want this on the record.  We've got a dispute going on with terms right now, and whether they're going to be narrowed or not, and I'm about to go back into session in the next 30 minutes and find out what these terms are and if they're unsuccessful or successful.  If not, I'm going to appoint you in charge of each of them.  Okay?  So, I'll call you within an hour.  All right.  Bye bye.

All right.  I'll introduce to who I'm going to choose in a just a moment.  Go out in the hallway in the next 15 or 20 minutes.  See if you can work out the terms or not.  If you can't, come in in half an hour.  Thank you.

ALL:  Thank you, your Honor.

THE COURT:  All right.

34

(Proceedings recessed briefly.)

THE COURT:  Come on up, folks.

Now, depending on all of you, I've got clerks, so, I'm willing to give up my lunch hour and go through, so hopefully I can get you out of here.  But, if not, I've got a full afternoon, and my apologies.  You'll be here.

MR. YAGMAN:  I've got a court mandated meeting in Venice.

THE COURT:  That's great.  You don't have to be here.  I would suggest you are here if you want to be included, but, no, you can go now.

All right.  Counsel, what -- where would you like to start?

MS. HASHMALL:  Well, your Honor, I want to just acknowledge the ?Court's comments earlier about how you seem to be getting mixed messages.  On one hand it seems like the parties are sort of a juggernaut on discovery and on the other hand, we think -- we show that we're making progress.

I think, quite frankly, it's a -- it's a matter of filings are on a schedule, and then the continuing discussion between counsel evolved.

THE COURT:  Okay.

MS. HASHMALL:  So, it -- it is true that when the --

THE COURT:  By the way, have a seat.  You don't

35

have to stand.  It will be more comfortable.  And you can use the lectern if you want to.  I'm just trying during flu season to keep you safe.

MS. HASHMALL:  Thank you.  So, the initial discovery dispute in front of he Court was limited to just a handful of requests for production.  And, so, that's what the parties' submission was based on, and the Court's order from our perspective addressed a much broader set of discovery.

So, what that meant is that the parties had to get to the table and meet and confer and discuss a number of issues, objections, scope, process for collection, that had not been the subject of a prior meet and confer because it just hadn't been teed up.  We had only teed up a small subset.

That discussion process has been ongoing.  My colleagues have been working with Plaintiffs' counsel, and we've been hacking away at it and I think making a lot of progress, but we also had a firm deadline to file a motion for protective order before the Court as directed.

And, so, we filed the motion.  We raised our concerns, and we were also hopeful that we were able to sort of put a little more substance as to our real concerns about burden because when we ran hit counts on the initial discovery that had been propounded, it was millions and

36

millions and millions of documents coming out.

Now, we filed the motion because we -- we felt it was appropriate. We also wanted to keep the Court aware of our concerns. But at the same time, we've kept talking, and we've been exchanging search terms and -- and a process to sort of get what the Plaintiffs want without creating a hugely disproportionate burden for the County on discovery.

And those conversations are going, and I think they're productive. So, I know the Court has asked whether we think we need a special master, and I think the person you have suggested, he looks imminently qualified, but he also looks specialized in sort of technical forensic issues.

I'm not sure we're there yet. I don't know that we -- we need that type of intervention or even that type of expertise.

THE COURT: Okay.

MS. HASHMALL: It's not that we're in need of guidance from a cyber expert. What we need to do is just kind of continue hacking away at the scope of the discovery and get to the same page. And -- and I think we can do that with a little more time.

THE COURT: Time period, how long would it take?

MS. HASHMALL: My guess is probably over the next 14 to 28 days, all -- all of those document issues will have run to ground, and we'll either have an agreed protocol and

37

scope and search terms and implement a collection process or, if not, we'll have a much smaller area of concern and issues for the Court.

That's not to say that's going to be the only issue for discovery that the parties need to work out.  We do need to continue to meet and confer about the 10 deposition limit because we think we may need more than that.

