UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

LA ALLIANCE FOR HUMAN RIGHTS, )  Case No. LA CV 20-02291-DOC-
et al.,                        )                      (KESx)
                               )
           Plaintiffs,         )
                               )
vs.                            )  Los Angeles, California
                               )
CITY OF LOS ANGELES, et al.,   )  Thursday, September 28, 2023
                               )
           Defendants.         )  (8:40 a.m. to 9:35 a.m.)
_____)


TRANSCRIPT OF STATUS CONFERENCE RE SETTLEMENT AGREEMENT
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE


Appearances:                   See next page.

Court Reporter:                Recorded; CourtSmart

Courtroom Deputy:              Karlen Dubon

Transcribed by:                Jordan Keilty
                               Echo Reporting, Inc.
                               9711 Cactus Street, Suite B
                               Lakeside, California 92040
                               (858) 453-7590


Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiffs:       ELIZABETH A. MITCHELL, ESQ.
                          Spertus, Landes & Umhofer, LLP
                          617 West 7th Street, Suite 200
                          Los Angeles, California 90017
                          (213) 205-6520

                          MATTHEW D. UMHOFER, ESQ.
                          Spertus, Landes & Umhofer, LLP
                          1990 South Bundy Drive
                          Suite 705
                          Los Angeles, California 90025
                          (310) 826-4700

                          CARA ARNOLD, ESQ.

For the Defendants:       JENNIFER MIRA HASHMALL, ESQ.
                          Miller Barondess, LLP
                          2121 Avenue of the Stars
                          Suite 2600
                          Los Angeles, California 90067
                          (310) 552-4400

For the Intervenors:      SHAYLA RENEE MYERS, ESQ.
                          Legal Aid Foundation of Los
                            Angeles
                          7000 South Broadway
                          Los Angeles, California 90003
                          (213) 640-3983

For Paul Boring:          STEPHEN YAGMAN, ESQ.
                          Yagman & Reichmann, LLP
                          333 Washington Boulevard
                          Venice Beach, California
                            90292
                          (310) 452-3200

For the City of Los Angeles:  SCOTT D. MARCUS, ESQ.
                          Los Angeles City Attorneys
                            Office
                          200 North Main Street
                          7th Floor, Room 675
                          Los Angeles, California 90012
                          (213) 978-7558

3

Los Angeles, California; Thursday September 28, 2023 8:40 am

--o0o--

(Call to Order)

THE COURT:  If you'd call LA Alliance to order and please make your appearances.  I know some of our officials have other business today.

So, beginning with Plaintiffs, please.

MS. MITCHELL:  Good morning, your Honor.  Elizabeth Mitchell, Matthew Umhofer, and Cara Arnold on behalf of Plaintiffs.

THE COURT:  Thank you.

With proposed intervenors?

MR. YAGMAN:  Good morning, your Honor.  Steven Yagman for the proposed Intervenors.

THE COURT:  Thank you.

And for the Intervenors?

MS. MYERS:  Good morning, your Honor.  Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of Intervenors.

THE COURT:  All right.  For the County, please?

MS. HASHMALL:  Good morning, your Honor.  Mira Hashmall for the County of Los Angeles.

THE COURT:  And for the City?

MR. MARCUS:  Good morning, your Honor.  Scott Marcus on behalf of the City of Los Angeles.

4

THE COURT:  Mr. Marcus, it's nice seeing you.

The Court's received a proposed settlement agreement.  I know that the Mayor and Supervisor Hahn have other businesses with the Metro Board.  So, we tried to call the case earlier today at 8:30 for you.  Hopefully we can get this resolved today.

I want to start with a very positive statement today, and that is the Court appreciates the efforts that you put into this.

So, I'm going to begin with Mayor Bass and then with Councilperson Paul Krekorian.  The simple question is for each of you, your thoughts concerning this agreement? And the County before has argued that this agreement is somewhat tied to your efforts on behalf of the City.

MS. BASS:  Thank you very much, Judge.  Yes, as we have learned about the agreement, we are in support of it.

THE COURT:  Okay.

MS. BASS:  And the fact that we're now talking about 3,000 beds I think would make a tremendous difference and is a significant increase from where we were several months ago.  So, we are in support, and we're glad that we are to the point where hopefully all parties will agree today.

One issue that is important to the City of Los Angeles, of course, is that the people that would be in the

5

beds would be from the City of Los Angeles.  That's very important because it could be possible that people from surrounding areas do that, and that would not really address the problem in the City of Los Angeles.  So, thank you very much.

THE COURT:  And, Mayor, thank you for being here; and thank you for your efforts.

Let me turn to Council President Paul Krekorian. By the way, it's good to see you also.

MR. KREKORIAN:  Thank you very much, your Honor. And let me say first how much we appreciate your persistence in this and how much we appreciate the leadership of the County Board of Supervisors for really leaning in on this and moving us forward significantly from where we were the last time we were all together.  And I especially want to recognize Supervisor Hahn who has personally taken this on to try to get a resolution of --

THE COURT:  Yeah.

MR. KREKORIAN:  -- works in the interests of the County and in the City and our unhoused population and the Plaintiffs, and -- and I believe she has done that.

To -- to the Mayor's point, it is a constant struggle in the City of Los Angeles as we continue to do what we need to do in building housing and -- and doing the other aggressive bold steps that we're taking to address

6

homelessness, that we continue to have the challenge that we are devoting resources to an unhoused population that -- that we're trying to target within the City and within our boundaries, and I think that this settlement will -- will certainly help us in those efforts. But if there is a way that, consistent with the legal requirements and other issues of the County, that we can ensure that the resolution of this lawsuit, which was directed at the problem within the City of Los Angeles, that named the City of Los Angeles as a party, and that the resolution of which should involve the City of Los Angeles, to the extent that we can identify a way operationally to ensure that the unhoused residents of Los Angeles are the beneficiaries of these beds, that would be a very important step forward for us.

