HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-6952
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:  March 4, 2024<br>Time:  8:30 a.m.<br>Courtroom:  10A<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTS APPLICABLE TO THIS MOTION ................................................... 3

III.   ARGUMENT .................................................................................................. 5

IV.   PLAINTIFFS ARE NOT ENTITLED TO THE RELIEF SOUGHT ...................... 7

    A.  The City has Complied with the Settlement Agreement, And  There is No Performance for the Court to Compel............................................................ 7

    B.  The Alliance's Accusation Of Bad Faith Negotiating Is Unfounded............ 10

    C.  At a Minimum, The City Substantially Complied With Section 5.2............. 11

    D.  The City's Bed Milestones Are Goals, Not Requirements Under the Settlement Agreement ............................................................................................... 12

V.  THERE HAS BEEN NO LOSS OF ACCOUNTABILITY FOR THE CITY WHICH REGULARLY PUBLICLY REPORTS ON ITS PROGRESS UNDER THE AGREEMENT AND OTHER PROGRAMS ........................................................... 14

VI.  THE ALLIANCE'S REQUEST FOR SANCTIONS IS A GROSSLY IMPROPER OVERREACH .............................................................................. 15

VII.  CONCLUSION ............................................................................................. 177

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Johns-Manville Corp.*,
876 F.2d 702 (9th Cir. 1989) ...........................................................................8

*Ashker v. Newsom*,
968 F.3d 939 (9th Cir. 2020) ..........................................................................11

*Callie v. Near,*
829 F.2d 888 (9th Cir. 1987) ...........................................................................7

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991)..........................................................................................16

*Ins. Co. of State of Pa. v. Associated Int'l Ins. Co.*,
922 F.2d 516 (9th Cir. 1990) ..........................................................................12

*Ins. Exchange v. Hodroj*,
72 Cal.App.5th 272 (2021) ..............................................................................13

*Jeff D. v. Andrus*,
899 F.2d 753 (9th Cir. 1989) ...........................................................................8

*Shine v. Williams-Sonoma, Inc.*,
23 Cal.App.5th 1070 (2018) ............................................................................13

*Skilstaf, Inc. v. CVS Caremark Corp.,*
669 F.3d 1005 (9th Cir. 2012) .........................................................................8

*Stone v. City and County of San Francisco*,
968 F.2d 850 (9th Cir. 1992) ..........................................................................15

*TNT Mktg. Inc. v. Agresti,*
796 F.2d 276 (9th Cir. 1986) .......................................................................7, 15

ii

*Westlands Water Dist. v. Amoco Chem Co.*,
  953 F.2d 1109 (9th Cir. 1991) ..................................................................................... 17

**Statutes**

Cal. Govt. Code § 818 ................................................................................................... 18


**Other Authorities**

Restatement (Second) of Contracts § 357 (1981) ............................................................. 8

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT
AGREEMENT COMPLIANCE AND SANCTIONS

## I.    **INTRODUCTION**

Plaintiff LA Alliance ("the Alliance") files an unprecedented and unfounded motion for sanctions ("Motion") against the City of Los Angeles.  Stripped of hyperbole, the Motion admits (as it must) that as of the date that the Alliance filed the Motion, the City was in full compliance with its obligations under the Settlement Agreement ("SA") and that the Alliance has suffered no actual damages as a result of any delay.  On that basis alone, the Motion should be summarily denied.

***During 2023, the City of Los Angeles moved swiftly to shelter and house an unprecedented number of unsheltered individuals.***  Despite the urgency with which the City moved to bring thousands of unsheltered individuals indoors in just 12 months, the Motion picks at the numbers and complains that the clear success of the City's efforts is "not traceable to City initiatives" or "arose from efforts that predated the City's new leadership."  The Motion's petty focus on allocating credit for the truly extraordinary progress achieved in our City during 2023 is unbecoming, incorrect, and cannot serve as a basis for sanctions.  Irrespective of who gets the credit, the City and its current leadership remain laser focused on delivering results and moving as quickly as possible to address this homelessness crisis and emergency.

