Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (31) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel:  (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Intervenors Los Angeles Community Action Network and Los Angeles Catholic Worker*

*Additional Counsel Listed Below*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br>Plaintiff(s),<br><br>vs.<br><br>City of Los Angeles, et. al.<br>Defendant(s). | ) CASE NO. 20-CV-02291-DOC-KES<br>)<br>) Hon. David O. Carter<br>) Courtroom 1<br>)<br>)<br>) Intervenors' Opposition and Objection to Plaintiffs' Motion for Sanctions<br>) (Dkt. 668)<br>)<br>) Date: March 4, 2024<br>) Time: 8:30 a.m.<br>) Courtroom: 10A<br>)<br>) Complaint Filed:  March 10, 2020<br>)<br>)<br>)<br>)<br>) |

INTERVENORS'  OPPOSITION AND OBJECTION TO PLAINTIFFS' MOTION FOR SANCTIONS

*Additional Counsel*

**BROOKE WEITZMAN** SBN 301037
**WILLIAM WISE** SBN 109468
ELDER LAW AND DISABILITY
RIGHTS CENTER
1535 E 17th Street, Suite 110
Santa Ana, California 92705
t. 714-617–5353
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

*Attorneys for Orange County Catholic Worker*

## I.    INTRODUCTION

Although not parties to the settlement agreement or subject to the requested sanctions, Intervenors stand to be impacted by the Court's potential adoption of the LA Alliance's interpretation of the Settlement Agreement and the issuance of the requested sanctions.  As such, Intervenors oppose the LA Alliance's Motion for Order RE: Settlement Agreement Compliance and Sanctions.

First, as outlined below, the interpretation of the Settlement advanced by the LA Alliance is not consistent with nor required by the plain language of the Settlement and adopting the interpretation runs afoul of the procedures for adopting settlement agreements and amending them.  Second, even if the City was in violation of the Settlement, there would still be no basis for much of the relief requested by the LA Alliance, including orders compelling the City to target specific encampments and areas of the City and the payment of taxpayer funds to the LA Alliance that would otherwise go towards addressing homelessness.

Finally, Intervenors object to the lack of transparency related to the parties' ongoing settlement negotiations, which but for the LA Alliance's sanctions motion, would have remained hidden from Intervenors and members of the public.

## II.    THE LA ALLIANCE IS ATTEMPTING TO REWRITE THE SETTLEMENT THROUGH ITS SANCTIONS MOTION

### A. The Settlement Does Not Mandate the Creation of Deadlines and Milestones to Reduce Encampments

Although not framing the request as such, by seeking significant monetary sanctions not provided by the Settlement, the LA Alliance effectively requests this Court hold the City in contempt because the City did not provide milestones and deadlines for "engagement, cleaning and reduction of encampments in each Council District or Citywide" fast enough for the LA Alliance. Motion at 4.  Yet contrary to the LA Alliance's attempt to make it so, the Settlement simply does *not* require the City to provide deadlines and milestones for "encampment engagement, cleanups, and reductions," nor does it include a standalone requirement that the City reduce

encampments at all.

According to the plain language of the Settlement Section 5.2(ii) and (iv) requires only that the City develop milestones and deadlines for "the City's *plan* for encampment engagement, cleaning, and reduction in the City," i.e., the milestones and deadlines the City was obligated to provide was the deadline to come up with the plan to engage, clean, and reduce encampments, not as LA Alliance now asserts, to mandate the City come up with deadlines and milestones that mandate when and how many encampments the City will engage, clean, and reduce. This distinction is clear when compared to other provisions of Section 5.2, and in particular, Sections 5.2(i) and (iii), which require deadlines and milestones for "the City's *creation* of shelter and housing solutions." Settlement at 8:12-19.

The LA Alliance may argue that reading the plain language of the Settlement puts too fine a point on the distinction between Sections 5.2(i) and (iii) and (ii) and (iv) but that is exactly what the Court must do when ruling whether a party can be held in contempt for violating a Settlement. *See Vertex Distributing, Inc., v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892 (9th Cir. 1982).

The distinction in the agreement between the City's obligation to put forward deadlines and milestones related to the creation of housing and deadlines and milestones for the creation of a plan to engage, clean, and reduce encampments is a critical distinction. Such a distinction makes sense, given the need for the City to create housing and shelter before it will see a reduction in encampments in the City. On this point, the settlement is explicit that "no enforcement of public space regulations shall be taken against any individual unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws." Settlement at 6:2-4. Moreover, when Intervenors raised objections that the settlement agreement would lead to the displacement of unhoused individuals without providing housing, both the City and the LA Alliance assured this Court that the agreement did no such thing. This is consistent with LA Alliance attorney

---

INTERVENORS' OPPOSITION AND OBJECTION TO PLAINTIFFS' MOTION FOR SANCTIONS

2

Elizabeth Mitchell's representations to this Court during the hearing approving the settlement agreement, when she stated that "any person prior to any type of enforcement or any type of enforcement of -- of these sweeps, one, has to be given an option to vacate the premises or an opportunity for appropriate and adequate shelter or housing. So, not a single person under this agreement would ever face enforcement unless that was first met, unless offers were first met." Dkt. 441, 36:25-37:6. Therefore, in order to be consistent with Section Four of the agreement, the reduction of encampments will have to stem from the provision of shelter or housing, not from other enforcement efforts unrelated to shelter.

To this point, Section 5.2 is the only provision in the entire agreement that mentions "encampment engagement, cleanup, and reduction." Unlike the creation of housing and shelter units, which is covered by Section 3 of the Settlement and explicitly requires the City to "create a Required Number of housing or shelter solutions," there is no corresponding provision that requires the City to "engage, clean, and reduce" homeless encampments. In fact, the only provision that even mentions "encampment engagement, cleaning, and reduction" is Section 5.2. Moreover, unlike the provisions related to the creation of housing and shelter, which contains a formula for determining, to the bed, the number that must be created, the requirement that the City create a plan for the engagement, cleaning, and reduction of encampments contains no requirements regarding the number of encampments that must be reduced or require the City to agree to set a number. Instead, it requires only that the City create a plan, which by the LA Alliance's own accounting, the City did in October 2023.

While the LA Alliance may now want to mandate the number of encampments the City will reduce and tie that number to the number of beds the City is required to create, this was not mandated by the Settlement, nor does any plan that does so become an enforceable part of the agreement. On the contrary, it is presumed that the parties decided against including a requirement that the City reduce encampments,

since they clearly knew how to write in a specific requirement to take action by including a mandate to create a precise number of beds (or formula to derive the number) in other provisions in the agreement. *See U.S. v. Armour & Co.*, 402 U.S. 673, 679 (1971) (declining to look to the purpose of the consent decree to interpret the order in a way that was not required by the plain language of the agreement and noting that "[i]f the parties had agreed to such a prohibition, they could have chosen language that would have established the sort of prohibition that the Government now seeks."). As the Supreme Court in *U.S. v. Armour* noted, consent decrees like the one at issue in this litigation are the result of careful negotiation between the parties. They require interpretation of the negotiated language, rather than what the parties later represent the agreement was intended to effectuate.

This distinction is critical when it comes to LA Alliance's motion for sanctions. LA Alliance complains that the City should face sanctions because it failed, prior to January 31, 2024, to set out the specific number of encampments that would be "resolved" under the agreement. Granting the LA Alliance's request for sanctions based on the City's purported failure to provide the LA Alliance with benchmarks related to the clearing of encampments would serve to rewrite the Parties' agreement, simply because the LA Alliance believes the City should be required to take further actions to reduce encampments. Nothing in the Settlement or the Court's inherent authority to enforce the consent order allows it to do so here. *See Vertex Distributing, Inc., v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 892 (9th Cir. 1982) (declining to hold defendant in contempt for violation of the consent judgment and noting that the Court did not "wish to rewrite the parties' 'contract' by holding, in light of the purpose of only one of the parties to the consent judgment, that language which does not explicitly prohibit [the conduct in question] does in fact do so").

Throughout the litigation, the LA Alliance has represented itself as promoting housing and shelter for unhoused residents of Los Angeles; in their current filing, they now make it clear their "singular focus" in the litigation is "encampments and

---

the need to reduce them . . . ." Motion at 2. Regardless of whether their focus is reducing encampments, the Settlement as drafted does not include a standalone requirement that the City reduce encampments, except to the extent the reduction results from the provision of housing and shelters mandated by Section Three of the Settlement. The LA Alliance's "singular focus" on encampment reduction is irrelevant to interpretating the Settlement. "The scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Armour & Co.*, 402 U.S. at 682. Here, there is no requirement that the City reduce encampments, nor is there a requirement that it create milestones or deadlines to do so.

**B. The Settlement Does Not Allow the LA Alliance or this Court to Dictate Which Encampments the City Should Target for Reduction**

In addition to advancing an unfounded interpretation of the Settlement to justify its sanctions request, the LA Alliance goes further by demanding an order compelling specific performance by the City that is in no way allowed under the agreement. Intervenors specifically object to LA Alliance's request to this Court for an order compelling the City to specifically target unhoused residents' encampments in Skid Row and in two specific locations in Highland Park. Even if the Settlement called for the reduction of encampments, there is absolutely no support for the LA Alliance's request to target specific encampments.

First, although the LA Alliance finds its proverbial home in Skid Row, many of the property owners identified by the LA Alliance as members own property in Skid Row, and the lawsuit originally focused on Skid Row, nothing in the settlement specifically requires the City to target resources let alone target enforcement and displacement in Skid Row. The LA Alliance cannot use the Court's inherent enforcement authority to insert provisions into the settlement it could not obtain through the settlement negotiation process. *See Vertex Distributing, Inc.,* 689 F.2d at 892.

---

INTERVENORS' OPPOSITION AND OBJECTION TO PLAINTIFFS' MOTION FOR SANCTIONS

Nor does any provision allow the LA Alliance to ask this Court to mandate the City "reduce" encampments anywhere else in the City.  Yet in its motion, the LA Alliance targets two specific encampments in Highland Park, referring to the encampments as "some of the most dangerous encampments in the City" and requesting this Court order the City to focus resources on "resolving the encampments." Motion at 16-17.  To support its request, the LA Alliance makes unfounded accusations against the residents of the encampments, accusing the residents of the encampments, who are not parties to this litigation and unable to defend themselves, of engaging in illegal activity and causing harm to the community. These accusations are wholly without any evidentiary support whatsoever in the record.

Moreover, LA Alliance suggests it specifically demands the City target encampments in Highland Park to force the City to address the unequal distribution of resources and the City's "unwillingness to "direct the same level of encampment reduction energy to [a] working class neighborhood that is has devoted to the wealthier West side."  Motion at 17.  LA Alliance's portrayal of Highland Park as a "working class neighborhood" obfuscates the economic reality facing low-income housed and unhoused residents of the neighborhood.  Highland Park's status as an epicenter of gentrification in Los Angeles, where wealthier, often white homebuyers have changed the composition of the neighborhood is well-established.[1]  Just as the

[1] *See e.g.,* Aura Bogado, *Dispatch from Highland Park: Gentrification, Displacement and the Disappearance of Latino Businesses*, COLORLINES, Jan. 20, 2015, https://colorlines.com/article/dispatch-highland-park-gentrification-displacement-and-disappearance-latino-businesses/; Jan Lin, *Taking Back the Boulevard: Art, Activism, and Gentrification in Los Angeles* 60 (2019); Debra Kamin, *Highland Park, Los Angeles: A Watchful Eye on Gentrification*, THE NEW YORK TIMES, Oct. 22, 2019, https://www.nytimes.com/2019/10/22/realestate/highland-park-los-angeles-a-watchful-eye-on-gentrification.html. Andrew Gumbel*, Whitewashed: how*

LA Alliance's push to remove encampments in Skid Row is fueled by a push to aid in the gentrification of the community on behalf of its members, "reducing encampments" primarily serves to benefit property owners in the neighborhood, not the unhoused residents, many of whom were last housed in Highland Park but displaced and became homeless as a result of gentrification.[2]

Requesting this Court target specific encampments based on unfounded and wholly unsupported allegations against specific encampment residents not a party to this lawsuit constitutes an egregious abuse of the LA Alliance's role as Plaintiffs in this litigation. Even if the Settlement allowed the LA Alliance or the Court to compel the City to move to "reduce" specific encampments, the lack of evidentiary support to back up the LA Alliance's allegations would not.

### C. Re-writing the Settlement as Requested by the LA Alliance Raises Due Process Concerns

As outlined above, the Settlement adopted by this Court and integrated into its June 14, 2022 Order Approving Stipulated Dismissal and Proposed Settlement, Dkt 445, places no obligation on the City of Los Angeles to engage, clean, or reduce encampments in Los Angeles. Holding the City in contempt for taking too long to outline its plans to fulfill that requirement, when no such requirement exists, would effectively be rewriting the Settlement at the request of the LA Alliance. Doing so in response to a Sanctions motion, without otherwise following the procedural requirements for an amendment to the agreement, raises considerable due process concerns, not only for the City, but also Intervenors.

It is well established that Intervenors had a right to "present evidence and have its

---

*gentrification continues to erase LA's bold murals*, THE GUARDIAN, Jan. 26, 2020, https://www.theguardian.com/us-news/2020/jan/26/whitewashed-how-gentrification-continues-to-erase-las-bold-murals.

[2] *See e.g.*, Makenna Sievertson, NELA's New Face, available at https://medium.com/@makenna.sievertson.367/nelas-new-face-42de1340d3f7.

objections heard at the hearings on whether to approve the consent decree." *Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland,* 478 U.S. 501, 529 (U.S.,1986). This is meaningless where, as here, a party advances an interpretation of the agreement that is inconsistent with the plain language and then seeks sanctions for violation of that interpretation. It is also irrelevant that the City ultimately acquiesced to the LA Alliance's interpretation of the agreement by providing milestones and deadlines related to encampment reductions. The right to object to the Settlement does not rest with the City, but rather, with intervenors and others impacted by the agreement. While it is one thing for the parties to reach a side agreement regarding interpretation of the Settlement that is not mandated by the plain language of the agreement, when the Court agrees to enforce that interpretation, adopting that agreement and making it enforceable by contempt  amends the Settlement, which the Court may do only if it finds it meets the requirements of Federal Rule of Civil Procedure 60(b). *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992) (modification of a consent decree requires a "significant change in facts or law warrants the revision of the decree and that the proposed modification is suitably tailored to the changed circumstances").

## III.   THERE IS NO LEGAL SUPPORT FOR LA ALLIANCE'S ATTEMPTED MONEY GRAB OF TAXPAYER FUNDS

There is also no legal basis for the LA Alliance's demand for the transfer of over six million dollars in taxpayer funds away from the City's efforts to address homelessness and to the LA Alliance. The Settlement contains no provision for the payment of taxpayer funds if the City is in violation of the agreement. Nor is there any basis in common law contempt for such a sanction. Sanctions for civil contempt may be either coercive or compensatory in nature. *General Signal Corp. v. Donallco, Inc*., 787 F.2d 1376, 1380 (9th Cir. 1986). Awards of compensatory sanctions are limited to actual losses sustained for injuries resulting from the noncompliance. In re *Crystal Palace Gambling Hall, Inc*., 817 F.2d 1361, 1366 (9th Cir. 1987) (quoting *Falstaff Brewing*

*Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983). The LA Alliance has not shown or claimed that they have sustained any actual losses, let alone $6.4 million.

If the sanction is coercive and employed to coerce the defendant into compliance with a court's order, generally the minimum sanction to obtain compliance is to be imposed. *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992). Such sanctions are only possible if future action is relevant, as they are "conditional sanctions; they only operate if and when the person found in contempt violates the order in the future." *In re Magwood*, 785 F.2d 1077, 1082 (D.C. Cir. 1986). The LA Alliance is seeking sanctions only for past acts; they are ineligible for civil  sanctions.

If a sanction is sought instead to punish past defiance, it is a criminal sanction. *Falstaff*, 702 F.2d at 778. Prosecution for criminal contempt requires the heightened procedural safeguards afforded to criminal defendants. Whittaker Corp., 953 F.2d at 517. Criminal contempt is appropriate where the actor "defies public authority and willfully refuses his obedience." I*d., quoting United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947). The LA Alliance, though seeking sanctions for past acts, does not further an argument calling for criminal sanctions, nor do the present circumstances merit them. Their call for sanctions is baseless, as neither compensatory, nor coercive civil, nor punitive criminal sanctions can legally be granted in this circumstance.  Furthermore, even if a coercive sanction was legally appropriate—which it is not—the sanction would be payable to the court, not to the LA Alliance. *See, e.g., Woods v. O'Brien*, 78 F. Supp 221 (D. Mass., 1948).

### IV.    INTERVENORS OBJECT TO THE LACK OF TRANSPARENCY RELATED TO THE SETTLEMENT PROCEEDINGS

Finally, Intervenors continue to raise objections to the lack of transparency related to the City's compliance with the Settlement.  According to the LA Alliance, numerous documents have been created and given to the Court, yet these documents do not appear on the case's public docket. This includes the milestones related to the

creation of housing and shelter beds and now, milestones related to the reduction of homeless encampments.[3] As a result, Intervenors and the public have had no information about the milestones and goals set in the litigation, let alone the City's actions to meet those goals.  This is contrary to the transparency demanded by the Court and professed by the parties.

## V.  CONCLUSION

There is no basis for issuing the requested sanctions, and interpreting the agreement as requested by the LA Alliance would run afoul not only of the City's rights, but also the intervenors'. For the reasons outlined above, Plaintiffs' motion should not be granted.


Dated: February 12, 2024                    Respectfully submitted,

                                            Legal Aid Foundation of Los Angeles


                                            _____/s/ Shayla Myers_____
                                            Attorneys for Intervenors


                                            Law Office of Carol A. Sobel


                                            _____/s/ Carol A. Sobel_____
                                            Attorneys for Intervenors

---

[3] Intervenors and the public have access to the City's "encampment engagement, cleaning, and reduction" milestones and deadlines only because the LA Alliance included them in its motion for sanctions—a motion that was initially filed under Seal, even though doing so was a violation of this Court's Local Rules.  *See* Dkt. 663, Local Rule 77-5.2.2.  The LA Alliance re-filed its brief and exhibits, making the motion and exhibits available to the public and intervenors for the first time after the close of business on Wednesday, February 7, 2024.

INTERVENORS' OPPOSITION AND OBJECTION TO PLAINTIFFS' MOTION FOR SANCTIONS
10