

**FILED**
CLERK, U.S. DISTRICT COURT

2/29/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT**

LA ALLIANCE FOR HUMAN RIGHTS, et al.,

                Plaintiffs,

v.

CITY OF LOS ANGELES, et al.,          Case No. 2:20-CV-02291-DOC-KES

          Defendants.          Assigned to Judge David O. Carter

# **Independent Monitoring Report Year One (1)**

The Special Master Michele Martinez submits the attached Independent Monitor Report for Year one (1).

Date February 22, 2024        Michele Martinez
                          Special Master
                          Telephone: 714-887-9845
                          Email: Michele@MicheleCMartinez.com

1

2

## CERTIFICATE OF SERVICE

The undersigned Special Master herby certifies that, on February 22, 2024, she caused a true and correct copy of the foregoing Independent Monitoring Report 1 to be filed electronically with the Court's system, which caused an electronic copy of this filing to be served to all parties on record.

/s/Michele Martinez
Michele Martinez
Special Master
Telephone: 714-8879845
Email: Michele@ MichelecMartinez.com



AP PHOTO/DAMIAN DOVAGANES: FEB 4, 2021 SKID ROW HEARING, JUDGE CARTER IN THE MIDDLE, GENERAL JEFF, RIGHT AND MICHELE MARTINEZ, SPECIAL MASTER

# INDEPENDENT MONITORING REPORT 1

*Reporting Period July 1, 2022, through December 31, 2023*

February 22, 2024

## Roadmap

This report has been crafted with readability and accessibility in mind. Recognizing the comprehensive nature of the parties' reports, it focuses on showcasing compliance efforts during the initial reporting phase that require attention. As the first in a series of upcoming reports, it establishes the groundwork for comprehending the obligations set forth in the agreement, guiding readers through the monitoring process.

I begin this report with an introduction section that provides background about the settlement agreement and my role as the Special Master.

The next section, Compliance Activities, provides the following information regarding the reporting period for year one:

- An overview of monitoring the settlement agreement, including six sections with deadlines, targets, and goals the City must meet under the agreement for compliance
- A summary of the City's achievements and challenges
- Foundational paragraphs without deadlines that lay the groundwork for future compliance efforts
- Build a baseline understanding of current systems through data requests from all parties in this agreement

Finally, we conclude with a summary of our assessment and a preview of the upcoming work.
- Report on year one milestones, targets, goals , and deadlines

## Introduction

As the Special Master/Monitor, my primary role is to evaluate the City's compliance with the stipulations outlined in the *LA Alliance for Human Rights v. City of Los Angeles* Settlement Agreement. This report specifically focuses on the monitoring and compliance efforts conducted during year one of the five-year agreement. It encompasses an assessment of the City's adherence to each obligation specified in the agreement, an overview of some of the challenges faced by the City in fulfilling these obligations, and an updated projection of the forthcoming work required for the City to fully satisfy the terms of the agreement.

This first-year report provides activities and findings from the first reporting period from July 1, 2022, through December 31, 2023.

4

Specifically, consistent with the settlement agreement and throughout the sections of this report, we address the following:

- Monitor's efforts during the reporting period
- A description of each settlement agreement requirement
- A summary of the challenges facing the City's ability to achieve or complete compliance with the settlement agreement
- Monitors' recommendations regarding the City's future efforts to achieve compliance
- Obligations with which the City must comply under the Settlement Agreement include:
    - Housing and Shelter for the "city shelter appropriate"
    - Street Engagement - Council District and Citywide Engagement
    - Milestones - deadlines and targets for the creation of shelter or housing beds and encampment reductions
    - Dispute Resolution Process - parties will design a process that will allow a person experiencing homelessness ("PEH") to submit a complaint to the Court or special master concerning an offer of shelter or notice provided under this Agreement
    - Status updates - The City will provide regular status updates to the Court (at least quarterly) regarding its progress with this Agreement. In addition, the parties agree to engage a mutually agreed-upon third party to provide data collection and analysis and regular public reports on the City's compliance with the terms of this Agreement
    - Funding - Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion. The City agrees to petition the county, state, and federal government for additional funding, consider expediting public/private partnerships that utilize private capital and require no up-front costs to the City, and consider other possible funding mechanisms to pay for future housing, facilities, and services for PEH.

## **Background: LA Alliance Settlement Agreement**

In March 2020, the LA Alliance for Human Rights took legal action against the City and County of Los Angeles. The key allegations and claims in the lawsuit included:

- The homelessness crisis in LA has grown exponentially in recent years, yet the City and County have failed to implement effective solutions to provide shelter and address public health and safety issues.

- Allowing long-term homeless encampments has blocked sidewalks, increased crime and drug use, and spread disease. This has interfered with people's use of public spaces and private property.
- The conditions have negatively impacted businesses and property values. Plaintiffs allege that their properties are now nearly impossible to rent or sell due to the surrounding conditions.
- That the City and County have been negligent in their duties to maintain public spaces and address public health and nuisance issues.
- That the City and County have violated statutes requiring them to provide medical care for indigent populations.
- ADA and fair housing laws are being violated by blocking sidewalks and access for disabled individuals.
- Taxpayer funds allocated to address homelessness through measures like Proposition HHH and H have been misspent or wasted without significantly impacting the problem.

The lawsuit sought declaratory and injunctive relief, requiring the City and County to better address the homeless crisis, maintain public spaces, and clear sidewalk obstructions.

In May of 2020, the Honorable David O. Carter, U.S. District Court of Central District of California, issued a preliminary injunction requiring both the City and County of Los Angeles to relocate and shelter homeless individuals living near freeway overpasses, underpasses, and ramps because of the deadly hazards in the area. This resulted in the City and county agreeing to create 6,700 new housing solutions within 18 months. The City was required to open and maintain 6,000 NEW beds not covered by existing City-County agreements. The County provided the City $60 million in annual service funding, totaling up to $300 million over the five-year agreement based on the number of interventions open and occupied within 60 days of July 1st of each year.

In May of 2022, the LA Alliance and the City of LA reached a preliminary settlement agreement that would span for a duration of five years (June 2022 through June 2027). The Court approved the final settlement agreement in June 2022. I was appointed by the Judge Carter to serve as the Special Master/Monitor, entrusted with the responsibility of enforcing and overseeing the agreement. Equally important, I was also assigned the duty of assisting the Honorable Judge Andre Birotte in resolving any future disputes that may arise in relation to the interpretation, execution, or enforcement of the settlement agreement.

## The City of LA Achievements and Challenges

This section provides an overview of the City's efforts for the year one reporting period. I wish to thank the City staff and elected officials for being open to communication and feedback on the status of the settlement agreement during year one. During 2023, the City moved quickly to relocate unhoused individuals into various shelter solutions in a majority of the council districts.

As of September 30, 2023, the City has made significant strides in opening 2,347 beds or units. This accomplishment is commendable, but there is still much work ahead. Currently, the City has 6,108 beds or units in the pipeline, expected to be operational after 2027. This indicates that the City's journey towards reaching its target number of beds or units is not yet complete, with a current gap of 4,460.

The magnitude of this gap should not be underestimated, particularly in light of a recent presentation by the City's CAO, Matt Szabo, on February 21, 2024. During the presentation, it was revealed that the City is projected to face budget deficits, especially in the fiscal years 2025-2026. These deficits pose a potential threat to the sustainability of interim housing programs, which could have an impact on the binding settlement agreement. Therefore, it is crucial for the City to inform all involved parties and the Court about the current funding gaps and carefully consider the potential consequences for its obligations under the binding settlement agreement, both in the current reporting period and beyond. Furthermore, it is essential to assess how these funding gaps, in conjunction with the funds allocated for the Inside Safe Program, will affect the City's ability to fulfill its binding commitments. The City has a responsibility under the agreement to open and operate the 6,108 units currently in progress, as well as securing funding for the 4,460 beds or units that currently lack financial support. Given these challenges, it is imperative for the City to take proactive measures to bridge the funding gap and ensure the successful implementation of the agreed-upon beds or units.

Although the City did not meet its initial target goals for creating beds/units in each council district in the first year, progress has been made. For more detailed information on the current beds/units that are open and in progress, please refer to Exhibit 1: City - Road Map Alliance Milestones.

The landscape of compliance activities in the 2022/2023 period has been significantly shaped by a myriad of challenges and advancements. The City encountered unprecedented obstacles leading up to the final quarter report of 2022. Unanticipated changes in the makeup and leadership of the City Council caused widespread disruption throughout the City. Amidst this turmoil, an election was underway, poised to usher in

substantial changes to the City council and introduce a new mayor. These shifts prompted the Alliance and the City to agree to an extension to establish encampment reductions and plans by council district and Citywide in 2023.

Consequently, in January 2023, the Alliance initiated a crucial meeting with the City regarding Section 5.2 of the settlement agreement. Through constructive dialogues, a mutual understanding was reached, with the City committing to present new encampment milestones by October 1, 2023, allowing ample time for the new leadership and staff to shape these goals. Regrettably, the City failed to meet the deadline, delivering the milestones on October 3, 2023. Dissatisfied with the delays, the Alliance sought intervention from the Honorable Judge André Birotte Jr. and myself, the Special Master, to address the encampment milestones issue. Together, we engaged with all involved parties through extensive discussions before convening in court in January 2024 to resolve the issue.

Furthermore, at the beginning of January 2024, Judge Carter, Judge Birotte, and I received an invitation to a gathering hosted by Mayor Karen Bass, representatives from the Los Angeles Homeless Services Authority (LAHSA), and key City staff. The purpose of this meeting was to explore the Court's consideration of transitioning from district-specific encampment targets to a comprehensive Citywide approach in alignment with the overarching goals of the Mayor's Inside Safe Program.

The Mayor's team delivered a presentation (please see exhibit 2 Mayor's Office of Housing and Homelessness Solutions), encompassing the Inside Safe Program and the LA Alliance Settlement Agreement, the challenges associated with a council district strategy, and the achievements of the Inside Safe Program. We acknowledged the interaction and absorbed the fresh perspective presented, emphasizing the necessity of consultation with the Plaintiffs and City Council regarding any changes to the settlement agreement, as the Court did not have the authority to make any such changes.

In my capacity as the Special Master, I fielded numerous inquiries from Council Members concerning adjustments to the Alliance Agreement and their concerns about the lack of transparency surrounding the agreement's status. These concerns were relayed to the Court. Shortly thereafter, a dispute resolution session was convened in Court to address the encampment milestones, culminating in the approval of the district-specific encampment targets by the City Council and their subsequent submission to the Alliance and the court in mid-January 2024.

It is crucial to emphasize that despite the temporary disruption of compliance efforts caused by changes in City leadership, I, in my role as the Special Master, maintained

vigilant monitoring and observation of the City's advancement in fulfilling the settlement agreement obligations. Throughout the first year of monitoring, I, sometimes accompanied by Judge Carter, independently conducted on-site visits to observe encampment clean-ups and evaluate the effectiveness of various housing solutions across all Council Districts. During some of these visits, I discovered instances where a few unhoused individuals were being relocated without proper due process. Dialogues with Council Members and homeless individuals across various districts unveiled a concerning lack of knowledge about the dispute resolution process put in place by the parties and the Special Master. To the best of my understanding, it appears that Council Districts have yet to integrate the dispute resolution process. Should this assertion be inaccurate, I strongly urge the City to swiftly furnish the required documentation for the initial year, as stipulated in the agreement, to address this issue promptly.

Despite these challenges, the City has made significant progress in expanding housing solutions to a majority of Council Districts. However, I must caution the City that many of the new housing solutions in 2023, that are part of the Inside Safe Program will not be counted toward the settlement agreement because these housing solutions will not be occupiable after 2027.  The interim housing solutions from Inside Safe don't have the same requirements under the Alliance Settlement Agreement were all the housing solutions must be occupiable after the July of 2027 to count towards meeting the agreement.

I want to highlight the crucial discussions that took place in various City Council and committee meetings, especially those concerning the Housing and Poverty Committee meetings in 2023. Various Council Members shared their concerns about the progress of complying with the Alliance Settlement Agreement. As the Special Master, I have informed the Court of the apparent lack of communication and transparency with the City Council, who approved this settlement agreement. If the City Council is not kept in the loop about the Alliance Agreement's status, the public will also not be well-informed regarding an important issue for all Angelenos.

I will remain actively involved and informed about homelessness issues and updates regarding the Alliance settlement agreement. As per the Court's directive, I will continue to diligently observe all City Council/committee meetings, stay updated on Mayor-related news, monitor encampments, housing solutions, and engage with the public and City Council members, along with the Mayor's office, to ensure consistent communication and transparency.

Lastly, the vital elements of the settlement agreement revolve around data accessibility and performance requirements. I would highly advise the City to embrace a similar online platform and data portal utilized in the Inside Safe Program for the Alliance Settlement

Agreement. I would recommend the importance of collaboration with the Controller's Office, whose significant contributions in creating an interim housing and shelter bed availability map and conducting comprehensive analysis are truly invaluable. As the monitor, I stress the need to ensure that these data are easily accessible online. I applaud the City for its achievements in the initial year and look forward to working together in year 2.

## Compliance Report For Year One(1)

The settlement agreement outlines the terms and continuing jurisdiction in sections 2, 3, 4, 5, 6, and 7. The parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this settlement agreement.

## Section 3. Housing and Shelter for City Shelter-Appropriate Individuals

**3.1.** The City agrees to create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate *s*ixty percent (60%) of unsheltered City Shelter-Appropriate (including any PEH within the City whom the City can reasonably assist, meaning the individual: does not have a severe mental illness, and/or is not chronically homeless and has a substance use disorder or a chronic physical illness or disability requiring the need for professional medical care and support) People Experiencing Homelessness (PEH) within the City based on LAHSA 2022 Point in Time Count.

## Compliance Progress:

## Met Deadline (x)

The City created a Required Number of 12,915 on September 8, 2024.

_____

**3.2.** Subject to Constitutional requirements and legal mandates, the City may choose, at its sole discretion, any housing or shelter solution, *as long as the milestones are met.* The housing or shelter solutions may be government-and/or privately-funded as long as each offer is adequate for the individual. Accommodations shall be made for those who qualify as disabled under the Americans with Disabilities Act.

The City may not use any shelter/housing interventions toward the Settlement agreement that opened prior to the Settlement stater date of June 14, 2022, or any interventions used to satisfy the City's freeway homelessness roadmap agreement.

**Compliance Progress:**

**Met Obligation (x)**

The City has created various housing and shelter solutions in year one in most council districts.  Please note under 3.3, the City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City.

_____

**3.3.** The City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City.  The Required Number and 60% threshold is the minimum required by the agreement.

**Compliance Progress:**

**Partially Met Obligation (x)**

The progress made by the City in ensuring fair distribution of housing and shelter options across council districts is commendable. However, the Inside Safe Program, aimed at addressing homelessness, predominantly focuses on interim housing initiatives within a select few Council Districts. As of December 2023, the Inside Safe program has provided housing for 1,951 individuals in temporary hotels and motels located in a limited number of Council Districts. As mentioned above, there appears to be a lack of communication as some City Council Districts have expressed concerns about the City's compliance with the settlement agreement. If there are any discrepancies in how these housing accommodations are allocated within the program, I strongly urge transparency in sharing such information with City Councilmembers, the Court and the Special Master/Monitor. It is crucial that the City remains committed to implementing fair housing solutions by Council Districts, regardless of the specific homeless programs currently in place.

_____

**Section 4. Street Engagement**

**4.1.** City will continue to offer shelter or housing to City Shelter Appropriate PEH within the City and enforce public space regulations and health and safety laws consistent with

its own protocol (Street Engagement Strategy) and constitutional requirement. NO enforcement of public space regulations shall be taken against any individual unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws.

**4.2.** Council District-wide Engagement, Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulation and ordinances within that entire Council District as to those individuals who refuse an offer of shelter or housing/ and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce District-Wide. Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of unsheltered   in a council district, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing/ or to relocate to an alternative location consistent with applicable laws and this agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

**4.3.** City-wide Engagement, Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number, the City, in its sole discretion, may implement and enforce pubic space regulation and ordinance throughout the City as to those individuals who refuse an offer of shelter or housing/ and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce District-Wide. Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of unsheltered in a council district, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing/ or to relocate to an alternative location consistent with applicable laws and this agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

**Compliance Progress:**

**Partially Met Obligation (x)**

12

The primary goal of Section 4 Street engagement is to guarantee complete adherence to the Council's district-by-district method, ensuring equitable participation from every Council District. With the Inside Safe Program, the City has actively pursued a comprehensive City-wide plan to boost street engagement. If the City considers shifting away from the current Council District-based model, it is essential to engage in conversations with both the Plaintiffs and the City Council. A collaborative dialogue is crucial for the Court to determine the City's compliance with the obligations outlined in Section 4 of the Street Engagement Strategy.

_____

## Section 5. Milestones and Deadlines

**5.1.** Within 30 days from the date information from the 2022 Point In time (PIT) count is confirmed by LAHSA and released, the City will calculate the required number
and provide its calculation to the Plaintiffs.

## Compliance Progress:

**Milestone Deadline:**  Within 30 days from the release date from LAHSA.

## Met Deadline (X)

The City did meet the within 30 days of LAHSA's confirmation of the 2022 PIT homeless count. The calculation of the required number was submitted on October 6, 2022, of 12,915 and agreed upon by the parties. It was docketed with the Court on October 14, 2022.

**Table 1.  City Shelter Appropriate 60% PEH Council District for year one (1) (Dkts. 539, 598, 652, 660)**

| Council Districts | 60 % PEH Goal | Beds/Units Open Dkt. 539-3/31/23 | Beds/Units Open Dkt. 598 6/30/23 | Beds/ Units Open Dkt. 652 9/30/23 | Bed/ Units Open Dkt. 660 12/31/23 | Delta of 60% PEH Goal | Bed Units in Process Dkt. 660 12/31/23 |
|---|---|---|---|---|---|---|---|
| CD 1. Hernandez | 1,075 | 124 | 305 | 441 | 494 | 581 | 656 |
| CD 2. Krekorian | 419 | 0 | 0 | 51 | 51 | 368 | 143 |
| CD3. Blumenfield | 410 | 13 | 54 | 54 | 54 | 356 | 350 |
| CD4. Rayman | 406 | 143 | 143 | 143 | 197 | 209 | 121 |

| Council Districts | 60 % PEH Goal | Beds/Units Open Dkt. 539- 3/31/23 | Beds/Units Open Dkt. 598 6/30/23 | Beds/ Units Open Dkt. 652 9/30/23 | Bed/ Units Open Dkt. 660 12/31/23 | Delta of 60% PEH Goal | Bed Units in Process Dkt. 660 12/31/23 |
|---|---|---|---|---|---|---|---|
| CD5. Yaroslavsky | 347 | 50 | 50 | 99 | 99 | 248 | 111 |
| CD6. Padilla | 730 | 28 | 76 | 111 | 189 | 541 | 220 |
| CD7. Rodriguez | 781 | 136 | 136 | 136 | 136 | 645 | 0 |
| CD8. Dawson | 574 | 40 | 225 | 322 | 322 | 252 | 541 |
| CD9 Price | 1504 | 48 | 48 | 82 | 82 | 1,422 | 355 |
| CD10 Hutt | 628 | 111 | 169 | 189 | 263 | 365 | 221 |
| CD 11 Park | 734 | 59 | 179 | 179 | 179 | 555 | 438 |
| CD 12 Lee | 415 | 0 | 0 | 0 | 0 | 415 | 379 |
| CD 13 Martinez | 1,020 | 0 | 180 | 180 | 241 | 779 | 725 |
| CD 14 De Leon | 2,941 | 81 | 81 | 258 | 258 | 2,683 | 1022 |
| CD 15 McOsker | 931 | 102 | 102 | 102 | 245 | 686 | 458 |
| Totals | 12915 | 935 | 1748 | 2347 | 2810 | 10105 | 5740 |

**5.2.** Thereafter the City will create plans and develop milestones, and deadlines for:

(i) The City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number;

(ii) The City's plan for encampment engagement, cleaning, and reduction in each Council District;

(iii) The City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH throughout the City as determined by the Required Number ; and

(iv) The City's plan for encampment engagement, cleaning and reduction in the City. The City will provide the plans, milestones and deadlines, and will consult the court as necessary.

The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with the established plans, milestones and deadlines.

**Compliance Progress:**

**Met Deadlines and Obligations Partially (X )**

The City partially met section 5.2 deadlines and obligations for (i), (ii), (iii) (iv) to create plans and develop milestones and deadlines.

(i)  The City did meet the creation of housing and shelter plan solutions in each *council district* on October 6, 2022, both the City and the Alliance agreed upon the required number of 12,915.

(ii) The City did not submit plans for encampment engagement, cleaning, in each council district.  Although no hard deadline existed for the plans' submission, it was still an obligation that should have been met especially if the City started its street engagement strategy.

(iii) The City did meet the creation of shelter and housing plan throughout the City and submitted that in November 2022.

(iv) The City did not submit a plan for encampment reductions, engagement, cleaning and deadlines in each Council District or city-wide. The obligation in this section states clearly that the City will provide the plans, milestones and deadlines, and will consult the Court as necessary. These plans, milestones and deadlines are important in year one as they are a road map that will help keep the City accountable to all the other terms in the agreement.

Understanding the challenges the City faced in October 2022 and new elected leadership in November 2022, the Alliance and the City agreed to a January 2023 extension of time to discuss the why this obligation was not being met by the City. The parties met and conferred between January 2023 through May of 2023, when the City confirmed it would provide the milestones by October 1, 2023. The Alliance did receive the City's Encampment Engagement plan on October 3rd but the Alliance was not satisfied and the parties could not reach agreement because the plan did not include deadlines, milestones and/or a breakdown by council district or city-wide. Soon after, I was contacted by the Alliance requesting Judge Andre Birotte and I to assist in resolving the dispute the parties had regarding the milestones and plans for encampment reductions. We moved forward with a Zoom meeting and a few more exchanges through the end of the year.  Judge Andre Birotte and I requested that the City provide to the Court the plan by the end of

Nov 2023. On November 29, 2023, the city did submit a revised Encampment Engagement Plans and Milestones to the Court that was not satisfactory to the Alliance.

At this point, Judge David O. Carter set a dispute hearing for December 14, 2023. Both parties agreed to a required number and milestones for the encampment resolutions and plan and were asked to submit this agreed upon deadlines and milestones to the Court by December 29, 2023.

Those updated plans were submitted the court on January 7, 2023 and were not satisfactory to the Alliance. In a last effort to try to resolve the objections raised by the Alliance and any potential next steps on moving forward with the plans, milestones and the numbers in council districts and city-wide, both Judge Andre Birotte and I met with the parties in person on January 17th, 2024.

On January 31, 2024, the City Council approved the milestones and the City provided the confirmed proposal of 9,800 encampment reductions milestones over 4 years, and provided the updated district by district milestones.

**Table 2: 60 % Encampment Resolutions Per Council Districts Targets**

| Council Districts | Period Goal July-Dec 22 | Period Goal Jan-June 23 | Period Goal July-Dec 23 | Period Goal Jan-June 24 | Period Goal July - Dec 24 | Period Goal Jan-June 25 | Period Goal July-Dec 25 | Date Goal Jan-June 26 | Total By CD'S all Periods |
|---|---|---|---|---|---|---|---|---|---|
| CD 1. Hernandez | 71 | 88 | 88 | 110 | 110 | 132 | 132 | 132 | **863** |
| CD 2. Krekorian | 31 | 38 | 38 | 48 | 48 | 57 | 57 | 57 | **374** |
| CD3. Blumenfield | 24 | 30 | 30 | 37 | 37 | 44 | 44 | 44 | **290** |
| CD4. Rayman | 24 | 30 | 30 | 38 | 38 | 45 | 45 | 45 | **295** |
| CD5. Yaroslavsky | 23 | 29 | 29 | 37 | 37 | 44 | 44 | 44 | **287** |
| CD6. Padilla | 45 | 56 | 56 | 70 | 70 | 84 | 84 | 84 | **549** |
| CD7. Rodriguez | 42 | 52 | 52 | 65 | 65 | 78 | 78 | 78 | **510** |
| CD8. Dawson | 38 | 47 | 47 | 59 | 59 | 70 | 70 | 70 | **460** |
| CD9 Price | 83 | 103 | 103 | 129 | 129 | 155 | 155 | 155 | **1012** |
| CD10 Hutt | 40 | 50 | 50 | 62 | 62 | 75 | 75 | 75 | **489** |

16

| Council Districts | Period Goal July-Dec 22 | Period Goal Jan-June 23 | Period Goal July-Dec 23 | Period Goal Jan-June 24 | Period Goal July - Dec 24 | Period Goal Jan-June 25 | Period Goal July-Dec 25 | Date Goal Jan-June 26 | Total By CD'S all Periods |
|---|---|---|---|---|---|---|---|---|---|
| CD 11 Park | 48 | 60 | 60 | 75 | 75 | 90 | 90 | 90 | **588** |
| CD 12 Lee | 27 | 33 | 33 | 41 | 41 | 50 | 50 | 50 | **325** |
| CD 13 Martinez | 66 | 82 | 82 | 102 | 102 | 123 | 123 | 123 | **803** |
| CD 14 De Leon | 184 | 235 | 235 | 293 | 293 | 352 | 352 | 352 | **2296** |
| CD 15 McOsker | 54 | 67 | 67 | 84 | 84 | 101 | 101 | 101 | **659** |
| **Grand Totals** | **800** | **1000** | **1000** | **1250** | **1250** | **1500** | **1500** | **1500** | **9800** |

## Section 6. Street Engagement Dispute Resolution Process

The parties agree to design, in conjunction with the Court and/or Special Master, a dispute resolution process for individuals who are subject to the City's Street Engagement Strategy in connection with the City's performance of this Agreement, pursuant to paragraph 4.

**Compliance Progress:**

**Target/Goals Obligations**: Design a dispute resolution process for individuals who are subject to the city's street engagement strategy.

**Met Obligation Partially (x)**

In October 2022, the City established a dispute resolution process with the Alliance and the Special Master. Please see Exhibit 3 Dispute Resolution Process. It is crucial to note that the city has only partially met this obligation.

In addition, the City has not yet updated the Court or the Alliance on how dispute resolution is managed in each Council District or Citywide, particularly concerning the engagement process with encampments and the hiring of third-party facilitators for training.

17

These facilitators, once trained, should assist individuals experiencing homelessness when shelter is offered. As the Special Master, I have not been contacted by any facilitators for resolving housing disputes or informed about the training vendor's hiring.

If the city has engaged a vendor, they must disclose the vendor's details, hiring date, and the engagement process for facilitator assistance promptly.

The City is also required to provide documentation of dispute resolution activities for review by the Special Master for the first year. The city should provide documentation of its dispute resolution activities by the March 22, 2024.

_____

## Section 7: Status Updates

The City will provide quarterly status updates to the Court regarding its progress with this agreement. These updates would include information on the progress made in implementing the agreement, such as:

- The number of housing or shelter opportunities created or otherwise obtained.
- The number of beds or opportunities offered and the numbers of bed opportunities currently available in each council district.
- The City will work with LAHSA to include in the quarterly status updates, to the extent possible:
- The number of PEH engaged
- The number of PEH who have accepted offers of shelter or housing
- The number of PEH who have rejected offers of shelter or housing and why offers were rejected
- The number of encampments in each council district

## Compliance Progress:

Quarterly status updates regarding its progress with the obligations of the agreement.

## Met Obligation Partially (x)

Quarterly status updates have been submitted to the Court on time, but these reports only contain the number of housing or shelter opportunities created or otherwise obtained, the

number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District for each quarter thus far.

The City is missing other key progress areas that must be reported to the Court and the public quarterly.

The City has yet to provide the court with the following information:
- The number of PEH who have accepted offers of shelter or housing
- The number of PEH who have rejected offers of shelter or housing and why offers were rejected
- The number of encampments in each council district

_____

**Section 7.2 of the agreement states that the parties will engage a mutually agreed-upon third party to provide:**

- Data collection
- Analysis
- Comments
- Regular public reports on the City's compliance with the terms of the agreement

**Compliance Progress:**

Did the City engage a mutually agreed upon third party to provide data collection, analysis, comments and provide regular public reports on city's compliance with the terms of the agreement?

**Met Obligation Partially (x)**

Initial discussions were initiated with the City and the Alliance, yet it appears that a third party has not been hired to gather the crucial data required for this agreement. It is paramount that the City adheres to these vital provisions to ensure full compliance with all aspects of the agreement. While deadlines may not be specified, it is crucial for the City to disclose details about its existing data collection systems and make the data gathering, analysis, and feedback easily accessible for transparency and accountability purposes.

Consequently, the absence of reporting or sharing this information needs to be rectified through an accessible platform. Notably, I have noticed that the City has a data dashboard

and various metrics for the Inside Safe Program; the City should consider a similar platform should be established for the Alliance Settlement Agreement. Moreover, accessibility of data pertaining to housing solutions and other mandated provisions is essential for both the court and the public to have insight into meeting the agreement's obligations. Ensuring accurate information on shelter availability and usage, without compromising individual privacy, is critical for the City to adhere to the settlement (tracking touches and not people in housing solutions must be addressed). A precise understanding of the number of beds available and their utilization at any given time is imperative. Equally important is granting the Court and the general public comprehensive access to data on the housing interventions implemented to fulfill the agreement's terms. The City's compliance with the settlement hinges significantly on the availability and efficient use of shelters and alternative housing options. Therefore, obtaining dependable information on bed availability and usage trends is essential for an accurate assessment of the situation at any point in time.

## Conclusion and Looking Ahead to Special Master Monitor Report 2

For the first reporting period (July 1, 2022, through December 2023), the City did meet major milestones but only partially met other key obligations in the agreement that were important in year one due to the alignment with the bed and encampment reductions plans, milestones, and deadlines.  As mentioned at the beginning of the report, the City faced various challenges in late 2023, that caused delays in the production of data and other reporting required under the agreement.  The parties and I will continue to work to ensure the necessary data and information are included moving forward. The City has much work ahead, but I am encouraged by the efforts made thus far and the strides they continue to make to meet the terms of the agreement.

As we move into year two of the reporting period, I wish to draw attention to a few key observations and future considerations regarding data and performance metrics for the City's consideration.

In my observations of the Homeless and Poverty Committee meetings discussing the Inside Safe program's progress, a notable concern arose regarding the alignment of program efforts with the City's obligations under the Alliance Settlement. This raised apprehension as metrics revealed the shifting of unhoused individuals between council districts, deviating from the Settlement's goal of fair distribution and meeting PEH targets. The City's recent opposition motion against the Alliance highlighted a few discrepancies in housing solutions within specific Council Districts with the Inside Safe Program. The data from Inside Safe from the January 19, 2024 report, and the City's Alliance Settlement Quarterly Report ending December 31, 2023, highlights a few

20

disparities, such as the relocation of 91 homeless individuals from district 12 to district 14 without adequate interventions in their own council district for year 1. The transfer of unsheltered individuals without proper housing solutions in their own district undermines the equitable distribution per council district.

While acknowledging the significance of encampment operations in aiding individuals off the streets promptly with the Inside Safe Program, it is crucial to ensure adherence to dispute resolution processes outlined in the Settlement Agreement. Upholding protocols safeguards the rights of homeless individuals and ensures the City's actions align with agreed upon terms. Addressing these concerns is paramount for compliance with the Settlement Agreement, emphasizing the importance of transparency and accountability in the City's efforts moving forward.

It is crucial for the City to prioritize the gathering and reporting of data to ensure the monitoring of progress and compliance. This includes overseeing the occupancy and departures of housing accommodations, as well as the exact count of individuals receiving housing and services without any unnecessary duplications or repetitions of counting for the same person in the system. Accurate and current data on shelter usage and bed availability are essential for effective measurement criteria. In terms of collaborating with City partners to tackle homelessness, homeless service providers should provide details on the entry and exit points of individuals in housing solutions, along with the expenses per homeless individual. This approach will offer a clear depiction of the cost per individual, real-time availability of beds, and utilization rates at any given moment.

Ensuring accountability and promoting transparency in the monitoring process are key components of upcoming reports. Additionally, my goal is to enhance communication channels with elected representatives, offering consistent insights and updates on the monitoring strategy, actions with the Court, and stakeholders.

All participants involved in this agreement recognize the urgency and the pressing need for swift action. They understand the complexity of the issue of homelessness, calling for a holistic approach. Through collaboration, innovation, and a shared commitment to compassion and empathy, all parties and the Court stand firm in their determination to advance efforts in addressing street homelessness for all individuals in Los Angeles.

Looking toward the Reporting Period of Year Two (2), here are some suggestions for the City to review, the Court to contemplate, and the LA Alliance to consider:

- Encampment Resolution Progress Report for each Council District for year one

22

- Include the number of People Experiencing Homelessness (PEH) engaged in all future  Quarterly Reports
- Include the number of PEH who have rejected offers of shelter or housing and why offers were rejected in all future Quarterly Reports
    - Provide a status update on Data collection, Analysis, and Comments and next steps regarding data tracking tools
    - Provide readily accessible regular public reports on the City's compliance with the terms of the agreement online
    - Provide documentation of the dispute resolution activities to the Special Master for year one for review and moving forward
    - Collaboration with the Controller's Office on interim and shelter map data in real-time for accuracy in bed availability
    - Provide vendor and expenses incurred for the Alliance Agreement, similar to  the Inside Safe Program

## EXHIBIT 1: City - Roadmap Alliance Milestones

**ROADMAP ALLIANCE MILESTONES**

| Roadmap Interventions Open and Occupiable (1) | Council District | As of: 11/9/2022 | FY 2022-23 | | | | | FY 2023-24 | | | | | FY 2024-25 | | | | | FY 2025-26 | | | | | FY 2026-27 | | | | | Overall Total | Goal | Current Delta |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Q1 | Q2 | Q3 | Q4 | FY Total | Q1 | Q2 | Q3 | Q4 | FY Total | Q1 | Q2 | Q3 | Q4 | FY Total | Q1 | Q2 | Q3 | Q4 | FY Total | Q1 | Q2 | Q3 | Q4 | FY Total | | | |
| 1,461 | All CDs | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 106 | 1 | - | 0 | 350 | 65 | 72 | 487 | 62 | 53 | 0 | 63 | 178 | 0 | 47 | 52 | 54 | 153 | 0 | 0 | 0 | 142 | 142 | 0 | 0 | 0 | 143 | 143 | 1,103 | 1,103 | -285 |
| | | Interim Housing | 0 | 0 | 65 | 0 | 65 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 65 | | |
| | | Permanent Housing | 0 | 350 | 0 | 72 | 422 | 62 | 53 | 0 | 63 | 178 | 0 | 47 | 52 | 54 | 153 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 753 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 610 | 2 | - | 0 | 48 | 51 | 0 | 99 | 0 | 0 | 32 | 0 | 32 | 0 | 63 | 0 | 0 | 63 | 0 | 0 | 0 | 147 | 147 | 0 | 0 | 0 | 93 | 93 | 434 | 434 | -185 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 48 | 51 | 0 | 99 | 0 | 0 | 32 | 0 | 32 | 0 | 63 | 0 | 0 | 63 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 | 0 | 0 | 249 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 274 | 3 | - | 0 | 13 | 0 | 273 | 286 | 44 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 | 0 | 63 | 0 | 0 | 44 | 107 | 0 | 0 | 0 | 44 | 44 | 481 | 481 | -88 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 13 | 0 | 243 | 256 | 44 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 | 0 | 63 | 0 | 0 | 0 | 63 | 0 | 0 | 0 | 0 | 0 | 363 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 30 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | | |
| 287 | 4 | - | 0 | 143 | 0 | 54 | 197 | 61 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 21 | 21 | 0 | 0 | 0 | 21 | 21 | 400 | 400 | -142 |
| | | Interim Housing | 0 | 143 | 0 | 0 | 143 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 143 | | |
| | | Permanent Housing | 0 | 0 | 0 | 54 | 54 | 61 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 115 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 81 | 5 | - | 0 | 50 | 0 | 0 | 50 | 49 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 107 | 107 | 0 | 0 | 0 | 108 | 108 | 314 | 314 | -215 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 50 | 0 | 0 | 50 | 49 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 609 | 6 | - | 0 | 83 | 76 | 104 | 263 | 0 | 197 | 89 | 0 | 286 | 0 | 0 | 0 | 0 | 0 | 90 | 33 | 24 | 0 | 147 | 108 | 0 | 0 | 0 | 108 | 804 | 730 | 74 |
| | | Interim Housing | 0 | 83 | 0 | 0 | 83 | 0 | 148 | 0 | 0 | 148 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 | | |
| | | Permanent Housing | 0 | 0 | 76 | 104 | 180 | 0 | 49 | 89 | 0 | 138 | 0 | 0 | 0 | 0 | 0 | 90 | 33 | 24 | 0 | 147 | 108 | 0 | 0 | 0 | 108 | 573 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 86 | 7 | - | 0 | 136 | 0 | 0 | 136 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 322 | 322 | 0 | 0 | 0 | 323 | 323 | 781 | 781 | -645 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 136 | 0 | 0 | 136 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 82 | 8 | - | 0 | 182 | 97 | 180 | 459 | 0 | 0 | 0 | 45 | 45 | 36 | 80 | 0 | 45 | 161 | 26 | 85 | 0 | 0 | 111 | 0 | 0 | 0 | 0 | 0 | 776 | 574 | 202 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 182 | 97 | 180 | 459 | 0 | 0 | 0 | 45 | 45 | 36 | 80 | 0 | 45 | 161 | 26 | 85 | 0 | 0 | 111 | 0 | 0 | 0 | 0 | 0 | 776 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 420 | 9 | - | 0 | 141 | 51 | 0 | 192 | 56 | 0 | 31 | 31 | 118 | 56 | 0 | 0 | 100 | 156 | 41 | 0 | 0 | 498 | 539 | 0 | 0 | 0 | 499 | 499 | 1,504 | 1,504 | -1,097 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 141 | 51 | 0 | 192 | 56 | 0 | 31 | 31 | 118 | 56 | 0 | 0 | 0 | 56 | 41 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | 0 | 407 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 160 | 10 | - | 0 | 147 | 94 | 0 | 241 | 88 | 20 | 20 | 0 | 128 | 0 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 65 | 158 | 0 | 0 | 0 | 65 | 65 | 592 | 592 | -130 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 147 | 94 | 0 | 241 | 88 | 20 | 20 | 0 | 128 | 0 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 | 0 | 462 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 136 | 11 | - | 0 | 67 | 112 | 131 | 310 | 0 | 0 | 73 | 0 | 73 | 39 | 133 | 0 | 0 | 172 | 0 | 0 | 0 | 89 | 89 | 0 | 0 | 0 | 90 | 90 | 734 | 734 | -179 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 67 | 112 | 131 | 310 | 0 | 0 | 73 | 0 | 73 | 39 | 133 | 0 | 0 | 172 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 555 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 202 | 12 | - | 0 | 0 | 0 | 115 | 115 | 0 | 54 | 0 | 0 | 54 | 0 | 0 | 0 | 100 | 100 | 99 | 0 | 0 | 27 | 126 | 0 | 0 | 0 | 27 | 27 | 422 | 422 | -154 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 0 | 0 | 115 | 115 | 0 | 54 | 0 | 0 | 54 | 0 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 | 0 | 268 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 355 | 13 | - | 0 | 59 | 63 | 67 | 189 | 20 | 157 | 145 | 0 | 322 | 111 | 32 | 0 | 0 | 143 | 18 | 0 | 145 | 104 | 267 | 0 | 0 | 0 | 105 | 105 | 1,026 | 1,026 | -209 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 59 | 63 | 67 | 189 | 20 | 157 | 145 | 0 | 322 | 111 | 32 | 0 | 0 | 143 | 18 | 0 | 145 | 0 | 163 | 0 | 0 | 0 | 0 | 0 | 817 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 1,360 | 14 | - | 0 | 101 | 251 | 0 | 352 | 58 | 513 | 0 | 83 | 654 | 43 | 44 | 16 | 0 | 103 | 0 | 148 | 0 | 810 | 958 | 0 | 0 | 0 | 811 | 811 | 2,878 | 2,878 | -1,621 |
| | | Interim Housing | 0 | 0 | 74 | 0 | 74 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 | | |
| | | Permanent Housing | 0 | 101 | 177 | 0 | 278 | 58 | 513 | 0 | 83 | 654 | 43 | 44 | 16 | 0 | 103 | 0 | 148 | 0 | 0 | 148 | 0 | 0 | 0 | 0 | 0 | 1183 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 277 | 15 | - | 0 | 102 | 0 | 222 | 324 | 0 | 58 | 108 | 40 | 206 | 0 | 80 | 0 | 0 | 80 | 0 | 83 | 30 | 104 | 217 | 0 | 0 | 0 | 104 | 104 | 931 | 931 | -208 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 102 | 0 | 222 | 324 | 0 | 58 | 108 | 40 | 206 | 0 | 80 | 0 | 0 | 80 | 0 | 83 | 30 | 0 | 113 | 0 | 0 | 0 | 0 | 0 | 723 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 6,506 | Totals | | 0 | 1,622 | 860 | 1,218 | 3,700 | 438 | 1,052 | 498 | 262 | 2,250 | 285 | 479 | 68 | 399 | 1,231 | 430 | 349 | 199 | 2,480 | 3,458 | 108 | 0 | 0 | 2,433 | 2,541 | 13,180 | 12,904 | -5,158 |

(1) Number reported under "All CDs" represents the point-in-time number of Rapid Rehousing/Shared Housing slots in use as of 9/30/2022 out of 2,000 slots funded by the City under the Roadmap agreement

(2) Other Interventions may include rental assistance/rapid rehousing; family reunification; safe parking; safe sleeping/camping

24

# EXHIBIT 2

PDF attached with report



# EXHIBIT 3

**DISPUTE RESOLUTION PROCESS**

This Dispute Resolution Process (DRP) is created pursuant to Paragraph 6 of the Settlement Agreement and applies to the resolution of disputes raised by individual Persons Experiencing Homelessness (PEH) in connection with the City's performance of paragraph 4 of the Settlement Agreement. Consistent with Section 4, this DRP applies only to enforcement of District-wide or City-wide prohibitions on sitting, lying, sleeping or camping in public. Neither Section 4 nor this DRP apply to enforcement of any time, place, or manner regulation of sitting, lying, sleeping, camping, or storing, using, maintaining or placing personal property in public.

**Dispute Resolution**

The City will ensure that third party personnel with training in dispute resolution facilitation involving homelessness (Facilitators) are available to individual PEH at or near the time of the offer of shelter to PEH. Facilitators will be reasonably available and may be present at an encampment site or by calling 311.

Facilitators will assist individual PEH in the resolution of any legitimate dispute claimed by the PEH relating to an offer of appropriate shelter. Facilitators will coordinate any proposed resolution with on-site outreach workers and/or other service providers.

The goal of dispute resolution is to resolve legitimate disputes that arise in the shelter process by exploring in good faith any appropriate shelter resources along with effectively communicating with the PEH.

Factors to Consider in resolving disputes relating to appropriate shelter:

1. Type of shelter, including but not limited to:
    a. Community/location, including proximity to services already receiving and/or work location
    b. Pets
    c. Size and makeup of family unit (whether shelter allows for spouse/domestic partner to stay together or is appropriate facility for children)
    d. Need for separate quarters for men and women, if applicable
2. Type of services available, including but not limited to:
    a. Does PEH need on-site mental health, substance abuse and addiction, medical, or other specialized services?
    b. Can the shelter reasonably accommodate the PEH's mental or physical needs or disabilities?

If facilitation does not resolve the dispute, the Special Master will make the final determination concerning the appropriate resolution.

The Special Master may, in his or her discretion, refer any dispute to the Court for consideration and resolution.

**Administration**

Training and Oversight:

The Facilitator shall be approved by the parties. The parties shall also approve the vendor to train the Facilitators. Any dispute regarding the identity of the Facilitator or training vendor may be referred by the parties to the Special Master for final resolution.

(*The City envisions using an existing mediation program to provide the facilitators, maybe an organization from the County's list of approved DRPs. The City also thinks the facilitators should be trained by a professional mediator/trainer under the supervision of the Special Master. We've had preliminary (i.e. off the record) discussions with Maia Ferdman from Bridges Intergroup Relations Consulting, who created a mediation framework for outreach workers, activists, PEH and City personnel in CD 10. We're happy to take other suggestions*)

Coordination by the City:

The City shall establish a process for the engagement by PEH of assistance from the Facilitators. This process may be coordinated through a centralized person or office within the City (i.e. CAO / UHRC).

Documentation of dispute resolution process, including outcome:

Facilitators will document their activities and provide reports to the City's centralized person or office. Reports shall be made available to the Special Master upon request.

The parties may agree to modifications of this DRP, in writing.

25