# Funding for Homeless Initiatives

| SOURCE | AMOUNT |
|---|---|
| STATE FUNDING EXPENDED IN LAST 3 YEARS (per State Auditor Elaine Howle) | $13 billion |
| LA CITY PROPOSTION HHH FUNDING | $1.2 billion |
| LA COUNTY MEASURE H FUNDING | $3.5 billion |
| PROPOSITION J FUNDING | Up to $900 million per year |
| GOVERNOR NEWSOM'S PLEDGED BUDGET | $12 billion over five years |
| ADDITIONAL CALTRANS BUDGET | $1.5 billion |
| LA HOMELESS REVENUE, 2019-20 | $2.6 billion expended |
| PROJECT ROOMKEY | 100% FEMA Reimbursement available, not yet applied for |
| AMERICAN RESCUE PLAN | $1.3 billion |
| LAHSA | ? |
| 2020 BUDGET ROLLOVER | $160 million |

# State Auditor Releases Scathing Audit of the Failure to Mitigate Homelessness in California

*'CA has the largest homeless population in the nation, but its approach to addressing homelessness is disjointed'*

By Katy Grimes, February 18, 2021 12:43 pm

California State Auditor Elaine Howle recently released a **rather scathing audit** of the management or mismanagement of Homelessness in California. She said that the state continues to have the largest homeless population in the nation "likely in part because its approach to addressing homelessness has been disjointed."

In her **cover letter** to the Governor, President pro Tempore of the Senate, and Speaker of the Assembly, Howle said "At least nine state agencies administer and oversee 41 different programs that provide funding to mitigate homelessness, yet no single entity oversees the State's efforts or is responsible for developing a statewide strategic plan."

The state's plan to mitigate homelessness is not designed to achieve this, as the audit shows. Because if the 9 agencies and 41 different programs were, they would no longer be needed, the federal and state funding would dry up, and public employee union jobs would be lost. In California, no program ever sunsets.

"The State continues to lack a comprehensive understanding of its spending to address homelessness, the specific services the programs provide, or the individuals who receive those services."

"Our audit found three additional factors that make state guidance to coordinate efforts to address homelessness especially necessary:

- CoCs do not always employ best practices related to identifying, planning for, and providing services for those experiencing homelessness.
- None of the five CoCs we reviewed has adequately determined whether it has enough service providers to meet the needs of those experiencing homelessness.
- Two of the five CoCs we assessed do not have current comprehensive plans."

2

Just the year before in 2018, a United Nations expert on housing singled out Oakland and San Francisco **in a report** as the only two U.S. cities which are part of a "global scandal," saying the homeless encampments are "cruel and inhumane," after visiting the Bay Area in January, KTVU Fox **reported**. In the same report the Special Rapporteur says "residents of informal settlements affirm humanity in the most inhumane circumstances. The Special Rapporteur has visited many informal settlements in the global North and South. She has found the severity of the living conditions and the failure of States to respond to them profoundly disturbing."

California has spent $13 billion in just the last three years on the massive homelessness problem. The auditor said the approach to dealing with homelessness is so fragmented and incomplete it actually hinders efforts at getting people into stable housing.

"Last year, Newsom vetoed a bill that would have created a uniform data-collection system on homelessness spending, saying the measure was duplicative and would create additional and unnecessary data collection costs," KCRA Channel 3 reported. However, the auditor found a lack of coordination between agencies, and largely, no accountability by any agency our the task force.

Some **highlights** from the audit:

- In recent years, the number of individuals experiencing homelessness in California has soared. More than 151,000 Californians were homeless in 2019, an increase of 15 percent from 2017.

- Unlike in some other states, no single state entity in California oversees efforts to address homelessness or is responsible for developing a statewide strategic plan. Instead, at least nine state agencies administer and oversee 41 different programs that provide funding for purposes related to homelessness.

- Despite creating the Homeless Coordinating and Financing Council in 2017, homeless council staff stated that the council has not set priorities or timelines for achieving all 18 statutory goals (below). Further, the homeless council still has not finalized an action plan that homeless council staff believe will serve as the council's strategic plan, and has yet to fulfill some of its most critical goals.

- Council staff said they can request information from state agencies, but it does not currently have the authority to require this information from other state agencies and has not been able to track program spending to date.

"In September 2019, the Governor signed a package of 13 bills addressing homelessness, including Senate Bill 211, which authorizes the California Department of Transportation to lease certain property to local governments for temporary emergency shelters or feeding programs, and Senate Bill 450, which exempts certain hotels converted to supportive or transitional housing from the requirements of the California Environmental Quality Act until January 1, 2025," the Auditor reported. "In January 2020, the Governor signed an executive order that focuses on preventing homelessness, providing shelter and services to people experiencing homelessness, and creating new temporary housing to reduce unsheltered homelessness. This executive order calls for, among other things, a multiagency state strike team to provide technical assistance and direct support to counties, cities, and public transit agencies seeking to bring people experiencing homelessness indoors and connect them with appropriate health, human, and social services."

The auditor said the homeless council staff reported that the homeless council has not formally gone through the process of prioritizing the 18 statutory goals.

Homeless council staff claims they need many more staff positions to fulfill some of its most critical responsibilities, despite already having 24 staff positions available due to the Legislature appropriating an additional $1.5 million to add 10 more staff in fiscal year 2020–21, bringing its operating budget to about $3.4 million, to carry out its statutory mandates.

"According to homeless council staff, the homeless council likely still lacks the necessary resources to be able to address all of its statutory goals." However, the Auditor said more funding isn't automatic, and, "the Legislature should require the homeless council to conduct an analysis to determine its budgetary needs for implementing any new statutory requirements."

The state does not track the funding it provides to combat homelessness, which could be perhaps the biggest problem of all. "There is no single state entity that comprehensively tracks the sources of funding, the intended uses, or related expenditures for these programs," nor does the state "track how much funding is available or spent toward addressing homelessness statewide."

Additionally, "the homeless council has not prioritized coordination of existing funding and applications for competitive funding," the auditor reported. "We believe that it [the Council] is well positioned to track the State's sources of funding and spending on homelessness activities and make informed recommendations to decision makers to ensure proper coordination among different programs."

The auditor said her office reviewed a number of other states which have charged a single agency with addressing homelessness statewide and tracking funding information centrally. "These other states have fared better than California in stemming the number of people who experience homelessness."

The second part of the audit focused on the Continuum of Care organizations (CoCs), which "do not consistently employ best practices to improve homeless services in their areas."

"The five CoCs we reviewed do not adequately conduct a comprehensive annual gaps analysis," the Auditor reported. And two of the CoCs don't even have current comprehensive plans. "Federal regulations require each CoC to have a plan in place to conduct an annual gaps analysis to determine whether the number and type of current services and service providers in its area are adequate to meet the needs of all the people it has identified as experiencing homelessness."

Because of this, some homeless are struggling to access services because of gaps in the CoCs' coordinated entry processes.

The Auditor makes a long list of recommendations, which frankly should already have been a priority for the county Continuum of Care organizations if they are truly focused on the goal of reducing homelessness by providing assessments and proper services for those they are tasked with helping. However, the audit does not state the obvious: if these five CoCs were to successfully reduce homelessness in California, they would work themselves out of jobs and the funding would dry up.

6

## LOS ANGELES HOMELESSNESS REVENUE

IN 2018, THE STATE OF CALIFORNIA PROVIDED ONE-TIME BLOCK GRANT FUNDING FOR $500 MILLION TO SUPPORT CoCs AND LARGE CITIES. IN 2019, THE STATE OF CALIFORNIA PROVIDED ONE-TIME BLOCK GRANT FUNDING OF $650 MILLION TO CoCs, LARGE MUNICIPALITIES AND COUNTIES.

| HUD FUNDING | 2019 | 2020 | TOTAL |
|---|---|---|---|
| Continuum of Care Funding | $134,763,670 | $132,361,222 | $267,124,892 |
| ESG City of LA | $4,688,518 | | $4,688,518 |
| ESG County of LA | $1,915,450 | | $1,915,450 |
| CDBG City of LA | $53,358,857 | | $53,358,857 |
| CDBG County of LA | $22,969,231 | $13,668,315 | $36,637,546 |
| ESG CV City of LA | | $183,598,812 | $183,598,812 |
| ESG CV County of LA | | $69,050,943 | $69,050,943 |
| CDBG CV City of LA | | $31,963,374 | $31,963,374 |
| CDBG CV County of LA | | $13,668,315 | $13,668,315 |
| HUD-VASH LA City | $289,559 | | $289,559 |
| HUD-VASH LA County | $425,867 | | $425,867 |
| **TOTAL** | **$218,411,152** | **$444,310,981** | **$662,722,133** |

| STATE OF CA FUNDING | 2018 & 2019 Homeless Block Grants | 2020 COVID-19 Funding | TOTAL |
|---|---|---|---|
| LAHSA | $134,763,670 | $10,963,460 | $158,333,589 |
| LA City | $202,576,107 | $19,335,938 | $221,912,045 |
| LA County | $64,310,071 | $10,567,011 | $74,877,082 |
| **TOTAL** | **$414,256,307** | **$40,866,409** | **$455,122,716** |

| LOCAL FUNDING | 2018-2019 | 2019-2020 | TOTAL |
|---|---|---|---|
| LA CITY | $372,735,754 | $426,329,846 | $799,095,600 |
| LA COUNTY | $355,572,000 | $355,572,000 | $711,144,000 |
| **TOTAL** | **$728,307,754** | **$781,901,846** | **$1,510,239,600** |

## TOTAL PUBLIC FUNDS FOR LA HOMELESSNESS: $2,628,084,449

7

# COUNTY OF LOS ANGELES
# DEPARTMENT OF AUDITOR-CONTROLLER



**COUNTY OF LOS ANGELES**
**DEPARTMENT OF AUDITOR-CONTROLLER**

KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET, ROOM 525
LOS ANGELES, CALIFORNIA 90012-3873
PHONE: (213) 974-8301   FAX: (213) 626-5427

ARLENE BARRERA
AUDITOR-CONTROLLER



NUMBER OF RECOMMENDATIONS

**PRIORITY 1**
**0**

**PRIORITY 2**
**1**

**PRIORITY 3**
**1**

February 14, 2020

TO:         Each Supervisor

FROM:       Arlene Barrera, Auditor-Controller

SUBJECT:    **LOS ANGELES COUNTY DEVELOPMENT AUTHORITY – HOMELESS INITIATIVE – STRATEGY B4: FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES – PERFORMANCE DATA AND EXPENDITURES REVIEW**

With the support and active participation of the Chief Executive Office (CEO) and the Los Angeles County Development Authority (LACDA), we have completed a review of LACDA's Homeless Initiative – Strategy B4: Facilitate Utilization of Federal Housing Subsidies (Strategy B4) performance data and expenditures. In collaboration with the CEO, LACDA serves as the lead agency in providing Strategy B4 services. Strategy B4 utilizes Measure H funding to support LACDA's Homeless Incentive Program (HIP), which offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders.

LACDA's Strategy B4 expenditures were allowable, supported, and used for HIP services as required. However, we identified opportunities where LACDA can improve and strengthen controls over Strategy B4 services. For example, LACDA could not readily provide the detailed supporting documentation for their July through September 2018 performance data. After our review, LACDA was able to assess and analyze their existing data to identify and provide the requested supporting documentation. However, LACDA should develop policies and procedures to ensure the appropriate documentation is always maintained and readily available.

These enhancements will provide greater assurance that LACDA has the appropriate procedures over Strategy B4 data to ensure the performance metrics are reported accurately.

For details of our review, please see Attachment I. LACDA's response indicates agreement with our findings and recommendations and is included in Attachment II.

We thank LACDA management and staff for their cooperation and assistance during our review. If you have any questions please call me, or your staff may contact Terri Kasman at (213) 253-0301.

AB:PH:TK:JH

Attachments

c:   Sachi A. Hamai, Chief Executive Officer
     Emilio Salas, Acting Director, Los Angeles County Development Authority
     Audit Committee

CHIEF EXECUTIVE OFFICE

2020 FEB 18 PM 1:13

RECEIVED

REPORT #X19910

**FAST FACTS**

LACDA serves as the lead agency in providing Strategy B4 services, which utilizes Measure H funding to support LACDA's HIP.

HIP offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders.

CEO advanced LACDA approximately $4.5 million, of which LACDA utilized approximately $4 million from October 2017 through September 2018.

Help Conserve Paper – Print Double-Sided
"To Enrich Lives Through Effective and Caring Service"

BE COUNTED ✓   http://census.lacounty.gov

**LOS ANGELES COUNTY**
# AUDITOR-CONTROLLER

Attachment I
Page 1 of 2

| Peter Hughes | Terri Kasman |
|---|---|
| ASSISTANT AUDITOR-CONTROLLER | DIVISION CHIEF |

**COUNTYWIDE CONTRACT MONITORING DIVISION**          *Report #X19910*

---

## LOS ANGELES COUNTY DEVELOPMENT AUTHORITY
## HOMELESS INITIATIVE – STRATEGY B4
## FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES
## PERFORMANCE DATA AND EXPENDITURES REVIEW

### BACKGROUND AND AUDIT SCOPE

In collaboration with the Chief Executive Office (CEO), the Los Angeles County Development Authority (LACDA) serves as the lead agency in providing Homeless Initiative – Strategy B4: Facilitate Utilization of Federal Housing Subsidies (Strategy B4) services. Strategy B4 utilizes Measure H funding to support LACDA's Homeless Incentive Program, which offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders. Incentives include vacancy payments to landlords to hold housing units, participant move-in costs such as security and utility deposits, and financial assistance for damage claims caused by tenants. The CEO advanced LACDA approximately $4.5 million to provide Strategy B4 services, of which LACDA utilized approximately $4 million from October 2017 through September 2018.

We reviewed a sample of transactions from July through September 2018 to determine whether LACDA appropriately accounted for and spent Strategy B4 funds. In addition, we reviewed LACDA's Strategy B4 performance data for July through September 2018 to ensure the data was adequately supported with documentation.

### TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION

| | ISSUE | RECOMMENDATION |
|---|---|---|
| 1 | **Supporting Documentation for Performance Data** - LACDA submits their Strategy B4 performance data to the CEO quarterly. During our review, LACDA could not readily provide the detailed supporting documentation for their July through September 2018 performance data. Specifically, LACDA did not maintain point-in-time details for the reporting period (i.e. July through September 2018) and instead, maintained real-time, running totals. As a result, LACDA could not readily generate reports to support the data for the specified timeframe.<br><br>After our review, LACDA was able to assess and analyze their existing data to identify and provide the requested supporting documentation. However, LACDA should develop policies and procedures to ensure the appropriate documentation is always maintained and readily available.<br><br>**Impact:** Increased risk of inaccurate and/or unsupported performance data. | **Priority 2** – LACDA management develop policies and procedures to ensure adequate documentation to support their reported performance data is appropriately maintained and readily available upon request.<br><br>**LACDA Response: Agree**<br>Implementation Date: October 2019 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Department's operations if corrective action is not taken.

10

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

Attachment I
Page 2 of 2

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| **2**   **Support for Quarterly Expenditure Reports** - LACDA provides cash advances to their contracted Public Housing Agencies (PHAs) to ensure funds are readily available to provide Strategy B4 services. The PHAs spend down and track the funds in their quarterly expenditure reports submitted to LACDA, which are in turn reported to the CEO. However, we noted that LACDA does not require the PHAs to provide supporting documentation, such as detailed accounting records, at the time the quarterly expenditure reports are submitted.<br><br>It should be noted that we conducted Fiscal Year 2018-19 monitoring reviews for LACDA's two largest contracted PHAs and determined that the PHAs' Strategy B4 expenditures were allowable, supported, and used for their intended purposes. However, to enhance assurance over the accuracy/appropriateness of the quarterly expenditure reports, LACDA should require that PHAs provide supporting documentation with the reports.<br><br>**Impact:** Increased risk of inaccurate and/or inappropriate financial reporting. | **Priority 3** - LACDA management require additional information, such as the PHAs' accounting records, to be submitted with the quarterly expenditure reports.<br><br>**LACDA Response: Agree**<br>Implementation Date: November 2019 |

We conducted our review in conformance with the International Standards for the Professional Practice of Internal Auditing. For more information on our auditing process, including recommendation priority rankings, the follow-up process, and management's responsibility for internal controls, visit https://auditor.lacounty.gov/audit-process-information/

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Department's operations if corrective action is not taken.

Case 2:20-cv-02291-DOC-KES Document 30677-12 Filed 05/29/23/07/24 Page 12 Page 192 of 119 PageID Page #:34620394



January 22, 2020

Arlene Barrera, Auditor-Controller
County of Los Angeles
Department of Auditor-Controller
Countywide Contract Monitoring Division
350 South Figueroa Street, 8th Floor
Los Angeles, CA 90071

**SUBJECT:** **RESPONSE TO LOS ANGELES COUNTY DEVELOPMENT AUTHORITY (LACDA) HOMELESS INITIATIVE - STRATEGY B4: FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES PERFORMANCE DATA AND EXPENDITURES REVIEW**

Dear Ms. Barrera:

This letter is in response to the results of the Performance Data and Expenditures Review conducted by the Los Angeles County Auditor-Controller's Office. The results of the review received by the LACDA cited two recommendations related to opportunities where we can improve and strengthen controls over Strategy B4 services.

Recommendation #1:

The first recommendation resulted from the LACDA not readily providing the detailed supporting documentation for our July through September 2018 performance data. It was recommended that the LACDA develop policies and procedures to ensure adequate documentation to support our reported performance data is appropriately maintained and readily available upon request.

**LACDA's Response:** The LACDA management agrees with the recommendation. The LACDA agreed to establish a procedure to require the submission of statistical reports utilized in preparing the Homeless Initiative – Strategy B4 quarterly performance data to the Chief Executive Office by all Public Housing Agencies (PHAs) including LACDA. On August 19, 2019, the LACDA instructed all PHAs when submitting their quarterly report to make certain that the time and date is printed on the report to ensure that the reporting period reflects point-in-time details that correlates with their data. The implementation occurred within the 1st quarter reporting period; thus, quarterly reports received on or after October 1, 2019, are complying with the new procedures.



700 West Main Street, Alhambra, CA 91801
Tel: (626) 262-4511  TDD: (626) 943-3898

lacda.org

Acting Executive Director: Emilio Salas
Commissioners: Hilda L. Solis, Mark Ridley-Thomas, Sheila Kuehl, Janice Hahn, Kathryn Barger

Arlene Barrera, Auditor-Controller
January 22, 2020
Page 2

### Recommendation #2:

The second recommendation relates to support for quarterly expenditure reports. It was noted that the LACDA does not require the PHAs to provide supporting documentation, such as detailed accounting records at the time the quarterly expenditure reports are submitted. To enhance assurance over the accuracy/appropriateness of the quarterly expenditure reports, the LACDA should require that PHAs provide supporting documentation with the reports.

**LACDA's Response:** The LACDA management agrees with the recommendation. LACDA established a procedure to require all PHAs to submit general ledger reports when requesting reimbursements for Strategy B4 expenditures. The LACDA notified PHAs that all required quarterly reports must be submitted to LACDA by the 15th day of the month following the end of each fiscal quarter. We further instructed the PHAs that the reports should be accompanied by fund expenditures supporting documentation such as financial ledgers. This procedure was implemented on November 25, 2019, during our Fiscal Year 2019/2020 Homeless Incentive Process Interagency Amendment process.

We will provide additional supporting documents during the follow-up review process. If you have any questions, please contact Matthew Fortini, Director of Finance and Budget at (626) 586-1890.

Sincerely,

EMILIO SALAS
Acting Executive Director

cc: Matthew Fortini, Director of Finance and Budget Division

# LA COUNTY DEVELOPMENT AUTHORITY - STRATEGY B4
## PERFORMANCE DATA AND EXPENDITURES REVIEW

Strategy B4 utilizes Measure H funding to support LACDA's Homeless Incentive Program (HIP), which offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders.

In February 2020, Los Angeles County Auditor-Controller Arlene Barrera identified opportunities where LACDA could improve and strengthen control over Strategy B4 services. For example, LACDA could not readily provide supporting documentation for their July - September 2018 performance data and instead maintained real-time, running totals.



| July - Sept. 2018 | Oct. - Nov. 2019 | Jan. 2020 |
|---|---|---|
| IDENTIFICATION AND RECOMMENDATION | TIME TABLE TO BEGIN IMPLEMENTATION | ACTUAL IMPLEMENTATION |

Data: County of Los Angeles Department of Auditor-Controller, February 14, 2020, "Los Angeles County Development Authority - Homeless Initiative - Strategy B4: Facilitate Utilization of Federal Housing Subsidies - Performance Data and Expenditures Review"
Los Angeles County Development Authority (LACD), directed to Arlene Barrera, Auditor-Controller, January 22, 2020, "Response to Los Angeles County Development Authority (LACDA) Homeless INitiative - Strategy B4: Facilitate Utilization of Federal Housing Subsidies Performance Data and Expenditures Review"

## Measure H Citizens' Oversight Advisory Board Meeting
## COUNTY OF LOS ANGELES

DATE:                      Thursday, December 5, 2019
TIME:                       1:00 p.m.

IV. **Measure H Funding and Outcomes (Phil Ansell, Chief Executive Office – Homeless Initiative)**

Mr. Ansell provided an update on the FY 2018-19 Measure H Final Expenditures. A copy of the chart is available on the website (https://homeless.lacounty.gov/oversight/) and has the following information: Funded Measure H Strategies, description, lead agency, final allocations for FY 2018-19, expenditures by quarter, total expenditures, and the difference between allocation and expenditures (underspending).

2

15

- In FY 18-19, there was $58.5M in underspending, including:
  - $3.9M of expenditures were incurred by lead agencies, but were not submitted to Auditor Controller by the deadline (funding will be carried over to FY 2019-20, so that agencies can pay costs).
  - $15.3M represents funding previously approved for interim housing capital expenditures (dollars not spent in FY 2018-19, but will be used for multi-year projects)
- When these numbers are excluded, there is $39.3M in actual under- expenditures (between 9-10% of total allocation of $412M in FY 2018-19).
- For context, in FY 2017-18 (first year of Measure H), the total allocation was $216M and under expenditures were about 33%.
- There are certain strategies with higher rates of under expenditures:
  - Underspending is largely due to staff vacancies associated with ramp-up and/or turnover.
  - According to the lead agencies for those strategies, underspending in FY 2018-19 is not predictive of underspending in FY 2019-20.
  - This data will assist in Measure H Funding Recommendations for FY 2019-20, 2020-21, 2021-22
- Measure H is not expected to have zero under expenditures, since it is a complex system with many contract providers. Contractors must ensure they do not exceed contract maximums, which results in some underspending.
- Measure H revenue for FY 2018-19 ($398M) exceeded the initial, projected Measure H revenue projection of $355M.
- It is projected that FY 2019-20 Measure H revenue will also equal $398M.
- Mr. Naimo asked about funding for services versus rental subsidies.
  - Mr. Ansell responded that Measure H is not an appropriate funding stream for ongoing rental subsides, since Measure H is time- limited.
  - Measure H funding was used in early years for rental subsidies to increase the pace at which people can enter PSH, but local subsidies will eventually need to be replaced with federal subsidies.
  - On a long-term basis, the County intends to fund intensive case management services (ICMS) for all new project-based PSH in LA County
  - There are insufficient federal subsidies today for all new PSH units and there is currently dialogue on how to cover the future need for rental subsidies for new PSH (particularly project-based PSH).
  - There is no intention to reduce PSH services to pay for rental subsidies.

Mr. Ansell also provided information on the FY 2018-19 Measure H Outcomes (Quarterly Report #14)

- Interim housing placements:
  - 18,323 individuals and family members were placed in interim housing funded in whole or in part by Measure H in the past fiscal year.
  - Almost 32,000 individuals and family members placed in interim housing funded in whole or in part by Measure H for the first two fiscal years.

3

Case 2:20-cv-02291-DOC-KES Document 206 Filed 05/29/20 Page 4 of 9 Page ID #:2660

- Permanent housing placements:
  - housing in the permanent housing in the...
  - A total of 16,003 have been permanently housed through Measure H over the past two fiscal years.
  - Measure H is on track to meet its 5-year goal of placing 45,000 family members and individuals in permanent housing.
- Ms. Margiotta asked for more context regarding the 45,000 goal: 1) how many additional housing placements are needed and 2) how was goal determined?
  - Mr. Ansell responded that there were about 48,000 people who exited homelessness in LA County in calendar year 2018. Of that number, about 21,000 were directly assisted by the homeless services system. (Measure H represented slightly under half of the total permanent housing placements).
  - The 45,000 number is an estimate based on the costs associated with securing permanent housing, outreach, interim housing, and benefits advocacy, etc.
  - This number is not based on the total need.
- Mr. Kerr expressed concern about homelessness inflow and suggested that the County have a dashboard/open source data to analyze best practices. Mr. Ansell responded that the homelessness crisis is primarily the result of our affordable housing crisis and the Board has taken the following actions:
  - required the creation of an annual affordable housing outcomes report, which documents the gap in affordable housing and identifies current affordable housing properties at-risk of losing affordability
  - is pursuing tenant protections to mitigate the impact of shortage of affordable housing
  - considering permanent rent stabilization ordinance for unincorporated areas
  - supports SB 1482 which caps rent increases statewide for multi-unit rental housing built more than 15 years ago at 5% plus CPI for 10 years (would also extend just cause eviction protections)
  - The fundamental solution is a combination of increasing housing supply and tenant protections.

Mr. Ansell also provided information about the FY 2019-20 Key Metrics:
- Key performance metrics have been identified, but the CEO-HI is still working with lead agencies to identify which metrics are the most consequential relative to the performance of Measure H.
- Mr. Naimo stated this info will help understand the year-to-year changes in the homeless population.
- Ms. Al-Mansour stated it would help to know about zoning ordinances for affordable housing.
- Mr. Kerr was interested to have a presentation by the California Housing Partnership Corporation regarding their work on the County's annual affordable housing outcomes report.
- Mr. Margiotta stated that she was interested in the prevention metrics and thought it would be helpful to see hard numbers and how it relates on a macro level.

4

- Mr. Ansell stated that the intent is to complete the key metrics chart and return to the Advisory Board with more information.

Mr. Ansell presented information on the FY 2020-21, 2021-22, and 2022-23 Measure H Funding Recommendations Process:

- The process will include final recommendations for FY 2020-21 and tentative recommendations for FY 2021-22 and FY 2022-23.
- Outcome data is now available, which assists in discerning how to best deploy Measure H resources.
- Will include eight Policy Summits, which will take place through November and primarily focus on discussion questions, expenditure outcome data, and evaluation reports on Measure H strategies.
- LAHSA/CEO-HI will conduct community meetings to solicit stakeholder input.
- There will also be an on-line mechanism for written public input
- A draft set of recommendations will be developed based on this input and posted in early March 2020 on the CEO-HI website and discussed via a Webinar
- There will be an additional public meeting in March 2020, which will include another opportunity for written public comment.
- There will be a panel discussion of draft recommendation at the March 2020 HI Conference.
- Draft Funding Recommendations will be presented to the Board Deputies in April 2020 and the Board of Supervisors will vote on the recommendations in May.
- In addition to Measure H, there is also a new State funding source: Homeless Housing, Assistance, and Prevention Program (HHAPP) that will be incorporated into the process.
- County was aggressive in increasing the Measure H funding to $460M this year and hopeful to sustain in 2021 and beyond, though it is dependent on the economy.
- Ms. Margiotta asked how funding conversations will address themes that cut across multiple strategies (for example, sustainability and compensation for employees who are working in the homeless services system or how black people experiencing homelessness are affected).
  - Mr. Ansell responded that the first and last Policy Summits are intended to cover cross-cutting themes and funding.
  - Also, the last summit will compile the key themes from the prior seven Summits.
- Mr. Kerr asked if there has been an opportunity to look at non-Measure H revenue that the County is saving and reinvest this funding to known strategies that are saving the County money.
  - In February 2016, the Board directed the CEO to identify single adults in LA County who are experiencing homelessness for whom the County has incurred the greatest costs (also known as the 5% list).
  - Housing and services are prioritized for this group of people and the CEO was asked to determine the associated savings for potential reinvestment.
  - There are challenges in capturing savings and reinvesting, since savings usually accrue to the State or Federal Government. For example, savings to Medicaid or in food stamps are not available to the County to reinvest.
    - Additionally, savings are in systems that otherwise have surplus demand.
    - However, there is a promising opportunity around increasing access to Medicaid funding for housing and homelessness related purposes
    - The County is in dialogue with the State in anticipation of the expiration of the current 1115 waiver.
    - Medicaid requires a non-federal match and Measure H is available to draw down the federal match, which will further leverage funding.
- Public Comment: Six persons provided public comment.

## APPROXIMATELY 1 BILLION IN MEASURE H FUNDING 2017-2020

(FY) 2017-18*
Measure H Funding Allocation: $216 million
Unspent: approx. $71.8 million (33%)

(FY) 2018-19**
Measure H Funding Allocation: $412.2 million
Unspent: $39.3 million (9.5%)

(FY) 2019-20***
Measure H Funding Allocation: $534 million
Unspent: $95.6 million (17.9%)
*Actual FY 2019-20 revenue was $22.5 million less than budgeted*



| 2017-18 | 2018-19 | 2019-20 |
| $216 million | $412.2 million | $534 million |

Fiscal Year ("FY")
* Source
* "Measure H Funding and Outcomes (Phil Ansell, Chief Executive Office - Homeless Initiative)," Measure H Citizens' Oversight Board Meeting, County of Los Angeles, December 5, 2019
** "FY 2018-19 Measure H Strategy Underspending Survey Compilation," Measure H Citizens' Oversight Advisory Board Meeting, County of Los Angeles, September 5, 2019
*** "Measure H Funding and Outcomes (Phil Ansell, Chief Executive Office, Homeless Initiative (CEO-HI)", Measure H Citizens' Oversight Advisory Board, Thursday, March 4, 2021

19

**"THE HIGH COST OF HOMELESS HOUSING: REVIEW OF PROPOSITION HHH" (2019)**
**CITY OF LOS ANGELES, CONTROLLER RON GALPERIN**



**RON GALPERIN**
CONTROLLER

October 8, 2019

Honorable Eric Garcetti, Mayor
Honorable Michael Feuer, City Attorney
Honorable Members of the Los Angeles City Council

**Re: The High Cost of Homeless Housing: Review of Proposition HHH**

Los Angeles voters approved Proposition HHH in November 2016 by an overwhelming margin, authorizing City officials to issue up to $1.2 billion in general obligation bonds to partially subsidize the development of up to 10,000 supportive housing units for individuals and families experiencing homelessness. HHH funds can also be used to support new affordable housing units, temporary shelters and service facilities. The ballot language of HHH provides that the City Controller shall conduct a financial audit of the program each year bonds are outstanding or proceeds remain unspent. The attached audit examines how the City is delivering on HHH to alleviate the most pressing issue facing Los Angeles.

As of last month, the City has conditionally awarded nearly all of the funds authorized by HHH to build 114 projects across Los Angeles, which are slated to provide a total of 5,873 supportive units for homeless residents and another 1,767 affordable units. However, more than two years after the first bond issuance and nearly three years since voters approved HHH, not one bond-funded unit has opened. While 19 projects are under construction and two are scheduled to open in the coming months, it is clear that the City's HHH program is not keeping pace with the growing demand for supportive housing and shelter. According to the Greater Los Angeles Homeless Count, homelessness in the City has increased by 40 percent to more than 36,000 people over the past four years.

**Increased costs, timelines**

There is currently a lack of clarity surrounding the City's goal for the number of supportive housing units to be built using HHH funds. This review found that, regardless of the actual target, high costs and slower than expected pre-development and construction timelines have significantly hindered the City's ability to achieve the ballot measure's intentions.

Building cost estimates skyrocketed from $350,000 for a small studio or one-bedroom unit and $414,000 for a larger unit, as projected in 2016, to a median cost of $531,000 per unit today. More than 1,000 HHH units are projected to exceed $600,000, with one project topping $700,000 per unit.

21

The cost of building many of these units exceeds the median sale price of a market-rate condominium in the City of Los Angeles and a single-family home in Los Angeles County. Reasons for this include the number and complexity of funding sources required to complete an HHH project, the relatively limited pool of eligible developers, regulatory barriers and permitting challenges, and considerable construction and labor costs. An unusually high 35 to 40 percent of costs are so-called "soft costs" (development fees, consultants, financing, etc.), compared to just 11 percent for actual land costs.

The high price of development is linked with elongated approval and construction timelines. HHH projects are estimated to take between three to six years to complete — a schedule plainly out of step with the City's urgent need to bring tens of thousands of people off the streets and into housing. In an attempt to speed up the pace, the City created a position to serve as a dedicated concierge for HHH projects, a welcome step that should have been taken sooner. City leaders have also set aside one-tenth of the bond proceeds to explore alternative housing models, such as modular homes and shared units with simplified financing mechanisms. This strategy aims to provide 975 additional supportive units and could lower per-unit costs, which would be positive. It remains to be seen whether the projects will live up to expectations, and evaluating outcomes will help determine what should be replicated and what to avoid.

Two additional financial issues of note are the premature sale of HHH bonds and the decentralized nature of HHH accounting authority. Because the City decided to sell so many bonds long before the proceeds would be used to build homeless housing, Los Angeles taxpayers incurred at least $5.2 million in excess interest payments through June 2019. At this time, there is also an unnecessary division of labor in program accounting for the housing and facilities components of HHH, which should centralized in one department.

## Recommendations

In order to reduce Proposition HHH project costs and development timelines, prevent any potential future delays, and strengthen the bond program's financials, the City should:

- Put a greater focus on innovative practices to save time and money, including ways to reduce costs on approved or conditionally-approved projects, and consider using any savings achieved for temporary shelters, bridge housing, hygiene centers and other service facilities to address more immediate needs.
- Streamline the permitting process and add needed personnel to ensure quicker development approvals and processing.
- Centralize accounting responsibility in one City department.

The recommendations in this review are intended to help the City's Measure HHH program achieve its voter-mandated goals, while also ensuring that valuable taxpayer dollars are managed transparently and carefully.

Respectfully submitted,

RON GALPERIN
L.A. Controller

22

# "MEETING THE MOMENT:
# AN ACTION PLAN TO ADVANCE PROPOSITION HHH" (2020)
# CITY OF LOS ANGELES, CONTROLLER RON GALPERIN

23



RON GALPERIN
CONTROLLER

September 9, 2020

Honorable Eric Garcetti, Mayor
Honorable Michael Feuer, City Attorney
Honorable Members of the Los Angeles City Council

**Re: Meeting the Moment: An Action Plan to Advance Prop. HHH**

By overwhelmingly approving Prop. HHH in 2016, Los Angeles' voters authorized City officials to issue up to $1.2 billion in general obligation bonds with the aim of reducing homelessness by acquiring, developing, or remodeling supportive housing and facilities, including interim housing, restrooms, showers, health clinics and storage. The measure provided for citizen oversight and a yearly financial audit by the City Controller. My office first examined HHH in October 2019 and recommended reallocating funds to lower-cost projects and streamlined permitting.

Over the last year, homelessness in the City of Los Angeles jumped to 41,290 according to the 2020 Greater Los Angeles Homeless Count, up 16 percent from 2019 and 45 percent since 2016. Deaths among the unhoused population climbed almost 100 percent over seven years, with 1,047 people dying on the streets in 2018 alone. And COVID-19 has caused outdoor health and safety conditions to deteriorate further. While these facts illustrate the depth of the humanitarian emergency, they also reveal how one of the City's primary tools to address it is coming up short. My latest audit reassesses the current HHH strategy and recommends a short-term action plan to utilize the remaining bond funds and provide more immediate relief to people experiencing homelessness.

**Time, costs still rising**

Today, more than three years after the first bond issuance and nearly four years since HHH's approval, only three bond-funded supportive housing projects are open. There are 5,522 supportive units and 1,557 additional units in the pipeline, but 73 percent are not yet in construction. An additional 975 supportive units are being developed through the HHH Housing Challenge. The City also funded 24 interim housing projects and facilities with $58 million from HHH — a deliberately limited amount to focus on supportive housing.

My office's 2019 audit uncovered that supportive housing projects typically take three to six years to complete from concept to occupancy. COVID-19's impact on these already lengthy timelines is not clear, but will almost certainly extend them, and it is possible that some projects

24

in the pipeline today may never come to fruition. Before the pandemic hit, the City had already granted time extensions for 15 projects in pre-development, ranging from 45 days to more than one year, because of permitting problems, CEQA complexities and lawsuits. Not only do delays slow projects down, they also increase development costs.

Based on present estimates, 81 percent of units will not be completed until at least January 1, 2022, with 57 percent unavailable until 2023 or later — seven years after the bond's approval. Supportive housing is considered the best long-term strategy to help chronically homeless individuals get back on their feet, but HHH's lagging progress could leave that population without stable shelter options for years to come. Even when every HHH unit is completed, tens of thousands of Angelenos will still require housing — highlighting the need for a more strategic and flexible approach to utilizing remaining HHH funds.

Not only are HHH timelines out of step with the demand for housing, rising program costs are as well. For projects in construction, the average per-unit cost increased from $521,000 in 2019 to $531,000 this year, with the highest per-unit cost reaching $739,000. And the share of units costing more than $600,000 spiked from 10.8 percent in 2019 to 28.5 percent today. Similarly, one-third of the units in pre-development will exceed $600,000, and per-unit averages increased from $507,000 to $558,000 in the past year. The highest total development cost for a single project in pre-development now surpasses $76 million.

### Short-term action plan needed

Our most vulnerable residents are suffering concurrent crises and deserve a housing strategy that addresses this reality. Although the City has a plan to use the remaining $30 million in HHH funds, along with any money returned due to unsuccessful supportive housing projects, it would simply replicate the status quo by starting the development process all over again. Instead, City leaders should pivot to a viable plan that would spend available HHH dollars in these ways:

- **Build more interim housing and facilities:** Stopgap measures will not end homelessness but will get thousands of people off the streets more rapidly while supportive units are built, and help meet health, hygiene, sanitation and storage needs.

- **Prioritize adaptive reuse:** The City should pursue alternative development strategies that could prove cheaper and faster to complete, including acquisition or adaptive reuse of existing buildings, like hotels/motels, and unused commercial and office space.

Adopting a short-term action plan will add flexibility to the HHH program, ease suffering for the unsheltered population and help the City achieve its long-term, voter-mandated goals — adding housing to improve people's lives while reducing homelessness in Los Angeles.

Respectfully submitted,

RON GALPERIN
L.A. Controller

WOMEN IN SKID ROW













33



34













40















# SKID ROW
# FIRE AND ADA VIOLATIONS



51







54

Case 2:20-cv-02291-DOC-KES Document 306 Filed 05/20/21 Page 55 of 119 Page ID
Page #:3020437

55









60

61





Case 2:20-cv-02291-DOC-KES Document 367 Filed 05/23/23 Page 65 Page ID
Page #:13810447



https://losangeles.cbslocal.com/2021/05/03/goldstein-investigates-trailers-for-homeless-unused/







# STRUCTURAL RACISM



**HOMELESS**

## LA County to Expand Naloxone Distribution Among Homeless in Bid to Reduce Overdoses

A recent report by the county's Department of Public Health found an 84% increase in overdoses among people experiencing homelessness in recent years.

By City News Service • Published May 19, 2021 • Updated on May 19, 2021 at 9:24 am

Supervisor Hilda Solis, who co-authored the motion, said it is also an issue of racial justice.

"This issue disproportionately impacts Black and Latinx residents and in our efforts to address these racial inequities, community-based efforts like overdose prevention programming and increased access to naloxone will help reduce deaths by overdose by training homeless service providers and people experiencing homelessness for situations in which an overdose may occur," Solis said.

70

Local News

## Committee for Greater L.A. Calls for New Entity to Address Homelessness

By **City News Service**
May 19, 2021



LOS ANGELES (CNS) - A coalition of civic leaders called today for the city and county of Los Angeles to create an independent entity to address the homelessness crisis through data, measurable outcomes and greater accountability.

The "Homelessness Governance in Los Angeles: Centering the System" report was commissioned by the Committee for Greater L.A. in partnership with the UCLA Luskin School for Public Affairs and the USC Equity Research Institute.

It asserts that Los Angeles' governance problem stems from the lack of a central entity to address the problem of homelessness, and calls for officials to create one.

The report notes that while the Los Angeles Homeless Services Authority is a shared city-county agency, it "was never designed nor has it evolved into the kind of entity that can knit together the fragmented threads of LA governance in homeless policy."

"We actually have too much leadership, all too often scattered and freelancing; too much data, not forged around outcomes; too much informal, unaligned coordination," according to the report, which was authored by Raphael Sonenshein of the Pat Brown Institute for Public Affairs at Cal State Los Angeles.

71

# Garcetti Unveils 'Justice Budget' At State Of The City

**By CBSLA Staff**   April 19, 2021 at 7:46 pm    Filed Under:  Los Angeles,  Mayor Eric Garcetti,  State Of The City

**LOS ANGELES (CBSLA)** — Mayor Eric Garcetti Monday night announced a number of initiatives aimed at recovery, racial equity and clean energy during his State of the City address broadcast from the Griffith Observatory.



Mayor Eric Garcetti gives his 2021 State of the City address from Griffith Observatory. (CBSLA)

"The state of our city is strong and bruised, bursting with joyous possibility while it cracks with sorrow," Garcetti said. "But if you ask me for one word that defines Los Angeles in 2021, I would tell you that we are becoming."

**READ MORE:** 'We Have Just Been Devastated': Community Mourns Death Of Aiden Leos As CHP Continues Investigation

**COVID-19 Pandemic Recovery:**

On the recovery front, Garcetti announced he was proposing to set aside $75 million to provide additional testing, vaccine distribution and personal protective equipment for all Angelenos.

"Job 1 in the budget: end this pandemic," Garcetti said.

The mayor also announced his budget proposed additional funding for businesses to help in post-pandemic recovery in the form of a $25 million "comeback check" program that would provide $5,000 to 5,000 businesses and an additional $1.3 million specifically for street vendors to upgrade their equipment, clear bureaucratic hurdles and purchase modernized carts.

He also announced that he was asking the city council to adopt an ordinance that cuts the cost of fees and permits and make al fresco dining a permanent feature for L.A. restaurants.

**Racial Equity And Justice:**

Garcetti said his proposed budget included $1 billion to "untangle the inequities that have strangled our city and our nation for decades."



**MayorOfLA** ✔
@MayorOfLA

If job one is to end this pandemic, then job 2 and 3 and 4, for every day as long as I am your mayor, is that we demand — and deliver — justice.

Our justice budget will invest in services for residents, infrastructure and cleanliness, arts and culture, and an economic comeback.

5:25 PM · Apr 19, 2021

♡ 27    ⤶ 9    🔗 Copy link to Tweet

He also announced a proposed $12 million investment in a pilot program called L.A. Reforms for Equity and the Public Acknowledgement of Institutional Racism — L.A. REPAIR.

72



"The L.A. REPAIR pilot will give communities a direct say in grassroots investment to support job creation and provide organizational backing for community intervention, racial healing, justice and reconciliation," he said. "And we will also use that funding to partner with community and faith organizations to establish spaces that foster dialogue among youth and adults alike to name the things that have so starkly divided our fortunes and to hold our city to promises of a better future."

**Poverty And Homelessness:**

Garcetti also announced another $300 million in direct relief assistance for Angelenos struggling to pay their rent and utility bills would come this summer from the American Rescue Plan, bringing the total to more than $700 million.

pandemic didn't start our housing crisis, and our success in eliminating so much rent won't end it," he said. "Loving Los Angeles means facing the bitter truth about our past that maps of our city were drawn to protect the wealth of white people and destroy the wealth of Black people and other people of color."

According to Garcetti, the acts of red-lining and exclusionary zoning resulted in a city where Black and Mexican families hold 1/90th the wealth of white families today, on average.

Garcetti said the pandemic finally allowed the city to react to the growing homelessness crisis — one that impacts Black and Latino Angelenos at a higher rate — with a "FEMA-like" aid response.



73

**"WE'RE NOT GIVING UP: A PLAN FOR HOMELESSNESS GOVERNANCE IN LOS ANGELES"**

74

Case 2:20-cv-02291-DOC-KES Document 2067 Filed 05/29/23 Page 75 of 119 Page ID Page #:33240457



# WE'RE NOT GIVING UP:

A plan for homelessness governance in Los Angeles

  

PAT BROWN INSTITUTE
FOR PUBLIC AFFAIRS
Unleashing the Power of Participation

# We're Not Giving Up:

## A Plan for Homelessness Governance in Los Angeles

■ **Raphael J. Sonenshein, Ph.D.**
EXECUTIVE DIRECTOR
*Pat Brown Institute for Public Affairs*
*Cal State LA*

Presented to the Committee for Greater LA

May 2021

LA INNOVATION INSTITUTE
**FOR PUBLIC AFFAIRS**
*Unleashing the Power of Participation*

2

## EXECUTIVE SUMMARY

" We actually have
too much leadership,
all too often scattered
and freelancing;
too much data,
not forged around
outcomes; too much
informal, unaligned
coordination…
but we most truly need
alignment of money
and institutions around
a common mission
with agreed-upon and
impactful outcomes.

The ongoing homelessness crisis in Los Angeles has elevated calls for a better governance structure to address this devastating issue. Los Angeles combines an already fragmented system of general governance with a fragmented governance approach to homelessness. Any new governance structure must be customized around these distinctly Los Angeles features.

We often assume the problems in homelessness governance can be solved with more leadership, more data, restructured government institutions, more coordination, more city-county collaboration, and more money. This independent report commissioned by the Committee for Greater LA challenges these assumptions.

We actually have too much leadership, all too often scattered and freelancing; too much data, not forged around outcomes; too much informal, unaligned coordination. Formal city-county collaboration, as currently devised, is too inconsistent to carry the community's effort in the long term. We definitely need more money and should improve existing institutions, but we most truly need alignment of money and institutions around a common mission with agreed-upon and impactful outcomes.

The actual governance problem in Los Angeles is the absence of a center, a magnetic force that can draw our disparate best efforts to a common mission.

A centering structure customized for Los Angeles will focus the community and the stakeholders around a common mission, will develop and win consensus for shared outcomes, and will put elected leaders at the city and county levels in the central, but not exclusive role of leadership without creating a time-consuming process to create a new formal authority.

The centering entity will replace scattered and freelancing leadership, masses of uncoordinated data, inconsistent city-county collaboration with a focused, consensus building approach that will foster alignment of institutions around common objectives. Rather than setting out to "fix" agencies, it will realign their work around a common mission and hold all participants accountable for helping to achieve the mission. In that process, much organizational fixing is likely to occur.

This new, independent entity known as the Center will be led by a CEO, governed by a board mostly of elected officials, from the county, the city and state, and overseen by a powerful board of key community stakeholders. As a "start up", the Center will begin as a nonprofit organization funded by local philanthropy. If necessary, it can transition to a public agency with support from multiple governments. If required, voter support will be sought through a ballot measure to develop and bolster the Center.

The Center's first task will be to build community consensus around a well-designed mission and outcomes plan. From there it will work nonstop to be the voice of the Los Angeles homelessness effort, keeping the community informed, and advocating for new policies to address not just the symptoms but the underlying policy causes of homelessness.

77

Case 2:20-cv-02291-DOC-KES Document 657 Filed 05/29/23 Page 78 of 119 Page ID #:3270460

## INTRODUCTION

> Public frustration is deepening as, despite major improvements in helping people into housing, the crisis not only continues, but seems to get worse.

Los Angeles has been called "the homelessness capital of America."[1]

Every day, we see people without housing, on the streets, in the parks, on the trains, often viewed as outcasts. And these are only the people who are visibly unsheltered. Even the great improvements that have been made in recent years have been swamped by the new inflow of people onto the streets.

Those who work to address homelessness, the unhoused and unsheltered people themselves, residents and business owners, are deeply frustrated. Many have lost confidence in our ability to effectively address this tragedy.

Public frustration is deepening as, despite major improvements in helping people into housing, the crisis not only continues, but seems to get worse.

Now more than ever, the crisis of people who are unhoused is a matter of life and death. A recent UCLA study found a large spike in Los Angeles County in COVID-19 deaths among unhoused and unsheltered people under the age of 65 relative to those who are housed.[2] Data from the LA Department of Public Health found a rise of deaths from a variety of causes among unhoused individuals in both 2019 and 2020.[3]

Homelessness is more than the visible problem of unhoused people living, and far too many dying, on the street. Homelessness is nested within another set of crises, often less visible but no less devastating:

- Racial inequity due to decades of systemic racism and housing discrimination in particular has resulted in homelessness disproportionately affecting African Americans. While comprising less than 9% of the county's population, African Americans represent approximately 40% of the unhoused.[4] The role of government policies in creating these conditions of inequity, particularly in housing, is a core underlying factor that must be reversed.[5]

1  Joel John Roberts. 2014. Where is the Homeless Capital of America? *Huff Post* (May 2) analyzed and critiqued this widely accepted statement. www.huffpost.com/entry/who-is-the-homeless-capit_b_4886379

2  Kathryn M. Leifheit, Lelia H. Chaisson, Jesus Alejandro Medina, Rafik Wahbi, and Chelsea L. Shover. Elevated mortality among people experiencing homelessness with COVID-19. Posted March 8, 2021 https://www.medrxiv.org/content/10.1101/2021.03.05.21253019v1.full.pdf in advance of peer review due to the urgency of vaccination programs serving people experiencing homelessness (PEH).

3  Los Angeles County Department of Public Health. 2021 (January). Recent Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Los Angeles County. http://publichealth.lacounty.gov/chie/reports/HomelessMortality2020_CHIEBrief_Final.pdf

4  LAHSA Report of the Ad Hoc Committee on Black People Experiencing Homelessness 2018, p.9 https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness

5  See Richard Rothstein, 2017. *The Color of Law: A Forgotten History of How Our Government Segregated America*. Livelight. Also, Rothstein, The Black Lives Next Door, *New York Times* opinion article, August 14, 2020. https://www.nytimes.com/2020/08/14/opinion/sunday/blm-residential-segregation.html

LUSKIN INSTITUTE
FOR PUBLIC AFFAIRS
Unleashing the Power of Participation

4

## Introduction
*(continued)*

- A crisis of economic inequity, with an economy characterized by low-wage employment, often in industries vulnerable to COVID-19, low incomes and high rents creates profound vulnerability. Even a relatively strong economic recovery is unlikely to fundamentally alter these disparities without new government policies.

- A continuing lack of affordable housing and a legacy of federal, state and local policies hamper efforts to provide housing options for working class Angelenos in the face of rising rents and exploding housing costs.

- The historic gaps in the social safety net, for too long tolerated as a feature of American life, but now laid bare during an epidemic, have disproportionately affected communities of color and those facing economic calamity. As we emerge from the pandemic, we may find ourselves in an even worse situation as past rent becomes due and government supports decline.[6]

- A multisystem crisis, in which people exit other institutional systems and enter homelessness, makes this a multilayered challenge. Incarceration is one of these systems, and movements to seek alternatives to incarceration now overlap with efforts to address homelessness.[7] The mental health system is another critical factor affecting both people entering and, if fortunate, exiting homelessness.

But we also face cascading political challenges:

- A political crisis within Los Angeles, as deep and growing divisions about how to address homelessness threaten to tear communities apart.

- A democracy crisis, and not just in Los Angeles, with democracy facing authoritarian challenges, posing the urgent question whether democratic institutions at all levels of government can solve the most glaring problems that we face.

In the past, voters have demonstrated a willingness to support major public expenditures to address homelessness, particularly in 2016 and 2017 with the passage of Measures HHH and H. We cannot assume that similar measures, or extensions of the existing ones, will continue to inspire public support. Progress toward addressing homelessness can and must demonstrate that these investments are well worth making.

At the same time, the homelessness challenge bears within it the seeds of renewal and opportunity. Considerable, at times astonishing progress has been made, even as water continues to pour over the side of the ship.

### About Measures HHH and H

Measure HHH, passed by Los Angeles city voters in November 2016, authorized the city to borrow up to $1.2 billion over 10 years to partially subsidize the development of up to 10,000 housing units for those experiencing homelessness. In March 2017 Los Angeles County voters passed Measure H to increase the sales tax by ¼ cent to provide supportive services for the unhoused and other services, with estimated funding of more than $350 million yearly over 10 years. Both measures passed the imposing two-thirds majority vote requirement.

---

6   Blasi, Gary. *UD Day: Impending Evictions and Homelessness in Los Angeles*. UCLA Luskin Institute on Inequality and Democracy, 2020. https://escholarship.org/uc/item/2gz6c8cv

7   Los Angeles County Alternatives to Incarceration Work Group Final Report. *Care First, Jails Last*. https://ceo.lacounty.gov/wp-content/uploads/2020/10/1077045_AlternativestoIncarcerationWork-GroupFinalReport.pdf

Case 2:20-cv-02291-DOC-KES Document 306 Filed 05/20/21 Page 80 of 119 Page ID #:10462

## PROVISIONS OF
## APRIL 20, 2021 PRELIMINARY INJUNCTION
## (DKT. 277)

## IV. CONCLUSION: A WAY FORWARD

The devotion that Abraham Lincoln called for has not been met here.

For decades in Los Angeles, the desperation of its citizens has been met with a yawn. Each day, newspaper headlines bring forth different cities and communities calling for action. Meanwhile, politicians measure success by how much money they have raised to combat homelessness. Service providers with clipboards endlessly approach homeless individuals with services and promises to return, yet are unable to provide sufficient shelter or housing. Bureaucrats create statistics trumpeting their efficiency and success to the public. But none of this has led to accountability or solutions. As Councilmember Mark Ridley-Thomas remarked, "the issue of homelessness is of insufficient importance to the decision makers of this region. Therefore, we have this languishing set of circumstances where we chase our tails day in and day out claiming that we're doing things."[495]

There can be no defense to the indefensible. For all the declarations of success that we are fed, citizens themselves see the heartbreaking misery of the homeless and the degradation of their City and County. Los Angeles has lost its parks, beaches, schools, sidewalks, and highway systems due to the inaction of City and County officials who have left our homeless citizens with no other place to turn. All of the rhetoric, promises, plans, and budgeting cannot obscure the shameful reality of this crisis—that year after year, there are more homeless Angelenos, and year after year, more homeless Angelenos die on the streets.

Like Abraham Lincoln's call to action in his Gettysburg address, it is for us "to be dedicated here to the unfinished work which they who fought here have thus far nobly advanced." Let us pick up that flag, and have the courage of those who fought so long ago, to act so that we can become a better nation and people.

## V. PROVISIONS OF THE PRELIMINARY INJUNCTION

In an attempt to balance the interim nature of a preliminary injunction with the emergency conditions created by the homelessness crisis, the Court hereby ORDERS the following:

---

[495] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit,* YouTube (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

Case 2:20-cv-02291-DOC-KES   Document 277   Filed 04/20/21   Page 107 of 110   Page ID
Case 2:20-cv-02291-DOC-KES   Document 306   Filed 05/29/23   Page 82 of 119   Page ID
Page #:33320464

1. Accountability

    a. Pursuant to the Mayor's announcement[496] of a "justice budget"[497] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

    b. Within 90 days, conduct an audit of all funds received from local, state, and federal entities intended to aid the City and/or County of Los Angeles in solving or alleviating the problem of homelessness, including, but not limited to, Proposition HHH funds, MHSA funds, Measure H funds, and emergency relief from the state and federal government, including the American Rescue Plan and the Cares Act.

    c. Within 90 days, conduct investigations and prepare a report on all developers that are currently receiving funds from Proposition HHH; propose revised procedures for evaluating future applicants for Proposition HHH funds that would limit the possibility of funds being misused or wasted.

    d. Within 30 days, the County shall conduct an audit of any funds committed to mental health (MH) and substance use disorder (SUD) treatment.

All above audits and background investigations must be completed by independent auditors and investigators, respectively. Parties are ORDERED to meet with Special Monitor/Master Michele Martinez within 10 days to receive her input regarding independent auditors and investigators.

2. Action

    a. *City- and County-Wide Actions*

---

[496] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[497] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.

i. Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

ii. The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

iii. Within 30 days, the Los Angeles City Council Homelessness and Poverty Committee shall report back to the Court with specific actions to address 1) structural barriers (including but not limited to redlining, highway construction, eminent domain, and health exposure) that cause a disproportionate number of people of color to experience homelessness or housing insecurity; 2) solutions to the problem of extremely low income individuals being foreclosed from the affordable housing market in favor of higher-income individuals; and 3) the possibility of rezoning to accommodate more R3 (multi-family) zoning. The Committee is ordered to invite local non-governmental stakeholders (such as the NAACP, the Downtown Women's Action Coalition, and any additional groups that the Committee deems would be beneficial in this process) to participate in the production of the report.

iv. Mayor Garcetti, the Los Angeles City Council, and Hilda Solis, Chair of the County Board of Supervisors, shall submit a report to the Court by April 27, 2021 at 8:00 a.m. to explain why an emergency declaration has not been issued.

v. Within 30 days, the City and County shall prepare a report on the status of Projects Homekey and Roomkey, with a specific

focus on the geographic and racial distribution of project sites and beneficiaries.

vi. Within 30 days, with regard to MH and SUD beds, the County shall report to the Court on the progress towards establishing the 1,508 new sub-acute beds to accommodate the needs of the non-jail population and an additional 1,418 new sub-acute beds to accommodate those with substance abuse disorders being diverted from jails.

b. *Actions Specific to Skid Row*

i. Within no more than 90 days (i.e., on or before July 19, 2021), the City and County must offer and if accepted provide shelter or housing immediately to all unaccompanied women and children living in Skid Row; within 120 days (i.e., on or before August 18, 2021) to all families living in Skid Row; and within 180 days (i.e., on or before October 18, 2021) to the general population living in Skid Row. Skid Row, originally defined as the area between 3rd and 7th and Main to Alameda, will be extended to the surrounding area, defined as 2nd to 8th and Spring to Alameda. The City and County shall consult with the Skid Row Advisory Council to identify the number of unaccompanied women who are willing to move to shelters.

ii. The County shall, no later than within 90 days (i.e., on or before July 19, 2021), offer and if accepted provide to all individuals within Skid Row who are in need of special placement through the Department of Mental Health or Department of Public Health appropriate emergency, interim, or permanent housing and treatment services. The County shall work with providers to build meaningful relationships with homeless individuals to ensure that these individuals are fully informed of their options for services, housing, and shelter. Within ten days (i.e., on or before April 30, 2021), the County shall provide to the Court a list of providers who are already

established in the area and who will be working in tandem with the County on these efforts.

iii. The County shall provide, or fund third parties to provide, support services to all homeless residents who accept the offer of housing. County and City shall evenly split the cost of providing operational services.

iv. The City and County shall prepare a plan that ensures the uplifting and enhancement of Skid Row without involuntarily displacing current residents to other parts of the City or County. Moving forward, the City and County are encouraged to develop a hyper-local approach with community-based organizations throughout each district, including the Skid Row Advisory Council.

c. *Other Actions*

i. After adequate shelter is offered, the Court will let stand any constitutional ordinance consistent with the holdings of *Boise* and *Mitchell.*

ii. The Court shall appoint a Special Monitor/Master, Michele Martinez, at the City and County's expense to assist with the implementation of this order and to resolve disputes among the parties or other interested parties. The City and County shall meet and confer with Special Monitor/Master Michele Martinez within three days to agree upon reasonable compensation.

## PROVISIONS OF
## APRIL 26, 2021 ORDER RE APPLICATION TO
## STAY PENDING APPEAL (DKT. 287)

## VIII.   Provisions of the Stay

The Court has carefully considered the parties' Applications to Stay Pending Appeal. The Court recognizes the need for flexibility in determining the best way forward to help the homeless population.

The failure of settlement negotiations over the last few months has been a source of concern for the Court. The City and County continue to squabble over financial responsibility for addressing the homelessness crisis. Monetary commitments alone do not fulfill the parties' obligations to their constituents. As action and accountability continue to stagnate, the homeless population and number of deaths increase.

The Court believes that increasing the availability of long-term housing is critical, and we cannot let our homeless die in the streets while we build it. The Court thus welcomes any effort to provide temporary relief while simultaneously building abundant and sustainable long-term housing.

The Court invites the Mayor of Los Angeles, the President of the Los Angeles City Council, and the Chairman of the County Board of Supervisors to meet with the Court pursuant to settlement discussions. Without a global settlement, the Court will continue to impose its April 20, 2021 preliminary injunction, subject to certain modifications in response to the City and County's Applications to Stay Pending Appeal (Dkts. 282, 284):

### A.  Skid Row

With respect to Skid Row, the Court is mindful of the impact that decompression of Skid Row would have on neighboring districts and has DENIED without prejudice Plaintiffs' request for 50% decompression. Rather, the Court's order mandates that the City *offer* housing options to Skid Row residents within 90 days in the case of unaccompanied women and children; within 120 days in the case of families; and within 180 days in the case of the general population. The Court notes that under the terms of the preliminary injunction, while the City is ordered to *offer* housing options on this timeline, Skid Row residents are not required to accept and may decline these offers.

Therefore, the Court DENIES the request to stay with respect to this provision.

10

## B. Accountability of Funds Dedicated to Homelessness

On April 20, 2021, the Court ordered the following:

> Pursuant to the Mayor's announcement[2] of a 'justice budget'[3] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

Dkt. 277 at 106.

The Court included this provision in response to the City's "justice budget," which purportedly allocated $1 billion to address the homelessness crisis, including an unused $164 million dedicated to homeless relief that remains available as a roll-over from the previous year's budget. Rather than directing the City's homelessness spending, the Court's order for escrow was intended to make certain that this promised money would in fact be set aside for homelessness. Reports have alleged that the distribution of Proposition HHH funds has been corrupted by "everything from fake not-for-profits to contractors with zero employees and multi-million dollar development fees, and lucrative guaranteed management fees that support zero-risk development."[4] Repeated concerns such as this are the basis for the Court's ordered audits.

Further, City Controller Ron Galperin cited a balance of "10-ish billion dollars available in the City treasury" and stated that "the point I've made repeatedly to others in the City is that if the issue is cash flow . . . we can solve that cash flow issue. That should not be the impediment."[5] The Court was troubled by the apparent incongruity between the available "cash flow" and the severe conditions of homelessness in Los Angeles. The Court was also concerned

---

[2] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.
[3] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.
[4] Letter from Ron Miller, Exec. Sec'y, L.A./Orange Cntys. Bldg. & Constr. Trades Council, to Mike Feuer, L.A. City Att'y (Dec. 17, 2020).
[5] People's City Council – Los Angeles (@PplsCityCouncil), TWITTER (Apr. 15, 2021, 6:33 PM), https://twitter.com/pplscitycouncil/status/1382869701852729348?s=21.

by the City's failure to apply for 100% reimbursement from FEMA for funds spent on Project Roomkey in light of purported budget concerns.

However, on April 21, 2021, the City represented that the billion dollars allocated for homelessness in the justice budget is not available to put in escrow.[6] Los Angeles City Administrative Officer Richard Llewellyn further stated that "the great majority of these funds are not currently in the City's possession."[7] Given this new information, the Court agrees that a modification of this provision is appropriate. Therefore, the Court STAYS provision 1(a) of the preliminary injunction for 60 days in order to hear testimony from the City regarding details of the $1 billion and asks the parties to create a *Binding Commitment and Implementation Plan* (the "Plan"):

1. The City shall draft the Plan within 60 days to ensure that the full $1 billion is spent city-wide.

2. The Plan shall provide the Court with a detailed breakdown of funding sources, uses, objectives, methods, and means so that the Court can monitor the Plan's implementation.

3. The Plan shall further provide specific information about the number of homeless individuals who will be housed and by when.

4. The Plan shall also provide details on the 89 pending projects with timeframes for completion and move-in dates.

5. Finally, the Plan shall provide details on how the funding will be used to address racial disparities in housing and homelessness.

6. The objectives and deadlines established in response to items 3 through 5 above shall be binding on the City.

---

[6] Christopher Weber, *Judge Orders LA to Offer Shelter for Homeless on Skid Row*, YAHOO! NEWS (Apr. 20, 2021), https://www.yahoo.com/news/judge-orders-la-offer-shelter-213848366.html. *But see* Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[7] Dkt. 284-1, ¶ 10 (Richard H. Llewellyn, Jr. Declaration).

### C. Availability of City Property

#### i. Cessation of Transfer of Property

On April 20, 2021, the Court ordered the following:

> The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

Dkt. 277 at 107.

The Court will not impede any progress toward programs the City is proposing to help homelessness, including Proposition HHH. In a clarifying order issued last week, the Court emphasized that the Court's order will not apply to projects that are already in progress.[8] To ensure no further confusion regarding what qualifies as projects in progress, the Court hereby STAYS provision 2(a)(ii) of the preliminary injunction until May 27, 2021, when an evidentiary hearing will be held to determine what properties exist and are available for homelessness relief.

#### ii. Creation of Report on Property

On April 20, 2021, the Court also ordered the following:

> Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

Dkt. 277 at 107. This order was based on the City's report to the Court that "[t]he City Controller [Ron Galperin] compiled a list of nearly 14,000 properties in the City owned by six major public entities, including over 7,500 properties owned by the City." Dkt. 149 at 6. The City maintained

---

[8] See Dkt. 279 ("Second, the provision regarding the cessation of sales and transfers by lease or covenant under Section 2(a)(ii) does not apply to projects in progress as of the date of the order, April 20, 2021.").

that "the City does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 8.

The Court was deeply troubled that despite the City's representation of access to over 14,000 properties, the City committed not one of these properties to building additional long-term sustainable housing or interim housing.[9] The City explained that these conclusions are based on a process of "constant evaluation"; however, this "constant evaluation" has constantly led to no options for housing.

As mentioned above, the Court recognizes a need for all housing options, including long-term housing. The property identified in the ordered report must be used for both long-term and interim housing. The alternative is to leave our homeless no place but the sidewalks while we build long-term units. There is no plan brought before this Court to accommodate all 66,000 homeless individuals in long-term housing, at a cost of $531,000 per unit.[10] Such a plan would cost in excess of $30 billion. Further, while long-term housing is vital, its construction is long-term, and the interim period has lasted decades. Accountability cannot always be on the horizon—people are dying on the streets now.

Therefore, given the urgent need to understand the inventory of available properties, the Court DENIES the request to stay with respect to this provision.

The Court DENIES the City and County's Applications to Stay the remaining provisions of the Court's April 20, 2021 preliminary injunction.

Finally, the Court SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. At the hearing, the Court will receive evidence as to what properties are available for homelessness relief, as detailed in section VII(C)(i) above. In addition, the City and County have requested to be heard concerning the Court's findings on structural racism in its April 20, 2021 preliminary injunction. At the May 27, 2021 hearing, the Court will therefore receive testimony from the City and County on these findings. The Court additionally invites all interested parties to notify the Court if they would also like to be heard in this regard. The Court hereby SCHEDULES a hearing for Thursday, May 27, 2021 at 9:00 a.m. IT IS SO ORDERED.

---

[9] The City stated that it "does not have any property for sale, nor does it own or possess vacant properties, that are immediately available and suitable for use for interim housing or shelter purposes." Dkt. 149 at 6, 8.

[10] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/.

LETTER FROM SKID ROW ADVISORY
COUNCIL (DKT. 306)

Case 2:20-cv-02291-DOC-KES  Document 306  Filed 05/24/21  Page 93 of 119  Page ID
Page #:13420475





**-Skid Row Advisory Council-**

LA20CV02291-DOC

May 6, 2021

Federal Judge David O. Carter, City of Los Angeles, County of Los Angeles and Los Angeles Police Department,

In light of the intricately-detailed, in-depth historical analysis within the 110-page preliminary injunction issued recently by Federal Judge David O. Carter which clearly identifies the roles both the City of LA and the County of LA played in masterminding structures of racism through policies, laws, ordinances and more that all combined to create a web of deceit, bias and prejudice against Black individuals and families that have continued for generations across the city and county, can be directly attributed as the main component in the widespread systemic racism, housing discrimination, systemic oppression and more which all have greatly contributed to the Black homelessness epidemic in Skid Row and across the city and county of LA. Our official Skid Row AdCo response is as follows;

Because of the intentional, egregious and malicious acts towards Black Angelenos the Skid Row Advisory Council DEMANDS an acknowledgement of said acts and a public apology from both the City of LA and the County of LA- prior to any attempts to convene a working relationship in any capacity as so ordered by Federal Judge Carter in his preliminary injunction.

How can the Skid Row Advisory Council sit across from both the City of LA and the County of LA in efforts to create housing solutions when both the City and County played significant roles in the oppressive "containment" of Black homeless people in Skid Row?

Similarly, we DEMAND an apology from the Los Angeles Police Department for all the generations of "containment-style" policing towards Black homeless people in Skid Row as LAPD's way to keep a unified front regarding the daily distribution of systemic racist agendas against Black people in Skid Row.

It is the position of the Skid Row Advisory Council that the true reason both the City and County of LA filed for stays against said preliminary injunction so quickly is solely because each of these government entities attempted to create a diversion that would take the focus completely away from all of the many systemic racist and systemic oppressive acts identified by Federal Judge Carter in his masterful work within his preliminary injunction.

It MUST be noted that neither the City nor County even attempted to be appalled by Federal Judge Carter's findings...Just a total ignoring of arguably thee most compelling presentations of undisputed proof of systemic racism, systemic oppression and more in our lifetime at the hands of a network of cohorts all connected to both the City and County of LA.

How can all other Angelenos remain silent at this time?...In an era where people of all creeds and colors, all walks-of-life have bonded together to "take it to the streets" and shout "Black Lives Matter" at the top of their lungs, yet the widespread silence on these issues directly affecting Black homelessness is eerily deafening.

How, then, can Black homeless people in Skid Row even consider a court-ordered "offer" of housing from the very entities whose systemic racist and systemic oppressive tactics led them on a downward spiral by design to begin with?

The amount of trauma is beyond measure and at this point beyond a simple public apology (even though we still want it!)

Before any efforts to move forward can materialize, both the City and County, as well as the LAPD, MUST first move forward with efforts to heal all the trauma they've caused Black homeless people across LA.

It must also be stated that any attempts to "decompress" Skid Row's residency of Black homeless people by any measure is also an attempt to undermine Skid Row's Black population in the form of gentrification- of which, then, falls directly in line with the aforementioned systemic racist and systemic oppressive tactics that have continuously plagued Black residents of Skid Row for generations...Any additional tactics which appear identical or even similar to criminalization and/or displacement MUST be immediately eradicated and frowned upon by the courts, followed by the implementation of additional protections by the court in order of

protecting Black homeless individuals and families from the collective systemic racist and systemic oppressive wrath of both the City of LA and the County of LA.

The Skid Row Advisory Council strongly believes that all of the aforementioned issues MUST be addressed prior to any discussions regarding housing of any nature.

To completely omit the Skid Row Advisory Council's DEMANDS to appropriately address the widespread systemic racism and systemic oppression by both the City of LA and the County of LA prior to any other actions would be akin to completely ignoring the "generational rape" of the Black community.


With vigor,


The Skid Row Advisory Council


General Jeff

-Spokesperson

LETTER FROM SKID ROW STAKEHOLDERS
(DKT. 307)

96



LA20CV02291-DOC


















May 17, 2021

The Honorable David O. Carter
United States District Court – Central District of California
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Courtroom 9 D
Santa Ana, CA, 92701-4516

Honorable Judge Carter:

We write to you as leaders of 12 nonprofit organizations that have spent decades as part of the Skid Row community. The current situation on our streets is disgraceful. We commend your refusal to accept the current status quo. Your recent orders powerfully articulate the damning history of how we got to this awful place where more than 66,000 Los Angeles County residents are homeless. This includes more than 4,600 in Skid Row. Thank you for shining a spotlight on our collective problem and for demanding that our city and county must do better.

It is obvious that those stuck living on our streets would be better off in shelters and housing. We whole heartedly agree that all unsheltered residents should be offered a housing solution that best fits their unique needs. We agree that that there is a desperate need for more emergency shelter and permanent supportive housing for those struggling with mental health issues and/or substance abuse. And all of us agree that we

must do a better job of holding ourselves, our elected officials, and our fellow citizens accountable for this crisis.

Of course, we agree that shelter or housing should be offered to everyone living in Skid Row. What is critically important here is that new resources are provided to offer and provide this additional shelter and housing options. These new resources should not come at the expense of ongoing efforts to create affordable housing, provide healthcare, workforce development, and social services which strive to prevent homelessness more generally.

We need a this "and" approach to this problem, rather than a this "or" approach to the problem. It is incumbent upon us to provide more shelter and more housing, and we need to provide more supportive services. This approach will require additional funding. Without appropriate levels of funding, progress will not be made.

The bottom line here is that resources for additional shelter should not be diverted from current efforts to build housing or to keep people stably housed. It is essential that the City of Los Angeles honor its commitments to use Proposition HHH funding for specific permanent supportive housing projects. In addition, the County of Los Angeles should honor its commitments to use Measure H funding to support the needs of the individuals and families living in this housing.

Just because the overall problem is getting worse should not be interpreted to mean that nothing is working. Plenty of amazing work is happening to avert homelessness every day in Los Angeles. The challenge comes down to this:  the scope of the problem far outstrips the resources available to address it. We need to double down on what is working, and we must scale our activities up to the size of the problem.

As Skid Row stakeholders, we stand firmly against criminalizing homelessness. By including this statement outlining that after "adequate shelter is offered, the Court will let stand any constitutional ordinance consistent with the holdings of Boise and Mitchell," the court's injunction appears to be explicitly creating a road map to show local governments how to increase the use of punitive law enforcement. Actions of this sort will not help to end homelessness. Such criminalization will only lead to further retraumatization and displacement for those struggling to survive here. Since any court would need to independently assess the constitutionality of any future ordinances, we urge you to consider removing this advisory statement from the order.

We also encourage you to consider expanding your order to address the root cause of homelessness in Los Angeles—the collective failure to preserve and build significantly more affordable housing in every neighborhood. We urge you to order local governments to expedite and approve all pending low-income housing projects in the pipeline, to impose inclusionary zoning set-asides that would require that 25% of all new housing developments be affordable, and to require that new construction result in no net loss of affordable units. There are numerous policies (e.g., providing public land) that could be enacted to encourage the development of more affordable housing, along with a spate of anti-displacement protections that could allow people to stay in their homes. We must elevate the practical solutions that can ultimately solve this crisis.

Thank you for considering our thoughts and recommendations. We would welcome the opportunity to discuss these matters with you further.

Respectfully,

Chrysalis
Downtown Women's Center
Inner City Law Center
JWCH Institute, Inc.
Los Angeles Mission
Little Tokyo Services Center
Los Angeles Christian Health Center
Midnight Mission
Skid Row Housing Trust
SRO Housing
Street Symphony
The People Concern


cc:     Michele Martinez – Special Master, United States District Court, Central District of California
        Los Angeles County Board of Supervisors
        Honorable Eric Garcetti – Mayor, City of Los Angeles
        Los Angeles City Council
        Heidi Marston – Executive Director, Los Angeles Homeless Services Authority
        Elizabeth Mitchell – LA Alliance for Human Rights
        Shayla Myers—Legal Aid Foundation of Los Angeles
        Carol Sobel – Law Office of Carol A. Sobel

# LETTER FROM DOWNTOWN LOS ANGELES NEIGHBORHOOD COUNCIL (DKT. 310)

100

FILED
CLERK, U.S. DISTRICT COURT

5/25/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: KD DEPUTY



LA20CV02291-DOC

May 11, 2021

The Downtown Los Angeles Neighborhood Council (DLANC) Board writes this letter in support of Judge Carter's decision to deny the County's motion to dismiss themselves in the lawsuit filed by the Alliance for Human Rights against the City of Los Angeles and County of Los Angeles.

As you know, our neighborhood is at the epicenter of this crisis. Those of us who live, work and/or have businesses downtown see the pain on the streets which is not being addressed in a responsive, timely, or compassionate manner. The result of this grotesque negligence of the government in Los Angeles is the death of numerous unhoused Angelenos on a daily basis. We want to clearly reflect our board's strong feelings that the county, in particular, is missing in action in meeting their humanitarian responsibilities.

The DLANC Board also unanimously supported the goal of the 25 in 25 housing plan for 25,000 housing units in 2025 promoted by Councilmember Kevin de León and others, but there must be more action. Los Angeles County has one of the world's largest economies - death in our streets as a result of homelessness is unacceptable. Los Angeles can never claim to be a world class city with this humanitarian crisis hanging over us. We have already seen the homeless crisis become the image of Los Angeles to the world - one more powerful than the Hollywood sign or gleaming new towers in downtown.

DLANC stakeholders include our unhoused neighbors, who live with this failure of government every day in an up close and personal manner. We see women, mostly of color, curled up in fear in blankets, we encounter ravaged human souls in tents or in cardboard boxes on the sidewalks or under the freeways and sometimes the connection can feel threatening, especially for women or the elderly who live or work in the neighborhood. We don't even need to imagine what our unhoused neighbors experience on a daily basis because we witness it. It is their own personal living hell.

Thousands are saying, "Are you going to help me?" DLANC is saying yes, but we need the county and the city to step up - NOW!

Richard Nordin
President Downtown Los Angeles Neighborhood Council

101

# LETTER FROM CENTRAL CITY ASSOCIATION OF LOS ANGELES (DKT. 311)

Case 2:20-cv-02291-DOC-KES Document 306 Filed 05/20/23/07/24 Page 105 of 119 Page ID Page #:5520485

LA20CV02291-DOC

FILED
5/26/2021
CENTRAL DISTRICT OF CALIFORNIA
BY:   KD   DEPUTY

May 25, 2021

The Honorable David O. Carter
United States District Court - Central District of CA
Ronald Reagan Federal Building & US Courthouse
411 W. 4th Street, Courtroom 9 D
Santa Ana, CA 92701- 4516

Re: LA Alliance for Human Rights v. LA County & City

Dear Judge Carter,

CCA is a membership organization comprised of over 300 members including large employers, small businesses, housing developers, non-profit service providers and trade associations. Our broad coalition is committed to advancing comprehensive solutions to homelessness. We greatly appreciate all that you have done to raise awareness of the homelessness crisis in Skid Row and to bring a sense of urgency to housing unsheltered people living in Skid Row. Skid Row has served as LA County's center for homeless for decades, but it is under-resourced and the City and County continue to lack a coordinated response. **Skid Row is the right to place to focus your efforts and will serve as the barometer to measure the progress we are making to house homeless people.**

### Support for Skid Row

There are many experienced organizations in Skid Row providing interim and permanent housing and services. A number of these housing and service providers sent correspondence to you asking for your help to increase resources from and alignment between the City and County. We agree with those calls and believe your leadership has and should continue to require the City and the County to work together in a coordinated and productive manner. Under your guidance, the City and County agreed to an MOU to house people living by and below freeways. Once completed, the MOU will deliver almost 7,000 new housing solutions. This is a good example of the power that you have to help the City and County work together to support our rapidly growing unhoused population. We believe a similar focused approach could also be done in Skid Row. Skid Row housing providers are working on this challenge now and should provide input on a Skid Row-focused MOU between the City and the County.

### Updated CDC Guidance for Encampments

We are also looking towards June 15th when California is expected to fully reopen and the emergency orders regarding Covid-19 may be modified or lifted. Currently, the CDC has advised cities that encampments cannot be moved to help slow the spread of the virus, but it is unclear how long or if this guidance will remain in place. We are concerned that the current guidance and future ambiguity is contributing to worsening health and safety risks in and around encampments and hope that you will help clarify the guidance and work to restore our public spaces in conjunction with housing and services provision for the most vulnerable among us.

626 Wilshire Blvd., Suite 850, Los Angeles, CA 90017
213.624.1213  |  ccala.org

Case 2:20-cv-02291-DOC-KES   Document 306   Filed 05/20/21   Page 104 of 119   Page ID #:13520486



**CENTRAL CITY ASSOCIATION OF LOS ANGELES**

**CCA supports your effort to house homeless people, and we thank you for your commitment.** It will take strong, ongoing partnerships to build a stronger and more inclusive LA and we greatly appreciate your consideration of this letter.

Sincerely,

Jessica Lall
President & CEO
Central City Association of Los Angeles

Cc: Supervisor Solis, Chair, LA County Board of Supervisors
    Mayor Garcetti, City of LA
    Councilmember Ridley-Thomas, Chair, Homelessness & Poverty Committee
    Councilmember de León, Vice Chair, Homelessness & Poverty Committee
    Councilmember Buscaino, Member, Homelessness & Poverty Committee
    Councilmember Rodriguez, Member, Homelessness & Poverty Committee
    Councilmember Raman, Member, Homelessness & Poverty Committee

# COUNTY OF LOS ANGELES
# DEPARTMENT OF AUDITOR-CONTROLLER



**ARLENE BARRERA**
AUDITOR-CONTROLLER

# COUNTY OF LOS ANGELES
## DEPARTMENT OF AUDITOR-CONTROLLER

KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET, ROOM 525
LOS ANGELES, CALIFORNIA 90012-3873
PHONE: (213) 974-8301    FAX: (213) 626-5427

| NUMBER OF RECOMMENDATIONS | |
|---|---|
| **PRIORITY 1** | 0 |
| **PRIORITY 2** | 1 |
| **PRIORITY 3** | 1 |

February 14, 2020

TO:        Each Supervisor

FROM:    Arlene Barrera, Auditor-Controller

SUBJECT:  **LOS ANGELES COUNTY DEVELOPMENT AUTHORITY – HOMELESS INITIATIVE – STRATEGY B4: FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES – PERFORMANCE DATA AND EXPENDITURES REVIEW**

With the support and active participation of the Chief Executive Office (CEO) and the Los Angeles County Development Authority (LACDA), we have completed a review of LACDA's Homeless Initiative – Strategy B4: Facilitate Utilization of Federal Housing Subsidies (Strategy B4) performance data and expenditures. In collaboration with the CEO, LACDA serves as the lead agency in providing Strategy B4 services. Strategy B4 utilizes Measure H funding to support LACDA's Homeless Incentive Program (HIP), which offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders.

LACDA's Strategy B4 expenditures were allowable, supported, and used for HIP services as required. However, we identified opportunities where LACDA can improve and strengthen controls over Strategy B4 services. For example, LACDA could not readily provide the detailed supporting documentation for their July through September 2018 performance data. After our review, LACDA was able to assess and analyze their existing data to identify and provide the requested supporting documentation. However, LACDA should develop policies and procedures to ensure the appropriate documentation is always maintained and readily available.

**FAST FACTS**

LACDA serves as the lead agency in providing Strategy B4 services, which utilizes Measure H funding to support LACDA's HIP.

HIP offers monetary incentives to encourage landlords to rent their available units to homeless

These enhancements will provide greater assurance that LACDA has the appropriate procedures over Strategy B4 data to ensure the performance metrics are reported accurately.

For details of our review, please see Attachment I. LACDA's response indicates agreement with our findings and recommendations and is included in Attachment II.

We thank LACDA management and staff for their cooperation and assistance during our review. If you have any questions please call me, or your staff may contact Terri Kasman at (213) 253-0301.

AB:PH:TK:JH

Attachments

c:  Sachi A. Hamai, Chief Executive Officer
    Emilio Salas, Acting Director, Los Angeles County Development Authority
    Audit Committee

Section 8 voucher holders.

CEO advanced LACDA approximately $4.5 million, of which LACDA utilized approximately $4 million from October 2017 through September 2018.

CHIEF EXECUTIVE OFFICE

2020 FEB 18 PM 1:13

RECEIVED

Help Conserve Paper – Print Double-Sided
"To Enrich Lives Through Effective and Caring Service"

REPORT #X19910



http://census.lacounty.gov

107

# LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

**Attachment I**
**Page 1 of 2**

| Peter Hughes<br>ASSISTANT AUDITOR-CONTROLLER | Terri Kasman<br>DIVISION CHIEF |
| --- | --- |

## COUNTYWIDE CONTRACT MONITORING DIVISION

*Report #X19910*

## LOS ANGELES COUNTY DEVELOPMENT AUTHORITY
## HOMELESS INITIATIVE – STRATEGY B4
## FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES
## PERFORMANCE DATA AND EXPENDITURES REVIEW

### BACKGROUND AND AUDIT SCOPE

In collaboration with the Chief Executive Office (CEO), the Los Angeles County Development Authority (LACDA) serves as the lead agency in providing Homeless Initiative – Strategy B4: Facilitate Utilization of Federal Housing Subsidies (Strategy B4) services. Strategy B4 utilizes Measure H funding to support LACDA's Homeless Incentive Program, which offers monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders. Incentives include vacancy payments to landlords to hold housing units, participant move-in costs such as security and utility deposits, and financial assistance for damage claims caused by tenants. The CEO advanced LACDA approximately $4.5 million to provide Strategy B4 services, of which LACDA utilized approximately $4 million from October 2017 through September 2018.

We reviewed a sample of transactions from July through September 2018 to determine whether LACDA appropriately accounted for and spent Strategy B4 funds. In addition, we reviewed LACDA's Strategy B4 performance data for July through September 2018 to ensure the data was adequately supported with documentation.

108

| TABLE C-2 RECOMMENDATIONS AND CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| 1 **Supporting Documentation for Performance Data** - LACDA submits their Strategy B4 performance data to the CEO quarterly. During our review, LACDA could not readily provide the detailed supporting documentation for their July through September 2018 performance data. Specifically, LACDA did not maintain point-in-time details for the reporting period (i.e. July through September 2018) and instead, maintained real-time, running totals. As a result, LACDA could not readily generate reports to support the data for the specified timeframe.<br><br>After our review, LACDA was able to assess and analyze their existing data to identify and provide the requested supporting documentation. However, LACDA should develop policies and procedures to ensure the appropriate documentation is always maintained and readily available.<br><br>**Impact:** Increased risk of inaccurate and/or unsupported performance data. | **Priority 2** – LACDA management develop policies and procedures to ensure adequate documentation to support their reported performance data is appropriately maintained and readily available upon request.<br><br>**LACDA Response: Agree**<br>Implementation Date: October 2019 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Department's operations if corrective action is not taken.

Case 2:20-cv-02291-DOC-KES Document 306-12 Filed 05/29/23/07/24 Page 110 of 119 Page ID Page #:13592 0492

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| 2   **Support for Quarterly Expenditure Reports** - LACDA provides cash advances to their contracted Public Housing Agencies (PHAs) to ensure funds are readily available to provide Strategy B4 services. The PHAs spend down and track the funds in their quarterly expenditure reports submitted to LACDA, which are in turn reported to the CEO. However, we noted that LACDA does not require the PHAs to provide supporting documentation, such as detailed accounting records, at the time the quarterly expenditure reports are submitted.<br><br>It should be noted that we conducted Fiscal Year 2018-19 monitoring reviews for LACDA's two largest contracted PHAs and determined that the PHAs' Strategy B4 expenditures were allowable, supported, and used for their intended purposes. However, to enhance assurance over the accuracy/appropriateness of the quarterly expenditure reports, LACDA should require that PHAs provide supporting documentation with the reports.<br><br>**Impact:** Increased risk of inaccurate and/or inappropriate financial reporting. | **Priority 3** - LACDA management require additional information, such as the PHAs' accounting records, to be submitted with the quarterly expenditure reports.<br><br>**LACDA Response: Agree**<br>Implementation Date: November 2019 |

We conducted our review in conformance with the International Standards for the Professional Practice of Internal Auditing. For more information on our auditing process, including recommendation priority rankings, the follow-up process, and management's responsibility for internal controls, visit https://auditor.lacounty.gov/audit-process-information/



January 22, 2020

Arlene Barrera, Auditor-Controller
County of Los Angeles
Department of Auditor-Controller
Countywide Contract Monitoring Division
350 South Figueroa Street, 8th Floor
Los Angeles, CA 90071

SUBJECT:    RESPONSE TO LOS ANGELES COUNTY DEVELOPMENT AUTHORITY (LACDA) HOMELESS INITIATIVE - STRATEGY B4: FACILITATE UTILIZATION OF FEDERAL HOUSING SUBSIDIES PERFORMANCE DATA AND EXPENDITURES REVIEW

Dear Ms. Barrera:

This letter is in response to the results of the Performance Data and Expenditures Review conducted by the Los Angeles County Auditor-Controller's Office. The results of the review received by the LACDA cited two recommendations related to opportunities where we can improve and strengthen controls over Strategy B4 services.

## Recommendation #1:

The first recommendation resulted from the LACDA not readily providing the detailed supporting documentation for our July through September 2018 performance data. It was recommended that the LACDA develop policies and procedures to ensure adequate documentation to support our reported performance data is appropriately maintained and readily available upon request.

**LACDA's Response:** The LACDA management agrees with the recommendation. The LACDA agreed to establish a procedure to require the submission of statistical reports utilized in preparing the Homeless Initiative – Strategy B4 quarterly performance data to the Chief Executive Office by all Public Housing Agencies (PHAs) including LACDA. On August 19, 2019, the LACDA instructed all PHAs when submitting their quarterly report to make certain that the time and date is printed on the report to ensure that the reporting period reflects point-in-time details that correlates with their data. The implementation occurred within the 1st quarter reporting period; thus, quarterly reports received on or after October 1, 2019, are complying with the new procedures.



lacda.org

700 West Main Street, Alhambra, CA 91801
Tel: (626) 262-4511   TDD: (626) 943-3898

Acting Executive Director: Emilio Salas
Commissioners: Hilda L. Solis, Mark Ridley-Thomas, Sheila Kuehl, Janice Hahn, Kathryn Barger



112

Arlene Barrera, Auditor-Controller
January 22, 2020
Page 2

**Recommendation #2:**

The second recommendation relates to support for quarterly expenditure reports. It was noted that the LACDA does not require the PHAs to provide supporting documentation, such as detailed accounting records at the time the quarterly expenditure reports are submitted. To enhance assurance over the accuracy/appropriateness of the quarterly expenditure reports, the LACDA should require that PHAs provide supporting documentation with the reports.

**LACDA's Response:** The LACDA management agrees with the recommendation. LACDA established a procedure to require all PHAs to submit general ledger reports when requesting reimbursements for Strategy B4 expenditures. The LACDA notified PHAs that all required quarterly reports must be submitted to LACDA by the 15th day of the month following the end of each fiscal quarter. We further instructed the PHAs that the reports should be accompanied by fund expenditures supporting documentation such as financial ledgers. This procedure was implemented on November 25, 2019, during our Fiscal Year 2019/2020 Homeless Incentive Process Interagency Amendment process.

We will provide additional supporting documents during the follow-up review process. If you have any questions, please contact Matthew Fortini, Director of Finance and Budget at (626) 586-1890.

Sincerely,

EMILIO SALAS
Acting Executive Director

cc: Matthew Fortini, Director of Finance and Budget Division

113

# SKID ROW HOUSING TRUST LETTER (DKT. 305)



**SKID ROW HOUSING TRUST**
Homes. Support. Success.

1317 E. 7th Street
Los Angeles, CA 90021
213.683.0522 Tel
213.683.0781 Fax
skidrow.org

**Board of Directors**

Simon Ha, AIA
Chair
Steinberg Hart

Martice Mills
Vice Chair
The Capital Corps

Jennifer Christian-Herman, Ph.D.
Secretary
Blue Shield of California

Max Kolomeyer
Treasurer
Forbix Capital Corp.

Diane Ballen
Burnham Benefits

Nancy Goldblum Geller
Mattel, Inc.

Paul Gregerson, MD
JWCH Institute, Inc.

Benjamin Henwood, Ph.D.
USC School of Social Work

Rex Jones
Wells Fargo

Emil Khodorkovsky
Forbix Capital Corp.

Dan Mahoney
Pacific Empire Builders

Diana Skidmore
Crain & Associates

Patrick Spillane
IDS Real Estate Group

David Waite
Cox, Castle & Nicholson LLP

Lee Raagas
Chief Executive Officer

May 20, 2021

The Honorable David O. Carter
United States District Court – Central District of California
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Courtroom 9 D
Santa Ana, CA, 92701-4516

RE: LA Alliance for Human Rights vs. County of Los Angeles and City of Los Angeles

Honorable Judge Carter:

Skid Row Housing Trust ("The Trust") respectfully submits this letter to provide perspective, support and commitment to the court's efforts to resolve the enduring crisis of homelessness in Los Angeles vis a vis LA Alliance for Human Rights v. County of Los Angeles and City of Los Angeles. It is the organization's hope that this communication, combined with our track record of housing solutions, facilitates a partnership to continue solving the crisis.

In response to your injunction and clarifying orders, the Trust signed letters of support with other organizational leaders dedicated to addressing the criticality in Skid Row. In addition to that collective support, the Trust welcomes the opportunity to specifically share the direct perspective of an organization that has implemented solutions for over 30 years. We are currently responsible for 36% of residential units that include services in Skid Row and have permanently ended homelessness for 10,037 people. As a community operator, the Trust operates 26 buildings and over 2,000 units of permanent supportive housing ("PSH"), offering supportive services, property management and asset management. Skid Row Housing Trust is a real estate developer, health and social service provider and a Skid Row based employer & workforce developer.

Your adjudication of the LA Alliance for Human Rights case created urgency and acceleration in a community that was in a decades long crisis prior to the pandemic. For that, the Trust extends its deepest gratitude.

We appreciate the urgency of the court's focus on our 4,600 unhoused neighbors in Skid Row, 2,100 of whom are unsheltered. The Trust supports more shelter and housing of all types to be implemented immediately and further proposes additional resources be deployed in resolving the homelessness crisis without jeopardizing existing affordable and permanent supportive housing ("PSH") development pipeline or its funding. There should be an equal amount of attention placed on streamlining timelines and financial management as well.

**Support Position & Recommendation One (1) – House / Shelter Those Suffering and Dying on the Streets**

Skid Row Housing Trust supports the priority to immediately address those suffering and dying on the streets. There was a sharp increase in homelessness prior to the COVID 19 pandemic. Unfortunately, there was no count in January 2021, meaning the industry will be working with January, 2020 numbers through May, 2022. That

Case 2:20-cv-02291-DOC-KES   Document 305   Filed 05/21/21   Page 116 of 119   Page ID #:13620498
Page 2 of 5

count delay will unfortunately skew the already poor numbers and trend to a false baseline, as the actuals are known to be worse.

The Trust is concerned about the growth in chronic homelessness, 58% year over year in the Continuum of Care and 35% in Skid Row. Unfortunately, underinvestment in safe camping, shelter and transitional housing is creating an increasing number of individuals and families exposed to prolonged trauma on our streets. We know firsthand that chronic homelessness requires the most costly and complicated solutions in the housing ecosystem and want to make sure every effort is taken to embrace lower cost interventions to keep people housed and provide relief from suffering long before there is a need to address chronic levels requiring PSH solutions. PSH requires complex financing, re-syndication every 15 years and active asset management for 55 years with limited provision for inflation and rising operating costs.

Skid Row Housing Trust, along with its community alliances have raised urgent and consistent concerns around the following:

- Ensuring street safety for **existing** residents that consider Skid Row their permanent home and living community
- Ensuring health & safety for encampment population; sidewalks and streets were not designed for habitability and rising climate concerns regarding heat from concrete and tar negatively affect those living directly on that heat. Emissions due to construction impact those living on the streets as well. Outbreaks of infectious disease; Tuberculosis, Hepatitis A, and Flea Borne Typhus were prevalent in our Skid Row community long before COVID
- Ensuring sidewalk accessibility for disabled Residents living in Skid Row. It has become impossible for Residents / Clients living in Skid Row to utilize sidewalks forcing those with disabilities to walk in the streets causing unsafe circumstances.
- Ensuring Employee safety to and from work. Employees experience onsite and near-site assaults as well as workplace accidents resulting in significant Employer and City risk

Recommendation = Provide sites and funding for outreach and engagement, safe camping, shelters and transitional housing to create a conduit so those living in safe campsites and shelters have prioritized access to transitional and permanent supportive units available through vacancies and/or development in Skid Row.

### Support Position & Recommendation Two (2) – Increase Subsidies, Safety and Security

Skid Row Housing Trust supports the financial audit, funding review and potential reallocation of resources to effectively fund a full ecosystem of solutions. The most immediate needs are safe camping, shelters, and transitional housing. The affordable and permanent supportive housing pipelines must be accelerated, not decelerated. In the PSH space, the most urgent need is unit based vouchers for operating subsidies to complete the Proposition HHH pipeline. Historically, Skid Row Service Providers had differing philosophies of how to address this crisis. While those Organizations have co-existed, served and provided solutions, efforts have fallen short to effectively collaborate serving the overall community. Failure has occurred in; 1.) lack of resources to support upticks in crime and pandemic costs, leaving providers across the spectrum to absorb the responsibility of the growing risk they are neither funded nor trained to manage, 2.) lack of subsidies for current Los Angeles development pipeline in process and, 3.) lack of project based voucher subsidies for units for

forecasted housing needs overall. Residents and Clients have been forced to resort to leaning on CBO's and NGO's for needs such as policing, security, public safety, sanitation, enforcement but with no funding and resources to do so. That expertise and responsibility lies with the City and County. Significant increase in property damage and loss have forced providers to identify philanthropic funding sources while simultaneously managing increasing unfunded COVID costs. Specific impacts and requests to solve are listed below:

- The Organization fully supports all calls and initiatives to continue to decriminalize poverty and homelessness
- Ensuring safety for Veterans experiencing homelessness concerned about Skid Row resulting in lack of interest in moving into housing
- Providing enhanced funding to housing, program and service providers
- Increasing police presence for predation and organized crime in Skid Row
- Transition "policing" from housing and service providers to law enforcement and other government specialists to provide mental health intervention and de-escalation. Developers and service providers should not be in position to manage crime in or out of buildings / communities
- Provide a one time "Relief Package" to provide "recovery" funds for damages sustained during 2020 due to lack of City, County support for COVID impact unaddressed by the CARES Act as well as the Continuum of Care Emergency Manager for FEMA funding, LAHSA, and county crisis management agencies Department of Public Health and Department of Health Services
- Provide ongoing financial support for services and property management in Skid Row by increasing property management fees to "reasonable" premiums for high crime and communities impacted by encampments and crime

Recommendation = Provide more funding, resources and subsidies for safe camping, shelter, interim/transitional housing and permanent supportive housing to immediately and significantly decrease the risks and damage the community.

**Support Position & Recommendation Three (3) – Identify, Collaborate and Innovate Solutions; Rapidly Match Existing Supply to Demand**

Skid Row Housing Trust supports the improved collaboration of all parties at the City and County level with those in the field providing the solutions. That improvement includes a rapid reduction in time to provide and approve a recommended Resident / Client to service providers for available units. There is existing "housing stock" in Skid Row that has become unattractive to new and potential Residents / Clients due to the increased encampment and crime in the community. There are multiple phases of homelessness and therefore multiple solution typologies. A root cause analysis is required to appropriately match needs. Supply and Demand typology examples are:

- Chronic = typically requires Shelters and Permanent Supporting Housing
- Episodic = typically requires Rapid Re Housing and/or Interim Housing
- Transitional = typically requires Internal and/or Transitional Housing
- Hidden = could be a combination of the above

Recommendations and Solutions:

- Identify and fund outreach, engagement, land and supportive services for those who refuse housing due to concerns of privacy or losing possession of belongings



SKID ROW
HOUSING
TRUST

1317 E 7th Street, Los Angeles, CA 90021 | 213.683.0522 Tel | 213.683.0781 Fax | skidrow.org

- Fund safe camping and shelter expansion
- Re-engage and support interim and transitional housing or equivalent

**Support Position & Recommendation Four (4) – Seek to Understand Those with Experience & Operations in Skid Row**

The make-up of Skid Row geographically is a semi-complicated definition and delineation of boundaries and descriptions. That complexity results in either a.) "multi" accountability or b.) "absent" accountability therefore leaving many businesses and providers in the community to manage and regulate independently which are neither designed, nor funded to do. While that experience has reaped objective and subjective expertise, it is time for additional resources to support those in Skid Row by definition of their responsibilities. Intersecting authorities in Skid Row are further complicating. The Industrial District BID is bordered by Third, 8th, Alameda and San Pedro, extending a block beyond Skid Row to 8th Street. There is no BID from San Pedro to Los Angeles in Skid Row. The Historic Core BID picks up at Los Angeles and covers the buildings on Main between 3rd and 7th. Skid Row comprises three (3) separate census tracts, 2073, 2062, and 2063.

There are approximately 5,400 affordable, residential units in the traditional fifty block Skid Row boundary with over two thirds (71%) or 4,000 of these being operated by Skid Row Housing Trust and SRO Housing. Skid Row is considered one of the highest communities in the nation. There's a perception that housing providers and shelters do not have common ground, however all Organizations are committed to decreasing the highest number of people at risk slipping into chronic homelessness (as outlined above) which is the most difficult, expensive and complex population to house and serve. Prioritizing and solving for that forecasted risk is an aligned goal for Skid Row providers. Weingart provides hundreds of housing assistant options and thousands of direct, multi-faceted services. Shelters such as Union Rescue Mission and The Los Angeles Mission, provide thousands of beds and food services every day to existing homeless individuals in our community. Our collective expertise and data are available and we encourage the combined platform to be heard. We at the Trust and Mike Arnold of The Midnight Mission, Reverend Andy Bales of Union Rescue Mission, Senator Kevin Murray of the Weingart Center, Anita Nelson of SRO Housing Corporation and Troy Vaughn of the LA Mission have met to collaborate on solving this post pandemic crisis with the experience and tangible results all the Organizations have demonstrated for decades. We are all encouraged by our shared commitments and hope the court will entertain guidance from the largest providers in Skid Row.

Residential Contributions & Collective Impact:

- ✓ SRO Housing; 2,099 residential units / 29 buildings / Development Pipeline
- ✓ Skid Row Housing Trust; 1,972 residential units / 27 buildings / Development Pipeline
- ✓ Weingart; 600 housing assist units / 1 building / 40,000+ multi services provided / Development Pipeline
- ✓ Shomof 415 units / 3 buildings
- ✓ DWC 119 units / 1 building
- ✓ Mercy Housing 28 units / 1 building
- ✓ Other - 794 Units



SKID ROW
HOUSING
TRUST

Case 2:20-cv-02291-DOC-KES   Document 306   Filed 05/20/21   Page 119 of 119   Page ID #:8501

Skid Row Shelter and Bridge Housing Contributions & Impact:

- Union Rescue Mission; 1,000 housed per night / 3,000 fed per day
- Los Angeles Mission; 340 housed per night / 1,100 fed per day
- The Midnight Mission; 50 housed per night / 2,200 fed per day

The Trust supports immediately transitioning people off the street and into humane, sanitary and safe environment including an "all hands" approach to find temporary, bridge, transitional, permanent housing with service options to accommodate different people with different needs. This comprehensive approach includes building permanent supportive housing because a solution that does not include a permanent home only prolongs homelessness.

Skid Row Housing Trust is both a resource and an ally in collectively ending this crisis with all partners committed to ending homelessness.

Thank you for your consideration,

Lee Raagas
Chief Executive Officer

Distribution:

- Michele Martinez – Special Master, United States District Court, Central District of California
- Mayor Eric Garcetti
- City Council President Nury Martinez
- Councilmember Joe Buscaino
- Councilmember Kevin De Leon
- Supervisor Hilda Solis
- Supervisor Holly Mitchell
- Senator Maria Elena Durazo
- Senator Sydney Kamlager
- Assemblymember Miguel Santiago
- Congressman Jimmy Gomez
- Heidi Marston – Executive Director, Los Angeles Homeless Services Authority
- Elizabeth Mitchell – Spertus, Landes &Umhoffer, LLP



SKID ROW
HOUSING
TRUST

1317 E 7ᵗʰ Street, Los Angeles, CA 90021 | 213.683.0522 Tel | 213.683.0781 Fax | skidrow.org