UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>　　　　Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS**<br><br>Before:  Hon. David O. Carter<br>Courtroom: 10A<br>Hearing Date:  March 4, 2024<br>Hearing Time:  8:30 p.m. |

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE on the above date and time Plaintiffs will and hereby do move for an order compelling specific performance by the City of Los Angeles and sanctions for non-compliance with the agreement. This motion is set for hearing on March 4, 2024, at 8:30 a.m. before the Honorable David O. Carter in the United States District Court, Central District of California, Western Division, located at 411 West Fourth Street, Courtroom 10A, Santa Ana CA 92701-4516.

The motion is made following the conference of counsel that has taken place numerous times from January 30, 2023 to most recently January 17, 2024 with assistance from the Honorable District Court Judge Andre Birotte and Special Master Michele Martinez. This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Elizabeth A. Mitchell and exhibits attached thereto, the pleadings and records on file in this action, and any further oral or written documentation that may be provided to the Court as necessary or requested.

Dated: February 7, 2024        Respectfully submitted,

/s/ Elizabeth A. Mitchell
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

ii
*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ......................................................................................1

II.   THE CITY WILLFULLY VIOLATED THE SETTLEMENT AGREEMENT FOR 447 DAYS.......................................................................2

    A.    The Settlement Agreement Requires Milestones and Deadlines for Encampment Engagement, Cleaning, and Reduction in Each Council District ...............................................................................................3

    B.    The City Willfully Violated the Milestones and Deadlines Provision from November 2022 through January 2024 ..............................................4

    C.    The City Engaged in Bad Faith Negotiation for 14 Months......................4

III.  PLAINTIFFS, THIS COURT, AND THE CITY LOST MORE THAN A YEAR OF ACCOUNTABILITY UNDER THE SETTLEMENT AGREEMENT...........................................................................................10

IV.  THIS COURT MUST ORDER CITY TO COMPLY WITH TERMS OF SETTLEMENT AGREEMENT....................................................................13

    A.    The Requested Sanctions are Warranted ................................................. 14

V.   CONCLUSION .......................................................................................17

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

# TABLE OF AUTHORITIES

**CASES**                                                      **PAGE(S)**

*Ahearn ex rel. N.L.R.B. v. Inteternational Longshore & Warehouse Union, Locals 21 & 4,*
721 F.3d 1122 (9th Cir. 2013) .......................................................................15

*In re Suchy,*
786 F.2d 900 (9th Cir. 1985) .........................................................................15

*International Union, United Mine Workers of America v. Bagwell,*
512 U.S. 821 (1994).........................................................................................15

*Kelly v. Wengler,*
822 F.3d 1085 (9th Cir. 2016) .......................................................................14

*Kokkonen v. Guardian Life Insurance Co. of America,*
511 U.S. 375 (1994).........................................................................................14

*Stone v. City & County of San Francisco,*
968 F.2d 850 (9th Cir. 1992) .........................................................................15

*TNT Marketing, Inc. v. Agresti,*
796 F.2d 276 (9th Cir. 1986) .........................................................................15

**RULES**

Federal Rules of Civil Procedure 41 ...................................................... 14, 15

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

## I.    INTRODUCTION

For more than a year, the City of Los Angeles has willfully and intentionally violated the Settlement Agreement in this case and failed to meet the milestones it set for itself.

After this case invited judicial scrutiny on the City's decades of ineptitude on homelessness, the City entered into a Settlement Agreement that required milestones and deadlines for the creation of new beds and reduction of encampments.  Over the ensuing year following the Court's approval of the Agreement, **the City obstructed efforts to establish critical encampment milestones and created far fewer beds than it promised to.**

The City has compounded its non-compliance by claiming success in the face of failure—recently telling the *Los Angeles Times* that the City and its new leadership had moved 21,000 persons experiencing homelessness off the streets.  That assertion cannot be squared with City's own statistics. Specifically:

- The City set a milestone of 3,700 new beds in the last fiscal year—and then conceded it had created only 1,748 beds in that period.
- The City committed to creating a total of 5,190 beds by the end of 2023, but admits that it has only created 2,810—falling 2,380 short.
- While falling 2,380 beds short, the City claims success in sheltering 1,951 PEH through the new Inside Safe program—with far less than 2,380 beds.  The City simply "borrowed" Alliance beds and called it a successful new program.
- The 21,000 number is not traceable to City initiatives, but instead reflects double- and triple-counting, and reflects mostly federal, state, and county initiatives.  Critically, at least 13,972 of the identified 15,923 individuals counted were brought inside through efforts that either had nothing to do with the City or arose from efforts that pre-dated the City's new leadership.

1

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

Because the City has willfully violated the Settlement Agreement for 14 months and is failing to perform under the Agreement, sanctions must by imposed.

## II. THE CITY WILLFULLY VIOLATED THE SETTLEMENT AGREEMENT FOR 447 DAYS

The complaint tells the story of the homelessness crisis in Los Angeles and the City's complicity in that crisis—in particular, a disturbing lack of urgency and a profound lack of accountability.  That complaint led to settlement agreements that were designed to fix those failures by setting urgent deadlines and imposing accountability on the City and the County.  The deadlines in the City agreement center on two related efforts: (i) the creation of beds and (ii) the filling of those beds through encampment reduction.

Encampment reduction was a critical element of the deal for the Plaintiffs because it ensures that the City is moving people from unsanitary, unsafe conditions on the street and into the beds created by the City under the Settlement Agreement. Encampments are dangerous—often deadly—to people living in them and to the surrounding communities.  They attract and propagate drugs, crime, violence, fires, and disease.  Throughout the litigation, encampments and the need to reduce them has been a singular focus for the Plaintiffs.

Despite the importance of encampment reduction to the deal, the City spent 13 months refusing to even propose the encampment reduction deadlines required by the Agreement and when it finally did, it still refused to produce district-specific numbers. This was an egregious violation of both the letter and the spirit of the Agreement and there must be consequences to ensure that defendants are not emboldened to further ignore their commitments.

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

**A.** **The Settlement Agreement Requires Milestones and Deadlines for Encampment Engagement, Cleaning, and Reduction in Each Council District**

The City's obligation to establish milestones and deadlines appears in Section 5.2 of the settlement agreement. Under that Section, the City must first calculate the Required Number (i.e. number of beds the city will create), and then it is required to:

Create plans and develop milestones and deadlines for:

(i)     the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH [persons experiencing homelessness] in each Council District as determined by the Required Number;

(ii)    the City's plan for encampment engagement, cleaning, and reduction in each Council District;

(iii)   the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and

(iv)    the City's plan for encampment engagement, cleaning, and reduction in the City.

(Stipulated Order re Dismissal, Ex. 1, Settlement Agreement (hereinafter "Settlement Agreement") 4:8–12, ECF No. 421-1; Order Approving Settlement, ECF No. 445.)

Under the plain language of Section 5.2, the City had an obligation to "provide the plans, milestones and deadlines to Plaintiffs" at which point "the City and Plaintiffs" would "work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines" and "consult with the Court for resolution, if necessary." (Settlement Agreement 8:22–26.)

3

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

**B.**    **The City Willfully Violated the Milestones and Deadlines Provision from November 2022 through January 2024**

The Plaintiffs and the City consummated the settlement agreement on May 19, 2022.  After several months of initial delay by Los Angeles Homeless Services Authority (LAHSA), the City finally calculated the "Required Number"—that is, the total number of beds it must provide under the Agreement based on the point-in-time count—on October 6, 2022, and provided it to Plaintiffs. (Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") Ex. A, City Shelter Appropriate Tracker, Oct. 4, 2022.) After another month of delay, on November 11, 2022, the City provided to Plaintiffs its proposed plans, milestones, and deadlines for **beds**—"creation of shelter and housing solutions" under Sections 5.2(i) and 5.2(iii). Settlement Agreement, p. 8.  **But the City made no effort to provide plans, milestones, and deadlines for encampments**— "engagement, cleaning, and reduction" of encampments in each Council District or Citywide pursuant to 5.2(ii) and 5.2(iv). (Mitchell Decl. Ex. B, Alliance – Potential Project List and Roadmap – Alliance Milestones, as of Nov. 9, 2022.)  This was the beginning of a 14-month odyssey of City violations of the settlement agreement.

Believing—incorrectly—that the City was acting in good faith under a new mayor who had made bold and sweeping campaign promises concerning homelessness, Plaintiffs waited to bring this issue to the Court's attention until after a January 17, 2023, hearing on the County settlement, at which the new mayor would appear and discuss her new plans. (Mitchell Decl. ¶ 3.)

**C.**    **The City Engaged in Bad Faith Negotiation for 14 Months**

January 17 came and went, without any further commitment to encampment milestones and deadlines.  (Mitchell Decl. ¶ 4.)

On January 30, 2023, the Alliance again approached the City to meet and confer about the city's failure to provide deadlines in violation of Section 5.2(ii) and (iv), and Plaintiff's concerns about the adequacy of the City's housing and shelter plans under

4

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

Section 5.2 (i) and (iii). (Mitchell Decl. Ex. C, Letter from E. Mitchell to S. Michaelson and S. Marcus, dated Jan. 8, 2024.)[1] The City denied any violation and refused to provide updated plans pursuant to Section 5.2. (*Id*.)  This was the third instance of the City refusing to comply with Section 5.2(ii) and (iv).

After several delays caused by City (and city attorney) schedules, Plaintiffs finally met with the City (represented by Scott Marcus, David Michaelson, and Mercedes Marquez) on March 8 and again March 15, 2023 to discuss the City's non-compliance with the Agreement.  (Mitchell Decl. ¶ 5.)

On March 15, 2023, the City—specifically then-Chief Housing and Homelessness Officer Mercedes Marquez—claimed that the City had significant plans intended to come into compliance with Section 5.2(ii) and (iv).  Specifically, Marquez assured Plaintiffs that the City had already put out an RFQ (Request For Quote or Request for Qualification) for service/outreach providers, would be "fully staffed" with an assigned service/outreach provider for each district by July 1, 2023, and would "have each district fully assessed" (which was described as identifying the numbers of unsheltered PEH, plus a description of the needs of various groups, including an estimate of the number of individuals with serious mental illness and substance use disorder, in each district) by September 30, 2023.  (Mitchell Decl. ¶ 5.)  Ms. Marquez promised that once that effort was complete, the City would then provide the Alliance its proposed encampment milestones and deadlines by October 1, 2023.  (*Id*.)  Counsel for the Alliance, Elizabeth Mitchell, summarized the meeting in an email thereafter:

> In our last meeting we talked about the RFQ that the City has put out
> for a list of qualified service/outreach providers, and that the City
> expects to be fully staffed with the District's chosen providers by July 1

---

[1] The letter from Plaintiffs to City dated January 8, 2024 summarizes the entire meet-and-confer process.  Each date is associated with voluminous e-mails relevant to this analysis.  However, the City has asked Plaintiffs to keep the communications themselves confidential, and only submit the more recent letters.  Plaintiffs defer to the Court on whether the e-mails themselves are necessary to the court's resolution of this motion, and will produce said e-mails upon request.

5

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

. . . . We also discussed that the City could commit to having each district fully assessed and get us a list of proposed milestones and deadlines within 3 months thereafter (October 1).

(Mitchell Decl. Ex. C, at 2.)

Relying upon the promises of the new mayor's representative, and extending a good faith opportunity to a new administration, the Alliance agreed to the extension. Mr. Marcus, on behalf of the City, confirmed the request for extension and the City's need to provide encampment deadlines by October 1, 2023. (*Id.*)

The City blew that deadline as well.  Two days after October 1, the City gave Plaintiffs its "Encampment Engagement, Cleaning, and Resolution" proposal … that contained no proposed deadlines or milestones at all.  (Mitchell Decl. Ex. D, Encampment Engagement, undated.)  The Alliance and the City (again represented by Scott Marcus, David Michaelson, and Mercedes Marquez) met about the City's violation of the agreement during which Ms. Marquez confessed that the City had violated its promises in March to hire preferred service/outreach providers for encampment reduction in each district and assess each district's needs, and had instead done nothing towards these commitments. (Mitchell Decl. ¶ 9.)  This was the third instance of the City refusing to comply with Section 5.2 (ii) and (iv).  The Alliance had waited months in reliance on false promises of City progress, while the City had done none of the things it had promised to do to come into compliance with this section.

The Alliance again insisted the City comply with Section 5.2(ii) and (iv) and provide the encampment deadlines required by the Agreement.  (Mitchell Decl. ¶ 10.) Unable to bring the City into compliance, the Alliance brought the City's violation of Section 5.2 to the attention of Michele Martinez, appointed monitor to oversee the City/Alliance settlement agreement.  (Mitchell Decl. Ex. E, Email from E. Mitchell to M. Martinez, dated Oct. 19, 2023.)  After a Zoom meeting with the parties, Ms. Martinez asked the parties to again meet and try to come up with a plan that would satisfy both parties.  (Mitchell Decl. ¶ 11.)  The parties then met to discuss the issue on

6

November 8, 2023; at that meeting the City proposed its first 5.2 commitment: a single encampment resolution per month for the entire city. (*Id.*) The City claimed no more could be done because there was insufficient bed capacity. (*Id.*) The Alliance responded that a lack of bed capacity necessarily meant that the bed-creation plans the City had provided under Section 5.2 (i) and (iii) were insufficient if the City couldn't increase its milestones sufficiently to address the severe crisis on the street. (*Id.*)

On November 29, 2023, the City submitted an updated Encampment Engagement, Cleaning, and Reduction plan to the court and counsel—and still, it did not comply with Section 5.2. The City proposed to resolve "at least two tent and makeshift shelter encampments and at least three RV encampments involving at least 100 individuals" per month for the first six months of 2024, and thereafter "aim[]" to increase to "three tent and makeshift shelter encampments and four RV encampments involving at least 150 individuals" per month for the second half of 2024. (Mitchell Decl. Ex. F, Encampment Engagement, update at 5–6.) But there were two major problems with this proposal. *First,* the City's proposal was still facially non-compliant with Section 5.2 because it ignored the requirement that the City propose milestones and deadlines for "encampment … reduction in each district." (Settlement Agreement 8:14–28 (emphasis added).) This was the fourth instance of the City refusing to comply with Section 5.2 (ii). *Second,* the City's proposed "plan" was plainly insufficient—at a rate of 1,800 individuals, citywide, per year, the City would not meaningfully reduce the numbers of the 32,680 unsheltered persons experiencing homelessness in Los Angeles.

Still unable to move the City into compliance or obtain a City commitment that matched the scale of the crisis, the Alliance <u>again</u> requested that the Court resolve the matter under Section 5.2.[2] The court set a hearing date for resolution of this dispute

_____

[2] Section 5.2 further provides:
The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good

7

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

for December 14, 2023. As the hearing approached, the City made a series of proposals that culminated in a commitment of 9,782 resolutions,[3] encompassing tents, makeshift shelters, RVs, vans, and cars over a five year period (including the entire agreement). (Mitchell Decl. Ex. C, at 2.) The City then committed to submitting the new numbers in writing to the court and Plaintiffs by the end of the month. The City did not, however, comply with Section 5.2(ii)'s requirement of establishing district-by-district encampment milestones. (Mitchell Decl. ¶ 14.)

On December 29, 2023, the City unilaterally increased its proposed encampment reduction commitment to "a minimum of 12,000 tents, makeshift shelters, cars, vans, and RVs over the term of the settlement agreement . . ."—an increase from the previously agreed-to 9,782 resolutions. (Mitchell Decl. Ex. G, Revised Encampment Reduction Milestones at 1.) The City imposed no conditions on this 12,000-encampment reduction number—it did not condition the 12,000 on anything from the Plaintiffs and did not suggest that the 12,000 was contingent upon the Plaintiffs giving up the district-by-district demands of Section 5.2(ii). But still, the City did not provide district-by-district encampment reduction numbers as required by Section 5.2(ii)—this was the fifth instance of the City's failure to comply.

On January 4, 2024, the Alliance, represented by Paul Webster, Matthew Umhofer, and Elizabeth Mitchell, met with the City, represented by Mayor Karen Bass, Chief Housing and Homelessness Officer Lourdes Castro Ramirez, Chief Administrative Officer Matthew Szabo, Counsel to the Mayor David Michaelson, and Chief Assistant City Attorney Scott Marcus. At this meeting, the parties discussed mutual goals, and the mayor and staff explained their focus on citywide efforts.

---

faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. (Settlement Agreement 8:22–26.)

[3] Because the word "encampment" was difficult to define, the City and Alliance used LAHSA metrics for tents, makeshift shelters, cars, vans, and RVs. LAHSA CVRTM conversion factors (Aug. 15, 2022), https://www.lahsa.org/documents?id=6533-cvrtm-summary-by-geography.

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

(Mitchell Decl. ¶ 17.) No council member was present. During that meeting, the City withdrew its unconditional commitment to 12,000 encampment reductions and attempted to revise the history of the negotiations by suggesting the 12,000 number was conditioned on an Alliance agreement to abandon the district-by-district requirements of Section 5.2(ii). The City then declared that if the Alliance insisted on district-by-district numbers as required by Section 5.2(ii), the City would only commit to 5,300 encampment resolutions.[4] (*Id.*) The Alliance explained—as it had for the entire prior year—that the district-specific numbers were required under the settlement agreement and were necessary for accountability. No agreement was reached at this meeting. (*Id.*)

Two days later, on January 6, 2024, the City (David Michaelson) emailed counsel for the Alliance stating, for the first time "The City . . . will update the encampment reduction goal to 9,800 . . . and provide district by district milestones." (Mitchell Decl. ¶ 18.) The City then provided, for the first time—and 14 months after it was required to— proposed milestones and deadlines for each district throughout the City. (Mitchell Decl. Ex. H, Milestones, undated.)

The Alliance then began assessing these new district-by-district numbers, and learned that they were not the product of any consultation with the City Council members who represent those districts. (Mitchell Decl. ¶ 19.) In March 2023, the City had promised to analyze the needs of each district and engage each Council member to arrive at <u>real</u> district-by-district number that reflected the needs of each district in the City. But in January 2024, the City had still not done what it had promised. This was the sixth violation of Section 5.2(ii).

---

[4] The 5300 number came from an original proposal from the Alliance prior to the December 14 hearing, which was the result of a mistaken view of the relevant encampment numbers. Recognizing the mistake, the Alliance immediately withdrew that number and informed the City of withdrawal, which culminated in the agreement to 9,782. (Mitchell Decl. Ex. C.)

9

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

In response to the City's continued failure to provide vetted and agreed-to district-by-district encampment reduction numbers,[5] the Alliance sent a written demand seeking: (i) a return to the 12,000 resolution commitment or 9,800 within a 4-year period (ending in June, 2026) rather than 5, (ii) quarterly reporting, (iii) specific plans for egregiously ignored areas of Skid Row and Avenue 45, and (iv) monetary sanctions as a consequence for the City's willful noncompliance with the Settlement Agreement and to deter future similar violations. (Mitchell Decl. Ex. C, at 3–4.) The City responded by offering 9,800 resolutions within 4 years (by June, 2026), and quarterly reporting, but refusing to provide specific plans for designated encampments and refusing to pay any sanctions amount. (Mitchell Decl. Ex. I, Letter from S. Marcus to E. Mitchell, Jan. 10, 2024.)

Under threat of exposure and multi-million dollar sanctions, the City finally provided Council-approved commitments under 5.2(ii) and (iv) and came into compliance with the Agreement—447 days late. (Mitchell Decl. Ex. J., Milestones.)

## III. PLAINTIFFS, THIS COURT, AND THE CITY LOST MORE THAN A YEAR OF ACCOUNTABILITY UNDER THE SETTLEMENT AGREEMENT

The City's 447-day violation of the Settlement Agreement was no mere foot-fault—it allowed the City to delay and evade accountability under the Agreement. By

---

[5] Specifically:
　(i)　　refusing to provide any numbers at all,
　(ii)　　promising a significant evaluation effort with meaningful numbers with apparently no intention to ever fulfill that promise and no communication during that period about any changed plans,
　(iii)　　*still* refusing to provide any numbers or commitment at all,
　(iv)　　providing only minimal efforts and apparently misleading the news media about successes,
　(v)　　committing to numbers the morning of the hearing and again in writing to the court, then withdrawing and changing the terms of the commitment and thereby negotiating with human lives, and
　(vi)　　re-committing to 9,800 (slightly up from 9,782 that had been agreed-to on December 14, 2023 but still lower than the number previously committed to on December 29, 2023.) (Mitchell Decl. Ex. C, at 3–4.)

10

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

delaying and obstructing the establishment of the complete set of milestones and deadlines required by the Agreement, **the City prevented the Plaintiffs and this Court from enforcing the Agreement in any meaningful way for more than a year**.

The lack of accountability occasioned by the City's noncompliance is established by the City's own numbers.

In this case, the City set a milestone for itself to create 5,190 beds by the end of 2023 (Exhibit B) —but the City's own reports filed in this case admit that the City has created only 2,810 beds. (City's Quarterly Status Report, Ex. A, Jan. 16, 2024, ECF No. 660-1). **This means that in the past year—while the City refused to establish the full set of milestones and deadlines under the Agreement—the City fell 2,380 beds short of the threshold it set for itself in this case.**[6]

The City has also claimed that it separately brought roughly 2,000 people inside through the Inside Safe program, which relies on short-term hotel beds. But the City has also acknowledged that because these beds are temporary, they do not count toward the City's bed commitments in this case. Therefore, the City has devoted substantial resources to a temporary program that does not advance the cause of the Settlement agreement—"borrowing" from the Alliance beds while leasing only short-term motels that will ultimately be closed. This is neither the progress nor the accountability contemplated by the Agreement.

Recent claims of success by the City are belied by the City's own math. In a December, 2023 *Los Angeles Times* article (and on a City website), the Mayor stated

---

[6] The Alliance has never approved nor submitted this document, because it insisted on the City fully complying with Section 5.2 by providing all the milestones and deadlines required by that section before the Alliance evaluated the sufficiency of the City's.

11

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

that her administration had brought 21,694 persons experiencing homelessness inside in 2023.[7]  That figure is problematic for several reasons:

- The 21,694 figure represents "touches" and not people.  (Mitchell Decl. ¶ 21.)  The City and LAHSA do not track individuals, and people can and regularly do cycle in and out of programs more than once, meaning the 21,694 includes double-, triple-, or quadruple-counting of the same individuals. (*Id*.)

- The City's figure takes credit for the efforts of the federal government, the state government, and the county.[8]  What the new administration has actually done is less than 10% of that number (slightly less than 2,000).

---

[7] Mayor Karen Bass, *More Than 21,000 Angelenos Came Inside This Year – Thousands More Than Last Year as Mayor Bass deployed New Urgent Strategies* City of Los Angeles (Dec. 6, 2023), https://mayor.lacity.gov/news/more-21000-angelenos-came-inside-year-thousands-more-last-year-mayor-bass-deployed-new-urgent ("Los Angeles Mayor Karen Bass today announced that more than 21,000 Angelenos have come inside since December 2022, thousands more than last year, as she deployed a new and urgent strategy to reduce homelessness.").

[8] *See* Mayor Karen Bass, *More Than 21,000 Angelenos Came Inside This Year – Thousands More Than Last Year as Mayor Bass deployed New Urgent Strategies* City of Los Angeles (Dec. 6, 2023), https://mayor.lacity.gov/news/more-21000-angelenos-came-inside-year-thousands-more-last-year-mayor-bass-deployed-new-urgent:
- 1,951 Inside Safe (City)
- 1,332 Tiny Homes (Alliance and Garcetti administration)
- 1,398 Homekey (State)
- 2,934 A Bridge Home (Alliance and Garcetti)
- 1,977 Roadmap Interim Housing (Alliance)
- 4,088 Family Shelters (Fed/State/County/Alliance)
- 2,243 DHS & DMH Interim Housing (County).

This list only totals 15,923 "touches." It is unclear where the remaining 5,771 is being reported, as those are not publicly disclosed.

Compare this list with the promises Mayor Bass made to *increase* the number of sheltered individuals by 17,000 in her first year, the majority of which has not been done (reflected in only an increase of 5,000 in the first year…not 17,000).  Doug Smith, Benjamin Oreskes, *Can Bass or Caruso solve the L.A. homeless housing crisis? Here are their divergent plans*, Los Angeles Times (Sept. 4, 2022, 8:13 AM), https://www.latimes.com/california/story/2022-09-04/homelessness-plans-la-mayor-candidates-karen-bass-rick-caruso-explainer.

---

12

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

- The 21,694 figure includes 7,677 persons brought inside as a result of prior City and County commitments made in this case—and therefore were not the result of the new administration's efforts.[9]

- Similarly 21,694 represents approximately 66 percent of the total number of unsheltered individuals in the City (32,680, per LAHSA). There is no evidence to suggest the City has sheltered two-thirds of its unsheltered population in the past year.[10]

The City's questionable numbers—and the failure to meet the targets it set for itself in this case—underscore the need for robust accountability. By delaying and obstructing the establishment of milestones and deadlines, the City has undermined the very accountability Plaintiffs sought and this Court insisted upon when the Agreement was reached. Accountability can only be restored through consequences.

## IV. THIS COURT MUST ORDER CITY TO COMPLY WITH TERMS OF SETTLEMENT AGREEMENT

The consequences required to reaffirm and restore accountability under the Settlement Agreement must be substantial. If the City is allowed to ignore its obligations under the Agreement for more than a year with impunity, there can be little hope the City will comply with its obligations in the years to come.

To that end, Plaintiffs seek the following sanctions, which are designed to be proportional to the City's 447-day period of noncompliance and obstruction:

    i. The City shall pay sanctions to the LA Alliance for Human Rights $100,000 for each week of noncompliance and obstruction from November 11, 2022 to the date it came into compliance, January 31, 2024. The payment shall be made within 30 days and will fund the Alliance's

---

[9] (*Compare* City Status Reports, ECF Nos. 515-1 and 516-1 with ECF Nos. 660-1 and 661-1 for the differential in PEH served as a result of the two agreements in 2023: 7,677.)

[10] LAHSA, 2023 Greater Los Angeles Homeless Count, City of Los Angeles, https://www.lahsa.org/documents?id=7680-city-of-la-hc23-data-summary.

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

efforts to ensure accountability for the remaining four years of the Agreement.

    ii.    The special masters of both the City and County agreements shall provide quarterly written reports to the parties and the Court to allow effective monitoring success and failure on this crucial issue.

    iii.    The City Attorney and the Mayor's Office shall report monthly to the City Council or a subcommittee or task force designated by the City Council concerning compliance with the Settlement Agreement.

    iv.    The City Attorney shall assign a Deputy City Attorney with no supervisorial duties to monitor and ensure the City's compliance with the Settlement Agreement.

    v.    The City shall present plans within 30 days to reduce encampments in two high-acuity areas: (i) Avenues 59 and 45 in Highland Park and (ii) Skid Row. The City's plans will include aggressive milestones and deadlines to resolve encampments in those areas.

## A.    The Requested Sanctions are Warranted

Where a district court dismisses a case under Rule 41 of the Federal Rules of Civil Procedure and incorporates the terms of the settlement into dismissal (as it did in this case), the court maintains "ancillary jurisdiction to enforce the settlement agreement, the terms of which were incorporated into the district court's dismissal order." *Kelly v. Wengler*, 822 F.3d 1085, 1095 (9th Cir. 2016); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994) ("[T]he court is authorized to embody the settlement contract in its dismissal order or, what has the same effect, retain jurisdiction over the settlement contract[] if the parties agree."). District Courts have inherent power to enforce settlement agreements, including orders for specific performance and monetary and non-monetary sanctions. *In re Suchy*, 786 F.2d 900, 902-03 (9th Cir. 1985) ("It is well settled that a court has inherent power to enforce summarily a settlement agreement involving an action pending before it.");

14

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

*Stone v. City & County of San Francisco*, 968 F.2d 850, 864–65 (9th Cir. 1992) (monetary sanctions was appropriate where a city failed to take reasonable steps to comply with a consent decree);  *TNT Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) ("The district court's enforcement power include[s] authority to award damages for failure to comply with the settlement agreement.")

The City's 14-month campaign of non-compliance and obstruction *which continues to this day* requires consequences in the form of sanctions and orders for specific performance designed to coerce compliance with the court order embodying the settlement agreement under *Kokkonen* and Rule 41.  *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1130 (9th Cir. 2013) (explaining that "a sanction generally is civil if it coerces compliances with a court order") (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994).  Here, the City frustrated the Plaintiff's efforts to ensure compliance with the Settlement Agreement for more than a year—since November 2022.  This serious conduct warrants serious consequences to ensure future compliance with the agreement as a court order.  Accordingly, the Plaintiffs ask the Court to order the City to pay to the LA Alliance monetary sanctions in the amount of $100,000 per week for every week from November 11, 2022[11] through January 31, 2024, when the City finally came into compliance with Section 5.2 (currently, a total of $6,400,000).

The City will resist and complain about the cost of the sanctions.  This is precisely why such sanctions are necessary—they introduce adverse consequences for noncompliance in a manner that ensures future compliance with the Settlement Agreement.  The City will seek to reduce the amount of the sanctions—but the amount represents a mere 0.6 percent of the Mayor's $1.3 billion in proposed spending on the

---

[11] The date the City first sent its proposed Milestones and Deadlines for Housing and Shelter, but failed to comply with its obligations under Section 5.2 providing plans, milestones, and deadlines for encampment reduction.

15

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

homelessness crisis[12] and only 0.2 percent of the $3 billion committed by the City under this Agreement. Moreover, the funds will support the Alliance's efforts to enhance accountability under the Settlement Agreement and ensure that the Mayor's homelessness efforts are successful.

Monetary sanctions are the only meaningful, proportional consequence available to address the City's past noncompliance with the Settlement Agreement and ensure future compliance. If monetary sanctions are not ordered, the City will have escaped and obstructed accountability for one year without any consequence. This would send the message that compliance with the Settlement Agreement is optional, and will undermine the Plaintiffs' and the Court's efforts to ensure compliance with both the City and County settlement agreements.

Monetary sanctions are necessary but not sufficient. Skid Row remains the epicenter of tragic homelessness in the entire country, and while the City and County have announced a "Skid Row Action Plan," it contains very few concrete plans and little relief to both unhoused and housed members of the community on the horizon.[13] And it is undisputed that despite Skid Row's centrality to the homelessness crisis, the City has made no serious effort to reduce homelessness in Skid Row over the past year. Thus, it is imperative that the City develop and execute on a plan to reduce homelessness in Skid Row.

While the City must take on large challenges like Skid Row, it must also address smaller, specific encampments that affect residential neighborhoods throughout the City. Avenues 59 and 45 in Highland Park (Council District 1) are home to historic working class, largely Latino communities, and host some of the most dangerous

---

[12] Lauren Coronado, *Mayor Karen Bass Unveils Nearly $13 Billion Spending Plan for LA*, NBC Los Angeles.com (Apr. 18, 2023, 5:55 PM), https://www.nbclosangeles.com/news/local/mayor-karen-bass-la-city-budget-homelessness-lapd-spending/3136781/.

[13] Homeless Initiative, *More Housing and Services in Skid Row*, County of Los Angeles (June 16, 2023), https://homeless.lacounty.gov/news/skid-row-action-plan-erf/.

16

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

encampments in the city with regular fires (an average of *3 fires per week* at Avenue 45), constant drug activity, and major property and violent crime. While these encampments are not particularly large (an average of eight to fifteen tents and makeshift shelters per encampment), they represent the inability and/or unwillingness of the City to direct the same level of encampment reduction energy to this working class neighborhood that it has devoted to the wealthier West Side.

The City's failure over the past year to meaningfully engage with the City Council concerning compliance with the Settlement Agreement appears to have contributed to the City's violation of the terms of the Settlement Agreement. A reporting requirement mandating monthly updates to the Council will ensure that the City is focused on compliance with the Agreement at both the City-wide and district levels. Moreover, a reporting requirement will allow the Council and its members to have a meaningful role in ensuring the City's success under the Agreement.

The City has been ably represented by the City Attorney's Office in this matter, but the sole attorney assigned to this case is also in charge of supervising the entire Civil Division of the City Attorney's Office. The City's compliance with this agreement would be enhanced by the assignment of a Deputy City Attorney who does not have competing supervisory responsibilities to oversee the City's compliance with this case.

Finally, the Court has assigned two Special Masters to supervise the City and County's related settlement agreements in this case. Quarterly reports by the special masters will further enhance accountability under those agreements and provide the parties an opportunity to identify and address issues before they become disputes.

## V.    CONCLUSION

The citizens of Los Angeles lost a year of accountability to the City's noncompliance and obstructive conduct. A stern warning will not suffice—only serious sanctions will ensure the enforceability and success of the Settlement Agreement.

17

Accordingly the Court should issue the following orders as sanctions for the City's violations of the Settlement Agreement:

i. The City shall pay to the LA Alliance for Human Rights $100,000 for each week of noncompliance and obstruction from November 11, 2022 to the date it came into compliance, January 31, 2024. The payment shall be made within 30 days and will fund the Alliance's efforts to ensure accountability for the remaining four years of the Agreement.

ii. The special masters of both the City and County agreements shall provide quarterly written reports to the parties and the Court to allow effective monitoring success and failure on this crucial issue.

iii. The City Attorney and the Mayor's Office shall report monthly to the City Council or a subcommittee or task force designated by the City Council concerning compliance with the Settlement Agreement.

iv. The City Attorney shall assign a Deputy City Attorney with no supervisorial duties to monitor and ensure the City's compliance with the Settlement Agreement.

v. The City shall present plans within 30 days to reduce encampments in two high-acuity areas: (i) Avenues 59 and 45 in Highland Park and (ii) Skid Row. The City's plans will include aggressive milestones and deadlines for resolve encampments in those areas.

Dated: February 7, 2024          Respectfully submitted,

/s/ Elizabeth A. Mitchell
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

18

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*