UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,

        Plaintiffs,

    v.

CITY OF LOS ANGELES, *et al.*,

        Defendants.

Case No. 2:20-CV-02291-DOC-KES

Assigned to Judge David O. Carter

**REPLY ISO MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS**

Before:  Hon. David O. Carter
Courtroom: 10A
Hearing Date:  March 4, 2024
Hearing Time:  8:30 p.m.

*REPLY ISO MOTION FOR ORDER*

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ........................................................................................................1

II.   The City Willfully Violated the Settlement Agreement for 447 days ...................2

    A.   "Thereafter" Is Not Infinite. ...............................................................3

    B.   The City Engaged in Bad Faith Negotiations, Misled Plaintiffs, and Actively Prevented Court Oversight and Accountability. ..........................5

    C.   City Disregarded, and Still Disregards, Clear Mandates in the SA. .............8

    D.   City Has Not Substantially Complied With the Terms of the Settlement Agreement. ..........................................................................................8

III.   Plaintiffs, this Court, and the City Lost More than a Year of Accountability Under the Settlement Agreement ...........................................................................10

IV.   This Court Must Order City to Comply with Terms of Settlement Agreement ...11

    A.   The Requested Sanctions are Warranted. ......................................................11

V.   CONCLUSION .......................................................................................................13

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Ashker v. Newsom*,
  968 F.3d 939 (9th Cir. 2020) ..............................................................................9

*In re Suchy*,
  786 F.2d 900 (9th Cir. 1985) ..............................................................................6

*Jeff D. v. Andrus,*
  899 F.2d 753 (9th Cir. 1989) ..............................................................................6

*Kokkonen v. Guardian Life Insurance Co. of America*,
  511 U.S. 375 (1994)...........................................................................................2, 5

*Local No. 93, International Ass'n of Firefighters, AFL-CIO C.L.C. v. City of
  Cleveland*,
  478 U.S. 501 (1986)..............................................................................................5

*New West Charter Middle School v. Los Angeles Unified School District*,
  187 Cal. App. 4th 831 (2010) ..........................................................................6, 7

*Postal Instant Press, Inc. v. Sealy*,
  43 Cal. App. 4th 1704 (1996) .............................................................................6

*Rouser v. White*,
  825 F.3d 1076 (9th Cir. 2016) ............................................................................9

*Stone v. City & County of San Francisco*,
  968 F.2d 850 (9th Cir. 1992) ..............................................................................6

*United States v. Asarco, Inc.*,
  430 F.3d 972 (2005)..............................................................................................6

*United States v. State of Oregon*,
  913 F.2d 576 (9th Cir. 1990) ...........................................................................2, 5

*REPLY ISO MOTION FOR ORDER*

## I.   INTRODUCTION

The City's opposition does not dispute the facts set forth in the motion for sanctions.  Those facts prove that the City (i) ignored its obligations under the settlement agreement in this case; (ii) failed to create the beds it said it would; and (iii) overstated its success in bringing unsheltered individuals inside.  Those facts alone are enough to warrant serious sanctions.

But the City has also done something in its opposition that underscores the need for sanctions: it has taken the extraordinary position that it doesn't have to comply at all with its bed and encampment reduction milestones and deadlines.  This is not hyperbole—it is what the City says: "The City did not agree—and the SA does not require the City—to meet any interim plan, milestones or deadline; they are goals and targets the City hopes to achieve on an interim basis." (Opp'n 13:5–7, ECF No. 669 .) This is (i) a willful misreading of the Settlement Agreement, and (ii) an indication that the City intends to avoid accountability for the remainder of the agreement's term.

The facts are simple:

- The City failed to provide <u>any</u> plans for encampment engagement, cleaning, and reduction until October 3, 2023, nearly 16 months after the Court approved the Settlement Agreement.
- The City failed to provide any encampment-related milestones or deadlines at all until November 29, 2023.
- The City failed to provide any district-specific plans, pursuant to 5.2(ii) on January 31, 2024 . . . 447 days after it first acknowledged the obligation to do so.
- The City has failed to meet its to-date bed goals and targets by 2,380 beds.
- The claimed 21,694 brought inside through the efforts of the City isn't actually attributable to this administration at all; had the City instead done what it was supposed to do, five times the number of human beings would have been helped off the street.

1

*REPLY ISO MOTION FOR ORDER*

Should the Court fail to impose serious sanctions on the City for its willful failure to meet its obligations under the Settlement Agreement, particularly considering the City's belief that the agreement is not enforceable, it will render the agreement worthless.

## II. THE CITY WILLFULLY VIOLATED THE SETTLEMENT AGREEMENT FOR 447 DAYS

The City does not dispute that Section 5.2(ii) of the Settlement Agreement ("SA")[1] requires the City to create plans, milestones, and deadlines for "encampment engagement, cleaning, and reduction in each Council District."[2] Nor does the City dispute that it failed to provide fully-compliant district-specific plans until January 31, 2024. (Opp'n 5:15–18.)

Yet the City claims it was still in full compliance with the SA because: (i) the word "thereafter" provides no effective deadline (*Id*. at 4), (ii) the City has been meeting and conferring in good faith for 14 months, (*Id*. at 10) (iii) it doesn't have to comply with milestones anyway (*Id*. at 12–13), and (iv) it substantially complied, even if it didn't fully comply (*Id*. at 11.)

None of these limp excuses withstand even the most basic level of scrutiny.

---

[1] The Settlement Agreement was incorporated into the Court's order for dismissal under *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375 (1994) and thus has many markings of a consent decree. *See United States v. State of Or.*, 913 F.2d 576, 580 (9th Cir. 1990).

[2] This was a crucial aspect of the Settlement Agreement for Plaintiffs who wanted to make sure that not only beds were built, but that they were used to move people out of encampments and into healthier, safer living conditions. (Stipulated Order re Dismissal, Ex. 1, Settlement Agreement (hereinafter "Settlement Agreement") § 5.2(ii), ECF No. 421-1; Order Approving Settlement, ECF No. 445.)

Intervenors' Opposition (to the extent they even have standing to do so as non-parties to the Agreement, which the Alliance does not concede) pushes for a semantics-interpretation to the Settlement Agreement which neither party advocates for and for good reason: it does not reflect the intention of the parties who actually negotiated and entered into the Agreement. Should the Court find Intervenors have standing to object despite not being a party to this Agreement, and should the Court entertain such an argument despite neither party's understanding thereof at the time of agreement, the Alliance requests an opportunity to respond separately to this misplaced argument.

*REPLY ISO MOTION FOR ORDER*

## A.      "Thereafter" Is Not Infinite.

The City committed to providing plans, deadlines, and milestones once its calculation of the Required Number was complete. (Settlement Agreement § 5.2.)  The Required Number was provided on October 6, 2022, and the shelter and housing solutions plan was provided to Plaintiffs on November 11, 2022 "Pursuant to Paragraph 5.2 of our Settlement Agreement" (Declaration of Elizabeth A. Mitchell ISO Reply ("Mitchell Reply Decl.") Ex. K at 3, Email from S. Marcus to E. Mitchell, dated Nov. 11, 2022), demonstrating that at least by November 11, 2022 the City recognized it had an obligation to produce its required commitments.

The City attempts to evade this reality by claiming "[t]here is no deadline by which the milestones under Section 5.2 had to be developed or delivered[.]" (Opp'n 2:1–4.)  Under this theory, the City could avoid all obligations under the agreement until an infinite thereafter, which would deprive Plaintiffs the benefit of a bargain negotiated through dozens of hearings, settlement conferences, and mediations with the assistance of this Court, District Court Judge Andre Birotte, and Special Master Michele Martinez.  Plaintiffs never anticipated that the City could forever evade the obligations to which it committed in the Settlement Agreement, and it is likely none of the participants in this litigation thought so either (with the possible exception of the City).  The City's "thereafter" theory is also belied by the City's own representations and discussions, which morphed as months went on:

- 2/14/23: City claimed it had no obligation to provide any encampment-related commitments under Section 5.2 (Mitchell Reply Decl. Ex. L, Email from S. Marcus to E. Mitchell, dated Feb. 14, 2023.)
- 3/8/23 – 3/15/23: City requested an extension from the Alliance to provide the encampment-related commitments (tacitly recognizing a date certain by which it was supposed to have been done.) (Mitchell Reply Decl. Exs. M and N, Emails, dated Mar. 28, 2023 and May 8, 2023.)

- 10/3/23: City provided a "plan" of sorts related to encampment engagement, cleaning, and reduction but wholly devoid of milestones or deadlines, apparently again claiming zero obligation to provide the requisite metrics. (Mitchell Decl. ISO Mot. Ex. D, ECF No. 668-1.)

- 10/03/23-01/31/24: City engaged in series of negotiations, not just on the numbers but to convince the Alliance to centralize decision-making authority and disregard Section 5.2(ii) which required commitments in each district—all without conferring with its legislative body first. (Mitchell Decl. ¶¶ 6-20, ECF No. 668-1.)

This series of pivots is not the conduct of an entity taking its time because there is no deadline built into an agreement, but the behavior of an organization shifting tactics to avoid complying with its obligations and the built-in oversight and accountability attendant to those obligations. The Settlement Agreement certainly affords the City flexibility in _**how**_ it complies with the milestones and deadlines (i.e. it may choose different bed options as appropriate), but it provides no discretion in _**whether**_ it provides milestones and deadlines in the first place—or whether it meets those milestones and deadlines. (Settlement Agreement § 5.2.)

The Alliance specifically negotiated away its right to bring this issue to the Court in early 2023 in exchange for the City's full evaluation of encampments in each district and provision of the requisite metrics no later than October 1. (Mitchell Reply Decl. Exs. M and N.)  The City had no right, and retained no discretion, to "shift[] gears" away from compliance with the Settlement Agreement (Opp'n 10:17–19) without Alliance or Court consent.  And the City's claim that it was fully accountable despite its noncompliance falls flat: each of the reports filed in this case pursuant to the SA report only on bed metrics but zero encampment metrics.

Ultimately, the City's claim that there was no breach of the Settlement Agreement because there was no deadline associated with Section 5.2(ii) and (iv) reflects the failure of the City's leadership: the City didn't provide plans because it

4

_REPLY ISO MOTION FOR ORDER_

didn't have any.  So it swayed from tactic to tactic to avoid accountability, and then only came into compliance under threat of exposure and sanctions. This is why sanctions are necessary—to ensure the City does not continue to undermine the Settlement Agreement in the manner it has for the last 14 months.

**B.     The City Engaged in Bad Faith Negotiations, Misled Plaintiffs, and Actively Prevented Court Oversight and Accountability.**

Nearly two years—40% of the five-year SA term—have passed since the City and Plaintiffs entered into the SA, and there has been no encampment-related reporting by the City during that time.   As the City grappled with internal politics and self-inflicted policy shifts, encampments cropped up throughout Los Angeles—largely in the poorer areas as they shrank in wealthier ones.  Throughout this time, the City has avoided its encampment-reduction obligations contained in the Settlement Agreement: first claiming it had no obligation (Mitchell Reply Decl. Ex. L), then promising it would fulfill its obligation over a period of time (Cite old exhibits E, F.), then breaking that promise (Mitchell Decl. ¶¶ 8-9, Ex. D, ECF No. 668-1), then attempting to coerce the Alliance into either accepting reduced metrics or shifting political power away from the councilmembers to the administration (Mitchell Decl. ¶¶ 6-20, ECF No. 668-1.)  And as the encampments grew, bed production dropped, and the Alliance was denied the beds, encampment reductions, and accountability it bargained for.

While settlement agreements are typically treated as contracts for the purpose of evaluating whether a party breached the agreement, this settlement agreement is closer to a consent decree because the court incorporated the agreement's terms as part of its dismissal order under *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375 (1994). S*ee, e.g. United States v. State of Or.*, 913 F.2d 576, 580 (9th Cir. 1990) ("A consent decree is 'essentially a settlement agreement subject to continued judicial policing.'") (citation omitted).   Thus, the agreement bears some attributes of a judgment entered after litigation due to its enforceability as a judicial decree. *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519

*REPLY ISO MOTION FOR ORDER*

(1986) ("[C]onsent decrees 'have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes. The question is not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both.") (citations omitted). Article III courts have inherent authority to modify and enforce their own orders. *In re Suchy*, 786 F.2d 900, 902–03 (9th Cir. 1985) ("[I]t is well settled that a court has inherent power to enforce summarily a settlement agreement involving an action pending before it."); *Stone v. City & County of San Francisco*, 968 F.2d 850, 864–65 (9th Cir. 1992) (monetary sanctions appropriate where City failed to take reasonable steps to comply with a consent decree).

Both consent decrees and settlement agreements are governed by contract theory for enforcement purposes. *Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir. 1989) ("[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."); *United States v. Asarco, Inc.*, 430 F.3d 972, 980 (2005) ("*Without question courts treat consent decrees as contracts for enforcement purposes.*") (emphasis in original). Under California law, "the breaching party is . . . responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain." *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996); *see also New W. Charter Middle Sch. v. L.A. Unified Sch. Dist.*, 187 Cal. App. 4th 831, 844 (2010) ("Contract damages compensate a plaintiff for its lost expectation interest. This is described as the benefit of the bargain that full performance would have brought.").

The Alliance, for well over a year, has lost the three key benefits it bargained for: (i) creating new beds for those experiencing homelessness; (ii) getting people off the streets and into those beds; and (iii) judicial enforcement of those efforts. Because of the City's delay tactics, the Alliance was prevented from holding the City accountable in court for failing to meet its bed milestones and for the lack of encampment reduction.

Moreover, the Alliance lost the benefit of the bargain when it negotiated away its right to immediately bring the City's noncompliance to the Court's attention in early 2023 in exchange for the City's promise to employ a designated service provider in each district to evaluate the unhoused population and produce data-driven commitments per district which the City prompted violated. That March 2023 promise was itself an enforceable contract that was then breached by the City.[3] The City had no right to "shift[] gears" unilaterally and did not "retain[] full discretion over how [the City] would meet the requirements of the SA" because it negotiated away any alleged right when it entered into the March, 2023 agreement. (Opp'n 10:17–19; 10:24–11:1.)

Because both the Settlement Agreement and the March 2023 agreement required specific performance by the City, there is no explicit monetary damage amount which could fully compensate Plaintiff for its "lost expectation interest." *New W. Charter Middle Sch.*, 187 Cal. App. 4th at 844. Without a time machine, there is no way for the Alliance to recoup the lost benefit of the bargain in terms of human lives impacted by the lost year of action and accountability. The Alliance has no recourse other than monetary sanctions for the multiple breaches and bad faith negotiation tactics over the last year to address the City's past misconduct, deter future misconduct, and ensure that the Settlement Agreement retains vitality for its duration. Without sanctions, the City can and will continue to violate the agreement with impunity. See Section XX *infra*.).

---

[3] The Settlement Agreement specifically provides for the possibility of modification of the agreement: "Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective." (Settlement Agreement SA § 18.)

In March, 2023, the City made an oral offer (for full district evaluation with thoughtful, data-driven metrics) which was reduced to writing and accepted by the Alliance. When the Alliance requested a written confirmation of the City's agreement, counsel for the City confirmed: "I think these emails suffice to memorialize our understanding and agreement. . . . I don't think we need to file anything with Judge Carter if we all agree on the plan." (Mitchell Reply Decl. Ex. N, at 1.) Thus, the agreement was made in writing, and each party, through its respective attorneys, agreed.

**C.     City Disregarded, and Still Disregards, Clear Mandates in the SA.**

The City's remarkable claim it has no obligation to meet the milestones and deadlines under Section 5.2 demonstrates exactly why Court-imposed sanctions are necessary.  Without a firm judicial hand holding the City accountable for meeting its targets, the City will continue down its decades-long path of failure on on this issue.

The language of the City's opposition and Settlement Agreement stand in stark contrast to each other:

- Opposition: "The City did not agree—and the SA does not require the City—to meet any interim plan, milestones or deadline; they are goals and targets the City *hopes to achieve on an interim basis*." (Opp'n 13:5–7 (emphasis added).)

- Settlement Agreement: "The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines." (Settlement Agreement § 5.2 at 8:27–28.)

Clearly the City—as one of "The Parties"—*did* agree to do everything it could to actually meet its plans, milestones, and deadlines.  That the City is now dismissing its legal obligations as mere "hopes" alarmingly foreshadows future non-compliance by demonstrating what the City believes the Settlement Agreement requires it to do: nothing.  In the City's view, it didn't have to produce any metrics at all within any time frame whatsoever, and even if it did, has no obligation to stick to those metrics.  In other words, the City's commitments are meaningless absent sanctions forcing it to comply.

**D.     City Has Not Substantially Complied With the Terms of the Settlement Agreement.**

The City's obligations under the Settlement Agreement can be distilled into three discreet but inter-related categories: (i) creation or establishment of homeless beds, (ii) encampment resolution to move people from the streets into those beds, and (iii) accountability and oversight to ensure transparency and compliance.  (Settlement

8

*REPLY ISO MOTION FOR ORDER*

Agreement § 5.2; *see also* Recitals at 2:10–15 "[T]he purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos[.]").)

"'Without question courts treat consent decrees as contracts' . . . that have 'the additional element of judicial approbation.'" *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016) (citation omitted).  The City claims it is in "substantial compliance" with the agreement because it claims to have engaged in several homelessness-related efforts.  But even if the Settlement Agreement could be satisfied by "substantial" rather than actual compliance, merely trying hard on homelessness is not "substantial compliance" with the Settlement Agreement.   To be in compliance with this Agreement, "each of [the City's distinct obligations] must be satisfied" and "merely taking significant steps towards compliance comes nowhere near satisfying this exacting standard." *Id*. at 1081–82. Minor deviations are permitted so long as the deviation is "unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Id*. at 1082 (citations omitted); *Ashker v. Newsom*, 968 F.3d 939, 946 (9th Cir. 2020) (same).

The City cannot reasonably claim substantial compliance when (i) it has only met 54% of its bed milestones to date and (ii) it neither committed to encampment reduction metrics nor reported on any encampment resolutions since the Settlement Agreement was entered, avoiding accountability on both.  In evaluating the three inter-related goals of the Settlement Agreement (beds, encampment reduction, accountability), the City stands in violation of every single one.

*REPLY ISO MOTION FOR ORDER*

## III.   PLAINTIFFS, THIS COURT, AND THE CITY LOST MORE THAN A YEAR OF ACCOUNTABILITY UNDER THE SETTLEMENT AGREEMENT

Defendant City downplays its 447-day failure by claiming it has done significant work outside the Settlement Agreement and reported its efforts both publicly (through reports to the City Council) and privately through its reports filed in this case.  But those reports only underscore the problem:  the City's numbers are misleading, and none offer true comparisons to each other or to the metrics required to be reported through this case.

*First,* as referenced in the moving papers, the public reporting coming out of City Hall is untrustworthy, as demonstrated by the City's claim that it brought 21,694 people into interim housing in 2023 when that number not only represented double- and triple-counting but also took credit for things the City had nothing to do with. (Mot. at 12, ECF No. 668.)  In its Inside Safe reporting, the City disclosed paying for 210,187 "hotel nights" which reflects an average of less than 500 rooms leased overall (approximately 493, on average, since the inception of the program). (Opp'n Ex. 1, ECF No. 669-2.)  Compare that with the 2,380-bed deficit in this case. (Mot at 11.)  Had the City focused its resources on its legal commitments, it could have removed five times the number of people from the street.

*Second*, the City has never submitted any encampment-related metrics as part of its reporting in this case, leaving the Plaintiffs and the Court with no means to distinguish between success and failure as it relates to this Agreement.  And to the extent the Inside Safe metrics reported to City Council, and submitted with the City's opposition, purport to demonstrate transparency, the reports are devoid of any factual details which could be separately evaluated.[4]

---

[4] The City is well-aware of the need for specific accountability, not only from the multitude of briefings in this case but from the Court's own comments during the first hearing on the Plaintiffs/County Agreement:

*REPLY ISO MOTION FOR ORDER*

*Third*, the insinuation that Special Master Michele Martinez's role as monitor over the City/Plaintiff agreement negates the City's obligation to provide transparency to the Alliance backfires: to the Alliance's knowledge, Special Master Martinez has been excluded or at least not informed about most of the encampment resolution efforts throughout the City until long afterwards, if at all.  Regardless, without the information being transmitted to the Alliance either through the City's quarterly reporting obligations or reports drafted by the Special Master, the Alliance has no ability to track progress of its own agreement.

This appears to be the point: The City avoided committing to any metrics for over a year in order to claim "success" in whatever happened without anyone able to evaluate true success or failure of the new administration's efforts.

## IV.    THIS COURT MUST ORDER CITY TO COMPLY WITH TERMS OF SETTLEMENT AGREEMENT

### A.    The Requested Sanctions are Warranted.

Monetary sanctions are the only meaningful, proportional consequence available to address the City's past noncompliance with the Settlement Agreement and ensure future compliance.  The need is particularly acute after the City's Opposition laid bare its belief it is under no obligation to meet any milestones and deadlines at all, despite its explicit agreement to the contrary in the SA.  Without a strong consequence for the City's obstinate refusal to comply due to its administration's divergent focus, neither the City nor the County—which is certainly watching this dispute with interest—will

---

And finally, I want to turn back to you, Scott [Marcus].  In the City settlement, there's accountability.  You created a monitoring provision.  It didn't leave the Court at the whim of not being able to check either the good faith accuracy or just the accuracy by having a monitor.  [That] gave me the confidence that I could spot check, et cetera, and know that those numbers were credible.  I took that as a tremendous breakthrough in terms of the trust between us because there it seems that you were not only giving the Court the power to monitor but you were absolutely accepting accountability, and that's what I— what I perceived for so long was missing in all of these aspirational promises that were being made to the public and to the Court.
(Hr'g Tr. 16:22–17:8, Nov. 14, 2022, ECF No. 505.)

*REPLY ISO MOTION FOR ORDER*

have any cause to comply with the further significant commitments made in the two agreements moving forward.

The litany of errors which led to this motion demonstrates the need for not only monetary sanctions to ensure future compliance but also the need to pivot to a more hands-on approach by both the Alliance and the Court, neither of which can sit idly by hoping the City finally gets it right.  The orders requested by the Alliance are directly tied to problems and failures raised herein:

- Quarterly written reports by both monitors of the City and County Agreements provide more transparency to the parties and to the community about success and failure under the Settlement Agreements.  City and County monitors, as neutral arms of the court, have more access to information than Plaintiffs who largely must rely on reports filed in court and anecdotal stories.

- Monthly reporting to the City Council on progress ensures the Council—the legislative body of the City which was wholly left out of these negotiations for the last 15 months—will be active participants in meeting each district's goals for both shelter and encampment resolution.

- Assignment of a Deputy City Attorney without supervisorial duties to oversee compliance of the SA safeguards against the long delays of communication due to an overly-impacted supervisor schedule.  This suggestion is taken directly from the City's experience in managing the LAPD/DOJ consent decree in 2001 wherein a single Deputy City Attorney was assigned exclusively to ensuring compliance with the consent decree, including all projects taken pursuant thereto.

- Encampment resolution plans for Highland Park and Skid Row address the disparity in resolutions between wealthier communities and those who have been ignored during the last year of unaccountability.  This lawsuit stemmed from disputes surrounding Skid Row, many Plaintiffs still live or operate

*REPLY ISO MOTION FOR ORDER*

businesses in Skid Row, and there is no plan at all to address the devastation to that neighborhood.  Instead, the City appears committed to maintaining the status quo in these areas.

While the City eventually (after 447 days) did come into compliance with Section 5.2(ii) and (iv), it did so *only because* the Alliance informed the City it was proceeding on this motion, and then when the City scrambled to finally get the issue in front of Council, the Alliance in good faith agreed to wait to bring this motion until after Council had an opportunity to vote on the numbers.[5]  The fact that the City finally cured its non-compliance does not solve the need for sanctions as <u>consequence</u> for 447 days of non-compliance and <u>deterrent</u> against non-compliance with the terms of the Settlement Agreement.

## V.    CONCLUSION

The City's opposition is an unfortunate canary in the coal mine of this case.  It is now clear that the City believes it is not accountable under the Settlement Agreement and need not comply with its terms.  Only sanctions for noncompliance can restore accountability and vitality to the Settlement Agreement and ensure that it makes the difference it was intended to make for those suffering on the streets and sidewalks, and the citizens of Los Angeles.

//

//

//

---

[5] That City Council hadn't been informed, much less approved, of the negotiations between the parties and the numbers that were being offered is further demonstration of bad faith by the part of the City that *was* negotiating.  The numbers were not based on any realistic evaluation of the districts or produced in consultation with the legislative member elected to represent the district.  The frustration by the Council about being kept in the dark is, to Plaintiff's knowledge, accurately portrayed in the recent LA Times article covering this issue: Doug Smith, *L.A. should pay $6.4 million for slow action on cleaning homeless camps, judge is told*, Los Angeles Times (Feb. 14, 2024, 6:18 PM), https://www.latimes.com/california/story/2024-02-09/l-a-should-pay-6-3-million-for-foot-dragging-agreement-to-clean-homeless-camps-a-federal-judge-is-told#:~:text=Alleging%20more%20than%20a%20year,to%20clean%20up%20homeless%20camps.

*REPLY ISO MOTION FOR ORDER*

Dated: February 22, 2024       Respectfully submitted,

*/s/ Elizabeth A. Mitchell*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

*REPLY ISO MOTION FOR ORDER*