UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

LA ALLIANCE FOR HUMAN
RIGHTS, et al.,

                    Plaintiffs,

     v.                              No. 2:20-cv-02291-DOC

CITY OF LOS ANGELES, et al.,

                    Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MARCH 7, 2024 - A.M. SESSION

_____

SUZANNE M. MCKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

APPEARANCES:

On Behalf of the Plaintiff:

    ELIZABETH A. MITCHELL, Attorney at Law
    MATTHEW D. UMHOFER, Attorney at Law
        Umhofer, Mitchell, and King LLP
        767 South Alameda Street, Suite 270
        Los Angeles, California 90021

On Behalf of the Defendant City of Los Angeles:

    SCOTT D. MARCUS, Attorney at Law
        Los Angeles City Attorneys Office
        200 North Main Street, 7th Floor, Room 675
        Los Angeles, California 90012

On Behalf of the Defendant County of Los Angeles:

    JENNIFER MIRA HASHMALL, Attorney at Law
        Miller Barondess LLP
        2121 Avenue of the Stars, Suite 2600
        Los Angeles, California 90067

On Behalf of the Movant Paul Boring:

    STEPHEN YAGMAN, Attorney at Law
        Yagman and Reichmann LLP
        333 Washington Boulevard
        Venice Beach, California 90292-5152

On Behalf of the Intervenor Los Angeles Catholic Worker:

    SHAYLA R. MYERS, Attorney at Law
        Legal Aid Foundation of Los Angeles
        1550 West 8th Street
        Los Angeles, California 90017

On Behalf of the Intervenor Orange County Catholic Worker:

    CAROL A. SOBEL, Attorney at Law
        Law Office of Carol A. Sobel
        1158 26th Street Suite 552
        Santa Monica, California 90403

Special Master:  MICHELLE MARTINEZ

(Proceedings commenced on March 7, 2024, at 9:06 a.m.)

THE COURT:  Counsel, first of all, good morning.  I hope all of you are well.  We'll call the matter of LA Alliance for Human Rights versus the City of Los Angeles to order.  It's Case Number 20-02291.

Please make your appearances.

You can be seated in the audience.  I can register your appearance.

MS. MITCHELL:  Good morning, Your Honor.  Liz Mitchell from the law firm of Umhofer, Mitchell, and King on behalf of Plaintiffs.  With me is also Matthew Umhofer.

MR. UMHOFER:  Good morning.

THE COURT:  Good morning.

MR. YAGMAN:  Steve Yagman for the intervenor.

MS. HASHMALL:  Good morning, Your Honor.  Jennifer Hashmall --

THE COURT:  What is your name?  Tell us your name, sir.

MR. YAGMAN:  He's my assistant.

THE COURT:  Well, he has a name.  What's your name, sir?

MR. ALEXANDER:  Alexander.

THE COURT:  It's nice meeting you.

Counsel?

MS. HASHMALL:  Good morning, Your Honor.  Jennifer

Hashmall for the County of Los Angeles.

MR. MARCUS:  Good morning, Your Honor.  Scott Marcus on behalf of the City of Los Angeles.

THE COURT:  Pleasure.

MS. MYERS:  Good morning, Your Honor.  Shayla Myers on behalf of the intervenors Los Angeles Community Action Network and Los Angeles Catholic Workers.

THE COURT:  And?

MS. SOBEL:  Good morning, Your Honor.  Carol Sobel also on behalf of the intervenors.

MS. GATES:  Good morning, Your Honor.  Isabelle Gates also on behalf of the intervenors.

THE COURT:  I want all of you young people on the record.  You are all the future so it's nice to meet both of you.

All right.  I want a full and complete rendition of the issues in this case.  I want you to assume I have read absolutely nothing.  Am I clear?  I represent to you I almost have it memorized now in terms of your briefing.

We'll start with plaintiff, Ms. Mitchell?

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  Take as long as you need and same courtesy to the City and same courtesy to the other parties.

MS. MITCHELL:  Thank you, Your Honor.

We filed this case nearly four years ago today.  It was

March 10 of 2020 when we filed --

(A discussion by Mr. Yagman and his assistant off the record.)

THE COURT REPORTER:  Counsel, can you please repeat?

THE COURT:  We're going to go move you closer to mic. The court reporter is having trouble.

MS. MITCHELL:  Sure.  How's this?  Is this better?

THE COURT REPORTER:  Thank you.

THE COURT:  A little bit better.

MS. MITCHELL:  Thank you, Your Honor.

So four years ago, when we filed this, we sought four things.  We sought immediate beds, people coming inside off the street into those beds, services for all individuals on the street and in those beds, and judicial accountability.  Those are the four things that we were looking for.

May 19 of 2022, nearly two years ago, we settled with the City of Los Angeles for three of those four things -- for beds, for encampment reduction, meaning people coming from the street into those beds, and for judicial accountability.

And for the last year, we have lost all of that.  The City of Los Angeles has only 50 percent of the beds that they themselves set out to accomplish.  For fourteen months we got zero milestones or metrics on a district by district basis for encampment reduction under Section 5.2 subsection (ii) and (iv) of this agreement.  And we've had no accountability because of the failure to comply with those metrics and milestones and to

provide those in the first place.

So because of the City's tactics, we were prevented from holding the City accountable for the last year.  We are nearly at 40 percent complete of this agreement, Your Honor.  In May, that would have been two years.  And that is two years of lost action and lost accountability.  And now is the time to course correct as we move forward.

Of those 12,904 or 905 beds that were committed to you, over 4,000 beds still don't have any plan at all by the City of Los Angeles.  We have a critical shelter emergency as documented not only in the media by City Controller Phelp, and you have the City only accomplishing 10 percent of that number, roughly 2,810.

THE COURT:  Would you repeat that again?

MS. MITCHELL:  At this point in time, the City has only accomplished 10 percent of the beds that it's required to do under the agreement.

I'm going to change that percentage a little bit as I am doing the math in my head.  I think it's maybe 20 percent. 20 percent of the beds that the City is required to do under the agreement.

And by this -- by today, which was the last milestone we had had at the end of 2023, it was required to produce over 5,000 beds.  And it only has 2,810.  That's a 54 percent accomplishment in meeting those milestones in beds.

THE COURT:  Would you repeat those figures more slowly, please?  5,000 beds and 2,000 --

MS. MITCHELL:  2,810 beds have been accomplished so far.

THE COURT:  All right.

MS. MITCHELL:  It's a 54 percent completion rate, Your Honor.

The City argues it has no obligations to meet those milestones and deadlines that it set for itself.  But that is patently untrue, and it's completely opposite of what the agreement itself says.  The City claimed it did not agree to meet any interim plan, milestones, or deadlines.  They are goals and target the City hopes to achieve on an interim basis.

But I am going to read the exact language the City agreed to into the record.  "The parties" --

THE COURT:  Refer to the page you're --

MS. MITCHELL:  Page 8, line 27 to 28, Your Honor, of the Settlement Agreement --

THE COURT:  Thank you.  "The parties agree the City will promptly" --

MS. MITCHELL:  Correct.  "The parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines."  It has failed to do so.

(A discussion by Mr. Yagman and his assistant off the record.)

THE COURT REPORTER:  I'm sorry, ma'am.  Can you repeat that?

MS. MITCHELL:  The parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.  And the City has failed to do so.

And I think a bigger concern, a greater concern to the Alliance, is the failure to provide those plans, milestones, and deadlines for encampment reduction in first place.

Under Section 5.2, after the City created its plan for beds, it had an obligation to then provide to the Alliance its plans, milestones, and deadlines for encampment reduction under sections (ii) and (iv) -- 5.2 section (ii) and section (iv).  It didn't do so.

In November of 2022, November 11, specifically, is when we got the bed plan, with no encampment reduction plan.  I immediately reached out to the City and asked about the encampment reduction plan.  Because we had a new administration that came in with grand plans, significant commitments, we said we're going to wait for two months.  Let's see what the City has to say at the next hearing.  The next hearing was scheduled for January 17, 2023.

On January 17, 2023, Mayor Bass came in and made no commitment to encampment reduction.  We got no further commitments to encampment reduction from the City.

So I then followed up with kind of a second e-mail to the City on January 30 of 2023.

(Court reporter interrupted.)

MS. MITCHELL:  We then started a series of back and forth ultimately culminating in a meeting between the Alliance and the City on March 8, 2023, and follow-up meeting on March 15 of 2023.

And in that meeting you had a series of individuals from the City as well as from the Alliance, but in particular --

THE COURT:  I want you to name who was present for the record.  I know who was present from your briefing.  Start with Dan Conway and all the parties present.

MS. MITCHELL:  I can tell you who I specifically remember.  I can tell you who I believe was also present. Specifically, it was myself, Mercedes Marquez, David Michaelson, Scott Marcus, I believe, that Daniel Conway, Paul Webster, and, I think, Edwin Gibson from the CAO's office or perhaps Matt Szabo.  There was certainly a member from the CAO there, Your Honor.

In that meeting it was committed to Alliance that the City already submitted an RFQ, which I was told is a request for quote, or request for qualification, for service providers to be hired in every single Council district.  I was told that each Council district would be fully staffed with their required service providers by July 1 of 2023.  And then each

service provider in each Council district would then start a systematic evaluation of the needs and the residents, specifically the unhoused residents of every single district. And then I was told, by October 1 of 2023, we would have thoughtful and intelligent numbers that the City could commit to.

Now, Alliance was very hesitant and not happy about entering into that agreement.  But because we had been told by the City that there were extreme difficulties with the LAHSA and the complications from the switchover of administration and the desire to do this thoughtfully and not just throw numbers on a paper but do this in a thoughtful and methodical way, the Alliance agreed.  And nothing further was communicated to the Alliance from the City about this issue that tied up this end.

October 1, I reached out to the City and asked where the milestones and deadlines were.  I was told they would be fine.

October 3, when we got the City's alleged plan for encampment plan reduction and that plan contained absolutely zero milestones and deadlines, and that was submitted to the Court, Your Honor.

At that point, I believe it was October 16 of 2023, I'm speaking by memory by now, so if you've got the date, we can change the pleading.  But I believe it was October 16 of 2023 we then had another sit-down meeting with the City.  And I can confirm certainly Mercedes Marquez was there and David

Michaelson was there, Scott Marcus was there, and I was there, and, I believe, Paul Webster was also present.  I don't recall if anybody from the CAO's office was present.

And at that time we were told, for about 45 minutes, how hard Ms. Marquez's job was.  It was a patently offensive to the Alliance, because that was the benefit that the parties -- the Alliance -- had negotiated for.  And instead of committing to specific numbers and deadlines and milestones, which are required for accountability, we were given none of that.  It took until November 29 for us to get any numbers at all.

Now, we had previously reached out to the Special Master and monitor.  Michelle Martinez was present.  I sent Michelle Martinez and e-mail on October 19 about this.  We had a meeting with her.  We then sat down between the Alliance and the City, and at that point Lourdes Castro Ramirez was there.  I believe Mercedes Marquez was still there.  We had Matt Szabo present, Scott Marcuson [sic] -- I'm sorry.  Scott Marcus, David Michaelson was there, myself, Daniel Conway, Daniel Conway, and Paul Webster were there.

THE COURT:  I want you to repeat those names more slowly.

MS. MITCHELL:  Yes.  Matt Szabo, Daniel Conway, and present for the Alliance --

THE COURT:  And you said Paul --

MS. MITCHELL:  Webster.

THE COURT:  Webster.  Mercedes Marquez?

MS. MITCHELL:  I believe Mercedes was there.  I know Lourdes Castro Ramirez was there.  It was the first time I had met her.  She was taking over for Mercedes.  Matt Szabo was present, Scott Marcus, David Michaelson.  There were a few other individuals in the room who I remember but off the top of my head do not recall who they were.

In that meeting, we had significant conversations about the reduction, the cleanup, and what numbers they could commit to.  And at the time we were told it was one encampment per month and that encampment was an average of 50 individuals living in these encampments.

Now, because of the difficulty defining what an encampment was, -- it's a very loose word -- we ended up with going with the loss of encampment had for identification of tents, make-shift shelters, vans, cars, and RVs.  And that was the number that we ended up working with.

November 29, which was deadline, I believe, that was given by the Court, or maybe Ms. Martinez, the updated plan was submitted to the Court with that single encampment reduction commitment.  And I think, if I recall correctly, -- and the paper's here if the Court wishes me to access them -- there was a commitment then after the six months to increase that number to, I think, two encampments per month.

THE COURT:  I'm sorry.  Actually repeat that.

MS. MITCHELL:  I believe after six, the City the original proposal -- the first time they gave us any numbers was November 28.  And originally they committed to one encampment per month.  And I believe, after six months, it increased to two encampments per month.  Again, that has been filed with the Court.

THE COURT:  I want you to check just a moment.  I think in the first six months it was one to three encampments.  I think it increased after six months to seven encampments.  The initial, I believe, was 100 of for the first six months and then increased to 150 in the next six months over nine years.  Being most generous of the number, there were about 9,000 of the 32,600 population or 12,950, depending upon what the arguments of Counsel are.  Please double-check that when you get a chance.

MS. MITCHELL:  Thank you, Your Honor.  I'll defer to the Court on that.  We've submitted all of the documents.

THE COURT:  Don't defer to me.  You check my memory, also.

MS. MITCHELL:  Thank you.

Thereafter, we engaged in a series of negotiations.  We came into court with Judge Birotte and Special Master Martinez.  We had several conversations between some or just between Mr. Marcus and myself.  We had a sit-down meeting with Mayor Bass.  Lourdes Castro Ramirez present.  Myself, Matt Umhofer,

Paul Webster were present as well as David Michaelson and Scott Marcus.  Matt Szabo was present as well.

And we had an entire conversation that I advised the Court that I committed in that conversation to keep confidential the discussions to the extent that there was a desire to keep confidentiality, and it was expressed there was no desire to keep confidentiality on the vast majority of what we talked about.

In that meeting we were told the series of negotiations that had happened previously in December, where the City originally said, "Hey, we will commit to 5,300 encampment reductions," within about a day, we told them that calculation was wrong.  Our number was about 9,789 reductions.  The City then committed to 9,789 reductions.

At no point was it ever communicated to the Alliance that those numbers were on a citywide basis -- and the reason this is so important, Your Honor, if you look at what was specifically negotiated for in the agreement 5.2 section (ii) and section (iv), section (ii) requires milestones and deadlines on a district by district basis.  Each Council district would have hit all milestones for the deadlines for the entirety of the agreement; section (iv) is citywide.

In that meeting on January 4, we were then informed for the first time that all of those numbers that had been previously committed to by the City, the 9,798 -- two, I think

is ultimately what we had landed on -- was only for a citywide number and not for a district by district number.

And there was a request of the Alliance to move away from a district by district number and only enforce the citywide number. That was a nonstarter for the Alliance from the beginning because of the accountability factor. I want to draw the Court's attention back to what I said earlier: We first filed, in March 10 of 2020, right before the world came crashing down. One of -- the number one reasons we filed was for judicial accountability. And a district by district model allows for accountability in ways the citywide model did not.

And we were told that, if we could agree to the citywide model, the City would commit to a 12,000-bed number, which is the number I previously told the Court. But if we were insisting on a district by district model, they would commit to 5,300 encampments.

THE COURT: Let me stop you for one moment to inform all of the parties the following: Initially, when the Court became involved, the Court initially was interested in a district by district or citywide model. Matt Szabo was present. I'll bring him up if necessary -- Mayor Garcetti and then the City Attorney Matt Feuer -- Mike Feuer. And this Court was told that a city by city -- or strike that. A citywide settlement was not going to be forthcoming.

Therefore, through hard bargaining, we moved for a

district by district model.  And the Court was told initially back 19 -- strike that.  20000 -- my proxy says 2021 -- the citywide settlement was not possible.  And I informed all of you of that as well.  Call Mike Feuer.  And we can put him under oath as well.

MS. MITCHELL:  Thank you, Your Honor.

And my co-Counsel just handed me the numbers from Exhibit F, which was, I think, consistent with the Court's recollection where, on November 29, the City proposed to a resolve two tent and makeshift shelter encampments and RV --

(The court reporter interrupted.)

THE COURT:  Little bit slower.  We need you to pull that microphone closer.  The court reporter is having a problem, I assume, so I need you to slow down.

MS. MITCHELL:  The City proposed to resolve at least two tent and makeshift shelter encampments and at least three RV encampments involving 100 individuals per month for the first six months of 2024 and, thereafter, to increase to three tent and makeshift shelter encampments and four RV encampments involving 150 individuals the second half of 2024.

THE COURT:  And the 150 would then carry over to the subsequent years?  If you multiply that over five years, being generous, you would have a little under 9,000?

MS. MITCHELL:  Right.

THE COURT:  Please continue.

MS. MITCHELL:  Now, after that -- and I explained at the meeting on January 4, where we were told we could either accept 12,000 encampment reductions citywide for the entirety of the agreement or 5,300 if we were going to insist on a district by district model, which to the Court's point is something that is necessary and was specifically negotiated for.

So this entire process, Your Honor, from November 11 of 2022, when we were first given the bed numbers but no encampment numbers to date when, finally, after threatening sanctions, significant letters, and informing the City that we were going into court to inform the Court of the violation and request sanctions, did the City finally come into compliance by submitting district by district numbers to the Council, and then Council sign off with the legislative body.  And on January 31 that's finally approved.

Now, we were asked to wait to file this motion until after the City came into compliance, which they believed was going to take place on January 31, and we agreed in great faith and always wanting the City to succeed and wanting established Council vetted numbers.  We agreed.  But that does not mean there was any less of a violation in this case.

And I want to bring the Court right back to, like, the very beginning, like, we're almost 40 percent of the way through this agreement, and now is the time to course correct.

We had no bed plan at all from 4,000-plus beds they are required to produce in next three years, and we have significant thumbing of their nose, frankly, in disregard of this agreement over the last 14 months.

And so the question, I think, for the Alliance and the question that we are posing to the Court is:  What does this agreement even mean?  If the City is permitted to have a series of half measures and nonfulfillment of the agreement, which was specifically signed and agreed to with verbiage that has been submitted to the Court, then what does this agreement even mean and how are we going to ensure success moving forward, not just for the City but also the County, what do these agreements mean.

The Alliance, through this 14-month effort, is in no way convinced that the City will do what it committed to do without serious sanctions.  Now, we have suggested $100,000 per week. The amount of monetary and nonmonetary damages is up to the Court.  But I would suggest that it needs to be serious enough that they pay attention; right?

Liking it to a traffic violation, a carpool lane violation is $50.  A lot of people are going to break that law.  But you increase that fine to $850, that is little bit more serious of a sanction.  People are going to think twice before they break that law.  Yet the same seriousness means you could find in this case -- but even more human lives are what we're

negotiating with.

Now, we were promised March 15 of 2023 that, if we held off on bringing this to the court, just six months, that there would have been a full complete evaluation of each district. That, to my knowledge, has never been done.

Even the number that were finally agreed upon by the City and agreed to by the Council --

(The court reporter interrupted.)

MS. MITCHELL:  Yes, I apologize.

The number that were finally agreed upon by the Council members are not thoughtful.  They are not fully vetted.  They were --

THE COURT:  Karlen, it's fine.  It's too important. I apologize.

MS. MITCHELL:  They were not fully vetted.  There was no service provider.  They don't know how many people are in each district.  If you look at all of the problems that have happened with point and time counts over the last couple years, it's significant.  That's part of the reason the Alliance agreed to that six-month pause in the first place was to allow the City to get its head around the numbers; the City never did that.

Now, we've agreed to numbers that they submitted, and we would like to move forward on the numbers they submitted, but it must established that this agreement is important.  These

beds have to be produced.  We need a plan for those remaining 4,500 that they do not have a plan.  People need to get off the street.

In the last 14 months, people -- six people dying per day.

(The court reporter interrupted.)

THE COURT:  Dying per day.

MS. MITCHELL:  Six people dying per day.  Over 2,000 in the last 14 months that shouldn't be on the street in the first place.

We brought this for accountability, for urgency, to establish immediate shelter beds, and to get people off the street.  And we have lost a year of that, Your Honor.  And we ask this Court at this time to award significant monetary and nonmonetary sanctions as a result.

But I want to talk a little bit about the encampment reduction.  We had a series of asks but specifically for skid row, Your Honor, and specifically for Avenue 45 in Highland Park.  Both of these communities are suffering.  There is no plan for either of them.

This lawsuit came from skid row.  My clients live in skid row.  They work in skid row.  They own businesses in skid row. I have currently unhoused clients living in skid row in tents.

And when we brought this four years ago, it was more immediate resolution.  There is still no plan for relief.  And we would ask that that be part of the planning in addition to

this very dangerous Avenue 45 microcosm that it became recently.  With that, I'll answer any questions the Court may have.

THE COURT:  If you would be seated for a moment, I'm going to pull up a couple documents and then turn to whoever would like to argue for next.  Who would like to argue next?  The City?

MR. MARCUS:  I am.

THE COURT:  Well, I would like to go to that portion of the declaration of Elizabeth Mitchell where Mercedes Marquez is mentioned.

Yeah, help me.  As you can see, I need a lot of help from the younger generation to help me.

It's going to be -- can you help me bring up those documents, the three briefings?  There we go.  All right.  Stay here.  In fact, grab a chair.

I need you to go to page 5.  I need to go to line 9, if you would help me with that.

I'm requesting some people be put under oath today under penalty of perjury.  And I'm going to have a record where this Court is not guessing by representations of any Counsel.

I'm going to read the following:  On March 15, 2023 -- this comes from document 668, here at page 5, line 9.  On March 15, 2023, the City, specifically then-Chief Housing -- if we can get on the monitor -- this can't be absorbed without it

going up on the screen.

"On March 15, 2023, the City, specifically then-Chief Housing and Homelessness Officer, Mercedes Marquez, claimed that the City had significant plans intended to come into compliance with Section 5.2 subsection (ii), subsection (iv). Specifically Marquez assured plans that the City had already put out an RFQ, request for quote or request for qualification, for service outreach providers would be fully staffed with an assigned service outreach provider for each district by July 1, 2023, and would," quote, "have each district fully assessed," end of quote, "which was described as identified in numbers of unsheltered PEH plus a description of the needs of various groups, including an estimate of the number of individuals with serious and mental illness and substance abuse disorder in each district by September 30, 2023," Mitchell declaration paragraph 5.

So if you go back to the declaration from this document, you'll see that this same area is covered in Ms. Mitchell's declaration.

Ms. Marquez told us that, once the effort was complete, the City would then provide the Alliance its proposed encampment milestones and deadlines by October 1, 2023. Counsel for the Alliance, Elizabeth Mitchell, summarized to me in an e-mail thereafter, quote, "In our last meeting" -- let's actually pull up that e-mail for a moment.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

Reading from the first paragraph, "In our last meeting we talked about the RFQ that the City has put out for a list of qualified service outreach providers, and that the City expects to be fully staffed with the districts' chosen providers by July 1.  We also discussed that the City would commit to having each district fully assessed and give us a list of proposed milestones and deadlines within three months thereafter, October 1."  You'll also cross-reference that to Ms. Mitchell's declaration, which will be at two, and it's Exhibit C.

"Relying upon the promises of the new Mayor's representative and extending a good faith opportunity to a new administration, the Alliance agreed to the extension. Mr. Marcus, on behalf of the City, confirmed the request for extension and the City's need to provide encampment deadlines by October 1, 2023."

Could we pull up the next e-mail about the agreement?

There is going to be a contention about whether this is an agreement or what the parameters are, but this confirming letter that, apparently, you wrote Ms. Mitchell --

(A discussion was held off the record.)

THE COURT:  So this is from Scott Marcus, and it's dated May 8, 2023.  So we may get into a contention between the two of you according to the briefing whether this is an agreement or not.

Mr. Marcus writes, "I think these e-mails suffice to

memorialize our understanding and agreement.  Though we said 'October 1,' not 'September 30,' if you have something different in mind let me know.  I don't think we need to file anything with Judge Carter.  I think we all agree on the plan."

Oona, take that down for just a moment.  Go back to page 6.  And if you would be so kind to go to line 5 again on page 6.

"Relying on the promises of the new Mayor's representative" -- and I'll reread this -- "and extending a good faith opportunity to a new administration, the Alliance agreed to the extension.  Mr. Marcus, on behalf of the City, confirmed the request for extension and the City's need to provide encampment deadlines by October 1, 2023.  The City blew that deadline as well.  Two days later, October 1, the City gave plaintiffs it's encampment engagement cleaning and resolution proposal that contained no proposed deadlines or milestones at all."

Now, let me stop you.  This Court is not too concerned about the two days from October 1 to October 3.  So if you're arguing that that is transgression, I can bear two days.

Mitchell declaration exhibits, encampment engagement, are dated.  The Alliance and the City, again represented by Scott Marcus and David Michaelson and Mercedes Marquez, met about the City's violation of the agreement during which Ms. Marquez confessed that the City had violated its promises in March to

hire preferred service outreach providers for encampment reduction in each district and assess each district's needs and had instead done nothing towards these commitments.  This was the third instance of the City refusing to comply Section 5.2 subsection (ii) and (iv).  The Alliance had waited for months," et cetera.

Now, would you help me turn to the declaration of Liz Mitchell, because the persons allegedly present from the City -- Scott Marcus, David Michaelson, and Mercedes Marquez -- is further shown to be -- and this is going to be the declaration.  In fact, I can do it this way.  Let me see the declaration.

If you turn to document number 664-2, if you go to page 3, if you go to line 22, which is paragraph 9, "With the City in clear violation of the agreement, as subsequent promises made by Daniel Conway, Paul Webster, and I met with the City.  Scott Marcus, David Michaelson, and Mercedes Marquez were present," which is set forth in the prior document.  But now we know also that Daniel Conway and Paul Webster are present.

Are they able to testify?  Are they present to be sworn?

MS. MITCHELL:  Daniel Conway is not here, but Paul Webster is.

THE COURT:  I cannot hear.

MS. MITCHELL:  Daniel Conway is not; Paul Webster is.

THE COURT:  Go get Daniel Conway, get him on the

phone.  If he's in Sacramento, fly him down here.  We're gonna lock and load.

MS. MITCHELL:  Okay.

THE COURT:  Number two, is Paul Webster available to testify?

MR. UMHOFER:  He is, your Honor.

THE COURT:  All right.  Is Mercedes Marquez present to testify?

MR. MARCUS:  She is not, Your Honor.

THE COURT:  I suggest you get her on the phone and get her here.  We'll wait as long as it takes.  I want people under oath now about this meeting.  I don't know if this is bad faith or not.  I want a clear record of what was said at this meeting and whether this was misleading or not.  It may not be sanctionable.  I'm not going to rely on Counsel's representations.  Get her here.  Thank you.

All right.  Counsel, I've got a number of questions to ask.  I want to hear from the City first.  Counsel, Mr. Marcus?

MR. MARCUS:  Thank you, Your Honor.  Scott Marcus on behalf of the City.

Your Honor, the City -- the parties are here on a motion for sanctions for the City's delay in complying with a single term of the agreement, one that we have complied with and complied with per the request of the plaintiffs.

They are trying to make this into more than it is.  They

are claiming that they've lost action; that they've lost an entire year.  That is not what their motion for sanctions is about.  Their motions for sanctions is the City's delay in providing encampment milestones.

The City has not breached the agreement with respect to the bed creations that is required.  There is no number in the Settlement Agreement as to the number of encampments that must be engaged, cleaned, or reduced, or the time in which those must occur.  The City has an obligation to provide milestones for doing so, which it has now done per the request of the Alliance.  Yes, it took the City longer to do it than it should have.  For that, we are sorry.

Yes, the City could have done a better job keeping the Alliance in the loop and communicating with them when our circumstances changed, specifically when the RFQ process was no longer viable.  The City takes full responsibility for not communicating with the Alliance the change in those circumstances.  But the fact of the matter remains the milestones have been provided.  We provided a first set in October, as Ms. Mitchell indicated.

And if you look at the very first milestone that was submitted, I believe it is Exhibit D to Ms. Mitchell's declaration, it recites that the City has, in the prior ten months, resolved 26 encampments and brought 1,600 people experiencing homelessness inside.

Now, if you do the math -- forgive me, I went to law school so I won't have to do math anymore -- but you are looking at 160 people a month, which is about 1,900 people a year, which over a five-year agreement is close to the 9,600 that we already agreed to.  It's basically the same number.  The Alliance did not accept those milestones because it did not have district by district specified numbers for district by district.  This is true.

So we met and conferred with the Alliance.  That's what we agreed to in the Settlement Agreement.  We proposed milestones.  We'd meet and confer if there was any dispute or disagreement, and we did so.  We provide additional milestones.  These are ones that the Court referenced on November 29, where the City committed to resolving two tent and three RV encampments in the first six months and then thereafter three tent and four RV encampments through the end of the agreement.

THE COURT:  That is how I came up with the number seven.  I combined the two.

MR. MARCUS:  Yes.  The City at the time was using encampment as LAHSA defines encampment.  That is a certain number of either structures or dwellings within a certain specified geographic area.  That is the encampment definition that the City was operating using those milestones.

The Alliance asked us to use a different number.  They wanted us to use a specific number of tents, makeshift

shelters, cars, and RVs instead of the encampment from LAHSA. We stayed okay, fine.

The number, according to the Alliance, was 5,328; that was the City's share of the total number of those encampments in the County.  We agreed.  We said it should be reduced for the City shelter appropriate number, because that is the number that, per the Settlement Agreement, makes the City responsible for not those people who have such acuity either for mental health or substance abuse disorder, that the County bears responsibility for, but the people that the City is adequately enabled to take care of.

So we said, "Fine.  We'll agree to your number once it gets reduced for the City's shelter appropriate."

The Alliance came back and said, "No, actually our number is double what we told you it was.  It's not the 5,000; it's actually 12,000."

We said, "Fine.  But, again, let's reduce it for the City shelter appropriate people."  That's how we arrived at the 9,782 number.

But the City offered to do more.  The City offered to do 12,000 milestone reductions, again using Alliance's definition -- a tent, a makeshift shelter, a car, or an RV, around 12,000.

They said, "No."

So we met and conferred, just as Ms. Mitchell indicated.

We offered the 9,800, their number, the number they asked us to do, the 9,800 number.  It's actually 9,782, but we rounded it up to 9,800.  So we said, yes, we will do the 9,800.  And we provided them district by district breakdowns of the 9,800 number that they asked for.

They said, "No.  We want you to do 9,800 over four years, or 12,000 over five years," and they asked for specific milestones on encampments of interest to their members, to their business interests.

We said, "Fine.  We'll do the 9,800 over four years as you're asking."

They said, "No," again.  Now, we want $6.4 million, and we want to dictate to you how to do your job, when you report to Council, who gets staffed, how often things get reported.

Your Honor, they could not take "Yes" for an answer. Every time in this process that we were providing them with milestones, they kept asking for more.

Their motion, and specifically their requested motion, has nothing to do with the delay that the City incurred in providing those milestones.  They are actually trying to get things that they couldn't get in the negotiation of the Settlement Agreement.

They wanted to be able to dictate to the City which encampments get resolved first.  They asked for that in the settlement negotiations.  The City said, "No."

They wanted to tell us how to do our job.  They wanted to be in those meetings to dictate City operations.  They asked for that in the Settlement Agreement, and we said, "No."

They asked for compliance costs.  They wanted to get paid throughout the five years of the agreement a certain amount of money to monitor the agreement.  We said, "No."  And then we signed the agreement.

They are trying to now get this Court to order the things that the City wouldn't agree to in the agreement that was signed and approved by this Court.

THE COURT:  What are those things?

MR. MARCUS:  Specifically monitoring costs, which they are now totaling at $6.4 million, the ability to direct the City as to which encampments to resolve first, and they will be able to dictate to the City how it essentially runs itself, how it does what it does.  Those are what it's asking for in its proposed --

THE COURT:  I just want to be clear.  What are they dictating?

MR. MARCUS:  I'm sorry?

THE COURT:  Define what they're dictating.  In other words, I understand directing the City for specific cleanups they're requesting, costs of $6.4 million, which is putting -- we haven't even gotten that far.  I don't know what I am going to eventually do with the case.

What are they dictating besides these specifically upsides?

MR. MARCUS:  In their proposed order, they are dictating that the City attorney and the Mayor's office make specific monthly reports.  They are directing who the City attorney should assign to staff this case.

THE COURT:  They're also requesting an audit, aren't they?

MR. MARCUS:  They are requesting that the Special Masters provide, I believe, it's quarterly written reports. Again, That is not dictating something to the City.  That is between the Court and Special Master and certainly not anything that is called for in the Settlement Agreement document.

THE COURT:  Check your documents.  They're also requesting an audit.

MR. MARCUS:  Okay.

THE COURT:  Okay.

MR. MARCUS:  I think, Your Honor, the sanction is the important component because it really explains the difference between the Alliance and the City.  It encouches fees.  It encouches compliance.  It encouches damages when compliance has not been met.

But if their proposal is "If you make the City pay $6.4 million, you'll get better compliance; the City will better comply," that shows a very important difference between

the City and the Alliance.

The Alliance is made up of business owners, property owners.  These are people who are motivated by profit.  They are motivated by greed.  If you threaten them with money, they're to do things differently.

That is not the City.  The City is not motivated by profit.  We are not doing this for profit.  We are not doing this out of greed.  We are doing this to better our citizens. We are doing this to take care of the people that it is our obligation to take care of.

The question for the Court is, while we're awarding the Alliance $6.4 million, will it help build one more bed?  Will it help one more person off the street?  The answer is "No."

The City has consistently been doing the work throughout this entire process.  The Alliance claims it has lost a year. It has not.  The City has been building beds.  We have roughly two-thirds of the beds that are required for the 12,915. They're either built or in the pipeline.  That is projects either committed to, projects that have been financed, projects that we are building.

Yes, there are additional beds that we have to come with plans for, that we have to come up with financing for.  We are in the process of doing so, and we've got three years to figure that out.  We are not yet in breach of this agreement.

The Alliance has not lost the accountability, nor has this

Court.  We publish quarterly reports on the 6,700-bed MOU as well as this Settlement Agreement.  The CAO provides additional public reports to the City and then the City Council on the bed building, on triple H, on a number of things.  The City is fully transparent of what it is doing.  And, yes, we are fully transparent about how we are not there yet.

We may not have done as much as we had hoped we wanted to, but you cannot say that the City is not using its best efforts to do the job the Settlement Agreement requires us to do -- build beds.

If the Court has any questions.

THE COURT:  Mr. Marcus, thank you.

Let's take some of the issues potentially off the table right to begin with so we're not wasting time.  First, subject to your rebuttal and argument by the intervenors, I'm uncomfortable dictating to the City where your encampment cleanups take place.  That is not the Court's place.  You'll decide, in conformity with your Council members and with the Mayor, whether it's the Alliance agreement or Inside Safe, and that is subject to your rebuttal argument.

Second, I am uncomfortable with any sum approaching $6.4 million.  That money is better spent at the present time. But by the same token we wouldn't be here but for the Alliance calling this to our attention, quite frankly, and literally in a small law firm acting as a monitor.

Why don't you have a seat, Mr. Marcus?

So I'm not going to -- I propose to you that, I think, we could resolve a few things by agreement.  And instead of pointing out what is bad, I think that this offers an opportunity for the good, maybe not the perfect.

So could I have the transcript for a moment for May 26 and May 27?  I'm going to laboriously read to you, in case you've forgotten, first, this Court's request for an emergency to Mayor Garcetti, which he declined, and Mayor Bass has now adopted and streamlined this process, with my compliments to her.

I will say to you that I am extraordinarily pleased with the fact that the inertia has been broken.  I am not looking for the perfect; I am looking for the good.

(A discussion was held off the record.)

THE COURT:  Counsel, you are going to go back to a presentation that all of you were present at on May 26, 2021.

I've got it.  I wanted the 27th.

And we're going to go back to a series of documents that calls for accountability.  And I'm going to ask you why you can't reach an agreement before the Court ever makes critical decisions in terms of transparency and accountability.  I'm going to begin reading at page, I believe it was, 16.  Yeah, 32.

All right.  Could you put page 32?  Help Oona with that.

It's small print so, but hopefully all of you can follow this.  It's going to be a laborious reading, but it's going to point out and simply ask the question:  "With our providers, why don't we have underlying documentation when an invoice is submitted, in an agreement with complete transparency, so we know what each provider is allegedly providing?  And the reason I'm raising that is the following:

"Now, I understand that $13 billion is statewide."

And what I'm referring is that's the amount of money if you go to the cover sheet.

And would you put up 11, the cover sheet?

At that time the Court calculated about $13 billion that the Governor had spent over $21 billion, by the way, right now.

If you can go back to the first slide against, "We know that HHH has $1.2 billion over ten years.  And it's arguable whether it's 480 homes or 483 homes or maybe just north of that now, but we're building out in four years.  Let's say 500 HHH so far."

Now, this is back in 2021.  You made progress on this.  These are old numbers.

"I state that portion of my order to make sure I didn't interfere with anything concerning HHH at the present time, but you would have to be a little dense not to know that the Court is looking at parking lots and motel rooms and everything else because, if we move into the next step, the Court might be

looking at a far different scenario in terms of commandeering.

"I want you to go down to Measure H funds $3.5 million. That is a rough estimate over ten years because originally we were going to generate that amount of money.  And in 2017 and 2018, Mr. Miller, how much Measure H was generating?"

"216 million."

"Excellent.  What was the under on that?"

"It was about one-third, so about $140 million was generated, approximately in 2017 and 2018."

"I'm going to show you a couple of slides in a moment, because I am deeply concerned about what information the board is getting in good faith to vote on, in just a moment.  And in a moment, although I am speaking about the board, this is going to directly pertain to the City and on accountability with your providers, and I am going to raise again why are we going through this Rocky Horror picture show without accountability and transparency four years later.

"Let's move down.  Proposition J has a lot of contradiction.  You will know what Proposition J was.  It wasn't wrapped up yet, but it's got a contradiction.  The advocates, et cetera, and the City, and the advocates will estimate about $500 million -- or strike that --- about $900 million per year.  The City will come back and say it's going to produce about $300 million, and there is a huge $300 million.

"SPECIAL MASTER MARTINEZ:  The County, Measure H.

"THE COURT:  I mean -- I say, yeah, Measure H.  There is a discrepancy going on between what it's going to generate, whether it's 300 million or 900 million, referring to Measure J.

"The government doesn't just make an extraordinary pledge that it's $12 million, but it's not over three years; it's over five years.  So in one way of looking at this, if we added $13 million in the last three years, according to Elaine Howle, now, we've got $12 million over five years."

Remember Elaine Howle was the treasurer at the time for the state.

"And I know we've only been asking for $20 million, but the Governor also kicked $1.5 billion additional monies from Caltrans."

If you remember, the Governor put in another $1.5 billion.

All right.  Could you go to slide number one?  Would you go to slide number one?

"And you'll find this in my record -- I'm going to put it pursuant to this hearing again.  I expect this to come from the County and the City.  This is just rough for everybody, but I could be called on this at any time, but I'm going to put it up on the board.

"Now, would you turn to slide number 7 and follow it closely?  I'm going to go into HUD funding for a moment, and

this is just the last 24 months.  If you look at the right-hand column, about 662 million, just out of HUD funding, now, we've got LAHSA, we've Tri-City, LA County, rough figure 495.  And you've got some overlap at about 2.6 million having been expended over the past 24 months.  So what it means is we're already at a million-dollar budget that the Mayor has proposed for a long, long period of time.

"There is nothing shocking about this.  It's a good faith effort."

(The court reporter interrupted.)

"THE COURT:  All right.  Go back for just a moment. On the City, how much unexpected funds for homelessness were expended last year.  In other words, instead of saying that we don't have money, how much money did you have in that coffer last year that was designated for homeless that you didn't even spend?  I'm speaking to you.

"SCOTT MARCUS:  For the record, on behalf of the City of Los Angeles, Your Honor, my understanding from the budget is there was approximately $150 million.  But last year that was rolled into the current budget expended this year."

Now, this isn't in the record, but that means unexpended funds for homeless.

"THE COURT:  Exactly.  Now, look down at the bottom line.

"SPECIAL MASTER MARTINEZ:  160?

"THE COURT:  160.  So excellent, you're very close. What you'll find, I think, is 159.

"Now, I'm going to walk you through something very complicated, and I'm going to start asking some tough questions because I've got an order out there demanding an accounting from the City or the County.

"All right.  Could you turn to number 9?

"You have it up now.  Now, pay close attention because this is going to get complicated and it's going to lead to some questions and, as the chairperson, you can answer and, as councilman, you answer.  And I wish Mark Ridley-Thomas or the Mayor were here.  I would like them to answer it, or whoever. But let's read together, quote, 'Strategy B, Measure H funding,' which is really the County, quote, 'to support LACDA's homeless incentive program which honors monetary incentives to encourage landlords to rent their available units to homeless Section 8 voucher holders,' end of quote.

"It actually probably does more than that, by the way. It's a quick summary of it.  This is artfully worded.  Only lawyers can make this up.  Are you ready?  Quote 'However,'" -- and whenever you see however with a comma, watch out -- "'However, we identified opportunities'" -- and I want you to circle the word 'opportunities' -- pardon the expression, that means you screwed up -- quote, "-- where LACDA can improve and strengthen controls over Strategy B before measures.  For

example, LACDA could not readily provide the details and supporting documentation of the July through September 2018 performance data."

I'm going to lean back a little, and I want you to read that for yourself.  That's an order, because it's in small print.

I'll publish this on the website tonight so you can look through these documents.

"You will find that there is a staff audit that takes place in July through September of a very limited number of providers.  And eventually I'm going to ask you, as you read through documents with me, Mr. Ballard, since you're the County and Measure A, some very difficult questions about that which was retained or not retained, however, given to the board for consideration.  So follow closely."

I'm talking to Counsel.  You'll see this involves the City in just a moment.

"Now, I want you to turn to page -- to slide ten for a moment because, when I first came to this court, General Jeff came up and said, 'This homeless industrial complex -- this money isn't hitting the streets that the providers have set for aren't providing."

Shayla Myers has come down in one of the conversations and says, "Yes, they are.  They're doing a good job."

So I want to look at the first box, and it says -- right

where the one is -- and I'm going to read it because it's small print, quote, "During our review, LACDA, which, of course, is Los Angeles County Development Authority, could not readily provide the detailed supporting documentation for July through September 2018 performance data.  Specifically, LACDA did not maintain point in time details for the reporting period and instead maintained realtime running totals.  Well, what does that mean, Mr. Miller?  What is difference between realtime running totals and point in time?

          "MR. MILLER:  I don't have a clue, Your Honor."

          "THE COURT:  Hypothetically, point in time might be, I submit, something that you, with dates, a bill, and it tells me what the bill is for.  And realtime might be just to accomplish a running total.  If you will, I'll bill an amount, so I bill $100,000, or I bill $150,000.  And I'm going to be asking you at this audit, in just a moment, because I'm just going to point out some details for you."

          "MR. MILLER:  I'm not an expert on the audit either."

          "THE COURT:  Well, that's okay.  We'll sort through this."

     We both went to UCLA and even sat behind each other, so we know each other well.

          "THE COURT:  All right.  Here we go.  Now, what happens is that there is a recommendation of your auditor to do the job.  It says, 'Increased risk of accurate or unsupported

performance data.'  But turn the page for a moment at number two on slide 11, quote 'We noted that LACDA does not require the PHAs to provide supporting documentation such as detailed accounting records at the time the quarterly expenditure reports are submitted,' end of quote.

"And then, if you read carefully, they went after the two largest providers -- so locate that on the document -- who hadn't supplied the documentation.  And this is really a fuzzy line.  It can be read two ways.  Your provider hasn't supplied the documentation, and LACDA was able to put it together.  But it could be read a different way -- that providers didn't have the documentation, and LACDA had to construct this themselves.

"Now, what is the bottom line?  Increased risk of inaccurate and credible bids by actually reporting.  That was the chairperson, and sincerely I'm going to speculate that the board even knows about that.

"But I want you to remember the following:  July through September 2018; right?  So, Mr. Miller, if you would helpful, could I bother you with no affront?  Could you write down $216 million for me, 2017 to 2018, just $216 million?"

"MR. MILLER:  Sure, Your Honor."

"THE COURT:  Okay.  Thank you for your help."

"MR. MILLER:  No problem.  $216 million."

"THE COURT:  $216 million?  That's your Measure H, the implementation date.  If you look off on the one year, it

is a year and two months later.  So in this staff audit, where our bureaucracy and discovery is, oops, we've got a problem in terms of the inaccurate and not supported data.  Well, we're going to take a year and two months to implement that.  And if you look at the right-hand corner of both former documents, and I'll flip that back -- and Alexa who was my law clerk -- so they can see it.

"So we implement in October of 2019 so one year at, three months' rate.  In the meantime -- and this is going to get complicated.  I want you to turn to be slide 15 for a moment.  And if you can track this, you're going to unlock because some of these providers are just excellent by the way and some of them may not be supplying you any data at all.

"I want you go to go down 15, and I want you to find the third bullet point.  For context, in 2017 to 2018, the total allocation was $216 million and other expenditures were 33 percent.  So if you take your 216 million and you roughly take a third away, you've got about $140 million of Measure H funds flowing through 2017 and 2018.  Okay?  Because -- so Skip -- could you do me another favor?  Could you write in parenthesis about 140 million.

"I would offer you to do that while you walk down through these minutes -- apparently I don't have all this stuff because it's public documents -- and I want you to go down to one, two, three, four, five, six bullet points.  Counsel, go down six

bullet point on the slide.  Follow this.

"And you're going to Measure H for the fiscal year 2018 to 2019 and the other $98 million.  And it exceeded our initial projections of 350 million that year.  But we have a deduction here.  And if you go all the way up, you'll find a deduction of 58 million in other spending.  So really our Measure H that we actually expended that year was $340 million.

"Do me a favor.  Go down to 2018 to 2019 and put down the initial figure of $398 million and then the actual figure, because we didn't spend all of that -- we spent 340 million.  Go down to the bullet point right below it, and you'll see it's projected, that fiscal year 2019 to 2020, Measure H would also equal 398 million.  We undercut" --

"ALEXA:  What?

"THE COURT:  -- "500-million something after deductions.  And I'll have you look at this report because I'm not an accountant.  We had about 503 million.  We think that came in and that was subject to the audit, as presented to me.  And you have an underage, and we think you had about 340 million you actually expended that year.  So it is rough figures.  Take 398 -- well, it's 503, and I'm sorry, it should be about 440 million.  But we'll take just these figures, that type of accounting, take 398 -- and I'll represent this for you at about $340 million dollars."

And my apology to the court reporter.  I'm reading too

fast.  Rest your hands for a most.  Just rest.

"What we think is about 440 million a year, you caught all that?"

"MR. MILLER:  No, I don't.  I'm sorry."

"THE COURT:  You want to me to come down and do it?"

"MR. MILLER:  Oh, I" --

"THE COURT:  Okay.  Skip, 2017 to 2018, $216 million."

"MR. MILLER:  Okay."

"THE COURT:  2018 to 2019, I want you to put in 398 million minus 58 million and 340 million Measure H."

"MR. MILLER:  Okay.  58.  The difference is 58."

"THE COURT:  Now, 2019 to 2020, you can take the County's figures, but they're underrepresented.  398 million.  You're really about 503 million, but we'll take their figures."

"Okay."

"THE COURT:  Okay.  I'm want you to double -- I'm almost done.  To slide 12 for a moment.

"And look at LACDA's response, because on January 22 of 2020, without the board knowing, in my opinion, information came back as follows:  There is an agreement between LACDA and the providers that from now on we're going to have printed on the report to ensure the reporting period reflects the point in time details that correlates to their data.

"Someone could read that as bills being handed in without

dates, not able to match up to the project; and, number two, that the providers are retaining the data that is never going over to LACDA.

"And, therefore, Skip, why you keep calling my Special Master.  That is the very thing Michelle is demanding from you and apparently you are not absorbing.  In this audit, I am also asking -- not documents, not flowing in -- it's better to freeze at this point.  There could be speculation that LACDA didn't get the underlying data, that this data is being retained by the providers, and only through a spot audit with two of the providers is it being recommended or being noted with tens and tens and tens of providers out there.  Now, I don't know that, but it's one thing -- one of things I am asking for in this audit."

"MR. MILLER:  I hope" --

"THE COURT:  And it shows me that clear view of your associate."

"MR. MILLER:  Yes."

"THE COURT:  And the response we got back is something that it's not new.  And there is an order by Court, right now it escapes me, that there has to be an accounting here.  I believe after this Court then got the February 20 letter.  And the board in good faith for the first time saw this and saw the attachments and probably didn't think much of it with all the volume going on the random audit after July

through September of 1968 [sic].

"But the spot audit doesn't show that it is dated.  It doesn't even show dates.  It doesn't show why that LACDA got the information because LACDA is trying to reach back to the provider to construct it.  And 95 percent of your providers are probably doing just a great job and can justify it, so it's not an accusation.

"So the compliment is that this has been rectified -- this is good lesson for all of us so let's move forward in good faith and let our providers supply this data.  If not, we've got about $600 million that flows through the whole County.  And that seems to match with what Elaine Howle was saying because, if you would now turn back to the state audit and return back to slide five -- let's read this together -- quote, 'The state does not tract the funding it provides to combat homelessness,' end of quote.  Let me repeat that in case any of you missed that, quote, 'The state does not tract the funding it provides to combat homelessness,' which could perhaps because the biggest problem of all.

"'There is no single state entity that comprehensibly tracks the sources of funding.  The intended uses or related expenditures of these programs, nor does the state,' end of quote, quote, new quote, 'track how much money is available towards address homelessness statewide.'

"Look, forget the past.  But if this was a problem then,

just make certain now that this data is coming into LACDA from our providers in good faith with correct dates and times so we can match up what they're doing, so we can have milestones with accountability here, because the argument could be made that $600 million or more flowed through with no accountability, no tracking."

Now, let me stop for a moment. Whether it's in my purview or not, I'll decide that later. Why can't we reach an agreement? Whether it's Inside Safe or whether it's the Alliance agreement, you have the same requirements that we demanded in settlement with the County with the 35,000 bed spaces when everyone was asked to go to the lectern and write in all invoices were to be also accompanied by what work was done.

And the reason for that is that, I think, Mayor Bass and the Court and the public needs to know the following: What are we spending our money on? Is our money being spent on overstaffed providers, or is a particular provider providing a service, which is the ultimate goal of, namely, treating homeless on the street but also getting them into shelter and/or housing?

In other words, which providers are producing results out there? And we have no benchmark and we have no accountability at this point. It's just as simple as that.

So can all of reach an agreement today and take this off

the Court's plate, where you're going to agree that Inside Safe, which I think they have a good accountant, by the way -- by the way, I want to state for the record I have a lot of confidence in this Mayor.  I am going to peer the corner, and I'm going to pay some compliments in a moment.

But by the same token, I don't see an accountability from the LA Alliance case.  I don't see any accountability from the freeway case.  So the Mayor can be called, the chairman of the board.  Can we get an accounting and an agreement to this, or do you want me to decide?

Why don't you two have a conference?  That is an order. Stand up, Mr. Marcus.  Move over to Alliance.  Apparently you can join in.  What I am still looking for is an accounting. How are we spending our money?  So the Mayor and the Court can make the decisions and see what is actually flowing to the street, because Kevin is out there and a whole bunch of people from skid row.  And if you walk around, they'll tell you they don't have any idea where this money is going in this homeless industrial complex.  And if you don't believe me, come with me to the streets and just talk to the people.

So that's an order.  Just get together real quick and then call the Mayor up.  Talk.  Let's see if we can come to an agreement.  We've got Counsel over here for Mayor Bass.  Come on up here and join us, Matt.

Why don't we reach an accounting so all of see

transparency and accounting for every buck.  Just have a conference.  Go on outside and talk about this.  Tell me rest or no.

I'll take a brief recess.  We'll resume in just a minute.

(A brief recess was taken.)

THE COURT:  We're back in session.  If you can come up.  We're back in session.  All Counsel are present.

What are your thoughts and responses?

MR. MARCUS:  Scott Marcus for the City, Your Honor.  Your Honor, we agree.  We can meet this matter with the accountability that the Court has described.

THE COURT:  That is a big word.  Here is my specificity I mean by it.  With every invoice that is submitted -- here's $248,000 to United Way.  That the underlying work that is performed is also shown to us when that invoice is made so the public can track this.  You can track this.

Do you agree to that?  Yes or no?

MR. MARCUS:  Yes.

THE COURT:  Does the Mayor agree to that?  Has she been contacted?  I have a great relationship with her.  I respect her immensely.  But part of our negotiations are between the two busts.  I want opinions.  Her support system is letting her down.

Does she agree to this?  Have you contacted her?

MR. MARCUS:  I have not contacted the Mayor, Your Honor.

THE COURT:  I am ordering you to contact the Mayor. Get on the phone.

MR. MARCUS:  Your Honor --

THE COURT:  Just a moment.  You are talking to her staff.  You owe her that.  Get her on the phone and make sure that the Mayor said okay.  We can call each other any time.  I trust her.

WOMAN IN AUDIENCE:  Yes, Your Honor.

THE COURT:  I don't want this from attorneys; I want this from the Mayor.  I respect you, Mr. Marcus.  You agreed to it.  I understand that.  I want the Mayor to agree to this. I'm asking for transparency for all of us from this point forward, whether it's the freeway, LA Alliance, or the Inside Safe.

I happen to believe she's doing a good job of Inside Safe. I think she's trying to, but I am not sure yet.  We have that, and we finally got transparency.  And she can make decisions, and I can make decisions, and the public can see where our money is going.  We can also see what your providers are providing.  Are they overstaffed?  We are going to be able to reflect what they are doing on the street.  We can get rid of those providers that are not worth the money.  That will send a chill to some of our providers, trust me.

Our ultimate goal is that we have accountability, but our ultimate goal was to get shelter and housing.  That is what we eventually achieved.

Now, where's LAHSA's budget?  Get the LAHSA's budget from them.  Is anybody here from LAHSA?

MS. MITCHELL:  Your Honor, while that is --

THE COURT:  Just one minute.  I want L-plus's budget now.  You'll find it someplace between 650 and $800 million if you pull it up.

MS. SOBEL:  Your Honor, I think it's $845,000.

THE COURT:  It's $845 million.

MR. MARCUS:  $845 million.

THE COURT:  Million and not thousand.

Are they giving you accurate data, Mr. Marcus?  It just requires a yes or no.

MR. MARCUS:  Your Honor, since I don't get data directly from LAHSA, my understanding is we are working with LAHSA to get better data from them than we have gotten before. And we are making strides towards that.

THE COURT:  Okay.  The next issue we can take off the Court's plate in deciding might be how we deal with our MOUs. If you would be kind enough to turn to --

MS. MITCHELL:  Your Honor, I want to very clear. Plaintiffs did not agree to that.  I'm glad the City has answered that.  But I want it to be very clear that we do not

have an agreement that that takes care of the entire motion.

THE COURT:  Okay.  Tell me where else you're seeking because I can call for an audit.  I don't want an audit.  But I am amenable where I would like to see the City start to produce these first, so I inch my way up.

So what is your concern?

MS. MITCHELL:  Your Honor, yes, that is -- should the Alliance be awarded sanctions, that is the goal of the Alliance.  Outside audit, an outside entity, but not within the City but from the outside, that has the ability to not just look at the numbers, so forensic accounting, significant forensic accounting, but also performance auditing is hugely important, because the numbers don't always tell the whole story.

THE COURT:  Let's say I wanted to save and devote as much money to homeless as possible and not to attorneys and auditors, et cetera.

Isn't the controller an independently elected official?

MS. MITCHELL:  I don't believe the controller has full access to the data, Your Honor.

THE COURT:  Well, then we can question why not.  In other words, I don't know that the outside auditor might be any more successful unless there is kind of a subfeed to the controller in the City, and they're not getting the full information.  That is the inference to be created.

MS. MITCHELL:  So to be quite transparent, Your Honor, I'm not in the controller's office.  What I am hearing from people within the City, as recently as this morning, is the controller doesn't have complete access, particularly, to the Inside Safe numbers.

THE COURT:  Okay.  We might ask the controller to tell me.  Let me delay that for just a moment.  Let's see what that controller has in terms of authority.

MS. MITCHELL:  Your Honor, so what we are looking for is outside auditors, both performance auditing and forensic financial auditing, including the service providers.  And Ms. Myers mentioned to include hotel owners.

THE COURT:  Here's the problem.  I am going to think we are going to speculate we are not going to be able to account for a minimum of $600 million or more in this period of time.  I am going to speculate that those records don't exist because they were retained by providers who could produce them historically and can't produce them now.

Okay.  Do I spend money then going back, or do I spend money going forward, because what I want is to move from this point forward.  I can't recreate the past.  What a waste.

But I can go forward and make these requests.  I'll come back to it.  I don't want to get tied up in this right now.  I promise you we'll come back.

MS. MITCHELL:  Okay.  And I am not done with that.

THE COURT:  Okay.

MS. MITCHELL:  The reason we don't think this goes far enough is because there has not been any consequences on the City for extreme bad faith behavior over the last 14 months on this issue.

THE COURT:  The courts are told by the circuit to inch up.  We just don't come out with a harshness.  If I'm going to impose penalties or I'm going to impose sanctions, I am being instructed by the circuit to make those gradual so there is a warning along the way.  Let me reflect on that here just a moment.  Not to whether we're going to have an audit or not.  I'll leave that on the table.

But amenably I just want transparency right now, period, going forward.  Can I have an agreement at least as to that?  From your position you agree at least to that.  You're stating what you know to be because this is inadequate.

MS. MITCHELL:  We agreed to the transparency.  We think it is the earliest first step, an important first step, in getting the truth.  We do not believe that is sufficient to resolve our concerns that we brought the motion.

THE COURT:  I hear you.  All right.  We will have more argument.  I just don't want to decide.  We have a lot to cover.

All right.  The MOUs that have been created have been so time-consuming that, when Mayor Garcetti or I reach an

agreement along with the County, when Mayor Bass reaches an agreement, that then it gets turned over to the attorneys, to the support group. And so I'm going to read from the transcript May 26. And this pertains to the freeway agreement.

If you remember historically, you were supposed to have an MOU to the Court within two weeks. Let me repeat that. "Now, deciding to work with you, the Court took a risk" -- I'm reading from page 16, line 3.

Could you put that up for a moment?

"Now, deciding to work with you, the Court took a risk, and that is, when the courts say something, we should just wing it; we should actually follow through with it. We're not politicians. What we mean should have some weight and not that politicians shouldn't have weight, but in case any things change.

"In good faith, you entered into an agreement with me that is dated June 16, and it can be found docket number 136. Now, let me remind you, when entered into this binding term sheet, you represented to -- I will name the names if you want me to -- the members of the board and Council, that you will have the MOU in two weeks. Let me repeat that -- two weeks.

"Mr. Marcus, how long did it take you to get an MOU?"

"MR. MARCUS: I believe the MOU was signed in October."

"THE COURT: Four months."

"MR. MARCUS:  Roughly, yes.

"Mr. Miller, how long did it take -- how long did that take?"

"MR. MILLER:  Sounds right."

"THE COURT:  About four months?"

"Yes."

That's stipulated.  I mean, a lot has gone by since the agreement between Janice Hahn, Karen Bass.  How long?

MS. MITCHELL:  It's been at least a year, Your Honor. I would say probably about 16 months.

THE COURT:  About 16 months.  It seems to me that with the emergency repair declaring and in good faith trying to move forward, that what we have is a bureaucracy slowing this process and causing issues.

Can we reach an agreement, if Mayor Bass and Alliance reach agreements in the future or with the intervenors, et cetera, that the MOUs have to be produced within 30 days?

The Court will discuss this.  Stand up.  We'll have a conference.  For now on, when we reach an agreement of any type, regardless, 30 days for the MOU.

MS. MITCHELL:  Your Honor, I don't think we need to talk about it.  We can agree ---

THE COURT:  Go talk about it.  That's an order. That's not a request.  Just tell me "No."

(A discussion was held off the record.)

THE COURT: Because the delays are repeated. And the next thing I'm going to ask you, when you have this little discussion, right now you have 3,500 beds supposedly from the County -- let me repeat. Not beds, but bed for mental health, not beds, and you don't have an MOU yet. So your Council members are individually complaining that they're not getting any beds over to the City. And if not, talk to your Council members.

So the City is not getting any beds from this. And if you talk Judge Pregerson -- Judge Pregerson and I have a sneaking suspicion that what you do with your beds is you're sliding them over to Judge Pregerson's case where he threatened to hold the County in contempt with jail and taking those 3,000 beds meant for the streets for elderly women, our people on the streets, and slid them over so Judge Pregerson doesn't hold you in contempt, and that's what I call "double counting."

But go have a conversation back there privately, because we haven't raised that yet. We'll take a recess.

(A brief recess was taken.)

THE COURT: All right. Then we're back on the record. Ms. Mitchell, I'm going to take you up on your concern for the audit and resolve it this way. I am going to request that the auditor controller come over, and the reason for that is I am deeply concerned whether the auditor controller could even audit the Mayor's program. I don't believe she can. I

would like to find out from the auditor controller because, if not, then your outside audit starts getting strength.

The second thing is I would like to ask all parties -- the County who apparently is not here and the City -- it's been 16 months.  Can both parties agree to getting this MOU between City and the County done in 30 days?

The third thing I would like know, I'm going to request the auditor controller to come over this afternoon as a courtesy.  If not, I'll sit here and wait until they can.

MS. MITCHELL:  Your Honor --

THE COURT:  Let me ask the County of the three -- you're fine.  Mira, are there -- and pardon the informality. Are there any Alliance beds, of these 3,500 mental health beds, reserved for people exiting the jail?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Good to see you.

MS. HASHMALL:  I would like to comment on a number of matters that were raised.

THE COURT:  No.  I want you to answer my question, first.  Are there any of the Alliance beds, the 3,500, for people exiting the jail?

MS. HASHMALL:  So my understanding is there is no overlap for the beds --

THE COURT:  Just a moment.  Slower.  Judge Pregerson was here, and Judge Carter was here.  If we wouldn't have our

3,500 beds used for jail outtake, these beds would go to the City.

What is the status?

MS. HASHMALL:  Your Honor, I am not sure what 3,500 beds you're referring to.

THE COURT:  This agreement of 3,000 and the 500 that the County, Janice Hahn, entered into.  Those were mental health beds, not beds.

MS. HASHMALL:  So, Your Honor, we're here with a full and complete accounting for the first quarter of --

THE COURT:  You are not answering my question.  I'm going to say it again and very respectfully I'm going to ask you to answer this.

Do you know if any of these 3,500 beds, that we reached an agreement with Janice Hahn, when she was the board chair, are going towards Judge Pregerson and the jail output?

MS. HASHMALL:  At this time I do not know that.  What I do know, Your Honor, is that the County met or exceeded all of the benchmarks with regards to the County/Plaintiff settlement.  They put up over 900 new mental health and substance abuse disorder beds in connection with the first reporting period.

They also provided over 100 subsidies for board and care facilities significantly exceeding the benchmark requirements for the County's performance under its Settlement Agreement

with the plaintiffs.

THE COURT:  I'm not questioning that.  In fact, within a month, I'm going to call a similar hearing with the County.  This pertains to the City.  And the reason I'm asking this is because I don't mean a separate hearing within a month for accountability.  You may have done an excellent job.  Some of the reports are very good.  I'll pay you a compliment.

Understood that I asked and the City Council was saying, "We're not getting mental health beds out in our districts." What is happening with these 3,500 mental health beds?  And the concerns that Judge Pregerson and I have is that they're being put over in his case so that there is a decrease on the City level for the beds you expect your Council districts to have.

Mr. Marcus, why don't you join Mira for a moment?  Have any of your Council districts received any of these 3,500?  Yes or no?

MR. MARCUS:  I don't know.  Your Honor, I don't know.

THE COURT:  Can you make some calls and start checking.

Can I get Bob's letter up for the moment?  We just got this the other day.  I will give you the letter so the both of you can absorb this.  In other words, you're reading the copy.

One of you put it on the computer, and one of you put it on the screen.

A number of Council members are representing that they're

not getting these beds.  Have you read it yet?  Have you read Council member --

MR. MARCUS:  Yes, and I've heard that complaint from Council Blumenfield as well as other Council members.  Your question is if I knew we were getting beds, and the answer is I don't.

THE COURT:  Well, I'll ask my question to the Magistrate.  She met with Council people yesterday, and the input is we're not getting any of this.  We're getting a homeless return.

MS. HASHMALL:  Your Honor, we know that we met and exceed the amount of mental health and substance abuse disorder beds called for under the Plaintiff/County Settlement Agreement.  But we do also know is that an impasse jogger, he is our greatest need.

THE COURT:  Yes.  Sure.

MS. HASHMALL:  And, yes, the point in time count of demographics of people experiencing this throughout the County and the City, and the City does have a significant portion.  So by definition, they're going to get a significant amount of those resources, but need is what dictates those, not geography.

THE COURT:  Absolutely.  That's agreeable.  We're saying the same thing.  I agree with you.

which Council districts has gotten any of these beds so

far?

MS. HASHMALL:  I do know that people have to be a district by district accounting.  That is not how the system works.  The system works in identifying people who need these resources and placing them.

THE COURT:  Okay.

MS. HASHMALL:  We provided that information in our detailed accounting and our compliance with regards to the settlement.  Those are provisions that were heavily negotiated to and agreed to.  And the County submission recently met or exceeded all of those benchmarks.

THE COURT:  Let's assume on paper that that is true. Let me compliment you.  Okay?  But on paper doesn't mean it's reaching the street.  And what I'm asking -- I'm giving the fair opportunity.  That's why I keep saying within 30 days, because within 30 days I'm going to hold a formal hearing with County.  Okay?  You'll have a chance to make all of these points.

I'm giving you every courtesy in the world of giving you that 30 days to try to rectify this if there does need to be some rectifying here.  Or can we take the position that these are going out?  Because on paper you may have complied.  The question is where are they going?

MS. HASHMALL:  Thank you, Your Honor.  I certainly appreciate the opportunity.

THE COURT:  I'm not trying to trap you.

MS. HASHMALL:  I didn't think I would have to speak much today because this is Plaintiff's motion about the City.

THE COURT:  Mira, I'm not trying to trap you.

MS. HASHMALL:  I do want to say, Your Honor --

THE COURT:  I am giving a month's warning about what is coming and the questions I'm going to be asking you.  And you've got to talk to -- if you're not getting these out, talk to Scott, talk to the City to try to get these beds out to the City.  And if you don't have them going out, then I'm going to be asking you these same questions, so I am giving you all the courtesy.  I'm not trapping you or surprising you.

MS. HASHMALL:  I appreciate that, Your Honor.  I also want to make clear that the coordination on the County and the City on traffic conditions has been significant.  There were discussions about a potential MOU between the County and the City.  And the City had a change in administration, and it needed time to get its bearings, and that is why that MOU did not move forward --

THE COURT:  How much more time do you need?  Instead of me saying 30 days, how much more time do you need?

MS. HASHMALL:  I think we learned from today's conversation, Your Honor, that you set deadlines that can't met.  It creates frustration and inefficiency.

THE COURT:  Let's stop that record right now.  I not

only have set deadlines that can't be met, but I've been patient with the dragging and slow footing on these MOUs on the freeway agreement to the County agreements. And I'm raising the next specter so you're not trapped because, if we have this out months and months with the City and they're not receiving any mental health beds and all of this input is coming to me by the Special Master, then you may have put this on paper but, hey, that is getting produced to the streets once a month.

MS. HASHMALL: Your, Honor, our acute MOU was consummated. And every time we have been doing reports show the County is in full and complete compliance and committed over $300 million and new resources for people experiencing homelessness.

THE COURT: No disagreement at all. I just disagree with the fact that it's a constant of slow footing the MOUs.

MS. HASHMALL: I also want to say, Your Honor, the County has stepped up. When the City made a declaration of emergency, the County was there side by side assisting with Inside Safe and other City initiatives. This is a partnership that doesn't require paperwork because of County's significant commitment to addressing this all.

THE COURT: Let me pay you the courtesy. When would you like to have the hearing with the County, because you are going to have a similar hearing with the County? What date?

MS. HASHMALL: I have to look at my calendar.

THE COURT:  Go get your calendar and make it 30 days out or more.  Okay?  I'm not pressing you.  I am giving you every opportunity, and I think you've probably done well. I think -- by the way, there's been a significant change.  I think we both agree there.  So I will pay some compliments at the end of this.  But I'm not paying compliments yet.

MS. HASHMALL:  Okay.

THE COURT:  Look at your calendar.  Tell me when we can have this date with the County.  And that will give everyone a fair warning to look at this to getting out to the City in terms of mental health beds.  And, also, remember, these are mental health beds.  These are not "beds" where you put somebody in, and then you count that as a mental health bed.  These are acute and subacute beds.

MS. HASHMALL:  Are you thinking maybe first week of April?

THE COURT:  Give me a date.  Make it convenient for you.  And don't worry about inconveniencing the Court or the City.  Try to get it on a date not conflicting.  That's usually a Thursday.  But tell me, Mira.

MS. HASHMALL:  Thursday is April 4.

THE COURT:  Perfect.  Now, if you need an extension, tell me, and I can go back.  I don't want to trap you into it. If you need a couple more weeks, just tell me.  Okay?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Now, is there anything else you'd like to say?  Anyone else want to make a general statement about the County?  And I agree with you.  Okay?

MS. HASHMALL:  Your Honor, I'm just very, very proud of how hard the County has worked and to have accomplished those significant new mental health and substance abuse disorder beds, to have had the ability to put all three multidisciplinary teams and senile teams serving PHUSA.  It's an extraordinary amount of work, and they're continuing to do the work that fast and not slack and do the terms of the Settlement Agreement.

THE COURT:  Let me say that I agree with you.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  Accept.  The only part I disagree with is if these mental health beds are being produced on paper and they're either going over to the jail or -- and the City Council isn't any of these beds for L.A. -- is that true?  Then on paper it looks good.  I just want to see what is being produced on the streets.  Okay?

And I want to hear from Counsel, so let's put up Bob Blumenfield's letter.  "I've read what the interest the County of Los Angeles first status report pursuant to the Settlement Agreement filed on January 30, 2024, and am pleased to see some progress implementing additional beds for mental health, substance abuse disorder per this agreement."

And as a side, the Court joins in that.

"I have several concerns about the implementation of this settlement to which the City of Los Angeles is not a party."

And for the court reporter, I will slow down.

And would you get her a copy of this?

"About which the City has grateful and meaningful progress in our efforts to serve the unsheltered and reduce street homelessness and encampments, under our own LA Alliance settlement agreement.

"As you know the City's ability to implement its own agreement relies on funding for services and support from L.A. County, which has not yet been fully defined or realized.  The City and County have been negotiating and not only have they not reached an agreement for settlement implementation."

This didn't come on my screen until I got this letter.

"The Court may find that, since the City of Los Angeles is not a party to the Settlement Agreement, the City and myself, as representative of 260,000 residents, have no standing to speak up about these concerns; however, having worked with you and followed the direction of all LA Alliance lawsuits since 2020, I'm hopeful the Court may be able to facilitate meaningful progress in a timely manner.  In particular, the lack of the MOU with the County is a challenge for the City as the payment for services, bed rate, and list of services to be provided remain incomplete.

"If the Court could encourage the completion of an MOU" -- and I'm encouraging the completion -- "prior to the City Council's consideration of the fiscal year '24-'25 budget anticipated after the release of the Mayor's budget, which is required by April 20, 2024, by charter, would be most beneficial."

Can I see the next page.  Thank you.

"While the September 12, 2022 nonbinding preliminary agreement between the City and the County, signed by the County's Chief Executive Officer and City Administrative set the framework for the Alliance settlements.

"The Alliance agreement between the City and the County through a future MOU will require willingness from the County to avail and assure services to residents at City interim and permanent sites.

"Unfortunately, Court oversight and agreements with the County are necessary to ensure general relief, social services, health and mental health, and re-entry services are being delivered to County residents within the City.  The current Roadmap agreement avails $60 million in funding for services for every year for five years for the 6,700 homeless housing interventions the City built."  that's the freeway agreement. You probably will call that the Roadmap agreement.

"The City funds supplemental services at our Roadmap sites.  And on January 9, 2024, authorized a midyear bed rate

adjustment for service providers.  See CAO report CF-23-1348. Additional bed rate increases will occur for both City and County beds and will be important to establish a daily bed rate that clearly defines mainstream services and enhanced services offered by providers and offered by County department staff.

"Bed rates determine how many staff members a service provider can hire to operate a site, which impacts their capacity and ability for service delivery.  Service providers, that operate our Roadmap alliance and Inside Safe sites, state the higher bed rate is required to provide case management, housing navigation, and connection to health and behavioral health services.

"The County needs to play a more active role and avail County staff to support the nonprofit service providers low barrier City sites.  As the Roadmap agreement expires in 2025, it will be important to identify a sustained funding source for beds created by the Roadmap agreement and reviewed by the Court on the compliance with the Roadmap agreement is important to set the foundation for this next Alliance agreement.

"The MOU of the County should have an agreed-upon definition of main steam and enhanced County services. Clarification, are the cities responsible to provide for City-appropriate shelter, or will the County provide to complement the City's investment of a bed rate for payment that covers the expenses of the services, whether mainstreamed or

enhanced, by location, including retroactive payment for services that were obligated by not provided by the County during the term of the agreement."

If you'd move that up a little.

"Additionally, it would be mutually beneficial to include clear direction for how clients in the City interim housing can access crisis, behavioral health bridge housing, high service need housing, and other County services.  Also, important would be a clear direction for how people experiencing homelessness on the" street -- strike that -- "on the streets, in the City can access County services and the required new MH-SUD beds."

Next page.

"Finally, it would be helpful to all if the MOU provided clarity that the City's general fund and estimates should be focused under priority housing and an obligation that the County provide services with the City funds only tapped for health, mental, or substance services.  Rarely, as exception, once the County funds and resources have been exhausted, reimbursement by the County cannot be obtained.  Until an MOU is signed, the City will continue to pay for services, mainstream and enhanced, by contracting the service providers already contracted with the County to provide health and mental health and substance abuse disorder and treatment services for people currently in our City sites."

What they're saying is that they're double paying.

"Including these issues and an MOU would assist the City with creating its own mechanism to comply with the settlement, as approved by the Council, less implementation interruption, CF-23-1054, passed by Council November 2023, when I authored it. I would to call to your attention the following concerns from the County of Los Angeles first status report, and I appreciate your consideration of these issues as you oversee this event.

"First, there is no path for placement of individuals who would be better served with higher acuity programs slash County appropriate shelter. And in the meantime many individuals with these needs may, in the City's low barrier, City-appropriate care and housing where they often were exited for class disruption to other clients new in their unmet needs, provides sufficient access to County funded, high-service need beds is a critical point in the City's settlement, Section 9, County obligations, which has not been implemented.

"Second, mainstream County services which are supposed to be provided to the City's interim house program under the prior Roadmap agreement and have not been delivered. And there appears to be no prioritization for the City in the newly created 500 beds reported in this document for existing Roadmap clients.

"Three, establish the status report of which does not include a list of which interim housing sites are eligible for

and should be receiving these County services, which makes it difficult for the City to ensure they are being provided, as required, to the maximum 3,100 interim housing units.  Without a list in tracking, the City is unable to know when/if County is deploying staff to interim sites or funding for additional services albeit contracts with service providers are occurring."

And then the last page, Oona.  Thank you.

"Four, the County seems to rely on reporting by the City on requests made for the Department of Mental Health, DMH, services and tracking of those requests by the City.  My staff and I were informed that our teams needed to track these requests.  I do not believe that there is any system in place for the City to meet its responsibility to provide this information and thus no accountability from the County to provide services.

"Furthermore, my staff have only very limited access to HMIS data about clients, i.e., only name and service provider they are linked to if there is one.  So the City has very little ability to ensure that a client has been enrolled in County services once referred.

"Five, subsidies, vouchers, and other assistance required in the settlement do not appear to have any allocation toward residents of the City and interim housing, connection to the responsibility of the City, in its own settlement agreement

with the Alliance.  In particular, a board and care subsidy could be a lifesaving resource for an individual on the street in my district with ongoing medical needs who has been placed repeatedly in an error housing program to only walk away due to ongoing medical issues but this resource has never been made available to her.

"Six, the Exhibit B chart which lists referrals to high-service need interim housing beds lacks information about which city or location these referals were made and has no information about where those beds are.  Even so, with 900 new traffic beds, the report shows that there are only the total of 190 clients placed which makes it difficult to understand why mental health beds should be made so difficult to access.

"Seven, the Exhibit D chart listing placements in facilities by facility does not indicate where the client had previously been residing, making it impossible to determine in residents of Los Angeles and in particular skid row benefiting from these placements.

"Further, there is no information provided about the request per individual site.

"Eight, the implementation of this agreement relies in part on coordination of LAHSA and joint powers authority that is not a party to the agreement and service providers who may be coordinating their efforts to ensure compliance with this agreement.

Nine, implementation of the City's Settlement Agreement assumes prioritization of people expressing homelessness in the City of Los Angeles to permanent support of housing beds created in the City of Los Angeles.  The placement of the individuals by LAHSA matches service providers relies on a different system tied to the CES system which has facilitated placement of non-City visitors in City public units.

"As the City strives to improve the lives of people with disabilities, substance abuse disorder, ongoing medical conditions, mental conditions, your assistance to spur action in a timely manner would be appreciated.  If I can be of help to you in this effort, please do not hesitate to call me and my chief of staff, Lisa Hanson, and then there is a phone number. Bob Blumenfield."

Now, it's come to me through Michelle Martinez that a number of Council are on board with what this letter spells out.  I leave that to you, Mr. Marcus, and indeed the County. I have no comment on that at the present time.  It's just a letter I am receiving.  That's what peaked my curiosity about where we are in terms of these units actually getting out to the City and in what manner.

And of all the information Michelle Martinez has received, Michelle, do you know of any bed going out?

MS. MARTINEZ:  Not to my knowledge.  But I will say that --

THE COURT:  Why don't you use the microphone?

MS. MARTINEZ:  Not to my knowledge.  But I will say that the County has reduced, as Mira mentioned, 900 beds, and I know they have housed through the Inside Safe Save program.  So not speaking to individual Council members requesting beds, they have yet to receive one of those beds.

THE COURT:  Okay.  So, Mira, we'll take that up in April.  Okay?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  I want to hear from the intervenors.

Has there been compliance with this agreement?  That's ultimately what I'm going to ask you.

MR. YAGMAN:  Here comes Miss Crazy.

MS. MYERS:  Your Honor, Shayla Myers on behalf of the intervenors.  And to clarify as to what you addressed -- what you want is compliance with which agreement?

THE COURT:  Has there been compliance with the LA Alliance agreement?

MS. MYERS:  Between the City and the LA agreements?

THE COURT:  Yes.

MS. MYERS:  We don't believe that the City of Los Angeles -- and it pains me to say this because it's something I normally say -- based on the plain --

(The court reporter interrupted.)

MS. MYERS:  Our plan and position is to stand in line

with the City of Los Angeles.  My concern is that the LA Alliance is pushing for an agreement and a reading of the agreement that by no stretch of the imagination is called for by the plain language of the agreement.

And I'm actually incredibly concerned, Your Honor, at this time of deals struck by the City of Los Angeles and the Alliance after months of assertions by LA Alliance that the City was out of compliance is actually contrary to the plain language of the Settlement Agreement.  And I'm very, very concerned about the precedent that that is setting and what the LA Alliance is asking this Court to do.

The City of Los Angeles and LA Alliance negotiated a Settlement Agreement -- intervenors were no part of it.  It was an agreement between business community, the City of Los Angeles to construct beds.

We had objections to settlement all along.  And a variety of ways we were concerned it didn't provide enforceable provisions.  We were concerned how that was seeking enforcement.  We were concerned with a variety of other points.  And the LA Alliance and the City of Los Angeles stood up to this Court and represented repeatedly that this agreement wasn't about creating beds; it was about bringing people inside.

And we are very concerned, Your Honor, that LA Alliance right now is pushing for something that they've never asked for

from this Court, which is an enforceable agreement that requires the City of Los Angeles to clean up and resolve the encampments without any connection to bringing people inside.

So when this initial outline to what the request was in bringing this lawsuit about, it was about bringing people inside.  But now they're seeking encampment resolutions that seem to be untied and untethered to actually bringing people inside.

It seems to be talking about encampment resolutions as opposed to people.  We want to really, really clear on when we're talking about this agreement.  Ms. Mitchell and Mr. Marcus and the Court has repeatedly talked about encampment resolutions.  We're talking about the number of beds or the number of tents.  We're talking about the number of RVs. They're talking about usable evidence of homelessness on the streets.  They're not talking about people, Your Honor.

This 9,800 encampments represents tents and people's possessions.  It doesn't represent bringing the people inside. The LA Alliance is asking for a separate part of the agreement that simply does not exist in the Settlement Agreement that says that the City has an obligation to clean our encampments on its sidewalks.  What the City has no obligation to do, under this agreement, is build shelter beds and build housing units.

When the City does that, people will come inside.  The reality is, when you build housing, when you provide shelter,

people come inside.  In the Inside Safe program, my office has some objections to Inside Safe program.  Our clients has concerns with how that program implemented.

I think what Mayor Bass has been very clear about with the Inside Safe program -- and I think, Your Honor, you have said this all along.  When you provide shelter, people will come inside.  And so that is what is happening with Inside Safe program; right?  Hotel beds are being provided and people are coming inside.

This LA Alliance agreement was about negotiating for shelter beds to bring people inside, and now the LA Alliance is looking for something to fight, which is about cleaning up, the visible signs of homelessness, as opposed to bringing people inside.

This side agreement that has been negotiated against 9,800 encampment resolutions bears no relationship to the Settlement Agreement and the creation of housing.  So we are very concerned, Your Honor, this is going to be used by groups like the LA Alliance, plaintiffs in this case, to target specific encampments.

I know Your Honor has said that you are not going to entertain that idea.  Hopefully you will not entertain targeting specific encampments.  But we have to uplift what the LA Alliance did their Pleadings in this case.  The intervenors are involved in this case and have been involved since the

beginning.  And with this Court, we still have standing to participate in these proceedings.

And LA Alliance specifically targeted two encampments in Highland Park and represented that they were incredibly dangerous and why put forth no evidence whatsoever, Your Honor, about those specific encampments.  They specifically targeted people who were living in those encampments, defamed them in court proceeding with no representation whatsoever, and asked the Court to target -- to require the City of Los Angeles to target those encampments for enforcement activity.

That is why the intervenors in this case have been objecting to the participation by LA Alliance without representation by unhoused folks in these negotiations. Because the LA Alliance believes that they can target specific encampments for reduction simply because for whatever reason -- their members want it, whatever it is.

And, Your Honor, the way that they targeted Highland Park in this representation no different than the way they have targeted skid row, the way they're targeting my clients that have been in LACAN and they're a cabinet worker and they're boarders who live in skid row.  They are making gratuitous statements about how dangerous it is in inner city in that location to seek this Court's intervention to require the City to target encampments as opposed to actually bringing people inside.

The last thing -- so what we would like to say about this and to your point, obviously, we do not believe that the City of Los Angeles has been, based on what has been represented to this Court -- that the City of Los Angeles by failing to provide specific numbers for the encampment resolutions that they are not obligated to do so by the Settlement Agreement.

But we want to raise our continued objection to lack of transparency related to the negotiations that have been going on related to this side agreement at the request by the LA Alliance to turn a side agreement into an enforceable order by this Court.

Your Honor, they are specifically requesting the resolution of encampments, not bringing people inside; right? Targeting them with activities that have been problematic and the basis of lawsuits for decades, to actually target those resources through a side agreement that was negotiated.

The only reason why anyone, including parties to this case, know that those negotiations were going on, that they were interpreting the Settlement Agreement have a binding obligation on the parties that is not articulated in the agreement, because the LA Alliance wanted $6.4 million.  Absent that, no money to the public and not -- none of the parties to this case, especially that represent unhoused folks living in the encampments that Liz Mitchell is attempting to target for resolution, no one would have had any idea that any of those

negotiations were going on but for LA Alliance seeking $6.4 million after the fact.

What we want to say is to the extent, Your Honor, is considering this, the agreement between the parties to anything resembling a binding obligation, the parties who are literally the individuals living in those encampments in skid row should have an opportunity to raise objections.  And there should be transparency about these side agreements that are being negotiated.  Because they can say the LACAN does not have standing to raise issues, but their members are living in encampments that Liz Mitchell and the LA Alliance is specifically targeting to be "resolved."

MR. YAGMAN:  Are not?  Sit down now.

THE COURT:  You'll have another opportunity.  So if you've forgotten something, don't worry.

MS. MYERS:  No, Your Honor.  So what we would say is we want to raise that.

The last thing I want to say, in terms of how this has proceeded, is that we have been raising concerns with the district by district approach that the LA Alliance has forced in this agreement.

And we just want to sat that we strongly support Mayor Bass's position in a way to move away from a district by district approach.  It is not that the district by district approach provides more accountability; it's that the district

by district approach provides more opportunities to displacement.  Thank you.

THE COURT:  Mr. Yagman?

MR. YAGMAN:  I agree more than 100 percent with everything I just heard from the speaker whose name I can't remember.  I would add only that I have always said -- and I think the Court knows -- that this is a false flag action.  And inherent in the false flag action is what was just described by Counsel who previously spoken.

Last, it seems that this action proceed towards resolution like the loser in Zeno's first paradox of the stadium, where you have two guys standing with backs to the wall in the stadium wanting to reach the other side.  One of them walks to the other side and touches the wall, and the other one always goes just half the distance and is never able to reach the wall.

With respect to the pending motion, which is the reason primarily that we're here today, I strongly oppose the motion to impose $6 million sanction.  I think it should be double that.  Thank you.

THE COURT:  You claim it should be doubled sanctions on the City?  12 million?

MR. YAGMAN:  I think the request for --

THE COURT:  6.4.

MR. YAGMAN:  So it should be 12.8.

THE COURT:  So the sanction --

MR. YAGMAN:  So unless something like that happens, we're going to keep going back here all the time.  I mean, the City just needs to get this done.  And there isn't any good reason why this isn't getting done, whether it's on a district by district basis or citywide basis.  Just do it.  It can be done.

And this Court needs to do something kind of spectacular to shock the City into doing what it's supposed to do, which is getting people indoors.

THE COURT:  What basis would I impose those sanctions on?  From what you have heard today, what would I impose for the 6.4 or 1 million or 12 million or whatever?  What basis?

MR. YAGMAN:  I think the City is in contempt of court.  They're supposed to do things, and they haven't done them.  And they haven't done them timely.  And that's intolerable because there are actually human beings involved in this, many of whom I represent and live in encampments.

And they keep being thrown out of the encampments, their possessions and belongings are taken and being put 18 miles away from where they are to get them.

As this Court knows, in my case, in which I represent David Jacobs --

THE COURT:  Right.

MR. YAGMAN:  -- who lives on Main Street in Venice,

every few weeks them come and grab his stuff.  And he's got nowhere to stay.  I buy him a new tent.  I'm getting tired of that.  I don't mind the money for the tent, but I'm getting tired of doing it.

There has got to be a solution to this.  And if the City needs to be shocked into doing something, Your Honor, I think the bases for the sanctions are appropriately set forth in the subject motion.  And the Court needs to do something.  It needs to shock the City into doing something.  Thank you.

THE COURT:  Mr. Yagman, thank you.

Let me raise a couple issue.  Who is available to testify right after lunch?  Is Daniel Conway?

MS. MITCHELL:  Mr. Webster is present.  Daniel Conway is available by phone.

THE COURT:  He's available by phone?

MS. MITCHELL:  Yes.  He's in Sacramento right now.

THE COURT:  Mercedes Marquez?

MR. MARCUS:  Your Honor, Ms. Marquez doesn't work for the City anymore.  We attempted to contact her earlier today. We have not been able to reach her.

THE COURT:  Well, why don't we get back to it tomorrow then and reconvene if we can.  I would like Daniel Conway to fly down here, not by phone, and I appreciate Paul -- what's his name?

MS. MITCHELL:  Paul Webster.

THE COURT:  Okay.  I want the principals there.

You notice, Mr. Newman, I haven't imposed on you.  You have a relationship with the Mayor.  If you're present at that meeting, and I don't want to cause any conflict in that regard.

So can we try to get ahold of Mercedes Marquez?

MR. MARCUS:  We can continue to try, Your Honor, but if the question is whether or not the facts, as recited by Ms. Mitchell in her declaration, are accurate, the City is not disputing those facts.

THE COURT:  Let's be certain of this.  Because if that is the case, if there is stipulation, no problem.  Maybe I don't need people under oath.  And I want to be very certain, before I write this opinion, that I'm not taking any estimates.

Could you help me, once again -- could you help up that portion -- here we go.

Because here's what may have happened, and I'm going to speculate for a moment.  Page 5 and 6, without reading this again, what the concern is, that I encapsulate or summarize, is, look, you were misled.  Whether that was sanctionable or not, you were misled.

MS. MITCHELL:  Correct.

THE COURT:  The plaintiff was misled.

You go into this meeting on March 15, and you have no indication that the Mayor is moving in a separate direction and trying to go citywide.  Regardless of what the Mayor does, you

took it and negotiated citywide or district-wide.  The Court can be flexible in that regard.  What I will not do is breaching an agreement.

And that agreement is district by district, and I remind you that the City refused a citywide settlement way back when.

Have a seat, Mr. Marcus.

And this was hard fought with the Counsel at that time.  And this agreement will be upheld.  Now, if you two choose to modify it, come to court with the Mayor, I'm open to that in the future.  I am not going to do is to have this agreement broken.  This is not just another consent decree -- period.

So what do I do about that?  Mercedes Marquez allegedly comes in, and I get her under oath.  But she is not here today.  That answers my question very quickly.  I want Daniel Conway under oath, and I want Paul under oath, because I want to hear exactly what was said so you're not making representations, unless if you want to take an oath.  That's fine.  Or any of the parties for the City, if they disagree with any statement.

But you seem to have focused on a confirming e-mail that confirms everything that you said in that agreement.  And Mr. Marcus refers to this as an agreement.  So I think we're past that.  This is an agreement.

And the end of the result, what may have happened is that the Mayor or the staff who needs some leeway coming in as a new Mayor forces her to the mat.  She could have done two things.

She could have come back to the LA Alliance -- adopted the LA Alliance agreement, called it her own for all I care, and services through the County and called it the Mayor Bass program.  Terrific.  No problem.

But instead Inside Safe started, and $250 million came out the City's budget to kick-start this from the Mayor.  And in good faith she has to move this.  She has to break the inner shell.  Commendable.

The problem is much of that money was probably due from the County, quite frankly.  Those were services the County should have provided.  But if the Mayor has to kick-start a program, she has to get this off -- we're going to say she has to do something, so she gets Inside Safe.

But there is duplication potentially happening here. Nobody is communicating you, and nobody is communicating with the City Council.  So now the City Council is caught flatfooted.  And if representations are made by Mercedes Marquez in the presence of David Michaelson or Scott Marcus and if you're willing to testify, then eventually these representations are made about by district by district applying this.  And then we find out that there is a confession or statement that the City had violated its promises in March to higher what was represented as preferred service outreach providers for encampment reduction in each district and assess each district's needs and had set money towards these

commitments.  That is what you're doing in this letter, and that is where you raise the spectrum.  You know, we wasted 14 months.

MS. MITCHELL:  Correct.

THE COURT:  We wasted a lot of time.  I don't know what to do about that yet, but I am going to have to go into it all, number one.

Number two, I am requesting the controller, over the inconvenience.  But I want to find out can the controller actually audit this.  If they can't audit Inside Safe or LA Alliance, then I want to know, because that is going to raise the spectrum of an independent audit, and maybe we need that.

And, finally, I want to put up Michelle's report, and I want to show you what I'm concerned with and ask you folks to try to help so we're not in an adversarial position, from the City or from the LA Alliance, because I think we're fighting again.

As my wife said, some of our kids came through the front door, some of our kids came through the back, some of our kids came through the window, but they all got to the dinner table. Let's all try to get to the dinner table and do the best that we could.

You know, the Mayor has a good theme about that.  She's trying.

Now, let's watch.  I want to pull up Michelle's report,

and I want to pull up the encampment portion.  Your mindset has to be the City's not in good faith to begin with because what they bring you to begin with is an impossibility.

You use the number 32,600-some homeless on the street, and you say, look, the City is nowhere meeting that obligation.

But Scott comes back and says, "That's our obligation, Judges."  12,000 eight or 900.

MR. MARCUS:  915.

THE COURT:  915.  So the end result of this is "No, we're not meeting obligation, but, Judge, we're trying.  We're substantially trying to comply here in good faith."

Yeah.  And I need to get my notes.  Just a moment.

But this is the predicament you put yourself in.  All right.  This is your encampment resolution, regardless of Shayla's position.  This is your agreement.  60 percent of the encampment resolutions.

Now, this is finally stipulated by all parties that you're in compliance; right?  Your in compliance right now?

MS. MITCHELL:  As of January 31,, yes.

THE COURT:  Yes.  Okay.  I'm going to take a line, and I want you to see the period goal of July through December '23.  Do you see that?  And I want you to draw hypothetical line, so you've got three reporting periods -- July through December 2022.  See it?  First column?

MR. MARCUS:  I'm sorry.  What document are you

referring to?

THE COURT:  Michelle's report, Special Master's report.  It's going to be on page 16.  I'm going to show you the impossible position you're both in, in terms of compliance, so three or four years from now we get a "Oops, we don't quite make it" excuse.  So here we go.

MS. MITCHELL:  Your Honor, may I modify a statement?  I agree they're in compliance as far as providing the dates and the deadlines and milestones.  I just want to be clear on that, not as far as meeting them.

THE COURT:  No, that is not my point.  Thank you.

The period goal July to December 22, do you see that first column?  And go over to next column, period goal January to June 2023.  Do you see that column?

Now go over to the third column.  Period goal, July 23 -- July through December '23.  Right there, draw a hypothetical line, because we're now in this period.  We're in period goal January through June 24.  That is the period we're in right now.

Do all of you see that?  That is going to get complicated.

All right.  Just to start with, period goal January-June 2024.  I'm going to take Hernandez's district, Council District One.  Your goal is 110, however you define encampments.

How many have been completed?

MR. MARCUS:  I don't know what that number is, Your

Honor.

THE COURT: To belabor this, Krekorian, District Two, how many have been complete?

MR. MARCUS: I don't have that district by district.

THE COURT: Now, watch the catch-up game you're playing. Let's go back just in Hernandez's district for a moment. Not only do we have an unsettling feeling that we are accomplishing very few of these encampment cleanups -- let's just say 15 to 20 -- but you have a makeup here, according to the schedule, of 71, 88, 88, of 110.

How can you possibly accomplish that when 40 percent of this agreement has already passed by, other than coming to me in three years -- and I'll still be here -- and saying, "Judge, we didn't make it." In other words, it's doomed to failure right to begin with.

Number 2, how can you possibly reach the goal of 12,000-some people when the initial offer to you is ridiculous? The initial offer is two to three encampments. Well, multiply that times 12, 36, to 48.

How do you possibly even get close when the City offers you that kind of initial bargaining position? And how do you get close when the City offers you 100 for the first six months, let alone 150 persons, so we deal with real people, as Shayla said?

This has already failed. And, in fact, you set this up

for failure.  So in three or four years, unless you get going -- and I don't see how you catch up -- this is going to be just another consent decree given to some judge, giving some excuse about how you couldn't do it.

So the question is how restrained am I?  I'm trying to make up my mind about that.  Mayor Bass has turned the corner on this to some degree.  I went down and met her.  She met an awful lot of happy people on the boardwalk.

Shayla's positions is they got displaced.  And if you drive up two blocks, up to PCH, they're all by the market, by the way.  Or they get transported down to Kevin de Leons' Street.  Check it out.

And what I'm concerned about is that this Mayor is trying. You have somebody genuinely out there in good faith trying to make an effort.  So I am not looking for perfect, but unless I get some confidence, this is doomed to failure.

You can't possibly make up these numbers because you are catching up your past three reporting periods, all of about 110.

And right now Mr. Marcus can't give us, in good faith -- he should be able to -- any encampment cleanups in any of these districts.  And I guarantee now out of 110 taking place in Hernandez's district.

Do you all understand that?  So when do I step in?  That's what I'm making up my mind about.

Okay.  You're going to go to lunch and have a nice lunch. And we'll begin at 1:30, and I'm going to start calling witnesses.

You can ask the controller to come over.  If the controller is unavailable, tell them I'll sit here until they're available.  Okay?

MS. MITCHELL:  Your Honor, if I can make a suggestion about that, the City has stipulated to the facts in the declaration, so I would ask that the controller comes over, but I don't know if other witnesses need to be called.

THE COURT:  Okay.  You two, over the lunch hour, draft that stipulation.  I'm not going to get crocked, or whatever that word is, in the future about whether this is an agreement or not an agreement.  This is an agreement -- period. And, now, what we agree to in that agreement is something else. So you can draft that, so I am not mincing words in the future about this.  Okay.

MR. MARCUS:  Again, Your Honor, as I stated earlier, yes, that was the plan.  The plan was to -- as Ms. Mitchell describes in her declaration, the RFQ to have that done, that did not happen.  The City did not do a good job communicating to Ms. Mitchell the change that the RFQ process was essentially falling apart.  This document being, oh, it's got to go forward.

THE COURT:  My bottom line is you have witnesses on

the stand under oath or have a stipulation.

See you at 1:30.  Have a nice lunch.

(Whereupon a lunch recess was taken at 11:55 a.m.)

-oOo-

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.

/s/ Suzanne M. McKennon, CSR, CRR, RMR
_____     Date:  03/09/2024
United States Court Reporter