UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Monday, March 18, 2024 |
| CITY OF LOS ANGELES, ET AL., | ) | (10:54 a.m. to 11:35 a.m.) |
| | ) | (11:59 a.m. to 12:09 p.m.) |
| Defendants. | ) | ( 5:21 p.m. to  5:38 p.m.) |

HEARING RE:

MOTION TO ENFORCE THE SETTLEMENT AGREEMENT
AND FOR SANCTIONS [DKT.NO.668]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                    SEE PAGE 2


Court Reporter:          Recorded; CourtSmart


Courtroom Deputy:        Karlen Dubon


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988



Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES:


For Plaintiffs:           ELIZABETH A. MITCHELL, ESQ.
                          MATTHEW D. UMHOFER, ESQ.
                          Umhofer Mitchell & King
                          767 S. Alameda Street, Suite 270
                          Los Angeles, CA 90021
                          213-394-7979


For Defendants:           SCOTT D. MARCUS, ESQ.
                          Los Angeles City Attorney's Office
                          200 N. Main St.
                          7th Floor, Room 675
                          Los Angeles, CA 90012
                          213-978-7558

                          JENNIFER M. HASHMALL, ESQ.
                          Miller Barondess
                          2121 Avenue of the Stars
                          Suite 2600
                          Los Angeles, CA 90067
                          310-552-4400


For Proposed Intervenor:  STEPHEN YAGMAN, ESQ.
                          Yagman & Reichmann
                          333 Washington Boulevard
                          Venice Beach, CA 90292
                          310-452-3200


For Intervenor:           SHAYLA R. MYERS, ESQ.
                          Legal Aid Foundation of LA
                          7000 S. Broadway
                          Los Angeles, CA 90003
                          213-640-3983

EXCEPTIONAL REPORTING SERVICES, INC

3

**Los Angeles, California; Monday, March 18, 2024; 10:54 a.m.**

--oOo--

THE COURT:  We're going to go on the record at this point.  I certainly know each of you.  Your appearances, please, on behalf of the Plaintiffs to begin with.

MR. UMHOFER:  Good morning, Your Honor.  Matthew Umhofer and Elizabeth Mitchell on behalf of the LA Alliance.

THE COURT:  Proposed intervenor.

MR. YAGMAN:  Good morning.  Stephen Yagman on behalf of the proposed intervenor.  And my assistant, Alexander.

THE COURT:  City.

MR. MARCUS:  Good morning, Your Honor.  Scott Marcus on behalf of the City of Los Angeles.

THE COURT:  And the County.

MS. HASHMALL:  Good morning, Your Honor. Mira Hashmall for the County of Los Angeles.

THE COURT:  And the present intervenors.

MS. MYERS:  Good morning, Your Honor.  Shayla Myers on behalf of the intervenors.

THE COURT:  All right.  There have been a number of representations to me made by Judge Birotte and the special master.  But we need to create a record.  And in that regard we need transparency.

And I think that this can have a very good ending with what I'm hearing.  But I'm not certain that I've got a

**4**

record, and I'm not willing to take that input from each of you separately.

I know that you've talked to the special master, to Judge Birotte separately on occasion. But I need each of you to hear with clarity what the other side's saying today.

So I'm going to start with either the alliance, the City, but you two are particularly involved. And I don't care who starts with the representations.

And then, Mayor, if you wouldn't mind, I -- maybe we can just enter into a transparent conversation if we've got questions. Okay. All right. So where are we with this case?

**MS. MITCHELL:** Thank you, Your Honor. So --

**THE COURT:** Have a seat.

**MS. MITCHELL:** Yeah.

**THE COURT:** Or go to the lectern so we can hear.

**MS. MITCHELL:** Would you like me to go have a seat or go to the lectern?

**THE COURT:** Just as long as I can hear, I don't care where you are.

**MS. MITCHELL:** Okay, thank you, Your Honor.

So we have been talking, we've been exchanging directions for the audit that the City has agreed to pay for. And so I think we are close. I think we agree on more than we disagree.

There are some disagreements about scope.

**EXCEPTIONAL REPORTING SERVICES, INC**

And so I think the most productive way to move forward, Your Honor, especially because it has been represented to us the Court doesn't feel that the record is sufficient, which is part of why we're here, we do have Daniel Conway and Paul Webster here today in case testimony was needed.

But I think a better way forward would be for us to supplement the record with more sufficient stipulated facts.

And we can have two weeks and cross-brief the sanctions issue, and that should give us sufficient time to hammer out the agreement on the audit, or at least identify the areas where we disagree.

And then we can submit that to the Court for resolution, Your Honor.

**THE COURT:**  What other representations?  I'm not quite certain where we're at.

**MS. MITCHELL:**  We are here today to resolve the very serious accountability issues that the L.A. Alliance has identified and has been concerned with.

Now, we do feel like there has been forward progress since the motion was filed.  But certainly there still needs to be further resolution, Your Honor.

And so we agree with the audit.  We appreciate the City's willingness to pay for that audit, the outside, independent, third-party audit.

We have had the opportunity to present our views on

**6**

the scope of what is appropriate for the audit, and that is still in discussion as we have been exchanging redlines over the weekend, Your Honor.

However, the issue of sanctions for consequences for the City's bad behavior over the last year is still on the table, and the L.A. Alliance still feels there is -- accountability is worthless without consequences, Your Honor.

And for 14 months there was no accountability and no consequences.  And it got to be too much.  And so we moved forward with this motion for sanctions against the City of Los Angeles for the bad faith conduct.

Now, I recognize that the City has now turned a corner and things are moving a very positive direction.

And it doesn't change the fact that for the last year there has been no accountability on these issues and there has been no forward progress on those specific issues, which is why we brought the motion for sanctions in the first place, because of the City's, from the Alliance's perspective, bad faith conduct in making agreements and not following through with those.

So we still believe the issue for sanctions needs to be on the table, and we would like an additional two weeks to brief that --

**THE COURT:**  Okay.

**MS. MITCHELL:**  -- issue.

THE COURT:  Mr. Marcus.

MR. MARCUS:  Thank you, Your Honor.  Scott Marcus for the City of Los Angeles.

The City has both briefed and, at the last hearing, made records with respect to the sanctions.  And I agree that we can do further briefing to resolve that issue.

I think taking the Court's suggestion from last week of the audit, that is I think the primary focus.

We did exchange a scope of work over the weekend.  We do agree on more than we disagree.

Really the only issue is the breadth of the audit.  The City was very focused on the Court's suggestion on the service providers and LASA.  What is it the City is getting for the money that it is paying?  And that's the scope of the audit that the City was proposing.

The Alliance wants that to be a little bit broader.  We're concerned that broadening the audit might cause it to take longer.  And we're looking for this information sooner rather than later.

But that's really the only I would say disagreement at this point.  Otherwise, we're largely in step with what we think the scope of the audit to be paid for by the City.

THE COURT:  Mr. Yagman.

MR. YAGMAN:  I have nothing to say about any of that.

THE COURT:  Okay.  Ms. Myer.

**8**

**MS. MYERS:**  Yes, Your Honor.  We were invited by Special Master Martinez to provide feedback.  And we anticipated based on the last discussion that we would be included in the conversation about what the audit would entail. We have yet again been excluded by the Plaintiffs and the City in that audit.

I understand this audit is not included in the settlement agreement.  And we think this audit is in the Court's purview.  So I'm very, very concerned.

I think it is highly likely that the intervenors in this case who represent folks who are unhoused would have a different perspective about what is relevant in terms of the --

**THE COURT:**  The scope.

**MS. MYERS:**  -- service provision than the business community as represented by the L.A.  Alliance.

So this is the first that we are hearing, Your Honor, redlines have been exchanged.  I'm a little bit shocked and I'm a little bit surprised.

And I would also note that we did not speak to Judge Birotte or Special Master Martinez this morning.  So, yeah, it's just another example I think of a lack of transparency --

**THE COURT:**  Okay.

**MS. MYERS:**  -- and the relationship between the City and the L.A. Alliance on these issues.

**THE COURT:**  Mayor, you and I and Mr. Kerkorian, first

**EXCEPTIONAL REPORTING SERVICES, INC**

of all, let me represent have an excellent ability to communicate. And I really appreciate that.

And this requires flexibility on the Court's part because as an elected official, that landscape is constantly changing for you, making real time decisions.

And when a court issues an opinion, our opinion then stands for ten or 15 years until that issue becomes before us again. And you as a City are frozen by often times Federal Court opinions. You need more flexibility, and the Court recognizes that.

Second, I commented that I think that there has been a real break in the inertia. I want you to hear that personally from the bench. Somehow this corner has turned, how much I don't know yet. But it's turned. And I want the counsel present to hear that also.

But I'm going to ask some questions and ask why this cannot be achieved. And I don't want you to respond, Mayor, until you talk to counsel or Paul Kerkorian.

First, I don't want to go into two-week recess concerning the parameters of the audit. The easiest way to lose inertia and this weekend you've spent is to either appoint a committee to study it or get a two to three-week continuance.

So if you're not close, I need to know that. Now, hold on, no, I'm -- this is me, I'm talking now. Don't interrupt me.

I want to know what your disagreements are.  What are your disagreements concerning the audit?  Tell me on the record.  Let's get some transparency.

**MR. MARCUS:**  Yes, Your Honor.  As I indicated, the -- from the City's perspective, the only real dispute is whether the audit should stay focused on what the Court indicated last week, what the City gets for the money it pays to service providers and LASA, or whether it should also include other spending by the City that does have effect on and provide some services to addressing homelessness.

The one example being emergency services performed by the fire departments, things like that.

**THE COURT:**  Now, the intervenors in their briefing call into question 4118 and that this audit would pertain to the effectiveness or non-effectiveness.

The Plaintiffs are concerned about fire response, for instance.

You'd like a narrower audit as your -- in your papers, you said it would be quicker and we could modify that.  How are we going to resolve that?  In other words, I don't see that a two-week continuance resolves that.

I think a continuous session resolves that, and I know very shortly because you did stipulate literally over the lunch hour to all set of facts concerning the sanctions issue.

So, first of all, I'm not willing to go into a two-

week continuance.  I think we would be in continuous session. We've got all of the decision makers here or available by phone because you've got a city to run, for goodness sakes.  But we're in continuous session until I know.

So if you want to meet at 5:00 o'clock at Petrie Hall (phonetic), fine.  If you want to meet at 9:00 o'clock tonight, fine.  You two discuss that.

But we're never going out of session until we get down to what that is because the mayor's declared an emergency, we treat it like an emergency.  And it's not an emergency going away.

**MS. MARTINEZ:**  Your Honor, is it possible that I can share Ms. Myers and her letter to the Court?  We have yet to share the letters between the City and the Alliance with Ms. Myers and vice versa.

**THE COURT:**  I thought --

**MS. MARTINEZ:**  I wanted to get permission, wanting to make sure that that's okay with them as well.

**THE COURT:**  Is that acceptable?

**MS. MYERS:**  Of course, Your Honor.  We would be happy to file it on the record.  And --

**THE COURT:**  I --

**MS. MYERS:**  -- we would just ask that we get to see the L.A. Alliance and City's positions, or that they say on the record now, Your Honor, what they're agreeing to; because at

**EXCEPTIONAL REPORTING SERVICES, INC**

**12**

this point we have no idea of what they think the scope of the audit should be.

**THE COURT:** I agree. And I don't want to come back to the scope in two weeks. We're in continuous session until we get to the scope and how broad that is.

And one thing I'd caution each of you, I know you want an audit that takes into account, for instance, the results concerning fire. And I know that you want to get involved in 4118. But those are policy decisions by the City.

And I would prefer that that audit -- it's just a preference that that audit be quicker. And if we can get that audit with the basic programs involved, then I think you can go forward from that point with the data and come back to the Court and say we have a agreement to modify it.

But I'm a little afraid that this audit gets tied up in minutia and back and forth, and I'm not willing to take that time. So that's my first preference. And it depends upon whether we go forward.

My second is this. If we have an audit, it takes some time. And in 2021, we had a hearing over a day in length, or most of a day.

And we were able I think to show that it's arguable that there was absolutely no accounting and no transparency for at least $600 million that flowed through this -- the City.

And I've constantly asked why from this point going

forward can't we have in two weeks an agreement between the City and you as the Plaintiffs that all invoices have to have supporting documentation concerning what was performed?  And why are we waiting for an audit to do that?

Second, that that's public, that we have a public website -- and I think the mayor's in agreement with that -- so that this transparency takes place.

And, third, you seem to have focused on Inside Safe. I made the statement that Inside Safe may turn out to be a very well-document program.  I don't know.

I'm focusing on the case before me, L.A. Alliance. And I want to see the documents and invoices that support the amount spent on the L.A. Alliance agreement.

And I also want to see the documents on the road agreement.  You may have them, you may not.  That may be embarrassing to the City.  It may be that you've got the documents.

But this isn't solely Inside Safe.  In fact, I didn't raise Inside Safe.  I am particularly interested in L.A. Alliance.  Where are these -- or L.A. settlement.  Where are these invoices?  What was expended?

And so I'm going to give you three Ps that I wrote down this weekend.  Just give me a moment.  Yeah.

Generally speaking, the Court would hope that there are proper invoices.  The Court would hope that these are to

the proper people.  The Court would hope that this is for the proper purpose, and that this is on a public website.  It's as simple as that.

And these invoices that I think on the spot audit -- and, Mayor, you don't know this but a spot audit was conducted long before your term.

There's no transparency or accountability for $600 million.  I think you as the mayor have a unique opportunity, along with Paul Kerkorian, to be the first to step up in terms of transparency.

And now I'm going to read to you from the State for a moment.  Elaine Howle was our auditor on the State level.  She released a scathing report from the State.  And I'm literally going to read to it and then check my veracity by going back to that report.

At least nine state agencies administers -- administer and oversee 41 different programs that provide funding to mitigate homelessness, yet no single entity oversees the State's efforts or is responsible for developing a statewide strategic plan.

"The state continues to lack a comprehensive understanding of its spending to address homelessness, the specific services the programs provide, or the individuals who receive those services."

So when I was reading this report for the second or

third time, I'm writing a note to myself, are we making the proper payments to the proper people in the proper amounts for services, shelter, or housing?

Or what's our administrative cost with some of the providers that might be let's say overstaffed hypothetically virtue -- in relation to the services being delivered to the streets on behalf of the counsel and the mayor.

She goes on to say, California has spent $13 million. Now, this is in 2021.

And could you put up (inaudible) the front page of my -- it's the document that is attached.

**(Judge/Ms. Speaker confer.)**

And I underestimated, Mayor, what I'm about to show you. And check my figures, okay. You've got a whole city. I've got -- she says in 2021, $13 billion have already been expended by 2021.

Michelle, I underestimated. Would you read what the legislature says was -- has been expended?

**MS. MARTINEZ:** Yes, Your Honor.

**THE COURT:** Loud. Just in 2018, 2019.

**MS. MARTINEZ:** Yes. Governor Gavin Newsom's leadership allocating 20.6 billion towards housing and homelessness since 2018, 2019, according to the legislative analyst office.

**THE COURT:** So on this slide I put in 13 billion, and

I underestimated.

And then Gavin had promised another 12 billion. So I've consistently said about $25 billion in homeless funds. It's much more.

If you take those figures of 20 billion, you add on just the 13 million. Let's take Proposition One with another six million. Let's take H money that's flowing in about 350 million. Let's take Triple H money. We're well over $30 million.

So in continuing to reading from Ms. Howle's report, which is apparently in the dustbin, California has spent 13 billion in just the last three years on the massive homeless problem. The auditor said the approach to dealing with homelessness is so fragmented and incomplete, it actually hinders efforts at getting people into housing.

The auditor goes on to state and finds that this lack of coordination between agencies accounts for no accountability.

Unlike some other states, no single entity in California oversees efforts to address homelessness or is responsible for developing a statewide strategic plan. Now, this is still at the State level.

The State does not track the funding it provides to combat homelessness, what could be perhaps the biggest problem of all.

There's no single state entity that comprehensively -- just a moment, I want to make sure -- tracks the sources of funding, the intended uses, or related expenditures of these programs, nor does the State track how much funding is available to spend towards addressing the homelessness issue statewide.

She goes on to state recommendations that have been ignored.  If the State is not tracking, which I now believe isn't $25 billion but more than $30 billion, then where does the accountability lie?

Now, Mayor, and Chairman of the Council, perhaps if the governor was here he might hypothetically say, I need to continue to fight this homeless issue and I'm going to give money.

But I hypothetically am not getting accounting back from the City or the counties in the State, so the governor might be hypothetically in a political box because he doesn't want the cities or counties to turn around and criticize him for not supplying money.  But by the same token, he has no barometer coming back.

You have a chance as the president of the counsel.  And, Mayor Bass, you have this chance as the mayor to be the first entity in this State that steps up with transparency.  And if you do, I commend you.

All right, now hold on.  Continue to separate out an

**18**

audit that goes backwards with homeless, the freeway -- I call freeway but highway agreement, and L.A. Alliance.  Those are my critical focus.

Inside Safe, that was brought up at the last hearing.

This audit has to pertain to all three programs, but specifically it has to obtain (sic) to the L.A. Alliance agreement.

And if we're embarrassed by no records from the providers, let's find that out going forward, which is why I'm suggesting to you that there's an immediate agreement that in two weeks all invoices submitted to the City have the underlying data of what these folks performed so that you as the mayor and you as the council president can measure what you're obtaining in terms of services or intermediate housing or long-term housing; because none of us can make a decision.

All right, the second thing I would hope for.  Give me a moment.  This is on the public website.

The best auditor will be the public.  And there will be an interest in which provider is actually providing something meaningful and which provider is submitting this underlying data to justify these invoices because right now, Mayor, in the spot audit of 2018 -- and I won't name the agencies involved, lack of embarrassment -- they didn't have any records.

And we showed last time when you weren't here that

**19**

the City wasn't requiring any records, that those records sat with the provider.

So if I go all the way back to 2018, I'm going to hear probably an excuse, well, Judge, we weren't required to keep these records over three years, like an income tax return, and it'd be an absolutely waste.

But there's no waste in terms of our L.A. Alliance agreement, which you weren't a part of.

There's no disagreement or should be concerning the roadway agreement which you weren't a part of.

And Inside Safe, you may have very good records, I don't know.

But those all three have to be subject to an audit.

But, folks, I really mean this.  There is absolutely no reason that in two weeks all invoices that requested for payment for the City don't have substantiation.

Now, would you put up the slide for LASA for a moment?

I anticipate this argument.  Judge, in two weeks quietly I get a phone call or Judge Birotte does, and the conversation goes this way.  Judge, all this money flows through LASA.  We are the City, hope to get through this information.

But I would suggest to you is might be like punching the Pilsbury Doughboy.  As you punch on the City's behalf, the

**20**

arm flies up and the finger-pointing starts and we're back in this convoluted system of trifurcation between City responsibility, County responsibility, and LASA responsibility.

And just an opinion which has no proof, but my guess that one of the motivations for LASA being formed was the past bickering between the City and the County. And, Mayor, that's when you've been instrumental and stepped up and tried to stop that bickering.

But LASA in a sense acted as a shield for the City and the County not having responsibility.

So right now, in 2023, we have a budget of $845.4 million; $726.2 million is going to the service providers.

Now, remember, I'm up all night getting these figures. If I'm wrong, call me on this. Tell me, judge Carter, you're wrong.

Can Dr. Adams come over and if you're agreeable to this on behalf of the City, this transparency in terms of these invoices going forward so we're not waiting, I don't want your representation and I believe you would make the representation through Judge Birotte that you've talked to Dr. Adams, and she's promised you that she will undertake this because she's not on the record.

So while I might trust you, I need a record. And I'm going to ask humbly if somebody can call Dr. Adams. She can appear by phone, she's not inconvenienced.

But I'd like to hear today what her position is because you as the City are going through LASA.  And 11.8 percent of your general budget goes into LASA; 80 percent of that money comes over from the County's side.  But it's not really County money, it's HUD money, State money as the COC.

So while the County acts like it's their money, it's not.  It's passthrough money.  This money to LASA comes out of your budget.  And it's hurtful, it's harmful.

So who's going to call Dr. Adams and ask her to come over?

(No audible response.)

Because I want her position.  And I don't later on want the City in that position of, well, I heard from Dr. Adams.  Can you call her?

**MS. SPEAKER:**  Yes.

**THE COURT:**  And tell her I'll be here at midnight, no problem.

All right, the third thing is, these MOUs that we're reaching on the freeway agreement -- and Paul and I've talked about that -- they were supposed to take two weeks.  That's not your responsibility.

But it went over to the City attorney and it took four months.  We're not at 14 months with the First Alliance agreement.

We're at 16 months with no MAU (sic) with -- we've

**22**

got to work out some system, whether it's 30 days or 60 days, that the MOU has to follow in close proximity to all of us reaching an agreement.  I leave that to your negotiation.

Lastly, I stated to you that I'm worried about the sanctions.  I agree to some degree with you, Ms. Myers, that if the Court was to impose sanctions and impose the $12 million that Mr. Yagman has argued for, the $6.4 million that L.A. Alliance is requesting, that that's taking money from the homeless when we need that money on the front side.

You need to be compensated for this time.  You're a small law firm.  You've probably given up all future business with the City.  Most of the large law firms are never going to enter into this because in good faith, they're intertwined with the City.

And I told Mayor Bass -- well, never mind.

You're paying a tremendous price in terms of bringing this, even though people are arguing that you're only business-oriented, etcetera.

This wouldn't be before the Court but for you bringing it.

Now, I can't sustain you in the future, nor do I choose to with -- because Downtown Alliance is your client.

But as far as compensation's concerned, you're richly (phonetic) entitled to some compensation.

And what I'm debating is if you're going to submit

that issue to me, but the two of you are going to reach a compromise on that; because my findings concerning whether you were misled or whether this was bad faith are critical to that for this reason.

Ms. Marcus, are you willing to stipulate to the ninth paragraph in the declaration by Liz Mitchell, in Document 664-2, page three?

And that paragraph, to remind everybody, reads as follows. With the City in clear violation of the agreement and subsequent promises made, Daniel Conway, Paul Webster and I met with the City, Scott Marcus, David Michaelson, and Mercedes Marquez about the City's violation of the agreement, during which Ms. Marquez confessed -- now, that's a word of art, okay? It could be stated and should be sated.

But confessed that the City never hired, preferred service outreach providers for encampment reduction in each district, have not had each district accessed, and has instead done nothing towards these commitments.

And yet the stipulation that you've submitted to me, you could certainly argue that there's a breach of the agreement.

You can argue on March 15th that all these things were promised to you and that you may have been misled.

But if I was to make a determination -- and this is going up to the circuit, I need to protect my record so that

**24**

I'm not overturned, and I need to know what was said in that room because this is probably going to the circuit, unless all of you stipulate you -- way out of the circuit.

So if something is promised to you and nothing is intentionally done, you may have an argument for bad faith.

But I don't know because none of you have stipulated to paragraph nine yet.  And I doubt that the Cit's going to be in a position to stipulate to it.

So if you two are going to delay the sanctions but you can't reach some agreement in the future going forward, then I've got to proceed.

And you put me in a box of calling witnesses, which I don't think any of us quite frankly want to do, because at least according to L.A. First, Ms. Marquez does not want to be anybody's scapegoat.

And she wrote that it was not the mayor's office but a different city office, that of the City administrator officer who managed the outreach contractor during a hiring that didn't come to fruition.

I hope we don't have to go there, frankly.  But I've got to have a record, and the Court will protect itself on appeal.  So I'm forcing you to do it, then we're calling witnesses.

All right, I'm almost done.

Mayor, I ask you to consider -- because I think that

you may be the leader that we're searching for.  If you after a recess and talking to Scott Marcus, your counsel, are willing and able to make the statement that from this point forward -- in two weeks or a reasonable period of time, but all invoices submitted and paid by the City have the underlying documents so you can see and all of us can see and make good value judgments.

I know you're going to run into an eventual problem no matter what your charm is, frankly, with LASA.  And I'm not going to get stonewalled by that.  I need Dr. Adams to make the same statement or to tell the public that she's not willing to be transparent.

And I don't want that coming through you or putting your reputation on the line.  That's not fair to you.

I want this all to be worked out at least in those three homeless programs that I mentioned.

But specifically you came here with L.A. Alliance, and I think we're doing that.  And I think we're growing that, and I think we're growing the freeway agreement also.

And if we don't have the records, just tell me and tell the public that we don't have them and let's move on.

But if we do, then let's see who has the records and what they did for this money.

Now, I'm going to leave with one -- I want to tell you the most inspirational thing that's happened to me, besides

**26**

all of you being present.

Want to take you down to skid row yesterday.  Yeah. And put up, first of all, some depressing things before we take a recess.  And then we'll come back and help me with -- I'm just going to go through some slides.

We've got a problem with children, which drove me down was Kevin and a lot of the community calling and saying -- Kevin, how you doing -- calling and saying, we've got a lot of kids down here, Judge.  They're coming in from Texas, they're coming in on buses.

Mayor, you've got overwhelming issues to deal with. You really have my compliments.

Put this thing up.  No, don't start with me.  Start with somebody -- no, go up to the top, go up to the top.  Okay.

Here are kids on skid row.  Go down there, you'll see some buses dropping them off.

But you'll also see some kids now back on skid row after the City had done a good job getting the children off of skid row.  Thank you.

Let's go to the next one.

If this doesn't break your heart, this little gal was latching onto my leg.  She's either found Santa Claus or somebody, but she's not letting go, okay.

Well, she's not from Texas, folks.  She's from right here.

Next one.

Now, you can talk to the community.  But when I'm asking, how's LASA doing, the Community points out to me, well, there goes a LASA car.  I said, what are they doing?

Kevin, you can give the testimony -- not right now, no, not now.  Basically everybody breaks out in laughter and says they're not stopping, they're doing nothing.  It's all coming from the community.

Go to the next one.

I think you can harness this energy in me.  I really believe.

So this is part of the community, NGO.  Next one.

McCann's involved in this, different folks.  Next one.

Here are your kids.  Next one.

Inspirational.  In the parking lot of Catch 21 after we got there, what, 6:00 or 6:30, Kevin?  I forget.

About to leave.  And I want to give a shout out to the Boyle Heights Boys and Girls Club.  You should be immensely proud of your city.

Four or five kids arrive, and young people, young adults let's say.  And they've got bags.  What are you doing?  Well, we've got like a thousand sandwiches that we put together in the Boys and Girls Club and at the church up in Boyle Heights and to Salesian.  And here are your wonderful young

**EXCEPTIONAL REPORTING SERVICES, INC**

people of the future.  America's in good hands.

Flip the next slide.

And they're going to go out to the street.  And afterwards they're going to gather in a circle and ask what did you learn.  And this is what they said.  And this has to make you feel good.

Kids went around and said:  hope, love, and how fortunate they are after seeing skid row.

Let's go to the next one.  No, go back.

There's a bullet casing nearby.

Next one.

This is the circle of goodness afterwards.

Next one.

And these are your kids.  If that doesn't make you feel proud as a mayor I don't know what does.  If someone you can harness this church, public, witness, I represent to you that it's probably not our government agencies that are doing so well as these wonderful people out in the streets who are delivering the product.

Now, that isn't to slam LASA.  It's just where's the $745 million going?  You make that judgment call.

All right.  When can Dr. Adams be here?

**MR. MARCUS:**  Your Honor, I think she can be available by phone in the next 15 minutes.

**THE COURT:**  Okay.  We'll take a ten-minute recess,

get her on the phone, and we'll see if she'll make the representation or not.  Okay.

And, Mayor, why don't you talk to Scott Marcus.

Michelle, anything else that you've thought of?

(No audible response.)

Judge Birotte, anything else?

(No audible response.)

Okay.  Why don't you have a conversation?  Because minimally I'm hoping that we get that transparency immediately in terms of our invoices.

**MR. SPEAKER:**  Thank you, Your Honor.

**(Recess taken from 11:35 a.m. to 11:59 a.m.)**

**(In progress)**

**THE COURT:**  ... session.

And Dr. Adams, are you on the phone?

**THE CLERK:**  Not yet.

**THE COURT:**  Okay.  I want her on the phone listening so she's fully aware of what's occurring.

Dr. Adams, are you on the phone?

**DR. ADAMS:**  I am, sir.

**THE COURT:**  Just a moment.  I want to raise the volume so we can hear you.

**DR. ADAMS:**  Okay.

**THE COURT:**  Now I can hear you.  How are you?

**DR. ADAMS:**  I'm fine, sir.  How are you?

THE COURT:  I'm fine.  Thank you.

So Dr. Adams is on the phone.  Dr. Adams, before I ask you any questions, Mayor Bass is here, the president of the Council's here, and I'd like to hear what their positions are concerning some questions I've asked so I've got a record of what their position is.  And one involves the audit and it involves much more than Inside Safe, it involves also the, they call it the Roadway agreement, I call it the Freeway agreement, and the case that originally came before this Court, which was the LA Alliance agreement.

And so Mayor Bass, what are your thoughts on this matter and what can you represent that you're comfortable with?

MAYOR BASS:  Thank you, Judge.

I believe this is responsive to your request.  The City will ensure that within two weeks on an ongoing forward basis the City will provide supporting documentation for invoices and make them publicly available.  These will be invoices for the Alliance agreement, the Roadmap agreement, and Inside Safe.

THE COURT:  Got the first mayor, the first city that's undertaken that transparency.

MAYOR BASS:  Thank you.

(Applause)

THE COURT:  Yeah, thank you.

Dr. Adams, first of all, I know the approximate

EXCEPTIONAL REPORTING SERVICES, INC

**31**

ledger from 2022/2023 was $845.4 million, give or take, and of that, $726.2 million went through service providers.  What I've been asking, besides an audit that we've discussed, is that these invoices would hopefully have the supporting documentation that show what our providers are providing or allegedly providing.  And, frankly, the public should be able to see what the administrative costs are versus the services or shelter or housing that's being delivered to the streets.

You're responsible for much of the provider money. Are you willing or able to make the statement that within two weeks, or if you need a little longer, I just don't know your organization, but within two weeks that you would require -- or I'm sorry, at least send notice to all of your providers that you're requiring the underlying documentation for the work or alleged work that they've performed?

And the reason I ask that is, you may not have been present in 2021 but I think it was not only arguable but absolutely apparent that over $600 million flowed through at least the City of Los Angeles, some of that substantially through LAHSA, with no supporting documentation.  And in fact, on one occasion the invoice, which was quite a substantial sum, didn't even have the date on it, just a request for hundreds of thousands of dollars.

What's your position on behalf of LAHSA?

**DR. ADAMS:**  Yes.  We could meet those demands and

requests within two weeks to require our providers to have that underlying documentation.

**THE COURT:** Excellent. Yeah, excellent. The benefit is that you, the Mayor, the Council will now be able to make good decisions about which provider is providing based upon their goals for the City, their vision for the City, versus what apparently in the past has been no requirement of the provider to submit the underlying documents that justify their work.

If you want to do that and match the Mayor's representation, then once again I applaud you.

**DR. ADAMS:** Absolutely. One hundred percent committed to doing that.

**THE COURT:** All right. There's going to be an audit conducted that will-- the scope is still being shaped and that audit will include at least the homeless programs, the Roadmap agreement, the first Alliance agreement, and Inside Safe. Inside Safe is not technically your program, but monies may be flowing through LAHSA. I'm not sure yet.

To make certain that the City isn't undertaking that audit solely and making those representations and so this is effective, are you willing to undergo that same type of audit so the City is not in the position of being in, let's say, conflict with you if LAHSA ever claimed that they weren't willing to undergo this kind of audit? Are you willing to

undergo that kind of audit?

And by the way, I know the County's ordered an audit but, frankly, it's too narrow.

**DR. ADAMS:**  Yes, we are.

**THE COURT:**  Okay.  That's it.  That's it.  That's it.

MOU's, subject to discussion, 30-60 days so we have more immediacy.  I leave that to you to bargain with, so we'll recess in a moment.  Is your position that you'd still like additional time to brief the sanctions issues or are you moving forward today?

**MS. MITCHELL:**  I think additional time would be helpful, particularly to identify the factual issues which I think we have an agreement on and I think additional briefing is helpful.

**THE COURT:**  I'll set that for April 4th then, the same day that the County's going to be coming in.  I've already noticed that -- strike that.  I've already stated April 4th, but I haven't put that out on the docket until we knew what occurred today.  I'll docket that tomorrow.  April 4th.

**MR. UMHOFER:**  Your Honor, you have our commitment to continue to work with the City to try to resolve that issue as well.

**THE COURT:**  Now, here's our commitment, we're not going home.  You can sleep, but we're now in continuous session.  So Ms. Myers' participating, you're participating, we

**34**

need to know the scope of this audit and this isn't going to some back road for two weeks or three weeks with a last moment inconvenience of the weekend and all calls.  So tell me when you want to meet?  We can meet tomorrow at 9:00 o'clock, we can meet tonight at 9:00 o'clock at Patriot Hall.

          **MS. MITCHELL:**  Your Honor --

          **THE COURT:**  We're 24/7 now.

          **MS. MITCHELL:**  -- and I want to separate these two.  So regarding the sanctions, we do believe the two weeks are necessary.  Regarding the audit, we think we can get that taken care of today.

          **THE COURT:**  Okay.  You tell me.  Today, tonight, whatever.  Mayor, could you help me with Patriot Hall in case -- the Courts close down here at 6:00 o'clock --

          **MS. MITCHELL:**  Absolutely.

          **MAYOR BASS:**  Absolutely.

          **THE COURT:**  -- but if we need to go late tonight.  I just want to see the parameters of this and I think we can accomplish this quickly for you, get back to you and the presidents for your input.

          **MAYOR BASS:**  Is it my understanding you want me to reserve space at Patriotic Hall?

          **THE COURT:**  Yeah, because I hear that they're going to get done today, but that might be tonight.

          **MAYOR BASS:**  Right.

**35**

THE COURT:  So we're not leaving.

MAYOR BASS:  Okay.

THE COURT:  Okay.

MAYOR BASS:  Absolutely.

THE COURT:  Okay, so when do I reconvene?  Do I reconvene here in court at 4:30, do I meet you at Patriot Hall at 9:00 o'clock?  What?

MS. MITCHELL:  Your Honor, if the Court can --

THE COURT:  Tomorrow morning?  Anything you want.  I just want this continuous.  We've got all the players now. This is not going back to the bureaucracy.  We're going to get this done.

MS. MITCHELL:  I think that we can reach an agreement by this afternoon, Your Honor.  I think we're --

THE COURT:  Give me a time.

MS. MITCHELL:  I'm going to say 2:00, 2:00 p.m.

THE COURT:  Mr. Marcus just has a scowl on his face.

(Laughter)

Why don't we do this, why don't we say 4:00 o'clock?

MR. MARCUS:  Let's say 4:00 o'clock, Your Honor.

THE COURT:  Let's say 4:00 o'clock.  Okay?

MR. MARCUS:  Yeah.

THE COURT:  A.M. or p.m.?

(Laughter)

Just joking.

**EXCEPTIONAL REPORTING SERVICES, INC**

**36**

MR. MARCUS:  Your choice.

THE COURT:  Okay.  Four o'clock, we'll reconvene --

MS. MYERS:  Your Honor?  Your Honor, can we just clarify.  I understand that you have intended us to be included in that --

THE COURT:  Yes.

MS. MYERS:  -- conversation --

THE COURT:  Yes.  Yes.

MS. MYERS:  -- but this is the first we've seen of this and they seems to be talking amongst themselves.  I just wanted to be clear on the record that we'll be participating --

THE COURT:  Absolutely.

MS. MYERS:  -- and we need --

THE COURT:  And here's the --

MS. MYERS:  -- five minutes to read your statement.

THE COURT:  And here's the debate I expect.  I think that you really want to bear down on 4118 reading your document.  I understand that.  And you want to bear down on some of the fire issues and services.  I understand that.  But before you get there, I just need something to be accomplished with transparency quickly for the public on these invoices and I need an audit and we can go from there on the audit as long as we get an audit that we can make decisions about.  And I don't want to get into these cross purposes of Line 32 on Page 15.  Okay?  So basic stay out of policy, get the

information on this audit and I'll see you at 4:00 o'clock.

All right.

MS. MITCHELL:  Thank you, Your Honor.  Understood.

MAYOR BASS:  And the 4:00 o'clock is here?

THE COURT:  Mayor -- oh by the way, Mayor and

President, thank you very much.

**(Counsel thank the Court)**

**MAYOR BASS:**  Thank you, Judge.

**(Proceeding recess at 12:09 p.m.; resumed at 5:21 p.m.)**

THE COURT:  On the record, Counsel?

**(Counsel respond in the affirmative)**

All right, we're on the record.  Counsel are present

without making a reappearance.

Counsel?

MS. MITCHELL:  Thank you, Your Honor.

Would the Court like me to, I'm sorry, make an

appearance or to inform the Court about our current status?

THE COURT:  I'd like to know what's happening.

MS. MITCHELL:  So obviously we've been negotiating

quite heavily.

THE COURT:  You know, either have a seat next to the

microphone or go to the lectern.  Either one.

MS. MITCHELL:  I'll do that.

THE COURT:  Yeah --

MS. MITCHELL:  Thank you, Your Honor.

**38**

THE COURT:  -- just so we can absolutely hear.

MS. MITCHELL:  So the parties have reached an agreement on the scope of the audit.  There are some details about, for example, definitions of words and things that we think that a potential future auditor would benefit from having and that will be included in an addendum.  But the scope of the audit has been agreed by both the City, the Alliance, and the Intervenors.

THE COURT:  Okay.

MS. MITCHELL:  They both, all three.

THE COURT:  And I don't know yet what the addendum would entail.  How long would that take and what do you need to do to complete that?

MS. MITCHELL:  I think -- yeah, so the current plan is that we would work on some of the definitions that were included.  Ms. Myers is going to be circulating that in a draft form today.

THE COURT:  Okay.

MS. MITCHELL:  The City and the Alliance will be taking a look at that and I think within 48 hours we can have a response.

THE COURT:  So when do I need to reconvene or have this on the table so I have a tickler date, you know, so that we have date?  And if it's acceptable, we probably won't reconvene.  If it's not, then we need to have definite dates

EXCEPTIONAL REPORTING SERVICES, INC

**39**

from this point forward.

So why don't you two talk about that for a moment. And the next question, so I don't surprise you, is when, in your opinion, would you have recommended auditor or auditors to the Court?  So discuss that for a moment.  Just give me the dates.

**(Counsel confer)**

**THE COURT:**  And while you're discussing that, Counsel, one of the things that the Court may or may not be concerned with is what is that auditors -- what do they look like?  Are they former City employees, for instance, who have gone over to a auditing firm here in Los Angeles who might have past, you know, dealings in good faith with the City or County? Are they out of county hopefully?  But maybe not.  In other words, I want the least entanglement so I'm not in a position of refusing you.  Okay?  So really to discuss that and you don't have to decide that today, but that's kind of a bellwether mark.

Second --

**(To the Clerk):**  Would you put up the following so we can discuss this, put up the stats?

We haven't been able to gather any statewide statistics that the State seems to be compiling.

**(Court confers with Clerk)**

We've been trying to gather statistics across the

**40**

state.  I don't know that these are absolutely accurate, but we think that they're pretty accurate and the only statewide summation that we can find by major cities --

**(To the Clerk):**  So flip to the next page.  Flip to the next page.

I want to give these to you and I want you to challenge this at the next hearing in case there's inaccuracy on our part.  But we're trying to get a five-year total out of all of these various counties and cities, et cetera, and if you want to challenge these figures, so be it.  But we can't find anything that the State is putting out on a city-by-city basis in California, so once again we're concerned about a central authority.

Now, I'm not vouching for the quality of this.  I'm not saying that these are shelter or housing or the right mix or making any representation, but we think that these are pretty accurate.  Now --

**MS. MYERS:**  Your Honor?  Can I make a quick suggestion --

**THE COURT:**  Sure.

**MS. MYERS:**  -- for this data?  Which is HUD Point-in-Time Count data and they're required to do it by HUD.  We frequently turn to HUD and their reports to pull that data.

**THE COURT:**  That's fine.  Turn to them.  But I'm not waiting.  In other words, I'm going to put this out to you to

**EXCEPTIONAL REPORTING SERVICES, INC**

**41**

look at now and if you can get better data, that's what I'm saying, come back to us here with better data. But we've been combing through the last four or five years with the major cities, Oakland, Sacramento, San Francisco, by year, taking the data that they've been publishing each year.

(To the Clerk): And then flip back, go back, go backwards for a moment.

And what I'm asking you to do is look at this carefully and if this isn't correct, show me what's not correct about it so that we --

(To the Clerk): Next.

We can't find anything that the State's publishing by city. So we've done a lot of work in chambers on this. Okay? And I'm asking you to check these numbers and if you disagree by year, so be it. Now, we could be a percentage point off, but we don't think we're very far off with all the data that we've gone through.

Now, I'm sorry, back to you with the issue at hand.

MS. MITCHELL: Your Honor, so one, Mr. Webster, who was formerly with HUD, actually has a lot of that data he has been compiling for the last decade or so and we can circulate that --

THE COURT: Right.

MS. MITCHELL: -- with the Court and the counsel.

THE COURT: Well, I'm just asking you to put it

**42**

together.

        **MS. MITCHELL:**  Yes.

        **THE COURT:**  We've gone through every piece of data we can -- we've gone through a lot of data.  I don't need more data.  If you're challenging this, if it's higher or lower, just get back to me and say, you know, with Oakland in year 2020 we disagree, it wasn't 2.60, and in 2023 they didn't go up -- I'm sorry, Riverside County, they didn't go up 12.33 percent.  What did they go up?  So it gives you, Mr. Webster, all the time in the world, it gives HUD, you know, information over here.

        But do you remember any place, Mr. Webster, where the State's publishing is?

        **MR. WEBSTER:**  Typically, the State and the municipalities rely on HUD Point-in-Time data --

        **THE COURT:**  Right.

        **MR. WEBSTER:**  -- for their continuums of care.

        **THE COURT:**  Yeah.  And so if I go through each city I can find it, but I'm not getting any statewide readout of different cities.  We can't find it.  Can you?

        **MR. WEBSTER:**  No.  I don't think it exists.

        **THE COURT:**  Do you know of any statewide readout, any centralized authority trying to put out this data?

        **MS. MYERS:**  Your Honor, I believe HUD would have that information.

        **EXCEPTIONAL REPORTING SERVICES, INC**

**THE COURT:** I know HUD has it, but I'm not seeing any -- I'm not seeing San Bernardino on a piece of paper next to Riverside next to Ventura County next to San Diego. I'm not seeing a five-year trace. Nobody's putting this together to see whether we're going up or down hypothetically in different cities. I'm not seeing that from the State.

**MR. WEBSTER:** I don't think you're going to find it from the State and that's why --

**THE COURT:** I don't either.

**MR. WEBSTER:** -- in my capacity as an independent contractor, I actually compiled that data over the last ten years --

**THE COURT:** Right.

**MR. WEBSTER:** -- for selective continuums of care that usually in the state of California match with the counties.

**THE COURT:** Right. And all I'm looking for is something that I can turn to in three or four pages to have a statewide scan. I may have left out a particular city, maybe San Jose or something. But I'm going to put this on the docket and if I'm wrong I want you to challenge me and correct me. And I've got a five-year running status or total going now. I can't find any other document.

**MS. MYERS:** Your Honor, HUD has the HUD Exchange, which is a data collection for HUD, includes 2007 to 2023

Point-in-Time --

  **THE COURT:**  Right.

  **MS. MYERS:**  -- estimates by state and by continuum of care.  So --

  **THE COURT:**  Right.

  **MS. MYERS:**  -- that's how they'll do these counts.  They're happy to share that with the Court.

  **THE COURT:**  Sure.  And I just took the last five years, Shayla.  In other words, I didn't go back to 2007, because I wanted to see -- I was concerned about where money was going across the state, let alone here.  Los Angeles may be unique now in terms of stepping up with this transparency and maybe a first.  I'm just wondering if that message might be picked up across the state with other providers in San Francisco and Riverside and if they get put, let's say, under the same scrutiny so that they start supplying underlying documentation.  You know, because first to light, you've kind of set this in motion.  Where are these documents?  And Los Angeles is a pretty big fish, but what about San Jose, Sacramento, are they doing it and do they have a provider problem up there?  That is not part of our lawsuit, but I would think that across the state we need these kinds of data.

  So let's move on, okay?  I'm going to put this on the docket.  It's transparent.  It's the last five years.  If you want to add to it.

**MS. MITCHELL:**  Thank you, Your Honor.  So we have met and conferred.  We believe that we can have a draft done --

**THE CLERK:**  Would you speak into the mike please.

**MS. MITCHELL:**  So we have conferred.  We believe we can have a draft done by Thursday morning so we suggest we reconvene Friday morning, if that's convenient for the Court. Or we could reconvene only if we don't get the documents into the Court maybe by Thursday morning.

**THE COURT:**  I always want to have a date.

**(To the Clerk):**  So Karlen, what do we have Friday morning?

Just let me check my other 300 cases.

**(Court confers with Clerk)**

**THE COURT:**  Nine o'clock here in Los Angeles.

**MS. MYERS:**  Your Honor, we did not confer about Friday.  The Los Angeles Homeless Services Authority is holding a pretty significant hearing that day.

**THE COURT:**  Thursday at 5:00 o'clock?

**MS. MYERS:**  Sorry.

**THE COURT:**  Thursday?  Give you all day Friday, I mean all day Thursday, 5:00 o'clock?

**MS. MITCHELL:**  Your Honor, I have childcare issues.

**THE COURT:**  Okay.

**MS. MITCHELL:**  I'd have to talk to my partner before I can do it.

**46**

THE COURT:  2:00 o'clock Thursday?

MS. MITCHELL:  Two o'clock Thursday is fine.

THE COURT:  Two o'clock okay?

MS. HASHMALL:  Your Honor, could we do 3:00 o'clock?

THE COURT:  Three o'clock?

MS. MYERS:  Yeah, that's fine.

THE COURT:  I think you've got childcare issues. Yeah --

MS. MITCHELL:  Right.  I'm sorry, Your Honor.  My husband's out this week.

THE COURT:  Let's not hurt each other with family. Okay?  Let's never do that.  I'm not going to keep you tonight. We can get this done.  But --

MS. MARTINEZ:  We're here Wednesday, Judge.

THE COURT:  Pardon me?

MS. MARTINEZ:  Myself and Judge Birotte are here Wednesday.

THE COURT:  Wednesday's great.  Thursday's great. Just talk about it.  You meet so I'm not arbitrarily picking a time.  You've got family issues.  I could be the bad judge of the year by telling you to come back at 8:00 o'clock tonight. Just go talk to each other, okay, and give me a time.

But every date now has a tickler date.  Every date we make an appearance and we get the data and we get the stipulations and if we have a problem let me know about it.

**47**

(Counsel confer)

MS. MITCHELL: Your Honor, can I step out and make a quick call?

THE COURT: Absolutely. And don't hurt your family. Okay? We've got Wednesday, Thursday, Friday. I'm going to change my schedule around to accommodate you.

(Counsel confer)

THE COURT: Don't change family commitments. Okay?

(Counsel confer)

MS. MITCHELL: Yes, Your Honor. So I think what we have agreed on is Friday afternoon, but I do have a question for the Court. If the parties submit the documentation and they are agreed documents, which we believe they will be, would we still be having a hearing on Friday afternoon?

THE COURT: I don't know because I need to look at those documents and when you put it into Friday you're not giving me a chance to look at those documents and get back to you.

MS. MITCHELL: Okay.

THE COURT: So you're kind of putting me in a box of -- is Wednesday possible?

MS. MARTINEZ: We can submit the document to the Court.

MS. MITCHELL: Yeah. Thank you, Your Honor. The intent would be to submit the document to the Court on

Thursday, so Thursday morning?

THE COURT: If it's to the Court Thursday morning, I have a chance to look at it --

MS. MITCHELL: Yes.

THE COURT: -- I may simply take you off calendar.

MR. MARCUS: That's our intent, yes.

THE COURT: Okay --

MS. MITCHELL: Yes.

THE COURT: -- I just need to look at it.

MS. MITCHELL: Correct.

MR. MARCUS: Yes. We're planning to get it to you on Thursday.

THE COURT: And I don't think you've stipulated that I have the final consent or the final say concerning the parameter of the document, but I think I do. I'd like to make certain it meets our needs.

And at some point I need that auditor and I'm giving you direction. I don't want a bunch of folks who were previously employed with the County and the City, someone leaving and going over to some local auditor. I want some independence here. And I don't know if that's in-county or out of -- in-city or out-of-city, but I'm giving you that direction so I don't, you know, surprisingly say no.

MS. MITCHELL: We appreciate that, Your Honor --

THE COURT: Okay.

**MS. MITCHELL:** -- and what we have talked about --

**THE COURT:** Okay, so Thursday what time, so I can get you home to your family?

**MS. MARTINEZ:** Thursday, 9:00 a.m., Judge.

**THE COURT:** Thursday, 9:00 a.m.

**MS. MARTINEZ:** We'll be submitting the document.

**THE COURT:** There's a look of bafflement already. Okay?  I'll let you talk.

**MR. MARCUS:** I'm just trying to be realistic, Your Honor.  The --

**THE COURT:** I'm not -- you two are going to meet and confer.  This is taking time.  Just give me a time.

**MR. MARCUS:** Are you asking for the time for when the documents will be submitted?

**THE COURT:** Yes.  Because I have to read them and I want to read them and I want to think about them.

**MR. MARCUS:** So if we could have until Thursday afternoon, would that work?

**THE COURT:** No.  Because then I don't have time and I've got you at 9:00 o'clock on a Friday or -- I'm sorry, 12:00 o'clock or whatever time you're done.  That's not giving me sufficient time and I'm not skimming through these.  I want to read them and think about them.

**MR. MARCUS:** Understood.

**THE COURT:** Okay.  Why can't we do this by Wednesday

**50**

at 5:00 o'clock or 8:00 o'clock?

          **MR. MARCUS:**  Mostly because of me, Your Honor.  I am not going to be --

          **THE COURT:**  All right, that's fine.  That's fine.  I don't want to embarrass you.

          This isn't the biggest decision we've made all day.

          **MS. MYERS:**  It's not.

          **THE COURT:**  Okay.  So arbitrarily -- well, I want at least 24 hours to look at them.  I want to read them, set them down, pick them up again, and if I need to set them down and read them again.  So I'm going to schedule this for -- what time is your program done on Friday?

          **MS. MYERS:**  We would be fine with noon or any time later, Your Honor, on Friday.

          **THE COURT:**  Anytime on Friday?

          **MS. MYERS:**  After 11:00.

          **THE COURT:**  After 11:00.  That's when I'm okay.  So we'll schedule this for 1:00 o'clock on Friday, which is our in-court date, and I'd like to have these documents by Thursday morning at some point and I'm going to arbitrarily say by 11:00 o'clock.  Okay?  By 11:00 o'clock.  And that should give me that afternoon and that evening to read them and then I'll notify you if you're not needed.

          Now, when do I get the suggested auditor?

          **MS. MARTINEZ:**  The various names, Judge.

**51**

THE COURT:  Pardon me?

MS. MARTINEZ:  The various names of the auditing firms.

THE COURT:  Yeah.  When do I get that?

MR. MARCUS:  Your Honor, we're going to -- I think the plan is for us to exchange proposed names at the same time we are also dealing with that addendum so that we'll have both of those --

THE COURT:  Okay.

MR. MARCUS:  -- available to send to you at that time --

THE COURT:  Thursday --

MR. MARCUS:  -- that's the intention.

THE COURT:  Thursday same time then?

MR. MARCUS:  Yes.

THE COURT:  Okay.  That's fair enough.

MR. MARCUS:  Yes.

THE COURT:  Okay.  Well then why don't we recess for the evening and get you back to your families with the Court's thanks.  Okay?  Have a good evening.

     (Counsel thank the Court)

     (This proceeding was adjourned at 5:38 p.m.)

52

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>March 19, 2024</u>

                **Signed**                                              **Dated**


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**