UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, *et al.*, <br><br> Defendants. | Case No. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **NOTICE OF FILING REVISED AUDIT SCOPE** <br><br> Before:  Hon. David O. Carter <br> Courtroom: 10A <br> Hearing Date:  March 4, 2024 <br> Hearing Time:  8:30 p.m. |

*NOTICE OF FILING REVISED AUDIT SCOPE*

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to the Court's request, the parties submit the Revised LA Alliance for Human Rights' and City of Los Angeles' Agreement for an Independent and Objective Audit of City-Funded Homelessness Assistance Programs.

Dated: March 22, 2024          Respectfully submitted,

*/s/ Elizabeth A. Mitchell*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

4854-8792-2352

i

*NOTICE OF FILING REVISED AUDIT SCOPE*



**LA Alliance for Human Rights' And City of Los Angeles' Agreement For An Independent and Objective Audit of City-Funded Homelessness Assistance Programs**

**I.   Introduction**

The L.A. Alliance for Human Rights and the City of Los Angeles jointly submit their agreement for a comprehensive financial and performance audit of the City of Los Angeles's homelessness programs.[1]

**II.   Audit Purpose**

Complete and thorough transparency for each and every homelessness assistance program and initiative funded or conducted by the City of Los Angeles.[2]

**III.   Audit Background Information and Foundation**

The audit scope should include at least the following subjects.  Issues that arise during the audit process shall be reported to the Court and all parties to determine if the scope of the audit should be modified to include such issues.

1.  Complete descriptions of the programs funded or conducted by the City and/or LAHSA to assist people experiencing homelessness in the City of Los Angeles and how those programs differ in their populations served, benefits provided, and how they work together.

---

[1] In referencing "City" throughout this document, the Parties refer to all programs funded by or otherwise sponsored by the City or in collaboration with the City, whether or not directly, internally, or through a third party such as a service provider, LAHSA, the County of Los Angeles, or other government or non-government organizations.  In particular, LAHSA funding and expenditures must be included.

[2] The term "homelessness assistance programs" should include but are not limited to the programs used by the Mayor in her 2024-2025 draft budget summary as included in the $1.3 billion dollar commitment to end homelessness, available at https://cao.lacity.gov/budget/23-24/Budget Summary (recognizing that some programs may not ultimately be approved and therefore will not be contained in the audit), and the programs and initiatives for the implementation of the LA Alliance settlement, including programs related to encampment reduction, including Inside Safe, and the implementation of the City's Street Engagement Strategy, and the 6,700 bed MOU (sometimes referred to as the Roadmap or Freeway MOU).

2. A thorough understanding of how the City and/or LAHSA manages and evaluates the activities implemented to assist people experiencing homelessness. An understanding of how data is coordinated and shared with outside agencies, such as Los Angeles County, LAHSA, and providers contracted with the City to assist in its actions to address the homelessness crisis.

3. A review of the technical, performance management, and accepted standards of government quality management systems utilized by City-run departments and activities intended to assist people experiencing homelessness.

4. Budgets and Financial Expenditures – Complete and accurate information relating to City expenditures and the uses of public funds, including City, County, State, and Federal funds intended to assist people experiencing homelessness.  At a minimum, a financial audit should include: 1) the line items the City counts towards its "homelessness" budget, including the department that receives the fund; 2) to which programs/departments/agencies those funds are allocated and for what purpose; and 3) the source of those funds.

**IV.    Audit Methodology**

The audit should be conducted in accordance with generally accepted government auditing standards, e.g GAO Yellow book or IIA Red Book. The final report should include a statement of compliance with the applicable standards.

The selected audit firm will assign personnel with sufficient training and experience in the applicable standards to perform the audit.

**V.     Findings, Conclusions, and Recommendations**

Findings, conclusions, and recommendations will be supported by sufficient and appropriate evidence cited in the audit report.

**VI.    Audit Scope of Work, Standards and Required Work Product**
**VI-A: Scope of Work**

The Parties seek to include the following audit parameters:

1. Budgets and Financial Expenditures – Complete and accurate information relating to expenditures and the uses of public funds intended to assist people experiencing homelessness.

2. Performance – A complete and accurate description of programs intended to address homelessness including their objectives, target populations, methods of delivery, reporting, and management. An evaluation and analysis of how well these programs meet their objectives, the efficiencies and effectiveness of such programs, and the outcomes of such programs.  Tools such as cost-effectiveness analysis, per-capita spending analysis, and performance management analysis should be utilized.

3. Impact – An analysis and evaluation of whether programs and activities performed or funded (including through LAHSA and/or service providers) by the City of Los Angeles:
    a. Increase, reduce, or otherwise impact housing placements and stability of people experiencing homelessness.
    b. Assist or hinder people experiencing homelessness in enrolling and receiving proper care and services including behavioral health, access to treatment beds, and substance use treatment.
    c. Increase, reduce, or otherwise impact the number of individuals experiencing unsheltered and chronic homelessness.
    d. Reduce, increase, or otherwise impact barriers to individuals attempting to obtain permanent housing.
    e. Increase the prospects that outreach services and referrals result in securing shelter, housing and /or treatment or rehabilitative services for people utilizing homelessness assistance programs.
    f. Result in individuals obtaining permanent housing.

4. Quality – A review of how well the City and/or LAHSA adheres to financial, auditing and management standards and how that adherence ensures that the City receives and produces reliable, objective, and high-quality engagements.  This review should include processes and checks to correct programs and make changes in programs that are not producing the desired results.

**VI- B: Work Product**

The final work product should be an accurate, detailed, and easily understood accounting of public funding and programs intended to assist people experiencing homelessness.  This should include but is not limited to direct assistance, housing and shelter, outreach, and related services. To the extent relevant, the audit should use 2024 Point in Time count numbers to calculate the current need for housing, shelter, services, etc.[3]

The final audit report will include, but not be limited to, the following subjects:

1. What are the different programs and services the City and/or LAHSA utilizes to address the City's homelessness crisis?

2. What are the sources of the funding for those programs?

3. How effectively is funding utilized by LAHSA and the City and on what specific programs and activities is that funding attributed?

---

[3] The parties recognize the City's obligations under the Settlement Agreement are fixed to the 2022 Point in Time count numbers, not 2024.

4. What City programs and activities utilize the majority of City and/or LAHSA homelessness assistance resources?

5. Is the use of these funds effective in reducing homelessness? How can the City show effectiveness in reducing homelessness? What are the retention rates for each shelter bed? For all participants that exited the shelter, what are the reason for the exit and the location to which they exited?  For individuals who are exited from City programs and shelters, where do they go?

6. What is the rate of success with making housing placement to a permanent housing destination from emergency/interim shelter, transitional housing, safe haven, or rapid re-housing project? What is the average length of time that it takes for that placement to occur?  What is the average length of time that the placement in permanent housing lasts?  What programmatic aspects contribute to the length of time it takes for a person to move from interim shelter to permanent housing?  Are there any barriers to receiving services in interim shelter or identifying and moving into permanent housing?

7. For Rapid Rehousing, how many clients are served by Rapid Rehousing vouchers? How long did it take to locate housing units for individuals with vouchers?  How long did each individual receive the voucher assistance?  How many individuals were evicted during the voucher period and for what reason? If individuals' vouchers expired, what happened with individuals when their vouchers expired?   What is the cost of the program per voucher, including the amount of the voucher and the cost to implement the program and all overhead costs associated with the program?.

8.  How are service providers paid? How is invoicing done? What information is or should be included in the invoice? What is the basis of payment (e.g. per hour, per contact, identified milestones, etc.)?

9. How are service providers demonstrating success with funds? What performance measures and status reports are used to demonstrate success? How are service providers tracking this information and sharing with the City and/or LAHSA?

10. What requirements for the use of funds are service providers obligated to follow by funding source? How does the City and/or LAHSA demonstrate compliance with funding restrictions/requirements?

11. How does the City and/or LAHSA ensure accurate payment for beds and services to avoid double payments or paying for empty beds?

12. How are the funding and staffing levels determined, and what are the services rendered, for all housing and shelter programs covered by the audit? What are the capital and operating costs for each housing and shelter program and how are they determined on a per project and per unit/bed basis?

13.  What is the cost per bed of service providers contracted with either the City or LAHSA?

14. How is administrative funding used by LAHSA? How is administrative funding used by service providers? How is the administrative overhead rate determined by LAHSA and/or service providers?

15. What is the level of fiscal oversight and accountability of service providers? What internal financial controls are in place to ensure all funding is used only for the intended purpose?

16. What are the challenges impacting service providers' ability to deliver City contracted services, i.e. recruiting and retaining staff, training and supervision, etc.? What prevents the City from directly providing some of these services?

17. What programs or services are most positively impacting unhoused people's ability to obtain shelter?  What programs or services are most positively impacting unhoused people's ability to obtain permanent housing?   How is or can that impact be documented?

18. What programs or services, if any, are negatively impacting unhoused people's ability to obtain shelter or housing services?  How is or can that impact be documented?

19. What is the process by which the City and/or LAHSA bids for or requests homelessness assistance services and by what standards are contracts awarded? To what extent does the City grant sole source or no-bid contracts and for what reasons?

20. What performance metrics direct program managers to report outcome measures instead of workload statistics or output measures?

21. How does the City and/or LAHSA verify the data it uses to base decisions on homelessness assistance programs?

22. How are services coordinated between the City, County, LAHSA, and service providers? How is it determined which entity performs what services and how do those agencies report to their counterparts to ensure performance and avoid duplication of services and expenditures?  Has the City had to fill in resources to cover gaps in services that should have been handled by County, and if so, what were the costs incurred by the City?

23. Is there a gap in navigation services for the City's interim housing stock?

24. What data were relied on and what sources were utilized to conclude that 21,000 people in the City were housed through various City, County, State and federally funded programs?

25. How does the City and/or LASHA avoid double counting of people receiving housing and services and match invoices and spending reports with accurate numbers of people being served?

26. How many homeless encampments (meaning tents, makeshift shelters, cars and RVs) exist in the City of Los Angeles and how is this number determined?

27. What efforts has the City made to engage LAHSA to share its data with the City and what have been the results of those efforts?

28. What policy or programmatic barriers exist for unhoused people in receiving services provided by the City and/or LAHSA?

29. How many net new shelter and housing units have been added to the City's housing and shelter stock, since the litigation commenced? If units have been taken offline during the pendency of the litigation, has any funding for those units been used to fund new units, and if so, how? How are beds counted (e.g two beds in a hotel room or Tiny Home, etc.).

30. How many units created in the Alliance/Roadmap agreements were required to be used or used prior to their inclusion in the Settlement/MOU as non-market-rate housing or shelter?

31. For encampments reduced pursuant to the agreement, inside safe, or any other city program, what are the outcomes of individuals in those encampments? Were they moved into housing? Were they located to another area? Track by operation or operation date.

Issues that arise during the audit process shall be reported to the Court and all parties to determine if the scope of the audit should be modified to include such issues.

### VI-C: Audit Outcomes
The Parties seek the following outcomes from this audit:

1. A determination as to whether the expenditures made by the City and/or LAHSA are effective in reducing homelessness and providing housing and shelter to people experiencing homelessness or whether the programs have a negative impact on achieving that goal.

2. A determination as to whether public funds are utilized effectively and efficiently by the City, LAHSA, and/or service providers.

3. A determination as to whether the City and/or LAHSA is using accurate data in reporting the results of homelessness assistance programs.

4. A determination as to whether the City and/or LAHSA has a process to hold service providers accountable for poor performance.

5. A determination of how many net new housing and shelter beds have been created, how many individuals have been placed, and therefore, how many people have been served by each of the programs since March, 2020.