UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

LA ALLIANCE FOR HUMAN RIGHTS, )   CASE NO: 2:20-CV-02291-DOC-KESx
ET AL.,                       )
                              )                CIVIL
          Plaintiffs,         )
                              )      Los Angeles, California
     vs.                      )
                              )      Friday, March 22, 2024
CITY OF LOS ANGELES, ET AL.,  )
                              )      (1:11 p.m. to 1:46 p.m.)
          Defendants.         )
_____ )

HEARING RE:

MOTION TO ENFORCE THE SETTLEMENT AGREEMENT
AND FOR SANCTIONS [DKT.NO.668]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:            SEE PAGE 2

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Karlen Dubon

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For Plaintiffs:            ELIZABETH A. MITCHELL, ESQ.
                           Umhofer Mitchell & King
                           767 S. Alameda Street, Suite 270
                           Los Angeles, CA 90021
                           213-394-7979


For Defendants:            SCOTT D. MARCUS, ESQ.
                           Los Angeles City Attorney's Office
                           200 N. Main St.
                           7th Floor, Room 675
                           Los Angeles, CA 90012
                           213-978-7558

                           JENNIFER M. HASHMALL, ESQ.
                           Miller Barondess
                           2121 Avenue of the Stars
                           Suite 2600
                           Los Angeles, CA 90067
                           310-552-4400


For Intervenor:            SHAYLA R. MYERS, ESQ.
                           Legal Aid Foundation of LA
                           7000 S. Broadway
                           Los Angeles, CA 90003
                           213-640-3983

1      **Los Angeles, California; Friday, March 22, 2024; 1:11 p.m.**

2                          **(Call to Order)**

3              **THE COURT:**  First of all, counsel, thank you for your

4      courtesy, if you'd be seated.

5              I don't think this is going to take long today, but

6      you can make the appearance on behalf of the Plaintiff, please.

7              **MS. MITCHELL:**  Yes, good afternoon, Your Honor.

8      Elizabeth Mitchell on behalf of Plaintiff, LA Alliance For

9      Human Rights.

10             **THE COURT:**  Mr. Marcus.

11             **MR. MARCUS:**  Good afternoon, Scott Marcus for the

12     City of Los Angeles.

13             **THE COURT:**  Okay.  And Mira.

14             **MS. HASHMALL:**  Good afternoon, Your Honor.  Mira

15     Hashmall for the County of Los Angeles.

16             **THE COURT:**  And Shayla.

17             **MS. MYERS:**  Good afternoon.  Shayla Myers on behalf

18     of the Intervenors.

19             **THE COURT:**  Okay.  In the last 24 hours I've tried to

20     go over the submission to the Court yesterday.  And I am

21     prepared to adopt the scope after I pose a few questions to you

22     to make certain that you're comfortable with a couple areas.

23             Some of the things I've been able to look at have

24     been the -- some documents from Austin, Sacramento, Oakland,

25     San Francisco, New York.  And I'm not confident I've had enough

**4**

1    time in the last 24 hours to look.  But I'll show you what

2    we -- some of the reasons that I'm going to ask you the

3    questions in just a moment.

4            Would you put up the first one?

5            **MR. SPEAKER:**  Karlen, can you flip the screens?

6            **THE COURT:**  From memory, and I want to put up a

7    document from Austin.

8        **(Mr. Speaker/Judge confer.)**

9            **THE COURT:**  Okay, this is Austin's special report

10   concerning homeless spending.  And --

11       **(Mr. Speaker/Judge confer.)**

12           **THE COURT:**  Okay.  This is on from my memory page 67.

13   And in their reports concerning spending, they noted that

14   service providers contracted by the city to provide

15   homelessness services frequently did not meet performance goals

16   and there were no consequences.

17           That frequent contract amendments to goals, even

18   after annual performance was reported, that current performance

19   measures do not report on the length of time a person remains

20   housed, making it difficult to accurately identify successful

21   programs and services.

22           The resources to prevent people from experiencing

23   homelessness are not sufficient and may not have been used to

24   serve people who had the highest risk of experiencing

25   homelessness.

1          That no centralized system could track case

2   management services existed.  I added the word existed.  And

3   that reducing and eliminating barriers to service is one reason

4   where the city can improve its -- is one area where the city

5   can improve its efforts.

6          In your scope under four, if you'd look at that,

7   under budget, financial expenditure, so you'd be on page two,

8   you'd be at section three, and this is the fourth paragraph.

9   And I've taken the liberty of putting that up.

10          Does this adequately cover the concerns in the Austin

11   audit that may come before us?  And the reason I'm asking is I

12   want to make certain that your scope is complete enough so that

13   these problems occurring in other jurisdictions are something

14   that we can foresee and we don't have to keep modifying or

15   amending.

16          So just a moment.  Don't talk to me about this.  Just

17   look at this carefully.  And my question is, does three,

18   subsection four or the other portions of this scope adequately

19   encompass the problems that Austin ran into?  And have a

20   conference with each other for just a moment before you speak

21   to me.

22          And if it does, I'd like your representation that

23   you're satisfied that the scope encovers (sic) the problems

24   that they ran into.

25          And by the way, there may be no cure.  In other

**6**

1   words, we don't know what occurs in our audit when we get to

2   different agencies and entities and their processes or

3   procedures or if they're storing data differently from the way

4   the city would or LASA would or provider would.

5            I don't want to have another conversation with you

6   until all of you meet and confer for just a moment.  And if

7   you're satisfied, then I'm satisfied, I'll turn to the next

8   question.

9        **(Attorneys confer.)**

10       **(Judge/Mr. Speaker confer.)**

11           **THE COURT:**  And, counsel, up on the board also there

12   was a second portion of that Austin finding.  It's still on

13   page 67.

14           And it's that the spending generally aligns with city

15   council direction and stated priorities despite not all

16   spending action related to homelessness assistance can be

17   directly traced to specific guidance from city council.

18           And multiple city departments manage agreements

19   related to homelessness assistance, but there's no single

20   department responsible for tracking all agreements related to

21   homeless assistance.

22           And agreements often are not standardized and led to

23   inconsistent names and titles.

24           Now, we may have those issues before us obviously.

25   And we're not the mayor or the city council.  But if we're

1   running into these problems, we should be forewarned and make

2   certain the scope of your audit covers these problems raised at

3   least down in Austin.

4            I'm going to turn to Oakland next, but have a

5   conference.

6            **MS. MYERS:**  Can you pull back up the previous slide,

7   Your Honor?  Thank you.

8       **(Attorneys confer.)**

9            **MS. MITCHELL:**  So, Your Honor, we have discussed it

10  and we all agree if the Court --

11           **THE COURT:**  Pull the mic just a little closer if you

12  would.

13           **MS. MITCHELL:**  If the Court looks at section six,

14  there are four delineated items in section six.

15           **THE COURT:**  Right.

16           **MS. MITCHELL:**  Budget and financial expenditures,

17  performance, impact, and quality.

18           **THE COURT:**  And what number is it in section six?

19  There's like 31 items.

20           **MS. MITCHELL:**  So specifically I think the majority

21  is covered by section two, the performance, Mr. Marcus.

22           **MR. MARCUS:**  Just to be clear, Your Honor, we're

23  talking about section 6-A --

24           **THE COURT:**  Okay.

25           MR. MACUS:  -- the scope of work, which is on the

1    second -- begins on the second and continues to the third page.

2         **MS. MITCHELL:**  So Roman numeral six.

3         **THE COURT:**  Just one moment.  Okay, the scope of

4    work, six, all right, under budgets and financial expenditures

5    but under number two, performance.

6         **MS. MITCHELL:**  Correct.

7         **THE COURT:**  Okay.

8         **MS. MITCHELL:**  And, Your Honor, the one area where we

9    don't think this is covered is preventing homelessness.  That's

10   not something that we have included in the scope.

11        **THE COURT:**  Okay.

12        **MS. MITCHELL:**  But the rest of it we all agree is

13   covered by the scope, Your Honor.

14        **THE COURT:**  Then we're forewarned are you satisfied

15   then with the scope so far?

16        **MR. MARCUS:**  Yes.

17        **MS. MITCHELL:**  Yes, Your Honor.

18        **MS. MYERS:**  Yes, Your Honor.

19        **MS. MITCHELL:**  These points, Your Honor, yes.

20        **THE COURT:**  Okay.  Then let me turn to Oakland.  And

21   they have an executive summary, and there are four areas that

22   Oakland wanted to cover, and that was in particular number two,

23   evaluate the performance of contractors, service providers

24   against intended program outcomes.

25             I think you've covered that more than adequately in

1    what I'm going to call 6-B, work product.  Then I want to make

2    certain on my record that each of you are satisfied that this

3    has been covered.

4              And I think it's covered specifically in nine of 6-B,

5    work product, where it reads, how are service providers

6    demonstrating success with funds, what performance measures and

7    status reports are used to demonstrate success, how are service

8    providers tracking this information and sharing with the city

9    and/or LASA.

10             But I want to make certain you're satisfied with the

11   scope.

12             **MS. MITCHELL:**  Can the Court put the prior slide back

13   up, Your Honor?

14             **THE COURT:**  Yeah.  And this is from the Oakland

15   audit.  In fact, I can give you the whole Oakland audit but I

16   don't think you want to read it right now.  But you -- if you

17   look at the executive summary, there are four bullet points,

18   and this one stood out.

19             **MS. MITCHELL:**  I'd also direct the Court to number 20

20   where it talks about outcome measures.

21             **THE COURT:**  I'm sorry, I couldn't hear.

22             **MS. MITCHELL:**  I'd direct the Court to number 20

23   where it talks about outcome measures on page five.

24             **THE COURT:**  Better yet, all of you have the

25   discussion.  I think I'm satisfied but I want to double-check

10

1    with you because you've drawn up the scope of this.

2          **MR. MARCUS:**  We are satisfied, Your Honor.

3          **THE COURT:**  Satisfied, Shayla, you satisfied.

4          **MS. MYERS:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  All right.  Let's go to the next

6    one in that.  Then let me go back to the proposed scope and let

7    me go to, Mr. Marcus, what you raised was six, number two,

8    performance.

9          **MR. MARCUS:**  Yes.

10          **THE COURT:**  You have that in front of you.

11          **MR. MARCUS:**  Yes.

12          **THE COURT:**  Okay.  I would just suggest, although I

13    think you more than adequately covered this in current terms of

14    shelter, that you add a complete and accurate description of

15    programs intended to address homelessness, including their

16    objectives, targets, populations, methods of delivery,

17    reporting, and management and evaluation and analysis of how

18    well these programs met their objectives, the efficiencies and

19    effectiveness of such programs, and outcomes of such programs.

20          And then turn to three.  And in 3-E and "F," I think

21    you should add so it's absolutely clear, shelter; so it would

22    read, increase the prospects that outreach services or

23    referrals resulted in securing shelter or housing.

24          Now, that's clear later on.  Just a moment.  That's

25    clear later on, I think, in paragraphs under 6-B, number six,

1    number 17, number 18, number 29, and number 30 where you refer

2    to new shelter or shelter and housing.  In other words, those

3    words are always used.

4            But when we get into the beginning of this, under our

5    performance and then impact, that impact, because of Inside

6    Safe, the mayor now has not just a housing first, she also has

7    moved to interim housing in the meantime.

8            And I think it has to be clear that this applies to

9    shelter because that's what Boise talks about.  And that's

10   missing in "E" and "F" of three.

11           So I'm just suggesting that we add shelter.

12           **MS. MYERS:**  Your Honor, I'd like to address that.

13           **THE COURT:**  Well, you two have a conversation first,

14   because this has to be not just shelter and not just housing.

15           This is now a -- Boise stands for shelter.  The

16   city's made a political choice in terms of housing in the past.

17   Now we've moved back to a shelter and housing dynamic.

18       **(Attorneys confer.)**

19       **(Judge/Mr. Speaker confer.)**

20           **MR. MARCUS:**  Your Honor, --

21           **THE COURT:**  Yes, please.

22           **MR. MARCUS:**  -- so we have conferred.  We will

23   certainly add shelter to impact "E."  I -- we think it was

24   covered as well but we can certainly add --

25           **THE COURT:**  I do, too.

1          **MR. MARCUS:** -- it in specifically.

2          "F," however, is a very specific request that is

3   being made to the auditor that specifically addresses permanent

4   housing.  That was done on purpose.

5          **THE COURT:**  Okay.  So leave "F" as it is.

6          **MR. MARCUS:**  Yes.

7          **THE COURT:**  Add shelter to "E."

8          **MR. MARCUS:**  Yes.  I think we're all in agreement on

9   that.

10         **THE COURT:**  Agreed.

11         **MS. MITCHELL:**  Agreed.

12         **THE COURT:**  Okay.  Shayla, agreed.

13         **MS. MYERS:**  Yes, Your Honor.

14         **THE COURT:**  All right.  The next concern isn't

15  something you can resolve.  But I want to move to 11 so I pay a

16  courtesy to the county and Mira.

17         On six, can we put up six on this screen?  And can we

18  put up six eleven, yeah?  Okay.

19         Mira, on April, you're going to come back in good

20  faith -- and the county, they've done an exemplary job.  In

21  fact, you may have overperformed on your milestones.

22         Part of that agreement, though, is also what I had

23  Una, my clerk, write on the board when we resolved this matter

24  with chairperson Janice Hahn here and the mayor and you.

25         And that was that for the 3500 mental health beds,

1    the supporting documentation that went with it.  And I don't

2    want to catch you by surprise so I want you well-prepared, and

3    that is the city is claiming at the present time, or at least

4    councilmembers are claiming, that these units aren't going out

5    on the -- into their counsel districts.

6           I don't know where you both stand with the MOU

7    between the city and the county.

8           And Judge Pregerson and I jointly want to make

9    certain so there's no surprise and you're asked that day.  He

10   has a separate consent decree.  I have a separate agreement.

11          I view, and I think I can represent that he views,

12   that those jail spaces that are required under his decree are

13   separate and apart from the settlement we reached with the

14   county.

15          And so when we get to 11, how does the city and/or

16   LASA ensure accurate payment for beds and services to avoid

17   double payments?  And we get to -- well, there was one more.

18          **MR. SPEAKER:**  Five.

19          **THE COURT:**  Yeah, I think number five.

20      **(Mr. Speaker/Judge confer.)**

21          **THE COURT:**  Yeah, number 25.  I just want you to be

22   prepared, you know, because I'll ask that question that day so

23   there's no surprise.  I think that will resolve that issue.

24          Also, I would suggest you think about in number six,

25   if you'd put this up, yeah, right there, that way when we say

**14**

1  interim transitional, wouldn't that be shelter?  Or are you

2  going to use the word "housing" broadly?  I think that's going

3  to get confusing.

4          To me, housing mean we're talking about permanency,

5  our ultimate goal.

6          When we're talking about transitional, often times I

7  think politically it's referred to as being interim housing.

8  And you could keep it that way.  But I look at that as, you

9  know, an interim something.  It's not permanent.

10         And I've often times referred to that as the Boise

11 case did as shelter.  I'll leave that to you.  If you're

12 satisfied with that wording, I'm satisfied also.  But I'd just

13 ask you two to meet and confer and make certain we're not

14 getting into parsing these words later on.

15         **MS. HASHMALL:**  Your Honor, while they're discussing

16 that point, I just want to thank you.

17         **THE COURT:**  I'm sorry, what, Mira?

18         **MS. HASHMALL:**  On behalf of the county, obviously we

19 are not party to these discussions, but I appreciate your

20 guidance regarding the issues I should be prepared to

21 address --

22         **THE COURT:**  Yeah, I --

23         **MS. HASHMALL:**  -- on April 4th.

24         **THE COURT:**  -- don't want embarrassment, I don't want

25 a trap.  I just tell --

1          **MS. HASHMALL:**  Yeah.

2          **THE COURT:**  Okay.

3          **MS. HASHMALL:**  And we're very proud of having met or

4     exceeded the --

5          **THE COURT:**  Good.

6          **MS. HASHMALL:**  -- guidelines and benchmarks in the

7     County Alliance settlement.

8          **THE COURT:**  Good.

9          **MS. HASHMALL:**  And we look forward to further

10     reporting on that.

11          **THE COURT:**  Great.  That way you know the tough

12     questions I'll be asking, okay, you'll be prepared for it.

13          **MS. HASHMALL:**  Thank you, Your Honor.

14          **THE COURT:**  Thank you.  And, Mira, you might check

15     with the city or the council or Kerkorian because that's the

16     word coming back to the special master about the units not

17     actually going out to the council districts.  So just make that

18     inquiry yourself.  It may be resolved, it may not be, okay.

19          **MS. HASHMALL:**  Yes, thank you, Your Honor.

20          **MS. MITCHELL:**  Your Honor, we think that it should be

21     rephrased as interim -- excuse me, emergency/interim shelter,

22     transitional housing comma.

23          **THE COURT:**  I think it's much clearer that way but --

24          **MS. MITCHELL:**  Right.  We can edit that.

25          **THE COURT:**  Okay.  And that we have housing.  Usually

1    we think of permanency.  Okay, all right.  Okay, just -- I

2    think that that's it.

3          All right.  Now I want to raise something for your

4    consideration.  In the past, a provider may have submitted

5    invoices to the city or the county or LASA.  And if we asked

6    where those invoices were and that provider didn't have the

7    invoices, those invoices were paid anyway.

8          I might ask all of you to think how we change that

9    presumption or that past practice so that going forward with

10   fair notice our providers know on behalf of the city and Mayor

11   Bass when she's making these evaluations, or LASA and Dr. Adam,

12   or the chairperson of the board, that due process and fair

13   notice, that if our providers in the future don't have this

14   underlying documentation, that the presumption's quite the

15   opposite:  they didn't perform the work.

16         Now, let me say that again.  That's a game changer.

17   In the past, it may be that our providers in good faith didn't

18   retain this documentation or some of it, and these invoices and

19   bills were paid anyway.

20         It would seem to me going forward that the

21   presumption, once we get notice out to the providers will be --

22   and that's a decision for the major and for the council

23   president and for the chairman of the board of supervisors.

24         But the presumption should be the opposite, and that

25   is if a provider doesn't supply the substantiating

17

1    documentation, that these invoices should not be paid, that the

2    default is you don't have them.

3          And I'll give you some example.  A couple goes to the

4    IRS and claims child deductions, childcare.  And they say to

5    the IRS person, he or she, we are claiming $2,000 in

6    deductions.  And the IRS looks at the person and says, show me

7    your documentation.  I don't have it.

8          I think we can imagine what the response would be,

9    and that is you don't get the deduction.  And that goes for

10   travel expenses also.

11         We seem to have operated in the past on these

12   documents when they're not produced being presumed that they

13   existed.

14         And I think if we change that scenario to, if you

15   don't produce them, the default is you didn't do the work, that

16   will incentivize our providers to get the documentation to the

17   city, to the mayor to make good decisions, to the council.  And

18   I think they need that and I think the board needs that.

19         Now, I'm going to leave that to you.  But I want to

20   put that right on the table.

21         I think for a long time the money's been large.  No

22   bad faith, I'm not claiming that, I'm not claiming fraud.  I'm

23   just saying we have to change that presumption that if you

24   don't have it, you didn't do it.

25         And that will incentivize our providers to get those

 1   documents out front instead of just presuming, oops, can't find

 2   it, pay the bill.

 3              Okay.  Now, I'm almost done.

 4              I want to compliment you.  I'm prepared to adopt the

 5   scope of this.  I think that you've worked extraordinarily

 6   hard.  I've growled at you on occasion.

 7              But when -- you've really done a good job.  I want

 8   you to hear that I think you've done an excellent job with this

 9   scope, on behalf of the city, Marcus, Shayla, glad to see you

10   involved finally, and on behalf of LA Alliance, okay, Liz.

11              And so unless there's anything further, with those

12   minor changes, I'm going to adopt the scope of the audit at

13   this point, and so ordered.

14              Now, I want to raise the next issue, and then we're

15   going to get you on the way to have a wonderful weekend.

16              You've submitted so far to me 14 names of potential

17   auditors.  And you're going through a conflict check, and I

18   understand that we need to take a little bit of time and be

19   certain.

20              I'm wondering this.  I'm wondering if instead of you

21   coming up with one name, you came up with three names, and that

22   way we would have those three make a presentation to us.  And

23   in that presentation they might see something as an auditor

24   that they might say, this is overly complicated.

25              But that presentation would give us an idea in 20 or

1   30 minutes.  It would also let us know if they're really

2   available or not because those calls probably haven't been

3   made.

4           And I'm looking for a couple things from my

5   perspective, so you don't have surprises.

6           One, I'm hoping that since these homeless initiatives

7   often rely on government funding and grants, this -- the

8   auditors might be somewhat familiar with regulations and

9   compliance requirements associated with the funding sources so

10  we're not paying for what I call education money.

11          That's costly to the city.  And including some

12  reporting standards and allowed expenses.

13          So they might have to get up-to-date with Oakland,

14  Sacramento, New York, Austin, or some amount of prior what I

15  call minimal audits.

16          I would hope that they would have some understanding

17  coming in of the issues involving homelessness and some of the

18  underlying causes and demographics and challenges that are

19  facing all of us so that we're not paying what I call catch-up

20  time or education time.

21          I'm hoping that these folks aren't prior city or

22  county employees involved in the process who've gone over --

23  who have a past nexus, because it doesn't look independent.

24  But some of them may have.  And I'm hoping that they have the

25  bandwidth.

1          If we could get those three names to the Court

2  through you, it'd be acceptable.  If not, I'm prepared to pick

3  three names as early as this afternoon after we recess and just

4  give them to you.

5          Where do we stand on these 14 potential auditing

6  firms that have been submitted?  And have a conference once

7  again amongst yourselves because, Marcus, if there's

8  disagreement, you might as well find out informally to begin

9  with.  So just have that conference.

10          In other words, instead of just picking one name,

11  because I may not agree to that name, you pick three names.

12          And I think we should do that today so we can set up

13  a timeframe with them, hopefully give them a week, have them

14  come into court and, with transparency, make their

15  presentation.

16          **MR. MARCUS:**  Your Honor, as we initially thought, and

17  as we have discussed, our thought is now that the scope of work

18  has been adopted by the Court with the amendments that you

19  indicated, that we send that scope of work to everybody --

20          **THE COURT:**  Okay.

21          **MR. MARCUS:**  -- on that list because there may be

22  some who have conflicts we don't know about, we have not spoken

23  to them.  There may be people who don't have the capacity to do

24  something of this scope.  They may not be interested.

25          But once we get a response, for anyone who has a

1  potential yes, we can certainly amongst the three of us make a

2  recommendation to the Court of three or four of those to come

3  in and make a presentation.

4          **THE COURT:**  Okay.

5          **MR. MARCUS:**  That was our thought.

6          **THE COURT:**  Fair enough.  Now let's do this.  Let's

7  give a timeframe.  Everything now needs a timeframe.  And I

8  need to get your wisdom concerning what's fair.

9          From my perspective, if you hadn't reached that

10  agreement, I was going to pick three names off this list.  I

11  would then know their availability, whether they were willing

12  to undertake it.

13          And I think you're absolutely right.  Now that I've

14  adopted the scope, we're going forward with an audit.  How long

15  do we need?

16          Because we reassemble on April 4th, I'd like to have

17  them coming in on the same day minimally because I don't want

18  to wait too long but I want to get the auditor right, or at

19  least three or four auditors right.

20          And I'd like that to be a public presentation, not a

21  backroom presentation.  Let's let everybody hear what their

22  qualifications are because they're going to be producing a

23  public document anyway.

24          So, now, all of you talk about that.  April 4th we're

25  back here again.  It saves me from bringing you in here on

1    another date.  Maybe that date would be too soon.

2            But they've got a week or so.  These folks are

3    professionals.  They can get a product out to you and get your

4    best thoughts.

5            And by the way, I've been through this in terms of a

6    receivership in Saipan before.  And we've had what was

7    historically called kind of a show-and-tell where they present

8    it in court.  And we made the decision who that receiver would

9    be concerning facilities so --

10           MS. MITCHELL:  Your Honor, before we discuss, can we

11   get the names -- and via email is totally fine -- but of the

12   auditors that did the Oakland and the Austin audits that the

13   Court found persuasive?

14           THE COURT:  Why don't put up that report for you?  Do

15   you want the -- now, we've been looking the last 24 hours.  I

16   don't think we've slept.  But we've been looking at so many

17   auditing reports.  You want Oakland specifically, Oakland?

18           MS. MITCHELL:  Yes, Your Honor.

19           THE COURT:  Okay.  Well, I'll start with the

20   executive summary.  It's a lengthy document.  It'll send you to

21   sleep, trust me.

22           MS. MITCHELL:  Oh, I'm happy to read it.

23           THE COURT:  Okay, yeah.  But you want me to email the

24   Oakland document?

25           MS. MITCHELL:  Emailing would be fine.  What I'm

1  looking for is the name of the auditing firm just so we can --

2  to the Court's point so there's not an education period.  If

3  there are folks that are already familiar with the funding

4  process, I think that makes a lot of sense --

5          THE COURT:  Yeah.

6          MS. MITCHELL:  -- to reach out to them.

7          THE COURT:  Yeah, here, I've got it right here.  Hang

8  on.

9          MS. MYERS:  And I think that's probably true, Your

10  Honor, for each of the firms that did the audits for

11  Sacramento, for San Francisco, New York that you identified.

12          THE COURT:  Yeah.  Well, there's a lot more out

13  there.  It's just the time I had to go through when I got the

14  scope of your audit.  And I wanted to just look at -- New

15  York's out there also.  I didn't have time to get through it.

16          Okay, hold on.  Hang on.

17          MS. MITCHELL:  While the Court's getting the name,

18  Your Honor, --

19          THE COURT:  No, just --

20          MS. MITCHELL:  -- can we confer?

21          THE COURT:  -- counsel, just a moment.  Just let --

22  give me a chance to get this up here.  Okay.  I haven't gotten

23  through the review of the New York City Department of Homeless

24  Services Programs.  It's dated August 17th, 2023.  I didn't pay

25  too much attention to that.

1            I've got the City of Sacramento city auditor, that

2    report, preliminary report on the city's homeless responses.

3            See, these weren't audits.  These were just problems

4    that they were running into.

5            Got the performance audit, City of Oakland Homeless

6    Services.  And I'll find the auditor for you now.  It was the

7    city auditor, Courtney Ruby.  Now, that's not going to have any

8    relevance to you because it's the city auditor so it will

9    short-circuit that.

10            Let me see.  There's the California State Audit

11    Report of 2023 from the auditor here in California, the Austin

12    one.  I hope that's complete.  There may be another as I

13    glanced at.

14            I couldn't get through each one page-by-page so some

15    were executive summaries, one (inaudible) going relevant, like

16    page 67 of the Austin report or number two of Oakland.  So --

17    but I'll leave those to you to find.

18            **MS. MITCHELL:**  Thank you, Your Honor.

19            **THE COURT:**  Okay.  But the Oakland one seems to be

20    irrelevant because we're going to a third party audit.  That

21    was the city auditor.

22            Okay, any other questions of me?

23        (No audible response.)

24            Because I'm adopting the scope of this audit and

25    we're going forward now with the audit and we just need to have

1    some timeframes for what you think is fair to get this scope

2    out, Marcus, and to have them have a pageant.

3              And I don't want to bring you in, you know, next

4    Wednesday, it may be too soon.  So I need your wisdom about how

5    much time.  We're coming back April 4th.

6              **MR. MARCUS:**  Can I have a moment, Your Honor?

7              **THE COURT:**  Sure.  By the way, that's going to be a

8    packed day.  We're going to have the VA here on their homeless

9    cases, the city, the county.

10             And if you want to have the audit late in the day or

11   the auditors make their appearance or presentation, you can do

12   it the same day.

13             So, Karlen, for our records, the scope of the audit's

14   adopted with the minimal changes represented on the record that

15   counsel can make at a later time.

16        **(Mr. Speaker/Judge confer.)**

17             **MS. MITCHELL:**  Your Honor, so that I can make --

18             **THE COURT:**  Wait --

19             **MS. MITCHELL:**  -- those changes, --

20             **THE COURT:**  -- until they're present.  Wait until

21   Marcus is hearing.  He's in conversation so wait.

22             **MS. MITCHELL:**  That's fine.

23        **(Pause)**

24             **MR. MARCUS:**  So, Your Honor, I obviously can't speak

25   for the firms themselves.  But what the city can do is the city

1    can send the solicitations out.  We can try to get those out

2    today --

3              THE COURT:  Okay.

4              MR. MARCUS:  -- to the firms, ask them to get back to

5    us within a week time or so.

6              And one of the questions we will ask is if not only

7    are they interested and available to do the audit but are they

8    also available to come to court on April 4th and do a

9    presentation about the audit that they would do.

10             THE COURT:  Sure.

11             MR. MARCUS:  We can put that in the solicitation.

12             THE COURT:  Perfect.  So we'll try to get that out in

13   a timely fashion.  I'm not tying you to five or six days.

14             But I'm going to schedule this for let's say 3:00

15   o'clock so they're not standing around because we've got the VA

16   homeless cases in the morning, which you're not a part of but

17   you may be interested in.

18             We've got the county status report, and the city's

19   back on alleged sanctions at that time, with or without

20   testimony or stipulations or briefing, which I'm leaving to all

21   of you in terms of presentation.

22             Instead of having the auditors stand, wasting time,

23   let's schedule them for 3:00 o'clock in the afternoon, okay?

24             I have nothing further.  I just want to thank each of

25   you, all of you, Shayla, Marcus, Liz, and Mira for working --

**27**

1   well, you weren't involved were you, Mira?  All right.

2          **MS. HASHMALL:**  Not involved --

3          **THE COURT:**  All right.

4          **MS. HASHMALL:**  -- in this one, Your Honor.

5          **THE COURT:**  For working so hard on this.  I think

6   it's really a good scope that you've come out with, so it's

7   adopted by the Court.  We'll move forward and get the auditors

8   next.

9          All right, we're in recess.  Thank you very much.

10  Have a nice weekend.

11          **(This proceeding was adjourned at 1:46 p.m.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

28

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                              <u>March 23, 2024</u>

             Signed                                               Dated


                    *TONI HUDSON, TRANSCRIBER*