UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, *et al.*, <br><br> Defendants. | Case No. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **SURREPLY ISO MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS** <br><br> Before:  Hon. David O. Carter <br> Courtroom: 10A <br> Hearing Date:  March 4, 2024 <br> Hearing Time:  8:30 p.m. |

## I.  INTRODUCTION

The City does not dispute that it entered into an agreement with Plaintiffs on March 15, 2023 ("3/15 Agreement") to complete a series of steps which it did not accomplish. (Stipulated Facts re: RFQ Agreement at 2, ECF No. 678 ("The City did not complete the RFQ process as represented to LA Alliance, and did not have each district fully assessed to help establish appropriate milestones as the City had committed to on March 15, 2023.").)  The City claims at the time it entered into the agreement, it intended to comply; however at some point it made the decision to totally ignore its promises and totally failed to deliver any deadlines or milestones by October 1, 2023.  In fact, the City provided no district-specific milestones at all until January 7, 2024, and even those weren't the result of district-assessment nor agreed-to by City Council until January 31, 2024—well over a year after they were originally due.

The City had no right to unilaterally refuse to comply with the Settlement Agreement, nor rescind the 3/15 Agreement.  And by hiding its decision to breach the 3/15 Agreement, the City delayed enforcement of the entire Settlement Agreement by Plaintiff, thereby avoiding any accountability during that time.  In the three months that followed Plaintiff's discovery of the City's hidden breach, the City continued to try to avoid compliance with the Settlement Agreement altogether.  It was not until Plaintiff threatened to move forward with this motion that the City produced ratified district-specific milestones.

The City's claims that it didn't act in bad faith are both untrue and irrelevant, and sanctions are both appropriate and warranted in this context.

## II.  DEFENDANT LURED PLAINTIFF INTO BELIEVING IT WAS COMPLYING, DELAYING ACCOUNTABILITY FOR AN ENTIRE YEAR, AND DENYING PLAINTIFF THE BENEFIT OF THE BARGAIN.

The City, by entering into the 3/15 Agreement and thereby staying Plaintiff's hand, lured Plaintiff into the false belief that the terms of the Settlement Agreement and 3/15 Agreement were being complied with.  In doing so, the City gained for itself

*SURREPLY ISO MOTION FOR ORDER*

an entire year—during which the term of the Settlement Agreement continued to run—of non-compliance and non-accountability, and preventing Plaintiff from experiencing any benefit of the bargain struck.

The parties' settlement agreement, which is more akin to a consent decree that a traditional settlement agreement (*see United States v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990)), is governed by contract theory for enforcement purposes. *Jeff D. v. Andrus,* 899 F.2d 753, 759 (9th Cir. 1989) ("[t]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally."); *United States v. Asarco, Inc.*, 430 F.3d 972, 980 (2005) ("*Without question courts treat consent decrees as contracts for enforcement purposes*.") (emphasis in original).

There is no question that the City breached the Settlement Agreement by failing to provide the requisite milestones and deadlines for over a year after it was required to, and to the extent that its deadline was extended to October 1 due to the 3/15 Agreement, it breached that agreement as well. But the City claims that its failure to assess each district and provide thoughtful, fact-based milestones and deadlines as promised was more of a minor delay than a material breach. Not so. Intentionally withholding communication about the failure of the RFQ process, and abandonment of its commitments to assess each district to provide accountability measures (i.e. milestones and deadlines) is much more egregious than simply forgetting—the City induced the Alliance into complacency thus avoiding accountability for a year.

For nearly 35% of the term of the Settlement Agreement, the Alliance lost the three key benefits it bargained for with the City: (i) creating new beds for those

experiencing homelessness[1]; (ii) getting people off the streets and into those beds[2]; and (iii) judicial enforcement of those efforts.  By failing to provide the requisite accountability measures initially, then promising enhanced measures in the 3/15 Agreement in exchange for delay, then failing to perform the enhanced measures but still delaying the metrics *another* four months thereafter, the City denied the Alliance the benefits of all three for more than a year—and the City is obligated to repay that benefit.  *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996) (In California, "the breaching party is . . . responsible to give the nonbreaching party the benefit of the bargain to the extent the specific breach deprived that party of its bargain."); *see also New W. Charter Middle Sch. v. L.A. Unified Sch. Dist.*, 187 Cal. App. 4th 831, 844 (2010) ("Contract damages compensate a plaintiff for its lost expectation interest.  This is described as the benefit of the bargain that full performance would have brought.").

Nor is this a victimless crime: The Alliance as an organization was founded for the purpose of advocating for more shelter, services and treatment, getting the unhoused off the street and into that shelter with supportive services and treatment, and holding governments accountable for their role in accomplishing these things.  Not being able to maintain accountability and ensure maximum beds were being created (they weren't) and maximum people were moving off the street and into shelter (they weren't) caused the Alliance organizational and reputational harm, and prevented the Alliance from demonstrating the efficacy of the social contract for which it advocates (providing a place for unhoused individuals to go, help for them there, in exchange for

---

[1] As discussed in Plaintiff's moving papers, the bed metrics provided by the City in November, 2022, were never finalized and submitted to the Court because Plaintiff had to wait on the encampment metrics to determine the sufficiency of each.  By withholding the encampment metrics, and thus delaying finalization of the bed metrics, the City evaded accountability on bed production as well:  The City only created 2,810 beds as of the fourth quarter of 2023, 2,380 beds short of its commitment—a 54% success rate.

[2] The City claims 21,694 persons experiencing homelessness were brought inside in 2023, but its own figures demonstrate the hollowness of this claim.  (*See* Motion for Order re Compliance and Sanctions at 11–13, ECF No. 668.)

clean and safe streets). And far worse, the lack of accountability likely meant that thousands of people have stayed on the street for longer than would otherwise have been the case, suffering and in many cases dying. Some measure of consequences for these harms must be imposed.

## III.   SPECIFIC INTENT IS IRRELEVANT IN DETERMINING VIOLATION OF AGREEMENT

It matters not whether the City intended to break the 3/15 Agreement at the time the City entered into it or it made the decision to break the deal later down the line; either way it failed to perform "all reasonable steps within [its] power" to comply with both the Settlement Agreement and the 3/15 Agreement, thereby supporting a contempt order.[3] "This Circuit's rule with regard to contempt [for violation of consent decree] has long been whether the defendants have performed 'all reasonable steps within their power to insure [sic] compliance' with the court's orders." *Stone v. City & County of San Fransisco*, 968 F.2d 850, 856 (9th Cir. 1992) (citation omitted). In *Stone*, the City was held in contempt for violating a consent decree requiring its jails to adhere to capacity limits. *Id*. at 852–53. The City of San Francisco argued that "its good faith efforts to comply with the provisions of the consent decree should excuse its noncompliance." *Id*. at 856. The Court of Appeals disagreed: "The City . . . confuses the liability standards for Eighth and Fourteenth Amendment violations with applicable standards of review for contempt orders. Intent is irrelevant to a finding of civil contempt and, therefore, good faith is not a defense." *Id*. *See also Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir. 1983) ("Appellants' assertions of their good

---

[3] Because the terms of the Settlement Agreement were incorporated into the district court's dismissal order, and the court retained jurisdiction for purposes of enforcing the agreement, violation of the Settlement Agreement is therefore a violation of a court order. *See Kelly v. Wengler*, 822 F.3d 1085, 1095 (9th Cir. 2016) (holding the court maintains "ancillary jurisdiction to enforce the settlement agreement, the terms of which were incorporated into the district court's dismissal order.") *and Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994) ("[T]he court is authorized to embody the settlement contract in its dismissal order or, what has the same effect, retain jurisdiction over the settlement contract[] if the parties agree.").

*SURREPLY ISO MOTION FOR ORDER*

faith efforts to comply with the order are irrelevant.  Intent is not an issue in civil contempt proceedings.")

The City has admitted it did not comply with the order and therefore may be held in contempt.  To evade an order of contempt, therefore, the burden shifts to the City to "show 'categorically and in detail' why they were unable to" comply with the terms of the Agreement. *Toussaint v. McCarthy*, 597 F. Supp. 1427, 1430 (N.D. Cal. 1984) (citing *Donovan*, 716 F.2d at 1240). Far from demonstrating "categorically and in detail" the basis for non-compliance, the City nonchalantly claims it should be excused because the breach was really just a minor delay[4], and the obfuscation after the 3/15 Agreement was just a miscommunication.[5]  But neither of these is relevant to the analysis directed by *Stone*: did the City perform "all reasonable steps within [its] power to comply" with the Settlement Agreement? The distinct answer is no.  Did the City perform "all reasonable steps within [its] power to comply" with the 3/15 Agreement? Again, the answer is no.

## IV.   THE REQUEST FOR SANCTIONS IS APPROPRIATE UNDER THE CIRCUMSTANCES

Sanctions are appropriate both to compensate LA Alliance for losing the benefits of the bargain over 447 days of delay and to ensure future compliance. *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013) (explaining that "a sanction generally is civil if it coerces compliances with a court order") (citing *Int'l Union, United Mine Workers of*

---

[4] Submitting Milestones and Deadlines two days late would have been a delay. Submitting them 447 days late—34% of the Agreement having already passed—is a material breach. *See, e.g. Urica, Inc. v. Pharmaplast S.A.E.*, CASE NO. CV 11-02476, 2013 WL 12123230, at * 7 (C.D. Cal. May 6, 2013) (collecting cases comparing length of delay to determine whether delay "frustrate[d] the purpose of the contract." (citation omitted)).

[5] At some point the City was aware it "did not complete the RFQ process" and would not "have each district fully assessed." (Stipulated Facts re: RFQ Agreement at 2, ECF No. 678.)  Rather than fessing up to its failure, the City made the decision to conceal this fact from the Alliance to avoid drawing attention to its inaction.  This was not a miscommunication but rather an intentional act designed to delay and avoid accountability—which the City succeeded in doing.

*Am. v. Bagwell*, 512 U.S. 821, 828 (1994).  LA Alliance initially requested $100,000 per week for each week the City was out of compliance with the Agreement, for a total of $6,400,000.)  The intent behind the request of the dollar figure was multi-faceted: i) to ensure that the amount was significant enough that it caused City officials and others to recognize the gravity of non-compliance and take the obligations in the Settlement Agreement seriously, ii) to ensure accountability by hiring an auditing firm to conduct both a forensic accounting and performance audit, iii) to hire staff to assist the Alliance in monitoring City and County compliance, now that it has become clear it will be a more involved and complicated process than originally anticipated when the Alliance entered into the Settlement Agreement, iv) compensate counsel for its work on this issue, and v) compensate the Alliance for the loss of the benefits of the Agreement and for reputation damage.  With the Court now overseeing the fiscal and performance audit, paid for by the City, the amount paid by the City for the audit should be subtracted from the ultimate sanctions award.  But the other issues remain and should not be ignored.

"[A]lthough the district court generally must impose the minimum sanction necessary to secure compliance, the district court retains discretion to establish appropriate sanctions[.]" *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010) (citations omitted).  "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries from the contemptuous behavior, or both."  *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986).  Here the Alliance seeks sanctions both to coerce obedience and to compensate the party pursuing the contempt action (the Alliance) for its injuries in i) losing the benefit of the bargain for nearly 35% of the entirety of the Agreement, ii) reputational harm to the Alliance over the last year, iii) the Alliance's staff's time spent in meetings internally, with the City, and with Alliance members and the community on these issues, and iv) the Alliance's counsel's time spent dealing with this issue.  While counsel and Alliance staff can provide a breakdown of time, if

necessary, a reasonably calculated flat-fee award would achieve all the goals of reimbursement of time and effort, plus compensation for loss of the benefit of the bargain and reputational harm, in addition to providing the necessary coercive effect to ensure future compliance.  The Alliance maintains that $100,000 per week for each week of delay is appropriate, minus the costs of the audit.

While $6.4 million sounds like a high dollar figure on its face, it represents only 0.6 percent of the Mayor's $1.3 billion homelessness budget and only 0.2 percent of the $3 billion committed by the City under this Agreement.  Given the massive dollar spending by the City in this area, and the vast sums of money it controls, the Alliance echoes the concerns of Mr. Yagman, counsel for proposed intervenor, that even $6.4 million is an insufficient number to "shock the City into doing what it's supposed to do, which is getting people in doors." (Hr'g Tr. 85:8–10, Mar. 7, 2024, ECF No. 681.) The amount of money available for beds and services has never been the issue.  The City has spent billions on homelessness over the past three decades, but the problem has only grown worse, and the City has never been held accountable for its profligate spending and paltry results.  What the City needs is accountability, which is what this case and the Settlement Agreement sought to ensure.  The City spent over a year evading accountability; sanctions awarded by this court will be used by the Alliance to impose that accountability on the City for the remainder of the term.

The sanctions requested are incremental, and the minimum necessary to secure current and future compliance.  Given the $1.3 billion requested by the mayor to address homelessness in the upcoming fiscal year, utilizing less than 1 percent of that to ensure accountability for the remaining 99 percent is minor and proportional given that the City deprived the Alliance of the benefit of its billion-dollar settlement bargain for a full year.  There is no authority cited by the City that supports the notion that the Court does not have the inherent authority and discretion to impose sanctions commensurate with the conduct.  There is no case involving a billion-dollar settlement where a district court was overturned for imposing a relatively modest financial

7
*SURREPLY ISO MOTION FOR ORDER*

sanction for a year's worth of violations by a settling party.  And there is no case barring a district court from requiring a city that has violated an agreement to pay an organization to ensure future compliance with the agreement.

## V.     CONCLUSION

Only sanctions for noncompliance can restore accountability and vitality to the Settlement Agreement and ensure that it makes the difference it was intended to make for those suffering on the streets and sidewalks, and the citizens of Los Angeles.

Dated: April 1, 2024                    Respectfully submitted,

                                        /s/ Elizabeth A. Mitchell
                                        UMHOFER, MITCHELL & KING, LLP
                                        Matthew Donald Umhofer
                                        Elizabeth A. Mitchell

                                        *Attorneys for Plaintiffs*

4867-1864-3634, v. 5

8
*SURREPLY ISO MOTION FOR ORDER*