UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

LA ALLIANCE FOR HUMAN RIGHTS, )  Case No. CV 20-2291-DOC (KESx)
et al.,                        )
                               )  Los Angeles, California
        Plaintiffs,            )  Thursday, April 4, 2024
                               )  9:08 A.M. to 6:38 P.M.
            v.                 )
                               )
CITY OF LOS ANGELES, et al.,   )
                               )
        Defendants.            )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:               See Page 2

Deputy Clerk:              Karlen Dubon

Court Reporter:            Recorded; CourtSmart

Transcription Service:     JAMS Certified Transcription
                           16000 Ventura Boulevard #1010
                           Encino, California  91436
                           (661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:     Umhofer, Mitchell and King LLP
                        By:  ELIZABETH A. MITCHELL
                             MATTHEW D. UMHOFER
                             EUGENE LIM
                        767 South Alameda Street, Suite 270
                        Los Angeles, California  90021
                        (213) 394-7979
                        elizabeth@umklaw.com
                        matthew@umklaw.com


For the Defendants:     Los Angeles City Attorney's Office
                        By:  SCOTT D. MARCUS
                        200 North Main Street, Room 675
                        Los Angeles, California  90012
                        (213) 978-7558
                        scott.marcus@lacity.org

                        Miller Barondess LLP
                        By:  JENNIFER MIRA HASHMALL
                             LAUREN M. BRODY
                        2121 Avenue of the Stars, Suite 2600
                        Los Angeles, California  90067
                        (310) 552-4400
                        mhashmall@millerbardondess.com


For the Intervenors:    Legal Aid Foundation of Los Angeles
                        By:  SHAYLA R. MYERS
                        1550 West Eighth Street
                        Los Angeles, California  90017
                        (213) 640-3983
                        smyers@lafla.org

Also Present:           MICHELE MARTINEZ, Special Master
                        (714) 887-9845
                        michele@michelecmartinez.com

LOS ANGELES, CALIFORNIA, THURSDAY, APRIL 4, 2024, 9:08 A.M.

THE COURT:  Counsel, thank you for courtesy.  Have a seat.

All right.  Then we're in session, and we're on CourtSmart, and let me just have you remain seated.

And counsel on behalf of the LA Alliance, if you'd make your appearances.

ELIZABETH A. MITCHELL:  Thank you, Your Honor.  Elizabeth Mitchell on behalf of LA Alliance for Human Rights.

THE COURT:  And with you is Paul Webster?

PAUL WEBSTER:  Paul Webster with -- executive director of the LA Alliance for Human Rights.

THE COURT:  And Scott?

SCOTT D. MARCUS:  Scott Marcus for Defendant City of Los Angeles.

THE COURT:  Okay.

Mira?

JENNIFER MIRA HASHMALL:  Good morning, Your Honor.  Mira Hashmall here for the County of Los Angeles.

THE COURT:  Okay.  And who's with you today?

LAUREN M. BRODY:  This is Lauren Brody also of Miller Barondess.

THE COURT:  Nice to have you here.

Shayla?

SHAYLA R. MYERS:  Shayla Myers on behalf of the

intervenors.

THE COURT:  All right.  I want to start with a very positive comment about some of the activities that have been taking place both on behalf of the City and the County, but before doing that, I want to remind you and me consistently of the following:  that the State does not track the funding it provides to combat homelessness.  Quote, "There's no single State entity that comprehensively tracks the sources of funding, the intended uses or related expenditures of these programs, nor does the State track how much money is available toward addressing homelessness statewide."

I understand that the Court doesn't have jurisdiction at the present time over the State, but as we've tried to create transparency amongst all of us on the City and County level, you have to wonder why the State isn't involved in a co-equal effort.  So I hope one of you has contact with the legislature or the government because, as we're asking for this transparency that the mayor has come forth with on behalf of the City, which I'm complimentary about, you have to wonder why there isn't reciprocity and why there isn't leadership from the State.

So for a moment -- on Tuesday I was informed by docket that -- through Scott Marcus, and thank you -- that you had put up a website -- a public website, worked out some of the nuances throughout the afternoon, and by Tuesday

evening the mayor has honored the obligation that she made. That's very positive.  These are one of the few deadlines that have been, quite frankly, complied with, and I want to pay you the compliment.  And I don't mean by this mayor, in particular, but by past interactions with the City.  Maybe that ship is turning, and if so, you're hearing a compliment from the bench.

So we're going to pull up that website, and for any of you folks in the audience, we're going to walk through today a website.  So you're going to have access to it.  So folks are here from Skid Row who couldn't get the information, you members of the press, we're literally going to show you how to do that today and so you can have direct access, which you have never had before.

So for a moment you're going to go to https- -- and we're going to put this up on the screen.  We're -- / -- //cao.lacity.gov/homelessness/ [sic].  And we're all going to pull out our cell phones if you'd like to.  You don't -- not an order, but it'll save my clerk getting 50 calls about how to access this.  So you're more than welcome and you have Court disposition.

Morning, Kevin.  Pull out your cell phone, Kevin, because this way the world gets information.  Okay?

And if Big Mama is here or some of the other folks, you're going to finally have transparency.

Okay.  Does everybody see the screen?

(Court confers with clerk.)

Historically, this information was difficult, if not impossible, to obtain, and different providers kept this information in-house, if they even had it, and the City did not require this information, the State did not track this information, and I think that this pledge of transparency between Paul Krekorian, as Council president, and Mayor Bass is exemplary and maybe a model that other cities in the state should follow.

I want the public also to have access because while we wait for this audit -- whatever period of time this is on the selection process -- I don't want to waste time with lack of transparency when invoices can be put up in real time during the next couple months that the audit is taking place, and it also sends a message to the providers that the presumption should be reversed now and the presumption should be if you don't have the underlying documentation, you simply didn't perform the work.  Now, if the City and County decide to go on and pay those bills, then that's on you.

But I'm going to repeat: We need to change the presumption from the past that, when we conduct an audit back in 2018 and 2019 and the two providers that were chosen, whose names I won't mention so they're not embarrassed, couldn't produce the underlying documentation -- and these

were major providers -- that means that they were kept in-house, probably not accessible at the present time, and that laxness needs to stop.  So the presumption, I think, and suggest to all of you as County and City officials, should be if the underlying documentation is not readily available, the presumption should be that work was not performed, and I would encourage you not to pay these bills.

Now -- so everyone has permission to now take out your cell phone.  I've got mine out.  All those court rules are waived, and you are now on -- going to go to the home page at https://cao.lacity.gov/homeless/.  And I'll docket this also so that any members who aren't here can look at this in the future also.

Now, my law clerks are here.

So, Una, would you be so kind.  Would you get up and walk around.

Any of you who aren't there, just raise your hand. I want to make sure all of you are on this home page if you choose to be.

Jim, you got it?

Don?

Daniel, good morning.  Got it?

Okay.

Now, when you get on this site, you're now going to be on a home page, and does everybody have the home page?

And if anybody needs help, my law clerks are here to walk you around just to save frustration on your part.  Okay?

Now, when you're on the home page, from here you can go to links for Alliance Settlement Program, the Freeway Agreement, and Inside Safe.

And do me a favor.  Don, don't record this.  Okay?  Take the video off.  In other words, if anybody is -- yeah, don't want recording.  I don't want video made.  I just want you to be able to get on this site.

And the invoices are divided out by each program.  So, when you look down, you're going to see LA Alliance Settlement Program; the Freeway Agreement, the Roadmap Program, (COVID-19); and Inside Safe.

And now I'm going to stop just to make certain all of you have that.

And, Una, just in case, anybody raises their hand needs help.

Okay.  If you click on the "Alliance Settlement Program" and you scroll down under heading "LAHSA Cash Requests/Invoices Submitted to Los Angeles Housing Department (LHD)" [sic], you can view the invoices that were paid by the City between January 1, 2024, and March 28, 2024.  So let's do that.

Okay.  Now, let's stop there.  If any of you folks out in the audience -- either the press or the folks from

Skid Row or anybody else -- needs help, just raise your hand. Don't be embarrassed. Because I need help. If you notice, I've got a law clerk standing beside me. All you folks okay? All of you on that page who want to be?

Okay. Now, let's scroll down, because this is from "Path," and what you'll see is a billing. An invoice is -- I won't name the name of the entity on the record, but it's self-explanatory if you get on the website -- a request for $1,373,728 as part of the approved budget of the $11,235,224 pursuant to Contract No. -- okay -- Contract No. C-141840.

All right. Now we need to go to that contract number, and to save you doing that and save a lot of time, I've already got the contract number up.

So can we go to that contract.

And this is where your cell phones can leave you. You're now on the site. You're now looking at invoices.

So here's a contract, and it appears that $8,998,000 and 66 -- or, I mean, eight million nine hundred ninety eight thousand sixty six hundred dollars has been paid, and quote -- if you read this, these funds are for reimbursement for costs related to the program specified in the aforementioned contract.

Now we're going to go, once again, to that City contract at C-141840 and go to Section 202 on page 13, and you'll see that you can look at Exhibit G, and on page 5 of 8

under "Project Description" -- this is the first time, in good faith, we see the project description -- and you can read about this project.

And so let's go down to the metrics for a moment. Now, here's the description, and then we've got the metrics. There we go.

Now, let's read through the metrics because, in a sense, this might be very good metrics.  You might have another provider with very bad metrics, but it's been what all of you folks have been asking for, for a long time, whether it's Skid Row, who wanted direct access; the press, who's been, you know, trying to get these figures, et cetera; the general public.

Okay.  The number and percentage of clients that are document ready; number and percentage of clients that are connected to housing navigation; number and percentage of clients who are connected to time-limited subsidy; number and percentage of clients that are receiving housing case management and services at the "IH" site; average and median time for housing connection "HN," "TLS," "CMN" at IH; number and percentage of enrollments into TLS with a move-in date; number and percentage of enrollments into permanent supportive housing with a move-in date.

Number and percentage of exits to a permanent housing ("PH") destination, which is one of the metrics that

Inside Safe is going to be most interested in.  You've got a figure of 2,200-some that we put in through Inside Safe, but two council meetings ago LAHSA made a presentation that there were 1,400, and we'll play that tape in just a moment.  So what you've got is an influx and an out-flux of some kind.  These metrics are valuable.

And what I'm driving at is hopefully we're going to start making decisions on database information and not political decisions, where the person with the loudest megaphone applies the most pressure to City officials or elected officials to make short-sighted decisions that aren't for the benefit of the general public.

So we have the number and percentage of exits to the permanent housing destination.  We have the average and median time to exit.  We have the number and percentage of exits to temporary housing.  We have the number and percentage of exits to unsheltered homelessness.  We have the number and percentage of exits to institutions, criminal.  We have the number and percentage of exits to institutions, medical.  We have number and percentage of exits, deceased; and number and percentage of exits to unknown.

Now, these metrics may be excellent.  They may be what you've been looking for, for a long period of time.  They may need to be -- some modification.  There may be too much information, just like the intelligence community gets

where it's not actionable because too much flows in and it's just kind of data garbage.

Well, from there would you go to page 5 of 8, and the question is are there quarterly reports referred to on page 7 of 8?

Okay.  On page 7 of 8 under "Reporting Activities," are these publicly available? -- because this is the data that we just asked for in Exhibit G -- and how can the public access this information that the metrics call for?  Now, it may very well exist over at LAHSA.  We can't find it.  It may be there.  It may not be there.  I'll leave that to you.

So let me stop there because, first of all, I want to ask is this all -- are these all of the invoices or is this the only invoice that we have, Marcus, between the dates that I just stated?  In other words, are there more invoices that we didn't -- that we have in our position with the City, or is this just an example that we used to put up?

MR. MARCUS:  Good morning, Your Honor. Scott Marcus for the City.

THE COURT:  Good morning.

MR. MARCUS:  My -- first, my apologies.  Matt Szabo, the chief administrative officer, is on his way.  He is running a bit late, and he can provide more information, but my understanding is in order to make the time line, we made the decision to put up the invoices from the -- for the

current calendar year.

THE COURT:  Okay.

MR. MARCUS:  I do believe that there are invoices prior to that, which will obviously be subject to the audit --

THE COURT:  Yeah.

MR. MARCUS:  -- but we do believe -- this was to get it up and running.

THE COURT:  No criticism on my part.  I just want to make certain that I'm dealing with all of the invoices between January 1, 2024, and March 28, 2024.  I'm not asking you to go back in time.  I don't think it's fair on my part because you didn't have notice about this, but is this -- when Matt comes in, I'm going to ask him -- and remind me -- is this the only invoice that we have posted in that period of time, or do we have five other invoices and was this invoice just used as an example?  So let's wait until Matt's here.

All right.  Now, Ms. Mitchell, do you have any questions about this?

And, Mr. Webster, do you have any questions or initial improvements?

MS. MITCHELL:  May I have a moment, Your Honor?

THE COURT:  Sure.  Take your time because that's an unfair question and I'm giving you like 2 1/2 seconds to

answer.  So it can get modified in the future.

MS. MITCHELL:  Your Honor, this is the first time that we're looking at this website, and so I think we'd like some time with it.

THE COURT:  Yeah.  Let's take some time, subject to modification but -- okay.

Scott, do you have any questions about this?

MR. MARCUS:  I do not.  No.

THE COURT:  Mira, do you?

MS. HASHMALL:  No, Your Honor.

THE COURT:  Shayla, do you?

MS. MYERS:  No.  Same as Ms. Mitchell.  We'd like some time.

THE COURT:  Yeah.  We all need time to look at it. What we were looking for and couldn't find and may exist or may not was what happens with these metrics that look good on paper, and was there a follow-through with exhibits?  And the reason for that is I think that the mayor and the Council would appreciate making database decisions this point forward because, quite frankly, these have been political decisions thus far, and we need to move beyond that.

Next, could one of you reach out to the governor or the State and ask why they don't have this same transparency from the State level, and I'm going to be blunt about that. In other words, where did $30 billion go?

To our knowledge, the HMIS, "Homeless Management Information System," program has been used for Inside Safe, and I'd like to confirm that just through the City for a moment.

It was represented at one time, Scott, that the HMIS site was being used for Inside Safe, and my impression was that it was not used for the "Roadway" -- with agreement -- and that the HMIS system was not used for LA Alliance, but I could be wrong.  Would you have a -- (indecipherable) conference with the City?

(Pause.)

MR. MARCUS:  Your Honor, I conferred with City officials who are here including the --

THE COURT:  Come on up, folks.  You can come up to the first row so he doesn't have to walk so far.

MR. MARCUS:  I need the steps, Your Honor.

My -- what they confirmed is that everyone goes through the HMIS system, whether it's Alliance, whether it's Roadmap, whether it's Inside Safe.  That is how we both --

THE COURT:  Okay.

MR. MARCUS:  -- access and keep track of the participants in the system.

THE COURT:  All right.  I'll come back to the City in just a moment.

And I want to start with a compliment to the County

as well.  Based on the status report that you submitted to the Court, it appears that the County has made significant progress and that you've exceeded your obligations, as you stated before, for individuals exceeding -- or experiencing homelessness, and it's been represented that the County created 921 new mental health substance use disorder (SUD) beds.

So could we put that up, Una, for a moment.

See, I'm intellectually challenged with this computer.  So the law clerks, for the record, are coming up and helping.

(Law clerk assists the Court pulling up website.)

All right.  I'm going to read from lines 6 through 11 (reading):  In response to the Court's request appended hereto is Exhibit 1 -- as Exhibit 1 is the chart from Exhibit C of the report with an additional column identifying the city in which each reported facility is located.  For those facilities under the jurisdiction of the City of Los Angeles, Exhibit 1 identifies the council district and elected councilmember.  Nearly half, 458, of the 921 new mental health SUD beds are in the city.

This would exceed your obligation, Mira, of 610 beds.  And I quote from Docket 646, page 23, paragraph 3(a) that the obligation was 610 beds by December 31st of 2023.

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Okay.  Yeah.  All right.

MS. HASHMALL:  Mira Hashmall for the County of Los Angeles.

The County has vastly exceeded --

THE COURT:  Yeah.

MS. HASHMALL:  -- that benchmark with regards to the reporting period and is continuing to work to add new mental health and substance use --

THE COURT:  Yeah.

MS. HASHMALL:  -- disorder beds.

THE COURT:  There was -- or were individual concerns by councilmembers to the special master and thus reported to the Court that they did not have what I'm going to call "first access" within their individual council districts to these mental health beds.  But I understand the County's position, and that is that these acute psychiatric beds have to be concentrated for the highest degree of professional help and professional skill that's available. Eventually, though, the persons experiencing homelessness who are undergoing treatment for acute psychiatric disorders are moved to subacute beds for longer stays, and then, hopefully, with increased mental health, these folks are moved, you know, back into some kind of accommodation.

How do we stop -- and you don't have to answer

immediately.  In fact, I'd encourage you just to think about this.  How do we stop the historic concentration of those with mental health illness and substance abuse disorders in our poorer areas due to more affluent districts' unwillingness, in the past at least, to build out substance abuse mental health treatment centers, let alone simple housing and shelter?

And the County has stated on page 2, lines 20 through 21 (reading): Once a client is stabilized, they are moved to a different bed class so that another eligible individual can be placed.  As indicated in the report, the County is diligently expanding the pool of available mental health SUD beds across the continuum of care in order to create flow access across all levels of need.

In doing this -- I want you to reflect and not answer immediately -- how are we going to guard against this historic concentration of those with either substance abuse disorder or mental illness once again being shipped into the poorer or less affluent districts?  Because that's what caused this huge disparity in Skid Row historically.  So let's reflect on that a moment, and then what your answer is, is going to be paramount to where I go next.  Okay.  So take your time.  If you need to make some calls, so be it, but we've been dealing with racial "indisparity" for a -- or disparity for a long time and this containment policy and

this high ratio, and the recipients seem to be these poorer districts.

And that's why the -- apparently the council districts, Marcus, are reaching out to the special master saying, "At least we should have some access to those who are in our district getting some kind of treatment or preference from the County in terms of the acute psychiatric" -- "the subacute psychiatric."

So I leave that to a discussion privately between the two of you for the moment.

All right. Now, (indecipherable) HMIS, Homeless Management Information System, has been used, now I know, for Inside Safe, LA Alliance Settlement, and the Roadmap agreement. But we had 6,700 beds created, and it was represented to me, through the Roadmap agreement. We're supposed to have a little under 13,000 beds created through the LA Alliance agreement, so in rough math about 19- to 20,000 beds that are coming online. We have 3,500 mental health beds through the County settlement. So let's say about 22- to 23,000. And I don't know what happens in the VA case. I don't know if they're going to settle, litigate, if there's liability or not. So, if that's the case, in some flow we have about 22- to 23,000 beds being created, and HMIS is essentially an information tracking system that collects client data of individuals experiencing homelessness as well

as outreach efforts and services provided to them.

So I'm going to ask a series of questions and then just reflect on them.  You don't have to answer immediately.

What process is being implemented to ensure that the City of Los Angeles is effectively accessing the County's new mental health beds through the referral program?  And if you could -- and I'd like you to explain this referral program and how it works and what procedures are in place to track these referrals.

I think the public and I would like to know who's in charge of the database or databases being used in the Roadmap Freeway Agreement or LA Alliance Settlement agreement.

(Siren sounds.)

THE COURT:  You won't believe that.  What was that all about?  I don't even know if I want to -- that's a drone attack taking place in Kyiv, and I keep it on my phone because I was there recently and a lot of folks are suffering because of that.  So it's a reminder.  Sorry for the interruption.

I'll repeat:  What database is being used in these agreements?

How is that database updated?

Who's able to assign people experiencing homelessness to vacant beds, and what criteria is used?

And how many people contact the unhoused in the City of Los Angeles to assess their needs in the field, and how is this information processed from the field into meaningful data?

Now, Mira, I've talked to you before -- and maybe unfairly, but I think fairly -- about double counting. That's occurred to the Court before, in past incidences, but I don't want that to be the past problem transferred as an inference to the County.

But was anyone prepared on behalf of the chairman of the Board of Supervisors -- I know Cheri Todoroff has been here.  Where's Cheri?  Yeah -- under penalty of perjury, whether any of these beds from LA Alliance County Settlement agreement for 3,500 new mental health beds are being counted towards Judge Pregerson's separate jail release settlement agreement that occurred over five years ago?  And Judge Pregerson had a separate settlement agreement, and he threatened to hold the County in contempt.

And I'd just like to have a concrete representation of some kind that I can rely upon.  I'd like you to assess that because I'm not playing with this at all.  I really want to know, you know, under penalty of perjury so I don't have to worry about any double counting -- and if there is, just tell me.  Just truthfully say some is going on and what the degree of that is.  And I'm going to come back to you.  I

don't want you to answer quickly because I'm going to hold you to whatever your answer is.

MS. HASHMALL:  Your Honor, I'm prepared to address that right now.

THE COURT:  Not now.  I'm going to come back to you because I'm going to give you the lectern in a moment, roll right through it.

And I want that under penalty of perjury, by the way.  Because I'm not coming after you, Mira.  You're counsel.  You're an intermediary.  You're giving information to me from other people.  I want to know who I'm going to sanction if this turns out to be false.

In LA Alliance county settlement agreement, page [sic] 646 at page 38, the County committed that all future billings -- and could you put that up, Una, for a moment.

(Law clerk assists the Court pulling up docket up on the screen.)

THE COURT:  Okay.  When we reached the agreement, I asked my law clerk to step to the lectern and to handwrite in conditions that the Court needed to accept this settlement.  One was that the agreement is a floor, not a ceiling.  The agreement does not solve homelessness in Los Angeles County.  It's a huge step forward.

And the reason I had you write that, with

transparency, is I didn't want each of you relying upon the minimum that you could perform, that this was a base of minimally performing and you should extend this upward and outward, that this wasn't a crutch to come back to the Court and say, "Well, gee, we performed it."  This was a beginning.

The second, though: All future billings from providers must be completely transparent, and all invoices are to be public documents.

Are the underlying invoices for services provided with the County funds publicly available, Mira?

MS. HASHMALL:  Your Honor, the County is committed to transparency --

THE COURT:  No.  I know you're committed.  That's not my question.

MS. HASHMALL:  Our departments are gathering --

THE COURT:  No.  I'm going to give you the lectern in a moment.  I'm not going to let you do that.  I'm going to ask you a series of questions, and then you're going to respond to me.  You're not going to do this piecemeal, and you're going to think about this for a moment.

I know you're committed.  That's not what I'm asking.  I'm asking are the underlying invoices for services provided with the County publicly available, and if so, where would I find those, and if not, then will the County make a website, like the one recently created by the City, where the

public can have access to your invoices as well?  Because Mayor Bass has taken a leadership in this, and Paul Krekorian has, and LAHSA has, and are you willing, once again, to reverse this presumption from this point forward that nonsubstantiated documents for invoices requested have the assumption of work not performed?  Because I'll state in the past that providers were not required to supply any of these underlying worksheets, and back in the past audit that the City tried to attempt, they couldn't get the documents in 2018, 2019, and they had to try to recreate that themselves.

Now, I'm going to stop for a moment.  That's a lot of things that I'm asking, and I'm not finding fault.  I just want to move forward with transparency.  I want to change this public playing field so the public has access to this.

So, Elizabeth, your turn on behalf of the -- and, Matt, come on up for a -- have a seat.

Your turn on behalf of LA Alliance.  Anything that you'd like to say?

MS. MITCHELL:  On this issue?

THE COURT:  On this issue.

MS. MITCHELL:  No, Your Honor.

THE COURT:  With the County?

MS. MITCHELL:  Regarding the invoice transparency, I'm certainly interested to know what the County's response is --

THE COURT:  Okay.

MS. MITCHELL:  -- but we don't have anything to add on this issue, no.

THE COURT:  Okay.

Would you put up what Paul Webster created -- that chart -- and I'm going to ask, once again, for you to reach out to the State, because I have no power, and ask why we don't have a statewide dashboard created by Mr. Webster -- and by the way, the Court's figures turned out to be pretty accurate in terms of the 18 percent all the way down the line, but we didn't have all of the data you had.

And so this chart has been created, and I'm going to post it on the court's site, but why is a federal court posting this?  Why isn't the State of California putting up -- and keeping going down -- what San Francisco, Santa Ana, San Diego -- slower -- Riverside, San Bernardino -- why don't we have a cross-section across the state of where this money is going, what the results are?  Because it comes right back to what Elaine House said.  The State isn't tracking this, and the question has to be why?  So as we're putting pressure on all of you folks locally to respond -- and thank you -- why isn't the State doing the same thing?  Because I don't accept an excuse, and the taxpayers shouldn't accept an excuse, that this can't be tracked by the State.  So I'll leave that to you.  And if not, why don't one of you call

Gavin and get him on the phone.

Anybody want to place the call?  I didn't think so.

Okay.  We'll wait for the County for just a moment.

Scott, we're going to turn in just a moment to Mira.  Do you have any -- anything -- concerning the County right now.  We'll come back to the City in just a moment.

MR. MARCUS:  Not on this issue.  Thank you.

THE COURT:  Mira, the lectern is yours.  You can remain seated.  You can go to the -- whatever you'd like.

MS. HASHMALL:  Thank you, Your Honor.

So the County is preparing a public interface that will reflect invoices for the October to December 2023 period from our departments -- that are DMH and DPH SAPC -- with regards to the --

THE COURT:  Okay.

MS. HASHMALL:  -- beds under the settlement agreement with the LA Alliance.

But separate and apart from that and as part of the ethos of the County in committing to transparency and accountability, they take significant steps to ensure that all those payments for beds and services are accurate, that they're supported with documentation.  Steps are taken to make sure that the beds are being used and authorized and paid for.  DMH has a system of checks and balances for exactly that purpose --

THE COURT:  Uh-huh.

MS. HASHMALL:  -- to ensure that the authorization of the invoices is tracked and that the financial numbers are checked and double-checked.  SAPC also has systems for its billing for fee for service providers and cost-based reimbursement process.

THE COURT:  Okay.

MS. HASHMALL:  So that is already built into our system, and it's something that's important to the County -- to hold all of those partners and those services accountable.

THE COURT:  Okay.

MS. HASHMALL:  So I expect to have an update and a live website for the Court shortly.

THE COURT:  Okay.  I want to thank you for that answer.

MS. HASHMALL:  Thank you.

THE COURT:  And you've heard compliments from me now, but I'm now not going to be complimentary.

Who's constructing this website, and when will it be up?  Now, take your time.  You can make some phone calls.  Okay?  But I'm not leaving here today -- and I had a commitment from Mayor Bass publicly who said "two weeks."  The City fulfilled this.  So I know that they got their website up in two weeks.  And what I don't want is audits by either the County or the City while we wait when we can have

these invoices transparently put up so everybody can look at them, from Skid Row to the press to the general public.

And I know the government is here to help us, I understand that, but I want to trust you, but I want to verify it now.  And so it's not good enough for me to hear the commitment without dates and times because now everything has a date and a time, and I don't care what that is.  So I'd like you to make some phone calls today.  I'd like -- and who's doing this?  Let's start with who?  Who's the name of the person who's going to put up this public website?

MS. HASHMALL:  Your Honor, I don't have an individual's name, but I can certainly run that down.

THE COURT:  Excellent.

MS. HASHMALL:  We have --

THE COURT:  Excellent.  No.  Time out.

And when?

MS. HASHMALL:  So we have a reporting obligation to the Court in connection with the January to March time period.  So we will be doing a --

THE COURT:  But your figures aren't sufficient for me right now.  I trust you, but I'm going to verify now.  And I want the public to see this, just as the City, so they can look at this, and I will never understand why you can't duplicate what the City is doing in a very short period of time.  Because you're also tied into LAHSA, just like the

City is.  So I don't see you as exception to what we're asking.  And I'm also asking the representation that from now on that these invoices have something attached to tell us what these people did and so the mayor and the Council can make database decisions, and here's why:

I may have a service provider who's providing great services on the street but not billing towards shelter or housing.  Fine.  That's a political decision for the elected body.  That's not my decision.  But that may be overstaffed also.  I may have a huge staff ratio to what's being serviced.  I may have another provider -- and this last one was in the shelter business, but we ought to be able to measure what the cost is per person.

And maybe for those limited unsheltered spaces we're paying, hypothetically, oh, $200 a night, and if we compute the per person, maybe the decision would be made of its database to go to long-term supportive because it might be cheaper in five years.  You see?  And nobody can make that decision because right now they're all political decisions based upon pressure.  So I'm trying to see if we can move to a database system on behalf of the City, and so, if you'd make the calls, I'd appreciate it.

MS. HASHMALL:  So, Your Honor, what I was going to say is because we have a status report due to the Court at the end of this month, it is my plan to, in the context of

that reporting period, have this up and ready and be able to walk the Court through --

THE COURT:  No, no.

MS. HASHMALL:  -- how to access it, what's available --

THE COURT:  I'm not dealing with you.  I'm dealing with Mayor Bass and Lindsey Horvath from now on, and if Mayor Bass can sit in my court and make a representation, while I'm not going through attorneys and intermediaries, and then fulfill that, that's exactly what I want from the County.  I want the top of the echelon now.  I'm not dealing with you, Mira.  You're a conduit.  You don't make those representations, and intermediaries don't.  I want the same courtesy and I want the same commitment that came from the mayor, who then honored this, as coming from your Board, and if you can't give that to me, let's make a call to Lindsey and see if she'll come on over.

MS. HASHMALL:  Your Honor, I know the Board is committed to this, and that's why the County exceeded the benchmarks in its first reporting  period --

THE COURT:  Good.

MS. HASHMALL:  -- and I'm confident that we will have that database up and running when we report --

THE COURT:  And I'm positive I'm in continuous session each day until I get that answer.  I'm not waiting.

I don't care about that now.  Up to you.  Okay?  But otherwise, my next step will be to get Lindsey Horvath over here.  That's up to you.  I don't want that embarrassment. Don't fight me on this.

MS. HASHMALL:  Your Honor, I would never fight you.

THE COURT:  Okay.  You've heard me loud and clear now.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Done with that discussion.

Where are we between the City and the County on agreeing that the MOUs will be submitted going forward in a reasonable period of time?  In the Freeway Agreement, the representation was two weeks.  It took four months.  In the LA Alliance agreement, the representation was "promptly" -- it's in paragraph 5, the last line if we want to put that up -- and it took, what, 14 to 16 months?  That's not prompt.

So how do we reach agreements in the future between Mayor Bass, Paul Krekorian, you know, Lindsey Horvath, and all of you folks, and then have that turned over to the lawyers, who in good faith then bicker back and forth over the MOU and slow-foot this, quite frankly?  What kind of commitment do I have to the speedy resolution of the MOUs?

MS. HASHMALL:  So, Your Honor, just to reiterate the history on this, the City and the County had come together and reached a term sheet, and then there were some

significant changes in leadership at the City, and they wanted to take a step, take a beat, and reevaluate their priorities for their administration.

THE COURT:  Sure.

MS. HASHMALL:  The County gave them that grace but at the same time continued to be boots on the ground --

THE COURT:  Okay.

MS. HASHMALL:  -- supporting Inside Safe and working diligently with regards to the Roadmap agreement with the City, as well as the County's deal to make those beds --

THE COURT:  Okay.  So now hear me again very clearly.  We're in continuous session until that's completed.  We're going to sit here each day.  I've got all the lawyers here.  I've got all the parties here.  We're not going back to our office.  This is slow-footing this.

MS. HASHMALL:  But, Your Honor, I have a good update on this because -- and the Court was very encouraging at the last hearing and really suggested it was time to light a fire and restart those discussions.

THE COURT:  Sure.

MS. HASHMALL:  So while the cooperation has been on the ground with regards to the programs that the City and the County are doing on homelessness, they also got the conversations directly started between the principals, and they've had conversations and meetings, and things are

progressing.  And so I've learned sometimes lawyers getting involved can be counterproductive.  We've got leadership in the homeless services specialty areas for the County and the City working on this, and I think they're making a lot of progress.

THE COURT:  I want to be polite about this, and I want to thank you and compliment you.  Do you hear that?  And then hear me: We're in continuous session until this is accomplished.  So we're coming back tomorrow.  We're coming back Monday.  You're going to get this done after 14 to 16 months.  So I hope all of you enjoy sitting here with me because this is going to get accomplished now after 14 to 16 months.  And I was already courteous and accepted the 30 days that you asked for.  I've been courteous about that.  My patience has run out with it now.  This is taking too long.

Now, I'm going to take a recess for just a moment.  You're going to have a conversation amongst yourselves.  Then you're going to have additional input after you have that conversation.  So we'll be back in about 20 minutes.  Thank you.

(Recess from 9:53 a.m. to 10:29 a.m.)


AFTER RECESS

THE COURT:  Yeah.  We're back in session.  Thank you so much for the courtesy.  Please be seated.

And Karlen informed me we have new people who are making an appearance this morning.  So why don't we have those additional appearances.

MS. MITCHELL:  Thank you, Your Honor.

Matthew Umhofer and Eugene Lim, both from Umhofer, Mitchell and King, are also here for plaintiffs today.

THE COURT:  Nice to see you.

MS. MITCHELL:  Thank you.

Anybody else?

Okay.  Then, Mira, let me turn this back to you.  Or the City or whoever wants to speak.

MR. MARCUS:  If Your Honor would like to hear about the MOU issue first --

THE COURT:  Yeah.

MR. MARCUS:  -- I do have Matt Szabo present in court.  So you can have a firsthand account of the status of the negotiations.

THE COURT:  Great.

Matt, if you'd be kind enough to come forward.  You're not under oath.  I just need some informal questions from you or -- and/or Lourdes Castro, who's present.

So if you want to join Matt at any time.

Where are you on the MOU?

MATTHEW SZABO:  Thank you, Your Honor.

The County and the City -- the City represented by

myself and Ms. Castro Ramirez, the County represented by their CEO, Fesia Davenport, and Cheri Todoroff -- have been -- we met about two weeks ago and then have been in, pretty much, daily communication on the issues that need to be worked out on the MOU.  Earlier this week we submitted a proposal.  The County is considering that --

THE COURT:  What day did you -- what day did you submit the proposal?

MR. SZABO:  Monday.

THE COURT:  Okay.

MR. SZABO:  We submitted the proposal on Monday. They are reviewing that proposal.  They intend -- not to speak for the County, but we understand they intend to be working on it over the weekend, and then we will be meeting early next week to try to finalize some of the areas that need to be worked out.

THE COURT:  Okay.

MR. SZABO:  So our schedule is to -- it is -- we are both committed -- both sides are committed to getting this to a place where it can be --

THE COURT:  Sure.

MR. SZABO:  -- at least semi-final by April 27th.

THE COURT:  Okay.  You just frightened me with "semi-final."

MR. SZABO:  Well, semi-final -- you know --

THE COURT:  Subject to the City's approval or the Board approval?

MR. SZABO:  Subject to City's approval, Board approval.

THE COURT:  Okay.  Now, when I'm setting this date, I need the help from the Board and the City to have this finalized on the date I'm setting.  In other words, what's happening to me is I set a date, but then the City and the County -- or somebody -- has to approve it, and we're a week or two weeks over.  When I'm giving you that courtesy of 30 days, I'm expecting that this is going to the Board or going to the City and it's back to me at that time period. So help me.

I'm going to be in continuous session.  In other words, my life is going to be miserable.  So is yours.  So we're going to meet tomorrow at 4:00 o'clock.  You're to be present, and you're going to give me a status report at that day.  And then I'm coming back Monday.  And then I'm coming back Tuesday.  Because I don't understand the interchange of time.  I've got all of the players here.  I know you're busy, but you understand my frustration going back -- Matt, not with you -- but going back to a Freeway Agreement that was supposed to take two weeks and took four months, to the LA Alliance agreement that's supposed to be -- in that last line, paragraph 5 -- "prompt."  We're 14 to 16 months.

So, when I reach an agreement with Mayor Bass -- or anybody else -- what happens is it gets slow-footed somehow on these MOUs that you take as the gospel, but the governing document is the agreement.  It's not the MOU, and I just need your help.  So I'm coming here every day.  And I can set it at 3:00 o'clock.  I can set it at 4:00 o'clock.  It doesn't matter.  I'm going to give you the day, but we're in continuous session now.  Okay?  Understood?

MR. SZABO:  Understood.

THE COURT:  Okay.  Now, Lourdes, why don't you come on up here also.  Tell me where we're at because I don't want Matt by himself on this.  Where are we at on these negotiations?  And I'm not inquiring of what the hang-up is.  I'm not entering into that personal -- you know, that dispute between the two of you.  I'm not having you make that public right now, but where are you at in these negotiations?

LOURDES CASTRO RAMIREZ:  Yes, Your Honor.  Lourdes Castro Ramirez, chief of Housing and Homelessness for Mayor Karen Bass.

As Matt indicated, we are making very good progress --

THE COURT:  Good.

CHIEF CASTRO RAMIREZ:  -- and appreciate the -- of course the opportunity to work closely with the leadership of the County to make this happen.

The only other thing that I would add is that we also have engaged the mayor and the Council --

THE COURT:  Right.

CHIEF CASTRO RAMIREZ:  -- in providing the level of direction on the (indecipherable) terms that are set within the agreement.

THE COURT:  And that's what I need to do, courteously to you, is give you time to get this in front of the mayor and the Council, and I understand those time delays, but it can't be April 17th or 18th, which is the 30th day, and then it's "semi," "subject to."  Now, this is completed from now on.  That's our drop-dead date.  So hopefully we'll get this done next week and get it to the mayor or the Council, et cetera, for their approval.  Okay?  Hopefully.  Otherwise, we're all here.

Okay.  I'd like to hear from Cheri Todoroff for a moment if you'd come on up.

Folks, stick around in case Cheri disagrees with you.

Where are we at in these negotiations?

CHERI TODOROFF:  Hello, and good morning, Your Honor.  Cheri Todoroff, executive director of the Homeless Initiative.

And I agree with the comments from Matt and Chief Castro Ramirez.  We are making really good progress.

We are in constant communication, and we are committed to getting this done.

THE COURT:  Okay.  Are you working this weekend?

MS. TODOROFF:  Yes.

THE COURT:  You don't have to.  I'm not requiring it.

MS. TODOROFF:  I am, actually.  Yeah.

THE COURT:  I am.  Are you working?

MS. TODOROFF:  I am. Yeah.

THE COURT:  Matt, are you working this weekend on this?

MR. SZABO:  Yes, Your Honor.

THE COURT:  Lourdes, you working this weekend on this?

CHIEF CASTRO RAMIREZ:  Yes, Your Honor.

THE COURT:  You want me to assemble you on Sunday?  I'm just joking but I'm not.  I can't remember a Saturday or Sunday.  I'm always in session.  So, if you want to meet with me Saturday and Sunday, that's fine.  I don't want to harass you, I don't want time taken from your family, but I'm serious.  If you want to meet me on a Saturday or Sunday, no problem.

MS. TODOROFF:  I think -- we will be working this weekend.  I think we'll be able to get the job done more quickly if we're able to get together and work on it with our

teams.

THE COURT:  Well, we're all here.  Who else do we need?

MS. TODOROFF:  We are working with some of our County department leadership.

THE COURT:  Okay.

MS. TODOROFF:  It involves some of those other services that we're talking about.

THE COURT:  Give me a name.

MS. TODOROFF:  We're working with our Department of Mental Health and Department of Public Health.

THE COURT:  Give me a name.

MS. TODOROFF:  We have directors for those departments and so --

THE COURT:  Give me a name.

MS. TODOROFF:  -- we have Lisa Wong, who's with the Department of Mental Health.

THE COURT:  Okay.  Lisa Wong.  Who else do you need?

MS. TODOROFF:  And we have Gary Tsai, who's with the Department of Public Health Substance Abuse Prevention and Control.

THE COURT:  Great.

MS. TODOROFF:  Yes.

THE COURT:  They working this weekend?

MS. TODOROFF:  I imagine -- yeah, well, we already -- we actually already have plans to be meeting with them this weekend too.

THE COURT:  I bet you with all of our help, we can get this done as early as next week.  I'll bet you anything we can get this to our Council or the Board for approval -- whoever we're dealing with this -- within the time frame.  I know we can do that.  But if not -- okay?

All right.  So 4:00 o'clock tomorrow.

MS. HASHMALL:  Your Honor --

THE COURT:  Ordered to be present.

MS. HASHMALL:  Your Honor, the Court posed a couple of questions in the early session.  I --

THE COURT:  Yeah, I've got a lot more.  I just wanted to get that one out of the way.

MS. HASHMALL:  Okay.  I'd like to answer them if --

THE COURT:  So we're clear about when we're working.

MS. HASHMALL:  -- the Court will indulge me.

THE COURT:  Okay.

MS. HASHMALL:  Thank you.

THE COURT:  Thanks, Mira.

MS. HASHMALL:  Okay.  So, first, the Court had questions about when the County will be making invoices publicly available relating to services --

THE COURT:  On a public website.

MS. HASHMALL:  Yes.  And I conferred with Ms. Todoroff and our chief -- our information office is making that website available this month, and so I expect to not only have that live and be able to walk the Court through it, but I will also make sure our next status report details exactly what's there and how to navigate it so it's user friendly.

THE COURT:  Okay.

Daniel Garrie, would you come up for just a moment and be kind enough to join Mira.

He can't divulge part of his background because of national security concerns, but he's Harvard -- probably one of our foremost -- go over there, Daniel.  I'm going to toot your own horn -- one -- probably one of our foremost experts in the United States, and he can't divulge part of that background because of government security, but I wanted you to check his background for a moment.

And, Daniel, how quick can you get this website up?

DANIEL GARRIE:  If it's already --

THE COURT:  Well, step to the lectern.  I want to hear you loud and clear.

MR. GARRIE:  If it's already -- if you want what we saw this morning, I would think three to five days -- business days max.  To connect the system.  I mean, three to

five with testing.

THE COURT:  Are you willing to work with the County on this?

MR. GARRIE:  Yeah.  I mean, sure.

THE COURT:  I can't describe to you the level of expertise he has.

MR. GARRIE:  I do a lot of work in this area.  Just leave it there for now.

THE COURT:  So I would think by the end of next week.

MR. GARRIE:  Assuming they're available, I'm happy to be --

THE COURT:  They're available.  Trust me.

MR. GARRIE:  Okay.

MS. HASHMALL:  I'm happy to connect my client with you --

THE COURT:  Sure.

MS. HASHMALL:  -- and we can --

THE COURT:  And who would that be by name?

Come on up folks.  Help her.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  And then why don't you make a call and have the person come over and work with Daniel.  Okay?  Because I've got literally, I think, the country's foremost expert standing in front of you.

MS. TODOROFF:  We are -- we're happy, actually, to work with Daniel.  Our chief information office is led by Peter Loo, and his team are working on this.

THE COURT:  Is it possible that the person could come over -- out of the ring because I'd like them to talk to Daniel today.

MS. TODOROFF:  He is not able to come today because he's out of the country --

THE COURT:  Tomorrow?

MS. TODOROFF:  -- but we are working with him.

THE COURT:  Tomorrow?

MS. TODOROFF:  I will have to get his schedule. I'm sorry.  I don't have it.

THE COURT:  Well, go get his schedule.  I've got him here, and I can fly him out from New York, but trust me. I've got the person who can get this done.

MS. HASHMALL:  Thank you, Your Honor.  Appreciate that.

Now, I want to go back to something you raised earlier, and it's really important because I don't want there to be any ambiguity.  The County is not double counting beds. The proceedings before Judge Pregerson relate to different issues.  It had to do with overcrowding in the jails.

THE COURT:  Right.

MS. HASHMALL:  And the County came forward with a

comprehensive plan to address that very --

THE COURT:  Right.

MS. HASHMALL:  -- difficult and challenging issue, particularly during the pandemic, and crafted solutions to deal with overcrowding.

THE COURT:  Right.

MS. HASHMALL:  One of those solutions with regards to decompression --

THE COURT:  Right.

MS. HASHMALL:  -- is beds.  It's one of several different solutions that are at play in that case.  There are over 1,500 beds overseen by the Office of Diversion and Reentry --

THE COURT:  Right.

MS. HASHMALL:  -- that relate to that issue.  Those beds have absolutely nothing to do with this case.

THE COURT:  They're for settlement.  I understand. By the way, Judge Pregerson and I have talked on numerous occasions.  So I want you to know that.

MS. HASHMALL:  So there is no double counting.

THE COURT:  Okay.  Now, I simply want that -- Mira, so you're not in the headlight, I want that attested to under penalty of perjury.  Who's going to do that on behalf of the County?

MS. HASHMALL:  I'm happy to prepare a sworn

declaration to those facts, Your Honor.

THE COURT:  And who will sign it?  Lindsey Horvath?

MS. HASHMALL:  I would not put my Board office on that.  I would put the subject matter --

THE COURT:  Yes, you will.  Yes, you will.  If Mayor Bass can come over with courtesy, either Lindsey or Cheri or somebody who's got absolute authority -- because I'm not coming after you.  You're an intermediary.  You're not there.  You're not County.  I don't want you responsible for this.

MS. HASHMALL:  I will make sure we have someone who has the information and the knowledge to give that to the Court.  I will make sure that happens.

THE COURT:  I'm going to give you direction.  Either Lindsey Horvath, your chairman, is what I will accept or Cheri Todoroff, who's here.  One of the two.

MS. HASHMALL:  Thank you.

THE COURT:  Nobody else.

MS. HASHMALL:  The other thing I wanted to talk to you about, Your Honor -- respond to the Court's inquiry, and it had to do with the location of the new mental health and substance use disorder beds that --

THE COURT:  Right.

MS. HASHMALL:  -- are being recorded by the County.

In the April 3rd submission, we provided the

comprehensive list of those new beds and their locations. They are widely dispersed.

THE COURT:  Right.

MS. HASHMALL:  There is no particular area of the city, low income or not --

THE COURT:  And let's put that up to verify this. Put that up on the screen.  Because I'm complimenting on -- you on this.  I want you to hear that loud and clear.  So we're going to put that up.  Just slow down for a moment, Mira, because you have a genuine compliment coming.  Okay?

(Court confers with law clerk.)

THE COURT:  There we go.  So this is page 1, and it goes on to page 2.

MS. HASHMALL:  The County --

(Court confers with law clerk.)

MS. HASHMALL:  The County is responsible for the entire area of the county and other cities within it, but as you can see from this information, these new beds are widely distributed, and the challenges of the clinical setting and the more specialized beds --

THE COURT:  Right.

MS. HASHMALL:  -- is they've got to be somewhere where the provider can have the means to service those populations, and so hospital settings and other sort of requirements relating to the regulatory framework often

dictate the location of these facilities.  They're usually part of a broader framework of mental health and hospital networks, and so it's not as if the County unilaterally can make decisions about location.  It has to do with availability --

THE COURT:  Right.

MS. HASHMALL:  -- and space and the providers who are doing this difficult work.  But I think that the submission on April 3rd really shows the geographic reach and so, you know, that -- the goal is to serve the people who need them in areas dispersed --

THE COURT:  Right.

MS. HASHMALL:  -- throughout the county and the city of Los Angeles.

And then, finally, Your Honor, the -- you asked for more information about how the City can access the County's mental health and substance use disorder beds, and I don't pretend to be a mental health expert, I'm a trial lawyer, but I think we cannot lose sight of the fact that these resources are part of a voluntary offering to the participants.  Folks have to want to get these services, and they have to voluntarily reach out.  There are a number of mechanisms for that.  There are online portholes [sic].  DMH has access lines and phone numbers.  There are resources publicly available to people experiencing homelessness -- any of these

resources.  There are outreach workers.  As you know, the Court saw in our submission that the County has met or exceeded its obligations with regards to new MDT teams and home teams.  Those are the folks that interface with people experiencing homelessness and have these specialized needs.  There are also case workers who know their clients and facilitate their placement into these beds.  Involuntary placement in mental health or substance use disorder beds is a very, very narrow part of this story.

THE COURT:  The Court's well aware of the HIPAA argument.  I exceeded that no person's privacy is going to be disclosed, but we need to know if these are overstaffed.  We need to know where this money is going.  We've spent over $30 billion on this issue, and I don't think that the County would be willing to have the same transparency, subject to privacy -- not being, you know, harmed -- for any person to know where this money is going.

MS. HASHMALL:  The County is absolutely committed to transparency.

THE COURT:  Good.  So when will my public website be up, then, for the public?

MS. HASHMALL:  We're going to get Daniel on the phone with our information officer, and this month I have no doubt that we will have it up and running, and I think it will be a comprehensive information source going forward, and

it will be updated --

THE COURT:  Okay.

MS. HASHMALL:  -- as the Court has required.

But I want to kind of go back to --

THE COURT:  No, no.  Let's stay right with this now.  This is too important.

Then I'm going to repeat back what I'm hearing, and then correct me if I'm wrong.  You will have a public website with invoices put up to show the public where this money is going, subject to any HIPAA issues concerning privacy.  We'll strike individual names, et cetera; correct?

MS. HASHMALL:  Yes, Your Honor.  We are going to be --

THE COURT:  Okay.  Now, hold on.

MS. HASHMALL:  -- providing the backup for our --

THE COURT:  No, no.  See you're adding something.  Now, will you have a public website up?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Will it show, basically, invoices with no violations of HIPAA?  We understand that.

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Okay.  So therefore we'll be able to compare and we'll be able to look at what our providers are doing?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Okay.  Will you reverse this presumption from this point forward and make that agreement that, if these invoices aren't included, we're going to presume that the work isn't done?  In other words, the backup material.  No more one-liners for $248,000 with no date on the invoice that's being paid.

MS. HASHMALL:  Your Honor, all of the agreements that the County --

THE COURT:  Will you reverse this presumption about allowing our providers not to submit data and the City and County not checking on this data?  Yes or no?

MS. HASHMALL:  Your Honor, I don't know of any such presumption.  All I know is that the County's agreements with their vendors require appropriate documentation, the County checks that documentation, and all of these resources are subject to a review and an audit process as part of a regular course of business.

THE COURT:  I'm hearing that I'm to trust and not verify what you're saying.  I don't agree to this any longer.  I don't accept the fact that this is being done blindly.  It may be in good, faith but it hasn't been done in the past.

MS. HASHMALL:  Your Honor, I understand the Court's concerns, and of course none of us --

THE COURT:  I am really concerned about this, and unless you're willing to accept this reverse presumption and

start requiring invoices to substantiate where these billions of dollars are going, then I think our conversation is meaningless, frankly.

MS. HASHMALL:  Well, Your Honor, I understand the Court's concerns, and I don't think it's meaningless, and I do want to highlight --

THE COURT:  Okay.  Now, do I need to ask Lindsey Horvath to come over or have Cheri step forward?  I don't want to embarrass you, but you're counsel, and you're running interference right now.  I want to get an answer to that from -- just like Mayor Bass stepped up with great leadership, probably a first in the country, certainly a first in the state, reverse this presumption, put it in on a public website, nip this obligation so the public can share. Are you going to do the same thing?

MS. HASHMALL:  Your Honor, we are.  As I've mentioned, we are putting it on the website.  I want to also note --

THE COURT:  No, no.  And are you going to reverse this presumption?  You're sliding on me now.  Are you really going to start saying, "If you don't provide the underlying documentation, we aren't paying the bill"?

MS. HASHMALL:   Your Honor, I think that's what our contracts say now.  And I want to emphasize that Measure H is done annually -- a transparent audit that's publicly

available every year.  What we are -- the resources, the beds and the services are --

THE COURT:  Good.  Then -- so it should be easy to get that attestation then if you're already doing this.  This is a simple thing.  The chairman of the Board can do this just like the mayor can.  Why don't you go make a call?  I was trying to avoid this, but I'm not going to avoid it now, and I'm not going to slide back in lawyer words later on where the County's getting protected.  This is so easy.  If you're interested in transparency, follow the mayor's lead, and reverse this presumption, and let people know where this money is going.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Now, if Lindsey won't come over here, I'm in continuous session.  I'll fit into her schedule.

MS. HASHMALL:  This is something that the County --

THE COURT:  In order to make that call.  Understood?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

MS. HASHMALL:  Okay.  Just one more point if I could.

I'd like to highlight the existing mechanism for transparency in addition to the new website that the County is putting up.  So, as I mentioned, Measure H annually is

subject to an audit and a public review.  The Board of Directors has already directed an audit of LAHSA.  It's underway and being conducted by our Auditor Controller's Office.  Those are our specialized auditors that -- they -- this what they do.  This is their bread and butter.  The County also reports annually with regards to state resources and funding as it relates to mental health programs, and DMH is subject to specialized audits related to its regulatory role with regards to the State of California.

So transparency is part of the way County does business on these issues, and we're committed to more.

THE COURT:  How do you deal with the -- how do you deal with Lynn Chow's (phonetic) statement that the State isn't tracking?  They're not tracking this homeless money.  How do you deal with that?  So we're reporting to the State, who's not tracking?  That makes no sense.

And if you're doing all this, it's an easy attestation, and that's following the mayor's lead and her leadership in this on a public website so that people can read it, so people know where this $30 billion is going, and reversing this presumption, which is a huge sea change.  No longer can providers hold the documents in-house, or not even have the documents, write for an invoice that none of us know what they're doing -- and they may be doing it in good faith, but they may not.  And the public needs this accounting

because the public is generous.  We will vote those tax dollars if we see results or know where it's going, and for the life of me, I'm not hearing yet that you're willing to reverse that presumption.

MS. HASHMALL:  Your Honor, we will provide the attestation you require -- you've requested, and I will make sure that you get it from the horse's mouth -- all of the -- the mechanisms --

THE COURT:  And we'll --

MS. HASHMALL:  -- of transparency we have at the County.

THE COURT:  And that will come from Lindsey Horvath or Cheri Todoroff; is that correct?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  And that will be reverse presumption from this point forward that you're committing not to pay these bills unless there's substantial documentation.  Now, I'm not going to quibble over, you know, what that is, but we've got to see from now on these invoices and what they did on these invoices because it's not hitting the streets.  And you know what the community calls it?  "Poverty pimping." Check it out.  Just check it out with the folks on Skid Row what they call it.

UNIDENTIFIED SPEAKER:  "Poverty pimping."

THE COURT:  You see all the heads out there?  They

call it "poverty pimping" because it's not hitting the streets.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  I appreciate your courtesy, by the way, and I'm sorry for cutting you off.

So how long will it take you to get this attestation?  I'm in continuous session now.  I'll fit into Lindsey's --

MS. HASHMALL:  May I have until Monday, Your Honor? And may I suggest --

THE COURT:  Sure.  We'll be back in session, I assume, at 4:00 o'clock on Monday.  Absolutely.

MS. HASHMALL:  And may I suggest that -- the principals are making so much progress.  I'd rather have them talking than sort of dealing with me as --

THE COURT:  Oh --

MS. HASHMALL:  -- counsel.

THE COURT:  There's no problem.  4:00 o'clock Monday.  They've got all day to talk.  They've got the weekend, and if not, I'm here on Tuesday, Wednesday.

MS. HASHMALL:  Okay.

THE COURT:  Okay.  It gets done.

MS. HASHMALL:  We'll get that to you on Monday, Your Honor.

And I just -- again, I want to sort of not lose the

punchline.  The County has met or exceeded --

THE COURT:  Right.

MS. HASHMALL:  -- all of its benchmarks, and we're very proud of that --

THE COURT:  Yeah.

MS. HASHMALL:  -- hard work, and we're continuing that hard work going forward.

THE COURT:  And I don't want to either.  I'm complimenting you.  I want that loud and clear.  I think you have, too, Mira.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Yeah, I really do.  You can see my frustration, though, with where this $30 billion is going without accounting, and I haven't really accept and believe that the County is going to step up with the same leadership that Mayor Bass displayed.  Let's just all be co-equal.  And we've got to reverse this presumption.  Providers may be providing and they may not, but from now on, there has to be an accountability, and that will make them perform better. They know if they're having to disclose the underlying documents -- because remember, in 2018 the City tried to conduct an audit, and other folks did also, and nobody could find the selected entities that they tried to audit.  They couldn't even reconstruct it.  And that can't go on.

MS. HASHMALL:  I hear the Court's concerns, and I

share them.  Thank you.

THE COURT:  Okay.  Okay.  But let's leave on a positive note.  First of all, thank you and a compliment, and send that back to the Board.

MS. HASHMALL:  I will.

THE COURT:  And I'll be even more complimentary when I have this attestation and I have this website up. Okay?

Okay.  Now, folks, I want you to vacate for just a moment.  I want to talk to the VA.  They -- there's a case that you might want to be listening to in a moment, but it involves the VA, and that was the first case I was going to call at 9:00 o'clock this morning.  One of the counsels had an issue at that time.  I need to take them shortly because I've got special masters here to talk to them.

And by the way, you know, follow through on this period of time so I don't have to fly Daniel back.  Okay?  He can really help you.  He can get this website up for you in nanoseconds, frankly.

(Recess from 10:53 a.m. to 11:35 a.m.)

AFTER RECESS

THE COURT:  Okay.  Then we're on the record in the *LA Alliance* case.  Thank you for your courtesy.  That's very much appreciated and extraordinarily courteous on your part.

And let me just state that all counsel are present, at least the principal counsel are present, and we're now moving back to the *LA Alliance* matter.

So, counsel, any input before we proceed on this matter concerning sanctions?

MR. MARCUS:  Yes, Your Honor.  Scott Marcus for the City of Los Angeles.

The City and the Alliance have reached a stipulated resolution of the motion for sanctions.  It entails a -- an enhanced stipulation of facts.  It includes an agreement to meet on at least a monthly basis to discuss any issues or concerns with performance under the agreement and a monetary component as well.  The monetary component needs Council approval.  We have arranged for a emergency Council Meeting tomorrow so that we will know tomorrow whether or not the Council agrees to that portion, and we can report back to the Court any time after that at the Court's convenience.

THE COURT:  Let me hear from LA Alliance.

MS. MITCHELL:  Your Honor, we agree with Mr. Marcus's representations.  We have reached a stipulated agreement.  The filing that we anticipate later today -- it contains the additional facts that the Court was looking for, and so the statement of facts will be presented to the Court in addition to our stipulated resolution.

THE COURT:  All right.  You said that the Council

would go into emergency session on this tomorrow; is that correct?.

MR. MARCUS:  That's correct.  There was a --

THE COURT:  Okay.  First of all, would you convey to the Council the Court's appreciation.

MR. MARCUS:  Yes.

THE COURT:  You need to hear that.  Okay?

Second, when do you want to submit that stipulated set of facts to see whether I agree with it or not so it's in writing?

MR. MARCUS:  We should be able to submit it, Your Honor, probably within an hour or so with Ms. --

THE COURT:  No.  I want you to have a nice lunch for goodness sakes.  How about by 2:00 o'clock?  Would that be acceptable?

MR. MARCUS:  I suspect we'll get it done before then.

THE COURT:  Okay.  If you don't, how about 2:00 o'clock?  Because we're here for the audit anyway at 3:00 o'clock.

MS. MITCHELL:  That's fine, Your Honor.

THE COURT:  Okay.  And if not, if you're a little late, we're here today anyway.  So it could be 2:30 because we're here.

All right.  Then why don't I send you to lunch and

to work on this without taking any more of your time.

MR. MARCUS:  May I clarify, Your Honor?  Submitting it in on the docket -- is that sufficient, or do you want us to bring it into court physically?

THE COURT:  I want the transparency.  I want it on the docket.

MR. MARCUS:  That's fine.

THE COURT:  Yeah.

MR. MARCUS:  We'll have it on the docket by 2:00 o'clock.

THE COURT:  Okay.  Okay.  Well, then go have a nice lunch.  We'll just a moment.

Mira, do you have any comments about this?

MS. HASHMALL:  No.  No, Your Honor.

THE COURT:   Shayla, any thoughts or comments?

MS. MYERS:  No, Your Honor.

THE COURT:  Okay.  Then go have a nice lunch. We'll see you at 2:00 o'clock to 2:30 -- whenever that period of time is.

MS. MITCHELL:  Your Honor, may I clarify briefly? Are we going to be talking at 2:00 -- at 2:00 p.m. are we going to be talking about the County status report and those issues as well?

THE COURT:  Yes.  I've given the County plenty of time.

MS. MITCHELL:  Great.

THE COURT:  So Mira doesn't have to piecemeal this. She's going to make calls.  I don't want her to have to get up each time and, you know, get with another question of the Court.  She knows what she can do.

MS. MITCHELL:  Great.  Thank you, Your Honor.

THE COURT:  Okay.  Okay.  Okay.  Have a nice lunch.

MR. MARCUS:  Thank you, Your Honor.

(Recess from 11:39 a.m. to 1:45 p.m.)

AFTER RECESS

THE COURT:  Back into session.  Why don't you find LA Alliance, and all the folks can come forward.

Then all counsel are present and just -- Mr. Webster, just -- have you been able to get the website up statewide yet by calling the governor?

MR. WEBSTER:  No, Your Honor, I haven't.

THE COURT:  Okay.  Well --

MR. WEBSTER:  But I'm -- I --

THE COURT:  -- why don't you work on it.  I mean, it's a wonderful dashboard.  You put that together.  It's got multiple counties, multiple cities, the "Big 7," as I call them.

MR. WEBSTER:  I very -- I appreciate that you acknowledge the -- in my term, the "beauty" of it.

THE COURT:  Yeah, it's quite a document, and I think it would be very helpful statewide for -- you know, far beyond this litigation and other parts of the state, quite frankly.  So my compliments to you putting this together.  And my compliments to my staff.  I think they came out with 17.6 percent.  You came out with 17 percent.  I think we rounded off to the higher number, 18 percent.  So my law clerks were extraordinarily accurate and -- Don, who worked on it, and some other people.

MR. WEBSTER:  Just as a note of clarification, I really think that the ten-year trends are particularly eye-opening with respect to the amount of money over time.  And my charts are just limited to federal --

THE COURT:  Right.

MR. WEBSTER:  -- money going to continuums of care, but you could see how, both in terms of the increase in the awards and also the point in time count by subpopulations, there's some tremendous challenges there.

THE COURT:  Yeah, the federal side I've seen about 3.5 -- or a little bit more -- billion.  On the state side, 12 million that Gavin said initially, expended another 13 billion -- I said "million" -- but billion.  I'm counting right away 25- plus 3- -- about 28 billion and probably approaching well over 30 billion so far.

MR. WEBSTER:  Well, and you can also add into some

of the one-time funds for the CARES Act 1, CARES Act 2, and the American Rescue Plan. I mean, when you look at those federal funds that came not only to state government but municipalities, counties, it's a lot of money.

THE COURT: Well, just an educated guess -- I've been using the figure 20 billion and trying to low-side that. I would say it's closer to over 30 billion so far.

MR. WEBSTER: You -- with respect to statewide dollars?

THE COURT: Yep. I'm going to take 12- that Gavin said he'd put in up to the last -- then he was going to put in 13-, then 1.5- came from Caltrans on the side. So rough math about 26 billion. Then 3 billion from the fed is 29 billion. And that's not even counting.

MR. WEBSTER: And I think that it's -- I think it's -- a compliment to the work that we've done here with respect to this audit to see if we could really determine how some of these funding streams -- federal, state --

THE COURT: Yeah.

MR. WEBSTER: -- municipal, local -- that's -- I think that's what we're really trying to get down to, and it is going to take some real expertise.

THE COURT: Yeah.

MR. WEBSTER: And I think that's really, you know, what people are hoping for is that kind of transparency.

THE COURT:  And I'm hoping we move from the people with the loudest megaphone or putting political pressure into a data-driven system, where the mayor and the Council and the Board can make decisions based upon that data, or choose not to.  And what I'm really hoping is that my best auditor eventually are the public.

And there's one thing that's come to my attention, and that is the form of this data that we've put up, Scott.

So, Michele, I want you to talk to us about --

MS. HASHMALL:  Your Honor, I just want to flag that counsel for intervenors is not here yet.  So I just -- I don't know if you want to --

THE COURT:  Shayla Myers?

MS. HASHMALL:  Yeah.

THE COURT:  Anybody seen her?

MS. HASHMALL:  I think she's probably expecting to start at 2:00 p.m., Your Honor.  I just --

THE COURT:  I should wait.

MS. HASHMALL:  I think so.

THE COURT:  Yeah.  Absolutely.  Can somebody find her?

MS. HASHMALL:  We've alerted her.

THE COURT:  It's not in your job description, but if somebody can find her.  I'll take a recess for just a moment.

And, Mira, thank you for calling that to my attention.

MS. HASHMALL:  Thank you.

THE COURT:  I appreciate it.

(Recess from 1:50 p.m. to 2:01 p.m.)

AFTER RECESS

THE COURT:  Then let's go back on the record on the *County* matter.

And that way, Mira, you don't have anything to do with the audit, I don't think, at 3:00 o'clock, and that will free up -- depending upon the progress you've made.  Okay?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  So let me just say that all counsel are present.  As a courtesy, we're going to call the *County* matter before the *City* matter.  So --

MS. HASHMALL:  Your Honor, I just want to follow up on two of the matters that we addressed this morning.

You told me you don't want a lawyer's word for it; you'd like to hear directly from my client on, I think, two key issues, from your perspective -- the Court's perspective. One was the issue of the beds and the fact that there's no double counting, and then the second issue relating to the transparency of the invoices, the County contract, and backup requirements that the County has with its providers.

And so what I'd like the Court's indulgence is the opportunity to prepare a declaration from --

THE COURT:  Absolutely.

MS. HASHMALL:  -- Cheri Todoroff and submit that?

THE COURT:  Oh, absolutely.  I'm not trying to inconvenience the chair of the Board.  She's got a county to run.  But if we can get that declaration.

MS. HASHMALL:  I'd appreciate that, Your Honor.

And then --

THE COURT:  And you can work with LA Alliance on that and Shayla.  I don't think the City's as involved but -- okay.  Okay.

MS. HASHMALL:  So that's my request.  I know we're in continuous session, but I also want to make sure that the principals are able to do the hard work of hashing out the discussions on the City, County MOU.  So, you know, I don't know if you want a report back.  I'd request, if we can, to report back on Monday because I think there is going to be progress over the weekend, and I'm not sure we'll have much to report tomorrow, but I think on Monday we would have an update on that.  So that is my suggestion, that we submit a sworn declaration --

THE COURT:  I can back away if you're going to make progress over the weekend, if you're going to work.

For LA Alliance, is that acceptable?  I can back

away on that.

MS. MITCHELL:  I think Monday would be preferable, Your Honor.

THE COURT:  Okay.

MR. MARCUS:  For the City, yes, Your Honor, I think --

THE COURT:  For the City?

MR. MARCUS:  -- I think it makes sense.

THE COURT:  Shayla, Monday?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Let me back away from that.  Monday, 4:00 o'clock.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Now what about the invoices?  That's what we're talking about?  Getting the website up?  Just to make sure.

MS. HASHMALL:  So the declaration that we are preparing is going to address --

(Beep sounds.)

THE COURT:  Don't worry about that.

MS. HASHMALL:  -- who at the County is working on the website, when we expect it to be up, and also going to address your concerns about transparency on the invoices.

THE COURT:  And a time frame?

MS. HASHMALL:  Yes.

THE COURT:  Okay.  When is this going to be up?  Because Daniel can get this up for you in nanoseconds.

MS. HASHMALL:  We actually shared Daniel's contact information with our information officers, and I know they're going to be reaching out to him and I --

THE COURT:  Okay.

MS. HASHMALL:  -- by Monday I will have their firm launch date, and I will put it in that declaration.

THE COURT:  Okay.  Now, just one moment.  Let me get (indecipherable).

Would you do me a favor -- or no.  Would you ask Daniel to come out for a moment -- bring him out.  I want him to hear this conversation.  Okay?

And then the website and then the -- just the attestation that these aren't being used?  This is the declaration you want to work on?

MS. HASHMALL:  No double counting, the status of the website and the launch date, and the concerns the Court has about our contract requirements because we --

THE COURT:  Fair enough.

MS. HASHMALL:  -- we looked at them, and we want to explain to the Court, from our perspective, what our contracts absolutely require in terms of backup, substantiation, and verification from our contractors that they're doing the work they're billing for.

THE COURT:  Okay.

Then, Daniel, I want you to hear this conversation because the County may have contacted you.  I know how quickly you can get this website up, and I'm going to need -- I may need you back.  They want to come back Monday at 4:00 o'clock.  Because they think they can make substantial progress on Friday without being bothered coming into court and over the weekend.

MR. GARRIE:  I'll make -- I can myself available over the weekend if they --

THE COURT:  And I can too.

MR. GARRIE:  So if --

THE COURT:  So we're both available to you.  Daniel is available to you.  I'm available to you.

MR. GARRIE:  And, Your Honor, I did look at the website in between --

THE COURT:  Use a mic so we can pick this up because we're on CourtSmart.

MR. GARRIE:  I did have a chance to view the website on my phone in between hearings, and it looks like it's a static HTML page that is updated with user enter data, as someone rightfully point out to me, you get things in the U.S. mail so you can scan them in, and then you manually upload the static HTML site.  So I would only think it would take a couple days to put the site up, and I'm available as a

resource to help in any way with your CIO or the people underneath him or -- I mean, you're talking about coding literally two HTML pages and putting in some links with some text.  So I'm more than happy to either help or do it just so we can expedite it, and if I had my computer here, we could just do it now, but I don't.

THE COURT:  Well, time out.

MS. HASHMALL:  I'm going to connect him with our CIO --

THE COURT:  Well, wait.  We can do it now.

MR. GARRIE:  I mean, it's just HTML.  I mean --

THE COURT:  Well, hold on.  This is -- Daniel, can we do this now?

MR. GARRIE:  I mean, I can go get my computer, and we can code it now --

THE COURT:  Okay.

MR. GARRIE:  -- if you want.

THE COURT:  Let's go do it now.

MS. HASHMALL:  Your Honor, I'd be using a Blackberry if it was my choice.  So technology is not my thing.  I'm going to connect him with our CIO's office because I know that they've been working on this.  So I think that getting his consult on what they're already doing --

THE COURT:  Sure.

MS. HASHMALL:  -- and figuring out where we are and

how, maybe, we can do it better or faster is really important.

THE COURT:  But here's the -- I don't have to hold Daniel then.  I can fly him back to New Jersey if we can do it now.  He gets to go see his lovely wife, Sarah.  Okay?  Good?

MS. HASHMALL:  Well, my concern is I need my folks to be available.

THE COURT:  Sure.  Just ask him to come over.  It's amazing.  Pick up the phone --

MR. GARRIE:  I --

THE COURT:  -- and ask him to come on over.

MS. HASHMALL:  Okay.

THE COURT:  Okay?

MS. HASHMALL:  I'll pick up the phone.

THE COURT:  So Daniel stick around, and we're going to get this website up.

MR. GARRIE:  Okay.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  And they're going to come over, and we're going to do this today, and we're not going to slow-foot it -- you're -- not that you're slow-footing it, but let's just get it done.

MS. HASHMALL:  Okay.

THE COURT:  Okay.  Call him.  Tell him to come on

over.

MR. GARRIE:  Okay.

(Brief recess.)

AFTER RECESS

THE COURT:  Pardon me for the interruption.  We're back to the County.

And, Mira, I apologize for the interruption.

MS. HASHMALL:  No problem, Your Honor.  Thank you.

THE COURT:  Okay.

MS. HASHMALL:  So -- and just so I'm clear, I'd like to submit that sworn statement.  I can do it by 10:00 a.m. on Monday, and I'll be here at 4:00 p.m. on Monday for --

THE COURT:  Fair enough.

MS. HASHMALL:  -- any questions or comments or concerns --

THE COURT:  Okay.

MS. HASHMALL:  -- for the Court.

THE COURT:  And there's two things I'm looking for, just in summary once again, an attestation.  I don't care if it's from the chairman of the Board.  I -- just somebody with authority or --

MS. HASHMALL:  It's going to be Cheri Todoroff, Your Honor, who is our --

THE COURT:  Who?

MS. HASHMALL:  Cheri Todoroff --

THE COURT:  Sure.

MS. HASHMALL:  -- the executive director of our Homeless Initiative.

THE COURT:  That's fine.  I just don't want attorneys in the position, from this point forward, Mira, of signing an affidavit.  It leaves me helpless because that would never be unintentional -- or intentionally signed by you.  You're, in a sense, a well-needed conduit, but you don't bear this ultimate responsibility.

So I think that that resolves that matter, then, until --

MS. HASHMALL:  I believe so, Your Honor.

THE COURT:  -- Monday.  Okay.  Have a good day, and thank you very much for your courtesy today.

MS. HASHMALL:  Your Honor --

THE COURT:  And by the way, send back -- (indecipherable) comments.  I'm sorry.

Yeah, I'm worried about the quarterly reports, also.  There's one more thing I wanted to talk to you about, and that was whether the other parties were satisfied concerning these quarterly reports.  So before you leave, I'm going to have Shayla talk to me and Liz talk to me -- in no particular order -- and the City talk to me about whether

you're satisfied with these quarterly reports because in a sense you're my best auditor.

So start with LA Alliance.

MS. MITCHELL:  Thank you, Your Honor.

So the short answer is, no, we aren't satisfied, but I think part of that is there's still a -- we're seeing a disconnect between the City and the County with data sharing. The County's report noted they could not actually report on several things which the County's required to do because they were not getting the data from the City.  It looks like there's some confusion with the City.

THE COURT:  Hold on.

Daniel, stick around for a moment.  You might --

MR. GARRIE:  I was just going to go in the back room and get my computer.

THE COURT:  Okay.

MS. MITCHELL:  It looks like there's some confusion within the City about the data they're supposed to be collecting and reporting.  At the same time, we have Councilmember Blumenfeld's response to the County's report --

THE COURT:  Right.

MS. MITCHELL:  -- talking about services that the City is not getting still, and so there's still a lot of disconnect.

Now, the settlement with the County was, maybe, six

months ago or so.  So for the last six months, we've really kind of seen how the two entities can work together, and unfortunately what it seems like we're seeing is still a lot of lack of communication and coordination regardless of representations to the opposite.

So what we suggest, as we're looking at the report, the lack of coordination, the frustration both between the County and the City in really helping folks on the street that need it the most, is we think rather than hashing these issues out in open court, which we can certainly do, getting together a working group that includes LAHSA, the County, the City, and the Alliance -- because we have not been in this for the last six months.  It's been the City and the County, I think, attempting to coordinate, and because we have seen this lack of coordination, we think at this point the Alliance needs to sort of step in and almost, like, micromanage these communications to making sure the County is talking to the right person, who isn't necessarily the CIO; councilmembers aren't getting the information that's needed.

And so really being able to get in there and troubleshoot that communication we think would be very helpful in getting all of the parties working together the way they need to work.

THE COURT:  It's a brilliant idea, but most political entities push back from -- I believe for

perception, whether it's the federal court or a committee giving them direction.  In other words, they guard their turf.  And what's amazed me is the decision-making in Los Angeles being so dysfunctional that you've got a mayor who doesn't have a vote on the Council.  You've got a Council over here, you've got the County, they create LAHSA, and by the time you're done, who's in charge?  That committee would be extraordinarily helpful, but I think that Mira deserves the courtesy of hearing that and going back to her Board with that thought -- not a direction by the Court at this time -- and Scott has the option of going back to the Council.

Now, do I have the power to order that?  I think it's a brilliant idea because somehow we've got to get these entities together and -- I'll say it -- LAHSA was created, quite frankly, so that politicians didn't have to make tough decisions.  Nobody's going to say it.  I'm going to say it.  And so everybody points at LAHSA, fairly or unfairly, and (indecipherable) helps the Board and the Council, and the reason they were created was the decades of bickering between the two of them, and so this was the political solution.  So every time you punch the dough boy, in a sense, an arm pops up and it goes and points to another entity.

It's so dysfunctional that somebody has to make the decision, and so far Mayor Bass seems to be -- you know, be stepping up and making commitments.  I'm waiting to see what

the Board does.  LAHSA's made that commitment now, but it's like trying to get these bodies together, and we should have had some kind of unity decades ago.  And who's suffering? People on the street --

MS. MITCHELL:  That's right, Your Honor.

THE COURT:  -- in not getting these services.

MS. MITCHELL:  And we couldn't agree more.  And I think that's where this third-party, the Alliance, can come in because we don't have a dog in that fight other than to see the two entities working together effectively.

THE COURT:  Yeah.

MS. MITCHELL:  And so, when I'm looking at these, and just specifically addressing the County's status report, Councilmember Blumenfeld's response to that status report, our concerns about the deficiencies in the status report, and the data that is not being shared, councilmembers don't know what data they're even supposed to be collecting and reporting on, CIO doesn't even know that the councilmembers are doing their own outreach.  The County, I think, is a little bit stuck in the middle.  I'm not one to necessarily typically defend the County, but I think it has been frustrating --

THE COURT:  Yeah.

MS. MITCHELL:  -- from their perspective.  And at the same time, we need to make sure that the City projects

are actually getting supported by the services, and I don't know that they are because I'm being told, you know, individuals aren't being evaluated by case managers for two weeks when they enter into projects and things like that.  So I think there needs to be some problem solving in a more aggressive way than we're currently seeing when it's just the City and the County getting together.

THE COURT:  I don't know how a federal court does that because the only reason that you're here is because there's been an issue that breaks out between the parties.  In other words, I just don't sua sponte hold court to pronounce some judgment.  You come here for a reason.  You came here initially for sanctions, and part of that was your request for an audit.

MS. MITCHELL:  Correct.

THE COURT:  Unless acquiescence is by all parties, I could see this going to the circuit, if I made such an order, and getting reversed almost immediately.

MS. MITCHELL:  (Indecipherable.)

THE COURT:  Separation of powers argument.  Now, hold on.  I'm not saying this is -- it's a brilliant idea because somehow these parties have to come together and they're not coming together.  There's another way, and that's a receivership.  But I'm not there.  But if that did occur, there would have to be a whole series of transgressions

because the Ninth Circuit says, "If you're ever going to get there, you better have a pretty good record, Judge Carter." Well, I'm not seeking receivership.  I don't want to run the County, I don't want to run the City, but that's  -- if that occurred, that might be something that the Court ordered.

MS. MITCHELL:  So, Your Honor, when we're looking at this dysfunction, right, that we've seen -- and I'm specifically talking about lack of services, City doesn't know how to get the services, complaints services aren't being provided, County says they are but they're not getting the data, and they're -- we're still seeing a --

THE COURT:  Right.

MS. MITCHELL:  -- lack of communication, how do we solve that if not for meetings and -- I mean, should we sit here every day and --

THE COURT:  I --

MS. MITCHELL:  -- go through the issues.

THE COURT:  I don't know, but it's premature for the Court to go down that line, you know, of reasoning unless there's a whole series of noncompliance or sanctions involved.  The Court just doesn't jump to that extraordinary remedy.  I think it's a brilliant idea, I can try to persuade, but I can't order.

MICHELE MARTINEZ:  Your Honor?

THE COURT:  Hold on.

Michele?

(Pause.)

THE COURT:  Michele?

MS. MARTINEZ:  Yes.  If I may.  Testing one, two.

If I may, Your Honor, what I would like to state is that you have two special masters.  You have Special Master Gandhi and myself, who have been in communication, and we have done some meetings between the City and the County, and myself -- I have met with certain councilmembers, and they did voice wanting a working group to understand what their role is in providing the data that is needed and the collection.  It is my understanding -- we have not received an update thus far -- that the County, the City, and LAHSA would be working on the HMIS system to create some new fields where the City would be able to input the data.  That was a conversation we had about a month and a half ago with myself and Special Master Gandhi.

And so what I would recommend -- and including the Alliance -- is that we continue these dialogues through the special master because, you know, we're going to have to -- when reports come through the Court, we're reviewing those quarterly reports, and if there is inconsistent information or not everyone is on the same page -- and I stated that a month and a half ago -- we need to hash that out now.  We don't want to wait a year later and say, "Hey, you are

required to do" X, Y, and Z "in regards to providing data to the Court and to the general public."

And so what I would encourage, Your Honor, is to continue to utilize the special masters to coordinate these meetings, and whatever is missing -- that we're able to document that and submit that to the Court so that we're all on the same page.

THE COURT:  We're having trouble finding the same central authority that you are suggesting, and perhaps the committee is the way to go, but if that occurred, I would want this at the top levels of government.  Attorneys might pave the way for Chairman Lindsey Horvath and Mayor Bass, et cetera -- and LA Alliance and Shayla should be included as well, and so should the City, County, et cetera -- but I don't want to deal with intermediaries any longer because they act a shield to the very people who are supposed to be making the decisions, and that's why you've seen me time and time reach out again to Mayor Bass or Lindsey Horvath or her representative here at the highest echelons to sign these documents.  I'm done having attorneys sign them.  The principals sign them.  And we should be involved, and we should be making these decisions, and we should be accountable for what we do, including the bench.

So a great idea, but you're not hearing acquiescence yet.  Why don't you discuss that privately.

Okay?

All right.  Now, are you satisfied with the quarterly report?

MS. MITCHELL:  No.  I'm not.

THE COURT:  Tell me why.

MS. MITCHELL:  For all the reasons I just said.

THE COURT:  Okay.

MS. MITCHELL:  I think that there is a lack of data sharing.  So the County has a whole set of obligations that they have to --

THE COURT:  Okay.

MS. MITCHELL:  -- report.  Some of that data is based on reporting from the City which the County is not getting, and I think there's a lack of coordination on the City's part in responding to that data, and I think at the same time we're seeing general statements, like the County is using its "best efforts" but not describing what those best efforts are, or "according to the greatest need" but not describing how the need was determined --

THE COURT:  Yeah.

MS. MITCHELL:  -- and so I think more information would certainly be helpful in that regard.

But our primary concern at this point is, honestly, the City-County coordination so that we are getting the information that we need, and then we can deal with the lack

of detail, in my opinion, at a later time.  But I think it's much more crucial and much more impactful on the street to get that coordination going immediately.  So I will be reaching out to the County, to the City, to the special masters to get that coordination going, and if we don't and we continue to see the lack of response, then that's something that we'll separately bring up to the Court.

THE COURT:  Then you'll be back in court, obviously.

MS. MITCHELL:  I hear it's Monday at 4:00 p.m.

THE COURT:  Uh-huh.

MS. MITCHELL:  I'll be there.

THE COURT:  Yeah.

Scott, let me turn to you on behalf of the City.  Are you satisfied with the quarterly reports?

And let me remind you that the special master got a lot of -- I mean, a lot of contact from individual councilmembers.  We'll try to coordinate that through Paul Krekorian, but the special master has the absolute mandate to reach out and to talk to your councilmembers.  Their constant concern was lack of access to County services in their district where they felt that their homeless within the district who had either psychiatric or substance abuse issues weren't being served -- there wasn't priority, or there wasn't even access and that it was being transferred

from other council districts.  Mira is correct, and that is, how does the County do that, though, when they need specialized help?  You can't put a psychiatric, you know, top-flight geographic entity -- cost-effectiveness -- in every single council district.  So it's a difficult position for everybody.

I would think it would work, though, with our acute because our acute have to be specialized.  They have to be centralized someplace.  Subacute -- probably it has to work, to some extent, also because we're taking them out of the acute, hopefully in a minimal period of time with good care, into subacute, but they're still in that same flooding district.  And you've heard my concern that in the past that happened to be CD14 and right down the 110, right into Curren Price, into Dawson's district, or into what used to be Mark Ridley-Thomas's district.  You can almost trace the concentration, and it seems to come -- and I'll say, quite frankly, that one of the council people in the Valley seems to have pushed quite hard without producing shelter, and it's causing (indecipherable) problems under 41.18.  So you're going to get in (indecipherable) over 41.18, and 41.18, if it's misused, shuffles people.  On the backside, you're oftentimes left with people either returning or who are selling dope or having sex under the stars, quite frankly, who need that push in some kind of, you know, way after we

get rid of the volunteers who will come in to our shelters and our housing projects.

Are you satisfied on behalf of the Council?

MR. MARCUS:  No, Your Honor.  I've heard the same concerns that you have about the availability of County services at times of need on the streets.  I also agree with the comments the special master made.  I understand that there have been conversations about the data collection --

THE COURT:  Yeah.

MR. MARCUS:  -- and data sharing.  The Court will be happy to hear I wasn't part of those conversations -- trying to keep the lawyers out of it -- and I do think that that's the correct format to address those issues.  I think part of the problem was, Your Honor, the Alliance and the County made an agreement that required the County to make various reportings, and then the County may have turned around and said, "Well, we don't have that information.  We need it from the City," and no one bothered to ask the City for it in the first place.  So we're trying to play catch-up a little bit here.

THE COURT:  Okay.  I think that Mayor Bass has established -- and this is a personal opinion, not a judicial opinion -- a -- at least, a good conversation with the Board.  She said, "Better together than apart."  And I think the Board, when Janice Hahn, at least, was chair, had established

a really good rapport with the City, and I believe truly that they had turned that, in terms of their personal relationships, into a much better atmosphere that may have existed in the past, and I think it's rather extraordinary.

I get really worried, Scott, about where LAHSA stands.  LAHSA's constantly the punching bag for criticism on one hand, but on the other, that was created, frankly -- and I'll say it again -- between the County and the City to avoid political responsibility.  Because they've been fighting for so long, and L.A. Times ran articles back in the 1980's that I've pulled up with the same problem going on between the City and the County and the editorial pages saying the same thing that we were saying until this new kind of atmosphere came along.

But that doesn't mean it's working at our level -- you know, as you as counsel or the Court's level.  I would just encourage a little bit of forbearance on both of our parts and a little bit of goodwill to see a little bit longer if we can get -- keep that sense of goodness going between the highest representatives.  Okay?

MS. HASHMALL:  Thank you, Your Honor.  And on behalf of the County, we are in full compliance with the settlement agreement --

THE COURT:  Uh-huh.

MS. HASHMALL:  -- and the plain language did

provide that we had reporting that was tied to data coming from the City of Los Angeles --

THE COURT:  Okay.

MS. HASHMALL:  -- and I understand the City may not have understood what information it needed to collect and provide.  I also understand that they're working on that, and so, you know, I'm optimistic that those issues are getting worked out --

THE COURT:  Yeah.

MS. HASHMALL:  -- by the people who are doing the work and understand the system.

THE COURT:  Let's keep that part of optimism alive for a while.  Because I always go the other way, but let's try to keep that optimism alive.  I think it's good for the City -- and a little bit more patience.  But there's some dissatisfaction.  I leave that, Mira, to get together with Scott, to get together with Liz, Shayla, and see if you can work that out.  Okay?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  Now, there's a concern about the website.  It came to us -- and then Michele conveyed it to me -- through some of the members in the audience.

Michele, why don't you talk to me about that website on the record.

MS. MARTINEZ:  Yes, Your Honor.  Just to keep in

mind that we should keep the end user, the public, in mind when we're creating this website to make sure that it's accessible, searchable, readable.  As we all know, PDFs sometimes are static and are not user friendly.  So the PDF documents, because they're problematic for a lot of the web content, it's important for us to figure out a way that, if these files are going to be super big, sometimes you can't open them on a mobile phone.  And so we want to make sure that they're mobile friendly and web content friendly, if possible.

And more importantly, I think it's important, you know, as we move forward -- and if you're doing the HTML, you're using a gateway page -- make sure that we're able to ensure that whatever files you're putting on -- that it doesn't move in a way where, you know, you can't get some certain files.  For example, today when the judge opened and he was looking for some documentation, it wasn't there and so -- and I don't want to go back to that, but unfortunately it seems like it was in a different document; it was not in the document that they opened.  And so there could be an error, I don't know, but just wanted to track that.

And just for the County, as they move forward, just ensure that we look at the end user in mind because, at the end of the day, if we want to be accountable, have transparency, you know, the general public has to make sure

that they have the ability and capability to open these documents.

THE COURT:  And you conveyed that to Scott, and Scott was very helpful.

So Scott?

MR. MARCUS:  Well, yes, the special master did convey to me during the break the issue about the searchability, machine readability of the documents, and I did confirm with the CAO's office that they will OCR the documents before they upload them going forward so they are searchable.

THE COURT:  Okay.

MR. MARCUS:  This is the first I've heard of the mobile-friendly issue.  I have not yet had a chance to --

THE COURT:  Okay.

MR. MARCUS:  -- speak with him about it, but I will.

THE COURT:  Now, here's what I want: I not only want attorneys or the press, if they're interested, or the general public, but I also want -- Kevin, where are you? There you are.  Good.

I want to make sure that this is accessible to the world, to a person who doesn't have access but is carrying around a mobile phone or a friend.  Okay?  Because for so long their perception is that these services haven't been

delivered to the street.  So they need to be looking at this and have some confidence they are or some complaints that they're not.

So we're going to make this mobile friendly to the general public, Kevin, and to -- okay?  And then if not, you're going to get back to me and tell Michele.  You're going to help improve this site.

Because I will make a record this is a good faith effort by everybody -- another compliment to you.  Of course I expect there to be some processes along the way that need to be corrected, but that's what we're working on.  So I'm appreciative of the input we got today.

Okay.  Now, Mira, if there's nothing else, have a good day.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  See you Monday at 4:00 o'clock?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Okay.  See you then.

Shayla, are you going to be here for the audit?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  Obviously, Liz, will you be here for the audit?

MS. MITCHELL:  Yes, Your Honor.

MR. MARCUS:  Of course.

THE COURT:  Of course.  Okay.

What other business do we have before the audit, then?  I think it's now we're back to the City.  I think we're back to this affidavit.

MR. MARCUS:  The stipulation.

THE COURT:  The stipulation.

MR. MARCUS:  So, as we indicated before the recess, Your Honor, the parties have reached a stipulated resolution --

THE COURT:  Okay.

MR. MARCUS:  -- of the motion for sanctions.  That includes further stipulated facts.  It includes the agreed-to sanction the Court -- the City agrees to pay for the court-ordered audit -- things like that.

There was a question about the language the Court might want in terms of continuing the hearing until the next court date when we can report back on City Council's action on the issue.  That's sort of how we phrased it for now.

THE COURT:  Okay.

MR. MARCUS:  I showed it to the special master.  We can discuss if there's different language the Court wants. If not, we'll be able to file it on the docket before the audit hearing starts.

THE COURT:  So I want to repeat, then.  The Council's willing to go into an emergency session tomorrow?

MR. MARCUS:  The agenda has already gone out.  Yes,

it is being -- it is --

THE COURT:  At 10:00 o'clock?

MR. MARCUS:  -- they are meeting tomorrow.

THE COURT:  So, if I reconvened at 1:00 o'clock, would that be acceptable?

MR. MARCUS:  I would --

THE COURT:  2:00 o'clock?

MR. MARCUS:  I would -- I think 2:00 o'clock or after --

THE COURT:  2:00 o'clock.

MR. MARCUS:  -- would probably be better, or we could report back Monday at 4:00 since we're going to be back here Monday at 4:00.

THE COURT:  No.  No.  We're in continuous session now.  2:00 o'clock.  In other words, counsel is paying the Court the courtesy of getting this done.  The Court will pay the counsel the courtesy of knowing that we're sitting right here waiting.

Okay.  So this will be resolved, then.  I don't think there's anything else until tomorrow at 2:00 a.m., then, is there, Liz?

MS. MITCHELL:  Well, I hope the Court meant 2:00 p.m. --

THE COURT:  I mean --

MS. MITCHELL:  -- but yes.

THE COURT:  Did I say "2:00 a.m."?

MS. MITCHELL:  You -- yes.  Yes.

MR. MARCUS:  You did.

THE COURT:  Those are the hours I'm keeping, Liz, but 2:00 p.m.  2:00 p.m.  Okay.  Thank you.

MS. MITCHELL:  I think that's fine, Your Honor.

And this is closed session, which typically happens after open session.  So I do -- I would like to query whether 2:00 p.m. is sufficient.

THE COURT:  Put it this way: I'm sitting here at 2:00 p.m., and I'm sitting here until the Council resolves that.

MS. MITCHELL:  I will join you, Your Honor.

THE COURT:  But I'm requesting that you be here at 2:00 p.m.

And, Scott, if you're still in closed session -- obviously we know you're there, but we're going to reconvene at 2:00 p.m.  If you're not here, we know you're talking to the Council.

MR. MARCUS:  That's fine, Your Honor.  I can also alert, at least, the special master and counsel if the closed session is going that long --

THE COURT:  All right.

MR. MARCUS:  -- so at least you know what's going on.

THE COURT:  Just make it easy.  We're here at 2:00 p.m. available to you.

MR. MARCUS:  Understood.

THE COURT:  Okay.  Is -- now, Michele, anything further?  Michele?  Because you've been talking to -- anything further?

MS. MARTINEZ:  No, Your Honor.

THE COURT:   Liz, anything further?

MS. MITCHELL:  No, Your Honor.

THE COURT:  Scott, anything further?

MR. MARCUS:  No.

THE COURT:  Okay.  Then -- Shayla?

MS. MYERS:  No, Your Honor.

THE COURT:  Then we'll see you at 3:00 o'clock for the audit presentations.  I haven't put a time limitation on them.  Some have called and asking for a presentation.  You may put a time limit on them but --

MR. MARCUS:  Yes.  To be clear, Your Honor, I was contacted -- let me start back.

The three audit firms that submitted written proposals were all invited to make a presentation.  All three firms confirmed that they will be here --

THE COURT:  Hold on for one second.

Mira, my apologies.  We will need you back with Daniel because we're going to get that website up today.

MR. GARRIE:  We're talking, Your Honor.  I think she has a --

THE COURT:  No, no.  Mira's here.  Stay with this. We're going to get this website up.  You tell me when it's up and running so I can pull it up on the board.  Okay?

All right.  Thank you.

I'm sorry, Scott.

MR. MARCUS:  That's All right.

All three confirmed that they will be here at 3:00 o'clock to make a presentation.  At least one, I think two, of the firms asked about timing.  I suggested a 15-minute presentation would be sufficient, and then obviously it would be up to the Court if they want to hear more, and at least one of the firms also asked if they would be able to do a visual presentation --

THE COURT:  Sure.

MR. MARCUS:  -- and I already spoke with your clerks about that.

THE COURT:  The more information the better.  If you've said 15 minutes, I'll back that up, but it could be an hour apiece as far as I'm concerned.  As much information as they want to convey is acceptable.

Okay, then.  Is there anything else until we take a recess then until 3:00 o'clock?

MS. MITCHELL:  No, Your Honor.

MR. MARCUS:  Not from the City.

THE COURT:  Okay.  I want to thank you very much for your courtesy.

MS. MITCHELL:  Thank you.

THE COURT:  We'll see you at 3:00 o'clock.

(Recess from 2:35 p.m. to 3:06 p.m.)

AFTER RECESS

THE COURT:  We're in session, and counsel are present for the City, the Council, the intervenors, and the County, in case Mira has questions, also.

And I want to thank all of you folks for joining us today.  We're really humbled by your response and very appreciative, and I hope I had a chance to greet you personally and just shake your hand and welcome you because I know it's a little stressful making these kinds of presentations.

Also, for all counsel, we believe that the County website may be up and operating within the hour.  If that's the case, Mira and Daniel are going to show us that website, but that website won't have invoices on them today.  It's enough that we can view the website in operation, but I'm not asking the County to put up -- you know, they've got hundreds, if not thousands, of invoices, and Mira will give us a time frame on Monday, when she comes back to court, that

these can -- you know, complete the uploading of these invoices. So, if there's any interruption, my apologies. We've got our special master working in the back with the County to get a website up.

It's suggested as follows, and that is that we have each of you give a presentation. The other parties will remain out in the hallway because we have the Veterans Administration -- well, strike that. No longer. They're back tomorrow.

(Court confers with clerk.)

THE COURT: And there may be some clarifying questions, but then we'd like to invite each of you back in so that all counsel and the Court have to think -- can have a chance to think -- questions and thoughtful questions.

It's 3:00 o'clock, and there's no time frame. We're open for business until as long as we need. So probably past 4:30 or 5:00 tonight. It may be much quicker, but I doubt that.

I have no preference in order. So I'm just going to ask: Who are you folks?

SCOTT MC KEE: Alvarez and Marsal

THE COURT: I'm going to have you go first. It's as simple as that. I'm going to ask the other two entities to remain out in the hallway. There's no preference.

You'll go second.

And you'll go third.  Okay?

And I -- Michele, I'll have them introduce themselves as they present, not in one place.

And thank you, Michele, I'd forgotten until we cleared them out.

(Pause.)

THE COURT:  We're on the record.  We have CourtSmart, who's the young lady.  So you can speak as quickly as you can.  You're not limited by a court reporter tonight.  But I've certainly met each of you, but for my record, I'd like to have your names once again, and you represent Alvarez and Marsal Public Sector Services; is that correct?

MR. MC KEE:  Yes, sir.  That's correct.

THE COURT:  Then why don't each of you start and make your introduction then.

MR. MC KEE:  Great.  Your Honor, thank you for having us here today.  We appreciate the opportunity.  We do have a small presentation --

THE COURT:  Great.

MR. MC KEE:  -- some leave-behind materials that we prepared.

THE COURT:  Oh, and we can put that, by the way, if you give us permission, up on the screen.

MR. MC KEE:  You want to do that?

UNIDENTIFIED SPEAKER  If you'd like.

MR. MC KEE:  Okay.  Can we have --

THE COURT:  Yeah?  Why don't you give us to my law clerks.  They're technological proficient.  If you want to put that --

(Counsel and law clerks assist setting up presentation.)

THE COURT:  You know, I'll watch the screen at the same time.  I'll get a copy from you, but I'll be watching the screen to see what is being presented.

(Court confers with law clerk.)

THE COURT:  The screens operating for the audience, also?  For you folks out there?  And for the -- I know there's a lot of City folks present.  Want to make sure it's operating for you.  Okay.

(Court confers with law clerk.)

THE COURT:  Okay.  This should be up on the screen, and then your introductions by name, please.

SCOTT A. MC KEE:  Excellent.

So, Your Honor, my name is Scott McKee.  I am a managing director at Alvarez and Marsal.

THE COURT:  Okay.

MR. MC KEE:  I'm from our Dallas office.  We are -- my job today is just to give you a little bit of background about our firm.  We have -- we are a 9,000-person global

consulting firm.  We are not a CPA firm.  We are completely independent of the types of conflicts that CPA firms would have.  The -- we -- today I represent us with my colleagues. We have a multidisciplinary team that we would bring to this project.

One of the things that benefits working with Alvarez and Marsal is I'm a CPA.  I'm an accountant.  I work in our disputes and investigations group.  I spend my day day-in, day-out, my whole career, doing forensic accounting just like you're asking for here -- is my understanding -- of following sources and uses of money, documentation that supports that, as well as looking back and understanding whether or not the funds are being used appropriately in accord with, you know, program documentation.  So that's something that we have done.  My colleague Lisa will talk about some of the projects that her and I have led together --

THE COURT:  Okay.

MR. MC KEE:  -- over our career.

The way our firm has grown is not through acquisition.  Our firm was founded in 1983 by two individuals, and the way that they've grown from 2 people to 9,000 is through every leader that is hired, they sit down and talk to them about their view of the firm, the culture, and the importance of objectivity and integrity.  So that's

what we represent.

We also bring -- you'll hear about our operational experience.  We have folks from our public sector unit who will be working on that team leading the performance in that audit, and they have actually sat and helped many, many clients that are at the state and local level deal with issues such as what we're dealing with here today.

So with that, I will turn it over to my colleague Dave --

THE COURT:  All right.  And let me ask --

MR. MC KEE:  Yes, sir?

THE COURT:  -- one more time.  I'd like to get your full name spelled slowly for me.

MR. MC KEE:  Sure.

THE COURT:  First name?

MR. MC KEE:  Scott, S-c-o-t-t.

THE COURT:  And your last name?

MR. MC KEE:  McKee, M-c-K-e-e.

THE COURT:  Thank you very much.

MR. MC KEE:  Yes, sir.

THE COURT:  And your colleague?

MR. MC KEE:  Dave McCurley.

MR. MC CURLEY:  Thank you, Judge.  My name is David McCurley.

THE COURT:  The first name is easy for me to spell.

MR. MC CURLEY:  Okay.  Good.

THE COURT:  How do I spell your last name?

MR. MC CURLEY:  Last name is M-c-C-u-r-l-e-y.

THE COURT:  And please?

(CRD helps with glare.)

THE COURT:  Okay.

MR. MC CURLEY:  So, again, I -- we appreciate the opportunity to speak with you guys today.  My role in Alvarez and Marsal -- I'm the leader of our state and local government practice and managing director based in Austin, and so we brought people in from all over, and we can -- and we do that on a regular basis.

And what I wanted to talk about for a minute is part of the differentiation about us is that we've got experts in a variety of different areas that we know are going to be critical to success.  So, as you just heard Scott talk about, we've got -- on the upper-left corner of our slide here, we've got the forensic accounting folks that comes in and he has a certification in forensic accounting, and our company has done that in both the commercial and the public sector for decades.

And then once we start that thread to figure out where the money is going -- we've got to do that first to help us clear in the scope of the audit, then the next thread is, okay, well, what's it doing?  How effective is it?  And

my team's got an entire organization that that's all we do is government effectiveness audits, government performance assessments --

THE COURT:  Okay.

MR. MC CURLEY:  -- figuring out what's broken?  How do we fix it?  What are the recommendations?  And I'll talk for just a minute about some of the areas we do that.

So we'll have those people start looking at each of the individual programs.  One of the things we've got to do -- and the question we'll have to have before we can get too serious is how many different organizations are we looking at?  How many different programs do we actually have to investigate?  All of the work that we'll have to figure out with you -- that's all things that we'll have to do to --

THE COURT:  Sure.

MR. MC CURLEY:  -- hammer out in the scope.  But part of that will be then, okay, now that we've figured out who they are, are the programs really working?

And then the third leg of the stool that we bring is a tremendous amount of health and human services experience because we know that the effective populations that we're going to be dealing with -- many of them struggle with either behavioral health, physical health, disabilities, a variety of other challenges that make them a more challenging population to deal with, and we want to make sure

that we're bringing all of that stuff to bear as we tackle it.  And so, as we think about the recommendations and we look and say, "Okay.  This program is not being as effective," well, let's make sure we're bringing the expertise in from the health and human services work that we've done in other states.

And so we've recently completed work in New Hampshire for their health and human services agency specifically about homeless on a statewide -- homelessness on a statewide basis.  We've done work in Rhode Island --

THE COURT:  Hold on.  Hold just a moment.  We're going to get the screen back up.  It just went dark for a moment and make sure --

MR. MC CURLEY:  Oh. Sorry.

THE COURT:  Yeah, just give us one second so that --

MR. MC CURLEY:  Yep.

THE COURT:  Right now it says "Visual Presenter," but we'll get back to your screenshot in just a moment.

MR. MC CURLEY:  I'm glad you got me.  I wasn't even looking.  I was just on a roll here.

THE COURT:  There we go.

MR. MC CURLEY:  Okay.  So we've done this kind of work.  Oregon -- we helped them create an agency specifically focusing on some of the aspects of behavioral health and how

they related to homelessness in Oregon.  So we've done this work hands-on in other states.

It is a top priority for my team.  For this year -- we identified at the beginning of this year priorities that we wanted to focus on for the next five years, and homelessness and housing made the top of our list.  So we're -- we are continuing to attract experts in this area, we are excited about the work we have done, and we would love to have the opportunity to work with you.

So I'm going to hand it over to my colleague --

THE COURT:  And thank you.

MR. MC CURLEY:  -- who's going to talk a little bit about our team and some of the experience.

THE COURT:  Okay.  And your name slowly, once again?

MR. POTTER:  My name is Michael Potter.  That's P-o-t-t-e-r.

THE COURT:  Okay.

MR. POTTER:  I'm a senior director with Alvarez and Marsal Public Sector Services.  I'm based here in L.A.  I've spent my career primarily invested in focusing on taking a really objective database perspective to look at public sector entities and providing insight that helps guide transformation.  We've particularly focused in spaces that are highly complex -- dealing in education, human services,

public safety -- and trying to really help organizations develop an objective perspective on what works and what doesn't and guide -- develop recommendations that guide a roadmap to get us there.

I'm going to tell you a little bit more about our experience and some of our past performance and the things that we think qualify us uniquely to do this work.

First, I'd like to share the experience that, I think, Dave alluded to, which is our experience with the State of Oregon.  In the last two years, Oregon has -- you know, has faced many of the same challenges that Los Angeles and California have, and when Oregon's governor declared a state of emergency and requested over a billion dollars to combat homelessness, the state hired us to help them administer that by strengthening the housing and stabilization division of the state Department of Health and Human Services.

We conducted analysis, interviews, and community engagement to understand the way that that organization functioned, the degree to which it was able to serve, and the degree to which it could handle scaling the way that these organizations had to scale in the past several years, and, particularly of interest here, were they able to handle an influx of challenges and an influx of funding?  Can they put money to work effectively?

We then developed a series of recommendations which we're leading, 30 total initiatives across the agencies, to really implement a new organizational structure that's helping them better organize the scale up to serve the needs in communities like Portland, and we're working on improving their contracting and procurement procedures, strengthening their internal controls, and then also improving the way that they work with vendors and sub-grantees.

So obviously this is a complex environment, and so little of the work that's done is done directly by government employees.  So our experience there relates to being able to take a look at the way the organizations work together -- this network of nonprofits -- and apply a consistent methodology to understanding their effectiveness.

Next, I'd kind of highlight two projects that we've worked in the state of Rhode Island.  When the pandemic started, the state made housing and homelessness a priority for their pandemic recovery funding, and we served two different purposes related to this in -- both with the Department of Housing and with the Pandemic Recovery Office.

In the Department of Housing, we interviewed service providers who utilized funds and built performance tracking tools to help them demonstrate their compliance with state and federal requirements, also track performance and inform the perspective on the future as to where we continue

to invest funds.  And then we recommended seven short- and long-term reforms to improve homelessness, focusing primarily on putting resources in paths that are proven and accountable that can be demonstrated to make a difference in cities.

With the Pandemic Recovery Office, we were engaged to assess with a huge influx of money under the ARPA act, the American Reinvestment Plan Act.  We -- the state dedicated a lot of extra funding to housing and homelessness, and we were responsible for managing those federal funds and standing up an organization that could help them manage those funds to ensure their effectiveness and support the successful rollout of that across all areas but specifically focused on the new investments -- new federal investments that the state directed towards housing.

I personally led the project with the District of Columbia and the office -- the city administrator, where we conducted a review -- similar in some ways to this -- of the public housing -- or -- sorry -- the public regulatory agency, which was responsible with overseeing the safety of housing and building.  After a horrible fire took the lives of two people, the city commissioned us to conduct an independent review, which consisted of people from my team who are public sector performance experts who understand the regulatory background, policy framework, et cetera, but also brought in folks from organizations like Scott's team that

have the forensic ability to kind of demonstrate -- trace the decisions back to how they were made and help the city understand the many lapses of administration that happened that led to this horrible tragedy.

We were really relieved to see that the city took action based on the information that we provided, and this was the beginning of a significant reform in the way that the city regulates businesses and the way that the city has their emergency management and regulatory agencies engage with one another.  For example, the police, the fire, the EMS, and the regulatory agency, which approves housing and monitor housing -- we made a lot recommendations to help them improve that, and the mayor and the city council created a plan to reorganize the regulatory agency to better engage with that.

The last one I'll share here is just a quick, you know, anecdote.  We've also been recently working with the State of New Hampshire and their Department of Health and Human Services, where conducted a rapid review of the whole organization -- multibillion-dollar organization to understand the effectiveness of their programs, their ability to engage with federal waiver programs, which allow them to do more creative things to serve the unique challenges of the populations that they serve, and we worked to transform the continuum of care.  Pursuing that waiver, we then recommended the implementation of critical time interventions, which help

really prioritize investing in health care when it's most impactful for the people who are suffering or needing support.

I'm going to turn it over to my colleague Lisa to talk a little bit more about some of the details of our forensic accounting work.

THE COURT:  Okay.  Thank you very much.  Appreciate it.

LISA BROWN:  Thank you.

THE COURT:  Good afternoon.

MS. BROWN:  My name is Lisa Brown.  So probably the easiest to spell but L-i-s-a Br-o-w-n.  I have been with Alvarez and Marsal since 2009 in the disputes and investigations practice, and one of my specializations is in forensic accounting projects, and I've worked with Scott McKee on many projects over the years.

THE COURT:  Okay.

MS. BROWN:  Related to the matter at hand, Scott and I have worked with over a team of 20 professionals to lead forensic accounting reviews in multiple cities and counties to evaluate the sources and uses of funds related to government services and programs serving at-risk populations, whether that be substance abuse, mental illness, or people experiencing homelessness.

As part of that, we did a comprehensive assessment

of dollars coming in and expended on these issues over a span of multiple years.  As part of this, we analyzed all the relevant financial information from public and internal sources.  We looked at published budgets, annual reports, meeting minutes, and also got into the details of the general ledger accounting data.  Looking at that, we were able to quantify contracted expenditures -- in other words, those were the third-party vendors where expenses are supported by invoices -- and we also looked at supporting expenditures, which were more of the administrative expenditures or salaries that may be expended within the city or county departments, such as the fire, police, et cetera.

Of course, working in local municipalities, we also tracked grant proposals and awards and how those funds were being expended.  And similar to LAHSA in this case, we are familiar with working with organizations and assessing funding flowing into these quasi-governmental entities that receive funding from the city and the county but are also independently receiving funding from the federal government from grants and even from private donors, and I understand that those entities are very responsible for some of these contractual issues.

So to summarize, I think that we have focused expertise in the financial review that would be necessary for this project.

And I believe that summarizes our formal presentation --

THE COURT:  Okay.

MS. BROWN:  -- but happy for questions now or later.

THE COURT:  Well, maybe just any clarifying questions quickly, but then we'll bring you back almost immediately, you know, after the other presentations so all counsel can think out questions that they might have.

So let me turn to LA Alliance.  Do you have a couple of quick questions, and then I'll turn to Scott, and then I'll turn to Shayla.

MS. MITCHELL:  Thank you.

You mentioned --

THE COURT:  Would you move that mic just a little closer.

MS. MITCHELL:  Yes.  Thank you.

You mentioned that you're not a CPA firm but you would partner with a qualified CPA firm to certify the audit. Can you describe that process?

MR. MC KEE:  Yes.  So to the extent that we need to have a CPA firm or an independent firm confirm that we followed the GAGAS procedures -- which we will, and we are familiar with and are qualified to do -- we have -- we can build -- have a relationship -- I know our firm has

relationships with firms that we would team with that would come in and do whatever -- like peer review -- needed to be done on our work, and that would be included in, you know, the scope that we would define, so.

MS. MITCHELL:  So the cost -- the estimated cost that you submitted includes the partnership of the CPA firm for certification purposes?

MR. MC KEE:  That's correct.

MS. MITCHELL:  And the range that you provided the estimate was quite wide --

MR. MC KEE:  Yes.

MS. MITCHELL:  -- 2.8- to 4.2-.  Can you explain why that range is so wide?

MR. MC KEE:  We can.  Go ahead.

MR. MC CURLEY:  Yeah.  I'll take a stab at it.

And the -- part of what was unclear in the -- I mean, there was a lot of clarity in the scope of work that you guys want us to do.  What was unclear to us in the documentation that was provided is how large a universe of people do we have to talk to?  Right.  And so it really -- the scope of what we're going to do is going to depend on how many interviews do we need to do?  How many organizations are involved?  What's the complexity as we go through that?

And so one of the things that we'd like to do at the next -- you know, if we are selected to move forward,

we'd sit down with you and draw a fence around that so we're all comfortable saying, "Yeah, these guys we're going to talk to.  These guys we're not."  We can do a sample.  You guys can decide we need to talk to every single person who's involved regardless if they only get one dollar, or you can say, "You know what?  We only want you to talk to people who are being" -- "who we're spending 500,000 or a million dollars on.  Everybody else we're okay with leaving out."

So we just got to work through that, and then that's going to tell us, again, are we doing 300 interviews or 30 interviews? and that's kind of where that range comes from.  It's really about that much -- all that work.

MS. MITCHELL:  Got it.

MR. MC KEE:  Yeah, and I'll just add to that.

The other issue is the accessibility and timeliness of getting ahold of the data and the people and the documentation that we need, right.  So, if we're having to do multiple follow-ups because we need the documentation -- it exists, we're just not getting it -- that could cause us to have, you know, a little bit longer of a time line than we hope to but -- and that really comes from the projects that Lisa described.  Some of those entities provided us information quickly.  Those were pretty short-term projects.  Others it took, you know, several months and several tries to get at the information.

MS. MITCHELL:  Thank you.

The -- looking at the last -- the confidential clients' experience that you cited, was that one or more government entities or private entities?

MR. MC KEE:  No, those were all government entities --

MS. MITCHELL:  Okay.

MR. MC KEE:  -- that we were examining.  Yes, both county and city level.

MS. MITCHELL:  And were any of those in California, if you can tell me?

MR. MC KEE:  No.  Not -- none.  No.

MS. MITCHELL:  Okay.

I think that's it for now.  I might want to come back, though, before they step down.

THE COURT:  Yeah, we're going to bring you back.

But any quick questions or -- so, Scott, do you have questions you'd like to ask?

MR. MARCUS:  No, not at this time.  Thank you.

THE COURT:  All right.  Well, you think of those questions.  Talk to your folks out there so they can participate.

Shayla, do you have questions you'd like to ask?

MS. MYERS:  Yeah.  Just in terms of thinking about the cost and how you establish the cost with the 2.8- to

4.2-, can you give us a sense of just where the starting point was for the 2.8- and the ending point is for the 4.2-? What is that -- sort of what assumptions did you draw relevant to that because we want to get a good sense of where that number comes from.

MR. MC CURLEY:  So we looked at, honestly, some of the work that we had done in Rhode Island and New Hampshire, where we looked at about -- in those cases we were interviewing about 30-plus support organizations that were part of the homeless -- or the homeless response network.  So that kind of -- we created -- we recognize that we're talking about New Hampshire and Rhode Island, right, not L.A.  So we said, "We know what that is because we've done that now in" -- you know, with a size that -- and so that's kind of where that floor came from.

And then we said, "Okay.  Depending on how much bigger it's going to be, that's" -- we kind of looked and said, "Okay.  How much" -- there's some economies of scale.  So it's not a perfectly linear thing, right, but it was really a "Okay.  What's the most complex stuff that we've done," not necessarily homeless related, where we felt like we had a similar size and scale to what we've done in L.A.?  And so those are some of our statewide assessments where we looked at budgets across multiple agencies and organizations where we felt like that complexity was simple and -- or

similar, and we used that as kind of -- to create the ceiling.

MS. MYERS:  And what do you think is the -- size and scope-wise, what are the closest audits that you've done to what you envision in -- just in terms of your cost estimates for this project?

MR. MC CURLEY:  Well, I mean, the one that we did -- the one that we did in New Hampshire, which was directly -- I mean, a very similar one, looking at all of the different people -- that's probably got the most direct relevance, and that's at the lower end of that scale.

Yeah?

MR. POTTER:  And I can speak to -- I mean, the -- there's a little bit more to, you know, scaling it obviously --

THE COURT:  Come just a little closer to the microphone.  Thank you.

MR. POTTER:  So just to add to what Dave said, we have to -- we think about the way that we build a team --

MS. MYERS:  Uh-huh.

MR. POTTER:  -- that can develop a series of observations and recommendations as it comes to the performance review aspects of this that are going to be meaningful in understanding and addressing these challenges. So there's some things that scale really well, like

reviewing, you know, a million lines of data not taking more time than reviewing 500,000 lines of data. Some of the things that depend on the size of the network of providers and vendors we will have to hammer out assumptions based on, but I think the range of prices for reviews of organizations this size could be anywhere from kind of right around the bottom of our range here, all the way up to larger reviews that we've done of organizations that are multibillion dollars that could be $7- to $10 million.

MS. MYERS: And just one last quick question. When you did the Oregon Office of Housing and Community Services, I know it was a one-point -- $1 billion estimate for requested funds but you -- it seems that you audited a specific division within that; right?

MR. POTTER: So -- yeah, and I think that it's important to clarify the difference between what we think of as, like, an audit versus a review and improvement initiative. So it would be really hard for me to draw exact parallel between the review that we did there that led to us continuing to engage in improving --

MS. MYERS: Uh-huh.

MR. POTTER: -- to what we're doing here, which is sort of scope that's stopping at delivering a report that clarifies what the challenges are.

MS. MYERS: So --

MR. POTTER:  So that project was probably equal in scale to this, but that took a smaller division much further into fixing the things that aren't working.

So it is challenging.  We think that the size of the team that we need to deliver this, we think about the complexity of, like, filtering the recommendations that we have through the realities of operating in a public sector environment with things likes regulation and policy, stakeholders, and, you know, there's some of that complexity layered in, in terms of creating a meaningful report that can be used.

MS. MYERS:  So just to finish up my question, how big was the division within that billion-dollar request?

MR. POTTER:  You know, I'll be honest with you -- and I should share -- you know, we shared some additional bios here.  Our team is not the team that delivered that project.  So I can't answer that question with a lot of specificity.  It's, you know, a smaller organization for sure than the City's services, but it is a significant unit of Oregon's Department of Health.  So I would -- I wouldn't want to venture a guess, as I didn't deliver that work myself, but we're happy to answer that question.  Yeah.

MS. MYERS:  Thank you.

MR. MC CURLEY:  Your Honor, want to clarify: We passed over a couple of slides in our presentation that --

one that showed the team that's here.

THE COURT:  Sure.  Why don't you show them so --

MR. MC CURLEY:  The second one that was in there showed the slides of the people that were in our original presentation -- or original response to you, and so those people -- Diane Rafferty is who we're proposing as the lead. She's the head of our public health practice from a public sector perspective.  She's a registered nurse, a behavioral health clinician, a behavioral health, at one point, owner and -- so Tom Shaffer -- that's on here -- led our work in Oregon.  Erin Leveton was involved in our work in New Hampshire.

So the team that you've got -- now, the reason they couldn't be here today is, on this particular day at this particular time, they are actually delivering services to those clients today, and so you got us.  So -- and we know enough about it to talk about it, and we remain passionate about it, but a lot of these folks are going to be attached to the actual work that we do based on their hands-on experience with doing it other places, at least in advisory roles, if not on a day-to-day basis.  Diane would certainly be the day-to-day project lead.

So I just want to outline that we had included that.  We kind of skipped over it  I think I was supposed to cover it at the beginning.  I take all the blame.

THE COURT:  Okay.

Michele?

MS. MARTINEZ:  Thank you, Your Honor.

Just very quickly on the analytics and visualizations and trying to get information in real time. Just what kind of system do you have in regards to your analytics, and what kind of visualizations would you be able to provide?

MR. MC KEE:  Well, as far as systems go, I mean, we have a wide range of tools that we use, but, frankly, I mean, what we do is we will get, you know, say, general ledger data.  We would expect to get that for the time -- relevant time period.  We will go through that.  We have some tools that will look for specific information that will be tailored just to this particular issue, and then from that we will then show and -- visually, you know, where the dollars are being spent, at a high level where the gaps are, if they're supposed to have been spent already, and then we will drill down from there.  So, you know, we have all kinds of technical tools but, you know, anywhere from -- what is it? -- Power BI.  We use that.  We have some other things that sit on top of Excel, and then, if we have to go into SQL, we have that as well.

So the other thing, too, is not listed here, but we do have -- to the extent we get into statistical sampling,

you know, we do have individuals on our team that are -- you know, have Ph.D.s in statistics or a masters in statistics that we work with day-in, day-out to design those sampling plans according to the accounting standards.

MS. MARTINEZ:  And just my final question, and obviously we don't have all the details beyond the scope that was provided, but, you know, there's kind of two audits, as you all state at the very beginning -- a forensic audit and then a performance.  How long do you think -- and I know you don't have all the information in front of you or how many folks you have to interview or what -- how many organizations on and so forth, but what do you think would be the time duration?  Is it six months? eight months? one year? five years?  What do you anticipate?

MR. MC KEE:  Well, I think in our estimate we -- in our proposal we suggested 20 weeks, right.

THE COURT:  20 --

MR. MC KEE:  That was our initial time frame.

MS. MARTINEZ:  I read that.  Just want it for the general public --

MR. MC KEE:  Oh, sure.

MS. MARTINEZ:  -- because that's the big question that a lot of people are asking.

MR. MC KEE:  I mean, I think -- this is an important question, you know --

MS. MARTINEZ:  Yes.

MR. MC KEE:  -- and so we can get -- we want to get in and get done.  And I think that's a little bit of a differentiator.

MS. MARTINEZ:  Yes.

MR. MC KEE:  If our firm founders were standing here, they would say we're not a consulting firm that comes up with plans that we turn over.  We actually roll up our sleeves and get the work done.  And we'll partner with you on recommendations as well, so.

MS. MARTINEZ:  Great.  Thank you.

THE COURT:  They'll have questions for you folks a little later today.  Okay?  So we get to the presentations.

And I have one question: How early do you get up in the morning?

MR. POTTER:  4:30 a.m.

THE COURT:  Excellent.  The reason I'm asking that is because good input in, good input out; garbage in, garbage out -- it's kind of like an accounting principle; right?

MR. POTTER:  Yes, sir.

THE COURT:  Okay.  I want to make certain that you are willing to visit with the community.  In other words, you're going to be talking to politicians, statisticians, et cetera, and I want you to absolutely promise me that you're willing to take to the streets -- you know, safely --

we'll -- the community will take good care of you -- plus me -- and that you're willing to talk to just members in the community at 5:30 to 6:30 in the morning, because that's when the homeless population is moving, and to hear the community's perspective.  Can you do that?

MR. POTTER:  Yes, sir.

MR. MC KEE:  Yes, sir.

THE COURT:  Raise your right hand.  Just kidding you.

(Laughter.)

THE COURT:  Okay.  All right.  Okay.  Good enough for now.

All right.  Thank you very much.  And we'll take you back, and I really appreciate your presentation -- everybody does, and thank you so much.

And, Michele, I think the second one -- yeah.

MS. MARTINEZ:  Yep.

(Pause.)

MR. MC CURLEY:  Thanks again, Your Honor.

THE COURT:  Thank you very much.  I really appreciate your presentation.  We'll be right back with you.

(Pause.)

THE COURT:  And we'll put this up on the screen, if you'd like, also.  So if you have a USB or something.

JIM KREISER:  (Inaudible) hard copy.

THE COURT:  Oh, that's okay.  And make sure all the counsel have one.

(Pause.)

THE COURT:  And just one moment.  Let me get situated.

(Pause.)

THE COURT:  Well, please, if you'd just introduce yourself to the record.  I hope I met you earlier, and I'm smiling at your so everything's good.  Okay?  But who are you folks, and let's get your names slowly -- first name and last name.

MR. KREISER:  Terrific.  Well, that'll start into our presentation as well.  That's one of our pages so --

THE COURT:  Oh, that's okay.  Let me write that down for a moment.  What's your name?  And just move a little closer to the microphone.  The reason: We're on CourtSmart, and it's this microphone --

MR. KREISER:  This one here?

THE COURT:  -- just to your right.  Yeah.

MR. KREISER:  All right.  So I'm Jim Kreiser --

THE COURT:  Jim.

MR. KREISER:  -- principal with CLA, national service leader for risk and advisory services and our value and risk services team for state and local governments.

THE COURT:  Pleasure.

BRENT WARNER:  Good evening.  Brent Warner.  I'm a signing director with CliftonLarsonAllen.  I'm in our value and risk services folks (indecipherable) internal audit for state and local government agencies.

THE COURT:  Thank you.  It's a pleasure.

BRIANNE WIESE:  Hi.  My name is Brianne Wiese.  I'm a principal with CLA, and I serve in the audit practice primarily with state and local governments.  Thank you.

THE COURT:  All right, please, whoever would like to lead off, we welcome your presentation.

MR. KREISER:  Sure.  So I'll get started here on page 3 just kind of to build upon our proposal a little bit that we had submitted to the Court, in addition just to highlighting some things about our firm overall.  At the end of 2023, we -- as far as top-10 firms go, we were one of the largest firms in the country in terms of being fastest growing.  So we -- you know, some of our statistics are already a bit outdated.  We will be exceeding over $2.2 billion of revenue by the end of the year.  We're exceeding over 9,000 employees, 130 locations across the country.  We do rank No. 8 in the country in terms of size of professional services and CPA firms.  We're very proud of the fact that we have Brianne here, who leads up our state and local government practice locally here in L.A., leading our large team of professionals dedicated to this space.

And, again, highlighting that, you know, not just here locally but nationally our firm is allocated and specifically designed uniquely within the space of large top-10 firms in the country that we are allocated specifically by industry.  So we are one of the few firms in the top-50 firms in the country.  We do not audit SEC companies, right.  So we do not audit SEC registrants.  We do not audit publicly traded companies.  Therefore, government and state and local government performance audits -- the types of things here that the Court has asked for is kind of the bread and butter of our firm, making us one of the largest firms in the country where this is the core of what we do, rather than most other firms our size, SEC registrants and public company audits are the bread and butter of what they do.

So I just wanted to highlight that.  I think that comes across in our proposal but also was something that we wanted to emphasize here.

On the next page of our deck here, just our commitment to serve.  Hopefully, what I just mentioned really comes across.  Again, I think not only are we one of the largest firms in terms of not auditing SEC companies but within our firm, our state and local government practice is one of the largest industries that we serve from a revenue base.  From a personnel standpoint, we're approaching 800 to 900 professionals specifically dedicated hundred percent of

their time to state and local government.  Everybody on the team that would serve in this engagement are people that spend their time in governmental activities, meaning they know GASB; they know Yellow Book; they now performance audits; they understand the objective requirements, the types of programs that the Court has ordered and asked for.

The team and our commitment to serve very much based in understanding the communities, the impact on the community, the constituents, the stakeholders involved.  But the team not only is made up of folks that you see here -- folks like myself that are dedicated to risk, understanding risk assessments, performance audit -- the kind of activities -- Brent, who's a certified internal auditor, understands the Red Book requirements that the Court had indicated inside and out, all of us who understand Yellow Book, but also a team of government focused forensic auditors, right.  So specific government-focused forensic team members, data analytics members that are specifically focused in government analytics.  So we're understanding the kind of data, the grants, right.  We're not bringing in data analytics folks that are looking at different types of things and other organizations or public companies that then we have to train them differently to understand grant programs, grant compliance, grant requirements, right.

So we have a team of analytics professionals,

forensics, IT professionals that understand the kind of systems that are involved here. So for the number of the requirements that the Court had ordered and asked for, you know, we're going to have folks from the IT standpoint. When we look at are things effective, what data is involved, we have IT professionals as well that understand those work flows and can complement our team that understand those governmental systems and work flows as well.

The last thing I'll talk about real briefly is just, again, highlighting a little bit more about our internal audit practice, right. The Court asked for some things around Red Book and our --

THE COURT: Right.

MR. KREISER: -- you know, Institute of Internal Audit activities and requirements, and I just want to highlight how proud we are as a firm of our experience, highlighting a number of specific areas: work we do with places like California Housing Finance Agency -- the work we do with them from a risk control perspective not only in their audit but things around risk assessment, performance reviews; the work we do with CalSTRS around risk, IT systems; a number of other areas that you can see listed here -- Sacramento Housing, Seattle Housing, New York Deferred Compensation Plan -- a number of areas, agencies, local authorities that we work with from a risk and performance

audit standpoint that have a number of aspects not identical, certainly, by any stretch but certainly things that have some overlap with some of the requirements and objectives that the Court had laid out in those 31 items in the order that was issued.

So that's what I'll highlight.

THE COURT:  Okay.

MR. KREISER:  One comment just to segue things when Brent kind of talks about our approach a little bit. Certainly, we understand the nuance here and the heavy burden the Court has on it with these audit requirements.  You know, it's hard to nail down specifics --

THE COURT:  Yeah.

MR. KREISER:  -- right, but certainly our overall approach is, certainly, trying to look at this from a performance standpoint, right, how are the programs performing?  We certainly do that by trying to understand what are the risks?  What are the areas where fraud, waste, and abuse can purvey themselves from a risk standpoint? and then designing and tailoring our test procedures in a way to assess that level of risk, to understand and ascertain the data that's necessary to make determinations around how that risk is being managed by the City itself but also how we can then make determinations around how that risk is being managed as it relates to those 31 objectives and requirements

that the Court had laid out in its order as well.

Brent, you want to go through --

MR. WARNER:  Thank you, Jim.

THE COURT:  Thank you.

MR. WARNER:  Your Honor, on page 9 of our presentation outlines our internal audit methodology.  So this is how we would execute any internal audit project that we have regardless of industry, whatever the objectives may be.  This is meant to align with the professional internal audit standards as promulgated by the Institute of Internal Audit.

We define the engagement.  So a lot of that has been in the proposal that the Court -- the request for proposal that the Court had issued.  Obviously, we work with all sides to make sure we have an understanding of the scope of the work that's necessary.  It's important for us to be able to define that engagement as part of our methodology we do for each and every audit that we do.

Once we have an agreement on what that engagement is, we'll develop what we call a "risk model" or a "risk universe."  So we're going to assess the "what could go wrongs."  There may be some inputs on what has gone wrong or what else may be going wrong, but at the end of the day, we want to understand what are all the risk that we are going to have to face -- we're going to have to address with our

testing?  The risk would be assessed as high, moderate, or low depending on the impact and the likelihood.  We also consider other factors such as speed of onset -- how fast could the risk happen? how fast are we able to respond? -- in order to meet the objectives of the process that we're auditing.  Everybody has a process in any organization that is designed to accomplish certain objectives.  So what gets in the -- what gets in the way of accomplishing those objectives, the what gets in the way are the risks.

So once we've identified the risk universe, we develop our audit plan.  This is our project for how we're going to develop the internal audit program.  Internally with us, we would, you know, staff it, schedule it, make sure we have the right resources in place, make sure that we have communicated clearly and transparently with all parties involved as far as the timing, here's how we're going to execute the engagement.

Once we've done that, we build out our audit program.  The actual steps that we're going to do largely rely on at least the 32 items that were in the request for proposal.  We understand that that may not be an all-inclusive list.  At the end of the day, we'll identify (indecipherable) is through the step one.  So, when we get to step four, that audit program is meant to accomplish the objectives that we all want to hear -- that we want to

accomplish here was outlined in the proposal which -- to understand, you know, what's happened with the homelessness programs that are in place.  Our objective with that program is to answer those questions that's spelled out in the request for proposal.

Once we get past that piece, then we execute, you know, from document requests, setting up periodic meetings with all parties involved to make sure we're transparent and we're communicative throughout the entire process so at the end of the day everybody knows where we're at on the process, what we're seeing in terms of the tests that we're conducting, and what are the preliminary results.  And there may be times when, you know, we may not have gotten something right.  Our job is to make sure this is what we see, this is what we find.  Is everybody in agreement?  If so, great, then we get an agreement on consensus of what the result of that test is.  If not, we go back and sharpen our pencil, make sure we wok (indecipherable) collaboratively to get to the right result at the end of the day.

So as we're executing that -- the audit program, we're identifying the results.  So at that time we build out our program -- or our -- sorry -- our report, our deliverable that we deliver to the Court as to, you know, what the scope of objectives were, the work we did, and the results.  The results is obviously going to be what's very important here.

We'll identify the root cause.  We always go through a root cause analysis with our -- the folks whom we're auditing just to understand why the control deficiency occurred or why we have a control gap.  There could be a number of reasons why that happens, but we would report that.  We issue -- usually it's a draft report, you know, parties time to look at that draft report, and then we'd come back and meet and discuss the draft report.  If we have to sharpen our pencil in any areas, we might do that, and ultimately we issue the final report.

I will say throughout this process our objective is, when we get to the exit meeting, there are no surprises. So by the time we communicate "Here's the results of our work," it shouldn't be a surprise.  We would have already communicated these throughout our work.  We issue the draft report.  The draft report is going to mirror what's in the exit meeting.  So that way, we have found that -- that's the best method -- the best way we can go about in executing our audit methodology to make sure we eliminate surprises.

As needed, we'll -- you know, we mentioned a couple frameworks here.  Basically, let's just say we align our process with the known professional standards that are out there.  And so, you know, I've got 23 years in internal audit.  I'm a CPA certified internal auditor, certified risk management insurance.  This is what I do.  And so, you know,

we're comfortable with this.  This works with all of our clients, and this is meant to drive the results that we're trying to get to.

So that's our methodology.

The objectives on page 10 is largely things I've already touched upon.  Again, it's important that we -- we want to learn and agree on what that scope of work actually is; what's the deliverable format?  We can tailor our deliverable however the Court wants.  It does not matter.  But we obviously, at the end of the day, want to make sure that everybody understands what we're trying to accomplish and agree on the plan for that accomplishment.  And it is a collaborative approach.  We don't go in a corner somewhere and go do our field work and then at the end of it come back and say, "Boom.  Here it is."  We have to have open client communication when it comes to these types of matters.  So I just wanted to touch upon the objectives here.  I don't want to read through all of that there, but I just want to summarize what our objectives of this engagement is.

That's largely it.  The "Why CLA?" page is something that Jim has already touched upon.

That's our presentation.

Jim or Brianne, if you had anything you wanted to add?

THE COURT:  All right.  Please?

And thank you very much, and nice meeting you.

MS. WIESE:  I just would like to say, you know, the cornerstone of our approach in everything we do is really a collaborative and transparent approach, and we would certainly want to make sure that the Court felt that throughout our process and that we were, you know, meeting the objectives of the Court.  So just as my colleagues outlined the approach, you know, the cornerstones are that transparency and collaboration.

THE COURT:  Okay.

MR. KREISER:  And I think just one last piece.

I think an important part of that collaboration and I think an important strategic advantage that we have within our firm simply with the breadth of clients that we have would be the ability for our team to coordinate with Brianne on the local level and the national level with over 4,000 clients.

A lot of the objectives that Your Honor and the Court had put in the order were a lot of things of -- you know, evaluate effectiveness, benchmark, you know, evaluate, you know, where the program is from an effectiveness standpoint.  Effectiveness is kind of a subjective evaluation, right.  A lot of that comes down to really how does the program operate relative to its peer programs and other similar activities in its class?  I think our ability

to kind of collaborate on a local, as well as national, level across a broad, broad spectrum of clients and bring that kind of benchmarking and determination and kind of minimize that subjectivity as part of our review and collaboration with the City, with the Court, and across the firm as we executive our procedures is an important element of things as well.

THE COURT: Okay. Then we're going to have just a brief round of questions and then bring you back after counsel have more time to think about what they'd like to ask.

But let me turn to LA Alliance for some of the initial questions you might have, then to the City, then to the intervenors.

MS. MITCHELL: Thank you, Your Honor.

As we're reviewing your proposal, we're looking at -- and correct me if I'm wrong here, but it looks like a blended rate of about 250 an hour and 1,200 hours, which from the folks that we've spoken to is the equivalent of two managers and staff for four to five weeks of full-time work; yet it looks like you guys are quoting a five- to seven-month period. Can you explain that to me about the length of time versus the number of hours and the rates that you guys are looking at?

MR. KREISER: So I'm sorry. Can you, maybe, clarify -- so is the question on the rate or the duration or

both?

MS. MITCHELL:  I would say how do they tie together? and then also the duration.  If what we're looking at is four or five weeks of full-time work but a five- to seven-month period, tell me how we marry those two and why it would take so long to get it done.

MR. KREISER:  Correct.  So the way our approach is built, right, we don't assume that this is just purely getting out day one and sitting for six, seven weeks; eight hours a day; that many people -- to your point, three, four people; eight hours a day; six, seven weeks; day-in, day-out; minute to minute; fully productive stream, right.  Our experience tells us that I'm going to have questions; I'm going to need to interview someone.  We don't charge for our time waiting to schedule a meeting next week.  So, if we're sitting there and they say, "I'm available to meet with you next week," that four days, five days of downtime to meet with them next week -- that's where we're saying that's the duration of the project extends, right.

Also, our process is built around what we call "data requests," right.  So we're going to say, "Here's a whole slew of data that we need."  In our experience, that's not going to get turned around tomorrow.  It's generally two to three weeks -- every tranche of data that we request.  So we build that into our time line.  So, if I have five, six

tranches of data being requested, I have two to three weeks of downtime kind of sitting within the process.  That's how we get to the five to seven months of duration.  It is simply the downtime of waiting to schedule meetings, as well as the downtime of ensuring that we're giving adequate time for the requests that we're asking to be pulled and prepared in a proper, efficient, and effective manner.

And also, just really quickly on the rates.  That's our fully loaded rate, right.  So that's any expenses, travel costs -- everything else being all encapsulated in there.  So that's not just purely the hourly rate or an expense or payroll cost perspective, right.  That's travel, admin, any other surcharges, expenses -- that sort of thing as well.

MS. MITCHELL:  So can you describe any experience that you have -- outside of your work with the public housing authorities, any experience you have specifically with homeless assistance programs, for example, behavioral health challenges that impact program performance and things like that?  Is this something that you guys have experience with?

MR. WARNER:  I don't say we have experience in those programs, no.  Most of my clients are -- they're in the low -- affordable housing industry.  As far as, like, specific, you know, behavioral health, no, I don't have any client experience with that.

MS. MITCHELL:  Okay.

MR. KREISER:  Our breadth of experience in that area is going to be in the single audit area.  We have a slew of them in the single audit perspective.

MS. MITCHELL:  I'm sorry.  What do you mean by "single audit perspective"?  I'm not an auditor; so I don't know what that means.

MR. KREISER:  I'm sorry.  I'm sorry.  I'm sorry. I'm sorry.  I'm sorry.  I apologize.  I apologize.

MS. MITCHELL:  That's okay.

MR. KREISER:  So those behavioral health programs, those mental health facilities, county assistance offices -- they get federal grant dollars for all those programs.  I didn't put it in here, but our firm is the largest issuer of single audits in the country.  A "single audit" is an audit of those federal grant dollars under uniform grant guidance. We aren't just the largest issuer of single audits.  We're the largest by more than double whoever is in second place. So that's going to be the predominant area where we draw most of our experience, and we have -- I mean, we could list off Bible and verse of a number of them at the county levels, most in particular, but there's an awful lot of them when it comes to that uniform grant guidance and the single audits --

MS. MITCHELL:  Right.

MR. KREISER:  -- that we issue over those behavioral health.  State levels as well -- Medicaid

programs.  You know, I've worked with Texas, Pennsylvania, Delaware -- myself personally -- on those Medicaid programs, behavioral health, temporary assistance for needy families, state hospitals, disproportionate share reviews -- things like that -- but hundreds, probably, of single audits that encapsulate some of those areas.

MS. MITCHELL:  Okay.  In --

MR. KREISER:  I apologize for that -- the "single audit" term.

MS. MITCHELL:  No, no, no.  That's okay.

So in looking at your proposal, we saw a lot with compliance and internal controls but not a lot with actual performance and impact and efficacy reviews.  Can you tell me a little bit about what you guys have done and how you think you could be helpful here recognizing that it's kind of a dual track.

MR. KREISER:  Correct.  So, you know, certainly as a CPA firm we do a lot more with audit and compliance, right, but my team, in particular, does lead up the performance audit area.  So quite a few performance audits, probably as a firm, quite candidly, far more east of the Mississippi than west -- just pure honesty there.  We're in a court, right, so.

MS. MITCHELL:  I don't think you were sworn in quite yet.

MR. KREISER:  Right.  Right.  So I guess I don't have to worry about that.

No, but -- no.  Quite a few performance audits.  I listed a few of them in our supplemental deck.  Rhode Island, in particular, we do several every year.  A number of counties we do performance audits.  We've done them in Pennsylvania.  Several performance where we're -- you know, performance is hard to measure, though, right, because it's kind of engagement to engagement.  So it's not "apples to apples," right.  What they define as their objectives or criteria that we're measuring performance against is not really the same as this exact set of 31, 32 items in this order, to be candid, but --

MS. MITCHELL:  Sure.

MR. KREISER:  -- certainly quite a bit of experience understanding how do we set the KPIs?  How do we set the criteria?  How do we work with all the parties to ensure we're understanding, again, what is effective, what is successful, making sure we get a benchmark and a metric for that so that we can make the determination of how we're concluding on that objective and that criteria in that performance marker.

MS. MITCHELL:  And one of the things that I think makes this a little bit more complicated than some others is that we're looking at multiple agencies as well as third-

party, you know, service providers.  Do you have experience coordinating that across multiple agencies and multiple providers?

MR. KREISER:  So that's where I mentioned, like, Rhode Island.  So, like, in Rhode Island we're looking at Narragansett Bay Development Corporation.  We're looking at Johnson and Wales Development.  We're looking at Department of Commerce.  We're looking at --

MS. MITCHELL:  I see.

MR. KREISER:  -- multiple, multiple, multiple -- RIPTA, the convention center -- we're looking at multiple, multiple agencies and factors and things.  I mean, that's just one as an example.

I would say, to your point, quite candidly, most of your performance activities are far more one entity, one set of markers and objectives -- far more -- but we do have -- I mean, Rhode Island, to me, is going to be by far most notable, where we have a number of set of items.  Probably during COVID we say, maybe, more of it, you know, with different governments that were looking at, you know, what's the effectiveness of stimulus dollars? and just kind of carte blanche we were doing performance reviews of "Go look at our agencies," but those are kind of one-time reviews from, you know, a couple years ago.

MS. MITCHELL:  Got it.  Thank you.  I don't think I

have anything else.

THE COURT:  Scott, let me turn to you.  If you have questions now.  They'll be back.  So, if you want to consult, you know, the group of folks out in the audience, you're more than welcome to, but if you have questions, please.

MR. MARCUS:  Just a couple.  Thank you.

Thank you very much for the presentation.

Your original proposal talked about your vast experience with housing authority clients.  This is a little bit different being homelessness issues.  Can you speak to how you think that experience will translate into the -- not so much a housing authority issue but a homeless service provider issue.

MR. WARNER:  Yeah. Absolutely. Yeah, this was kind of a best fit of what we have.  However, at the end of the day, we know what -- affordable housing -- what their objectives, are and by and large, it's a similar -- they're not -- they're trying to make housing affordable for low-income families.  Here it's a little step further.  We're trying to put people into homes.  At the end of the day, it goes back to setting the objectives.  In these audits that we've done with these clients, it's about, you know, what are their policies and procedures?  what are they trying to accomplish? and are they accomplishing it?  Here, again, it is a different -- it is a different area, if you will.

However, this is -- would be an audit of -- or audits of the plans and effectiveness of the plan.

So at the end of the day, they still have criteria, they still have, you know, we -- you know, "This program was meant to accomplish this."  The affordable housing clients that we have, you know, probably the next closest fit we have because a project on homelessness is fairly unique.  It's not something that comes up very often.  Given our experience as internal auditors and in serving the organizations you see listed here, we're pretty confident that we can come in and identify what was the criteria by which we were trying to get folks off the street and into homes: "We spent money.  We allocated money."  There were, you know, monies cut and spent, deposited, bank accounts -- supposed to be return on that.  It's a very similar approach.  It's just it's a different flavor.

So at the end of the day, we're still testing controls.  We're still testing compliance with the expectations.  It's just getting an understanding of what those expectations are, what was that criteria?  Whenever you do an audit, you're always auditing to a criteria, something that was required, something that was expected.  Same approach with this.  This is -- these are just clients that I think we thought were just closest to what the Court was looking for.  So that's -- that would be my answer to that.

MR. KREISER:  And again, full disclosure, like, it's also -- in three pages trying to get as --

MR. MARCUS:  Sure.

MR. KREISER:  -- our best foot forward, as much as we can, right, far more scale in that area for us, right, versus, you know, where we have, you know, 15, 20, right.  So I mean, there are, you know, programs we've looked at.  You know, there's -- I don't want to get too detailed on the record of things, right, but some counties where we've worked with performance reviews and different programs of indigent populations, and things like that, but, you know, they're much fewer and far between of -- you know, how do you highlight that in three pages and trying to come across.  So to Brent's point, it was trying to find something that we thought captured that same general experience.

MR. MARCUS:  Thank you.

And then also you disclosed in your initial proposal that you've done work actually for City entity, County entities, and LAHSA -- all three.  And as I understand it based on the disclosure, those were purely financial audits, none of them were performance audits; is that correct?

MR. KREISER:  That's a hundred percent correct.

MR. MARCUS:  Okay.  And do you see any issue, any conflict of interest, any problem with now being asked to do

a performance audit on, essentially, prior clients?

MR. KREISER:  We do not, one, because, again, they are prior clients; two, because the audits that were performed were all done under independent audit standards. So all of the work that was done were performed as independent audit activities.  So in no way, shape, or form, from our consultations that we had briefly internally, did we do anything that impaired any future or existing independence of any activities at the time.

MR. MARCUS:  Thank you.

THE COURT:  For this round anyway?

MR. MARCUS:  Yes.

THE COURT:  Okay.

Shayla?

MS. MYERS:  Just trying to get a sense of the -- sort of the basis for your estimate for cost.  Can you just give us a sense of what the largest audit that you've done is in terms of the scope and the size of the budget of the program that you were auditing and then the cost of that audit?

MR. KREISER:  Well, I mean, we --

MS. MYERS:  In a comparable program that you would say comparable to -- like the type of audit that we're looking for here.

MR. KREISER:  Yeah, I mean, I think this is --

relative -- I mean, from a cost standpoint, this is right within our leverage model and costing for all-in exclusive rates of expenses, overhead allocation, and leverage model of what we expect and anticipate the team to look like in terms of level of expertise required, the time involved, and things like that.  I mean, one of our largest audits is the State of Texas -- single audit -- under uniform grant guidance.  I mean, it's $2 million so -- I mean, when you get to that size of scale, we get a little more economies of scale.  So it's -- you know, I don't know that -- we're probably more $190 an hour, maybe -- something like that.  I don't know the exact number of what that blended rate per hour looks like.

But there's certainly some audits we have that are more than this and some that are less.  You know, it's a factor of, you know, again, just the best guess we had of, you know, I think looking at what those objectives were, what we thought some of the specialists would be from -- you know, what -- we as a firm don't do change orders, right.  We're not a big fan of being halfway into the project and going, "Oh, you need a forensic auditor?  Well, they're $400 an order," so you're going to pay a change order if you want to really dig into that area because now it needs a forensic review.  So we wanted to build in a little bit of a cushion for, you know, are they going to be needed and how much time would that be and -- you know, so that -- when we put the

whole leverage model together of what the rates are of the individuals and how much time for the 1,400 hours that we thought would be involved, that's, I think, what the rate came -- what we felt comfortable would be the rate, as well as, you know, again, flying specialists in or, you know, needing travel and all that sort of (inaudible).

MS. MYERS:  Uh-huh.

MR. KREISER:  And that's really just how we built it.  Put it on a spreadsheet: who are the people, what's their rate, what's the discount that we're going to apply as best we can, and what's the overhead we're expecting --

MS. MYERS:  Uh-huh.

MR. KREISER:  -- based on their time and where they'd be traveling from, or how much do we think we could do remote virtually.

MR. WARNER:  Yeah, I think -- I mean, I think, you know we have (indecipherable) clients with fees all across the board less than what we've quoted there and far more.  I mean, I've had clients that -- you know, close to half a million dollars.  So, again, this was, you know, based on the -- what was in the proposal, the number of days we had to prepare it, this was sort of our best, you know, estimates of what we thought the level of effort was need based on the 31 items and just kind of walking through what do we think that it's going to take to execute this.

So it's probably -- you know, like as Jim said, it's right in line with what we thought, but again, if we're comparing it to other work that we've done, the fees are -- you know, this is just one fee just kind of thrown in a bucket of fees and (indecipherable). So we've got them all across the board as a firm. So again, I've had clients where fees are twice that and clients where the fees that are half that just depending on scope, really, the work, and once we get into it and get a better understanding of it, that's -- you know, that's -- and we're trying to apply lessons learned and -- when we price these things out. So it was a challenge for sure, but we think we came up with our best estimate there.

MS. MYERS: Yeah, and I'm really just looking for some scope and comparison for us because I think we have a sense of what the scope of -- I have a sense of what the scope of the audit is and just what you think -- in terms of coming up with this rate, what a comparative type of audit would be relative to how much the cost was.

So maybe some -- maybe a better question to ask would then be can you tell us an audit that you've done and the scope of that audit that you think came in at about the estimate that you've given us?

MR. WARNER: Well, that's a good question. I -- what I was -- what I was going to say -- we'll answer that

question -- is I -- what we would normally do in a normal process is have the scoping discussion, you know, with you when we're putting this together.  So we come back and go, "Oh, this is what they're wanting.  Let's tailor our scope and approach to that."  We didn't have that opportunity.

MS. MYERS:  Sure.

MR. WARNER:  But in terms of --

MR. KREISER:  Yeah, I mean, I think it's really hard, right, because it's 31 very specific things so it --

MS. MYERS:  Which is why -- that's why I'm sort of focusing --

MR. KREISER:  So is there --

MS. MYERS:  -- on what work have you already done that costs roughly what you think this is going to cost?

MR. KREISER:  That had those other 31 same specific things?

MS. MYERS:  No, no, no.

MR. KREISER:  It's very difficult, right.  But, I mean --

MS. MYERS:  No.  That had the cost of the audit -- $320,000 -- and five to seven months -- what is another audit that you've done that roughly comes into that ballpark in terms of cost and scope so that we can see what you're thinking about, what are the types of audits that you've done that match that, and how does it match what we're asking for.

But just answer the audit question.  So can --

MR. KREISER:  Yeah.  So, I mean, I think -- you know, we're working with Maricopa Housing right now -- I don't know exactly what the -- I don't recall exactly what the total fee is.

MS. MYERS:  Sure but ballpark.

MR. KREISER:  But it's probably not too far from this in the overall ballpark.

MS. MYERS:  Perfect.  Can you tell us the scope of the audit that you're doing for Maricopa Housing Authority?

MR. KREISER:  Oh.  It's -- a number of performance criteria that they've laid out: How effective is operations?  How is management doing it?  How are they -- how effective are they at managing the properties and the facilities?  How are they doing at maintaining things in terms of sustaining valuations of the facilities that are within the authority?  What are the projected cash flows of the authority based on those facilities, then?  How are they managing the debt related to all of those activities?  How effective is the staffing at the programs and facilities?  How have they organized themselves?  They have a number of different component units that they break out for each.  So, you know, how effectively are they organizing in terms of supporting the structure and operations that they have?

I'm probably not hitting everything -- I apologize

-- off the top of my head, but that's kind of, I think -- and again, I think they're probably kind of in the ballpark at least, and I don't know, I -- the project is still ongoing, and I think we started November, December.

MS. MYERS:  That's exactly what I was looking for. Thank you.

MR. KREISER:  Yeah.

THE COURT:  Okay.  Michele, do you have questions?

MS. MARTINEZ:  Thank you, Your Honor.

Just very quickly, what software, analytics, or visualizations do you use in -- for your audits?

MR. KREISER:  So for visualizations we're big fans of Power BI.  It's probably the biggest one by far -- is what we use for visualization.

From an audit tool perspective, we use Fieldguide. We use a proprietary tool called "AIE."  I'm not the biggest fan of that, but we use it if you -- if that's what we use. We use a work paper management system called Pro fx.

And then from an analytics software perspective, we use a tool called Alteryx and Tableau -- is probably the two biggest behind-the-scenes ones that we run for analytics, verification, validation of populations -- things like that.

The forensics teams get into some interesting things.  I'm not really up to speed on that.  I know we used to use products called EnCase and FTK -- Forensics Toolkit, I

think is that -- but we have some specialists that handle those.

MS. MARTINEZ:  Great.  Thank you.  Appreciate it.

THE COURT:  You're going to talk to a lot of professional people who are suits -- and are women -- and people in politics, different heads of different agencies. Are you willing to take to the streets here in Los Angeles and talk to the community -- the homeless community?  Yes or no?

MR. KREISER:  Hundred percent.

THE COURT:  Are you willing to do that between, let's say, 5:15 and 6:30 in the morning?

MR. KREISER:  Hundred percent.

THE COURT:  Are you willing to do that at night?

MR. KREISER:  Yes, sir.

THE COURT:  Do you find them any less credible or more credible, or are you going to give the community, you know, who are actually homeless out in the streets, a voice? Going to listen to them, in other words?

MR. KREISER:  Absolutely. Okay.  Now, that doesn't mean that everybody is truthful.  It doesn't -- everybody's got an ax to grind, but you're willing to go out there; is that right?

MR. KREISER:  Correct.

THE COURT:  Okay.  Okay.  We'll come back to you,

and I want to thank you for you courtesy.

(End of second presentation.)

THE COURT:  I'm going to ask you to do this: I want Daniel Garrie to come forward for just a moment.

If we'd just have a set up here.

And, Michele, would you get the other folks out in the back.  They can hear this.  They're sitting -- just have a seat.

We've got some matters from this morning, and I saw Daniel kind of waving at me.

So, Daniel, just a moment.  I want to get the other folks out before you say anything.

(Pause.)

THE COURT:  And folks, as a courtesy -- whoops. Just have a seat.  Any place.

As a courtesy, I didn't want you to think you were sitting back there needlessly.  We've had two presentations. we're going to have a third in a moment, but before we came into court, there were requests by the Court of Daniel Garrie, my special master, and the County, and I think that, unrelated to you, I'd like to have them make that presentation now, and then I'll come back to the third person.

So, Daniel, come on up for just a moment, but before you do, let's tie into this website.

(Law clerk assists pulling up website.)

THE COURT:  All right.  So, well, Daniel Garrie's here, along with Mira -- and thank you for staying -- and I wanted you folks to be able to go home at some point.  We may be here a little bit later.

I understand that this website went up --

MR. GARRIE:  It's live.

THE COURT:  Huh?

MR. GARRIE:  It's live.

THE COURT:  It's live?

MR. GARRIE:  Yeah.

THE COURT:  Like live?

MR. GARRIE:  People can access it now.

THE COURT:  Excellent.  I want you to slowly walk us through that.

If anybody would like to get out their cell phones again, they're more than welcome to, no affront to the Court.

And if you'd like -- and I know that the invoices haven't been up because my -- yet.

MR. GARRIE:  Yeah.  So the invoices weren't added because they're creating a process they can follow to make sure they have a standard way of doing it and by -- on Monday in the declaration -- or whatever -- the document that will be --

THE COURT:  Okay.

MR. GARRIE:  -- submitted, they'll detail out the process they're going to do.  So by the end of the month, you'll have the invoices there ready to roll and for people to view, but it's --

THE COURT:  Excellent.

MR. GARRIE:  -- complicated because of the way and the manner in which they're paying and the invoices are paying difference in --

THE COURT:  Okay.

MR. GARRIE:  -- some sense from the City.

THE COURT:  I want to compliment both of you.  You've got our website within hours instead of weeks.

MR. GARRIE:  Well, you should compliment the -- counsel and the County.  They --

THE COURT:  Mira, a compliment again.  Thank you.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Yeah.

MR. GARRIE:  And I'll turn it over to my colleague.  She -- really, she drove it.  So I'll turn it over to her.

THE COURT:  So, Mira?

MS. HASHMALL:  Mira Hashmall for the County of Los Angeles.

So we got the right folks on the phone together, and at the end of the day, the challenge is not the website, right.  The challenge is making sure we have the information

accurate and complete and in a way that doesn't violate privacy rights --

THE COURT:  Exactly.

MS. HASHMALL:  -- of the individuals.

THE COURT:  Yeah.

MS. HASHMALL:  And so with the benefit of our esteemed colleague here, he sort of enforced the idea that we'll start getting things going, they'll be sort of a working out of the kinks, and that process will be iterative --

THE COURT:  Yeah.

MS. HASHMALL:  -- and then we don't have a problem where we've committed completely down one road, find out it's not working or has problems, and have to reverse course.

THE COURT:  Right.

MS. HASHMALL:  So we are going to explain in greater detail on Monday where we are in the steps and what we're -- our progress is, but this is a really encouraging first start.

THE COURT:  Yeah.  And I want to thank you.  You literally have saved weeks getting this up today.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  I'd ask that, as you're comfortable, though, you start putting up some initial invoices so I can work through -- in other words, don't wait until the very

160

end.  We're going to have a date that you'll give me for completion, but as you get some of these invoices -- like, we had one today from the City -- start putting some of those up so we can just see -- my law clerks and I can work through that?  Is that fair enough?

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  Okay.

MS. HASHMALL:  That is our plan, and we're going to do our best to make sure it's mobile friendly, searchable, really a good interface for the public to use.

THE COURT:  Okay.  Now, walk me through this.  How do I get to it?  In other words, what am I looking at?  I want -- I'm really simple.  I'm not very smart.  I want you to walk me through this.  How do I find this?

MR. GARRIE:  Well, we put it up quickly.  So right now you have this URL that you have to enter, but I'm sure the County will create some sort of vanity URL.

THE COURT:  Yeah.  In normal person's language now.

MR. GARRIE:  So in normal person language, they're going to take this long string of junk and create a set of words that people will be able to easily type rather than typing in the https -- data.lacounty.gov/apps.

THE COURT:  Okay.  Now, hold on.  Let's go slowly.  They're -- we have that.  Right.

MR. GARRIE:  So rather --

THE COURT:  And if everybody in the audience got out their cell phones, they could get onto this site; is that correct?

MR. GARRIE:  Yeah.  A hundred percent.

THE COURT:  Okay.  Does anybody care to do that?  In other words, I don't want my law clerks to get 20, you know, phone calls about how you do this, and I'll put it on the docket.  So, if any of you are interested, we'll walk through this site very slowly.

MS. HASHMALL:  Your Honor, the only thing I'd ask is, to his point, we probably do want a simpler URL.  So maybe we don't put it on the docket until we've got a --

THE COURT:  Oh, I'm not going to yet.  And maybe Monday then?

MS. HASHMALL:  That's -- hopefully.  I think that's right.

THE COURT:  Okay.

MS. HASHMALL:  Yeah.

THE COURT:  Yeah.  So put your cell phones away if you want to, then.

But I want to have access, you know, to the public, and I want to have that access by cell phone also.

MS. HASHMALL:  Yep.

THE COURT:  I care the community gets this as well.

Let me just thank you.  Is there anything further?

MS. HASHMALL:  No, Your Honor.

THE COURT:  Go home enjoy your family, then.

MR. GARRIE:  And I think they have the right process.  So kudos to them.

THE COURT:  Yeah.

And, Mira, thank you very much.  We really appreciate it.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  Okay.  So, folks, it's up and operating in some form at the present time.  We've saved weeks.  The invoices will start going up as quickly as possible in a usable form.  I would like to get input from any member of the public into my chambers, into my law clerks, or Karlen if there's a problem accessing this.  Because you're the user, in a sense.  I want to make sure that this is simple and can be used.  Okay?

All right.  Then, folks, if you'd go back.  We have one last person to -- or group to make a --

(Court confers with staff.)

THE COURT:  Daniel, thank you.  Daniel, see you tomorrow?

MR. GARRIE:  Maybe.

THE COURT:  We'll talk. Yeah.  Okay.  All right.  Thanks, a lot.

Would you be kind enough to just state who you

represent, to begin with.  I know who you do, but we need to have a record.

JOE GREEN:  Yes, Your Honor.  We're here representing Horne LLP.

THE COURT:  All right.  And your names, please?

MR. GREEN:  Joe Green.

THE COURT:  Will you spell your first name?

MR. GREEN:  J-o-e.

THE COURT:  And your last name?

MR. GREEN:  G-r-e-e-n.

THE COURT:  Thank you so much.

GEOFFREY ROSS:  Your Honor, I'm Geoffrey Ross, G-e-o-f-f-r-e-y R-o-s-s.

THE COURT:  Thank you very much.

And please?

MR. GREEN:  Your Honor, again, my name is Joe Green.  I started as the firm director of assurance for Horne, which means I oversee all the audit practice firm-wide, which that does include the government audits as well.

First of all, we would like to thank the Court for allowing us to present here today.

THE COURT:  No, quite the opposite.  Thank you, humbly, for being here, and it's appreciated.

MR. GREEN:  And I would also like to thank the Court for the level of detail that they provided in the

scope-of-work document.  It was very helpful as we worked through scoping this engagement and actually coming up with the time line and the fees that we added to the document.  So again, just want to thank the Court for that level of detail provided.

As auditors, we always need to exercise professional skepticism.  We understand the importance of evaluating the evidence given to us.  What we believe makes us different is that we understand the nuances and the urgency around this -- around the effort that this will take, and that's because of the auditors, the CPAs, the programmatic managers, and the homelessness experts that we will -- that will be a part of this team.

We know we are required to evaluate the evidence objectively.  We'll be seekers of the facts.  We believe the -- again, we believe the scope of work that the Court has outlined and the methodology under the government standards certainly creates a path for executing that scope of work outlined by the Court.

I would just -- before I hand it over to Geoffrey, I would also -- as an auditor for -- however many years -- and a CPA, I think the most important thing about this particular audit, financial and performance, is the subject matter and the subject matter experts that will be assigned. There is no substitute for having experts on the ground

evaluating those experiencing homelessness, and if you've ever done anything, it's kind of like you don't know what you don't know, and as an auditor, having somebody like Geoffrey along my side and representing the Court, is invaluable.

THE COURT:  Thank you very much.

MR. ROSS:  Your Honor, again, Geoffrey Ross, director for government services at Horne.

Prior to my current position, I've actually served at all levels of government, federal, state, and local.  I have worked in two continuum of cares overseeing a housing authority, worked in a separate housing authority.  The team that we have assembled that would be accompanying the auditors are folks with expertise on all the funds that the Court has identified in terms of what the scope of work is to cover.

And in terms of what Joe is referring to, I think that it is critically important that given the urgency of homelessness -- you know, I think that we all understand -- or should understand the level of need that's trying to be addressed through the Court's actions -- that understanding what this takes, what we're reviewing is paramount.  In this -- you know, to be very frank, this is about taking an unsheltered individual or family and moving them into permanent housing with appropriate wrap-around services.  Our team understands the standards by which that means.  We

understand, you know, what generally is accepted nationally as the standards for placement, referral, for seeking the outcomes and then being able to measure how those outcomes are performing.

And that's really fundamental as to what we see the scope of work asking is follow the money, understand where bottlenecks, where barriers might be occurring, be able to document those, but beyond that, also really understanding what that means in terms of the delivery of service itself. I will say with over two decades of public service and housing community development and homelessness that there are a lot of nuances that you don't catch if you're seeing this for the first time, and it is those nuances that are paramount for the Court's understanding in terms of measuring the effectiveness and being able to report back as to what is being done well, where improvements could be made what that looks like.

So in the interest of the Court's time, we're happy to make ourselves available to any questions that you have, but we do believe, you know, we do have the audit expertise and the internal staff expertise as former government officials, sub-recipients, third-party administrators to really understand the nuances of the programs and the funds the Court is seeking to review and audit.

THE COURT:  Let me turn to counsel if they have

questions, and this will be just their initial questions, and then we're going to invite each of you back so they have time to consult their various colleagues who may be in the audience.

So, Ms. Mitchell, please?

MS. MITCHELL:  Thank you, Your Honor.

Can you describe some recommendations that your work has made that address deficiencies in homeless assistance programs?

MR. ROSS:  So -- yeah.  So specifically speaking, we've actually been serving as the third-party administrator for the State of California's Community Care Expansion Program most recently.  That is to provide both preservation of existing licensed care facilities and permanent supportive housing facilities, as well as expansion of such facilities, across the state.  We're partnering with 34 counties that are delivering programs directly, as well as delivering projects on behalf of the state directly.

We actually took that program over from a previous administrator due to challenges that that administrator was having.  As a result of that, we've come into the process, had to fully reevaluate the process by which projects were coming in, the way that counties were being asked to participate, and through that process we've gone through where we've been able to continue to make awards to move

forward with, you know, technical assistance in a learning, collaborative format with our county partners to make sure that facilities are being set up both in conformance with licensing, have sustainability as part of their actions, are tied in with permanent supportive housing in terms of new appropriate program supports.

California is a housing, you know, first state, which means that there are specific rules to access and that providers need to be, you know, in line with, and so in that effort we've been doing that for the last nine months, most recently and currently, very specifically on behalf of the state and in partnership, again, with 34 counties.

MS. MITCHELL:  Your proposal mentions your experience, and you obviously have quite a bit of experience with Housing First policies and low-barrier shelters.  We, on the Alliance, have been fairly critical of Housing First and low-barrier shelters as an exclusive option.  How would you make sure, if you were selected as the auditing firm, to avoid confirmation bias in some way, as opposed to looking at a particular project objectively without looking at it from a Housing First or low-barrier perspective?

MR. ROSS:  I think, first off, you have to look at from its requirement.  But that being said, the objectivity that you're speaking to is you do need to be able to look at, you know, where are obstacles, barriers being encountered in

terms of what's being sought and in terms of what's actually occurring on the ground.

I will say, you know, through years of experience, understanding the nuance difference between the intent of a policy and the actual material outcome of a policy is critical in terms of making sure that the desired outcome is being achieved, and that is what this -- our understanding of the scope of work in this audit is seeking is that level of nuance as to we are trying to make sure that individuals or families are housed and they're housed quickly and they're brought through the homeless system of care.  Understanding where that's being successful and where that's not is the key component of what this is, you know, seeking to be able to identify so that further conversations of what changes may need to be made can be had.

MS. MITCHELL:  In your work with COCs, have you made any recommendations for changes or for reforms that have reduced unsheltered homelessness or point in time counts that you can point us to?

MR. ROSS:  Yeah, so in a previous role, again, serving in the County of Sonoma specifically, I was the assistant executive director and then the executive director for the county's housing commission, which also served as the lead agency for homelessness for their county-wide COC.  That time was shortly after the Sonoma fires.  That was a period

of time where we were redesigning and implementing new programs, and coming out of the fires, there was a reduction in homelessness two years after the fact.  So it wasn't just because folks were dislocated due to the fires and that, but it was actually as a result of the county implementing the programs, working very closely with its COC providers, and seeking, you know, to have more productive interventions in terms of ending homelessness and preventing homelessness.

MS. MITCHELL:  What were those more productive interventions?

MR. ROSS:  Really, it was about coming up with a system where the providers and the government were able to work in a method where -- again, under the Housing First guidelines but really understanding the nuances of how do you place?  What facilities were best positioned to handle certain clientele?  How do you make referrals using at that time was the VI-SPDAT, and trying to make sure that those types of placements were occurring in the correct place, that if placements weren't being able to be maintained -- so we sought at the time 85 percent success rate -- or "stick rate" is what we referred to is as -- which meant you were generally reaching deep enough into the need level for that population without overreaching because, if you overreached, you would have a lower success rate.  If you were under-reaching, you'd have in the 90s or higher.  So it was really

trying to be able to match that level of need to the type of intervention that was available, trying to make sure, again, that it was available to all folks that were, you know, going through that process, and that the method by which folks were being identified that that, too, was being constantly monitored and updated.

MS. MITCHELL:  Got it.  Thank you.  That's all I have at the time.

THE COURT:  Scott?

MR. MARCUS:  Thank you.  Thank you for the presentation, and forgive me if I get this terminology wrong because I'm also not an auditor.

It seems like a lot of your experience, particularly in this field, is from actual administration of programs, you're actually doing the work, as opposed to auditing the work or auditing somebody else do the work, and I just want to understand if that distinction is accurate and, if so, how much of your experience is from being an administer and actually performing the function, as opposed to overseeing -- not overseeing but evaluating the programs, evaluating the function, and then being in a position to make recommendations to change those programs because I'm assuming you're not auditing yourselves.

MR. GREEN:  That's correct.  And I can speak to that as the audit guy in this group.

I have overseen audits of ESSER funds  from the state of Florida -- ESSER I, ESSER II, ESSER MS. MYERS: -- which I know -- I realize is different from this particular program, but those are the elementary and secondary education emergency relief funds.  Those projects -- each one could last anywhere from six to eight months, but in our role we are auditing the financial performance, compliance aspects of those engagements.  We serve in a similar audit role in about 19 states currently with projects of this scope.

And so, really, what I see this is -- I've kind of mentioned it earlier -- is I'm going to be the guy making sure that the audit programs are in place, that the sufficient objective, audit evidence is there to support the recommendation.  And while I'll be able to look to Geoffrey and say, "Hey, Geoffrey, is what the respondent" -- "is what they're telling us factual?  Does it seem reasonable?"  And so, again, we will -- the performance and the financial audit will run parallel, but you will have auditors, CPAs performing the audit aspects and making sure that the evidence we obtain and the recommendations that we make are (indecipherable).

And so another example is not particularly related to this topic, but, again, it's relevant to financial audits of rate payers and fuel costs being passed along by local utilities.  We've be in the throes of those types of

engagements, evaluating that from a financial and performance standpoint.  So that's why you have both of us here today is that with any audit -- with any audit the subject matter expert piece is very -- is so critical because I could go in and audit somebody for a year, but if I don't have the requisite knowledge to understand what they're telling me is fact or reasonable, then I'm not going to be as effective.  So that's why.

MR. MARCUS:  Thank you.  Thank you.

THE COURT:  Shayla?

MS. MYERS:  Scott covered my question.

THE COURT:  Michele?

MS. MARTINEZ:  Thank you, Your Honor.

Just very quickly, what software, data tools, or analytics, and visualizations do you utilize?

MR. GREEN:  From a visualization standpoint, we use numerous tools.  I could -- as -- I can give you those -- like, as simple as Smartsheet -- but we have already -- in hopes of being engaged by the Court, we have spoken to our team about establishing a project management tool.  It can be whatever tool, but that will enable us to -- we can create dashboards that we can see as we're interviewing people.  It can be task driven such that, you know, if we need to go talk to this person before we can develop a test, the whole team can see that.  Even -- it can even be client facing if the

client, Court, would like to see that progress as it's being made, that can be shared.  We also have calendar email reminders with the clients because obviously this -- or the audit (indecipherable).  As we're going through this process, you know, they have jobs as well.  So we can set up email reminders saying, "Hey, this Thursday you have a interview with Geoffrey."  And so that is kind of our project management tool and software tool.

And I'm sorry.  I forgot the other question?

MS. MARTINEZ:  It's okay.  No, you answered most of it.

And just the last question that I would ask of you because it's very unique that you've been in various sectors of government.  You know, as you're aware, most governments don't take a systems-thinking approach.  They work in silos. They focus on parts of a system and not the whole, and so I would like to get your perspective because a lot of times, when we are talking about audits, we're not thinking about taking a systems-thinking approach, and that's what's actually needed, and so I would like to get your perspective.

MR. ROSS:  Yeah, I appreciate that.

So I think that that's -- that is critical. Breaking down silos in government is an ongoing, ever-present effort, and it is one that consciously needs to be made every day in terms of conversations with folks.  And so I will say

that over time, going back to previous experience of success, it is breaking down those silos. It is making sure that you invite other partners that are part of the process that we might not interface with on a daily basis into the conversation. Understanding shared terminology -- a lot of times what happens is we think we're saying something but we're actually talking past each other because we haven't taken the time to understand the nuance of the language that we're using.

So those are pieces that, as you go through any effort, you know, an audit or just seriously trying to internally evaluate is a policy working, it's -- you have to look at the outcome. It's not a widgets-based approach, and when you're in silos, a lot of times it's -- you end up focusing on widgets. And in this moment, again, this is about individuals and families, generally speaking, unsheltered living on the street. So we understand that. We understand that the outcome is not just shelter. It is actually permanent, affordable housing with the desired wrap-around services, trying to make homelessness rare, finite, and one time. Like, that's what the mission and the goal of anyone that works in the field is trying to achieve. We lose that sometimes as we're trying to execute the nuts and the bolts of that, and so being conscious of that, communicating that, and reminding folks it's okay to think about that or to

state that or if you think that you're off of that to revisit it, that's a critical component.

So I will say that anytime you're going to have success in the field, you're engaging in that type of effort because you have to be open to the fact that conditions change, partners change.  There is a lot of turnover in the service provider world, and so while you might have discussed and taught something in one moment to one person, that is not necessarily going to be the case two months from now, sometimes not even two weeks from now.  So you always have to be revisiting and thinking about those things and why -- turnover is a reality in the nonprofit provider world, it is also a reality in government, and so all of those pieces are crucial in terms of thinking about systems approach and how to get at it effectively.  It's revisiting and making sure that any assumption that you've made still applies in the moment.  So everything should be living documents.

MR. GREEN:  Yeah, that's -- I guess that's what I was going to say is the audit plan, even the risk assessment, is an ongoing, living document.  It doesn't -- we don't prepare it and then push it to the side and then go run and do -- go run and do, I guess, I'm -- it's always --

MS. MARTINEZ:  That's been my past experience.  It goes to a shelf.  So --

MR. GREEN:  Well, I understand but -- and we

acknowledge particularly -- and it should be the fact in all cases but particularly in this case, and again, I can't emphasize enough that's why, you know, I think this team that we have established is kind of the best of both worlds, I guess I would say.

MR. ROSS:  One last comment to your question is you're making decisions across -- the entire time as you're doing this.  You also have to be very mindful that everyone understands what's a two-way decision and a one-way decision.  Two-way decisions you can revisit and change and change direction.  One-way decisions you're forcing yourself down a particular path.  And you need to make sure that everyone understands what type of decisions are being made at a particular point in time and ultimately why that decision is being made at that particular point in time.  So that's crucial as well is, if you're trying to break down silos and you're trying to think about systems, that's a really important aspect.

MS. MARTINEZ:  Couldn't agree more.  I call them "feedback loops."

MR. ROSS:  I figured in L.A. we'd think about traffic.

(Laughter.)

THE COURT:  Okay.  You're going to meet a lot of folks who are what I call "expected" people that you'd

interview -- your providers, heads of different government agencies, NGOs -- but are you willing to take to the streets and talk to the actual homeless community, and are you willing to get up and do that early in the morning before they're moving around?  Are you willing to expose yourself to that kind of effort on the streets?

MR. ROSS:  Your Honor, it would be my pleasure and honor.

THE COURT:  Okay.  And you'll listen to them?

MR. ROSS:  Yes, Your Honor.  Absolutely.

THE COURT:  So, if somebody tells you, "We're providing all this," and you don't see it, X doesn't match Y, you're going to take that into account?

MR. ROSS:  Yes, Your Honor.

MR. GREEN:  Yes, Your Honor.

THE COURT:  Okay.  I'd like to do this.  I'd like to go -- have the gentlemen go back and then bring them back out in the same order that they made their initial presentation and then -- so you'll be the last, but I'd like to give the folks some time to answer -- you know, we're going to leave them back there.  Yeah.

And let the folks out here talk to some of their constituents out in the audience.  They may have questions or input for the City or different folks.  So we'll be right with you within the next five hours.  I'm just kidding you.

No, we'll be right with you.

Okay. What I want to do is I want to take about a 15- or 20-minute recess.

Scott, as a courtesy, et cetera, you've got a number of folks who may have input back there.

MR. MARCUS: Thank you.

THE COURT: Liz, same thing.

Shayla, if you've got constituents, please.

So we'll see you in 20 minutes.

(Recess from 4:53 p.m. to 5:09 p.m.)


AFTER RECESS

THE COURT: Then we're back on the record.

My suggestion is, unless you disagree, I'd like to bring the presenters out in the same order that they made their presentations in and not have a collective group, where they hear a question asked and hear the answer of one of the presenters that the other presenter can then, let's say, improve upon. I just think that's a lot fairer than having all three of them in your presence. So unless there's an objection.

Folks, I'm going to turn this over to counsel. You're the Alvarez group, and why don't you go to the lectern for just a moment, and let's see if they have any questions for you, and then, if not, we're going to bid you good

evening, and let's begin with LA Alliance.

(Pause.)

THE COURT:  So, LA Alliance, do you have questions?

MS. MITCHELL:  Oh, sure.  Thank you.

So the scope of work focused on budgets, performance, management, and impact.  What experience does your firm have in work of this scope, and please describe.

UNIDENTIFIED SPEAKER:  Sure.

THE COURT:  And read that again one more time so that --

MS. MITCHELL:  Yes.  I'm reading handwriting, to be clear, so I had to clarify.

UNIDENTIFIED SPEAKER:  And it's my handwriting, Your Honor.  It's awful.

MS. MITCHELL:  The scope of work focused on budgets, performance, management, and impact.  What experience does your firm have in the work of this scope?  Please describe.

MR. POTTER:  Yes.  I can take that.

So I'm part of A and M's public sector services group, and the primary business we engage in is (indecipherable) performance improvement.  So over the last 30 years, we've worked in many of the largest sort of public sector organizational turnarounds in the history of the country nationwide, working with places like New York City

Public Schools, the State of Louisiana, the state transportation agencies, state health and human services agencies, and we, you know, really have a core of about 110 people in our public sector group that focus all of their time and energy on specifically this type of project.

So to highlight an experience that I have personally or that a lot of the team that would be participating in this, we work with -- you know, in taking it past the level of just doing a review, think about how to improve things, worked with a major public school district -- one of the top-five school districts in the country -- to assess -- kind of take a look -- very similar to this -- understand what's happening with their finances, their outcomes, and help the district and the state plan a restructuring plan that would help them reshape the organization to better serve students.

So what was unique about that which is similar to this work is you're not looking for efficiency to save money, right.  You're looking for how do we take the resources that we have, put them in -- in this instance, the people that are serving -- putting the right resources in the hands of the people that are directly serving the people we're trying to serve.  So in the instance of a public school district -- which we've done, say, half a dozen of these types of projects for -- you're serving schools, you're serving

students, and you're serving -- really, making sure you have teachers well equipped to serve students, looking at the entire flow of funds through the whole organization to say what doesn't support a student, and how can we figure out a way to make it support a student?

So we do that kind of in agencies such as education agencies, health and human service agencies, developmental disabilities agencies, and really kind of anywhere in the public sector where there's kind of messy, complex challenges related to serving members of the public.

MR. MC CURLEY:  I want to add just a couple other types of examples where the work that we've done has really been about budget prioritization and those kinds of things.

So we've done work and helped in the State of Louisiana, in the City of New Orleans, City of St. Louis, and some others, helping manage -- and in Puerto Rico -- helping manage FEMA funds that have come in in terms of hurricane or disaster recovery, helping make sure that they evaluate the potential impact of the projects that they're considering, thinking about how they budget, take that money and apply it to have the greatest good, as they think about that, and manage the complexities of all the environmental work that's got to be done, the cooperation of the local units as they go through that stuff.  So we've done a number of work in that area.

And then we've also been selected to be a third-party fiduciary responsible for helping oversee the failing school districts in Puerto Rico, in the U.S. Virgin Island [sic}, in Guam, and helping them reestablish financial processes necessary to really do a good job of managing all the different grant funds that the schools receive and (indecipherable).

So that's just another couple of examples where it was about, really, evaluating that budget and then helping them to determine what projects need to be there for the best outcome.

MS. MITCHELL:  So quick follow-up to that.  You used the term "greatest good."  I think we would say that that's the efficacy or effectiveness of the program, right, which is what we're trying to determine: What are the programs that are effective, and what are the programs that aren't?  What are some methods that you would use to determine the effectiveness of a program and -- and during the performance audit portion of this?

MR. MC CURLEY:  Well, I mean -- I mean, one of the things that we would do would be, I mean, working with you guys to help understand what you think "good" looks like, right.  And it's going to have a different -- it's going to have a different -- it's going to look different depending on who we're dealing with.  And so, if we take specifically the

homeless population, if we have someone who's coming into the situation and they're experiencing homelessness because they've lost their job, they don't have the economic wherewithal to reestablish homelessness, then a good outcome for them might be establishing job training, temporary housing, childcare to support them while they're in the job search, and then finding themselves reemployed, potentially in subsidized housing, but out of the homeless crisis zone and into a situation where they're on the path to self-sufficiency.

So that might be what "good" looks like for that particular constituent, but it may be very different for a constituent who is coming into the homeless situation because they are -- they're dealing with a substance use disorder or they're dealing with a behavioral health -- so what we'll need to work with you guys on is to define what that looks like for the desired outcome that we have.  So there may be a situation where the best outcome that we want is someone that could be -- potentially participate in a group home kind of setting versus on their own, self-sufficient, but that may be what "good" looks like for that particular -- does that make sense?

MS. MITCHELL:  Yeah.  I mean, I think you're talking about people, and I'm talking about programs, and I think it's much more -- it's much easier to think about what

success looks like for a person versus what success looks like for a program, and that's what, I guess, I was trying to get at.

MR. MC CURLEY:  Okay.  Well, I mean, if you've got some specific --

MS. MITCHELL:  Yeah.

MR. MC CURLEY:  But I think we would -- I'll let him talk about this --

MR. POTTER:  Yeah.

MR. MC CURLEY:  -- how we measure success at a program level.

MR. POTTER:  You know, it's really complex in an organization that's serving people through so many intermediaries, right.  So there's --

THE COURT:  Just a little closer to the microphone. Thank you.

MR. POTTER:  Oh, sorry.

It's very complex in looking at an organization that serves so many individuals or needs through so many intermediaries, right.  And so one of the things that we'd love to do is establish a clear understanding of the outcomes -- the outcome measurement that's available and try to understand the gap between output analysis, which we're usually pretty good at, and outcome analysis, which actually tracks the longitudinal impact of the things that are done.

There's research that helps us understand what actually leads to an -- you know, a good indicator of success of a program.

But, you know, in an organization that's this complex and has so many layers to it, we'd really try to establish a clear understanding of the tie between the intent of the funds. So we're going -- you know, what's the story we tell ourselves about what we're going to do with this money and then what do we do with it, and understanding where that disconnect is and the kind of value chain of Did we actually hire the people we said we're going to? Yes, we usually do. And did we actually get the grants out that we hoped to? Yes, for the most part we can do that.

Somewhere in that chain the question is did we actually achieve the things that those things were supposed to be buying? And what we try to do is kind of deconstruct that value chain to understand where the breakdown is and identify -- there are going to be organizations and subunits that do really well at achieving outputs but don't have the ability themselves or haven't developed the performance management culture and capabilities and infrastructure to say, "Okay, but are we tracking longitudinally what's happening to the population that we're serving?"

So I think we'd look for opportunities like that to kind of close that gap and then really focus on outcomes where outcomes are able to be focused on. That is

challenging at this scale because the infrastructure of these organizations is going to be a limiting factor but I -- you know, I think that's where a lot of that hard work is, and that, frankly, is what contributes a lot to how many hours we have to put into this.

MS. MITCHELL:  Your Honor, would it be okay if Mr. Webster addressed them directly?

THE COURT:  Yes.

MS. MITCHELL:  Thank you.

MR. WEBSTER:  Thank you, Your Honor.

So I very much appreciate these comments and the ability to follow up with some of these questions.

So I like when you mentioned restructuring, and one of the challenges of homeless assistance programs, not only here in Los Angeles but, I think, across the country, is that there are certain constraints both with existing funding and policy, and I think one of the challenges is that we've got problems here in Los Angeles at scale that perhaps the funding requirements and the policy constraints never contemplated.

So what I'm looking for, and I hope what we're looking for, is, really, an organization that's willing to go beyond and identify where some of these funding requirements, funding restrictions, or policy constraints can actually solve problems if we had the right identification.  And I'm

not persuaded by saying, you know -- you know, (indecipherable) comments about saying, "Let us understand your recommendations so that we can put them on the shelves," and we said, "We had a nice audit."  What I'm interested in is saying, "How can we get actionable recommendations that break the status quo in order to meet the needs of people on the street?"  The reason -- and there's a question in here somewhere.

(Laughter.)

MR. WEBSTER:  (Indecipherable.)

MS. MITCHELL:  I was about to tell you to get to it, Paul.

MR. WEBSTER:  Yeah.

MS. MITCHELL:  Okay.

MR. WEBSTER:  But the reason that we sued is because we saw there's a lot of money out there that's not necessarily getting to the needs of folks on the street, and we need not just the financial understanding, the fiscal accounting part, but also that performance, to outcomes, to problem-making recommendations, and I want to know where in your experience you've been able to kind of break the status quo and provide recommendations that have gone outside of the box that's sort of a wakeup call and how those were implemented to produce change.

MR. POTTER:  Thank you so much for that question.

I -- you know, I can answer that --

THE COURT:  Did you understand the question?

MR. POTTER:  Yes.  Yes, I did.

THE COURT:  Okay.

MR. POTTER:  I think I did.  You'll be able to tell me whether I did or not.

Those are all really great questions.  I think an important thing is there is the box that we put our -- you know, we put our public programs into, which is the combination of kind of a structure of governance that goes from law, to policy, to regulations, to the board governance of all the organizations that we serve.  And so, when we think about recommendations that we put forth to fix a problem, we need to view them through that but also relieve ourselves of those when we it comes to recommendations.

So we -- what we would do in that case -- or what we've done in many cases with large public organizations -- understand the regulatory framework, understand -- there's so many requirements that come through federal funding that tie our hands that say we can't do X, Y, or Z.  A lot of cases we need to challenge the assumption that we know what that means and that we actually can't do that thing because we have practices and policies and procedures.

So we would -- what we do is we take that sort of -- we look at it as, like, a governance -- sort of a pyramid

of governance that flows down from the law into what does appropriation require along with it.  So the state or the feds, they say, "This appropriation has these strings attached," and then you go down to the state level, the local level, and then even into the governance of the nonprofits, right.  There are all these requirements.  We need to view the entire project through those -- through that filter and understand the way that those requirements play out in realities.

And when we make recommendations, we typically would take -- for example, if we did a -- and I tend to think of, like, things at this scale that we do -- I think something like a whole state might spend as much money as we're talking about spending on this (indecipherable), right.  The regulatory framework and the governance framework that controls how we spend money to do things well in an organization that size is incredibly complex.  We would set ourselves to understanding that and building a framework to analyze these problems through.

And then, as we think about recommendations, we think of a layered set of recommendations.  We set out the recommendations that work in today's organizational structure, what are the regulations that work if you remove that bottom layer?  Say, "We're not using the same organizations.  We're going to follow the same law.  We're

going to follow the same regs.  We're going to follow the same policy," and sort of apply that layered approach to recommendations to say, "What are the things" -- "What's the blank space version of the solution for this problem?"

And a lot of times clients can't push through all of the things needed to get to that, you know, brand new, you know, approach to that, but what we find is giving recommendations that layer the policy requirements, the legal requirements, the governance of the organizations into it help the organization we're serving utilize the recommendation depending on how far they're able to go in solving the problem.

This is a huge problem.  It's massively important to the community.  We're hopeful that means the unconstrained version is really valuable.  What could you do better?  You could spend more money on this.  That -- we -- is a great recommendation, we'd love to do that, but we don't want to cut ourselves short by not applying -- you know, not giving you the other options, the options that work in -- at each level.

MR. WEBSTER:  And how long do you hope to be able to produce that for us?

MR. POTTER:  For how long would we hope to produce --

MR. WEBSTER:  How long will it take for you to

produce that for us?

MR. POTTER:  To understand the governance and make the recommendations?  So I think we'd need to understand the requirements, the governance, study the problem, make recommendations that are filtered through that.  From our perspective, that's five to six months' worth of work.

MS. MITCHELL:  You're hired.

MR. WEBSTER:  Thank you.

MS. MITCHELL:  Just kidding.  Just kidding.  I don't have that authority.

THE COURT:  (Laughs.)

MR. POTTER:  One thing I'd say is, like, a lot of us here are accountants.  We're not all accountants.  A lot of us are public policy people.  This is what we're passionate about.  This is what we like doing.  I haven't worked in a space that isn't a messy, complex, social services space, and that's hard to understand if you only look at the finances of it.  And we try to bring the rest of our team.  Frankly, they're so busy working on problems like this, we couldn't get them here today.  We tried to bring the rest of the team that can actually help with understanding the "really close to the ground" perspectives that are related to providing these services to help us do that efficiently.

MR. WEBSTER:  Thank you.

THE COURT:  All right.  Then, Scott?

MR. MARCUS:  Thank you.

Can you give me -- or us -- excuse me -- an idea of the total number of hours and staffing and rates that went into your estimate.  Because, as you know, your estimate is a fairly broad range of 2.8- to 4.2 million.  So we're just trying to understand what -- in your mind, what does that entail.  How many hours?  How many people?  What rates?  That kind of thing.

MR. MC KEE:  Yeah, I mean, so we did it in two parts, right.  So the part that I lead is the more forensic auditing piece.  What we did for that is we have equivalent of about eight people for those 20 weeks, and that's a rough number, but depending on -- you know, and that would be individuals that both have the data skills necessary to come in and to help, you know, sort through the data and everything, as well as folks that have, you know, the accounting skills necessary to follow that.

Now, we will team with our public sector folks to understand, you know, all the requirements that were done.  So one of the key things is -- on the front end is to understand what these appropriations were meant to do, following the invoices to see where the money was spent, and then going out and doing site visits to try to figure out, you know, did those things actually happen?

But you guys -- I don't know how many people you sort of --

MR. MC CURLEY:  Yeah, we were just -- we were just working through it.  I think we had about -- on the program side -- the program effectiveness side probably about 10 to 12 people for that period of time, and then we also included the time for the third-party auditor to come in and double-check the statements if that's something that you guys still want us to do.

MR. MARCUS:  So just so I'm clear, so we're talking eight auditors for 20 weeks, I'm assuming, full-time?

MR. MC KEE:  Yeah, those would be full-time equivalent.

MR. MARCUS:  Okay.  And then 12 -- 10 to 12 subject matter experts also full-time for 20 weeks?

MR. MR. MC CURLEY:  Mostly full-time.  Yeah.

MR. MARCUS:  Okay.  And is -- if you can give me an idea of the rates.  I imagine there's rates for auditors, the rates for audit managers, but just a general idea of what we're looking at.

MR. MC KEE:  Yeah, I mean, I don't recall specifically the bill that we have but our rates -- what was it, between, probably, 250 for the less-senior people.  The more-senior people -- our rates are around $800 an hour.

MR. MC CURLEY:  And our subject matter expert rates

-- those guys probably top out at --

THE COURT:  I need you at the microphone just so we have --

MR. MC CURLEY:  Subject matter expert rates on our team probably top out at, like, 650 at the top end.

MR. MARCUS:  Thank you.

MR. POTTER:  I think just one thing worth adding there is the way that we build our team is more senior heavy, probably, than a lot of organizations that would say, "Hey, we're going to go into an organization like this."  This is a fairly representative group of the people that would work on the project, rather than at a lot of places I might be the most-senior person you see.

We usually have a relatively small number of analysts that are really bright data analytics type people and a lot of mid-level managers and senior people -- senior people would be a combination of people like myself, who've done a lot of these reviews in terms of effectiveness and implementation programs, and then also people who have worked in organizations like this that we consider, like, operators, who have done this work before to help us understand the public agencies we're working with.  And that helps us get a lot more leverage out of a team than I've seen in the past in other organizations that rely on, you know, really -- a lot of junior people which --

THE COURT:  Okay.

MR. POTTER:  -- you know, we don't want to do.  We don't think it drives the right outcome.

THE COURT:  Okay.

Scott?

MR. MARCUS:  And I just want to -- thank you.  Just a couple more questions.

Your -- whether it's your -- I assume your subject matter experts, your understanding of the types of things we're going to be looking at -- homelessness programs, homelessness response systems, COCs, HMIS -- I don't know if those things mean anything to you -- just what you're background or expertise or knowledge of those would be that you would be brining to the (indecipherable.)

MR. MC CURLEY:  Yeah, again, we've got -- one of the people we've brought on the team just did the full homeless -- led the whole -- full homeless work that we just did in New Hampshire.  We'd be having him as an advisor to the team.  And we've got others as well that would be -- that have been doing this for our clients day to day, and we've got them identified as being part of the team.

MR. POTTER:  And I think we have some benefit from having two major -- we've had two major projects of this scale on this subject matter that are finishing now.  So we -- not only do we have the people that are excited and

interested to do the work but also learned a lot during that process and hope to put a lot of those people on the team.

MR. MARCUS:  Right.

MR. POTTER:  Some of them are still working on those projects at this moment, but this would be a priority for us to staff.

MR. MARCUS:  And then just, if I remember from before, those projects were not in California; right? They're outside of California?

MR. MC CURLEY:  Correct.

MR. MARCUS:  Okay.

MR. POTTER:  That's correct.  Yeah.

MR. MARCUS:  Okay.  Thank you.

THE COURT:  Scott, are you satisfied?

MR. MARCUS:  Yes.  Thank you.

THE COURT:  Okay.  Okay.  Okay.

Then, Shayla?

MS. MYERS:  I have a few questions.  Thank you again so much for coming to talk about this.

One of the things that we have not touched in, and I don't think you touched on it in your proposal, is the fact that here in Los Angeles the homelessness doesn't hit each community equally.  There's a significant amount of racial disparities in terms of who is unhoused, and also, subject-specific audits in the City of Los Angeles and the County of

Los Angeles have identified racial disparities in terms of who is receiving services.

Obviously, this is a broad and general audit, but I think it's safe to say that this audit would be remiss if it didn't take into account not just issues affecting racial equity but also the ways in which it -- homelessness and services disproportionally impact people based on gender identity, based on disability, based on other aspects -- language access, immigration status -- that sort of thing.

So what experience does your team have in identifying issues related to racial disparities, sexual orientation, gender identity, disability, immigration, and evaluating the work through those lenses?

MR. MC CLUREY:  Yeah, I'll let him give some very specific examples, but we are one of the national leaders in the area of intellectual and developmental disabilities. We've done more work in those agencies than any other consulting firm, and so we kind of have built a lot of practice in understanding how a very targeted, challenged population has been dealt with as we go through that.

But the work that we're doing in Oregon right now for their housing specifically is addressing some of the -- exactly what you're talking about with the disparity in response based on race, based on gender, based on gender identity, based on the community -- or part of the state that

they actually are living in, and so that is part of the analysis. We've -- we were watching some training just yesterday that's being produced alongside our client that's helping housing agencies understand any perceived biases that they have and how they can learn in turning around that and make sure that the populations that may be being more affected than others in that particular area are being dealt with properly.

So --

MR. POTTER: Yeah.

MR. MC CLUREY: -- if you've got more?

MR. POTTER: Yeah.

MR. MC CURLEY: Did that help answer?

Sorry.

MS. MYERS: Yeah. Thank you.

MR. POTTER: I think that's a great example of a project we're working on currently.

To give a couple other recent examples, the pandemic was a great learning experience for everyone, right. We learned how bad we could be at seeing these just, you know, inequities and serving well.

I personally helped a school district that serves over 200,000 students reallocate their ESSER allocation, their -- the recovery plan based on recognizing and understanding the disparity and outcomes that were being

supported by those funds.  So taking data that understands the interventions and support the people that we're trying to support and applying that through the lens of diversity, equity, and inclusion we were able to kind of, really, help the public and, really, the board and the leadership understand the need to reinvest in areas where people are being underserved.  Before, a lot of the trailing indicators got so bad that it was kind of an intervention.

I think that's a good experience that's kind of parallel to this in that you're -- you know, you're thinking about how funding is distributed and how you see outcomes and using data.  You can't do this type of work without doing analysis that incorporates those factors, and it would be blind to present analysis results that don't tell that story.

The other example I would give is there's a state in the Northeast that asked us to help with their COVID vaccine distribution and particularly added tasks to our team to develop strategies to engage with and strengthen the vaccine outreach into communities that were multilingual or -- you know, people who are economically disadvantaged, racial disparities.  And particularly in the Northeast, the disparities in use and immunization levels were really significant.  We rolled out a program in about three months that totally pivoted the way the state was engaging with those communities to a different delivery model than what we

were used to with "Oh, go to your minute clinic," or "Go to your neighborhood" -- you know, "Go to the stadium in your neighborhood," because they were missing so many of those opportunities to serve people.

So we have the folks that worked on those projects. We have the experiences from those projects that help us kind of understand that the pitfalls of assuming that we're doing things well because we're doing it the way that we see it well, and I think we could apply those to this project.

MS. MYERS:  So and that's -- my next question is what checks and balances do you have in place to ensure that things like implicit bias and determining the effectiveness of outcomes isn't going to impact this audit?

MR. MC CLUREY:  Well, so I will tell you one of our core values is inclusive diversity, and it's incorporated into every bit of training that we do, went from our training our people in how they interact with one another, how they interact with our clients, how we recruit people, how we train people.  I literally was in training last week that included understanding the inherent biases that we all walk into every conversation with, every situation with, and trying to make ourselves self-aware about that.

So it's -- it is literally one of our core values and one that we're working very hard as an organization to have completely engrained not in just the way we serve our

clients but the way we treat each other, the way we treat our clients' clients, and as we work through that.  So it -- as he said, we -- it -- when we are doing the analysis where we know that those biases need to be part of the data that we're capturing and the data that we're measuring, we are absolutely doing it and bringing it to light in every way we can, but it impacts our organization from the top down.

MR. POTTER:  I'll add just one -- or, I guess, two things to that.

You know, one of the things that we'd like to do is build a team that looks a lot like the people that will be serving and the team that's here in front of you.  To be honest, the people with these skills that are -- they're so busy out serving communities that are meeting in nine days was not doable.  But that's important to us -- to build a team that represents the community we're trying to serve.

I think also from a data analysis perspective, the way that we frame our data analysis has to be based on integrating that from the beginning rather than doing it as an afterthought, saying, "Oh, what if we filter on the race of the people that are being served," and so really designing specific types of analyses that follow -- you know, follow the -- those threads to understand them well early.

And the last thing is, like, there's a whole community of people who know way more about the social

services side of this than we do as professional services professionals, right.  And so we know that we'll have to engage with individuals that work in the organizations that serve the people that we're trying to help the City serve better to understand whether or not our analysis actually makes sense.  And a lot of what we need to do is framing it in advance of seeing our results and getting feedback on how we think we will analyze a challenge from a diverse group of individuals, and so we would want to integrate that into our approach here to make sure that we don't end up doing what makes sense to a bunch of people who, you know, puts -- put ties on to go to work, right, because we don't understand it the same way.  So we would try to do that.

The other thing that we have is a lot of -- we think -- we're really grateful to have really strengthened the way that we recruit and attract professionals, and, you know, Dave could speak more to how we actually recruit for diversity, but diversity of experiences helps with that a lot.  We have a lot of former social workers, nurses, and teachers on our team that help us bring a different perspective that challenges a little bit of our, you know, professional services legacy of being too far from the challenges that we're working on.

MS. MYERS:  I really appreciate that.  Obviously, that is a huge aspect of this audit.  It's incredibly

important to the folks who are unhoused here in Los Angeles. So I appreciate you taking the time and answering those questions, and I would expect that you would follow through on each of those if you're the team that's chosen to do this audit because it is such a critical aspect of services in Los Angeles. So thank you so much.

MR. POTTER: Thank you.

THE COURT: Michele, you have questions?

MS. MARTINEZ: I just have a quick, brief question for you. You know, I know a lot of the conversation being had is what's not working, but there's also a lot of things that are working, right, and how do we highlight those things that are working, and then how do you -- is it possible for them to scale that? I don't -- you know, I'm in the belief that you need to scale across communities, scale across council districts, but sometimes what works in one neighborhood or one encampment may not be true for the next council district or the next encampment.

And so what I would ask for you all is not just to -- you know, to figure out how can we figure out what is working and can we scale across these communities but, more importantly, on the things -- the system flow of homelessness, there are a lot of bottlenecks, and some of them have not been identified, and we have two issues that create these bottlenecks. One is the funding -- sometimes

there's funding constraints and there's comingling of funds for federal, state local -- and then you have policy, and sometimes there's no feedback loops within that system and then we get those additional bottlenecks, and so how would you approach that within the audit?

MR. MC CLUREY:  So what I would say is one of the things whenever we're doing a performance review that includes recommendations of changes, and particularly when it's as politically sensitive and as visible as this one is, it's going to be critical to everybody that there is a regular, steady stream of quick wins that we can identify and successes so that we can build the momentum and gain the trust of the community that we are in fact actually doing something, actually acting upon the basis of this agreement and that we are in fact -- that there are some things.  And part of that may also be identifying and publicly saying, "Hey, we also identified this bottleneck.  We haven't fixed it yet, but we know it's here," and we go public with it.

So one of the things that I think is critical in any of these things where you know it's -- the challenge that you're facing are multifactorial, right, there's lots of things that are going on, some are right, some are wrong, some are just misaligned, but as we -- we've got to celebrate the successes and even celebrate the identification of the bottlenecks because even that is a win if you -- and continue

to seek the feedback from the advocates in the community that are behind the pressure to do better, seek the advocate -- the feedback from those who are being served, as well as those that are doing the serving, and making sure, if we're getting better, let's tell people about it, because I think it's important to maintain that momentum.  So --

MS. MARTINEZ:  Thank you.

MR. POTTER:  And I think just -- sorry to keep jumping in here, but to add to that, I think the way that we do analysis can think about the way that we produce insights, being respectful of the understanding that we develop with regard to the framework of governance and understand that success looks different in different places and be able to control for and highlight the places where we're overcoming or coexisting with very challenging environments rather than taking a broad -- I mean, I can do the data analysis needed to prove dollars per individual served pretty quickly, right. That's not insightful to you.

And so we know that we need to layer in the constraints, the challenges, the controls.  The things like funding controls, the things like people -- historically challenging populations to serve, there's no one size fits all, and we don't want produce analysis -- and we can produce an analysis that tells us how everything looks objectively, but that's only the first step, and the second step, really,

requires us to engage with the community and then understand the constraints that are affecting the major programs that we're looking at so that we're not assuming that we're looking at an apples-to-apples comparison when, you know, the fruits could not be more different.  And that's -- you know, we learned a lot of lessons about that in every project that we do, and we'll bring those lessons to this.

MS. MARTINEZ:  Great.  And I'll just ask one more thing before the judge is -- and this is an interesting question, right, so get prepared.

A lot of the services and programs and housing for homelessness, not just here but across the country, takes a lot of people's agency away, right.  And we continue to give, give, give, but we never tend to ask the people that need the services, the housing, the programs, what they really need. Sometimes we go a little overboard, or sometimes we're not giving enough because we're not communicating, and I think at the end of the day, for us to address and solve homelessness within this realm and looking at what's effective or not effective, for the most part, I'm sure the City and County of Los Angeles and everyone in this room would want to end homelessness and give agency back to those who are on the street.

MR. MC CLUREY:  I'm not sure if there was a question.   But I think --

THE COURT:  No, there is not so --

MR. MC CLUREY:  Okay.

THE COURT:  Yeah.  That's -- all right.

I'm going to give you a warning.  This is an incredible city, but it's a mosaic, and the strength of this great city is the fact that we are a rare blend, a rare mosaic in this city.  That makes Los Angeles an amazing city in the world community.  But if I talk to somebody from the Valley and I talk to somebody on Skid Row and then I move down the 110 Freeway corridor, I'm telling you there is no consistency.  So who you start talking to becomes that information that you receive, and I will tell you that our strength is our diversity, but it's going to cause you a heartache.

And you're also about to enter into some very difficult issues that politicians haven't been able to solve, and that ranges from the plaintiff, who is going to talk to you about fire and the costs; and Shayla, who's going to talk to you about 41.18; and then Krekorian's position, (indecipherable) position.  By the time you're done, if you're not schizophrenic, something's wrong.

So I just kind of warn you of that.  When you're stepping in here, you're stepping into problems that society hasn't been able to solve.  And from my perspective, this has taken a good turn because all parties have expanded this much

beyond what I initially thought we were entering into, but maybe this is the time and place for you or another organization to step in, but we need data-driven information. If the politicians don't accept it, so be it.  If they don't want to follow it, we're helpless.  But I will tell you that my firm belief is that decisions in the past have been largely based upon who's pushing that politician at that time with enough pressure to do X, Y, and Z, and that's why you've seen and you're going to hear my push for data, and then they can do it with what they want because we've not been data-driven so far.

How many people are dying on the streets of Los Angeles today?  Can you help me?

(Pause.)

THE COURT:  Don't worry.  It's a trick question.  I don't expect you to know.  Six.  Does that give you some importance about what you're about to do?  This isn't your normal audit.  You're going to be a first in this country that really takes on the scope and magnitude of this, and I'm warning you, do you really want to get involved in this?

MR. MC CLUREY:  Yes, sir.

THE COURT:  You really do?

MR. MC CLUREY:  Yes, sir.

THE COURT:  Okay.  You remember you said that.

MR. MC CLUREY:  I will.

THE COURT: Okay. Now, we're going to excuse you tonight. We have a couple other folks, and I got special permission to work after 6:00 o'clock because they normally turn off the lights at 6:00 o'clock. You'll hear from me, but you'll hear from me -- because I'm on at least the weekend, and I'll pay you the courtesy of telling you if we're inviting you back or not. Have a good evening.

Okay, Michele. Invite up the other folks here.

And thank you very much. It's been a pleasure visiting with you.

MR. MC CLUREY: Are we excused, Your Honor, or are we back in the (indecipherable) room?

THE COURT: You're going home.

MR. POTTER: Thank you.

MR. MC CLUREY: Thank you, sir.

(Pause.)

THE COURT: Thank you, folks. If you'd just come out to the lectern for a moment.

And obviously this is CLA.

So, Ms. Mitchell, on behalf of LA Alliance, do you have questions of CLA?

MS. MITCHELL: I'm going to ask the same question. I'm going to read again directly.

The scope of work that we have provided focused on budgets, performance, management, and impact. What

experience does your firm have in work of this scope?

MR. WARNER:  Well -- yeah, I think largely what we had explained earlier is, you know, performance audit is an internal audit.  It's about controls, about objective setting; did we meet the objectives?  That's key to understanding the criteria.  I think we've got plenty of experience in serving internal audit clients of all shapes and sizes, of all industries and understand is the company going to be successful in achieving their objectives or is the program going to be successful achieving their objectives?  So we -- you know, we identify what those are, we identify the risks that are in there, identify what the controls, what the expectations are, and we test to that.  So it's -- I think it's largely what we had explained earlier, just trying to elaborate on that a little bit more.

So, you know, we've got broad base experience in doing that, and at the end of the day, to understand what success looks like, we have to -- we would have to know in your mind what is success in combatting the homeless problem? in the City's mind what does success mean for and the impact of helping the homeless situation? and we audit -- you know, or we design our tests to answer that question.  So that's -- you know, that would be my answer.

I don't know if the two if you want to elaborate on that?

THE COURT:  No.  That's okay.  We don't need to second-story each other.

Brianne, I want to hear from you a little bit more.

MS. WIESE:  Me?

THE COURT:  Yeah.  We've had the two guys speaking.  Come on over here.  I want to hear a little bit more about your background.

And, Liz, I'll come back to you in a moment.

MS. MITCHELL:  Okay.

THE COURT:  You mentioned that you worked with LAHSA for a while?

MS. WIESE:  Excuse me?

THE COURT:  Who have you worked with in the past?

MS. WIESE:  Well, so I work primarily with our audit team.

THE COURT:  Okay.

MS. WIESE:  It's a little bit different.  So I work on financial statement audits --

THE COURT:  Okay.

MS. WIESE:  -- do a lot of the single audits, I think, that we had mentioned previously, and so my experience has largely been related to state and local governments from audit perspective.

THE COURT:  Tell me about that a little bit more.

MS. WIESE:  So a lot of cities, a lot of counties,

some college districts, special districts, ports, airports --

THE COURT:  Okay.  Good enough.

MS. WIESE:  Okay.

THE COURT:  I'll turn you back to Liz.  I'm sorry for the interruption.  I hadn't really met you and heard you.  Thank you.

Liz?

MS. WIESE:  That's Okay.  Thank you.

MS. MITCHELL:  I don't have any further questions.  Thank you.

THE COURT:  Scott?

MR. MARCUS:  Thank you.

Can you give us an example of a audit recommendation that you made at the conclusion of an audit specifically involving a governmental entity that led to improved performance, improved systems -- something along those lines -- a specific example?

MS. WIESE:  I will talk about my experience as it relates to financial statement audits.  We do a lot of work with controls, and during the course of that, we often see areas for improvement either in the execution of a control or the design of a control, and where we've seen that really play out is -- you know, timeliness, I would say, is probably a specific recommendation we see, that you should perform this reconciliation on a more timely basis, or you should

have this report or analysis done on a more timely basis to help the stakeholders in evaluating the results of that.  So I -- that would probably be my best example.

I don't know if these guys have anything to add.

MR. KREISER:  Yeah.  You said just one; right?

MR. MARCUS:  Yeah.

MR. KREISER:  So I don't know that this was a publicly disclosed audit so I don't want to be specific of the client name or things, but we did an indigent population review for accounting in the Southeast and helped them with several recommendations around some programs, including some medical and health care benefits and programs for indigent population, and helped them set up dashboard and reporting for benchmarking of care, management, and social work programs for the population there to show improved cost containment of dollars and spend.  I can't share the specific --

MR. MARCUS:  No, I understand.

MR. KREISER:  -- I don't have it in my mind, but I know they showed a three-year improved trend of spend on that care program.

MR. WARNER:  So just real quick.

So we -- this was a -- it was a not-for-profit organization.  I think it was a club -- was a soccer club and they -- we did an internal control assessment of the finance

operations.  Each of the teams had their own bank account, and they controlled their own expenses in that account, but then there was the corporate part of the club -- oversight function.  We made -- that was responsible for the financial reporting of all cash.  We made a recommendation that "Look, we don't think all the clubs should have their own cash account.  So we recommend you close those accounts and you just operate all the expenses of those clubs out of one account.  It just makes it easier to control the cash."

Well, they agreed with that.  They told all the clubs, "Close your bank accounts, send us the cash, and we'll manage from here."  All the clubs but one complied with that and when the -- they kept going after the one who refused, and it turns out that that person was taking those funds and using those for personal expenses.  So there's an example of where, obviously, the recommendation helped bring about the uncovering, unfortunately, of fraud.

THE COURT:  Okay.

Scott, do you have any other questions?

MR. MARCUS:  No.  Thank you.

THE COURT:  You want to consult any of the team out there and make sure?  You okay?

MR. MARCUS:  Yeah, we did.  Thank you.

THE COURT:  Folks, just to make sure.  There's a lot of you here.  So if you have anything you want to say to

Scott?

(Pause.)

THE COURT:  Okay.  Okay.

Shayla?

MS. MYERS:  Thank you so much for coming in and answering our questions today.

When we think about the unhoused population here in Los Angeles, we know that the impact of homelessness don't affect every community equally.  We know that there's significant disparities when it comes to racial diversity, that a disproportionate number of people who are unhoused on our streets are people of color.  We also know that it impacts people based on sexual orientation and gender identity in significantly higher rates than it does to straight cisgender people.  And also, there are incredibly high rates of disabilities in most people experiencing homelessness, as well as impacting folks based on their immigration status, the language barriers, the people who speak different languages face.  So there are disproportionate barriers that people experience in the types of services that you'll be auditing.

We also know that there have been these disparities that have been identified in specific audits that have focused on racial barriers and barriers for people based on gender and sexual orientation, but you're asked to do a

general audit here.  But obviously, those issues are the types of barriers that people are experiencing, and so any audit that happens in this area would have to take that into account.

So what experience does your team have in ensuring that you are identifying racial disparities, disparities based on gender identity, sexual orientation, disability, immigration status, language access, and evaluating programs through those lenses and taking those parameters into account?

(Pause.)

THE COURT:  Do you understand the question?  Make sure and have -- Shayla's an excellent communicator, but just have her repeat that if you don't.  Don't start to answer because -- do you understand the question?

MR. KREISER:  I believe so but --

THE COURT:  Good.  Tell me what the question was.

MR. KREISER:  I mean, if you --

THE COURT:  Shayla, just repeat it for them.

MR. KREISER:  Yeah.  In the --

THE COURT:  Just make sure.  I want to be sure.

MR. KREISER:  -- context of auditing standards, could you rephrase it like -- in the context of the order?

MS. MYERS:  Sure.

MR. KREISER:  I think I understand what you're

saying but --

MS. MYERS:  Sure.  So the scope of services -- or the scope of the audit includes identifying barriers. Barriers can be felt differently by different folks based on their race, based on their sexual orientation and gender identity.  An audit would have to take those things into account in order to ensure that the audit is evaluating the programs for each of the communities that are experiencing those services, right.  So I would like to know what experience your team has in doing audits that take into account racial diversity, sexual orientation and gender identity, disability, immigration status in evaluating the effectiveness of services.

MR. KREISER:  Okay.  So I would say our experience with that is going to be primarily in the area of program requirements and program specifics relative to eligibility, and most of our performance reviews, most of our impact engagements aren't set at what's the barrier around what you're asking, right.  There's usually an objective around are they eligible? are they not eligible? are they receiving service as required or not?  So disability comes into focus quite frequently, race quite frequently.  Quite honestly, some of the other areas you mentioned not so much so in the typical scope of requirements and objectives that we see within the performance audits and reviews that we perform.

THE COURT:  Okay.

MR. WARNER:  Oh.  Sorry.

MS. WIESE:  I'm sorry.  If I could just tap into that.

You know, I think your -- I feel the core of your question is, you know, really, how do you make sure that the different barriers different people face are being evaluated, you know, throughout the process?  And I think that that really starts with making sure you have a representative population when we are doing this test work and when we are doing these procedures, right.  It's making sure that the population of folks we talk to on the street, the population that we're looking at is representative of both the community and the folks that are unhoused, right, making sure that we have a diverse group of people who have these different experiences.  Because, if we're just talking to the same type of group, then we're not getting the real results that are a broad factor.

MS. MYERS:  So does your team have any structures in place firm-wide or within the team that you would bring in to address issues related to diversity, equity, and inclusion?  For example, has your firm undergone any implicit bias training or any training to identify issues related to implicit bias in the auditing process?

MS. WIESE:  Go ahead.

MR. WARNER:  We -- our firm has a DEI platform -- a DEI initiative.  We have DEI counsel.  We're required to go through training every single year on the biases that you've mentioned.  So we do -- we're required to complete that training or we're taking off of client work.  So we do take that training.  CLA has invested a lot in DEI over the years. In our full proposal we normally have our DEI plan and program that shows that we are investing in those communities, we are making sure that we're not discriminating in our hiring practices.  So I feel like CLA as a firm is a very strong DEI partner to those individuals, those communities, and, again, yeah we do take training in those areas.

MS. MYERS:  And what checks and balances do you have in place to ensure in the auditing process that implicit bias isn't playing in a role -- a role when you are evaluating, for example, efficiencies, when you're evaluating whether or not the greatest good is impacting communities differently or the same?

MR. WARNER:  Yeah, I would answer it this way is we're -- there's a common objective, okay, and there's a very clear path in how we're going to determine whether or not the objective is successful for the controls and the processes are in place.  We don't bias our population or bias our testing.  We just test the control and the process as it's

performed.  I think to Brianne's comment earlier is, you know, we're -- we have to be objective in what we're looking at, which means we're not going to discriminate against anybody or look at a set of data in -- through any kind of a bias lens.  If a program has failed because of these factors and these factors don't show any bias, I mean, that's -- those are just the facts.

So I -- you know, I don't -- I don't think we run into implicit bias.  I've not seen that in our -- I mean, we have a find, and we have a control deficiency, and we have the support for that -- for why that control failed or that program is not effective, and if it's -- and it's because there -- if we found evidence of bias, obviously we would ferret that out and look into that.  So it's difficult to answer that question because it's not something that -- in 23 years of audit, I've not ever experienced that or run into that or ran into a case or cause where I felt that that was the case.

It's -- you know, it's just us being completely objective and completely unbiased in our approach.  It's -- you know, you have the transactions, you have the check register, you have the controls where somebody was supposed to sign something or someone was supposed to segregate duties.  That's -- you know, just to give you some generic examples of what your test, and there's no bias in that as

long as you don't bias the population.  You don't have a prejudge, a presuppose conclusion based on what you're looking at.  It's -- we're completely open.  We don't know -- we don't know what we're going to get into it when we get into it.  So we're just -- it's just, you know, just being open and honest.  And with looking at data, it was not-- you know, again I don't -- I've not come across any instances where I felt that we had any -- ran into any kind of bias issues there.

MS. WIESE:  I'm just going to tack on here because apparently that's what I do.

You know, and what I would just say is I think, you know, there can -- the fear of bias is real, right, and there is -- people's lives create unnatural bias, implicit bias, like you mentioned, and I think, in addition to what my colleagues said here, we try to keep it as objective as possible.

But I also think we have a really robust review process.  I'm not saying that we have two people do the same thing, but we'll have somebody do something, somebody else will do something that can be related to it, and so we have two different people, oftentimes more than two people, with different perspectives and different approaches to things, and we want to make sure that their conclusions and their results are consistent, and if they're not, then it might

suggest that somewhere along the line there was some bias that we need to sort out.  So we have a robust review process that includes different people with different perspectives to sort of identify if we've caught anything during the course of our procedures.

MR. KREISER:  And just one quick thing overall as a firm -- training and bias and DEI.  As principals, signing directors, it's required in our review process, through our assessment on the engagement, in our performance, in our role.  Part of our scorecard and assessment is our support of our inclusion communities.  I believe there's 67?

Do I have that number correct?

I believe there's 67 that we support within the firm as part of DEI, but also did we properly support DEI within our team, within the engagement and within our performance? and it's part of our evaluation and assessment of our performance on the engagements as well. So --

THE COURT:  Okay.

MR. KREISER:  -- it's a formal factor of our performance evaluation.

MS. MYERS:  So I just have one last question.  It's related to the controls that you talked about because I -- you know, obviously how you set those controls and what you control for can have a significant impact on determining the impacts on different communities.  And so, for example, if

you have 15 percent of all participants fall back into homelessness that -- that's fine.  If you control for race and you find that all 15 percent of the folks that were falling into homelessness are black, then that is obviously significantly different.

So tell me about ways in which you integrate demographic information into your analysis, and what types of commitments do you have related to evaluating or cross-backs? I didn't hear anyone mention those types of things when talking about controls and identifying biases.

MR. WARNER:  So if we -- to use your example, if we had 15 percent exception rate and 100 percent of that was the African American community -- I mentioned earlier we do a root cause analysis as to why -- so why was that community impacted more than the others?  I think it's -- part of whoever is going to get to do this work is going to have to go down that path in identifying the why.  That root cause is critical to us identifying the corrective action plan that we would put in place to fix that so that we don't have that discrepancy.

So I think it's important for us to have those conversations, you know, with the impacted community, with everybody involved in that just to understand what was the root cause?  Why did it happen?  Because, you know, if we don't identify the root cause, our recommendation is probably

not going to keep it from happening again.  So it's important for us to get the right source of what happened.  So again, it just goes back to the facts of why it was.  And we would certainly put in recommended action that fixes that issue so that you don't get those disparities.  I mean, at the end of the day, that's what we want, right.  So that's ultimately what would -- what we're looking for, and that's what our objective would be in that particular test, just to give you -- just to use your example.

MR. KREISER:  And the one other thing about the scoping of these kind of engagements, which is always so difficult from an auditing standards perspective, is getting the concurrence of all parties, right.

And then the process is such that we're also dependent on the integrity, accuracy, and process by which that type of demographic data is utilized, reported, tracked, and available from the auditee, right.  So part of our process as well is making sure, number one, what data elements, what indicators of data are all the parties to the audit factoring into the metrics of performance, right, because that's key to our reporting within the audit, right, but then also what data integrity, data completeness, data accuracy, and data reporting is available from the auditee relative to all those factors, and then we have to be able to design our procedures accordingly.  If all those factors fall

into place, we certainly want to factor in the examples like you mentioned and report that out accordingly and try to then ensure that the solutions and recommendations are focused accordingly if that's how the data is being tracked and that's how the metrics and information is being agreed to as part of the objectives within the consensus of the audit.

MS. MYERS:  Okay.  Thank you.

THE COURT:  Michele?

MS. MARTINEZ:  I'm good.

THE COURT:  I warned the last party, and I'm going to warn you.  Be very careful that you really want to get involved in this.

(Laughter.)

THE COURT:  I'm serious.  I'll say to you again, this is one of the great cities of the world, and our strength is this incredible mosaic of people here, but in a sense if you talk to somebody in the Valley compared to Tim's district or move up the 110 Freeway to Curren's district or up into -- you're talking to a whole different world depending upon who you're talking to, and their needs are different.

And the second thing I'm going to warn you about is that this is fundamentally going to change you unless you insulate yourself.  You're going to go bed, I hope, every night asking with this newfound opportunity what could you

have done better today?  What did you fail at?  And that's a tremendous amount of responsibility.

So how many people are dying on the streets of L.A. today?  Can you help me?

MS. WIESE:  Too many.

THE COURT:  How many?

MS. WIESE:  Too many.

THE COURT:  Too many.  Right.  How many?  Around six.  Now, let that sink in for a moment.

(Pause.)

THE COURT:  I'm warning you, if you get involved in this, you're not going to come out the same way you walked in.  Either that or you don't have a soul.  I'm serious. This is going to fundamentally change you.  And you're going to be talking not only about different policies, you're going to be talking about one side telling you about, you know, fire and the cost of that, another side telling you about whether 41.18 is successful or not.  You're stepping into a whole series of political questions that haven't been able to be solved by politicians.  We need to keep you focused, though, on your primary job, and that is you need to give us good data without bias, or as little bias as possible, so that then we can give these to the elected political officials to accept or reject.  Understood?

Okay.  I want to thank you very much, and why don't

you go home and you'll hear from me.

UNIDENTIFIED SPEAKER:  Thank you.

(Pause.)

(Court confers with clerk.)

THE COURT:  Well, thank you.  You represent Horne, and we're going to throw that open for any questions -- follow-up questions, and I'll start with LA Alliance.

MS. MITCHELL:  Yes.  Thank you, Your Honor.

The scope of work is fairly complicated across multiple agencies and focused on budgets, performance, management, and impact.  What experience does your firm have in work of this magnitude?

MR. GREEN:  From a -- I can address this question.  From a --

THE COURT:  If you don't understand the question, just repeat back.

MR. GREEN:  No.  I understand it.

THE COURT:  Make sure.  Yeah.

MR. GREEN:  From a financial and performance audit standpoint, we have experience over numerous years of financial audits where we've -- I think I mentioned earlier where we were performing financial audits over energy costs for consumers.  We're performing performance audits for the State of Florida on how ESSER funds are used.  In those same audits, we're covering compliance.  We're also evaluating the

objectivity -- the objects -- or the objectives that each program within the ESSER funds -- how the school districts use those funds.  We're evaluating how the school districts use those funds in accordance with the objectives themselves.

You know, how this translate into the work that Geoffrey does is that any time you do any audit -- a financial audit or a performance audit -- the audit is led by auditors, but what you typically see with a profile -- or audit like this or one that has high risk, you need a auditor specialist, and that may be what we didn't communicate clearly earlier is that we are the auditors.  We're relying on Geoffrey and his team to be the auditor specialist to assist us throughout the entire portion of the engagement. And Geoffrey's team has effectively -- or Geoffrey himself has effectively performed the same types of services through his work that you would expect to see in a performance audit. And also, he's going to be able -- and as we go through the financial aspects of that -- of the audit and the performance aspects of the audit, he's going to help us verify the audit evidence that we see, and he's going to help us build those audit plans out to make sure that we're executing the audit plan in a correct manner.

I don't -- if I answered your --

MS. MITCHELL:  Yeah.  No, I think you did, and I think I understand.

So in looking at your proposal, I see that you are currently -- you contracted with The Center by Lendistry. Can you tell me about your work there?

MR. ROSS:  Yeah.  So in the partnership with The Center for Lendistry, we are providing the payment process for the County's rental assistance program.  So this is post the statewide rental assistance program, and it's primarily for small mom-and-pop landlords that have not been able to receive payments, and so this is to help serve.  It's about 50 million in ARA (phonetic) funds that have been set aside by the County to make those payments.  The Center for Lendistry is the lead in that engagement.  They're working as a nonprofit with other nonprofits to bring folks in.  We are, in that capacity, serving as the payment processor, so making sure that the payments get to the intended small mom-and-pop landlords.

THE COURT:  Okay.

MS. MITCHELL:  And that's county-wide?

MR. ROSS:  That is in the areas of the county that is being engaged.  So I believe it is county-wide but not city of Los Angeles because City of Los Angeles would have their own program, and there might be a few others -- because I know there's a lot of cities in L.A., but it is generally county-wide.

MS. MITCHELL:  And then you also serve as a third-

party administrator on behalf of the California Department of Social Services Community Care Expansion Program.  Can you tell us a little bit about that?

MR. ROSS:  Yes.  So in that we are directly serving in direct partnership with CDSS, and what that means specifically is we interface on a daily basis with the leadership team within CDSS responsible for housing and homelessness for the department.

As the administrator, we are going through and -- as you would imagine, we are intaking applications from sponsors that are trying to create licensed care facilities, RSPT facilities, permanent supportive housing facilities for folks that are Social Security income and CAPI eligible, which then includes folks with disability, as well as folks that are unstably housed and homeless.  And so in the performance of that work, we are working -- we are in the process of awarding about $550 million worth of projects for expansion, new units coming online, right now projected to be over 3,000 units under the current trajectory.

We're also partnering, then, on a preservation piece where there's over $200 million that the counties themselves are implementing.  That work very similar to as we're doing on the state side but within their own county.  So there is some overlap between the State's awards as well as the county awards, but the counties are focused on

preservation; so they have to be existing beds, existing units, existing facilities. And along those lines, we serve as an extension of the State overseeing their -- the performance of the counties in that role. We, again, process the dollars so they can request in advance, and then they do reimbursements, and so we're doing all that on behalf of the State in that performance.

We also are providing technical assistance and overseeing, like, a learning collaborative process, where we get the 34 counties that are participating together on a monthly engagement to go over lessons being learned across the state.

MS. MITCHELL: Is that a program that cities can participate in as well?

MR. ROSS: No. It is county specific. so the cities can work with the counties, but it is a county award. So much like many government programs, there are specific entities who can or cannot directly be the recipient. Of course you can have sub-recipients, you can have agreements -- things like that -- but in this moment it is the county that would be the lead agency.

MS. MITCHELL: And does Los Angeles County participate in that?

MR. ROSS: Yes. Los Angeles County does participate.

MS. MITCHELL:  And do you know if Los Angeles City participates in that through the County?

MR. ROSS:  I do not know that off the top of my head.

MS. MITCHELL:  Okay.  Thank you.

THE COURT:  Scott?

MR. MARCUS:  Thank you.

And thank you again for your presentation and your patience at this late hour.

Can you give us an idea of the staffing hours and rates that went into your estimate that you put in your written submission?

MR. GREEN:  Yes, sir, I can.  I prepared the budget and the plan.  The plan has eight to ten people working on the engagement the full amount time.  That does not include individuals that I've mentioned earlier that might be helping with some of the project planning transparency question that I had earlier about dashboards and all that.

But anywhere from eight to ten individuals, and we estimated 6,000 hours, and when we populated that to our team member, it comes to about six to eight months, you know, as far as a project time line, and that project time line does -- with any audit you're going to have periods where you're asking for data, the auditee is going to have to time to pull that data, and so there's an understood window of time there

where, you know, you're going to be waiting on information. That's just the -- you know, they can't get it to you on the same day -- so many different departments.  So -- and then it also considers -- on the reporting side, it includes draft reports, agreeing to a time line on that with the Court, and also having all stakeholders involved in reviewing that report, providing comment, ultimately issuing the financial performance audit with findings and responses.  So it does -- it's 6,000 hours, I think eight to ten people.

MR. MARCUS:  And at what rates -- the eight to ten full-time equivalent auditors?

MR. GREEN:  I mean, I -- it would -- the fee is 1.1 million.  It's -- I mean, we -- it's a blended rate so --

MR. MARCUS:  Okay.

MR. GREEN:  And that 1.1 million includes our out-of-pocket costs.  So that's an -- that is a all-encompassing cost.  That's -- we went ahead and -- I've been doing this at least long enough to know about where we land on out-of-pocket costs generally given the size of the engagement.  So that's -- so 1.1 million divided by 6,000.  Sorry.

MR. MARCUS:  No.  That's all right.  That's why I have a calculator.

MR. GREEN:  (Laughs.)

MR. MARCUS:  Perfect.  Thank you.

MR. GREEN:  I didn't mean to laugh.

MR. MARCUS:  Yeah.  It's good.

MR. GREEN:  But I have a blended rate worksheet that I prepared so it's -- and I've had input from Geoffrey and others, but again, we've done -- the similar work we've done in other states that I mentioned earlier, while I think this particular project is -- has a lot more nuances to it, it's similar in size and what you would expect, kind of the communication back and forth, entrance conferences, exit conferences, meetings, and so that's -- that's what we -- that's the budget we prepared, and that's what we're going to stand by.  So --

MR. MARCUS:  All right.  Thank you.

MR. GREEN:  I haven't heard anything that would make me change that so --

MR. MARCUS:  Thank you, Your Honor.

THE COURT:  Scott, thank you.

Shayla?

MS. MYERS:  So, when we're thinking about the homelessness crisis in Los Angeles, obviously the impact of the crisis is felt differently depending on the communities that are impacted.  For example, here in Los Angeles we know that homelessness disproportionately impacts communities of color. It also disproportionately impacts people based on their sexual orientation and especially their gender identity.  We also know it has significant impacts on people

with disabilities, that barriers to providing services are received differently based on people's immigration status, their language capabilities, and those sorts of things.  So understanding that part of the scope of the audit is to identify barriers that people are experiencing, those barriers might hit different communities differently.

So what experience does your team have in ensuring that you are identifying racial disparities in auditing practices and evaluating programs through an equity lens?  So if you can just talk about what experience you might have there.

And I would just want to make point that many audits focus specifically on those topics.  So here in Los Angeles, we've had a number of audits that have focused specifically on racial disparities.  This is obviously a general audit, but any audit that identified barriers that didn't take that into account, I think, would be lacking in that sense.  So, if you can talk about the experience you have, that would be great.

MR. ROSS:  Yeah, I can start and, Joe, please feel free.

But I think -- so first of all, with the City of Los Angeles, the vast majority of folks are unhoused, unsheltered homeless, right.  So that's the first barrier. So you -- to -- Your Honor, to your question earlier tonight,

sometimes you might have to go out into the community and understand some of those barriers, and so I think as we work up what an engagement plan looks like, it is understanding specifically what we are seeing in the City of Los Angeles. I know what we have seen in other communities, but I think we also want to make sure that we don't assume anything.  So that's the first step in terms of our engagement and our design.

We had the fortune of overseeing the California statewide emergency rental program, and that was trying to engage some of the very same groups that historically are disadvantaged that don't participate in government programs, are distrustful of government programs for various reasons. Language -- major issue, an obstacle -- as well as physical disabilities.

And, you know, part of that is making sure that you're not afraid to ask the question in terms of are we seeing the uptick and participation by a particular group that we need to see in accordance to the broader community that we're trying to serve?  And you have to be measuring that.  So that is something that -- to the tools that Joe was speaking of earlier.  In that engagement we used a Power BI model where we could look physically on maps and see uptake and engagement by particular groups, as well as geographic communities, trying to make sure that we really understood

where uptake was happening, and if uptake wasn't happening, then diving in in more detail to understand what was the obstacle, barrier in that moment to get there?  And so that is one example of how we would go about in this particular case.

This is a more unusual -- so I understand that there are equity audits, there are, you know, audits that deal with this, but we are talking about very vulnerable populations.  We are talking about folks that have real concerns about their immigration status.  One thing that we have done in other programs is we don't use the word "documentation."  We use "information," right, because we're trying to be very explicit in the way that we communicate and what we're trying to see.  Again, it goes back to making sure that we're not talking past each other but we're talking the same language and understanding.

So that's -- those are the keys as you set up and engage in an audit, in program design, in development.  So, when we're looking at and understanding within the realm of a program that could have multiple agencies funding it in multiple jurisdictions -- things like that -- it's also understanding how are they plugging in, where is capacity, and where is capacity not, and, you know, fully mapping those pieces out.

And again, this is about breaking down the silos,

like we talked about earlier, in terms of making sure that we have folks that if -- if we're talking about a program that is dealing with housing the homeless, and we're targeting veterans, and we have community groups there, and we have, you know, the city government -- things like that -- if the housing authority is not there, then it's a problem because they have access to a VASH voucher, right.  So there are things like that, there are nuances to understanding all the different players that need to be in a room to go about and evaluate and really look at what's going into a program.

So for those reasons -- that's why this is a little different -- it is an audit, yes, it is a performance audit, but it is also a little different because of the nature of what we're trying to do -- very vulnerable populations and really trying to get at an understanding of how the dollars and cents are flowing, as well as what are the actual outcomes that are being achieved.

MS. MYERS:  And in doing that, how will you ensure that you're taking into account the -- you know, racial disparity issues and equity issues and --

MR. ROSS:  Right.  So we would -- yeah, so we would be looking at the demographics that currently comprise the homeless population in the city of Los Angeles, as well as the population as a whole.  What are participation rates in both populations?  Where -- how are we more effective in

reaching some groups than other groups?  So it's all of those measures combined, and as we mentioned earlier, you know, we can come up with dashboards -- things that are available for everyone to be looking at.  So it's not like, well, we're just looking at it, no one else can see it, but it's where it's open and we can all ask the question.  "If someone sees something, speak up" kind of moment and have that type of framework.

MR. GREEN:  And if I can, I think it's -- to Your Honor's question earlier, are -- were we willing to go out on the streets and visit with these people, and Geoffrey didn't get -- he's done that before, and I think it's -- you know, as -- we would go and, I think, have those conversations with people and understand some of those things.

I think from an audit standpoint it would be terrible for us to get to the end of this engagement and questions like that not have been addressed, and so what we -- as part of that audit planning process, which takes -- it takes about a month, at least, and the reason it takes so long is because you want to have -- you want to have conversations with your -- people like you that have these questions and concerns, and we want to address those and make sure that we're -- at -- as the Court allows that we are considering those areas.  So while we might not get every

answer today, there will be plenty of time and opportunity for those questions to be asked -- Are you doing this?  How did you address that?  We want to have those conversations early as possible.

But again, it's never too late, but we will -- we'll pound the pavement, we'll have conversations, we'll ask, we'll get insights as -- again as the Court and Your Honor allows, and we will certainly have those factors and questions developed -- incorporated into the plan.

MS. MYERS:  Right.  So just looking firm-wide and specifically of your audit team, does your audit team or your firm have any structures in -- built in place to address issues related to diversity, equity, and inclusion, and does your audit team receive any training related to implicit bias in auditing or other types of training like that?

MR. GREEN:  We have committees at our firm that does -- it's called a "Belonging at Horne Committee" that's led by -- it's led by a partner in our firm that executes the strategy around those things and those -- that diversity and inclusion lead is appointed by the firm's board, and underneath her she has a team of folks from all areas of our firm participating in how we make sure that -- we refer to it as a "sense of belonging."  We want everybody, regardless, to feel like they belong and have -- they have a voice, and so part of that Belonging at Horne Committee is a number of team

members across different practice groups that help our firm in that area.

MS. MYERS:  Great.  And understanding that, you know, training is one thing and, you know, committees are another thing, what types of checks and balances do you have in place to ensure that you're identifying implicit bias or that the work on diversity, equity, and inclusion is included in the actual substantive work that you're doing so that we would benefit from that here in Los Angeles?

MR. GREEN:  Can you repeat the question?

MS. MYERS:  Sure.  What types of checks and balances does -- do you have in place to ensure that you are -- you're identifying implicit balance in the substantive work that you're doing and that the work that your firm is doing on diversity, equity, and inclusion would impact the substantive work that you'd be doing here in Los Angeles?

MR. ROSS:  So maybe I can start.

So one of the things -- the reason why you have both of us, right, is -- to Joe's initial comments -- you would have an audit specialist, like, that helps lead the engagement.  So that's partly why I'm here, partly why the group of subject matter experts would be there because we do have folks that have gone through those types of trainings that have operated programs, have done those types of engagements more broadly that would be helping inform, making

sure as we go through the audit itself, and again, as we stand up, what would become the intended, you know, scope -- taking the scope of work as designed and actually going through it.  We would make sure that it's being reflected into the overall audit plan and engagement.

MS. MYERS:  And then just a last specific question. You said that you were involved in the statewide Emergency Rental Assistance Program.  What was your firm's role specifically in that, and is this the -- who was the statewide entity that you were working and contracted with?

MR. ROSS:  So the statewide entity was the Department of Housing and Community Development that sat as the lead.  It was a three -- three-legged stool, basically, is best way to describe it.  Horne acted as the payments processor, as well as data analytics components.  There was a communications lead, as well as a nonprofit, which was known as the Local Partner Network, and that was about 100 directly contracted nonprofits statewide that had another 100 or so underneath them.  It was those three parties that worked directly with HCD, Department of Housing and Community Development, and met on a daily basis over the lifetime of the program.  And so it was a combination of communications, coordination with nonprofit partners, and the administration of processing data, which Horne was responsible for, that helped feed into the HCD framework that, you know, was

leading the state effort on a statewide ERAP program.

MS. MYERS:  Great.  And were you specifically involved, or were there other -- were other people involved with that that would be involved here?

MR. ROSS:  So, yes.  In fact, my former role before joining Horne was running that program, so.

MS. MYERS:  All right.  Thank you.

MR. ROSS:  You're welcome.

THE COURT:  How many people are dying on the streets of Los Angeles each day that are homeless?

MR. ROSS:  That number I do not know, sir.

THE COURT:  Okay.  That's okay.  Nobody else has so far.  So you're not in the doghouse.  Okay?  About six.  And the only reason I mention that to you is I want you to understand the gravity of the situation you're undertaking here.  And this isn't just an audit.  This is a massive audit.  This expanded over what the Court's initial thoughts were, and each party drafted 32 areas, let's say, and the Court's exceeded to that.  So this just isn't an audit.  This is a massive audit.  Now, it can be a tremendous success and a guideline literally for the rest of this state and cities and the country, or it could be an absolute failure.

So you're going to be manipulated, and rightfully so, by the advocates, and politicians, if you talk to them. They're going to be selling their viewpoint in an adversarial

system.  I want that to take place.  I want one side to talk about the cost of fire, the other side to cost about -- the cost -- the effectiveness of 41.18 or not.  And you're going to hear everything from someone in the Valley telling you something, to somebody along the 110 Freeway, to somebody down in San Pedro -- I mean, by the time you're done -- I want to tell you that this is a great city, but it's a mosaic.  It's not one uniform city.

And if you're going to undertake this, you better do this humbly because you're going to go sometimes and just wonder what the heck you got involved in.  So, as you enter this with such surety today, you better be able to back up and ask yourself every single night: What could we have done better?  And are you going to -- passionately going to devote your efforts to this, or is this just another audit?  Because this is just not another audit.  You get it?

MR. ROSS:  Absolutely, Your Honor.

THE COURT:  Loud and clear?

MR. ROSS:  Absolutely.

MR. GREEN:  Absolutely, Your Honor.

THE COURT:  You got people's lives at stake.  Now, this is the epicenter, apparently, for the press across the country pointing to Los Angeles.  It used to be New York.  I guess they're second now.  But you're right at the epicenter of this, and I can't tell you how many social and political

problems you're about to take -- well, you're about to become involved in that the politicians haven't been able to resolve or unwilling to solve or cowards and won't solve.  It's as simple as that.  My job is to make certain that you stay databased also.  My job is to make certain that you give good data on these areas, and if the politicians reject that input, so be it.  Understood?

MR. ROSS:  Yes, Your Honor.

THE COURT:  Do you really want to get involved in this?

MR. ROSS:  Your Honor, I've been involved in it for two decades, and I would be honored to continue that fight.

MR. GREEN:  Yes, Your Honor.

THE COURT:  Okay.  Well, go home and then have a nice evening with your family.  Good night now.  You'll hear from me.

MR. ROSS:  Thank you.

THE COURT:  So, folks, we're going to reconvene at 1:00 o'clock tomorrow -- is  -- was it 2:00 o'clock?

I think, Scott, you said 2:00 o'clock would be better?

MR. MARCUS:  I said any time after 2:00 because I don't know how long Council will go.

THE COURT:  I'll -- put it this way: I'll be here at 2:00 o'clock.  We're not worried.

MR. MARCUS:  Okay.

THE COURT:  If you're not here, that means you're in session with the Council.

MR. MARCUS:  Well, and as I indicated, if I am there, I will get word to the special master and to counsel --

THE COURT:  No problem.

MR. MARCUS:  -- of my situation and the timing.

THE COURT:  We know where you are.  We have a drone following you.  I'm just joking.

MR. MARCUS:  Yes.  I can hear the chip.

THE COURT:  Okay.

MR. MARCUS:  I can hear the chip.

THE COURT:  Okay.  Okay.

All right, folks.  2:00 o'clock tomorrow, folks?  Is that okay?  We'll see you tomorrow at 2:00 o'clock.  Have a good evening.

THE COURT:  And thank the Council for taking this up on -- Scott?  Scott, thank the Council for taking this up on an emergency basis.

MR. MARCUS:  I will.  Certainly.

THE COURT:  Okay.

(Proceedings adjourned at 6:37 p.m.)

///

///

                              CERTIFICATE

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa              April 5, 2024
Julie Messa, CET**D-403       Date
Transcriber