1

LA ALLIANCE FOR HUMAN RIGHTS, ) Case No. CV 20-2291-DOC (KESx)
et al.,                       )
                              ) Los Angeles, California
        Plaintiffs,           ) Thursday, May 2, 2024
                              ) 4:07 P.M. to 4:37 P.M.
            v.                )
                              )
CITY OF LOS ANGELES, et al.,  )
                              )
        Defendants.           )
_____)


                         TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE DAVID O. CARTER
                      UNITED STATES DISTRICT JUDGE


Appearances:                  See Page 2

Deputy Clerk:                 Karlen Dubon

Court Reporter:               Recorded; CourtSmart

Transcription Service:        JAMS Certified Transcription
                              16000 Ventura Boulevard #1010
                              Encino, California  91436
                              (661) 609-4528


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:          Umhofer, Mitchell and King LLP
                             By:  ELIZABETH A. MITCHELL
                             767 South Alameda Street, Suite 270
                             Los Angeles, California  90021
                             (213) 394-7979
                             elizabeth@umklaw.com


For the Defendants:          Los Angeles City Attorney's Office
                             By:  SCOTT D. MARCUS
                             200 North Main Street, Room 675
                             Los Angeles, California  90012
                             (213) 978-7558
                             scott.marcus@lacity.org

                             Miller Barondess LLP
                             By:  JENNIFER MIRA HASHMALL
                                  LAUREN M. BRODY
                             2121 Avenue of the Stars, Suite 2600
                             Los Angeles, California  90067
                             (310) 552-4400
                             mhashmall@millerbardondess.com


For the Intervenors:         Legal Aid Foundation of Los Angeles
                             By:  SHAYLA R. MYERS
                             1550 West Eighth Street
                             Los Angeles, California  90017
                             (213) 640-3983
                             smyers@lafla.org

Also Present:                MICHELE MARTINEZ, Special Master
                             (714) 887-9845
                             michele@michelecmartinez.com

LOS ANGELES, CALIFORNIA, THURSDAY, MAY 2, 2024, 4:07 P.M.

THE COURT:  I'm sorry.  Counsel, we're on the record, and if you'd come forward on the *LA Alliance* case, please.

All right.  And just -- and if you'd make your appearance.

ELIZABETH A. MITCHELL:  Good afternoon, Your Honor.  Elizabeth Mitchell on behalf of Plaintiff LA Alliance.

JENNIFER MIRA HASHMALL:  Good afternoon, Your Honor.  Mira Hashmall here for the County of Los Angeles.

I'll try one more time.

Good afternoon, Your Honor.  Mira Hashmall here for the County of Los Angeles.

LAUREN M. BRODY:  This is Lauren Brody also for the County of Los Angeles.

SCOTT D. MARCUS:  Scott Marcus for the City of Los Angeles.

THE COURT:  Okay.

SHAYLA R. MYERS:  Shayla Myers on behalf of the intervenors.

THE COURT:  All right.  Now, I haven't been involved in the discussions, but the special master has; so I'm going to let Michele Martinez lead off with what the Court has just heard has been occurring throughout the day.

So, Ms. Martinez?

MICHELE MARTINEZ:  Thank you, Your Honor.

And let me just preface that this is the initial steps towards a comprehensive audit for the City of Los Angeles.  Alvarez and Marsal will be engaged to conduct an initial assessment for the purposes of making a final proposal to the Court of the scope of work for the full assessment of the City's homeless programs based on their professional expertise.  A and M will proposal a final assessment based on the direction of the Court and the prior scope of work agreed to amongst the parties and propose a full budget estimate at that time.  A and M estimates that this initial assessment will take about five to six weeks.

THE COURT:  And in the meantime will the assessment not move forward?

MS. MARTINEZ:  Yes.

THE COURT:  And how will that be accomplished?

MS. MARTINEZ:  Well, this is the initial step, Your Honor.

THE COURT:  Okay.  And so I'm going to repeat back that the assessment audit will move forward, that the final agreement is not in place, that the scope of this, as I understand it, with all of the information that's now much more relevant to the City and to A and M and the parties will give the Court, hopefully, a range, and the parties a range, based upon all of the information that -- some of which is

new and fresh.  I think I'm agreeable with that.

Now, Ms. Mitchell, do you have any comments?

MS. MITCHELL:  No, Your Honor.   I think --

THE COURT:  Or concerns about that?

MS. MITCHELL:  Obviously, there is a concern should the cost estimate be too high and the City not being -- wanting to pay it, et cetera, but I do think that it makes sense to get in there and have them do their initial assessment.  This is their job.

THE COURT:  Yeah.

MS. MITCHELL:  Their job is to get in there and try to figure out, you know, what exactly it is they need to know, and this is how every audit starts, and so I think it does make sense to go forward and do the assessment first, and then we can see what they come back with.

THE COURT:  It also is -- my understanding is that they could get started with the assessment and the audits now.

MS. MITCHELL:  Yes.  Correct.

THE COURT:  Okay.  That's my understanding.

Mr. Marcus, is that your understanding also?

MR. MARCUS:  Yes.

THE COURT:  Now, Mira, do you have -- I mean on behalf of the County, do you have any comments?  I know you weren't involved in these negotiations, but.

MS. HASHMALL:  The County doesn't have a position on this.

THE COURT:  Ms. Myers, do you have questions?

MS. MYERS:  No.  I mean, the only thing that I would say is I think we've -- we keep running into definitional issues within the scope of the audit in terms of what is included and then what it means for the program audit and which of the different programs are included, and those kinds of things.  I think that's been clear in the negotiations between the parties, conversations with A and M, conversations with the Court, and so I would just say, if we're leaving it to A and M, which is an outside -- you know, an outside auditor --

THE COURT:  Uh-huh.

MS. MYERS:  -- definitely their expertise, and I think this is a very good --

THE COURT:  Right.

MS. MYERS:  -- way to get started.  I would just hope that it's very clear what the purpose of the audit is --

THE COURT:  Uh-huh.

MS. MYERS:  -- in terms of really articulating to them because, otherwise, I think they're going to come up with some of the same difficulties that they're already having to finding that scope if it's not clear what the Court's expectation is at the end of this.

THE COURT:  Uh-huh.  I would also encourage a range, again, and the reason for that is we're just going to run into unforeseeable problems on occasion, and we need a good faith range, I believe.  So I just toss that out to the parties because there will be unexpected things that occur, and I don't want to have to come back and renegotiate this.

In that five-to-six-week period of time, I want you to pick a date for us to reassemble.  And I can do that now, or I can simply go back to chambers and send out a docket, but what day of the week would be best for the City and all of you?  In other words, you have Council meetings, you have Board meetings, you've got --Is it Wednesday? Thursday?

MR. MARCUS:  Thursdays work best for the City --

THE COURT:  Thursday?  All right.  I'll pick a date -- Thursday -- five to six weeks from now and send that out on the docket.

I want to compliment the Mayor, and I want to compliment LAHSA, and I want to say to you "job well done."  You've removed a number of children off the Skid Row weeks ago.  Unfortunately, children came back on Skid Row, but you removed the children and found shelter for them.  My compliments to you.  And the Row has kept children off the Row historically.  I think there's been a large influx recently, and the community has been checking.

I also want to pay a compliment to -- Michele, help

me -- Alchemy?

MS. MARTINEZ:  Alchemy?

THE COURT:  Alchemy.

MS. MARTINEZ:  Urban Alchemy?

THE COURT:  Urban Alchemy.  They have been watching those children from their viewpoint in terms of safety, and they've actually been accompanying them to the bus stop in the morning for safety purposes.  They're to be commended.

The third thing before we recess will be I'm concerned about data retention.  Not by the City or LAHSA. I'm concerned about providers.  I'm concerned that there's a clear message that data retention means that there shouldn't be a practice where later on we hear that there is a normal course or practice of destroying data on a 90-day cycle or six-month cycle, for instance, and I think that that needs to be docketed by the Court and sent on your behalf to the City and the County on behalf of the plaintiffs so that we don't have the excuse later on, "Judge, we had a normal data destruction every six months, and data wasn't available."

And so I'm going to fashion that, and I'm going to send that out on a docket to the parties, and it's going to be an order to the City and the County.  Not because of my distrust for you, but I want a clear message to the providers that you're relying upon that you can send to them on behalf of the Court, and I think that protects the City and the

County as well.

MS. MITCHELL:  Your Honor, will that be addressed to LAHSA as well?

THE COURT:  Yes.

MS. MITCHELL:  Thank you.

THE COURT:  Yeah, they've agreed to this audit. It'll be to LAHSA as well.

I'm concerned about the report that was filed yesterday by the County.  I think that it was inadequate. I'm going to put in writing what the inadequacies are so you can correct that report, and I think by doing that, then we won't any future issues about what the expectations are by this Court in terms of what's needed.

I would appreciate the Mayor's signature on any agreement that we reach or the Council president's signature on any agreement we reach.  If the federal Court is signing off on a unique document like this, then the political leaders of this County sign off and the City sign off.  We have that equal dignity and respect with each other. Therefore, I will not be accepting -- with no disregard to the city attorney, I will not be accepting attorneys' signatures on this document.  It will come from the Mayor, just as it will come from the Court.  Otherwise, I could take the position that my special master would sign off.  I don't think that would be satisfactory to anybody.  So the Mayor

deals with the Court.  The Court deals with the Mayor.  The head of your Board deals with the Court.  The Court deals with the heard of the Board.

Now, I don't think that there's anything further, Michele, that I have after the discussion you've had with me. What have you been engaged in that I might be missing in the conversations that you've had with counsel all day?

MS. MARTINEZ:  Yes, Judge.  The MOU -- I think they're prepared.

Is that a true statement, Mr. Marcus?

MR. MARCUS:  Yes.  I --

MS. MARTINEZ:  Okay.  Yes.

Is the City and County?  Yes.

THE COURT:  Terrific.  Is that going to be submitted to me, or is that simply something that the Court would -- obviously -- am I approving that, or is this just between the City and the County and they submit --

MS. MARTINEZ:  I think that's just between the City and the County but I --

THE COURT:  Historically, it has been.  The Court hasn't been involved.

And remember, sometimes the MOU drives both of you, but I'm almost operating off of the agreement -- off the settlement agreement.  If that's satisfactory between the City and the County and I have that representation, then the

Court will accept that today, so.

Marcus?

MR. MARCUS:  Yes, Your Honor.  That's acceptable.

THE COURT:  Okay.

MS. HASHMALL:  Yes, Your Honor.

THE COURT:  One of the particular areas that I'd asked you to either comment upon or be aware of has been the historic concerns concerning HMIS and the data fields, and those data fields have been inadequate in terms of allowing the necessary services to be provided by the County to the City.  Without finding fault, I want to make certain that those data fields are relevant, and I'm not too certain that Ms. Myers shouldn't be involved in that as well.  Those data fields are essential, I think, to your clients.

Have you discussed those, and are those HMIS data fields sufficient for the City?  Are they sufficient for the County?  Are they relevant?

Marcus?

MS. MARTINEZ:  Yes.  Your Honor, today that's what we spoke about during our 1:00 p.m.

THE COURT:  Oh, now just a moment.  I wasn't aware of that until just now.

MS. MARTINEZ:  Yes.  Yeah.  I didn't have the opportunity to share --

THE COURT:  I know.

MS. MARTINEZ:  -- because we were dealing with the other --

THE COURT:  Okay.

MS. MARTINEZ:  So I wasn't able to brief you.  So if you want to be briefed.  If not, I would give the opportunity to the Alliance to speak and then allow the --

THE COURT:  Yeah.

MS. MARTINEZ:  -- the Mayor's Office and/or the City and/or the County -- and if LAHSA is still here -- to really give a brief update about what the next steps are as it pertains to the training and the HMIS and what are some potential next steps and some of the feedback.

I will just mention, Your Honor, that I did mention that I will be out in the wash in Council District 6 next week --

THE COURT:  Okay.

MS. MARTINEZ:  -- myself but as well as asking for feedback as they go through the training for the HMIS system and the additional fields that will be inputted to ensure that the City is able to access those.  So I will be visiting various sites throughout the next couple of weeks and months and hoping that we can have ongoing communication as it pertains to this system to ensure that we're getting the appropriate information and reporting that is necessary so the City can access those beds.

THE COURT:  The two most relevant people I'd like to talk to is the City, at this moment, because you're dependent for services from the County, and I need to hear that you're satisfied with the HMIS field, and I'd really appreciate Ms. Myer being involved because these are your clients.

LA Alliance, you're not being discarded, but.

And by the same token, then, I'd like to hear from the County because this has been a constant concern about services being adequately provided based upon the City's efforts, so.

MR. MARCUS:  Your Honor, my understanding from the meeting this afternoon is that LAHSA is working on changing those data fields.  We have not seen what those are yet.

THE COURT:  Okay.

MR. MARCUS:  So I don't think the City can comment one way or the other whether they're sufficient.

THE COURT:  That's good for me to know.  That means it's a work in progress, but I think we need a time frame again so we're not dragging around like we did with the MOUs in an indeterminate time, and I'm going to trust the good faith between the Chairman of the Board, Lindsey Horvath, and the relationship with Mayor Bass for the moment, but I need to know that those data fields are now relevant to the City so as you provide shelter or housing that those services are

being provided.

MS. HASHMALL:  Your Honor --

THE COURT:  Ms. Myer, I'd like you, in some way, to look at these -- this also at some point.

And now I'm going to turn to the County.

MS. HASHMALL:  Thank you, Your Honor.

And on behalf of the County, my understanding is that LAHSA has put a lot of effort into a revamping and adding --

THE COURT:  Okay.

MS. HASHMALL:  -- additional data fields and that has been in consultation with City officials --

THE COURT:  Great.

MS. HASHMALL:  -- and County officials and that they're rolling out training as early as next week with regards to --

THE COURT:  Great.

MS. HASHMALL:  -- those new systems and a new training manual.  So a lot of these questions, I think, will be answered by those training programs.

THE COURT:  I want to pay another compliment.  Of course, it's a growing document, and as we look at it, fields may be changed, they may be unnecessary, and I've got a story for you.  It'll only take one minute.

When Mueller took over as the head of the FBI, he

had a perfect document.  It had 300 fields in it.  And he gave it to local law enforcement agencies, who looked at that and said, "I'm a local police officer.  Do you think I'm going to have somebody fill out 300 fields?"  He canned a $157 million project because it was useless.

So therefore, we may have too much data, too little data.  We understand it's a growing product, but if I have that kind of cooperation, my compliments.

All right.  Now, would you put up any one of the three -- well, let's say any one of the three areas that we've asked for data to be put onto the internet.

You can start with any one of them, Una (phonetic).  The freeway agreement?

Yeah.  Okay.  Now, I want you to check, and I want all of you to get on your computers.  It's easy to do.  I want you to tell me when the last data was put on the sites that the Court has requested to show what we're paying for, and I think you'll find it's March 28th.  So get on your computers.  You know how to pull up these data sites.

And we'll put it up on the screen for you.

And do you folks out in the audience see this?  Do we have the screens up for you so you can track this?

So let's see the last documents we've posted for any one of these programs.

(Court confers with clerk.)

THE COURT:  Okay.  Let's take the Alliance settlement first.

So, so far the Court has been very complimentary to all of you today; correct?  Now I'm not.

(Court confers with clerk.)

THE COURT:  So this covers to March 28th.  Has there been any document that counsel can share with me posted after March 28th on the LA Alliance?

(Pause.)

THE COURT:  Look at your computers.  You verify it for me.

MR. MARCUS:  Yes, Your Honor.  That's correct.  That's the last upload date.

THE COURT:  Now, let's take the freeway settlement.

(Court confers with clerk.)

MR. MARCUS:  Your Honor, it's the City's --

THE COURT:  No, Counsel.  Have a seat for a moment, with all due respect.  Sit down for a moment.  Please.

(Court confers with clerk.)

THE COURT:  What's the last date on the freeway settlement?

(Pause.)

THE COURT:  You tell me so you all have a record from you and not from me.

(Pause.)

THE COURT:  I've got all day.

MR. MARCUS:  It appears to be March 28, 2024.

THE COURT:  March 28th.  Amazing.

Okay.  Now let's take Inside Safe.

MR. MARCUS:  Also March 28th.

THE COURT:  This is not my expectation of having a press conference claiming victory in this regard and this kind of transparency that's been promised to me by LAHSA and the Mayor.  First warning.  Clear?

MR. MARCUS:  It's clear, Your Honor.  Can I ask --

THE COURT:  Now you can, Counsel.

MR. MARCUS:  Thank you.

With what frequency is the Court looking for these to be updated?  For example --

THE COURT:  All of these documents before you start paying for them should be transparent and up, and I can go through a couple documents today, if I want to, which would be embarrassing to all of the parties.  I choose not to.  Get these documents up on the screen.

MR. MARCUS:  As we have, Your Honor, we will continue to do so.  My --

THE COURT:  If you do that at this rate, you're in trouble.

MR. MARCUS:  We can certainly work on getting them.

THE COURT:  Do it.  Don't work on it.  Do it.  I'm

giving you a first warning.  This is unacceptable for five weeks to go by without any further posting.  And if I wanted to, I -- if you challenge me, I'm going to pull up a document right now that I think you would not appreciate.

MR. MARCUS:  I have no interest in challenging --

THE COURT:  Okay.

MR. MARCUS:  -- the Court.  I am simply asking with what frequency the Court is looking to have these updated.

THE COURT:  This should have been done on almost a daily basis on any bill that you're paying or you contemplate paying.  The public has the right to see what they're paying for.  Or "We don't have the data," and if that's the case, just tell us that.

MR. MARCUS:  I understand all that.  My understanding is we are providing the documents as we receive them, and I will certainly work with LAHSA to get them on a more frequent basis so they can be uploaded more frequently.

THE COURT:  Okay.  I won't challenge you.  If we haven't had any documents since March 28th if that's what you're representing?

MR. MARCUS:  Again, it's my understanding we receive the documents from LAHSA on a quarterly basis.  Yes.

THE COURT:  Okay.  On a quarterly basis?

MR. MARCUS:  That's my understanding.  Yes.

THE COURT:  Why?  I mean, every -- in other words

-- and maybe I don't understand.  Every quarter.  In other words, we have no documents that LAHSA is posting except every three months?

(Pause.)

THE COURT:  Okay.  Let's have some fun.

(Court confers with clerk.)

THE COURT:  I want to walk you through a document, then.  We're going to pull up a Safe Parking document.

(Court confers with clerk.)

THE COURT:  Let's take the payment on -- can all of you see that for just a moment?  No embarrassment intended, and I don't know the answer to this, but I believe, from memory, that the January column that we're going to look at has a -- what I'm going to call --

(Court confers with clerk.)

THE COURT:  -- a staff salary of $24,000.  Do you see that?

(Pause.)

THE COURT:  Now, I don't know, looking at this, if this is a staff salary for this one Safe Parking lot or, maybe, staff salary coming out of a central office for three, four, or five parking lots.  But with the range we have $22,389.49.  I have security of $24,287.53, and yet there's a article by somebody named --

(Court confers with clerk.)

THE COURT: Tim -- I don't know if this is true or not, but apparently there's a visit to this site by this gentleman, and he says he confronts two people at the site -- want to pull up that newspaper article?

Well, I can get it for you. I don't want it (indecipherable). We'll pull it up in just a moment.

And he says that there's two toilets and a wash basin. Well, it may be justified that you're paying $24,509 for two people, but let's be fair and say that there's 24-hour service needed and we can't work. There may be six people there. But are the services, if he's correct of two toilets and a wash basin, the services that are expected? I don't know. I don't know what the 10 percent total administration cost is. And so by the time we're done, we have $83,714, but if this hearsay article is true or not, when he visits, he has one person and another person arrive, a total of two to three people in this lot.

If this bill has been paid, who monitored this? It may be entirely justifiable, and it may be an absolute boondoggle. How do I tell from this bill? So this seems to be what I call "provider friendly" up to this point, where providers are getting paid, submitting bills, but I can't monitor this.

So let me turn to any of you. Help me with this -- just this January bill for a moment. What does it stand for,

for you?

And by the way, I'm not responsible for creating a meaningful website. LAHSA and the City and the County are responsible for creating a meaningful website for the City. Let me repeat that. You are responsible for making this clear to the public -- what these bills are and what's being paid for.

So it could be argued that the staff salaries are redundant. It could be argued that two folks out in the parking lot are being paid minimum wage. It could be argued that it's justifiable. Who's the person who monitored this? Did they ever go out and check? Or does somebody named Tim "something-or-other" post something on the internet that he goes out there and spontaneously checks, and we don't know if it's true or not, but I'm happy to drive over there with you tomorrow if you want to. I'm suggesting you go check before I have to. Okay?

And that's why I care that these start getting posted and we know what we're paying for. Because the American people are generous. I think we have milestones. They'll continue to contribute. They'll pass Proposition 1. They'll do all the wonderful things that we need as long as they know that they're getting something from their services, and something like this might be questionable. That's a pretty big overhead, by the way. So I'll leave that to you.

And you want to go through another one?

MR. MARCUS:  No.

THE COURT:  Okay.  Let's just leave it at that, then.

Please start moving this from easy to pay providers, which this system apparently was set up for, to a system where the providers are having to provide and make known to LAHSA, and through them to the public, fairly, what they are providing for.  Because, if your goal is truly shelter and housing, then we ought to know that and we ought to devote a lot of resources.  If you're going to be service-oriented, we ought to know that because "service-oriented" means we're perpetuating people on the street with services humanely but we're not building enough shelter or housing.  You've got to make some (indecipherable) choices, and you can't tell from this what the policy of the City and the County is.  I'm hoping it's shelter and housing eventually.

Now, I'm going to leave that.  If you have any comments, so be it, but it is your duty to explain to the Court and to the public what this means.  It is not my duty to create a meaningful website.  So, when you ask me what I need, on behalf of the public, I need transparency and I need understandability about what these bills are that we're paying.  Does that answer your question?

(Pause.)

THE COURT:  Mr. Marcus?

MR. MARCUS:  I understand, Your Honor.

THE COURT:  Okay.

Mira?

MS. HASHMALL:  No questions, Your Honor.

THE COURT:  Okay.

Liz?

MS. MITCHELL:  Nothing, Your Honor.

THE COURT:  Shayla?

MS. MYERS:  No, Your Honor.

THE COURT:  Okay.  Let's get this product out to the street and the people who need it.

By the way, I was down on Skid Row this morning, and I also want to pay another compliment to the Mayor.  I wish she was here.  Look, I don't know if you're just scattering people or not, but you seem to be turning a corner.  You seem to be turning a corner in a positive way.  There's a lot of things happening down there as long as you have shelter or housing for people and we're not just destroying tents and moving people around.

But today there was an operation that went place -- took place at 7:00 o'clock or 7:30 -- and, Shayla, I think you might have been very interested it.  There were some tents simply into the dump truck.  Okay?  I don't know because I didn't contact those people about what that

situation was, and I don't know what the notice is down there. So there's a rumor out in the community right now that "Look, we post it so we can clean up at any time," but at the same time, there's a rumor out in the community that they're arriving a short period before, and it's not consistent. It's not, like, every Tuesday from 2:00 to 3:00. So there's some surprises going on out there in the community where they're scrambling to pick things up and move them. Okay? I'll leave that to you, but I think I'd like to meet you down there one morning and just walk around and take a look spontaneously like we did today. Okay?

Okay. Now, leave you with a compliment. I want the Mayor to hear this very clearly. I think you're turning a corner from what I can see out there, and it's a hard job. It took three decades to get into this. Okay? And now you're tasked with getting us out of this mess in a very short period of time. That's a hard job after three decades of this malfeasance, quite frankly, and negligence. So I'll leave you with a compliment: Thanks for trying. Okay?

Liz, anything further?

MS. MITCHELL: No, Your Honor.

THE COURT: Okay. We'll pick the date for you. We'll pick it on a Thursday. All of you have a good day.

MULTIPLE SPEAKERS: Thank you, Your Honor.

(Proceedings adjourned at 4:37 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa                    May 3, 2024
Julie Messa, CET**D-403            Date
Transcriber