**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

LA ALLIANCE FOR HUMAN RIGHTS, ET )
Al.,                             )
                                 )
                                 )
                      Plaintiffs, )
                                 )
                                 )  No. CV20-2291-DOC
          Vs.                    )
                                 )
                                 )
CITY OF LOS ANGELES, ET AL.,     )
                                 )
                                 )
                                 )
                     Defendants.  )
                                 )
_____

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**LOS ANGELES, CALIFORNIA**

**THURSDAY, JUNE 6, 2024**

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET
FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90012
MVB11893@aol.com

UNITED STATES DISTRICT COURT

**A P P E A R A N C E S**

**ON BEHALF OF THE PLAINTIFFS,**          UMHOFER, MITHCELL & KING,
**LA ALLIANCE FOR HUMAN RIGHTS,**         LLP
**ET AL:**                                BY:  ELIZABETH MITCHELL
                                          PAUL WEBSTER
                                          767 SOUTH ALAMEDA STREET
                                          SUITE 270
                                          LOS ANGELES, CA 90021


**ON BEHALF OF THE DEFENDANTS,**          LOS ANGELES CITY ATTORNEY'S
**CITY OF LOS ANGELES, ET AL.:**          OFFICE
                                          BY:  ARLENE HUANG
                                               VALERIE FLORES
                                               JESSICA MARIANI

                                          MILLER BARONDESS, LLP
                                          BY:  JENNIFER MIRA HASHMALL
                                          LAUREN M. BRODY
                                          2121 AVENUE OF THE STARS
                                          SUITE 2600
                                          LOS ANGELES, CA 90067

**FOR THE INTERVENORS:**                  LEGAL AID FOUNDATION OF LOS
                                          ANGELES
                                          BY:  SHAYLA R. MEYERS
                                               CHRISTIE SWISS
                                          1550 WEST EIGHTH STREET
                                          LOS ANGELES, CA 90017


**ALSO APPEARING:** SPECIAL MASTER, MICHELE MARTINEZ
                    MATT SZABO
                    KENNETH MEJIA
                    SERGIO PEREZ
                    DR. VA LECIA ADAMS KELLUM

LOS ANGELES, CALIFORNIA; THURSDAY, JUNE 6, 2024

---

THE COURT:  We're on the record then in the LA Alliance for Human Rights versus the City of Los Angeles, Case No. 20-02291.

Counsel, if you just remain seated.  Would you begin with appearances by the plaintiff.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell on behalf of the plaintiffs.  With me as well is Paul Webster, executive director for L.A. Alliance.

THE COURT:  Thank you.  And Shayla?

MS. MYERS:  Good morning, Your Honor.  Shayla Myers on behalf of the intervenors.

THE COURT:  Thank you very much.  On behalf of the -- well, City, let's take the City first.

MS. HUANG:  Good morning, Your Honor.  Arlene Huang, Deputy City Attorney for the --

THE COURT:  Nice meeting you.  It's a pleasure, by the way.  I think this is the first time we've had a chance to interchange.  Would you move the microphone just a little bit closer.  And who is with you today?

MS. MARIANI:  Good morning, Your Honor.  Jessica Mariani for the City of Los Angeles.

THE COURT:  Nice meeting you.  It's a pleasure.

UNITED STATES DISTRICT COURT

MS. FLORES:  Good morning, Your Honor.  Valerie Flores, Chief Deputy City Attorney.

THE COURT:  Pleasure.  Keep those microphones closer.  It's not you.  It's me.

So on behalf of the County?

MS. HASHMALL:  Good morning, Your Honor.  Mira Hashmall here for the County of Los Angeles.

THE COURT:  Pleasure.

MS. BRODY:  I'm Lauren Brody, also here on behalf of the County of Los Angeles.

THE COURT:  I was informed by the special master yesterday after double-checking that the controller might be present that moved to -- would be present today.  I know you have another meeting.  So I'm going to take this out of order out of courtesy.  But I want to note that Dr. Adams is here.  It's nice to see you.  It's a pleasure.

And you folks are?

MS. SWISS:  Good morning, Your Honor.  Christie Swiss, outside counsel for LAHSA.

THE COURT:  Pleasure meeting all of you folks.  Thank you very much.  And I'm going to give you a good shout-out about a couple things today later on.  Okay?  It's nice to have you here.

Go and come any time you want.  You're busy.  You've got a city to take care of.

But my first question is really the second question I put out in the notice.  And that is that the June 6th hearing, I'd requested that the City and County provide an update on the timeline on which they received invoices from LAHSA and post them to the public website.  And I also expected to hear what verification and documentation procedures the City, County, LAHSA, and the controller used to ensure services that are paid for are being provided by the providers.

Now, to set the record also, we received from the City a posting last night at 6:00 p.m.  I read those.  We also had the opportunity to listen to your homeless committee meeting which was lengthy, about four hours -- three hours and actually 18 minutes yesterday.  So we listened to that last night also.  So we're aware of your testimony yesterday, Doctor, at that hearing.  And I'll have some questions hopefully about how we're going to get verification.

Now, the controller is here.  And if you feel comfortable, I'd like to ask you a couple questions.  I'm not going to put you under oath.  We're going to have a conversation, if you'd be so kind.  And if you have some folks with you, if you have Sergio or any of your staff, come on up here and gather around for goodness' sakes.  Have a seat right up here.

First of all, good morning.

UNITED STATES DISTRICT COURT

MR. MEJIA:  Good morning, Your Honor.

THE COURT:  Thank you for your courtesy.  You don't have to be here.  You understand that?  I have requested.  I haven't ordered.

MR. MEJIA:  I'm honored to be here to talk about this issue.

THE COURT:  One thing I'm concerned about is the dispute you have going between the Mayor's Office and your office.  And I don't want to get into that dispute today.  I don't think that that's appropriate.  But I need to understand the process by which checks are literally written and your role in that.

So when you write a check on behalf of the City of Los Angeles to a provider, how are you able, if at all, to verify that the work has been done?  And later on I want to talk to you about this website going forward.

So let me start just with your role or what you perceive your role to be.  You write a check.  What information do you have to verify that?

MR. MEJIA:  Sure.  Thank you, Your Honor.  So when -- I am the City's paymaster.  So a lot of the -- all the checks essentially have my signature on it.  But because of the sheer volume and amount of these invoices that we do receive, we also allow the departments to do that inspection of goods and services.

UNITED STATES DISTRICT COURT

In the case of service providers, a lot those service providers are paid and done with the Housing Department through a contract with LAHSA.  So from my experience, what I've seen is when the Housing Department is about to pay an invoice, they get this cash request summary from LAHSA which details 10s or 20 or 30 service providers on that cash request summary.

And then from that point, it's our understanding that the Housing Department has done that verification of, you know, inspection of goods and services.  And then that -- then we pay it after that.  And so we allow the departments to do that inspection role before payment.

And what I've seen from these LAHSA request summaries, I have not personally -- for the ones I've seen, I have not seen the detailed invoices attached to those cash request summaries from the service providers.

THE COURT:  So you then write a check based upon your belief that the invoices, for want of a better word, are accurate?

THE WITNESS:  Correct.  So we rely on the departments because of the sheer volume.  My office has actually tried to do an inspection ourselves recently.  And we have been essentially blocked to do that by the City, the City Attorney, because we wanted to actually inspect the goods and services we were paying to a service provider.

But the City Attorney said hold on, you actually have to do a full-blown audit of the entire department and see that they are not inspecting correctly before you can inspect it yourself as a City Controller.

So I actually tried to do that for a specific time period.  And, you know -- because I understand your frustration.  So I want -- we wanted to do the inspection as well.  But we -- even me as City Controller, I'm getting fought and -- fought back on by my own -- by my own city.

THE COURT:  I don't want to get deeply into that dispute between you and the City.  But the City's position, as I understand it, is that the charter doesn't allow for the -- I'll check in with you in the City Attorney's office in just a moment -- that the charter doesn't allow one elected official to conduct an audit of another elected official.

And yet I understand from your perspective that you're an independently elected official by the public and that your position is that you have that authority, and you're not auditing a public official.  You're auditing a program.

MR. MEJIA:  Correct, a program that receives funds --

THE COURT:  One of the concerns I raised before you folks got involved with the City Attorney's Office, Matt was

UNITED STATES DISTRICT COURT

here, Szabo, at the time, is the position that had been taken that the City couldn't be audited.  And my concern at the time was that if a program was then tucked under the umbrella of the Mayor or the City Council, unrelated to the controller, take the controller out for a moment, that means that at any time a program came under that authority of the City or the Council, if it was read that way, we haven't had an audit until this case came along, and the Mayor voluntarily stated that she was willing to have a third-party audit, which means, if that is true, that we haven't had an audit historically because the City has been able to claim, rightfully or wrongfully, we can't audit another public official.

And if that's the case, then there's been no check on the City, no verification or accountability, for the time of this charter.  And but/for this lawsuit and the Mayor coming forward and voluntarily agreeing to this third-party audit, there wouldn't be any audit of this City.  You can make a comment about that.  But if that's the case, then this may be the only audit, depending upon how this conflict sorts out between the both of you, that we're going to have because of the peculiarity of this lawsuit.

MS. MARIANI:  Thank you, Your Honor.  I'd like to distinguish between financial audits and performance audits. The charter does allow the controller to conduct a financial

UNITED STATES DISTRICT COURT

audit of the Mayor's Office and any programs in the Mayor's Office.  And so that's always been allowed.

The only thing the charter prohibits is the controller, because the controller is an elected politician, to do a performance audit which is more in the nature of a policy audit, a review of the policies of another elected official.

And so to reassure you, most of the programs are actually housed in city departments.  And the controller can do performance audits of the policies of those departments. So for the most part, the controller can do a financial audit of the Mayor's Office and a performance audit of all of the city departments.

And this distinction in the charter was very intentional.  There was a lot of discussion by the Charter Reform Commission about the potential dangers, not with this controller or any specific controller, but of allowing elected officials to second-guess, as you were, the policies of another elected official.

We in the City have had City Controllers who have gone on to run for City Attorney, to Mayor.  And so the idea was to keep performance audits as independent, and beyond question, there should be no political involvement in a performance audit.

THE COURT:  Then does that leave a court or the

public in the position that if a Mayor or Council or whoever states that a program, you know, is under their umbrella, that no audit can take place by the controller?  Does that leave the Court then in a position that the only audit that can take place, at least in a broad sense, with some of the verifications that are needed here, have to occur from a third-party audit that we're going to pay for outside the Controller's Office?

MS. FLORES:  Again, there can be a financial audit of any program in any elected official's office including the Mayor's Office.  And as is the case here, the Mayor has voluntarily submitted to an audit, not by an elected politician like the current City Controller, but by an independent auditor.

And so I think you'll find for the most part, when requested to submit to an audit, elected officials do so. We've had instances where the City Attorney, also an elected office, has agreed to an audit of its own office, a performance audit.  So the charter does allow the elected official to agree to an audit.  It's just that another elected official can't compel an audit because there could be some political implications of that.

And, again, here, I think we don't need to worry about whether this is a good aspect of the charter or not. It was something the voters enacted.  And the Mayor has

agreed to an audit.

THE COURT:  I called for an audit three years ago in a hearing.  That fell on deaf ears.  Why?

MS. FLORES:  I'm sorry?

THE COURT:  I called for an audit three years ago.  I wrote an opinion and asked Eric Garcetti to put a billion dollars in the bank.  Part of that was an audit of the City at that time and the County.  I was reversed on that by the Circuit.  The Circuit is never wrong, by the way.  So let me make a record of that.

I called for that three years ago.  Why didn't you conduct an independent audit at that time?

MS. FLORES:  Again, that was a different administration, both in the Mayor's Office and the City Attorney's Office.

THE COURT:  For me, it's the same problem.  It's homeless and it's public accountability.

MS. FLORES:  But, again, there could have been an audit by the then controller of all of the homeless services in every city department.  That is always allowed, a performance or a financial audit.

So I can't speak to why the former City Controller did not take you up on your suggestion.  But here we have a Mayor willing to submit to an independent audit.  And she should be applauded for that.

MR. MEJIA:  Your Honor, can I just give a quick response real quick?

THE COURT:  Yes.

MR. MEJIA:  Your Honor, the Chief Deputy City Attorney talked about the people who wrote the charter reform in 1999, which is where it gave me the power to conduct performance audits.  We disagree with her reading of what the intent was by the charter reformers who were on the commission.  Actually, we have a letter from the chair of the Charter Reform Commission at the time who said that the City Controller can be empowered to do audits of all city programs.

And that's why in our charter section, it doesn't say -- it doesn't say, you know, offices in the -- he meant to say all programs, even those housed under elected officials.

And just to give you a sense of financial materiality and why it is important now is because a lot of the homelessness programs currently today, hundreds of millions of dollars are being housed under the Mayor's Office.  Right?  And hundreds of million of dollars are being housed under the Housing Department.

So before, you know, there probably wasn't that much in the Mayor's -- under her umbrella.  But now there are.

THE COURT:  I see.

MR. MEJIA:  And so, you know, I just wanted to mention that.  We have this -- we will have this disagreement that we can audit city programs as well underneath elected officials.

THE COURT:  Could you put up this letter for just a second?

I'm more -- you two will sort that out between you and the Mayor, hopefully for the public good.

MR. MEJIA:  Right.

THE COURT:  I don't want to go any further with that disagreement between the two of you.  I'm really asking about the process.

And I want to put up a letter from LAHD.  It doesn't have a date on it.  But it does refer -- and if you -- you have a monitor there.  Is it on for you?

MR. MEJIA:  Now it is.

THE COURT:  Now it is.  Do you folks have this up on the monitor?

MS. FLORES:  Yes.

THE COURT:  When was this letter created?

Matt, come on up for a second.  You may know.  When was this letter created?

MR. SZABO:  My understanding, that letter was created and posted concurrent with the initial set of

documents that were posted to the City's website.

THE COURT:  Would that be 6 o'clock last night?

MR. SZABO:  No, no, no.  That -- and I just can't remember, Your Honor, when we initially posted.

THE COURT:  Approximately.

MR. SZABO:  It was the first -- at the last hearing when you asked us to post within a week, the first round. That was posted with the first round.

THE COURT:  All right.  Thank you.

Someone, before you write the check, must or may determine that the invoice being submitted to you is accurate?

MR. MEJIA:  Correct.

THE COURT:  Now, what I'm in search of is that central authority, that person.  So far you've told me that you don't do the verification.  Who does?

MR. MEJIA:  It would be the department that is contracted who are related to those invoices being submitted. So if it were the Housing Department, it would be the Housing Department.  If it were under the Mayor's program, it would be the Mayor or the CAO or some other --

THE COURT:  Could I borrow you for just a moment? Would you turn to page 2 for just a moment.  And let's take Inside Safe.  Turn to this page.  Inside Safe.  All right. It should be right here.

UNITED STATES DISTRICT COURT

So for Inside Safe, in the second bullet point, "In addition, LAHSA provides the following documents which are reviewed by the CAO."

Does the CAO validate these documents?

MR. MEJIA:  Based on my understanding for Inside Safe, when they do receive invoices for service providers, we would rely on the CAO to make those verifications.

THE COURT:  Would you go to the LAHSA request submissions to the City Alliance and Road Mapping.  Go to the bullet points below that.

Who verifies the checks that you write on the L.A. Alliance settlement or Road Map agreement?  Who attests to their accuracy?

MR. MEJIA:  Based on what I'm reading here, where it comes to -- this doesn't look like an Inside Safe program. It looks like your standard LAHSA service provider invoices. It would be the Housing Department who would have to do the verification of goods and services before payment.

THE COURT:  Okay.  All right.  Turn to the first page, would you, for just a moment.  Go down to the bottom paragraph if you would be so kind.

I want to read to you.  It says, "Contracts follow a cost reimbursement model which means the service providers must perform work first and then invoice LAHSA for reimbursement of program expenses they have incurred."

I'm assuming that you have nothing to do with that process?

MR. MEJIA:  No.  But this is familiar -- what I'm familiar with.

THE COURT:  Turn to page 2, would you.  Go to the second paragraph under LAHSA invoicing requirements.

"Payments from LAHSA to contracted service providers are contingent upon receipt of required documentation as noted below."  Then we have a number of bullet points below.  Do you see that?

MR. MEJIA:  Where are you?

THE COURT:  I want you to go to LAHSA invoice requirements for service providers.  That's the topic heading.  Go down to the second paragraph where it says, "Payments from LAHSA to contracted service providers are contingent upon receipt of required documentation."  Do you see that?

MR. MEJIA:  Yes, I see that now.

THE COURT:  Now, do you have anything to do with this required documentation?

MR. MEJIA:  Our policy, which the controller gives to the entire department, it is our understanding -- so they follow our instructions.  And our instructions basically says you have -- what this says here.  They have to provide and they have to -- the departments we give that power to to make

sure that they check that the invoices, the services were provided, and that the goods were received.

So that is how we're involved but not at the actual detail level.  That's the departments.  We set the entire framework, and we give that to the departments to follow.

THE COURT:  I'm going to try to summarize that. This is what I've absorbed.  That you don't do any verification?

MR. MEJIA:  For these specifically, no.  And that's why I reiterated, when I -- I actually -- my office tried to do that for a service provider at that detailed level because it's my authority.  I got basically fought by the City Attorney to do that.

THE COURT:  Go back to page 3, would you, Inside Safe.  We're going to go back to Page 3 under on the topic Inside Safe Program, the second bullet point.

It states:  "In addition, LAHSA provides the following documents which are reviewed by CAO."  And the first bullet point is, "Service provider invoices."  The second is "Service provider general ledger report and trial balance."  The third is "Service provider profit and loss statement."

Do you know -- and I'll ask Matt Szabo in a few moments if he's kind enough to respond.  Does the CAO get all of these three categories from the service providers or do

you get all of these three categories from the service providers when you write a check?  That's a dual question.  My apologies.  Do you get --

MR. MEJIA:  My office does not get this level of detail.

THE COURT:  You don't get that level of detail.

MR. MEJIA:  Right.  We rely on in this case the CAO to do the actual work in checking.

THE COURT:  It would be the CAO?

MR. MEJIA:  For Inside Safe, the CAO or the Mayor's Office.

THE COURT:  What about for the settlement of the Road Map and Alliance agreement?

MR. MEJIA:  For those ones which are non-mayoral programs or your typical service providers, that would be -- my understanding would be the contracting department, and most of it is usually in the Housing Department.

THE COURT:  It was called to my attention by my special master that there -- some type of statement by you that you would be involved in some way in enhancing the website.  And let me explain that to you.

I expect the audit to go backwards from a certain period of time, let's say from April, May, June.  But it's a backwards-looking audit.  And whatever that finds is valuable, but I am more concerned without finger pointing

that we up the accuracy from this point forward and the transparency going forward.

So the idea was to create a website, which the Mayor has consented to, because going forward the public should see what the invoice is and what work was performed or we don't have the records.

And if we don't have the records, I'd just as soon hear that and move on.  But if we do have the records, then I'd like to make certain that there's transparency so that everybody can make a decision whether this is data-driven or not.  There can be input to enhance this.  And we up, if you will, our level of professionalism in reporting to the public.  Got that?

MR. MEJIA:  Yes, Your Honor.

THE COURT:  You understand that?

MR. MEJIA:  Yes.

THE COURT:  How can you help me, if at all, with this website going forward?

MR. MEJIA:  Your Honor, if you order the City family, the Mayor, the CAO, the City Attorney --

THE COURT:  I'm going to be told I don't have that authority.  So you tell me how voluntarily you're going to help me.

MR. MEJIA:  Let me just give you a quick ten-second story.  When I started, I actually tried meeting with -- I

met with the CAO and the Mayor's Office.  And I tried to say I want to provide more transparency and create a transparency website on Inside Safe because it is --

THE COURT:  Just a moment.  I know you and the Mayor haven't --

MR. MEJIA:  Right.  Right.  Right.

THE COURT:  I'm going to cut you off for a moment.

MR. MEJIA:  Right.

THE COURT:  She's not here.

MR. MEJIA:  But --

THE COURT:  Hold on.

MR. MEJIA:  But yes, I can --

THE COURT:  You're an independently elected official.  You're called a Controller.  The public elects you.

MR. MEJIA:  Right.

THE COURT:  Can you be of any help to the public or the Court, or do I turn to the City?  In other words, who do I turn to to make certain that we -- and I'm adamant about this -- going forward, we up, instead of finger-pointing going backwards --

MR. MEJIA:  Right.

THE COURT:  -- and we see what is being paid for on those invoices and our providers get the message, and if they haven't done it, they start doing it.  Because what I'm

afraid of is this lawsuit may be the only one-off --

MR. MEJIA:  Right.

THE COURT:  -- thing about how you and the Mayor work out your differences --

MR. MEJIA:  Yeah.

THE COURT:  -- where we have an independent third-party audit and we go another 10 or 15 years without any examination of the City.

MR. MEJIA:  My office can create this website and of the quality you need for this transparency website, which will -- you want the --

THE COURT:  Let's assume that the City is creating this website --

Matt, come on up a second so it's co-equal.

And let's assume that last night they posted at 6:00 p.m.

Thank you, Matt.  6:00 p.m.?  Just joking.

MR. SZABO:  Well --

THE COURT:  Just joking.  No problem.  I read it until midnight.

They already have a website up.  Are we cooperative enough between these two entities, regardless of the, you know, political issues you might have in terms of your authority or non-authority, is there a cooperative level in some point on the public's behalf that you could be of aid to

the City?  And, if so, in what way?

MR. MEJIA:  I have the -- my team is specialized in technology.  So we can actually create the interface and the surface.  And that is actually what our office is known for out of all the city departments is we can create the technology.  And also, we have the -- the invoices too.  Do we have it at the detailed level that you want?  As I said, no, because, like I said, the example of the LAHSA invoices, they bill us for tens of millions of dollars for tens of service providers, but we don't get at that specific service provider level.

That's where I would need your help and the City's help to actually get those actual service provider details.  But I could create the tech, and I can do pretty much everything you want on this if I have the City's cooperation.

THE COURT:  Let's assume that you're correct hypothetically, and I'm not saying you are, that you have the independent ability to audit Inside Safe.  What I would hate to see is the independent auditor that the control -- that the Mayor has consented to getting information that you don't get if you have that authority, or if you have that authority and you're conducting an audit in the future that that information is not fed back to the independent third-party auditor.

In other words, if you prevail in this, we could

have two audits going, one through the third-party auditor that Mayor Bass consents to and one through the Controller's office which might be a great check against each other.

How would we get cooperation between the interchange of that information that you might have access to that the third-party auditors are seeking or that the third-party auditor develops so we don't have duplication if you're correct in your position that you can audit?

MR. MEJIA:  Just to talk about our audit, you know, our audit is more detailed in scope.

THE COURT:  Stop.  That's not what I asked.

MR. MEJIA:  Right.

THE COURT:  I'm trying to make certain that if you are correct -- and I have no idea.  It's not before me.

MR. MEJIA:  Right.

THE COURT:  But what I don't get are two different audits that reach, you know, somewhat different numbers because the information isn't uniform, that you get a portion, and the City doesn't or the City gets a portion and you don't.

And if you are correct -- and I'm not saying you are.  I don't know who is correct, nor do I care right now. But I do care, if you are correct, that we don't get two different or so -- different audits based upon information that isn't being shared.  It's called cooperation or lack

thereof.

MR. MEJIA:  Right.

THE COURT:  How are we going to work that out?

MR. MEJIA:  I mean, I understand, Your Honor.  The work that we carry out --

THE COURT:  Hold on.  How are we going to work that out?  Let's assume that you're right.  He has no authority, end of discussion.  But let's assume that he does, then how do we stop this duplication or two audits that are dissimilar, not because there's lack of competency, but because there's a lack of information that is uniformly given to both?  How do we work that out?  How do we get past the politics of this?

MR. SZABO:  So, Your Honor, I would suggest that there are two separate issues.  As it relates to the trans -- there's the audit function, the audit that we've been discussing in this courtroom for several months, and then there's the transparency piece, which you have instructed the City to post and make publicly available documents related to Inside Safe, the Road Map, and the Alliance agreement.  I can speak to the latter.  And I would be very happy to work with the Controller's office and --

THE COURT:  Would you be happy to work with the Mayor's Office?

MR. MEJIA:  Oh, yes.  And we have been trying,

yeah.

THE COURT:  Everybody is happy.  We're all going to work together; right?

MR. SZABO:  I would be very happy to work with the Controller's Office on the transparency website, absolutely.

THE COURT:  I hear that clearly.  Transparency but no further?

MR. SZABO:  That is correct, Your Honor.

THE COURT:  And your end of the performance at this point?

MR. PEREZ:  With regards to the audits, our office is transparent --

THE COURT:  You are --

MR. PEREZ:  Sergio Perez, chief of accountability and oversight for the Controller's Office.  As part of my work, I help the Controller manage our audits and reviews.  And we can commit to the fact that the information that is and will inform our performance audit of Inside Safe will be transparent.  And we are eager to share it with the third-party auditors.

We would also work with those folks to settle a mutual understanding and agreement that would allow for the exchange of information.  The controller is someone who practices what he preaches on that front.  We're not barred by law.  And there wouldn't be much here that would be

confidential.  We are open to disclosing and sharing.  And we would expect that from the independent auditor.

THE COURT:  How soon do you and the Mayor's Office resolve this issue?  Is it going to be through a court process?  Is it going to be through some mediation?  Because as I move forward with that third-party audit, it could be extraordinarily wasteful if you do have that authority that now we're back again waiting for a Controller audit, and we're going through the same people, the same invoices, wasteful for taxpayers.

How do we work that out, or do we?  In other words, I'm not summoning the Mayor.  You're kind enough to be here.  She's been here before.  Is there any level of cooperation here, or do we just wait for the politics to take over?

MS. FLORES:  Your Honor, I think the Mayor's Office would like an independent audit and believes that that's the best way to achieve transparency.  So the Mayor is very much looking forward to having the third-party independent auditor deliver a report that will be transparent and cover all of the issues that an audit should cover.

THE COURT:  What happens -- first of all, if the Mayor's position and the City's position is that he doesn't have authority, this is not an issue.  But if he -- if the Controller does have authority in the long run, then I'm concerned about the same information getting to both parties.

And his position is going to be what is the harm in a second audit to check the first audit?  Now, I'm hearing some politics involved in this.  But what I'm looking for is if this issue is going to be resolved or not.  And if it is, then I'd like all of you folks to get together and try to resolve it now.  And if that's an impossibility because of the politics involved, so be it, because we're going ahead with the third-party audit.  And your position may be, Judge, that's all we want.  We don't want to go any further on the performance audit with the Controller's Office.

But if he is right and he does have that independent authority, he's going to be coming right back a couple months after that independent audit, and I just want to make sure that information is out there co-equally shared with whatever access you've got and whatever access you've got --

MS. FLORES:  Your Honor, the website will do just that.  The website will have all of the detailed documentation, invoices, backup, and so that will be open to everyone, the Controller's Office, the public.  So your concern about sharing of information will be taken care of by the website.

MR. PEREZ:  Your Honor, what we've seen in the past is invoices that are redacted that don't include crucial necessary information to be able to track and assess

outcomes.  We understand why that may be necessary when it comes to a public website.

THE COURT:  By the way, we've had a hearing on this.  And I'll validate a portion of that.  And that is back in 2021 or '22 when we had this and were able to show that -- on a large amount of money, let's say, was flowing through the City at that time with a one-line incorrect date on an invoice, no substantiating document, that's where all this started.  That's what you're hearing now two or three years later.

MR. PEREZ:  And so we're looking for the kind of access that goes beyond what has been promised and often not delivered, which is full transparency on financial documents.  You also heard the City Attorney previously say on the record that this Controller's Office has unfettered authority to conduct a financial audit.  So why aren't those documents being made transparent to the Controller's Office?

I think we are eager to reach a collaborative commitment to ensure that the information exchange that you have described is something that both the Court and the City of Los Angeles and its residents benefit from.

And again, the Controller's posture is that we are fully transparent in the work that we do.

THE COURT:  I'm going to leave this subject because I'm primarily here for the process.  What I'm understanding

is this passes to the CAO in terms of at least validation or verification.

MR. PEREZ:  For Inside Safe, for the mayoral programs.

THE COURT:  Just a moment.  Michele, can I speak to you for a moment?

I didn't mean to turn my back.  I'll be right with you.

MR. MEJIA:  Of course.

THE COURT:  I'm not going to belabor this.  I'm just going to encourage, on the public's behalf, cooperation. I'll leave that politics to each of you.  I don't want to get into that at all between you and the Mayor or the city charter whether you have power or not.  But if you can reach an accomodation, it would be for the public good.  I'll just leave it at that.

Sir, thank you very much.  I may call upon you again.  But we'll always request.  We won't order.  Okay?

MR. MEJIA:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. MEJIA:  Your Honor, we're willing to make that technological website if you are.

THE COURT:  So now let's take the website for just a moment, Matt.  Before I do that, are you the decision-maker in terms of these invoices being submitted to the Controller

who writes the check?

MR. SZABO:  So as the Controller correctly stated, the CAO plays an important role as it relates to Inside Safe. We do review the invoices.  We work with LAHSA to reconcile and to ensure that they're appropriate and they're actually charging for services that were delivered.  We do that work before we submit the request for the Controller to make the payment for Inside Safe.  And that information is -- and we've provided the backup information on the website.

We do not do the -- the CAO does not do that for the Alliance and for the Road Map programs.  Those programs are with the Housing Department.  It goes back and forth between Housing and LAHSA, and Housing does that work.

THE COURT:  So the LAHD Housing Department document that I put up, this is certainly applicable to the Road Map and the L.A. Alliance agreement.  In fact, it sublists those on this document.

MR. SZABO:  Correct.

MS. FLORES:  Your Honor, may I make one clarification?

THE COURT:  Certainly.

MS. FLORES:  The reason why different invoices go to different parts of the city for verification is because of Charter Section 262-B, which mandates that the Controller allow the awarding authority, the department or the office

with the expertise, to verify that the invoices are correct and supported.  And so that's why that process happens.  And that's why different offices review different invoices.

THE COURT:  Well, first, I'm going to repeat my concern because it's the first time you're hearing -- you haven't heard me say it ten times yet.  I'm worried that the City either intentionally or unintentionally is able to put a program under the umbrella of an elected official, the Mayor or whomever, and not have accountability in terms of somebody watching and verifying.

And I'm concerned that the only thing that has gotten us an audit has been this L.A. Alliance case where the Mayor graciously came in and volunteered, and a real compliment to her, and thank goodness, before the State came out with a statement, she got ahead of the game, that she would undertake an independent third-party audit.  I think she actually got a rousing round of applause in the court, which is unheard of in federal court.  I've never seen it before.

But I'm worried that without this litigation causing that third-party audit that we go back to a city that is able to take a program with billions of dollars involved like homelessness and claim that they are not subject to an audit or to scrutiny, and that seems, regardless of what you say, to have happened for decades now.

Now, you can make any comment that you'd like.  But I'm very fearful that without this litigation we wouldn't be in a third-party independent audit.  And the person under scrutiny is controlling that audit.

By the way, that's why you saw me push back on that 2.2 million.  Let's get that on the table.  If I need more money, you're going to supply it.  I want to be very clear about that.  You will not limit this Court by -- I'm not accusing you of this -- slow walking information or confining that third-party audit as long as the costs are within reason.

And we knew going into this that that auditor had a 2.8 to $4.2 million.  Everybody here heard that.  And then I got back from the City Council a $2.2 million off-the-wall amount, which I see as nothing but attempting to limit this Court.  And I won't stand for that.  Am I clear?

MS. FLORES:  I -- I understand.

THE COURT:  Am I perfectly clear?

MS. FLORES:  I understand what you're saying.

THE COURT:  You may try to limit other people.  Don't try to limit the Court.

So I will come to you with all of the parties if that's needed, but I'm not tied to that 2.2.  And that's why I insisted on rewriting that.  By the way, the Mayor was in agreement with that.  We all were.  Paul was in agreement

with that.  It will be reasonable.  You're not going to get a big bill run-up.  But there better not be any slow walking in terms of documents because the cost goes up.  And I'm going to put you on notice now because I'm getting stuff at 6 o'clock last evening.

So, Matt, why did I get finally some documents at 6 o'clock last evening?  What was happening in this couple months in between?

MR. SZABO:  So, your Honor, as it relates to getting documents at 6 o'clock, I think the team that has been working to provide or to upload the documents onto the website, they -- there is a tremendous amount of work related to making the documents available --

THE COURT:  I compliment you.

MR. SZABO:  -- ready to be posted.  The team has been working to ensure that the documents are ADA compliant, that they're able to be read by screen readers.  There's remediation of that documents that needed to be take place.

Also in the detailed documents that we did provide that we have uploaded for Inside Safe, I think there are two documents.  One was 69 pages.  One was 123 pages.  And our team, which is not very big, had to go through page by page and make sure that any personal identifiable information was redacted.  So that just took some time.  Obviously the office has a lot of responsibilities.  And we wanted to get as much

information on the website before this hearing.

So much of the work happened before 6:00 p.m. last night.  It was those last two documents that we uploaded once the redaction process was complete.

THE COURT:  Yesterday the director of LAHSA, who is present, testified to the homeless committee that $80 million had been received, and approximately $20 million of checks had been provided or written to the providers.  Now, I've got to listen to that tape again.

Yet on the website, there are two documents filed of 5 point something -- and I'll pull it up in a moment -- million.  And it doesn't give any explanation for it.

So I'm going to read this to you because -- if, in fact, we don't have the documentation, Matt, just tell me.  Okay?

MR. SZABO:  Sure.

THE COURT:  But if we do have the documentation --

So, Wil, come on up for a moment.  I want to read this to you for just a moment.

So last evening there are two new Alliance settlement program invoices that are for $633,109 and $616,180, respectively.  Are you aware of those, Matt?  I can pull them up, if you want, off your website.

MR. SZABO:  If you could pull them up, Your Honor, that would be helpful.  I'll try to follow along.

THE COURT:  Yeah, I don't expect you to know --

MR. SZABO:  Sure.

THE COURT:  That's not fair to you.  So let me get them up.

MR. SZABO:  Thank you.

THE COURT:  The invoices are reimbursements to Highland Gardens.  Although it's unclear from the invoices themselves, Highland Gardens is a hotel located a couple blocks from the Hollywood Walk of Fame in Council District 4 that use -- that the City uses for interim housing.  And the hotel occupancy is for up to 143 beds if each room has two occupants.

You got that up?  Yeah.  You can scroll through as we go so he can see the documentation.

According to the invoices, the City paid $372,191 for leasing and $260,918 for operations for the month of January 2024.  For March, the City paid $120,092 for leasing and $496,088 for operations.  The City did not post any invoices for Highland Gardens for the month of February.  You can start verifying that.  Check that if you'd like to.

Between January 1, 2024 and March 31, 2024, Highland Gardens served 129 unique clients.  It's unclear how long the average person stays at Highland Gardens making it impossible for the Court to determine the nightly cost of housing for an individual.  When I say "the Court," I don't

UNITED STATES DISTRICT COURT

know how the public determines that yet.

In the three months between January and March, a total of 21 people left Highland Gardens.  15 of the 21 exited to unsheltered homelessness.  Five exited to a criminal institution.  One found permanent housing.

Are these the -- and I don't mean to de-minimize this -- the only documents we have?  Are there any other supporting documents that the public and the Court doesn't have access to?

MR. SZABO:  Those are the documents that we have.

THE COURT:  Fair.  Okay.

On the freeway agreement settlement last evening, the City posted.  And the only invoice that the City had submitted for the freeway agreement were submitted concerning the La Cienega Safe Parking lot.  And that parking program allows people to safely park in secure overnight parking lots.

The lot also allegedly provides limited services such as restrooms and running water as well as supportive services to facilitate pathways for health and housing.  The La Cienega lot has a total of 50 spaces now.

The City has submitted monthly invoices from this parking lot -- why don't we pull that up for a moment -- from October 2023 to April 2024.  The City pays between $69,196 to $83,714 per month to operate this lot.  In April 2024, the

parking lot served 30 unique clients in 25 different cars. The average length of stay is 46 days.

It's unclear to the Court the number of cars in the parking lot each night. And there's been some investigative reporting. I think it was -- was it -- West Side Current -- West Side. It's hearsay. But investigative reporting that they did spot checks. And they found anywhere from 0 to 14 cars using the lot at any one time.

The LAWA Board of Airport Commissioners has reported that since the lot opened on June 1st of 2023, overnight participant usage rates have ranged between three to 22 vehicles, okay, that range.

Assuming three vehicles, Matt, used in the lot every night in April, the cost per person per night would be $863. Assuming 22 vehicles, the upper end of that, then the lot used every night in April would be $117.

Michele, may I borrow you for just a moment? Just one moment.

Last evening at the board, I believe, Dr. Kellum, you testified that the base rate was $112 at the homeless committee. Now, that didn't include -- that included security, food, you testified, about 112.

DR. ADAMS KELLUM: Could you repeat that?

THE COURT: Yeah. Last evening, listening to the homeless -- I can play it back for you -- you testified that

the basic cost for interim housing was $112.  That included -- it may have been you, but you were both there.  Would that include things like security and it included some food.

But what I'm trying to get without a long-winded discussion is just the basic.  And here's why.  Listen for a moment.

So assuming at 22 nights, a vehicle was used every night.  The cost per person would be $117, Matt.  If I took an average of 12.5 vehicles used in the lot every night in April, the median cost is $207.  Now, you're the City.  I don't make those decisions.  But that's the kind of data you need to decide the benefit.

And now let's look at the figures for a moment.  I want to look at staff salaries and go across the top of the line.  And let's just take April at 21,000 or March at 29,000.  I don't know if that staff salary is a person or persons who are supervising let's say three or four Safe Parking lots or one.

And I want you to look at security at 18,000 to 23,000, which is an absolute necessity.  I don't know the cost per hour.  And so when I look at those two figures, the argument could be made that we've got fairly high administrative costs.  Okay?

I'm not the decision-maker, you are, how the money

is spent.  But this is exactly the data-driven commitment that the Mayor has entered into, and I think would be helpful.  We've had these discussions.  And, in fact, we had a discussion as of last evening.  And I informed you both of that, a very good discussion.

Do you have any more information about these summary sheets that you've submitted to me?  And that's not fair to you, Matt.  You may not know.  They may have gone up.

MR. SZABO:  As it relates to the Safe Parking site that you're referencing, these are the -- this is the documentation that we have.  Now -

THE COURT:  Is this it?

MR. SZABO:  This is it.  And --

THE COURT:  This is what our providers provided to us?

MR. SZABO:  That is correct, yes.  And you are correct, Your Honor.  We pay on an a per-space basis.  So if the utilization is down, the cost per actual person served is up.  That is correct.

THE COURT:  That's not a criticism.  But eventually, if we get to data-driven decisions, you'll be able to wisely decide as we get more information.  So instead of going backwards and finding blame, let's make sure that we go forward and make the system better.  Let's up the game in terms of accountability.

Now Inside Safe Parking invoices last evening, there are two Inside Safe programs.  And there's the number of $5,478,082 you submitted to me and $9,751,307.  The first invoice claims that the entire 5.4 million was used for shelter and housing interventions.  But it's not apparent from the website how many people were provided housing or shelter and/or the way that these interventions were conducted.

And without this information, it's almost impossible for the public or the Court to know whether the 5.4 million in taxpayer funds were effective.  And that's what the Mayor drove at on the Larry Mantle show, and that is getting not just numbers but an outcome to satisfactory.

And the second invoice, Matt, was for $9.7 million and two categories, 8.1 -- 8.8 million in shelter and housing interventions plus 409,000 in salaries, which is 4 percent; 270,000 in benefits, 2.7 percent; 90,000 in professional services; 90,000 in depreciation; 90,000 in office expenses.  And the money was given to several different service providers, including Path, Hopkins, and the people concerned.

But it is not apparent whether those services were successful in housing people or the methods those agencies used.  Who is verifying this?

MR. SZABO:  Sorry?

THE COURT:  Who is verifying this?

MR. SZABO:  So the CAO is verifying this.  And I will say, as it relates to Inside Safe, that is why we separately issue monthly, lengthy, and detailed reports on the program.  And that report includes a dashboard with all of the information that you just -- that you just said that the invoices don't have.

Part of the reason that we're posting those, of course, is that the public shouldn't have to dig through an invoice.  They should be able to see the information presented and verified in an easily consumable way, which we do with our HEA reports, which our partners at LAHSA help us with the dashboards, so they can verify every dollar that's being spent on Inside Safe and the outcomes that that dollar is achieving.

So that's -- that's why we -- on the Inside Safe page you see all of those first HEA reports.  That is where all that information is compiled.  Our office does a significant amount of analysis on it working with the Mayor's Office and LAHSA.  And we on a monthly basis respond to the Council.  And it is probably the most scrutinized homelessness program anywhere in the City currently.  And we continually add information as requested by the City Council, add additional data as well.

So that's where you'll find all of that information, Judge.

THE COURT:  The Mayor made the statements -- and with full disclosure, I'll share a part of that conversation because it's a good conversation.  And that is that the statement was made when asked concerning, "So you've got this hearing next Thursday.  It's before Judge Carter again.  What's the City going to go back to him to present in the way of documentation?"

The Mayor responded:  "Well, actually, I'm not positive about that.  I'm sure what we will present will be much better than what we have received.  But in the rush to respond to him, data was put up, and that clearly needs to be refined."

Later on the statement was made, "But, Larry, I have to say that the system was never designed based on outcome measures.  It was designed based on process."  And that's something that the Court started to feel also, that this was driven by providers in good faith to get paid.  But quite frankly, when the -- when this initially occurred, we didn't have milestones.  We didn't have outcome-driven processes.  And here the Mayor seems to be coming back and really trying to change that.

And what -- and the statement is, "We're trying to -- what was the progress six months, eight months down the line.  So that is stuff that we're trying to correct now, but it has not been corrected.  And by the way, the system that

the state was talking about was statewide, and they were talking about from years ago. So the stuff has gone on for years, and it needs to be fundamentally transformed.

So you were just talking about outcomes, which we understand perhaps need more infrastructure to be able to track down. But what Judge Carter is concerned about sounds like it is more basic. It's what are the details in the invoices or how this money was spent just to document that it's actually going to services. How was it spent? Food? Was it spent for food services? Saying that there's not infrastructure to track? Exactly.

And the statement that was of concern was this: The answer is, Sure. Let me say that we all know the overall system in every aspect has been broken for many, many years. And you know, Larry, that I choose to act to get people off the street as fast as possible and correct the broken system. So there's not an attempt to hide anything, but it is taking the City a while to develop the invoices that they can put on -- you know, that they can publish so that they are understandable.

I was concerned that there was any potential alteration through any miscommunication and that these bills were being paid so that we knew what was behind this payment at the time that they were being paid, not what we then added onto or tried to make clear.

So if we just had an invoice from a certain organization with, by the way, no date or even the incorrect date and no documentation, we ought to know that.  We lost that money.  Let's move on.

I'll disclose to all of you that the Mayor has assured me that this is not occurring; that these are not being altered or let's say put out for public consumption in a better form; that we have the raw data; and even if the system was failing because of lack of documentation, that money is gone.

What I want to make certain is we don't get into an issue in the future where the Mayor in good faith is talking to the Court, but our bureaucracy isn't getting the message, and the Mayor is now head to head with the federal court.

What are you doing, if anything, concerning making this more clear to the public and what are you as the CAO and the -- I'm going to say the bureaucracy doing to allegedly make this more understandable?  And is there any alteration going on?  Because what I'm concerned about, and Judge Fisher is also -- or has been a little concerned with the City lately in her lawsuit.  So you don't want two federal judges saying the same thing.

MR. SZABO:  Let me respond to that just categorically.  Outside of obviously the redaction of personal information, there's no alteration at all for -- on

anything that we're posting other -- again, other than --

THE COURT:  It's clear to your staff also?

MR. SZABO:  It's absolutely clear to those who work in the CAO's office.  Other than --

THE COURT:  If there's a problem then, we know that we've had this conversation, correct?

MR. SZABO:  Yes.  There's -- Judge, this is not the issue.  We're -- we're providing the information that is requested by the Court in the best form that we can.  In some cases, we need to redact personal information.  In some cases, we turn an Excel sheet into a PDF.  Okay?

THE COURT:  Sure.

MR. SZABO:  That's not alteration.  But that's -- we do some of that sort of thing to get it out there.

But I will say -- and I just want to make this point.  And it does relate to the conversation that we had with the Controller and having the program in the Mayor's Office, there is a -- an inherent conflict between the perfection of the transparency of every dollar that we're spending and the speed with which we're able to spend it.

And the reason that -- and you've heard this directly from the Mayor of the City, the reason that the program is in the Mayor's Office, it is typically -- it is not unusual that new programs could be incubated within the Mayor's Office for the purposes of being able to provide that

speed to get the services out.

And so when we're doing that, we are going to be doing things, Judge, like providing front funds.  And you'll see advances in these documents so that we can get the services out there to address the emergency as directed by the Mayor and the --

THE COURT:  Let's stop right there and get LAHSA involved.  I think at two hours and 14 minutes on the tape, there's a statement made that you can actually advance 25 percent to a provider without documentation.

Now, just a moment.  I've got to look at that timing again.  But the interesting conversation starts at 2 hours, 26 minutes, and 30 seconds, and it goes to about 2 hours and 50 minutes.

Part of that conversation is that apparently, at the present time, you can advance.  But part of that conversation was that for the invoices for three quarters, quarters 2, 3, and 4 for the current year, we didn't have on the City's part the invoices for LAHSA.  They were only working off of quarter 1.

How can the public possibly scrutinize and be aware of what you're paying and what the verification is when we are two and three quarters behind getting that information?  And then there's an interesting discussion about maybe going to 50 percent.  And if you go to 50 percent, then my effort

and the Mayor's effort and the Controller, so we're all co-equal here, to get transparency is ridiculous because we're paying 50 percent on the front side in violation of -- and will you put up this document again -- your own written document that states as follows:  "Contracts follow a cost reimbursement model which means that service providers must perform work first and then invoice LAHSA for reimbursement of program expenses.  And payments from LAHSA to contracted service providers are contingent upon receipt of required documentation."

How do I possibly and you possibly get transparency for the public if we're fronting 50 percent of this money before any service is performed?

MR. SZABO:  Judge, that is a fair question.  But it goes back to my prior point which is if there's a need to provide -- we are talking about millions and millions of dollars of services that people are receiving right now and need right now.  And so -- so, Judge, and so we do have a process in the contract that allows us to advance money.  That doesn't mean that money is not verified.  They still invoice against that.

THE COURT:  No.  They verify it on the backside.

MR. SZABO:  That is --

THE COURT:  So far we haven't done very well, Matt, with the verification.  That's my concern.

Number two, this Court recognizes that the Mayor is in a difficult position.  She can't stop this process of putting people in interim housing or housing to then clean up the system, which apparently she'd like to.  She's got to work with this antiquated system that is not verifiable at the present time and at the same time keep it going for humane reasons.  I understand that.

But, Matt, I'm starting to form the opinion that either we don't have the verification, period.  And if we don't, I need you and the doctor to just tell me that and let's move on.  Or we're going to be in a situation where we're dragging this out of the providers.  And that's going to get very, very painful because it's going to look like you're hiding.

MS. SWISS:  Would you like Dr. --

THE COURT:  Sure.  Speak any time you want to. Because your input would be welcome.  Because there's also an interesting discussion in that same meeting by different members of that committee that why don't we just shorten the time period.  And then there were a number of reasons why you couldn't.

But I got concerned -- I think the members did also -- about being two and three quarters behind in submission from LAHSA which makes it impossible to verify. So --

Please come on up for a moment.  I can't hear you.

DR. ADAMS KELLUM:  I need my chief of staff to join me.

THE COURT:  Well, have her come with you.  Sure. Bring the whole group.  That's fine.

If we can get this system together -- by the way, coming up here, I'm going to raise another problem.  Why don't we have the State involved through you folks?  I'll give you an example.  I'm houseless.  I'm contracting with LAHSA.  I now go into -- not recuperative care, but I go into substance abuse.  Most of those are private providers.

Now, if I'm contracting with LAHSA, I have to go in the HMIS system, which we're going to talk about in just a moment, Doctor.  We're going to talk -- come on up.  Join me.

But as soon as I go over to substance abuse, which is a huge amount of money, I don't have to get entered in the HMIS system.  So now I provide for Medi-Cal through my private provider, and I'm double paying.  LAHSA innocently doesn't know I've gone over to my private substance abuse provider who is now billing through Medi-Cal.  And LAHSA is still paying the bill believing that they're still providing in some way.

A lot of our contracts, by the way, are contractually based for X number of beds, but we don't know if those beds are filled.  And my concern is that we're

creating a system that doesn't encourage frankness, I'll just say it, truthfulness.  Because you get punished if you're a provider and you only fill 80 percent because then we come back and say you didn't fill the 80 -- you only filled 80 percent.  We might give the other 20 percent to another competitive provider or we might cut back your services because it's not outcome-driven.

Now, Doctor, I'm going to turn this over to you.  By the way, thank you for your courtesy.  Thank you for being here.  I want to compliment you.  I think you're trying to do a good job.  Let's just start the conversation.

DR. ADAMS KELLUM:  Thank you so much.  Va Lecia Adams Kellum, CEO of LAHSA.

Judge, do you mind repeating your question?  I know you've raised a couple, and I just want to make sure --

THE COURT:  How are we working off of accuracy for the public if we're two and three quarters behind?  And the testimony yesterday was we had quarter 1, 2, 3, and 4, that we were working off quarter 1, but we didn't have quarter 2 and 3.  I'll play the tape if you want.  I can get it for you.

DR. ADAMS KELLUM:  So I think it's important to differentiate between the cost reimbursement model and the invoicing system.  The providers have been doing the work, and they have the, because of the cost reimbursement model,

the accrual of expenses, as well as documentation on expenditures, services rendered, beds filled, et cetera.

And because of the cost reimbursement model and the amendment process, there's a certain process by which they submit those.  But that doesn't mean the work hasn't been done or the documentation is not available.

THE COURT:  We don't have the documentation verifying it.

DR. ADAMS KELLUM:  The documentation begins to get verified once we have an approved budget template, et cetera. We can call it the bureaucratic controller type of audit steps to make sure that you know we're doing our due diligence.

THE COURT:  You got $80 million in May?

DR. ADAMS KELLUM:  That is jumping ahead.  I want to say first that those pieces which the Mayor raised are the things we go back and forth to make sure are clean before we can pay a provider.

So it may feel like you're missing the documentation.  That is not a hundred percent true. You're -- you're delayed in getting that documentation because there's been a delay for some in the payment of those invoices from a cost reimbursement model.

The 80 million that you heard us reference of paying out last month was not all city reimbursements.  That

was a mix of state, county, and city expenditures.  And those were all based on documented-based invoices from service providers and paid.

THE COURT:  Thank you.

DR. ADAMS KELLUM:  Absolutely.

THE COURT:  Matt, any other comments?

MR. SZABO:  Only that to echo Dr. Adams Kellum that the work of verification happens.  And in the case of the advance, it is just delayed.  And it's also the reconciliation.  So if -- if the service wasn't provided at the level that was requested, we only pay for the level that was actually provided, and we -- we make good as we go along.

That's -- that's just a necessary -- it's a necessary component to the need -- the conflict between the need and the need to verify.

THE COURT:  Who goes out to spot check, at least, and verify some of this?  In other words, nobody expects you to go from establishment to establishment, but some folks have been out there.

And let's just say that it's -- it's hard to find some of the representations being made.  If we want to get into that today, we'll start calling some people.  Okay?

But let's just say it's hard to find.  Who is actually going out there other than the data-driven information that we received and occasionally spot checking

to make certain that these services are really being performed or bed spaces being filled?  And we can't find that entity doing actually on the ground except maybe my special master and a few others just making these checks.

So, therefore, we're completely dependent upon the data coming from providers who are decent but also very self-interested.

MR. SZABO:  My office does the financial analysis. Dr. Adams Kellum, I think your team --

THE COURT:  Who checks?

DR. ADAMS KELLUM:  We have a contracts and grant team that check -- first of all, finance looks at those from a financial perspective monthly.  The contracts and grants team now meets monthly as well to go over expenditures, underspending, overspending, et cetera.  So there's a lot of scrutiny of those contracts and of the utilization.

THE COURT:  We know this --

DR. ADAMS KELLUM:  Once a year we go out in person --

THE COURT:  Right.

DR. ADAMS KELLUM:  -- and do audits where we can at any time pull a representative sample of actual receipts.

THE COURT:  I'm going to read this to you.  This is verbatim:  "Service providers are contractually obligated to maintain copies and make them available during monitoring."

That is what we seem to be missing.

"All contract providers must undergo annual audits by qualified external accounting firms."  That's literally reading verbatim.

"Loss of monitor service providers quarterly reviews detailed receipts and other financial records."  I don't see anywhere here that anybody is on the ground going out and verifying the data-driven information coming from good but self-interested providers.

DR. ADAMS KELLUM:  To clarify, yes, quarterly all providers have to have their own outside audit that is turned in to LAHSA just to make sure they have an actual audit firm and then LAHSA.  We can show you some examples of the letters that go out where we notify providers that we're coming out to monitor in person.  And that happens.  There's a report, and it also includes whether there's any findings or any issues.  And that is public.  So we can give you an example of what that looks like.  That is in-person monitoring.

THE COURT:  So if we went out and spot checked, you feel pretty confident that I would find these services?

DR. ADAMS KELLUM:  I feel confident that you would see the services rendered.  What -- I think you would find the services rendered --

THE COURT:  We'll give you a microphone or something, yeah, just so we can hear.  Yeah, it's okay, just

yell.

DR. ADAMS KELLUM:  I think this is an excellent opportunity to verify and show the community what is going on out there.

THE COURT:  Okay.  I'm going to turn to a different area for just a moment.  You're welcome to stay.  It may concern you.  It's the second area so we don't belabor this today.

MS. SWISS:  Your Honor, I apologize.  I would like to ask if LAHSA could be excused.

THE COURT:  You're here because you want to be or not.  It's going to get really interesting, though, in a couple minutes, much more interesting than so far.  But it's up to you.  You're here because you want to be.  You're not ordered by the Court.  But I'm glad you're here because at least I'm getting input.  Thank you.

I toss out to all of you in LAHSA as you leave, Doctor, that you may be getting hypothetically double billed in what I'm going to call the Wild West area of substance abuse because the substance abuse people aren't required to put into your HMIS system.  Let me repeat that.  You know that, and I know that.  And that's where the bulk of our money is going.

So I could have a good provider or let's say a self-interested provider.  And as soon as I go over to

UNITED STATES DISTRICT COURT

substance abuse, those are private providers.  And who do they bill?  Medi-Cal.  Now, meanwhile, you have them on your roll.  And there's no effort and we don't even know at LAHSA innocently that they're over there with the private provider.

How do we get the State involved to start linking the system that everybody is trying to make better so that the State when we have a private provider and they're paying through Medi-Cal has to put into our HMIS system so you don't get double billed?

Help me with that.  How do we do that?  I'm looking for suggestions because there's the other part.  And that's a huge part of what could be happening in terms of unintentional double billing.  Now, we can get to the intentional in just a moment, the dead people, we will in a few moments.

This is a large part of your money out there.  It's not recuperative care, Doctor.  It's not recuperative care with old people like me, no.  It's over in that substance abuse area where we don't have to put it into the HMIS system.  And that's where a lot of that money is going.  And you could be getting billed and not knowing that.

Because, as an example, if I'm homeless and I am down in Curren Price's district, I'm getting treated by Hopkins hypothetically.  And I move up the road and I go to -- I mean Dawson's district.  And I move up the road and I

go to Curren Price's or St. John's or somebody.  I'm just picking.  And then I go over to VOA.

I know that HMIS system, we have a tickler.  The last provider should be picking up the fact that the other two providers.  But we have no way of knowing how quickly they stop billing you.  There could be a time delay in good faith because they don't know if the person is coming back.  They could have some kind of specialized treatment.  That is one potential problem as a homeless person moves around.

The second, though, is that whole billing with Medi-Cal when we can't keep track of people in the substance abuse area.  They're over here with a private provider that applies to Medi-Cal that we don't even know about.  Meanwhile you're paying for a month or longer innocently.  Doing a good job by the way.

How do we get the State hooked in?  Because the State on one hand complains I'm putting out money and I'm getting little data back.  How do we tie that together?  Think about that anyway, would you?  Have the Mayor think about that.  Because I think you've got power with the Governor.  Because that's Medi-Cal.  That's his.  Okay.

I'd like to hear from the completion of the necessary field from the HMIS system which was just started into.  There have been numerous delays from the County and the City resolving these fields.

And the parties and LAHSA I think should be able to testify and verify today that these fields are sufficient or not.

So let me start with the City.  Are these fields sufficient?  Get Matt involved.  Get the crew up here if you want to.  Because it's in your self-interest to make these fields sufficient.

MS. MARIANI:  Understood, Your Honor.  A lot of progress has been made on this.

THE COURT:  I know that.  Are they sufficient?

MS. MARIANI:  Honestly, I'm not in a position to testify to that today.

THE COURT:  Crew, come on up here.  From the City, just gather around.  She needs help.  This is really simple.  This has been going on a long time.  Are they sufficient or not?  Yes or no?

MS. MARIANI:  Unfortunately, Your Honor, I don't think we can say that today.  We had a productive --

THE COURT:  Then they're not.

MS. MARIANI:  Well --

THE COURT:  Then they're not.  What's missing?

MS. MARIANI:  That isn't the issue at this point.

THE COURT:  What's missing?

MS. MARIANI:  I'm sorry, Your Honor.  I really can't --

THE COURT:  Go out and talk to Matt.  Go out and talk to your crew for a moment.  I don't want you in that position.  That's an order.  Stand up on your feet and walk back and talk to him.

MS. MARIANI:  We can talk.  I just --

THE COURT:  No, no.  Now.  That's an order.  I don't need to hear any more lawyer talk now.  Go back and talk to him.

What's missing?  Let's get past this and get this resolved.  This has been going on like the Rocky Horror Picture Show.  In fact, better yet, why don't you folks go to lunch.  I'll see you at 1 o'clock.  Okay?  Have a nice lunch.  Ordered back at that time.

(Proceedings concluded at 11:56 a.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/s/ Miriam V. Baird                    06/07/2024

MIRIAM V. BAIRD                                    DATE
OFFICIAL REPORTER

UNITED STATES DISTRICT COURT