UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-CV-02291-DOC-KES |
| ) | |
| Plaintiffs, ) | CIVIL |
| ) | Los Angeles, California |
| vs. ) | |
| ) | Thursday, June 6, 2024 |
| CITY OF LOS ANGELES, ET AL., ) | |
| ) | (1:39 p.m. to 3:26 p.m.) |
| Defendants. ) | |

STATUS CONFERENCE RE MOU

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:                          CONTINUED ON PAGE 2

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979

For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Karlen Dubon

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES FOR:            (CONTINUED)


Defendants:                 LAUREN M. BRODY, ESQ.
                            Miller Barondess, LLP
                            1999 Avenue of the Stars, Suite 1000
                            Los Angeles, CA 90067
                            310-552-4400

                            ARLENE N. HOANG, ESQ.
                            JESSICA MARIANI, ESQ.
                            Los Angeles City Attorney's Office
                            200 N. Main Street, Room 675
                            Los Angeles, CA 90012
                            213-978-6952

                            VALERIE FLORES, ESQ.

Intervenor:                 SHAYLA R. MYERS, ESQ.
                            Legal Aid Foundation of LA
                            7000 S. Broadway
                            Los Angeles, CA 90003
                            213-640-3983


Also present:               PAUL WEBSTER
                            CA Controller

                            SPECIAL MASTER MICHELE MARTINEZ

                            KENNETH MEJIA

                            ANTHONY PEREZ

                            MATT SZABO

                            CHRISTIE SWISS

                            DR. VA LECIA ADAMS KELLUM

EXCEPTIONAL REPORTING SERVICES, INC

**Los Angeles, California; Thursday, June 6, 2024; 1:39 p.m.**

--oOo--

THE COURT:  I apologize for the lateness.  We had a judges' meeting and it went forever.  So we're back on the record with my apologies.

All right.  For the City and the County, have you been able to discuss these remaining issues?

MS. HASHMALL:  Your Honor, I think we were asked to put our appearances back on the record for the afternoon session.  So I figure I'll start.  Mira --

THE COURT:  I couldn't hear you.  I'm sorry.

MS. HASHMALL:  We've been asked to put our appearances back on the record for the --

THE COURT:  Oh, we have?

THE CLERK:  Yes.

THE COURT:  Oh, because we have a different court reporter.  Okay, well thank you.  And you can make your reappearance then.

MS. MITCHELL:  Thank you, Your Honor, Elizabeth Mitchell on behalf of LA Alliance and here with me is also Paul Webster on behalf of LA Alliance as the Executive Director.

MS. MYERS:  Shayla Myers on behalf of the Intervenors.

MS. HASHMALL:  Mira Hashmall for the County of Los Angeles.

**4**

**MS. BRODY:**  Lauren Brody for the County of Los Angeles.

**MS. HOANG:**  Arlene Hoang, Deputy City Attorney for Defendant City of Los Angeles.

**MS. MARIANI:**  Jessica Mariani, Deputy City Attorney for City of Los Angeles.

**MS. FLORES:**  Valerie Flores, Chief Deputy City Attorney for the City of Los Angeles.

**THE COURT:**  Once again, just the ability to verify that these fields are sufficient, are you able to do that?

**MS. MARIANI:**  Your Honor, we spoke at the break and we think it would make sense for the County to provide an update on this first.

**THE COURT:**  All right, sure.  Follow up, please. Thank you.

Michelle.

**MS. HASHMALL:**  Thank you, Your Honor.  I just thought it might be helpful to put in context what HMIS is and how this issue relates to the County settlement agreement.  So as the Court is aware, HUD-mandated funding has to be accounted for with regards to resources that are in a case management system. That's what HMIS is.  It's in effect across the country and while local agencies have some discretion to customize it, it's really a matter of a system that captures how HUD funding is being utilized on the ground.

**EXCEPTIONAL REPORTING SERVICES, INC**

With regards to this issue, the County has a reporting obligation under its settlement agreement to account for referrals from city-funded outreach teams.  And as we got ready to do the last quarterly report, it became clear that there had been a disconnect in capturing those referrals.

And so the City, the County, LAHSA, folks that are really involved in this on a day-to-day basis got together and figured out, what can we do?  Is there a way that we can systemize those referrals, capture them so the County can provide the data that is called for for its reporting obligations and its own?

THE COURT:  Okay.

MS. HASHMALL:  HMIS system was customized and that was a work group of -- "work group" is probably too formal.

THE COURT:  Okay.

MS. HASHMALL:  I don't think it was that fancy but they put their heads together and they created a system where you can capture your referral.  An outreach -- a City-funded outreach worker can now identify where they're referring and which County department is obtaining the referral.  And then the County is going to be able to capture that data and as part of its reporting obligation, identify outcomes, dispositions.

Now, every report is a snapshot.  So the new fields which capture these referrals were the subject of trainings and they are available online.  Over 600 individuals sat through

**6**

these trainings and these are the outreach workers who are actually going to use it.  They are the individuals who really use it.

THE COURT:  Just a little slower.

MS. HASHMALL:  These are the individuals who really need to understand how the fields work and they went through the training and they're going to use them.

Now, there's going to be a second-quarter report and that report is now -- because of this new referral reference, is going to allow the County to provide information about the referrals and the disposition.  You'll see that, Your Honor, in the next report the County submits and that's going to, I think, not only satisfy our reporting obligation but really be an informative measure of the work the County is doing and the extensive services that are being provided in connection with the settlement agreement.

So we are happy on the progress of that.  It's up and running.  Departments and personnel and outreach workers participated in the training.  It's available online and it's going to have that data that allows us to report as required under our settlement agreement.

Does the Court have any questions for me?

THE COURT:  Are these fields sufficient?

MS. HASHMALL:  I think it is, Your Honor.

THE COURT:  Okay.

**7**

**MS. HASHMALL:** We're going to do this reporting on -- in July and if there are any glitches, if there's any utilization quirks, I think -- you can do the training, right? But these individuals are going to have to use it and as the real-time users identify concerns, you sort of have to get things up and running and then you can tweak them if it's not working as contemplated.

I believe there's been a lot of thought to this and I think it's going to work efficiently.

**THE COURT:** I'll ask the City if these fields are sufficient.

**MS. MARIANI:** Your Honor, to Ms. Hashmall's point, once they've submitted their quarterly report, which will show the actual reporting, how it plays out in the field and then the dispositions as well so that we can actually see from HMIS what is captured is -- as I understand it, it's as people enter in information, that's captured in HMIS but the actual dispositions are not.

So to actually see what is reported by the County, that's when we'll know if these fields have been sufficient.

**THE COURT:** Has the City received training in the HMIS field?

**MS. MARIANI:** My understanding is the outreach workers that are funded by the City have at least to some extent but what hasn't yet occurred is the people in this room

**EXCEPTIONAL REPORTING SERVICES, INC**

maybe have been trained yet.  I think there might be a specialized training that's going to occur but -- and they've also made available the training on the website.

**THE COURT:**  Yeah.  So what I'm absorbing is that we really haven't had the field training yet and -- is that correct?

**MS. MARIANI:**  Well, I think the outreach workers have been trained.  It's just the other City officials and non-outreach workers have not yet had that opportunity.

**THE COURT:**  And let me take public comment also but let me take comment first of all from the parties involved. I'd like to have -- LA Alliance, if you want to make any comments concerning this --

**MS. MITCHELL:**  Yes.

**THE COURT:**  -- and then share that on behalf of the Intervenors if you have any comments.

**MS. MITCHELL:**  Thank you, Your Honor.  Our question -- our main question is whether there's a loop-back to the outreach workers and/or City workers after information is inputted.  So after request for service or put in through HMIS, is there some mechanism by which those outreach workers or City workers or whomever can access that, see what these dispositions are on a real-time basis for individuals so that we -- the outreach workers know how to assist the individuals or how to follow up appropriately.

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  So, Mira, on behalf of the County or the City, your response?

MS. HASHMALL:  I'm happy to speak on that, Your Honor.

THE COURT:  Please.

MS. HASHMALL:  So not everyone who works for the City of Los Angeles is going to be able to have access to HMIS. It's not a free-for-all.  It is a secure online data system that tracks personal patient information, HIPAA-protected information for people experiencing homelessness.

HUD sets standards that significantly restrict access to the disposition of some of these referrals and that is particularly true, Your Honor, in the context of substance use disorder.  The law truly restricts any information being shared about an individual's treatment relating to substance use disorder and other things and that's a matter of privacy and security.

So authorized users are trained on what they can or cannot see in HMIS.  The average employee isn't and that's not something the County can change.  That's a function of Federal law.

THE COURT:  City, any comment?

MS. MARIANI:  Not at this time, Your Honor.

THE COURT:  Okay.  All right.

MS. MITCHELL:  Your Honor, can I follow up with that?

**10**

**THE COURT:** Oh, please.

**MS. MITCHELL:** So I just want everyone to understand and I recognize that not everyone in the City has access and probably appropriately so but what about the outreach workers that specifically made those referrals?  Can they then see what the disposition is so that they know, should I continue following up with this person, had they been accepted into a detox bed or something like that so that we have a full loop of communication and we can make sure individuals are getting helped appropriately?

**THE COURT:** Uh-huh.  Yeah.

**MS. HASHMALL:** Your Honor, I'm not sure I understand the question.  So you --

**THE COURT:** Could you repeat it a little bit more slowly for the court reporter?

**MS. MITCHELL:** Sure.  So recognizing that not all City employees have access to it and probably appropriately so, what about the outreach workers that are making the referrals at least to the extent of understanding whether services are being provided, whether the individual has been accepted into a bed at some other facility so that we can make sure that individuals are being helped appropriately?

**MS. HASHMALL:** So after an outreach worker has inputted a referral, are they able to see an outcome?  Is that your question?

**11**

MS. MITCHELL:  Correct, ultimately.

MS. HASHMALL:  Okay.  So, ultimately, all of the outcomes are going to be reflected in the County's reporting relating to the referrals.  Right.  That is the reason that this HMIS was modified to capture those referrals so that we could report out under our settlement obligation the number of contacts, the result of those contacts, the types of service requests and the agency that provided services, the request per individual and their location where the request was made.

That is a provision of our settlement agreement.  This data was not being provided to the County.  So it couldn't comply with that part of the provisions.  Now it can.  Now, does that mean that Bob Outreach Worker on any given day can put in a person's name and find out where they happen?  I don't know that it's going to have that type of individualized real-time access information but ultimately the reports are going to generate the conclusion of each referral.

MS. MITCHELL:  So I recognize that the reports and particularly the County reporting that happens on a quarterly basis but those are -- that's kind of a macro-level, right, the high-level numbers as I understand it.  And so if we're talking about help for individuals on the street, the outreach worker will not have an opportunity to access the outcomes or the disposition for their help request through HMIS.  Is that --

MS. HASHMALL:  So that sounds like an issue that's

**12**

not in our settlement agreement but I will ask our subject

matter experts and I'll get back to you about that question.

THE COURT:  And let me come back to where I started

inartfully this morning about this whole area of substance

abuse, not recuperative care.  That is a huge dollar item and

whether the estimate is 40 percent or 60 percent or a

combination of mental illness, there, once again, "Unless the

project funder requires documentation for

recordkeeping purposes, clients are not required to

provide documentation of the substance abuse

disorder," et cetera.

MS. MARTINEZ:  This is on the HUD exchange.

THE COURT:  Huh?

MS. MARTINEZ:  This is on the HUD exchange.

THE COURT:  Yeah, this is HUD.  So the end result is

we are losing a huge amount of documentation and I'm just

wondering why we don't have the State at the table because this

duality of private providers not having to come into our HMIS

system billing Medi-Cal with LAHSA still having this person on

the book is really costly.  So I leave that to all of you but

there's a missing party here.  It's the State.

MS. MITCHELL:  And we don't think that the Court is

wrong on that issue but we're concerned about really the

granular level, right, from -- when you have an outreach worker

who has 15 people that they've referred to substance use

disorder treatment --

THE COURT: Right.

MS. MITCHELL: -- and there is no loop-back so the outreach worker can understand what happened to that referral, there's no way to maintain accountability both for the outreach worker and for, frankly, the County and the service providers to make sure that someone is actually getting help on the street without that loop-back mechanism.

THE COURT: So here's my proposal. We all want to make this work. We want to make it better. Right? Okay. When do we come back and see how this is functioning rather than just having this conversation? What's our tickle or report-back date where we see --

MS. MARTINEZ: We need a suggestion for --

THE COURT: Hold on. Michelle is about to make a suggestion but she was going to whisper it to me. So she can just -- transparency is the key. Make your suggestion transparently.

MS. MARTINEZ: No, I just -- I said I would make a suggestion since there are some pending questions that the Alliance has and, obviously, the City that maybe we can have a learning session as we did not too long ago with myself and Judge Birotte and be able to help facilitate and figure out the appropriate and best approach to help the County and LAHSA and have the City understand and the Alliance understand moving

**14**

forward, how can we better improve not just the system but the feedback loops and the communication between all parties.

THE COURT:  Okay.  Now, having said that, I want a definite date where there's pressure on people to get this done rather than the usual -- oh, sorry -- rather than drifting.

MS. MARTINEZ:  If I may --

THE COURT:  So I want you all to discuss a date rather than me arbitrarily imposing a date but I want to come back together and see how this is coming to fruition or not. So why don't you just have a conversation so I don't arbitrarily impose a time but we're going to reconvene.  I would suggest sometime in August.  I'll be here on some other cases anyway.

MS. HASHMALL:  Your Honor, I think August is probably a reasonable timeframe because I think --

THE COURT:  Well, talk to your colleagues.  Just -- I trying not to choose a date.  Kids are going back to school. Just give me a date.  Otherwise, I'm going to throw out a date and that's the end of it.

MS. HASHMALL:  Well, so our reporting obligation is the end --

THE COURT:  Ta, ta -- yes.  Would you walk towards Mira?  Some of you have been able to walk towards.  It's amazing.  It's called a quiet conference and just talk to each other.

MS. MYERS:  And, Your Honor, I assume the Intervenors will be involved as well.  Thank you.

THE COURT:  And just give a suggestion.  Don't --

Shayla, would you walk towards them also?

MS. MYERS:  Sure.

THE COURT:  Thank you.  All right, it's called "cooperation."  It'll save a lot of paperwork back and forth.  Just come up with a date.

MS. MARTINEZ:  Just suggest your date and --

THE COURT:  Let them tell me the date.

Can you get the City involved?  Louis (phonetic), come on up, Louis.  Joint the family here and just give us a date so that we have something that we have to do on each occasion rather than just talking about the problem without results.

**(All attendees in discussion)**

MS. HASHMALL:  Your Honor, how does August 29th look on your calendar?

THE COURT:  It looks absolutely perfect.  If all of you are available, I'll be available.  Fair enough?

MS. HASHMALL:  Okay.  So if I may, before we move to other topics --

THE COURT:  And August 29th, what time?  9:00 o'clock?

MS. HASHMALL:  Yes, Your Honor.

**THE COURT:** 9:00 o'clock, folks?  9:00 o'clock.

**MS. SPEAKER:** Thank you, Your Honor.

**MS. HASHMALL:** I just -- before we move to a different topic and I'd like to, I just -- I want to reiterate that the County and LAHSA really worked with a coalition of partners in connection with rolling out this new HMIS field training and implementation.

**THE COURT:** Right.

**MS. HASHMALL:** It was the LAHSA Homeless Engagement teams, the City-funded MDTs, Council District's staff, Hope the Mission, the Downtown Women's Center, the Midnight Mission, Union Station, Volunteers of America, Union Rescue Mission, the Weingart Institute, PATH and many more.

**THE COURT:** Okay.

**MS. HASHMALL:** So we are really trying to bring all of the important stakeholders into this training and implementation process and I think it's -- we're excited to see how it rolls out.

Now, the other reason that we are here, I believe, is because the Court had questions about the County's website. And I just -- I want you to know that the County has been working intently to upload on almost like a weekly basis these invoices and we're committed to do it monthly but we are also hoping to beat that commitment on a regular basis.

And so the date of the invoices not necessarily

indicative of when it was reviewed for HIPAA issues, processed and uploaded and so we have actually done a tweak on the County's website. So you can see without having to guess how recent the update has been and we think that helps with usability and we think it also helps with everyone understanding whether anything has changed since the last time they looked.

Our goal for this website is to make it clear and make it accessible. And those invoices are going to be on different timelines just because the departments get their invoices on different timelines. But, again, we're going to be uploading them on an ongoing basis. And I think as it continues, it's going to continue to be refined based on user feedback. So I'm encouraged about that and any suggestion that the County hadn't made progress on that since the last hearing is just not accurate.

THE COURT: Okay.

MS. HASHMALL: We have and we will continue to do so.

Now, the other thing that dovetails with that is the verification process. The Court has expressed concern about how carefully we are scrutinizing the invoices.

THE COURT: Uh-huh.

MS. HASHMALL: Are we getting what we paid for --

THE COURT: Uh-huh.

MS. HASHMALL: -- I think is the Court's concern.

And so we really dug into that and I kind of want to talk about it on a macro-level and then if the Court has questions, I'm happy to drill down.

So the first thing is the contract requires them to do what they say they're going to do and to account for it with specific documentation.  Then beyond just their obligations under the agreements that the providers have with the County, there are department-specific billing practices.

So you do the work and then you submit the invoice. And the departments are getting real-time documentation and that's required and there are also verification systems that are in place tailored to, is it an interim-housing bed or is it a different type of resource?  There are accountability and transparency requirements built into the real-time use.

For example, DMH is not going to pay for a bed that's not being used for a DMH-referred client.  So there are systems in place to make sure that the providers are providing that data in real-time.

Then there's an additional layer of review and accountability.  The key departments that provide these resources through the County, DHS, DMH, they have what we call "contract management teams" in place.  DPH has it for SAPC as well.

And so these are teams that are specialized in testing compliance with the contract terms, verifying the

accuracy of the invoices that are provided.  I'm happy to go into more detail but this is -- these are highly trained individuals who are checking compliance beyond what is the real-time reporting on the vendors' side.

Then there's another layer.  The County's Auditor/Comptroller Department is, again, essentially the watchdog for the County's finances and so they have specialized teams that conduct audits, program audits, department-specific resource audits and that is a third layer on top of the real-time reporting and on top of the contract management teams that are embedded in the key departments.

And then, finally, there is a fourth layer and that's Federal and State law, Your Honor.  These contractors by contract and by law are subject to significant penalties if there's any fraudulent billing.  That's the Federal and State False Claims Act and other law that is sort of the ultimate check with very significant financial consequences.

So I'm happy to sort of walk through in more detail as to each department, how that accountability works but that's sort of it on the macro-level.

**THE COURT:**  Thank you.

**MS. HASHMALL:**  Thank you.

**THE COURT:**  Appreciate it.

All right.  Any more questions you'd like to ask, Ms. Mitchell?  If so, this is a good time.  I mean, we're all

getting together trying to make it better.

MS. MITCHELL:  Your Honor, we still have significant issues with the report -- the County's report.  We can talk about that today.  We can continue meeting and conferring if that's helpful.

THE COURT:  Yeah, why don't we come back to that in just a moment?

MS. MITCHELL:  Thank you.

THE COURT:  That's -- coming right back to that.  I promise you.

On this issue with the HMIS fields.

MS. MITCHELL:  I have no further questions on this issue, Your Honor.

THE COURT:  All right.  Shayla?

MS. MYERS:  Yes, Your Honor.  We have not actually seen the HMIS fields.  I know at the last meeting -- we had a meeting here in chambers.  We thought that we would get them. We have not seen them.  So we would love to take a look at them and then obviously be involved in --

THE COURT:  Now, how do you feel about that?  This is a negotiation, quite frankly, between the County and the City. What about including Ms. Myers?  Any concern?

MS. HASHMALL:  So we can -- I will email to Ms. Myers personally a link to the implementation program and the training.

**21**

**MS. MYERS:** Okay.

**MS. HASHMALL:** And we'd love her input.

**THE COURT:** Okay.  Okay, Shayla?

**MS. MYERS:** Thank you.

**THE COURT:** Have any more questions?

**MS. MYERS:** No, that's it.

**THE COURT:** All right.  Public comment then.  Anybody in the public, as you're eventually going to be the consumers of this especially as the HMIS feels and it's your money. Anybody want to speak?

Yes, sir?

**MR. WESTCOLL:** The boss is -- the people don't even want to take their bosses because the bosses are --

**THE COURT:** Come on up for a moment.  We can't hear you.  I'm sorry.  My apologies.

**MR. WESTCOLL:** See something, say something.  How are you doing, Judge Carter?

**THE COURT:** Very good, sir.

**MR. WESTCOLL:** All right.

**THE COURT:** And what's your name?

**MR. WESTCOLL:** My name is Ricardo Westcoll (phonetic) --

**THE COURT:** Thank you.

**MR. WESTCOLL:** -- known as Rick.

**THE COURT:** Thank you.

**EXCEPTIONAL REPORTING SERVICES, INC**

**22**

MR. WESTCOLL:  Okay, yes.  Some of the people, they don't trust the vouchers.  And some of the people in the street don't trust none of the entities that's passing out vouchers.  Some people say they give their information to somebody else to become them in another city.  Then also I'm seeing where they're talking about they're bringing vouchers out there.  I don't see nobody coming around bringing no vouchers.  I don't see nobody coming around talking about beds or none of that.

THE COURT:  Section 8.

MR. WESTCOLL:  And people are just not trusting LAHSA.  People are concerned and they're missing -- they're saying they got ghost beds.  Anybody know what a "guest bed" is?  Whereas three people get in the bed in one day.  How do you get in the bed three -- three people get in bed one day and I believe it's about $900 a whack.  And I'm, like, where are all these people at?  They're gone.

And then the building that they're in, they're mold infested.  Who will want to stay in a brand new building where the water is running and there's no control over the water in the building?  You call the police to do something and they can't do nothing because they're too busy.  And that's okay.

I've been waiting 21 years for a Section 8 voucher.  I started from Wall and Fifth Street.

THE COURT:  Are you on Wall and Fifth?

MR. WESTCOLL:  Yeah, that location they used to give

out boxes over there at the ward.

THE COURT:  I'll see you Sunday.  You'll be at Wall and Fifth?

MR. WESTCOLL:  I'm going to be at Wall and Fifth, too.

THE COURT:  See you Sunday.

MR. WESTCOLL:  San Pedro and Winston (phonetic) really.  So you can catch me on San Pedro and Winston.  But a lot of people are not trusting these people.  They're running from them because of people that are selling vouchers and they had other people -- and I live in apartments -- that was right along with lots of selling the vouchers, including the Police Department.

THE COURT:  Okay.  Sir, I want to thank you very much.

MR. WESTCOLL:  Thank you.

THE COURT:  Now -- okay.  Kevin, come on up.  And use the microphone.  Use the mike.

MR. CALL:  Kevin Call (phonetic), Skid Row's mayor. You know, it's a shame that I live in a city that they look around and see that all these agencies is supposed to be out here helping the people and they ain't doing nothing to help the people.

You know, I got a lot of people in this courtroom here who spend a lot of their energy out here helping the

**24**

people who don't even get paid to help the people but they're out here on Skid Row.  I encourage the County, the State, the -- all of them to come out to Skid Row.  Put your boots on the ground.  I want you to come out to Skid Row and see what we do without no money.

Here is the people who get millions of dollars to do the job who just ain't doing the job.  They told him just to call Skid Row mayor, the manager at the City office.  So shall it be because I'm intending to expose those organizations that's supposed to be standing up for the people who ain't standing up for the people.  That mean the money is not hitting the streets here in Los Angeles.  It is not hitting the streets.

I'm at Skid Row every day, day and night.  So can't nobody come tell me, LAHSA is doing this.  LAHSA ain't doing nothing.  LAHSA is doing exactly what they say they doing, is making people a lot of promises when they ain't keeping none of them.  And if I continue to be at Skid Row as the Skid Row mayor, I'm intending to expose them until we can do some changing here in this city.

A lot of people are lining their pockets up but they ain't doing the job.  I mean, people are talking about it.  But I want the people that's going to do about it come to Skid Row.  Put your boots on the ground.  If you work for the City or the County, I want to see you down on Skid Row to show us that you

**EXCEPTIONAL REPORTING SERVICES, INC**

care.  People that care show up.  All the people that work for me, they're not getting a dime out of it but they show up because they care, not because they have to.  People say, oh, I don't like Skid Row.  There's a lot of stuff.

There sure is because I've been in Skid Row and I know what goes on in Skid Row.  What the City tell me, Kevin, we're doing the best we can.  I said, if this the best that the City can do, Los Angeles is in trouble.  This is almost like a third-world country when you go to Skid Row.  Makes me cry sometime, make me cry for the city to be like this.

How do we allow our kids to live on the Skid Row in any city?  Not only in this city but in any other city across America?  Children, infants living in tents, that's not too good for the City.  But I will continue to expose it knowing this is happening.  Somebody better be getting to do the work because I'm going to be watching and I'm not sleeping and I've got other people watching.

So with that today, I hope that we can get a handle on this thing and begin to get this thing right because something is happening.  Somebody not doing the job.  And you say you're going to the job, do the job.  And I'm going to expose it.  Know that I'm here at the City.  I'm going to expose it so we can begin to do the work.  The work need to be done.  The people say, we care, but they're not caring.

We need the City to come out and see what's going on

**26**

so they can see that the people, their life is changing because of what we think it should be here in the City.  People talk about it but we want somebody going to be about it.  And that's who I am, the Skid Row mayor and I will be a Skid Row mayor from here on out.  So hopefully we can get ready to get the job done and, again, see what we can do to make this city a better city for people to live in.

THE COURT:  I didn't think I was going to show this today to all of you.  I was waiting but I am.

Terry, come on up.  And you have something to say?

MR. TERRY:  Excuse me.  Dewey Terry.

THE COURT:  No, use the mike.  Okay?

MR. TERRY:  I'm Dewey Terry.  I work on Skid Row.

THE COURT:  Terry, stand over towards the mike.

MR. TERRY:  I work on Skid Row.  I'm down there 5:00 in the morning, every morning, seven days a week.  Everybody got their phones in their hand.  They're not paying attention.  They got kids on the street.  You've turned your back on these kids.  I see them every day.  The town is a safety for women that be raped every night.  I see it.  Old women, they can't find no place to stay.

You asked where LAHSA at?  LAHSA don't come until the *LA Times* come.  Excuse me.

THE COURT:  That's okay.  It's government property. We'll replace that.  Don't worry about it.

**EXCEPTIONAL REPORTING SERVICES, INC**

**27**

MR. TERRY: See, we sitting here and you're playing games with the paper game. That's not America. America is built on "We the people." When did you stop being, "We the people"? When did you stop doing civil rights? When did you start turning your back because you got a paycheck and you're just passing the buck on?

This man comes. We give out blankets like our donors. I don't get no money from the City. We give out blankets, socks, shoes. Donors give it, 900. I gave out 2,000 shoes. Blankets when it's raining. They're dying in front of the Midnight Mission. Hypothermia death, laying in the cold with the rats and everything else.

I have not seen the City down there unless there's a camera down there so they can take a photo. I don't see nobody want to be the mayor unless they want to be the mayor. That's the only time he going to come down there and give a 30-second commercial.

But we sitting here talking about money. I've got -- I had nine families. They all had children from El Salvador. That's where the bus came at. Yeah, you remember the bus from Texas? They was bringing them here and they was dropping them off in the Union Mission.

Then once they was in the Union Mission, guess what happened? They had to come out of there because they don't got no money to spend. So they come to the street. I had to make

a place for them to be.  I had nine toddlers.  Here, I'll show you the pictures.  They're not just little kids.  They could be your kids, somebody you know.

But we sit here and we just talking about, well, that guy, he gave me a million dollars and, you know, where the money at?  They got a parking lot.  They ain't got nobody in it.  Cars are over there, safe thing.  There's nobody want to sit here and say, listen, Judge, you need an oversight for everything that you do because when you try to look out for them, there's ten other people that ain't looking out for nobody.

I'm down there every day.  I see it every day, 24 hours a day.  The community center, showers, bathroom, get your phone, get you some IDs.  Okay.  They got people down here working in the street.  Do you know how much trash they pick up every day?

**THE COURT:**  Uh-huh.

**MR. TERRY:**  7.5 tons of trash every day --

**THE COURT:**  Uh-huh.

**KEVIN:**  -- two times a day.  I know.  I was picking it up.

All right.  Then you turn around and you've got to give blankets out here.  Somebody is shaking like an old Chihuahua.  Right?  It ain't funny because it be women.  You are women.  You're supposed to stand up and make sure that a

women don't get raped down there.

I've got old people down there, old.  I have not seen one person other than jumping out of their car, take a picture, make a speech and take off.  You guys making 50, a hundred thousand dollars and you ain't been down there one time.  The only time you come down there, you -- whoever is in these districts need to come down there and walk down there without the police.  You ain't got -- you don't need the police.  Come down there and see what's going on.

But you're not doing it.  You're making pictures on the bridge on holidays.  And I don't see nobody down there. I'm down there every day.  I see Rick Caruso.  Yes, I've seen him, talked to him, shook his hand.  Everybody that wanted to be a mayor, I shook their hands.  What you going to do?

Teens are -- they got teens at Urban Alchemy running around.  They're picking up trash.  They got crime stations just for to keep the people from -- look, we give out coffee, cocoa, water, blankets, socks, hats.  Whatever you need, we try to provide.  Right?  Start dealing with some of them groups down there that's really putting it out.  Come down there and talk to the real people, not the ones that want to put -- I just want an endorsement.  I just want some of your money.

I don't want nothing from you.  I want you to bring some trucks down there and then start doing it.  I want LAHSA -- don't come around there when they're tearing up the street

**30**

because that's the only time you come.  That's the only time they come.  I've got three families over there right now LAHSA been supposed to been put up.  They're still there.  I got a little bitty boy I just gave some toys to, like some shoes, too.  A little bitty boy -- I mean, a little bitty boy, your grandson, your son, you know, you young girls that got kids.

Come on now.  You've been in this place too long talking about the same old thing.  You put the blame game on this person, put the blame game on that -- but nobody is standing up and say, hey, this is enough.  We're in America. When did we stop -- when did you stop putting your hand out? Tell me that.  Tell him that.

Don't wait for the TV camera to come.  That little boy get hit on the street over there where I'm at.  Where was the mayor?  It ain't going to the mayor because that's a little boy.  We stopped -- you know, moral fiber?  Don't lose that moral fiber.  You know, God looks at a lot of things.  And I know don't nobody want to go to hell and everybody want to go to heaven.  You better fix this.  This has been 30 years of you not doing what you're supposed to do when they didn't have a problem in Los Angeles about homeless.

You turn your back, building buildings and turned your back on the street literally, mental people.  They got a bunch of them in there.  No doctors, no psych doctors.  You're putting them in these tiny homes.  They're trying to transfer

them out of the tiny homes.  Some people stay in them tiny homes for two to three years.  Why are they staying there?  Because you're building all these buildings.  By law, they've got to have some kind of -- what you say, for people that have no money to --

THE COURT:  Yeah.

MR. TERRY:  -- get in there.

THE COURT:  Terry --

MR. TERRY:  What are you going to do?

THE COURT:  -- I'm going to show -- I intend to show some pictures today. I'm going to go ahead and show some pictures and --

Don, come on up, Don.

And by the way, folks, listen.  What you're hearing is what I'm hearing on the streets.  It doesn't mean that we're bad people and not trying.  But there's a real disconnect between -- hundreds of people on the streets tell me the same thing and that is whatever we're doing in court trying hard for all of us, it's not hitting the streets.

And (indisc.) start with it.  And we have Kevin starting with it.  The community -- you walk down the street and I don't care what we're doing here.  And I have talked to hundreds of people.  They're not wrong.  It's not hitting the streets.  That's what we've got to cure, okay, together.  I think that most of us are trying to do that, okay.

Don, whatever you'd like to say.  And it's good for us all of us to hear it because most of you won't go down to the street --

MR. GARZA:  I've lived in Skid Row for 25 years. I've been down there since 1999 and let me tell you something. This is the same game that's been played all this time but now it's elevated to the point where it's hundreds of millions of dollars, not just non-profits gas-lighting the City and the County saying, this is what we're doing when they're not doing it.  Now it's LAHSA and the social service providers and the City and the County gas-lighting the community telling us that they're doing something when they're not doing anything.

And let me tell you something.  I used to do everything I could, get close to politicians, try to get them elected, you know, work with LACAN, work against LACAN.  Then they come back and help me.

Skid row is a community, and we have a mission.  And let me tell you what that mission is because you don't understand that mission.  And this is the mission that this man is doing right now.  And he's on that mission because he gives a shit.

Let me tell you something.  I'd rather stand with somebody that gives a shit than somebody that doesn't.  And I'm going to say it like that.

But let me tell you what.  We do -- this is what

these people do.  The man they're walking (inaudible) this is what they do.

And I used to say it because I had hope that one day something was going to happen, that somebody was going to come along and be the one that was going to rescue us because I am one of the weaker ones.

I don't drink, I don't smoke, I don't use drugs, I don't do all of those things.  But I still suffer with a mental illness.  I still have PTSD.  I still have bad days.  So I try to make my forward, I try to wake (sic) my way back.

But let me tell you what I used to sell people.  The reason we do what we do is to keep people alive long enough so that help does come.  And let me tell you something, help has not come.

Politics that I learned when I was in -- going to college -- and I got to sit on an advisory board -- I learned what politics was.  And this is what politics is.

Number one, only show them what you want them to see. That's number one.

And, number two, fighting over other people's money. That's what politics is.  All they do is fight over other people's money.

The money not coming to the streets anymore.  This cognitive dissonance, this dissonance that's been created over these years by politicians, by the nonprofit service providers

**34**

telling me that this is what we're doing -- and I see it every day.

I used to walk out of my building and I used to thank God.  And I say, I'm blessed.  I'm going to tell you why I say I'm blessed.  Because when I would turn the corner onto San Julian, somebody would either be in hundred degree heat under a blanket or in a coat dying.  There was always somebody dying in skid row.

Think about it, 1999, that's -- don't give me these numbers about, you know, just five a day or only 5,000 people have died.  Let me tell you something.  I'm going to be honest with you.  I went to war.

And let me tell you something, I'm going to be -- tell you the facts.  In the City of L.A., I've got to say over -- since I've been here, I'm going to say 30,000 people have died on these streets.

People have been evicted, people have committed suicide because they're afraid to be evicted.  People have committed suicide, OD'd because they're homeless.

And the other thing is, and I'm going to say it because I live there and I see it every day and I see the game that's played.  When it comes election time, everybody wants to start moving everybody from the west side as close to downtown L.A. as possible.  That's the game.

And what happens is what I'm hearing right now is

**EXCEPTIONAL REPORTING SERVICES, INC**

that everybody wants to come in.  And what I'm hearing is that we don't want people to languish in the streets.

But let me tell you something.  In the back of their minds, skid row, let's keep it off limits because skid row, we'll just go and let them languish in the streets and let them die in the streets.

And this is what I also used to tell people.  If people are dying in the streets of skid row, guess what?  Then actually it's doing its job.  That is sick and disgusting.

The children, skid row people, did not tolerate children in the streets.  We never tolerated people in the streets.

We actually had a person by the name of Big Mama.  We would ask her -- and even and Andy (inaudible) call her. There's a -- we have word that there's a woman down here, she's got a kid in the tent, we need you to come down here and create a relationship, try to get her out of that tent, try to get the kid inside.

All of a sudden we've got hundreds of kids in the streets.  Why is that tolerated all of a sudden?  That is not to be tolerated.

Mr. Judge, Mr. Honorable Judge, we need help.  I've been feeding people.  I'm tired.  I'm exhausted.  My body hurts.  I'm diabetic.  I'm going to the gym, I'm doing what I can to be strong to support you, to support the people that are

**36**

doing this.

I'm exhausted.  We're exhausted.  We need -- we want to rescue ourselves.  We have our advocates.  But we need -- I'm tired of trying to stay alive and keep people alive long enough for help to come, and help does not come.

THE COURT:  I wasn't going to show you some pictures today.  I was going to wait until later on.  But what you're sharing today I promise you, if you hit the street, you could line up person after person after person after person, and I can't go on that would say exactly the same thing to us.

I didn't plan this.  I didn't know that this was going to happen.  I'm telling you straight up.  I'm glad it did today because if we're not going to the streets, at least we're hearing it.

And I hope it's taking me and I hope it takes you out of our comfort zone because I tell you I don't know what the auditors are going to do.  It is not hitting the streets.

And so the money's flowing, it's going someplace.  I don't know where.  It's our job to make it better.  We've got to make it better, okay?

So we're going to show a couple things I didn't expect.  Why don't we just start with -- and then we'll describe the shooting into the car with the five kids in a moment, you know.

Sir, I'll be right with you, okay?  I promise you.

**37**

But just flip up a couple.  We'll start with just the walk.

Now, first of all, let's just take some (inaudible) out there.  See, the game -- the way the game used to be played is I'm a hype (phonetic).  I'm not a hype, by the way.  But I'm a hype hypothetically.  And I want some pizza.  And you give me my medical card.  I'm a middle provider.  I run up the bill.

Let's say some less than scrupulous people who are happy to bill (inaudible) medical services.  And if the pizza didn't do it, right, Don, --

**MR. SPEAKER:**  Right.

**THE COURT:**  -- (inaudible) $20 because I'm a hype and for $20 because I need a fix.  You give me your Medi-Cal card, I give you the $20.  I get my fix, you run up the bill.  That has been going on for a long time.

And all you have to do is go down to skid row and talk to people.  And you can say, oh, the first person is lying to you.  But after you got down to the fifth or fourteenth or fiftieth person, they're not lying to you, folks.

And, number two, I don't know what the auditor's going to do.  But I can tell you straight going in people are (inaudible) there every single day.

And (inaudible) critics out there, and you're getting billed unfortunately over at LAHSA for a lot of double-counting going on.

**38**

And just talk to the community, if they'll talk to you, and find that out.  And it's been going on a long time.

So with all of our virtue here, what I'm saying is we're living a different lifestyle, we're not exposing ourselves, so I thank God that we actually heard that today.

I'm almost stunned that I did because I'm going to hear it Sunday again.  And by the way, if you want to meet Big Mama, she'll be there.

Okay.  Let's just put up some street stuff because maybe we're not going to ask you for a Medi-Cal card for a change.

So, Michael, where are you?  Now just go over to the lectern again.  I don't want a long speech but let's just go through some of the things that we see.

Well we see gangrene down there.  I've shown that to you.  I've shown a woman crawling in the rain; women who rush up to you and say that they've been raped and accosted and please find me a shelter or any place to go.

**(Clerk/Judge confer.)**

**THE COURT:**  Oh, Michael, hi.  Say hi.

**MR. WRIGHT:**  Hi.  Michael Sean Wright, Director of Field Medicine --

**THE COURT:**  Okay.

**MR. WRIGHT:**  -- for Lestonnac Clinics, and founder of wound walk dot org.

**EXCEPTIONAL REPORTING SERVICES, INC**

**THE COURT:** And by the way, if you don't want to go down the street, Andy, would you stand up for a minute? And Victoria is not here today but we can call Dr. Patel, Amy, all these people handling out blankets, food, water, it's not coming from the City, it's not coming from LAHSA. It's not coming from government.

The people on the row get things. Folks, who are they from? Churches, communities, NGOs, Victoria, Big Mike, Amy. You'd be stunned that all that isn't translating somehow.

Now, we do have contracts, don't get me wrong. The City (inaudible) contracts, for instance with the, you know, what I call Urban Alchemy, for instance. Your contract -- the (inaudible) stop down there.

For basic things come in the summer, water, it's coming from a water drop. It's coming from UCLA, USC students distributing it. It's coming from volunteer doctors.

So let's just go through a couple of these. These are just the last couple days. Is this on the screen? Flip on your monitors. Can you see it?

**MR. WRIGHT:** Not yet.

**THE COURT:** Okay. Well, Carmen, we need your help. It doesn't do any good with -- and tell me when you can see it.

Michael, I didn't plan to show this today, okay?

**MR. WRIGHT:** Yes, sir.

**(Judge/Clerk confer.)**

THE COURT:  We're just going to go on through quickly.  I was going to save it for two or three weeks to see if we made any progress.

But in Vietnam, by the way, people got what's called gray foot.  A lot of people (inaudible) other places with the rain, one of the major problems is you get your feet wet, you don't change your socks, the socks rot off your feet, you get gray foot, you get amputated, okay.  Same thing as getting shot.  Next one.

Here are kids.  They're right back.  And but for the Court raising it, frankly, and Doug Smith writing about it over at the L.A. Times, who's in the back, every time something happens --

MR. WRIGHT:  There we go.

THE COURT:  -- then there's a reaction.  And I'll say this point blank, Mira, by LAHSA.  But without that, there is no reaction.  I'm telling you that.

And right now, we've got these kids sitting out on the street right now.  And there's lots of them, including five kids in a car who -- Terry, come on up.  Did they get shot at? What happened out there?

Five kinds in a car with a mom right by Victoria on the corner of San Pedro and town.  Now, you listen to this story for a moment.

MR. TERRY:  A family, this mother, she's got sons and

some daughters, driving a white Suburban ended up getting shot up.  Nobody got hit luckily, right.

But you got to remember something.  It's a element of people, and there's a lot of stuff going on down there, and it's in a confined area.  We confined them in a area and so you got a bunch of people.

At one time, in 2020, was 1500 tents.  And if you ever seen the moving "Z" (phonetic), they was walking across the street where you couldn't even get your car through, okay.

**THE COURT:**  The bottom line, Terry, is so you're on with this, the community cleaned that up.  The community took care of the kids quite frankly.  Now we've got the kids back.

And what happens with Urban Alchemy is that they're open 24 hours a day with coffee right across from (inaudible) stop.

So what happens is these families are clustering in that area because Urban Alchemy's guarding them and literally walking them to school.

Now, I want to give a shoutout to the women's (phonetic) club right around the corner because (inaudible) down there talking a look.  Where are they?  Any women's club folks here?  Well, a shoutout to you, congratulations.  You're actually on the street.  Next one.

**MR. TERRY:**  Your Honor, --

**THE COURT:**  Don't go away, Terry, hang on.  Don't go

away.

Okay.  Now this is free medical, okay, not pushing for anybody but this is free medical.  They're not asking for Medi-Cal cards this time, not going to run up a bill.  Next one.

I submit 40 to 50 percent of the folks down there, if you took off their clothing, have some severe wound or abrasion that needs to be treated right now.

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Right now.

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Michael, is that validated?

**MR. WRIGHT:**  That is correct, Your Honor.

**THE COURT:**  You take it from him.  Next one.  Same person.  It's the next one.

Now you sit down there at that tent, if you don't feel uncomfortable already, come on down Sunday and just sit and volunteer to take people's names in.

**MR. SPEAKER:**  (Inaudible)

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Next one.  Next one.  Different people.  Next one.  Next one.  Next one.  Next one.  Next one.  Hit the next one.

**(Mr. Speaker/Judge confer.)**

Is this guy's back up there?

(Multiple unidentified speakers respond in the affirmative.)

MR. WRIGHT:  Yes, sir.

THE COURT:  Well this is what I'm going to do.  I'm going to put this on the court website.  I'm going to start making the public uncomfortable because if we're uncomfortable here, we should all be uncomfortable just watching this in this sacred courtroom, insulated.

You hit the streets and you see this and smell this and I'll tell you what, this will wake you up.  And you got to ask what the Hell are we doing when it's not hitting the street.  And it's not hitting the street.

Next one.  That's good enough.  Yeah, I think that's enough.

MR. WRIGHT:  Your Honor, just one point.  Our nurse practitioner and pediatric nurses, for the children that are out here, a lot of upper respiratory infections happening with the little ones because it's so damp and cold at night, they're -- the young ones can't handle that kind of exposure, sir.

THE COURT:  So 11:00 o'clock there'll be something called the water drop.  It won't be from LAHSA, it won't be from the City.  It'll be from private entities coming out and supplying water.

And so, Amy, mayor, you know, you see these wonderful kids from UCLA and USC come out and volunteer.  You'll see a

**44**

church group come out here, Boyle Heights, kids handing out 1500 sandwiches last week alone.

I don't know if that's our responsibility for feeding and clothing.  But I am telling you, whatever we're doing is not hitting the streets.

Okay, Terry, thank you.  I'll -- Michael, thank you.  I didn't expect to show these today.

Take those down.

All right.  I'm going to ask you a couple more questions.  I'm going to go ahead and put these on the Court website.  I'm going to take the chance that it's inappropriate and just let's make the public wiser.

I want to hear about our quarterly reports at the end of -- Michelle, have a seat next to me.

At the end of April, both the County and the City filed the status reports regarding their compliance with the settlement agreements.

And the June 6th I invited objections and feedback from the Plaintiffs, Intervenors, and the public regarding the adequacy of this report.

**(Judge/Clerk confer.)**

**THE COURT:**  So I will lead off with the Plaintiffs.  Then, Shayla, I'm going to go to you next.  Normally I would go back to the City and the County but you're at the table now.

So, Ms. Mitchell.

**MS. MITCHELL:** Your Honor, we have a lot of issues with the report. I have to be frank, though. After I think the testimony or the statements that we just heard, after the pictures we just heard, these are very granular comments.

And so we could continue to meet and confer or I can -- you know, I can just spell them out if the Court wants to hear them now.

**THE COURT:** I think we've met and conferred ad nauseum, frankly. It's time to do something. Let's hear what the problems are.

**MS. MITCHELL:** Sure. So with the City reports, what we're seeing is we have in the sheltering and housing reports, we had locations and addresses. And so we actually have verifiable information.

The last report we got from the City only had numbers, and it was cumulative numbers, as I understand it, over the last year and a half. We don't have any addresses, locations. There is no way to verify this information is correct.

**THE COURT:** No way to spot-check, is there?

**MS. MITCHELL:** On the encampment reduction, apologize, on the encampment reduction piece, and so there's no way to spot-check, there's no way to verify these --

**THE COURT:** Right.

**MS. MITCHELL:** -- things occurred. So that's on the

City piece.

On the County, we don't have -- under 911 reporting obligations, they never reported the numbers of PEH accessing services. We only see total beds. And we see that services were commenced but no numbers of PEH accessing services.

And I think maybe to take a step back and make a larger point, what we've heard in the past, particularly regarding the freeway agreement, is that the -- when we received this statement, this public statement that services are commenced, but we're hearing both from providers and from the City directly that those services aren't real services, maybe it's a meeting with a case manager once a month or, you know, referral to mental health that shows up every three months, or something like that.

I obviously don't have any way of verifying that information. But all I'm seeing is services were commenced. And so I would like to hear from the City about whether those are actually sufficient services that are being provided both in the PSH and in the interim housing projects.

So we can take a break if you want to hear from the City or I can just keep going with my comments, Your Honor.

**THE COURT:** I want you to keep going --

**MS. MITCHELL:** Okay.

**THE COURT:** -- and then I want to turn it over to either Paul and then Shayla. I'm not limiting you to time.

**47**

**MS. MITCHELL:**  Thank you.

So the -- on the high needs beds, we have the County making this conclusory statement that it's using reasonable best efforts to ensure access to high service need interim housing beds, provides no description about what these reasonable best efforts are.

Additionally, we saw that there were only 12 referrals in a single quarter from DMH.  When we have something like 30,000 mental health situations on the street, 12 referrals seems very small.

**THE COURT:**  Twelve.

**MS. MITCHELL:**  And so that's kind of a concern.  I would like some explanation as to why we only have 12 referrals to high service needs beds from DMH.

Additionally, on DHS I'm now being told actually from Michael from -- that they're in need of detox beds.  I was previously told that there was an overabundance of detox beds in the County.

And on this report I have 69 DHS referrals pending placement, which means that I believe there have been referrals made.  Department of Health Services have accepted.  I believe these are appropriate placements but cannot yet place them.

So if I have 69 pending placements, to me that does not seem like reasonable best efforts to connect individuals with high needs beds.

On the mental health and substance use disorder beds we asked for a granular breakdown of which types of beds. We did ultimately get that, thank you to the County. And we were able to see the different breakdown in beds.

We would like that level of detail moving forwards, whether that's in the confidential report or in the public report, so that we can track it.

There were noted that eight of those beds that have been provided are urgent care beds, which are less than 24-hour services. And I'm not sure that that counts as a bed. I've never heard of an urgent care having a bed. Perhaps it does. But it's something of note.

I think another issue that we received -- and we've been hearing that some of these beds that are being provided by the County are beds that have already been in existence but are now being counted.

And one of the concerns that we have, if you look at the mental health and substance use disorder beds that are listed, there are multiple entries with a single bed at multiple locations.

**THE COURT:** No, hold on for a minute. Mira, --

**MS. MITCHELL:** Yes.

**THE COURT:** -- I don't know if that's correct or not or the City. The end result is if you find that out, just correct it. In other words, instead of me breathing fire or

damnation, just correct it, move forward, okay?  I don't know if that's true or not so just listen for a moment.

**MS. HASHMALL:**  Thank you, Your Honor.

**THE COURT:**  You're taking that in, okay?  Because I know you'll get up and believe you're doing a good job, and you may be.  I'm not questioning you.  I don't know that yet.  And I'm not going to make a ruling on that.

But if you find it, come forward and just say, you know what, yeah, it happened, let's get it corrected, okay?  Let's -- in other words, let's move forward in a positive way.  It's easy to tear it down.  Let's see if we can build on this, okay?

Keep going on this.  What else?

**MS. MITCHELL:**  Thank you, Your Honor.

We did receive a report that over 200 board and care subsidies, or ARFs, adult residential facilities, and rich residential care beds, those subsidies are being provided.

However, we have no information which we were supposed to receive about the number of referrals, name of referral sources, number of referrals accepted, etcetera.

And really I think the key here is those vouchers exist, so subsidies exist.  We want to make sure that they're actually getting used and people are using them.

And then finally on the home and MDT teams, we received no information about how many people experiencing

homelessness living with complex health and behavioral conditions have been connected to necessary services through these teams.

Now, on this last piece I do want to note there is nothing in the agreement that requires that report.

THE COURT:  Right.

MS. MITCHELL:  But on, you know, I think when we're talking about a duty to report and public transparency and faith that these services are actually being provided, I think that would be a good thing to note pursuant to this agreement to make sure that we're getting what we bargained for.

That's all I've got on these issues, Your Honor.

THE COURT:  That's quite a -- okay.  Shayla.

MS. SPEAKER:  Paul.

THE COURT:  Or, I'm sorry, Paul.

MR. WEBSTER:  Thank you, Your Honor.

THE COURT:  I'm sorry, Shayla, but come right back to you.

MR. WEBSTER:  I think my comments when I received these quarterly reports and we had this conversation with the County, and I think it's true -- it's less true for the City because a lot of times we'll get these reports and we'll see --

THE COURT:  Bring that microphone closer.

MR. WEBSTER:  Absolutely.

We'll see cumulative data, which is nice.

I think one of the real challenges that we're having is that when we see these snapshots of what occurred in this quarter, it's out of context. So we don't know if this is less. I mean, I guess we could go back, you know, and do the math ourselves.

But I think for the public's perspective it would be nice to be able to say over the terms of this settlement agreement and over these quarterly reports, we're either making progress, --

**THE COURT:** No.

**MR. WEBSTER:** -- we're stagnant, or we're going behind. For some reason in this quarter we went behind because the numbers are less than last quarter.

Now, as, you know, as Ms. Mitchell mentioned, you know, none of this is stipulated, required, you know, in detail in the settlement agreement.

But if we're trying to kind of get to the same thing, which is how are we improving, how are we serving more people, how are the commitments of the settlement agreement actually being performed, it's good to have some context.

And let me tell you, I know that the City has a lot to do. And I heard what Matt Zabo (phonetic) said with respect to his small team.

And, you know, from the Alliance perspective, we're happy, you know, if there is a way that we could partner with

**52**

the City and the County to say, let us tell you how we think these report and this information could be reported so that maybe we could be kind of the first pass for the public to say, this is -- this passes the laugh test or the small test or whatever, we're happy to do that.

Anyway, I think that there needs to be some greater contextual and some greater continuity with respect to some of the data that we're receiving so that we can then say at a glance very easily, are things getting better, are things not getting better, or are things staying the same.  That's all I have.

**MS. MITCHELL:**  Yeah, and if I can add to that, Your Honor, I think obviously the Court knows, as we were working out these agreements, the entire purpose was for the City and the County to work together, to work better together so that the money does get to the streets, right, so we're not hearing these stories and people are actually getting helped and getting addressed.

And we are here to try to facilitate that.  And as these reports come back, we're identifying these problems of, look, we're not getting the information, we're not getting the data, we're still not working well together, even though we claim that we are.

And our role here is to really poke holes in that and say, these are the problems, this is where things aren't

working, and to try to make that move a little smoother.

And so when we're identifying reports, it's not just to get people in trouble.  But it is to say, this, what we're hearing, shouldn't keep happening.  We shouldn't keep hearing this.  People should actually respond.

We should try to identify what are the problems that we're seeing and how do we fix that instead of these are our strict obligations and this is how we're trying to move forward to try to bring all of this together on a -- both on a granular level and on a macular level.

**MR. WEBSTER:**  And I would just add one last thing.

Thank you, Liz.

Because when we see these reports of something like, you know, for example high need beds, the County's reporting on a snapshot in time for this quarter, they made I think the number is 429 referrals, I look at that and I say, okay, 429 referrals, that's good.

How did those referrals result in some kind of a positive outcome?  I need to suss that out with respect to the reporting.  Some of it I can determine, some of it I can't.

But here's the real challenge for me and for us as the Alliance.

When we're looking at these reporting, the reporting numbers, and we're looking at metrics in the hundreds, okay, or with respect to some of these behavioral help that's in the

**54**

ones -- but we'll just kind of go past that -- when we're looking at these metrics in the hundreds and we understand that the need in Los Angeles is in the tens of thousands, the need -- the reason that we need this kind of contextual aggregate data is to say, how can we move from the hundreds to the ten thousands.

THE COURT:  Ten thousands.

Shayla.

MS. MYERS:  Thank you, Your Honor.  Obviously representing the Intervenors and unhoused folks.

We are significantly concerned about the City's representation related to encampment resolutions.

THE COURT:  A little slower, just a little louder. It's me, it's not you, Shayla.

MS. MYERS:  Sure, Your Honor.

We're very concerned about the City's representations related to encampment resolutions.  So the Exhibit B of their report this time included a significant number of encampments that were "resolved."

There is absolutely no information in that report about what it means for an encampment to be resolved.  It says that they have addressed tents, makeshift encampments, and RVs.

Cannot stress this enough; as the representative of Intervenors in this case who intervened because of our concern about the City's practices related to encampments, that tents,

RVs, and makeshift encampments actually belong to people that live on the streets in Los Angeles, and the suggestion that the City can simply resolve these encampments without any description of how those resolutions are occurring, is incredibly problematic to the Intervenors.

And I think it should be problematic to the Court as well under the circumstances.

**THE COURT:** I'm going to be transparent with you and get away from the conversations about -- let me say it a different way.

San Francisco has a homeless problem, correct?

**MS. MYERS:** I believe San Francisco would agree, yes.

**THE COURT:** Yeah. And during the G7 conference, did they seem to have a homeless problem? No. They swept the streets.

I don't know what's going to happen with the Olympic games, but my guess is Los Angeles is going to look a lot cleaner as we present a nice, shiny image to the world.

If these cities could do this in their self-interest, like San Francisco -- so I pick on my hometown for a moment -- then why can't we do this for the citizens and the homeless community in Los Angeles in this interim period of time of three or four years before we hit the goodness cleaning button and people are swept off the streets.

And we saw the Academy Awards on a small scale

bluntly, couldn't find a homeless people driving down to the union.

Saw it for soccer.  You're going to see it again I promise you in every event where the City is pristine for a few blocks or area.

If we can do that in our own self-interest as politicians and citizens, why don't we do this for our common citizen for the three or four years while these events are coming up?  They're paying the tax dollar.

So I don't know what's happening on the encampment (inaudible) I'm going to get out there a lot more, okay.

**MS. MYERS:**  But --

**THE COURT:**  They're not inviting me sometimes to go out.

**MS. MYERS:**  I mean, Your Honor, we do want to just raise the concern that --

**THE COURT:**  I want you to speak whenever you want to, want you talk, say whatever you want to.

**MS. MYERS:**  From the quarter that's represented in the report, the City of Los Angeles opened 139 units and resolved 2,137 encampments.  There's no information, as I said, about what happened.  There's no definition in either the settlement agreement or the City's report.

We just want to stress again that the settlement agreement approved by this Court did not provide any obligation

for the City to resolve encampments.

**THE COURT:**  Right.

**MS. MYERS:**  That was a side negotiation between the City of Los Angeles and the L.A. Alliance to put in deadlines and put in expectations that were not part of the settlements to which we objected to which there was due process associated.

And now the City of Los Angeles is purporting to report back to this Court and to the Plaintiff about encampment resolutions, as if that was part of the agreement all along.

Our concern is that the encampment resolutions that are articulated here have nothing to do with people getting housed, despite obligations in the settlement agreement that people be offered shelter before they are moved from specific locations.

What does it mean to resolve an encampment?

**THE COURT:**  Okay.  Now I'm going to give you a statistic.

Terry, if you're there or some folks.  You gave me a statistic last weekend down on the row.  You told me -- come on up for a second -- about 1500 tents.  And, Urban Alchemy, you count them almost every day, remember?

**MR. SPEAKER:**  Yeah.

**THE COURT:**  Okay.  Get -- toss out so everybody can hear what your original count was and where we stand on the last count in terms of tents.

**EXCEPTIONAL REPORTING SERVICES, INC**

**58**

**MR. TERRY:** Okay. Two thousand and twenty was 15,000 tents.

**THE COURT:** And as of last week.

**MR. TERRY:** Last -- and now it is 300 and, what, 49, --

**THE COURT:** Okay.

**MR. TERRY:** -- 50, yeah.

**THE COURT:** Yeah. Now listen very closely. Fifteen hundred tents at one time, we got about 349 as of last Sunday, right?

**MR. TERRY:** Yeah. The --

**THE COURT:** Folks are going someplace. And if I'm sharing my concern about where they're going, are they just being scattered or are they going into the Mayfair Hotel or other hotels? Are they going back and couch surfing, etcetera?

So in some ways the row is looking better. I got to tell you, if you drive down there, you've got visually a cleaner look. I mean, there's -- there is progress going on. But we don't know what's happening to the people.

And it may be that they're getting housed, tiny homes, getting on a bus and going back to New York if they're from there, couch surfing, getting mental health. We don't know. But I tell you what, the row is looking better. It's turning some corner out there. Thank the mayor.

By the same token, these folks (inaudible) getting

**EXCEPTIONAL REPORTING SERVICES, INC**

scattered, don't know where they're going.

MS. MYERS:  Yes, Your Honor.  And to put an even more fine a point on it, the City of Los Angeles is not saying 2,137 people --

THE COURT:  That's right.

MS. MYERS:  -- are not on the streets.  They are saying their tents, their makeshift encampments, and their RVs, i.e., their property, is not on the streets of Los Angeles. And that is our concern.

THE COURT:  And remember the point in time count.  If we see a tent, do you folks know how many people we count inside that tent?

(No audible response.)

Any volunteers in the audience?

MS. MYERS:  It's approximately 1.7.

THE COURT:  (Inaudible) 1.7 but have City --

MS. MYERS:  It's a multiplier.

THE COURT:  -- count three and four.  I see count one.  That point in time, counsel, an interesting phenomenon because it depends upon what the criteria is, what city you're in.  It's a measurement but it's not a great measurement, okay.

MS. MYERS:  But also --

THE COURT:  All right, Terry, --

MS. MYERS:  -- Your Honor, --

THE COURT:  -- thank you very much, I'll be back with

**EXCEPTIONAL REPORTING SERVICES, INC**

you.

MS. MYERS:  And, Your Honor, just to continue to put the fine point on it, the City of Los Angeles is not saying in, for example, in counsel district one, when there's 125 tents, makeshift encampments or RVs that have been resolved, they're not saying 125 people.  They're saying 125 --

THE COURT:  Twenty-five --

MS. MYERS:  -- tents, makeshift encampments, or RVs. So what we want to know is how were they resolved, did you throw away the tent, did you tow the RV, and what happened to the individual who was previously living in the tent or the makeshift encampment or living in the RV?

Because what we will say is in that same quarter the City of Los Angeles opened 139 new units.  So what happened to the people?  That's our concern, Your Honor.

And the fact is, is that this is being presented as an obligation in a settlement agreement that simply does not exist simply because the City of Los Angeles and the L.A. Alliance entered into an agreement that they would do a thing.

And so we're concerned about the lack of reporting of any information to the Court about anything and some suggestion that this is being done pursuant to this Court's authority where it wasn't part of the settlement agreement in the first place.

THE COURT:  Now, I've had the following conversation

with Mayor Bass, and I don't think she would be concerned and, if so, Laura, stand up.

You're a relatively progressive city.

You've got a governor down in Texas putting people on busses.  And if you're not, sit down on skid row and watch them get dropped off, go over to the mission and then coming out.

And I want to talk to you about *Boise* for a moment because the City took a position that *Boise* should get overturned.

First of all, that doesn't have anything to do with this Court because I've got a settlement with you.  So whether *Boise*'s overturned or not makes no difference in the way I conduct myself or with you.

But watch out because every time I've been in this City, you've got more conservative cities around with their own police force and their own mayor, and they're happy to take the homeless, put them in a patrol car, and show them the border of their city.

And a progressive city like Los Angeles, if you haven't seen the inundation now, you wait.  And if *Boise*'s overturned, you're going to get flooded.

And I heard that story four years ago when I came to this city from your city council explaining -- I won't say Culver City or Burbank or Glendale or etcetera.  I won't mention those cities.

But you're going to get flooded with independent cities who have their own police force and their own mayors much more conservative, and they're going to push on this city just like Texas is right now.

I don't mean to make that a political statement but that's exactly what's happening on your street because the kids getting off this bus are from Venezuela, Colombia, Honduras; they're very Hispanic.  And that's our kids on the street right now.

So *Boise*'s overturned, I leave that to the City of Los Angeles.  (Inaudible), we've had that conversation.  You can verify that with the major or not.

And there's a great concern that the City with this generous heart and this generosity is about to be the recipient.

And you heard the accusation that this is coming from the west side of L.A. for a lot of years into the CD14 (phonetic).  I'll leave that to you to discover.  But that just might or might not be true.  Why don't you figure it out.

And the old signs from Santa Monica that used to point to the shelter down the street in L.A., down in Venice, if you haven't seen those signs, Santa Monica used to have a little sign that said shelter that way.

So I leave that to the City because sometimes, you know, humaneness, etcetera, hopefully is going to be rewarded.

But I'm worried about you.

Okay.  Lourdes, and by the way, is that a correct statement, did we have that conversation with the mayor?

**MS. RAMIREZ:**  I believe so.

**THE COURT:**  About *Boise.*

**MS. RAMIREZ:**  Yes, I believe so.

**THE COURT:**  Yeah, we did.  Okay.

Okay, folks, (inaudible) the City, welcome.  As your first appearance, aren't you have a great time?

(No audible response.)

That's the most transparent hearing you're ever going to be involved in.  Nothing taking place back there.  It's all any comments you want to make because I beat up on you a little bit, okay.  Don't worry about that.

Your job is to make this better,--

**MS. SPEAKER:**  Understood.

**THE COURT:**  -- okay?  (Inaudible) how do we move forward, okay?

(No audible response.)

You okay?  Want to come back next time or get a substitute?

**(Laughter)**

**MS. FLORES:**  I'll be back.

**THE COURT:**  Okay.  Mira, your turn.  Anything you want to stay (sic)?  And then the -- I've got a question to

**EXCEPTIONAL REPORTING SERVICES, INC**

answer.  Let me ask the question first.

MS. HASHMALL:  Sure, Your Honor.

THE COURT:  Yeah, and then I'll turn you loose, okay.

Look.  I've been reading everything I can, including last night when the City gave me this at the 6:00 o'clock drop. And I'm worried that there's a history of slowness -- and I'm being transparent with you --, of slowness on the County's part responding to the City, who's out front first, building a shelter and then trying to get the services.  And that doesn't mean you're not supplying services or trying but I want to give you a couple of statistics.

I first saw it -- well, one of the times I saw it was the initial offer that I think all of you thought was in good faith with the 300 mental health spaces.  I didn't see how that could possibly work when Mayor Bass was trying to get 15,000 people into a shelter or housing.  We had 30 or 40 percent of our mental health substance abuse out there, okay?  I think you were gracious.  You came back and I think you genuinely believed a thousand was okay and I'm obstinate and I said no.

You came back with 3,000 and you've got my commendation for that, plus another 500, by the way, but I think we'd forgotten to mention for the elderly, et cetera, who could have issues.  And I thought that that was an appropriate number and it somewhat balanced out against the 15,000 and didn't want to turn down what I thought was reasonableness.

EXCEPTIONAL REPORTING SERVICES, INC

**65**

The first Measure H, in 2017 when the voters approved Measure H, the quota set Sales tax, the revenues were supposed to be used to create permanent support housing for people experiencing homelessness but there's this report that you authored through Tim Campbell?  Tim Campbell, I think.  I read that -- I've never talked to him or met him.  In fact I think last time I called him Tim Carpenter -- and these revenues weren't spent in significant amounts.  So I'd like all of you to check that out and if I'm wrong then in fiscal year 2021 to 2022, the County had a 302 million dollar net balance of Measure H funds.

Now remember this is a critical time.  We needed those mental health services out there, we needed substance abuse.  And in this crazy governance, we've actually pitted in some ways the City and the County, who didn't get along for years, into these two different buckets of trying to cooperate.

And so in the four years between 2018 and 2022, the County didn't spend over 200 million in Measure H funds.  Now part of that came at a critical time during the Covid crisis.

Now, I'm going to pick on Orange County because what the board did down there was that they chipmunked mental health funds down there and frankly I've accused them of it.  If I had my own investigative team I can prove it but they used the interest off of those Chipmunk Funds to help pay off the Orange County bankruptcy.  It didn't go back into mental health.

**EXCEPTIONAL REPORTING SERVICES, INC**

So having looked through that Rockey horror picture show, I come to your -- here with a certain amount of maybe bias in the past having had that experience.  And if these are invested monies, where are they going?  Are they going back into the homeless trough, are they going back into run the City.  I don't know.  I'm just going to raise that with you because another county -- yeah, I'm ashamed of them frankly.

So you created a one percent sales tax on people earning over a million dollars.  It's distributed to counties who are supposed to be in or on the mental health services for people experiencing homelessness but Los Angeles County --

Mira, you can check this out at your convenience.

-- has received 7.65 billion in MHSA funds --

And when I read this I tried to independently corroborate that.

-- since fiscal year 2019.  But I want you to check. I believe you've only spent approximately 3.4 billion of that. And I believe that there are approximately sitting, or at one time sitting, 4.2 billion surplus intended for private mental health.

Now I think there was a sea change with Janice Hahn. I'm going to give a big shot out to her.  When she was a member of the board I think she moved heaven and earth to try to reach settlements, you know, to get the County really cooperating along with Mayor Bass.  I think they had a really good relationship.  And therefore you have a compliment about that.

That never could have significantly decreased.

I could be wrong in that figure but just check that out and see what that distribution was because if not then whether we have an agreement or not, I just think it's a moral and ethical duty that the County is running right along step in lockstep with the Mayor and the City to get these services as quickly as possible to match the shelter or housing that's coming down the pike.

All right.  Now, Mira, it's yours.  You can say anything you want to and you've got unlimited time.

**MS. HASHMALL:**  Thank you, Your Honor.

**THE COURT:**  Pleasure.

**MS. HASHMALL:**  I'm going to start by responding to your recent questions and then I think I'm going to step back a moment and talk about our successes under the settlement agreement.

This case is challenging, unprecedented.  The Court has certainly shown a lot of courage in pushing the City and the County to do better.

I think it's also prompted a lot of self-reflection and the County is doing significant work to address this homelessness crisis, and it's really guided by the board of supervisors' commitment to a care-first approach.

**THE COURT:**  And give a shot out back to Fesia also, okay?  Would you?  On our behalf?  She's working hard.

**MS. HASHMALL:** Our CEO, Fesia Davenport, is a leader in this, along with the entire homeless initiative team, including Sheree Totaroff (phonetic) who is our subject matter expert on many of these issues.

The Court has prompted us and it has caused us to engage in a lot of self-reflection. And really scrutiny, what we're doing right, what can we do better because the board does believe this is a crisis.

But there are nuances and complexities that the average civilian just doesn't get by driving down the street or reading the paper.

**THE COURT:** Okay.

**MS. HASHMALL:** And I think what's dangerous is when we try to go to court based on rumor or hearsay and make that issues when it's not grounded in fact. And so just to kind of directly respond to the two things the Court has recently addressed, Measure H funds.

That is a voter sponsored new resource integral to funding the County's outreach and mainstream services in mental health, substance use disorder and other resources, not only just addressing issues with regards to people experiencing homelessness but trying to prevent individuals from falling into homelessness.

But as the Court also noted, we went through a pandemic and the County had the benefit of some very

**EXCEPTIONAL REPORTING SERVICES, INC**

unprecedented one-time funding sources from the State and the Federal Government in the same timeframe the Court's looking at.  So I won't pretend to know anywhere near what Fesia Davenport knows as our CEO but what I can tell you is when the County has one-time funding it has to spend --

THE COURT:  Right.

MS. HASHMALL:  -- it's going to prioritize that over recurring revenue streams.  And so that's why you might see shifts in spending.  If we've got other dollars, we're only going to get once and we spend it or we lose it, we're going to spend it if we can on important programs, and that might mean other funds that have a longer tail, less restriction, won't be used for the same resources.  Those are the kind of details that information and education require us to really understand. Soundbites don't really do it justice.

The same with Measure -- with MHSA Funds.  That's a State-dictated program regarding very very specialized resources for mental health conditions and disorders.  You know, we all think we may be able to diagnose mental health crises but there are real rigid standards for those fundings. They go through a community board, a resource allocation process that's very much forward facing, it's in front of the community, and it's subject to review and scrutiny and State approval.  And so it's not a slush fund, it's subject to accounting, very public accounting as to what that money can be

used for and where and why it goes in certain places.

And then the other thing I would say, Your Honor -- and I've learned a lot from this court's prodding and our talking to our internal experts who really are boots on the ground -- money is one thing but you have to have a service provider, you have to have a resource that can be effective and so you've always got to calibrate those two things, right?  You need to be able to stand up something and have it be available as a resource and have it have longevity to serve its purpose.  So money is only part of the problem, right?  You have to have the teams and the staff to do the work.

And I say that all to say that while it's required a lot of reflection, it's always pushed us too.  And I think the County has not only met but exceeded the milestones under our settlement agreement.  We are in full compliance.  We have really shot out of the park some of the benchmarks in the settlement agreement.

We heard some concerns from the plaintiff and I think by their own admission, some of those concerns are about issues that are not subject to the reporting requirements in the settlement agreement.

We also heard some questions and so we got with them and we walked them through our exhibits and our documents so they could better understand it.  And I actually think that was helpful.  I think it resolved a lot of those questions.

Concerns?  Everybody has concerns.  Our focus is on very, very significant financial and resource commitments we've made and we have exceeded them.

As our status report shows, wrap-around services are being provided by DPSS, DHS and DMH, as well as DPH SAPC. There are reporting descriptions of the beds that are available to the County outreach teams.

There is and there will always be a spectrum of resources that come to bear.  We brought online over 900 new mental health and substance-use disorder beds.  That far exceeded the 600 that were required during this timeframe.

And they fit into categories.  Our expert understand what the sort of categories mean but we've taken the steps to really try to explain that so people understand resources have to be along the spectrum of care.

And while the beds are not exclusively reserved for City PEH, the majority of the people experiencing homelessness in the County of Los Angeles -- which our board is considered about -- is concerned about addressing this crisis for the County it serves, not just the City.  And the City does have the majority of the crisis.  And so the City is getting the majority of the resources as a result.

There has been some question as to what does greatest need mean?  Rightfully so, the settlement gives the County the discretion to decide what the greatest needs are.  And that's

**72**

the departments with the subject matter expertise are sort of addressing the ratio of mental health beds versus substance-use disorder beds.  They are majority mental health but it's going to always be on that continuum of care because it needs to be. We can't have a one-size-fits-all solution to this difficult crisis.

And at the board's direction, the County is constantly reassessing what should be the mix of beds and resources that are available.  Highly acute specialized beds are important but so are unlicensed beds because there are individuals who may not have severe mental health, as the diagnosis would be required in order to get access to other resources, but do need help.  And so we've got those types of resources available for that population as well.

The board and care subsidies, again this is something where we have far exceeded the requirement.  To the Court's point, these are resources for elderly and other individuals so that they don't fall into homelessness.  It's a residential setting and the idea is if we can give these folks a subsidy and they can have a safe, healthy place to live, they will stay out of homelessness and that's been an important resource and the County has devoted significant funds to that resource.

We've got 34 MDT teams, 10 home teams.  They're serving PEH in the City.  They're assigned across the City based on the point and time count and the density of PEH in

those areas.

MDTs have a specialized mix of healthcare professionals, mental health specialists, in order to really have boots on the ground and give folks the help they need.

Home teams which are put up by DMH also have specialized mental health resources.  And we've increased those resources across the board in a significant way on a very accelerated timeframe and we're very proud of that at the County.

So again, you know, we have an open-door policy and we're happy to engage and answer questions.  I think we have answered questions and provided additional information offline in order to address some of the issues raised by the plaintiffs but we really want to do the work.  We don't want to continue sort of re-signing reports and refining reports.  We really want to be able to allow our teams to do this difficult job.

So unless the Court has any questions, I think that's all I'd add.

**THE COURT:**  I'd like the special master to give you an update and then I think enough for today.

Okay.  So Michelle?

**MS. MARTINEZ:**  Thank you, Your Honor.  I just will be giving a quick update.  I don't have all my notes here but on the progress that we've made with A&M, the independent consultant that is working with the Court and obviously the

**74**

parties.

So at this time, this is the following things that have been done and we will continue to move forward.

And the first thing is that A&M has submitted to both the City and County information that they need in regards to data requests and documentation.  And that has to be submitted by June 14th.  We are just waiting for the City to provide us a name and give them the link so they can upload that information.  LAHSA has responded and we have submitted that link to them.

The second thing that A&M is working on is current interviews with key stakeholders.  And the first round is with the mayor and city council and their chief of staffs and their homeless folks on the ground.  And they're moving forward with the CAO's, CLA, and others and also LAHSA staff.  So those interviews will start to move forward in the next two weeks with A&M.

Yesterday, which was June 5th, we had the kickoff with the advisory committee and so the next steps for us as we move forward of Your Honor is to ensure that we move in an expedited fashion to -- and hoping that A&M receives its documents and information by June 14th so that they can do their initial assessment.  And once that initial assessment is done, we will come back to the advisory committee to take a look at what has been presented.  And if any changes need to be

made to the scope of work, that conversation will be had and then be brought back to the Court and/or to the City.

So that's where we currently are at and we hope to have that update by August. And so any concerns that the public may have or have interest in wanting to learn, they can always contact me as a special master.

And finally, we will also -- A&M will be doing interviews with unhoused and housed but that will -- I know it's taking place with judge Carter this Sunday out in Skid Row. Ms. Myers did ask a very good and poised question to the A&M team about ensuring that unhoused and those that are now currently housed be interviewed. But those interviews will happen on the street and that is to be determined in how that takes place. And so if there's any recommendations from the advisory committee or the public as it pertains to how we go out into the street, we just we are not -- the court is not in the place to ask service providers, the City, the mayor's office, you know, for names of unhoused or housed people. We want to make sure that we have an organic process and that the A&M team is able to select folks who are actually are out in the community and are facing challenges and they're able to do those interviews. And those interviews will be done in a way that are done with integrity, with respect and dignity.

And so I want -- I do appreciate the advisory committee and appreciate the City and LAHSA for their continued

efforts and ensuring that they are replying in a timely fashion and because we cannot get this work done together if we don't do it collectively.  And I just want to share with you that we are moving in a very fast pace and everyone is cooperating.

THE COURT:  I think also the mayor from the beginning has tried to set a tone of cooperation and I think that that's been a benefit.  I think that the County has joined in that.

But there are those historical and traditional barriers that we've created and I want you just to think about the system that we have.  The mayor has no voting power.  Think about that.  So who do we go to?  The council?  Are they the center of authority here?  Well, in other words, where is our centralized authority here?  The mayor's the spokesperson.  The council votes the money.  We have the division historically with *LA Times* articles that go back in the 1980s about the fights going on between the City and the County.  Then we create LAHSA, which frankly has shielded both the City and County, from my opinion, from responsibility but they became the distributing entity.

I mean think about what we've created in terms of not having a centralized place to go and have to deal with all of these different wheels, none of which has the power in and of themselves to implement unless we all get onboard the same wagon.  And if we don't then the bickering is going to go on and that's why you're here, all of you, my concern and that is,

**77**

if this third party audit takes place and that's all we've got, then it's a place in time and what do we do in the future?  And that's why I want this website created from now on where you put the billings up from the City or the County, where there's a chance to spot verify whether they're good or not.  And we're not just relying upon data from providers who may be righteous and honest and who may not be frankly.  Or who may not be serving.  We need to get rid of those.

And if we can create that board going forward and make that understandable, then you can make data driven decisions because right now these decisions are political decisions driven by the loudest voice quite frankly and that's unfortunate.  It's harmful of the City.

And finally, if you're going to do this do it now. Do it for the benefit of the citizens and the homeless and all your residential folks who are paying taxes out there.  Don't wait for the next great event in the city like the Olympic games to look like we've cleaned up this mess.  Do it now because it's the right thing to do.

Now, I'm going to schedule you back probably in August and I'm going to encourage you concerning the update on the status reports to work with Judge Birotte and Michele but I'll probably bring you back the second of August.  Okay?  I'll set a date.

Anything further by any of you folks?

**MS. HASHMALL:** Nothing from the County, Your Honor.

**THE COURT:** Okay. Mira? Okay.

City? You okay?

**MS. MARIANI:** Nothing further.

**MS. HOANG:** Thank you, Your Honor.

**THE COURT:** Liz?

**MS. MITCHELL:** Nothing, Your Honor, thank you.

**THE COURT:** Shayla?

**MS. MYERS:** No, Your Honor, thank you.

**THE COURT:** You folks in the community okay? You all right? Good. We'll see you out there, all right?

You folks out there for the City okay? Do you need to consult County?

Except there's one gentleman that I was rude to. Sir, come on up for just a moment and I apologize. You wanted to speak and ...

**MR. FERNANDEZ:** (indisc.).

**THE COURT:** No. Listen. That was my fault. You wanted to speak and I said you could and I --

**MR. FERNANDEZ:** Yeah.

**THE COURT:** Yeah. What's your name, sir?

**MR. FERNANDEZ:** My name is Alfred Fernandez (phonetic). And I live in Skid Row. I have for the last year and a half. And before that I lived there about three years so but I live on the busiest corner of Skid Row which is Fifth and

Los Angeles. And you can see anything go on there. I have seen things that you would not believe on people getting dinged by cars. Just last week there was a naked woman in the middle of the Fifth and Los Angeles --

THE COURT: I know that. We were out there --

MR. FERNANDEZ: -- screaming and yelling and everything else. I had to call 911. They sent the police. They did not send anybody from psyche (phonetic) which had they done that, she probably would have been treated much better instead of being handcuffed and thrown away and that's basically what we feel like.

And being disabled is really difficult because I have a huge target on my back to get mugged so I don't carry a wallet, I carry a money clip.

And mental health is really something that -- I'm a retired LPT, licensed psyche tech. And it used to be that if the police got called on somebody that's having a psychotic break or is just being looney -- sorry for the language but it is what it is -- and so it used to be they had to have an LPT, at least two LPTs along with the police and the LPTs would go in first so the patient did not or the client did not see the police at all. So they weren't feeling threatened so the LPTs were able to go ahead and talk them down and then no police force was really needed. So they went to the ER and then went through the process of being placed in you know either in an

acute unit or you know or something else of that nature.

And I see that needed downtown, especially on my corner. I see everything on my corner, anything from crystal dealers to pot dealers to whatever, any drug you want it's there and it's there readily available.

And they were going ahead and power washing the tents off the street, off of Los Angeles Street and so that finally stopped and that was due to a friend of mine who ended up getting placed in a halfway house because she's kind of off but she went ahead and she went to the Historic Core and got them to stop doing that because it's not against the law to sleep on the street. Unfortunately some people have to.

And I feel so blessed that I have my room that I live in, in the Baltimore hotel, I live basically in a prison cell. That's the size of my room. I have to sidestep everywhere around my bed and I'm a real risk for a fall so. And I've been working six months to get a larger room but it's not going to happen but like I say, I feel blessed I at least have a roof over my head and that's good.

THE COURT: Okay, sir, thank you very much. Nice meeting you.

MR. FERNANDEZ: So that's all I really have to say.

THE COURT: No, it's a pleasure meeting you. Thank you. And I'm sorry I said I'd get back to you and I almost didn't so thank you.

**81**

**MR. FERNANDEZ:**  That's okay.  No worries.  Thank you.

**THE COURT:**  Appreciate it.

All right.  Then folks, we're in recess.  Thank you.

**(Proceeding adjourned at 3:26 p.m.)**

82

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                <u>June 7, 2024</u>

            **Signed**                                    **Dated**


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**