UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HONORABLE DAVID O. CARTER, JUDGE PRESIDING

LA ALLIANCE FOR HUMAN RIGHTS, ET )
Al.,                             )
                                 )
                                 )
              Plaintiffs,         )
                                 )
                                 )    No. CV20-2291-DOC
        Vs.                       )
                                 )
                                 )
CITY OF LOS ANGELES, ET AL.,      )
                                 )
                                 )
              Defendants.         )
                                 )
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, AUGUST 29, 2024

MIRIAM V. BAIRD, CSR 11893, CCRA
OFFICIAL U.S. DISTRICT COURT REPORTER
350 WEST FIRST STREET
FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90012
MVB11893@aol.com

1

<u>**A P P E A R A N C E S**</u>

**ON BEHALF OF THE PLAINTIFFS,**   UMHOFER, MITHCELL & KING,
**LA ALLIANCE FOR HUMAN RIGHTS,**   LLP
**ET AL:**   BY:  ELIZABETH MITCHELL
         MATTHEW DONALD UMHOFER
         DIANE BANG
767 SOUTH ALAMEDA STREET
SUITE 270
LOS ANGELES, CA 90021


**ON BEHALF OF THE DEFENDANTS,**   LOS ANGELES CITY ATTORNEY'S
**CITY OF LOS ANGELES, ET AL.:**   OFFICE
   BY:  ARLENE HOANG
         VALERIE FLORES
         JESSICA MARIANI

MILLER BARONDESS, LLP
BY:  JENNIFER MIRA HASHMALL
LAUREN M. BRODY
2121 AVENUE OF THE STARS
SUITE 2600
LOS ANGELES, CA 90067

**FOR THE INTERVENORS:**   LEGAL AID FOUNDATION OF LOS
   ANGELES
   BY:  SHAYLA R. MEYERS
   1550 WEST EIGHTH STREET
   LOS ANGELES, CA 90017


**ALSO APPEARING:** SPECIAL MASTERS:  MICHELE MARTINEZ
                JUDGE GANDHI
                MATT SZABO
                KENNETH MEJIA
                SERGIO PEREZ
                SCOTT MCKEE, DIANE RAFFERTY, EMILY
BRANDENFELDS, LAURA COLLIER, DAVID MCCURLEY

LOS ANGELES, CALIFORNIA; THURSDAY, AUGUST 29, 2024; 9:05 A.M.

---

THE COURT:  We're calling the matter to order in the LA Alliance for Human Rights versus City of Los Angeles, case number LACV-20-02291.

Counsel, if you would be kind enough to make your appearances today.  Just remain seated.  It's fine.

MR. UMHOFER:  Good morning, Your Honor.  Matthew Umhofer and Diane Bang on behalf of LA Alliance.  And Ms. Mitchell will be here in a moment.

THE COURT:  Okay.  Thank you.

MS. HASHMALL:  Good morning, Your Honor.  Mira Hashmall for the County of Los Angeles.

MS. BRODY:  Lauren Brody also for the County of Los Angeles.

THE COURT:  Okay.

MS. MARIANI:  Good morning, Your Honor.  Deputy City Attorney Jessica Mariani for the City of Los Angeles.

THE COURT:  Okay.

MS. HOANG:  And good morning, Your Honor.  Deputy City Attorney Arlene Hoang for defendant City of Los Angeles.

THE COURT:  Thank you.

MS. MYERS:  Good morning.  Shayla Myers on behalf of the intervenors.

THE COURT:  Okay.  And I recognize many of you

folks in the audience who are staff, et cetera, and also from A&M.

We had a conference call two days ago, and in that conference call it occurred to this Court that after listening to some of the input of A&M, that these interim calls should be transparent to you as the parties and also to the public so if they're running into issues or problems along the way, all of us are forewarned about what those are and have a chance to correct or self correct along the way to make certain that this is a timely and thorough audit.

So I'm going to ask all of you folks from A&M if you would stand up for a moment.  And if you would like to, for some of the other folks, why don't you just have a seat up here in the jury box and I'm going to have you come forward.

Also I know there are different people in Dallas and Denver.  Could we bring up that Zoom for a moment.  I want to get your other counterparts in Dallas and Denver and different parts of the country on Zoom.

Also, while we're waiting, I have taken the liberty of asking both Judge Gandhi and Michele Martinez, the two Special Masters, literally to be with me on the bench today, if they want to write me a note.

I don't want to take the time to see what their questions might be that the Court might ask.  I've also given

them consent to intercede at any time and ask any questions unfettered by the Court and unfiltered by the Court so we can have a good, hopefully, dialogue just as we did on Tuesday.

While we're getting the Zoom up, I think we can save a little bit of time by the Court putting on the record the four questions I'd asked of you to start the conversation and during the conversation that we had.

The first was:  Can you confirm with the Court whether the data required for the assessment is being received in a timely manner from the City, LAHSA, and other relevant entities?

The second question I had was:  In the event of any delays, how might this affect the established timeline for the completion of the initial assessment?  Will additional time be necessary to accommodate these delays?

The third question that I asked you is:  Do you find that the current scope of work requested is sufficient to deliver a comprehensive assessment that meets our objectives?

The fourth question I had asked you:  If modifications are needed or supplemental work is recommended, please provide the Court with these details and the adjustments.  It's imperative that you receive this information today or before the hearing scheduled on the 29th.

6

Now, at our conference two days ago, you hadn't received certain what I thought and you thought was vital information.  Michele informed me later -- I think it was yesterday -- that you'd finally received that.  Therefore, I have a chart now that shows that you're examining that versus the yellow or orange blank that you had originally filled in, which has been changed to green, and that will be self-explanatory to the parties.

My assumption is you're still examining this data at the present time.  Okay.  And, of course, I'll be asking you --

(Brief interruption)

THE COURT:  You'll be first in the presentation.  But if one of you or more could remain for the rest of the discussion up to 11:00 o'clock, it would be appreciated.  It may be relevant; it may not.  I think it will be relevant, though.

When we finally get these folks online, work with Karlen so you can put up the presentation or the modified presentation that you showed me on Tuesday.  Okay?  Why don't we let Karlen work on this so we're not wasting time.

If you would like to step forward collectively or as a group, you're more than welcome to, but I'd like you to start this presentation, please.  I know it will take about 20 minutes.

THE WITNESS:  So, Your Honor, we have a paper copy of our presentation, but we'd like to use that Elmo.

THE COURT:  I'm going to -- and I'll need your name, sir.

MR. MCKEE:  Sure.  So my name is Scott McKee.  I'm with Alvarez and Marsal.

THE COURT:  This will become a public document, and I'm going to docket this on both the Court and the public website when we're done with the hearing today.

MS. RAFFERTY:  Diane Rafferty, Alvarez and Marsal.

MS. BRANDENFELS:  Emily Brandenfels, Alvarez and Marsal.

THE COURT:  Nice seeing you.

MS. COLLIER:  Laura Collier, Alvarez and Marsal.

THE COURT:  Thank you.

MR. MCCURLEY:  And David McCurley, Judge.

THE COURT:  Why don't you state some of the people that will be joining us from different parts of the country that are part of your team so when they join us, they won't have to make their appearance.

MR. MCKEE:  Joining us via the Teams link will be Michael Potter, Lisa Brown --

THE COURT:  Now, just a moment.  Where is he located?

MR. MCKEE:  He's in LA proper, but he's in Illinois

now.  Lisa Brown is in Seattle.

THE COURT:  Just a moment.  Is he in Illinois at the present time?

MR. MCKEE:  Yes.

THE COURT:  Okay.  The next person.

MR. MCKEE:  Lisa Brown, and she is in Seattle.

THE COURT:  Seattle.

MR. MCKEE:  Is that it?

THE COURT:  There was somebody from Denver, also in Dallas.

MR. MCKEE:  Lana Jasinski, and she is in New York.  And Katherine Swanson, who is in Dallas.  Thank you.

THE COURT:  And they were in this process of moving around the country also?

MR. MCKEE:  That's correct.

THE COURT:  All right.  So why don't you begin your presentation and use the Elmo.

MR. MCKEE:  Okay.  So thank you for allowing us to be here.  As you said, we gave you a brief status update on Tuesday which you asked us to come here to present.  We want to make it clear that we're not presenting any preliminary findings.  These are observations based on the work that we've done.

We've been -- our team has been involved, and we'll go through some of the things that we've done to this point.

We have been working on this project now for approximately 12 weeks.  I think our original time frame we said would be approximately 24 weeks.  We have -- we'll show the progress we've made.  We've made quite a bit of good progress.

We've talked to a lot of people.  We've had access to a lot of information.  But as we'll try to demonstrate today, it is not a straightforward accounting process for the financial assessment.

On the performance side, we will also present today our initial --

(Brief interruption)

THE COURT:  That music was from one of the counsel that apparently just entered, so please continue.

MR. MCKEE:  Okay.  So the second part of our presentation today will go over our field work where we have selected.  It's still preliminary.  We may make some adjustments based on the information that we've been receiving this week from the various parties that are providing us data -- the City, LAHSA, you know, and different departments in the city.

We will -- we have made some initial work and progress on selecting contracts between LAHSA and sub-providers for the various programs that we have been asked to review, and we are set to start the planning for our field work, for our performance assessment later this month.

So we wanted to provide and share some preliminary details of that field work.  But again, we're not here to provide any preliminary findings.  These are -- we will talk about a few of the challenges that we have incurred in gathering data.

It's not necessarily that anybody is holding back on us.  It's that we are making sure that we are asking the right questions and getting the information, especially on the accounting data side, you know, general ledger information, census detail, those kinds of things.  These are details that we'll get to.

So I'm going to turn it over, I think, to Laura to kick us off.  We do apologize in advance.  We had a little bit of printing issues this morning, so our presentation, we have a single copy.  We're going to put -- use the Elmo.

THE COURT:  I want to start now, and I want you to be candid.  Let's start with this presentation.

MR. MCKEE:  Yes.  Here we go.

THE COURT:  I'm also going to want to hear from Diane because she's been on the streets.

MS. RAFFERTY:  First, thank you, Your Honor, for asking us to come here.  We want to --

THE COURT:  Would you state your name.  I know who you are.

MS. RAFFERTY:  Oh.  Diane Rafferty.

THE COURT:  And she's been on skid row with this on one or more occasions.

MS. COLLIER:  I'm Laura Collier.

THE COURT:  Thank you.  Please.

MS. RAFFERTY:  First, we want to express that this work is important to everyone in the city of Los Angeles, and it's very important to us.  We have two clinicians here. Emily is a physician and I'm a nurse.  We have spent time in the field.

Our job is really to be neutral and gather this information so you can come to some sort of conclusion or look as a go-forward basis on how do you track these funds, how do you know these funds are getting to the street, to the people that really need them.

It has been difficult to get data.  We understand everybody is busy.  We understand -- it's not that intent to not give us the information.  I think there's so many programs out there, sub-providers, how many flows.  It's never -- it just is not a concrete basis.

I explained to you it's like a bowl of spaghetti. Every time we try and look at where funds went, how they were given to a provider, and how do we know that provider provided that service.  It's very convoluted and complicated.

We know we still have to dig in deeper.  We appreciate the Court's support in getting data that has been

delayed.  We're not, you know, saying anything wrong about people that have delayed data.  I think sometimes that data does not exist, and that is a concern.

So, Laura, why don't you just talk about --

MS. COLLIER:  Laura Collier.

THE COURT:  Can the Zoom participants hear this conversation?  Katherine, can you hear this conversation, Katherine Swanson?  No, she can't.

Lana, can you hear this conversation?

Please continue, counsel.  We'll get the technology worked out, but I don't want to waste more time.

MS. COLLIER:  So to today we've got approximately about 23, 24 hundred documents produced from the City of Los Angeles.

THE COURT:  A little louder.

MS. COLLIER:  We have about 2,400 documents produced to date from the City, about 1,600 from LAHSA.

THE COURT:  Could we see this presentation up on the screen, up on the Elmo.  We have an extra copy if we need one.  Okay.  And if we need to, we're going to just have the folks listen because we want the screen going out.  No.  I want the screen out so everybody can see it.

This is already small.  If I need to take the images of Katherine and Lana off, I will, but I want these documents as large as possible so they can be looked at.

Then I'm going to put them on the public docket and I'm going to put them on the Court docket.

Right now as we go, I don't know what's being seen out there.  I know on my screen it's extraordinarily small.  Now, I want to see the documents up full screen.  It's not full screen yet.

Now that should be full screen.  It's not yet; is it?  We're going to get this full screen somehow.  If I need to cut off Lana and Katherine, I'm going to do it.  If it would help, we can take Lana and Katherine off the screen.  I think that would resolve it, so let's do that.

Karlen, let's take them off.  They can catch up or phone in and listen.  Karlen, take the whole thing down and just start with Elmo.  Make it simple.  Thank you.  Now let's see if we can get Elmo to work and let's fill up the screen as best we can.  Perfect.

All right.  Now, why don't you start over so we can all look at this.  And go slowly.  I just don't want a bunch of data thrown up.  Okay?  Now your presentation.

MS. COLLIER:  Absolutely.  Okay.  So for -- and just kind of leading to what Ms. Rafferty and Mr. McKee have just outlined, what we're showing right here is the amount of documentation produced approximately to date from the City as well as from LAHSA, and echoing again the various analyses that we're conducting are highly dependent on receiving

accurate and timely data.

We've been managing the data intake process to ensure that everything outlines correctly with our objectives.  To address these complexities, we're taking a methodical approach.  This sometimes means the process is taking a little bit longer, but we want to be as effective as possible as well as achieving the best possible outcome.

At the bottom you can see that we've specified that A&M requested data from LAHSA on July 30th.  As of August 26th some of the data still had not been produced, so the team did their best to leverage existing data, but this definitely did cause a little bit of delay in impacting our timeline.  I will definitely go into those details a little bit later in this presentation.

What we're showing also right here is the reviewing of contracts that the team did in terms of what has been produced to date, and that relates to the City contracts with LAHSA as well as LAHSA's contracts with service providers.

As we are just also understanding HMIS data, we've had conversations with LAHSA around that as well as wanting to understand metrics and outcomes that have been reported to the City as well from LAHSA.

MR. MCKEE:  The third column that we're showing on this slide, Your Honor, is our review of the financial information that has been produced to date.  So it's

important that we're able to trace all the dollars, is our goal for the three programs that flows from the City and either directly to service providers or for beds, or from the City through LAHSA to the sub-recipients that LAHSA contracts with.

So we've requested -- beyond the contracts we've requested accounting information as detailed as general ledger data specific to contracts for Roadmap, Inside Safe, and the Alliance settlement agreement, as well as other financial information related to those.

We are reconciling.  We want to show appropriations.  We want to show dollars expended and encumbered for each of those programs.  That's going to be key also to our field work because for the samples that we select, we are going to look at at least six months of detailed review of invoices.

Some of those invoices we have not received yet, but we anticipate before our field work or during our field work, we will get invoices that flow from the service providers to LAHSA to the City.  They go through the City approval system, and then the dollars get disbursed back to LAHSA and then back to the service providers.

So that's our goal.  Some of the information we have.  We do have gaps there.  Those gaps, if they aren't completed and filled in, then we will end up having gaps in

some of our final findings.

So that is that for that slide.

MS. RAFFERTY:  I'm not a very good Vanna White.  Sorry.

MR. MCKEE:  So this slide is going to be a little bit tough to see for everyone, but I will tell you what we're trying to show here.  Oh, that's excellent.

So what we have here is -- across the top are the different types of or categories of services.  So there's outreach services that are performed.  There are supportive services that are performed.

There's interim housing beds that are -- that are acquired and maintained, and then there's permanent housing beds that are -- and properties that are acquired, maintained, and paid for by City funds.

The City has involvement in this.  Obviously LAHSA has involvement, and the County does as well.  The colors didn't come through very well here, but what we're trying to do is to demonstrate for the judge and now the Court here what is in our -- what we believe is in our scope of work and what we plan to assess both from a financial assessment as well as a performance assessment and the types of services.

So the City has, for example, field intervention teams.  Okay.  The City spends money on people that go out, and we want to understand exactly what they do, and we want

to observe that in realtime.

LAHSA, for instance, they provide a lot of supportive services both at encampments into homeless that aren't in interim housing and permanent housing, but they also provide a lot of those services for interim housing. Those are important aspects of our analysis.  So they -- LAHSA is responsible in some instances for making sure people are in beds.

Then there's also work that the County is doing. So the County is in charge of a lot of the healthcare for some of these three programs, so that is outside of our purview at this point, that we are not involved -- our analysis does not involve any sort of financial performance review of work that's being done by the County or directed by the County and paid for.

So one thing you can't see from the slides because of the shading -- the judge referenced this earlier today -- is that many of these boxes were not green.  So we sort of color-coded them to show that, hey, we know these are not in our scope.  We plan on reviewing this information and having findings.

We are trying to get the data necessary to do so, but some of the data hasn't come through yet.  And so we are -- those shaded that would be orange, some of those boxes are in jeopardy of falling behind our analysis.  We do have a

plan to hopefully catch those up.

As the judge mentioned earlier today, we have received data and we continue to, you know -- Laura is very involved in working with the various counterparts of the City and LAHSA to provide us information.  So she's communicating with them.  But we do need to ask the right questions and make sure we get data that is vital to our review.

MR. MCCURLEY:  This is David McCurley.  Again, because of the printing, we can't quite tell, but we wanted to alert the Court that there -- if we were trying to make -- do the analysis and the determination with the data we have today.  There's several areas where we don't have enough.  It's either incomplete where there's things that are missing.  But again, it's continuing to come in.  We appreciate the stuff that showed up yesterday, and we've got folks right now that --

THE COURT:  I don't.  I don't.

MR. MCCURLEY:  You don't what?

THE COURT:  Appreciate that it showed up yesterday.  I'm going to be asking questions in just a moment, and I'm going to be very blunt.  Why did they show up yesterday?  Who's slow-footing this?

Now, you go on with your presentation, but it's going to be just as candid as that.

MR. MCCURLEY:  Yeah.  So the other point that we

wanted to make on this slide, again, as we start thinking about the six questions that were part of our original scope that are about the service delivery and is it making it better, what things are working and what things aren't working in terms of actually addressing the --

THE COURT:  We're going to figure that out in detail in just a moment when I ask you about the City, LAHSA, the County, et cetera.  So go on with your presentation, but in a few moments I'll come back and ask you specifics.

MR. MCCURLEY:  The only point I was trying to make there is that because the County is responsible for some significant pieces of that, it's going to be -- we're going to have to have the cooperation of them in order to get there.

THE COURT:  Just a moment.  Cooperation with the County.

MS. RAFFERTY:  If I can just say something about the County, because the goal here is to get people in homes and get people housing.  But along with that, if we don't take care of their social needs, it's not going to be permanent housing.  So the County is sole [sic] responsible for providing medical and social services.

So if we see someone was placed, how do we know that they've gotten treatment for mental illness, for drugs, whatever those issues are?  We don't have that piece because

it wasn't within our scope, but it's part of the entire picture.

When you look at unhoused people, if you look at people experiencing homelessness, it's a very holistic -- it's not just one getting someone in a hotel room.  That's -- that's not the answer.

So, yes, we have struggled getting all the data.  We're not pointing any fingers.  It's been frustrating for us because we want to get you a report that's meaningful so you can move forward, and we're doing the best we can.

Like I said before, we appreciate the Court supporting us in getting this information.  There's still a question of is the information available.

THE COURT:  What has changed, as the parties know, is the interaction now that it previously had taken place between you requesting and the City or LAHSA's interaction with you.

Those are now the Court requesting.  So I'm taking you out of the negotiating phase.  This is the Court's request and orders from this point forward.  All right.

Counsel.

MS. RAFFERTY:  And we greatly appreciate that.

So like we talked about -- and this is just a slide to really go over the key challenges.  You know, we're a firm that relies on data in, and everybody knows good data in,

good data out.  If we don't have all the data, it's -- it's very, very difficult, or it's very convoluted.  The documentation sometimes comes to us and it's not complete, or it doesn't to us make logical sense, some of the data.

If you're looking at a contract that has been provided by LAHSA, they're to provide a service.  If you can't track that invoice back to the service, back to the contract, we -- it's hard for us to make an analogy to say it's working; it's not working.

The lack of information that we talked about in the HMIS system, I'm just saying it's very archaic.  It's very cumbersome.  So we know when someone is trying to get us information and they can't get it through their system, it's not due to lack of intent.  It's just not there.

I am going to push on the lack of the County, you know, insight, because to us that's extremely important to the holistic care of these people.

MR. MCCURLEY:  Any questions, Your Honor, here, or should we go on?

THE COURT:  No.  I want to finish your presentation, and I want to thank you for your candidness.

Oh, there's no photography in the court.  I'm sorry.  I apologize.  Erase it.  Do me a favor -- we're going to have this available on a public website literally today.  So if you've taken a picture, you're precluded from doing so.

Take that off your camera or leave.

Counsel, thank you.

MS. COLLIER:  Laura Collier.

We are hoping to just give you just a quick update on our next steps --

THE COURT:  Okay.

MS. COLLIER:  -- specifically the field work and onsite visits.  And just generally this is just showing overarching methodology.

THE COURT:  Before we go there, on the last occasion you actually gave me locations, dates, and I've asked you at least not to make that public at the present time.  So you can do one of two things.  Give that entity the courtesy of notice that you're coming by, or literally drop by on the moment so nobody can prepare for your entry.  Okay?

All right.  So for those members of the staff for the City and LAHSA and counsel for the County, there may be some visits that you have the courtesy of getting prior notice and there may be some drop-ins, and that's with the Court's authority with no notice.

And Michele may accompany you.  Judge Gandhi may accompany you, or I may accompany you on occasions to make sure that there's no issue.  But that's not necessary.  You have full authority to drop in unannounced.

MS. COLLIER:  Thank you.

MR. MCCURLEY:  Thank you.

MS. COLLIER:  Would you like us to -- do you want us to go through this methodology?  I'm happy to.

THE COURT:  Yes.

MR. MCCURLEY:  The key thing here on this is we -- we wanted to demonstrate for folks that -- sorry.  We wanted to demonstrate that we are taking a cross-section of the different contracts, programs.  We've got Alliance.  We've got Roadmap.  We've got Inside Safe programs.

So with the field work, we're trying to interview people that are involved in each one of those.  We've got field work being done in eight of the council districts and in --

MR. MCKEE:  15 locations.

MR. MCCURLEY:  -- 15 different locations.

MS. COLLIER:  I mean, this is potentially subject to change.  This goes back to the data.  What we did with the data that we had, we have the LAHSA general ledger expenditures that provide insight into how much money has been spent on services.

Then we've done our best with the data that we have to trace them back to the beds created under Alliance and Roadmap as well as Inside Safe.  So this is depicting the largest five LAHSA sub-programs for the fiscal year '24 within the five contracts that we have between City and LAHSA

of the transactions that we have.

But again, this potentially is subject to change as we get more data.

MR. MCKEE:  And, Your Honor, just one last thing on this.  We are going to 14 or 15 physical locations.  Okay.  Our goal would be --

THE COURT:  Initially you are.

MR. MCKEE:  Initially, yes.  And if we need to do more, we will.

THE COURT:  You'll be doing more.

MR. MCKEE:  Okay.  Thank you.  But ultimately our goal is to be able to tell in our report what services are being provided, how much it's costing, what has been expended, the process for the invoicing, and those types of things.  Right.

So -- but we're going to do it in a way that aligns with the contract terms that the City has with the property owner or the City has through LAHSA with the sub-vendor.  And we'll comment on those things as well, as well as recommendations for potential improvement in the transparency and visibility.

So that's -- without showing that slide, that is the end of our presentation -- oh, yeah.  Go ahead, Dr. Emily.

MS. BRANDENFELS:  Emily Brandenfels.  I'm a

physician, and I am seeing this work very similarly to work I've done evaluating healthcare systems where you definitely will find a lot of very committed and passionate individuals really trying hard to do right by the people they serve.

You'll see evidence of really great processes and creative programs that people are developing.  But without a clear goal and shared objectives and priorities that are really driven by data and include accountability and transparency, it's really hard to see the dial move on population health.

We're really approaching this in a similar way in terms of, you know, wanting to see what that looks like in the efforts to address homelessness here in the city.

THE COURT:  Okay.  Are you getting data in a timely manner?  Unfortunately I'm starting to form an opinion, and I'll put on the record it may be unfair, but nothing seems to move until one to two days before we have a hearing.  And all of a sudden the data comes in.

Now, that doesn't require a comment.  That's speculation.

MR. MCKEE:  Rhetorical, okay.

THE COURT:  That's kind of a warning on my part. If we're going to deal with data, I shouldn't be reading that 24 hours and you shouldn't be reading it 24 hours, and especially between a conference two days ago and then data

flows in.  End of discussion.

You'll be back in three to four weeks, and we'll see if we're functioning better in that regard.

The second thing I'm hearing is that the County is an integral part of this.  But I believe, Mira, you and the board have taken the position that this would lie outside the Court's jurisdiction.

MS. HASHMALL:  Yes, Your Honor.  The County is not subject to an audit order.  They're also very robust in existing transparency measures undertaken by the County on a regular basis --

THE COURT:  I don't --

MS. HASHMALL:  -- regarding its programs.

THE COURT:  I've expressed this to one or more of your board of supervisors.  I don't believe that that's transparent at the present time.  My concern is that if LAHSA isn't getting you the information in a timely manner, then the costs of this audit go up.

So Mr. Szabo is here, and unfortunately that means that if there is delay, the reason I wouldn't agree without the additional language concerning the $2.2 million is that I've never seen a government contract that didn't go up.  I wasn't going to be tied to $2.2 million.

But, Matt, you need to hear this because when the Court bears down on you, you're dependent upon information

from LAHSA.  You're also somewhat dependent upon information from the County.  And you've heard their position.  So since we're all joining together now as a new family under Mayor Bass's leadership and the County claims that they're cooperating, I'm going to leave that to the mayor and the board of supervisors.

The next time I'm going to put the board on the spot.  I'm going to request that the chairman of the board of supervisors be here and take the mayor's position publicly about their cooperation and their transparency, because this doesn't work not only in terms of your audit unless I have LAHSA who feeds us information and the board in a timely manner.  It doesn't work for the homeless on the street unless they have services provided, or we're just warehousing people and moving them around.

Now, Michele and Judge Gandhi had an interesting drop-in that they can describe later if we have time in a very interesting situation in Hollywood.  That's why, Mira, I'm putting you on fair notice.  I'm going to expect the chairman of the board of supervisors here next time to take your position publicly about cooperation and transparency. And that's for the benefit of the homeless and the residents of this city.

All right.  I'm going to turn this over to Michele. I have a couple other questions.

28

MS. MARTINEZ:  At this time, Judge, I do not have any questions for them.

THE COURT:  Jay, any questions you've got?

JUDGE GANDHI:  Out of curiosity -- and I should know this -- has LAHSA ever been audited before?

MR. MCKEE:  I've seen two single audits from LAHSA during this time period that we're reviewing.  I can't quote the years for you right off the top of my head, but there have been two single audits that are publicly available.

THE COURT:  Which agency?  They have over 32 different agencies that I've counted, maybe more.  Who was audited?

(No response)

THE COURT:  Well, I'll be asking that in three weeks, then.  Okay?  Jay?

JUDGE GANDHI:  Of the records, and I don't have the realtime in front of me, did -- is your concern that the records don't actually exist?  Is that what you said?

MS. RAFFERTY:  It's a question.  So when we ask for data and explain who we are and try and explain how we need to receive the data, the delays -- we don't know why the delays are.

Like I was trying to explain, when we're trying to look at -- money came in through LAHSA, went to a contract provider, and went to the entity.  If we can't look at a

contract and understand the invoicing concern and how the service went out, is that because the data doesn't exist, or their systems just aren't -- have the availability or the tracking system like you would see in a normal business?

So we're not saying it doesn't exist.  We don't know.  Is it the system, the HMIS system?  Is it the way they set up their contracting vehicle?  We know Inside Safe was put together very quickly to try and get services to the street.

So we don't know if the process didn't allow the tracking mechanism.  It's a vary between not great tracking systems for the data.  We're not sure if some of data doesn't exist.  When we do receive data, it's not clear-cut on what we've received.

So when we ask for certain things and we get them back, we have to kind of ferret through and -- we're a big team.  There's nine of us.  We're all seasoned either executives from hospitals or accounting firms.  We know how to do this.

It's unbelievably labor intensive to do this kind of audit that is based on financials and performance.  It's hard to put them together.  So that's what we're struggling with.

JUDGE GANDHI:  Will there be an answer to that question sooner rather than later?  I assume it won't be in a

final report that we're going to find out the records don't exist.

MS. RAFFERTY:  Well, I think with the support of the Court to motivate people to give us data, then we will be able to answer that question much more clearly.

JUDGE GANDHI:  I heard Judge Carter is good at that.

THE COURT:  Well, I was just chuckling about motivation, how well they will be motivated.  We'll see.

All right.  Now, let's just have this blunt family discussion with all counsel present.  We had a hearing in 2022, I think, April -- I may be a little bit off, but it's part of the record -- where we became very concerned early on about the providers being able to keep the underlying and supporting data in-house.

So this system was what I call provider oriented. I'm not chiding anybody for that, but this was a system set up in the Court's opinion -- and I've stated this on the record -- so the providers could get paid.

When we were looking for the supporting data at that hearing, we weren't getting supporting data.  That left the Court with two assumptions.  There were tens of millions of dollars at that time, and we speculated that there could have been hundreds of millions of dollars that flowed through unaccounted for in 2018 and 2019.

Now, little did we know a short time later that the state treasurer, was it, state controller, came out with a report stating that the state couldn't track at that time about $20 billion, a little less by that time.  We've grown to $25 billion.

This Court made a clear record later on that my assumption is going to be that if we don't have these underlying supporting documents, they don't exist, and I'm concerned that the work was ever performed.  Now, that might be unfair because possibly the work was performed and nobody put a control mechanism to notify our good providers to keep this underlying documentation.

So going forward, my thought was that's money already expended.  We can't get back any wastage or nonaccountable funds expended in 2018, 2019, 2020.  And I wondered about my own efforts to discover this and whether it was simply wasted.

But going forward, I tried to make a clear record that one of the reasons for this public website going forward from this point is to try to change the system so that the provider knew when he or she or the institution presented an invoice, that they had to have supporting documents so the public, who is probably the best auditor, that all of the folks could take a look at what was being done.  And then if they wanted to complain individually or collectively, at

least it was transparent.

So my hope is that the going-forward effort to make this public, that we're changing a system. And I've stated that my assumption going forward is if you don't have the underlying document supporting your invoice, you didn't do the work. I can't be more clear about that. So it's designed to take this from a default situation.

The second thing is -- and I see the controller is here. I've spoken to the mayor about this -- the City hasn't undergone an audit of the type that you're undertaking now. The reason for that is historically the City took the position -- and, Matt, listen very closely in case you've changed your position -- that if it was under the purview of the mayor or the City, they couldn't be audited.

Well, the City can't be audited. You can sweep any program that you want under the auspices of the city council and the mayor. So we haven't had an audit, and you may be the only audit and peek we get because I don't know in the future what happens.

So this may be the only audit, and this is going to be thorough comprehensive. So, Matt, get out your checkbook in case we're not getting a timely audit and you go talk to LAHSA and the County, because we're going to get timely information and this is going to be thorough.

Now, that's kind of where we're at with my thought

process transparently, but from this point forward or from the last pronouncement of this, these providers better be getting in their supporting documentation to support these invoices or my assumption is you didn't do the work.  And that should be the public's presumption also.  We should have complete transparency about this.

Now, with the County, I may not have jurisdiction, but I want to have an on-the-record conversation with your chairperson of the board, not you as counsel.  If I'm going to get the same cooperation that LAHSA is supposedly given and if you're not getting documentation, then I'll leave that to the chairman of the board about how complete this audit is and what the cooperation level is, because I think you need this from the County because they're the other half of this archaic system or services or bifurcated from the City.

Jay, any more questions, please?

JUDGE GANDHI:  No.

THE COURT:  Michele?

MS. MARTINEZ:  No.

THE COURT:  We're going to start speeding up because now I want more timely reports back to the Court the third week or fourth week in September.

Michele, after we take a recess, consult with all the parties and get the most convenient date, but you'll never get everybody on board at the same time.

I don't think I have any other questions in this area, Michele.

MS. MARTINEZ:  No.

THE COURT:  I don't have any questions either. We're going to get this information to you.  If we don't, it doesn't exist.

MR. MCKEE:  Yes, sir.

THE COURT:  Simple as that.

MS. RAFFERTY:  Thank you.

THE COURT:  And you're done bickering back and forth with the City and LAHSA and/or the County on occasion in these conversations and negotiating.  This now flows through the Court, and these are my orders.  You need that kind of support.  I changed that in the docket last week.

I would stick around because I think it's going to be interesting to you.  It may not be.  It may be like watching grass grow, but stick around for a little while and we'll see what happens next.  Okay?

MR. MCKEE:  Thank you.

THE COURT:  Pardon me?  I will.  Thank you.

Michele reminded me that you're all included.  On behalf of LA Alliance, do you have questions?

MR. UMHOFER:  No.

THE COURT:  And input and what can make this audit better and flow more smoothly and what can make this timely

and meaningful.

MS. MITCHELL:  Thank you, Your Honor.  I appreciate that.

One of the things that the Court mentioned was requesting that the chair of the board of supervisors be here next time to talk about cooperation and whether, to the extent that the company feels that having data from the County would be helpful, I think that's something very worthwhile in talking so that we do get a complete picture.

I think the other thing that we wanted to raise specifically is just in looking at identification of the plan moving forward --

THE COURT:  We're going to get this acceptable to you in just a moment.

MS. MITCHELL:  Do you want me just to yell?  I can do that.  I can wave my arms.  So I just wanted to make sure that we were all on the same page, that the actual outcomes, the performance objectives, are being included as part of the audit.

I didn't see that in the paperwork, but I might have missed it.  Or maybe that's not what we're talking about today.

MR. MCCURLEY:  Yes.  That's absolutely part of your work.

MS. RAFFERTY:  It absolutely is, but it's important

to include all the field work.  We need to go out and see it, touch it, to understand the performance measures and how they're met.

MS. MITCHELL:  Thank you.

THE COURT:  Now, Gary, could you come up for a moment.  Is he here?  Is anybody here from the Luskin Institute?  No?

One of the concerns I have is that you can't be robust enough nor can my two Special Masters, nor can I, in this time period; and I'm not expecting an audit or a drop-in of every one of these entities.  But I need to make certain that this is comprehensive enough.

The Luskin Institute has been around for a while, and I'm just wondering about using some of our local resources or something like that to get involved in a monitoring position.

They've got wonderful students at some of these schools, et cetera, and they've got really good policymakers, which, they won't be involved in making policy, but, you know, maybe we can enhance that.  Maybe we could get somebody in the next time.

I'm going to request somebody come in from the Luskin Institute.  But so we don't favor them, maybe Dr. Henwood also over at USC so we have UCLA and USC together.  Okay?  Let's get you some increased resources out

there.

Okay.  Any other input, LA Alliance?  Any other questions about A&M?

MS. MITCHELL:  No, not at this time, Your Honor.  Thank you.

THE COURT:  Okay.  Let me turn to the City.

MS. MARIANI:  No questions, Your Honor.  I just want to echo the City is welcoming this audit and the information, as you all have pointed out, is very important and it's very important work to the City.

THE COURT:  And I'm concerned about the cost increasing if you don't get information from entities you can't control.  So if LAHSA is slow-footing or the County is not going to take a more robust position and rely upon, you know, their belief that they're transparent, then that potentially costs the City.  And that's not fair, but it will cost the City.  Okay.  I will have a good audit.

Any other input?

MS. MARIANI:  Understood.  And certainly the City stands ready to do everything it can to help get all the data you require in a timely fashion.  And as you pointed out, we don't control the other entities.

THE COURT:  Also the head of LAHSA will be invited, Dr. Kellum, next time, as well as the chairman of the board.  All right.

On behalf of the County?

MS. HASHMALL:  I have nothing to add, Your Honor.

THE COURT:  Then on behalf of the intervenors?

MS. MYERS:  Yes, Your Honor.  And I appreciate the opportunity.  I just have a couple of quick questions.

THE COURT:  You don't even have to make them quick.

MS. MYERS:  I think everybody would disagree with that.  I really appreciate that you have --

THE COURT:  This is Shayla Myers.

MS. MYERS:  Apologies.  I really appreciate that you've outlined the scope of the audit.  This is the first time I think that we've seen transparently the full scope of what the audit is going to include, and I really appreciate that.

Obviously as the intervenors we've raised some concerns both in my interview with you all to the Court about the scope of the audit and what programs were included.  I did note when you talked about the City's supportive services, you outlined a couple of supportive services, specifically the Inside Safe bus services and the Care Plus.

Obviously Care Plus is a significant program for the City of Los Angeles, and I would ask, first, what is the scope of the audit for the Care Plus program?  Is that specifically related to Inside Safe and the ways in which Care Plus interacts with the three programs you're auditing?

If not, can you just give us a sense of how you're including the Care Plus.  And then I do have a follow-up question about that as well.

MR. MCKEE:  So what you couldn't see -- thank you for the question.  What you couldn't see is that -- and I don't know if we spoke about this during your interview -- some departmental costs, expenses, are not part of our scope as it stands right now.

However, for Inside Safe, encampment resolution is a major piece of that.  So we will be -- we do plan on observing and talking to and studying from a performance perspective some of the activities going on with, you know, the resolution or encampment cleanup.

But we won't be tracing, for instance, every dollar spent on Care Plus to these three programs.  The County wouldn't allow us to.  The accounting is hard.  They don't track it that way.  So that's one thing.

The other thing is that on that slide -- and I have missed it many times and Laura will attest to it -- those were just examples.  We weren't trying to be super comprehensive of everything that we might review in each one of those, you know, rectangles, but they were examples.

So I just want to make that clear for everyone.

MS. MYERS:  That's helpful.  I do just have one follow-up question related to that.  I think you answered it

to the extent that these are about examples, but I would note that one of the most significant line items for the City of Los Angeles supportive services, in quotes, is the Los Angeles Police Department and the role that the Los Angeles Police Department plays both in Care Plus and in other instances and specifically related to Inside Safe.

So does your plan include calculating the cost of Los Angeles Police Department as it relates to these, quote, encampment resolutions?

MR. MCKEE:  It does not.

MS. MYERS:  It does not?

MR. MCKEE:  No.

MS. MYERS:  And can you just provide us a quick explanation about why, given the significance of that line item and the role that LAPD plays in homeless services in Los Angeles.

MR. MCKEE:  Okay.  Well, just from a cost perspective we're not -- from a cost perspective we are not -- because there's lots of departments that are involved in doing things with personnel, City people that are --

THE COURT:  There's also the fire department.

MR. MCKEE:  -- the fire department, that are doing work in relation to these programs.  So it's engineers that are looking at plans and designing things and architects and lawyers.  Okay.

41

That doesn't -- we were -- we were instructed that that really isn't part of our purview as far as tracking the costs.  We're trying to understand for many of these services that are nondepartmental, do the dollars get to the street and are they helping?  So that's where we have focused, you know, our scope of work.  So it might be something.

MS. RAFFERTY:  Yeah.  I can answer that.  When we interviewed LAPD and talked to them about what their role was on either covering, you know, encampments being moved or cleared or when they have to respond to an area where, you know, citizens are being disruptive, they basically told us they can't tell you the cost.  They cannot tell us the cost.

They have a special unit that they deal with kind of the interactions with homelessness.  The people that we talked to said we just -- the LAPD does not track every single penny that relates to some of these programs.  It's just not in their budget.

So that's what we were told.

MS. MYERS:  I mean, it does seem, I would say, that that is a response that you've gotten from the City of Los Angeles in a lot of circumstances, and certainly you've pushed back related to that in other programs.

I would also just say that is it -- are you not -- so you're tracking LA sanitation's participation in these cleanups, but you're not tracking LAPD's participation in

42

these cleanups?

MR. MCKEE:  Not the dollars.  We've observed their performance when we go to some of these Care Plus cleanups.

MS. RAFFERTY:  We want to understand their role in how they support this, but it was not in our scope to understand exactly what's being spent.

MS. MYERS:  And I think, Your Honor, I would just say this remains our concern about what the scope of the audit is.  We are incredibly concerned about the City of Los Angeles and the LA Alliance's ability to shape this audit for the Court in terms of defining what constitutes a supportive service.

The City of Los Angeles will tell you about the participation of the Los Angeles Police Department in other contexts, but when asked about that line item cost or the role of law enforcement, it is systematically excluded.

So to the extent that the Court is looking for a transparent audit about the full shape and scope of these programs, leaving out the Los Angeles Police Department, which is the single largest line item for the City of Los Angeles exponentially, we think it's a huge misstatement or a huge misstep by the auditors and is going to undermine the scope of this audit.

THE COURT:  Okay.

Eventually it's going to be my responsibility to

define the scope, so you act through me.

With transparency, I was concerned about the tussle going back and forth, for instance, with 4118. That's a policy decision by the mayor, by the police, by the counsel, et cetera. And especially after Boise, you know, coming onto the horizon at that time, I'd excluded that. I'd also excluded the fire.

That is a line item that you can find. It's much better defined in fire services but only better defined, not necessarily accurate. With the police, let me take that into consideration. Let me give that some thought. Okay? But certainly you're dealing with sanitation out there.

Okay. Any other questions? I want to thank you very much. I would stick around for a moment because I'm going to call on the controller next.

If you would be so kind, as the controller, I'm not going to put you on the witness stand. You're more than welcome to address the Court from the lectern and provide an update on the website.

I know that there is a pledge between you and the mayor's office, but I'm a little concerned that what's being said publicly is and how that's functioning behind the curtain.

MR. MEJIA: Sure. Well, thank you, everyone. Thank you, Your Honor, for having the controller's office

here today.  So do you just want me to give you just a rundown of how things have been?  And then do you also want me to present you what the website looks like?

THE COURT:  Everybody knows who you are except the court reporter.

MR. MEJIA:  My name is Kenneth Mejia.  I'm the city controller of Los Angeles.

THE COURT:  And it's nice to have you here.  Thank you.

MR. MEJIA:  Thank you.  So since we were last here -- I think it was around June -- we all had a consensus that we were all going to work together to provide a better, transparent, user-friendly website on homelessness spending related to the Alliance, to the Roadmap, and to the Inside Safe programs, so those three programs specifically.

So we had initial meetings with the CAO because we are working with them to find out which payments are the ones that relate to these three specific programs for this case.

So we got the list of payments from the CAO, and from there what we try to look at next is let's look at number one, the financial aspects.  So what are the invoices so we can tie out what are we paying for.

And then number two, what are the metrics?  So that way people can know what they got.  So for Inside Safe -- I'll start with Inside Safe first -- we are able to get the

financial information or the invoices from the CAO.  When it comes to metrics, we were directed to go to LAHSA.

So we are waiting on LAHSA to provide -- and actually, funny story on how -- sorry.  Go ahead.

THE COURT:  How long have you been waiting on LAHSA?  A day?  A month?  How long?

MR. MEJIA:  I would say we requested it on August 19th --

THE COURT:  Okay.  When will you get the data?

MR. MEJIA:  -- for some data points.  They sent us some during the middle of this court hearing.

THE COURT:  Right now?

MR. MEJIA:  Right now.

THE COURT:  Right now?

MR. MEJIA:  Yeah.

THE COURT:  Amazing what court hearings accomplish?

MR. MEJIA:  Funny story, and as you said, in two days they send everything.  So that's on the Inside Safe side.  So CAO is providing us financials, and then metrics from LAHSA.

When it comes to the Alliance, we are -- we need the -- LAHSA are the ones who are going to provide the invoice and financial information.

THE COURT:  Have you requested that information?

MR. MEJIA:  Same time.

THE COURT:  When?

MR. MEJIA:  August 19th.

THE COURT:  Have you gotten that information?

MR. MEJIA:  We just got it.  We just got some information, but we haven't seen everything -- literally in the last 20 minutes.

THE COURT:  Right now?

MR. MEJIA:  Right now.  So I don't know what they gave us, to be honest, but within the last 30 minutes we got an e-mail from them.

THE COURT:  I would hope that we don't have to hold hearings to get information that is requested and that the only reason we're getting this is because these hearings trigger this last-minute information, because there's no way that you can analyze that quickly enough to know what you've got or if it's meaningful.

The Court should not be the trigger point.  There has to be better cooperation between LAHSA, the City, and the County to get you this information.

MR. MEJIA:  Correct.  And lastly, for the Roadmap, same thing.  LAHSA are the ones who are going to provide the financial or invoice information.

THE COURT:  And when did you request that?

MR. MEJIA:  August 19th.

THE COURT:  And have you gotten anything?

MR. MEJIA:  We got an e-mail in the last 30 minutes.  We don't know what it is yet, but we did get an e-mail from them.  And for the metrics, they will be the ones to provide it.

Now, when it comes to the metrics, they did tell us, though, that when it comes to Alliance, Roadmap, and Inside Safe, for the metrics they would have that for us in October.  So the ones that I was saying right now that we got in the last 30 minutes relate to the invoice and --

THE COURT:  Whoa, whoa.  No.  Listen very carefully.  No.  This audit is hopefully going to be completed sometime around November.  If you're conducting an audit also, you're a great guarantee that A&M is somewhat credible and that you're somewhat credible.

If I have a divergence that's this big, I'm going to ask each of you why.  So it seems to me that there's slow-footing going on.  Now, that may not be fair, but I'll put it bluntly:  Why in October?  This data should have been available a long time ago.

MR. MEJIA:  So specifically we're asking for metrics from service providers, and they said they are rolling out a website that would show that in October.  That's when we would be able to get the metrics side for those three that we're requesting.

THE COURT:  When in October?  Latter part?  Early

part?

MR. MEJIA:  No idea.

THE COURT:  Okay.

MR. MEJIA:  Sometime in October.

THE COURT:  We'll be calling everybody in in the last part of September.

MR. MEJIA:  And just to clarify, the data that we did receive in the last 30 minutes relates to the financial and contractual side.  So the CAO has provided us with, you know, a high level on how much money has been spent.

Can I present the website to you guys?

THE COURT:  Absolutely.  Take as much time as you like.  This is fascinating.

MR. MEJIA:  I don't know if you guys have HDMI, or should I just put it underneath the screen?  Are there IT people here doing this?

THE COURT:  You don't want a judge doing this.  You want competent people in electronics.  Karlen, help.  Law clerks, help.  Michele, help.

We'll get you set up, okay?  Make sure it's comfortable and you're really set up so that ...

MR. MEJIA:  Sure.  Can everyone see it?

THE COURT:  I see tips to use the website right now.

MR. MEJIA:  Perfect.  So when you first enter the

website, we took everyone's suggestions on making it very user friendly, add directions and tips on how to use this transparency website.  So these are just tips.  So when you first open the website, you will see, you know, three bullet points.

You can hover over italicized words to view their definition.  You can hover or hyperlink amounts to view more.  You can also hover over pie charts to get information.

So at the very top, we do a brief rundown on the -- this case.  If you click on see more, it gives you the background on how this all started.  And this is just, you know, for the public's description.

At the very top, so this information here lists how much money has been spent so far that we have received in terms of payments in 2024 from the CAO.  So we are relying on the CAO's office to provide us the amounts of payments related to these three programs.

Basically you can click on these amounts, and then it will take you to where you want to go.  So when our office receives these payment amounts, we then go into the pdf cash request support, which comes from LAHSA, and we break down who is the sub-recipient, what was the encampment, what is the related contract, and how much money was spent.

On the left side, these are the payment dates from the City to LAHSA.  So as you can see here, this is still

very high level.  What we have requested from LAHSA is we want these service provider invoices and we want the metrics.

So in terms of this one program for the Alliance, this is all we got.  As I mentioned five minutes ago, like I said, we got some information today, and then we're waiting on the metrics in October.

THE COURT:  You know my position, and that's going to be if you don't get this underlying data, this work wasn't performed.

MR. MEJIA:  Correct.  I hear you loud and clear.

So the next thing -- so that was it for the Alliance.  The next thing you could click on is Inside Safe. So in 2024 so far for payments made to LAHSA which were then paid to service providers, we have a -- we were able to get this information from the CAO in terms of financial information.

So this just provides the public a view of a pie chart on who we're paying and how much they're getting in terms of service-provider related services for Inside Safe. So you could hover over a piece of the pie chart and it will tell you how much was spent on -- can you guys see up there?

THE COURT:  Oh, yeah.

MR. MEJIA:  You could go over each one and it will tell you how much percentage of the pie they got so far for payments in 2024.  And here you could also see, if you don't

like pie charts, you could see a spreadsheet.

Now, if you're asking, well, what is that 8.2 million made of, this weingart, you can actually scroll down; and similar to the other spreadsheet for the Alliance, we do break out from the cash request, you know, those amounts right here.  So you could see how much, when these service providers were paid, when they were paid and what encampment it relates to.

So going back to where the two things we're looking at, we're looking at financial data and we're looking at metrics.  So luckily the CAO has provided us with financial data for at least one payment so far for Inside Safe, and we were able to get that information, which is basically general ledger data, from service providers.

THE COURT:  Let me repeat that.  One payment?

MR. MEJIA:  Yes.

THE COURT:  I want to emphasize that.  One payment?

MR. MEJIA:  We have received financial documents for one payment out of six.  Two of them are advances.  So they're also working on providing us financial information for the other remaining.

THE COURT:  When?

MR. MEJIA:  We're supposed to get the next one --

THE COURT:  When?

MR. MEJIA:  They're here, but soon.

THE COURT:  When?  I sound like an owl?  When?  Kind of like hoo?

MR. MEJIA:  That's request number three?

THE COURT:  When?

MR. GIPSON:  Good morning.  Ed Gipson with the CAO's office.

THE COURT:  Nice to see you, sir.

MR. GIPSON:  Certainly.  So as we've discussed several times, we have certain billing information that comes in, particularly --

THE COURT:  When?

MR. GIPSON:  I'm not sure when we made the last request.

THE COURT:  Why don't you two have a conference just amongst yourselves.  I don't want to embarrass you. When?  I don't need the rest of the information.  Just talk to each other.

MR. GIPSON:  That's perfectly fine.  The only thing I would like to clarify is we get that information for the details from LAHSA as well.  So that's why I was, like, I can make the request.

MS. MARTINEZ:  Wow.

MR. GIPSON:  And to be fair, certain ones are advances, so there's no backup paperwork, and the others are forthcoming and they come through another department in the

City.  We are working very hard to gather everything from every place.

THE COURT:  LAHSA.

MR. GIPSON:  Yeah.

THE COURT:  So our roadblock bluntly is LAHSA.

MR. GIPSON:  Gathering data is always a challenge from everywhere all the time.

THE COURT:  Very diplomatic way to put it.  Thank you.

MR. GIPSON:  These are service bills, so ...

MR. MEJIA:  Correct.  So of the six payments, we've received the one so far, which is cash request number six. Four and five are cash advances, and then they're working on cash request number three right now.

So for cash request number six, for presentation purposes, what we want to show you what we've been able to do for this website is when you look at some of these service providers, you'll notice we pay them on July 2 for this sub-recipient and for this encampment.

Now, because this has a hyperlink, you can actually click on it and it will tell you the breakdown of what it was made up of when it comes to the finances.  So for this location, from October to December you can see what the breakdown was of how much money was spent on security, which makes up the bulk of the payment to the service provider.

54

Then, second, 15 percent goes to the actual navigators.  Then 74,000, or just for this example, or 13 percent was related to back-billing, which in accounting means they weren't billed in the past, so now they're billing the City.

So this is just, you know, for presentation purposes what it would look like.  Then eventually once we do get the metrics, it would be below the financial section, and it would be down here somewhere (indicating).  But we don't have that.

But as you could see here, we do have some of the financial information that breaks out -- because I know you wanted, Your Honor, to see how much money actually goes to case workers, how much money goes to administration, to directors, how much money goes to security, versus actual services.

So we're laying that out, and this is just -- you know, hopefully once we do get the metrics, it will show you a full-scale picture.  Same thing, you could click on more as well.

And I'll just do one more example.  So, like, The People Concern, for example, this one was from October to December 2023.  You could see the breakdown of services --

THE COURT:  This is a wonderful opportunity for the public to take a look at the salaries, security,

administrative overhead, and what's hitting the street and what's not.

MR. MEJIA:  Right.  So we haven't -- this is pretty much what we've gotten so far.  So, like I said, eventually you will have the metrics on the bottom.  And what we noted for some service providers is sometimes they don't break out how much they spent on security.

So, for example, I'll use St. Joseph as a service provider as an example.  For here you could see that -- I believe the security might be in-house, so it might be part of the salaries information, so you don't really know what is broken out.

So that's something that also we'd like to look at.  You know, there's line items called missing backup.

THE COURT:  The interesting thing is in the future going forward to improve, not to criticize.

MR. MEJIA:  Right.

THE COURT:  To create templates for our providers with different categories so we're looking at apples to apples and oranges to oranges.

MR. MEJIA:  Correct.

THE COURT:  That's what I've had a feeling over the last few years hasn't been done.  So this is an opportunity for the City, the controller, for the County maybe to get together --

MR. MEJIA:  Correct.

THE COURT:  -- to start putting these categories into understandable tranches.

MR. MEJIA:  Exactly.  And we agree that when you put everything out, this gives the public and you all to see, well, this is what we have.  How can we make it better?

So I'm going to scroll down to the next program, which is the Freeway agreement.  So this one they broke it out between Safe Parking and regular Roadmap freeway.  So this one --

MR. GIPSON:  Actually, let me pause you for a minute.  Did you say payments four and five were advance payments?

THE COURT:  Go back.

MR. MEJIA:  Okay.  So these ones right here, this is for cash request number six.  And so this amount here, although it says 285,000 was paid, this was actually a combination of cash request number six and a previous advance to this.

So that's why you see the amount here is actually here higher than the amount, because the way they're doing it is we pay LAHSA some advances, so they bill us later.  Now you basically, when we got this financial support, like, for example, this amount here, this 707,000, the payment amount relates to a previous advance and cash request number six.

THE COURT:  Hold on just a moment.  This is invaluable, because you probably don't listen to the council meetings or the homeless poverty committee meetings like Michele does and then has me sitting up all night to listen to them.

One of the things in the past were these advance payments of 25 percent that have recently been raised significantly as advancements.  Are you aware of that?

MR. MEJIA:  Yes, I am aware of that.

THE COURT:  Front loading.

MR. MEJIA:  Yeah.  We're aware of that, my office is.

THE COURT:  Okay.  Please continue.

MR. MEJIA:  Did you have another question, Your Honor?

THE COURT:  I have ten, but I'm going to wait for you.

MR. MEJIA:  Okay.  So that's -- so I'll go back to the third program.  So you could click on this, so $103 million has been paid so far for Roadmap.  We don't have any financial documents or information or metrics, so we're waiting on LAHSA to provide this.  But eventually --

THE COURT:  Just a moment.  Usual question:  When was it requested?

MR. MEJIA:  This was the one that I was mentioning

earlier.  So, August 19th.  We might have gotten some in the past 30 minutes, but I know on the metrics side, October is when they said they'll have it up.

THE COURT:  October?

MR. MEJIA:  Sometime in October for the metrics, right.

THE COURT:  We'll have that discussion in September, but they're on notice through you folks that the Court is going to be asking questions, why, after this period of time.  This couldn't be much more timely.

MR. MEJIA:  Right.

So lastly, this is actually probably our best example that I could show you because for the Safe Parking, which is an actual vendor, the CAO did provide the financial documents and they provided the metrics.

So here, as you could see here, from October to April 2024, you could see how much was split between staff salaries, security, financial assistance, administrative costs, and other benefits.  So you could also hover over this so you could see a better visual on what is getting paid out.

THE COURT:  Did you have a question, Jay?

MR. MEJIA:  Ask anything you want, or say anything.

THE COURT:  We're just going to have a family discussion.

MR. MEJIA:  We're locking arms, yeah.

JUDGE GANDHI:  Do you drill down on it?  Will you be drilling down on any of these line items?  I mean, just office supplies of four mil?

THE COURT:  The reason Judge Gandhi is asking that is somebody from the public went out and checked on one of these sites, and let's say that they report back, which is hearsay, you know, and the press was not very complimentary about how it was staffed.

So, I mean, that's not your opinion.  You weren't there.  But, you know, you get these reports back from the public going out there independently or people interested.  They report back to the press -- I think it was West Side News or something -- that, let's say, was less than adequately staffed and that there were just very few people on site for this kind of expenditure.

I don't know that is a fact.  I read the West Side whatever and --

MR. MEJIA:  Your Honor, your question was have we ever drilled down to one of these.  We have done one, and it was during our fraud, waste, and abuse case where a service provider was charging for food, and the amount -- you know, this is still under investigation, but they were getting subpar meals such as ramen noodles every day.

So that would be an example of us actually drilling down into a line item that you're seeing here and seeing what

did the service provider actually provide.  Did they provide actual meals that are in regulation with, you know, FDA or some other health organization?  We found out that they were just providing ramen noodles and some other canned foods, but that's an example -- to answer your question.

Are we looking at it for all of this, for this website and for everything?  No.  It would probably be impossible, but --

MS. MARTINEZ:  Mr. Mejia, how does that translate as it pertains to the actual contract and what they said their scope would be and what they would actually be doing?  How does that tie in?

MR. MEJIA:  Yeah.

MR. PEREZ:  Your Honor, Sergio Perez, chief of accountability and oversight.  When our fraud, waste, and abuse team received that complaint, we immediately requested the contract, which included specific language about providing three square meals a day under FDA regulations.

That means that the meals needed to meet certain basic, limited nutritional value guidelines set by the federal government.  What we found through our fraud, waste, and abuse investigators who went out on site, interviewed folks, looked at the storage of food, was that, as Controller Mejia stated, the participants in this Inside Safe program were only receiving instant ramen cup-o-noodles soups for

breakfast, lunch, and dinner for weeks on end.

After we uncovered that and provided notice to LAHSA, they went to the service provider, and the service provider ended up retroactively updating an invoice bringing that amount down by nearly $70,000.

THE COURT:  Because they got caught.

MR. PEREZ:  Yep.  And that investigation is still ongoing.  That information is public, and we plan through our fraud, waste, and abuse investigators to get to the bottom of it because this particular service provider operates at other Inside Safe locations.

As Controller Mejia stated, our resources are quite limited.  We only have four fraud, waste, and abuse investigators for the entirety of the city.

THE COURT:  Why don't you have more?

MR. PEREZ:  You should ask the city council and the mayor.

THE COURT:  Maybe we'll have them in here next time and ask them why.

MR. PEREZ:  We would certainly appreciate that.

MR. MEJIA:  So just to continue, for this Safe Parking one, we do have the metrics, too.  If you scroll down, this is more financial information which shows the spreadsheet on how much they were paid for a specific month as well.

So if you're curious how much someone got in January or in February, you can do that, but the metrics is down here.  So if you scroll down here, you could see this vendor did provide their metrics, and we did tie it to the amount that was paid for that specific month.

So using October, for example, we paid them 69,000. So for this example we paid Safe Parking LA $69,000 for 50 spaces.  We calculated utilization for a space of 48 percent, and you could see how much, you know, how many clients were served, 24 head of household, one minor, six adults.

It also tells you how many exited to permanent housing, interim housing, how long they stayed at the Safe Parking site before they exited, so 60 days for those who exited in October; how much financial assistance was given, you know, for, and it tells you what it was related to so it could either be meal cards, credit repair, employment.

It also tells you how many were enrolled, so 31. And it tells you how many service referrals were made, you know, how many social service referrals were made.  So this one tells you, you know, the metrics on the Safe Parking.

And you could see here, like I said, the utilization rate of the 50 spaces and more here tied to the actual dollars spent for that month.

THE COURT:  Just a moment.

All right.  Okay.

63

MR. MEJIA:  So this is -- you know, you all can feel free to view it if you want.  This will be updated on a rolling basis and based on information that we do receive from our other partners, from LAHSA and the CAO.

And the one thing I just want to mention, Your Honor, is this was able to be completed because of my executive office, which includes me spending time as the City controller for Los Angeles, our deputy controller, and also our directors as well.

I would say because -- in my particular position, because we are in an office that handles the entire city's accounting, payroll, audits, investigations, I personally won't be able to continue to sustain this.  A lot of this here is because of the work that our executive office has done.  But because of budget cuts, because we are short staffed, you know, I just want to reiterate that this is very time-intensive work from my office.

And I would love to continue to show you guys, like, what you saw here today so the public can have this transparency.  But I do need more resources.

THE COURT:  Just a moment.

(Pause in proceedings)

THE COURT:  I want to thank you.  Let's see if the parties have any questions, if you're uncomfortable answering them.  So let me turn to --

64

MR. MEJIA:  Any questions?

MS. MITCHELL:  Thank you.  A couple questions.  So, one, comparing this website with the City's public-facing website, we notice that there aren't links to the actual documents underlying contracts.  Is that something that your office intends to do?

MR. MEJIA:  Correct.  So that is something that we are trying to -- these are huge documents.  Some of these service provider invoices are literally accounting documents of general ledgers that I don't think the public will understand because they're, like, 10 pages, 20 pages.  But we can and we will upload them.

MS. MITCHELL:  Great.  The other question I had is I noticed that there were some categories that I found to be somewhat vague, like indirect costs, back-billing, missing backup, fringe.  Are those going to be broken down anywhere or some definition of what that means?

MR. MEJIA:  In terms of what we're doing, this is as far as we've gone.  I think if we were to do that, it would require a lot more resources.  Like I said, a lot of this information that was put on here was done by me, my deputy controller, and --

THE COURT:  If you don't do it, who does?  I know you say you're lacking resources --

MR. MEJIA:  Yeah.  So, we'll do it, but it will be

65

done not as fast as it was done here.  So we'll still do it, but it's just -- you might not get this amount of time and, you know, sensitive information in a timely manner.  And if, you know --

THE COURT:  Well, you can't do it without LAHSA getting you more timely information.  It's as simple as that.

MR. MEJIA:  Correct -- or whoever the source is of the data we do need.  But so far we have caught up -- yeah.

THE COURT:  Just a moment.  Who else is the source of the data besides LAHSA, then?

MR. MEJIA:  When it comes to the number of payments that have been made, we get this information from the CAO.  Then when it comes for the CAO specifically, we get information for the finances for Inside Safe.

THE COURT:  Okay.  More questions?

MS. MITCHELL:  Yes.  So what are indirect costs?

MR. MEJIA:  That's a good question.  We would have to ask the service provider what indirect costs are.

MS. MITCHELL:  So you're taking those categories directly from the invoices?

MR. MEJIA:  Correct.  So we are literally taking their invoices and their information and putting it on a website so you all could see it.

MS. MITCHELL:  So they're the ones identifying things like fringe?

MR. MEJIA:  Correct.  So if I could just explain our process.  So we get the information from -- so for these ones specifically, from the CAO for Inside Safe.  The CAO provides us with the service provider invoices, which are accounting records; GLs, general ledgers; P&L reports, profit-and-loss reports.

We just transcribe that.  We convert it into Excel, and then we code it for a website.  So it is a whole entire process that is happening to get this to what you're seeing here.

THE COURT:  By the way, the person I referred to that I couldn't recall, Michele just showed me was Tim Campbell, who I think is here.  Is Tim Campbell here?

Yeah.  Thank you.  I don't think I've ever met you.  It's a pleasure to see you, sir.  Thank you for being here.

Okay.  Any more questions by LA Alliance?

MS. MITCHELL:  No.  That's it at this time.

THE COURT:  Matt, you're welcome to participate if you'd like to.

Counsel, do you have any questions on behalf of the City?

MS. MARIANI:  No questions, Your Honor.

THE COURT:  On behalf of the County?

MS. HASHMALL:  No questions, Your Honor.

MS. MYERS:  I just have one quick question, which

is related to the Alliance settlement program.  It seems that the only program for which the City is providing any documentation is the Highland Gardens interim housing program.  That's only 143 beds out of roughly 3,000 the City is reporting have been opened.

Can you just explain why we're only receiving information about that and whether there's any intention to provide any information about the City's expenditures related to the other 3,000 some odd beds they're crediting towards the LA Alliance settlement?

THE COURT:  Is that also better asked of the City as well?

MR. MEJIA:  Yeah, that's better asked of the CAO.  So think of us as we just get the data and then we put it up.

THE COURT:  Matt is right there.  Ask him.

MS. MYERS:  Hi, Matt.  What I said to the controller.

MR. SZABO:  Sure.  Matt Szabo, city administrative officer.  The very simple reason is that in the category of beds that we're reporting in compliance with the Alliance settlement, at the time Highland Gardens was the only interim site which we had records for.  It's the only interim site that we were reporting.

The rest is permanent housing that is directed -- that is contracted directly from the County to the service

provider.  So we don't contract directly for the services provided at our permanent supportive housing.  So that was the entirety of what was in the City's controller.  It's the interim side of the beds that comply with Alliance.

MS. MYERS:  So I would -- just to make a point, I think it's not clear from the website that this is just about the services.  I think there is a -- the website presents it as the cost associated with the settlement as opposed to the cost associated with the service provision of those beds.

So I think just for purposes of transparency, I think it would be important to make it clear that this is just a very small fraction of the cost associated with the creation of those beds that are being counted towards it.

THE COURT:  Okay.  Any other questions?

Matt, thank you very much.

I'm going to delay any further questions until our next meeting.  Michele and Judge Gandhi will reach out to you to try to make this convenient, but this time I'm going to want minimally the head of LAHSA present.

If the mayor wants to be present, I'll leave that to her discretion, but this time I want a representation from the board of supervisors concerning their willingness to cooperate or not.

Okay.  I want to thank you very much, sir.  Excellent presentation.  Very thoughtful and very much

appreciated.

MR. MEJIA:  Thank you.

THE COURT:  Thank you.

Now also the auditors are listening over here and so is the City controller.  They may be talking to you also.

MR. MEJIA:  Yep.

THE COURT:  All right.  I think the last item on the agenda today should be -- counsel, let's try to take the LA Alliance agreement at this time and any concerns that we have or don't have.  So let me start with LA Alliance.

MS. MITCHELL:  Sure.

THE COURT:  Just a moment.

And for the other matter, counsel, we're going to be a little bit late.  If Barbara Ferrer is here, pardon the discourtesy, or any member of the board of supervisors. We'll take that next.  We're running a little over time.

The court reporter needs a break.  We're going to come back in ten minutes, so we'll take that up at 11:00.

(Recess taken from 10:49 a.m. until 11:09 a.m.)

THE COURT:  I want to make sure that A&M is present.

We are back in session and all parties are present.

After listening to some of the discussion today, effective immediately this Court is adding the LAPD and all enforcement-related expenditures to the scope of the audit

and requesting that A&M submit a cost estimate to the mayor and the city council for approval.

Ms. Myers, after listening to your input, that's critical and that's an immediate order or request to the Court.  Now we have pushback.  So be it.  But it can't be too much more expensive than the 2.2 million, which was a measly sum to begin with frankly --

MR. MCCURLEY:  We'll get it to you.

THE COURT:  -- and pushed upon you after their 2.7 to 4.2 million by the City.  This is necessary and should be expected by the City.  All right.

Now, counsel, back to the LA Alliance agreement.

MS. MITCHELL:  Your Honor, Elizabeth Mitchell on behalf of the plaintiffs.  What I'd like to do is just give the Court a quick update of the ongoing issues, what we are still meeting and conferring about, and what we believe that we are at an impasse on.  And we believe we will need a Court resolution.

THE COURT:  Okay.

MS. MITCHELL:  So starting with the City --

THE COURT:  By the way, you're going to put this in writing, then --

MS. MITCHELL:  Yes, of course.

THE COURT:  -- as a request to the Court.  This is what's coming.

Case 2:20-cv-02291-DOC-KES   Document 768   Filed 09/04/24   Page 71 of 111   Page ID #:22214

71

MS. MITCHELL:  Of course.

THE COURT:  Okay.

MS. MITCHELL:  So starting with the City, we believe that the City is now in violation of the agreement regarding both beds and encampment reduction.  They are -- they should have, according to the goals and milestones that were provided to the Alliance and to which the Alliance agreed, they should have 5,950 beds built by now, and they only have 4,017.  So it's a difference of 1,933.

We also don't have a plan for these missing beds, I will call them.  The initial plan that we were provided, the commitment was to 12,904.  We have plans for 8,663.  So there are still 4,241 beds that are unaccounted for and unplanned for.

So on those -- on the beds issue, we did meet and confer about this issue a couple days ago in addition to a month ago or so.  We are continuing to meet and confer, and we think we may reach a resolution on that issue.  So that is not ripe for Court resolution.

What we believe is ripe for Court resolution is the encampment reduction issue.  It seems there may have been an error with reporting, so it's unclear on whether the City is on target for their milestones, but they may be behind by 2,362 encampment resolutions as committed to on January 31st by the city council.

We have asked for addresses or locations of where these encampment resolutions are taking place that they have been reporting.  The City has refused to provide those locations, and we believe that it's necessary to make sure this is actually happening.

We are concerned that the City is counting these Care Plus cleanups as, quote, unquote, resolutions when nobody is going inside and it's just some trash that's being thrown away.  We don't believe that counts, which is why we think the addresses are necessary.

So that issue we believe we are at an impasse, and we will be filing a motion to the Court for enforcement of the agreement.

THE COURT:  Matt Szabo is here.  I want to provide Matt an opportunity to provide any comment concerning the bed plan for the City if you have an update before we go back to the County and Ms. Myers.

MR. SZABO:  Thank you very much, Your Honor.  Matt Szabo, city administrative officer.

THE COURT:  It's good seeing you.  It's good to have you here.

MR. SZABO:  Thank you.  So as plaintiff's counsel stated, our commitment, as the Court is aware, is 12,915 beds by June of 2027.  We've submitted to the Court that we have established 4,017 beds that are open and occupiable.  We have

73

another 4,646 beds which are in the pipeline that are in some process of being established.

That does leave a gap of 4,252 beds that would need to be identified and funded between now and June of 2027.  If it is the Court's request, I am prepared to provide a plan for how we would get there.

THE COURT:  Please.

MR. SZABO:  But with permission as I do that, I do need to provide -- I would like to provide some financial context that dictates our plan specifically as it relates to the Freeway agreement.

THE COURT:  If you have a presentation, Matt, and you want to put it up, that's fine.  If not, if you just want to speak, that's fine.

MR. SZABO:  I would prefer to speak because I have notes.  These are just my notes.  But I will -- I will identify some key numbers.

So as we're looking at our financing plan for the remaining 4,252 beds, as I said, I wanted to take just a minute to talk about the Freeway agreement that -- and again, as the Court knows, we had an obligation to establish 6,700 beds.  The County contributed for a period of the five years, the period of the agreement, the settlement, $60 million a year to pay for those services.

Roughly we currently have just shy of 7,000 beds

under the Freeway agreement that are open, and 4,100 of those beds I would refer to as brick and mortar. They are physical beds, either buildings that we purchased and converted to interim housing, the tiny home villages that you have all visited, the Sprung structure, interim housing. 4,100 of those are the hard physical beds, and then we have another 2,500 mostly rental subsidies, time-limited subsidies, which was referred to earlier as the rapid rehousing subsidy.

As the Court knows, the Freeway agreement expires this year, so we have received our last check from the County to subsidize those services. I say subsidize because when we made the agreement, the amount that the County was contributing was about half of what it would cost to provide the services for those beds.

At the time we made the agreement, the bed rate per night was $50. So this year there are two emerging developments that provide that financial context that I would like the Court to understand.

So, number one, we have the expiration of the Freeway agreement. We will not be getting any more funding from the County for those. At the same time there is a conversation and a process ongoing that will likely result in a very significant increase in the bed rate.

So we are looking at bed rates that will almost certainly exceed a hundred dollars. Under current proposals

the top rate for the basic level of services would be $143. So overnight, at the end of this fiscal year with the loss of the County 60 million and the increase of the bed rate, we could be looking at having to pay out $150 million to add no beds, no new beds, and to provide no additional services just to keep open what we have open.

That puts significant financial constraints on what we would be able to do on the remaining beds.  So as it relates to our plan, which does need to be approved by the mayor and the council, we would propose of the remaining 4,252 beds that we would engage in a master leasing program which the council has already approved for several hundred beds.

I'm going to be a little bit less specific, but I'll get to general numbers.  A master leasing program, which would be additional permanent housing that would provide relief to our interim housing stock, we will be establishing at least 500 new tiny homes in part in help from a grant that we received from the state.

The mayor's office has committed to extending and making more permanent some of the hotels that it uses for the Inside Safe program.  So we would look at a number in the low hundreds for those, and those would be more permanent interim housing resource.

Then we would look at additional Sprung structure

type congregate housing, congregate interim housing that I know, Judge, you visited some of the structures that we have up that are -- that we use for the Freeway agreement.

So we have a financing plan for 1,752 beds, and I would be making that recommendation to the council.  We have identified the funding for that.  For the remaining 2,500, our proposal would be to extend 2,500 of those 4,100 Freeway agreement beds under the new regime.

Under the new potential funding regime, it would be very, very difficult for the City to maintain those beds at the same time as we are establishing up to 4,200 new beds.  And speaking for the mayor and the council, I can tell you there is a very, very strong desire to avoid having to close down beds that we spent hundreds of millions of dollars to establish and are currently in service and are providing shelter, needed shelter now.  It would not make any sense to have to close down beds in order to build new beds.

So our request to the Court would be to allow our final calculation of that 12,000 to include preserving 2,500 of our Roadmap beds in addition to the master leasing, the tiny homes, the congregate shelter, and the long-term agreements in the motel.

That would be our plan which we would make public and that I would ask the council to approve should the Court be comfortable with the 2,500 migration, bed migration from

the Freeway agreement to the Alliance settlement, and that we are confident that we would be able to secure that in advance of the June 2027 deadline.

THE COURT:  Matt, thank you very much.

MS. MARTINEZ:  Matt, when will you be able to provide that plan, this tentative plan, obviously to the mayor and city council and then to the LA Alliance.  And if there is some form of agreement between yourselves and the LA Alliance and then moving it forward here to the Court to review, what would be the timeline?

MR. SZABO:  So if -- really it all is dependent upon our ability to assume the continuation of the 2,500 beds.  If the Court is comfortable with that number, I would be able to provide a written public report on the matter with specificity in a matter of weeks.

THE COURT:  I'm going to go around the room for just a moment.  I note through Michele there's been some discussion of this, but I'm not privy to all the details, Matt.  She's somewhat walled me off as well as Judge Gandhi and Judge Birotte in some of these discussions.

I was aware of some proposal coming to the Court, so I'm hearing it now in detail although I heard that there was something afoot trying to keep some of these beds in a more permanent basis rather than destroying them.

MS. MARTINEZ:  LA Alliance?

THE COURT:  Liz, Matt, any input?  Take your time.  This is important now.

MR. UMHOFER:  Your Honor, I think it's a tragedy that it takes these agreements to get the City and the County to fund beds and services.  It is an additional tragedy that the moment that these agreements expire, we have to talk about these beds going away and County funding going away for the services to support those beds.

We shouldn't have to force through judicial action and settlements achieved in judicial actions the City and the County to house more people and TO provide services for more people.

Mr. Szabo is crunching the numbers and trying to find a way to comply with the other agreement while this first agreement expires, AND I just want to pause for a moment and focus on that fact --

THE COURT:  Okay.

MR. UMHOFER:  -- that the City and the County are always saying they're going to create beds; they're going to create those services; they're going to do it no matter what.  But the moment this agreement goes away, beds and services start to disappear.

It portends poorly under this agreement which will at some point expire.  And then what is this -- are the 12,000 beds that are being created under the City agreement

and are the 3,000 mental health beds that are being created under the County agreement going to just dissipate because we don't have to do it anymore?

It's a -- it's a tragedy that we have to be here and do this and find out that when these agreements expire, the City and the County through budgetary reasons, through no fault of any individual but as institutions, fail to meet the need.

So we're having to talk about taking beds from a prior agreement, 6,700 beds that should exist regardless of whether this lawsuit happened or not, and we're having to take that to serve another agreement that will also expire. And then what happens with those beds?

I can go -- I do have some questions about the numbers, but I -- we brought this case to give the City and the County an opportunity to overcome whatever internal challenges they encounter, whatever nimbyism they encounter, whatever challenge they encounter with each other, to create momentum, to create more and more beds.

When the politicians come into this courtroom, they say we want this to be a floor.  We don't want this to be a ceiling.  We want to do at least this much.  But then when the obligation goes away, the beds and the services fall away.

So if we had electeds in this room from the County,

why are you going to stop giving the City $60 million to serve beds that the City is creating?  Why?  I don't think this County is struggling for money.  I don't think the County is struggling to get money from the federal government to support these initiatives.  There's money that's being unspent that is coming from the federal government.

Why do we have to be -- why did Mr. Szabo have to borrow beds?  The rate goes up, let's figure it out.  Let's not try to let these beds fall away.

So when I look at those numbers, we have 6,700 beds, 4,100 which are the hard beds, and we're trying to -- we're trying to get 2,500 counted towards this new settlement.  The question, I guess, just mathematical question I have is what happens to the remainder of the 6,700 which I know includes the 4,100?

THE COURT:  Ask it.

MR. UMHOFER:  So that's the question.  Okay.  We have these rapid rehousing efforts.  We have these other hard beds that are -- my math is terrible -- 1,600 hard beds.  Are they going away?  Are the rapid rehousing efforts going away?  Are we just left -- from the 6,700, are we down to the 2,500, and that's folded into the agreement under what you're proposing?

MR. SZABO:  So the City's intention and the proposal that I've provided is our best shot based on our

analysis to maintain all of the beds.  I do not want to be in a position to propose to city council a demobilization or shutting down of beds for financial purposes.  There may be, of course, cases which has been present throughout the Freeway agreement that some interim housing sites expire.

Some of them are on park land that has a time-limited lease or there's other development happening. So I -- there's always going to be some churn, but the goal in this proposal is to -- it's our best shot to absorb the dramatically increased rates and keep the beds open and to not have to shut them down.

There's always, as you know, fluctuation with the amount of rental subsidies that we have at any given time.  I certainly would expect there would be fluctuation there.  But as it relates to those hard physical beds that we spent months and months gathering community support for and hundreds of millions of dollars to establish, the goal would be to keep every one of those open to the extent that they can be open unless there's other circumstances that require them to close.  That is our goal.

So I'm not requesting all 4,100 be counted towards the Alliance settlement.  If we're allowed to migrate 2,500 of those 4,100 in, the impact to the City would be that the County would cover those services under the MOU we have with the County.

So the County covering the services for 2,500 would put the City in a position if we maximize every dollar that we have available, I believe, to keep -- to keep those 4,100 open.

THE COURT:  Mira, why is the County ending the funding?

MS. HASHMALL:  Your Honor, so I am hearing the details of Mr. Szabo's plan that it sounds like he is working up to present to his council and his mayor.  I obviously need to learn more about that, and I look forward to seeing that plan in more detail.

The agreement between the City and the County was a term of years, so it was always contemplated that it would expire.  But I think, as Matt has identified in his proposal, if he is allowed to move those beds to his agreement with the City and the plaintiffs to which the County is not a party, the County would continue to provide resources for those beds.

So I don't think it's an issue of why is the County stopping.  The County has always been committed to providing resources and, it sounds like under this proposal, would still be providing resources.  It would just be in a different framework.

THE COURT:  Okay.

JUDGE GANDHI:  Matt, with your proposal, the 2,500

that you're borrowing from the Freeway agreement, is that a temporary patch?  Optimistically if the City came into additional funds, is there a trigger that would then commit the City back to putting the 2,500?

MR. SZABO:  We hadn't -- I have not -- I have not conducted scenarios that would contemplate that.  However, our goal would be, as it is with the Freeway agreement, to overshoot, to make plans to develop more beds than the minimum required.  That's what we would do in this scenario.

So we know we can count on the 2,500 and that the services would be provided for those.  Then I can take down some of the resources that are -- that were dedicated to picking up the services after the Freeway agreement ended and dedicate that to new resources while keeping everything open.

The plan that I would submit to council would overshoot our minimum target, and our hope would be that we would exceed that.  So I don't want to -- you know, that could be something that we could discuss.

My preference would be to provide -- to give us the authority to migrate 2,500 with the understanding -- and you'll see this in a public report, that our plan would be to overshoot our minimums and hope that we can achieve those goals.

JUDGE GANDHI:  Thank you.

MR. UMHOFER:  So my other question is:  With

respect to the 2,500, that would come under the MOU with the County.  There's remaining 1,600.  Would the County -- who would be paying for the services for those remaining 1,600 beds once the Freeway agreement expires?

MR. SZABO:  Under the projections that I would provide to the council, it would be the City of Los Angeles.

MR. UMHOFER:  So the County would not be providing payment for 1,600 is my understanding, the 1,600 beds, because that agreement is expiring and the City would have to shoulder the payment for those.

THE COURT:  That's their position, but I heard something else from Mira.  I'm not tying her to this position, but this doesn't work without services and in this archaic system that's divided between the City and the County.

MS. HASHMALL:  Your Honor, may I speak to that?

THE COURT:  Please.

MS. HASHMALL:  The term services is being used with too great generality.  It's not accurate in this context.

THE COURT:  Right.

MS. HASHMALL:  We're not talking about the specialized resources that the County's department of health services, mental services, and -- that provide to put resources for individuals experiencing homelessness.

What we are talking about are the costs of the bed

and that per-night rate.  It's not services in the specialized sense.  It's janitorial.  It's cleaning.  It's kitchen.  It's stuff that just gets written on a check to the provider.

So I want to be sure we don't fall into the misunderstanding that we're talking about County services.  What we're talking about is a per-bed, per-night rate.  The providers through the entire system, my understanding not being a subject matter expert, are making a case for their costs exceeding the prior contract's amounts, and they are asking for an increase across the board.

So the County is also navigating those cost increases.  It is not just a City issue.

THE COURT:  I see.  Okay.

Shayla, do you have any questions?

MS. MYERS:  I do.  So how many of the existing Roadmap beds are time-limited subsidies or individual subsidies that aren't tied to the hard beds?

MR. SZABO:  Existing Roadmap time-limited subsidies, we're currently funding 2,163.

MS. MYERS:  Okay.  So ostensibly the funding for those will end in terms of the City counting them at the end of the Roadmap agreement, then?

MR. SZABO:  I can't project that.  There's always a need, and there will be a continuing need for the City to

fund TLS or, I should say, for TLS, for time-limited subsidies to be funded as it provides the bridge from interim housing to permanent housing and then before that individual is able to secure a long-term voucher.

So there will be a need to have a complement of rental subsidies as part of our program.  So I don't want to commit to a minimum or a maximum because that number will fluctuate, but there will without question be a component that will continue on into the future for investment in time-limited subsidies.

MS. MYERS:  And are time-limited subsidies counted towards the Alliance settlement?

MR. SZABO:  They can be.

MS. MYERS:  How many are currently counted towards the LA Alliance settlement agreement?

MR. SZABO:  None.

MS. MYERS:  None?

MR. SZABO:  No.  It's permanent housing and then the two interim sites, and there will be more that we'll be adding on the interim site.

MS. MYERS:  More time-limited subsidies?

MR. SZABO:  No.  There are more interim sites on the pipeline, but it's all -- everything that we're reporting thus far, the 4,017, is permanent housing.  And then the one interim site is the Highland Gardens.  Then the Mayfair would

be joining that number soon.

MS. MYERS:  And is there any intention after the end of the Roadmap agreement to count time-limited subsidies towards the settlement numbers?

MR. SZABO:  It's an option that is contemplated in the settlement, so we may avail ourselves of that option.

MS. MYERS:  So it could be the case that the 2,163 Roadmap time-limited subsidies after 2025 could then just simply be transferred over to the LA Alliance settlement agreement because they're not tangible.  Does the City think that that is allowable under the settlement agreement?

MR. SZABO:  That's a question for the City attorney, but what I just laid out in front of the Court was a plan for multiple types of other housing that master leasing, which would use time-limited subsidies; master leasing, congregate shelter, non-congregate, tiny homes, and hotels.

That will be the plan.  That will be the recommendation that I make to the council, and we will make funding recommendations as well to ensure that those -- that that plan would be implemented.

MS. MYERS:  So obviously -- I think you appreciate where I'm going with this -- there is the potential for these time-limited subsidies, when they expire at the end of the Roadmap, for the same dollars, the same vouchers to be

counted towards the settlement agreement.  And it doesn't seem like there's any commitment from the City not to do that, so that could be just an additional 2,163 beds that would go away?

MR. SZABO:  The conversation, that's -- you can theorize with the City attorney about what is possible and what's not possible.  I just laid out a plan for the judge and the Court that doesn't include the scenario that you've just laid out.

It's -- it's 2,500 physical beds that we would like to continue from the Roadmap and then 1,752 other forms of housing both permanent and interim that we would fund through sources available to us.

MS. MYERS:  One thing that has been unclear to me, and I apologize if it is clear to the other parties, but what counts in a City expenditure that allows a bed to be counted towards the City's obligation under the settlement agreement?

What does the City have to do towards that bed or unit?  Do they have to put forward funding for it?  Do they have to grant an entitlement?  How is it that the City participates in the creation of a bed that allows it then to be counted towards the 12,000 for the City's obligation?

MS. MARIANI:  To that point, the settlement agreement does spell out a variety of different types of housing solutions that could count towards the settlement

agreement.  It even spells out the type of sort of private or various different funding that could be used.

So that is spoken to in the agreement.  And as Mr. Szabo just pointed out, you know, sort of theoretical scenarios are not necessarily contemplated right at this moment.  However, everything that was put in the agreement are options that the City could use to fulfill its 12,915 bed requirement.

MS. MYERS:  And just to be clear, I have read the settlement agreement many times, and I have -- and again perhaps you could point us to the point where it states what the City's participation in the creation of a bed has to be in order for it to be counted, because as you stated, private beds can be counted.  Family reunification can be counted.  Time-limited subsidies can be counted.  Safe Parking can be counted, all these kinds of things.

And I don't recall, but again I'm happy if I'm wrong on this point, but an indication to the public for transparency's sake or to the Court about how these beds are being counted by the City of Los Angeles.

We're looking at your reports, and there are a number of, for example, non-proposition HHH permanent supportive housing that's being counted.  What was the City's contribution to the creation of that housing that allowed it to be counted towards the bed, to the bed count?  That's all

I'm asking.

MS. MARIANI:  And I understand the question.  I can't tell you as I sit here this moment exactly what the contribution was to each bed.  I'm happy to look into that further.  I was just speaking to the, you know, intentionally broad range of options that were negotiated that could all be counted towards the settlement agreement, because there are a variety of different housing solutions.

As you heard, hard beds, also time-limited subsidies, various types that were all contemplated because they are at the end of the day providing a housing solution for people who need it.

So if you want more detail on exactly what is in the report, we can certainly look at that, but I can tell you that if they are in the report, you know, that one we can give you the -- you know, we can give you some more detail on that.

MS. MYERS:  Your Honor, just to this point, I think as we're talking about the City's obligations under the settlement agreement being very, very clear about how the City is reaching those bed counts, I think it's critical for purposes of accountability.

We've -- the intervenors have posed this to A&M for purposes of audit questions, and certainly I think you can appreciate that was part of our question to the controller's

office about what the contribution is.

I think it really does get to an issue that the intervenors have been raising about supplantation of housing resources.  You know, many of the resources that the City has undertaken for interim housing, for interim shelter, have been supplanting existing low-income housing that already exists, either naturally occurring or protected beds for purposes of bed counts.

We know, for example, that the City of Los Angeles has taken affordable housing stock that was available and used it towards Inside Safe interim housing beds.  So for purposes of contemplating this question about whether or not the City should be allowed to yet again supplant the use of existing beds towards an obligation, we think it's critical that we understand how the City is reaching those numbers in the first place.

THE COURT:  Okay.

Matt, I want to thank you.  I'm going to go back to another matter and then come back to this issue.  So remain with me just for a moment at the lectern.

First, you folks are here from A&M, and I'm going to send out a docket at the end of the day stating somewhat the following:  This Court is requesting that the County support the City's assessment of homelessness programs.  For the A&M team to conduct a comprehensive assessment, they need

data from LAHSA or the County departments regarding the services and health and mental health programs being provided in the three initiatives -- Inside Safe, LA Alliance, and the Freeway agreement.

This Court would appreciate a response from the County by next Friday, September 6th, regarding their ability to accommodate this request so that you can modify your scope and submit a new cost estimate for the City's consideration.

Therefore, we'll get an answer pretty quick from the County in terms of their willingness or their position.

As far as this plan, Matt, I've heard rumors about it.  In other words, I know enough to know that there was some effort from your point to salvage these.  I didn't know what the response would be until today from LA Alliance or the intervenors.

I'm going to request a tentative plan by September 12th.  I want to be able to wrap my arms around this and see what that plan is before I give you an indication today.  So not September 6th but September 12th. That allows you to meet and confer with Michele, Judge Gandhi, Judge Birotte.

It gives you time to go back and talk to the homeless and poverty committee as well as the council, as well as the mayor, to make certain that that plan being put forward is the best effort on your part.

Then if there's criticism, we can get that shortly thereafter because we'll be rejoining sometime the third or fourth week of September.  Okay?

Matt, thank you very much.

MR. SZABO:  Thank you, Your Honor.

THE COURT:  Once more around the room.

LA Alliance.

MS. MITCHELL:  Thank you, Your Honor.  I do want to emphasize that the issues that were on the table that we are continuing to meet and confer about were not just those remaining 4,200 beds but also the delay of 1,933 beds that we currently have.

But again, those are issues that are -- that I don't think are ripe for judicial consideration at this time.

THE COURT:  You forewarned me about that.  Now I need to see what comes to the Court in written form.  In other words, some of these may be resolved in their discussions with Michele and Judge Gandhi and Judge Birotte, but you have to bring this to me in a form, a concrete form --

MS. MITCHELL:  Yes.  That is our intent, Your Honor.

THE COURT:  -- give a chance for the other side to respond.  But if you're going to do this, do it quickly because I probably will be requesting the mayor and the

chairman of the board at the next meeting.

MS. MITCHELL:  Will do.  Thank you, Your Honor.

THE COURT:  I don't want them to waste their time.

MS. MITCHELL:  I'm sorry.  I would like to continue.  I addressed my issues with the City, but there are some ongoing issues with the County as well.

THE COURT:  Well, put those in.  Let's get those in.

MS. MITCHELL:  So one of the major issues that has come up is with this HMIS system.  Part of the agreement with the County requires the County to provide direct access to service providers between City-funded outreach teams --

THE COURT:  Right.

MS. MITCHELL:  -- and certain departments like DMH, DCFS, et cetera.

The way the County has done that, it appears, is just adding these certain forms to HMIS.

THE COURT:  I see.

MS. MITCHELL:  So the outreach workers still are providing the exact same referral that they've always done over to these departments, but then they're documenting then on HMIS, and that is the direct access that the County has given.

Now, these issues are I don't think at this time ripe for judicial consideration.  I'm raising this for this

point only, because there are ongoing data concerns, right? Exhibit E that was submitted by the County at this last reporting cycle only reported 15 referrals in a month-and-a-half period from the City to the County, which is, you know, inexplicably low.  It makes no sense that we would only have 15 referrals from City outreach workers to County in a month-and-a-half period.

Now, we believe there's some miscounting happening accidentally.  There are glitches in the system.  Something is going on.

So the County to my understanding is separately working on that, and the City and the County are conferring. We're in the loop on that as well about the data piece.  The problem the LA Alliance has at this time is that we do not think that that suffices for direct access.  Right.

The City outreach workers in doing their job need to have direct access to DPSS, to DMH, to the Department of Public Health, to these places.  It's something we specifically negotiated for.

Faxing referrals and documenting on HMIS does not constitute direct access.  Again, I don't believe it's ripe for the Court's consideration at this time because we want to work out the data issues.  But I do think this is something that is coming to a head soon.

THE COURT:  I'm concerned about requesting the

96

mayor's presence, the chair of the board, LAHSA, unnecessarily or repetitively.  They're going to be here hopefully at our request on the next occasion because of the issues involving the auditor and some of the issues raised today.

If there's any way we can stop those kinds of repetitive requests and out of courtesy, work quickly.  And we'll pick a date, either the last week of September, maybe the first week of October.  Okay?

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  Okay.

MS. MITCHELL:  The remaining issues are simply reporting issues.  We believe that the County has an obligation to provide far more detail in their reports than are currently happening.  So, for example, their Exhibit A-1 did not report numbers of PEH accessing services.

There are a number of those things we believe that additional detail is required, and the County is at this point unwilling to provide additional detail and believes that it has met its reporting services.

So we would be filing a separate motion on that.  I just wanted to give the Court a heads-up.

THE COURT:  Okay.

MS. MITCHELL:  Thank you.

THE COURT:  Matt, anything further?

97

MR. UMHOFER:  No, Your Honor.

THE COURT:  Then I'm going to turn to somebody who's had his hand up -- I'm not sure -- but come on up here.

But I'm going to turn to either the County or the City once again.  Who would like to speak first?  Mira, would you?

MS. HASHMALL:  Your Honor, yes.  Absolutely.

THE COURT:  I don't know who you are, sir.  Come on up.  Who are you?

MR. YAP:  I'm Robert Yap, Your Honor.  I represent LAHSA.  I apologize.  I think you moved on from the audit and the website --

THE COURT:  Oh, please.

MR. YAP:  We have representatives from --

THE COURT:  We're going to need your name, and we're going to slow way down.

It's good to have you here.

MR. YAP:  Thank you, Your Honor.  As I mentioned, my name is Robert Yap.  I represent LAHSA.  We have representatives of LAHSA here today.

THE COURT:  Who?

MS. HENDERSON:  Good morning, Your Honor.  Dr. Holly Henderson.  I'm the Director of Risk Management at LAHSA.  I oversee audits.

THE COURT:  Pleasure.  Nice seeing you.

98

MS. KUHN:  Good afternoon.  Bevin Kuhn, acting deputy chief analytics officer at LAHSA, and I oversee HMIS and all of the reporting.

THE COURT:  Were you here earlier this morning?

MR. YAP:  Yes, Your Honor.  And I apologize.  We probably should have spoken up earlier when you were dealing with the audit and the website issues.  We just wanted to provide an update of our involvement with that.

THE COURT:  So, Mira, before we get to your input on this last issue, would it be acceptable to hear from LAHSA?

MS. HASHMALL:  Of course.

THE COURT:  All right -- out of courtesy.

MR. YAP:  Thank you, Your Honor.

MS. HENDERSON:  Again, I'm Dr. Holly Henderson, Director of Risk Management.  First and foremost I wanted to thank you all for allowing us to be here.  I also wanted to mention under Dr. Adams Kellum's leadership -- she's our CEO -- we remain in lockstep to support this audit.

I wanted to clarify a few things that were raised. One of the first things I wanted to raise as it relates to our collaboration in working with A&M, we have provided all of the documents except one of them which was item number 32, which we acknowledge there needed to be further clarification.  So we've been going back and forth.

For the most part we have provided most of the documents that are being sought within about four business days.  But again, we also acknowledge that some of the items do require additional clarification for us to provide.

Another thing that I would like to also clarify as it related to Controller Kenneth Mejia's statement about docs he requested on the 19th.  He requested invoices and contracts related to cash requests.  We have been in collaboration with him.

THE COURT:  Just a moment.  Is the controller here anymore?  Somebody, call him.

MS. HENDERSON:  May I proceed?

THE COURT:  Get him on the phone and get him back over here.

MS. HENDERSON:  Should I proceed?

THE COURT:  Please.

MS. HENDERSON:  Okay.  We have been in communication with him and requested if we could provide those on September 4th, which he agreed via an e-mail.

In addition, we also committed to as we have the information, we would provide it in that time frame to him in a tiered method so that everything didn't come at once.  That's why he may have received some today.

Again, he did acknowledge and agree to allowing us to provide those on September 4th.  And other than those two

requests as it relates to financial requests or other data requests, which Begin will speak on shortly, we have not received any other requests that we have not provided.

THE COURT:  Okay.  Thank you.

MS. KUHN:  I wanted to clarify about the --

THE COURT:  Your name?

MS. KUHN:  Bevin Kuhn, acting deputy chief of analytics.

For the data requested around -- also for Controller Mejia's request for the data requested -- there was no program performance data requested or program data specifically requested.

During a meeting we did demonstrate -- we understand that the data at LAHSA has been a problem. Dr. Adams Kellum understands that, and under her leadership we are really working to improve that.  In my role which I have been in in the past eight months, we are working to get more transparent and accurate data into the hands of the public.

In October we will be bringing online all of our contract performance data as well as filterable dashboards where you can dig in, and that's what he was --

THE COURT:  I hope you hear me clearly.  I hope it's before that.  I'm going to be requesting that -- listen to me carefully.  You're not working on your time frame now.

You're working on mine.  Understood?

MS. KUHN:  Yes, Your Honor.

THE COURT:  Am I clear?

MS. KUHN:  Yes, Your Honor.

THE COURT:  Number two, we're going to be assembling sometime the last week of September.  I don't know how to more plainly say it:  Get going.

MS. KUHN:  Yes.  We've already provided this data to all the auditors as requested, so we can happily do this.  I'm saying that as far as, like, the public --

THE COURT:  You've been told, and I'm clear.

MS. KUHN:  Yes, Your Honor.

THE COURT:  There's no miscommunication in my message to you.  Your director will be asked to be here when I set that date the last date in September.  You're hopefully guarding your director and hopefully getting this data immediately.  I mean now.  Understood?

MS. KUHN:  Understood.

THE COURT:  All right.  Thank you.

Okay.  I want to thank each of you for your courtesy being here.  I'm sorry that the controller wasn't here.  I didn't know you were present.

All right, counsel, once more time around the room.  If there's nothing else, then we're going to --

MS. HASHMALL:  Can we go back to the County?

THE COURT:  My apologies.  Back to the County.

MS. HASHMALL:  Thank you, Your Honor.

So I just want to note that the County's report was filed about a month ago, and it demonstrates full and complete compliance with the settlement agreement.  This is the first I'm hearing that Ms. Mitchell has concerns.  I'm happy to talk with her offline if she'd like to ask any questions about the recent report.

As it relates to the issue regarding the City-funded outreach workers, the contract is clear that the City is supposed to provide information about referrals made, and then the County is going to account for the outcome of those referrals.

These are referrals that are happening in realtime between outreach workers and their contacts at the various applicable county departments at mental health, at health services.  And this -- the reason that we modified the HMIS system, which is the subject of federal regulation -- and so I know we keep hearing it's archaic and it's cumbersome.

It's not ours.  It's a federally mandated system for this type of programming.  We modified it so that the City-funded outreach workers, after they've done the referrals, could document it.  And through that documentation the County can report under its settlement agreement the outcomes.

There seems to be some concerns about potential glitches.  Are their folks using it correctly?  Are the right individuals' referrals being tracked accurately?  That's the product of ongoing conversations between the City and the County to make sure that everyone is reporting what's expected and that we're as accurate and as complete as possible.

The second thing that was referenced relates to more details in the reports.  The contract was very carefully negotiated, and the County has specific, very detailed reporting obligations that it is complying with.

The reality is that sometimes individuals have questions and want more detail, and we're happy to answer questions, but we have to keep in mind the reporting obligations were agreed to for a reason.

There is always a balance.  Sometimes reporting for the sake of reporting is a huge drain on resources for individuals who are doing this difficult work all day every day.  So we struck that balance when we wrote that contract with very experienced counsel on both sides, and the County would like to focus its resources on the work and not the reporting for the sake of reporting.

That said, we also have a process where concerns about any of this reporting are supposed to be addressed offline and in a productive way so we don't burden the Court

with motions that sort of come out of left field.

So I'm going to reach out to our counterparts on the plaintiff's side and make sure we can talk about these issues and hopefully not burden you with any disputes that are unnecessary.

THE COURT:  Okay.  Mira, thank you very much.

Any other comments by the City or the County before I turn to Shayla?

MS. MARIANI:  Yes, Your Honor.  Just to pick up on what Ms. Hashmall is saying, you know, we share the sentiment that reporting for the sake of reporting is not useful or productive and takes away from the real work.

However, the reporting in the County's settlement agreement with the plaintiffs does serve an important purpose, which is to ensure or at least help us to be able to ensure that the substantive obligations are actually being met, and that does include the direct access to services and specialized beds that the County provides.

So, for example, one thing that Ms. Mitchell pointed out was that the Exhibit A-1 to the County's report does not provide the number of PH actually accessing the County's department services at the city's Highland Garden site.

That's critical because the only number that's provided in that exhibit is the 143 beds that the City has

brought online, but we need to be sure that the people in those beds are actually receiving important services that they need.

So we need to have that information reported as well, and that's just one example.  We are working with the County, and we certainly hope to continue our dialogue with them.  And we very much appreciate the assistance of the Special Masters in those discussions so that we can really get the reporting that we think is necessary.

To the HMIS issue, there do appear to be sort of two buckets of issues.  One could be glitches and sort of more technical ramp-up, I'll call them, problems with a new system, with these new fields.

But there is, as the City sees it, another bucket that is a more fundamental problem with the HMIS fields, the way they're set up, just not being designed to capture all contacts or service support requests from City-funded outreach workers.

It sounds at least as we're hearing it that it is only for direct referrals made from City-funded outreach workers directly to County departments, and so that's another issue that we think is important that we need to get to the bottom of.

THE COURT:  And what drives the improvement of that?  In other words, what moves us forward in a positive

way in making these HMIS fields manageable?

MS. MARIANI:  We certainly --

THE COURT:  In other words, where's my central authority who's going to push this?  It's LAHSA; isn't it?

MS. MARTINEZ:  It is LAHSA.

THE COURT:  And where's LAHSA?  Come on up here, please.  Now, Michele is going to ask you a question.

MS. MARTINEZ:  I know that the City and County will be working with you.  I'm not sure if they've even given you notice yet.  But from our conversation yesterday, they are seeking some full rosters of clients in each of these sites, and they're saying that that's going to come from LAHSA.

If that is the case, is LAHSA supportive of helping the County provide that information to the City and the City's providing certain information to the County so that they can report accurately the numbers?

MS. HENDERSON:  Again, Dr. Holly Henderson, Director of Risk Management.  Absolutely we are supportive. We got the request about 4:15, 4:30 last night, and I had my team on it first thing this morning.  So they should be getting that information if not already by COB today.

We've remained cooperative, and, yes, we'll provide.

MS. MARTINEZ:  Great.  Thank you.

THE COURT:  Okay.  Shayla?

MS. MARIANI:  Your Honor, if you don't mine, if I could just also address --

THE COURT:  Oh, I'm sorry.  City.

MS. MARIANI:  Sorry.  I just also wanted to quickly address a couple of other points that Ms. Mitchell made with respect to our agreement.

THE COURT:  Just a movement.  If she brings this motion, you may be joining her in this motion.

MS. MARIANI:  With respect to the County.  I am now shifting to the issues that she raised with respect to the City's settlement agreement with LA Alliance.  I won't really touch on the beds since Ms. Mitchell did represent that we're still working through that issue.

However, as to the other issue that she raised, it is the first time that we're hearing this, and it's surprising because we have been in talks with you.  What you had represented to us previously was that your understanding was we were meeting our goal on encampment reduction.  You just were seeking addresses to verify that.

That's a different issue than what you -- at least a different framing than what you did today.  And maybe that is the issue, but you seem to make it sound as though you now are contending that we may not even be meeting our encampment reduction goals.

So to that point I would say I actually don't think

that that issue is ripe for the Court at this stage.  I'm happy to engage with you further on that if you wish to pursue it.

MS. MITCHELL:  Quickly may I respond to that, Your Honor?

So you were correct to think it was a framing issue.  We're not talking about the numbers of resolutions at this time.  We are talking about locations because of the verification, because we are concerned that resolutions aren't actually happening to the extent that we are being told they are happening.

So it is only the locations issue that we've been going back and forth that we've been talking about.

MS. MARIANI:  I see.  Okay.

And the only additional point I would make to that is the City disagrees that we're not doing them or that we are required to provide the addresses.  You know, even I believe Special Master Martinez has been out in the field and seeing the encampment reductions occurring.

THE COURT:  Listen to this.  There's not an issue until you bring it to the Court in writing.

MS. MARIANI:  Understood.

THE COURT:  Everybody is airing their potential issues, but this isn't an issue until it's brought to the Court.

MS. MARIANI:  Understood.  Thank you, Your Honor.

MS. MARTINEZ:  I also want to make it very clear as the Special Master that the other points that you guys are working out, I made it clear to the Court that you all will be conferring still on those issues, in particular to the data and working with LAHSA.

But on the issues in regards to the interpretation of your requirements and your obligations of reporting, that's not something that Judge Birotte or the Special Masters at this point can be helping any longer.

So it is up to the plaintiffs if they want to submit something officially to Judge Carter to address, but at this point I made it very clear to you all yesterday and also to Judge Carter in the evening that we will no longer be discussing that issue.

That has to come before the Court now, and it's going to be up to Judge Carter to decide what obligations you have as it pertains to reporting.

THE COURT:  Okay.  Then, go ahead.

MS. MITCHELL:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Then Shayla.

MS. MYERS:  No comments, Your Honor, in light of Ms. Martinez's comments.

THE COURT:  I think that's enough for today if it's acceptable with all of you.  I just want to humbly thank you

for your transparency and your willingness to quite frankly get these disputes out in the open.

I don't want this to come as a last-moment issue where the auditors, for instance, come to me in October, for instance. So along the way hopefully we can adjust and speed this along in an appropriate way.

The Court is here to support you, as you know. From now on all these requests come from the Court. You're done bickering and bargaining with the entities.

I'm going to ask Michele to reach out to you and Judge Gandhi concerning your most convenient date, but you know my expectations that now we have the policy and decision makers with us on the next occasion.

Anything that you can do to help your clients in that regard I think they will appreciate.

Okay. Have a good day.

(Proceeding concluded at 12:22 p.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


/s/ Miriam V. Baird                    09/04/2024

MIRIAM V. BAIRD                              DATE
OFFICIAL REPORTER