

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION – LOS ANGELES

LA ALLIANCE FOR HUMAN RIGHTS, ET AL.,               )
)
)
PLAINTIFFS,               )
)
vs.               )          CASE NO. 2:20-CV-02291-DOC-KES
)
CITY OF LOS ANGELES, ET AL.,)          LOS ANGELES, CALIFORNIA
)          OCTOBER 2, 2024
DEFENDANTS.               )          (9:07 A.M. TO 11:26 A.M.)
)          (11:37 A.M. TO 11:42 A.M.)

SESSIONS 1 AND 2

STATUS CONFERENCE
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES  DISTRICT JUDGE

APPEARANCES:               SEE NEXT PAGE

COURT REPORTER:               RECORDED, COURTSMART

COURTROOM DEPUTY:               KARLEN DUBON

TRANSCRIBER:               DOROTHY BABYKIN
COURTHOUSE SERVICES
1218 VALEBROOK PLACE
GLENDORA, CALIFORNIA   91740
(626) 963-0566

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

APPEARANCES:


FOR PLAINTIFF LA ALLIANCE FOR HUMAN RIGHTS, ET AL.:

        UMHOFER MITCHELL & KING LLP
        BY:  ELIZABETH ANNE MITCHELL
           MATHEW DONALD UMHOFER
           ATTORNEYS AT LAW
        767 SOUTH ALAMEDA STREET
        SUITE 270
        LOS ANGELES, CALIFORNIA  90021


FOR DEFENDANT LA CITY ATTORNEY'S OFFICE:

        LOS ANGELES CITY ATTORNEY'S OFFICE
        BY:  ARLENE HOANG
        DEPUTY CITY ATTORNEY
        CITY HALL EAST
        200 NORTH MAIN STREET
        ROOM 675
        LOS ANGELES, CALIFORNIA  90012

        LOS ANGELES CITY ATTORNEY'S OFFICE
        BY:  JESSICA MARIANI
        DEPUTY CITY ATTORNEY
        BUSINESS AND COMPLEX LITIGATION
        CITY HALL EAST
        200 NORTH MAIN STREET
        ROOM 675
        LOS ANGELES, CALIFORNIA  90012

               :

APPEARANCES:  (CONTINUED)


FOR COUNTY OF LOS ANGELES:

MILLER BARONDESS LLP
BY:  JENNIFER MIRA HASHMALL
       ATTORNEY AT LAW
2121 AVENUE OF THE STARS
SUITE 2600
LOS ANGELES, CALIFORNIA  90067


FOR INTERVENOR:

SHAYLA MYERS
LEGAL AID FOUNDATION OF L.A.
1550 WEST 8TH STREET
LOS ANGELES, CALIFORNIA  90017


SPECIAL MASTERS:

MICHELE MARTINEZ


SPEAKERS:

DIANE RAFFERTY
ALVAREZ & MARSAL

LAURA COLLIER
ALVAREZ & MARSAL

I N D E X

2:20-CV-02291-DOC-KES                                    OCTOBER 2, 2024

PROCEEDINGS:   MOTION FOR ORDER FOR SETTLEMENT AGREEMENT

COMPLIANCE (767); STATUS CONFERENCE

Dorothy Babykin Courthouse Services
1218 Valebrook Place  •  Glendora, CA 91740  •  626.963.0566  •  dotnisbet@aol.com

LOS ANGELES, CALIFORNIA; OCTOBER 2, 2024; 9:07 A.M.

THE COURT:  COUNSEL, JUST REMAIN SEATED.

LET'S BEGIN WITH LA ALLIANCE.

AND YOUR APPEARANCE, PLEASE.

MR. UMHOFER:  OH, SORRY, YOUR HONOR.  GOOD MORNING.

MATTHEW UMHOFER ON BEHALF OF THE LA ALLIANCE.

THE COURT:  OKAY.

IS ELIZABETH GOING TO BE HERE TODAY?

MR. UMHOFER:  SHE'S  -- SHE IS ON HER WAY.

THE COURT:  OKAY.  FINE.

NOW, ON BEHALF OF THE CITY.

MS. HOANG:  GOOD MORNING, YOUR HONOR.

ARLENE HOANG, DEPUTY CITY ATTORNEY.

THE COURT:  NICE SEEING YOU AGAIN.

MS. MARIANI:  GOOD MORNING, YOUR HONOR.

DEPUTY CITY ATTORNEY JESSICA MARIANI.

THE COURT:  IT'S A PLEASURE.

MS. HASHMALL:  GOOD MORNING.

MIRA HASHMALL FOR THE COUNTY OF LOS ANGELES.

THE COURT:  JUST REMAIN SEATED.  THAT'S FINE.  THAT WAY WE CAN PICK UP YOUR VOICES.

IT'S GOOD SEEING YOU, MIRA.

I WANT TO THANK THE INTERPRETERS AND THE BOARD OF SUPERVISORS, ESPECIALLY RECOGNIZE LINDSAY HORVATH.  I HAVE NO JURISDICTION OVER YOU.  SO, IT'S APPRECIATED THAT YOU'D

VOLUNTARILY APPEAR.  AND I WANT TO PUT THAT ON THE RECORD.

MS. HORVATH:  GOOD MORNING, YOUR HONOR.

THE COURT:  ON BEHALF OF – SHAYLA.

MS. MYERS:  SHAYLA MYERS ON BEHALF OF THE INTERVENORS.

THE COURT:  ALL RIGHT.

ONE OF THE THINGS THAT WE HAD HOPED TO ACCOMPLISH WHEN MAYOR BASS PLEDGED TO A THIRD PARTY AUDIT ALONG WITH THE CHAIRMAN OR  -- I'M SORRY, THE PRESIDENT OF THE L.A. CITY COUNCIL, WAS AN AUDIT THAT WOULD BE TIMELY AND COST EFFICIENT BUT BE BROAD ENOUGH.

BECAUSE HISTORICALLY THE CITY HAD TAKEN THE PLACE THAT IF THE PROGRAM WAS UNDER THE MAYOR'S AUSPICES, THAT THERE COULDN'T BE AN AUDIT.  AND THERE'S SOMEWHAT OF A CONFLICT BETWEEN THE CONTROLLER AND MATT ZAEBO AND THE CITY CONCERNING THE AUTHORITY OF THE CONTROLLER.

THE AUDIT BY A&M ORIGINALLY HAD A PRICE OF 2.6 OR 2.7 TO 4.1 OR 2.  AND I'M OFF A LITTLE BIT IN TERMS OF THE NUMBERS.

THE CITY COUNCIL CHOSE TO COME BACK AND VOTE 2.2, ABOUT 500 TO 600 THOUSAND DOLLARS UNDER THE AMOUNT.

NOT ONLY ARE YOU ENTITLED TO DO THAT, YOU HAVE THE PURSE STRINGS IN A SENSE.  THE COURT DOESN'T.

BUT AT THAT TIME I WAS CONCERNED ABOUT JUST THE MINIMUM NUMBER NOT BEING PUT FORTH BY THE CITY.  BUT I WAS WORRIED ABOUT ANY EXPANSION.  AND MS. MYERS VERY EFFECTIVELY PERSUADED THE COURT LAST TIME THAT THIS AUDIT COULDN'T BE

COMPLETE WITHOUT THE POLICE BEING AUDITED.

AND AFTER LISTENING TO THAT, I ABSOLUTELY AGREE.

SO, HOPEFULLY THE INCREASE IS MODEST.  AND I WANT TO THANK THE COUNCIL AND CONVEY THAT BACK TO THEM.  THEY TOOK THAT UP IMMEDIATELY, ASKED THAT SUM OF MONEY, WHICH STILL IS UNDER THE MINIMAL 2.7 THAT A&M STATED THAT THEY COULD CONDUCT THE AUDIT FOR.

I DON'T WANT THIS AUDIT IN NOVEMBER TO CATCH ANY OF US BY SURPRISE.  SO, WE'VE HAD ONE A&M UPDATE ALREADY.  AND I'D LIKE YOU TO LISTEN TO A LITTLE BIT OF THE INFORMATION THAT I RECEIVED AND MY SPECIAL MASTER HAS RECEIVED FROM THE AUDITORS TODAY SO THAT COME NOVEMBER YOU MIGHT AS WELL -- ON THE CITY'S SIDE.

AND IF WE'RE RUNNING INTO PROBLEMS WE TRY TO RESOLVE THOSE NOW EFFICIENTLY AND HAVE THAT DISCUSSION OPENLY TODAY.

I KNOW THAT MAYOR BASS CAN'T BE HERE.  SHE WOULD NORMALLY BE HERE.  APPARENTLY SHE'S IN MEXICO.

BUT HER STAFF  -- WOULD YOU JUST RAISE YOUR HAND. YOU'RE HERE WITH OUR APPRECIATION.

I ALSO KNOW THAT THERE'S BEEN AN INFORMAL BACK CHANNEL THAT THERE MAY BE A REQUEST FOR A TWO-WEEK EXTENSION TODAY.

IS THAT RIGHT, MICHELE?

SPECIAL MASTER MICHELE MARTINEZ:  UH-HUH.

THE COURT:  AND, MICHELLE, WOULD YOU EXPLAIN THAT REQUEST.

SPECIAL MASTER MICHELLE MARTINEZ:  WELL, I WOULD WAIT UNTIL  --

THE COURT:  OH, I'LL WAIT TILL WE GET THERE.

ALL RIGHT.  I'D LIKE A&M TO COME FORWARD AND MAKE YOUR PRESENTATION TODAY.

AND THIS IS AT THE COURT'S REQUEST.

I ALSO WANT TO RECOGNIZE THE AUDITOR/CONTROLLER BEING HERE.  I DIDN'T SEE YOU.

THANK YOU VERY MUCH.

AND I LOOK FORWARD TO YOUR PRESENTATION.

AND, REMEMBER, THERE'S TWO AUDITS IN A SENSE TAKING PLACE.

ONE IS WHAT I'M GOING TO CALL THE A&M AUDIT.  THAT'S LOOKING BACKWARDS TO WHERE AND HOW THE MONEY WAS SPENT.

AND I THINK MAYOR BASS AND I SHARE THE SAME.  AND I THINK MS. HORBATH DOES ALSO -- HORVATH DOES ALSO.  BUT I HAVEN'T SPOKEN TO YOU ABOUT THAT IS THAT WE CAN'T MAKE EFFECTIVE DECISIONS ON THE CITY AND COUNTY'S PART UNLESS WE KNOW WHERE THAT MONEY IS GOING, HOW IT'S BEING SPENT, WHAT THE RESULTS ARE.  OTHERWISE WE'RE JUST VOTING MONEY.

THE COURT HAD HAD A HEARING IN 2022 IN WHICH WE BELIEVED AND MADE A RECORD THAT TENS OF MILLIONS OF DOLLARS, IF NOT HUNDREDS OF MILLIONS OF DOLLARS, HAD BEEN UNACCOUNTED FOR IN THE 2019 TIMEFRAME.  AND IT CAUSED US GREAT CONCERN.

THE SECOND PART OF THE AUDIO IS NOT AN AUDIT.  IT'S WHAT I

CALL "A GOING FORWARD." IT'S AN ATTEMPT TO HAVE TRANSPARENCY AND HAVE A WEBSITE WHERE IF WE RECEIVE AN INVOICE, WE ALSO RECEIVE --

(BRIEF INTERRUPTION IN PROCEEDINGS.)

THE COURT: I WANT TO RECOGNIZE THE PRESIDENT OF THE COUNCIL HARRIS-DAWSON.

SIR, COME UP AND BE COMFORTABLE. IT'S NICE TO HAVE YOU HERE. VERY MUCH APPRECIATED. I KNOW THE MAYOR CAN'T BE HERE TODAY.

THE SECOND PART OF THIS IS WHAT I CALL "GOING FORWARD."

LET'S JUST ASSUME THAT THAT MONEY HAS BEEN SPENT, THAT WE'RE NOT GOING TO GET THAT MONEY BACK, THAT THERE COULD BE CRITICISM, ET CETERA.

REGARDLESS, GOING FORWARD THE INVOICES SHOULD HAVE THE SUBSTANTIATING PAPERWORK FOR WHAT THAT INVOICE STANDS FOR.

AND WE'VE SEEN TOO MANY INVOICES WITH A ONE-LINE WITH A REQUEST FROM DIFFERENT AGENCIES. AND I WON'T EMBARRASS THEM TODAY. ONE LONE DATE, NO SUBSTANTIATING INFORMATION.

AND WE COULD SPECULATE THAT THIS WAS SET UP BY PROVIDERS TO GET PAID AND IT WAS PROVIDER ORIENTED.

GOING FORWARD IT SEEMS THAT WE SHOULD HAVE TRANSPARENCY WITH THESE INVOICES THAT THE CITY AND THE COUNTY MAY BE PAYING. AND THAT WE SHOULD KNOW WHAT THE UNDERLYING WORK WAS THAT WAS PERFORMED SO ONCE AGAIN YOU CAN MAKE GOOD

DECISIONS ON BEHALF OF THE CITY AND THE COUNTY.

SO, THERE'S TWO THINGS TAKING PLACE TODAY.

YOU'RE ABOUT TO HEAR FROM A&M, AND THAT'S WHAT I CALL THE BACKWARDS-LOOKING AUDIT, WHAT HAPPENED ON THE ROME APP AGREEMENT, THE LA ALLIANCE AGREEMENT AND INSIDE SAFE.

AND THEN GOING FORWARD, THEY HOPEFULLY WOULD PUT OUR PROVIDERS ON NOTICE SO THAT THEY CAN GET THOSE DOCUMENTS IN GOING FORWARD SO YOU CAN SEE HOW THIS MONEY IS BEING SPENT. AND THAT THIS IS TRANSPARENT AND ON A PUBLIC WEBSITE.

SO, I'M GOING TO TURN THIS OVER.  I CERTAINLY KNOW EACH OF YOU.  BUT WOULD YOU STATE YOUR NAME SO THE PARTIES KNOW WHO YOU ARE.

MS. RAFFERTY:  GOOD MORNING, YOUR HONOR.

I'M DIANE RAFFERTY FROM ALVAREZ & MARSAL.

MS. COLLIER:  GOOD MORNING.

LAURA COLLIER FROM ALVAREZ & MARSAL.

THE COURT:  NOW, ON THE ZOOM THERE'S A NUMBER OF PEOPLE.  YOU DON'T HAVE TO IDENTIFY YOURSELF.   BUT, DAVID, I SEE JUST A SMALL PORTION OF THE GROUP WITH A&M THAT'S WORKING ON THIS PROJECT.  I KNOW THEY'RE FROM NEW YORK TO DALLAS RIGHT NOW.

SO, I'M JUST GOING TO HAVE YOU START.  WE'VE HAD A CONVERSATION THAT'S BEEN BRIEF.  SO, I KNOW A LITTLE BIT ABOUT WHAT YOU'RE GOING TO SAY, BUT I DON'T THINK I KNOW THE TOTALITY TODAY.

PLEASE.

MS. RAFFERTY:  THANK YOU, YOUR HONOR.

I'LL START AND I'LL LET LAURA GO AHEAD AND MAKE THE REPORT.

WE DID WANT TO STATE THAT WE'VE TALKED TO A LOT OF PEOPLE IN THIS ROOM.  AND OUR JOB, YOU'RE RIGHT, CORRECT, IS TO LOOK BACKWARDS, TO UNDERSTAND THE PROCESSES THAT HAVE BEEN PUT IN PLACE.  SO, WHEN WE LOOK AT A FINANCIAL AUDIT, OPERATIONAL AUDIT, TO UNDERSTAND WHERE THE DOLLARS COME FROM, HOW THEY'RE ALLOCATED, THE RECORDKEEPING OF THAT.

AND AT THE END OF THE DAY, HOW DID IT REACH THE PEOPLE THAT THEY'RE MEANT TO REACH.

THE COURT:  OKAY.

AND IF AT ANY TIME YOU NEED A CHAIR, JUST SLIDE IT OVER. BECAUSE I WANT TO HEAR THE REPORT IN DEPTH.

SO, WHEN YOU SPEAK, YOU AND DIANE, I NEED THAT MICROPHONE A LITTLE BIT CLOSER.  I WANT EVERYBODY TO HEAR YOU. YOU'VE GOT SOFT VOICES.

(LAUGHTER.)

SO, WHY DON'T YOU START WITH YOUR PRESENTATION TODAY.

AND THEN I'LL THROW THIS OPEN FOR  QUESTIONS.

MS. COLLIER:  OKAY.  ABSOLUTELY.

SO, OUR CURRENT FIELD WORK HAS BEEN PRIMARILY FOCUSED AT THIS POINT IN TIME WITH INTERIM HOUSING AND CARE-PLUS OPERATIONS AND OUTREACH.

WE HAVE NOT HAD A CHANCE TO REALLY DIG INTO PERMANENT HOUSING AT THIS TIME.  IT HONESTLY HAS BEEN A CHALLENGING ENDEAVOR.  SO, FOR EXAMPLE, THE 2,130 BEDS THAT ARE TIME – SUBSIDIES REPORT UNDER THE ROAD  MAP PROGRAM TO THE COURT.

WE'RE TRYING TO UNDERSTAND WHERE ARE THOSE BEDS, WHAT HAS THE CITY FUNDED FOR THOSE BEDS, AND WHAT PROVIDER IS PROVIDING SERVICES.

FROM THE INTERIM HOUSING WE WENT TO -- AND THE OUTREACH AND CARE-PLUS OPERATIONS APPROXIMATELY 18 SITES.  AND SO WE WANTED TO FULLY UNDERSTAND WHAT SERVICES WERE BEING PROVIDED AND THE QUALITY OF THOSE SERVICES.

FROM JUST A HIGH LEVEL OF OUR PRELIMINARY FINDINGS WE NOTED INCONSISTENCIES IN SERVICES OFFERED DUE TO A LACK OF CLEAR STANDARDS  --

NO, GO AHEAD.

MS. RAFFERTY:  AND WHAT WE MEAN IS THAT THE WAY CONTRACTS WERE PUT TOGETHER  --

THE COURT:  RIGHT.

MS. RAFFERTY:  -- FOR THE SERVICE PROVIDERS, THERE'S NO CONSISTENT DEFINITION OF WHAT IS STORAGE, WHAT IS A SHOWER, WHAT IS A HOT MEAL.

SO, THERE'S NO DEFINITION.  AND IT WINDS UP BEING THE SERVICE PROVIDER DEFINING THOSE FOR THE PEOPLE THAT THEY'RE SERVING.

SO, WE SAW A LOT OF INCONSISTENCIES BECAUSE THE

CONTRACTS WERE NEVER WRITTEN TO BE SPECIFIC AND TO BE ABLE TO BE MEASURABLE.

GO AHEAD.

MS. COLLIER:  THANKS, DIANE.

ONE OF THE REASONS, AND TO ADD ON TO THAT, RIGHT, THESE INCONSISTENCIES POSE A MULTITUDE OF RISKS THAT HINDER OVERALL EFFECTIVENESS -- SO, LEADING TO UNEQUAL EXPERIENCES OR PERCEPTIONS OF INEQUITY.  BUT IT'S THE REALLY THE PARTICIPANTS WHO SUFFER.

AND SO, FOR EXAMPLE, WE'RE HAPPY TO GO INTO EXACTLY WHAT DIANE HAD JUST COVERED.  SO, IF THE SERVICE IS STORAGE, WHAT IS THAT EXPECTATION.  IS THAT A CUBIC FOOT.  IS IT PARTICIPANTS ARE ALLOWED TWO 10-GALLON BAGS.  AND THEN OUTSIDE OF THAT, WHAT IS THAT EXPECTATION THAT PROVIDERS SHOULD BE GIVING THEM.

IF THE SERVICE IS SHOWERS, IS THE EXPECTATION TO HAVE A CLEAN OPERATIONAL SHOWER.  WE SAW -- OF HIM IN A WHEELCHAIR INQUIRE WHEN A SHOWER WOULD BE FIXED BECAUSE THERE WAS NO SHOWER HEAD FROM THE SHOWERS THAT WE SAW DUE TO ALLEGED PROPERTY DAMAGE OF PARTICIPANTS.

IF THE SERVICE IS LAUNDRY, WHAT IS THAT EXPECTATION.  IS THAT JUST A PARTICULAR TIME AND DAY THAT A PARTICIPANT HAS ACCESS TO A WASHER AND DRYER.

WHAT'S THE CONSEQUENCE IF THERE'S NOT EVEN A LAUNDRY FACILITY ON SITE THAT'S OPERATIONAL.

WHAT'S THE EXPECTATION OF TRANSPORTATION.  IF IT'S

EXPECTED THAT YOU'LL ACCOMPANY PARTICIPANTS TO THEIR APPOINTMENTS.  HOW IS THAT MONITORED AND HOW IS THAT OUTLINED TO MAKE SURE THAT SERVICE IS RENDERED.

MS. RAFFERTY:  SO, PART OF WHAT WE'RE SEEING IS THE INCONSISTENCY OF THE SERVICES BEING PROVIDED.  ASKING A LOT OF HOW ARE THESE SERVICES AUDITED.  NORMALLY IF YOU HAVE A CONTRACT WITH SOMEBODY YOU WANT TO KNOW THAT THAT CONTRACT IS BEING FULFILLED AS WRITTEN.

AND THERE DOESN'T SEEM FROM OUR EXPERIENCE  -- AND THE PROVIDERS THAT WERE CHOSEN WERE REALLY -- AND WE KNOW IT'S A SMALL PERCENTAGE AND WE ARE GOING TO BE DOING MORE FIELD WORK.  BUT WE ALSO UNDERSTAND THAT THE CHOICES WERE MADE BASED ON THEIR FUNDING, THE AMOUNT OF FUNDING THEY RECEIVED.

SO, THAT'S WHERE WE STARTED.  AND NOT ONLY TALKING TO THE SERVICE PROVIDERS ON SITE BUT ALSO THE RESIDENTS THAT ARE STAYING IN THOSE AREAS -- WHAT SERVICES HAD BEEN PROVIDED.

AND WE ALSO KNOW THAT'S ANECDOTAL.  WE ALSO KNOW THAT A LOT OF PEOPLE THAT ARE RECEIVING THESE SERVICES ARE EXTREMELY UPSET.

THE COURT:  UH-HUH.

MS. RAFFERTY:  THEY FEEL NEGLECTED.  AND, SO, WE DO GET A LOT OF EMOTION THAT COMES OUT OF THIS.  BUT THERE'S TRUTH TO THE EMOTION.  AND WHEN THEY GIVE US PARTICULARS LIKE LAURA WAS SAYING ABOUT SHOWERS, OR I CAN'T – IF I'M 10 MINUTES LATE BECAUSE I'M TRYING TO GET A JOB, I DON'T GET MY HOT MEAL.

THERE'S JUST -- IT'S ONGOING.  IT'S HEART-BREAKING, YOUR HONOR.  IT IS HEART-BREAKING.

AND I WOULD ENCOURAGE EVERYONE TO GO OUT AND EXPERIENCE THIS.  IT'S NOT JUST PASSING TENTS WITH YOUR CAR.  THESE ARE PEOPLE THAT ARE NOW IN THE SYSTEM.

GO AHEAD.

MS. COLLIER:  THANK YOU.

ADDITIONALLY, WHAT I WANT TO ALSO ADD TO WHAT DIANE JUST MENTIONED WAS GAPS IN UNDERSTANDING THE NEEDS OF PARTICIPANTS.

SO, FOR EXAMPLE, IF A PARTICIPANT HAS A TRAUMATIC BRAIN INJURY AND IS UNABLE TO MAKE IT TO MEAL TIME, HOW ARE PROVIDERS ABLE TO ACCOMMODATE THAT RESPECTIVE PARTICIPANT, WHICH IS SOMETHING THAT WE HAD HEARD WHERE SHE WOULD HAVE TO PROCESS YOU IN ORDER TO AFFORD FOOD BECAUSE THEY'RE UNABLE TO ACCOMMODATE.

IF THERE'S SOMEONE WHO'S FORCIBLY EXITED BECAUSE OF THEIR BEHAVIOR.  IF THEY HAVE A SUBSTANCE USE DISORDER OR THEY ARE UNABLE TO CLEARLY COMMUNICATE DUE TO THEIR DISABILITY THEY CAN BE FORCIBLY EXITED FROM A PROGRAM.

HOW ARE CASE MANAGERS AND WHAT IS THEIR LOAD.  AND IT FURTHER GIVES US INSIGHT INTO THE IMPORTANCE OF UNDERSTANDING THE NEEDS OF PARTICIPANTS, NOT ONLY IN THE CARE AND HELPING THEM ACHIEVE THEIR GOALS TO OBTAINING PERMANENT HOUSING OR AFFORDABLE HOUSING, BUT THEN ALSO WHILE THEY ARE IN THE INTERIM

HOUSING BED, WHAT DO THEY NEED AND HOW THEY CAN BEST BE GIVEN THE CARE TO HELP THEM GET TO A STABLE POINT IN THEIR LIFE.

MS. RAFFERTY:  AND WE RECOGNIZE THIS IS A HUGE ISSUE. LOS ANGELES AND L.A. COUNTY IS -- YEAH, WE'VE TALKED ABOUT THIS -- IT'S LARGER THAN RHODE ISLAND.  WE UNDER-  -- AND IT'S A LARGE POPULATION.

BUT IF YOU LOOK AT FROM OUR PERSPECTIVE THE AMOUNT OF EFFORT, FUNDING AND PEOPLE INVOLVED WITH THIS, WE'RE HAVING DIFFICULTY UNDERSTANDING WHY THE RESULTS AREN'T MEASURABLE AND EASILY SEEN.  WE RECOGNIZE THAT.

WE KNOW THAT L.A. COUNTY IS NOT PART OF OUR SCOPE AT THIS TIME.  WE DO THINK IT SHOULD BE.  IT'S REALLY UP TO THE COURT. BUT BECAUSE THEY PROVIDE VITAL SERVICES FOR THIS POPULATION IT'S INTERTWINED.

SO, KNOWING THAT WE'RE NOT – IT'S NOT WITHIN OUR SCOPE AND IT'S NOT AN APPROVED SCOPE AT THIS TIME, WE HAVE WORKED WITH THE COUNTY.  AND THEY'VE BEEN VERY GOOD ABOUT TALKING WITH US AND HAVING OPEN DIALOGUE.

AND IF WE DO GO TO AN AUDIT WITH THEM, WE WANTED TO LET THEM KNOW WHAT THOSE QUESTIONS WOULD BE.  BECAUSE IF IT DOES GET APPROVED, WE DIDN'T WANT A DELAY IN TRYING TO INTRODUCE OURSELVES AND KIND OF UNDERSTAND THEIR PROCESSES.

WE'VE  ASKED SOME QUESTIONS THAT -- AND I DON'T KNOW IF ANYBODY HAS THE ANSWER TO.  IF SOMEONE COMES INTO THE SYSTEM AND THE REFERRAL GOES TO THE COUNTY FOR SERVICES -- OKAY.  WE

KIND OF UNDERSTAND. THAT PERSON IS IDENTIFIED FOR THOSE SERVICES. BECAUSE L.A. COUNTY IS SO BIG IF SOMEONE IS IN TEMPORARY HOUSING AND BECAUSE THEY HAVE NO STORAGE HAS TO TAKE A BUS 30 MILES TO USE STORAGE, AND THEN DECIDES TO STAY IN THAT LOCATION, HOW DO YOU KEEP TRACK OF PEOPLE THAT ARE PROVIDED -- THESE SERVICES ARE SUPPOSED TO BE PROVIDED.

WE UNDERSTAND A LOT OF PEOPLE DON'T HAVE CELL PHONES. BUT THE QUESTION WE SAID IS IF YOU MOVE FROM ONE DISTRICT TO ANOTHER DISTRICT AND YOU'RE BEING -- YOU KNOW, NOW YOU'RE BEING REFERRED TO THE COUNTY AGAIN, WHAT IS THAT RECORD OF MR. JONES. MR. JONES NEEDED SUBSTANCE USE TREATMENT. MR. JONES NEEDED THESE KIND OF SERVICES TO SURVIVE.

WE'RE STILL TRYING TO UNDERSTAND THAT GAP. BECAUSE WE ALSO KNOW THIS POPULATION IS TRANSIENT. NOT EVERYBODY STAYS IN THE SAME AREA.

AND, SO, ONCE YOU'RE IN THE SYSTEM, HOW DO YOU -- HOW ARE YOU RECOGNIZED THAT YOU RECEIVE SERVICES IN ONE DISTRICT AND NOW YOU'RE LIVING IN ANOTHER DISTRICT.

I'M NOT SAYING IT'S NOT HAPPENING. WE JUST HAVEN'T GOTTEN TO THE ROOT OF THOSE QUESTIONS. BECAUSE A LOT OF THESE CLIENTS AND RESIDENTS -- AND I CALL THEM PATIENTS. AND I ALWAYS HAVE TO CORRECT MYSELF BECAUSE I'M A NURSE – THEY'RE BEING LOST IN THE SHUFFLE. THEY'RE THE ONES THAT ARE SUFFERING BECAUSE WE HAVEN'T BEEN ABLE TO REALLY UNDERSTAND THE ENTIRE PROCESS. NOT ONLY FINDING TEMPORARY HOUSING BUT, LIKE LAURA MENTIONED,

FINDING PERMANENT HOUSING AND PROVIDED  -- BEING PROVIDED THE SERVICES.

WE UNDERSTAND THE MEDICAL SERVICES.  WE UNDERSTAND ONCE YOU GET MEDICAID, GOING INTO THE MANAGED MEDICAID 3 PROGRAMS.  WE UNDERSTAND THAT.

WE'RE STILL TRYING TO UNDERSTAND SUBSTANCE USE AND BEHAVIORAL HEALTH SERVICES THAT ARE BEING PROVIDED.

MS. COLLIER:  AND THEN ONE OTHER FINDING I WANTED TO MAKE SURE I MENTIONED TODAY WAS AT THIS POINT IN TIME WE'RE UNABLE TO VERIFY SERVICES FOR EXPENSES INCURRED AND THEIR ACCURACY.  SO, FOR EXAMPLE, IF THE EXPENSES INCURRED WERE FOR A MULTITUDE OF CASE MANAGERS, BUT WE WERE UNABLE TO LOCATE THE CASE MANAGER THAT WE SPOKE TO FROM INVOICES AS WELL AS VERIFY THE NUMBER OF CASE MANAGERS THAT WERE EXPENSES INCURRED.  THAT WOULD BE AN EXAMPLE.

SO, AT THIS POINT IN TIME FROM LOOKING AT SUPPORT DOCUMENTATION AS I MENTIONED IN THESE CONTRACTS, IT CAN ABSOLUTELY BE WITHIN COMPLIANCE OF WHAT IS REQUIRED.  BUT IT DOES NOT GIVE US THE SUPPORT IN BEING ABLE TO VALIDATE WHAT THOSE EXPENSES ACTUALLY WERE AND IF THE ACTUAL SERVICES WERE RENDERED.

THE COURT:  YOU SHARED WITH US IN A CALL A COUPLE OF DAYS AGO THEY ADMIT A NUMBER OF SPOT CHECKS.

WITHOUT NAMING THE ORGANIZATION SO THAT THERE'S NO EMBARRASSMENT I'D LIKE YOU TO RUN THROUGH THE SAME

CONVERSATION THAT YOU HAD WITH THE SPECIAL MASTERS AND THE COURT ON THAT CALL.

AND I'LL TURN THAT BACK TO YOU.  BUT DON'T MENTION THE PROVIDER.  I DON'T WANT ANY EMBARRASSMENT.

BUT WHAT ARE YOU FINDING OUT THERE?  BECAUSE I KNOW YOU SAID THAT YOU CONDUCTED MINIMALLY 18 SPOT CHECKS.  YOU'RE GOING TO DO MORE IN THE FUTURE.

AND EVENTUALLY I'M GOING TO RAISE WITH COUNSEL HOW WE MIGHT LEVERAGE THAT AND HELP YOU THROUGH MAYBE SOMETHING LIKE THE LUSTIN INSTITUTE OR SOMETHING ELSE, SOME OTHER EFFORT THAT WOULDN'T HAVE CAUSED A COST INCREASE.

AND I DON'T EXPECT A CHECK OF EVERY ESTABLISHMENT BUT WHAT YOU TOLD ME WAS RATHER SHOCKING.

SO, SHARE THAT WITH THE PARTIES HERE.

MS. RAFFERTY:  YOUR HONOR, JUST TO MAKE SURE I'M UNDERSTANDING.

WE DID  -- AND IT WAS AN EXAMPLE OF 2.1 CITE  -- WHERE WE SPOKE WITH AN EMPLOYEE WHO CLAIMS THAT THERE ARE HIMSELF AND ONE OTHER CASE MANAGER.  THEY'RE BUDGETED FOR FOUR.  THEY HAVE ABOUT 130 PARTICIPANTS.  THAT CASE WAS ABOUT 65 PER CASE MANAGER.

WITH THE INVOICE THAT WE WERE ABLE TO SEE IN RELATION TO OUR SCOPE, AGAIN, GOING THROUGH JUNE 30TH, 2024, THAT RESPECTIVE PROVIDER HAD INCURRED EXPENSES FOR TEN CASE MANAGERS.

AND WHAT WE HEAR WHEN WE TALK TO THE RESIDENTS IS HAVE YOU SPOKEN TO A CASE MANAGER.  YES, I SPOKE TO THEM ONCE.  DID THEY PROVIDE YOU SERVICES.  NO.

SO, I MEAN, THAT'S JUST ONE EXAMPLE.  I THINK THE  -- I MEAN, MY TEAM AND A LOT OF US ARE ON THE PHONE.  A LOT OF US ARE NOT.  IT'S A VERY LARGE TEAM.

I DID TELL YOU, JUDGE, AFTER THE STREET SITES I WAS CONCERNED ABOUT MY TEAM HAVING PTSD.  THAT, I MEAN  -- AND ONE OF MY TEAM MEMBERS IS A PHYSICIAN.  AND THE EMOTION THAT CAME OUT OF SEEING WHAT THEY WERE SEEING AND HOW THESE PEOPLE ARE LIVING, WITH ALL THIS FUNDING GOING TO THE SERVICE PROVIDERS WAS HEART-BREAKING.

IT'S HARD ENOUGH TO DRIVE BY PEOPLE IN A TENT, BUT IT'S DIFFERENT WHEN YOU TALK TO SOMEONE ONE ON ONE WHEN YOU DO THESE SPOT CHECKS.

I THINK THE MOST HEART-BREAKING ONE WAS SOMEONE THAT HAS A TRAUMATIC BRAIN INJURY, DOESN'T ALWAYS KNOW EXACTLY WHAT TIME IT IS.  MEALS CUT OFF AT A CERTAIN TIME.  AND IS PROSTITUTING THEMSELVES ON THE STREET TO GET FOOD.

THAT DOESN'T MAKE SENSE IN THIS -- IN OUR CITY.  IT DOESN'T MAKE ANY SENSE.

AND TALKING TO THE CARE MANAGERS, WE HEARD COMMENTS FROM CARE MANAGERS, YOU KNOW, THESE PEOPLE, IF THEY WOULD JUST GET THEIR ACT TOGETHER, THEY SHOULDN'T BE ON THE STREET.  IT'S THEIR FAULT.  THEY LIVE THIS WAY BECAUSE THEY WANT TO LIVE

THIS WAY.  IT'S JUST A CHRONIC PROBLEM NEVER TO BE SOLVED.

WELL, THEN, YOU SHOULDN'T BE A CASE MANAGER.

AND, SO, IT'S -- IT WAS VERY DIFFICULT FOR US.  I MEAN, IT'S DIFFERENT WHEN YOU LOOK AT PAPER.  MONEY GOING IN.  WHERE THE MONEY WAS SPENT.  WHAT THE RECORD IS.

THAT'S WHAT WE REALLY NEEDED TO UNDERSTAND IS HOW IS THE MONEY GETTING TO PEOPLE IN THE STREET.

AND WE'RE NOT SAYING IT'S EVERY SINGLE PERSON.  BUT EVEN IF YOU STATISTICALLY LOOK AT HOW MANY PROGRAMS ARE OUT THERE -- WE DID 18 BASED ON THE AMOUNT OF FUNDING THEY'RE GETTING, IT'S  -- IT'S JUST YOU CAN EXTRAPOLATE THAT THERE'S A HUGE PROBLEM WITH THE SERVICE PROVIDERS AND -- NOT EVERY SINGLE ONE.  WE'RE NOT SAYING THAT.

BUT THE UNDERSTANDING OF HOW IS THIS BEING AUDITED.  HOW ARE OUTCOMES TRACED.  HOW  -- HOW DOES THE CITY AND THE COUNTY KNOW THAT YOU'VE GOT A BAD ACTOR OUT THERE PROVIDING SERVICES.

WE'RE SEEING PEOPLE SUFFER.  AND IT'S REALLY DIFFICULT FOR US.  BUT WE ALSO KNOW WE NEED TO LOOK AT MORE SERVICE PROVIDERS TO GET MORE INFORMATION.

WE TALKED LAST TIME WE GAVE AN UPDATE THAT IT'S HARD TO UNDERSTAND ALL THE PROCESSES, ESPECIALLY THAT THE CITY HAS, FOR TRACKING THESE FUNDS.  AND WE KNOW THE CONTROLLER IS LOOKING AT A LOT OF THIS ALSO.

THAT'S  -- WE KNOW THAT THERE'S SOME PROBLEMS THERE.

AND GOING FORWARD THE CITY REALLY NEEDS TO LOOK AT THEIR PROCESSES TO IMPROVE THIS.  BUT EVERY DAY THAT GOES BY THERE'S PEOPLE ON THE STREET THAT ARE NOT RECEIVING THE SERVICES THAT THE CITY IS PAYING FOR.

SO, IT'S  -- I DON'T MEAN TO BE EMOTIONAL.  BUT I'M A NURSE.  AND IT'S JUST -- IT'S HARD TO UNDERSTAND UNTIL YOU SEE IT.

THE COURT:  YOU HAD SHARED WITH THE SPECIAL MASTERS AND WITH THE COURT WHEN WE ASKED THE QUESTION IF THIS WAS ONE OR PREDOMINANTLY A HIGH NUMBER OF THE 18 SPOT CHECKS SO FAR, THAT THIS WAS ALMOST UNIVERSAL IN TERMS OF THE INFORMATION THAT YOU HAD RECEIVED IN TERMS OF THE SERVICES OR STAFFING OR LET'S JUST SAY STRUCTURE.

AND THAT YOUR STATEMENT TO US WAS THAT THIS WAS ALMOST UNIVERSAL.

IS THAT TRUE OR NOT?

MS. RAFFERTY:  IT'S TRUE.

THE COURT:  OKAY.  NOW, HOLD ON.  WE'RE NOT GOING TO GO THROUGH EVERY PROVIDER TODAY.  THAT'S NOT BEFORE THE COURT BUT FOR THE PRESIDENT OF THE COUNCIL IT'S IMPORTANT FOR YOU TO MAKE INTELLIGENT DECISIONS THAT YOU GOT DATA.

AND HISTORICALLY SINCE 2022 THIS COURT IN HEARINGS -- THAT YOU WERE NOT INVOLVED IN AND WOULD NOT BE AWARE OF -- MADE A RECORD CONCERNING TENS OF MILLIONS OF DOLLARS IF NOT HUNDREDS OF MILLIONS OF DOLLARS THAT COULD NOT BE ACCOUNTED FOR IN THE 2019 TIME PERIOD.

THAT DOESN'T MEAN THE PROVIDERS WEREN'T PROVIDING. WHAT IT MEANT WAS THAT YOU WERE RECEIVING INVOICES AND PAYING IN A PROVIDER-ORIENTED NETWORK. AND YOU WEREN'T RECEIVING THE SUPPORTING DOCUMENTATION.

AND I WOULD ASSUME THAT IN GOOD FAITH A PROVIDER MIGHT SAY TODAY, WE WEREN'T REQUIRED TO KEEP THAT INFORMATION. WE DON'T HAVE THAT INFORMATION.

IF THEY DON'T HAVE IT, WE JUST NEED TO KNOW THAT AND NEED TO QUIT CHASING THIS SUBJECT. IT'S GONE. NO RECORD.

BY THE SAME TOKEN I WOULD HOPE IT WOULD BE HELPFUL TO YOU TO KNOW WHO'S PROVIDING, WHERE YOUR MONEY IS BEING SPENT. AND IF IT'S ADVANTAGEOUS, YOU KEEP THAT PROGRAM OR THAT PROVIDER. AND IF IT'S NOT, YOU CAN SHIFT YOUR MONEY. BECAUSE I KNOW YOU DON'T HAVE -- OR THE CITY DOESN'T HAVE THE RESOURCES YOU PROBABLY NEED.

THE SECOND THING IS BEFORE YOU GOT HERE WE TALKED ABOUT TWO TYPES OF AUDITS. THIS IS THE A&M AUDIT THAT YOU'RE PAYING FOR. AND I'M GOING TO ASK IN A MOMENT IF THEY CAN COMPLETE THIS AUDIT IN TIME, WHICH I HAVEN'T ASKED YET, AND WHAT PROBLEMS ARE OCCURRING SO THAT WE CAN RESOLVE THAT INTERIM SO WE DON'T COME OUT WITH A REPORT IN NOVEMBER. AND THERE ISN'T A CHANCE TO ADJUST. AND THAT'S WHY I APPRECIATE YOU BEING HERE. OKAY.

THE SECOND PART IS REGARDLESS OF WHAT HAPPENED IN THE

PAST WITH THE A&M AUDIT, GOING FORWARD IT WOULD SEEM THAT THE PROVIDER SHOULD BE PUT ON NOTICE -- THE PROVIDERS -- THAT IT'S NO LONGER SUFFICIENT FOR AN INVOICE THAT THAT SUPPORTING DOCUMENTATION THAT LEADS TO THIS INVOICE, THIS REQUEST FOR A BLANKET SUM, THAT YOU SHOULD KNOW WHAT THEY'RE DOING.  AND YOU SHOULD KNOW HOW HIGH THAT COST OVERHEAD IS.

AND I DON'T KNOW IF I'M GOING TO THROW IT OPEN TODAY, BUT THERE'S A LOT OF PEOPLE FROM THE COMMUNITY OUT THERE -- SKID ROW AND OTHER PLACES.

I THREW THE MICROPHONE OPEN TWO SESSIONS AGO.

AND IF YOU WOULD HAVE HEARD THAT, I CAN REPRESENT TO YOU -- AND GO BACK AND GET THE TRANSCRIPT.  LISTENING FOR ABOUT 45 MINUTES TO AN HOUR THAT THEY WILL SAY UNIVERSALLY TO THE PERSON IN THE COMMUNITY THAT THE RESOURCES AREN'T HITTING THE STREET.

NOW, WHETHER THAT'S GETTING STOPPED AT THE PROVIDER NETWORK, WHETHER THEY'RE GETTING RESOURCES.

BUT IF I TOOK YOU TO THE COMMUNITY -- WHICH YOU KNOW -- AND YOU AND I WALKED DOWN THAT STREET, I PROMISE YOU THAT EVERY PERSON WE TALKED TO LITERALLY WITH A FEW EXCEPTIONS MAYBE WE'LL SAY IT'S NOT HITTING THE STREET.

AND IN A FEW MOMENTS WE'RE GOING TO PUT UP A COUPLE OF DOCUMENTS THAT'S GOING TO SHOW OVER 50 PERCENT OVERHEAD WITH SOME OF THESE FOLKS.

AND I'LL TRY TO KEEP THE NAME -- BECAUSE WE'RE NOT

TRYING TO EMBARRASS ANYBODY.   BUT IT SEEMS TO ME THAT IT'S JUST VITAL TO THE CITY.  OKAY.

THE SECOND THING THAT HAPPENED IS A DISPUTE THAT KEVIN DE LEON BROUGHT TO OUR ATTENTION.

AND WHAT I'M NOT GOING TO DO IS GET INVOLVED NOW WITH YOUR COUNCIL PERSON.

AND A LETTER I RECEIVED LAST NIGHT, A REPLY FROM HILDA SOLIS.  I HAVE CALENDARED BOTH OF THOSE.

BUT THIS COURT CANNOT BECOME AND WILL NOT BECOME A FORUM FOR A POLITICAL DISAGREEMENT.  THAT'S NOT MY FUNCTION.

BUT IT'S SOMEWHAT A CONCERN THAT THE SERVICES THAT ARE COMING JUST OUT OF THE MENTAL HEALTH SETTLEMENT OF THE 3500 ARE SUBJECT TO QUESTION AND STILL SOME DISAGREEMENT APPARENTLY BETWEEN THE CITY AND THE COUNTY.

THE LAST SETTLEMENT WAS REACHED.   WE STARTED WITH 300 MENTAL HEALTH SPACE -- BED SPACES WHICH DIDN'T MAKE ANY SENSE AT ALL WITH MAYOR BASS REPRESENTING SHE WAS TRYING TO MOVE 15,000 PEOPLE.

AND BY THE WAY, I APPLAUD WHATEVER NUMBER.

WE THEN GOT TO A THOUSAND.  AND I WANT YOU TO KNOW THIS CITY WAS AGREEABLE TO THE 300.  AND I'M SHOCKED BY IT.

AND I NEED TO SAY THAT TO YOU.

AND I'VE SAID THAT TO MAYOR BASS.   HOW COULD WE POSSIBLY HAVE 15,000 PEOPLE OR ANY SIGNIFICANTLY LOWER NUMBER  -- 2,000, 7,000 WITH 300 MENTAL HEALTH BED SPACES.

THE COURT SAID NO.

THE FOLKS CAME BACK AT A THOUSAND.

THE COURT SAID NO.

AND I WILL PUT ON THE RECORD THAT I FEEL THAT THE COURT SOLD OUT IN A SENSE IN ACCEPTING 3500.

I NEED TO TAKE RESPONSIBILITY FOR THAT AND STEP UP AND SAY I DON'T NEED 3,500.   WE NEED SIGNIFICANTLY MORE.   BUT THAT'S THE BEST WE COULD DO AT THE TIME.

NOW, THE COUNTY IN GOOD FAITH IS GOING TO SAY WE FULFILLED OUR OBLIGATION.  BUT IF YOU LOOK AT THAT SETTLEMENT AGREEMENT, WE SAID SPECIFICALLY THAT THIS WAS A BEGINNING.  THIS WASN'T SOMETHING THAT THE COUNTY SHOULD TAKE A POSITION THAT WE FULFILLED OUR OBLIGATION.  THAT THIS WAS A FULFILLING WORKING WITH THE MAYOR BECAUSE IT WAS PLEDGED TO BE THAT BOTH COUNSEL AND THE BOARD WERE WORKING TOGETHER SO THAT THE SERVICES WOULD BE COMMENSURATE.

NOW, THERE'S TWO OTHER THINGS THAT HAPPENED.  AND I'M GOING TO BE PRETTY BLUNT TODAY.

THE CITY ENTERED INTO AN AGREEMENT, A SETTLEMENT WITH THIS EARLY.

BUT WHAT HAPPENED IS THAT THE COUNTY HAD NOT.

AND IN THAT SIX TO NINE PERIOD OF TIME, MY GUESS IS THAT I'M GOING TO SPECULATE THAT MAYOR BASS ENACTED A NEW PROGRAM.

LA ALLIANCE WAS A LITTLE BIT FORGOTTEN IN THAT PROCESS.

INSIDE SAFE CAME ON BOARD.

BUT A GOOD COUNSEL AND A GOOD MAYOR SAID SOMETHING. WE CAN'T JUST PUT PEOPLE INSIDE WITHOUT SERVICES.

SO, YOU UNDERTOOK SERVICES THAT NOW YOU BELIEVE THE COUNTY SHOULD HAVE UNDERTAKEN.

AND YOU WENT IN TO A LOT OF YOUR RESERVE.

THAT'S CAUSING A LOT OF CONFLICT TODAY. SO, I'VE GOT GOOD PEOPLE ON BOTH SIDES. BUT BECAUSE OF THE LATER SETTLEMENT BY THE COUNTY THERE IS THIS VOID WHERE MAYOR BASS THEN STEPPED IN WITH FUNDS THAT YOU WOULD NORMALLY ARGUE WOULD BE SERVICES FROM THE COUNTY.

THAT'S CAUSED SOME DETRIMENT TO THE CITY.

BY THE SAME TOKEN, THE COUNTY HADN'T ENTERED INTO A SETTLEMENT.

NOW, WHAT YOU'RE GOING TO HEAR FROM THE MIRA -- AND I RESPECT THAT -- IS WE FULFILLED OUR OBLIGATION.

THEY HAVE. ON PAPER. BUT IT WAS WRITTEN THAT THIS WAS THE BEGINNING NOT THE END.

NOW, YOU TWO NEED TO WORK THAT OUT.

AND WHAT'S DISAPPOINTING IS THIS.

I DON'T THINK IT'S THE COURT'S ROLE TO DICTATE HOW THAT 3500 METAL BED SPACE -- BED SPACE IS DIVIDED.

I DON'T THINK A COURT SHOULD COME IN AND SAY 60/40 OR 40/50. THAT'S UP TO THE CHAIRMAN OF THE BOARD WHO IS WORKING WELL WITH THE MAYOR, A REFRESHING NEW ATTITUDE I THINK THAT THE COURT HAS SEEN COMPARED TO THE PAST.

YOU'VE GOT TO WORK THAT OUT.

AND, OF COURSE, I'M NOT GOING TO INTERCEDE IN THAT.

I'M NOT GOING TO CREATE A COURT ORDER.

I MAY IN OTHER AREAS TAKE A CHANCE.   BUT NOT  -- NOT HERE.  OKAY.

SO, I'M HOPING YOU CAN GET TOGETHER AND RESOLVE THIS BY AN MOU.  BECAUSE THIS IS COMING CONSTANTLY FROM KEVIN DE LEON'S LAST LETTER.  HILDA SOLIS ANSWERED LAST NIGHT.

IN A LETTER  -- I'VE GOT PRIOR LETTERS FROM MONICA RODRIGUEZ.

AND I WOULD ASK THIS.  THAT WE KIND OF CENTER THE CONVERSATION BETWEEN YOU AS THE PRESIDENT -- BECAUSE IF EACH COUNCIL MEMBER COMES IN -- WHICH THEY'RE ENTITLED TO.   AND I'LL DOCKET THE LETTERS.   I DON'T HAVE ANY CENTRAL AUTHORITY.

SO, I'M LISTENING TO DIFFERENT COUNCIL MEMBERS.  IT'S NOT MY --- MY JOB.

ALSO, I HAD HOPED THAT THE COURT'S NEVER ENTERING INTO A LEGISLATIVE EXECUTIVE FUNCTION WHERE YOU ARE DECIDING HOW THESE RESOURCES ARE DIVIDED.

BUT THIS WAS SUPPOSED TO BE THE BEGINNING.

ALL RIGHT.   NOW --

(PAUSE IN PROCEEDINGS.)

(THE COURT AND SPECIAL MASTER CONFERRING.)

THE COURT:   AND, SO, I'M GOING TO HAVE YOU CONTINUE.  I JUST BROKE IN.

AND I WANT YOU TO CONTINUE ON WITH YOUR PRESENTATION.

AND IF YOU'RE SATISFIED, THEN, I'M GOING TO THROW THAT OPEN FOR QUESTIONS FROM THE PRESIDENT OF THE COUNCIL, THE CHAIRMAN OF THE BOARD, ANYBODY ELSE WHO WANTS TO ASK -- FIRST OF ALL, WILL YOU BE ABLE TO COMPLETE THIS AUDIT BY NOVEMBER?

MS. RAFFERTY:  THERE WERE A LOT OF DELAYS IN THE VERY BEGINNING OF OUR WORK.

I'M NOT TARGETING ANYBODY OR SAYING ANYTHING NEGATIVE.

I THINK A LOT WAS YOU'RE ASKING FOR THINGS THAT WE EITHER DON'T HAVE OR HAVING A HARD TIME FINDING.

THE COURT:  OKAY.

MS. RAFFERTY:  AND WE UNDERSTAND THE SYSTEMS AREN'T AS ROBUST AS THEY MIGHT BE OR SHOULD BE.

THE COURT:  OKAY.  NOW WE'RE DANCING AROUND HERE.

MS. RAFFERTY:  SO, THERE WERE A LOT OF DELAYS GETTING DATA. AND THEN WHEN WE GOT THE DATA, IT WASN'T USABLE DATA. AND, SO, WE WERE GOING BACK AND FORTH AND BACK AND FORTH.

I WILL TELL YOU A LOT OF PEOPLE WE'VE WORKED WITH ARE REALLY TRYING TO BE HELPFUL

I THINK THE SYSTEM WAS NEVER SET UP TO LOOK AT -- LIKE YOU[ SAID, JUDGE, THE MONEY COMES IN.  IT GOES THROUGH LAHSA. LAHSA IS CONTRACTING WITH THOSE SERVICE PROVIDERS.

THAT THERE'S A LOT OF DIFFERENT STEPS ON HOW THE MONEY MOVES BEFORE IT GETS TO WHAT IT'S INTENDED TO.

SO, WE -- WE REALLY BURNED THROUGH TWO TO THREE

WEEKS OF CHASING DOWN THE NUMBERS. AND THEN ANALYZING THE NUMBERS.

WE HAVE A VERY LARGE TEAM.   WE HAVE ANALYSTS, FINANCIAL PEOPLE.  WE HAVE A LOT OF PEOPLE THAT HAVE WORKED IN THE PUBLIC SECTOR FOR A LONG TIME.

IT WAS NOT EASY.  AND, SO, WE DON'T WANT TO RUSH THROUGH THE LAST PART OF OUR AUDIT.

WE WANT TO DO A REALLY THOROUGH AND GOOD JOB.  AND WE WANT TO BE ABLE TO CREATE A PRODUCT THAT PEOPLE CAN LEARN FROM GOING FORWARD.

SO, WE ARE ABOUT THREE WEEKS?  TWO WEEKS?  BEHIND.

SPECIAL MASTER MICHELE MARTINEZ:   AT LEAST.

MS. RAFFERTY:   AT LEAST.

THE COURT:  OKAY.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

SPECIAL MASTER MICHELE MARTINEZ:  GREAT.  THANK YOU.

THE NEXT QUESTION THAT WE HAVE -- AND I KNOW YOU'VE BEEN WORKING WITH THE COUNTY AS IT PERTAINS TO THE DATA SPECIFICALLY FOR THE THREE PROGRAMS THAT YOU ARE DOING THE ASSESSMENT FOR THE CITY OF LOS ANGELES.

YOU MENTIONED TO THE COURT THAT YOU WANT TO PROVIDE THE CITY A COMPREHENSIVE ASSESSMENT.  AND TO DO THAT YOU ALSO NEED TO VERIFY THE DATA FROM THE COUNTY BASED ON THOSE THREE PROGRAMS.

AND I KNOW YOU ALL HAVE BEEN WORKING.

AND WE'RE GOING TO NEED AN ANSWER.

AND I KNOW THAT THE COUNTY NEEDED A LITTLE  BIT OF MORE TIME WHICH I'VE INFORMED THE COURT.

BUT TO A&M,, WHEN DO YOU THINK YOU NEED THAT DATA?

AND WHEN DO YOU THINK THE TIMELINE TO RECEIVE THAT DATA AND TO DO YOUR ANALYSIS -- TO DO THIS COMPREHENSIVE AUDIT WHEN DO YOU THINK YOU WILL ACTUALLY HAVE IT. A PRELIMINARY REPORT THAT WE CAN REVIEW WITH OBVIOUSLY THE CITY FAMILY AND LAHSA, WHO IS THE GUARDIAN OF THE DATA FOR THE CITY OF LOS ANGELES.

(PAUSE IN PROCEEDINGS.)

MS. RAFFERTY:   RIGHT.

WHEN DO YOU THINK?

MS. COLLIER:  IDEALLY IF WE COULD HAVE THE COUNTY -- IF, AGAIN, I MEAN TO THE POINT THAT YOU MADE, DIANE, LIKE WE UNDERSTAND THE COUNTY AND ITS SERVICES ARE NOT CURRENTLY IN OUR SCOPE.

MS. RAFFERTY:   RIGHT.

MS. COLLIER:  BUT IF THEY ARE, WE WOULD NEED THE DATA BY THE LATEST OCTOBER 18TH.  THAT WOULD GIVE US  --

MS. RAFFERTY:  BECAUSE THAT'S WHY WE MENTIONED THAT THE COUNTY IS NOT PART OF OUR AUDIT.

BUT WE THINK IT SHOULD BE.   BECAUSE I THINK IT'S PART OF THE HOLISTIC PICTURE THAT WE MENTIONED THE LAST TIME WE TESTIFIED.

IT'S -- IT'S HARD TO LOOK AT SERVICES BEING PROVIDED TO SOMEONE THAT WHEN YOU GOT THE CITY AND THE COUNTY INVOLVED.

THE LOS ANGELES POLICE DEPARTMENT WAS ADDED TO OUR AUDIT.  AND WE'RE IN THE PROCESS OF DOING THE DATA REQUEST NOW TO REALLY UNDERSTAND THE IMPACT FINANCIALLY TO THE CITY FOR LAPD TO BE ABLE TO PROVIDE SERVICES TO THE HOMELESS.

AND WE -- WE ACTUALLY SPOKE TO A GROUP BEFORE WITH LAPD.   BUT I DON'T THINK WE SPOKE TO THE RIGHT GROUP BECAUSE THEY WERE SAYING THEY JUST DIDN'T TRACK THEIR OVERTIME AND THEIR FUNDING.

AND, SO, WE WANT TO DIG INTO THAT MORE.

LIKE I SAID, WE ARE NOT APPROVED TO TALK TO THE COUNTY. ALTHOUGH, THE COUNTY HAS BEEN EXTREMELY GRACIOUS TO MEET WITH US MORE THAN ONCE TO SAY IF WE'RE GOING TO GO FORWARD, WE'D LIKE TO UNDERSTAND THESE ARE THE THINGS THAT WE WOULD ASK FOR.

SO, IF WE'RE APPROVED TO MOVE FORWARD, THEN, WE CAN BE AHEAD OF THE -- AHEAD OF THE TIME SCHEDULE.

BUT KNOWING -- I MEAN, WE ARE -- WE ARE A CONSULTING FIRM.  AND WE ARE RUNNING OUT OF FUNDS.

I THINK THAT THE COUNTY WORK WOULD BE ADDING ON TO -- IT'S -- WE WOULD HAVE TO LOOK AT THE FINANCIAL IMPACT AND TO SAY IF THAT'S THE REQUEST, AND THE COUNTY SAID YES, THAT'S SOMETHING WE WANT TO DO.

THE FUNDING MECHANISM, THAT'S SOMETHING SEPARATE.

BUT WE WOULD HAVE TO PROBABLY ADD ADDITIONAL TIME AND MONEY.

THE COURT: WHEN WAS THE LAST TIME ASKING THE PRESIDENT OR THE CHAIR THAT AN AUDIT TOOK PLACE OF THE -- OF THE CITY OF THIS TYPE?

I'VE GONE BACK TO THE 1980'S. AND I CAN'T FIND ONE.

(LAUGHTER.)

THE COURT: AND THIS ISN'T CASTING ASPERSIONS.

BUT WHAT'S HAPPENED IS THIS DISPUTE RIGHT NOW OCCURRING BETWEEN THE CITY AND THE CONTROLLER. SO, LET'S JUST GET THAT OUT IN THE OPEN.

FIRST, IF THE MAYOR SWEEPS A PROGRAM LIKE HOMELESS UNDER HER, LET'S SAY, UMBRELLA, THE POSITION OF MATT SAVO AND THE CITY IS YOU CAN'T AUDIT US.

THAT LEADS TO SHADOW AND DARKNESS AND THE INABILITY TO THE PUBLIC TO HAVE ANY TRANSPARENCY IF THAT'S THE POSITION.

AND TAKE THAT IF YOU WANT TO.

BY THE SAME TOKEN, FOR THE CONTROLLERS OVER THERE REQUESTING INFORMATION THAT WE'LL GET TO -- THAT'S BURDENSOME FROM THE COUNTY'S PERSPECTIVE OR LAHSA'S PERSPECTIVE -- AND WE'LL DISCUSS THAT IN A FEW MOMENTS BECAUSE WE THINK WE HAVE SOME SUGGESTIONS FOR YOU.

SO, THIS AUDIT IS INCOMPLETE.

I DON'T KNOW WHEN THE NEXT AUDIT OCCURS.

AND THAT LEADS TO NON-TRANSPARENCY WHICH MEANS

NOBODY IS LOOKING AT WHERE THIS MONEY IS GOING WHICH IS WHAT WE DISCOVERED IN 2022 WHEN WE LITERALLY COULDN'T ACCOUNT FOR HUNDREDS OF MILLIONS OF DOLLARS.

NOW, I HAVE TO GO BACK AND READ THAT TRANSCRIPT.  AND IT'S PRETTY CLEAR.

SO, WHAT YOU'RE SAYING TODAY THE COURT HAS BEEN SEEING NOW FOR TWO TO THREE YEARS.

ALL RIGHT.  JAY, DO YOU HAVE ANY QUESTIONS?

THEN I'LL THROW IT UP TO ANY OF YOU THAT HAVE QUESTIONS.

JUDGE JAY GHANDI:  I JUST WANT TO GET A LITTLE BETTER FLAVOR OF A COUPLE OF THINGS.

HOW WAS THE CITY CONTRACTING WITH PROVIDERS?

IS THERE A DEPARTMENT?   ARE THERE TEMPLATES?  OR IS IT JUST ALL ONE-OFF CONTRACTS WITH THE PROVIDERS?

MS. COLLIER:  THE CONTRACTS ARE SET UP IN VARIOUS WAYS.

WE'VE SEEN  -- THERE'S MULTIPLE CITY DEPARTMENTS THAT WILL ENTER CONTRACTS EITHER DIRECTLY WITH SERVICE PROVIDERS.

MAINLY, FOR EXAMPLE, FROM THE FIELD WORK THAT WE'VE DONE, IT'S PROVIDING LOSS OF THE FUNDING AND LOSS OF THE --THE CONTRACTS TO SERVICE PROVIDERS.

JUDGE JAY GANDHI:  AND THEN WHAT KIND OF CONTRACT?   I MEAN, IS IT JUST A PROVIDER PROVIDES?  IT'S STANDARD CONTRACT?

OR IS IT AN INVOICE SYSTEM OR DOES IT JUST VARY?

MR. COLLIER:   IT'S PRETTY STANDARD ACROSS DEPENDING ON THE RULE  -- THE RESPECTIVE LOSS OF PROGRAM, RIGHT.

LIKE TINY HOME VILLAGE.  WHETHER THAT'S A ROADMAP INTERIM HOUSING PROGRAM.  THAT COULD BE A BRIDGE HOME.

THAT'S TYPICALLY WHAT WOULD STIPULATE TO THE SCOPE OF REQUIRED SERVICES.   AND THE CONTRACT LANGUAGE IN GENERAL IS PRETTY STANDARD.

JUDGE JAY GANDHI:   AND THEY  --

MS. COLLIER:  SO, IT'S  --

MS. RAFFERTY:   I'M SORRY.

JUDGE JAY GANDHI:  NO.,  PLEASE.

MS. RAFFERTY:  I DIDN'T MEAN TO INTERRUPT YOU.  I'M SORRY.

IS YOUR QUESTION ARE THESE CONTRACTS TAILORED TO THE SERVICE PROVIDER, THE PROGRAM AND THE INTENT?

OR IS IT JUST BOILERPLATE?

JUDGE JAY GANDHI:   OR THEY  --

MS. RAFFERTY:  IS THAT  --

JUDGE JAY GANDHI:   YES.   ARE THEY BESPOKE TO THE PARTICULAR PROVIDER?   OR IS THERE A TEMPLATE?

MS. COLLIER:  NO.  IT IS NOT TAILORED TO A SPECIFIC PROVIDER.

IT DOES NOT APPEAR THAT WAY AT THIS POINT IN TIME.

JUDGE JAY GANDHI:   IS THERE A ONE-OFF TEMPLATE?

MS. COLLIER:   YEAH.  IT'S A GENERAL TEMPLATE.

JUDGE JAY GANDHI:   AND THEN HOW ARE THEY KEEPING TRACK OF THIS?

IS THERE A  -- IS THERE A SALES FORCE PROGRAM OR

SOMETHING?

MS. RAFFERTY:  YOU'RE FAMILIAR WITH SALES FORCE.

(LAUGHTER.)

MS. RAFFERTY:  WOULDN'T THAT BE NICE.

WE ARE STILL TRYING TO UNDERSTAND HOW THESE ARE TRACKED.

THERE MIGHT BE SOMETHING AT THE CITY.  WE JUST HAVE THE QUESTIONS THAT WE'VE ASKED.

WE HAVE NOT GOTTEN THAT INFORMATION ON HOW THEY TRACK THESE CONTRACTS, WHEN THEY EXPIRE.  DO THE INVOICES MATCH TO THE CONTRACT.

SOME OF THEM MIGHT.  BUT WE ALSO KNOW THAT'S A PAPER DRILL.

SO, IF I'M HIRED TO PROVIDE A SERVICE, I CAN SUBMIT MY INVOICE.

THE INVOICING IS A WHOLE SUBJECT IN ITSELF.

BECAUSE IF YOU ALLOW ME A HUNDRED DOLLARS, AND I GIVE YOU AN INVOICE FOR $100, WHAT DID I SPEND THE HUNDRED DOLLARS ON.

SO, THERE  -- THERE'S NOT THE NORMAL -- I DON'T WANT TO SAY NORMAL.  THAT'S NOT FAIR.

WHAT WE WOULD EXPECT IN THE WORK THAT WE DO THAT DETAILED TRACKING  -- I MEAN, THESE ARE TAXPAYER DOLLARS.

SO, EVERYONE IS ACCOUNTABLE FOR EVERY PENNY.  THEY NEED TO LOOK AT IT THAT WAY.

AND I ALSO UNDERSTAND TRYING TO GET SERVICES OUT QUICKLY ESPECIALLY WITH INSIDE SAFE.  IT WAS AN EMERGENCY TRYING TO GET MONEY OUT THERE QUICKLY.

BUT YOU STILL HAVE TO HAVE PROCESSES AND DUE DILIGENCE TO UNDERSTAND SOMETHING  -- LIKE YOU SAID, SALES FORCE.

SO, YOU KNOW EXACTLY WHO THE MONEY WENT TO, WHEN THE INVOICE CAME IN AND WHAT IT'S RELATED TO.

AND THEN LIKE WE'VE SAID YOU NEED TO GO OUT AND SEE IT SOMETIMES.   YOU – YOU NEED TO HAVE AN AUDITOR OUT THERE SAYING OKAY.  YOU'RE PROVIDING INTERIM HOUSING OR INTERIM  -- THAT IS FOR 60 PEOPLE.  YOU'RE BILLING THE CITY FOR 60 PEOPLE.  DO YOU ONLY HAVE 20?  AND YOU'VE ONLY HAD 20.  THAT'S  -- THAT INFORMATION SEEMS TO BE STILL MISSING.

SO, DATA IS A BOILERPLATE CONTRACT.  WHAT WE UNDERSTAND IT'S NOT BEST SPOKE.  IT'S NOT SOMETHING THAT'S ENTERED INTO A SYSTEM WHERE YOU CAN JUST TAKE THAT SERVICE PROVIDER, WHERE THE MONEY CAME FROM, HOW IT GOT ALLOCATED AND HOW TO INSURE THAT THE SERVICES WERE PROVIDED.

MS. COLLIER:   JUST FOR CLARITY, THERE IS LIKE A FINANCIAL SYSTEM THAT LAHSA USES THE ENTERPRISE GRANT MANAGEMENT SYSTEM, THE EGMS.

JUST  --

MS. RAFFERTY:   IT PROBABLY COULD BE UPGRADED.

(LAUGHTER.)

JUDGE JAY GANDHI:   FAIR ENOUGH.

AND THEN I JUST WANTED TO PRESS ON THIS ISSUE A LITTLE BIT.  AND I KNOW IT'S STILL EARLY.  IT'S 18 SITES.

ARE YOU SAYING WHAT YOU BELIEVE TO BE INDICIA OF FRAUD?

MS. RAFFERTY:  SO --

(LAUGHTER.)

MS. RAFFERTY:  IF YOU WANT TO TAKE ME OUT FOR A GLASS OF WINE, I MIGHT TALK TO YOU A BIT.

(LAUGHTER.)

JUDGE JAY GANDHI:  PERHAPS AFTER.

MS. RAFFERTY:  OKAY.  THIS IS MY POLITICAL ANSWER.

WHEN YOU RECEIVE STATE AND FEDERAL FUNDS, YOU ARE REQUIRED TO UNDERSTAND WHERE THOSE FUNDS GO.

OTHERWISE, OTHER PEOPLE MUCH MORE POWERFUL THAN US COULD COME IN AND AUDIT THAT AT A DIFFERENT LEVEL THAT WE PROVIDE.

SO, WE  -- OUR DIVISION FROM ALVAREZ & MARSAL, WE'RE  -- WE WORK IN PUBLIC SECTOR.

SO, WE UNDERSTAND FUNDING MECHANISMS FROM STATE, COUNTIES, AND FEDERAL GOVERNMENT.

SO, WE ARE OVERLY COMPULSIVE ABOUT LOOKING AT THAT.

I WOULD JUST SAY THERE'S PROBABLY SOME WORK TO DO.

JUDGE JAY GANDHI :   THERE'S A REAL TIME  -- AND THEN LET'S JUST KEEP FOLLOWING IT.

IS THERE REAL TIME INFORMATION BEING PROVIDED TO THE CITY ATTORNEY'S OFFICE?  MAYBE WHERE THEY HAVE AN OFFER TO

CLAW BACK SOME OF THESE MONIES?

MS. RAFFERTY:   WE -- WE -- I DIDN'T ASK THAT QUESTION.

MS. COLLIER:  I THINK TO OUR POINT IN TIME I THINK THE -- FROM OUR UNDERSTANDING AT THIS POINT IN TIME WE HAVEN'T SEEN LIKE -- WE HAVEN'T SEEN THAT EVER OCCUR WHERE MONEY HAS BEEN CLAWED BACK OUTSIDE OF LIKE A NORMAL COURSE OF MONITORING.

MS. RAFFERTY:   RIGHT.

WE -- WE HAVEN'T SEEN IT.  AND DO KNOW -- I MEAN, WE'VE ONLY BEEN -- AS THE TIME WE'VE BEEN WORKING ON THIS, WE RECOGNIZE -- AND WE'VE HAD CALLS FROM THE COUNTY OR MOSTLY THE CITY -- LET ME EXPLAIN THIS.

AND, SO, WE COULDN'T -- WE HAVE NEVER BEEN TOLD THAT THERE HAS BEEN A RETRACTION OR A RECUPERATION OF FUNDS BASED ON NON-SERVICE.

MS. COLLIER:  AS LONG AS IT FALLS WITHIN THE BUDGET.

MS. RAFFERTY:   YEAH.

MS. COLLIER:   AND THERE HAS BEEN INCIDENCES WHERE WE'VE SEEN LAHSA DENY, RIGHT?  -- IF A SERVICE PROVIDER GOES OVER A BUDGET FOR A CERTAIN CATEGORY. FOR EXAMPLE, SUPPORTIVE SERVICES OR OPERATIONS.

MS. RAFFERTY:  YEAH.  THEY WON'T FUND THAT.

THE COURT: I COULD ANSWER THAT.  BUT I WON'T --

(LAUGHTER.)

THE COURT:  ANY QUESTIONS?

MS. COLLIER:  NO.

THE COURT:  I'M GOING TO TURN THE MICROPHONE OVER TO ANY OF YOU FOLKS WHO WANT TO ASK A QUESTION TO MAKE THIS AUDIT BETTER, TO GIVE SUGGESTIONS.

IF YOU CHOOSE NOT TO SPEAK, SO BE IT.

BUT, MATT, ANY-- ANY QUESTIONS OF THE AUDITORS?

BECAUSE WHEN THIS COMES IN NOVEMBER, I DON'T KNOW WHAT THE FINAL RESULT WILL BE.   BUT I WANT TO ADJUST THIS ALONG THE WAY.

IF WE'VE GOT A PROBLEM, I WANT TO TRY TO WORK IT OUT BEFORE THE FINAL DOCUMENT COMES IN.

MR. UMHOFER:   I THINK MY ONLY QUESTION THAT I WOULD HAVE IS TO THE EXTENT THAT YOU'VE ASKED THE COUNTY IF THEY WOULD JOIN THE AUDIT AND PROVIDE INFORMATION, WHAT HAS BEEN THEIR RESPONSE?

MS. RAFFERTY:  WE DIDN'T ASK THEM DIRECTLY IF THEY WOULD.   BUT THEY'VE BEEN AMAZINGLY COOPERATIVE.

MR. UMHOFER:   BUT YOU DON'T HAVE THE DOCUMENTS YOU NEED TO CONDUCT  -- TO COMPLETE AN AUDIT THAT INCLUDES THE COUNTY, CORRECT?

MS. RAFFERTY:   CORRECT.

SO, WE WORK BY A CONTRACT.   SO, WE HAVE TO STICK TO THE GUIDELINES OF THAT CONTRACT.

MR. UMHOFER:  AND, SO, YOU HAVE NOT ASKED FOR THE DOCUMENTS THAT YOU WOULD NEED FROM THE COUNTY?

MS. RAFFERTY:   WE GAVE THEM A HEAD'S UP.

(LAUGHTER.)

MR. UMHOFER:  OKAY.

THE COURT:  MATT.  MATT.

MR. UMHOFER:  SO, THE COUNTY  --

THE COURT:  MATT, JUST A MOMENT.

MS. MARTINEZ:  THE COURT REQUESTED THE COUNTY TO PROVIDE AN ANSWER.  OBVIOUSLY, THEY NEEDED MORE TIME.

BUT THE COURT DID ASK THE COUNTY THE SAME TIME WE ASKED THE CITY FOR THE LAW ENFORCEMENT TO DO THAT ASSESSMENT AS WELL.

AND, SO, WE UNDERSTAND THAT THE COUNTY NEEDS TO GO  -- LEGAL COUNSEL NEEDS TO GO BEFORE THE BOARD OF SUPERVISORS BECAUSE THEY'RE THE ONES THAT HAVE TO APPROVE THAT.

THEY JUST NEEDED MORE INFORMATION.  AND THAT'S WHAT WE'VE BEEN DISCUSSING.

EXACTLY WHAT IS IT THAT THE A&M TEAM NEEDS AND SPECIFICALLY IN REGARDS TO THE THREE PROGRAMS SO THAT THEY CAN GO BACK TO THEIR CLIENT.

THE COURT:  AND WE CAN READ THAT BACK INTO THE RECORD BECAUSE THE CHAIRPERSON OF THE BOARD IS HERE.

SO, ELLY, THAT DOCUMENT THAT I SAID WE DIDN'T NEED TODAY THAT YOU SHOWED ME BACK IN  -- THE BACK  -- IF YOU WANT TO PRODUCE THAT FOR A MOMENT IF NEEDED.

MR. UMHOFER:  THANK YOU.

THE COURT:  OKAY.

MR. UMHOFER:  I'LL LEAVE IT THERE, YOUR HONOR.

THE COURT:  NO.  KEEP GOING.

MR. UMHOFER:  THE  --

THE COURT:  SO, PASS THE MICROPHONE AROUND OR  --

AS THE PRESIDENT OF THE COUNCIL, IF YOU HAVE ANY COMMENTS.  OKAY.

AT THE PRESENT TIME, NITHYA.

MS. RAMAN:  YOU KNOW, I GUESS I WOULD JUST SAY  -- AND I WANT TO THANK THE AUDITORS FOR THEIR FINDINGS –

(THE COURT CONFERRING WITH SPECIAL MASTER.)

MS. RAMAN:   -- WITH  --

THE COURT:  NITHYA --

MS. MARTINEZ:  JUDGE  --

THE COURT:  WE'RE GOING TO GET YOU A MICROPHONE.  OKAY.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  YEAH.

AND THIS IS THE HEAD OF THE HOMELESS AND POVERTY COMMITTEE FOR THE CITY, NITHYA RAMAN.

MS. RAMAN:  THANK YOU SO MUCH.

AND I JUST WANT TO  -- I WANT TO THANK THE AUDITORS FOR THEIR PRESENTATION SO FAR.

AND I REALLY JUST WANTED TO SAY THAT I DO THINK IT WOULD BE USEFUL TO HAVE THE COUNTY'S INFORMATION INCLUDED IN THIS.

I WANTED TO SHARE SOMETHING THAT WE'RE GOING TO BE

HEARING IN THE HOUSING AND HOMELESSNESS COMMITTEE TODAY WHICH IS ABOUT EXITS FROM INTERIM HOUSING SITES BACK INTO -- INTO HOMELESSNESS.

THE COURT:  OKAY.

MS. RAMAN:   AND A NUMBER OF THOSE -- ABOUT A QUARTER OF THOSE FROM RITNER INTERIM HOUSING SITES ARE RELATED TO BEHAVIORAL ISSUES.

AND IF YOU LOOK DOWN AT THE REASONS FOR THOSE BEHAVIORAL ISSUES, A LOT OF THOSE ARE INDICATIVE OF MENTAL ILLNESS OR OF OTHER HEALTH ISSUES.

AND, SO, I THINK THAT IF THERE COULD BE GREATER COORDINATION BETWEEN THE COUNTY'S INTENSIVE SERVICES FOR PEOPLE WHO ARE EXPERIENCING MENTAL ILLNESS AND SUBSTANCE ABUSE ISSUES, WE CAN ACTUALLY INSURE THAT MORE PEOPLE WHO ARE GETTING HOUSED ARE STAYING HOUSED.

THE COURT:  OKAY.

MS. RAMAN:   AND, SO, FOR ME IT WOULD BE VERY USEFUL TO UNDERSTAND WHERE ARE THOSE LINES OF COMMUNICATION BREAKING DOWN SUCH THAT THOUSANDS OF PEOPLE WHO HAVE BEHAVIORAL HEALTH ISSUES ARE NOT BEING EXITED BACK INTO THE STREET BUT INSTEAD BEING, YOU KNOW, FUNNELED OVER TO THE CARE THAT THEY NEED.

THE COURT:  OKAY.

OKAY.  TERRY IS HERE AND --

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  AND KEVIN  --

I KNOW.  BUT I'M GOING  TO COME BACK TO THEM IN JUST A MOMENT.

GO UP TO THE COUNTY ASSESSOR, PLEASE.

ALL RIGHT.  DO YOU HAVE ANY QUESTIONS UP TO THIS POINT BECAUSE YOU'RE GOING TO MAKE A PRESENTATION.

WE'RE GOING TO PUT UP SOME OF THE DOCUMENTS OFF OF THIS WEBSITE IN A MOMENT.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

MR. MEJIA:  NO, NO QUESTIONS.

THE COURT:  OH, PRESENT.  THE CONTROLLER.  OKAY.

THE CITY, DO YOU HAVE ANY QUESTIONS UP TO THIS POINT?

JESSICA MARIANA:  NO, YOUR HONOR.

THE COURT:  COUNTY?

MS. HOANG:   NO QUESTIONS.

THE COURT:   SHAYLA?

MS.  MYERS:  YES, JUST A QUICK QUESTION.

BUT FIRST OF ALL, THANK YOU SO MUCH FOR THE WORK THAT YOU'RE DOING AND REALLY DIGGING IN AND UPLIFTING THE VOICES OF UNHOUSED FOLKS.

I THINK THAT'S BEEN SOMETHING THAT'S BEEN SOMEWHAT MISSING JUST DUE TO THE NATURE OF THIS LITIGATION.

AND I THINK IT'S BEEN INCREDIBLY HELPFUL TO HEAR THAT YOU'RE WORKING WITH A NUMBER OF UNHOUSED FOLKS.

AND PARTICULARLY A NUMBER OF UNHOUSED FOLKS, I THINK IT

REALLY RESONATES WHEN YOU SAID THAT THESE ARE PEOPLE WHO ARE IN THE SYSTEM BECAUSE I THINK WE TALK SO MUCH IN THIS COURTROOM AND IN OTHER PLACES ABOUT THE SORT OF SCOURGE OF FOLKS AROUND THE STREET BUT REALLY UNDERSTANDING HOW THESE SYSTEMS ARE WORKING OR NOT.

SO, WE REALLY APPRECIATE THAT YOU'RE THINKING ABOUT THE BARRIERS THAT FOLKS HAVE TO EXITING.

AND, SO, REALLY APPRECIATE THE HOMELESSNESS AND HOUSING COMMITTEE UPLIFTING EXITS OUT OF INTERIM HOUSING.

WE KNOW THAT THAT IS A HUGE BARRIER, PARTICULARLY BECAUSE OF THE CITY'S DECISION TO ALLOCATE THE VAST MAJORITY OF PERMANENT HOUSING RESOURCES TO INDIVIDUALS WHO ARE IN INTERIM HOUSING.

SO, WHEN FOLKS ARE FALLING OUT OF INTERIM HOUSING, AND THEY'RE ACTUALLY FALLING OUT OF A PATH TO PERMANENT HOUSING.

BUT MY QUESTION IS RELATED TO THE PERMANENT HOUSING PIECE OF THIS.

THE VAST MAJORITY OF PLACEMENTS AND UNITS THAT ARE BEING ALLOCATED IN THE LA ALLIANCE SETTLEMENT, THAT PARTICULAR PIECE OF IT NOT THE ROADMAP OR INSIDE TAKE IS PERMANENT HOUSING.

IT'S THE PROPOSITION HHH AND OTHER FUNDING.  I THINK IT'S 75 PERCENT.

SO, WHAT IS YOUR AUDIT GOING TO TOUCH ON RELATIVE TO THAT.

I KNOW YOU FOCUSED ON THE INTERIM.

ARE YOU GOING TO GET TO THE PERMANENT HOUSING?

BECAUSE OBVIOUSLY THAT'S -- THAT IS -- IT'S BEEN A HUGE POINT ABOUT THE L.A. ALLIANCE THROUGHOUT THIS LITIGATION IS THE COST OF PERMANENT HOUSING.

SO, WE REALLY WANT TO KNOW ARE YOU GOING TO FOCUS ON THAT.

MS. COLLIER:   NO.   WE ABSOLUTELY WANT TO.

WE RECOGNIZE THAT THE CITY HAS STARTED RIGHT TO FUND THE INFRASTRUCTURE OF THOSE BEDS.

BUT IN ORDER TO UNDERSTAND THE SUPPORTIVE SERVICES IT'S OUR UNDERSTANDING THAT THAT WOULD BE THE PIECE THAT THE COUNTY, WE WOULD HAVE TO GET INSIGHT INTO.

BUT, YES, WE WOULD ABSOLUTELY WANT TO GET MORE INSIGHT.

MS. MYERS:   AND JUST TO RAISE.

OBVIOUSLY, WE  -- WE'VE BEEN RAISING THIS ISSUE ABOUT HOW THE CITY FUNDING ALLOWS PERMANENT HOUSING TO COUNT TOWARDS THE SETTLEMENT.

AND I THINK THAT – THAT IS A PAPER ISSUE OBVIOUSLY.

BUT  -- BUT ALSO IT IS JUST A SIGNIFICANT PIECE OF IT AND NOT JUST THE SERVICES BUT ALSO JUST THE CREATION OF IT AND THE WAYS IN WHICH INDIVIDUALS MOVE THROUGH THE HOUSING.

BECAUSE I UNDERSTAND SERVICES.  BUT SERVICES ARE A MUCH SMALLER PART OF PERMANENT HOUSING THAN THEY ARE THE INTERIM SHELTER PROGRAMS.

MS. COLLIER:  RIGHT.

MS. MYERS:  AND THAT WE THINK THAT THERE'S A LOT OF INFORMATION THAT NEEDS TO BE GATHERED RELATED TO THE PERMANENT SUPPORTIVE HOUSING THAT IS ON THE CITY SIDE.

MS. RAFFERTY:  YEAH.  WE AGREE.

THE COURT:  ALL RIGHT.  I WANT TO ASK WHAT DO YOU NEED TO OVERCOME –

WHAT THE COURT MIGHT SUGGEST TO THE PARTIES IN A MEANINGFUL WAY?

MS. RAFFERTY:  WELL, WE'D LIKE TO THANK THE COURT FOR WHEN WE ARE  --

THE COURT:  NO.  DON'T THANK ME YET.

MS. RAFFERTY:   -- FOR WHEN WE ARE  --

THE COURT:  DON'T TAKE THE TIME.

(LAUGHTER.)

THE COURT:  WHAT DO YOU NEED?

MS. RAFFERTY:  WE'D LIKE TO THANK THE COURT TO THIS THUS FAR.

WHEN WE HAVE RUN INTO OBSTACLES GOING THROUGH THE COURT TO BE ABLE TO GET INFORMATION, I THINK EVERYBODY UNDERSTANDS THE SERIOUSNESS OF THIS.

BUT WE ALSO UNDERSTAND PEOPLE HAVE VERY BUSY JOBS AND WORK.

BUT TO BE ABLE TO EXPEDITE, YOU KNOW, IT  -- GETTING INFORMATION THAT WE'RE ASKING FOR PEOPLE TO RESPOND, IT'S MUCH

IMPROVED.

THE COURT:  WHO  -- WHO DO YOU NEED THAT FROM SPECIFICALLY?

IN OTHER WORDS, TO GET A GOOD THOROUGH LOOK AT THIS CITY IN THE LAST  -- I'M GOING TO JOKE WITH YOU BUT A THOUSAND YEARS  -- WHAT GETS A GOOD LOOK ON THE PUBLIC'S BEHALF AND FOR THE CITY OFFICIALS TO MAKE GOOD DECISIONS?

WHAT DO YOU NEED?  AND WHO DO YOU NEED IT FROM?

AND BE DONE ABOUT THIS.  BECAUSE THERE MAY NEVER BE AN AUDIT LIKE THIS AGAIN.

MS. COLLIER:  OKAY.

THE COURT:  IF THE CITY TAKES ITS PRESENT POSITION THAT THEY CAN SWEEP IT.

BUT FOR MAYOR BASS COMING FORWARD, QUITE FRANKLY, WITH MY COMPLIMENTS TO HER, WE WOULDN'T' HAVE ANYTHING OCCURRING.

AND I THINK IT'S THE FIRST TIME IN FEDERAL COURTHOUSE HISTORY WHERE I'VE HEARD APPLAUSE BREAK OUT ON BEHALF OF A MAYOR, SO.

(LAUGHTER.)

MS. COLLIER:  AND WE WOULD REALLY  -- WE WOULD LOVE TO OBTAIN MORE OF AN UNDERSTANDING ON THE CONTINUUM OF CARE THROUGHOUT THE SYSTEM, SPECIFICALLY, RIGHT, AT HOW A PARTICIPANT ENTERS THE SYSTEM, HOW THEY MOVE THROUGH THE SYSTEM.  WHAT IS THAT INTAKE.   HOW ARE THEY MATCHED.

LIKE WE MENTIONED, UNDERSTANDING THE NEEDS OF PARTICIPANTS IS INCREDIBLY VALUABLE AND VERY INSTRUMENTAL TO THE SUCCESS THROUGHOUT THEIR -- THEIR HOUSING.

SO --

MS. RAFFERTY:  I THINK WHAT'S STILL A LITTLE FUZZY FOR US IS ONCE SOMEONE GETS ENTERED INTO THE SYSTEM  -- WE UNDERSTAND HOW THE COUNTY IS NOTIFIED THAT SOMEONE HAS BEEN IN THE SYSTEM -- WHO EVALUATES THAT PERSON FOR THE SERVICES THAT THEY NEED.

THE COURT:  OKAY.

MS. RAFFERTY:  WHERE IS THAT  -- THE CARE MANAGEMENT COMPONENT OF THIS IS SO IMPORTANT.  NOT ONLY THE CASELOAD OF THE CARE MANAGERS BUT THEIR TRAINING, THEIR COMPETENCY, THEIR  -- UNDERSTANDING THEIR JOB.

WE'RE STILL TRYING TO UNDERSTAND.

AND I'M NOT SAYING IT'S NOT THERE.  WE JUST  -- IT'S STILL A LITTLE CLOUDY TO US THAT IF SOMEONE HAS RECOGNIZED THAT THEY HAVE A SUBSTANCE ABUSE TREATMENT BUT ALSO HAVE A HISTORY OF TBI OR OTHER  -- ALSO DEVELOPMENTAL DISABILITY OR BEHAVIORAL HEALTH.

HOW ARE THEY  -- HOW IS THAT DETERMINED WHAT SERVICES THEY NEED TO PROVIDE.

WE UNDERSTAND THE MEDICAL SIDE, BUT WE DON'T UNDERSTAND THE BEHAVIORAL HEALTH SIDE.

AND HOW LONG DOES IT TAKE.

SO, TALKING TO SOMEONE IN THIS SITUATION, THEY KNOW

THEY HAVE A MENTAL DISORDER.   THEY'VE BEEN ON MEDICATIONS BEFORE.   THEY DON'T KNOW HOW TO GET THEIR MEDICATIONS FILLED.

DO YOU TALK TO YOUR CARE MANAGER?

WELL, I HAVEN'T SEEN THEM IN THREE WEEKS.  SO, I DON'T KNOW WHAT TO DO.

OR I TALKED TO MY CARE MANAGER.   AND THEY SAID I NEED TO GET A PRESCRIPTION FILLED.  BUT I DON'T KNOW WHERE I GO.

WHERE DO I GO TO GET THAT FOR MY MENTAL HEALTH SUPPORT?

THAT'S STILL FUZZY TO US.

AND WE NEED TO UNDERSTAND LIKE LAURA SAID HOW YOU ENTER THE SYSTEM, HOW THE REFERRALS GO TO THE COUNTY FOR SERVICES, WHEN ARE THOSE SERVICES PROVIDED, WHO EVALUATES WHAT SERVICES NEED TO BE PROVIDED.

THAT'S WHAT CARE MANAGEMENT IS.

IT'S CARING FOR AN INDIVIDUAL WITH AN INDIVIDUALIZED CARE PLAN TO MAKE SURE THEY GET THE SERVICES THEY NEED.  ITS NOT BLANKET.

SO, WE HAVE HEARD FROM PEOPLE THAT WE'VE WORKED WITH SAYING THAT  -- WHAT WAS IT?  -- FOUR, THREE MONTHS?

MS. COLLIER:  FOR SERVICES?

MS. RAFFERTY:  YEAH.

MS. COLLIER:  YEAH.

MS. RAFFERTY:   SO, THE SERVICES  -- EVEN THOUGH IF SOMEBODY IS IN THE SYSTEM, IF IT TAKES 90 DAYS TO GET SERVICES TO

THAT PERSON, THEY'RE GOING TO WIND UP BACK ON THE STREET. THEY'RE GOING TO LOOK FOR ILLICIT DRUGS.  THEY'RE PROBABLY GOING TO WIND UP ARRESTED.

WE'VE JUST PUT THEM IN A WORSE SITUATION.

SO, WE'RE STILL TRYING TO UNDERSTAND THAT COMPONENT -- HOW ARE THE CARE MANAGERS ALLOCATED.

LIKE I SAID, I THINK IT'S REALLY IMPORTANT TO UNDERSTAND WHAT THEIR JOB DESCRIPTION IS.

OUR UNDERSTANDING WHETHER IT'S ACCURATE OR NOT -- WE HAVEN'T TOTALLY DUG INTO THIS -- YOU CAN'T JUST RAISE YOUR HAND AND SAY YOU'RE A CARE MANAGER.  YOU NEED TO HAVE TRAINING TO UNDERSTAND HOW TO TALK TO THIS PATIENT POPULATION, TO HAVE EMPATHY FOR THIS POPULATION AND ALSO UNDERSTANDING WHAT SERVICES ARE AVAILABLE.

THEY CAN'T JUST BE SOMEBODY SAYING I'VE TALKED TO MR. SMITH.

THE COURT:  ALL RIGHT.  LET ME RECOGNIZE THE PRESIDENT OF THE COUNCIL.

MR. MARQUEECE HARRIS-DAWSON:  THANK YOU.  THANK YOU SO MUCH, JUDGE.  AND THANK YOU FOR THE WORK THAT YOU ALL HAVE DONE AND THE  TESTIMONY THAT YOU PROVIDED TODAY .

IT'S  -- A LOT OF WHAT YOU'RE SAYING ARE THINGS THAT WE CAN IDENTIFY WITH AS COUNCIL MEMBERS BECAUSE WE'RE OUT ON THE STREET.   AND WE SEE THEM.

I WANTED TO GO BACK TO THIS  -- YOU KNOW, THE QUESTION

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com

ABOUT CARE MANAGERS, CONTRACTORS, WHAT THE CONTRACTS ARE.

AND I GUESS I'M CURIOUS, AND MAYBE YOU ALL KNOW OR SOMEONE IN YOUR ZOOM KNOW.

HAVE YOU ALL EVER LOOKED AT A SCHEME LIKE THE ONE ANALOGOUS TO THE ONE WE HAVE.

SO, FOR EXAMPLE, THE CONTRACT THAT YOUR FIRM HAS IS WITH THE CITY OF L.A.

MS. RAFFERTY:  CORRECT.

MR. MARQUEECE HARRIS-DAWSON:  SO, IT'S DIRECT.  THE RELATIONSHIP IS A ONE TO ONE.

ALMOST NONE OF THE CONTRACTS WE HAVE WITH REGARD TO SERVICES AT LEAST, WHICH YOU'VE SPENT -- WE TALKED A LOT ABOUT THIS MORNING – ARE DIRECTLY WITH THE CONTRACTOR.

MS. RAFFERTY:  CORRECT.

MR. MARQUEECE HARRIS-DAWSON:  THEY'RE THROUGH LAHSA, WHICH IS, YOU KNOW, A JOINT POWERS AUTHORITY.

SO, I'M WONDERING IF YOU'VE LOOKED AT ANYTHING LIKE THAT AND SEEN WAYS TO REMEDY THE CHALLENGE THAT WE ALL HAVE.

BECAUSE EVERYTHING THAT YOU ALL HAVE EXPRESSED IS UNIVERSALLY FELT ON THE CITY COUNCIL.  WE SPEND COUNTLESS HOURS IN THE CHAIRWOMAN'S COMMITTEE DISCUSSING IT.  AND WE'RE ALL BANGING OUR HEADS AGAINST THE WALL BECAUSE WE'RE ON THE STREET.

I'VE BEEN ON THE STREET, YOU KNOW, WITH JUDGE CARTER. AND WE HAVE A PERSON IN FRONT OF US THAT WE CAN'T FIGURE OUT

HOW TO GET SERVICES FOR, EVEN THOUGH WE'VE ALLOCATED A LOT OF MONEY TO LAHSA – OR -- I MEAN, IF YOU CALL LAHSA AT 5:01 IT'S CLOSED FOR STARTERS.

BUT --  AND, AGAIN, I'M JUST  -- BUT IT'S THE NATURE OF THE SCHEME THAT WE  -- THAT HAS BEEN  -- THAT WE'VE ALL INHERITED.

I JUST WONDER IF YOU'VE LOOKED AT ANYTHING ELSE LIKE THAT AROUND THE COUNTRY AND IF THERE ARE ANY LESSONS THAT YOU COULD SHARE WITH US FOR HOW TO MAKE THAT WORK BETTER.

MS. RAFFERTY:  SO, WHAT WE LOOK AT IS WHEN YOU HAVE THIS TYPE OF FUNDING MECHANISM, THE CITY IS ACCOUNTABLE.  THE CITY HAS THE MONEY.

WHO -- IT'S JUST LIKE WE'RE SAYING THAT LAHSA NEEDS TO HOLD THE SERVICE PROVIDERS ACCOUNTABLE.

YOU NEED TO PROVIDE LAHSA  -- YOU NEED TO HOLD LAHSA ACCOUNTABLE.  YOU NEED TO UNDERSTAND -- YOU NEED TO HAVE THAT INTEGRATION OF THIS IS WHY I'M PAYING YOU.

AND IF THEY SAY, WE'RE DOING ABSOLUTELY EVERYTHING APPROPRIATE.  WE'RE DOING THE BEST WE CAN.  THEN, LOOK AT YOUR OUTCOMES.

AND THESE CONTRACTS WERE NEVER SET UP TO PROVIDE OUTCOMES.  WE DO DAY COUNTS.  WE DO  -- BUT THERE'S A MISSING LINK.

AND I THINK THERE NEEDS TO BE  -- IF YOU LOOK AT THE  -- IN THE FUTURE, WHETHER PROP A GETS PASSED – WHATEVER YOU DO, THERE NEEDS TO BE A HIGH-LEVEL OF ACCOUNTABILITY, TRACEABILITY.  IT'S INTERESTING YOU MENTIONED SALES FORCE.  SOME SORT OF

SYSTEM SO YOU KNOW THE DOLLARS.

MAYBE YOU  -- IF IT GOES THROUGH LAHSA, WHAT REPORTS DOES LAHSA PROVIDE YOU THAT THESE – WE KNOW EXACTLY WHERE THOSE DOLLARS WENT.  THEY WENT TO THE PERSON THAT THEY WERE ACTUALLY ALLOCATED FOR.

RIGHT NOW YOU'VE DELEGATED A LOT OF THE AUTHORITY TO SOMEONE ELSE.  LIKE LAHSA DESIGNATES THEIR AUTHORITY TO THE SERVICE PROVIDERS.  BUT THERE'S A LACK OF ACCOUNTABILITY.

AND WE  -- WE'RE NOT  -- WE'RE NOT HERE TO JUDGE OR TO SAY ANYTHING IS RIGHT OR WRONG.   WE'RE AN INDEPENDENT PARTY.

BUT THERE'S PROCESSES I THINK THAT THE CITY COULD LEARN FROM PRIVATE INDUSTRY.

MR. MARQUEECE HARRIS-DAWSON:  SO – SO, THANK YOU FOR THAT.  THAT'S EXTREMELY HELPFUL

DO YOU  -- HAVE YOU – UP SYSTEMS LIKE THIS AROUND THE COUNTRY.

AND COULD WE -- ARE THERE PLACES WE COULD LOOK AT THAT HAVE ACTUALLY DONE THE THING THAT YOU'RE SAYING?

MS. RAFFERTY:  YOU KNOW, WE'VE DONE SOME MARKET RESEARCH.  EVERYBODY BRINGS UP HOUSTON, YOU KNOW, BECAUSE OF THEIR PROGRAM.

LOS ANGELES IS SUCH A BEHEMOTH.

IF WE LOOK AT OTHER CITIES TO SAY THEY'RE MAKING IT WORK, IT'S ON SUCH A SMALL SCALE.

I MEAN, L.A. IT'S  -- I HAD TO EXPLAIN TO MY -- I'M BORN AND

RAISED HERE.  SO, I HAD TO EXPLAIN TO MY TEAM, YES, YOU CAN BE IN THIS CITY BUT YOU'RE IN L.A. COUNTY, BUT YOU'RE NOT IN PROPER L.A. CITY.  IT'S  -- AND I WORKED AT LACUSC.  SO, I KIND OF UNDERSTAND  -- I JUST KNEW IT.

IT IS VERY COMPLICATED WHEN YOU  -- MAJOR CITIES ARE DEALING WITH THIS.  A LOT HAS TO DO WITH THE COST OF LIVING.  AND THERE'S SOME IN DRUG USE AND SUBSTANCE ABUSE AND MENTAL HEALTH.

IT'S SUCH ON A SMALL SCALE I DON'T KNOW IF IT'S REALLY PERTINENT TO LOOKING AT WHAT YOU'RE DEALING WITH.  IT'S -- IT IS SO LARGE.  THERE'S SO MANY PEOPLE THAT NEED SERVICES.

AND JUST LOOK AT THE GEOGRAPHICS.  I MEAN, IT'S HARD TO REACH EVERY PERSON.

THE COURT:  THANK YOU.

MR. MC CURLEY:  YOUR HONOR.

THE COURT:  PLEASE.

MR. MC CURLEY:  THANKS.

DAVID MC CURLEY FROM A&M.

I WOULD JUST ADD IN OUR EXPERIENCE WE SEE LOTS OF -- LOTS OF SITUATIONS WHERE JOINT POWER AUTHORITIES WERE ESTABLISHED.

AND WE CAN BRING SOME BEST PRACTICES ON HOW THE JOINT POWER AUTHORITY THEN  -- HOW THE INVESTING AGENCIES THAT CREATED THE JOINT POWER AUTHORITY CAN REQUIRE THROUGH THEIR CONTRACTS WITH THEM APPROPRIATE CONTRACT CONTROLS AND

MEASURES.

AND WHAT WE FOUND AGAIN IN THE WORK THAT WE'VE DONE SO FAR A LOT OF THE CONTRACTS WITH THE SERVICE PROVIDERS HAVE KEY PERFORMANCE INDICATORS, PERFORMANCE MEASURES THAT THEY'RE EXPECTED TO BE ACCOUNTABLE TO.

WHERE THE BREAKDOWN SEEMS TO BE IS IN THE VERIFICATION THAT THOSE THINGS ACTUALLY HAPPENED.

THE COURT:  OKAY.

MR. MC CURLEY:  AND, SO, AGAIN, WE CAN BRING SOME BEST PRACTICES WHERE -- THE ONES I'VE BEEN PERSONALLY ASSOCIATED WITH -- NOT IN THE – NOT IN THE HOMELESS SPACE BUT IN PUBLIC WORKS AND A VARIETY OF OTHER PLACES.

AND, AGAIN, WHAT IS I THINK ONE OF THE KEY SUCCESS FACTORS IN ALLOWING THE JOINT POWERS AUTHORITY TO DO IT IS MAKING SURE THAT THE INVESTING AGENCIES ARE SAYING, HEY, THESE ARE THE ACCOUNTABILITY MEASURES.  THESE ARE THE OUTCOMES THAT WE'RE EXPECTING.  AND WE WANT YOU TO HOLD YOUR PROVIDERS TO THESE STANDARDS AS WELL.

AND THEN MAKING SURE THAT THE JOINT POWERS AUTHORITY -- IN THIS CASE LAHSA  -- IS IN FACT VERIFYING, INSPECTING AND INSURING THAT THE SERVICES ARE BEING PROVIDED IN THE MANNER THAT THE FUNDING AUTHORITIES DICTATE.

THE COURT:  OKAY.

ANY OTHER QUESTIONS?

AND I WANT TO TOSS SOMETHING OUT TO YOU.

I DON'T SEE HOW YOU POSSIBLY CAN CHECK THE NUMBER OF PROVIDERS THAT -- OR I WOULD HOPE YOU CAN CHECK.  AND IT'S NOT YOUR JOB.  SO, IT WOULD BE SPOT CHECKING.  AND WE GET ANECDOTAL INFORMATION FROM THE QUALITY OF FOOD, YOU KNOW, FROM TOP RAMEN TO PERSONS NOT BEING ON THE PREMISES WHO ARE SUPPOSED TO BE.

(COURT AND SPECIAL MASTER CONFERRING.)

THE COURT:  THE LUSKIN INSTITUTE IS AROUND.  AND I'M GOING TO PICK THEM OUT OR USC.

YOU'VE GOT AN ARMY OF VOLUNTEERS OUT THERE WHO COULD HELP YOU IF YOU NEED THAT.

I WANT YOU TO THINK ABOUT THAT FOR A MOMENT.  AND YOU DON'T HAVE TO ANSWER NOW.   BUT I GUARANTEE IF WE CALLED USC OR UCLA OR SOME OF THESE OTHER FOLKS, THAT THERE ARE VOLUNTEERS OUT THERE THROUGH DIFFERENT PROGRAMS AND DIFFERENT STUDENTS WHO  COULD DO SOME SPOT CHECKING THAT WOULDN'T COST THE CITY OR COUNTY ANY MONEY AT ALL.

I'M GOING TO ASK YOU TO STAY BECAUSE WE'RE  --  I KNOW THAT THE CONTROLLER IS HERE.  AND WE'RE GOING TO GET INTO A DISCUSSION IN JUST A MOMENT.

I PUT UP SOME CHARTS.

AND I WANT TO ASK THE CONTROLLER TO COME FORWARD AND  –

(THE COURT CONFERRING WITH SPECIAL MASTER)

THE COURT:  AND WHILE  -- I WILL.  I WILL.

BUT WHILE YOU'RE DOING THAT, I WANT YOU TO START GETTING SET-UP IF YOU WOULD BE SO KIND WITH KARLEN QUIETLY.

ALL RIGHT.  NOW,  FOR THE ELECTED OFFICIALS, IF YOU'D LIKE TO SAY ANYTHING --

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  I'M SORRY?

(PAUSE IN PROCEEDINGS.)

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  THE CHAIRWOMAN.  YEAH, I'M GOING TO GO IN REVERSE, RIGHT.

LET ME START WITH THE CHAIRWOMAN, PLEASE.

CHAIRWOMAN HORVATH:  THANK YOU, YOUR HONOR.  GOOD MORNING.

THE COURT:  GOOD MORNING.

CHAIRWOMAN HORVATH:  FIRST TO ACKNOWLEDGE THE COUNTY IS ABSOLUTELY OPEN AND AGREEABLE TO COOPERATING WITH AND SUPPORTING THE AUDIT, THE CITY'S THREE HOMELESS INITIATIVES -- THE FREEWAY ROADMAP AGREEMENT, THE CITY'S LA ALLIANCE PROGRAM AND THE CITY'S INSIDE SAFE PROGRAM.

I BELIEVE THAT WAS THE REQUEST, AND WE ARE FULLY OPEN AND AGREEABLE TO COOPERATING WITH THAT.

THE COURT:  WELL, LET ME STOP YOU THERE.

THE POSITION OF THE COUNTY OFTENTIMES HAS BEEN – WE'VE MET OUR AGREEMENT.  AND LET'S ASSUME THAT THAT'S TRUE.

THE AGREEMENT THOUGH WAS A FORWARD LOOKING

AGREEMENT, WHICH SPECIFICALLY WROTE THAT THIS WAS BASICALLY THE BEGINNING, NOT THE END, THAT THE COUNTY WOULD RELY UPON AND CONTINUALLY SAY WE'VE MET OUR AGREEMENT.

I KNOW THAT YOU AND MAYOR BASS HAVE A GOOD RELATIONSHIP.  I KNOW THE PRESIDENT DOES.  IN FACT, IT'S SOMEWHAT UNIQUE.  AND I APPLAUD YOU ALL FOR IT.  I THINK YOU HAVE LOCKED ARMS.  AND THERE HAS BEEN PROGRESS THAT SHOULD BE RECOGNIZED.

GOING FORWARD, I'D ASK YOU TO CONSIDER WITH NO COMMITMENT THOUGH THAT -- AND THIS IS THE BEGINNING OF THAT COMMITMENT  -- THAT 3,500 WAS THE LOWEST OR THE BEST NUMBER I FELT I COULD GET IN THE NEGOTIATIONS.  BUT QUITE FRANKLY, I THINK THE COURT FAILED.  I NEED TO TAKE RESPONSIBILITY.  MAYBE I SHOULD HAVE PRESSED FOR 7,000.  I'M NOT SUGGESTING THAT'S THE NUMBER, BUT 40 TO 50 PERCENT OF OUR PEOPLE ARE OUT THERE WITH SUBSTANCE ABUSE OR MENTALLY -- MENTAL DISORDERS.  AND MAYOR BASS IS TRYING TO MOVE 15,000 PEOPLE HUMANELY.

AND YOU'VE GOT A BUDGET OF 42 MILLION.  THEY'VE GOT A BUDGET OF ABOUT 11 OR 12.  I'M JUST JOKING.  BUT THAT'S A BUDGET.

WE NEED YOUR HELP.

CHAIRWOMAN HORVATH:  ABSOLUTELY.

THE COURT: OKAY.

CHAIRWOMAN HORVATH:  AND WE ARE CONTINUING TO HOLD PUBLIC MEETINGS WHERE WE ARE SHARING THAT INFORMATION.  IT'S OPEN AND ACCESSIBLE TO THE PUBLIC.

THE COURT:  YEAH.

CHAIRWOMAN HORVATH:  IF I MAY SPEAK TO A COUPLE OF OTHER THINGS THAT WERE MENTIONED HERE TODAY.

THE COURT:  PLEASE.

CHAIRWOMAN HORVATH:  I THINK I HAVE A LITTLE BIT OF A DIFFERENT PERSPECTIVE.  I DO SHARE YOUR COMMITMENT TO TRANSPARENCY AND ACCOUNTABILITY.  AND THANK YOU FOR YOUR COMMITMENT TO THAT.

I DON'T SEE LAHSA AS AN OUTSIDE ENTITY.  LAHSA IS A JOINT POWERS AUTHORITY OF THE CITY AND THE COUNTY.  SO, FIVE OF THE APPOINTMENTS ARE FROM THE CITY.  AND FIVE OF THE APPOINTMENTS ARE FROM THE COUNTY.

SO, I APPRECIATE THAT WE WANT TO HOLD LAHSA ACCOUNTABLE.  BUT THAT'S US.  AND, SO, THAT'S WHY I PUT MYSELF AT THE TABLE AT LAHSA.  I'M NO LONGER SERVING AS CHAIR.  BUT WHEN I STARTED MY YEAR AS CHAIR, I CALLED ALL OF THE CITY COUNCIL OFFICES IN LOS ANGELES BECAUSE I HAD HEARD FOR MANY YEARS, EVEN PRIOR TO MY SERVICE AS A SUPERVISOR, OF CHALLENGES WITH LAHSA AND REACHED OUT PROACTIVELY AT THE START OF MY TENURE.

I CAN SAY THAT WE -- WE ALSO APPRECIATE YOUR ACKNOWLEDGEMENT THAT THE ENTIRE LOS ANGELES REGION IS QUITE UNIQUE.  AND I DON'T THINK THERE IS A COMPARABLE EXAMPLE MAYBE ON THE PLANET.  BUT CERTAINLY AT LEAST IN THIS COUNTRY TO LOOK AT.

AND, SO, SITTING AT THAT TABLE MAKING SURE THAT LAHSA IS CHANGING HOW WE'RE HAVING THAT CONVERSATION SO WE AREN'T RUNNING INTO SORT OF THE SAME FRUSTRATIONS OVER AND OVER IS

SOMETHING I TAKE SERIOUSLY.

THAT'S WHY I PLACED MYSELF THERE.  I COMMEND THE MAYOR FOR DOING SO AS WELL.

THE COURT;  RIGHT.

CHAIRWOMAN HORVATH:  MY COLLEAGUE SUPERVISOR BARGER IS ALSO THERE.

OCCASIONALLY WE SEE STAFF FROM SOME OF THE CITY COUNCIL OFFICES COMING TO BE AT -- BUT THEY ARE PUBLICLY NOTICED MEETINGS.  AND I WELCOME EVERYONE TO BE PART OF THAT CONVERSATION AS WELL TO INSURE THAT THE ACCOUNTABILITY THAT PEOPLE ARE EXPECTING IS ACTUALLY HAPPENING IN THOSE PUBLIC DISCUSSIONS.  THEY'RE ALL PUBLICLY NOTICED.  AND I WELCOME PEOPLE INTO THAT.

I WOULD SAY THE COUNTY HAS DEVELOPED AN ENCAMPMENT RESOLUTION PROGRAM CALLED "PATHWAY HOME," WHICH NOT ONLY HELPS GET PEOPLE INTO INTERIM HOUSING, BUT FROM THE OUTSET WHEN WE FIRST ENGAGED PEOPLE AT A PATHWAY HOME SITE, THE PERMANENT HOUSING SOLUTION IS ALREADY PART OF THAT FORMULA.

SO, FROM THE START TO THE FINISH THERE IS A PATHWAY HOME.  THERE IS A PIPELINE SO WE DON'T HAVE PEOPLE LINGERING FOR EXTENDED OR UNDETERMINED PERIODS OF TIME IN INTERIM HOUSING. AND I THINK THAT IS  -- THAT'S A MODEL THAT I THINK WOULD BE HELPFUL TO EXPAND.

I WOULD SAY THE COUNTY -- I KNOW IT'S BEEN  -- THE MENTAL HEALTH PROCESS HAS BEEN REFERENCED.  AND THE DEPARTMENT OF

MENTAL HEALTH HAS A UNIVERSAL ENTRY REFERRAL WHICH IS AN ONLINE PORTAL FOR HOMELESS OUTREACH TEAMS.  AND IT'S A CENTRAL ENTRY POINT FOR DMH FOR MENTAL HEALTH SERVICES.

THIS PORTAL IS ON LINE.  IT'S ACCESSIBLE.  DMH HAS BEEN PROACTIVELY REACHING OUT TO ORGANIZATIONS TO TRAIN THEM ON THE PORTAL IF THEY DON'T KNOW HOW TO ACCESS IT.  THEY WILL ALSO DO ONE ON ONE TRAINING.

THE COURT:  OKAY.

CHAIRWOMAN HORVATH:  SO, IF THERE ARE PEOPLE WHO DON'T UNDERSTAND HOW THAT WORKS, DMH IS INTERESTED AND AVAILABLE TO WORK WITH SERVICE PROVIDERS, ANYONE WHO WANTS TO UNDERSTAND WHAT THAT PORTAL IS AND HOW IT OFFERS SERVICE.

AND I WOULD ALSO FINALLY ADD THAT THERE IS  -- WHEN THERE IS INCONSISTENCY IN USING THE CES SYSTEM THAT EXISTS TO MATCH SERVICES  --

THE COURT:  RIGHT.

CHAIRWOMAN HORVATH:  -- TO WHEN SOMEONE GETS HOUSED. AND I UNDERSTAND THERE'S BEEN EXTENSIVE CONVERSATION AROUND THE SHORTCOMINGS OF THE SYSTEM.

THE COURT:  UH-HUH.

CHAIRWOMAN HORVATH:  AND IF WE WORK OUTSIDE THAT COORDINATED AGREED UPON SYSTEM, MATCHING SERVICES CAN SOMETIMES BE CHALLENGING.

AND, SO, I WOULD SAY MAKING SURE THAT WE ARE -- YOU KNOW, WHEN THE CITY, FOR EXAMPLE, HAS USED WHAT WAS SORT OF

REFERRED TO AS THE ALTERNATE  CES PROCESS WHEREBY THEY COULD SELECT WHO WENT INTO A BUILDING DESPITE THE FACT THAT THERE WAS AN AGREEMENT ABOUT HOW SERVICES WOULD BE MATCHED.  YOU KNOW, THAT CAN CREATE CHALLENGES.

SO, TO  -- I APPRECIATE YOUR EXPRESSION OF FRUSTRATION BECAUSE THERE IS NO ONE ENTRY POINT.

AND, SO, I THINK THAT ALSO NEEDS TO BE ACKNOWLEDGED. THERE ARE LOTS OF WAYS INTO WHICH PEOPLE -- OR THROUGH WHICH PEOPLE COME INTO THE SYSTEM.  AND I THINK THAT'S CHALLENGING FOR ANYONE TO UNDERSTAND, WHICH IS WHY I PERSONALLY PUT MYSELF AT EVERY TABLE THERE IS LAHSA, LA CASA, ECRA  -- ALL OF IT TO REALLY UNDERSTAND AND WRAP MY HAND  -- MY ARMS AROUND.  BUT WHAT IS ACTUALLY GOING ON HERE AND HOW DO WE MAKE IT MAKE SENSE. BECAUSE RIGHT NOW IT DOESN'T.

SO, I THINK THE COUNTY WANTS TO BE A PARTNER IN THAT CONVERSATION.  I AGAIN COMMEND YOUR COMMITMENT TO ACCOUNTABILITY AND TRANSPARENCY.  AND WE ARE COMMITTED TO THAT AS WELL.

THE COURT:  THANK YOU FOR  -- AND TO READ INTO THE RECORD WHAT I READ LAST TIME FOR THE COUNSEL PRESENT.

THE COURT SPECIFICALLY STATED, AND YOU'LL SEE THIS IN THE RECORD:

"THAT THE COURT KINDLY REQUESTS THAT THE COUNTY SUPPORT THE CITY'S ASSESSMENT OF HOMELESSNESS PROGRAMS FOR THE A&M TEAM TO CONDUCT A COMPREHENSIVE ASSESSMENT.

"THEY NEED DATA FROM EITHER. LAHSA OR COUNTY DEPARTMENTS REGARDING THE SERVICES AND HEALTH AND MENTAL HEALTH PROGRAMS BEING PROVIDED IN THE THREE INITIATIVES -- INSIDE SAFE, LA ALLIANCE AND THE FREEWAY AGREEMENT.

"WE WOULD APPRECIATE A RESPONSE FROM THE COUNTY BY NEXT FRIDAY REGARDING THEIR ABILITY TO ACCOMMODATE THIS REQUEST SO THAT A&M CAN MODIFY ITS SCOPE AND SUBMIT A NEW COST ESTIMATE FOR THE CITY'S CONSIDERATION."

THAT'S IN THE RECORD.

THE COUNTY RESPONDED WITH A YES ALREADY.  OKAY.

ALL RIGHT.  ANYTHING ELSE THAT WE CAN DO ALONG THE WAY TO HELP YOU WITH THIS AUDIT?

AND THAT'S THE FIRST LOOK THAT THE CITY HAS HAD THAT I CAN FIND.  AND THERE MAY NOT BE ANOTHER ONE.  BECAUSE IF THE CITY TAKES THE POSITION FROM THIS POINT FORWARD THAT THE CONTROLLER CAN'T AUDIT, THAT THERE CAN'T BE AN INDEPENDENT THIRD AUDIT, THAT'S WHAT'S BEEN HAPPENING HISTORICALLY.  SO NOBODY HAS GOTTEN A LOOK AT THE PROCESS YOU'RE GOING THROUGH.  AND THAT HAS TO BE A PUBLIC CONCERN NOW.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  OKAY.  HARRIS-DAWSON, DO YOU HAVE ANY OTHER COMMENTS?

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  NITHYA RAMAN, DO YOU HAVE ANY?  -- COUNCILWOMAN?

SHE'S CHAIR OF THE HOMELESS AND POVERTY COMMISSION.

MS. RAMAN:  IT'S HOUSING AND HOMELESSNESS COMMITTEE. BECAUSE I THINK THE TWO ARE INTERRELATED.

THE COURT:  YEAH.  MY APOLOGIES.

MS. RAMAN:  I JUST WANTED TO THANK SUPERVISOR HORVATH FOR HER COMMITMENT TO CONTINUE PARTNERSHIP.  I TOO SIT ON ECRA AND LA CASA.  AND I THINK THERE IS SIGNIFICANTLY MORE COMMUNICATION AND WILLINGNESS TO COOPERATE BETWEEN THE CITY AND COUNTY THAN BEFORE, INCLUDING OFFICIAL BODIES THROUGH WHICH WE CAN MAKE SHARED REQUESTS FOR DATA THAT CAN HELP US HOLD BOTH OUR PARTNER LAHSA ACCOUNTABLE AND OUR SERVICE PROVIDERS ACCOUNTABLE.

AND ALL OF THEM ARE OUR PARTNERS IN THIS WORK.

I WANTED TO JUST SAY THAT IF THE COURT WANTED TO FACILITATE A JOINT LEARNING SESSION BETWEEN MEMBERS OF THE BOARD OF SUPERVISORS AND THE HOUSING AND HOMELESSNESS COMMITTEE ON THESE ISSUES, I WOULD WELCOME THAT.

AND I THINK IT WOULD GIVE ELECTED OFFICIALS AN OPPORTUNITY TO ENGAGE WITH EACH OTHER.

`        I APPRECIATE THAT THE LAWYERS ARE ENGAGED IN THIS COURTROOM.

AND I THINK IT'S ALWAYS PRODUCTIVE AND FRUITFUL WHEN ELECTED OFFICIALS ARE SPEAKING DIRECTLY TO EACH OTHER ABOUT THE CHALLENGES THAT THEY'RE DEALING WITH IN ADDRESSING HOMELESSNESS, OUR BIGGEST CRISIS, AND INSURE THAT WE ALL FEEL

THE SAME URGENCY IN ADDRESSING THESE ISSUES.

SO, I JUST WANTED TO OFFER THAT UP AS AN OPPORTUNITY HERE THAT I WOULD REALLY WELCOME.

AND IF THE COURT WANTED TO FACILITATE IT WE WOULD BE VERY OPEN TO THAT.

THE COURT:  I CAN SUGGEST THAT.  I CAN'T ORDER IT.  I DON'T HAVE THAT AUTHORITY.  THAT'S THE ULTIMATE JUDICIAL ARROGANCE.

BUT I WOULD SUGGEST THAT ONLY BECAUSE WE SAW IT PUT TOGETHER --

JUST A MOMENT NOW.

PUT TOGETHER A SESSION OUT IN THE VALLEY WITH BOB.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:   THE DISTRICT 3.  AND IT WAS INSPIRING.

IF YOU FOLKS WOULD HAVE BEEN THERE AND HEARD THE PEOPLE ON THE GROUND DOING THE WORK, I THINK ALL OF US WOULD WALK AWAY IN GOOD FAITH SAYING WE'VE GOT SOME INCREDIBLY DEDICATED PEOPLE ON THE FRONT LINE MAKING CONTACT WITH OUR HOMELESS POPULATION.

THE PROBLEM SEEMS TO BE OUR COORDINATION AT THE TOP – HOW WE'RE GOING TO UNWIND THE SPAGHETTI OF HISTORICAL, LET'S SAY, FUNDING.

AND I'LL BE A LITTLE BIT BLUNT WITH YOU.

IT'S JUST A PERSONAL OPINION.   AND I CAN'T MAKE A FINDING ON THIS, BUT LAHSA IN A SENSE SHIELDED US FROM RESPONSIBILITY.   IN SOME WAYS IT WAS CREATED IN GOOD FAITH TO PASS ON FUNDS.  BUT

WHAT IT DID IS IT PASSED ON TO WHAT I CALL THE PILLSBURY DOUGH BOY.  IF YOU PUNCH HIM, THE ARM FLIES UP.

THIS LACK OF RESPONSIBILITY -- NOT INTENTIONALLY BUT BY THE CITY AND BY THE COUNTY.   AND THAT GOES BACK TO L.A. TIMES EDITORIALS I CAN FIND THAT SPEAK EXACTLY TO THE CONFRONTATIONS TAKING PLACE BACK IN THE 1980'S.   IN FACT, I'LL PULL OUT THE EDITORIAL.  IT'S THE ROCKY HORROR PICTURE SHOW.

SO, LAHSA WAS CREATED IN A SENSE I THINK IN AN EFFORT TO MOVE FORWARD.  BUT IT'S ENDED UP TAKING A LOT OF RESPONSIBILITY AWAY FROM ALL OF US FRANKLY.

SO, THE COURT WOULD LIKE TO TURN THE CORNER AND BE POSITIVE.

I WANT TO MOVE ON  -- PUT TOGETHER DE LEON FOR A MOMENT.

AND WE'VE TALKED EARLY THIS MORNING.  AND I'VE SEEN HIS LETTER.   I ASKED HIM TO FILE IT.

I DIDN'T KNOW WHY HE WANTED TO SPEAK, BUT WHEN HE -- THE LETTER CAME TO ME HILDA SOLIS RESPONDED.

I DON'T WANT TO GET INTO THAT POLITICAL DISCUSSION.  THIS IS NOT THE FORUM.   I'M NOT A COUNCIL MEMBER.

SO, I'VE ASKED YOU IF YOU'RE GOING TO MAKE COMMENTS, PLEASE CONFINE THOSE TO THE TRANSPARENCY --

MR. DE LEON:  WE'RE NOT GOING TO  --

THE COURT:  -- OF THE  -- SITE.

MR. DE LEON:  YEAH.

THE COURT:   OKAY.

MR. DE LEON:   WE'RE NOT GOING TO TOUCH THAT SUBJECT, YOUR HONOR.

I JUST WANT TO SAY GOOD MORNING --

THE COURT:   GOOD MORNING.

MR. DE LEON:   -- TO YOU, TO THE SPECIAL MASTER MICHELE MARTINEZ.  AS WELL, I APOLOGIZE.   I DON'T KNOW THE GENTLEMAN'S NAME, BUT.

THE COURT:   JUDGE GANDHI.

MR. DE LEON:   JUDGE GANDHI.   JUDGE GANDHI.  OF COURSE, YES.  SPECIAL MASTER, TOO, GOOD MORNING.

AS YOU KNOW, I'M HERE AS A COUNCIL MEMBER FOR THE 14TH COUNCIL DISTRICT REPRESENTING THE MOST UNHOUSED ANGELINOS.  THEY ARE MY CONSTITUENTS.   AND I AM THERE FOR THEM.

AS YOU ALSO KNOW, I'M THE AUTHOR OF "NO PLACE LIKE HOME ACT" OF 2018 WHICH DELIVERED $2 BILLION  -- A 2-BILLION-DOLLAR BOND TO DEVELOP PERMANENT SUPPORTIVE HOUSING FOR UNHOUSED PERSONS WHO ARE IN NEED OF SEVERE MENTAL HEALTH SERVICES.

TO MY KNOWLEDGE MY LEGISLATION HAS DELIVERED $540 MILLION IN FUNDING FOR THE COUNTY OF LOS ANGELES FOR PERMANENT SUPPORTIVE HOUSING FOR THOSE WHO ARE HIGHLY ACUTE.

THAT SAID, I DO WANT TO START MY REMARKS BY SHARING A STORY OF MIGUEL.   OBVIOUSLY, I WON'T SHARE HIS LAST NAME, BUT MIGUEL IS  -- MIGUEL'S EXPERIENCE IS A STARK ILLUSTRATION OF THE PROBLEM OF THE CURRENT SYSTEMATIC FAILURES.

NOW, MIGUEL BORN AND RAISED IN THE CITY OF GLENDALE, NEIGHBORING CITY TO THE NEIGHBORHOOD OF EAGLE ROCK.  SUFFERED GREATLY ON THE STREETS.  WE WERE ABLE TO HOUSE HIM AT OUR TINY HOME VILLAGE IN EAGLE ROCK OFF FIGUEROA RIGHT ACROSS THE STREET FROM EAGLE ROCK PARK JUST SOUTH OF THE BARACK OBAMA FREEWAY.

MIGUEL HAS BEEN PLACED ON SEVERAL OCCASIONS AT THE TINY HOME VILLAGE.  BECAUSE OF SEVERE MENTAL ILLNESSES HE WAS ASKED TO LEAVE BECAUSE OF VIOLENCE COMMITTED ON THE SITE PHYSICALLY.

THE COURT:   RIGHT.

MR. DE LEON:   AS A RESULT ALSO TO MIGUEL ON THE CORNER OF EAGLE ROCK BOULEVARD AND COLORADO BOULEVARD, ONE DAY IT WAS A WEEKDAY -- IN FACT, I WITNESSED IT BECAUSE I WAS ON MY WAY TO A MEETING LATE AFTERNOON.   THERE WERE SWARMS OF POLICE OFFICERS.  LAPD AS WELL AS THE L.A. FIRE DEPARTMENT.

I CAME UP UPON THE CAPTAIN.   THE CAPTAIN -- I ASKED FOR A BRIEFING FROM THE CAPTAIN.

HIS MOTHER WAS THERE.  AND I SPOKE WITH THE MOTHER.

APPARENTLY ON THE CORNER MIGUEL HAD A TORCH.  THERE WAS A CAR NEXT TO THE GAS, A TANK AT THE GAS STATION.  AND HE WAS THREATENED TO STICK THE TORCH INTO THE GAS TANK AND BLOW UP THE CAR.  WITH THAT, THE GAS STATION.

SWARMS OF LAPD AS WELL AS FIRE DEPARTMENT THERE.

LONG STORY SHORT,  IT WAS  -- IT WAS A GOOD DAY BECAUSE

MIGUEL WAS APPREHENDED AND WAS TAKEN TO A 5150.

THE COURT:  OKAY.

MR. DE LEON:  WHICH HE WAS SHORTLY RELEASED.

LET ME UNDERSCORE THE FOLLOWING, YOUR HONOR, AS WELL AS TO THE SPECIAL MASTER AND SPECIAL MASTER GANDHI.

THE CITY DOES NOT EMPLOY SOCIAL WORKERS.  THE CITY DOES NOT EMPLOY MENTAL HEALTH PROFESSIONALS.  THE CITY DOES NOT EMPLOY SUBSTANCE ABUSE COUNSELORS.

WE HAVE NO OTHER CHOICE BUT TO RELY ON LAPD AND THE L.A. FIRE DEPARTMENT WHICH BOTH ENTITIES WITHIN THE CITY OF LOS ANGELES ARE OVERTAXED AND OVER BURDENED.

IN PARTICULAR, THE LOS ANGELES FIRE DEPARTMENT WITH THE VAST MAJORITY OF THEIR CALLS NOW ARE HOMELESS RELATED, DRUG RELATED AND MENTAL HEALTH RELATED.

MIGUEL WAS TEMPORARILY PLACED IN A TINY HOME VILLAGE LIKE I SAID.  BUT AGAIN HE WAS EJECTED BECAUSE OF SEVERE VIOLENCE.

HE WAS  -- IT WAS NO LONGER A SAFE PLACE FOR HIM OR FOR THE RESIDENTS.

BACK ON THE STREETS MIGUEL FOUND HIMSELF ENCAMPED OUTSIDE A SCHOOL, A SITUATION SO DIRE THAT MY STAFF HAD TO INTERVENE TO DEMAND HE RECEIVE THE HELP THAT HE NEEDED URGENTLY.

NOW, THIS ANECDOTE ABOUT MIGUEL UNDERSCORES  -- UNDERSCORES NOT JUST OUR CITY'S CRISIS BUT A SYSTEMATIC FAILURE BY THE COUNTY.

NOW, I UNDERSCORE THE FOLLOWING BECAUSE WE ARE -- CONTINUE TO BE AT A POINT OF CRISIS.

NOW, I WANT TO PREFACE THE FOLLOWING COMMENTS BECAUSE SUPERVISOR LINDSEY HORVATH -- AND I RECOGNIZE THAT SHE MADE THE PHONE CALLS.

THE COURT:  WELL, I WANT TO STOP THAT BACK AND FORTH RIGHT AT THIS POINT IF IT'S OKAY WITH --

MR. DE LEON:  NO, NO.  I WAS JUST GOING TO RECOGNIZE HER -- VALIDATE --

THE COURT:  WELL, LET'S DO THAT POSITIVELY —

MR. DE LEON:  -- HER PHONE CALLS TO ALL THE COUNCIL MEMBERS.

THE COURT:  AND THEN LET'S MOVE ON.

MR. DE LEON:  YES.

THE COURT:  BECAUSE I DON'T WANT TO GET IN THIS BACK AND FORTH BETWEEN YOU AND HILDA RIGHT NOW.

MR. DE LEON:  NO, NO, NO.  THAT'S NOT THE CASE, YOUR HONOR.

THE COURT: OKAY.

MR. DE LEON: I WANT TO UNDERSCORE THE FOLLOWING.

THE COURT: OKAY.

MR. DE LEON:  THAT'S NOT THE CASE.  BUT WE HAVE TO UNDERSCORE THE REAL ISSUES HERE.

THE COURT:  OKAY.

MR. DE LEON:  THEY'RE NOT THE PERSONAL ISSUES.

THE COURT: OKAY.

MR. DE LEON: BUT THE REAL FUNDAMENTAL ISSUES.

NOW, SHE MADE -- SHE OUTREACHED. AND I RECOGNIZE AND I THANK HER -- THANK HER FOR THAT. AND WE HAD A LOVELY CONVERSATION AND I THINK A PROACTIVE POSITIVE CONVERSATION.

AND I RECOGNIZE THAT MANY IN THE -- ELECTED OFFICIALS ONCE TAKING OFFICE WHETHER IT BE US AT THE CITY LEVEL, WHETHER IT BE COUNTY OR SUPERVISOR WE INHERIT SYSTEMATIC FLAWS IN THE SYSTEM. AND WE DEAL WITH THAT SYSTEM THE BEST AS WE CAN.

BUT THIS SITUATION, FOR EXAMPLE, HAS TAXED AND BURDENED THE CITY GREATLY.

AND ONE POINT THAT THE AUDITORS BROUGHT UP WAS THE COORDINATED ENTRY SYSTEM WHICH IS A PERFECT EXAMPLE.

WHILE INTENDED TO PRIORITIZE AND MANAGE ACCESS TO RESOURCES, IT SYSTEMATICALLY FAILS THE LOS ANGELES CITY RESIDENTS ITS REQUIRED TO SERVE LIKE SOMEONE LIKE MIGUEL.

NOW, RATHER THAN BUILDING HOUSING, WHAT HAS HAPPENED NOW IS THAT MANY OF OUR UNHOUSED INDIVIDUALS WHO ARE SEVERELY MENTALLY ILL, HIGH ACUITY, ARE EITHER IN HOTEL ROOMS, WHETHER IT BE INSIDE SAFE HOTEL ROOMS OR IN TINY HOME VILLAGES.

AND THAT HIGHLY ACUTE POPULATION -- THAT SUBSET NEEDS TO BE IN A PLACE OF RESIDENCE WHERE THEY CAN GET THE HELP THAT'S NECESSARY. THAT IS A MENTAL HEALTH BED.

THE COURT: OKAY.

MR. DE LEON: WE SIMPLY DON'T HAVE ENOUGH MENTAL

HEALTH BEDS.

THE COURT:  I'M GOING TO  -- I'M GOING TO CUT YOU OFF FOR JUST A MOMENT.

MR. DE LEON:  GO AHEAD.

THE COURT:  BE IMPOLITE ON MY PART.

BUT I'D LIKE YOU TO STAY OR ANY ELECTED OFFICIAL FOR JUST A MOMENT.

WE'RE GOING TO GET INTO SOME OF THIS THROUGH THE AUDITOR OR CONTROLLER IN JUST A MOMENT AND THROUGH MATT SABO AND THE CITY WHO WE ASKED TO COOPERATE BECAUSE QUITE FRANKLY THERE WAS SOME DISSENSION THERE.

AND I DON'T KNOW HOW THAT'S GOING TO BE WORKED OUT BETWEEN THE TWO OF YOU.  FROM MY PERSPECTIVE, I WELCOME ANY AUDIT.  I WELCOME A&M'S AUDIT BUT I ALSO WELCOME THE CONTROLLER'S AUDIT.

AND I'D LOVE TO HAVE THE DOUBLECHECK BETWEEN THE TWO AND SEE HOW THEY MATCH UP.

BUT REMEMBER FOR A&M THEY'RE GOING BACKWARDS.  YOU KNOW, HOW DID WE SPEND OUR MONEY.   AND IF SO, HOW CAN WE IMPROVE IN THE FUTURE.

FOR THE CONTROLLER AND THE CITY WHO PLEDGED TO COOPERATE, WE'RE GOING FORWARD.  AND THAT IS HOW DO WE GET AN ACCOUNTING TRANSPARENTLY FROM THIS POINT FORWARD FROM OUR PROVIDERS SO THEY CAN MAKE DECISIONS AND SO THE PUBLIC CAN IMAGINE THIS.

SO, FOR A MOMENT I WANT TO GO RIGHT BACK TO THE  -- YEAH, TO THE CONTROLLER.

AND THANK YOU FOR BEING HERE.

I WANT TO SAY TO ALL OF YOU THAT THIS IS THE FIRST EFFORT THAT I'VE SEEN THAT I CAN PERSONALLY UNDERSTAND.

I LOVE THE PIE CHARTS.

AND I LOVE THE FACT THAT I CAN KIND OF SEE WHAT IS SECURITY, WHAT IS OVERHEAD.

AND I REPRESENT TO YOU  --

KEVIN, RAISE  -- RAISE YOUR HAND.

TERRY, RAISE YOUR HAND BACK THERE.

MEMBERS OF THE COMMUNITY, GO BACK AND TALK TO THEM.

AND INSTEAD OF TAKING THE TIME RIGHT NOW BECAUSE YOUR TIME IS VALUABLE -- I PROMISE YOU THAT IF YOU GO BACK OUT IN THE COMMUNITY  -- I DON'T CARE WHETHER IT'S FROM VERNON DOWN FIGUEROA OR I DON'T CARE IF I CAN TAKE YOU INTO SKID ROW WITH THE COMMUNITY HERE -- YOU WILL HEAR FROM EVERY SINGLE PERSON THAT IT'S NOT HITTING THE STREETS.  IT'S NOT GETTING TO US, JUDGE.

AND I THINK WE CAN DEMONSTRATE THAT WITH JUST INSIDE SAFE FOR A MOMENT.

SO, I WANT YOU TO GO THROUGH THIS WEBSITE.

I WANT YOU TO PUT UP THE WEBSITE.   I WANT YOU TO SHOW PEOPLE HOW IT WORKS SO THAT THEY CAN CHECK THIS WEBSITE.

AND THIS IS ONE THING THE COURT WAS ADAMANT ABOUT.

I WON'T TELL YOU WHAT I WAS GOING TO DO TODAY.  BUT UNTIL

I GOT SOME INFORMATION I WAS GOING TO ACT TODAY.  IT MIGHT HAVE BEEN SHOCKING.

I'M NOT THREATENING YOU.  I'M JUST TELLING YOU THAT I'M GOING TO DESIST FROM THAT FOR TWO WEEKS.

BUT THIS IS SOMETHING THAT THE COURT IS GOING TO DEMAND ON THE PUBLIC'S BEHALF.   THIS WEBSITE HAS TO GO UP.  AND IT HAS TO BE TRANSPARENT.  AND THAT'S GOING TO BE MY RED LINE.

SO, SHOW US WHAT YOU'VE GOT WITH THE WEBSITE SO FAR.

BECAUSE LAHSA WILL SUPPLY YOU WITH THE INFORMATION.

AND I GOT A 5:00 NOTICE THAT I'LL READ TO YOU FROM LAKEISHA ADAMS.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  YEAH.  I KNOW YOU'RE AWARE OF HOW MONUMENTAL IT IS TO HAVE THESE DASHBOARDS.   AS YOU KNOW, WE CAME TO LAHSA ONLY A YEAR AND A HALF AGO.  AND DEVIN HAS ONLY BEEN WITH US FOR A YEAR.  AND WE'VE BEEN WAITING TO HAVE THESE OUTCOME DASHBOARDS FOR YEARS AND YEARS AND YEARS.

IT WAS AMAZING TO LEVERAGE OUR WORK AS PROVIDERS.  AND DASHBOARDS WE CREATED ON OUR OWN AT ST. JOSEPH'S, ET CETERA.

SHE COMMUNICATED THIS MORNING AND SAID THAT THIS INFORMATION HAD BEEN HANDED OVER LAST NIGHT.

OF COURSE, YOU HAVEN'T HAD A CHANCE TO EVALUATE IT.

I ALSO WANT TO GIVE A SHOUT OUT TO HER BECAUSE SHE WAS ON THE ROAD WITH US LAST SUNDAY AND CAME DOWN PERSONALLY.

AND SHE DESERVES CREDIT -- CREDIT FOR JUST TALKING TO THE PEOPLE ON THE STREET SO SHE COULD VERIFY EXACTLY WHAT I'M SAYING.

IT'S NOT HITTING THE STREET.

SO, YOU'RE INVITED AT ANY TIME.

HILDA IS INVITED AT ANY TIME.

KATHRYN BARGER HAS BEEN ON THE STREET NOW TWICE.  I COMMEND HER FOR IT.

ALL RIGHT.  YOU'RE THE CONTROLLER.  SHOW US WHAT YOU GOT.

MR. MEJIA:  GOOD MORNING, YOUR HONOR.

I THANK YOU FOR HAVING US.

CAN  WE PUT UP THE SCREEN ON.  I HAVE  -- I HAVE THE HDMI CONNECTED.  I JUST NEED IT TO BE SHOWN.

(PAUSE IN PROCEEDINGS.)

MR. MEJIA:  ALL RIGHT.  CAN EVERYONE SEE IT?

SO, THIS IS OUR HOMELESSNESS DASHBOARD.  AND ON THE TOP WE HAVE A SECTION RELATED TO THE ALLIANCE ROADMAP.   AND INSIDE SAFE EXPENSES RELATED TO THIS ALLIANCE SETTLEMENT.

AND, SO, FOR THOSE  -- IF THIS IS YOUR FIRST TIME SEEING THIS, WE PUT A LITTLE BACKGROUND INFO ON THE TOP SO YOU COULD JUST READ MORE ABOUT IT.

YOU COULD CLICK ON SOME OF THESE -- THESE OPTIONS HERE.  AND IT WILL  -- A POP UP WILL COME UP.  AND IT WILL TELL YOU WHERE YOU COULD GO.

IN ADDITION, IF YOU GO DOWN HERE YOU COULD SEE A

SUMMARY OF PAYMENTS SO FAR RELATED TO 2024.

WE GET THESE PAYMENTS FROM THE CAO.  THE CAO'S OFFICE PROVIDES US WITH THESE.

AND, SO, WHEN YOU SEE THESE HYPERLINKS YOU CAN ACTUALLY CLICK ON IT.  AND IT WILL TAKE YOU TO MORE DETAIL.

SO, IF YOU CLICK ON THIS 6.2 MILLION IT WILL TAKE YOU DOWN HERE.

AND BEFORE I KEEP GOING AND SHOWING YOU ALL THE  -- HOW IT WORKS, TO  --

SHAYLA, I KNOW YOU WANTED US TO INCLUDE FOR THE ALLIANCE SETTLEMENT PROGRAM THAT THIS ONLY RELATES TO INTERIM HOUSING ONLY BECAUSE I KNOW IT'S ONLY A SMALL PORTION OF THE ALLIANCE SETTLEMENT PROGRAM.   SO, WE ADDED THAT PORTION HERE JUST SO THERE IS NO CONFUSION THAT ALLIANCE IS ONLY 6.2 MILLION.

BUT IF YOU SCROLL DOWN HERE, THE 6.2 MILLION IS MADE UP OF ALL THESE INDIVIDUAL PAYMENTS.

ON THE LEFT YOU COULD SEE THE DATE OF THE PAYMENT AND THEN YOU COULD SORT OF SEE WHO THE SERVICE PROVIDER IS, WHAT ENCAMPMENT IT WAS RELATED TO AND THEN THE CONTRACT AND THEN THE AMOUNT.

AND, SO, FOR HERE IF YOU ACTUALLY CLICK ON THESE HYPERLINKS RIGHT HERE, ONE PIECE THAT WE ADDED THAT'S  NEW IS WHEN YOU CLICK ON THIS HYPERLINK HERE OF THE SERVICE PROVIDER FOR THIS PAYMENT ON FEBRUARY 2022, WE HAVE ATTACHED THE INVOICE.  SO, YOU ALL COULD SEE THE INVOICE ATTACHED.  IT'S 54 PAGES

LONG.

IT COULD BE PRETTY DIFFICULT FOR THE PUBLIC, BUT YOU COULD PRETTY MUCH SCROLL DOWN.  AND YOU ALL CAN DO SOME RESEARCH.   THERE ARE REDACTED PARTS HERE OF COURSE TO PROTECT, YOU KNOW, SENSITIVE INFORMATION AND PEOPLE.

BUT YOU COULD PRETTY MUCH SCROLL DOWN.  AND YOU COULD SEE WHAT WAS PROVIDED BY LAHSA AND THE SERVICE PROVIDER.

SO,  I'LL GO BACK TO THE WEBSITE.

BUT WHAT WE DID WAS WE TOOK THAT INFORMATION ON THAT INVOICE WHICH IS, YOU KNOW, IT COULD BE 100 PAGES.  IT COULD BE 54.  BUT IF YOU CLICK OVER HERE WE ACTUALLY TRY TO MAKE IT EASIER FOR YOU ALL TO SEE WHAT IT WAS SPLIT UP INTO.

AND, SO, WE KNOW FOR THIS PAYMENT THAT WE DID IN FEBRUARY IT WAS FOR THE MONTHS OF NOVEMBER TO DECEMBER 2023.

AND IF YOU SCROLL DOWN YOU COULD SEE THE FINANCIAL PIECE WHICH WE TOOK FROM THAT 54-PAGE INVOICE SO THAT IT'S EASIER FOR YOU ALL SO YOU COULD SEE WHAT THE BREAKDOWN IS ON WHAT WE WERE PAYING FOR.  SO YOU COULD SEE THE LARGEST SHARE.  YOU COULD HOVER OVER THE PIE CHART.  AND IT COULD TELL YOU HOW MUCH WE SPENT ON PROGRAM SITES.  IT COULD TELL YOU HOW MUCH WE SPENT ON SECURITY AND SO FORTH.

SO, YOU COULD SCROLL DOWN.

ONE NEW COMPONENT THAT WE ADDED IS WE GOT SOME OF THE PERFORMANCE METRICS BY LAHSA.  AND, SO, WE GOT PERFORMANCE METRICS.   AND WHAT I  -- WHAT I TOLD YOU WAS THAT

NOT -- NOT ONLY CAN YOU SEE THE FINANCIAL PIECE, BUT IF YOU SCROLL DOWN NOW YOU COULD SEE THE PERFORMANCE METRICS PIECE HERE.

SO, WE GOT THIS INFORMATION FROM LAHSA.

AND YOU COULD SEE JUST SOME OF THE METRICS THAT HAD TO DO WITH NOVEMBER AND DECEMBER SO THAT YOU ALL CAN HAVE AN IDEA ON, YOU KNOW, WHAT WERE THE METRICS FOR THIS.

SO, THIS IS A FULL EXAMPLE OF ONE WHERE YOU CAN GO TO A PAYMENT AND FIND OUT -- SEE THE FULL INVOICE.   SEE THE FINANCIAL AND SEE THE PERFORMANCE METRICS TIED.

SO -- AND FROM OUR POINT OF VIEW THIS WOULD BE A FULL EXAMPLE OF EVERYTHING.

AND, SO, PRETTY MUCH YOU COULD KEEP SCROLLING DOWN.

WE ARE STILL WORKING ON GETTING MORE -- MORE INVOICES OR -- SO THAT IT CAN -- WE CAN ADD MORE.

SO, WE ARE WORKING WITH LAHSA TO GET THAT INFORMATION.

IF YOU SCROLL DOWN, THIS IS THE INSIDE SAFE PROGRAM.

SO, WE MADE A LITTLE PIE CHART OF THE SERVICE PROVIDERS WHO ARE GETTING A SHARE OF TAXPAYER FUNDS.

AND IF YOU SCROLL DOWN SIMILAR TO WHAT YOU JUST SAW YOU CAN CLICK ON -- YOU CAN CLICK ON THE AMOUNT.   AND IT COULD TELL YOU HOW MUCH YOU'RE SPENDING ON -- SO, FOR THIS ONE WE'RE SPENDING 35 PERCENT ON SECURITY.  15 PERCENT ON WAGE NAVIGATORS.

FOR HERE WE  -- WE NEED TO  -- WE HAVE THE PERFORMANCE METRICS, BUT WE NEED TO WORK WITH LAHSA TO TRY TO  --

THE COURT:  LET'S JUST STOP THERE FOR JUST A MOMENT.  OKAY.

MR. MEJIA:  SURE.

THE COURT:  I WANT YOU TO GO DOWN FOR A MOMENT AND PICK SOME CATEGORIES WHERE WE HAVE WHAT I'M GOING TO CALL DIRECT SERVICES TO A HOMELESS PERSON.

AND AS I SEE SECURITY IS ABOUT 35 PERCENT.

WELL JUSTIFIED MAYBE.  MAYBE NOT.

WAGES, 15 PERCENT.

BACK BILLING, I DON'T KNOW WHAT THAT IS.  BUT 12 PERCENT.

SUPPLIES, 11 PERCENT.

NOW, HEALTH, DENTAL, VISION, I'M EXCITED ALL OF A SUDDEN.  AS TO THE STREET.

AND WE'VE GOT 2.49 PERCENT.

WAGES, DIRECTORS, I DON'T KNOW IF THAT'S ONE PROGRAM OR ACROSS THE BOARD.  2.22 PERCENT.

CONTRACT PERSONNEL, 2.14.

FOOD, I'M EXCITED AGAIN.  1.82 PERCENT.

FICA, I THINK I KNOW WHAT THAT IS.

WAGES, ASSOCIATES.

OFFICE SUPPLIES.  I DON'T KNOW IF THAT'S A DUPLICATE OR NOT OF THE OTHER SUPPLIES.

PENSION CONTRIBUTIONS.

WAGE COMPENSATION OVERTIME.

SENIOR DIRECTORS.

JANITORIAL SUPPLIES.  OBVIOUSLY, NEEDED.

INTERIM FEEDING COOKING SUPPLIES, .21 PERCENT.

INSURANCE.

CELL PHONE SERVICES.

AND I'M SHOWING THAT THAT HELPS THE HOMELESS.

SYSTEM SUBSCRIPTION.

BUS TOKENS.  I'M ASSUMING THAT HELPS THE HOMELESS.

VET SUPPLIES.  I'M ASSUMING THAT HELPS THE HOMELESS.

I'LL LEAVE THAT TO YOU AS THE PRESIDENT AND THE CHAIRMAN OF THE BOARD.

BUT THE QUESTION WILL ALWAYS BE IF WE WENT OUT TO THE STREET TO TALK TO THE FOLKS, WHAT GOT TO THEM.  YOU KNOW, SOMETHING MEANINGFUL.

WOULD YOU GO BACK TO INSIDE SAFE FOR A MOMENT.

GO UP TO THE  -- YEAH, TAKE  -- WELL, PEOPLE'S CONCERN. WHY DON'T YOU TAKE PEOPLE'S CONCERN.

GO DOWN FOR A MOMENT.

AND, WELL, I DIDN'T MEAN TO MENTION THEM.  BUT LET'S SEE HOW THEY'RE DOING.

OKAY.  LET'S PUT THIS UP.

AND I DIDN'T MEAN TO MENTION THEM, SO.

ALL RIGHT.  SECURITY IS 46.6 PERCENT.

SALARY IS WHAT?  -- 41 PERCENT.   THAT'S ALL OVERHEAD THERE.

LET'S GO DOWN TO ADMINISTRATIVE OVERHEAD.  8.3 PERCENT.

AND MEDICARE.  HEALTH INSURANCE.

NOW, I WANT TO SAY THAT'S NOT HELPING THE HOMELESS.

BUT I'M SAYING IF YOU TALK TO THE PERSON ON THE STREET FOR FOOD, WATER, CELL PHONE SERVICES, ET CETERA.  I THINK UNIVERSALLY --

AND, KEVIN, YOU'RE THE UNOFFICIAL MAYOR.

AND, TERRY, IN A MOMENT.

IF THEY DON'T BELIEVE ME, YOU KNOW, I'VE GOT ALL SORTS OF PEOPLE OUT HERE WHO HAVE TALKED TO ME ABOUT THAT.

THEY'LL TELL YOU UNIVERSALLY AND THEY'LL TELL YOU ON THE STREET IF YOU TALK TO A COUPLE OF HUNDRED PEOPLE, AND I TAKE YOU OUT THERE, NOT HITTING THE STREETS.  NONE OF IT IS GOING DOWN.

MILEAGE.  LOCALE.

KEEP GOING DOWN.

I'LL LEAVE IT TO YOU.   WHAT'S HITTING THE STREET THAT A HOMELESS PERSON CAN SAY THAT THEY RECEIVED IN ACTUAL SERVICES THAT THEY CAN EAT, FEED A PET, GET HOUSING, DO SOMETHING WITH.

OKAY.  KEEP GOING WITH YOUR PRESENTATION.

MR. MEJIA:  AND, SO, FOR THE INSIDE SAFE PIECE WE ARE WORKING TO ADD THE PERFORMANCE METRICS.

THAT'S WHY IF YOU SCROLL DOWN YOU WON'T SEE THE PERFORMANCE METRICS.   IT CAN BE DIFFICULT TO FIND WHAT THE PERFORMANCE METRICS ARE BECAUSE THE METRICS ARE TIED TO THE INTERIM HOUSING LOCATIONS.

AND, SO, AN INTERIM HOUSING LOCATION CAN INCLUDE MANY

DIFFERENT ENCAMPMENT SITES.  SO, THAT'S THE PART THAT WE'D HAVE TO RECONCILE AND FIND OUT WHERE THAT IS.

BUT IF YOU -- BUT, YEAH, IF YOU KEEP SCROLLING DOWN YOU CAN PRETTY MUCH SEE MORE INVOICES ON THE LEFT.  AND FOR THE ONES THAT HAVEN'T BEEN ADDED, WE'RE STILL WORKING ON ADDING THEM.

IF YOU SCROLL DOWN YOU GET DOWN TO THE ROADMAP AGREEMENT.   THIS IS ONE WHERE WE ARE HAVING A LITTLE TROUBLE WITH.

AND, SO, WE'RE WORKING WITH LAHSA TO FIND OUT HOW THE SERVICE PROVIDER INVOICES TIE TO THE PAYMENTS THAT THE CITY MAKES.  AND ONCE WE CAN GET CLARITY AND WE MEET WITH THEM AGAIN WE WILL BE ABLE TO HAVE THESE PORTIONS HERE ON THE RIGHT SO THAT YOU COULD CLICK ON IT AND FIND OUT MORE.

SO, THAT'S FOR THE ROADMAP.

IN ADDITION WE DO HAVE SAFE PARKING HERE.

THE COURT:   OKAY.

MR. MEJIA:  I'D SAY SAFE PARKING IS ANOTHER EXAMPLE OF ONE THAT IS FULLY COMPLETE.

AND, SO, SAFE PARKING L.A. IS OUR VENDOR.  AND YOU COULD SEE THE BREAKDOWN OF THE FINANCIAL SIDE HERE.

STAFF, SECURITY AND WHATNOT.  AND THIS JUST PROVIDES MORE INFORMATION ON THE  --

THE COURT:   WE'LL GO AROUND THAT PIE CHART AGAIN. SLOW DOWN JUST A LITTLE BIT.

MR. MEJIA:  ALL RIGHT.

THE COURT:  OKAY.  GO AROUND THAT PIE CHART.

(PAUSE IN PROCEEDINGS.)

THE COURT:  OKAY.  ALL RIGHT.  PLEASE CONTINUE.

MR. MEJIA:  YEAH.  SO, SAFE PARKING L.A. IS A VENDOR.

AND, SO, IF YOU ACTUALLY SCROLL DOWN, WE DO HAVE THE PERFORMANCE METRICS PIECE BECAUSE WE HAVE IT FROM OCTOBER TO APRIL OF THIS YEAR.

AND ONE PIECE THAT WE ADDED FOR TODAY IS NOW YOU CAN CLIC K ON THESE HYPERLINKS.  AND IT WILL GIVE YOU THE VENDOR INVOICE SO YOU COULD SEE THE BREAKDOWN OF HOW WE POPULATED THE INFORMATION.

AND  – YEAH.  BUT, OF COURSE, WE DID IT FOR YOU ALL THROUGH THE PIE CHARTS.  BUT HERE YOU COULD ALSO SEE THE PERFORMANCE METRICS BECAUSE THEY DID PROVIDE THE METRICS.  AND YOU COULD SEE HOW MANY SPACES THEY HAVE, HOW MANY CLIENTS THEY SERVED, UTILIZATION.

AND THAT'S PRETTY MUCH OUR – OUR PRESENTATION.

AND JUST TO TELL YOU WHERE WE'RE AT.  WE ARE WORKING WITH LAHSA TO  -- TO RECONCILE SOME OF THE FINANCIAL INVOICES TO THE PAYMENTS HERE.

FOR WHAT WE CAN MATCH ONE FOR ONE WE DID ADD THEM HERE.

WE ARE  -- WE STILL NEED TO HAVE ADDITIONAL MEETINGS WITH THEM SO THAT THEY CAN TIE THAT OUT.

I THINK AS MENTIONED EARLIER BY A&M YOU SORT OF HAVE TO REALLY -- THE SYSTEM WASN'T BUILT SO THAT IT'S IN- -- IT'S INTUITIVE WHERE IF YOU SAY THE CITY PAID YOU A MILLION DOLLARS.  SHOW ME WHERE THAT MILLION DOLLARS IS.

THE COURT:  RIGHT.

MR. MEJIA:  IT'S – IT'S NOT BUILT THAT WAY.  IT'S  -- YOU HAVE TO ACTUALLY GET A MAPPING FILE TO FIGURE OUT HOW IT TRANSLATES.  AND THEN  -- AND THEN YOU END UP BACK AT THE INVOICE.

AND THEN  -- SO, THERE'S  -- WE ARE WORKING WITH  -- WITH LAHSA TO TRY TO FIND OUT HOW TO MAKE THE  -- THE DATA MAKE SENSE MORE IN TERMS OF THE FINANCIAL SIDE AND ALSO THE METRIC SIDE.

SO, THAT'S WHAT I HAVE FOR  -- FOR YOU ALL TODAY.

AND THIS IS ALL PUBLIC.  SO, YOU ALL CAN PLAY AROUND WITH IT OR LOOK AT IT MORE.  BUT I CAN TAKE ANY QUESTIONS OR ANYTHING.

THE COURT:  YEAH.  I'M GOING TO THROW  -- I'LL PASS AROUND THE ROOM.

SO, L.A. ALLIANCE, DO YOU HAVE ANY QUESTIONS?

MS. MITCHELL:  NOT AT THIS TIME, YOUR HONOR.

THANK YOU.

THE COURT: LET ME TURN TO ANY OF YOU FOLKS.

MS, MITCHELL:  I THINK IT'S GREAT.

THE COURT:  AS CHAIRPERSON.

MR. HARRIS-DAWSON: I THINK IT'S WONDERFUL.   AND IT ALLOWS US TO DIG BENEATH THE SURFACE.

SO,  YOU KNOW, ONE OF THE NUMBERS THAT JUMPED OUT WAS

SECURITY.

AT ONE OF THE SITES ALMOST HALF THE COST -- WHICH REMINDED ME OF THE CONVERSATION WE JUST HAD ABOUT MENTAL HEALTH BEDS.   AND IT  -- YOU KNOW, WE DON'T KNOW FROM HERE.  BUT WE WONDER IF THERE'S A RELATIONSHIP BETWEEN THOSE TWO THINGS.

BUT SEEING THE NUMBERS LETS US ASK THAT QUESTION AND DRILL DOWN.

THE COURT:  OKAY.

YEAH.   LET ME TURN TO THE CITY  --

MR. DE LEON:   I WAS GOING TO ADD THE SAME THING TO THE SECURITY BEING DISAGGREGATED FROM SALARIES FROM THE GENERAL SALARIES OF STAFF WORKERS TO COUNCIL PRESIDENT MIKE HARRIS-DAWSON'S POINT.  IT GIVES AN OPPORTUNITY TO ASK AND DIG DEEPER WITH GRANT'S QUESTIONS WHY DO WE  -- ARE SALARIES HIGH  -- OR NOT HIGH, I SHOULD SAY, BUT EXPANSIVE WITH REGARD TO SECURITY.

ARE THERE ISSUES WITH REGARDS TO HIGH ACUITY FOLKS. AND DO WE HAVE A LOT OF HIGH ACUITY FOLKS WHETHER IN INTERIM HOUSING, TINY HOMES, ALLIANCE ROADMAP OR IN THIS CASE INSIDE SAFE.

YOU KNOW, AND WOULD THEY BE BETTER FITTED IN A DIFFERENT LOCATION.   AND HENCE THE HIGH NUMBER WHEN IT COMES TO SECURITY.

THE COURT:  OKAY.

MS. RAMAN:  AND I JUST WANTED TO ADD THAT I'M REALLY  -- AFTER QUITE A LONG TIME OF ASKING IN OUR COMMITTEE FOR

ADDITIONAL DATA ABOUT OUTCOMES SO THAT WE CAN ACTUALLY CONTRACT IN A WAY THAT INCLUDES OUTCOMES, LAHSA HAS WORKED WITH US TO CREATE A SET OF DATA DASHBOARDS THAT WILL ALLOW US TO MONITOR PERFORMANCE ACROSS OUR INTERIM HOUSING SITES WHICH IS SOME OF THE DATA THAT HAS ACTUALLY BEEN INCLUDED IN HERE.

SO, I'M REALLY DELIGHTED TO SEE THAT PROGRESS HAPPENING.

THIS IS THE FIRST TIME THANKS TO -- I THINK THE COMMITTEE'S INSISTENCE AND TO THE WORK OF LAHSA TO REALLY PROVIDE THIS -- THAT WE HAVE INFORMATION ABOUT HOW LONG PEOPLE ARE STAYING AT OUR INTERIM SITES, HOW MANY PEOPLE ARE CONNECTED TO DOCUMENTS, HOW CAN WE INSURE THAT THEY'RE MOVING QUICKLY TO THEIR NEXT STEP, WHETHER IT BE A TIME-LIMITED SUBSIDY OR A PERMANENT HOUSING UNIT.

I WANT TO SEE THAT SAME INFORMATION ACROSS EVERY PIECE OF THE SPENDING THAT WE'RE DOING.  BUT I THINK THIS IS GREAT IN TERMS OF ITS PRESENTATION AND HOW EASILY IT ALLOWS US TO VIEW THESE EXPENDITURES.

THE COURT : YOU FOLKS REPRESENTING THE CITY, YOUR COUNSEL, DO YOU HAVE ANY QUESTIONS?

MS. MARIANI:  NO QUESTIONS AT THIS TIME, YOUR HONOR.

THE COURT:  LET ME TURN BACK TO THE COUNTY THEN, MIRA.

MS. HASHMALL:   NO QUESTIONS.

THE COURT:   SHAYLA?

MS. MYERS:  YEAH.  JUST A  -- JUST A COMMENT AND PERHAPS A QUESTION OR A SUGGESTION RELATIVE TO THE WAY THE DATA IS PRESENTED.

BUT I THINK THE CITY COUNCIL HAS DONE A GOOD JOB LATELY OF RECOGNIZING THAT OUR HOMELESS SERVICE PROVIDERS ARE FAIRLY UNDERPAID IN TERMS OF LIVING WAGES, THAT THAT HAS ACTUALLY BEEN A CHALLENGE THAT THE CITY COUNCIL HAS BEEN STRUGGLING WITH.

IT'S A CHALLENGE THEY'VE STRUGGLED WITH IN TERMS OF LAHSA.

LAHSA EMPLOYEES ARE PAID MORE.

WE HAD A REALLY PHENOMENAL LISTENING SESSION THAT SPECIAL MASTER MARTINEZ PUT TOGETHER WITH SOME SERVICE PROVIDERS.

AND I THINK WHAT EVERYONE REMARKED UPON  -- AND I THINK YOU REMARKED UPON IT, TOO, JUDGE CARTER, IS THAT THE SERVICE PROVIDERS HAVE VERY HARD JOBS AND ARE DOING  --

THE COURT:  YEAH.

MS. MYERS:  -- VERY HARD WORK.  AND ONE OF THE CHALLENGES IS RETENTION OF EMPLOYEES.

WE ARE LOOKING AT LINE BY LINE THE COST OF EMPLOYING INDIVIDUALS WITHIN THE CITY OF LOS ANGELES TO DO THIS WORK.

WE ARE POINTING OUT THE COST OF THEIR HEALTH INSURANCE, THE COST OF THE CELL PHONES THAT THEY USE.

EACH LINE BY LINE IS BEING PRESENTED AS A COST WITHOUT AN ACKNOWLEDGEMENT THAT THIS IS THE COST OF A CASE WORKER,

RIGHT.   WHAT IT COST A CASE MANAGER TO DO THIS WORK.

SAME THING WITH HOUSING NAVIGATION.

WE'RE SAYING PEOPLE AREN'T GETTING CONNECTED.  BUT THAT'S THE COST OF A HOUSING NAVIGATOR.   AND IF YOU CAN'T FILL THOSE POSITIONS BECAUSE THEY'RE UNDERPAID COMPARED TO LAHSA, PEOPLE AREN'T GOING TO GET HOUSING NAVIGATION SERVICES.

I SAY THIS WITH REGARD TO THE CONTROLLER'S OFFICE BECAUSE THIS IS A PHENOMENAL WEBSITE.  BUT WE DON'T SEE  -- WE DON'T SEE IT AS INDIVIDUAL CASE MANAGERS.  HOW MANY PEOPLE ARE BEING FUNDED FOR THIS, RIGHT.   WHAT EACH OF THE LINE ITEMS ARE.  WHAT IS THE COST OF EACH OF THESE PEOPLE.  WHAT IS THE SALARY THAT A PERSON IS RECEIVING BECAUSE I THINK IT'S JUST VERY EASY TO LOOK AT A LINE-BY-LINE BREAKDOWN AND POINT OUT THIS ISN'T GETTING TO THE STREET.

BUT IF IT'S THE COST OF HEALTH INSURANCE FOR AN OUTREACH WORKER, AND WE ARE SAYING THE OUTREACH WORKER IS GETTING TO THE STREET, THEN, THAT IS.

AND I JUST  -- I DON'T WANT TO BE NITPICKING AT A TIME WHEN THE CITY COUNCIL IS STRUGGLING TO PROVIDE COST ALLOCATION FOR SERVICES THAT WE ARE SAYING PEOPLE NEED TO GET OFF THE STREETS.

SO, I DON'T KNOW IF THE CONTROLLER'S OFFICE CAN  -- CAN POINT OUT THE NUMBER OF EMPLOYEES WHO ARE PAID WITH THAT.

THAT I THINK WOULD BE USEFUL TO SAY IT COSTS $52,000 FOR A CASE WORKER TO PROVIDE THEM THE INCIDENTAL BENEFITS  -- FICA.  YOU KNOW, THOSE KINDS OF THINGS.

THE COURT:   ALL RIGHT.

MS. MYERS;   AND THEN THEN WE CAN JUDGE IS IT TOO EXPENSIVE TO PAY $26,000 FOR AN OUTREACH WORKER, RIGHT.  IS THAT TOO EXPENSIVE.

THANK YOU.

MR. MEJIA:  YEAH.  AND I CAN JUST RESPOND, SHAYLA.

SO, WHEN YOU CLICK ON THE INVOICE AND IF YOU GO TO THE INVOICE AND YOU SCROLL DOWN, YOU CAN ACTUALLY FIND THE BREAK-DOWN ON HOW MUCH  -- HOW MANY CASE MANAGERS WERE THERE.

SO, THIS IS FOR THE MONTHS OF OCTOBER, NOVEMBER, DECEMBER.

SO, FOR THIS EXAMPLE THIS IS OCTOBER.

SO, THERE WERE FIVE CASE MANAGERS.   AND YOU COULD SEE HERE HOW MUCH THEY MADE IN THAT MONTH.

AND, YOU KNOW, I JUST DID SOME BACK-OF-THE-HAND CALCULATIONS.   BUT IF WE JUST TOOK THE HIGHEST CASE MANAGER, WHICH THEY GOT PAID 4,076.  AND LET'S JUST SAY THEY WORKED 20 DAYS, BUSINESS DAYS IN THE MONTH OF OCTOBER.  THAT'S $204 A DAY.  AND THEN IF YOU DIVIDE IT BY 8 IT'S $25 AN HOUR.

SO, THIS IS JUST – THIS IS NOT OFFICIAL.   THIS IS JUST LIKE ME DOING MY ACCOUNTING, YOU KNOW, BECAUSE I'M AN ACCOUNTANT.

BUT YOU COULD SEE, YOU KNOW, THAT DETAIL HERE.

I THINK IF WE WERE TO ADD IT HERE THIS WOULD MAKE IT REALLY FOR TECHNOLOGY-WISE IT MIGHT BE A LOT.  BUT  -- BUT WE DO

HAVE THE INVOICE WHERE YOU COULD SEE THE BREAK-DOWN ON HOW MANY PEOPLE WERE THERE – THAT WERE WORKING.

THE COURT:  OKAY.

MR. DE LEON:  YOUR HONOR, I JUST WANTED TO ADD SOMETHING THAT SHAYLA MYERS  -- JUST TO UNDERSCORE THE POINT THAT SHE'S MADE.

OFTENTIMES THE CASE WORKERS, THE LINE STAFF AT THE SERVICE PROVIDERS, THEY THEMSELVES ARE OVERWHELMINGLY PEOPLE OF COLOR.  THEY THEMSELVES ARE TEETERING THEMSELVES OF EXPERIENCING HOMELESSNESS.

I CAN'T SAY THE COUNTLESS VISITS THAT I'VE MADE AND I'VE SPOKEN WITH THEM.  THEY THEMSELVES HAVE JOKINGLY HAVE ASKED CAN YOU RESERVE A TINY HOME FOR US OR CAN YOU RESERVE A BED FOR US BECAUSE THEY'RE BARELY MAKING ENDS MEET.

THEY ARE THEMSELVES JUST ONE PAYCHECK OR TWO PAYCHECKS FROM EXPERIENCING HOMELESSNESS.  AND THAT'S ONE OF THE BIGGEST CONUNDRUMS WE'VE HAD.   WE'VE HAD THIS DISCUSSION AD NAUSEUM IN THE COUNCIL.

HOW CAN WE, YOU KNOW, INCREASE THEIR SALARIES BECAUSE OF THE RETENTION ISSUE.  BECAUSE IT'S  -- IT'S HARD WORK.

THE COURT:   RIGHT.

MR.  DE LEON:  TO BE THERE 24/7.

THE COURT:  SO, THE VALUE JUDGMENTS LIE WITH YOU AS THE ELECTED OFFICIALS  -- NOT WITH THE COURT.

MY ONLY RED LINE IS I WANT THIS DATA UP.  I WANT THE PUBLIC

TO BE ABLE TO SEE IT.   I WANT YOU[ TO BE ABLE TO SEE IT.   AND THEN YOU MAKE YOUR DECISIONS AS ELECTED OFFICIALS.

AND THE ONE THING I'M ENCOURAGING THE CITY TO DO WITHOUT TAKING ACTION TODAY IS TO MAKE CERTAIN OR HOPEFULLY THINK ABOUT IF YOU'RE PAYING THE BILL, WHAT ARE YOU PAYING FOR.

LET ME REPEAT THAT.

ARE YOU GETTING AN INVOICE AND THEN PAYING A BILL WITHOUT KNOWING THE UNDERLYING DATA BECAUSE HISTORICALLY NO MATTER WHAT YOU TELL ME THIS WAS PROVIDER ORIENTED.

THIS SYSTEM INITIALLY WAS SET UP TO GET PROVIDERS PAID. NOTHING WRONG WITH THAT.

BUT FOR YEARS WE WENT BY.   AND WE'VE HELD HEARINGS. AND NOBODY HAS BEEN LISTENING.

WE DIDN'T HAVE ANY DATA SUPPORTING IT.   NOW THAT WAS EARLIER IN 2022, ET CETERA, WHEN WE'RE SEEING TENS IF NOT HUNDREDS OF MILLIONS OF DOLLARS GOING THROUGH THIS SYSTEM WITH NO ACCOUNTING.

THAT'S WHY WE'VE BEEN AFTER THIS AUDIT WITH A&M AND ENCOURAGING YOU TO GET THIS WEBSITE UP AND POST THIS ON THE FRONT SIDE BEFORE THESE BILLS ARE PAID.

NOW, YOUR PROVIDERS ARE GOING TO PUSH BACK AT YOUR COMMITTEE AND SAY, LOOK, WE'VE GOT 25 PERCENT.   WE WANT TO GO TO 40 OR 50 PERCENT OR WE'RE GOING TO GO OUT OF BUSINESS.

WELL, I'LL LEAVE THAT RESPONSE TO YOU FOLKS AS ELECTED OFFICIALS.  BUT MINIMALLY, YOU'VE GOT TO HAVE THIS.   AND THE PUBLIC

HAS TO HAVE IT NO MATTER WHAT YOUR POSITION IS.

SO, THAT'S MY RED LINE.  AND I'M GOING TO CONSTANTLY ASK THE QUESTION IS WHY ARE THESE BILLS BEING PAID UNLESS YOU HAVE THIS UNDERLYING DATA FROM LAHSA IN REAL TIME WHEN YOU GET THE INVOICE.

SO, YOU GET AN INVOICE INTO THE CITY.  THEY SHOULD HAVE THIS UNDERLYING DATA.  THEY'RE PROBABLY GOING TO PAY THE BILL ANYWAY, BUT AT LEAST YOU HAVE SOME IDEA WHAT YOU'RE PAYING.

FOLKS, THAT WASN'T HAPPENING IN THE PAST.  I DON'T CARE WHAT YOU SAY TO THE COURT.

ALL RIGHT.  NOW, WE'RE GOING TO MOVE ON BECAUSE I KNOW YOU'RE GETTING  --

YEAH.  LAHSA, DO YOU HAVE ANY QUESTIONS?   I KNOW THAT YOU'RE HERE.   AND I WANT TO COMMEND YOU QUITE FRANKLY AND YOUR DIRECTOR FOR TAKING TO THE STREETS WITH US LAST SUNDAY.  IT WAS REFRESHING.

SO, WHERE IS LAHSA?   LAST TIME YOU SAID NOTHING.   YOU WAITED UNTIL THE CONTROLLER LEFT.   THEN YOU HAD A LITTLE BIT OF AN ACCUSATION.

SO, YEAH.  AND IF YOU NEED TO GO AT ANY TIME, THAT'S FINE.

MR. HARRIS-DAWSON:  NO.  THANK YOU FOR THAT.

BUT I DO THINK  -- YOU KNOW, WE'RE SITTING HERE WITH OUR CALCULATORS OUT DOING  -- DOING MATH.  AND I THINK, ONE, THIS IS A GREAT PIECE OF WORK TO THE CONTROLLERS OR PERHAPS TO YOU.

BUT, YOU KNOW, ON THESE  -- PARTICULARLY ON THE

STAFFING, KNOWING THE AMOUNT OF TIME ON THE PROJECT MATTERS A LOT.  BECAUSE IF IT'S ONE DAY AND SOMEONE MADE $5,000, THAT'S VERY DIFFERENT THAN IF THEY WORKED, YOU KNOW, ALL 20 DAYS OF THE MONTH.  OR IF THEY WERE A HALF-TIME WORKER OR THREE-QUARTERS' TIME OR A FULL-TIME WORKER, THAT MATTERS A LOT.

BUT I THINK IT'S AN IMPORTANT DETAIL THAT  -- I MEAN, I DON'T WANT TO MESS UP THE BEAUTY OF THE PRESENTATION.

BUT FROM THE POINT OF VIEW OF US AS DECISION-MAKERS AND THE PUBLIC, THAT'S  -- THAT'S AN IMPORTANT DETAIL.

THE COURT:  OKAY.

SOMETIMES THE GOOD IS BETTER THAN THE PERFECT.

AND BEFORE  -- WE HAVEN'T EVEN HAD THE GOOD.  SO, THANK YOU.

NOW, ANY OTHER COMMENTS?

ALL RIGHT.

(THE COURT AND SPECIAL MASTER CONFERRING.)

THE COURT:   YEAH.  I WANT TO GO  -- I WANT TO BRING LAHSA UP.

LAST TIME YOU DIDN'T MAKE AN APPEARANCE.  THIS TIME YOU ARE MAKING AN APPEARANCE.

COME ON UP HERE.

(PAUSE IN PROCEEDINGS.)

THE COURT : AND YOU AND THE CONTROLLER HAD A LITTLE BIT OF A DISPUTE LAST TIME.  I DON'T THINK IT'S WORTHWHILE TO GET BACK INTO IT.

BUT I WOULD APPRECIATE YOU MAKING YOUR APPEARANCE TODAY AND BEING HERE BEFORE THE CONTROLLER LEAVES.

ALL RIGHT.   COUNSEL, SO, WHO ARE YOU?

I KNOW WHO YOU ARE, BUT FOR MY RECORD DOESN'T.

MS. JOHNSON:   GOOD MORNING.  RACHEL JOHNSON, CHIEF OF STAFF, REPRESENTING LAHSA ON BEHALF OF DR. ADAMS KELLUM WHO ALSO CANNOT BE HERE BECAUSE SHE IS WITH HER NEW GRANDBABY.

THE COURT:   A BIG SHOUTOUT.   SHE'S GOT A NEW GRANDCHILD, SO.

MS. JOHNSON:  YEAH.   SO, SHE CANNOT BE HERE UNFORTUNATELY.

THE COURT:  YEAH.

MS. JOHNSON:  BUT WE ARE HERE TO REPRESENT HER.

THE COURT:   AND I'VE GOT A PICTURE TOO.  IT'S TERRIFIC.

MS. JOHNSON:  OH, GOOD.  GOOD.

(LAUGHTER.)

THE COURT:  OKAY.

MS. JOHNSON:   AND I'M WITH MY COLLEAGUES BEVIN KUHN, WHO IS OUR DEPUTY DIRECTOR OF DATA ANALYTICS.

OUR CFO JANINE TREJO AND DR. HOLLY HENDERSON WHO OVERSEES OUR RISK MANAGEMENT.

THE COURT:  THANK YOU VERY MUCH.

NOW, DO YOU HAVE ANY QUESTIONS?

THIS IS YOUR OPPORTUNITY.

SPECIAL MASTER MARTINEZ:   WELL, NO.  AT THIS TIME  -- SO,

WE WANTED TO TAKE THIS OPPORTUNITY, ONE, TO THANK LAHSA FOR SUPPLYING A&M WITH THE CRITICAL DATA ESSENTIAL TO THE HOMELESSNESS ASSESSMENT FOR THE CITY OF LOS ANGELES.

THE COURT MUST UNDERSCORE THE PRESSING URGENCY OF INSURING THAT THIS DATA IS DELIVERED PROMPTLY TO A&M TO MAINTAIN THE INTEGRITY AND TIMELINES OF THE ASSESSMENT WHICH IS CENTRAL TO OUR EFFORTS.

ADDITIONALLY, IT'S IMPORTANT TO RECOGNIZE THE PARALLEL NEED FOR LAHSA TO PROVIDE THE CONTROLLER WITH INVOICES AND SUPPORTING DOCUMENTS RELATED TO THIS YEAR'S EXPENSES ON HOMELESSNESS WITHIN THE THREE PROGRAMS, THE LA ALLIANCE AGREEMENT, THE FREEWAY AGREEMENT AND INSIDE SAFE.

THIS IS KEY TO MAINTAINING ACCOUNTABILITY AND TRANSPARENCY AND HIGHLIGHTED ON THE PUBLIC WEBSITE.

NONETHELESS, THE MOST IMMEDIATE FOCUS SHOULD REMAIN ON INSURING THAT ALVAREZ & MARSAL RECEIVES THE DATA NECESSARY TO PROGRESS WITH THEIR ASSESSMENT TO INSURE THAT WE GET THE REPORT IN A TIMELY FASHION.

I PRO- -- WE PROPOSE THE COURT THAT A&M AND THE CONTROLLER'S OFFICE AND LAHSA WORK COLLABORATIVELY PARTICULARLY IF THERE ARE ANY OVERLAPPING DATA REQUESTS RELATED TO THIS FISCAL YEAR.

BY COORDINATING CLOSELY THESE PARTIES CAN INSURE THAT ALL RELEVANT INFORMATION IS SHARED ACCURATELY AND EFFECTIVELY AND BENEFITING OUR COLLECTIVE GOALS.

THEREFORE, THE COURT URGES ALL PARTIES TO PRIORITIZE AND ADVANCE THIS PROCESS WITH URGENCY AND COMMITMENT.

THE COURT:  NOW, THAT CAME TO ME FROM THE SPECIAL MASTERS.

I DRAFTED IT OUT.  SO, THANK YOU FOR READING THAT.

DO YOU HAVE ANY QUESTIONS ABOUT OUR REQUEST?

DR. HENDERSON:  I'M  -- HELLO.  DR. HOLLY HENDERSON, DIRECTOR OF RISK MANAGEMENT.

I JUST WANTED TO NOTE.  WE ACKNOWLEDGE IT.  WE ARE FULLY ON BOARD AND REMAIN COMMITTED TO PROVIDING THE INFORMATION WITHIN THE SET TIMEFRAME.

SO, WE ARE VERY COMMITTED TO THAT.

THE COURT:  NOW, WHAT ABOUT THIS TWO-WEEK REQUEST, MICHELE.

SHARE THAT WITH ME AND JAY.  SHARE THAT WITH ME BECAUSE TODAY  --

(THE COURT CONFERRING WITH SPECIAL MASTERS.)

THE COURT:  I'M GOING TO SET THIS FOR A TIME THAT'S CONVENIENT FOR ALL OF THE ELECTED.  OKAY.

SPECIAL MASTER MARTINEZ:  CORRECT.

THE COURT:  AND LAHSA.

SPECIAL MASTER MARTINEZ:  YES.

THE COURT:  AND IS THIS THE APPROPRIATE TIME?

SPECIAL MASTERS MARTINEZ:  NO.

THE COURT:  ALL RIGHT.  THEN I'LL WAIT FOR A FEW MOMENTS.

OKAY.  BECAUSE I DON'T WANT TO LOSE THEM.  I WANT TO BE -- IT CAN BE CONVENIENT TO YOU -- IT COULD BE CONVENIENT TO YOU.  BUT THIS TIME CONVENIENCE TO THE MAYOR.  OKAY.

THIS NEEDS TO BE AT THE TOP LEVEL.  IT'S NOT GETTING DOWN TO THE FLOOR.  ALL RIGHT.

I THINK WE'RE ALMOST DONE.

SPECIAL MASTER S MARTINEZ:  YEAH.  IF I CAN NOW, YEAH, WE'RE GOING TO HAVE THE ALLIANCE COME UP NEXT.  BUT IF I CAN PROVIDE A BRIEF UPDATE.

I'M JUST GOING TO PROVIDE A BRIEF UPDATE ON THE CONVERSATION ON WHAT THE ALLIANCE IS GOING TO DISCUSS, JUDGE.

THE COURT:  YEAH.  I'LL TURN BACK TO THE ALLIANCE THEN.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  I'M GETTING DIRECTIONS FROM THE SPECIAL MASTER.

(LAUGHTER.)

THE COURT:  SHE'S GOT AN AGENDA HERE.

SPECIAL MASTER  MARTINEZ:  I DO -- WE ALL HAVE AN AGENDA.

THE COURT:  WHAT'S -- WHAT'S --

SPECIAL MASTER MARTINEZ:  JUDGE, BEFORE WE MOVE FORWARD TO THE LA ALLIANCE, THIS PAST MONTH PRIOR TO THE LAST HEARING WE ASKED THEM TO GO BACK.

ONE, THE CITY APPROVED THEIR HOUSING BED PLAN.  THEY'VE BEEN IN COMMUNICATION WITH THE LA ALLIANCE IN REGARDS TO THE ENCAMPMENT RESOLUTIONS THAT THE COUNTY -- THE CITY.

THE LA ALLIANCE HAS ALSO BEEN INTERACTING WITH THE COUNTY IN REGARDS TO SOME OF THE ISSUES THAT THE LA ALLIANCE HAS AND AS WELL WITH THE CITY IN REGARDS TO THE ENCAMPMENT RESOLUTIONS AS WELL THE CITY HAS BEEN COMMUNICATING WITH THE COUNTY IN REGARDS TO SOME ISSUES.

WE HAVE SOME UPCOMING ZOOM MEETINGS WITH THE SPECIAL MASTERS, ONE WHICH IS OCTOBER 9TH SPECIFICALLY WITH THE CITY, COUNTY AND THE ALLIANCE.

AND I KNOW THE CITY AND THE LA ALLIANCE HAVE BEEN DISCUSSING ABOUT THE BED PLAN AND ALSO THE ENCAMPMENT RESOLUTIONS.

AND, SO, THIS IS WHERE WE'RE AT.

WE WOULD LIKE TO GET AN UPDATE FROM THE LA ALLIANCE BEFORE -- AND SEEING WHERE WE ARE AT AS IT PERTAINS TO THEIR ISSUES AND RESOLUTION TO POTENTIALLY BASED ON MY CONVERSATIONS YESTERDAY WITH THE CITY FAMILY THEY MAY -- YOU ALL MAY NEED SOME ADDITIONAL TIME TO HASH THIS OUT.

AND, SO, THIS IS WHERE THE TWO-WEEK EXTENSION JUDGE CARTER IS SPEAKING ABOUT.

BUT BEFORE THAT, WE NEED TO KNOW IF TWO WEEKS IS WHAT THE LA ALLIANCE NEEDS TO GET THIS ALL WRAPPED UP WITH BOTH PARTIES.

THE COURT: YEAH. IT OCCURRED JUST BEFORE I CAME INTO COURT MICHELE HAD INFORMED ME THAT THE PARTIES NEEDED AN ADDITIONAL TWO WEEKS.

SPECIAL MASTER MARTINEZ:  POTENTIALLY.

THE COURT:   POTENTIALLY.   BUT I DON'T KNOW THAT.

SO, LET ME HEAR FROM LA ALLIANCE.

MS. MITCHELL:  SURE, YOUR HONOR.

YESTERDAY I BELIEVE THE CITY AND MY COLLEAGUE MR. UMHOFER WHO HAS STEPPED OUT I THINK DID HAVE A CONVERSATION.

I WAS ON A PLANE ON THE WAY BACK FROM EUROPE.  AND, SO, I DID NOT PARTICIPATE  --

THE COURT:  OKAY.

MS. MITCHELL:  -- IN THAT CONVERSATION.

MY UNDERSTANDING IS THERE WAS SOME MORE INFORMATION THAT WAS PRESENTED ABOUT THE BED PLAN.

AND I THINK THE ALLIANCE DOES NEED SOME ADDITIONAL TIME TO CONSIDER ITS POSITION ON THE BED PLAN.

REGARDING THE ISSUE ON THE ENCAMPMENT RESOLUTIONS IN WHICH THERE'S A MOTION PENDING, I THINK THERE WAS A SUGGESTION THAT THERE MAY BE A PLAN COMING.  BUT WE HAVEN'T SEEN ANYTHING.

SO, AT THIS TIME FROM THE ALLIANCE'S PERSPECTIVE  --

THE COURT:   AND, MATT, COME ON UP HERE.

MATT, COME ON.  THANK YOU.

I'M SORRY, LIZ.  PLEASE CONTINUE.

MS. MITCHELL:   SO  -- SO, AT THIS TIME IT'S MY UNDERSTANDING THAT WE JUST -- I THINK WE'RE LOOKING FOR AN ORDER FROM THE COURT.

I THINK ALL THE BRIEFING HAS BEEN DONE ON THE

ENCAMPMENT RESOLUTION ISSUE.

BUT MR. UMHOFER CAN SPEAK MORE TO THAT CONVERSATION YESTERDAY.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

(PAUSE IN PROCEEDINGS.)

THE COURT:   I'M GOING TO ASK THE CONTROLLER TO STAY FOR JUST A MOMENT.  I WANT TO THANK YOU FOR YOUR PRESENTATION BECAUSE WHENEVER WE SET THIS NEXT MEETING I WANT TO BE COURTEOUS AND SEE IF EVERYBODY IS AVAILABLE.  OKAY.

MR. UMHOFER:   SO, YOUR HONOR, ON THE ENCAMPMENT RESOLUTION PIECE, ITS OUR VIEW THAT IT'S BRIEFED.

WE DID HAVE A CONVERSATION YESTERDAY WHERE THERE WAS FOR THE FIRST TIME A SUGGESTION THAT THIS COULD BE RESOLVED QUICKLY.  BUT WE DON'T HAVE THE PROPOSAL FROM THE CITY ABOUT HOW TO GET THOSE.

THE COURT:   WHO WERE YOU SPEAKING TO?   GIVE ME A NAME.

MR. UMHOFER:  MATT -- MATT SABO.

THE COURT   MATT IS HERE?

MR. UMHOFER:   YES.

THE COURT:  MATT, THANK YOU FOR BEING HERE.

MR. UMHOFER: YES.

THE COURT:  SO WHEN ARE YOU TWO  GOING TO GET TOGETHER?

MR. UMHOFER:   WE CAN DO IT AGAIN.  BUT OUR  -- OUR  --

THE COURT:  WALK OVER AND TALK TO HIM.  JUST --

MR. UMHOFER:  OKAY.

THE COURT:  -- GET A CHAIR.   THAT'S AN ORDER.

MR. UMHOFER:  OKAY.

THE COURT:  GO OVER AND TALK TO HIM.

MR. UMHOFER:   YEAH.

THE COURT:   SEE WHERE THE PAPERWORK  ---

(PAUSE IN PROCEEDINGS.)

THE COURT:  COUNSEL, I'M NOT GOING TO SET DATES WITHOUT --

(PAUSE IN PROCEEDINGS.)

THE COURT:  YEAH.   AND IF YOU HAVE TO GO, I UNDERSTAND YOU HAVE OTHER DUTIES.  I'VE BEEN FOLLOWING WHAT YOU HAD GOING YESTERDAY.   YOU'VE GOT QUITE A BIT ON YOUR TABLE.

OKAY.

MS. MITCHELL:  I APPRECIATE THAT, YOUR HONOR.

THE COURT:   BUT LET ME  -- LET ME CHECK WITH MIRA.

I NEED A CONVENIENT TIME.  I NEED TO KNOW THAT YOU'RE AVAILABLE OUT OF COURTESY SO I'M NOT JUST WRITING AN ORDER.

OKAY.

MS. MITCHELL:  OF COURSE.

THE COURT:  AND THE SAME THING WITH MAYOR BASS AND THE SAME THING WITH THE PRESIDENT.

MS. MITCHELL:  OF COURSE.

THE COURT:  OF THE COUNCIL.  OKAY.

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com

AND THEY'RE DECIDING A MUCH -- WHAT THEY TELL ME IN TERMS OF DATES MAKES A DIFFERENCE WHAT I SET.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  DO YOU WANT TO GIVE AN UPDATE ON THE PUBLIC WEBSITE WHERE THEY'RE TALKING, MIRA.

MS. HASHMALL:  YES, YOUR HONOR.  THANK YOU.

THE COURT:  YEAH.

MS. HASHMALL:  THE COUNTY HAS KEPT ITS WEBSITE AS CURRENT AS POSSIBLE.

THE COURT:  RIGHT.

MS. HASHMALL:  IN FACT, THERE ARE RECENT UPDATES THAT HAVE DETAILED INVOICES WITH REGARDS TO OUR --

THE COURT:  I SEE THAT --

MS. HASHMALL:  -- OUR SETTLEMENT EXPENSES.

AND I THINK WE'RE ALL EXCITED TO SEE THE TRANSPARENCY REGARDING THE SIGNIFICANT –

THE COURT:  YEAH.

MS. HASHMALL:  -- FINANCIAL COMMITMENT THE COUNTY MADE TO THE CITY'S ROADMAP --

THE COURT:  AND LET ME TAKE A MOMENT TO COMMEND --

MS. HASHMALL:   -- AGREEMENT.

THE COURT:   LET ME TAKE A MOMENT TO COMMEND YOU ON THAT.

SOMETIMES I GROWL.  BUT WHEN YOU  -- THANK YOU.

MS. HASHMALL:  YES.  THANK YOU.

AND I KNOW THE CHAIR HAS OTHER COMMITMENTS.  BUT WE CERTAINLY APPRECIATE THE COURT'S INDULGENCE  --

THE COURT:  AND  --

MS. HASHMALL:   -- AND TIME TODAY.

THE COURT:   -- THEY'RE BACK THERE TALKING.  THEY'RE GOING TO BE DONE WITH THIS CONVERSATION IN JUST A MOMENT.

AND THEY'RE GOING TO GIVE US A TIMEFRAME WHEN THE TWO OF THEM CAN MEET.

(PAUSE IN PROCEEDINGS.)

THE COURT:  AND YOU HAVE OTHER DUTIES TO PERFORM.

THANK YOU FOR YOUR COURTESY.

MS. HASHMALL:   THANK YOU, YOUR HONOR.

THE COURT:  AND THANK YOU VERY MUCH.

AS THE PRESIDENT OF THE COUNCIL, YOU PROBABLY HAVE OTHER DUTIES TO PERFORM.

YOU KNOW, WE CAN GIVE YOU A CALL INSTEAD OF  --

YEAH.

IF YOU NEED TO GO, YOU'VE GOT  -- YOU'VE GOT A CITY TO RUN.   YOU'VE GOT A COUNTY TO RUN.

THANK YOU FOR YOUR COURTESY TODAY.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  FOR THE AUDITOR, YEAH, THANK YOU FOR YOUR PRESENTATION.

AND, OF COURSE, I'M GOING TO BE ASKING WHY WE'RE NOT DOING THIS WITH EVERY INVOICE GOING FORWARD.  OKAY.

SO, FOR THE COUNCIL PRESIDENT, BEFORE YOU PAY THE BILLS, COUNCIL PRESIDENT, BEFORE YOU PAY YOUR BILLS, I'M GOING TO BE ASKING WHY WE DON'T HAVE THIS GOING FORWARD FOR EVERY SINGLE INVOICE BEFORE YOU PAY THAT BILL.

I LEAVE THAT TO YOU, BUT I THINK YOU'RE GOING TO NEED THIS DATA GOING FORWARD.

OKAY.

AND FOR THE AUDITORS, THANK YOU VERY MUCH.

DIANE, LAURA, THANK YOU.

AND, BY THE WAY, THINK ABOUT THE LUSKIN INSTITUTE OR SOMEBODY ELSE.

I'M GOING TO HAVE MICHELE CONTACT YOU.  BUT IF WE NEED PEOPLE OUT IN THE STREETS INSTEAD OF JUST THE 18 AUDITS, IF WE NEED A HUNDRED, ET CETERA, LET'S GET THE PERSON POWER TO HELP YOU.  AT LEAST SOME OF THESE GREAT INSTITUTIONS.  OKAY.

OKAY.  NOW, WHAT'S YOUR SUGGESTION?  -- YOU AND MATT.

MR. UMHOFER:   THEY NEEDED A COUPLE OF MINUTES TO DISCUSS --

THE COURT:  OKAY.

MR. UMHOFER:  -- AMONGST THEMSELVES, YOUR HONOR.

APOLOGIES.

(THE COURT CONFERRING WITH SPECIAL MASTER.)

THE COURT:  THANK YOU VERY MUCH.  APPRECIATE YOUR COURTESY.

KEVIN, THERE'S GOING TO BE ANOTHER OPPORTUNITY IN TWO

WEEKS.  BECAUSE THAT'S WHAT I'M TRYING TO SAY, KEVIN.

THAT'S GOING TO BE MORE MEANINGFUL BECAUSE I WANT MORE --

SO, TERRY, KEVIN, NO DISCOURTESY TO YOU.  BUT I WANT MAYOR BASS HERE ALSO.  OKAY.

SO, THIS IS GOING TO BE IN TWO WEEKS.

I THOUGHT WE WERE GOING TO TURN THE LECTERN OVER TO YOU TODAY.  I MADE THE DECISION NOT TO.  I WANT ALL THE ELECTED HERE AT ONE TIME.  OKAY.  AND THAT'S WHY.

SO, PARDON THE DISCOURTESY TO YOU.  OKAY.

AND THAT'S A SNAP JUDGMENT CALL ON MY PART BECAUSE I WANTED TO GIVE YOU THE LECTERN TODAY.

BUT I WANT ALL THE ELECTED OFFICIALS HERE.

SO, KEVIN, TERRY, AS I SAID, I WANT ALL THE ELECTED OFFICIALS HERE.  I JUST DON'T WANT IT PIECEMEAL.   OKAY.

(PAUSE IN PROCEEDINGS.)

THE CLERK:  FOR MY LMN PARTICIPANTS ON THE ZOOM, THE COURT IS GOING TO END THE ZOOM AT THIS TIME.

(PAUSE IN PROCEEDINGS.)

THE COURT:  AND TERRY  -- TERRY, KEVIN, THE COMMUNITY, LET ME APOLOGIZE TO YOU.  BECAUSE I WAS GOING TO GIVE YOU THE LECTERN TODAY TO TELL OUR ELECTED OFFICIALS WHETHER THIS IS HITTING THE STREET OR NOT.

AND MAYOR BASS IS IN MEXICO.   SHE'LL BE BACK.   WE'RE GOING TO SET A DATE SO THE COUNCIL PRESIDENT IS PRESENT AGAIN.

AND THE CHAIR OF THE BOARD OF SUPERVISORS IS PRESENT.

AND DR. ADAMS IS PRESENT, PARTICULARLY FROM LAHSA.

SO, WE'RE MISSING TWO KEY PEOPLE.

I DON'T THINK WE NEED TO HEAR TWICE.

SO, PARDON MY DISCOURTESY BECAUSE I THOUGHT I WAS GOING TO GIVE YOU AN OPEN MIC TODAY.  BUT THAT OPPORTUNITY WILL COME SO THEY HEAR FIRSTHAND WHETHER THIS IS HITTING THE STREET OR NOT.

OKAY.  SO, YOU HAVE MY APOLOGIES FOR THAT.

(PAUSE IN PROCEEDINGS, 11:26 A.M. TO 11:37 A.M.)

THE COURT:   WE'RE GOING TO GO BACK ON THE RECORD FOR JUST A MOMENT.

AND GET ALL YOU FOLKS BACK TO YOUR RESPECTIVE OFFICES.

TO INSURE PRECISION AND DUE FAIRNESS, THE COURT WILL PROCEED AS FOLLOWS.

AND I WANT TO THANK MICHELE GOING FROM PARTY TO PARTY AND CONVERSING WITH YOU.

LA ALLIANCE WILL GIVE THE COURT THEIR ACCEPTANCE OF THE RESPECT A BED PLAN THIS UPCOMING FRIDAY, OCTOBER 4TH.

SPECIAL MASTER MARTINEZ: ACCEPTANCE OR   --

MR. UMHOFER:   OR REJECTION.

THE COURT:   OR REJECTION.

SPECIAL MASTER MARTINEZ: OR REJECTION.

THE COURT:   YEAH.  OR REJECTION.   MY APOLOGIES.

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com

NOW, OCTOBER 4TH.  WE'LL BE BACK IN SESSION ON OCTOBER 8TH AT 9:00 A.M. IN THIS COURTHOUSE.

OF COURSE, ALLOWING THE INTERVENORS ONE WEEK TO BRIEF UPON THIS INFORMATION AND REQUEST THAT THEY SUBMIT THEIR BRIEFING BY OCTOBER 11TH.

IF THERE'S A DISAGREEMENT ON THE BED PLAN, THEN, THE COURT WILL RECONVENE IN TWO WEEKS ON OCTOBER 16TH AT 9:00 A.M. IN THIS COURTHOUSE WITH OTHER MATTERS PENDING.

AT THAT TIME WE'D INVITE THE ELECTED OFFICIALS BACK BECAUSE MAYOR BASS COULD NOT BE PRESENT TODAY.

AND DIRECTOR ADAMS HAS THE BLESSINGS OF A NEW GRANDCHILD.  SHE'S OUT OF THE AREA.

THE PRESIDENT OF  THE COUNCIL WILL BE INVITED BACK AS WELL AS THE CHAIRMAN OF THE BOARD.  SO, WE HAVE ALL FOUR ENTITIES PRESENT.

I'M GOING TO REQUEST ONCE AGAIN THAT THE CONTROLLER AND THE CITY MAKE ANOTHER PRESENTATION CONCERNING THIS WEBSITE.

AND I'VE STATED BEFORE.  THAT'S MY RED LINE.  I WANT TRANSPARENCY ON THIS WEBSITE GOING FORWARD.

I'M HOPING THAT THIS WEBSITE WILL CONVINCE THE CITY TO NOT ONLY HAVE AN INVOICE BUT THE UNDERLYING DATA THAT SUBSTANTIATES THEIR PAYING OF THESE BILLS WHICH HAVE SIMPLY BEEN BASED UPON AN INVOICE FROM LAHSA IN THE PAST.

AND I'M NOT CERTAIN ABOUT THE AUDITOR CONTROLLER --

STRIKE THAT -- THE A&M.

ALTHOUGH, I THINK THAT THEY WILL GET BACK TO YOU, MICHELE, THIS WEEK.  BECAUSE I THINK IT WILL BE WISE AND HAVE SUGGESTED TO THEM THAT WE GET THE LUSKIN CENTER INVOLVED OR OTHER ENTITIES THAT CAN HELP SPOT CHECK THE DIFFERENT PROVIDER SITES -- NOT EXPECTING A HUNDRED PERCENT TO BE CHECKED BUT A SIGNIFICANT NUMBER.   BECAUSE THE INFORMATION COMING BACK TO THE COURT AS YOU'VE HEARD TODAY IS TROUBLING IN TERMS OF THE REPRESENTATIONS BEING MADE CONCERNING STAFFING AND QUALITY OF SERVICES.

I WANT TO COMMEND ALL OF YOU THOUGH FOR WORKING TOGETHER.  THUS FAR  --

MIRA, I SAW THAT YOU WANTED TO SAY SOMETHING.

MS. HASHMALL:   YES, YOUR HONOR.

I HAVE AN IMMOVABLE CONFLICT ON THE 17TH OF OCTOBER. I'M JUST WONDERING  --

THE COURT: NO, THE 16TH.

MS. HASHMALL:  OH, IS IT THE WEDNESDAY OR THE THURSDAY?

THE COURT:  IT'S A WEDNESDAY.

MS. HASHMALL:  WEDNESDAY, THE 16TH.

THE COURT: THE 16TH. 1-6.

MS. HASHMALL:  OKAY.

THE COURT: IS THAT OKAY?

MS. HASHMALL:   I'LL HAVE TO MAKE IT WORK.

THE COURT:  OKAY.

MS. HASHMALL:   AND THEN I'M NOT SURE I UNDERSTAND THE OCTOBER 8TH DATE.

THE COURT:   THAT IS THE DATE FOR THE BED PLAN.

WE'VE SEPARATED THAT OUT.

MS. HASHMALL:   OKAY.  SO, JUST TO CLARIFY BECAUSE MY NOTES ARE SLOPPY.

THE COURT:   WHY DON'T WE JUST PUT THIS OUT ON THE DOCKET FOR YOU.  WE'RE GOING TO DOCKET THIS ANYWAY.

MS. HASHMALL:   OKAY.  BUT I UNDERSTOOD YOU TO SAY THAT THE PLAINTIFF NEEDS TO RESPOND TO THE BED PLAN BY OCTOBER 4TH.

AND THEN OCTOBER 8TH IS IN A HEARING.  OKAY.

OCTOBER 11TH IS THE INTERVENOR RESPONSE DEADLINE.

AND THEN OCTOBER 16TH --

THE COURT:  IS THE HEARING AGAIN.

MS. HASHMALL:   OKAY.

THE COURT:   WE'VE SEPARATED OUT THE BED PLAN SO WE GET THAT RESOLVED.  OKAY.

NOW, IS THERE ANYTHING FURTHER?

AND I'M SORRY, JUDGE.   JUST -- INTERVENORS.

MY APOLOGY, SHAYLA.

MS. MYERS:   JUST TO CLARIFY.

SO, WE ARE BRIEFING AFTER THE HEARING ON THE BED PLAN NOT BEFORE?

THE COURT:   THAT WAS MY UNDERSTANDING FROM MICHELE. WHEN I SENT HER TO EACH PARTY TO TALK TO EACH PARTY.

MS. MYERS:  AND SO THE  -- IS THE HEARING ON THE  -- ON OCTOBER 8TH TO APPROVE THE BED PLAN?

THE COURT:  NOT NECESSARILY.

MS. MYERS;  OKAY.  I JUST WANT TO MAKE SURE THAT WE UNDERSTAND WHAT WE'RE BRIEFING.

THE COURT:  YEAH.  NO.  YOU'RE  -- YOU CAN'T BE  -- I CAN'T HAVE A HEARING AND NOT HAVE YOU HAVE A CHANCE TO PARTICIPATE.

SO, WE'LL HEAR THAT.

AND THEN YOU'LL HAVE YOUR BRIEFING.

MS. MYERS:  OKAY.  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.

ALL RIGHT.

AND FOR THE COMMUNITY THAT WAS PREPARED TO SPEAK TODAY, YOU'LL SPEAK ON THAT DATE.

AND TO PRESENT WHETHER THIS IS GETTING TO THE STREET OR NOT WHEN ALL OF THE ELECTED OFFICIALS ARE PRESENT.

AND WE'LL SEE WHAT THIS WEBSITE LOOKS LIKE AS WELL.

ALL RIGHT.  THEN IS THERE ANYTHING FURTHER?

THEN HAVE A GOOD DAY.  APPRECIATE YOUR ATTENDANCE TODAY.

ALL:  THANK YOU, YOUR HONOR.

(PROCEEDINGS ADJOURNED AT 11:42 A.M.)

TRANSCRIBER'S CERTIFICATE


DISCLAIMER

THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.


I, Dorothy Babykin, attest that the foregoing proceedings provided to me electronically were transcribed by me to the best of my ability.

/s/  *Dorothy Babykin*


Dorothy Babykin

Date: 10/3/2024

Dorothy Babykin Courthouse Services
1218 Valebrook Place  •  Glendora, CA 91740  •  626.963.0566  •  dotnisbet@aol.com