UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) |
| | )                    CIVIL |
| Plaintiffs, | ) |
| | )      Los Angeles, California |
| vs. | ) |
| | )      Tuesday, October 8, 2024 |
| CITY OF LOS ANGELES, ET AL., | ) |
| | )      (9:08 p.m. to 10:11 a.m.) |
| Defendants. | ) |

HEARING RE BED PLAN REVIEW

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**                    CONTINUED ON PAGE 2

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979

For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Karlen Dubon

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES FOR:**          **(CONTINUED)**


**Defendants:**               LAUREN M. BRODY, ESQ.
                              Miller Barondess, LLP
                              1999 Avenue of the Stars, Suite 1000
                              Los Angeles, CA 90067
                              310-552-4400

                              ARLENE N. HOANG, ESQ.
                              JESSICA MARIANI, ESQ.
                              Los Angeles City Attorney's Office
                              200 N. Main Street, Room 675
                              Los Angeles, CA 90012
                              213-978-6952

**Intervenor:**               SHAYLA R. MYERS, ESQ.
                              Legal Aid Foundation of LA
                              7000 S. Broadway
                              Los Angeles, CA 90003
                              213-640-3983

**Also present:**             MATT SZABO

**Los Angeles, California; Tuesday, October 8, 2024; 9:08 a.m.**

--oOo--

THE COURT:  Then, counsel, we'll go on the record then in *LA Alliance For Human Rights versus the City of Los Angeles*, 20-02291.

Just remain seated.  And if you'd start with your appearances, please.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell on behalf of Plaintiffs.

THE COURT:  Morning.

MS. HASHMALL:  Good morning, Your Honor.  Mira Hashmall for the County --

THE COURT:  Good morning.

MS. HASHMALL:  -- of Los Angeles.

MS. BRODY:  Lauren Brody, also for the County of Los Angeles.

THE COURT:  Morning.

MS. MARIANI:  Good morning, Your Honor.  Deputy City Attorney Jessica Mariani.

THE COURT:  Nice seeing you.

MS. HOANG:  And good morning, Your Honor.  Arlene Hoang, Deputy City Attorney.

THE COURT:  Pleasure.

MS. MYERS:  Good morning, Your Honor.  Shayla Myers on behalf of the Intervenors.

**4**

THE COURT:  I think today will be a rather short hearing.  And it's -- the key issue I think is your request for response from the County concerning whether services would be forthcoming in light of the 2,500 PSH beds that the City would like to receive credit for in the LA Alliance case.

MS. MITCHELL:  Correct.  But those are 2,500 interim shelter beds, Your Honor.

THE COURT:  Interim.  I'm sorry.

MS. MITCHELL:  Not PSH.

THE COURT:  I said PSH, my apologies.

And the County has stated in the past that they have fulfilled their obligations.  We all know that this runs at the end of the year.

So, Ms. Mitchell, why don't you start with -- or the County, it doesn't matter who starts, but it should be a very brief hearing with just a yes or a no eventually.  So let's find out.

MS. MITCHELL:  Sure, Your Honor.  I mean, I think our position is pretty clear on the papers.

The roadmap agreement ends at the end of this fiscal year, so I think June 30th of 2025, and so those -- there's 4,100 interim shelter beds for which the County's funding will end at the end of this fiscal year.

And due to not only the lack of funding but additionally the, as I understand it, the increased bed rate

**5**

that needs to happen, the City cannot afford to keep those 4,100 beds open without migrating 2500 of them over to the Alliance agreement.

The problem, Your Honor, is that the Alliance agreement anticipates an overall increased number of beds, right?  And so what this would do is effectively decrease the anticipated negotiated beds by 2,500.

I think the facts that we don't have and what the County's position is on potentially extending that agreement to continue funding 50 percent of those operational costs for the 4,100 existing shelter beds.

And while the roadmap agreement is certainly ending, I think it is in the people of Los Angeles's interest to keep those beds open.  And it is in the County's stated interest to keep those beds open as well.

I mean, we've heard from all supervisors, and it's been in the news extensively, talking about the shelter crisis. The County is repeatedly opening new shelters.  There's no reason the County shouldn't have a similar interest in maintaining the existing shelters.

So the question I think needs to be answered from the County is upon expiration, would the County agree to extend the agreement and fund 50 percent of the service costs or operational costs for those interim shelter beds.

**THE COURT:**  I want to hear from the City, then

EXCEPTIONAL REPORTING SERVICES, INC

I'll -- Mira, I'll be right with you.

And I'd really like to know your position.  I know we've all locked arms politically.  But behind the scenes, I've got some doubts about that.

**MS. MARIANI:**  Thank you, Your Honor.

I mean, I would like to start by saying I really cannot underscore enough that the City does understand the need for more housing and wants to create more beds and maintain existing ones, including beds established pursuant to the roadmap agreement with the County.

Those were the dual goals set forth in the --

**THE COURT:**  Just a little slower.

**MS. MARIANI:**  -- City's proposed --

**THE COURT:**  Just a little slower.

**MS. MARIANI:**  Sorry, Your Honor.

Those were the dual goals that were set forth in the City's proposed bed plan submitted just a few weeks ago.

To achieve those goals, the City welcomes support from the County, including a commitment to fund services for roadmap beds beyond the expiration of the roadmap agreement, so that the City is financially able to keep those beds open.

I want to stress nobody wants to be in a situation where any of those beds, which the City invested enormous capital to establish and which are still desperately in need, are required to close due to lack of funding.

Our city administrative officer, Mr. Szabo, is here and can elaborate further --

THE COURT:  And, Matt, you're --

MS. MARIANI:  -- if necessary.

THE COURT:  -- welcome to come up any time.  You're not required but --

MS. MARIANI:  Thank you.

But the County, pursuant to the -- throughout the five-year term of the roadmap agreement, the County had agreed to pay annual payments of $60 million, which actually covered less than half the per night bed costs of the roadmap beds.

The City and County entered into this --

THE COURT:  Just -- that was about half the cost?

MS. MARIANI:  It was slightly less is my understanding.

THE COURT:  So the City then had to come up with how much?  Let's put that in dollars and cents.

MS. MITCHELL:  I think it was -- the County ended up covering something like 42 percent of the operational costs, if I'm not mistaken.

THE COURT:  So we had 300 million eventually.  Wasn't it, Mira, 60 million for five years, 300 million total?

MS. HASHMALL:  The County committed $300 million --

THE COURT:  So for roughly double --

MS. HASHMALL:  -- to those --

**THE COURT:** -- that, I mean, we were another 300 million on top of that for services.  In other -- I'm just doing rough math, see.  So let's --

**MS. MARIANI:** Sure.

**THE COURT:** -- walk through that again.  If you said 42 percent, that leaves about 58 percent that the City had to pick up.  I don't mean had to, but picked up to supply these services.  So let's just say a little over double.

Now, Matt's rushed up here to give me the correct figures.

**MS. MARIANI:** He is much better at math than I am so I will defer to him.

**THE COURT:** But the point is, it's double -- in other words, with the County's good faith in entering into 300 million, it cost the City another 300 million on top of that, 300 million plus, Matt, out of your pocket?  Not yours but the City's pocket.

**MR. SZABO:** Sure.

**THE COURT:** Okay.

**MR. SZABO:** Yes, Your Honor.  At minimum because, again, the 60 million covered -- can you hear me?  Oh, I'm sorry, Matt Szabo, City Administrative Officer, City of Los Angeles.

The freeway agreement was structured so that the 60 million roughly covered about $24 per bed per night.

**THE COURT:**  Okay.

**MR. SZABO:**  Okay.

**THE COURT:**  Twenty-four.

**MR. SZABO:**  About $24 per bed per night.

**THE COURT:**  Okay.

**MR. SZABO:**  At the time that the agreement was made, the nightly bed rate was $50.

**THE COURT:**  Right.

**MR. SZABO:**  The nightly bed rate now is $60.  It is set to increase.  It is set to almost double by the end of the fiscal year, at the same --

**THE COURT:**  Okay.

**MR. SZABO:**  -- time as the freeway agreement expires.

**THE COURT:**  Okay.

**MR. SZABO:**  So what the City was responsible for was initially not just 50 percent of the operational costs but 100 percent of the capital costs, which we already invested.

**THE COURT:**  Right.

**MR. SZABO:**  At the end of next year, and the reason we made the proposal as we did, Your Honor, is that just to keep the roadmap beds open, we would -- the City would then be responsible for all the capital costs that we put in, and then the 100 percent of the operational costs which are double that which -- as they were when we made the agreement.

So essentially not just doubling but almost

EXCEPTIONAL REPORTING SERVICES, INC

**10**

quadrupling the City's requirement just to keep the beds open, which is why we made the proposal to migrate those beds into an existing structure the -- of the Alliance agreement to -- and we -- if we were to do that, it would require increased resources for beds that would otherwise very likely need to be closed for lack of financial capacity.

THE COURT:  If the two of you can't come to an agreement then with this settlement coming to an end, you would lose what; you would lose 2500 PSH, correct?

MR. SZABO:  So we're talking mostly, Your Honor, of about interim housing.  That's --

THE COURT:  Forty-two hundred then.

MR. SZABO:  -- the tiny home villages, the bridge home, the Sprung shelters, those.

THE COURT:  So about 4200.

MR. SZABO:  There are about 4200 in total of those.

THE COURT:  Okay.

MR. SZABO:  As -- if there is no agreement -- again, I'm not the decision-maker, the final decision-maker on this, but I would be required to present options to the mayor and to counsel to close up to 2500 beds.

THE COURT:  Okay.  All right.

Mira, let me turn back to you and the County.

MS. HASHMALL:  Thank you, Your Honor.

So the County and the City in connection with the

EXCEPTIONAL REPORTING SERVICES, INC

roadmap agreement agreed to a five-year term.  The County devoted $300 million in resources towards those beds, in additions to enhance services.

The roadmap deal is coming to an end.  But there's already $260 million committed by the County towards the City with regards to the City/County MOU.  And that provides for interim housing beds.

So the County plans to work collaboratively with the City.  If the City decides to move those interim housing beds over to the new agreement, then that's the City's decision.

The County doesn't have a concern about that.  It plans to continue supporting those City beds pursuant to the new agreement.

**THE COURT:**  Say that again.

**MS. HASHMALL:**  Roadmap deal was five years.  We're in year four, year five essentially.

**THE COURT:**  Five.

**MS. HASHMALL:**  Right.  We have a new City/County MOU. It's not part of this case but it's between the City and the County.  The County --

**THE COURT:**  I haven't seen that so --

**MS. HASHMALL:**  The County has committed hundreds of millions of dollars to -- in resources towards interim housing and other shelter opportunities the City is putting up under the City/County MOU.

**12**

So if the City elects to close -- move beds from the roadmap agreement to that new structure, the County will be supporting them in that.

THE COURT: I don't know what's happening, you know, in these private discussions. I do know, though, when the civic leaders are here or in another location, not necessarily court, when we get the mayor together with Lindsay Horvath or whomever, things seem to occur.

Have they had these kinds of discussions between then? Without divulging the content, have they met at that level? Because I was going to call them in on October 16th, but there's no reason to if you two have an agreement. I don't wish to have the mayor coming in or the chair.

But by the same token, if you haven't reached a concrete agreement, if there's something of concern here, then I just as soon ask them to come in and get some decisions at their level.

MR. SZABO: So what I can say, Your Honor, is that I feel comfortable in representing that there is agreement between the City and the County on the path forward.

And that path forward was what we presented to the Court, the plan that you requested, the plan that we developed strategically, so that we would move exactly the number of beds we would need to move to the Alliance agreement in order for us to keep open all 4100.

THE COURT:  So do you have that commitment from the County?

MR. SZABO:  I -- yes, we have that commitments to the County that they would --

THE COURT:  Hold on.  I want to be very careful.

MR. SZABO:  Yes.

THE COURT:  I'm going to ask again.  Do you have that commitment from the County?

MR. SZABO:  On the plan that we presented, yes.

THE COURT:  And I don't know what that plan is.

MR. SZABO:  The plan to migrate the 2500 freeway agreement beds --

THE COURT:  Okay.

MR. SZABO:  -- to the Alliance agreement.

MS. MITCHELL:  There is no agreement by the alliance, Your Honor, the reason being that that would effectively reduce the overall number of beds available in the City of Los Angeles by 2500 because the City is attempting to reuse or migrate, what they call migrate, reuse those beds, which aren't new beds, right, to absorb them within the Alliance agreement, and the reason being because the roadmap agreement is closing.

If the County agrees to continue the roadmap agreement, there is no reason for the alliance to absorb those beds.

THE COURT:  Any comments?  Then I'll turn to Shayla

**14**

in just a moment.

MS. HASHMALL:  The roadmap agreement has expired under its terms at the end of the fiscal year.  It's not going to be extended.  But the County has no objection to the City's proposal of migrating the beds.  And the County's committed to supporting those beds under the new agreement.

THE COURT:  Shayla.

MS. MYERS:  I just have a couple of points of clarification.

It appeared -- and I could be wrong -- that the City intended to close some of the 4100 beds, irrespective of the migration of the 2500 because of expiring leases, use of land, the natural life of the shelters.

So how many of those 4100 beds will be closing as a result of those sorts of decision-making?

MR. SZABO:  Due to the natural -- there are -- I don't have that number right now.

THE COURT:  Well give us a guesstimate, Matt.  We won't --

MR. SZABO:  It would be --

THE COURT:  -- hold you to specifics.

MR. SZABO:  -- somewhere between three and 500 that are naturally expiring.

For example, there's -- there is the -- in Venice, there's a Sprung shelter that is on metro property.  And metro

has use for that property so we no longer will have access to that property.

So there are cases -- which has happened through the life of the freeway agreement is that we've had short-term use for the land, three years, four years, and then we have to turn the land back.

THE COURT:  Right.

MR. SZABO:  And it's those circumstances in which we would be closing.  But in those cases, we are actively looking for replacement housing.

But it is the case that there will be some natural turnover.  But our goal would be to keep open the same number of beds to try to replace those that we would lose to those natural -- for those natural reasons.

THE COURT:  So, Matt, once again, just to be certain, just a guestimate.  You would have about 500 people that would literally -- you know, we have questions about their housing or shelter; or is it the opposite, we'd have about 3600 people?

MR. SZABO:  In the event that the Court doesn't accept the City's proposal there would be questions around about 300 -- 3,000 of --

THE COURT:  About 3,000.

MR. SZABO:  -- our current, --

THE COURT:  All right.

MR. SZABO:  -- existing used interim housing beds.

**16**

**THE COURT:** Now, for all of us, wouldn't that be a tremendous step backwards?

In other words, if we just take round numbers and forget the programs for a moment and this overlap, I don't know what Inside Safe's numbers are right now, but it's ranging between, depending upon how many people return to the street or not, about a thousand let's say success rate in terms of shelter or housing at or up to 1800.

Those numbers vary, Shayla, depending upon how long people are staying, how quickly they return. So I've seen some statistics that say that really about less than a thousand have been sheltered or housed for some period of time.

Statistically, though, if you measure the input, it looks like about 1800 minus -- and I forget, I've got it at home -- but 300 or so, about 1500.

Overall, that's a huge step backwards for us. I mean, just in terms of numbers of people who are going back out on the street, it almost eradicates the success or attempted success of Inside Safe. That's disastrous.

The other thing I've always questioned is this. And the City has a duty to supply services. But what we've been doing is getting these settlements piecemeal, and then the agreement to move forward with services at the same time.

So I may be wrong about this. I see you're shaking your head. But I've always wondered why we're not reaching

**17**

these MOUs earlier, why in fact when the City is successful in housing -- shelter, housing, whatever, these services are automatically flowing from the County.

And one of the things I think happened to everyone was that you settled first with the Court.  And when you settled first, I think Mayor Bass wisely decided -- well, I shouldn't say that, but decided but wisely decided that she wasn't going to put people inside with Inside Safe without services.

But the County hadn't settled at that time, Mira.  We didn't settle until about nine months later I think with the 3500 bed spaces which were -- it put you in a box politically because of your -- or humanely because if you're going to put people inside and they don't have services, we're just warehousing them and they're going to return to the street even quicker.

So my guess is you had to go into the City coffer someplace, Matt, to supply those services for a period of time.

MR. SZABO:  One hundred percent.

THE COURT:  Yeah.

MR. SZABO:  The Inside Safe housing is 100 percent funded in terms of the operations of the hotels and --

THE COURT:  Exactly.

MR. SZABO:  -- the leasing of the hotels by the City general fund.

**18**

THE COURT:  That's probably decreased your reserve significantly, and maybe even the tobacco fund money that you had to go into.  I'm hearing rumors about that.  I don't know for sure.

But, well, you've got a potential disaster on your hands.  I mean, we're moving forward with Inside Safe with a number of about a thousand plus or minus, and we're returning potentially 3,000 to the streets.

MR. SZABO:  And the proposal that the City put forward would -- is designed to avert that disaster.  That is the goal.

Our goal here is to keep the beds open that we've worked so hard to open, to keep people housed, and to put us in a position where we can continue to add housing and fulfill our agreement under the alliance.

THE COURT:  And so what are you asking the Court to do?

MR. SZABO:  I'm -- we're asking the Court to approve the updated, revised bed plan for the alliance settlement that allows us to continue services for 2500 of the freeway agreement beds, and count those towards our alliance commitment of 12,915.

THE COURT:  And once again from LA Alliance.

MS. MITCHELL:  Your Honor, the -- I don't think that we have an answer still on the question of whether the County

has considered at the board level extending the roadmap
agreement.

**THE COURT:** I already -- just a moment. Mira, that's what I'm uncomfortable with. I know that there must be an MOU. I accept that out there.

But I wasn't going -- I've held off on October 16th inviting -- reinviting the mayor to come back and the chairperson. I don't want them in and out of my court. They've got a city to run.

By the same token, I would really like to hear from their level that they've reached an accommodation because I still don't feel comfortable with the answer between the two of you frankly.

**MS. HASHMALL:** Your Honor, I can try and be more clear. The roadmap agreement is not being extended. It's expired under its terms.

The County is supporting the City's migration of those beds so they do not have to close under the new County/City MOU.

I don't believe the alliance has a basis for objecting on the expiration of a contract that was already --

**THE COURT:** Well, --

**MS. HASHMALL:** -- set to expire.

**THE COURT:** -- yeah, I hear you fulfilled your duty. I am not arguing nor contesting that under the present

agreement.

What I'm concerned about is how concrete this agreement is. I haven't seen the MOU. I'm not entitled to see the MOU apparently.

By the same token, I feel very comfortable when I have Mayor Bass making a representation at her level, and very comfortable with Lindsay Horvath making a representation.

And you're going to feel more or less comfortable and make a decision, as well as Shayla, based upon that because too many times we have good faith intermediaries dealing.

But I think these belong at the top levels of government, a commitment quite frankly. And that's why you've seen in the past that I've asked recently that the mayor or whoever I'm dealing with actually sign it instead of an attorney on behalf of, that way I know the mayor has considered it, I know that Lindsay Horvath's considered it, or whomever.

Well where do we go from here? Because I don't want to run the mayor in here unnecessarily, nor Lindsay Horvath. By the same token, you've asked for an evidentiary hearing on the 16th.

So any other comments, Shayla?

**MS. MYERS:** Yes, Your Honor. What I did not hear from the City is whether if the LA Alliance's proposal that the County pay for 50 percent of the bed rate going forward, the 16 million or whatever, whether the City would commit to

continuing that; because what I hear from Mr. Szabo is that there is an expenditure.

So I just want to question the City if the County were to agree, would the City then agree to continue those beds and then open the additional 2500 beds as they're obligated under the settlement agreement?

**MR. SZABO:** The plan that we presented was the plan after judge -- careful analysis we put forward the plan that would be required in order to not need to consider closing beds, to keep every bed open, whether or not it -- the County was paying for it.

If the Plaintiff's plan would work for the City, we would have proposed it. There are issues with the Plaintiff's plan beyond the County's objection.

It would not achieve the objectives that the City's seeking in order to provide the capacity for the City to keep all of the beds open. It would not.

**MS. MITCHELL:** And why not?

**MR. SZABO:** Because it does not cover the -- because the 50 percent regime that was under the freeway agreement was not sufficient.

The agreement that we have under the Alliance settlement and the companion MOU provides that the County pays for a hundred percent of the services.

And as I said in the beginning, when we made the

freeway agreement the rate was $50, and now it's going to be as high as $115.  And the County has agreed that they would cover the total cost.

Having the County cover the total cost of those 2500 beds will allow the City to keep the remaining beds open and invest the resources necessary to complete our obligation.

THE COURT:  So it'll be able to keep the 4200 open as well?

MR. SZABO:  Correct.  All 4200 will remain --

THE COURT:  So if the County funds --

MR. SZABO:  -- open under that proposal.

THE COURT:  -- the 2500, you could keep the 4200.

MR. SZABO:  Yes.

THE COURT:  And we don't take a step backwards.

MR. SZABO:  Correct.

THE COURT:  In the freeway agreement, I've learned a lot since that agreement.  And you noticed in the LA Alliance agreement I had one of my law clerks literally go to the lectern and write-in.

And one of the things that we wrote in was this was what I'm going to call a ground floor.  In other words, the expectation was this was minimal.  But my hope was that more would be done.

And I was trying to cover the very situation that we're in because the County will literally argue in good faith

**23**

we fulfilled our obligation.

But I was asking in that agreement that we recognize that there could be cost overruns and increases.  And that's why if you go back and look at that handwritten portion of that agreement, it really was intended to say, and it did say, this is the beginning.

Why are we going through this process?  Why isn't the City and the County in lockstep when instead of these agreements and these finite amounts that when you place somebody in housing or shelter that the services are in fact covered by the County?

And why isn't that transparent so I'm not dealing with an MOU that later on can be argued between the parties and we're back in a year?  Why isn't that -- why are we going agreement by agreement between the County and the City?

**MR. SZABO:**  I -- Judge, I think that's a larger question.  It has been the position of the City that a fair way to proceed with housing for the homeless is that the City provides the capital investment --

**THE COURT:**  Sure.

**MR. SZABO:**  -- and provides the land, and that the County provides the services.  That has been our position, so there's no argument from the City on that point.

But we are also working within quite honestly the confines of what are the available resources.

**EXCEPTIONAL REPORTING SERVICES, INC**

And there are many things that are going to happen. For example, there's a measure on the November ballot that could provide a significant, new, extended funding to the County.

We'll have -- at that time, if those dollars are available, we certainly would want to have those conversations.

But the proposal that the City put forward was within the context of the previously approved agreements, understanding that the County made a commitment and we wanted to maximize their commitment for now.

But I don't -- the City is not arguing that this is it.  We just want to stabilize where we are so that we can be in a position to build as we are able to secure additional dollars.

And if the mayor were here, I'm sure she would say that she's committed to seeking more federal dollars, more state dollars.  Not -- again, not to speak for her, but she's mentioned that every time.  She wants to know what -- how much more we need to secure.

It's just that with the dollars that we have now, we don't have the capacity as a city alone to keep those beds open and move forward with the Alliance agreement given the increase in the bed rate.

THE COURT:  In the agreement with the County with the 3500 -- well, 3,000 plus 500 mental health beds, the Court

chose not to enter into any kind of delineation like 50/50, 50 for the rest of the cities, 50 percent with LA.  That wasn't appropriate on my part.

But there's been a lot of counsel people, you know, in terms of letters to the Court, etcetera, who are complaining on the City's behalf that they're not getting these bed spaces.

I don't know what the proper delineation is between the counties, other cities, and the City of Los Angeles. What's happening on the mental health beds?  Have the two of you worked out an accommodation somehow between the County and the City?

Because I'm getting repetitive letters, frankly, that those services aren't being applied.  And Michelle's out there and the auditors are out there seeing that these services in some locations that are being spot-checked aren't being applied.

Do you two have an MOU of some kind?  Is there a decision that it's 50/50 split or 60/40?  Where are we with those 3500 mental health spaces?

**MR. SZABO:**  We do not have an agreement related to the 3500 beds in terms of allocation or reservation or set aside.

**THE COURT:**  Sure.  Why?

**MR. SZABO:**  In our -- excuse me, sir?

**THE COURT:**  Just a moment.  Why?

**MR. SZABO:** The 3500 beds were established with a settlement between the Plaintiffs and the County.

**THE COURT:** Right.

**MR. SZABO:** We were not part of that settlement.

**THE COURT:** I understand that. Do we have any kind of accommodation? Because I continually get these letters from different counsel people, depending upon the district. That's how it got called to my attention.

And it seems to be regardless of what the mayor and the chairman of the board are saying that there's some -- there hasn't been a number set forth yet.

Has there? Is there some kind of an agreement between the City and the County that I'm not aware of concerning these 3,000 or 3500 spaces?

**MS. HASHMALL:** Your Honor, the County has met or exceeded all of the benchmarks regarding putting up those new resources under the Plaintiff, Alliance, and County agreement.

**THE COURT:** Oh, I understand that, Mira.

**MS. HASHMALL:** It has not ever been expressly tied to geography but rather need and eligibility. And I think that this is the problem when individuals who mean well don't educate themselves on the criteria for entry on some of these resources.

You actually have to be in a category of some level of substance use disorder or severe mental health for some of

these resources --

THE COURT:  Isn't the acuity score eight?  And correct me if I'm wrong.  What's our acuity score?  Shayla, help me.

And while you're helping me, I've literally sat in a parking lot and watched a county and a city bicker over a person who was mentally ill and try to decide who was going to take that person under their wing, and they both walk away.

Now, it wasn't this county.  It was Anaheim in a parking lot.  And it was quite a sight, and it was an education for me about five years ago about how that can occur on a much greater level.

I'm just curious because I keep getting those letters.  In other words, I keep getting complaints from individual council people that the services aren't matching the intake in their council district.

MS. HASHMALL:  Your Honor, I will say I think some of that confusion has to do with the fact that the City's not using the coordinated entry system with regards to placements.

And when you don't use that system, it does create an impediment to application for resources because --

THE COURT:  Okay.

MS. HASHMALL:  -- that system was developed in order to match individuals based on their need with the appropriate service level.

EXCEPTIONAL REPORTING SERVICES, INC

THE COURT:  Okay.

MS. HASHMALL:  So when you go around the system, it's going to create issues.  And I think that that's what we are seeing reflected in those individual --

THE COURT:  Yeah.

MS. HASHMALL:  -- councilmembers' correspondence.

MS. MYERS:  Your Honor, and we just want to very, very, very, very strongly agree with the County on this particular position.

We are very, very concerned about the allocation of resources that are sort of politically driven or driven by council decision-making as opposed to need.

Where prior systems allowed for a match -- and this was something that came out in the listening session -- that allows for a match between the resources that an individual needs to move off the streets and the decision-making of a council office, that that person or that encampment should be given resources.

The challenge is, is that I think what we're seeing repeatedly and is part of the reason why so many people are falling back into homelessness out of these interim programs is this disconnect between the folks who need the services and the ways in which those services are now being allocated.

And I think we're going to continue to see those disconnects as we have conversations that are about this

councilmember isn't getting the resources as opposed to these unhoused folks aren't getting the resources that they need to come in.

And I think that's part of this push to allocate resources between the City getting entitlement to a certain number of beds as opposed to the rest of the County, even though half of the unsheltered population of the County of Los Angeles is outside of the City of LA.

**THE COURT:**  Well, 76,000 to 45,000.

**MS. MYERS:**  But if you look at the unsheltered population, Your Honor, there's 52,000 unsheltered folks in the County of Los Angeles, and 25,000 in the City of Los Angeles, so half of the unsheltered population.  And that's the population that we would expect would be targeted for some of these resources.

**THE COURT:**  I'm going to close off in just a moment.

And I want to compliment Michelle Martinez.  She didn't know I was going to pay this compliment to her.

But I want to compliment you, Shayla, for being there, the County, and the City.  All of you folks had a fabulous session out in Bob --

**MS. SPEAKER:**  (Inaudible)

**THE COURT:**  Yeah, Blumenfield's district.  And those were the people on the front lines doing the work.  But  I was astounded to listen at that conversation.  It was really

**30**

educational.

And I think that all of us should take hope from our people on the front lines doing the everyday work.  They were really not only impassioned but those frontline workers are doing a fabulous job.

It is a (indisc.) structurally it seems to be here at the top.  And, Michelle, why don't you tell them a little bit about how that was put together?

Because when Michelle and I walked out, we were wondering why there weren't groups like this taking place a long time ago, why a special master's doing this.

And, number two, it was suggested that we ought to have the City leaders in the same kind of room listening to the providers who are out in the street, listening to the frontline workers.  It would probably be some of the best time that all of us have spent together, you know.

So, Michelle, why don't you tell them what happened?  Because Shayla was there, she knows that.  Mira, this is -- and, Liz, this is somewhat for you, okay?  So --

**MS. MARTINEZ:**  Yes, Judge.  As I've been out making observations in the field, I made a commitment to both the City and County that I would share my observations so that we all can learn and try to correct things in real time instead of trying to address these in court.

And so it's been very I believe favorable both to the

**31**

City and County to have a better understanding on what's happening in real time on the ground.

And one of the reasons why we decided to have this learning session was trying to get an understanding of, one, what's happening out with encampment resolutions and the process that's taking place with care, care plus, or other operations.

But more importantly, how the interconnections between these systems are working, whether it's LASHA, whether it's the City, whether it's the sanitation department, the County and its various departments, and those that have to interface with those platforms in real time.

What I can share and what we all have learned is that the system that we currently have is a very top/down system. It comes from the Federal government.

If you're part of the COC, you have to, you know, input information into an HMIS system, a CES system.  Then we recognize that the County has its own systems and not -- that are not truly connected with those systems.

And when you're out there on the ground and you're trying to understand in real time who's receiving services, where our folks are actually getting shelter, you start to realize in a very short period of time that the people that we're trying to help out in the streets sometimes are not getting those placements in real time because of these systems.

And I won't go into full detail as we did and we are trying to answer, you know, ask and answer some of these questions because I will actually be back out in the field to actually understand in real time with a service provider from the very beginning of outreach and engagement to actually completing the application process in the HMIS system, to the referral process, so that I can see myself in real time.

And I will be coming back, providing those observations both to the City and County and to the Court to really gather more information.

But what I just can tell you in short, Judge, again is that I truly believe that the current system that is in place is not benefitting those with high acuity or those that truly need the resources because of the way the system was created, and no fault of the County, not fault of the City, no fault of LAHSA.

This is a system that was created at the Federal level. They never came down, you know, I -- and maybe they have. But I'm sure HUD or those that created this system never came down to actually observe or ask the locals if the HMIS system or the CES system or County systems, how they would be able to integrate into a fully regional, functional system.

And, you know, I'm -- I continue to be very perplexed after five years. And finally the research that I'm doing and being on the ground, I could tell you that there are a lot of

folks who are exiting this system.  And many of the councilmembers are stressing this, as you said in your letter.

What I would say is that the reason why they're exiting these systems and why they're not getting these placements immediately is because you don't have a full system that is interconnected.

And so there is a lot of displacement that is happening; and, again, no fault of the City, no fault of the County.  But it's the system as a whole and how it was created that is not sufficient for the problem here in the City of Los Angeles.  That is the main difference.

These systems may work in a smaller community in Idaho or somewhere else.  But when you're dealing with this many unhoused folks with a lack of shelter and demand, the system does not work in its entirety for the problem that we are facing here today.

And I've said that to you more than once.  But I will continue to go out and continue to have these learning sessions because I believe that they are important.

And this is a moment in time where I think everyone that's in this business can recognize that those service providers, those volunteers that are out there in the street trying to help those unhoused people, it's not that they don't want these folks to get place.  It's the determination, the criteria, the eligibility, the information that's being asked.

**34**

And, more importantly, Judge, that if you don't have some form of subsidy and the duration of how long you've actually been homeless, you may not get placed in one of those beds because that's how the system was created.

And I know that LAHSA, and I know a lot of times folks want to pick on LAHSA, beat LAHSA up.

But what I can tell you here today is that there are times that LAHSA has recognized and is trying to make the changes necessary to create a localized system that is going to help place people faster into these beds.

And so I just wanted to reiterate that they are doing everything that they can with this new leadership.  And I want to give them kudos because I'm actually starting to see it as I'm out there with some of the providers.

But it's taking -- it's going to take them time to try to create a system that's localized -- that's able to help certain council districts and other cities throughout this region to get folks placed appropriately and in an efficient time, because we're not seeing that at this time because of the way the system was designed.

**THE COURT:**  Matt, in a perfect world we wouldn't be here with you and the County because every time you placed a person who needed services, that would automatically follow

What we've been doing to move this iceberg in a sense is having to reach agreements and then designated, you know,

**EXCEPTIONAL REPORTING SERVICES, INC**

spaces from the County.  It shouldn't be agreement by agreement.  It should be an automatic between you and the City. I mean the County.

And that's what I'm concerned about.  I don't know what that MOU looks like.  But we're constantly running into that repetitive problem that we have to enter into the next settlement with a designated number of mental health spaces or beds, and if that's not met, you have to pick that up.

I'm guessing that you're minimally double the amount of money of that 300 million.  Just doing the rough math, you've got to be up to six to 700 million, three to 400 million of which the City picked up.

And my question to both of you would be, hey, that was our agreement, and it may be fulfilled contractually.  But why wasn't this occurring automatically?  As you put a person in, why wasn't the County matching you, regardless of this agreement of 300 million?

And I know that we've fulfilled our agreement. That's not in question right now.  That's what we need to get to.

The second thing is the night before we met on the last occasion -- and I would have counseled Lindsay Horvath coming in.  I didn't know about Dr. (inaudible) Adams, her -- had a grandchild, okay?

And I wasn't aware until right before that Mayor Bass

wasn't available.  She was in Mexico.  Because really we needed all the folks here.  And so I would have counseled that.

We got some information in terms of this website.  And I really would like to see this website created with the cooperation between you and Mejia over at the controller's office.

And we got a lot of information literally the night before.  And I want to commend LAHSA for it.  I got a 6:00 a.m. email from Dr. Adams about her crew.  But there was no time to put that up in a meaningful way on the website.

Are you and the controller still cooperating?

**MR. SZABO:**  Absolutely, Your Honor.  We're --

**THE COURT:**  Okay.

**MR. SZABO:**  -- in constant communication, almost daily.

**THE COURT:**  Great.

**MR. SZABO:**  We're in a good position there.

**THE COURT:**  You have my compliments about that.

I'm going to ask, though, that that information be put up on October 16th again.  I want to see if that website is truly progressing or if it's just the Court pushing and it goes up, you know, the night before, etcetera, because somehow this has to occur in perpetuity for the benefit of the public.

You also moved from 25 percent what I call fronting providers to 40 percent.  I -- Michelle, you had me listen to

the committee to the early hours.

What's -- what may be happening is in good faith as the providers want to get paid out front or they say that they can't operate, you're getting in a situation where you're paying or fronting money not knowing what you're paying for. In other words, it's here.

Somehow we either have to catch up or get a system where there is more accountability on that front side.  So I -- it's a political decision to go from 25 to 40 percent.  That's my -- not my decision.

But it's got to put you in a terrible and stressful situation where the Court's bearing down saying, you know, where are the invoices, and you've got providers saying, we can't provide if you don't go from 25 percent to 40 percent.

So you're paying, once again, invoices without knowing what's occurring.  Somehow we've got to get to the point where the invoice goes up, the substantiating paperwork is there.

Now, I'm going to frighten you for a moment.  I'm not going to do this.  I'm going to repeat this.  I'm not going to do this, got it?

    (No audible response.)

But for a while I thought, wait a minute, why don't I just put an injunction on the City that you stop paying all of the bills until you have those invoices and this underlying

information?

What's wrong with that?  A tremendous amount.  A lot of people would be hurt.  You know, we don't want to stop providers.  So for a period of time we'd have people that were really harmed by that.

But somehow we've got to get to that point, Matt.  So on October 16th, no surprise, I need Mejia back in here.  I'd appreciate you being in here.

And right now I think I'm going to go ahead and request that the mayor and Lindsay Horvath be here.  I'd really like to hear from their level, okay, that they've really reached an accommodation, and say that publicly to all of us.

And that's not any, you know, denigration of you or Mira.  But these decisions should be represented by our government leaders.

**MS. SPEAKER:**  Your Honor, I'm aware that Chair Horvath may have a conflict on October 16th.

**THE COURT:**  Then I can change the date.  You know, in other words I'm requesting.  But at some point we're all going to get together.  So you tell me.

I set the 16th because I thought it was available last time when everybody walked out.  I could set the following week.  Ther's nothing magic about it.

So would all of you get together?  Remember, I don't have jurisdiction.  They don't have to come.  But by the same

token, there should be a public, you know, statement on their part that they are working together because for so long, regardless of what's been said, behind the scenes there's been a lot of strife.

So I hear politically that we're all working together. I've got some concerns behind the scenes that we really are, okay, Matt?

**MR. SZABO:** Okay.

**THE COURT:** Let's leave this -- Elizabeth, what are you asking? You're asking for a evidentiary hearing. But if you had documentation, if the mayor came in here and the chairman of the board came in here, would that give you a comfort level, not to say yay or nay, but would you still be asking for evidentiary hearing at this time?

**MS. MITCHELL:** Yes, Your Honor. And I'd like to explain why.

**THE COURT:** Please.

**MS. MITCHELL:** Because what the County has suggested is that, you know, this isn't the County's fault, right, they're going to pay for these regardless, whether they're under the Alliance agreement or the roadmap agreement.

But the roadmap agreement isn't extending, and I recognize that.

And the reason why is because their financial contribution would be reduced, right, if they are being

migrated under the Alliance agreement.

I don't know that there is an actual consideration at the board level that the overall number of beds created as a result of these agreements are being reduced by 2500 by doing this migration.

THE COURT:  Right.

MS. MITCHELL:  And I would like somebody at the board level to understand that and to explain to this Court why that is an acceptable situation in the County, whether that's a financial issue, whether that's a motivation issue, whatever the reason is.

I think that the public and I think that this Court should hear what the reason is, but that the County is comfortable with reducing the number of beds.

THE COURT:  Matt.

MR. UMHOFER:  Your Honor, my -- the only thing I'd add to that is to be very crystal clear about it because this is said in open court.

Mr. Szabo has said that one of the reasons, if not the chief reason, that 2500 beds needs to come under the Alliance agreement is that the County is not going to be supporting the beds at the level that they have under the roadmap agreement.

THE COURT:  Right.

MR. SZABO:  Okay.  So we have that causal link there.

The migration of these beds from the roadmap agreement, I hate using that term.  It is an overall reduction in the number of beds available for people living on the streets of 2500.

THE COURT:  Yeah.

MR. UMHOFER:  And we are at this point trying to understand the facts so that we can understand whether there's a violation of our agreement as by the City or by the County because under our agreement, the City had to create a certain number of beds over the existing beds, and that includes the roadmap beds.

And so if we're borrowing from the roadmap beds, we are reducing the number of beds that are being created.  This case has contributed to the creation of or commitments to the creation of 20,000 beds thereabouts.

But this will reduce that number.  And the City of Los Angeles, the people of Los Angeles deserve to know why the County would be making a choice that would result in a reduction of the total number of beds that was -- that were envisioned to be created under these two agreements.

And so my concern here is that we don't have enough facts to make that determination yet, which is why we need that evidentiary hearing.  We need more facts.  We need to understand the math.  Mr. Szabo has laid out in open court some of the math.

But at the end of the day we need to get to the bottom of what -- of precisely what's happening, why it's happening, and whether there is a violation by the City of the agreement contemplated by the migration of those beds or potentially a violation of our -- the County's commitment because the County's commitment goes beyond those 3,000 beds into providing services for the beds that the City creates.

THE COURT: Okay.

MR. UMHOFER: So that's where we are.

MS. HASHMALL: Your Honor, I have to respond to that.

THE COURT: Sure, Mira.

MS. HASHMALL: That was not an accurate reflection of either the statements in court today or the reality on the ground.

The roadmap beds are -- the roadmap agreement is expiring under its terms. I think we've heard Mr. Szabo explain that the financial structure where the City was committing $300 million to share approximately half of the operational costs of those beds are no longer in the City's interest because they don't want to have to fund their half of those operational costs.

And the numbers themselves have been --

THE COURT: Okay.

MS. HASHMALL: -- superseded by subsequent events. The County's not closing beds. The agreement

expires.  And the County is funding the beds that the City is electing to migrate over to the Alliance settlement.

And I think Mr. Szabo has also confirmed that actually that structure is more beneficial to the City because the County's actually going to be funding more, not less.

So it would be helpful maybe for the lawyers to talk outside of court --

**THE COURT:**  Okay.

**MS. HASHMALL:**  -- so we can explain the facts.  And I think that probably would be more efficient than an evidentiary hearing because the County is not stopping funding, the County's not denying services.

And, again, what we're talking about is operational costs:  janitorial, kitchen, supplies, lights, beds, blankets.

**THE COURT:**  Right.

**MS. HASHMALL:**  We are not talking about any specialized services that are uniquely within the paradigm of the County departments.

We're talking about operational costs.  And the County is going to be funding the costs for beds that the City migrates into the Alliance agreement pursuant to an agreement between the County and the City.

**THE COURT:**  Fair enough.

**MR. UMHOFER:**  And, Your Honor, those are factual representations that need to be borne out in an evidentiary

hearing.

THE COURT:  Well, --

MR. UMHOFER:  So --

THE COURT:  -- just a moment.

Shayla, I want to turn back to you if you had any comment.

MS. MYERS:  Yes, Your Honor.

I did actually have a question about another category of beds that --

THE COURT:  Go ahead and ask it.

MS. MYERS:  Sure.  There are 2,000 beds that are funded under time-limited subsidies, those subsidies obviously pursuant to the terms of the agreement.

The City's no longer required to fund them after the ending of the agreement.  Does the City intend to continue to fund those agreements?

And I would note, Your Honor, that a significant number of folks who are moving from Inside Safe into permanent housing are funded through time-limited subsidies.

So it might be helpful for the Court to also know whether or not the time-limited subsidies that are being used for Inside Safe are the roadmap time-limited subsidies or whether there are other pools of time-limited subsidies.

MR. SZABO:  There are multiple pools of time-limited subsidies.  And the reason we're counting those differently,

**45**

those are annual allocations, annual appropriations for a subsidy for a year as opposed to a bed that exists that can exist for multiple years.

But our plan, our -- that we submitted for the Alliance agreement includes a significant allocation for time-limited subsidies.

We will -- short answer is, yes.  I can't be specific on the number.  But time-limited subsidies for permanent housing will -- is and will continue to be a robust portion of our homelessness program.

**MS. MYERS:**  But my question has to do with the supplanting issue.  So there's 2,000 time-limited subsidies that are currently being counted towards the roadmap.

Understanding that the City is going to count a significant number towards the LA Alliance settlement as well in the future, are they the same time-limited subsidies?

Understanding that these of course are fungible, but is the City going to continue to fund 2,000 that they funded under the roadmap and additional beds for time-limited subsidies under the Alliance agreement?

What -- is there going to be an increase in the number or is this like the interim shelter beds?

**MR. SZABO:**  That's going to be -- that's -- that would be an annual decision that we would make on how much we can put in the TLS program.

I can say that there will be -- I'm comfortable in saying that there will be at least that many on an ongoing basis.  But I can't commit to a number in part because it's entirely dependent on the plan that we submitted.

If for some reason the Court doesn't accept our plan, we will have to completely rework and restructure.  And in addition to proposing beds for closure, permanent, existing beds for closure, we'll need to look to fill the gaps with other kinds of subsidies.

So I can't give you an answer on that right now.  I can say that on a go-forward basis we will have a minimum of the amount of permanent housing subsidies as we do now.

**MS. MYERS:**  And will those count towards the LA Alliance settlement?

**MR. SZABO:**  Potentially.

**MS. MYERS:**  And then the other question that I have has to do with the funding of the interim services under the LA Alliance agreement.

So it's my understanding that the County pays a higher rate for the interim beds under the LA Alliance agreement than under the roadmap agreement.

**MR. SZABO:**  I'm sorry, can you repeat that?

**MS. MYERS:**  The County pays a higher rate under the LA Alliance agreement than under the roadmap agreement.

**MR. SZABO:**  The County under the Alliance agreement

pays the full cost of operations; whereas under the roadmap freeway agreement they just -- they essentially gave us a check for 60 million at the beginning of the year that represented about just under 50 percent of the cost.

So the County would pay the full cost what it is today, which is $60, what it is likely to be in January, which is $69, and what it is likely to be in July, which is as much as $113.

So their agreement doesn't -- it isn't a fixed number in terms of the rate.  They'll pay whatever the rate is for the basic bed rate within the confines of their agreement, which is a maximum of 3100 units.

**MS. MYERS:**  So then the operations cost is effectively the day rate, whatever the day rate is.

**MR. SZABO:**  Whatever the -- correct.

**MS. MYERS:**  And so if -- and this is just a hypothetical because I think it gets to the LA Alliance's proposal.

If, for example, the County were to agree to pay the bed rate, the day rate for the 2500 beds, would the City then commit to open an additional 2500 beds consistently with its LA Alliance agreement?

So as if to say if the County would agree to put in place the same requirements for funding, would the City then have capacity to open up the 2500 additional units that it's

obligated to do under the settlement agreement?

**MR. SZABO:** I can't commit to that right now. I'd have to do analysis and come back with an answer. But we haven't -- I'll just leave it at that. I'd have to do analysis and come back with an answer.

**THE COURT:** Okay. Here's where I tentatively feel comfortable without finalizing it.

I'm going to invite counsel to meet and come up with a date when Mayor Bass is available and when the chairman of the board's available. I assumed that that was the 16th. And that Dr. Adams is available.

I don't want to have an evidentiary hearing until I hear from the City and County leaders and their representations.

I think Mayor Bass by her locking arms has been somewhat successful in turning the increase and starting a decrease. And the numbers were ten percent of the City, less of course in the County.

And if we have representations from that level, the Court has more of a comfort level than just moving into an evidentiary hearing. But eventually, without any denigration, Matt and Liz, we may get there.

But I'd prefer the first step of literally hearing from the government leaders and paying them the courtesy.

I'm not satisfied not because of your answers but

your position with the answers I've received today.

I trust Mayor Bass's representations.  I trust Lindsay's.  I trust yours also.  But I think now that this is a leadership issue and that the leaders need to be fully committed and on the record.

So if you'd meet and confer and come up with a date that those three persons would be available, I would appreciate it.

And I want to compliment you if in fact we have turned that corner, that's the first time in the City in a long time that we've had a decrease of ten percent.

Imagine the disaster now if we take Inside Safe and whatever those numbers are and we unload 3500 people; because what will happen is politically people will claim success depending upon the program by segmenting it out to the public. I call it propaganda.

But in reality, we've gone down in numbers.  And when you take it holistically, that message will be lost because the representation will be that this program is doing well or this program is doing well when in fact we're having a catastrophe on our hands.

I just can't imagine putting 3500 people or even thinking about it back on the street.  It erases all of your good efforts, okay.

I'll be here most of the day.  So would you go out

and meet-and-confer?

I see staff from Mayor Bass's office here.  I appreciate your attendance today.  And tell her I paid her a compliment today, okay, for her leadership.

But if you go out and give me a date, I'd appreciate that.  And if it's not the 16th, then give me another date.  But that's when I would appreciate the leaders being here.

And after that then I'll decide if an evidentiary hearing is necessary or not, okay?

**MS. SPEAKER:**  Thank you, Your Honor.

**THE COURT:**  All right, counsel.  Thank you very much.

**MS. HASHMALL:**  Thank you, Your Honor.

**MS. SPEAKER:**  Thank you, Your Honor.

**(This proceeding was adjourned at 10:08 a.m.)**

51

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 9, 2024

          **Signed**                                           **Dated**


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC