UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Wednesday, October 16, 2024 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | (9:01 a.m. to 11:06 a.m.) |
| Defendants. | ) | |

HEARING RE SETTLEMENT AGREEMENT COMPLIANCE [DKT.NO.767]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:                    SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Karlen Dubon

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiffs: | ELIZABETH A. MITCHELL, ESQ. |
| | MATTHEW UMHOFER, ESQ. |
| | DIANE BANG, ESQ. |
| | Umhofer Mitchell & King |
| | 767 S. Alameda Street, Suite 270 |
| | Los Angeles, CA 90021 |
| | 213-394-7979 |
| | |
| For Defendants: | JENNIFER M. HASHMALL, ESQ. |
| | Miller Barondess, LLP |
| | 1999 Avenue of the Stars, Suite 1000 |
| | Los Angeles, CA 90067 |
| | 310-552-4400 |
| | |
| | LAUREN M. BRODY, ESQ. |
| | Miller Barondess, LLP |
| | 1999 Avenue of the Stars, Suite 1000 |
| | Los Angeles, CA 90067 |
| | 310-552-4400 |
| | |
| | ARLENE N. HOANG, ESQ. |
| | JESSICA MARIANI, ESQ. |
| | Los Angeles City Attorney's Office |
| | 200 N. Main Street, Room 675 |
| | Los Angeles, CA 90012 |
| | 213-978-6952 |
| | |
| Intervenor: | SHAYLA R. MYERS, ESQ. |
| | Legal Aid Foundation of LA |
| | 7000 S. Broadway |
| | Los Angeles, CA 90003 |
| | 213-640-3983 |
| | |
| Special Masters: | MICHELLE MARTINEZ |
| | JUDGE JAY GANDHI |

EXCEPTIONAL REPORTING SERVICES, INC

**Los Angeles, California; Wednesday, October 16, 2024; 9:01 a.m.**

--oOo--

THE COURT: We're in session on Case No. 20-02291, LA Alliance versus the City, County, et al. And, counsel, if you just remain seated and make your appearances, please.

MS. MITCHELL: Good morning, Your Honor, Elizabeth Mitchell on behalf of plaintiffs.

MR. UMHOFER: Good morning, Your Honor, Matthew Umhofer, Diane Bang also on behalf of plaintiffs.

MS. HASHMALL: Good morning, Your Honor, Mira Hashmall for the County of Los Angeles.

THE COURT: Morning.

MS. BRODY: Lauren Brody also for the County of Los Angeles.

THE COURT: All right.

MS. MARIANA: Good morning, Your Honor, Deputy City Attorney Jessica Mariana on behalf of the City of Los Angeles.

THE COURT: Good morning.

MS. HOANG: And good morning, Your Honor, Arlene Hoang, Deputy City Attorney.

THE COURT: Good morning, how you doing?

MS. MYERS: Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT: I've invited both special masters, Michelle Martinez and Judge Gandhi to join me on the bench this

EXCEPTIONAL REPORTING SERVICES, INC

**4**

morning, because much of their conversations have been with you as parties and I get that information back on occasion from them, if it's appropriate.

I'd like to turn to the first matter this morning regarding the issue raised by LA Alliance concerning the City and County, it would be a docket filed, plaintiff's position concerning proposed City bed plan. And the brief summation in that document is that the plaintiffs are in receipt of the City of Los Angeles proposed bed plan, requesting migration of the 2,500 beds from the 2020 City/County MOU road map agreement, which expires at the end of this fiscal year and to the Alliance agreement which expires in 2027.

The document goes on to state that plaintiff's understanding the City's requesting the migration because the County will stop funding these beds pursuant to the expiration of the agreement and the City cannot otherwise afford to maintain 4,100 beds.

Just a moment.

The -- also the review of the issues highlighted by the LA Alliance concerning the County's quarterly status reports, particularly regarding the adequacy of the data provided. I think the reference back to that is as much as the Court would like to say concerning the motion, so I'm going to turn this over to LA Alliance.

MR. UMHOFER: Your Honor, we need a couple of moments

EXCEPTIONAL REPORTING SERVICES, INC

to work on --

            THE COURT:  Okay.

            MR. UMHOFER:  -- to just get things up on the screen here.

            THE COURT:  Fine.

            MR. UMHOFER:  So I apologize for the delay.

        **(Pause)**

            MS. MITCHELL:  Thank you, Your Honor.  So regarding -- we'll take the second issue first if the Court's okay with this, the issues that we've raised regarding the data sufficiency that's come from the County.

            We have been meeting and conferring on these issues since at least --

            THE COURT:  Would you move that microphone a little bit closer and just a little slower.

            MS. MITCHELL:  I'll move myself closer, how's that sound?

            THE COURT:  Okay.  Thank you.

            MS. MITCHELL:  We've been meeting and conferring on these issues since at least April of 2024, so the last six months.  And we raised a number of issues back in a hearing in April.  We subsequently met and conferred with the County in May.  They were supposed to be providing some information to us, they didn't.  We followed up by e-mail, we got no response.

            Ultimately in August we were planning on going

**6**

forward with a motion to compel when the County sort of re-engaged and we have been involved in a couple of meet and confers since then about the data sufficiency and if I can just take the Court back real quick to why this is important.

Because the City and County agreements were designed to work together, you have the City putting up beds and you have the County providing services.  The County also is providing 3,500 mental health beds, but equal or more important to those beds are the services that the County is providing partnering with both the City outreach teams and providing the City projects.  Because without those services, people truly are just being warehoused, will never recover, and oftentimes end up back in the streets.

So that -- those services are so crucial to the recovery and the progress that is intended to be made under these agreements.

Now, the problem is, and what we have raised with the County is anecdotally we are being told both by service providers and by outreach folks that those services are not hitting the streets.  That the outreach workers are not able to directly access these departments as they are required to do under the agreement, that services are not being provided to the City projects to individuals in these City projects, both the interim and the permanent supportive housing projects.

So we have raised these issues and have asked for

**7**

additional data by the County to support their contention that they are complying with the agreement.  And we have been waiting for that data, we have been talking about it for the last six months.  We still don't have satisfactory responses to those.

And so we have engaged directly with the City as well.  The City was part of the meet and confer last week, has raised similar concerns.  And so what we would like from the Court on this issue and I'm happy to go by one-by-one, but I think a more efficient way to do this is just an order by the Court to be done with this meet and confer to have the data, the answers by a date certain so that we can move forward with either a motion to compel or be satisfied.

**THE COURT:**  Okay.

**MS. MITCHELL:**  The concern, Your Honor, if I can just add one more thing is that, you know, the County agreement is for a lesser period of time than the City agreement.  And it does feel at some point like we're going to be meeting and conferring throughout the pendency of this agreement, while it never does what it's intended to do.

And those services, to get to those City projects are so crucial for the success.  And to this day, we still do not have evidence that it is happening.  And I think we've heard concerns from the auditors.  We certainly heard concerns from the special master who's been present on scene and we don't

EXCEPTIONAL REPORTING SERVICES, INC

have the information from the County to support -- that those services are making their way both to the street through outreach workers and to the City projects and we would like some final resolution to this issue.

(Pause)

MS. MITCHELL:  Your Honor, Mr. Umhofer is going to talk about the evidentiary hearing issue if the Court wants to move onto that or we can address the data issues first.

THE COURT:  Either one.

MR. UMHOFER:  Thank you, Your Honor.  I'd like to be able to present this and I'm pushing all the right buttons here for presenting from counsel table here that the PowerPoint's ready to go, but we're still seeing the remote folks instead.

THE COURT:  Just move that microphone closer to you.

MR. UMHOFER:  Yes, of course, Your Honor.

THE COURT:  Thank you.

(Pause)

MR. UMHOFER:  I'm going to try from the lectern here, see if that works better.

(Pause)

THE COURT:  If you're going to put up a display, do we need -- oh, do we need to have a --

MR. UMHOFER:  I'd like this to be full screen.  I just saw it for a moment there on the big screen.

THE COURT:  Okay.

**MR. UMHOFER:** Great, thank you, Your Honor, for your patience there.

**THE COURT:** Okay. All right.

**MR. UMHOFER:** So, Your Honor, we're here about beds and for people like this and this is a scene that could be playing out today on any street down near 7th and San Pedro, but this is from the LA Times 1985. This is also a photograph from 1985 of a person sleeping, just outside this court. And looking up at city hall there. That's from the LA Times in 1984. This is the LA -- this is in the LA Times in 2024, 40 years later, we're still dealing with people living on the streets rather than getting into beds.

And this is on the City and County's watch for four decades. Not enough beds, not enough services. So what we want to focus on today is the importance of enforcing the settlement agreements that we've entered into to solve this decades long problem of there not being enough beds, shelter or housing and services for people within the City and County of Los Angeles.

And we wanted to talk about two things today. The first thing that I'm going to talk about is and the thing I'm going to talk about is the City's proposed violation of its settlement agreement in this case, a violation which will reduce the number of beds the City already committed to create by 2,500.

The second thing we wanted to talk about was already spoken to by Ms. Mitchell, the County's apparent violations of the settlement agreement reached with the County which we are still in the process of -- we were desperately seeking to conclude so that we can bring that matter to the Court's attention, but let's focus on the City's proposed violation of the agreement.

And it's important, Your Honor, to go back to 2020. This is the road map, the freeways agreement. In 2020, before the settlement -- the City settlement was entered into in this case, the City separately committed with the County to the creation of 6,700 new beds. That was a commitment the City and County made to each other, arising out of this case to create 6,700 new beds.

So we're going to do some math here and I just want to be very clear about the math and I'll provide this PowerPoint, a PDF of this PowerPoint to the Court and all the parties so that everybody has it. So you don't necessarily need to write it all down.

**THE COURT:** All right. Thank you.

**MR. UMHOFER:** So that road map settlement. Already in existence as of 2020, 6,700 beds. Then comes the City's settlement agreement in 2022 and as part of that settlement agreement, this is the settlement agreement with the City, Section 3.1, the City agrees to create a required number of

housing or shelter solutions rooted in the pic count, ultimately determined to be about 1,200 -- 900 -- 12,915 beds.

And the key word here in Section 3.1 is create. You can't create something that already exists. The 6,700 beds already exists under the road map freeways agreement. So it's really important that the City committed to creating an additional 12,915 beds in 2022, beyond what already existed and what already existed included the road map 6,700.

So we have the 6,700 already created in 2022 and a City commitment, under our settlement agreement, to an additional 12,915 beds. Those are not disputed numbers. Mr. Szabo stood up in court and talked about those some weeks ago.

So you add all those up, arising out of this case, City commitments to 19 -- City and County commitments include what -- when you include the road map settlement to 19,615 beds.

Now, here's what the City's proposing to do which is a violation of Section 3.1 of our agreement. They want to take 2,500 beds from that road map settlement and not to continue to fund those beds independently, but to count them toward the City settlement.

So they're going to borrow 2,500 beds from the road map beds and reduce the number of beds that they are seeking to create under our agreement. So you're taking that only 4,200

**12**

road map beds just continue, 2,500 get ported over into our settlement agreement, reducing the number of new beds created under the 2022 settlement agreement by 2,500 beds.  This is what the City is proposing to do.

And what that does overall, we've got those original numbers that I just showed you, but here's the effect of the proposed plan by the City.  It's going to essentially continue the 4,200 separately and continue to fund those, but it wants to borrow those 2,500, an additional 2,500 from the road map settlement, reduce that amount of beds that it was going to create under the 2022 settlement and thereby reduce the total number of beds by 2,500 that are being created under this agreement -- under this case and under our agreements in this case.  And again, that violates Section 3.1 which required the City to create new beds, 12,915.  They now only want to create 10,215 I believe is the number, to 10,415 beds.

So they're reducing the number of beds they're creating.  The City is not creating the required number of beds, they're reducing the number of beds that they committed to creating.

Reducing that 19,000 number down to 17,000, at a time when we need more than even the 19,000.  Why?  We know why, Mr. Szabo told the Court why, because the County refuses to continue to fund those road map beds as it committed to, in the memorandum agreement.

**13**

Now, I don't mean to belabor this, but here's the transcript.  Mr. Szabo laid it out clearly, and I want to preface this by saying Mr. Szabo was very diplomatic and very politic about this, but there's no question that the County's refusal to continue to fund those road map beds at the level they had under the road map agreement is causing the City to have to reduce the number of beds it's creating.

Mr. Szabo says,

"The County contributed for a period of five years under the settlement, under the road map settlement agreement $60 million a year to pay for those services."

He then said,

"As the Court knows the freeway agreement expires this year, so we've received our last check from the County to subsidize those services."

And then he said,

"Overnight at the end of this fiscal year with the loss of the County's $60 million, and the increase of the bed rate, we're going to be looking at a payout of $150 million to add no new beds and provide no additional services, just to keep open what we have open."

And so as a result of that, Mr. Szabo proposed for the remaining 2,500, our proposal will be to extend those 2,500

**EXCEPTIONAL REPORTING SERVICES, INC**

**14**

of those 4,100 agreement beds under the new regime.  That is that move that I just talked about, that move of the 2,500 beds into the 2022 agreement, thereby reducing the number of new beds to create, allow our final calculation from that 12,000, it's actually 12,915 to include preserving 2,500 road map beds because the County isn't continuing to fund the road map beds. That's what he said in court.

Now, we have a factual dispute on this issue because County counsel got up and said this,

"The agreement between the City and the County was a term of years, so it was always contemplated that it would expire and the County says, this County would continue to provide resources for those beds."

But Mr. Szabo is saying, they're not.  Mr. Szabo is saying they're not going to continue to provide the $60 million a year.  And so County counsel said again,

"I don't think it's an issue of the County stopping."

But the City says it is an issue of the County stopping.  This is what the City said.  This is what Mr. Szabo said.

"The freeway agreement expires this year.  We've received our last check and that's why they want those 2,500 beds."

Now, I wanted to point out to the Court, and I apologize for covering this, but there was a very recent resolution that arrived by the City council that came up just recently after one of our hearings on this subject.  And the City council was addressing this very issue and passed a resolution signed by many members of the City Council saying the City Council urges the Board of Supervisors to direct their departments to cover the full cost to operate and service all city beds and units created before and after the road map agreement.

So we have additional evidence there, Your Honor, that the City's asking the County to keep funding those road map beds, and they're not doing it.  So we've got Mr. Szabo and now the City Council saying, hey, County -- if the County doesn't continue to fund these beds, we're going to need to borrow 2,500 beds and reduce the number of beds we're creating.

So those are the facts in the record right now, so why do we need an evidentiary hearing?  We need to develop facts on these two questions.  Does the City's proposal to port those -- borrow those 2,500 beds and thereby reduce the total number of beds by 2,500 that they propose to create originally, does that violate the settlement agreement?

And potentially develop facts around the question of whether the County's refusal to continue to fund those violates the County's settlement agreement as well.  We needs facts in

**16**

order to do that.

What's going to happen after I do this is that this County is going to stand up and make several factual representations.  Those need to be tested.

THE COURT:  I'm sorry, you dropped your voice.  Those need to be?

MR. UMHOFER:  Those need to be tested.  We do not accept counsel's proffer on these issues.  We need to hear from City officials in an evidentiary hearing.  We need to hear from County officials and we need to hear from supervisors and Council members on this issue.

The City Council just passed a resolution on this issue.  There are facts to be developed on this and we need to fundamentally ask the question why won't the County continue to fund those road map beds.

What the County will say and what they've already said is because we don't have to.  Because it was always contemplated that that agreement would expire.  Now, that cuts in two directions.  It also raises questions about the City knowing that this was coming, committing in 2022 to 12,915 beds and then suddenly wanting to reduce that by 2,500 beds.  So this is why we're here.

We're trying to put an end to the dysfunction that's led to 40 years of this.  And that's why we need this evidentiary hearing and that's why we ask the Court to order

one.  Thank you, Your Honor.

**THE COURT:**  All right.  If you'd make that PowerPoint available to the Court I'll docket that.

**MR. UMHOFER:**  Yes, Your Honor.

**THE COURT:**  Let me turn to the County first instead of the City attorneys for just a moment.

**MS. HASHMALL:**  Thank you, Your Honor.

The County is in full and complete compliance with its settlement agreement.  It's put up beds at a faster rate and a greater number than the benchmarks required between the plaintiff and the County in the settlement agreement.  There's no dispute about that.

I'm not going to get into a tit for tat about the meet and confer process.  I will -- I'm happy to sit down and detail that and further factual grounds with the monitors.  I think what the record will show is that plaintiff has asked questions that have been answered by our status reports, maybe they didn't understand them, maybe they needed better background, but the information was there.

The meet and confer process has also illuminated a lack of understanding of how the system works and we've offered to do learning sessions so the plaintiffs can better understand how these departments provide vital services to people experiencing homelessness both in the City of LA and throughout the entire County of Los Angeles.

**18**

The County has been committed to that, is working tirelessly at that. We have meetings scheduled next week where more information can be provided. We've learned through the course of these discussions that sometimes there are false leads that sometimes anecdotes are unreliable, they are not a substitute for data or facts, but we're willing to have that open conversation and share that information.

I don't think there is any grounds for burdening the Court with further proceedings about information that counsel can share collaboratively off line and with the assistance of our monitors.

There are a couple of categories of information relating to certain facilities of the City, certain high service need beds, we need to share some information that is held by LAHSA and we're coordinating that. I think that's in progress and I'm optimistic that that information will be gathered and will be able to be shared on short order.

We're also learning that some of the City shelter and housing providers are still needing maybe a little bit more training on how to use HMIS and how to make appropriate referrals and that type of boots on the ground training and learning is happening. I think our monitors have gotten the benefit of sort of hearing those conversations, figuring out how that system can work better and the County is committed to that.

**EXCEPTIONAL REPORTING SERVICES, INC**

So there's no basis for an assertion that the County has breached its settlement agreement.  There's certainly no basis for an evidentiary hearing.  I think a lot of these questions are better handled through the meet and confer process, including meetings that are literally on calendar for next week.

**THE COURT:**  Okay.

**MS. HASHMALL:**  Now with regards to the presentation, I struggle to see how the County is being drawn into a dispute that seems to be the plaintiff's concerns about its settlement agreement with the City.

The County has locked arms with the City.  There is a real commitment to collaboration, to resource sharing.  I think we heard from Matt Szabo at a prior hearing that the City is going to actually get more funding from the County for operating costs, not services, operating costs for those 2,500 beds as part of this migration plan that's in the City's bed plan.

So the suggestion that the County is quote not funding the beds is simply inaccurate.  There's no foundation for that.

The agreement expired by its terms.  The road map agreement had a concept of 50/50 sharing for operating costs, not services.  The City's financial experts I think have concluded that fiscally they'd prefer to have those beds

sourced under the different agreement because they get more resources for operating costs from the County.  So the County is providing more resources for those beds, not less.

The County does not have a position on the City's request to migrate those beds, but what the County has reiterated I think repeatedly is that it's committed to funding the resources in the agreements between the City and the County and working to provide additional resources throughout the County.

I think sometimes what gets lost is sort of the myopic focus about a settlement agreement from these plaintiffs is that the County of Los Angeles is working to provide resources to the entire County, including the unincorporated areas.  Money and resources are finite.  And any sort of forced command of resources in one place necessarily jeopardizes really, really vital resources elsewhere.

But in any event, in order to burden the Court with a request for an evidentiary hearing there needs to be evidence, not pictures, evidence of an alleged breach and there is not a shred of evidence that the County has breached any agreement, whether it's the road map agreement that expired by its terms, which involved $300 million in resources to fund City beds and additional services to support those resources or in the plaintiff/County settlement agreement where the County has gone above and beyond its benchmarks and provided detailed status

reports and quarterly reports regarding its compliance.

So unless the Court has any questions, I don't see a basis for an evidentiary hearing and I want to reiterate that the County is committed to working with the City and resourcing those beds under the agreements between the County and City and always looking to find more available and better ways to address this crisis.

THE COURT:  All right.  Just one moment.

(Pause)

THE COURT:  Thank you.  Let me turn to the City for a moment.

MS. MARIANI:  Thank you, Your Honor.

Turning to the first point as to the data in the County's quarterly reports, which is necessary to allow us and the Court to ensure that the County is fulfilling its substantive obligations, I would simply say that we echo the plaintiff's desire to obtain information necessary to ensure that the County is providing the direct access to services --

THE COURT:  Would you pull that -- would you repeat that for a moment.  Just pull the microphone a little bit closer and start over again a little more slowly.  We're on CourtSmart and if you can repeat please.

MS. MARIANI:  Certainly.  I was just saying that we do echo the plaintiff's desire to obtain the information necessary to ensure that the County is providing the direct

access to services and beds the County committed to in its settlement and we hope to continue the dialogue with the County and the plaintiffs on that point.

As to the bed plan and evidentiary hearing issue, the County's funding for those 2,500 beds only occurs if the beds can migrate to the settlement agreement.

As we stated at the last hearing, in light of the funds currently available to the City, based on changes and circumstances since 2022, including the expiration of the road map agreement and the increased bed rates, the City's submitted proposed bed plan is the City's best path forward put forth by the City's leaders to meet two primary goals; to add new beds to meet the City's commitment, to create beds under the Alliance settlement, while also maintaining existing housing in the face of significant financial constraints.

This plan was carefully considered and approved by City Council and the Mayor, and we are seeking approval of this plan.

There has not been any breach of the agreement by the City.  And I cannot emphasize enough the City does not want to be in a position where any beds it worked so hard to create, and which are still needed, are required to close due to lack of funding.  But again, barring a commitment from the County to provide additional funding going forward, which would cover the full cost of operating road map beds going forward, the City's

previously proposed bed plan is the City's best path forward.

**THE COURT:** All right. Thank you. I'll turn to Ms. Myers as intervenor.

**MS. MYERS:** Thank you, Your Honor. And we do want to address a number of the issues. We'll leave the issue of the County reporting to the parties, but I do want to address a number of issues related to the bed plan.

I'm generally loathe to speak on behalf of the City, I would never want to do that, but I do think it's important to point out that I think Mr. Umhofer perhaps misstated Mr. Szabo's position relative to the justification for the City not moving forward.

In the last hearing, I specifically asked Mr. Szabo if the City could continue to move forward if the road map -- if this County paid for the funds from the road map for the services going forward and Mr. Szabo said, no, that the -- Alliance's plan provided significant other barriers to the City.

And then when I asked him if under the hypothetical scenario the County agreed to the full scope of services, whether or not the City would continue those road map beds, in addition to creating the 2,500 beds under the settlement. And Mr. Szabo said specifically that he couldn't commit to it right now, that he'd have to do the analysis and come back.

I think we're in a position right now, Your Honor, in

**24**

this case in which the City and the County are being pitted against each other in ways that I think are incredibly problematic towards reaching a resolution.

This issue, in terms of the bed plan, is about the City asking the Court to modify the settlement agreement and allow them to use 2,500 beds they created under a previous agreement for the new agreement. That is what it is about. And there has been no representation whatsoever from the City that if the County paid for the services, that the City would then create the 2,500 additional beds they're obligated to do under the settlement.

One thing that I think is incredibly important to note and we would agree with the LA Alliance related to the obligation to create new beds, as Mr. Umhofer said, the obligation for the City is to create new beds. We are in a position where the City of Los Angeles and the County of Los Angeles have 525,000 two affordable units for low income folks. We are in an affordable housing crisis. We simply do not have enough places for people to live.

And so when this case was started, the goal was to create new capital, with new capital investment to create new infrastructure, i.e., to create new beds. What's not being talked about in this bed plan, is that if the City is allowed to move 2,500 beds that they created under the road map into the new LA Alliance settlement agreement, that would be the

creation of 2,500 less beds. That's not about the County funding less services. That's about the City of Los Angeles not paying for or bringing in resources to create 2,500 new beds.

And if you do the back of the envelope math calculation of what that discount to the City is, by allowing the City to get out of its obligation to create 2,500 beds, that's roughly $200 million that the City of Los Angeles will not be bringing to the table for the creation of those beds.

We raised in our objections to the settlement agreement this question about whether or not the City of Los Angeles would be able to do literally exactly what it is asking to do right now. Your Honor, you raised it in a hearing in May, we raised it in our objection to the settlement agreement and the City of Los Angeles addressed it in their response to our objections.

And they said, they would not count beds from the road map agreement for the LA Alliance settlement agreement. It was an issue that was briefed and discussed long before this Court approved the settlement agreement. And it was the City's representation that they would not do exactly what they are asking to do today, which is get out of their obligation to create those beds.

I understand that there is a discussion about the creation of or I'm sorry, the services related to this, but I

do think that by focusing on the services, by focusing on who is paying for it, we're ignoring the fact that the City of Los Angeles when it put forward the settlement agreement said with great pride, that as a result of the settlement agreement, $2 billion in new infrastructure and funding would go towards the creation of 12,000 new beds.

If the City is allowed to modify it in this way, and reduce its obligations by roughly 20 percent, it will reduce its obligation to bring $200 million worth of funding to the City of Los Angeles to shelter its homeless vulnerable residents.

And, Your Honor, I think this hits on another point that we have been raising throughout this litigation that we raised and Ms. Mariani said she would address, which is what it means to actually create a bed under the settlement agreement, what the City's obligation is to be able to count a bed towards creating it.

Because the settlement agreement says the City can use private funding to create the beds. One of the ways I think this agreement has been incredibly successful I think in large part because what you all have been doing, is that it has forced the City to go out and bring money to the City from the state, from the federal government, to scrimp and save and scrounge to get the money to bring that $2 billion to Los Angeles. So they are counting beds that they are not actually

creating for purposes of funding.

There are beds that other entities in the City are creating, but they are doing the work to ensure those beds are created. If the City -- if the Court relieves the City of its obligation for those 2,500 beds, the City won't do it. We know that. We know that the reason the City has gone out and pounded the pavement and done the work to bring money to Los Angeles related to this is because they have an obligation to do it and I hope that what is not lost in this fight between the City and County that seems to be the discussion everyone wants to talk about, is the fact that we desperately need new housing units and beds and the City's obligation under the settlement agreement is to bring those physical beds to the City of Los Angeles which we desperately need.

And any modification allowing the City to count beds that's already created is going to dramatically reduce the number of beds that are literally on the streets for our most vulnerable residents.

**THE COURT:** Just one moment.

**(Pause)**

**THE COURT:** I want to speak to both special masters for just a moment.

**(Pause)**

**THE COURT:** And any further comments on the second round that you care to make, starting with LA Alliance in a

moment, then going to the County, then the City, then the intervenor.

The bottom line is that I don't think it's in anyone's interest nor the Court's interest to have any reduction in beds. I repeat that. I don't see how we take a step backwards of this magnitude and frankly it wipes out the success of the City with inside safe and a reduction of 10 percent that was a -- at least a turning point last year, and I think the first time in a long, long time that there was a really positive sign of change.

I'm going to ask you to focus eventually on how we bring the County and City together and unfortunately as attorneys I don't think we can do that. I think it literally lies in the Mayor's hands, the Chairman of the Board, and other entities, in a sense we represent them, but they're the decision-makers.

My bottom line is, there just can't be a reduction of beds. We can't step backwards 2,500 and reduce that number. That's not in anyone's interest. By the same token, the services have to be supplied.

Lerna (phonetic), could you put up the settlement agreement for just a moment and I want you to turn to what I had my law clerk write in. I want to literally put this on the screen. The Court actually anticipated some problem. Here, you can take my copy, put it on the Elmo.

**MS. HASHMALL:** The City -- is the Court looking for the City settlement agreement or the County?

**THE COURT:** Yeah, the County's. Did I say City's? I'm sorry, the County.

Now turn to the handwritten portions because when the Mayor was here, the Chairman of the Board, if you recall, I think you were here, I had my law clerk literally go to the lectern and handwrite the following. And that was hoping that we didn't get into the problem that we're presently in. And you can use my copy if you want to use the Elmo, I've got it.

**MS. HASHMALL:** Thank you, Your Honor.

**THE COURT:** Just come up informally and you can take it. It's going to be 1 and 2 right here. Let's put that up so we can recall that and I think, Ms. Mitchell, you were here, Mr. Umhofer here, Mira, I think you were here, is that --

**MS. HASHMALL:** Yes, Your Honor.

**THE COURT:** Okay. Sherrie, you were here? I don't think the two City attorneys were here at the time. But I want to remind us where we -- where this Court was adamant and the Mayor readily agreed and the County agreed and your signatures are on this document.

Now, we're going to have to blow that up and, Karlen, if you could bail us out, I'd appreciate it. There we go. You're going to have to blow that up somehow so we can see that on the full screen. There we go. Blow that up.

**30**

And this is 3.  I want to go to 1 and 2.  Okay.  So it's colloquial, somebody can read it from each side, but why don't you read handwritten number 1.

**MR. UMHOFER:**  This agreement is a floor, not a ceiling.  While this agreement does not solve homelessness in Los Angeles, County, it is a huge step forward.

**THE COURT:**  Okay.  Number 2.

**MR. UMHOFER:**  All future billings from providers must be completely transparent and all invoices are to be public documents.

Number 3 --

**THE COURT:**  Well, 3 and 4 doesn't -- 3 doesn't matter, it's inconsequential.  It was the point by the special master.

Now, the Mayor was here, the Chairman of the Board was here, we all signed off on this.  So I'll turn to LA Alliance and give you back that document.  Also, you can note 3.1 in that document and you call that, in fact, put up 3.1 while you're at the lectern for a moment.

**UNIDENTIFIED:**  That's on the City's.

**MR. UMHOFER:**  That's on the City's.

**THE COURT:**  Yeah.  Thank you very much.  I appreciate it.  And there are a number of other provisions, but let me just remind you of this document.

**UNIDENTIFIED:**  Will you need the provisions of the

**EXCEPTIONAL REPORTING SERVICES, INC**

County?  The provisions of the County map.

THE COURT:  Is the County.

MR. UMHOFER:  The County, okay.

UNIDENTIFIED:  Here you go.

THE COURT:  It's the County agreement, it's 3. -- in fact, I can give it to you because I've got it underlined. Just one moment.

(Pause)

MR. UMHOFER:  Your Honor, I apologize --

THE COURT:  Yeah, yeah.

MR. UMHOFER:  -- I'm going to need to pull it up differently because first it gets up on the screen --

THE COURT:  Just a moment, counsel.  Just one minute.

MR. UMHOFER:  Yes.

(Pause - Court and clerk confer)

THE COURT:  All right.  Why don't you put up -- it's the County's obligations and it's in Docket No. 646.  And it's the second amended addendum to the settlement agreement.  And I'm going to give you this to put up on the screen.

MR. UMHOFER:  I can probably pull it up, if you just give me the number.

THE COURT:  Yeah, it would be page 12 of 40 in Docket 646.  The actual document will be 4 of 11.  In fact, it's quicker, why don't I just give this to you, we can read it together.

**MR. UMHOFER:** 4 of 11. I got it right here, Your Honor.

**THE COURT:** Okay. There it is. Carla, that's okay, I can get that back now.

All right. Blow up No. 1, even larger. All right. Now, read that into the record if you'd be so kind.

**MR. UMHOFER:** Yes, Your Honor.

From fiscal year 2022, 2023 through fiscal year 2026, 2027 the County shall fund and provide supportive services for interim housing and permanent supportive housing units financed by the City as part of the City's settlement, as units are developed by the City and become occupiable in an amount to be determined solely by County and City in their respective discretion. These supportive services shall include, but shall not be limited to mainstream services including public assistance programs, mental health services, substance use disorder services and benefits advocacy services to clients who meet eligibility criteria for these services.

**THE COURT:** All right. In the second round, anything that you want to state beginning with the plaintiffs?

**MR. UMHOFER:** Yes, Your Honor.

So I appreciate the kind words by the intervenors about the agreement. I have to differ with counsel for intervenors on one issue, which is an issue where I disagree with where we fundamentally disagree with the County on as

EXCEPTIONAL REPORTING SERVICES, INC

well.

Both the intervenors and the County, an interesting alliance of a different sort here, have both said this isn't about County funding, but what we just heard at the close of the City council's remarks was the following, absent a commitment for additional monies from the County, the bed plan is the best we can do, that -- less than net loss of 2,500 beds is the best they can do absent a commitment by the County.

That's a representation by the City that is a factual representation that needs to be tested and explored in an evidentiary hearing. We also have the City Council's resolution recently passed which I put up on the screen where the City Council is begging the County --

**THE COURT:** Put that up on the screen.

**MR. UMHOFER:** Apologies, Your Honor, it'll take a second to pull that up.

**THE COURT:** Well, it's my understanding from the special master that that didn't go before the entire Council, that this went before the committee, but the committee chair is here and please correct me at any time. And by the way, you're more than welcome to be seated here, but if you have anything that you want to add or any correction, please just step forward.

**MR. UMHOFER:** So the -- I apologize, Your Honor, it'll take me a second to pull that up. There we go.

(Pause)

MR. UMHOFER:  Okay.  So this is a lengthy resolution and I hesitate to read it fully into the record; however, you can see the reference in the fourth paragraph to -- regarding to maintain the road map beds in fiscal year 2024/'25 it cost the City $110,975,000 --

THE COURT:  Just a little louder and a little slower.

MR. UMHOFER:  Right, yep.

Whereas, as to maintain the road map beds in fiscal year 2024 to 2025 it costs the City $110,975,611 and the City funds services for an additional 12 -- 1,285 additional interim housing beds, contributing an additional $25,953,325, it says million, but dollars, toward homelessness solutions.

As you continue in the -- downward in this resolution, toward the bottom up here --

THE COURT:  Blow that up.

MR. UMHOFER:  -- and I'm pointing to it here.

THE COURT:  Blow that up a little bit.

MR. UMHOFER:  Blow that up a bit as big as I can and I'll read it into the record.  Whereas, on September 11, 2024 the City Council authorized the City administrative officer to submit the City's/Alliance settlement agreement program to the United States District Court, Central District of California, outlining the City's plan to establish 12,915 beds, units and beds and seeking 2,500 road map beds and units to count towards

the Alliance settlement agreement.

Then goes on to talk about welfare and institutions Code Section 17000 which requires the County to relieve and support incompetent, poor and indigent persons. It continues on the next page to speak about a reference to the Court here, whereas during hearing in federal court, before the federal court on these issues on October 2nd, 2024 the Court reiterated that the County settlement agreement should be a starting point to address the need for enhanced beds -- services and beds while acknowledging the City and County should work together to develop terms for their MOU and agreements to fulfill the need of PEH.

The -- it goes on to talk about the City Council urges the Board of Supervisors to direct their departments to cover the full costs to operate all City beds and units created before and after the road map agreement. It then urges the Board of Supervisors to direct their departments to accelerate the implementation of the Alliance MOU and to provide people experiencing homelessness with access -- direct access to County intensive services, (indisc.) beds, access to data, et cetera and seeks to engage the Board and their departments to complete. It's to seek complete assessments for 100 percent of referred clients.

So we have in the record right now, Your Honor, evidence and facts asserted by the City that they can't do more

**36**

without more County funding. That puts in question the representations made by County counsel and supported by the intervenors, that this is not a County issue. We are losing beds and the City is losing beds and they're -- seem to be trying hard. They're running into a fiscal issue and they're asking to be able to continue the work that they're doing here, but they can't create those 12,915 beds without borrowing from an agreement that the County has ceased funding for.

And what we heard from the County was it's about money. The County of Los Angeles doesn't have enough money to continue to fund beds. And by the way, the math doesn't work out that the 60 million a year under the road map agreement isn't enough to allow the City to keep those 2,500 beds and create the full 12,915, then dang it, the County should step up with the funding. If it can't step up with the funding, then there needs to be an answer for that.

So we didn't drag the County into this. The City identified the County as the reason why they can't meet their 12,915 bed number. Those facts, the facts that were articulated and detailed by County counsel, let's test them in an evidentiary hearing.

Those facts set forth by City council, let's test them in an evidentiary hearing. Anything that anybody gets up and says here about facts let's test them in an evidentiary hearing so we can make sure that we are not losing beds. Thank

you, Your Honor.

**MS. MITCHELL:**  Your Honor, the only other thing that I would add in addition to my co-counsel's statements is that, you know, the County did pass an emergency declaration on homelessness last year.

And in that emergency declaration, committed to quote, providing supporting supportive services in both interim and permanent housing and proactively -- and to proactively support our local jurisdictions and governing entities to resolve encampments by providing funding and resources while at the same time directing local jurisdictions to identify and cite housing in their respective jurisdictions.

This is exactly what the City of Los Angeles has done and, in fact, already established the infrastructure to do so. You have a County commitment to providing and funding resources in supportive services, but yet at the same time we don't have any evidence that this has been considered at the Board level, to actually do what they have already committed to do and continuing to fund these beds, which would then obviate the need to produce the total number of beds produced by 2,500.

So I think by the County's own declarations, by the City's recent resolutions, I think we have a lot of information here that says there needs to be either an evidentiary hearing or we extrapolate the facts and we explore those facts, or some type of separate conversation that needs to happen, perhaps

**38**

with the Court on the County Board and the City Council level, to make sure that this conversation is actually happening, so that we can move forward on that issue.

I mean, we are in agreement with the Court and I think with everybody, that we do not want these beds to close, but we also don't think they need to close.  The amount of money that is pouring into this County is beyond anything that has ever come into this County from the state and federal level.

As far as I know, the County isn't even spending any general funds to do any of this program with the City at the moment.  There's no reason it cannot step up with the money now to continue funding those beds.  I think it is disingenuous for the County to sit here or to provide a declaration that commits to supporting its local jurisdictions, but not actually supporting those local jurisdictions when we do have a true bed emergency.  I think that's what needs to be addressed, Your Honor.

THE COURT:  County.

MS. HASHMALL:  Thank you, Your Honor.

I think some basic principles are worth reiterating. The road map agreement was a landmark collaborative agreement between the City and the County.  The County funded $300 million towards those resources for a period of five years. It's expired.  The plaintiffs are not party to that agreement,

no one's asserting a breach of that agreement.  We have every year confirmed to the Court, the payment's been made.  Every quarter we have documented the mainstream services under the road map agreement.  It just happens to be a term of years coming to the end, number one.

Number two, the City's request to migrate beds is between the City, the plaintiff and the Court.  The County doesn't take a position on it.  The County has committed to resourcing those beds if they're migrated.  We heard from the City that if they're not given permission to migrate those beds, they will not be able to continue to support them.  That's the City's position as to those beds.

The County's position is that it will provide the resources under the City and County arrangement for the migrated beds under a separate agreement that as again, as the City's administrative officer confirmed, is actually more beneficial financially for the City than the old road map deal.

Underlying all of this is the reality that the cost of these beds is going up.  The bed rate is significantly increasing.  And this idea that lawyers can tell the County how to spend its funding is absurd.  The County funds thousands of beds outside of the City of LA and 6,000 interim housing beds in the City of LA fully funded, a hundred percent by the County.

All of these bed rate constraints are going to impact

the County of Los Angeles on a level of magnitude that is hard to fathom.  So it is not for lawyers to try to dictate the allocation of these very valuable resources, at a time when the costs are going up.  Those are decisions that are best left to subject matter experts.  And it's certainly not the place of a lawyer to dictate resources without an agreement, a legal obligation or standing to say anything to intervene with the discretion regarding the use of those resources.

Again, I think the beds are the Court's concern.  The Court doesn't want the beds to close.  The City has represented that it doesn't want the beds to close and it wants to be able to migrate them so it can get access to County resources.  And the County stands ready and willing to provide those resources under the existing agreements with the City.  That's not a basis for an alleged breach.  That's certainly not a basis for burdening the Court or the parties with an evidentiary hearing.

And again, these resources have to be addressed through the entire system.  The County has always gone above and beyond the agreements in this case, with regards to addressing this homelessness crisis.  It's constantly looking for new and better ways to improve the system.

It has a lot of beds that it has to continue to fund with higher rates and difficult resources.  The economic reality on the ground changes on a yearly basis when it comes to government entities.  And so you have to have the

flexibility to make adjustments to structure the resources in the most beneficial way.

I don't see a basis for an evidentiary hearing. I think it's burdening the Court and I think it's grandstanding in the absence of a shred of indicia of a breach by the County of any of these agreements.

**THE COURT:** Let me turn to the City.

**MS. MARIANI:** I'll first point out the City and the County entered into the historic road map agreement in 2020 to address the regional homelessness crisis. Unfortunately, the crisis will persist beyond the five year term of that agreement which ends on June 30, 2025.

As Ms. Myers referenced, the City has been out doing the hard work to identify funds and create beds and the City has invested enormous financial and other resources to build beds.

There's no lack of will to continue that. The City is stretching every dollar to create beds. At this time in addressing how we move forward from here, rather than engage in plaintiff's request for what could be a very time consuming evidentiary hearing on legal questions concerning the settlement agreements, which would pull City and County staff into the courtroom away from their jobs, we would suggest perhaps the alternative path mentioned by Ms. Mitchell, which could be a more productive path forward if we spend time in an

out of court discussion to see if the City and County can reach agreement on a path forward to address the concern raised by Alliance with the City's proposed bed plan.

**THE COURT:**  When would that occur?

**MS. MARIANI:**  As soon as possible.

**THE COURT:**  Who would be the persons involved in that kind of discussion?

**MS. MARIANI:**  I don't know precisely, but I think that it does make sense for it to be at the level of individuals making the decisions.

**THE COURT:**  Who?

**MS. MARIANI:**  At this time, I'm not sure exactly who would participate, Your Honor.

**THE COURT:**  Let's all agree that the lawyers can't make these decisions.  But the lawyers --

**MS. MARIANI:**  Yes.

**THE COURT:**  -- have been rightfully involved, they're too involved.

**MS. MARIANI:**  Understood, Your Honor.

**THE COURT:**  So if we're ready to take that alternative, I think we would minimally need the Mayor, minimally need the Chair of the Board and probably the president of the Council, because remember the Mayor doesn't have a voice.  Doesn't have a vote.  Well, she has a voice, but not a vote.  It would have to be at that level if that

alternative was taken.

The question is when. And I'll turn to you, Ms. Myer. In other words, this has been going on for a long, long time. And it's too important for the citizens of Los Angeles, which include the homeless, if there's going to be a reduction that takes away the gains that the City's made, so when? Next Friday? Excellent. I love your enthusiasm.

**(Counsel and clerk confer)**

**THE COURT:** Now we can proceed in two different ways. First of all to put pressure on all of us to start making decisions at the highest level. And that is a morning session if you chose between the parties separate from the Court or with the Court. With the potentiality of an evidentiary hearing starting in the afternoon. That puts a lot of pressure on everybody to start making decisions. We don't need to complete it that day, but something has to be done to get these answers as quickly as possible. So it's just a suggestion. Ms. Myers. And I've got plenty of time, by the way. Ms. Myers.

**MS. MYERS:** Your Honor, I think resolving the issue of the City and the County's disputes over the funding for services would go a long way --

**THE COURT:** Yeah.

**MS. MYERS:** -- to get at the question about whether or not the City can actually create the additional 2,500 beds.

**44**

THE COURT:  Yeah.

MS. MYERS:  Your Honor, I did want to say one point about the floor versus the ceiling, because I think you make an incredibly important point about this being a floor and not a ceiling.  And I think I just want to point the Court to the City's objections to response to the intervenor's objections, in which we raised this very issue about closing beds and we raised it that it was going to be a concern.

And the City reassured Your Honor, in approving the settlement, that the absence of a clause preventing the closing of beds should not be a concern of the Court, because the City has demonstrated its commitment to continue building new beds.

All of the beds the City is committed to build in the settlement agreement are in addition to the beds being built to -- pursuant to the MOU.

THE COURT:  Okay.

MS. MYERS:  All of this was contemplated before Your Honor agreed to the settlement and did so with the reassurances of the City of Los Angeles that they would not be here today.

THE COURT:  Let me ask the special masters if they have any questions.  You don't have to have a question, but if you do of any of the parties, I'm not going to screen those questions so if you have something you want to ask the parties, this would be the time.

MS. MARTINEZ:  Just a statement, Judge.  I can't ask

**45**

any questions at this time, I would rather provide those to the Court and you can docket those.

THE COURT:  Okay.

MS. MARTINEZ:  Because I do have questions and a statement.

THE COURT:  Okay.  I don't have anything further. Let me think this out unless any counsel have any further comment.

MS. MITCHELL:  A couple of comments, Your Honor.  So the first -- next Friday is fine with us and I do think that it makes sense to address these issues.  We would ask that somebody from the Council, City Council be present as well.  We would suggest either Council members Blumenfield or Park who signed this resolution, Councilwoman Raman is present as well. I think it makes sense for somebody from the CAO's office to be there because I think, you know, we have in the City it's sort of a multi-headed beast and I think it makes sense to have representations from each entity.

THE COURT:  I won't order that.  I'll simply request. I know that Mayor Bass was not available today.  I think she stated she'd be available October 25th.  But to get all of these people together, I ask you to meet and confer.  None of the dates matched up, so I will be moving forward in some form next Friday.  Let me think how I want to fashion that order.

MS. MITCHELL:  Thank you, Your Honor.  That works for

us.  I would like to get back to the County data issue.  We next week are talking to Department of Mental Health about the high needs beds and I think that will be important.  We still don't have a commitment to meet and confer further on a number of outstanding issues and we would like a date certain by which these issues should be resolved or brought to the Court.

**(Court and special masters confer)**

**THE COURT:**  All right.  Any further comments?

**MS. HASHMALL:**  Your Honor, as you've identified, we do have scheduling constraints.  I'm not sure that I'll be able to --

**THE COURT:**  I do too.  I think we all have busy schedules, but this now takes precedent so.

**MS. HASHMALL:**  The October 25th does not work --

**THE COURT:**  If you're not present, so be it, other counsel will be, but getting everybody together is getting very difficult.  So I may just set some dates and I think this is of sufficient import quite frankly to the citizens of Los Angeles that we finally get some resolution, some answers to this.  It's been going on a long, long time now.

All right.  I want to thank all of you.  If there's nothing further, I want to move on to the next topic.

And that is, I'd like A&M to come forward for just a moment on the timeline and progress once again of the data request from the County and the City.  And also I think we need

**47**

some answers from the City and the County concerning that last topic, because, Matt, you've got a budget coming up, the County's got considerations, et cetera.  I think I'm going to put some pressure on all of us, so it'll be October 25th.  And I'm contemplating, haven't made the final decision that hopefully that will be a meet and confer with the City leaders and the County leaders.  If the Court's involved, so be it, the monitors available.  I'll be here, but if you choose not to have me involved, that's fine.

And the evidentiary hearing, if we go forward, that will be that afternoon.  We may not finish it that day, but if we do, we'll start it that day.

All right.  A&M, can you help me with how you're doing with our audit?

**MS. COLLIER:**  Good morning, Laura Collier from A&M.  Do you have a --

**MR. MCCURLEY:**  David McCurley from A&M.

**THE COURT:**  All right.  Please, I'll turn this over to you.

**MS. BROWN:**  Oh.  Lisa Brown from A&M.

**MS. COLLIER:**  Good morning.  And I would just like to provide an update on the status of our assessment.  As you know, we've been working diligently to ensure the successful and timely completion of this important assessment.  However, we have encountered some increasing challenges along the way,

things that we have discussed at previous hearings, specifically delays and receiving critical data as well as the time required to thoroughly understand and analyze that data have impacted our original timeline.  And we understand the dependency of data from LAHSA and appreciate the City's gracious efforts to help us gather the data.  And we understand that LAHSA is incredibly busy as well.

But while our teams have tried to work diligently and really hard to mitigate the delays, their complexity coupled with the data's condition and the importance of the information we're processing demand attention and to ensure the quality of the final report.

As a result, we've had to reassess our schedule.  In light of these developments, we are requesting an extension of the current deadline and additional resources in order to allow for necessary adjustments.

**THE COURT:**  Okay.

**MS. COLLIER:**  Would you like us to talk about the options, Your Honor, or?

**THE COURT:**  Yeah, I'd like to hear those.  You proposed those to the special master, but I'd like to hear on the record what those options are.

**MS. COLLIER:**  Absolutely.  So we proposed two options.  We can incorporate the data once we're able to receive it from as we have worked with the LAPD expansion of

the scope, as well as the County's data that they're kindly providing once they receive that roster from LAHSA. And we could provide that report by December 20th.

If we want, that would be option one. If the Court and parties would like A&M to do further analysis and follow up in relation to that data, similar to the continuum of care we briefly spoke about the last hearing, that report would be issued on January 15th.

**MR. MCCURLEY:** The key difference, Your Honor, would be the report due on -- that we're asking for the delay until the 20th, we incorporate high level analysis of the data that the County is able to provide us, but it wouldn't provide us with enough time to verify any of that data with fieldwork. So if it's the Court's pleasure for us to verify that data with fieldwork that's effectively the difference between option 1 and option 2.

**THE COURT:** Okay. Any questions from Judge Gandhi or Michele?

**MS. MARTINEZ:** Yes. Can you just repeat the first option and the second option just again for, yeah, thank you.

**MS. COLLIER:** Absolutely. Option one would be providing the report on December 20th and would be incorporating the expansion scope of LAPD and the data the County is currently providing once they receive the roster from LAHSA. And then -- okay.

MS. MARTINEZ: Has LAHSA provided the roster through the County?

MS. COLLIER: From my understanding to the state, no, the County is waiting for LAHSA.

MS. MARTINEZ: I'd like to get an answer today from LAHSA when they will provide that roster to the County.

MS. COLLIER: We have inquired. We sent an e-mail to LAHSA last night. Dr. Henderson acknowledged it, but we're still waiting for a response on an exact time link from the last time I saw this, this early morning.

MS. MARTINEZ: If we don't receive the data by the 18th, you will have additional delays.

MS. COLLIER: Correct, yes.

MS. MARTINEZ: That's what I wanted to know about option one, specifically you need to receive the data by October 18th, is that a true statement or not?

MS. COLLIER: Yes, absolutely and I appreciate that clarification, yes. In our letter we did caveat that the December 20th date would be set dependent on receiving County data by October 18th as well.

THE COURT: Is LAHSA here?

MS. MARTINEZ: Yes, they are.

THE COURT: All right. I'd like you to come forward please. I'm going to ask them about these.

MS. MARTINEZ: No, no, let's not go there. Let's not

get confused.

THE COURT: Okay.

MS. MARTINEZ: Let's stay focused on this, and about the roster.

THE COURT: What obstacles are occurring between A&M and LAHSA? What could make this data flow more smoothly and quicker because in a sense the City is picking up this bill? And any extension or quite frankly inadequacy --

MS. MARTINEZ: Will cost the City more.

THE COURT: -- will -- thank you. Will cost the City money, but more importantly I reiterate we haven't had a third party audit that the Mayor agreed to -- I don't know historically when that's occurred.

So this is critical. So please.

MS. JOHNSON: Thank you. Rachel Johnson, Chief of Staff at LAHSA. We will provide the County the roster and I think we're set to do that this week, so it should be with the County at least today or tomorrow.

THE COURT: And you'll verify that with the special master?

MS. MARTINEZ: Just note today is -- I just want to be -- I want to clarify for the record. Today is the 16th. If this roster is not provided to the County in a timely fashion and they can't provide the data to A&M by the 18th, that means there's going to be more delays, which is going to cost the

City of Los Angeles more money.

So I just want to -- I keep iterating this and being very clear because I am sensitive to the financial situation that the City is under and we all should be.  And this is a -- we understand that this is the first time that an assessment is being done and some of the data and the questions that are being asked, you know, are -- you know, it's the first time that all of this is occurring so we understand that there's going to be delays and challenges, but we need to be up front, because who has to pay for this is the City of Los Angeles. And the County is now wanting to cooperate and is willing to provide, but it needs the roster.

If the County does not get the roster, it's not going to be able to provide the high level data that A&M needs.  And so we can't say that you're going to get them in two days because then -- today is the 16th.  The 18th is on Friday.

THE COURT:  I am going to say something in just a moment.

MS. KUHN:  Bevin Kuhn, Deputy Chief Analytics Officer at LAHSA.  We will a hundred percent provide the rosters by the end of the day and the County does have the ability to pull that at any time through the exchange.  So they already get weekly transfers of our data.

THE COURT:  Right.  Thank you.

MS. MARTINEZ:  Okay, great.  Thank you.  I didn't

EXCEPTIONAL REPORTING SERVICES, INC

**53**

know that.

THE COURT: Lisa, do you have anything?

MS. MARTINEZ: He can stay there, but let A&M finish their --

THE COURT: Well, I didn't know if -- A&M I thought was done. Did you have anything further you wanted to say?

MR. MCCURLEY: Unless you have any questions, we're done, Your Honor.

THE COURT: All right. Now, is there anything further on behalf of LAHSA that you would like to say? Anything on behalf of the City or County or the intervenors that you'd like to ask questions of with LAHSA here?

MS. MARTINEZ: No now you can get into these questions.

MS. HASHMALL: I'm sorry, Your Honor, the County looks forward to receiving that roster from LAHSA. That's not information that the County otherwise has and we'll work as tirelessly as we can. The 18th is obviously going to be difficult if we get the roster on the 16th, but we're going to work as quickly as we can.

THE COURT: I want to go over some specific requests. These are e-mail chains. I want to make certain that in request No. 43, 45 and 46 that there's no disagreements between A&M and LAHSA. Are there any disagreements concerning those items?

**54**

And maybe you need a reminder.  I know I get flooded with documents too, okay.  43 is the record of written requests for subcontracted services by the respective service providers and their referenced dockets that have been uploaded.  And you'll find that e-mail chain from Laura Collier to your offices on October 10th, 2024 at 4:48.

Any concerns about that information?

**MS. JOHNSON:**  No, I don't think so.

**THE COURT:**  Okay.  45.  A roster of the current and past participants.  This was a data field specified in the file.  Any disagreements in terms of disclosing that information?  Has that been resolved between A&M and between LAHSA?

**MS. JOHNSON:**  Yeah, I believe that's already been resolved.

**MS. MARTINEZ:**  We only have one pending issue left.

**THE COURT:**  Well, I'll get to that issue in a moment, but I want to be certain for my record now.  I don't -- any disagreement about No. 45?

**MS. JOHNSON:**  No.

**THE COURT:**  All right.  46 is the crosswalk of the sub-recipient contract agreements numbers to Inside Safe.  By example, the motel sites, who the service providers are in these contracts.  Any disagreement about the disclosure of that information?

**MS. JOHNSON:** No.

**THE COURT:** A&M, speak up?

**MR. MCCURLEY:** No.

**THE COURT:** All right. There is a disagreement about 42 and this is the data request to LAHSA and the request for documentation for first of all, the completed monitoring reports. Second, the data reports from the periodic monitoring; third, the monitoring reviews if you had any; and fourth, data access to any enforcement of sanctions on providers who weren't providing.

And LAHSA is responsible for compiling and maintaining a log of grievances and formal complaints against subcontractors, but LAHSA sent back word to A&M we're working under the Court's authority and claims the request is outside the scope.

I might have a strong disagreement with that, I don't want to docket that, but I have a strong disagreement with that. And if you have a disagreement, let's get that on the record and get that aired out.

**MR. YAP:** Your Honor, this is Robert Yap, General Counsel for LAHSA. As far as the disagreement, my understanding is when you said monitoring reports, this agreement, is my understanding, is regarding -- specifically regarding the request for grievances and investigation reports.

And as far as the grievances, we do believe that it

**EXCEPTIONAL REPORTING SERVICES, INC**

seems that it's outside the scope, but if the Court orders that, then we'll comply.  We just need to redact --

THE COURT:  I'd rather have you voluntarily comply and join the happy club; otherwise I'm prepared to order it.

MR. YAP:  But we would just say that we --

THE COURT:  Would you like to comply or would you like to have me order it?

MR. YAP:  It's --

THE COURT:  Always better to comply voluntarily and --

MR. YAP:  We'll comply, Your Honor.  I just wanted to --

THE COURT:  Excellent, thank you very much.

MR. YAP:  -- point -- we just need to redact the --

THE COURT:  Good.  So now we've resolved -- now we're -- we're back to the --

MR. YAP:  And then there's one -- but the -- with respect to the investigation reports, I wanted to put a separate issue is with respect to pending investigations, we would --

THE COURT:  Oh, of course.  But I'm interested in the data providers who aren't providing or who might be questionable in terms of their providing.

MR. YAP:  Right.  So their --

THE COURT:  And I think you're in an unenviable

position, but a great position.  I don't think a lot of these questions have been asked historically by anybody until A&M started asking those questions under the Court's authority. And so I understand that you're trying to gather information that you may not have been required to.  I'm trying to be kind about that.

MR. YAP:  I appreciate that, Your Honor.  It's just that I have a very specific issue regarding pending investigations that could be responsive to the request.  And we would have an issue disclosing that.

THE COURT:  Sure.  I'll get the U.S. Attorney down here.  If you have any concerns, we'll sort through that.

MR. YAP:  I'm sorry?

THE COURT:  We'll get the U.S. Attorney down here and we'll sort through any of your concerns.

MR. YAP:  If I could just say, Your Honor, it's information that hasn't been disclosed to the provider.  I'm just talking about pending.  I'm not talking about completed investigations.  You're talking about sanctions that have already been issued.  I'm not -- I'm separating that.  I'm talking about where a decision -- a conclusion hasn't been made and it's still pending.  Right?  I know these privileges probably aren't --

MS. MARTINEZ:  Understood, counsel.  I just want to ask A&M, is that fine if you're not going to review the pending

but the other documents?  You're the experts.  We want to hear from you.

THE COURT:  And by the way, I can put this under seal.  So if it's vital, it can come under seal to the court.  I can resolve that quickly.

MR. MCCURLEY:  What I would like to say is -- say we would be okay with not receiving the pending and ongoing --

THE COURT:  Okay.

MR. MCCURLEY:  -- assuming there's enough volume of the other that we can make a reasonable analysis to say -- make a judgment on the kind of -- on the way in which these have been conducted.

THE COURT:  Let's work together.  We'll hold the pending in abeyance right now.  Let's see what that volume is.  Let's come back to that issue if A&M contacts the monitor.  That way we'll go slowly and carefully, okay?

MS. MARTINEZ:  Go ahead.  Diane has a comment.

MS. RAFFERTY:  I do.  I agree exactly what the A&M team said.  It's really based on volume because we don't know how quickly these pending investigations or complaints are resolved.  So if there's a large number that are pending, we would like to know that, although you do not have to disclose the vendor or the service provider at this time.  We understand the sensitivity that if you've opened an investigation for non-compliance and haven't talked to them.  But depending on the

volume -- can you at least let us know the volume of pending investigations?

So if it's a large number, then we should know that. I think it's relative to what we're trying to look at because I don't -- we don't know how long it takes you to end an investigation. If it takes six months and there's a large volume pending, I think that's important for us to know.

MS. MARTINEZ: Okay.

MR. YAP: Your Honor, I think we would be willing to provide some sort of non-depersonalized about pending investigations, of course.

THE COURT: Thank you. Let's start there.

If this becomes a further issue, I can order them under seal under the court. All right.

Now, any other comments by the parties with A&M?

MS. MITCHELL: Your Honor, I do have a follow-up question. As far as -- and I know that we're waiting on information from LASA to the County and from County to A&M. As far as the data flow from the City of Los Angeles and from LASA to A&M, is that complete? Is that still pending? Are you guys getting sufficient responses in a timely manner? Or is that something that we are still contending with, hence the request for delay?

MS. BROWN: I think we've had pretty good responses from the City to our data requests. I think, as we've

EXCEPTIONAL REPORTING SERVICES, INC

mentioned before, some of it is just a bit of an iterative process in getting the data, analyzing it, realizing if there's any other additional requests we may have, and just kind of working through that process.

So it's more of the complexity of getting the data and just making sure we have what we need.

MS. MITCHELL: Thank you. We feel like the pending investigations are particularly relevant. So to the extent they can be disclosed, just perhaps with personal identifying information or provider information redacted, that's certainly something that we would push for. I think there are mechanisms in place in the court, you know, whether the entire thing is under seal or whether it's subject to some confidentiality agreement, but I think that the investigations themselves being turned over to the auditors is crucial for us to understand the current situation, as opposed to, you know, a year or two ago.

So we would certainly advocate for that. And to the extent that's not happening, we would like to understand why.

JUDGE GANDHI: Well, just for A&M, you were saying that if you needed to do field work, then the report would go to January 15th. Is that what I heard?

MR. MCCURLEY: That's predominantly the reason for the second option.

JUDGE GANDHI: Just to go back to that for a second on the output, isn't field work -- is that a standard procedure

for the audit?

MR. MCCURLEY:  Yes, sir, and we have conducted field work already on the things.  We recently added the County scope, and the scope as added was to review the data that came along.  The point being, if you want the additional field work to go verify the data, to go, for example, to a County facility and see that a person has been admitted for substance abuse disorder, or to go to the units and see that there are, in fact, County caseworkers in the units doing medical evaluations or behavioral health evaluations.  What we've got today is we'll get those reports, and I believe we'll get so far everything -- the cooperation is great with the county.  I believe we'll get the information that we need in the data and be able to make a judgment based on the data.  But it's a question of if you want us to do that further level of verification.

JUDGE GANDHI:  I mean, just without the field work, we're going to have less confidence level in the report that comes out, right?

MR. MCCURLEY:  Yes, sir.

JUDGE GANDHI:  I mean, given that this is the first precedent and the first time we're doing it, I'm not sure we want a report with medium or low confidence.  I think we want  -- anyway, not for me.  Judge Carter.

THE COURT:  I think option two.

EXCEPTIONAL REPORTING SERVICES, INC

**62**

**MS. MARTINEZ:** You're absolutely right.

**THE COURT:** If you can't tell already, we're tending towards option two.

**MS. MARTINEZ:** Option two, yes.

**THE COURT:** Okay? Do you need additional resources? Last time I tossed out that you can't possibly spot audit, maybe to your satisfaction and the Court's satisfaction and eventually the public confidence in your report.

I think you had 18 at that time, and you were moving up the ladder. I tossed out what about the Lusk Institute or getting you additional resources for a moment. No, I'm going to talk now. That's it. I'm going to talk now. No, thank you. Now, I toss that out. I want to hear your response to that.

There are resources out there from maybe UCLA, USC, the Lusk Institute to make your spot checking more robust. If you're confident that you'd like to hold that in-house right now, I need to hear that. If you're going to reach out, then maybe we can get other institutions involved, but that takes time getting up to speed. It may be cumbersome for you. Maybe this waits.

So why don't you huddle for just a moment because I proposed it last time and -- no, I'll be with you in just a moment.

**MS. RAFFERTY:** Judge, while the team is huddling, we

**EXCEPTIONAL REPORTING SERVICES, INC**

appreciate the gracious offer of looking at additional resources.  Right now, our team, the way we set this up is not all of them are working 40 hours a week, although they are working a lot of hours.

We can do it within our team.  I think we have people on our team that are very up-to-date on what we're looking for, looking at a provider that receives significant funds, understanding how they're funded, and then verifying at the location that those services are being provided.  If it becomes extremely extensive where we can't really have a statistically significant number, then we would be able to talk to other resources that can contribute to us.  We've --

THE COURT:  I'll leave that --

MS. RAFFERTY:  -- all been trained -- yeah.  We've all been trained on patient privacy.  We've all been trained on how to ask questions that are not intrusive.  So there would be some pre-work if we work with other institutions or organizations to be able to provide that same level of service.  Most of us work in clinical areas.  We are very, very sensitive to, especially, like I've said before, talking to people that  -- we don't want to talk to people that don't want to talk to us, just to get the information, in respect of their own privacy.  But right now, I think we have the team to be able to do it.  We just need more hours for our team.

THE COURT:  I'll leave that to you in consultation

**64**

with Michelle Martinez, the special master, okay?

MR. MCCURLEY:  Yes, sir.

THE COURT:  I just need to have confidence when this report comes in that there's been enough cross-checking or spot-checking.  Generally, we have confidence in your ability to verify.  Okay?

Michelle, do you have anything further?

MS. MARTINEZ:  You now have the --

THE COURT:  Jay, do you have anything further?

JUDGE GANDHI:  No.  No, sir.

THE COURT:  Okay.  I'm sorry.

MS. MARTINEZ:  You now have the controller.

MS. MARIANI:  Your Honor, can we ask just one question before LASA leaves actually?

THE COURT:  Well, they're not going to leave.  I'm sorry.

MS. MARIANI:  Okay.

THE COURT:  They're not leaving.  I'm inviting you to stay.

MS. MARIANI:  But on this topic --

THE COURT:  I'm done with the drop-in, drop-out.  Have a seat over here.  Come on up right in the jury box, that's fine, but I want to be able to see you now.  Last time, there was a contention between you and the controller, and we're not going to have any more of that.  You're both going to

**EXCEPTIONAL REPORTING SERVICES, INC**

be present.

I'm sorry, Counsel.

**MS. MARIANI:**  No problem, Your Honor.

I was just hoping we could get clarification.  I thought I heard LASA say that the requested data that needs to be provided to A&M can be pulled directly by the County, but I just wanted clarification on that point, and it's important as it relates to the ability to timely get data to A&M to avoid any delays.

**MS. MITCHELL:**  If I can second that, Your Honor, that's actually important.  It's one of the pieces of data that we have been in discussions about with the County because the County has said they need information from LASA to give us the details that the City and the plaintiffs have asked for.  So if the County can access it directly, I think that would be important to understand.

**THE COURT:**  Mira, can you access this directly?

**MS. HASHMALL:**  We're talking about a roster of resources that are not County controlled, and LASA holds the roster.  We had suggested alternative work arounds, but there was a request that this information come from a true roster, which we've requested from LASA.  We don't have that roster without getting it provided.

**THE COURT:**  Please.

**MS. EVAN:**  We will work with the County to make sure

that we can get them that roster.

THE COURT:  Okay, fair enough.  Any other questions?

MS. MITCHELL:  I'm sorry.  I don't think that was the question.  The question was whether the County currently has access to the data through another means.

MS. EVAN:  We transfer HMIS data on a weekly basis to the County via their InfoHub site.

THE COURT:  Would you state that again slowly?

MS. EVAN:  Yes.  We do a weekly transfer of all HMIS enrollment data to the county on a weekly basis to their InfoHub site.

MS. HASHMALL:  Right.  So where there's a disconnect, it's not the same as a roster.  That's my understanding.  Two different things.

Do you have something to say?

MR. YAP:  It's our understanding, Your Honor, that the roster --

THE COURT:  Use the mic.

MR. YAP:  Sorry.  It's our understanding that the roster can be pulled from that weekly data, but in any event, we'll provide it by the close of -- by the end of today -- or by today, the roster that's requested.

THE COURT:  Okay.  Now, just a moment.  Did you have anything you wanted to say?

All right, just a minute.  I want to talk to the

special masters for a moment.

(Pause)

THE COURT:  Thank you very much.

MS. HASHMALL:  Your Honor, can we have a point of clarification on that last issue, please?

THE COURT:  Please.  And if any folks from the County or the City out in the audience need clarification, just come up and talk to the attorneys.

So please, Mira.

MS. EVAN:  To clarify, they do have the data, but understanding the correct program IDs in order to pull the rosters needs further collaboration with LASA, which we will do by the end of today.

THE COURT:  Thank you.  And for more clarification.

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  All right.  I want to thank --

MS. HASHMALL:  Oh, just one more point.

THE COURT:  Please.

MS. HASHMALL:  And I just want to make sure that I'm clear.  I know the chair has a conflict on October 25th, and so we had suggested different dates, so I just --

THE COURT:  Vice chair is fine.  I can't get all of you together.  It's impossible.  It's going to be the 25th.

MS. HASHMALL:  Okay.

THE COURT:  All right.  Thank you.

**THE COURT:** Controller, Mr. Mejia, thank you for your patience today. And if you'd like to bring any of your staff up, and also Mr. Szabo, you both have been working on this website, and on the last occasion, we had data that came in literally the night before. I'd like to hear from you, you know, about obstacles, progress, anything that you'd like to state today.

**MR. MEJIA:** Thank you, Your Honor.

So we met two weeks ago in court, and we showed some of our updates. Some of our updates are pretty minimal. It's the same thing in which we add more financial metrics to our website, you know, the pie charts and some invoices.

We've also met with LASA, too, as well, to discuss how to reconcile some of the service provider invoices to the actual LASA payments. And over the course of this work, over the past two, three months of doing this, it has become absolutely clear that in order for us to do this going forward, there needs to be a more effective and efficient process on having these service provider invoices tie to these cash requests when they want the City to make payments to them.

So I know in one of the agreements that you showed, where you said these invoices should be publicly available and ready, that's what we're really having trouble with, is we do get these service provider invoices, but it is so difficult to tie them to these payments that it requires us to set up

**EXCEPTIONAL REPORTING SERVICES, INC**

multiple meetings.  And these meetings could take, you know, we'll meet in two days or we'll meet next week because, you know, LASA is very busy, we understand that.

But it is very difficult to reconcile invoices to these payments.  And so, you know, as controller for the City, we set the policies for how the City makes payments.  And one of the things that we're looking into is to have contractors, which the main contractor is LASA, have contractors provide the subcontractor invoices, which are the service providers, to match the invoices that they want the City to pay, because it is just so difficult to tie out these service provider invoices to these cash requests.

And so, you know, I say this because if we're going to keep doing this for eternity in the future, because we want to do this.  We want to give transparency on financial, you know, on spending.  It is just -- it's just come to the conclusion that this is going to take forever.

**JUDGE GANDHI:**  What is the remedy he's looking for?

**MR. MEJIA:**  Say it again.

**JUDGE GANDHI:**  What is the remedy you're asking for?  Are you asking for the City to revise its contracting process?

**MR. MEJIA:**  That could be a possibility.  From what we -- when we spoke to the housing department this week, they told us that they don't receive service provider contracts because it is not in their contract with LASA to get the

**70**

service provider contracts.  All the housing department gets are these cash requests and these Excel sheets of, you know, their general ledger.

And so, LAHD, the housing department, because they said that it's not in the contract to receive the service provider invoices, they, you know -- they just more so do checks, you know, making sure that the cash request that LASA is asking for is within budget, right?  There really is no verification from the City side on these invoices because we don't get it.  We don't get it.  We rely on LASA to basically verify that these invoices were received, that they're given, that services were rendered.

And so, what I'm saying is when it comes to us now to build this website to provide these invoices and match them to the payments, it is just very difficult because we don't -- number one, it's either we haven't got them yet; or number two, it is just we need to have multiple, multiple meetings to figure out how to tie an invoice all the way back to a payment.

And so, you know, what I'm trying to do is going forward, and I've already told LASA this, is that if we update our manual, the controller's manual, is that we would like the contractors to include the subcontractor invoices to the cash request so that it's able to tie one for one because right now it's very difficult to do that.

And as your question, if it's contractual, then that's something else that we'd probably have to discuss with our, you know, City attorneys or whoever can make that happen in the contract. But the contracts for some of these, for the ones that we've seen, it does say that the City can request contracts at any time from LASA. And so, you know, obviously we've been doing that, but it's just been very, very difficult.

And so, I think what we're saying is going forward, if we're going to keep doing this work, there needs to be a way to tie these future invoices and these future cash requests together so that we can be able to do this work with this website pretty efficiently and effectively because it's just taking so long to do this.

**JUDGE GANDHI:** And LASA should be asking its providers to provide the sub invoices?

**MR. MEJIA:** Say that again?

**JUDGE GANDHI:** And LASA should be asking the providers to provide the sub invoices?

**MR. MEJIA:** I think LASA does get the service provider invoices. They do get it. And so, it's just a matter of we need LASA to submit the service provider invoices now with the cash request to the City. And those invoices should match the cash request. That's pretty much the hard part, you know.

As a CPA auditor, like, that is just basic, you know,

**72**

verification is tying out an invoice to what's on the, you know, trial balance or general ledger, and then tying that to the payment.  Like, that's the difficulty that we're having.

So, you know, that's sort of pretty much our update. We've added -- like I said, we've added more and more financial metrics, but it's just if we're going to keep doing this, it's just very inefficient, and it's very hard, you know.

**(Pause)**

**THE COURT:**  So I'm going to simply restate what I've absorbed.  We're paying many bills without supporting documentation.

**MR. MEJIA:**  From my understanding, from what I see in the controller's office, we get the cash request, but we don't get the backup service provider invoices with it because, from what I've been told, it's not in the contract for the housing department, who handles the service provider contracts, to get those invoices.  So we don't get that level of detail.

**THE COURT:**  So we're paying invoices without supporting documentation.  We can dress that up and dance around it for a while, but --

**MR. MEJIA:**  From what I've seen and from what I've seen in our accounting system and the process, the City doesn't get the service provider invoices.

**THE COURT:**  Okay.  Now, LASA, why is the City, when they're paying these invoices without supporting documentation,

getting the supporting documentation from you?  And I understand in the past, you know, going backwards with the audit, that that money may not be able to be accounted for. But going forward, the whole idea of this website is to let the public know what they're paying for, but let civic leaders make good decisions based upon this data.

So an invoice for $248,000 with one line is no longer sufficient.  I won't name the entity that submitted that to you.  But number two, the City moved from 25 percent to I think it was 40 percent, Michelle, right, 40 percent on these cash requests, which means we've actually gone up, in a sense, our cash requests, which means we're getting less data about what the City's paying for.

And historically, it seems that these invoices have come in because this had been provider-oriented, not performance-oriented, and these payments have been made based upon an invoice that, quite frankly, the controller and the Court and I have difficulty understanding.  Help us.

How do we improve this?  Instead of criticizing it, how do we move forward and improve this?

**MS. TREJO:**  The established process is -- I apologize.  Janine Trejo, CFO for LASA.

The established process is LASA, as the joint powers authority, reviews the invoices from the service providers and submits those, and we submit and roll up a cash request to our

funder, which is LAHD.  LAHD does not request the backup documentation.

THE COURT:  I'm sorry, that's a -- who?

MS. TREJO:  LAHD is the City department that LASA submits the cash request to once LASA reviews all of the service provider invoices.

THE COURT:  So the City does not require this?

MS. TREJO:  The City does not require it.  LASA has complied and provided the --

THE COURT:  Will the City come up and join this for just a moment, or Matt?  Why?

MS. MARIANI:  Your Honor, unfortunately, nobody from the Housing Department is with us today.

THE COURT:  Okay.  Simple question.  Why?

In other words, let's all get together and see if we can improve this so that our invoices have supporting documentation.

MS. TREJO:  I do want to say that there is supporting documentation for each and every provider invoice, and that some of this is because the City is being introduced to the invoices.  It's their familiarity with reading the invoices and understanding if there is multiple funding sources, and receiving the books from the LAHD department, which has the general ledgers that tie back to the service provider invoices.

And that is some of what we've been doing with the

controller's office, is walking them through the process so that this way they have an understanding of it.

THE COURT:  Do they have an understanding of it?

MS. TREJO:  We've had two meetings so far, and walking them through.  We're hoping with further trainings that they will become familiarized with it and be able to move forward with reviewing of the invoices.  But LASA is supporting them at this time and walking them through.

MR. GIBSON:  Good morning, Your Honor.  Ed Gibson with the CAO's office.

She's referring to LAHD as the Los Angeles Housing Department.  It is the contract entity between the City of Los Angeles and LASA, who actually maintains the contracts, drafts the contracts, and reviews the invoices.

I think for further understanding for all of us, having better understanding of the invoices, getting the sub invoices underneath is of value.  I think that's been stated several times.

THE COURT:  Say that again, one more time.

MR. GIBSON:  It is of value to collect those invoices and sub invoices.

THE COURT:  Okay.  How do we then improve this?  In other words, how do we coordinate so that these invoices have a supporting documentation?

MR. GIBSON:  I'm going to defer to LASA on how it's

easiest to put together since they're putting the invoices into the City, into the housing department.  I apologize because the housing department is not here to speak for themselves.

THE COURT:  Okay.

MS. TREJO:  So LASA has been providing all of the invoices as been requested.  We've been uploading them to the City portal that they have available for LASA to upload.  And LASA has been doing this and providing the service provider invoices for the Inside Safe.  So it's part of the process with LAHD and their ability to review the invoices and request them.

Right now, that hasn't been an established process, and LASA is not resistant to the process and has been more than willing to share all of the information that we do have.

THE COURT:  Anybody?

MR. MEJIA:  Your Honor, you know, Janine is correct.  We are having meetings because it is so difficult to tie out these invoices to these payments, and so Janine is correct that we are trying to understand how to tie that.

THE COURT:  Just a moment.  You know what I'm absorbing, and that is if we have a hard time understanding, what are we paying for?

MR. MEJIA:  Right, right, right, right.  And so from my discussion with them is if they need to provide invoices, service provider invoices, with these cash requests, they would need to have more resources because it is time intensive.  And

so from my understanding, when my office, the controller's office, because we're the final approval, I don't see the service provider invoices with the cash requests. And so what I'm saying is that when you guys -- when LASA submits money for the City to pay in these cash requests to include the service provider invoices with that cash request, so that the backup is there already, so that way we already have it together.

And so I've made that known to LASA. They let me know that this can be something that can be done going forward, but they would also need additional resources in order to do that.

MS. MARTINEZ: Could I just get a good example, does LASA address the time-limited subsidies? Do you receive money from the City to manage the time-limited subsidies?

MS. TREJO: LASA receives a small amount of funding from the City to manage time-limited subsidies through the City HAP. It funds approximately 672 slots.

MS. MARTINEZ: So out of those 672 slots, when they're asking for cash, how does that work? So whoever you are providing those rental assistance for, because that's essentially what the time-limited subsidies are, just to be clear for the Court, for the judge to understand, how does LASA invoice that and show documentation that those time-limited subsidies are being provided to a subcontractor? It could be, you know, the private owner that owns the house or whatever

**78**

have you, wherever these people are living.  How is that documented?

MS. TREJO:  So LASA -- one, LASA conducts monitorings with the service providers.  Two, the service providers invoice to LASA, and LASA reviews all of those invoices.  Three, we then package up the items and we return those cash requests to our funders as the funders request and identify LASA does so.  So part of the process with LAHD is previously they were not requesting that documentation with the exception of Inside Safe, and LASA was uploading those invoices to the portal.

With the recent request that LASA has been receiving, LASA has been pulling all of those invoices and providing them to the City as we've been requested.  Because the City is not familiar with those invoices, it is difficult for them to go through, especially when there's blended funding sources, to understand.

So when they're referencing tying it out and they're referencing an invoice, they're looking at the total amount billed from the service provider.  We've -- on some of the -- you know, on one of the walkthroughs, the first ones, we did have to move down on the invoice and show that there's two different funding sources.  So the amount that you are trying to tie out, you're trying to tie out to the overall contract total, not to the total that has been billed to the funder.  So part of this is just a training and learning with the City,

**EXCEPTIONAL REPORTING SERVICES, INC**

since this is new to them, on how to review these invoices, also how to go back and tie in general ledgers and multiple invoices to a cash request.

The only thing that I want to add here is it's because the cash request with LAHD serves multiple purposes. It's for an advance, it's for a reconciliation, and it's to request additional funding. So because it serves three different purposes, there's multiple things that are going on there.

**MS. MARTINEZ:** Yeah. So I'm just trying to get some clarity, because if a council district -- you say Council District 14 wanted to know how much time-limited subsidies, you know, their folks are receiving within their council district, would you be able to provide that in any council district? And what I'm -- my research and what I'm observing at this point, there is no verification. I can't -- no one can tell me Council District 14 or Council District 3 has this many time-limited subsidies, this is where it's at, this is who, you know, we're serving. These are the contractors we're working with in regards to apartments, homes, or whatever have you, shared housing. There's no way to get that information, and that is -- I'm trying to figure out to explain to the Court what's going on here in regards to time-limited subsidies, and I can't get there.

So I now want to thank you for clarifying that it's

on the housing department side, it's on the City, there needs training, the monies, you know, provide different purposes, and I get all of that, but eventually we need to get to the root and figure out, and how do we follow once that person gets that time-sensitive -- that subsidy for that rental assistance, we're able to track it, and then track it by which council district is receiving those funds, because at this point, I can't tell the Court or -- how to verify that.

**MS. TREJO:**  And I just want to add to that point on council districts, that has never been a requirement of LASA is to track to the council districts.  It's always been contracting based off of the super -- off of the spile (phonetic) level.  And so that's how --

**MS. MARTINEZ:**  Which I'm in understanding, but you know, when they're putting time subsidies part of their beds, right, of paying for interim housing, I'm trying to connect those dots, and I can't.  I'm not saying it's on you, but for the City as well.

**(Pause)**

**THE COURT:**  Is there uniformity by your providers when they submit these invoices and underlying documentation?  In other words, are -- is there -- or are you unduly consuming time because each provider, in a sense, is submitting this underlying data in different, you know, different categories, different lines, different ways, which is -- must be incredibly

burdensome on you.

And if we don't have uniformity, can we create some kind of documentation where a provider can, you know, go down a checklist that would be able to be automated, because once we have uniformity, we could start plugging that in, in like categories.  I've got a feeling that we're still in the old days with providers demanding, in a provider, let's say, friendly system.  And when you do get those underlying invoices, it's incredibly time consuming to go through each individual submission, because you don't have uniformity or forms.

MS. TREJO:  There is uniformity, and there are checklists provided to the service providers on what it is that they're going to submit for their invoices.  And there is within our Salesforce platform, which is EGMS, there are lines where every service provider goes and completes their invoicing.

So within the system, that is standardized.  What I will say, though, is that every service provider has their own accounting system.  And so because they have their own accounting system and they have their own chart of accounts, how those map into our system, that is not standardized.  And so you're going to see nuances within the general ledgers that service providers are providing.  You're going to also see nuances in just the operations for every service provider.

Service providers have different needs, because although allocations are based off of a specific methodology, the way the service providers bill is based off of actual expenses.  And so when they bill for their actual expenses, if we're talking about an interim housing site, you're going to see different types of billing with service providers based off of what the service provider's needs are and their operations.

If a service provider owns their facility, they're going to be having different categories than a service provider that is leasing their facility.  So there is going to be a challenge with standardizing across service providers based off of their accounting systems, their chart of accounts, their general ledgers, and just the facilities that they operate.

**THE COURT:**  Thank you very much.  I'll turn back to the controller.

**MR. MEJIA:**  Thank you, Your Honor.  And yeah, so just to summarize pretty much, you know, we are getting these invoices because we've requested it, right?  It's just not standard in the city.  And so when we get these large millions of dollars for cash requests, there's just nothing there behind it.  And so we will continue to meet with LASA to be able to build this website for payments.  We will -- you know, we'll have these meetings.  It could take up to 30 minutes to just tie out one payment to a service provider invoice.

So if we're talking about hundreds or even a thousand

payments, like, for some we've been able to match one for one easily, and we've showed them the ones that we've been able to do.  But, you know, we're hoping along as we do this training and we do this work, there just needs to be a more efficient process.  Because like I said, if you want this to live on for eternity, we need to have -- to be able to have these service provider invoices tie easily to these cash requests that they want us to pay.

And so that's sort of, you know, where we're at.  We'll continue to keep working with LASA and request meetings and whatnot.  But yeah, I mean, the website's up for you all to see.  It's pretty much the same with a few additional things added.  So if there's any other questions, just let me know.

THE COURT:  Just one moment.  Why can't the City standardize?

(Counsel confers)

MR. MEJIA:  I'll just add before Edwin comes.  When we spoke to the housing department, LAHD, this week, they said it's not in their contract with LASA to explicitly provide the service provider invoices with these cash requests.

MS. MARTINEZ:  Just a question.  Why can't the LA housing department amend the contract to create that standardization if you guys want that information?

MR. GIBSON:  I agree.  They should be able to amend that agreement.  So it really comes down to what's practically

**84**

possible working within LASA's system and the service providers.  Because I think, as the controller mentioned, as those meetings go back and forth, and sometimes we're part of them, sometimes we're not, but as a CAO, but as we move towards that, if something works that gets us there, then yes, the housing department can amend their contracts.  They're updated all the time anyway, and get us to a better form.

But I acknowledge for LASA -- I'm going to acknowledge for LASA, those invoices come in all different kinds -- with the systems.

MS. MARTINEZ:  Right, formats.

MR. GIBSON:  It's quite challenging, even with the standardized forms that the housing department does use, which just don't tie out when you need the detail.

MS. MARTINEZ:  So on the City side, figuring out how do you standardize and amend that contract with LASA, and I think LASA is open to that.  But the issue is really, and I come from Orange County, much smaller county, right?  Typically, you know, we expect a lot of our contractors to have the same systems, and an example was given at the last hearing, the Salesforce, right?  But you know, typically cities have certain programs and systems in place.  And when we do subcontracting, we want to make sure that some of these contractors for their accounting purposes, that there is some standardization.

So if you have all these providers having their own systems that you can't integrate into your system is causing more work, something has to give.  That there has to be some form or way to streamline that and working with your providers or possibly your largest providers that could possibly undertake this.  I get the smaller providers may not be able to do that, but your larger providers possibly can so that you can streamline your work.  Because this is what it essentially comes down to is making sure that we create standardized processes, but more importantly, that it's not just within government, but it's also with the subcontractors as well.

THE COURT:  How do we move forward and improve this system?

MS. TREJO:  Janine Trejo, CFO LASA.

With that, that requires an investment from the funders to be able to stand that type of thing up with the service providers.  If we are going to request that the service providers are standardizing their accounting systems and/or chart of accounts, each individual entity being a non-profit establishes their chart of accounts based off of their agency needs.  And every single service provider receives a variety of funding, not just the funding received by LASA.

So LASA does work with the service providers to ensure that we are reviewing those invoices as they come in.  I will say also that with the amount of admin funding that LASA

does receive from the City, it is challenging for LASA to then establish even further setup internally.

**MS. MARTINEZ:** I definitely understand your position and I go back to the City. Ultimately, there's going to be a question, understand LASA is dealing with 85, 84 other cities, including the big monster, which is the City of Los Angeles. We all know that.

And, you know, looking at the functionality of the system, it's just -- this is one example that this is not functioning for the City of Los Angeles. When you can't even keep track of basic standardization of invoices.

So the City is going to have to have a broader and larger conversation with LASA and what the future looks like, because you cannot continue to offer 85 other cities and what you're doing with them, plus dealing with a major problem in Los Angeles, where they do have the largest homeless problem.

And this is an emergency. They look at this as a crisis and they were trying to get a hold of what's going on. And if there's limitations, they need to understand that and may need to make some big decisions in the future. We're not policy makers, but what we're hearing, there is some basic fundamental issues when it comes to standardization and not being able to get the information needed so their policy makers can make good decisions with the taxpayer's dollars.

**MS. TREJO:** I think the only thing that I want to add

is really it is also just that this is new to the City and it's partly that our City partners need to understand the backup documentation and how it links.  It is hard when you receive years' worth of invoices to then try to go back and tie cash requests.  So I acknowledge that that is challenging and that's why LASA is working with the City to walk through these types of invoicing.

It would also require a certain type of investment within LAHD for them to have the ability to be able to do that, to collect those invoices and do that review.

**MS. MARTINEZ:**  Agree.

**JUDGE GANDHI:**  Is A&M looking at the invoice submission and documentation process?

**MS. BROWN:**  Yes, we are.

**JUDGE GANDHI:**  Are you going to have recommendations or corrective actions on that?

**MS. BROWN:**  We will definitely address it in our report.

**JUDGE GANDHI:**  Thank you.

**THE COURT:**  I'll turn it back to the controller if you have any other further comments, but otherwise I think that's enough for today.

**UNIDENTIFIED SPEAKER:**  That's all we have.  Thank you, Your Honor.

**THE COURT:**  Okay, any other comments by any of the

parties?  Otherwise, I'm going to thank you for your attendance.  LA Alliance?

MR. UMHOFER:  No, Your Honor.

THE COURT:  City?

MS. BROWN:  Nothing further, Your Honor.

THE COURT:  I'm sorry.  I'm sorry, County?

MS. BROWN:  Nothing further.

THE COURT:  City?

MS. MARIANI:  Nothing further, Your Honor, thank you.

THE COURT:  Shayla?

MS. MYERS:  No, Your Honor.

THE COURT:  A&M?  Carla?  Yeah, we're going to be returning on October 25th at 8 o'clock in the morning.  If you want, we can make it earlier, but we'll set it at 8 o'clock right now.  And I would expect that that would be a meeting between the highest levels of the City decision makers.  And I would expect that LASA would be here with full authority to enter into a discussion with the mayor and whoever is here from the Board of Supervisors.  So if Lindsey Horvath can't be here, she has another obligation, I understand that.  Maybe she'll appoint somebody in her stead, okay?

MS. HASHMALL:  Thank you, Your Honor.

THE COURT:  And the President of City Council is invited.  Matt, you're always welcome, okay?  We need your

input, all right.

Anything further, Michelle?  Okay.  Thank you very much.  We're on recess.

**(Proceedings concluded at 11:06 a.m.)**

**\* \* \* \* \***

90

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    October 17, 2024

        **Signed**                                              **Dated**


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**