UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | CASE NO: 2:20-CV-02291-DOC-KESx |
| Plaintiffs, | CIVIL |
| | Los Angeles, California |
| vs. | |
| | Thursday, November 21, 2024 |
| CITY OF LOS ANGELES, ET AL., | (8:59 a.m. to 11:43 a.m.) |
| | (1:41 p.m. to 2:05 p.m.) |
| Defendants. | (2:27 p.m. to 2:37 p.m.) |
| | (2:50 p.m. to 2:50 p.m.) |

STATUS CONFERENCE RE A&M AUDIT;

MOTION FOR ORDER FOR SETTLEMENT AGREEMENT COMPLIANCE
[DKT.NO.767]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                SEE PAGE 2

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Karlen Dubon

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>**APPEARANCES:**</u>

| | |
|---|---|
| **For Plaintiffs:** | **ELIZABETH A. MITCHELL, ESQ.** |
| | **DIANE H. BANG, ESQ.** |
| | **Umhofer Mitchell & King** |
| | **767 S. Alameda Street, Suite 270** |
| | **Los Angeles, CA 90021** |
| | **213-394-7979** |
| | |
| **For Defendants:** | **JENNIFER M. HASHMALL, ESQ.** |
| | **Miller Barondess, LLP** |
| | **1999 Avenue of the Stars, Suite 1000** |
| | **Los Angeles, CA 90067** |
| | **310-552-4400** |
| | |
| | **LAUREN M. BRODY, ESQ.** |
| | **Miller Barondess, LLP** |
| | **1999 Avenue of the Stars, Suite 1000** |
| | **Los Angeles, CA 90067** |
| | **310-552-4400** |
| | |
| | **VALERIE FLORES, ESQ.** |
| | **JESSICA MARIANI, ESQ.** |
| | **Los Angeles City Attorney's Office** |
| | **200 N. Main Street, Room 675** |
| | **Los Angeles, CA 90012** |
| | **213-978-6952** |
| | |
| **For Intervenor:** | **SHAYLA R. MYERS, ESQ.** |
| | **Legal Aid Foundation of LA** |
| | **7000 S. Broadway** |
| | **Los Angeles, CA 90003** |
| | **213-640-3983** |
| | |
| **Special Master:** | **MICHELLE MARTINEZ** |
| | |
| **Also present:** | **LISA BROWN** |
| | **KEVIN CALL** |
| | **LAURA COLLIER** |
| | **DON GARZA** |
| | **DIANE RAFFERTY** |
| | **SUZETTE SHAW** |
| | **AMY SIMPSON** |
| | **DEWEY TERRY** |
| | **JANINE TREJO** |
| | **MICHAEL SEAN WRIGHT** |
| | **ROBERT YAP** |

**Los Angeles, CA; Thursday, November 21, 2024; 8:59 a.m.**

--oOo--

THE COURT:  If you'd be so kind and would you state your appearance?

MS. MITCHELL:  Good morning, Your Honor, Elizabeth Mitchell and Diane Bang from Umhoffer Mitchell & King on behalf of plaintiffs here today.

THE COURT:  And with you is?

MS. MITCHELL:  Diane Bang, my co-counsel, Your Honor, thank you.

THE COURT:  Okay.  Thank you.  And I don't care who, do you want to start with the county?

MS. HASHMALL:  Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

MS. BRODY:  Lauren Brody also here for the County.

THE COURT:  Good to see you.

MS. FLORES:  Valerie Flores for the City of Los Angeles.

MS. MARIANI:  Good morning, Your Honor, Deputy City Attorney Jessica Mariana for the City of Los Angeles.

THE COURT:  Okay.  Hey, Shayla.

MS. MYERS:  Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT:  Okay.  We're here because of the concerns about the additional time and/or requested fee amounts from

**4**

A&M.  And if we could have reached an accord, this hearing wouldn't be taking place today.

So the first document that I think we should look at would be Document No. 818 filed November 6th.  And this was the same day that the Court had ordered the City to make the payment specifically of $440,000 and I don't want to get the two requests mixed up.  One is of the County for $620,000.  My understanding through Michele is that you folks on both sides were agreeable to the $180,000 but let me put that aside for a moment.  Let me just talk to the City.

Could one of you turn that blackboard around for just a moment?  So it faces the folks.

Could you write $2,800,000, 4,200,000.  That was the original estimate.  I don't know if you were counsel at that time, it may have been prior counsel for the City.  I'm not sure if you were here because there was a change in counsel representing the City.

MS. FLORES:  No, we're both with the City Attorney's Office, but yes, I've been coming more often recently.

THE COURT:  But there was a prior City attorney --

MS. FLORES:  Yes.

THE COURT:  -- when these negotiations took place, when this offer was made.

MS. FLORES:  Yes.

THE COURT:  Okay.  So let me make certain then that

EXCEPTIONAL REPORTING SERVICES, INC

**5**

we're all on the same page.

The City came or the A&M came in with an initial estimate of 2.8 million to 4.2 million. The City Council, very shortly then, authorized I believe it was 2.2 million, wasn't it?

**MS. MARIANI:** Yes, Your Honor.

**THE COURT:** I was astounded at that and expressed that on the record. And my concern was that this had every possibility of being an inadequate audit, that the lower amount agreed to, even the 2.8 could be acceptable, but I think I'd expressed strong sentiment through Michele, to the Mayor's office, to the Council, and I think I've got a pretty good record of being astounded at that and that's why you see in the negotiation I didn't agree unless the Court had the ability to modify this.

And this is not, from my understanding of the documents, and I'm going to have A&M make their presentation, so we can all hear that, something new necessarily. This is allegedly delay or inability to get certain documents.

So I'm going to ask A&M to come up for just a moment and I want to go over these one by one. And let me remind the City, when's their last audit again, help me, on homeless issues? When's the last audit ever conducted by the City on homeless issues?

And, folks, come on up, and the staff help her. I

**EXCEPTIONAL REPORTING SERVICES, INC**

**6**

mean, any supporting staff, come on up.  The answer will be zero, but let's verify that.

MS. MARIANI:  I'm not aware of any.

THE COURT:  I have the City out there.  Come on up, City folks.

MS. MARIANI:  Your Honor, I am not aware of any performed by the City of Los Angeles.

THE COURT:  There is none.  And the City's taken the position, which is of great concern to this Court, that if these programs are put under the auspices of the mayor or the Council, Matt Szabo has stated point blank on the record, I'll read it back to you, that there's no authority to conduct an audit.  Which means in 30, 35 years of homeless issues since the 1980s when the LA Times was writing the same -- they were writing the same editorials we're seeing today about homelessness, the City has either avoided an audit.

And that's what's going on with the controller's right now with this controller now all of a sudden interceding and the City takes umbrage with that.  And if you weren't here for those discussions, Matt Szabo has taken the position on behalf of the City that the auditor controller doesn't have authority to conduct an audit in homeless issues, because this under the purview of the Mayor.  And the controller is now taking the position that, yes, he does.  And that's causing some tension.

Now, you can comment upon that, but I'll start reading back the record in just a few moments to you on this.

**MS. FLORES:** I would just like to clarify that the controller can and does conduct audits currently, I believe is conducting an audit of the homeless services administered by City departments. The only limitation in the City's charter is that the elected controller, a political office, can't audit programs in another elected office's purview.

**THE COURT:** And my record in the past and now is that that's allowed the City to avoid an audit quite frankly. And that the only audit we're going to get quite frankly is through a third party audit.

Remember Mayor Bass sat here with Janice Hahn and Adams Kellum and all pledged their loyalty to get this done, on the record. So I'm really concerned that about $440,000 that I either have to have a contempt hearing, or that I'm going to have to write and find that the City is not allowing a thorough audit, what seems to be a minimum amount of money.

Is that the City's position still or can we work this out without the drama?

**MS. MARIANI:** Your Honor, the engagement --

**THE COURT:** Can we work this out without the drama?

**MS. MARIANI:** I -- there certainly is an opportunity to do that. All the City --

**THE COURT:** Good, why don't you call the Mayor.

**MS. MARIANI:**  -- requested was --

**THE COURT:**  Why don't you call the Mayor.

**MS. FLORES:**  It would be the City Council.

**THE COURT:**  And see if we can work this out --

**MS. FLORES:**  Yeah.

**THE COURT:**  -- without going through this process.

**MS. FLORES:**  We would need to go back to the City Council to authorize the additional payment, which we're willing to do.

**THE COURT:**  Then why didn't you do it before?  Why are we even here?

**MS. MARIANI:**  Your Honor, we requested clarification because the engagement letter actually was for a $1.06 million amount and while some of that, a portion was attributable to County, the order requested that the City sign that engagement letter in total.  So especially in light of the County's objections to performing certain of that work, including field work and in light of the County's objection to the amount, we, on behalf of the City had requested clarification to understand exactly what the scope of the increased audit engagement would be.  And clarify who would pay for it.

And as to the remainder of the $440,000 that remainder that was not attributable to the County, we were requesting a clear basis for that increase, given that the City had already approved the initial $2.2 million and then had

**EXCEPTIONAL REPORTING SERVICES, INC**

**9**

already in September, approved another amount bringing the total fixed fee to $2.47 million.

THE COURT:  Why did the City with the good faith estimate of 2.8 to 4.4 million, literally, billions of dollars now falling through the system, take the position to undercut this by $600,000?  Why did you leave my court and go back -- not you personally by the way --

MS. MARIANI:  I understand.

THE COURT:  -- and go back to the City Council and come up with this arbitrary number, knowing that minimum bid was 2.8?  What's the explanation for that, other than undercutting the funding and giving us an adequate audit?

MS. MARIANI:  Your Honor --

THE COURT:  Which I'm not trying to countenance.

MS. MARIANI:  Your Honor, you're correct that I personally wasn't in the courtroom for that presentation --

THE COURT:  No, I know, you're not being blamed for it.

MS. MARIANI:  -- but my understanding was that the initial quote was in the range of 2.8 and upwards, but that the agreed amount was 2.2 million.

THE COURT:  It was never agreed upon for 2.2.  This was arbitrary on the City's part.  Everybody left this court at 2.8 to 4.4 knowing that audit and the next thing we hear the following week is it's 2.2.  Now, that's the City setting

itself up for an inadequate audit.  What's the explanation for this?

MS. MARIANI:  Your Honor, all I can say is that my understanding was that the auditors had indicated that they would be able to do the audit for the 2.2 within the scope that they had at the time.

THE COURT:  No, they didn't.  Find that on the record.  That was arbitrary on the City's part.  I repeat that, that came to Michele, to me, to Judge Birotte as a complete surprise.  And Michele was on the phone with different Council members about that.  All right.

MS. MARIANI:  Your Honor, all I know is what the engagement letter was for in the end.

THE COURT:  All right.  Let's go through this one by one then and would you be kind enough then to help me.  I need the Elmo.  And I need to go down each list of the requests.  So I'm going to turn this over to A&M for just a moment and we're going to go through each one of these requests and find out why this information hasn't been forthcoming.

So let me turn that over to you or Diane.  You make your presentation and I'm going to then going to go to this document in just a moment.

MS. COLLIER:  Okay.  All right.  Do you have a clean version of this, Your Honor, printed?

THE COURT:  You know I've got a version, but it's

marked out, I've been most of the night.

MS. COLLIER: There's still is ours, a little bit, we just -- okay, thank you.

THE COURT: Because we got a County report yesterday I think, so we've been up most of the night trying to match up some of the requests you're making to see where the County report is.

MS. COLLIER: Thank you.

Your Honor, do you mind if we get started while we wait?

THE COURT: Please, why don't you start.

THE CLERK: Can you state your name.

MS. COLLIER: Oh, absolutely, Laura Collier with A&M.

MS. BROWN: Lisa Brown.

MS. RAFFERTY: Diane Rafferty.

THE COURT: Okay.

MS. COLLIER: Good morning, Your Honor. The delays and complexity of the data coupled with its condition has required additional time and resources to allow A&M to conduct the necessary review and analysis of the data. Given the role these datasets play and analysis in the final report.

As established in the Court's prior considerations, the A&M team was tasked with assessing homelessness assistant services provided across the programs. To date, as the team yet to trace the flow of funds from key parties, like City and

**12**

LAHSA to service providers and their contracts.  However, challenges rose because neither the City nor LAHSA had processes that clearly tracked expenses by program or service as defined within the scope.

Therefore, while all parties have been generally responsive to data requests, the A&M team undertook an iterative process of receiving data, reviewing it, and working with the parties to address any gaps, or discrepancies, in the data received, which in some cases led to additional data requests.

To illustrate, the A&M team initially submitted 26 data requests to the City and 27 to LAHSA, the current number of data requests today is approximately 71 to each party.

**MS. BROWN:**  So I think we were going to speak on this in a little bit of a different order than how it's presented on this sheet.  But one of the first things to demonstrate the complexity of the data is that A&M originally requested accounting detail from the City related to expenses under the programs.  However, upon reviewing that data, it did not appear that capital or acquisition costs, which we understand would be required to set up some of these interim housing sites under Road Map, were included in that information provided.

So after discussion with the City, it was determined that Road Map programs, appropriations are reported within CAO funding recommendations, which provide anticipated acquisition,

capital and operating costs, for the sites included in those Road Map quarterly reports.

So A&M independently located and analyzed the CAO funding recommendation through the city clerk's website, however, the complexity of those appropriations still necessitated multiple follow up meetings and additional data requests to understand how to appropriations are processed through the City's accounting system.

For example, a single site could have various or multiple departments, multiple funds, and multiple accounts that are utilized to track the actual expenditures related to those appropriations.

And in response to request No. 13, dated May 31st, 2024 LAHSA produced approximately 280 contract documents on June 14th, comprising of base contracts, amendments and unique contracts.  So to understand how the respective contracts --

**THE COURT:**  Now, can we blow this up just a little bit as you go down each item eventually, Diane, I'd like to be able to --

**MS. BROWN:**  Yes.

**THE COURT:**  -- and let's point out where you're at. And you can blow it up even more.  So go back to the first one again.  Let's go through this slowly, okay.  And eventually, counsel, I'm going to ask you to take out the docketed County audit that the Court received yesterday.  What docket number is

EXCEPTIONAL REPORTING SERVICES, INC

that, Graham?

Because the same problem seem to be occurring when the County auditor/controller audited LAHSA.  And is anybody here from LAHSA?

Come on, folks, have a seat up here.  Last time you didn't make an appearance, sat until the controller left, come on up here and have a seat in the jury box.

Okay.  It was Docket 823.  You might pull that up. We received that yesterday, LA Alliance filed that in my court, so we've been up most of the night looking at this thing.

Okay.  Let's take the first item again.

**MS. COLLIER:**  Okay.  Absolutely.

So the A&M team, and I'm sorry, we're on -- can you point to the -- the first one.  The first one right here.  Yep.

So the A&M team was tasked with assessing the homelessness assistant services provided across the programs. To do this, the team needed to trace the flow of funds from key parties to service providers and their contracts.

However, challenges arose because neither the City or LAHSA had processes that clearly tracked expenses by program or service, which we'll provide some illustrative examples.

**THE COURT:**  Okay.

**MS. COLLIER:**  So therefore, all parties have been generally responsive to the data request, the A&M undertook an interim process of receiving data, reviewing it, working with

the parties, to address any gaps or discrepancies in the data received, which in some cases led to additional data requests.

To illustrate, the A&M team initially submitted 26 data requests to the City and 27 to LAHSA.  The current number is approximately 71 to each party.  This is as of late last week, which is now 71 for both.

**THE COURT:**  Okay.  Now, let me stop for just a moment.  Concerning the County auditor/controller report, I want to start with a compliment to the chairperson, Lindsey Horvath and I want to start with a compliment to Kathryn Barger, who specifically ordered this audit through the County.

And many of the findings that the auditor/controller found match up with your concern about non-existing data and delay.  And we'll go through those in just a moment.

So, counsel, concerning this first one, I would refer you back to the document 823 and I'd refer you to paragraph 3 under inadequate contract data, so as we're going through that, you might start matching this up because the finding of the County auditor/controller are matching the same concerns you're having, in terms of getting data.

And the difference is that I believe your audit will be more qualitative and more comprehensive than the County auditor/controller and it should be.

So move to the second one.  First here, you say the type of delays, deficiency and non-existing data, I think

you'll see that match up with the auditor/controller from the County saying exactly the same thing concerning LAHSA.

All right.  The second one.

**MS. COLLIER:**  So in relation to data request No. 13, dated May 31st, 2024 LAHSA produced approximately 280 contract documents on June 14th.  That comprised of base contracts and amendments by the many contracts.

So to understand how their respective contracts pertained to the programs, the A&M team presented a crosswalk, specifically the team extracted the site locations in the contract documents provided to trace to the quarterly reports, for example the Road Map, and Alliance, quarterly status reports to the Court.

The A&M team reviewed these documents, which after analysis, showed the contracts do not consistently have identifiable links to beds under the programs, making it difficult to align the financial records to the programs.

**THE COURT:**  Okay.  And, counsel, the notation by A&M is unforeseen data analysis deficiency, non-existent data which will match up to the County auditor/controller's finding in both paragraph 3, where they state that they're unable to find and they were unable to produce accurate lists of contracts and, in fact, the range was 676 to 1,070.  In other words, we don't know the number of contracts out there, according to the County auditor/controller and I'm going to have LAHSA respond

in just a moment.

And also finding number 9, where the auditor/controller for the County states that there was no inclusion of price or I'm sorry, procedures to monitor a provider or the provider programs or services delivery in compliance. And -- well, you can read that provision yourself. Let's go on.

The third was, your notation of incomplete and delayed data and why don't you tell us about that. It's a hundred contracts and financial records.

**MS. COLLIER:** The A&M team identified approximately a hundred contracts in the financial records that did not appear to be provided in response to request No. 13.

Therefore, on July 30th, the A&M requested a crosswalk to help clarify which contracts correspond to the beds identified in the Road Map and Alliance quarterly reports reported to the Court. This data was delayed. We did not completely receive it until September 13th. And when received, lacked clarity requiring additional analyses to reconcile across the various data sources.

**THE COURT:** And I refer each of you when you want to cross reference this to paragraph 3 of the auditor/controller's findings by the County.

All right. The next.

**MS. COLLIER:** So in addition to the analyses outlined

that Lisa will speak to, the A&M team analyzed also the contracts with a focus on specific sections of the contract, such as sub-award and the scope of required services, in an attempt to understand the specific services funded under the programs.

Through this analysis, the A&M team identified services within their respective scope of required services are funded according to the enterprise grant management system budget categories, which are itemized.

However, to accurately understand the services funded within each budget category, such as supportive services, personnel supportive services, non-personnel, operating costs, the team required to request supplemental data, specifically cost eligibility matrices in an attempt to gain insight into the types of services funded under each of those categories.

THE COURT:  And in cross referencing this last night, I invite you to look at once again finding No. 3 by the County auditor/controller concerning inadequate control data, and No. 7 as well, concerning recordkeeping deficiencies by LAHSA.  And your next one.

MS. BROWN:  The next one is more related to the City's expenditures under the programs, but A&M originally requested accounting detail from the City related to expenses under the programs.

THE COURT:  Was this on May 31st, 2024?

**MS. BROWN:** That is correct, yep.

**THE COURT:** Okay.

**MS. BROWN:** And upon review it did not appear that capital or acquisition costs, that we understood would be required to set up some of these interim housing sites under Road Map were included in the information provided.

So after discussion with the City, it was determined that the Road Map programs appropriations are reported within CAO funding recommendations. Those provide anticipated acquisition, capital, and operating costs for the sites included in the Road Map quarterly reports.

So A&M independently located and analyzed those CAO funding recommendations through the City Clerk's website; however, the complexity of these appropriations necessitated multiple follow up meetings and additional data requests to understand how the appropriations are processed within the accounting -- within the City's accounting system.

And for example, for a single site, there could be multiple departments, multiple funding sources, and multiple accounts that are utilized to track the actual expenditures related to those appropriations.

So that -- I don't think, that'll be separate from --

**THE COURT:** Yeah.

**MS. BROWN:** -- I believe the purview of the County's audit.

**THE COURT:** Now, if you look back at the County's audit in finding No. 3, the auditor states that LAHSA was unable to produce an accurate list and there were issues with the EGMS system or EGM system, I'm sorry, and they could not get these contract key data information, but -- and also it did not capture dates and they were inaccurate when they did capture the dates.

Now, these were small samplings, by the way. These were in some cases, three, five, eight or ten samplings. So you can skip the next one, I don't think that -- well, the next issue, so here we've got data incomplete, unforeseen data analysis --

**MS. BROWN:** Uh-huh.

**THE COURT:** -- and Dr. Kellum has said as much, she's trying to improve the system. But whatever those improvements are is costing time and delay when we can't get the data and that's why I'm really concerned why the City took the position with $2.2 million. And you weren't here at this time. But it was clear that the range was 2.8 to 4.2. That was arbitrary on the counsel's part. No reasoning behind it, no explanation.

And how far we have to go with this depends upon your phone calls today. Okay? Am I clear? In other words, you hold the key to this, but I want some guarantees today and this isn't -- that it's going back to the Council. Now Szabo can make the guarantee today, the Mayor can make the guarantee

today or we can go further with this.  Because this isn't new, this isn't even what Shayla Myers asked for in terms of fire and police, these are data things that we needed originally for this audit and this audit isn't going to be shortchanged by a couple of hundred thousand dollars by the City Council.

All right.  Your next.

**MS. BROWN:**  Sure.  So the next point we have is in relation to data request No. 5 issued to LAHSA in our original data request on May 31st.  We requested transaction level details for revenues and expenditures and we did specify that if possible the data should focus on the funding sources, the expenses, the vendors that are related to our programs.

So in response LAHSA did originally provide data, general ledger data for the named City to LAHSA contracts. There are City to LAHSA contracts called Road Map, Alliance and Inside Safe falls under the general fund.

However, as A&M's team's analysis progressed, it became apparent that the general ledger data was incomplete for our purposes and we needed a more comprehensive view of all City funded contracts between the City and LAHSA in order to thoroughly evaluate the service provider contracts linked to beds under the programs.

I mean, for example, there are Road Map service providers that do -- that are under the named City contract, but are also claimed under HHAP contracts.  So after extensive

correspondence between A&M and LAHSA, that data was provided on September 4th.

THE COURT:  How long was that delay?

MS. BROWN:  There was some analysis of ours in there and some back and forth, but I mean ultimately, we're looking at June, July and August.

THE COURT:  You're requesting specifically another $440,000 and it's also request to move this audit back and I've communicated through Michele that I am willing to move this audit back, because this may be the only look, you know, in the history of City that we get an independent third audit on the City's part.

What else do you need?

MS. BROWN:  I mean --

THE COURT:  Think about that.  You're going to be here today for a while.  Come back to me on that, okay?

Now, let me talk to the City again.  You know that I feel that this was an arbitrary decision on the City's part. If you haven't heard that, let me say it again, it was an arbitrary decision on your counsel's part.

We're not even approaching the minimum number that we were all aware of.  Was this an effort by the Council to underfund this audit so it was incomplete?

MS. MARIANI:  Your Honor, I do not believe it was that at all and --

THE COURT:  Then what's the explanation for this?

MS. MARIANI:  Well, Your Honor, if I may ask for a point of clarification.  I think what I'm hearing today is that the auditors are actually only requesting $440,000 in addition.

THE COURT:  That's all.

MS. MARIANI:  Well, in the proposed engagement letter that we were asked to sign, it was a total of $1.06 million so --

THE COURT:  Let me help you, it's going up because every time we're delaying this, the price is going to go up.  Am I clear?

MS. MARIANI:  Understood, very clear.

THE COURT:  Now, it may have been 440,000 a month ago, but this is causing me further delay in getting an audit out to the public, so the cost is going up.

MS. MARIANI:  Your Honor, we did request that clarification on November 6th, right after the order with the amendment, the proposed amendment and asking the City to sign it.  We're more than happy to take that to Council.  We just needed the clarification on exactly what amount they were being asked to sign off on.

THE COURT:  I want a guarantee today.  I'm tired of slow footing.  Either Matt Szabo is coming over here, I'm getting it from the Mayor, or his chief counsel back there, but I'm getting some kind of guarantee that this going to be a

**24**

representation in good faith to the Council to approve that.

Now, what the Council does, I'll wait.  But I want a guarantee that this is going to be a recommendation from the City.

MS. MARIANI:  Understood, Your Honor.

THE COURT:  Okay?  So, counsel, you're back there in the back, you've heard me loud and clear.  I don't want to run the Mayor over here, I'm trying not to be impolite.  I want a guarantee that this is going back to the Council.

Now, I want you to look at this agreement between A&M and the City and I want you to turn to paragraph 6.  And I want you to pull that up for a moment, because we had quite a tussle at the bottom of this, and can you help me?  We can just put this on the board.  So you can understand the Court's frustration with this, nickel and diming frankly.

Go to compensation and it's going to be the May 17th, 2024 letter.  And here's the tussle taking place behind the scenes.  And once again, counsel, you weren't involved in this, okay.  So listen carefully so we catch you up.

Under compensation, under Subsection 2, which is on page -- and my apologies, I said 6, but it's 2 and I'm counting letters, it's 2 under compensation.  A&M will perform the services described herein for a fixed fee of 2.2 million, which includes any additional expenses A&M incurs for travel and administrative expenditures.  That said, the purpose of this

assessment is to provide transparency to the public, ensure the assessment is adequate and transparent on behalf of the public and three, help policymakers make data driven decisions to address the homelessness crisis.  These objections will not be compromised by a budget imposed by the City Council.

Now, behind the scenes, counsel, listen carefully, we had a real tussle over this because the City Council took the adamant position 2.2 or take a hike.  And my position was, that's ridiculous going into any audit we don't know what's going to occur.  And one of those things that occurred was Ms. Meyers pointing out to the Court at the time that the police weren't being audited.  In fact, she made an additional request concerning fire, jails, because the amount being spent on homelessness through the City is vastly less when we deal with shelter and housing than the real costs coming through jails, our largest psychiatric ward is at the jail.  That's a County having to pick that up.

Fire, police, so the actual cost that we're dealing with here are much greater dealing with the homeless issue.  But we go on to say these policy objections will not be compromised by a budget imposed by the City Council that limits the adequacy and sufficiency of this assessment.

I insisted that that be put on or put in.  And accordingly, the Court retains the right to modify the terms of this agreement to seek any additional services from A&M.

Now, those are additional services.  These aren't the same services that we've been requesting through this audit from day one.  These are the things that we expected and with this delay, that's what's costing money.  Is this the City's fault, LAHSA's fault?  Whose fault is this concerning delay?  Because you're paying for it.  It's coming out of your pocket.

**MS. FLORES:**  Right.  I think the auditors have recognized that the City has attempted in good faith to satisfy all of their requests.  We do not completely control LAHSA.  LAHSA is an independent agency, so some of the delays listed are delays and inadequate documentation from LAHSA.  And the City is only one of the two partners in that JPA.

**THE COURT:**  Well, Lindsey Horvath at the last hearing said LAHSA is us.  Very candid, very honest.  And so the segmentation of LAHSA being a separate entity, LAHSA is the City and the County.

**MS. FLORES:**  Yes, it's the City and the County.

**THE COURT:**  City and the County.

**MS. FLORES:**  Yeah.

**THE COURT:**  But the cost is falling on you and I understand that you feel that that would be unfair on behalf of the City, so do you want to split it with LAHSA?

**MS. FLORES:**  Yes, I -- yes.

**THE COURT:**  Sounds like a good idea, doesn't it?

**MS. FLORES:**  Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

**27**

THE COURT: Have you asked them about that?

MS. FLORES: No, we have not.

THE COURT: Because this is silly. We're getting held up over $440,000 on a vastly -- we haven't even got to 2.8. And I'm not going to allow this to be an inadequate audit so. And you better quote me frankly to the Council, send that message back to them.

Okay. We're going to go through this audit for a moment. I want you to be able to see a screen, so if you need to take some chairs, do you have anything else you'd like to present at this time. Michele, I'm going to call on you just a moment. Diane, do you have anything?

MS. BANG: No, Your Honor.

THE COURT: Okay. Michele.

MS. MARTINEZ: Yes. If A&M can please stay, you know, as I'm overseeing this assessment I think it's critical to understand and appreciate A&M being diplomatic in regards to the delays. Regardless of the audit that was provided by the County to LAHSA, we have other issues of concern, not just on the City side and LAHSA.

When you have systems in place that aren't able to deliver financial information based on money being spent on homeless programs or services, and you can't get that information, obviously something is wrong.

And we can't continue to go back and forth trying to

validate, verify, because it's going to take us more time. So what we need from the City and from LAHSA is to either say, our systems are inadequate, they are not in place, we have no -- we don't have the appropriate accounting controls so that we can move forward and get the assessment and let both A&M and LAHSA, but more importantly, the City understand that time is of essence here.

One, because the City is having to spend the money for this assessment, but number two, we are already delayed when this assessment was supposed to be provided to the public. We are now looking at potentially February. And so what I'm asking A&M today, time certain, whatever data that is pending that you provide a date and that both LAHSA and the City do whatever it has to to either say they have the information or they don't, or they don't have the systems controls in place. And number three, provide what you can and A&M will do what it can. But going back and forth we will never get an assessment done.

And so I want to be very clear not just with the Court but with the City, with LAHSA and then finally with the County as we're trying to move forward and get that angle. And if the County is going to move forward and I know you still have to talk about that issue, Judge, but if they only going to provide the data which they've been open to, but not the spot checks we need to know that today and again time certain of

when that information is going to be provided.

And that is it.  We are not going to have any more delays and so what I'm asking from A&M today, you are the experts to tell us based on what you've provided us and what's missing, what can we anticipate and more importantly, when can the public anticipate that this assessment will come out.  Thank you.

THE COURT:  Yeah, you're wasting time going back and forth because A&M is not getting the data and we're going to go to this auditor/controller report, and once again, I want to compliment Mayor Bass, because she had the courtesy to come forward and order an independent third report or auditor, first time in the City's history.  And the courage of Lindsey Horvath and Kathryn Barger, quite frankly to order this independent audit as well.

And so I want you to put up the auditor/controller report for a moment.

MS. COLLIER:  Can I just state a response?

THE COURT:  Yeah, grab a chair.  I want you to be able to see this.  This is going to tie in in just a moment to some questions I've gotten.

MS. COLLIER:  Special Master Martinez, did you want like the response in terms of like what --

MS. RAFFERTY:  Thank you, Your Honor, Michele.  We would love to have the City, County, LAHSA tell us the data

EXCEPTIONAL REPORTING SERVICES, INC

doesn't exist.  This back and forth of we gave it to you but it's not adequate, it's not what we asked for, it's not complete, I think everybody just needs to be really honest that the system is completely broken and who gets penalized.  The people on the street.

So someone says to us the number -- it's not -- we don't have it.  We never put accounting controls in place.  We never had contracts that tracked outcomes or ensured the care delivery and services.  We would be okay with that.  I mean, not ethically we wouldn't be okay with that, but we would at least know how to move forward.  And that will be in the report.  It will reflect that controls were not in place, but this dance we're going back and forth are -- it's very labor intensive, we have a huge team working on this.  And it will delay the report.

**THE COURT:**  Now, some of the things that you've noted in your request in showing these delays are absolutely mirrored in the auditor/controller's report.  And so I'm going to have that auditor/controller's report put up.  I need you to get some chairs and look at this closely, okay, because this just came in yesterday.

I want to go to page 1 of 16 and when that's up, Karlen, make sure I can see this on my screen also.

This concerns the $82.5 million.  Okay.  Do all of you folks have that?  Because I want to put it up on the screen

and underline it.

Yeah, and then blow up if we have to and get a chair because you'll be there a while.

All right.  Now, go down to number 1 please.  All right.  In 2017 to 2018 through 2019 to 2020 the County provided LAHSA approximately $82.5 million.  No contract.  No scope of work.  These sub-recipients and I'm going to call them providers, were allowed to retain these advances across multiple fiscal years and were not required to repay the funds annually.

LAHSA did not establish formal agreements, which means no contracts with the sub-recipients, that's a provider from now on, to determine how and when the working capital advances would be repaid.

Now, when you turn the page for just a moment, you're going to see that there's been some effort to recoup this money and we have a grand recoupment over $2.5 million.

Now doing math late last night I came out with a figure of $48.3 million that providers have obtained with no contract, no scope of work, and some effort to recoup 2.5.  Who are these providers?

By name I would like to see today, in fact, I'm going to demand since we have that information from the auditor/controller of the company who these rather special people are as providers, who can obtain 48.5 million and then

**EXCEPTIONAL REPORTING SERVICES, INC**

the City and County comes to the Court and says we don't have any money.  Who are they?

Okay.  We're going to sit here today until we have those people come or not those people, but that information. And if you go on, you'll see that about 36 million from memory, are among a small subset of providers.  Have they been sued or did they just walk out with almost $50 million of taxpayer money and now we have an accounting issue about and some excuse that it isn't going to be repaid to help us with the homeless community.  And I'm going to sit here all day until I get that information.  So whoever, Mira, you need to call, I don't think you've got it with you.

**MS. HASHMALL:**  No.  No, Your Honor.

**THE COURT:**  And this just got to me yesterday, I mean, I was up all night with this, okay.  So it's not fair to you to put you on the spot.  Please make some calls.

**MS. HASHMALL:**  Okay.  Thank you.

**THE COURT:**  Get the auditor/controller over here and I want those gifted providers put on the record.  Eventually, LAHSA, you're going to have the floor and I'm going to ask you what efforts have you made.  Have you gone to the U.S. Attorney's Office, have you gone to a private lawsuit, have you gone to some kind of process or is the taxpayer just stuck with money literally gifted and handed out to providers to the tune of $50 million.  And we're going to forgive and forget that,

because this Court's not.

So one, who are the providers that have not repaid the funds.  I typed that in as a question, so you can see it.  And how is this outstanding 48.3 million in cash advances being recouped now.

All right.  The second is the sum of 8 million, but it's really 15 million if you read this carefully.  And these are what we're going to call annual cash advances.  And LAHSA had approximately 15 million in outstanding cash advances made to providers, not sub-recipients, but providers.  Some of your sub-recipient providers have refused to pay this, and the excuse is that they're no longer doing business with the County, so therefore, it seems -- or LAHSA, so therefore it seems that you've given up any recoupment from civil or criminal liability.  And I'd like an explanation about that.

The third is the inadequate contract data.  And, Diane, this is where A&M and your request today seem to tie in exactly with what the County auditor found.  LAHSA was unable to produce an accurate list of all their contracts in EGMS.  There are varying contracts total from 676 to 1,078, so from my standpoint reading this, we don't even know the number of contracts we have outstanding in 2024.

LAHSA is not tracking key data in EGMS, or maintaining an accurate data, and we reviewed a sample of the eight contracts.  Now, remember this is a small sampling, this

is just eight contracts of the hundreds out there.

And the findings on the next page are, they do not capture the dates of LAHSA's contracts and when they were signed by the parties and executed.  And by the way, this is 2024 now.  This is recent.  This isn't in the past.

They did not match the dates on the actual contract when they were found, and if you remember, and I'll go back on the record to 2021 when this Court was astounded that a major provider had literally written to the County, City and LAHSA, because you're all one in the same, with no date, one line asking for $248,000 that was paid.  No underlying documentation.

The next is of the four of the contracts, the term start dates in the actual contracts are inaccurate.  And the conclusion is you don't have reliable and accurate information about fundamental contract metrics, such as the quality, timeliness, in terms of the active contracts.

And so what's happening is, the City is going to end up paying for this one way or the other from this delay and from the City's perspective that's unfair, because they're not causing the delay from their perspective, it's the lack of information.

So if you don't have the information at some point, you need to just state it, that you don't have it.  And I'm becoming concerned that you even have this information now.

All right.  The fourth, is inadequate controls. LAHSA did not have other basic controls in place to ensure cash advances were appropriate, properly accounted for or safeguarded.  As of September 6th, 2024 the County had already provided LAHSA with $115,658,400 and major H advances for fiscal year 2024/2025.

One of the reasons that this Court wanted a website going forward regardless of this audit, was to make our providers put up not only the invoices but the worksheets so that all of us could see what they were doing.  And I'm going to be asking you when you take the floor in a few moments, what controls are in place for this money today.  Okay.

Because I don't see a website right now, other than controller's efforts on the City's behalf, that is robust enough.  And every provider should have not only the scope of work, but the invoice, they should have an underlying document.

Now, let me speak to the City again.  This may be a problem, it may not.  Do you listen to the what can be the homeless -- housing and homeless, do you listen to these four hour commissions?

**MS. MARIANI:**  Not all of them, but I have listened in, Your Honor.

**THE COURT:**  Interesting, aren't they?  You might talk to Michele and she'll pick out some.  Now, first of all you used to front 25 percent of the money to the providers.  And

historically the providers really didn't have to tell you much about what they were doing, because that was front loaded because your provider was complaining we're not getting paid in time.  In other words, we're actually have to carry some of these costs.

Well, this system was set up to be provider oriented. It wasn't set up to get this money to the street.  And so what happened is the Council then discussed 50 percent, but I believe lowered it to 40 percent, Michele, is that correct at the present time?  And now you've moved to 40 percent fronting money to a provider and when the invoices come in, if they ever do, and the worksheets, which they're not, then we've already paid the 40 percent without knowing what our provider is doing.

And I would just suggest to you that there's a better way, that you might consider doing business is that these payments should come in with invoices and worksheets attached and they should be within 7 days or 14 days or whatever or 30 days.  Because the problem is the bureaucracy isn't functioning quickly enough so the providers feel that they've got a legitimate claim when they're carrying this, because quite frankly ineptitude of the City and if you were paying your bills on time, we wouldn't have to front 25 or 40 percent and a Court wouldn't be in the position, nor the auditors, being in a position of not getting timely data because we're not getting it when you're fronting that money.  I'll leave that to you.

You're the governing body.

So six, we all know that the County is a pass-through agency in a sense.  The City's not.  The City pays out of your general budget, don't you?

**MS. FLORES:**  Yes, Your Honor.

**THE COURT:**  Yes, you do.  Yeah.  The County doesn't in a sense.  The County takes HUD money and pretends like it's theirs.  Now, they've got a certain amount of money that, you know, the County can use, but it's painful for the City.

So out of your budget, which is about what, 13 billion this year, a little over, and the County has about 43 billion, 42.5, 43.  Much of this money is HUD money that really isn't the County's money, it's pass through money.  So I understand that this is painful for the City.  And here it says, LAHSA paid their sub-recipients, which are providers, prior to receiving reimbursement for funders, and used funds received from other government funders.

Now, I'm going to tell you a story, I won't mention Orange County.  Bankruptcy.  And they did a little bit of shuffling about seven years ago.  And what they did is they took funds dedicated for homeless and shuffled into other accounts and they used the interest off that money to help pay off the bankruptcy.

Now, think about that for a moment.  That means those other entities, you know, those other bailiwicks that needed

money had some shuffling going on because the interest draw for this is so astounding when we deal with this kind of money, including maybe the $500 million not expended by the City of Los Angeles, that at least in another county it helped pay off the bankruptcy.  That's absolutely unethical and it's illegal.

What's the explanation from LAHSA eventually, how you take money from other programs, just maybe as needy, and shuffle them to providers and the impact is stated on the next page.  Using funds received from one government funder to pay for services provided under another government funder's contract grant constitutes a misuse of those funds and increases the risk that funder payments are not available for the purpose they were claimed and received.

That's a nice way of saying, misuse, I think it's illegal and harmful.  And I think we're putting a tuxedo on the pig and dressing this up by saying misuse.

Number 6, late payments to sub-recipients.  The providers have been complaining to Mayor Bass, rightfully, look we're not getting paid on time and she wants to keep these providers for the good of the homeless and working together.

But the providers have brought this on themselves also by not getting timely reports in, by delaying these reports, quite frankly, and I sure want to know where that $50 million has gone when we say we don't have any money.  And I think the public is going to want to know that too.  Or do

these people just get a free gift on the street corner of $50 million as providers with no contract, nothing that we know about work, nothing about the scope, it sounds like a gift quite frankly.  And I don't know why they're not being pursued minimally civilly.

The recordkeeping.  Number 7, this is fascinating. 12 of the 36 providers that received working capital advances totaling 34.6 or 68 percent of the total 50.8 million in working capital advances awarded, in other words, what we've got is what I call the big 12.  I want to know those names also.  I'm going to sit here, in fact, and demand that I have those names of these providers who are getting this amount of money.

Also the understated amount of the working capital advances of two separate recipients of 505 million, that really means that there's about $500,000 -- I said million, I'm sorry, 500,000, that means that there's really about $500,000 that just went out the door.  And there's no documentation.  And so who are the providers who were gifted this $500,000?

Go to number 9 for a moment, inadequate contracting monitoring plan.  Now, first of all, 50 percent of these programs, according to the auditor/controller and I'm going to read back the Court's own recitation of this in 2021, it's going to sound like Groundhog Day, when I read this transcript back to you.

50 percent of these programs aren't even monitored. So we're just going to deal now with the 50 percent that are being monitored and of the reviews, they do not include procedures to monitor a sub-recipient's program or provider's program or service or any delivery compliance or adherence to eligibility requirements and LAHSA did not have a process in place to ensure this form of monitoring would be completed.

So 50 percent, folks, of these contracts don't even have a monitoring procedure plan.  And now we're going to take the other 50 percent and our findings is, there's no way to monitor these.  And the result, by the auditor/controller, is quote, result in the waste or misuse of public funds and critical services not being provided.

Number 10, the contract monitoring centers because it ties right into what A&M's frustration is with this.  First of all, they took a sample of the contract monitoring reviews, but I believe there's only ten.  This is a small subset, folks, of our contracts out there.

LAHSA did not maintain adequate work papers to support the results and conclusions for all ten reviews.  Work papers for all ten reviews did not include evidence of supervisory review.  We could not determine whether LAHSA adequately monitored their contracts to ensure providers complied with their contract terms.  I'm getting rid of the word sub-recipients, it's meaningless.

The next one --

MS. MARTINEZ: Judge Carter, on -- just on this issue here, at the last court hearing LAHSA agreed to provide the program compliance for the monitoring. I just would ask A&M, did you receive that information?

THE COURT: Come on up so we can hear you.

MS. COLLIER: Laura Collier. It appears to still be incomplete. I think there was some conversation, if I recall, between Dr. Henderson from LAHSA, questioning scope. And then we still have not received the grievances. We received a summary table, but not anything --

MS. MARTINEZ: Yeah, but the attorney specifically said at the hearing that that information would be released and so I'm -- and it's now been over a month so you don't have all that documentation because it's out of scope. And so we can't move forward if we're hearing legal counsel say yes here to this Court and then nothing is provided to you, because -- and then you have Dr. Henderson e-mailing you saying that it's not part of scope.

So we either need to know that you are either going to provide that information today or you don't have it, period. And we're moving forward.

THE COURT: In other words, Michele and I are tired of chasing this quite frankly, along with Judge Birotte. And if you don't have this information, LAHSA, just say you don't

have it.  All right.

**MS. RAFFERTY:**  And, Your Honor, I'd just like to add that when we asked for certain information and if it is supplied to us but it's meaningless, the grievances, we need to know where a grievance was applied, what was the follow up on that grievance, are there multiple grievances at a service provider.  To say there's this many grievances, that doesn't mean anything to us.  We don't know is that the same provider, is it the same person, is it tracked, is it monitored, how serious it was.

So to say, well, we've given it to you, but it's not something that we can use or analyze to say we understand how the grievance process works.

**MS. MARTINEZ:**  Thank you.

**THE COURT:**  The next is concerning delay and reimbursement claims and the fact that the providers didn't submit when there was a review of a sample of 20 by the 15th of the month.  So when they're requesting money, the question is why not.

And there was an attempt to contact the providers and only two responded.  Why?  These providers are being paid by the County and the City and by LAHSA.  They should be jumping to respond with this kind of money that they're receiving.  And so where's our control here?  And due to internal issues? Nonsense.  They're getting a lot of money.

Now, there's supposed to be planned audits.  LAHSA did not complete any of the four planned audits in 2022, 2023, why?  And you've initialed only two of those for 2023, 2024.  Why?  You have no risk assessment in No. 13 to see who our bad providers are, who aren't supplying data to us.  They shouldn't be providers.

Number 14, did not provide a formal action plan that outlined specific safeguards in place to address, to proceed or actual impairments to independents.  Your charter was last updated in 2018.  Now, I know a lot of this falls on a new administration with Dr. Adams.  He wasn't here for much of this.  But you are here for this most recent 2023 and 2024.

And so, I'm going to turn one more document to you and I'm going to review it for all counsel back, to Document 331, which is a transcript.  And I'm going to read from part of that transcript dated May 27th, 2021.  And, Mira, you weren't here at that time, Skip was.

**MS. HASHMALL:**  Oh, I was here, that was my birthday.

**THE COURT:**  So -- well, congratulations.  Yeah.

Now, at that time, the Court noted that first of all I wanted an audit at that time, so this is three years ago.  And number 2, that we couldn't account for almost everything that the auditor/controller has found in terms of lack of records, and that we couldn't account with any accuracy for over $600 million that flowed through this City.

Now, that doesn't mean the work wasn't performed. That just meant we couldn't get the quality of the work or even if it was performed. And so if you were put on warning in 2021 by this Court, now what did you do in the meantime to rectify this situation, because the auditor/controller three years later has found much of the same things that this Court noted and I'm going to read you from the record, so it's going to sound like the Rocky Horror Picture Show and you were on notice and the City was on notice, and the County was on notice.

So I'll skip around a little bit. And let me set the scene that you actually did have a snap audit. You had a snap audit of a three month period of time and now I'm going to need help, this is going to get complicated for a moment.

I'm not going to go through the entire transcript with you, but what the snap audit found, could you go to these documents on the auditor/controller, it's page 10 of 119. And I've got a bunch of notes on the side, I don't care if counsel reads them. Blow those up for a moment.

So I'm going to read from page 36. Actually it starts a lot earlier, and we've gone through a whole recitation about how much money LAHSA has received from the County and the City, and at that time, the State had about 13 billion plus invested.

And about that time, the budget had about $150 million carryover from the last year and hadn't been spent on

homelessness.  Line 12, page 36,

"So as you look through these documents you'll find that there's a snap audit that takes places in July through September of a very limited number of providers.  And what you're going to find that these were two of your primary providers, two of what I call the Big Fish and they didn't have any records, they didn't have any data.  In fact, it had to be reconstructed I believe by the County and by LAHSA.

And I'm going to eventually ask you as you read through these documents with me, with Mr. Miller, since you're the County in measure, some difficult questions about data that was retained or not retained or even given to the Board for their consideration, so follow closely."

And then I can skip much of this.

Next page, page 37,

"So I want to look at the first box and it says right where the 1 is,"

And I'm going to read it because it's small print, so Mira, can you -- I mean, Allie, can you find that?  And can you blow it up on the small print because eventually there's also a letter that the County Board of Supervisors has,

"During our review, LACDA, which of course is

**EXCEPTIONAL REPORTING SERVICES, INC**

Los Angeles County Development Authority could not really provide the detailed supporting documentation for their July through September 2018 performance data."

So the County controller/auditor was on to this. I don't think anybody realized the magnitude of this at the time, and specifically LACD did not maintain point, quote/unquote, did not maintain point in time details for the reporting period, i.e., and instead maintained real time running totals.

"Well, what does that mean? Mr. Miller, what's the difference between real time and running totals and point in time?

"Mr. Miller: I don't have a clue, Your Honor. Well, hypothetically point in time might be I submit something to you with these dates, a bill, and it tells me what the bills are for. And in real time might just be a compilation of a running total if you will, of bills that mount.

"So I bill 100,000, I bill 150,000, but I'm going to be asking you in this audit in just a moment,"

And then we'll just skip over to the next page, to page 38.

"Now, turn the page for a moment and you'll see recommendation number 2 or finding No. 2.

**EXCEPTIONAL REPORTING SERVICES, INC**

It's on slide 11.  Quote, we noted that Lot -- LACD does not require the PHAs to provide supporting documentation such as detailed accounting records at the time the quarterly expenditure reports were submitted."

And then go through a long dissertation about how much money flowed into LAHSA, et cetera, year by year.  Go over to page 39,

"The Court:  216 million.  That's your measure H.  The implementation date if you look off to the right-hand corner, it's a year and two months later, so in this snap audit, which is what took place over a three month period of time, what our bureaucracy is discovering, oops, we've got a problem in terms of inaccurate and not supported data, but we're going to take a year and two months to implement that."

What occurred here was these findings were made by an auditor/controller at the time, but it took a year and a half of your bureaucracy to get to this Board for any attempted correction, while all this money just continued to flow out, with no data.

So down to line 14,

"Now in the meantime, and this is going to be complicated, I want you to turn to slide 15 for

EXCEPTIONAL REPORTING SERVICES, INC

**48**

a moment and if you can track this, I want you to go down to 15 and you'll find the third bullet point. And then we talk once again about the number of measure H funds that are flowing in.  And we move over so we're not boring you with the figures to well over $600 million.

"And that's noted on page 41.  So, Skip, just in rough figures take 398, well it's roughly 503," And by the way, this was just in one year for measure H funds.  Because it was under reported, they received a lot more money.

"And I'm sorry, it should be about 440 million but we'll take these figures that come from the County, we'll take 398 and I'm referring to million and we'll under represent this for you about 340 million, so I gave a discount arbitrarily to make it look better.

"And then we go down to the fact that the County's figures are under representing the 309.8 million because if you follow this, you really received 503 million, much more money than is being reported.

"Okay.  Now, I want you to go and we're almost done to slide 12 for a moment and look at LACDA's response because January 22nd of 2020 without the

Board knowing, in my opinion, because I don't know that this ever got to the Board, for the bureaucracy, the information came as follows,

'There's an agreement between LACDA and the providers that from now on, we're going to have printed on the report to ensure that the reporting period reflects the point in time details that correlates with their data.  Someone could read that as bills being handed in without dates, not able to match up to project, and number two, that the providers are retaining the data that's never going over to LACDA.'"

Now, this is in 2022, 2021 and the Board fully knows about this or the bureaucracy does at the time.  And I'm going to ask in the three years what you've done that's any different than the auditor/controller report coming in from the County? It's the same.

There could be -- line 11,

"There could be speculation that LACDA didn't get the underlying data, that this data is being retained by the providers and only through the spot audit with two of the providers is this being recommended or being noted with really tens and tens and tens of providers out there."

In other words, we just had two of the big fish, we

**50**

don't have the hundreds of contracts and the hundreds of providers even that we're able to monitor.

"The Court:  And the response we got back was it's something new, and it's not new.  And that's an order by the Court unless the Ninth Circuit stays me.  There has to be an accounting here."

I believe that after this, the Board did, in fact, did get the January 20th letter, and Mira, you've got that in your possession over at the County.  If you don't have it, I'll pull it up, because the Board got notice of this.

All these deficiencies, but the spot on doesn't show any data.  It doesn't even show dates.  It doesn't even show that LACDA got the information because LACDA is trying to reach back to the provider to construct it.  So what LACDA was doing at the time, since the provider didn't have it, they were helping the provider reconstruct it, which I mean, rescue it.

We've got about -- line 15,

"We've got about 600 million that flowed through with no accounting in this one year in 2021.  And it seems to match with what Elaine Howle is saying, because if you would now turn back to the state level and you would turn back to slide 5 and read this together, 'The State does not track the funding it provides to combat homelessness.'"

Let me repeat that, in case any of you missed that,

"The State does not track the funding it provides to combat homelessness which could perhaps be the biggest problem of all.  There is no single state entity that comprehensively tracks the sources of funding that's intended, its intended uses or related expenditures for these programs.  Nor does the State, 'track how much funding is available to spend towards addressing homelessness statewide.'"

That's from your State.

"But if this was a problem then,"

And this is the Court speaking,

"just make certain now that this data is coming in to LACD from our providers in good faith with the correct date, you can underline that, and time so we can match up what they're doing.

"So we can have milestones and accountability here, because the argument could be about $600 million or more flowed through with no accountability and no tracking."

And you completely ignored this Court.  I called for this in 2021 and I think everybody walked out and just completely ignored this Court and you've been on notice about this.

In short, 2017, 2018 do we have records or not?  2017 up to July, September we know on the spot on we don't have it. We don't even implement now for a year and three months later, so once it was caught in a sense, the Board didn't even know about it through the bureaucracy of the County for a year and three months.  And more money flowed out the door.

The demand should have been by the County under Measure H about where is this money going and the Board should have been notified years earlier and the Board was notified in 2021.

So I'm looking for an explanation today since it matches the request by the A&M concerning these delays, about no data, no monitoring, what the explanation is from LAHSA and I hold the County responsible for this and I hold the City. And in a few moments, Mira, you're going to tell me I don't have jurisdiction.  I've got that down.

But I'm going to say that you are LAHSA, just like Lindsey Horvath said, she accepted responsibility, refreshing. And I don't see why there isn't an additional spot check by A&M, because otherwise they're just working off of data and there should be at least ten more sites checked, where they can go out and verify the services are being -- now you can turn me down on that, I understand that, but I'm going to be asking you then, what would you do as a judge, do I then just adopt the findings of the auditor/controller and make that a part of the

**53**

findings and write as a factual determination that the County is unwilling to participate in these spot audits to verify, they can be minimal, probably ten or more, but at least it would give us a sampling.

Okay.  So, LAHSA, your turn.  And when you're speaking, you're not a separate entity.  I hold the County and the City responsible for this, because they are LAHSA.  And this trifurcation is ridiculous.  In fact, it's the perfect system for irresponsibility and not accountability.

**MR. YAP:**  Good morning, Robert Yap, counsel for LAHSA.  There was a lot of issues that were thrown at us this morning.  The one thing that we'd first like to address is this issue about data delays in responding to A&M's request.

Now, LAHSA does support the goals of the parties here, the goals of the Court and LAHSA has not delayed in -- has generally complied which is what the words that A&M has used, has generally been responsive and has complied and LAHSA has prepared an exhibit of -- containing a description of the 71 requests that A&M submitted, the date it was submitted to LAHSA, the due date that was given to LAHSA, and the date that LAHSA actually submitted to it.

We're willing to have this -- if I can put this on the Elmo, Your Honor.

**THE COURT:**  Sure.  And I'll make it a part of the record for you.

**54**

**MR. YAP:** Thank you. And so these are the -- again, oops, sorry. These are, as I mentioned, these are the requests that were submitted, they're numbered, they're all itemized. And as you can see from the first page, that LAHSA had submitted those requests before the due date. And there's about seven pages, Your Honor, and we have identified probably about 12 out of the 7 requests that were not done on time.

Three of the requests were beyond a week. The other eight, I'm terrible at math, the other nine or so were within a couple of days or under a week, Your Honor. But generally LAHSA has complied and provided the information.

Now, it was asked by -- I'll just use this as an example, Special Master Martinez talked about the grievances and the request that was made, that was made at the hearing last time, LAHSA provided those on -- let's see where it is, October 24th. And A&M had indicated, you know, that the data that was received, they couldn't tell what was -- what the resolution was, or what further action that was taken. And that might be.

But in responding to these requests, LAHSA has provided the information, the records that they have and I feel that the issue is, is it's the quality of information. And that doesn't mean though that LAHSA didn't submit the records that it has.

If there's missing information in those records, it's

**EXCEPTIONAL REPORTING SERVICES, INC**

not because we're withholding it.  There was an issue, Your Honor, if I could just continue, that was brought up last time, it was a question that Special Master Martinez asked about, you know, tracking, funding from a City Council level versus a small level and Ms. Trejo, CFO from LAHSA just mentioned, well, we don't -- we track on a small level.

So the information that is missing, it's not on the records, it's just the way that it's tracked, but it's not that we're withholding --

THE COURT:  Then say it's missing because it's costing the City money to chase this data.

MR. YAP:  I think -- well, I'll get to it.  I think we've stated, LAHSA has stated we provided the information and one of the -- I'll use another example about, there was -- about what A&M had mentioned about having requests that were initially done in July or June, LAHSA -- it received initial information but it needed to do a crosswalk and it didn't consider that the information -- and then LAHSA had to supply additional information and didn't consider receiving -- A&M did not consider that the information was received until August, but that's not what actually happened.

LAHSA provided what it had.  It needed -- the information is complex and we know, we understand that A&M has a hard job.  And if I could just quote Your Honor, this is -- A&M has mentioned these issues before.  I'm looking at the

**56**

transcript, Your Honor, from August 29th, I believe it was Ms. Rafferty, I'm reading from page 21 of the transcript, she says -- this is specifically regarding data received by -- from LAHSA.

"It's very, very difficult or very convoluted. The documentation sometimes comes to us and it's not complete or it doesn't make logical sense, some of the data. The lack of information that we talked about the HMI system it's very archaic, it's very cumbersome. So we know when someone is trying to get us information and they can't get it through their system, it's not due to lack of intent, it's not there."

We, LAHSA, is in good faith providing the records that we have. And it's -- and then obviously that generates, which A&M has also touched upon at that hearing, it generates follow up requests, but that doesn't mean that we didn't respond to the original request by the due date.

They analyze information, A&M has to understand -- realizes that they need to either provide a more focused request or a new separate request in order to provide that. And when they make that request, we generally -- we comply and respond back. But that doesn't mean, you know, as -- there was a description about an exchange of communications, that doesn't mean that we didn't respond to the original July request.

**EXCEPTIONAL REPORTING SERVICES, INC**

And going back to that initial hearing, Your Honor, A&M had mentioned that, had mentioned that issue.  I believe it was Mr. McKee who mentioned reading from page 18 of that transcript,

"Wards were involved with working various counterparts of the City and LAHSA to provide us information."

So she's communicating with them, but we need to ask the right questions and make sure that we get the data that is vital to our review.  So there are follow ups, Your Honor, and we're complying with them and LAHSA continues to -- intends to continue complying to the best of our ability.

Those are the records, though.  I don't know how else LAHSA can state it when a request is made, we are providing what it has.  And you can make judgments about it, you know, the report is clear about what's happening and not happening, I'm talking about the County's audit, but those are the records, we are complying, we are providing the data generally within either early, on time, a couple of a few instances where it was, you know, late, but it's not -- it's within good faith, Your Honor, and diligently.

**THE COURT:**  Michele.

**MS. MARTINEZ:**  Your Honor, if I may, I want to go back to the grievances, because the last time we were here I said that if you did not want to give the information directly

to A&M that you would seal that with the Court, the grievances. We didn't want redacted information.

If you go back to the transcript, we had a 25 minute conversation that even the LA Alliance chimed in and said it was important for that information to be provided as well, so that A&M can make that assessment as they were going over their grievances.

You agreed to providing that information directly to them, you didn't submit it -- you decided not to move towards and sealing the information and giving it to the Court.  And here we are, that the information of the grievances were redacted.

We can't do an assessment, you can't review any of this if everything is being redacted.  That's why we were very specific and when we asked you, if you feel uncomfortable, we can seal this with the Court, you ended up telling me not an issue, we will go ahead and submit the information.

There were certain -- I think there was one or two items that you spoke about that you were going to redact, but you weren't going to redact everything.  So I don't know why we're here, even at this point, when this information -- whether it's part of the scope or not, this is an issue that we specifically asked you to go through the Court or give it to them specifically and that was not happening.

And here we are, now in November, and November 21st.

So my question to you is that you stated to the Court one thing and LAHSA staff presented something else. So it's not -- that is considered a delay in my book. If you don't consider that a delay, then I don't know what a delay is. That -- we've now delayed this specific process in regards to the grievances and that was just one request.

So the other thing that I will state as well that I do appreciate LAHSA and specifically Dr. Henderson has been responsive and submitting, but the issue is this, the information that is being submitted at times, does not correlate with what is needed.

And so obviously, you know, and I get that LAHSA has to deal with various systems, various government structures, sub-recipients and -- I get all of that. But the question here today is that you can submit something, but if it's not the information that we're seeking and we're having to go back and forth, that costs the City of Los Angeles money.

So moving forward what we're asking if this is the records that have, and that's what you have, great. And we will utilize those records and move forward. But we can't continue to go back and forth over and over again and we've been doing this since, you know, go back to your number one, since June, July. Right? And we're now in November.

So I think it's important to recognize, is that we're not here trying to say, shame on, LAHSA, you know, all you've

done was delay, delay, no one is saying that here today, what we're saying is if you have records that you are submitting, and they are not correlating to the information that A&M needs and you're saying that's all that you have, then let us know that so that A&M can move forward and saying, this is all the records that LAHSA has, period.

But if we're going back and forth and still don't have the information, we're never going to get this assessment done.

**MR. YAP:**  Understood.  Just a couple of -- I'll address the last one though and that is what our understanding is what's going on is we're responding to the initial requests providing what we have.  But there -- and we have the communications to back all this up, but then there's a follow up request to that and that's where you talk about that back and forth.

That's like a different request.  And so we're not -- it's not that we're -- you're asking X and we're providing Y, it's just these are all the records that we -- that LAHSA has in response to X and it might not be what A&M is looking for or what they were expecting, what they needed.  And then there is that back and forth and is initiated, do you have this, do you have that.  That's not a delay on LAHSA's part.

And as I said, we with Dr. Henderson, she's providing -- she's gathering what records they have for that.

And again,  understand that, you know, issues about quality but that's what the records are.

And as far as the thing about the grievances, I need to see the transcript, but I recall the Court saying then we'll hold that request in abeyance because A&M was right here, and they said we can -- we just need to redact the participant information.  My understanding is that is the only information that is getting redacted.  We're not redacting the site, the name of the site, you know, what occurred.  It is just literally the name of the participant and we said we would disclose that.

There was -- the issue I understand from plaintiffs was about the -- it was about the pending investigations, and we said we'd be willing to work it out, but based upon the agreement that I understood that I made, which is we could redact the grievances and we could redact just again participant information.  And that's what we provided.  And that's what we provided on October 31st or whatever that date was.

Unless the Court has any further questions, I have nothing.  Other than to reassure the Court we are providing and we'll continue provide with whatever request.  We have this exhibit, Your Honor, that goes all the way to page 7 --

**THE COURT:**  When you put out a bid, when you put out a bid, you have to put out the scope and you get a response

from a provider.  That provider gets into a competitive situation and eventually LAHSA, through whatever means, picks a provider.

You already have the information, not only about the scope of the contract, at least those contracts that you can find, but there's absolutely no reason why you're paying out money without an invoice and substantiating documentation that goes with it.

And what we're getting, quite frankly, is very little because 50 percent of your contracts aren't even monitored, the other 50 percent we've only gone through a spot check on and they're disastrous in terms of their performance.  And how are we ever going to get transparency for the public and get this up on a website, other than just accepting, you know, gee, we're going to do better.  Because I've been hearing that now for three or four years.

When are we going to get this data in a timely fashion because you're not approving a contract unless you know what the scope of work is.  You've got this documentation from PATH or DLA already, you've got it from United Way already, it's easy to get to us.  So why aren't we getting invoices with substantiating documentation that goes with it?  And why aren't we getting some spot monitoring, even though the claim from the County is that I don't have jurisdiction, why isn't that happening?  Why don't we have this website up and operating in

a robust manner?  And I told you that with my redline before, so we had transparency for the public.  Because the audit that A&M is backward looking, what happened to the money.

If we were all on the same foot, we would be going forward and getting this documentation up and that's exactly what's not happening.

**MR. YAP:**  Your Honor, your points are well taken and --

**THE COURT:**  Then do it.

**MR. YAP:**  -- the --

**THE COURT:**  Well taken.  That's pablum.  Do it.  And I've been asking this forever.  Now what I am going to do about that?  I haven't decided yet, because I don't know if the City is going to be in default on the LA Alliance agreement and so I'm waiting to see where the City ends up on this, but whatever happens with the City is going to have repercussions for LAHSA and the County.

And so here's my request.  One, you two should get together right now and approve the $440,000 which is chump change, doesn't even rise to the lower estimate of 2.8, and actually have a guarantee from somebody who can give you that guarantee, whether it's the president of the Council or Matt Szabo or the Mayor that they're going to take this to the Council in good faith and request it, because I know you can't do that today.

Number two, with the other 600 and -- is it 20,000, Mira?  Yeah.  I think that there's an agreement about the 180,000.  But regardless of your position, you are LAHSA.  And it would seem to me that minimally we should have ten more spot checks, not more randomly selected in addition to your auditor/controller because that would give us confidence with the A&M report, which is going to be even more robust, then we've got some accuracy.

And it may make you folks look bad, but you already don't have the most favorable report, so I don't know how much worse you can look.  And I don't know why the County isn't going to exceed to that, for a minimal of $440,000 when you've got billions passing through.

And so what do I end up writing?  If you refuse, do I write down that the County refuses to cooperate in my final findings?  Now, you go and think about that and tell me how I'm going to get some guarantee today.

And number three or four, who are my providers?  I wanted to know these gifted special providers who have $50 million when you claim we don't have money.  Who are they?  And I'm ordering you now to bring those to me.  Understood?

And I'm going to sit here today or we can go through the auditor/controller because I'm going to have those providers today who haven't paid.

**MS. MARTINEZ:**  Judge Carter?

THE COURT:  Yeah.

MS. MARTINEZ:  If I may, if you're -- I know you asked for their original request, which was the 440,000 for the City --

THE COURT:  Saying 440 --

MS. MARTINEZ:  -- and then for the County I don't think you've asked the County yet.  I know the County I think --

THE COURT:  I'm asking --

MS. MARTINEZ:  -- in concept it had agreed to the 180 just for the data.

THE COURT:  Yeah.

MS. MARTINEZ:  They did not agree to the additional --

THE COURT:  Right.

MS. MARTINEZ:  -- funding for the spot checks.

THE COURT:  I'm not ordering or making, that's outside my jurisdiction.  I'm asking to complete this, I think the County should come forward with the other 440,000 --

MS. MARTINEZ:  But you haven't given them the opportunity to comment on that.

THE COURT:  Well, I'm going to go around the room in just a moment.

MS. MARTINEZ:  Okay.

THE COURT:  Okay?

**EXCEPTIONAL REPORTING SERVICES, INC**

MS. MARTINEZ: And then just the third --

THE COURT: I want them to talk about it.

MS. MARTINEZ: Yes, and then just the third is for A&M just to come back to us on a time certain and when this information is needed, when do they actually need the renewal of engagement letters from both the City and the County if the County agrees by what time certain. It's imperative that we have that. And then I have a final question but you can go around the circle, thank you.

THE COURT: Are you sure? Do you want to ask the final question now?

MS. MARTINEZ: Oh, my final question is one for the City and the County. I just wanted to specifically, as we look at transparency and accountability, we know that the MOUs had been signed between the City and County, and I know we have -- we can get those documents publicly, but the Court wanted those docketed. So I want to ask the City today if you are okay with docketing the MOUs between yourselves and the County of Los Angeles that pertains to the LA Alliance agreement and how you all agreed to funding some of these services and programs, and then the same question to the County of Los Angeles, if they are okay with also docketing those MOUs with the Court.

THE COURT: So, Michele, go ahead and ask the question again.

MS. MARTINEZ: City of Los Angeles?

MS. FLORES:  Yes, those are public documents.

MS. MARTINEZ:  The County of Los Angeles?

MS. HASHMALL:  They are public documents, Your Honor.

MS. MARTINEZ:  Great.  So we can docket those.

THE COURT:  Want to make sure.

MS. MARTINEZ:  I'll go ahead and get them, Judge, and I will have those docketed public.  Thank you.

THE COURT:  Okay.  And lastly, I'd like you to hear a little bit from the community today.  I threw this open one time before, but most of you don't go down to Skid Row or other places in the city.  I'm not chiding you for that.  You get statistics in your bureaucracies, et cetera.  But you're not talking to people.

And whatever this is, I'll tell you straight out, if you walk down the street and talk to 100 to 200 people, you'll hear one thing that you're about to hear, and you need to hear it at least in this court because I know you're not going to Skid Row.  So I'm going to invite the informal mayor to come up for a moment, Kevin.  And I've got one question.  And then Amy and Terry, I'm going to limit this to a couple of other people.  But, yeah -- no, it's going to be five minutes.  That's it.

So tell them what's happening down on the row because they won't go down there.

MR. CALL:  Good morning, Court.

THE CLERK:  Please state your name for the record.

**MR. CALL:** My name is Kevin Call, Skid Row mayor. Skid Row mayor.

We reached one of the biggest topics here in Los Angeles. It's almost like a third world country here in downtown Los Angeles, Skid Row. I've been working with Skid Row for a while. I know exactly who comes to Skid Row, how Skid Row runs, and what's not hitting the streets.

The money is not hitting the streets of Skid Row. I don't understand the City and the County because we've got a lot of people here in the City of Los Angeles suffering at the hands of the politics of this city. This city here is a great city, but somehow we've got the wrong people in charge. The job is not getting done. Everybody at Skid Row who's doing the job is not getting paid to do the job. They come to Skid Row because they care. They put their money on the table at Skid Row because they care.

I have offered a lot of times I came to this court and offered the people that are sitting in this courtroom, and this city hall, and the city council, come out to Skid Row. See what Skid Row is. But if I'm too good for Skid Row, something is happening. If I can put a man on the moon, I can clean up Skid Row.

We've got a lot of technology, but a lot of people is not using it. And I'm pretty fed up with the County and the City for making a whole bunch of promises that they have not

been keeping.  We've got over 78,000 still homeless here in the City of Los Angeles like a third world country.

You go down there, you see women and children living in tents.  We've got veterans sleeping in tents who fought for this country.  Is that fair?  But everybody is lining their pockets up, and the people out on the street is the ones suffering.

I told Dr. Adams last time she was here, we've got to begin to do something here.  You give these people all this money, and somehow the money come up missing when it ain't been used correctly.  Something is wrong with that.  I'm an eye in the sky.  I will stand up for the rights of the unhoused here in Los Angeles.  Not only in this city, across this country, we've got people homeless.  If you ever hear the movie Americans With No Address, that's the homeless.

**THE COURT:**  Mayor, thank you.  I want to hear from a couple other folks, okay?  Just randomly.

No, no.  No applause.  This isn't a popularity contest right now.

**MS. SHAW:**  Good day, everyone.  My name is Suzette Shaw.  I am a Skid Row resident.  I write, talk, and I advocate Skid Row from a woman's perspective.

**THE COURT:**  Nice to see you.

**MS. SHAW:**  Yes, sir.  Likewise.  Yes, sir.

**THE COURT:**  I know who you are.  Thank you.  I didn't

**70**

know you'd be -- it's nice meeting you in person.

MS. SHAW:  Likewise.  Thank you.

So what I want to say, as a woman who was displaced to Skid Row just over a decade ago, you know, when I was displaced to Skid Row as a missing person over a decade ago, they were literally putting us as women on the backside of men's programs because they didn't have programs, resources, and services to support the needs of us as women.  Since my displacement to Skid Row over a decade ago, we've learned that black middle-aged elderly women are one of the number one demographics displaced into poverty and homelessness in Skid Row and throughout Los Angeles, not just year after year, but literally decade after decade by huge disproportionate numbers.

We have also learned that the intersection of domestic violence and trauma is part of who we are.  As black women, it's trapped in our DNA that goes all the way back to our ancestors.  I will say that I have been on the LAHSA CLC board since 2017.  I was vice chair for a few years, and I was chair for a year.  I've also been a member and co-chair of the Los Angeles Central Providers Collaborative in Skid Row, and I was recently appointed to the Skid Row Resident Advisory Council, and yet today I'm speaking as a resident of Skid Row.

I will say that I have been concerned as a resident of Skid Row and as someone advocating for our community with the fact of, you know, every year we send back so many millions

of dollars to HUD, to the federal government, where those dollars should be better penetrated and spent here in our community.

And I've always been very perplexed as to, even sitting on these different entities, I've always been very complex as to how so much money ends up getting pushed back, including with LAHSA, with HECLA.  Some of this has been monies that are related to supporting people with rental assistance. There's been huge dollars related to domestic violence, and somehow there is an issue as far as understanding and creating an infrastructure to really penetrating, as the man said earlier, those dollars into the community so that we are better being assisted as residents of the community.

I can say so much more, but I'll leave it there and just leave you with, we can no longer talk about equality and empowerment while continuing to enforce inequities.  Thank you for your time.

**THE COURT:**  Thank you.  It's nice meeting you in person.

**MS. SHAW:**  Likewise.

**THE COURT:**  It's the first time I've really had a chance to associate.  Why don't you come up?

Oh, by the way, would you go over to the Elmo and that presentation that Allie put up, right?  Thumb through that.  And Amy, before you speak, go back to that presentation

and you'll see women on Skid Row.  You have to thumb way back. I can do it probably quicker, Allie.  Keep going.  It's back there.  You'll see a whole section of women on Skid Row.

Now, the mayor is actively working out there.  Let me repeat that, okay? S he's out there.  Dr. Adams-Kelton, she came out there with Katherine Barger.  My compliments.  Thank you.  And the community took care of her.  We didn't need four cars and 50 police officers.  The community will take care of people going out there.  So my compliments to Supervisor Barger for going out there and she had Dr. Adams-Kelton go with her. I think they got quite a sample of the street.

I don't expect all of you folks, but this is back in 2021.  And these are your vulnerable women plus an aging population.  So put it on the Elmo.  Just flip through a few. Just women on Skid Row.

These are women who get raped.  And when you walk down the street, quite frankly, you haven't lived until you've got five women running up to you from a tent, literally, and saying, you know, last night we got accosted, we got raped. And those are just words.  Just go through it real quick.

**MS. SHAW:**  May I say one other thing, Judge, while she's trying to find that?

**THE COURT:**  Sure.  But just a moment.  I want this to sink in because most of these people aren't going to go down there.  Pictures don't do half the betrayal.  And my goal isn't

**EXCEPTIONAL REPORTING SERVICES, INC**

improvement.  My goal is to stop this.  This is rain.  She's got hypothermia, for God's sakes.  Half nude.  This lady is elderly.  Your population is aging down there.

This is 2021.  I've got a myriad of other pictures I could show you in the last three years, but good enough.  They get the idea.  There's another woman out in the street.  Okay.  Ma'am, if you'd like to one more, but then --

**MS. SHAW:**  Just really quickly.  I'd also just say that, you know, one of the things that's also -- that I've been advocating is a pathway to success for people living in permanent supportive housing in Skid Row.  There needs to be an infrastructure.

HUD has a guideline called "Moving On."  It's not a mandate, but it's about how do we support people and empower them who don't maybe need all the bells and whistles of someone living in a permanent supportive project base.  How do we help them move on if they want to go back to school, if they want to seek employment, on and on and on.  We need to do a better job.

I consider myself to be the epitome of someone who should be a "Moving On" person.  I live on disability.  I'm also a full-time student and in the Watt School of Social Work at Arizona State University, setting community advocacy, social policy with a minor organizational leadership development, and yet I live on $635 per month as my disability.  It's extremely hard trying to live on public assistance.  It's extremely hard

**74**

trying to work your way out of nothing, pull yourself up by your bootstraps.

I lived on $221 a month GR for five years, five years. And I live on less -- still below the poverty level and yet it's very difficult even when I was an executive in my former life and ending up in Skid Row, and now I still have to figure out and all the work that I do in the community, still have to -- I'm still a pathology because I've got a stigma on me as a black middle-aged woman, living in Skid Row. And it's very hard for us to -- there's a glass ceiling for us in these executive positions and working within these entities, including LAHSA. There's a glass ceiling and there's toxic environments. There's no support system to really help and I've talked to Dr. Kellum about it. I've talked to others about it, that we need to create a pathway to success for people living in supportive housing in Skid Row and help us move and empower us to move on in our lives.

THE COURT: Thank you very much. Amy, why don't you come up and then Don or whoever, but I just -- I need to limit this and then Michael for the medicine, and maybe Terry.

Tell them who you are. Tell them what you do.

MS. SIMPSON: My name is Amy Simpson and I run the non-profit Humanity Heroes. I started serving in Skid Row in 2024. I wrote my notes because this is -- it's a very emotional thing what happens down there, and many of you won't

see it, but those of you who have taken the time to come down and serve with us know that there's a lot of pain and suffering.

I started back in 2013 with LA City Parks and Recreation, feeding homeless people at Gladys Park and San Julian Park.  In 2016, I joined Humanity Heroes and since then we have distributed 50,000 red backpacks that contain essentials that many of us take for granted and these are essentials that are very hard to come by to people that are living on the streets and unhoused.

The unhoused that are left in Skid Row are mentally ill and severely on drugs.  These people are probably some of the hardest people to deal with, which is why they're not being reached because some of the housing that is being offered prefers an easier type of client than what we see that are in Skid Row.  To expect that these people will remember to go to their appointment to follow up for housing, it's not likely. You really have to, like, get involved and get the community to trust you to get them to follow the procedures and those sort of things.

Talking to people that live in Skid Row that are desperate for housing say that it takes up to two months for them to get housing, and there's no emergency housing available.  And two months to a woman who's living on Skid Row can seem like eternity.

I've met many women who -- they're being raped and tortured, held hostage for days with no food and beaten, and the wounds that they have are so visible and they're so hopeless, and this is every single day in Skid Row, and it's not fair, and they're forgotten, and they have nowhere to go.

Many people that are down there, the streets are filthy on a daily basis and they're littered with trash, and so when new people get to Skid Row, they become angry and they succumb to the drugs and alcohol problems that are down there. And not only is it alcohol and drugs, but there's also streetwalkers, women with AIDS that continue to do what they do to get money. And so there's a whole other issue that started that's spreading down there that's not even being talked about.

So, let's talk about the drug lords that are living in the tents and in the RVs. Many of this, you know, we've seen here sitting in the court, many of the funds go to security, but --

**THE COURT:** Tell them about the white car on the corner near Veronica, where the five kids are in the car and the bullets start going through the car. Lay that out for them.

**MS. SIMPSON:** Yeah. So there's -- yeah, there's people living in cars, mothers with children, and the cars just, you know, possibly wrong place wrong time, but they're getting, you know, shattered with the bullets. There's kids

inside.

THE COURT:  Five kids in the car.

MS. SIMPSON:  The mothers are homeless, so they're hopeless, and this is the conditions that they're living in. On every single floor of the SROs and Skid Row are drug lords that are controlling the benefits that are given to these housed but unhoused people.  So we have a huge drug problem that's not being addressed, and we're constantly talking about the homeless issue.  But I'm sure that anyone -- you have to address the drug and the mental illness before you could be successful with housing.  So that's why many of these people that are being housed end up coming back to Skid Row because they're not getting proper treatment.

And when they go into these housing units or, you know, rooms and then they die because they had a fentanyl overdose, there's not even anyone to go get these bodies out. So the bodies start decomposing.  There's just not really a lot of care for the amount of money that has been given to this city to help these problems.

Now that they're -- now we have immigrants and children that are down there and it really hurts my heart.  We do a lot of outreach, but when young kids run to the table and cut the line, we're in a position to choose very quickly.  Do we -- do we take care of the children that are running to the front of our lines or do we take care of the people that have

been standing in line, sometimes in hundred degree weather, waiting an hour or longer for us to set up.

We know what happens.  There's been studies for years what happens to people that experience trauma as a child.  So now these immigrants are coming and they're being left on Skid Row, where they're instantly or within days of being there suffering some sort of trauma, and these kids and families are people that want to be here to stay.  So we're bringing the kids to Skid Row, or however they're getting there.  They're experiencing trauma, then they're going to grow up and they're going to have different mental illnesses because of this trauma.

So isn't there a way that these kids can be bypassed out of Skid Row, the families, the mothers?  Because the people that we're already dealing with down there, there's thousands, and there's not enough help that's coming down there.  We've been doing outreach in Skid Row for a very long time, consistently.  We've gotten to know the community. Organizations have come together so that we can make a greater impact, but it's almost impossible to get someone from the city any type of representation to come participate with us.

When the director of LAHSA came down, it was very nice, but she was completely shocked about what's going there and to me, from my perspective, it made me realize even more that may have been one of her first experiences there, which is

very alarming considering this has been going on for so long.

It's just -- it's hard.  It's a lot to take in and the money is not getting to the streets and to think about 50 million dollars is lost, we could have done so much with that money.  Even if it's just cleaning up the streets and providing mental health.

There's nonprofits, just like Humanity Heroes, that are committed to this that have no funding.  We're getting donations from corporations of things, things that are on the verge of expiring, so that we could go and give to the community.

It's really heartbreaking because we're committed to doing this work and no matter how hard we work, the problem continues to get worse.  So you know, anyone that wants to help us from the City, the County, we're there.  We're committed to this community.

**THE COURT:**  You know, let's take them down in the rain.  In other words, it's all good in the summertime sometimes, although it was 129 on the asphalt with that lady walking around at bare feet.  Let's invite them down in the rain, and see some of the conditions down there.  See who shows up.

**MS. SIMPSON:**  Yes, I would be happy to do that.

**THE COURT:**  Okay?  Thanks, Amy.

Now, remember, all these folks are volunteers.  This

isn't coming from the County or the City, including all your water going down there on a water drop from UCLA and USC students.  So Don.

**MR. GARZA:**  I need somebody to hold me while I'm up here.

Judge, you know I've been down in Skid Row.  My name is Don Garza.  I am a disabled veteran on Social Security disability.  I am a combat veteran.  So I don't quit.  I don't give up.  It hurts.  Amy, I'm going to answer your question so these people can hear it.

You asked why is this happening in Skid Row?  Well, I'm going to tell you why this is happening in Skid Row.  When I got down there in '99, when the non-profits were few, the City and the County would throw money at the non-profits, just throw it at them, because they're the experts.  They know what's going on, with no accountability.  That was 1999.  It's still going on now.

The other issue is the undertone that the City of Los Angeles, the culture within the county, the city, and now its huge billion-dollar business of LAHSA is that Skid Row is a place where people are sent to languish and die in the streets and in the housing.  The objective of the County and the City politicians is to appease their constituents who vote for them.  So not everybody in Skid Row and downtown LA are the majority voters of these politicians.

So what do they do?  You may disagree with me, but I've been watching this game played for 25 years.  When election time comes around, they allow all these people to scatter all over the city.  But when citywide election happens, countywide election happens, all of a sudden there are these efforts to move people, solve the homeless issue, but you want to move them as close to Skid Row as possible.

Ladies and gentlemen, Skid Row is still the place where if we can put them there, they will languish, they will be forgotten, and they will die.  Children should not be on the streets of Skid Row.  It was not tolerated ever.  If we knew there were children there, we found somebody, but we lost our advocate Andy Bales.  Andy Bales would not allow this to happen.  There was a time when a county official told these non-profits in Skid Row, you can ask Andy, they told him if you -- you will not receive any funding from the county if you take on children.  You know what Andy said?  We're not going to listen to you, but the other non-profits did, because they're going to be down there, but right now, this is intolerable.

THE COURT:  And if you want any verification on that, I'll get Andy Bales on the phone for you.

MR. GARZA:  This is my hero.  I have a chronic illness, chronic inflammatory demyelinating peripheral neuropathy.  Right now, it's cold and damp.  I'm in a lot of pain.  I cry easy.  The people on the street suffer with

EXCEPTIONAL REPORTING SERVICES, INC

chronic illnesses that you cannot see.  It isn't just about drugs.  It isn't just about alcohol.  I live in an SRO and let me tell you it's going to get a lot worse now that -- now that a lot of these non-profits housing -- a lot of non-profit housing developments are being taken over by non-profits.  It's become big business.  It's going to get a lot worse for us.

I don't drink.  I don't use drugs.  I don't tolerate in that.  I'm being bullied now in my building, but this man came down.  I asked him.  It was raining --

**THE COURT:**  Now, hold on, Don.  Let me get Michael up.

Now, I want to explain something to you that's happening on the Row.  First, historically, we've been picking up bodies near a fire station is incredibly busy down there, the busiest in the nation.  And but for a doctor also besides Michael, who you're about to meet, there wasn't proactivity.  In other words, we see somebody with gangrene on the street one day, we see, you know, a person that's literally almost dead and Narcan comes back the next day.  We were reactive.

It took me a year to gain the trust of the community, where I didn't go in with marshals.  I don't go in with marshals.  The communities have accepted me, and it took me another year to try to get something proactive with Michael.

So Michael, step up for a moment.  Don, stay for a second.  Explain what you do, because well, otherwise, we've

just been picking up bodies, City, County, and LAHSA, you need to get proactive and get some street medicine out there because all your water is not coming from you. They're tearing off fire hydrants.  Food is not coming from you.  Ask 200 people.  I'll take you with me, what city the streets, they'll tell you nothing.  All right.  Now tell them what you do.

**MR. WRIGHT:**  Thank you, Your Honor.  My name is Michael Sean Wright and I am the director of field medicine for Lestonnac clinics and the founder of WoundWalk.org, the nation's largest street medicine team.

Your Honor stated that we sought community buy-in, Kevin, Don, all -- Amy, all of our friends out there to bring our doctors, our team of medics --

**THE COURT:**  Terry, Paul.

**MR. WRIGHT:**  Terry, everybody.

**THE COURT:**  Mike.

**MR. WRIGHT:**  To come in on a weekly basis to make an assessment of the medical needs that are out there, and Your Honor has put us around those individuals that have come down to visit the row, including Dr. Adams, which I was quickly aware that not a medical doctor.  She got inside of our vehicle, witnessed as we treated somebody having seizures on the street.  The response later from her directly was that folks just need housing.

Your Honor, I come from the Midwest.  When a tornado

hits the street, that's not the first thing we're thinking about.  We're looking for the bodies.  We're trying to treat the wounds and the brokenness.  I think it's a shame that the city has let this go medically unaddressed for this long.  You can smell it.  You can smell the infections on the Row.  You can see the pain.  It doesn't take a genius or a medical degree.  Why have we not responded medical emphasis on the Row and around the city?

Sixty percent of your budget is going for security.  I don't carry any security.  My doctors don't carry any security.  None of us do, because we're out there treating the wounds.  First things first, stop the bleeding.  First things first.

**THE COURT:**  I'm going to allow two more people to speak because we're going to get on.

**MR. GARZA:**  Let me finish just one so I can talk about Michael.

I asked him.  I remember you remember this to ask him to come when it was raining, and they came.  And the reason I wanted them to come in the rain is because I wanted them to see the people.  When you see those people lying in mattresses because they're lying on the sidewalk after sanitation comes and takes away the pallets that they could be off the ground, the water comes up through, and they're lying in that all night long

EXCEPTIONAL REPORTING SERVICES, INC

**85**

These atmospheric rivers are not going away.  They're going to get worse, and they're going to continue to get worse, and people are going to die in these streets.  Whatever -- I'm just going to finish here.  He's going to keep doing what he's doing because as a community, we want him to keep doing what he's doing.  Amy's going to keep doing what she's doing because we want -- as a community, we want them to keep doing what they're doing.  We want them there.

These atmospheric rivers are going to continue.  We need and I'm going to continue to make my appeal because that is what I am here for, not just on behalf of the residents, but on my own behalf.  We need help.  We need help.  We need help.  And I don't understand why -- now I'm starting to see why.

The non-profits that I've known for years, it is a total betrayal.  Betrayal.  When I hear these non-profits executive directors tell me personally, they plead poverty, that they don't have enough money, and then I come here and I see this.  That the money is not even getting to them.  And then I hear that if they even try to ask for money or above, what goes on beyond, that LAHSA becomes vindictive.  Politicians become vindictive.  That needs to end, Judge.

That is our money.  That is for us.  We are literally -- this is what I'm going to end with so you guys can understand this, and I think you understand this.  Whatever support or safety net that you create is the one that you are

going to be depending on.  So start doing it now, because you never know what's going to happen.  If you get in an accident, if you become homeless, you are no longer considered a human being.  I've been on disaster response efforts with Team Rubicon, and let me tell you, a person has a tree on their house.  We haven't gotten there yet.  They're living in a parking lot.  I go to Walmart, and I'm saying, we're going to bring food to those people in that parking lot.  And that person has a home and property, and you know what they tell me?  They told me, well, I'm not going to donate.  Do you know why?  Because the real homeless might eat it.  That is what will happen.

You have to create what you are eventually going to be using.  And don't think it can't happen to you, because it can.  And I'm going to leave it there.  Stop leaving us on the street to languish and die.  I am sick of it.  I am tired of it.  I am tired of crying.  I'm done with it.

**THE COURT:**  Terry, I'm going to take -- just -- no, I'm going to take just one more speaker.  That's -- no, I apologize.  I'll take Terry.  Okay?  Next time.

**MR. TERRY:**  To the Court, thank you.  My name is Dewey Terry.  I've worked downtown for the last, since 2020, seven days --

**THE COURT:**  Well, come on back.  I can make an exception.  Have a seat.  Make it short, okay?  There are

always exceptions to the rule.  You've been sitting here, so go ahead.

**MR. TERRY:**  Okay.  So we're talking about non-profits giving up crack pipes that the city pays. Okay? Now, we don't aid and abet on anything when it comes to helping somebody get high.  Okay, but you're giving the money out.  You're giving the money out, man, serving needles, crack pipes, straight shooters, right?  And now they come out of the building that you paid hundreds of millions of dollars or five or six million dollars, right?  And they go right in front of the place, shoot the dope, smoke the crack.

Your money that you gave up is aiding and abetting in somebody's death.  Because if the LAPD were there, they'd charge you for it.  Okay, and you're giving that money up.

Now, when you talk to the SROs, right, and you take a person out of a tent and put him in a room, guess what you do? You pay for it, right?  But he's still got a psych, she's still got a psych, right?  You leave them unattended in these SROs. Now, there's a --

**THE COURT:**  Sir, there's no pictures taken.  If you'd do me a favor, delete the picture, okay?  Take it off.

**MR. TERRY:**  SROs, SROs are bought by, this man just bought 18 SROs.  They had security in the morning and night. They want to keep the dope man out of there.  But now this is what they're doing since he bought them, and you guys paid the

money for these people to be in these places, you can be in there and they would never know you were dead because they don't knock on the door to go see the people with the psych, okay?

I worked in there, so I can say that.  See, I've been down here just checking to see what's going on to see whether LAHSA going to do what it do and the City do what it do.  But you keep coming in here all the time and you got an excuse.  You policy this and policy that.  We don't want to hear no more policy.  That money ain't hitting the street.  It's hitting your pocket.  It's hitting your cronyism pocket.  That's what it's really doing.  And you sit here and you have these numb faces or you're playing on your phones.

This is the last point and the buck stops right here.  This is about we the people.  See, but I guess we're not America no more.  I guess that's what we're not.  I see nothing but women in here.  I am the man to put the children on town to keep them from the women getting raped when their husbands is out doing the -- you make a sub-level workforce when you don't have paperwork to go to work.  So these women get out there and sell strawberries and flowers at the nearest corner that you pass by every day.  But you don't care nothing about that.  That's not your people.  We, the people.  The Constitution is we the people.  When did we stop doing that?

We come here and you tell the judge this.  There's

too much money being missed.  And ain't nobody got no cuffs on.  You got a bunch of excuses.  You look around here at each other like there's no want.  We're just here for a minute.  We'll go back and drink our Starbucks, go have a nice lunch, $300, $400 suits on.  You don't care nothing about the man that's laying in the street.  It was 44 degrees this morning.  We gave out 1,500 blankets.  We fed 1,500 people Sunday, all non-profit and didn't get a dime from the city, paid for the streets to get --

**THE COURT:**  By the way, the City charged a fee of $750 for the homeless so they could rope off the street.  Now think about that for just a moment, LAHSA, City, County.  Homeless people have to put up a permit for $750.

**MR. TERRY:**  Just to feed them, to stand in the line, get something to eat.  The diet that they're on.  You got the Midnight Mission.  You got Fred Douglas.  You got Joe, what is it, Fred Jordan.  You got all these missions.  Sure enough, they do a good job, but their funding is getting relinquished because you're going to get a higher number now.  You're really fixing to get a higher number of people on the street.  You're not -- this animal has changed every day.  Did you understand?  I go down there seven days a week.  They call me.

Do you know they threw an unborn -- a baby out of the window at the wine garden off the fourth floor?  You didn't even know that.  The baby never lived three, four seconds.  Never got a chance to live. The mother, psycho, you got a $300

million building with security in it, cameras in it.  And she get up in the morning, they call me on the phone, T, you've got to get down here, man, because they just threw this baby out there.  What do you mean they threw a baby out there?  When I get down there, they got homicide down there, the whole place there.  That place is $300 million.  $300 million they built over there, and they can't find it -- they're not paying attention.  They're not paying attention.

You guys are not paying attention to what is needed.  You come here and you just sit for a little while.  What's wrong with you?  I've got more women in here than anything.  Y'all are mamas and aunties and everything else, grandmas and all that.  But you got your nice suits on, you don't care about nothing.

THE COURT:  Terry, we're going to have one more speaker.

MR. TERRY:  I'll leave you with this.  If you don't take care of the problem now, we're supposed to be the pattern for every other state to do.  If that governor wants to be a governor or a president, he needs to get on his job.  If she wants to be back up in there as mayor, she needs to get on her job.  And then, one thing about it, the County and the City, you really need to get on your job.  It's too much money missing.  Thank you for just listening.

THE COURT:  My apologies.  I almost saw.  Good

morning.

MR. WESCO:  Good morning.

THE COURT:  Morning.

MR. WESCO:  Judge Carter, good seeing you.  How you doing, Michele?

THE CLERK:  State your name, Rick.

MR. WESCO:  Recondal Wesco, known as Rick.  I recall LAHSA and a few of these other people, when I recall them by my second name, I say I need a discovery.  Anybody that know about a court term, I mean a discovery, you want to know what happened with your paperwork.  My voucher came one time and they told me I needed first and last month rent.  How am I going to pay first and last month rent when I ain't got no income and I can't get comfortable to do what I need to do?

And then LAHSA -- I called LAHSA.  I said, is this message being recorded?  I ain't recall the lady's name.  But she said, I don't know.  How does LAHSA know that a federal phone call is not being recorded?  I told her I knew because George Carter always tells me because I ask him questions.

And then another thing.  I'm looking, saying LAHSA has stolen a lot of people's information from the 90013 code.  And it's not just about that lawsuit.  You've got asbestos.  You've got mold.  The lawsuit for $5 million cannot cover your life.  Some people don't even know what the word $5 million means when compounded.

**92**

LAHSA is trying to, with the LA Alliance, trying to offer people $75,000.  None of us right here, I ain't talking about y'all, wouldn't take no $75,000 for dying.  It's worth millions.  You violated people's rights and you destroyed their health inside these buildings.

Even though you're walking through Skid Row, you can also get affected by mold and asbestos and other things to go with it.  The killers, the murderers, and the women sent them.  This bigger than you, LAHSA.  This so big it's going to trip you out.  They're making money off of debt.  You know what I mean?  Insurance policies.

When a person is sick in a room, the women's center said, don't worry about it.  You've got two or three lunches there two days in a row.  Just let them die off.

And there's a person that I know, they tried to get him to sign the paperwork for the insurance policy so it would go to the women's center and the staff with the money.

And you know, some insurance policy can cost a pretty penny.  If you want a million dollar contract, you got to pay maybe $5,000, $10,000 a month.  These people are doing it, and they can pay.  And these are not the only people that are doing it.  A lot of the SROs are in the same game, just like LAHSA.  They're killing people off.

And there's a place called the LA Mission.  Trey Vaughn, everybody know him.  Yeah, Mr. Trey Vaughn.  We know

Trey Vaughn.  He's crooked, too.  He is so crooked, he told me, Ricky, what you got about you now?  You got to get the hell out of here.  And he came and told me that.  I ain't getting ignorant.  But I walked up to him and said, let me holler at you, Mr. Trey Vaughn.  Why do you have a camera and trying to use me?  You probably saw the picture work that he had on me one day.  One day recently.  I said, Trey Vaughn, don't go around telling nobody about no 1.5 around me.

THE COURT:  Listen.

MR. WESCO:  I'm getting there.

THE COURT:  Yeah.  You're getting there.

MR. WESCO:  Yeah, what I'm saying.  Then all it is about is the money.  They're not bringing no voucher.  Karen Bass won't talk to me.  Soon as she see me, she walk off, and I know why.  There's a lot of things that's going on here with LAHSA.  LAHSA don't even answer the phone call.  I'll go up to the office.  I can't even get in there to get an apartment. They won't give me my discovery.  Nobody won't do nothing at all.  And all I'm seeing is women dying.  It's not only rape around the Women's Center.  It's insurance claim.  Everybody's done it.  Thank you.

THE COURT:  Now, once around the room, if you have any comments, but this is what I'm going to ask.  I need some kind of guarantee today that this will be taken back to the council for the $440,000 that you want clarity on.  Okay?

**94**

I understand that the council can't give me the representation that they'll vote for that.  But I'm asking that that go back to the council because this is ridiculous.  And this delay, whether it's the City, the County, or LAHSA is costing money.  Now, I'll wait to see what you do before I decide what I do.  I don't want to get ahead of this.  I'm going to assume you're successful, okay?  But I want that $440,000, and I want to stop this bill from going up.  Okay?

And I'd like to get some kind of indication today without embarrassing anybody or bringing somebody in.  I can take the representation of somebody who is responsible, either through the mayor's office or the president of the council, but I don't want it from you.  I want it from leaders now.  I want it for people who have to make the decision, and that's not denigrating you, but you're here representing them and you don't have that authority.

I'm asking that this be worked out for the $180,000.  And, Mira, I understand in a few moments you're going to say I don't have jurisdiction, but Lindsey's right.  You are LAHSA.  And it seems to me that a spot check of another 10, which is minimal with these hundreds of contracts, would be extraordinarily helpful for A&M to verify because otherwise I've got three choices.  One is to adopt the findings of the auditor controller.  Number two, to pursue this further, you know, take your emergency up to the circuit, okay?  Or number

three, to do nothing.  And the last is something I'm not willing to do, okay?

So I'm humbly asking, take this back to Catherine or somebody and see if this 440,000 for spot checking is reasonable because, first of all, I'm starting to believe, and I hope I'm wrong, that this is the tip of the iceberg.  And we need to get that out and find out with at least 10 more samplings how bad that is.  And if it's bad, it can't get any worse than being portrayed right now in reading the LA Times and LA Ist.  This came up on the internet last night like gangbusters.  You can't miss it.

Okay, now we're going to go once around the room, but I have to tell you and ask you what time do you want me to come back?  I want the name of those providers with the $50 million.  And I don't want to embarrass anybody, so tell me how I'm going to get it through the auditor, controller, or through LAHSA.  And I can come back at one o'clock.  I can come back at five o'clock.  I can come back, believe it or not, with my hours at eight o'clock tonight.  But I want those names.

So now, LA Alliance, it's your turn and I'll be quiet.

**MS. MITCHELL:**  Thank you, Your Honor.  I think it's important to remember that this audit is not a voluntary audit.  This was a stipulated sanction as a result of LA City not doing what it was required to do under the agreement.  And because it

is a stipulated sanction and because every step of the way there has been a requirement and a caveat that the Court could modify, if necessary, it is well within the Court's power to do so.

So I want to make that very clear and while we are all playing nicely and I appreciate the voluntariness of the language here, that this is a sanction for bad conduct and it has to continue.  And I think the problem is what we're seeing is systemic.

We're seeing it from the audit that we just saw from the County.  We're seeing repeatedly from A&M coming back to tell us either the data is incomplete or it doesn't exist or it's bad, right?  And so I think the problem is when we don't have the systems that are in place to ensure financial accountability, but I also don't think we have the systems in place to assure substantive and procedural accountability, right?  So that's why we asked for not just a financial audit, but also an audit of the operations, right?  We wanted to see whether what they're actually doing is working.  And I think part of the problem is if the financial controls are this bad, how is LAHSA doing at tracking its programs and clients, right?

I think -- we're hearing repeatedly that services are not reaching the streets, services are not reaching interim housing, services are not being provided a permanent supportive housing.  And we at the Alliance have repeatedly asked for that

data to back it up, but because of the lack of the data, because of archaic systems, because of the inability for these systems to even talk to each other, we can't even verify the veracity of what we're hearing.  And so when we, the Alliance, entered into this agreement, we presupposed that the systems and the infrastructure existed to accomplish the goals of the agreement.

The problem is over the last year, we're slowly finding that those systems either don't exist, they don't sufficiently exist, or whether they existed at one point, they are broken now.  And so while we talk about finances and finances, and obviously it's important, particularly because we have the, you know, now pleading poverty, as I listened to the Homeless and Housing Committee yesterday talking about shutting down some of these interim sites, right, which is hugely problematic, but yet you see hundreds of millions of dollars that have been poured into the system by the City, by the County over the last seven years without proper controls over where the money is going.  And it's obviously not going to the streets.

So I think by presupposing these systems were in place, it's now becoming apparent that I don't know that the City and County can meet their obligations under the agreement. And I think that's what the audit is starting to show.  I think that's what we saw with the County response, and I appreciate

the City's cooperation in trying to figure out what's going on with LAHSA, but these data systems don't exist.  Nobody is actually tracking outcomes, it appears, both with what's happening with the money and what's happening with individuals in the street.  We're just pouring money into a broken system and it's all being funneled away.

And so I think, you know, my team and I have been working on over the last month trying to map the system and identify the problems in the system.  And what we're finding is more problems than system.  And I think it is becoming very apparent to everyone in this court that things are broken, as we just heard.  And I don't know the way forward here.

I think we are starting to see the cracks very clearly, and I'm very concerned.  And I think I want to just go back to the point where this is a stipulated sanction for a reason.  So whether people agree to pay the money or don't agree to the money, in my opinion, it's frankly irrelevant because it's within this Court's rights and jurisdiction to order them to pay the money to get this done so we can actually see what's going on.

**THE COURT:**  Okay, let me turn to the City and get your position.

**MS. FLORES:**  We would like to confer with the clients over the lunch break, but we will come back with a statement on the 440.

THE COURT:  Tell me the time that's convenient for you.

MS. FLORES:  On that question, I think we could be back by 1:30.

THE COURT:  1:30, okay.

UNIDENTIFIED SPEAKER:  Make it 2 o'clock.

THE COURT:  No, that's fine, that's fine.  1:30 is fine.

Okay, anything else you'd like to say?

MS. FLORES:  No, that's it.

THE COURT:  Then let me turn to the County.  Mira.

MS. HASHMALL:  Thank you, Your Honor.  There's no doubt that homelessness is a crisis.  And I think the testimonials that we heard today from individuals living in Skid Row really bring that tragedy to life.  That's why the Board of Supervisors declared a state of emergency.  And that's why it's been looking at this so carefully to figure out how at the state, federal, and local levels things can be done better. That's why you saw such a thorough analysis from the County's auditor's controller's office about what can be done better.

As it relates to the audit, my understanding is that the City agreed in an engagement letter with A&M back in May. It was at the August 29th hearing where A&M's team said that they'd like to better understand the County's services and wanted to have information about those services in support of

**100**

their audit of the City's programs, specifically Inside Safe, Roadmap, and Alliance.

And so we worked through September.  We had a series of conversations because you have to understand what the County does to support those programs in order for the auditor team to formulate information requests, right?  They can't really ask for data in the abstract.  I think we did those discussions so that they could formulate their asks, grounded in what services we're actually providing relevant to those City programs.  And it was in October where our chair, Lindsey Horvath, made clear that the City audit was important to everyone and that the County would support the audit by providing information.

It was also in October where the County took the initiative to provide a draft engagement agreement because we do think having a direct contract with the auditor team is important.  The information that's being asked of the County is very, very confidential treatment and health records of individuals who may be experiencing homelessness, but they have the same rights of privacy as everyone else.  And the County departments that service those folks take those obligations very seriously.

We needed a contract to make sure that we're complying with our obligations to those individuals.  We also took the initiative of submitting a protective order to the Court for its consideration to facilitate the sharing of that

data.  In the process, the information requests were refined and conveyed to the County, and we provided that data in early November.

My understanding is that the A&M team is still working through that draft engagement agreement that we gave them in October.  We're obviously looking forward to any edits or questions or comments that they have on that.  That was all within the agreed parameters of $180,000 in costs that the County has agreed to pay.  The County has agreed to the data request.  The County has given the data.

So to the extent now that there's an ask for $440,000 regarding the site visits, we just need to better understand what that's about.  This is a backwards-looking audit.

**THE COURT:**  Right.

**MS. HASHMALL:**  So site visits to our facilities, which are treating individuals with specialized health needs, I mean, it heightens the privacy concerns on a really significant level, number one.

Number two, that anyone you see in a facility in November of 2024 isn't going to be within sort of the data or the time frame of the City audit.  So that just creates some questions.

We're happy to have some conversations with A&M to better understand what they think is productive.  We have to talk to our subject matter experts to make sure we're not

violating anyone's privacy or interfering with the provision of mental health and substance abuse services in those locations.

So we're happy to have those conversations. We weren't really clear where the 440 came from as it relates to site visits. We've given all the data. We're willing to pay the amount that was the agreed terms. We provided a draft engagement agreement. We've done the protective order to make sure we could give that data in compliance with federal law. And, you know, so I think, you know, from the County's perspective, we have gone, I think, above and beyond to expeditiously provide that information.

And if the Court is doing a lunch break, what we will do during a lunch break is run down whether we can identify these sub-providers that you flagged with regards to finding number one in the auditor controller's report, which I'm still analyzing and understanding. I understand the Court is as well.

THE COURT: Yeah, all night long analyzing it.

MS. HASHMALL: It's very informative. There's no doubt about it. So I just need to talk to our folks on that information request.

THE COURT: Fair enough. We know that the auditor controller has those names. In other words, to do this audit, your auditor controller has those names. LAHSA's got those names.

**MS. HASHMALL:** I think that's right, Your Honor. I don't think this is going to be a big hurdle.

**THE COURT:** Yeah. I don't either.

The second thing is I agree with you. There has to be a reasonable number. You can't walk in to any agreement concerning site visits with just an arbitrary number. I don't know what that is. I'll have you and Ann talk to each other about what is sufficient verification.

So, Diane, what do you think?

**MS. RAFFERTY:** That's fine. But I do need to address that issue. Yes, the County provided a contract with us because --

**THE COURT:** Use the mic, because we're on CourtSmart, and I apologize. We can't pick up the voice.

**MS. RAFFERTY:** I think there was some confusion regarding PHI, which we said we do not want, we should not have it, it is not pertinent, we do not want that information, period. But I also understand you felt that we could not work with the City on your behalf to bill the City and then you pay the City. I understand that.

I also explained very clearly we cannot sign a contract issued by you unless it goes through our legal department, because there are liability and indemnity clauses in your contract that we will not accept. So that is the legal fight on that end.

**104**

I think we're trying to work with each other in good faith, but unfortunately it's not -- it's, oh, we sent you a contract.  I cannot -- I am -- can sign contracts with my firm, not without legal review, and a lot of the terms in your contract our company will never agree to.  So that's where we're going to have to look and say can we come to some reasonable terms.  So we'll do that.

MS. HASHMALL:  So you've had it for a month.  We're happy to sit down and workshop that with your lawyers.

MS. RAFFERTY:  And I emailed you and said we cannot sign this contract.

THE COURT:  I've seen those emails by the way through Michele, back and forth.

MS. HASHMALL:  It's a standard county contract, but that doesn't mean we aren't willing to reconsider provisions.  We just have to have that conversation grounded in the document.

MS. RAFFERTY:  Correct.  Correct.

THE COURT:  Okay, well, we can do that over lunch.  We've got a lot to do today.

MS. RAFFERTY:  Correct.

THE COURT:  There's no reason to go into recess for a couple weeks now.

So I'm humbly asking, you know, what that number might be, just starting off.  And I've only arbitrarily chosen

10 because we never went above 10 sampling in any sampling that the auditor controller did.  So I think more than that's unreasonable.

Number two, I agree with you, 440,000, maybe more, maybe less.  I mean, what do we need?  I don't -- so I'm not quibbling about the 440 necessarily, but there has to be some additional money, and here's why. When the auditor controller did your audit, they're auditing in a sense process, procedure, contracts, data.  There has to be some comfort level in a spot audit that those services are actually being performed.  There has to be somebody that goes out there and verifies that. Otherwise, we're dealing with bureaucratic numbers, which may be correct and may not be.  That's the problem.

So we can certainly limit it, but enough confidence so that when we're writing this, there's enough credibility that we've made enough site visits to get a cross-section, and I'm just suggesting 10.  That's not a ruling by the court, of course.  And I think maybe we could talk over the lunchtime, and Michele might be able to get involved with you.  She's been intimately involved before, okay?

**MS. RAFFERTY:**  Thank you, Your Honor.

**THE COURT:**  Is 1:30 okay with you, Mira?

**MS. HASHMALL:**  Yes, Your Honor.

**THE COURT:**  Okay.  Shayla.

**MS. MYERS:**  Your Honor, just one observation looking

at this from the outside is that the service providers, the City, and the County are being asked to provide homeless services in the middle of a crisis where scarcity is what is driving this crisis.  The reality is we have simply too little affordable housing in the City of Los Angeles.

I know I echo that sentiment all of the time, but I think intervener's frustration with this process as we're talking about this is that as a result of the LA Alliance's litigation, as a result of the settlement agreements, the roadmap, the City and the County have scaled up significant resources to provide band-aids that don't actually address the underlying issue of the lack of affordable housing.  And as a result of that, what we are seeing is that system that was slapped together has not been able to respond to the crisis, and I think that's what we're seeing right now.

This system is about providing services to folks who are unhoused when what we actually need to do is provide housing to folks who are unhoused.  No amount of audits of the services that are being provided are going to tell us what's needed for folks who are on the streets.  What we're talking about is we're talking about billing failures.  We're talking about contracting failures.  And at the end of the day, irrespective of whether those things are fixed, whether the City or the County discovers any underlying problems that the services or providers are providing, the reality is people are

still unhoused and fixing these -- the system that Ms. Mitchell keeps talking about is a system that is perpetuating homelessness.  We're not actually getting to the root causes of it.

And so just -- as we talk about audits, backward-looking audits of systems, understanding that these systems are being developed in a crisis and they're not being developed to actually address these issues.  And we just want to continue to uplift that, particularly as folks from Skid Row are coming in to uplift the issues they're seeing.  We just want to make it clear the systems that are -- that are being perpetuated and when we talk about this.

**THE COURT:**  Michele, any thoughts?

**MS. MARTINEZ:**  Judge, just finally --

**THE COURT:**  I want to turn to LAHSA.  Michele, can I hold off with your thought for one moment?

**MS. MARTINEZ:**  Yes.

**THE COURT:**  I apologize.  Let me turn to LAHSA, my apologies.  I'm going to request you folks come back at 1:30 also.  And if you notice, I didn't ask Dr. Adams Kellum to come in.  I didn't ask the mayor to come in today.  I didn't ask Lindsey Horvath.  I wanted no embarrassment to the political officials today.  I wanted to have this conversation with you, and then where we go from here is up to all of you.

Come down use the mic just because we're on

**108**

CourtSmart, and we can't pick up your voice.

**MR. YAP:**  Your Honor, in terms of the audit, we are, as I've indicated, we'll continue to provide whatever records we do have, complying with the deadlines.  We are -- our staff is also trying to find --

**THE COURT:**  Right over there is A&M.  You can talk to them over the lunch time.

**MR. YAP:**  Will do, Your Honor.  And we are also trying to find and identify those providers that you've -- you mentioned about the -- that's mentioned on the report.

**THE COURT:**  Okay.  Because we're here until we do. We're going to find out who's gotten a free float and a gift out there.

Okay.  Okay, Michele, my apologies.

**MS. MARTINEZ:**  Yes, Judge Carter, based on the 1:30 conversation when we come back, both the City and County going to their to the to the principals in regards to the funding for the engagement letter, I think it -- it's important for A&M to also provide us today one or two options, a timeline of when, if both the City and County agree and A&M agrees to doing its own engagement in contract with the County and the City agrees, having that in addition to the current pending data that is out there of requests, whether it's from law enforcement, LAHSA, City CAO's office, housing department, on and so forth, providing a time certain of when that information needs to be

produced to ultimately getting to when we will be getting a draft report assessment to the Court, and also obviously for review for both the City, County, and LAHSA.

I think it's imperative that we continue to have these timelines and understand that this timeline is the last timeline, Judge Carter.  There is no more.  And so today, we need to lay out that final timeline of when we will be getting this report based on the pending data and also the pending engagement letters and changes to the funding for the City and County

**THE COURT:**  Well, let's go into recess now, if it's acceptable, because you've got a lot of conversation that can take place.  Okay?  And hopefully you resolve that yourself and the Court's not put in the position of remedying this for you.

**(Recessed at 11:43 a.m.; to reconvene at 1:41 p.m.)**

**THE COURT:**  We're back on the record, and let me just state that all counsel are present.  So counsel, I'm going to turn this over to you.  I don't know what the discussions were during the lunchtime or what's been accomplished.

**MS. FLORES:**  Your Honor, this is Valerie Flores for the City of Los Angeles.  Over the lunch break and after the clarifications of this morning, the council president will be scheduling the item regarding consideration of the $440,000 additional payment to A&M next -- well, the week of December 2nd.  The council is dark next week.

THE COURT: All right. Thank you. I'll wait to see what the results of the council are.

Now for A&M, how much more of a delay does this cost you? Come on up for a moment. Does it cost you in terms of two weeks? What can you move forward with? They have to go into session, and they obviously can't this week. Next week, they're out of session, so.

MS. COLLIER: At this point, then, we would be looking at late February for presuming that that would also include the County data analysis and fieldwork. If that is approved, that would be -- we're looking at a draft report to the court by late February.

THE COURT: I'll work with the council because I need to get those -- I need to get an excellent audit. This is our opportunity. Okay. Anything else?

MS. HASHMALL: Your Honor, Mira Hashmall for the County of Los Angeles.

So you asked us for the list of providers that are referenced in the first finding by the Auditor Controller's Office in its analysis of certain LAHSA matters. And so we have emailed that list to Special Master Martinez.

THE COURT: Can I see it? I want to print it.

UNIDENTIFIED SPEAKER: I'm in the process of emailing it.

THE COURT: Okay, wait. It'll come to you in a

EXCEPTIONAL REPORTING SERVICES, INC

moment, Michele, and then if you could just bring it up, we'll print it.

Anything else while we're waiting for that list?

MS. HASHMALL: The only other thing, Your Honor, is that before we resumed court, we did speak with A&M and we're going to have a continuing dialogue about what they're looking for with regards to field work as it relates to the County. We're going to get some clarity about that so we can bring it back to the Board.

THE COURT: So the $180,000 of the 620 is something that you both agreed to. It's that other 440, and what I'm concerned about is that I do need some verification because County Auditor didn't verify. They worked in a different menu. Yours will be much more qualitative and much more quantitative, and I need a certain amount of sampling, so I've arbitrarily come up with 10 because that's the most sampling I saw that came from the County Auditor.

When would I get the response? When's your best guess, Mira?

MS. HASHMALL: So we sort of expressed our concerns. I mean, as I kind of -- as I mentioned earlier, our subject matter experts get a little bit concerned about the concept of site visits writ large because of the privacy concerns, and so what we've talked about is what they're looking for and what programs or services they want to better understand. They're

**112**

going to refine that with the benefit of what they think will facilitate their analysis and send it to us with a cost estimate.  We're going to take it to our client.

THE COURT:  Why not now?  Is it the cost estimate?  In other words, it seems to me we've got to have the basic parameters first before you give a cost estimate, and I'm concerned that we haven't even arrived at that yet.  I've got all day, so you tell me because what we're not going to do is just go into another continuance and back with nothing.  That way the County has a chance to approve it or disapprove it.

MS. COLLIER:  Absolutely.  Diane, feel free to chime in.

THE COURT:  You don't have to disclose that to me.  Go back to the back and talk.  I'll xerox this off, and I'm here as late as you want to be.

Okay.  Michele, you can go talk.  Give me the list.  So why don't you have a seat?  We're here maybe until midnight.  I don't know.  We'll find out.  Because I agree, the council doesn't know -- I mean, the Board doesn't know what to vote on.

MS. COLLIER:  Right.

THE COURT:  That's not fair to the Board.  By the same token, you two need to have a dialogue, and I don't think going through Thanksgiving is going to be very helpful.  So you're all here.  I've got unlimited time.

MS. MARTINEZ:  Judge, we had dialogue.  We have

narrowed what the scope is going to be.  It's just really up to A&M that they need to make changes and revisions to the cost estimate.

**THE COURT:**  Okay.  So what do I do now?

**MS. COLLIER:**  If we continue with the number of sites of 10, we imagine the cost would not change from the 440.  We would still, then, take into the sensitivity of understanding the continuum of care and how these participants or clients entered into these units that were being created by the County or funded by the County, that would look into permanent supportive housing under Alliance and Roadmap.

**THE COURT:**  Okay.

**MS. COLLIER:**  We understand the sensitivity of going to mental health-set beds, as well as -- but potentially, we would like to get clarification of maybe in high service need interim housing beds.

**THE COURT:**  Okay.

**MS. COLLIER:**  But at this point in time, I think we've at least come to an agreement that at least permanent supportive housing we will happily do 10 spot checks.

**THE COURT:**  Then maybe I do this.  Maybe I just take good faith on all parties' parts, let you work with Michele.  She'll get back to me in terms of the dates, so I'm not setting a date certain and then having to either back away or force you in early.

**114**

**MS. HASHMALL:** Yes, and I imagine the Board is also in recess for Thanksgiving, although I don't know that for sure.

**THE COURT:** Okay. So my guess is I'm going to hear something the first or second week of December, and depending upon what everybody does, then I'll either schedule another date or not.

**MS. COLLIER:** And we'll have it written out for the County by the end of tomorrow.

**THE COURT:** Michele, does that work for you? Does that work for you?

**MS. MARTINEZ:** Yes.

**THE COURT:** Does that work for you?

**MS. HASHMALL:** Yes, Your Honor.

**THE COURT:** Let's do that.

**MS. HASHMALL:** Thank you.

**THE COURT:** Okay. Would you print another copy? Let's put this up on the board.

**(Pause)**

**THE COURT:** Michele or Karlen. Karlen, give this -- Karlen, I want to have this docketed.

Okay. First is 1736 Family Crisis Center. Total advances issued, $914,593. Advances recouped, $60,266. Balance, $854,327.

LAHSA, what efforts have you undertaken to retrieve

**115**

this money from this entity?  In other words, have you filed a civil suit, letters have gone out, U.S. Attorney.  What's been done with it?  I'm going to go down one by one.

MS. TREJO:  Janine Trejo, CFO for LAHSA.

I can't give you specifics on each one without having to go back and reference the records, but what I can tell you is that LAHSA has issued out advance recoupments and repayment letters to the service providers that the service providers have signed and agreeing to a repayment schedule.

THE COURT:  Fine.

MS. TREJO:  I'd have to look at the date for that.

THE COURT:  That's okay.  Get on the computer.  I'm here.

MS. TREJO:  Okay.

THE COURT:  Okay?  And come back to me and tell me when those letters were issued.

Second, 211 L.A. County.  $73,938.  Advances recoup, $73,938.  Excellent.

Third, Coalition for Responsible Community Development, $268,421.  Balance?  We've collected nothing from them.  What's the status of those folks?  Letters issued?  Okay.  Keep checking.  I'm going to go down each one.  Then you can walk down each one with me.

Community Partners, FBO, Safe Place for Youth, $64,274.  Advances recouped.  I want to know when these

advances were recouped also.  In other words, if they were recouped a year ago, two years ago, what activity we're having in these.  $3,570.  So they owe $60,704.  Same question to LAHSA.

Fifth, Covenant House of California, $491,468.  Advances recouped, $13,652.  Amount owed, $477,816.  So what I'm interested in is when our efforts started, when were the last letters, what we're doing to recoup this in real time.

Six, First to Serve, $755,528.  They have no recoupment.  Amount owed, $755,528.

Seven, Harbor Interfaith Services, Inc., $2,229,945.  The amount recouped is $10,603.  Balance owed, $2,219,342.

Eight, Hathaway Sycamore Child and Family Services.  Advances issued, $1,128,937.  Nothing's been recouped.  Balance owed, $1,128,937.

**MR. YAP:**  Your Honor, this is Robert Yap, counsel for LAHSA.  The LAHSA representatives here are working to try to obtain this information.  However, they need to contact staff and it's going to take time to determine each of these contracts.

**THE COURT:**  I've got all day.  I've got all night.  I've got all day tomorrow.  We're in continuous session until I get it.

**MR. YAP:**  I just want to point out that --

**THE COURT:**  I just want to inform you.  We're in

continuous session until I get it.

MR. YAP:  Understood, Your Honor.  It's just that we didn't -- you know, the order was for today was about delays that was docketed --

THE COURT:  I'm not going to let you go home for a week.  We're staying here until I get it.  It could be today or tomorrow.  That's an order.

MR. YAP:  Understood, Your Honor.  I just want to --

THE COURT:  Okay.  Thank you very much.  We're done with the discussion now.  Have a seat.

Number eight --

MR. YAP:  This wasn't enough notice, Your Honor. Thank you.

THE COURT:  You've got plenty of notice because I'm not going out of session, counsel, and I'll sit here until hell freezes ver.  Got it?  Now you get busy.

Nine, Home At Last Community Development Corporation, $797,681.  Balance owed, $797,681.  No recoupment.

Ten, Homeless Healthcare LA, $299,682.  What's been recouped is $5,344.  Balance owed is $294,338.

And the reason I want this information is maybe there was a token payment six years ago or five years ago or four years ago, and then everybody just walked away, a gift to the provider.  Or maybe you've got recent efforts and I want to know what those are.  This is outlandish.

Number 11, Hope of the Valley Rescue Mission, $68,250. Amount recouped, zero. Balance owed, $68,250.

Twelve, Giovanni's Inc., $449,117. Advance is recouped, as of 7/8, $92,425. Balance owed, $356.69. And what I'm going to be looking at, counsel, is if in fact there was some recoupment three or four years ago, why didn't that recoupment continue on? You know, what has been our exerts or are we just walking away from this?

LA Family Housing Corporation, $6,373,401. Amount recouped is $629,807. Balance owed, $5,743,594. Who's the CEO of that, Michele? Do you know who the CEO is that --

**MS. MARTINEZ:** Of who?

**THE COURT:** Of the LA Family Housing Corporation?

**MS. MARTINEZ:** Yes. Stephanie.

**THE COURT:** Stephanie?

Fourteen, Lamp Community, $2,464,714. Recouped, $26,623. Balance, $2,438,091.

National Health Foundation, number 15, $52,317. Recouped, $52,317. No balance owed. Congratulations.

New Directions, Inc., $34,347. No recoupments. Balance still owed, $34,347.

Ocean Park Community Center, doing business as the People's Concern, $453,868. There's been no recoupment. Balance still owed, $453,868.

People Assisting the Homeless, PATH, $8,274,239.

We've recouped $40,581.  Balance owed, $8,233,658.  Balance owed.

Rainbow Services, $118,317.  There's been no recoupment.  Still owing, $118,317.

Sanctuary of Hope, $344,884.  Recoupment, $96,280.  Balance still owing, $248,604.

Special Services for Groups, Inc., $6,674,335.  Recoupment, $814,377.  Balance owed, $5,859,958.

Michele, do you know where that group is located, by any chance?

**MS. MARTINEZ:**  Not off the top of my head, but I can look it up.

**THE COURT:**  Who the CEO is?

**MS. MARTINEZ:**  No.

**THE COURT:**  22, St. Ann's Maternity Home.  Advances, $326,067.  Advances recouped, $50,289.  Owing.  Balance, $275,778.

St. Joseph's Center, $2,930,300.  Recouped, $120,005.  Balance owing, $2,810,295.

Testimonial Community Love Center, $388,684.  There's been nothing recouped.  Balance still owing, $388,684.

Midnight Mission, $448,950.  Nothing's been recouped.  Still owing, $448,950.

The People's Concern, $893,505.  The recoupment's been $22,766.  The balance owed, $870,739.

Village Family Services, $869,561.  $70,915 have been recouped.  $798,646 is the balance owing.

The Whole Child, $914,426.  There's been no recoupment.  Balance still owing, $914,426.

Union Station Homeless Services, $2,035,055.  Recoupment has been $45,203.  Still owing, $1,989,852.

United Friends of the Children, advances $783,533, recoupment $43,530, owing $740,003.

United Victims Initiative, Inc., advance $229,119.  There's been no recoupment, balance still owing $229,119.

Upward Bound House, advances $262,105, recouped $56,197, balance owing $205,908.

Valley Oasis, formerly Antelope Valley Domestic Violence Council, $2,684,614, recouped is $24,669, balance owing is $2,659,945.

Volunteers of America of Los Angeles, advances $5,050,169, recouped has been $135,725, balance owing $4,914,444.

Winegard Center Association, advances $436,051, there's been no recoupment, owing $436,051.

Whittier Area First Aid Coalition, $206,833 advances, nothing has been recouped, still owing $206,833.

The total of advances issued is $50,791,228, recoupment is $2,489,083, balance still owing $48,302,145.  Now I want to check that against this report for just a moment from

the auditor controller.

And for our purposes, the auditor controller's figures match up for my record, he just rounded off a couple thousand dollars.  So we've got $48.3 million non-recouped, still owing, and we've collected $2.5 million.

Okay, Karlen, you can docket this.  Here's what I'm interested in.  I'm trying to see what the activity is here.  In other words, was there an early recoupment here and then we walked away?  Or has there been recent activity, you know, where we made that effort recently to recoup something that had laid dormant before this administration took place.  Just trying to find out the activity level on that.  Okay?

So how do we do that without having you here the rest of your life?  Your two talk, because you hold the keys to leaving today, tonight, tomorrow in your own hands.  Tell me how we're going to go about this.  I'll take a recess while you discuss that.  Discuss it with the County, the City if you want to, because you're all ordered to remain until we come up with some plan on getting this information to the court and the public.

**(Recessed at 2:05 p.m.; to reconvene at 2:27 p.m.)**

**THE COURT:**  Back on the record, and all counsel are present, and counsel representing LAHSA.

**MR. YAP:**  Your Honor, so Ms. Trejo's staff is putting together the information that you that you requested.  The

**122**

thing is that it's going to take time.

THE COURT:  Okay.  That's fair.

MR. YAP:  And they want to get it right, and they're requesting -- we're requesting, until close of business on Monday to submit something to the Court.

THE COURT:  Why don't we make it Tuesday?

MR. YAP:  Thank you.

THE COURT:  That's -- that gives you a chance on Friday, and you don't have to work all weekend that way.  Fair enough.  Tuesday, 12 noon?

MR. YAP:  12 noon, Your Honor.

THE COURT:  Strike that.  Five o'clock Tuesday.  Is that acceptable?  Are you sure?

MS. TREJO:  Thank you.  Yes.

THE COURT:  Okay.

MR. YAP:  Thank you, Your Honor.

Your Honor, one housekeeping matter, if I could request.

THE COURT:  Sure.

MR. YAP:  There was earlier part about the -- there was an item that I put on the Elmo, and I was wondering if we could request it -- that it be docketed today.

THE COURT:  And what was that item?  I'm happy to docket anything.

MR. YAP:  Oh, it was just the timeline that we put

123

together.

THE COURT:  Absolutely, absolutely.

MR. YAP:  Okay.  I'll give it to the clerk.

THE COURT:  Yeah, absolutely.  That gives you a fair shot showing what you were doing.  Okay?

MR. YAP:  Okay.  Thank you, Your Honor.

THE COURT:  We'll docket that through Karlen.

MR. YAP:  Thank you.

THE COURT:  Then I'll wait till the first week of December for the City's response on the vote.

MS. FLORES:  Yes, Your Honor.

THE COURT:  Wait for the meeting between A&M and the County to work out the parameters and a good-faith cost estimate to take to the Board.

I won't set a date for going back into session now, because it may be too soon or too late.  I'd ask you to work through the special master, Michele, who you all know, and she calls me at three o'clock in the morning, believe it or not, so she's always working.

Beyond that, I don't think that there's any further business unless I move around the room for just a moment.  Let me move to Diane.  This is A&M.

MS. RAFFERTY:  Thank you, Judge Carter.  Based on the information that LAHSA wants docketed on the schedule, is that the schedule pertaining to our requests and your response?

EXCEPTIONAL REPORTING SERVICES, INC

**124**

Okay.  We would like to also produce a document that totally contradicts what they have sent, because we also have emails.  So I want to clarify something.

If A&M requested something on a Monday and you sent us an email on Tuesday saying we've received your data, or we've received your request, that's a response, but that's not a response we can use.  So we have email verification of every single request, and when we received that information, and it is not -- it doesn't jive with your information.

So if they're going to docket that, we will produce our own document with email proof of the requests to receive --

**THE COURT:**  Why don't you two just meet informally and see the positions?  That's an order.  Stand up and go talk to each other for just a moment before we get in too deep of water here.

**MS. RAFFERTY:**  Okay.

**THE COURT:**  No, just go back and just make sure how far of the line we want to go down with this, okay?

**MS. RAFFERTY:**  Okay.

**THE COURT:**  Because remember, the Court has contempt powers.  So you go back and talk for a moment.  So if we don't have to travel down that road, we won't.  Otherwise, you'll supply the contra documents and the emails.

**MS. MARTINEZ:**  And Judge -- Your Honor?  As well, A&M tomorrow will be submitting the proposal of timeline based on

**125**

the options of both the City and County going to their respective elected body as well.

THE COURT:  Excellent.  So it's docketed --

MS. MARTINEZ:  So we'll be sending that to you tomorrow as well.

THE COURT:  All right.  It's docketed on the record, not just --

MS. MARTINEZ:  Yes, with the last week of February potential draft report.

THE COURT:  Okay.  Now remember, I haven't even started into the 15 million dollars in advances.  I've just let those off to the side for the moment.  So, we've got 48 million and I haven't even started into the 15 million.  I don't think I'll start tonight.  You know what I expect out of that next session, an explanation.

And just say to the City while we're waiting, you'll run the City, but when these advances are made 25 percent or 40 percent, historically, they're set up to for the providers. They were set up to get providers paid.  But it's causing an immense amount of trouble because if the providers were paid in a timely fashion with the invoices and supporting information, you could turn that around in seven, ten, thirty days, whatever that time period is.  We wouldn't then have to be waiting for documents that we're never receiving.  We wouldn't be in this position.

**126**

So, I leave that to you.  You'll run the City you want to, but it's causing a lot of concern about getting accurate information after this money gets fronted.  So I'll leave that to you and the Council, Kamithian (phonetic), all the folks involved.

**(Pause)**

**(Recessed at 2:36 p.m.; to reconvene at 2:50 p.m.)**

**THE COURT:**  Why don't you come on up then, and we'll go back on the record with your respective positions.

**MR. YAP:**  So, Your Honor, LAHSA will request -- I will withdraw that request to docket whatever I had put on the Elmo.

**THE COURT:**  Okay.

**MR. YAP:**  Thank you.

**THE COURT:**  Then you're granted, then we're in recess, and have a good weekend, okay?

**UNIDENTIFIED SPEAKER:**  Thank you, Your Honor.  Have a good Thanksgiving.

**MS. FLORES:**  Thank you, Your Honor.

**(Proceeding concluded at 2:50 p.m.)**

* * * * *

**EXCEPTIONAL REPORTING SERVICES, INC**

127

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    November 22, 2024

            Signed                                        Dated


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC