**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: November 25, 2024

Title: LA Alliance for Human Rights et al v. City of Los Angeles et al

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

Debora Lewman for
Karlen Dubon                                          Not Present
Courtroom Clerk                                    Court Reporter

ATTORNEYS PRESENT FOR                    ATTORNEYS PRESENT FOR
PLAINTIFF:                                              DEFENDANT:
None Present                                            None Present

**PROCEEDINGS (IN CHAMBERS):**

Pursuant to the Court's hearing on Thursday, November 21, 2024, LAHSA is to docket by noon Tuesday, November 26, 2024, the requested information of any documented actions by LAHSA to collect the $50.8 million in cash advances and any documented responses by providers. The County Auditor Controller's Report noted that "LAHSA slowed their recoupment efforts and only recovered approximately $2.5 million (5%) as of July 8, 2024." *See* Section 1, pg. 2 [Dkt. 823]. See the docketed list of providers with their outstanding balances [Dkt. 826]. The Court notes the first two bullet points of the County Auditor Controller's Report, which is on the first page of the second attachment.

The Court will set a future hearing date pursuant to the receipt of this information.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11

Initials of Deputy Clerk: djl

CIVIL-GEN

**County of Los Angeles Department of Auditor-Controller**
**Los Angeles Homeless Services Authority - Finance, Contracts, Risk Management, and Grants Management Review**
**Measure H Working Capital Advances**

| No. | Subcontractor | Total Advances Issued as of 7/8/2024 | | Advances Recouped as of 7/8/2024 | | Advance Balance as of 7/8/2024 | |
|---|---|---|---|---|---|---|---|
| 1 | 1736 Family Crisis Center | $ | 914,593 | $ | 60,266 | $ | 854,327 |
| 2 | 211 LA County | $ | 73,938 | $ | 73,938 | $ | - |
| 3 | Coalition for Responsible Community Development | $ | 268,421 | $ | - | $ | 268,421 |
| 4 | Community Partners fbo Safe Place For Youth | $ | 64,274 | $ | 3,570 | $ | 60,704 |
| 5 | Covenant House California | $ | 491,468 | $ | 13,652 | $ | 477,816 |
| 6 | First to Serve | $ | 755,528 | $ | - | $ | 755,528 |
| 7 | Harbor Interfaith Services, Inc. | $ | 2,229,945 | $ | 10,603 | $ | 2,219,342 |
| 8 | Hathaway-Sycamores Child and Family Services | $ | 1,128,937 | $ | - | $ | 1,128,937 |
| 9 | Home at Last Community Development Corporation | $ | 797,681 | $ | - | $ | 797,681 |
| 10 | Homeless Health Care LA | $ | 299,682 | $ | 5,344 | $ | 294,338 |
| 11 | Hope of the Valley Rescue Mission | $ | 68,250 | $ | - | $ | 68,250 |
| 12 | Jovenes, Inc. | $ | 449,117 | $ | 92,425 | $ | 356,692 |
| 13 | L.A. Family Housing Corporation | $ | 6,373,401 | $ | 629,807 | $ | 5,743,594 |
| 14 | Lamp Community, Inc. | $ | 2,464,714 | $ | 26,623 | $ | 2,438,091 |
| 15 | National Health Foundation | $ | 52,317 | $ | 52,317 | $ | - |
| 16 | New Directions, Inc. | $ | 34,347 | $ | - | $ | 34,347 |
| 17 | Ocean Park Community Center dba The People Concern | $ | 453,868 | $ | - | $ | 453,868 |
| 18 | People Assisting the Homeless (PATH) | $ | 8,274,239 | $ | 40,581 | $ | 8,233,658 |
| 19 | Rainbow Services | $ | 118,317 | $ | - | $ | 118,317 |
| 20 | Sanctuary of Hope | $ | 344,884 | $ | 96,280 | $ | 248,604 |
| 21 | Special Services For Groups, Inc. | $ | 6,674,335 | $ | 814,377 | $ | 5,859,958 |
| 22 | St. Anne's Maternity Home | $ | 326,067 | $ | 50,289 | $ | 275,778 |
| 23 | St. Joseph's Center | $ | 2,930,300 | $ | 120,005 | $ | 2,810,295 |
| 24 | Testimonial Community Love Center | $ | 388,684 | $ | - | $ | 388,684 |
| 25 | The Midnight Mission | $ | 448,950 | $ | - | $ | 448,950 |
| 26 | The People Concern | $ | 893,505 | $ | 22,766 | $ | 870,739 |
| 27 | The Village Family Services | $ | 869,561 | $ | 70,915 | $ | 798,646 |
| 28 | The Whole Child | $ | 914,426 | $ | - | $ | 914,426 |
| 29 | Union Station Homeless Services | $ | 2,035,055 | $ | 45,203 | $ | 1,989,852 |
| 30 | United Friends of the Children | $ | 783,533 | $ | 43,530 | $ | 740,003 |
| 31 | United States Veterans Initiative, Inc. | $ | 229,119 | $ | - | $ | 229,119 |
| 32 | Upward Bound House | $ | 262,105 | $ | 56,197 | $ | 205,908 |
| 33 | Valley Oasis (formerly Antelope Valley Domestic Violence Council) | $ | 2,684,614 | $ | 24,669 | $ | 2,659,945 |
| 34 | Volunteers of America of Los Angeles | $ | 5,050,169 | $ | 135,725 | $ | 4,914,444 |
| 35 | Weingart Center Association | $ | 436,051 | $ | - | $ | 436,051 |
| 36 | Whitter Area First Day Coalition | $ | 206,833 | $ | - | $ | 206,833 |
| | **Total** | **$** | **50,791,228** | **$** | **2,489,083** | **$** | **48,302,145** |



# COUNTY OF LOS ANGELES
## DEPARTMENT OF AUDITOR-CONTROLLER

KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET, ROOM 525
LOS ANGELES, CALIFORNIA 90012-3873
PHONE: (213) 974-8301   FAX: (213) 626-5427

**OSCAR VALDEZ**
AUDITOR-CONTROLLER

**CONNIE YEE**
CHIEF DEPUTY AUDITOR-CONTROLLER

| | NUMBER OF RECOMMENDATIONS |
|---|---|
| PRIORITY 1 | 10 |
| PRIORITY 2 | 3 |
| PRIORITY 3 | 3 |

November 19, 2024

TO:         Each Supervisor

FROM:     Oscar Valdez, Auditor-Controller

SUBJECT: **LOS ANGELES HOMELESS SERVICES AUTHORITY – FINANCE, CONTRACTS, RISK MANAGEMENT, AND GRANTS MANAGEMENT REVIEW (February 27, 2024, Board Agenda Item 4)**

With the support of the Chief Executive Office (CEO) and the Los Angeles Homeless Services Authority (LAHSA), we completed a review of LAHSA's Finance, Contracts, Risk Management, and Grants Management and Compliance units, as requested by the Board of Supervisors on February 27, 2024, Board Agenda Item 4. Our review was completed in accordance with the scope of work report back issued on April 23, 2024 (included in Attachment II).

We noted various opportunities for LAHSA to improve and strengthen their controls and processes over their operations, and offer the recommendations in this report to assist LAHSA management in that regard. For example, LAHSA:

- Awarded $50.8 million in Measure H working capital (multi-year) cash advances to various subrecipients beginning in Fiscal Year (FY) 2017-18, and did not establish formal agreements to determine how and when the funds would be repaid. As a result, while LAHSA indicated they initiated efforts to recoup the funds in FY 2023-24, some subrecipients cited cash flow issues, and LAHSA only recovered approximately $2.5 million (5%) as of July 8, 2024.

- Did not always recover annual cash advances awarded to subrecipients at year-end as required, and as of July 2024, had approximately $8 million in outstanding advances issued to subrecipients for the City of Los Angeles (City), County, and State programs that were carried over from FYs 2016-17 through 2022-23. Of the $8 million, approximately $409,000 is with six subrecipients who no longer contract with LAHSA.

**FAST FACTS**

*LAHSA is a joint powers authority created in December 1993 by the City and County of Los Angeles.*

*LAHSA receives funding from the County of Los Angeles, City of Los Angeles, State, and federal governments.*

*For FY ended June 30, 2023, LAHSA's total revenue was approximately $647 million.*

**REPORT #C24004**



# LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

**Attachment I**
**Page 1 of 16**

| Robert G. Campbell | Terri Kasman |
|---|---|
| ASSISTANT AUDITOR-CONTROLLER | DIVISION CHIEF |

## COUNTYWIDE CONTRACT MONITORING DIVISION      *Report #C24004*

### LOS ANGELES HOMELESS SERVICES AUTHORITY
### FINANCE, CONTRACTS, RISK MANAGEMENT, AND GRANTS MANAGEMENT REVIEW
### (February 27, 2024, Board Agenda Item 4)

### BACKGROUND AND SCOPE

The Los Angeles Homeless Services Authority (LAHSA) is a joint powers authority of the County of Los Angeles (County) and the City of Los Angeles (City) created in December 1993 to address homelessness in the region.  LAHSA coordinates and manages federal, State, County, and City funds for programs that provide various services to people experiencing homelessness.  According to LAHSA's audited financial statements for the Fiscal Year (FY) ended June 30, 2023, the majority of LAHSA's funding comes from the County and City, totaling approximately $246 million and $234 million, respectively.  The audited financial statements for the FY ended June 30, 2024, were not yet available at the time of our review.

At the Board of Supervisors' (Board) request, we completed a review of LAHSA's Finance, Contracts, Risk Management, and Grants Management and Compliance units, in accordance with the scope of work included in Attachment II.  This review is intended to inform incoming financial leadership at LAHSA of key financial and operational areas that need improvement.  In addition, as mentioned in Attachment II, our results will also help inform whether a strategic business process analysis and workplan for LAHSA is needed, which we will work with the County Chief Executive Office (CEO) and LAHSA to determine after the issuance of this report.

### TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION

| | ISSUE | RECOMMENDATION |
|---|---|---|
| 1 | **Did Not Establish Agreements for Working Capital Advances** - In FYs 2017-18 through 2019-20, the County provided LAHSA a) approximately $82.5 million in Measure H working capital advances to support Measure H operations, in which LAHSA awarded $50.8 million to various subrecipients beginning in FY 2017-18 to address cash flow needs that may occur throughout the fiscal year.  According to LAHSA, the subrecipients were allowed to retain these advances across multiple fiscal years and were not required to repay the funds annually.  LAHSA retained the remaining $31.7 million to support internal operations and awarded annual cash advances for Measure H subrecipients, as mentioned in Issue No. 2.<br><br>However, LAHSA did not establish formal agreements with the subrecipients to determine how and when the working capital advances would be repaid.  In addition, LAHSA indicated that while they initiated efforts to recoup the funds in FY 2023-24, some subrecipients reported having cash flow issues.  As a result, | **Priority 1 - LAHSA management:**<br><br>**Work with subrecipients to establish agreements with repayment terms for all outstanding working capital advances.**<br><br>b) **Provide the County CEO with quarterly updates until all advanced funds are repaid.**<br><br>**LAHSA's Response: Disagree**<br>Target Implementation Date: Not Indicated<br><br>LAHSA indicated disagreement and requested that we remove this finding and the associated recommendations, citing that their Operational Agreement (OA) with the County does not require LAHSA to recoup these advances annually or by July 8, 2024, as is stated in the report. However, our report does not state that these advances are required to be recouped annually or by July 8, 2024, and instead acknowledges that subrecipients were allowed to retain the advances across multiple fiscal years. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
# AUDITOR-CONTROLLER

Attachment I
Page 2 of 16

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| LAHSA slowed their recoupment efforts and only recovered approximately $2.5 million (5%) as of July 8, 2024.<br><br>While LAHSA initiated attempts to recover these funds, we have concerns about LAHSA's ability to recover all the advances given the lack of formal agreements memorializing the advances when they were issued. LAHSA must continue to actively work with the subrecipients to establish agreements that formalize how and when the outstanding working capital advances will be repaid. LAHSA must also establish controls over cash advances, including any future working capital advances, as mentioned in Issue No. 4.<br><br>**Impact**: LAHSA may not be able to recover all working capital advances and as a result, may not repay the County the full $82.5 million in advanced Measure H funds.<br><br>• **Who are the providers that have not repaid the funds?**<br>• **How is the outstanding $48.3 million in cash advances being recouped now?** | In addition, LAHSA indicated that while their OA does not require them to establish formal agreements, they took the initiative to do so and provided the agreements along with recoupment schedules during our fieldwork. However, LAHSA only began establishing formal agreements during FY 2023-24, and only provided agreements for some (not all) of the providers with outstanding working capital advances. As indicated under the Issue section and in our recommendation, LAHSA must continue to work with the subrecipients to establish agreements for all outstanding working capital advances.<br><br>Furthermore, LAHSA indicated they were in full compliance with their OA since they provided the County with reconciliations for the working capital advances (in lieu of recouping the funds) at the end of each fiscal year. However, our finding does not take issue with LAHSA's compliance with the OA terms and the reconciliation or recoupment of the funds, but rather with the lack of formal agreements documenting the advance and terms of recoupment of public funds. While the OA does not require LAHSA to establish formal agreements for the working capital advances (as LAHSA indicates in their response), given the significant public funds advanced to and still outstanding with subrecipients, it is critical LAHSA implement our recommendations to ensure public funds are properly accounted for and safeguarded. |
| **2**   Did Not Recoup Annual Cash Advances - LAHSA has contracts with subrecipients that include provisions for annual cash advances (cash advances), which differ from working capital advances in that these funds are to be awarded and recouped by LAHSA each fiscal year. However, LAHSA did not always recover the cash advances at year-end and had a significant amount of outstanding advances dating back to FY 2016-17, including advances with subrecipients who no longer contract with LAHSA.<br><br>Specifically, LAHSA had approximately $15 million in outstanding cash advances made to subrecipients for City, County, and State programs as of July 2024, and of those amounts, approximately $8 million (53%) was carried over from prior fiscal years (i.e., FYs 2016-17 through 2022-23), including approximately $185,000 in advances that were provided in FY 2016-17. Of | Priority 1 - **LAHSA management:**<br><br>a) **Work with subrecipients who have overdue outstanding cash advances to recover funds.**<br><br>b) **Ensure annual cash advances are recouped annually.**<br><br>c) **Consult with legal counsel regarding options for recouping outstanding cash advances with subrecipients who no longer contract with LAHSA.**<br><br>**LAHSA's Response: Partially Disagree**<br>Target Implementation Date:<br>Recommendation a): Not Indicated<br>Recommendations b) and c): June 30, 2026<br><br>LAHSA partially disagreed with our finding and that the requirement to recoup annual advances depends on the specific funder agreement for each grant. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |

| | ISSUE | RECOMMENDATION |
|---|---|---|
| | the $8 million, approximately $409,000 are outstanding advances to six subrecipients who no longer contract with LAHSA.<br><br>LAHSA indicated the cash advances received from their funders were trued-up against their actual expenditures in their year-end reimbursement claims. However, LAHSA did not recoup the $8 million in cash advances from their subrecipients, creating an $8 million cash deficit. LAHSA management indicated they track the outstanding cash advances as receivables in their accounting records, and the cash deficits will be resolved once the cash advances are collected from their subrecipients. LAHSA must work with their subrecipients to ensure all outstanding cash advances are recouped, and establish proper controls over future cash advances, as mentioned in Issue No. 4.<br><br>**Impact**: Increased risk that LAHSA is unable to recover all cash advances, especially with subrecipients that no longer have a business relationship with LAHSA, resulting in shortfalls with funds that were intended for other programs. | However, LAHSA's contracts with their subrecipients include standard language indicating that "advance payments must be repaid in full prior to the close of the FY in which the advance payment is received." Accordingly, regardless of funder requirements LAHSA's current practices are not in conformance with the terms of their own subrecipient contracts.<br><br>In addition, LAHSA indicated that their OA with the County allows for the funds to be reconciled annually in lieu of being recouped and therefore, they are fully compliant. However, the terms cited are requirements for cash advances between the County and LAHSA, not LAHSA and their subrecipients.<br><br>LAHSA also requested this finding be reduced to a Priority 3, indicating that significant improvements have been made. However, given the significance of the issues we identified in our review, such as outstanding advances with six subrecipients who no longer contract with LAHSA, it is critical for LAHSA to implement our recommendations to ensure public funds are properly accounted for and safeguarded.<br>• **When will the $15 million be recouped? What steps are being taken to do so? Who are the providers who owe the money?** |
| 3 | **Inadequate Contract Data** - LAHSA uses their Enterprise Grants Management System (EGMS) to manage the full lifecycle (i.e., pre-award to post-award phases) of their subrecipient contracts and contract amendments (referred throughout as "contracts"). However, LAHSA was unable to produce an accurate list of all their contracts in EGMS. Specifically, while LAHSA indicated they had 1,273 active contracts as of May 2024, LAHSA provided five different contract listings from EGMS that identified varying contract totals ranging from 676 to 1,078. Significantly, none of the different listings provided by LAHSA accounted for all of the active contracts LAHSA reported having.<br><br>In addition, LAHSA was unable to determine the total number of contracts that were executed either timely or retroactively in FY 2023-24. This was primarily due to LAHSA not tracking key data in EGMS, or maintaining inaccurate data. For example, we reviewed a sample of eight contracts and noted that for: | **Priority 1** - LAHSA management ensure key contract information is adequately tracked, reliable, and accurate.<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
# AUDITOR-CONTROLLER

**Attachment I**
**Page 4 of 16**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| • All contracts, the EGMS reports <u>did not capture the dates LAHSA's contracts were signed by all parties and executed</u>.<br><br>• Six (75%) contracts, the term start and/or end dates captured in EGMS <u>did not match the dates on the actual contract.</u><br><br>• Four (50%) contracts, <u>the term start dates in the actual contracts were inaccurate,</u> which in turn, resulted in inaccurate EGMS reports. Specifically, all four were contract amendments and instead of identifying the *amendment* term start dates, LAHSA identified the start dates for the entire *contract* term.<br><br>Retroactive and untimely contracts have been an ongoing and recurring issue for LAHSA. Management's attempts to address these issues are impaired when they <u>do not have reliable and accurate information about fundamental contracting metrics, such as the quantity, timeliness, and terms of their active contracts.</u> LAHSA must ensure they adequately track and maintain contracting data to measure performance and/or identify opportunities to improve their contracting function.<br><br>**Impact**: Reputational, operational, and compliance risk including, inability to fully assess contracting risk and performance, retroactive and untimely contracts, improper and late payments, lapses in critical services, administrative burden to correct data diverting resources from other tasks, and loss of trust from stakeholders. | |
| **4** **Inadequate Controls Over Cash Advances** - In addition to the deficiencies noted in Issues No. 1 and 2, <u>LAHSA did not have other basic controls in place to ensure cash advances were appropriate, properly accounted for, and safeguarded.</u> For example, LAHSA did not:<br><br>• Deposit cash advances received in a separate, interest-bearing account by funding source.<br><br>• Evaluate the subrecipients' contracting and advance repayment history prior to awarding | **Priority 1** - LAHSA management implement adequate controls, including the controls identified in this report, to ensure cash advances are appropriate, properly accounted for, and safeguarded.<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: November 1, 2024 (Partially)<br><br>LAHSA indicated they implemented bullets 2 and 4. However, LAHSA also indicated they disagree with bullets 1 and 3 because they are not required under the OA, requested the bullets be removed from our |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY
AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
| --- | --- |
| **ISSUE** | **RECOMMENDATION** |

| | ISSUE | RECOMMENDATION |
| --- | --- | --- |
| | cash advances, as stated in LAHSA's internal policy.<br><br>• Reconcile advances to the subrecipients' actual expenditures at least quarterly.<br><br>• Establish clear policies and procedures that address the recoupment of outstanding cash advances, including timelines for follow-ups and remedies for non-responsive subrecipients.<br><br>In response to a County Board motion on May 21, 2024, the County's CEO implemented an alternative funding model for Measure H funded contracts, which provided LAHSA with quarterly cash advances, where LAHSA will in turn provide monthly advances to their subrecipients. As of September 6, 2024, the County had already provided LAHSA with $115,658,400 in Measure H advances for FY 2024-25. Given that this new model increases the number and amount of cash advances received and disbursed, LAHSA must strengthen controls to ensure all cash advances are properly accounted for and used for their intended purpose.<br><br>**Impact**: Increased risk that cash advances are not used for their intended purpose and may not be fully recovered. | report, and that this finding be reduced to a Priority 3. While these controls are not required under the OA, they are best practices memorialized in the County Fiscal Manual to ensure proper controls over cash advances. Implementing the recommended controls will benefit LAHSA management and their overall administration of and accountability for cash advances. Given the findings noted in Issues No. 1 and 2, and the significant amount of cash advances that LAHSA receives and awards, LAHSA must implement these controls to ensure proper stewardship of public funds and that all cash advances are adequately accounted for and safeguarded.<br><br><br>• **What controls are in place for this money?** |
| 5 | **Inappropriate Use of Funds** a pass-through governmental agency, LAHSA submits reimbursement claims to its funders and must typically wait to be reimbursed before remitting payments to their subrecipients, unless other resources, such as cash advances, are made available by the funders. However, we noted instances where LAHSA paid their subrecipients prior to receiving reimbursement from funders who did not provide cash advances during FY 2023-24. To make these payments, LAHSA used funds received from other government funders even though the services being paid for were not contracted by those funders. Specifically, from our sample of subrecipient payments made in FY 2023-24, we noted that LAHSA paid: | **Priority 1** - LAHSA management ensure:<br><br>a) **Available funds are only used for their intended purposes.**<br><br>b) **Fund balances are monitored to verify program funding is available prior to remitting payments to subrecipients.**<br><br>**LAHSA's Response: Disagree**<br>Implementation Date: July 1, 2024<br><br>Although LAHSA's response indicated disagreement with our findings and recommendations, LAHSA did not specify any areas of disagreement and indicated they implemented our recommendations. While LAHSA indicated the implementation date occurred during our review, they did not provide any |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
| --- | --- |
| **ISSUE** | **RECOMMENDATION** |
| • One subrecipient for a federal Department of Housing and Urban Development (HUD) program 16 days prior to LAHSA receiving reimbursement, totaling $126,168.<br><br>• One subrecipient for a County (non-Measure H) program 14 days prior to LAHSA receiving reimbursement, totaling $31,770.<br><br>LAHSA confirmed they used other available funding unrelated to the programs to pay the subrecipients. LAHSA must discontinue this practice to ensure financial resources and operations for other programs are not inappropriately (and negatively) impacted.<br><br>**Impact**: Using funds received from one government funder to pay for services provided under another government funder's contract/grant constitutes a misuse of those funds, and increases the risk that funder payments are not available for the purposes they were claimed and received. This indicates weaknesses in internal controls and financial management practices, and may result in unintended cash flow issues for various programs and could expose LAHSA to administrative contractual remedies from funders. | documentation to support that they took corrective action during our fieldwork or with their response. As a result, we could not verify if LAHSA fully implemented our recommendations. We will review their implementation status during a future follow-up review, if requested.<br><br><br>• **How will LAHSA make sure that funds shuffling does not happen again?** |
| **6** | **Late Payments to Subrecipients** - LAHSA did not always pay subrecipients timely even when LAHSA had received payment for services from its funders. Our review of 13 subrecipient payments made between July 2023 through May 2024 noted that five (38%) of those payments were late. Specifically:<br><br>• Two were paid 53 and 68 business days after the receipt of the subrecipient invoices, respectively, even though these payments were Measure H funded and LAHSA should have had cash advances available to pay within 45 days of receiving the invoices, as stated in their subrecipient contracts. In addition, for one of the invoices, it took LAHSA 51 business days after receiving reimbursement from the County to remit payment to the subrecipient, even though LAHSA indicated their internal metric is to | **Priority 1** - LAHSA management:<br><br>a) **Ensure subrecipients are paid timely when cash advances are available or after reimbursement is received from funding sources.**<br><br>b) **Develop strategies for managing cash flow to ensure sufficient funds are available to meet their financial obligations.**<br><br>**LAHSA's Response: Agree**<br>Implementation Date: July 1, 2024 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| pay within 15 business days of receiving payment from the funder.<br><br>• Two were paid 42 and 50 business days after the receipt of the subrecipient invoices, respectively, even though LAHSA already received the funding in advance for these services. The payments were for a State funded program in which LAHSA received advanced installment payments in place of having to submit reimbursement claims.<br><br>• One was paid 55 business days after LAHSA received reimbursement from the funding source (i.e., the City). As mentioned above, LAHSA indicated their internal metric is to pay within 15 business days.<br><br>LAHSA indicated the late payments were due to cash flow issues. However, as noted in Issues No. 1 and 2, LAHSA received $82.5 million in working capital advances from the County, and also received cash advances from various other funding sources which were subsequently awarded to subrecipients and not recouped as required, creating a cash deficit. To ensure sufficient funds are available to meet their financial obligations, LAHSA should develop strategies to enhance their cash flow management.<br><br>**Impact**: Delayed payments can negatively affect a subrecipient's cash flow and their ability to provide critical client services. | • **Who were the providers that were gifted this tax-payer money?** |
| **7**    Record-keeping Deficiencies - Working Capital Advances - LAHSA used various methods to track their Measure H working capital advances provided to subrecipients, including their Working Capital Recoup Tracker report, which is generated from LAHSA's accounting records. We obtained a copy of this report and selected a sample of transactions to validate the accuracy of the information. Specifically, we selected 12 (33%) of the 36 subrecipients that received working capital advances, totaling approximately $34.6 million (68%) of the total $50.8 million in working capital advances awarded, and requested documentation to support the amounts, such as the request and q | Priority 1 - **LAHSA management investigate records for all working capital advances, including records for the issues noted in our review, and make any necessary corrections to ensure an accurate accounting of all working capital advances.**<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: March 31, 2025<br><br>• **Who are these 12 providers?** |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| approval documents, check registers/vouchers, etc. Of the $34.6 million, LAHSA: | |
| • Understated the amount of working capital advances for two subrecipients by $505,591. Specifically, LAHSA's accounting records understated the awarded amount by $356,967 for one subrecipient, and by $148,624 for the other subrecipient. | • Who are the two providers that got this gift of $505,591? |
| • Did not provide the advance request, approval, and/or disbursement documentation for eight subrecipients, totaling approximately $5 million (14%) in working capital advances reviewed. | |
| LAHSA attributed these record keeping deficiencies to various causes, including staff turnover and system changes. To ensure all working capital advances are fully accounted for, LAHSA must review all balances to ensure they are accurate and supported. | |
| **Impact**: Increased risk of misuse and/or misappropriation of funds if accounting records do not reflect actual amounts disbursed. In addition, inaccurate accounting of the Measure H working capital advances may hinder LAHSA's ability to accurately and effectively recover all funds and fully repay the County. | |
| **8**   Retroactive Contracts - Although LAHSA could not identify their total number of retroactive contracts in FY 2023-24 (as mentioned above in Issue No. 3), we reviewed a sample of eight contracts and noted that seven were executed retroactively in FY 2023-24. These seven contracts were executed between 23 and 170 days late, or an average of 73 days after the contract start date. While most of these contracts were executed late due to funding delays, we noted opportunities for LAHSA to improve the timeliness of contract executions. Specifically, funding for: <br><br> • Five of the contracts was approved by the City on August 10, 2023, which was 40 days after the contact start date of July 1, 2023. After funding was approved, LAHSA took between ten and 130 days to execute the | Priority 1 - **LAHSA management:** <br><br> a) **Identify internal delays in the contracting process and implement improvements to enhance the timeliness of contract executions.** <br><br> b) **Work with funding sources, where applicable, to identify possible solutions for funding approval delays to minimize retroactive contracting.** <br><br> **LAHSA's Response: Disagree** <br> Target Implementation Date: Not Indicated <br><br> LAHSA indicated disagreement and requested that we remove this finding. According to LAHSA, none of the contracts sampled experienced excessive delays attributable to internal issues with their contracting |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.



**LOS ANGELES COUNTY**
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |

| ISSUE | RECOMMENDATION |
|---|---|
| While LAHSA's Contract Compliance Unit developed a FY 2023-24 Contract Monitoring Plan (Monitoring Plan), they did not have adequate processes in place to ensure the Monitoring Plan provided effective oversight of their subrecipients. Specifically, we reviewed LAHSA's processes for developing and maintaining their Monitoring Plan and noted that LAHSA did not:<br><br>• Have an adequate risk assessment process. While LAHSA identified appropriate risk factors, such as a subrecipient's noncompliance history, LAHSA did not have a systematic and documented method to evaluate and determine a subrecipient's overall risk rating/score. Instead, LAHSA relied on internal/institutional knowledge to determine the overall risk for a subrecipient, which was then used to develop their Monitoring Plan.<br><br>• Track the status of all their contract monitoring reviews and as a result, could not readily determine their progress in completing the planned reviews. LAHSA should actively track the status of all contract monitoring reviews and evaluate their performance against the monitoring plans at year-end to determine whether monitoring resources are adequate.<br><br>• Have an adequate process for updating their Monitoring Plan with newly executed contracts. To identify new contracts, LAHSA's Contract Compliance Unit indicated they manually run accounting and contract reports monthly to identify activity (e.g., new subrecipient payments) that may suggest new contracts. However, the Contract Compliance Unit should instead be automatically notified when new contracts are executed to ensure proper and timely subrecipient oversight and monitoring.<br><br>• Have a process to ensure all subrecipients are monitored programmatically. Specifically, 54 (51%) of their 105 planned reviews did not include procedures to monitor a subrecipient's program/service | c) Implement a notification process to ensure that the Contract Compliance Unit is notified of newly executed contracts.<br><br>d) Ensure subrecipients are monitored for all key contract requirements (e.g., programmatic requirements).<br><br>**LAHSA's Response: Disagree**<br>Implementation Date: October 31, 2024<br><br>LAHSA indicated disagreement and requested that we remove this finding and the associated recommendations. For example, in their response, LAHSA indicated:<br><br>• They did have an adequate risk assessment process that included various risk factors. However, as indicated in the Issue section, while we acknowledged that LAHSA did identify appropriate risk factors, they did not have a systematic and documented method to determine overall risk.<br><br>• They diligently track the status of all contract monitoring reviews. However, as indicated in the Issue section, LAHSA could not readily determine their progress in completing their planned reviews during our fieldwork.<br><br>• Their Contract Compliance Unit receives notifications of all newly approved contracts and runs monthly reports to identify new contracts. However, during our fieldwork, LAHSA management indicated the monthly reports were the only way they could identify new contracts, and were unable to provide a comprehensive accounting of all contracts to the auditors.<br><br>• The 54 reviews identified in our finding were determined to be low risk and therefore, did not require a program/service delivery review. However, given the critical nature of LAHSA's contracted services, subrecipients need regular programmatic monitoring to ensure services are appropriately provided.<br><br>While LAHSA indicated they disagreed with our findings and recommendations, they also indicated they implemented recommendations a), c), and d). |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| ISSUE | RECOMMENDATION |
| delivery compliance (e.g., adherence to participant eligibility requirements), and LAHSA did not have a process in place to ensure this form of monitoring would be completed during the contract term.<br><br>**Impact:** Possible gaps in contract monitoring and inadequate contractor/subrecipient oversight, which may result in the waste or misuse of public funds and/or critical services not being provided. | LAHSA must implement the remaining recommendation to ensure adequate monitoring of their contracted services.<br><br>• Given that LAHSA is not reviewing program compliance, why is the county opposing the current A & M audit that will provide this monitoring? |
| **10**   **Lack of Contract Monitoring Standards** - An effective contract monitoring function should have standards for conducting and documenting the results of their contract monitoring reviews. We found that LAHSA's contract monitoring function does not always have or adhere to standards. Specifically, we selected a sample of 1 0 contract monitoring reviews LAHSA conducted in FY 2023-24 and noted that:<br><br>• LAHSA did not maintain adequate workpapers to support the results and conclusions for all ten reviews. Specifically, while LAHSA generally maintained workpapers (e.g., client eligibility records, cost allocation plans, etc.) for their reviews, LAHSA was unable to provide any documentation for one review, indicating the records were lost, and could not readily demonstrate how the workpapers supported their conclusions for the remaining nine reviews.<br><br>• Workpapers for all ten reviews did not include evidence of supervisory review. Contract monitoring reviews should be properly supervised to ensure objectives are appropriately met and supported.<br><br>As a result, we could not determine whether LAHSA adequately monitored their contracts to ensure subrecipients complied with their contract terms. Given the critical nature of their contracted services, LAHSA must have a robust contract monitoring function to ensure critical services are adequately provided, that recipients exist and are eligible, and that contracted funds are used for their intended purposes. | **Priority 1** - **LAHSA management:**<br><br>a) Ensure adequate workpapers are maintained for all contract monitoring reviews, and consider the use of audit workpaper software to ensure consistency and efficiency.<br><br>b) Contract monitoring reviews are properly supervised, and evidence of supervision is documented.<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025<br><br><br><br><br>• A & M needs to verify contracts and provider compliance with spot checks, why will the county not pay for these spot checks? |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
| ISSUE | RECOMMENDATION |
|---|---|
| **Impact**: Increased risk that contract monitoring reviews are not properly conducted, potentially resulting in various issues going undetected, such as funds not used for their intended purposes, misuse and misappropriation of funds, services not provided and/or not provided in accordance with contract terms and other noncompliance issues. | |
| **11**   Delays with Reimbursement Claims - As mentioned above, LAHSA is primarily a pass-through governmental agency, and typically must wait for invoices from their subrecipients before submitting their own reimbursement claims to their funders. While these claims should be submitted timely to ensure adequate cash flow, we noted instances where claims were excessively late. Specifically, of the 13 LAHSA reimbursement claims we reviewed:<br><br>• One claim to the County, totaling $487,125, was submitted 214 days after the end of the billing month when LAHSA's County OA requires they submit claims within 30 days. LAHSA indicated this was due to their subrecipients not submitting year-end invoices timely and delays with their own year-end reconciliation and close-out processes.<br><br>• One claim to HUD, totaling $126,168, was submitted 144 days after the billing month, and while there was no submission deadline, the delay appeared excessive. LAHSA indicated the subrecipient could not submit their invoices in EGMS due to pending contract amendments. In addition, we contacted the subrecipient who cited additional issues, such as barriers with accessing EGMS and complexities with the system.<br><br>In addition, we reviewed a sample of 20 subrecipient monthly invoices to LAHSA from FY 2023-24 and noted that 12 (60%) were not submitted by the 15th of the following month, as required by their contracts. According to LAHSA, there were no barriers that prevented the subrecipients from submitting their invoices timely. We attempted to contact the | Priority 2 - LAHSA management:<br><br>a) **Monitor subrecipients to identify and address barriers in submitting their invoices to ensure they are submitted timely as required by their contracts.**<br><br>b) **Ensure their own reimbursement claims to funders are submitted timely.**<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| subrecipients, and while only two responded, they confirmed that the late submissions were due to internal issues, such as inadequate oversight and staff turnover.<br><br>LAHSA should monitor their subrecipients and address barriers, where appropriate, to ensure invoices are submitted by the required deadlines since late submissions delay their own reimbursement claims, as evidenced by the findings detailed above.<br><br>**Impact**: Delayed reimbursement claims by LAHSA and invoices from subrecipients can negatively impact the budget processes for LAHSA's funders, and delayed payments can cause cash flow issues for both LAHSA and their subrecipients. In addition, funds may go unspent or underutilized when claims are not submitted timely. | |
| **12**   **Did Not Complete Planned Audits** – While LAHSA has an Internal Audit Unit to evaluate internal controls, compliance, and operational efficiencies, we noted that LAHSA did not complete any of the four planned audits in FY 2022-23 and carried over the audits to their FY 2023-24 Internal Audit Plan. In addition, LAHSA indicated they only initiated two (50%) of the four planned audits for FY 2023-24, both of which began in May 2024, and attributed the audit delays to emerging issues. While deviations from internal audit plans are not uncommon, LAHSA's lack of adherence to their plans for the past two fiscal years and overall lack of internal audit activity raises concerns about the adequacy and capability of their internal audit function.<br><br>In addition, according to LAHSA's Internal Audit Charter, LAHSA adheres to the International Standards for the Professional Practice of Internal Auditing (Standards). However, LAHSA did not communicate the deviation from their planned work to senior management and their governing body for review and approval, as required by Section 2020 of the Standards. To maintain a robust internal audit function, LAHSA should ensure they have adequate resources to complete the work in their annual internal audit | **Priority 2** - LAHSA management ensure:<br><br>a) **Internal audit resources are adequate to complete the audits in the annual audit plans.**<br><br>b) **Deviations from annual audit plans are reviewed and approved by the appropriate parties.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested this finding be reduced to a Priority 3, citing that status updates and deviations from the Audit Plan were communicated to LAHSA's Management Committee. However, LAHSA communicated the deviations from their audit plan after the fact. As mentioned in the Issues section, deviations from the Audit Plan should be communicated for review and approval before changes are adopted. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| | TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|---|
| | **ISSUE** | **RECOMMENDATION** |
| | plans, and that any deviations are reviewed and approved as required.<br><br>**Impact**: Increased risk of errors, fraud, noncompliance, and other operational weaknesses and inefficiencies going undetected. | |
| 13 | **Internal Audit Risk Assessment Not Completed Annually** - An internal audit function's work must be based on documented risk assessments that are completed at least annually, which in turn, guide the development of annual internal audit plans. However, LAHSA's Internal Audit Unit did not complete a risk assessment to develop their FY 2023-24 Internal Audit Plan as required by Section 2010A.1 of the Standards. Instead, LAHSA carried over their FY 2022-23 planned internal audits to FY 2023-24, as mentioned in Issue No. 12. According to LAHSA management, this was due to capacity issues and the ongoing prevalence of the issues identified in their FY 2022-23 risk assessment.<br><br>**Impact**: Emerging risks may go undetected/ unevaluated, which may result in utilizing audit resources on less critical assignments. | **Priority 2** - LAHSA management ensure risk assessments are completed annually to develop their internal audit plans.<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested this finding be reduced to a Priority 3, citing that they assessed the situation and decided to carry over the FY 2022-23 methodology and results at their discretion. However, risk assessments must be completed annually as required by the Standards and ultimately, LAHSA indicated they will implement our recommendation.<br><br>• **Please provide to the Court these completed audits.** |
| 14 | **Internal Audit Independence** - LAHSA's Director of Risk Management oversees their Internal Audit Unit, serving as their Chief Audit Executive (CAE), and also has oversight of LAHSA's Legal Operations, Investigations, Third Party Audits, Risk Management, and Quality Standards Units. According to Section 1112 of the Standards, where a CAE has or is expected to have roles and/or responsibilities that fall outside of internal auditing, safeguards must be in place to limit impairments to independence or objectivity. However, LAHSA did not provide formal action plans that outlined specific safeguards in place to address perceived or actual impairments to independence.<br><br>In addition, Section 7.1 of the new 2024 Global Internal Audit Standards, which must be adopted in 2025, requires the roles and responsibilities that go beyond internal audit, and the established safeguards be documented in the Internal Audit Charter (Charter). However, LAHSA's Charter, which was last updated in 2018, did not | **Priority 3** - LAHSA management identify and document the CAE's roles and responsibilities that fall outside internal auditing, and the established safeguards to limit impairments to independence or objectivity in LAHSA's Internal Audit Charter.<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested that we remove this finding and the associated recommendations, citing that they had already taken steps towards greater independence and had also revised their Internal Audit Charter. However, our findings were accurate at the time of our fieldwork, and their Internal Audit Charter was not revised until after our review. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| document the CAE's other responsibilities and established safeguards. LAHSA management indicated they are in the process of updating their Charter to include all the required information.<br><br>**Impact**: Actual or perceived impairments to independence, which can impact the Internal Audit Unit's ability to function in an unbiased manner. | |
| **15** No Quality Assurance and Improvement Program - According to Section 1300 of the Standards, the CAE must develop and maintain a Quality Assurance and Improvement Program (QAIP) that covers all aspects of the internal audit activity. The QAIP must include both internal and external assessments, and the CAE discuss the results of the assessments with senior management and the governing body. However, LAHSA did not have a QAIP in place at the time of our review. According to LAHSA management, they will establish a QAIP and anticipate completing the assessments in FY 2024-25.<br><br>**Impact**: Increased risk of nonconformance with the Standards, which can negatively impact the quality of an internal audit function.<br><br>   • **The A & M audit is an external assessment, so why is the County fighting it?** | Priority 3 - LAHSA management:<br><br>a) **Establish a Quality Assurance and Improvement Program.**<br><br>b) **Ensure internal and external assessments are completed as required by the Standards.** must<br><br>c) **Ensure results are communicated to senior management and their governing body.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: June 30, 2025<br><br>Although LAHSA's response indicated partial disagreement with our finding and recommendations, LAHSA did not specify any areas of disagreement. However, LAHSA did indicate that the Standards acknowledge that public sector entities like LAHSA face unique challenges that can impact the ability to fund and implement QAIP. Ultimately, LAHSA indicated they will implement our recommendations provided funding is available. |
| **16** Key Performance Indicators Not Established - Key performance indicators (KPIs) are metrics that are used to measure how well an organization is performing a given function. When evaluated regularly, KPIs can help identify areas for improvement, help make decisions and prioritize actions, and detect patterns and trends over time and reveal improvement opportunities. While LAHSA had not yet established KPIs for their Internal Audit Unit at the time of our review, LAHSA did establish a new policy in May 2024 governing the development and implementation of KPIs. The new policy applies to all functions, and LAHSA indicated they expect KPIs will be finalized in FY 2024-25. | Priority 3 - **LAHSA management ensure KPIs are finalized and implemented where applicable, and establish a mechanism for collecting, analyzing, and reporting KPIs to the appropriate parties.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: June 30, 2025<br><br>Although LAHSA's response indicated partial disagreement with our finding and recommendation, LAHSA did not specify any areas of disagreement. LAHSA acknowledged their Internal Audit KPIs were in draft form at the time of our review and indicated they will implement our recommendation. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.



























































