**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No: LA CV 20-02291-DOC-(KESx)               Date: January 7, 2025

Title:  LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et al.

PRESENT:   THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE

| Karlen Dubon | Court Smart |
|---|---|
| Courtroom Clerk | Court Reporter |

| **ATTORNEYS PRESENT FOR PLAINTIFF:** | **ATTORNEYS PRESENT FOR DEFENDANT:** |
|---|---|
| Elizabeth Mitchell | Jessica Mariani |
| Shayla Myers, Intervenor | Mira Hashmall |
| | Arlene Hoang |

**PROCEEDINGS:**   **MOTION FOR ORDER FOR SETTLEMENT AGREEMENT COMPLIANCE [767]**

**STATUS CONFERENCE RE A&M AUDIT**
*(Held at Los Angeles First Street)*

Also Present, Special Masters Michele Martinez and Jay Gandhi, LA Controller Kenneth Mejia, A&M Representatives, and  LAHSA Representatives.

The Court orders the transcript of the hearing held January 7, 2025 be immediately produced at the government's expense and billed at the daily rate.

The transcript shall be prepared forthwith and filed on the docket with immediate release to the public.

The transcript will also be available to download on the Court's Cases of Interest webpage, located here: https://www.cacd.uscourts.gov/newsworthy/cases-of-interest

**cc:**     CourtRecording_CACD@cacd.uscourts.gov
Transcripts_CACD@cacd.uscourts.gov
Reporter_CACD@cacd.uscourts.gov

2  :  58

Initials of Deputy Clerk: kdu

# 2:20-cv-02291-DOC-KES

## LA Alliance for Human Rights et al v. City of Los Angeles et al

## Supplemental 1:

## LA City Controller Presentation



  

# Pathways to Permanent Housing

City of Los Angeles

Office of the City Controller

1

# Purpose of the Audit



- Evaluate LAHSA management of LA City shelter beds

- Determine whether shelter beds are going unfilled

- Assess efforts to transition people from shelters to permanent housing

- Analyze LAHSA efforts to monitor service provider performance

- Scope period of FY 2019 - FY 2023

# What We Found    *Shelter Management*



- Shelter occupancy rates have been well below LAHSA's 95% target

| | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|
| Citywide Occupancy | 78% | 68% | 64% | 74% | 73% |

- The estimated cost of unused beds was $218 million

- Non-congregate shelters tend to cost more to operate than traditional congregate setting

- Occupancy rates at non-congregate shelters were higher

3

# What We Found    *Shelter Management*



- Service providers are typically paid the same rate regardless of shelter occupancy rates

- LAHSA's service provider monitoring program is weak and unable to hold poor performers accountable

- Some beds may go unfilled due to bed reservation protocols

- LAHSA's shelter occupancy data is often unreliable

4

# What We Found   *Permanent Housing*



- LAHSA's capacity for transitioning people into permanent housing remains limited

- Just 30% of shelter residents are enrolled in Housing Navigation services

- A majority of shelter residents returned to homelessness or an unknown destination

- Fewer than 1 in 5 in shelters residents were placed into permanent housing

# What We Found   *Permanent Housing*



- Time Limited Subsidies (TLS) is the most common permanent housing destination

| Permanent Housing Destination | % of Total |
|---|---|
| Time Limited Subsidy | 39% |
| Vouchers (e.g., Section 8) and Other Housing Subsidies | 25% |
| Unsubsidized Permanent Housing | 23% |
| Permanent Supportive Housing | 13% |

- 12% of those housed through TLS returned to homelessness during the life of the subsidy

- LAHSA does not track long term outcomes for TLS recipients

- Effective case management and support remain crucial for permanent housing transitions

6

# What We Recommend



- Revamp the service provider contract and performance monitoring program

- Clarify contract terms and develop performance-based compensation models for shelter operators

- Consider new permanent housing placement rate metrics

- Formalize the City's shelter bed reservation protocol

- Increase Housing Navigation capacity

- Track long term outcomes for clients in permanent housing

- Improve congregate living settings

# 2:20-cv-02291-DOC-KES

## LA Alliance for Human Rights et al v. City of Los Angeles et al

## Supplemental 2:

## LAHSA Production



707 Wilshire Blvd. 10th Floor
Los Angeles, CA 90017
213 683.3333
www.lahsa.org

January 6, 2025

Honorable David O. Carter
U.S. Courthouse
350 West 1st Street
Los Angeles, California 90012

**Subject: January 2025 Update on Recoupment of Measure H Working Capital Advances**

Dear Judge Carter:

This letter is to update you on recoupment of Measure H Working Capital Advances since LAHSA's last update to the Court in November 2024.

As LAHSA noted in its response to the Auditor-Controller report last year, the understanding around these advances was that they were designed to support Measure H start-up costs and ongoing cashflow needs for service providers as the system rapidly ramped up and sustained a higher level of services. As such, the advances were always intended to be recouped at the conclusion of Measure H. Consistent with this understanding, the County has not sought recoupment of these funds, nor has it instructed LAHSA to specifically recoup these funds.

LAHSA's previous report to the court cited the LA County Auditor's total of $50.8 million in advances provided to contracted agencies for Measure H. At that time, $6.3 million had been recouped. Financial recoupment progress since November 21, 2024, is as follows:

**Progress on Recoupment**

- Between November 22, 2024, and December 31, 2024, LAHSA recouped an additional $7.2 million.
    - This brings the total recouped to $13.5 million.
    - The outstanding balance is now $37.3 million.

**LAHSA's Plan for Continued Recoupment**

Measure H will be superseded by Measure A in spring 2025. With the early conclusion of Measure H, LAHSA will work with its partners at LA County to complete plans to recoup these funds from providers. As noted previously, these recoupments may come in the form of:
- **Reduced Payables:** Offsetting future payments to service providers against their outstanding balances.

- **Direct Payments:** Providers making direct payments to LAHSA.

LAHSA will work with LA County to identify additional means of recoupment as needed.

Sincerely,

Dr. Va Lecia Adams Kellum
Chief Executive Officer
Los Angeles Homeless Services Authority

**Los Angeles Homeless Services Authority**
**Measure H Working Capital Advances and Recoupment Status**
**Through December 31, 2024**

| No. | Service Provider | Total Advances Issued as of 7/8/2024 (a) | Advances Recouped as of 7/8/2024 (b) | Advance Balance as of 7/8/2024 (c) = (a) - (b) | Recouped date of advances in Column D | Letter Issued Date | Letter Returned by Provider | Date of additional Recoupment through FY23-24 | Additional Recoupment amount 11/21/24 (d) | Date of additional Recoupment through 12/31/24 | Additional Recoupment amount since 11/21/24 as of 12/31/24 (e) | Total Recoupment (f) = (c) + (d) + (e) | Advance Balance as of 12/31/24 (g) = (a) - (f) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1736 Family Crisis Center | 914,593 | 60,266 | 854,327 | 7/16/2024 | 12/18/2023 | 1/5/2024 | 6/4/2024 | 97,637 | 10/5/2024 | 97,637 | 255,541 | 659,052 |
| 2 | 211 LA County | 73,938 | 73,938 | - | 11/3/2021 | N/A | N/A | N/A | - | N/A | - | 73,938 | (0) |
| 3 | Coalition for Responsible Community Development | 268,421 | - | 268,421 | N/A | 12/15/2023 | 12/22/2024 | 6/12/2024 | 7,500 | 10/8/2024 | 60,000 | 67,500 | 200,921 |
| 4 | Community Partners fbo Safe Place For Youth | 64,274 | 3,570 | 60,704 | 5/1/2024 | 12/18/2023 | 1/11/2024 | 8/21/2024 | 5,355 | N/A | - | 8,925 | 55,349 |
| 5 | Covenant House California | 491,468 | 13,652 | 477,816 | 7/3/2024 | 12/15/2023 | | 8/21/2024 | 54,608 | 11/28/2024 | 68,260 | 136,520 | 354,948 |
| 6 | First to Serve | 755,528 | - | 755,528 | N/A | 12/18/2023 | 1/9/2024 | 7/16/2024 | 41,974 | 8/6/2024 | 41,974 | 83,948 | 671,580 |
| 7 | Harbor Interfaith Services, Inc. | 2,229,945 | 10,603 | 2,219,342 | 6/30/2019 | 12/18/2023 | 1/29/2024 | 8/7/2024 | 308,346 | N/A | - | 318,949 | 1,910,996 |
| 8 | Hathaway-Sycamores Child and Family Services | 1,128,937 | - | 1,128,937 | N/A | 12/15/2023 | 12/19/2023 | 6/21/2024 | 125,437 | 10/28/2024 | 162,740 | 288,177 | 840,760 |
| 9 | Home at Last Community Development Corporation | 797,681 | - | 797,681 | N/A | 12/18/2023 | 5/1/2024 | N/A | - | N/A | - | - | 797,681 |
| 10 | Homeless Health Care LA | 299,682 | 5,344 | 294,338 | 7/20/2024 | 1/11/2024 | 1/22/2024 | | - | N/A | - | 5,344 | 294,338 |
| 11 | Hope of the Valley Rescue Mission | 68,250 | - | 68,250 | N/A | 12/15/2023 | | 8/13/2024 | 11,375 | 10/28/2024 | 22,750 | 34,125 | 34,125 |
| 12 | Jovenes, Inc. | 449,117 | 92,425 | 356,692 | 6/4/2024 | 12/18/2023 | 12/19/2024 | 6/21/2024 | 21,618 | N/A | - | 114,043 | 335,074 |
| 13 | L.A. Family Housing Corporation | 6,373,401 | 629,807 | 5,743,594 | 12/16/2023 | 1/12/2024 | 1/16/2024 | 8/7/2024 | 1,240,954 | N/A | - | 1,870,761 | 4,502,640 |
| 14 | National Health Foundation | 52,317 | 52,317 | - | 6/5/2024 | 12/18/2023 | 12/18/2023 | N/A | - | N/A | - | 52,317 | - |
| 15 | New Directions, Inc. | 34,347 | - | 34,347 | N/A | 12/18/2023 | | N/A | - | N/A | - | - | 34,347 |
| 16 | People Assisting the Homeless | 8,274,239 | 40,581 | 8,233,658 | N/A | 12/20/2023 | 7/2/2024 | N/A | - | N/A | - | 40,581 | 8,233,658 |
| 17 | Rainbow Services | 118,317 | - | 118,317 | N/A | 12/15/2023 | 1/24/2024 | N/A | - | N/A | - | - | 118,317 |
| 18 | Sanctuary of Hope | 344,884 | 96,280 | 248,604 | 3/20/2024 | 12/18/2023 | 1/19/2024 | 8/21/2024 | 28,412 | 11/18/2024 | 28,412 | 153,104 | 191,780 |
| 19 | Special Services For Groups, Inc. | 6,674,335 | 814,377 | 5,859,958 | 4/23/2024 | 12/15/2023 | 1/10/2024 | 8/21/2024 | 306,982 | 12/11/2024 | 5,552,976 | 6,674,335 | - |
| 20 | St. Anne's Maternity Home | 326,067 | 50,289 | 275,778 | 2/13/2024 | 12/18/2023 | 1/28/2024 | 8/13/2024 | 32,444 | N/A | - | 82,733 | 243,334 |
| 21 | St. Joseph's Center | 2,930,300 | 120,005 | 2,810,295 | 5/15/2020 | 2/8/2024 | 2/28/2024 | 8/7/2024 | 156,128 | 8/9/2024 | 78,064 | 354,196 | 2,576,104 |
| 22 | Testimonial Community Love Center | 388,684 | - | 388,684 | N/A | 1/11/2024 | 1/31/2024 | N/A | - | N/A | - | - | 388,684 |
| 23 | The Midnight Mission | 448,950 | - | 448,950 | N/A | 12/19/2024 | | N/A | - | N/A | - | - | 448,950 |
| 24 | The People Concern | 3,812,087 | 49,389 | 3,762,698 | N/A | 12/18/2023 | 12/19/2023 | N/A | - | N/A | - | 49,389 | 3,762,698 |
| 25 | The Village Family Services | 869,561 | 70,915 | 798,646 | 6/7/2024 | 12/15/2023 | 12/21/2023 | 8/21/2024 | 88,738 | N/A | - | 159,653 | 709,908 |
| 26 | The Whole Child | 914,426 | - | 914,426 | N/A | 1/22/2024 | 1/23/2024 | N/A | - | N/A | - | - | 914,426 |
| 27 | Union Station Homeless Services | 2,035,055 | 45,203 | 1,989,852 | 2/12/2024 | 12/15/2023 | 12/22/2023 | N/A | - | N/A | - | 45,203 | 1,989,852 |
| 28 | United Friends of the Children | 783,533 | 43,530 | 740,003 | 3/1/2024 | 12/18/2023 | 1/10/2024 | 8/13/2024 | 87,060 | N/A | - | 130,590 | 652,943 |
| 29 | United States Veterans Initiative, Inc. | 229,119 | - | 229,119 | N/A | 12/15/2023 | | N/A | - | 7/8/2024 | 51,520 | 51,520 | 177,599 |
| 30 | Upward Bound House | 262,105 | 56,197 | 205,908 | 7/20/2002 | 1/22/2024 | | N/A | - | N/A | - | 56,197 | 205,908 |
| 31 | Valley Oasis (formerly Antelope Valley Domestic Violence Council) | 2,684,614 | 24,669 | 2,659,945 | 1/16/2024 | 12/15/2023 | 12/21/2023 | N/A | 450,012 | 10/28/2024 | 369,561 | 844,243 | 1,840,371 |
| 32 | Volunteers of America of Los Angeles | 5,050,169 | 135,725 | 4,914,444 | 5/1/2024 | 12/18/2023 | 12/21/2023 | 8/13/2024 | 678,625 | 11/1/2024 | 678,625 | 1,492,975 | 3,557,194 |
| 33 | Weingart Center Association | 436,051 | - | 436,051 | N/A | 1/22/2024 | | N/A | - | N/A | - | - | 436,051 |
| 34 | Whitter Area First Day Coalition | 206,833 | - | 206,833 | N/A | 12/18/2023 | 12/29/2023 | 8/21/2024 | 23,000 | 11/18/2024 | 28,750 | 51,750 | 155,083 |
| | Total | 50,791,228 | 2,489,083 | 48,302,145 | | | | | 3,766,206 | | 7,241,269 | 13,496,558 | 37,294,669 |

# 2:20-cv-02291-DOC-KES

## LA Alliance for Human Rights et al v. City of Los Angeles et al

## Supplemental 3:

## Public Comment Statement

## NOTES FOR JANUARY 7 HEARING JUDGE DAVID O. CARTER PRESIDING

My name is Mrs. Cheryl Gray. I am married to Gregory Edward Gray who is present but under doctor's care with restrictions, which is why I am speaking before the Court today.

I am here to share information that my husband and I are confident will provide further transparency that the Court seeks regarding the use of the public funds to support the unhoused in their quest to obtain permanent housing.

The Court has said it has specific interest in three questions this morning. I am here to present transparency regarding one of those questions; and that is, **"What factors contribute to the ineffectiveness of the permanent supportive housing program?**

All that I assert is contained in more than 100 pages of documentation that includes a compilation of email exchanges and other materials with LAHSA, its services providers, and other public entities, including, but not limited to, the Office of the Mayor, Los Angeles City Council, the County of Los Angeles, and HACLA.

My husband and I are residents of Los Angeles, California. We are both seniors. My husband has a documented disability as do I. In my husband's case, he is a post-stroke/heart patient and diabetic under the care of physicians at UCLA Health.

Countless news stories report on the state of homelessness in Los Angeles and throughout California. However, there are two things often missed:

One: That the unhoused population is not a monolithic one. There are doctors, lawyers, and other professionals, like my husband and me, who have experienced this crisis.

The second thing is this: Perpetual abuses go unchecked—verbal abuse of clients by provider agency staff, refusal by agency staff to acknowledge clients' critical health needs, shifting rules of engagement for clients to obtain permanent housing, a constant turnover of caseworkers, client paperwork critical to applying for housing being either lost or, in my husband's case, falsified by service provider program staff, including the vital information contained in what is called HMIS that is used across the housing services community.  Finally, more often than not, there appears to be a general atmosphere of overall indifference to the individual needs of each client.  We have seen this happen to other senior citizens like us, one as old as eighty-five years old with medical challenges that include a heart condition and to military veterans.

The list of egregious behavior by LAHSA and its service provider agencies is an infinite one, fueled by an apparent top priority of LAHSA and these agencies to retain government and private funding for their operations at any cost. The results are that many clients, most of whom are fearful of retaliation for speaking out, are shoved through a proverbial revolving door that ultimately winds up putting them back onto the streets. They are replaced by a set of new clients, whose fate is, predicably, the same. My husband and I have witnessed these occurrences multiple times.

My husband and I spent some twenty-seven months in interim housing funded and operated by the County of Los Angeles and the City of Los Angeles through LAHSA, the Los Angeles Homelessness Services Authority. Throughout those twenty-seven months, we engaged with the following LAHSA service providers: First to Serve, The Salvation Army, Weingart Center Association and People Assisting the Homeless *also known as* PATH.

Last June, and only because LAHSA and one of these service providers, Weingart Center Association, found themselves in a predicament for leaving me and my husband in an extremely vulnerable state --perpetually ignoring my husband's medical challenges, falsifying information in my husband's HMIS housing and medical file, threatening to put my husband in a nursing home, threatening to prematurely exit us from interim housing with no permanent housing in place, trying to coerce us to transfer to an unsafe, unsanitary motel--did we finally exit the interim housing revolving door, becoming residents of a new apartment building for which LAHSA is the master leaseholder.

When my husband and I were shown the building last June, it was brand new. It was clean and orderly, with the promise of being a responsible member of the neighborhood. Sadly, questionable behaviors and the resulting property destruction by some tenants, their guests and trespassers have severely compromised this building, to the tune of roughly one million dollars and counting.

There is no other building on our avenue that would tolerate the kind of behavior and property destruction that my husband and I have seen and have been subjected to in this building. It's not the dog feces and urine left at the front entrance, in the elevator, in the stairwell, in the carpeted hallways by irresponsible pet owners. It's not the gang graffiti scribbled throughout the building and left for days at a time. It's not the trash, food scraps, and clothing items strewn outside and throughout the building. It's not the stolen mail for which no one in building management can account. And yes, it is wrong, horribly wrong, for LAHSA to allow these behaviors to continue unchecked for six months now.

But there is a more menacing problem.

We have reported to LAHSA, building management and the Los Angeles Police Department information about trespassers, suspected gang activity, drug use and trafficking, including the existence of this suspected activity on our floor. The stress of these events is adversely affecting my husband's health. We are extremely concerned for our safety and welfare, particularly because we have been confronted by retaliatory acts of stalking and harassment for making these reports.

LAHSA and its building security have allowed standard protocols to collapse when it comes to tenants who follow the rules—like me and my husband—who report the actions of tenants who don't. As a result, the suspected perpetrators of these activities have targeted us for acts of intimidation and retaliation. My husband and I lay the blame squarely on LAHSA because it failed to immediately address these problems and, instead, allowed them to fester.

One blatant example is, on New Year's Day, between 8AM and 8:30 AM, stranger came to our apartment door, ringing the doorbell several times. When we didn't respond, the stranger began pounding on our door multiple times, which each knock growing louder. Finally, the stranger began shaking the door handle. We still did not respond. When I called building security, all I got was a voicemail. My husband observed the stranger through our peephole and watched while the stranger kept shaking our doorknob and then, looking through our peephole. This went on about three to five minutes. Then, the stranger shook the doorknob one more time and finally left.

There can be no doubt that the person had nefarious intent, which is why we contacted reported the Los Angeles Police Department and to LAHSA.

There are other incidents wherein my husband and I have been singled out by at least one problem tenant and their associates, everything from attempts to spit on my husband as he passed on the sidewalk in front of the building, to having dogs owned by other tenants and associates of the problem tenant lunge at us, to having individuals associated with the problem tenant stalk me and my husband to having the problem tenant confront me in the hallway with a histrionic outburst that served no other purpose than to harass me.

We spent fifteen of those months in PROJECT ROOM KEY under Mayor Eric Garcetti---between March 2022 and June 2023. For the remainder of 2023 until the end of June 2024, the balance of that time was spent in the INSIDE SAFE INITIATIVE under current Mayor Karen Bass.

What was supposed to be an orderly transition from interim to permanent housing instead locked us into a state of literal captivity that subjected us to a process of stops and starts by service provider programs funded and operated by the City of Los Angeles through LAHSA.

For twenty-seven months, LAHSA and its service providers were non-responsive to my husband's medical challenges and our need for permanent housing that is in accordance with my husband's plan of care as well as the needs of our household.

This non-responsiveness led to us being roadblocked, time after time, with no way to move out of interim housing and into a permanent housing environment in accordance with my husband's medical needs and our housing needs.

My husband and I were subjected to some of the most counterintuitive acts imaginable committed by LAHSA and its service providers.

Those acts included, but were not limited to:

1) falsifying and breaching of my husband's personal, financial, health and housing records;

2) committing acts of intimidation to silence my husband for complaining about the clear bias against him for speaking about the adverse actions to which I was subjected;

3) encouraging gross negligence in protecting my husband's rights under HIPPA, THE PRIVACY ACT, and ADA laws;

4) willfully ignoring no less than 25 medical letters from physicians at UCLA HEALTH documenting my husband's medical challenges and need for permanent housing specific to his health needs and that of our household;

5) willfully sabotaging our opportunities to swiftly move forward to secure permanent housing; and

6) attempting multiple times, through service provider agencies and staff, to coerce us into interim housing rife with unsanitary, unsafe conditions and otherwise unsuitable for my husband's medical needs and our housing needs.

==========================================================================

I have a brief list of examples that I would like to share with the Court. They are organized according to the service provider involved. All but one of these service providers is on the list that you requested to provide updates on regarding the recoupment of $51.8 million in funds from service providers funded through LAHSA.

**FIRST TO SERVE was a service provider contracted by LAHSA during PROJECT ROOMKEY and on the recoupment list requested by the Court**

- **First to Serve** never provided a case worker at the PROJECT ROOM KEY LOCATION BEST WESTERN DRAGON INN CHINATOWN

- **First to Serve** failed to timely respond to a HACLA request for documentation needed to complete my husband's application for a HUD Emergency Housing Voucher, causing him to almost miss the HACLA deadline; My husband and I had to complete the process alone. My husband's HUD-EVH was issued by HACLA on or about June 4, 2022;

- **First to Serve** tried to place my husband and I in a shelter but the transfer was stopped by a Los Angeles County nurse. The nurse told **First To Serve** that my husband and I were medically ineligible for a shelter due to our documented disabilities and the potential for increased exposure to COVID. We were transferred to the LA GRAND or about June 9, 2022;

**The Salvation Army was a service provider contracted by LAHSA during PROJECT ROOMKEY**

- **The Salvation Army** assigned a caseworker to us at the LA GRAND who told my husband to be sure to put everything in writing because if he didn't, it would be like "it never happened." The caseworker also recommended my husband provide medical documentation for his file so that the caseworker could assist him; The caseworker was fired shortly thereafter;

- **The Salvation Army**, immediately after firing our original case worker, began placing misinformation in my husband's file, i.e., that he did not have an emergency housing voucher, that he was not engaged in a search for permanent housing, etc. TSA program staff shared this misinformation with at least one city official;

- **The Salvation Army** disregarded all medical letters my husband provided as documentation, returning those letters, literally hand-delivering the documentation back to my husband at our door;

- **The Salvation Army** threatened to have my husband placed in a nursing home through LAHSA, telling my husband that LAHSA doctors "could be rough" and despite there being no medical documentation from my husband's UCLA health care professionals to support this kind of transition;

- **The Salvation Army** tried to force our exit from PROJECT ROOM KEY on December 5, 2022, ignoring my husband's medical documentation and ignoring the fact that we were working with PATH, a HUD-funded service provider contracted by LAHSA, to secure permanent housing. The TSA administrator sent a staffer who gave us information about a place called The Beacon. We took photos of The Beacon, which at that time was dilapidated and had a huge contractor's bin in the middle of its parking lot with discarded wood and trash brimming to the top. We also looked up photos on the Internet where program service clients had posted pictures showing roach infestations, bug bites and the like. After informing the TSA administrator that a lawsuit had been filed on December 2, 2022, the administrator rescinded the exit threat;

- **The Salvation Army** tried again to force our exit from PROJECT ROOM KEY on January 19, 2023 but once again, the threat of exit was rescinded following legal intervention on my behalf;

**PATH was a service provider contracted by LAHSA during PROJECT ROOMKEY and on the recoupment list requested by the Court**

- **PATH** abandoned me and my husband at LAX in January of 2022. A PATH representative took photos of our identification and had us on a conference call with a PATH administrator who promised to help with interim housing within two days but failed to do so. Shortly afterward, my husband was hospitalized after falling in the airport due to what was diagnosed as symptoms relating to a possible stroke.

- In July, 2022, an unknown person claiming to represent PATH contacted me and my husband through TSA. The person who represented themselves as an employee of PATH provided a telephone number with a Kentucky area code. We contacted the person, left a voice mail message but never heard from this person again.

- **PATH** sent a housing navigator to us in November 2022 who said he could assist us in locating permanent housing. We met with the navigator several times to get an overview of the process.

- **PATH**, on December 30, 2022, as my husband and I were filling out our housing navigation paperwork, there was an Information Disclosure Form that stated we were allowed to select which program service agency, if any, we wanted our information disclosed. We did not select LAHSA.

  The PATH housing navigator then told us he would have to check with his PATH supervisor to be sure that we could proceed. He called his supervisor and then came back to tell us that unless we signed the form to include LAHSA, he was ordered to halt the paperwork process---the very paperwork that would have assisted us in obtaining permanent housing for me and my husband. Both LAHSA and PATH were aware that we had a January 19, 2023 exit date.

- **PATH** entered the equation again when an attorney contacted the PATH supervisor who had halted our housing navigation paperwork. After that attorney contacted the PATH supervisor, that PATH supervisor communicated to us that PATH had arranged, through LAHSA, to extend our interim housing past January 19, 2023.

- **PATH** came back to us in March 2023 with a proposal from LAHSA—to fill out a form for DOMESTIC VIOLENCE victims as a method to keep our information private. My husband and I kept the PATH email and the form that was attached. We did not respond to this approach offered by LAHSA/PATH because for us, the suggestion lacked integrity.

**WEINGART CENTER ASSOCIATION was a service provider contracted by LAHSA during THE INSIDE SAFE INITIATIVE and on the recoupment list requested by the Court**

- Weingart assigned at least eight case workers—six of those within three months. In September 2023, My husband discovered that a Weingart case worker had falsified his medical and housing information for which the Weingart management team admitted Weingart was responsible, pledged to correct, but, to our knowledge, never did.

- Another Weingart case worker breached protocol by sharing my husband's personal housing file and communicating with HACLA about his housing information without his authorization. When my husband contacted HACLA about the breach and HACLA acknowledged it, the Weingart case worker sought to retaliate by threatening to exit my husband and I from our interim housing.

- Weingart case workers ignored medical letters from my doctors (no less than twenty-five letters from my physicians at UCLA HEALTH) that I submitted to agency management. Those letters also documented that the medical information in my husband's housing file was false. I also made a written request for a copy of my housing file but I never received it.

- A Weingart staff member threatened to place my husband in a nursing home despite there being no medical documentation from my husband's UCLA Health physicians to support such a transfer.

- A Weingart staff member denied my husband's request for transfer to The Mayfair Hotel despite medical documentation his physicians provided to support the transfer. The LA Grand was days from closing and the staffer tried to coerce my husband and I to transfer to an unsafe, unsanitary motel in a neighborhood rife with criminal activity. This action came within days before the LA GRAND Hotel was scheduled for closure in June 2024.

- Weingart upper management visited my husband and I four days before the LA GRAND was scheduled close in June 2024. They reviewed my husband's medical documentation, learned that he had an active emergency housing voucher, and told us that the Weingart staffer trying to force us into a rundown motel was not being truthful about our housing options. The Weingart representatives initially mentioned The Beacon but we told them this was not an option for us.

- Weingart upper management returned the next day with a LAHSA administrator and two staff people from LAHSA. They told my husband and I about a new housing development that had just opened and that my husband and I could move in right away. They showed us a photo and offered a tour. They assisted us in getting our belongings out of the hotel. We moved into our new apartment on July 2, 2024.

- The day before the LA GRAND was due to permanently close, my husband and I met former California State Senator Kevin Murray, President and Chief Executive Officer of the Weingart Center Association as we were leaving the hotel for the last time. We followed this encounter with a letter addressed to Senator Murray detailing the problems we had encountered with Weingart's program staff. We also provided a compilation of emails documenting all that we said. The package was sent via FedEx. Senator Murray never responded to our letter or our support documentation.

## **LAHSA**

- In June 2023, my husband forwarded a registered letter and support documentation to Dr. Va Lecia Adams Kellum, CEO of LAHSA. While we have proof that the letter was received, Dr. Adams Kellum never responded.

- As I've noted, LASHA serves as the master leaseholder for the new apartment building that my husband and I moved into in July 2024. The building has received federal funds and other assistance for its construction and operation.

- In the six months since we moved in, LAHSA has allowed the building to deteriorate both aesthetically and operationally. Onsite management disclosed that roughly one million dollars in damage is due for repairs caused by tenants, guests and trespassers. I would invite the Court to tour the building to see it for yourself.

- After our pleas for help were ignored by onsite LAHSA staff and KRPM GROUP, the LAHSA contracted management company charged with operating the building, we wrote letters asking for assistance from the Mayor's Office, Diversity Housing Corporation (the building developers), LA Care Health Plan, (a LAHSA funder), and others. Only then did LAHSA finally show up, beginning with a text sent to my phone on Saturday, November2 from a Kris Freed of LAHSA.  Since that time, my husband and I have corresponded directly with Ms. Freed, who was recently named as a Chief Strategist for LAHSA. According to Ms. Freed, she is responsible for the overall operations for the apartment building development. Virtually all of the emails to and from Ms. Freed are carbon copied to LAHSA CEO Dr. Va Lecia Adams Kellum. Dr. Adams Kellum has corresponded at least once with us regarding the initial email sent to her attention.

- The apartment building is rife with all manner of questionable activity, including the suspected infiltration of gang organizations, such as one known as the 18th Street Gang and the so-called Mexican Mafia, the latter a criminal enterprise that was the subject of a federal case over which Your Honor presided.

- There has been other criminal activity, including mail theft, vandalism and trespassers squatting in vacant apartments. Gang graffiti is constantly on the elevator interior and elsewhere in the building, as is dog feces, dog urine, trash, food scraps, clothing items, etc., At one point, even the elevator's surveillance camera was not operating.

- There are tenants, guests, trespassers who habitually show a wanton disregard for building rules, a fact that has gone on for months.  I have already shared some of these examples. Even the simplest precautions, such as the front entrance door malfunctioning by not automatically locking, went unchecked for months.

- My husband and I reported our concerns to LAHSA, including the suspected gang activity, drug use and trafficking, gang graffiti, dog feces, hair and trash inside and outside of the building, strangers marauding throughout the building, day and night, disruptions during what are supposed to be building quiet hours and more.

- LAHSA did not act early enough on our reports on these problems and, as a result, my husband and I have been singled out and subjected to acts of intimidation/retaliation, which I have already described.

- Our first grievance with LAHSA was in November 2022, when we filed a grievance regarding a planned forced exit on December 5, 2022 from our interim housing site at the LA GRAND. By November 30, 2022, we received an email from LAHSA that it had denied our grievance. On December 2 2022, a lawsuit was filed on our behalf by Attorney Faisil Gill, who was then a candidate for Los Angeles City Attorney endorsed by then-mayoral candidate Karen Bass. The forced exit was rescinded.

- In November 2024, my husband and I filed another grievance with LAHSA because, as I said, LAHSA is the master leaseholder for our apartment building. As such, it is our position that LAHSA is responsible for allowing violations of building rules and property damage to continue. That grievance was submitted through a portal on LAHSA's website.

- Since September 6, 2024, my husband and I had been waiting for information from LAHSA and its operatives on how it intends to satisfy the lease documents required by the HACLA that are needed to finalize my husband's Request for Tenancy Approval package that would formally activate my husband's federal emergency housing voucher. To date, there has been no plausible explanation from either LAHSA or its building management about why it took so long for this documentation to be finalized. For months, LAHSA's onsite staff and KRPM Group, LAHSA's subcontracted building management, failed to respond to our multiple requests, both written and verbal, for information regarding their respective roles in this process and exactly when HACLA would receive the paperwork necessary to activate my husband's housing voucher.

- LAHSA's subcontracted management, KRPM Group, went so far as to instruct us to keep our correspondence "internal"-- meaning to let no one outside of KRPM Group know what was going on. We did just the opposite, informing not only LAHSA and other public entities I have previously named but also, The Mayor's Office, The County of Los Angeles, and the like.

- As a result of this inexplicable delay, my husband and I were left in yet another holding pattern, virtual captives once again, in a process impacting our permanent housing that should have been resolved long ago. More importantly, the stress of the delay has impacted my husband's health, which is why he is currently under physician-ordered restrictions. At present, HACLA has advised us that a proposed new lease is in place, presumbably to salvage my husband's emergency housing voucher.

## ATTORNEY FAISIL GILL

- In November 2022, my husband sought representation from Faisil Gill, an attorney who was then a candidate for Los Angeles City Attorney and endorsed by then mayoral candidate Karen Bass;

- Gill filed a lawsuit on my husband's behalf because LAHSA denied our request to extend our interim housing until at least January 19, 2023. At the time, we were working with PATH to obtain permanent housing;

- The suit was filed on December 2, 2022, three days before LAHSA and The Salvation Army planned a forced exit for us on December 5, 2022. Gill told my husband that the filing had been assigned to Judge Carter. Gill contacted my husband on the morning of December 5th with a proposal he said would halt the forced exit from our interim housing;

- The filing was subsequently withdrawn as part of the proposal Gill said he made with LAHSA through the County of Los Angeles. When my husband asked Gill whether there was a written agreement from the Court for him to sign, my husband told me that Gill hesitated, then nervously laughed and said, "You got the house, don't you?"

- Gill provided my husband with language extracted from an email that read that my husband had to agree and confirm "that he has another emergency shelter or housing of his own choosing when he leaves…" This meant that my husband was being required to perform housing navigation on his own.

- By early January 2023, my husband informed Gill about LAHSA and PATH disrupting our housing navigation process on December 30, 2022 by trying to coerce us to sign documents in a way that contradicted the instructions on the Information Disclosure Form and as a condition of receiving housing navigation services. I should point out that this appears to be a standard practice with PATH because the same thing happened with PATH again when we moved to our new apartment. A PATH staffer tried to check off the information disclosure options for us instead of allowing us to complete the form and when had to stop we her. In this case, the staffer simply wrote on the form that we declined to fill out and/or sign it. The staff did not halt the process of us receiving program services.

- Gill never followed through on filing a complaint about LAHSA and PATH disrupting our housing navigation process. My husband provided Gill with nearly 100 pages of documentation that included details and at least six medical letters confirming my husband's ADA-defined disability and our need for permanent housing appropriate to his health challenges and our household needs. Gill never used any of these documents, never filed the complaint. My husband never heard from Gill again.

## **HUD**

- My husband brought his concerns to HUD in correspondence dated January 13, 2023. HUD scheduled a telephone conference call that occurred on or about February 21, 2023 with my husband. During that conference call, HUD officials Rufus Washington and Nathaniel King advised my husband that HUD had the authority to extend my husband's emergency housing voucher because the voucher program is under HUD authority.

- As follow up to the February 21, 2023 telephone conference with HUD, My husband complied with a HUD request to send documentation that chronicled all of the problems that we had encountered with LAHSA and its service providers in our efforts to secure permanent housing. My husband provided documentation chronicling the time that said agencies wasted, including the agencies' collective failure to acknowledge my husband's multiple medical challenges.

- On April 24, 2023, my husband wrote to HUD to report everything that had occurred pertaining to the continuing delay in securing permanent housing by HUD-funded agencies since the date of my husband's conference call with HUD.  My husband requested that HUD fulfill its pledge to extend his emergency housing voucher. My husband made the extension request to HUD because HUD officials told my husband that they were ultimately in charge of extending the voucher. On or about April 25, 2023, HUD officials passed the matter onto the Housing Authority of the City of Los Angeles also known as HACLA.

---

In closing, we asked for help to get our information to the Court from many of the organizations and public entities represented in this room, including LA Alliance for Human Rights, the City of Los Angeles, namely the Mayor's Office and Los Angeles City Council, the County of Los Angeles Board of Supervisors, Los Angeles Legal Aid Foundation and more.  No one would help.

All that I assert is documented through a compilation of email correspondence with the City of Los Angeles, which includes the Office of the Mayor, HACLA, Los Angeles City Council, City Planning Department, and the Los Angeles Police Department; the County of Los Angeles, which includes the County Board of Supervisors and Adult Protective Services; the State of California, which includes the Office of the Governor, members of the California State Assembly, members of California's congressional delegation, LAHSA and its service providers, including PATH, First to Serve, The Salvation Army, and Weingart Organization.

Additional information regarding our concerns can be found in the complaints filed on December 2, 2022 and June 30, 2023, and motions filed on December 18, 2023 and December 9, 2024.

My husband and I would like to thank the Court for its time and attention this morning.