UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,

Plaintiffs,

v.

CITY OF LOS ANGELES, *et al.*,

Defendants.

Case No. 2:20-CV-02291-DOC-KES

Assigned to Judge David O. Carter

**MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE**

Before:  Hon. David O. Carter
Courtroom: 10A
Hearing Date:  March 24, 2025
Hearing Time:  8:30 a.m.

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE on the above date and time Plaintiffs will and hereby do move for an order compelling specific performance by the City of Los Angeles. This motion is set for hearing on March 24, 2025, at 8:30 a.m. before the Honorable David O. Carter in the United States District Court, Central District of California, Western Division, located at 411 West Fourth Street, Courtroom 10A, Santa Ana CA 92701-4516.

The motion is made following the conference of counsel that took place on December 12, 2024 with the parties and Special Master Michele Martinez.  This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Elizabeth A. Mitchell and exhibits attached thereto, the pleadings and records on file in this action, and any further oral or written documentation that may be provided to the Court as necessary or requested.

Dated: February 20, 2025          Respectfully submitted,

*/s/ Elizabeth A. Mitchell*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

1

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 1

    A.    Terms of the Settlement Agreement ........................................................ 1

    B.    The City Failed to Produce Appropriate Plans, Milestones, and Deadlines under Section 5.2. ................................................................... 2

    C.    The City's Multiple Violations of the Agreement .................................. 3

III.  THE CITY CONTINUES TO BE IN VIOLATION OF THE SETTLEMENT AGREEMENT ......................................................................... 10

    A.    No Bed Plan Has Been Provided To Date ............................................. 10

    B.    Milestones and Deadlines For Beds Have Not Been Met ...................... 11

    C.    Encampment Reduction Numbers Have Also Not Been Met ................. 13

    D.    The City is Violating Both the Letter and the Spirit of the Agreement. .............................................................................................. 15

IV.   CONCLUSION ................................................................................................. 16

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

## <u>TABLE OF AUTHORITIES</u>

**OTHER AUTHORITIES**                                                    **PAGE(S)**

BallotPedia, Los Angeles County, California, Measure A, Sales Tax Measure (November 2024), https://ballotpedia.org/Los_Angeles_County,_California,_Measure_A,_Sales_Tax_Measure_(November_2024) ............................................................................... 6

City of Los Angeles, Sanitation, Livability, https://sanitation.lacity.gov/livability (last visited Feb. 19, 2025) ....................................................................... 14

LA City Controller, https://homelessdashboard.lacontroller.app/InsideSafe, (last visited Feb. 19, 2025) ...................................................................... 4

Zhiyun Li & William Yu, *Economic Impact of the Los Angeles Wildfires*, UCLA Anderson School of Management, https://www.anderson.ucla.edu/about/centers/ucla-anderson-forecast/economic-impact-los-angeles-wildfires (last visited Feb. 18, 2025) ........................................ 7

U.S. Census Bureau, QuickFacts: Los Angeles city, California, https://www.census.gov/quickfacts/fact/table/losangelescitycalifornia/LFE046223, (last visited Feb. 19, 2025) ...................................................................... 4

Videotape: Housing and Homelessness Committee Meeting, Timestamp 01:16:00–1:26:41, Jan. 29, 2025 ("Jan. 29, 2025 Hearing"), https://www.youtube.com/watch?v=Z-3UbkR03_Y............................................. 7, 8

Videotape: Housing and Homelessness Committee Meeting, Timestamp 1:31:27–1:43:00, Feb. 12, 2025 ("Feb. 12, 2025 Hearing"), https://www.youtube.com/watch?v=ugCrbD6R2AY ................................................. 8

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

## I.    INTRODUCTION

Following fires that have forced thousands more Angelenos into homelessness and exacerbated an already urgent housing shortage, the people of Los Angeles need City leadership to meet its commitments to people suffering on the streets and all those affected by the homelessness crisis. Instead, the City's leadership is openly violating commitments on homelessness it made to this Court and the City.

More than halfway through the five-year term of the Settlement Agreement, the City is failing at nearly every one of its obligations.  It has not met its milestones and deadlines for bed creation a single time—and cannot demonstrate it has used its "best efforts" to do so.  It has no plan for the additional 3,800+ beds that must be created under this agreement in the next two years—and has not budgeted adequately for the operation of existing beds.  It is failing to properly report "encampment engagement, cleaning, and reduction," misleadingly reporting basic sanitation activities instead. The City is not executing the terms of the Settlement Agreement as designed, and the result on the street is painfully obvious: death and destruction continues city-wide. The tide of human tragedy continues to grow.

The LA Alliance requests that the Court declare the City in violation of the Settlement Agreement, and set a date certain for the City to meet its shelter and encampment reduction commitments under the Settlement Agreement or undergo serious consequences.

## II.    STATEMENT OF FACTS

### A.    Terms of the Settlement Agreement

The City and Plaintiffs entered into a Settlement Agreement on May 24, 2022 which was subsequently approved by the Court.  (Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") ¶ 2, Ex. A, Am. Stipulated Order re Dismissal at Ex. 1, Settlement Agreement (hereinafter "Settlement Agreement") 4:6-10, ECF No. 429-1; Ex. B, Order Approving Settlement, ECF No. 445.)  Pursuant to the Settlement Agreement, the City

1

had an obligation to develop a plan and establish milestones and deadlines for the following:

**Shelter & Housing (District Level)** – Creating shelter and housing for at least 60% of unsheltered persons experiencing homelessness (PEH) in each Council District.

**Encampment Resolution (District Level)** – Implementing a strategy for encampment engagement, cleaning, and reduction in each Council District.

**Shelter & Housing (Citywide)** – Providing shelter and housing for at least 60% of unsheltered PEH across the entire city.

**Encampment Resolution (Citywide)** – Establishing a citywide plan for encampment engagement, cleaning, and reduction.

(Settlement Agreement § 5.2 at 8:11–19.)

Section 5.2 also requires that the City "provide the plans, milestones and deadlines to Plaintiffs," at which point "the City and Plaintiffs" would "work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines" and "consult with the Court for resolution, if necessary." (Settlement Agreement § 8:19–23.). Finally, the Settlement Agreement requires the City to "promptly employ its best efforts to comply with established plans, milestones, and deadlines." (Settlement Agreement § 5.2 at 8:24–25.)

**B.     The City Failed to Produce Appropriate Plans, Milestones, and Deadlines under Section 5.2.**

Despite the City's obligations under the Settlement Agreement, it has yet to provide a clear, structured framework for how it intends to move forward to meet its obligations. On November 11, 2022, the City provided Plaintiffs with two separate documents titled, "LA Alliance Milestones Potential Project List" and "LA Alliance Milestones." (Mitchell Decl. ¶ 3, Exs. C & D.) The Potential Project List is a chart that lists the following information: council district, intervention type, project type, address/location, ready for occupancy date, status, total units, and PSH/interim units.

2

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

(Ex. C.)  The Milestones is a chart that sets forth numbers and dates by which beds would be created under the Settlement Agreement.[1]  (Ex. D.)  Importantly, the Potential Project List did not provide the plan for all 12,915 (or even 12,904) beds, limiting its plan to only 10,450 beds.  It was understood that some of the potential projects would not come to fruition, and the City would be adding additional projects in due course while others fell away. (Mitchell Decl. ¶ 4.) In its November 11, 2022 email, the City made no effort to provide plans, milestones, and deadlines for encampments in each Council District or Citywide pursuant to 5.2(ii) and 5.2(iv).

### C.      The City's Multiple Violations of the Agreement

Almost one year after the Potential Project List and Milestones were submitted, on October 3, 2023, and several intervening meetings about this issue, the City provided an "Encampment Engagement, Cleaning, and Resolution," which was purported to be the plan for encampments that the City was obligated to provide under Section 5.2, but it did not include any proposed deadlines and milestones.  (Mitchell Decl. ¶ 6, Ex. E.)  Only after several more meetings, including with Special Master Michele Martinez and District Court Judge Andre Birotte, and upon information that the Alliance would be filing a motion for sanctions, did the City finally identify and then ratify its plan for 9,800 encampment resolutions within a four-year period.

Over the last two-and-a-half years the City has provided quarterly updates on its progress in meeting its obligations under the settlement including, starting the first quarter of 2024, its progress on encampment reduction (though nothing for encampment engagement or cleaning).  **By its own account, the City has yet to meet <u>any</u> of the City-wide milestones by the deadlines it agreed to.**  In fact, the City has continued to fall alarmingly behind in meeting its milestones without explanation or demonstration of "best efforts."  Simultaneously, reports provided in City Council, as well as at the Budget and Finance and Housing and Homelessness Committees,

---

[1] The Milestones identifies a target of 12,904 beds. This number was subsequently amended by the City of Los Angeles to 12,915.

3

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

demonstrate that the City is facing clear financial peril, without ways to sustain its excessive spending. (Mitchell Decl. ¶ 7.) One of the most draining items on the City budget over the last two years was the exorbitant cost of the mayor's "Inside Safe" projects which, in Fiscal Year 2023-2024, only placed 1,668 people inside, with a budget of $250 million, at a whopping $149,880 spend per person.  (Mitchell Decl. ¶ 8, Ex. F, Report, Office of the City Administrative Officer at 24, 28, Dec. 26, 2024).  The total cost of the Inside Safe program from inception to November 30, 2024 was $342,797,134 with a total of 3,782 interim placements (which "may include duplicates" per the CAO report), for an average of $90,636.11 spent per person.[2]  For reference, the median per capita income in LA City from 2019 to 2023, in 2023 dollars, was $46,270—The City is spending 196% of the median per capita income per person with the Inside Safe program.[3]

On August 16, 2024, the Alliance served on the City a letter enumerating the City's breaches of the Settlement Agreement, including the following issues:

- The City was behind in bed production by 1,933 beds, or 32%.
- The City reported only 8,663 beds open or in process, leaving no plan for 4,252 beds.
- The City's refusal to provide locations of encampment resolutions supported the Alliance's continuing concerns that the City was inappropriately counting sanitation actions as "resolutions."

(Mitchell Decl. ¶ 9, Ex. G, Letter from E. Mitchell to A. Hoang and J. Mariani, Aug. 16, 2024.)

These three issues were thereafter raised in court.  At a hearing in this court on August 29, 2024, City Administrative Officer Matt Szabo presented a proposed

---

[2] *Id*.; LA City Controller, https://homelessdashboard.lacontroller.app/InsideSafe, (last visited Feb. 19, 2025).

[3] U.S. Census Bureau, QuickFacts: Los Angeles city, California, https://www.census.gov/quickfacts/fact/table/losangelescitycalifornia/LFE046223, (last visited Feb. 19, 2025).

4

modified bed plan which included "migrat[ing]" 2,500 Roadmap[4] beds to the Alliance Agreement. (Minute Order, Aug. 30, 2024, ECF No. 765; Hr'g Tr. 81:21–25, Aug. 29, 2024, ECF No. 768.)  According to Mr. Szabo, because the County funding under the Roadmap Agreement ended in July, 2024, the City would be unable to both maintain all Roadmap beds and provide new beds for the Alliance Agreement.  (Hr'g Tr., Aug. 29, 2024, ECF No. 768.).

On September 4, 2024, the Alliance filed a Motion for Order re Settlement Agreement Compliance regarding the Encampment Resolution reporting. (ECF No. 767.)

On September 12, 2024, the City filed its new plan which included these 2,500 Roadmap Agreement beds.  (ECF No. 775.) The fundamental problem with the City's proposed plan is that it sought to violate (or modify) section 3.1 of the Settlement Agreement which required the City to "create" housing or shelter solutions (not borrow, or re-use ones which were already in existence such as Roadmap beds). Furthermore the City previously represented to the parties and this Court that the Settlement Agreement beds would be "in addition to the beds being built pursuant to the [Roadmap] MOU. . . . There will be no double-counting of beds between this Settlement Agreement and the [Roadmap] MOU."  (City Reply to Objections to Its Settlement Agreement 10:7–10, June 3, 2022, ECF No. 438.)

On October 4, 2024, the Alliance filed its response to the City's proposed bed plan, not taking a position on the plan but instead requesting that the County explain why it would discontinue funding or otherwise for the Court to hold an evidentiary hearing on the issue. (Pl.'s Position Concerning Proposed City Bed Plan, Oct. 4, 2024, ECF No. 785.)

On October 16, 2024, the Court held a hearing regarding the parties' positions on the bed plan, at which the Alliance's counsel presented in stark numbers the

---

[4] "Roadmap" beds refer to the agreement between the City and County to jointly fund 6,700 interim shelter beds.  (*See* MOU, Oct. 12, 2020, ECF No. 185-1.)

5

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

problem with the presented plan: namely that it would reduce the overall intended production of beds from 19,615 beds down to 17,115 which violates both the terms and the spirit of the Settlement Agreement, and is the opposite of what has been previously represented by the City. (Hr'g Tr. 11:14–22, Oct. 16, 2014, ECF 791.) The Court then set an evidentiary hearing for October 25, 2024. (Order, Oct. 18, 2024, ECF No. 795.) Before the evidentiary hearing could commence, the City unilaterally withdrew its proposed bed plan, stating it would "present other possible solutions to ensure the timely compliance with the City's Agreement with the LA Alliance." (Hr'g Tr. 5:12–15, Oct. 25, 2024, ECF No. 808.) Months have passed, and the City has presented no other solutions.

On Tuesday, November 5, 2024, the voters of LA County approved Measure A which replaced Measure H, increasing sales tax from .25% to .5% specifically to fund homelessness solutions.[5] The Alliance anticipated that after such a drastic increase in receipt of money to fund homelessness solutions by the County that a new agreement to continue funding Roadmap beds between the County and the City would be forthcoming. None did.

On November 26, 2024, the Alliance sent another letter to the City regarding its violations of the Settlement Agreement, specifically identifying:

- A continued production gap in beds of approximately 30%;
- No new bed plan, nor any assurance that said beds would be *in addition to* the Roadmap Beds despite passage of two major voter initiatives providing hundreds of millions of homelessness-related dollars to the City and County within two years; and
- Improper counting of CARE/CARE+ clean-ups as "encampment reductions."

---

[5] BallotPedia, Los Angeles County, California, Measure A, Sales Tax Measure (November 2024), https://ballotpedia.org/Los_Angeles_County,_California,_Measure_A,_Sales_Tax_Measure_(November_2024).

6

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

(Mitchell Decl. ¶ 10, Ex. H, Letter from E. Mitchell to J. Mariani and A. Hoang, Oct. 26, 2024.)  On December 12, 2024, counsel for the City, counsel for LA Alliance, and Special Master Martinez met and conferred about these issues without reaching a resolution.  Specifically, the City's counsel stated they could not "get ahead" of the elected officials, and no such new bed plan, approved by the elected body, was in place.  No reason was given for the delay in bed production other than vague references to delays being common in housing production.  (Mitchell Decl. ¶ 11.)

On January 7, 2025, the City of LA suffered a set of devastating wildfires, centered largely in the Pacific Palisades and Altadena areas.  (Mitchell Decl. ¶ 13.) Beyond the tragic loss of life and property, the aftermath of the wildfires threatens billions of dollars in economic damage to the Los Angeles area, including from reduced GDP and wage loss, with the potential for the City and County to suffer not only the loss of associated tax revenue, but also hundreds of millions of dollars in out-of-pocket costs.[6]

The City of Los Angeles is facing a financial cliff of its own creation.  Reports in the Housing and Homelessness Committee are dire: the City has not planned sufficiently to pay for its existing properties, much less account for the additional 3,800 new beds it must create to satisfy the Settlement Agreement.[7]  Without building any new beds, the City faces a cost of $302 million to maintain its current properties, with funding availability of only $220 million:

> **Matthew Szabo** (01:18:16): For next [fiscal] year, we have a larger
> problem, again, in large part because we are going to the full $89 and
> $116 a night bed rate, and we will not have the $60 million available

---

[6] Zhiyun Li & William Yu, *Economic Impact of the Los Angeles Wildfires*, UCLA Anderson School of Management, https://www.anderson.ucla.edu/about/centers/ucla-anderson-forecast/economic-impact-los-angeles-wildfires (last visited Feb. 18, 2025).

[7] *See generally* Videotape: Housing and Homelessness Committee Meeting, Timestamp 01:16:00–1:26:41, Jan. 29, 2025 ("Jan. 29, 2025 Hearing"), https://www.youtube.com/watch?v=Z-3UbkR03_Y.

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

from the county roadmap funding. So we are projecting, and I do need to say for when we're when we're talking about our total costs, obviously, no decisions have been made about what new housing will be funded in 25-26, this number represents just keeping open what we will have open by the end of the year. So this would include units that are in progress. There's 500 state funded tiny homes that are in progress. If we assume that we build everything that is funded and in progress, and keep it open through 25-26 we will have an obligation for interim housing of $302 million and we have including, including our state HAP dollars, and importantly, what we project we will be getting as far as a local return, or local solutions from Measure A, an availability of $220 million

**Chair Raman**  (01:19:32) just clarifying that this doesn't include the cost of new beds that we will have to bring online as part of the Alliance settlement.[8]

There are far more economical means by which to pay for these beds but the City has consistently chosen the most expensive path, including focusing largely on expensive permanent housing and Inside Safe programs.  The City has identified Inside Safe properties it intends to make "Alliance-Compliant" (meaning it would be open and occupied through June 30, 2027), which would allow the City to receive reimbursement for approximately $43 million of its supportive services by the County through the Alliance settlement agreements, but still intends to maintain 790 Inside Safe beds at significant expense.[9]  Unfortunately, even with the transition of Inside Safe beds to be Alliance-compliant, the City still shows a monetary shortfall of

[8] *Id.*

[9] *Id.* at Timestamp 1:20:00–1:21:00; Videotape: Housing and Homelessness Committee Meeting, Timestamp 1:31:27–1:43:00, Feb. 12, 2025 ("Feb. 12, 2025 Hearing"), https://www.youtube.com/watch?v=ugCrbD6R2AY.

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

approximately $40 million just to maintain its current properties without adding a single new bed as required in fiscal year 25-26. *Id.* And, as discussed further *infra,* the City currently has no plan for the remaining 3,894 beds needed to comply with the agreement. Feb. 12, 2025 Hearing, Timestamp 1:56:00–1:58:00; *but see* (City Quarterly Status Report Ex. A, Intervention Data, Jan. 22, 2025, ECF No. 858-01, identifying plans for 9,093 beds open and in process, leaving 3,822 without a plan.)

Moreover, instead of the County <u>increasing</u> its contribution to the City of LA's homelessness projects by, *inter alia*, resuming its commitment to fund the City's Roadmap beds, the County appears to be <u>decreasing</u> its contribution to the City by $10 million for Fiscal Year 2025-2026. Jan. 29, 2025 Hearing, Timestamp 1:46:00–1:50:00; *see also* Feb. 12, 2025 Hearing, Timestamp 42:00–45:00 ("**Blumenfield:** But the goal was, prior to Measure A passing, everyone say, we do Measure A we'll be able to get the county to step up and pay for more of the services. I don't even see how they're going to pay for the existing services that we're getting if we're getting less absolute dollars, and the value of those dollars is extremely less, because the cost of labor has gone up, so now they have less absolute dollars, and they have much less spending power. And all the time we were talking about actually getting them to step up and meet their responsibility and fund more of our services. Is there a prayer that they're going to do that?").

There are cost-effective ways for the City to comply with the terms of the settlement without bankrupting itself—for example, pivoting many current permanent housing projects into low-cost and quick interim shelter, operating Inside Safe projects as multi-units, contracting with shared housing providers, and making all Inside Safe projects Alliance-compliant to shift the costs of supportive services to the County. But these things require immediate and drastic changes to current operations to come into compliance.

9

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

## III.   THE CITY CONTINUES TO BE IN VIOLATION OF THE SETTLEMENT AGREEMENT

### A.   No Bed Plan Has Been Provided To Date

The City committed to 12,915 shelter beds but no plan for the creation of all those beds has been provided to date.  It is missing either 3,822 (according to its latest report to the court) or 3,894 (according to reports from the CAO's office), and has no way to pay for these beds, particularly after the extreme challenges caused by the January wildfires.  Special Master Martinez identified this significant funding gap in the Independent Monitoring Report Year One, filed on February 29, 2024:

As of September 30, 2023, the City has made significant strides in opening 2,347 beds or units. This accomplishment is commendable, but there is still much work ahead. Currently, the City has 6,108 beds or units in the pipeline, expected to be operational after 2027. **This indicates that the City's journey towards reaching its target number of beds or units is not yet complete, with a current gap of 4,460.**

The magnitude of this gap should not be underestimated, particularly in light of a recent presentation by the City's CAO, Matt Szabo, on February 21, 2024. During the presentation, it was revealed that **the City is projected to face budget deficits, especially in the fiscal years 2025-2026. These deficits pose a potential threat to the sustainability of interim housing programs, which could have an impact on the binding settlement agreement**. Therefore, it is crucial for the City to inform all involved parties and the Court about the current funding gaps and carefully consider the potential consequences for its obligations under the binding settlement agreement, both in the current reporting period and beyond**. Furthermore, it is essential to assess how these funding gaps, in conjunction with the funds allocated for the**

10

**Inside Safe Program, will affect the City's ability to fulfill its binding commitments.** The City has a responsibility under the agreement to open and operate the 6,108 units currently in progress, as well as securing funding for the 4,460 beds or units that currently lack financial support. Given these challenges, it is imperative for the City to take proactive measures to bridge the funding gap and ensure the successful implementation of the agreed-upon beds or units.

(Independent Monitoring Report Year One (1) at 7, Feb. 29, 2024, ECF No. 674 (emphasis added).)

Moreover, the Alliance is deeply concerned that beyond not having any plan for meetings its obligation under the Settlement Agreement, the City will start closing Roadmap beds despite its assurance to the Court and the parties during the Settlement Agreement hearings and associated briefing that the Alliance beds would be in addition to the Roadmap beds.

**B.      Milestones and Deadlines For Beds Have Not Been Met**

The City is likewise far behind its milestones for bed production.  By the second quarter of fiscal year 24-25 (i.e. December, 2024), the City should have had 6,714 beds built, obtained, or otherwise "created."  (Mitchell Decl. ¶ 14, Ex. D.)  However, only 4,815 beds have been created, a shortfall of 1,899 or nearly 30%.  (City Quarterly Status Report, Ex. A, Quarterly Report at 5, Jan. 22, 2025, ECF No. 858-01.)  This is not an anomaly; the City has been consistently behind at every single reporting period:

- January 17, 2023: The City reported 721 beds created, short of its target of 1,622 (**56% shortfall**).  (City Quarterly Status Report, Ex. A, Quarterly Report at 7, Jan. 17, 2023, ECF No. 516-1.)

- April 21, 2023: The City reported 935 beds built out of a target of 2,482 (**62% shortfall**).  (City Quarterly Status Report, Ex. A, Quarterly Report at 7, Apr. 21, 2023, ECF No. 539-1.)

11

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

- July 17, 2023: The City reported only 1,748 beds built with a target of 3,700 (**53% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 8, July 17, 2023, ECF No. 598-1.)

- October 16, 2023: The City reported only 2,347 beds out of a target of 4,138 (**43% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 8, Oct. 16, 2023, ECF No. 652-01.)

- January 16, 2024: The City reported only 2,810 beds out of a target of 5,190 (**46% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 8, Jan. 16, 2024, ECF No. 660-01.)

- April 15, 2024: The City reported only 3,018 beds out of a target of 5,688 (**47% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 8, Apr. 15, 2024, ECF No. 728-01.)

- July 15, 2024: The City reported only 4,017 out of a target of 5,950 (**32% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 8, July 15, 2024, ECF No. 757-01.)

- October 18, 2024: The City reported 4,455 out of a target of 6,235 (**29% shortfall**). (City Quarterly Status Report, Ex. A, Quarterly Report at 6, Oct. 18, 2024, ECF No. 797-01.)

The City's collective shoulder-shrug, citing run-of-the-mill delays in housing and shelter production, is unacceptable in light of the shocking statistic that six people die a day on the streets of Los Angeles. Plaintiffs brought this lawsuit to force the City to move with alacrity and treat this issue with extreme urgency. While the City's leadership has called for a FEMA-style response to the crisis, its conduct has a distinctly business-as-usual vibe. The City has not and cannot demonstrate that it has used "best efforts" to meet its milestones. And given the extreme financial challenges, Plaintiffs now question whether it can or will be able to do so without Court intervention.

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

## C.      Encampment Reduction Numbers Have Also Not Been Met

According to the City's proposed Encampment Resolution Milestones, the City should have recorded 4,175 by December 30, 2024.  (Mitchell Decl. ¶ 12, Ex. I.) According to its report, filed January 22, 2025, it has met and exceeded those numbers, recording 4,705 "resolutions."  However, through discussions with the City over the last six months, in addition to presentations made in the Homelessness and Housing Committee,[10] it has become clear that the City is counting CARE and CARE+ clean-ups as "resolutions" or, in the terms of the Settlement Agreement, "reductions."  But these are not "reductions," they are "cleanings" that do not qualify as reductions under the Settlement Agreement.[11]

The Settlement Agreement requires the City to "promptly employ its best efforts to comply with established plans, milestones, and deadlines" for "encampment engagement, cleaning, and reduction" in each Council District and Citywide. (Mitchell Decl. Ex. A, Settlement Agreement § 5.2 at 8:11–25.)

The Sanitation Department of the City of Los Angeles describes CARE/CARE+ Teams:

---

[10] February 12, 2025 Hearing: "Raman: [Exhibit B] is reported as encampment resolution.  It's data taken from CARE and CARE Plus operations, right? Falcone [CAO's office]: Yes, the data comes from LA sanitation.  And there is also data from LA DOT from the vehicles that are removed from public right of way. (Feb. 12, 2025 Hearing, Timestamp 1:59:56–2:00:12.)

[11] Plaintiff LA Alliance has a pending motion addressing the City's encampment reduction reporting.  (*See* Pls.' Mot. for Order re Settlement Agreement Compliance, Sept. 4, 2024, ECF No. 767 and subsequent pleadings and hearings thereon.)  In that motion, LA Alliance requested that the City report locations of alleged reductions to verify accuracy of the City's claims.  The greater concern was that the City was counting regularly scheduled sanitation clean-ups as "reductions."  The City has since admitted this is so.

13

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

**CARE/CARE+ Teams**

On October 1, 2019, LASAN's LSD launched the Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) program providing CARE and CARE+ teams for immediate, dedicated service deployed regionally to ensure the highest level of service. These teams conduct citywide encampment clean-ups along with trash, litter/debris, and health hazard and/or safety hazard removal on the City's public rights-of-way. The primary mission of the CARE and CARE+ teams is to deliver services to the individuals experiencing homelessness within their service areas.

The CARE+ Teams are deployed across three main assignments:
- CARE/CARE+ service for A Bridge Home Special Enforcement Cleaning Zones (ABH SECZs)
- CARE+ service for Citywide Services
- CARE+ service for Focused Service Zones (FSZ): Operation Healthy Streets Skid Row/Venice Beach (OHS), Downtown LA (DTLA), and Grand Ave/110 Fwy Corridor (Grand Ave)

CARE+ teams assigned to ABH SECZs provide full comprehensive cleanings including the identification, documentation, and removal of line-of-sight health and/or safety hazards, the removal of trash, litter, and debris, and the power washing of public rights-of-way to ensure fully sanitized areas for public safety. Additionally, the CARE teams assigned to ABH SECZs provide L.A.M.C. 56.11 compliance, spot cleaning services, health hazard and/or safety hazard identification, documentation, and removal, trash, litter, and debris removal. The CARE teams provide day-to-day maintenance to achieve safe and clean public rights-of-way.

LSD also provides comprehensive teams dedicated to specific high-need regions that require consistent, recurring, and dedicated services. In addition to the existing OHS Skid Row and Venice areas, these Focused Service Zones (FSZ) include the Grand and Flower Avenue Corridor and Downtown LA where teams operate 5 days a week.

City of Los Angeles, Sanitation, Livability, https://sanitation.lacity.gov/livability (last visited Feb. 19, 2025).

LA Sanitation is not "reducing" or "resolving" encampments when it removes abandoned or unused tents, makeshift shelters, and vehicles from the public right-of-way—it is *cleaning* the public right-of-way, which is separately provided for in the agreement, and then people are largely moving back into the same location within minutes. The words "reduction" or "resolution" are not included a single time in the CARE/CARE+ description but variations of the word "clean" appear not only in the title, but also six (6) separate times in the description. The City has changed nothing about how CARE and CARE+ teams operate but instead is trying to fit the Settlement Agreement terms within current operations. But business-as-usual is not the deal Plaintiffs bargained for. What *would* count as encampment reductions would be Inside Safe or similar coordinated efforts to systematically engage with individuals living outdoors, offer appropriate housing or shelter opportunities, and bring them inside while removing unnecessary items from the street. Those are the numbers which

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

should be reported—and which Plaintiffs suspect are far below the 4,175 required by end of 2024.

**D.      The City is Violating Both the Letter and the Spirit of the Agreement.**

The context of the Settlement Agreement provides useful insight into the manners in which the Settlement Agreement is being violated. The provisions of the Settlement Agreement, in conjunction with the City and Plaintiffs' agreements with the County, were designed to work together to provide a blueprint for achieving functional zero unsheltered homelessness in the City of Los Angeles.  The express intention of both parties was for the City to rapidly increase the number of homeless beds across the spectrum of needs while systematically engaging unhoused individuals throughout the City to fill new beds as they are brought online.  Thus thousands of new beds would go up, thousands of people would be brought inside, and thousands of encampments would go down, benefiting both the housed and unhoused communities and putting Los Angeles on a path to resolving this ever-expanding crisis.

In 2022, the change in leadership caused the City to shift its focus—from the LA Alliance blueprint to the Inside Safe program, which was done at high cost and without strong collaboration with, or monetary support from, the County.  This mismanagement drained crucial City funds and caused non-elected City employees to scramble to try to fit the LA Alliance framework into existing programs to meet its legal obligations.  This has resulted not only in delays bringing beds and housing online, but also a total mismatch in encampment resolution and reporting.[12]

The Settlement Agreement is not working as it was designed to by the parties, in consultation with the Court, in 2021 and into early 2022.  The milestones and deadlines for bed production, established by the City of LA in late 2022, already provide timelines that are far too expanded; LA Alliance grudgingly accepted this slow

---

[12] Some of this mismatch is likely due to the shift in the City leadership's focus: the City refused for over a year to provide the Alliance and the Court with any plan for encampment engagement, cleaning, and reduction, meaning none of the tracking systems had been put in place. The City is now playing catch-up.

15

pace as long as it aligned with encampment engagement and reduction, allowing the two processes to work together in an orderly and functional manner.  None of this is now happening.  The City is at its best 30% behind in bed production, has no plan and no money to establish the nearly 4,000 new beds in the next two years it is required to under the agreement, and is claiming basic sanitation functions meets its "encampment engagement, cleaning, and reduction" obligations.  The City is failing at every level of this Agreement.

## IV.    CONCLUSION

The City is full of well-intentioned actors; Plaintiffs do not suggest otherwise. But the lack of focus, mismanagement of funds, and improper counting and reporting is placing the City squarely in violation of its obligations under the Settlement Agreement.  And based on the undisputed financial challenges facing the City in this and next fiscal year, the City will be unable to meet its obligations without stark and immediate changes.

The LA Alliance requests (i) a formal finding by the Court that the City is in violation of its obligations under the Settlement, (ii) that the Court set an immediate target by which the City must come into compliance, and (iii) the identification of clear consequences for non-compliance in the form of monetary and injunctive measures the Court deems proper.

Dated: February 20, 2025          Respectfully submitted,

*/s/ Elizabeth A. Mitchell*
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

16

*PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*