1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
┌─────────────────────────────────────┐
│          F I L E D                    │
│   CLERK, U.S. DISTRICT COURT          │
│  ┌─────────────────────────────┐     │
│  │      03/06/2025             │     │
│  └─────────────────────────────┘     │
│   CENTRAL DISTRICT OF CALIFORNIA      │
│  BY: _____ kdu _____ DEPUTY    │
└─────────────────────────────────────┘
```

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,

      Plaintiffs,

v.

CITY OF LOS ANGELES, et al.,

      Defendants.

Case No. CV 20-02291 DOC (KES)

**SECOND AMENDED DRAFT OF THE ALVAREZ AND MARSAL (A&M) ASSESSMENT OF LOS ANGELES CITY HOMELESSNESS PROGRAMS**

**Hon. David O. Carter**
**United States District Judge**



Draft & Preliminary
For Discussion Purposes Only
Work Product Prepared at the
Direction of Hon. David O. Carter

# Independent Assessment of City-Funded Homelessness Assistance Programs

Financial and Performance Assessment Report of the Roadmap Program - Freeway Agreement, Alliance Program, and Inside Safe Program

CASE NO. 2:20-CV-02291-DOC-KES

**SUBMITTED TO:**

Judge David O. Carter

California Central District Court

411 West Fourth Street, Courtroom 10A

Santa Ana, CA 92701

**SUBMITTED BY:**

Diane Rafferty

Alvarez & Marsal Public Sector Services, LLC

6060 Center Drive, Suite 950

Los Angeles, CA 90045

March 6, 2025

Hon. David O. Carter
United States District Court
Central District of California
411 West Fourth Street, Courtroom 10A
Santa Ana, CA 92701

Dear Judge Carter:

On behalf of A&M, I am pleased to submit the enclosed report, *Independent Assessment of City-Funded Homelessness Assistance Programs*, to the Court. In accordance with our engagement letter dated May 17, 2024, its subsequent amendment to include the Los Angeles Police Department on September 25, 2024, and our engagement letter with the County of Los Angeles approved on January 7, 2025, this report presents our assessment of the City of Los Angeles' homelessness assistance programs: Roadmap Program – Freeway Agreement, Alliance Settlement Program, and Inside Safe. It has been a privilege to conduct this engagement for the Court, the City and County of Los Angeles; and I want to extend my deepest gratitude for the opportunity.

Our objective, throughout this assessment, has been to provide an impartial and data-driven analysis, supported by relevant documentation and firsthand observations. We aimed to furnish the Court with a clear, factual basis for understanding the issues presented and endeavored to maintain a balanced perspective throughout this review.

I appreciate the courtesy and cooperation extended to us by the Court, including Special Master Michele Martinez and all participating stakeholders. Should you have any questions or wish to discuss any aspect of this report further, please feel free to contact me at my email (drafferty@alvarezandmarsal.com). We remain available to clarify any details or provide additional assistance as needed.

Thank you for entrusting us with this important matter.

Sincerely,

**Alvarez & Marsal Public Sector Services, LLC**

By: _____
Name:  Diane Rafferty
Title:    Managing Director

DRAFT & PRELIMINARY

# Executive Summary

## Purpose and Scope of the Assessment

Alvarez & Marsal ("A&M") was retained to perform an independent financial and performance assessment by the Honorable David O. Carter, United States District Judge for the Central District of California ("the Court") on May 17, 2024. A subsequent amendment on September 25, 2024 included the Los Angeles Police Department, and an engagement letter with the County of Los Angeles ("the County") was approved on January 7, 2025. The primary intent of this financial and performance assessment was to examine the appropriation and expenditure of funds through the City of Los Angeles ("the City") under the Roadmap Program – Freeway Agreement ("Roadmap Program"), Alliance Settlement Program ("Alliance Program"), and Inside Safe Program (collectively, the "City Programs") from June 1, 2020, through June 30, 2024 ("Lookback Period"). It further evaluated whether these monetary resources effectively supported individuals experiencing homelessness in achieving improved outcomes and housing stability.

By tracing the flow of funds, evaluating the services offered by the City Programs, and analyzing reported results and data, the assessment aimed to provide an objective perspective on the alignment of financial decisions with service delivery outcomes. The assessment was intended to provide stakeholders with a clear understanding of the City Programs' overall impact and identify opportunities to enhance efficiency and effectiveness in addressing homelessness in the City.

A&M and the Court agreed that A&M's work would not constitute a formal review or audit in accordance with any applicable accounting standards. The Court also understands that A&M is not a public accounting firm or CPA firm and does not issue opinions on financial statements or provide audit or other attestation services. While A&M's work may include an analysis of financial accounting data, the Court acknowledges that A&M's engagement is an assessment and shall not constitute an examination, review of any kind, compilation or compilation of agreed-upon procedures as defined by the AICPA, or any other type of financial statement reporting engagement that is subject to the rules of the AICPA, GASB or other state or national professional or regulatory body.

## Acknowledgments

This report reflects a significant effort made possible by the collaboration and support of numerous individuals, organizations, and key stakeholders from the City, the County, and Los Angeles Homeless Services Authority ("LAHSA"). Over 90 interviews were conducted with stakeholders, subject-matter experts, and front-line staff. A&M reviewed more than 11,500 documents and carried out approximately 30 site visits to gain firsthand insight into the City Programs. Multiple meetings were also held with Judge Carter, Special Master Jay Gandhi, and Special Master Michele Martinez, whose guidance and accessibility proved invaluable to this financial and performance assessment.

The A&M team was comprised of over ten professionals and executives from the firm, each contributing their expertise to every phase of the engagement. We extend our gratitude to the key stakeholders, who generously shared their time, knowledge, and expertise. This report stands as a testament to the collaborative efforts, dedication, and collective engagement of everyone involved in assessing the homelessness assistance services provided in the City and the County under the City Programs.

## Key Findings: Financial and Performance Overview of City Programs

**Poor Data Quality and Integration**: Repetitive information gaps, coupled with a lack of accurate and complete data and documentation, posed significant obstacles to this assessment. Insufficient financial accountability led to an inability to trace substantial funds allocated to the City Programs. Fragmented data systems across LAHSA, the City, and the County and inconsistent reporting formats made it challenging to verify spending and the number of beds or units reported by the City and LAHSA, track participant outcomes, and align financial data with performance metrics. The lack of uniform data standards and real-time oversight increased the risk of resource misallocation and limited the ability to assess the true impact of homelessness assistance services.

*During this assessment, it became apparent to A&M that key stakeholders did not monitor or regard the City Programs in the same manner as the Court, particularly with respect to the Roadmap and Alliance Programs. This misalignment created confusion when inquiries arose about topics such as the amount of funding appropriated and spent on a City Program. For example, LAHSA was unable to identify all relevant service provider contracts and expenses under the Roadmap Program, leading to inconsistencies between the contracts linked to the Roadmap Program within LAHSA's accounting data and service provider contracts identified in response to other data requests. This discrepancy created confusion over which service provider agreements were in effect and funded under the City Program. Such gaps in documentation complicated efforts to track expenditures comprehensively, highlighting the need for more accurate recordkeeping within LAHSA's financial and performance oversight processes. Without a unified understanding of the scope, it proved challenging for all parties to determine the costs per bed, reconcile reported data, track expenses across the various funding sources and multiple funders, and respond accurately and timely to requests for information.*

**Quantification of Funding for City Programs:** A&M identified approximately $2.3 billion of funding, including appropriations, commitments, or spending, related to the City Programs across the Lookback Period. This amount includes capital costs for the creation of interim housing and permanent supportive housing beds, rent or lease expenses for interim housing beds, funding for time-limited subsidies, and supportive service expenses passed through LAHSA. See Appendix A.

*As discussed in detail throughout this report, due to the manner in which the City recorded expenditures for homelessness assistance services, A&M was unable to completely quantify the total amount spent by the City for each component of the City Programs using the data provided. Multiple funding sources and allocations across various City departments resulted in fragmented accounting records. A&M identified that the City and LAHSA did not initially provide all requested financial data, prompting A&M to make multiple efforts to identify, trace, and reconcile relevant data as it was produced to A&M. Further, A&M relied on the financial data produced by the City and LAHSA, as A&M did not have direct access to the financial information systems. Therefore, since the City and LAHSA were unable to identify and calculate the relevant expenses for all City Programs, A&M was*

*unable to quantify the total amount of money spent to establish the beds and provide associated supportive services.*

**Disjointed Continuum-of-Care System**: Multiple siloed referral processes and disparate data systems, along with differing prioritization and matching processes to connect people experiencing homelessness to services, impeded the establishment of a uniform coordinated entry system. This fractured system contributed to potential inequities in resource allocation and a lack of transparency in the prioritization of unsheltered individuals experiencing homelessness for various shelter and housing interventions and supportive services.

*With respect to interim housing, LAHSA, the City, and the County implemented incongruent prioritization and matching pathways for interim housing enrollments. For example, LAHSA acknowledged that it lacked a standardized prioritization policy during the Lookback Period. This variation caused confusion among stakeholders, including service providers, and increased the risk of inequitable and inefficient resource allocation, potentially delaying timely shelter and housing placements.*

**Limited Financial Oversight and Performance Monitoring**: Invoice reviews by the City and LAHSA typically centered on reconciling aggregate amounts in financial reports, rather than verifying the quality, legitimacy, or reasonableness of expenses. Antiquated systems and manual processes, prolonged budget amendments, and inconsistent invoice submission practices, resulted in administrative inefficiencies and potential payment delays. Existing controls did not always detect or address potential discrepancies, heightening the risk of underfunding essential services or approving unsubstantiated expenses. LAHSA's monitoring activity revealed a high level of noncompliance among the limited number of service provider contracts reviewed. City and LAHSA capacity constraints and insufficient segregation of duties may have further limited the extent of performance monitoring, ultimately affecting service quality and effectiveness.

*Based on discussions with LAHSA personnel and review of relevant policies and procedures, A&M found that, during the Lookback Period, LAHSA did not contemporaneously verify that the service provider invoices reflected actual services provided at the given location before approving payment. Instead, it appears that LAHSA approved service provider invoices based solely on a high-level review of supporting financial documents, which did not include receipts or clear indications of the specific services delivered, allowing for potential misalignment between the services being reimbursed and those outlined in the service providers' contracts.*

*The invoicing process between the City and LAHSA, or the "cash request" process, was a time-consuming, manual process at risk of human error, exposing the City and LAHSA to potential accounting inaccuracies and complicating precise reconciliation of contract expenditures.*

*A&M's analysis of a sample of service provider contracts provided by LAHSA found that, on average, 82 days elapsed between the contract term's start date and the contract's execution date. Furthermore, each sampled contract reached full execution after its stated term had commenced, raising concerns about oversight and clarity regarding service provision during the interim period.*

**Lack of Contractual Clarity and Accountability**: Contracts between the City, LAHSA, and service providers frequently contained broad terms without clear definitions, which created ambiguity about the scope and type of service delivered. This lack of specificity complicated efforts to align service types,

delivery, and quality. These challenges were compounded by multiple funding sources, poorly designed and siloed processes, lack of collaboration, and overlapping responsibilities between the City, the County, LAHSA, and service providers. Furthermore, service providers were granted discretion in allocating funding for services, adding another layer of complexity, accountability and risk. Collectively, these factors reduced transparency, blurred roles and responsibilities, and impeded effective coordination of homelessness assistance services.

> *Contracts provided a wide scope of allowable services, granting service providers discretion in allocating funding across different service types, such as "Case Management" and "Residential Supervision." For example, although a sample of contracts referenced "Residential Supervision" as a direct supportive service, it did not appear to define its scope or associated expectations. Meanwhile, the list of allowable costs under supportive services, based on the cost eligibility matrix for FY 2023-24 issued by LAHSA, were broad. Allowable costs for supportive services encompassed examples such as "case management," "legal services," "mental health services," "child care," and "life skill[s] training," without specifying how or whether these categories intersect with "Residential Supervision." This lack of clarity may have complicated determinations of eligible expenses and created variability in how service providers interpreted and delivered services, ultimately hindering consistent performance.*

> *Due to ambiguous contractual language and the broad discretion granted by LAHSA to service providers in allocating funds for services, a wide range of allowable expenditures was deemed eligible for reimbursement. This discretion complicated efforts to establish uniform service types, ensure consistent delivery standards, and maintain quality across multiple service providers, ultimately hindering meaningful performance comparisons and accountability.*

**Cost and Service Variability**: Within the City Programs, subprograms and their associated services demonstrated significant cost and performance variability across service providers. These variabilities were partly due to inconsistent outcome tracking, differences in participants' needs and acuity levels, and variations in staffing models across the sites. These disparities made it difficult to compare the performance of each service provider and determine the cost-effectiveness of each intervention.

> *A&M identified and compared the most substantial categories of expenses reported by service providers across a sample of sites during FY 2023-24. A&M utilized the supporting invoice detail attached to the service provider invoices for this comparison. A&M identified considerable differences in actual expenses incurred associated with primary supportive services offered. For example, A&M observed the following ranges in expenses between the sampled sites (on a per-bed, per-day basis): personnel expenses ranged from $67 to $7, food or meal expenses ranged from $18 to $7, and security expenses ranged from $32 to $2. While these expenses should not be regarded as absolute, due to the varying formats and expense categories presented in each service provider's supporting financial statements, the amounts illustrate the challenges of determining which services the City funded, and the nuance involved in reviewing financial records when assessing the overall cost of homelessness assistance services.*

> *For FY 2023-24, a sample of sites reported a median permanent housing exit rate of approximately 22.0%, whereas 47.8% of exits resulted in a return to homelessness, exceeding the rate of exits to permanent housing. Overall, the reported metrics did not demonstrate consistent trends or correlations. For instance, a high percentage of document-ready participants or prolonged stays did not appear to*

*result in higher permanent housing placements, nor did any specific type of housing arrangement (congregate and non-congregate). These observations suggest that participants' outcomes are dependent on a multitude of factors.*

**Reconciliation of Spending**: Funding and the City's budget allocations for homelessness assistance services were not routinely reconciled with actual spending or contractual obligations. This lack of reconciliation led to confusion about the total amount expended on homelessness assistance services, which made it challenging to ascertain how budgets for multiple endeavors and funding sources were utilized or whether they achieved the intended outcomes.

*Across the Lookback Period, the City published a "Homeless Budget" each fiscal year within the City's Adopted Budget, amounting to a total of $3.6 billion dollars from Fiscal Year 2020-21 through Fiscal Year 2023-24. However, the Inside Safe Program is the only City Program distinctly budgeted for within the Homeless Budget; otherwise, the Homeless Budget is primarily delineated by the City department receiving the allocated funds or sources of Special Funds (e.g., federal grants, Proposition HHH) available to the City to support homelessness-related activities. The City identified that many appropriated line items supported overlapping initiatives, not only for the City Programs, but also for "Other Homelessness Programs." Further, the City does not routinely reconcile actual spending to the Homeless Budget, complicating the ability manage costs and monitor spending.*

## Key Recommendations for Improvement

**Establish a Comprehensive Homelessness Strategy and Strengthen Fiscal Alignment**: The City, the County, and LAHSA should consider developing a unified homelessness strategy to align all existing and newly established beds under the City Programs and respective subprograms with specific, measurable objectives, ensuring that supportive services are both coordinated and impactful. This approach should include standardized processes and a mechanism to accurately track and reconcile homelessness-related expenditures against the approved fiscal budget to reduce duplications and inefficiencies while enhancing accountability. By integrating an aligned strategy with fiscal oversight, the City can better utilize its resources to reduce homelessness effectively.

**Strengthen Coordination and Data Sharing**: The City, the County, and LAHSA should consider developing and adopting consistent data definitions and integrate databases, consistent with data privacy requirements and all applicable laws, to reduce fragmentation in referral, prioritization and matching, and outcome-tracking processes. This coordination would improve overall communication, provide the ability to timely match an individual experiencing homelessness to the appropriate level of services, and track outcomes. Implementing a unified, coordinated entry process promotes equitable resource allocation, transparency, and fosters a more seamless continuum of care for individuals experiencing homelessness as they progress through various shelter and housing interventions and services.

**Enhance Financial Oversight and Transparency**: The City should consider authorizing and appointing an independent financial manager to develop a clear framework for reviewing and approving service provider invoices and the associated LAHSA invoices, or "cash requests." This role would develop processes to verify expense validity, confirm compliance with contractual requirements before payment of the City's funds, and help streamline and automate administrative processes. By introducing this level of objective oversight, stakeholders can bolster confidence in financial management and better ensure that the City's allocated funds are used effectively for their intended purposes.

**Strengthen Invoice Transparency and Institute Real-Time Monitoring:** The City and LAHSA should consider mandating that all service providers submit detailed, itemized invoices outlining specific costs, accompanied by clear supporting documentation for verification of services. This level of transparency would help reviewers quickly identify major cost drivers and assess compliance with contractual requirements. Shift away from predominately retrospective reviews by integrating regular, real-time monitoring of expenditures and onsite reviews of service delivery.

**Improve Contract Monitoring and Compliance:** LAHSA should consider enforcing clear, uniform standards for the format, frequency, and level of detail in reporting, ensuring service providers accurately and completely record expenses, participant data, and service delivery in a timely manner. Supplement existing key performance indicators (e.g., occupancy rates, number of people served) in contracts with outcome-based measures (e.g., housing stability and retention rates, referrals and healthcare access, returns to homelessness), as well as site locations where applicable, enabling more meaningful evaluations of service effectiveness and transparency.

**Optimize Resource Allocation**: The City, the County, and LAHSA should consider linking portions of funding or contract renewals to verified results, incorporating measurable goals and long-term outcomes with clear benchmarks for continuous improvement. Use standardized, accurate, and complete data to determine the most effective subprogram models and redistribute funds, as needed.

**Conduct an Independent Operational Assessment of LAHSA:** The City and the County should consider commissioning an external, comprehensive review of LAHSA's organizational structure, staffing, data management, service delivery models, and interagency collaboration. This independent assessment would help clarify whether LAHSA's current capacity and processes align with leading practices, identify operational gaps, and propose targeted improvements. By providing an objective evaluation, stakeholders can better determine how to enhance the agency's overall performance and ensure effective use of the City's funds.

## Table of Contents

Executive Summary ................................................................................................ 3

Table of Contents ................................................................................................. 9

Introduction ....................................................................................................... 11

1.1    THE CURRENT STATE OF HOMELESSNESS IN THE CITY OF LOS ANGELES ............................ 11

1.2    INTERJURISDICTIONAL, GOVERNANCE, AND SERVICE DELIVERY FRAMEWORKS ............... 13

1.3    HISTORICAL EXAMINATION OF EACH CITY PROGRAM'S DEVELOPMENT ............................ 15

1.4    OBJECTIVES OF THE FINANCIAL AND PERFORMANCE ASSESSMENT ...................................... 30

City Programs' Structure ..................................................................................... 33

2.1.    TYPES OF HOUSING INTERVENTIONS ESTABLISHED BY THE CITY PROGRAMS ................... 33

2.2.    IDENTIFICATION OF SUBPROGRAMS, SERVICES, AND INTERSECTIONS WITHIN CITY PROGRAMS .................................................................................................................. 37

Financial Assessment .......................................................................................... 44

3.1    BACKGROUND ON THE CITY'S FINANCIAL AND ACCOUNTING PROCESSES ........................... 44

3.2    A&M APPROACH TO FINANCIAL ASSESSMENT ................................................................. 44

3.3    OVERVIEW OF FUNDING PROCESS FOR CITY PROGRAMS ................................................ 46

3.4    ROADMAP PROGRAM APPROPRIATIONS AND EXPENDITURES ............................................. 50

3.5    ALLIANCE APPROPRIATIONS AND EXPENDITURES .......................................................... 66

3.6    INSIDE SAFE PROGRAM APPROPRIATIONS AND EXPENDITURES ........................................ 68

3.7    LAHSA FINANCIAL ASSESSMENT (INVOICING AND REIMBURSEMENT PROCESSES) ........... 75

Performance Assessment ..................................................................................... 100

4.1    A&M APPROACH TO PERFORMANCE ASSESSMENT ......................................................... 100

4.2    CITY PROGRAMS' PRIORITIZATION AND MATCHING ...................................................... 100

4.3    QUALITY OF CITY-FUNDED SERVICES ........................................................................... 106

4.4    QUALITY OF COUNTY-FUNDED SERVICES ...................................................................... 112

4.5    EFFECTIVENESS OF SERVICES ...................................................................................... 116

Assessment of Monitoring and Oversight by LAHSA ......................................... 130

5.1    A&M APPROACH TO EVALUATION OF MONITORING AND OVERSIGHT BY LAHSA ........... 130

5.2    GOVERNANCE AND ACCOUNTABILITY .......................................................................... 130

5.3    DISTINGUISHED ROLES AND RESPONSIBILITIES ............................................................. 131

5.4        Results from Monitoring and Oversight Processes ................................................. 135

The Los Angeles Police Department ....................................................................................139

6.1        A&M Approach to LAPD Assessment .......................................................... 139

6.2        Roles and Responsibilities for Homeless Services .................................... 139

6.2        Financial Overview ........................................................................................ 142

6.3        Performance Overview .................................................................................. 148

Appendix A: City Funding (Appropriations, Commitments, or Spending) Related to the City Programs Across the Lookback Period ..............................................................................155

Appendix B: A&M Onsite Fieldwork Summary (City-Funded Services)..............................156

Appendix C: A&M Onsite Fieldwork Summary (County-Funded Services) ........................157

Appendix D: Glossary ........................................................................................................158

SECTION 1

# Introduction

## 1.1  THE CURRENT STATE OF HOMELESSNESS IN THE CITY OF LOS ANGELES

The growth of the homeless population in the City and the County of Los Angeles has reached historical levels driven by a combination of rising housing costs, economic inequality, and limited social and mental health services.[1] Many public health scientists and researchers have deemed homelessness a public health "crisis" in many cities and communities, such as Seattle and New York City.[2] In March 2020, the LA Alliance for Human Rights filed a federal lawsuit against the City and the County, alleging that the parties had not allocated sufficient resources or developed the necessary infrastructure to adequately address the needs of the unsheltered population. The litigation, *LA Alliance for Human Rights et al. v. the City of Los Angeles, et al.* (Case 2:20-cv-02291-DOC-KES), alleged systemic failures as the root causes of homelessness and demanded comprehensive reforms.

Los Angeles Mayor Karen Bass issued a local emergency declaration on December 12, 2022, with respect to the City's homelessness crisis.[3] In 2024, more than 45,000 individuals were reported experiencing homelessness within the City,[4] reflecting a 2.2% decrease compared to the previous year's Point-In-Time ("PIT") count.[5] Notably, the City experienced a 9.6% increase in homelessness since 2020, underscoring the continued challenges in addressing homelessness in Los Angeles.[6]

Last year, in May 2024, the Los Angeles County Department of Public Health ("DPH") published a report on mortality rates and causes of death among people experiencing homelessness ("PEH"), analyzing data from 2014 through 2022.[7] Over this eight-year timeframe, the mortality rate among PEH increased at a pace approximately 30% higher than overall growth in this population, indicating a disproportionate increase in deaths relative to population size.[8] The report cited overdoses, coronary heart disease, and transportation-related injuries as primary contributors.[9]

During the combined years of 2021 and 2022, the all-cause mortality rate among PEH in the County was 3.9 times higher than that of the total County population.[10] Within the same period, PEH were 40.5 times more likely to die from an overdose, 18.3 times more likely to die from a transportation-related injury, 17.7 times more likely to die from homicide, 8.4 times more likely to die from suicide, 4.3 times more likely to die from coronary heart disease, and 1.7 times more likely to die from COVID-19, compared to the total County population.[11]

---

[1] The Homelessness Public Health Crisis, Harvard Magazine, May-June 2024.
[2] Ibid.
[3] Mayor Bass Executive Directive No. 2, Inside Safe Initiative, Issue Date December 21, 2022.
[4] 2024 Greater Los Angeles Homeless Count, dated June 28, 2024 (LAHSA).
[5] 2023 Greater Los Angeles Homeless Count [No Date Available] (LAHSA).
[6] City of Los Angeles Point-In-Time Counts, 2020 through 2024 (LAHSA).
[7] LA County Public Health, Mortality Rates and Causes of Death Among PEH in LA County: 2014-2022, May 2024, p. 3 of 37.
[8] Ibid.
[9] County of Los Angeles Public Health, New Public Health Report Shows Homeless Mortality Rate Plateaued in 2022, dated May 9, 2024.
[10] LA County Public Health, Mortality Rates and Causes of Death Among PEH in LA County: 2014-2022, May 2024, p. 21 of 37.
[11] Ibid.

Section 1

The report reflected the need to sustain and expand access to healthcare, mental health and substance use treatment, and permanent and supportive housing solutions to address preventable fatalities in this population.[12] While the rise in mortality among PEH signals critical service gaps, it also emphasizes the importance of examining fiscal spending to ensure resources are allocated effectively to address these urgent concerns.

FIGURE **1.1**

City of Los Angeles Annual PIT Counts



SOURCE: 2020 – 2024 Greater Los Angeles Homeless Count, City of Los Angeles

FIGURE NOTE: In 2021, the Los Angeles Homeless Services Authority did not conduct the annual unsheltered Point-In-Time count due to COVID-19-related health and safety concerns. The U.S. Department of Housing and Urban Development granted an exemption for that year, resulting in a data gap for 2021 compared to other periods.[13] LAHSA, the lead agency for the Los Angeles Continuum of Care, determined that mobilizing approximately 8,000 volunteers to perform the PIT count was not feasible during this high-risk stage of the pandemic.[14]

---

[12] County of Los Angeles Public Health, New Public Health Report Shows Homeless Mortality Rate Plateaued in 2022, dated May 9, 2024.
[13] LAHSA, HUD Exempts Los Angeles from 2021 Unsheltered Point-in-Time Count, dated December 9, 2020.
[14] Ibid.

DRAFT & PRELIMINARY

## 1.2 Interjurisdictional, Governance, and Service Delivery Frameworks

The City of Los Angeles, situated within the County of Los Angeles – the most populous county in the United States, with over ten million residents[15] – operates in a complex environment when addressing homelessness. The multifaceted homeless services delivery system within the City relies on both a Joint Powers Authority and County-level agencies.

Although the City provides funding for homelessness services, these efforts are implemented primarily through LAHSA, a Joint Powers Authority established in December 1993, through a collaborative agreement between the City and the County ("Joint Powers Authority Agreement" or "JPAA").[16] On behalf of both jurisdictions, LAHSA manages resources and facilitates the delivery of essential programs and services to address homelessness throughout the region through its Coordinated Entry System ("CES") while navigating policy priorities, funding streams, and administrative requirements of both the City and the County.

As the designated Continuum of Care ("CoC") lead agency for the Los Angeles region,[17] LAHSA is responsible for coordinating and administering a comprehensive response to homelessness in compliance with U.S. Department of Housing and Urban Development ("HUD") mandates and guidelines.[18] This framework outlines a continuum of intervention points, including outreach, emergency shelter, transitional housing combined with supportive services, and permanent housing options, including permanent supportive housing as needed.[19]

LAHSA, as the lead CoC agency, bears the responsibility for overseeing and evaluating its local homelessness response systems. A central element of this oversight involves conducting a PIT count of PEH at least biennially, and an annual housing inventory count. These data collections yield valuable insights into local conditions, informing decisions on resource allocation, service delivery, and policy adjustments aimed at reducing homelessness and improving outcomes for vulnerable populations.[20]

In contrast to the City's governance structure, which is organized into 15 Council Districts,[21] LAHSA administers homelessness services regionally, using eight Service Planning Areas ("SPAs") that were originally defined by the County's DPH.[22] These SPAs are designed to reflect differences in demographics, socioeconomic conditions, and service needs across the county, in hopes to allow LAHSA to tailor interventions more effectively.

---

[15] Los Angeles County California, 2020 Decennial Census, United States Census Bureau.
[16] LAHSA Joint Powers Authority Agreement, dated December 17, 1993, p. 1 of 20.
[17] LAHSA, Los Angeles Continuum of Care (https://www.lahsa.org/coc/).
[18] HUD CoC Program Interim Rule, 24 CFR Part 578.
[19] LAHSA, Los Angeles Continuum of Care (https://www.lahsa.org/coc/).
[20] Ibid.
[21] City of Los Angeles, Meet Your Government (https://lacity.gov/government).
[22] LAHSA, Coordinated Entry System (https://www.lahsa.org/ces/home/accessingces/); County of Los Angeles Public Health, Service Planning Areas (http://publichealth.lacounty.gov/chs/SPAMain/ServicePlanningAreas.htm).

DRAFT & PRELIMINARY

FIGURE **1.2**

## Map of LAHSA SPAs and City Council District



SOURCE: ArcGIS Online Mapping Software. The datasets overlapped are "Service Planning Areas 2022 (view)" and "LA City Council Districts (Adopted 2021)"

However, this regional approach, because of its design, is misaligned between the City and LAHSA, and introduces complexities. This misalignment diminishes direct accountability for financial investments and complicates the evaluation of outcomes at the Council District level. This dual-layered structure often results in overlapping responsibilities, differing funding streams, and intricate accountability arrangements. The intersection of Council Districts and SPAs influences both the governance processes and the financial oversight of the City's homeless services system.

Concurrently, the City depends on the County for the provision of critical supports. For instance, the Los Angeles County Department of Health Services ("DHS"), rather than the City, provides public healthcare

DRAFT & PRELIMINARY

services through County-operated or contracted sites. Similarly, other County-level agencies offer mental health and social service resources that directly influence the conditions faced by unsheltered PEH. This reliance by the City on County-provided services introduces additional financial, operational, and administrative considerations into the City's homeless services delivery system.

This intertwined governance structure, with LAHSA at the nexus of the City and the County's roles, results in a complex environment characterized by overlapping responsibilities, diverse funding streams, communication obstacles, and multiple accountability channels; consequently, it is extremely difficult to clearly define the process flows for both funding and service delivery within the CoC system.

## 1.3 HISTORICAL EXAMINATION OF EACH CITY PROGRAM'S DEVELOPMENT

Within this environment, the City developed the City Programs. As described further below, two of the City Programs were developed in response to a litigation matter, and the other followed the mayor's declaration of a state of emergency within the City. These originating conditions have significantly influenced each City Program's structural design, strategic focus, and operational implementation of the respective services. This section outlines the historical context behind the establishment of each City Program, highlighting their unique objectives and operational frameworks.

### 1.3.1.  ROADMAP PROGRAM

The Roadmap Program emerged from the LA Alliance for Human Rights lawsuit against the City. In May 2020, the Honorable David O. Carter, United States District Judge for the Central District of California, issued a preliminary injunction requiring both the City and County of Los Angeles to relocate and shelter homeless individuals living near freeway overpasses, underpasses, and ramps.[23] In response, the City entered into a Memorandum of Understanding ("Roadmap MOU") with the County, to address homelessness, particularly encampments near freeway areas, individuals aged 65 and older experiencing homelessness, and other vulnerable populations, such as individuals with preexisting medical conditions and/or susceptible to the COVID-19 virus, experiencing homelessness within the City.[24] The Roadmap MOU, as of October 2020, formalized a commitment between the City and the County to provide a total of 6,700 beds and associated services for these target populations within an 18-month timeframe.[25] The term of the Roadmap Program ends on June 30, 2025, unless extended upon mutual agreement by the City and the County.[26]

---

[23] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 178 of 209.
[24] Roadmap MOU, dated October 12, 2020, p. 4 of 15.
[25] Ibid., p. 3.
[26] Ibid., p. 4.

Section 1

FIGURE **1.3**

Bed Establishment and Existing Bed Obligations of the Roadmap Program



SOURCE: Roadmap MOU, dated October 12, 2020

The County committed to providing a one-time monetary incentive of $8 million of funding if the City successfully opened and made 5,300 New Beds[27] operational and available for occupancy within ten months from June 16, 2020.[28] Further, to support the City in funding services for the newly established beds, the County committed to contributing up to $53 million for the first year and up to $60 million annually for years two through five, amounting to an estimated total of $300 million including the one-time incentive.

In addition to funding the services for the New Beds and Other Beds,[29] the County committed to providing a package of "mainstream services" to PEH residing in the City-established facilities under the Roadmap MOU.[30] These "mainstream services" delivered through the County Departments of Health Services, Mental Health, Public Health, and Public Social Services, encompass:

- Mental health and substance-use disorder outreach,

---

[27] "'New Beds' provided under this MOU shall be defined as beds (i) not previously captured in any agreement or plan between the PARTIES, and (ii) opened on or after the date of the Binding Term Sheet (i.e., June 16, 2020). New Beds may include any combination of the following: (i) purchased and/or leased motel/ hotel rooms by the City; (ii) rental assistance, including rapid rehousing, but only for the duration of the assistance; (iii) sprung structures or tents; (iv) safe parking; (v) safe sleeping; (vi) scattered site or permanent supportive housing; (vii) ABH [A Bridge Home] beds; and (viii) other innovative modes of housing or shelter. Family reunification is not included as a New Bed under this MOU." Roadmap MOU, dated October 12, 2020, p. 7 of 15.

[28] Roadmap MOU, dated October 12, 2020, p. 8 of 15; the Roadmap MOU appeared to be based on a binding term sheet dated June 16, 2020, p. 14 of 15.

[29] "'Other Beds' provided under this MOU may be beds previously captured in an agreement or plan between CITY and COUNTY." Roadmap MOU, dated October 12, 2020, p. 7 of 15.

[30] Roadmap MOU, dated October 12, 2020, p. 9 of 15.

DRAFT & PRELIMINARY

Section 1

- Disability benefits advocacy,
- Public assistance application support (e.g., EBT benefits, Medi-Cal, temporary financial assistance, and employment services), and
- General relief for indigent adults.[31]

Additionally, these services remained available at County offices and other locations for all eligible PEH within the City, including those benefiting from family reunification efforts.[32] To optimize resources, services for PEH housed or sheltered under the Roadmap MOU were permitted to be facilitated by LAHSA in collaboration with community-based providers.[33]

### 1.3.1.1.   Status Reporting as of June 30, 2024

Pursuant to the Roadmap MOU, the City agreed to submit to the County and the Court their "Bed Plan" describing how the City would establish New Beds and Other Beds.[34] During the term of the Roadmap MOU, the City also agreed to provide written quarterly status reports ("Roadmap Quarterly Reports"), starting at least by October 15, 2020, to report on the City's progress in providing New Beds, Other Beds, and services.[35] The County agreed to report to the City and the Court the amounts paid to the City as well as the provision of mainstream services for PEH in facilities established by the City under the Roadmap MOU.[36]

The Roadmap Quarterly Reports from the City were required to include various fields:

- Updates to the Bed Plan,
- Number and location of New Beds and Other Beds,
- Current status of bed development and other interventions under consideration pursuant to the Roadmap MOU, and
- Number of PEH provided New Beds and Other Beds, categorized by the three target populations within the City:
    i.    PEH within 500 feet of freeway overpasses, underpasses and ramps,
    ii.   PEH who are aged 65 years or older, and
    iii.  Other vulnerable PEH.

As part of the reporting requirements under the Roadmap MOU, the City provided updates on several key data points. Specifically, the City outlined the:

- Types of interventions being developed in each Council District ("Project Type" and "Address/Location"),
- Number of beds provided in each intervention ("Beds" and "Beds Open to Date"),
- Status of each project ("Status"), and
- Number of unsheltered individuals from each of the three target populations placed in the intervention ("PEH within 500 ft [Individuals]," "PEH 65 Years or Older [Individuals]," "PEH

---

[31] Ibid.
[32] Ibid.
[33] Ibid., p. 8.
[34] Ibid., p. 9.
[35] Ibid., p. 10.
[36] Ibid., pp. 10-11.

DRAFT & PRELIMINARY

Other Vulnerable [Individuals]," "Total PEH Served per the Agreement," "Other PEH Not Prioritized In Agreement [Individuals]," and "Total PEH Served to Date [Individuals]").

FIGURE **1.4**

**Roadmap Overview of Reported Open Beds and PEH Served as of June 30, FY 2020-21 through FY 2023-24**



SOURCES: Roadmap Quarterly Reports: Dkt. 342 (Roadmap Quarterly Status Report as of June 30 2021), Dkt. 560 (Roadmap Quarterly Status Report as of June 30, 2022), Dkt. 559 (Roadmap Quarterly Status Report as of June 30, 2023), Dkt. 756 (Roadmap Quarterly Status Report as of June 30, 2024)

As of June 30, 2024, the City appears to have met its obligation to establish and open 6,700 New Beds by June 30, 2025. As of June 30, 2024, the City reported 7,429 New Beds and 792 Other Beds as open and occupiable, with services provided to 17,560 PEH served from the target populations, or "Total PEH Served per the Agreement," and 15,660 PEH not prioritized under the Roadmap MOU, or Other PEH Not Prioritized in Agreement.[37] With the Roadmap Program in place, the City and the County had taken a step toward further addressing homelessness.

---

[37] Dkt. 756, Roadmap Quarterly Status Report as of June 30, 2024, p. 8 of 59; although the PEH served total 33,220, the City reported that 33,410 total PEH had been served to date, based on the data provided by LAHSA.

### 1.3.2.   ALLIANCE PROGRAM

Similar to the Roadmap Program, the Alliance Program emerged from the LA Alliance for Human Rights lawsuit. In May 2022,[38] the plaintiffs and the City sought to fully and finally resolve all claims arising from or relating to any matters alleged, or that could have been alleged, in the case, without any admission of fault, liability, or wrongdoing.[39] This resolution ("Alliance Settlement") was intended to avoid the additional expense and inherent uncertainties of prolonged litigation, in accordance with the terms and conditions set forth in the settlement agreement. The parties agreed that the duration of the Alliance Settlement would be five years (ending in June 2027), during which time the Court would retain continuing jurisdiction to oversee and enforce the settlement agreement.[40]

The Alliance Settlement sought to significantly increase the availability of shelter and housing options within the City, to address the needs of all individuals who shared public spaces and rights-of-way and to achieve a substantial, measurable reduction in unsheltered homelessness.[41]

Within the Alliance Settlement, the City agreed to establish a required number of housing and shelter options that was at least equal to, and could, at the City's discretion, exceed the capacity needed to service 60% of the unsheltered City Shelter Appropriate[42] population, as identified by LAHSA's 2022 PIT count.[43] Subject to constitutional requirements or other applicable legal requirements, the City retained sole discretion to determine the form of shelter or housing solutions to meet the required number of beds specified within the settlement agreement.[44] These options could include, but were not limited to:

- "Tiny homes,"[45]
- Shared housing,
- Purchased or master-leased apartments, hotels/motels or other buildings,
- Congregate shelters,
- Permanent supportive housing,
- Rental assistance,
- Family reunification,
- Spring structures or tents,
- Safe parking,
- Safe sleeping/camping,
- Affordable housing, and

---

[38] The Court did not approve the Alliance Settlement until June 2022. (Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 178 of 209).

[39] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 2 of 209.

[40] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 4 and pp. 67-70 of 209.

[41] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 2 of 209.

[42] The term "City Shelter Appropriate" was defined as the inclusion of any PEH within the City whom the City could reasonably assist, "meaning the individual: (A) does not have a severe mental illness, and/or (B) is not chronically homeless and has (i) a substance use disorder, or (ii) a chronic physical illness or disability requiring the need for professional medical care and support, such that the individual (a) is unable to perform activities of daily living, including bathing, dressing, grooming, toileting, transferring between bed and chair, and feeding oneself, and/or (b) lacks medical and/or mental health care decision-making capacity, and/or (c) is in danger to themselves or others...the definition of City Shelter Appropriate, will not preclude the City from making an offer of shelter or housing to the individual if the City can reasonably assist that individual. (Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, pp. 2-3 of 209).

[43] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 5 of 209.

[44] Ibid.

[45] 2021 International Residential Code (IRC), Appendix AQ, "[Tiny House is] a dwelling that is 400 square feet (37 m2) or less in floor area excluding lofts."

- Interim housing.[46]

Both publicly and privately funded solutions were permitted.[47] Furthermore, the City was required to provide accommodations for individuals qualifying as disabled under the Americans with Disabilities Act.[48]

Under the Alliance Settlement, the City also agreed to continue to offer shelter or housing to the City Shelter Appropriate PEH within the City and enforce public space regulations and health and safety laws consistent with its own protocol, or "Street Engagement Strategy."[49]  Under the Alliance Settlement, once the City provided sufficient shelter or housing options to accommodate at least 60% of the unsheltered City Shelter Appropriate PEH, the City may, at its sole discretion, implement and enforce public space regulations and ordinances throughout its jurisdiction.[50] These measures may be applied to individuals who refused offered shelter or housing and/or declined relocation to a legally permissible alternative location.[51]

Within 30 days from the confirmation and release of information from the 2022 PIT count by LAHSA, the City would calculate the required number of shelter and housing options and provide that calculation to the plaintiffs.[52] Thereafter, the City would create plans and establish milestones for (i) creating shelter and housing solutions to accommodate at least 60% of unsheltered individuals considered City Shelter Appropriate PEH in each Council District, as determined by the calculation; (ii) addressing encampment engagement, cleaning, and reduction in each Council District; (iii) creating shelter and/or housing to accommodate at least 60% of unsheltered City Shelter Appropriate PEH in the City as a whole; and (iv) implementing a plan for encampment engagement, cleaning, and reduction citywide.[53] The City agreed to provide these plans, milestones, and deadlines to the plaintiffs, and both parties would work together in good faith to address any concerns or disputes. The City could not count any shelter or housing interventions toward the Alliance Settlement if the interventions began operating before June 14, 2022, or if the interventions were used to fulfill the City's existing obligations under the Roadmap Program.[54]

On October 6, 2022, the City calculated and provided the required number of shelter and housing beds to the plaintiffs, within the 30 days from the release of the 2022 PIT count by LAHSA as prescribed in the Alliance Settlement.[55] It was docketed with the Court on October 14, 2022.[56] The City originally calculated 12,904 units.[57] However, the City ultimately agreed to create 12,915 shelter and housing beds.[58] On November 11, 2022, the City provided the plaintiffs with its proposed plans, milestones, and deadlines for the 12,915 beds necessary to serve 60% of the City Shelter Appropriate PEH.[59]

In response to the Alliance Settlement, the City and the County entered into another MOU (the "Alliance MOU") in May 2024, approximately two years after the Alliance Settlement. The purpose of the Alliance MOU was to establish a framework for funding and expanding housing, outreach, and supportive services

---

[46] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 5 of 209.
[47] Ibid.
[48] Ibid.
[49] Ibid., p. 6.
[50] Ibid., p. 7.
[51] Ibid.
[52] Ibid., p. 8.
[53] Ibid.
[54] Ibid., p. 183.
[55] Ibid., p. 30.
[56] Dk. 483, Alliance Settlement - Required Number of Housing and Shelter Solutions, filed October 14, 2022, p. 3 of 3.
[57] Ibid.
[58] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 91 of 209.
[59] Ibid., p. 30.

for PEH, as well as for facilitating data-sharing and other forms of collaboration.[60] The term of the Alliance MOU is through June 30, 2027, unless terminated sooner or extended by the parties, in whole or in part.[61] As of the date of this report, no information has been identified indicating that the Alliance MOU has been terminated.

Under the Alliance MOU, the City outlined its responsibilities, which included but were not limited to:

- Contracting for the interim housing beds the City established under the Alliance Settlement,
- Invoicing the County for the cost of interim housing beds established by the City under the Alliance Settlement,
- Ensuring access to City interim housing beds for City PEH who are connected to County services,
- Conducting assessments and connecting clients to Mainstream Services,[62]
- Establishing a City structure for outreach coordination,
- Prioritizing the placement of City PEH exiting County Homeless Initiative-funded unlicensed high service need interim housing ("High Service Need Interim Housing") beds for City interim housing beds once clients are ready to be discharged,
- Establishing a process for the County to refer City PEH in High Service Need Interim Housing beds to City interim housing beds, and
- Developing a community housing preference program.[63]

Additionally, under the Alliance MOU, the County outlined its responsibilities which included but were not limited to:

- Reimbursing the City on a retroactive and go-forward basis for the Bed Rate[64] of interim housing beds established by the City pursuant to the Alliance Settlement between June 14, 2022, and June 30, 2027,
- Providing Mainstream Services to clients in interim housing beds established by the City pursuant to the Alliance Settlement to clients who meet eligibility criteria for these services,
- Contracting and funding PSH Services,[65]
- Prioritizing referrals of PEH in the City to PSH placements in project-based units located within City limits,
- Allocating at least one multi-disciplinary team per Council District and assigning the remaining multi-disciplinary teams where there is greatest need as informed by the PIT count,
- Providing access to City-funded outreach teams to refer City PEH to High Service Need Interim Housing beds using the County's centralized bed management for High Service Need Interim Housing beds,

---

[60] Alliance MOU between County and City, dated May 2, 2024, p. 1 of 15.

[61] Ibid., p. 4.

[62] Pursuant to the Alliance MOU, "Mainstream Services" is defined as "County Department of Public Social Services ('DPSS') public assistance programs, DMH mental health services, County Department of Public Health-Substance Abuse Prevention and Control ('DPH-SAPC') services, and benefits advocacy services to clients who meet eligibility criteria for these services." (Alliance MOU between County and City, dated May 2, 2024, p. 3 of 15).

[63] Alliance MOU between County and City, dated May 2, 2024, pp. 4-6 of 15.

[64] "Bed Rate" is defined as the daily or nightly fee paid to an interim housing provider to house one person. (Alliance MOU between County and City, dated May 2, 2024, p. 2 of 15).

[65] "PSH Services" is defined as Social welfare or benefits administered by or through the County, including ( I) Intensive Case Management Services ("ICMS") and integrated health services; (2) Mainstream Services; and (3) services to facilitate a tenant's connection to primary care, specialty mental health services, and substance abuse disorder services. (Alliance MOU between County and City, dated May 2, 2024, p. 4 of 15).

- Prioritizing referrals for City PEH to "mental health/SUD [substance use disorder] beds," and
- Prioritizing referrals of City PEH to PSH placements in project-based units located within City limits, even if the units are funded and/or operated by the County.[66]

### 1.3.1.2.   Status Reporting as of June 30, 2024

Under the Alliance Settlement, the City agreed to provide quarterly status reports ("Alliance Quarterly Reports") to the Court detailing its progress.[67] Specifically, these reports were required to address the following items:

- Number of housing and shelter units created or otherwise secured,
- Number of beds or opportunities offered, and
- Number of available beds or opportunities in each Council District.[68]

In coordination with LAHSA, and to the extent feasible, the City would also include additional fields in the Alliance Quarterly Reports:

- Number of PEH engaged,
- Number of PEH who accepted offers of shelter or housing,
- Number of PEH who declined such offers and reasons for their refusal, and
- Number of encampments within each Council District.[69,70]

As part of the reporting requirements under the Alliance Settlement, the City provided updates on several key data points. Specifically, the City outlined the:

- Types of interventions being developed in each Council District ("Intervention Type," "Project Type," and "Address/Location"),
- Number of beds provided in each intervention ("Units/Beds" and "Open & Occupiable Date"),
- Status of each project ("Status"),
- Number of unsheltered individuals enrolled in the respective intervention ("Total PEH Served"), and
- Number of encampment resolutions by Council District.

As of June 30, 2024, the City identified 8,663 beds as "Open" or "In Process" – approximately 67% of the goal.[71]

---

[66] Alliance MOU between County and City, dated May 2, 2024, pp. 6-9 of 15.
[67] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 9 of 209.
[68] Ibid.
[69] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 9 of 209.
[70] The parties planned to engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of the Alliance Settlement. As of the date of this report, based on the information available, there was no indication that any third party has been retained. Furthermore, based on the quarterly status report as of June 30, 2024, data concerning the number of beds or opportunities offered, number of PEH engagement, number of PEH who accepted offers of shelter or housing, the number who declined such offers, the reasons for their refusal, and number of encampments within each Council District have not been provided to date.
[71] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024, pp. 4-10 of 12.

Section 1

FIGURE **1.5**

## Housing and Shelter Beds for City Shelter Appropriate PEH

| Council District | Unsheltered PEH[72] | 60% City Shelter Appropriate Goal[73] | Beds "Open" as of June 30, 2024[74] | Beds "In Process" as of June 30, 2024[75] | Remaining Beds |
|---|---|---|---|---|---|
| 1 | 2,511 | 1,075 | 922 | 228 | 75 |
| 2 | 1,087 | 419 | 83 | 111 | -225 |
| 3 | 844 | 410 | 98 | 355 | 43 |
| 4 | 858 | 406 | 197 | 121 | -88 |
| 5 | 834 | 347 | 99 | 111 | -137 |
| 6 | 1,590 | 730 | 189 | 220 | -321 |
| 7 | 1,484 | 781 | 136 | 0 | -645 |
| 8 | 1,334 | 574 | 375 | 454 | 255 |
| 9 | 2,943 | 1504 | 166 | 230 | -1,108 |
| 10 | 1,420 | 628 | 403 | 159 | -66 |
| 11 | 1,704 | 734 | 213 | 404 | -117 |
| 12 | 944 | 415 | 54 | 325 | -36 |
| 13 | 2,330 | 1,020 | 241 | 844 | 65 |
| 14 | 6,659 | 2,941 | 674 | 626 | -1,641 |
| 15 | 1,916 | 931 | 167 | 458 | -306 |
| **Grand Total** | **28,458** | **12,915** | **4,017** | **4,646** | **-4,252** |

SOURCES: Count of Unsheltered "All Persons," Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024; Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024.

FIGURE NOTE: The "60% City Shelter Appropriate Goal" was calculated by the City based on the 2022 PIT count. The "Remaining Beds" field represents the difference between the total number of beds classified as "open" and "in process" in the reported Council District and the 60% target established for that Council District.

---

[72] Count of Unsheltered "All Persons"; The jurisdictional boundaries were modified in December 2021, resulting in Council District distinctions (City Council Districts: 1, 2, 3, 4, 5, 10, 12, 13, and 14) that differ from those used in the LAHSA 2022 Greater Los Angeles Homeless Count, (2022 Greater Los Angeles Homeless Count [No Date Available]). The numbers above for these respective Council Districts reflect the modified jurisdictional boundaries.
[73] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, pp. 185-186 of 209.
[74] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024, pp. 4-10.
[75] Ibid.

DRAFT & PRELIMINARY

FIGURE **1.6**

Alliance Overview of Reported Open Beds and PEH Served as of June 30, FY 2022-23 through FY 2023-24



SOURCES: Dkt. 598, Alliance Quarterly Status Report as of June 30, 2023; Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024

Based on the quarterly report ending June 30, 2024, 4,017 new beds or units had opened and an additional 4,646 were in progress, out of the 12,915 units required under the Alliance Settlement – totaling 8,663 new beds or units aligned with the Alliance Settlement's objectives. Consequently, 4,252 additional beds or units were still required by June 13, 2027, to fulfill the terms of the Alliance Settlement. Four Council Districts were projected to meet their respective targets; however, the remaining Council Districts were required to include more beds or units in the pipeline to achieve compliance.[76] As of the date of the report, the City has not submitted to the Court its methodology to create the remaining 4,252 beds.

---

[76] Alliance Settlement Agreement Program (ASAP) Strategy and Progress as of June 30, 2024, dated September 6, 2024, p. 4 of 32.

### 1.3.1.3.  Encampment Resolutions

In relation to addressing encampment[77] engagement, cleaning, and reduction in each Council District, the City provided the plaintiffs with its plans, milestones, and deadlines on January 31, 2024.[78] For the time period of January 1, 2024, through June 30, 2024, the City established a milestone of 1,125 encampment resolutions.[79] The City specified that its encampment resolution data encompassed only tents and vehicles.[80] The City intended to broaden future reporting to include makeshift shelters in addition to tents and vehicles.[81]

FIGURE **1.7**

### Reported Encampment Resolutions, January 1, 2024 Through June 30, 2024

| Council District | Goal | Encampment Resolutions | Δ |
|:---:|:---:|:---:|:---:|
| 1 | 102 | 70 | -32 |
| 2 | 45 | 100 | 55 |
| 3 | 38 | 74 | 36 |
| 4 | 35 | 28 | -7 |
| 5 | 31 | 61 | 30 |
| 6 | 63 | 123 | 60 |
| 7 | 59 | 54 | -5 |
| 8 | 53 | 35 | -18 |
| 9 | 116 | 89 | -27 |
| 10 | 53 | 67 | 14 |
| 11 | 67 | 172 | 105 |
| 12 | 38 | 121 | 83 |
| 13 | 91 | 126 | 35 |
| 14 | 258 | 525 | 267 |
| 15 | 76 | 43 | -33 |
| **Grand Total** | **1,125** | **1,688** | **563** |

SOURCES: Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024; Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024

As reflected in Figure 1.7, based on the milestones set by the City for this time period, nine Council Districts met their designated targets, while six Council Districts – representing 40% of all Council Districts – did

---

[77] "LAHSA considers an 'encampment' to be 5 or more PEH and 3 or more shelters (tents, makeshifts, or vehicles) within a 300-foot radius or physical boundaries defined by an encampment resolution effort." (Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, Exhibit F, p. 81 of 209).

[78] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 134 of 209.

[79] Ibid., p. 123 of 209.

[80] Alliance Settlement Agreement Program (ASAP) Strategy and Progress as of June 30, 2024, dated September 6, 2024, p. 15 of 32.

[81] Ibid.

DRAFT & PRELIMINARY

not achieve their goals. However, the total number of encampment resolutions exceeded the City's overall target by 563. The available data did not clarify whether unsheltered PEH were ultimately housed or relocated as a result of these interventions, leaving the outcomes uncertain and providing limited insight into the City's encampment resolution endeavors.

The Alliance Settlement, together with the Alliance MOU between the City and the County, laid the groundwork for the Alliance Program in its objectives to address homelessness. In sum, these agreements established a framework for coordinating funding, scaling housing infrastructure, and enhancing supportive services – all with the goal of ensuring that unsheltered PEH receive the comprehensive assistance they need.

### 1.3.3.    INSIDE SAFE PROGRAM

Mayor Bass issued a local emergency declaration on homelessness in Los Angeles on her first day in office, December 12, 2022.[82] Shortly thereafter, on December 21, 2022, the City officially launched the Inside Safe Program.[83] The Inside Safe Program collaborates with members of the Los Angeles City Council, the Los Angeles County Board of Supervisors, LAHSA, and a wide array of service providers. The Inside Safe Program focuses on selecting and prioritizing encampments identified by Council Districts throughout the City, with the objective of transitioning individuals from these encampments directly into interim housing. This interim housing placement serves as a temporary step toward achieving stable, permanent housing.[84]

A key tactic of the Inside Safe Program is the use of motels and hotels as interim housing options. Rather than immediately relying on the available shelter and interim housing infrastructure, the City began negotiating contracts under booking or occupancy agreements with motel and hotel operators. This approach provides private rooms in hopes of fostering a safe and stable environment. These interim accommodations serve as a housing solution ensuring people are sheltered while permanent housing solutions are identified and arranged.

Specific to the Inside Safe Program, supporting these efforts is a dedicated Field Intervention Team, a multidisciplinary team composed of experienced professionals with backgrounds in lived-experience of homelessness, policy, public health, community advocacy, and substance-use recovery. This Field Intervention Team attempts to coordinate closely with various outreach teams on the ground including LAHSA Homeless Engagement Teams ("HETs"), USC Street Medicine and other service providers.[85] The Field Intervention Team leverages on-the-ground observations with the objective of ensuring that outreach and housing placements are targeted, efficient, and responsive to the needs of each individual.

During the operations of an Inside Safe Program encampment operation, various City departments perform specific roles. For example,

- The Los Angeles Sanitation and Environment Departments remove debris to restore sidewalks,
- The Los Angeles Department of Transportation ("LADOT") provides transportation services to interim housing units, and

---

[82] Mayor Karen Bass Declares a State of Emergency on Homelessness, City of Los Angeles, dated December 12, 2022 (https://mayor.lacity.gov/news/mayor-karen-bass-declares-state-emergency-homelessness).
[83] Mayor Bass Executive Directive No. 2, Inside Safe Initiative, Issue Date December 21, 2022.
[84] City of Los Angeles, Inside Safe (https://mayor.lacity.gov/InsideSafe).
[85] Ibid.

DRAFT & PRELIMINARY

- The Los Angeles Police Department ("LAPD") provides public safety.[86]

In addition to the above, under the Inside Safe Program, the County's Department of Mental Health ("DMH") offers guidance and treatment, as needed.[87] LAHSA assists with shelter placement and data management support. State agencies could become involved under specific circumstances, such as when an encampment is located on property under the jurisdiction of the California Department of Transportation or on another state-managed parcel.

Each location under the Inside Safe Program is overseen by a nonprofit service provider responsible for delivering various supportive services to support participants' transition out of unsheltered homelessness.

### 1.3.1.4.    Status Reporting as of June 30, 2024

To understand the progress of Inside Safe operations and its participants, the Mayor's Office requested recurring data reports from LAHSA.[88] This request aimed to ensure up-to-date and accurate provider data, while also communicating the Inside Safe Program's progress to key stakeholders.[89] The reporting schedule was initially set on a weekly basis but altered to a bi-weekly frequency around August 2023.

The data reports provided by LAHSA consist of a dashboard highlighting aggregate-level data of current housing and program statuses, along with participant demographics for the Inside Safe Program.

Below are a few examples of the data fields in the dashboard: [90]

- Number of encampment operations ("Encampment Operations"),
- Number of individuals served or entered interim housing ("Entered Interim Housing"), and
- Number of participants who were permanently housed ("Currently Permanently Housed").

The reports also include an Excel file containing deidentified demographic data, as well as the current housing and program status of each Inside Safe participant.

Below are a few examples of the data fields in the Excel file: [91]

- "Ethnicity,"
- Gender ("Gender [group]"), and
- "Current Status."

The source data for these reports was drawn directly from the Homeless Management Information System ("HMIS").[92] According to a memo from LAHSA to the Mayor's Office, service providers were generally permitted up to 72 hours following an interaction with, or a status change of, a participant to enter data into HMIS.[93] However, due to the Inside Safe Program's dynamic nature and its participants, this process may

---

[86] Ibid.
[87] Ibid.
[88] Mayor's Office Memo, Weekly Inside Safe Report, dated July 21, 2023, p. 1 of 2.
[89] Ibid.
[90] LAHSA Data Report, Inside Safe, updated June 30, 2024.
[91] LAHSA Data, Demographic and Housing Summary Report, dated June 14, 2024.
[92] Mayor's Office Memo, Weekly Inside Safe Report, dated July 21, 2023, p. 1 of 2.
[93] Ibid.

DRAFT & PRELIMINARY

have occasionally exceeded the 72-hour window.[94] Additionally, certain activities may have remained unrecorded in the information system, resulting in data gaps.[95]

LAHSA's Data Integrity, Training, and Program teams actively sought to identify and address the discrepancies with service providers.[96] The reports generated by LAHSA supported the detection of data integrity issues. Once inaccuracies were identified, providers were responsible for updating the system. In accordance with LAHSA's data integrity policy, per the referenced memo, LAHSA may only make corrections on behalf of a provider under extenuating circumstances.[97] For example, in July 2023, it was noted that 13 clients had undefined permanent housing destinations, 91 clients had no documented record of entering interim housing (i.e., enrolling in the Inside Safe Program), and seven clients had rental assistance recorded without a corresponding move-in date or address.[98]

---

[94] Ibid.
[95] Ibid.
[96] Ibid.
[97] Ibid.
[98] Ibid., p. 2.

DRAFT & PRELIMINARY

FIGURE **1.8**

Inside Safe Program's Beds (Available and Occupied) as of June 28, 2024



SOURCES: City Data, Inside Safe Motel Occupancy Details; Inside Safe Occupancy Agreements for Hotels/Motels (from LA City Clerk Connect)

FIGURE NOTE: The figure above representing the 1,241 "Available" and "Occupied" beds does not include the Mayfair Hotel (294 beds) and LA Grand (473 beds), since these beds were reported under the Alliance Program and Roadmap Program, respectively, as of June 30, 2024.

As of June 28, 2024, the Inside Safe Program reported 1,241 "Available" and "Occupied" beds intended to support the unsheltered PEH. Due to limited data, the number of open and occupiable beds available for the Inside Safe Program's participants throughout the Lookback Period was unavailable.

By June 30, 2024, the Inside Safe Program completed 56 encampment operations, resulting in 2,870 unsheltered individuals entering interim housing.[99] These figures highlight the City's actions to address homelessness through both the expansion of housing resources and targeted encampment operations.

---

[99] LAHSA Data Report, Inside Safe, revised June 30, 2024.

In transitioning from understanding the City Programs' historical context and operational framework, the next section of the report clarifies the specific objectives guiding this financial and performance assessment. This shift in focus enables a more detailed examination of the ways in which the Roadmap Program, Alliance Program, and Inside Safe Program translated into measurable outcomes.

## 1.4 OBJECTIVES OF THE FINANCIAL AND PERFORMANCE ASSESSMENT

The overall objective of this financial and performance assessment was for A&M to conduct an independent, evidence-based evaluation of the City Programs, with a particular emphasis on the infrastructure and services funded by the City. The assessment's specific objectives were developed in consultation with the Court.[100] In fulfilling these objectives, the assessment, generally, examined the funds expended by the City through LAHSA, evaluated the quality and effectiveness of the services provided by the City Programs in reducing homelessness and supporting affected individuals, and reviewed the accountability measures in place for achieving intended results and outcomes.

### 1.4.1. METHODOLOGY

This financial and performance assessment employed a systematic methodology designed to uphold objectivity, reliability, and credibility in evaluating both the financial and performance aspects of the City Programs. The process adhered to established professional standards and incorporated multiple analytical steps to support a thorough and balanced examination of the City Programs under review. The high-level approach is illustrated on Figure 1.9.

FIGURE **1.9**

**Approach of Financial and Performance Assessment**

   

**DATA REQUESTS**

150+ Data Requests to the City, the County, and LAHSA.

**DOCUMENTATION**

11,500+ Documents Received from the City, the County, and LAHSA

**INTERVIEWS**

90+ Interviews with the City, the County, LAHSA, Service Providers, and People with Lived Experience

**SITE VISITS**

30+ Site Visits

The assessment began with a review of contract documentation made available involving the City, LAHSA, and service providers. This initial phase identified key enforceable terms within the contracts, including invoice and payment requirements, defined service standards, monitoring and oversight mechanisms, and

---

[100] Dkt. 743, A&M Engagement Letter, dated May 17, 2024.

specified outcome metrics. Building on this foundation, the assessment included compliance testing in an attempt to determine whether the parties fulfilled all City-funded contractual obligations and conditions. To gain additional qualitative insights, A&M conducted interviews with City Council members and key stakeholders to capture qualitative insights into the service delivery effectiveness and perspectives of the City Programs.

Parallel to these steps, A&M performed analyses to evaluate expenses incurred under each City Program and associated contracts, determining whether expenses were properly supported by underlying documentation and accurately traced through the City and LAHSA's financial records. Additionally, financial data from LAPD was reviewed to analyze homeless-related appropriations, expenditures, and the associated performance measures. The assessment also evaluated whether the provision of services within the City Programs achieved predefined quality benchmarks and intended outcomes for PEH, as articulated in the various contract terms.

Overall, the assessment A&M conducted employed a multifaceted methodology, drawing on a wide range of data requests, data sources and approaches to develop a comprehensive understanding of the City Programs under review. In addition to examining various reports and records, A&M conducted onsite fieldwork at a sample of locations ("sampled sites"),[101] reviewing relevant documentation and transactions firsthand. The selection of sampled sites sought to representatively reflect the various types of services funded by both the City and the County. This combination of quantitative data analysis and qualitative observations provided deeper insights into both operational practices and financial processes.

By incorporating these various procedures, the assessment endeavored to deliver a balanced and objective view of the operational integrity, financial stewardship, and performance effectiveness of the City Programs.

### 1.4.2.    SCOPE LIMITATIONS

This financial and performance assessment conducted by A&M operated within a defined scope developed, as noted earlier, in consultation with the Court and, therefore, did not encompass all dimensions of the broader homelessness crisis facing the City. For instance, it did not evaluate whether newly established shelter and housing interventions for beds created under the City Programs represented an actual net increase in available resources or if these beds simply repurposed existing housing units – an analysis that would have required more extensive data collection and longitudinal market assessments. Furthermore, the evaluation did not examine the broader social, economic, and policy factors that may disproportionately affect certain demographic groups within the CoC system. These limitations acknowledge the complexities and interdependencies inherent in homelessness as a humanitarian crisis, emphasizing the need for continued research, dialogue, and policy development to fully understand and effectively address the issue.

Furthermore, while the City has executed a multitude of contracts related to addressing homelessness, most of these were ultimately excluded from the assessment because they could not be directly linked to the shelter and housing interventions and services established under the City Programs. In May 2024, the City identified approximately 30 distinct contracts across six separate departments, in addition to its existing contractual arrangements with LAHSA. These separate contracts may have supported activities or services operating independently of the City Programs' specific objectives or target populations.

---

[101] See Appendix B and Appendix C.

DRAFT & PRELIMINARY

By maintaining this distinction, this assessment remained within its intended scope, allowing for a focused examination of the interventions and outcomes of the City Programs aligned to the judicial objectives and expectations of the Court.

### 1.4.3.    DATA LIMITATIONS

Throughout this assessment, A&M issued multiple data requests, and worked to reconcile data provided across various disparate information systems. To illustrate the extent of the data collection process, the initial data request included 26 requests to the City and 27 requests to LAHSA. After the initial data production, A&M submitted supplemental requests to obtain additional information needed for comprehensive analyses. Therefore, over time, these figures increased, with the total number of formal requests reaching 72 and 75, respectively.[102]

Despite the substantial volume of information that A&M requested and received, the overall data provided remained limited in its accuracy and completeness. This limitation was partially due to the multiple information systems being used by the City, the County, and LAHSA which produced siloed and fragmented data resulting in the inability to determine the accuracy of key metrics. At times, the data production resulted in inaccurate, incomplete, or incompatible datasets that hindered a comprehensive understanding of the City Programs' performance. This fragmented landscape prevented the depth of insight desired, as inconsistencies and data gaps rendered certain aspects of the analyses inconclusive. Additionally, during the assessment, the parties expressed reservations about providing data they believed fell outside the defined scope. The parties may have exercised discretion in interpreting the data requests from A&M. At the same time, A&M endeavored to limit its data requests to information directly relevant to the objectives of this engagement; therefore, all parties' interpretations may have limited the completeness of the dataset, which may have affected the comprehensiveness of the respective analyses.

Therefore, while all parties endeavored to provide timely, complete, and accurate data, variations in data sources, reporting formats, and production timing introduced complexities and contributed to delays in the assessment process. Due to the quality and condition of the data, A&M relied upon the most comprehensive and reliable information available. In the absence of accurate and complete data, as well as an integrated data infrastructure, critical understanding of the City Programs' effectiveness, resource allocation, and long-term outcomes remained constrained.

---

[102] Supplemental data requests were informally submitted to the parties through interviews and follow-up emails.

DRAFT & PRELIMINARY

SECTION 2

# City Programs' Structure

## 2.1. TYPES OF HOUSING INTERVENTIONS ESTABLISHED BY THE CITY PROGRAMS

Under the City Programs, the City established a range of shelter and housing interventions and supplementally funded supportive services to engage with unsheltered PEH both prior to and during enrollment in these interventions. Generally, these interventions and their associated services were classified as various types of programs, each designed to address specific needs of unsheltered PEH during their enrollment.

For the purposes of this financial and performance assessment, each individual program is referred to as a "subprogram" to refer to a component of the broader City Programs; these subprograms were established within the CoC framework to target housing solutions and provide specialized supportive services aligned with defined objectives.

It is important to note that the City's public services, such as public safety and health, were not classified as subprograms under this definition. Although these government functions may intersect, the primary focus of these endeavors, such as encampment clean-ups, existed independent of the City Programs and, therefore, they generally operate outside the CoC framework, which reflect the distinct but interrelated nature of municipal operations. This section provides a foundational overview of the City Programs' structure and the resources dedicated to achieving their homelessness assistance objectives; it also offers context for understanding the role these subprograms and services play within the CoC system.

Across the Lookback Period, as exhibited in the subsequent graphical illustrations in Figures 2.1, 2.2 and 2.3, the City funded various types of emergency shelter and housing interventions across the City Programs, each with its own emphasis and scope. Under the Roadmap Program, a diverse array of shelter and housing interventions was developed, including interim and permanent housing; these interventions encompassed both short-term and long-term solutions. By comparison, the Alliance Program prioritized permanent housing, specifically permanent supportive housing ("PSH"), focused on long-term solutions. In contrast, the Inside Safe Program devoted all efforts to interim housing through beds established under booking or occupancy agreements with motel/hotel owners.[103]

---

[103] No expenditures were identified for any form of permanent housing under the Inside Safe Program.

DRAFT & PRELIMINARY

FIGURE **2.1**

Roadmap Program - New Beds (Open and In-Process) by Type of Housing Intervention as of June 30, FY 2020-21 through FY 2023-24



SOURCES: Roadmap Quarterly Reports: Dkt. 342 (Roadmap Quarterly Status Report as of June 30, 2021); Dkt. 560 (Roadmap Quarterly Status Report as of June 30, 2022); Dkt. 559 (Roadmap Quarterly Status Report as of June 30, 2023); Dkt. 756 (Roadmap Quarterly Status Report as of June 30, 2024)

FIGURE NOTE: In the Roadmap Quarterly Status Report as of June 30, 2021, the City reported a total of 9,633 New Beds and Other Beds. Of that figure, 8,879 beds appeared to pertain to the category of New Beds. Further, some Project Homekey sites were counted as interim housing; it is A&M's understanding that some of these units are in process of being converted to PSH.

Section 2

FIGURE **2.2**

**Alliance Beds (Open and In-Process) by Type of Housing Intervention as of June 30, FY 2022-23 through FY 2023-24**



SOURCES: Dkt. 598 (Alliance Quarterly Status Report as of June 30, 2023); Dkt. 757 (Alliance Quarterly Status Report as of June 30, 2024)

FIGURE **2.3**

**Inside Safe Beds (Open) by Type of Housing Intervention as of June 28, 2024**



SOURCES: City Data, Inside Safe Motel Occupancy Details; Inside Safe Occupancy Agreements for Hotels/Motels (from LA City Clerk Connect)

FIGURE NOTE: The "Number of Beds" represents the number of "Available" and "Occupied" rooms per City Data.

Section 2

## 2.2. IDENTIFICATION OF SUBPROGRAMS, SERVICES, AND INTERSECTIONS WITHIN CITY PROGRAMS

Figure 2.4 outlines the subprograms within each of the City Programs.[104] The identification of these components was based on contracts and various documentation produced throughout this assessment. By documenting these subprograms and their interconnections, this section attempts to provide a general overview of the structural similarities and differences among each City Program.

FIGURE 2.4

**Overview of the Structure of City Programs**

| | Subprogram | City Program | | |
|---|---|---|---|---|
| | | Roadmap | Alliance | Inside Safe |
| **Outreach** | Homeless Engagement Team | ☑ | ☑ | ☒ |
| | Field Intervention Team | ☒ | ☒ | ☑ |
| | USC Street Medicine | ☒ | ☒ | ☑ |
| **Emergency Shelter / Interim Housing** | Emergency Response Program | ☑ | ☒ | ☒ |
| | Supplemental Hotel/Motel Vouchers | ☑ | ☒ | ☒ |
| | Crisis/Bridge Housing | ☑ | ☒ | ☒ |
| | A Bridge Home | ☑ | ☒ | ☒ |
| | Project RoomKey/HomeKey | ☑ | ☒ | ☒ |
| | Safe Parking | ☑ | ☒ | ☒ |
| | Safe Sleep | ☑ | ☒ | ☒ |
| | Tiny Home Village | ☑ | ☒ | ☒ |
| | Roadmap Interim Housing | ☑ | ☑ | ☒ |
| | Inside Safe | ☑ | ☑ | ☑ |
| **Permanent Housing** | Permanent Supportive Housing | ☑ | ☑ | ☒ |
| | Time-Limited Subsidy[105] | ☑ | ☒ | ☑ |
| | Housing Navigation | ☑ | ☑ | ☑ |
| | Landlord Incentives | ☑ | ☒ | ☒ |

Key:
☑ : This component appeared to be included in the City Program's design
☒ : This component did not appear to be included in the City Program's design

---

[104] Where collaborative efforts existed, such as the utilization of shared resources, they were viewed as operational support rather than programmatic overlap, unless formal funding or documentation indicated a more integrated relationship.
[105] Although "Time-Limited Subsidy" is referenced in Figure 2.4, the subprogram has historically been known by multiple names including Rapid Re-Housing, Recovery Re-Housing, Shallow Subsidy, Street to Subsidy and Bridge to Subsidy, across the Lookback Period. They appeared to be referenced generally by LAHSA under the umbrella of Time-Limited Subsidy.

DRAFT & PRELIMINARY

Section 2

## 2.2.1.    OVERVIEW OF OUTREACH SUBPROGRAMS

Outreach services provided under the City Programs involved actively engaging unsheltered PEH to connect them with resources, services, and housing opportunities. This engagement was designed to build trust, conduct assessments, and facilitate access to housing, healthcare, and other services. Outreach was a critical first step in engaging PEH and linking them to the CES.

**Homeless Engagement Team**

The City funded various types of HETs through LAHSA: General, Comprehensive Cleaning and Rapid Engagement ("CARE"), Comprehensive Cleaning and Rapid Engagement Plus ("CARE+")[106], and Roadmap.[107] The primary focus of HETs was "to undertake targeted engagement efforts that focus on moving unsheltered residents experiencing homelessness into crisis, bridge, and/or permanent housing utilizing a housing-first orientation with minimum eligibility criteria."[108]

The City represented that it had funded 41 HETs as of October 2023:

- 15 CARE+ HETs were focused on supporting CARE+ operations for each Council District,
- 13 CARE HETs were dedicated to providing outreach services for CARE citywide,
- 10 General HETs were deployed to target areas identified and prioritized by City Council offices, the public, and service requests from "lahop.org," and
- 3 (type unknown) HETs were focused on specific geographic locations that covered Hollywood, the area surrounding City Hall, and the Boadway/110 corridor.[109]

Additionally, the City appeared to have funded 15 Roadmap HETs that were dedicated to addressing encampments and PEH within 500 feet of freeway overpasses, underpasses, on-ramps, and off-ramps in their respective districts.[110]

**Field Intervention Team**

Specific to the Inside Safe Program, the Mayor's Field Intervention Team ("FIT") was a multidisciplinary group comprised of professionals with lived experience of homelessness, policy development, public health, community advocacy, and substance-use recovery.[111] This outreach team initiated engagement with PEH at identified encampments following a comprehensive site assessment.[112] Several of the encampments were present in local neighborhoods for over five years. To gain an understanding of the individuals residing in these encampments, the FIT professionals sought to collaborate with other outreach groups, including USC Street Medicine, LAHSA HET members, and various service providers, that may have previously engaged with the encampment.

---

[106] CARE/CARE+ operations are managed by the Los Angeles Bureau of Sanitation (sanitation.lacity.gov).
[107] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 72 of 209; City/LAHSA Roadmap Contract C-137223 (Amendment 17), p. 40 of 77.
[108] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 72 of 209.
[109] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, pp. 68-72 of 209.
[110] City/LAHSA Roadmap Contract C-137223 (Amendment 17), p. 40 of 77.
[111] City of Los Angeles, Inside Safe (https://mayor.lacity.gov/InsideSafe).
[112] City of Los Angeles, Inside Safe (https://mayor.lacity.gov/InsideSafe).

DRAFT & PRELIMINARY

Section 2

**USC Street Medicine**

The USC Street Medicine team provided a comprehensive range of services including street-based engagement, primary care, clinical supervision, and healthcare consultation.[113] This initiative involved a team of physicians, advanced practice providers, nurses, outreach workers, and both clinical and administrative support staff, working in full-time and part-time capacities. Within the designated service region, the medical team actively conducted outreach and delivered healthcare services to PEH who were living on the street or in other temporary locations. Additionally, the team explored strategies and facilitated connections to social services and housing resources, aiming to address healthcare needs and improve the overall well-being of the homeless population.[114]

## 2.2.2.    OVERVIEW OF EMERGENCY SHELTER AND INTERIM HOUSING SUBPROGRAMS

Across the Lookback Period within the City Programs, LAHSA identified "emergency shelter" as one category within the broader concept of "interim housing," encompassing all short-term or temporary living arrangements. Consequently, various forms of temporary housing, including those specifically referenced as emergency responses, were commonly grouped under the umbrella of interim housing.

Generally, the primary goal of these subprograms was to offer a safe, trauma-informed, harm-reduction, low-barrier environment aligned with the Housing First model, enabling participants to work toward permanent housing solutions within a stable living environment.[115] Required services often included case management, meals, connection to mainstream services or benefits, life skills training, and 24-hour bed availability. [116]

**Emergency Response Program/Inclement Weather Program/Augmented Winter Shelter Program**

The Emergency Response Program ("ERP") was also referred to as the Inclement Weather Program or the Augmented Winter Shelter Program, depending on the time of activation.[117] When activated between July 1 and October 31 or between April 1 and June 30, the subprogram was referred to as the "Inclement Weather Program." When activated between November 1 and March 31, it was known as the "Augmented Winter Shelter Program."[118] Although the required services remained consistent across all program designations, the primary distinction related to the activation period.

This subprogram provided shelter during severe weather events or circumstances that posed an immediate danger to unsheltered PEH including but not limited to "severe cold, rain, heat, flooding and tropical storms."[119] While residing in these emergency shelters, services included but were not limited to meals, referrals to supportive services, and connection to permanent housing.[120]

---

[113] The USC C-141111 contract is directly administered and funded by the City. However, it is not exclusive to the Inside Safe Program. USC Street Medicine provides services to unsheltered PEH across the City of Los Angeles. Although the Inside Safe program is not explicitly referenced in the contract, available information indicates that it is included in the Inside Safe Program's operations.

[114] City/USC Care Medical Group Contract C-141111, pp. 7-8 of 36.

[115] Sampled Service Provider Contract Review, Scope of Required Services [Multiple].

[116] Ibid.

[117] LAHSA, 2024 Emergency Response Program/Inclement Weather Program/Augmented Winter Shelter Program/ RFP [No Date Available], p. 4 of 16.

[118] LAHSA, 2024 Emergency Response Program/Inclement Weather Program/Augmented Winter Shelter Program/ RFP [No Date Available], p. 4 of 16.

[119] Ibid.

[120] LAHSA, 2024 Emergency Response Program/Inclement Weather Program/Augmented Winter Shelter Program/ RFP [No Date Available], pp. 2-3 of 16.

**Supplemental Hotel/Motel Vouchers**

Hotel/motel vouchers[121] served as a temporary and emergency shelter resource by providing accommodation in hotels or motels for unsheltered PEH.[122] This intervention aimed to offer participants a measure of stability while facilitating ongoing efforts to identify, secure, and maintain permanent housing.[123]

Additionally, supplemental hotel/motel vouchers may have been integrated into existing outreach programs, providing a comprehensive range of stabilization services such as case management and additional supportive services. These vouchers were also eligible for distribution through centralized referral systems (e.g., 211 LA County).

**(Crisis/Bridge) Housing for Adult Programs**

(Crisis/Bridge) Housing for Adults Programs was a subprogram that aimed to assess participants' needs and connect them to resources to resolve their homeless situation.[124] This subprogram was further characterized as a short-term, 24-hour emergency shelter intervention offering a secure environment for individuals while they were assessed and connected to more permanent housing options. Resource referrals and case management were integral services accessible to all participants.[125]

(Crisis/Bridge) Housing for Adult Programs offered beds in a single-site location, with sleeping accommodations arranged in multiple rooms or within a congregate dormitory setting.[126] The use of bunk beds was permitted; however, the service providers were expected to develop and implement policies and procedures to ensure accessibility for all participants.[127] Sleeping areas were assigned based on gender identity; alternatively, the subprogram may be designated to serve a specific gender (typically referred to under a different subprogram name such as Enhanced Bridge Housing for Women).[128]

**A Bridge Home**

A Bridge Home was a subprogram introduced under former Los Angeles Mayor Eric Garcetti in response to the City's declaration of a shelter crisis in April 2018.[129] According to the Scope of Required Services ("SRS"), this subprogram adhered to the requirements of the (Crisis/Bridge) Housing for Adults Program unless otherwise specified.[130] The (Crisis/Bridge) Housing for Adults Program SRS remained in effect unless exceptions were noted, and in the event of a conflict, A Bridge Home SRS took precedence.[131]

---

[121] Under the Roadmap-named contract between LAHSA and the City of Los Angeles (C-137223), funding was allocated to miscellaneous services that may not be tied to individuals enrolled in the housing interventions created under the Roadmap Program. This reflects the Roadmap Program's complex funding structure, where certain activities or services may address tangential needs that were not directly aligned with the housing interventions established under the Roadmap Program. While these services may have indirectly supported the Roadmap Program's core purpose, they nonetheless represent an ancillary component of its funding.

[122] City/LAHSA Roadmap Contract C-137223 (Amendment 17), p. 73 of 77.

[123] Ibid.

[124] Sampled Service Provider Contract Review, (Crisis/Bridge) Housing for Adult Programs Scope of Required Services.

[125] Ibid.

[126] Ibid.

[127] Ibid.

[128] Service Provider Contract Review, (Crisis/Bridge) Housing for Adult Programs Scope of Required Services, Appendix - Enhanced Bridge Housing for Women.

[129] Mayor Garcetti Executive Directive No. 24, Building "A Bridge Home," Issue Date May 30, 2018, p. 1 of 6.

[130] Sampled Service Provider Contract Review, A Bridge Home Scope of Required Service

[131] Ibid.

DRAFT & PRELIMINARY

## Project RoomKey/HomeKey

In March 2020, the County and the City declared a public health emergency due to COVID-19.[132] To address the needs of vulnerable PEH and combat the spread of COVID-19, local leaders launched Project RoomKey, later evolving into Project HomeKey.[133] This subprogram offered hotel or motel accommodations to provide temporary housing for asymptomatic PEH who were at high risk for severe illness, including those aged 65 or older or with underlying health conditions such as respiratory issues or chronic diseases.[134] The subprogram was designed to provide short-term housing while working on removing participants' barriers in an effort to resolve their housing crisis.[135]

## Safe Parking

The Safe Parking subprogram offered a secure and stable parking environment for individuals experiencing vehicular homelessness.[136] In addition, this subprogram facilitated client entry into the CES, provided housing-focused case management, and connected participants to Housing Navigation services within the homelessness response system.[137] All services were designed with the ultimate goal of achieving permanent housing.

## Safe Sleep

The Safe Sleep subprogram was a 24-hour "residence" that provided outdoor tent spaces for individuals to safely sleep in their tents with their personal belongings that fit in their designated area.[138] This subprogram aimed to "mitigate the risks of living in an encampment by providing on-site security, case management, laundry services, showers, bathrooms, and meals."[139] This subprogram focused on assessing participants' needs and connecting them to housing resources with the ultimate goal of achieving permanent housing.

## Tiny Home Village

The Tiny Home Village subprogram functioned within designed pallet shelters in a 24-hour supportive community for PEH.[140] Tiny Home Village sites were identified by the City. Each unit typically ranged from 64 to 100 square feet.[141] The subprogram focused on assessing participants' needs and connecting them to a comprehensive range of resources in an effort to resolve their homelessness as efficiently as possible.[142] The primary objective of the supportive services provided was to facilitate participants' access to permanent housing with obtaining documents needed to become "document ready."[143]

## Roadmap Interim Housing

The Roadmap Interim Housing subprogram provided a 24-hour supportive environment for PEH. This subprogram focused on assessing and connecting participants to a broad range of resources in an effort to resolve their homelessness situation as quickly as possible.[144] The primary objective of the supportive

---

[132] Sampled Service Provider Contract Review, Project Homekey Interim Housing Program Scope of Required Services.
[133] Ibid.
[134] Ibid.
[135] Ibid.
[136] Sampled Service Provider Contract Review, Safe Parking Scope of Required Services.
[137] Ibid.
[138] Sampled Service Provider Contract Review, Safe Sleep Scope of Required Services.
[139] Ibid.
[140] Sampled Service Provider Contract Review, Tiny Home Village Scope of Required Services.
[141] Ibid.
[142] Sampled Service Provider Contract Review, Tiny Home Village Scope of Required Services.
[143] Ibid.
[144] Sampled Service Provider Contract Review, Roadmap Interim Housing Scope of Required Services.

services was to facilitate participants access to permanent housing with obtaining documents needed to become "document ready."[145]

## Inside Safe

The Inside Safe subprogram, introduced under Los Angeles Mayor Bass, focused on supportive services at motel or hotel accommodations for unsheltered PEH from specific encampment locations within the City.[146] The primary objective of the supportive services was to obtain identification and other documents needed for permanent housing and resource linkages.[147] The service provider was required to oversee and promote safety for participants and staff.[148] Additionally, the service provider was expected to provide oversight at motels and "have standard operating procedures to ensure the safety of all residents and community members surrounding motels as necessary per individual hotel/motel site and provider arrangement with the hotel/motel."[149] Case management services were to be provided onsite during posted regular business hours and available to meet participants' needs.[150]

### 2.2.3.    OVERVIEW OF PERMANENT HOUSING SUBPROGRAMS

Permanent housing was intended as a long-term, stable solution for individuals and families transitioning from homelessness. In practice, it typically involved housing or time-limited rental or leasing subsidies supplemented by case management services. The primary goal was to promote independence and stability, with minimal barriers to entry.

## Permanent Supportive Housing

PSH combined long-term rental subsidies with supportive services to promote housing stability and improve overall well-being for PEH.[151] PSH was designed for participants with a disability to maintain independent housing and provide ongoing assistance that included case management, life skills training, employment support, and linkages to healthcare or mental health services.[152] By offering a stable and secure housing environment alongside individualized support, PSH aimed to create a sustainable pathway toward independence, reduce the risk of returning to homelessness, and ultimately contribute to more enduring housing solutions within the community.

## Time-Limited Subsidy

The Time-Limited Subsidy ("TLS") subprogram offered case management and financial support, including rental subsidies, for up to 24 months. Using a progressive assistance model, case managers collaborated with participants to secure and maintain stable housing in the private rental or affordable housing market, depending on availability.[153] These subsidies served PEH who did not require more intensive support offered by PSH.

---

[145] Ibid.
[146] City of Los Angeles, Inside Safe (https://mayor.lacity.gov/InsideSafe).
[147] Sampled Service Provider Contract Review, Inside Safe-Interim Housing Scope of Required Services.
[148] Ibid.
[149] Ibid.
[150] Ibid.
[151] LAHSA, Scope of Required Services COC Permanent Supportive Housing FY 2023-24, updated March 20, 2023, p. 1 of 20.
[152] Ibid., pp. 1-8.
[153] Service Provider Contract Review, Time-Limited Subsidy Scope of Required Services; LAHSA, Time-Limited Subsidy (TLS) Programs, webpage published September 23, 2022 (updated December 18, 2024).

DRAFT & PRELIMINARY

Section 2

During the Lookback Period, Rapid Re-Housing and Recovery Re-Housing were both considered forms of TLS, and Shallow Subsidy or Street to Subsidy also appeared to be included under that umbrella.[154] LAHSA consolidated various time-limited assistance models into the broader TLS framework.[155]

## Housing Navigation

Housing Navigation ("HN") functioned as a supportive service for permanent housing placement for PEH in locations identified by LAHSA.[156] It was not considered a type of housing intervention; rather, it was a supportive service modality providing dedicated assistance to participants to secure and transition into permanent housing.[157] This subprogram encompassed a range of activities, including comprehensive housing search plans, assistance with landlord outreach, coordination of required documentation, and support with completing rental applications.[158] HN aimed to provide tailored case management to address participants' unique barriers, ensuring that participants not only secure a suitable housing unit but also receive the ongoing support needed to maintain their tenancy.[159] By streamlining and systematizing the process, HN sought to help improve access to permanent housing options, enhance overall housing stability, and promote long-term well-being for those served.

## Landlord Incentives

The Landlord Incentives[160] subprogram provided incentives and bonuses to eligible landlords. These incentives were disbursed as risk mitigation funds, which could be used to cover property damages and/or vacancy losses during tenancy, thereby ensuring households maintain their housing stability.

---

[154] LAHSA, Time-Limited Subsidy (TLS) Programs, webpage published September 23, 2022 (updated December 18, 2024).
[155] Ibid.
[156] Service Provider Contract Review, Housing Navigation Scope of Required Services.
[157] Ibid.
[158] Ibid.
[159] Ibid.
[160] Under the Roadmap-named contract between LAHSA and the City of Los Angeles (C-137223), funding is allocated to miscellaneous services that may not be tied to individuals enrolled in the housing interventions created under the Roadmap Program. This reflects the Roadmap Program's complex funding structure, where certain activities or services may address tangential needs that are not directly aligned with the bed infrastructure of the Roadmap Program. While these services may indirectly support the Roadmap Program's core purpose, they nonetheless represent an ancillary component of its funding.

DRAFT & PRELIMINARY

SECTION 3

# Financial Assessment

## 3.1 BACKGROUND ON THE CITY'S FINANCIAL AND ACCOUNTING PROCESSES

Each year, the City prepares an annual budget projecting revenues and expenditures for the upcoming fiscal year, which runs from July 1 through June 30.[161] As part of this budget process, City departments submit budget requests that the Mayor reviews and includes in the Mayor's Proposed Budget. The City Council subsequently collaborates with the Mayor and other City personnel to review, modify, and approve the budget, resulting in the final Adopted Budget.

The City employs fund accounting, a system commonly used by municipalities, to track financial resources based on their intended purpose. The General Fund is used for the majority of City services, such as general government services, public safety, and sanitation. The General Fund revenues are sourced through various taxes, fees, and other mechanisms levied by the City. Revenues recorded in the General Fund are available for discretionary use by the City.

The City also uses Special Funds to account for "revenues derived from specific taxes, fees, governmental grants, or other revenue sources that are designated to finance particular functions and activities of the City."[162] Compared to the General Fund, the City typically has less discretion regarding the use of Special Funds and must comply with their intended use. For example, the "Home Investment Partnerships Program Fund" is a federal grant with the objective to expand the supply of affordable housing; therefore, the City must ensure those revenues (which would be held in a Special Fund) are spent in adherence with the relevant guidelines.[163] This framework ensures that the City appropriates and monitors resources responsibly, adhering to both broad policy goals and legally binding funding restrictions.

## 3.2 A&M APPROACH TO FINANCIAL ASSESSMENT

A&M's financial assessment focused on determining the amount of funds – both General Funds and Special Funds[164] – expended by the City to support all aspects of the City Programs. This included funds directly expended by the City, as well as funds passed through LAHSA. A&M also evaluated the contractual invoicing and payment processes in place between the City and LAHSA, and between LAHSA and service providers. Further, A&M conducted detailed analyses of service provider expenses for the sampled sites in an effort to provide transparency regarding the final allocation of City funds.

To further these objectives, A&M interviewed various City and LAHSA stakeholders to understand the funding structures in place for the City Programs. Further, A&M relied upon public reporting of funds allocated and expended for the City Programs and documents produced by the City and LAHSA, including

---

[161] City of Los Angeles 2023-24 Adopted Budget, pp. 159-165 of 626 .

[162] Ibid., p. 165 of 626.

[163] Ibid., p. 440 of 626.

[164] While Special Funds were subject to specific guidelines and regulations set by the funder, this assessment did not examine whether the requirements were fully met, as such a review fell outside the defined scope of this engagement.

accounting data produced to A&M for the purposes of this assessment, to inform A&M's approach for quantifying funds spent under the City Programs.

A&M attempted to quantify the total amount expended by the City for the City Programs. However, from an accounting perspective, the City Programs were not tracked in a way that allowed for expenses – specifically those incurred directly by the City to create the infrastructure for beds – to be analyzed in a comprehensive manner. The City explained that various different sources of funds, departments, and appropriation accounts were involved in administering the City Programs[165] and there was no centralized cost center[166] or accounting mechanism that could be utilized to extract all expenses specific to a City Program.[167] Employing the use of cost centers is not required under accounting standards, and therefore does not necessarily represent a gap in the City's accounting policies; instead, in the context of this assessment, the lack of a cost center posed a challenge when attempting to aggregate all expenses related to the City Programs.

The City's approach to budgeting for homelessness-related expenditures was evident in the annual "Homeless Budget" included within the City's Adopted Budget, amounting to a total of $3.6 billion dollars from Fiscal Year 2020-21 through Fiscal Year 2023-24. In FY 2023-24, approximately $1.3 billion was allocated to the Homeless Budget. Of the City Programs, the Inside Safe Program was the only effort distinctly budgeted for; otherwise, the City's Homeless Budget was primarily delineated by the department expending funds (from the General Fund) or the source of Special Funds available to support homeless-related initiatives.[168] A&M worked with the City Administrative Officer ("Office of the CAO" or "CAO") to identify relevant budgeted line items for the City Programs.[169] For the line items identified, the funding occasionally supported overlapping initiatives. For example, Homeless Housing, Assistance and Prevention Program grants (budgeted for $143.6 million) were slated to support both construction and operating costs for the Roadmap Program and Alliance Program. Further, the same grant funding also supported overlapping initiatives not only between the City Programs, but also for "Other Homelessness Programs." Also to note, a portion of funding allocated in the Homeless Budget relates to internal City personnel who support a variety of homelessness activities; because these administrative efforts are not tracked by Program, A&M did not quantify expenses for internal City personnel.

A&M also discussed the Homeless Budget with the City's Controller's Office during which they described difficulty in tracking amounts against the Homeless Budget, and that much of the tracking is dependent on the respective City departments to 'flag' homelessness-related expenditures.[170] Subsequent to this discussion, in November 2024, the LA Times reported that the City Controller Kenneth Mejia published findings revealing that over $500 million of the $1.3 billion Homeless Budget in FY 2023-24 was left unallocated or unspent.[171] The CAO responded to Controller Mejia's findings, clarifying that some of the budgeted amounts relate to multiyear grants not intended for expenditures within a single fiscal year.[172] This recent discourse surrounding the Homeless Budget provides insight into the complexities of tracking all homelessness-related spending within the City itself.

---

[165] Interview with the Office of the CAO on June 12, 2024, and October 8, 2024.
[166] An accounting method employed to manage expenses related to a specific department or function.
[167] Interview with City Controller's Office on July 26, 2024.
[168] City of Los Angeles 2023-24 Adopted Budget, p. 122 of 626.
[169] CAO, Homeless Budget Review, dated July 25, 2024.
[170] Interview with City Controller's Office on July 26, 2024.
[171] Nearly half of L.A.'s record homelessness budget went unspent, city controller finds by Doug Smith, LA Times, dated November 21, 2024, https://www.latimes.com/california/story/2024-11-21/nearly-half-of-los-angeles-homelessness-budget-went-unspent-controller-finds
[172] Ibid.

DRAFT & PRELIMINARY

In summary, based on discussions with City personnel and the accounting data received, A&M was not able to quantify the total amount spent by the City for each component of the City Programs. A&M was reliant on the accounting data provided by the City and LAHSA, and because the City and LAHSA were unable to accurately identify all relevant expenses under the City Programs, A&M's analysis was limited to the information provided. Accordingly, based on the structure of accounting records maintained by the City and LAHSA, in instances where A&M was unable to systematically trace or quantify expenditures for the entirety of a City Program (or component of a City Program), or when aggregate analyses were impractical for the measure being assessed, A&M utilized a smaller population of sampled sites[173] under the City Programs to perform in-depth reviews of financial data. Additionally, when actual expenditures were not quantified in aggregate, A&M quantified appropriated or committed funds for the respective City Program component.

See Appendix A for a summary of funding, including appropriations, commitments, or spending that A&M identified related to the City Programs across the Lookback Period, amounting to approximately $2.3 billion. This amount includes capital costs for the creation of interim housing and permanent supportive housing beds, rent or lease expenses for interim housing beds, funding for time-limited subsidies, and supportive service expenses passed through LAHSA, as will be discussed further in the following section of the report.

## 3.3  OVERVIEW OF FUNDING PROCESS FOR CITY PROGRAMS

Based on A&M's review of documentation for the City Programs, funding for the City Programs can be described within four broad categories:

- Interim Housing,
- Supportive Services,
- TLS subprogram, and
- PSH.

Across the Lookback Period, the City managed funding for interim housing sites, supportive services, TLS, and PSH through different oversight structures. The sections below generally describe the types of costs that were necessary to operate interim and permanent supportive housing within the City, as well as the City departments or other stakeholders responsible for managing the expenditures.

### 3.3.1.  INTERIM HOUSING

Interim Housing sites within the City were managed through the Office of the CAO.[174] The CAO acts as the financial advisor to the Mayor and the City Council and provides recommendations and advice regarding the fiscal condition of the City.[175] The CAO is also responsible for directing the administration of the Adopted Budget.

Regarding shelter and housing interventions, the CAO has knowledge of all available funding sources within the City and determined which revenue source(s) were utilized to support specific housing

---

[173] See Appendix B.
[174] Interview with the Office of the CAO on June 12, 2024.
[175] City Administrative Officer, City of Los Angeles (https://cao.lacity.gov/caoabout.htm).

projects.[176] This determination included assessing the intended use of certain Special Funds (including grant funds received by the state and federal government) and allocating those funds accordingly.

Payment for the use of physical locations to provide interim housing may have taken several different forms depending on the entity that owned the land. Firstly, the City may own the land on which the interim housing site was located. If the land needed to be purchased, the CAO was responsible for managing the approval process of proposed interim housing sites (typically introduced by the City Council), and the subsequent acquisition, approval of funding source, and allocation for the start-up costs of the site.[177] These initial, one-time costs for acquiring, constructing, or improving physical assets, which were utilized as interim housing, are generally referred to as "capital costs."

Secondly, the City may also directly pay motels and hotels for rooms used as interim housing, or pay rent or lease payments for other interim housing interventions (e.g., ABH). The City's General Services Department ("the GSD"), generally, assumed management of lease agreements or contracts and made payments to the owner of the property.[178] As will be discussed further, payments for hotels and motels under the Inside Safe Program were not managed by GSD, and instead were authorized for payment by the CAO and Mayor's Office.[179, 180] These recurring expenditures that are necessary for day-to-day operations (such as nightly rental or lease payments for the interim housing sites and other service provider costs associated with the interim housing) are referred to as "operating costs."

Lastly, some service providers entered into rental or lease agreements and paid rent directly for the buildings they occupied for the interim housing interventions established under the City Programs. In these instances, the rent payments were included in the invoices that the service provider submitted to LAHSA for reimbursement of operating expenses.

### 3.3.2.   SUPPORTIVE SERVICES (LAHSA)

Service providers supporting the City Programs were managed through the City's contracts with LAHSA. These contracts also specified supportive services provided directly by LAHSA, such as LAHSA HETs (outreach teams), rather than particular service providers. The City authorizes the Los Angeles Housing Department ("LAHD") primary responsibility for managing and overseeing the City's contracts with LAHSA.[181] Any funds appropriated by the CAO for LAHSA-managed supportive services were first appropriated to LAHD before payment was made to LAHSA.[182]

The City's contracts with LAHSA were typically structured based on primary funding sources. For example, the City had an annual General Fund contract with LAHSA to provide funding for basic CoC administrative services, among other items. As it related to the City Programs, the City and LAHSA established "named" contracts related to the Roadmap and Alliance Programs ("Program-Named LAHSA Contracts"). Inside Safe was embedded within the City's General Fund Contract, specifically C-140706 ("General Fund LAHSA Contract"). LAHSA then subcontracted with service providers that performed the required services.

---

[176] Interview with the Office of the CAO on June 12, 2024.
[177] Ibid.
[178] Interview with the Office of the CAO on October 8, 2024.
[179] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024, and Funding Recommendations, dated June 30, 2024, p. 8 of 42.
[180] With the exception of the LA Grand.
[181] Interview with the Office of the CAO on June 12, 2024; LAHSA Oversight Policies & Procedures, revised September 2024.
[182] Interview with the Office of the CAO on June 12, 2024.

Section 3

As part of the initial data request issued to LAHSA, A&M requested exports from LAHSA's contract management system (or other comprehensive list/tracking document) of all contracts executed with service providers for provision of services under the City Programs within A&M's Lookback Period. In response to this request, LAHSA produced a list of 139 unique contracts.[183]

Separately, A&M requested general ledger accounting data from LAHSA that was inclusive of all revenues and expenses related to the City Programs. LAHSA produced multiple iterations of this accounting data, including a chart of accounts that allowed A&M to link the expense line detail for the City Programs to service provider contracts. Using the accounting data, A&M identified 215 unique service provider contracts that incurred expenses related to the City Programs across the Lookback Period.

Upon identifying discrepancies between the list of relevant service provider contracts for the City Programs and the accounting data produced by LAHSA, A&M requested that LAHSA identify the corresponding service provider contract for each site listed on the Quarterly Reports, including those that had closed. The crosswalk that LAHSA provided included 191 unique service provider contracts.[184]

In summary, each set of contract listings derived from the above data requests included different service provider contracts. Although there was some overlap among the lists, each list contained missing or additional contracts, resulting in discrepancies across all sources. Therefore, A&M never received a definitive list of the relevant service provider contracts under the City Programs.

To quantify City expenditures for services under each City Program, A&M relied on LAHSA's accounting data. Specifically, A&M quantified expenses incurred by service providers and invoiced to LAHSA for service provider contracts encompassed under the City Programs, based on LAHSA's mapping of expense data to the City Programs. A&M also relied on LAHSA's accounting data to summarize internal LAHSA administrative or operating expenses.

### 3.3.3.    TIME-LIMITED SUBSIDIES

As previously discussed, the TLS subprogram offered case management and financial support, including rental or leasing subsidies, for up to 24 months. As compared to other types of housing interventions, the rental subsidy was, generally, not tied to a specific location and, instead, allowed participants to collaborate with case managers and Housing Navigators to secure and maintain stable housing in the private rental or affordable housing market, depending on availability.[185] Similar to other supportive services provided at non-PSH housing interventions, TLS was managed through service provider contracts with LAHSA.

During the Lookback Period, Rapid Re-Housing and Recovery Re-Housing were both considered forms of TLS, and Shallow Subsidy or Street to Subsidy also appeared to be included under that umbrella.[186] LAHSA consolidated various time-limited assistance models into the broader TLS framework.[187] While the name

---

[183]This list appeared to also contain contract codes for vendors that provided services directly to LAHSA.
[184] Excluding Inside Safe, as this contract listing was based on the Roadmap and Alliance Program Quarterly Reports. However, the service provider contracts identified for the Roadmap and Alliance Programs did not align with those on the other contract lists.
[185] LAHSA, Scope of Required Services (SRS) Time Limited Subsidy, updated April 20, 2023; LAHSA, Time-Limited Subsidy (TLS) Programs, webpage published September 23, 2022 (updated December 18, 2024).
[186] LAHSA, Time-Limited Subsidy (TLS) Programs, webpage published September 23, 2022 (updated December 18, 2024).
[187] Ibid.

and requirements indicate a time-limit to the support provided under the TLS subprogram, LAHSA considered TLS a form of permanent housing.

### 3.3.4.   PERMANENT SUPPORTIVE HOUSING

As part of the City Programs, the City also provided funding for PSH units. Funding structures for PSH were complex and involved numerous levels of government involvement and oversight.[188] Each PSH project had both public and private entities involved in the acquisition, development (construction), and operation of the property. The City's role, managed by LAHD, was to act as a lender to the developers in order to fund the creation of PSH units. The City did not own PSH properties; instead, a private developer typically owned the properties under the City Programs.[189]

Affordable housing projects were supported by tax credit programs to encourage private investment. The California Tax Credit Allocation Committee ("CTCAC") administered the tax credit program and offered two types of federal tax credits generally referred to as nine percent (9%) and four percent (4%) credits. The 9% tax credits were awarded on a competitive basis, while 4% tax credits were linked to a project's use of tax-exempt bond authority. Although CTCAC awarded the credits to the project developer, the tax credits were typically sold to corporate or individual investors. The proceeds of that sale were treated as equity invested to support the PSH project. As part of these transactions, the City acted as the conduit for the tax-exempt bonds or tax credits.[190]

Additionally, for a PSH project to be funded, typically both the City and the Housing Authority of the City of Los Angeles ("HACLA") had to approve the project.[191] When the City financed a PSH project, property records restricted use of a certain number of units for PSH.[192] HACLA awarded project-based housing vouchers to the developer, which guaranteed that a building would receive rent for PSH units as long as qualified tenants occupied the unit(s). Project-based housing vouchers remained with the unit, whereas tenant-based vouchers moved with the individual(s). HACLA project-based vouchers were awarded in 10-year intervals, although renewal is seldom denied for a building. This guaranteed unit income helped qualify the developer for conventional loans needed for construction and permanent financing.[193]

The City provided developers with direct funding structured as loans. Across the Lookback Period, the City committed mostly Proposition HHH funding to PSH properties. Proposition HHH was approved by voters in November 2016 and authorized the City to issue up to $1.2 billion in bonds to finance the development of PSH.[194]

While City funding provided to developers was structured as debt financing to comply with regulations surrounding tax-exempt bonds, the City did not expect to recoup the funding due to low operating margins at PSH properties.[195]

---

[188] Interview with LAHD Development & Financing on November 18, 2024.
[189] Interview with LAHD Development & Financing on November 18, 2024.
[190] California Tax Credit Allocation Committee Program Overview, California State Treasurer (https://www.treasurer.ca.gov/ctcac/program.pdf).
[191] Interview with LAHD Development & Financing on November 18, 2024.
[192] Email from the Office of the CAO, dated January 28, 2025.
[193] Interview with LAHD Development & Financing on November 18, 2024.
[194] LA Times, L.A. votes to spend $1.2 billion to house the homeless. Now comes the hard part, published November 9, 2016.
[195] Interview with LAHD Development & Financing on November 18, 2024.

DRAFT & PRELIMINARY

Section 3

## 3.4  ROADMAP PROGRAM APPROPRIATIONS AND EXPENDITURES

On July 1, 2020, $100 million of COVID-19 Federal Relief Funds received by the City from the federal government was initially reserved to implement the Roadmap Program,[196] with the City Council approving initial funding for the Roadmap Program on September 9, 2020.[197]  Subsequently, the status of Roadmap housing interventions (excluding PSH) were reported within *Roadmap Funding Recommendation Reports* ("Funding Recommendations") issued by the CAO to the City Council. The Funding Recommendations approved and appropriated costs for interim housing interventions, including capital, improvement, and operational expenditures, as well as TLS. The Funding Recommendations report only approved amounts (i.e., budgeted amounts) and do not report on actual funds expended to support the Roadmap Program. Twenty-four Funding Recommendations had been issued as of June 30, 2024. [198]

Funds were appropriated for capital and operating costs. As previously described, capital costs represent one-time investments into land, construction, acquisition, or other building improvements necessary to open interim housing sites. Operating costs generally include monthly lease payments for interim housing sites (managed by GSD) or service provider costs managed through LAHSA. Amounts were also appropriated specifically for the TLS program, Housing Navigation services, and City and LAHSA administrative costs for administering the Roadmap Program.

From the inception of the Roadmap Program through June 30, 2024, approximately $829 million was appropriated to support the Program's interim housing solutions.[199] This appropriation was inclusive of the amount appropriated for LAHSA-managed service providers and TLS under the Roadmap Program.

In addition to interim housing appropriations and TLS, there were 16 PSH locations included in the bed count under the Roadmap Program.[200] In total, $105.8 million in City funds appear to have been committed to PSH projects included under the Roadmap Program, with the majority sourced from Proposition HHH.[201]

### 3.4.1.  ROADMAP CAPITAL AND OPERATING APPROPRIATIONS (EXCLUDING PSH)

The Funding Recommendations include detailed information for each interim housing site, specifying the funding source, the City department receiving the funds, and the specific account to which the funds were allocated.

As an example, information outlined in Funding Recommendations may take the following form:[202]

*"Transfer $4,974,900 for the construction of a Tiny Home Village with 109 beds at 2301 West 3rd Street in Council District 13 from the following accounts:*

---

[196] Proposed Strategy and Funding Recommendations on COVID-19 Homelessness Roadmap, dated August 5, 2020.

[197] Twenty Fourth Report: COVID-19 Homelessness Roadmap Funding Recommendations, dated May 31, 2024.

[198] Ibid.

[199] The Funding Recommendations are typically provided by specific site location (site address and/or site name). A&M compared the list of sites on the Funding Recommendations to the list of Interim Housing Sites included in Q4 2024 Roadmap Quarterly Report and found several inconsistencies; however, A&M deemed the discrepancies to be immaterial.

[200] There was one location included in the bed count that was not provided in the financing data. Additionally, there was one location (the Pano) included in the financing data this is undergoing conversion from Project Homekey (as captured on the Roadmap bed counts) to permanent supportive housing.

[201] Due to the long lead time in developing PSH, all committed funds are summarized above, regardless of whether the initial commitment fell within the Lookback Period.

[202] Sixth Report:  COVID-19 Homelessness Roadmap Funding Recommendations, dated May 20, 2021, Item No. 4.

- *$10,000 from HHAP Grant Special Fund No. 62Y, Account No. 10S650, HHAP Category 1 – A Bridge Home Capital to the Fund No. 62Y, Department No. 10, account number to be determined; and*
- *$4,964,900 from the Additional Homeless Services General City Purposes Fund No. 100/56, Account No. 000931 to Capital Improvement Expenditure Program Fund No. 100/54, a new account entitled, 'CD 13 3rd Street Pallet Shelters.'"*

Funding Recommendations also included a matrix titled *Attachment 1: COVID-19 Homelessness Roadmap Status of Capital and Operating Funding* ("*Attachment 1*"); this matrix summarized and provided a comprehensive history of funding amounts by Roadmap site, type of unit/intervention, type of funding (generally, operating versus capital), source of funds, and fiscal year. [203]

Over 20 Funding Recommendations were issued throughout the Lookback Period, and each Funding Recommendation contained new funding approvals, reductions or reallocations of previous appropriations, or transfers between accounts. A&M attempted to verify the total amount of appropriations reported in *Attachment 1* to the Funding Recommendations. However, because there was no centralized City department, funding source, or cost center that could have been singularly used to monitor Roadmap appropriations, it was a time-consuming process to retroactively reconstruct all appropriation activity for each specific interim housing site established under the Roadmap Program; therefore, undertaking such an extensive effort was not considered practical by A&M given the parameters conveyed by the Court and resources budgeted for assessment.

Nonetheless, A&M conducted analyses and derived findings on the assumption that amounts reported by the City within *Attachment 1* to the Funding Recommendations were accurate. [204]  To be clear, A&M did not conclude that the summarized appropriations were incorrect; instead, this process simply reflects the complexity of the accounting mechanisms and record keeping in place for management of the Roadmap Program.

A&M summarized the appropriated funds for Roadmap Program interventions by the following categories utilizing *Attachment 1* to the 24th Funding Recommendation: [205]

- Source of Funds,
- Funding Category (generally, operating versus capital), and
- Type of Subprogram (type of unit/intervention).

Funding for Roadmap housing sites was sourced from local, state, and federal funds, described below:

## County
Under the Roadmap MOU between the City and the County for the Roadmap Program, the County provided $53 million to the City for the first year of the program and up to $60 million per year for years two through

---

[203] Funding amounts dependent on the most recent Funding Recommendation's approval by City Council.
[204] A&M noted that certain sources of funding (e.g., State Homekey Operating Subsidy) and certain other subtotal amounts were excluded from the grand total appropriations on Attachment 1. For the purposes of this Report, A&M summed all recorded appropriated funds through June 30, 2024.
[205] Office of the Office of the CAO Data, Attachment 1 to Roadmap Reports (CF 20-0841).

DRAFT & PRELIMINARY

five (ending in FY 2024-25) for an approximate total of $300 million.[206] The County supported the Roadmap MOU with Measure H funding.[207, 208]

### Emergency Solutions Grants – CARES Act ("ESG-CV")[209]

Through the ESG-CV program, the federal government appropriated funding under the Coronavirus Aid, Relief, and Economic Security (CARES) Act to "prevent, prepare for, and respond to Coronavirus" among PEH, including support for additional homeless assistance and prevention activities to mitigate the impact of COVID-19.

### Coronavirus Relief Fund ("CRF")[210]

An additional allocation from the federal government under the CARES Act to local governments for "necessary expenditures incurred due to the public health emergency with respect to" COVID-19.

### Homeless Emergency Aid Program ("HEAP")[211]

HEAP is a state grant with flexible funding for California's CoCs and large cities to address the homelessness crisis.

### Homeless Housing, Assistance and Prevention ("HHAP")[212]

HHAP consists of state grants for local jurisdictions and CoCs "with flexible funding to prevent and end homelessness in their regions."

### General City Purposes – Additional Homeless Services ("GCP-AHS")

GCP-AHS consists of funding for homeless services from the City's General Fund to provide additional support for the City's effort to address homelessness.[213]

### State Homekey Grant/Operating Subsidy

The State Homekey Grant/Operating Subsidy allowed municipalities to develop a range of housing types, including converting motels and hotels to interim or permanent housing units.[214]

### Community Development Block Grant – CARES Act ("CDBG-CV")[215]

Through the CDBG-CV program, the federal government appropriated funding under the CARES Act to "prevent, prepare for, and respond to Coronavirus." Eligible activities included public service activities and housing-related activities, among others.

Figure 3.1 below summarizes Roadmap appropriations by funding source.

---

[206] Roadmap MOU, dated October 12, 2020.
[207] Email from the Office of the CAO, dated January 9, 2025.
[208] Approved by voters in 2017, Measure H implemented a ¼ cent sales tax in Los Angeles County to support homelessness-related initiatives.
[209] Emergency Solutions Grants – CARES Act (ESG-CV), HUD Exchange (https://www.hudexchange.info/programs/esg/esg-cv/#program-requirements).
[210] Coronavirus Relief Fund, U.S. Department of the Treasury (https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/coronavirus-relief-fund).
[211] Homeless Emergency Aid Program (HEAP), State of California Business, Consumer Services and Housing Agency, [No Date Available], (https://bcsh.ca.gov/calich/aid_program.html#:~:text=About%20the%20Homeless%20Emergency%20Aid,homelessness%20crisis%20throughout%20the%20state).
[212] Homeless Housing, Assistance and Prevention (HHAP) Grant Program, California Department of Housing and Community Development (https://www.hcd.ca.gov/grants-and-funding/programs-active/homeless-housing-assistance-and-prevention-grant-program)
[213] City of Los Angeles 2023-24 Adopted Budget, p. 136 of 626.
[214] Homekey, California Department of Housing and Community Development (https://www.hcd.ca.gov/grants-and-funding/homekey).
[215] CDBG-CV Program, HUD Exchange (https://www.hudexchange.info/programs/cdbg-cv/).

DRAFT & PRELIMINARY

FIGURE **3.1**

Summary of Roadmap Program Appropriations by Funding Source by Year

| Source of Funds | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| County | $50,190,075 | $60,429,471 | $49,533,458 | $68,460,585 | **$228,613,589** |
| ESG-CV | 183,006,066 | (4,286,289) | (2,950,191) | 8,817,995 | **184,587,581** |
| CRF | 170,785,234 | 1,185,565 | - | - | **171,970,798** |
| HHAP/HEAP | 96,788,653 | (145,697) | 41,908,108 | 8,300,448 | **146,851,512** |
| GCP-AHS | 43,932,652 | 36,564,080 | 45,210 | 1,730,194 | **82,272,136** |
| State Homekey/Operating Subsidy | 6,679,200 | - | - | 2,710,000 | **9,389,200** |
| CDBG-CV | 7,000,000 | (1,812,279) | - | - | **5,187,721** |
| **Grand Total** | **$558,381,880** | **$91,934,851** | **$88,536,585** | **$90,019,222** | **$828,872,537** |

<u>SOURCE</u>: Office of the CAO Data, Attachment 1 to Roadmap Reports (CF 20-0841)

Of the $829 million in total funds appropriated for the Roadmap Program, the majority of the funds came from Special Funds with only $82 million of the total appropriation from the General Fund (under the General City Purposes - Additional Homeless Services). This occurred largely due to an influx of federal government funding released in response to the COVID-19 pandemic. Because the state and federal grant funds included flexible funding language that allowed for a broad use of funds, most housing sites were funded through a braiding of all available sources. Other Special Funds, with a more narrow objective, such as the State Homekey funds, were specifically allocated to Homekey sites. County Funds provided per the Roadmap MOU were appropriated for operating costs for the interim housing sites.

Figure 3.2 below summarizes the Roadmap appropriations by the type of funding.

DRAFT & PRELIMINARY

Section 3

FIGURE **3.2**

## Summary of Roadmap Program Appropriations by Funding Categories by Year

| Types of Funding Categories | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Operating | $208,760,127 | $58,472,451 | $70,540,523 | $79,822,353 | **$417,595,454** |
| Time Limited Subsidies (Rapid Re-Housing) | 83,421,920 | (710,000) | (5,020,377) | 1,309,681 | **79,001,224** |
| Administration | 8,935,612 | 4,142,620 | 2,366,711 | $ 93,479 | **15,538,422** |
| Outreach | 6,605.177 | 5,900,000 | 2,472,188 | - | **14,977,365** |
| **Subtotal – Operating & Other** | **$307,722,836** | **$67,805,071** | **$70,359,045** | **$81,225,513** | **$527,112,464** |
| | | | | | |
| Capital | $110,553,435 | $19,450,828 | $792,967 | $1,075,671 | **$131,872,902** |
| Match/Acquisition | 119,147,497 | (277,245) | 1,859,280 | - | **120,729,532** |
| Improvement | 20,958,112 | 4,956,197 | 15,525,292 | 7,718,038 | **49,157,639** |
| **Subtotal - Capital** | **$250,659,044** | **$24,129,780** | **$18,177,540** | **$8,793,709** | **$301,760,073** |
| **Grand Total** | **$558,381,880** | **$91,934,851** | **$88,536,585** | **$90,019,222** | **$828,872,537** |

SOURCE: Office of the CAO Data, Attachment 1 to Roadmap Reports (CF 20-0841)

FIGURE NOTE: Some "Improvement" costs for Project Homekey properties were managed through service provider contracts at LAHSA.

Figure 3.3 below summarizes the Roadmap Program appropriations by the type of unit or subprogram.

FIGURE **3.3**

## Summary of Roadmap Program Appropriations by Type of Subprogram by Year

| Subprogram | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Project Homekey | $179,606,387 | $(2,809,554) | $59,527,906 | $9,168,333 | **$245,493,072** |
| Other Interim Beds | 109,494,412 | 30,540,130 | 11,434,678 | 28,768,165 | **180,237,385** |
| Tiny Home Village | 82,234,997 | 32,439,265 | (4,916,721) | 39,350,029 | **149,107,570** |
| A Bridge Home | 79,809,460 | 22,049,490 | 19,226,082 | 5,743,860 | **126,828,892** |
| Time-Limited Subsidies | 83,421,920 | (710,000) | (5,020,377) | 1,309,681 | **79,001,224** |
| Administration | 8,935,612 | 4,142,620 | 2,366,711 | 93,479 | **15,538,422** |
| Outreach | 6,605,177 | 5,900,000 | 2,472,188 | - | **14,977,365** |
| Safe Sleeping | 5,674,984 | 382,900 | 555,853 | 3,217,675 | **9,831,412** |
| Safe Parking | 2,598,931 | - | 2,890,265 | 2,368,000 | **7,857,196** |
| **Grand Total** | **$558,381,880** | **$91,934,851** | **$88,536,585** | **$90,019,222** | **$828,872,537** |

SOURCE: Office of the CAO Data, Attachment 1 to Roadmap Reports (CF 20-0841)

DRAFT & PRELIMINARY

Section 3

As noted in Figures 3.1, 3.2, and 3.3 above, the majority of Roadmap funds were appropriated during the first fiscal year of the Roadmap Program. A&M observed the following regarding the appropriations:

- Higher reported amounts in the first year of the Roadmap Program were driven by initial appropriations of over $60 million for Project Roomkey (captured under "Other Interim Beds" within Figure 3.3). Project Roomkey provided hotel and motel rooms to PEH, or individuals at risk of experiencing homelessness, at increased risk for medical conditions due to the COVID-19 pandemic.[216] The City paid Project Roomkey hotels and motels directly.[217]
- Capital costs were incurred for the creation and start-up of various types of interim housing sites, including Tiny Home Village, A Bridge Home, and Safe Sleep.
- "Match/Acquisition" appropriations in Figure 3.2 relate to Project Homekey sites. Project Homekey was a state-led initiative that granted funding for municipalities to provide housing for a target population of PEH at increased risk for medical conditions due to the COVID-19 pandemic.[218] The City was awarded funding for the purchase of 15 properties.[219, 220]
- TLS were included in Roadmap appropriations from the outset of the program. As part of a larger "COVID-19 Recovery Plan for Homelessness," the CAO approved funding of $97 million over four years for 3,000 placements.[221] A&M noted in Figure 3.3 that this amount was ultimately amended to $79 million in appropriations throughout the Lookback Period.

A&M also reviewed amounts appropriated to LAHSA from the City under the two Roadmap Program-Named LAHSA Contracts (C-137223 and C-144656), which should be captured within the "Operating & Other" subtotal summarized in Figure 3.2. Because *Attachment 1* to the Funding Recommendations did not delineate between operating costs paid directly by the City versus those passed through LAHSA, A&M was not able to reconcile amounts between the Program-Named LAHSA Contract appropriations and overall Roadmap operating appropriations.

The Program-Named LAHSA Contract documentation included summarizations of primary funding sources used to support the subprograms managed by LAHSA, outlined in Figure 3.4.  In line with overall Roadmap appropriations, Roadmap Program-Named LAHSA Contracts were primarily funded by County funds and federal funds related to the COVID-19 pandemic.

---

[216] LAHSA, Project Roomkey, webpage published April 20, 2020 (updated July 29, 2021).
[217] City Data, Project Roomkey Cost Summary and Payment Logs.
[218] Homekey, California Department of Housing and Community Development (https://www.hcd.ca.gov/grants-and-funding/homekey/eligibility)
[219] The City and the Housing Authority of Los Angeles jointly applied for Project Homekey funds. HACLA retained the title to 5 properties and acquired the remaining 10 properties on behalf of the City, to hold as an intermediary before the City could select owner/operators to take title of each site.
[220] Project Homekey Regulatory Agreement, dated November 30, 2020.
[221] Proposed Strategy and Funding Recommendations on COVID-19 Homelessness Roadmap, dated August 5, 2020.

DRAFT & PRELIMINARY

Section 3

FIGURE **3.4**

Summary of City-LAHSA Contract Appropriations by Contract and Funding Source for Roadmap Program-Named LAHSA Contracts (C-137223 and C-144656)

| Contract | Contract Term End | Funding Source | Amount | Grand Total |
|---|---|---|---|---|
| C-137223 | 9/30/2023 | County | $174,016,998 | $457,800,706 |
| | | ESG-CV | 172,342,044 | |
| | | Joint County & ESG-CV | 60,895,110 | |
| | | General Fund | 43,561,354 | |
| | | State | 6,985,200 | |
| C-144656 | 6/30/2025 | County | 79,157,998 | 80,951,180 |
| | | General Fund | 83,182 | |
| | | State | 1,710,000 | |
| **Grand Total** | | **County** | **$253,174,996** | **$538,751,886** |
| | | **ESG-CV** | **$172,342,044** | |
| | | **Joint County & ESG-CV** | **$60,895,110** | |
| | | **General Fund** | **$43,644,536** | |
| | | **State** | **$8,695,200** | |

SOURCES: City/LAHSA Roadmap Contract C-137223 (Amendment 17) Compensation Table; City/LAHSA Roadmap Contract C-144656 (Amendment 2) Compensation Table

FIGURE NOTE: The amount appropriated under C-144656 relates to expenditure authority through 6/30/2024 with a Contract Term End date of 6/30/2025.

From an accounting perspective, each City-LAHSA contract had the ability to be funded through multiple different funding streams, whether that was the City's General Fund or state and federal government grants that the City passes through to LAHSA. LAHSA tracks these specific funding streams using grant codes. For the purposes of A&M's assessment, LAHSA provided a crosswalk that linked all grant codes from City funds to the associated City-LAHSA contract.[222] For example, there were eight LAHSA grant codes subsumed under the larger ESG-CV grant – all eight of those ESG-CV grant codes were linked to the Roadmap Program-Named LAHSA Contracts.[223]

### 3.4.2. ROADMAP – ACTUAL EXPENDITURES (CAPITAL EXPENDITURES – INTERIM HOUSING)

As discussed, the lack of a centralized cost center by City Program hindered A&M's ability to comprehensively assess the City's actual capital expenditures under the Roadmap Program within the scope of this assessment. As such, A&M tested the ability to trace appropriated capital funds to actual

---

[222] LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts.
[223] Ibid.

expenditures for the 11 sampled Roadmap sites. To perform this review, A&M requested supporting financial data from the CAO for the department(s), fund(s), and account(s) that incurred actual capital expenses for the given site to assess whether the actual expenses aligned with the appropriations.

For the 11 sampled sites under the Roadmap Program, A&M identified capital appropriations in *Attachment 1 to the Funding Recommendations* for seven locations. There were no capital appropriations for four of the 11 Roadmap Sites (Nos. 3-6), indicating that the location either incurred rent payments (i.e., operating costs) or was already owned outright by the City. The CAO provided documentation that was available from the City's financial management system for actual capital expenditures incurred for six of the seven sampled sites with capital appropriations. It appeared from A&M's review that the City was able to identify actual capital expenditures incurred for the sampled sites through appropriation accounts in the financial management system with site-specific nomenclature (e.g., Appr 00T788 – "CD 13 3rd Street Pallet Shelters").[224] Figure 3.5 below summarizes the capital appropriations and actual capital expenditures throughout the Lookback Period.

FIGURE **3.5**

Summary of Roadmap Program Capital Appropriations, Encumbered Funds and Actual Expenditures for 11 Sampled Sites Across the Lookback Period

| Sampled Site | Appropriated Funds | Encumbered Funds + Actual Expenditures |
|---|---|---|
| Roadmap Site #1 | $5,812,912 | $5,450,679 |
| Roadmap Site #2 | 30,712 | *Unknown – No Data Provided* |
| Roadmap Site #3 | *No Capital Appropriations (Operating Only)* | N/A |
| Roadmap Site #4 | *No Capital Appropriations (Operating Only)* | N/A |
| Roadmap Site #5 | *No Capital Appropriations (Operating Only)* | N/A |
| Roadmap Site #6 | *No Capital Appropriations (Operating Only)* | N/A |
| Roadmap Site #7 | 1,669,308 | 300,597 |
| Roadmap Site #8 | 8,906,965 | 7,591,263 |
| Roadmap Site #9 | 6,173,096 | 4,753,445 |
| Roadmap Site #10 (Homekey) | 20,076,247 | 20,056,747 |
| Roadmap Site #11 (Homekey) | 2,713,579 | 2,713,579 |
| **Grand Total** | **$45,382,819** | **$40,866,310** |

SOURCES: Office of the CAO Data, Attachment 1 to Roadmap Reports (CF 20-0841); City Data, Actual Roadmap Capital Expenditures

FIGURE NOTE: A&M analyzed operating costs separately.

The information provided indicates that the City is able to account for actual expenses for the Roadmap Program at a granular level. Additionally, as demonstrated in Figure 3.5, the City dedicated varying amounts to each of these projects. This is due to differing conditions present at each interim housing

---

[224] This is only used as an example and does not represent a sampled site.

location, which could include specific regulatory requirements or differing amounts of effort necessary to build the desired infrastructure (e.g., building rehabilitation costs versus new construction). It was not within the scope of A&M's assessment to evaluate whether the appropriated amounts accurately reflected the amount of capital funding necessary to establish these interim housing sites.

### 3.4.3. ROADMAP − ACTUAL EXPENDITURES (OPERATING EXPENDITURES PAID DIRECTLY BY THE CITY)

The City paid rent directly for certain Roadmap Program housing locations, including paying hotels and motels directly for rooms under Project Roomkey. In response to a data request for expenditures pertaining to leasing costs for beds reported under the City Programs, the City produced 'payment logs' for both Project Roomkey and 'bridge leases,' the latter of which appeared to relate to ABH and other interim housing locations. Based A&M's review of the payment logs, payments were oftentimes made from numerous City departments and funding sources throughout the Lookback Period; therefore, A&M's summarization of expenditures is based on the City's compilation of relevant payments.[225] Project Roomkey expenses, including any damage claims, and other lease payments are summarized in Figure 3.6 below for locations reported on the Roadmap Quarterly Reports.[226]

FIGURE **3.6**

Summary of Project Roomkey Hotel and Motel Expenses and Other Lease Payments Paid Directly by the City for the Roadmap Program by Year

| Category of Cost | June 2020 | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|---|
| LA Grand | $2,327,575 | $23,797,234 | $27,350,107 | $11,352,205 | - | **$64,827,120** |
| Mayfair Hotel | - | 11,833,276 | 12,732,241 | 3,311,192 | 9,537,239 | 37,413,948 |
| Airtel Plaza Hotel | - | 698,948 | 8,307,565 | 3,067,510 | - | 12,074,023 |
| Highland Gardens | - | - | 4,888,384 | 1,709,315 | - | 6,597,699 |
| Sportsmen Lodge | - | 5,055,360 | 950,864 | 103,233 | - | 6,109,457 |
| Other Hotels/Motels | - | 3,170,466 | 5,569,658 | 130,888 | - | 8,871,011 |
| **Subtotal – Project Roomkey** | **$2,327,575** | **$44,555,284** | **$59,798,818** | **$19,674,343** | **$9,537,239** | **$135,893,259** |
| Other Lease Payments | - | 1,247,009 | 1,874,406 | 2,119,570 | 2,054,183 | 7,295,168 |
| **Grand Total** | **$2,327,575** | **$45,802,293** | **$61,673,224** | **$21,793,912** | **$11,591,422** | **$143,188,427** |

SOURCES: City Data, Project Roomkey Cost Summary and Payment Logs; City Data, Bridge Lease Payment Logs

FIGURE NOTE: Per the City Controller's homelessness audit published in December 2024, at least some portion of the Project Roomkey hotel and motel expenses were funded by Federal Emergency Management Agency ("FEMA") funds.

The majority of Project Roomkey expenses were incurred during the earlier years of the Lookback Period, as Project Roomkey was deployed as an urgent response to provide non-congregate housing options for individuals at risk of illness due to COVID-19.[227] As Project Roomkey ramped down during the latter part

---

[225] A&M tested the ability to trace the compiled payments to separate general ledger files provided by the City.
[226] Both payment log files included payments for locations that could not be linked to the City Programs.
[227] Email from LAHSA dated February 21, 2025.

of 2022,[228] several of the Project Roomkey properties (e.g., LA Grand, Mayfair Hotel, Highland Gardens) provided shelter under the other City Programs. For example, the LA Grand lease was extended to serve Inside Safe participants in February 2023,[229] and Highland Gardens (as of December 27, 2022) and Mayfair (as of May 1, 2024) were both reported under the Alliance Program.[230] The expenses shown in Figure 3.6 above are solely related to the period when the hotels or motels were classified as Project Roomkey properties within the Roadmap Program.

### 3.4.4.   ROADMAP – ACTUAL EXPENDITURES (OPERATING EXPENDITURES – LAHSA)

Figure 3.7 below summarizes expenses invoiced to LAHSA by service providers under the Roadmap Program-Named LAHSA contracts through June 30, 2024, as well as internal LAHSA expenses attributed to the Roadmap Program. Vendor expenses were also included; LAHSA explained that compared to service provider expenses, LAHSA occasionally contracted directly with a third-party organization (i.e., vendor) to procure specific deliverables.[231] For the Roadmap Program, vendor expenses included nursing, security, and meals at Project Roomkey sites.[232] In total over the Lookback Period, approximately 200 service provider contracts incurred expenses linked to the City's Roadmap contracts with LAHSA.[233] Notably, during the Lookback Period, service provider contract codes changed between FY 2020-21 and FY 2021-22.  Because the data provided by LAHSA did not allow a comprehensive crosswalk from old contract codes to new ones, some duplication in counts likely occurred. Restricting the analysis to FY 2021-22 through FY 2023-24 indicated that 152 service provider contracts incurred expenses linked to the City's Roadmap Program-Named LAHSA Contracts.[234] Further, this service provider contract count is dependent on LAHSA's mapping of expense data to City-LAHSA contracts; in response to other data requests, LAHSA identified contracts for sites established under the Roadmap Program that did not appear in the financial data provided, leading to inconsistencies in reported service provider contracts relevant to the Roadmap Program.

---

[228] LAHSA, Project Roomkey Ends Homelessness for 4,824 People, published November 18, 2022.
[229] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 11 of 42; Office of the CAO Data, List of Active and Expired Inside Safe Motel Agreements.
[230] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024.
[231] Email from LAHSA GMC Department, dated February 11, 2025.
[232] City of Los Angeles Controller, Homeless Audit: Pathways to Permanent Housing, dated December 10, 2024, p. 25 of 86; LAHSA Accounting Data - General Ledgers (all City Funds).
[233] LAHSA Accounting Data - General Ledgers (all City Funds).
[234] Ibid.

Section 3

FIGURE **3.7**

Summary of Expenses Invoiced to LAHSA by Service Providers and Vendors and LAHSA Internal Expenses Attributed to Roadmap Program-Named LAHSA Contracts (C-137223 and C-144656) by Year

| Category of Cost | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Internal LAHSA | $885,165 | $9,365,211 | $3,530,201 | $749,200 | **$14,529,777** |
| Vendors | - | 5,423,808 | 7,143,900 | - | **12,567,708** |
| Service Providers | 23,485,237 | 139,599,215 | 142,141,511 | 91,162,308 | **396,388,271** |
| **Grand Total** | **$24,370,402** | **$154,388,234** | **$152,815,612** | **$91,911,508** | **$423,485,756** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

FIGURE NOTE: Vendor amounts identified as "PRK" designated contract codes linked to internal LAHSA agency codes.

LAHSA service providers incurred $396.4 million in expenses throughout the Lookback Period; vendors incurred $12.6 million. An additional $14.5 million was recorded to LAHSA's internal agency codes: Administration, Essential Services, Operating Costs, and HMIS. The majority of LAHSA's internal expenses were comprised of payroll payments, although beyond that, it was difficult to discern from the accounting data what specific LAHSA activities were charged to the Roadmap Program.

At the outset of this assessment, LAHSA identified only financial transactions associated with the Program-Named LAHSA Contracts as relevant to the scope of this assessment. However, A&M's subsequent analyses revealed that additional City-to-LAHSA contracts and County funds contributed funding to these City Programs. Specifically, A&M identified that various service provider contracts funded through the Roadmap Program-Named LAHSA Contracts also incurred expenses linked to other City-funded LAHSA contracts. For example, a service provider's contractual budget may be linked to four different grant codes – three of the four grant codes crosswalk to the Roadmap Program-Named LAHSA Contract (C-137223) and one grant code crosswalks to the City's General Fund Contract (C-140706) with LAHSA. Figure 3.8 below expands the expense analysis to capture all costs related to service provider contracts linked to the Roadmap Program regardless of whether all grant codes link directly to the Program-Named LAHSA Contract. This more accurately reflects the City's total cost for providing services at the Roadmap housing sites or subprograms.

DRAFT & PRELIMINARY

Section 3

FIGURE **3.8**

Summary of Roadmap Program Expenses Invoiced to LAHSA by Service Providers Linked to any City-Funded Contract by Year

| City-Funded Contract | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| C-137223 & C-144656 | $23,485,237 | $139,599,215 | $142,141,511 | $91,162,308 | **$396,388,271** |
| **Subtotal - Program-Named 'Roadmap' Contracts** | **$23,485,237** | **$139,599,215** | **$142,141,511** | **$91,162,308** | **$396,388,271** |
| | | | | | |
| C-135650 (HHAP) | - | $5,402,197 | $2,429,566 | $39,689,017 | **$47,520,780** |
| C-136465, C-138630 & C-140706 (GF) | - | 6,962,032 | 1,660,508 | 1,202,878 | **9,825,418** |
| C-138675 (ESG-CV) | - | 54,000 | 234,689 | 1,257,506 | **1,546,195** |
| C-133135 (HEAP) | - | 36,703 | - | - | **36,703** |
| **Subtotal - Other LAHSA Contracts** | **-** | **$12,454,932** | **$4,324,763** | **$42,149,401** | **$58,929,095** |
| **Grand Total** | **$23,485,237** | **$152,054,146** | **$146,466,274** | **$133,311,709** | **$455,317,366** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

FIGURE NOTE: LAHSA's Chart of Accounts linked two HHAP grants to the City's GF Contract. All other HHAP grants were linked to the C-135650 HHAP contract. A&M reclassified the two HHAP grants under C-135650.

While overall Roadmap Program expenses decreased by approximately $13 million between FY 2022-23 and FY 2023-24, the amount captured under the Program-Named LAHSA Contract decreased by almost $51 million. This decrease was due to the winddown of ESG-CV funding, which historically funded a large portion of Roadmap Program service provider expenses. As a result, many service provider contracts that were previously linked to only the Roadmap Program-Named LAHSA Contract were shifted and claimed for reimbursement under the City's HHAP contract (C-135650).

Figure 3.9 below summarizes the same Roadmap Program expenses incurred by service providers, as recorded under the "Program Title" field in LAHSA's general ledger data. As exhibited in Figure 3.9, the Program Title field was a broad categorization that did not always align with the corresponding subprogram. For example, the "Program Title" field might record "Bridge Housing," even though contracts pertained to subprograms such as A Bridge Home, Tiny Home Village, and Project Homekey. This misalignment between actual subprogram designations and accounting entries complicated A&M's efforts to accurately identify expenditures at the subprogram level and compare spending across different types of subprograms.

DRAFT & PRELIMINARY

FIGURE **3.9**

Summary of Roadmap Program Expenses Invoiced to LAHSA by Service Providers Linked to any City-Funded Contract by LAHSA Program Title by Year

| LAHSA Program Title | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Bridge Housing | $14,662,265 | $88,696,362 | $105,013,789 | $112,026,645 | **$320,399,061** |
| Rapid Re-Housing | 8,061,279 | 49,618,243 | 1,477,832 | - | **59,157,355** |
| Time-Limited Subsidies | - | - | 30,669,661 | 14,706,714 | **45,376,375** |
| Project Roomkey | - | 9,196,122 | 2,766,537 | - | **11,962,659** |
| Safe Sleep | 202,631 | 1,740,577 | 3,005,570 | 3,042,218 | **7,990,996** |
| Safe Parking | 423,196 | 1,912,632 | 1,950,338 | 2,099,413 | **6,385,580** |
| Outreach/Case Management Coordination | - | - | 1,008,953 | 467,290 | **1,476,243** |
| Crisis Housing | - | - | - | 915,380 | **915,380** |
| Housing Navigation | - | - | 573,593 | - | **573,593** |
| Winter Shelter | - | 505,035 | - | 53,957 | **558,992** |
| Sanitation Project | - | 388,823 | - | - | **388,823** |
| Capital Costs | 81,289 | | - | - | **81,289** |
| Shallow Subsidy | 54,577 | (3,648) | - | - | **50,929** |
| Inclement Weather Program | - | - | - | 93 | **93** |
| **Grand Total** | **$23,485,237** | **$152,054,146** | **$146,466,274** | **$133,311,709** | **$455,317,366** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts.

FIGURE NOTE: Expenses classified as "Bridge Housing" encompass multiple subprograms, including A Bridge Home, Tiny Home Villages, and Project Homekey.

During the course of A&M's assessment, it became apparent that some service provider contracts under the Roadmap Program received funding directly from the County. A&M requested additional LAHSA accounting data that included all service provider expenses for the Roadmap Program regardless of the funding source.[235] Figure 3.10 below summarizes the additional County-funded portions of the service provider contracts under the Roadmap Program.

---

[235] LAHSA Accounting Data - General Ledgers (all Roadmap Funding Sources).

FIGURE **3.10**

Summary of Roadmap Program Expenses Invoiced to LAHSA by Service Providers Linked to City-Funded and County-Funded Contracts by LAHSA Program Title Across the Lookback Period

| LAHSA Program Title | City | County | Grand Total |
|---|---|---|---|
| Bridge Housing | $320,214,731 | $14,850,227 | **$335,064,958** |
| Time-Limited Subsidies | 45,376,375 | 97,105,678 | **142,482,053** |
| Rapid Re-Housing | 58,194,292 | 32,715,781 | **90,910,074** |
| Project Roomkey | 11,560,067 | - | **11,560,067** |
| Safe Sleep | 7,990,996 | - | **7,990,996** |
| Safe Parking | 6,385,580 | - | **6,385,580** |
| Crisis Housing | 1,646,223 | 3,429,763 | **5,075,986** |
| City Inside Safe Program | 2,309,141 | - | **2,309,141** |
| Housing Navigation | 573,593 | 1,358,711 | **1,932,304** |
| Shallow Subsidy | 50,929 | 1,652,273 | **1,703,202** |
| Outreach/Case Management Coordination | 1,476,243 | - | **1,476,243** |
| Winter Shelter | 558,992 | - | **558,992** |
| Sanitation Project | 388,823 | - | **388,823** |
| Capital Costs | 81,289 | - | **81,289** |
| Problem Solving | - | 71,385 | **71,385** |
| Inclement Weather Program | 93 | 17,868 | **17,960** |
| Homelessness Prevention | - | 5,033 | **5,033** |
| **Grand Total** | **$456,807,366** | **$151,206,720** | **$608,014,085** |

SOURCES: LAHSA Accounting Data - General Ledgers (all Roadmap Funding Sources); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

FIGURE NOTE: The City-funded portion varies slightly from the prior accounting extracts provided that contained solely City-funded grants – $455.3 million versus $456.8 million. The differences were due to (1) service provider contracts that were included in the "all funding sources" file and not the City-funded files, or vice versa, and (2) differences in expense amounts for service provider contracts present in both source files. The discrepancies did not materially affect the analysis.

According to LAHSA's accounting records, an additional $151.2 million in services (related to over 80 service provider contracts) for the Roadmap Program was funded through County funds. The vast majority of this additional amount relates to TLS (previously called Rapid Re-housing). In fact, County funding provides more than half (55%) of the funding for TLS service provider contracts linked to the Roadmap Program. Per LAHSA, TLS beds reported under the Roadmap Program include all clients funded through TLS contracts that receive comingled City and County funding – "LAHSA's position is

that all clients are served by the full amount of funding a program receives and clients cannot be meaningfully separated by those funded by the City and those not."[236]

As mentioned, A&M noted inconsistencies between service provider contracts linked to the Roadmap Program within the financial data and separate files LAHSA produced that purport to identify service provider contracts for each Roadmap housing intervention, highlighting the complexity in accurately accounting for all funds committed to the support the Roadmap Program. The largest discrepancy relates to TLS contracts – LAHSA identified 95 contracts for the 2,293 "Scattered Sites" (representing approximately 30% of all open and occupiable beds) reported by the City as of June 30, 2024. Of the contracts identified by LAHSA, approximately 70% did not report financial expenditures in FY 2023-24.[237] A&M requested supporting workpapers from LAHSA regarding the TLS bed count to investigate this discrepancy further in an effort to ensure all costs related to TLS were captured. However, LAHSA was unable to provide the requested documentation, and instead furnished a memorandum that was not sufficient to permit reconciliation of the identified misalignment in contracts.[238] Therefore, A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds.

In summary, LAHSA service provider expenses constitute a significant portion of the ongoing operating costs needed to sustain housing interventions. A&M noted that as of September 6, 2024, the City reported 6,956 open beds and/or units under the Roadmap Program,[239] with 4,201 of those beds being interim housing beds[240] expected to remain operational through June 30, 2025.[241] However, the City indicated that an annual allocation of $100.9 million for operating costs would need to be identified to sustain the beds past FY 2024-25, excluding additional funding for leasing and other potential cost increases related to the anticipated interim housing bed rate adjustment. This highlights potential financial challenges in maintaining Roadmap resources in the future, considering the annual $60 million contribution from County funds per the Roadmap MOU is expiring as of June 30, 2025.

### 3.4.5.    ROADMAP APPROPRIATIONS (PSH)

A&M requested supporting financial data in an effort to quantify City funds committed to PSH properties included within the Roadmap Quarterly Reports submitted to the Court. A&M also conducted multiple interviews with the CAO and LAHD regarding the City's role in funding PSH projects.

The Roadmap Program includes 16 PSH locations. LAHD provided financing information for 16 projects related to the Roadmap Program; A&M compared the addresses and/or names of the 16 PSH projects to the list of locations from the Roadmap Quarterly Reports. Generally, the addresses aligned.[242]

Three categories of financing amounts were included in the data:[243]

- **Construction Financing**: Sources necessary to fund construction.

---

[236] LAHSA Memo, Roadmap Report FY23-24 Q3, dated April 5, 2024.
[237] Analysis of LAHSA's contract listing for the Roadmap Program.
[238] LAHSA Memo, TLS Beds Open to Date and Clients Served in Roadmap Reports, dated December 19, 2024.
[239] 7,429 beds less 473 demobilized LA Grand Hotel beds.
[240] Per the City, the remaining Roadmap Program beds and/or units were a mix of PSH, TLS, Safe Parking, and Safe Sleep interventions.
[241] Alliance Settlement Agreement Program (ASAP) Strategy and Progress as of June 30, 2024, dated September 6, 2024, p. 12 of 32.
[242] The financing information included one Project Homekey conversion (Panorama Inn - 8209 Sepulveda Blvd.) classified as Interim Housing in the bed counts. Alternatively, the funding information lacked detail for a PSH site (5215 S. Figueroa St.) included in the bed counts. All City funding information provided is summarized despite the misalignment.
[243] Interview with LAHD Development & Financing on November 18, 2024.

- **Permanent Financing**: After construction is complete, the construction loans are rolled over into forms of permanent financing (i.e., sources used to pay off construction financing).
- **Funding Information**: Indicates the specific City fund and appropriation accounts drawn down to provide the City's permanent financing commitment.[244]

$549.3 million in permanent financing from all sources (not solely the City) was reported for the 16 housing projects to create a total of 1,016 total units,[245] or $540,685 per unit. The total unit count includes units classified as affordable housing where tenant-based vouchers can be utilized. In total, the 16 projects are reported to have created 621 PSH units.[246]

Of the total $549.3 million, $105.8 million in City funds have been committed to Roadmap PSH projects, or $170,368 per PSH unit, with the majority sourced from Proposition HHH. Per conversations with LAHD, with the Proposition HHH measure being passed in 2016, some portion of the Roadmap Program PSH projects would have been awarded Proposition HHH funds as early as 2017, with construction projects starting in 2019, prior to the Lookback Period.[247]

FIGURE **3.11**

## Summary of City Funds Committed to Roadmap Program PSH Locations

| City Funds Source | Amount Committed |
|---|---|
| Proposition HHH | $77,171,108 |
| HOME Investment Partnerships Program | 15,884,495 |
| General Fund | - |
| Other | 12,742,945 |
| **Grand Total** | **$105,798,548** |

SOURCE: LAHD Data, Roadmap PSH Financing

FIGURE NOTE: Due to the long lead time in developing PSH, all committed funds are summarized above, regardless of whether the initial commitment fell within the Lookback Period.

---

[244] A&M relied on the fund numbers from the Funding Information section of the financing data provided by the City to crosswalk to the source of funds using the City's chart of accounts.

[245] LAHD Data, Roadmap PSH Financing.

[246] Dkt. 756, Roadmap Quarterly Status Report as of June 30, 2024. The financing information included one Project Homekey conversion (Panorama Inn - 8209 Sepulveda Blvd.) classified as Interim Housing in the bed counts. Alternatively, the funding information lacked detail for a PSH site (5215 S. Figueroa St.) included in the bed counts. All City funding information provided is summarized despite the misalignment.

[247] Interview with LAHD Development & Financing on November 18, 2024.

KEY TAKEAWAYS OF SECTION 3.4

-   The City appropriated over $829 million from various sources of funding to support the Roadmap Program. This amount included capital costs to create interim housing beds, rent or lease payments for interim housing beds, time-limited subsidies, and supportive service expenses passed through LAHSA. Additionally, the City committed $105.8 million to fund Permanent Supportive Housing projects.

-   LAHSA incurred over $455 million in City-funded service provider expenses linked to the Roadmap Program across the Lookback Period. Many of these service provider contracts received additional funding directly from the County, increasing the total amount of service provider funding to $608 million.

-   The budget or compensation clauses in the Roadmap Program-Named LAHSA Contracts do not completely capture the total costs required to support operations at the shelter and housing interventions established under the Roadmap Program, especially for the Time-Limited Subsidy subprogram. LAHSA employed multiple funding streams and contributions from various entities to support beds and associated services at the respective sites.

-   Subprogram designations did not always align with categories used in accounting records, leading to difficulties in accurately identifying expenditures for specific subprograms. This mismatch hindered efforts to analyze and compare spending across subprograms, which limited the ability to obtain a deeper understanding of homelessness assistance services.

-   The City faces funding constraints concerning future monetary support of Roadmap housing interventions due to the loss of federal ESG-CV funding and forthcoming loss of County funds governed by the Roadmap MOU.

## 3.5  ALLIANCE APPROPRIATIONS AND EXPENDITURES

### 3.5.1.  ALLIANCE APPROPRIATIONS (PSH)

The Alliance Agreement is primarily comprised of PSH solutions. A&M requested supporting financial data in an effort to quantify City funds committed to PSH properties included within the Alliance Quarterly Reports submitted to the Court. A&M also conducted multiple interviews with City departments including the CAO and LAHD, regarding the City's role in funding PSH projects.

As of June 30, 2024, under the Alliance Program, the City reported 142 PSH locations with a status of "Open" or "In Process" amounting to 7,810 PSH beds.[248] LAHD provided financing information for 132 PSH projects related to the Alliance Program. A&M compared the addresses and names of 132 PSH projects with the sites listed in the Alliance Quarterly Reports. Two of the PSH sites in the City's reporting had no corresponding funding details, while the remaining eight locations were Project Homekey PSH locations whose information was managed by HACLA.[249, 250]

---

[248] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024.

[249] HACLA Homekey Data Response, dated August 7, 2024.

[250] The additional Project Homekey PSH projects with data maintained at HACLA are primarily funded through California Department of Housing and Community Development Homekey Awards.

Section 3

$5.47 billion in permanent financing from all sources (not solely the City) was reported for the 132 housing projects to create a total of 9,592 total units,[251] or $569,802 per unit. The total unit count includes units classified as affordable housing where tenant-based vouchers can be utilized. In total, the 132 projects are reported to have created 7,395 PSH units.[252]

Of the total $5.47 billion, $1.13 billion in City funds were committed to Alliance PSH projects, or $153,288 per PSH unit, with the majority sourced from Proposition HHH. Again, a portion of the Alliance PSH projects funded through Proposition HHH would have been in process prior to both the Alliance Settlement and the Lookback Period.

FIGURE **3.12**

Summary of City Funds Committed to Alliance Program PSH Locations

| City Funds Source | Amount Committed |
|---|---|
| Proposition HHH | $815,448,430 |
| HOME Investment Partnerships Program | 158,578,503 |
| General Fund | 60,454,387 |
| Other | 99,083,429 |
| **Grand Total** | **$1,133,564,750** |

SOURCE: LAHD Data, Alliance PSH Financing

FIGURE NOTE: Due to the long lead time in developing PSH, all committed funds are summarized above, regardless of whether the initial commitment fell within the Lookback Period.

The funding exhibited relates to 7,395 of the 7,810 PSH beds reported as either open or in process under the Alliance Program.[253] Under the Court's requirements, as of June 30, 2024, the City still needed to create 4,252 additional beds (not specific to PSH) to fulfill its remaining obligation. However, as previously noted, the CAO's report outlined potential fiscal constraints, which introduces risks to both sustaining existing housing interventions and respective services under the Roadmap Program as well as securing resources for creating new beds under the Alliance Settlement.[254] Balancing the maintenance of established housing interventions with the Court's mandate for additional beds underscores a strained budgetary environment that may hinder long-term progress toward meeting the Alliance Settlement's objectives.

### 3.5.2.    ALLIANCE – ACTUAL EXPENDITURES (LAHSA)

The Alliance Agreement included two interim housing locations operational throughout the Lookback Period – Highland Gardens and the Mayfair Hotel.[255] Service provider costs for these locations were handled through LAHSA; however, because the Mayfair Hotel housed Inside Safe participants, service provider expenses are linked to Inside Safe funding and quantified under the Inside Safe Program.

---

[251] LAHD Data, Alliance PSH Financing.  A&M noted that several properties in the data indicated that zero units were created even though funding amounts were provided.
[252] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024.
[253] Dkt. 757, Alliance Quarterly Status Report as of June 30, 2024.
[254] Alliance Settlement Agreement Program (ASAP) Strategy and Progress as of June 30, 2024, dated September 6, 2024, pp. 11-12 of 32.
[255] There are interim housing sites (Project Homekey) included in Alliance Reporting that were listed as 'in process' as of June 30, 2024.

Figure 3.13 below summarizes expenses invoiced to LAHSA by service providers under the Alliance Program-Named LAHSA Contract through June 30, 2024, as well as internal LAHSA expenses attributed to the Alliance Program.

FIGURE **3.13**

**Summary of Expenses Invoiced to LAHSA by Service Providers and LAHSA Internal Expenses Attributed to the Alliance Contract C-141840 by Year**

| Category of Cost | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Internal LAHSA | N/A | N/A | $      - | $      - | $      - |
| Service Provider | N/A | N/A | 4,818,632 | 7,870,142 | 12,688,774 |
| **Grand Total** | **N/A** | **N/A** | **$4,818,632** | **$7,870,142** | **$12,688,774** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

Per the Memorandum of Understanding between the City and the County, the County was to reimburse the City on a retroactive and go-forward basis for the Bed Rate (i.e., nightly rental rate) for interim housing beds under the Alliance Program.[256] The City issued an invoice to the County on December 10, 2024, for Highland Garden bed costs for the period of November 2022 through June 2023; the City had not been reimbursed at the time of this analysis.[257]

> **KEY TAKEAWAY OF SECTION 3.5**
>
> - Housing interventions reported under the Alliance Agreement primarily consisted of PSH units. The City committed $1.1 billion to support 132 PSH projects encompassed under the Alliance Agreement, largely sourced from Proposition HHH funds.

## 3.6  INSIDE SAFE PROGRAM APPROPRIATIONS AND EXPENDITURES

On January 18, 2023, the City Council and the Mayor approved a motion to establish the Homelessness Emergency Account ("HEA") to manage City expenses related to administering the Inside Safe Program.[258] Subsequently, the status of Inside Safe Program operations and related funding recommendations were reported within Homelessness Emergency Account – General City Purposes Fund Status Reports and Funding Recommendations ("HEA Reports") issued by the CAO to the City Council. The HEA Reports provide both budgeted and actual expenses for the Inside Safe Program since the inception of the City Program.

For FY 2023-24, a total of $250 million in funding was allocated to the Inside Safe Program, with $65.7 million appropriated to the HEA account and the remaining $184.3 million held in an Inside Safe Reserve

---

[256] Alliance MOU between County and City, dated May 2, 2024, pp. 6-7 of 15.
[257] Alliance Reimbursement Claim from City to County, dated December 10, 2024.
[258] Homelessness Emergency Account – General City Purposes Fund Eighteenth Status Report (C.F 22 – 1545) as of Wednesday, July 31, 2024 and Funding Recommendations, dated August 22, 2024.

Fund account.[259] If the balance in the HEA account dropped below $25 million during the fiscal year, the CAO was instructed to provide the Mayor, Council, and Controller a memo to request the transfer of additional funds in the HEA account. Funds were transferred out of the Inside Safe Reserve Fund account to the HEA in increments of $25 million, as necessary.[260]

Inside Safe Program exclusively uses hotels and motels to provide interim housing for PEH through its operations. The City negotiated two types of contracts with hotel and motel owners: booking and occupancy agreements. Under a booking agreement, the City secures a fixed nightly rate; however, the total number of rooms billed fluctuates based on the number of participants occupying the site and the rooms that are available at any given time.[261] An occupancy agreement stipulates a fixed nightly rate and guarantees a specified number of rooms to be billed, regardless of whether the rooms are occupied. As of July 2024, the City had 34 active booking agreements and 11 active occupancy agreements (for a total of 45 active motel/hotel agreements). The 11 occupancy agreements guaranteed the availability of 460 rooms.[262]

The largest occupancy agreement executed by the City was for the LA Grand Hotel, which initially provided interim housing as a Project Roomkey site under the Roadmap Program before housing Inside Safe participants. The LA Grand lease covered 481 rooms, according to the CAO.[263], [264] The lease on the LA Grand (managed by GSD) was extended through July 31, 2024, allowing residents to transition to the Mayfair Hotel. As of June 28, 2024, all participants exited the LA Grand.[265]

In addition to contracts with private hotels and motels, the City invested in acquiring properties to provide interim housing. In August 2023, the City Council approved the acquisition and rehabilitation of the Mayfair Hotel for use as interim housing (294 rooms) under Inside Safe for approximately $83 million.[266] The Mayfair Hotel previously served as a Project Roomkey site under the Roadmap Program. In total, the HEA account funded $15.6 million in costs related to the acquisition of the Mayfair Hotel.[267] While the Mayfair Hotel was acquired in relation to Inside Safe, the beds were reported under the Alliance Program as of June 30, 2024.[268] Additionally, the HEA account has appropriated $31 million in matching funds for the acquisition of two Project Homekey properties that will provide 185 units.[269] Similar to the other City Programs, services for Inside Safe participants were managed through LAHSA.

Figure 3.14 below summarizes actual expenditures incurred for the Inside Safe Program for the two years that the program was in operation during the Lookback Period as reported in the HEA Reports. Actual expenditures include amounts incurred prior to the end of each fiscal year, although the City indicated that payments were remitted (or pending payment) after the end of the respective fiscal year.[270]

---

[259] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 3 of 42.
[260] Ibid.
[261] Ibid., p. 8.
[262] 460 includes service provider rooms and does not account for double occupancy of rooms.
[263] Office of the CAO Data, List of Active and Expired Inside Safe Motel Agreements.
[264] In other CAO reports, the LA Grand lease was reported to cover 473 rooms. Since the City reported 473 beds in the Roadmap Quarterly Reports, 473 was ultimately used for various calculations.
[265] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 11 of 42.
[266] LA Daily News, LA City Council green-lights $83 million deal to turn Mayfair Hotel into housing for homeless, dated August 18, 2023
[267] The HEA account also provided cash flow loans of $42.9 million for the acquisition which were reimbursed by the CDBG fund, the Municipal Housing Finance Fund, and Proposition HHH fund.
[268] Beginning in Q4 FY 2023-24 coinciding with the opening date of May 1, 2024.
[269] Office of the CAO Data, 19th HEA – Attachment 2; Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 12 of 42.
[270] Office of the CAO Data, 19th HEA – Attachment 2.

FIGURE **3.14**

Summary of Expenses Reported by the City for the Inside Safe Program by Year

| Expense Type | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|
| Private Motels | $6,483,410 | $40,199,554 | **$46,682,964** |
| Contracted Motel (LA Grand) | 8,749,681 | 23,422,369 | **32,172,050** |
| Facility Expenses | 31,203 | 277,069 | **308,272** |
| **Subtotal – Hotels/Motels Nightly Rentals** | **$15,264,294** | **$63,898,992** | **$79,163,286** |
| | | | |
| **LAHSA Service Providers** | **$11,027,650** | **$28,579,919** | **$39,607,569** |
| | | | |
| **Motel Acquisition (Mayfair and Homekey)** | - | **$41,898,370** | **$41,898,370** |
| | | | |
| LADOT | 54,922 | - | **$54,922** |
| Personnel | 976,591 | - | **976,591** |
| LAPD / LAPD Overtime | 147,590 | 67,452 | **215,042** |
| City Clerk - DSW Oversight | 27,169 | - | **27,169** |
| Mayor's Office | - | 7,200,000 | **7,200,000** |
| LAPD - Vehicle Recycling Program | - | 250,000 | **250,000** |
| **Subtotal - City Departments** | **$1,206,272** | **$7,517,452** | **$8,723,725** |
| **Grand Total** | **$27,498,216** | **$141,894,734** | **$169,392,950** |

SOURCE: CAO Data, 19th HEA – Attachment 2

FIGURE NOTE: For the row labeled "LAHSA Service Provider" the amounts shown represent actual expenses reported by LAHSA to the City as of March 15, 2024.

FIGURE NOTE: For the row labeled, "Mayor's Office," The Mayor's Office reported to the CAO that approximately $4.32 million of the $7.2 million will be carried over into FY 2024-25.

FIGURE NOTE: The expenses exhibited for FY 2023-24 did not include the projected expenses identified for the fiscal year, estimated at $37.9 million as of August 1, 2024. Expenses for FY 2023-24 also exclude $42.9 million in cash flow loans from the HEA account for purchase of the Mayfair Hotel, which were subsequently reimbursed from non-General Fund funds.

In total, the City expended $169.4 million from the General Fund for the Inside Safe Program from inception through June 30, 2024. The Inside Safe Program incurred $141.9 million in FY 2023-24, less than the $250 million initially budgeted, with a projected year-end balance of over $90 million.

Nightly motel rates and the associated service provider costs comprise the majority of expenditures under the Inside Safe Program. According to the HEA Reports, as of June 30, 2024, there were 1,502 interim housing hotel rooms available for Inside Safe (including 294 rooms at the Mayfair Hotel).[271] The average nightly room rate in FY 2023-24 was $118.41, with the exception of LA Grand, which had a nightly rate

---

[271] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 8 of 42. (1,983 less 481 at the LA Grand.)

of $125 plus $29 per person for meals.[272]  Because the Mayfair Hotel was purchased by the City, there is no corresponding nightly rental rate.

The CAO's Office was involved in the invoicing process for Inside Safe across the Lookback Period. Generally, hotels and motels submitted invoices to the CAO's Office, where they were reviewed by both the CAO staff and service providers.[273]  Once the review was complete, the CAO submitted the invoice to the Mayor's Office for payment approval, and subsequently, to the City Clerk for payment processing. The City Attorney's Office also reviewed hotel/motel payments over a certain amount, especially if there was no booking or occupancy agreement in place. Of the active hotel/motel contracts, 31 of the 45 locations invoiced the City prior to contract execution.[274]

A&M reviewed a financial data extract for the HEA account to verify expenses reported in the HEA Reports. Figure 3.15 summarizes expenditures recorded within the HEA account for the respective fiscal years.

FIGURE **3.15**

Summary of Inside Safe Program Expenditures Recorded in the Homeless Emergency Account (HEA) by Year

|  | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|
| Number of Hotel/Motels | 23 | 52 | **N/A** |
| Hotel/Motel Expenditures | $2,964,083 | $33,529,810 | **$36,493,893** |
| Other Expenditures | 13,600 | 48,620 | **62,220** |
| **Grand Total** | **$2,977,683** | **$33,578,430** | **$36,556,113** |

SOURCE: City Accounting Data, Account 000959

The recorded amount of $36.5 million in hotel/motel expenditures should reconcile to the $46.7 million reported in the HEA Reports. However, the difference may be due to the timing of payments, as the HEA Reports include pending payments and/or payments made after the close of the fiscal year, whereas the HEA expenses analyzed by A&M included only those recorded within each fiscal year. Additionally, funds to support the LA Grand were transferred to GSD for payment, and consequently, not captured within the HEA accounting data analyzed by A&M.[275] A&M confirmed there were $26.1 million in expenses recorded for LA Grand invoices from February 1, 2023, (date of contract execution for use under Inside Safe)[276] through April 30, 2024 based on separately provided Project Roomkey expense data.[277]

The other expenditures recorded in the HEA account relate to a garage/gate door vendor (FY 2022-23) and reimbursement to the LAPD for overtime (FY 2023-24). A&M did not find other expenses for Inside Safe reported in the HEA Reports (i.e., acquisition costs and reimbursements to City Departments) through

---

[272] Ibid.
[273] Ibid..
[274] Office of the CAO Data, List of Active and Expired Inside Safe Motel Agreements
[275] Interview with the Office of the CAO on October 8, 2024; City Data, Project Roomkey Cost Summary and Payment Logs.
[276] Office of the CAO Data, List of Active and Expired Inside Safe Motel Agreements.
[277] City Data, Project Roomkey Cost Summary and Payment Logs.

review of the HEA account. This is likely a consequence of funds being transferred out of the HEA account and to other departments before payment was remitted.

To better understand the invoicing process related to Inside Safe, A&M requested FY 2023-24 invoices submitted to the CAO for two of the Inside Safe hotels/motels visited during onsite fieldwork. Both motels were operating under a booking agreement with the City; therefore the amount of the invoices varied based on occupancy. Figure 3.16 below summarizes expenses for one of the locations – both the hotel/motel nightly costs and the associated service provider expenses invoiced to LAHSA.[278] Service provider expenses included personnel (case managers, resident aides, drivers, etc.), security, and food expenses.

FIGURE **3.16**

Summary of FY 2023-24 Motel Expenses and Service Provider Expenses for Sampled Inside Safe #2 Location

| Month | Monthly Expenses | | | Number of Beds Served | Expenses per Bed, per Day | | |
|---|---|---|---|---|---|---|---|
| | Hotel/ Motel | Service Provider | Total | | Hotel/ Motel | Service Provider | Total |
| Jul-23 | $28,700 | $49,689 | $78,389 | 287 | $100 | $173 | $273 |
| Aug-23 | 27,600 | 97,747 | 125,347 | 276 | 100 | 354 | 454 |
| Sep-23 | 25,200 | 71,278 | 96,478 | 252 | 100 | 283 | 383 |
| Oct-23 | 32,700 | 72,129 | 104,829 | 327 | 100 | 221 | 321 |
| Nov-23 | 44,400 | 71,065 | 115,465 | 444 | 100 | 160 | 260 |
| Dec-23 | 40,700 | 74,374 | 115,074 | 407 | 100 | 183 | 283 |
| Jan-24 | 47,800 | 79,551 | 127,351 | 478 | 100 | 166 | 266 |
| Feb-24 | 41,600 | 74,953 | 116,553 | 416 | 100 | 180 | 280 |
| Mar-24 | 46,100 | 57,644 | 103,744 | 461 | 100 | 125 | 225 |
| Apr-24 | 63,100 | 65,365 | 128,465 | 631 | 100 | 104 | 204 |
| May-24 | 58,800 | 111,832 | 170,632 | 588 | 100 | 190 | 290 |
| **Grand Total** | **$456,700** | **$825,628** | **$1,282,328** | **4,567** | **$100** | **$181** | **$281** |

SOURCES: CAO Data, Motel Invoices; Service Provider EMGS Invoices

FIGURE NOTE: The hotel/motel invoiced the City weekly; weeks were categorized into months according to the invoice week end date. No service provider invoice was produced for June 2024; therefore, the Figure 3.16 concludes as of May 2024.

FIGURE NOTE: Service provider invoices included expenses for multiple hotel/motel locations; only expenses for the specific hotel/motel visited during fieldwork are included.

The weekly hotel/motel invoices outlined the rooms occupied by Inside Safe participants, including the check-in and check-out dates and service provider confirmation of those dates (presumably because the service provider would know on a day-to-day basis whether the room was, in fact, occupied).

---

[278] A&M could not perform the same analysis for the other Inside Safe location because the service provider invoices were categorized by encampment locations and not by hotel/motel locations.

Section 3

Overall, for this Inside Safe location, the total cost per-bed, per-day was $281 during FY 2023-24. The service provider portion of expenses, $181 per-bed, per-day, was multiples higher than the budgeted bed rates for other subprograms operated by LAHSA; as will be discussed further, budgeted bed rates for services at A Bridge Home, Tiny Home Village, and Project Homekey ranged from $55 to $85 per bed at the outset of FY 2023-24. While differences in leasing costs or facility ownership make direct comparisons between total operating costs for subprograms difficult, paying for nightly room rentals at hotels/motels (in addition to service provider expenses) increases ongoing operating costs necessary to support the Inside Safe Program.

Inside Safe motel/hotel owners additionally invoiced the City for any property damage that occurred onsite, which further increased the overall cost of the program. This opportunity was unique to Inside Safe and other hotel-based interim housing options; based on A&M's review of service provider invoices for other City housing interventions, such as A Bridge Home and Tiny Home Village, service providers were responsible for managing property damage within their allocated budget. While the City received invoices with pictures of the property damage, a copy of repair invoices, and proof of payment (which may simply note that the repair vendor was paid in cash) under Inside Safe,[279] this added another layer of oversight complicating the City's ability to determine whether the services paid for were necessary and received. Additionally, the majority of damage costs may not be fully recognized until the occupants exit the hotel, as evidenced by "final settlement" costs related to repairs that were paid to former Project Roomkey locations.[280]

### 3.6.1.  INSIDE SAFE − ACTUAL EXPENDITURES (LAHSA)

Figure 3.17 below summarizes expenses invoiced to LAHSA by service providers and vendors under the Inside Safe program through June 30, 2024. Because Inside Safe is subsumed under the larger General Fund LAHSA Contract (C-140706), A&M identified specific Inside Safe service provider contracts using the two grant codes in LAHSA's accounting files specified as relating to the Inside Safe Program.[281]

---

[279] Inside Safe Damage Claim Invoices.
[280] City Data, Project Roomkey Cost Summary and Payment Logs.
[281] LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts (Grant Codes 21010 and 21011).

Section 3

FIGURE **3.17**

Summary of Expenses Invoiced to LAHSA by Service Providers and Vendors and LAHSA Internal Expenses Attributed to the Inside Safe Program by Year

| Category of Cost | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Internal LAHSA | N/A | N/A | $922,722 | $4,781,926 | **$5,704,648** |
| Vendors | N/A | N/A | 2,755,989 | - | **2,755,989** |
| Service Provider | N/A | N/A | 8,405,605 | 42,040,079 | **50,445,684** |
| **Grand Total** | **N/A** | **N/A** | **$12,084,316** | **$46,822,005** | **$58,906,321** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

FIGURE NOTE: Vendor amounts identified as "PRK" designated contract codes linked to internal LAHSA Agency Codes.

FIGURE NOTE: "Service Provider" line item includes $1,394,386 in FY 2023-24 costs for the C-145331 contract related to the Mayfair Hotel.

LAHSA service providers incurred $50.4 million in expenses for the Inside Safe Program throughout the Lookback Period; vendors incurred $2.8 million. An additional $5.7 million was recorded to LAHSA's internal agency codes for Administration, Essential Services, and Operating Costs, the majority of which supported payroll, staffing, and computer software expenses. The $58.9 million should reconcile to the $39.6 million in LAHSA expenses reported in the HEA Reports. The difference may be due to the time period captured – the HEA Reports noted that expenses incurred by LAHSA service providers were as of March 15, 2024, whereas A&M analyzed expenses incurred through June 30, 2024.

---

KEY TAKEAWAYS OF SECTION 3.6

- The Inside Safe Program incurred at least $169.4 million in expenditures during the Lookback Period, primarily funded through the City's General Fund. This amount included nightly motel or hotel rental rates, supportive service expenses passed through LAHSA, as well as acquisition costs for interim housing properties.

- While differences in leasing costs or facility ownership make direct comparisons between total operating costs for subprograms difficult, paying for nightly room rentals at hotels or motels, in addition to service provider expenses, increases ongoing operating costs necessary to support the Inside Safe Program. Additionally, the City is exposed to increased costs in the form of damage claims submitted for reimbursement by motel owners.

DRAFT & PRELIMINARY

## 3.7 LAHSA FINANCIAL ASSESSMENT (INVOICING AND REIMBURSEMENT PROCESSES)

Throughout the Lookback Period, service providers managed by LAHSA incurred over $500 million in expenses linked to City-funded LAHSA contracts related to the City Programs.

FIGURE **3.18**

Summary of City Program Expenses Invoiced to LAHSA by Service Providers Linked to City-Funded LAHSA Contracts by Year

| Program | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| Roadmap | $23,485,237 | $152,054,146 | $146,466,274 | $133,311,709 | **$455,317,366** |
| Alliance | N/A | N/A | 4,818,632 | 7,870,142 | **12,688,774** |
| Inside Safe | N/A | N/A | 8,405,605 | 42,040,079 | **50,445,684** |
| **Grand Total** | **$23,485,237** | **$152,054,146** | **$159,690,511** | **$183,221,930** | **$518,451,824** |

SOURCES: LAHSA Accounting Data - General Ledgers (all City Funds); LAHSA Chart of Accounts, Crosswalk to City-Funded Contracts

As part of the financial assessment, A&M analyzed how funds paid to service providers were managed at LAHSA, with a specific focus on the contractual requirements – between both the City and LAHSA, and LAHSA and the service providers – related to invoicing and payment processes. A&M also reviewed supporting invoice detail submitted by service providers managing the sampled sites to assess whether the supporting detail submitted with the invoices allowed LAHSA to substantiate the category or quantity of services being provided at each location.

From a high-level perspective, invoicing and reimbursement was intended to adhere to the following process:[282] First, LAHSA and the service provider executed a contract with defined budget categories for the upcoming fiscal year (or other defined budget period). Each month, the service provider was required to submit an invoice to LAHSA through the Enterprise Grants Management System ("EGMS") containing spend amounts by the service provider for each of the budget categories, as well as Profit and Loss and general ledger data to support the expenses. LAHSA then reviewed the invoice submission and approved the invoice for payment (pending the resolution of any identified issues with the invoice). Subsequently, LAHSA compiled all service provider expenses linked to each City-funded contract – in this case, contracts related to the City Programs – and submitted those expenses to the City for reimbursement (i.e., the "cash request" process). The City then reviewed the cash requests and reimbursed LAHSA for the approved amount. LAHSA was to use the City funds to reimburse service providers. Each step in the process is discussed in further detail within this section of the report.

### 3.7.1. SERVICE PROVIDER CONTRACTS AND BUDGETING

Operating costs for service providers contracted through LAHSA were typically budgeted on an annual basis. Some types of housing interventions and/or LAHSA subprograms had stated bed rates that were set

---

[282] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].

DRAFT & PRELIMINARY

by the City. For those subprograms, City-reported per night budgeted bed rates are below as of the beginning of FY 2023-24: [283]

- A Bridge Home: $60 per night
- Tiny Home Village: $55 per night
- Project Homekey: $85 per night
- Safe Sleep: $67 per night
- Safe Parking: $30 per car per night
- Project Roomkey/Other Roadmap Interim Housing: Costs vary by site
- Inside Safe: Service provider budgets were approved on a per-encampment, by service provider basis.[284]

Budgets for other subprograms, such as TLS or HN, were established using other methodologies. All service provider budgets were further allocated to predetermined LAHSA EGMS cost categories for purposes of invoice tracking and submission. The largest cost categories containing expenses for the Programs were:[285, 286]

- Operations (Non-Personnel)
- Supportive/Financial Services (Personnel)
- Operations (Personnel)
- Supportive/Financial Services (Non-Personnel)
- Rehabilitation
- Rental Assistance
- Administration Costs
- Financial Assistance
- Motel Vouchers
- Leasing
- Start-Up Costs – Furniture, Fixture and Equipment
- Rental Assistance

As previously discussed, each City-LAHSA contract may be funded through multiple different funding streams, whether that is the City's General Fund or state and federal government grants that the City passes through to LAHSA. LAHSA tracks these specific funding streams using grant codes. To the extent that a service provider contract is funded by multiple funding streams, each funding stream will have its own budget allocated to the categories above.[287]

Throughout the Lookback Period, LAHSA published multiple Cost Eligibility Matrices that provided additional detail on the activities and services permitted under the EGMS cost categories. For example, for

---

[283] Twenty Fourth Report: COVID-19 Homelessness Roadmap Funding Recommendations, Attachment 1 (Note 2), dated May 31, 2024; CAO Report, Housing Bed Rates Adjustment Report, dated December 1, 2023, pp. 3-4 of 13.
[284] Homelessness Emergency Account - General City Purposes Fund Seventeenth Status Report (C.F 22-1545) as of Sunday, June 30, 2024 and Funding Recommendations, dated June 30, 2024, p. 29 of 42.
[285] LAHSA, Cost Eligibility Matrix - FY 2023-24, dated February 13, 2024.
[286] LAHSA Accounting Data - General Ledgers (all City Funds).
[287] LAHSA, EGMS Invoices.

DRAFT & PRELIMINARY

interim housing activities, LAHSA reported subcategories of allowable costs including, but not limited to:[288]

- Supportive/Financial Services (Non-Personnel) – Non-personnel activities related to the staff carrying out the supportive/financial services to the client; may include office supplies and equipment, transportation (milage reimbursement, leasing, insurance, gas for staff, client's bus pass/tokens, documents, etc.), cell phone, etc.
- Operations (Non-Personnel) – Operations non-personnel costs are generally costs associated with running congregate site based facilities. Examples: cleaning supplies, meal preparation/food for participants (shelters), hygiene items, maintenance, site rent, security, equipment, insurance, utilities, costs necessary to operate the program.
- Operations (Personnel) – Staff overseeing the operations of the program. Operations personnel costs are generally positions associated with congregate site based facilities and these staff do not provide supportive services. Example: cook, driver, janitor, monitors (may be better allocated to supportive services based on the responsibility of the job description), security, etc.

Based on the cost eligibility guidance issued by LAHSA, service providers classified their actual expenditures into high-level EGMS cost categories. This approach afforded service providers a degree of interpretation and discretion. Further, for example, security was identified as eligible under different EGMS cost categories, complicating consistent classification of expenses.

**Contract Modifications and Amendments**

Contract amendments included any change to a service provider's contract; contract modifications specifically affected the funding and could add, remove, or reallocate funding, and typically occurred after a contract amendment.[289] LAHSA was expected to request approval of budget modifications from the City.[290] Oftentimes, these amendments and/or modifications required City Council Authority if the overall contract amount was increased, or funds were being moved between accounts and/or program categories.[291]

Once the modification was approved, LAHD sent an updated invoice spreadsheet (i.e., cash request template) to LAHSA. This process is currently being revised; however, during the Lookback Period, LAHD had responsibility for providing updated cash request templates.[292]

*3.7.1.1.  A&M Observations from Sampled Sites*

For the sampled sites, A&M summarized the original awarded amount for FY 2023-24, the number of budget modifications within the fiscal year, and the final awarded amount based on service provider invoice submissions for the service provider contracts linked to each sampled site. With the exception of Inside Safe, services at each sampled site were encompassed under a single service provider contract with LAHSA, referenced as "sampled contracts" in the following analyses. Alternatively, most Inside Safe service provider contracts were structured around encampment locations and not necessarily motel locations; therefore, the service provider invoices may include additional expenses beyond those related solely to the sampled site visited during A&M fieldwork.

---

[288] LAHSA, Cost Eligibility Matrix - FY 2023-24, dated February 13, 2024.
[289] LAHD, "Budget Modifications" Training Presentation, dated October 8, 2024.
[290] Ibid.
[291] LAHD, "Motion and Report Interpretation" Training Presentation, dated October 2, 2024.
[292] Interview with LAHSA GMC Department on September 18, 2024.

Section 3

FIGURE **3.19**

Summary of FY 2023-24 Awarded Amounts for A&M Sampled Sites

| Sampled Contract | LAHSA Subprogram | Budget Period | Awarded Amount | Beds | Budget per Bed | Budget Increases | Final Awarded Amount |
|---|---|---|---|---|---|---|---|
| Roadmap #1 | A Bridge Home | 7/1/2023-6/30/2024 | $2,196,000 | 100 | $60 | 1 | $2,305,200 |
| Roadmap #2 | A Bridge Home | 7/1/2023-6/30/2024 | 2,196,000 | 100 | 60 | 1 | 2,375,300 |
| Roadmap #3 | Roadmap IH | 7/1/2023-6/30/2024 | 7,135,320 | 232 | 84 | 1 | 7,217,520 |
| Roadmap #4 | Roadmap IH | 7/1/2023-6/30/2024 | 2,938,980 | 146 | 55 | 1 | 3,085,126 |
| Roadmap #5 | Roadmap IH | 7/1/2023-6/30/2024 | 2,954,232 | 72 | 112 | - | 2,954,232 |
| Roadmap #6 | Safe Parking | 7/1/2023-6/30/2024 | 329,400 | 30 | 30 | - | 329,400 |
| Roadmap #7 | Safe Sleep | 7/1/2023-6/30/2024 | 3,065,250 | 88 | 95 | 1 | 3,217,675 |
| Roadmap #8 | Tiny Home Village | 7/1/2023-6/30/2024 | 4,026,000 | 200 | 55 | 1 | 4,226,201 |
| Roadmap #9 | Tiny Home Village | 7/1/2023-6/30/2024 | 4,509,120 | 224 | 55 | 1 | 4,733,343 |
| Roadmap #10 | Homekey | 7/1/2022-6/30/2024 | 18,279,716 | 148 | N/A | 3 | 21,398,266 |
| Roadmap #11 | Homekey | 7/1/2022-6/30/2024 | 5,269,333 | 90 | N/A | - | 5,269,333 |
| Alliance #1 | Roadmap IH | 7/1/2023-6/30/2024 | 5,175,874 | 143 | 99 | 3 | 7,870,142 |
| Inside Safe #1 | Inside Safe | 6/1/2023-7/31/2024 | 9,019,449 | 473 | N/A | 1 | 15,128,732 |
| Inside Safe #2 | Inside Safe | 3/20/2023-6/30/2024 | 2,445,279 | N/A | N/A | 3 | 4,665,455 |
| Inside Safe #3 | Inside Safe | 1/1/2023-6/30/2024 | 3,695,274 | N/A | N/A | 2 | 13,073,433 |
| **Grand Total** | | | **$73,235,227** | | | | **$97,849,358** |

SOURCES: Service Provider EGMS Invoices

FIGURE NOTE: Not all service provider contracts were budgeted on a fiscal-year basis; therefore, the "Budget Period" field represents the budget period (as reported in EGMS invoices) encompassing FY 2023-24.

FIGURE NOTE: The "Awarded Amount" exhibited was sourced from EGMS invoice summaries, not based on the service provider contracts.

FIGURE NOTE: Project Homekey sites (Roadmap Site #10 and Roadmap Site #11) do not have a calculated "Budget per Bed" because expenses are related to construction (e.g., general contractor and insurance expenses) and not participant services.

A&M confirmed that the original awarded amounts for the sampled A Bridge Home, Tiny Home Village, and Safe Parking sites were at the stated bed rate of $60, $55, and $30, respectively. The budgeted rates for Roadmap Interim Housing locations varied. Roadmap Site #7 is part of the City's Project Homekey Program but is operating as a Safe Sleep location until the owner begins construction of PSH,[293] which may explain the misalignment between the awarded budget per bed ($95) and the City's published bed rate ($67).

Twelve of the 15 sampled contracts had at least one budget increase during FY 2023-24. For Roadmap Sites #1 through #9, the City instituted across-the-board bed rate increases for interim housing

---

[293] Twenty-Fifth Report: COVID-19 Homelessness Roadmap Funding Recommendations, dated August 1, 2024.

interventions to be effective January 1, 2024.[294] These increases were in response to an interim housing cost rate study by Abt Associates procured by LAHSA (with support from the County of Los Angeles) following concerns from service providers that bed rates did not adequately reimburse all operating costs.[295, 296]

LAHSA's Grants Management and Compliance Department ("GMC") explained that LAHSA monitors spending throughout the year as service providers submit monthly invoices. If projections indicated overspending or underspending in one or more budgeted cost categories, a Grants Management Specialist would assess whether funds could be shifted among cost categories to address any shortfalls. Additionally, in 2024, a "spend-down tracker" was implemented to assist service providers with estimating spend for the upcoming months.[297]

It was challenging for A&M to thoroughly understand both LAHSA's and the City's processes for approving and enacting service provider budget modifications. Multiple stakeholders were involved, and both LAHSA and LAHD staff noted challenges arising from these budget adjustments. While budget modifications were in process, service providers were unable to submit invoices to LAHSA, resulting in reimbursement delays driven by the varying levels of stakeholder approval and additional administrative tasks required.[298] In some instances, service provider contracts for the sampled sites were executed after the close of the fiscal year due to the time needed for budget amendments to receive all necessary reviews and approvals.

### 3.7.2.   SERVICE PROVIDER INVOICE SUBMISSION AND LAHSA REVIEW

Service providers were paid by LAHSA under a cost reimbursement model; under this model, service providers must deliver services prior to receiving payment, which entailed the submission of reimbursement requests for incurred operating expenses to LAHSA.[299]

LAHSA mainly utilized EGMS to manage service provider invoices, or reimbursement requests, for the City Programs.[300] Service providers were contractually obligated to submit invoices to LAHSA by the 15th of each month (i.e., 15 days after the end of the prior billing period).[301] The invoices contained a cover page with several overview fields, such as "Spent this Request," "Advance Recouped this Request," and "Payment Remaining After this Request." In the subsequent section of the invoice, the "Spent this Request" field was further broken out by funding source (e.g., "HCID/City General Fund," "City of LA/City General Fund) and budget category (e.g., "Supportive Services/Financial Services (Non-Personnel)." According to LAHD's *Homeless Services Invoicing Overview and Flow* document, each service provider invoice was required to include copies of the:[302]

- General ledger report that provides a history of transactions by account
- Profit and Loss statement outlining the service provider's financial position

---

[294] CAO Report, Interim Housing Bed Rates Adjustment Funding Report, dated March 19, 2024, pp. 5-6 of 17.
[295] Ibid.
[296] Roadmap Sites #5 and #6 did not receive a budget adjustment; it is unclear from the data produced why these sites vary from other Roadmap interim housing sites.
[297] Interview with LAHSA GMC Department on September 18, 2024.
[298] GMC-GS Invoice Review Checklist, dated August 28, 2023, Step 2.
[299] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].
[300] Per LAHSA personnel, there are instances where alternate methods are used for service provider invoice submission.
[301] Sampled Service Provider Contract Review, Section 10.A.
[302] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].

- Trial Balance describing revenue and expenses for the invoice period
- Projected total spending of the contract through the end of the fiscal year

The above requirements outlined in LAHD's documentation generally align with service providers' contractual requirements with LAHSA for invoicing:[303]

- Summary statement of revenue and expenditures or a detailed general ledger
- Any supplemental schedules necessary to support or reconcile the ledger and cost allocations to amount invoiced.

The contracts between LAHSA and service providers also required that the service provider maintain detailed information available upon request including but not limited to, receipts or invoices for goods and services, lease agreements, and payroll records.[304] However, these were reviewed only if and when a service provider underwent monitoring by the compliance arm of LAHSA's GMC team.[305]

Once an invoice was uploaded to EGMS, the assigned Grant Specialist from GMC received an automated email. Each Grant Specialist provided oversight to a portfolio of approximately 28 to 31 service provider contracts.[306] During their invoice review, the Grant Specialist's assigned responsibility involved evaluating two key factors:[307, 308]

1. Confirming that the general ledger information supports or reconciles with the Profit and Loss statement and the invoiced amount, and
2. Verifying that the service provider has a sufficient budget in the relevant cost categories, as determined by funding source, to cover the invoiced amount.[309]

The Grant Specialist was expected to align the invoiced amounts to the support documentation provided, and confirm eligibility of expenses using the most recent cost eligibility matrix.[310] The Grant Specialist's oversight role also included confirming that the service providers calculated the administration and/or indirect costs correctly, which were, generally, allowed at 10% of direct costs based on the funding source.[311] LAHSA reserved the right to disallow costs that did not meet requirements during invoice review.

General ledger information provides transaction-level detail that is compiled to create the Profit and Loss statement. For example, the general ledger may include an account for salaries or wages that lists individual employees and their associated bi-weekly payroll amount. For the Profit and Loss statement, the detailed general ledger information is consolidated into a single-line item for salaries and wages. By requiring the general ledger and the Profit and Loss statement, LAHSA aimed to confirm service provider spend from two different accounting sources.[312]

---

[303] Sampled Service Provider Contract Review, Section 12.A.1 and 12.A.2.
[304] Sampled Service Provider Contract Review, Section 12.A.3.
[305] Interview with LAHSA GMC Department on September 18, 2024.
[306] Ibid.
[307] Interview with LAHSA GMC Department on September 18, 2024; GMC-GS Invoice Review Checklist, dated August 28, 2023, Steps 5 & 6.
[308] This section is not intended to include a detailed overview of every step LAHSA undertakes in invoice review and approval; instead, significant procedures are highlighted based on A&M's review of various contractual and procedural documentation, as well as discussions with LAHSA personnel.
[309] GMC-GS Invoice Review Checklist, dated August 28, 2023, Steps 5 & 6.
[310] Interview with LAHSA GMC Department on September 18, 2024; GMC-GS Invoice Review Checklist, dated August 28, 2023, Step 8.
[311] Sampled Service Provider Contract Review, "Subrecipient Advance, Administration Rate, Indirect Cost Rate Table."
[312] Interview with LAHSA GMC Department on September 18, 2024.

After the Grant Specialist completed their review, the invoice was then submitted for a second and final review by a Senior Grant Specialist or Manager before being approved and scheduled for payment.[313]

Under the terms of the contract with service providers, LAHSA was required to pay service providers the approved reimbursement request within 30 business days of the receipt of the service provider's invoice, provided the invoice was uploaded to EGMS within 15 days of the end of the billing period. If the invoice was submitted late, the contract only obligated LAHSA to remit payment within 45 days of invoice receipt.[314] Additionally, service provider contracts under the City Programs were subject to terms that allowed LAHSA the right to disregard any invoices submitted later than 60 days after the service performance period.[315]

**Service Provider Advances**

While service providers were paid on a cost reimbursement basis, service providers may have been eligible to receive advance payments after the contract was executed. Service providers did not submit an invoice for an advance; instead, service providers requested advances directly through EGMS.[316]

Service providers were able to request an advance of 17%, based on 12-month grant term, under eligible City funding sources.[317] For City-funded contracts, LAHSA policies and procedures state that 20% of the advance amount is recouped in each month from October through February.[318] In other words, the monthly invoices submitted to LAHSA from October through February should have been reduced by an amount equal to 20% of the advance. There were additional policies and procedures for situations where the service provider's invoice was less than 20% of the advance, or instances where the service provider requested to postpone an advance recoupment.

*3.7.2.1.    A&M Observations from Sampled Sites – Invoice Submission and Review*

A&M reviewed service provider invoices and supporting documentation submitted to LAHSA related to the sampled sites for FY 2023-24. In total, A&M reviewed over 200 invoices related to $74.5 million in invoiced amounts.

---

[313] Interview with LAHSA GMC Department on September 18, 2024; GMC-GS Invoice Review Checklist, dated August 28, 2023.
[314] Sampled Service Provider Contract Review, Section 10.A, 10.B, and 10.C.
[315] Ibid.
[316] LAHSA, "Subrecipient Advance, Distribution, Recapture, and Repayment" Policy & Procedure document, dated June 24, 2024.
[317] LAHSA, Cost Eligibility Matrix - FY24-25 - Version 3.
[318] LAHSA, "Subrecipient Advance, Distribution, Recapture, and Repayment" Policy & Procedure document, dated June 24, 2024.

FIGURE **3.20**

Summary of Service Provider Invoices Reviewed Related to Sampled Sites for FY 2023-24

| Sampled Program Contract | LAHSA Subprogram | Beds | Invoices Reviewed | Amount Invoiced | Amount Paid by LAHSA |
|---|---|---|---|---|---|
| Roadmap #1 | A Bridge Home | 100 | 11 | $2,305,200 | $2,305,200 |
| Roadmap #2 | A Bridge Home | 100 | 12 | 2,361,377 | 2,361,377 |
| Roadmap #3 | Roadmap IH | 232 | 13 | 6,977,352 | 6,977,352 |
| Roadmap #4 | Roadmap IH | 146 | 13 | 3,085,060 | 3,085,060 |
| Roadmap #5 | Roadmap IH | 72 | 12 | 2,825,262 | 2,825,262 |
| Roadmap #6 | Safe Parking | 30 | 12 | 327,337 | 327,337 |
| Roadmap #7 | Safe Sleep | 88 | 16 | 3,042,218 | 3,042,218 |
| Roadmap #8 | Tiny Home Village | 200 | 14 | 4,037,650 | 4,037,650 |
| Roadmap #9 | Tiny Home Village | 224 | 13 | 4,402,368 | 4,402,368 |
| Roadmap #10 | Homekey | 148 | 22 | 10,972,338 | 10,972,339 |
| Roadmap #11 | Homekey | 90 | 21 | 4,160,541 | 4,160,541 |
| Alliance #1 | Roadmap IH | 143 | 13 | 7,870,142 | 7,870,142 |
| Inside Safe #1 | Inside Safe | 473 | 12 | 11,251,001 | 11,251,001 |
| Inside Safe #2 | Inside Safe | N/A | 13 | 3,550,846 | 3,550,836 |
| Inside Safe #3 | Inside Safe | N/A | 22 | 7,407,524 | 7,204,180 |
| **Grand Total** | | | **219** | **$74,576,216** | **$74,372,863** |

SOURCES: Service Provider EGMS Invoices; LAHSA Accounting Data - General Ledgers (all City Funds)

As illustrated in Figure 3.20 above, many service providers issued supplemental invoices during the fiscal year (i.e., more than 12 monthly invoices were submitted to LAHSA).[319]

Figure 3.21 below summarizes whether service providers met submission timelines (within 15 days of the end of the billing period) and supporting documentation requirements.

---

[319] Project Homekey service providers for the sampled sites submitted two sets of invoices (same contract number but different award amounts), causing the invoice count to be relatively higher compared to other sampled sites.

DRAFT & PRELIMINARY

FIGURE **3.21**

**A&M's Assessment of Contractual Compliance for Sampled Contracts for FY 2023-24 Invoice Submission and Required Supporting Documentation**

| City Program | Number of Contracts | Median Days to Upload | Timely Invoice Submission by Provider | | | Deficient Supporting Financials | |
|---|---|---|---|---|---|---|---|
| | | | Always Met | Sometimes Met | Never Met | Profit and Loss | General Ledger |
| Roadmap | 9 | 28 | - | 5 | 4 | 2 | 2 |
| Roadmap – Project Homekey | 2 | 16 | - | 2 | - | 2 | 1 |
| Alliance | 1 | 20 | - | 1 | - | - | - |
| Inside Safe | 3 | 37 | - | 2 | 1 | - | - |

SOURCES: Service Provider EGMS Invoices; LAHSA Accounting Data - General Ledgers (all City Funds)

From the sampled sites, A&M observed that none of the service providers consistently submitted invoices by the 15th day of each month. Submission times varied from month to month; some invoices were uploaded several months after the end of the respective billing period. Although the contracts between LAHSA and service providers permitted LAHSA to reject any invoice submitted more than 60 days after the service performance, or billing period, LAHSA did not appear to exercise that right and continued to approve payments even when service providers submitted invoices after the 60-day window.

Almost all service providers submitted the contractually required supporting documentation with each invoice. For the service providers that did not, the missing documentation was limited to one or more specific invoices within FY 2023-24 (i.e., not prevalent throughout the fiscal period), with the exception of one Project Homekey site under the Roadmap Program, for which the service provider consistently lacked a Profit and Loss statement.[320] The sampled Project Homekey sites were undergoing construction during FY 2023-24. Consequently, the supporting financial information reflected capitalized construction costs that were not captured in Profit and Loss statements.[321] During the assessment, A&M confirmed with the City that LAHSA (through service providers) also managed the rehabilitation of buildings in conjunction with operational funding.[322]

While the supporting financial information submitted by service providers was compliant with contractual requirements, A&M observed several complications in utilizing that information to reconcile with the amount ultimately invoiced. First, there were no standardized formats or templates for service providers to use when submitting supporting Profit and Loss or general ledger statements. Because service providers potentially utilized different accounting software and/or systems, the financial information submitted varied in format. For example, some service providers submitted monthly general ledger reports, while others presented cumulative (year-to-date) reports,[323] and at least one service provider submitted a general ledger without total amounts, limiting the ability to efficiently reconcile expense amounts.[324] Additionally, some service providers submitted supplemental invoices, potentially including previously billed amounts that were not clearly distinguishable. Compounding these challenges, the supporting financial documents were

---

[320] Roadmap Sampled Site #10.
[321] Interview with LAHSA GMC Department on September 18, 2024.
[322] Email from Office of the CAO, dated October 31, 2024.
[323] Roadmap Sampled Site #3.
[324] Roadmap Sample Site #6.

typically uploaded in PDF format (i.e., digitalized document that cannot be modified), limiting the ability to reconcile data electronically. As a result, the invoice review process required the Grant Specialist to be familiar with the unique reporting formats used by each service provider in their portfolio.

Service providers were responsible for classifying expenses into the appropriate cost categories (e.g., determining if a cost was "Supportive Services – Personnel" versus "Operations – Personnel"). However, LAHSA did not verify the accuracy of these classifications when reviewing invoices for payment.[325] In certain cases, there was a clear correspondence between a financial line item (e.g., a 'payroll' account) and a specific cost category (e.g., a 'personnel' category). In other instances, it was unclear how the monthly expenses reported in the Profit and Loss statement or general ledger were classified into the overarching cost categories. LAHSA explained that, on occasion, the Grant Specialist would follow up with service providers to clarify how the supporting financial information corresponded to the invoiced amount.[326]

With limited exceptions, A&M observed that the total amounts recorded in the general ledger aligned with those in the Profit and Loss statement. In the few exceptions observed, the issue did not appear to stem from errors in the supporting documentation but rather from the varying formats of the general ledger reports, which made it difficult to efficiently reconcile. Nevertheless, reconciling the total expenses from the supporting documentation to the invoiced amount remained a challenge.

Reconciling the supporting financial information with the invoiced amount was unclear in cases where only a portion of the service provider's monthly expenses were claimed for reimbursement from LAHSA. A&M identified numerous instances where the difference between the general ledger total and the reimbursement requested amount were labeled "not billed," although the rationale for excluding certain expenses classified as "not billed' was not always evident. In some cases, the "not billed" portion was noted within the supporting documentation, but it often appeared to be simply the difference between the general ledger total and the invoiced amount. This lack of clarity hindered the reviewers' ability to accurately determine which expenses were ultimately claimed for reimbursement and, occasionally, prompted further follow up with the service provider.[327] LAHSA also confirmed that service providers may rely on external funding sources (i.e., private donors, non-governmental grants, etc.) to support operations, resulting in the general ledger and Profit and Loss statements reflecting higher overall expenses than those invoiced to LAHSA.[328] Furthermore, if a service provider held multiple contracts, the associated financial reports could include transactions unrelated to the specific contract, adding another layer of complexity when identifying expenditures tied to each specific reimbursement request.

In summary, the extent of LAHSA's verification of the expenses reported in the general ledger and Profit and Loss statements, beyond ensuring the totals reconcile, remains unsubstantiated. In other words, A&M was not able to confirm that LAHSA actually validated the accuracy of the expenses, including that the service paid was actually provided. LAHSA noted that the invoice reviews were conducted at a high level, with Grant Specialists not performing a "deep-dive," or in-depth, examination of expenses submitted for reimbursement.[329] Detailed reviews of expenses, including assessments against contractual requirements and service providers' budgets, were intended to occur during compliance reviews, which occurred on a

---

[325] Interview with LAHSA GMC Department on September 18, 2024.
[326] Ibid.
[327] Interview with LAHSA GMC Department on February 12, 2025.
[328] Interview with LAHSA GMC Department on September 18, 2024.
[329] Interview with LAHSA GMC Department on September 18, 2024.

DRAFT & PRELIMINARY

retrospective basis. [330] In the absence of timely and continuous financial oversight, there was heightened risk that non-compliant expenses were undetected.

---

[330] Ibid.

DRAFT & PRELIMINARY

Section 3

*3.7.2.2.  A&M Observations from Sampled Sites – Utilization of Funds*

A&M reviewed the service provider invoice documentation to assess the utilization of funds under the sampled contracts.

FIGURE **3.22**

## Summary of Invoiced Expenditures by Beds of the Sampled Sites for FY 2023-24

| Sampled Program Contract | LAHSA Subprogram | Amount Invoiced | Beds | Invoiced Amount per Bed | Payroll and Benefits | Cost per Bed | % of Total | Rent | Cost per Bed | % of Total | Security | Cost per Bed | % of Total | Food | Cost per Bed | % of Total | Total – Expense Categories | % of Total Expenses Captured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Roadmap #1 | A Bridge Home | $2,305,200 | 100 | $63 | $539,760 | $15 | 23% | N/A | N/A | N/A | $419,094 | $11 | 18% | $559,583 | $15 | 24% | $1,518,437 | 66% |
| Roadmap #2 | A Bridge Home | 2,361,377 | 100 | $65 | 438,254 | $12 | 19% | N/A | N/A | N/A | 235,526 | $6 | 10% | 268,203 | $7 | 11% | 941,983 | 40% |
| Roadmap #3 | Roadmap IH | 6,977,352 | 232 | $82 | 911,646 | $11 | 13% | N/A | N/A | N/A | 2,401,418 | $28 | 34% | 1,495,506 | $18 | 21% | 4,808,569 | 69% |
| Roadmap #4 | Roadmap IH | 3,085,060 | 146 | $58 | 984,429 | $18 | 32% | $703,092 | $13 | 23% | 107,640 | $2 | 3% | 647,448 | $12 | 21% | 2,442,609 | 79% |
| Roadmap #5 | Roadmap IH | 2,825,262 | 72 | $107 | 903,830 | $34 | 32% | 1,303,603 | $49 | 46% | 210,816 | $8 | 7% | 269,137 | $10 | 10% | 2,687,385 | 95% |
| Roadmap #6 | Safe Parking | 327,337 | 30 | $30 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Roadmap #7 | Safe Sleep | 3,042,218 | 88 | $94 | 2,159,409 | $67 | 71% | N/A | N/A | N/A | N/A | N/A | N/A | 575,266 | $18 | 19% | 2,734,676 | 90% |
| Roadmap #8 | Tiny Home Village | 4,037,650 | 200 | $55 | 2,371,001 | $32 | 59% | N/A | N/A | N/A | 831,121 | $11 | 21% | 609,052 | $8 | 15% | 3,811,174 | 94% |
| Roadmap #9 | Tiny Home Village | 4,402,368 | 224 | $54 | 2,343,908 | $29 | 53% | N/A | N/A | N/A | 759,523 | $9 | 17% | 565,971 | $7 | 13% | 3,669,402 | 83% |
| Roadmap #10 | Project Homekey | 10,972,338 | 148 | $203 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Roadmap #11 | Project Homekey | 4,160,541 | 90 | $126 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Alliance #1 | Roadmap IH | 7,870,142 | 143 | $150 | 550,763 | $11 | 7% | 4,422,928 | $85 | 56% | 1,523,124 | $29 | 19% | 769,868 | $15 | 10% | 7,266,683 | 92% |
| Inside Safe #1 | Inside Safe | 11,251,001 | 473 | $65 | 1,277,087 | $7 | 11% | N/A | N/A | N/A | 5,458,103 | $32 | 49% | N/A | N/A | N/A | 6,735,190 | 60% |
| Inside Safe #2 | Inside Safe | 3,550,846 | N/A | N/A | 2,052,496 | N/A | 58% | N/A | N/A | N/A | 1,092,188 | N/A | 31% | 223,919 | N/A | 6% | 3,368,603 | 95% |
| Inside Safe #3 | Inside Safe | 7,407,524 | N/A | N/A | 4,279,447 | N/A | 58% | N/A | N/A | N/A | 1,143,238 | N/A | 15% | 1,015,695 | N/A | 14% | 6,438,381 | 87% |
| Subtotal | | $74,576,216 | | | | | | | | | | | | | | | | |
| Less: Non-Itemized Sites (6, 10, 11) | | (15,460,216) | | | | | | | | | | | | | | | | |
| Grand Total | | $59,116,000 | | | $18,812,030 | | 32% | $6,429,623 | | 11% | $14,181,791 | | 24% | $6,999,648 | | 12% | $46,423,092 | 79% |

DRAFT & PRELIMINARY

Section 3

SOURCE: A&M utilized a combination of Profit and Loss and general ledger supporting financial data attached to EGMS service provider invoice submissions for the sampled contracts.

FIGURE NOTE: Roadmap Site #6 is excluded from the analysis because the invoice submitted by the service provider related to multiple contracts for multiple sites. Project Homekey sites (Roadmap Site #10 and Roadmap Site #11) are excluded from the analysis because expenses are related to construction (e.g., general contractor and insurance expenses) and not participant services.

FIGURE NOTE: Per CAO reports, Inside Safe #1 food costs were included in the nightly rate paid to the hotel/motel and not incurred by the service provider.

FIGURE NOTE: Bed counts are not included for Inside Safe #2 and #3 due to the bed count varying based on participation at each hotel/motel operation under booking agreements.

DRAFT & PRELIMINARY

In an effort to interpret the high-level financial reports submitted by service providers, A&M attempted to identify and compare the most substantial areas of spending across the sampled sites: payroll and benefits for personnel, rent (for service providers that pay rent directly), food/meals, and security services. However, because the financial reports lacked clear or standardized breakdowns, accurately distinguishing these costs proved challenging. A&M could not definitively verify that these expenditures represented the complete cost expended by each service provider for the summarized cost categories, as the analysis was limited by the level of detail in the submitted reports. The findings nonetheless illustrated both the complexity of analyzing costs tied to homelessness assistance services based on the documentation submitted by service providers, and the wide variability in reported expenditures across the sampled sites. For example, A&M observed variability in per-bed, per-day rates within the same type of subprogram; amounts were based on total bed count, unadjusted for actual occupancy:

- A Bridge Home | Food/Meal Expenses | Roadmap Site #1: $15 | Roadmap Site #2: $7 [331]
- Roadmap Interim Housing | Security | Roadmap Site #3: $28 | Roadmap Site #4: $2

Even across different types of subprograms, the costs varied. Identifiable food expenses ranged from an estimated $7 per-bed, per-day to $18 per-bed, per-day. Personnel cost varied from $67 per-bed, per-day at Roadmap Site #7 to $7 per-bed, per-day at Inside Safe Site #1. Additionally, for Inside Safe Site #1, the invoices indicate that the service provider received additional funding directly from the County, meaning that the City's expenses in Figure 3.22 may only fund services for a portion of the reported beds. Therefore, although these amounts should not be regarded as absolute, they illustrate the challenges of determining which services the City funded, and the nuance involved in reviewing financial records when assessing the overall cost of homelessness assistance services.

LAHSA did not provide evidence that LAHSA personnel performed a sufficient degree of review (or conducted follow up with service providers) to better understand factors contributing to varying levels of expenses, not only between different service providers, but month-to-month variances for the same service providers, prior to approval for invoice payment across the Lookback Period. However, LAHSA personnel explained that service providers have discretion over allocating the total awarded (or budgeted) amount among various services, recognizing that each service providers' operating model may differ by site location or subprogram. [332]

Conducting informed analyses of the general ledger and/or Profit and Loss statements submitted with EGMS invoices may have been challenging for LAHSA. Without itemized receipts or vendor invoices to support the listed amounts, it would be difficult to determine the underlying drivers of the reported expenses. For instance, in the documentation reviewed, A&M identified a general ledger that listed a single line item for "Security" with a corresponding amount.[333] Consequently, LAHSA would not have been able to determine the number of security personnel involved, the hours billed, or corresponding hourly rates for each security guard, making it difficult to assess cost reasonableness based solely on the financial reports accompanying the invoice. In another instance, during onsite fieldwork, A&M met with a case manager at one of the sites. This individual, who reported being one of two case managers and having worked at the site for approximately two years, did not appear in the general ledger payroll records submitted to LAHSA for FY 2023-24. However, eleven other case managers were listed. This discrepancy indicates a potential

---

[331] Occupancy rates did not appear to contribute to the disparity in food costs based on enrollment data within HMIS. Additionally, during onsite fieldwork, concerns were noted regarding the quality of food at Site Roadmap #2.
[332] Interview with LAHSA GMC Department on February 12, 2025.
[333] Roadmap Sampled Site #4 - March 2024 Invoice, p. 12 of 14.

misalignment between the invoices submitted for reimbursement and the actual services provided at the site, underscoring the challenges in verifying staffing costs and ensuring that invoiced expenses align with site operations.

Further, LAHSA occasionally disallowed certain expenses during the invoice review process. Across the sampled sites, A&M identified three instances where expenses were deemed "disallowed" during the invoice review process. These disallowances were not based on the type of expense or its inherent eligibility; rather, the amounts exceeded budgetary or allowable rate limits or surpassed the total expenses reflected in the supporting documents.

- Roadmap Site #7: $13,006 disallowed.[334] The initial amount requested from the service provider included a payroll amount plus 40% fringe benefits. However, the general ledger and Profit and Loss statement did not support the 40% fringe rate (i.e., actual fringe benefits were lower than 40%). Therefore, the difference between the service provider's calculated expenses and the actual expenses supported by the underlying documentation was disallowed within the Operating Costs-Personnel budget category.
- Roadmap Site #8: $226,606 disallowed.[335] The service provider exceeded the total budget allocated to specific cost categories, resulting in the disallowance of any amounts above the approved budget.
- Inside Safe #2: $3,762 disallowed.[336] The amount claimed for reimbursement exceeded the expenses recorded in the general ledger and Profit and Loss supporting documentation.

Based on the applicable invoice review policies and procedures, discussions with LAHSA personnel, and documentation provided, A&M determined that, during the Lookback Period, LAHSA approved invoices based exclusively on the financial reports submitted. LAHSA did not contemporaneously verify that the financial reports reflected the actual services provided at the given location before approving payment. The high-level financial review performed by LAHSA allows for potential misalignment between the services being reimbursed and those outlined in the service providers' contracts, which may directly affect the quality of services reaching the population being served.

### 3.7.3.   CASH REQUEST PROCESS

To receive reimbursement from the City for incurred service provider expenses, LAHSA aggregated service provider expenses and LAHSA administrative costs and submitted a "cash request" to the City. Separate "cash requests" are submitted for each City-LAHSA contract. According to LAHD's *Homeless Services Invoicing Overview and Flow* documentation, each cash request must contain:[337]

- Supporting documentation with a report of LAHSA's direct costs and total "Subrecipient Expenditures"
- Schedule of total "Subrecipient Expenditures by Subrecipient"
- General Ledger, Trial Balance, Revenues, and Expenditures

Additionally, Inside Safe cash requests must contain the following documents:
- Service providers' invoices

---

[334] Roadmap Sampled Site #7 - July 2023 Invoice.
[335] Roadmap Sampled Site #8 - May 2024 Invoice.
[336] Inside Safe Sampled Site #2 - July 2023 Invoice.
[337] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].

DRAFT & PRELIMINARY

Section 3

- Service providers' General Ledger Report and Trial Balance
- Service providers' Profit and Loss Statement

Notably, with the exception of Inside Safe, the City did not request nor review the service provider invoices submitted to LAHSA. The *Homeless Services Invoicing Overview and Flow* documentation guidelines generally align with the City-LAHSA contractual requirements for invoicing the City, outlined below:

- Roadmap (C-137223)[338]
  - o Expenditure Report – "Due on or before the 15th day of each month, [LAHSA] shall submit the Expenditure Report to the City, which reflects accrued expenditures as of the previous month on forms provided by the City."
- Roadmap (C-144656)[339]/Alliance (C-141840)[340]/Inside Safe (C-140706)[341]
  - o LAHSA is required to submit quarterly invoices on the prescribed forms and based on a budget approved by LAHD. LAHSA may submit invoices more frequently. The forms are:
    - ▪ Cash Request
    - ▪ Summary by City Budget Line (C-144656 only)
    - ▪ Expenditure Report
    - ▪ Schedule of Subrecipients

Accordingly, LAHD created each City-LAHSA cash request template and provided the templates to LAHSA's accounting group.[342] Each of the above forms contained differing levels of detail regarding costs incurred by LAHSA and service providers. The "Schedule of Subrecipients" provided the highest degree of detail and included at least one separate line item for each service provider contract. The Schedule of Subrecipients may include multiple lines for a service provider contract, differentiated by the primary City grant funding source (e.g., ESG-CV funds, General Funds), annual budget period, or both.

Each service provider contract line item on the Schedule of Subrecipients tracked relevant financial information and included the following fields of information:

1. Original Approved Budget
2. Budget Amendments
3. Approved Budget (1+2)
4. Year-to-Date Expenditures
5. Previous Report Year-to-Date Expenditures
6. Expenditure for the Period (4-5)
7. Advance Requested
8. Cash Released and In Transit
9. Current Amount Requested (4+7-8)
10. Budget Balance per LAHSA YTD and Cash Released & Requested (3-8-9)

LAHSA submitted an Excel version of the cash request to LAHD, as well as a PDF version of the document, which contained a cover letter indicating the relevant Contract number, City Program, and amount

---

[338] City/LAHSA Roadmap Contract C-137223, Section 601.B.1.
[339] City/LAHSA Roadmap Contract C-144656, Section 601.B.1.
[340] City/LAHSA Alliance Contract C-141840, Section 601.B.1.
[341] City/LAHSA General Fund Contract C-140706, Section 601.B.1.
[342] Interview with LAHSA Finance Department on September 18, 2024.

DRAFT & PRELIMINARY

requested. As of May 2024, there were four LAHD personnel budgeted to perform LAHSA oversight, which included processing cash requests.[343]

LAHD's review of LAHSA cash requests entailed the following key steps:[344, 345]

- Ensure that the Excel workbook had the same information as the PDF submissions, plus required backup documentation.
- Ensure that the cash requested amount from each tab (tabs: Cash Request, Summary by City Budget Line, Expenditure Report, Schedule of Subrecipients) matched the requested amounts within the Excel and PDF documents.
- Ensure no advances were requested for federal funding sources.
- Other items to review:
    - LAHSA is not requesting more than what is budgeted,
    - LAHSA is not requesting more advance than allowed,
    - No requests are being made for line items that are labeled 'unallocated,' and
    - LAHSA is not trying to move funds between line items or program categories.

Per discussions with LAHD personnel, LAHD would disallow amounts when:[346]

- Amount requested was over budget,
- Duplicate advances were requested, or
- If LAHSA requested something that was in excess of an amendment, or if for some reason, the necessary funds had not been transferred to LAHD.

The City was responsible for remitting payment of the "current amount requested" (less any disallowed amounts) to LAHSA after review and approval.[347]

**LAHSA Advances From the City**

During the Lookback Period, LAHSA was eligible to receive 25% of the annual budget for each service provider contract in the form of an advance payment.[348] These advances were not automatic and had to be requested within a cash request. Recoupment of the advance was to begin immediately.

The 25% advance paid by the City to LAHSA was unrelated to the advance (often 17%) that LAHSA paid to service providers. The City's payments to LAHSA were not influenced by the methods LAHSA employed (e.g., advances or other arrangements) for disbursing funds to service providers.

*3.7.3.1.    A&M Observations of Cash Request Process*

It is important to understand the significance of cash requests in the flow of funds between the City, LAHSA, and service providers. LAHSA is a "pass-through" entity for City funds, meaning that while

---

[343] Six budgeted positions with two vacancies. (LAHD, LAHSA Oversight Policies & Procedures, revised September 2024, p. 6 of 37).
[344] LAHD, LAHSA Oversight Policies & Procedures, revised September 2024, pp. 10-12 of 37.
[345] This section is not intended to include a detailed overview of every step LAHD undertakes in invoice review and approval; instead, significant procedures are highlighted based on A&M's review of various contractual and procedural documentation, as well as discussions with LAHD personnel.
[346] Interview with LAHD personnel on July 26, 2024.
[347] LAHD, LAHSA Oversight Policies & Procedures, revised September 2024, pp. 10-13 of 37.
[348] Interview with LAHSA Finance Department on September 18, 2024.

LAHSA was the entity that contracted with and directly paid service providers, funds for payment originated from the City.[349]  Therefore, it is vital that cash requests were submitted in a timely manner to ensure that LAHSA had sufficient cash flow to cover payments due to service providers.

A&M first assessed cash requests related to the Roadmap Program. The initial Roadmap Program-Named LAHSA Contract (C-137223) was the only contract with specified due dates for cash requests (due on or before the 15th day of each month).[350] A&M inventoried the cash requests submitted under Roadmap Program-Named LAHSA Contracts, including the submission date to LAHD, the amount requested, and the "months covered" (i.e., the service provider invoice periods included in the cash request). The original Roadmap Program-Named LAHSA Contract (C-137223) commenced in October 2020 and terminated at the end of September 2023; therefore, 36 monthly cash requests should have been submitted to the City. In total, LAHSA submitted 23 cash requests under Contract C-137223, failing to consistently meet the monthly requirement.

Through A&M's analysis of the cash requests and discussions with City and LAHSA personnel, the complexity of the cash requests – specifically those for Roadmap Program-Named LAHSA Contracts – was a paramount issue. The contract period for the original Roadmap Contract (C-137223) contributed to the lengthy and complex nature of the Roadmap cash requests. The original Program-Named LAHSA Contract spanned the entire period of October 2020 to September 2023. This period encompassed FY 2020-21 (partial), FY 2021-22, FY 2022-23, and the first three months of FY 2023-24. However, service provider contracts were typically tracked by annual budget periods. At the time of the final cash request (Roadmap Cash Request #23), not only were current (FY 2023-24) service provider contracts accounted for, but there were also outdated line items related to prior budget periods. In total, Roadmap Cash Request #23 included over 425 lines of service provider information on the Schedule of Sub-Recipient[s].[351]

LAHSA personnel manually updated the cash request templates prior to each submission. The key data point updated within the cash request was the "Year-to-date expenditures." LAHSA accounting personnel extracted up-to-date LAHSA general ledger expense data and summarized the cumulative amount of expenses for each service provider contract for the relevant period. The difference between this cumulative expense amount and the amount claimed on the prior cash request (plus any advances) equaled the current amount requested.[352] The month of service provider expenses subsumed within LAHSA's general ledger expense data will vary due to the number of service providers involved and the fact that not all service providers submit invoices according to contractual due dates. In other words, a cash request submitted in September of a given year may include current expenses through August for one service provider and only through June for another service provider (the latter having not met invoice submission requirements). As a result, it is difficult to determine – without delving into the details – what months of expenses were included at the time of the cash request for any given service provider contract.

Based on A&M's review of cash requests, LAHSA utilized functions (e.g., formulas) within Excel to electronically summarize the detailed general ledger information into year-to-date expenditures, "YTD Expenditure." However, A&M identified instances of manual adjustments (i.e., hardcoded amounts) within the formulas. LAHSA explained that this was occasionally necessary for contracts listed in multiple sections

---

[349] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].
[350] City/LAHSA Roadmap Contract C-137223, Section 601.B.1.
[351] Roadmap Cash Request #23.
[352] Interview with LAHSA Finance Department on September 18, 2024.

Section 3

of the cash request.[353]  LAHSA also needed to edit the Excel formulas over time as new grant codes were added/removed, budget periods were extended, or other adjustments were necessary.

Additionally, LAHSA personnel described difficulty in ensuring that amounts were not overbilled when a service provider contract was funded from multiple City contracts.[354] For example, as previously demonstrated, some Roadmap service provider contracts were also funded through the City-LAHSA HHAP contract. In this instance, expenses for the same service provider contract, from the same LAHSA general ledger accounting data, must be parsed between two different cash request templates.

Many of the other inputs in the cash request template were also manually updated: expenditures from the previous cash requests, and the amount of "Cash Released and In Transit" from the City related to prior cash requests. At the time of this report, LAHSA had only two personnel responsible for assembling the cash requests, covering all of the City-funded LAHSA contracts with total expenditures in FY 2023-24 alone of over $250 million. While the LAHSA personnel responsible for the cash request process demonstrated a strong understanding of the process and possessed the necessary skills to manage the tasks, it was apparent that additional staffing was needed to ensure optimal accuracy and efficiency.[355,356]

A&M also encountered difficulty reconciling the amount that LAHD paid LAHSA for each submitted cash request due to the structure of the cash requests and the corresponding amounts recorded in the City's financial management system. Each cash request was broken down into multiple payment entries in LAHD's accounting data (based on the specific appropriated line item, e.g.,43TA29 - Tiny Home Operations - 1060 Vignes'), but there was no field in LAHD's accounting data linking these entries directly to the corresponding cash request. Therefore, the process to reconcile whether the City reimbursed LAHSA for the full amount requested required A&M to crosswalk subtotal amounts to the cash request, which as previously discussed, were difficult to follow. Consequently, A&M was not able to fully reconcile the amounts paid for each cash request submitted to LAHD under the City Programs.[357]

Overall, the cash requests were complicated and cumbersome documents that did not provide the City with the transparency needed to ensure funds were spent as intended. By the time the cash request reached the City, LAHD personnel were primarily checking whether the cash request made logical sense (i.e., do the numbers – already summarized at a high level – reconcile; confirming that budgetary limits were not exceeded) before remitting payment to LAHSA. Former LAHD personnel described that the department "pays the bills" and did not have adequate staffing to perform any level of detailed oversight.[358]

### 3.7.3.2.  A&M Observations of Transition From Old Roadmap to New Roadmap Contracts

The City and LAHSA executed a new Roadmap contract (C-144656, the "New" Roadmap contract) effective October 1, 2023.[359] At the request of the CAO, the creation of the New Roadmap contract coincided with the winddown of ESG-CV federal funds,[360] which supported a large portion of the original

---

[353] Ibid.
[354] Ibid.
[355] LAHSA Accounting Data - General Ledgers (all City Funds).
[356] Ibid.
[357] LAHD's data can be summarized on a City-LAHSA Contract basis, allowing for total City Program expenses to be quantified; at the time of this report, payments to LAHSA in LAHD's accounting data were less than those service provider expenses recorded in LAHSA's accounting system (i.e., the amounts presented throughout this Report), as would be expected due to timing of the invoicing and payment processes.
[358] Interview with LAHD Management on June 17, 2024.
[359] City/LAHSA Roadmap Contract C-144656.
[360] Interview with LAHD LAHSA Oversight Unit on October 24, 2024.

DRAFT & PRELIMINARY

Roadmap contract. As such, the original Roadmap Contract (C-137223, the "Old" Roadmap contract) was closed out and new cash request forms were established for the New Roadmap contract.

Per LAHSA and LAHD's own perspective,[361] the transition between Roadmap Program-Named LAHSA Contracts was problematic and caused a significant disruption in the accounting processes and, therefore, in the payment schedule between the City and LAHSA. This disruption was exacerbated because the transition became effective three months into the fiscal year – appropriations had already been made to service providers for FY 2023-24 under the Old Roadmap contract, which then had to be transferred to the New Roadmap contract. Additionally, LAHSA and LAHD tried to ensure that any payments made for the first three months of FY 2023-24 were appropriately accounted for on the New Roadmap cash requests.

FIGURE **3.23**

Summary of Roadmap Program Cash Requests Related to Service Provider Expenses Incurred During FY 2023-24

| Cash Request | For the Month(s) of | Amount Requested | Submitted to City |
|---|---|---|---|
| Old Roadmap #22 | June 1, 2023 - August 1, 2023 | $50,341,660 | 10/26/2023 |
| Old Roadmap #23 | June 1, 2023 - September 30, 2023 | 13,092,184 | 5/8/2024 |
| New Roadmap #1 | October 1, 2023 - December 31, 2023 *(Advance amounts only)* | 19,905,182 | 7/10/2024 |
| New Roadmap #2 | October 1, 2023 - June 30 2024 | 35,728,723 | 8/2/2024 |
| *New Roadmap #3* | Not Related to FY 2023-24 Expenses/Cash Requests for FY 2024-25 Advances | | |
| *New Roadmap #4* | Not Related to FY 2023-24 Expenses/Cash Requests for FY 2024-25 Advances | | |
| New Roadmap #5 | June 1, 2024 - June 30, 2024 | 6,906,214 | 10/29/2024 |

SOURCE: Roadmap C-137223 Cash Request Nos. 22-23; Roadmap C-144656 Cash Request Nos. 1-5; LAHD Data, Cash Request Tracker

Cash Request #23 – the last cash request submitted under the Old Roadmap contract – was submitted to LAHD on May 8, 2024.[362]  Based on the dates, LAHSA did not request reimbursement from the City for the remainder of expenses under the Old Roadmap contract related to services provided on or before September 30, 2023, until seven months after the expenses were incurred. According to LAHD, the delay was due, at least in part, to the tedious process of ensuring that all amounts claimed under the federal ESG-CV grant met the requirements as "allowable" expenses.[363] This process involved requesting and reviewing supporting documentation for certain expenditures, which hindered the closeout process.

Cash requests under the New Roadmap contract did not go into effect until the Old Roadmap contract had effectively been closed out. Even though service providers worked at Roadmap locations throughout the entirety of FY 2023-24, and LAHSA continued to pay service providers, LAHSA did not submit a cash request until July 2024, or nine months after contract went into effect on October 1, 2023.

## Observations From Sampled Sites

---

[361] Interview with LAHD LAHSA Oversight Unit on October 24, 2024; Interview with LAHSA Finance Department on September 18, 2024.
[362] Roadmap Cash Request #23.
[363] Interview with LAHD LAHSA Oversight Unit on October 24, 2024.

Section 3

A&M attempted to trace expense amounts from service provider invoices for sampled contracts for FY 2023-24 to the associated cash requests where those expense amounts were requested from the City. As discussed, the "months covered" indicator included on the cash requests often covered large periods of time. A&M also noted instances where the "months covered" indicator was incorrect.[364] Therefore, this did not help to pinpoint the specific months of expenses included in "Expenditures for the Period."[365] Consequently, A&M's process involved trial-and-error to determine which cash request contained expenditures for the relevant service provider invoices.

**Roadmap Program – Sampled Sites**

For the Roadmap sampled sites (excluding Project Homekey contracts), A&M was able to trace FY 2023-24 service provider expenditures to the associated cash requests submitted to the City. In tracing these service provider expenditures through the relevant cash requests, A&M identified potential accounting deficiencies regarding advances the City paid to LAHSA for at least four of the nine Roadmap service provider contracts. LAHSA requested, and the City paid, a 25% advance of the annual FY 2023-24 budget on both Old Roadmap Cash Request #22 and New Roadmap Cash Request #1 for at least four service provider contracts.[366] As a result, at the time of this report, it appears that LAHSA received duplicate cash advances that were not accurately accounted for within the New Roadmap cash requests (i.e., LAHSA received payment in excess of the FY 2023-24 service provider costs incurred in an amount equal to a 25% advance).

A&M discussed these observations with LAHSA personnel and LAHSA provided two different explanations for the receipt of multiple advances:

- The advance amount from Old Roadmap Cash Request #22 was related to FY 2022-23 and not FY 2023-24.[367] A&M has not been able to verify this information; however, A&M did confirm that the advanced amounts equated to 25% of the FY 2023-24 budget (and not FY 2022-23).
- The advance amounts from Old Roadmap Cash Request #22 and New Roadmap Cash Request #1 were not duplicative and merely represented two separate quarterly advances available to LAHSA.[368] Even if this is correct, and LAHSA was eligible to request multiple advances within the same fiscal year, the "Cash Released and In Transit" field within New Cash Request #1 does not appear to account for the receipt of advance funds from Old Roadmap Cash Request #22.

Based on the information reviewed to date, LAHSA and the City should review advance payments made to LAHSA for service provider contracts claimed for reimbursement on both Old Roadmap Cash Request #22 and New Roadmap Cash Request #1 for potential overpayments.

A&M also analyzed the time between cash request submission and City payment and found the following:

- Old Roadmap CR #22: 26 days
- Old Roadmap CR #23: 21 days
- New Roadmap CR #1: 13 days

---

[364] For example, at least four of the sampled Roadmap contracts had monthly invoices from the first three months of FY 2023-24 (July, August, September 2023) claimed under New Roadmap Cash Request #2, which indicated that the period covered was October 1, 2023 – June 30, 2024.
[365] 'Expenditures for the period' did not always align with the 'current amount requested' for a given contract, as previously received advances may cover partial or full expenses for the period.
[366] Roadmap Sampled Sites #2, #4, #8, #9.
[367] Email from LAHSA Finance Department, dated November 22, 2024.
[368] Interview with LAHSA GMC Department on September 18, 2024.

DRAFT & PRELIMINARY

Section 3

- New Roadmap CR #2:  The City finalized payment for $32.7 million of the $35.7 million requested on August 9, 2024 (7 days after submission).[369] As of October 2024, the payment had not been allocated to specific service provider contracts.
- New Roadmap CR #5: 32 days[370]

For Roadmap (Project Homekey) sampled sites, A&M experienced difficulty in tracing FY 2023-24 service provider expenditures to the associated cash requests. A&M requested – and LAHSA provided – a crosswalk to directly link each monthly service provider invoice to the associated cash request.[371]  However, after review of the crosswalk, A&M remained unable to identify or confirm which cash requests included the relevant monthly invoice amounts.

**Alliance Program – Sampled Sites**

The City-LAHSA Alliance contract included one service provider contract during the Lookback Period; therefore, review of the cash requests was relatively straightforward compared to Roadmap and Inside Safe. A&M confirmed that the amount invoiced by the service provider matched the amount LAHSA requested from the City for FY 2023-24.[372]

The City remitted payment to LAHSA within 15 days for all Alliance cash requests reviewed for FY 2023-24.

**Inside Safe Program – Sampled Sites**

A&M could not comprehensively trace FY 2023-24 service provider expenditures to the associated cash requests for Inside Safe. A&M requested – and LAHSA provided – a crosswalk to directly link each monthly service provider invoice to the associated cash request.[373]  However, after review of the crosswalk, A&M remained unable to identify or confirm which cash requests included the relevant monthly invoice amounts.

Even so, A&M analyzed the time elapsed between LAHSA's cash request submission and City payment utilizing accounting data. A&M observed that, compared to the Roadmap and Alliance Programs, City payment took a significantly longer period of time, particularly for the cash requests submitted at the beginning of the Inside Safe Program – LAHSA received payment for Inside Safe Cash Request #2 and Inside Safe Cash Request #3 after 216 days and 172 days, respectively.

The time lag observed between some Inside Safe cash requests and payments is due, at least in part, to the deviation from the normal cash request review process undertaken by LAHD and other City departments. Unlike the Roadmap and Alliance Programs, LAHD and the CAO received the actual EGMS invoices submitted by service providers with supporting financial documentation, in addition to the cash request, during the Lookback Period. Typically, LAHD performed the standard verifications of the cash request while the CAO reviewed the supporting financial documentation.[374] Per an email regarding Inside Safe Cash Request #6, dated June 18, 2024, LAHD management stated to the Office of the CAO:[375]

---

[369] LAHD Data, Cash Request Tracker.
[370] Per LAHD, partial payment of New Roadmap CR#5 was made on December 2, 2024. Due to the recency of the payment, A&M was not able to confirm in accounting data. (Email from LAHD, dated January 6, 2025).
[371] LAHSA Data, Subrecipient Invoice to Cash Request Crosswalk.
[372] Excluding expenses for the month of June 2024, which did not appear to be included in a cash request to the City at the time of this analysis.
[373] LAHSA Data, Subrecipient Invoice to Cash Request Crosswalk.
[374] LAHD, LAHSA Oversight Policies & Procedures, dated April 2024, pp. 9-20 of 53.
[375] Payment Package, Inside Safe Cash Request #6, dated June 2024, p. 7 of 7.

DRAFT & PRELIMINARY

> *…LAHD is going to go ahead and process the LAHSA CR6 request without detailed review of the subcontractor invoices…the subcontractor review takes weeks. We do not do that level of subcontractor review with any other contracts – [LAHD] rel[ies] on LAHSA or our other contractors to review their providers' payment requests…If we want to get this payment made before the end of the fiscal year, we need to proceed with this approach now.*

Based on the email correspondence, it appeared that in order to process timely payments to LAHSA, the City did not consistently review the additional service provider details submitted in conjunction with the Inside Safe cash requests. This exchange further highlighted confusion surrounding the responsibility for reviewing these Inside Safe cash requests; as outlined in LAHD's process documentation, LAHD staff would only assist the CAO in examining supporting, or "backup," documentation when deemed necessary.[376] The cash request was recommended for payment, noting "LAHD to reconcile at a future time."[377]

### 3.7.4.    LAHSA PAYMENTS TO SERVICE PROVIDERS AND ADVANCE RECOUPMENT

LAHSA is contractually obligated to pay service providers for approvable reimbursement requests within 30 business days if the invoice is uploaded to EGMS within 15 days of the end of the billing period.[378]  If the invoice is submitted late, the contract only obligated LAHSA to remit payment within 45 days of invoice receipt.  Additionally, service provider contracts under the Roadmap Program are subject to terms that allow LAHSA the right to disregard any invoices submitted later than 60 days after the performance period. [379]

#### *3.7.4.1.    A&M OBSERVATIONS – LAHSA SERVICE PROVIDER PAYMENTS AND ADVANCE RECOUPMENT*

Figure 3.24 below summarizes whether LAHSA made payments to service providers according to the contractual provisions. A&M also confirmed whether LAHSA fully recouped service provider advances (where applicable).

FIGURE **3.24**

**A&M's Assessment of Contractual Compliance for Sampled Contracts for FY 2023-24 Related to LAHSA Payments to Service Providers and Service Provider Advance Recoupment**

| City Program | Number of Contracts | Median Business Days to Payment | LAHSA Payment to Service Provider - Days Paid | | | Advance Recoupment | |
|---|---|---|---|---|---|---|---|
| | | | Always Met | Sometimes Met | Never Met | Contracts with Advance | Contracts with Adv. Recouped |
| Roadmap | 9 | 41 | - | 9 | - | 7 | 7 |
| Roadmap - Project Homekey | 2 | 23 | - | 2 | - | 1 | 1 |
| Alliance | 1 | 24 | - | 1 | - | 1 | 1 |
| Inside Safe | 3 | 37 | 1 | 2 | - | N/A | N/A |

SOURCES: Service Provider EGMS Invoices; LAHSA Accounting Data - General Ledgers (all City Funds)

---

[376] LAHD, "Cash Requests_Invoice Review Presentation" Training Presentation, dated October 8, 2024, Slide 12.
[377] Payment Package, Inside Safe Cash Request #6, dated June 2024, p. 1 of 7.
[378] Sampled Service Provider Contract Review, Section 10.A, 10.B, and 10.C.
[379] Ibid.

Section 3

LAHSA only occasionally met contractual requirements for payments to service providers based on the service provider's invoice submission date. Service providers under the Roadmap Program experienced the longest delay in payment, followed by those under Inside Safe. Payment lags are due, at least partially, to the complications previously discussed surrounding the Roadmap and Inside Safe cash request submission processes. A&M also verified that LAHSA recovered the full amount of service provider advances for FY 2023-24 by June 30, 2024.

Further, A&M evaluated whether LAHSA payments conform to the 'invoicing flow' model in place for LAHSA and service providers. LAHD's *Homeless Services Invoicing Overview and Flow* documentation states that service providers "must perform work first and then invoice LAHSA for reimbursement of program expenses they have incurred. LAHSA, in turn, invoices the City to request cash to pay these Service Provider invoices…LAHSA pays service providers once the City pays cash requests."[380] Accordingly, the dates of LAHSA's payments to service providers should occur after LAHSA receives reimbursement from the City.

However, A&M documented many instances – across all City Programs – where the flow of funds did not follow this pattern. Specifically, for Roadmap contracts during FY 2023-24, LAHSA paid the majority of service provider invoices before the associated cash request was submitted to the City. This is true for service provider advances as well – the 17% advance paid to the service providers was made before LAHSA received its 25% advance for FY 2023-24 from the City. This finding highlights that LAHSA did not consistently direct funds from the City to the exact expenditures those funds were intended to support. LAHSA confirmed that while they attempt to direct funds received from the City to the specific contracts supported, LAHSA at times uses other sources of available cash to reimburse service providers with long-outstanding invoices.[381] This finding is indicative that the invoicing and payment flow was not functioning as intended.

---

[380] LAHD Homeless Services Invoicing Overview and Flow [No Date Available].
[381] Interview with LAHSA GMC Department on September 18, 2024.

## KEY TAKEAWAYS OF SECTION 3.7

- Multiple approval layers involved in the budget modification process increased administrative workloads and potentially delayed the processing of service provider invoices and corresponding payments. Some service provider budget modifications were executed after the fiscal-year end, obscuring alignment between budgeted funds and actual expenditures, and disrupting the payment processes. Any interruptions in payments could potentially impact the service provider operations and service delivery, which may have ultimately impacted the participants relying on these subprograms.

- Service providers consistently submitted invoices late per contractual requirements, complicating the ability for LAHSA or the City to accurately track year-to-date expenditures.

- LAHSA's service provider invoice review and payment approval process failed to verify whether the services invoiced were provided, or whether the amounts invoiced were adequate or reasonable to meet the requirements of their contracts. Essentially, LAHSA did not evaluate the linkage between the services being paid for and the services received, potentially impacting resource allocation and, consequently, the quality of services reaching the population served.

- The manual cash request process was time-consuming and at risk of human error, exposing the City and LAHSA to potential accounting inaccuracies and complicating precise reconciliation of contract expenditures.

- The cash requests did not clearly indicate which months of service provider expenses were included in the request for reimbursement, hindering the ability to precisely identify and track the service provider expenses reimbursed at a given point in time.

- Cash requests were confusing and cumbersome documents that did not provide the City with the transparency needed to ensure funds were being spent as intended; however, as the process was designed during the Lookback Period, the majority of service provider oversight was delegated to LAHSA.

- LAHSA did not meet contractual requirements for providing payments to service providers, potentially impacting the service providers' ability to deliver services.

- LAHSA did not consistently direct funds from City payments to the specific service provider contracts supported. Instead, LAHSA confirmed that payments to service providers were occasionally made using available cash from unrelated funder contracts, indicating a gap in internal controls and potentially exposing LAHSA to cash flow management issues.

SECTION 4

# Performance Assessment

## 4.1 A&M APPROACH TO PERFORMANCE ASSESSMENT

A&M reviewed each City Program's prioritization and matching practices for homelessness assistance services, and the quality and effectiveness of homelessness assistance services in reducing unsheltered durations and fostering long-term housing stability. Multiple analyses were based on a variety of documentation reviewed by A&M, interviews with stakeholders, and onsite fieldwork[382] to determine whether participants experienced better outcomes than they otherwise might have. However, limitations in data availability and quality impacted A&M's ability to form definitive conclusions about the City Programs' impact on their respective goals. As a result, while the findings offer insights into the strengths and opportunities for improvement, further refinement of data collection and reporting processes would be necessary to comprehensively evaluate the City Programs' effectiveness in achieving their intended goals.

## 4.2 CITY PROGRAMS' PRIORITIZATION AND MATCHING

This section examines the prioritization and matching of PEH to the various beds and services established under the City Programs, specifically outreach, interim housing, HN, PSH, and TLS. According to LAHSA, the CES Policy Council served as the governing body tasked with ensuring consistency and quality.[383] It guided strategic policy development, supported implementation through the alignment of practices and resources, and monitored the system's effectiveness and efficiency.[384] The processes used to prioritize and match participants to the established beds and/or supportive services proved challenging due to the complex and opaque nature of the procedures within each of the City Programs and in the City at large. Multiple stakeholders, each relying on distinct eligibility criteria, contributed to a system that lacked consistent documentation and clear, standardized guidelines. As a result, the steps taken to determine who received priority and the methods by which PEH were ultimately matched to interventions and services were not readily discernible, hindering transparent decision-making and complicating efforts to understand service delivery.

### 4.2.1.    OUTREACH

In coordination with Council Offices, FIT, and all City-funded HETs through LAHSA, the City prioritized outreach to unsheltered PEH residing in encampments.[385] As mentioned previously, these outreach teams were dedicated across multiple encampment-related endeavors. Therefore, the prioritization and outreach services appeared to create duplicative services, especially when multiple

---

[382] Although the Lookback Period served as the primary timeframe for this assessment, onsite fieldwork extended past the Lookback Period to gain a deeper understanding of current service quality. The Court also requested onsite fieldwork to facilitate firsthand verification of service delivery and site operations. Onsite fieldwork was conducted in September 2024 through January 2025.
[383] LAHSA, The CES Policy Council, webpage published December 8, 2017 (updated August 22, 2024).
[384] Ibid.
[385] Dkt. 677, Alliance Settlement Agreement, filed March 7, 2024, p. 73 of 209.

DRAFT & PRELIMINARY

initiatives such as a CARE+ operation and the respective CARE+ outreach team overlapped with other existing outreach teams (e.g., Roadmap HET) within the City's Council Districts.

Although each subprogram specified its own focus and objectives, they generally relied on similar referral pathways, raising the possibility that the same unsheltered PEH may be counted or served multiple times by different outreach teams. Furthermore, differing prioritization criteria for various encampments resulted in inconsistencies or unclear rationales for allocating outreach resources. This fragmentation potentially generated confusion among stakeholders and unsheltered PEH, who may have been uncertain about which subprogram they were engaging with or lack clarity on the overall process. Such confusion risks eroding trust in outreach efforts, highlighting the need for more coordinated planning, data sharing, and accountability channels to optimize the effectiveness of their outreach and ensure equitable service delivery.

### 4.2.2.    SHELTER AND INTERIM HOUSING

**Roadmap Program and Alliance Program**
No formal prioritization policy was created or implemented within the Lookback Period for the shelter and interim housing beds created by the City under the Roadmap Program and Alliance Program.[386] Per LAHSA, the beds created under these City Programs were "dedicated to encampment resolution projects."[387]

Under the terms of the Program-Named LAHSA Contracts, participants were referred to the interim housing beds through LAHSA's centralized matching process for interim housing, which was intended to apply eligibility and prioritization criteria established by the City and/or the relevant Council District office.[388] These criteria were anticipated to include, but not be limited to, the participant's geographic location, the length of time they had experienced homelessness in a specific area, alignment with designated outreach or encampment response efforts, and/or other participant-level approvals as determined by the Council District governing the bed's location.[389]

Throughout the Lookback Period, the eligibility criteria for prioritizing and matching PEH to interim housing underwent multiple changes.[390] Within the encampment-focused operations, individuals were initially prioritized by acuity, but this approach shifted over time to emphasize the length of time experiencing homelessness and, ultimately, to prioritize those deemed most vulnerable (e.g., age, underlying conditions, safety, etc.).[391]

According to the City Controller's most recent homeless audit, interim housing beds within the City operate within designated geographic "catchments" that generally correspond to Council District boundaries.[392] Under this framework, unsheltered individuals may have been matched only to the beds situated within the catchment areas where they reside.[393] Moreover, Council Districts retained the ability to reserve beds at

---

[386] LAHSA explained, "We have not had a formal prioritization policy from 2020-2024. We currently have a draft policy that is in the review process and likely to be launched by the end of the calendar year." (Email from LAHSA Risk Management Department, dated November 6, 2024).
[387] Email from LAHSA Risk Management Department, dated November 6, 2024.
[388] City/LAHSA Alliance Contract C-141840 (Amendment 3), p. 11 of 15; City/LAHSA Roadmap Contract C-137223 (Amendment 17), p. 43 of 77.
[389] Ibid.
[390] Email from LAHSA Risk Management Department, dated November 6, 2024.
[391] Ibid.
[392] City of Los Angeles Controller, Homeless Audit: Pathways to Permanent Housing, dated December 10, 2024, p. 11 of 86.
[393] Ibid.

DRAFT & PRELIMINARY

these interim housing sites for an unspecified duration, which may, at times, limit the number of beds for immediate placement of unsheltered individuals who were prepared to transition into the respective interim housing site.[394] The City did not establish formal referral and placement protocols for this process in the Lookback Period, a gap which may have contributed to underutilized bed capacity and reduced the efficiency and equity of shelter and housing placements.[395]

**Inside Safe Program**

In contrast to the Roadmap Program and Alliance Program, the Inside Safe Program generally prioritized interim housing placements in select City-contracted motels/hotels for PEH from specific target encampments identified by City Council Districts and the Mayor's Office.

The Mayor's Office independently matched available beds to these unsheltered individuals, including those who were found to have returned to encampments previously deemed resolved.[396] Unsheltered individuals, outside the targeted encampments, were precluded from accessing these specific City-contracted beds and services since these beds were specifically reserved for Inside Safe's target encampments. LAHSA clarified that when beds become available between encampment resolution projects, Inside Safe participants were prioritized based on: participant vulnerability (e.g., safety, age, underlying conditions), length of time on the "interim housing queue" and catchment area, or the location of homelessness, as the participant must align with the catchment requirements of the interim housing site.[397]

### 4.2.3.   HOUSING NAVIGATION

Beginning October 1, 2022, LAHSA implemented a slot-based management model for HN.[398] Under this approach, each "participant slot" represented a participant that the service provider was required to serve at any given time during the contract year.[399] This model was intended to help providers and the broader system maintain full capacity without exceeding available resources.[400] Additionally, the established caseload ratio was one Housing Navigator per 20 participants.[401]

According to a memorandum drafted by LAHSA in response to Council File No. 23-0302, HN slots were allocated annually to service providers based on the availability of the County and the City funding for the fiscal year, as well as the most recent PIT count.[402] Many of these slots, particularly for the adult population, were paired with interim housing sites to facilitate "flow through" into permanent housing.[403] According to a recent audit by the City Controller, interim housing participants were typically prioritized based on their document readiness and length of time they had been enrolled at an interim housing site.[404]

---

[394] Ibid.
[395] Ibid.
[396] Email from LAHSA Risk Management Department, dated November 6, 2024.
[397] Ibid.
[398] LAHSA, Housing Navigation Programs, webpage published September 23, 2022 (updated February 3, 2025).
[399] Ibid.
[400] Ibid.
[401] Ibid.
[402] LAHSA Memo, Overview of CF-23-0302, regarding Emergency Housing Vouchers and Housing Navigation with the City of Los Angeles, dated May 30, 2023, p. 2 of 4.
[403] Ibid.
[404] City of Los Angeles Controller, Homeless Audit: Pathways to Permanent Housing, dated December 10, 2024, p. 31 of 86.

LAHSA estimated 30% of interim housing beds across the system had a corresponding HN slot as of May 2023.[405] However, under the Roadmap Program, in January 2025, LAHSA identified 310 HN slots for 4,932 interim housing beds as of June 30, 2024, estimating 6% of the interim housing beds had an allocated HN slot.[406] Under the Alliance Program, LAHSA identified 33 HN slots out of 143 interim housing beds within the Lookback Period, approximately 23%.[407] LAHSA was unable to report on the number of HN slots allocated for the beds created under the Inside Safe Program. The data provided did not specify whether these services and their associated contracts were active throughout the Lookback Period, limiting insights into service availability and accessibility.

A&M reviewed the only HN contract under the Roadmap Program-Named LAHSA Contracts and the number of HN slots was not easily identifiable. If these slots were not explicitly defined within the contract and its amendments, the service provider may have faced difficulties aligning resources with demand, potentially resulting in service gaps and inconsistencies in participant enrollment. Similarly, if staffing levels were insufficient, the service provider may have been unable to adequately serve all slots, which may have resulted in reduced quality, longer waiting times, and disengagement from participants. As a result, during the Lookback Period, it was not possible to determine the number of individuals in interim housing established under the City Programs who were matched and had the opportunity to access HN services or whether they received such support.

### 4.2.4.    PERMANENT SUPPORTIVE HOUSING

PSH within the CES was generally understood to operate under a standardized prioritization and matching process intended to ensure prompt and equitable housing for the most vulnerable PEH.[408] According to LAHSA's *CES PSH Prioritization and Matching Guidance* document, originally approved on June 28, 2023, this process changed throughout the Lookback Period.[409]

Historically, the CES relied on established triage tools, such as the CES Survey for Adults (also known as the VI-SPDAT), VI-FSPADT for Families, and the Next Step Tool for Youth, to evaluate the needs of PEH upon their initial engagement and prioritize them for PSH placement.[410] While these triage tools were previously considered industry standards, concerns emerged in 2019 regarding their potential bias, especially against Black individuals.[411] The Ad Hoc Committee on Black People Experiencing Homelessness raised concerns, which were corroborated by research conducted through the CES Triage Tool Research & Refinement ("CESTTRR") project.[412] In 2023, the CESTTRR Project released a report with recommendations to reduce bias and improve equitable access.[413]

In response, LAHSA refined its CES assessment process, reserving the use of triage tools for circumstances in which their input was deemed necessary, rather than employing them as the primary factor in PSH prioritization.[414] In 2024, LAHSA began implementing the Revised Triage Tool, referred to as the Los

---

[405] LAHSA Memo, Overview of CF-23-0302, regarding Emergency Housing Vouchers and Housing Navigation with the City of Los Angeles, dated May 30, 2023, p. 2 of 4.
[406] LAHSA Response to HN Questions, dated January 6, 2024[sic].
[407] Ibid.
[408] LAHSA, CES Permanent Supportive Housing Prioritization and Matching Guidance, approved June 28, 2023 (revised December 4, 2024), p. 1 of 11.
[409] Ibid.
[410] Ibid.
[411] Ibid.
[412] Ibid.
[413] Ibid.
[414] LAHSA, CES Permanent Supportive Housing Prioritization and Matching Guidance, approved June 28, 2023 (revised September 25, 2024), p. 1 of 9.

DRAFT & PRELIMINARY

Angeles Housing Assessment Tool, which replaced the CES Survey for Adults, or VI-SPDAT.[415] Additionally, persistent challenges in identifying and contacting accurate Points of Contacts ("POCs") in the HMIS led to a shift away from relying on POCs for outreach.[416] Instead, enrollment directed assigned staff of an eligible CES subprogram toward PEH in need of assistance, in an effort to enable more direct and reliable engagement.[417]

Furthermore, document readiness, which was previously considered a preference, became a requirement for PSH housing matches.[418] This requirement could be waived if: (a) the resource did not necessitate documentation, and/or (b) no other individuals or households with documentation readiness could be located for the available resource in the County.[419] This adjustment aimed to enhance the efficiency and equality of allocating PSH units, ensuring that those with the greatest need receive the support necessary to secure stable housing.[420]

Although LAHSA did not identify any supplemental change in the prioritization and matching process, outside of the information outlined in the *CES PSH Prioritization and Matching Guidance* document, during the Lookback Period providers reported that the process had a supplemental change. Previously, the SPA Lead (designated service provider for the respective SPA) served as the primary agency responsible for matching participants within its designated SPA to permanent supportive housing. However, in 2024, LAHSA centralized this matching process under its administration.

The matching approach for project-based PSH units, which relate to the permanent supportive housing beds developed under the Roadmap Program and Alliance Program, was also revised and documented in the *CES PSH Prioritization and Matching Guidance*.[421] Although one-to-one matching was used within the Lookback Period, LAHSA later transitioned eligible individuals at the top of the Enhanced Community queue[422] to a Batch Matching process in 2024.[423] Beginning a specified number of days prior to the anticipated Certificate of Occupancy (based on the expected construction schedule for the completion of new PSH units), a group of participants equal to twice the number of available units were identified as potential applicants.[424] For example, for a 50-unit building, 100 participants were selected.[425] This strategy aimed to minimize delays and resource inefficiencies that occurred when initially referred individuals either declined housing or were deemed ineligible.[426]

LAHSA and service provider teams of the respective site managed project-based PSH matching, utilizing the Resource Management System ("RMS"), an inventory of available project-based units maintained by LAHSA, to match PEH that meet each unit's eligibility criteria.[427] These criteria included income thresholds, homeless status, special population designations, or disability verification.[428] PEH who met

---

[415] LAHSA, CES Permanent Supportive Housing Prioritization and Matching Guidance, approved June 28, 2023 (revised December 4, 2024), p. 1 of 11.
[416] Ibid., p. 2.
[417] Ibid.
[418] Ibid., pp. 4-5.
[419] Ibid.
[420] Ibid.
[421] Ibid., p. 5.
[422] Email from LAHSA Risk Management Department, dated November 6, 2024.
[423] LAHSA, CES Permanent Supportive Housing Prioritization and Matching Guidance, approved June 28, 2023 (revised December 4, 2024), pp. 4-5 of 11.
[424] Ibid.
[425] Ibid.
[426] Ibid.
[427] LAHSA Memo, Report on Improvements to the Coordinated Entry System and PSH Tenant Selection, dated March 12, 2024, p. 5 of 9.
[428] Ibid.

DRAFT & PRELIMINARY

these standards were informed by their POC that they may qualify for a unit and are encouraged to promptly complete the Universal Housing Application.[429]

Applications were reviewed by PSH property management on a first-come, first-served basis, ensuring adherence to established eligibility requirements.[430] Applicants approved beyond the number of units available in the building were placed on a waitlist, retaining their eligibility should units become available during the lease-up period or through other comparable housing opportunities.[431]

Once a PEH was confirmed as eligible for a given unit, the process involved securing approvals from the PSH service provider, PSH property management, and the public housing authority (e.g., HACLA).[432] Following these approvals, the household proceeded to sign a lease and occupy the PSH unit.[433] This structured approach was designed to promote efficiency, consistency, and compliance with all applicable guidelines and regulations.

### 4.2.5.  TIME-LIMITED SUBSIDY

Throughout the Lookback Period, the prioritization and matching processes for TLS slots underwent changes. Between 2020 and 2022, according to LAHSA, any "homeless program" could directly refer individuals to Rapid Re-Housing, another name of the TLS subprogram.[434] These referrals could be initiated as soon as a person expressed interest, leading to large enrollments of unhoused individuals who had not yet identified a housing option.[435] Beginning in 2022, the referral process shifted so that referrals originated from interim housing interventions through Housing Navigation. Following this referral, the housing search process may have taken approximately 165 days for adult participants.[436] As explained by LAHSA, "Once a participant begins applying to units they will make a referral to TLS. The TLS team will then provide stabilization services."[437]

A&M reviewed the TLS contracts under the Roadmap Program-Named LAHSA Contracts and the number of TLS slots was not easily identifiable. If these slots were not explicitly defined within the contract and its amendments, the service provider may have faced difficulties aligning resources with demand, potentially resulting in service gaps and inconsistencies in participant enrollment.

---

[429] LAHSA Memo, Report on Improvements to the Coordinated Entry System and PSH Tenant Selection, dated March 12, 2024, pp. 5-6 of 9.
[430] LAHSA, CES Permanent Supportive Housing Prioritization and Matching Guidance, approved June 28, 2023 (revised December 4, 2024), p. 5 of 11.
[431] Ibid.
[432] LAHSA Memo, Report on Improvements to the Coordinated Entry System and PSH Tenant Selection, dated March 12, 2024, p. 5 of 9.
[433] Ibid.
[434] Email from LAHSA, Manager, Risk Management dated November 20, 2024.
[435] Ibid.
[436] Ibid.
[437] Ibid.

**KEY TAKEAWAYS OF SECTION 4.2**

- The design of the various outreach subprograms funded by the City may have contributed to overlapping services, creating a risk of inefficiencies or duplication of efforts. Individuals experiencing homelessness could be served by more than one outreach subprogram, which may have complicated data collection, led to possible duplication of efforts, created confusion among the unsheltered community, and diminished transparency regarding the allocation of resources. Without effective coordination of outreach teams, their respective endeavors may have potentially reduced the overall impact of their services.

- In the absence of a standardized prioritization policy from LAHSA and formal protocols from the City uniformly governing the referral and placement of unsheltered individuals, the criteria and eligibility for placement may have been subject to varying interpretations influenced by evolving circumstances and trends, potentially resulting in confusion among stakeholders, including service providers. This uncertainty increased the risk of inequitable, inefficient allocation of resources, and may have delayed the timely provision of shelter and housing for those in need.

- The Inside Safe Program's approach diverged from other referral mechanisms generally employed by the CES, which underscores the fragmented nature of strategies. As a result, the unhoused community may have faced inequitable access to services, with certain populations benefiting from prioritized placement while others await assistance through less clearly defined processes. This fractured structure highlights the extent to which differing methodologies and priorities can lead to inconsistencies in the allocation and utilization of available housing resources.

- The number of beds or service slots specified in service provider contracts was not clearly or consistently defined, undermining transparency about the actual capacity and scope of services supported by allocated funds. This lack of clarity made it difficult to confirm that the contracted services aligned with intended goals and obligations.

## 4.3 QUALITY OF CITY-FUNDED SERVICES

To develop a more robust view of the quality of homelessness assistance services offered prior or during enrollment in the shelter and housing interventions established under the City Programs, A&M conducted onsite fieldwork at selected locations and interviewed service providers. These activities provided insight into daily operations and service delivery methods. Observations drawn from these visits and discussions contributed to the broader performance analysis, identifying both notable strengths and potential areas for improvement in service provision to enhance the overall effectiveness and impact of City-funded subprograms.

### 4.3.1. OUTREACH

This subsection highlights A&M's observations on the key strengths and potential areas for improvement identified within outreach endeavors.

### 4.3.1.1.  Strengths

**Proactive Approach**
To obtain insight into outreach, A&M shadowed LAHSA's Roadmap HET members. A&M noted that the Roadmap HET members employed various strategies to engage with unsheltered PEH, beginning with an assessment of each individual's needs upon initial contact. In addition to providing direct services, such as offering water or other basic supplies, they arranged referrals to housing or directed higher-acuity PEH to specialized outreach teams. They also attempted to maintain ongoing engagement to ensure continuity of support where necessary.

### 4.3.1.2.  Opportunities for Improvement

**Enhanced Coordination and Efficiency**
Onsite fieldwork illustrated the complexities involved in outreach, given the transient nature of unsheltered populations, varying levels of acuity, and the distrust of outreach workers that some unsheltered PEH may have. The Roadmap HET members explained the unpredictable environment they encounter and the survival mindset many unsheltered PEH adopt. The difficulty of establishing engagement was compounded by the possibility that individuals may not be in their tents or familiar locations when they arrive, as well as reluctance some exhibit in leaving a known encampment or community.

Despite these proactive measures, it was difficult to determine whether contacts led to successful referrals or housing placements, particularly when overlaps occurred with other City-led efforts that impacted the same encampments. Consequently, while these observations provided insights into the day-to-day realities of service delivery, the lack of integrated reporting systems and comprehensive performance tracking hindered a complete assessment of service quality and effectiveness.

### 4.3.2.  SHELTER AND INTERIM HOUSING

This subsection highlights A&M's observations on the key strengths and potential areas for improvement identified within shelter and interim housing interventions established under the City Programs.

### 4.3.2.1.  Strengths

**Improved Engagement**
Interim housing facilitated a stable living environment for PEH and the opportunity for service providers to have consistent engagement with the participants. With a dedicated onsite presence, service providers could regularly interact with participants, offer coordinated case management, and facilitate connections to additional resources, such as referrals for mainstream benefits, mental health support, and other services. This structured setting allowed staff to better track participants' progress and tailor assistance with the goal of transitioning participants toward more permanent housing and overall stability.

**Variability and Adaptability of Interim Housing Arrangements**
Many interim housing subprograms offered varying housing arrangements across geographic locations. For example, Inside Safe offered private motel/hotel rooms, A Bridge Home employed a congregate model, and Safe Parking provided a secured lot at night for individuals experiencing vehicular homelessness. This variety allowed the interventions to accommodate participants' preferences or circumstances related to their living environment.

**Shortened Pathways to Permanent Housing**

When designed and managed effectively, interim housing served as a transitional step between unsheltered homelessness and permanent housing. Its structured environment, paired with case management and other supportive services, expedited the process of identifying, applying for, and securing permanent housing options.

*4.3.2.2.  Opportunities for Improvement*

**Contract Requirements, Compliance, and Service Consistency**

The performance assessment of service delivery revealed significant challenges in contract compliance and consistency due to service providers' varying interpretations of contractual requirements and their independently developed methods for service delivery. While some sites adhered to basic contractual obligations, A&M observed that other service providers fell short of meeting key requirements. For example, one service provider supplied only two meals per day instead of the three meals specified in the contract, while another site lacked amnesty lockers, despite this requirement being a facility standard. Additionally, through onsite fieldwork, A&M identified noncompliant ratio of case managers to support clients, which resulted in variability in the quality and consistency of case management services, as well as the associated caseloads. This variability impacted the quality of services provided. Some service providers employed minimal staff, potentially prioritizing cost savings, while others increased staffing but the funding model did not appear to adjust in proportion to staffing levels. Such disparities, combined with differing interpretations on what constitutes compliance (e.g., "hot meal," functional shower facilities, or "Residential Supervision"), led to inequities in service quality.

A&M's onsite evaluation found that some contractual provisions, though technically compliant in terms of execution by the service provider, did not adequately address the practical and nuanced needs of participants who were experiencing homelessness. A primary example of not addressing the practical needs of PEH involves storage space; while the contract specified a requirement for one cubic foot of storage space per participant, with additional storage subject to facility capacity, this provision was frequently inadequate for individuals to securely store their belongings. This limitation may have deterred participants from leaving their possessions to obtain or maintain employment, attend medical appointments, or manage other essential errands. Due to limited secure storage, participants may have been reluctant to leave their possessions unattended. This reluctance may have discouraged them from leaving the site and thereby limiting their engagement in other activities or services. For participants with hoarding tendencies, a common challenge among participants, the limited storage allowance may have also exacerbated feelings of insecurity or loss, further complicating their willingness to utilize services. Service providers, in turn, may have had trepidation about allowing supplemental storage due to concerns over safety and hygiene risks, the potential for hoarding to escalate, or logistical challenges in managing additional space and costs. Such gaps between compliance and practical utility undermine the effectiveness of services and hinder participants' ability to achieve stability.

**Mental Health and Other Healthcare Services**

The inconsistencies in service quality were further complicated by the complexities inherent in serving a population with levels of high acuity, including individuals experiencing severe mental illness, substance use disorder ("SUD"), and/or chronic health conditions. A&M's onsite evaluation identified a critical gap in the provision of mental health services across the sites, despite a widespread recognition of the significant mental health needs among participants.

Based on the Health and Disability data captured during the 2024 PIT Count for the City of Los Angeles, approximately 31% of unsheltered PEH reported a substance use disorder and approximately 24% reported a serious mental illness.[438] These figures may be underreported due to data collection methodology.

Service provider personnel consistently reported that they lacked the necessary training, expertise, and resources to adequately address these needs. Additionally, service providers cited insufficient funding to hire qualified mental health professionals or to establish dedicated services. Instead, most service providers relied heavily on referrals to the County for services or nonprofit organizations to support participants with their mental health challenges. While these outside providers may be helpful in meeting participants' needs, this approach often left service providers and participants navigating complex and under-resourced systems, delaying access to care.

These observed challenges are reflective of broader systemic issues, including the legacy of deinstitutionalization and lack of infrastructure to adequately support individuals with severe mental health conditions. The absence of accessible and integrated mental health services not only limits the effectiveness of homeless service programs but also perpetuates barriers to stability and recovery for the population served. Addressing this gap will require not only enhanced funding and training but also a collaborative effort to integrate mental health services into the CoC system, ensuring that participants receive the comprehensive care needed to achieve long-term stability.

## Property Damage

Property damage posed a significant obstacle to service providers, as frequent repairs and cleanup efforts diverted limited funds and reduced the number of available units. Property damage incidents may have ranged from accidental or intentional destruction of infrastructure and furniture to natural wear-and-tear associated with high usage. Participants experiencing severe mental illness, substance use disorders, or trauma, encounter crisis situations involving aggressive behavior or self-harm. Such incidents not only strained staff morale but also heightened fear or insecurity among other participants who perceived a potential risk of violence. In turn, service providers were required to maintain oversight to balance facility preservation with participant well-being without undermining critical support services.

## Transportation

The onsite fieldwork of sampled sites identified challenges related to transportation, a critical component in ensuring access to essential services such as medical care, housing appointments, and employment. While contracts encouraged service providers to assist clients in coordinating transportation and, when necessary, accompany them to appointments, this support was inconsistently provided. In many cases, the burden of coordinating transportation fell on the homeless participants themselves, posing substantial barriers.

Participants often lacked access to reliable transportation, making it difficult to reach distant service locations or attend appointments on time. Public transit options, where available, may not align with the timing or routes needed, particularly for those living in areas with limited infrastructure. Additionally, PEH may face challenges such as the inability to afford transit fares, navigate complex transit systems, or carry personal belongings while traveling. For clients with mobility issues, mental health conditions, or other disabilities, these barriers are even more pronounced. The lack of proactive support in addressing

---

[438] City of LA Point-in-Time Counts; 9,010 SUD / 29,272 Unsheltered All Persons = 30.8%; 7,080 SMI / 29,272 Unsheltered All Persons = 24.2%.

transportation needs not only hampers clients' ability to access essential services but also undermines broader goals of stability and self-sufficiency.

**Bed Occupancy and Enrollment**

A&M's onsite evaluation revealed a misalignment in the established protocol for the timely reporting of vacancies and availability across the sites. While contracts required service providers to directly input bed services and exit data into HMIS, many service providers instead emailed updates, creating inconsistencies and potential delays in accurate reporting. These reporting challenges may have stemmed from insufficient communication and lack of clarity surrounding reporting requirements and deadlines, as outlined in the contract or accompanying instructions.

According to various service providers, if participants did not consistently occupy their assigned bed and failed to notify the service provider about any absence lasting three or more consecutive nights, staff would attempt to contact the participant before declaring the bed abandoned and exiting the participant from the subprogram. Consequently, occupancy data may not always align with enrollment data when participants remained enrolled but did not physically occupy the bed. Additionally, without a standardized method for LAHSA to verify occupancy, maintaining an accurate and up-to-date understanding of service capacity was limited. Furthermore, because funding did not fluctuate based on occupancy levels, service providers may have lacked incentive to prioritize timely reporting. This dynamic may have contributed to discrepancies in data, potentially inequitable fund distribution, and moreover, decreased motivation to maximize occupancy for the benefit of unsheltered PEH.

In an effort to verify the number of interim housing bed interventions established for potential enrollment, A&M compared the sampled sites under the City Programs that were identified as open and occupiable as of December 31, 2023, with LAHSA's Housing Inventory Count dated January 24, 2024. The results of the analysis showed multiple discrepancies, potentially stemming from differences in data collection methods, timing, or other reporting factors between the two entities. Further, the Office of the CAO acknowledged that the City had also identified discrepancies in LAHSA's Housing Inventory Count and explained, "…we continue to work with LAHSA on ongoing data challenges."[439] This lack of clarity regarding the total number of available and open beds hinders service delivery. Without a clear understanding on the number of beds or units that are available for enrollment, stakeholders face difficulties in allocating resources and ensuring participants receive timely placements.

In an audit published by the City Controller in December 2023, it was reported that LAHSA did not have a process to monitor and evaluate bed attendance data.[440] The City Controller's audit found that, although shelter staff were required to enter bed attendance into HMIS, LAHSA remained responsible for monitoring the effectiveness of the contracted service organizations that operate the "shelter system."[441] However, LAHSA did not maintain an ongoing process to review or evaluate bed attendance data to enhance its quality.[442]

The Inside Safe Program operated under a unique structure in which occupancy was reviewed by the Mayor's Office based on the occupancy and booking agreements. The Mayor's Office relied on the respective hotel/motel owner to report vacancies as well as LAHSA's automated Daily Motel Occupancy

---

[439] Email from the Office of the CAO, dated January 9, 2025
[440] City of Los Angeles Controller, Interim Housing & Shelter Bed Data, dated December 5, 2023, p. 43 of 50.
[441] Ibid.
[442] Ibid.

Report of the Inside Safe hotels/motels contracted with the City.[443] This variation further highlights the lack of uniformity in tracking occupancy across City Programs. The lack of effective oversight exacerbated these issues, as there was no consistent mechanism to ensure compliance or verify the accuracy of reported data.

### 4.3.3.    HOUSING NAVIGATION

As discussed previously, due to the ambiguity in the service provider contract language outlining the scope and nature of services provided under Housing Navigation, as well as limitations in tracing any funds expended by LAHSA under the City Programs, A&M was unable to assess the quality and effectiveness of HN services. Further, without specific metrics, deliverables, or performance indicators, it remains unclear whether Housing Navigation services achieved intended outcomes from the funding provided by the City. This lack of clarity highlights the importance of clear contractual obligations and documentation of services.

### 4.3.4.    TIME-LIMITED SUBSIDY

Due to limitations in tracing funds, as well as in identifying the specific contracts and residential addresses associated with the participants' rental or leasing subsidies and services, it was not feasible to confirm which participants were served through the TLS housing interventions established under the Roadmap Program. This gap in information precludes verifying whether participants received the intended case management and rental subsidy services. Consequently, there is a heightened risk in accurately assessing the quality and effectiveness of these services under the City Program, as the inability to link resource allocation to participant outcomes hinders a comprehensive evaluation of performance.

#### 4.3.4.1.    Strengths

**Mobility and Scattered-Site Housing**
Time-limited rental subsidies generally enabled participants to choose their housing arrangements, facilitating integration into neighborhoods that align with their needs (e.g., proximity to employment opportunities or family support). Additionally, the flexibility offered with these subsidies in dispersing participants across multiple properties, alternatively referred to as "scattered-site" housing, may have reduced the concentration of poverty commonly observed in large, project-based developments, potentially improving community engagement and decreasing stigma. This autonomy in housing selection, particularly when supported by comprehensive case management and other services, may have further enhanced satisfaction, stability, and long-term self-reliance for participants.

**Rapid Deployment**
Rental subsidies were implemented more rapidly than developing a new housing project, allowing participants to leave interim housing interventions or unsheltered situations sooner. This accelerated transition into stable housing potentially helped mitigate the negative impacts associated with prolonged housing instability.

#### 4.3.4.2.    Opportunities for Improvement

**Resource Allocation of Services**
Similar to the concerns identified under service consistency for interim housing sites, it remains unclear whether the case management services of TLS service contracts, intended to assist participants in transitioning from a rental subsidy to another form of stable, permanent housing, were delivered at a quality

---

[443] Interview with Mayor's Office on November 6, 2024; LAHSA Memo, Explanation of Daily Motel Occupancy Report Inclusions, dated June 28, 2024, p. 1 of 1.

DRAFT & PRELIMINARY

level sufficient to meet that objective. Because direct observation of these services was not feasible, the quality of services could not be fully assessed. Service providers determined the number of case management staff based on various operational factors; however, funding does not appear to fluctuate with staffing levels, potentially reducing the incentive, or limiting their ability to hire and fund enough personnel to manage caseloads effectively. Without adequately funded and qualified staff, the ability to deliver consistent, high-quality services and to achieve the intended outcomes may be significantly constrained. Furthermore, due to potential variability and unpredictability of rent costs, a significant portion of the funding may be absorbed by the rental subsidies. As a result, there was a risk that the remaining funds were insufficient to fully support case management services, potentially compromising the quality and consistency of participant support.

---

**KEY TAKEAWAYS OF SECTION 4.3**

- Outreach teams deployed various strategies to engage unsheltered individuals. However, limited data tracking and coordination between different outreach subprograms led to potential overlaps and inconsistencies. Strengthening data collection, standardizing referral processes, and fostering collaboration across the City, the County, and LAHSA may improve service delivery and ensure that outreach efforts align effectively with broader homelessness assistance strategies.

- Inconsistent services made it difficult to measure and compare performance across various City-funded beds and respective subprograms, as different standards and processes were applied at various sites.

- Contracts lacked clear, enforceable provisions and did not adequately account for the practical needs of both service providers and the diverse participant populations. Additionally, insufficient oversight of contractual terms hindered equitable and effective service delivery across sites.

- Although TLS offered flexibility through scattered-site housing and rapid deployment of permanent housing resources, fluctuating rent costs potentially consumed a material portion of allocated funding. Consequently, there was a risk that insufficient resources remained to fully support case management services, which may have compromised the overall quality of services.

---

## 4.4  QUALITY OF COUNTY-FUNDED SERVICES

Although the focus of this performance assessment was on City-funded services, the County shared information regarding its service contracts for the High Service Need Interim Housing beds and PSH. Therefore, supplemental onsite fieldwork was conducted to gain additional perspectives to obtain a more comprehensive understanding of the County-funded contracted services available to PEH in the City. This approach offered valuable insight into the CoC system. The evaluation was based on site visits and interviews with executives and County representatives. This section highlights the strengths and constraints identified by stakeholders and through A&M's observations from onsite visits.

DRAFT & PRELIMINARY

Section 4

### 4.4.1.  INTERIM HOUSING

This subsection highlights A&M's observations on the key strengths and potential areas for improvement identified within the High Service Need Interim Housing beds funded by the County. Certain strengths and opportunities for improvement associated with City-funded services may overlap with those funded by the County. For clarity, only distinct strengths and improvement opportunities were highlighted to remain focused on the unique aspects of services funded by the City or the County.

#### 4.4.1.1.  Strengths

**Onsite Medical Personnel**
Executive stakeholders identified the presence of onsite medical staff, such as clinical nurses, as a valuable resource for supporting participants in the High Service Need Interim Housing beds. A few executives of the service providers noted that having a dedicated healthcare professional enhanced responsiveness to potential medical concerns and necessary referrals to specialized care. This arrangement promoted a more holistic approach to service delivery, benefiting both staff and participants through prompt and knowledgeable medical support.

**Qualified Staff**
During discussions, executives noted that DHS conducted a preliminary review of proposed staff resumes prior to hiring decisions for service providers. By screening candidates against the qualifications outlined in the contract's Statement of Work, DHS used a quality-control measure to ensure that service provider personnel met the necessary standards. This practice aimed to ensure that only appropriately qualified personnel delivered services. This approach may have contributed to higher quality and more effective service delivery.

**Direct Contracts**
Upon review of the High Service Need Interim Housing contracts provided by DHS, the contractual language appeared to provide clear expectations on the required services, enabling service providers to better understand the required services and obligations. This clarity potentially reduced ambiguity and fostered accountability as service providers aligned their practices with stipulated expectations.

#### 4.4.1.2.  Opportunities for Improvement

**Participant Acuity Levels Across Differing Bed Types**
The level of participants' acuity appeared consistent to service providers across City-funded and County-funded interim housing sites, even though these High Service Need Interim Housing beds funded by the County were designed to provide a higher level of support services for PEH with complex medical and behavioral health conditions. This challenge may indicate that a significant portion of PEH generally presents a high level of need. Consequently, the intended purpose of the High Service Need Interim Housing beds, as a recuperative or stabilization step prior to transitioning participants to another form of interim housing, may not have been clearly realized. In practice, service providers explained participants remained in these beds until exiting to permanent housing or another destination, similar to those in City-funded interim housing beds. Further, this overlap in acuity levels and variability in services complicate the CoC system. It reduces the overall effectiveness, as those placed in a less supportive setting may not receive sufficient services, potentially prolonging their homelessness or leading to repeated enrollments. This variability in services highlights the necessity for equitable resource allocation to ensure that participants receive consistent support aligned with their level of need.

DRAFT & PRELIMINARY

**Multiple Referral and Matching Processes**

The existence of parallel referral and matching processes led by separate entities (DHS, DMH, LAHSA, the City, etc.) within the CoC system created challenges in ensuring that PEH were consistently matched to the most appropriate interim housing option. Varying eligibility criteria and prioritization methods increased the risk of inefficiencies, duplication of efforts, inequitable resource distribution, and overall complexity in resource allocation.

### 4.4.2.   PERMANENT SUPPORTIVE HOUSING

This subsection outlines strengths and potential opportunities for improvement pertaining to the Intensive Case Management Services funded by the County for PSH units established under the City Programs.

#### 4.4.2.1.   Strengths

**Low Turnover**

PSH exhibited a lower rate of participant exits compared to other types of housing interventions. This continuity often translated into improved engagement, more consistent follow-through with services, and enhanced trust between participants and staff. Moreover, with fewer client transitions, administrative responsibilities associated with intake and discharge were potentially reduced, enabling service providers to allocate resources effectively. In comparison to high turnover, a stable population may have yielded clearer, more reliable data for measuring outcomes over time.

**Direct Contracts**

The County, specifically DHS, directly contracted with service providers for the County-funded sampled sites, rather than through LAHSA. A key advantage of this contractual arrangement was streamlined oversight and communication that resulted from working with a single contracting entity. This approach enabled the County to negotiate contract terms more directly, monitor provider performance in real time, and address any compliance or service delivery issues with fewer bureaucratic layers. For example, DHS provided weekly and monthly reports to the service providers based on the data entered into their information system, CHAMP. Direct contracts potentially helped maintain clearer lines of accountability and transparently define roles, funding, and outcomes. Consequently, resource allocation, coordination of services, and responsiveness to client needs were potentially more adaptable.

#### 4.4.2.2.   Opportunities for Improvement

**City-County Coordination for Permanent Supportive Housing**

A challenge identified during the assessment was the shared responsibility between the City and the County in funding and operating PSH. While the City partially finances the infrastructure for a designated number of PSH units within a project (with some additional units set aside for affordable housing), the County may also elect to contribute infrastructure funding and is responsible for contracting and funding the services (i.e., intensive case management). In practice, this arrangement can result in reclassification of certain affordable housing units into PSH based on modifications to service contracts. As a result, the City did not always have the most current information on the number of units that served as permanent supportive housing versus affordable housing. Further, the service contracts that the County provided for PSH services did not specify the number of beds or participants. This misalignment illustrates the importance of ongoing collaboration and transparent communication among stakeholders to ensure alignment, coordination, and clarity regarding the resources and services available to PEH.

**Matching**

Due to the high costs associated with PSH in the City, funding for PSH was often a combination of federal, state, and local funds. Consequently, each unit within the PSH project may have had different eligibility criteria and application processes, making coordination and matching complex. Further, in a memo dated February 22, 2022, LAHSA acknowledged a "concerning level" of project-based PSH vacancies and extended timelines to fill vacant units.[444] During onsite fieldwork, service providers consistently reported similar concerns about delays in the matching process. Consequently, despite the new centralized matching approach for PSH, certain systemic constraints appeared to persist.

In an attempt to analyze and verify the vacancy rates at PSH sites, A&M requested RMS Vacancy reports from LAHSA for the PSH sites established under the Roadmap and Alliance Programs. The RMS data produced in response to this request contained listings of units at PSH locations with the "Status" (e.g., "Occupied," "Match Confirmed," "Available for Match," etc.) of each unit. However, A&M identified instances where the total number of listed units reported in the RMS Vacancy reports did not match the number of beds reported for the respective site in the quarterly status reports to the Court. Without being able to confirm the base number of units for each PSH site within the RMS Vacancy reports, a vacancy analysis could not be performed. Further, approximately 20% of the PSH sites identified as "open" were not found in the RMS system at all, deepening concerns about transparency regarding available resources and potential underutilization of those resources.

---

### KEY TAKEAWAYS OF SECTION 4.4

- County-funded interim housing beds, specifically the High Service Need Interim Housing beds, were designed to serve participants with higher levels of acuity. However, participants generally presented similar levels of need across other types of interim housing beds within the City. Without clear distinctions in levels of acuity, the intended purpose of specialized beds (e.g., serving as a stabilization step) becomes convoluted, complicating the system's capacity to allocate resources effectively.

- Multiple entities had their own referral and matching processes, which potentially introduced inefficiencies and confusion among both service providers and people experiencing homelessness who were seeking assistance.

- Although both the City and the County contributed funding to housing infrastructure that, at times, included both affordable housing and PSH units, the County exclusively funded the intensive case management services for the newly established PSH units. Under certain contractual arrangements, the County's services extended to additional units within the same site, effectively converting some affordable housing units to PSH. As a result, the City lacked clear visibility into the actual number of PSH and affordable housing units in the City, reducing overall transparency regarding the available housing resources.

- Missing or untracked PSH sites and their respective beds in the RMS raised concerns about whether those beds remain actively operational and whether appropriate matches were made. This uncertainty limited a unified view of the total available resources, potentially leaving beds underutilized and undocumented.

---

[444] LAHSA, Vacant Turnover Units Project-Based Permanent Supportive Housing, dated February 22, 2022, p. 1 of 3.

DRAFT & PRELIMINARY

## 4.5  EFFECTIVENESS OF SERVICES

Another key objective of this performance assessment was to determine whether City Programs effectively supported PEH in obtaining or maintaining housing, relative to the outcomes they might have faced without these interventions. Specifically, the assessment attempted to measure whether participation in these City Programs reduced the time individuals spent unsheltered and supported their long-term housing stability. However, limited data availability and quality constrained the accuracy and completeness of these analyses.

For example, the data provided to A&M offered minimal insight into the extent to which outreach services and referrals ultimately led unsheltered PEH to secure housing and supportive services. Additionally, it was not possible to trace whether individuals counted in the annual PIT count later received assistance through the City Programs, introducing further uncertainty in evaluating the reach and impact of these housing interventions and respective services. Consequently, while these City Programs play an important role in addressing homelessness, the absence of critical data elements limited A&M's ability to draw definitive conclusions about their overall effectiveness.

### 4.5.1.  COMPARATIVE ANALYSIS OF METRICS ACROSS CITY PROGRAMS

To assess the effectiveness of services across the City Programs, A&M analyzed performance data from various sources to evaluate the City Programs' ability to achieve intended outcomes, including service accessibility, housing placements and sustainable exits. As mentioned previously, significant data limitations constrained the scope of these analyses. For example, HACLA did not provide PSH data that would have shed further light on long-term housing impacts. Moreover, only the data reports produced by LAHSA and the County related to the City Programs were available, precluding broader comparisons to other service offerings.

LAHSA provided data from HMIS, while the County supplied multiple data sources including but not limited to HMIS, Comprehensive Health Accompaniment Management Platform ("CHAMP"), Integrated Behavioral Health Information System ("IBHIS"), SAPC claims, and California Outcomes Measurement System ("CalOMS"). The data from HMIS was categorized by subprogram identifiers established by LAHSA, making performance results dependent on the accuracy and completeness of those designations. Additionally, the service provider contracts LAHSA identified in HMIS as associated with the City Programs did not always match those linked to the City Programs within LAHSA's accounting data. Consequently, the performance data and financial data may be slightly misaligned.

Additionally, missing critical data elements, such as accurate and complete records of unsheltered periods, and incomplete information in existing reports made it difficult to draw definitive conclusions. In many cases, data quality was compromised due to reliance on timely and accurate inputs from system users. Collectively, these factors limited the ability to thoroughly assess the City Programs' effectiveness and identify improvement opportunities to better serve the unsheltered community.

#### 4.5.1.1.  Shelter and Interim Housing

Each of the City Programs established interim housing interventions across various types of subprograms. The chart below exhibits comparative metrics across the Lookback Period to offer insight into service effectiveness. As mentioned previously, LAHSA did not differentiate between emergency shelter and other interim housing interventions, which prevented A&M from accurately distinguishing them, especially under the Roadmap Program. Because, as mentioned previously, the Alliance Program and the Inside Safe

Program did not appear to establish traditional emergency shelter interventions. Consequently, the data reflects both emergency shelter and interim housing interventions. To limit the performance data within the scope of this assessment, Figure 4.1 exhibits shelter and interim housing metrics based on participants who enrolled in the LAHSA subprograms across the Lookback Period.[445]

FIGURE **4.1**

Shelter and Interim Housing Enrollments by City Program Across the Lookback Period

| City Program | Number of Total Participants | Number of Unique Participants | Median Days Until Exit | Median Percentage Document Ready |
|---|---|---|---|---|
| Roadmap Program | 34,564 | 30,711 | 71 | 80.0% |
| Alliance Program | 378 | 353 | 111 | 84.4% |
| Inside Safe Program | 3,209 | 2,991 | 162 | 78.3% |

The Roadmap Program enrolled the largest number of participants, indicating a substantial reach within the City's homelessness assistance efforts. Meanwhile, the Inside Safe Program had the second highest enrollment of interim housing but recorded the longest median duration before clients exited. This trend suggests that although the Inside Safe Program served fewer participants, those it did enroll tended to remain in Inside Safe for a longer period in comparison to the other subprograms under the Roadmap Program. Such differences draw attention to the need to examine factors influencing the length of stay and to determine whether variations in service delivery, participant needs, or other variables contribute to these contrasting outcomes.

Of the approximately 38,000 participants served across the Lookback Period by the shelter and interim housing beds established by the City Programs, 51% of participants were enrolled in more than one of the City's interim housing and/or shelter subprograms. Because the performance data did not differentiate between these intervention types, this high re-enrollment rate may reflect a progressive engagement model within the CoC where participants moved between subprograms as their needs evolved and resources became available; or due to site closures, participants may have been transferred to a different subprogram. Alternatively, it may point to inefficiencies in delivering services and highlights uncertainty about whether services were successfully coordinated. This ambiguity underscores the importance of enhanced data tracking to determine whether services are meeting participant needs optimally. Furthermore, upon reviewing the invoices related to the Inside Safe Program, the CAO identified an instance where two participants occupying the respective motel/hotel site were also served under the Augmented Winter Shelter subprogram.[446] This overlap introduces ambiguity regarding whether a net increase in bed capacity was achieved across the City Programs or whether existing beds were merely reallocated across subprograms.

---

[445] This data was provided by LAHSA on December 17, 2024.
[446] Inside Safe Motel Invoices.

DRAFT & PRELIMINARY

FIGURE **4.2**

Shelter and Interim Housing Exits by City Program Across the Lookback Period

| City Program | Percentage of Clients Exited | Exited to Permanent Housing | Exited to Homelessness | Exited to Homelessness and Not Specified |
|---|---|---|---|---|
| Roadmap Program | 93.6% | 17.2% | 36.6% | 72.5% |
| Alliance Program | 71.7% | 18.8% | 49.8% | 66.4% |
| Inside Safe Program | 67.1% | 35.2% | 28.7% | 53.9% |

FIGURE NOTE: Alliance Program and Inside Safe Program did not establish any shelter interventions.

Among the City Programs, the Inside Safe Program reported the longest median stay until exit, the lowest median percentage of document-ready participants, and the highest rate of exits to permanent housing. By contrast, the Alliance Program reported the highest percentage of document-ready participants but reported the lowest exits to permanent housing and approximately 50% of its exits as returning to homelessness.

Although the Inside Safe Program demonstrated a higher placement rate into permanent housing, it also had the fewest document-ready clients across the Lookback Period. Given that permanent housing is a limited resource, the factors contributing to this trend remained unclear and raised questions about equitable distribution. Absent more detailed data on the selected participants for permanent housing, it was difficult to determine whether the higher exit rate reflected a more effective program design or other contributing factors. This gap emphasized the need for transparent processes to ensure equitable access to permanent housing.

Due to limited detail within the HMIS data, it was not possible to determine whether exits categorized as permanent housing were specifically through TLS or PSH. This distinction is significant because these two interventions offer different levels of support and may result in varying long-term stability outcomes.

Section 4

FIGURE **4.3**

Overview of Interim Housing Subprograms by Sampled Sites for Clients Enrolled Across the Lookback Period

| Sampled Contract | LAHSA Subprogram | Clients Enrolled | Clients Exited | Median Days Until Exit | Document Ready | Exit Data | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Permanent Housing | Return to Homelessness | Homelessness and Not Specified |
| Roadmap #1 | A Bridge Home | 632 | 588 | 84 | 81.2% | 22.1% | 45.7% | 66.7% |
| Roadmap #2 | A Bridge Home | 791 | 751 | 55 | 79.6% | 19.0% | 47.4% | 62.5% |
| Roadmap #3 | Roadmap IH | 898 | 748 | 132 | 79.7% | 26.5% | 7.6% | 61.5% |
| Roadmap #4 | Roadmap IH | 801 | 730 | 57 | 77.7% | 10.5% | 35.5% | 85.2% |
| Roadmap #5 | Roadmap IH | 168 | 138 | 56 | 86.3% | 13.8% | 12.3% | 76.8% |
| Roadmap #6 | Safe Parking | 296 | 277 | 41 | 93.6% | 19.1% | 51.3% | 67.9% |
| Roadmap #7 | Safe Sleep | 556 | 517 | 44 | 64.0% | 4.3% | 71.2% | 85.1% |
| Roadmap #8 | Tiny Home Village | 874 | 760 | 79 | 82.2% | 15.9% | 61.7% | 78.4% |
| Roadmap #9 | Tiny Home Village | 624 | 545 | 103 | 81.9% | 25.5% | 49.7% | 65.5% |
| Alliance #1 | Roadmap IH | 378 | 271 | 111 | 84.4% | 18.8% | 49.8% | 66.4% |
| Inside Safe #1 | Inside Safe | 267 | 267 | 196 | 78.3% | 23.2% | 42.3% | 68.9% |
| Inside Safe #2 | Inside Safe | 268 | 171 | 123 | 58.6% | 21.6% | 6.4% | 67.3% |
| Inside Safe #3 | Inside Safe | 559 | 352 | 186 | 64.4% | 49.7% | 17.6% | 36.4% |

FIGURE NOTE: This performance data represents enrollments on or before June 30, 2024.

DRAFT & PRELIMINARY

Section 4

FIGURE **4.4**

Overview of Interim Housing Subprograms by Sampled Sites for Clients Enrolled in FY 2023-24

| Sampled Contract | LAHSA Subprogram | Amount Invoiced | Annual Enrollment Rate | Clients Enrolled | Clients Exited | Median Days Until Exit | Document Ready | Exit Data | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Permanent Housing | Return to Homelessness | Homelessness and Not Specified |
| Roadmap #1 | A Bridge Home | $2,305,200 | 91.1% | 284 | 188 | 83 | 79.2% | 27.7% | 62.2% | 64.4% |
| Roadmap #2 | A Bridge Home | 2,361,377 | 88.1% | 309 | 214 | 56 | 84.5% | 19.2% | 44.4% | 57.5% |
| Roadmap #3 | Roadmap IH | 6,977,352 | 92.1% | 350 | 139 | 290 | 88.9% | 49.6% | 10.1% | 41.7% |
| Roadmap #4 | Roadmap IH | 3,085,060 | 90.4% | 371 | 245 | 69 | 81.7% | 15.1% | 47.8% | 79.6% |
| Roadmap #5 | Roadmap IH | 2,825,262 | 71.9% | 158 | 103 | 48 | 85.4% | 10.7% | 13.6% | 82.5% |
| Roadmap #6 | Safe Parking | 327,337 | 81.6% | 90 | 63 | 57 | 95.6% | 27.0% | 58.7% | 65.1% |
| Roadmap #7 | Safe Sleep | 3,042,218 | 97.3% | 218 | 146 | 64 | 73.4% | 2.7% | 71.9% | 80.1% |
| Roadmap#8 | Tiny Home Village | 4,037,650 | 79.3% | 363 | 178 | 157 | 88.2% | 21.3% | 71.3% | 73.6% |
| Roadmap #9 | Tiny Home Village | 4,402,368 | 62.9% | 347 | 216 | 129 | 81.0% | 31.9% | 61.1% | 61.1% |
| Alliance #1 | Roadmap IH | 7,870,142 | 96.7% | 296 | 156 | 145 | 86.1% | 21.2% | 57.1% | 62.2% |
| Inside Safe #1 | Inside Safe* | 11,251,001 | N/A | 259 | 259 | 197 | 78.4% | 22.0% | 43.6% | 70.3% |
| Inside Safe #2 | Inside Safe | 3,550,846 | N/A | 237 | 99 | 144 | 60.8% | 30.3% | 6.1% | 62.6% |
| Inside Safe #3 | Inside Safe | 7,407,524 | N/A | 500 | 227 | 199 | 65.4% | 60.4% | 15.0% | 26.9% |

FIGURE NOTE: The performance data represents clients enrolled and exited during FY 2023-24. Reference Figure 3.22 for supplemental financial detail. *This site (Inside Safe #1) closed in FY 2023-24, and participants were transitioned to another location. Further, this performance data was limited to a City-funded service provider contract with LAHSA, other performance data exists under additional contract(s).

DRAFT & PRELIMINARY

For FY 2023-24, the sampled sites reported a median permanent housing exit rate of approximately 22.0%, whereas 47.8% of exits resulted in a return to homelessness, exceeding the rate of exits to permanent housing. Within the sample, one congregate site (Roadmap #1) reported a higher permanent housing placement rate than a non-congregate site (Inside Safe #1). At other sampled locations, however, non-congregate sites sometimes demonstrated higher placement rates than congregate sites. This variation illustrates the risk of oversimplifying any single housing arrangement, such as congregate or non-congregate, as the primary driver of successful outcomes. Figure 4.3 and 4.4 present data across multiple subprograms, but no clear trends or direct correlations emerge. For example, a high percentage of document-ready participants or long duration of stay did not appear to yield a corresponding increase in permanent housing placements.

In terms of enrollment rates, as previously noted, due to the nature of the Inside Safe Program and its operations, it was not possible to calculate an enrollment rate given the lack of clarity regarding the total number of beds served by these contracts. For the remaining sites with available data, enrollment rates ranged from 62.7% to 97.3%. This variation may be due to differences in actual capacity along with the timing of participant matching or intake processes. Because enrollment rates depend on the accurate number of open and occupiable beds, any misalignment in reporting can lead to discrepancies between reported and actual utilization.

In summary, a site's performance was influenced by multiple factors, such as staffing ratios, participants' acuity, resource allocation, quality of supportive services, and external factors. Consequently, determining whether a subprogram or site performs effectively requires a nuanced examination of these intersecting elements rather than relying on a single indicator, such as type of housing arrangement or subprogram.

DRAFT & PRELIMINARY

Section 4

**FIGURE 4.5**

Permanent Housing Exits of Sampled Sites for Clients Enrolled in FY 2023-24

| Sampled Site | LAHSA Subprogram | Exits to Permanent Housing | | | |
| | | Subsidized Exit | Median Days to Subsidized Exit | Unsubsidized Exit | Median Days to Unsubsidized Exit |
|---|---|---|---|---|---|
| Roadmap #1 | A Bridge Home | 80.0% | 329 | 20.0% | 62 |
| Roadmap #2 | A Bridge Home | 54.5% | 233 | 45.5% | 110 |
| Roadmap #3 | Roadmap IH | 80.3% | 380 | 19.7% | 301 |
| Roadmap #4 | Roadmap IH | 81.8% | 315 | 18.2% | 265 |
| Roadmap #5 | Roadmap IH | 84.2% | 273 | 15.8% | 120 |
| Roadmap #6 | Safe Parking | 35.8% | 118 | 64.2% | 42 |
| Roadmap #7 | Safe Sleep | 81.8% | 387 | 18.2% | 151 |
| Roadmap#8 | Tiny Home Village | 91.7% | 329 | 8.3% | 179 |
| Roadmap #9 | Tiny Home Village | 87.1% | 340 | 12.9% | 102 |
| Alliance #1 | Roadmap IH | 78.4% | 184 | 21.6% | 45 |
| Inside Safe #1 | Inside Safe | 82.3% | 141 | 17.7% | 115 |
| Inside Safe #2 | Inside Safe | 91.9% | 219 | 8.1% | 13 |
| Inside Safe #3 | Inside Safe | 88.0% | 189 | 12.0% | 194 |

Across the sampled subprograms, the majority of permanent housing exits involved subsidized placements rather than unsubsidized ones, as exhibited in Figure 4.5. Notably, participants who exited to unsubsidized situations did so in fewer days compared to those receiving subsidies. However, the median time to complete a subsidized exit varied widely among the different subprograms. By subprogram, Tiny Home Village recorded the longest time to a permanent housing exit with the highest percent of subsidized exits on average, whereas Safe Parking had the shortest and lowest percent of subsidized exits. Differences in permanent housing placement rates and median days to subsidized exits among the subprograms may reflect multiple factors such as potential inequitable distribution of subsidies (as certain subprograms may receive a disproportionate share of funding or prioritize certain populations), participant characteristics, variations in the availability of supportive services, and external factors, such as landlord engagement, local rental market conditions or available PSH units, that may impact the feasibility and pace of permanent housing exits. Consequently, interpreting differences in performance across subprograms often necessitates a comprehensive look at funding mechanisms, participant needs, operational practices, and broader community resources.

Overall, these varying statistics across subprograms and service providers highlight potential inconsistencies in service delivery, resource allocation, and potentially, poor data quality. They also indicate a need for standardized metrics and closer examination of factors influencing participant engagement and housing stability. Without a more uniform approach, the system remains vulnerable to uneven performance, under- or over-utilized resources, and the risk that PEH may not receive the most effective interventions.

DRAFT & PRELIMINARY

Section 4

*4.5.1.2.  Mental Health and Substance Use Disorder Treatment*

Limited data was available in determining whether the City Programs supported participants' overall well-being and access to mental health or substance use disorder services. In an attempt to gain further insight, A&M examined data on the designated "mental health/SUD beds" to determine the number of City Program shelter and interim housing participants who received access to these services. However, the data provided did not provide a clear picture of the outcomes of these interventions, hindering a complete evaluation of the effectiveness of "mental health/SUD beds" for participants enrolled within the City Programs.

During the Lookback Period, approximately 34,000 unique participants were enrolled in shelter and interim housing beds created under the City Programs. Of these participants, 632 unique participants accessed a mental health/SUD bed service while enrolled in a City Program; some participants accessed multiple types of services on different occasions, for a total of 996 services exhibited in Figure 4.6. Of the 632 unique participants, 76 participants entered or exited the City shelter or interim housing bed on the same day of enrollment in a mental health/SUD bed, indicating a direct transition between enrollments.

FIGURE **4.6**

Number of Services for Enrolled Participants in Mental Health/SUD Beds by Type of Service and City Program Across the Lookback Period

| Service Type | Roadmap Program | Alliance Program | Inside Safe Program | Grand Total |
|---|---|---|---|---|
| Acute Inpatient | 574 | 4 | 20 | **598** |
| Withdrawal Management (Bed) Services | 185 | 1 | 26 | **212** |
| Residential (Bed) Services | 136 | 1 | 15 | **152** |
| Recovery Bridge Housing | 11 | 0 | 1 | **12** |
| Other Residential | 11 | 0 | 0 | **11** |
| Sobering Center | 4 | 0 | 7 | **11** |
| **Grand Total** | **921** | **6** | **69** | **996** |

FIGURE **4.7**

Number of Services for All Participants in Mental Health/SUD Beds by City Program Across the Lookback Period

| City Program | Timing of Service | |
|---|---|---|
| | Before/After Enrollment | During Enrollment |
| Roadmap Program | 13,493 | 913 |
| Alliance Program | 87 | 6 |
| Inside Safe Program | 721 | 67 |
| **Grand Total** | **14,301** | **986** |

FIGURE NOTE: The number of services decreased from 996 due to participants who received more than one type of service during enrollment.

"Acute Inpatient" under DMH, "Withdrawal Management (Bed) Services" and "Residential (Bed) Services" under DPH-SAPC were the most accessed services. As exhibited in Figure 4.7, fewer participants accessing services in mental health/SUD beds during their enrollment in a City Program than before or after may suggest gaps in referral pathways, timing, or communication between service providers and participants. For instance, participants may have faced logistical challenges, such as transportation or timely referrals, making it more difficult to secure a mental health/SUD bed; or, they may have been unaware that services in mental health/SUD beds were available while enrolled in a subprogram. A more comprehensive analysis would require additional data on referral processes and pathways, including the referrals issued and received and whether participants received services, to fully evaluate access and utilization rates. Consequently, A&M's ability to interpret participant enrollment in mental health/SUD beds was constrained by insufficient data.

According to available information, across the Lookback Period, there was not a system that tracked SUD bed referrals. Mental health bed referrals can only be initiated by clinical providers.[447] Street outreach teams could not directly refer individuals to a mental health bed; instead, they may have referred participants to clinical providers who determined the appropriate level of care and made a referral, as needed.[448] Moreover, the total number of mental health/SUD beds available across the Lookback Period remained unknown, leaving uncertainty about the number of available beds. In addition, no unified dataset reliably tracked a DMH referral alongside previous engagements with outreach teams or service providers. This gap in referral tracking and unclear bed inventory restricted A&M's ability to evaluate participant access to these specialized services and assess the effectiveness of existing referral processes.

Overall, the number of participants that accessed mental health/SUD beds represented a small subset of the overall participant population. This shortfall suggests potential fragmentation in referral mechanisms, service capacity, and outreach strategies for these services. The limited utilization raised concerns about the overall effectiveness of the City Program in meeting participants' long-term needs, as individuals who did not receive timely and appropriate mental health support may have experienced poorer outcomes and reduced housing stability.

---

[447] Correspondence by County Attorneys dated December 10, 2024.
[448] Ibid.

DRAFT & PRELIMINARY

*4.5.1.3.   High Service Need Interim Housing*

Although the High Service Need Interim Housing beds were not counted under the interventions for the City Programs, the Alliance MOU stipulated that individuals exiting the High Service Need Interim Housing beds should receive priority for City interim housing placements once they were "ready to be discharged."[449]

An analysis of the City shelter and interim housing beds established under the City Programs revealed that 276 unique participants from the High Service Need Interim Housing beds eventually enrolled in a City shelter or interim housing bed after an average gap of approximately 360 days, nearly one year after discharge. Although High Service Need Interim Housing beds were intended to provide a recuperative or stabilization option prior to transitioning to City shelter or interim housing beds, the significant delay suggests a disconnect in the CoC system. Moreover, 421 unique participants transitioned from a City shelter or interim housing bed to a High Service Need Interim Housing bed, outnumbering those who moved from High Service Need Interim Housing beds to City shelter or interim housing beds. While the system design and Alliance MOU agreement anticipated participants initially enrolling in High Service Need Interim Housing beds and later stepping down to City interim housing upon discharge, the data exhibited the opposite pattern: More individuals began in City interim housing and later enrolled in High Service Need Interim Housing beds. This misalignment between intended design and actual data highlights potential inefficiencies in resource allocation and raises broader concerns about the system's effectiveness in delivering the appropriate level of care at the right time.

During onsite fieldwork, service providers reported that the participant acuity levels were not clearly distinguishable between City interim housing beds and the High Service Need Interim Housing beds, and participants were not transferred to another site upon reaching a specific acuity level. Given that both bed types appeared to serve participants with similar acuity levels, the pattern from the analysis indicated that the original design, where High Service Need Interim Housing beds would address higher-acuity needs before transitioning participants, did not function as envisioned. These findings raise concerns about the efficacy of the overall CoC system in providing a timely and cohesive pathway to long-term stability.

*4.5.1.4.   Permanent Supportive Housing*

The Roadmap Program and Alliance Program both established PSH interventions; using data provided by the County, [450] Figure 4.8 below exhibits comparative metrics across the Lookback Period to offer insight into the effectiveness of services.

---

[449] Alliance MOU between County and City, dated May 2, 2024, pp. 5-6 of 15.

[450] A&M requested data for the provision of County-funded services to eligible participants served at PSH beds established under the Roadmap and Alliance Programs; the "permanent_housing_site" field did not include an address, so A&M was unable to comprehensively verify that the PSH data provided aligned with all relevant sites opened as of June 30, 2024 under the City Programs as reported in the respective quarterly status reports to the Court.

DRAFT & PRELIMINARY

FIGURE **4.8**

Enrolled PSH Participants with Move-In Dates by City Program Across the Lookback Period

| City Program | Total Number of Participants | Median Days Until Exit from PH | Percent of Clients Exited from PH |
|---|---|---|---|
| Roadmap Program | 63 | 401 | 43.8% |
| Alliance Program | 2,599 | 285 | 10.2% |
| Inside Safe Program | N/A | N/A | N/A |

FIGURE NOTE:  "Median Days Until Exit from PH" is based on the move-in and move-out dates in the PSH data; A&M noted inconsistencies in the reported "move-out" and "exit" dates within the PSH data for the Alliance Program and relied on the "move-out" date (i.e., in the absence of a move-out date, A&M assumed the individual is still enrolled in PSH).

The data summarized in Figure 4.8 was produced by the County; however, within the PSH data, a "source" field indicated that data was pulled from both HMIS and CHAMP. Data from HMIS included only three PSH sites under the Roadmap Program, offering limited insight into the participants served across the 16 PSH interventions established under the Roadmap Program. Additionally, one of the Roadmap Program's PSH sites had no "move-in" dates within the data, despite the City reporting that 10 PEH had been served at this location. These discrepancies highlight the convoluted nature of the manner in which PEH are tracked throughout the information technology systems employed by different stakeholders, especially when attempting to parse the data by locations categorized under the City Programs.

While the median length of stay at the Roadmap Program's PSH sites (401 days) was longer than the Alliance Program's PSH sites (285 days), the Roadmap Program exhibited a higher rate of PSH exits at 43.8%. Both metrics may reflect the longer operational tenure of the Roadmap Program's PSH sites compared to those of the Alliance Program, which opened more recently during the Lookback Period.

During the Lookback Period, 2,662 individuals moved into PSH units[451] created under the Roadmap and Alliance Programs. Participants residing in PSH units were, generally, provided with approximately 40 unique services overseen by the following County departments:

- Department of Health Services (including Housing for Health, Countywide Benefits Entitlement Services Team ("CBEST"), and medical services),
- Department of Public Social Services ("DPSS"),
- DMH, and
- Department of Public Health – Substance Abuse Prevention and Control ("DPH-SAPC")

Figures 4.9 and 4.10 below demonstrate the most highly utilized County services provided both before and after each participant was enrolled in the PSH program.[452]

---

[451] 2,658 unique PSH participants (out of the 2,662 total PSH participants) enrolled under the Roadmap Program (63) and Alliance Program (2,595). Under the Alliance Program, four PSH participants, ultimately, moved into different PSH locations for a unique participant count of 2,599.

[452] For clients with a move-in date during the Lookback Period, services provided were summarized prior to PSH enrollment and from the PSH enrollment date through the move-out date (if applicable).

FIGURE **4.9**

County Services for Enrolled PSH Participants with Move-In Dates under the Roadmap Program Across the Lookback Period

| Type of Service | County Department | Before PSH Enrollment | | After PSH Enrollment | |
|---|---|---|---|---|---|
| | | Number of Participants | % of Total Participants | Number of Participants | % of Total Participants |
| Intensive Case Management Services | DHS Housing for Health | - | 0% | - | 0% |
| CalFresh | DPSS | 50 | 79% | 53 | 84% |
| Medi-Cal | DPSS | 28 | 44% | 32 | 51% |
| Outpatient | DMH | 33 | 52% | 32 | 51% |
| | DHS-Medical | 4 | 6% | 7 | 11% |
| General Assistance/General Relief | DPSS | 12 | 19% | 9 | 14% |
| General Relief Opportunities for Work | DPSS | - | 0% | - | 0% |
| Emergency Room | DHS-Medical | 11 | 17% | 6 | 10% |

FIGURE NOTE: Not reflected in the table were DPH-SAPC services were provided to five, or 18%, of participants prior to enrollment and four, or 6%, of participants subsequent to enrollment in the PSH program.

FIGURE **4.10**

County Services for Enrolled PSH Participants with Move-In Dates under the Alliance Program Across the Lookback Period

| Type of Service | County Department | Before PSH Enrollment | | After PSH Enrollment | |
|---|---|---|---|---|---|
| | | Number of Participants | % of Total Participants | Number of Participants | % of Total Participants |
| Intensive Case Management Services | DHS Housing for Health | - | 0% | 2,595 | 100% |
| CalFresh | DPSS | 2,335 | 90% | 2,337 | 90% |
| Medi-Cal | DPSS | 1,894 | 73% | 1,781 | 69% |
| Outpatient | DMH | 1,323 | 51% | 1,123 | 43% |
| | DHS-Medical | 676 | 26% | 357 | 14% |
| General Assistance/General Relief | DPSS | 1,313 | 51% | 1,168 | 45% |
| General Relief Opportunities for Work | DPSS | 876 | 34% | 662 | 26% |
| Emergency Room | DHS-Medical | 874 | 34% | 468 | 18% |

FIGURE NOTE: Not reflected in the table were DPH-SAPC services provided to 367, or 14%, of participants prior to enrollment and 137, or 5%, of participants subsequent to enrollment in the PSH program.

The PSH service data exhibited above demonstrates that participants served under both the Roadmap and Alliance Programs received County services prior to PSH enrollment. Under the Alliance Program, however, 100% of participants received Intensive Case Management following their enrollment at the PSH site. Comparable data was not available for the Roadmap Program, potentially due to differences in the

information systems, HMIS and CHAMP, from which the data was obtained. Overall, the Alliance Program appears to have a higher proportion of participants connected to services.

Because the exit, or move-out, data on exit destinations for all PSH participants enrolled was not available, A&M was unable to analyze the outcomes of the participants (e.g., deceased, relocated, or returned to homelessness). However, the HMIS data provided by LAHSA for the PSH sites under the Roadmap Program, though not fully aligned with the County's PSH records, indicated that an average of 60% of participants exited the PSH sites, with a median exit rate of 46%. Of these exits, an average of 29%, median of 36%, was attributed to participant deaths, while an average of 1% involved individuals returning to homelessness.

A comparison between the permanent housing interventions established under the Roadmap Program, specifically TLS and PSH beds, revealed differing exit patterns and potential service gaps. An average of 64% of participants in TLS exited, median exit rate of 66%; of these exits, approximately 60%, median of 63%, transitioned to a form of permanent housing, though it is unclear whether this exit was to another TLS subprogram or PSH site. This exit data reflects a need for continued rental subsides and/or supportive services, such as intensive case management. An average of approximately 10% of TLS participants returned to homelessness. These trends underscore the distinct support requirements for long-term housing interventions and highlight the importance of strengthening the provision of ongoing services to foster sustained housing retention.

DRAFT & PRELIMINARY

KEY TAKEAWAYS OF SECTION 4.5

- A review of the sampled sites found that 22.0% of participants exited to permanent housing, while 47.8% returned to homelessness, a higher rate than permanent housing exits. This discrepancy suggests ongoing challenges in maintaining stable housing and underscores the need for stronger strategies to reduce returns to homelessness.

- In the absence of uniform, transparent protocols for distributing housing resources and associated services, some individuals experiencing homelessness may have received quicker or more extensive support, such as permanent housing, mental health/SUD beds, and High Service Need Interim Housing beds, than others with comparable needs. This lack of clarity as to why certain individuals received quicker and more extensive support not only complicates accountability but also hinders stakeholders' ability to assess the long-term stability of participants and the overall effectiveness of these City Programs in serving people experiencing homelessness.

- Multiple segmented data systems and a lack of integration among them hindered the ability to track individuals experiencing homelessness throughout their engagement with services. This fragmentation not only complicated efforts to consolidate critical information, such as service utilization and outcomes, but also increased the risk of duplicated or incomplete records. Consequently, identifying an individual's progress and coordinating service delivery across various subprograms became more challenging, potentially undermining the effectiveness of the homelessness assistance services provided under the City Programs.

- Without a clear grasp on the types and range of supportive services that increase housing retention or contribute to higher exit rates or reentry into homelessness, resource allocation decisions may not effectively address existing service delivery gaps. Consequently, the inability to tailor funding and support to meet actual needs could undermine the overall effectiveness of the City Programs.

DRAFT & PRELIMINARY

SECTION 5

# Assessment of Monitoring and Oversight by LAHSA

## 5.1 A&M Approach to Evaluation of Monitoring and Oversight by LAHSA

The financial and performance assessment mainly focused on LAHSA's monitoring and oversight processes of service providers, given its role in managing the majority of the City's funds for homelessness assistance services under the City Programs. However, the County also delivered services directly and/or contracted with service providers for City-funded beds, specifically PSH. This arrangement resulted in distinct monitoring and oversight frameworks across the two entities. For the purposes of this section, the focus remains on LAHSA, as it administered the majority of funding for homelessness assistance services for the City.

## 5.2 Governance and Accountability

LAHSA was established in response to litigation in the 1980s and early 1990s, sparked by disagreements between the City and the County.[453] Its authority derives from the JPAA, dated December 17, 1993, executed between the City and the County.[454] This foundational agreement permits LAHSA to exercise its powers independently from the City and the County, coordinating existing services for the PEH previously operated separately by the City and County.[455] It also authorizes LAHSA to design, fund, and operate other homeless and social services to assist those in the community who are eligible for those services.[456] LAHSA was authorized to do all acts necessary, including but not limited to:

- Make and enter into contracts,
- Employ agents and employees,
- Acquire, construct, manage, maintain, operate and lease buildings, works or improvements,
- Acquire, hold or dispose of property within the County,
- Incur debts, liabilities, or obligations, which shall not constitute debts, liabilities or obligations of the City or the County,
- Receive services and other forms of assistance from persons, firms, corporations, and any governmental entity, and
- Solicit charitable contributions from private sources.

The JPAA stipulated that none of its provisions would preclude the City or the County from establishing, maintaining, or providing social programs or services to their residents as deemed appropriate and necessary.[457]

---

[453] LAist, Confused About What the LA Homeless Services Authority (LAHSA) Does? We Have Answers., dated September 27, 2021.
[454] LAHSA Joint Powers Authority Agreement, dated December 17, 1993, p. 1 of 20.
[455] LAHSA Joint Powers Authority Agreement (Amendment 1), dated February 28, 2001, pp. 5-7 of 28.
[456] Ibid.
[457] Ibid., p. 3.

DRAFT & PRELIMINARY

### 5.2.1.    OVERVIEW OF LAHSA'S GOVERNANCE STRUCTURE

LAHSA, as an organization, was designated as the HMIS lead, the management entity for the CES, and the collaborative applicant, bearing responsibility for administering and allocating homelessness assistance funding throughout the CoC system.[458] The governing body of LAHSA is the Commission ("LAHSA Commission"), which is composed of 10 members with representatives appointed by both the City and the County.[459] The City and the County authorized the LAHSA Commission to make "budgetary, funding, planning, and program policies related to homelessness, with a particular focus on funding sources administered by LAHSA on their behalf."[460] In the JPAA, the City specified that its financial contributions must be allocated exclusively to services within its jurisdiction.[461] The Los Angeles CoC Governance Charter published by LAHSA additionally outlined other boards, councils, and committees that contribute to the overall governance of homelessness services and the continuum of care, including the LA CoC Board, the CES Policy Council, Lived Experience Advisory Board, and the Homeless Youth forum of Los Angeles.

In accordance with the JPAA, LAHSA was allowed to employ an Executive Director, Chief Financial Officer, and such other officers and employees as LAHSA deemed necessary to carry out any of its powers.[462] Departments within LAHSA, such as Access and Engagement, Finance, Contracts and Procurement, Data Analytics, Funding and Allocation, and Grants Management and Compliance, functioned under their respective responsibilities and lines of accountability.[463]

LAHSA was entrusted with various key activities:

- Serving as the lead agency for the LA CoC, which includes meeting HUD requirements and facilitating the annual PIT Count,
- Establishing priorities for funding,
- Administering and monitoring the delivery and quality of service contracts, and
- Managing data collection through the HMIS and producing official reports on service outcomes.[464]

## 5.3    DISTINGUISHED ROLES AND RESPONSIBILITIES

Throughout the Lookback Period, LAHSA was the primary administrator of the City's homelessness assistance services. This framework split responsibilities among multiple entities, notably between LAHD, LAHSA, and service providers. The following section clarifies the general roles and responsibilities of these parties, detailing the distribution of monitoring and oversight.

### 5.3.1.    LOS ANGELES HOUSING DEPARTMENT

In relation to the City Programs within the scope of this assessment, the City, specifically LAHD, entered into various professional services agreements with LAHSA.[465] These executed contracts authorized LAHSA to contract with service providers for the delivery of services for the applicable housing interventions established under the City Programs. The City outlined standard provisions, reporting

---

[458] Los Angeles Continuum of Care Governance Charter adopted December 13, 2023, p. 8 of 22.
[459] LAHSA Joint Powers Authority Agreement (Amendment 1), dated February 28, 2001, p. 7 of 28.
[460] Los Angeles Continuum of Care Governance Charter adopted December 13, 2023, p. 7 of 22.
[461] LAHSA Joint Powers Authority Agreement (Amendment 1), dated February 28, 2001, p. 19 of 28.
[462] Ibid., p. 13.
[463] LAHSA Organizational Chart as of June 1, 2024.
[464] Los Angeles Continuum of Care Governance Charter adopted December 13, 2023, pp. 12-14 of 22.
[465] LAHD was formerly known as the Housing and Community Investment Department across the Lookback Period.

DRAFT & PRELIMINARY

requirements, procedures, remedies, and other miscellaneous terms in the contracts pertaining to the respective City Program. LAHD was designated by the City to provide "the proper planning, coordination, direction, and management oversight of the City's homeless programs and certain projects funded by the City" in its contract with LAHSA.[466] Therefore, under the City's contract with LAHSA, LAHD was designated to monitor and evaluate LAHSA's performance, ensuring that all contracted activities align with the agreed-upon terms.

In an organizational chart provided by the City in May 2024, the LAHD had a unit titled "LAHSA Oversight" that exhibited six budgeted positions:

- One Sr. Project Coordinator,
- Three Management Analysts,
- One Project Coordinator, and
- One Admin. Clerk.[467]

Two of the three Management Analysts were identified as "vacant" – leaving four positions occupied.

According to a draft internal policy for reporting and monitoring of LAHSA, last revised in September 2024, LAHD was required to conduct periodic site visits to LAHSA's programs, or subprograms, of each project sponsor at least once per year to verify compliance with the City's contractual requirements.[468] These site visits formed part of LAHD's responsibility to ensure adherence to contract provisions and other obligations related to homeless programs funded by the City. Based on email correspondence from LAHD, this policy was not in effect throughout the entire Lookback Period, creating potential inconsistencies in monitoring activities. Notably, by design, the same team that approved LAHSA's invoices, or cash requests, was also tasked with overseeing and monitoring LAHSA's performance; therefore, this designed structure created a potential conflict of interest, as it combined financial validation responsibilities with broader oversight and monitoring responsibilities for compliance and service quality. Within this arrangement, impartial judgment may have been compromised, particularly if payment approvals conflicted with findings that indicated service deficiencies.

### 5.3.2.    LOS ANGELES HOMELESS SERVICES AUTHORITY

In accordance with the contractual obligations under the professional services agreements between LAHSA and LAHD, LAHSA was charged with monitoring and oversight responsibilities, including ensuring subcontractor compliance with City terms, conducting periodic review of program and fiscal performance, and withholding funds when necessary. For example, in the Program-Named LAHSA Contracts and General Fund LAHSA Contract, they stated,

> "[LAHSA to] Oversee and monitor all project activities, including those of subcontractors to which program participants are referred … Ensure that the terms and conditions of this Agreement with the City are incorporated into all subcontractor agreements. The Contractor shall submit all subcontractor agreements to the City for review prior to the submission of cash requests. The Contractor shall withhold funds to any subcontractor agency that fails to comply with the terms and conditions of this Agreement and their respective subcontractor agreement." [469]

---

[466] City/LAHSA Roadmap Contract C-144656, p. 7 of 119.
[467] LAHD, Organizational Chart - Program Operations and Grants Management, April 1, 2024.
[468] LAHD, LAHSA Oversight Policies & Procedures, revised September 2024, p. 39 of 54.
[469] City/LAHSA Roadmap Contract C-144656, Section 202.B.3.

DRAFT & PRELIMINARY

As a result of this requirement, LAHSA was directly responsible for ensuring compliance at the subcontractor, or service provider, level. If a service provider failed to meet contractual obligations, LAHSA was expected to withhold funds, functioning as the initial line of oversight.

Further, the Program-Named LAHSA Contracts and General Fund LAHSA Contract required, "Contractor [LAHSA] shall conduct periodic, objective program and fiscal monitoring reviews of the project it operates to ensure compliance with applicable federal, State and City requirements."[470] This contract language explicitly assigned LAHSA the duty to conduct its own monitoring of both program and fiscal management. With the language of "periodic, objective" reviews, it has an independent responsibility to identify and address any noncompliance or performance issues among the projects it operated or subcontracted.

To align contractual language with operations, during the assessment, A&M requested formal policies and procedures detailing the oversight of service providers within the scope of the assessment. In response, LAHSA provided a single document under this request[471] titled *Interim Housing Department: Standard Operating Procedures* last updated on April 26, 2024, which was specific to the Interim Housing Department ("IHD"). The document explained that the IHD staff were meant to utilize data to inform decisions, monitor activities, ensure adherence to SRSs, program standards and guides, and evaluate the effectiveness of interim housing in transitioning participants to permanent housing.[472] LAHSA Analysts and Coordinators were responsible for reviewing various reports for the programs under their purview, including HMIS Data Quality Reports, Active System Management reports, and budget versus actual expenditure reports generated from EGMS by the GMC.[473] Coordinators were expected to contact service providers whose data implied non-compliance with SRS expectations. The process was designed for the GMC to take the lead with service providers concerning underspending, overspending, funding requests, and budget adjustments.[474] The GMC was expected to conduct separate meetings with service providers to address these matters and consult with the Interim Housing Department staff to obtain KPI data and contextual information on spending-related challenges. The GMC was responsible for completing the monitoring reports of service providers, gathering all relevant financial and performance data, escalating these findings to their leadership, and making determinations regarding requests for additional funding. Due to the limited documentation provided, it remains unclear whether the processes identified for interim housing programs differ from those applicable to permanent housing programs.

According to an organizational chart provided by LAHSA, as of June 1, 2024, the IHD had 10 Coordinator positions, four of which were vacant. The IHD also had six Analyst positions, three of which were vacant.[475]

The Program-Named LAHSA Contracts and General Fund LAHSA Contract further outline: "The Contractor shall be responsible for compiling and maintaining a log of all grievances and formal complaints filed against itself, and of all grievances and formal complaints against subcontractors that are appealed to the Contractor." LAHSA's Quality Standards team was responsible for documenting the analysis and resolution of all grievances submitted by participants and the public concerning LAHSA and LAHSA-funded programs and services, thereby providing supplemental oversight of compliance with contractual

---

[470] City/LAHSA Roadmap Contract C-144656, Section 202.B.6.
[471] LAHSA, Interim Housing Department: Standard Operating Procedures, updated April 26, 2024.
[472] LAHSA, Interim Housing Department: Standard Operating Procedures, updated April 26, 2024, p. 42 of 50.
[473] Ibid., pp. 42-43.
[474] Ibid., p. 45.
[475] LAHSA Organizational Chart as of June 1, 2024, p. 40 of 71.

DRAFT & PRELIMINARY

requirements.[476] LAHSA maintained a grievance process that triaged grievances and terminations, including associated appeals, through three distinct phases, designed to address participants' concerns.[477]

- In Phase One, the participant and the service provider completed the grievance appeal and/or termination appeal process. If the participant wanted to file an appeal after this phase, it triaged to Phase Two.
- In Phase Two, the LAHSA Quality Standards team verified that the participant was afforded due process during Phase One, and the service provider complied with the requirements. If the participant desired to pursue further appeal following this phase, the appeal entered Phase Three.
- In Phase Three, the grievance and/or termination appeal was reviewed by LAHSA's Risk Management Investigations Unit.

In summary, this sampling of clauses from contracts and documents assigned day-to-day compliance monitoring and enforcement responsibilities directly to LAHSA. Rather than merely acting as an intermediary, pass-through entity for funds, LAHSA was expected to actively ensure that each service provider adhered to the respective terms of its professional services agreements with the City and comply with all applicable regulatory standards. This arrangement appeared to relieve the City of needing to closely track each service provider directly, while retaining authority to hold LAHSA accountable if it failed to fulfill these duties. Therefore, service providers reported to and were regulated by LAHSA, and LAHSA remained accountable to the City for ensuring compliance of service providers.

### 5.3.3.    SERVICE PROVIDERS

In the contracts between LAHSA and service providers, similar contract language involving monitoring and oversight was consistently identified. For example, in a sampled contract pertaining to homelessness assistance services under the City Programs, the agreement terms outlined that:

> *"LAHSA and/or Funding Entity(ies) will monitor Contractor's [Service Provider's] performance under this Agreement on not less than annual basis. Such monitoring will include assessing Contractor's compliance with all Agreement terms and conditions and performance standards. LAHSA and/or Funding Entity(ies) shall issue a monitoring report following the fiscal and program monitoring reviews."[478]*

Additionally, the terms stated that the "Contractor [Service Provider] shall conduct periodic, objective program and fiscal monitoring reviews of the Program it operates to ensure compliance with applicable Federal, State, County, City, and LAHSA requirements."[479] The contractual terms further outline, "Contractor [Service Provider] must maintain a written set of Grievance and Termination Policies and Procedures that comply with LAHSA requirements, as specified … Contractors must submit a copy of said policies and procedures as required by this Agreement."[480]

A copy of the grievance policy and procedure attached to a service provider contract outlined:

> *"If the client believes that [Service Provider] has not followed this established Grievance Policy in hearing and attempting to resolve the grievance, the client has the right to: File a due process appeal with LAHSA after*

---

[476] LAHSA Data, Grievance Tracking [No Date Available].
[477] Ibid.
[478] Sampled Service Provider Contract Review, Section 35.
[479] Sampled Service Provider Contract Review, Section 28.
[480] Sampled Service Provider Contract Review, Section 28.

DRAFT & PRELIMINARY

Section 5

> *receiving the written decision from the dispute resolution or mediation meeting. The client will be assisted in filling out and submitting the LAHSA Grievance Resolution Appeal Form. [Service Provider] will either provide a stamped envelope address[ed] to LAHSA or fax the form directly to LAHSA depending on the client's choosing.'*[481]

This contractual language, mirroring the terms between LAHD and LAHSA, incorporated requirements for program and fiscal monitoring review as well as grievance procedures into LAHSA's service provider agreements. Consequently, service providers were expected to conduct internal oversight of their own service delivery, financial management, and compliance, assuming an active role in program quality and accountability alongside LAHSA's oversight role on behalf of the City.

The service providers became part of a broader accountability chain. Each level, City to LAHSA and LAHSA to service provider, maintained a layer of monitoring and oversight responsibility. As designed, this structure was intended to promote consistent evaluation of compliance, data integrity, and program effectiveness at multiple levels.

## 5.4 RESULTS FROM MONITORING AND OVERSIGHT PROCESSES

### 5.4.1.  LOS ANGELES HOUSING DEPARTMENT

During the Lookback Period, LAHD disclosed it did not complete any monitoring reports of LAHSA due to the COVID-19 pandemic, from July 1, 2020, through June 30, 2023.[482] Beginning in FY2023-24, LAHD explained it completed monitored activities of LAHSA, specifically LAHSA's HETs funded under its contracts with LAHSA: C-140706, C-135650, and C-137223. In a joint effort with LAHSA, LAHD additionally monitored one service provider funded under four contracts between LAHD and LAHSA: C-135650, C-138675, C-137223, and C-144656. Although the City did not provide a monitoring report in reference to this joint monitoring effort with LAHSA, this omission may have been due to the timing of the report's completion.

LAHD's monitoring of LAHSA's HETs indicated that the teams were on track to meet their fiscal year performance target but identified the absence of comprehensive operational policies and procedures, which LAHD believed hindered a more thorough evaluation.

In addition to the COVID-19 pandemic, due to limited staffing, LAHD may have faced constraints in conducting thorough oversight of the six active contracts[483] between LAHD and LAHSA, as of June 30, 2024, including three contracts that were explicitly tied to the City Programs (Program-Named LAHSA Contracts and General Fund LAHSA Contract). This limitation may have restricted LAHD's capacity to perform in-depth monitoring of LAHSA's contractual obligations and respective performance data. Further, although LAHD has management oversight of LAHSA, City officials may occupy seats on the LAHSA Commission, which complicates oversight mechanisms. When City officials shape policy at LAHSA, LAHD may be less inclined to highlight potential shortcomings in an entity the City helps govern. This limitation can lead to less rigorous audits, performance reviews, or corrective action.

---

[481] Sampled Service Provider Contract Review, Service Provider Client Grievance Policy and Procedure.
[482] LAHD Data, List of LAHSA Monitoring Reports [No Date Available].
[483] Active City/LAHSA Contracts as of June 30, 2024:  C-141840, C-144656, C-140706, C-138675, C-135650, and C-145331.

DRAFT & PRELIMINARY

### 5.4.2.   LOS ANGELES HOMELESS SERVICES AUTHORITY AND SERVICE PROVIDERS

As of August 2024, LAHSA identified and completed six monitoring reports of five service providers for services within scope during the Lookback Period – encompassing 42 unique contracts. Since a single monitoring report can include multiple contracts, among these 42 unique contracts, 18 contracts (excluding their amendments) were associated with the Program-Named LAHSA Contracts and General Fund LAHSA Contract.[484] This monitoring activity represented 11% of, approximately, 165 LAHSA-managed contracts across the Lookback Period under the City Programs.[485]

Within the scope of this assessment, 45 findings and concerns were identified by LAHSA.[486] Three contracts did not have a finding or concern reported; therefore, 15 of the 18 contracts within scope, or over 80%, had a finding or concern identified by LAHSA. This review of the sampled contracts revealed a high incidence of noncompliance during the monitoring reviews, indicating gaps in adherence to established contractual or regulatory standards. LAHSA's findings highlight the need for strengthened oversight and corrective measures to ensure consistent compliance across all contracts. Common findings and concerns involved missing participant files and documentation, inaccurate bank reconciliations, and procurement issues. Although LAHSA's monitoring reports highlighted these issues, LAHSA did not address the reasonableness of expenditures or the extent to which performance goals, or key performance indicators, were met. Consequently, this gap limits assurance that the expenditures incurred were aligned with intended service outcomes, potentially compromising the overall effectiveness and accountability of homelessness assistance services.

LAHSA's findings identified instances of disallowed costs of approximately $500 related to three of the 18 contracts within scope. Disallowed costs included purchases from Amazon, Ralph's, a bakery, and Best Buy.[487] LAHSA requested repayment of the costs questioned in the respective monitoring reports; A&M did not identify repayment of the amounts within the financial data that LAHSA produced to A&M.

During the review of executed contracts for sampled interim housing sites under the Roadmap Program and Alliance Program, A&M noted multiple discrepancies between the date the site was reported open and occupiable and the date of formal contract execution. Based on the service provider contracts provided by LAHSA related to the sampled sites, an average of 140 days elapsed between the site's reported opening date and the contract execution date; however, due to changes in the contracts' naming convention and potential deficiencies in recordkeeping, it is likely that LAHSA did not produce all relevant executed contracts pertaining to the sampled sites. As previously noted, A&M endeavored to identify which service provider contracts were associated with the sites established under the Roadmap and Alliance Programs. However, the initial list of contracts provided by LAHSA did not include approximately 145 contracts that LAHSA later claimed were related to these sites, resulting in confusion regarding which contracts pertained to the sites within scope. This confusion was compounded by the inconsistent referencing of interim

---

[484] These contracts were identified using LAHSA's financial records, which tracked the services associated with the City Programs' housing interventions under LAHSA's management.
[485] Service provider contract nomenclatures changed between FY 2020-21 and FY 2021-22, making it challenging for A&M to fully reconcile older contract codes with the new ones based on the data provided by LAHSA. Consequently, to avoid duplication in the contract counts, 165 unique contracts incurred expenses tied to the City Programs from FY 2021-22 through FY 2023-23. (LAHSA Accounting Data).
[486] These findings and concerns do not include the State of California's Department of Housing and Community Development ("HCD") "Areas of Attention." HCD completed a desk monitoring between April 5, 2024 and December 15, 2022 of the Emergency Solutions Grant – CARES Act (ESG-CV) Program. The "Areas of Attention" identified by HCD were included for awareness in the monitoring reports but did not specify whether the "Areas of Attention" applied to the service provider.
[487] Ibid.

housing site locations within the respective contracts. Moreover, the County's Department of Auditor-Controller of LAHSA, identified analogous issues and raised similar concerns:

> *"[LAHSA] Could not provide comprehensive contract data (e.g., an accurate list of all contracts, execution dates, etc.) to determine the total number of contracts that were executed either timely or retroactively in FY 2023-24. In addition, we noted instances where contracts were executed excessively late and the delays were due to issues concerning LAHSA's internal contracting processes…Specifically, while LAHSA indicated they had 1,273 active contracts as of May 2024, LAHSA provided five different contract listings from EGMS that identified varying contract totals ranging from 676 to 1,078. Significantly, none of the different listings provided by LAHSA accounted for all of the active contracts LAHSA reported having."[488]*

A&M's analysis of the sampled sites' service provider contracts provided by LAHSA further identified that, on average, 82 days elapsed between the contract term's start date and the contract's execution date. Furthermore, each sampled contract reached full execution only after its stated term had already commenced. These delays not only created uncertainty about service delivery during the interim period but potentially complicated monitoring and oversight, as the necessary contractual framework for tracking compliance and performance was not formally established. In comparison, the service contracts provided by the County for PSH were executed prior to the start date of the contract term.

In relation to grievances, LAHSA produced a summary table in response to the request for the log of all grievances and formal complaints against subcontractors, or service providers, that were appealed to them, within the scope of the assessment. The summary table outlined the number of grievances by year for all service provider contracts as well as a section specific to the City Programs titled "Roadmap," along with the respective phases of the grievance process.

Of the 2,244 unique requests LAHSA received for grievance support from October 2020 through October 2024, LAHSA reported 45 grievances that were transitioned to Phase Two; therefore, approximately 2% of grievances escalated to Phase Two.[489] Phase Three was not disclosed. In relation to Phase Two specific to participants of the City Programs, LAHSA produced six "Determination Appeal Notice" documents. LAHSA determined that due process was substantiated, and the service provider was found compliant in all instances; therefore, these grievances did not progress to Phase Three.

In summary, across the Lookback Period, over 80% of the City-funded service providers exhibited at least one instance of noncompliance with contractual requirements or other standards of the monitored contracts. Notably, the reported number of appealed grievances remained low, raising concerns about the effectiveness of the grievance process or awareness among participants of the process itself. Compounding this issue, the IHD units responsible for performance oversight faced staffing vacancies, which likely hindered their ability to conduct robust reviews and address compliance gaps. Further, the involvement of two separate LAHSA departments (IHD and GMC) in monitoring and oversight presented potential risks and gaps. Responsibility for key tasks, such as evaluating compliance, financial reporting, and performance metrics, may become fragmented, or duplicated across departments, leading to inconsistencies or omissions. Without a clearly defined chain of command and well-documented communication channels, accountability may have been diminished, and timely identification or resolution of compliance issues may

---

[488] County of Los Angeles Department of Auditor-Controller, Los Angeles Homeless Services Authority – Finance, Contracts, Risk Management, and Grants Management Review, dated November 19, 2024, pp. 2-6 of 57
[489] LAHSA Data, Grievance Tracking [No Date Available]; "Electronic tracking of grievances began in October 2020. Prior to this, files were stored in hard copy format."

Section 5

be hindered. Establishing a unified oversight framework with clearly delineated roles and responsibilities is critical to mitigating these challenges.

### KEY TAKEAWAYS OF SECTION 5.4

- Although this assessment did not examine the monitoring and oversight of the County's service contracts, the County's direct provision of services and/or its direct contracting with service providers, appears to streamline communication and oversight by reducing an additional level of bureaucracy. Based on feedback from service providers, this structure facilitated more efficient coordination and clearer accountability in comparison to indirect contracting arrangements with the City.

- The number of staff vacancies limited LAHD's capacity for in-depth monitoring of LAHSA's contractual obligations and performance data. Moreover, because City officials served on LAHSA's Commission, LAHD may have been less inclined to highlight potential shortcomings with an entity the City helped govern. Additionally, the lack of separation of duties within LAHD created a potential conflict of interest, as it combined financial approval responsibilities with oversight of LAHSA. This arrangement increased risks for weaker audits, performance reviews, or corrective actions, ultimately reducing accountability

- Multiple factors point to the need for enhanced monitoring protocols, more robust grievance reporting mechanisms, and greater capacity to oversee service provider performance. For example, only 11% of service provider contracts underwent monitoring by LAHSA across the Lookback Period, and of those examined, 80% were found to be noncompliant. This limited monitoring and high noncompliance rate underscore the need for stronger oversight to ensure service effectiveness and accountability among all involved parties. Aligning performance and financial oversight is essential to verify that expenditures support intended service outcomes.

- Due to LAHSA's inability to accurately and completely identify and provide all service provider contracts, it was not possible to confirm whether the contracted services were established and available at each sampled site when the City reported them as open. This gap in documentation and recordkeeping complicated A&M's ability to confirm the scope and timing of service provision, raising concerns on the continuity and oversight of contracts. On average, 82 days passed between the contract's term start date and the contract's executed date. These discrepancies potentially complicated monitoring and oversight.

SECTION 6
_____

# The Los Angeles Police Department

## 6.1 A&M APPROACH TO LAPD ASSESSMENT

The LAPD is the largest City department with a budget for approximately 14,000 personnel and over $1.8 billion during FY 2023-24.[490] The majority of LAPD's policing activities are managed through the Office of Operations, which is comprised of four Bureaus that are further divided into 21 geographic Areas (or Divisions).[491] The LAPD's Homeless Coordinator's Office, along with a few other specialized Divisions, sits within the Office of Operations.

The LAPD's role in the context of A&M's assessment proved challenging to delineate, largely due to limited data documenting its specific involvement in the City Programs. The LAPD's core function of ensuring public safety means that the LAPD will be incidentally involved in any matter, related to homelessness or otherwise, where the public safety of citizens is at issue.

Therefore, the objective of A&M's review of the LAPD within the broader financial and performance assessment focused specifically on the evaluation of funds appropriated for the LAPD in the City's adopted Homeless Budgets. A&M aimed to furnish the Court with transparency regarding the LAPD's units that are directly involved in homelessness-related activities, the amount of expenditures associated with those activities, and where possible, the metrics tracked and reported by the LAPD.

## 6.2 ROLES AND RESPONSIBILITIES FOR HOMELESS SERVICES

A&M requested financial data and performance metrics for the budgeted items in Figure 6.1 for the LAPD in the City's Homeless Budgets throughout the Lookback Period:

_____

[490] City of Los Angeles 2023-24 Budget Summary, pp. 11 and 13 of 27.
[491] LAPD, Office of Operations (https://www.lapdonline.org/office-of-the-chief-of-police/office-of-operations/).

FIGURE **6.1**

LAPD Budgeted Amounts per the City's Annual Homeless Budget Across the Lookback Period

| LAPD Homeless Budget Category | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|
| A Bridge Home / Overtime for IHHS | $8,400,000 | $8,000,000 | $9,000,000 | $8,360,000 | **$33,760,000** |
| Homeless Coordinator Resources | 216,482 | 220,938 | 231,035 | 255,326 | **923,781** |
| Resource Enhancement Services and Enforcement Team (RESET) | 257,703 | 282,042 | 296,819 | 316,967 | **1,153,531** |
| Unified Homeless Response Center (UHRC) | 434,000 | 437,459 | 460,578 | 472,900 | **1,804,937** |
| Proactive Engagement Staff / Support for Public Right-of-Way Clean Up | 4,875,830 | - | - | - | **4,875,830** |
| **Grand Total** | **$14,184,015** | **$8,940,439** | **$9,988,432** | **$9,405,193** | **$42,518,079** |

SOURCE: City of Los Angeles Adopted Budgets

In response, LAPD provided financial and performance data related to the A Bridge Home/Interim Homeless Housing Site overtime hours and payroll data for the Homeless Coordinator's Office and Resources Enhancement Services Enforcement Team ("RESET"); no additional information was provided for UHRC or the Proactive Engagement Staff/Support for Public Right-of-Way Clean Up. A&M also conducted onsite interviews with the Homeless Coordinator's Office and the RESET teams.

6.2.1.    LAPD OVERTIME COSTS FOR INTERIM HOMELESS HOUSING SITES

Regarding the broader activities and costs associated with homeless-related services within the LAPD, the LAPD did not routinely track financial data for homelessness-related responses during the normal course of duty. However, the LAPD provided data related to the use of overtime funds allocated to the LAPD during the City's budget process.

Specific to the scope of this assessment, LAPD tracked actual utilization of the allocated overtime funding for homeless-related activities, which was referenced interchangeably as A Bridge Home ("ABH") or Interim Homeless Housing Site ("IHHS") funds within the City's records,[492] under Code 49 in LAPD payroll data.[493] The creation of ABH sites led to the origin of these overtime funds, which LAPD used to provide patrols, security, or other enforcements around the sites. However, the data did not actually track the hours by ABH/IHHS site, and since 2021, the overtime funds have been utilized for a broader array of services related to homelessness.[494]

Generally, LAPD overtime was managed and assigned through the LAPD's Cash Overtime Allotment for Scheduling and Timekeeping ("COAST") System. However, Code 49 was managed separately, with each Area using discretion regarding fund utilization.[495] The Homeless Coordinator's Office provided guidance to Areas on appropriate use of these funds. Per memorandums to City Council, the following criteria governed the use of these funds:[496]

---

[492] Interview with LAPD Homeless Coordinator's Office on November 20, 2024.
[493] LAPD Data, ABH/IHHS Overtime.
[494] Interview with LAPD Homeless Coordinator's Office on November 20, 2024.
[495] Ibid.
[496] LAPD Memo, Release of Remaining a Bridge Home Funds, dated September 7, 2022, p. 4 of 6.

- Funds could be used for CARE or CARE+[497] operations, enforcement of Los Angeles Municipal Code sections 41.18 and 56.11, and/or to deter repopulation in areas prohibited by the aforementioned LAMC sections.
- Funds could support homeless-related vehicle impound operations and the impounding of oversized vehicles.
- Funds could be used in support of operations conducted by the Department of Recreations and Parks, the Department of Transportation, and the Department of Sanitation in response to requests from City Council Districts.
- Resources could be deployed beyond ABH Special Enforcement and Cleaning Zones ("ABH SECZ") to address crime suppression in any geographic area where PEH was a contributing factor.
- Primary consideration was given to specialized units (including but not limited to Narcotics Enforcement Details, Vice Units, Gang Enforcement Details, Bike Details, Senior Lead Officers, Task Forces, and Footbeats). Secondary consideration was focused on a high-visibility uniformed presence within ABH SECZ areas based on data-driven research.
- Each Bureau's deployment plan was expected to consider crime classifications involving PEH as suspects, victims, and/or witnesses, as well as homeless encampments as potential areas of occurrence.
- Detectives were expected to conduct Wanted Persons Task Forces on weekends to locate and arrest PEH identified as perpetrators of violent crimes.

These criteria formed the basic framework for the use of ABH/IHHS funds. The Homeless Coordinator's Office explained that the use of these funds may have taken various forms, including scheduled outreach details or details responsive to current community concerns.[498] Areas also utilized ABH/IHHS hours to support CARE/CARE+ operations in coordination with the Sanitation Department, and Inside Safe operations within their geographical boundaries.

### 6.2.2.   HOMELESS COORDINATOR'S OFFICE

The LAPD Homeless Coordinator's Office sits within LAPD Headquarters and was staffed with nine individuals[499] who coordinated homeless-related response services for the four Bureaus, including coordinating the LAPD's response to crime and quality of life issues, as well as aligning the LAPD's activities with the Mayor and City Council's homelessness policies and priorities.[500] In addition to providing guidance to LAPD Areas on eligible uses of ABH/IHHS overtime hours, LAPD Homeless Coordinator's Office also wrote policies and provided training relevant to Los Angeles Municipal Codes, supported Council Districts and the CAO with staffing and resources for various homelessness-related activities (including Inside Safe and vehicle dwelling operations), and coordinated any other operations that required or requested LAPD presence.[501]

---

[497] CARE and CARE+ operations are carried out by the Los Angeles Sanitation Department; teams conduct encampment clean-ups along with trash, litter/debris, and other health or safety hazard removals on the public rights-of-way.
[498] Interview with LAPD Homeless Coordinator's Office on November 20, 2024.
[499] As of November 2024, including two vacant positions. (Interview with RESET Team on November 20, 2024).
[500] City of Los Angeles, FY 2023-24 White Book, Supplement to the 2023-24 Adopted Budget, Volume II, p. 522 of 540.
[501] Interview with LAPD Homeless Coordinator's Office on November 20, 2024.

### 6.2.3.    RESOURCES ENHANCEMENT SERVICES ENFORCEMENT TEAM (RESET)

The LAPD RESET served the "Skid Row community by utilizing [o]utreach and [s]ervice [p]roviders."[502] RESET was staffed with one lieutenant, five sergeants, and 32 full-time officers and operates out of the Central Division. [503] RESET operated two shifts:

- Watch 2:  06:00 – 18:00 (12-hour shifts)
- Watch 5:  12:00 – 22:00 (10-hour shifts)

The first shift (Watch 2) was dedicated to Operation Healthy Streets (also known as Watershed).[504] Operation Healthy Streets was similar to a CARE+ operation, wherein Skid Row blocks were cordoned off, PEH removed their belongings, and then, the designated area was cleaned. Operation Healthy Streets had permanently posted signage that indicated streets that were in a zone where the City conducted enhanced cleaning and trash removal. Operation Healthy Streets operations occurred daily within Skid Row, meaning the designated streets received recurring cleaning approximately every two weeks. The RESET attended Operation Healthy Streets operations solely to provide public safety for sanitation and other onsite staff members.

Once Operation Healthy Streets has concluded and Watch 5 was on duty, the larger RESET collaborated on Los Angeles Municipal Code 41.18 enforcement or other targeted operations.

### 6.2.4.    UNIFIED HOMELESS RESPONSE CENTER

The Unified Homeless Response Center ("UHRC") was a collaboration between City departments to respond in a coordinated fashion to issues related to encampments and PEH. The LAPD was budgeted for officers to be staffed at the UHRC to ensure the coordination of City efforts related to homelessness involving the LAPD.[505]

Per conversations with LAPD personnel, the UHRC was effectively phased out during the COVID pandemic. No specific data was provided in response to A&M's assessment across the Lookback Period.

### 6.2.5.    STAFF / SUPPORT FOR RIGHT-OF-WAY CLEAN UP

No specific data was provided for A&M's assessment related to LAPD Proactive Engagement Staff/Support for Public Right-of-Way Clean Up. This omission may be due to the fact that the program was not funded beginning in FY 2021-22.

## 6.2  FINANCIAL OVERVIEW

### 6.2.1.    FUNDING FOR PERSONNEL – HOMELESS COORDINATOR'S OFFICE AND RESET

A&M received payroll information for the Homeless Coordinator's Office and RESET during the Lookback Period to quantify the amount of funds actually expended for these LAPD teams. The payroll information

---

[502] LAPD RESET, X Profile (https://x.com/LAPD_RESET).
[503] Interview with RESET Team on November 20, 2024.
[504] Ibid.
[505] City of Los Angeles, FY 2022-23 White Book, Supplement to the 2022-23 Adopted Budget, Volume II, p. 516 of 53.

included pay amounts for hours worked, overtime, and other various pay codes (vacation, sick leave, bereavement, training, etc.).

Salaries for personnel within the Homeless Coordinator's Office amounted to $5.08 million throughout the Lookback Period.[506]

FIGURE **6.2**

**LAPD Payroll Expenses for the Homeless Coordinator's Office Across the Lookback Period**

| Fiscal Year | Number of Unique Personnel | Hours | Payroll Amount |
|---|---|---|---|
| June 2020 | 9 | 503 | $35,333 |
| FY 2020-21 | 10 | 18,571 | 1,316,355 |
| FY 2021-22 | 16 | 17,033 | 1,204,409 |
| FY 2022-23 | 15 | 16,941 | 1,244,568 |
| FY 2023-24 | 9 | 17,332 | 1,279,802 |
| **Grand Total** | **22 Unique Personnel** | **70,380** | **$5,080,467** |

SOURCE: LAPD Data, Homeless Coordinator Payroll History

Payroll amounts for personnel within RESET amounted to $21.2 million throughout the Lookback Period.

FIGURE **6.3**

**LAPD Payroll Expenses for the RESET Team Across the Lookback Period**

| Fiscal Year | Number of Unique Personnel | Hours | Payroll Amount |
|---|---|---|---|
| June 2020 | 45 | 7,648 | $399,537 |
| FY 2020-21 | 50 | 94,532 | 5,283,443 |
| FY 2021-22 | 47 | 94,320 | 5,491,440 |
| FY 2022-23 | 49 | 87,977 | 5,117,156 |
| FY 2023-24 | 47 | 79,568 | 4,954,226 |
| **Grand Total** | **67 Unique Personnel** | **364,044** | **$21,245,803** |

SOURCE: LAPD Data, RESET Payroll History

FIGURE NOTE: Some personnel were not full-time during a given fiscal year.

Due to the change in staffing of the Homeless Coordinator's Office and RESET throughout the Lookback Period, A&M did not verify that the provided payroll information accurately aligned with organizational charts (i.e., the personnel assigned to each LAPD team) throughout the entirety of the Lookback Period.

---

[506] A&M noted that the payroll information provided did not perfectly align with the current organization chart.

A&M also observed that actual payroll was significantly greater than the budgeted amount for the Homeless Coordinator's Office and RESET. Per the LAPD, the discrepancy arises because of the manner in which LAPD structured homelessness response using existing position authorities; in addition to the specific positions budgeted within the Homeless Budget, the LAPD had individuals that work on homelessness-related activities while being tracked against the LAPD's regular departmental budget.[507] This further illustrates the challenge of accurately tracking all the time and efforts dedicated by the LAPD to homelessness-related activities.

### 6.2.2.    LAPD HOMELESS-RELATED OVERTIME FUNDS

Figure 6.4 below summarizes overtime hours, overtime payroll amounts, and the number of officers that charged time to the ABH/IHHS overtime account (Code 49) during the Lookback Period based on an analysis of payroll data provided by the LAPD.

FIGURE **6.4**

**Summary of Financial Metrics Related to LAPD ABH/IHHS Overtime Hours Incurred Across the Lookback Period**

|  | June 2020 | FY 2020-21 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Grand Total |
|---|---|---|---|---|---|---|
| Number of Officers | 163 | - | 1,878 | 1,563 | 1,414 | **2,999 Unique Personnel** |
| Hours Incurred | 2,392 | - | 87,864 | 78,354 | 88,347 | **256,956** |
| Overtime Amount ($) | $184,599 | - | $7,322,514 | $7,057,311 | $8,481,768 | **$23,046,192** |
| Average Hourly Rate ($) | $77 | - | $83 | $90 | $96 | **$90** |

SOURCE: LAPD Data, ABH/IHHS Overtime (Code 49)

FIGURE NOTE: A&M included the month of June 2020 to encompass the entire Lookback Period (noting that fiscal year 2020-21 began on July 1, 2020.)

Throughout the Lookback Period, LAPD incurred $23 million in overtime[508] for activities related to homelessness. (To be clear, as described, these hours are limited to specifically allocated overtime funding and do not include any hours spent by the LAPD during the normal course of duty, or general overtime funds; therefore, the hours in Figure 6.4 only constitute a portion of LAPD hours spent on homelessness-related matters.) LAPD confirmed there was no utilization of Code 49 in the overtime system in FY 2020-21 due to a budget reduction during the fiscal year.[509] Also, the Homeless Coordinator's Office tracked the subset of Code 49 overtime used for Inside Safe operations and submitted the hours for reimbursement from the CAO.[510]

For LAPD personnel that received overtime (excluding the one month of June 2020), the annual amount of pay ranged from $78 to $90,477, with average annual overtime per officer of $4,709.

---

[507] Email from Office of the CAO, dated January 23, 2025.
[508] Officers charging time to Code 49 received hourly pay of 1.5 times the normal rate, which is a standard practice that aligns with the federal Fair Labor Standards Act.
[509] Email from LAPD, dated October 23, 2024.
[510] Inside Safe specific hours are included in the financial data summarized.

DRAFT & PRELIMINARY

Section 6

A&M also reviewed the methodology for allocating overtime hours to Areas within the LAPD. Beginning in FY 2022-23, the LAPD reported on the allocation method and the utilization of overtime funding through memos to City Council. The City's approved budget allocated overtime funding of $9 million[511] and $8.36 million[512] for FY 2022-23 and FY 2023-24, respectively. The LAPD used an average hourly overtime cost per officer to translate the funding into hours. Each Council District was then allocated a "base" allotment of overtime hours with an additional 1,000 hours for each A Bridge Home location within the Council District. Figure 6.5 below demonstrates the hours allocated to each Council District for FY 2022-23 and FY 2023-24.[513]

FIGURE **6.5**

Summary of Initial Overtime Hour Allotment by Council District as of FY 2022-23 and FY 2023-24

| Council District | No. of ABH Sites | FY 2022-23 | | | | FY 2023-24 | | |
|---|---|---|---|---|---|---|---|---|
| | | Base Hours | ABH Hours | Shelter Intervention | Total Hours | Base Hours | ABH Hours | Total Hours |
| 1 | 2 | 3,996 | 2,000 | 724 | 6,720 | 4,090 | 2,000 | 6,090 |
| 2 | 2 | 3,996 | 2,000 | 724 | 6,720 | 4,090 | 2,000 | 6,090 |
| 3 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 4 | 3 | 3,996 | 3,000 | 724 | 7,720 | 4,090 | 3,000 | 7,090 |
| 5 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 6 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 7 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 8 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 9 | 2 | 3,996 | 2,000 | 724 | 6,720 | 4,090 | 2,000 | 6,090 |
| 10 | 3 | 3,996 | 3,000 | 724 | 7,720 | 4,090 | 3,000 | 7,090 |
| 11 | 1 | 3,996 | 1,000 | 724 | 5,720 | 4,090 | 1,000 | 5,090 |
| 12 | 0 | 3,996 | - | 724 | 4,720 | 4,090 | - | 4,090 |
| 13 | 3 | 3,996 | 3,000 | 724 | 7,720 | 4,090 | 3,000 | 7,090 |
| 14 | 3 | 3,996 | 3,000 | 724 | 7,720 | 4,090 | 3,000 | 7,090 |
| 15 | 3 | 3,996 | 3,000 | 724 | 7,720 | 4,090 | 3,000 | 7,090 |
| Total Hours | 27 | 59,940 | 27,000 | 10,860 | 97,800 | 61,350 | 27,000 | 88,350 |
| Budgeted Funds ($) | | | | | $9,000,000 | | | $8,360,000 |

SOURCES: LAPD Memo, Interim Homeless Housing Funds First Quarter (July 2, 2023, to October 7, 2023) Update (Fiscal Year 2023/2024), dated January 31, 2024; LAPD Memo, Release of Remaining A Bridge Home Funds, dated September 7, 2022

---

[511] FY 2022-23 White Book, Supplement to the 2022-23 Adopted Budget, Volume II, pp. 995 and 1004 (Unappropriated Balance – ABH Overtime, $4 million; Unappropriated Balance – Shelter Interventions not covered by ABH, $1 million; LAPD Budget – Sworn Overtime ABH, $4 million).
[512] FY 2023-24 White Book, Supplement to the 2023-24 Adopted Budget, Volume I, p. 472 (Unappropriated Balance – IHHS Overtime, $6.27 million; LAPD Budget, Overtime for IHHS, $2.09 million).
[513] Specific allocation methodologies were not provided prior to FY 2022-23.

DRAFT & PRELIMINARY

Section 6

While hours are initially allocated by Council Districts, LAPD Areas within each Council District were ultimately responsible for deploying the budgeted hours/funds. The LAPD distributed the hours to each Area in a similar manner. Each Area received 1,000 hours per IHHS location within the Area plus a portion of each Council District's base hours allotment (calculated from each Area's geographic percentage within the Council District).[514] This allocation becomes increasingly convoluted, as the 21 LAPD Areas can overlap across the 15 Council Districts.

Figure 6.6 below exhibits the allocation of funds by Area for FY 2023-24.

FIGURE **6.6**

Summary of Overtime Hour Allotment by LAPD Bureau and Area as of FY 2023-24

| Bureau | LAPD Area | Interim Housing Sites | Allocated Hours from Council Districts | Interim Homeless Housing Site Allotment | Total |
|--------|-----------|----------------------|---------------------------------------|----------------------------------------|-------|
| Central Bureau | Central | 3 | 1,040 | 3,000 | 4,040 |
| | Rampart | 2 | 1,431 | 2,000 | 3,431 |
| | Hollenbeck | - | 2,821 | - | 2,821 |
| | Northeast | 2 | 5,520 | 2,000 | 7,520 |
| | Newton | 2 | 2,699 | 2,000 | 4,699 |
| | **Subtotal – Central Bureau** | **9** | **13,511** | **9,000** | **22,511** |
| South Bureau | Southwest | - | 3,351 | - | 3351 |
| | Harbor | 2 | 3,435 | 2,000 | 5,435 |
| | 77th | 2 | 3,025 | 2,000 | 5,025 |
| | Southeast | 1 | 1,843 | 1,000 | 2,843 |
| | **Subtotal – South Bureau** | **5** | **11,654** | **5,000** | **16,654** |
| Valley Bureau | Van Nuys | 2 | 2,132 | 2,000 | 4,132 |
| | West Valley | - | 3,720 | - | 3,720 |
| | North Hollywood | 1 | 3,517 | 1,000 | 4,517 |
| | Foothill | - | 4,334 | - | 4,334 |
| | Devonshire | - | 3,475 | - | 3,475 |
| | Mission | 1 | 2,494 | 1,000 | 3,494 |
| | Topanga | 1 | 3,353 | 1,000 | 4,353 |
| | **Subtotal – Valley Bureau** | **5** | **23,025** | **5,000** | **28,025** |
| West Bureau | Hollywood | 4 | 1,758 | 4,000 | 5,758 |
| | Wilshire | - | 2,248 | - | 2,248 |
| | West Los Angeles | 2 | 5,765 | 2,000 | 7,765 |
| | Pacific | 1 | 1,758 | 1,000 | 2,758 |
| | Olympic | 1 | 1,634 | 1,000 | 2,634 |
| | **Subtotal – West Bureau** | **8** | **13,163** | **8,000** | **21,163** |
| **Grand Total of LAPD Areas** | | **27** | **61,353** | **27,000** | **88,353** |

---

514 LAPD Memo, Interim Homeless Housing Funds First Quarter (July 2, 2023, to October 7, 2023) Update (Fiscal Year 2023/2024), dated January 31, 2024, p. 3.

SOURCES: LAPD Memo, LAPD Memo, Interim Homeless Housing Funds Fourth Quarter (April 7, 2024, to June 30, 2024) Update (Fiscal Year 2023/2024),

Considering that utilization of ABH/IHHS overtime hours was not confined to only ABH/IHHS sites, it is unclear why the City continued to include the number of ABH sites in the hours allocation methodology. Additionally, the base equitable allocation to each Council District did not appear to consider other potentially relevant factors, such as crime rates or the geographic distribution of PEH throughout the City. Overall, it is unclear whether the overtime allocation methodology in place during the Lookback Period led to optimal outcomes for the geographic areas served.

Figure 6.7 below summarizes actual IHHS overtime by Bureau (excluding the one month of information for June 2020).

FIGURE **6.7**

Summary of Overtime Hours Incurred by Police Bureau as FY 2021-22, FY 2022-23, and FY 2023-24

| Police Bureau | Hours | | | Amount | | | Grand Total | |
|---|---|---|---|---|---|---|---|---|
| | FY 2021-22 | FY 2022-23 | FY 2023-24 | FY 2021-22 | FY 2022-23 | FY 2023-24 | Hours | Amount |
| Central Bureau | 21,436 | 23,431 | 22,441 | $1,854,196 | $2,075,880 | $2,055,007 | 67,307 | $5,985,083 |
| South Bureau | 20,855 | 14,884 | 16,884 | 1,729,731 | 1,359,754 | 1,678,875 | 52,622 | 4,768,360 |
| Valley Bureau | 18,248 | 23,560 | 28,133 | 1,523,680 | 2,188,516 | 2,778,393 | 69,942 | 6,490,589 |
| West Bureau | 27,019 | 16,471 | 20,752 | 2,184,259 | 1,431,931 | 1,955,612 | 64,242 | 5,571,802 |
| Other | 306 | 8 | 138 | 30,647 | 1,231 | 13,881 | 452 | 45,759 |
| Grand Total | 87,864 | 78,354 | 88,347 | $7,322,514 | $7,057,311 | $8,481,768 | 254,564 | $22,861,593 |
| Budgeted Amounts | N/A | 97,800 | 88,350 | $8,000,000 | $9,000,000 | $8,360,000 | N/A | N/A |

SOURCES: LAPD Data, ABH/IHHS Overtime (Code 49); City of Los Angeles Adopted Budgets

FIGURE NOTE: Central Bureau includes Central, Hollenbeck, Newton, Northeast, Rampart. South Bureau includes 77th, Harbor, Southeast, Southwest. Valley Bureau includes Devonshire, Foothill, Mission, North Hollywood, Topanga, Van Nuys, West Valley. West Bureau includes Hollywood, Olympic, Pacific, West Los Angeles, Wilshire.

As illustrated by Figure 6.7 above, actual ABH/IHHS hour utilization stayed fairly consistent between FY 2021-22 (87,864) and FY 2023-24 (88,347), with an approximate 11% decrease in FY 2022-23 (78,354). During FY 2022-2023, a decrease in hour utilization coincided with an increase in budgeted hours, with approximately 80% of allocated hours being used during this fiscal year. Based on the data provided, A&M was unable to ascertain the driver behind the underutilized hours, although Figure 6.8 below illustrates a lower incidence of overtime hours in the earlier months of the fiscal year, with more than 40% of hours used in May and June 2023. The trend of increased hour usage congregated in the latter months of the fiscal year was observed for all Bureaus/Areas for both FY 2021-22 and 2022-23. These trends raise questions about whether the LAPD deployed ABH/IHHS overtime hours in a manner that was responsive to and addressed the specific needs of the communities served.

DRAFT & PRELIMINARY

Section 6

FIGURE **6.8**

LAPD Overtime Hours and Overtime Payroll Amounts Incurred by Month, FY 2021-22, FY 2022-23, and FY 2023-24



SOURCE: LAPD Data, ABH/IHHS Overtime (Code 49)

## 6.3  PERFORMANCE OVERVIEW

### 6.3.1.  ABH/IHHS OVERTIME METRICS

In a notice dated February 20, 2020 that LAPD produced in response to A&M's data request of policies and procedures specific to homelessness services and engagement with PEH, the Office of Operations reminded personnel about LAPD's role in addressing homelessness:

> "As the state of homelessness is not a crime in itself, the Department does not have the means to be the point agency in addressing this humanitarian crisis. Rather, the Department is committed to supporting the City-led initiative to eliminate homelessness and fully embraces the 'Services-Led' approach to contacting persons who are experiencing homelessness. As such, officers should view enforcement actions for quality-of-life offenses associated with homelessness as a last resort. Instead, officers should obtain voluntary compliance to cease the public offense or work in partnership with outside entities to assist homeless individuals with housing

DRAFT & PRELIMINARY

*placement. Additionally, all personnel are reminded that the Department strictly prohibits biased policing…Therefore, officers shall not use homeless circumstance as a basis for conducting any law enforcement activity, including stops and detentions"[515]*

While the notice recognized that homelessness, on its own, was not a criminal offense, the LAPD devoted overtime hours to support homelessness-related endeavors, ranging from CARE/CARE+ operations to the Inside Safe Program's operations.

According to a memorandum from the LAPD dated September 7, 2022, the department developed a "results-based tracking matrix" to monitor the productivity of the operations funded by ABH/IHHS overtime hours.[516] This matrix was specifically designed to exhibit the utilization of ABH/IHHS overtime hours.[517] Officers completed the matrix during or after their details, or operations, submitted it to their respective Area commands, and the Homeless Coordinator Office subsequently updated and maintained the data.[518]

Figure 6.9 below outlines the various data metrics collected by officers through this matrix, offering insight into how the LAPD tracked and evaluated the deployment of ABH/IHHS-funded overtime. Performance data, specifically the usage of ABH/IHHS overtime hours, was not consistently reported across the two fiscal years, FY 2022-23 and FY 2023-24, creating challenges in conducting a comprehensive analysis. Consequently, drawing definitive conclusions from the available information was limited.

---

[515] LAPD Memo, Department Role in City-Led Initiative to Eliminate Homelessness; Biased Policing Policy, dated February 20, 2020 .
[516] LAPD Memo, Release of Remaining A Bridge Home Funds, dated September 7, 2022, pp. 5-6 of 6.
[517] Ibid.
[518] LAPD Memo, Release of Remaining Interim Homeless Housing Funds, dated July 27, 2023, p. 4 of 6.

DRAFT & PRELIMINARY

FIGURE **6.9**

Metrics for ABH/IHHS Overtime Hours, FY 2022-23 and FY 2023-24

| Metric | Description |
|---|---|
| ACE | Number of Administrative Citation Enforcement (ACE) citations issued by officers. |
| CARE+ OPERATIONS | Number of Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) operations supported. |
| FELONY | Number of felony arrests that were made by the officers. |
| FI | Number of Field Interview (FI) cards completed. |
| GUNS | Number of guns recovered - found or related to an arrest. |
| HOUSING OFFERS | Number of subjects who expressed a desire for housing and the officer directed them to the proper resources or completed the referral themselves. |
| IMPOUNDS | Number of vehicles that were impounded or towed by the officers. |
| MISD | Number of misdemeanor arrests made by the officers. |
| PAROLE | Number of subjects who were identified by officers as being on parole. When completing an FI card, this information would be obtained by conducting a want-and-warrant check. |
| PED/TRAFFIC STOPS | Number of vehicle and pedestrian stops conducted. |
| PEH HOUSED | Number of instances where the officers directly assisted in housing a PEH or supported a housing operation with other City partners. |
| PROBATION | Number of subjects who were identified by officers as being on probation. When completing an FI card, this information would be obtained by conducting a want-and-warrant check. |
| REPOPULATION OPERATION | Number of repopulation prevention operations that the officers supported. This involves the patrol of an area where there is no sitting, sleeping, lying, or storing of property that had a recent CARE+ operation. |
| RFC | Number of all Release from Custody (RFC) issued by the officers. |
| RV OPERATIONS | Number of vehicle dwelling operations that the officers supported. |
| SECURITY CHECKS | Number of time officers checked in with the IHHS sites. |
| SERVICE REFERALS | Number of contacts/subjects that the officers referred to services during these details (e.g., Los Angeles Homeless Outreach Portal ["LA-HOP"]). |
| TRAFFIC CITES | Number of parking and traffic citations issued. |
| VERBAL WARNING | Number of verbal warnings made by the officers |
| WARRANT | Number of subjects who were identified by officers as having a warrant. When completing an FI card, this information would be obtained by conducting a want-and-warrant check. |

SOURCE: LAPD Data, Code 49 Metrics

Section 6

FIGURE **6.10**

Metrics for ABH/IHHS Overtime Hours, FY 2022-23 and FY 2023-24



SOURCE: LAPD Data, ABH/IHHS Overtime Metrics

From Figure 6.10, in FY 2023-24, the number of "Traffic Cites" (number of parking and traffic citations) was the highest metric recorded, followed by "Service Referrals" (number of contacts that the officers referred to services [e.g., outreach services through the Los Angeles Homeless Outreach Portal]), and "Housing Offers" (number of subjects who expressed desire for housing and the officer assisted with a referral).

DRAFT & PRELIMINARY

Section 6

Certain performance metrics for ABH/IHHS overtime hours, such as "Traffic Cites" or "PED/Traffic Stops," fail to provide a clear link to homelessness-related efforts. Additionally, metrics that were explicitly connected to assisting PEH (e.g., Service Referrals and Housing Offers), lacked the necessary details to track successful referrals or outcomes, limiting the ability to fully assess LAPD's impact on referral processes.

Based on filings and documentation provided by LAPD, there was no clear evidence indicating that the metrics reported in the "results-based tracking matrix" directly informed or guided budget decisions, staffing adjustments, or other resource-distribution measures. Therefore, in the absence of explicit documentation linking these metrics to resource allocation, it remains unclear whether these metrics effectively inform or justify the allocation of overtime hours or capture the impact of the initiatives on the unsheltered PEH or the communities in which they reside. This lack of clarity complicates the financial and performance assessment regarding the contribution of overtime expenditures to, and the measurement of, the intended goals for supporting City-led homelessness initiatives.

Further, without clear documentation and evidence on the specific LAPD operations related to the ABH/IHHS overtime funds, it was challenging to determine whether the respective actions taken aligned with established policies and procedures for engagement with PEH. This lack of operational detail complicated endeavors to correlate officers' activities with policies, assess consistency across different contexts, or measure enforcement outcomes. As a result, the broader effectiveness of ABH/IHHS overtime expenditures could not be fully evaluated, and any conclusions about adherence to standards for PEH-focused initiatives remained inconclusive.

### Inside Safe

LAPD separately reported efforts related to ABH/IHHS overtime hours used for the Inside Safe Program's encampment operations. Figure 6.11 exhibits, on a quarterly basis, the total hours used, the number of encampment operations that necessitated overtime, and the total number of encampment operations, according to LAPD's memos. However, the data reported in the memos was unable to be reconciled to other data reports produced. Based on the LAPD memos, it appears that LAPD did not consistently rely on overtime hours for the encampment operations under the Inside Safe Program. LAPD's involvement may have been performed during regular working hours, meaning not every operation required additional time beyond standard shifts. As a result, based on the memos produced by LAPD, there was no definitive pattern indicating uniform reliance on overtime; therefore, more complete and accurate data is needed to fully assess resource allocation and its associated costs.

FIGURE **6.11**

Usage of ABH/IHHS Hours for the Inside Safe Program for FY 2023-24

| FY 2023-24 | Total Hours Used | Encampment Operations IHHS Funds | Total Encampment Operations | Average ABH/IHHS Hours Per Operation |
|---|---|---|---|---|
| Q1 | 229 | 6 | 6 | 38.1 |
| Q2 | 183 | 4 | 4 | 45.6 |
| Q3 | 238 | 9 | 13 | 26.4 |
| Q4 | 154 | 3 | 9 | 51.3 |

SOURCES: LAPD Memo, Interim Homeless Housing Funds First Quarter (July 2, 2023, to October 7, 2023) Update (Fiscal Year 2023/2024), dated January 31, 2024, LAPD Memo, Interim Homeless Housing Funds Second Quarter (October 8, 2023, to

December 30, 2023) Update (Fiscal Year 2023/2024), dated January 31, 2024, LAPD Memo, Interim Homeless Housing Funds Third Quarter (December 31, 2023, to April 6, 2024) Update (Fiscal Year 2023/2024), dated April 26, 2024, LAPD Memo, Interim Homeless Housing Funds Fourth Quarter (April 7, 2024, to June 30, 2024) Update (Fiscal Year 2023/2024), dated July 16, 2024

FIGURE NOTE: For an encampment operation dated June 25, 2024, the respective LAPD Memo reported that ABH/IHHS funds were used; however, the hours were not reported in the memo. Therefore, Figure 6.11 did not include that operation.

### 6.3.2.    ARREST DATA

A&M requested data from LAPD concerning homelessness-related incident and interaction data as well as historical arrest and citation data, specifically pertaining to LAMC 41.18, 56.11, CARE/CARE+, and any other City-funded sites/endeavors under the City Programs. In response, LAPD referred A&M to publicly available data, which did not clearly distinguish homelessness-related cases. Ultimately, no additional data was provided that provided supplemental insight into LAPD's involvement with PEH across the Lookback Period. Consequently, A&M focused on two specific municipal codes, LAMC 41.18 and LAMC 56.11, within publicly accessible arrest data in an effort to approximate PEH-related activity. LAMC 41.18 restricts sitting, lying, or sleeping in certain public spaces, while LAMC 56.11 concerns the storage of personal property in public areas.[519] By isolating these codes, A&M attempted to gain insight into enforcement patterns, although the lack of explicit indicators for individuals' housing status presented ongoing challenges in interpreting the data.

Figure 6.12 exhibits publicly available arrest data, categorized by fiscal year. This data identifies the number of arrests that appear to be made under LAMC Section 41.18 and LAMC Section 56.11; the ordinances potentially relevant to PEH due to their focus on sitting, lying, sleeping, or storing personal property in public spaces. However, because housing status was not explicitly identified in the data, the data may not be complete or accurate. This data serves as broad indication of enforcement activity but cannot conclusively determine whether the arrests involved PEH.

In a memo from LAHSA dated November 28, 2023, LAHSA reported in response to the effectiveness of LAMC 41.18 interventions that:

> *The overall data quality surrounding reporting on 41.18 is low when compared to other encampment resolution initiatives … as 41.18 does not have any funded components for services or interim housing. There was also no formal request in the ordinance language or accompanying street engagement strategy that requested City Departments or LAHSA to develop universal tracking standards.[520]*

Given the limited information and lack of funded components for services or housing under the enforcement of LAMC Section 41.18, the available data remains inconclusive.

---

[519] Los Angeles Municipal Code, Section 41.18 and Section 56.11.
[520] LAHSA Memo, Los Angeles Municipal Code Section 41.18 Effectiveness Report (21-0329-S4), dated November 28, 2023.

DRAFT & PRELIMINARY

FIGURE **6.12**

Summary of Publicly Available Arrest Data, LAMC Section 41.18 and LAMC Section 56.11

| Fiscal Year | LAMC 41.18 | LAMC 56.11 | Other | Share of 41.18 and 56.11 Arrests | Grand Total |
|---|---|---|---|---|---|
| FY 2020-21 | 334 | 49 | 64,585 | 0.6% | 64,968 |
| FY 2021-22 | 580 | 40 | 62,456 | 1.0% | 63,076 |
| FY 2022-23 | 1,887 | 49 | 62,695 | 3.0% | 64,631 |
| FY 2023-24 | 1,132 | 73 | 63,917 | 1.9% | 65,122 |
| Grand Total | 3,933 | 211 | 253,653 | 1.6% | 257,797 |

FIGURE NOTE: The arrest data exhibited above includes "RFC" and "Booking." LAPD explained "RFC" [Release from Custody] is categorized as an arrest, but the violator is not booked and released at the scene with the citation.

**KEY TAKEAWAYS OF SECTION 6.3**

- Across the Lookback Period, the LAPD incurred over $49 million in expenses related to ABH/IHHS overtime and personnel assigned to the Homeless Coordinator's Office and RESET.

- The initial methodology for allocating homelessness-related overtime hours includes equitable hour allocations across all 15 Council Districts, plus additional allotments for ABH sites located within each Council District.

- The LAPD did not deploy ABH/IHHS hours consistently throughout each fiscal year. The data demonstrated that LAPD utilization of ABH/IHHS hours peaked near the end of the fiscal year in FY2021-2022 and FY2022-23, prompting questions about whether the LAPD deployed ABH/IHHS overtime hours in a manner that was responsive to the specific needs of the communities served.

- The LAPD's framework for tracking the productivity of ABH/IHHS hours lacked clear and measurable outcomes related to homelessness initiatives that, if instituted, could assist in resource allocation and effectiveness of public safety services within City-led initiatives.

- LAPD was unable to provide arrest or interaction data specific to people experiencing homelessness, limiting A&M's ability to evaluate the extent and nature of enforcement actions against unsheltered individuals. This gap highlights the need for enhanced tracking and reporting mechanisms to inform future policy and resource decisions.

## Appendix A: City Funding (Appropriations, Commitments, or Spending) Related to the City Programs Across the Lookback Period

| Expense/Appropriation/Commitment | Roadmap | Alliance | Inside Safe | Total | Figure Reference(s) |
|---|---|---|---|---|---|
| PSH – Committed Funds | $105,798,548 | $1,133,564,750 | $N/A | $1,239,363,298 | 3.11; 3.12 |
| Interim Housing – Capital Appropriations | 301,760,073 | N/A | N/A | 301,760,073 | 3.2 |
| PRK and Other Lease Expenses | 143,188,427 | N/A | N/A | 143,188,427 | 3.6 |
| Inside Safe – Hotel/Motel Nightly Rental Expenses | N/A | N/A | 79,163,286 | 79,163,286 | 3.14 |
| Inside Safe – Motel Acquisition Expenses | N/A | N/A | 41,898,370 | 41,898,370 | 3.14 |
| Inside Safe – City Departments Expenses | N/A | N/A | 8,723,725 | 8,723,725 | 3.14 |
| **Subtotal – Non-LAHSA** | **$550,747,048** | **$1,133,564,750** | **$129,785,381** | **$1,814,097,179** | |
| LAHSA – Internal Expenses | 14,529,777 | N/A | 5,704,648 | 20,234,425 | 3.7; 3.17 |
| LAHSA – Vendor Expenses | 12,567,708 | N/A | 2,755,989 | 15,323,697 | 3.7; 3.17 |
| LAHSA – Service Provider Expenses | 455,317,366 | 12,688,774 | 50,445,684 | 518,451,824 | 3.8; 3.13; 3.17 |
| **Subtotal – LAHSA Expenses** | **482,414,851** | **12,688,774** | **58,906,321** | **554,009,946** | |
| **Grand Total** | **$1,033,161,899** | **$1,146,253,524** | **$188,691,702** | **$2,368,107,125** | |

FIGURE NOTE: Funding for time-limited subsidies is included within the "LAHSA – Service Provider Expenses" category.

## Appendix B: A&M Onsite Fieldwork Summary (City-Funded Services)

| Sampled Site | LAHSA Subprogram | Service Provider | Titles of Interviewed Stakeholders |
|---|---|---|---|
| Roadmap #1 | A Bridge Home | People Assisting the Homeless | Associate Director, Case Manager |
| Roadmap #2 | A Bridge Home | LA / US Veterans Initiative | Resident Assistant, Person Experiencing Homelessness |
| Roadmap #3 | Roadmap Interim Housing | Weingart Center Association | Associate Director, Case Manager |
| Roadmap #4 | Roadmap Interim Housing | Home at Last | Program Manager, Case Manager |
| Roadmap #5 | Roadmap Interim Housing | Volunteers of America | Not Specified |
| Roadmap #6 | Safe Parking | Safe Parking LA | Executive Director, Lead Case Manager, Program Manager for Case Management Team, Director of Programs |
| Roadmap #7 | Safe Sleep | Urban Alchemy, Inc. | Case Manager |
| Roadmap#8 | Tiny Home Village | Hope the Mission | Program Manager, Case Manager, Lead Clinical Director, SUD Counselor |
| Roadmap #9 | Tiny Home Village | Hope the Mission | Program Manager, Lead Case Manager |
| Roadmap #10 | Project Homekey | National Health Foundation | N/A - Site Under Construction |
| Roadmap #11 | Project Homekey | LA Family Housing Corporation | N/A - Site Under Construction |
| Alliance #1 | Roadmap Interim Housing | People Assisting the Homeless | Case Manager |
| Inside Safe #1 | Inside Safe | Weingart Center Association | N/A - Site Closed |
| Inside Safe #2 | Inside Safe | First to Serve | House Managers/Resident Supervisor, Resident Aides, Case Manager, Person Experiencing Homelessness |
| Inside Safe #3 | Inside Safe | Special Services for Groups/HOPICS | Associate Director of Street Based Engagement, Security, Person Experiencing Homelessness |
| Outreach | Homeless Engagement Team | LAHSA | LAHSA Deputy Chief Sr. Advisor, CEO, LAHSA Access & Engagement Manager, LAHSA Roadmap HET members |
| LAPD | N/A | N/A | RESET (Lieutenant); HCO (Officers) |

DRAFT & PRELIMINARY

# Appendix C: A&M Onsite Fieldwork Summary (County-Funded Services)

| Sampled Program Contract | County Subprogram | Service Provider | Titles of People Spoke With |
|---|---|---|---|
| County Site #1 | Permanent Supportive Housing | The People Concern | Chief Program Manager |
| County Site #2 | Permanent Supportive Housing | LINC Housing Corp | Assistant VP of Resident Services |
| County Site #3 | Permanent Supportive Housing | American Family Housing | Associate VP of Programs |
| County Site #4 | Permanent Supportive Housing | Penny Lane Centers | Director of Housing Services, Director of Housing, Program Manager |
| County Site #5 | Permanent Supportive Housing | Special Service for Groups | Associate Director, Program Manager |
| County Site #6 | Permanent Supportive Housing | Weingart Center | COO, CEO, Director of Housing |
| County Site #7 | Interim Housing - Stabilization | SRO Housing Corp | CEO, Director, Program Manager |
| County Site #8 | Interim Housing - Stabilization | Home at Last | Clinical Program Director, Program Director, |
| County Site #9 | Interim Housing - Stabilization | Weingart Center | COO, CEO, Director of Housing, Associate Director of Programs |
| County Site #10 | Interim Housing – Recuperative Care | JWCH Institute | Director, Assistant Director |

## Appendix D: Glossary

| A&M | Alvarez & Marsal |
|---|---|
| ABH | A Bridge Home |
| ACE | Administrative Citation Enforcement |
| Alliance Program | Alliance Settlement Program |
| CalFresh | California's Supplemental Nutrition Assistance Program (SNAP) |
| CalOMS | California Outcomes Measurement System |
| CAO | City Administrative Officer |
| CARE/CARE+ | Comprehensive Cleaning and Rapid Engagement |
| CBEST | Countywide Benefits Entitlement Services Team |
| CD | Council District |
| CDBG-CV | Community Development Block Grant – CARES Act |
| CES | Coordinated Entry System |
| CESTTRR | CES Triage Tool Research & Refinement |
| CHAMP | Comprehensive Health Accompaniment Management Platform |
| City | The City of Los Angeles |
| City Programs | Roadmap Program, Alliance Program, and Inside Safe Program |
| COAST | LAPD's Cash Overtime Allotment for Scheduling and Timekeeping System |
| CoC | Continuum of Care |
| County | The County of Los Angeles |
| Court | Judge David O. Carter |
| CR | Cash Request |
| CRF | Coronavirus Relief Fund |
| CTCAC | California Tax Credit Allocation Committee |
| DHS | Los Angeles County Department of Health Services |
| DMH | Los Angeles County Department of Mental Health |
| DPH | Los Angeles County Department of Public Health |
| DPH-SAPC | Los Angeles County Department of Public Health – Substance Abuse Prevention and Control |
| DPSS | Los Angeles County Department of Public Social Services |
| EGMS | Enterprise Grants Management System |
| ERP | Emergency Response Program |
| ESG-CV | Emergency Solutions Grants – CARES Act |
| FEMA | Federal Emergency Management Agency |

Appendix D

| | |
|---|---|
| FI | Field Interview |
| FIT | Field Intervention Team |
| FY | Fiscal Year |
| GCP-AHS | General City Purposes – Additional Homeless Services |
| GMC | Grants Management and Compliance |
| GR | General Relief |
| GSD | General Services Department |
| HACLA | Housing Authority of the City of Los Angeles |
| HCD | Department of Housing and Community Development |
| HCID | Los Angeles Housing and Community Investment Department |
| HEA | Homeless Emergency Account |
| HEAP | Homeless Emergency Aid Program |
| HET | Homeless Engagement Team |
| HHAP | Homeless Housing, Assistance and Prevention |
| HMIS | Homeless Management Information System |
| HN | Housing Navigation |
| HUD | U.S. Department of Housing and Urban Development |
| IBHIS | Integrated Behavioral Health Information System |
| ICMS | Intensive Case Management Services |
| IH | Interim Housing |
| IHD | LAHSA's Interim Housing Department |
| IHHS | Interim Homeless Housing Site |
| JPAA | Joint Powers Authority Agreement |
| KPI | Key Performance Indicator |
| LA CoC | Los Angeles Continuum of Care |
| LADOT | Los Angeles Department of Transportation |
| LAHD | Los Angeles Housing Department |
| LAHSA | Los Angeles Homeless Services Authority |
| LAMC | Los Angeles Municipal Code |
| LAPD | Los Angeles Police Department |
| LASAN | Los Angeles Sanitation |
| Lookback Period | June 1, 2020, Through June 30, 2024 |
| Medi-Cal | California's Medicaid Program |
| MISD | Misdemeanor |

Appendix D

| | |
|---|---|
| MOU | Memorandum of Understanding |
| PEH | People Experiencing Homelessness |
| PIT | Point-In-Time |
| POCs | Points of Contracts |
| PSH | Permanent Supportive Housing |
| RESET | Resources Enhancement Services Enforcement Team |
| RFC | Release from Custody |
| RMS | Resource Management System |
| Roadmap HET | Roadmap Homeless Engagement Teams |
| Roadmap Program | Roadmap Program – Freeway Agreement |
| SAPC | Substance Abuse Prevention and Control |
| SECZ | Special Enforcement Cleaning Zones |
| SPA | Service Planning Area |
| SRS | Scope of Required Services |
| SUD | Substance Use Disorder |
| TLS | Time-Limited Subsidy |
| UHRC | Unified Homeless Response Center |
| USC | University of Southern California |
| VI-SPDAT | Vulnerability Index: Service Prioritization Decision Assistance Tool |

DRAFT & PRELIMINARY