HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
KATHLEEN KENEALY, Chief Assistant City Attorney (SBN 212289)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California 90012
Telephone: 213-978-7508
Facsimile: 213-978-7011
Email:  Arlene.Hoang@lacity.org
        Jessica.Mariani@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a Municipal entity, et al., <br><br> Defendants. | Case No. 2:20-cv-02291 DOC (KES) <br><br> Hon. David O. Carter <br><br> **DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE** <br><br> <u>Hearing</u> <br> Date:  March 27, 2024 <br> Time: 9:00 a.m. <br> Courtroom:  TBD |

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................1

II.    SUMMARY OF RELEVANT FACTS........................................................3

    A. Alliance Acknowledges The Recent Wildfires Substantially Increased The City's Financial Challenges....................................................................3

    B. Alliance Ignores Section 8.2 of The Settlement Agreement..........................5

    C. Alliance Agreed To Meet And Confer With The City As Required By Section 8.2 After Filing Its Motion ................................................................6

    D. Despite Financial Strain, The City Has Continued Its Ceaseless Efforts To Address Homelessness, Including The Creation Of Beds Pursuant To The Settlement ..........................................................................................6

III.   ALLIANCE FILED ITS MOTION REGARDING THE CITY'S PAUSED OBLIGATIONS PRIOR TO MEETING AND CONFERRING AS REQUIRED BY THE SETTLEMENT AGREEMENT ...............................................7

IV.   ALLIANCE'S MOTION SEEKS TO REWRITE THE SETTLEMENT AGREEMENT AND PRESENTS NO EVIDENCE OF NON-COMPLIANCE OR LEGAL AUTHORITY ...................................................8

    A. The City Has Until 2027 To Fulfill Its Commitment To Create Beds............8

    B. The City's Bed Milestones Are Aspirational Interim Goals Which The City Has Employed Its Best Efforts To Achieve ..................................................10

    C. Alliance's Argument Regarding Encampment Reduction Is Redundant Of Its Pending Motion, Which Also Attempts To Rewrite The Agreement...........14

    D. Alliance Has No Basis For Its Requested Relief, Which Is An Unfounded and Thinly Veiled Attempt To Usurp City Leaders' Discretion...................16

V.    CONCLUSION.............................................................................17

# TABLE OF AUTHORITIES

Page(s)

## CASES

*California Pines Property Owners Ass'n v. Pedotti*,
206 Cal. App. 4th 384 (2012) ....................................................................10, 11

*Clinton v. Acequia Inc.*,
94 F.3d 568 (9th Cir. 1996) ................................................................................9

*CSAA Ins. Exchange v. Hodroj*,
72 Cal.App.5th 272 (2021) ...............................................................................11

*Dominguez v. Better Mortg. Corp.*,
88 F.4th 782 (9th Cir. 2023) .............................................................................16

*Jeff D. v. Andrus,*
899 F.2d 753 (9th Cir. 1989) ............................................................................16

*Rizzo v. Goode*,
423 U.S. 362 (1976) ..........................................................................................13

*Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*,
637 F.Supp.2d 712 (C.D. Cal. 2008) ...............................................................11

## STATUTES

Fed. R. Civ. P. 7(b)(1)(B) and 7(b)(1)(C)..............................................................16

## I.    **<u>INTRODUCTION</u>**

In the midst of a tragic time for the City of Los Angeles (the "City"), when the City's elected leaders and employees are working diligently to address the aftermath of the recent devastating wildfires in addition to their ongoing work to address the homelessness crisis, the City should not find itself needing to respond to Plaintiff LA Alliance for Human Rights' ("Alliance's") baseless motion to compel compliance with obligations Alliance agreed to pause, and meet and confer about, during precisely the situation the City is currently facing.

Section 8.2 of the Settlement Agreement mandates the City's obligations under Sections 3, 4, and 5 of the Settlement Agreement are paused by the wildfires and subsequent emergency declaration, and the Parties are to meet and confer on any necessary and appropriate amendments to the City's obligations.  The Parties included Section 8.2 in the Settlement Agreement specifically in contemplation of a situation such as the present wherein widespread devastation would be wrought by a catastrophic natural disaster beyond the Parties' control.  Despite referencing the wildfires, and acknowledging facts that form an appropriate basis for modification under Section 8.2 to the very obligations Alliance's Motion contends are not being met, Alliance fails to mention Section 8.2 anywhere in its Motion.  Alliance's decision to file a motion to compel the very obligations that are currently paused is inappropriate given the express terms of Section 8.2 of the Parties' Settlement Agreement, and is premature in light of the fact that, since Alliance filed its Motion, the Parties have begun meeting and conferring pursuant to Section 8.2 regarding potential necessary and appropriate amendments to the City's obligations that are the subject of the Motion.

On top of that, Alliance's rush to file this Motion now is premature when the Motion is entirely based on Alliance's speculation of future noncompliance by the City, without any evidence of a current breach.  Before accounting for any necessary and appropriate amendments to the City's obligations necessitated by the wildfires, the City's current (paused) bed creation obligations are to create 12,915 beds by June 14,

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

2027, and to use its best efforts to meet aspirational goals and milestones along the way. While the City hoped to bring as many beds online as it could as quickly as possible, and accordingly agreed to use its best efforts to meet aggressive interim bed creation milestones, falling short of those interim milestones is not a violation of the Agreement. And the City cannot be in breach of an obligation to create 12,915 beds when the City has until June 2027 to fulfill that obligation (again, notwithstanding any necessary and appropriate amendments to the obligations). Alliance's fear the City *might* not comply with an obligation it still has over two years to meet does not justify Alliance's Motion. Indeed, while both Parties acknowledge that the financial impact of the wildfires has only worsened what was already a challenging financial environment for the City, there is no basis for speculating that the City will not comply with its settlement obligations. However, complying with the current terms without any necessary and appropriate modification would likely necessitate other cuts nobody wants to make, including possibly to the City's budget for homelessness programs.

Alliance's contention the City has not met its encampment reduction milestones is likewise flawed, and suffers from the additional problem that Alliance's argument is also based on an insupportable effort to rewrite the City's obligation.

Alliance's effort to rewrite the Settlement Agreement solely for its benefit, and simultaneously ignore the actual language of express terms (Section 8.2) contained in the Agreement, should be rejected. The present motion is yet another improper effort by Alliance to try to impose additional obligations on the City different from what the Parties agreed to, and to usurp the core policymaking functions of the City's elected leaders to address the complex homelessness crisis, including those expressly delegated to the City's discretion in the Settlement Agreement. Alliance's Motion hurls criticism at, and asks for "serious consequences" against, the City without citation to a single case supporting its baseless contentions. Indeed, the Motion fails to offer any legal basis for the requested finding of noncompliance or the other unspecified monetary and injunctive relief Alliance seeks. Alliance's motion is wholly without merit, and should be denied.

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

## II.    SUMMARY OF RELEVANT FACTS

### A. Alliance Acknowledges The Recent Wildfires Substantially Increased The City's Financial Challenges

Alliance's Motion not only acknowledges, but is premised on, the fact that the City is facing "undisputed financial challenges in this and next fiscal year." Motion (Dkt. 863) at ECF 20:12.  Alliance specifically acknowledges in its Motion "the extreme challenges caused by the January wildfires" (Motion, Dkt. 863 at ECF 14:7-8) and that "the aftermath of the wildfires threatens billions of dollars in economic damage to the Los Angeles area, including from reduced GDP and wage loss, with the potential for the City and County to suffer not only the loss of associated tax revenue, but also hundreds of millions of dollars in out-of-pocket costs." Motion (Dkt. 863) at ECF 11:11-14. Indeed, the wildfires caused what will be ongoing financial impact to the City by increasing expenditures (not all of which are eligible for reimbursement) and simultaneously decreasing expected revenues due to decreased collection of business, sales, and property taxes from the affected zip codes (both due to deferral and relief granted by the State). *See* Feb. 28, 2025 Third (Mid-Year) Financial Status Report from CAO at pp. 1-4, 9[1]. On top of that, all credit agencies that review the City's credit have published reactions to the impact of the wildfires on the City's credit rating, with at least one downgrading revenue bonds and others placing the City on negative credit watch, which could lead to an increased cost of borrowing for the City. *See id.* at pp. 4-5.

As Alliance also acknowledges in its Motion, the fires have exacerbated what was already a challenging financial environment for the City, leaving "the City [] facing clear financial peril." Motion (Dkt. 863) at ECF 8:1.  Indeed, the end of County funding for the Roadmap beds combined with skyrocketing bed rates the City is now facing years

---

[1] https://cao.lacity.gov/budget/20250228%20CAO%202024-25%20BUDGET%20THIRD%20(MID-YEAR)%20FINANCIAL%20STATUS%20REPORT.pdf (last visited 3/5/25).

3

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

after the Alliance Settlement Agreement was entered[2] led the City to submit a proposal in September 2024 to migrate 2500 of the beds the City created under the 2020 Roadmap agreement to be credited toward the number of beds the City committed to build under the Settlement Agreement. *See* Dkt. 775.  The City ultimately withdrew that proposed modification to the bed plan in the face of Alliance's objection to it, and following the start of productive conversations with the County on October 25, 2024. Those conversations immediately preceded the evidentiary hearing scheduled for later that day concerning the County's ability to provide additional funding beyond the contractual term of the Roadmap Agreement to help the City keep those beds open while also meeting its additional bed creation obligations under the Settlement Agreement. *See* 10-25-24 Hr'g Tr. (Dkt. 808) at 5:5-15.  While the City shared Alliance's hope and expectation that the November 5, 2024 passage of Measure A (by which voters approved a half-cent sales tax to provide funding for homeless services in perpetuity) would lead to a new agreement for the County to fund the City's Roadmap beds, no such agreement has been reached. *See* Motion (Dkt. 863) at ECF 10:11-16.

Now, faced with the additional unforeseeable financial burden caused by the January wildfires, the City is left shouldering a much greater financial burden than it committed to when it entered the Settlement Agreement in 2022, thus necessitating necessary and appropriate amendments to the Settlement Agreement as contemplated by Section 8.2.

---

[2] The nightly bed rates have skyrocketed beyond what could have been reasonably expected at the time the Settlement Agreement was entered in June 2022.  As just one example, at that time, the nightly bed rate for Roadmap beds was $55.  Today, those same beds cost $80 per night, and by July 1, 2025, they will cost $89 per night at sites with more than 50 beds and $116 at sites with 50 or fewer beds.  At those sites where the nightly bed rate will be $116 by July 2025, that rate has more than doubled since the City entered into the Agreement, leading to a much larger than anticipated expenditure. *See e.g.,* Dec. 6, 2024 Report from CAO re: Interim Housing Bed Rates Adjustment Supplemental Report at https://clkrep.lacity.org/onlinedocs/2023/23-1348_rpt_cao_12-06-24.pdf (last visited 3/6/25).

4

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

### B. **Alliance Ignores Section 8.2 of The Settlement Agreement**

Despite acknowledging in its Motion the extreme financial burden wrought by the recent devastating wildfires on the City, Alliance's Motion entirely ignores the provision of the Settlement Agreement that implemented a pause and a requirement to meet and confer – in precisely the situation the City currently finds itself – of the very obligations Alliance is complaining the City is not meeting in its Motion.

Section 8.2 of the Settlement Agreement provides in relevant part: "In the event of fires…or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council…the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." Dkt. 863-2, Ex. A at § 8.2 In response to the January 7, 2025 outbreak of the devastating fire and windstorm event in the City, the City's Mayor declared a Local Emergency on January 7, 2025, which was updated on January 13, 2025 and ratified by City Council on January 14, 2025.[3] Accordingly, as set forth in Paragraph 8.2 of the Settlement Agreement between Alliance and the City, the City's obligations under Sections 3, 4, and 5 of the Settlement Agreement are paused.

On January 15, 2025, over a month before Alliance filed its Motion, counsel for the City reminded Alliance's counsel that the self-effectuating pause mandated by Section 8.2 of the Settlement Agreement was in effect, and told Alliance's counsel the Parties would engage in the mandatory meet and confer process under Section 8.2 when possible.

But before meeting and conferring as required, Alliance prematurely filed its Motion on February 20, 2025.

---

[3] Declaration of Local Emergency (Updated), available at: https://clkrep.lacity.org/onlinedocs/2025/25-0030_rpt_mayor_1-13-2024.pdf (last visited 3/5/25); *see also* Council File No. 25-0030.

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

**C. Alliance Agreed To Meet And Confer With The City As Required By Section 8.2 After Filing Its Motion**

Although Alliance filed its Motion before it agreed to begin the meet and confer process with the City mandated by Section 8.2, facts acknowledged by Alliance in its Motion reflect that modification to the City's obligations is both necessary and appropriate so that the City is not left shouldering a much larger burden than it anticipated when it entered the Settlement Agreement in 2022 – an unexpectedly disproportionate burden caused by significantly changed circumstances, including skyrocketing bed rates that are now far beyond the rates that existed at the time the Settlement Agreement was entered in 2022, the County's refusal to step up and provide more funding for the City's beds even after Measure A's passage like the City expected its partner the County to do, and the unanticipated and unforeseeable expenses associated with recovery from the wildfires entirely out of the City's control. *See* Motion (Dkt. 863) at ECF 10:11-16, 11:8-14, 21-12:12, 13:7-19.

On March 4, 2025, the Parties began the meet and confer process mandated by Section 8.2 to discuss necessary and appropriate amendments to the City's obligations based upon those facts, and as of the time this opposition was filed, discussions between the City and Alliance are ongoing.

**D. Despite Financial Strain, The City Has Continued Its Ceaseless Efforts To Address Homelessness, Including The Creation Of Beds Pursuant To The Settlement**

The City has to-date spent or committed over $1.4 billion on creating beds pursuant to the Alliance Settlement Agreement.[4]  This enormous investment of monetary

---

[4] *See, e.g.,* Alliance Funding Reports, available at: https://clkrep.lacity.org/onlinedocs/2023/23-1022-s3_rpt_cao_5-31-24.pdf, https://clkrep.lacity.org/onlinedocs/2023/23-1022-S6_rpt_cao_8-01-24.pdf, https://clkrep.lacity.org/onlinedocs/2023/23-1022-S11_rpt_cao_12-6-24.pdf; Proposition HHH Quarterly Reports, *see, e.g.,* Jan. 17, 2025 Proposition HHH Quarterly Report –

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

resources toward bed creation during just the first three years of the Alliance Settlement has only been made possible by the City's commitment not only to spend its own General Fund dollars, but to also actively make every effort to seek and obtain other funding sources available to it. This includes, for example, successfully applying for State funding through HHAP, and Encampment Resolution Fund grants from the California Interagency Council on Homelessness administered by the California Housing and Community Development Department.

These extraordinary efforts by the City are all in addition to continuing to fund other programs to address homelessness throughout the City, including hygiene centers, outreach prevention and navigation programs. The City also continues to fund other interim housing beds, including the beds created under the Roadmap Agreement, that have not been counted toward the City's Alliance settlement obligation.

## III. ALLIANCE FILED ITS MOTION REGARDING THE CITY'S PAUSED OBLIGATIONS PRIOR TO MEETING AND CONFERRING AS REQUIRED BY THE SETTLEMENT AGREEMENT

Alliance cannot dispute that Section 8.2 was included in the Settlement Agreement to automatically implement a pause of certain of the City's obligations, including those relating to the creation of beds and encampment reductions, in the event of fires, locally declared emergencies, and other catastrophes such as precisely the situation the City currently finds itself facing. Nor can Alliance deny that Section 8.2 also mandates the Parties to meet and confer on necessary and appropriate amendments to the paused obligations. *See* Dkt. 863-2, Ex. A at § 8.2 ("In the event of fires…or any

Fourth Quarter of Fiscal Year 2023-24 (April 1, 2024 – June 30, 2024), available at: https://clkrep.lacity.org/onlinedocs/2017/17-0090-s27_rpt_cao_2-06-25.pdf (last visited 3/5/25); Homekey Funding Reports, *see, e.g.,* June 16, 2023 Recommendations Related to the State of California Department of Housing and Community Development Homekey Program, Round 3, available at: https://clkrep.lacity.org/onlinedocs/2021/21-0112-S3_misc_6-16-23.pdf (last visited 3/5/25); Prop HHH Progress Report, available at: https://housing.lacity.gov/housing/hhh-progress-dashboard (last visited 3/5/25).

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council…the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.").

Yet, despite acknowledging in its Motion that the devastating and ongoing impact of the recent wildfires have only made even worse what was already a challenging financial environment for the City (*see* Motion (Dkt. 863) at ECF 10:7-8, ECF 11:11-14, ECF 8:1, ECF 20:12), Alliance chose to ignore the self-executing pause, and meet and confer requirements imposed by Section 8.2 of the Settlement Agreement.  Alliance instead filed the present Motion prematurely before any meet and confer, or any necessary and appropriate amendments to the City's obligations contemplated by Section 8.2, could occur.  The express requirements, the spirit, and the underlying policy of Section 8.2 weigh against ruling prematurely on a Motion alleging a breach of obligations that are paused, and subject to a mandatory meet and confer process that had not occurred prior to the Motion's filing – one which the Parties only began to engage in on March 4, and which is currently ongoing.

## IV. ALLIANCE'S MOTION SEEKS TO REWRITE THE SETTLEMENT AGREEMENT AND PRESENTS NO EVIDENCE OF NON-COMPLIANCE OR LEGAL AUTHORITY

Setting aside the impropriety of Alliance filing its Motion in circumvention of its obligation to meet and confer about necessary and appropriate amendments to the very obligations about which the Motion complains, the Motion lacks any merit, and should be rejected.  Indeed, no breach of any provision has occurred, and Alliance fails to cite to a single case decision or statute to support its motion on substantive or procedural grounds.

### A. The City Has Until 2027 To Fulfill Its Commitment To Create Beds

Not only are the obligations at the heart of Alliance's motion paused, but the City has not breached any settlement provision.  Alliance does not dispute – nor can it – that

8

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

the date by which the City committed to create 12,915 beds is more than two years away in June 2027 (even assuming no necessary and appropriate modifications to address the impact of the wildfires as contemplated by Section 8.2). Thus, the date for performance of this obligation – without taking into account any amendments – has not yet arrived, so there cannot yet be a breach of that obligation. *See Clinton v. Acequia Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) (breach of contract claim was not ripe where defendant's time to perform its obligation had not yet elapsed); *see also Cassis v. Sun Life Assurance Co. of Canada*, 2018WL1358971 at *9 (C.D. Cal. Jan 18, 2018) (plaintiffs could not yet bring an action for breach of contract because the contract had not yet been breached where defendant's time for performance had not yet arrived). The fact that Plaintiffs question whether the City will have the financial capability to meet its obligation by the end of the Settlement Agreement term is not a basis for a current breach of the agreement. Premature speculation of a possible future breach is insufficient. Although complying with the current terms without any necessary and appropriate modification to account for the impact of the wildfires, as contemplated by Section 8.2, would likely necessitate other painful and significant budgetary cuts and policy decisions nobody wants to make, this does not rise to a breach of the City's obligations.

There is simply no merit to Alliance's disingenuous suggestion that the City has not provided a bed plan. *See* Motion (Dkt. 863) at ECF 14:3-5. To the contrary, the City submitted a bed plan in November 2022, and it is the milestones provided in that bed plan that Alliance relies on in this Motion. Furthermore, Alliance knows the City submitted a proposed revision to that original bed plan to Alliance and the Court in September 2024, which was withdrawn after Alliance objected to it. In Court on October 25, 2024, following productive discussions between elected officials for the City and County, counsel for the City stated on the record that: "…the City and the County have committed to working together to pursue solutions at the highest levels. And based upon those discussions: The City hereby withdraws the bed plan and will present other possible solutions to ensure the timely compliance with the City's

9

agreement with the LA Alliance." Dkt. 808 at 5:7-15. While the City is still working to identify pathways to create additional beds, including pursuing discussions with the County, which unfortunately have not resulted in a commitment from the County, the City's resources have been strained by dealing with the aftermath of the devastating wildfires. The City continues to be committed to dealing with the homelessness crisis, but needs time to evaluate all of the impacts on its resources. Given that the deadline to create beds will not arrive for over two more years, and the mandates of the Parties' *force majeure* provision are in effect, Alliance is not entitled to any intervention now.

### B. The City's Bed Milestones Are Aspirational Interim Goals Which The City Has Employed Its Best Efforts To Achieve

Alliance rehashes efforts made in the similar motion it filed last year to mischaracterize and rewrite the Settlement Agreement. Alliance again complains the City has not met all of its interim aspirational goals set forth in the milestones, but Alliance cannot convert a pledge to use "best efforts" to reach aspirational goals into a contractual obligation. As the City argued previously, the City did not agree – and the Settlement Agreement does not require the City – to meet any interim milestone; instead, they are aspirational goals and targets which the parties agreed the City would use its "best efforts" to achieve on an interim basis. *See* Dkt. 429-1 at § 5.2 ("The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines"). The interim bed creation milestones – which the City pledged to use its best efforts to achieve – stand in contrast to the City's time-fixed obligation (pre-wildfires) to create the Required Number of 12,915 beds by the end of the agreement term, June 14, 2027. *See* Dkt. 429 at § 3.1; *see also California Pines Property Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 393 (2012) ("a best efforts clause must be reconciled with other clauses in the contract to the extent possible."). An agreement to use best efforts to meet a goal is not the same as a contractual obligation to meet that goal. Alliance is conflating the two, and just like its ignoring Section 8.2, Alliance is also ignoring that the City's agreement to employ its best efforts is not the

10

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

same as agreeing to meet its milestones. Falling short of an interim milestone there was no contractual obligation to meet is not a breach of the Settlement Agreement. *See, e.g., CSAA Ins. Exchange v. Hodroj*, 72 Cal.App.5th 272, 276 (2021) ("[t]he elements of a breach of contract claims are that a contract was formed; that the plaintiff did everything required by the contract; that the defendant did not do something required by the contract; and that the plaintiff was harmed as a result."). Indeed, Alliance's argument lacks logic in that if the City was obligated to meet the milestones and goals, there would be no need to have agreed to employing best efforts to comply with them.

Perhaps recognizing that falling short of an interim target for bed creation does not constitute a violation of the Settlement Agreement, Alliance now contends – without any substantiating evidence – that the City has not used its best efforts to reach the interim targets. Yet the only "evidence" Alliance points to of a supposed failure to use best efforts is the City having fallen short of interim bed creation goals, but falling short of a target does not equate to a failure to use best efforts to reach that target. Simply not attaining something a party promises to use best efforts to attain is not a breach; all that is required of a party that has agreed to use its best efforts is "to make such efforts as are reasonable in…light of that party's ability and the means at its disposal and of the other party's justifiable expectations." *See Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*, 637 F.Supp.2d 712, 717 (C.D. Cal. 2008) (holding defendant did not breach "best efforts" provision of agreements). To put a finer point on it, "[b]est efforts does not mean every conceivable effort. It does not require the promisor to ignore its own interests, spend itself into bankruptcy, or incur substantial losses to perform its contractual obligations." *California Pines Property Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 394-95 (2012) (internal citations and quotations omitted).

Where, as here, the City is striving to bring online as many new beds as possible, and has in fact created hundreds of additional beds in each and every quarter since the agreement was entered at a cost to the City of over $1.4 billion to-date, despite the financial hurdles Alliance acknowledges the City has been facing (much of which was

11

not foreseeable in 2022 when the Agreement was reached), it cannot be reasonably disputed that the City has used efforts that are reasonable in light of its ability and the means at its disposal. *See, e.g.,* Quarterly Reports at Dkt. 516-1, 539-1, 598-1, 652-1, 660-1, 728-1, 757-1, 797-1, 858-1; *see also* Section II.D, *supra*.  In fact, despite the financial hurdles Alliance acknowledges the City has faced since entering the Settlement Agreement in 2022, which have been recently exponentially exacerbated by the unforeseen and tragic devastation caused by the wildfire and windstorm emergency, and are above and beyond what the City contemplated when it entered into the Settlement Agreement[5], the City has continued to use its best efforts to continue creating new beds and to meet its milestones.  As Plaintiffs reference in their motion, Special Master Martinez acknowledged in her Independent Monitoring Report Year One, filed on February 28, 2024, that "[a]s of September 30, 2023, the City ha[d] made significant strides in opening 2,347 beds or units.  This accomplishment is commendable…" Motion (Dkt. 863) at ECF 14:10-11 (citing Independent Monitoring Report Year One (1) [ECF No. 674]).  Since then, as reported in its quarterly reports to the Court, the City has consistently continued to pour resources into urgently creating an additional 4,185 beds, as of December 31, 2024, to serve the City's homeless population pursuant to the Settlement Agreement (which is on top of other beds the City has created, and other actions the City continues to take to address homelessness).  In other words, less than 3 years into the 5-year term of the Settlement Agreement, the City has created 4,185 beds and has another 4,278 beds in process.  Beyond those 9,093 beds currently open and in process (as of December 31, 2024), the City is also continuously working to add more beds to its pipeline, which involves identifying funding, reviewing both privately- and publicly-owned land, and examining the feasibility of future projects that could support

[5] In addition to significantly higher bed rates than in 2022, and the unforeseeable and widespread devastation wrought on the City by the January wildfires, the City is also facing the unexpected disappointment that the County, its partner in addressing this regional homelessness crisis, has not agreed to step up and provide additional funding following Measure A's passage in November 2024.

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

additional beds.

The City's enormous investment of monetary resources toward bed creation during just the first three years of the Alliance Settlement has only been made possible by the City's commitment not only to spend its own General Fund dollars, but to also actively make every effort to seek and obtain other funding sources available to it. This includes successfully applying for State funding through HHAP, and Encampment Resolution Fund grants from the California Interagency Council on Homelessness administered by the California Housing and Community Development Department, as just two examples. *See* CAO Funding Reports Re: Alliance Settlement Agreement Program, dated May 31, 2024, August 1, 2024, and Dec. 6, 2024.[6]

In the face of the evidence above alone, and in light of the appropriate standard for judging best efforts, Plaintiffs cannot credibly argue that "[t]he City has not and cannot demonstrate that it has used its 'best efforts' to meet its milestones." *See* Motion (Dkt. 863) at ECF 16:24-25.

Lacking in any evidence of a breach by the City, Alliance takes issue with the City's policy decisions, including which housing solutions the City is choosing to pursue – decisions which are left entirely to the City under both the law and the express language of the Settlement Agreement, which Alliance agreed to. *See* Settlement Agreement (Dkt. 429-1) at § 3.2 ("Subject to Constitutional requirements and legal mandates, **the City may choose, at *its sole discretion*, *any* housing or shelter solution**….")(emphasis added); § 8.1 ("Funding of housing and shelter opportunities created by the City shall be **at the City's sole discretion**.")(emphasis added); *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) ("the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'"). Whether a particular

---

[6] https://clkrep.lacity.org/onlinedocs/2023/23-1022-s3_rpt_cao_5-31-24.pdf; https://clkrep.lacity.org/onlinedocs/2023/23-1022-S6_rpt_cao_8-01-24.pdf; https://clkrep.lacity.org/onlinedocs/2023/23-1022-S11_rpt_cao_12-6-24.pdf (last visited 2/28/2025)

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

housing solution – be it Permanent Supportive Housing or Inside Safe – is deemed "cost-effective" in Alliance's estimation does not bare on whether the City can or should pursue that option, and certainly does not indicate a breach of the Settlement Agreement, which expressly left decisions regarding the choice of housing solution entirely within the City's sole discretion. *See id.* Both the law and the Settlement Agreement make clear that it is not up to the Alliance – or the Court – to determine *how* the City meets its obligations; that is a policy decision that is committed to the sole discretion of the City's leaders.[7] Far from establishing a breach of any obligation, at most, Alliance has voiced its opinion that the City's funds should be spent not on permanent housing and Inside Safe but on some allegedly cheaper housing options, *i.e.,* in a different way than the City's elected leaders have chosen to address the homelessness crisis. Alliance's attempts to rewrite the Settlement Agreement to allow it to dictate how the City creates beds, and what type of housing solutions it pursues, is improper.

While the City has always and will continue to use its best efforts to meet its bed creation milestones, falling short of hitting an interim milestone does not constitute a violation of the Settlement Agreement, and Alliance has not offered any credible evidence demonstrating the City has failed to use its best efforts to achieve its interim milestones for bed creation.

### C. Alliance's Argument Regarding Encampment Reduction Is Redundant Of Its Pending Motion, Which Also Attempts To Rewrite The Agreement

The portion of Alliance's motion addressing encampment reduction reporting and milestones should be dismissed because Alliance admits that it is redundant of another pending motion it already filed addressing the City's encampment reduction reporting

---

[7] Alliance complains not that the City is failing to invest resources in creating beds, but that it is spending too much money on bringing people indoors through Inside Safe. *See* Motion, Dkt. 863 at ECF 8:2-12. This argument underscores that all Alliance really wants to do is dictate precisely how the City spends money on addressing homelessness – decisions Alliance, through the Settlement Agreement, properly left to the City's sole discretion. *See* Dkt. 429-1 at §§ 3.2, 8.1.

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

(*see* Motion, Dkt. 863 at ECF 17:10, n.11), and on which the Court expressly deferred ruling at the last hearing on January 7, 2025. *See* Jan. 7, 2025 Hearing Tr. [Dkt. 850] at 58:15-59:13.  Alliance has essentially filed an unauthorized surreply, which the Court should reject.

To the extent the Court is inclined to address this issue now, Alliance's current motion makes even clearer than its other pending motion that all Alliance is attempting to do is add to, and alter, the terms of the Settlement Agreement between the City and Alliance without any basis for doing so.  The Settlement Agreement at Section 5.2 required the City to create plans and develop milestones for "the City's plan for encampment engagement, cleaning, and reduction in the City." Dkt. 429-1 at § 5.2.  The City complied with its obligation to create this "plan for encampment engagement, cleaning, and reduction in the City" – a plan with milestones that Alliance accepted. *See* Dkt. 713 at ¶¶ 7-8 (Joint Stipulation to Resolve Motion for Order re: Settlement Agreement Compliance and Sanctions).  Just like the bed creation milestones, the interim encampment reduction milestones are aspirational targets the City agreed to use its best efforts to meet.  Despite Alliance's ongoing effort to change the parties' agreement, what the encampment plan actually called for was removal of 9800 tents, makeshift shelters, RVs and vehicles from the public rights of way over 4 years (July 2022-June 2026).  Alliance's attempt to now – a year after the encampment reduction plan was agreed upon – to argue that items removed in connection with CARE and CARE+ operations should not count imposes a restriction that was never contemplated by the parties, and entirely changes what the parties agreed to. *See* Motion (Dkt. 863) at ECF 17:8-10.  It is thus unsurprising that Alliance's after-the-fact effort to rewrite the terms does not make any logical sense.  If the encampment reductions were to be tied or equated to bed offers, there would be no need to have separate provisions in the Settlement Agreement addressing bed creation, on the one hand, and encampment reductions, on the other.  Furthermore, Alliance's attempted "rewrite" of what these provisions mean is not factually or legally viable, and could not be what the Parties

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

intended.  The City does not control who is eligible for housing in each of the City sites (or in the County's sites, which include specialized beds for individuals with substance use disorders or mental health issues, and other higher acuity individuals), and therefore cannot tie encampment reductions to housing offers.  Moreover, Alliance's reimagined interpretation of the encampment reduction plan whereby the 9,800 number equates to offers of shelter does not make sense in light of the 12,915 required number of beds.

Nothing in the Settlement Agreement supports the interpretation that Alliance is now seeking to impose on the Settlement Agreement.  And neither the Alliance nor the Court can modify the Settlement Agreement terms or re-write the terms in this way. *Jeff D. v. Andrus,* 899 F.2d 753, 758 (9th Cir. 1989).  Alliance's after-the-fact effort to change the Settlement Agreement terms and to reimagine what it bargained for, is unfounded and should be rejected.

## D. <u>Alliance Has No Basis For Its Requested Relief, Which Is An Unfounded and Thinly Veiled Attempt To Usurp City Leaders' Discretion</u>

Alliance has no basis for its vague and unspecified requested relief, which is an unfounded and thinly-veiled effort to usurp City leaders' discretion, and to obtain relief Alliance did not bargain for.

Alliance does not identify any basis for the requested monetary and injunctive relief, nor does it describe such relief with the required specificity. *See Dominguez v. Better Mortg. Corp.*, 88 F.4th 782, 789 (9th Cir. 2023) (a "motion" must "state the relief sought" and "state with particularity the grounds for seeking the order."): Fed. R. Civ. P. 7(b)(1)(B) and 7(b)(1)(C).  Indeed, Alliance's motion does not cite to any legal authority whatsoever.  The City should not be at risk of facing what Alliance characterizes as "serious consequences" without being put on notice of the specific monetary and injunctive relief it may face. *See* Motion (Dkt. 863) at ECF 5:19-20.  Alliance's failure to identify with specificity the relief it seeks renders Alliance's motion procedurally improper and subject to being stricken. *See Dominguez*, 88 F.4th at 789.

None of what Alliance contends or complains about is an appropriate basis for a

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE

finding of breach, much less for imposing unspecified "monetary and injunctive measures" at some future unspecified date – a date Alliance is requesting the Court to impose, despite it being found nowhere in the Settlement Agreement. *See* Motion (Dkt. 863) at ECF 20:15-19; *see also* Proposed Order (Dkt. 863-11).  Not only does Alliance's motion lack any legal or procedural basis for such vague and unspecified measures, but it is particularly troubling that Alliance would suggest monetary consequences of any amount against the City in the same brief in which it repeatedly acknowledges the City's "undisputed financial challenges" and that "the City is facing clear financial peril" (*see* Motion, Dkt. 863 at ECF 8:1, ECF 20:12).  Any money the City is ordered to pay is money that cannot be spent on addressing the homelessness crisis.

Given the glaring lack of evidence of any breach of the Settlement Agreement, and the lack of any legal authority, coupled with Alliance's disregard for its obligations under Section 8.2, there is no factual or legal basis for Alliance's request for the Court to step in and make a finding that the City is in violation of its obligations under the Settlement Agreement.  Nor are there any grounds for an order setting an immediate – but unspecified – target by which the City must come into compliance, much less unspecified "monetary and injunctive measures" to be imposed after that future, unspecified date, which the Parties did not contemplate or agree to. *See* Motion (Dkt. 863) at ECF 20:15-19 16:15-19; *see also* Proposed Order (Dkt. 863-11).

### V.   **CONCLUSION**

For the foregoing reasons, and for additional reasons that may arise at the hearing on this matter, Alliance's Motion should be denied in its entirety.

DATED:  March 6, 2025

HYDEE FELDSTEIN SOTO, City Attorney
DENISE C. MILLS, Chief Deputy City Attorney
KATHLEEN KENEALY, Chief Assistant City Attorney
ARLENE N. HOANG, Deputy City Attorney
JESSICA MARIANI, Deputy City Attorney

By: /s/ _____
Arlene N. Hoang, Deputy City Attorney
Counsel for Defendant City of Los Angeles

17

DEFENDANT CITY OF LOS ANGELES' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE