UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>　　　　Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**REPLY ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE**<br><br>Before:  Hon. David O. Carter<br>Courtroom: 10A<br>Hearing Date:  March 24, 2024<br>Hearing Time:  8:30 p.m. |

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.      INTRODUCTION .................................................................................................1

II.     THE CITY HAS BREACHED THE SETTLEMENT AGREEMENT BY FAILING TO PRODUCE A PLAN TO CREATE THE REQUIRED NUMBER OF BEDS .................................................................................................2

      i.      City Has Failed to Produce a Complete Bed Plan ........................................2

      ii.     The City is in Anticipatory Breach of the Agreement Because it has Impliedly or Expressly Repudiated the Terms.................................................2

      iii.    The Court Should Order the City to Maintain All Roadmap Beds, Pending Resolution of This Motion and the Audit Hearing. .......................3

III.    THE CITY HAS NOT DEMONSTRATED BEST EFFORTS TO MEET MILESTONES AND DEADLINES .................................................................8

      i.      City Has Failed to Use Its Best Efforts to Meet its Shelter or Housing Milestones .....................................................................................................9

      ii.     City Has Failed to Use Its Best Efforts to Meet its Encampment Reduction Milestones ...................................................................................10

IV.     THE CITY'S OBLIGATIONS HAVE NOT BEEN PAUSED UNDER SECTION 8.2 .................................................................................................11

V.      CONCLUSION ................................................................................................12

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                      **PAGE(S)**

*California Pines Property Owners Ass'n v. Pedotti*,
206 Cal. App. 4th 384 (2012) .......................................................................................8

*Romano v. Rockwell International, Inc.*,
14 Cal. 4th 479 (1996) ................................................................................................3

*Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*,
637 F. Supp. 2d 712 (C.D. Cal 2008) ......................................................................8, 10

*Taylor v. Johnston*,
15 Cal. 3d 130 (1975) ..................................................................................................3

## **OTHER AUTHORITIES**

City of Los Angeles, Overview of the 2024-25 Proposed Budget (Apr. 30, 2024),
https://clkrep.lacity.org/onlinedocs/2024/24-0600_rpt_cla_4-30-24.pdf....................9

Benjamin Oreskes, *L.A. will shelter more homeless people to end major lawsuit, But how many?*, Los Angeles Times (Apr. 1, 2022, 4:19 PM),
https://www.latimes.com/homeless-housing/story/2022-04-01/los-angeles-homeless-lawsuit-settlement-judge-carter ................................................................................10

David Zahniser, *Pay hikes for city workers will add $1 billion to L.A.'s yearly budget by 2028, report says*, Los Angeles Times (Apr. 13, 2024, 3:00 AM),
https://www.latimes.com/california/story/2024-04-13/raises-for-los-angeles-city-workers-will-cost-an-extra-billion-annually-by-2028 ...............................................6

David Zahniser, *L.A. City Council signs off on police raises amid warning of financial risk*, Los Angeles Times (Aug. 23, 2023, 3:06 PM),
https://www.latimes.com/california/story/2023-08-23/lapd-union-contract-is-approved-by-the-city-council..................................................................................6

*Reduce*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/reduce (last visited Mar. 13, 2025) ............................................................................................10

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

## I.   INTRODUCTION

The years that have passed since the settlement agreements were reached in this case have confirmed that the homelessness response system in Los Angeles is not working—billions of dollars are being poured into the "system" but very little of it is making its way to the streets in the form of shelter and true assistance.  In an effort to understand the reason, Plaintiffs and the City last year agreed to a stipulated sanction in the form of a third-party audit of LA City homelessness programs.  The findings of that audit, filed last week, paint a bleak picture of a City and County system that cannot accomplish what's required under the settlement agreements.

LAHSA does not know who it is paying and for what.  The City doesn't know how much it is paying, and for what.  The system is disjointed and mismanaged, with layers of redundancies and bureaucracy built on top of itself.  There is nearly zero financial oversight or accountability by the City and County of LAHSA, or by LAHSA of the service providers with whom it contracts.  Nobody is ensuring that services which are paid are actually given.  Contracts are vague, unclear, and often missing.  70% of the 2,293 "Scattered Sites"—time limited subsidies—could produce *no documentation of financial expenditures* in the last year, despite multiple follow-ups, resulting in the auditors being unable to "validate the reported number of TLS beds or the total expenses necessary to support those beds." (Second Am. Draft of the A&M Assessment of the L.A. City Homelessness Programs ("A&M Audit") at 64, Mar. 6, 2025, ECF No. 870.)

Against this backdrop, the Alliance's Motion for Order re Settlement Agreement Compliance is all the more significant.  The City must be ordered to comply with the terms of the Settlement Agreement by a date certain—the Alliance requests no more than 30 days for a complete bed plan and no more than 90 days to come into compliance with established Milestones and Deadlines—or face significant consequences up to and including receivership by this Court.  The City must also be

1

ordered to maintain all Roadmap beds that are not otherwise set to expire while a decision on this motion is pending.

## II.    THE CITY HAS BREACHED THE SETTLEMENT AGREEMENT BY FAILING TO PRODUCE A PLAN TO CREATE THE REQUIRED NUMBER OF BEDS

### i.    City Has Failed to Produce a Complete Bed Plan

The City is in *per se* breach of the Agreement and has publicly announced an anticipatory breach of the remaining terms of the SA.  The City must be ordered to maintain all beds, including Roadmap beds, pending this Court's resolution of the issues raised in this motion and the Court's consideration of the massive structural issues raised by the Audit Report. (*See generally*, A&M Audit.)

In November 2022, the City was required—but failed—to produce a complete plan for creation of shelter and housing to meet its obligation under the SA.  (Am. Fully Executed Order of Dismissal, Ex. 1, Settlement Agreement ("Settlement Agreement") § 5.2, ECF No. 429-1 ("[After calculating the Required Number under Section 5.2], the City will create plans and develop milestones and deadlines for: . . . the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District . . . [and] in the City.  The City will provide the plans, milestones and deadlines to Plaintiffs . . . .") The plan provided to Plaintiffs in November 2022, contained only 10,450 beds, short of the 12,915 beds as required.  (Pl.'s Second Mot. for Order re Settlement Agreement Compliance ("Mot.") 3:2–4, Feb. 2, 2025, ECF No. 863.)  Despite ample opportunity and multiple requests over the last two-and-a-half years the City has not produced an updated plan encompassing the remaining beds.  The City is in *per se* violation.

### ii.    The City is in Anticipatory Breach of the Agreement Because it has Impliedly or Expressly Repudiated the Terms

The reason *why* the City has failed to produce a bed plan is even more concerning: it either cannot or doesn't want to.  It has made too many poor financial

2

decisions, resulting in a fiscal crisis of its own making, and now cannot fulfill the terms of the SA without an immediate about-face that it refuses to make.

This is an implied and/or express repudiation, also known as an anticipatory breach. *See Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975) ("Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract.  The repudiation may be express or implied.  An express repudiation is a clear, positive, unequivocal refusal to perform; an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible.") (citations omitted); *see also Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 488–89 (1996) ("[I]f a party to a contract expressly or by implication repudiates the contract before the time for [its] performance has arrived, an anticipatory breach is said to have occurred.  The rationale for this rule is that the promisor has engaged not only to perform under the contract, but also not to repudiate his or her promise.") (citations omitted).  Here, the City has made it very clear that it cannot both support the current projects and pay for the new housing and shelter solutions required by the SA.  However, the City has also made it clear that it is unwilling to pivot to less expensive options or otherwise make cuts necessary to fulfill the terms of its obligations.  (Mot. 7–11.)  Whether this is considered an express or implied repudiation, the result is the same: the City is in breach of the SA.

### iii.       The Court Should Order the City to Maintain All Roadmap Beds, Pending Resolution of This Motion and the Audit Hearing.

In September 2024, the City did temporarily produce an updated "plan" which included "migrating" 2,500 Roadmap beds from the Roadmap Agreement with the County (the financing for which has ended) to the Alliance Agreement.  This would have the financial benefit to the City of reducing the City's overall build-obligation by 2,500 beds and taking advantage of County funding under the separate Alliance-County/City-County agreements. But the Alliance would have had to agree to amend the SA to permit re-use of those beds rather than "creat[ing]" beds as required.

3

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

(Settlement Agreement § 5.2(i), (iii).)  Because this would cause the overall bed count to be reduced by 2,500—affecting the 2,500 souls who occupy those beds—the Alliance did not agree. (Hr'g Tr. 9–19, Oct. 16, 2024, ECF No. 791.) The City withdrew its proposed bed plan after the County promised to work with the City in good faith to continue to fund the Roadmap beds upon the passage of Measure A—but the County has reneged on that promise. (City's Opp'n to Mot. for Order re Settlement Agreement Compliance ("Opp'n") 3:21–4:15, Mar. 6, 2025, ECF No. 871.)

Now the City claims it cannot afford to both keep the bed established pursuant to the City/County MOU ("Roadmap beds") open and add additional housing and shelter beds as required by the SA. (Mot. 7–11.) That claim is highly problematic for two reasons: (i) closing Roadmap beds would be a violation of the SA, and (ii) the City's alleged fiscal crisis is both self-inflicted and preventable.

*First*, the SA contemplates—and the City explicitly agreed—that the beds created under the SA would be in addition to the Roadmap beds. (Declaration of Elizabeth A. Mitchell ("Mitchell Decl.") ¶ 2, filed hereto concurrently.) In the lead-up to the Court's approval of the City-Alliance Agreement, the Intervenors specifically objected to the alleged lack of clarity in the Agreement as potentially permitting the closure of existing shelter beds while creating new ones. (Intervenors' Objs. To Proposed Order of Dismissal at 22, May 31, 2022, ECF No. 434.)  In response to that specific objection, the City affirmed its commitment to open SA beds *in addition to* Roadmap beds:

> [T]he absence of a clause preventing [the City from closing beds that are already in existence] should not be of concern because the City has demonstrated its commitment to continue building new beds.  Indeed, earlier in this case, the City agreed to build 6,700 beds through the [Roadmap] Memorandum of Understanding ("MOU") with the County . . . **All of the beds the City is committing to build in this Settlement Agreement are in addition to the beds being built**

4

**pursuant to the [Roadmap] MOU**. There will be no double-counting of beds between this Settlement Agreement and the MOU.

(City's Reply to Objs. to Settlement Agreement at 10, June 3, 2022, ECF No. 438 (emphasis added) (citations omitted); *see also* Hr'g Tr. 60:21–22, June 9, 2022, ECF No. 441 ("[Court in announcing decision]: We don't have double counting here. We have 6700 [Roadmap beds]. You're representing you're producing new beds [as part of this agreement.]".) Closing the Roadmap beds would violate the implicit and explicit understanding of the Settlement Agreement, which is that the Roadmap beds would remain open,[1] and the SA beds would be created "in addition to." Indeed, the Agreement only required the City to build sufficient beds for 60% of the "unsheltered" population. (Settlement Agreement § 5.2.) Without the 6,700 Roadmap beds, the City's unsheltered number would be far higher, because all persons residing in a Roadmap bed at the time of the 2022 count would have been counted as "sheltered." (Mitchell Decl. ¶ 3.) It is anticipated that the City may try to close its funding gap by closing at least some of the Roadmap beds, beyond those leases which are naturally expiring. This would be a violation of the terms of the agreement and the City's on-the-record assurances to the Plaintiffs and the Court. Accordingly, the Alliance asks the Court to issue an order to the City to maintain all Roadmap beds open pending resolution of these significant issues.

*Second*, the City's fiscal woes have been apparent for years, while the City continued to make bad decisions and failed to pivot as needed to fulfill the terms of the SA. Now the City wants an out—which the Court cannot grant. Over a year ago, Special Master Martinez identified the significant financial challenges facing the City: "[T]he City is projected to face budget deficits, especially in the fiscal years 2025-2026. These deficits pose a potential threat to the sustainability of interim housing

---

[1] The Alliance recognizes that some beds are set to close for reasons other than fiscal concerns, including expiration of land leases. The Alliance does not object to the natural closure of these beds.

5

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

programs, which could have an impact on the binding settlement agreement . . . . [It] is essential to assess how these funding gaps, in conjunction with the funds allocated for the Inside Safe Program, will affect the City's ability to fulfill its binding commitments." (Independent Monitoring Report Year One (1) at 7, Feb. 29, 2024, ECF No. 674.)  Rather than heed the warnings of both Chief Administrative Officer (CAO) Matthew Szabo and Special Master Martinez, the City instead made a series of financial decisions which put them on this path: The City approved massive pay increases for its civilian workers which added $196 million to the budget in Fiscal Year 24-25, $311 million in Fiscal year 25-26, and is estimated to add $1 billion to the City's yearly budget by 2028.[2]  This was on top of $1 billion in pay increases to the City's sworn personnel over a four-year period in an agreement reached in 2023.[3] And specifically in the area of homelessness response funding, the City has consistently focused on the most expensive solutions, namely permanent housing and Inside Safe operations, over more economic options. (Mot. 6–9.)

The City claims its financial difficulties were "unexpected" at the time it entered the SA, but the ending of County funding was certainly foreseeable because the agreement by its terms expires this year,[4] the budget shortfall was identified more than a year ago, and the raises of sworn and unsworn City personnel and focus on expensive homeless housing options all occurred after the agreement was entered into. The only

---

[2] David Zahniser, *Pay hikes for city workers will add $1 billion to L.A.'s yearly budget by 2028, report says*, Los Angeles Times (Apr. 13, 2024, 3:00 AM), https://www.latimes.com/california/story/2024-04-13/raises-for-los-angeles-city-workers-will-cost-an-extra-billion-annually-by-2028.

[3] David Zahniser, *L.A. City Council signs off on police raises amid warning of financial risk*, Los Angeles Times (Aug. 23, 2023, 3:06 PM), https://www.latimes.com/california/story/2023-08-23/lapd-union-contract-is-approved-by-the-city-council.

[4] The Alliance understands that on October 25, 2024 the County committed to continuing to pay for Roadmap beds if Measure A passed in November, 2024. Measure A passed, yet the County has backed out of that promise, which is unfair, unfortunate, and should be separately remedied.  But that does not mean the lack of funding was unforeseeable at the time the SA was entered into.

6

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

truly "unexpected" issue was the wildfires in January which, while devastating, do not justify the breaches identified herein which occurred and began well before the fires broke out, and at least would warrant the City pivoting to less expensive housing and shelter solutions, which it has not indicated it is willing to do.

Finally, the Audit Report released last week reveals in damningly direct language the level of substantive and fiscal mismanagement which has occurred over City homelessness programs, explaining in large part the lack of progress we have seen in reducing street homelessness. (*See generally* A&M Audit.)  The lack of oversight and accountability has created an atmosphere that encourages fraud, waste, and abuse while the disjointed system and bloated bureaucracy makes trickle-down help nearly impossible.  The City has been throwing hundreds of millions of dollars at LAHSA with little attempt at accountability—and then claims surprise at its financial troubles.

The City's failure to produce a complete bed plan nearly three years into this agreement puts it squarely in violation of the SA.  Its recent announcements of massive financial shortfalls both in its general budget and, especially, its inability (or unwillingness) to fund current and future homeless shelter and housing commitments is an implied repudiation of the SA, making it ripe for a finding of anticipatory breach. Closing Roadmap beds in an attempt to re-invest those dollars into SA-compliant beds would violate the implied and express understanding undergirding the SA that SA-beds would be in addition to Roadmap beds.

The Alliance thus requests the Court: (i) make a finding the City is in breach of the SA, (ii) order the City to maintain all Roadmap beds pending resolution of these issues, and (iii) order the City to produce a complete bed plan within thirty (30) days which anticipates maintenance of all current and future beds or face serious and significant sanctions to be determined by the Court including but not limited to receivership.

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

## III.   THE CITY HAS NOT DEMONSTRATED BEST EFFORTS TO MEET MILESTONES AND DEADLINES

The City does not dispute that it has not met the required Milestones and Deadlines, but audacious contends it does not have to. (Opp'n 10 (calling the milestones and deadlines "aspirational goals and targets" and arguing "the Settlement Agreement does not require the City . . . to meet any interim milestone.").)  By the City's logic, it could establish all 12,915 required beds on the last possible day—June 30, 2027—keep them up for 24-hours, and then destroy every single one.  This result would frustrate the purpose of the agreement.  Plaintiffs specifically negotiated for the ability to challenge the City's plans to prevent such an unjust result from occurring. (*See* Settlement Agreement § 5.2 (requiring the City to "provide the plans, milestones and deadlines to Plaintiffs," mandating the City and Plaintiffs to "work together in good faith to resolve any concerns or disputes" and "consult with the Court for resolution, if necessary.").)

Contrary to the City's argument, the Agreement does require the beds to be created in line with the milestones and deadlines—the City was and is required to "promptly employ its best efforts to comply with established plans, milestones and deadlines."  (*Id.*)  These were never intended to be "aspirational" or unenforceable; rather the City was and is required to move with alacrity and stick to the timeline the City itself identified. It has undoubtedly failed to do so.  The only remaining question is whether the City has used "best efforts" to comply.  It has not.

A party's "best efforts" "requires a party to make such efforts as are reasonable in [] light of that party's ability and the means at its disposal and of the other party's justifiable expectations . . . ." *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 717 (C.D. Cal 2008) (citations omitted) (noting "best efforts" is "more exacting" than a "good faith" standard); *see also Cal. Pines Prop. Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 395 (2012) ("best efforts" means "the promisor must use the diligence of a reasonable person under comparable circumstances.").  The City

8

has made no effort to prove that it has employed its best efforts to comply with the agreement, and therefore cannot establish compliance with the SA.

**i.      City Has Failed to Use Its Best Efforts to Meet its Shelter or Housing Milestones**

The City baldly claims it has used its "best efforts" to meet housing or shelter deadlines but does not even attempt to cite any facts or evidence in support of that claim. (Opp'n 11–12.)  The City of Los Angeles has a yearly budget of nearly $13 billion and a homelessness budget in Fiscal Year 24-25 of $950.8 million, down 25.6% from the prior fiscal year.[5]  It could have done any number of things with such significant funds, including: dedicating all or part of the hundreds of millions of dollars in Inside Safe funds to SA-compliant beds, contracting with shared housing providers to utilize existing infrastructure, placing permit inspectors on-site to avoid having to wait for city inspectors (as the Special Master did in Santa Ana to raise a shelter in only 28 days), or establishing safe sleep sites at very low cost for those who are not yet ready to come inside with a roof and a bed. Yet the City did none of this, plodding along at its business-as-usual pace despite operating under several years of "emergency" declarations.

The City takes umbrage with the Alliance's critique of its choice to focus on slow, expensive housing solutions, and emphasizes that the SA imbues the City with "sole discretion" to choose the housing or shelter solution it deems appropriate.  (*See* Opp'n 13–14.)  In truth, the SA only gives City "sole discretion" to choose the housing or shelter solution it deems appropriate **"as long as the Milestones are met."** (Settlement Agreement § 3.2 (emphasis added).)  The City has not met a single milestone since the SA began—thus it no longer has "sole discretion" to determine the appropriate housing or shelter solution.

---

[5] City of Los Angeles, Overview of the 2024-25 Proposed Budget (Apr. 30, 2024), https://clkrep.lacity.org/onlinedocs/2024/24-0600_rpt_cla_4-30-24.pdf.

9

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

Plaintiffs filed this case in large part to inject urgency into efforts to reduce unsheltered homelessness to the greatest extent possible, as fast as possible. With a $3 billion-commitment amongst significant platitudes and claims of "big" changes[6] Plaintiffs justifiably expected the City to meet or exceed the milestones it identified. *See Samica Enters.*, 637 F. Supp. 2d at 717. It has not, nor has the City demonstrated in any way that its efforts were "reasonable" in light of its "ability and means at its disposal." *Id*. (citations omitted).

### ii. City Has Failed to Use Its Best Efforts to Meet its Encampment Reduction Milestones

The City also does not dispute that it is using CARE/CARE+ clean-ups to meet its encampment reduction numbers which is inappropriate in the Alliance's view and not what the parties intended when the agreement was entered into. An encampment is not "reduced" when abandoned property or trash is disposed of, but people are permitted to immediately return to the newly cleaned site and no person has been offered shelter or housing. "Reduce" means, according to Merriam-Webster online dictionary, to "decrease" or "diminish in size, amount, extent, or number."[7] Nothing in the definition of "reduce" refers a *temporary* or *fleeting* state. There are no words such as "moved, cleaned, temporary, or momentary." A "reduction" infers a permanent state. CARE/CARE+ cleanings do not "reduce" encampments and should not be counted.

It is worth noting, and deeply concerning, that the City alleges that such a policy (offering beds in conjunction with encampment reduction) would not be "factually or legally viable" because "[t]he City does not control who is eligible for housing in each

---

[6] Benjamin Oreskes, *L.A. will shelter more homeless people to end major lawsuit, But how many?*, Los Angeles Times (Apr. 1, 2022, 4:19 PM), https://www.latimes.com/homeless-housing/story/2022-04-01/los-angeles-homeless-lawsuit-settlement-judge-carter.

[7] *Reduce*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/reduce (last visited Mar. 13, 2025).

10

of the City sites . . . and therefore cannot tie encampment reductions to housing offers." (Opp'n 15–16.) This was clearly not anticipated as part of the SA in 2022—as evidenced by the significant struggle of Councilmembers to maintain the beds they have established over the last several years.  Rather, the plain language of the agreement expresses the intent of *both* parties to link the offered shelter and housing opportunities with encampment reduction efforts.  Indeed, that is why the parties agreed in the SA to both housing and shelter obligations <u>and</u> encampment reduction efforts.

## IV.   THE CITY'S OBLIGATIONS HAVE NOT BEEN PAUSED UNDER SECTION 8.2

The City's argument that its obligations are "paused" is disingenuous in light of the City's failure to even attempt to meet and confer about this issue until after Plaintiff filed its motion for an order compelling compliance.  (Mitchell Decl. ¶ 5.)

Section 8.2 of the Settlement Agreement provides that "[i]n the event of fires . . . or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council . . . the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." (Settlement Agreement § 8.2.) The City's counsel sent an email on Wednesday, January 15, announcing "[T]he City's obligations as provided in Section 8.2 are hereby paused." (Mitchell Decl. ¶ 6, Ex. 1, Email dated Jan. 15, 2025.)  The City promised follow-up: "When we are able to confer with the County and our clients, we will get back to you to engage in a meet and confer process regarding the settlement agreement." (*Id.*)  The Alliance's response was simple: "I recognize the City is going through an emergency and I am willing to delay filing the motion to compel to permit the City a reasonable period of time to recover from this."  (*Id.*) The Alliance waited for over a month after that email, and three

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

weeks after the fires were fully extinguished, before filing the subject motion. No further contact was made by the City prior to the Alliance filing its motion.[8]

Moreover, even if the "pause" is in effect—which it is not because the emergency is no longer pending—such a pause is not indefinite and there is nothing about Section 8.2 which prevents these issues from being resolved while the parties are conferring. The City is undoubtedly in breach, and the people of Los Angeles are undoubtedly suffering from the City's refusal to comply with the Settlement Agreement.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff LA Alliance requests (i) the City be ordered to maintain all Roadmap beds which are not otherwise set to expire during the pending of the Court's consideration of these issues, (ii) a formal finding by the Court that the City is in violation of its obligations under the Settlement, (iii) that the Court set an immediate target by which the City must come into compliance (no more than 30 days for a complete bed plan and no more than 90 days to come into compliance with established Milestones and Deadlines), and (iv) the identification of clear consequences for non-compliance in the form of monetary and injunctive measures the Court deems proper up to and including receivership by this Court.

Dated: March 13, 2025            Respectfully submitted,

                                 */s/ Elizabeth A. Mitchell*
                                 UMHOFER, MITCHELL & KING, LLP
                                 Matthew Donald Umhofer
                                 Elizabeth A. Mitchell

                                 *Attorneys for Plaintiffs*

---

[8] The City did contact the Alliance *after* the subject motion was filed to begin discussions regarding Section 8.2. While the Alliance will continue to meet and confer in good faith, the urgency of the situation demands the Court resolve these issues immediately.

12

*REPLY ISO PLAINTIFF LA ALLIANCE'S SECOND MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*