LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
MIRA HASHMALL (State Bar No. 216842)
mhashmall@millerbarondess.com
JASON H. TOKORO (State Bar No. 252345)
jtokoro@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Defendant
COUNTY OF LOS ANGELES

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | **CASE NO. 2:20-cv-02291 DOC (KES)**<br><br>**DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED DRAFT ASSESSMENT OF ALVAREZ AND MARSAL OF LOS ANGELES CITY HOMELESSNESS PROGRAMS**<br><br>Assigned to the Hon. David O. Carter and Magistrate Judge Karen E. Scott |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

723944.4

## I.   **<u>INTRODUCTION</u>**

On March 6, 2025, the Court made public Alvarez and Marsal ("A&M")'s Second Amended Draft "Independent Assessment of City-Funded Homelessness Assistance Programs" ("Report") (Dkt. 870).  The Report represents the culmination of A&M's retrospective financial and performance assessment of three "programs" administered by the City of Los Angeles ("City") related to homelessness: Inside Safe, the 2020 Memorandum of Understanding ("Roadmap Agreement") between the City and County of Los Angeles ("County"), and the City's settlement with Plaintiffs in this Action ("LA Alliance" and, together, "City Programs").[1]

Although the focus of A&M's assessment was services (including housing and law enforcement) contracted for or otherwise provided by the City, at the request of A&M and the Court, the County voluntarily provided County-maintained data and information regarding related County beds or services accessed by clients of the City Programs during the assessment's lookback period.  (*See* Dkt. 801 (A&M's Updated Data Requests); *see also* Dkts. 770, 814, 849 (County's prior status updates to Court).)  Also, at A&M's request, the County facilitated 10 site visits by A&M to permanent supportive housing ("PSH") units at which the County provides Intensive Case Management Services ("ICMS") and high-service need interim housing beds contracted for by the County's Department for Health Services.  (Dkt. 845.)

In addition to supporting A&M's assessment with data, information, access,

---

[1] The scope and lookback period of A&M's assessment was defined in A&M's May 17, 2024 engagement letter, to which the County is not a party.  (Dkt. 743.)  As that letter explains, A&M's assessment is not an audit nor intended to conform to the standards issued by the Governmental Accounting Standards Board nor the Government Accountability Office for audits of governmental entities.  The lookback period varies by program: June 2020 for the Roadmap Agreement, June 2022 for LA Alliance, and December 2022 for Inside Safe.  (Report at 1–3 & n.2.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

and funding,[2] the County met and conferred with A&M on numerous occasions and through written correspondence.  The County hereby provides this response to offer the Court, the parties, and the public background information, as well as additional context and clarification to assist them in understanding the Report as it relates to the County's programs and services.

## II.      BRIEF SUMMARY OF COUNTY'S CONTRIBUTIONS TO REPORT

As the Report explains, A&M's stated intent in performing its assessment "was to examine the appropriation and expenditure of funds through the City" and "evaluate[] whether these monetary resources effectively supported [people] experiencing homelessness [("PEH")] in achieving improved outcomes and housing stability" in order "to provide an objective perspective on the alignment of financial decisions with service delivery outcomes" and "identify opportunities to enhance efficiency and effectiveness in addressing homelessness in the City."  (Report at 3.)

The County's data intersected with these City-focused goals in three narrow ways: (1) the County provides a significant amount of the financing for the interim housing created by the City pursuant to the Roadmap and LA Alliance Agreements, both directly and through LAHSA; (2) as a result of the 1991 Realignment,[3] the County (rather than the City) administers mainstream services, including to the PEH participating in the City Programs; and (3) A&M sought to evaluate the flow of PEH, including those with behavioral health conditions, from housing created by the City pursuant to the City Programs to certain County services and programs.

***The County's Financial Support For The City's Housing***.  As part of its financial and accounting assessment, A&M sought to determine and track the funds

---

[2] As the County previously reported, its Board of Supervisors ("Board") approved $620,000 in fees to cover A&M's assessment related to the County.  (Dkt. 845.)

[3] The 1991 Realignment refers to the transfer of fiscal and programmatic responsibility for many health and human social services programs from the State to counties, which are funded by a combination of federal, state, and county dollars.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

723944.4

3

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

expended by the City on each of the Programs.  (Report at 44–45.)

As explained in the Report, the Roadmap Agreement memorializes a commitment by the City and County during the height of the COVID-19 pandemic to increase housing units in order to relocate and shelter PEH who were living near freeway overpasses, underpasses, and ramps, or aged 65 years or older.  (Report at 15; *see also* Dkts. 136, 185-1.)  Pursuant to the Roadmap Agreement, which naturally sunsets on June 30, 2025, the County agreed, *inter alia*, to contribute $53 million for the first year and up to an additional $60 million per year for each of the remaining years of the Agreement, as well as additional monetary incentives. (Report at 16.)  The County tendered these payments directly to the City.  (*E.g.*, Dkt. 177, 203, 254, 341, 758.)  To optimize resources, the City was permitted to contract for services under the Roadmap Agreement through LAHSA in collaboration with community-based providers.  (Report at 17.)  Over the course of A&M's assessment, it discovered that some of the service provider contracts under the Roadmap Agreement held by LAHSA also received funding directly from the County.  (*Id.* at 62.)

In May 2024, the City and County executed another Memorandum of Understanding, under which the County reimbursed the City on a retroactive and go-forward basis for the Bed Rate (i.e., nightly bed rate) for interim housing units under the Alliance Program.  (Report at 68.)  Pursuant to the May 2024 MOU, the County also contracts for and funds PSH services for PEH in PSH units established by the City pursuant to the LA Alliance program.

These City beds/services that are funded by the County in whole or in part are in addition to the portfolio of more than 14,000 interim housing units funded and contracted exclusively by the County, of which more than 8,000 are within the City.

***The County's Provision Of Mainstream Services***.  The County supports the Roadmap and LA Alliance programs by funding a suite of "mainstream" services provided by the Departments of Health Services ("DHS"), Mental Health ("DMH"),

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF
ALVAREZ AND MARSAL (A&M)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Public Health ("DPH"), and Public Social Services ("DPSS") to clients residing at the City's interim housing and PSH.  Mainstream services, include public assistance programs (i.e., General Relief, CalFresh, and Medi-Cal), healthcare, mental health and substance use disorder ("SUD") services (outpatient and inpatient), and benefits advocacy services.  DHS also provides ICMS to residents of PSH, which are designed to assist clients in achieving and maintaining their health, mental health, and housing stability.  By contrast, the services provided by the provider frequently include safe and clean shelter, meals, furniture, hygiene supplies, clean linens or laundry services, etc. and are built into the aforementioned "bed rate."

To assist A&M, the County provided it with data showing enrollment in mainstream services during the lookback period by PEH who were also enrolled in the City Programs.  The Report includes information about enrollment in PSH under the Roadmap and LA Alliance Programs, which reflect high enrollment in CalFresh (food assistance) and Medi-Cal (public health insurance).  (Figures 4.9, 4.10.)  Other mainstream services are unlikely to be utilized broadly by PSH residents, such as emergency-room medical care or General Relief, which is a temporary cash-assistance program.[4]  Note, ICMS is available only to PSH residents, which is the majority of housing created by the City under the LA Alliance Program, and the minority of housing created under the Roadmap Agreement.

***The County's Housing For Higher Acuity PEH***.  The County also provided A&M data regarding clients of the City's interim housing who received DHS's high-service-need interim housing[5] or bed-based mental health or SUD services

---

[4] Eligibility is subject to monthly income caps as well as other limits.  *See*, General Relief, L.A. County Dep't of Pub. Social Servs., https://dpss.lacounty.gov/en/cash/gr.html (last visited Mar. 18, 2025).

[5] There are two types of housing within this category of beds.  Recuperative care beds are designed to provide short-term, unlicensed housing for individuals recovering from an acute illness or injury who need stable housing with medical

723944.4

5

contracted by DMH or the Substance Abuse Prevention and Control division of DPH ("DPH-SAPC")—namely, inpatient psychiatric treatment, subacute residential treatment, recovery bridge housing, or sobering centers.  However, in the LA Alliance settlement agreement, the universe of clients "appropriate" for the housing created by the City was defined as *not* having a severe mental illness and *not* having co-occurring chronic homelessness and a SUD or chronic physical illness or disability.  (Dkt. 677-4 at 2–3 (definition of "City Shelter Appropriate").)

The Report also identified several strengths in the County-funded beds/services, including:

*Onsite Medical Personnel.*  A&M explained that the presence of onsite medical staff at the County's high-service need interim housing beds, such as clinical nurses, was a valuable resource for supporting participants.  This arrangement promotes a more holistic approach to service delivery, benefiting both staff and participants through prompt and knowledgeable medical support.

*Staff Quality.*  The County conducts a preliminary review of proposed staff resumes prior to hiring decisions for service providers, ensuring that personnel met the necessary qualifications outlined in the contract's Statement of Work.  This quality-control measure ensures that only appropriately qualified personnel deliver services, contributing to higher quality and more effective service delivery.

*Direct Contracting.*  The County directly contracts with service providers for County-funded housing sites, rather than through LAHSA.  This approach enables the County to negotiate contract terms more directly, monitor provider performance in real time, and address any compliance or service delivery issues with fewer bureaucratic layers.  Direct contracting helps maintain clearer lines of accountability and transparently define roles, funding, and outcomes.

---

care; and stabilization beds are interim housing with supportive service for unhoused individuals with complex health and/or behavioral health condition.

723944.4

6

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

*Lower Turnover In PSH*.  PSH is a type of permanent housing that combines rental assistance with supportive services—including ICMS and mainstream services funded by the County—to assist PEH with physical, mental health, substance-use, or behavioral health conditions and a lengthy history of homelessness become and remain stably housed.  Although the Plaintiffs in this case originally filed suit challenging the City's alleged "near-exclusive focus on building permanent supportive housing" and arguing that interim housing and temporary/emergency shelters were not only preferable but constitutionally mandated (Dkt. 361 ¶ 5; *see also id.* ¶¶ 73–74, 76, 93, 95, 217), the Report noted that PSH exhibited a lower rate of participant exits compared to other types of housing interventions, and highlighted the important relationship between the supportive services (such as those provided by the County) and housing retention.

It would be impossible for any single assessment to capture every facet of the system that seeks to permanently lift the City's PEH out of homelessness, which requires complex, multi-faceted coordination of local, state, federal, and private resources and careful balancing of policy prerogatives informed by data, research, and input from a wide range of stakeholders.  Even with a focus on only the three City Programs described above, the Report exceeds 150 pages and reflects nearly a year of work by ten professionals following 90 interviews, more than 11,500 documents, and 30 site visits.  (Report at 3–4.)  For this reason, the Report is not, and does not purport to be, a comprehensive accounting of all programs and services available to PEH in the City—let alone across the 88 municipalities and unincorporated areas that make up the County.  Nevertheless, the Report offers new transparency into the City Programs and offers meaningful suggestions about how existing resources could be improved to more effectively impact PEH.

## III.    ADDITIONAL CONTEXT AND CLARIFICATION

The County is still analyzing the Report but thinks it would be helpful to provide a few comments regarding the portions that discuss mental health/SUD

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

treatment and the County's high-service need beds, given their relative interest lately to the Plaintiffs and the Court.

### A. Mental Health/SUD Services

The Report suggests the existence of a potential gap in the provision of mental health services across the City's housing sites (Report at 109), but it appears to inadvertently overlook a few pertinent factors that do not support this conclusion.

As a threshold matter, not everyone who is homeless has a clinically diagnosed Serious Mental Illness ("SMI"), which is the population served by DMH. Individuals with mild-to-moderate mental health challenges are typically served through health plans, not DMH. As such, not everyone in City housing would need or be eligible for DMH services. This context is the product of state law, not local policymaking, and is crucial to understanding the dynamics of mental health services in the City. Mental health conditions are often complex and may not always be outwardly visible. A more comprehensive evaluation requires clinical assessments, participant interviews, and a review of individual case files (which contain PHI/PII), not just informal, in-person observations.

Although the Report refers to data regarding the prevalence of mental health and SUD needs that is self-reported during the annual Point-In-Time ("PIT") Count, it would be inappropriate to infer demographic data about the population of clients at the City's housing sites from the PIT data about unsheltered PEH, as the Report currently does. (Report at 109 & n.438.) Reported mental health/SUD information for sheltered PEH is lower than unsheltered PEH, and the PIT Count also does not differentiate among housing programs.[6] It is important to remember that the County

---

[6] LAHSA, 2024 Greater Los Angeles Homeless Count – City of Los Angeles (June 27, 2024), https://www.lahsa.org/documents?id=8152-city-of-los-angeles-hc2024-data-summary. As the Report notes, the PIT Count is also not a perfect methodology. (Report at 109.) The California Policy Lab issued a recent study of unsheltered PEH that found the percentage of people with a SMI was approximately

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

723944.4

8

maintains a portfolio of housing for individuals eligible for County-contracted mental health and SUD services that is independent of the housing created pursuant to the City Programs that are the subject of A&M's assessment.

Additionally, while the Report appears to define access to mental health/SUD treatment services as intake into a "bed," this fails to account for medical necessity or the broader spectrum of care provided by the County.  Not everyone presenting with mental health/SUD concerns requires or is eligible for inpatient care, and the majority of PEH receive all appropriate, medically necessary services in an outpatient setting, which are not discussed in the Report at all.  For example, Figure 4.6 (titled "Number of Services for Enrolled Participants in mental Health/SUD Beds by Type of Service and City Program Across the Lookback Period") excludes outpatient services provided by DMH and DPH-SAPC and suggests that the listed service types are the only ones available through them, which is not true.

In a similar vein, the Report should not gauge the overall effectiveness of the City Programs in meeting participants' long-term needs, or potential barriers to care, based on allegedly low utilization of mental health/SUD beds.  (Report at 124 & Figure 4.7.)  On the mental health side, the Report is focused only on participants enrolled in acute inpatient beds and "other residential", which includes subacute inpatient mental health beds and crisis residential treatment.  (*See* Figure 4.6.)  The inpatient beds are reserved for individuals experiencing severe mental health crises, such as suicidal thoughts or psychotic episodes, often involving involuntary holds (commonly known as 5150 holds).  Lack of placement in these beds does not reflect a denial of care, as the Report suggests.

Low usage actually indicates that the broader continuum of care—including preventive, outpatient, and supportive services—is effectively addressing

17 percent.  *See* https://files.hudexchange.info/resources/documents/PIT-Survey-Crosswalk.pdf.

723944.4

9

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

participants' needs before they escalate into crises that would require inpatient care. Therefore, the lower bed usage is a positive indicator, suggesting that the system is working as intended by providing appropriate care at earlier intervention points. This is also consistent with the Report's observation that fewer participants accessed services in MH/SUD beds during their enrollment in a City Program than before or after. (Report at 124.) Opposed to suggesting gaps in referral pathways, timing, or communication between service providers and participants, it reflects the anticipated lower-acuity population enrolled in City shelters as defined in the City/Plaintiffs' own settlement agreement.

Finally, the County clarifies two things with respect to the referrals to mental health beds and SUD beds discussed in the Report. (*See* Report at 124–25.) First, the report erroneously states that "mental health bed referrals can only be initiated by clinical providers," which should be limited to the context of locked facilities. It is true that street outreach teams cannot directly refer clients to locked subacute settings. Instead, outreach teams refer clients to clinical providers who then determine the appropriate level of care and make the referral if necessary. However, this policy specifically pertains to locked subacute beds, not mental health beds in general. Second, there are systems to track SUD referrals, but there has been variable utilization of these tracking systems. A more accurate statement would be the County was unable to produce complete information regarding SUD referrals relevant to the population of PEH in the City Programs across the lookback period.

**B.    High Service Need Beds**

The Report opines that the level of participants' acuity appeared to be consistent to service providers across City-funded and County HI-funded interim housing sites, even though the County's beds were designed to provide a higher level of support services for PEH with complex medical and behavioral health conditions. (Report at 113.)

The Report may be misunderstanding the assessment process and the purpose

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

of the high service needs beds. Acuity levels are determined through standardized, evidence-based tools and multidisciplinary evaluations. All participants in the high service needs beds undergo extensive health screening, including medical and behavioral health questionnaires, a review of health records and clinical consulting to ensure their individual needs warrant the level of services DHS sites can provide. The eligibility criteria for these beds are clearly defined and shared with all referrers. Similar levels of need across the spectrum of interim housing does not necessarily indicate inefficiencies in the allocation of interim housing, but, rather, the complexity of the population and limited existing resources. There are only approximately 3,300 high service needs beds available for PEH who require a higher level of care, compared to the much bigger portfolio of interim housing where baseline services are provided.

Although the parties generally refer to the DHS beds colloquially as "high service need *beds*," the enhanced services attendant to this housing type are typically the product of the County's contracting, not the housing itself.

The Report also questions whether the existence of parallel referral and matching processes led by separate entities (DHS, DMH, LAHSA, the City, etc.) introduce challenges to the goal of ensuring that PEH are consistently matched to the most appropriate interim housing option. (Report at 114.) As an initial matter, the County is always trying to break down barriers to housing. This is why the County has long championed Housing First, an evidence-based approach to addressing homelessness that prioritizes providing stable housing to PEH before addressing other needs, such as mental health and substance use disorders. This approach reduces the stigma and discrimination that can come with traditional programs where housing is contingent on mental health or SUD treatment, making it easier for people to engage with other services without fear of losing their home. Not only is it easier to participate in treatment and maintain regular contact with healthcare providers when they are not preoccupied with finding shelter or meeting

723944.4

11

survival needs, but individuals can receive care during crises or relapse without fearing loss of housing.  This approach supports long-term recovery by providing a consistent, stable base even if setbacks occur.

Although the different referral processes across entities may appear unnecessary or cumbersome, it allows for additional screening to ensure that an individual's needs are best accommodated and that the limited resources available to serve those with higher-level needs are used appropriately to serve the most acute. Each entity also administers different funding streams with different eligibility and reporting requirements, so the individual review enables administrators to facilitate placements across a broader range of beds.  All prioritization for all beds remains consistent across inventory, and eligibility is reviewed on the backend and does not affect referral processes or procedures for referrers and participants.  Additionally, each agency works together to redirect referrals to the most appropriate beds.  This happens on the backend and is actually a quick and efficient process.

## IV.   THE COUNTY IS ALREADY IMPLEMENTING MANY OF A&M'S KEY RECOMMENDATIONS

The Report included four recommendations relevant to the County: (1) establish a comprehensive homelessness strategy and strengthen fiscal alignment; (2) strengthen coordination and data sharing; (3) optimize resource allocation; and (4) conduct an independent operational assessment of LAHSA. These recommendations are consistent with efforts the County is already pursuing in collaboration with the City and other partners in this crisis.

Separate from this litigation, the County's Board of Supervisors ("Board") created a Blue Ribbon Commission on Homelessness (the "Commission") to research and analyze various homelessness governance reports, study models from across the nation, and provide feedback to implement reform to help solve the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

723944.4

12

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

homelessness crisis in the County.[7]  On March 30, 2022, after hundreds of hours of research and interviews with stakeholders, the Commission published its Governance Report and delivered it to the Board.[8]  The Governance Report highlighted several "key concerns" for addressing the homelessness crisis, including the need to act with urgency and develop flexible solutions; to improve communication and focus on diversity, equity, and inclusion; and to increase support for small service providers in order to build capacity.

In response to these and other concerns, the Governance Report delineated several recommendations to the Board, which included unifying the work of various agencies and eliminating existing silos to create a more transparent and effective response; renewing and restarting relationships with other cities and councils of government; streamlining LAHSA by transitioning away from having it provide direct services, and otherwise improving its operations to maximize the agency's effectiveness; simplifying governance into a cohesive agency; requiring data-sharing, defining metrics, tracking goals, and establishing tools for accountability; and establishing an executive-level action team to drive urgently needed reforms, discuss issues of common interest, and facilitate data development and sharing.

The Board adopted all of the Commission's recommendations and has spearheaded a new regional governance structure for combatting homelessness through the Executive Committee and Leadership Table for Regional Homeless Alignment.  The new Leadership Table comprises a cross section of County/City

[7] Statement of Proceedings for the Regular Meeting of the Board of Supervisors of the County of Los Angeles (July 27, 2021), http://file.lacounty.gov/SDSInter/bos/sop/1110950_072721.pdf.

[8] Blue Ribbon Commission on Homelessness Governance Report (Mar. 30, 2022), https://assets-us-01.kc-usercontent.com/0234f496-d2b7-00b6-17a4-b43e949b70a2/c15b378d-d10e-46aa-a6cc-7102043aa708/BRCH%20Homelessness%20Report%20%28033022%20Adopted%29%20%28Final%29.pdf.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

leaders, homeless service providers, members of the business community, researchers/academia, the faith community and veteran community, and people with lived experience, and is focused on building one unified plan of action for addressing and preventing homelessness in the region. The Executive Committee—which includes two Board members as well as the Los Angeles City Mayor, among others—and Leadership Table also have an oversight and advisory role in the governance of homelessness services and funding, including accountability measures to ensure that funds are directed to programs that are proven effective. The Board will be considering baseline and target metrics based on recommendations from the Executive Committee, to establish measurable outcomes for reducing homelessness and tracking progress.

The Board also voluntarily called for a financial audit of LAHSA in February 2024, which was performed by the County's Auditor-Controller's office and published in December 2024, and the County is involved in ongoing public discussions about how to improve accountability, contract management practices, and outcomes related to the services currently administered by LAHSA.

In November 2024, a majority of voters passed County Ballot Measure A, a sales tax that will take effect on or after April 1, 2025, to continue funding programs related to homelessness prevention and affordable housing. Although Measure H is already subject to annual financial and performance audits, Measure A includes several new provisions intended to further enhance accountability. Measure A sets five homelessness and affordable housing outcome goals, including: (1) increasing the number of people moving from encampments into permanent housing to reduce unsheltered homelessness; (2) reducing the number of people with mental illness and/or substance use disorders who experience homelessness; (3) increasing the number of people permanently leaving homelessness; (4) preventing people from falling into homelessness; and (5) increasing the number of affordable housing units in LA County. Measure A also requires the County to adopt metrics that will

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

DEFENDANT COUNTY OF LOS ANGELES' RESPONSE TO SECOND AMENDED ASSESSMENT OF ALVAREZ AND MARSAL (A&M)

measure progress towards those goals and to then provide ongoing reports.

\* \* \*

A&M's other recommendations are directed to parties other than the County, but the County is nevertheless closely reviewing A&M's feedback to identify additional opportunities for the County to strengthen its own homeless services system for the benefit of all who live and work here.

## V.   CONCLUSION

The County appreciated the opportunity to contribute to A&M's assessment and thanks A&M for its work on the Report.  The County is happy to provide additional information to A&M or the Court to the extent it would be helpful in interpreting the Report.

DATED:  March 21, 2025          MILLER BARONDESS, LLP

By: _____

MIRA HASHMALL
Attorneys for Defendant
COUNTY OF LOS ANGELES

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400