UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Thursday, March 27, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | ( 9:18 a.m. to 9:26 a.m.) |
| | ) | (10:58 a.m. to 1:29 p.m.) |
| Defendants. | ) | ( 1:46 p.m. to 2:08 p.m.) |

HEARING RE:

MOTION FOR ORDER FOR SETTLEMENT AGREEMENT COMPLIANCE
[DKT.NOS.767,863]

STATUS CONFERENCE RE A&M AUDIT

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                    SEE PAGE 2

Court Reporter:                 Recorded; CourtSmart

Courtroom Deputy:               Karlen Dubon

Transcribed by:                 Exceptional Reporting Services, Inc.
                                P.O. Box 8365
                                Corpus Christi, TX 78468
                                361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979


For Defendants:          JENNIFER M. HASHMALL, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         LAUREN M. BRODY, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         SCOTT D. MARCUS, ESQ.
                         ARLENE N. HOANG, ESQ.
                         Los Angeles City Attorney's Office
                         200 N. Main Street, Room 675
                         Los Angeles, CA 90012
                         213-978-6952

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Special Masters:         MICHELLE MARTINEZ
                         JUDGE JAY GANDHI


Also present:            LA CONTROLLER KENNETH MEJIA

                         LOS ANGELES MAYOR KAREN BASS

                         COUNCILMEMBER EUNISSES HERNANDEZ

                         MARQUEECE HARRIS-DAWSON

                         WENDY GREUEL

                         LAHSA REPRESENTATIVES

EXCEPTIONAL REPORTING SERVICES, INC

3

APPEARANCES:              (CONTINUED)


Also present:            LISA BROWN

                         KATHRYN BARGER

                         DIANE RAFFERTY

                         A&M REPRESENTATIVES

**4**

**(Call to Order)**

THE COURT:  Thank you for your patience.  I'd like to get an update.  First of all, thank the elected officials who are here and recognize them.  As the president of the council, the chairman of the board, and this Court well recognizes that I requested, but that was a polite way of saying, we have very few of these court hearings.  And when we're dealing with an audit that hasn't been conducted of this City in decades, I would hope and believe that this is important enough at the request of the Court that that's all taken as please be here.

There's a lot of positive things that could happen today without the leadership present.  I have two ways of going about this.  The nice way is, how are we doing with Dr. Adams Kellum's presence?  Will she be here and when?

MR. CHANDLER:  Good morning, Your Honor.  (inaudible) on behalf of LAHSA.  We have Wendy Greuel, who's the chair --

THE COURT:  Will she be here and when?

MR. CHANDLER:  Wendy Greuel, the chairman of the Commission --

THE COURT:  Will she be here and when?

MR. CHANDLER:  Dr. Kellum or the Chairman of the Commission?  I thought you -- when you had indicated earlier said the chairman of the Commission, so we have the chairman of the Commission that can be here --

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT: Not acceptable to me. When will she be here?

MR. CHANDLER: I will inquire further.

THE COURT: Have you placed that call to her? I have two ways of doing this.

MR. CHANDLER: That's in process.

THE COURT: Is my message clear?

MR. CHANDLER: Yes, Your Honor. Thank you.

THE COURT: You're inconveniencing all the other elected officials.

MR. CHANDLER: Okay. I thought you asked for the chairman.

THE COURT: This is a request. I've got another way of doing this. So we're done with this conversation.

MR. CHANDLER: Okay.

THE COURT: Auditor controller. Will the auditor controller be here?

MR. UMHOFER: Yes, Your Honor. I was told he's on route.

THE COURT: I don't want to redo a few of the things I have to say before I turn this over to the parties. It's wasteful of time. Will the mayor be here?

MR. UMHOFER: If I could have a moment to step outside, Your Honor.

THE COURT: Step outside.

**MR. UMHOFER:**  Thank you.

**THE COURT:**  I've got two ways of doing this.  I'm not making appearances yet.  I want to know who's present and who's not and if I need to take next steps.  Summon two marshals.  I want the marshals up here.

And for you elected officials, first of all, once again, I appreciate your courtesy.  I would really request if you have other meetings today that this takes precedence.  I think we can get through this quickly.  And I don't think that there should be anything more important on your agenda than what we're about to discuss today.  And maybe some steps forward if we have the leadership in this room.  Maybe some positive things can happen.

And folks, just visit.  Have a nice time out in the audience.  I don't mind the conversation.  We're just waiting now.

**MR. CHANDLER:**  Your Honor, brief update.

**THE COURT:**  Pardon me?

**MR. CHANDLER:**  Yes.  Dr. Kellum is currently in Boston.  Her chief of staff is here.

**THE COURT:**  She's in Boston?

**MR. CHANDLER:**  Yeah.  But her chief of staff is here, and the chairman of the --

**THE COURT:**  That's not acceptable to me.  She knew about this.  She was communicating with my special master as

late as last night.  All right.  Have a seat.

**(Pause)**

**THE COURT:**  Okay.  Ladies and gentlemen, Judge Frimpong has been kind enough to give us this court.  She has a jury that is in deliberation and I've just been informed they've reached a verdict.  We had an agreement so that I could have this court and you weren't shuffled off to a much smaller court, which wouldn't contain you, that as soon as she had that verdict, I would vacate temporarily.  I choose not to move this up to 8B.  You wouldn't like the court and it couldn't continue.

But as chairman of the board, I know that you're busy.  I'm going to ask you to remain with us today.  And if you have another meeting, I don't mean to be ungracious, I'm going to have very few of these meetings and hopefully some positive things can come out of it if the leadership is in the room.  It can turn another direction also.  For you as the president of the council, I'm going to ask the same courtesy.

After 35 years of not having a look at the City, we need to decide where to go from here, maybe in a very positive way.  This doesn't have to be negative.  I want to recognize Councilwoman Hernandez.  It's a pleasure.  We've gathered just too many people.  Everybody's had notice.  And that was my gracious way of requesting.  I could have ordered.

Now, I see the auditor controller.  I want to thank

you for being present.  I want to be hospitable.  Come up and join us for a moment.  Thank you for your presence.  We're not going to do this in two or three different sessions.  I'm waiting to hear if the mayor's going to be present.  I believe she's at a Metro board meeting.  This takes precedence.

Nice seeing you.  How are you today?  And when Judge Frimpong comes down, hopefully that'll give a little bit more time without embarrassment for folks to get here.  She's got to take a quick verdict.  You'll probably be out in the hallway.

**MR. UMHOFER:**  Your Honor, the mayor's on her way.

**THE COURT:**  Thank you very much.  Very gracious of the mayor, I want to start on a very positive note.  How long before she gets here?

**MR. UMHOFER:**  I was told about 10 minutes.

**THE COURT:**  Okay.  I think Judge Frimpong's coming down for a moment to take that verdict.  If we could ask her to come down, Karlen, as quickly as possible, so we're not inconveniencing her.  She's got first priority because of the jury.  I don't think the verdict will take very long, but let's just wait, see what we can do.  So just remain seated for a moment.  Let's wait until Judge Frimpong gets here.

**(Recessed at 9:26 a.m.; to reconvene at 10:58 a.m.)**

**THE COURT:**  This is Case No. 20-00291, L.A. Alliance for Human Rights v. the City of Los Angeles.  I'm going to invite Special Master Martinez to come up and join me.  I have

**9**

a seat here for you.  I'm going to ask Jay Gandhi, my Special Master, to come up and join me.  But at the present time, I'd like to lead off the discussion today.

I want to recognize and thank the Chairwoman of the Los Angeles County Board of Supervisors, once again, and appreciate your presence.

Mayor, I appreciate your presence as the Mayor of Los Angeles.  I appreciate the auditor controller's presence, and I especially appreciate as well the presence of Marqueece Harris- Dawson as the President of the Council.  The Councilwoman Hernandez is here.  I wish Nithya Raman was here also, but we'll leave that to the side.  I want to thank you, and I know you're being inconvenienced, but after 35 years, et cetera, of an audit not taking place in the City that was meaningful, this is an important date.  And in the future, my request is simply a humble way of having you here.  I never wanted to order you to be present, because it treats you subserviently as another branch of government.  I don't choose that.

Also, with certain persons, I don't have authority to order you here, but I would expect your wisdom would bring you here on this important date.  So I think we've resolved that now, and thank you for your presence humbly.

I think as elected officials, you've inherited an extraordinarily difficult task, and I imagine you came to court

today thinking that hell and brimstone would reign upon you. Quite the opposite.  At the end of this, I'm going to be asking if there's anything that your branch of government can do to resolve the problems that have been presented to you.  And I fully recognize that there has been some progress.  How meaningful that is, I'll leave that to you and the public.  But I don't want to discount that in any way.

And so therefore, let's start off on a positive note and start showing you and the public how we got into this mess. I'm going to go through lunch and give up my lunch time.  I expect you to, because you're busy.  But I'm going to start with coming to Los Angeles and being given the keys to the City by Mayor Garcetti.  "Judge Carter -- I'm a fan of Judge Carter, and it's so great to have you here, and the keys to this City are wide open to you."  And I told him I would probably be his worst nightmare.

Now, I've told this story to Mayor Bass privately.  I told that publicly.  I'm in a billionaire's office.  I'm being told I have the keys to the City, and a phone call comes in from the City where this billionaire literally is ashen because he's being told not to talk to me.  My first dealing with certain elected officials, and I'm going to be blunt about it.  Unappreciated.  Not to you, but unappreciated.

The double counting that went on has led me to disbelieve much of the figures being submitted to you and many

of the figures being submitted to me.  I've expressed that before in terms of my distrust.  I commend those of you who are on the street and wonder why the rest of you aren't, because whatever is being presented to you, I have grave doubts about now, and you can't help but talk about hundreds and hundreds and hundreds of homeless people, and they're not wrong, and they're not lying to you.  So, therefore, I question your information and the information you're receiving from your bureaucracies.

A gentleman stood in front of me on November 5th, 2020, and his name was General Jeff, and I just want to start with what's being said to the Court, because, remember, I'm a new judge.  Well, I'm an old judge, but I'm listening to this person in my presence who I barely know.  He's addressing the Court.  That said, Skid Row, Skid Row Advisory Council is active out in the streets because we live in Skid Row.  We're in Skid Row every day.  I just came here today from Skid Row.  Matter of fact, right now, I'm mourning right now because I was at the candlelight vigil last night.  Three nights ago, I was at another candlelight vigil.  You know, Pete Clouseau, David Lindley, Teaspoon.  The coroner's van is frequently in Skid Row.  We may not know why it's always our community, but it's in our community like the white van with the blue stripe down the middle.  That means death.  That means someone just died.  Someone from our community, and we have no understanding

as to what the cause of death was.  Who it was?  Is there even a next of kin?  Has the next of kin been notified?

That scene, that white van with the blue stripe down the middle, that causes trauma to our community members, myself included, and there's a lot of concern.  And so when we talk about Project Room Key, because he was addressing Room Key at that time, and this was General Jeff.  When we talk about Project Room Key, you know, there's a direct message to you from the folks that have met you in your community that really feel open enough, and they say, hey, General Jeff, the next time you see the judge, tell him I'm ready for -- where is my hotel room at?  Tell him to make some, get those people, not you, get those people to give us our hotel rooms.  It's going to get cold.  It's about to be wet.  We're about to be stuck in the rain.  What do I do with my stuff?  Where are the answers?

This is real-time information, Judge.  I appreciate this opportunity to be able to give it to you today, along with the City and the county, the City and the county and everyone else, LAHSA and everybody.  Like, where is the sense of urgency?  Why is the victim blaming going on in the homelessness area, homeless industrial complex?  The poverty pimps are winning the narrative, and that's why we, the people in Skid Row, are fighting very hard to change that narrative.  Thank you.

Now, when I say you've inherited a difficult task, I

don't know that anybody in your staff has gone back historically, nor if you should be motivated to go back historically and see the constant message that's been sent to all of us, including the judiciary.

So we're going to take, if you'd put up the, first of all, the Los Angeles Joint Powers Agreement, which all of you know about, but we're going to remind ourselves of February 28th, and you can get a chair if you'd like to. And make sure that the elected officials can see that, and if not, we need to turn a screen or get something available to you.

You should have, I think, here in this courtroom, do we have monitors on the jury seats that you occupy? Is it on now? Okay. In my court, we don't, so this is a real blessing. All right. I want you to go to 4B -- 4B, Joint Powers Agreement. And down at the very last line, by memory, this Joint Powers Agreement that was created was probably for a very noble purpose. If you go back to the Los Angeles Times editorial board, there had been bickering between the City and the county for a long period of time over who had responsibility over shelter or housing, and who had responsibility for services. And that acuity level and that variance had caused tremendous conflict.

So let's just say a noble purpose, hopefully with a noble solution. But down at the bottom, it gave the authority, the ability to sue and to be sued. In its own name, except

**14**

that in no event shall the authority have the power to sue the parties to this agreement. Fair enough. And so along the way, for the auditor controller, for the City, I'm going to ask with approximately $40 million, as you can anticipate, of the $50.8 million that was given to providers in 2016 with no contract, no payment schedule, with the City having financial problems at the present time. Why there hasn't been a suit to retrieve this money?

And I received an e-mail and disclosed to you from Dr. Kellum Adams that agreements had been signed, and I'll show you that document, but it gives no schedule with the City having issues concerning money. It gives no payback, and what I'm worried about is two or three years from now, everybody simply says, we've forgotten this. And that's close to $40 million. Dispersed with no milestone, no contract, no accountability.

Now, I'm going to put up the next document, it's from 2017. So, Jay, if you do this for a moment. It's been quite a journey, historically, with the City. This is a HUD report from 2007. This is from the inspector general. And this is the mess that you've inherited as the present elected officials, which you're not responsible for. Let me be that clear. This isn't a criticism of you. It's how we got there, and what, if anything, you're going to do about it.

What we audited and why. We audited the Los Angeles

Homeless Service Authority in the light of publicity, which alleged mismanagement and misuse of the U.S. Department of Housing and Urban Development, HUD funding.  And there are three findings.  They found first that the authority did not perform on-site fiscal monitoring of its project sponsors during the past two years.  So this isn't new, and the six other reports I'm going to show you as we move towards the A&M audit, this is old news to elected officials and to LAHSA.  There's no auditing going on.  There's no transparency.  There's no accountability.

They did not perform 100 percent source documentation.  Watch linguistics.  100 percent, what does that mean?  That means they didn't perform any.  And eventually, I'm going to quarrel with words such as, our reports are linguistics nightmares.  Providers are providers, but we refer to them as partners, subrecipients, recipients.  There's all sorts of nomenclature in each of these reports that the reader tried to sort out these are providers.

Our audit objectives were to determine whether the authority adequately monitored its project sponsors to ensure compliance with HUD regulations, and second, to determine whether the project sponsors administered their supportive housing program grants in compliance with grant agreements and other HUD program requirements.

Now, these are federal requirements.  So I'm going to

**16**

raise the question, where's HUD in this?  Where's their responsibility also with this warning from the inspector general?  Not necessarily you as elected officials, but how bad is this system?  What we found, the authority did not perform on-site fiscal monitoring of its project sponsors during the past two years, so we also know, and it's going to sound pretty redundant pretty soon, no auditing.  They did not perform and could not find the source documentation, at least in the two of its project sponsors, and if you go back, that was our sampling.  There were only two project sponsors that they looked at.  So it sounds like when you read it, they examined hundreds.  No, they didn't.  They examined two.

To ensure cash matching was eligible and supported of the two project sponsors reviewed, one had applied ineligible expenses as cash match, while the other was unable to support its cash match due to poor financial management system.

Now, just kind of bookmark that in your mind for a moment, because I think at the end, you're probably going to agree with what I've concluded, and that is we're being told all the way along the line the same thing over and over again, which even makes me wonder why we spent $2.8 million for the excellent job that A&M did, because we've been told, we attribute these deficiencies, et cetera, et cetera, to management.  So 2007, and Michelle, if you could put this off to the side.

Okay.  The next one, and by the way, there are interims, but we're going to take the 2019.  Most of you weren't in office, but 2019 is the Ron Galperin controller, your predecessor, Mr. Mejia, the entity tasked with connecting the homeless housing and services in the region is the Los Angeles Homeless Service Authority, LAHSA, a joint powers authority of the City and county of Los Angeles, operating with a $300 million annual budget provided by federal, state, county, and city funds.  One of LAHSA's core functions is street outreach to homeless population.

The City and County have spent more than $54 million funding just your outreach efforts over the past two years, with the City paying $10.3 million to LAHSA out of its general fund.  And this has got to hurt, because this comes out of your general fund.  This isn't pass-through money coming from HUD to the County as a COC and out to you.  This is coming out of your general fund.  And it's an entirely different situation that the County finds itself in compared to you as the mayor.

Finding.  LAHSA is "falling short" of its City goals in 2018-2019, and I put that up there for yellow underlining for you, and I'm going to attach these documents to the court's hearing today.  LAHSA failed to meet five City outreach targets, in some cases reporting 4 or 6 percent success, and reaching only dozens of people in need.

Next, currently the goals are ill-defined and do not

**18**

align with benchmarks established by the County, leading to an uncoordinated approach to outreach and data collection.  Next, LAHSA's insufficient street outreach performance is matched by its loose review and reporting procedures.

If you turn to page 21 and you dig into this document, there are unclear metrics and results, and for LAHSA's reports to be meaningful, its metrics and expected results need to be clear.  HMS data needs to be accurate and complete, and the results need to be consistent across the entire COC.

So when we get to the A&M audit, keep asking yourself, have we heard this redundantly before?

Turn to page 22 eventually so I make a record.  Data quality and reporting inconsistencies for City outreach.  During review, LAHSA provided the controller's office with four separate reports for the same outreach activities performed during the same time frame in fiscal 2017-2018.  Each report corrected prior results.  In other words, we're not getting one report that is accurate.  Each report, each query leads all of us to a different result and show different outcomes that raise questions.

Now, that's a polite way of saying raise questions about the agency's ability to measure performance and whether it's accurately reporting results to its shareholders.  A clearer way that I can say it bluntly is we don't have accuracy

**19**

here in a way to report this.  So these are nice auditor words, a little bit protective, but I'm going to be blunt about it. We don't have accuracy.

All right.  Now we're going to turn, and I'll make a record of all this and your staff can take it back, and I know that there's no real motivation to go through this, except maybe on the public's part.  I want to turn to your 2021 Committee of Greater Los Angeles, May 19, 2021.  Now this is the committee that Fred O'Leary is involved in, Miguel Santana, a whole group of really good private public servants.  They engaged Dr. Raphael Sonenshein.  "No matter how many Angelenos are doing tireless work," and I want to compliment right to begin with.  Your folks on the street.  They're underpaid.  And I'm going to raise why we're paying, if the City's short of money, $430,000 bluntly, which I leave to you, and staff is turning over $300,000 with LAHSA, and I'm going to be blunt with you.  I've already made a record on three different occasions that I will never go into LAHSA's offices building again, because it's ostentatious, downtown, in a high-rise effort, or area, that I will never step foot in again because I don't think it serves the public good with that kind of money expended.  But I'll leave that to you and your finances, so when you come back and tell me you're short of money, trust me, we've got a real argument coming whether you have enough money or not.

So let's hear the frustration with the Blue Ribbon Committee.  No matter how many Angelenos are doing tireless work to help our region's most vulnerable, L.A.'s public sectors still lack a shared set of quantifiable goals and a consensus on the mission and skill of the work specific to addressing region's homeless population.

We recommend a recalibration of the government's structure.  There's where I'm going to use the first word of centrism, which you're going to see a centering recommendation in a number of these reports.  And ask us if we've really restructured this or if we took all of this pressure in 2025 to get our attention, resulting in a more coordinated and strategic approach among state, county of Los Angeles, cities and the service providers responsible for this crisis.

If you turn to 8, you'll see the road to this point is paved with broken promises and new initiatives that fill us with hope when adopted, but fail to fully reach our objectives.  So back in 2021, this committee is really laying out the frustration of the public.

If you turn to page 6, eventually in the body, governance can, and we can keep up, Maren, with that.  Create a framework for shared data information goals and best practices and ask ourselves, what's different in the A&M report and the county report from this constant message?  Align authority and responsibility so those with power can make changes are held

responsible.  What's different than what we've been hearing?

So when we dig into A&M in a few moments and I ask what your criticism is, keep all these documents in mind.

Now what I think is that this was a noble effort was a gratuitous comment on my part, but what it effectively did also was a byproduct where county officials weren't held responsible, and this is long before your time.  This is not a criticism of you folks sitting here.  But it created the perfect Pillsbury Doughboy.  Punch him in the stomach and LAHSA pointed to the City.  Talk to the City and they pointed back to LAHSA or the County or the County pointed to the City.  And so what it really did is it took the responsibility of us as elected officials off the table previously.  And I'm not saying that that was an intended consequence, but that's exactly what happened.  And that's why in their papers when L.A. Alliance refers to LAHSA as a scapegoat, it's a pretty dramatic word.  But LAHSA would point back and say, well, we're not getting this from the City or the County.

So that's our third document.  You can dig into it.  There's a lot more I could say about it, but you don't have time and I don't have the energy right now.

All right.  The next report is in 2022.  And by the way, about this time, what I haven't interjected is this Court's waking up.  You'll go back and read in 2021, I start to question that I can't track or understand where the $600

million went.  And it's dawning on me that the providers now are keeping this documentation in-house and that nobody's asking the providers what they did.  And I'm going to say that again.  Nobody is asking our providers what they did or what services they performed.  So we're not asking that.

We may have providers who, quite frankly, committed fraud and we'll never know.  We may have providers who, for want of a better word, underserviced their client, provide minimal services for the money, and then we may have excellent providers.  And we as elected officials could never sort that out.

So as the City was in the position of, Judge, we can't give A&M and you the documentation until LAHSA got it, the Court then gets push back.  Well, Judge, LAHSA hasn't been a party to this case.  And I'll tell you the truth.  I think that was stonewalling.  And I'm going to ask you, L.A. Alliance, to address me and tell me why, since we've been going around in this circle, like the Rocky Horror Picture Show, why, if LAHSA thinks it's a separate entity, why it hasn't been joined involuntarily and sued.

Because, quite frankly, the Court, every time it bears past the City, which I have a good faith settlement with the City, and thank you.  And every time I bear into LAHSA, I'm told, you don't have jurisdiction, Judge.  Well, then maybe you should bring that jurisdiction into the court if that's their

present position.

Okay.  Let's go to the 2022 report.  This is a report.  Hopefully it's up on your screen.  This is from the inspector general again.  This is from HUD.  And what does HUD say?  Well, on January 20th, HUD is right back to us.  They audited Los Angeles because of the homeless crisis in Los Angeles, which has the highest number of unsheltered people in the United States.  And in addition, the Los Angeles City Controller issued a report in 2019.  So, Mr. Mejia is referring back, Galperin again, criticizing LAHSA for falling short.

You can read this, but if you go down to the findings, look at page 6.  If we can flip that up quick.  And by the way, you're welcome to read all this.  I'm just picking up.  Trust me, we can really get into this document, but the authority did not perform monitoring subgrantees during the term of the grants.

Now we have a new name for providers, don't we?  We've moved from subrecipients to subgrantees to partners.  I feel sorry for these elected officials trying to understand these linguistics.  These are providers.

I'll refer you to page 9.  I'll refer you to page 12 in the findings, not to waste time.  Your staff can look at this and put this together.  I'm blurry-eyed with it.  You don't have the authority supporting costs to its HMIS or planning COC grants.  There aren't adequate procedures and

controls.  It sounds familiar.  Didn't follow its cost allocation plan.

I don't want to waste too much more time with it because there's even more important documents.  Now I'm going to turn to 2024.

This is the audit from the County for a moment.  I want to compliment the County and I want to compliment the mayor because, Mayor Bass, you agreed to this third-party audit, much to your credit.  I know it has to be uncomfortable on occasion, but I've never heard a federal court break into applause before.  That occurred in your presence.  And I want to compliment you and the board because you conducted this audit.

I will be very blunt with you.  I don't know about Measure A, but this came on the ballot, and I'm going to be blunt about this, on November 19th.  And I'm going to wonder if the public wasn't entitled to this document because I don't believe that this was suddenly prepared on November 18th, because this document is extraordinarily critical.  And I know it's not in our self-interest in terms of taking money out of the homeless.  Quite the opposite.  But I do question, and I bluntly question, why this was released on the 19th and not before the voters went to the polls.  And I'll leave that to you.  Leave that to your own conscience.

So let's go through this for a moment.  This is by

Oscar Valdez, November 19th, 2024.  We completed a review of losses, finance, contracts, risk management, and grants management and compliance units as requested by the Board of Supervisors on February 27th, 2024.  That was your board agenda item number four.  Our review was completed in accordance with the scope of the work report issued on April 23rd, 2024.

Okay, the first, and I'm never going to let this go.  There's a 50.8 million in Measure H capital advances.  There are no contracts.  There are no milestones.  And frankly, until the L.A. Times caught this, I will subjectively believe that there was no intent to pay this money back.  I'm going to be blunt about that.  And I don't even know that you're catching this.  It's not even coming to your attention as elected officials.  And these are cash advances in fiscal year 2017 to 2018.  And they also range from 2018 to 2020.

And I recently received a letter from LAHSA that since our last hearing on January 9th, do you know how much money has been collected?  $220,000.  If we're so short of money, why aren't these providers being sued?

And I also received a letter from Dr. Kellum Adams that agreements have been signed, and that's meaningless to me.  These parties owe you that money, period.  And a simple agreement means they're waiting for us to either get senile or die, or forget this.  And if we're short of money, go get it.

Now hold on.  I'll leave that to you.  But this 50.8,

I put those providers up on the screen last time.  And I'm waiting at the end of this to put those providers right back up on this screen and ask how we're going to get this money back, because you need the cash, or at least you're going to throw that to me.  So we're almost done with it, but where's that money?

The next is that they did not recoup.  It's number two, if you put that up, annual cash advances.  So separate and apart from this, we've got 15 million in outstanding cash advances with 8 million over the fiscal years 2016-2017.  But the most interesting thing is you've got $409,000 out there.  And what I'm hearing from LAHSA is as follows.  Because they're no longer providers, it's almost like we're giving up on that $409,000 because these subrecipient providers are no longer doing business with us.  And my response is if we're short of money, why hasn't LAHSA sued?  Because LAHSA can sue and be sued.  I leave that to you as elected officials, but if you're going to tell me how short you are of money, then you've got a real concern with the Court.

But what's even more interesting in subsection 2 is they only review eight contracts, eight contracts.  And of those, all the contracts, 100 percent did not capture the dates, 75 percent or six contracts did not match the dates in the actual contract, 50 percent the start dates were inaccurate, and "LAHSA does not have reliable and accurate

information about fundamental contracting metrics such as quantity, timelessness, and terms."  I'm quoting that.

Now, when we get to A&M's audits, please ask me what's different to A&M's saying.

The next is the number three, I believe.  And to me, this is, let's see here.  Now I want to get to the -- my special master got a couple requests from the press.  Judge Carter, have you found fraud?  I didn't respond to that for a couple reasons.  I leave that to you to define fraud.  Is fraud not performing any of these contracts?  Certainly.  Is fraud underservicing and charging you more money for the services performed?  I leave that definition to you.

But in this section, LAHSA was unable to produce an accurate list of all their contracts in the ETMS system. Specifically, they initially informed us of 1,273 active contracts as of May 2024, but they provided five different contract listings.  Now, I struggle with linguistics, folks, and I don't know what listings means.  I'm going to substitute the word queries.  And you can correct me if I'm wrong, but in reading this document, they went through this five different times, and guess what?  The range of the active contracts, and now, by the way, we are responsible because Adams Kellum is in place now, are as follows.  We have a run of six -- let me get my notes for just a moment because I'm blurry eyed with this.  676 to 1,078 in five different runs.  We don't even know

the number of active contracts, so how can we actively even have a forensic audit and discover what our providers have been doing?

And since nobody is checking our providers, well, my next question to all of you folks is, are you willing, LAHSA, since you're not a part of the lawsuit, to undergo a forensic audit to find out where this money went and if it was well spent or not?

Judge Carter, you don't have jurisdiction. Fine. Then I turn to L.A. Alliance. Why haven't they been joined? Because this circle keeps twirling around with everybody pointing the finger at everybody else, and hopefully we'll end on a positive note.

Now, our sampling is really interesting. Go down just a little bit. I've just told you about the 100 percent, 75 percent, and 50 percent, and all we have are eight entities that we checked, folks. Of all these contracts, we've looked at eight, and we are not doing well. I won't belabor it, but read this document because I want to compliment the County for at least undertaking this audit on your own request and not pressure from the Court.

But number five, the inappropriate use of funds. I'm going to call this commingling. And what this simply is is that, look, you've got a provider like HUD or somebody else, and you and I are faced with the situation now of when these

payments come due, we don't go into that funder's source or wait for the payment.  We simply go into another funder's source.  I won't say anything further, but I can imagine if a lawyer did that, what would happen with our bar license.  So I leave you to define what that is.

You've got cash advantages -- cash deficiencies in number seven, and if you turn to that, we'll skip some of this, number seven.  We only selected 33 percent or 12 of the subrecipients, which means providers, working capital advances totaling 34.6 million of the 50.8 million, and what do we find?  We find that in this limited survey that $505,000 is an advance by two subrecipients, and we have an understatement of the amount, whatever that means.

Now look down to the next one by memory, $5 million of the rest.  And what does that say?  Well, that says that they did not provide documentation.  Does that sound familiar to A&M?  So the impact, as best can be said, is the increased risk of misuse, and I leave that to you and the misappropriation of funds, and we can't discover what's occurring out there because nobody's checking our providers nor demanding documentation from them.

And every time the Court intercedes, the Court's too aggressive or it's not my jurisdiction, well, who the heck is going to ask on behalf of the public then if you're not, as elected officials?  And I'd like you to be asking instead of me

because I'm only going back to the circuit on it.  So I'm asking you to help me as elected officials and assume this responsibility and come up with some centrism.

Now I'm almost done, and then I'm going to turn it over to you folks.  We now are back to our Homeless Audit, Pathways, Permanent Housing, and this is the committee, again, that you've appointed.  So we're right back with Sarah Dusseault and Ali and Miguel.

**UNIDENTIFIED SPEAKER:**  That's Kenneth Mejia's audit.

**THE COURT:**  Oh, my apologies.  You're absolutely right.  My apologies, Michelle.

This is, Mr. Mejia, your audit.  It's a great audit.  My compliments.  And I know that there's some conflicts between you and Mr. Szabo, and I want to hear again what you do, what's your function, what authority do you think you have because you've got a real disagreement going on with the City that's now harmful between you and Szabo to the American public.

Because these programs have been able to be swept under prior mayor's auspices and because the position of the City has been once that occurs, you can't audit.  That was Szabo's position in my court.  Then for 35 years, we've escaped audits here until the Court, quite frankly, was overbearing and the mayor was gracious with this third-party audit that nobody thought would come out in glowing terms.  We all knew that

there was going to be an issue.  We talked about that.  And I was willing to take that on with transparency.

But your findings are as follows.  The lagging occupancy rate, Mr. Mejia, in the interim housing shelter alone, is significantly below LAHSA's target occupancy.  Unoccupied beds cost an estimated $218 million.

Now let me just stop.  But you tell me you don't have money?  I'm coming back and asking why.  Because all of this is occurring before the fires take place.  And in a moment, under 8.2, you're going to find that I'm going to be very gracious and work with you because regardless of what L.A. Alliance may say, this does cause a hiatus.  This is a priority for your folks out there.  But at some point, this emergency is going to end.  And while this may be a priority, this will no longer be an emergency.  And right now, what's emerging is a slow train wreck.  And therefore, when the Court gets involved in six months, or two months, or a year from now, we all better be on the warning that this emergency can't extend forever.  But it is a priority.  The Court recognizes that.

Okay, next.  Severe data quality issues.  The lack of reliable information makes meaningful evaluation of system performance difficulty and impedes LAHSA's ability to hold underperforming, and I'll say non-performing, and I'll substitute the word -- well, providers accountable and prevents the City from making informed decisions.  The next

quote.  LAHSA's program management and monitoring are vastly inadequate.  The agency does not have a formal process in place to regularly review the performance providers, including occupancy, placement, rates, and holding underperforming service providers accountable by requiring significant corrective action.

You've taken the position in my court that the City has cut back your accounting staff.  I really don't care to enter into that dispute.  But if your responsibility is, as you said to the last judge, I'm writing blank checks.  Remember that?  I've got the quote for you in a moment.  Judge, I'm writing blank checks.  Then there has to be some accommodation between you and Mr. Szabo and the mayor's office, et cetera, to have you tell us what you think you can do so that we don't have another third party audit and $2.8 million put on the City.

And what you can do, and I'll come back to you in just a moment, so think about that.  What are your duties?  And where are you reaching on the roadblock?  Okay?

Now we're into the third -- or the second amended draft of the Alvarez-Marcell assessment.  And I left this tentative because I'm going to give the folks an opportunity out there to ask some questions.  I'm not going to call on the informal mayor of Skid Row right now, Kevin, and I apologize for that, because what you would hear, I guarantee, is what I

heard last time, and I don't mean to cause you embarrassment. It's not hitting the streets, folks. At least it's not hitting the streets for the money being expended in a meaningful manner. And if you want to hear from that, if you want to challenge me, I'll invite the community to come up here and talk to you.

So let's go through A&M's report for a moment. And I told you with A&M that this would probably fundamentally change who you are as a human being and that you were almost silly to accept this contract. Where are you, folks? Yeah. And I'll have you come up and just describe the process you've been through. Because in reading this, I will tell you, folks, behind the scenes, if you read the emails I read submitted to me by Special Master Martinez, there was a lot of stonewalling going on. And for the City, you paid some extra money because LAHSA didn't produce in a timely manner, or kept telling us that we had the information and redefining it. And that cost the City unnecessary money.

If you don't have the documentation, just say you don't have the documentation. But we ran up a significant bill on the City, and I apologize to that now, because we couldn't get the information from LAHSA. So we came back to you with $400,000, and we came back to the County with additional resources we need. We couldn't get the documents that we needed from LAHSA.

Okay.  Key findings from the A&M report.  Poor data quality and integration.  A&M report identified multiple siloed, and you can literally put up -- well, let's leave my notes out for a moment, but I'll make them part of the record.  A&M reported identifiable multiple siloed referral processes, different data systems, and inconsistent prioritization and lack of matching.  I received a letter from Dr. Kellum Adams Kellam -- Adams Kellam?

**UNIDENTIFIED SPEAKER:**  Yeah.  But let them just do the presentation first.

**THE COURT:**  No, just a minute.  Adams Kellum?

**UNIDENTIFIED SPEAKER:**  Yes.

**THE COURT:**  Yeah.  Do we have that letter from Dr. Adams Kellum that we can put up quickly?  I'm going to make this all part of the record, because it's hard for you folks to switch back and forth.  But basically, LAHSA agrees, but states that this issue extends beyond LAHSA's sole control.  In other words, she's pointing right back to you folks.  And this is why the system needs to be centralized, frankly.

And I'm going to try to end positively and ask you, can you help our public and the Court, so I'm not interceding unnecessarily in coming up with a system of centralization with some true weight and power behind it, because this system is not working.

So, number two, the quantification of funding for

**EXCEPTIONAL REPORTING SERVICES, INC**

**35**

city programs.  We put up number two.  Do you have that for them?  Our elected officials need to see this.  Well, instead of jumping around, let's just go to number two.  My fault.  I'll just take the actual document, okay, so you can see it.  And if we put up the actual document, we just go to two.  There we go.  Okay.

Number two, quantification of funding for City programs.  Here, A&M's report identifies 2.3 billion in funding related to city program.  Now, remember, this is only three programs that we're monitoring, Roadmap, Inside Safe, L.A. Alliance.  You've got, I'll guarantee you, close to $15 billion out there in homelessness expended.  We can add it up for you if you want.  You've got about $25 billion statewide so far.

Now, in between all of this, let me just interject one more thing.  Elaine Howe, in the meantime, because most of you weren't here as elected officials, your staff were, and I don't know if this gets back to you, is reporting from the state that they can't keep track of the homeless money flowing from the state to local government.

A&M's report identifies $2.3 billion in funding related to City programs.  We know this is a very small portion of this amount spent by the City and County to combat homelessness.  And I remind you, this is only a three-program audit that we're doing.  Really, the total cost is probably 12 to $15 million in Southern California.  LAHSA, in response from

**36**

Dr. Adams, states that this is in part due to how the City recorded its expenditures.  Right back to the City.  So you poke LAHSA, points to the City, you point to the City, and they say, we don't have the contracts, Judge, we can't provide them because they're over with LAHSA.  It's a perfect shield for political responsibility.  And I don't think you intended that, but that's the end result of it.

Number three, a disjointed continuum of care system.  The A&M report states that the system is fractured and requires reform.  When have we heard that before?  LAHSA agrees that the current continuum of care structure is fragmented and requires reform, and then goes on with a whole bunch of futuristic promises about what they're going to do.  And frankly, I could care less.  If they were going to do it, they should have done it, or they should have given you a road map now of elected officials, how they're going to do it.  All these promises now are meaningless.

Number four, limited financial oversight and performance monitoring.  A&M states that there are invoicing inefficiencies and inadequate invoice validation.  That's a fancy way of saying we can't find the data.  LAHSA agrees.  If you look at Dr. Adams, she agrees with it.  And then goes on to give me a whole bunch of futuristic things that might be accomplished.  There's a need for enhanced financial oversight and transparency, she says, looking through her letter back to

the Court, which I've docketed.

Number five, lack of contractual clarity and accountability.  The report notes that contracts lack clear definitions and accountability measures.  LAHSA agrees.  My question once again and continually is, who monitors these service providers?  If we're giving them this kind of money, of course they're going to accept it.  Now where's the supporting invoices and documents?

So let me turn to you, Mr. Mayor.  First of all, your site is excellent.  It's professionally well done.  I can actually understand it.  The public, I think, can understand it.  The problem you're running into that I see is you can't get the information from LAHSA, and I'm going to continually ask you and the City, when we have a request for proposal, that request for proposal, as the president, you know, has to set out, I'm requesting X amount of money, and here are my milestones.  Why isn't that going up on this data website that I've proposed so we can see that because there's no HIPAA violation here.  And by the way, HIPAA was thrown back at this court time and time again, but these are just milestones without individuals, and that way, at least our public and you would know, and we might get criticized, but at least we'd know, hey, who's serving Top Ramen when they're charging us $15?  Do we have two people out in the parking lot, and if we're short of money, can we get the bad providers out and keep

**38**

the good providers and reward them?  Maybe we even pay them more for goodness sakes.  You'll hear no blowback from the court, but we don't even know.  Because the providers won't provide it, and now I've formed the conclusion, bluntly, they don't have the documents.  They don't have the data.

And if we went back right now with a forensic audit, it might be a waste of $2 million or more to prove that, but I'm going to challenge all of you to a forensic audit in a moment, and let's get rid of the bad ones and reward the good ones so you're getting services.  Okay, I'm almost done.

The cost of service variability.  The A&M report highlights variable program cost of service provider performance and operational models very significantly.  LAHSA agrees, and LAHSA also states it has no provider checks, just read what Dr. Kellum Adams is saying, but she goes on for four paragraphs telling me what they've done, what they're going to do after decades.  It's falling on deaf ears, and they then conclude with what your Blue Ribbon Committee concluded.

I strongly agree with A&M's recommendation for a unified homeless strategy and funding priorities across the City and County.  Where's the governor?  I mean, if we're going to take this homeless industrial complex on, you're a part of that, but you're not the ultimate solution, and so why isn't the governor here?  I didn't request him.  I can't order him, but he's an integral part of what you need, and if you're going

**39**

to come up with a centralized authority, Mayor Bass, I don't know that you've got the power from the City's standpoint of $4 million to be that omnibus leader.  I don't know from the County's perspective that you've got that power with the City, but everybody's saying we need a central authority in agreeing on that, and one of the examples is out in Venice.

I don't want to get too political, but a great editorial in the L.A. Times the other day about one council voting to approve a project in the City, and now it's tied up with another one with Tracy Parks, and it'll probably never get built, and your bills just keep going up.  So who's going to make that tough decision?  Because you as elected officials, you're going to get crucified by your public as soon as that goes in.  I get it, but somebody's got to start making it, or we're just running up a bill, pretending with the American public like we're doing something, and we're not.

Okay.  I'm done.  So I want to say to you, you've inherited one heck of a mess, and this has occurred for decades.  So when I'm talking to you, I'm not bearing down on you.  I'm bearing down on every past official who saw this slow train wreck occurring, and then I'm going to ask you, what are you going to do about it, or is the Court going to have to do something about this?

Now, first of all, I don't have the power to vote where these projects go.  I don't have the power to vote money,

**40**

do I?  I can make your lives miserable, but I don't have that power, unless I do a couple things.  I can impose a monitor.  I can impose a receivership.  I can stop your funding until you get this website up with transparency.  I choose not to, and I question this.  I will guarantee you, and I promise you I'll be alive at the 2028 Olympics, and these streets will be clean.  You've already shown me that at the Academy Awards.  Could we find a homeless person between here and Union Station?  I couldn't.  We swept those streets clean, and we'll do it again.

No matter, Mayor -- I know your proclamation (inaudible), you're not going to do that.  I get it, but they will be clean, because you'll be on the world stage, and whether Trump comes out here as the president, or you, you're on a national stage.

If we can do all these things, because of the Academy Awards, and supposedly give our homeless hotel rooms at a couple hundred times, then why aren't we doing that in the next three or four years for the citizens of this City and County, because you've shown me you can do it.  So why are our citizens waiting until two weeks before the Olympic Games to see the cleanliness of Los Angeles?  It's a fiction.

And by the way, I hope you run the marathon partially through Skid Row.  The folks out there would like to see it and volunteer.  Okay, now, I'm done.

**41**

Can you help by doing a couple things?  First of all, I don't trust you.  Not you individually, I don't trust you as an institution any longer.  I want two more years of jurisdiction, and I want to see LAHSA joined to this if it continues to exist, and I want the County to stop stalling, because you're part of my obstacle and problem.  Just think about that.

I want to go up through the Olympic Games.  I want two more years.

**UNIDENTIFIED SPEAKER:**  Beyond '27.

**THE COURT:**  Absolutely.  Number two, I want you to get together and call Gavin down here.  He has a blog, and he's busy blogging.  And I'll request him and embarrass him, but get him down here in a room with you.  It doesn't have to be here.  I'm not the center of the universe, and start coordinating with him, because he's in a box.  If he doesn't supply money, he's going to be criticized as not helping you.  But if you talk to him hypothetically, he might be saying, I'm not getting anything back from my City and County that gives me confidence in the money I'm giving.  He's in a box just like you folks are.

And Michelle and Judge Birotte will act as the moderator or mediator if you want to, or do it yourselves.  But I'd like to hear a report back.

Now, the good news, I'm not going to do anything

**42**

today.  I'm going to wait to see what the County does in terms of your vote in early April.  I don't care what you do.  But whatever you do, it has to be something to stop this train wreck.

Mary, I think you've taken a little bit different position.  The council recently decided as of 24 or 48 hours ago to explore that.  Explore means nothing to me.  It means you're exploring it, which means you haven't had a vote yet.  I'm kind of waiting.  So I'm going to reschedule something in April at your convenience, and I'd like to hear before I decide to take action that you're the leadership that we all need.  And God bless you because it's fallen to you for decades of negligence.  And it's fallen to you with decades of unaccountability.  And guess what?  That's why you got elected, to solve this problem.

So I apologize that this has fallen on you for all these decades, but you're it.  Next person up, like the Marine Corps said.

Okay, now, do any of you, and I don't want to talk to your staff.  I'm done talking to your staff.  I'm talking to elected officials.  Do any of you disagree with any portion of this report?  And if so, as elected officials, not your staff, tell me what you disagree with.  And A&M's here to answer your questions.  Otherwise, I'm going to make this draft final.

So take a moment, talk to your staff.  Wendy Greuel

**EXCEPTIONAL REPORTING SERVICES, INC**

**43**

you're here.  Thank you.  Because I want to know that you've read it now and not your staff and what they're feeding you, because I've had this experience.  I don't even think your counsel is aware of half the things that happened in this court and are caught by surprise because I don't think your City attorney's informing them.

(Pause)

THE COURT:  Hey, Karlen, thank you so much.  We got a mic.  Go consult your staff.  If you disagree with a portion.

UNIDENTIFIED SPEAKER:  Judge, I think the public wanted to hear the presentation.  That's why they're here.

THE COURT:  I understand that.  I want to hear, first of all, if they disagree.  Which sections you disagree with and why.  And then to give A&M a chance to make your presentation and to rebut whatever's being said.  And also, our conversations have been quite candid privately.  You've dressed this up in nice auditor language.  You've said things like extraordinarily difficult when you've said to me, we're not able to get it, Judge.  Okay?  I'll leave that to the two of you.  But this audit is the only look we've had in decades at this city.

MS. BARGER:  Your Honor?  Over here.

THE COURT:  Oh, I'm directionally challenged.  There you go.

MS. BARGER:  I guess, you know, I mean, overall, I

agree with the report.  But there are little nuances and so, oh, Supervisor Kathryn Barger, L.A. County.

I would ask the opportunity to sit down with you all in terms of methodology and that was my concern from day one as it relates to the County working with A&M because there are, having been with the County for 35 years, there are certain things, especially as it relates to methodology that can change outcome.  But overall, I do not disagree with it, but I would like to at least have the opportunity -- I didn't know if it was appropriate for me to be able to sit down with them.

**THE COURT:**  More than fair.

**MS. BARGER:**  Okay.  So, you know, tentatively overall, I agree, but there are some concerns regarding some of the methodology that in turn affected the finding, not to the point where it is an oh, my God, but at the same time, I want to understand that portion, so I would like to set up a meeting if that would be okay.

**THE COURT:**  Done.

**MS. BARGER:**  Okay.

**THE COURT:**  Okay.  Mayor, and take your time with this.

**MAYOR BASS:**  Sure.  Well, first of all, let me join with my colleague here, the Chair of the Board of Supervisors, Kathryn Barger.  I would like time as well to go through it.

You know, Judge, when we first met, I ran because I

**EXCEPTIONAL REPORTING SERVICES, INC**

knew the system was broken and I wanted to come here and I wanted to make a difference.  To me, though, the first priority, the first mandate on day one was to save people's lives and to get them off the street.

**THE COURT:**  And by the way, let me verify that publicly that we've had that conversation.  Okay.

**MAYOR BASS:**  To diagnose the system, to figure out what was wrong, and to fix it.  And so the approach that we have taken, definitely not enough, was to go -- was to figure out what was wrong, fix it, but getting people off the street at the same time.  So I know that there's a lot in this report that I agree with.  I would question some of the methodology.

The other thing is that the report points out what is wrong, but not necessarily how it's supposed to be resolved.  And one problem I have with all of these discussions is that you're talking about a system, but you're not talking about the people.  It doesn't start with what do the people who are on the street need to get off the street.  We focus on the bureaucracy.  We focus on the administration.  But we don't focus on the needs of the people.  I would like to do that.  I'd like an opportunity to do that.  I'd like an opportunity to spend some time and dig into it.  And I think we had conversations along this line.

So I pointed out to you before you discovered it a lot of the stuff that was wrong.  We know this.  The point is,

is how to fix it and what we're going to do about it.

THE COURT:  Can you fix it?

MAYOR BASS:  Yes.  Well, put it this way.  I believe that we can stop people from dying on our streets.  That's what I believe.

THE COURT:  Let's have that discussion publicly now.  Just like you and I are sitting down for pancakes.  When we meet for pancakes.  Okay.  How?  Do you have the power, you know, to get this county, city, constant decades discord, dysfunctionality between, oh, my acuity level is seven.  I'm just a little bit bipolar.  And the County says to you, your problem City.  You get to house me.

And then we get into a dispute whether I'm really an eight or nine and whether it passes to this County to pay these services.  And the best analogy I can say is what I did years ago when Mayor Garcetti was here.  It's like two millionaires in the parking lot of a fast food arguing over how to feed the homeless person and they bicker while the homeless person dies, because they can't sort out between the City and the County this responsibility.  And the problem is, how do we get that functional other than us locking arms?  That's a great political phrase.  That doesn't mean that's occurring, though, between the two of you, because if I was to share and you were to share, you'd know that there's some real disagreements between the two of you and your staff.

**47**

**MAYOR BASS:** There's disagreements.  Locking arms, from my perspective, was not a political phrase.

**THE COURT:** Okay.

**MAYOR BASS:** It was something that was meant deeply, because I believe the only way you're going to solve this problem is by bringing both parts of government together.  You asked whether I had the authority.  I don't single-handedly have the authority, and neither does my colleague here.  We inherit some of this system between the City and the County, and it's not unique to us.  It's the entire state of California.  We meet weekly with the different mayors, and they all go through the same differences that they have with the County.  But that does not mean that these differences are antagonistic.  I think we work hard to work together, and we have a lot, lot more to do.

**THE COURT:** Sure.

**MAYOR BASS:** But it needs to be focused on the people and what their needs are and not the administration.

**THE COURT:** But you agree that we're done.  In other words, we finally reached the point in 2025, going clear back to 2007, that now there has to be a resolution.

**MAYOR BASS:** I think we reached the point much earlier than that.

**MS. BARGER:** Yeah.  And I just want to say this, Supervisor Barger again on the record.  The City is one of 88

cities in the county, and I have said this, and that is why we set up the executive committee that has cities at the table, and that is why we have a motion on Tuesday to address LAHSA. Because at the end of the day, when the Measure H passed and Measure A passed, the buck stops with the board. And I've said that.

So you can't -- I mean, quite frankly, when I see the letter that LAHSA wrote to you saying that the county did not instruct them to get the money back, I question anyone's intelligence that we'd have to tell them, based on a meeting we had, that they should go collect the money or at least get the verification of how that money was spent, because I'm not convinced that that money, all of it -- I think all of that did go to services. I think it was poor bookkeeping on their part, and there's no excuse for that.

But at the end of the day, Your Honor, for me personally, and I think for my board, because we are going to be discussing this on Tuesday, but we have responded with the Blue Ribbon Commission, and we are looking at accountability and transparency and whether or not we create an entity on its own, which I don't think is going to solve it. I don't think a Department is going to solve this problem. Acknowledge the fact that it's the Board of Supervisors who is the collector of the money and then distributes it.

And it is the executive committee of which the mayor

sits on it, City of L.A., and then we have representatives from every single region in the county, so that they all have skin in the game and a voice in how that money is spent.  We approved the budget on Tuesday for the homeless, and I had some concerns about the presentation.  But at the end of the day, in answer to your question, locking arms, we're going to lock arms, but responsibility for how the money is spent is on the County.

And then I would also say this, and I know my lawyers are probably going to have me crawl into this, but I'm just going to say it.  What we agreed to in this room with the agreement is only one part of what goes on on a day-to-day basis, not only within the City of L.A., but across the county.  And so I don't want there to be this thought.  I mean, I know in your report, A&M, the issue regarding mental health beds.  That is an issue that keeps me up at night, and your report is not going to make them come online any quicker.  But it is something we're very cognizant about and recognize that housing alone is not going to address what's going on in the street.  It's an important piece, but if we don't have the mental health beds, because many of the people that are severely mentally ill are not ready to just be simply warehoused, for lack of a better term.

So all of this to say to you that I don't want you to think that I don't hold myself accountable, because I do.  I've

walked Skid Row, and I've seen what you see, and I understand why you get frustrated.  But the mayor is a partner, not even, but the mayor is a partner, as is the city council, because we work with all of our cities.  Because it's not -- I mean, L.A. City is definitely ground zero, but the unhoused crisis is regional, countywide, statewide, and quite frankly, across the country.  And the system is broken.

You saw in the audit that we asked for.  We asked for that audit.  I think it was in response to a LAHSA meeting that I went to where I think you mentioned Ramen was being served.  I mean, that kind of triggered it.  And we did a deep down dive because we wanted to understand how the accountability was going on.  It didn't get filed.  We closely monitor and are watching that.

I actually took myself off LAHSA and put someone on LAHSA who has a passion for the finance side of things.  So, you know, I just don't want you to think that we don't take all this seriously or that we recognize that the status quo is working, because it's not, and we know that.  I think you would agree.  We have to fix it.  Right.

THE COURT:  Okay.  Let me be patient with that because I need to bow to the legislative and executive.  You're the problem solvers.  Courts only get involved when we read something ridiculous like the Los Angeles Times article.  Excellent article.  I think it's by Doug Smith out

EXCEPTIONAL REPORTING SERVICES, INC

**51**

there in the audience.  But they call to our attention that we seem to be plateauing at seven to eight deaths, like this is a victory.  Like how well we're doing.  You've got to be kidding me.  That doubled since the time I've been involved in this case.  It's a tragedy for all of us.

Now let's hear from A&M and then get you out of here in just a moment.  But I want you to hear, you folks, you can say anything you want to, but I would suggest a couple weeks so that you can work.  If you want to change any of the methodology, I don't expect your findings are going to change, but if they do, let me know.

But the end result, these findings are consistent across the board.  I can read the same thing in 2007, folks, that I'm reading in 2018, 2019, 2022.  And I want to demonstrate to you that we've been told repeatedly, do we have to go through another audit at the taxpayers' expense?  Diane, is it you?  Anybody want to say anything?

**MS. RAFFERTY:**  Thank you, Judge.  I just want to make a comment to Mayor Bass's comment.  And everyone, our report, it did change us.  And the comment on the report, where are the solutions, we are really interested in that.  We weren't asked to do that.  We're contractually bound on what we're asked to do.  I think that's a real important step.  And I would just encourage you from our work and our analysis and being on the streets and visiting so many places and talking to so many

people, whatever solutions you come up with, there has to be the loop of accountability.

The solution isn't, you know, 200 more SUD beds or mental health beds.  It's absolutely important, but it's that holistic care and that continuum of care because people wind up right back on the street.  And that's what we heard.

Yes, I had a temporary home or I had a shelter, but I'm right back out on the street.  And so we're seeing the same people over and over again.  And so what we were saying when we were working, we said if we've met one homeless person, we've met one homeless person.  Very unique circumstances.  Not everyone has behavioral health needs.  Not everyone has a drug issue.  But you have to treat people holistically and understand the continuum of care.

And you and I had a conversation on an airplane from D.C. because we're caregivers, and how important this work is, and we understand how complicated it is.  There's been many audits and many reports, but hopefully this information gives you some information to how do you move forward?

So we are very interested in that.  I mean, I've said this a thousand times, born and raised in L.A., you know, care a lot about this city and this endeavor, but it's going to take more than smart minds and money.  It's going to take a plan that really works.  And talking about what's going on nationally, there are some cities that are figuring it

**53**

out.  And they're looking at how do you become homeless in the first place, and what are those preemptive strikes that you can do so we're not having so many on the street.  So we give encouragement.  We would love to still be involved with this.  Like I said, Judge, it did change us.

I got off the freeway today, and I look at someone on the street very differently than I did a year ago.  And I think all of us have been frustrated with just everything in the past, and we know how complicated it is, tracing funds and putting systems in place, but it has to be done because at the end of the day, it's going to help each person on the street.

**THE COURT:**  Anybody else want to make a comment?  Okay.  Let's get together informally with the special master, Diane, right back to you in a moment, and work on a time between you folks with the City and your staff, mayor and chairperson and president, that's comfortable for you, but by early May.  I mean, I think a month's plenty of time to get together and take a look at this and see if there's a methodology that you'd like to comment upon.  Fair enough?  But not over a significant period of time past that.

**MS. RAFFERTY:**  Thank you, Your Honor.  Just one last comment.

I know when we do reports like this, it's financially based, and it can be seen as critical.  And, yes, we do try and soften words because we want people to accept the report and

**54**

not be defensive.  All of us have to say how impressed we were meeting with some of the staff from Inside Safe, incredible, dedicated human beings that probably could do a different job and make a little bit more money or not have the stress, going into permanent supportive housing and the shelters.  There are some angels out there really fighting uphill battles.

So we don't want to paint a totally negative picture.  And for us as outsiders, we were very accepted by the workers out there trying to show us what they're doing.  And so we really, really appreciate it.  We're kind of a nuisance.  We kept showing up.  But we really do appreciate that those people that are out there working every single day with this population deserve our respect.  We just wanted to say thank you to all of them.

THE COURT:  Okay.  Now I'm going to turn to the parties.  So I'll turn to L.A. Alliance first.  And one of the things we ought to take up in your presence right now and your counsel is this 8.2.  In other words, you've declared an emergency.  I want to hear L.A. Alliance's position on that first of all.

MS. MITCHELL:  Your Honor, the issue, if I may, the issue about the emergency, about Section 8.2.  Elizabeth Mitchell, thank you, on behalf of the Alliance, I apologize.

THE COURT:  By the way, we can go to Court Smart for the court reporter.  I want you to have lunch for the court

**EXCEPTIONAL REPORTING SERVICES, INC**

reporter.  Lunch.  But I want to go straight through because I don't want the electeds sitting here when you tell me when you're not.  I'm sorry.  Ms. Mitchell?

**MS. MITCHELL:**  Yes.  No, thank you, Your Honor.

So regarding the emergency issue on Section 8.2, the City has brought to the attention that Section 8.2 of the agreement specifically permits the City to declare an emergency if there are certain things like fires, for example, and pause the agreement during the pendency of the emergency.  And the City has taken the position that its obligations under this agreement are paused.

The Alliance very much disagrees with that position.  Certainly the fires are now out, and the financial issues, which the City is now trying to use to amend the agreement, existed prior to the fires in January.  Certainly there was an emergency, and there's no dispute about that in January.  But these financial issues preexisted that emergency and, in fact, caused the City to try to submit a proposed updated bed plan back in the fall, in August, September, October.  We had a series of hearings where the City had been asking to take 2,500 road map beds and use those for the Alliance agreement.

We asked for an evidentiary hearing on that issue, and the morning of the evidentiary hearing, the City and the County got together, pursuant to the Court's request, in a

separate mediation, and there was an agreement that if Measure A passed, because Measure A was scheduled to be voted on just two weeks later, that there would be an agreement to pay for those road map beds. There was an agreement by the County to work out funding to pay for those road map beds if Measure A passed. That was my understanding, Your Honor. I was not in the room. That's my understanding of what occurred.

Measure A passed thereafter, and that offer was rescinded. So now the City has come back to us to say, hey, we still have a financial emergency, and we want to take not 2,500 road map beds but 3,000 road map beds and use those as part of the Alliance agreement. And as we indicated six months ago when we were in this court, Your Honor, that would reduce the overall bed production by now 3,000 from 19,000 roughly to 16,000 roughly, which is unacceptable from the L.A. Alliance's perspective and frankly goes against what the City previously represented, which was that all of the Alliance beds would be in addition to the road map beds.

So I think this claim that because of the fire in January, now suddenly there is a fiscal emergency that necessitates amending the agreement, I think is disingenuous, Your Honor, because that fiscal emergency existed. The special master raised this issue a year ago in her report, indicating there was a massive budget shortfall that the CIO had been predicting for this upcoming fiscal year, and there was no plan

to resolve it to address those beds.

So if we're going back, Your Honor, just specifically to 8.2, and we have a lot of comments about the rest of it, and I appreciate that the Court is patient, but we are out of patience for this, because as we have heard, the system is broken and there are the best of intentions in this room.  Nobody is doubting that there are the best of intentions in this room.  But for 24 years, going back to these audits, we pulled audit after audit from HUD, going back to 2001, Your Honor, and it says the same thing.  And the City and the County kept throwing money into this broken system.  And now, suddenly, everybody is surprised that nothing is working.

Because we entered into this agreement, assuming that the infrastructure existed to see success.  The goal of this agreement was to substantially reduce the number of unsheltered individuals on the street, to put us on a path towards functional zero of unsheltered homelessness.  That was the point.  But the infrastructure does not exist to get us there.

It is about the people, Mayor.  It is about the people.  And the people are dying.  We have seven to eight people a day, thank you, Doug, dying on the street.  And the system is broken and we are out of patience.  This agreement is now three years in.  And now we're saying things are going to change?  When in 2001, HUD was identifying these issues and nothing changed.  And in 2007, HUD identified these issues and

nothing changed. And in 2019, HUD and the controller and the County and the City all identified these issues and nothing has changed, because the system is broken. Because the culture is broken, Your Honor.

It is a culture of unaccountability, lack of efficiency, and the result is a waste of money, a waste of time, and certainly a waste of lives. So for the City to sit here now and claim under 8.2 that its obligations are paused because now it has a fiscal emergency is disingenuous and L.A. Alliance wholeheartedly regrets that, Your Honor.

**THE COURT:** Okay.

**MS. MITCHELL:** Go ahead, Matt.

**MR. UMHOFER:** Thank you.

**THE COURT:** How do you really feel about this? How do you really feel about this? All right.

**MR. UMHOFER:** Thank you. Your Honor, we've looked at this photograph before. It was taken in 1984, just outside of this courtroom, just down the street from an angle looking up at City hall. Forty years later, same angle, same problem. And it's gotten much worse. That's 40 years.

Five years ago, we gathered in this courtroom, previous mayor stood up and announced himself to be a member of your fan club and City official after City official came up here and spoke of locked arms and they spoke of wanting to solve this problem with a FEMA style response to this

humanitarian crisis, a FEMA style response, immediate.

All hands on deck.  Let's get people safe.  That's what that meant at that time and everybody in this courtroom agreed.  Five years and I think nine days ago, that's what happened and here we are.  The problem has gotten worse.

Three years ago we signed an agreement.  Eventually a new mayor came into the City with promises of fixing this problem.  The problem has gotten worse.  The City is failing and the County is failing.  We have settlement agreements in this case and the settlement agreement with the City specifically targeted the goal as a substantial and meaningful reduction in unsheltered homelessness.  Can anybody in this room that that goal has been accomplished?  Can anybody in this room say that we are on the path toward accomplishing that goal?  We are not.  Let's be honest.  The City is failing and the County is failing.

And, Your Honor, you talked about inherited problems.  And, yes, 40 years of challenges on this is an inherited problem.  But I want to be clear and I don't like saying it.  Mayor Bass, I voted for you, the City is failing and you are failing.  Council Member Barger, when I lived in your district I voted for you.  The County is failing and you are failing and I don't want you to.

This audit confirms that the City and the County are failing.  And when we have fires that render thousands more

**60**

people in the County homeless and then the City turns around and says, we can't do the homelessness thing right now.  The City turns around -- I'm sorry, the City turns around and says we can't do homelessness right now.  It's shocking and heartbreaking to everybody here.

And again, individual motives, I take no issue with them, but we are failing at this.  My colleague, Ms. Mitchell is going to speak more about the ways in which the City is in breach of the actual agreements, over which the Court has jurisdiction.  This City is in breach of its obligation around creation of beds.  It's trying to reduce the number of total beds that are created, but it's also not on track to meet the beds it committed to.  And it is openly announcing its intention to breach this agreement.

It is not reducing encampments, the other piece of this.  We create the beds and we reduce the encampments and get people into beds.  That's what the agreement was structured to do and the City is announcing that taking an empty tent and throwing it away is a encampment reduction.

The cleaning an area, cleaning a sidewalk is an encampment reduction, indefensible.  The City is failing, the County is failing and after decades of audits, including this one, I think the answer is clear, that they cannot solve this problem without Court intervention.

We brought this case --

**EXCEPTIONAL REPORTING SERVICES, INC**

**61**

**THE COURT:** What are you asking of the Court?  In other words, I'm going to interrupt you for a moment, because when you ask -- I want you to hear this, folks.  What LA Alliance is saying is, Judge, sanction all the way up to a receivership.  And so it occurred to me that you're still kind of making up your mind what you're asking of the Court and I'm going to be transparent of that.

What are you asking?  Because first of all the argument can be, Judge, we haven't breached yet, this is anticipatory.  Second, there wasn't a definition until recently, although you disagree and I disagree with the City's position that cleaning is encampment reduction.  I think it's silly, but that was their position.

But by the same token if they really believe that, then there has to be a little bit of time.  But number three, this is a sole train wreck and if the Court is going to act, everybody needs to be on notice, that this just didn't come out of the blue, you know, all of a sudden.

What are you asking for?  Are you asking for monitoring?  Are you asking for receivership?  If you're asking for a receivership, what does that look like?  Are you asking for money because you left that wide open and I think all of us need to hear where we're potentially going?

**MR. UMHOFER:**  Your Honor, at the close of our presentation, we anticipated asking for an order to show cause

from the Court as to whether a receivership should be imposed on the City --

       **THE COURT:**  And, folks, you might as well --

       **MR. UMHOFER:**  -- on the issue of --

       **THE COURT:**  -- stick around.  You might as well hear this because first of all tentatively you're going to have an uphill push because I agree to this extent.  This 8.2 gives you the authority, Mayor, to declare an emergency.  And I think that in writing that paragraph to counsel, floods, fire and you lead off with a fire, I've often wondered if 75,000 homeless people control 10 million people or 10 million people control 75,000 people.

      But here, the fire victims have to take priority, period.  But what can't happen is that this can't become an emergency for a prolonged period of time, it could always be a priority.  But at some point, you're under a rebuilding phase.  And when that happens, the Corut can be patient for a month, for two months or a small period of time and work with you, but I'm not going to accept that this is an emergency although it may always be a priority.

      So what you're hearing is, I'm a little reluctant right now, subject to your presentation to take 8.2 as a -- other than a hiatus for a brief period of time, but also to warn the City that this is not an emergency that extends forever, although it'll always be a priority for our citizens.

And that we were getting into this mess a long time before this fire.  So whatever our financial issues were have nothing to do -- well, have very little to do with this fire.  We were in a mess and going bankrupt quite frankly or close to it.

So you can make your presentation, but I think we need to hear what's being asked, because I don't trust your Council getting back to you.  I'm going to be blunt about that. I don't think meeting with a number of Council people that you've been informed through the City Attorney's Office.

Michelle?

**SPECIAL MASTER MARTINEZ:**  Judge, I don't know.

**THE COURT:**  Yeah?  I'm talking to you Council people.

**SPECIAL MASTER MARTINEZ:**  I don't know if they're briefed or not.

**THE COURT:**  Well, I'll leave that to you as the president, but I had breakfast and lunch with a number of your Council people who said, Judge, we didn't know this was coming. And if you want me to name them, I will.  So I'm really concerned that this is getting from the City Attorney back to you folks on the firing line, and in fact, it got so bad that Michelle was sending out notices to each of the Council people specifically until (inaudible) Kekorian (phonetic), your prior Chair said, Judge, drop back and centralize that through my office.  But that's how bad it got because your Council wasn't getting the communication from the Court.  And that's why

**64**

you're here today to hear this.  Where are we going?

Okay.  So --

MR. UMHOFER:  Your Honor --

THE COURT:  And by the way, this does not change the terms.  The City is arguing that this 8.2 changes the terms.  It doesn't change the term.  This is the settlement period.  It may buy some time and a hiatus in the definition of emergency but that doesn't let the City come back and renegotiate.

MR. UMHOFER:  That's correct, Your Honor.

THE COURT:  Okay.

MR. UMHOFER:  And I believe that the Court has jurisdiction to interpret and determine whether 8.2 applies.  And so if the Court were to come to a conclusion that the emergency has passed, the City does not have the ability to unilaterally get out of an agreement that it signed and committed to.  And so --

THE COURT:  I don't know that I will today, Matt, just as --

MR. UMHOFER:  Not asking you to.

THE COURT:  -- a forewarning.  I want to talk to the Mayor.  I want to talk to maybe Kathryn Barger through the Special Master, I want to give them a little time.  I don't like the Court being pitted against, what is it, citywide tragedy quite frankly.  If they need a little bit more time, they need time, but at some point, this passes from an

emergency into a rebuild and I don't know whether that's in May or June, but it's coming pretty quickly.

**MR. UMHOFER:**  And, Your Honor, time has passed in this case, five years since we started it.  And so as my colleague Ms. Mitchell pointed out, it is our job --

**THE COURT:**  Right.

**MR. UMHOFER:**  -- to be short on patience.  We are the plaintiffs in this case.  We got a deal with the City and the County.  The City is having an immense problem complying with the agreement before the fire.  We raised the City's non-compliance with this agreement before the fire, before this emergency was declared.  The City is also having problems complying with the agreement because the County isn't stepping up.

**THE COURT:**  We've been told informally that they can't comply with the agreement, quite frankly.  I'll put it right out there.

**MR. UMHOFER:**  I am not certain at this point that the City or the County can fully comply with either of the agreement.

**THE COURT:**  Okay.  So, folks, you're hearing this. This is a slow train wreck and this is coming down the line, I'll leave that to you, because we've got some time, so Ms. Kathryn or -- Chair?

**UNIDENTIFIED:**  No, I just think that there's some

things that were said that were misrepresented.  She said that she heard, but then takes that as a gospel as it relates to the agreement that we had when we left the courtroom.  So I listen to this a little frustrated because it's like -- and I get it, you're lawyers and you've got to convince the Judge, but I think there's a little misleading verbiage being made, so I'm sitting here trying to be patient, but I don't know that now is the time and place, I'll let my attorneys address that.  But it's just a little frustrating.

**THE COURT:**  Okay.  So let me ask, is there any reason then to have the elected officials stay?  In other words, we'll get into the lawyers, et cetera, they can convey the information back to you.  I want you to take your time, except you do want to go back to the controller, what do you do?  Come on up?  And I want to hear this conflict again between the City and the County because now it's caused a real problem.  What can you audit?  I wish Mr. Zabel (phonetic) was here, because he had a different opinion.  What can you audit?  And when do I have to go to a third party auditor?

**MR. MEJIA:**  Thank you, Your Honor.  So it is our position and the way that we read the City charter that my office can audit the performance of any program whether if it's housed underneath an elected official or not.

**THE COURT:**  Now, let me stop you there and be clear. When Mr. Zabel was here, he said you couldn't because any

**EXCEPTIONAL REPORTING SERVICES, INC**

program swept under the Mayor's umbrella, and I don't mean this Mayor specifically, but the Mayor historically, like a homeless problem stopped you from the performance audit.  That's why we went to a performance audit quite frankly of a third party. Can you audit, performance?

          **MR. MEJIA:**  It is our belief that, yes, we can.  We can.

          **THE COURT:**  And the City's position?

          **SPECIAL MASTER MARTINEZ:**  He just did, he just --

          **THE COURT:**  No, I want to hear from the City now again, I heard it from Zabel because he took the position that they couldn't.  Real simple, can they perform a performance audit if the programs are under the Mayor's offices?

          **MR. MARCUS:**  Good afternoon, Your Honor, Scott Marcus on behalf of the City of Los Angeles.  Under the charter, the controller cannot conduct a performance audit of other elected offices or other elected officials.  The controller can conduct a performance audit of any City department.  The controller can also perform a financial audit of anything involving City money.

          **THE COURT:**  So let's be clear then, if the Mayor, not specific to this Mayor, but if any Mayor in the future decides to sweep a program under his or her office, we can't have a performance audit, which is where we've been for the past 35 years.

MR. MARCUS:  The charter limits the powers and the duties of the controller, Your Honor, it's Section 2.61.

THE COURT:  So therefore, for the public to get any look at the performance if a Mayor sweeps this under his or her authority or bailiwick, we've got to go to a third party audit and have this Court intersession and all of this drama going on to get a third party performance audit.

MR. MARCUS:  Your Honor, there's a number of ways that it could take place.  My -- the question that you asked is whether the controller has the power under the charter to conduct a performance audit of the Mayor's office and the answer is no.

MR. MEJIA:  Your Honor?

THE COURT:  Yeah.

MR. MEJIA:  So we have a disagreement with the City Attorney's reading of the City charter, but even if that interpretation were true, there's nothing stopping from an elected office from voluntary submitting to a performance audit, which has been done in the past from other elected offices.

THE COURT:  Now, I'm going to be a little bit facetious but without the Court, quite frankly obnoxiously pressing on occasion, in other words, you know, being gracious I don't think we would have had this audit.  In other words, if I'm depending upon somebody voluntary it's only because the

EXCEPTIONAL REPORTING SERVICES, INC

Mayor stepped in and said, you know, Judge, I know it's going to be bad, I'm willing to undertake this for transparency which I think she deserves a tremendous amount of -- now we've got to go begging for an audit in the future between the two of you? That is ridiculous.  How does that benefit the public?

And number two, this audit may be even more valuable than a forensic audit because let's say we discovered two providers with two fraudulent, you know, under servicing.  Oh, that make a headline in the LA Times or channel whatever, but quite frankly the performance audit is even more valuable, because this is all structure.  Something significantly has to change here, so the most valuable audit we could have.  Say that again, if we look through whatever number of contracts we have that we don't even know about, he'd probably find under performance on many occasions.  He'd probably even find fraud where people didn't perform.

So you can -- but you can't undertake a forensic audit, right?  Let me make that clear.  You can undertake a forensic audit, correct?  Yes or no?

**MR. MEJIA:**  Yes.

**THE COURT:**  Okay.  Now, if you can undertake a forensic audit, the problem you've got is that all of the documentation is over, most of it, with LAHSA because they're doing the contracting.  And so you go over to LAHSA and I'm being told, Judge, you don't have jurisdiction because LAHSA is

**70**

not a party to the lawsuit and I guarantee you if Diane was really forthcoming right now, she would tell me that she's unable to get the documents from LAHSA.

That puts you in a heck of a position.  See, it's the perfect triangle of irresponsibility going on and how are you going to get a forensic audit.  How do we discover what happened in 2019 with the $600 million?

MR. MEJIA:  Well, first, we would need to scope out the forensic audit, we would also need to have enough resources and capacity.  The biggest issue on my office is the resource constraint that we have in order to perform the --

THE COURT:  And you complained about a special master, that you'd be cut from ten to four auditors or something like this and you thought you were being punished quite frankly.

MR. MEJIA:  Yeah, a third of our audit division cut.

THE COURT:  Yeah.  None of this interested the monthly benefit unless we're going to have the Court constantly interceding and requesting the volunteerism of the Mayor because I don't think any public is going to stand for the last 35 years of non-accountability in the future.

So how are we going to work this out between the two of you without running up a bill?  And if Dr. Adams Kellum was here, I would ask if she would voluntarily undertake a forensic audit of LAHSA.  If she answered no, I think she's going to get

crucified.  If she answers yes, I think that would open up the Pandora's Box because most of these contracts are with LAHSA and I will tell you, we've had a heck of a time getting these contracts from LAHSA, to the City's benefit, and the City having to pay more money that you should have paid.

And I've seen the e-mails time and time again from the special master and the frustration with A&M on this.  Now, are we going to do this?  Because 35 years is a long time without the City being accountable.  How are we going to work this out between you and Zabel or the Mayor or whoever?

**MR. MEJIA:**  I think that's a conversation that, you know --

**THE COURT:**  Why don't you sit -- just talk to the Mayor, she's right there.  See, I don't have bureaucracy and bureaucrats now and I don't have lawyers in my way.  Why don't you step down and talk to the Mayor for a moment.

**MAYOR BASS:**  We talk all the time.

**MR. MEJIA:**  We talk.  We --

**THE COURT:**  Well, talk again.  Just talk to us in public.  We're your public.  We pay your bills.  Work this out now.

We're waiting.  I'm very patient.

**MR. MEJIA:**  Oh, you want -- for the record?  Oh.

**THE COURT:**  I want the two of you to come up with a solution, just like I'm asking elected officials, are we going

to get this for the public good --

**MR. MEJIA:**  Sure.

**THE COURT:**  -- in performance audits in the future because the Court is going to be able to intercede every time and I'm not going to go begging this mayor or some other mayor for their voluntary acquiescence.

**MR. MEJIA:**  Right.

**THE COURT:**  Now, she's right there.  You two have a conversation instead of the bureaucracy.  Come on, that's an order, sit down and talk to her.

**MR. MEJIA:**  My name is Kenneth Mejia, the controller, but.

**THE COURT:**  Go talk to her for a moment.

And you're the president of the Council, you've got the 15 votes, the Mayor doesn't have a vote, so you might as well air into this also.  Come up with a solution so we're not spending your money needlessly or the Court's not intermeddling and badgering the two of you.

**(Pause)**

**THE COURT:**  Okay.  Matt, you're up while they're talking.  If you're coming to me with a receivership, what's this supposed to look like?  Let's get this right out on the table.  No, stand up here.  We were fronting for the homeless and have the death toll rise, are we going to punish the City that's near bankruptcy?

**MR. UMHOFER:**  Yes.

**UNIDENTIFIED:**  And, Matt, walk us through a partial or full receivership too.

**MR. UMHOFER:**  Matthew Umhofer on behalf of the Alliance.  Your Honor, receiverships take a lot of different forms.

**THE COURT:**  No, I know that, what do you want?

**MR. UMHOFER:**  Specifically what we intend to seek is a receivership that involves the appointment of a receiver --

**THE COURT:**  A what?

**MR. UMHOFER:**  The appointment of a receiver that is an individual like receiver/monitor --

**THE COURT:**  Who?

**MR. UMHOFER:**  -- whose job it is -- we would like to propose names, but I do not want to do that off the cuff, Your Honor.  I think that's a very, very --

**THE COURT:**  Well, it's going to have to be an 800 pound gorilla.

**MR. UMHOFER:**  Absolutely, Your Honor.

**THE COURT:**  Okay.

**MR. UMHOFER:**  So, you know -- so when Congress passed the law regarding the compensation of victims of 9/11, Ken Feinberg stepped in.  Ken Feinberg is an extraordinary human being.

**THE COURT:**  I know who he is.

MR. UMHOFER: And he took that, on that extraordinary responsibility of resolving thousands and thousands of cases and he did it without a single litigation shot being fired. That's the level of gravitas that we're going to need.

THE COURT: How much are we going to pay him in a bankruptcy? Anybody know what his fees are? I do.

MR. UMHOFER: I know they're substantial but I also know in that case he did it pro bono, Your Honor.

So I'm just saying we're going to -- so we absolutely need somebody with gravitas and I want to give careful consideration, I do not want to be off the cuff in terms of who would be the receiver.

THE COURT: What's the function of this receiver? What are they going to do?

MR. UMHOFER: The receiver, from our perspective, becomes the homelessness czar for the City.

THE COURT: Does that receiver tell Venice to build a home site that's been stalled for four or two different --

MR. UMHOFER: The receiver will have the power --

THE COURT: -- Council members and go against authority of the Board out here? Because you've got local folks like Tracy out there who's very concerned about that by the way. Maybe we ought to build something on the west side of LA for a change, wouldn't that be refreshing, send the Mayflower and dumping it on the 14th District, wouldn't that be

refreshing, Mr. Hernandez's district, all the folks on the west side might like to contribute.

**MR. UMHOFER:**  Your Honor, a receiver has the authority that the Court delegates to the receiver.  And if that means that that receiver takes control of the budget around homelessness in Los Angeles --

**THE COURT:**  That's the budget.  Now, that's a different --

**MR. UMHOFER:**  That's correct.

**THE COURT:**  Just a moment.  We're going to walk through this very slowly.

**MR. UMHOFER:**  I understand, Your Honor.

**THE COURT:**  That doesn't mean that the budget, it's far different than your position as an elected official because nobody elected the Court, nobody elected the receivership, that could be construed as a real intrusion of power.  And I'm trying to get a resolution from you, but let's hear the drama of this for just a moment, because I'm having trouble sorting through what this would even potentially look like.

**MR. UMHOFER:**  And, Your Honor, it will be extraordinary because the failure of the City and the County is extraordinary.  And so this person would have budget control, they would have the ability to spend what the City has appropriated on these issues in order -- and in order to lead the City effort on these issues.

So this person would have the authority vested by the Court, because the City has failed on this, vested by the Court to commandeer what it needs to within the City in order to solve this problem.

THE COURT:  Okay.  The person comes in and says, you know what, I like the Marriott Hotel downtown, if there's such a thing, and I'm going to commandeer all the excess bed space.

MR. UMHOFER:  Your Honor, that obviously imposes costs on private parties and so that's going to -- I'm talking about control -- right now, the receivers controls the City.

THE COURT:  I want to walk through this with you for a moment, Matt, because that's really a dramatic action by a Court.  And if that was ever to be considered, I need to be very certain what the attainable goals are and why the legislative and executive branch can't accomplish this.

MR. UMHOFER:  Because they have not accomplished it, Your Honor.  That's exactly --

THE COURT:  I know.  Assume that is true.

MR. UMHOFER:  That's exactly the point.  We brought this case --

THE COURT:  I know.  I know.

MR. UMHOFER:  -- because the executive and legislative branches have failed.  We've given the --

THE COURT:  Does this receiver then say to Traci Park, Traci, I'm going to build this regardless of what you

EXCEPTIONAL REPORTING SERVICES, INC

think?

MR. UMHOFER:  Any receiver is going to have to operate within the confines of legitimacy and within the confines of the Court's order --

THE COURT:  Those are big words.

MR. UMHOFER:  -- so a receiver -- I understand that. If a receiver believes that it is appropriate for a shelter to be built somewhere, they can also do things to build community support for that, to inform the community, but if we need to overcome some NIMBYism to get shelter and housing built we should absolutely empower a receiver to do that.  It's the kind of power that I would expect this Court to exercise if faced with that question.

THE COURT:  I could do --

MR. UMHOFER:  And so I'm talking about endowing a receiver with the authority of this Court.

THE COURT:  I could do certain things.  I could do things that are drastic.  I could order the City not to expend anymore funds for providers until they have a public website. I'm concerned about that because of the interim period of time. The providers are going to come back and say, you're not providing this in a period of time and a number of people die.

And so the Court has immense power, but if I exercise that, I need to be certain that you folks have reached an impasse where you can't get a setter or breachalism

(*12:46:13).  I don't think I'm there yet.  The bright message is, I really want you to be successful, but I'm running out of time too.

When I read an article in the LA Times that we're supposed to claim victory because we've reached a pause of seven to eight dead a day.  That is not a success story. Bright didn't write that headline, he wrote the article, but somebody came in with a headline quite frankly that said, we've only got seven or eight dead a day.

**MR. UMHOFER:**  And, Your Honor, we are at an endless loop of let's give the City and the County one more chance.

**THE COURT:**  I hear your frustration.  But I want you to go back and if you come to me, sanctions seem ridiculous in a City that's broke, a monitor might be possible, but now we're not bluffing, if I appoint that, I've got to have some teeth behind it and mean what I do, or if you're asking for a receivership, are you asking that the Court take over the entire City?  First of all, I would be working with a bureaucracy that is not functioning from my situation.  I don't know that I want to work with those same people anymore. That's doomed to failure.

And number two, am I going to create an alternative structure and then build the city?  In other words, go back and think, if you're asking for this drama of a receivership how that really works and why the Court would be more effective

than you folks who have this power to solve this.

So I'm giving you a chance. Solve it. We're out of time. I can't say it enough and every time I say it, it sounds like I don't mean it now, solve it, you've heard it.

Okay. I'm going to hear your presentation but --

**MR. UMHOFER:** I second that --

**THE COURT:** -- let them go.

**MR. UMHOFER:** I second that motion, Your Honor.

**THE COURT:** Okay. You tell me what that receivership is supposed to look like or a monitor et cetera, but be finite about that, because I'm not just going to declare a receivership for the drama of some front page headline --

**MR. UMHOFER:** Absolutely.

**THE COURT:** -- because first of all, that removes all your political careers. You understand if I do that, you're dead politically. Did you get that? Do you hear me? You can pick up that in the LA Times or you can pick it up in the New York Times, then you pick that up in Paris before the Olympics, that's the last thing I want to do. But we're out of time now, we're out of patience and you've got to solve this.

Okay. You go back and you think, what do you really want to ask Judge Carter.

**MR. UMHOFER:** Yes, Your Honor.

**THE COURT:** Okay. And you be finite about that. Don't give me a conclusion that, Judge, you can sanction all

the way up to sanctions and then a receivership.  You go back and tell me what exactly is feasible and attainable and what works up the ladder in terms of sanctions potentially so that you have every folks from the legislative and executive branch to solve this.  Still in this position after decades, you need to solve it now.  Okay?  Okay, Matt.

**MR. UMHOFER:**  Thank you, Your Honor.

**THE COURT:**  Okay.  All right.  Now, I want to hear from you folks, so you're the attorneys.  And I'll hear from Shayla.  Anything?

Council present, yeah, absolutely right.  You've got the votes, the Mayor doesn't have the votes.  She can close your budget.

So first.

**MR. HARRIS-DAWSON:**  Well, one very enlightening hearing today, it's the first time I'm hearing from lots of these folks.  I want to thank the folks who did the audit.  And just this is the only thing I have to offer on -- Marqueece Harris-Dawson and President of the Los Angeles City Council.

**THE COURT:**  Pleasure.

**MR. HARRIS-DAWSON:**  Thank you.  The -- as I sit and listened to the audit and the different audits over decades, over most of my adult life, these audits have been coming out.  The challenge for us as Council members is, even if the audit were perfect and there was a receipt for every dollar and you

could trace down what was bought with that receipt and there were still people in the street the way they are, it'd be completely meaningless.

THE COURT:  Right.

MR. HARRIS-DAWSON:  And so the question is, how do we get to the point that we have resolution of the problem and how do we document and repeat that.  And so what's exciting is, whether it's Council Member Hernandez in the First District or Bob Blumenfield in the Third District, we're figuring out solutions on the ground, at the Council office level, at the provider -- at the individual provider level, at the housing level, we're figuring out solutions.  And what I would really love is if somebody would come and study that, study what works, and then tell us how to grow that, as opposed to, you know, sort of box checking around, you know, where dollars are going or not going.

In point of fact is, widespread, no one in this courtroom agrees -- disagrees with the statement that the problem is not being solved on a broad scale, and everybody agrees that there needs to be solutions and what I would offer on behalf of the Council is, there are solutions in isolated areas that can be broadened and I just think the Court, the plaintiffs, us, all of us need to look at that with a magnifying glass as opposed to trying to come up with a perfect spreadsheet that accounts for every dollar.

**82**

**THE COURT:** And I think that we need to recognize that there was a 5 percent drop in homelessness. Now, whether you believe the figure or not --

**MR. HARRIS-DAWSON:** After 10 percent last year.

**THE COURT:** Hold on. The year before. Now, this audit, I've got -- or this last one, I've got some real questions about it. But at least if it was going up 20 percent and you went down 5 percent, you need to hear some recognition about that, but by the same token, I'm a little skeptical of LAHSA coming out and I'll be blunt about this with an early report without USC involved, with 10 to 11 percent less people on the street taking the audit, my view is that they're in a political battle for their lives right now and I think anybody recognizes that, with the County vote coming up and the City exploring this and they're putting out early information. And that's curious because for years, we've been asking for this information before June or July and suddenly, we get this unverified information. That causes me a lot of concern.

Now, that doesn't mean it's not happening, it just means I'm really skeptical of that. That's political gamesmanship. So we can't get it until June or July or August before, why is it coming out now, hurriedly now that's unverified by USC. We've got rain on that particular night and we've got 10 to 11 percent less people on the street. KKV point and time count. I'm supposed to accept that?

Ms. Hernandez, Council Vu (phonetic), by the way it was a pleasure to have breakfast with you the other day.

**MS. HERNANDEZ:**  Thank you.  Thank you, Your Honor.

**THE COURT:**  And how's the park doing over there?  I know Echo, but how about that other park, MacArthur?

**MS. HERNANDEZ:**  The park is doing a lot better.

**THE COURT:**  They're doing a lot better, isn't it?

**MS. HERNANDEZ:**  Yes.  Working very closely with the Mayor to make sure we get the accurate resources.  We solarized lights, we have clean teams there seven days a week, it's looking a lot better, so I hope people can stop by and check it out because --

**THE COURT:**  I have.

**MS. HERNANDEZ:**  Yeah.

**THE COURT:**  You don't know, but I've been by it.  And it looks a lot better and by the way, some of the businesses back there are very appreciative, you need to hear this. There's a lot more safety factor out there.  But I'm convinced of one thing, there's a guy named Steve Lopez over at the LA Times who really focused on this.  I would hate to think that every time LAS or Channel 5 or Channel 7 or whatever writes an article that someone would respond and that's our response to clean up that front page article.  It ought to be across the board in the City of Industry and other places, that aren't getting this notoriety, so I'm wondering if we're just reacting

**84**

to the press sometimes.

MS. HERNANDEZ: Well, I will tell you that, no, we're not. Since I got elected into office MacArthur Park has been a priority of mine. It's the densest neighborhood in the entire West Coast and we're working closely with the Mayor to bring in those resources, opioid settlement dollars. And it's also a location where many hands on deck. I'm working very closely with the County departments, Department of Public Health to secure resources. They pay for an overdose response team that walks the area of the park, have already reversed 24 overdoses, so that is an example of what happens when different levels of government come together to address a crisis.

So MacArthur Park is doing great and we're going to keep working together to keep bringing the resources there.

THE COURT: Okay. I want to hear from Shayla Myers. We've neglected to -- we'll get right back to you.

MS. MYERS: Thank you, Your Honor. I appreciate the opportunity to talk about this. I do want to pull it back to the audit and I want to echo the Council President and his comments that if we address everything in this audit, all of the spreadsheets, we would still have tens of thousands of people who are unhoused on the street.

You know, we represent the Los Angeles Community Action Network whose members are unhoused every day on the streets of skid row. While it's important to recognize some of

the challenges that are uplifted in the audit, at the end of the day, fixing the billing and invoicing problems that have been identified are not going to ensure the folks on skid row are housed.

And there are a number of issues that we have with the audit and the approaches and we'd like the opportunity to also work with the audit team.  The biggest concern that we have with the audit is that it doesn't seem to address the first and foremost question which is whether or not the City is actually constructing the beds that they have promised to construct.

The City has been putting forth reports indicating that they are creating beds.  Those reports change on a regular basis.  We know, Your Honor mentioned Venice Del which is a program -- it's a housing unit that is being constructed as in progress.  It's no longer in progress.  They had to remove it from their reports.

The reality is is these reports and what the City says it is building is not being investigated for purposes of this report.  And I raise that because I think at the end at the day, with 525,000 too few affordable units for the people who need them in the County of Los Angeles, my understanding of the settlement agreement was that it was about bringing on board resources to ensure that folks who were on the streets would have housing units available to them.

**86**

The audit raises a number of concerns, throughout the audit, that the beds that have been identified by the City don't actually exist, are not actually on line or not being tracked appropriately.

Over 2,000 of the road map beds have been allocated for the time limited subsidy program, which is a significant resource that the City continues to invest in to get people off the streets.  But the audit doesn't address any of the program requirements of the time limited subsidies and it seems to take for granted that those subsidies actually existed and were continued to be provided.

We raise these issues because this agreement was very much about bringing new resources on board.  And if the audit at the end of the day does not verify that those resources were actually brought on board does not verify that the City is actually meeting the obligations as it says that it is, then the audit will have done no work to instill confidence that the City is fulfilling its obligations.

At the end of the day, this was a sanction for the City's failure to abide by it, had nothing to do with LAHSA and it had nothing to do with the County.  So we're just very concerned that the City continues to get off scout free in terms of what their obligations are under the settlement.

And, Your Honor, I really want to address the LAPD issue because -- and I know that that gets ignored frequently

when we talk about what's going on in this courtroom, but at the core of the settlement agreement between the LA Alliance and the City of Los Angeles is the issue of criminalization and the way in which LAPD is being used to enforce these agreements.

The audit was unable to receive information from the Los Angeles Police Department related to homelessness data. And yet for the past five years, the LAPD has tracked homelessness data that they have made available when it has been appropriate and convenient for them. They have special orders and directives that have indicated how that information should be tracked, that I don't believe were provided to the auditors to be able to look into. They were told to look at publicly available data, data that doesn't necessarily track anything, but when asked, when asked by the City Council or in other spaces to track that information, they had the opportunity to do that.

And so we are concerned again that the audit is focusing on aspects that are popular to points to, whether it's LAHSA or the County, and as a result of that, by forming the conversations around those issues, that actually impacts unhoused folks on a day to day basis, are getting ignored because we're focusing on line items and budgets in those kinds of spreadsheets.

So we would just -- we'd like the opportunity to work

with the auditors before this becomes final, to point out data sources that we believe exists, that we've seen exist, that the City has produced, because it cannot be the case that the City continues to not be held accountable because of their -- because of what they represent are issues.

THE COURT:  How's the Mayor Dundon --

SPECIAL MASTER MARTINEZ:  No, we still have the LA Alliance.

THE COURT:  I'll be right to them.  How has the Mayor done and you as the auditor/controller, have you worked out this problem for us, to your collective responsibility or do we have to keep going to a third party and paying for this or asking you to volunteer?

MR. MEJIA:  You need my name again?  Oh, Kenneth Mejia, City controller.

So for the question that you wanted me to estimate, I did ask the Mayor how we can go about future related oversight for programs underneath her and I asked her and I will let her answer for herself.

MAYOR BASS:  Karen Bass, Mayor of Los Angeles.  The City controller and I have worked together I think very well in many ways.

THE COURT:  Uh-huh.

MAYOR BASS:  But I won't agree to this.  I do not agree to it because it is not consistent with the charter and

because I fundamentally don't think it is right for one elected official to audit another.

THE COURT: Now, for both of you then, how do we then not let 20, 30, you know, this extraordinary period of time go by without a performance audit and is there some future court long after I'm gone going to have to come begging to each of you or one of you as the future mayor, not you at that time probably, ten years from now and ask for volunteerism, we're going to be told no.

And so therefore, any program that you or a future mayor decide to sweep under your umbrella we don't get a look at. That's just not good for the public.

MAYOR BASS: I would agree, and I think that it can be looked at. And I think that it's very important that whatever programming we do be outcome driven and the outcome is getting people off the street and housed permanently. And that should be the performance standard. And I think programs should be designed that way.

You know, I'm actually sitting next to another former controller who faced the same situation. Wendy Greuel was a City controller a few years ago and was in the same situation where the Mayor didn't agree to an internal or an external audit.

THE COURT: Okay. So what we're left with is takeaway, we're not going to have another performance, quite

frankly audit, unless you have this Court or another court in the future badgering the elected officials or asking for your consent.  That's my takeaway from this.

**MAYOR BASS:**  And maybe my attorney could address that as well, because I don't think it means that no audit would be done --

**THE COURT:**  Yeah.  And/or --

**MAYOR BASS:**  -- I think it's a question by who.

**THE COURT:**  -- a forensic audit also, I mean, I think that this covers the bailiwick that the City is not going to get another look, except for the drama that we've gone through quite frankly.

Now, I'm speaking directly to officials, I've had enough counsel for a moment.  I'm really talking to you, you're the decisionmakers.  These attorneys act as a buffer quite frankly.  I -- really if that's the position we're in, how do we break that impasse or do we.  Or is this City been doomed and I mean doomed to another 20 or 30 years without accountability.

**MR. MARCUS:**  Your Honor, if I may, Scott Marcus for the City, the controller does have the ability to conduct a financial audit.  There are inspection rights between the City and LAHSA and the contracts that the controller can take advantage of.  The Court is --

**THE COURT:**  But he'll tell me that he can't get, as

he has, or A&M can't get the documents from LAHSA and LAHSA quite frankly gave my auditors a very difficult time because a lot of these documents didn't exist and you ought to read the e-mail streams, they are frustrating.

Now, you can't defend that, Ms. Greuel, because you weren't there. But I can tell you point out, I'm watching these e-mail streams come from Michelle through LAHSA and it's ridiculous.

**MS. GREUEL:** Judge, is it okay if I say something?

**THE COURT:** Yeah, but I wouldn't defend LAHSA right now in this, you might defend them in the past because --

**MS. GREUEL:** I -- what I wanted to say is that we will provide any information that we are asked for and if there's an issue, you should let me know.

**THE COURT:** You don't have it, Wendy, because you haven't asked your providers for it and you let -- not you personally, you let your providers keep this house and nobody checked. We don't know what the heck they did with this money.

**MS. GREUEL:** I'm just making a commitment to you that we will provide the information requested and I think that's what you're wanting to hear today, Judge, is that -- is you want action, so I will say that as well.

**THE COURT:** Fair enough.

**MS. GREUEL:** And I will say with the Mayor, and as a former controller, I've also tried to audit at the time a

performance audit and was told we could not and it was my predecessor as well, Laura Chick --

**THE COURT:** Right.

**MS. GREUEL:** -- because of the charter.

But I will say this Mayor said come on in and do this. Previous Mayors did not do that. So it would take a charter change to allow for that performance audit, I'm not sure, but it also is in a cooperation that is the City Council members and the Mayor whenever they get funded say part of that is a performance audit. I mean, there's things that you can do to do that, but it is a charter -- and I lived through it, I fought in the public, and in the news at the time with Chutanich (phonetic) about it wanting to be able to do a performance audit and was not. So I just want to give you that history so you know.

**THE COURT:** But if we can't resolve this problem, Wendy, you're going to end up pushing a Court that doesn't want to be there more and more towards intervention. In other words, if we can't resolve this for the public, in terms of transparency and accountability, you're going to end up pushing this Court or another court into a position of being very aggressive and entering into the legislative and proper functioning of the executive branches where we really don't want to be there.

So if you can't solve it at some point, we're going

to not want to be complicit in it, because otherwise by me not taking action I become part of you and I'm complicit in it. And I don't want to do that.

So I'm not hearing a solution yet, I'm hearing an impasse and what you're putting the Court in a position of eventually, so you hear the slow train wreck is that all of a sudden LA Alliance starts to gain credibility if I can't even get accountability and transparency then you don't leave me many options in the future except sitting docilly by and doing nothing and trust me, that's not this Court. I'm trying to give you every opportunity. You really need to solve this.

SPECIAL MASTER MARTINEZ: It's LA Alliance now.

THE COURT: Okay. LA Alliance, we're almost done.

SPECIAL MASTER MARTINEZ: We still have the encampment resolution issue, LA Alliance from the A&M report.

THE COURT: Okay. Michelle's whispering in my ear.

SPECIAL MASTER MARTINEZ: LA Alliance on the A&M report.

THE COURT: Okay. And then let's wrap this up.

SPECIAL MASTER MARTINEZ: LA Alliance.

THE COURT: LA Alliance, A&M report.

MS. MITCHELL: A whole lot to say, Your Honor, but I understand that we'll be back in a couple of weeks to talk maybe more substantively about motions and outcomes.

THE COURT: I think about early May to give everybody

a chance to meet --

MS. MITCHELL:  I did.

THE COURT:  -- as the Chairperson of the Board, you go through your vote, the City can decide as the president, what you're going to do or not with LAHSA.  I know that takes a little bit of time, the Mayor, et cetera, so I'm thinking May and I'm thinking about that time whether we have an emergency by that point or not or we're back.  I'm thinking about not April, not precipitous, but I'm looking at May.

MS. MITCHELL:  Thank you, Your Honor.  Regarding, specifically regarding the audit, one I think it does support what everybody in this room has said, is that it is a broken system so I'm very much looking forward to what the potential solutions and they do have to be the 800 pound gorilla solutions.

But a very specific question I do have for A&M is actually regarding these time limited subsidies that Ms. Meyers raised and I think it's an excellent point I'm very concerned about the statement on page 65, addressing the 2,293 scattered sites which are the time limited subsidies for the road map and there's a statement, approximately 70 percent of the contracts did not report financial expenditures in fiscal year 2023 to 2024.  A&M requested supporting work papers from LAHSA, however LAHSA was unable to provide the requested documentation and instead furnished a memorandum that was not sufficient to

permit reconciliation of the misaligned -- misalignment in contracts, therefore A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds.

I'm not an auditor. And so I would really like that in very simple language. Like does that mean we have 1,600 missing beds, what is going on with those, that's about, if my calculations are right, 1,600 beds that could not be verified. Do I understand that correctly?

**MS. BROWN:** Lisa Brown for A&M. I don't know if I can answer the bed count question directly, but what happened is in the financial data, there are clearly contracts that are linked to time limited subsidies. Alternatively we asked LAHSA outside of the financial data, please give us a list of all of the contracts that relate to the scattered sites, TLS beds that are in the quarterly reports. And there was a large misalignment, which is the 70 percent you see there, between the list of contracts they gave us separately outside of the financial data.

So we asked them, you know, we see this large discrepancy, can you please help us reconcile that. And the memorandum that we were given on how they calculate that number of beds did not have anymore specific information on the contracts to allow us to kind of align and figure out what that discrepancy may be.

**MS. MITCHELL:** I guess fundamentally, could you confirm that those beds are in existence, that the time limited subsidies are being used and that people are in those beds or using those subsidies?

**MS. BROWN:** I mean, I don't think at this point in time we can verify that.

**MS. MITCHELL:** Thank you.

**THE COURT:** Which is back to the auditor controller's part that you noted with $212 million in terms of wasted money for non-occupancy.

**SPECIAL MASTER MARTINEZ:** Yeah, very few concerning, especially --

**THE COURT:** Here.

**SPECIAL MASTER MARTINEZ:** I would just say that it's also very concerning if those time limited subsidies are being counted as interim housing or potentially permanent supportive housing and being counted towards the LA Alliance agreement. I want you all to keep that in mind if we're unable to verify. If we are not able to verify, you're not going to be able to count those. So just please keep that in mind.

**THE COURT:** I think we're done. Any other comments by any other parties?

**SPECIAL MASTER MARTINEZ:** The County?

**THE COURT:** My apologies.

**MS. HASHMALL:** Thank you, Your Honor, Mira Hashmall

for the County of Los Angeles.  You know, I'm a lawyer, so I don't play politics, I deal with facts, I deal with evidence, I deal with the law and there were a couple of misstatements today that I think really need to be addressed before the Court, if I may.

First, there was a statement with regards to discussions between the County and the City regarding Measure A and that's in connection with a hearing that was back in October of 2024, there was no agreement.  The record of the hearing will make clear the conversations that were going on at that time, it's on the transcript, it's in the record.  There was a misstatement about that that needs to be clarified, number one.

Number two, the County and City are continuing to have conversations and working together on matters that go far beyond this lawsuit.  I want to echo what Supervisor Varga said, that the County has engaged in significant resources, thousands of beds that it funds, operates and has in the City of Los Angeles that has nothing to do with this agreement, any settlement in this case.

So there is a big picture of resources and I think it's important that we never lose sight of the County's overall commitment to homelessness, even if it's not a specific bed or resource in an agreement in this case.

The other thing I'd like to reiterate is that the

County has been consistently committed to transparency, that's why the Board ordered a LAHSA audit back in 2024.  That's why the Board is looking carefully at a plan for how to improve the delivery of homeless service for county-wide.

And that's also why the County stepped up and agreed to support the A&M audit of the City's programs, providing data and information and resources and opening up some of its subject matter experts, so that they would get the benefit of what's really happening on the ground with those resources.

We filed something with the Court, sort of identifying some areas that we think could require potential conversation or clarification.  The supervisor has indicated she thinks it would be productive to maybe sit down and get down to more of the specifics of the County resources, because sometimes you don't really understand it, if you're just looking at the service, but that has been an open door and transparency policy that the County has had throughout.

And finally I'd like to just make clear there have been statements here about the County and the City allegedly not in compliance.  That is completely wrong.  The County is fully and completely in compliance with its settlement obligations.  It's not the subject of any motion before the Court.  It has met or exceeded all of its milestones and benchmarks in connection with an agreement with the plaintiffs and it has supported the City in connection with other

resources and beds.

With regards to the road map agreement, the County funded $300 million towards those beds and resources over the last five years.  And the agreement is just coming to an end, according to its terms, but the County is standing by all of its obligations under its agreement with the Alliance and it's standing by its agreements with the City, with regards to other resources.

So from our perspective, we want to be sure that there's no lack of clarity, there's no misstatements, there's no misunderstanding with regard to the County's role in connection with these proceedings today.

**THE COURT:**  So --

**SPECIAL MASTER MARTINEZ:**  Thank you, Your Honor. Just very quickly I wanted to give my Special Master report and I just wanted to clarify as well for the record regards to the road map beds that are -- the parties continue to speak about and I want to be very clear that the reason why the City of Los Angeles wanted to utilize those beds is because I am the one who suggested that they could possibly transfer those beds to the LA Alliance.  And I mentioned to the LA Alliance to have an open mind as well, as I mentioned to the Court, to have an open mind so the City of Los Angeles never wanted to double count or utilize those beds to take advantage of the situation.  I brought that idea up to them, because prior to them signing on

to the LA Alliance agreement, many of the prior Council members and certain Council members worked really hard to put up tiny homes and none of those beds, they were not going to get credit for, nor did they get creditor for for the LA Alliance agreement.

And so I was just trying to do my best to help those Council members out. And so I just suggested that idea. So not one Council member, not the City of Los Angeles was trying to say, hey, let me pull a fast one on the LA Alliance or the Court. I wanted to just state that for the record.

Number two, I wanted to also state for the record in regards to the County, as discussed in its points to the A&M and also during the learning session, and I think it's very important to highlight this point that when we talk about acuity levels and who's responsible for care and specifically in regards to mental health, I think it's imperative to understand that when we're dealing with service providers, with outreach workers, with the City of Los Angeles and cities period, who's responsible to sharing information or providing the appropriate information to these folks who are on the ground.

So if you anxiety, you have some form of mental health illness and you're not severely mentally ill, that's typically the high acuity, typically that is the issues and concerns of the County. You go ahead and submit that, you get

**101**

help from the County.  But if you don't have high severe mental health issues, typically you have to go through a health managed care system.  Well guess what, folks, a lot of these outreach workers on the ground don't know that.

So they're trying to go through the system and they never are able to get the folks on the ground help.  And these are just going into the abyss, but no one is telling these outreach workers what they need to do to give these basic folks care.

And so someone, and I don't know who that is, if it's the County, if it's training, who is supposed to help the City of Los Angeles or City or LAHSA to help these outreach workers, navigators or whomever, the appropriate training that if someone doesn't have the acuity level that the County's responsible for that's under the 1 to 5 or 5 to 6, whatever the levels are, I don't know specifically, if the County's not responsible for if they have to go through a -- through the managed care MediCal, this is who you need to communicate with. But unfortunately that is not happening in the system right now and during our learning session that we had, we heard that time and time and -- from the various providers and the outreach workers.

But we also heard it from the County as well that that is not their responsibility.  And sure 'nuf, it's not, the County is responsible for a certain segment of the population

and I respect that, but at what point in time is the City of Los Angeles or anyone else that is part of this homeless response system going to tell these outreach workers who are they supposed to call to get the appropriate care for the people that they're helping out on the ground.  And unfortunately they know what that process looks like.

And so what I'm going to ask is that it's -- we have a process, whether it's the County or someone else, if you all can please share that with the City of Los Angeles or with myself so that we can help these outreach workers, that would be greatly appreciated, thank you.

**THE COURT:**  Jay.

**SPECIAL MASTER GANDHI:**  I just want to make a final comment as we prepare, as you all prepare for the May hearing, I don't want to lose sight of some of the first principles and the first principles are that the City will always confront major challenges, including as a victim of the fire that burned my home and destroyed my life.

So the City will confront challenges, there's no exception in the settlement agreement, however, for that.  The City has an obligation to create beds.  Beds are not created. Agreement is breached or appears to be breached.  And so in May, let's focus on the remedies or potential remedies. Understood, Alliance?

**MR. UMHOFER:**  Yes, Your Honor.

THE COURT: And while we're sharing, we're all undertaking this tragedy, my daughter's home burned also. Jay's home burned. I don't think there's any of us, Mayor, who don't want this to be a priority. But at some point the emergency ends and if the City was going bankrupt or close to it before the fire ever occurred.

Folks, you've got to solve this or if not, the Court is going to step in and that's why I'm saying, and LA Alliance, you're not coming to me with just a broad request for a receivership, you better be very specific in terms of what you're asking of the Court, because if I act, I need to number one know that I've got the power to do so, and it's just not an action by the Court that's taken up to the Circuit that overturns me.

Now, I did that one time before and I'll be very specific with you. Transparent. I had a pretty good idea when I told Garcetti, Mayor Garcetti to put a billion dollars in jail or into a trust fund, and I had a pretty good idea when I said clear skid row in 180 days I was going to get reversed. But I'd reached the level of there was no place else to go. Nothing was happening.

Now, what nobody knows is I actually had 600 beds in the audience. I could have cleared most of the women with housing in skid row, but I'll be transparent to you, I didn't know what to do with all the guys out there.

**104**

What did I ask for in that opinion?  I asked for an accounting, if you recall and I asked for an audit, both forensically and I asked for a performance audit, didn't I?  We have wasted, rather the Circuit I will never disagree with, we've wasted three years since that opinion, waiting for an audit to take place.  And, Mayor, only because you volunteered this are we here, or we would still be going through 30 years of non-transparency.  That cannot happen.

So unless the two of you can work this out in some way the Court's going to have to.  And I'm not sure what to do about that, because then I am intruding.  I've got a great chance of a reversal, I understand that.  But if I don't, then I'm complicit, I'm sitting here doing nothing and nobody's going to question you by the way except the Court.  It's not in your interest as politicians to question this.  And I mean that in good faith.

Now, you've done a lot of soul searching, I know that.  You're reputable people.  This mess has fallen on you. I get it.  But I am your worst nightmare like I told Garcetti. And unfortunately, that's the position I'm going to take very aggressively.  Okay?  Please work this out for me.

If you two can't agree, then that starts to gain some credibility and so does Liz and you're forcing me into a position where I will act.

All right.  Now, I think we should excuse the folks

with this.  Yeah.  The remainder is the increased reporting concerning encampment reductions and the specific metrics necessary by the City and I said that I would leave this for oral argument today.  I've already decided that encampment reduction is not cleaning.  Because there, the person has cleaning, comes right back to the same location, that was never envisioned.  This is meaningful encampment reduction.

And the next thing is, I think the Mayor is in a hard space and that is, you're struggling right now with, well I cleaned the encampment, I really don't want to use 4118 or criminal wise as Shayla is concerned, by the same token the folks are right back there, they're right back in the same location.  Now, that's cleaned up in MacArthur Park substantially, okay.  A lot of places you've been successful.  By the same token, go over to Franklin, they just moved up the street, okay.

And so every time you clean up, that leaves the public with a situation well, this was supposed to be meaningful because there's a school or a park and lastly I'll toss this out to you.  We've focused so much on the homeless, the 75,000, haven't we?  We keep talking about homeless.  No.  It's the person also who can't take their kid to the park.

If the person down in Marqueece's district, which is one of the most affluent districts, if they can't fly to Europe, they've got to use their parks, their schools, their

streets.  And so it's not the homeless, it's the whole city of maybe 200, you know, 2 million people, well we've got 4 million here, trust me, but 2 million people who may be earning 18 to $25 an hour.  And when we fail here, we talk about homeless for 75,000, what we're really talking about all these millions of people who just can't use their parks.  That's what I'm also really concerned about because I'm so focused on the 75,000 that we can't lose -- your district especially, the (indisc.) district and the 14th and your district, because you're not the west side of LA.  And I'm not saying the west is all that can get on a plane, but they're going to do a lot better than your constituents and we can't use the park, who's suffering?  It's not only the homeless, it's about 2 million out there or more who are between 18 and $25 an hour.  There's something terribly wrong with that.

And that's why I'm telling you I need two more years or I've got to do something because I can't see the City swept clean, even though the Mayor doesn't say that that will happen, I believe you, but we did it with the Academy Awards.  And I can't see people sit three or four years or three years before the Olympic Games with our present situation all of a sudden on the world stage, we're clean for two weeks.  That doesn't make sense to me.  And it doesn't make sense to your constituents.

Yeah, what is -- Michelle, ask the question.

**SPECIAL MASTER MARTINEZ:**  So was there communication

with the parties as moving -- when we move forward as it pertains to the increased reporting on encampment reductions and the specific metrics?

MR. MARCUS:  Scott Marcus on behalf of the City.  No, Your Honor, we understood that we would be having argument about the encampment reductions --

SPECIAL MASTER MARTINEZ:  That's today.

MR. MARCUS:  -- today.  That being said though, as the Court indicated, I don't know if the electeds could possibly be excused before the lawyers --

THE COURT:  Yeah, I don't think --

MR. MARCUS:  -- do their business.

THE COURT:  -- the elected officials need to be here for this.  This is attorney.  So, folks, let me first of all recognize you on the record and thank you.  These are tough discussions.  These are really hard transparent discussions.  Mayor, I want to thank you.  Thank you.

Auditor controller Mejia, I want to thank you.  Thank you.  Chairman of the Board, thank you.  And by the way, thank Lindsey Horvath on the way back there for being so candid one time and saying, LAHSA is us, we all knew it, she stood up in court and said LAHSA is us and we are LAHSA.  Just thank her on her prior statement, okay.  You won't know what it's about.

MS. RAFFERTY:  Really briefly, Judge.

THE COURT:  Yeah, hold on.

**108**

**MS. RAFFERTY:** There's been a lot of requests to work with us if there's something we misinterpreted --

**THE COURT:** Yeah, what about billable hours?  Since we're going to run up the bill and we can't agree, hold on.

**MS. RAFFERTY:** It's now pro bono.

**THE COURT:** Okay.  Team, listen to this.  This is going to cost you, Mayor.  Going to cost you.

**MS. RAFFERTY:** No, we're more than willing to work with all the parties if there's something that was interpreted wrong.

**UNIDENTIFIED:** Oh, Palisades (phonetic).

**MS. RAFFERTY:** But I do have to make one comment about Ms. Meyers.  We understand the difference between spreadsheets and outcomes, but if you do not understand how much money comes in and where the money's going and how it hits the street, you'll be able to measure outcomes.

So we understand that, but you have to understand the dollars first, but that's -- but we're available to any of you who need to meet with.

**THE COURT:** All right.  We're going to take a brief recess.  No, we're taking a recess now.  We're going to get off the stand, we're going to come back in about 15 minutes.  You wanted to say something?

**UNIDENTIFIED:** Yeah, I just wanted to make sure --

**THE COURT:** I can't hear you.

**(Multiple voices (indisc.)**

Absolutely.  And remember, what I'm requesting -- 15 minutes, folks.

**(Recessed at 1:28 p.m.; reconvened at 1:46 p.m.)**

**THE COURT:**  We're back in session and this concerns the increased reporting on the encampment reductions and the metrics necessary for production by the City.  And I left that for oral argument today, counsel, so who'd like to begin?

**MR. MARCUS:**  Thank you, Your Honor, Scott Marcus on behalf of the City.

Your Honor, the City read the order, Docket 874 that the Court issued I believe earlier this week, that the City may not report the care and Care Plus metrics, tents, makeshift shelters, cars and RVs, but could only report reductions when the persons associated with those tents, shelters, cars and RVs were given shelter.

One, grants relief that was not requested in the motion or even in the reply; and two, ignores the stipulation entered into between the parties that was approved by this Court that required the City to use the very metrics.

These are actually metrics that the Alliance proposed.  The Alliance proposed that the City, for its encampment reduction metrics count the number of tents, make shift shelters, cars and RVs that were removed.  That was Alliance's proposal.  The City agreed to it.  The Court blessed

EXCEPTIONAL REPORTING SERVICES, INC

it.

The stipulation did not include a specific number of people experiencing homelessness who must receive shelter in connection with those reductions.  Nor did it include the additional reporting that the Alliance is now requesting because neither of those are required under the settlement agreement.

As I stated, the City actually initially proposed when we were discussing about milestones, the City initially proposed encampment locations and numbers of people, as that term is colloquially used, and in fact, the City started out those negotiations using LAHSA's definition of encampments. That is what we proposed.  And that proposal noted that the involvement of care and Care Plus in encampment reductions and noted that the Care Plus operations include the homeless engagement teams, that the City funds through LAHSA, that provide outreach and offers of shelter.

This was all contained in some of the documents that were put forward by the Alliance, both in the old motion for sanctions from a year ago, Docket 668-1, as well as the new motion to compel 863-6.

That was the City's initial proposal.  The Alliance came back and said, no, we have a different proposal, we have a different metric, we want you to count the tents, make shift shelters and cars and RVs that you pull off the city streets.

**111**

It was clear, Your Honor, from a hearing a year ago that that is what the County -- excuse me, that is what the Alliance was requesting the City count, it's what the City was agreeing to count. This is the March 7th, 2024 hearing. It's docketed at 681.

And throughout that, it is clear that these were the metrics that everyone was agreeing to. There was no discussion and no requirement of tying it to a specific number of people being outreached, or a specific number of people being housed, because those are not required under the settlement agreement.

And, in fact, this Court made a point of stating that we all needed to understand that this was an agreement that in the future about whether this is an agreement or not, this is an agreement period. That was the Court on page 95, lines 11 through 17 of docket 681.

So for the last year, the City has reported the metrics that the Alliance asked us to report, that everyone knew we would be reporting. If I could go back, I also want to point out, Your Honor, for the Alliance to claim that none of these metrics are tied to outreach is incorrect. These metrics are often tied to outreach, are often tied to offers of shelter, as I indicated, the Care Plus operations are led by the homeless engagement teams that the City funds through LAHSA. And, in fact, the A&M audit report acknowledges that these Care Plus engagements include outreach. This is at the

second amended draft report, Docket No. 870, I believe it's pages 39 and 102.

So what we have, Your Honor, is a motion by the Alliance asking to undo the stipulation we agreed to a year ago.  It's buyer's remorse.  They don't like the terms that they proposed, the terms that the City agreed to and the terms that the Court blessed.

The City has done for the last year exactly what we were asked to do.  We reported the metrics as requested by the Alliance.  They now want to change those, that's fine.  But the City can't be faulted for doing what they asked us to do, what the Court told us to do and what the City agreed to do.

If, in fact, the Court rules that the metrics being used by the City are inappropriate for whatever reason, then we have to come up with new metrics.  Either we need to come up with a new number, if the Court is going to require that any tent, make shift shelter, car or RV taken off the road, or off the public way, has to include an offer of shelter for it to be included as an encampment reduction metric, we'll have to come up with a new number because the 9,800 was not based on that additional requirement that is not in the settlement agreement, or we'll have to come up with a new metric entirely, maybe going back to the original metric proposed by the City, based on the LAHSA definition of encampments.

**THE COURT:**  All right.  Thank you.  Who would like to

be the next?  Myra, did you want to --

MS. MITCHELL:  No, Your Honor, the County does not have a position on this motion.

THE COURT:  I understand.  But I just wanted to make sure out of courtesy.  Shayla?

MS. MITCHELL:  I mean, Your Honor, yes, we'd like to be heard on this issue obviously.  I don't know if you want to hear from the Alliance first, but happy to weigh in as well.

THE COURT:  Your choice.

MS. MITCHELL:  I'm here, Your Honor, I might as well talk if that's okay with the Court.

THE COURT:  Thank you.

MS. MITCHELL:  So at no point has the Alliance ever agreed that care and Care Plus cleanings could or should be counted, that in fact, just a few months after we entered into this agreement which is a stipulated sanction, not voluntary, I think it was in March or April of last year we got word that the City was using care or Care Plus clean ups to include these metrics and we contacted the City I think it was in August of last year, specifically asking for the locations, because we were concerned that care and Care Plus was being utilized.  And that was never the anticipated goal.  Reductions are permanent in nature as the Court indicated and as we briefed.  So at no point did we indicate that was okay.

The reason that the metrics for tents, RVs, vehicles

and makeshift shelters were used is because that's what LAHSA was counting during the PIC count.  So when we were trying to identify numbers and metrics to figure out exactly what numbers we could use, that came up as something LAHSA specifically counted during the point in time count, so it was a number.  Because otherwise, there was no other estimation of how many quote/unquote encampments are within the City of Los Angeles.

The definition, the LAHSA definition the City was coming up with was very vague.  It was like somewhere between 50 and a hundred people and because it was so vague we wanted more specific metrics, using the numbers that were included in the PIC count.  That has no -- at no point did we ever agree that care and Care Plus numbers should be used, that basic city clean ups could be used, reductions to us always had the simple meaning as we indicated in our briefing and as the Court indicated of a permanent reduction and that is what we believed we were agreeing to and that is what we believe that the City was reporting and should be reporting.

So I think, and I don't think that the Court in its order indicated that it has to be tied to a specific order, you know, specific offer of housing, but the order says that the City is only to report encampment reductions that have a more permanent meaning, such that people are moved off of the street.  And I think that's the point, is that it needs to have a more permanent meaning, not that there has to be a one to one

tie, but the ultimate goal as we made clear this morning has always been a reduction in unsheltered homelessness on the street.  And that's why these shelters were intended to go up and the people were intended to move into those shelters.

And so reporting care and Care Plus clean ups has never been part of our goal, that's never something that was raised during negotiations.  And so we obviously agree with the Court, agree with the plaintiffs, that they need to be reporting more permanent reductions.

Now, if we need to separately meet and confer about how they're going to do that, I'm happy to do that so that we can make sure that we're getting appropriate metrics.  But I don't think that anything involved in the briefing or in the Court's order would require any type of new negotiation from the numbers, because I think we reached in the agreement, as to the stipulated sanction last year, the agreement remains, Your Honor.

If the Court has additional questions, I'm happy to answer them or I'm happy to turn the lectern over to my colleague.

**THE COURT:**  Okay.

**MS. MITCHELL:**  Thank you.

**MS. MYERS:**  Your Honor, as intervenors who are not party to the settlement agreement, obviously what we are only party to is what is presented to the Court and what the Court

rules on. And at this point, we don't think there's actually an agreement that the Court has ruled on related to this quote encampment resolutions that has been approved by the Court.

And the reason why we keep going back to this is that our clients were allowed to intervene in this case because they represent unhoused folks, who are subject to the City's conduct related to their tents, makeshift encampments and RVs.

**THE COURT:** Uh-huh.

**MS. MYERS:** The parties, the LA Alliance and representing the business community, the City of Los Angeles are having a fight about whether or not the rules are about housing folks or throwing away their property for purposes of counting towards encampment resolutions.

Neither the LA Alliance or the City of Los Angeles put forth a plan for this Court to institute as an order that would have given the intervenors the opportunity to weigh in for purposes of due process related to that order.

We keep going back to that, Your Honor, because the suggestion that there is an enforceable order that would require and incentivize the City to discard 10,000 encampments, makeshift encampments which are made up of people's belongings, tents and RVs is incredibly problematic.

We do not believe that this Court should be incentivizing or rewarding or insisting that the City of Los Angeles is destroying unhoused people's belongings. To

**117**

Ms. Mitchell's point and to Your Honor's point in the proposed order -- in the order that you issued related to this, if the goal is about bringing people in, actually reducing encampments, then Your Honor's interpretation of the settlement agreement that the two parties reached, but Your Honor has never weighed in makes sense.

But if the Court is inclined to rule that this has to do with disposing of tents or disposing of RVs or disposing of people's encampments, then we would ask for the opportunity to be heard on that because it really does implicate people's interests that are not present in this courtroom, except to the extent that the intervenors are part of this and the suggestion that the LA Alliance and the City of Los Angeles can negotiate an agreement about people's belongings is incredibly problematic.  Thank you, Your Honor.

**THE COURT:**  Thank you.  Mr. Marcus?

**MR. MARCUS:**  Thank you, Your Honor.  Just to address a couple of points raised by the Alliance.  They slipped in the word permanent and they did so in their documentation, their pleadings as well that the reductions that the Alliance meant were a more permanent reduction.  There is no requirement in the settlement agreement of a permanent reduction because it's very much outside the City's ability to control such a thing, as I think the Court has indicated earlier when we were talking about Inside Safe and trying to keep those encampment areas

**EXCEPTIONAL REPORTING SERVICES, INC**

**118**

from repopulating.

There's a lot of factors that go into that, that's largely out of the City's control, which is why the City didn't agree to any type of permanency of reduction in the settlement agreement and didn't do so in the stipulation as well.

The stipulation that the Alliance and the City entered to that was agreed to or blessed by this Court for the 9,800 number wasn't tied to that, any kind of permanence. It wasn't tied to specific offers of outreach or specific offers of shelter as the Court's order yesterday indicated it needs to be.

So that number, that agreement is now void if there are now additional elements that have to be considered to count it as a metric. So that agreement isn't still in existence, it does not remain. We have to come up with a new one if that's the way the Court wants to rule with respect to what metrics could be covered.

And I will -- I do have to give Ms. Myers a little bit of credit, because literally one year ago she said almost the same thing in objection to the Court agreeing to the stipulation that the Alliance and the City entered into because she noted, and this is at Docket 681, pages 78 through 80, that she noted that the stipulation was about taking property out of the public right of way, in her words, untied and untethered to offering shelter or bringing people inside.

Your Honor, we all knew what the City agreed to because it's based on the numbers and the metrics the Alliance asked us to agree to.  We shouldn't be faulted for doing what we all agreed we would be doing.  If the Court wants to change that metric, wants to impose a new metric on the City, of course we will follow that order, but we now need to meet and confer and come up with a new metric and a new number.

**THE COURT:**  All right.  Thank you.

**MS. MITCHELL:**  I mean, I think I will just address just a couple of points, Your Honor.  I think the word reduction necessarily means reduce, permanently reduce, yes, I agree that the word permanently was not in the stipulated sanction that we agreed to, but that is the plain meaning of the word as we cited and as the Court agreed to.

So I don't think there's no changing of an agreement here.  It's very specific that this has to be permanently reduced and that's what we negotiated for, so we believed we were getting.  And so I think at this point it's just an interpretation by the Court which is properly done.  And at that, I think we'll submit.  Thank you, Your Honor.

**THE COURT:**  Thank you.  Anybody else?

All right.  Let me take that under submission and think about that for a while.  Is there any other business before the Court today?

**MS. MYERS:**  Your Honor, I'd like to raise something.

**120**

THE COURT:  Please.

MS. MYERS:  I just want to raise this issue that I previously raised with the audit and the representation from the Los Angeles Police Department that they don't track information related to homelessness.  We work with a number of community organizations that get data.  One of those organizations, the Human Rights Watch, is to receive data from the Los Angeles Police Department, in response to a Public Records Act request that was able to quantify when arrests were done of people who were unhoused.

That's consistent with our understanding and I believe the press' understanding about how the LAPD has tracked data for a very long time related to people who are unhoused. 2018 and 2019 the LAPD released quarterly reports that specifically tracked the number of people who were arrested that were unhoused, the number of victims who were unhoused.

They released memoranda in 2018 and 2016 that specifically outlined how the LAPD would track homelessness and the housing status of people that were arrested as part of a broader push by the LAPD to provide transparency related to these issues.

I just received that data, Your Honor, from Human Rights Watch, and I'm raising that here, but I'm just very, very concerned about the City's representation about transparency related to this information and limitations.

Your Honor made a specific order to the City of Los Angeles for the audit to include specific points and the suggestion that the LAPD represented that that was not possible to the auditors is incredibly concerning to us.  We're happy to share that information, but I didn't want the Court proceeding to end without us being able to put that on the record.

THE COURT:  Thank you very much.  Anything further?

MR. MARCUS:  Your Honor, if I could just clarify that the Alliance's other motion, the motion for compliant -- motion to compel compliance at 863, that's being continued to the next May hearing; is that correct?

THE COURT:  Yes.

MR. MARCUS:  Thank you.

THE COURT:  Okay.  Anything else?

No, thank you very much.  Thank you for your courtesy today.

MS. MITCHELL:  Your Honor, I did just want to advise the Court that we will be briefing the receivership issue so that it's very clear and out there and it's something that people can respond to.

THE COURT:  Yeah.  I'm trying to unartfully say, if I'm going to be asked to consider something like, there's a huge difference between the word receivership which captures the public's imagination.  And actually something that is meaningful and I need to proceed, if I ever considered that or

**122**

monitoring, what that looks like.  And I need to be able to climb what I call an escalation letter, so that the legislative and executive branches always have a chance to go about their powers before a Court intercedes.  I should be the last entity interceding and that should only be because I truly find and feel that there's a necessity which you've argued and it climbs now to seven or eight plateauing, so be specific.  Because when you left me with the ordinary phrase sanctions, bankruptcy?  Number two, receivership.  Wow.

But number three, I don't intend to let go of you folks unless I have to, because I'm worried about what happens in 2028.  And so what you're both hearing is, I don't believe you.  I don't believe you that these streets aren't going to be swept clean.  You've already shown me that in the Academy Awards.  You folks out in skid row know it, I know it.  And you couldn't find a homeless person between here and the Academy Awards.  And if that's going to happen it makes me wonder why the common every day citizen, whether they're earning $18 an hour or, you know, $1,000 an hour, why we can't do that in the next two or three years or if we're just putting on a show for the world for two weeks.  Our citizens here are the folks that count over and above the Olympic Games and they deserve the right to have, you know, us resolve this problem.

That's the transparent concern I've got going and if I share that with you, number two, I really don't want the

**123**

Court interceding if I don't have to, but if I don't and this continues then I'm complicit.  I'm accepting this.  And for too long I think we've had many mis-consent decrees, that have been nice pieces of paper that might have captured some article in the press turned out to be meaningless.

I talk to my colleagues about some of these consent decrees that we're entered into.  Well, at some point that has to end, this is too serious, okay.  So I really appreciate our elected officials being here today, don't you?  And I don't mean to denigrate the attorneys, but it's their call.  You're a wonderful advocate, you're a wonderful buffer for these folks, let them discuss between the auditor and the Mayor, how in the heck are we going to get an audit in the next 30 or 35 years with this going back and forth about what their authority is in the charter.  And any time the Mayor or the Council decides to sweep this, the public's going to be in a situation of non-transparency and non-accountability.  And maybe we got into this slow train wreck just because of that.  Okay?

So that's kind of my transparent position on that.  I don't know quite frankly where I'm going with it then.  I'm waiting.  I'm just praying and hoping that these folks over here who weren't part of the problem, they now are responsible for the problem.  Come up with something for the benefit of the public that we can all live with.

Okay.  All right.  Have a good day.

124

(Proceedings concluded at 2:08 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Signed

March 29, 2025

Dated

*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC