# Exhibit A



| | |
|---|---|
| Issue Date | June 8, 2007 |
| Audit Report Number | 2007-LA-1013 |

TO:         William Vasquez, Director, Los Angeles Office of Community Planning and Development, 9DD



FROM:      Joan S. Hobbs, Regional Inspector General for Audit, Region IX, 9DGA

SUBJECT:   The Los Angeles Homeless Services Authority, Los Angeles, California, Did Not Perform On-Site Fiscal Monitoring of Its Project Sponsors

# HIGHLIGHTS

## What We Audited and Why

We audited the Los Angeles Homeless Services Authority (Authority) in light of publicity, which alleged mismanagement and misuse of U.S. Department of Housing and Urban Development (HUD) funding.  Our audit objectives were (1) to determine whether the Authority adequately monitored its project sponsors to ensure compliance with HUD regulations and (2) to determine whether the project sponsors administered their Supportive Housing Program grants in compliance with grant agreements and other HUD program requirements.

## What We Found

The Authority did not perform on-site fiscal monitoring of its project sponsors during the past two years.  It also did not properly perform its 100 percent source documentation desk review for at least two of its project sponsors to ensure that cash match funding was eligible and supported.  Of the two project sponsors reviewed, one had applied ineligible expenses as cash match, while the other was unable to support its cash match due to a poor financial management system.  We attributed these deficiencies to the Authority's lack of capacity to comply with HUD requirements while under the management of the

former executive director.  As a result, the Authority failed to ensure that HUD grants were spent in accordance with requirements and that the effectiveness of the grant activities was fully maximized as intended by HUD.

## What We Recommend

We recommend that HUD require the Authority to comply with HUD's requirements regarding on-site fiscal monitoring of its project sponsors, reexamine its desk review procedures to ensure that reviews are performed to adequately monitor its project sponsors' cash match, reevaluate its current risk analysis matrix to better identify the more problematic project sponsors, and establish and implement written monitoring procedures.

## Auditee's Response

We provided our discussion draft report to the Authority on May 23, 2007, and held an exit conference on May 29, 2007.  The Authority agreed with our report findings.

The complete text of the auditee's response, along with our evaluation of that response, can be found in appendix A of this report.

# TABLE OF CONTENTS

Background and Objectives                                                                    4

Results of Audit
    Finding 1:  The Authority Did Not Perform On-Site Fiscal Monitoring of Its      6
    Supportive Housing Program Project Sponsors during the Past Two Years

Scope and Methodology                                                                       12

Internal Controls                                                                           13

Appendixes
    A.   Auditee Comments                                                               14
    B.   Criteria                                                                        15

# BACKGROUND AND OBJECTIVES

The Supportive Housing Program is authorized under Title IV of the McKinney-Vento Homeless Assistance Act (*United States Code* 11381-11389).  The program is designed to promote the development of supportive housing and services, including innovative approaches to assist homeless persons in the transition from homelessness, and to promote the provision of supportive housing for homeless persons to enable them to live as independently as possible.  Eligible activities include transitional housing, permanent housing for homeless persons with disabilities, innovative housing that meets the intermediate and long-term needs of homeless persons, and supportive services for homeless persons not provided in conjunction with supportive housing.

The Los Angeles Homeless Services Authority (Authority) was established in 1993 by a joint powers agreement between the City and County of Los Angeles (City/County) to coordinate services for homeless people in the area.  As a pass-through entity, the Authority's primary function is to administer and manage the distribution of federal funds it receives from the U.S. Department of Housing and Urban Development's (HUD) Supportive Housing Program, the City Housing Department, and the County Community Development Commission's distribution of Community Development Block Grant and Emergency Shelter Grant funds.

According to the Authority's own tracking system, there were 137 active grants totaling $40.6 million for the Supportive Housing Program as of January 2007.  The majority of the grants were subcontracted out to 60 community nonprofit agencies called project sponsors.  In addition to these grants, for the fiscal year 2006-2007, the City Housing Department awarded the Authority an estimated $9.2 million in Community Development Block Grant and $3.1 million in Emergency Shelter Grant funds, while the County Community Development Commission awarded approximately $285,000 in Community Development Block Grant and $1.3 million in Emergency Shelter Grant funds.

In July 2005, the City and County conducted a joint assessment of the Authority as a result of complaints from the Authority's project sponsors reporting significant delays in receiving payments for services.  In addition, City and County departments noted delays in contract execution and problems with the Authority's grant claiming process.  The purpose of the assessment was to provide an overview of the Authority's current fiscal problems and make specific recommendations to correct them.  The joint assessment reported four findings with seven recommendations, which the Authority's new management adequately addressed; corrective action is expected to be completed by June 30, 2007.

When we started our audit in January 2007, one of our initial objectives was to determine whether the allegations in recent newspaper articles regarding the mismanagement, misuse, and commingling of federal funds were accurate.  Specifically, the article stated that the Authority used $1.7 million in federal funds to bail out other programs by making improper transfers from federal funds to pay emergency bills when the proper funds were not accessible.  Based on our testing, we concluded that the Authority did not commingle or use HUD funds to pay for non-project-related expenses.  Project sponsor funds were adequately segregated in the Authority's

4

books and records and were paid directly to the project sponsor that made the initial drawdown request.  Further, during the City, County, and the Authority reconciliation of all project funds, the County auditor in charge of the assignment informed us that all funds, including HUD Supportive Housing Program grants, were accounted for and no misuse took place.  Based on our testing, we confirmed that this issue was resolved and focused the remainder of our audit on our two other objectives, which were (1) to determine whether the Authority adequately monitored its project sponsors to ensure compliance with HUD regulations and (2) to determine whether the project sponsors administered their Supportive Housing Program grants in compliance with grant agreements and other HUD program requirements.

# RESULTS OF AUDIT

## Finding 1: The Authority Did Not Perform On-Site Fiscal Monitoring of Its Supportive Housing Program Project Sponsors during the Past Two Years

The Authority did not perform on-site fiscal monitoring of its project sponsors during the past two years. It also did not properly perform its 100 percent source documentation desk review of at least two of its project sponsors' cash match funding to ensure that it was eligible and supported. Of the two project sponsors reviewed, one had applied ineligible expenses as cash match, while the other was unable to support its cash match due to a poor financial management system. We attributed these deficiencies to the Authority's lack of capacity to comply with HUD requirements while under the management of the former executive director. As a result, the Authority failed to ensure that HUD grants were spent in accordance with requirements and that the effectiveness of the grant activities was fully maximized as intended by HUD.

**The Authority Did Not Perform On-Site Fiscal Monitoring of its Project Sponsors as Required**

Contrary to 24 CFR [*Code of Federal Regulations*] 85.40(a) (see appendix B), the Authority did not perform on-site fiscal monitoring of its project sponsors during the past two years. Based on a sample, we selected the first two of the Authority's project sponsors that were awarded the most HUD Supportive Housing Program grant funds, A Community of Friends and Homes for Life Foundation (Foundation), and determined that they claimed ineligible and unsupported expenses as cash match, respectively.

Ineligible Cash Match

Office of Management and Budget Circular A-110, subpart C, section 23(a)(6), states that all contributions shall be accepted as part of the recipient's matching when such contributions are provided for in the approved budget when required by the federal awarding agency.

A Community of Friends operates 12 supportive services/operations and four construction/rehabilitation HUD Supportive Housing Program projects totaling $5.3 million. Our on-site review disclosed that A Community of Friends inappropriately applied expenses that were not listed in its technical submissions as eligible Supportive Housing Program-supportive services activities and not directly associated with the grant as cash match. We reviewed the invoices of three grants to verify that the cash match

6

requirements were met and identified material deficiencies with A Community of Friends' cash match application and documentation for all three grants.  Illustrated below are specific examples for each project:

- ❑ **CA16B300012 (Brandon Apartments)** – A Community of Friends claimed the expenses for the purchase and installation of security cameras for Brandon Apartments ($15,555) and Figueroa Court ($3,990) as cash match for the Brandon Apartments project.  Neither security cameras nor their installation are listed as eligible Supportive Housing Program-supportive service items on both Brandon Apartments' and Figueroa Court's technical submissions; therefore, those expenses are ineligible for cash match.

- ❑ **CA16B400002 (California Hotel)** – A Community of Friends applied $460 of $1,150 in mileage and cell phone allowances as cash match to the California Hotel project.  The expense report for the mileage and cell phone allowance did not indicate that charges were project related.  The technical submission did not list mileage or personal cell phone allowances as approved supportive service expenses.  For costs to be eligible as match, they must be approved supportive service items that benefit the California Hotel project.

- ❑ **CA16B500003 (Figueroa Court)** – A Community of Friends applied a portion of the salary made by a residential services coordinator to the Figueroa Court project as cash match.  For the period March 1 through October 31, 2006, the coordinator for outreach earned a salary of $27,388, of which $3,042 (or 11.1 percent) was applied as cash match to the November 2006 drawdown for Figueroa Court.  However, the timesheets showed no allocation of this employee's work toward the Figueroa Court project.  Instead, it showed that his time was allocated to other projects, including Las Palomas, another A Community of Friends project receiving Supportive Housing Program funding.

We are conducting a separate audit of A Community of Friends to determine the extent of the cash match deficiencies.  If the Authority had conducted on-site fiscal monitoring as required, it may have detected the problem, and taken corrective actions.

We also noted that the Authority's desk review practices were inadequate to detect a problem with the cash match.  The director of finance and accounting at A Community of Friends informed us that the cash match detail documentation for the entire grant year was not requested as part of the drawdown request package until January 30, 2007, shortly after we began our audit of the Authority.  A Community of Friends typically submitted only a summary document to show that it met its cash match (as shown below) but never any supporting documentation to further explain the line items of the match.  During its desk review, it is evident that the Authority only verified that the 25 percent match was met and did not explore in further detail whether the expenses were eligible under the technical submission, indicating a deficiency in its review process.

```
                        ACOF
            Cash Match - SHP- BRANDON
            Contract Period: 12/05-11/06


                                ACOF-pd
    Month          Security     expenses         Total
    12/05        $    1,820    $      -        $    1,820
    01/06        $    1,820         1,293           3,113
    02/06        $    1,820           361           2,181
    03/06        $   (2,460)          791          (1,669)
    04/06
    05/06
    06/06
    07/06
    08/06
    09/06
    10/06
    11/06


                 $    3,000    $    2,445     $    5,445
```

Unsupported Cash Match

24, CFR [*Code of Federal Regulations*] 85.20(b)(2) requires grantees and subgrantees to maintain records that are verifiable and adequately identify the source and application of funds for financially assisted activities. Office of Management and Budget Circular A-110, subpart C, requires all cash match contributions to be verifiable from the recipient's records.

The Foundation operates seven supportive services and two construction/rehabilitation HUD Supportive Housing Program grants totaling $2.5 million. We could not track or determine the source of the cash match claimed due to the Foundation's outdated financial accounting system, use of a single checking account which commingled all grant funds and rental income received, and the lack of a reasonable allocation base to distribute expenses among multisource-funded grants. When we spoke with the accounting and asset manager, who prepares the voucher requests submitted to the Authority for review along with the supporting documentation, he could not provide us with a more detailed source of the claimed cash match funds; therefore, those funds are unsupported. We do not know the extent of the unsupported cash match; however, it appears to be a systemic problem shared among all of the Foundation's Supportive Housing Program grants. We will conduct a separate review of the Foundation to determine the extent of the deficiencies.

Because the Authority did not carry out its responsibility of performing an on-site fiscal monitoring review of the Foundation, it was not aware of the state of the Foundation's financial accounting system, operation under a single checking account, and lack of an allocation base. Further, the accounting and asset manager informed us that the Authority did not request detailed sources of cash match until after we began our audit, similar to the situation at A Community of Friends. He also stated that the Authority requested that information for only one of the grants (CA16B400051, Athena project), and it is probable that the remaining six grants are not being reviewed with the same scrutiny as the Athena project grant (CA16B400051). Before the Authority requested

8

additional information submitted by the Foundation for the Athena project, the Foundation would only submit a spreadsheet (shown below) without any detailed information to verify its source of funds.  Clearly, the Authority did not properly fulfill its desk review responsibilities relating to cash match.

| CURRENT SALARY | CASH % MATCH | SALARY % MATCH | FICA + FUTA % MATCH | SUI % MATCH | W/C % MATCH | HEALTH % MATCH | TOTAL MATCH |
|---|---|---|---|---|---|---|---|
| $ 1,280 | 15.0% | $ 192 | N/A | N/A | N/A | N/A | |
| $ 6,469 | 2.5% | $ 162 | N/A | N/A | N/A | N/A | |
| $ 4,025 | 4.9% | $ 197 | $ 17 | $ 0 | $ 22 | $ 8 | |
| $ 3,141 | 0.0% | $ - | N/A | N/A | N/A | N/A | |
| $ 3,833 | 4.1% | $ 157 | $ 6 | $ 0 | $ 17 | $ 7 | |
| $ 6,067 | 41.0% | $ 2,487 | N/A | N/A | N/A | N/A | |
| $ 552 | 57.0% | $ 315 | $ 27 | $ 5 | $ 35 | N/A | |
| $ 759 | 72.0% | $ 546 | $ 46 | $ 6 | $ 60 | N/A | |
| $ 2,710 | 10.0% | $ 271 | N/A | N/A | N/A | N/A | |
| $ 1,080 | 54.0% | $ 583 | $ 50 | $ 5 | $ 64 | $ 89 | |
| $ 3,605 | 14.4% | $ 519 | $ 44 | $ 1 | $ 57 | $ 24 | |
| $ 2,760 | 62.0% | $ 1,711 | $ 145 | $ 5 | $ 188 | $ 102 | |
| | | $ 7,141 | $ 336 | $ 23 | $ 443 | $ 230 | $ 8,173 |
| $ 2,466 | 91.80% | $ 2,264 | N/A | N/A | N/A | N/A | |
| $ 2,520 | 92.00% | $ 2,318 | N/A | N/A | N/A | N/A | |
| $ 2,466 | 92.30% | $ 2,276 | N/A | N/A | N/A | N/A | |
| $ 2,352 | 2.00% | $ 47 | N/A | N/A | N/A | N/A | |
| | | $ 6,905 | $ - | $ - | $ - | $ - | $ 6,905 |

$ 15,079  Total Cash Match for the Month

We also noted that in an audit of another Authority project sponsor, the Institute of Urban Research and Development (Institute) (audit report number 2006-LA-1015) issued in July 2006, we found, among other deficiencies, that the Institute could not document that it provided $181,020 in required cash match funds.  Consequently, we recommended that the Authority ensure that it had adequate monitoring procedures in place to monitor its grant activities to identify problems in a more timely manner.

With the exception of not conducting on-site program monitoring in 2005, the Authority typically monitored each project sponsor every year.  However, it failed to perform on-site fiscal monitoring of its project sponsors during the past two years (2005 and 2006) and based on our review, it did not properly conduct its 100 percent desk review of cash match claimed by project sponsors.  The chief operating officer informed us that monitoring was planned for the end of March 2007, but we had not been able to confirm that information at the time of this report.  The chief operating officer attributed the Authority's failure to perform fiscal on-site monitoring to the lack of stable leadership within the finance department and lack of experienced staff to carry out the monitoring of its project sponsors.  Although those are contributing factors, it is clear that the Authority, under the management of the former executive director, ignored and lacked the capacity to comply with HUD requirements by not taking the initiative to properly remedy the situation when first presented in the audit of the Institute.

Inadequate Risk Analysis Matrix

The Authority did not have written monitoring (desk and on-site) procedures.  However, it designed a risk analysis matrix to provide an objective assessment to identify the

project sponsors most likely at risk for noncompliance with contractual and federal regulations. The assigned risk rating allows the fiscal staff to prioritize those projects most in need of formal monitoring. The rating is based on the assessment of five elements: agency capacity, record retention, submission of fiscal documentation, past monitoring, and recent problems. Scoring a "high" or "medium" will result in an annual monitoring of the project sponsor, while a "low" score will be monitored less frequently, perhaps every two years. For fiscal year 2006-2007, only 5 of 60 project sponsors scored a "high" level. A Community of Friends and the Foundation scored a "low." However, based on the results of our on-site review, A Community of Friends and the Foundation should have scored at least a "medium" given the gravity of the cash match issue identified. The disparity can be attributed to the design of the Authority's risk analysis matrix, which did not detect problem indicators for cash match by individual grants. Rather, the risk is calculated by taking the average of all grants received by project sponsor. By not including cash match criteria on the matrix, the risk assessment matrix did not appropriately capture all risk elements related to aging compliance, resulting in an inaccurate risk assignment.

## Conclusion

The Authority did not perform on-site fiscal monitoring of its project sponsors during the past two years. It also did not adequately perform its desk review of at least two of its project sponsors' cash match supporting documentation. These violations occurred because the Authority, under the management of the former executive director, did not comply with HUD requirements. Consequently, the Authority failed to ensure that HUD grants were spent in accordance with requirements and that the effectiveness of the grant activities was fully maximized as intended by HUD.

10

**Recommendations**

We recommend that the director of the Los Angeles Office of Community Planning and Development require the Authority to

1A.    Comply with HUD's policies and procedures regarding on-site fiscal monitoring of its project sponsors.

1B.    Reexamine its desk review procedures to ensure that the reviews are performed to adequately monitor its project sponsors' cash match.

1C.    Revise its risk analysis matrix to better measure and evaluate the project sponsors it needs to more frequently monitor to ensure that federal awards are used for authorized purposes in compliance with laws, regulations, and provisions of contracts or grant agreements.

1D.    Establish and implement written monitoring procedures to ensure that grant funds are used in accordance with HUD requirements.

# SCOPE AND METHODOLOGY

We performed our audit work from January through April 2007 at the Authority and two of its project sponsors (A Community of Friends and the Foundation), all located in the Los Angeles, California, area.  Our audit generally covered the period December 2004 through January 2007. We expanded our scope when necessary.

To accomplish our audit objectives, we

- Reviewed applicable HUD regulations and Office of Management and Budget Circulars.

- Reviewed HUD's Los Angeles Office of Community Planning and Development grant files associated with Supportive Housing Program grants received by the Authority and interviewed appropriate personnel.

- Selected and reviewed two Supportive Housing Program sponsors due to the high dollar amounts of the grants associated with the Authority's program and noted a large number of cash match deficiencies with these sponsors during our review.  The total authorized amount awarded to A Community of Friends was $4.6 million and to the Foundation was $2.5 million.  The Authority had $40.6 million in active grants as of our audit.

- Obtained an understanding of the Authority's procedures, including its controls to ensure that it properly administers its Supportive Housing Program.  We obtained an understanding of A Community of Friends' and the Foundation's operations and internal controls.

- Interviewed Authority, A Community of Friends, and Foundation management and staff to acquire an understanding of the Authority and its relationship with its project sponsors, along with the procedures that are currently in place.

- Performed site reviews of two of the Authority's project sponsors to determine whether they were adequately monitored and understood the requirements of the grant agreement and other regulations and, most importantly, whether they followed those requirements.

- Reviewed project sponsors' payroll data, cost eligibility, and cash match accounts.

- Reviewed a sample of A Community of Friends' client files to verify homeless eligibility and determine the nature and extent of supportive services provided.

- Reviewed the City and County joint assessment to determine whether it identified any findings or concerns that pertain to the scope of our survey work.

We performed our review in accordance with generally accepted government auditing standards.

12

# INTERNAL CONTROLS

Internal control is an integral component of an organization's management that provides reasonable assurance that the following objectives are being achieved:

- Effectiveness and efficiency of operations,
- Reliability of financial reporting, and
- Compliance with applicable laws and regulations.

Internal controls relate to management's plans, methods, and procedures used to meet its mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations. They include the systems for measuring, reporting, and monitoring program performance.

## Relevant Internal Controls

We determined the following internal controls were relevant to our audit objectives:

- Policies and procedures that management has implemented to ensure accurate, current, and complete disclosure of financial results.

- Policies and procedures that management has implemented to reasonably ensure that its Supportive Housing Program grants are carried out in accordance with applicable laws and regulations.

We assessed the relevant controls identified above.

A significant weakness exists if management controls do not provide reasonable assurance that the process for planning, organizing, directing, and controlling program operations will meet the organization's objectives.

## Significant Weaknesses

Based on our review, we believe the following item is a significant weakness:

- The Authority did not have sufficient controls in place to ensure that its Supportive Housing Program grants were monitored in accordance with applicable laws and regulations (finding 1).

13

# APPENDIXES

## Appendix A

# AUDITEE COMMENTS AND OIG'S EVALUATION

**Ref to OIG Evaluation**                    **Auditee Comments**

**Comment 1**



## Appendix B

# CRITERIA

A. **24 CFR [*Code of Federal Regulations*] 85.40(a)** states that grantees are responsible for managing the day-to-day operations of grant and subgrant activities.  Grantees must monitor grant- and subgrant-supported activities to assure compliance with applicable federal requirements and that performance goals are being achieved.  Grantee monitoring must cover each program, function, or activity.

B. **Office of Management and Budget Circular A-133, Audits of States, Local Governments, and Nonprofit Organizations, subpart D, section 400(d)**, states:  "A pass-through entity shall perform the following for the federal awards it makes:  …(2) advise subrecipients of requirements imposed on them by the federal laws, regulations, and the provisions of contracts or grant agreements as well as any supplemental requirements imposed by the pass-through entity; (3) Monitor the activities of subrecipients as necessary to ensure that federal awards are used for authorized purposes in compliance with laws, regulations, and the provisions of contracts or grant agreements, and that performance goals are achieved."

C. **24 CFR [*Code of Federal Regulations*] 85.20(a)(2)** states that fiscal control and accounting procedures of the state, as well as its subgrantees and cost-type contractors, must be sufficient to permit the tracing of funds to a level of expenditures adequate to establish that such funds have not been used in violation of the restrictions and prohibitions of applicable statutes.  Paragraph (b)(2) states that the financial management system of grantees and subgrantees must meet the following standards:  grantees and subgrantees must maintain records which adequately identify the source and application of funds provided for financially assisted activities.

D. **24 CFR [*Code of Federal Regulations*] 85.24(b)(6)** states that costs counting toward satisfying a cost sharing or matching requirement must be verifiable from the records of grantees and subgrantees.

E. **Office of Management and Budget Circular A-110, Uniform Administration Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Nonprofit Organizations, subpart C, section 23(a),** states that all contributions, including cash and third party in-kind, shall be accepted as part of the recipient's cost sharing or matching when such contributions meet all the following criteria:

(1) Are verifiable from the recipient's records;
(2) Are not included as contributions for any other federally assisted project or program;
(3) Are necessary and reasonable for proper and efficient accomplishment of project or program objectives;

(4) Are allowable under the applicable cost principles;
(5) Are not paid by the federal government under another award, except where authorized by federal statute to be used for cost sharing or matching;
(6) Are provided for in the approved budget when required by federal awarding agency; and
(7) Conform to other provisions of this circular, as applicable.

**Subpart C, section (21)(b),** states that a grant recipient's financial management system shall provide for the following:

- Accurate, current, and complete disclosure of the financial results of each federally sponsored project or program in accordance with the reporting requirements set forth in section C.52. If a federal reporting agency requires reporting on an accrual basis from a recipient that maintains its records on other than an accrual basis, the recipient shall not be required to establish an accrual accounting system. These recipients may develop such accrual data for their reports on the basis of an analysis of the documentation on hand.
- Records that identify adequately the source and application of funds for federally sponsored activities. These records shall contain information pertaining to federal awards, authorizations, obligations, unobligated balances, assets, outlays, income, and interest.
- Effective control over and accountability for all funds, property, and other assets. Recipients shall adequately safeguard all such assets and assure that they are used solely for authorized purposes.
- Comparison of outlays with budget amounts for each award. Whenever appropriate, financial information should be related to performance and unit cost data.
- Written procedures to minimize the time elapsing between the transfer of funds to the recipient from the U.S Treasury and the issuance or redemption of checks, warrants, or payments by other means for program purposes by the recipient.
- Written procedures for determining the reasonableness, allocability, and allowability of costs in accordance with the provisions of the applicable federal cost principles and the terms and conditions of the award.
- Accounting records including cost accounting records that are supported by source documentation.