# Exhibit D



# Los Angeles Homeless Services Authority
# Los Angeles, CA

## Continuum of Care Program

**Office of Audit**
**Los Angeles, CA**

**Audit Report Number:  2022-LA-1001**
**January 20, 2022**

**OFFICE OF INSPECTOR GENERAL**
U.S. Department of Housing and Urban Development

**To:**        Rufus Washington, Director, Los Angeles Office of Community Planning and Development, 9DD

              *//signed//*
**From:**      Kilah S. White, Assistant Inspector General for Audit, GA

**Subject:**   The Los Angeles Homeless Services Authority, Los Angeles, CA, Did Not Always Administer Its Continuum of Care Program in Accordance With HUD Requirements

Attached is the U.S. Department of Housing and Urban Development (HUD), Office of Inspector General's (OIG) final results of our review of Los Angeles Homeless Services Authority's Continuum of Care Program.

HUD Handbook 2000.06, REV-4, sets specific timeframes for management decisions on recommended corrective actions.  For each recommendation without a management decision, please respond and provide status reports in accordance with the HUD Handbook.  Please furnish us copies of any correspondence or directives issued because of the audit.

The Inspector General Act, Title 5 United States Code, appendix 8M, requires that OIG post its reports on the OIG website.  Accordingly, this report will be posted at https://www.hudoig.gov.

If you have any questions or comments about this report, please do not hesitate to contact Audit Director, Tanya Schulze at 213-534-2471.



**OFFICE *of* INSPECTOR GENERAL**

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

# *Highlights*

**Audit Report Number:  2022-LA-1001**
**Date:  January 20, 2022**

The Los Angeles Homeless Services Authority, Los Angeles, CA, Did Not Always Administer Its Continuum of Care Program in Accordance With HUD Requirements

## What We Audited and Why

We audited the Los Angeles Homeless Services Authority's Continuum of Care (CoC) program.  The audit was initiated because of the homelessness crisis in the City of Los Angeles, which has the highest number of unsheltered people in the United States.  In addition, the Los Angeles city controller issued a report in 2019, criticizing the Authority for falling short of City of Los Angeles homeless outreach goals.  (See Background and Objectives.)  Our audit objectives were to determine whether the Authority met the goals and objectives of housing and helping the homeless become self-sufficient through its CoC program and administered the program in accordance with HUD requirements.

## What We Found

The Authority did not fully meet the goals and objectives of the program and did not always follow program requirements.  Specifically, it (1) did not use $3.5 million in CoC grant awards and left the funds to expire, (2) did not support Homeless Management Information System and planning grant costs, and (3) did not submit timely annual performance reports (APR).  As a result, the unused CoC funds represent a missed opportunity to meet the program's goals of assisting the homeless, the U.S. Department of Housing and Urban Development (HUD) does not have assurance $879,847 in salary and rent costs were for the CoC grants, and CoC funds may have unnecessarily sat idle and unavailable for future awards.

## What We Recommend

We recommend that the Director of HUD's Los Angeles Office of Community Planning and Development require the Authority to (1) develop and implement policies and procedures to ensure that grant agreements are executed in a timely manner and effective monitoring is performed to prevent similar occurrences of grant funds going unused, (2) support payroll and rent costs or repay its CoC grants $879,847 from non-Federal funds, and (3) develop policies and procedures to ensure APRs are submitted in a timely manner and personnel are routinely trained on the grant closeout process.

For more information, visit www.hudoig.gov or contact
Tanya Schulze at (213) 534-2471 or tschulze@hudoig.gov.

# Table of Contents

**Background and Objectives** ................................................................................3

**Results of Audit** ..............................................................................................5

    **Finding 1:  The Authority Did Not Use All of Its Awarded CoC Grant Funds** ......... 5

    **Finding 2:  The Authority Did Not Support Salary and Rental Costs Charged to Its CoC HMIS and Planning Grants** ............................................................... 10

    **Finding 3:  The Authority Did Not Submit Annual Performance Reports in a Timely Manner** ............................................................................................ 14

**Scope and Methodology** ...................................................................................16

**Internal Controls** .............................................................................................19

**Appendixes** .....................................................................................................21

    **A.  Schedule of Questioned Costs and Funds To Be Put to Better Use** ...................... 21

    **B.  Auditee Comments and OIG's Evaluation** ............................................................ 22

    **C.  Criteria** .................................................................................................................... 38

    **D.  List of Reviewed Expired CoC Grants** .................................................................. 41

# Background and Objectives

The Continuum of Care (CoC) grant program was authorized under the McKinney-Vento Homeless Assistance Act, as amended by the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009.[1]  The CoC grant program (1) promotes communitywide commitment to the goal of ending homelessness; (2) provides funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to homeless individuals, families, and communities by homelessness; (3) promotes access to and effective use of mainstream programs by homeless individuals and families; and (4) optimizes self-sufficiency among individuals and families experiencing homelessness.

The Los Angeles Homeless Services Authority was formed by a joint powers agreement between the County and City of Los Angeles to coordinate services for homeless people in Los Angeles City and County.  The Authority is the lead agency in the Los Angeles Continuum of Care, the regional planning body that coordinates housing and services for homeless families and individuals in Los Angeles County.  The Authority coordinates and manages more than $300 million annually in Federal, State, County, and City funds for programs that provide shelter, housing, and services to people experiencing homelessness.  Since its inception in 1993, the Authority has primarily functioned as a "pass-through entity," administering and managing the distribution of Federal funds directly provided by the U.S. Department of Housing and Urban Development (HUD), mainly for the CoC program.  HUD awarded the Authority more than $149 million in CoC funding between 2016 and 2020.

| CoC awards | Amount |
|---|---|
| 2016 competition year | $27,916,004 |
| 2017 competition year | 21,835,358 |
| 2018 competition year | 28,768,178 |
| 2019 competition year | 33,288,892 |
| 2020 competition year | 37,203,631 |
| **Total** | **149,012,063** |

Local Homelessness Funding
Since 2017, the County of Los Angeles has been providing local Measure H [2] homelessness funding to the Authority.  This measure was to raise funds for 10 years to provide supportive services for the homeless, such as mental health, substance abuse treatment, health care, job training, transportation, outreach, and prevention.  The Authority received an estimated average

---

[1]    The Act streamlined HUD's homeless grant programs by consolidating the Supportive Housing Program, Shelter Plus Care, and Single Room Occupancy grant programs into the CoC program.  Unless otherwise noted in this audit report, the term "program" refers to the Supportive Housing Program, the CoC program, or both.

[2]    Measure H was approved by Los Angeles County voters on March 7, 2017, raising sales taxes by one-quarter of a cent to combat homelessness.

of 72.1 percent of the measure's total funding, averaging more than $189 million annually in the first 2 years.

| Los Angeles County Measure H | Fiscal year 17-18 | Fiscal year 18-19 | Yearly average |
|---|---|---|---|
| Total Measure H funding allocated | $258,937,000 | $412,251,000 | $335,594,000 |
| Total Measure H spending | 172,209,263 | 353,659,000 | 262,934,132 |
| Authority's allocation | 124,162,879 | 254,988,139 | 189,575,509 |

Homelessness Increasing
According to point-in-time homeless counts reported by the Authority, the homeless population in Los Angeles County generally increased between 2017 and 2020.  The sheltered and unsheltered homeless count dropped in 2018, the year after local Measure H funding became available in 2017, but increased in the following years.  By 2020 the homeless count was approximately 21 percent higher than in 2017.

| Year | Unsheltered homeless | Sheltered homeless | Total number of homeless | Overall increase percentage |
|---|---|---|---|---|
| 2017 | 38,470 | 13,972 | 52,442 | 19.6% |
| 2018 | 37,570 | 12,385 | 49,955 | -4.7% |
| 2019 | 42,471 | 13,786 | 56,257 | 12.6% |
| 2020 | 46,090 | 17,616 | 63,706 | 13.2% |

Los Angeles City Controller Report
The City of Los Angeles controller issued an August 2019 report assessing the effectiveness of street outreach throughout the Los Angeles Continuum of Care, with an emphasis on the City's contract with the Authority for fiscal years 2017-18 and 2018-19.  The report found that the Authority did not meet most citywide outreach goals and that the insufficient street outreach performance was because the Authority's "loose review and reporting procedures affect the Authority's ability to make data-driven decisions and impairs its ability to deploy resources to effectively combat homelessness."[3]  The controller recommended that the Authority
- Work with City and County partners to define a unified set of clear and consistent goals, specific metrics, and accurate reporting on outreach activities throughout the greater Los Angeles area.
- Focus on a proactive outreach strategy to reach a greater number of homeless people for the first time.

On August 28, 2019, the Authority issued a statement on the Los Angeles controller's report, indicating points of agreement, points of concern, and points of disagreement.

Our audit objectives were to determine whether the Authority met the goals and objectives of housing and helping the homeless become self-sufficient through its CoC program and administered the program in accordance with HUD requirements.

---

[3]    Our audit scope did not include verifying the controller's findings.

# Results of Audit

## Finding 1:  The Authority Did Not Use All of Its Awarded CoC Grant Funds

The Authority did not use all of its awarded CoC grant funds.  It had 20 expired grants with a total of almost $3.5 million in unused funds.  The Authority did not use the funds due to administrative challenges in several areas, including inadequate policies and procedures for grant execution timeframes, monitoring of subgrantees, and emphasizing CoC funds over other sources of funds.  In addition, the Authority experienced turnover and capacity difficulties, and performance goals were not always correlated to the funding amounts.  As a result, the unused CoC funds represent a missed opportunity to meet the program's goal of assisting the homeless.

### The Authority and Its Subgrantees Had Unused CoC Funds Totaling Almost $3.5 Million

As of May 2020, 20 of the 23 sample grants[4] active during the period October 1, 2017, to September 30, 2019, had remaining balances totaling almost $3.5 million.  The unused funds represent about 45 percent of the total approved funding.[5]  The 23 grants were issued under HUD's fiscal years 2017 and 2018 CoC Notice of Funding Availability (NOFA), and all but one were renewal grants.  Each grant had a 1-year grant term and 1 year of funding to use during the performance period in accordance with the NOFA.  (See appendix C.)  The only new grant from among the 23 sampled grants (CA1686L9D001700) also had the largest amount of unused funds, with more than $1.3 million unused from a $1.5 million grant award.  (See appendix D.)  Because each of the 20 grants with remaining balances expired more than 90 days before our sample selection date, these grants were due for closeout in accordance with 2 CFR (Code of Federal Regulations) 200.343 and 24 CFR 578.109 (see appendix C) and for the remaining balances to be recaptured by HUD.  (See finding 3.)  Therefore, the $3.5 million[6] could no longer be used by the Authority and its subgrantees to assist the homeless.

### Administrative Challenges Contributed to Grant Underspending

The Authority had administrative problems in several key areas that contributed to CoC funds' not being used.  These problems included inadequate policies and procedures for grant agreement execution timeframes, its monitoring review practices, and the prioritization of CoC funds.  In addition, the Authority experienced personnel staffing and capacity difficulties, and performance goals were not always correlated to the funding amounts.

---

[4]    See appendix D for the list of all 23 grants with respective awarded amounts, balances, and unused percentages and see Scope and Methodology for the sample selection methodology from the authority's 112 CoC grants active between October 1, 2017 and September 30, 2019.

[5]    We selected a nonstatistical sampled of grants; therefore, the levels of unspent funds are not representative or projectable to the entire population of 112 CoC grants in the audit universe.  (See Scope and Methodology.)

[6]    As of January 2021, all unused amounts had been recaptured by HUD except for CA1686L9D001700's $1.3 million balance.

- Delays in Executing Grant Agreements
  The Authority experienced delays in executing grant agreements with its subgrantees. For our sample of 23 grants, it took the Authority an average of 4 months from the start of the performance period to sign and execute the agreements with the subgrantees; however, 5 of the 23 grants took more than 7 months of their 12-month grant terms.[7]

  The Authority's Emergency Solutions Grants Program Policies and Procedures (which includes CoC) did not include guidance or information regarding timeliness for executing the grant agreements with subgrantees.  HUD took an average of 1 month from the start of the performance period to sign the grant agreements, and the Authority added an extra month to sign the agreement.  Therefore, 2 months passed before the Authority began to execute subgrantee agreements.

  We interviewed a sample of nine subgrantees (see Scope and Methodology), and their most common criticism was the amount of time it took the Authority to execute the grant agreements.  The delays resulted in subgrantees' having to front the program's costs for extended periods because they could not draw funds until the grants were executed.  In addition, if the subgrantee did not have other sources of funds to pay for grant activities in the meantime, it may have had to reduce performance until the CoC funds were available, potentially impacting its ability to initiate and draw funds in a timely manner in accordance with 24 CFR 578.85.  (See appendix C.)  Because the CoC grant expiration date did not change even if the grant execution was delayed, a grantee may have had trouble spending the funding within the reduced availability period.

- Monitoring of Subgrantees
  The Authority did not perform monitoring of subgrantees during the term of the grants, making it more difficult to address underspending issues.  According to 24 CFR 578.7(a)(6), the Authority's responsibilities included monitoring its subrecipients.  (See appendix C.)  According to Authority officials, before 2019, the Authority's practice was to perform monitoring reviews of subgrantees after the grants were closed.  This practice decreased the Authority's ability to proactively identify and address performance problems with its subgrantees.  Although staff accountants maintained a "Subrecipient Expenditure Tracker" to keep track of expenditures and the match for each subrecipient, their main focus was to ensure that there were no overpayments.

  In 2019 the Authority created the desk review unit to conduct reviews while the grant was still active.  However, the newly created desk review unit was completing risk assessments of all of the subgrantees during the audit fieldwork.  Therefore, we were not able to review new monitoring reports to fully assess how this change was being conducted and its impact on grant management performance.

---

[7]    We selected a nonstatistical sample of grants; therefore, the results are not necessarily representative or projectable to the entire population of CoC grants in the audit universe.  (See Scope and Methodology.)

**6**

- Prioritization of CoC Funding
  The Authority's policies did not prioritize the use of CoC funds and, instead, appeared to have offered some subgrantees the option of keeping their CoC grants or using less restrictive sources of funds. Some subgrantees informed us that the Authority made presentations to subgrantees promoting a new source of local funding (see Background and Objectives), emphasizing its flexibility in comparison to HUD CoC funding. In at least one case, a subgrantee stated that the Authority suggested that it surrender its CoC grants at the end of the term and shift to the new funding source with fewer restrictions. An Authority official said that HUD's annual renewal process and need for annual applications and agreements could result in funding gaps that did not apply to the local funds. Also, the CoC rapid-rehousing options were more limited than the local funding. Rather than using the additional source of funding to supplement or expand on the subgrantees homelessness activities funded by the CoC grants, the Authority offered grantees the option of keeping their CoC grant funds or giving them up for the local funding.

- Personnel Turnover and Capacity Issues
  The Authority experienced personnel turnover and capacity issues due to dramatic increases in local funding for homeless services and short-term housing since 2017. Overall, the Authority's operating budget more than tripled, increasing from $75 million in 2016 to more than $300 million in 2019. The large influx of additional local homelessness funding (see Background and Objectives) resulted in the need to hire significant numbers of additional staff members, including temporary workers. The Authority also needed to restructure most departments to be more efficient and account for all of the funding, including its accounting, finance, monitoring and compliance, and procurement and contracts departments. Although the Authority moved staff members and shifted responsibilities based on how it believed they would be best suited according to their knowledge, skills, and abilities, these changes resulted in a number of employees leaving the Authority. In addition, subgrantees informed us that the changes and understaffing made it difficult to contact and coordinate with the appropriate Authority staff members when problems and questions arose. Overall, the significant increase in funding and difficulty in hiring and retaining employees resulted in the Authority's staff's not increasing in proportion to its funding levels, creating capacity issues that also impacted the CoC program.

- Performance Goals Not Correlated to the Funding Amounts
  For the most part, the achievement of the utilization goals was not proportionally related to the percentage of funds used. In 15 of 23 cases, the subgrantees achieved the performance goals of utilizing proposed units and beds numbers, and in some cases exceeded them, by using only a fraction of the approved funding.[8]

---

[8] We selected a nonstatistical sample of grants; therefore, the results are not necessarily representative or projectable to the entire population of CoC grants in the audit universe. (See Scope and Methodology.)

- o One subgrantee was able to accomplish 105 percent utilization of 20 proposed units and approximately 89 percent utilization of 80 proposed beds while using only 31 percent ($143,005) of its CoC grant funding ($460,060).
- o Another subgrantee was able to accomplish 100 percent utilization of 23 proposed units and beds while using only approximately 22 percent ($70,546) of its CoC grant funding ($322,453).

The Authority's and its subgrantees' achieving goals while spending only a small portion of the funding did not provide sufficient incentive to use all available funding. They could be recognized as fully achieving the grant's goals and objectives, while significant amounts of funding that could have further contributed to assisting the homeless remained unused. The Authority may, therefore, have not fully met its responsibility to establish appropriate performance targets under 24 CFR 578.7. (See appendix C.)

In addition, we reviewed the Authority's CoC performance evaluation process and methodology and the performance goal indicators and targets relevant to the projects from our sample of 23 grants. These indicators and targets focus on housing stability and full and efficient utilization of resources by measuring, among other things, the percentage of project participants who remain housed or move on to other permanent housing and participant needs and increased stability. While these are important factors in measuring program performance, we found that the Authority did not include spend-down goals. The lack of performance indicators and targets in this area tended to deemphasize the importance of using all available funds to maximize homelessness assistance.

### The Underutilization of CoC Funds Primarily Impacted Leases and Rental Assistance

The Authority originally budgeted to use nearly half of the $7.7 million in funding for the 23 sample CoC grants for leases and rental assistance for the homeless population and just over half for its other services, operations, and administration. While the Authority's underutilization of funds impacted both activity categories, it primarily impacted spending on leases and rental assistance, for which it spent only 41 percent of the budgeted amount. The Authority's actual spending on leases and rental assistance was just over one-third of the total funds used, a significant shift compared to its budget.

### Budget and Actual CoC Expenditures

| Grant activities | Budget | | Actual | | Percentage of budget actually spent (actual - budget) |
|---|---|---|---|---|---|
| Leases and rental assistance | $3,722,172 | 48% | $1,533,969 | 36% | 41% |
| Supportive services, operations, and administration | 3,982,388 | 52% | 2,703,429 | 64% | 68% |
| **Total** | **7,704,560** | **100%** | **4,237,398** | **100%** | **55%** |

8

Overall, the Authority used less of its available funds to pay for leases and rental assistance, which is the activity that directly affects the number of homeless persons on the streets.[9]  The Authority's underspending reduced the CoC program's effectiveness in addressing the needs and housing the homeless population.

## Conclusion

The Authority did not use all of its CoC grant funds, with a combined outstanding balance of approximately $3.5 million in unused funds attributable to 20 grants.  (See appendix D.)  This condition occurred due to the Authority's administrative challenges, including inadequate policies and procedures to prevent delays in the execution of grant agreements, monitoring of subgrantees during the term of the grants, and emphasizing CoC over less restrictive sources of funds.  In addition, the Authority experienced personnel and capacity issues, and its performance goals were not correlated to its funding amounts.  As a result, the unused CoC funds represent a missed opportunity to meet the program's goals of assisting the homeless in the midst of the ongoing homelessness crises.

## Recommendations

We recommend that the Director of HUD's Los Angeles Office of Community Planning and Development require the Authority to

1A.  Develop and implement policies and procedures to ensure that subgrantee agreements are executed in a timely manner, effective monitoring is performed, and subgrantees maintain an emphasis on using their CoC funds, thereby preventing similar occurrences of $3.5 million (see appendix D) in CoC funding going unused.

1B.  Develop and implement strategies to address capacity and organizational problems or obtain technical assistance to address these issues.

1C.  Develop and implement procedures and controls to clearly define and update point-of-contact staff for subgrantees.

1D.  Work with HUD and subgrantees to reevaluate its CoC program's performance goals and set targets that help to ensure that funds for future CoC grants are fully and effectively used to advance the goal of ending homelessness.

---

[9]  We selected a nonstatistical sample of grants; therefore, the results are not necessarily representative or projectable to the entire population of CoC grants in the audit universe.  (See Scope and Methodology.)

9

# Finding 2:  The Authority Did Not Support Salary and Rental Costs Charged to Its CoC HMIS and Planning Grants

The Authority did not provide adequate documentation to support its Homeless Management Information System (HMIS)[10] and planning grant costs for the CoC program in accordance with HUD requirements.  This condition occurred because the Authority did not have sufficient procedures or controls to show that it followed its cost allocation plan and ensured that costs were charged to the grants based on the proportional benefit.  As a result, HUD had no assurance that up to $879,847 in payroll and rent fee charges were for these CoC grants.

### The Authority Did Not Support Salary Cost Allocations

The Authority charged direct and indirect payroll expenditures to both its HMIS and planning grants through allocation percentages.  Although the Authority was able to provide documentation for the sampled payroll expenditures, it was unable to sufficiently support the basis of the amounts allocated to the CoC program.  Program regulations under 2 CFR 200.403 state that costs must be adequately documented to be allowable under Federal awards.  (See appendix C.)

Although the Authority's procedures require employees to track and report time to charge codes, these codes were not specific to individual CoC grants.[11]  The amount of time attributed to each charge code was generally split the same daily and, therefore, appeared to be based on predetermined percentages and not the actual time worked.  The Authority could not adequately explain or support these predetermined rates to show that they were reasonable in accordance with 2 CFR 200.430, 200.403, and 200.404.  (See appendix C.)  In addition, the Authority further allocated the salary costs to individual grants using additional percentages for which it also could not adequately explain or support the basis, contrary to 2 CFR 200.405(D), which states that costs must be allocated to the projects based on the proportional benefit.  (See appendix C.)

The Authority's cost allocation plan methodology indicated that for direct costs, staff members were to code their timecards to reflect the specific program grant they worked on and the Authority would charge salaries and benefits directly to the funding source accordingly.  It also showed that for indirect costs, each funding source was allocated administrative funds based on its percentage of funding compared to the Authority's total funding received.  According to this methodology, HUD would get 8 percent of the indirect costs.  Additionally, costs that could not be reasonably associated with a specific program grant were recorded to an admin-indirect cost pool and distributed to the program grants using an equitable allocation method in accordance with 2 CFR 200.405.  However, the documentation provided during the audit did not support the methodology claimed by the Authority for HMIS and planning.

---

[10]  HMIS is a secure online database that enables organizations to collect client-level, systemwide information on the services they provide to people experiencing homelessness and those who are at risk of homelessness.

[11]  For example, an employee charging to HMIS may split daily hours among general admin, general HMIS, County HMIS, and other non-CoC programs.

- HMIS Grant
  The Authority did not provide adequate support to show how it arrived at the final percentages used for HMIS payroll costs.  We sampled the May and June 2019 payroll for HMIS grant CA0414L9D001710.  (See Scope and Methodology.)  The Authority's employees used a "general HMIS" charge code on their timesheets to record how they spent their time.  However, this charge code was not specific to the grant in question but applicable to 12 contracts from 5 different grants.  The Authority then allocated the costs for this general HMIS charge code to the individual HMIS grants based on a predetermined percentage that appeared to be the same for all months and, therefore, did not reflect the actual time that employees worked on this grant.  The Authority provided the allocation percentages for the charge code but did not provide documents or an explanation as to how they arrived at these percentages.  As a result, the salary expenses were unsupported.

- Planning Grant
  We sampled the September, October, and November 2019 payroll for planning grant (CA1683L9D001700).  (See Scope and Methodology.)  The Authority's employees used a charge code on their timesheets that was not specific to the grant in question but applicable to four contracts.  The Authority explained that it charged 45.4 percent of the time and costs attributed to the charge code to the sample grant based on budget amounts.  It would then be adjusted at the end of the contract and based on direct expenditures.  We reviewed the last 2 months of the grant to see if the Authority made final corrective adjustments at the end of the contract.  However, the Authority did not provide any adjustment or corrections to show that the costs were changed to reflect actual costs.  Because the final allocation percentages used for this charge code were predetermined, the time charged to this grant does not reflect the actual time that employees worked on this grant.

  In addition, the Authority charged temporary contingent employees to the planning grant.  While the Authority provided their invoices and timesheets for the sample month of June 2019 (see Scope and Methodology), it was unable to provide a clear explanation as to how it arrived at the 80 percent cost allocation charged to the grant.

Personnel costs allocated to the Authority's CoC program based on a predetermined cost allocation plan had been an ongoing issue.  The Authority's certified public accounting firm that performed single audits for fiscal years 2017 and 2018 identified the same issue with allocation percentages in both covered years, and it was not resolved according to the current-year status reported in the summary schedule of prior audit finding in the fiscal year 2018 report.

Because the salary allocations were not supported for all months reviewed and this allocation issue had also been previously identified in the single audits without being resolved, we determined that this was a systematic problem applicable to all of the salary draws for the two grants.  Therefore, the entire amount of $179,873 charged to the HMIS grant and $644,430 charged to the planning grant for salary expenses was unsupported.

**11**

**Unsupported Salary Costs**

| CoC grant | Grant number | Period | Salary expense |
|---|---|---|---|
| Planning | CA1683L9D001700 | 12/01/2018 to 12/31/2019 | $644,430* |
| HMIS | CA0414L9D001710 | 07/01/2018 to 06/30/2019 | 179,873 |
| **Totals** | | | **824,302**** |

\* Includes contingent staff costs.
\*\* $1 difference due to rounding.

## The Authority Did Not Support Rental Cost Allocations

The Authority also charged rental expenditures to its CoC HMIS and planning grants through cost allocations. Although it provided support showing that it did incur rental costs, it did not provide adequate documentation to show that the amounts allocated to the grants were reasonable and appropriate. According to the Authority's cost allocation methodology, rent (space costs) is allocated to the direct program grant and indirect costs pool based on the proportional share of the actual number of full-time-equivalent staff. However, the allocations for HMIS (CA0414L9D001710) and planning (CA1683L9D001700) grants were not consistent with the methodology. The Authority did not provide specific calculations showing how it arrived at the rent amounts charged for the entire grant term of these specific grants. There were also unexplained discrepancies for the HMIS grant in which the monthly amounts reported in the statement of revenues and expenditures and the rent schedules did not match. In addition, documentation for the planning grant included rent schedules and rent allocation by cost center but did not identify information for the specific grant. As a result, the rental amounts charged to the two grants totaling $55,545 (see Unsupported Costs table below) were unsupported.

**Unsupported Rent Costs**

| CoC grant | Grant number | Period | Rent costs |
|---|---|---|---|
| Planning | CA1683L9D001700 | 12/01/2018 to 12/31/2019 | $40,636 |
| HMIS | CA0414L9D001710 | 07/01/2018 to 06/30/2019 | 14,909 |
| **Totals** | | | **55,545** |

## Conclusion

The Authority did not support costs charged to its HMIS and planning CoC grants. This condition occurred because the Authority did not have adequate procedures and controls to show that it followed its cost allocation plan and ensure that costs were allocated based on the proportional benefit in accordance with 2 CFR 200.4. (See appendix C.) Because the salary allocation issue occurred for all months reviewed and it had been previously identified by the Authority's certified public accounting firm without being resolved, we determined that it was a systemic deficiency that called into question the entire amount of salary expenses and contingent staff charged to the HMIS and planning grants. As a result, HUD had no assurance that $879,847 in CoC funds charged for payroll and rent fee costs was for the CoC grants.

12

**Recommendations**

We recommend that the Director of HUD's Los Angeles Office of Community Planning and Development require the Authority to

2A.    Adequately support the eligibility of payroll costs or repay its CoC grants $824,302 from non-Federal funds.

2B.    Adequately support the eligibility of rent costs or repay its CoC grants $55,545 from non-Federal funds.

2C.    Develop and implement additional written procedures and controls to ensure that employees charge time in accordance with program requirements and that the Authority fully documents and supports that salary and rental cost allocations are charged to its CoC grants in accordance with its cost allocation plan.

# Finding 3:  The Authority Did Not Submit Annual Performance Reports in a Timely Manner

The Authority did not consistently submit its annual performance reports (APR) to the local HUD field office within the required 90 days.  This condition occurred because the Authority had not completed and implemented its APR procedures and lacked procedures and controls to ensure that its personnel were fully informed on the process.  The delays in submitting the APRs potentially left the funds unnecessarily sitting idle and potentially delayed HUD in recapturing the funds for future awards to other CoC grantees.

### Late Submission of APRs

The Authority is responsible for submitting APRs on behalf of its CoC.  According to 24 CFR 578.109(b), applicants must submit all reports required by HUD no later 90 days from the date of the end of the project's grant term.  (See appendix C.)  The APR is required for HUD closeout of expired CoC grants, and once HUD completes the closeout process in the Line of Credit Control System (LOCCS)[12] any leftover funding is recaptured[13] and reprogrammed as new CoC grants.

Although the Authority submitted APRs for all 23 expired grants in our review sample, only 3 were submitted within the required 90 days after grant expiration.  The Authority submitted the APRs for the 20 that were late an average of 208 days after grant expiration, and of those, 10 were late 190 days or more.[14]  Although the Authority had draft procedures related to the APRs, they were not finalized, approved, or implemented at the time of our audit fieldwork.  The Authority also lacked procedures and controls to ensure that relevant personnel were fully informed about the grant closeout process, including who approves or submits the reports.

### Conclusion

The Authority did not submit its APRs within the required 90 days as required as part of the grant closeout process.  This condition occurred because the Authority had not completed and implemented its APR procedures and lacked procedures and controls to ensure that relevant personnel were fully informed about the grant closeout process.  The delays in submitting the APRs potentially left the funds unnecessarily sitting idle and may delay HUD's recapture of the funds for future awards to other CoC grantees.

---

[12]  LOCCS is HUD's primary grant disbursement system, handling disbursements for most HUD programs.
[13]  As of January 2021, all unused amounts had been recaptured by HUD except for CA1686L9D001700's $1.3 million balance.
[14]  We selected a nonstatistical sample of grants; therefore, the results are not necessarily representative or projectable to all CoC grants in the audit universe.  (See Scope and Methodology.)

**Recommendations**

We recommend the Director of HUD's Los Angeles Office of Community Planning and Development require the Authority to

3A.  Complete and implement policies and procedures to ensure that APRs are submitted by the closeout deadline.

3B.  Develop and implement policies and procedures to ensure that relevant personnel are routinely and regularly trained on the grant closeout process.

15

# Scope and Methodology

We performed our audit work at the Authority's office located at 811 Wilshire Boulevard, Los Angeles, CA, from October 2019 through March 2020.  We performed additional audit fieldwork remotely in the Los Angeles, CA area between March and September 2020.  Our audit generally covered the period October 2017 to September 2019.

To accomplish our objective, we performed the following:

- Reviewed grant agreements between HUD and the Authority.
- Reviewed grant agreements between the Authority and its subrecipients.
- Reviewed contracts between the Authority and other entities.
- Reviewed APRs.
- Reviewed the Authority's policies, procedures, and controls regarding its CoC grant program.
- Reviewed the Authority's accounting records and single audit reports for years 2017 and 2018.
- Reviewed the Authority's organizational charts.
- Reviewed the Authority's drawdowns, supporting documentation, and timesheets.
- Interviewed appropriate Authority employees.
- Interviewed nine of the Authority's subgrantees.

We determined that the Authority had 111 CoC grants and submitted 757 LOCCS vouchers within our audit scope of October 1, 2017, to September 30, 2019.  The voucher universe totaled more than $26.8 million, with individual voucher amounts ranging from $35 to $456,529.  Of these 111 grants, the Authority directly operated 10 grants that had 30 vouchers totaling more than $5.4 million for the CoC planning project and HMIS-data collection and evaluation, among others.

During our initial survey, we selected a nonstatistical sample of 10 LOCCS vouchers from the audit universe, each from a different grant.  This selection included 8 randomly selected vouchers from the 101 grants operated by subgrantees and two randomly selected vouchers from the 10 grants operated by the Authority.  The 10 vouchers totaled $445,996 and represented 1.32 percent of the total voucher universe.  The two Authority-operated grant vouchers included partial HMIS grant expenditures from the month of July 2018 and all CoC planning grant expenditures from the month of September 2019.  In addition to reviewing the selected vouchers, we nonstatistically selected four of the eight subgrantees associated with these vouchers for our preliminary limited performance review, selecting grantees that had drawn significant portions of their awards (approximately 91 percent drawn overall).  We also selected 2 of the 10 grants for our monitoring survey review based on available monitoring reviews.  The results from this preliminary review were expanded and incorporated into the audit phase.

For the audit phase, we selected an additional sample of 23 expired grants (see appendix D) from the 111 expired grants that were active during the period October 1, 2017, to September 30, 2019.  We selected the 23 grants using two methodologies, including:

- 10 grants totaling more than $3.8 million in awarded funds at random from the 111 CoC grants (adjusted down to 83 grants to avoid duplicative selections of projects with multiple years of funding) as part of our overall review of grant performance.  The unused funds for these 10 grants totaled almost $1.7 million.
- 13 expired grants from the 111 grants with unused balances of more than $50,000.[15]  The 13 grants were selected to complete our review of expired grants with significant remaining balances.  The 13 grants totaled more than $3.8 million in awarded funds and had an unused balance of almost $1.8 million

We further reviewed expenditures from two grants (HMIS and planning costs) operated by the Authority.  We reviewed all grant-related rent costs for both HMIS and planning costs grants.  For the planning costs grant salary cost allocations, we randomly selected a sample of three vouchers using Excel's data analysis tool for sampling.  Due to the impact of the COVID-19 pandemic on available time and resources of the Office of Inspector General (OIG) and the auditee, we narrowed the sample to one voucher that covered expenditures for the last 2 months (October and November 2019) of the grant.  For the HMIS grant salary cost allocations, we reviewed Authority contracts for the entire grant and selected the last 2 months (May and June 2019) of the grant for our salary expenses review.  In both cases, we selected the last 2 months of the grant to ensure the inclusion of all final adjustments.

For the subgrantees from the selected 10 grants, we had planned to conduct site visits to gain an understanding of their funding, performance, goals, and achievements and also to find out how COVID-19 is affecting their operations.  However, due to COVID-19 restrictions, we conducted phone interviews instead with 9 of the 10[16] subgrantees.  In addition, we consolidated all 23 grants and conducted an overall review of performance goals, achievements, and financial information obtained from the related grant APRs, as well as from project budgets and profiles included in the grant agreements.

During the overall review of performance goals, achievements, and financial information, we analyzed information from 22 of the 23 APRs from the sampled grants because one of the APRs provided was incomplete.[17]  This APR was for the last grant listed in appendix D that had the largest amount of unused funds with more than $1.3 million and was also one of the nine subgrantees from our interviews.  The subgrantee mentioned having challenges with spending

---

[15]  We used a $50,000 threshold to focus on grants with the more material amounts of unused funds and ensure the number of grants selected could be reviewed within the audit's resources.

[16]  We were unable to schedule the interview with one of the subgrantees within reasonable timeframes due to the COVID-19 restrictions.  However, we believe we obtained sufficient information from the other nine subgrantees to meet our audit objectives.

[17]  The Authority indicated that at the time, the contract was not complete, so it provided only financial information that was available then.  We believed we had sufficient information from the 22 to perform our analysis.

the funding in time and wanted to move or change the budget line items to provide supportive services (apart from rental assistance) but was not able to make those changes.

Because our modified review sample included grants associated with two component types and one of them was divided into two, we separated some of the data accordingly into three groups, as follows:

1. Permanent supportive housing offers permanent housing and supportive services to assist homeless persons with a disability to live independently.
2. Rapid rehousing provides housing relocation and stabilization services and short- or medium-term rental assistance as necessary to help a homeless individual or family move as quickly as possible into permanent housing and achieve stability in that housing.
3. Transitional housing provides housing and accompanying supportive services to homeless individuals and families for up to 24 months to assist with stability and support to successfully move to and maintain permanent housing.

By grouping the data into these three categories, we were able to compare data more accurately within similar grant component and project types to avoid outliers.

Our findings cannot be projected to the entire universe of the Authority's portfolio of CoC grants. Although for HMIS and planning costs grants related salary expenses, we reviewed only the last 2 months of the grants, we identified recurring issues. Because these issues were systemic and they had been previously identified in the single audits without being resolved, we questioned the entire salary expenses charged to the grants.

We relied on the accuracy of computer-processed data taken from LOCCS and other HUD systems as well as data from the Authority's general ledgers, agreements, and financial and performance reports. We used these data to obtain a reliable audit universe for our overall review and for the selection of disbursements. Based on our assessment, we determined that the data obtained were sufficiently reliable for meeting our audit objective.

We conducted the audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objective(s). We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Internal Controls

Internal control is a process adopted by those charged with governance and management, designed to provide reasonable assurance about the achievement of the organization's mission, goals, and objectives with regard to

- effectiveness and efficiency of operations,

- reliability of financial reporting, and

- compliance with applicable laws and regulations.

Internal controls comprise the plans, policies, methods, and procedures used to meet the organization's mission, goals, and objectives. Internal controls include the processes and procedures for planning, organizing, directing, and controlling program operations as well as the systems for measuring, reporting, and monitoring program performance.

**Relevant Internal Controls**

We determined that the following internal controls were relevant to our audit objectives:

- Effectiveness and efficiency of operations – Implementation of policies and procedures to reasonably ensure that program funds are used for eligible purposes.
- Reliability of financial information – Implementation of policies and procedures to reasonably ensure that relevant and reliable information is obtained to adequately support program expenditures.
- Compliance with applicable laws and regulations – Implementation of policies and procedures to ensure compliance with applicable HUD rules and requirements.

We assessed the relevant controls identified above.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, the reasonable opportunity to prevent, detect, or correct (1) impairments to effectiveness or efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations on a timely basis.

**Significant Deficiencies**

Based on our review, we believe that the following items are significant deficiencies:

- The Authority did not have proper controls to ensure that all of its awarded CoC grant funds were used and that subgrantees maintained an emphasis on using all approved CoC funds to meet the program's goals of assisting the homeless in the midst of the ongoing homelessness crises (finding 1).

- The Authority lacked policies and procedures to ensure that subgrantee agreements are executed in a timely manner and effective monitoring is performed (finding 1).

- The Authority did not have policies and procedures in place to clearly define and update point-of-contact staff for subgrantees to coordinate efforts and effectively manage their CoC grants (finding 1).

- The Authority lacked adequate controls to ensure that the allocation percentages for salary and rent costs charged to its CoC planning and HMIS grants were supported and complied with HUD requirements (finding 2).

- The Authority had not implemented its draft procedures and controls over grant closeout and lacked policies and procedures to ensure that relevant personnel are routinely and regularly trained on the grant closeout process and APRs are submitted by the 90-day deadline (finding 3).

# Appendixes

## Appendix A

**Schedule of Questioned Costs and Funds To Be Put to Better Use**

| Recommendation number | Unsupported 1/ | Funds to be put to better use 2/ |
|---|---|---|
| 1A | | $3,500,000 |
| 2A | $824,302 | |
| 2B | $55,545 | |
| **Totals** | **879,847** | **3,500,000** |

1/    Unsupported costs are those costs charged to a HUD-financed or HUD-insured program or activity when we cannot determine eligibility at the time of the audit.  Unsupported costs require a decision by HUD program officials.  This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of departmental policies and procedures.  In this instance, the unsupported costs amount of $879,847 includes (1) $824,302 for salary expenses charged to HMIS and operating costs CoC grants and (2) $55,545 for rent costs also charged to HMIS and operating costs CoC grants.

2/    Recommendations that funds be put to better use are estimates of amounts that could be used more efficiently if an OIG recommendation is implemented.  These amounts include reductions in outlays, deobligation of funds, withdrawal of interest, costs not incurred by implementing recommended improvements, avoidance of unnecessary expenditures noted in preaward reviews, and any other savings that are specifically identified.  In this instance, they include $3.5 million in unused funding that could have been put to better use assisting the homeless as intended and can be prevented in future periods if the recommendation is put into place.

# Appendix B

## Auditee Comments and OIG's Evaluation

**Ref to OIG Evaluation**

**Auditee Comments**



August 17, 2021

Tanya Schulze
Regional Inspector General for Audit
Office of Audit, Region 9
300 N Los Angeles Street, Room 4070
Los Angeles CA 90012

Re: HUD Office of Inspector General (OIG) Audit, Los Angeles Homeless Services Authority, CoC, Audit Report Number: 2021-LA-100X

This letter serves as the Los Angeles Homeless Services Authority's (LAHSA) response to drafts of the above-referenced audit received on July 20, 2021, and August 17, 2021, for the review period of October 1, 2017 to September 30, 2019. In the draft report, HUD OIG makes several recommendations to LAHSA intended to improve CoC grant performance and compliance. LAHSA appreciates the recommendations and insights in the draft audit. Unfortunately, LAHSA disagrees with several statements and findings included in the draft audit report.

Considering the continuous growth experienced since its establishment, along with the exposure associated with such expansion, LAHSA has consistently pursued enhancements to existing programs and structural changes to effectively mitigate risks and meet the needs of people experiencing homelessness in Los Angeles County. LAHSA's keen attention to the issues in the audit along with its awareness of the problems it faces, has resulted in the implementation of meaningful changes to mitigate the recurrence of noted issues.

**Comment 1**

LAHSA notes that almost two years have passed since the audit date of September 30, 2019, and the organization has not only developed preemptive measures, but has also continuously performed due diligence in strengthening controls and resolving issues, while efficiently managing its entrusted resources. These improvements were implemented during the COVID-19 pandemic. As homeless system lead, LAHSA was the central point of coordination for the county-wide emergency response for people experiencing homelessness. During the height of COVID, LAHSA shifted much of its focus to the county-wide efforts to minimize the impacts of COVID-19 on our unhoused neighbors. Nevertheless, LAHSA implemented HUD's mutually agreed upon recommendations, and:

- Developed a Permanent Housing Department tasked with handling the Continuum of Care portfolio.
- Established a Permanent Supportive Housing (PSH) team to coordinate with the grant management and service providers to reconcile budgets and expenditures.
- Launched the Enterprise Grant Management System (EGMS) to support full grant lifecycle administration to enhance standardization of contracting requirements, transparent collaboration, and real-time spend-down analysis.
- Established a Housing Central Command (HCC) as a centralized approach to tackling systemic challenges with LA's permanent housing utilization.

**LAHSA**
LOS ANGELES
HOMELESS
SERVICES
AUTHORITY

**Heidi Marston**
Executive Director

**Board of Commissioners**

**Jacqueline Waggoner**
Chair

**Wendy Greuel**
Vice Chair

**Kelli Bernard**

**Sarah Dusseault**

**Noah Farkas**

**Mitchell Kamin**

**Lawson Martin**

**Irene Muro**

**Booker Pearson**

**Kelvin Sauls**

**Administrative Office**

707 Wilshire Blvd.
10th Floor
Los Angeles, CA  90017

213 683.3333 - PH
213 892.0093 - FX
213 553.8488 - TY

www.lahsa.org

22

## Auditee Comments and OIG's Evaluation

| Ref to OIG Evaluation | Auditee Comments |
|---|---|

**Comment 2**

**Comment 3**

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

LAHSA has concerns around the inclusion of the Los Angeles City Controller Report in the draft audit as this is one of many audits performed on LAHSA during the review period. The audit by the City Controller focused specifically on outreach programs funded by City of Los Angeles General Fund dollars, and we believe it is not relevant to the scope of the HUD OIG audit, which is HUD CoC Programs. In addition, OIG did not perform procedures to test the validity of the audit's findings or recommendations. Therefore, we formally request that inclusion of the Los Angeles City Controller report be removed from the OIG audit report.

We appreciate the opportunity to respond to the draft audit report and understand that this response, and all appendices, should be included in full in the final audit report.

**Rise in Homelessness**
The Los Angeles Continuum of Care's (LA CoC's) recent increase in homelessness reflects larger national and regional trends in the population of people experiencing homelessness. The latest federal Annual Homeless Assessment Report finds that homelessness in the United States rose for the fourth consecutive year in 2020.[1] Within California, 33 of the state's 44 Continuums of Care (CoCs) reported an increase in their Point in Time (PIT) Counts from 2017 to 2019.

Further review, however, finds that while the number of people experiencing homelessness in Los Angeles rose by 7.3% during that two-year period, the rate of growth was substantially lower than it was for many other CoCs in the state. During that same period, for example, San Francisco and Alameda CoCs reported increases of 16.8% and 42.5% in their homeless populations, respectively. The strong performance of Los Angeles' homeless services system, backed by key regional investments in housing and services, has tempered the degree of growth impacting other communities and, most importantly, resulted in more housing placements than ever before. In Los Angeles, more than 64,000 formerly homeless people have been connected to permanent housing over the past three years.

That homelessness continues to grow at a rate faster than the system can support is symptomatic of Los Angeles' exceedingly expensive rental market that keeps housing options out of reach for many residents and the underinvestment in safety-net programs that serve local individuals and families in poverty.

*Housing Unaffordability in Los Angeles*

While the nation is experiencing an affordable housing crisis, some of the deepest affordability gaps are concentrated in the Western region of the country (California, Oregon, Nevada, Arizona).[2] Close to half a million units of affordable housing are needed to meet current demand in LA County, with the largest deficit for the population at 15% Area Median Income (AMI) or below.[3]

The difficulty of securing affordable housing in Los Angeles' competitive rental market results in untenable levels of housing insecurity for low-income residents. Nearly half a million households in LA County are severely rent burdened, defined as spending at least 50% of their household income on housing costs.[4] Ninety percent of these severely rent burdened households earn less than 30% AMI. Rents in Los Angeles

---

[1] U.S. Department of Housing and Urban Development. (January 2021). "The 2020 Annual Homeless Assessment Report (AHAR) to Congress".
[2] National Low Income Housing Coalition. (March 2021 ). "The Gap of Affordable Rental Homes".
[3] California Housing Partnership. (April 2021). "Los Angeles County Affordable Housing Outcomes Dashboard 2021".
[4] California Housing Partnership. (April 2021). "Los Angeles County Affordable Housing Outcomes Dashboard 2021".

Page **2** of **11**

Note: Referenced documents are available upon request.

23

**Auditee Comments and OIG's Evaluation**

| Ref to OIG Evaluation | Auditee Comments |
|---|---|

Comment 3

---

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

also continue to grow at a rate higher than the national average. Since 2014, the majority of zip codes in LA County have recorded rent increases above the national average; some regions saw rental prices increase at nearly twice the national rate.[5] Market pressures, combined with weak tenant protections, also result in higher risks of eviction, another driver of instability and homelessness. Over the past decade, half a million formal evictions were filed with the Los Angeles County Superior Court while "informal evictions" outnumber formal evictions by about two-to-one.[6]

*Underinvestment in Affordable Housing*

Los Angeles has seen inadequate federal and state investment in creating housing that is affordable to people at the lowest income levels. Over the last decade alone, prior to new investments through recent stimulus, federal funding allocated to LA County for affordable housing programs such as Home Investment Partnerships Program (HOME) and Community Development Block Grants (CDBG) declined by 35%. State funding for affordable housing also declined sharply; the elimination of state redevelopment funding in 2012 cut about $275 million in annual affordable housing funding in Los Angeles County. A renewed focus on the housing crisis has helped state legislators focus on addressing these funding deficiencies, but new state investments are only now beginning to close the gap. A study[7] shows that the mismatch between numbers of poor people and numbers of affordable available units is greatest in the western census region, with only 30 rental units affordable and available per 100 renters with extremely low incomes in the West in 2015 and this gap is only growing larger.

*Weakened Safety Net Programs*

As the median rents in the Los Angeles rental market have increased substantially over the last decade, housing assistance in the form of Housing Choice Vouchers (HCV) and other tenant-based voucher programs has failed to keep pace with demand. While nationally, only 1 in 4 households that qualify for HCVs receive them, a Los Angeles Times report estimates that the ratio is closer to 1 in 10 in the City of Los Angeles. Additionally, the Great Recession led to freezes on cost-of-living increases for the state's major safety net programs for individuals and families in poverty, including CalWORKs and SSI/SSP. Only recently has monthly CalWORKs grant levels reached pre-Recession levels and cost of living adjustments restored.

*Effect on Permanent Housing Placements*

Los Angeles' tight rental market has a two-fold effect on the homeless services system, accelerating inflow into system entry points and challenging the system's capacity to transition people into stable living conditions and out of homelessness. LAHSA's recent Systems Analysis finds that an effective homeless services system requires a ratio of 1 shelter bed for every 5 permanent housing slots, while Los Angeles is closer to 1:1. In addition to increasing the overall inventory of affordable housing, LAHSA estimates that an additional 12,000 units of supportive housing, in addition to the 10,000 in the pipeline, would have to

---

[5] Zillow Presentation. (2018). "Priced Out: Rent Affordability in Los Angeles."
[6] Public Counsel and the UCLA School of Law Community Economic Development Clinic. (June 2019). "Priced Out, Pushed Out, Locked Out".
[7] Watson et al., 2017, "Worst Case Housing Needs 2017 Report To Congress".

Page **3** of **11**

---

24

## Auditee Comments and OIG's Evaluation

| Ref to OIG Evaluation | Auditee Comments |
|---|---|
| | HUD OIG CoC draft audit report<br>LAHSA response<br>August 17, 2021 |
| Comment 3 | be built in LA County to create a balanced homeless services system.[8]  Within the local homeless services system, upwards of 30,000 people are assessed and waiting for permanent housing services.<br><br>**FINDING 1**<br>**The Authority did not use all of its awarded CoC grant Funds.**<br><br>*A)  The Authority and Its Sub-grantees Had Unused CoC Funds Totaling Almost $3.5 Million* |
| Comment 4 | LAHSA acknowledges that during the period of OIG's audit, some grants were underspent, and money was returned to HUD. Since the period of the audit, LAHSA has enacted several changes which have reduced CoC underspending, including enhanced monitoring of CoC grant utilization. Once LAHSA became aware of the underspending issue across the CoC grant portfolio, LAHSA immediately convened the two largest grant recipients in the CoC (i.e., HACLA and LACDA, the City of LA and County of LA's Public Housing Authorities, respectively).  LAHSA then reported on underspending in the CoC portfolio to the LAHSA Commission in August 2019,[9] held additional meetings with the Public Housing Authorities, which resulted in a change to the CoC's 2019 Reallocation Policy to partially reduce funding from some of the grants.[10]<br><br>Recognizing more needed to be done to address the systemic challenges faced by homeless service providers and administrators, in November 2019, LAHSA requested support from HUD to address CoC grant underutilization and the permanent supportive housing (PSH) vacancies that drove the underspend. With enhanced HUD technical assistance support, LAHSA established Housing Central Command (HCC) as a centralized approach to tackling systemic challenges with LA's permanent housing utilization, particularly focusing on the CoC-funded PSH resources managed by the two largest housing authorities in the region (HACLA and LACDA). The HCC approach includes a high level of engagement and collaboration among key system stakeholders, who convene leadership meetings at least one time per week (including Public Housing Authorities (PHAs), Department of Health Services, Department of Mental Health, Department of Social Services, Veteran's Administration, and the city's Housing and Community Investment Department). Under LAHSA's leadership the HCC collaboration is piloting a Universal Housing Application to expedite move-ins to PSH; increasing tracking of the PSH portfolio to over 14,000 units and permanent subsidies in LAHSA's Resource Management System; and driving a collective commitment to moving toward a 21-day vacancy to move-in timeline. Despite the wide-scale challenges in securing tenant-based units in the LA rental market, this collaborative effort toward monitoring the PSH portfolio has resulted in 10.5 percent improvement of CoC-funded PSH utilization as of 6/30/2021, from a baseline of 79.5 percent in March 2020 to the current utilization of 90.1 percent.<br><br>HCC has also helped LAHSA maintain the focus on underspending, which resulted in the LA CoC portfolio improving at least 12.6 percent in spending between grants expiring in 2019 and grants expiring in 2020.<br><br>---<br>[8] Los Angeles Homeless Services Authority. (March 2020). "Homeless Systems Analysis: Envisioning an Optimal System in Los Angeles".<br>[9] See Item 7.0 "Report and Discussion on Continuum of Care Program Spend-Down," Finance, Contracts and Grant Management Committee of the LAHSA Commission, August 15, 2019. https://www.lahsa.org/documents?id=3605-8-15-19-fcgm-agenda-supporting-documents-revised.pdf<br>[10] See Item 1.0 "Review and approve Project Reallocation Policy for the Department of Housing and Urban Development (HUD) 2019 Notice of Funding Availability (NOFA)," Reallocation Standard #2, LAHSA Commission, September 10, 2019. https://www.lahsa.org/documents?id=3666-9-10-19-special-commission-agenda-supporting-documents.pdf<br><br>Page **4** of **11** |

25

## Auditee Comments and OIG's Evaluation

| Ref to OIG Evaluation | Auditee Comments |
|---|---|
| | HUD OIG CoC draft audit report<br>LAHSA response<br>August 17, 2021 |
| Comment 4 | LAHSA continues to monitor and report on CoC spending[11] on a quarterly basis, tracking key metrics and driving collaborative solutions in every segment of the pre-housing process from referrals to lease up. The CoC's approved 2021 Performance Evaluation Methodology reflects changes to how CoC grant spend-down is more robustly [12], incorporating metrics that align with those established through HCC work. The CoC is currently considering additional changes to its Reallocation Policy for 2021 to further address underspending in the portfolio to continue driving improved performance in this area.[13] |
| | *B) Administrative Challenges Contributed to Grant Underspending* |
| Comment 5 | On page 6 of the draft audit, OIG made several assertions regarding timeliness of LAHSA CoC grant execution process. The assertions are based on judging LAHSA execution timeline from the start of the period of performance. This is misleading in that it implies that LAHSA could have executed the sub-recipient agreements as soon as the performance period started, when, for all but 1 contract, LAHSA did not receive the grant agreement from HUD until months into the performance period. LAHSA is unable to execute sub-recipient agreements prior to execution of the underlying grant agreement from HUD. LAHSA's records indicate that it took an average of 70 days, or a little over 2 months, to execute agreements with sub-recipients after receipt of the grant agreement from HUD (see Appendix A). Across the entire 2016 and 2017 NOFA portfolios, the average time to execute sub-recipient agreements after receipt of the grant agreement from HUD was only 59 days, or a little under 2 months. LAHSA agrees that during the audit period LAHSA's Policies and Procedures lacked explicit timelines for execution of HUD grant agreements and sub-recipient agreements. As noted in the response to recommendations below, this has been rectified in current procedures.<br><br>OIG asserts that it only took an average of one month from the start of the sub-recipient performance period to sign agreements, and that LAHSA added another month to execute. This is inaccurate in 2 ways. First, the assertion regarding HUD's signature date implies that the date of HUD's signature marked the date LAHSA was able to process the grants, which is inaccurate, as LAHSA must first receive the grants from HUD before processing and executing them. LAHSA's records indicate that for all but 5 of the grant agreements in the sample pool LAHSA did not receive the grants from HUD until after the start of the sub-recipient performance periods. For the 18 grant agreements received by LAHSA from HUD after the start of the performance period, LAHSA received the grant agreements from HUD on average 72 days after the start of the sub-recipient performance period. HUD's issuance of grant agreements after performance start dates to LAHSA was a significant contributing factor to LAHSA's challenge in meeting the timeliness standard in 24 CFR 578.85 (c) (1 and 2) cited in page 25 of the draft audit. Second, for the entire sample pool, LAHSA's records indicate that LAHSA executed the grant agreements within an average of 9.78 days of receipt from HUD, far less than a month additional to execute. Based on LAHSA's records, across the entire 2016 and 2017 portfolios, the average time it took LAHSA to execute the grant agreements after receipt from HUD was 10.3 days. |

---

[11] See "Progress Report on Los Angeles Continuum of Care Program Utilization," October 13, 2020. https://www.lahsa.org/documents?id=4893-coc-program-memo-final-10-13-2020; "Quarterly Progress Report on Los Angeles Continuum of Care Program Utilization." https://www.lahsa.org/documents?id=5135-la-coc-quarterly-spending-utilization-report

[12] See "2021 Los Angeles Continuum of Care Program Performance Evaluation Process & Methodology," https://www.lahsa.org/documents?id=5514-final-2021-coc-program-performance-evaluation-methodology-approved-06-25-2021

[13] See Item 02 "FY 2021 CoC Program NOFA Review and Discussion," Los Angeles Continuum of Care Board, July 14, 2021. https://www.lahsa.org/documents?id=5521-coc-nofa-presentation-to-coc-board-7-14-2021

Page **5** of **11**

26

**Auditee Comments and OIG's Evaluation**

| **Ref to OIG Evaluation** | **Auditee Comments** |
|---|---|
| | HUD OIG CoC draft audit report<br>LAHSA response<br>August 17, 2021 |
| Comment 6 | On page 7 of the draft audit, OIG cites "Prioritization of CoC Funding" and asserts that LAHSA "lacked policies that prioritized the use of CoC funds and, instead, appeared to have offered some sub-grantees the option of keeping their CoC grants or using less restrictive funds... promoting a new source of local funding, emphasizing its flexibility in comparison to HUD CoC funding... Rather than using the additional source of funding to supplement or expand on the sub-grantees homelessness activities funded by the CoC grants, the Authority offered grantees the option of keeping their CoC grant funds or giving them up for the local funding." LAHSA objects to this statement.<br><br>Based on LAHSA's records, OIG's assertion is based on conjecture and contradicts one of HUD's policy priorities in the 2017 NOFA. LAHSA's understanding is that OIG and sub-grantee interviews were referencing the CoC's 2017 reallocation and priority list ranking strategy,[14] which was approved by the CoC and consistent with HUD's policy priority #1 "Ending homelessness for all persons" which stated "CoC's should use the reallocation process to create new projects that improve their overall performance and better respond to their needs."[15] The CoC strategy resulted in the CoC reallocating transitional housing and rapid re-housing projects[16] to be supported by local funding and submitting several new CoC project proposals for permanent supportive housing, consistent with the CoC's reallocation strategy which reflected the CoC's needs. Of the 23 grants reviewed by OIG, nine (9) of those grants were included on the CoC's reallocated project list from 2017.<br><br>Furthermore, LAHSA does not blend other sources of funding with subrecipient CoC contracts, therefore the assertion by OIG and/or interviewees that LAHSA instructed subrecipients to prioritize spending local funding over CoC funding is seemingly without merit. The majority of the reallocated projects had local funded project terms that started after the CoC project ended. Specifically, CA1496L9D001601 term ended in 12/31/2018 and the local funding contract, 2018CNGFH221, started in 1/1/2019. Therefore, the assertion that LAHSA instructed the subrecipient to prioritize spending local funding over CoC funding is unfounded because the local funding was not available to the project during the term of the CoC grant. |
| Comment 7 | On page 7 of the draft audit, OIG cites "Personnel Turnover and Capacity Issues" and asserts that LAHSA "experienced personnel turnover and capacity issues due to dramatic increases in local funding for homeless services and short-term housing since 2017" and that organizational restructuring "resulted in a number of employees leaving the Authority." Based on subsequent conversation with OIG, this statement seems to be based on observation. OIG did not request turn-over data or vacancy rates to validate this statement. It does not appear that analysis was performed to support this claim. At the time of the audit, LAHSA had experienced tremendous growth. Without data analysis, we are unclear if vacancies OIG observed were for new positions or for existing positions that support HUD CoC administration. LAHSA requests that this is removed from the draft audit report.<br><br>---<br><br>[14] See Item 2.0 and 3.0 "Review and approve LA CoC Program Priority List Ranking Strategy" and "Review and approve LA CoC Program Reallocation Policy." August 10, 2017. https://www.lahsa.org/documents?id=1534-commission-agenda-supporting-documents-08-10-17.pdf<br>[15] See FY 2017 CoC Program Competition NOFA, Section II-A-1 "Ending homelessness for all persons." https://files.hudexchange.info/resources/documents/FY-2017-CoC-Program-Competition-NOFA.pdf<br>[16] See FY 2017 Los Angeles Continuum of Care Program Application Reallocated Projects. September 13, 2017. https://www.lahsa.org/documents?id=1622-fy-2017-final-coc-nofa-reallocated-projects-list.pdf<br><br>Page **6** of **11** |

27

## Auditee Comments and OIG's Evaluation

**Ref to OIG Evaluation**

**Auditee Comments**

Comment 8

Comment 9

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

C) *The Underutilization of CoC Funds Primarily Impacted Leases and Rental Assistance*

On page 8 of the draft audit, OIG asserts that LAHSA "used less of its available funds to pay for leases and rental assistance, which is the activity that directly affects the number of homeless persons on the streets." This statement fails to account for how long-time funded CoC projects with supportive service budgets have been used to address homelessness in the LA CoC. Several LAHSA permanent housing CoC grants, including some reviewed by HUD during the audit period, are legacy projects that include funding for supportive services while leveraging other rental assistance subsidies (such as Section 8 or CoC rental assistance by a Public Housing Authority grantee) to create permanent supportive housing, which is a HUD-supported, evidence-based effective housing model that best serves program participants who are high acuity, disabled, and have chronic histories of homelessness, including unsheltered homelessness.

Furthermore, the two largest Public Housing Authorities in the region (City of LA, County of LA) each contribute a significant portion of their non-CoC-funded vouchers to people experiencing homelessness. In the 2018 NOFA LA CoC Collaborative Application, the LA CoC reported the Housing Authority of the City of LA (HACLA) and the LA County Development Authority (formerly the Housing Authority of the County of LA) reported 55.24 percent and 58 percent (respectively) of new admissions to their Housing Choice Voucher (HCV) Programs were people experiencing homelessness at the time of admission. In NOFA 2019, those figures were 46.84 percent and 67.6 percent respectively. This dedication of HCV resources by the two largest PHAs in the region further signals how LAHSA and the LA CoC leverage mainstream resources to serve those experiencing homelessness.

**Recommendations:**
*1A. Develop and implement policies and procedures to ensure that sub-grantee agreements are executed in a timely manner, effective monitoring is performed, and sub-grantees maintain an emphasis on using their CoC funds, thereby preventing similar occurrences of $3.5 million (see appendix D) in CoC funding going unused.*

LAHSA has updated contracting policies and procedures to include processing timelines to ensure timely execution of grant agreements with HUD and sub-recipient agreements with providers (see Appendix B) LAHSA has also streamlined contract processing by eliminating non-value-adding reviewers in the process workflow and has transitioned to digital routing both internally and to sub-recipients using AdobeSign. To provide additional support in the processing of grant agreements and to address staffing concerns, a new unit has been created specifically to manage the processing of funder agreements and grants (the Funding & Grants Unit). At the same time, the Contracts Unit expanded the number of Specialists charged with managing sub-recipient portfolios by 28%. In addition, LAHSA has launched a Contracting and Procurement Optimization project to enhance the procurement and contracting processes overall and implemented a new Enterprise Grants Management System (EGMS). The Contracting and Procurement Optimization project is intended to reduce contracting timelines through the development of standardized contract templates and streamlined procurement vehicles. LAHSA worked with HUD TA to develop new Funder-specific flow-downs Exhibits, rather than incorporating all terms within the contract body. This is being launched in the 2020 NOFA year.

LAHSA acknowledges that at the time of the audit, no active monitoring reviews were underway since staff were completing required annual risk assessments. Since the audit, LAHSA has enhanced CoC sub-award monitoring. LAHSA has strengthened our monitoring protocol through hiring a CoC Manager, who came on board in June 2019. The CoC Manager is responsible for oversight of the CoC Program-funded

Page **7** of **11**

28

## Auditee Comments and OIG's Evaluation

**Ref to OIG Evaluation**

**Auditee Comments**

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

**Comment 9**

grant portfolio, monitoring quarterly spending and ensuring the LA CoC Board is informed within its oversight function to set appropriate policies that help drive portfolio improvement. Furthermore, on July 1, 2021, LAHSA implemented a new re-organization of the program functions and developed a Permanent Housing Department responsible for the Continuum of Care portfolio.  The PSH team will develop a monthly performance meeting with services providers to reconcile budgets, expenditures, and coordinate with the grants management team. Finally, EGMS, powered by REI Systems, will support full grant lifecycle administration, enhancing standardization of contracting requirements, transparent collaboration, and real-time spend-down analysis. The EGMS was launched July 1, 2021, with LAHSA's HUD COC portfolio transitioning to the system starting in October 2021.

*1B. Develop and implement strategies to address capacity and organizational problems or obtain technical assistance to address these issues.*

**Comment 10**

The LA CoC has been identified by HUD as an S1 Initiative community for several years, with HUD deploying HUD Technical Assistance (TA) to focus on systemic challenges in the region. Beginning in November 2019, HUD augmented the S1 Initiative HUD TA with additional support to address the mission-critical work associated with the advent of Housing Central Command. In addition, HUD TA has been instrumental in evaluating LAHSA structure and CoC administration. We will continue to partner with HUD TA.

To enhance the assistance provided by HUD TA, LAHSA's Permanent Housing Department has developed a technical assistance plan for all service providers who will be trained on the specific CoC Grant, requirements, compliance, service delivery, outcomes, and expenditures of the funding allocation.  This technical assistance will be a collaborative and coordinated approach to facilitating change, building the capacity of both organizations as well as individuals, developing improved ways of doing things, and ultimately, achieving agreed-upon outcomes and ensuring utilization of funding allocations. This role will be handled by Analyst under the Performance Management section of the Permanent Housing Department.

*1C. Develop and implement procedures and controls to clearly define and update point-of-contact staff for sub-grantees.*

**Comment 11**

As previously stated, LAHSA's employment of a CoC Manager has established a centralized point of contact for CoC grants. The CoC Manager acts as the subject matter expert on CoC programs and a liaison between CoC sub-recipients, HUD CPD, and the CoC Board. In addition, the newly implemented EGMS introduces clear sub-award ownerships and collaboration features into the system, which will enhance transparency in LAHSA's role structure.

*1D. Work with HUD and sub-grantees to reevaluate its CoC program's performance goals and set targets that help to ensure that funds for future CoC grants are fully and effectively used to advance the goal of ending homelessness.*

**Comment 12**

LAHSA adheres to CoC regulations and ensures performance goals are developed and reviewed through the CoC Board, which includes representation from a cross section of stakeholders such as service providers, people with lived expertise of homelessness, and public housing authority officials. For the 2021

Page **8** of **11**

29

**Auditee Comments and OIG's Evaluation**

| Ref to OIG Evaluation | Auditee Comments |
|---|---|
| | HUD OIG CoC draft audit report<br>LAHSA response<br>August 17, 2021 |
| Comment 12 | NOFA,[17] the performance methodology includes a more robust metric for evaluating spend-down and utilization performance, serving as evidence of the LA CoC's commitment to addressing underperformance within its portfolio.<br><br>**FINDING 2**<br>**The Authority Did Not Support Salary and Rental Costs Charged to Its CoC HMIS and Planning Grants.**<br><br>*A)  The Authority Did Not Support Salary Cost Allocations* |
| Comment 13 | LAHSA will work with HUD CPD to address this finding.  During the FY 2018-19 audit conducted by OIG, LAHSA provided supporting documentation that OIG found to be predetermined costs. LAHSA will work with HUD CPD to provide additional supporting documents to validate that based on 24 CFR Section 578.39 - Continuum of Care Planning Activities, the position titles and job descriptions support direct planning and grant activities which benefits the entire continuum of care.<br><br>The salaries charged to COC were actual hours, directly charged, and allocated to COC, city match and county match as outlined in our contract with HUD. The HUD contract required that the grants received from HUD have a match of 25% split between City and County funds. Though the allocation percentage may differ across quarters, LAHSA made sure that at the end of the contract period the required match to COC contract was met. This is shown in the RER and final cash request documentation submitted during the audit. LAHSA was not required to split transactions according to funding allocations, as long as at the end of the contract the match requirement was fully met.<br><br>Additionally, in LAHSA's FY 2019-20 single audit, Clifton Larson Allen LLP (CLA)[18] reviewed the CoC as a major program. The samples included HMIS and Planning. The auditors deemed that Time and Effort documentation provided was sufficient and did not result in any findings.<br><br>*B)  The Authority Did Not Support Rental Cost Allocations* |
| Comment 14 | LAHSA does not agree with this finding. During the FY 2018-19 audit conducted by OIG, LAHSA provided supporting documentation to support rental cost allocations. Included is the Guiding Memo on LAHSA Rent Allocation and Rental Allocation Narrative as additional support. Refer to Appendix C of supporting documents with guidance on LAHSA's rent cost allocation. As explained in the guiding memo, LAHSA uses the FTE to distribute rent. Different cost centers represent the contract/program and/or grant the employee is being charged to. However, there are cost centers that represent allocation to multiple contracts just like the COC planning pool. The allocation is specific to COC planning. This pool is an allocation between 2 COC planning contracts that run concurrently and the city and county match. The allocation percentage is also affected by the fiscal year of our city and county match. The COC contract period does not follow our fiscal year while the city and county contracts do. This difference in contract period caused the match to be spent much earlier on their contracts than COC contracts. But at the end of the COC contract the required match is fully complied with. Appendix D shows Cost Center definition. |

[17] See Final 2021 CoC Program Performance Evaluation Methodology approved 6-25-2021
[18] See LAHSA 19-20 Single Audit 19-20 https://www.lahsa.org/documents?id=5232-lahsa-audited-financial-statements-and-single-audit-report-for-fiscal-year-2019-2020.pdf

Page **9** of **11**

30

## Auditee Comments and OIG's Evaluation

**Ref to OIG Evaluation**

**Auditee Comments**

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

**Recommendations:**
*2A. Adequately support the eligibility of payroll costs or repay its CoC grants $824,302 from non-Federal funds.*

Comment 15

LAHSA will continue to work with HUD CPD to validate the eligibility of all payroll costs incurred, through the supporting documentation. We feel very strongly that these expenses are eligible and in alignment with CoC Planning Grant Guidelines.

*2B. Adequately support the eligibility of rent costs or repay its CoC grants $55,545 from non-Federal Funds.*

Comment 15

LAHSA will continue to work with HUD CPD to provide support for all rent costs incurred. We feel very strongly that these expenses are eligible and in alignment with CoC Planning Grant Guidelines.

*2C. Develop and implement additional written procedures and controls to ensure that employees charge time in accordance with program requirements and that the Authority fully documents and supports that salary and rental cost allocations are charged to its CoC grants in accordance with its cost allocation plan.*

Comment 16

LAHSA will continue to enhance written procedures and controls to ensure personnel charges comply with our established cost allocation plan and OMB Uniform Guidance.

**FINDING 3**
**The Authority Did Not Submit Annual Performance Reports in a Timely Manner.**

*A)   Late Submission of APRs*

Comment 17

LAHSA acknowledges that APRs in the audit sample were submitted late. LAHSA has been working to document new procedures for timely APR submissions, at the same time it is actively tracking and managing the submission of APRs to comport with HUD requirements.

**Recommendations:**
*3A. Complete and implement policies and procedures to ensure that APRs are submitted by the closeout deadline.*

Comment 17

LAHSA acknowledges timely submission of APRs are a HUD requirement. Through the implementation of the Permanent Housing department and the streamlined process within EGMS (Enterprise Grant Management System), LAHSA will ensure APRS are being submitted timely.

*3B. Develop and implement policies and procedures to ensure that relevant personnel are routinely and regularly trained on the grant closeout process.*

Comment 17

LAHSA acknowledges training staff on grant closeout will ensure timely submission of APRs. Through the newly developed Permanent Housing Department and the process of implementing EGMS, we will also ensure this recommendation is followed.

Page **10** of **11**

31

**Auditee Comments and OIG's Evaluation**

**Ref to OIG Evaluation**

**Auditee Comments**

Comment 18

HUD OIG CoC draft audit report
LAHSA response
August 17, 2021

**Conclusion**
We appreciate the opportunity to address OIG's draft report of LAHSA CoC programs for the period of October 2017 to September 2019.  As detailed in the above response, LAHSA does not agree with all the statements and findings included in the draft report. In other areas, many of OIG's recommendations are already in place. LAHSA values the partnership with HUD in effectively administering CoC programs. LAHSA will continue to lead system solutions for the crisis of homelessness grounded in compassion, equity, and inclusion.

Should you have any questions regarding LAHSA's response, please do not hesitate to contact Darcie Mulholland, Director of Compliance, by email at dmulholland@lahsa.org.

Sincerely,

*Heidi Marston*
Heidi Marston (Aug 17, 2021 14:15 PDT)

Heidi Marston
Executive Director

Page **11** of **11**

32

**OIG Evaluation of Auditee Comments**

Comment 1    We acknowledge that the discussion draft was provided to the Authority almost 19 months after we started this audit.  Unfortunately, the challenges of completing the audit during the pandemic and other matters delayed the draft report.  Draft finding outlines were initially provided to the Authority on October 7, 2020, with revisions submitted on March 25, 2021.

We commend the Authority for developing preemptive measures and strengthening controls to address and correct identified issues occurring during our audit period of October 1, 2017, to September 30, 2019.  We also acknowledge that the Authority has provided us with documents to support these measures, including newly developed policies and procedures.  However, we cannot confirm that these changes have been fully implemented and, therefore, the associated recommendations can be resolved with HUD during the audit resolution process.

Comment 2    We acknowledge the Authority's concerns about the inclusion of the City controller's report.  However, as discussed in the exit conference, the controller's report was part of what prompted us to initiate the audit.  (See Highlights.)  The Background section provides context for what was in its public report.  We added a footnote to further clarify that our audit team did not validate the results from the controller's report.

Comment 3    We acknowledge that homelessness increased nationwide for the fourth consecutive year in 2020.  We also acknowledge that securing affordable housing in the Los Angeles rental market is a challenge.  We commend the Authority for being the lead agency in the Los Angeles CoC and a key member of the local homeless services system, which connects the homeless to permanent housing.

We audited the Authority's CoC program, which is only a portion of its overall investments in local housing and services.  Our audit scope was limited to a sample of CoC grants directly operated by the Authority or its subgrantees.  (See Scope and Methodology for sample selection.)

Comment 4    We commend the Authority for taking proactive measures to address this finding, which include acknowledging that grants were underspent and working with the public housing agencies to coordinate efforts to resolve the issue.

We also acknowledge that the Authority requested and obtained HUD technical assistance to address and improve CoC grant underutilization.  The Authority did not bring to our attention the technical assistance request or any derived improvements during the course of our fieldwork.

33

We did not review the grants of the other Los Angeles CoC members, the Housing Authority of the City of Los Angeles or the Los Angeles County Development Authority, as these grants are not directly administered or subgranted by the Authority and were, therefore, outside our audit scope.  (See Scope and Methodology.)

Comment 5    We acknowledge that the Authority's records indicated that it took an average of 70 days, not the 119 days stated in the report, to execute agreements with subrecipients after receipt of the grant agreement from HUD.  However, the Authority did not provide specific documents, other than a spreadsheet, to support the actual date on which it received the grant agreement from HUD.

As stated in the report, our numbers were calculated from the start of the performance period of each grant to the date on which it was signed.  We acknowledge that the date of HUD's signature was not necessarily the date on which the Authority was able to process the grants and that the Authority must receive the grants from HUD before processing and executing them.  We also acknowledge that grant agreement timeliness is a shared responsibility between HUD and the Authority.  However, as noted above, we cannot confirm delays on HUD's part based on the support provided.

We commend the Authority for recognizing that the policies and procedures lacked explicit timelines for execution of HUD grant agreements and subrecipient agreements and for taking steps to update its procedures to rectify the issue.  We cannot verify that the applicable procedures were implemented based on the documentation provided; however, the Authority will have the opportunity to demonstrate this assertion to HUD as part of audit resolution.

Comment 6    We acknowledge that of the 23 grants reviewed, 10 were included in the CoC reallocated project list of 2017.  However, for 6 of the 10, the bases for the reallocation were "voluntary surrender."  In addition, 4 of the 10 did not comply with the established reallocation policies.

This condition occurred because the Authority approached the subgrantees via email and using a preset template asking them if they would like to surrender their CoC grants and enter into a new locally funded contract, only allowing the grantees by the end of the day to decide.  In the case of grant CA1496L9D001601, the subgrantee agreed to surrender the grant with the understanding that the new local funding would be more flexible and it did not have to reapply the next year.  In the end, this subgrantee did not use 29.4 percent ($286,947 / 977,097) of the grant amount.  The Authority could have used the additional source of funding to supplement or expand on its subgrantees' homelessness activities funded by the CoC without blending funds.  Instead, the Authority offered subgrantees the option of keeping their CoC grant funds or giving up future grant renewal funding and replace it with the local funding.  By

34

asking subgrantees to replace CoC funding with local funding. The Authority was prioritizing the use of local funding over the existing and upcoming CoC renewal grant funding.

We have adjusted the wording of the report to clarify that the grant was being surrendered at the end of its term.

Comment 7     We acknowledge the Authority's position that our assertion on the cause of "personnel turnover and capacity issues" seemed to be based on observation. However, the Authority did not dispute that it experienced dramatic increases in local funding and went through organizational restructuring that we were able to verify to source documentation.  Our assertion was based on a discussion with an Authority management representative, who stated that these changes contributed to a number of employees leaving the Authority.  We also reviewed documentation related to the Authority's use of temporary employees, noted current vacancies on its organizational chart, and Authority committee meeting information showing its efforts to fill vacancies.

Comment 8     We acknowledge that several of the Authority's permanent housing CoC grants are legacy projects that include funding for supportive services while leveraging other rental assistance subsidies to create permanent supportive housing. However, our assertion is specifically about how the Authority's underutilization of funds disproportionally impacted the spending on leases and rental assistance.

Comment 9     We acknowledge that the Authority has been taking measures to address the issues identified in this recommendation.  However, we cannot confirm that the recommendation has been resolved based on the documentation provided.  The Authority will have the opportunity to further address the recommendation with HUD as part of the audit resolution process.

Comment 10    We acknowledge that the Authority has been working with HUD technical assistance to address this issue.  These ongoing efforts will facilitate resolving the recommendation with HUD as part of the audit resolution process.

Comment 11    We acknowledge the Authority's assertion that it established a centralized point of contact for CoC grants to address this issue.  HUD can verify this assertion, along with the associated policies and procedures, as part of the audit resolution process.

Comment 12    We acknowledge that the Authority complied with CoC performance goals regulations; however, we also recognize that there is room for improvements to advance the goal of ending homelessness.  Therefore, the Authority can resolve the recommendation with HUD in the audit resolution process.

35

Comment 13   We acknowledge that based on recently provided single audit reports for fiscal years 2018-2019 and 2019-2020, the Authority's certified public accounting firm indicated in the schedule of prior audit findings for fiscal year 2018-2019 that corrective action was taken for the allowable cost finding.  We also acknowledge that the finding did not reappear in the fiscal year 2019-2020 single audit.

We also acknowledge the Authority's assertion that the salaries charged to CoC were actual hours, directly charged and allocated to CoC, City match, and County match.  However, we disagree since City and County match were not included in the revenue and expenses reports provided by the Authority for both grants.  In addition, the charge code to which the salaries for HMIS were charged was not specific to the grant in question but applicable to 12 contracts from 5 different grants.  Therefore, the questioned costs were not actual hours worked on the specific grants and will still need to be reviewed and resolved during the audit resolution process.

Comment 14   We acknowledge that the Authority submitted additional support for rental costs with its response; however, the Authority did not provide specific and actual calculations for the monthly rent charged to the two grants.  Instead, it provided methodology and an example using a nonrelated department code.  In addition, and based on the guiding memorandum provided, "the department share in rent is determined by getting the ratio of total department employee salaries expense to the total [Authority] employee salaries expenses."  However, both CoC HMIS and planning grants show multiple department codes, and the methodology was specifically created to calculate rent costs charged to a "department" and not to a "grant."  In addition, since there were issues with the allocation of salaries (as discussed in finding 2), the results of the calculation would not be accurate.

Therefore, rental cost allocations have not been supported.  The Authority will have the opportunity to support the questioned rent costs during the audit resolution process.

Comment 15   We commend the Authority for working with HUD CPD to validate the eligibility of the questioned payroll costs. The Authority will have the opportunity to support the questioned costs and resolve the audit recommendations with HUD as part of audit resolution.

Comment 16   We commend the Authority for continuing to enhance written procedures and controls to ensure compliance with its cost allocation plan and Office of Management and Budget (OMB) guidance. The Authority will have the opportunity to provide enhanced written procedures and controls to resolve the audit recommendations with HUD as part of audit resolution.

Comment 17   We commend the Authority for developing new procedures to help ensure timely APR submissions. The Authority will have the opportunity to provide the written

policies and procedures for timely APR submissions and grant closeout personnel training to resolve the audit recommendations with HUD as part of audit resolution.

Comment 18   We acknowledge that the Authority does not agree with all the content of the report.  Even so, we commend it for already starting to take the necessary measures to address most of the recommendations to rectify the identified issues.

The Authority will have the opportunity to support the questioned costs and discuss how to resolve the audit recommendations with HUD as part of audit resolution.

# Appendix C

## Criteria

**2 CFR 200.4 Allocation**

*Allocation* means the process of assigning a cost, or a group of costs, to one or more cost objective(s), in reasonable proportion to the benefit provided or other equitable relationship.  The process may entail assigning a cost(s) directly to a final cost objective or through one or more intermediate cost objectives.

**2 CFR 200.343 (b) Closeout**

Unless the Federal awarding agency or pass-through entity authorizes an extension, a non-Federal entity must liquidate all obligations incurred under the Federal award not later than 90 calendar days after the end date of the period of performance as specified in the terms and conditions of the Federal award.[18]

**2 CFR 200.403 Factor affecting allowability of costs**

Except where otherwise authorized by statute, costs must meet the following general criteria in order to be allowable under Federal awards:

a. Be necessary and reasonable for the performance of the Federal award and be allocable thereto under these principles.

g. Be adequately documented.

**2 CFR 200.404 Reasonable Costs**

A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost.

**2 CFR 200.405 Allocable costs**

(a) A cost is allocable to a particular Federal award or other cost objective if the goods or services involved are chargeable or assignable to that Federal award or cost objective in accordance with relative benefits received.  This standard is met if the cost:

    (1) Is incurred specifically for the Federal award;

    (2) Benefits both the Federal award and other work of the non-Federal entity and can be distributed in proportions that may be approximated using reasonable methods; and

    (3) Is necessary to the overall operation of the non-Federal entity and is assignable in part to the Federal award in accordance with the principles in this subpart...

(b) All activities which benefit from the non-Federal entity's indirect (F&A [facilities and administrative]) cost, including unallowable activities and donated services by the non-Federal entity or third parties, will receive an appropriate allocation of indirect costs.

---

[18]    After the audit period, the applicable closeout requirements were revised to 2 CFR 200.344 (b) and the deadline was changed from 90 to 120 days, effective November 2020.

(d) Direct cost allocation principles.  If a cost benefits two or more projects or activities in proportions that can be determined without undue effort or cost, the cost must be allocated to the projects based on the proportional benefit.

**2 CFR 200.430 Compensation – personal services**
(i)  Standards for Documentation of Personnel Expenses
(1)  Charges to Federal awards for salaries and wages must be based on records that accurately reflect the work performed.  These records must:
(i) Be supported by a system of internal control which provides reasonable assurance that the charges are accurate, allowable, and properly allocated;
(ii) Be incorporated into the official records of the non-Federal entity;
(iii) Reasonably reflect the total activity for which the employee is compensated by the non-Federal entity, not exceeding 100% of compensated activities;

**24 CFR 578 (1) Continuum of Care Program**
The Continuum of Care (CoC) Program (24 CFR part 578) is designed to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by nonprofit providers, states, and local governments to quickly re-house homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs by homeless individuals and families; and to optimize self-sufficiency among individuals and families experiencing homelessness.

**24 CFR 578.7 Responsibilities of the Continuum of Care**
(a) Operate the Continuum of Care.  The Continuum of Care must:
(6) Consult with recipients and subrecipients to establish performance targets appropriate for population and program type, monitor recipient and subrecipient performance, evaluate outcomes, and take action against poor performers; (7) Evaluate outcomes of projects funded under the Emergency Solutions Grants program and the Continuum of Care program, and report to HUD;

**24 CFR 578.85 Timeliness standards**
(a) *In general.*  Recipients must initiate approved activities and projects promptly.
(c) *Distribution.*  A recipient that receives funds through this part must:
(1) Distribute the funds to subrecipients (in advance of expenditures by the subrecipients);
(2) Distribute the appropriate portion of the funds to a subrecipient no later than 45 days after receiving an approvable request for such distribution from the subrecipient; and
(3) Draw down funds at least once per quarter of the program year, after eligible activities commence.

**24 CFR 578.109 Closeout**
**(a)** *In general.*  Grants will be closed out in accordance with the requirements of 2 CFR part 200, subpart D, and closeout procedures established by HUD.
**(b)** *Reports.*  Applicants must submit all reports required by HUD no later than 90 days from the date of the end of the project's grant term.

**(c)** *Closeout agreement.*  Any obligations remaining as of the date of the closeout must be covered by the terms of a closeout agreement.

**Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2017 Continuum of Care Program Competition, FR-6100-N-25**
**B.  Distribution of Funds.**  The distribution of funds will depend largely on CoC determined priorities, HUD selection priorities, overall demand, and renewal eligibility.

3.  *Renewal Project Grant Terms*

a. All renewal project applications, including rental assistance, are limited to 1-year grant terms and 1 year of funding.

# Appendix D

## List of Reviewed Expired CoC Grants

| No. | Grant number | Expiration date | Grant amount | Balance | Unused percentage |
|---|---|---|---|---|---|
| 1 | CA0422L9D001609 | 3/31/2018 | $460,060 | $317,055 | 68.9% |
| 2 | CA0509L9D001609 | 6/30/2018 | 371,836 | 199,996 | 53.8% |
| 3 | CA0508L9D001609 | 6/30/2018 | 108,509 | 53,376 | 49.2% |
| 4 | CA0502L9D001609 | 6/30/2018 | 201,389 | 52,674 | 26.2% |
| 5 | CA0425L9D001609 | 7/31/2018 | 157,949 | 69,363 | 43.9% |
| 6 | CA0467L9D001609 | 8/31/2018 | 287,809 | 185,272 | 64.4% |
| 7 | CA0994L9D001603 | 8/31/2018 | 283,614 | 107,162 | 37.8% |
| 8 | CA1496L9D001601 | 12/31/2018 | 977,097 | 286,947 | 29.4% |
| 9 | CA1495L9D001601 | 12/31/2018 | 322,453 | 251,907 | 78.1% |
| 10 | CA1489L9D001601 | 12/31/2018 | 240,742 | 88,252 | 36.7% |
| 11 | CA0353L9D001710 | 1/31/2019 | 87,596 | 51,114 | 58.4% |
| 12 | CA0358L9D001710 | 3/31/2019 | 203,809 | 79,373 | 38.9% |
| 13 | CA0341L9D001710 | 4/30/2019 | 152,667 | 50,633 | 33.2% |
| 14 | CA0363L9D001609 | 6/30/2018 | 124,195 | 107 | 0.1% |
| 15 | CA0370L9D001609 | 1/31/2018 | 140,104 | 0 | 0.0% |
| 16 | CA0376L9D001609 | 11/30/2018 | 172,646 | 3,990 | 2.3% |
| 17 | CA0413L9D001609 | 1/31/2018 | 60,177 | 0 | 0.0% |
| 18 | CA0430L9D001609 | 3/31/2018 | 419,585 | 0 | 0.0% |
| 19 | CA0510L9D001609 | 6/30/2018 | 181,635 | 85,244 | 46.9% |
| 20 | CA0526L9D001609 | 8/31/2018 | 485,775 | 102,162 | 21.0% |
| 21 | CA0993L9D001604 | 10/31/2018 | 362,258 | 26,479 | 7.3% |
| 22 | CA1336L9D001602 | 12/31/2018 | 395,955 | 118,877 | 30.0% |
| 23 | CA1686L9D001700 | 12/31/2019 | 1,504,357 | 1,335,625 | 88.8% |
| **Total** | | | **7,702,217** | **3,465,608** | **45.0%** |

We selected sample numbers 14 through 23 for performance-related interviews.  We were not able to interview sample number 17.  (See Scope and Methodology.)