# Exhibit E

# COUNTY OF LOS ANGELES
## DEPARTMENT OF AUDITOR-CONTROLLER

KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET, ROOM 525
LOS ANGELES, CALIFORNIA 90012-3873
PHONE: (213) 974-8301    FAX: (213) 626-5427

**OSCAR VALDEZ**
AUDITOR-CONTROLLER

**CONNIE YEE**
CHIEF DEPUTY AUDITOR-CONTROLLER

November 19, 2024

TO:  Each Supervisor

FROM:  Oscar Valdez, Auditor-Controller

SUBJECT:  **LOS ANGELES HOMELESS SERVICES AUTHORITY – FINANCE, CONTRACTS, RISK MANAGEMENT, AND GRANTS MANAGEMENT REVIEW (February 27, 2024, Board Agenda Item 4)**

| NUMBER OF RECOMMENDATIONS | |
|---|---|
| PRIORITY 1 | 10 |
| PRIORITY 2 | 3 |
| PRIORITY 3 | 3 |

With the support of the Chief Executive Office (CEO) and the Los Angeles Homeless Services Authority (LAHSA), we completed a review of LAHSA's Finance, Contracts, Risk Management, and Grants Management and Compliance units, as requested by the Board of Supervisors on February 27, 2024, Board Agenda Item 4.  Our review was completed in accordance with the scope of work report back issued on April 23, 2024 (included in Attachment II).

We noted various opportunities for LAHSA to improve and strengthen their controls and processes over their operations, and offer the recommendations in this report to assist LAHSA management in that regard.  For example, LAHSA:

- Awarded $50.8 million in Measure H working capital (multi-year) cash advances to various subrecipients beginning in Fiscal Year (FY) 2017-18, and did not establish formal agreements to determine how and when the funds would be repaid.  As a result, while LAHSA indicated they initiated efforts to recoup the funds in FY 2023-24, some subrecipients cited cash flow issues, and LAHSA only recovered approximately $2.5 million (5%) as of July 8, 2024.

- Did not always recover annual cash advances awarded to subrecipients at year-end as required, and as of July 2024, had approximately $8 million in outstanding advances issued to subrecipients for the City of Los Angeles (City), County, and State programs that were carried over from FYs 2016-17 through 2022-23.  Of the $8 million, approximately $409,000 is with six subrecipients who no longer contract with LAHSA.

**FAST FACTS**

*LAHSA is a joint powers authority created in December 1993 by the City and County of Los Angeles.*

*LAHSA receives funding from the County of Los Angeles, City of Los Angeles, State, and federal governments.*

*For FY ended June 30, 2023, LAHSA's total revenue was approximately $647 million.*

*REPORT #C24004*

Each Supervisor
November 19, 2024
Page 2

- Did not always pay subrecipients timely even when the funds were available, whereas in other instances, inappropriately used funding from other sources to pay subrecipients prior to receiving reimbursement from the actual funder.

- Did not always maintain adequate records for working capital advances.  Specifically, we selected a sample of working capital advances to validate the accuracy of LAHSA's accounting records and noted that LAHSA understated the amounts awarded to two subrecipients by $505,591, and did not provide adequate supporting documentation for approximately $5 million in advances awarded to five subrecipients.

- Could not provide comprehensive contract data (e.g., an accurate list of all contracts, execution dates, etc.) to determine the total number of contracts that were executed either timely or retroactively in FY 2023-24.  In addition, we noted instances where contracts were executed excessively late and the delays were due to issues concerning LAHSA's internal contracting processes.

- Did not develop an adequate contract monitoring plan to ensure effective oversight of their subrecipients.  In addition, due to a lack of standards for conducting and documenting the results of their contract monitoring reviews, we could not determine whether LAHSA adequately monitored all their contracts to ensure subrecipients complied with their contract terms.

For details of our review, please see Attachment I.  LAHSA's response (included in Attachment III) indicates agreement with five, disagreement with four, and partial disagreement with seven of our findings and recommendations.  It should be noted that LAHSA did not communicate any of these disagreements during our review, including during our preliminary and formal exit meetings.  As mentioned in Attachment II, our results will also help inform whether a strategic business process analysis and workplan for LAHSA is needed, which we will work with the CEO and LAHSA to determine after the issuance of this report.

We thank LAHSA management and staff for their cooperation and assistance during our review.  If you have any questions please call me, or your staff may contact Terri Kasman at tkasman@auditor.lacounty.gov.

OV:CY:RGC:TK:JH:meb

Attachments

c:  Fesia A. Davenport, Chief Executive Officer
Edward Yen, Executive Officer, Board of Supervisors
Va Lecia Adams Kellum, Ph.D., Chief Executive Officer, LAHSA

# LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

**Attachment I**
**Page 1 of 16**

| **Robert G. Campbell**<br>ASSISTANT AUDITOR-CONTROLLER | **Terri Kasman**<br>DIVISION CHIEF |
| --- | --- |

## COUNTYWIDE CONTRACT MONITORING DIVISION          *Report #C24004*

### LOS ANGELES HOMELESS SERVICES AUTHORITY
### FINANCE, CONTRACTS, RISK MANAGEMENT, AND GRANTS MANAGEMENT REVIEW
### (February 27, 2024, Board Agenda Item 4)

### BACKGROUND AND SCOPE

The Los Angeles Homeless Services Authority (LAHSA) is a joint powers authority of the County of Los Angeles (County) and the City of Los Angeles (City) created in December 1993 to address homelessness in the region. LAHSA coordinates and manages federal, State, County, and City funds for programs that provide various services to people experiencing homelessness. According to LAHSA's audited financial statements for the Fiscal Year (FY) ended June 30, 2023, the majority of LAHSA's funding comes from the County and City, totaling approximately $246 million and $234 million, respectively. The audited financial statements for the FY ended June 30, 2024, were not yet available at the time of our review.

At the Board of Supervisors' (Board) request, we completed a review of LAHSA's Finance, Contracts, Risk Management, and Grants Management and Compliance units, in accordance with the scope of work included in Attachment II. This review is intended to inform incoming financial leadership at LAHSA of key financial and operational areas that need improvement. In addition, as mentioned in Attachment II, our results will also help inform whether a strategic business process analysis and workplan for LAHSA is needed, which we will work with the County Chief Executive Office (CEO) and LAHSA to determine after the issuance of this report.

### TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION

| | ISSUE | RECOMMENDATION |
| --- | --- | --- |
| 1 | **Did Not Establish Agreements for Working Capital Advances** - In FYs 2017-18 through 2019-20, the County provided LAHSA approximately $82.5 million in Measure H working capital advances to support Measure H operations, in which LAHSA awarded $50.8 million to various subrecipients beginning in FY 2017-18 to address cash flow needs that may occur throughout the fiscal year. According to LAHSA, the subrecipients were allowed to retain these advances across multiple fiscal years and were not required to repay the funds annually. LAHSA retained the remaining $31.7 million to support internal operations and awarded annual cash advances for Measure H subrecipients, as mentioned in Issue No. 2.<br><br>However, LAHSA did not establish formal agreements with the subrecipients to determine how and when the working capital advances would be repaid. In addition, LAHSA indicated that while they initiated efforts to recoup the funds in FY 2023-24, some subrecipients reported having cash flow issues. As a result, | **Priority 1** - **LAHSA management:**<br><br>a) **Work with subrecipients to establish agreements with repayment terms for all outstanding working capital advances.**<br><br>b) **Provide the County CEO with quarterly updates until all advanced funds are repaid.**<br><br>**LAHSA's Response: Disagree**<br>Target Implementation Date: Not Indicated<br><br>LAHSA indicated disagreement and requested that we remove this finding and the associated recommendations, citing that their Operational Agreement (OA) with the County does not require LAHSA to recoup these advances annually or by July 8, 2024, as is stated in the report. However, our report does not state that these advances are required to be recouped annually or by July 8, 2024, and instead acknowledges that subrecipients were allowed to retain the advances across multiple fiscal years. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| LAHSA slowed their recoupment efforts and only recovered approximately $2.5 million (5%) as of July 8, 2024.<br><br>While LAHSA initiated attempts to recover these funds, we have concerns about LAHSA's ability to recover all the advances given the lack of formal agreements memorializing the advances when they were issued. LAHSA must continue to actively work with the subrecipients to establish agreements that formalize how and when the outstanding working capital advances will be repaid. LAHSA must also establish controls over cash advances, including any future working capital advances, as mentioned in Issue No. 4.<br><br>**Impact**: LAHSA may not be able to recover all working capital advances and as a result, may not repay the County the full $82.5 million in advanced Measure H funds. | In addition, LAHSA indicated that while their OA does not require them to establish formal agreements, they took the initiative to do so and provided the agreements along with recoupment schedules during our fieldwork. However, LAHSA only began establishing formal agreements during FY 2023-24, and only provided agreements for some (not all) of the providers with outstanding working capital advances. As indicated under the Issue section and in our recommendation, LAHSA must continue to work with the subrecipients to establish agreements for all outstanding working capital advances.<br><br>Furthermore, LAHSA indicated they were in full compliance with their OA since they provided the County with reconciliations for the working capital advances (in lieu of recouping the funds) at the end of each fiscal year. However, our finding does not take issue with LAHSA's compliance with the OA terms and the reconciliation or recoupment of the funds, but rather with the lack of formal agreements documenting the advance and terms of recoupment of public funds. While the OA does not require LAHSA to establish formal agreements for the working capital advances (as LAHSA indicates in their response), given the significant public funds advanced to and still outstanding with subrecipients, it is critical LAHSA implement our recommendations to ensure public funds are properly accounted for and safeguarded. |
| **2**   **Did Not Recoup Annual Cash Advances** - LAHSA has contracts with subrecipients that include provisions for annual cash advances (cash advances), which differ from working capital advances in that these funds are to be awarded and recouped by LAHSA each fiscal year. However, LAHSA did not always recover the cash advances at year-end and had a significant amount of outstanding advances dating back to FY 2016-17, including advances with subrecipients who no longer contract with LAHSA.<br><br>Specifically, LAHSA had approximately $15 million in outstanding cash advances made to subrecipients for City, County, and State programs as of July 2024, and of those amounts, approximately $8 million (53%) was carried over from prior fiscal years (i.e., FYs 2016-17 through 2022-23), including approximately $185,000 in advances that were provided in FY 2016-17. Of | **Priority 1** - **LAHSA management:**<br><br>a) **Work with subrecipients who have overdue outstanding cash advances to recover funds.**<br><br>b) **Ensure annual cash advances are recouped annually.**<br><br>c) **Consult with legal counsel regarding options for recouping outstanding cash advances with subrecipients who no longer contract with LAHSA.**<br><br>**LAHSA's Response: Partially Disagree**<br>Target Implementation Date:<br>Recommendation a): Not Indicated<br>Recommendations b) and c): June 30, 2026<br><br>LAHSA partially disagreed with our finding and that the requirement to recoup annual advances depends on the specific funder agreement for each grant. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION ||
| ISSUE | RECOMMENDATION |
|---|---|
| the $8 million, approximately $409,000 are outstanding advances to six subrecipients who no longer contract with LAHSA.<br><br>LAHSA indicated the cash advances received from their funders were trued-up against their actual expenditures in their year-end reimbursement claims.  However, LAHSA did not recoup the $8 million in cash advances from their subrecipients, creating an $8 million cash deficit.  LAHSA management indicated they track the outstanding cash advances as receivables in their accounting records, and the cash deficits will be resolved once the cash advances are collected from their subrecipients.  LAHSA must work with their subrecipients to ensure all outstanding cash advances are recouped, and establish proper controls over future cash advances, as mentioned in Issue No. 4.<br><br>**Impact**: Increased risk that LAHSA is unable to recover all cash advances, especially with subrecipients that no longer have a business relationship with LAHSA, resulting in shortfalls with funds that were intended for other programs. | However, LAHSA's contracts with their subrecipients include standard language indicating that "advance payments must be repaid in full prior to the close of the FY in which the advance payment is received."  Accordingly, regardless of funder requirements LAHSA's current practices are not in conformance with the terms of their own subrecipient contracts.<br><br>In addition, LAHSA indicated that their OA with the County allows for the funds to be reconciled annually in lieu of being recouped and therefore, they are fully compliant.  However, the terms cited are requirements for cash advances between the County and LAHSA, not LAHSA and their subrecipients.<br><br>LAHSA also requested this finding be reduced to a Priority 3, indicating that significant improvements have been made.  However, given the significance of the issues we identified in our review, such as outstanding advances with six subrecipients who no longer contract with LAHSA, it is critical for LAHSA to implement our recommendations to ensure public funds are properly accounted for and safeguarded. |
| 3    **Inadequate Contract Data** - LAHSA uses their Enterprise Grants Management System (EGMS) to manage the full lifecycle (i.e., pre-award to post-award phases) of their subrecipient contracts and contract amendments (referred throughout as "contracts").   However, LAHSA was unable to produce an accurate list of all their contracts in EGMS.  Specifically, while LAHSA indicated they had 1,273 active contracts as of May 2024, LAHSA provided five different contract listings from EGMS that identified varying contract totals ranging from 676 to 1,078.  Significantly, none of the different listings provided by LAHSA accounted for all of the active contracts LAHSA reported having.<br><br>In addition, LAHSA was unable to determine the total number of contracts that were executed either timely or retroactively in FY 2023-24.  This was primarily due to LAHSA not tracking key data in EGMS, or maintaining inaccurate data.  For example, we reviewed a sample of eight contracts and noted that for: | **Priority 1** **- LAHSA management ensure key contract information is adequately tracked, reliable, and accurate.**<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025 |

**Priority Ranking:**  Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| • All contracts, the EGMS reports did not capture the dates LAHSA's contracts were signed by all parties and executed.<br><br>• Six (75%) contracts, the term start and/or end dates captured in EGMS did not match the dates on the actual contract.<br><br>• Four (50%) contracts, the term start dates in the actual contracts were inaccurate, which in turn, resulted in inaccurate EGMS reports. Specifically, all four were contract amendments and instead of identifying the *amendment* term start dates, LAHSA identified the start dates for the entire *contract* term.<br><br>Retroactive and untimely contracts have been an ongoing and recurring issue for LAHSA. Management's attempts to address these issues are impaired when they do not have reliable and accurate information about fundamental contracting metrics, such as the quantity, timeliness, and terms of their active contracts. LAHSA must ensure they adequately track and maintain contracting data to measure performance and/or identify opportunities to improve their contracting function.<br><br>**Impact**: Reputational, operational, and compliance risk including, inability to fully assess contracting risk and performance, retroactive and untimely contracts, improper and late payments, lapses in critical services, administrative burden to correct data diverting resources from other tasks, and loss of trust from stakeholders. | |
| **4**   **Inadequate Controls Over Cash Advances** - In addition to the deficiencies noted in Issues No. 1 and 2, LAHSA did not have other basic controls in place to ensure cash advances were appropriate, properly accounted for, and safeguarded. For example, LAHSA did not:<br><br>• Deposit cash advances received in a separate, interest-bearing account by funding source.<br><br>• Evaluate the subrecipients' contracting and advance repayment history prior to awarding | **Priority 1** - **LAHSA management implement adequate controls, including the controls identified in this report, to ensure cash advances are appropriate, properly accounted for, and safeguarded.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: November 1, 2024 (Partially)<br><br>LAHSA indicated they implemented bullets 2 and 4. However, LAHSA also indicated they disagree with bullets 1 and 3 because they are not required under the OA, requested the bullets be removed from our |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

LOS ANGELES COUNTY
AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| cash advances, as stated in LAHSA's internal policy.<br><br>• Reconcile advances to the subrecipients' actual expenditures at least quarterly.<br><br>• Establish clear policies and procedures that address the recoupment of outstanding cash advances, including timelines for follow-ups and remedies for non-responsive subrecipients.<br><br>In response to a County Board motion on May 21, 2024, the County's CEO implemented an alternative funding model for Measure H funded contracts, which provided LAHSA with quarterly cash advances, where LAHSA will in turn provide monthly advances to their subrecipients. As of September 6, 2024, the County had already provided LAHSA with $115,658,400 in Measure H advances for FY 2024-25. Given that this new model increases the number and amount of cash advances received and disbursed, LAHSA must strengthen controls to ensure all cash advances are properly accounted for and used for their intended purpose.<br><br>**Impact**: Increased risk that cash advances are not used for their intended purpose and may not be fully recovered. | report, and that this finding be reduced to a Priority 3. While these controls are not required under the OA, they are best practices memorialized in the County Fiscal Manual to ensure proper controls over cash advances. Implementing the recommended controls will benefit LAHSA management and their overall administration of and accountability for cash advances. Given the findings noted in Issues No. 1 and 2, and the significant amount of cash advances that LAHSA receives and awards, LAHSA must implement these controls to ensure proper stewardship of public funds and that all cash advances are adequately accounted for and safeguarded. |
| 5 | **Inappropriate Use of Funds** - As a pass-through governmental agency, LAHSA submits reimbursement claims to its funders and must typically wait to be reimbursed before remitting payments to their subrecipients, unless other resources, such as cash advances, are made available by the funders. However, we noted instances where LAHSA paid their subrecipients prior to receiving reimbursement from funders who did not provide cash advances during FY 2023-24. To make these payments, LAHSA used funds received from other government funders even though the services being paid for were not contracted by those funders. Specifically, from our sample of subrecipient payments made in FY 2023-24, we noted that LAHSA paid: | **Priority 1** - LAHSA management ensure:<br><br>a) **Available funds are only used for their intended purposes.**<br><br>b) **Fund balances are monitored to verify program funding is available prior to remitting payments to subrecipients.**<br><br>**LAHSA's Response: Disagree**<br>Implementation Date: July 1, 2024<br><br>Although LAHSA's response indicated disagreement with our findings and recommendations, LAHSA did not specify any areas of disagreement and indicated they implemented our recommendations. While LAHSA indicated the implementation date occurred during our review, they did not provide any |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY
AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| • One subrecipient for a federal Department of Housing and Urban Development (HUD) program 16 days prior to LAHSA receiving reimbursement, totaling $126,168.<br><br>• One subrecipient for a County (non-Measure H) program 14 days prior to LAHSA receiving reimbursement, totaling $31,770.<br><br>LAHSA confirmed they used other available funding unrelated to the programs to pay the subrecipients. LAHSA must discontinue this practice to ensure financial resources and operations for other programs are not inappropriately (and negatively) impacted.<br><br>**Impact**: Using funds received from one government funder to pay for services provided under another government funder's contract/ grant constitutes a misuse of those funds, and increases the risk that funder payments are not available for the purposes they were claimed and received. This indicates weaknesses in internal controls and financial management practices, and may result in unintended cash flow issues for various programs and could expose LAHSA to administrative contractual remedies from funders. | documentation to support that they took corrective action during our fieldwork or with their response. As a result, we could not verify if LAHSA fully implemented our recommendations. We will review their implementation status during a future follow-up review, if requested. |
| **6**    <mark>Late Payments to Subrecipients</mark> - LAHSA did not always pay subrecipients timely even when LAHSA had received payment for services from its funders. Our review of 13 subrecipient payments made between July 2023 through May 2024 noted that five (38%) of those payments were late. Specifically:<br><br>• Two were paid 53 and 68 business days after the receipt of the subrecipient invoices, respectively, even though these payments were Measure H funded and LAHSA should have had cash advances available to pay within 45 days of receiving the invoices, as stated in their subrecipient contracts. In addition, for one of the invoices, it took LAHSA 51 business days after receiving reimbursement from the County to remit payment to the subrecipient, even though LAHSA indicated their internal metric is to | <mark>Priority 1</mark> **- LAHSA management:**<br><br>a) **Ensure subrecipients are paid timely when cash advances are available or after reimbursement is received from funding sources.**<br><br>b) **Develop strategies for managing cash flow to ensure sufficient funds are available to meet their financial obligations.**<br><br>**LAHSA's Response: Agree**<br>Implementation Date: July 1, 2024 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| pay within 15 business days of receiving payment from the funder.<br><br>• Two were paid 42 and 50 business days after the receipt of the subrecipient invoices, respectively, even though LAHSA already received the funding in advance for these services.  The payments were for a State funded program in which LAHSA received advanced installment payments in place of having to submit reimbursement claims.<br><br>• One was paid 55 business days after LAHSA received reimbursement from the funding source (i.e., the City).  As mentioned above, LAHSA indicated their internal metric is to pay within 15 business days.<br><br>LAHSA indicated the late payments were due to cash flow issues.  However, as noted in Issues No. 1 and 2, LAHSA received $82.5 million in working capital advances from the County, and also received cash advances from various other funding sources which were subsequently awarded to subrecipients and not recouped as required, creating a cash deficit.  To ensure sufficient funds are available to meet their financial obligations, LAHSA should develop strategies to enhance their cash flow management.<br><br>**Impact**: Delayed payments can negatively affect a subrecipient's cash flow and their ability to provide critical client services. | |
| 7 | **Record-keeping Deficiencies - Working Capital Advances** - LAHSA used various methods to track their Measure H working capital advances provided to subrecipients, including their Working Capital Recoup Tracker report, which is generated from LAHSA's accounting records.  We obtained a copy of this report and selected a sample of transactions to validate the accuracy of the information.  Specifically, we selected 12 (33%) of the 36 subrecipients that received working capital advances, totaling approximately $34.6 million (68%) of the total $50.8 million in working capital advances awarded, and requested documentation to support the amounts, such as the request and | **Priority 1** - LAHSA management investigate records for all working capital advances, including records for the issues noted in our review, and make any necessary corrections to ensure an accurate accounting of all working capital advances.<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: March 31, 2025 |

**Priority Ranking:**  Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| approval documents, check registers/vouchers, etc.  Of the $34.6 million, LAHSA: <br><br> • Understated the amount of working capital advances for two subrecipients by $505,591.  Specifically, LAHSA's accounting records understated the awarded amount by $356,967 for one subrecipient, and by $148,624 for the other subrecipient. <br><br> • Did not provide the advance request, approval, and/or disbursement documentation for eight subrecipients, totaling approximately $5 million (14%) in working capital advances reviewed. <br><br> LAHSA attributed these record keeping deficiencies to various causes, including staff turnover and system changes.  To ensure all working capital advances are fully accounted for, LAHSA must review all balances to ensure they are accurate and supported. <br><br> **Impact**:  Increased risk of misuse and/or misappropriation of funds if accounting records do not reflect actual amounts disbursed.   In addition, inaccurate accounting of the Measure H working capital advances may hinder LAHSA's ability to accurately and effectively recover all funds and fully repay the County. | |
| 8 | Retroactive Contracts - Although LAHSA could not identify their total number of retroactive contracts in FY 2023-24 (as mentioned above in Issue No. 3), we reviewed a sample of eight contracts and noted that seven were executed retroactively in FY 2023-24.   These seven contracts were executed between 23 and 170 days late, or an average of 73 days after the contract start date.  While most of these contracts were executed late due to funding delays, we noted opportunities for LAHSA to improve the timeliness of contract executions.  Specifically, funding for: <br><br> • Five of the contracts was approved by the City on August 10, 2023, which was 40 days after the contact start date of July 1, 2023.  After funding was approved, LAHSA took between ten and 130 days to execute the | **Priority 1** - LAHSA management: <br><br> a)  **Identify internal delays in the contracting process and implement improvements to enhance the timeliness of contract executions.** <br><br> b)  **Work with funding sources, where applicable, to identify possible solutions for funding approval delays to minimize retroactive contracting.** <br><br> **LAHSA's Response: Disagree** <br> Target Implementation Date: Not Indicated <br><br> LAHSA indicated disagreement and requested that we remove this finding.  According to LAHSA, none of the contracts sampled experienced excessive delays attributable to internal issues with their contracting |

**Priority Ranking:**  Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| contracts. Some of the later contract executions in this example appear to be excessive and the result of avoidable internal delays at LAHSA. For example, in one instance, LAHSA did not create the actual contract until 41 days after the funding was approved. It also took LAHSA another 60 days to finalize the budget with the subrecipient.<br><br>• One of the contracts was approved by the County Department of Public Social Services on April 24, 2023, which was 68 days *before* the contract start date. However, LAHSA executed the contract 24 days *after* the contract start date. Similar to the example above, LAHSA did not create the actual contract until 15 days after the funding was approved, and it took LAHSA another 65 days to finalize the budget with the subrecipient.<br><br>• One of the contracts was approved by the City on June 1, 2023, the same date as the contract start date, and LAHSA executed the contract 23 days after the funding was approved. Although this did not appear excessively long, LAHSA may be able to identify opportunities for timelier execution (e.g., LAHSA did not create the actual contract until seven days after the funding was approved).<br><br>**Impact**: Unnecessary or avoidable delays when executing contracts, resulting in increased liability from subrecipients providing services without executed contracts and delayed payments for services provided. | process, and the delays were due to funder or service provider (i.e., subrecipient) delays. However, we did document instances where delays were attributable to issues with LAHSA's internal contracting processes. As indicated in the Issue section, we noted several delays with LAHSA's processes, such as when LAHSA did not create the contract until 41 days after funding was approved.<br><br>LAHSA also indicated that the sample was not fully representative of their overall contracting operations. However, as indicated in Issue No. 3, LAHSA did not adequately track key data (e.g., contract execution dates) and therefore, LAHSA could not determine the total number of contracts that were executed either timely or retroactively in FY 2023-24. |
| 9 | **Inadequate Contract Monitoring Plan** - Organizations should develop and adhere to annual risk-based contract monitoring plans to effectively allocate resources and mitigate contracting risks. Such risks may include, but are not limited to, contractors/sub-recipients billing LAHSA for services that were not actually provided, that do not meet contract standards/requirements, and/or that were provided to ineligible or fictitious recipients. | **Priority 1** - **LAHSA management:**<br><br>a) **Establish a standardized risk assessment process to use in developing annual contract monitoring plans.**<br><br>b) **Actively track the status of all contract monitoring reviews and measure performance against their contract monitoring plans at year-end.** |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| While LAHSA's Contract Compliance Unit developed a FY 2023-24 Contract Monitoring Plan (Monitoring Plan), they did not have adequate processes in place to ensure the Monitoring Plan provided effective oversight of their subrecipients. Specifically, we reviewed LAHSA's processes for developing and maintaining their Monitoring Plan and noted that LAHSA did not:<br><br>• Have an adequate risk assessment process. While LAHSA identified appropriate risk factors, such as a subrecipient's noncompliance history, LAHSA did not have a systematic and documented method to evaluate and determine a subrecipient's overall risk rating/score. Instead, LAHSA relied on internal/institutional knowledge to determine the overall risk for a subrecipient, which was then used to develop their Monitoring Plan.<br><br>• Track the status of all their contract monitoring reviews and as a result, could not readily determine their progress in completing the planned reviews. LAHSA should actively track the status of all contract monitoring reviews and evaluate their performance against the monitoring plans at year-end to determine whether monitoring resources are adequate.<br><br>• Have an adequate process for updating their Monitoring Plan with newly executed contracts. To identify new contracts, LAHSA's Contract Compliance Unit indicated they manually run accounting and contract reports monthly to identify activity (e.g., new subrecipient payments) that may suggest new contracts. However, the Contract Compliance Unit should instead be automatically notified when new contracts are executed to ensure proper and timely subrecipient oversight and monitoring.<br><br>• Have a process to ensure all subrecipients are monitored programmatically. Specifically, 54 (51%) of their 105 planned reviews did not include procedures to monitor a subrecipient's program/service | **c) Implement a notification process to ensure that the Contract Compliance Unit is notified of newly executed contracts.**<br><br>**d) Ensure subrecipients are monitored for all key contract requirements (e.g., programmatic requirements).**<br><br>**LAHSA's Response: Disagree**<br>Implementation Date: October 31, 2024<br><br>LAHSA indicated disagreement and requested that we remove this finding and the associated recommendations. For example, in their response, LAHSA indicated:<br><br>• They did have an adequate risk assessment process that included various risk factors. However, as indicated in the Issue section, while we acknowledged that LAHSA did identify appropriate risk factors, they did not have a systematic and documented method to determine overall risk.<br><br>• They diligently track the status of all contract monitoring reviews. However, as indicated in the Issue section, LAHSA could not readily determine their progress in completing their planned reviews during our fieldwork.<br><br>• Their Contract Compliance Unit receives notifications of all newly approved contracts and runs monthly reports to identify new contracts. However, during our fieldwork, LAHSA management indicated the monthly reports were the only way they could identify new contracts, and were unable to provide a comprehensive accounting of all contracts to the auditors.<br><br>• The 54 reviews identified in our finding were determined to be low risk and therefore, did not require a program/service delivery review. However, given the critical nature of LAHSA's contracted services, subrecipients need regular programmatic monitoring to ensure services are appropriately provided.<br><br>While LAHSA indicated they disagreed with our findings and recommendations, they also indicated they implemented recommendations a), c), and d). |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| delivery compliance (e.g., adherence to participant eligibility requirements), and LAHSA did not have a process in place to ensure this form of monitoring would be completed during the contract term.<br><br>**Impact**: Possible gaps in contract monitoring and inadequate contractor/subrecipient oversight, which may result in the waste or misuse of public funds and/or critical services not being provided. | LAHSA must implement the remaining recommendation to ensure adequate monitoring of their contracted services. |
| **10**  **Lack of Contract Monitoring Standards** - An effective contract monitoring function should have standards for conducting and documenting the results of their contract monitoring reviews. We found that LAHSA's contract monitoring function does not always have or adhere to standards. Specifically, we selected a sample of 10 contract monitoring reviews LAHSA conducted in FY 2023-24 and noted that:<br><br>• LAHSA did not maintain adequate workpapers to support the results and conclusions for all ten reviews. Specifically, while LAHSA generally maintained workpapers (e.g., client eligibility records, cost allocation plans, etc.) for their reviews, LAHSA was unable to provide any documentation for one review, indicating the records were lost, and could not readily demonstrate how the workpapers supported their conclusions for the remaining nine reviews.<br><br>• Workpapers for all ten reviews did not include evidence of supervisory review. Contract monitoring reviews should be properly supervised to ensure objectives are appropriately met and supported.<br><br>As a result, we could not determine whether LAHSA adequately monitored their contracts to ensure subrecipients complied with their contract terms.  Given the critical nature of their contracted services, LAHSA must have a robust contract monitoring function to ensure critical services are adequately provided, that recipients exist and are eligible, and that contracted funds are used for their intended purposes. | **Priority 1** - **LAHSA management:**<br><br>a) **Ensure adequate workpapers are maintained for all contract monitoring reviews, and consider the use of audit workpaper software to ensure consistency and efficiency.**<br><br>b) **Contract monitoring reviews are properly supervised, and evidence of supervision is documented.**<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| **Impact**: Increased risk that contract monitoring reviews are not properly conducted, potentially resulting in various issues going undetected, such as funds not used for their intended purposes, misuse and misappropriation of funds, services not provided and/or not provided in accordance with contract terms and other noncompliance issues. | |
| 11   **Delays with Reimbursement Claims** - As mentioned above, LAHSA is primarily a pass-through governmental agency, and typically must wait for invoices from their subrecipients before submitting their own reimbursement claims to their funders.  While these claims should be submitted timely to ensure adequate cash flow, we noted instances where claims were excessively late.  Specifically, of the 13 LAHSA reimbursement claims we reviewed:<br><br>• One claim to the County, totaling $487,125, was submitted 214 days after the end of the billing month when LAHSA's County OA requires they submit claims within 30 days. LAHSA indicated this was due to their subrecipients not submitting year-end invoices timely and delays with their own year-end reconciliation and close-out processes.<br><br>• One claim to HUD, totaling $126,168, was submitted 144 days after the billing month, and while there was no submission deadline, the delay appeared excessive.  LAHSA indicated the subrecipient could not submit their invoices in EGMS due to pending contract amendments.  In addition, we contacted the subrecipient who cited additional issues, such as barriers with accessing EGMS and complexities with the system.<br><br>In addition, we reviewed a sample of 20 subrecipient monthly invoices to LAHSA from FY 2023-24 and noted that 12 (60%) were not submitted by the 15th of the following month, as required by their contracts. According to LAHSA, there were no barriers that prevented the subrecipients from submitting their invoices timely.  We attempted to contact the | **Priority 2** - LAHSA management:<br><br>a) **Monitor subrecipients to identify and address barriers in submitting their invoices to ensure they are submitted timely as required by their contracts.**<br><br>b) **Ensure their own reimbursement claims to funders are submitted timely.**<br><br>**LAHSA's Response: Agree**<br>Target Implementation Date: February 28, 2025 |

**Priority Ranking:**  Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| subrecipients, and while only two responded, they confirmed that the late submissions were due to internal issues, such as inadequate oversight and staff turnover.<br><br>LAHSA should monitor their subrecipients and address barriers, where appropriate, to ensure invoices are submitted by the required deadlines since late submissions delay their own reimbursement claims, as evidenced by the findings detailed above.<br><br>**Impact**: Delayed reimbursement claims by LAHSA and invoices from subrecipients can negatively impact the budget processes for LAHSA's funders, and delayed payments can cause cash flow issues for both LAHSA and their subrecipients. In addition, funds may go unspent or underutilized when claims are not submitted timely. | |
| **12**   Did Not Complete Planned Audits - While LAHSA has an Internal Audit Unit to evaluate internal controls, compliance, and operational efficiencies, we noted that LAHSA did not complete any of the four planned audits in FY 2022-23 and carried over the audits to their FY 2023-24 Internal Audit Plan. In addition, LAHSA indicated they only initiated two (50%) of the four planned audits for FY 2023-24, both of which began in May 2024, and attributed the audit delays to emerging issues. While deviations from internal audit plans are not uncommon, LAHSA's lack of adherence to their plans for the past two fiscal years and overall lack of internal audit activity raises concerns about the adequacy and capability of their internal audit function.<br><br>In addition, according to LAHSA's Internal Audit Charter, LAHSA adheres to the International Standards for the Professional Practice of Internal Auditing (Standards). However, LAHSA did not communicate the deviation from their planned work to senior management and their governing body for review and approval, as required by Section 2020 of the Standards. To maintain a robust internal audit function, LAHSA should ensure they have adequate resources to complete the work in their annual internal audit | Priority 2 - **LAHSA management ensure:**<br><br>a) **Internal audit resources are adequate to complete the audits in the annual audit plans.**<br><br>b) **Deviations from annual audit plans are reviewed and approved by the appropriate parties.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested this finding be reduced to a Priority 3, citing that status updates and deviations from the Audit Plan were communicated to LAHSA's Management Committee. However, LAHSA communicated the deviations from their audit plan after the fact. As mentioned in the Issues section, deviations from the Audit Plan should be communicated for review and approval before changes are adopted. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| plans, and that any deviations are reviewed and approved as required.<br><br>**Impact**: Increased risk of errors, fraud, noncompliance, and other operational weaknesses and inefficiencies going undetected. | |
| 13    **Internal Audit Risk Assessment Not Completed Annually** - An internal audit function's work must be based on documented risk assessments that are completed at least annually, which in turn, guide the development of annual internal audit plans. However, LAHSA's Internal Audit Unit did not complete a risk assessment to develop their FY 2023-24 Internal Audit Plan as required by Section 2010A.1 of the Standards. Instead, LAHSA carried over their FY 2022-23 planned internal audits to FY 2023-24, as mentioned in Issue No. 12. According to LAHSA management, this was due to capacity issues and the ongoing prevalence of the issues identified in their FY 2022-23 risk assessment.<br><br>**Impact**: Emerging risks may go undetected/ unevaluated, which may result in utilizing audit resources on less critical assignments. | **Priority 2** - LAHSA management ensure risk assessments are completed annually to develop their internal audit plans.<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested this finding be reduced to a Priority 3, citing that they assessed the situation and decided to carry over the FY 2022-23 methodology and results at their discretion. However, risk assessments must be completed annually as required by the Standards and ultimately, LAHSA indicated they will implement our recommendation. |
| 14    **Internal Audit Independence** - LAHSA's Director of Risk Management oversees their Internal Audit Unit, serving as their Chief Audit Executive (CAE), and also has oversight of LAHSA's Legal Operations, Investigations, Third Party Audits, Risk Management, and Quality Standards Units. According to Section 1112 of the Standards, where a CAE has or is expected to have roles and/or responsibilities that fall outside of internal auditing, safeguards must be in place to limit impairments to independence or objectivity. However, LAHSA did not provide formal action plans that outlined specific safeguards in place to address perceived or actual impairments to independence.<br><br>In addition, Section 7.1 of the new 2024 Global Internal Audit Standards, which must be adopted in 2025, requires the roles and responsibilities that go beyond internal audit, and the established safeguards be documented in the Internal Audit Charter (Charter). However, LAHSA's Charter, which was last updated in 2018, did not | **Priority 3** - LAHSA management identify and document the CAE's roles and responsibilities that fall outside internal auditing, and the established safeguards to limit impairments to independence or objectivity in LAHSA's Internal Audit Charter.<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: October 25, 2024<br><br>LAHSA partially disagreed and requested that we remove this finding and the associated recommendations, citing that they had already taken steps towards greater independence and had also revised their Internal Audit Charter. However, our findings were accurate at the time of our fieldwork, and their Internal Audit Charter was not revised until after our review. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| document the CAE's other responsibilities and established safeguards. LAHSA management indicated they are in the process of updating their Charter to include all the required information.<br><br>**Impact**: Actual or perceived impairments to independence, which can impact the Internal Audit Unit's ability to function in an unbiased manner. | |
| **15**   **No Quality Assurance and Improvement Program** - According to Section 1300 of the Standards, the CAE must develop and maintain a Quality Assurance and Improvement Program (QAIP) that covers all aspects of the internal audit activity. The QAIP must include both internal and external assessments, and the CAE must discuss the results of the assessments with senior management and the governing body. However, LAHSA did not have a QAIP in place at the time of our review. According to LAHSA management, they will establish a QAIP and anticipate completing the assessments in FY 2024-25.<br><br>**Impact**: Increased risk of nonconformance with the Standards, which can negatively impact the quality of an internal audit function. | **Priority 3** - **LAHSA management:**<br><br>a) **Establish a Quality Assurance and Improvement Program.**<br><br>b) **Ensure internal and external assessments are completed as required by the Standards.**<br><br>c) **Ensure results are communicated to senior management and their governing body.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: June 30, 2025<br><br>Although LAHSA's response indicated partial disagreement with our finding and recommendations, LAHSA did not specify any areas of disagreement. However, LAHSA did indicate that the Standards acknowledge that public sector entities like LAHSA face unique challenges that can impact the ability to fund and implement QAIP. Ultimately, LAHSA indicated they will implement our recommendations provided funding is available. |
| **16**   **Key Performance Indicators Not Established** - Key performance indicators (KPIs) are metrics that are used to measure how well an organization is performing a given function. When evaluated regularly, KPIs can help identify areas for improvement, help make decisions and prioritize actions, and detect patterns and trends over time and reveal improvement opportunities. While LAHSA had not yet established KPIs for their Internal Audit Unit at the time of our review, LAHSA did establish a new policy in May 2024 governing the development and implementation of KPIs. The new policy applies to all functions, and LAHSA indicated they expect KPIs will be finalized in FY 2024-25. | **Priority 3** - **LAHSA management ensure KPIs are finalized and implemented where applicable, and establish a mechanism for collecting, analyzing, and reporting KPIs to the appropriate parties.**<br><br>**LAHSA's Response: Partially Disagree**<br>Implementation Date: June 30, 2025<br><br>Although LAHSA's response indicated partial disagreement with our finding and recommendation, LAHSA did not specify any areas of disagreement. LAHSA acknowledged their Internal Audit KPIs were in draft form at the time of our review and indicated they will implement our recommendation. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

# LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION ||
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| **Impact**: Not measuring performance diminishes the organization's ability to determine whether they are effectively meeting their objectives. | |

For more information on our auditing process, including recommendation priority rankings and the resolution process, visit http://auditor.lacounty.gov/contract-monitoring-audit-process-information/.

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.



**COUNTY OF LOS ANGELES**
**DEPARTMENT OF AUDITOR-CONTROLLER**

KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET, ROOM 525
LOS ANGELES, CALIFORNIA 90012-3873
PHONE: (213) 974-8301   FAX: (213) 626-5427

**OSCAR VALDEZ**
AUDITOR-CONTROLLER

**CONNIE YEE**
CHIEF DEPUTY AUDITOR-CONTROLLER

ASSISTANT AUDITOR-CONTROLLERS

**MAJIDA ADNAN**
**ROBERT G. CAMPBELL**

April 23, 2024

TO:          Each Supervisor

FROM:      Oscar Valdez, Auditor-Controller

SUBJECT:   **LOS ANGELES HOMELESS SERVICES AUTHORITY – FISCAL AUDIT SCOPE OF WORK (February 27, 2024, Board Agenda Item 4)**

On February 27, 2024, your Board instructed the Auditor-Controller (A-C), in collaboration with the Chief Executive Officer (CEO), relevant County departments, and the Los Angeles Homeless Services Authority (LAHSA), to conduct an audit of LAHSA's fiscal operations, including but not limited to the Finance, Contracts, Risk Management, and Grants Management and Compliance units.  In addition, the motion instructed a report back within 60 days with a detailed scope of work, including, if needed, expansion of the audit scope to potentially include a strategic business process analysis and workplan based on the audit's findings, and also delegated authority to the A-C to enter into negotiations and execute contract amendments to perform the audit and aforementioned directives.

In collaboration with the CEO and LAHSA, we identified key focus areas for the units indicated in the motion and developed the attached scope of work.  The potential need for a strategic business process analysis and workplan will be determined based on the audit results.  Therefore, after the review, we will work with the CEO and LAHSA on whether the analysis is needed, including possibly engaging a consultant to complete the work.

We determined the proposed scope of work can be completed with existing A-C resources and unless otherwise instructed, we plan to begin this audit no later than July 2024.  If you have any questions please call me, or your staff may contact Terri Kasman at tkasman@auditor.lacounty.gov.

OV:CY:RGC:TK:JH:meb

Attachment

c:  Fesia A. Davenport, Chief Executive Officer
    Jeff Levinson, Interim Executive Officer, Board of Supervisors
    Va Lecia Adams Kellum, Ph.D., Chief Executive Officer, LAHSA

*Help Conserve Paper – Print Double-Sided*
*"To Enrich Lives Through Effective and Caring Service"*

# Los Angeles Homeless Services Authority – Fiscal Audit
## (February 27, 2024, Board Agenda Item 4)

## Scope of Work[1]

### **Finance**

### **Objective:**

Determine whether Los Angeles Homeless Services Authority (LAHSA) meets their financial obligations and pays their subrecipients timely, and where applicable, whether its Finance functions are appropriately supported by the Finance staff and other organizational units to meet their objectives.

1.   Reimbursement Claims

    A.   Assess whether LAHSA submits their reimbursement claims to their funding sources timely.

        i.   Obtain an understanding of LAHSA's process for submitting reimbursement claims to their funding sources.

        ii.   Determine LAHSA's billing process requirements by funding source.

        iii.   Assess whether LAHSA follows their policies and procedures and/or has adequate controls in place to ensure reimbursement claims are submitted to their funding sources timely.

        iv.   Determine the cause of any delays in submitting reimbursement claims to their funding sources.

2.   Cash Advances

    A.   Assess whether LAHSA appropriately accounts for cash advances in their accounting records, whether LAHSA regularly reconciles the cash advances to their actual expenditures, and whether cash advances are used for their intended purpose.

        i.   Cash Advances from Funding Sources

            a. Obtain an understanding of LAHSA's cash advance process for requesting cash advances from their funding sources.

---

[1] Procedures may be modified throughout the review to ensure risks identified during the review are addressed and the objectives are met.

b. Inquire with LAHSA management to identify which funding sources allow for cash advances and whether any cash advances were requested/received.

c. Determine if LAHSA is utilizing all available cash advances from their funding sources.

1. If LAHSA is not utilizing all available cash advances, determine what prevents LAHSA from maximizing available cash advances.

ii. Cash Advances to Subrecipients

a. Obtain an understanding of LAHSA's process for paying and reconciling cash advances to subrecipients.

b. Determine LAHSA's requirements for providing and reconciling cash advances to subrecipients.

c. Assess whether cash advances are appropriately accounted for in LAHSA's financial records and whether LAHSA reconciles cash advances to actual expenditures.

d. Determine whether the reconciliations are appropriate and consistent with funding source requirements and/or best practices.

3. Subrecipient Invoices/Payments

A. Assess LAHSA's subrecipient invoice and payment processes to determine whether LAHSA processes invoices and remits payments to their subrecipients timely.

i. Obtain an understanding of LAHSA's subrecipient invoice and payment process.

ii. Determine LAHSA's disbursements requirements by funding source.

iii. Obtain relevant invoice and payment documentation and assess whether LAHSA follows their policies and procedures and/or has adequate internal controls over their subrecipient invoice and payment processes.

a. If invoice/payment processing delays are identified, select a sample of invoices to determine the causes of delays in the invoice/payment lifecycle.

## Contracts

**Objective:**

Determine whether LAHSA's Contracts and Procurement unit executes contracts timely, and where applicable, whether the contracting functions are appropriately supported by unit's staff and other organizational units within LAHSA to meet their objectives.

1.  Timeliness of contract executions within the last year

    A.  Obtain relevant documentation to assess whether contracts were executed timely within the last year.

        i.  If retroactive contracts are identified, select a sample of retroactive contracts to determine the causes of delays in the contract lifecycle.

## Grants Management and Compliance

**Objective:**

Determine whether LAHSA's Grants Management and Compliance unit has adequate policies and procedures in place to effectively identify and assess the risks associated with LAHSA's contractors/subrecipients, and whether LAHSA periodically monitors their contractors/subrecipients for compliance with contractual requirements. Where applicable, assess whether its contract monitoring functions are appropriately supported by the contract monitoring staff and other organizational units to meet their objectives.

1.  Roles and responsibilities

    A.  Determine if roles and responsibilities of their contract monitoring staff are clearly defined.

2.  Risk-based Contract Monitoring Plan

    A.  Determine if LAHSA adequately prepares an annual risk-based contract monitoring plan.

        i.  Meet with the LAHSA's contract compliance unit and obtain an understanding of their risk assessment process.

        ii.  Determine if LAHSA adequately performed an annual risk assessment and used it to develop a risk-based contract monitoring plan.

    iii.    Obtain the contract monitoring plan to assess whether LAHSA is complying with their plan.

    iv.    Assess LAHSA's process for updating their contract monitoring plan and whether the contract monitoring plan and updates are appropriately shared with management.

3.    Contract Monitoring Engagement and Follow-Up Procedures

    A.    Determine if LAHSA has policies and procedures for documenting, conducting, reporting and following-up on the results of their contract monitoring process, and whether the monitoring procedures are appropriate.

        i.    Meet with LAHSA's contract compliance unit and obtain an understanding of their policies and procedures.

        ii.    Review a sample of contract monitoring engagements to determine whether key areas are appropriately monitored.

        iii.    Determine whether LAHSA has a standardized process for reporting the results of their contract monitoring reviews, and whether the results are shared with the appropriate parties.

        iv.    Evaluate LAHSA's post-monitoring resolution process to determine if adequate measures are in place to ensure contractor compliance.

## Risk Management

**Objective:**

Determine whether LAHSA's Risk Management unit has adequate policies and procedures in place to effectively identify and assess organizational/operational risks, and whether LAHSA periodically conducts internal audits of LAHSA's operations to measure and evaluate its performance. Where applicable, assess whether its internal audit functions are appropriately supported by the Risk Management staff and other organizational units to meet their objectives.

1.    Professional Standards

    A.    Determine whether LAHSA's internal audit unit conducts internal audits in accordance with professional standards.

        i.    Interview LAHSA management to determine whether they have developed an internal audit charter and policies and procedures to guide the internal audit activity.

ii.    If applicable, obtain and review the internal audit charter and the policies and procedures to assess compliance with professional standards.

iii.    Determine whether the internal audit's functional reporting promotes organizational independence.

2.    Risk-Based Internal Audit Plan

    A.    Determine whether LAHSA established a risk-based audit plan to appropriately guide their internal audit activity.

        i.    Meet with the LAHSA's internal audit unit and obtain an understanding of their risk assessment policies and procedures.

        ii.    Determine if LAHSA adequately performed an annual risk assessment and used it to develop a risk-based internal audit plan.

        iii.    Assess LAHSA's process for communicating the internal audit activity's plans and resource requirements, including changes, to senior management and their governing body.

        iv.    Obtain the internal audit plan to assess whether LAHSA is complying with their plan.

3.    Key Performance Indicators

    A.    Determine whether LAHSA has established Key Performance Indicators (KPI) to measure the internal audit unit's performance.

        i.    Meet with LAHSA's management to determine if they have identified quantifiable performance measures.

        ii.    Determine whether LAHSA has established a mechanism for collecting, analyzing, and reporting KPI results.

        iii.    Assess LAHSA's process for summarizing, reporting, and communicating KPI results to LAHSA management and their governing body.



November 7, 2024

Oscar Valdez, Auditor-Controller
County of Los Angeles
Department of Auditor-Controller
Countywide Contract Monitoring Division
500 W. Temple St., Room 525
Los Angeles, CA 90012

**Re: Los Angeles Homeless Services Authority – Finance, Contracts, Risk Management, and Grants Management Review (February 27, 2024, Board Agenda Item 4)**

Dear Mr. Valdez:

Attached is the Los Angeles Homeless Services Authority's (LAHSA) response to the Finance, Contracts, Risk Management, and Grants Management Review conducted by the Auditor-Controller at the request of the Board of Supervisors. LAHSA's response includes both broad contextual dynamics and key factors it deems important to note and acknowledge, as well as more specific comments and proposed modifications regarding the issues themselves. LAHSA respectfully requests that the County consider and incorporate these points in the Final Audit Report.

**Context Considerations**
The period of the Audit (FY16-17 through FY23-24) captured a time of rapid growth and expansion for LAHSA, both in its organizational size, scope, and nature of its functions. Specifically, during this period, LAHSA both:

1. Grew from a more conventional pass-through grant and contract administrator into a systems administrator with significant programmatic and direct services roles, as a result of Measure H; and
2. Rapidly underwent a complete agency-wide reorientation (from FY19-20 to FY21-22) to primarily focus on public health response functions, as required by the unprecedented coronavirus (COVID-19) pandemic, which demanded similar extraordinary restructuring, expenditures, and personnel use from other public sector entities during that time, including the City and County of Los Angeles.

Multiple Issues identified in the Draft Audit Report (especially those associated with service provider advance payments and recoupments) are, in whole or in part, attributable to LAHSA's fiscal practices during the COVID-19 years. Although these actions occurred prior to Dr. Adams Kellum and the current leadership team's arrival, LAHSA maintains that they were necessary and warranted. Therefore, these actions should be considered within a broader context of the public health emergency, rather than being assessed solely through the conventional accounting framework.

During the COVID-19 pandemic, LAHSA's primary objective, as directed by its government funders and partners, was to save the lives of unhoused individuals experiencing homelessness (PEH) in Los Angeles County by moving them indoors to prevent the spread of COVID-19. This goal was primarily achieved through rapid, substantial investments in programs such as Project RoomKey (PRK).

To support its service providers—many of whom faced significant financial challenges early in the pandemic—LAHSA at times made advance payments to ensure their continued operations. This approach, aimed at avoiding disruption to essential services, influenced LAHSA's decisions regarding advance payments and their recapture. Notably, the amounts under audit represent a small fraction of the total funds spent during the COVID-19 period, and an even smaller portion of LAHSA's overall budget.

Critically, LAHSA was able to account for all its funding during the COVID-19 years, since the appointment of the current leadership team in April 2023, LAHSA has continued to strengthen its commitment to responsible stewardship of public funds. This is reflected in significant improvements to its contracting and accounting processes, including:

1. Prior to Dr. Kellum's arrival, LAHSA executed only 30% of its Service Provider Contracts by the start of the Fiscal Year (July 1). In both FY23-24 and FY24-25, over 80% of contracts were executed by July 1.
2. LAHSA has significantly improved the speed of service provider payments by working with funders to develop a new advance payment model that mitigates the financial challenges providers faced due to the cost-reimbursement model.
3. LAHSA has also terminated provider contracts when financial irregularities have been found.

LAHSA highlights that this audit covers FY16-17 through FY23-24, and the spending practices captured during the COVID-19 years of this audit should be viewed as an essential investment that contributed to achieving critical public health and service delivery outcomes. As demonstrated, the funding had a substantial and lasting impact, as detailed below:

1. Success of Project Room Key (PRK): There were 4,824 permanent housing placements for PRK clients between April 2020 and February 2023 (please note these are placements, not separate individuals). As a public health response, this effort significantly reduced COVID-19 transmission, positive cases, and fatalities among participants compared to the broader County and City populations.
2. Increased Shelter Capacity: Since FY18-19, Los Angeles County has added over 10,000 shelter beds.
3. New Program Models: The success of PRK informed the development of ongoing programs such as Project HomeKey (PHK), the Inside Safe Program (ISP), and Pathway Home.
4. Reduction in Unsheltered Homelessness: In 2024, the number of unsheltered PEH countywide decreased by 5.1%, while the sheltered population increased by 12.7%, reflecting a positive trend since 2023.
5. Permanent Housing Placements: In 2023, LAHSA achieved 28,000 permanent housing placements, bringing the total to over 110,000 in the past seven years.
6. Increased Placement Speed: From 2022 to 2023, LAHSA reported a 47% increase in interim housing placements through street outreach and a 25% increase in permanent housing placements from interim housing, demonstrating improved system efficiency.

**Draft Audit Issue Response Overview**
Of the sixteen (16) issues presented to LAHSA in the Draft Audit Report, LAHSA agreed with five (5) issues, partially disagreed with seven (7) issues, and disagreed with four (4) issues, as outlined below:
- Issue 1: Did Not Establish Agreements for Working Capital Advances: LAHSA Disagrees
- Issue 2: Did Not Recoup Annual Cash Advances: LAHSA Partially Disagrees
- Issue 3: Inadequate Contract Data: LAHSA Agrees
- Issue 4: Inadequate Controls Over Cash Advances: LAHSA Partially Disagrees
- Issue 5: Inappropriate Use of Funds: LAHSA Disagrees
- Issue 6: Late Payments to Subrecipients: LAHSA Agrees

- Issue 7: Record-keeping Deficiencies - Working Capital Advances: LAHSA Agrees
- Issue 8: Retroactive Contracts: LAHSA Disagrees
- Issue 9: Inadequate Contract Monitoring Plan: LAHSA Disagrees
- Issue 10: Lack of Contract Monitoring Standards: LAHSA Agrees
- Issue 11: Delays with Reimbursement Claims: LAHSA Agrees
- Issue 12: Did Not Complete Planned Audits: LAHSA Partially Disagrees
- Issue 13: Internal Audit Risk Assessment Not Completed Annually: LAHSA Partially Disagrees
- Issue 14: Internal Audit Independence: LAHSA Partially Disagrees
- Issue 15: No Quality Assurance and Improvement Program: LAHSA Partially Disagrees
- Issue 16: Key Performance Indicators Not Established: LAHSA Partially Disagrees

LAHSA believes it is most appropriate for the final report to reflect the following adjustments:
- Eight (8) of the 16 issues noted in the draft report:
    - **Remove** 1, 4 (bullet points 1 and 3), 8, 9, and 14 from the audit report.
        - LAHSA believes the reasoning behind these issues is invalid, as LAHSA's current practices fully comply with regulatory, contractual, and operational requirements.
    - **Reclassify** 2 and 4 (bullet points 2 and 4) from Priority 1 to Priority 3.
        - These items have been addressed or are in the process of being addressed.
    - **Reclassify** 12 and 13 from Priority 2 to Priority 3.
        - These items have been addressed or are in the process of being addressed.
- Two (2) of the 16 issues noted in the draft report:
    - Partially disagree with 15 and 16.
- Five (5) of the 16 issues noted in the draft report:
    - Agrees with 3, 6, 7, 10, and 11.
- One (1) of the 16 issues noted in the draft report:
    - Disagree with 5.

## Conclusion

LAHSA has actively collaborated with the County prior to this audit, and many of the issues identified were already recognized through our ongoing partnership. We have already begun implementing most of the recommendations, with many having already been resolved. We remain committed to our continued collaboration and to addressing the needs of the most vulnerable populations. If you or your staff have any questions or require additional information, please contact Dr. Holly Henderson, Director – Risk Management, at 213-683-3334 or hhenderson@lahsa.org.

Sincerely,

_(Nov 7, 2024 19:14 PST)_

Dr. Va Lecia Adams Kellum
Chief Executive Officer

HH:MV:df

| | | |
|---|---|---|
| 1 | **Did Not Establish Agreements for Working Capital Advances** - In FYs 2017-18 through 2019-20, the County provided LAHSA approximately $82.5 million in Measure H working capital advances to support Measure H operations, in which LAHSA awarded $50.8 million to various subrecipients beginning in FY 2017-18 to address cash flow needs that may occur throughout the fiscal year. According to LAHSA, the subrecipients were allowed to retain these advances across multiple FYs and were not required to repay the funds annually. LAHSA retained the remaining $31.7 million to and awarded annual cash advances for Measure H subrecipients, as mentioned in Issue No. 2.<br><br>However, LAHSA did not establish formal agreements with the subrecipients to determine how and when the working capital advances would be repaid. In addition, LAHSA indicated that while they initiated efforts to recoup the funds in FY 2023-24, some subrecipients reported having cash flow issues. As a result, | **Priority 1** - LAHSA management:<br><br>**Work with subrecipients to establish agreements with repayment terms for all outstanding working capital advances.**<br><br>**Provide the County CEO with quarterly updates until all advanced funds are repaid.**<br><br>**LAHSA's Response: DISAGREE**<br><br>**LAHSA respectfully requests that these issues and the associated recommendations be removed from the audit report.**<br><br>We disagree with this finding because the Operational Agreement between Los Angeles County and LAHSA does not require LAHSA to recoup working capital advances on an annual basis or by July 8, 2024, as stated in the report. Furthermore, the agreement does not require LAHSA to establish formal agreements with subrecipients to determine the terms or schedule for the repayment of these advances.<br><br>LAHSA is in full compliance with the September 1, 2017, operating agreement, which states, on page 2 section c: "County shall reconcile and/or recoup all advances by the end of each fiscal year."<br><br>The inclusion of the term "and/or" provided the County with flexibility to either recoup, reconcile, or pursue both options. The approach selected was to reconcile on an annual basis. At the close of each fiscal year, the Los Angeles County Chief Executive Office, Homeless Initiative (CEO-HI), requested that LAHSA provide a reconciliation. In response, LAHSA submitted a detailed report outlining the cash advances issued to each subrecipient, along with the remaining balances held by LAHSA.<br><br>To date, CEO-HI has not directed LAHSA to shift from annual reconciliations to annual recoupments, nor has it raised any concern regarding the advances remaining unrecouped. In fact, as documented in the CEO Authorization for the processing of additional working capital advances dated August 22, 2019 (exhibit 1 *CEO Authorization for the Processing of Additional Working Capital Advances 08.22.2019.pdf*), LAHSA's unrecouped balance of Measure H advance funding exceeded $71 million. This amount included funds received as far back as October 26, 2017. The authorization did not require LAHSA to recoup or repay any portion of the $71 million in cash advances. Instead, it approved an additional $11 million in cash advances. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

| | | The County did not attempt to recoup the cash advances because of the extended duration of the Measure H grant term and the intention for these funds to support subrecipients over multiple years. The goal was to ensure subrecipients had sufficient cash flow throughout the life of the grant.

While LAHSA was not required to recoup advances from service providers as of July 8, 2024, LAHSA proactively began the process of recoupment in advance of the June 30, 2027, grant end date. This initiative accounts for the fact that only 5% of the advances had been recouped by that date.

Recoupment efforts were slowed during FY 2023-24 due to the cash flow crisis, as well as the decision to offer subrecipients more flexible repayment terms. During this period, LAHSA collaborated with the County to address the cash flow challenges by implementing the Alternative Provider Payment Model.

Although the Operational Agreement does not require LAHSA to establish formal agreements with subrecipients regarding the specifics of advance repayments, LAHSA nonetheless took the initiative to do so. We provided these agreements, along with the recoupment schedules, to the auditors during fieldwork.

Following direction from the County CEO for LAHSA to resume recoupment efforts with subrecipients, LAHSA will provide the County CEO with quarterly updates until all advanced funds have been fully repaid.

**Target Implementation Date:** N/A |
|---|---|---|

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**Attachment III**
**Page 6 of 33**

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| LAHSA slowed their recoupment efforts and only recovered approximately $2.5 million (5%) as of July 8, 2024.<br><br>While LAHSA initiated attempts to recover these funds, we have concerns about LAHSA's ability to recover all the advances given the lack of formal agreements memorializing the advances when they were issued. LAHSA must continue to actively work with the subrecipients to establish agreements that formalize how and when the outstanding working capital advances will be repaid. LAHSA must also establish controls over cash advances, including any future working capital advances, as mentioned in Issue No. 4.<br><br>**Impact**: LAHSA may not be able to recover all working capital advances and as a result may not repay the County the full $82.5 million in advanced Measure H funds. | |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| 2 | Did Not Recoup Annual Cash Advances - LAHSA has contracts with subrecipients that include provisions for annual cash advances (cash advances), which differ from working capital advances in that these funds are to be awarded and recouped by LAHSA each FY. However, LAHSA did not always recover the cash advances at year-end and had a significant amount of outstanding advances dating back to FY 2016-17, including advances with subrecipients who no longer contract with LAHSA. Specifically, LAHSA had approximately $15 million in outstanding cash advances made to subrecipients for City, County, and State programs as of July 2024, and of those amounts, approximately $8 million (53%) was carried over from prior FYs (i.e., FYs 2016-17 through 2022-23), including approximately $185,000 in advances that were provided in FY 2016-17. Of the $8 million, approximately $409,000 are outstanding advances to six subrecipients who no longer contract with LAHSA.

LAHSA indicated the cash advances received from their funders were trued-up against their actual expenditures in their year-end reimbursement claims. However, LAHSA did not | Priority 1 - LAHSA management:

Work with subrecipients who have overdue outstanding cash advances to recover funds.

Ensure annual cash advances are recouped annually.

Consult with legal counsel regarding options for recouping outstanding cash advances with subrecipients who no longer contract with LAHSA.

LAHSA's Response: PARTIALLY DISAGREE

LAHSA respectfully requests that this issue Priority 1 be reduced to Priority 3.

LAHSA partially disagrees with this finding. The requirement to recoup annual advances depends on the specific funder agreement associated with each grant, and may or may not include a contractually mandated timeline for recoupment. As noted in our response to Issue #1, under the LA County Operational Agreement, cash advances received from the County are reconciled annually but are not required to be recouped. Therefore, the annual advances received from LA County, which total over $2 million of the approximately $8 million carried over from prior fiscal years, are fully compliant with the terms of the agreement and do not constitute an issue.

- The approximately $6 million in advances carried over from prior fiscal years were issued to service providers by LAHSA's previous management. In FY 2023-24, LAHSA's current management established repayment terms with all service providers, with final recoupments scheduled to be completed by June 30, 2026. Due to cash flow issues, LAHSA, with CEO-HI's agreement, offered flexible repayment terms to avoid further cash flow challenges.
- LAHSA acknowledges that, as of July 2024, some FY 2023-24 advances had not yet been recouped, but this was due to a timing issue related to pending service provider invoices, through which advances are recouped via reductions to invoiced amounts.
- LAHSA has implemented procedures in FY 2023-24 to ensure all current-year advances are recouped annually. Any unpaid amounts will be recovered through reductions on services provider invoices.
- LAHSA will consult with legal counsel by December 31, 2024, regarding options to recoup the $409,000 in outstanding advances from service providers that have closed and are unable to repay. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
AUDITOR-CONTROLLER

|  |  | Since Dr. Adams Kellum joined LAHSA in 2023, her team has spent the past 18 months addressing and improving the contracting process to better support providers and allow them to focus on their on-the-groundwork.

As a result, significant changes have been made to streamline operations, ensuring that providers are paid more quickly. In partnership with LA County, LAHSA implemented new, expedited payment procedures for Measure H funds in July 2024, aimed at addressing long-standing contract payment delays that have been a challenge for providers. LAHSA is also working with the City of Los Angeles to implement similar procedures for City contracts in the near future.

Given these improvements, LAHSA respectfully requests that Priority Level 1 be reduced to Priority 3, as substantial actions have been taken to mitigate the associated risks. Repayment plans for advances carried over from prior fiscal years have been established with service providers, and LAHSA continues to work diligently with providers to recover all outstanding funds. Furthermore, LAHSA's new policies and procedures, established in FY 2023-24, ensure that annual advances are recouped annually, preventing the carryover of unrecouped funds as has occurred in the past.

**Target Implementation Date:**
- Work with Service Providers who have overdue outstanding cash advances to recover funds. Partially implemented.
- Recoupment of Prior Year Annual Advances - June 30, 2026.
- LAHSA will consult with legal counsel no later than June 30, 2026. |
|  |  |  |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

# LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| recoup the $8 million in cash advances from their subrecipients, creating an $8 million cash deficit. LAHSA management indicated they track the outstanding cash advances as receivables in their accounting records, and the cash deficits will be resolved once the cash advances are collected from their subrecipients. LAHSA must work with their subrecipients to ensure all outstanding cash advances are recouped, and establish proper controls over future cash advances, as mentioned in Issue No. 4.<br><br>**Impact**: Increased risk that LAHSA is unable to recover all cash advances, especially with subrecipients that no longer have a business relationship with LAHSA, resulting in shortfalls with funds that were intended for other programs. | |
| **3**   **Inadequate Contract Data** - LAHSA uses their Enterprise Grants Management System (EGMS) to manage the full lifecycle (i.e., pre-award to post-award phases) of their subrecipient contracts and contract amendments (referred throughout as "contracts"). However, LAHSA was unable to produce an accurate list of all their contracts in EGMS. Specifically, while LAHSA indicated they had 1,273 active contracts as of May 2024, LAHSA provided five different contract listings from EGMS that identified varying contract totals ranging from 676 to 1,078. Significantly, none of the different listings provided by LAHSA accounted for all of the active contracts LAHSA reported having.<br>In addition, LAHSA was unable to determine the total number of contracts that were executed either timely or retroactively in FY 2023-24. This was primarily due to LAHSA not tracking key data in EGMS, or maintaining inaccurate data. For example, we reviewed a sample of eight contracts and noted that for:<br><br>• All contracts, the EGMS reports did not capture the dates LAHSA's contracts were signed by all parties and executed.<br>• Six (75%) contracts, start and/or end dates captured in EGMS did not match the dates on the actual contract. | **Priority 1** - LAHSA management ensure key contract information is adequately tracked, reliable, and accurate.<br><br>**LAHSA's Response: AGREE**<br><br>Dr. Adams Kellum assumed her role as CEO in March 2023 and, since then, has led substantial efforts to improve LAHSA's funding and accounting practices, both internally and in collaboration with partners in the city and county.<br><br>Over the past 18 months, Dr. Adams Kellum's team has focused on accelerating the contract and payment process. Timely payments to providers are critical to ensure they can carry out their essential work. Recognizing the challenges posed by complex systems and prolonged wait times, LAHSA has worked with its partners to make significant improvements in these areas.<br><br>Under new leadership, LAHSA has committed to ensuring that key contract information is tracked accurately, reliably, and in a timely manner. Efforts are underway to develop custom dashboards and reports in EGMS that will provide accurate, real-time data on critical contract metrics. Additionally, work has begun on an EGMS enhancement to track and report the dates when contracts are signed and fully executed by all parties.<br><br>**Target Implementation Date**: February 28, 2025. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| • Four (50%) contracts, the term start dates in the actual contracts were inaccurate, which in turn, resulted in inaccurate EGMS reports. Specifically, all four were contract amendments and instead of identifying the *amendment* term start dates, LAHSA identified the start dates for the entire *contract* term.<br><br>Retroactive and untimely contracts have been an ongoing and recurring issue for LAHSA. Management's attempts to address these issues are impaired when they do not have reliable and accurate information about fundamental contracting metrics, such as the quantity, timeliness, and terms of their active contracts. LAHSA must ensure they adequately track and maintain contracting data to measure performance and/or identify opportunities to improve their contracting function.<br><br>**Impact**: Reputational, operational, and compliance risk including, inability to fully assess contracting risk and performance, retroactive and untimely contracts, improper and late payments, lapses in critical services, administrative burden to correct data diverting resources from other tasks, and loss of trust from stakeholders. | |
| **4**   **Inadequate Controls Over Cash Advances** - In addition to the deficiencies noted in Issues No. 1 and 2, LAHSA did not have other basic controls in place to ensure cash advances were appropriate, properly accounted for, and safeguarded. For example, LAHSA did not:<br><br>• Deposit cash advances received in a separate, interest-bearing account by funding source.<br>• Evaluate the subrecipients' contracting and advance repayment history prior to awarding cash advances, as stated in LAHSA's internal policy.<br>• Reconcile advances to the subrecipients' actual expenditures at least quarterly.<br>• Establish clear policies and procedures that address the recoupment of outstanding cash | **Priority 1** - **LAHSA management implement adequate controls, including the controls identified in this report, to ensure cash advances are appropriate, properly accounted for, and safeguarded.**<br><br>**LAHSA's Response:** PARTIALLY DISAGREE<br><br>**LAHSA respectfully requests that this issue Priority 1 be reduced to Priority 3. LAHSA also requests Bullets 1 & 3 be removed from the report.**<br><br>LAHSA disagrees that two of the four observations noted (bullets 1 and 3) are issues warranting an audit finding. We also disagree that the conditions observed justify a Priority 3 Finding, which signifies a severe financial or operational risk.<br><br>With regards to bullet 1, depositing cash advances received in separate, interest-bearing accounts by funding source is not required by the County's Operating Agreement. In accordance with Generally Accepted Accounting Principles (GAAP) and the Code of Federal Regulations (2 CFR 200) and in |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
## AUDITOR-CONTROLLER

compliance with the LA County Operating Agreement, advances received are effectively separated by grant in our fund accounting system, and are deposited in LAHSA's operating account, an interest-bearing account, which enables LAHSA to quickly disburse funds to Service Providers.

With regards to bullet 3, LAHSA receives funding from a multitude of governing bodies and private organizations and maintains compliance with each funder's requirements, and since quarterly Service Provider advance reconciliations are not consistent with the terms in all Funder's operational agreements, LAHSA does not agree that lack of quarterly reconciliations warrants an audit finding.

For example, LAHSA reconciles advances received from the County of Los Angeles in accordance with the County's Operating Agreement, which makes no reference to quarterly reconciliations and specified advances are to be reconciled on an annual basis. Thus, LAHSA, in compliance with the Operating Agreement, reconciles Service Provider advances annually and provides the reconciliation to the CEO-HI.

Bullets 2 and 4, the management team that pre-dated Dr. Adams Kellum have been addressed by LAHSA's new financial leadership and the corrective actions detailed below have significantly mitigated risks.

Therefore, we request this issue priority rating be adjusted to Priority 3, to more appropriately reflect the risk associated with the conditions observed and mitigation of risk associated with our corrective action plans.

**Finding Bullet 1** – LAHSA requests removal of this issue from the audit report.

The Operating Agreement between the County and LAHSA does not require separate interest bearing accounts and permits the use of cost centers. It states:

"LAHSA shall maintain a system of accounting records that clearly identify the revenues and expenditures for each HI strategy by the use of cost centers or separate accounts.

Therefore, advances from various funding sources are recorded and tracked through LAHSA's Fund Accounting system/Cost Centers. Specifically, each advance is associated with a unique Grant Number applicable to only one funding source.

LAHSA has already established adequate controls to ensure that cash advances are appropriately accounted for and safeguarded and comply with the existing funding agreement.

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

**Finding Bullet 2** – LAHSA agrees that historically it did not evaluate Service Providers' contracting and advance repayment histories prior to awarding cash advances.

Upon review, we identified that the lapse occurred due to staff turnover and lack of awareness of the existing policy. To address this, we are implementing the following corrective actions:

- **Training and Awareness**: We will conduct mandatory training sessions for all relevant staff to ensure they are fully aware of and understand the importance of this policy no later than March 31, 2025.
- **Process Improvements**: We are enhancing our internal processes by introducing additional checks and balances. This includes requiring Director and CFO approvals before cash advances are awarded to Service Providers.

**Finding Bullet 3** – LAHSA requests removal of this issue from the audit report.

The County of Los Angeles Operating Agreement does not require advances to be reconciled to the Service Providers' actual expenditure quarterly.

The Agreement specifies that advances are to be reconciled and/or recouped by the end of each fiscal year." LAHSA adheres to this contractual obligation.

**Finding Bullet 4** –LAHSA agrees that historically it did not establish clear policies and procedures that address the recoupment of outstanding cash advances.

Under new financial leadership, LAHSA has established clear policies and procedures that address the recoupment of outstanding cash advances, including timelines for follow ups, and for non-responsive Service Providers.

Since Finding Bullets 1 and 3 are not related to established requirements, and since LAHSA is in compliance with the applicable requirements, and since the issues noted in bullets 2 and 4 have been addressed by current management and the associated risks mitigated, LAHSA requests the Priority Level be reduced to Priority Level 3 as there is no significant risk posed to LAHSA at this time.

**Target Implementation Date:**

- Evaluate the Service Providers' contracting and advance repayment history prior to awarding cash

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| | advances, as stated in LAHSA's internal policy. Implemented November 1, 2024. |
|---|---|
| | • Establish clear policies and procedures that address the recoupment of outstanding cash advances November 1, 2024. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

# LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION ||
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| advances, including timelines for follow-ups and remedies for non-responsive subrecipients.<br><br>In response to a County Board motion on May 21, 2024, the County's CEO implemented an alternative funding model for Measure H funded contracts, which provided LAHSA with quarterly cash advances, where LAHSA will in turn provide monthly advances to their subrecipients. As of September 6, 2024, the County had already provided LAHSA with $115,658,400 in Measure H advances for FY 2024-25. Given that this new model increases the number and amount of cash advances received and disbursed, LAHSA must strengthen controls to ensure all cash advances are properly accounted for and used for their intended purpose.<br><br>**Impact**: Increased risk that cash advances are not used for their intended purpose and may not be fully recovered. | |
| 5   **Inappropriate Use of Funds** - As a pass- through governmental agency, LAHSA submits reimbursement claims to its funders and must typically wait to be reimbursed before remitting payments to their subrecipients, unless other resources, such as cash advances, are made available by the funders. However, we noted instances where LAHSA paid their subrecipients prior to receiving reimbursement from funders who did not provide cash advances during FY 2023-24. To make these payments, LAHSA used funds received from other government funders even though the services being paid for were not contracted by those funders. Specifically, from our sample of subrecipient payments made in FY 2023-24, we noted that LAHSA paid:<br>• One subrecipient for a federal Department of Housing and Urban Development (HUD) program 16 days prior to LAHSA receiving reimbursement, totaling $126,168.<br>• One subrecipient for a County (non-Measure H) program 14 days prior to | **Priority 1** - LAHSA management ensure:<br><br>**Available funds are only used for their intended purposes.**<br><br>**Fund balances are monitored to verify program funding is available prior to remitting payments to subrecipients.**<br><br>**LAHSA's Response:** DISAGREE<br><br>Throughout the pandemic, LAHSA's leadership worked closely with funders and service provider partners to ensure continuity of essential services, allowing organizations to remain operational and frontline staff to continue supporting those in need.<br><br>In response to evolving financial circumstances, LAHSA has implemented changes to its payment protocols. The agency has discontinued the practice of making payments to service providers prior to receiving reimbursement from funders, and no longer provides cash advances to providers facing urgent cash flow crises.<br><br>Additionally, LAHSA has strengthened its internal controls to ensure that available funds are allocated solely for their intended purposes. To further enhance fiscal oversight, LAHSA will actively monitor program fund balances to |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

|  |  | confirm the availability of funding before processing any payments to service providers.<br><br>**Target Implementation Date**: Implemented July 1, 2024. |
| --- | --- | --- |

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION ||
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| LAHSA receiving reimbursement, totaling $31,770.<br><br>LAHSA confirmed they used other available funding unrelated to the programs to pay the subrecipients. LAHSA must discontinue this practice to ensure financial resources and operations for other programs are not inappropriately (and negatively) impacted.<br><br>**Impact**: Using funds received from one government funder to pay for services provided under another government funder's contract/ grant constitutes a misuse of those funds, and increases the risk that funder payments are not available for the purposes they were claimed and received. This indicates weaknesses in internal controls and financial management practices, and may result in unintended cash flow issues for various programs and could expose LAHSA to administrative contractual remedies from funders. | |
| **6**   **Late Payments to Subrecipients** - LAHSA did not always pay subrecipients timely even when LAHSA had received payment for services from its funders. Our review of 13 subrecipient payments made between July 2023 through May 2024 noted that five (38%) of those payments were late. Specifically:<br>• Two were paid 53 and 68 business days after the receipt of the subrecipient invoices, respectively, even though these payments were Measure H funded and LAHSA should have had cash advances available to pay within 45 days of receiving the invoices, as stated in their subrecipient contracts. In addition, for one of the invoices, it took LAHSA 51 business days after receiving reimbursement from the County to remit payment to the subrecipient, even though LAHSA indicated their internal metric is to pay within 15 business days of receiving payment from the funder.<br>• Two were paid 42 and 50 business days after the receipt of the subrecipient invoices, respectively, even though LAHSA already received the funding in advance for these | **Priority 1** - **LAHSA management:**<br><br>**Ensure subrecipients are paid timely when cash advances are available or after reimbursement is received from funding sources.**<br><br>**Develop strategies for managing cash flow to ensure sufficient funds are available to meet their financial obligations.**<br><br>**LAHSA's Response: AGREE**<br><br>Since Dr. Adams Kellum's appointment as CEO, her leadership team has prioritized significant improvements to LAHSA's contracting processes, with a focus on enabling service providers to carry out their critical work in the field without unnecessary administrative burdens.<br><br>Under Dr. Adams Kellum's guidance, LAHSA has expedited the contracting and payment cycles, recognizing that providers must receive timely payments to sustain their essential operations. Previous inefficiencies, such as overly complex systems and lengthy delays, were identified as barriers to effective service delivery. Over the past two years, LAHSA has worked closely with its partners to implement substantial improvements, reducing the administrative obstacles that providers with experience. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
AUDITOR-CONTROLLER

|  |  | Upon assuming her role, Dr. Adams Kellum set a key goal for the Contracts Department: to increase the percentage of contracts executed from 30% to 80% by the end of the next fiscal year, June 30. The department not only met this goal but successfully repeated the achievement in 2024. These results were made possible by the implementation of new, streamlined processes that also ensure long-term sustainability for LAHSA staff.

**Target Implementation Date:** Implemented July 1, 2024. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| services. The payments were for a State funded program in which LAHSA received advanced installment payments in place of having to submit reimbursement claims.<br><br>• One was paid 55 business days after LAHSA received reimbursement from the funding source (i.e., the City). As mentioned above, LAHSA indicated their internal metric is to pay within 15 business days.<br><br>LAHSA indicated the late payments were due to cash flow issues. However, as noted in Issues No. 1 and 2, LAHSA received $82.5 million in working capital advances from the County, and also received cash advances from various other funding sources which were subsequently awarded to subrecipients and not recouped as required, creating a cash deficit. To ensure sufficient funds are available to meet their financial obligations, LAHSA should develop strategies to enhance their cash flow management.<br>**Impact**: Delayed payments can negatively affect a subrecipient's cash flow and their ability to provide critical client services. | |
| 7 | **Record-keeping Deficiencies - Working Capital Advances** - LAHSA used various methods to track their Measure H working capital advances provided to subrecipients, including their Working Capital Recoup Tracker report, which is generated from LAHSA's accounting records. We obtained a copy of this report and selected a sample of transactions to validate the accuracy of the information. Specifically, we selected 12 (33%) of the 36 subrecipients that received working capital advances, totaling approximately $34.6 million (68%) of the total. $50.8 million in working capital advances awarded, and requested documentation to support the amounts, such as the request and approval documents, check registers/vouchers, etc. Of the $34.6 million, LAHSA:<br>• Understated the amount of working capital advances for two subrecipients by $505,591. Specifically, LAHSA's accounting records understated the awarded amount by | **Priority 1** - LAHSA management investigate records for all working capital advances, including records for the issues noted in our review, and make any necessary corrections to ensure an accurate accounting of all working capital advances.<br><br>**LAHSA's Response: AGREE**<br><br>The understated amounts of $356,967 and $148,624 represent 1.03% and 0.43% respectively, and total 1.46% of the $34.6 million of Measure H Working Capital sampled, and this error is significantly below any reasonable materiality threshold.<br><br>LAHSA acknowledges that we were unable to provide the advance request, approval, and/or disbursement documentation for all Service Providers sampled at the time of the request. This was due to a high volume of competing urgent requests that exceeded our staff's capacity to respond within the required timeframe. However, we were able to successfully provide 86% of the requested supporting documentation.<br><br>**Target Implementation Date:** March 31, 2025. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

# LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| $356,967 for one subrecipient, and by $148,624 for the other subrecipient.<br><br>• Did not provide the advance request, approval, and/or disbursement documentation for eight subrecipients, totaling approximately $5 million (14%) in working capital advances reviewed.<br>LAHSA attributed these record keeping deficiencies to various causes, including staff turnover and system changes. To ensure all working capital advances are fully accounted for, LAHSA must review all balances to ensure they are accurate and supported.<br><br>**Impact**: Increased risk of misuse and/or misappropriation of funds if accounting records do not reflect actual amounts disbursed. In addition, inaccurate accounting of the Measure H working capital advances may hinder LAHSA's ability to accurately and effectively recover all funds and fully repay the County. | |
| **8**   **Retroactive Contracts** - Although LAHSA could not identify their total number of retroactive contracts in FY 2023-24 (as mentioned above in Issue No. 3), we reviewed a sample of eight contracts and noted that seven were executed retroactively in FY 2023-24. These seven contracts were executed between 23 and 170 days late, or an average of 73 days after the contract start date. While most of these contracts were executed late due to funding delays, we noted opportunities for LAHSA to improve the timeliness of contract executions. Specifically, funding for:<br>• Five of the contracts was approved by the City on August 10, 2023, which was 40 days after the contact start date of July 1, 2023. After funding was approved, LAHSA took between ten and 130 days to execute the contracts. Some of the later contract executions in this example appear to be excessive and the result of avoidable internal delays at LAHSA. For example, in one instance, LAHSA did not create the actual contract until 41 days after the funding was approved. It also took LAHSA another 60 | **Priority 1** - **LAHSA management:**<br><br>**Identify internal delays in the contracting process and implement improvements to enhance the timeliness of contract executions.**<br><br>**Work with funding sources, where applicable, to identify possible solutions for funding approval delays to minimize retroactive contracting.**<br><br>**LAHSA's Response: DISAGREE**<br><br>**LAHSA respectfully requests that this issue be removed from the Audit Report.**<br><br>None of the contracts sampled experienced excessive delays attributable to internal issues within LAHSA's contracting process.<br><br>Under new leadership, LAHSA has made significant improvements to expedite the contracting and payment process, ensuring providers can continue their vital work addressing homelessness. Over the past two years, LAHSA has worked closely with its partners to streamline systems and reduce delays. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| | | |
|---|---|---|
| | | When Dr. Adams Kellum became CEO, she set a goal for the contracting team to increase the number of contracts executed from 30% to 80% by June 30. This goal was achieved and repeated in 2024, with new, sustainable processes in place. |
| | | Of the seven sampled retroactive contracts, six were delayed due to funder or service provider delays, not LAHSA's internal contracting process. As noted in the report, LAHSA executed one contract 23 days after funding approval—an acceptable timeframe given the complexity of the Inside Safe program, which was part of an emergency declaration. |
| | | Additionally, the audit sample was not fully representative of LAHSA's overall contracting operations. Of the eight contracts sampled, five were specific to the Inside Safe program, which was still being developed and faced unique challenges, including delays in provider budgets and contract adjustments. While LAHSA followed up on these issues, the completion timelines were outside of LAHSA's control. |
| | | **Target Implementation Date**: N/A |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| days to finalize the budget with the subrecipient.<br><br>• One of the contracts was approved by the County Department of Public Social Services on April 24, 2023, which was 68 days *before* the contract start date. However, LAHSA executed the contract 24 days *after* the contract start date. Similar to the example above, LAHSA did not create the actual contract until 15 days after the funding was approved, and it took LAHSA another 65 days to finalize the budget with the subrecipient.<br>• One of the contracts was approved by the City on June 1, 2023, the same date as the contract start date, and LAHSA executed the contract 23 days after the funding was approved. Although this did not appear excessively long, LAHSA may be able to identify opportunities for timelier execution (e.g., LAHSA did not create the actual contract until seven days after the funding was approved).<br>**Impact**: Unnecessary or avoidable delays when executing contracts, resulting in increased liability from subrecipients providing services without executed contracts and delayed payments for services provided. | |
| 9   **Inadequate Contract Monitoring Plan** - Organizations should develop and adhere to annual risk-based contract monitoring plans to effectively allocate resources and mitigate contracting risks. Such risks may include, but are not limited to, contractors/sub-recipients billing LAHSA for services that were not actually provided, that do not meet contract standards/requirements, and/or that were provided to ineligible or fictitious recipients.<br>While LAHSA's Contract Compliance Unit developed a FY 2023-24 Contract Monitoring Plan (Monitoring Plan), they did not have adequate processes in place to ensure the Monitoring Plan provided effective oversight of their subrecipients. Specifically, we reviewed LAHSA's processes for developing and | **Priority 1** - LAHSA management:<br><br>Establish a standardized risk assessment process to use in developing annual contract monitoring plans.<br><br>Actively track the status of all contract monitoring reviews and measure performance against their contract monitoring plans at year-end.<br><br>Implement a notification process to ensure that the Contract Compliance Unit is notified of newly executed contracts.<br><br>Ensure Service Providers are monitored for all key contract requirements (e.g., programmatic requirements). |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| maintaining their Monitoring Plan and noted that LAHSA did not:<br><br>• **Have an adequate risk assessment process.** While LAHSA identified appropriate risk factors, such as a subrecipient's noncompliance history, LAHSA did not have a systematic and documented method to evaluate and determine a subrecipient's overall risk rating/score. Instead, LAHSA relied on internal/institutional knowledge to determine the overall risk for a subrecipient, which was then used to develop their Monitoring Plan.<br>• Track the status of all their contract monitoring reviews and as a result, could not readily determine their progress in completing the planned reviews. LAHSA should actively track the status of all contract monitoring reviews and evaluate their performance against the monitoring plans at year-end to determine whether monitoring resources are adequate.<br>• Have an adequate process for updating their Monitoring Plan with newly executed contracts. To identify new contracts, LAHSA's Contract Compliance Unit indicated they manually run accounting and contract reports monthly to identify activity (e.g., new subrecipient payments) that may suggest new contracts. However, the Contract Compliance Unit should instead be automatically notified when new contracts are executed to ensure proper and timely subrecipient oversight and monitoring.<br>• Have a process to ensure all subrecipients are monitored programmatically. Specifically, 54 (51%) of their 105 planned reviews did not include procedures to monitor a subrecipient's program/service delivery compliance (e.g., adherence to participant eligibility requirements), and | **LAHSA's Response:** DISAGREE<br><br>**LAHSA respectfully requests that these issues and the associated recommendations be removed from the audit report.**<br><br>We disagree that LAHSA did not have an adequate risk assessment process. The Code of Federal Regulations, 2 CFR 200, requires a thorough risk assessment process, however it does not require an overall risk/rating score for assessing Service Providers. LAHSA's risk assessment process is thorough and includes risk ratings derived from three distinct assessments that measure:<br><br>1. Organizational Risk<br>2. Financial Risk, and<br>3. Programmatic Risk<br><br>In addition to these three risk scores, and in accordance with 2 CFR 200, LAHSA also considers various factors such as Service Provider's past performance, financial stability, and compliance history.<br><br>Nevertheless, as the recommendation would be beneficial, LAHSA has established a standardized risk assessment process which uses an overall risk/rating to use in developing annual contract monitoring plans.<br><br>We disagree that LAHSA did not track the status of all contract monitoring reviews and could not readily determine progress in completing the planned reviews.<br><br>LAHSA diligently tracks the status of all contract monitoring reviews. Some reviews remained in the same status because they were placed on hold to prioritize higher-risk monitoring reviews. The conclusion that LAHSA could not readily determine their progress in completing the planned reviews is not accurate. The lack of status changes does not equate with a lack of tracking. LAHSA continued to track all reviews and was aware that these reviews were placed on hold.<br><br>We disagree that LAHSA did not have an adequate process for updating their Monitoring Plan with newly executed contracts. The Contract Compliance receives notifications of all newly approved contracts and runs monthly Contracts and Accounting Reports to identify new contracts and ensures, in accordance with 2 CFR 200, the monitoring plan is regularly updated to include new Service Providers. Whereas 2 CFR 200 does not require the monitoring plan |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

|  |  | to be updated through automatic notifications, therefore we kindly request this finding be deleted from the report.

While we disagree with our 2 CFR 200-compliant monitoring plan update process warrants a Priority 1 finding, we agree the recommendation would optimize efficiency and LAHSA will implement an automatic notification process to ensure that the Contract Compliance Unit is notified of newly executed contracts.

All LAHSA's new Service Providers are monitored, and all Service Providers of federal funds are monitored in accordance with 2 CFR 200. LAHSA's lowest risk Service Providers are monitored remotely through reviews of a more limited scope. These reviews do not always require a programmatic review and all 54 of the planned reviews that did not include procedures to monitor a Service Provider's program/service delivery compliance were Service Providers with the lowest risk score.

However, LAHSA has revised the Service Provider monitoring process for FY24-25, which requires programmatic reviews for all monitoring reviews, including reviews Service Provider with the lowest risk scores.

**Target Implementation Date:** Implemented October 31, 2024. |
|---|---|---|

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

# LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| ISSUE | RECOMMENDATION |
| **Impact**: Possible gaps in contract monitoring and inadequate contractor/subrecipient oversight, which may result in the waste or misuse of public funds and/or critical services not being provided. | |
| **10** **Lack of Contract Monitoring Standards** - An effective contract monitoring function should have standards for conducting and documenting the results of their contract monitoring reviews. We found that LAHSA's contract monitoring function does not always have or adhere to standards. Specifically, we selected a sample of 10 contract monitoring reviews LAHSA conducted in FY 2023-24 and noted that:<br>• LAHSA did not maintain adequate workpapers to support the results and conclusions for all ten reviews. Specifically, while LAHSA generally maintained workpapers (e.g., client eligibility records, cost allocation plans, etc.) for their reviews, LAHSA was unable to provide any documentation for one review, indicating the records were lost, and could not readily demonstrate how the workpapers supported their conclusions for the remaining nine reviews.<br>• Workpapers for all ten reviews did not include evidence of supervisory review. Contract monitoring reviews should be properly supervised to ensure objectives are appropriately met and supported.<br>As a result, we could not determine whether LAHSA adequately monitored their contracts to ensure subrecipients complied with their contract terms. Given the critical nature of their contracted services, LAHSA must have a robust contract monitoring function to ensure critical services are adequately provided, that recipients exist and are eligible, and that contracted funds are used for their intended purposes.<br>**Impact**: Increased risk that contract monitoring reviews are not properly conducted, potentially resulting in various issues going undetected, such as funds not used for their intended purposes, misuse and misappropriation of funds, services not provided and/or not provided in | **Priority 1** - LAHSA management:<br><br>**Ensure adequate workpapers are maintained for all contract monitoring reviews and consider the use of audit workpaper software to ensure consistency and efficiency.**<br><br>**Contract monitoring reviews are properly supervised, and evidence of supervision is documented.**<br><br>**LAHSA's Response: AGREE**<br><br>LAHSA acknowledges that we were unable to provide documentation for one review. To compensate, we used HMIS data to support the conclusions of the contract monitoring review and conducted a live walkthrough of the HMIS system for the auditors to demonstrate the availability of relevant data.<br><br>To prevent future data loss, LAHSA will require all coordinators to maintain backups of monitoring documentation on an encrypted USB drive. Additionally, we will ensure that all workpapers for contract monitoring reviews are properly maintained and are considering the use of audit workpaper software to enhance consistency and efficiency.<br><br>While the workpapers and contract monitoring reviews were not signed by a supervisor, they were reviewed and approved via email. Moving forward, LAHSA will ensure proper supervision of all contract monitoring reviews, with documented evidence of supervision. We will implement signature and date lines on all workpapers and monitoring reviews, and update policies to require supervisors to formally review and approve documentation.<br><br>**Target Implementation Date**: February 28, 2025. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**Attachment III**
**Page 25 of 33**

## LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| accordance with contract terms and other noncompliance issues. | |
| 11   **Delays with Reimbursement Claims** - As mentioned above, LAHSA is primarily a pass-through governmental agency, and typically must wait for invoices from their subrecipients before submitting their own reimbursement claims to their funders. While these claims should be submitted timely to ensure adequate cash flow, we noted instances where claims were excessively late. Specifically, of the 13 LAHSA reimbursement claims we reviewed:<br><br>• One claim to the County, totaling $487,125, was submitted 214 days after the end of the billing month when LAHSA's County operating agreement requires they submit claims within 30 days. LAHSA indicated this was due to their subrecipients not submitting year-end invoices timely and delays with their own year-end reconciliation and close-out processes.<br>• One claim to HUD, totaling $126,168, was submitted 144 days after the billing month, and while there was no submission deadline, the delay appeared excessive. LAHSA indicated the subrecipient could not submit their invoices in EGMS due to pending contract amendments. In addition, we contacted the subrecipient who cited additional issues, such as barriers with accessing EGMS and complexities with the system.<br><br>In addition, we reviewed a sample of 20 subrecipient monthly invoices to LAHSA from FY 2023-24 and noted that 12 (60%) were not submitted by the 15th of the following month, as required by their contracts. According to LAHSA, there were no barriers that prevented the subrecipients from submitting their invoices timely. We attempted to contact the subrecipients, and while only two responded, they confirmed that the late submissions were due to internal issues, such as inadequate oversight and staff turnover. | **Priority 2** - LAHSA management:<br><br>**Monitor subrecipient to identify and address barriers in submitting their invoices to ensure they are submitted timely as required by their contracts.**<br><br>**Ensure their own reimbursement claims to funders are submitted timely.**<br><br>**LAHSA's Response: AGREE**<br><br>LAHSA acknowledges that two of the 13 reimbursement claims were delayed. However, 11 of the 13 claims were submitted on time, reflecting LAHSA's overall commitment to timely submissions. The delay with the County claim was due to the need for the County to amend the budget to release prior-year carryover funds. The HUD claim was delayed due to limitations in the EGMS system, which prevented Service Providers from submitting invoices; this issue has since been resolved.<br><br>Additionally, 12 of 20 Service Provider invoices were not submitted by the 15th of the following month, as required by contract, primarily due to staffing shortages among providers.<br><br>We agree with the recommendations and are committed to their implementation. Specifically, LAHSA will:<br><br>• Streamline the year-end close process to ensure timely reimbursement claims and avoid internal delays.<br>• Continue to monitor Service Providers and address any barriers to timely invoice submission.<br>• Implement improvements to the EGMS system to reduce the need for amendments and minimize invoice delays.<br>• Work collaboratively with Service Providers and funding partners to address staffing shortages and explore innovative solutions to these challenges.<br><br>**Target Implementation Date:** February 28, 2025. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION ||
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| LAHSA should monitor their subrecipients and address barriers, where appropriate, to ensure invoices are submitted by the required deadlines since late submissions delay their own reimbursement claims, as evidenced by the findings detailed above. | |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| 12 | Did Not Complete Planned Audits - While LAHSA has an Internal Audit Unit to evaluate internal controls, compliance, and operational efficiencies, we noted that LAHSA did not complete any of the four planned audits in FY 2022-23 and carried over the audits to their FY 2023-24 Internal Audit Plan. In addition, LAHSA indicated they only initiated two (50%) of the four planned audits for FY 2023-24, both of which began in May 2024, and attributed the audit delays to emerging issues. While deviations from internal audit plans are not uncommon, LAHSA's lack of adherence to their plans for the past two FYs and overall lack of internal audit activity raises concerns about the adequacy and capability of their internal audit function. In addition, according to LAHSA's Internal Audit Charter, LAHSA adheres to the International Standards for the Professional Practice of Internal Auditing (Standards). However, LAHSA did not communicate the deviation from their planned work to senior management and their governing body for review and approval, as required by Section 2020 of the Standards. To maintain a robust internal audit function, LAHSA should ensure they have adequate resources to complete the work in their annual internal audit plans, and that any deviations are reviewed and approved as required. | Priority 2 - LAHSA management ensure:

**Internal audit resources are adequate to complete the audits in the annual audit plans.**

**Deviations from annual audit plans are reviewed and approved by the appropriate parties.**

LAHSA's Response: PARTIALLY DISAGREE

**LAHSA respectfully requests that this issue Priority 2 be reduced to Priority 3.**

While LAHSA deviated from its Internal Audit Plan in FY22-23 and FY23-24, regular updates on the status and rationale for these deviations were provided to the Management Committee and leadership throughout both fiscal years. Specifically:

1. On March 23, 2023, Internal Audit's senior leadership discussed the flexibility of the Internal Audit Plan, including the capacity to undertake ad-hoc audits.
2. On April 19, 2023, during the Audit and Risk Management (ARM) Committee meeting, Internal Audit leadership presented modifications to the Internal Audit Plan. This presentation, which was endorsed by the LAHSA Commissioners, highlighted the discretion to deviate from the plan based on the Phase 2 Risk Assessment Methodology. The full details of the meeting can be found in Exhibit 2. |
| | **Impact**: Increased risk of errors, fraud, noncompliance, and other operational weaknesses and inefficiencies going undetected. | Given these efforts and the progress made, including the revised Internal Audit Charter, LAHSA requests that Issue #12 be downgraded to a Priority 3 finding, which more accurately reflects the current status of the matter.

As of August 2024, the Internal Audit Unit has achieved full staffing under its current authorized budget. Furthermore, the revised Internal Audit Charter (approved on October 25, 2024) grants the Management Committee greater responsibility for overseeing the Internal Audit function and ensuring adequate resources for future fiscal years.

Additionally, the revised Charter stipulates that any future modifications to the Internal Audit Plan must be reported to and approved by the Management Committee prior to implementation. Please refer to Domain III: Governing the Internal Audit Function in the attached LAHSA Internal Audit Charter for further details on the Management Committee's role moving forward. |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
AUDITOR-CONTROLLER

|  |  |  |
|---|---|---|
|  |  | **Target Implementation Date**: Revised Internal Audit Charter and FY24-25 Risk Assessment Methodology and Internal Audit Plan were both approved on October 25, 2024 (IMPLEMENTED) |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
# AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | |
|---|---|
| **ISSUE** | **RECOMMENDATION** |
| **13**   **Internal Audit Risk Assessment Not Completed Annually** - An internal audit function's work must be based on documented risk assessments that are completed at least annually, which in turn, guide the development of annual internal audit plans. However, LAHSA's Internal Audit Unit did not complete a risk assessment to develop their FY 2023-24 Internal Audit Plan as required by Section 2010A.1 of the Standards. Instead, LAHSA carried over their FY 2022-23 planned internal audits to FY 2023-24, as mentioned in Issue No. 12. According to LAHSA management, this was due to capacity issues and the ongoing prevalence of the issues identified in their FY 2022-23 risk assessment.<br><br>**Impact**: Emerging risks may go undetected/unevaluated, which may result in utilizing audit resources on less critical assignments. | **Priority 2** - LAHSA management ensure risk assessments are completed annually to develop their internal audit plans.<br><br>**LAHSA's Response:** PARTIALLY DISAGREE<br><br>**LAHSA respectfully requests that this issue Priority 2 be reduced to Priority 3.**<br><br>While LAHSA did not conduct a new formal Risk Assessment for FY23-24, the Internal Audit function exercised its discretion to assess the risk and audit landscape for that year. As a result, the decision was made to carry over the Risk Assessment methodology, results, and planned Internal Audits from FY22-23 and complete them in FY23-24. The risks and issues identified in the previous assessment were evaluated and determined to remain relevant and worthy of continued audit.<br><br>Given these considerations and the ongoing efforts to strengthen Risk Assessment practices at LAHSA (outlined below), the organization respectfully requests that Issue #13 be reduced from Priority 2 to Priority 3.<br><br>The internal audit function will continue to conduct Annual Risk Assessments each year. With the Internal Audit Unit now fully staffed, the capacity challenges noted in FY22-23 and the early part of FY23-24 are no longer a concern. To mitigate potential future capacity issues, Internal Audit will proactively raise such concerns with the Management Committee to assess whether additional resources should be allocated or if the Internal Audit Plan requires adjustment.<br><br>Finally, as part of a procedural enhancement, Internal Audit will begin conducting Risk Assessments for the upcoming Fiscal Year at an earlier point—no later than Q2 of the current FY. This proactive approach will enable LAHSA to complete its Risk Assessment, Internal Audit Plan, and a greater portion of planned Internal Audits in a timelier manner going forward.<br><br>**Target Implementation Date**: Revised Internal Audit Charter approved on October 25, 2024 (IMPLEMENTED); |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

**LOS ANGELES COUNTY**
**AUDITOR-CONTROLLER**

| 14 | Internal Audit Independence - LAHSA's Director of Risk Management oversees their Internal Audit Unit, serving as their Chief Audit Executive (CAE), and also has oversight of LAHSA's Legal Operations, Investigations, Third Party Audits, Risk Management, and Quality Standards Units. According to Section 1112 of the Standards, where a CAE has or is expected to have roles and/or responsibilities that fall outside of internal auditing, safeguards must be in place to limit impairments to independence or objectivity. However, LAHSA did not provide formal action plans that outlined specific safeguards in place to address perceived or actual impairments to independence. In addition, Section 7.1 of the new 2024 Global Internal Audit Standards, which must be adopted in 2025, requires the roles and responsibilities that go beyond internal audit, and the established safeguards be documented in the Internal Audit Charter (Charter). However, LAHSA's Charter, which was last updated in 2018, did not document the CAE's other responsibilities and established safeguards. LAHSA management indicated they are in the process of updating their Charter to include all the required information. | **Priority 3** - **LAHSA management identify and document the CAE's roles and responsibilities that fall outside internal auditing, and the established safeguards to limit impairments to independence or objectivity in LAHSA's Internal Audit Charter.**<br><br>**LAHSA's Response:** PARTIALLY DISAGREE<br><br>**LAHSA respectfully requests that these issues and the associated recommendations be removed from the audit report.**<br><br>LAHSA took steps to improve the independence of the Internal Audit function in FY22-23 and FY23-24, first by vesting Internal Audit in the newly created Risk Department (it previously fell within the Finance Department), and later changing Risk Management's line of authority to report to the Chief Operating Officer (COO) instead of the Chief Financial and Administrative Officer (CFAO). The latter move further improved Internal Audit's independence and decreased the number of Departments subject to potential leadership influence or conflicts of interest (COIs) than was previously the case when Risk Management fell in the CFAO's portfolio.<br><br>In addition, LAHSA advises that the 2024 IIA Standards (pgs. 116-119) identified multiple factors that were acknowledged to make full conformance with the IIA Standards more challenging for public sector entities like LAHSA.<br><br>Given these considerations and the steps toward greater independence that LAHSA has already taken, LAHSA requests that Issue #14 be deleted from the Final Audit Report.<br><br>Internal Audit also advises that the revised Internal Audit Charter makes several additional changes to further improve Internal Audit Independence; these changes include:<br>1. Designating the *Director* position as the FTE that functionally fills the *Chief Audit Executive* (CAE) role at LAHSA, and additionally outlining the roles and responsibilities of the LAHSA CAE.<br>2. Revising LAHSA's Organizational Chart so the *Director*, in their capacity as the CAE, reports to the Chief Executive Officer (CEO) administratively but to the Management Committee itself from a functional standpoint; both moves grant the CAE greater independence from influence by other LAHSA leadership figures by placing it outside the direct authority of another leadership position.<br>3. Providing for both the CAE and other personnel |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| | | involved in the execution of the Internal Audit function to sign Internal Audit Independence Statements; the CAE is expected to sign the first such statement (which the Management Committee will also sign) in October 2024, after which the remaining personnel will similarly sign their own Internal Audit Independence Statements.

Further details on those provisions can be viewed in the attached LAHSA Internal Audit Charter, specifically in *Domain III: Governing the Internal Audit Function*, as well as the new attached Internal Audit Unit Organizational Chart.


**Target Implementation Date**: Revised Internal Audit Charter Implemented on October 25, 2024 (IMPLEMENTED) |
|---|---|---|

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| TABLE OF FINDINGS AND RECOMMENDATIONS FOR CORRECTIVE ACTION | | |
|---|---|---|
| | **ISSUE** | **RECOMMENDATION** |
| | **Impact**: Actual or perceived impairments to independence, which can impact the Internal Audit Unit's ability to function in an unbiased manner. | |
| 15 | **No Quality Assurance and Improvement Program** - According to Section 1300 of the Standards, the CAE must develop and maintain a Quality Assurance and Improvement Program (QAIP) that covers all aspects of the internal audit activity. The QAIP must include both internal and external assessments, and the CAE must discuss the results of the assessments with senior management and the governing body. However, LAHSA did not have a QAIP in place at the time of our review. According to LAHSA management, they will establish a QAIP and anticipate completing the assessments in FY 2024-25.<br><br>**Impact**: Increased risk of nonconformance with the Standards, which can negatively impact the quality of an internal audit function. | **Priority 3** - LAHSA management: **Establish a Quality Assurance and Improvement Program.**<br><br>**Ensure internal and external assessments are completed as required by the Standards.**<br><br>**Ensure results are communicated to senior management and their governing body.**<br><br>**LAHSA's Response:** PARTIALLY DISAGREE<br><br>Internal Audit advises that, while LAHSA did not previously have a Quality Assurance and Improvement Program (QAIP) in place, efforts to revise the Internal Audit Charter were underway prior to the issuance of this finding. The IIA Standards (pp. 116-119) note that public sector entities like LAHSA face unique challenges, such as limited resources and a lack of an independent budget, which can impact the ability to fund and implement QAIP. Given these factors,<br><br>Internal Audit also advises that, under its newly revised Internal Audit Charter, LAHSA remains fully compliant with the 2024 IIA Standards, including provisions for a QAIP and both internal and external assessments.<br><br>While the revised Charter addresses compliance considerations outlined by the IIA, including resource constraints that may limit the full implementation of a QAIP and assessments, Internal Audit anticipates no difficulties in meeting the standards,' provided funding is available.<br><br>**Target Implementation Date**: The Revised Internal Audit Charter has been implemented as of October 25, 2024 (IMPLEMENTED); QAIP Establishment June 30, 2025 |

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.

## LOS ANGELES COUNTY
## AUDITOR-CONTROLLER

| 16 | **Key Performance Indicators Not Established** - Key performance indicators (KPIs) are metrics that are used to measure how well an organization is performing a given function. When evaluated regularly, KPIs can help identify areas for improvement, help make decisions and prioritize actions, and detect patterns and trends over time and reveal improvement opportunities. While LAHSA had not yet established KPIs for their Internal Audit Unit at the time of our review, LAHSA did establish a new policy in May 2024 governing the development and implementation of KPIs. The new policy applies to all functions, and LAHSA indicated they expect KPIs will be finalized in FY 2024-25. **Impact**: Not measuring performance diminishes the organization's ability to determine whether they are effectively meeting their objectives. | **Priority 3** - LAHSA management ensure KPIs are finalized and implemented where applicable, and establish a mechanism for collecting, analyzing, and reporting KPIs to the appropriate parties.<br><br>**LAHSA's Response:** PARTIALLY DISAGREE<br><br>Internal Audit advises that the Internal Audit Unit KPIs were provided in draft form in May 2024 and were only awaiting finalization. While each department will have its own KPIs aligned with their core functions, a single, uniform mechanism for data collection, analysis, and reporting is unlikely to be suitable due to the varied data types, functions, and software used across departments. Therefore, KPI infrastructure will be aligned with LAHSA-wide policies, with application varying by department as appropriate.<br><br>Internal Audit further advises that its new KPI and KRI Policy has been approved, and efforts to communicate this policy to other departments are ongoing. Established departments with well-defined processes will be the first to submit KPIs for their major functions, while newer departments will follow. Additionally, Internal Audit plans to expand its existing policy with a second policy to provide further guidance on the collection, analysis, and reporting of KPIs.<br>In addition, Internal Audit advises that it further expands its existing Policy with a second Policy that establishes guidance for the collection, analysis, and reporting of KPIs.<br><br>**Target Implementation Date**: June 30, 2025 |

For more information on our auditing process, including recommendation priority rankings and the resolution process, visit http://auditor.lacounty.gov/contract-monitoring-audit-process-information/.

**Priority Ranking:** Recommendations are ranked from Priority 1 to 3 based on the potential seriousness and likelihood of negative impact on the Agency's operations if corrective action is not taken.