# Exhibit F



 

# HOMELESSNESS AUDIT:

## Pathways to Permanent Housing



**TRANSPARENCY & ACCOUNTABILITY**

December 10, 2024

Honorable Karen Bass, Mayor
Honorable Hydee Feldstein Soto, City Attorney
Honorable Members of the Los Angeles City Council

**Re: Pathways to Permanent Housing**

Until a person is permanently housed, that person's homelessness is not successfully ended. That is the guiding principle for the City and nation's homelessness strategy. Understanding this bedrock concept, our Office conducted this audit to identify opportunities for the City and the Los Angeles Homeless Services Authority (LAHSA) to improve the rehousing system and increase the likelihood that unhoused people are able to secure a stable, safe, and permanent place to live.

For this audit, we focused our analysis on City-funded interim housing programs that were operational between FY 2019 to FY 2023 which included crisis and bridge shelters, A Bridge Home (ABH), hotel and motel based programs, and tiny home villages. Auditors measured the performance of each interim housing program by using metrics such as permanent housing placement rates, utilization/retention rates, and returns to homelessness. Auditors then evaluated permanent housing destination types including Time Limited Subsidies, vouchers and other subsidies, unsubsidized permanent housing, and permanent supportive housing.

There are a woefully inadequate number of people moving from interim to permanent housing: **Less than 20% of people in interim housing secured permanent housing, and more than 50% of people exiting interim housing returned to homelessness or unknown destinations**. There are also major concerns about long term stability for people who have been placed in permanent housing. Furthermore, over the 5 year scope covered in this audit, **an average of 1 in 4 interim beds - which are the gateway to permanent housing - went unused costing taxpayers an estimated $218 million**.

Achieving successful housing outcomes is exceedingly difficult because there is a chronic shortage of affordable housing in Los Angeles. Beyond inadequate supply, unhoused people frequently struggle with financial barriers, bureaucratic hurdles, and bias from landlords. Together, these obstacles contribute to long periods waiting to secure permanent housing. The delays and uncertainty compel many people to return to the streets, which places them at significant risk to their safety and wellbeing, and derails the hard work and resources that have gone into ending their homelessness.

It is essential to scale up permanent housing resources and maximize the efficiency with which LAHSA and its contracted service providers are successfully moving people through the rehousing system (i.e., throughput). It is also critical to understand which interim housing programs and services are achieving the best permanent housing outcomes in the most cost-effective manner while still taking into account the experience of unhoused individuals.

**Key findings on Interim Housing:**

- <u>Lagging occupancy rates</u> - Interim housing/shelter bed occupancy is significantly below LAHSA's target occupancy rate of 95%. During the five-year scope period (FY 2019 - FY 2023), unoccupied beds cost an estimated $218 million. Each unfilled bed represents a missed opportunity to provide critical assistance to unsheltered people who desperately need help.

    - Citywide Interim Housing Occupancy:

        FY19: 78%
        FY20: 68%
        FY21: 64%
        FY22: 74%
        FY23: 73%

- <u>Severe data quality issues</u> - The lack of reliable information makes meaningful evaluation of system performance difficult, impedes LAHSA's ability to hold underperforming service providers accountable, and prevents the City from making informed decisions about where to direct future spending.

- <u>LAHSA's program management and monitoring are vastly inadequate</u> - The agency does not have a formal process in place to regularly review the performance of providers, including occupancy/placement rates, and hold underperforming service providers accountable by requiring significant corrective action.

- <u>City restrictions on shelter bed availability</u> - Elected Offices request reservations for shelter beds based on geographic zones ("catchments") and prior to encampment cleanups or 41.18 enforcement operations. The lack of formal policies guiding these reservations contributes to shelter beds going unused and compromises service provider efforts to equitably and efficiently house people.

**Key findings on Permanent Housing placements and destination types:**

- Low permanent housing placement rates: Fewer than one in five people enrolled in City-funded shelters have been able to secure some sort of permanent housing. Between FY 2019 and FY 2023, City shelters served 93,741 people and only 15,818 people (17%) secured permanent housing. On average, approximately 3,200 people per year were placed into permanent housing during the scope period.

- Time Limited Subsidies were the most common pathway to secure permanent housing, while permanent supportive housing was the least common

- Stability in permanent housing may not be sustainable - Data shows that some people who secured permanent housing placements using Time Limited Subsidies returned to homelessness in a short amount of time. For FY 2021, the most recent period for which a complete 24-month Time Limited Subsidy lifecycle is available, 12% of people returned to homelessness over the life of the subsidy. Of those that returned to homelessness, just over half did so within one year of moving into a unit using a Time Limited Subsidy. The initiative does not

track data related to returns to homeless following the expiration of the subsidy, which may mean higher percentages of people returning to homelessness after subsidies expire.

- <u>Factors for successful outcomes:</u> Successful housing outcomes are less impacted by interim housing type, and more impacted by effective service delivery and other factors that help people become stable. Examples: consistent/communicative case management, housing navigation, access to mental health services, job training.

**Key Recommendations:**

- Service provider performance: LAHSA should revamp its contract and performance monitoring program to ensure the agency can promptly identify underperforming homeless service providers, and provide technical assistance or implement corrective actions when necessary.

- New bed solutions: Examine the feasibility of developing new, trauma-informed bed solutions for congregate settings that would provide more privacy and comfort to clients.

- Performance-based incentives: Develop performance-based compensation incentives for service providers tied to shelters' occupancy rates, permanent housing placement rates, and other relevant performance metrics.

- Increase Housing Navigators: To the greatest extent possible, increase the number of Housing Navigators so that more people staying in shelters have access to services that can connect them to permanent housing.

- Consolidate contracts: Clearly define the responsibilities of interim housing operators and Housing Navigation service providers, or assess the feasibility of consolidating interim housing and Housing Navigation services under single contracts to streamline case management responsibilities and make it easier for LAHSA to monitor performance and contract non-compliance.

- Revise metrics: Adopt permanent housing placement rate metrics that are not dependent on shelter occupancy rates in order to minimize instances where low occupancy at a shelter results in the appearance of improving permanent housing placement rates.

- Formalize reservation policy: Develop a formal policy for administering catchments and shelter bed reservations by City offices to ensure equitable access to shelter beds and maximize occupancy rates.

- Monitor outcomes: Monitor outcomes for people after their Time Limited Subsidies expire, and for people permanently housed with subsidies other than Time Limited Subsidies, and individuals that obtain housing without government assistance, such as an apartment without subsidies or moving in with a family member or friend.

As a City, we must do more to ensure that unhoused community members can move through the rehousing system, obtain permanent housing, and receive the support needed to stay there. Our office remains committed to researching and assessing system performance, and making recommendations for how we can more effectively bring our unhoused community members indoors for good. We hope this audit will be a vital tool for our City to understand the work that needs to be done on evaluating

programs and performance, and analyzing whether we are making the right decisions to get our unhoused population permanently housed.

Sincerely,

Kenneth Mejia, CPA

City Controller

# TABLE OF CONTENTS

| | |
|---|---|
| **Executive Summary** | **2** |
| **Background** | **11** |
| City-funded Interim Housing Facilities | 13 |
| The Los Angeles Homeless Services Authority and the Los Angeles Continuum of Care | 21 |
| Pathways to Permanent Housing | 23 |
| **I. Interim Housing Occupancy Rates Have Been Significantly Below LAHSA's Target Level** | **28** |
| Occupancy Rates at City-Funded Shelters Have Lagged in Recent Years | 29 |
| LAHSA's Efforts to Hold Underperforming Service Providers Accountable Have Been Ineffective | 32 |
| Improvements to Congregate Interim Housing Facilities Are Needed | 35 |
| City-imposed Shelter Placement Criteria Can Result in Missed Housing Opportunities | 38 |
| **II. Permanent Housing Placement Rates Are Failing to Keep Pace with Growing Demand** | **42** |
| Permanent Housing Outcomes for People Enrolled in the City's Interim Housing Types Are Mixed | 42 |
| A Lack of Housing Navigation Services Hinders Rehousing Efforts | 52 |
| **Recommendation Table** | **58** |
| **LAHSA Response** | **61** |
| **Auditor Comments on LAHSA's Response** | **78** |
| **Appendix A – Permanent Housing Placement Destinations** | **80** |



# EXECUTIVE SUMMARY

Vulnerable Angelenos continue to fall into homelessness due to high housing costs. The steady growth in homelessness and other contributing factors have pushed the City to expand the number and types of interim housing beds that are available. Interim housing typically provides basic accommodations, access to services, and relief from the dangers of living outdoors. Estimates from the annual homeless count (January 2024) indicate that the City has made progress on increasing the number of people in interim housing (+17.7%) and decreasing the number of unsheltered people (-10.4%) compared to the previous year. Over a longer period, data shows that the number of people living in interim housing has nearly doubled since 2016.

However, interim housing is inherently a temporary measure and an early step in the rehousing process. **Success is ultimately measured by securing permanent housing for people and ending their homelessness.** Nationwide policies established by the U.S. Department of Housing and Urban Development (HUD) and City-funded homelessness programs administered by the Los Angeles Homeless Services Authority (LAHSA) are built around this central goal. Permanent housing, as defined by HUD, includes a range of destinations with varying levels of support and stability (e.g., market rate apartments, permanent supportive housing, housing obtained using government vouchers, and long-term stays with family or friends).

**Achieving successful housing outcomes is exceedingly difficult because there is a chronic shortage of affordable housing in Los Angeles.** Beyond inadequate supply, unhoused people frequently struggle with financial barriers, bureaucratic hurdles, and bias from landlords. Together, these obstacles contribute to long periods where people wait to secure permanent housing. The delays and uncertainty compel many people to return to the streets, which places them at risk and derails the hard work and resources that have gone into ending their homelessness.

Given this scenario, **it is essential to scale up permanent housing resources and maximize the efficiency with which LAHSA and its contracted service providers are successfully moving people through the rehousing system (i.e., throughput). The faster the rehousing system can move a person from an interim shelter into permanent housing, the faster that shelter beds, supportive services, and permanent housing placement services will be available for new participants.**

Beyond throughput, it is critical to understand which interim housing programs and services are achieving the best permanent housing outcomes in the most cost-effective manner

because the City is facing several years of budgetary uncertainty that threatens the sustainability of its homeless programs. **The City's dire fiscal outlook—and tens of thousands of unhoused people who need help—require LAHSA and the City to effectively manage the rehousing system and ensure that taxpayer funds are carefully spent.**

We conducted this audit to identify opportunities for LAHSA and the City to **improve the rehousing system and increase the likelihood that unhoused people are able to secure a stable, safe, and permanent place to live**. Since supportive services at interim housing sites help people transition to permanent housing, we focused our analysis on City-funded interim housing programs that were operational between FY 2019 to FY 2023.[1] By the end of this five-year period, the City had an inventory of approximately 7,000 shelter beds spread across different settings that offer varying levels of privacy and comfort.



- **Crisis and Bridge** shelters are traditional congregate (i.e., shared) settings and functioned as the primary shelter option in Los Angeles until 2018.

- **A Bridge Home** shelters are congregate shelter sites built by the City, primarily using portable and prefabricated structures that offer an additional level of privacy through a cubicle-like configuration.

- **Hotel and Motel-based** programs such as Project Homekey and Inside Safe consist of leased hotels/motels that provide single occupancy units to residents.

- **Tiny Home Villages** were developed by the City using small, prefabricated dwellings that can serve as a single or double occupancy shelter unit.

We measured the performance of each interim housing program by using metrics such as permanent housing placement rates, utilization/retention rates, and returns to homelessness. Specifically, we sought to:

- estimate the cost to operate the City's various interim housing shelter types;

---

[1] We focused on this subset of beds due to the growing share of direct City funding and because they generally have a low barrier to entry and are not restricted to special populations such as veterans or individuals with acute mental health needs. City-funded beds represent approximately 53% of the total number of shelter beds available in the City of Los Angeles.

- assess whether the City and LAHSA are maximizing the use of shelter beds and ensuring high rates of occupancy across the City's interim housing inventory;

- determine whether certain shelter types are more efficient than others in moving people into permanent housing solutions; and

- evaluate the effectiveness of LAHSA's efforts to monitor and manage the performance of the rehousing system.

The City is at an important juncture with its rehousing system. There will likely be less resources available over the next several years and the City is in the process of increasing the rates paid to interim housing service providers. **Given these conditions, we strongly encourage LAHSA and City officials to implement the recommendations in this report, particularly those related to improving permanent housing placement rates, strengthening oversight of service providers, and resolving longstanding data quality issues.**

## What We Found

Overall, we found that while the City has embarked on initiatives to expand the supply of interim shelter beds, much more work needs to be done to build on those investments and improve permanent housing outcomes. **A large number of City-funded interim housing beds went unused during the five-year scope period. For beds that were occupied, less than 20% of people were successfully housed and more than half returned to homelessness/unknown destinations. In addition, there are concerns about long-term stability for many people who were placed into permanent housing.** LAHSA and the City need to make significant improvements to its programs in order to maximize occupancy rates, improve accountability and the performance of service providers, and help unhoused Angelenos successfully transition into permanent housing as quickly as possible.

Findings aside, there are critical data quality issues, some of which are tied to the pandemic, that made seemingly straightforward questions (e.g., shelter capacity) difficult to answer. LAHSA officials acknowledged that these data quality issues have caused interim housing occupancy rates to appear overstated in some cases, and understated in others. **The lack of reliable information makes meaningful evaluation of system performance difficult, impedes LAHSA's ability to hold underperforming service providers accountable, and prevents the City from making informed decisions about where to direct future spending.**

4

## Interim Housing Occupancy Rates Have Been Significantly Below LAHSA's Target Level

We found that shelter bed occupancy rates have lagged in recent years and were significantly below LAHSA's target occupancy rate of 95%.[2] LAHSA's ineffective oversight of service providers, policies that create interim housing placement restrictions, the COVID-19 pandemic, and changes in the makeup of the City's interim housing inventory have likely contributed to lower occupancy rates at City-funded shelters. For purposes of this audit, we used LAHSA data and acknowledged its limitations throughout the report.

|  | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|
| Citywide Occupancy | 78% | 68% | 64% | 74% | 73% |

**Interim housing programs that are fully or partially funded by the City cost an estimated $900 million to operate during the five-year scope period, and a growing share of City funds are being used to fund operations.[3] Each unfilled bed represents a missed opportunity to provide critical assistance to unsheltered people who desperately need help.** Third-party service providers who operate City-funded interim housing facilities are paid on a cost reimbursement basis, which is based on the estimated operating costs of a site and providing an agreed upon level of services. **Reimbursements are issued for eligible expenses, regardless of whether the available beds are occupied. As a result, tens of millions of dollars in City funds are being spent on unused shelter beds every year.**

Our analysis also provided the following insights.

- Non-congregate shelters offering private living settings (i.e., hotel and motel-based shelters and Tiny Home Villages) generally had higher occupancy rates compared to higher-density congregate shelters (i.e., Crisis and Bridge shelters and A Bridge Home facilities). **Between FY 2019 and FY 2023, the total occupancy rate across all non-congregate shelters was 86%, compared to 65% for congregate shelters.**

- Operating costs for non-congregate facilities, which provide residents with more space and can provide residents with a greater sense of safety as they recover from their time being unsheltered, are approximately $57,000 per bed annually.

---

[2] For purposes of measuring occupancy, a participant is considered enrolled if they have been accepted into the applicable interim housing program. Because this measure is based on enrollment data, which reflects the number of beds reserved for admitted participants out of total capacity, occupancy rates tend to overrepresent actual shelter bed use because enrolled individuals are not required to stay at the shelter site every night.

[3] The City funded approximately 52% of the operating costs identified.

Congregate facilities, which offer less space and privacy, cost approximately $29,000 per bed annually. **It is important to acknowledge that there are several people-centered qualitative factors, such as privacy and comfort, that are difficult to capture in any cost analysis.** But understanding the estimated cost of each type of intervention can help inform future funding decisions and prioritize development of strategies to boost efficiency.

- A Bridge Home, Tiny Homes, and Project Roomkey/Homekey are subject to geographic zones called "catchments," which closely align with City Council District boundaries. Outreach workers can typically only place unhoused clients in shelters that are located within the same catchment where they reside. Elected offices also have the ability to reserve space in these shelters for an unspecified period of time, which can prevent the placement of someone who is ready to move in immediately. **The City lacks formal referral and placement policies for this process, which may contribute to shelter beds going unused and compromise service provider efforts to equitably and efficiently house people.**

- LAHSA's efforts to monitor and manage the performance of interim housing service providers are vastly inadequate. **The agency does not have a formal process in place to regularly review the performance of providers, including occupancy/placement rates, and hold underperforming service providers accountable by requiring significant corrective action.** Insufficient monitoring has also resulted in occupancy data quality problems, which makes evaluating the transition rates from interim to permanent housing difficult.

Lagging occupancy rates and weak service provider oversight result in shelter beds going unfilled. Any bed that goes unfilled means an unsheltered person living on the streets is waiting longer to move into a safer space and begin the transition to securing permanent housing.

## Permanent Housing Placements Have Not Kept Up with Growing Demand

The movement of people from interim housing shelters into permanent living situations is central to the success of the City's rehousing system. Securing permanent housing can include a person renting an apartment on their own, staying with a family member or friend, using a government voucher or time limited subsidy (TLS) to obtain an apartment (i.e., a subsidy that expires after two years), or moving into permanent supportive housing. The faster a person can move into permanent housing, the faster a shelter bed can open up allowing the next unsheltered person to take their first steps toward stability. **However, we**

**found that service providers responsible for helping people secure permanent housing have struggled to provide services to the growing number of people staying in interim housing.**

- **The majority of people staying in interim housing were not successfully permanently housed and returned to homelessness or other unknown destinations during the five-year scope period.** Shelter facility types varied with regard to how often people departed from shelters and returned to homelessness. For example, 76% of people staying in Tiny Home Villages returned to homelessness or left for unknown destinations. Crisis and Bridge shelters (57%) and hotel and motel-based programs (60%) generally saw lower exit rates to homelessness and unknown destinations.

- **Fewer than one in five people enrolled in City-funded shelters have been able to secure some sort of permanent housing.** Between FY 2019 and FY 2023, City shelters served 93,741 people and only 15,818 people (17%) secured permanent housing.[4] On average, approximately 3,200 people per year were placed into permanent housing during the scope period.

- The most common pathway to permanent housing was Time Limited Subsidies and the least common was permanent supportive housing.

| Permanent Housing Destination | % of Total |
|---|---|
| Time Limited Subsidy | 39% |
| Vouchers (e.g., Section 8) and Other Housing Subsidies | 25% |
| Unsubsidized Permanent Housing | 23% |
| Permanent Supportive Housing | 13% |

Each housing destination offers different levels of stability and support and people may remain at risk of falling into homelessness. For example, we found that approximately 3,600 people exited to unsubsidized permanent housing. LAHSA data indicates that the majority of people in this group (55%) secured market rate housing without any financial subsidies or rental vouchers. **These individuals may not be able to sustain their housing independence without financial support.** In addition, almost half of the exits to unsubsidized permanent housing consisted of people making plans to stay with family and friends for an extended period, which may not provide long-term stability.

---

[4] Based on the count of unique participants served each year.

7

- LAHSA began tracking outcomes for the Time Limited Subsidies program through its Key Performance Indicator initiative. **Data shows that some people who secured permanent housing placements using Time Limited Subsidies returned to homelessness in a short amount of time. For FY 2021 (the most recent period for which a complete 24-month Time Limited Subsidy lifecycle is available) 12% of people returned to homelessness over the life of the subsidy. Of those that returned to homelessness, just over half did so within one year of moving into a unit using a Time Limited Subsidy.** The initiative does not track data related to returns to homelessness following the expiration of the subsidy. More long-term data is needed for other permanent housing destination types.

- For people who secured permanent housing placements between FY 2019 and FY 2023, people tended to secure unsubsidized permanent housing faster (two to five months) than permanent supportive housing or housing using government vouchers (six to eight months).

- It is unclear whether there is a strong causal relationship between interim housing type and permanent housing placements. **Effective service delivery and other factors may have a larger impact on successful housing outcomes.** In addition, a direct comparison between programs was limited by several conditions, including the COVID-19 pandemic and data quality concerns. Our analysis showed that permanent housing placement rates were mixed for the various types of interim housing in the City's shelter portfolio. Between FY 2019 and FY 2023, the permanent housing placement rate per shelter bed maintained for Crisis and Bridge shelters ranged from 0.6 to 1.4. Tiny Home Villages saw the lowest overall placement rate, with a placement rate that did not exceed 0.2.[5]

- The specialists who assist people as they secure housing benefits, search for permanent housing options, and find permanent housing, are known as Housing Navigators, and their services are essential for transitioning people from shelter environments to permanent living settings. Contract service providers carry out housing navigation services. **However, the rehousing system does not have a sufficient number of Housing Navigators. According to LAHSA, it only has the**

---

[5] The placement rate is based on the number of permanent housing placements per shelter bed maintained. A 1-to-1 ratio (expressed as 1.0) indicates that each shelter bed resulted in one permanent housing placement annually. A higher ratio indicates a greater number of permanent housing placements per interim housing bed.

**capacity to enroll 30% of people staying in shelters into Housing Navigation services due to funding constraints.**

- Ensuring the system for transitioning people from shelters into permanent housing is operating efficiently is **difficult because responsibilities related to permanent housing placement are spread across different service providers.** LAHSA has set a permanent housing placement rate goal of 20% for shelter operators, but placement of people into permanent housing is a shared responsibility of service providers that operate shelters, and service providers that deliver housing navigation services.

## What We Recommend

LAHSA and the City must take steps to ensure the rehousing system serves as many people as possible. Those steps include making improvements to how LAHSA manages the performance of the rehousing system, and how individuals are connected to interim housing beds and permanent housing solutions. Specifically, LAHSA, in coordination with the City, should:

- Examine the factors that are contributing to the different permanent housing placement rates for congregate and non-congregate shelters. Once those factors are identified, work to implement improvements in non-congregate shelter settings that will accelerate the permanent housing placement process.

- So long as non-congregate shelter beds remain scant, establish a new, needs-based criteria for non-congregate shelter bed placement to ensure those spaces are available to individuals that would benefit most from private living quarters.

- Establish formal policies for the administration of catchments and bed reservations by City offices to ensure mechanisms are in place to limit the risk of beds going unfilled.

- Establish new data quality control standards and monitoring procedures that ensure service providers accurately report bed capacity information. Procedures should include regular monitoring to the accuracy of bed capacity information to ensure occupancy rates are as accurate as possible when measuring system performance.

- **Revamp its contract and performance monitoring program to ensure the agency can promptly identify underperforming homeless service providers, and provide technical assistance or implement corrective actions when necessary.**

- **Develop performance-based compensation incentives for service providers tied to shelter occupancy rates, permanent housing placement rates, and other relevant performance metrics.**

- **To the greatest extent possible, increase the number of Housing Navigators so that more people staying in shelters have access to services that can connect them to permanent housing.**

- Clearly define the responsibilities of interim housing operators and Housing Navigation service providers, or assess the feasibility of consolidating interim housing and Housing Navigation services under single contracts to streamline case management responsibilities and make it easier for LAHSA to monitor performance and contract noncompliance.

- Adopt permanent housing placement rate metrics that are not dependent on shelter occupancy rates in order to minimize instances where low occupancy at a shelter results in the appearance of improving permanent housing placement rates.

It is critical that LAHSA and the City help those living on the street move into permanent housing solutions as quickly as possible, and move away from a system which relies heavily on interim shelter facilities and services that often result in people returning to homelessness. By implementing the recommendations proposed in this report, we can ensure accountability and efficiency while the City continues to reimagine the Los Angeles rehousing system and deliver vital services to those most in need.

# BACKGROUND

The combination of low wages and high housing costs continues to push vulnerable Angelenos into homelessness. In response, the City of Los Angeles (City) has expanded its shelter bed capacity and the number of people in interim housing has nearly doubled since 2016. Interim housing typically functions as a temporary measure that is intended to provide relief from the dangers of living in tents, vehicles, and other makeshift dwellings. **But a person's homelessness is not successfully ended until they are permanently housed.** This concept remains the guiding principle of the City's comprehensive homeless strategy and nationwide policies established by the U.S. Department of Housing and Urban Development (HUD).[6] The Los Angeles Homeless Services Authority (LAHSA) has a central role in designing and administering homelessness programs that are aligned with City priorities and federal guidelines.

**Although permanent housing placements are the focus of the rehousing system, there is a chronic shortage of affordable housing in Los Angeles. This reality—a growing number of people living in interim housing combined with insufficient permanent housing destinations—leads to significant risks. Lengthy stays in interim housing may cause people to return to the streets, thereby restarting the cycle of homelessness. As a result, it is essential to maximize the efficiency with which LAHSA and its contracted service providers are successfully moving people through the rehousing system (i.e., throughput). The faster the rehousing system can move a person from an interim shelter into permanent housing and ensure that they are able to stay there the faster that shelter beds, supportive services, and permanent housing placement services will be available for new participants.**

LAHSA has made operational changes in an attempt to streamline the rehousing process and increase the speed at which people can secure permanent housing. But identifying and placing people into permanent housing remains challenging. The rehousing system primarily relies on private markets and landlords for the supply of permanent housing. According to LAHSA, one of the most serious challenges facing unhoused residents and case managers is the bias that unhoused members of the community often face. Bias sometimes causes landlords and management companies to avoid renting to people experiencing homelessness, and those seeking to rent properties with the assistance of government

---

[6] Unless specified otherwise, the term "permanent housing" refers to HUD-defined housing destinations (i.e., market rate apartments, permanent supportive housing, housing obtained using government vouchers, and long-term stays with family or friends).

vouchers. **Case managers and participants are often subject to private landlords' screening criteria, including credit checks and rental histories, which can disqualify individuals experiencing homelessness.**

Moreover, systemic barriers—some of which are beyond the control of LAHSA, the City, and service providers—make the rehousing of unhoused people difficult regardless of investments that have been made in the interim and permanent housing systems.

- **Financial Barriers** – Even when housing options are available, including affordable housing with monthly rents below market rates, many individuals face financial barriers that make it difficult to apply for and secure a unit. Those financial barriers include a lack of documented income, poor or no credit, bad rental history, and the inability to afford security deposits, rent, and utilities.

- **Bureaucratic Hurdles** – State law prohibits discrimination by landlords against applicants or tenants using Section 8 vouchers and other subsidies, but enforcement remains difficult. In addition to being left vulnerable due to these ineffective legal protections, unhoused individuals often face overwhelming bureaucratic hurdles and waiting lists when working to secure assistance and apply for housing. The nature of these processes and the difficulties inherent to them can be overwhelming to most individuals, but particularly to those who lack access to case management and support services like many unhoused individuals do. An additional hurdle unhoused individuals face is that landlords often prioritize renting units to tenants who are not reliant on vouchers due to the wait time inconveniences that housing vouchers create for landlords. Wait times before landlords receive payments from the agency issuing a voucher can sometimes be months.

- **Service Provider Staffing** – Many service providers report ongoing challenges related to hiring and retaining the very employees that are tasked with helping people transition into permanent housing. Some service providers report that they simply lack sufficient staffing to effectively deliver support services, which is negatively impacting their ability to help clients. Causes of the staffing shortages include low pay for service provider staff, burnout due to the workload placed upon case management staff, and overarching market factors that have resulted in fewer qualified candidates applying for vacancies.

Both LAHSA and the City are working to mitigate the impact of these obstacles. **This report explores opportunities for LAHSA and the City to make strategic and program management improvements to the rehousing system** that will not only improve performance management and accountability, but enhance the experience of unhoused

12

clients as they move through the rehousing system, and increase the likelihood they are able to secure a stable, safe, and permanent place to live.

**The City's ability to achieve successful permanent housing outcomes is inherently tied to the effectiveness of its interim housing programs.** Beyond providing shelter and meeting individuals' basic needs, supportive services at interim housing sites are intended to provide stability and help people transition into permanent housing. **As a result, this report primarily focuses on the performance of the City's interim housing system.** Specifically, we evaluated the performance of City-funded interim housing programs that were operational between fiscal year (FY) 2019 to FY 2023. We measured the performance of each interim housing program by using metrics such as permanent housing placement rates, utilization/retention rates, and returns to homelessness. We also sought to identify barriers that LAHSA and service providers encounter when working to transition people into permanent housing and explored potential improvements.

The need to better understand which interim housing efforts are producing the best permanent housing outcomes—and at what cost—is especially important because the City is struggling to address its structural deficit and there are growing concerns about the fiscal sustainability of the City's homelessness programs. **It is essential that the City and LAHSA take steps to ensure that taxpayer funds are carefully spent—tens of thousands of people remain on the streets and are in dire need of help.**

The following subsections of this report further outline the interim housing programs launched by the City during the last several years and provide additional context about LAHSA's efforts. We encourage the public and City policymakers to use the objective analysis in this report to improve the rehousing system in Los Angeles.

## City-funded Interim Housing Facilities

The City's interim housing sites provide people with temporary housing intended to address their unsheltered homelessness and support them as they seek to attain permanent housing. While service levels may vary across shelter facilities, each site is responsible for providing a bed, regular meals, showers, and case management services. According to LAHSA, at minimum, case management includes an assessment of an individual's housing and service needs, establishment of a housing and service plan, and attempts to connect clients to available resources and assistance programs. Interim housing facilities also facilitate access to medical, mental health, and addiction treatment.

Historically, the City has relied on partnerships with the County of Los Angeles (County), LAHSA, and nonprofit organizations to develop and provide interim housing. But growing

concerns about the health and safety of unsheltered residents, combined with the proliferation of encampments in the public right-of-way, have led to the City taking a more hands-on role and directly funding the development of new shelter beds. An ongoing federal lawsuit and the COVID-19 pandemic further accelerated the City's efforts.[7]

**Figure 1: City-funded Interim Housing Program Timeline**[8]

*The City launched new interim housing programs after the onset of the COVID-19 pandemic.*

*Source: Office of the Controller*



The introduction of new interim housing programs has led to a significant increase in the number of shelter beds. In total, the City added almost 5,000 shelter beds between FY 2019 and FY 2023. The total number of City-funded beds made up approximately 53% of the overall inventory of interim housing beds in the City of Los Angeles (as reported in the 2023 Point-in-Time shelter count).[9] The City-funded beds are also notable in that they have a low-barrier to entry and are not restricted to special populations such as veterans or individuals with acute mental health needs. The table below shows the total number of beds in the City's shelter inventory from FY 2019 through FY 2023, and the number of beds for each program category.

---

[7] The LA Alliance for Human Rights, a group of business owners, residents, and other stakeholders filed a case against the City and County alleging an inadequate response to homelessness and violations of state and federal law. In a settlement agreement, the City agreed to create sufficient shelter and housing to accommodate 60% of unsheltered people experiencing homelessness within the City based on the 2022 Point-In-Time for those who can be reasonably assisted by the City. The City pledged to pursue an approach of equitably distributing housing and shelter facilities for unhoused individuals throughout the City. The City also agreed to not enforce action against any individual unless that individual has first been offered an opportunity for shelter or to relocate.

[8] This report does not include assessments of City programs that allow people to camp and park in designated areas with access to limited services. These programs are referred to as "safe camping" and "safe parking."

[9] City funding for shelters primarily supports the adult unhoused population, but the City also funds some beds dedicated to youth and family populations.

**Table 1: City-funded Interim Housing Beds by Program**

| Program | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 |
|---|---|---|---|---|---|
| Crisis + Bridge Housing | 2,026 | 2,655 | 2,664 | 2,759 | 3,258 |
| A Bridge Home | 137 | 454 | 1,205 | 1,250 | 1,569 |
| Hotel and Motel-based Programs | - | 331 | 1,978 | 1,677 | 1,097 |
| Tiny Home Villages | - | - | 41 | 596 | 1,004 |
| **Total** | **2,163** | **3,441** | **5,889** | **6,283** | **6,929** |

*Source: Controller analysis of data generated by LAHSA*

Each facility varies with regard to configuration, density, and comfort for residents. In addition, there are different intake mechanisms for some sites. The section below provides an overview of each interim housing type and its percentage share of the City-funded shelter bed inventory as of FY 2023.

### Crisis and Bridge Housing

Crisis and Bridge shelters functioned as the primary shelter option in Los Angeles until 2018. Crisis and Bridge sites are traditional congregate shelter facilities (i.e., shared or communal living spaces), and account for more beds than any other interim housing type. Crisis and Bridge housing facilities are generally easier to access by participants as they can accept people without going through LAHSA's centralized referral process. Although these sites are low-barrier, providers may still implement policies that require referrals from local providers, and may utilize waitlists when sites are at capacity.

**47%**

 

### A Bridge Home

A Bridge Home sites were developed and constructed by the City typically using modular building designs. A feature that distinguishes these sites from Crisis and Bridge housing is

15

that they offer an additional level of privacy, in that the living spaces feature a cubicle-like configuration to allow for a semi-enclosed space.



**23%**

 

### Hotel and Motel-based Programs

During the COVID-19 pandemic, the City began leasing underutilized hotels and motels, and temporarily repurposed those properties to serve as housing for people experiencing homelessness. Hotels and motels have become a significant portion of the City's interim housing inventory.



**16%**

 

- **Project Roomkey** – The City used Federal Emergency Management Agency (FEMA) disaster assistance funds to secure hotel rooms for emergency, non-congregate shelter use. The program was initially designed to prioritize individuals most at risk of experiencing negative health impacts from contracting the virus, including people 65 years or older and those suffering from chronic illness. Project Roomkey units were also used to help those who had contracted COVID-19 to isolate in a safe space. The program transitioned to include the prioritization of people impacted by encampment cleanups after the City and the County of Los Angeles agreed in 2020 to relocate unhoused people residing within 500-feet of freeway overpasses and underpasses. One high-profile example of an encampment cleanup where Project Roomkey was used to shelter individuals was the 2021 cleanup operation at Echo Park Lake. Project Roomkey ended in 2023 following the expiration of funding from FEMA.

16

- **Project Homekey** – Building on the efforts of Project Roomkey, Project Homekey was designed to provide funding for the acquisition of hotels, motels, apartments, and other buildings for eventual conversion into long-term and permanent housing units. The City is in the process of converting most Homekey facilities currently being used as interim housing into permanent housing.

- **Inside Safe** – Inside Safe is a shelter program funded primarily by the City's general fund. Inside Safe's goal is to focus on resolving the City's largest encampments, and eliminating or limiting the number and size of encampments across the City. The Office of the Mayor, which administers the program, selects the encampments that will be targeted for resolution and oversees referrals into the program.

**Tiny Home Villages**

The City's Tiny Home Villages are temporary housing communities constructed with small, prefabricated shelters. Tiny homes provide temporary housing in individual, 64-square foot cabin units designed to house up to two individuals at time. Dwellings typically feature a lock on the door, shelves for storage of personal possessions, outlets for charging phones and other devices, a heater, and an air conditioner. Tiny Home Villages also offer community spaces and communal bathrooms for residents.

**14%**

 

**Stricter time- and place-based restrictions may result in a growing number of people seeking placements into interim housing.** Ongoing changes to Los Angeles Municipal Code Section 41.18 and Section 56.11 regulate the storage of personal property in the City's public right-of-way, and prohibit individuals from sitting, lying, sleeping, or storing personal property on streets and sidewalks near "sensitive use" properties, such as schools and daycare centers. As of May 2024, there were 2,443 designated Special Enforcement Zones within Los Angeles. In addition, the City enacted overnight parking restrictions on residential vehicles (RVs) in many neighborhoods and is developing a policy to implement citywide restrictions.

**<u>Estimated Operating Costs of City-funded Interim Housing Facilities</u>**

All City-funded interim housing sites are operated by contracted third-party service providers who are paid on a cost reimbursement basis. The reimbursement is based on the estimated operating costs of the interim housing site. **Reimbursements are issued for eligible expenses, regardless of whether the available beds are occupied by clients.** The service provider costs shown in Figure 2 represent the total cost of operating the sites for the four program categories outlined in the previous section. Hotel and motel-based programs generally require additional operating expenses because the City pays a nightly room rate to hotel/motel owners.

In order to estimate operating costs, we reviewed operating expenditures for all interim housing facilities funded by the City. This assessment primarily included costs associated with contractual expenditures paid by LAHSA to service providers for interim housing operations, leases for hotels and motels, payments related to property damage at facilities, and other miscellaneous incidental expenses.[10] **This analysis focused on measuring ongoing variable costs and sought to provide insights into the differences in shelter operating costs based on facility type, capacity, and delivery of services. However, these cost estimates do not include startup expenditures associated with site acquisition, site construction, or improvements to leased facilities (i.e., capital expenditures).**

### Figure 2: Estimated Total Operating Cost and Funding Source for City-funded Interim Housing (in Millions)

*City-funded interim housing programs cost almost $900 million during the five-year scope period and a growing share of City funds are being used for these sites.*

*Source: Controller analysis of data obtained from LAHSA, and the City's Financial Management System (FMS)*





---

[10] Facility lease costs were obtained from the City's Financial Management System. Service provider costs were obtained from LAHSA.

Given the significant costs associated with City-funded interim housing facilities and the tens of thousands of unsheltered Angelenos, it is critical that the City and its partners maximize the impact of those investments. Beyond getting people into interim housing and quickly moving them into permanent housing, the City's dire fiscal condition requires a prioritization of services and programs that achieve the best housing outcomes in the most cost-effective way.

**Cost Comparisons of City-funded Interim Housing Programs**

One of the objectives of this project was to provide the public and stakeholders with a comparison of City-funded interim housing programs in terms of **permanent housing placements, participant retention, and costs.** However, data limitations and operational circumstances limited our ability to provide a complete picture of each program's true performance. This section details our observations based on information that we reviewed.

**It is important to acknowledge that there are several people-centered qualitative factors, such as privacy and comfort, that are difficult to measure in any cost analysis.** But understanding the estimated cost of each type of intervention can help inform future funding decisions and prioritize development of strategies to boost efficiency. **Overall, we found that there is a significant difference in the per bed operating cost between congregate and non-congregate interim housing options.**[11]

**Figure 3: Estimated Annual Operating Cost for Each Shelter Bed in the City's Interim Housing Programs (FY 2019 to FY 2023)**

*Non-congregate interim housing options, which represent a growing share of the City-funded interim housing inventory, are significantly more expensive to operate than congregate options.*

*Source: Controller analysis of data obtained from LAHSA, and the City's Financial Management System (FMS)*



---

[11] Shelter bed capacity data quality issues can result in differences in the estimated cost of shelter beds. For example, instances of overstated bed capacity result in understatement of estimated costs on a per-bed basis.

19

Comparing the operating costs of interim housing programs is difficult in large part due to differences in lease costs, facility ownership costs, and differences in the level of services provided to unhoused clients. This is especially true for hotel and motel-based programs. For example, Project Roomkey sites provided fewer services to unhoused people.[12]  With Project Homekey, public agencies acquired hotels and motels and then transferred the facilities to LAHSA to administer, meaning there was no ongoing leasing or nightly lodging rate costs. Inside Safe incurred costs associated with both leasing *and* support services. The City launched Inside Safe near the end of this evaluation's five-year scope period. As a result, the above cost estimate understates the costs to both lease and operate hotel and motel-based interim housing sites.

Furthermore, our cost estimate does not include the cost to purchase or upgrade (i.e., site preparation and construction) interim housing properties, and it is important to note that these start-up costs can be considerable. For example, in 2023, the City approved the purchase of the 294-room Mayfair Hotel for $83 million ($282,000 per room), which included both the purchase price and necessary renovations and upgrades. With an expected useful life of 40 years, the annual cost of each room is approximately $7,000.

Even when using its own property for the development of an interim housing facility, the City must make significant investments. For example, developing vacant lots for Tiny Home sites typically requires extensive site preparation, including obtaining permits, leveling land, trenching, connecting utilities, construction of communal service structures (e.g., restrooms and social spaces), and installation of prefabricated shelter units.

Leasing hotels or motels typically entails a lower initial fixed cost compared to purchasing sites or repurposing City-owned properties. However, leasing can incur higher variable costs over time due to the need for ongoing lease payments. Between FY 2020 and FY 2023, the City paid a total of $138 million in lease costs, which amounts to approximately $27,000 in annual leasing expenses per bed.

While our analysis provides general cost estimates, it was bound by LAHSA's bed capacity data limitations, which was the foundation for how the number of beds was calculated. Our Office previously outlined LAHSA's shelter bed data quality problems in a December 2023 audit (*Homelessness Audit: Interim Housing and Shelter Bed Data*). We recommended that

---

[12] LAHSA indicated that services related to Project Roomkey operation such as security, food, and nursing, were contracted with vendors directly by LAHSA and were not included in the interim housing service provider contracts. The Project Roomkey services directly procured by LAHSA, which totaled an estimated $48 million, were not included in our cost estimates.

LAHSA should reevaluate and redesign its bed availability system, and do more to monitor and improve the quality of data entered by contracted interim housing service providers.

A 2023 cost study commissioned by LAHSA and Los Angeles County, *Understanding Interim Housing Costs Across Los Angeles County*, also described how discrepancies between LAHSA bed inventory records and bed inventories reported by service providers impacted consultants' ability to develop accurate cost estimates. The study heavily relied on the results of a survey in which interim housing operators self-reported cost information. The study also described service provider concerns about funding. Specifically, interim housing service providers voiced concerns related to reimbursed costs not reflecting their true operating costs. The study cited several factors as having a significant impact on operational cost including:

- staffing is the single largest cost driver and makes up about half of total costs;

- smaller sites generally have higher costs and larger funding gaps; and

- shelter facilities that are rented (e.g., hotels and motels) have higher costs and greater funding gaps than sites that are owned.

Additionally, staffing challenges within the Los Angeles homeless service system have become worse since the COVID-19 pandemic.

## The Los Angeles Homeless Services Authority and the Los Angeles Continuum of Care

LAHSA is the lead government agency in the Los Angeles Continuum of Care (CoC) responsible for coordinating and providing homeless services, which includes operation of interim housing facilities.[13] LAHSA was created in 1993 as an independent joint powers authority agency of the City and County to "provide homeless programs and services…in furtherance of the programs and goals of the County and City." LAHSA receives funding from the federal government (via HUD), state, county, city, and private sources on behalf of the Los Angeles CoC. This funding is spread across a large portfolio of programs that includes approximately 40 different interim housing service providers at more than 140 interim housing sites.

---

[13] A Continuum of Care (CoC) is a U.S. Department of Housing and Urban Development-recognized regional or local planning body that coordinates housing and services funding for homeless families and individuals. The Los Angeles CoC includes the County of Los Angeles and 85 separate cities, including the City of Los Angeles.

21

**Coordinated Entry System**

LAHSA is responsible for managing the CoC's coordinated entry system (CES) for homeless services and resources. Federal rules established by HUD require CoCs to establish and operate a CES to prioritize and allocate limited resources, such as access to shelters and housing. HUD defines coordinated entry as "a process developed to ensure that all people experiencing a housing crisis have fair and equal access and are quickly identified, assessed for, referred, and connected to housing and assistance based on their strengths and needs."

LAHSA's CES is split into three distinct systems: (1) adults; (2) families with children; and (3) youth. Table 2 summarizes the core functions of CES, its prioritization goals, and how it interacts with unhoused people seeking help.

**Table 2: Coordinated Entry System Core Elements**

| Purpose | Description |
|---|---|
| **Access** | Access provides a wide array of ways a person experiencing a housing crisis can enter the system and begin to seek help. Appropriate system access policies and coordination allow clients to quickly engage with the system to get immediate services, regardless of their individual characteristics or where they are able to access the system. |
| **Assessment** | Assessment helps ensure detailed and standard measurements of strengths and needs of people experiencing homelessness. Given the large homeless population in Los Angeles, the assessment does not rely on a comprehensive assessment tool, but instead a shorter survey that triages people's needs and determines which types of housing interventions and supportive services would be most effective in permanently ending the person's homelessness crisis. |
| **Prioritization** | While the demand for homeless services exceeds the relative availability of resources, prioritization helps reconcile this needs gap by identifying and prioritizing those with the most severe service needs or highest health vulnerabilities and connecting them to the most appropriate life-saving housing to meet their needs. |

| | |
|---|---|
| **Referral** | Referral which is commonly referred to as "matching" is the process of connecting individuals, based on prioritization and participant preferences, to available housing and resources that meet their needs. LAHSA notes that a well-coordinated referral process ensures participants are quickly and effectively connected to the appropriate resources, regardless of where they accessed the system or which provider they first contacted. |

*Source: Department of Housing and Urban Development (HUD) requirements as adopted by LAHSA.*

Given the major demand for housing services in Los Angeles and the limited inventory of interim and permanent housing in the region, **it is critical that the City and its partners adopt systems that connect people to resources in an efficient and equitable way.**

**Homeless Management Information System**

LAHSA's Homeless Management Information System (HMIS) is an online database that enables CES-participating organizations to collect client-level information about the services they provide to people experiencing homelessness, and those who are at risk of homelessness. LAHSA and its partners use the system to track contacts with unhoused Angelenos, document the services they have received, and develop plans for improving access to resources and housing.

Federal law requires LAHSA to maintain HMIS in order to track homelessness resources and the recipients of those services. HMIS holds vital information that ultimately impacts how unhoused individuals are prioritized and referred for services and housing. LAHSA and its contracted service providers use HMIS to collect and analyze client information, including personal identifiers, client assessments, case management notes, demographic data, and program enrollments and exits. HMIS also tracks service provider and facility information, such as service organization names and profiles, homeless services provided at each facility, and shelter bed inventory and utilization data. **HMIS is the primary data source for information in this report related to City-funded interim housing beds, bed utilization rates, and interim and permanent housing placements.**

## Pathways to Permanent Housing

While each person has their own unique experience as it relates to their housing struggle and rehousing journey, people experiencing homelessness can face long, often complicated pathways to interim housing, and later permanent housing. While there is no single pathway for securing permanent housing, individuals typically make an initial connection with an outreach worker or caseworker, who helps facilitate a placement into an interim housing

23

facility. From there, the client receives support services to improve their readiness for permanent housing, and eventually work with caseworkers and/or housing navigators to secure a permanent living arrangement.

**Figure 4: Typical Rehousing Process**

*Clients rely on a network of shelters, outreach workers, and case managers as they navigate the path from the streets to permanent housing.*

*Source: Office of the Controller*

**Connect with an Outreach or Case Worker -** An unsheltered person works with an outreach worker or other social services specialist to obtain a bed in an interim housing facility and move off of the street.

**Move in To Interim Housing -** Interim housing staff connect the individual to health, career, and other resources and prepare them for a transition to permanent housing.

**Identify Permanent Housing Opportunities -** The individual works with a housing specialist that assists them with searching for and securing permanent housing based on their benefits, income, and service needs.

**Secure and Move into Permanent Housing -** The housing specialist coordinates the person's move into the secured permanent housing unit.

It is important to note that this path is not always linear and people often drop in and drop out of homelessness for various reasons. **The entire rehousing system needs to be working in harmony in order to get people housed as quickly and cost effectively as possible.** The following subsections provide additional information about each stage of the process.

## Street Outreach and Other Rehousing System Entry Points

Street outreach teams serve as one of the primary CES access points. Street outreach aims to identify unsheltered people and build relationships with the goal of connecting them to support and housing resources. Outreach workers seek to develop trust and rapport with people experiencing homelessness to begin assessing their needs and explore problem solving or diversion options. During the engagement process, the outreach worker can begin offering services and developing a care management plan.

Outreach workers aim to link participants to interim housing as soon as possible, but also make referrals to non-housing services and support. This can include physical or mental health services, substance use services, documentation assistance, legal services,

24

employment services, housing navigation, permanent housing, domestic violence services, childcare, family reunification, or other community-based services.

In addition to contact with street outreach workers, unhoused people can enter the rehousing system through one of several other designated Access Centers, which can which include government buildings (e.g., libraries, county buildings, police stations), interim housing sites, safe parking sites, or other homeless services centers. Access Centers engage clients to provide problem solving services, build client relationships, evaluate participant needs, connect participants to housing programs, and provide support as needed. People can also call 2-1-1, the regional help line that connects callers to community and public health services.

### Matching Unsheltered People to Interim Housing Beds

Upon entering CES, outreach or service provider staff work with unsheltered people to connect them to an interim housing bed. Within LAHSA's interim housing network, beds are classified as either matched or non-matched. Matched beds require a reservation and are subject to eligibility criteria, often established by the funder, to ensure that facilities with specific services, levels of care, or intended for specific populations are reserved for people most in need of those particular beds. For example, a specific portfolio of interim housing sites is dedicated to serving women, older adults, or people exiting incarceration.

Most interim housing beds funded by the City are considered matched beds because they are subject to eligibility criteria tied to geography. **In practice, this means that shelter beds are typically reserved for unsheltered people who are located in designated geographic zones near an interim housing facility.** The geographic zones are referred to as "catchments" by LAHSA and service providers. **Catchment criteria** and its impact on the interim housing matching process are described later in this report.

To facilitate the matching of eligible individuals to beds with enrollment criteria, LAHSA has established the **Community Queue**, which serves as a wait list for people seeking housing. LAHSA employs teams of matchers, who are specialists that work with clients and outreach workers to connect individuals in the Community Queue to matched interim housing beds, based on their eligibility and needs. Once a City-funded interim housing bed becomes available, a LAHSA matcher reviews the list of participants in the Community Queue and determines whether the catchment zone where the client is located aligns with the catchment where the bed is located.

Interim shelter beds that are not matched are typically available to people experiencing homelessness on a first-come, first-served basis. The majority of LAHSA and City-funded shelter beds are centrally matched (i.e., beds in A Bridge Home sites, Tiny Home Villages, and

25

hotel and motel-based shelters).[14] Crisis and Bridge shelter facilities, which account for just under half of the shelter bed inventory, are able to accept new participants without a centralized referral from LAHSA, but may still require a referral from a local service provider.

### Navigating People into Permanent Housing

After their housing crisis has stabilized and a person experiencing homelessness is staying in an interim housing facility, case managers evaluate their needs and eligibility with regard to permanent housing. The process, which is known as **Housing Navigation** and coordinated by LAHSA service providers, is carried out by teams of case managers known as Housing Navigators. Housing Navigators are dedicated specialists that help people experiencing homelessness identify, apply for, secure and move into permanent housing.

**It is important to note that not all individuals enrolled in interim housing are enrolled into Housing Navigation services because there are a limited number of Housing Navigators.** LAHSA's goal is to move people into permanent housing within 120 days of Housing Navigation program enrollment. Currently, interim housing participants are generally prioritized based on document readiness (i.e., the client has identification, proof of benefits, and other records required to secure permanent housing), and length of time a person has been staying at an interim housing site.

### Permanent Housing Destinations

People who are able to secure permanent housing may end up at one of several housing destinations. Permanent housing does not necessarily mean that a person is placed into government subsidized housing or housing that is owned by a public housing agency. **Permanent housing, as classified by LAHSA, can range from people moving in with a friend or family member for an extended period, to securing a voucher which can be used for rent. Each housing destination offers different levels of long-term stability.**

Unsubsidized Permanent Housing – An exit to unsubsidized permanent housing is when a client is able to secure an apartment, or a bed or accommodation in a traditional housing setting, without additional government assistance.[15]  Exits to unsubsidized permanent housing

---

[14] Between FY 2021 and FY 2023, centrally matched beds accounted for 53% to 55% of total City funded interim housing beds.

[15] This category is officially referred to as "Permanent Housing" by LAHSA based on HUD guidelines. It is defined as a community-based housing model, the purpose of which is to provide housing without a designated length of stay. Permanent Housing program participants must be the tenant on a lease (or sublease) which must have an initial term of at least one year, be renewable for a minimum term of one month, and be terminable only for cause. We incorporated the term "unsubsidized" for clarity and to emphasize the lack of ongoing financial support in the form of vouchers or rental assistance.

include instances where clients secure a rental unit on their own, without a housing subsidy, or stay or live with family or friends on a long-term basis.

Permanent Supportive Housing – Permanent supportive housing is an intervention that combines subsidized housing with supportive services to address the needs of people experiencing homelessness with more acute needs. There are two broadly recognized types of permanent supportive housing – project-based and tenant-based. In project-based housing, residents live in a single site with some supportive services located on-site. In tenant-based housing, residents live in different units across a community, with supportive services individually provided through case managers.

Time Limited Subsidies – Time Limited Subsidies (formerly known as Rapid Re-Housing) are LAHSA's primary form of subsidy assistance for clients. The Time Limited Subsidy program assists people in accessing permanent housing for a limited amount of time, which is usually two years. To qualify, participants must meet HUD's definition of homeless and be at or below the 50% of Area Median Income threshold for Los Angeles County.

Throughout the life of the subsidy, service providers are expected to continue providing case management services to assist participants with housing retention goals and other service needs. The financial assistance is provided on a progressive basis, with the participant gradually assuming more and more responsibility for the cost of rent with the aim of empowering the participant to gradually be able to exit the Time Limited Subsidy program and remain housed.

Other Subsidies – Other subsidies, as presented in this report, are subsidies secured by clients that are not part of the Time Limited Subsidy program, including subsidies provided by the federal government. These subsidies assist clients with rental payments and other services. According to LAHSA, these vouchers, which commonly include case management or other services, can also be considered a type of permanent supportive housing.

- **Housing Choice Vouchers (Section 8)** – This is the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market. Since housing assistance is provided on behalf of the family or individual, participants are able to find their own housing, including single-family homes, townhouses, and apartments.

- **Veterans Affairs Supportive Housing** – The HUD-Veterans Affairs Supportive Housing program combines HUD's Housing Choice Voucher rental assistance for homeless veterans with case management and clinical services provided by the Department of Veterans Affairs (VA). The VA provides these services for participating veterans at VA

27

medical centers, community-based outreach clinics, through VA contractors, and other VA service providers.

- **Emergency Housing Vouchers** – Emergency Housing Vouchers are HUD vouchers that public housing authorities, CoCs, and victim service providers can administer to support particularly vulnerable populations within the community. The vouchers are available to eligible individuals and families who are homeless, at-risk of homelessness, fleeing, or attempting to flee, domestic violence, dating violence, sexual assault, stalking, or human trafficking, or were recently homeless or have a high risk of housing instability.

The subsequent findings and recommendations in this report are intended to help the City and LAHSA improve the rehousing system in order to produce better permanent housing outcomes. These improvements are critical given the sheer magnitude of the homelessness crisis in Los Angeles and the City's precarious financial outlook.

# I. INTERIM HOUSING OCCUPANCY RATES HAVE BEEN SIGNIFICANTLY BELOW LAHSA'S TARGET LEVEL

**An early and critical step in the rehousing process is getting unsheltered people to transition to interim housing.** We found that LAHSA and City strategies for moving people into shelter beds have fallen short, and most interim housing facilities are not meeting LAHSA's goal of maintaining bed occupancy rates of at least 95%. **Our analysis of LAHSA bed occupancy data showed vacancy rates between 22% and 36% during the five-year scope period of this audit.** While occupancy rates have been impacted by the pandemic, LAHSA's ineffective oversight of service providers, policy changes, and changes in the makeup of the City's housing inventory has likely contributed to lower occupancy rates at City-funded shelters.

To boost occupancy rates, LAHSA and the City should take steps to resolve longstanding data quality issues, strengthen efforts to hold underperforming service providers accountable, and improve living spaces in congregate shelters. LAHSA and the City should also develop additional policies and procedures governing how individuals are matched to available beds to ensure that City-imposed bed eligibility rules are not contributing to high vacancy rates, wasted resources, and inequitable outcomes.

## Occupancy Rates at City-Funded Shelters Have Lagged in Recent Years

In an effort to minimize the number of beds that go unused on any given night, LAHSA has established the goal for all interim housing facilities to have an occupancy rate of 95%. To assess whether City and LAHSA rehousing efforts are maximizing the utilization of shelter beds, we analyzed HMIS data provided by LAHSA to determine the estimated occupancy rates for each of the City-funded interim housing types.

Occupancy is measured as the portion of bed capacity during the fiscal year reserved for enrolled participants. For purposes of measuring occupancy, a participant is considered enrolled once they have been accepted into the applicable interim housing program. LAHSA requires its funded shelters to reserve a bed for a newly enrolled participant for 90 days. Beyond the initial bed reservation period, there is currently no limit to a participant's length of stay at a shelter.

According to service providers that we interviewed, participants remain enrolled as long as they do not skip a certain consecutive number of nights, do not violate shelter rules, or voluntarily exit the program. Because this measure is based on participant enrollment data, which reflects the number of beds *reserved* for admitted participants out of total capacity, these occupancy rates tend to over represent actual shelter bed utilization because enrolled individuals are not required to stay at the shelter site every night.

**Our analysis of LAHSA data indicates that between FY 2019 and FY 2023, approximately 24% of interim housing beds went unfilled, based on the number of beds occupied and the total number of beds available for occupancy during the fiscal year.**[16] While lower occupancy rates for certain years are in part due to a decrease in demand for congregate living facilities during the COVID-19 pandemic and the need to reduce the number of people in interim housing facilities, the data indicates that the City and LAHSA need to do more to ensure that each shelter bed is filled on a given night.

---

[16] Based on the percentage of unused shelter bed capacity below LAHSA's 95% target occupancy threshold.

**Figure 5: Interim Housing Bed Occupancy Based on Enrollment**

*Citywide interim housing occupancy rates have ranged between 64% and 78% between FY 2019 and FY 2023, well below LAHSA's target rate of 95%.*

*Source: Controller analysis of data generated by LAHSA*



| Program | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|
| Citywide Occupancy | 78% | 68% | 64% | 74% | 73% |

Overall, LAHSA interim housing enrollment data shows that **hotel and motel-based programs (Project Roomkey, Project Homekey, and Inside Safe) saw the highest rates of occupancy during the five-year period, reaching a high of nearly 97% in FY 2022**. Congregate facilities, including A Bridge Home, and Crisis and Bridge Housing, saw lower rates of occupancy, with Tiny Home Villages having the lowest rates of occupancy. Tiny Home Village occupancy rates did not exceed 70% in any of the five fiscal years covered by this audit.

It is important to acknowledge that the pandemic impacted clients' willingness and ability to enter into congregate living spaces due to the potential health risks. According to LAHSA, quarantine rules also impacted clients' willingness to enter congregate spaces because an entire facility could become subject to quarantine if an individual tested positive for COVID-19. **That being said, each unfilled bed represents a wasted public resource and a missed opportunity to provide critical assistance, and the citywide occupancy rate still had not recovered to pre-pandemic levels by the end of FY 2023. Based on LAHSA occupancy data from HMIS and estimated City spending to operate interim housing facilities, we estimate**

30

**that between FY 2019 and FY 2023, unoccupied beds cost the City and other funders approximately $218 million.**[17]

### Occupancy Rate Data Quality Problems Makes Evaluation of Shelter Performance Difficult

LAHSA has not maintained a process to regularly verify the accuracy of bed capacity information in HMIS. Data quality issues make assessing the interim housing system's performance difficult, and the extent of inaccuracies related to shelter bed capacity is not entirely known by LAHSA. According to LAHSA officials, HMIS errors in shelter bed capacity data (i.e., the number of beds at a shelter) have caused occupancy rates to be overstated in some situations and understated in other situations. A common cause of LAHSA data quality issues is fluctuations in shelter bed capacity which are not accurately reflected in HMIS, which is demonstrated in the following examples.

- LAHSA reduced maximum occupancy levels at many interim housing sites to reduce the spread of COVID-19. While the reduced maximum occupancy levels were initially updated in HMIS, subsequent fluctuations in occupancy thresholds were not always recorded in HMIS. As a result, occupancy rates for some facilities may appear to be artificially low during our five-year scope period. Alternatively, other shelters may have brought beds back online incrementally as the pandemic subsided, but HMIS capacity data was never updated to reflect increased capacity, which then resulted in occupancy rates being overstated.

- **LAHSA staff indicated that during the startup phases for hotel and motel-based shelters, significant data entry errors occurred because individuals would exit a facility, but shelter staff would then not always update HMIS to document their departure.** This resulted in hotel and motel-based programs having overstated occupancy rates for FY 2020 and FY 2021.

- During the COVID-19 pandemic, Tiny Home Village units, which are normally designed for two occupants, were converted to single occupancy to ensure that residents could maintain safe distancing practices. Although the occupancy policy changed, bed capacity data in HMIS was not consistently updated by shelter operators, which meant that the system reflected more bed inventory than was actually available. As a result, occupancy rates for Tiny Home Villages are likely understated.

---

[17] This cost estimate is based on the percentage of unused shelter bed capacity below LAHSA's 95% target occupancy threshold and the relative share of the total estimated operating costs for City funded interim housing facilities.

LAHSA must work to improve the accuracy of its occupancy rate data and other important metrics in order to ensure that the agency and its partners can effectively measure the true performance of homeless services programs and determine which service providers need improvement.

## LAHSA's Efforts to Hold Underperforming Service Providers Accountable Have Been Ineffective

Given the huge demand for interim housing and supportive services, it is essential that third-party contractors hired by LAHSA effectively deliver services and meet their contractual obligations. To ensure this occurs, LAHSA must evaluate service provider performance to assess progress toward achieving established goals, and take appropriate actions to improve performance when providers are falling behind.

**We found that LAHSA's system for monitoring the performance of service providers and their adherence to performance requirements has been inadequate, and that the agency needs to take additional steps to ensure that it maintains a comprehensive oversight program which holds service providers accountable for performance.** LAHSA has a dedicated compliance and monitoring program led by its Grants Management and Compliance Department. This unit is responsible for overseeing the administrative and fiscal practices of service providers. However, **the department was not tasked with monitoring service provider performance targets, including LAHSA's occupancy rate target of 95% and the rates at which individuals are placed into permanent housing.**

The lack of effective contractor oversight is especially concerning given ongoing stakeholder discussions that may result in higher rates paid to interim housing service providers. The City, County, and LAHSA are in the process of standardizing the scope of services and bed rate formula that is used to reimburse service providers. **While these potential cost increases may help address service provider concerns about staff salaries and retention, higher rates should further compel the City and LAHSA to develop improved performance management tools that hold underperforming service providers accountable.**

To evaluate the potential effects of insufficient service provider monitoring and performance variations among individual interim housing sites, we selected nine City-funded shelters and obtained the bed occupancy rate for each. To learn about the experiences of unhoused people staying at the sites and the challenges facing service provider staff, we also conducted site visits at eight of the selected nine locations to speak with facility managers, case workers, and residents.

Of the interim facilities selected for review, only one met LAHSA's target occupancy rate over the five-year period. Across the sites we selected, occupancy rates varied widely, ranging from a low of 66% at an A Bridge Home site to a high of 96% at a Crisis and Bridge Housing site. The range of occupancy rates indicates additional efforts by LAHSA to enforce the performance standards set in service provider contracts are necessary to ensure that taxpayer funds spent on interim housing do not go to waste.

**Table 3: Aggregate Occupancy Rates at Randomly Selected Shelter Sites**

| Facility Type | Number of Beds | Enrollment Occupancy Rate |
|---|---|---|
| A Bridge Home 1 | 99 | 67% |
| A Bridge Home 2 | 80 | 66% |
| Crisis and Bridge 1 | 28 | 81% |
| Crisis and Bridge 2 | 121 | 96% |
| Crisis and Bridge 3 | 10 | 85% |
| Project Home Key 1 | 91 | 81% |
| Project Home Key 2 | 22 | 70% |
| Project Home Key 3 | 44 | 79% |
| Tiny Home Village 1 | 70 | 75% |

*Source: Controller analysis of data generated by LAHSA*

According to LAHSA management, effectively monitoring service provider performance and holding service providers accountable for failing to meet occupancy or other targets has been difficult in recent years. The passage of Measure H in 2017 brought a significant amount of new funding to LAHSA, and resulted in a rapid expansion of LAHSA administered homeless services and programming.[18] However, LAHSA staff explained that the agency was primarily focused on expanding the service provider network and its capacity, and that the contract monitoring and audit functions of the agency did not expand at the pace of provider services.

During this period of capacity growth, the agency also chose not to take a punitive approach when service provider performance was below expectations. **Service providers that were identified by LAHSA as failing to meet contracted performance terms typically would not face any serious consequences.** LAHSA's primary means of enforcement has been sending letters of noncompliance to service providers, and the agency has generally lacked a formal escalation or performance improvement program for contractors that perform poorly.

---

[18] Measure H was a countywide measure approved by voters in 2017 that established a 1/4-cent sales tax increase to create a revenue stream dedicated to addressing and preventing homelessness.

**LAHSA Is Piloting a New Service Provider Management Approach**

According to LAHSA, the agency has made some changes to its service provider management approach. In FY 2023, LAHSA implemented a new monitoring strategy called "Active System Management", which it believes is a more proactive approach to reviewing provider performance. With the Active System Management strategy, LAHSA claims to review occupancy rates and other relevant performance information on a continuous basis. According to LAHSA, the Active System Management initiative will include the potential for reduced funding for service providers that demonstrate poor performance or violate contract terms. With Active System Management LAHSA staff plan to conduct monthly meetings with service providers to review client roster, case management, and program management issues. LAHSA aims to provide technical assistance to providers with weaker performance records, and hopes to work towards advising service providers on how to help clients that are struggling to make connections to permanent housing and other services.

Since the rollout of Active System Management, LAHSA has only withheld funds for Housing Navigation service providers that failed to adhere to required staffing standards. **It remains to be seen the extent to which LAHSA will exercise its practice of withholding funds for other program areas, such as outreach and interim housing.** LAHSA management has also acknowledged the need to improve data collection and analysis practices so that it can identify performance issues, facilitate problem solving, and eliminate any barriers which may be hindering efforts to rehouse people.

**LAHSA Needs Formal and Enforceable Performance Improvement Standards for Providers**

HUD recommends establishing a "schedule of actions" with deadlines and milestones to address gaps between expected and actual performance. The schedule should set out the specific actions that will be taken based on the extent of underperformance, growing increasingly more severe if performance does not improve on the established timetable. Initial actions taken by program management can include providing technical support and developing a corrective action plan. If performance issues persist, more severe actions might include revising the program, reallocating funds, suspending payments, and ultimately cutting funding or terminating the contract.

Specifically, HUD recommends that local agencies take the following steps to address poor performance by service providers:

- **Establish a schedule of remedial actions** – Prepare a schedule of remedial actions the service provider should implement to improve program performance.

34

- **Develop a management plan** – Establish a management plan that assigns responsibilities for carrying out the remedial actions.

- **Create an escalation plan –** If performance issues persist, establish escalation options, which could include revising programs, reallocating funds, suspending payments, cutting funding and terminating contracts.

**LAHSA should reconsider its approach to performance and contract management to ensure that it has mechanisms in place to improve contractor performance, or initiate enforcement actions if serious performance or contract compliance issues persist.** LAHSA instead has taken the approach of encouraging improvement and providing technical assistance when feasible. Performance improvement and contract enforcement protocols are particularly important with regard to service providers because LAHSA generally does not incorporate any performance-based compensation models into its contracts, meaning contractors are paid the same amount—regardless of the occupancy rate and permanent housing placement success rate at any given interim housing facility.

### Improvements to Congregate Interim Housing Facilities Are Needed

As shown in Figure 6, interim housing occupancy rates were highest in FY 2019, the period preceding the onset of the COVID-19 pandemic, with Citywide occupancy levels reaching an average of 78%. During this period, the only shelter types in the City's portfolio were higher density, congregate interim housing facilities (i.e., Crisis and Bridge Housing and A Bridge Home facilities). The City had not yet introduced any tiny homes or hotel and motel-based shelters.

Due to changes to the City's interim housing portfolio and COVID-19-related restrictions during the five-year period of time covered by this review, it is difficult to determine the specific root causes of occupancy rate fluctuations and lower occupancy rates for certain shelter types. Overall, **congregate shelters (Crisis and Bridge and A Bridge Home facilities) underperformed compared to non-congregate shelter facilities (hotel and motel-based programs and Tiny Home Villages).**

35

**Figure 6: Occupancy Rates for Congregate and Non-Congregate Facilities**

*Beds in higher density congregate settings were more likely to go unfilled than those in more private, non-congregate settings.*

*Source: Controller analysis of data generated by LAHSA*



These occupancy trends suggest that certain improvements to congregate living facilities could result in higher occupancy rates and utilization. According to LAHSA officials, the introduction of newer hotel and motel-based shelters and tiny homes initially resulted in weaker demand for congregate living quarters, particularly Crisis and Bridge housing, which tend to offer beds in shared spaces with less privacy. Following the City's expansion of shelter facility types, interim housing participants have generally preferred both private hotel and motel rooms, as well as tiny homes, because both offer more privacy and sometimes more comfortable spaces. The images below show the stark difference between higher density congregate shelters, and those that offer private spaces.

**A Crisis and Bridge Shelter (left) and a Hotel-based Shelter Bed (right)**



*Source: Office of the Controller*

Interim housing site operators we interviewed stressed that each client will have their own unique history, perspective, and needs. Some clients may benefit from congregate settings,

36

which can facilitate a sense of community among clients and an environment where people can make social connections and support networks. However, **many individuals experiencing homelessness have been victims of assault, theft, and other traumatic experiences and hardships while unhoused, which can result in an unwillingness or discomfort with sharing living spaces with others.**

Based on our site visits to interim housing facilities and feedback from residents, we determined that the development of better, trauma-informed congregate shelter environments could result in improved occupancy rates by making the sites more attractive to people experiencing homelessness. Reasons people experiencing homelessness might avoid a congregate shelter include concerns or perceptions about:

- insufficient privacy in including sleeping areas, living spaces, restrooms, and showers;
- not wanting to be separated from a pet or a partner;
- restrictive curfews;
- lack of space to securely lock up and store personal possessions;
- unsanitary conditions and the spread of infectious diseases; and
- poor site reputations and substandard facility conditions.

According to LAHSA program management, most participants will request to be placed in one of the private or semi-private living spaces, which can result in a diminished demand for older, more congregate options. While these options are generally not exclusively funded or operated on property owned by the City, low-cost improvements and reconfigurations of congregate living spaces could result in improved occupancy rates for some interim housing facilities by increasing demand, and providing spaces that provide clients with bed spaces that afford more privacy, a greater sense of security, and a more dignified experience as they work to recover from their time living unsheltered.

At a minimum, shelters that currently offer limited amounts of personal space could be improved by introducing cubicle style beds similar to those placed in A Bridge Home shelters. New bed solutions being tested in other cities may also be suitable for congregate shelters in Los Angeles. Pre-fabricated sleeping "pods" tested in London, provide unhoused people with privacy, while maximizing space.

**A Bridge Home Bed (left) and Sleeping Pod in London (right)**

 

*Source: Office of the Controller (left) and Reeds Watts Architects (right)*

Creating and maintaining spaces where unhoused people can feel safe and experience stability is of utmost importance as they work to improve their housing situation. Regardless of what improvements take place at interim housing facilities moving forward, performance measures like occupancy rates and retention rates can help LAHSA better understand the strengths and weaknesses of each facility and bed type, and inform future decisions and investments.

## City-imposed Shelter Placement Criteria Can Result in Missed Housing Opportunities

As described in the background section of this report, Continuums of Care using HUD funding must implement a Coordinated Entry System. A Coordinated Entry System is a centralized and coordinated process to ensure that everyone experiencing a housing crisis has easy, fair, and equal access to resources and is quickly identified, assessed for, referred, and connected to resources. **While City shelters are generally not subject to HUD guidelines, the City has implemented policies that, in some situations, may be slowing interim housing placements.**

One impediment to expanding the City's network of shelter facilities is community resistance that is generally a result of the negative perceptions and stigmas about individuals experiencing homelessness. Communities also frequently express concerns about potential quality of life impacts, which include the establishment of encampments near shelter facilities, criminal activity, cleanliness concerns, and public health risks. There are also concerns that the facilities themselves will result in unhoused people being brought into the area from other parts of the City where there are fewer shelter beds.

LAHSA normally places unsheltered people waiting for a shelter bed on a wait list (known as the Community Queue), and the agency determines which interim housing facility is best for the client based on bed availability and eligibility. To manage community concerns and prioritize finding shelter for unhoused people in the areas where they reside, the City and LAHSA have implemented a geography-based placement criteria known as "catchments" for placements into City-funded shelters. Catchment zones closely align with Council District boundaries. **During LAHSA's matching process, where individuals are assessed and placed into an interim housing solution, a person typically can only be placed into a City-funded shelter that is within the catchment zone in which they are located**.[19]

In addition to the geography-based catchment system, **the City routinely reserves beds for certain individuals, rather than LAHSA filling beds based on a needs assessment and their place on the interim housing wait list.** In July 2021, the City approved its amendment to Los Angeles Municipal Code Section 41.18, the City's anti-loitering ordinance which allowed an increase in encampment cleanup activities within designated Special Enforcement Zones. Upon initial designation of a Special Enforcement Zone, the City claims that it tries to ensure no encampment cleanup actions take place unless individuals are provided with an opportunity for shelter. Outreach efforts also take place in connection with cleanups that take place after the initial designation of a Special Enforcement Zone.

However, available information suggests that outreach and housing offers made in conjunction with Los Angeles Municipal Code Section 41.18 cleanups are often ineffective, and are not resulting in a substantial number of people obtaining interim or permanent housing. A May 2024 report by the City's Chief Legislative Analyst reported that LAHSA had engaged 1,856 unique clients in connection with the cleanups. Of the engaged clients, 313 were placed in interim housing, and two were placed in permanent housing. The Chief Legislative Analyst report stated that it was unclear how many of the engaged individuals were actually offered housing.

The need to offer people residing on the streets and in encampments shelter space prior to the initiation of an encampment cleanup means that the City routinely sets aside bed blocks in interim housing facilities during the lead up to a cleanup. According to LAHSA staff, City officials, including representatives from City Council Offices and the Office of the Mayor, will reserve bed blocks for periods of up to two weeks to ensure shelter space can be offered to unhoused individuals selected by those respective Offices. **Reserved beds cannot be offered to other clients who are willing to fill them immediately.** For example, during the months of

---

[19] Inside Safe and Crisis and Bridge facilities are not subject to catchment requirements.

November and December 2023, LAHSA's matching team received 36 requests from elected offices to hold a total of 215 beds.

Despite having over 25% of unused capacity during FY 2022 and FY 2023, **approximately 30% (16,000) of LAHSA clients expressing interest in being connected to matched interim housing beds ultimately did not get connected to an interim housing bed and were exited from the Community Queue without a housing connection. This cohort of clients waited in the Community Queue for approximately six months, on average, prior to being exited.**[20]

Available resources should be provided to unhoused people in an equitable, needs-based manner, regardless of where they reside. **According to LAHSA, no formal policy or procedure exists codifying the catchment and bed reservation systems, and shelters funded by the City are not subject to Coordinated Entry System requirements. The lack of formal referral and placement policies for shelters funded by the City may have a negative impact on the City's ability to house individuals in an efficient and equitable manner, which is the ultimate goal of Coordinated Entry System guidelines. This may cause delays in connecting individuals to shelter beds, and prioritize people at certain encampment locations rather than making placements based on a person's individual needs and their place in LAHSA's Community Queue.**

Although interim housing service providers are required to maintain a 95% occupancy rate, many of the City-funded shelters are required to only receive referrals through LAHSA's centralized matching and referral process, meaning the inflow of clients is often beyond service providers' control. Furthermore, catchment restrictions and bed reservations by City officials means that LAHSA's service providers (i.e., shelter operators and outreach workers) may be unable to place people in beds due to geographic restrictions or existing bed reservations.

**Recommendations:**

To increase interim housing occupancy rates and maximize City investments in rehousing solutions, the LAHSA, in coordination with the City, should:

1.  Develop needs-based eligibility criteria for non-congregate shelter beds to ensure private spaces are available to individuals that would benefit most from private spaces.

---

[20] Wait time is based on the average quarterly median time in the Community Queue. LAHSA established the Community Queue in FY 2021. FY 2021 was excluded from this analysis because the tool was not widely and consistently used during its initial roll out.

2.  Examine the feasibility of developing new, trauma-informed bed solutions for congregate settings that would provide more privacy and comfort to clients.

3.  Develop a formal policy for the administration of LAHSA catchments which ensures that mechanisms are in place to fill available beds in each catchment with individuals residing in other geographic zones.

4.  Develop a formal policy for the reservation of interim housing beds by City offices which ensures mechanisms are in place to limit the risk of reserved beds going unfilled.

To improve the ability of LASHA and the City to evaluate interim housing system performance and hold service providers accountable for poor performance, LAHSA, in coordination with the City, should:

5.  Adopt/adhere to the federal government's Coordinated Entry System guidelines or another formal and consistent policy for the process of referring clients to City-funded interim housing facilities. Doing so would help the City maximize its investment in interim resources and ensure all open beds are available to individuals seeking shelter.

6.  Establish new data quality control standards and monitoring procedures that ensure service providers accurately report bed capacity information. Monitoring procedures should include regular monitoring to the accuracy of bed capacity information to ensure occupancy rates are as accurate as possible when measuring system performance.

7.  Develop occupancy performance monitoring and oversight mechanisms to ensure underperforming service providers are promptly identified.

8.  Develop a formal policy and procedure for the establishment of corrective action plans for service providers that fail to meet performance or requirements. The policy and procedure should require the development of corrective action goals and milestones, and management plans that describe performance improvement plans and assign responsibility.

9.  Develop and incorporate into contracts a compensation model which incorporates performance-based compensation in order to incentivize adherence to performance targets, and provide the agency with tools to hold service providers accountable for weak performance.

# II. PERMANENT HOUSING PLACEMENT RATES ARE FAILING TO KEEP PACE WITH GROWING DEMAND

When a person experiencing homelessness secures an interim housing bed, it can provide them with the stability and services they need in order to improve health, employment, and living conditions. **However, connecting people to shelter beds is only part of the solution for ending the homelessness crisis in Los Angeles.** People experiencing homelessness do not end their rehousing journey until they secure a permanent home, but moving people from interim housing facilities into long-term, permanent housing remains a major challenge for both LAHSA and the City.

**The rate at which LAHSA has been able to move people into permanent housing indicates that the agency has not been able to keep up with the growing demand, particularly given the expansion of the City's shelter system**. While interim housing bed capacity grew by 220% between FY 2019 and FY 2023, permanent housing placements grew by just 21% over the same period, from 2,770 to 3,353. When considering the permanent housing placement rate relative to interim housing beds maintained, **LAHSA data indicates that permanent housing placement performance is actually declining**. This is due in large part to the lack of affordable housing in Los Angeles. However, new efforts and strategies are needed to help navigate people from shelters into the permanent housing units that are available in the region.

The faster the rehousing system can move a person from a shelter into a permanent housing setting, the faster shelter bed, supportive services, and permanent housing placement services will be available for new participants. This concept, the efficiency with which LAHSA can successfully move a person through the rehousing system, is known as throughput. **Although the City has invested in interim housing solutions in recent years, we found that LAHSA's ability to move people through the rehousing system has not necessarily improved. By some metrics, throughput has actually declined.**

## Permanent Housing Outcomes for People Enrolled in the City's Interim Housing Types Are Mixed

The total number of people placed into permanent housing did not substantially increase during the five-year scope period, and actually decreased during some years. Between FY 2019 and FY 2023, City shelters served 93,741 people. However, just 15,818 people (17%) secured

permanent housing.[21] The most common pathway was the use of Time Limited Subsidies (39%) to secure a housing unit. Permanent supportive housing was the least common permanent housing destination, accounting for 13% of placements. Table 4 summarizes the total number of people that secured permanent housing, broken out by destination.[22]

**Table 4: Permanent Housing Placement by Destination Type**

| Permanent Housing Destination | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 | Total |
|---|---|---|---|---|---|---|
| Perm. Housing–Time Limited Subsidy | 929 | 1,069 | 1,808 | 1,276 | 1,022 | 6,104 |
| | *34%* | *35%* | *47%* | *45%* | *30%* | *39%* |
| Perm. Housing–Other Subsidy | 658 | 715 | 740 | 712 | 1,124 | 3,949 |
| | *24%* | *24%* | *19%* | *25%* | *34%* | *25%* |
| Unsubsidized Permanent Housing | 852 | 939 | 642 | 486 | 748 | 3,667 |
| | *31%* | *31%* | *17%* | *17%* | *22%* | *23%* |
| Permanent Supportive Housing | 331 | 302 | 635 | 371 | 459 | 2,098 |
| | *12%* | *10%* | *17%* | *13%* | *14%* | *13%* |
| **Total Perm. Housing Placements** | **2,770** | **3,025** | **3,825** | **2,845** | **3,353** | **15,818** |
| | *20%* | *17%* | *20%* | *14%* | *15%* | *17%* |
| **Total Participants Served** | **14,106** | **18,001** | **19,015** | **19,985** | **22,634** | **93,741** |

*Source: Controller analysis of data generated by LAHSA*

However, the total number of people who are placed into permanent housing is not always the most complete metric for measuring the efficiency of the rehousing system, or the types of interim housing and service programs that are most likely to put an unhoused person on a pathway to permanent housing. There are other key metrics that can be used to measure the success of a rehousing system and its components, such as occupancy rates at shelters, average length of stay for individuals housed at a shelter, rates at which people return to homelessness, and rates at which people are able to obtain permanent housing. **The rate at which people are able to transition out of interim housing into a permanent housing setting is among the most important of those metrics, because the ultimate objective for LAHSA, the City, and funding partners is linking people experiencing homelessness to permanent housing.**

---

[21] The count of participants served is based on the number of unique participants served by City shelters in each fiscal year.

[22] See **Appendix A** for a comprehensive breakdown of permanent housing placements for individuals enrolled in City shelters.

43

As part of this review, we sought to evaluate the performance of the various types of interim housing funded by the City, and whether clients at certain shelter types are more likely to achieve a placement in permanent housing. Specifically, we used LAHSA data to evaluate the following outcomes across City-funded interim housing types:

- rates at which people staying in interim housing returned to homelessness;

- rates at which people exit to permanent housing;

- length of stay at interim housing sites before securing permanent housing;

- length of stay at interim housing sites prior to returning to homelessness; and

- the extent to which Time Limited Subsidies (the most common permanent housing subsidy type) is successful in its efforts to help people remain permanently housed.

LAHSA does not set a maximum amount of time a person can stay at a shelter. Each client has unique needs as they work toward ending their experience with homelessness, and the amount of time it takes to secure permanent housing can vary. While permanent housing placements are successful outcomes, it should be noted that each destination offers different levels of stability and people may remain at risk of falling back into homelessness. **Of particular concern are the approximately 3,600 people who exited to unsubsidized permanent housing during the five-year scope period of this audit. More than 55% of this group are listed in HMIS as having secured market rate housing without any financial subsidies/rental vouchers. These individuals may not be able to sustain long-term housing independence without some level of financial support.**

Approximately 44% of exits to unsubsidized permanent housing consisted of people making arrangements to stay with family/friends. HUD regulations do not define the minimum length of time required for a stay with family/friends to be considered "permanent," and service providers have the discretion to make the determination and document the outcome in HMIS. **The lack of specificity combined with LAHSA's lack of oversight means that service providers could inflate their placement rates while exiting people into temporary/unstable "couchsurfing" arrangements that do not meaningfully end an individual's homelessness.**

### A Majority of People Return to Homelessness and Other Unknown Destinations, Regardless of Shelter Type

While the stated goal of the City and LAHSA is to move individuals into permanent housing, the rehousing system's temporary housing programs do not always serve as a stepping stone to becoming permanently housed. We analyzed the rates at which people staying in

44

interim housing are returning to homelessness and unknown destinations, a key metric tracked by LAHSA in order to monitor outcomes for clients.[23]

**We found that for all interim housing types, a majority of clients eventually exited shelters and returned to homelessness, or some other unknown destination, rather than permanent housing.** Individuals staying in Crisis and Bridge Housing facilities and hotel and motel-based shelters had the lowest rates of exits to homelessness and unknown destinations with averages of 57% and 60%, respectively. Tiny Home Villages had the highest rate of exits to homelessness and unknown destinations at 76%.

**Table 5: Rate of Exits to Homelessness and Unknown Destinations Relative to Total Exits**[24]

| Program | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | AVG |
|---|---|---|---|---|---|---|
| A Bridge Home | 62% | 70% | 69% | 60% | 61% | 65% |
| Crisis + Bridge Housing | 62% | 59% | 50% | 57% | 57% | 57% |
| Hotel/Motel Programs | – | 79% | 57% | 61% | 61% | 60% |
| Tiny Homes | – | – | 89% | 81% | 71% | 76% |

*Source: Controller analysis of data generated by LAHSA*

It is important to note that not every interim housing program was established with a primary objective of moving people into permanent housing. Project Roomkey was established in order to help vulnerable people shelter during the COVID-19 pandemic, while Project Homekey facilities were intended for eventual conversion into permanent supportive housing units. That being said, LAHSA and the City should take immediate steps to address data quality and performance management issues so that they can make informed funding decisions based on which facilities are producing the best permanent housing outcomes.

**LAHSA Performance Metrics for Permanent Housing Placement Rates Do Not Effectively Measure System Efficiency**

LAHSA's primary method for evaluating the performance of both individual homeless services providers and the rehousing system as a whole is the number of exits to permanent housing (i.e., permanent housing placement) relative to the total number of exits from the shelter. **LAHSA contracts with service providers set a permanent housing exit to total exit ratio performance goal of 20%.** Based on LAHSA's standard metric for permanent housing

---

[23] An exit to an unknown destination means a client's whereabouts are unknown because they left an interim housing facility but did not know their destination, left an interim housing facility but refused to provide information about their destination, or did not participate in an interview with shelter staff when leaving the facility.

[24] The five-year averages exclude the first fiscal year in which the interim housing type was established. Those exclusions are FY 2019 for A Bridge Home, FY 2020 for hotel/motel programs, and FY 2021 for Tiny Homes.

placement performance, Crisis and Bridge housing and A Bridge Home centers tended to see higher rates of exits to permanent housing destinations. Permanent housing exit rates tended to be lower from Tiny Home Villages and hotels/motels. The Citywide placement rate across all shelter types ranged from a low of 18% to a high of 24% during the five-year scope period of this audit.

It is important to note that the total number of individuals who transitioned to permanent housing destinations was small relative to the total number of unique individuals served by City shelters. Each year between FY 2019 and FY 2023, City shelters serviced an average of nearly 19,000 individuals. However, on average, fewer than 3,200 of those individuals enrolled in City shelters secured permanent housing each year. **Furthermore, a causal relationship between housing type and permanent housing exits is unestablished. Different variables, such as the performance of shelter operators, the quality of housing navigation services, and the clients' readiness for permanent housing, could explain outcome differences.**

**Figure 7: Rate of Exits to Permanent Housing Destinations Relative to Total Exits**
*Citywide permanent housing exit rates ranged between 18% and 24% between FY 2019 and FY 2023, though these exit rates do not necessarily reflect the efficiency of service providers.*
*Source: Office of the Controller analysis of occupancy data generated by LAHSA*



| Program | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|
| Citywide | 22% | 23% | 24% | 18% | 21% |

*Source: Controller analysis of data generated by LAHSA*

46

While the ratio of exits to permanent housing to total exits provides useful performance information about success relative to the number of people at a shelter, it does not necessarily provide LAHSA, the City, and members of the public with accurate information about the performance of individual service providers. In addition, it is not necessarily the best metric for determining which interim housing solutions and case management strategies are most successful in transitioning people into permanent living arrangements. That is because the existing performance metric can be impacted by the occupancy rates of shelter locations, meaning lower occupancy rates at shelters could actually make the permanent housing placement rate appear better relative to prior periods simply because the shelter is serving fewer people.

For example, between FY 2020 and FY 2021, Crisis and Bridge Housing facilities reduced their capacity in order to comply with pandemic-related public health guidelines, which resulted in fewer people enrolling in shelter beds. During that FY 2020 through FY 2021 period, LAHSA data indicates that the Crisis and Bridge Housing rate of exits to permanent housing relative to total exits increased from 25% to 31%. However, the number of placements into permanent housing actually declined 4% over that period, from 2,865 to 2,753. **This indicates that LAHSA's primary performance metric for measuring permanent housing placement success is not always the best measure, because it may show improvements when the number of actual permanent housing placements does not change, or even declines.**

To evaluate the ability of LAHSA and its partners to move people into permanent housing and free up interim housing beds and supportive services, **we considered an alternative performance measure to better assess rehousing system throughput**. We analyzed the ability of LAHSA to move people into permanent housing by determining the rate of permanent housing placements relative to the number of shelter beds maintained. This ratio of permanent housing placement generated per shelter bed provides a more complete picture of the efficiency in which LAHSA and service providers move people into permanent housing, and provides insights as to whether certain facilities or providers are more successful than others. A 1-to-1 ratio (expressed as 1.0) indicates that each shelter bed maintained resulted in one permanent housing placement annually. A higher ratio indicates a greater number of permanent housing placements per each interim housing bed.

**Using this performance metric, we found that while bed capacity for City-funded interim housing programs has nearly tripled during the scope period, LAHSA has been largely unable to scale up efforts to move people in interim housing into permanent housing.** According to LAHSA, this is due in large part to the lack of housing subsidies and permanent housing inventory. In FY 2019, the ratio of permanent housing placements generated per City-funded shelter bed was 1.3. That figure dropped to 0.6 in FY 2020, and was 0.5 in FY 2023. It is

47

important to note that between FY 2019 and FY 2023, the number of exits to permanent housing increased by just over 20%.

However, **the decline in the number of placements per bed maintained suggests an imbalance has developed within the rehousing system, as service providers responsible for placing people into permanent housing have not been able to keep pace with growing demand.** Table 6 below details the interim housing placement rates relative to the number of beds maintained between FY 2019 and FY 2023.

**Table 6: Permanent Housing Placement Rate Per Bed Maintained**

| Program | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|
| A Bridge Home | 0.1 | 0.2 | 0.3 | 0.3 | 0.3 |
| Crisis + Bridge Housing | 1.4 | 1.1 | 1.0 | 0.6 | 0.6 |
| Hotel and Motel-based Programs | – | 0.2 | 0.4 | 0.4 | 0.4 |
| Tiny Homes | – | – | 0.0 | 0.1 | 0.2 |
| **Citywide** | **1.3** | **0.9** | **0.6** | **0.5** | **0.5** |

*Source: Controller analysis of data generated by LAHSA*

**While this report acknowledges that a primary cause for LAHSA's inability to scale up the permanent housing transition process is the inadequate supply of supportive and market rate housing in Los Angeles, LAHSA must ensure that it has the capacity to move people out of interim housing, which is only meant to serve as a temporary housing solution**. LAHSA officials acknowledged that achieving and maintaining higher levels of throughput is a major organizational priority. **Both LAHSA and its service provider partners expressed concerns that the funding levels for permanent housing programming are insufficient given the large increase in interim housing clients that now require assistance.** LAHSA officials indicated that the expansion of interim housing without a major expansion for housing placement services is resulting in higher rates of individuals entering interim housing, but then returning to homelessness or outcomes other than permanent housing.

### Lengths of Stay Prior to Securing Permanent Housing Vary Greatly Across Shelter Types and Permanent Housing Destination Types

Identifying the type of interim housing that is best suited to maximize throughput is difficult, as there are many factors that contribute to how quickly people can transition from interim housing into permanent housing including the availability of permanent housing resources. **However, in many cases, the type of permanent housing the client is seeking to secure or the type of benefit the client is using has a greater impact on the time it takes to secure permanent housing than the type of shelter they are in.**

We found that between FY 2019 and FY 2023, people tended to secure unsubsidized permanent housing (i.e., an apartment or accommodation in a traditional housing setting, without additional government assistance) placements faster than any other housing type. Individuals in A Bridge Home facilities and Crisis and Bridge Housing secured permanent housing fastest, averaging 2.4 and 3.7 months, respectively. Placement into permanent housing took slightly longer from hotel and motel-based programs and Tiny Homes, averaging 5.2 and 4.8 months respectively.

Regardless of the type of shelter facility in which an individual is staying, placement into permanent supportive housing (i.e., subsidized housing with supportive services), of which there is an acute shortage, tends to take longer when compared to other permanent housing settings. Permanent supportive housing placements normally take between seven and eight months for all interim housing types, with the exception of Crisis and Bridge Housing, where it takes approximately five months. Similarly, permanent housing placements using subsidies (i.e., housing vouchers) tend to take a longer period of time – usually between six and nine months. Table 7 shows the average length of stay prior to being placed into permanent housing for each interim housing facility type.

**Table 7: Average Length of Stay Before Securing Permanent Housing (Months)**[25]

| Unsubsidized Permanent Housing | | | | | | |
|---|---|---|---|---|---|---|
| | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | AVG |
| A Bridge Home | 0.8 | 2.6 | 2.6 | 2.6 | 3.5 | 2.4 |
| Crisis + Bridge Housing | 3.0 | 4.4 | 5.3 | 2.8 | 2.8 | 3.7 |
| Hotel/Motel Programs | – | – | 4.3 | 4.3 | 7.0 | 5.2 |
| Tiny Homes | – | – | – | 5.7 | 4.0 | 4.8 |
| **Permanent Supportive Housing** | | | | | | |
| | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | AVG |
| A Bridge Home | 4.0 | 7.5 | 8.7 | 7.6 | 11.1 | 7.8 |
| Crisis + Bridge Housing | 3.0 | 3.0 | 7.3 | 4.5 | 5.8 | 4.7 |
| Hotel/Motel Programs | – | 1.2 | 4.6 | 9.0 | 10.8 | 8.1 |
| Tiny Homes | – | – | – | 4.2 | 9.9 | 7.1 |
| **Time Limited Subsidy** | | | | | | |
| | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | AVG |
| A Bridge Home | 3.8 | 8.0 | 4.9 | 6.9 | 8.4 | 6.4 |
| Crisis + Bridge Housing | 4.4 | 6.0 | 10.2 | 4.9 | 6.3 | 6.4 |

---

[25] Based on Controller analysis of data generated by LAHSA. Lengths of stay are based on the average quarterly median length of stay for participants placed in permanent housing.

49

| Hotel/Motel Programs | - | 1.5 | 5.2 | 6.8 | 7.4 | 6.4 |
| Tiny Homes | - | - | - | 6.0 | 11.2 | 8.6 |
| **Other Subsidies (Section 8, Veterans Affairs, and Emergency Vouchers)** | | | | | | |
| | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | AVG |
| A Bridge Home | - | 7.0 | 6.9 | 8.1 | 10.1 | 8.0 |
| Crisis + Bridge Housing | 5.0 | 5.4 | 8.4 | 6.4 | 6.0 | 6.2 |
| Hotel/Motel Programs | - | 1.5 | 5.0 | 7.0 | 10.1 | 7.3 |
| Tiny Homes | - | - | - | 4.8 | 10.4 | 7.6 |

According to staff responsible for managing interim housing facilities, every client has unique needs. Congregate living settings are best for some people who might not be ready to live on their own in a private space. For others, clients staying in non-congregate programs offer some participants the chance to acclimate to permanent housing settings by living in a unit that mirrors such environments. According to some interim housing case managers, transitioning from a private unit with wraparound services, such as meals, laundry, and other case management services, into a permanent housing setting without supportive services can sometimes be difficult for clients. This observation highlights the need for high quality Housing Navigation services for clients, as Housing Navigators are an essential link for people as they seek and apply for permanent housing units.

### Outcomes for Time Limited Subsidy Recipients Shows More Data Is Needed on Housing Permanency

Homelessness can be a revolving door for many unhoused people, and data related to outcomes for individuals that receive housing with Time Limited Subsidies indicates that more information is needed to better understand the types of permanent housing placements that result in people remaining housed on a long-term basis. **Data reported by LAHSA as part of its System Key Performance Indicators initiative shows that some people who secure permanent housing placements return to homelessness in a fairly short amount of time.**[26]

System Key Performance Indicator data for Time Limited Subsidies tracks client outcomes throughout the life of the 24-month subsidy. **For FY 2021, the most recent period for which a complete 24-month subsidy lifecycle is available, 12% of people returned to homelessness over the life of the subsidy**. Of those that returned to homelessness, just over half did so

---

[26] The System Key Performance Indicators initiative is a partnership between LAHSA and the California Policy Lab that monitors the performance of homeless services across certain components of the rehousing system. The California Policy lab is a research institution of the University of California that receives funding through public and private sources.

within one year of moving into a unit using a Time Limited Subsidy. This does not include the people that returned to homelessness after the expiration of their Time Limited Subsidies. Participants returning to homelessness will once again end up requiring shelter and rehousing services.

Exits from interim housing using Time Limited Subsidies accounted for 39% of total exits to permanent housing destinations between FY 2019 and FY 2023, which indicates that outcome information is available only for a small number of people LAHSA considers to be permanently housed.

**These trends highlight the need to further examine the success of permanent housing solutions in helping people remain housed on a long-term basis, as efficient throughput in the rehousing system will only be truly successful when people who secure permanent housing are not subsequently returning to homelessness**. The System Key Performance Indicator initiative does not currently track outcomes for subsidies other than Time Limited Subsidies, and does not monitor outcomes for people that secure unsubsidized permanent housing (i.e., an apartment or accommodation in a traditional housing setting, without additional government assistance).

**<u>Measuring Performance Is Difficult Due to Constant Program Changes</u>**

According to LAHSA, the disparities in outcomes and performance across interim housing programs is due at least in part to the numerous changes the interim housing system has undergone since FY 2019, and what it referred to as "ramp-up periods" when new programs are introduced. LAHSA officials explained that when new interim housing facility types were introduced, they were not necessary operating at full capacity or with normal efficiency levels within the first months or even up to a year after opening. As a result, certain services, such as case management services or housing navigation, may not have been delivered at full capacity at new sites.

During these periods, service providers typically undertake essential tasks such as hiring staff, establishing policies and procedures, and building connections with clients. **According to LAHSA, these initial steps are crucial for laying the foundation of a new program, but often lead to weaker initial performance results compared to well-established programs.**

Due to the dynamic nature of the rehousing process and the unique needs of each person, it may not be feasible to establish a single goal for the amount of time it takes to enroll a person into permanent housing once they begin their stay at an interim shelter. Furthermore, while it is understandable that newer programs require time to reach optimal performance levels, the absence of clearly defined performance expectations during ramp-up periods for goals such as occupancy rates, permanent housing placement rates, and rates at which

people return to homelessness, makes it difficult to assess whether a program or particular service provider is successfully carrying out required services and achieving intended outcomes.

New goals and guidelines that address expectations for lengths of stay at interim housing facilities and interim housing operator performance following the establishment of a new housing program or facility would help guide both LAHSA and City assessments of system performance.

## A Lack of Housing Navigation Services Hinders Rehousing Efforts

Housing Navigation services aim to help connect people experiencing homelessness to permanent housing by providing the services that help people identify, apply for, secure, and move into permanent housing. Based on our analysis and feedback received from homeless services officials, **connections to Housing Navigation case management services, and the quality of those services, is much more important than the type and quality of the interim housing facility in which a client resides.** With current funding levels, LAHSA only has the capacity to enroll 30% of the people staying in interim housing facilities into Housing Navigation.

According to LAHSA, the Housing Navigation system has been strained in recent years, which has limited the success of the program. Specifically, **housing navigation service providers had large caseloads that sometimes made it difficult to provide the level of attention and service to clients needed to make permanent housing connections.** We spoke to several case managers who highlighted issues about how many clients require intensive case management and assistance, and that coordinating permanent housing placements can take extended periods of time and patience.

In addition to large caseloads, until very recently, Housing Navigation services were a responsibility of interim housing facility operators. Given the broad scope of services required for shelter operators (e.g., operating and maintaining facilities, providing health and social services, and helping clients secure documents and records needed to apply for housing benefits), LAHSA officials believed Housing Navigation was not necessarily a top priority for all shelter operators. Moreover, it was possible for Housing Navigators at shelters to be drawn into other responsibilities due to shelter staffing constraints, which would impact their ability to help program participants.

To evaluate the overall success of Housing Navigation Services, we used LASHA data to compare the rates at which people with access to Housing Navigation Services exited to a permanent housing destination (i.e., exits to permanent housing relative to the total exits) to

the rates at which people exited to permanent housing destinations without access to Housing Navigation. LAHSA data indicates that **between FY 2019 and FY 2022, individuals with Housing Navigation were not more likely to secure permanent housing than those who were not enrolled in housing navigation services.**

**Table 8: Rate of Exits to Permanent Housing Relative to Total Exits**

| Housing Navigation Status | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 |
|---|---|---|---|---|---|
| With Housing Navigation | 18% | 19% | 22% | 16% | 35% |
| Without Housing Navigation | 21% | 23% | 26% | 21% | 20% |

*Source: Controller analysis of data generated by LAHSA*

As indicated by the increase in the permanent housing placement rate for FY 2023, LAHSA has taken steps to improve the delivery of Housing Navigation services to clients. In FY 2023, to address concerns related to weaker than necessary Housing Navigation performance, LAHSA made structural changes to its approach to making permanent housing connections. According to LAHSA, they made the changes following an evaluation of housing navigation data and programs. LAHSA reports that the recent shift is enabling the agency to proactively monitor the permanent housing placement process, and make proactive improvements to the housing navigation system's performance.

Rather than Housing Navigation being a responsibility of LAHSA's Interim Housing program, the agency established Housing Navigation as its own standalone program where dedicated housing navigation service providers would be responsible for assisting clients with their transition into permanent housing. **This organizational and contracting shift allows the agency to manage a service line dedicated to permanent housing placement, which it believes will help with client throughput.**

LAHSA now also prescribes a specific caseload for Housing Navigation staff, and switched to what it calls a "slot-based system" for managing caseload capacity. This slot-based system specifies that no more than 20 clients can be served by a case manager at any given time. Contracts previously operated on a "contracted-to-serve" basis, which specified the number of people a service provider was expected to assist during each fiscal year. According to LAHSA, this meant that a Housing Navigation case manager would often be responsible for managing too many cases at a time, which was permissible so long as the service provider provided housing navigation assistance to the number of individuals specified by the contract. **LAHSA believed that the quality of housing navigation services suffered when case managers had caseloads that were too large, which was unhelpful for clients seeking permanent housing.**

In addition to the new caseload policy, Housing Navigation is now only available to individuals enrolled in interim housing. Housing Navigation service providers previously had discretion with regard to enrolling clients, and would enroll clients engaged with street outreach and navigation centers. This resulted in the enrollment of larger numbers of individuals who were harder to navigate into permanent housing due to the instability associated with being unsheltered.

**While it remains to be seen whether LAHSA's changes to the Housing Navigation program will yield success over the long term, the initial data appears promising.** Over the first eight months of FY 2024, the permanent housing placement rate with Housing Navigation services was 50%, compared to 20% without. As detailed above, these outcomes are significantly different than in previous fiscal years. According to LAHSA, these improvements are intended to help move clients that are already staying in interim housing move into permanent housing more efficiently than in previous years, and ensure that limited Housing Navigations resources are maximized by allocating those resources to individuals who are in stable situations and most ready to make the permanent housing transition.

<u>**LAHSA Should Revisit Permanent Housing Placement Goals for Service Providers**</u>

As previously described in this section, Housing Navigation services have historically been carried out by interim housing service providers. However, Housing Navigation is a time and labor-intensive process. Housing Navigation staff help people apply for housing benefits, secure housing benefits and subsidies, locate units, visit available units, apply for housing units, and move into a housing unit. Despite the establishment of Housing Navigation as a dedicated program, permanent **housing placement rate goals are included in interim housing service provider contracts, but not contracts for housing navigation services.**

According to LAHSA, successfully moving a client into permanent housing is a shared responsibility, and it may be difficult to identify a specific service area in the rehousing process or specific service provider as most responsible. For example, interim housing service providers are responsible for the early tasks that assist participants with achieving a permanent housing placement, such as helping clients become document ready. Document readiness is a prerequisite of referral into LAHSA's housing navigation services, meaning interim housing facility case managers are a key part of the transition process even when not responsible for navigation. Furthermore, it is possible for people to transition into permanent housing without housing navigation enrollment. Interim housing staff for example can assist residents with securing federal vouchers, or guide a person as they seek self-resolution as an outcome (e.g., moving in with a friend or family member).

Due to the overlapping permanent housing placement responsibilities among interim housing operators and housing navigation service providers, the implementation of contractual performance goals for interim housing operators only does not adequately account for all responsible parties, leaving gaps in LAHSA's performance monitoring program. **Overlapping responsibilities among service providers and inconsistent assignment of permanent housing placement rate targets ultimately hinders LAHSA's ability to measure progress and operational efficiency.**

### New Efforts to Secure Master Leases Could Create More Permanent Housing Options for Navigators and Their Clients

In an effort to reduce its reliance on the private housing market, LAHSA is taking steps to gain more control over the number and availability of permanent housing units. LAHSA has launched a pilot program known as the Centralized Master Lease Program. With the Centralized Master Lease Program, LAHSA will lease an entire apartment building, and then in turn sublease the units in the building to people experiencing homelessness. The County of Los Angeles, through a partnership with L.A. CARE Health Plan and Health Net, provides funding to cover program costs not covered by rent revenue.[27] Those costs include property maintenance, property management, security, landscaping, damages, and utilities, among others.

The primary goal of the Centralized Master Leasing Program is to make it easier for unhoused people to secure apartment leases, as people with housing benefits such as Housing Choice Vouchers (Section 8) often struggle to secure leases with traditional landlords due to bias and other market factors. Individuals residing in interim shelters, those actively working with outreach workers to secure interim or permanent housing, and people impacted by encampment cleanups are eligible for units in master leased buildings. People experiencing homelessness do not need to be document ready in order to move into a master leased unit, which expedites the move-in process.

As of July 2024, LAHSA's master leasing program portfolio had 393 units. According to LAHSA, the agency has been able to fill master leased buildings in three to five days, which highlights what it says are efficiencies gained when subleasing units directly to people experiencing homelessness. While it remains to be seen whether this strategy controls or lowers permanent housing costs and moves a substantial number of people into permanent

---

[27] L.A. CARE Health Plan and Health Net are managed health care plan providers that serve individuals receiving Medi-Cal health benefits. Medi-Cal is a state program that pays for health care services for people with limited incomes and resources.

housing, it represents a positive step toward expanding the inventory of affordable housing units available to those experiencing homelessness.

**Recommendations:**

To maximize the number of permanent housing connections it can make, LAHSA, in coordination with the City, should:

10. Increase the number of housing navigators to expand the number of people staying in interim housing that are able to enroll in housing navigation services.

To ensure the effective monitoring of service providers and increase the performance of the permanent housing placement system, LAHSA should:

11. Assess the feasibility of consolidating housing navigation services and interim housing services under a single contract to streamline the case management process and make the performance management and contract monitoring process easier to implement.

12. Clearly define the permanent housing placement responsibilities of interim housing operators and housing navigation service providers to make clearer which parties should be held accountable for permanent housing placement rates that are below expectations.

13. Define permanent housing placement rate goals and expectations for new programs during what LAHSA considers to be ramp-up periods. Performance goals should consider expected performance levels while a program is developing, and length of time it should take for providers to begin operating at full capacity.

14. Develop formal monitoring and corrective action procedures for interim housing and housing navigation service providers that are failing to meet established performance goals.

15. Assess the feasibility of developing and incorporating into contracts a compensation model which incentivizes adherence to permanent housing placement rate targets.

16. Adopt permanent housing placement performance metrics that are not influenced by bed occupancy levels. Alternate metrics could include permanent housing placements achieved per bed maintained, or the total number of permanent housing placements against an established performance goal.

17. Establish key performance indicators and monitor outcomes for people after their Time Limited Subsidies expire, and for people permanently housed with subsidies

56

other than Time Limited Subsidies, and individuals that obtain housing without government assistance, such as an apartment without subsidies or moving in with a family member or friend.

# RECOMMENDATION TABLE

| Number | Recommendation |
|--------|----------------|
| *Responsible Entity: Los Angeles Homeless Services Authority* | |
| *To increase interim housing occupancy rates and maximize City investments in rehousing solutions, the LAHSA, in coordination with the City, should:* | |
| 1 | Develop needs-based eligibility criteria for non-congregate shelter beds to ensure private spaces are available to individuals that would benefit most from private spaces. |
| 2 | Examine the feasibility of developing new, trauma-informed bed solutions for congregate settings that would provide more privacy and comfort to clients. |
| 3 | Develop a formal policy for the administration of LAHSA catchments which ensures that mechanisms are in place to fill available beds in each catchment with individuals residing in other geographic zones. |
| 4 | Develop a formal policy for the reservation of interim housing beds by City offices which ensures mechanisms are in place to limit the risk of reserved beds going unfilled. |
| *To improve the ability of LASHA and the City to evaluate interim housing system performance and hold service providers accountable for poor performance, LAHSA, in coordination with the City, should:* | |
| 5 | Adopt/adhere to the federal government's Coordinated Entry System guidelines or another formal and consistent policy for the process of referring clients to City-funded interim housing facilities. Doing so would help the City maximize its investment in interim resources and ensure all open beds are available to individuals seeking shelter. |
| 6 | Establish new data quality control standards and monitoring procedures that ensure service providers accurately report bed capacity information. Monitoring procedures should include regular monitoring to the accuracy of bed capacity information to ensure occupancy rates are as accurate as possible when measuring system performance. |

| Number | Recommendation |
|--------|----------------|
| 7 | Develop occupancy performance monitoring and oversight mechanisms to ensure underperforming service providers are promptly identified. |
| 8 | Develop a formal policy and procedure for the establishment of corrective action plans for service providers that fail to meet performance or requirements. The policy and procedure should require the development of corrective action goals and milestones, and management plans that describe performance improvement plans and assign responsibility. |
| 9 | Develop and incorporate into contracts a compensation model which incorporates performance-based compensation in order to incentivize adherence to performance targets, and provide the agency with tools to hold service providers accountable for weak performance. |
| *To maximize the number of permanent housing connections it can make, LAHSA, in coordination with the City, should:* | |
| 10 | Increase the number of housing navigators to expand the number of people staying in interim housing that are able to enroll in housing navigation services. |
| *To ensure the effective monitoring of service providers and increase the performance of the permanent housing placement system, LAHSA should:* | |
| 11 | Assess the feasibility of consolidating housing navigation services and interim housing services under a single contract to streamline the case management process and make the performance management and contract monitoring process easier to implement. |
| 12 | Clearly define the permanent housing placement responsibilities of interim housing operators and housing navigation service providers to make clearer which parties should be held accountable for permanent housing placement rates that are below expectations. |
| 13 | Define permanent housing placement rate goals and expectations for new programs during what LAHSA considers to be ramp-up periods. Performance goals should consider expected performance levels while a program is developing, and length of time it should take for providers to begin operating at full capacity. |

59

| Number | Recommendation |
|--------|----------------|
| 14 | Develop formal monitoring and corrective action procedures for interim housing and housing navigation service providers that are failing to meet established performance goals. |
| 15 | Assess the feasibility of developing and incorporating into contracts a compensation model which incentivizes adherence to permanent housing placement rate targets. |
| 16 | Adopt permanent housing placement performance metrics that are not influenced by bed occupancy levels. Alternate metrics could include permanent housing placements achieved per bed maintained, or the total number of permanent housing placements against an established performance goal. |
| 17 | Establish key performance indicators and monitor outcomes for people after their Time Limited Subsidies expire, and for people permanently housed with subsidies other than Time Limited Subsidies, and individuals that obtain housing without government assistance, such as an apartment without subsidies or moving in with a family member or friend. |

# LAHSA Response



707 Wilshire Blvd. 10th Floor
Los Angeles, CA 90017
213 683.3333
www.lahsa.org

December 6, 2024

Devang Panchal, Director of Auditing
Office of the Controller
City of Los Angeles
(213) 978-7388

Re: LA City Controller Evaluation of Los Angeles Homeless Services Permanent Housing – Pathways Draft Audit Report

Dear Devang Panchal:

The Los Angeles Homeless Services Authority (LAHSA) appreciates the opportunity to respond to the City Controller's recent evaluation issued on November 8, 2024, regarding LAHSA's approaches to permanent housing pathways. We value the insights provided in the audit and acknowledge the importance of refining our processes to better meet the needs of our community and align with the best practices.

This audit assessed LAHSA and the City's rehousing system, focusing on interim housing occupancy rates, cost efficiency, permanent housing placement effectiveness, and service provider oversight. The period covered by the audit coincided with a transformative phase for LAHSA, characterized by rapid organizational expansion and the dual challenges of implementing Measure H and responding to the COVID-19 pandemic. Please note that in LAHSA's response, we discuss the broader contextual dynamics and key factors that have a significant impact on the outcomes of homelessness interventions.

**Organizational Growth and Transformation**
1. **Measure H Implementation:** LAHSA transitioned from a pass-through grant administrator to a systems administrator, taking on expanded programmatic and direct service responsibilities.
2. **COVID-19 Pandemic Response:** From FY 2019–FY 2022, LAHSA reoriented its priorities to public health, focusing on life-saving interventions for unhoused individuals, particularly through initiatives like Project RoomKey (PRK).

**COVID-19 Achievements and Public Health Investments**
During the pandemic, LAHSA prioritized moving individuals indoors to reduce COVID-19 transmission, resulting in significant public health and housing outcomes:
1. **Project RoomKey (PRK):** Achieved 4,824 permanent housing placements between April 2020 and February 2023, significantly reducing COVID-19 cases and fatalities among participants.
2. **Expanded Shelter Capacity:** Over 10,000 additional shelter beds were added countywide since FY 2018–19.
3. **New Program Models:** The success of PRK informed the development of ongoing initiatives, including Project HomeKey, Inside Safe, and Pathway Home.

**Post-Pandemic Strengthening of Financial Oversight**
Since April 2023, LAHSA's new leadership has enhanced fiscal accountability and operational efficiency:
1. **Contract Execution:** Improved from 30% of contracts executed by the fiscal year's start in FY 2018–19 to over 80% in FY 2023–24 and FY 2024–25.

2. **Service Provider Payments:** A new advance payment model was introduced to address delays inherent in the cost-reimbursement system.
3. **Financial Accountability:** Terminated contracts with providers where financial irregularities were identified.

**Key Housing Outcomes and Trends**
1. **Reduction in Unsheltered Homelessness:** A 5.1% countywide decrease in unsheltered homelessness in 2024, coupled with a 12.7% increase in sheltered populations.
2. **Permanent Housing Placements:** Over 28,000 placements were made in 2023, bringing the new total to 110,000 placements since 2016.
3. **Increased Placement Efficiency:** Interim housing placements from street outreach grew by 47%, and permanent housing placements from interim housing increased by 25% between 2022 and 2023.
4. **Integrated Performance Management:** In July 2024, LASHSA implemented comprehensive monthly contract monitoring with service providers that examines KPIs, spend-down, and utilization.

**Response to Draft Audit Recommendations**
Of the seventeen (17) recommendations presented to LAHSA in the Draft Audit Report, LAHSA agreed with ten (10) recommendations, partially agreed with five (5) recommendations, and disagreed with two (2) recommendations, as outlined below:

*To increase interim housing occupancy rates and maximize City investments in rehousing solutions, LAHSA, in coordination with the City, should:*

- Recommendation 1: *Partially Agree*
- Recommendation 2: *Partially Agree*
- Recommendation 3: *Partially Agree*
- Recommendation 4: *Agree*

*To improve the ability of LASHA and the City to evaluate interim housing system performance and hold service providers accountable for poor performance, LAHSA, in coordination with the city, should:*

- Recommendation 5: *Partially Agree*
- Recommendation 6: *Agree*
- Recommendation 7: *Agree*
- Recommendation 8: *Agree*
- Recommendation 9: *Partially Agree*

*To maximize the number of permanent housing connections it can make, LAHSA, in coordination with the city, should:*

- Recommendation 10: *Agree*
- Recommendation 11: *Disagree*

    ○ By maintaining separate contracts, LAHSA has been able to maintain greater visibility into the operations of the Housing Navigation services, ensuring that specialized staff are

62

dedicated to fulfilling those functions. This separation also provides the flexibility to quickly reallocate resources as new shelters are brought online, even when the system's need for housing navigators has not fully aligned.

- Recommendation 12: *Agree*
- Recommendation 13 *Agree*
- Recommendation 14: *Agree*
- Recommendation 15: *Agree*
- Recommendation 16: *Partially Agree*
- Recommendation 17: *Disagree*

    o LAHSA tracks homelessness for Time-Limited Subsidy (TLS) recipients for two years post-subsidy, with data available on our dashboard. We also analyze returns to homelessness from other programs and are working to integrate this data into regular reports. However, we currently lack a standardized way to track those who are permanently housed with other subsidies or without assistance after they exit the system.

**Conclusion**

The ongoing partnership between LAHSA and the City of Los Angeles is essential to addressing homelessness in our community. We are committed to fostering transparency, innovation, and collaboration as we work toward shared goals. We welcome the opportunity to improve the rehousing system collaboratively and look forward to our continuous partnership in addressing homelessness.

If you have any questions or need further clarification on the attached response, please feel free to contact Dr. Holly Henderson, Director of Risk Management, at (213) 683-3334 or via email at hhenderson@lahsa.org.

Sincerely,

Dr. Va Lecia Adams Kellum
Chief Executive Officer

HH:MV

63



LOS ANGELES
HOMELESS
SERVICES
LAHSA AUTHORITY

707 Wilshire Blvd. 10th Floor
Los Angeles, CA 90017
213 683.3333
www.lahsa.org

December 6, 2024

Devang Panchal, Director of Auditing
Office of the Controller
City of Los Angeles
(213) 978-7388

**SUBJECT: Re: LA City Controller Evaluation of Los Angeles Homeless Services Permanent Housing – Pathways Draft Audit Report**

Dear Devang Panchal,

We would like to take this opportunity to express our sincere appreciation for the strong partnership between the Los Angeles Homeless Services Authority (LAHSA) and the Office of the Controller, City of Los Angeles. We highly value the continued collaboration and remain committed to advancing our shared goals of accountability, transparency, and continuous improvement in the efficiency of the rehousing system.

LAHSA acknowledges receipt of the DRAFT – Controller Audit of Shelter Bed Availability Data, issued by the Office of the Controller on November 8, 2024. This collaborative effort represents a crucial step forward in advancing our shared mission to address homelessness in the City of Los Angeles.

To increase interim housing occupancy rates and maximize City investments in rehousing solutions, LAHSA, in coordination with the City, should:

**Recommendation 1:** Develop needs-based eligibility criteria for non-congregate shelter beds to ensure private spaces are available to individuals that would benefit most from private spaces.

**LAHSAs Response: Partially Agree**
LAHSA acknowledges the importance of allocating private spaces in interim housing (IH) to individuals who will benefit most. Non-congregate shelter beds are essential for supporting individuals with specific needs and vulnerabilities. Currently, non-congregated units are prioritized for participants who require an individual living space due to factors such as physical health, mental health, safety concerns, or trauma.

64

Establishing needs-based eligibility criteria, rather than prioritization, could have a negative impact on the utilization of these resources by increasing barriers to access. Frequently, those individuals that we would prioritize for non-congregated resources are also individuals who are the most disconnected from systems of care and who would have the most difficulty providing verification of need. Thus, they would be the least likely to be able to access those resources.

Additionally, the IH system includes a variety of shelter options, including semi-congregate, non-congregate, and congregate spaces of varying sizes, designed to meet the diverse needs of participants. However, despite these efforts, the system currently lacks sufficient interim housing beds to accommodate the full demand of individuals seeking access to these vital services.

**Recommendation 2:** Examine the feasibility of developing new, trauma-informed bed solutions for congregate settings that would provide more privacy and comfort to clients.

**LAHSAs Response: Partially Agree**
LAHSA appreciates the recommendation to examine the feasibility of developing new, trauma-informed bed solutions for congregate settings to enhance privacy and comfort for clients. We fully recognize that trauma-informed care is essential for supporting individuals who have experienced trauma, and creating environments that foster privacy and dignity is a priority for us. The interim housing system includes a range of bed/unit models designed to meet the diverse needs of participants, including semi-congregate, non-congregate, and congregate sites.

However, the system currently faces a shortage of interim housing beds, which limits its ability to accommodate all individuals seeking assistance. As the system expands, LAHSA is committed to carefully considering the specific needs of participants, along with the availability of suitable sites and locations that can best serve the population.

To address these challenges, new congregate spaces are incorporating semi-private pod structures. These pods provide increased privacy by offering individual sleeping areas and dedicated storage spaces for personal belongings, ensuring that participants have a more secure and private environment.

LAHSA is committed to ensuring that our housing environments support the needs of individuals in a holistic, trauma-informed manner, and we look forward to exploring innovative solutions to achieve this goal.

**Recommendation 3:** Develop a formal policy for the administration of LAHSA catchments which ensures that mechanisms are in place to fill available beds in each catchment with individuals residing in other geographic zones.

65

**LAHSAs Response: Partially Agree**

LAHSA is committed to ensuring that participants are matched with interim housing beds that best meet their individual needs, considering region-based data on where they are experiencing homelessness. Typically, participants are matched with housing within their current catchment area, unless a safety concern prevents them from staying in that area. In cases where there are no eligible participants within a given catchment, beds may be offered to individuals from neighboring areas. However, due to the high demand for housing and the strong preference of many participants who want to still be in their home areas, this situation is relatively rare.

To further strengthen this process, LAHSA has developed a draft policy that outlines how participants will be connected to the most proper IH resources. The policy is currently under review by our City and County partners to ensure that all relevant feedback is incorporated before finalizing and implementing it.

**Recommendation 4:** Develop a formal policy for the reservation of interim housing beds by City offices which ensure mechanisms are in place to limit the risk of reserved beds going unfilled.

**LAHSAs Response: Agree**

Over a year ago, LAHSA expanded the scope of work with Bitfocus, the vendor for the Homeless Management Information System (HMIS), to develop a bed inventory database that will be accessible to all providers for input and data retrieval. The first phase of this database went live in early 2024, with the final phase scheduled to be fully operational by January 2025. Data entry into both the bed inventory database and HMIS is mandatory, with routine check-ins conducted by LAHSA to ensure compliance.

The bed inventory module will enable real-time tracking and monitoring of occupied, available, and offline beds, significantly enhancing LAHSA's ability to match individuals with available beds. This system will also support more effective monitoring of bed utilization, ensuring that resources are allocated efficiently.

LAHSA acknowledges the importance of having a consistent citywide policy on the potential reservation of beds by City offices or departments. We welcome further discussions with the City to establish such a policy in a transparent manner that follows Fair Housing laws while minimizing any negative impact on access to beds for individuals already in the queue.

**Recommendation 5:** Adopt/adhere to the federal government's Coordinated Entry System guidelines or another formal and consistent policy for the process of referring clients to City-funded interim housing facilities. Doing so would help the city maximize its investment in interim resources and ensure all open beds are available to individuals seeking shelter.

**LAHSAs Response: Partially Agree**

LAHSA currently uses the Coordinated Entry System (CES) for matching participants to available resources, using the Homeless Management Information System (HMIS) along with the CES queue. For IH placements, we match participants directly into IH beds based on their needs, which are tracked in HMIS. The matching

66

process also considers the geographic location where participants are experiencing homelessness to ensure they are connected to the most appropriate IH resource. While our approach is structured to address participant needs, we understand that each individual may have unique challenges, barriers, and abilities. As a result, we are committed to maintaining flexibility in our matching process and avoiding a one-size-fits-all approach.

In addition, we are actively working to take our IH placement policies to the CES Policy Council for further review and discussion. This will allow us to refine our processes, ensure they are aligned with best practices, and ensure that we continue to adapt to the evolving needs of those we serve.

**Recommendation 6:** Establish new data quality control standards and monitoring procedures that ensure service providers accurately report bed capacity information. Monitoring procedures should include regular monitoring of the accuracy of bed capacity information to ensure occupancy rates are as accurate as possible when measuring system performance.

**LAHSAs Response: Agree**
LAHSA appreciates its recommendation to establish new data quality control standards and monitoring procedures to ensure service providers accurately report bed capacity information. In response, LAHSA has been actively developing the Inventory Module in the Homeless Management Information System (HMIS) for the past year. This new module provides LAHSA, providers, and other stakeholders with the ability to track interim housing assignments and vacancies in real time, which will enhance the accuracy of occupancy data.

The Interim Housing (IH) Inventory Module includes key features that directly address data accuracy and monitoring:

- Real-time tracking of sites, buildings, units, and beds, which allows for up-to-date information on bed availability and occupancy.
- Automatic updates to occupancy data, reducing the need for manual reporting by providers and minimizing the risk of inaccurate data entry.
- A filterable dashboard that displays current unit/bed availability, enabling providers to track occupancy in real time and adjust as needed.
- The ability for providers to take units offline for maintenance or repairs, ensuring that only unoccupied units are counted in occupancy reports.

These features significantly improve the ability to track and monitor bed capacity, making it easier to identify discrepancies and ensure that occupancy data reflects the actual availability of beds.

To further ensure data accuracy and adherence to quality control standards, the Grants Management and Compliance (GMC) has currently implemented the following:

- Monthly meetings are conducted with service providers to review Key Performance Indicators (KPIs) related to bed occupancy and data accuracy. These meetings focus on identifying challenges and offering solutions to improve data reporting.

- Provided a platform for service providers to receive technical assistance and policy guidance, ensuring that they have the resources needed to keep accurate bed capacity records.
- Ongoing collaboration with LAHSA's other departments to provide ongoing support, monitor compliance, and address any issues related to bed assignment and occupancy reporting.

These efforts have helped ensure that service providers consistently report accurate bed capacity information, and that the data LAHSA uses to measure system performance is as precise as possible. The collaboration between GMC, service providers, and other departments will support continuous improvement in data quality, ultimately enhancing the efficiency and transparency of the interim housing system.

**Recommendation 7:** Develop occupancy performance monitoring and oversight mechanisms to ensure underperforming service providers are promptly identified.

**LAHSAs Response: Agree**

To improve understanding of KPIs and ensure compliance with LAHSA's data integrity standards, the GMC team has implemented robust mechanisms for occupancy performance monitoring and oversight. These efforts include structured training, technical assistance, and resource distribution to equip service providers with the necessary tools and knowledge.

As part of the FY 25-26 annual monitoring reviews, the Compliance team will evaluate FY 24-25 KPI performance as a baseline. This marks a shift from active contract reviews to closed contract reviews for service providers selected for onsite or desk monitoring. The focus will be on assessing prior-year KPIs, providing a clear performance status without penalizing providers for goals that can still be achieved.

While the Compliance team evaluates goal achievement during annual reviews, the Grants Management team conducts ongoing KPI reviews throughout the contract period. This proactive approach identifies underperforming KPIs early, enabling timely interventions and support to address gaps and promote progress toward performance targets.

The Active Contract Management (ACM) performance management approach operates on a monthly cycle to support effective, responsible, and sustainable housing outcomes using data analytics within the Los Angeles County homeless system. ACM comprises four key components:

1. Monthly Dashboard Analysis
2. ACM Interdepartmental Meetings
3. Individual Service Provider Meetings
4. Post-Meeting Performance Improvement Plans

Each part drives action-oriented technical assistance for programs not meeting contractual outcomes. The iterative ACM process adjusts based on the results of implemented interventions, with the goal of supporting successful contract performance.

68

Monthly provider engagement meetings between LAHSA and service providers review contract performance during the active period. These meetings address concerns, review the prior month's performance, and integrate performance management evaluations as a standing agenda item.

Underperforming programs and contracts are identified, scored, documented, and discussed monthly with service providers. Once an action plan is implemented, performance is reassessed in subsequent months to evaluate whether technical assistance, guidance, and coaching interventions lead to sustained performance improvements.

**Recommendation 8:** Develop a formal policy and procedure for the establishment of corrective action plans for service providers that fail to meet performance or requirements. The policy and procedure should require the development of corrective action goals and milestones, the management plans that describe performance improvement plans that assign responsibility.

**LAHSAs Response: Agree**

LAHSA is committed to ensuring that service providers meet performance expectations and compliance requirements. In response to the audit recommendation, the Grants Management and Compliance (GMC) team is currently developing formal policies and procedures to guide the process for establishing Corrective Action Plans (CAPs) when service providers fail to meet performance standards or compliance requirements.

This policy will outline the following key components:

1. **Identification of Underperformance:** CAPs will be triggered through ongoing Key Performance Indicator (KPI) monitoring, routine audits, and annual reviews of provider performance. This will ensure that underperformance is identified early, and corrective measures can be put in place promptly.
2. **Formal Notifications:** The policy will detail the steps for issuing formal notifications to service providers when they do not meet established expectations or requirements. This ensures transparency and provides a clear understanding of the areas of concern.
3. **Corrective Action Goals and Milestones:** The policy will require the development of specific corrective action goals and milestones, with measurable outcomes and timelines. These goals will be tailored to address the specific deficiencies identified in the performance review.
4. **Assigning Responsibilities:** Each CAP will include a clear management plan that assigns responsibility to both LAHSA staff and service providers for implementing and monitoring the corrective actions. This ensures accountability and a clear division of responsibilities.
5. **Support and Monitoring:** LAHSA will provide structured support to service providers, including targeted technical assistance and training to help providers meet the goals in their CAPs. Regular progress reviews will be conducted to assess improvements and ensure ongoing compliance.
6. **Follow-up and Documentation:** A formal system will be put in place to track the progress of each CAP, including documenting all steps taken and results achieved. This will ensure that

corrective actions are completed within the defined timelines and will provide a clear record of any issues and resolutions for accountability purposes.

LAHSA is currently working on enhancing our current policy to ensure a standardized approach to managing performance issues with service providers, fostering greater accountability, transparency, and performance improvement. This process will ultimately help enhance the quality and effectiveness of services provided to those experiencing homelessness.

**Recommendation 9:** Develop and incorporate into contracts a compensation model which incorporates performance-based compensation in order to incentivize adherence to performance targets and provide the agency with tools to hold service providers accountable for weak performance.

**LAHSAs Response: Partially Agree**
LAHSA acknowledges the recommendation to develop and incorporate a performance-based compensation model into contracts to incentivize service providers to meet performance targets and improve outcomes. While LAHSA actively collects data from providers to evaluate performance, the current funding model for interim housing programs primarily relies on a bed-rate structure that covers a range of essential services, including staffing, food security, and basic needs, but does not currently incorporate performance-based incentives. Most costs to operate an interim housing program are fixed costs needed to support the safety and security of the project and its participants. Thus, we use performance in determining whether a provider should continue to operate a program, but not the level of funding for the program.

To date, there has been insufficient data to demonstrate a direct correlation between performance-based incentives and improved outcomes, such as permanent housing placements.

Successful permanent housing placements are influenced by multiple factors, including the availability of housing inventory, which is often beyond the control of providers.
LAHSA will be working on the following:

1. **Exploring Performance-Based Compensation Models:** LAHSA recognizes the value of incentivizing providers to meet performance targets and will begin exploring ways to incorporate performance-based compensation into contracts. We are open to engaging in discussions with the city and other stakeholders to design a model that aligns incentives with performance goals, while considering the complexities of service delivery and external factors that may affect outcomes.

2. **Addressing Data Gaps:** LAHSA acknowledges the existing gap in data correlating performance incentives with housing placements. We will expand our data collection efforts to better track performance metrics and assess the impact of potential incentives. We will work with service providers to ensure that data on permanent housing placements and other relevant outcomes is consistently captured and used to inform decision-making.

70

3. **Master Leasing Program:** LAHSA will continue to address gaps in the housing inventory through the Master Leasing program, which aims to increase the availability of housing for individuals transitioning from interim housing. This program is a critical part of our strategy to improve permanent housing placement rates and will complement any future performance-based compensation initiatives.

4. **Ongoing Conversations with the City:** LAHSA welcomes continued dialogue with the city to explore innovative approaches to performance-based compensation. We are committed to ensuring that any future models consider the realities of homelessness services, provider capacity, and external constraints on housing availability, while holding providers accountable for meeting performance targets.

LAHSA is committed to improving performance management across the interim housing system. While performance-based compensation is not currently a part of the funding structure, we are actively exploring opportunities to implement such models in a way that is effective, fair, and aligned with overall goals for permanent housing placement and client outcomes.

**Recommendation 10:** Increase the number of housing navigators to expand the number of people staying in interim housing that are able to enroll in housing navigation services.

**LAHSAs Response: Agree**

LAHSA agrees with the recommendation to increase the number of housing navigators to expand access to housing navigation services for individuals in interim housing. LAHSA has consistently advocated for increased funding for housing navigation over the past several years. Specifically, LAHSA requested significant increases in both the FY23-24 and FY24-25 City budget proposals to directly expand housing navigation services.

For the current fiscal year, LAHSA requested an increase of $1.8 million (from $1 million) to housing navigation slots from 172 to 300. Unfortunately, the city did not approve of this increase, supporting the same funding level as in FY23-24. Additionally, due to an increase in the housing navigation slot rate to support competitive salaries for housing navigation staff, the total number of city-funded housing navigation slots was reduced to 132.

LAHSA will continue to work on the following:

1. **Ongoing Advocacy for Increased Funding:** LAHSA will continue advocating for increased funding for housing navigation services in future budget proposals. Recognizing the critical role housing navigators play in helping individuals transition from interim housing to permanent housing, LAHSA is committed to securing the necessary resources to expand these services.

2. **Exploring Alternative Strategies:** In the absence of the requested funding increase, LAHSA is working with service providers to find innovative approaches to increase housing navigator capacity. This may include exploring partnerships, using existing resources more efficiently, or piloting new service delivery models to maximize the impact of available housing navigators. Additionally, LAHSA has worked with the city to shift some of its outreach workers to a new role

as System Navigators. These staff have been integral in assisting providers struggling with capacity due to staffing challenges or during start-up of new programs by filling the gaps through technical assistance and by directly providing services like Housing Navigation.

3. **Optimizing Existing Housing Navigation Services:** LAHSA will continue to monitor the effectiveness of the current number of housing navigation slots and seek opportunities to improve the efficiency and reach of existing services, ensuring that as many individuals as possible benefit from housing navigation support within the existing capacity.

While funding limitations have affected the expansion of housing navigation services, LAHSA is still committed to increasing the number of housing navigators and will continue advocating for the necessary resources. In the meantime, LAHSA is exploring all available options to optimize and increase housing navigation services to better support individuals in interim housing as they transition to permanent housing.

**Recommendation 11:** Assess the feasibility of consolidating housing navigation services and interim housing services under a single contract to streamline the case management process and make the performance management and contract monitoring process easier to implement.

**LAHSAs Response: Disagree**

LAHSA has historically contracted housing navigation services separately from interim housing for two primary reasons:

1. Funding Sources: Housing navigation services have been funded primarily through Measure H funds, while interim housing contracts are funded primarily by the City. This funding distinction makes it challenging to consolidate these services under a single contract. Under the current funding, there are not enough housing navigation slots to be tied to each Interim Housing bed.
2. Distinct Functions: The functions of housing navigation and case management in interim housing settings are distinctly different. Housing Navigators operate in the field, providing flexible mobile services to clients. In contrast, case management in interim housing is typically site-based and more focused on immediate needs and stabilization. Maintaining separate contracts for these services ensures that each service can be tailored to the specific needs of the participants.

By maintaining separate contracts, LAHSA has been able to maintain greater visibility into the operations of the Housing Navigation services, ensuring that specialized staff are dedicated to fulfilling those functions. This separation also provides the flexibility to quickly reallocate resources as new shelters are brought online, even when the system's need for housing navigators has not fully aligned. LAHSA is open to the possibility of fully integrating Housing Navigation into Interim Housing, provided our funders are willing to allocate the additional resources necessary to sustain these services effectively. We welcome any feedback from the city.

**Recommendation 12:** Clearly define the permanent housing placement responsibilities of interim housing operators and housing navigation service providers to make clearer which parties should be held accountable for permanent housing placement rates that are below expectations.

**LAHSAs Response: Agree**
LAHSA recognizes the importance of clearly defining the responsibilities of both interim housing providers and housing navigation service providers concerning permanent housing placements.

1. Interim Housing Providers: Providers are responsible for ensuring that participants are document-ready by obtaining necessary documentation (e.g., ID and Social Security Cards), completing comprehensive assessments, submitting Universal Housing Applications, meeting permanent housing placements, and limiting participant exits to the street. By meeting these requirements, providers help participants transition smoothly to permanent housing.
2. Housing Navigation Providers: Housing navigators are responsible for directly assisting participants in securing permanent housing by identifying housing opportunities, supporting the application process, and ensuring a successful move-in.

**Recommendation 13:** Define permanent housing placement rate goals and expectations for innovative programs during what LAHSA considers to be ramp-up periods. Performance goals should consider expected performance levels while a program is developing, and the length of time it should take for providers to begin operating at full capacity.

**LAHSAs Response: Agree**
LAHSA agrees with the recommendation to set up clear goals and expectations for permanent housing placement rates during the ramp-up periods of new programs. Below are the KPIs and proposed strategies for enhancing Interim Housing (IH) performance and IH to Permanent Housing (PH) throughput:

KPIs for Interim Housing (IH):
- Occupancy Rate Targets: Maintain consistent occupancy levels to optimize resource utilizations.
- Average Length of Stay Benchmarks: Reduce time spent in IH without compromising quality outcomes.
- Exit Outcomes: Focus on increasing successful exits to PH.
- Retention Rates for PH Placements: Track long-term housing stability post-placement.

System KPI Goals for IH to PH Throughput:
- Transition Rate to PH: Increase the percentage of IH participants moved to PH within defined timeframes.
- Reduction in Returns to Homelessness: Minimize the rate of participants returning to homelessness after PH placement.

As part of LAHSAs strategic approach LAHSA is working on the following:

1. **Set Ramp-Up Period Benchmarks:** Establish temporary performance goals for new programs focusing on document readiness, UHA completion, and assessments tied to long-term housing placements.
2. **Provide Training and Technical Assistance:** Offer targeted support to help new providers meet incremental performance goals during ramp-up.
3. **Ensure Accountability and Support:** Monitor progress regularly, addressing challenges with added training and adjustments to expectations as needed.

By aligning ramp-up expectations with defined benchmarks and strengthening ASM practices, LAHSA aims to ensure both immediate progress and long-term success in achieving IH and PH throughput goals.

**Recommendation 14:** Develop formal monitoring and corrective action procedures for interim housing and housing navigation service providers that are failing to meet established performance goals.

**LAHSAs Response: Agree**

LAHSA has formalized a comprehensive Active Contract Management (ACM) approach to performance management, which includes regular monitoring of KPIs and grant expenditure milestones. Service Providers are held accountable through structured conversations and action-oriented technical assistance.

If a Service Provider does not meet established goals, Performance Improvement Plans (PIPs) are developed. The PIP outlines corrective actions to improve performance including specific goals, milestones, and timelines. These plans are implemented iteratively, with regular check-ins to monitor progress. If performance does not improve after a PIP is in place, the service provider may be considered non-compliant.

Monitoring and Corrective Action Process:

1. **Identification of Underperformance:** Underperformance is identified by failure to meet contractual KPIs, or grant expenditure milestones. Monthly performance reviews track provider progress. If issues persist, corrective actions are initiated.
2. **Performance Improvement Plan (PIP):** When a provider underperforms, LAHSA develops a PIP specifying the areas of concern, corrective actions, and expected outcomes with a timeline (typically 90 days) to assess the effectiveness of the intervention, with the possibility of extending this timeline based on the complexity of the issues.
3. **Categorization of Non-Compliance:** Non-compliance is categorized as:
   a. Low risk: Minor issues requiring short-term corrective actions.
   b. Moderate risk: Persistent underperformance needing more intensive intervention or resources.
   c. High-risk: Significant performance failures, potentially leading to contract termination or other severe consequences.
4. **Accountability:** The Grant Specialist monitors the implementation of the PIP and ensures the provider meets established performance goals. Monthly assessments will determine if progress

74

has been made. If improvements are not made within the stipulated timeline, further corrective actions will be considered, including potential contract revisions or terminations.

5. **Continuous Improvement:** LAHSA's corrective action procedures are designed to support providers with technical assistance and resources, ensuring that performance standards are met in a timely and effective manner.

**Recommendation 15:** Assess the feasibility of developing and incorporating into contracts a compensation model which incentivizes adherence to permanent housing placement rate targets.

**LAHSAs Response: Agree**

LAHSA collects data from providers to evaluate the performance of interim housing programs. However, the current funding model for these programs is primarily a bed-rate model, which encompasses not just bed capacity but also services, staffing, food security, and other essential needs. There is no clear data yet showing a direct correlation between performance-based incentives and increased permanent housing placements.

We recognize that permanent housing placements are affected by several factors, including the availability of housing units, and that a performance-based compensation model may need to consider these complexities. We have not yet implemented such a model for permanent housing placement rates.

However, LAHSA acknowledges the importance of incentivizing performance in achieving permanent housing placements and will explore the feasibility of incorporating a performance-based compensation model. This will involve:

- Reviewing current performance metrics and outcomes to identify areas where incentives might be effectively applied.
- Conducting research or engaging with stakeholders to understand the potential impacts of such a model, including assessing its feasibility and considering external factors like housing inventory.
- Examining best practices from similar programs to determine if incentives can be tied to permanent housing placements and whether they are feasible within LAHSA's existing framework.

Additionally, LAHSA is committed to addressing housing gaps through initiatives like the Master Leasing program, which aims to expand housing options and could, over time, increase the availability of permanent housing for program participants. This program may complement future efforts to explore incentive-based models by increasing the housing stock available for placements.

We are open to discussions with the City to explore the development of such a model and will continue to evaluate the potential for its incorporation into our contracts.

**Recommendation 16:** Adopt permanent housing placement performance metrics that are not influenced by bed occupancy levels. Alternate metrics could include permanent housing placements achieved per bed maintained, or the total number of permanent housing placements against an established

**LAHSAs Response: Partially Agree**

LAHSA has already revised the Key Performance Indicators (KPIs) for Interim Housing for Quarter 2, to include KPIs focused on throughput from interim housing to permanent housing. LAHSA is currently adapting FY 25-26 KPIs, with a focus on ensuring that Interim Housing programs effectively support participants in achieving permanent housing and reducing exits to the street. The updated KPIs prioritize key activities such as document readiness, vulnerability assessments, timely referrals to Housing Navigation, and the completion of Universal Housing Applications (UHAs). These changes are designed to improve program performance and increase the likelihood of successful housing outcomes for participants.

As part of the re-procurement process, LAHSA is collaborating with the City and County to standardize the program model for single adult interim housing across all funding sources. This alignment will ensure consistent baseline expectations for providers, regardless of the funding source, providing clearer guidelines and streamlining oversight for LAHSA.

Also, with the upcoming rollout of the Bed Inventory Module, LAHSA will manage and track bed availability in real time. The module will help up manage changes in bed availability due to temporary offline status (e.g., for repairs or quarantine). This will address challenges faced during the COVID-19 pandemic and ensure more exact and consistent tracking of available beds going forward.

Additionally, LAHSA is introducing a new KPI focused on maintaining bed occupancy. By clearly defining bed occupancy expectations and aligning them with the activities mentioned above, we will create a more cohesive and measurable framework. This will make the path to permanent housing clearer and more tangible for both participants and providers.

Through these adjustments and enhancements, LAHSA aims to improve the effectiveness and efficiency of Interim Housing programs, ensuring better outcomes for participants and greater accountability for providers.

**Recommendation 17:** Establish key performance indicators and monitor outcomes for people after their Time Limited Subsidies expire, and for people permanently housed with subsidies other than Time Limited Subsidies, and individuals that obtain housing without government assistance, such as an apartment without subsidies or moving in with a family member or friend.

**LAHSAs Response: Disagree**

LAHSA currently tracks returns to homelessness for participants who have received Time-Limited Subsidies (TLS) for up to two years after the subsidy expires. This data is publicly available through our dashboard (https://www.lahsa.org/data-refresh/home/datadashboard?id=56).

LAHSA cannot track housing stability or outcomes for individuals permanently housed with non-TLS subsidies or without government assistance (e.g., private rentals or living with family) as they are no longer enrolled in HMIS programs. The only measure is whether they return to the homelessness system

76

for assistance. To address this, LAHSA has conducted ad-hoc analyses on returns to homelessness and is working to incorporate these findings into regular reporting metrics to improve system-wide outcome monitoring

**Conclusion**

LAHSA values the partnership with the Los Angeles City Controller in the work to end homelessness and looks forward to future engagements on refining and improving these efforts. If you or your staff have any questions or require additional information, please feel free to contact Dr. Holly, Director of Risk Management, at 213-683-3334 or via email at henderson@lahsa.org.

Thank you for your attention to this matter, and we look forward to our ongoing partnership.

Sincerely,

Dr. Va Lecia Adams Kellum
Chief Executive Officer

HH:MV

77

# AUDITOR COMMENTS ON LAHSA'S RESPONSE

Of the 17 recommendations contained in this report, LAHSA *agreed* with 9 recommendations, *partially agreed* with 6 recommendations and *disagreed* with 2 *recommendations*. We strongly encourage LAHSA to implement the recommendations it *disagrees* with.

**Recommendation 11:** Assess the feasibility of consolidating housing navigation services and interim housing services under a single contract to streamline the case management process and make the performance management and contract monitoring process easier to implement.

> **LAHSA Response:** Disagree

> **Auditor Comment:** Transitioning a client from an interim housing setting to a permanent housing setting is a shared responsibility between the service provider responsible for operating an interim housing site, and the service provider responsible for housing navigation case management. We found that interim housing service providers were typically subject to more defined permanent housing placement goals, while housing navigation service providers were not. We acknowledge that there may be funding and operational reasons to keep these functions independent. However consolidating these services to the greatest extent possible, and clarifying provider roles and responsibilities to eliminate ambiguity, would allow LAHSA to establish clear permanent housing placement goals for the rehousing system and hold service providers accountable for interim housing to permanent housing throughput.

**Recommendation 17:** Establish key performance indicators and monitor outcomes for people after their Time Limited Subsidies expire, and for people permanently housed with subsidies other than Time Limited Subsidies, and individuals that obtain housing without government assistance, such as an apartment without subsidies or moving in with a family member or friend.

> **LAHSA Response:** Disagree

> **Auditor Comment:** A better understanding of the permanent housing destination types which yield the best long-term outcomes (i.e., housing permanency) would assist LAHSA and its funders in making determinations regarding permanent housing solutions and investments. LAHSA's system for evaluating TLS participant outcomes is generally limited to tracking participant outcomes during the life of their 24-month subsidy. Furthermore, although tracking returns to homelessness for individuals permanently housed without the use of TLS subsidies may present challenges because they are no

78

longer enrolled in an HMIS program, LAHSA's efforts to conduct ad-hoc analysis on returns to homelessness are a positive step. LAHSA's plans to incorporate ad-hoc analysis findings into regular reporting metrics may satisfy the intent of this recommendation, and we encourage LAHSA to continue to make improvements to its systems for outcome monitoring.

We also encourage LAHSA to fully implement the recommendations it *partially agrees* with, and take steps to satisfy the intent of those recommendations and address the associated program management issues. The Audit Services Division appreciates LAHSA staff's collaboration and support during this review, and looks forward to working with LAHSA to monitor the implementation of recommendations contained in the report.

## APPENDIX A – PERMANENT HOUSING PLACEMENT DESTINATIONS FY 2019–FY 2023

| Permanent Housing Destination | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Total |
|---|---|---|---|---|---|---|
| **Permanent Housing** | **852** | **939** | **642** | **486** | **748** | **3,667** |
| **Percentage of Total Placements** | **31%** | **31%** | **17%** | **17%** | **22%** | **23%** |
| Rental by client, no ongoing housing subsidy | *66%* | *63%* | *54%* | *43%* | *40%* | *55%* |
| Staying or living with family, permanent tenure | *27%* | *28%* | *37%* | *45%* | *48%* | *36%* |
| Staying or living with friends, permanent tenure | *6%* | *6%* | *8%* | *11%* | *11%* | *8%* |
| Owned by client, no ongoing housing subsidy | *1%* | *3%* | *2%* | *1%* | *1%* | *2%* |
| **Permanent Supportive Housing** | **331** | **302** | **635** | **371** | **459** | **2,098** |
| **Percentage of Total Placements** | **12%** | **10%** | **17%** | **13%** | **14%** | **13%** |
| **Permanent Housing – Time Limited Subsidies** | **929** | **1,069** | **1,808** | **1,276** | **1,022** | **6,104** |
| **Percentage of Total Placements** | **34%** | **35%** | **47%** | **45%** | **30%** | **39%** |
| **Permanent Housing – Other Subsidies** | **658** | **715** | **740** | **712** | **1,124** | **3,949** |
| **Percentage of Total Placements** | **24%** | **24%** | **19%** | **25%** | **34%** | **25%** |
| Rental by client, with other ongoing housing subsidy | *83%* | *72%* | *63%* | *47%* | *50%* | *61%* |
| Rental by client, with HUD Housing Choice voucher | *1%* | *17%* | *19%* | *34%* | *38%* | *24%* |
| Rental by client in a public housing unit | *0%* | *6%* | *11%* | *14%* | *8%* | *8%* |
| Rental by client, with VA Supportive Housing subsidy | *16%* | *1%* | *3%* | *3%* | *1%* | *4%* |
| Owned by client, with ongoing housing subsidy | *1%* | *2%* | *4%* | *3%* | *3%* | *3%* |
| Rental by client, with VA Grant and Per Diem Housing subsidy | *0%* | *1%* | *0%* | *0%* | *0%* | *0%* |
| **Total PH Placements** | **2,770** | **3,025** | **3,825** | **2,845** | **3,353** | **15,818** |
| **Percentage of Participants Served Placed in Permanent Housing** | **20%** | **17%** | **20%** | **14%** | **15%** | **17%** |
| **Participants Served** | **14,106** | **18,001** | **19,015** | **19,985** | **22,634** | **93,741** |

*Source: Controller analysis of data generated by LAHSA*

## AUDIT SERVICES DIVISION

The Office of the Controller was created by the Los Angeles City Charter as an independent office, and is headed by the Controller: the elected auditor, paymaster, and chief accounting officer for the City of Los Angeles. Under the Controller's leadership, the Office's Audit Services Division performs audits, investigations, and other oversight functions to help provide transparency, accountability, and improve City services for all Angelenos.

## AUDIT TEAM

Raymond Munandar, Internal Auditor III

Hazem Alqam, Internal Auditor IV

Nicholas Ketter, Audit Manager

Devang Panchal, Director of Auditing

## CONTACT

**Phone**: 213.978.7200

**Email**: controller.mejia@lacity.org

**Website**: https://controller.lacity.gov/

Copies of our audit reports are available at https://controller.lacity.gov/audits

81