Name: _Gregory Edward Gray_

Address: _3183 Wilshire Boulevard_

_Ste. 196K26_

Phone: _(213) 638-2039_

Fax: _____

In Pro Per

FILED

CLERK, U.S. DISTRICT COURT

04/02/2025

CENTRAL DISTRICT OF CALIFORNIA

BY ____GSA____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

LA Alliance for Human Rights, et al.,

Plaintiff

v.

City of Los Angeles, et al.,

Defendant(s).

CASE NUMBER: 2:20-cv-02291-DOC-KES

MOTION FOR PERMISSION TO REQUEST OF THE COURT TO REQUIRE THE CITY OF LOS ANGELES, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, LOS ANGELES, HOMELESS SERVICES AUTHORITY AND ITS SERVICE PROVIDERS TO CORRECT EXECUTION OF PROGRAM SERVICES AND DOCUMENTS, AND TO FACILITATE TRANSFER TO AND PAYMENT FOR NEW PERMANENT HOUSING OF CLIENT'S CHOICE AS DEFINED IN COURT-ORDERED AUDIT

_Page Number_

CV-127 (09/09)          **PLEADING PAGE FOR A SUBSEQUENT DOCUMENT**

Gregory Edward Gray
Pro Se
3183 Wilshire Boulevard
Ste. 196K26
Los Angeles, CA 90010
gegcbg@outlook.com

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

LA ALLIANCE FOR HUMAN
RIGHTS, et al.

vs

CITY OF LOS ANGELES, et al.

Case No. 2:20-cv-02291-DOC-KES

**MOTION FOR PERMISSION
TO REQUEST OF THE COURT
TO REQUIRE THE CITY OF
LOS ANGELES, HOUSING
AUTHORITY OF THE CITY OF
LOS ANGELES, COUNTY OF
LOS ANGELES, LOS ANGELES
HOMELESS SERVICES
AUTHORITY AND ITS
SERVICE PROVIDERS TO
CORRECT EXECUTION OF
PROGRAM SERVICES AND
DOCUMENTS, AND TO
FACILITATE TRANSFER
TO AND PAYMENT FOR NEW
PERMANENT HOUSING
OF CLIENT'S CHOICE AS
DEFINED IN COURT-
ORDERED AUDIT IN
CASE NO. 2:20-CV-02291-DOC-
KES**

## I.  INTRODUCTION

1.  COMES NOW, Gregory Edward Gray and hereby makes a request to the Court for permission to file this Motion asking the Court to require the City of Los Angeles, County of Los Angeles, Housing Authority of the City of Los Angeles *aka* HACLA, Los Angeles Homeless Services Authority *aka* LAHSA and all relevant federally-funded service providers to correct errors in the content, quality and execution of housing program documentation and program services relating to Mr. Gray and his household.  Moreover, Mr. Gray requests the Court to require the aforementioned parties to facilitate transfer to and payment for new permanent housing of Mr. Gray's and his wife's choosing in accordance with HUD guidelines governing Mr. Gray's Emergency Housing Voucher *aka* EHV, applicable Time Limited Subsidies *aka* TLS, applicable housing laws and all properly executed permanent housing program protocols identified in the newly released preliminary draft audit, *Independent Assessment of City-Funded Homelessness Assistance Programs*.  Mr. Gray asks the Court for permission to file this Motion because he is not a party to the above-named case but has been harmed by the entities named in the audit involved in Mr. Gray's search for permanent housing.

This request is in accordance with the findings of the second amended preliminary draft of the court-ordered audit of all housing and housing assistance

programs operated or funded by the City of Los Angeles.

The executive summary of the preliminary draft states, **"The primary intent of this financial and performance assessment was to examine the appropriation and expenditure of funds through the City of Los Angeles ("the City") under the Roadmap Program – Freeway Agreement ("Roadmap Program"), Alliance Settlement Program ("Alliance Program"), and Inside Safe Program (collectively, the "City Programs") from June 1, 2020, through June 30, 2024 ("Lookback Period").  It further evaluated whether these monetary resources effectively supported individuals experiencing homelessness in achieving improved outcomes and housing stability."** [1]

2. For Mr. Gray and his wife, trust is irrevocably broken by the current agencies and program systems in place that are the subject of the audit and were involved in Mr. Gray's interim housing and search for permanent housing. In the hearing held on March 27, 2025, and in hearings prior, the Court has expressed multiple times its own distrust of the City, the County, and the same agencies and current program systems, stating in the March 27th hearing, ***"…I don't trust you as an institution any longer."***  The County of Los Angeles amplified its own distrust of the status quo by voting on April 1, 2025 to strip the Los Angeles Homeless

---

1) Extracted from Executive Summary, Document 870, entitled, *Independent Assessment of City-Funded Homelessness Assistance Programs*, filed March 6, 2025.

Services Authority *aka* LAHSA of all county funding, effective July 2026, and to form a new county homelessness department. The Los Angeles City Council is exploring similar action.

The preliminary audit confirmed gross deficiencies in LAHSA's execution of its published Scopes of Services. Those deficiencies, helped along by those of LAHSA's contracted service providers, adversely impacted Mr. Gray's permanent housing goals in no less than the following categories:  **1)** false and inaccurate information in Mr. Gray's HMIS data and suspected false and inaccurate information in the processing of an Emergency Housing Voucher *aka* EHV, along with the EHV's extension and final processing for activation; **2)** lack of proper housing navigation services; **3)** failure to meet program standards to reach the goal of obtaining permanent housing aligned with Mr. Gray's medical and household needs; **4)** lack of consistency in support services and activities; **5)** length of enrollment; **6)** participant exiting; and **7)** participant file.

From former CEO Heidi Marston in 2022 to current CEO Dr. Va Lecia Adams Kellum in 2023, Mr. Gray and his wife appealed to LAHSA's leadership for assistance in navigating out of LAHSA's and its service providers' interim housing and into a permanent housing solution that aligned with Mr. Gray's medical challenges and the overall needs of his household.  A March 2022 email addressed to Ms. Marston went unanswered as did a registered letter to Dr. Adams Kellum in June 2023.

Similarly, Mr. Gray and his wife appealed by letter to the leadership of the service providers contracted by LAHSA for assistance in correcting the problems that were delaying their progress toward achieving their permanent housing goals. Those individuals and offices included:  The CEO of Weingart Center Association, Senator Kevin Murray, The Salvation Army, Southern California Division Headquarters in Carson, California, Richard Reed, President and CEO of First To Serve, and the CEO of PATH, Jennifer Hark Dietz.  None responded.

Mr. Gray and his wife supplied documentation of the deficiencies adversely affecting their permanent housing goals to Special Master Michele Martinez at the instruction of the Court following a January 7, 2025 hearing.[2]  Public comments made at the hearing detailing these matters were also included in the January 7th hearing transcript and general minutes.[3]

## II.  STATEMENT OF FACTS

### A. Present Conditions

Mr. Gray and his wife are residents in a permanent supportive housing apartment building for which the Los Angeles Homeless Services Authority *aka*

---

2) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and email on January 10, 2025, January 16, 2025. Additional documents provided via email on February 14, 2024 & March 13, 2025.

---

3) See Exhibit 2: DKT. 850, Hearing Transcript, Extracted Pages 116-122 and DKT. 852, Civil Minutes – General, Case No: LA CV 20-02291-DOC-KES, Date: January 7, 2025 Title: LA Alliance for Human Rights, et al, v. City of Los Angeles, et al.

LAHSA is the master lease holder.  People Assisting the Homeless *aka* PATH is the contracted services provider within the building. Mr. Gray and his wife were moved to this building within days of the closure of the LA Grand Hotel in June 2024. The LA Grand was an INSIDE SAFE interim housing location for which Weingart Center Association served as the LAHSA-contracted site administrator.

The move to a permanent supportive housing building was not Mr. and Mrs. Gray's first choice for permanent housing.  Rather, the move occurred because LAHSA and Weingart Center Association found themselves exposed for leaving Mr. Gray and his wife in an extremely vulnerable state--with no permanent housing after Mr. Gray and his wife had invested some twenty-seven months trying to reach their permanent housing goals through LAHSA and its service providers. The timeline and events that occurred during this twenty-seven-month period are detailed in the documentation presented to Special Master Michele Martinez as instructed by the Court following the January 7, 2025 hearing.[4]

Weingart and LAHSA presented the building to Mr. Gray and his wife as a brand new development.  The Grays were never advised that much of the building would be occupied by individuals with issues of substance abuse, mental health challenges, histories of criminal violence, and other adverse behaviors.

---

4) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and email on January 10, 2025, January 16, 2025. Additional documents provided via email on February 14, 2024 & March 13, 2025.

When Mr. Gray and his wife toured the building last June with LAHSA, Weingart Center Association and the building's management, there was no indication of what was to come.  However, days after the Grays signed their lease, a PATH staffer remarked, ***"Just wait until you see who is coming in here."***

Nine months later, Mr. Gray and his wife have been subjected to a living environment that has been the site of no less than two fires (causing more than one million dollars in damage), at least two knife attacks, including a near-fatal stabbing, suspected illegal drug use and trafficking, at least one overdose death, suspected gang activity, innumerable physical altercations, trespassers, unit break-ins, mail theft, vandalism, gang graffiti, unkempt areas where trash and rubbish are strewn about the building's common areas, pet hair/urine/defecation in the building's common areas, incessant loitering outside the building entrance and adjacent alleyway, and various other disorderly behaviors and practices by some tenants who either refuse to or are incapable (due to mental/behavioral disorders, substance abuse, or both) of following the building rules, thereby creating a constant flow of disruptions.  LAPD and the LA Fire Department are routinely called to the premises.

For Mr. Gray and his wife, the consequences of reporting some of these events have made them targets of stalking and other retaliatory acts of intimidation, including an apparent break-in attempt of their unit on January 1, 2025 that they reported to the Los Angeles Police Department.

In addition to the LAPD, Mr. Gray and his wife have made written reports about the disruptive behaviors and suspected illegal activities in the building to LAHSA, KRPM Group (the building's management), Los Angeles County Adult Protective Services (whose agency representative came to the building, witnessed the property destruction, took a report and contacted the LAPD on the Grays' behalf), the offices of Los Angeles Mayor Karen Bass, U.S. Senator Alex Padilla, Los Angeles City Council and The County Board of Supervisors.  Details about these events, including the public officials and other entities to which Mr. Gray and his wife appealed for help are contained in the documentation forwarded to Special Master Martinez.

The cumulative stress of these events has adversely affected Mr. Gray's health.[5] Mr. Gray has reported these events to his UCLA Health specialists and to the CEO and a medical director for LA CARE Health Plan, Mr. Gray's health insurer and a major funder of supportive services at the building where Mr. Gray and his wife reside and where LAHSA is the master lease holder. Moreover, Mr. Gray and his wife are extremely concerned for their safety and welfare as these adverse behaviors and suspected criminal activity appear unlikely to cease any time soon.

---

5)  Physician letter, Dr. Alexan Yerevanian, UCLA Neurology, ULCA Health;
Physician letter, Dr. Esther Yu, Family Medicine, UCLA Health

**For all of these reasons, Mr. Gray is making an urgent request to the Court to require the aforementioned parties to facilitate transfer to and payment for new permanent housing of Mr. Gray's and his wife's choosing in accordance with HUD guidelines governing Mr. Gray's Emergency Housing Voucher *aka* EHV (including verifying all information to ensure that Mr. Gray's EHV is current, accurate and aligned with HUD's FY 2025 Fair Market Rent (FMRs) Documentation System), applicable Time Limited Subsidies *aka* TLS, applicable housing laws and all properly executed permanent housing program protocols identified in the preliminary draft audit, *Independent Assessment of City-Funded Homelessness Assistance Programs.***

**B. Examples of Missteps by LAHSA and Its Service Providers**

The preliminary draft audit, *Independent Assessment of City-Funded Homelessness Assistance Programs,* cites innumerable missteps by LAHSA and its service providers in successfully transitioning clients from interim housing to permanent housing aligned with clients' housing preferences and household needs. Mr. Gray and his wife, both of whom were what the audit describes as "document-ready", personally experienced the negative impact of those missteps in their journey to secure permanent housing aligned with Mr. Gray's medical challenges

and the needs of his household. [6]

The HUD issued guidelines governing the INSIDE SAFE Program reference 24 CFR § 982.303(b)(2) of Title 24, Subtitle A, Part 8-Non-discrimination Based on Handicap in Federally Assisted Programs and Activities of the Department of Housing and Urban Development. The authorities listed are 29 U.S.C. 794; 42 U.S.C. 3535(d) and 5309. The source noted is 53 FR 20233, June 2, 1988, unless otherwise noted.  This court has jurisdiction under 28 U.S.C. § 1331 AND U.S.C. § 1343.  Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.

Mr. Gray and his wife spent some twenty-seven months in interim housing funded and operated by the County of Los Angeles and the City of Los Angeles through LAHSA.  Fifteen of those months were spent in PROJECT ROOM KEY under former Mayor Eric Garcetti---between March 2022 and June 2023. For the remainder of 2023 until the end of June 2024, the balance of that time, twelve months, was spent in INSIDE SAFE under current Mayor Karen Bass.  During these time frames, the Grays engaged with the following LAHSA service providers:  People Assisting the Homeless *aka* PATH, First to Serve, The Salvation Army, and Weingart Center Association.

_____

6) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and email on January 10, 2025, January 16, 2025. Additional documents provided via email on February 14, 2024 & March 13, 2025.

**1**. **Weingart Center Association**

*"We apologize for any inconvenience this may have caused you."*

Weingart Center Association was the LAHSA contracted operator of the INSIDE SAFE location at the LA Grand Hotel from June 2023 through June 2024. The documentation provided to Special Master Martinez details how Weingart Center Association case management staff and administration perpetually: 1) ignored Mr. Gray's documented disabilities and medical challenges that needed to be addressed in order for Mr. Gray to be successful in securing permanent housing that met Mr. Gray's medical needs and that of his household. No less than eight case managers were assigned to Mr. Gray and his wife, with six of those assigned within a three-month period. None were aware of Mr. Gray's health challenges and medical needs; 2) disregarded the medical documentation that Mr. Gray provided for his housing file and, instead, engaged in recording false and inaccurate medical and other information in Mr. Gray's HMIS file; 3) promised but never made corrections to Mr. Gray's HMIS data. To quote a Weingart administrator overseeing operations at the LA Grand, *"We will make sure the notes are corrected to accurately report information provided. We apologize for any inconvenience this may have caused you. We look forward to resolving this matter as quickly as possible.";* 4) threatened Mr. Gray with transfer to an assisted living facility/nursing home despite there being no medical

documentation from Mr. Gray's UCLA Health physicians and specialists to support such a transfer.  Mr. Gray's primary care physician confirmed this fact in letters to Weingart Center Association, stating, ***"There is nothing in Mr. Gray's medical record to support his transfer to an assisted nursing facility. … This letter is to inform of Mr. Gray's current medical condition written by his primary care provider, and any other report of his medical condition by another person who is not a physician should not be used against Mr. Gray's housing placement. … Any other documentation generated outside of UCLA Health does not represent patient's current medical condition…"***; 5) engaged in threatening Mr. Gray with exit from INSIDE SAFE when he discovered and challenged the fact that Weingart Center Association case management staff had violated his rights under ADA, HIPPA, THE PRIVACY ACT and other applicable laws governing client privacy by falsely representing to HACLA that Weingart Center Association had Mr. Gray's permission to speak to HACLA about his case management and emergency housing voucher. Weingart Center Association also threatened Mr. Gray with exit from INSIDE SAFE when he refused to abandon his UCLA Health physicians' and specialists' recommendations in place to protect his health. While HACLA admitted violation of its own privacy policy, the Weingart case worker involved issued Mr. Gray and his wife a written threat of exit from the INSIDE SAFE program; and 6) denied Mr. Gray's request for transfer to The Mayfair Hotel in the final days before the closing of the LA Grand Hotel as an interim housing

site, despite medical documentation from his physicians provided to support the transfer.  Quoting the Weingart staffer issuing the denial, ***"You are not eligible for transfer to Mayfair at this time, and as I have stated in previous emails your request to relocate there is denied."*** [7]

That same Weingart staffer tried to coerce Mr. Gray and his wife to transfer to an unsafe, unsanitary motel in a neighborhood rife with criminal activity, a move that one could describe as getting rid of all evidence, including Mr. and Mrs. Gray, that pointed to Weingart's clear missteps concerning Mr. Gray's and his wife's efforts to secure permanent housing aligned with Mr. Gray's health challenges and the needs of his household.

On the same morning as Mr. Gray received this email from the Weingart staffer denying his transfer to The Mayfair Hotel—five days before the LA Grand was due to close--senior Weingart administrators came to Mr. Gray and told him that the lower level staffer who denied Mr. Gray's transfer request was not being truthful, and that Mr. Gray and his wife were eligible for transfer to the Mayfair.

One of the Weingart administrators mentioned a place known as The Beacon operated by Weingart.The Grays declined this site, having already researched The Beacon and knowing it to be wholly unsuitable for Mr. Gray's

---

7) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

health challenges and the needs of their household.  Mr. Gray provided medical documentation regarding his health challenges for the Weingart administrators to review. After reading it, one of the Weingart administrators remarked, ***"This is serious."***

When the Weingart administrators learned from Mr. Gray that he possessed an EHV, they asked to see it, recorded the EHV identifying number and told the Grays they would return shortly. Less than 24 hours following this disclosure, the senior Weingart staff members returned to Mr. Gray, accompanied by LAHSA management, to present the permanent supportive housing site to Mr. Gray and his wife.  LAHSA staff transferred the Grays' belongings to a LAHSA site on Broadway and told them they would have to wait until the following week to sign a lease for the new building. Mr. Gray and his wife signed a lease for a unit in the new building on July 2, 2024.

On June 27, 2024, as the Grays were leaving the LA Grand for the last time, Mr. Gray met and spoke briefly with former California State Senator Kevin Murray, President and Chief Executive Officer of the Weingart Center Association. Mr. Gray told Senator Murray that he would be forwarding materials to Senator Murray regarding adverse events at the LA Grand while under Weingart Center Association onsite management.  Mr. Gray followed through with his correspondence to Senator Murray via a letter detailing the problems encountered with Weingart's program staff relating to his search for permanent housing.

Mr. Gray also provided support documentation, including a compilation of emails documenting all that he said. The package was sent via FedEx and Mr. Gray received a delivery confirmation.  Senator Murray never responded to Mr. Gray's letter or his support documentation.  Mr. Gray has filed a grievance against Weingart Center Association.

**2. The Salvation Army**

***"It's like it never happened."***

The Salvation Army *aka* "TSA" was a service provider at the LA Grand contracted by LAHSA during PROJECT ROOMKEY and preceded Weingart Center Association in the onsite management role.  Mr. Gray and his wife arrived at the LA Grand on or about June 9, 2022, being transferred from another PROJECT ROOMKEY site. It would be several weeks before the Grays were assigned a TSA caseworker. When they did meet, the TSA caseworker warned Mr. Gray to be sure to put everything in writing because if he didn't, ***"It's like it never happened."***  The caseworker also recommended Mr. Gray provide medical documentation for his file so that the caseworker could assist him and his wife.

Not long after, the TSA caseworker was fired. However, it would be some three weeks before Mr. Gray and his wife were notified of their caseworker's departure.  Soon afterward, TSA began placing misinformation in Mr. Gray's housing file, i.e., that he did not have an EHV, that he was not engaged in a search for permanent housing, etc. TSA program staff shared this misinformation with

at least one city worker in the office of former Los Angeles City Councilmember Kevin de León, which is how Mr. Gray discovered the existence of the false information.

TSA administration and staff disregarded all medical letters Mr. Gray provided as documentation as requested by his original case worker who was fired and by the subsequent case worker who asked what ADA and other medical considerations Mr. Gray might need. However, shortly after Mr. Gray supplied the medical documentation to the new case worker, a TSA administrator returned it, literally hand-delivering Mr. Gray's documentation to him at his room door.

Mr. Gray would later discover that none of the onsite nurses at the LA Grand were ever provided the documentation of his medical challenges, which was one of the reasons Mr. Gray supplied the information to TSA. Remembering what his original case worker told him about keeping things in writing or ***"It's like it never happened,"*** Mr. Gray retained the emails of the medical documentation that he had forwarded to his new caseworker but was returned by the TSA administrator.

Upon return of his documents, Mr. Gray forwarded hard-copies to the TSA office in Carson, California. That documentation was eventually required by the onsite nurses at the LA Grand, who needed the documentation so that the nursing team could assist Mr. Gray in a medically-related incident. The nurses actually scanned and uploaded Mr. Gray's medical documentation into their onsite nursing system so that they could assist him.

The same TSA administrator who returned Mr. Gray's medical documentation also threatened to have Mr. Gray placed in a nursing home through LAHSA, with that TSA administrator telling Mr. Gray that LAHSA doctors ***"could be rough."*** Again, there was no medical documentation from Mr. Gray's UCLA Health physicians to support this kind of transfer.

At every step, the actions of TSA and LAHSA were counterintuitive and appeared more focused on hiding their missteps--again, getting rid of the evidence and, in effect, getting rid of Mr. and Mrs. Gray. TSA and LAHSA tried to force the exit of Mr. Gray and his wife from the LA Grand on December 5, 2022, ignoring Mr. Gray's medical documentation and ignoring the fact that, contemporaneously, the Grays were working with PATH, a HUD-funded service provider contracted by LAHSA for housing navigation, to secure permanent housing aligned with Mr. Gray's medical needs and the overall needs of his household.

The TSA administrator continued to pursue a forced exit, instructing a TSA staffer to provide Mr. Gray and his wife information via email about a place called The Beacon which the staffer said was being offered by LAHSA. (This was the same site mentioned by the Weingart administrators in June 2024.) Mr. Gray and his wife investigated The Beacon on or about November 28, 2022, took photos of the building, which at that time was dilapidated and had a huge contractor's bin in the middle of its parking lot with discarded wood and trash brimming to the top.

The Grays also looked up photos on the Internet where program service clients at The Beacon had posted pictures showing roach infestations, bug bites and the like.

On December 5, 2022, the TSA administrator came to the Grays' room to exit them. The Grays informed the TSA administrator that a lawsuit had been filed on December 2, 2022 (Case 2:22-cv-08748 assigned to The Honorable David O. Carter) and that their investigation of The Beacon contradicted the TSA administrator's description that it was "a nice place."  At the TSA adminstrator's request, a copy of the lawsuit was forwarded to the TSA administrator by the attorney representing Mr. Gray. TSA/LAHSA then rescinded the exit threat. The rescinded exit was the result of an unofficial agreement between the attorney representing Mr. Gray and outside counsel representing LAHSA through the County of Los Angeles. The filing was subsequently withdrawn as part of the unofficial proposal the attorney said was made with LAHSA through the County of Los Angeles. When Mr. Gray asked the attorney whether there was a written agreement from the Court for him to sign, the attorney nervously laughed, telling Mr. Gray, ***"You got the house, don't you?"***  The only thing in writing Mr. Gray was provided was language extracted from an email from the LAHSA/Los Angeles County attorney that stated Mr. Gray had to agree and confirm ***"that he has another emergency shelter or housing of his own choosing when he leaves…"***

It meant that Mr. Gray was being required to perform housing navigation on his own.  As there was no record of the agreement with the Court, there was no other evidence—other than the single email written by the attorney representing LAHSA and Los Angeles County—that an agreement had even been reached. The attorney further instructed Mr. Gray to communicate with the TSA administrator—the same administrator who returned Mr. Gray's medical documentation to him—to inform that TSA administrator of the unofficial agreement.  Predictably, this unofficial agreement wasn't worth the virtual paper upon which it was written.  As soon as LAHSA, TSA and PATH collectively thought that the legal threat was over, they colluded, resuming business as usual. On or about January 11, 2023, Mr. Gray notified the attorney that there were major problems with his housing navigation paperwork that surfaced within days of his scheduled exit from PROJECT ROOMKEY and The LA Grand on January 19, 2023.  Moreover, Mr. Gray expressed his displeasure that the attorney hadn't used all of the information that Mr. Gray had initially provided that may have roadblocked what was now unfolding---another attempt to force Mr. Gray's exit from the LA Grand absent securement of permanent housing aligned with Mr. Gray's medical needs and needs of his household.  The attorney promised to return to the Court and file a complaint before Judge Carter as early as January 17, 2023, telling Mr. Gray that due to the Martin Luther King, Jr. Day federal holiday that fell on Monday, January 16, 2023, this was the earliest date to file.  However, the attorney never

made good on this promise and Mr. Gray has never heard from the attorney again.

As expected, TSA attempted another forced exit of Mr. Gray and his wife from the LA Grand on January 19, 2023, with the TSA administrator either unaware or choosing to ignore that the Grays were awaiting resolution by PATH of a paperwork issue and that PATH had been advised by LAHSA that the Grays' interim housing at the LA Grand was extended. The threat of exit was again rescinded following legal intervention on the Grays' behalf wherein Mr. Gray found an attorney who spoke directly with the PATH supervisor who interrupted the PATH housing navigation services for the Grays because Mr. Gray and his wife would not sign the documents to include disclosure of their information to LAHSA.  TSA's contract as the administrator for the interim housing site at the LA Grand ended June 2023. [8]

### 3. PATH

***"Please see attached which is the guidance we received from LAHSA."***

PATH is a service provider contracted by LAHSA, providing housing navigation and other housing program services. PATH was a contracted service provider during PROJECT ROOMKEY and currently provides services at the permanent supportive housing site where Mr. Gray and his wife reside.

---

8)  Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

PATH has intersected with the Grays and their permanent housing search on at least three occasions, perhaps the most critical being the Grays' encounter with PATH at Los Angeles International Airport, when PATH and LAHSA abandoned Mr. Gray and his wife at LAX in January of 2022.

The Grays' introduction to PATH came by way of a Southwest Airlines senior ticker agent who referred the Grays to a PATH staffer. At the time, the Grays had no idea about PATH or what role it could serve to assist them in their housing emergency. The PATH staffer met with Mr. Gray and his wife, took photos of the Grays' identification, then placed them on a conference call with a PATH administrator who promised to help with interim housing within two days. However, that promise never materialized and the Grays found themselves abandoned by PATH and LAHSA, with no housing options. Mr. Gray kept the text messages exchanged with the PATH staffer along with a voicemail message, as this was the only proof of said encounter. Mr. Gray also shared with the PATH staffer documentation relating to a report that Mr. Gray filed with Congressman Elijah Cummings, who served as Chairman of the U.S. House Committee on Oversight and Reform.  The report contained information on how a billionaire real estate developer, many of whose projects were funded by the federal government, including HUD, had violated Mr. Gray's civil rights and destroyed a major development project that Mr. Gray had worked on for years, a project that was also funded by HUD.  The only thing the PATH staffer could say was, ***"You don't mess***

*with a billionaire like that.*" Within a few days, Mr. Gray was hospitalized at UCLA Medical Center in Santa Monica after falling in the airport due to what was diagnosed as symptoms relating to a possible stroke. When he left the hospital, Mr. Gray and his wife were transferred by the hospital to a rehabilitation center in Palmdale. The events that followed will be discussed separately in this motion.

The second encounter the Grays experienced with PATH occurred in July, 2022, when an unknown person claiming to represent PATH contacted Mr. Gray and his wife through TSA. The Grays were told by a TSA staffer that the person was an employee of PATH. The TSA staffer provided a telephone number with a Kentucky area code. The Grays did contact the person, with the TSA staffer present, at the telephone number provided, leaving a voice mail message. Neither the Grays nor TSA ever heard from the individual again.

The Grays still needed to receive housing navigation services in order to reach their permanent housing goals. When PATH sent a housing navigator to introduce themselves to Mr. Gray and his wife in November 2022, the Grays were open to the opportunity because the PATH representative said that he was confident he could help assist in locating permanent housing aligned with Mr. Gray's medical needs and the needs of the Grays' household. In their initial meeting, Mr. Gray and his wife were candid with the PATH housing navigator about their past experiences with PATH but agreed to meet with the PATH housing navigator several times to get an overview of the process.

By December 2022, the Grays were receiving paperwork from PATH to review for entry into PATH's housing navigation program services. On December 30, 2022, as the Grays were filling out the housing navigation paperwork for their signatures, there was an Information Disclosure Form stating that PATH program applicants were allowed to decide to which program service agency, if any, they wanted their personal information disclosed. The Grays did not select LAHSA. When the Grays did not select LAHSA, the PATH housing navigator told them he would have to check with his PATH supervisor to be sure that the Grays could proceed. The PATH housing navigator stepped away to call his supervisor. When he returned, the PATH housing navigator told Mr. Gray and his wife that unless they signed the form to include LAHSA, he was ordered to halt the paperwork process-the very paperwork that would have assisted Mr. Gray and his wife to obtain permanent housing. At that time, both LAHSA and PATH were aware that the Grays were trying to meet a scheduled January 19, 2023 exit date.

PATH entered the equation again when an attorney contacted the PATH supervisor who had halted the Grays' housing navigation paperwork. After that attorney contacted the PATH supervisor, the PATH supervisor informed Mr. Gray and his wife that PATH had arranged, through LAHSA, to extend their interim housing at the LA Grand past January 19, 2023 while PATH waited further guidance from LAHSA on how to proceed with housing navigation for the Grays.

The PATH supervisor who had disrupted the Grays housing navigation paperwork came back to the Grays in March 2023 with a proposal from LAHSA—to fill out a form for domestic violence victims as a method to keep the Grays information private, advising Mr. Gray via email, ***"Please see attached which is the guidance we received from LAHSA. It says domestic violence which is not your situation, but it is the guidance for moving forward with clients that have good reason not to share their information with LAHSA*.***"   In other words, both PATH and LAHSA recommended to the Grays to complete a document tied to public funds with false information. The PATH email and the actual form are part of the documentation forwarded to Special Master Martinez.  Mr. Gray and his wife did not respond to this approach offered by PATH/LAHSA because for the Grays, the suggestion lacked integrity.

The last interaction with PATH came in July 2024, when the Grays learned that PATH was the service provider assigned to assist them in processing Mr. Gray's Request for Tenancy Approval *aka* RFTA package required by HACLA to activate Mr. Gray's emergency housing voucher for rental assistance.  Upon the first meeting with onsite PATH staff, Mr. Gray provided copies of the emails that chronicled his past experiences with PATH.  Those emails are part of the documentation provided to Special Master Martinez as requested by the Court.  While PATH facilitated the submission of Mr. Gray's RFTA package, provided

TLS assistance while the RFTA package was being processed, it became apparent that PATH could not—or would not—do anything to curtail the adverse behaviors of disruptive tenants, many of whom were PATH clients and required to follow building rules as a condition of receiving housing program services.  The Grays would later be advised by city officials that PATH was, in fact, responsible for monitoring adverse behaviors of clients who were not abiding by building rules.

The Grays' final interaction with PATH came in February 2025, when the Grays forwarded to PATH an email with support documentation chronicling the multiple times that PATH's assistance was requested in curtailing adverse behaviors of PATH clients that were in violation of building rules. Following this final email, the Grays filed a grievance with LAHSA regarding PATH.  As of this writing, the Grays have not heard anything from either PATH or LAHSA regarding the grievance. [9]

### 4. First To Serve

***"If the requested information is not received by 5/30/22, the application will be withdrawn."***

In March 2022, Mr. Gray and his wife were transferred by LAHSA to a PROJECT ROOMKEY site managed by First To Serve in Los Angeles. This transfer occurred after LAHSA had placed Mr. Gray and his wife in a dilapidated,

---

9)  Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

roach-infested motel contracted as a PROJECT ROOMKEY site in Lancaster following Mr. Gray's exit from a rehabilitation facility in Palmdale contracted by UCLA Health for Mr. Gray's convalescence. The experience in Palmdale and Lancaster was so dire that Mr. Gray and his wife contacted the Office of Governor Gavin Newsom and Los Angeles County Adult Protective Services, the latter sending an agent who came to the site to investigate. While Governor Newsom's office promised a follow up within ninety days, the Grays did not receive the promised follow up.

First To Serve never provided a case worker at its PROJECT ROOMKEY site.  Administrators determined that they would serve in this role. As a result, First To Serve failed to timely respond to a HACLA request for documentation needed to complete Mr. Gray's application for a HUD Emergency Housing Voucher *aka* EHV.  The delay nearly caused Mr. Gray to miss the HACLA deadline and forfeit the voucher as noted in the following HACLA email:

***"If the requested information is not received by 5/30/22, the application will be withdrawn."***

Mr. Gray and his wife discovered by accident that HACLA was trying to contact them regarding completion of the HACLA voucher process when Mrs. Gray received an email from HACLA congratulating another client on receiving a voucher. The Grays contacted HACLA, located their HACLA liaison, compiled

the documentation on their own and submitted it to HACLA. Mr. Gray received his EHV issued by HACLA on or about June 4, 2022.  At no time did either First To Serve or LAHSA offer housing navigation services to Mr. Gray and his wife while they were housed at the First To Serve site. LAHSA actually kept offices at the First To Serve location.

During the final weeks of First To Serve's administration of the interim housing site, staff tried to place Mr. Gray and his wife in a shelter on Skid Row but the transfer was halted by a Los Angeles County nurse who was onsite performing COVID tests. It should be noted that these events were happening at the same time that HACLA was trying to reach the Grays through First To Serve for the completion of Mr. Gray's HACLA application for a HUD EVH.  Mr. Gray told the nurse of First To Serve's intent to send him and his wife to a shelter on Skid Row and that he was concerned because he and his wife both had documented disabilities and were cautioned by their UCLA Health physicians to avoid places that would increase their exposure to COVID.  This conversation took place in front of a First To Serve administrator. The nurse told the First To Serve administrator that the Grays were medically ineligible for a shelter due to their documented disabilities and the potential for increased exposure to COVID.  As documentation, Mr. Gray provided the nurse with an overview of their conversation via email. The Grays were then transferred to the LA Grand on

June 9, 2022. These events are chronicled in the documentation provided to Special Master Martinez as instructed by the Court.[10]

## C. **HACLA**

Mr. Gray applied for a HUD-issued Emergency Housing Voucher *aka* EHV through HACLA on or about April 7, 2022. The application and initial paperwork (i.e., physician disability forms, federal tax returns, etc.) was facilitated by LAHSA staff known as Document Specialists.  The Grays completed the documentation and waited for the HACLA process of approval.

Mr. Gray received his EHV on or about June 4, 2022.  However, just days before the deadline for submission of remaining paperwork was due to HACLA, the Grays learned that onsite management for First To Serve had failed to respond to the notices requiring the additional paperwork. This delay almost cost Mr. Gray to lose his opportunity for an EHV.

As it happened, HACLA mistakenly sent Mrs. Gray an email notice of congratulations for issuance of an EHV to another client. Mrs. Gray traced the email back to HACLA and found the HACLA liaison assigned to Mr. Gray's EHV application.  The Grays worked with the HACLA liaison to complete the application process. Again, Mr. Gray received his EHV and accompanying

---

10)  Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

documents from HACLA on or about June 4, 2022. Throughout the duration of his time in PROJECT ROOMKEY and INSIDE SAFE, Mr. Gray communicated with HACLA regarding extending his EHV.

HACLA has the ability to grant clients an emergency housing voucher extension request pursuant to a HUD-issued document published on May 4, 2023, entitled, "EMERGENCY HOUSING VOUCHER FAQ. On page 17, paragraph 52, the document reads as follows: *"Can PHAs provide additional search time after the initial 120-day search term has expired if the family still has not found a unit? (NEW) Yes. After the minimum-required 120-day initial search term, the PHA would apply their policy on granting extensions in accordance with their administrative plan. **PHAs are reminded that there is no limit on the number of extensions that can be granted, and per 24 CFR § 982.303(b)(2), a PHA must grant reasonable accommodation requests to extend the search term that may be necessary for individuals with disabilities to find a unit that meets their needs.***

In all cases, Mr. Gray provided the documentation required to fulfill his extension requests, including medical letters from his physicians at UCLA Health. However, in May 2023, and again in May 2024, HACLA allowed Mr. Gray's EHV to lapse and expire. In the case of the first incident, and after repeated inquiries about the status of his EHV, including correspondence Mr. Gray addressed to HACLA's then-CEO, Douglas Guthrie, Mr. Gray filed a civil complaint on June

30, 2023, with only two days remaining before his EHV was to expire.  On or about July 5, 2023, HACLA finally issued the EHV extension request.

In the second instance, in May 2024, Mr. Gray submitted the requisite Special Accommodation Form and accompanying physician documentation that would allow HACLA to extended his EHV.  Instead, HACLA denied the request, ignoring both the physician letters and signed HACLA physician form requested by HACLA.  HACLA allowed Mr. Gray's EHV to lapse on May 30, 2024.  Mr. Gray filed an appeal. The appeal was granted and Mr. Gray's EHV was reinstated on June 11, 2024. It is worth noting that HACLA was aware of the LA GRAND's imminent closing at the end of June 2024 and that Mr. Gray was a client of  INSIDE SAFE.

Mr. Gray's EHV is activated for use as rental assistance.  However, there have been past and current problems with timely communication from HACLA senior management regarding information about Mr. Gray's EHV, its RFTA approval process, and now, the assignment of a HACLA housing advisor.

Among other responsibilities, HACLA must annually conduct a redetermination of eligibility for Mr. Gray's EHV, including factoring in any FY 2025 payment value of the EHV as defined in HUD's FY 2025 Fair Market Rent (FMRs) Documentation System. As such, Mr. Gray has requested follow up from HACLA on the assignment of a housing advisor. Mr. Gray last heard from

HACLA via email on February 27, 2025, in which a HACLA representative responsible for assigning a housing advisor promised a 48-hour turnaround for that assignment.  As of this writing, more than a month later—the equivalent of 864 hours and counting, Mr. Gray has heard nothing further from HACLA.[11]

**D. REPORT TO HUD**

The Department of Housing and Urban Development *aka* HUD is largely responsible for the funding of the housing programs operated by the City of Los Angeles, administered by LAHSA and its service providers. Mr. Gray initially brought his concerns regarding LAHSA and its service providers to HUD in correspondence dated January 13, 2023.  HUD officials then scheduled a telephone conference call with Mr. Gray that occurred on or about February 21, 2023.

During the conference call, Mr. Gray shared the problems he had endured with LAHSA and its contracted service providers, all of which are funded by HUD.  Mr. Gray also spoke to the HUD officials about his report to Congressman Elijah Cummings about a real estate developer whose companies have received millions of dollars in HUD funding and how the real estate developer derailed a HUD-funded project that Mr. Gray had spearheaded.

_____

11) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

The lead HUD official told Mr. Gray that he was not going to discuss the latter but would focus exclusively on ensuring that Mr. Gray's HUD EHV would be protected from expiration.  The notes from this conference call are part of the documentation provided to Special Master Martinez at the request of the Court.

As follow up to the conference call with HUD, Mr. Gray complied with a HUD request to send documentation that chronicled all of the problems that he had encountered with LAHSA and its contracted agencies in trying to secure permanent housing. Mr. Gray's documentation chronicled the time that LAHSA and said agencies wasted, including the agencies' collective failure to acknowledge Mr. Gray's multiple medical challenges. Mr. Gray also sent documentation about his report to Congressman Cummings on the HUD-funded development project that the real estate developer destroyed.

On April 24, 2023, Mr. Gray wrote to HUD to report everything that had occurred pertaining to the continuing delay imposed upon him in securing permanent housing by HUD-funded agencies since the date of the conference call with HUD. Mr. Gray requested that HUD fulfill its pledge to assist in extending his EHV because HUD officials told him that HUD had ultimate authority over the EVH program.

On or about April 25, 2023, HUD officials passed the matter onto the Housing Authority of the City of Los Angeles also known as HACLA.[12]

_____
12) Reference to Documentation forwarded to Special Master Michele Martinez via Docu-Sign, Google Docs and Email on January 10, 2025 and January 16, 2025. Additional documents provided via email on February 14, 2024 and March 13, 2025.

**RELIEF REQUESTED**

Mr. Gray requests the Court to require the aforementioned parties to facilitate correction of his HMIS data since this information must be in compliance with HUD's data collection, management, and reporting standards. Mr. Gray also requests that the Court require the aforementioned parties to facilitate transfer to and payment for new permanent housing of Mr. Gray's and his wife's choosing in accordance with HUD guidelines governing the use of Emergency Housing Vouchers *aka* EHV, Time Limited Subsidies *aka* TLS, applicable housing laws and all properly executed permanent housing program protocols identified in the newly released preliminary draft audit. Mr. Gray has preliminarily identified new housing that is more aligned with his health needs and absent the challenges of his current housing as detailed in this motion. Mr. Gray wants written assurance from all of the aforementioned parties that all of his housing paperwork associated with each of the aforementioned entities and their respective housing programs is accurate and updated. This includes verifying all information to ensure that Mr. Gray's EHV is current, accurate and aligned with HUD's FY 2025 Fair Market Rent (FMRs) Documentation System), is in accordance with Mr. Gray's qualifying choice of permanent housing, and that the aforementioned parties will acknowledge and promptly execute their collective responsibilities to assist Mr. Gray in finally achieving his permanent housing goal.  Mr. Gray also seeks

any other relief that the Court may deem appropriate.


Dated: April 2, 2025                              /s/ Gregory Edward Gray
                                                  Pro Se
                                                  3183 Wilshire Boulevard
                                                  Ste. 196K26
                                                  Los Angeles, CA 90010
                                                  (213) 638-2039
                                                  gegcbg@outlook.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on April 2, 2025, the foregoing submission requesting permission to file this Motion asking the Court to require The City of Los Angeles, Housing Authority of The City of Los Angeles, County of Los Angeles, Los Angeles Homeless Services Authority, and its service providers to correct execution of program services and documents, and to facilitate transfer to and payment for new permanent housing of client's choice as defined in the court-ordered audit in Case No. 2:20-Cv-02291-DOC-KES was filed electronically with the Court. Counsel of record will be served by electronic mail on this same date as follows:

Elizabeth Mitchell
emitchell@umklaw.com

Matthew Donald Umhofer
mumhofer@umklaw.com

Valerie Flores, Esq.
Valerie.Flores@lacity.org

Jessica Mariani, Esq.
Jessica.Mariani@lacity.org

Jennifer M. Hashmall, Esq.
mhashmall@millerbarondess.com

/s/ Gregory Edward Gray
Gregory Edward Gray
Pro Se
Ste. 196K26
3183 Wilshire Boulevard
Los Angeles, CA 90010
(213) 638-2039
gegcbg@outlook.com

Lauren Brody
lbrody@millerbarondess.com

Shayla Myers, Esq.
lschmidt@lafla.org

**EXHIBIT ONE**

Name: Gregory Gray | DOB: 8/5/1953 | MRN: ▓▓▓▓ | PCP: Esther S. Yu, DO | Legal Name: Gregory Gray



**Santa Monica Neurology**
1801 WILSHIRE BLVD
SUITE 100
SANTA MONICA CA 90403
Phone: 310-319-5098
Fax: 310-319-4552

December 2, 2024

Gregory Edward Gray
3183 Wilshire Ste196 K26
Los Angeles CA 90010

Dr. Brodsky,

Gregory Edward Gray (date of birth: 8/5/1953) is followed at the UCLA Neurology clinic for diagnoses of stroke, cervical spinal canal stenosis, neuropathy, cognitive impairment.  I have recommended Mr. Gray obtain further diagnostic testing - including an EMG/NCS, MRI of the spine.  I have also recommended physical therapy for cervical spinal canal stenosis as well as gait and balance training.   Mr. Gray's symptoms can be worsened with psychological stress which may result in recrudescence of neurological symptoms.  Mr. Gray should receive housing that is most appropriate for his needs, including that which is in close proximity to his primary care doctor and specialists. Mr. Gray would benefit most from housing that is safe and maintained in a cleanly and well kept manner.  Mr. Gray reports that these issues have been very stressful to him - it is important that we minimize psychological stress for Mr. Gray.

Given the complexity of his medical problems, such as difficulty with cognition, ambulation, and diabetes care, it is essential that Mr. Gray have housing to facilitate his care, prevent adverse outcomes (such as recurrent stroke, heart attack, falls) and prevent hospitalizations.

I again request that Mr. Gray be given an extension for 6 months (May 27, 2025) regarding clerical matters given that Mr. Gray focus on diagnostic testing and rehabilitation efforts.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Alexan I. Yerevanian, MD

CC:

No Recipients

RE: Gray, Gregory -- CSN#: 90221017033                    Page 1 of 1

MyChart® licensed from Epic Systems Corporation© 1999 - 2024

**EXHIBIT TWO**

Name: Gregory Gray | DOB: 8/5/1953 | MRN: ███████ | PCP: Esther S. Yu, DO | Legal Name: Gregory Gray



**UCLA Health Downtown Los Angeles Primary Care**

700 W 7TH ST
SUITE S270
LOS ANGELES CA 90017
Phone: 213-988-8380
Fax: 213-988-8390

December 30, 2024

Gregory Gray
3183 Wilshire Ste196 K26
Los Angeles CA 90010

To Whom It May Concern,

I am writing to provide information regarding Mr. Gregory Gray, born on August 5, 1953, who is under the care of UCLA Health for various personal health conditions. Due to the nature of his medical issues, Mr. Gray's symptoms can be exacerbated by both physical and mental stressors. Therefore, it is crucial that he is provided with appropriate and safe housing to optimize his health and well-being.

Mr. Gray's situation is complex, and it is essential that his living environment minimizes the daily stressors he encounters. Ensuring he has access to stable and supportive housing will significantly contribute to his overall health management and quality of life.

Thank you for your attention to this matter and for considering Mr. Gray's need for suitable housing accommodations.

Sincerely,

Esther Yu, DO
Family Medicine
700 7th Street, Suite S270
Los Angeles, CA, 90017
Phone: 213-988-8380
Fax: 213-988-8380

RE: Gray, Gregory -- CSN#: 90224463876                                    Page 1 of 1

my UCLA health - Letter Details

MyChart® licensed from Epic Systems Corporation© 1999 - 2025