UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, *et al.*, <br><br> Defendants. | Case No. 2:20-CV-02291-DOC-KES <br><br> Assigned to Judge David O. Carter <br><br> **PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT** <br><br> Before: Hon. David O. Carter <br> Courtroom: 10A |

Plaintiff LA Alliance for Human Rights ("Plaintiff" or "LA Alliance") hereby files the following Points and Authorities in support of it's oral motion for the court to issue an Order to Show Cause re Receivership and in response to issues raised by the Court at the last hearing. Plaintiff hereby incorporates by reference the entire record in this case in support hereof.

## TABLE OF CONTENTS

**PAGE**

I.   This Court Has Authority to Appoint a Receiver if the City Fails to Create and Promptly Execute Plans to Bring It Into Compliance. ...................................1

    a.   Brown v. Plata .........................................................................................2

    b.   The City Has Breached its Obligations Under the Settlement Agreement...8

    c.   The City Has Breached Its Obligations Under the Roadmap Agreement ..10

    d.   The A&M Audit, Historical Audits, Years Of Non-Compliance, And Public Records Collectively Demonstrate That The City Is Incapable Of Meeting The Terms Of The Agreement Because The Homelessness Response Infrastructure Is Incapable Of Supporting The Terms And Leadership Is Unwilling Or Incapable Of Changing It...........................12

        i.   A&M Audit Demonstrates The Broken System.............................13

        ii.   Historical and Concurrent Audits Reflect the Same Incompetency .................................................................................17

        iii.   Recent Events Demonstrate Lack of Solutions ...............................20

    e.   Fundamentals of Receivership ("How it Would Work").............................25

        i.   Types and Levels of Leadership .......................................................25

        ii.   Incremental Options.........................................................................26

        iii.   Receiver ...........................................................................................27

II.   This Court has Jurisdiction Over LAHSA and/or the City and County May (and Indeed Must) Consent to Jurisdiction on LAHSA's Behalf .........................29

    a.   LAHSA's Status as a City-County Joint Powers Authority Places It Within the Court's Jurisdiction Through its Constituent Members............30

        i.   LAHSA is a Creation of the City and County, Exercising Their Joint Powers for Homeless Services.................................................30

        ii.   The Court May Treat LAHSA's Conduct and Obligations as Those of the City and County for Jurisdictional Purposes ...............34

    b.   Alternatively, the City and County Can and Should Consent to the Court's Jurisdiction Over LAHSA and Be Required to Ensure LAHSA's Compliance ................................................................................36

        i.   Parties May Consent to Jurisdiction and Bind Affiliated Entities Under Legal and Equitable Principles ..............................................36

        ii.   The City and County's Control Over LAHSA Empowers Them to Submit LAHSA to the Court's Authority .........................37

i

# TABLE OF AUTHORITIES

**CASE**                                                                                                    **PAGE(S)**

*Brown v. Plata ("Plata II"),*
563 U.S. 493 (2011) ...............................................................................................*passim*

*Burbank-Glendale-Pasadena Airport Auth. v. Hensler,*
83 Cal. App. 4th 556 (2000) ...............................................................................31

*Cal. Pines Prop. Owners Ass'n v. Pedotti,*
206 Cal. App. 4th 384 (2012) ................................................................................9

*Cam-Carson, LLC v. Carson Reclamation Auth.,*
82 Cal. App. 5th 535 (2022) ...............................................................................31

*City of La Mesa v. Cal. Joint Powers Ins. Auth.,*
131 Cal. App. 4th 66 (2005) ...............................................................................31

*Cooke v. Superior Ct.,*
213 Cal. App. 3d 401 (1989) ..................................................................................7

*Dixon v. Barry,*
967 F. Supp. 535 (D.D.C. 1997) ..........................................................5, 7, 25, 26

*Harris v. Board of Supervisors,*
366 F.3d 754 (9th Cir. 2004) .................................................................................7

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guiné,*
456 U.S. 694 (1982) ............................................................................................36

*LaShawn A. v. Kelly,*
887 F. Supp. 297 (D.D.C. 1995) ....................................................................25, 27

*Lopez v. Heckler,*
713 F.2d 1432 (9th Cir. 1983) ...............................................................................7

*Morgan v. McDonough,*
540 F.2d 527 (1st Cir. 1976) ...........................................................................4, 27

*Perez v. Bos. Hous. Auth.,*
379 Mass. 703 (1980) ..........................................................................................25

*Petitpren v. Taylor Sch. Dist.,*
104 Mich. App. 283 (1981) .................................................................................28

*Plata v. Schwarzenegger ("Plata I"),*
No. C01–1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ...........................*passim*

*Regal Knitwear Co. v. NLRB,*
324 U.S. 9 (1945) .................................................................................................37

*Robings v. Santa Monica Mountains Conservancy,*
188 Cal. App. 4th 952 (2010) .............................................................................31

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

*Rodde v. Bonta*,
357 F.3d 988 (9th Cir. 2004) ..................................................................................7

*Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*,
637 F. Supp. 2d 712 (C.D. Cal. 2008) ....................................................................9

*Shaw v. Allen*,
771 F. Supp. 760 (S.D. W.Va. 1990) .......................................................................7

*Shermoen v. United States*,
982 F.2d 1312 (9th Cir. 1992) ..............................................................................35

*Sigala v. Anaheim City Sch. Dist.*,
15 Cal. App. 4th 661 (1993) .................................................................................31

*Sw. Ctr. for Biological Diversity v. Babbitt*,
150 F.3d 1152 (9th Cir. 1998) ..............................................................................35

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
402 U.S. 1 (1971) ...................................................................................................4

*Tucker Land Co. v. State of California,*
94 Cal. App. 4th 1191 (2001) ...............................................................................33

*Turner v. Goolsby*,
255 F. Supp. 724 (S.D. Ga. 1966) ...........................................................................4

*United States v. Gov't of Guam*,
Civil No. 02-00022, 2008 WL 732796 (D. Guam Mar. 17, 2008) ...........................25

*United States v. State of Oregon*,
913 F.2d 576 (9th Cir. 1990) ..................................................................................3

*Washington v. Wash. State Com. Passenger Fishing Vessel Assoc.*,
443 U.S. 658 (1979) ................................................................................................4

**STATUTES**

42 U.S.C. § 1983 ......................................................................................................34

California Government Code § 6500 ..................................................................30, 31

California Government Code § 6502 ..........................................................................31

California Government  Code § 6507 ........................................................................33

California Government Code § 6508 ..........................................................................33

California Government  Code § 6508.1 ......................................................................33

California Government  Code § 6509 .........................................................................33

California Welfare & Institutions Code § 5600 .........................................................38

California Welfare & Institutions Code § 17000 ..................................................30, 31

iii

**RULES**

Federal Rule of Civil Procedure 19 ........................................................................34, 35

Federal Rule of Civil Procedure 65 ........................................................................36, 37

**OTHER AUTHORITIES**

Order, *Plata I Docket*, No. C01–1351 (N.D. Cal. July 23, 2007), ECF No. 780 ............3

Order, *Plata I Docket*, No. C01–1351 (N.D. Cal. Aug. 4, 2009), ECF No. 2197 .....3, 26

Minute *Entry*, *Plata I Docket*, No. C01–1351 (N.D. Cal. Dec. 16, 2024),
    ECF No. 3942 .................................................................................................................3

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

In light of the City's failures to meet the terms of the Agreement, the continued constitutional and statutory violations that plague this City, and having exhausted the full panoply of remedial measures within the Court's authority, no further options remain but receivership. The appointment of a receiver over the City's homelessness response, as a final and extraordinary remedy, is now the sole recourse available to promptly and efficiently ensure compliance with the Settlement Agreement and address the constitutional and public welfare crisis unfolding in Los Angeles, where nearly seven people perish daily on the streets and the homeless population continues to languish. Furthermore, Plaintiff respectfully submits this Court does have jurisdiction over the Los Angeles Homeless Services Authority ("LAHSA"). In truth, because LAHSA is a joint powers authority whose only members are properly before this court, this court does have jurisdiction over the JPA.

The LA Alliance takes each issue separately:

- This Court has authority to appoint a receiver if the City fails to create and promptly execute plans which would immediately bring it into compliance.

- The Court has jurisdiction over the Los Angeles Homeless Services Authority ("LAHSA") and/or the City and County may consent to the Court's jurisdiction on LAHSA's behalf.

**I.   This Court Has Authority to Appoint a Receiver if the City Fails to Create and Promptly Execute Plans to Bring It Into Compliance.**

This Court possesses broad equitable authority to appoint a receiver to enforce the Settlement Agreement and remedy the City's breaches, particularly given the ongoing humanitarian crisis. Federal courts have inherent power to fashion equitable remedies, including receiverships, to address constitutional and statutory violations or enforce judicial orders. The Supreme Court and Ninth Circuit precedent, notably *Brown v. Plata ("Plata II")*, 563 U.S. 493 (2011), confirm this authority.

1

### a.   Brown v. Plata

In *Plata II*, the Supreme Court upheld a three-judge panel's order requiring California to reduce its prison population to remedy Eighth Amendment violations due to inadequate medical care, requiring the release of over 40,000 prisoners. *Id*. The Supreme Court recognized that "[i]f government fails to fulfill [its constitutional] obligation, the courts have a responsibility to remedy the resulting [] violation." 563 U.S. at 510–11. While *Plata II* addressed constitutional violations under the Prison Litigation Reform Act, its principles apply to the City's breaches here, which implicate constitutional and statutory claims.  Moreover, the litigation history of *Plata*, including actions and findings by the District Court prior to appointment of the three-judge panel, provides a comprehensive roadmap for the Court's actions here.

Plaintiffs in *Plata I* filed a class action in 2001 alleging constitutionally inadequate care in California state prisons. *Plata v. Schwarzenegger ("Plata I")*, No. C01–1351, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005).  In 2002, Defendants entered into a consent decree which required significant acts by the state, including implementation of medical policy reforms. *Id*. At the same time, Defendants agreed to court-appointed medical experts ("Court Experts") to assist the court in oversight of the parties' agreement. *Id*. at *2. In 2004 the Court Experts identified an "emerging pattern of inadequate and seriously deficient physician quality in CDC facilities." *Id*. (citation omitted).  In response, the Court ordered the defendants to engage an independent entity to evaluate the physicians, provide training to deficient physicians, and undertake a series of other measures. *Id*. Defendants failed to meet the terms of the order even with extensions of time. *Id*. In May, 2005, the district court issued an OSC re receivership and civil contempt. *Id*. Over the course of six days, the court held an evidentiary hearing in which the parties presented evidence, including testimony from the Court Experts. *Id*. After the evidentiary hearing, on June 30, 2005, the court issued an oral ruling that it would "take control of the medical delivery system of the [California Department of Corrections and Rehabilitation]." *Id*. Three months later, on

October 3, 2005, the district court issued its Findings of Fact and Conclusions of Law re Appointment of Receiver. *Id.*[1]

The similarities in evolution of the *Plata I* case in the district court and this case are striking: both involved massive constitutional crises resulting in the death of thousands of individuals: in *Plata* one every six-to-seven days[2] in *LA Alliance* six-to-seven per day.[3]  Both cases resulted in consent decrees[4] where a public entity agreed to significant performance and oversight.  In both cases experts and neutral third parties were appointed to help inform the court about Defendants' compliance: in *Plata* it was medical experts and an "independent entity"; in *LA Alliance* it was Special Master Martinez, the myriad of informal and formal meetings undertaken by the district court, the City Controller, and ultimately a third-party auditing firm, Alvarez & Marsal ("A&M"), who spent nearly a year reviewing data and completing a financial and

[1] The district court declined to appoint a temporary receiver at the outset due to the "wholesale systemic reform" required, and instead undertook a "professionally organized national search for a Receiver" which ended with appointment of a receiver on February 14, 2006. *Plata I*, 2005 WL 2932253, at *34.  Defendants did not appeal this order. In 2007, in response to Plaintiffs' motion, the district court convened a three-judge court to consider a prisoner-release order. Order, *Plata I Docket*, No. C01–1351 (N.D. Cal. July 23, 2007), ECF No. 780. On August 4, 2009 after full discovery and a trial, the three-judge panel issued an order to release 46,000 prisoners which was thereafter appealed by Defendants. Order, *Plata I Docket*, No. C01–1351 (N.D. Cal. Aug. 4, 2009), ECF No. 2197. The August 4, 2009 release order is the subject of the Supreme Court decision in *Plata II*, 563 U.S. 493 (2011). Crucially, the receiver was still in place—having been replaced at different periods of time by different individuals—throughout the appeals and remains in place today as control for medical care in the state's prison system is slowly and systematically being returned to Defendants. Minute Entry, *Plata I Docket*, No. C01–1351 (N.D. Cal. Dec. 16, 2024), ECF No. 3942.

[2] *Plata I*, 2005 WL 2932253 at *1.

[3] Doug Smith, *Homeless deaths in L.A. County are leveling off but still nearly seven per day*, Los Angeles Times (Mar. 6, 2025, 12:22 PM), https://www.latimes.com/california/story/2025-03-06/homeless-deaths-in-l-a-county-are-leveling-off-but-still-nearly-seven-per-day.

[4] While the Settlement Agreement is not titled "consent decree" historical briefing has demonstrated the Settlement Agreement is more akin to a consent decree than a traditional settlement agreement.  *See, e.g. United States v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) ("A consent decree is 'essentially a settlement agreement subject to continued judicial policing.'") (citation omitted).

3

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

performance review. And in both cases, three years into the consent decree, the public entities in question demonstrated not only failures to hit targets but also a irreparably broken infrastructure incapable of independent reform. (Hr'g Tr. 44:25–45:2, Mar. 29, 2025, ECF No. 878 "I knew the system was broken" (Bass); *id.* at 50:7 "the system is broken" (Barger); *id.* at 57:21–22 "the system is broken and we are out of patience"; *id.* at 58:1–4 "In 2019, HUD and the controller and the County and the City all identified these issues and nothing has changed, because the system is broken. Because the culture is broken".) "By all accounts, the California prison medical care system is broken beyond repair." *Plata I*, 2005 WL 2932253, at *1.

The Supreme Court in *Plata II* emphasized the breadth of equitable powers available to courts: "Once invoked, 'the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies.'" 563 U.S. at 538 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971)); *see also Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976); *Washington v. Wash. State Com. Passenger Fishing Vessel Assoc.*, 443 U.S. 658, 695–96 (1979) (district court has power to "assum[e] direct supervision" of state property "if state recalcitrance or state-law barriers should be continued[,]" and that the court may "displace local enforcement of [the court's] orders if necessary to remedy the violations of federal law found by the court."); *Turner v. Goolsby*, 255 F. Supp. 724, 730 (S.D. Ga. 1966) (receiver for county school system); *Morgan*, 540 F.2d at 533 (approving temporary receivership of Boston High School). The district court in *Plata I* appointed a receiver to manage the prison medical system after finding the State's "Failure to Provide Constitutionally Adequate Medical Care" caused "Extreme Harm." *Plata I*, 2005 WL 2932253, at *3.

In evaluating whether a receivership may be appropriate when an entity has failed to meet its obligations, courts evaluate the following factors: (i) "Whether there is a grave and immediate threat or actuality of harm to plaintiffs;" (ii) "Whether the use of less extreme measures of remediation have been exhausted or prove futile;" (iii)

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

"Whether continued insistence that compliance with the Court's orders would lead only to confrontation and delay;" (iv) "Whether there is a lack of leadership to turn the tide within a reasonable period of time;" (v) "Whether there is bad faith;" (vi) "Whether resources are being wasted;" and (vii) "Whether a receiver is likely to provide a relatively quick and efficient remedy." *Id*. at \*23 (citing *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997)).

Each of these elements weighs heavily in favor of receivership in this case: *First,* the "grave and immediate threat" to Plaintiffs and the unhoused community writ large has been well-documented in the media and throughout this litigation. *Second,* the Court has tried less extreme measures of remediation—including use of a special monitor, third party auditors, threat of sanctions, and repeated opportunities for the City to course-correct; all have failed. *Third,* for the same reasons "continued insistence" on "compliance" is likely to be fruitless; the parties and the court have endured years of City foot-dragging, delay, and non-compliance. Indeed, the recent budget proposal and subsequent hearings showed no significant shift in funding or priorities has been offered.[5] *Fourth*, like the Governor in *Plata I*, the LA City Mayor has "inherited many of the problems . . . from past administrations" which has both caused and worsened the intractable—yet solvable—issue of unsheltered homelessness. 2005 WL 2932253, at \*30. Yet for all the platitudes and promises to do better, the current City administration has done little to address the systemic issues undergirding this crisis, much of which was discussed in depth in the A&M report. (Second Amended A&M Audit Report ("A&M Audit"), Mar. 6, 2025, ECF No. 870.) Apart from leasing and acquiring a thousand or two motels rooms at wasteful prices, without services cooperation from the County, the Mayor's strategy has largely been business-as-usual—meaning thousands are left to suffer and die on the streets. *Fifth* while it is difficult to assign malintent to any one person, the decades of

---

[5] City of Los Angeles, Proposed Budget for the Fiscal Year 2025–2026 (Apr. 2, 2025), https://clkrep.lacity.org/onlinedocs/2025/25-0600_misc_4-2-25.pdf.

5

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

mismanagement evidenced by nearly a dozen audits repeatedly identifying the same systemic issues, and this court case placing a spotlight on the massive structural problems, all without real attempts to overhaul the infrastructure to become functional, leaves little else to be concluded. *See also Plata I*, 2005 WL 2932253, at \*26 (discussing the problem of "trained incapacity" wherein "[s]tate officials have become so inured to erecting barriers to problems that appear to threaten the bureaucracy (or that at least appear to require the bureaucracy to bend or flex) that the officials have trained themselves into a condition of becoming incapable of recognizing, and acting in response to, true crisis.") *Sixth*, there is no doubt that resources—hundreds of millions of dollars at least—have been wasted (A&M Audit, ECF No. 870); *see also Plata I*, 2005 WL 2932253, at \*31 ("[S]pending over one billion dollars annually on a system that far too often neglects, mistreats, and at times literally kills those it is intended to serve is a massive waste of money and, more importantly, life."). S*eventh*, while Plaintiff doubts a receiver could provide a "quick" remedy, due to the monumental and complicated nature of the task, a receiver could no doubt—with the backing of the Court—break through bureaucratic barriers and complicated regulatory issues, and put politics entirely aside, in a way that current leadership is unable to do. Such ability is necessary to correct the systemic failures in a way that sets the City, and the entire Continuum of Care, on a correct trajectory to end unsheltered homelessness—the very point of the City and County settlements in the first place.

Here, the City's repeated failure to meet bed production milestones, provide a viable plan, and accurately report encampment reductions mirrors the systemic inaction in *Plata*. Likewise, the difficulty in getting the "system" to work properly, with cooperation between the City, LAHSA, and the County—as demonstrated in numerous audits, informal meetings, hearings in this case, and the recent listening sessions hosted by the Special Master—evidence the broken structural system causing the ongoing crisis. The Court's prior orders, including the March 24, 2025, clarification on encampment reductions (ECF No. 874), have not spurred compliance.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

As in *Plata II*, where the Court noted that "courts have substantial flexibility when making these judgments" (563 U.S. at 538), this Court can appoint a receiver to oversee the City's homelessness programs, leveraging its equitable authority to address a public health and safety emergency.

Additional Ninth Circuit precedent supports these principles. In *Rodde v. Bonta*, the court affirmed an injunction requiring Los Angeles County to maintain services at a rehabilitation center, noting that when "[f]aced with[] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." 357 F.3d 988, 999 (9th Cir. 2004) (citing *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)). Similarly, in *Harris v. Board of Supervisors*, the court upheld an injunction against closing county hospitals: "A lack of funds is no defense to a county's obligation to provide statutorily required benefits." 366 F.3d 754, 764 (9th Cir. 2004) (citing *Cooke v. Superior Ct.*, 213 Cal. App. 3d 401, 413–14 (1989)). These cases underscore the Court's power to impose structural remedies, including receiverships, to prevent harm and enforce legal duties, even against budgetary objections.

The most significant factor in the propriety of appointing a receiver is whether any other remedy is likely to be successful. *Dixon*, 967 F. Supp. at 550 (citing *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W.Va. 1990) ("When more traditional remedies, such as contempt proceedings or injunctions, are inadequate under the circumstances a court acting within its equitable powers is justified, particularly in aid of an outstanding injunction, in implementing less common remedies, such as a receivership, so as to achieve compliance with a constitutional mandate.")). Here, the City's consistent failure to comply with this Court's orders demonstrates that no alternative remedy is likely to succeed, thereby justifying the appointment of a receiver as the sole remaining means to ensure adherence to the Court's directives.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

## b. The City Has Breached its Obligations Under the Settlement Agreement

As briefed thoroughly heretofore (*see* LA Alliance's Mot. for City Settlement Agreement Compliance, Feb. 20, 2025, ECF Nos 863; City's Opp'n, Mar. 6, 2025, ECF No. 871; LA Alliance's Reply, Mar. 13, 2025, ECF No. 872), the City has breached and continues to be in breach of the Settlement Agreement by:

- Failing to demonstrate it has used its *best efforts*[6] to achieve its bed production milestones;
- Failing to produce a complete bed plan; and
- Failing to appropriately engage, clean, and reduce encampments, and track those reductions

The City is required to use its "best efforts" to meet milestones, and has flat-out failed to do so.  Some examples of "best efforts": the 28-day shelter build demonstrated by Special Master Martinez in Santa Ana,[7] the establishment of refugee camps in Syria within nine days,[8] or even the rapid identification and building of interim shelters that the City engaged in to meet its nine-month bonus target under the Roadmap Agreement. (Settlement Term Sheet, June 18, 2020, ECF No. 136.)

---

[6] The Agreement, executed on May 24, 2022, required the City to develop plans, milestones, and deadlines for creating shelter and housing for at least 60% of unsheltered persons experiencing homelessness (PEH) in each Council District and citywide, and for encampment engagement, cleaning, and reduction. The City was to **"promptly employ its best efforts to comply with established plans, milestones, and deadlines."** (City Settlement Agreement § 5.2 at 8:24-25, ECF No. 429-1 (emphasis added).)

[7] Allison Norlian, *To Help End Homelessness In Her City, She Had a Radical Idea: Sue Us*, Forbes (July 21, 2021, 10:41 AM), https://www.forbes.com/sites/allisonnorlian/2021/07/21/to-help-end-homelessness-in-her-city-she-had-a-radical-idea-sue-us/.

[8] UNHCR The UN Refugee Agency, *Making the Za'atari refugee camp a community* (June 17, 2017), https://www.unrefugees.org/news/making-the-za-atari-refugee-camp-a-community/#:~:text=Within%20nine%20days%2C%20the%20UN,later%20on%2C%20with%20prefabricated%20homes.&text=As%20soon%20as%20tents%20were,to%20their%20friends%20and%20relatives.

8

These circumstances demonstrate that when there is actual urgency behind an effort, great things can be accomplished in minimal time. By contrast, some of the City projects have suffered years of delay with zero urgency by the City to meet its obligations: an astonishing *46 projects* representing **2,845 beds** were noted as "in process" in 2022 (ECF No. 516-1) and remain "in process" today (892-01).   This cannot possibly be construed as the City using its "best efforts."

A party's "best efforts" "requires a party to make such efforts as are reasonable in [] light of that party's ability and the means at its disposal and of the other party's justifiable expectations . . . ." *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 717 (C.D. Cal. 2008) (citations omitted) (noting "best efforts" is "more exacting" than a "good faith" standard); *see also Cal. Pines Prop. Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 395 (2012) ("best efforts" means "the promisor must use the diligence of a reasonable person under comparable circumstances."). While "best efforts" is a subjective and fact-specific analysis, there is no doubt that here, where the City has spent itself into a budget crisis while allowing housing and shelter projects to languish, "best efforts" cannot be demonstrated.  Under the deadlines the City itself created, by December 2024, the City should have created 6,714 beds but reported only 4,815, a shortfall of 1,899 beds or nearly 30%. (City Quarterly Status Report at 5, Jan. 22, 2025, ECF No. 858-1.) This pattern persists across all reporting periods with shortfalls ranging from 29% to 62%. (*See* City Quarterly Status Reports, Jan. 17, 2023 – Oct. 18, 2024, ECF Nos. 516-1, 539-1, 598-1, 652-1, 660-1, 728-1, 757-1, 797-1.) The City's explanation—run-of-the-mill delays in housing and shelter production— cannot possibly be considered "best efforts" in this circumstance, especially given the urgency of the crisis where shockingly six people die a day on the streets of Los Angeles. **To the extent there is a factual dispute about whether the City has demonstrated its "best efforts", LA Alliance requests the court hold an evidentiary hearing on this issue.**

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

Moreover, the City has never provided a plan for all 12,915 beds as required. (Settlement Agreement, May 24, 2022, ECF No. 429-1.) The Mayor released her proposed budget on April 21, 2025, which still reflects no plan for meeting the remaining 1,913 beds required to hit the 12,915 commitment.[9]  More than a year ago, the Special Monitor highlighted "budget deficits, especially in the fiscal years 2025-2026" that threaten compliance, yet the City did not change course accordingly. (Independent Monitoring Report at 7, Feb. 29, 2024, ECF No. 674.) Now it faces a significant budget crisis, and has cut crucial spending on CARE and CARE+ by more than 75%, threatening basic sanitation efforts of the City. The City previously wrongly reported those routine sanitation activities as "encampment reductions" thereby misleading the Court and Plaintiffs into believing it was meeting its encampment reduction numbers—now it is unclear whether any compliant "encampment reduction" efforts will be or have been made at all.

### c.      The City Has Breached Its Obligations Under the Roadmap Agreement

Since at least June 30, 2021 the City has been reporting funding and opening thousands of Rapid Rehousing/Shared Housing/Time Limited Subsidy beds (known collectively as "TLS" beds), contained at "scattered sites"  (City Status Reports re MOU, July 15, 2021, ECF No. 342-1 (944 open TLS); Oct. 15, 2021, ECF No. 356-1 (1,224 open TLS); Apr. 22, 2022, ECF No. 414-1 (1975 open TLS); Oct. 14, 2022, ECF No. 482-1 (1521 open TLS); Jan. 26, 2023, ECF No. 523-1 (1424 open TLS); Apr. 21, 2023, ECF No. 538-1 (1323 open TLS +484 emergency housing vouchers); July 17, 2023, ECF No. 599-1 (1263 open TLS +484 emergency housing vouchers); Oct. 16, 2023, ECF No. 651-1 (781 open TLS + 484 emergency housing vouchers);

---

[9] City of Los Angeles, Budget Hearings, YouTube (May 1, 2025), https://www.youtube.com/watch?v=L2mjXRyQoPk (54:10: Matthew Szabo: "[W]e do have 11,002 beds that are either open and occupiable or in progress. That breaks down as 6724 beds that are open and occupiable currently, and another 4278 beds which are in progress. So that leaves a Delta of just shy of 2000 beds for our remaining two year obligation.")

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

Jan. 16, 2024, ECF No. 661-1 (943 open TLS); Apr. 17, 2024, ECF No. 729-1 (1,786 open TLS); July 15, 2024, ECF No. 756-1 (2,293 open TLS); Oct. 18, 2024, ECF No. 796-1 (2,479 open TLS); Jan. 22, 2025, ECF No. 857-1 (2,424 open TLS); Apr. 15, 2025, ECF No. 891-1 (2,679 open TLS).)

Alvarez & Marsal specifically looked at the beds reported on the City's Quarterly Report ending on June 30, 2024 which identified 2,293 "Scattered Sites" (2,163 Rapid Rehousing/Time Limited Subsidies [line 1]+130 Rapid Rehousing/Shared Housing [lines 61-62] LAHSA identified 95 contracts for these TLS beds but "approximately 70% [of the contracts]" reported no "finances expenditures in FY 2023-24." (A&M Audit at 64, ECF No. 870.) A&M requested additional paperwork but "LAHSA was unable to provide the requested documentation, and instead furnished a memorandum that was not sufficient to permit reconciliation of the identified misalignment in contracts." (*Id.*; *see also* Declaration of Elizabeth Mitchell ("Mitchell Decl.") Ex. 1, LAHSA Memorandum, Dec. 19, 2024.)

Informally, after months of avoiding the question, LAHSA finally explained that in Fiscal year 2023-2024 the City paid LAHSA $14,870,939 million which only subsidized 673 beds, and that LAHSA "braided" the City funding with "other" funding to "stretch" those funds to get the 2,293 reported scattered sites. But the City only paid for 29.4% of those beds. The real-world equivalent would be if two people decided to pay for 10 pizzas for a total of $100.  Person A paid $30 and Person B paid $70; combined they achieved a total purchase of 10 pizzas.  But under no interpretation of the event could Person A claim to have purchased and provided all 10 pizzas. Likewise, knowingly or unknowingly, the City was falsely reporting that it paid for and provided all 2,293 beds when it unequivocally did not.  And even more shocking is that LAHSA to this day, even during informal discussions referenced *supra*, has failed to produce evidence of any expenditures for the remaining 1,620 beds.

The MOU between the City and County addressed funding requirements for these beds: "CITY is responsible for all costs, including capital costs, operating costs,

11

and/or other expenses associated with the 6,000 New Beds and 700 Other Beds described herein." (MOU at III.E, Oct. 13, 2020, ECF No. 185-1.) Nothing in the MOU allows for "braiding" or counting beds paid for by different entities.  And LAHSA monitors the beds separately and can separately identify which beds were paid for by the City because a spreadsheet was produced which identifies City-paid beds as only 673—and nothing more.

While the A&M review only looked at FY 23-24, these scattered sites have been reported back to at least to July 2021 and continue to today (City Status Reports re MOU, July 15, 2021, ECF No. 342-1; Apr. 15, 2025, ECF 891-1.)  It is reasonable to assume that this same financial mismanagement and mis-accounting has occurred since the inception of the Roadmap Agreement and funding of the Scattered Site beds. We request confirmation from the City and LAHSA regarding the exact number the City paid for versus the number reported.  Either way, as these scattered sites account for approximately 1/3 of the Roadmap Beds, with a "missing" 1,620 (27% of the "new" beds requirement under the Roadmap Agreement), the City has breached and continues to be in breach of this agreement as well.

> **d.    The A&M Audit, Historical Audits, Years Of Non-Compliance, And Public Records Collectively Demonstrate That The City Is Incapable Of Meeting The Terms Of The Agreement Because The Homelessness Response Infrastructure Is Incapable Of Supporting The Terms And Leadership Is Unwilling Or Incapable Of Changing It.**

Beyond the black-and-white failures described *supra*, it has become clear over the last three years that the purpose of the two agreements with the City and County of Los Angeles respectively is not being fulfilled.[10]  Despite billions of dollars spent between the two entities on this issue, Los Angeles has barely moved the needle on

---

[10] The purpose of the Settlement Agreement with the City is identified on page 2: "to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." (City Settlement Agreement, Recitals 2:10–15, ECF No. 429-1.)

12

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

unsheltered homelessness.  Spot audits, community meetings, and listening sessions have shown that services from the County are still difficult obtain, and shelter and housing provision is rare.  The City Controller reports a 25% vacancy rate in City-shelter beds[11] yet in meetings outreach workers report 6-8 month wait lists for their clients to be matched to a bed.  LAHSA claims a small reduction in unsheltered homelessness based on 2025 raw numbers, but the streets tell a very different story and the point-in-time count is notoriously inaccurate.[12]

Plaintiffs entered into both Settlement Agreements with the belief and understanding that there was sufficient infrastructure in place to support the Agreements.  The truth appears to be the exact opposite.  A review of the A&M audit, the historical audits, and public committee and council meetings demonstrates that the City is not meeting the terms of the Agreement <u>because the homelessness response infrastructure in Los Angeles is broken</u>.  The City is not capable of success because its infrastructure cannot support it, and the current administration either cannot or will not fundamentally alter that infrastructure as evidenced by a review of both historical and present events.

         i.        <u>A&M Audit Demonstrates The Broken System</u>

To understand why, despite record monetary investment, the needle was not moving, Plaintiffs requested and the Court ordered a third-party audit of both finances and performance of the City of Los Angeles's key homeless initiatives: The Alliance Settlement Agreement, the Roadmap Agreement, and the Inside Safe Program. Several

---

[11] Press Release, Kenneth Mejia, City Controller Kenneth Mejia Releases Performance Audit of Pathways to Permanent Housing in LAHSA's and the City of Los Angeles's Rehousing Systems (Dec. 10, 2024), https://firebasestorage.googleapis.com/v0/b/lacontroller-2b7de.appspot.com/o/Press%20Releases%2FPress%20release%20Controller%20Audit%20of%20Paths%20to%20Perm%20Housing.pdf?alt=media&token=f154a67f-c359-4d82-b913-42522dac1847.

[12] Doug Smith, *Los Angeles homeless count raises doubts about accuracy. Is it time for a new way?*, Los Angeles Times (Sept. 24, 2022, 5:00 AM), https://www.latimes.com/california/story/2022-09-24/doubts-raised-over-the-los-angeles-homeless-count-is-it-time-for-a-new-way.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

organizations submitted proposals, but ultimately all parties—including the City of Los Angeles—agreed that A&M was best suited to the task. The results of the A&M audit are staggering:

- **The City does not know how much it's paying, to whom, and for what.** A&M found "[i[nsufficient financial accountability led to an inability to trace substantial funds allocated to the City Programs[,]" making it challenging to "verify spending and the number of beds or units reported by the City and LAHSA, track participant outcomes, and align financial data with performance metrics." (A&M Audit at 4, ECF No. 870.)

- **The City has spent *at least* $2.3 billion, but probably more**. A&M was "*unable to completely quantify the total amount spent by the City for each component of the City Programs . . . .*" (*Id.*)

- **No one knows exactly how to get an unsheltered person, sheltered**. "Multiple siloed referral process and disparate data systems, . . . differing prioritization and matching processing . . . [resulted in a] "fractured system" with "*confusion among stakeholders, including service providers, and increased the risk of inequitable and inefficient resource allocation, potentially delaying timely shelter and housing placements.*" (*Id.* at 5.)

- **No verification of services rendered by providers**. City invoicing reviews consisted only of "reconciling aggregate amounts in financial reports, rather than verifying the quality, legitimacy, or reasonableness of expenses. Antiquated systems and manual processes, prolonged budget amendments, inconsistent invoice submission practices" resulted in inefficiencies and delays. (*Id.*) Controls did not always "detect or address potential discrepancies" with a "high level of noncompliance" among service provider contracts. (*Id.*) Neither LAHSA nor LAHD verified "*that the service provider invoices reflected actual services provided*" and every single contract reviewed was executed "*after its stated term had commenced.*" (*Id.*)

14

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

- **Providers can get paid for nearly anything**.  Contracts "contained broad terms without clear definitions, which created ambiguity about the scope and type of service delivered." (*Id*.) The "multiple funding sources, poorly designed and siloed processes, lack of collaboration, and overlapping responsibilities" between entities, in addition to granting service providers discretion in funding for services added multiple "layer[s] of complexity, accountability and risk" and "reduced transparency, blurred roles, and responsibilities, and impeded effective coordination of homelessness assistance services." (*Id*. at 6.)

- **Fraudulent Charges will go undetected**.  "[S]ignificant cost and performance variability across service providers" (for example "*personnel expenses ranged from $67 to $7, food or meal expenses ranged from $18 to $7, and security expenses ranged from $32 to $2*" per bed per day) combined with the failure by anyone to verify services provided, meant bills could be padded, extra charges added, and made it impossible to compare performance and cost-effectiveness of each intervention. (*Id*.)

- **No one knows where the money went and whether it was well-spent**. "Funding and the City's budget allocations for homelessness assistance services were not routinely reconciled with actual spending or contractual obligations[,]" which "led to confusion about the total amount expended" and made it "challenging to ascertain how budgets . . . were utilized or whether they achieved the intended outcomes." (*Id*. at 7.)

The audit report goes on to explain that LAHSA's records do not accurately reflect total Roadmap Program costs, which means provider performance cannot be measured and elected leaders cannot make informed decisions about the cost-effectiveness of specific programs. (A&M Audit, Section 3.4 at 50.) Inside Safe is wildly expensive, at up to $281 per night ($102,565 per year) for one person in addition to significant repair costs from tenant-caused damage. (*Id*., Section 3.6 at 68.) LAHSA and the City lack effective management over their contractual payments.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

Because LAHSA isn't verifying that services are provided, and the City pays LAHSA, the City doesn't know what it's paying for. The process is so cumbersome, that it focuses on paying vendors as soon as possible without taking the time to verify service levels. (*Id.*, Section 3.7 at 75.) The City/LAHSA outreach and shelter system is disjointed and fractured, with various programs failing to communicate with one another. Eligibility criteria are ill-defined and applied inconsistently.  This means various programs may be providing services to the same people while counting them as unique. Others receive no services at all. Contracts are written so poorly, the entities don't clearly know how many shelter beds exist.  (*Id.*, Section 4.2 at 100.)  LAHSA's contracts are vague and virtually unenforceable. Data collection for the wide array of programs is haphazard and inconsistent. This means LAHSA and the City are paying millions of dollars to providers with few meaningful performance requirements. The data that is collected is inaccurate and incomplete.  Neither LAHSA nor the City can say with any degree of accuracy how well tax dollars are being used.  (*Id.*, Section 4.3 at 106.) The City and County do not know how many acute care beds are available. Beds designated for high-needs clients may be occupied by people who do not meet eligibility criteria. This means many unhoused people with a high need for supportive housing do not receive services because no entity accurate tracks bed usage. (*Id.*, Section 4.4 at 112.)  The shelter-to-housing system is disjointed, inefficient, and inequitable.  Clients in need of housing are at the mercy of a system which largely depends on the personal expertise and commitment of individual case workers.  This means the number of people lost back into homelessness is twice the number of people who are housed.  Unhoused people with the same needs are treated differently depending on the agency serving them and the name of their case manager.  Some people receive the same service more than once, while others receive nothing at all. (*Id.*, Section 4.5 at 116.)  There are serious systemic problems with contract and vendor performance monitoring.  Because of intersecting leadership and oversight roles, staff may be hesitant to bring LAHSA's problems to the attention of elected

officials.  Insufficient staffing prevents identification of staff performance issues, as evidenced by the note that 80 percent of the contracts that were examined were noncompliant.  This highlights the high risk that LAHSA and the City are paying for services they are not receiving.  (*Id.*, Section 5.4 at 135.)

ii.    Historical and Concurrent Audits Reflect the Same Incompetency

- **2001:** A HUD audit of LAHSA's supportive housing program found LAHSA violated the grant agreements by failing to conduct onsite monitoring of sub-grantees and failing to conduct any formal monitoring of subgrantees prior to awarding renewal grants.[13]

- **2007:** HUD audit of LAHSA found LAHSA failed to perform required fiscal monitoring, paid for ineligible expenses, and could not provide documentation to support its cash match for other organizations.  LAHSA was also criticized for its use of a poor financial management system.[14]

- **2018:** In 2018 Los Angeles County Auditor-Controller identified 16 deficiencies, including problems with sufficient staffing and contract oversight.  Many of the same problems identified by A&M and later County auditors was included in these findings:  "Retroactive Contracts," "Inadequate Cash Flow to Pay Sub-Recipients," "Lacked Documentation Supporting  . . . Cash Advances from Funding Sources", "Fiscal Operations Lacked Management Oversight," as well as various inefficiencies, untimely payments and reimbursement claims, excessive management reviews and approvals, and lack of clarity of roles and responsibilities.[15]

---

[13] Memorandum from the U.S. Department of Housing and Urban Development, Office of Inspector General on Los Angeles Homeless Services Authority, et al. (Mar. 23, 2001), https://archives.hud.gov/offices/oig/reports/files/ig191803.pdf.

[14] Audit Report, Joan S. Hobbs, Regional Inspector General for Audit, The Los Angeles Homeless Services Authority, Los Angeles, California, Did Not Perform On-Site Fiscal Monitoring of Its Project Sponsors (June 8, 2007), https://www.hudoig.gov/sites/default/files/documents/audit-reports/ig0791013.pdf.

[15] Los Angeles County, Auditor-Controller, Follow-Up Review  of Los Angeles Homeless Services Authority (June 4, 2018),

17

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

- **2019:** The LA City Controller reviewed LAHSA's Outreach program, finding that LAHSA failed to meet seven of nine goals in FY 17-18 and five of nine goals in FY 28-19.  These included housing placement rates as low as four percent (target was 10); substance abuse treatment rates of just six percent (target was 25); mental health treatment of just four percent (target was 25), placements from streets to shelter was 14 percent (goal was 20), and LAHSA could not report on the goal of data accuracy. LAHSA blamed data quality from a new system; improved "data quality" did not improve the results. The Controller also found LAHSA improperly aggregated countywide numbers to falsely report placing 21,000 people in housing from the City, and counted the same people multiple times as they moved in and out of the system.[16] Also in 2019 the Controller reviewed Proposition HHH finding that money was mismanaged and a lack of accountability within the City of LA "caused confusion during the audit, demonstrated a lack of consistent understanding of the departments' roles and responsibilities, and created unnecessary financial risk."[17]

- **2021:** LA County Auditor-Controller released a series of four reports. The reports identify as unresolved the same staffing and oversight issues previously identified.  The reports also identified as problems paying providers late, failing to make reimbursement requests, and insufficient financial controls.  A report written by

---

https://file.lacounty.gov/SDSInter/auditor/cmr/1038695_2018-06-04LosAngelesHomelessServicesAuthority-MeasureH-PhaseI-FiscalOperationsAssessmentFollow-UpReview-BoardMotionApril10_2018_Item1.pdf.

[16] Ron Galperin, Controller, City of Los Angeles, Strategy on the Streets: Improving Los Angeles Homeless Services Authority's Outreach Program (Aug. 28, 2019), https://firebasestorage.googleapis.com/v0/b/lacontroller-2b7de.appspot.com/o/audits%2F2020%2FStrategy-on-the-Streets_Improving-LAHSAs-Outreach-Program_8.28.19.pdf?alt=media&token=6653a96a-ba5b-4900-9e57-8b230aa444bd.

[17] Letter from Ron Galperin, The High Cost of Homeless Housing: Review of Proposition HHH (Oct. 8, 2019), https://controller.lacity.gov/audits/high-cost-of-homeless-housing-hhh.

18

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

an independent consultant identified an insufficient structure to manage LAHSA's growing responsibilities.[18]

- **2023**: LA City Controller reviewed LAHSA's real-time shelter availability system which the Authority it was directed to create by the City and County **seven years prior** (in 2016).  LAHSA tried twice to create the system and failed both times.  The report noted significant problems with data issues and oversight by LAHSA.[19]

- **2024**:

    o  The LA County Auditor-Controller (10 days after the Measure A vote) released a "Review" of LAHSA's "Finance, Contracts, Risk Management, and Grants Management."  It again identified 16 deficiencies, finding the cash management process was so bad, it created a recurring cycle of payment and billing crises.  It was chronically late in making funding applications which created cash shortages in some restricted funds. LAHSA was chronically late paying providers and sometimes used funds from other sources to make payments, then backfilled the original fund. It failed to recoup advanced funds. It also found LAHSA paid on expired contracts, was regularly making payments to vendors before contracts were finalized, and paying providers without proof of performance.[20]

---

[18] County of Los Angeles, Arlene Barrera, Auditor-Controller, Los Angeles Homeless Services Authority – Measure H – Contracting Operations Assessment Review (Report #X18703) – First Follow-Up Review (Feb. 5, 2021), https://file.lacounty.gov/SDSInter/bos/supdocs/148452.pdf.

[19] LA City Controller, Kenneth Mejia, Homelessness Audit: Interim Housing & Shelter Bed Data (Dec. 5, 2023), https://firebasestorage.googleapis.com/v0/b/lacontroller-2b7de.appspot.com/o/homelessnessaudit-interimhousing.pdf?alt=media&token=9c88b2c7-fd89-4613-be66-b0b4cca9b61a.

[20] County of Los Angeles, Oscar Valdez, Department of Auditor-Controller, Los Angeles Homeless Services Authority – Finance, Contracts, Risk Management, and Grants Management Review (Nov. 19, 2024), (https://file.lacounty.gov/SDSInter/auditor/cmr/1170598_2024-11-19LAHSA-Finance_Contracts_RiskManagement_andGrantsManagementReview_February27_2024_BoardAgendaItem4_.pdf.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

o    The LA City Controller found that for the five years covered by the audit (dating back to 2019, pre-pandemic), interim housing occupancy rates never rose above 78 percent.  Fewer than 20 percent of interim housing clients were moved to permanent housing, and more than half fell back into homelessness.  The report also found (once again) that LAHSA's data reliability was low, preventing the Authority from holding underperforming providers accountable and leaving Council members with incomplete data when making important policy and funding decisions.[21]

iii.    Recent Events Demonstrate Lack of Solutions

The A&M audit was publicly released March 6, 2025, though earlier versions had been produced to the parties prior to that. (A&M Audit, ECF 870.)  LAHSA responded by agreeing about the data and funding issues, fragmented structure requiring reform, limited oversight and performance monitoring but in large part blamed the City and County's lack of coordination and lack of funding for more staff. (Letter from LAHSA, Mar. 24, 2025, Ex. A, ECF No. 876.)  And of course it contained multiple empty promises to do better in the future. (*Id*.) On March 27, 2025, this Court held a hearing regarding the City's failures and the audit results.  Mayor Bass, several City Councilmembers, and Board Chair Supervisor Barger were all present in the Courtroom to hear the Court, A&M, and Plaintiffs describe the massive systemic failures identified.  They were also present for the Court's presentation regarding historical audits which have reflected the same systemic problems for years without being addressed by LAHSA, the City, or the County. The Court and Plaintiffs pressed the significance of the issues:

- Court: "I'm going to try to end positively and ask you, can you help our public and the Court, so I'm not interceding unnecessarily in coming up

_____

[21] LA City Controller, Kenneth Mejia, Homelessness Audit: Pathways to Permanent Housing (Dec. 10, 2024), https://firebasestorage.googleapis.com/v0/b/lacontroller-2b7de.appspot.com/o/PH%20Pathways_LAHSA%20Final_12.10.2024.pdf?alt=media&token=0f6681b8-a28b-44ed-8bfa-e040fd2a127f.

20

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

with a system of centralization with some true weight and power behind it, because this system is not working." (Hr'g Tr. 34:20–24, Mar. 27, 2025, ECF No. 878.)

- Court: "[W]hatever you do, it has to be something to stop this train wreck." (*Id*. at 42:2–4.)
- Court: ". . . I'd like to hear before I decide to take action that you're the leadership that we all need.  And God bless you ecause it's fallen to you for decades of negligence.  And it's fallen to you with decades of unaccountability. And guess what? That's why you got elected, to solve this problem." (*Id*. at 42:9–12.)
- Plaintiffs: " . . . [W]e [are] asking for an order to show cause from the Court ask to whether a receivership should be imposed on the City." (*Id*. at 62:24–62:2.)
- Plaintiffs and the Court: Discussion of potential receivership and what it looks like on the record with Plaintiffs' counsel. (*Id*. at 72–79.)
- Court: "So I'm giving you a chance.  Solve it.  We're out of time. I can't say it enough and every time I say it, it sounds like I don't mean it now, solve it, you've heard it." (*Id*. at 79:2–4.)
- Court: "We're out of time now, we're out of patience and you've got to solve this." (*Id*. at 79:19–20.)

Mayor Bass acknowledged that the system is broken (*id*. at 44:25–45:2) there must be a resolution (*id*. at 47:17–21), and that she alone does not have the power to fix it because the systemic issues also involve other government actors. (*Id*. at 46-47.) Chairwoman Barger also acknowledged that "the system is broken" and while the County is responding by creating a new department she also acknowledged "I don't think a Department is going to solve this problem." (*Id*. at 50:21–22.)

After the March 27, 2025 hearing, on April 1, 2025, the County Board of Supervisors voted to move more than $300 million it will be receiving through

Measure A out of LAHSA and into a new county agency to improve oversight and accountability.[22]  Unfortunately, hundreds of the employees needed to staff the new county department will come from LAHSA, bringing with them the same broken culture of unaccountability and lack of transparency.  This new department is set to open in July 2026.

After the disastrous audit results, recent scandals involving the CEO directing money to her husband's non-profit, and the County's withdrawal of significant funds from LAHSA, LAHSA CEO announced her resignation on April 4.[23] And on May 6, 2025, allegations were published from the former Chief Financial Officer and the former Deputy Chief Information Officer and that LAHSA was hiding data regarding Inside Safe "because Kellum did not want Mayor Bass to look bad" that there was "no source of truth with the data" from Inside Safe produced, and that LAHSA's CEO unnecessarily hired friends and associates from prior non-profit work at high salaries.[24] Those allegations resulted in an $800,000 settlement to the two individuals.[25] While those allegations are unproven, they are consistent with LAHSA's inability or unwillingness to produce accurate, consistent, and complete data, and unwillingness to critically review service provider performance and spending.

[22] David Zahniser and Rebecca Ellis, *County supervisors create new homeless agency, despite warnings from L.A. mayor*, Los Angeles Times (Apr. 1, 2025, 7:19 PM), https://www.latimes.com/california/story/2025-04-01/county-votes-to-pull-money-from-homeless-agency-despite-mayors-opposition.

[23] Doug Smith and David Zahniser, *Los Angeles homes chief to resign after the county guts her agency*, Los Angeles Times (Apr. 4, 2025, updated 7:14 PM), https://www.latimes.com/california/story/2025-04-04/los-angeles-homeless-chief-to-resign-after-the-county-guts-her-agency.

[24] Demand Letter from Allison R. Bracy, Bracy Hawkins, P.C. re *Emily Vaughn Henry v. City of Los Angeles Homeless Services, Authorities, et al.*, Case Number 00174-2024 (May 31, 2024), https://s3.documentcloud.org/documents/25931615/demand-letter-vaughn-henry-v-lahsa-5-31-24-redacted.pdf.

[25] Nick Gerda, *Whistleblowers say LA's top homeless official hired unqualified friends, tried to destroy public records*, LAist (May 6, 2025, 4:47 PM), https://laist.com/news/housing-homelessness/whistleblowers-homeless-official-misconduct.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

The City has made no significant changes.  On April 1, just days after the last court hearing describing the historic failure to demand documentation prior to making payments to providers, the City voted to approve payment of $46 million in payments for Inside Safe providers without proper documentation or data supporting the payments.[26]  The Mayor published her proposed budget for Fiscal Year 25-26 on April 21, 2025 and there were no significant changes to proposed projects or homelessness response other than to significantly reduce CARE and CARE+ cleanings.[27]  All Inside Safe units will be maintained, and the City still lacks a plan for approximately 2,000 beds required under the Agreement.[28] There is no proposal to pivot projects from the most expensive (Inside Safe and PSH) to more cost effective (e.g. shared housing, tiny homes, congregate shelters).[29] In fact, the budget hearings reflected far more questions

[26] City of Los Angeles, Regular City Council, YouTube (Apr. 1, 2025), https://www.youtube.com/watch?v=ybQsnJz-vgI (3:15:31 (Rodriguez: "The fact that we are accepting, after the budget committee gave a very clear instruction about the data that was supposed to be provided to this council with respect to the inside safe operations, and these reports still have a litany going back for over a year of blank spaces with pending information under underscores the failure for LAHSA to give us real time data. . . . We are in a fiscal crisis, and yet we have not cut off the spigot for funding….How many more audits do you need? How many more examples do we need that? Not only is this cost prohibitive, 351 days ago today, the mayor in her state of the City address said that inside safe needed to be recalibrated, and yet not a single thing has changed. It's inequitably distributed. The maps themselves show you that there has not been equitable distribution across the city. We see the exit rates that give us all of the red flags about what the problems are. We see the fact that this is going to obligate us for future budgetary obligations of more than $61 million. It needs to stop. . . . The idea of what it costs Inside Safe to house individuals is exorbitant, and it, frankly, is offensive to working Angelinos who survive on far less. We don't have the money to continue to enable this.  , and right now, as the county is contemplating a conversation about pulling their money out of Lhasa, a year ago, I introduced the motion, and I'm still living I'm waiting for that report to come back about how we centralize, not in a political office, but how do we centralize the operation and work that we're doing around homelessness, because we can no longer have this multiple siloed environment that is costing us 10s or hundreds of millions of dollars that we fund LAHSA to tell us we will get back to you. You that we give to the mayor's office with Inside Safe to say 'We'll get back to you,' only to just force this Council's hand, to continue to fund this failure."

[27] City of Los Angeles, Budget Hearings, YouTube (May 2, 2025), https://www.youtube.com/watch?v=Tjk043szTqE.

[28] (*Id.*)

[29] (*Id.*)

23

than answers.[30] And three separate City Housing and Homelessness Committee meetings have been cancelled in the last month, with nothing of substance occurring in the meetings that were held.[31] The City Council asked the CLA and CAO to report back within 30 days on the impacts of the County's partial withdrawal from LAHSA and creation of a separate department responsible for management of the City's homelessness programs.[32] On April 22, 2025, the CLA issued a report responsive to multiple motions entitled "Formation of a City Homelessness Governance Structure" which describes options for the City to consolidate homelessness response within a single department for a less fractured system, as well as provides some options for responding to the County's significant withdrawal for LAHSA.[33]

In short, the City's system to address the homelessness crisis in Los Angeles is in a state of crisis.  It has been in crisis for decades, as evidenced by the ballooning numbers of unhoused individuals and the series of audits identifying massive mismanagement for decades with no recourse; only recently as the public has become aware of the cause of the disfunction—largely through this litigation—have the City and County made moves to course-correct.  It is unclear at this point whether any such efforts will be fruitful or whether they are just moving deck chairs around on the Titanic.  Given the many years of notice the City and County have had about these problems, and each entity's demonstrated inability or unwillingness to demand transparency, accountability, and results (instead of just process), Plaintiffs are deeply

[30] (*Id.*)

[31] Office of the City Clerk, Council and Committee Meeting Calendar, https://clerk.lacity.gov/calendar (last visited May 8, 2025).

[32] LA City Clerk Connect, Council File: 25-0316, https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=25-0316; City of Los Angeles, Official Action of the Los Angeles City Council, Housing and Homelessness Committee Report (Apr. 30, 2024), https://clkrep.lacity.org/onlinedocs/2024/24-0330_CAF_4-30-24.pdf.

[33] Report from Sharon M. Tso, Chief Legislative Analyst, Formation of a City Homelessness Governance Structure (Apr. 22, 2025), https://clkrep.lacity.org/onlinedocs/2025/25-0207_rpt_cla_4-22-25.pdf

24

skeptical. *See, e.g. Plata I*, 2005 WL 2932253, at *4 (when the state "reorganized the prison system into a new organization structure effect" the day after the Court announced its imposition of a receiver, the Court appointed a receiver anyway because "[w]hile the new structure holds promise for some improvements in the Department, it fails to provide sufficient authority to the medical leadership, and may well exacerbate the problems that currently exist.")

### e.      Fundamentals of Receivership ("How it Would Work").

#### i.      Types and Levels of Leadership

Federal receiverships mandated to correct systematic failings by city and state agencies have been established across a wide variety of settings. *See, e.g.*, *Plata I*, 2005 WL 2932253, at *24; *Dixon*, 967 F. Supp. at 555 (appointing receiver over prisons); *LaShawn A. v. Kelly*, 887 F. Supp. 297, 300 (D.D.C. 1995) (imposing a full receivership over child welfare system), *aff'd*, 107 F.3d 923 (Table) (D.C. Cir. 1996); *United States v. Gov't of Guam*, Civil No. 02-00022, 2008 WL 732796, at *1 (D. Guam Mar. 17, 2008) (appointing a receiver to manage, supervise and oversee the Solid Waste Management Division ("SWM") of DPW), *order clarified*, CIVIL CASE NO. 02-00022, 2017 WL 5907861 (D. Guam Jan. 27, 2017); cf. *Perez v. Bos. Hous. Auth.*, 379 Mass. 703, 725 (1980) (appointing receiver to manage Boston Housing Authority due to severe mismanagement, including failure to maintain safe and habitable public housing discriminatory practices, and violations of tenants' rights). The Court could establish a receiver for a limited purpose (*e.g.* to bring the City into compliance with its bed and encampment obligations pending structural overhaul by the entities) or more fundamentally over the homelessness response system (until the City can demonstrate ability to manage) to address the larger, more fundamental structural issues which underpin the failures this case has demonstrated.  Or the Court could establish a receiver for a limited purpose and, if necessary, evolve the purpose. For example, in *Plata I*, a receiver was appointed over medical care in the entire California Prison System (165,000 in 2005). *Plata I*, 2005 WL 2932253, at *34–35.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

But by 2007, overcrowding in the prisons became a focus when the Court concluded, based on recommendations from the receiver in addition to other evidence presented, that overcrowding was undergirding the crisis in medical care and therefore convened a three-court panel to evaluate a mass prisoner release order (which occurred in 2009). Order, *Plata I Docket* (N.D. Cal. Aug. 4, 2009), ECF No. 2197. Plaintiff has requested and again renew their request for the Court to issue an Order to Show Cause re Receivership to determine the best course.  At minimum Plaintiff requests the Court appoint a receiver to implement the terms of the Agreement pending a systemic restructuring.

ii.    Incremental Options

Courts typically utilize an incremental approach before appointing a full receiver. *Dixon*, 967 F. Supp. at 554 ("The Court has taken a number of different tacks in an effort to force the District to comply with the *Dixon* Decree, including general consent orders, specific implementation plans with numerical targets, the appointment of an expert technical assistant, and the appointment of a special master."). In *Plata I*, the district court went through a litany of alternatives before deciding to appoint a receiver: noting that sanctions, contempt orders and appointment of special master would all likely be fruitless:

> [S]teps toward resolving this crisis have been ordered by the Court. Additionally, the Court Experts, plaintiffs, and the Court itself have provided specific achievable measures and have made innumerable informal suggestions as to how defendants can move forward. The Court invited the parties during monthly status conferences to contribute ideas as to possible remedies, and the Court especially encouraged defendants to consider ways in which they could take the actions necessary to solve the medical care problems through measures within their own control, including use of the extraordinary powers of the Governor. The Court went to the length of requesting that defendants present it with a series of proposed orders so that

26

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

the Court could help empower them to overcome some of their bureaucratic hurdles on their own. . . . Finally, the Court issued the [OSC] which stated that "with respect to the substantive remedy itself, the Court encourages all parties to think as creatively as possible, and the Court will remain open to all reasonable alternatives. Even following issuance of the OSC—on the brink of possible contempt and the imposition of a Receivership—the *Plata* defendants were able to enact only very limited and piece-meal measures, with no prospect for system-wide reform or restructuring.

2005 WL 2932253 at *26–27 (citation omitted). Like *Dixon* and *Plata I*, this Court has already taken numerous half-measures to cajole compliance: appointment of special master, institution of sanctions, establishment of numerical targets (milestones), appointment of a neutral, third-party evaluator, listening sessions between the parties, outreach workers, and department representations, numerous informal meetings and formal status conferences with defendants, plaintiffs, and various members of the community offering suggestions and requesting defendants to provide ideas.  Yet none of the milestones, tough words, suggestions, ideas, monitoring, sanctions, or audits have achieved results.  After five years of litigation, and three years in this Settlement Agreement, the City offers no solutions.  Receivership is the last resort available to this court.

               iii.      <u>Receiver</u>

Because of the intransigent and complicated nature of the task, Plaintiff suggests the Court consult with the parties to organize an urgent national search for a receiver, with parties submitting requests for proposals regarding potential candidates. *See, e.g.*, *Plata I*, 2005 WL 2932253, at *34. During the period of reviewing proposals, the Court could appoint a temporary receiver. *See e.g., id.* at *34–35; *Morgan*, 540 F.2d at 533 (approving temporary receivership of South Boston High School to ensure immediate transfer of certain staff who were impeding desegregation goal, given local authority's failure to comply with the court's desegregation orders); cf. *LaShawn A.*,

887 F. Supp. at 300 (court imposed two "limited receiverships" in child welfare system at time consent agreement was entered; after subsequent non-compliance, court imposed a full receivership); *Petitpren v. Taylor Sch. Dist.*, 104 Mich. App. 283, 293 (1981) (noting that a trial court "may appoint a receiver in the absence of a statute pursuant to its inherent equitable authority").  Given her work in Santa Ana and Los Angeles over the last seven years, Plaintiff suggests Special Master Martinez as an initial and temporary receiver, with the power to hire staff to assist.

While this Court is understandably frustrated and skeptical of the City leadership, staff, and programs, and reticent to work within the existing infrastructure (Hr'g Tr. 78:18–21, ECF No. 878), the Court could establish a parallel body to work alongside the City to implement the terms and reform needed.  *Plata I*, 2005 WL 2932253, at *30 ("When appointing receivers, courts often remove the officials in charge of the entity responsible for the constitutional violations from power and place the receiver in their stead. . . . [T]he Court will deviate from this practice and will not displace any State officials. . . . This Order shall serve as notice to the current leaders of the prison system and of the State that they must do everything in their power to work cooperatively with the Receiver, to create substantial reform in the executive branch . . . , to seek legislative reform where necessary, and take all other necessary measures to eradicate the barriers that have led to the current crisis.").

The receiver's authority should at minimum include program management (including redirecting remaining HHH funds and City/grant funding into cost-effective solutions), financial oversight (including negotiating directly with County for funding), encampment resolution efforts, and streamlining collaboration between the City, County, and LAHSA (in whatever form it continues to exist) to accomplish the goals of the Settlement Agreement. Depending on the type and purpose of the receivership, establishment for a defined term (*e.g.*, 3–5 years) would be appropriate, with the goal of returning control to the City once compliance is achieved. In *Plata I*, while the receivership has lasted over two decades, it has achieved significant reforms which

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

would otherwise have never occurred. It would also be appropriate to establish metrics, such as bed creation and encampment reduction rates, to measure progress.

A receivership is a proportionate response to the City's systemic failures, which have left thousands unsheltered and endangered public health and safety. By restructuring operations, leveraging resources, and enforcing accountability, the receiver would fulfill the Settlement Agreement's vision of achieving functional zero unsheltered homelessness.

## II.  This Court has Jurisdiction Over LAHSA and/or the City and County May (and Indeed Must) Consent to Jurisdiction on LAHSA's Behalf

LAHSA is a joint powers authority ("JPA") created and controlled by Defendants City of Los Angeles and County of Los Angeles and is the instrumental agency through which the City and County have carried out their homeless services obligations over the last thirty years. Two independent grounds exist for the Court's jurisdiction over LAHSA: (1) LAHSA's status as a JPA of the City and County means the Court already has jurisdiction over it by virtue of the City's and County's jurisdiction, since LAHSA acts on behalf of its constituent members and is not wholly independent of them for these purposes; and (2) alternatively, the City and County can consent (and indeed, have an equitable duty) to submit LAHSA to this Court's jurisdiction and orders, given their joint control over LAHSA's governance and operations. Both arguments are rooted in California's Joint Exercise of Powers Act, the terms of the operative 2001 Amended Joint Powers Agreement creating LAHSA, and applicable legal principles of agency, consent, and equity. For the reasons below, the Court can and should treat LAHSA as within its jurisdiction, notwithstanding that LAHSA has not been named as a formal defendant.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

**a.**    **LAHSA's Status as a City-County Joint Powers Authority Places It Within the Court's Jurisdiction Through its Constituent Members**

i.    LAHSA is a Creation of the City and County, Exercising Their Joint Powers for Homeless Services

LAHSA was established in 1993 by the City of Los Angeles and the County of Los Angeles pursuant to California's Joint Exercise of Powers Act (Cal. Gov't Code § 6500 *et seq.*). (*See* Mitchell Decl. Ex. 2, JPA Agreement, Feb. 28, 2001).) It is an agency jointly created and governed by the City and County to administer homeless services on their behalf. (*Id.*) The JPA Agreement confirms that the City and County formed LAHSA to "coordinate the operation of existing services for the homeless which the [City and County] operated separately" before LAHSA, and to "design, fund and operate other homeless and related social services . . ." for the community. (*Id*. § 1.) In other words, LAHSA exists to carry out the very functions in the homelessness arena that would otherwise be the individual responsibility of the City and County. LAHSA's mandate is thus coterminous with the homeless services obligations and commitments of its parent governments.[34]

LAHSA's activities (namely shelter, services, and housing coordination for homeless individuals) are not undertaken on some wholly separate policy agenda, but squarely "in furtherance of the programs and goals of [the] County and City" as set forth in the Joint Powers Agreement. (JPA Agreement § 4(b).) The JPA Agreement explicitly provides that "[t]he Authority shall have the powers common to the Parties to this Agreement to provide homeless programs and services and other related social

---

[34] Notably, LAHSA's genesis was directly tied to the County's legal obligations to care for indigent homeless persons. Welfare & Institutions Code section 17000 imposes on every county in California a mandatory duty to "relieve and support" all indigent persons residing within the county. In fact, LAHSA was formed as part of a settlement of litigation in the early 1990s in which the City of Los Angeles, civil rights groups, and homeless advocates had alleged that Los Angeles County was failing to meet its obligations under section 17000. The creation of LAHSA was the chosen vehicle to ensure a coordinated, regional response to homelessness and compliance with the County's legal duties.

30

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

services to assist those persons in the community who are eligible to receive those services." (*Id.*) In short, everything LAHSA does is an exercise of powers *jointly held* by the City and County, undertaken for their collective benefit and on their behalf.

Under California law, this is the very purpose of a JPA. "Since 1949, the Joint Exercise of Powers Act [Cal. Gov. Code § 6500 et seq.] has permitted two or more municipalities to form a joint powers authority which they agree will exercise any power that each municipality has power to exercise individually." *City of La Mesa v. Cal. Joint Powers Ins. Auth.*, 131 Cal. App. 4th 66, 69 (2005).  The Joint Exercise of Powers Act allows "governmental agencies [to] join together to accomplish goals that they could not accomplish alone, or that they might more efficiently and more effectively accomplish together." *Robings v. Santa Monica Mountains Conservancy*, 188 Cal. App. 4th 952, 962 (2010). "[T]wo or more public agencies by agreement may jointly exercise any power common to the contracting parties" and they may join in the creation of a separate entity to exercise those powers on their behalf. Cal. Gov't Code § 6502. LAHSA is, by statutory design, acting as the combined agent of the City and County in the homeless services sphere. *See*, *e.g. Cam-Carson, LLC v. Carson Reclamation Auth.*, 82 Cal. App. 5th 535, 550 (2022) (holding a joint powers authority could be considered an alter ego of a city where the complaint demonstrated "unity of interest" such as integrated resources and domination of "finances, policies, and practices" such that the authority "had no separate 'mind, will or existence' of [its] own but [was] merely [a] conduit[]' through which [the City] conducted its business" and "an inequitable result would follow" if the authority was treated as separate than the City) (citation omitted); *Burbank-Glendale-Pasadena Airport Auth. v. Hensler*, 83 Cal. App. 4th 556, 563 (2000) (where cities created a JPA, the Authority "derives the power" from the City, including the ability to exercise eminent domain); *Sigala v. Anaheim City Sch. Dist.*, 15 Cal. App. 4th 661, 672 (1993) (trial court had authority to order JPA members to attend a mandatory settlement conference even though JPA had not been separately named in the suit: "Although at liberty to provide their own

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

internal operating procedures, the school districts do not have the license, by setting up a JPA, to place themselves beyond the reach of the law.").

Although LAHSA is a distinct legal entity for certain purposes, it is in no way independent of the City and County's governance or control. The Joint Powers Agreement makes clear that LAHSA is entirely governed by the City and County officials. (*See generally* Mitchell Decl. Ex. 2, JPA Agreement § 4.) Its policy-making body is a ten-member Commission composed equally of City and County appointees (five commissioners appointed by the County Board of Supervisors; five by the Mayor of Los Angeles with City Council confirmation). (*Id*. § 4(c).) These commissioners serve at the pleasure of the appointing City/County authorities. (*Id*.) Thus, the City and County literally occupy all the seats at LAHSA's governing table. LAHSA cannot take any significant action except through decisions of this City/County-appointed Commission. Moreover, the City and County fund LAHSA's budget and dictate its scope of operations through that funding and through contractual directives. (*Id*. § 9.) The City and County each contribute resources to LAHSA and must approve LAHSA's annual budget. (*Id*. § 11.) LAHSA's very existence and powers remain subject to the will of the City and County: either the City or County may terminate the joint agreement (with notice), which would dissolve LAHSA and require distribution of its assets back to the City and County. (*Id*. § 3.) Indeed, additional parties can only join LAHSA's joint-powers agreement with the consent of the City and County's governing bodies, and LAHSA cannot even sue its own members. (*Id*. § 4(b).) In sum, LAHSA is thoroughly intertwined with and subordinate to its constituent governments: its leadership is hand-picked by the City and County, its funding comes from them, and its continued corporate existence depends on their ongoing agreement. It is not a rogue or separate power unto itself, but rather an administrative arm through which the City and County jointly pursue homeless services.

It is true that under the Joint Powers Act and the JPA Agreement, LAHSA is considered a "public entity separate from the parties to the agreement", and that

32

LAHSA's "debts, liabilities and obligations" are not automatically imputed to the City or County. Cal. Gov't Code § 6507; (Mitchell Decl. Ex. 2, JPA Agreement § 4(a)). This legal separateness is chiefly intended to protect the member agencies from financial liability for the JPA's debts and to allow the JPA to enter contracts and sue or be sued in its own name. Cal. Gov't Code § 6507 ("the agency is a public entity separate from the parties to the agreement."); Cal. Gov't Code § 6508.1 ("the debts, liabilities, and obligations of the agency shall be debts, liabilities, and obligations of the parties to the agreement, unless the agreement specifies otherwise."). It does not alter the fundamental reality that a JPA is exercising the "common powers" of its members and is wholly dependent on, and ultimately controlled by, those members. *See* Cal. Gov't Code § 6508; *see also Tucker Land Co. v. State of California,* 94 Cal. App. 4th 1191, 1199 (2001) (confirming that member entities of JPAs are still "liable for the *torts* of the JPA" even if they are not "also liable for the contractual obligations of the JPA" under the terms of the agreement). In fact, the Joint Powers Act explicitly requires that a JPA's exercise of power be subject to the restrictions that apply to one of its constituent agencies (designated in the agreement)—a provision which ensures the JPA remains tethered to the legal and policy framework of its creators. (*See* Cal. Gov't Code § 6509 ("Such power is subject to the restrictions upon the manner of exercising the power of one of the contracting parties, which party shall be designated by the agreement.").) Here, for example, LAHSA must exercise its powers in the manner of the City of Los Angeles's procedures. (Mitchell Decl. Ex. 2, JPA Agreement § 4(b).)

In short, LAHSA's separate legal status does not immunize it from the jurisdictional reach of this Court so long as the City and County—the entities that direct LAHSA's actions—are properly before the Court. To hold otherwise would allow the City and County to evade judicial oversight simply by interposing a jointly controlled agency to carry out their policies. In this litigation, the City and County cannot use LAHSA as a shield to avoid responsibility for executing the terms of the

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

Settlement Agreements where LAHSA is the City and County's chosen instrument to perform those very tasks.

        ii.        <u>The Court May Treat LAHSA's Conduct and Obligations as Those of the City and County for Jurisdictional Purposes</u>

Because LAHSA functions as an extension of the City and County, the Court's jurisdiction over the City and County encompasses the authority to effect relief involving LAHSA. The Court already has subject-matter jurisdiction over the claims in this case (which include federal constitutional claims under 42 U.S.C. § 1983 and related state-law claims) by virtue of federal question jurisdiction and supplemental jurisdiction. There is no jurisdictional defect that prevents reaching LAHSA's actions. To the extent LAHSA's involvement in relief is necessary, it is well within the Court's power to order the City and County to cause LAHSA to act or to refrain from acting in certain ways.

Federal Rule of Civil Procedure 19 reinforces that LAHSA is not an "indispensable party" that must be independently joined for the Court to grant complete relief. Fed. R. Civ. P. 19. Under Rule 19(a), a party is "[r]equired" (and must be joined if feasible) only if, *in that party's absence*, the court cannot accord complete relief among the existing parties, or if the absent party claims a legally protected interest that would be impaired or leave an existing party subject to multiple obligations. Here, *complete relief* can be accorded among the present parties (City, County, and Plaintiffs) without formally joining LAHSA, because the City and County have both the authority and the practical means to fully implement any court order by directing LAHSA's policies and use of resources by virtue of the JPA. LAHSA's "interest" in this litigation is entirely represented by the City and County, its principals. Any equitable relief regarding homeless services will necessarily involve LAHSA's operations (so long as it exists in its current form); and the City and County, appearing in this Court, have the power to ensure LAHSA's compliance. Thus, LAHSA's absence as a named defendant does not impede the Court's ability to grant effective

34

relief, nor can LAHSA claim any divergent interest that would justify separate party status. LAHSA is therefore not a necessary or indispensable party under Rule 19, and its non-joinder does not deprive the Court of jurisdiction to proceed.

When the interests of an absent agency are aligned with and adequately represented by existing parties, and those parties can implement the judgment, the absent agency is not indispensable. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. Babbitt*, 150 F.3d 1152, 1153 (9th Cir. 1998) ("We conclude, however, that as a practical matter, the Community's ability to protect its interest will not be impaired by its absence from the suit because its interest will be represented adequately by the existing parties to Southwest's suit."). "A non-party is adequately represented by existing parties if: (1) the interests of the existing parties are such that they would undoubtedly make all of the non-party's arguments; (2) the existing parties are capable of and willing to make such arguments; and (3) the non-party would offer no necessary element to the proceeding that existing parties would neglect." *Id*. at 1153–54 (citing *Shermoen v. United States*, 982 F.2d 1312, 1317–18 (9th Cir. 1992)). Here, any relief regarding homelessness in Los Angeles can be implemented through the City and County, who are before the Court and who direct LAHSA; LAHSA's formal joining into the case is therefore not required.

In short, there is no gap in jurisdiction that would prevent the Court from reaching LAHSA's role. Given that the City and County have already submitted to the Court's jurisdiction, LAHSA is effectively before the Court as well, through its principals. ( "Chairwoman Horvath: "I don't see LAHSA as an outside entity.  LAHSA is a joint powers authority of the City and the County.  So, five the appointments are from the City.  And Ffive of the appointments are from the County.  So, I appreciate that we want to hold LAHSA accountable.  But that's us.") Hr'g Tr. 60:8–13, Oct. 3, 2024, ECF No. 783.) The Court's existing jurisdiction over the City and County encompasses the joint authority they wield through LAHSA.

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*

**b.** **Alternatively, the City and County Can and Should Consent to the Court's Jurisdiction Over LAHSA and Be Required to Ensure LAHSA's Compliance**

      i.    <u>Parties May Consent to Jurisdiction and Bind Affiliated Entities Under Legal and Equitable Principles</u>

If there were any doubt about the Court's inherent jurisdictional reach to LAHSA (which there is not), that doubt can be resolved by the affirmative consent and participation of the City and County on LAHSA's behalf. It is a fundamental principle that parties may consent to a court's exercise of personal jurisdiction over them. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived"). Here, LAHSA's presence can be consented to in two complementary ways: (1) the City and County, as the governing authorities of LAHSA, can consent to have LAHSA bound by any orders of this Court, effectively extending their consent to jurisdiction to the agency they created; and (2) LAHSA's Commission (comprised entirely of City/County appointees) can itself vote or agree to submit LAHSA to the Court's jurisdiction in this matter. In practice, these amount to the same thing because the City and County control the Commission. The key point is that there is no adverse party asserting a jurisdictional objection on LAHSA's behalf. To the contrary, all relevant government actors (City, County, and by extension LAHSA) can affirmatively welcome the Court's oversight to achieve a comprehensive solution.  And it would defy logic for the City and County to blame LAHSA for so many of their woes yet refuse to consent to the Court's jurisdiction over the Authority for the purpose of addressing those woes.

From an equitable standpoint, courts have long recognized that an injunction or judgment may extend to parties not formally before the court if those parties are represented by or in privity with the defendants, or if they are aiders and abettors of the defendants. Federal Rule of Civil Procedure 65(d)(2) explicitly provides that an

36

injunction order binds not only the parties but also "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation with" the parties or their agents, so long as those persons have notice of the order. Fed. R. Civ. P. 65(d)(2)(B) & (C). "This is derived from the commonlaw doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).

LAHSA falls squarely within this principle: it is unquestionably in privity with the City and County, is represented by them, and is subject to their control. Under Rule 65(d), if this Court issues an injunction or order requiring certain action (or inaction) in the realm of homeless services, LAHSA will be bound to comply just as the City and County are, because LAHSA is effectively their combined agent and is working *in active concert* with them. The City and County can consent to and facilitate this outcome by explicitly acknowledging that they will treat any court order as binding upon LAHSA and will direct LAHSA to comply. The crucial fact is that no one is opposing the inclusion of LAHSA—Plaintiffs seek it, and the City and County can hardly object since they themselves choose to utilize LAHSA to carry out their obligations under the Settlement Agreements.

        ii.      <u>The City and County's Control Over LAHSA Empowers Them to Submit LAHSA to the Court's Authority</u>

Given that the City and County are properly before this Court, and given that they have complete control over LAHSA's structure and leadership, the simplest route is for the City and County to explicitly acknowledge and exercise that control in aid of the Court's jurisdiction. They can do so in several ways: by stipulating that LAHSA will comply with all Court orders in this case; by directing their respective LAHSA Commissioners to vote to authorize LAHSA's submission to the Court's jurisdiction;

37

and by agreeing to incorporate any judicially mandated terms into the City-County-LAHSA funding contracts or governance documents. California law empowers the City and County to dictate LAHSA's scope: for example, the JPA can be amended by the parties, and LAHSA's budget and programs are subject to City/County approval. Thus, if the Court finds that certain relief (such as providing a specified number of shelter beds or services) is warranted, the City and County can *instruct* LAHSA to implement that relief and can amend LAHSA's operating parameters to ensure compliance. The City and County's consent to jurisdiction over LAHSA is effectively an agreement to use their full powers over LAHSA to carry out the Court's directives. There is no legal barrier to them doing so. In fact, it is an expected incident of the joint powers arrangement that the members direct the agency's actions.

A concrete example illustrates the point: If the Court were to order the County to provide enhanced mental health services to unsheltered persons (a duty which falls under California Welfare & Institutions Code sections 5600 *et seq.* and is part of LAHSA's coordinated efforts), the County can satisfy this order either through its own departments or by utilizing LAHSA (to coordinate outreach and services). Because LAHSA at least currently serves as the County's service-delivery vehicle, the County's compliance necessarily means LAHSA's compliance. The County cannot then evade liability for failing to comply with the Court's order because it delegated that effort to LAHSA. The City and County's unified consent thus removes any arguable due process concern about binding an alleged non-party: LAHSA, through its creators, would be voluntarily coming under the Court's authority.

* * * *

The Court is on solid legal ground to find that LAHSA is within its jurisdictional reach. Whether viewed as already encompassed by the City and County's presence or by virtue of the City and County's consent, the result is the same: LAHSA can be ordered to act (or refrain from acting) as part of the relief in this case. Plaintiff urges the Court to so-hold, and to not permit any procedural technicality to impede much-

38

needed remedies. Both law and equity favor treating LAHSA as a collaborative creation of the City and County that stands in their shoes for the delivery of homeless services. Accordingly, the Court can and should assert jurisdiction over LAHSA to the full extent necessary to fashion and enforce effective relief in this litigation.

Dated: May 8, 2025             Respectfully submitted,

                               */s/ Elizabeth A. Mitchell*
                               UMHOFER, MITCHELL & KING, LLP
                               Matthew Donald Umhofer
                               Elizabeth A. Mitchell

                               *Attorneys for Plaintiffs*

*PLAINTIFF LA ALLIANCE'S RESPONSE RE ISSUES RAISED BY COURT ON MARCH 27, 2025; POINTS AND AUTHORITIES IN SUPPORT*