**FILED**
CLERK, U.S. DISTRICT COURT

5/14/25

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ eva _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> CITY OF LOS ANGELES, et al., <br><br> *Defendants.* | Case No. 2:20-CV-02291-DOC-KES <br> Assigned to Honorable Judge David O. Carter |

SPECIAL MASTER INDEPENDENT MONITORING REPORT AND RECOMMENDATIONS NO. 2

The Special Master Michele Martinez submits the attached Independent Monitor and Recommendations Report 2, covering the period from January 1, 2024, to December 31, 2024.

Date May 13, 2025

Michele Martinez
Special Master
Telephone: 714-887-9845
Email: Michele@MicheleCMartinez.com

1

2

CERTIFICATE OF SERVICE

The undersigned Special Master hereby certifies that, on May 13, 2025, she caused a true and correct copy of the foregoing Independent Monitoring Report two to be filed electronically with the Court's system, which caused an electronic copy of this filing to be served to all parties on record.

/s/Michele Martinez

Michele Martinez

Special Master

Telephone: 714-887-9845

Email: Michele@ MichelecMartinez.com

**Table of Contents**

COVER PAGE................................................................................................................1
Case Title & Court Information......................................................................................1
Special Master Identification & Contact Details ...........................................................1

CERTIFICATION OF SERVICE.................................................................................2

EXECUTIVE SUMMARY ...........................................................................................5
Purpose of the Special Master Report............................................................................5
Need for Systemic Change.............................................................................................6

INTRODUCTION .........................................................................................................7
Roadmap ........................................................................................................................7
Background on Alliance Settlement Agreement.............................................................8

FINDINGS FROM ALVAREZ & MARSAL ASSESSMENT....................................9
A&M Assessment Findings ...........................................................................................9
Sanctions Agreement 2024 on Independent Assessment................................................9
Compliance Challenges Identified in the A&M Assessment ........................................10
City's Homeless Administrator Historical Gaps ...........................................................10

CITYOF LA ACHIEVMENTS AND CHALLENGES ............................................11
Proposed Governance Reform from city leaders...........................................................13

COMPLIANCE ASSESSMENT REVIEW ...............................................................14
Key Obligations Under the Settlement Agreement .......................................................14
Housing and Shelter Compliance..................................................................................15
Encampment Resolution & Street Engagement Tracking .............................................17
Milestone Progress & Bed Plan Development...............................................................18
Dispute Resolution Mechanisms...................................................................................18

COURT OVERSIGHT AND POTENTIAL JUDICIAL INTERVENTION
Special Master Recommendations ................................................................................22
Establishing Homeless Strategy & Performance Office................................................23
Oversight Approach ......................................................................................................25
Proposed Extended Settlement Agreement Terms ........................................................27

CONCLUSION AND LOOKING AHEAD TO SPECIAL MASTER REPORT 3...................29
Looking Ahead to Special Master Report 3...................................................................30

EXHIBITS .....................................................................................................................31
Exhibit 1:
    Conceptual Framework: A Roadmap for Structured Oversight, Accountability, and
    Performance-Driven Reform.....................................................................................32

LAHSPO – Proposed City Homeless Strategy & Performance Office.................................37
Template 2: Hybrid CoC Transition Roadmap-Phased Implementation Strategy for Los
Angeles' Independent CoC ...............................................................................................44
Exhibit 2:
Compliance Milestones Breakdown & Data Tables ..........................................................45
Encampment Clean-up Goals...........................................................................................47

Additional Research and Supporting Documents on File:
Encampment Reduction Goals & Timeline
Special Master Learning Session Notes
Correspondence from LAHSA and County
All Court-docketed Quarterly Reports
A&M Assessment
City and Plaintiff's Motions and Response to Motions
Court Transcripts on Hearings
City Council Homeless Strategy
City Council Motions
Chief Administrative Officer Report on Motions

## EXECUTIVE SUMMARY

This report serves as the second update to the Court on the progress of the City of Los Angeles in fulfilling the obligations outlined in the LA Alliance for Human Rights settlement agreement. This document aims to provide a comprehensive review of the City's achievements, challenges, and ongoing efforts, with an emphasis on observations and recommendations that arise from assessments and fieldwork.

Since 2020, I have served as the Special Master, dedicated to monitoring, enforcing the settlement agreement and learning and understanding the homelessness response system. This Special Master report results from an extensive review of pertinent city documents and active participation in council meetings, homeless committee sessions, and LAHSA board discussions. The observations and insights from these engagements and the two learning sessions with the parties, along with direct interactions with council members, outreach workers, and members of the unhoused community, have revealed critical systemic gaps and shaped targeted recommendations for a more effective and accountable approach to homelessness.

The City of Los Angeles is at a pivotal moment with significant opportunities for improvement. Recent reports, such as the Alvarez & Marsal (A&M) Assessments and various audits, and observations have uncovered notable challenges in financial management, service delivery efficiency, and housing allocation. A proactive approach will enable the city to improve its homelessness response system, ensuring accountability and transparency.

My recommendations are developed independently of the Court and involved parties, drawing from objective analysis, thorough research, and meaningful engagement with stakeholders, including City officials, service providers, and individuals experiencing homelessness.

**This special master report is built on the following guiding principles:**

- Objective Research and Learning: A thorough examination of current practices and innovative strategies in managing homelessness. Two learning sessions with the parties and various field outreach observations and learnings.
- Insights from city Council and Committee on Housing and Homeless Meetings: Active participation in discussions that inform policy decisions and enhance my understanding of the decision-making landscape but also the concerns and issues City council was having with the regional homeless response system.
- Collaborative Engagement with council districts and visiting and hearing directly from Outreach Workers and Service Providers: Partnering with other organizations and all those on the ground to ensure their insights inform our recommendations.

The recommendations in this report frame current challenges as essential opportunities for transformative change. By adopting a proactive approach, the city can enhance the homelessness response system, better serve our communities, and create an environment grounded in compassion and accountability. With these efforts, Los Angeles can fundamentally transform its approach to homelessness, ensuring every individual receives the necessary support and resources.

While this report does not constitute formal City policy, it serves as a structured proposal to assist City leaders in envisioning an independent governance model aimed at improving funding transparency, integrating housing and services, enhancing provider accountability, and promoting sustainable housing placements.

The homelessness crisis in Los Angeles demands urgent, systemic change in housing infrastructure, financial oversight, and service delivery models. The city has struggled to meet its binding obligations under the LA Alliance Settlement Agreement, raising plaintiff concerns, judicial concerns about funding accountability, encampment resolution, and governance inefficiencies.

**Need for Systemic Change**

- The A&M Assessment highlighted failures in financial oversight, housing placement inefficiencies, and program accountability.
- The current reliance on LAHSA is unsustainable, with millions in untracked spending and slow direct housing placements for the city.
- To correct systemic inefficiencies, the City must establish an independent governance Department focused on performance-driven homelessness response strategies.

The A&M Assessment revealed severe financial mismanagement, untracked expenditures, and systemic failures in service coordination. The LA Alliance for Human Rights has called for receivership, arguing that judicial intervention is essential to catalyze progress. In response, Judge David O. Carter requested briefing on the proposal and recommended extending the settlement agreement for an additional two years—until June 2029—to facilitate transformative change.

As Special Master—drawing on my five-year involvement in this case along, with extensive fieldwork, and engagement—I present this report, which outlines the City progress on the goals and milestones under the settlement agreement, key findings, court considerations, and a comprehensive oversight framework designed to realign governance and accountability with the City homelessness response.

**INTRODUCTION**

I am pleased to present the second update of the Special Master Report, which comprehensively reviews the City of Los Angeles' progress in fulfilling the obligations outlined in the LA Alliance for Human Rights settlement agreement.  I extend my gratitude to the parties, council staff, outreach workers, service providers, LAHSA and unhoused individuals who participated in the learning and observation sessions throughout 2024. This report highlights the City's achievements, challenges, and ongoing efforts in addressing homelessness, drawing from thorough assessments, stakeholder engagements, and fieldwork observations.

Since assuming the role of Special Master in 2020, I have dedicated myself to understanding and evaluating Los Angeles's homelessness response system. This report's recommendations are independently developed to guide the City toward a more effective and accountable approach to managing homelessness.

Key findings from the Alvarez & Marsal assessment, coupled with insights from direct interactions with stakeholders, reveal critical systemic gaps that must be addressed through intentional structural reforms. The City is at a critical juncture with opportunities to strengthen its homeless response system, optimize financial and performance management and secure sustainable housing solutions.

I encourage the city to evaluate the recommendations in this report, including the formation of a dedicated department to manage homelessness and the exploration of a transition to an independent Continuum of Care (CoC). These steps are essential for meeting obligations under the settlement agreement and addressing systemic issues related to homelessness in the City.

This report serves not only as a structured proposal for City leaders but also as an opportunity for transformative change that prioritizes compassion, accountability, and sustainable outcomes for all individuals experiencing homelessness.

**Roadmap**

As the Special Master/Monitor, my primary role is to evaluate the City's compliance with the terms outlined in the *LA Alliance for Human Rights v. City of Los Angeles* Settlement Agreement. This second report specifically focuses on the monitoring and compliance and recommendations conducted from January 1 through December 31,2023 in the five-year agreement. It encompasses an assessment of the City's adherence to each obligation specified in the agreement, an overview of some of the challenges faced by the City in fulfilling these obligations, and updated recommendations of the forthcoming work required for the City to fully satisfy the terms of the agreement.

This second report provides activities specifically consistent with the settlement agreement and throughout the sections of this report, we address the following:

**Monitor's efforts during the reporting period**

- A description of each settlement agreement requirement.
- A summary of the challenges facing the City's ability to achieve or complete compliance with the settlement agreement.
- Monitors recommendations regarding the City's future efforts to achieve compliance

**Obligations with which the City must comply under the Settlement Agreement Include :**
- Housing and Shelter for the "City shelter appropriate".
- Street Engagement - Council District and Citywide Eengagement.
- Milestones- deadlines and targets for the creation of shelter or housing beds and encampment reductions.
- Dispute Resolution Process- parties will design a process that will allow a person experiencing homelessness ("PEH") to submit a complaint to the Court or special master concerning an offer of shelter or notice provided under this Agreement.
- Status updates - The City will provide regular status updates to the Court (at least quarterly) regarding its progress with this Agreement.
- In addition, the parties agree to engage a mutually agreed-upon third party to provide data collection and analysis and regular public reports on the City's compliance with the terms of this Agreement.
- Funding - Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion. The city agrees to petition the county, state, and federal government for additional funding, consider expediting public/private partnerships that utilize private capital and require no up-front costs to the city, and consider other possible funding mechanisms to pay for future housing, facilities, and services for PEH.

**Background: LA Alliance Settlement Agreement**

In March 2020, the LA Alliance for Human Rights took legal action against the City and County of Los Angeles. The key allegations and claims in the lawsuit included:

- The homelessness crisis in LA has grown exponentially in recent years, yet the City and County have failed to implement effective solutions to provide shelter and address public health and safety issues.
- Allowing long-term homeless encampments has blocked sidewalks, increased crime and drug use, and spread disease. This has interfered with people's use of public spaces and private property.
- The conditions have negatively impacted businesses and property values. Plaintiffs allege that their properties are now nearly impossible to rent or sell due to the surrounding conditions.
- That the City and County have been negligent in their duties to maintain public spaces and address public health and nuisance issues.

- That the City and County have violated statutes requiring them to provide medical care for indigent populations.
- ADA and fair housing laws are being violated by blocking sidewalks and access for disabled individuals.
- Taxpayer funds allocated to address homelessness through measures like Proposition HHH and H have been misspent or wasted without significantly impacting the problem.

The lawsuit sought declaratory and injunctive relief, requiring the City and County to better address the homeless crisis, maintain public spaces, and clear sidewalk obstructions.

In May of 2020, the Honorable David O. Carter, U.S. District Court of Central District of California, issued a preliminary injunction requiring both the City and County of Los Angeles to relocate and shelter homeless individuals living near freeway overpasses, underpasses, and ramps because of the deadly hazards in the area. This resulted in the city and county agreeing to create 6,700 new housing solutions within 18 months. The city was required to open and maintain 6,000 NEW beds not covered by existing City-County agreements. The County provided the city $60 million in annual service funding, totaling up to $300 million over the five-year agreement based on the number of interventions open and occupied within 60 days of July 1st of each year.

In May of 2022, the LA Alliance and the City of LA reached a preliminary settlement agreement that would span for a duration of five years (June 2022 through June 2027). The Court approved the final settlement agreement in June 2022. I was appointed by the Judge Carter to serve as the Special Master/Monitor, entrusted with the responsibility of enforcing and overseeing the agreement. Equally important, I was also assigned the duty of assisting the Honorable Judge Andre Birotte in resolving any future disputes that may arise in relation to the interpretation, execution, or enforcement of the settlement agreement.

**FINDINGS FROM ALVAREZ & MARSAL ASSESSMENT**

**Findings from the Alvarez & Marsal Assessment**

The A&M Assessment, mandated by the federal court, assessed financial oversight, compliance, and accountability in Los Angeles' homelessness response system. The assessment quantified $2.3 billion in funding across three City Programs (Roadmap Program- Freeway Agreement, Alliance Settlement Program, and Inside Safe) that was not routinely reconciled, making it difficult to determine how various budgets and fundings sources were utilized or whether they achieved intended outcomes. In addition, over $ 500 million administered throughout LAHSA could not be definitively verified in terms of specific services and the reported creation of open beds, highlighting potential non-compliance and mismanagement. These findings reinforced the need for systemic reform, particularly in contract oversight and financial accountability.

**Sanctions Agreement (April 2024)**

In April 2024, the United States District Court imposed sanctions on the City of Los Angeles following concerns raised by the L.A. Alliance for Human Rights regarding mismanagement and non-compliance in homelessness funding.

The sanctions agreement required the City to:

Undergo an independent Financial and Performance Assessment conducted by A&M to examine the appropriation and expenditure of funds through the City to the three City Programs across a lookback period. It further evaluated whether these monetary resources effectively supported individual experiencing homelessness in achieving improved outcomes and housing stability. The court requested that A&M report their findings and recommendations to the court to ensure judicial accountability and compliance enforcement.

The A&M Assessment identified significant governance, financial oversight, and service delivery deficiencies that hinder the City's ability to manage homelessness effectively.

Some key findings which include:

- Financial Tracking Deficiencies: The absence of detailed expenditure tracking across various service provider contracts has impeded informed decision-making and limited accountability over allocated funds.
- Data Integrity Concerns: The assessment revealed gaps in documentation for approximately 2,300 housing sites, with reimbursement under service provider contracts lacking detailed expenditure support, causing inefficiencies in resource allocation.
- Homelessness Recidivism: Nearly 47.8% of individuals who exited emergency shelters or interim housing returned or remained homeless, underscoring systemic failures in sustainable housing placements.
- Lack of Real-Time Monitoring: Service coordination remains fragmented, restricting timely interventions and limiting effectiveness in homelessness prevention efforts.

**Compliance Challenges Identified in the A&M Assessment**

The A&M Assessment outlined a number of challenges which made determination of compliance with the Alliance agreement and overall accountability difficult to ascertain. Examples include:

- Limited Supporting Documentation for Time-Limited Subsidies (TLS): The City must collaborate with LAHSA to ensure the Court receives supporting documentation for any TLS slots or beds included in compliance reports for both the Roadmap Program, Freeway Agreement and Alliance Settlement Agreement. The Roadmap Program lacked sufficient workpapers, preventing verification of TLS-specific "new beds" that have been reported in quarterly status reports to the court.
- Inside Safe Booking Agreements under the Alliance Settlement: The city has reportedly included Inside Safe booking agreements under the Alliance Settlement as of March 31,2025. However, booking agreements fluctuate based on usage, unlike occupancy agreements, which establish fixed contractual bed numbers.
- Court Consideration: Verification is needed to determine how these beds are accounted for, especially if they are not reflected in LAHSA's shelter inventory system.

- Funding Constraints & Governance Reform Necessity, Budget limitations jeopardize compliance with the June 2027 bed plan obligation.

**City of Los Angeles Homeless Administrator, LAHSA's Data Standardization & Historical Gaps**

As of 2024/2025, LAHSA has introduced standardized performance metrics to improve data accuracy and service evaluation. These metrics allow for consistent program tracking but were not in effect during the period covered by the court agreement—resulting in historical inconsistencies in prior reports. The A&M Assessment underscores the challenges posed by the absence of standardized benchmarks during the review period regarding the quality of services or reasonableness of expenses, caused by limited financial oversight and performance monitoring.

**Key Considerations for Judicial Review**

The court may wish to consider:
- The A&M Assessment's findings on mismanagement and whether the city has taken corrective steps.
- The impact of historical data inconsistencies on assessing program effectiveness.
- The necessity of sustained judicial oversight to ensure structural changes are implemented and enforced.

In summary, these findings underscore the critical need for immediate action to enhance oversight and accountability in Los Angeles' homelessness response. Without strong financial controls, real-time tracking, and performance management, billions of taxpayer dollars risk being wasted without measurable impact.

**City of LA Achievements and Challenges: 2024**

In 2024, the City of Los Angeles advanced its efforts to meet the obligations under the LA Alliance Settlement Agreement, reporting the opening of 4,815 beds/units, with 4,278 still in progress, indicating progress as of December 31, 2024, indicating progress toward 12,915-bed obligation. However, a year-over-year review of milestone tracking reveals persistent reporting discrepancies, emphasizing the need for greater accuracy in compliance verification.

Furthermore, a review of Exhibit A (Dkt 858) shows that several projects may not be completed by June 13, 2027, raising concerns about potential last-minute compliance risks rather than adherence to a consistent implementation schedule. To meet the remaining 3,822-bed requirement, the city must accelerate construction timelines to ensure projects are operational before the deadline.

**City's Argument for Reduced Compliance & Opposition Considerations City's Argument for Reduced Compliance & Opposition Considerations Due to Recent Fires (January 2025) City's Position (Dkt 872, Sec. IV)**

11

- The City claims its obligations were paused due to financial hardship, invoking the force majeure clause (Sec. 8.2).
- It argues that interim milestones are aspirational rather than enforceable under Sec. 5.2 of the settlement agreement.
- The City asserts that funding limitations hinder expansion of housing placement programs, delaying shelter capacity increases.

**Plaintiffs' Opposition (Dkt 863, Sec. II.i-III):**
- Plaintiffs reject the force majeure argument, stating that no formal meet-and-confer process took place, violating Sec. 8.2.
- They contend that the City's budget shortfalls are self-inflicted, arguing that compliance obligations remain binding despite financial difficulties.
- Plaintiffs advocate for court enforcement mechanisms, including structured oversight hearings and monetary enforcement measures, to prevent further delays in fulfilling bed creation obligations.

**Binding Nature of Bed Creation Under the Settlement Agreement**
- Court's Retention of Jurisdiction for Enforcement: The Court retains jurisdiction for five years to enforce the terms of the Settlement Agreement, ensuring ongoing accountability in bed creation compliance (Dkt 445, p. 2).
- Explicit Language of the Court's Approval Order: The Court affirms that the Settlement Agreement establishes a structured framework for enforcing bed creation mandates, ensuring the City meets compliance expectations (Dkt 445, p. 2
- Historical City Commitments to Bed Creation: In prior commitments, the City pledged to establish 6,700 beds within 18 months, as outlined under the Memorandum of Understanding (Dkt 136, 138), reinforcing the binding nature of settlement obligations.

Inconsistency in the City's Interpretation: The City's current argument that bed creation is non-binding appears inconsistent with the terms of the settlement agreement. The Settlement Agreement was ratified with enforceable housing mandates (Dkt 445, p. 3), reinforcing compliance expectations.

**Fiscal Sustainability and Compliance Risks**

- The City's financial outlook for FY 2025-2026 remains uncertain, with projected budget shortfalls impacting housing sustainability efforts. The Inside Safe Program, while contributing to rehousing efforts, not all beds count toward compliance under the Alliance Settlement Agreement.
- Judge Carter's observations in Dkt. 878 highlighted that budget constraints directly influence compliance viability, necessitating the City to provide clear financial disclosures to the Court to confirm funding stability for milestone achievement.

**Absence of a Funding Bed Plan for Remaining Mandate Bed/ Shelter Obligations**

Despite prior commitments, the city has not produced a comprehensive funding bed plan for the remaining 3,822-bed deficit as of December 31, 2024, necessary to meet the 12,915-bed mandate by June 2027. This omission raises serious concerns regarding the feasibility of compliance given fiscal constraints:

- No secured funding streams have been identified for beds beyond the current inventory.
- Projected budget shortfall for FY 2025-2026 suggests funding instability.
- Encampment resolution efforts lack alignment with shelter expansion, creating operational gaps.
- Funding allocations for bed expansion have not been publicly disclosed, creating transparency risks.

**Proposed Governance Reform: City Council Legislative Efforts in Progress**

Councilmember Monica Rodriguez has motioned for Los Angeles to withdraw from its role as the regional Continuum of Care (CoC) due to operational constraints. Her proposal focuses on direct City contracting with service providers, aimed at enhancing transparency and efficiency. Key components of this proposal include:

- Independent Oversight: Creation of a Department of Homelessness within City government to manage programs and conduct rigorous performance evaluations.
- Streamlined Financial Management: Redirecting funding flows to bolster accountability in provider contracts and enforce clearer performance metrics
- Alternative Service Models: Prioritizing direct contracting over reliance on intermediary entities like LAHSA, which has faced systemic inefficiencies.

Councilmember Nithya Raman has also put forth a motion to create a dedicated Bureau within the Los Angeles Housing Department (LAHD) to unify oversight of homelessness investments. This Bureau would:
- Convene staff from multiple City departments to ensure coordinated service delivery.
- Implement a performance management system to track spending efficiency and program effectiveness.
- Utilize regularly updated data to identify gaps and improve service outcomes.

Raman's motion aims to enhance accountability within the City's homelessness response, ensuring that funding effectively transitions individuals into stable housing.

**COMPLIANCE ASSESSMENT REVIEW**

This section serves as the second compliance update to the court assessing whether the City of Los Angeles is fulfilling its obligation under the LA Alliance Settlement Agreement (Dkt. 421). Based on City filings, Plaintiffs Reply (DKT. 872), the Court Directives, and CAO documents online, and several critical concerns regarding bed/unit creation, beds in process, PEH served, encampment resolutions and financial accountability and transparency and if the City is meeting the milestones agreed upon by all the parties.

**Detailed Analysis & Verification Framework**

This section provides a structured review of the City's compliance with key provisions in the Settlement Agreement, ensuring accuracy through independent verification and judicial oversight.

- Housing & Shelter Provision (Section 3.0): Creating shelter solutions for 60% of unsheltered City Shelter-Appropriate persons.
- Street Engagement & Encampment Resolution (Section 4.0): Requiring all shelter/housing offers before enforcing public space regulations.
- Milestone Tracking & Structured Deadlines (Section 5.0): Monitoring bed creation, encampment clearance, and adherence to timelines through structured sub-milestones.
- Status Updates & Dispute Resolution (Sections 6.0 & 7.0): Ensuring quarterly reporting and independent third-party audits.
- Funding Transparency (Section 8.0): Mandating that budget disclosures align with the City's housing projects and long-term financial sustainability.

**A. Housing & Shelter Compliance (Section 3.0)**
The city must provide housing and shelter solutions to achieve the statutory threshold of 60% of unsheltered City Shelter-Appropriate persons. Our analysis includes:

3.1 – Shelter/Housing Mandate
Verification: Quarterly reports detail new units created, occupancy rates, and data on shelter offers extended versus accepted.
Oversight: Independent audits validate that completed placements meet mandated thresholds.

3.2 – Types of Housing & Shelter Solutions Verification: The City's use of various solutions, including tiny homes, shared housing, motels, and congregate shelters, is verified to ensure a diversified approach.
Oversight: Documentation confirms that any delays or permitting issues in specific shelter types are noted.

3.3 – Equitable Distribution of Housing
Verification: District-level placement data is analyzed to ensure resources are evenly distributed across Council Districts.
Oversight: Adjustments are recommended when imbalances in allocation are detected.

**B. District-Level Bed/Shelter Progress (2024 Quarterly Data Reports)**

The following tables presents the city-reported data by Council District, which serves as a baseline for identifying reporting inaccuracies in "beds open" versus "beds in process."

**Note**: Independent review of the Special Master flagged potential overstatement in "beds in process" figures in some districts due to changes from quarter-to-quarter reporting.

**Key Compliance Data (2024 Reporting Period, Table 1.)**
- Total beds/units opened by December 31, 2024: 4,815
- Total beds/units in process (2024 cumulative): 4,278
- Obligation bed requirement: 12,915

- Deficit toward 60% PEH housing goal across Council Districts 3,822

**Table 1: City Shelter Compliance with 60% PEH Standards, based on City data provided to the court in the quarterly reports.**

| Council Districts | LA Alliance 60 % PEH Milestone Goal | Beds/Units Open Dkt.-728-1 3/31/24 | Beds/Units Open Dkt. 757-1 6/30/24 | Beds/ Units Open Dkt. 797-1 9/30/24 | Bed/ Units Open Dkt. 858-1 12/31/24 | Delta of 60% PEH Goal 2024 | Total beds in process (cumulative) Dkt 858-1 |
|---|---|---|---|---|---|---|---|
| CD 1 | 1,075 | 595 | 922 | 936 | 1,061 | 14 | 229 |
| CD 2 | 419 | 51 | 83 | 131 | 167 | 252 | 107 |
| CD3 | 410 | 98 | 98 | 98 | 98 | 312 | 330 |
| CD4 | 406 | 197 | 197 | 197 | 231 | 175 | 83 |
| CD5 | 347 | 99 | 99 | 99 | 99 | 248 | 111 |
| CD6 | 730 | 189 | 189 | 189 | 189 | 541 | 428 |
| CD7 | 781 | 136 | 136 | 136 | 136 | 645 | 0 |
| CD8 | 574 | 322 | 375 | 375 | 375 | 199 | 431 |
| CD9 | 1,504 | 82 | 166 | 248 | 248 | 1,256 | 148 |
| CD10 | 628 | 341 | 403 | 403 | 403 | 225 | 159 |
| CD 11 | 734 | 179 | 213 | 252 | 325 | 409 | 158 |
| CD 12 | 415 | 0 | 54 | 54 | 54 | 361 | 325 |
| CD 13 | 1,020 | 241 | 241 | 360 | 403 | 617 | 737 |
| CD 14 | 2,941 | 336 | 674 | 694 | 743 | 2,198 | 566 |
| CD 15 | 931 | 167 | 167 | 283 | 283 | 648 | 566 |
| Totals | **12,915** | **3,033** | **4,031** | **4,455** | **4,815** | **8,100** | **4,278** |
| City Totals | **12,915** | **3,018** | **4,017** | **4,455** | **4815** | **8,100** | **4,278** |
| Diff | | **15** | **0** | **0** | **0** | **0** | **0** |

15

**Key Table Findings**

- The city's quarterly report docket 728 lists 3,018 beds/units created, while my verified inventory shows 3,033 beds, resulting in a discrepancy of 15 beds.

**Recommendations**

- The city should provide confirmation and verification of beds.

- The city should provide confirmation of status (funded vs. contracted, vs. under construction) for all beds in process.

**Table 2: Beds Established by Council District for Each Quarter of 2024. These numbers derive from City data submitted to the court in quarterly reports.**

| Council District | Q1 ( Jan-Mar) | Q2 (April-Jun) | Q3 (July- Sept) | Q4 (Oct-Dec) | Total for 2024 |
|---|---|---|---|---|---|
| CD1 | 93 | 327 | 14 | 125 | 559 |
| CD2 | | 32 | 48 | 36 | 116 |
| CD3 | (84) | | | | (84) |
| CD4 | (1) | | | 34 | 33 |
| CD5 | | | | | |
| CD6 | 78 | | | | 78 |
| CD 7 | | | | | |
| CD8 | (53) | 53 | 53 | | |
| CD9 | | 84 | 82 | | 166 |
| CD10 | 152 | 62 | | | 214 |
| CD11 | (88) | 34 | 39 | 73 | 58 |
| CD12 | (53) | 54 | | | 1 |
| CD13 | 36 | | 119 | 43 | 198 |
| CD14 | 78 | 338* | 20 | 49 | 485 |
| CD15 | 65 | | 116 | | 181 |
| Totals | 223 | 984 | 438 | 360 | 2,005 |

Note: A discrepancy has been identified in the reported number of beds opened for Council District 14, as reflected in Dkt. 728.

**Summary of Bed/Unit Tracking Compliance**

- Current Progress: The city has reported bed/unit developments tied to funding streams such as Prop HHH, Homekey, and PSH, detailing project timelines and tentative completion rates.

- Compliance Challenges: Discrepancies exist between reported units and actual availability, with delays in site activation and or potential occupancy rates.

- Milestones Met: Some benchmarks for shelter expansion have been achieved, yet intervention type distribution (temporary vs. permanent housing) may not align with expected targets or for the city to meet its obligation by June 2027. It is understood it is at the sole discretion of the city to choose its interventions. But if the city's projects of PEH are stalled or have funding issues it should inform the court immediately and figure out ways on how to remedy the situation with the Plaintiff's in a meet and confer with the Special Master.

- In 2024, approximately 2,000 beds were opened under the Alliance Settlement. This progress is concerning considering the settlement agreement, which requires an additional 3,822 beds to be opened by the end of June 2027. Given the timeframe of the agreement, it is imperative for the City to accelerate efforts to meet these obligations. Furthermore, many council districts have shown minimal quarter-to-quarter growth in opened beds, raising additional concerns about overall progress and strategy.
- Since Q1 of 2022, multiple projects across council districts have remained in process, meaning they have not yet transitioned into occupiable beds. Despite efforts to complete certain bed/units at least 4, 278 beds remain in process as of Q4 of 2024. The long-term delays persist and raises concerns about funding, construction or administrative barriers.
- Key Discrepancies: Independent reviews suggest inconsistencies in how units are classified, particularly regarding "beds in process" versus bed/units open. The city must provide more context and explanation in its reports beyond providing numbers.

## Recommendations for the Court & City

### For the Court
- Mandate Third-Party Validation: Require independent reviews for all city-reported bed/unit figures to ensure data accuracy.
- The beds/units in process should undergo immediate milestone verification to determine their status, funding barriers and the likelihood of completion before June 2027.
- Enhance Reporting Standards: Introduce quarterly compliance checks to validate whether newly reported beds meet occupancy standards.
- Legal Accountability for Non-Compliance: Establish structured consequences for failure to meet obligations under the Settlement Agreement.

### For the City
- Accelerate bed/units in process that have been in the pipeline since 2022: Streamline approvals to ensure faster transition from in process to bed/ unit open and occupiable.
- Ensure timely occupancy reporting: verifying that beds open are being used and not just counted toward compliance.
- Improve Disaggregated Reporting: Differentiate between funded, in-process, and fully functional beds for transparent tracking.
- Strengthen Service Coordination: Ensure shelter expansion aligns with wraparound services, preventing gaps in mental health and substance use support from County of LA. This means if these services are not being provided the city must notify the court in writing. As the Special Master it is imperative that the county and city meet to cross reference data before quarterly reports are due to the court. The referral system and challenges with what city is reporting versus county must be addressed by May 30, 2025. I am recommending for the CAO office and county staff and all the parties to schedule a learning session to address this by June 30th.

## C. Street Engagement & Encampment Resolution (Section 4.0)

17

Before enforcement, the city must extend shelter, or housing offers and ensure proper classification of encampment resolutions.

**Table 3: Breakdown of 60% Encampment Resolutions Compliance by Council District and City Milestones for 2024. These figures are based on City data provided in the quarterly reports to the court.**

| Council Districts | Total millstones by CD | Encampment reductions Quarter ending January 1-March 31, 2024, Dkt. 728 | Encampment reductions Quarter ending January 1-June 30, 2024 Vehicles (all quarters FY 24)-Dkt. 757 | Encampment reductions Quarter ending July 1, -Sept 30, 2024- Dkt. 797 | Encampment reductions Quarter ending July 1-Dec 31m2024-Dkt. 858 | Total Encampment Resolutions (2024) | Delta of Target |
|---|---|---|---|---|---|---|---|
| CD 1 | 863 | 125 | 70 | 146 | 209 | 279 | 584 |
| CD 2 | 374 | 250 | 98 | 57 | 105 | 203 | 171 |
| CD3 | 290 | 85 | 74 | 79 | 131 | 205 | 85 |
| CD4 | 295 | 34 | 28 | 19 | 48 | 76 | 219 |
| CD5 | 287 | 70 | 60 | 73 | 99 | 159 | 128 |
| CD6 | 549 | 159 | 123 | 80 | 140 | 263 | 286 |
| CD7 | 510 | 160 | 54 | 46 | 94 | 148 | 362 |
| CD8 | 460 | 61 | 35 | 59 | 110 | 145 | 315 |
| CD9 | 1,012 | 185 | 89 | 205 | 344 | 433 | 579 |
| CD10 | 489 | 66 | 67 | 60 | 102 | 169 | 320 |
| CD 11 | 588 | 178 | 172 | 67 | 138 | 310 | 278 |
| CD 12 | 325 | 144 | 121 | 51 | 87 | 208 | 117 |
| CD 13 | 803 | 115 | 126 | 160 | 251 | 377 | 426 |
| CD 14 | 2,296 | 447 | 525 | 634 | 1,078 | 1,603 | 693 |
| CD 15 | 659 | 58 | 43 | 32 | 81 | 124 | 535 |
| Grand Totals | 9,800 | 2,137 | 1,685* | 1,768 | 3,017 | 4,702 | 5,098 |

**Note:**

- Discrepancies been identified in the total number of encampment resolutions ( total sums to 1,685 not 1,688) reported by the City for encampment reductions for the period January 1- June 30, 2024 based on updated numbers reported in Dkt. 858.

**Encampment Resolution Monitoring and Oversight Adjustments**

Judicial site evaluations throughout 2024 identified instances of unhoused individuals being relocated without proper adherence to formal dispute resolution procedures, raising significant concerns about enforcement and transparency in encampment resolution strategies. According to Dkt 874, removals under Care/Care+ programs do not meet settlement compliance requirements unless documentation of housing placements is provided. The court still must agree to the City's

18

new definition and process but as of now, disparities across council districts continue to necessitate heightened monitoring and verification mechanisms to ensure these resolutions are happening.

Moreover, City Council members have expressed ongoing concerns in Housing and Homeless Committee meetings regarding limited access to compliance reports, underscoring the need for a transparent and accessible reporting system to verify fulfillment of milestones.

**Encampment Resolution Compliance Adjustments**
- City encampment resolution tracking lacks independent verification measures, to verify discrepancies in final reported figures from the city reports.
- The Care/Care+ removals do not meet Settlement Agreement compliance unless linked to documented permanent placements (Dkt. 874). Judicial oversight considerations must be expanded to confirm whether encampment removals align with settlement terms on housing placements.
- Verification of Compliance Figures and Persistent Reporting Discrepancies
- Independent verification of the City's Quarterly Reports for 2024 has revealed numerical inconsistencies in reported beds/units opened and beds in process across multiple Council Districts. These miscalculations underscore serious concerns about data integrity in milestone tracking from LAHSA.

**4.1 – Shelter Offers Before Enforcement**
- Verification: Audit trails document that housing offers were extended to unsheltered persons prior to any enforcement actions.
- Oversight: Ensures that temporary cleanups are not misclassified as verified resolutions.
- Compliance/ Milestones Met: No documentation on dispute resolutions or data on who has been offered shelter in quarterly reporting.

**4.2 – Council District-Wide Engagement**
- Verification: Enforcement actions are initiated in a council district only after reaching the 60% shelter threshold, with prior notice provided to all stakeholders.
- Oversight: Any deviations trigger a judicial review process.
- Compliance/Milestones Met: Only two council districts are at 60% percent threshold but not documentation or information if enforcement actions are initiated.

**4.3 – City-Wide Engagement**
- Verification: Citywide regulations are enforced only after overall City shelter targets are verified.
- Oversight: If disparate enforcement or discrepancies in thresholds are detected, corrective interventions are triggered.
- Compliance/Milestones Met: Only a few council districts are at 60% percent threshold but not documentation or information if enforcement actions are initiated.

**Recommendations for Strengthened Oversight and Compliance**

To effectively address the issues of recurring compliance discrepancies, fiscal constraints, and enforcement gaps, the following structured recommendations are proposed for judicial consideration:

**Reconcile Compliance Discrepancies in Court Reporting**

- The city should be required to correct milestone figures prior to future report submissions.
- Implement quarterly compliance audits accompanied by judicial oversight to avoid persistent miscalculations.

**Clarify Encampment Resolution Tracking for Compliance Verification**

- Ensure that the city programs for encampment removals are excluded unless accompanied by documented housing placements.
- Standardize tracking methodologies throughout all council districts to guarantee accuracy.

**Address Fiscal Sustainability Risks Through Structured Budget Adjustments**

- Mandate the City to disclose funding gaps that could impact milestone commitments
- Align long-term financial planning with Alliance compliance mandates to support sustainable housing solutions.

**Expand Oversight Mechanisms for Enhanced Transparency and Monitoring**

- Develop a public-facing compliance tracking system, like the Inside Safe Program, to promote accessibility.
- Require that council districts submit verified documentation demonstrating compliance with milestone enforcement.
- A&M Assessment findings identified irregularities in compliance reporting, reinforcing the need for structured reconciliation mechanisms.
- Judge Carter emphasized in Dkt. 878 the necessity of accurate milestone tracking, warning that compliance miscalculations undermine judicial oversight.

**Urgent Corrective Actions Required**

To address the remaining shortfall of 3,822 bed and funding plan as of December 31, 2024, the City must:

- Develop a formal funding plan outlining revenue source, expenditure projections, and timeline.
- Provide beds in process construction, permitting and or delays timelines to the court by May 30, 2025, to verify operational readiness before the June 2027 deadline.
- Strengthen compliance verification to resolve inconsistencies in reported figures.
- Reassess geographic bed distribution to align with equitable resource allocation.

These challenges underscore the need for strategic adjustments in implementation pacing to fulfill compliance requirements effectively.

**Verification Status of Quarterly City Data and LAHSA Housing Intervention Inventory**

**Review of City Quarterly Data**
- As of May 6, my verification of the quarterly City-reported data remains pending due to the following unresolved factors:
- Methodology Confirmation: The city has yet to provide a clear methodology for compiling and reconciling reported figures.
- Data Inconsistencies: Insufficient documentation in the quarterly reports prevents a thorough assessment of inconsistencies across reporting periods.
- Additional Clarifications Needed: The City's responses regarding discrepancies remain incomplete, impeding a definitive validation of reported figures.

**Court-Mandated Review of LAHSA Housing Intervention Inventory**
- In compliance with the court directive, I have initiated a review of LAHSA's housing intervention inventory data. This process includes:
- Spot Checking of Projects/Sites: Identifying active and in-progress projects to verify their inclusion in the housing inventory system.
- Pending Data from LAHSA: As of May 6, I am awaiting LAHSA's confirmation of available bed/unit data for independent verification.
- Gaps in HIMIS Reporting: LAHSA has indicated that not all interventions are captured within the Homelessness Management Information System (HIMIS), further delaying verification efforts.

**Bed/ Unit Sites Not Reflected in RSM/HIMIS**
- Upon preliminary review of the provided site list, it has been noted that:
- 20 sites are not a part of the management and data from RSM/HIMIS: These projects were identified as operational but are not accounted for within existing reporting systems.
- City Responsibility for Missing Inventory: If these units/beds are absent from LAHSA's inventory, the city must provide comprehensive data on their location, management, and oversight.
- Verification Pathway: The court requires confirmation of bed/unit management to ensure accurate assessments of available housing interventions.

**Next Steps**
- Await City's clarification on methodology and provision of additional documentation to assess quarter-to-quarter inconsistencies.
- Receive LAHSA's finalized inventory data and identify accessible beds/units for physical verification.
- Confirm management entities responsible for untracked units to provide the court with a complete accounting of available housing resources.

While the City has made progress in expanding shelter access and moving toward compliance with Alliance milestones, it must address ongoing discrepancies, fiscal uncertainties, and enforcement variations. Enhanced transparency, fiscal accountability, and structured monitoring are crucial to maintaining the integrity of compliance efforts moving forward.  I will continue my review of City Council and committee meetings, LAHSA meetings, Quarterly bed spot-checks, monitoring encampment resolution efforts, and evaluating financial disclosures to provide structured, neutral, and precise recommendations for judicial review.

**COURT OVERSIGHT AND POTENTIAL JUDICIAL INTERVENTION**

If the City does not present a detailed plan to address the systemic and structural issues identified by the A&M Assessment at the next hearing on May 15, 2025, the court may need to intervene. This intervention would ensure that the City addresses governance, structural changes, gaps in governance, and financial management challenges. Judicial oversight may be required for the city to meet settlement agreement obligations.

**Special Master Recommendations on Creating a department to Address the City Homeless Response System.**

As Special Master, I recommend the City council establish a dedicated department to manage homelessness. This department would develop and implement an independent homeless response system and consider becoming its own CoC.

These recommendations aim to create a more structured and accountable system for managing the City's homeless response system. A dedicated department is an initial step to address systemic challenges and meet City commitments, ensuring viability and accountability for the settlement agreement.

Systemic issues impede the City's compliance with the Settlement Agreement. The city must evaluate the implementation of the suggested measures and frameworks.

- Funding Constraints: Budget limitations remain a significant barrier, impacting the City's capacity to fulfill the bed plan obligations by the June 2027 deadline. A thorough funding strategy is urgently needed to address these constraints.
- Definition and Verification of Encampment Reductions: Inconsistencies in defining and verifying encampment resolution continue to complicate efforts. A re-evaluation and collaborative approach are necessary to establish consistent success metrics.
- External Pressures and Organizational Changes: The withdrawal of the County from the Los Angeles Homeless Services Authority (LAHSA) and potential receivership complicate matters further. The court's suggestion to extend the settlement agreement indicates necessary strategic reorientation.
- Formalize Encampment Resolution Verification Process- The Court and the parties must establish clear verification standards for encampment resolutions and cleaning procedures

22

to ensure accuracy in compliance tracking. A structured review process must confirm whether encampment removals align with settlement obligations.

- Develop and Release a Comprehensive Bed Plan – The City must finalize its plan to meet the 12,915-bed mandate by June 2027. This plan must include specific funding strategies, geographic allocation benchmarks, and real-time tracking tools to measure progress effectively.
- Implement Data Transparency and Accountability Measures – The City must provide quarterly public-facing reports on bed availability, service usage, and financial expenditures, ensuring transparent and consistent data-sharing among stakeholders, the Court, and the public.
- Improve Coordination Among Service Providers – Homeless service providers must standardize reporting on entry and exit tracking, including cost-per-individual assessments to ensure efficient allocation of housing resources.
- Address Governance and Structural Reforms- Given persistent administrative challenges, the City should transition toward independent oversight, establishing its own Department of Homelessness and Continuum of Care (CoC) to improve accountability, funding efficiency, and operational effectiveness.
- Respond to Alvarez & Marsal Assessment Findings – The City must address financial and programmatic inefficiencies identified in the assessment, including budget oversight, tracking inconsistencies, and service coordination weaknesses. Corrective performance-driven reforms will ensure fiscal responsibility and improved service delivery.
- Engage in Court-Led Governance Discussions – The Court and the parties must explore whether an alternative oversight structure, such as judicial receivership, is necessary to ensure compliance and enforcement of settlement obligations. The city should be ready to present a structured plan by May 27, 2025 to demonstrate readiness and accountability.

These challenges highlight the pressing need for strategic realignment within the City. The following section emphasizes the recommendation for the City to consider establishing its own homeless department and transitioning towards becoming its own Continuum of Care (CoC).

This recommendation is essential for meeting obligations under the settlement agreement and addressing systemic issues related to homelessness in the City. City elected leadership has propose governance motions to withdraw from LAHSA and create its own homeless department. Thus far, nothing has been presented to City Council or the public yet.

**Establishing the Los Angeles Homeless Strategy & Performance Office (LAHSPO)**

As detailed in Exhibit 1 on Establishing LAHSPO and Independent CoC, it is recommended that the City transitions away from its sole reliance on LAHSA. Instead, Los Angeles should consider implementing a performance-driven governance structure that places accountability, data-driven decision-making, and service integration at its core.

**Key Components of LAHSPO's Oversight**
- Financial Accountability & Compliance Audits
- Quarterly Audits: Implement rigorous audits to ensure funds are used effectively.

- Real-Time Financial Tracking: Deploy systems to monitor resource allocations continuously.
- Competitive Bidding: Require competitive bidding for service contracts to prevent mismanagement.

**Shelter & Housing Verification Requirements**

- To ensure accurate reporting of bed inventory and housing solutions, the court must verify quarterly reports provided by the City:
- LAHSA Resource Management System Access: The City must grant direct access to its shelter inventory and resource management system for court verification. All reported figures must align with LAHSA data systems.
- On-Site Verification: The Special Master will conduct visits to both interim and permanent housing facilities to verify actual bed availability and service functionality.

**Diversified Housing Solutions**

- Expand Non-PSH Models: Integrate Transitional Living Settings, Scattered-Site Housing, Tiny Homes, Bridge Housing, and Shared Housing to facilitate quicker exits from homelessness.
- Revise Matching Processes: Reform LAHSA's housing matching process to reduce delays and ensure that individuals are accurately placed.

**Strengthening RFP Processes**

- Demand Competitive Bidding: Enforce competitive bidding for all homelessness service contracts.
- Ensure Financial Transparency: Mandate detailed financial disclosure before contract approval.

**Hybrid Transition Model & HUD Approval Timeline**

- Adopt a phased approach as LAHSPO builds capacity while LAHSA maintains federal CoC oversight:

**Special Master Recommendation on Oversight Approach**

This recommendation outlines a hybrid oversight model aimed at improving accountability and the operational framework of the City's homeless response system. Based on findings from the Alvarez & Marsal Assessment, it addresses concerns related to financial controls, performance management, and quality assurance. The initial proposal provides a structured framework to guide the City in implementing oversight mechanisms while maintaining its leadership role. If significant progress is not achieved within the established timeframe, it is recommended that the court consider transitioning to full receivership.

This section serves as a proposed framework aimed at enhancing accountability and ensuring operational continuity. It is important to note that this proposal represents a set of options based on the opinion of the Special Master. The recommendation builds on existing settlement agreement obligations, addressing issues related to accountability, transparency, financial controls, performance management, and quality assurance.

**The Potential Role of the Fiduciary Monitor**

**Introduction**
The establishment of an independent fiduciary monitor, appointed by the court, presents a strategic opportunity to rectify systemic deficiencies in financial and management controls within the City's homelessness response system. Findings from the Alvarez & Marsal (A&M) Assessment indicate significant gaps in fiscal oversight, contract management, and performance evaluation. To address these concerns, the fiduciary monitor would serve as an impartial oversight entity focused on improving transparency, accountability, and efficiency.

**Purpose and Scope**

The fiduciary monitor would ensure alignment with the A&M assessment recommendations while fostering an environment of rigorous financial discipline and operational accountability.

The scope of the monitor's role encompasses:
- Financial Management Controls – Strengthening budgeting, appropriation tracking, and expenditure oversight to ensure funds are allocated appropriately and in support of service delivery outcomes.
- Compliance Enforcement – Conducting systematic audits to verify adherence to established agreements, including bed inventory and placement commitments.
- Operational Efficiency – Providing data-driven insights to refine governance structures, enhance performance evaluation frameworks, and improve resource allocation strategies.

Key Responsibilities

**Financial Oversight**
- Assess appropriations and expenditures to ensure compliance with funding mandates.
- Implement tracking mechanisms to enhance fiscal transparency and prevent inefficiencies.

- Evaluate contract administration processes to align spending with strategic priorities.

**Compliance Monitoring**
- Verify adherence to the A&M assessment recommendations through periodic audits.
- Conduct independent reviews to assess program effectiveness and policy implementation.
- Provide structured reporting to facilitate judicial oversight and informed decision-making.

**Governance Reforms Facilitation**
- Establish performance metrics to evaluate service provider efficiency and impact.
- Recommend structural governance improvements to enhance oversight mechanisms.
- Strengthen accountability measures to ensure compliance with regulatory requirements.

**Stakeholder Engagement**
- Facilitate discussions with service providers, community representatives, and individuals experiencing homelessness to integrate diverse perspectives into policy refinements.
- Identify systemic barriers to service access and propose corrective measures to improve program efficacy.

**Training and Capacity Building**
- Develop targeted training programs for City staff and service providers focused on financial oversight, case management, and performance evaluation.
- Support competency-building initiatives to reinforce evidence-based decision-making and operational best practices.

**Conclusion and Considerations**

The fiduciary monitor's role is instrumental in restoring public trust and reinforcing governance reforms within the City's homelessness response system. By ensuring financial discipline, operational accountability, and compliance with the A&M assessment findings, the monitor lays the foundation for sustainable systemic improvements.

Should substantial progress not be achieved under the fiduciary's oversight, the groundwork established will provide a structured basis for potential transition to full receivership, should the court deem necessary. The court is advised to review this recommendation as a preliminary step toward safeguarding fiscal integrity and enhancing performance-driven management controls in the homelessness response system.

**Proposed Extended Settlement Agreement Terms between LA Alliance and the City**

Given the City's lack of a bed funding plan, thousands of beds in process since 2022, the Alvarez & Marsal Assessment, and the plaintiffs' briefing on receivership, it is probable that the City will engage in discussions with the LA Alliance or take into consideration the court's proposal for a two-year extension of the settlement agreement.

The following are proposed terms for the extension. These recommendations are not directives from the court or the special master; rather, they should be considered by the parties based on the role of the Special Master if they decide to meet and confer.

**Proposed Extended Settlement Agreement Terms between LA Alliance and the City**

**Extension of Settlement Agreement**
- It is recommended to extend the current settlement agreement until 2029 to allow sufficient time for the effective implementation of critical obligations.

**Development of Comprehensive Plans**
- It is recommended to mandate the creation of a new bed plan and strategies for encampment resolution, ensuring endorsement by the LA Alliance to promote consensus on operational objectives aligned with the City's vision for homeless services.

**Oversight and Exit Strategy**
- It is recommended that the parties collaboratively agree to transition away from LAHSA, initiating the process of forming a new homeless department operating as its own Continuum of Care (CoC).
- It is recommended that the Independent Fiduciary assume immediate control over all contract management in collaboration with the Los Angeles Housing Department.
- It is recommended to empower the Special Master and Independent Fiduciary to develop a transition strategy away from LAHSA, ensuring the adoption of best practices essential for accountability and transparency.

**Incorporation of A&M Assessment Recommendations**
- It is recommended to systematically integrate the recommendations from the Alvarez & Marsal Assessment into operational protocols overseen by the Independent Fiduciary, reinforcing compliance and governance structures.

**Oversight and Reporting Mechanisms**

**Regular Reporting to the Court**
- It is recommended to establish a robust system for the Independent Fiduciary monitor to provide regular updates to the court regarding compliance, operational improvements, and progress toward established objectives.

**Transparency and Engagement**

- It is recommended to facilitate ongoing engagement with stakeholders, including community representatives and advocacy groups, to uphold transparency and encourage collaborative feedback.
- Extension of Settlement Agreement: Propose to extend the current settlement agreement until 2029 to allow sufficient time for effective implementation of critical obligations.
- Development of Comprehensive Plans: Mandate the creation of a new bed plan and strategies for encampment resolution, ensuring endorsement by the LA Alliance to promote consensus on operational objectives aligned with the City's vision for homeless services.
- Oversight and Exit Strategy: The parties should collaboratively agree to transition away from LAHSA, initiating the process of forming a new homeless department operating as its own Continuum of Care (CoC).
- The Independent Fiduciary will assume immediate control over all contract management in collaboration with the Los Angeles Housing Department.
- Empower the Special Master and Independent Fiduciary to develop a transition strategy away from LAHSA, ensuring the adoption of best practices essential for accountability and transparency.
- Incorporation of A&M Assessment Recommendations: Systematically integrate the recommendations from the Alvarez & Marsal Assessment into operational protocols overseen by the Independent Fiduciary, reinforcing compliance and governance structures.

**Oversight and Reporting Mechanisms**
- Regular Reporting to the Court:  Establish a robust system for the Independent Fiduciary Monitor to provide regular updates to the court regarding compliance, operational improvements, and progress toward established objectives.
- Transparency and Engagement: Facilitate ongoing engagement with stakeholders, including community representatives and advocacy groups, to uphold transparency and encourage collaborative feedback.

**Timeline for Implementation**
- Phase 1 (0-6 Months): Establish Independent Fiduciary Monitorship and initiate assessments; formulate plans for operational improvements and engage stakeholders.
- Phase 2 (0-6 Months): Implement new bed plan and encampment resolution strategies; evaluate progress with regular reporting to the court.

This recommendation outlines a proposed hybrid oversight model deemed essential for improving the accountability and operational framework for the City's homelessness response system. The proposal aims to address significant concerns identified in the Alvarez & Marsal assessment and offers the court and involved parties a potential path forward. It is important to emphasize that this recommendation operates within the context of a proposal rather than a mandate, guiding the parties toward effective and constructive solutions.

The establishment of an Independent Fiduciary Monitorship represents a proactive step that can enhance governance while allowing the City to maintain its leadership role in addressing homelessness. This phased approach seeks to improve compliance and operational efficiencies

while prioritizing transparency and stakeholder engagement. The involvement of various community representatives ensures that the voices of those affected by homelessness are heard and included in the decision-making process.

It is crucial for all parties to seriously consider this recommendation to foster a collaborative spirit and shared responsibility. While the court may need to consider more stringent measures, including full receivership, if progress is not made, this recommendation serves as an important opportunity for initial systemic changes in financial controls and performance management.

## CONCLUSION AND LOOKING AHEAD TO SPECIAL MASTER REPORT 3

**Conclusion**

As outlined in this monitoring report, the City of Los Angeles has made measurable progress in expanding housing solutions, yet critical gaps remain in compliance with settlement milestones. Persistent funding shortages, verification discrepancies in encampment resolutions, and uneven geographic distribution of resources impede full adherence to the agreement. The absence of a comprehensive funding plan for the remaining bed deficit, and the bed/units in progress raises concerns about the feasibility of meeting the obligations in the settlement agreement by June 2027. While the Inside Safe Program has contributed to interim housing placements, its implementation lacks alignment with equitable service distribution across Council Districts. Transparency concerns surrounding milestone reporting and budget allocations further complicate enforcement efforts.

As the Special Master I am recommending immediate corrective action by formalizing the encampment resolution verification process once the parties and the court determine the process and verification methods, establishing a funding roadmap plan for the bed deficit, and strengthening compliance mechanisms to ensure transparency and equitable service delivery.

**Moving forward, the City must demonstrate measurable progress in key areas**

- Finalizing and executing a comprehensive bed plan with verified funding sources to meet settlement obligations.
- Implementing structured oversight mechanisms, with the special master for real-time compliance tracking.
- Providing greater transparency in quarterly reports, ensuring all relevant PEH engagement data is included and a mechanism for verification.
- Enhancing governance structures through the establishment of a dedicated homelessness department, reinforcing accountability beyond the existing framework.

Compliance risks will continue to escalate without these critical structure changes. The upcoming monitoring period will serve as a pivotal test for the City's ability to align its strategies with settlement mandates. The Court, LA Alliance, and all stakeholders must remain committed to reinforcing accountability, ensuring the City meets its obligations under the settlement agreement.

**Looking Ahead to Special Master Monitor Report 3**

As the City enters the second quarter of Year Three of the reporting period, key focus areas must include:

- Bed/Unit Verification: Conduct data verification and spot checks on bed/unit figures, detailing how these figures were gathered and presented to the court.
- Beds/Units in Process: Provide documentation on beds in process since 2022, explaining delays and outlining comprehensive reporting to enable timely court tracking and verification.
- Encampment Resolution Progress Reports: Offer a district-specific breakdown of encampment interventions and resolution verification to ensure compliance.
- Bed Plan Implementation and Monitoring: Demonstrate measurable progress toward the 12,915-bed mandate, with structured funding allocations and milestone tracking.
- Quarterly Data Expansion: Ensure all future reports include comprehensive People Experiencing Homelessness (PEH) engagement metrics, shelter rejections, and reasons to identify gaps in service delivery with the County to ensure proper referral and service delivery.
- Ongoing Governance Reform Discussions: Provide updates to the special master on the advancement motions to establish an independent Department of Homelessness, ensuring direct oversight and financial transparency.
- Regular Public Reports and Compliance Transparency: Improve accessibility of compliance tracking tools, offering real-time data updates on bed availability and expenditures.
- Structured Response to Receivership Discussion: Present alternative oversight structures to the Court, demonstrating the City's ability to meet settlement obligations without judicial intervention.

EXHIBITS

Exhibit 1:
Conceptual Framework: A Roadmap for Structured Oversight, Accountability, and Performance-Driven Reform
LAHSPO – Proposed City Homeless Strategy & Performance Office
Template 2: Hybrid CoC Transition Roadmap-Phased Implementation Strategy for Los Angeles' Independent CoC

Exhibit 2:
City LA Alliance Milestones
Encampment and Cleaning resolution goals

**EXHIBIT 1**

**Conceptual Framework: A Roadmap for Structured Oversight, Accountability, and Performance-Driven Reform**

By Michele Martinez, Special Master

**I. Introduction & Context**

This conceptual framework is a recommendation developed as part of my role as Special Master, based on:

- ✅ Extensive research, learning sessions, and direct field observations
- ✅ Insights from City Council and committee meetings
- ✅ Engagement with outreach workers, providers, and service providers

It does not constitute formal City policy but serves as a structured proposal to help City leaders envision an independent governance model designed to improve funding transparency, housing and service integration, provider accountability, and sustainable housing placements.

In recent proceedings, the court has repeatedly received affirmations from the Mayor and City Council members acknowledging their awareness of the shortcomings within the current system. Those leaders have consistently conveyed that the findings from various audits have reiterated what was already apparent to them. However, a pivotal moment arose when the Court sought the insights provided by the Alvarez and Marsal Assessment of the City's homeless programs. This evaluation uncovered more deficiencies than previously articulated by City officials. It revealed a an absence of a cohesive homeless response system equipped to efficiently track, verify, and hold service providers accountable. Additionally, it highlighted the lack of a robust data and accounting framework necessary for monitoring performance measures aligned with funding allocations.

These findings from the Alvarez and Marsal Assessment raises critical questions about the transparency and communication between City officials and the court. Were City Leader and policy makers aware of the extent of the deficiencies highlighted in the A&M Assessment? If so , should there have been discussions amongst the parties and the Court prior to any agreement being entered into? Particularly when a number of obligations contained in the settlement agreement are seemingly quite difficult to attain without the foundational support of a competent homeless response system.

In light of the above, I am compelled to recommend and propose a new structure: establishing a dedicated homeless department for the City. This department would oversee the design and implementation of a comprehensive and independent homeless response system. Moreover, I suggest considering a strategic departure from the Los Angeles Homeless Services Authority (LAHSA) Continuum of Care (CoC) and the creation of an autonomous system, akin to the approaches taken by cities such as Long Beach and Pasadena. These cities have implemented models that enhance accountability and operational efficiency.

This recommendation aims to guide the City towards a more effective and responsible system, better equipped to meet its commitments and serve its homeless population. The establishment of such a department would signify a significant step forward in addressing the systemic issues and achieving the desired outcomes. It is an essential move to foster a system that is not only viable but also accountable to all stakeholders involved.

**The City of Los Angeles must assume full responsibility for its homelessness response system, transitioning LAHSA's toward a direct governance structure. This framework outlines a phased roadmap to establish an independent homeless department, ensuring**

- Strategic financial governance to eliminate inefficiencies
- Enforceable performance measures
- Structured accountability mechanisms to track provider compliance
- Data transparency & real-time monitoring of housing placements

This framework provides a policy structure, governance model, and implementation plan for executing a permanent transition away from LAHSA-driven administration, while ensuring the City retains full oversight responsibility as mandated under the LA Alliance settlement agreement.

**II. Structural Governance & Oversight Model**

Current System Weaknesses:
► The City funnels all funding through LAHSA, allowing fragmented oversight and opaque financial management.
► LAHSA lacks authority to enforce compliance measures, causing disjointed provider coordination.
► Unverified bed counts and service inefficiencies prevent transparent tracking of outcomes.

**Proposed Reform Model**

Create an independent department, directly accountable to the City Council and Mayor's Office.

Shift CoC leadership to a new governance entity, ensuring local control over funding priorities. Establish a Performance & Compliance Division, monitoring provider accountability, contract enforcement, and financial audits.

**Governance Structure:**

| Entity | Role and Oversight Authority |
|---|---|
| Independent Department | Direct oversight of funding allocation, contract enforcement, housing placements |
| CoC Governance Board | Prioritizes funding for LA's unhoused population rather than regional redistribution |
| Performance & Compliance Division (Controller Office/ CAO's Office partnership) | Conducts audits, enforces provider compliance, tracks real-time placement data |

**III. Financial Oversight & Accountability**

Current System Weaknesses
► LAHSA receives all City funding but lacks structured financial accountability mechanisms from the City.
► 70% of contracts lack detailed expenditure tracking, causing inefficiencies in resource allocation.
► The City currently funds regional CoC priorities rather than directly supporting local placements.

Proposed Fiscal Accountability Plan
- Implement zero-based budgeting, requiring departments to justify every dollar allocated based on measurable results.
- Mandate independent financial audits, ensuring third-party verification of spending and contract expenditures.
- Develop a financial transparency dashboard, providing monthly reports on budget performance, housing placements, and provider compliance along with RFP's.

**IV. Performance Management & Provider Accountability**

Current System Weaknesses
► Success metrics rely on bed-count tracking, failing to measure long-term housing placements and retention.
► Providers operate with minimal oversight, leading to unverified service impact.
► Disjointed referral processes hinder effective housing placements.

Proposed Performance Model
- Enforce provider audits, linking funding to verified housing placement outcomes.
- Track individual client progress, using real-time data systems beyond traditional bed counts.
- Benchmark success metrics, aligning LA's model with other cities or the prior system.

**V. Data Transparency & Real-Time Tracking**

Current System Weaknesses
► Fragmented data systems prevent structured tracking of placements and service success rates.
► Ghost bed claims obscure transparency in funding allocations.
► Regional CoC data priorities override local placement tracking.

**Proposed Data Oversight Strategy**
- Adopt a unified By-Name List, ensuring live tracking of individuals in the homelessness response system.
- Enforce data verification protocols, eliminating ghost bed claims and unverifiable placement figures.

- implement monthly public dashboards, showing funding allocations, provider performance, and housing retention rates.

**Quality Assurance & Program Standards**
- A rigorous monitoring system will be established to improve service accountability:
- Annual audits of all homelessness programs.
- Third-party evaluations to assess effectiveness.
- Standardized protocols for risk mitigation, community safety, and service alignment.

**Transition Strategy & Hybrid Model Until HUD Approval**
Since HUD approval for an independent CoC takes 2-3 years, LA will gradually build its own homeless department while LAHSA remains the official CoC during the transition.

**Stage 1: Establish a City Homelessness Department (0-6 Months)**
- LA City creates a department to oversee local initiatives.
- LA City pilot's performance-based funding before full CoC implementation.
- Service providers begin reporting directly to the new independent department while LAHSA maintains HUD oversight.

**Stage 2: Negotiate Shared Governance with LAHSA (6-12 Months)**
- LAHSA remains the HUD-designated CoC, but City homeless department co-manages services and decisions.
- City Homeless Department starts independently managing City and state funds, shifting governance control.

**Stage 3: Develop Separate HMIS & Performance Systems (12-18 Months)**
- LA builds an independent Homeless Management Information System (HMIS).
- City Homeless Department creates real-time tracking, ensuring transparency in service coordination.
- LAHSA and the City Independent Department to address the Homeless Response System will share data while transitioning responsibilities.

**Stage 4: Shift Funding & Programs to City Control (18-24 Months)**
- LA City Independent Homeless Response System Department gradually assumes funding authority, shifting allocations away from LAHSA.
- City contracts expand direct services, reducing reliance on LAHSA's oversight.
- Service providers begin reporting exclusively to City.

**Stage 5: Apply for HUD CoC Status (24-36 Months)**
- LA submits a formal application to HUD for an independent CoC.
- City demonstrates governance structure, funding sustainability, and program effectiveness.
- Once approved, LA fully transitions to a city-run CoC.

**VI. Compliance Enforcement & Judicial Oversight**

Current System Weaknesses
▶ LAHSA lacks authority to enforce direct compliance mechanisms and LAHSA is not a part of the Alliance settlement agreement.
▶ The City's reliance on regional CoC frameworks delays internal funding realignment.
▶ Settlement agreement risks continued failure without enforceable oversight strategies.

Proposed Compliance Model
- Implement provider performance reviews, ensuring clear consequences for non-compliant service organizations.
- Align tracking with judicial oversight, ensuring compliance with LA Alliance settlement benchmarks.
- Expand public grievance systems, allowing direct community reporting on financial mismanagement and service failures.

**VII. Implementation Roadmap**
- If the City shall extend its settlement agreement for another two years it should look at creating its own homeless department and transitioning to become its own COC by 2029.

**VIII. Conclusion**
This proposed framework provides the structured policy roadmap necessary to transition Los Angeles to a transparent, accountable, and performance-driven homeless response model.

Ultimate responsibility lies with the city—not LAHSA—for oversight failures. Direct City control over funding, compliance enforcement, and performance tracking is essential with structured milestones, this framework ensures the City is moving towards the creation of the new department and transition to its own Coc.

**Template Model 1**

**Creation of the Los Angeles City Homelessness Strategy & Performance Office "LAHSPO"**

- Structured Governance & Accountability Model
- Independent Governance Framework for LA's Homelessness Response System
- A Roadmap for Structured Oversight, Accountability, and Performance-Driven Reform

**I. Introduction & Justification for Creating LAHSPO**

Los Angeles' current homelessness response system suffers from governance inefficiencies, financial mismanagement, and ineffective service coordination, limiting the City's ability to reduce street homelessness and transition individuals into stable housing.

Findings from the A&M assessment and independent site evaluations reveal:
🚩 $2.3 billion in untracked homelessness spending, preventing accountability in resource allocation.
🚩 Unverified housing placements and fragmented referral processes, limiting the City's ability to track program success.
🚩 LAHSA-controlled CoC governance, restricting the City's ability to prioritize services for LA's unhoused residents.

The City of Los Angeles must assume full responsibility for its homelessness response system, transitioning oversight away from LAHSA and toward a direct governance structure. This framework outlines a phased roadmap to establish an independent homeless department, ensuring:

- Strategic financial governance to eliminate inefficiencies
- Enforceable performance measures beyond traditional bed counts
- Structured accountability mechanisms to track provider compliance
- Data transparency & real-time monitoring of housing placements
- County service integration—mental health, substance use, public assistance
- Centralize financial oversight and compliance across all homelessness programs
- District-level governance, ensuring localized strategies for each council district
- Transition LA into a standalone CoC, ensuring full operational autonomy over homelessness response
- Implement By-Name List tracking & acuity-based placements for real-time prioritization
- Create a structured PSH triage model, ensuring housing readiness and document completion

**Why the City Needs LAHSPO**

LAHSA operates under a Joint Powers Agreement (JPA) between Los Angeles County and the City of LA, limiting the City's direct oversight over funding, policies, and contracts because LAHSA serves as the COC and is the homeless administrator for the City. Currently, LAHSA

operates as the primary CoC authority for the City, controlling funding allocations, provider agreements, and compliance audits. However, LAHSA's regional CoC model forces Los Angeles to subsidize other in the coordinated entry system because it is focused on high acuity, instead of prioritizing its own unhoused residents.

LAHSPO enables the City to independently oversee financial allocations, enforce performance benchmarks, and create direct housing pathways tailored for LA's unhoused population.

LAHSPO ensures the city controls all its local and state funding sources, enforcement mechanisms over LAHSA and all service providers, and direct homelessness response oversight—eliminating service inefficiencies and fragmented governance.

Without LAHSPO, the city remains dependent on LAHSA, preventing structured accountability over homelessness resources and housing investments directly for the city.

**Department Overview**
The Los Angeles Homeless Strategy & Performance Office (LAHSPO) will serve as the City's independent homelessness governance department, ensuring direct financial oversight, provider accountability, and performance-driven service delivery.

While LAHSA remains the official CoC during transition, LAHSPO will operate under direct City control, centralizing oversight of funding allocations, service contracts, and system performance tracking.

## II. Organizational Structure & Leadership

Current System Weaknesses
▶ City Homeless administrator LAHSA receives City homeless and housing funding but lacks structured financial accountability mechanisms.
▶ 70% of contracts lack detailed expenditure tracking, causing inefficiencies in resource allocation.
▶ The City funds regional CoC priorities rather than directly supporting local placements.

**Proposed Fiscal Accountability Plan**
- Implement zero-based budgeting, requiring departments to justify every dollar allocated based on measurable results.
- Mandate independent financial audits, ensuring third-party verification of spending and contract expenditures.
- Develop a financial transparency dashboard, providing monthly reports on budget performance, housing placements, and provider compliance.

LAHSPO Leadership & Organizational Structure

| Division | Responsibilities | Reporting Authority |
|---|---|---|
| Homeless Strategy & Policy | Sets Citywide homelessness strategies, aligns services with local, state and federal mandates | Mayor Office / City Council |
| Performance & Compliance | Track service provider accountability, enforces data verification standards | LAHSPO/ CAO/ Mayor Office |
| Funding & Resource Oversight | Manages City budget allocations, ensures transparency reporting | LAHSPO/ CAO / Controller office |

**Strategy & Performance Office (LAHSPO)—which will:**
- Centralize financial oversight and compliance across all homelessness programs.
- Establish district-level governance, ensuring localized strategies for each council district.
- Transition LA into a standalone CoC, ensuring full operational autonomy over homelessness response.

**LAHSPO's Core Responsibilities**
- Data-Driven Decision Making – Implement real-time tracking, predictive analytics, and outcome-based reporting.
- Strategic Housing Expansion – Work with developers, policymakers, and stakeholders to increase affordable housing stock.
- Enforce Provider Accountability – Conduct quarterly audits, mandate performance reviews, and ensure contract compliance.
- Integrated Service Coordination – Align mental health, employment, substance recovery, and housing services.
- Hybrid CoC Oversight – Ensure funding and program coordination while transitioning LA to full CoC independence.

**III. Council District Governance Model**

Each City Council district will function like its own localized municipality, overseeing homelessness response tailored to its unique demographics, housing stock, and service infrastructure.

District Homelessness Action Boards (DHABs):

**To ensure targeted homelessness reduction strategies, each City Council district will establish a District Homelessness Action Board (DHAB)responsible for:**

- Developing localized homelessness reduction plans, considering district-specific needs

- Managing funding allocations, ensuring resources are distributed based on localized demand
- Coordinating housing placements with outreach teams to ensure real-time tracking
- Reporting performance metrics to LAHSPO's Citywide CoC Advisory Council

## IV. Performance Management & Accountability

Current System Weaknesses

⚑ Success metrics rely on bed-count tracking, failing to measure long-term housing placements and retention.

⚑ Providers operate with minimal oversight, leading to unverified service impact.

⚑ Disjointed referral processes hinder effective housing placements.

**Proposed Performance Model**
- Enforce provider audits, linking funding to verified housing placement outcomes.
- Track individual client progress, using real-time data systems beyond traditional bed counts.
- Benchmark success metrics, aligning LA's model with LAHSA and County Department.

**Performance Management & Accountability:** This is an Example table not an exhaustive list of KPI's.

**Key Performance Indicators (KPIs)**

| Category | Key Metrics |
|---|---|
| Housing stability | Retention rates (6, 12, 24 months), reduction in unsheltered homelessness per district |
| Health & Service Utilization | ER visits, hospitalizations, EMS calls, jail/court system interactions |
| Self Sufficiency | Employment enrollment, income growth, access to stable public assistance |
| Public system cost reduction | Decrease in overall public expenditures tied to homelessness |
| Service Coordination | County service participation—mental health, substance use, healthcare access |

**Performance Metrics for Success:** This is an example system level metrics not an exhaustive list.

| System-Level Metrics | Tracking Measures |
|---|---|
| Reduction in unsheltered homelessness | Real-time tracking via By-Name List and Point-in-Time counts |
| Verified housing placements | Percentage of individuals successfully housed |
| Housing retention rates | Percentage of clients maintaining stable housing at 3, 6 and 12 months |
| Recidivism tracking | Percentage of individuals returning to homelessness within 3-12 months |

40

| Cost-efficiency of interventions | Per-client spending analysis versus long-term housing stability |
|---|---|

**Layered Outcomes Beyond Housing Placements:**

| Short-Term Outcomes (0-6 months) | Housing acquisition, reduction in shelter dependency |
|---|---|
| Mid-Term Outcomes (6-18 months) | Mental health, substance use treatment engagement, self-sufficiency growth |
| Long-Term Outcomes (18+ months) | True stability and independence, reducing recidivism |

### System Performance & Quality Assurance Metrics

**Outcome-Driven Metrics for Housing Stability & Provider Compliance**

| Indicator Type | Measurement Criteria | Example Targets |
|---|---|---|
| Housing stability | Permanent housing retention rates at 6,12,24 months | 85% retention for placed individuals |
| Service Effectiveness within 30 days | Successful case management follow-ups | 95% completion rate |
| Financial Transparency | Quarterly provider audits, ensuring reported expenditures align with funding contracts | 100% compliance across programs |
| Provider Accountability | Contract renewals tied to measurable outcomes (housing placements, service success rates) | Minimum 75% success rate for renewals |
| Diversified Housing Placement | Percentage of unhoused individuals placed into alternative housing models (TLS, Tiny Homes, Shared Housing) | Target: 50% non-PSH placements |

These benchmarks ensure service efficiency is measured beyond shelter capacity, focusing on true housing stability and financial accountability.

**Example Data Tracking Documents**
Spot-Check Audit Checklist for Housing Providers
- ✅ Verify physical existence of funded housing sites (ensuring site matches records)
- ✅ Review provider financial expenditures (confirming alignment with approved budgets)
- ✅ Assess quality of case management services (ensuring promised support is provided)
- ✅ Inspect housing conditions & safety compliance (ensuring habitability standards)
- ✅ Interview program participants (gather direct feedback from housed residents)

**Housing Placement Tracking Report Format**

| Client ID | Referral Date | Housing Type | Provider | Placement | Outcome | Retention Status |
|---|---|---|---|---|---|---|
| 10543 | 04/02/25 | Scattered-Site Apartment | XXX | Housed | Active at 12 months | |
| 10800 | 05/01/25 | Shared Housing | SSS | Housed | Moved to Independent Living | |

Standardizing placement tracking ensures providers maintain housing success accountability.

**VI. Service Integration—Expanding Beyond Housing**

- County & Service System Coordination
- Direct integration of mental health, substance use, and healthcare into LAHSPO operations
- Joint City-county oversight committee, ensuring real-time coordination of high-acuity service needs
- Mandatory partnerships with public assistance program—ensuring economic stability as part of homelessness prevention

**County Service Coordination & Referral Process**

- Structured Referral System for County Services
- Step-by-step referral protocol, ensuring City outreach teams navigate County provider networks efficiently.
- Clear guidance on County acuity-based service eligibility, ensuring service providers understand who qualifies for County mental health, substance use treatment, and healthcare.
- Formal training program for outreach teams, ensuring providers know how to access County-funded care and avoid service gaps.
- Dedicated County liaisons embedded within City outreach teams, ensuring seamless referrals and service navigation.

**V. Incremental Housing Steps & PSH Triage Process**

- Acuity-Based Housing Placements & By-Name List Integration
- Housing placements must align with individual needs, ensuring low-acuity individuals transition faster while high-acuity cases receive intensive support.
- By-Name List tracking ensures real-time prioritization, matching document-ready and housing-ready individuals to appropriate placements.
- Diversified housing models beyond PSH, ensuring individuals are matched with Transitional Living, Scattered-Site Housing, Shared Housing, and Bridge Shelters.

**Step-by-Step PSH Triage Model:**

- Individuals must meet two key readiness benchmarks before entering PSH:

- Document Readiness: Ensuring all documents needed for PSH are completed
- Housing Readiness: Ensuring individuals can live independently without posing harm to themselves or the unit.

**Enhanced Services in Pre-PSH Stabilization Housing:**

- Before entering PSH, individuals may require enhanced case management and behavioral health treatment, ensuring mental health and other high-service needs are addressed before permanent housing
- Bridge Housing: Short-term supportive housing linked to case management.
- Shared Housing Models: Placements for individuals developing independent living skills.
- Workforce & Educational Housing: Transitional placements for those on a path toward self-sufficiency.
- Dedicated case management teams, ensuring individualized support and service coordination.
- Integrated mental health and substance use treatment, ensuring access to behavioral health specialists onsite.
- Expanded healthcare access, including chronic disease management, preventative screenings, and onsite medical assessments.
- Life skills training, ensuring clients build independent living skills before PSH placement.

**Template 2: Hybrid CoC Transition Roadmap**

**Phased Implementation Strategy for Los Angeles' Independent CoC**

**Introduction**

The City of Los Angeles is transitioning to an independent Continuum of Care (CoC) to strengthen accountability and efficiency in its homelessness response system. Since HUD approval takes time, the City will implement a hybrid model, gradually developing its own homeless department while LAHSA remains the official CoC. The five-stage transition ensures real-time oversight, data transparency, and progressive funding shifts, culminating in a fully independent City-run CoC within three years.

**Overview**

Transitioning Los Angeles City to its own Continuum of Care (CoC) will take two years, requiring HUD approval and City Council authorization. Until fully established, LAHSA remains the official CoC, while LAHSPO assumes full operational control of funding oversight, provider management, and strategic service expansion.

**Hybrid Model Governance Until Full CoC Independence**

**While awaiting HUD approval, LAHSPO will manage:**

- Direct financial accountability for all homelessness programs under City oversight
- Immediate compliance mechanisms for provider audits, data verification, and housing placements
- Service expansion & policy alignment while maintaining CoC authority under LAHSA
- Funding transition protocols, ensuring gradual withdrawal from regional CoC redistribution

**Phased CoC Transition Model**

| Phase | Key Actions Items |
|---|---|
| Phase 1 (0-6 months) | Establish LAHSPO, initiate program realignment, early performance audits |
| Phase 2 (6-12 months) | Develop independent data systems, strengthen governance, negotiate service coordination |
| Phase 3 (12-18 months) | Shift funding control, implement real-time tracking, enhance provider oversight |
| Phase 4 (18-24 months) | Apply for HUD CoC status, finalize transition framework |
| Phase 5(24-36 months) | Fully transition from LAHSA to City-controlled CoC governance |

This approach allows the new homeless dept LAHSPO to build internal capacity, governance oversight, and financial compliance mechanisms before assuming full CoC authority avoiding service disruptions while strengthening accountability measures.

Implementation Milestone Proposed Recommendations

If the City shall extend its agreement for another two years it should look at creating its own homeless department and transitioning to become its own COC by 2029.

EXHIBIT II

Compliance Milestones Breakdown & Data Table



Encampment and Clean-up Goals

### LA Alliance Milestone Goals

| Time Period | Citywide Milestone Period | Citywide Aggregate Milestone | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 | CD 8 | CD 9 | CD 10 | CD 11 | CD 12 | CD 13 | CD 14 | CD 15 | Total by CD | Aggregate by CD Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July - Dec 22 | 800 | 800 | 71 | 31 | 24 | 24 | 23 | 45 | 42 | 38 | 83 | 40 | 48 | 27 | 66 | 184 | 54 | 800 | 800 |
| Jan - Jun 23 | 1,000 | 1,800 | 88 | 38 | 30 | 30 | 29 | 56 | 52 | 47 | 103 | 50 | 60 | 33 | 82 | 235 | 67 | 1,000 | 1,800 |
| July - Dec 23 | 1,000 | 2,800 | 88 | 38 | 30 | 30 | 29 | 56 | 52 | 47 | 103 | 50 | 60 | 33 | 82 | 235 | 67 | 1,000 | 2,800 |
| Jan - June 24 | 1,250 | 4,050 | 110 | 48 | 37 | 38 | 37 | 70 | 65 | 59 | 129 | 62 | 75 | 41 | 102 | 293 | 84 | 1,250 | 4,050 |
| July - Dec 24 | 1,250 | 5,300 | 110 | 48 | 37 | 38 | 37 | 70 | 65 | 59 | 129 | 62 | 75 | 41 | 102 | 293 | 84 | 1,250 | 5,300 |
| Jan - June 25 | 1,500 | 6,800 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 6,800 |
| July - Dec 25 | 1,500 | 8,300 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 8,300 |
| Jan - June 26 | 1,500 | 9,800 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 9,800 |
| **Totals:** | **9,800** | **9,800** | 663 | 374 | 290 | 295 | 267 | 549 | 510 | 460 | 1,012 | 409 | 588 | 325 | 803 | 2,296 | 659 | 9,000 | 9,800 |