THE COURT:  Well, I'm -- I'm prepared to lift that.  I think the case has too many potential people involved.  If the apex rulings come down, if I rule that the Board has to testify, I mean, there's five more right off the bat.  Okay.  If not, you'll know, but I can't imagine 10 is a sufficient -- so, I'm -- I'm prepared to lift that, but I -- I'm waiting for the two of you to come up with a reasonable number, which is why I wanted you to meet and confer before I took control, and if you don't, then I will take control.

MS. HASHMALL:  Yeah, and we appreciate the Court's leadership on that, and I think our conversations are going to continue.  There are other discovery issues that are coming up during the course of the depositions that we have conducted, some privilege objections the Plaintiffs have made that we don't -- we don't think are appropriate.  We're continuing to meet and confer on that.  But at the same

38

time, we also are re-engaging in settlement discussions. And, so --

THE COURT:  Okay.

MS. HASHMALL:  -- when you look at -- at the sort of global picture of the case, on one hand extensive discovery, very very important issues that do need to get prepared for an appropriate trial before the Court, and the parties needing the -- and wanting the opportunity to re-engage in settlement, sort of -- that is what has informed the request for the stipulated continuance.

THE COURT:  What's -- what -- if you are going to settle or potentially settle, what's holding that up?  In other words, the parameters are pretty well set on this settlement.  That's either just a yes or no between the two of you.  I'm not going to get into funding issues, et cetera.  Of course, I'm willing to work with you, but those are easy calls to make.  We've been stretching this since, gosh, November, January, May.

I'll leave that to you.  I won't inquire further, but it seems to me that if there's going to be a settlement, it's relatively easy to enter into.  I mean, there's money out there.  Just check Sacramento today and what they're voting on today.  You're probably not aware of that, but there's plenty of money out there, and it's coming.  I just think it could be resolved very easily but maybe not.

39

So, Ms. Myers, let me turn to you.  Any comments are welcome.

MS. MYERS:  Not about these issues, your Honor.  We --

THE COURT:  Are you participating in this process?

MS. MYERS:  Yes, your Honor.  We've been actively participating in discovery.

THE COURT:  Okay.  Is Carol -- I mean, Ms. Sobel, is she involved, Counsel?

MS. MYERS:  Yeah.  We've been staffing it as appropriate with the various firms.  Your Honor, we have not been involved in the settlement negotiations, though.  We want to be explicitly clear, given the record from this morning, that Intervenors have not been allowed to participate nor been invited nor been included by this Court in the settlement negotiations.

THE COURT:  I'm not going to order you in right now, but if you're in front of Judge Birotte or something, that's a different matter.  Okay.  Right now, apparently these are private negotiations that I wasn't aware of until I read Document Number 600 or 603.  And then I called Andre five days ago and said, Hey, you didn't know I was approached by LA Alliance.  So, I assume that these were private negotiations.  I didn't know if you're involved.  That's why I'm asking.  Okay.

40

Okay.  Thank you for your courtesy.

What are your thoughts on my words?

MS. MITCHELL:  Your Honor, I --

THE COURT:  And, Mr. Yagman, we'll be with you in a moment, and I'll get you to that appointment.  I promise you.

MS. MITCHELL:  I echo a lot of what Ms. Hashmall said.  I think the -- the motion for protective order, while, we vehemently disagreed with a lot of what was going on at the time, I think it was filed because the County had a hard deadline, and they filed the motion for protective order because they were required to do so, in my opinion, in order to -- to maintain their objection.

But we have continued to meet and confer.  We're working through search terms.

THE COURT:  When will you have these search terms completed?

MS. MITCHELL:  Well, I think that's a better question for the County.

THE COURT:  No.  Just a moment.  I'm asking you a direct question, and I want a direct answer.  In other words, we're no longer floating out there.  You either govern the case or I'll govern it now.  How long?

MS. MITCHELL:  Can I explain my answer, your Honor?

41

THE COURT:  Hmm?

MS. MITCHELL:  So, we have exchanged search terms. What needs to happen at that point is they go back through. They run the search terms.  They provide me with a hit list, and it's an iterative process.

THE COURT:  No, but I ordered you to meet and confer to try to narrow these.  And, for instance HIPAA, I think that's a silly argument.  HIPAA is -- being raised is a silly argument.  We all understand HIPAA.  HIPAA -- you were ordered to meet and confer because from now on the rule is transparency unless there's an exception.  HIPAA's an obvious exception.

So, how long?

MS. MITCHELL:  So --

THE COURT:  Okay.  Two weeks then.  If you two don't have an answer, you've got two weeks.  On September 11th, I'm going to want in front of me a narrowing of these search terms, and I want to hear that at that time that you're really satisfied on behalf of LA Alliance and you're really satisfied on behalf of the County, or do I have the same argument that this is 35 billion gigabytes of something or other?  At that time, I'm going to appoint a special master.

You've got two weeks.  And you can -- I can order you out to meet and confer right now, and I don't have any

42

hours.  By 9:00 o'clock, I guarantee that you'd have search terms or I'll have Daniel Gary flying out this week.  Now, that's gracious on my part.  So, you've got two weeks now. Those search terms get narrowed.  And, from now on, this is transparent.  Okay.  Everything possibly that goes out is going to be transparent to the public from this point forward.

MS. MITCHELL:  That's totally fine.  We think --

THE COURT:  All right.  You've got two weeks.

Now, I want to hear from you, Mr. Yagman.  You want to intervene.  Are you sure you want to come into this case?

MR. YAGMAN:  Absolutely.

THE COURT:  Then you have to be certifiably nuts. No, I'm just kidding you.

MR. YAGMAN:  I am.

THE COURT:  Anybody coming into this case has to be by the time you're done with it.

MR. YAGMAN:  Here's my two cents based on 50 years of doing these kinds of cases.

THE COURT:  Pull the microphone closer.

MR. YAGMAN:  Lift --

THE COURT:  Pull the microphone closer.  Thank you.

MR. YAGMAN:  Here's my view of it.  Immediately

43

lift the apex rule.  Until the five supervisors are deposed on oral examination, this case will never resolve.

THE COURT:  Okay.  Now, stop.  Let's go through it one by one.  The present case law advises the Court usually not to get involved with the apex rule or order the board to testify until there's been a reasonable effort through discovery in a more generalized sense.  I mean, it's the case law.

I'm not jumping into apex with the board of supervisors right now.  But I am putting pressure on the County, and I'm putting pressure on LA Alliance to get to the basis of this discovery immediately, and that's why I'm going to pay them the courtesy of two weeks instead of bringing them back at 9:00 o'clock tonight.

So, I think if I did that, I think it's precipitous.  I thing it's wrong legally, but if they don't have an answer in two weeks, your position may be very well taken.  But right now I'm giving them every opportunity to narrow this, to meet and confer.

Okay.  Now your next point.  So, that's denied.

MR. YAGMAN:  It's --

THE COURT:  But in two weeks it could be much different.

MR. YAGMAN:  That's my only point.

THE COURT:  Okay.

44

MR. YAGMAN:  But it won't settle until they're deposed.

THE COURT:  And you've got -- you've got corresponding litigation, and their point is that you're late to the party.  You're late.  That's their point.  In both of their briefs, they say, you know, Mr. Yagman, you had a chance to come in before and right on the verge of litigation in November, but now we're here and we're asking for a continuance until February.  So, if they're asking for a continuance until February, why shouldn't you come in?

MR. YAGMAN:  I agree.

THE COURT:  I'm not ruling that yet.  But you've got corresponding ancillary litigation over here.  And, by the way, within three weeks I'll have a ruling concerning the City -- oh, you're not the City -- I'll have a ruling concerning the City and your motions concerning the City.

I'm delaying the County for a while, okay, because of this litigation and some of the issues that the County brought, but those rulings will be coming down on 56, et cetera, for both you and the other party.  It's about a 40-some page opinion right now for me to regurgitate and rethink about, but it's through the fifth iteration or something.  I won't go any further because I don't know if it's ex parte, but you'll have a ruling within three weeks on the City issues.

45

MR. YAGMAN:  When will this case next be here?

THE COURT:  Well, right now I'm going to schedule it for September 11th, because what I don't want is this.  I don't want to get into a situation where I'm not giving the parties time to resolve their own issues if they can.  And I'm a little afraid, frankly, of sending them out the door and bringing them back in at 9:00 o'clock tonight because I think that they could nail the terms if they want to by 9:00 o'clock, the whole lot.  But by September 11th, I'm going to have Daniel Gary or another person on a plane out here, and I'm appointing a special master, and he or she will know that issues a great expense to both parties.

MR. YAGMAN:  What time on September 11th and where?

THE COURT:  Well, you know, I think I'm going to come back to LA actually and transfer my entire calendar up here just as a convenience for all you folks.

MR. YAGMAN:  Can you make it at 10:00 o'clock instead of 8:30?

THE COURT:  No.

MR. YAGMAN:  Okay.

THE COURT:  No.  Most of the world goes to work at 8:00 o'clock.  You could be here at 8:30.  Okay.

And the second thing is I don't quite know what to do with you because you've got that corresponding

46

litigation.  And the other point you made was that the County and the Intervenors are too convenient and too cosy, as well as LA Alliance.

I don't know about that.  LA Alliance has been pretty aggressive in this matter.  And if the attack is on LA Alliance, I'm not -- I'm concerned.  I'm not so concerned about the County if they're in good faith, and I think that they're proceeding forward, accept your representation, Ms. Hashmall.  And I think that the Intervenors will also.

What I'm concerned about is if they're really on the verge of a settlement, everybody gives the Court, you know, some authority and they -- we don't now what that parameter is, and if the numbers are no longer so di minimus as 300 and 1,000 with this crisis, I might have to thoughtfully consider that.

But if it's during the litigation, that's a whole different matter.

MR. YAGMAN:  If they settle, it's done.  It doesn't make any difference.  There's no issue.

THE COURT:  Well, are you folks going to settle or not?

MS. HASHMALL:  Your Honor, we are re-engaged --

THE COURT:  No.  Are you going to settle or not?

MS. HASHMALL:  I think we're all --

THE COURT:  All of you know -- all of you know the

47

parameters now.

MS. MITCHELL:  I believe so.  I think in -- within 30 days.

THE COURT:  Pardon?

MS. MITCHELL:  I -- I believe from our position we think that we will have settlement within 30 days.

THE COURT:  Then if that was the case, why would I inconvenience you by bringing you back on September 11th and putting you through the expense?  I just need to know this. What I need to know is I'm not taking your position that the County's not supplying information to you -- and I'll read that again.  It can't be more stark.

(Pause.)

MS. MITCHELL:  Your Honor, I can cut to the chase on this.

THE COURT:  No, no, no.  I'm going to read exactly what both of you were writing to me.  Don't have to cut to the chase of anything here.

And, also, I'm noticing that all of these depositions are LA Alliance.  Where is the County deposition here?

MS. MITCHELL:  We've been waiting for the 30(b)(6) witnesses, your Honor.  We've been negotiating on the 30(b)(6) witnesses.

THE COURT:  When are we going to -- when are we

48

going to complete that?

MS. HASHMALL:  We have an extensive schedule that we've been working with, and --

THE COURT:  What is it?

MS. HASHMALL:  -- it involves upwards of about a dozen dates over the next couple of weeks, but there are a lot of schedules that need to be coordinated.  And, so, I -- I think everyone's working in the same direction.  Dates were on.  Then they needed to be shifted a bit.

(Pause.)

THE COURT:  Okay.  I'm going to come down there one more time.

(Pause.)

THE COURT:  I'm going to read this to you again because I'm not hearing with specificity to the Court's satisfaction yet.

Document 606, page two, line 14:

"Whereas the parties have multiple discovery disputes pending which have either been the subject of a court order or about which the parties are meeting and conferring."

This was filed on August 7th.  First notice that the Court had of any potential settlement discussions, which I don't want to get in the way of if you can settle this --

49

you know the parameters of your settlement.

Document 609, filed August 17th:

"Whereas the settling parties have also resumed settlement negotiations and are in discussions about a further addendum to the settlement agreement."

Which is why, Ms. Myers, I keep asking you are you involved and how much,, and what I'm hearing is you're involved in the discovery, but you're not involved in any meaningful way right now in the settlement.

MS. MYERS:  Yes, your Honor.  The stipulation is very clear that settling parties applies only to the Count and --

THE COURT:  Okay.

MS. MYERS:  -- to the LA Alliance.

THE COURT:  I'm going to keep you on as an Intervenor, but I asked the question before.  I was very concerned about your willingness to settle for 300 bed spaces on behalf of the Intervenors and you represent the homeless --

MS. MYERS:  Your Honor --

THE COURT:  Just a moment.  Let me finish my statement.  Then you can respond all day.  I was very direct about this.

The Court turned that down.  At least the County

50

came back with 1,000.  Okay.  I understand that.  You all know that that's one-third of what Doctor Sharon requested in 2019, and you want to stretch that over five years, which means by 2028, this settlement that you propose would have one-third of the need in 2019, and we've gone up, what, 40 percent in the meantime?

MS. MYERS:  Correct.

THE COURT:  And if I took your figures from both the County, LA, and you, but particular Carol Sobel, who I've worked with for a long time, who've told me from beginning one, Judge Carter, 25 percent of the people have mental illness.  And that's allegedly, from her perspective and your perspective, the County's obligation.  But we have 25 percent of now 46,000 people on the streets in LA.  Help me with the math.  If we have 25 percent of 69,000 people, help me with the math.  That doesn't even count substance, which you claim the County's responsible for.

So, I -- as you know, I turned that down.  Second, you know, my main concern is this.  This isn't going to be a situation where the Court just bows out with another meaningless consent decree.  You've heard that in the last case where they took the representations of the Government, not you.  You're not involved, but the United States Government and fell flat on their face with the VA because it was a meaningless document.

51

Now, I know you're wandering around about monitoring, but we don't even get there until the numbers. We don't even discuss it.  And that's one-third, for goodness sakes, over -- by 2028.  And you're willing to settle for 300.

MS. MYERS:  Can I respond, your Honor?

THE COURT:  Yeah, please respond.  I -- by the way, I'm keeping you on the case.  Don't worry.  It's whether I'm letting Mr. Yagman come in or not.

MS. MYERS:  So, your Honor, I want to be explicitly clear on the record.  The Intervenors never signed off on any settlement agreements, were never part of settlement negotiations.

THE COURT:  Okay.

MS. MYERS:  Have been explicitly excluded from settlement negotiations, and this Court as well as Judge Birotte have allowed and facilitated the exclusion of Intervenors from those settlement negotiations.

THE COURT:  Well, let me be direct with you then.  Why did you approve --

MS. MYERS:  We --

THE COURT:  -- working for the homeless, 300 bed spaces?

MS. MYERS:  Your Honor, we did not approve that number.  We were not given an opportunity.  The -- this

52

Court and Judge Birotte, the Intervenor -- or the LA Alliance in excluding unhoused folks from the settlement negotiations, as well as the County by excluding the Intervenors, have ensured that there's no voice at the table.

So, the suggestion, your Honor, that the Intervenors, that our clients, LA CAN and LA Catholic Worker and Orange County Catholic Worker, who have been defending these issues for a decade, signed off on a settlement agreement over which they had no part is incredibly problematic in terms of the construction of the record here.

THE COURT:  Okay.  So, you're willing --

MS. MYERS:  We did not participate.

THE COURT:  You're willing to work then to get these numbers up?

MS. MYERS:  Your Honor, we have been --

THE COURT:  Yes or no?

MS. MYERS:  You -- we have been arguing since the beginning that the settlement negotiations in -- and the settlements that have been signed off on by this Court as well as the Plaintiffs and the County and certainly the City of Los Angeles do not go far enough.

THE COURT:  So, you're willing to get these numbers up?  That would -- would negate Mr. Yagman coming in, because you're vigorously going to try to increase.  Is

53

this what I'm hearing?

MS. MYERS: Your Honor, we -- our clients have been arguing since the beginning that the settlement -- for example, the settlement that this Court signed off on and that Plaintiff signed off on that provided only for the provision of less than 60 percent of beds from the City of Los Angeles --

THE COURT: Umm-hmm.

MS. MYERS: -- we have been clear about the Plaintiffs' or the Intervenors' position relative to these settlement negotiations. Our concern is that by holding up the settlement negotiations, that it's having implications for the settlements that the Plaintiffs signed off on with the City of Los Angeles and that this Court signed off that Intervenors vigorously objected to, your Honor. So --

THE COURT: So, you're willing to undertake accountability then? Is that what I'm hearing on behalf of your clients?

MS. MYERS: Your Honor, we have been arguing --

THE COURT: Want a billion dollars worth of accountability?

MS. MYERS: Your Honor, we have been arguing against the settlement agreement signed off by this Court and the monitoring provisions because of the lack of transparency that exists in the settlement -- in the

54

settlement agreements.

For example, the Intervenors and the public have not been involved in any discussions between the Plaintiff and the City related to the enforcement of the City's settlement agreement because of the monitoring provisions that exist.  Intervenors have objected to the monitoring provisions that the Plaintiff and the County have been fighting over, your Honor, and that this Court has been forcing because it takes the settlement and the enforcement on the settlement outside of the public purview and outside of any participation by the Intervenors.

THE COURT:  So, you agree --

MS. MYERS:  The settlement agreement that exists between --

THE COURT:  So -- hold on.  With all these words, what I'm hearing is that you want supervision.  I'll call it a consent decree.

MS. MYERS:  We want --

THE COURT:  Yes or no?

MS. MYERS:  -- public transparency, your Honor.

THE COURT:  Well, trust me.  We're going to have public transparency.

MS. MYERS:  We'd like the public transparency to extend to the settlement between the City and the LA Alliance, which it does not exist for.

55

THE COURT:  How about general public transparency from now on?  All of this is happening now with counsel, et cetera, over decades, behind closed doors with LASA.  Let's open this up.

MS. MYERS:  We've strongly been advocating for that.  Our clients --

THE COURT:  Okay.

MS. MYERS:  -- have been advocating for that.

THE COURT:  Okay.  All right.  Couple more things then.  I know that you've got 35 million documents.  Look at the agency, the fire department, the mental health, the executive office, public health, health services.  That's a lot of good people out there and a lot of bureaucracies who've been generating a lot of documents concerning the homeless for decades.  You two can narrow that meaningfully, okay.  You're in the driver's seat on that.  And what I've inferred is you will comply with my discovery orders or I will issue adverse inferences in front of a jury.  I can't be clearer about that.  And an adverse inference is devastating.  I don't think we'll have to do that, but if we can get 17 hackers to show up across the world.

All right.  Now, this is what's most disturbing to me, and I'm going to take -- because I trust my counsel.  You hear that?  I'm going to trust you for the time being.  Let me refer you to Document 614:

56

"However, it has since become clear the County has withheld all communications, not just those of the supervisors."

And, remember, that's the apex ruling that I will get to, either favorably or unfavorably, when we've gotten good faith discovery, because the Ninth Circuit instructs try discovery first before you inconvenience.  But, by the same token, the factors with six people dying a day, I can't imagine a more important issue.  And they won't be inconvenienced unnecessarily.

"Note the objections in support of the County's refusal to produce any communications."

Now, when you read that as a judge, any communications?  And so far today I've just heard that you got 9 to 11 people you're having deposed.  I've heard nothing on the County's side except, "We're working it out." And I've got nothing dispositive yet from the County concerning these 30(b)(6) witnesses.

"Refusal to produce any communications are identical to the ones made in support of the County's refusal to produce supervisor or senior staff communications, and Defendants offered

57

no further argument in support of its position that they had previously articulated."

And the previous articulation in Document 603 was that you weren't getting any results.

MS. MYERS:  Right.

THE COURT:  "You ordered and the parties have met and conferred on August 9th regarding both the RFPs on which the parties were ordered.  Plaintiff suggested limiting factors to narrow the scope of the request" -- which I'm giving you the opportunity to do -- "but the County declined to adopt any of the limiting factors or suggest any alternative limitations that would be acceptable."

You know, as a judge, when you read that, that's why you're here today.  And I'm not going to simply continue a trial date and then face these same issues and the same argument in February or whenever you're allegedly requesting.

"And the County has not yet provided a hit list of any proposed search terms being sent over a week

58

ago,"

-- which is why I'm asking where are those search terms, and by September 11th, if you don't have them, I'm going to appoint a special master, and you're just going to get charged.  And if it's not Daniel Gary, then come up with some names.  Okay.  We can save you money, okay.  I've got a couple other suggestions, but that will be my choice eventually.  You'll suggest names to me.

All right.  Page four.  I ordered you to meet and confer and narrowly tailor these.  That's why I think this HIPAA argument's silly.  Of course we know we're not going to violate HIPAA.  You were supposed to narrow that.

But, beyond that, the word from now on is transparency with the public.

And, finally:

"Considering the portions of the issues at stake, every single factor that's been argued is in favor of disclosure"

The importance of the issues cannot be stated.  Homeless has been regular cited, almost 30 years now in the making, decades, six deaths a day.

Now the controversy involves billions.  This record is cited in so many places in front of me and others.  The $20 billion?  Where is the accountability?  County seems

59

to be in sole possession, a $43 billion budget.  The City has about $13 billion for the budget.

Okay.  Mr. Yagman, what I'm going to do is hold your motion in abeyance.  You're ordered back, not requested, on September 11th --

MR. YAGMAN:  I want to add I think there should be 20,000 beds, by the way, over the next two years.

THE COURT:  Well, if it's going to trial, you know, then that's the position that you talk to Ms. Myers over here.  She was -- well, allegedly.  I'll get a transcript for you, by the way, Ms. Myers, and --

MR. YAGMAN:  I'll be here on September 11th.

THE COURT:  Okay.  But I'm not going to let you in yet.  What I don't want to do is this.  I don't want to disturb good faith settlement negotiations at a late time if you're really entering into them.  But if we're going on to litigation, et cetera, we're going with 300 bed spaces initially or 1,000.  So, you don't even get to monitoring before I hear the numbers.

Understood?

(No response.)

THE COURT:  Okay.  Now, I don't want to take your time.  I was going to make you go out today.  I'm not going to do that.  That's under the Eighth Amendment cruel and unusual punishment.  You'd have to come back tonight.  Okay.

60

I'm going to trust you the next two weeks, but you're ordered to my court on September 11th.

Karlen, I think we're coming back here September 11th. I'll transfer my calendar back up here as a convenience for all you folks, but we're up at 4:30 doing that. So, yeah. It's a courtesy order to extend to you. Either control this case or I will control it. And, now, I'm not continuing the November 6th, because unless I hear compliance, et cetera, I mean immediately between the two of you, in some good faith, then I'm going to take control. I'm going to set the schedule based on that. It may go over to -- to the 6th. Understood. It may be a better time period. I may agree with you on that.

Now, do you have questions?

MS. HASHMALL: Yes, your Honor.

THE COURT: And, by the way, my discovery order stands. I took that order as a broad-based discovery. You're arguing 1, 3, 4 and 6. I disagree. The way it was presented to me was 21 different issues to resolve. It's been resolved, okay. But you've got your record, and I've got mine.

MS. HASHMALL: Thank you, your Honor.

THE COURT: Anything that you need?

MS. HASHMALL: I just -- I understand the Court wants to hold the parties' feet to the fire and --

61

THE COURT:  No, no.  I don't care.  You want to send this to litigation, then the public is going to get a really good look for a change.  You want to litigate, that's just fine.  Understood?

(No response.)

THE COURT:  No problem.  I just want to clear my calendar for it.  Yeah, I want to know that this isn't getting passed over until February and I -- January, and we've got the same discovery disputes going on.  And I'm giving good faith back to you to resolve that if you can.  Okay?

MS. HASHMALL:  I -- I hear you, your Honor.  I also think our motion for protective order sets forth why these issues --

THE COURT:  I'm denying it at the present time because I ordered you to meet and confer and narrow it.  Narrow it.  I'm giving you all that control.  Of course, we know HIPAA.

MS. HASHMALL:  The only thing I'd ask the Court to do is, if it's inclined, to withhold ruling on the motion for protective order.

THE COURT:  No, absolutely not.  From now on I told you transparency.  That order goes out.  It's going on the docket.  It already  is there.  The public's going to now have a good look at this case.

62

Okay.  Ms. Myers, anything else?

MS. MYERS:  No, your Honor.  Well, your Honor, I just want to make sure that the -- the record is clear that the 10 deposition rule was lifted, because I think that has been --

THE COURT:  I can't hear you.  I'm sorry.

MS. MYERS:  I just want to make sure that the record is clear -- and perhaps the County agrees that it is -- about the 10 deposition rule, because I think that's been a significant issue.

THE COURT:  I'm willing to lift that, but I'm waiting for the two of you to meet and confer.  I'm trying to give you all of that control back, but I think you obviously need more than 10 depositions.  And if you get involved, I think you're going to have other depositions that you're requesting.  Okay.  And you may -- you may go with the County.  You may go with the -- on the apex ruling requesting the board be -- I don't know what you're going to do, but I want to get you involved.

MS. MYERS:  Thank you, your Honor.

THE COURT:  Okay.  Okay.  On behalf of LA Alliance?

MS. MITCHELL:  Yes, your Honor.  The current fact discovery date is September 8th.

THE COURT:  I'll extend that obviously, but give

63

me a -- give me a date.  That's why I'm pressing to get some resolution between the two of you, and I'm giving you two weeks now.

MS. MITCHELL:  That's fine, your Honor.  So, if -- if the Court is extending the September 8, I would ask for, I suppose at this point October 6th.  And then, if we ultimately continue the trial, to then --

THE COURT:  Get together.

MS. MITCHELL:  Okay.

THE COURT:  Just reach out to the other side.  As long as it's internal and you know that I'm not continuing November 6th at the present time.

MS. MITCHELL:  Right.

THE COURT:  I'm waiting to see if you come back with a meaningful settlement.  And I just don't understand if you're settling, why that hasn't already occurred, why it's not with Judge Birotte and Special Master Martinez. And the Board knows what the parameters are.  All the parties know what the parameters are.  But if we're going forward, then I'm holding it in abeyance, and I'm going to wait because if the position's still 500 or 1,000 bed spaces for 25 percent of our population, no.

MR. YAGMAN:  That's going to continue.

THE COURT:  No.  Okay.  Okay.

Anything else?

64

(No response.)

THE COURT:  Then why don't I free my litigants under the Eighth Amendment and now you go have a good lunch. Okay.

ALL:  Thank you, your Honor.

THE COURT:  Okay.  Pleasure.  Oh, by the way, I'll make this statement.  I think that the attorneys are actively involved, but this also has to come from the board, okay.  In other words, I need to know that the board's fully on board if we're going to reach a settlement, and I need to know that this is meaningful in terms of accountability and something meaningful in terms of numbers.  So, we don't get to the monitoring situation at all until we also know what the numbers are.  Okay.

And I will represent to you check with Sacramento. There's money out there.  You could do a great service to the County.  Okay.

MS. HASHMALL:  Thank you.

THE COURT:  You can take a look at the bills today, in fact.

ALL:  Thank you, your Honor.

THE COURT:  Okay.  Thank you very much.

(Proceedings concluded.)

65

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty              8/30/2023
Transcriber                   Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.