THE COURT: Supervisor Hahn, let me come back to you in just a moment. I'd like to hear from the other parties and then, with your permission, come back to you.

On behalf of the Intervenors.

MS. MYERS: Good morning, your Honor. Shayla Myers on behalf of the intervenors. Obviously, we received the settlement agreement on Monday when the settlement was

7

filed publically with the Court.  The Intervenors played no role in negotiating the settlement agreement.  We were excluded by the -- from the settlement negotiations and by the County as well.

So, we just want to make a couple of statements regarding it because this is the first time that we've had a chance to weigh in on the settlement proposal.

First of all, we appreciate the County and the Plaintiffs working together to find a solution to the monitoring provision.  We appreciate Judge Gandhi's role in negotiating the settlement early on.  We did participate in an early settlement negotiation with Judge Gandhi and appreciate the role that he will play as a monitor.

We also appreciate the inclusion of the opportunity for Intervenors to participate in the monitoring.  We would note that the LA Alliance and the County have often agreed and the City of Los Angeles have often agreed on many things.  We think it's important to have representatives of unhoused folks participating in the monitoring and appreciate the opportunity for Judge Gandhi to involve the Intervenors if he finds that appropriate.

Second of all, we want to applaud the County of Los Angeles for leading on this issue without leading with enforcement.  That was a significant problem that Intervenors raised with the City settlement with the LA

8

Alliance which led -- which fronted the issue of enforcement of an anti-camping ordinance which I think history has shown is unnecessary to address this issue.  The County has led with care first throughout this entire negotiation, throughout this entire case.  That's evidenced in the settlement agreement, and we -- we really applaud the leadership of the supervisors and the County of Los Angeles on this issue, of -- of leading with services, which we'll address this issue, and not with enforcement, which is the problem with the City of Los Angeles's ongoing settlement negotiation -- or settlement agreement.

Third, we just want to say that we appreciate the County meeting the City's obligation.  The settlement agreement between the City and the Plaintiffs will not solve homelessness.  That's very clear.  We raised objections to the amount of resources that the City is putting in, but it is clear at this point that the County is both meeting the City's obligations and far exceeding them at this point with the 3,000 beds that they're offering, in addition to providing services for the permanent supportive housing that the City of Los Angeles was already providing.  It's an exceptional commitment by the County of Los Angeles to meet the City of Los Angeles, and we want that to -- we want to ensure that that does not go unremarked upon as we talk about the additional resources.

9

We would strongly object to any suggestion that the 3,000 beds be allocated solely within the City of Los Angeles.  The County of Los Angeles has an obligation to provide services throughout the County to 10 million people. The 3,000 beds, we assume based on the language of the settlement that the County will make those allocations based on the needs of the residents of the County of Los Angeles.

This case has been -- the point of this case has largely been a jurisdictional fight between the City of Los Angeles ensuring that its borders are protected through enforcement, and the suggestion that the City of Los Angeles be -- that the resources that the County is providing be dedicated only to the City of Los Angeles is incredibly problematic.  individuals who are unhoused in the City and County of Los Angeles are not bound by the jurisdictional fights that the City of Los Angeles has with other jurisdictions.  If people are forced out of the City of Los Angeles into other jurisdictions because of the City of Los Angeles' hostile climate towards folks who are unhoused, those individuals should not be precluded from getting the mental health services that they need.  And we would stress this point because the mental health services that folks who are unhoused need are sometimes in part because of the trauma that individuals who are unhoused face at the hands of enforcement by the Los Angeles Police Department, Los

10

Angeles Sanitation, and other enforcement provisions that are inscribed in the settlement agreement between the City and the LA Alliance.

And, so, finally, the last thing that we would say is we appreciate the addition of 3,000 mental health and substance abuse beds.  That is definitely a good start.  What we would say is that the provision of those beds are temporary for individuals who are receiving treatment, and the only way to address homelessness are to ensure that individuals who are coming out of those treatment beds have a permanent place to go.

We understand that this case has largely been fought about permanent supportive housing versus interim housing beds.  The 3,000 beds that are being offered here are interim beds.  They are incredibly important in terms of ensuring mental health and substance abuse treatment; but, absent a permanent place for individuals to go, there will be -- there will be no resolution of the homeless crisis.

THE COURT:  Okay.

MS. MYERS:  So, we appreciate the effort that went into this, and we do not have any current objections.

THE COURT:  Are you supportive of this agreement?

MS. MYERS:  I'm sorry, your Honor?

THE COURT:  Are you supportive of this agreement, yes or no?

11

MS. MYERS:  We don't have any objections.

THE COURT:  What does that mean?  Are you supportive of this agreement, yes or no?

MS. MYERS:  We don't have any objections.  We would be neutral on the -- on the substantive terms of the agreement.

THE COURT:  All right.  Before you approved 300 as the Intervenors, you know my deep concern over that, you --

MS. MYERS:  Your Honor, we did not approve --

THE COURT:  Yes, you did.  I'll get a transcript for you.  Now, if we had 300 bed spaces before, are you in agreement with 3,000 bed spaces?

MS. MYERS:  Your Honor, the Intervenors have never approved a settlement agreement.  We were never asked to do so.  We, similarly, took a non-objection position to the earlier settlement agreement because, again, the concerns that we have are about meeting the City's obligations which we thought the previous agreement did.  We -- we would stand by that, and we would stand by our non-objection.

THE COURT:  You know, I'm deeply troubled by it.

Counsel on behalf of the Proposed Intervenors?

MR. YAGMAN:  First, I agree with everything that the Mayor had to say.

Second and last, I hope that this isn't a good thing that turns into a bad thing.

12

THE COURT:  Right.

On behalf of the Plaintiffs.

MS. MITCHELL:  Thank you, your Honor.

So, when we were here five months ago, the Court, in order to accept continuing jurisdiction, gave us a task to come back with 3,000 beds and a monitor, and that's exactly what we did.

THE COURT:  Right.

MS. MITCHELL:  We feel very comfortable with this. We are very excited about this.  Congratulations to the County, and I really do believe that they dug deep to come up with these 3,000 beds.

Now, it took us five months to get there and five months of a lot of hard work with counsel to get there, but given not only the 3,000 beds which are desperately needed in this County, but all the other things that are included in this agreement, including the 450 enriched residential care, board and care supplements which go towards people with serious mental illness who are at risk largely of becoming homeless if they did not have these long-term care beds.  We think this is a significant deal.  We're very comfortable with it, especially with the partnerships with the City that we're seeing, and -- and I think to the extent there is some concern by the City, that these are not beds that are dedicated to the City, I think I would say the need

13

that was identified of 3,000 beds was county wide.  It was not city wide.  That was identified by the County.  And, so, we are comfortable with it being county wide.

To the extent that the City and the County -- I know they have ongoing conversations in an MOU -- want to make that part of the MOU, Plaintiffs certainly wouldn't object, but that is not part of this agreement.

THE COURT:  Okay.  All right.  Would you help me?  There will -- or, Alma, would you go to the ELMO and put up the agreement for just a moment.

I'm going to ask you to consider three following areas for your consideration.  I'm probably going to sign this agreement today.  I think that Supervisor Hahn has the authority to do that on behalf of the Board.

But, before I put up this, I'd like to hear from you, Supervisor Hahn, and I want to compliment you on your courage, quite a journey.  If there's anything you'd like to say, this is an opportunity.

MS. HAHN:  Thank you, your Honor, and good morning.

I will say this year, since I've been the Chair of our County Board of Supervisors, certainly the issue of homelessness in L.A. County has been my top priority.  This lawsuit has also been something that I have worked very hard on.

14

I will never forget when the Mayor, newly inaugurated, we sat here and, you know, Karen Bass and I have been friends a long time.  We served in Congress together.  Our offices were actually right next to each other.  But the relationship that the Mayor began to model publically was so different than I had experience, even when my own brother was Mayor.  She said, you know, no longer will the County and the City point fingers at each other.  There is enough blame to go around for all of us in terms of this problem.  She said let's lock arms and begin to move forward on a pathway that the public will see we are working together, and she said that day sitting here, "Your Honor, give us 90 days.  I think we can do better."

At that point, we were putting on the table 300 beds.  She said -- you said too -- let's put a zero behind that, and it was clear to you that you wanted the county to have some accountability, to have a monitor to make sure that our good intentions, that our -- our faith in our ability to do this would have some accountability.  You wanted to see a deal on the County's side that mirrored the City's --

THE COURT:  Right.

MS. HAHN:  -- which was -- I think a big part was the monitor.  So, for all this year, we've been working very hard -- all sides have been working really hard -- to bring

15

the County along, and I will say it was an all hands on deck with the County of Los Angeles.  I had my Department of Mental Health.  I had Cheri Todoroff with our Homeless Initiative.  I had Fesia Davenport, our CEO and our County Counsel, getting us to this point; and we are all now aligned.  The stars are aligned with 3,000 beds, the accountability piece that I think you wanted, and a real, you know, desire that everyone understands that, of course, you know, we are all in as the County to try to address the seriousness of homelessness.  The County is the safety net.  We're there to keep people from falling through the cracks --

THE COURT:  Um-hmm.

MS. HAHN:  -- both mentally, physically, financially, and every other way.  Is 3,000 beds enough?  Of course you know it's not.  But I believe this is a solid proposal.

THE COURT:  Um-hmm.

MS. HAHN:  We will make this happen.  And we can work out later the allocation of the beds.  I don't -- I understand that the majority of the homeless in the County resides in the City of Los Angeles.  Hilda Solis's district is the one --

THE COURT:  Right.

MS. HAHN:  -- most heavily impacted.

16

THE COURT:  Right.

MS. HAHN:  And 3,000 beds going towards solving that problem will help the entire County of Los Angeles.

THE COURT:  Um-hmm.

MS. HAHN:  We as elected officials have to be held accountable.  We want to see some progress.  Our constituents want to see some progress, and I think this gives us that pathway forward.

So, for me, the thanks today goes to my partners in the City of Los Angeles, Mayor Bass, Paul Krekorian.  I thank the -- the Alliance, the Plaintiffs, who have been wonderful in working with us, and I thank my lawyers for working hard to get us to this day, and I think about my good friend, Tom LaBonge, you know, who was probably my dearest friend on the City Council, who believed so much in you, Judge; and he believed in the better nature of all of us to dig deep and do all we can to -- to work to solve this problem.

So, I'm pleased with this settlement.

THE COURT:  Okay.

MS. HAHN:  I've worked really hard to get us here, and I hope you'll bless it --

THE COURT:  Sign it.

MS. HAHN:  -- today.  I want to put this lawsuit behind us so we can start doing the hard work that this

17

settlement will allow us to do.

THE COURT:  Okay.

MS. HAHN:  That's what I'm ready for.

THE COURT:  I want to put up three things for your consideration, and then I'm going to sign this without further negotiation.  I'll need the -- I'll need the signature of the Board of Supervisors.  Although I respect the attorneys, I'm tired of signing documents as a judge and having intermediaries or counsel sign it.  So, Judge -- or Judge Hahn, Supervisor Hahn, if you'd be kind enough to sign this today if you agree.

All right.  The first is I agree with you.  This is a floor, not a ceiling.  And, therefore, if you'd put up the very first provision of the three points I've got, just the first provision, and write in the following on the last page -- you can handwrite it in.

"This agreement is a floor, not a ceiling.  While the agreement does not solve the homelessness in Los Angeles County, it is an important and substantial step forward."

Now, why would I ask that?  This is a huge step forward.  You're all to be commended.  I want to be very positive about this.  But what I worry about in the future is we become protective that this is the only responsibility we have or believe we have in three to five years from now and we're clinging to this document saying, Judge, we've

18

done enough.  There's a lot more work to do.

Okay.  So, second:

All future billings from providers must be completely transparent, and all underlying invoices are to be public documents.

And I'll repeat that in just a moment.  All right. Now, I want to start why.

In the past, unconnected to any of you as public officials, there has been -- or let's be as kind as possible -- there may have been double counting.  When those figures thrown out to the public were 20,000, I want to thank Jeff, Katherine, Don, who's here, Pete, Dave Mala, Stephanie, for showing me the community.

And what I'm afraid of is that the Board got shielded and the City got shielded with well intentioned people in the past and, in doing so, that these figure's let's say were kindly questionable.  And what occurred in the past -- and let me be as kind as possible -- may be a person going into the Wellesley Center or other establishments -- and with your background, Mayor, you don't have to affirm this, but -- and you sit there and you watch 20 or 30 people waiting to be treated -- and they're doing a terrific job, by the way -- but if the person's bipolar or schizophrenic or needs to go use the bathroom, they leave. And, historically in the past, I worry about how your money

19

was spent because you had a sign-up, a name; but the person didn't receive treatment.

I'm not going to say what I witnessed or what was told to me by the community, but when you're on the ground, you have to believe -- and I'll take you down there any time and introduce you to the community.

Where's Don for a moment?  Don, you here?  Yeah, stand up.  He can take -- Katherine can take you down there. If General Jeff were still alive, Pate, you know, Pastor Q, Big Mama.  There's a host of people.  Thank you, Don.

The second thing is sometimes services were counted.  So, in other words, I went in as an individual, but a provider may have counted one service, a second service, and a third service.  And in the past, certain providers may have -- so I can be as kind as general -- submitted a bill to the City or the County, and that bill was supposed to have underlying documentation kept by the provider.  If you go back and look at our record in April of 2022, Michelle, 2022, that record is replete with millions if not tens of millions if not maybe hundreds of millions of dollars unaccounted for.  That doesn't mean there was fraud. That doesn't mean anything else except the providers didn't keep that information, and the reason I'm demanding that is is going forward, the public has to have faith that you as the Board and you as the City have the underlying

20

documentation so you can compare what one group is doing and producing in terms of homelessness versus another, and we don't have those records.

Well, the Governor's in the box.  Hypothetically, if Newsom were here, he'd tell you even with a deficit, he's going to supply money to the County and the City.  But you've heard him threaten from Sacramento to take over the accounting of this.  In reality, he can't do it.  By the same token, hypothetically, if you're the Governor, you might fear the cities and counties turning on you if you didn't give them money, hypothetically, and say you're not supporting homelessness.  He needs, the State needs, and, more importantly, you need, and the taxpayers need a full and transparent accounting of these moneys.

So, I'm going to sign this.  And if you choose not to -- but this strikes right at transparency that we've needed right from the beginning, and I think it's extraordinarily helpful to you and the Board, extraordinarily helpful to you on the City, you compare apples to oranges.

I want to talk about a very sensitive issue for just a moment, and that is is Judge Gandhi here?  It's been stated that Judge Gandhi would be my special monitor.  I've reached out to a myriad of people.  I'll name them.  John Heuston of the Heuston Hennigan Firm, who was the chief

21

prosecutor on Enron; Steve Larsen (phonetic), Antony Villaraigosa, and I can't -- I can't even start to name them.  No, I know, not going to happen.

But, you know, I've made the rounds with a lot of people.  Last night -- I forget, who was I speaking to last night?  I -- Miguel Santana.  I've been blessed by surrounding myself with absolute virtue.  And by that, I mean, for five years, nobody who's worked with me has accepted one cent.  Let me repeat that.  This City has incredible people here who really care who are working for minimum fee.  I'll start with Tom LaBonge, who you mentioned, and his wife.  Two days before he died, he was out fighting the Patriot Hall for our last meeting, and he passed away.  Okay.  The community out here with Katherine and Don and General Jeff, et cetera.  I'm just amazed at all the people trying to solve the problem.

I'm willing to accept Judge Gandhi.  I want to be very positive about that, but I worry about two things.  First of all, in the present provision, the provision has to be stricken before I will sign this, that aggrandizes Judge Gandhi's involvement.  He was involved in one mediation session, which I compliment him on.  And, although they won't accept praise, Judge Birotte and Michelle Martinez sat here until 2:00 o'clock in the morning with the parties night after night, and I don't want this historic document

and the fallaciousness of this taken out of context.

Second, I understand that there's been a struggle over money. I think we've had a meeting -- I'll be transparent. I met with Karen Barham (phonetic) this morning, a wonderful meeting, okay.

There was a proposal that Judge Gandhi get paid $200,000. First of all, he's a wonderful colleague, and I welcome him to this, but I need a monitor on the street, and that means he hits the street at 6:30 in the morning on Skid Row with me. Matt, are you listening? Is Fesia here also? Where's Fesia? She'll be my caller.

That means that I need to transition over the next year all this acquired knowledge that Michelle has having worked on the street. And, so, the proposal was that we pay Judge Gandhi $200,000, and the proposal was that we pay Michelle Martinez $50,000. She'd probably do it for free. And I want you to think about that for a moment. The person doing all the work and now comes a male, (indiscernible), and you propose to me to pay him $200,000. No. He can work for free or he can work for the same salary that Michelle Martinez receives and no more.

So, put up the next provision. If you don't agree to it, this deal's off. I won't have gender bias, and I won't have those people who've made special effort for no cost and sign this document unless that provision is

23

stricken.

For the first year, Judge Gandhi will work for free as a special monitor or, alternatively, will be compensated commensurately with Special Master Michelle Martinez.

Additionally, Judge Gandhi will work under the guidance of Michelle Martinez for the first year to ensure continuity.  The monitor must be willing to take to the streets and learn from the community, not the bureaucracy, and has an absolute fiduciary responsibility to the Federal Court as special master.

I would welcome Judge Gandhi.  I want that absolutely clear.  I would welcome him as a colleague.  I'd ask you to check for conflicts in case he has business at JAMS, where he has a lucrative income.  And if that includes a conflict with the County -- I haven't had that conversation with Jay, but, once again, I would welcome him, and I want to show that face to both of you, but I worry about the disparity, about who did the work.  And this paragraph is not correct.

Now, gently, take it or leave it.  I'm going to turn now to the Intervenors first of all.  Are these provisions agreeable to you, yes or no?

MS. MYERS:  Your Honor, I think we --

THE COURT:  Yes or no?

24

MS. MYERS:  No.

THE COURT:  Okay.  And tell me why.

MS. MYERS:  I think I'm -- I would just like to point out that it -- it is -- it is factually inaccurate to say that everyone has worked on this case for free. Certainly, the Intervenors have worked on this case for free, but the LA Alliance has not worked on this case for free.

THE COURT:  No.  No.  The people who I've consulted with have worked on this for free.  And I'll represent that to you, and I'll start with Tom LaBonge, and I'll go through Miguel Santana, and I'll go through a host of good people.  I'll go through the community out here with Pastor Q, who's certainly not getting paid, or General Jeff when he was alive.  So, that may not be you; but, as far as the parties are concerned, they're irrelevant to this provision.

I want people who I'm surrounded with with absolute virtue, who are willing to commit themselves to homelessness for one reason, that they really truly care.

MS. MYERS:  Yes, your Honor.  And -- and certainly we -- we appreciate that  That is -- and that is why we have been at the table, but I would say there is -- there is value in providing compensation to the individuals who are retained to provide objective monitoring of this settlement

25

agreement --

THE COURT:  Okay.

MS. MYERS:  -- which we believe that Judge Gandhi is being compensated to do.  We -- we appreciate that he --

THE COURT:  Why would he receive $200,000 for one mediation session then and the other monitor making this transition, a female, receive $50,000?  Help me with that.

MS. MYERS:  Your Honor, certainly, we are -- we are strongly opposed to gender bias in compensation.

THE COURT:  Okay.  So, they both receive --

MS. MYERS:  What we would say is --

THE COURT:  -- it?  Just a moment.  So, they both -- I'm not going to take up much more time with this.  So, they both receive equal compensation then.

MS. MYERS:  Your Honor, we were not part of nor were we aware of --

THE COURT:  Okay.  Thank you for --

MS. MYERS:  -- the negotiation --

THE COURT:  -- the discussion.  Thank you.  We're done with it.

MS. HASHMALL:  Your Honor, on behalf of the County, I'd like to speak about the settlement and about the Court's concerns.

THE COURT:  All right.

MS. HASHMALL:  This agreement represents a $1.2

26

billion commitment on behalf of the County of Los Angeles. These resources are unprecedented, and they're targeted towards the most vulnerable members of our population.

THE COURT:  Are you agreeing to this transparency or not?

MS. HASHMALL:  The County has always been committed --

THE COURT:  Are you committed to this transparency and these underlying documents being shared with the public, yes or no?

MS. HASHMALL:  The County has always been committed to transparency, your Honor, and also are champions of diversity and equity.  The Board believes that to their core, and any suggestion that they are complicit in bias or gender discrimination is completely misguided.

THE COURT:  Then you have no difficulty with this provision?

MS. HASHMALL:  The monitor of the City's agreement -- the compensation structure was agreed to by the City and the Plaintiffs and approved by the Court.  The monitor agreement the County has reached with Judge Gandhi mirrors that compensation structure.  There is parity and equality with regards to the monitor for the City agreement, Special Master Martinez, and the monitor of the County agreement, Judge Gandhi.

27

THE COURT:  I want to keep this positive, but that's not correct.

MS. HASHMALL:  We value and appreciate the commitment the Court has given to this issue, and we know you have pushed us, and I think the County has more than stepped up.  The resources here not only involve 3,000 beds, but --

THE COURT:  No.  I object strongly to not having continuity in this next year in transferring information from Michelle Martinez to Judge Gandhi.  I want that street knowledge.  This is no longer a mediation session where people are sitting in their offices.  This is on the street.  And, therefore, this Court will not be precluded from that kind of monitoring activity by someone who won't take to the street.  So, while I welcome Jay Gandhi, I've got a dozen other people I can insert.  It's my choice as the Judge, not the parties'.  This person has a fiduciary duty to the Court.  They are a creation of the Court just like the Grand Jury.

I'm going to turn to Paul Krekorian for a moment, Council President.  Transparency and coequality in terms of this next year -- and, by the way, if you want to limit it to $50,000, that's fine.  We'll save $100,000 for the County.  And, by the way, for the City, I think Mayor Bass will vouch and, Matt, you can vouch, that Michelle Martinez

28

could be paid up to $200,000 a year.  She's received less than $100,000, half of that, and walked away from lucrative contracts to keep virtue and to keep no conflict.  And I want to make sure that Judge Gandhi's doing that also, because the first time I hear -- that's why I wanted Jay here.  He's a close friend.  But the first time I hear he's got a business dealing with the County or with JAMS, you know what my response is going to be, because that reflects on the Court, and that's why up to this point, (indiscernible) amount of laundering, I've surrounded myself with people who did not take money.

So, I'll turn to both of you because I'm adamant about the transparency.  From now on, the public not only sees the documents submitted to you, they see the underlying documents that support this because that couldn't be found for two years, from 2017 to 2019, and there could be hundreds of millions of dollars unaccounted for, not fraudulently, just unaccounted for.

So, I'll turn to Paul Krekorian.

MR. KREKORIAN:  Thank you, your Honor.  I certainly share your concerns about transparency, and this has been an ongoing struggle that we've had with many providers to try to provide -- to -- to try to obtain actionable information --

THE COURT:  Yeah.

MR. KREKORIAN:  -- that we can use in policy making as well and to target our resources in the way that are most effective and most cost effective.  So, we certainly share that -- that concern.

I'm not an expert in what the legal requirements of the providers are and what they can and can't do, but I think having a strong statement like this is --

THE COURT:  Yeah.

MR. KREKORIAN:  -- a very productive, positive direction to go in.

THE COURT:  I'm going to say to you that I commend you for that statement for one reason amongst many.  How does the City or the County know what the provider's really providing?  And you need in the future to know X provider is getting so much housing or so much shelter or what that mix is and then somebody can complain about it.  But right now we're getting a vast amount of our documentation is a one liner, "$248,000, please pay me."  And what we couldn't find was that underlying documentation.  I think that the public -- the public has a right to know what that money is being spent on, is it being spent on water bottles or something substantive?

Judge, come on up here for a moment.  No, I -- I know you didn't want to be on the spot.  So, we're talking about Judge Gandhi.  Have you had any conversation with him

30

yet?

DISTRICT JUDGE BIROTTE:  I have not.

THE COURT:  All right.  Now, I was going to invite him to join me at 6:30 tomorrow.  I was going to tell him the location, and I want to take him out to view the community.  So, can somebody call him?

Now I'll turn to Mayor Bass.

MS. BASS:  Yes.  Once again, thank you so much for your leadership on this issue, and I really think that we're in a new time period of collaboration, as the Chair of the Board mentioned before, the collaboration between the City and the County.  All year long there has not been any finger pointing.

THE COURT:  Right.

MS. BASS:  We have been working together, and the transparency is absolutely critical --

THE COURT:  Okay.

MS. BASS:  Because, as we are focused on housing people and not using enforcement and thousands of -- of units of permanent supportive housing coming online, we have to know what we are accomplishing.  The transparency is critical.  But the other part of transparency is what are the outcomes, not just that you saw a person, but what happened to that --

THE COURT:  Yeah.

31

MS. BASS:  -- person, did they go into treatment, what type of treatment.  Services need to be defined.

So, I think the call for transparency is absolutely welcomed.

THE COURT:  I'm so pleased with your background that you have that, you know, wisdom in terms of your prior occupation.

Let me turn to the Supervisor.  I know you didn't expect this, but I just can't see how this is helpful to us to know which provider is doing what, what they're producing, et cetera, so you can compare, because going forward, my guess is we're going to have to ask the taxpayer for a bond issue.  They have to have absolute confidence going forward that that money is well spent, and I think this is the only way to do it, but I turn to Supervisor Hahn.

MS. HAHN:  Thank you, your Honor.  You're absolutely right.  I am a hundred percent in agreement with you in terms of the transparency.  And, by the way, as you know, the voters passed Measure H in 2017, and for 10 years, are -- are giving about a half a billion dollars a year to this problem through a sales tax.

We know at the end of 10 years the problem will not have gone away.

THE COURT:  Right.

32

MS. HAHN:  And we're looking to ask the voters again.  So, absolutely, they probably won't agree to re-upping this measure unless they know for sure, because voters have always said, We don't mind taxing ourselves as long as we know --

THE COURT:  No.

MS. HAHN:  -- where the money's going and how it's being spent.  So, I think transparency in this issue with providers is key.

Let me speak to the payment of the monitor and the special master.  I don't even know if Judge Gandhi is here this morning.  So, I'm not sure we could even ask him how he feels about this, but I certainly don't want this beautiful settlement --

THE COURT:  Right.

MS. HAHN:  -- to be blown up by a payment or nonpayment to him.  What I can say -- and I might have to consult with my -- my lawyers, but what I can say is the Board of Supervisors in closed session has authorized a certain amount of money to go towards Gandhi and to Special Master Martinez.  I would certainly be in favor of dividing that equally --

THE COURT:  Equally, sure.

MS. HAHN:  -- to both of them.  Means he would get a little less, but she certainly would get more.  I respect

33

Michelle so much.  I've always wanted her involved because I think she in her heart of heart wants to help us get to where we --

THE COURT:  Right.

MS. HAHN:  -- want to get, which is how I see the monitor and the special master.  It's not a got you punishment thing.  They're going to help us get to where we need to get.  And, so, I welcome their partnership.  I don't want this deal blown up over --

THE COURT:  I don't either.

MS. HAHN:  -- you know, a payment.  I really never sat here in a courtroom watching somebody like scribble on the actual document.

THE COURT:  Yeah.

MS. HAHN:  New proficiency.  It's making me nervous, but I am a hundred percent in support of it, and I think I -- I could -- I would think my colleagues would agree to the amount that we authorized, to split it between the two of them.  I think that would be a good solution.

THE COURT:  Okay.  And whatever that is, let's just have equality by gender and work.  And no denigration to Judge Gandhi, but in the past I would have literally asked him to work for free.  I would have wanted to see that passion on behalf of the homelessness --

MS. HASHMALL:  Your Honor --

34

THE COURT:  -- community and the City.

MS. HASHMALL:  -- in connection with the -- the Plaintiff and City settlement, the parties were able to address the monitor piece and the compensation in a separate agreement, and I think that that's appropriate here as well.

THE COURT:  I don't.  I don't.  This is going to be signed by me in a few moments, and I'm going to order that on page four of Document Number 641, that the appointment provisions from line 16 to line one, page five, be stricken for just a moment because that is a false rendition of what has occurred here, and I'm going to be blunt about it.  So, if you would be so kind, you will strike line 16 on page four -- draw a line through it -- up to line one on page five.  That will give me a coequality.

And whatever you decide, Mayor and Supervisor Hahn, that's fine.  If you decide to pay each of them nothing, fine.  She'd probably do it.

Okay.  But there's coequality here across the board, and I really am affronted where somebody's stepping on who had --

MS. HAHN:  No, I think women should make more.

THE COURT:  Talk to my wife.  I'm not going home without this.  Okay.  So, that's the bottom line.  But I don't see how -- and I commend Jay Gandhi for being involved.  He's one of the people I would have chosen

35

independently.  I want that compliment paid to him.  I need to know he's got an absolute passion for this.  I need to know he's going out not from a desk but at 6:30 in the morning and talking to the community.

And, Don, I'm meeting you and the community at 6:30 tomorrow.  We'll give you the location, on Skid Row.  And Jay Gandhi will be with me I hope.  So, let's start that relationship, because I don't need somebody sitting behind a desk.  I need somebody out there looking and not getting in your way but verifying, because there's been too much information that has been questionable.

All right.  Matt?

MR. UMHOFER:  Two -- two points.  The first is a small but important one with respect to the --

THE COURT:  Use the mic.  Just have a seat so I can hear you.

MR. UMHOFER:  With respect to the publication of invoices, your Honor, and bills, obviously there may be HIPAA --

THE COURT:  Oh, of course.

MR. UMHOFER:  -- and private information.  We just want to make sure that we're all in agreement that this wouldn't --

THE COURT:  That's obvious.  And, by the way, let me come back to the point between the County and the City.

36

I understand the City's need.  But you also -- I have to understand the County's need.  So, I'm going to take it in rough figures and finish this conversation and then you'll either sign it or not.

UNIDENTIFIED SPEAKER:  Your Honor --

THE COURT:  Have a seat.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  First of all, where did we start?  We started over 6800 on the freeway agreement.  So, let's just take the number 6,800 of newly created debts.  Okay.  Then there was a settlement with the City, and thank you for giving me your faith and trust because I've given that back to the City to work with Mayor Bass and her efforts.

So, with that 13 to 14 thousand -- I went to a public school.  So, I'm trying to -- I'm just kidding you.  So, how much is that?  That's about 20,000, isn't it, about 20,000, rough, give or take.

Well, with this agreement with mental health, we've got 3500, and let me profusely thank all of you folks.  I'm very impressed, and very courageous on your part.  Well, that's about 23 to 24 thousand beds, isn't it?

Now, as you've said, this does not solve homelessness.  Hopefully it's a substantial step that's meaningful, and I also noticed that you shortened the time period, which I appreciate, through Judge Birotte, to

37

overlap so that you're working together -- hold it from five years down.

THE COURT:  All right.  If we have 25 percent of our folks on the street who are mentally ill, I'm just going to take a rough number of about 5,000, right.  Well, where is the other 3500?  We've got another agreement over with Judge Pregerson, and he and I almost had a joint hearing today.  You've got some more commitments over there.  You're roughly about 5,000 beds between our two agreements, which matches that 25 percent.

Now, I'm going to take Mayor Bass's efforts, 15 to 17 thousand people off the street.  If I took those numbers, then about 25 percent, that's about 3,000, 3,500.  But when Doctor Sherrin (phonetic) wrote this report, he wasn't explicit.  He didn't say that these belonged to the City. He didn't say that these belonged to the County.  And what the Court won't do is enter into that between the two of you because I think you're getting along well.

Mayor Bass, I think you and Janice Hahn can work this out, and I'm not going to intrude and say the City should get 60 percent or 70 percent or 40 percent.  I leave that to your goodwill and the communication between the Board and the City.

My job is to get this as high as possible and still be reasonable so I match your efforts with the Court

38

pushing in terms of mental health, and that's why I commend the County for taking this step forward.

All right.  If there's no other comment, I want you to give me that document, and I'm going to sign it; and then, Supervisor Hahn, you can choose to sign it or not.

MS. MYERS:  Your Honor, we want -- we'd like to be heard on the transparency provisions.  I'm very concerned --

THE COURT:  This is going to take very few moments.  The Supervisor's due in a meeting.  One minute.

MS. MYERS:  Yes, your Honor.  You're adding a provision that requires billing records be provided to the City of Los Angeles from the County.  We would -- we would echo and request that something be written in to ensure that the individuals whose -- who are reflected in those agreements, i.e., unhoused folks whose mental health treatment is at issue here is absolutely protected because we are very concerned --

THE COURT:  Yeah.

MS. MYERS:  -- about the ways in which the City of Los Angeles has consistently used and attempted to use data related to enforcement as a part of the City's provision of the settlement agreement.  There's no --

THE COURT:  Hopefully --

MS. MYERS:  -- transparency --

THE COURT:  Thank you very much.

39

MS. MYERS:  -- in how that data will be used.

THE COURT:  Hopefully we're going to move forward now because this is a gigantic step forward, and all of you lawyers can get together and continue to bicker, but this is moving forward now.

Bring me the document.

MR. UMHOFER:  Final point, your Honor.

THE COURT:  Counsel?

MR. UMHOFER:  I want to be -- first of all, make it clear how deeply we appreciate Michelle Martinez's work on this case.  With respect to Judge Gandhi, my only comment and modification to what the Court suggested is that we, instead of naming Judge Gandhi in the agreement because we don't know the financial circumstances that he'll agree to, that we make it a special mast agreeable to the Court and the parties.  That way we're not committing ourselves in the document to Judge Gandhi himself, and the Court and the parties can agree on another person who can meet this requirement if Judge Gandhi can't.

THE COURT:  I'm going to get you out of here, I promise you.  Just a moment.

Briefly, one minute.

MR. YAGMAN:  I think under no circumstances should Judge Gandhi be the monitor; and if he is, he should work for free.

40

THE COURT:  I don't mind him working with a commensurate salary so there's no -- I get worried about $200,000 get paid to someone and $50,000 to another one when the work has already been done with the other one at $50,000.  Somehow that's just degrading.  That just isn't going to happen.  I don't care what the amount is, as long as there's coequality.  And, in good faith, I'm going to work with the County and your suggestion with Judge Gandhi.  I'm just asking you, I'm going to be on the street at 6:30 tomorrow morning.  He better be there because that's the first commitment, to get out in the community and take a look, and if I've got people still sitting in their offices, I need to know that now.  I think Jay will be there.  He's a good friend, and I think I would have recommended him also back to you if I was to choose a magistrate judge.  So, no denigration, but I need to know that these people really really care.  And if they don't, this isn't just another paid position.  Okay.

All right.  I'm going to sign the back of this.  And I don't want this to denigrate into this discussion about Judge Gandhi because it's so easily resolved.  And I think we're going to work very well together, but he has an absolute fiduciary responsibility to the Court.

(Pause.)

THE COURT:  All right.  It's up to you.  You

41

represent the Board.  You can consult with your attorneys.  I've signed this document.

(Pause.)

THE COURT:  Give that to the Supervisor.

UNIDENTIFIED SPEAKER:  Your Honor, if I --

THE COURT:  No.  Speak to the Chairman of the Board now.  We're all done with the attorneys.  We're all done with the bureaucracy.  This is the Mayor, the Court, and the Board.

And, Judge Birotte, thank you so much for being my colleague.  We'll see where this goes.

(Pause.)

THE COURT:  And Fesia and Matt, where are you?  Is Fesia here?  Matt, you also have the Court's commendation.  I wanted you to hear that on the record.  I know you've worked hard on this.  We've had some blunt discussions in the past.  I'm commending you.

(Pause.)

THE COURT:  Okay.  All right.  Counsel, I'll finally say this.  I want to thank all of you.  This is an extraordinary step forward.  It's going to save a lot of lives.  We're certainly not done with the task, but this is a literally courageous step, and I want to thank you for coming from that 300 to 3500, and just commend you, Mayor Bass, and Supervisor Hahn.  I want you to convey that back

42

to all of your colleagues.  And, Paul Krekorian, thank you.
Would you convey that back to the Council.

I'm sorry I was short with some of you who are
attorneys, et cetera; but this is at the highest level now.
This is not at an attorney level anymore.  This is between
the Mayor and the Court and the Chairman of the Board of
Supervisors and the Council, and that's where it should
always be.  These folks no longer should show this.  We're
the responsible parties.

Okay.  We're in recess.  Thank you very much.

(Proceedings recessed briefly.)

THE COURT:  Oh, by the way, one thing on the way
out the door -- would you put this up?  I think you'll find
this interesting.  Would you put this up for just a moment.

An aside, apparently the State won't gather these
figures, but I'll -- apparently the State's not giving it.
It's okay.  Orange County went down 18 percent last year.
L.A. County went up 9.22 percent, L.A. City 10.0 percent.
Keep going through.  Next page.  San Bernardino, up 25.8
percent.

Now, you can check these figures out.  My staff
and I have been working night and day since we can't get
this from the State.  Riverside County, up 12.33 percent;
Ventura County, up 9.0 percent; San Diego County up 21.8
percent.  Take the next one.  San Francisco, down 3.5

43

percent.  Don't ask me how, but whatever.  Sacramento, up 66.57 percent.

And, by the way, you should know I've rejected a number of people that the Plaintiff put forward.  So, I'm showing the County good faith in terms of your request right now with your monitor.

Oakland up 24.17 percent.  (Indiscernible) up 6.5 percent.

If you are the courageous people who keep acting, you will create such goodness that the Governor, I believe, will support you; and so will the Federal Government.  Be the first at the table to show that wisdom, and you'll create the need, and the money will come to you, and it will come from the taxpayers eventually because they'll gain our confidence through this transparency.

I want to commend all of you.

We're in recess.

(Proceedings concluded.)

44

          I certify that the foregoing is a correct

transcript from the electronic sound recording of the

proceedings in the above-entitled matter.


/s/Jordan Keilty                    9/29/2023
Transcriber                         Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.