Not only had the City delivered all milestones required before the Motion was filed – using numbers demanded by the Alliance – but the Motion still would have been indefensible had it been filed a day, a week, a month, or a year earlier.  As even a cursory review confirms, the City had met all its obligations under the SA within the only time frames specified in the SA, and has been actively meeting, conferring, and cooperating with the Alliance to resolve those areas where the Alliance was dissatisfied with the City's performance.  The only "deadline" in the SA was the 30 day timeframe within which to calculate the Required Number in Section 5.1 and the City did that calculation within the required timeframe.[1]

---

[1] The sole provision of the SA relevant to the Motion is Section 5 "Milestones and Deadlines" which provides that "within 30 days from the date information from the

1

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

There is no deadline by which the milestones under Section 5.2 had to be developed or delivered, so there is no breach at all, no bad faith conduct that would support an award of sanctions, and no basis for the absurd amount and nature of the sanctions requested in the Motion.  The most that can be said is that the City did not move as swiftly as the Alliance would have wished on the delivery of district by district encampment milestones, but it is clear that there is no breach and there has been no harm.  Despite the Motion's manufactured outrage at the City's alleged "wilful," "intentional" or "bad faith" delay, the process of meeting and conferring, even as described in the Motion itself, worked exactly as it was intended to - the parties met, discussed their disagreements and ultimately resolved them without the need for further Court intervention.  There has been no harm to anyone; in fact, the City has been historically successful in reducing encampments in 2023 and the showboat filing of the Motion is completely unsupported by the facts or the law.  The events of the last year (the most salient of which are summarized below) belie the Motion's harangue that somehow, somewhere the City must have done something wrong.

---

2022 Point in Time ("PIT") Count is confirmed by LAHSA", the City would calculate the Required Number.  Dkt. 421-1 at §§ 5.1 and 1.6. The City did so.  "Thereafter", with no specified deadline, the City was to create plans and develop milestones and deadlines for 4 items:

     (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number;

     (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District;

     (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and

     (iv) the City's plan for encampment engagement, cleaning, and reduction in the City.

Dkt. 421-1 at § 5.2.  The City agreed to provide the plans, milestones and deadlines to Plaintiffs, and the parties agreed to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and would consult the Court for resolution, if necessary. *Id.*  That is precisely what the City has been doing.

2

There is no requirement in the SA or elsewhere that says the City can *only* address homelessness under the umbrella of the SA or *must* address it in the way that the Alliance wants the City to do so[2]. The SA was intended to allow the City to focus its resources and efforts on actually addressing homelessness through creating shelter solutions and encampment outreach, engagement, and reduction, without the distraction of litigation and the diversion of resources to defend a lawsuit. This unwarranted intrusion by the Alliance, who concedes that the City is now in full compliance with the Agreement, is nothing but a distraction from the City's important and necessary work to actually bring unhoused Angelenos indoors and reduce encampments.

## II.    FACTS APPLICABLE TO THIS MOTION

Section 5.1 of the SA required the City to calculate and deliver its calculation of the "Required Number" within 30 days of LAHSA's confirmation of the 2022 Point in Time (PIT) homelessness count. A calculation was necessary because the Required Number is defined as 60% of that portion of the City's unsheltered 2022 homelessness population that met the SA's definition of "City Shelter Appropriate". LAHSA confirmed the 2022 homelessness count on September 8, 2022 and the City timely delivered its calculation of the Required Number on October 6, 2022. The City then provided the Required Number calculation to the Court on October 14, 2022. Dkt. 483. The Required Number as calculated by the City and agreed to by the Alliance is 12,915.[3]

---

[2] Section 3.2 of the SA states that "the City may choose, in its sole discretion, any housing or shelter solution", including government or publicly funded shelter and housing or "tiny homes, shared housing, purchased or master-leased apartments, hotels/motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance/rapid rehousing, family reunification, sprung structures or tents, safe parking, safe sleeping/camping, affordable housing, and interim housing (including A Bridge Home beds)".

[3] The Required Number increased from 12,904 to 12,915 due to changes in how LAHSA reported the results of the 2022 PIT Count after Council District lines were redrawn.

3

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

Section 5.2 of the SA then required the delivery of additional information, plans and milestones, but unlike Section 5.1, *the deliverables under Section 5.2 were not due by any particular date*. Despite the lack of a due date, the City moved expeditiously to do what it could and delivered the plans and milestones that relate to the creation of shelter and housing solutions on November 11, 2022. Unlike Section 5.1 which established a date for the delivery of the Required Number, Section 5.2 did not require the delivery of plans or milestones by a particular date, simply stating that the delivery of these plans and milestones would be some time "thereafter" the Required Number. As set forth below, the last quarter of 2022 brought some extraordinary intervening events.

In October 2022, the leaked recordings of a conversation among 3 Los Angeles City Council members and a labor leader resulted in extraordinary disruptions in the City. The then-Council president resigned, Council meetings were filled with protestors calling for the resignation of the other 2 members on the recording on a daily basis, and the November 7, 2022 election swept in a large group of new leaders.[4]

As of November 11, 2022, just over 60 days after the PIT count had been certified by LAHSA, the City had complied with all of its obligations other than the obligation to deliver a set of goals and milestones to serve as a guide for the City's efforts to engage, clean, and reduce encampments under the SA ("Encampment Milestones"). Unsurprisingly, given the events of late 2022, the Alliance did not raise any issues with the City's delivery until 2023.

In January 2023, the Alliance requested that the City meet and confer about the City's deliveries of the Encampment Milestones under Section 5.2 of the SA. The Parties met and conferred and the result was everyone agreed that the City would endeavor to provide new encampment milestones by October 1, 2023, to give the new City administration time to develop milestones based on its new approach and programs to address homelessness. The process, in fact, took longer than anticipated.

---

[4] All 3 Citywide elected officials and 7 of the 15 Councilmembers were newly elected and had not had the benefit of briefings or familiarity with the Alliance settlement.

4

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

On December 1, 2023, the Chief Administrative Officer for the City and the Chief Legislative Analyst for the City prepared and publicly filed an "Alliance Settlement Agreement Progress As of September 30, 2023" (SA Progress Report)[5] which sets forth the beds and units specifically open and in progress under and for the purposes of the SA. Although the City anticipates even better numbers once the report includes the progress through the end of 2023 in its next report, even the numbers as of September 30, 2023 are encouraging and paint a very different picture than the Motion's screed. For example, as of September 30, 2023, of the total 12,915 shelter and housing solutions required under the SA over 5 years, "2,347 beds or units are open and 6,108 beds or units are in progress, for a total of 8,455 units or beds that satisfy the intent of the Settlement. Therefore, the City will need to add a total of 4,460 beds or units that will be open by June 13, 2027." See SA Progress Report at page 4. ***That means that out of the total required over 5 years, over 65% are already open or underway in the first 9 months of 2023.***

Following the submission of the SA Progress Report, City Council went into their annual recess for the holidays. When they returned from recess, the Council approved the Encampment Milestones on January 31, 2024. Those Encampment Milestones in turn were delivered to the Alliance the very next day.

### III.    **ARGUMENT**

The Alliance has no basis upon which to ask this Court to impose severe and punitive sanctions upon the City. Arrogating to the Alliance the unprecedented sum of $6.4 million of taxpayer funds simply because the City did not act as swiftly as the Alliance might have wished would be unwarranted and without precedent. The Alliance concedes (a) the City timely complied with the other requirements of Section 5 of the SA, including calculating the Required Number of shelter and housing solutions, and providing milestones for their creation on both a Citywide and District-by-District basis,

---

[5] https://clkrep.lacity.org/onlinedocs/2023/23-1022_misc_12-01-23.pdf; Declaration of Scott Marcus, Ex. 5.

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

and (b) the City came into full compliance with Section 5.2 by January 31, 2024—before the Alliance filed their motion for sanctions. *See* Motion, Dkt. 668 at 17:23 and 19:18-19.[6] Yet, the Alliance nonetheless demands over $6 million plus a slew of other penalties that would give the Alliance powers far beyond the terms of the Agreement that invade the City's core regulatory and policy making functions and violate the discretion expressly reserved to the City under the SA.

Contrary to the Alliance's accusations, there is simply no "bad faith" where the only complaint is the City's alleged failure to provide a document outlining encampment milestones on a timely basis, especially when there was no timeframe specified in the SA for the provision of that document. Moreover, the Alliance ignores that during the timeframe the Alliance complains it did not have a document in hand outlining certain milestones, the City was consistently doing the critical work of encampment outreach, engagement, cleaning and reduction throughout the City and in each Council District – in addition to creating thousands of new beds to bring the City's unsheltered population inside. Far from engaging in the delay and lack of accountability that the Alliance suggests, since November 2022 the City has been accelerating its efforts and creating new programs to both create beds and increase encampment engagement, cleaning and reduction–and publicly reporting on its efforts along the way. As just one example, during that time, Mayor Karen Bass launched Inside Safe, a new initiative with the specific goal to house unsheltered Angelenos living in street encampments and to prevent those encampments from returning to public spaces. Inside Safe conducted 35 encampment operations during 2023 (at least 1 in each Council District), with 2,087 individuals having entered interim housing, and 20% being permanently housed under that program. *See* 02/01/24 Report, Homelessness Emergency Account- General City Purposes Fund Eleventh Status Report (C.F. 22-1545) as of Friday, January 19, 2024,

---

[6] All page number references to the Alliance's motion is to the ECF Court-filed Document page number.

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

Declaration of Scott Marcus ("Marcus Decl."), Ex. 1; https://clkrep.lacity.org/onlinedocs/2022/22-1545-s14_rpt_cao_2-01-24.pdf.

At the same time, the City was also working to bring online thousands of new beds. The City opened 2,810 new beds and has an additional 6,108 in process from June 2022 through September 30, 2023 pursuant to this SA, adding to the 6,600+ new beds created under the City's MOU with the County previously agreed to in this litigation. The result of 9,410 new beds open in connection with this litigation may be shy of the City's own aspirational milestone for the end of June 2023, but this alleged shortfall is scarcely the type of conduct that warrants sanctions. While the City hoped to bring as many beds online as possible and accordingly set aggressive bed creation milestones, falling short of one interim milestone is not a violation of the Agreement, evidence of bad faith, or a basis for the imposition of severe monetary sanctions.

In addition, the Alliance puts forward a false narrative of a loss of accountability despite a multitude of public Court and Council filings. Indeed, throughout the November 2022-January 2024 timeframe that is the focus of the Alliance's motion, the City was regularly reporting about its progress through quarterly reports pursuant to the SA, quarterly reports pursuant to the City's MOU with the County, and countless public reports to Council and Council Committees, such as Quarterly Reports on the Mayor's Emergency Declaration and regular reporting on the status of the Homelessness Emergency Account. Accordingly, the Alliance's suggestion that it and the City's residents somehow lost the ability to review the City's progress toward fulfilling its commitments in the SA and to hold the City accountable is baseless and false.

## IV.   PLAINTIFFS ARE NOT ENTITLED TO THE RELIEF SOUGHT

### A.   The City has Complied with the Settlement Agreement, And There is No Performance for the Court to Compel

Although a district court has the equitable power to enforce an agreement to settle a case pending before it (*Callie v. Near,* 829 F.2d 888, 890 (9th Cir. 1987); *TNT Mktg. Inc. v. Agresti,* 796 F.2d 276, 278 (9th Cir. 1986)), the settlement agreement is treated as

7

a contract, and a party may file a motion to enforce the settlement agreement seeking an order for damages or specific performance. *Id.; see also Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989) ("a motion to enforce the settlement agreement essentially is an action to specifically enforce a contract.")

Enforcement of the Parties' Settlement Agreement is governed by California contract law. *See Skilstaf, Inc. v. CVS Caremark Corp.,* 669 F.3d 1005, 1017–18 (9th Cir. 2012); *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989) ("[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."); Dkt. 421, Settlement Agreement, § 23. "An order of specific performance is intended to produce as nearly as is practicable the same effect that the performance due under a contract would have produced. It usually, therefore, orders a party to render the performance that he promised…. Such relief is seldom granted unless there has been a breach of contract, either by non-performance or by repudiation." Restatement (Second) of Contracts § 357 (1981). Here, there is no basis for an order of specific performance both because there is no specific deadline, date, or timeframe by which the milestones were required to be created, shared with the Plaintiffs, or finalized under Section 5.2, and because the Motion was filed after the date that the City had achieved full compliance and delivered every document called for in the SA.

The SA is clear that in the event of a dispute regarding the interpretation, performance or enforcement of the Agreement, the Parties would meet and confer in a good faith effort to resolve all disputes without Court intervention, and only if a resolution could not be achieved through the meet and confer process would the matter be submitted to the Court for review and decision. Dkt. 421., § 24. The Court appointed Michele Martinez as Special Master to monitor the Settlement Agreement and to assist the Court in overseeing and enforcing this Agreement. Dkt 445. The Court also appointed the Honorable Judge Andre Birotte to act as mediator and assist in resolving any disputes between the Parties.

8

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

As the Alliance admits, as of the date of the Motion, the City had complied with all its obligations under Section 5 of the Settlement Agreement (*see* Mot. at 14:12-14; Declaration of E. Mitchell ["Mitchell Dec."] at ¶ 20 and Ex. J), and therefore there is no specific performance for the Court to compel.  Indeed, by the Alliance's own admission, by November 2022, the City had fulfilled most of its obligations under Section 5.  *See* Dkt. 668 at 8:4-8; Mitchell Dec., Dkt. 668-1, at ¶ 2; *see also* 10/14/22 City's Quarterly Report, Dkt. 483; Mot., at 8:9-11; Mitchell Dec. at ¶ 3 and Ex. B.

Although the Motion argues the City was "447 days late" in providing its plan for encampment engagement, cleaning, and reduction under Sections 5.2 (ii) and (iv) of the SA, the facts establish otherwise.  First, neither Section 5.2, nor any provision of the Agreement, mandates a deadline for the plans, milestones and deadlines to be provided and so the City, by the terms of the SA, was not and could not be "late."  Second, as the Motion and declaration of counsel establish, the Alliance understood and agreed that the City would not be delivering the remaining Encampment Milestones until October 1, 2023 (Mot.,10:5-8; Mitchell Dec. at ¶ 7), and the City provided its initially proposed plan just two days later, on October 3, 2023.  Mot., 10:9-11; Mitchell Dec. at ¶ 8 and Ex. D. Although the Alliance was not satisfied with the document, which outlined the City's plans for "Encampment Engagement, Cleaning, and Resolution," the parties thereafter "work[ed] together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines" as they agreed to do in Sections 5.2 and 24 of the SA.  These efforts, as highlighted in the Alliance's motion, included multiple meetings between October 2023 and January 2024 involving counsel for the parties and the City's high-level officials, including the Mayor and Chief Administrative Officer, to discuss the Alliance's concerns over the milestones.  Marcus Decl. at ¶¶ 11-21.  Furthermore, and consistent with the Court's Order, Special Master Michele Martinez assisted and provided guidance concerning the Parties' dispute, as did Judge Birotte serving as mediator.  *Id.*, at ¶¶ 18, 25.  Through this process of working together, the issues were resolved.  Together with the Court's, Mediator's, and Special Master's assistance, by

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

January 2024, the City updated its previously-provided encampment reduction plans and milestones to include District-by-District milestones based on numbers proposed by the Alliance, thus fully complying with Section 5.2(ii), as the Alliance concedes.  Since the Parties ultimately reached a resolution, there was and is nothing to be brought to the Court for review and decision or to compel.

### B. The Alliance's Accusation Of Bad Faith Negotiating Is Unfounded

While the Alliance spends almost six full pages of its brief suggesting that "the City engaged in bad faith negotiation for 14 months," the facts paint a different picture, and fail to establish any bad faith on the part of the City.  On the contrary, the facts show the City engaged with the Alliance for over a year – in good faith and in the spirit of cooperation – to do exactly what it promised to do in Section 5.2 of the SA – "work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines."  Indeed, the Alliance's Motion highlights the many meetings – both in-person and via Zoom –that occurred between high-level City representatives, including the Mayor, and the Alliance to discuss and address the Alliance's concerns over the milestones, as well as the numerous emails exchanged between counsel for the Parties.

At most, what the Alliance paints as "false promises" (Dkt. 668 at 10:19) amounts to nothing more than shifting gears on something that remained entirely within the City's discretion.  Specifically, during the extensive conferring regarding the milestones, the Parties initially discussed the City's issuance of requests for qualifications (RFQs) to provide outreach and engagement services to people experiencing homelessness across multiple City Council Districts.  *See* Marcus Decl., ¶ 9.  Ultimately, the City decided to set aside the RFQ process in favor of dedicating those resources to Inside Safe and other City programs for addressing encampments.  *Id.*, ¶ 9.  It would be accurate to say that the City did not specifically notify Alliance of this change until January 2024 when the Parties were close to resolving the remaining deliverables but, as the SA made clear, City retained full discretion over how it would meet the requirements of the SA and has no obligation to obtain the Alliance's approval of the City's initial or updated street

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

engagement strategies.  See Dkt. 421, § 4.1.  What the Alliance is entitled to under the SA is reporting on the progress made, and throughout this entire process, the City has in fact made progress and has reported on that progress both to the Alliance and in other public forums.  The City's focus has been on the rapid deployment and coordination of resources to put successful encampment engagement and reduction strategies in place, precisely the type of Citywide and District-by-District encampment engagement, cleaning, and reduction contemplated by the milestones.  *See* Marcus Decl., ¶ 28 and Exhibits 1-5.

### C.    At a Minimum, The City Substantially Complied With Section 5.2

A party is deemed to have "substantially complied" with a settlement agreement obligation where "any deviation is 'unintentional and so minor or trivial as to not substantially defeat the object which the parties intend to accomplish.'"  *See Ashker v. Newsom*, 968 F.3d 939, 946 (9th Cir. 2020).  Here, the object that the Parties intended to accomplish by way of this Settlement Agreement – as the Alliance set forth in their brief in support of the Agreement filed on June 3, 2022 – was "providing immediate shelter or housing, and addressing the severe health and safety threats which result from unsheltered homelessness that face unhoused and housed people alike."  *See* Dkt. 437 at 2:21-24.  Section 5.2 of the Agreement was intended to encourage achievement of that goal.

The goals and objectives of the SA (and the specific goals of Section 5.2) have been satisfied.  Alliance's allegation of delay in providing a formal document outlining milestones and deadlines is insubstantial and rings hollow when measured against the progress made on encampment engagement and reduction[7] and the 65%+ of the total bed

---

[7] For example, LAHSA reported that Citywide, 45,445 individuals were contacted (which is an initial contact) and 25,844 individuals were engaged (meaning the individuals agreed to enroll in a care management plan) in 2023.  Also in 2023, the City conducted 2,252 Comprehensive Cleaning and Rapid Engagement Program (CARE) and 5,882 Comprehensive Cleaning and Rapid Engagement Plus (CARE+) operations, as reported publicly in reports to City Council. *See* Marcus Decl., Ex. 3 [Oct. 27, 2023

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

goals met during the first 18 months of the 5 year term.  The efforts described herein are just highlights – and not the entirety – of all the work the City was doing during the relevant time frame on a Citywide and District-by-District basis to address encampments and homelessness.  No characterization of the delivery of a formal document providing milestones as a delay (despite the absence of any firm date by which it was required) alters the fact that the City has substantially complied with the SA, and Section 5.2 in particular.

**D.    The City's Bed Milestones Are Goals, Not Requirements Under the Settlement Agreement**

Contrary to the Alliance's inaccurate attempts to mischaracterize or re-write the Settlement Agreement, the Motion fails to cite any provision the City purportedly violated regarding the plans, milestones and deadlines concerning its creation of shelter and housing solutions under Sections 5.2(i) and 5.2 (iii) of the SA because there is no violation.  The Alliance concedes the City provided its proposed plans, milestones and deadlines over a year ago, in November 2022, and complains the City did not meet the interim goal set forth in those plans and milestones for December 31, 2023.  But the City's failure to meet its interim target is not a violation of the SA.  To the contrary, the only mandatory obligation in the SA is the City's agreement to create the Required Number of housing and shelter solutions as set forth in Section 3.1.  *See Ins. Co. of State of Pa. v. Associated Int'l Ins. Co.*, 922 F.2d 516, 522 (9th Cir. 1990) (noting that, under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other" (citation

Inter-Departmental Correspondence re: Homelessness Emergency Declaration – Supplemental – 2023-24 First Quarterly Report (C.F. 23-0652-S2), at p.3]; Ex. 4 [Jan. 12, 2024 Inter-Departmental Correspondence re: Homelessness Emergency Declaration – 2023-24 Second Quarterly Report (Council File No. 23-0652), at pp. 4 and 7.]  Many Council Districts also conducted their own operations to address homelessness and the City's outreach and engagement included offers for safe parking, housing and services to hundreds of individuals living in vehicles.

12

omitted)); *Shine v. Williams-Sonoma, Inc.*, 23 Cal.App.5th 1070, 233 Cal. Rptr. 3d 676, 684 (2018) ("[T]he language of a settlement agreement must be viewed in its entirety, and, if possible, every provision must be given effect.").

The language of Section 3.1 – "the City agrees" – stands in stark contrast to the language in the rest of the SA. The City did not agree – and the SA does not require the City – to meet any interim plan, milestone or deadline; they are goals and targets the City hopes to achieve on an interim basis. The City cannot be in violation of, or breach of, something it was not required to specifically perform under the SA. *See e.g., CAA Ins. Exchange v. Hodroj*, 72 Cal.App.5th 272, 276 (2021) ("[t]he elements of a breach of contract claims are that a contract was formed; that the plaintiff did everything required by the contract; that the defendant did not do something required by the contract; and that the plaintiff was harmed as a result."). And neither the Alliance nor the Court can modify the settlement terms or re-write the Agreement without the City's consent. *Jeff D.,* 899 F.2d at 758.

The Alliance's claim that the City's proposed milestones did not "meaningfully reduce the numbers of the 32,680 unsheltered persons experiencing homelessness in Los Angeles" (Mitchell Decl., ¶ 13) also is misplaced. There is no requirement in the SA that the City reduce the number of people experiencing homelessness in Los Angeles, or that the City house a specific number of people experiencing homelessness. Instead, the Agreement focuses on that which the City can agree to accomplish - creating a specific number of shelter and housing solutions (12,915) by July 2027. Dkt. 421.

While the City is hopeful that its milestones will be met, and always uses its best efforts to do so, the City did not violate any provision of the SA whether or not it failed to meet its early interim milestones. Thus, the Alliance's attempt to arrogate for itself the City's discretion and policy making authority (and to obtain sanctions that look to be nothing more than non-recoverable punitive damages) is improperly made and must be denied.

13

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

V.  **THERE HAS BEEN NO LOSS OF ACCOUNTABILITY FOR THE CITY WHICH REGULARLY PUBLICLY REPORTS ON ITS PROGRESS UNDER THE AGREEMENT AND OTHER PROGRAMS**

The City regularly publicly reports both in this matter and elsewhere – including throughout the timeframe at issue in the Motion – on the work the City is doing to address homelessness, including its creation of beds and its encampment outreach, engagement, cleaning and reduction.  For example, during the November 2022 through January 2024 timeframe that is the focus of the Motion, the City filed with this Court and provided to the Alliance five Quarterly Reports called for by the SA,[8] and six Quarterly Reports called for under the MOU with the County.[9]  In addition to the filings with this Court, the City publicly files with the City Council various reports on its efforts to address homelessness.[10]

Through all of this public reporting, the City is (and was during the November 2022 – January 2024 timeframe) consistently transparent about the work it is doing to address homelessness, including its bed creation and encampment engagement, cleaning

---

[8] See Dkt. 516 (filed on 1/17/23), 539 (filed on 4/21/23), 598 (filed on 7/17/23), 652 (filed on 10/16/23), and 660 (filed on 1/16/24).

[9] See Dkt. 515 (filed on 1/17/23), 523 (containing a revised report filed on 1/26/23 to be transparent and accountable concerning a miscount of 100 beds in the original report), 538 (filed on 4/21/23), 599 (filed on 7/17/23), 651 (filed on 10/16/23), and 661 (filed on 1/16/24).

[10] In this timeframe, the City filed two Quarterly Reports (plus a supplemental report) on the Mayor's Emergency Declaration from the CAO (Council File 23-0652), which include reporting on CARE and CARE+ cleaning. *See* Marcus Decl., Exs. 2, 3 and 4, as well as ten monthly Status Reports on the Homelessness Emergency Account from the CAO (Council File 22-1545) to report on this account, which was created on January 18, 2023.  An attached example of one such report includes a dashboard entitled "Inside Safe Program Metrics" containing detailed information, such as the number of encampment operations, number of individuals served, number of individuals who entered Interim Housing, Housing Retention percentage, percentage of individuals Permanently Housed.  *See* Marcus Decl., Ex. 1.

14

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

and reduction.  This transparency allows any member of the public, including the Alliance, to regularly review how the City is spending money and deploying resources to address homelessness, including creating beds and performing outreach, engagement, cleaning and reduction.  In light of this, any claim that the Alliance or "[t]he citizens of Los Angeles lost a year of accountability" (Mot. at 21:25) is completely unfounded.[11]

## VI.  THE ALLIANCE'S REQUEST FOR SANCTIONS IS A GROSSLY IMPROPER OVERREACH

The most baffling and baseless part of the Motion is the request that this Court award millions of taxpayer funds and abrogate the City's discretion (which was expressly reserved in the SA) as punishment for alleged "for non-compliance."  Notice of Motion, Dkt. 668 at 2:4-6.  As discussed above, there were no timelines or deadlines for the establishment or delivery of any of the milestones under Section 5.2 of the SA so there was no breach by the City.  Moreover, Alliance admits the City is now in full compliance with the Agreement and was when the Motion was filed.  The Motion fails to cite any statute or cases, and the City does not believe that there is any legal authority, that could support granting the relief requested under these circumstances.  While this Court's enforcement power includes the authority to award *damages* for harm caused by any failure to comply with the SA, (*TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986),) the Alliance does not argue or provide any evidence of *damages* or harm.  Moreover, even where a court is exercising its equitable powers to sanction a party for contempt for violating a court order or consent decree, the Ninth Circuit has admonished district courts to "exercise the least possible power adequate to the end proposed." *Stone*

---

[11] In addition to the City's reporting, Special Master Michele Martinez routinely monitors the work the City is doing to fulfill its obligations under the Settlement Agreement.  Ms. Martinez is highly experienced and knowledgeable of the issues, and has been deeply involved in monitoring the City's efforts, including field visits to encampments, attending City Council meetings, reviewing the City's documents, and assisting the parties.  The Special Master's diligent review of the City's work is yet another built-in mechanism that has provided transparency and accountability.

15

*v. City and County of San Francisco* 968 F.2d 850, 861 (9th Cir. 1992) (vacating portion of order imposing more intrusive than necessary sanction).  Despite this settled maxim, the Alliance is unjustifiably seeking the most intrusive sanctions possible – an outrageous sanction of millions of dollars and incredibly, a judicial order to the City and to the City Attorney's Office requiring special staffing and internal reporting.  The Alliance, an unelected consortium, cannot direct the policy and staffing decisions of elected officials who answer only to the City's voters.  Moreover, diverting over $6 million in funds from the City's homelessness budget would undermine the City's efforts to provide shelter, intervention and other programs to the most vulnerable in the community.  Every dollar given to the Alliance is one less available to the City to use to address homelessness.[12]

In its Motion, the Alliance asked the Court to award $100,000 for each week of alleged noncompliance dating back to November 11, 2022, whereas it has been barely a month since the Alliance demanded $1 million – just over 15% of the current amount – "in the form of sanction, damages, and/or a non-profit grant for the purposes of continued policy work and engagement of other Los Angeles county cities, or any other description the City wants to use."  Mitchell 01/08/24 Letter, Ex. C to Mitchell Dec., Dkt. 668-1 at 26.  The same letter notes "[t]he Alliance has never sought damages from the City… [and] [s]hould the Alliance be required to seek Court intervention, the Alliance will ask for $50,000 for each week of delay between November 21, 2022 and today."  *Id*., at fn. 2.  Not only was the original threat by the Alliance unwarranted and not tied to any actual harm, but the Alliance's current Motion doubles that amount to $100,000 for each week between November 11 (not 21), 2022 and January 31, 2024 without any explanation or rationale other than the apparent effort by the Alliance and its counsel to capture headlines or obtain funding to further litigate against the City.  The Alliance is seeking

---

[12] In addition, while a court may assess *attorney's fees* as a sanction for the willful disobedience of a court order (*Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991), or where a party has acted in bad faith (*Id*., at 45-46), the Alliance has not requested any award of attorneys' fees, nor would it be entitled to same.  The City did not violate any Court Order, nor did it act in bad faith.

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

unrecoverable punitive damages against the City.  And just as punitive damages cannot be awarded against the City, neither can the drastic relief the Alliance seeks.  Cal. Govt. Code § 818; *Westlands Water Dist. v. Amoco Chem Co.*, 953 F.2d 1109, 1113 (9th Cir. 1991) (Cal. Govt. Code § 818 bars an award of punitive damages against a public entity).

Finally, a review of the Alliance's Proposed Order proves that it is not seeking to compel performance of any provision of the SA.  *See* Proposed Order, Dkt. 668-2. Rather, the Alliance is improperly seeking to re-write the Agreement and include additional terms to which the Parties did not agree, none of which are appropriate.  These includes (a) having the special masters "of both the City and the County agreements" provide quarterly written reports, (b) dictating what and how the City Attorney and Mayor's Offices are to report to City Council (which would violate the City Charter), (c) dictating how the City Attorney's Office should staff this matter, and (d) requiring the City to provide plans to reduce encampments in specific locations.  *See* Proposed Order. To be clear, there is no obligation to provide encampment-specific milestones in the Settlement Agreement, nor is the Alliance entitled under the Agreement to direct the City's efforts to encampments of particular interest to its members.

The Alliance is asking this Court to dictate to elected City officials how to perform the core functions of their office and how, when, and what to communicate with the City Council.  That request is shockingly intrusive, unwarranted, and outside the jurisdiction of this or any Court.  Not only does the relief requested impermissibly invade the core relationship between an attorney and her client, it also violates the sovereignty and independent relationships among elected offices under the City Charter.

## VII.  CONCLUSION

For the foregoing reasons, and for any reasons that may arise at the hearing, the City respectfully requests that the Alliance's Motion be denied in its entirety.

DATED: February 12, 2024      By: /s/  *Scott Marcus*
                              Scott Marcus, Chief Assistant City Attorney
                              Counsel for Defendant City of Los Angeles

OPPOSITION OF DEFENDANT CITY OF LOS ANGELES TO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS