UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) ) | Los Angeles, California |
| vs. | ) ) | Thursday, May 15, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) ) | ( 9:18 a.m. to 10:03 a.m.) |
| Defendants. | ) | (10:59 a.m. to 11:13 a.m.) |

STATUS CONFERENCE RE A&M AUDIT;

PLAINTIFFS' MOTION FOR ORDER FOR SETTLEMENT AGREEMENT
COMPLIANCE [DKT.NO.863]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:                 SEE PAGE 2


Court Reporter:             Recorded; CourtSmart


Courtroom Deputy:           Kelly Davis


Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         MATTHEW UMHOFER, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979

For Defendants:          LAUREN M. BRODY, ESQ.
                         JASON H. TOKORO, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         SCOTT D. MARCUS, ESQ.
                         ARLENE N. HOANG, ESQ.
                         Los Angeles City Attorney's Office
                         200 N. Main Street, Room 675
                         Los Angeles, CA 90012
                         213-978-6952

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983

Special Master:          MICHELLE MARTINEZ

Also present:            KATHRYN BARGER
                         LISA BROWN
                         LAURA FROST
                         DIANE RAFFERTY
                         PAUL WEBSTER

**Los Angeles, California; Thursday, May 15, 2025; 9:18 a.m.**

**(Call to Order)**

THE COURT:  Kelly, thank you very much.  If you'd be seated, I'm usually less formal than that, but Kelly, thank you.

We're in session on the matter of L.A. Alliance for Human Rights v. the City of Los Angeles.  And I'd like to have your appearances by all of the parties, please.  And you can remain seated if you'd like to during this presentation.  I'm trying to keep people away from the lectern during flu season.  If you want to use the lectern, you're more than welcome to, but you're also welcome to be rather informal and just be seated as if you are in state court.

MS. MITCHELL:  Thank you, Your Honor.  Elizabeth Mitchell, Umhofer, Mitchell & King, on behalf of plaintiffs.  Paul Webster from L.A. Alliance is also here with me.  My colleague, Matt Umhofer, is up in Judge Frimpong's courtroom.  He will be down with us when he's finished with that matter.

THE COURT:  Okay.

MS. BRODY:  Lauren Brody, Miller Barondess LP, on behalf of the county.  I'm here with my colleague, Jason Tokoro, and I'd like the record to note that Supervisor Kathryn Barger is also here.  Apologies, Your Honor.  Mira Hashmall is in trial, and her request to be excused today was denied.

**4**

**THE COURT:** Pleasure to have you here. Thank you, Supervisor.

**MR. MARCUS:** Good morning, Your Honor. Scott Marcus, on behalf of the City of Los Angeles.

**MS. HOANG:** And good morning, Your Honor. Arlene Hoang, for the City of Los Angeles.

**THE COURT:** Pleasure. Nice seeing both of you.

**MS. MYERS:** Good morning, Your Honor. Shayla Myers, on behalf of the intervenors.

**THE COURT:** I received a letter last evening from Judge Gandhi, who's the special master in this matter, along with Special Master Michelle Martinez. I've had a conversation with Judge Gandhi sometime last evening between 8:00 and 10 o'clock, and sometime this morning about between 6:00 and 7:00.

The letter I received last evening is as follows, and I'll docket this. "Dear Judge Carter, with profound respect for the court and administration of justice, I write to formally tender my resignation as a Special Monitor Master in the Los Angeles County's Historic Settlement in the L.A. Alliance for Human Rights Litigation. Serving in this role has been a singular honor. Since that day, we walked the streets of Skid Row in 2023, the opportunity to assist the Court in addressing one of our most urgent and complex humanitarian issues of our time, people experiencing homelessness in Los

Angeles has left an enduring mark on me, both professionally and personally.  Thank you for the grace to serve.  While I may be stepping down from this formal capacity, my commitment to the cause of housing justice and systematic reform remains unwavering.  The work to end this crisis is not only a policy imperative, it's a moral one.  I'm confident that with courage, collaboration, and your leadership, meaningful progress shall further continue to that most noble goal.  I'm grateful for the trust placed in me by the Court.  I will do everything possible to ensure the smooth transition."

When I received this, I've talked to him subsequently about whether, depending upon what the circuit does and this new directive and executive order from President Trump, would cause a conflict on his part if he entered into what I'm going to call the Veterans Administration case.  I subsequently had a conversation with him this morning and asked if there was any possible way that he believed that the parties or he could continue on.

He'll leave that to each of you, but he just thinks it's best under these circumstances to tender his resignation.  I leave that to the parties because today we're going to have to discuss who that new special master would be or start down that process, and that's why some of the delay in the back.

The second issue for consideration today is the A&M

audit, and I'm going to ask A&M to make their presentation today, and then I'll go around the room for any comments, et cetera, for any interested parties.  So if A&M would come forward, please, and I represent to you that I've had conversations with them.

Michelle, you'll have to help me with my memory, but as late as Wednesday.  Thank you very much.  Would you introduce yourself to the record?  Make sure you're comfortable.  If you'd like to bring a chair up so that the other parties who aren't making the initial presentation can be seated, then you can address the Court.

MS. FROST:  Thank you, Your Honor.  Laura Frost.

MS. RAFFERTY:  Diane Rafferty from Alvarez and Marsal.

MS. BROWN:  Lisa Brown.

THE COURT:  All right.  Please.

MS. FROST:  Thank you, Your Honor.  We appear before you today to address both the urgency of Los Angeles's homelessness crisis and to clarify the nature of our work.

THE COURT:  And I'm going to slow you down just a little bit like I do the litigants, okay, and sometimes myself.

MS. FROST:  Absolutely.  No, thank you.  As an objective third party, we wish to underscore that our financial and performance report was not a formal regulatory audit.  Rather, it was a comprehensive assessment and evidence-

**7**

based review intended to illuminate how homelessness services and beds are funded by the city and how services are delivered and managed.

Our purpose was to provide an impartial data-driven perspective that can guide meaningful solutions.  We arrived at our conclusions by examining the flow of funds, assessing the structures meant to serve people experiencing homelessness, and verifying how resources were ultimately reaching those in need.

During our assessment, we quantified 2.3 billion in total funding for the three city programs under our review.  This amount represents appropriations, commitments, and expenses across the look-back period June 2020 through June 2024.  It is important to note that over half of the quantified funding went toward investment in infrastructure or capital costs for beds.  For some of these capital funds, this quantified figure may extend beyond the parameters of the look-back period.

In other words, some of these allocations, while documented within the data we evaluated, could have been committed and spent prior to the look-back period or be destined for future expenditures rather than having been fully spent during the timeframe under review.  Additionally, of the quantified funding, roughly $500 million covered services managed through LHASA, and it is within this portion of

**8**

spending that we identified critical gaps in data and reporting where funds spent on specific services and the reported creation of open beds could not be definitively verified.

Despite repeated references to bed counts and court proceedings, our assessment suggests that these figures alone can be both incomplete and at times unverifiable. Without reliable data on occupancy, service quality, and genuine progress toward permanent housing, bed counts remain an empty measure that may mask deeper challenges in addressing the homelessness crisis. Lack of transparency does more than obscure resource allocation. It directly impedes the capacity to respond effectively to those who endure day after day of housing instability, whether they are on the streets and vehicles or rotating through shelters with no guaranteed path to a permanent home.

As an objective third party, we are not here to assign blame or sensationalize shortfalls, instead our report presents insight so we can collectively strengthen the system that this vulnerable population relies upon. When data is difficult to track or interpret or when its quality is compromised, it becomes nearly impossible to optimize services or demonstrate accountability to the public.

Your Honor, we respectfully submit that the findings in our assessment of our final report be used as a blueprint to improve transparency, refine processes, and maximize the impact

of every dollar spent on homelessness services.  Enhancing clarity and data and funding flows enables more targeted interventions, closing the gaps that have left too many without the support they urgently need.  In short, our intent is not to overstate challenges or diminish any progress that has been made, nor to fixate on technical disagreements.  Rather, it is to offer an impartial view that illuminates what works and what needs adjustment to reduce and ultimately end homelessness in Los Angeles.

After the previous court hearing and with the Court's permission, we met with all involved parties to solicit feedback, ensuring greater clarity and accuracy throughout the report.  However, no material changes have been made to our findings and recommendations.  We trust that the Court will draw on these objective findings and recommendations to encourage enhanced collaboration and accountability among all parties.  With your guidance, Your Honor, we can ensure that the findings borne of an unwavering commitment to objectivity catalyze real and measurable change for those who too often remain invisible.

Thank you for the opportunity to present our assessment and for recognizing the importance of evidence-based solutions in confronting one of the most pressing challenges facing Los Angeles today.

THE COURT:  Thank you very much.  Now, do either of

EXCEPTIONAL REPORTING SERVICES, INC

the other parties or persons present wish to say anything at this time?  If not, then I'll turn to the parties and see if they have questions.

Let me start with L.A. Alliance.  Do you have questions concerning this audit and if so, the auditors are in front of you.

**MS. MITCHELL:**  Thank you, Your Honor.  I think on a high level because you guys -- you spent a good 10 months with the data, interviewing people, reviewing documents, not getting documents, having to follow up over and over.  Is this a system that you believe can be fixed by a few patches or is it more of like a systemic overhaul that's needed in order to address the very serious challenges that you have identified?

**THE COURT:**  And just to identify who's the speaker so I have a record.

**MS. RAFFERTY:**  Yeah.  This is Diane Rafferty from A&M.

I think to your question, it's very difficult whether you're a company, a commission, to patch work things.  It really -- all of this needs to be looked at in a different way. I mean there's so many tools out there that we're not looking at AI solutions.  I think it needs to start from the ground up to figure out what you -- what the city and the county really want to do to make this system totally different.  There's too many gaps and there's old data systems, and it's really hard to

**11**

just patchwork it because it becomes -- you solve one problem and then you don't solve another.

So in our assessment, because we do a lot of this work, is to really build it up from the ground up.  That's not saying to replace every single person but the processes are extremely broken.

MS. MITCHELL:  I have nothing further.  Thank you.  Apparently I do have one more question.  Did you review any other audits from any other states or any other homelessness systems and did you see any similarities or patterns between those?

MS. FROST:  I mean, I think homelessness crisis is definitely not isolated within Los Angeles.  I believe to this magnitude, yes.  I think a lot of -- this is very unique and I think relation to the structure right between the infrastructure of how homelessness services are deployed, but I believe a lot of cities are facing a homelessness crisis and challenge.  So we definitely looked at this wasn't just pure isolation.

MS. RAFFERTY:  And just to add to that, you know, we did look at other cities that are dealing with this, in Seattle, Chicago, New York.  LA City and County are so unique because they are so vast and there's so many different components.  It just is -- that's why everybody's looking at this nationally thinking if LA can do something, then we

probably can too.  But there's no examples out there.  There's little things that we see work but not on a system level and the size and the scope of LA and LA County.

MS. MITCHELL:  Thank you.

THE COURT:  Any other comments concerning the audience from LA Alliance?

MS. MITCHELL:  No, not at this time.  Thank you, Your Honor.

THE COURT:  On behalf of Los Angeles County.

MS. BRODY:  Thank you, Your Honor.  You know, we've really appreciated the opportunity to work with A&M over this process.  You know, we really thank you for the empathy and care that you brought to this very challenging project.  You know, Supervisor Barger sat down with you about a month ago to discuss the methodology and findings and thank you for making the time in order to have those conversations ongoing.

You know, the County has independently taken a hard look on the system as it's working on the ground and whether it's serving the people who rely on it and we were really pleased to see that the steps that the County has independently undertaken are in line with your recommendations.  Now we're continuing to review them and you know we have nothing further to add.  We don't have any questions but we're happy to be here and thank you for your work.

THE COURT:  Supervisor Barger, does this meet with

**13**

your approval?

       **MS. BARGER:**  Absolutely.  And I thank you for taking the time.  I better understood --

       **THE COURT:**  Let's give you a microphone.  Kelly, I'm sorry.  Pardon me.  Just remain where you are.  No, you don't have to.  We'll get you a microphone.  Thank you, Kelly.

       By the way, for all parties, because we're entering a different phase potentially, those personal relationships with Mayor Bass and other people, Supervisor Barger, I'm now going to desist from.  So before we were having breakfast, et cetera, we're now in a new, let's say, potential realm of presentation concerning these alleged breaches of the agreements, and I think it would be best then that those personal discussions between the Mayor, the Court, Supervisors, until we have this hearing and the Court reaches some conclusions, I probably won't be accepting calls or conveying back.  But I want it clear to all parties, the Court is only going to deal eventually if we can reach further settlements, et cetera, and definitions with the Chairman of the Board, the Mayor, and the President of the Council and people of those stature, because I want those personal commitments.  And by the way, Judge Birotte was available today for any further settlement discussions.  He's standing by, but I don't think we have some of the folks here that would need to be present to make those kinds of representations.

**14**

So from now on, it has to start at this top with responsibility, not coming up through staff. Okay, all right, let me turn to the City. Oh, I'm sorry, I mean, we got you the microphone. My apologies.

MS. BARGER: That's okay. All I was going to say is thank you. We did meet and I better understood how they got some of the conclusions and I have to commend them because they understood but they also were able to figure it out without getting a lot of the documentation they needed. So I appreciate that challenge that they had and that's pretty much it. We don't have any dispute with what the conclusions were.

THE COURT: Thank you very much. Let me turn to the City. Scott Marcus.

MR. MARCUS: Thank you, Your Honor. Scott Marcus on behalf of the City.

The City also had an opportunity to meet with A&M after the last hearing to discuss the methodology and the findings, and we had a very productive conversation. The only question I have is if A&M could identify any changes.

THE COURT: Can you use that microphone?

MR. MARCUS: Yeah, if A&M could identify any material changes that were made in the final report from the second amended report that has previously been docketed. I did try to flip through it quickly last night after it got filed, but if A&M could identify if there are any material changes from

conclusions or findings from the first one, assuming there are not any material changes, the City has nothing further to say on the matter.

THE COURT:  Please.

MS. FROST:  Laura Frost.  No material changes have been made.

THE COURT:  Let me turn to the intervenors.  I'll strike that.  Does anybody have any other comments or questions?  Any other comments or questions?

MR. MARCUS:  No, thank you.

THE COURT:  Let me turn to Shayla Myers, who's the intervenor.

MS. MYERS:  Thank you, Your Honor.  We just want to express our thanks obviously to the A&M team for the work that you did and some of the clarifications that you added to the final report.  I appreciate the terminology, consistency in terminology that you used.

It's been my sense throughout this that some of the disconnect is about a lack of meeting of the minds around what terms mean.  Is that fair?  I know we've had this conversation many times.  I don't want to put words in your mouth but can you talk a little bit about the terminology and some of the challenges that you face in terms of defining the different programs and how you ultimately landed on the definitions for the Roadmap, L.A. Alliance, and InsideSafe that you use that

**16**

are the underlying assumptions that you used for the audit?

And the reason why I raised that question is I know you had mentioned this at the beginning. I think you uplisted that in the final draft that there is a disconnect around what those programs are and what the requirements are. So if you could just talk a little bit about how you landed on the definitions, and if there are questions about the definitions that you use, are there places in the audit that you can point the parties to to understand how you defined those -- you initially called them sub-programs and now you call them interventions. So just so that all of the parties and the court record is clear about that.

THE COURT: And that's a pretty broad question. So if you want to have just a discussion amongst yourselves before you respond to that.

MS. FROST: Yes, so for terminology of sub-program to interventions, we received guidance that in relation to the scope, right, it was to look at three city programs. That's the Roadmap Program, Alliance Settlement Program, and InsideSafe. Within each of those City programs, there are sub-programs, originally what we called them, right? You would have what they called roadmap interim housing, and this is in relation to like scope of required services. You would have a bridge home. You could have tiny home village. So how we wanted to make sure that it was clearly defined, instead of

**EXCEPTIONAL REPORTING SERVICES, INC**

using the word sub-program, we called them interventions.

And then we clarified the terminology between, I know we -- the parties use the word interim housing, and that could get confusing.  So we wanted to make sure that shelter, emergency shelter, was used synonymously with interim housing.

THE COURT:  Ms. Myers, does that answer your question, or do you have additional questions?

MS. MYERS:  No, where can we find how you defined the roadmap program?  How you defined the L.A. Alliance settlement?  This has been a significant topic of conversation in hearings before the court, in terms of the scope of the audit.  So is there a place in the audit where you actually define, we define the roadmap agreement and the programs under the roadmap agreement as X?  So that the parties understand when you're doing an assessment, or you're saying it's not clear that the City has provided documentation, that it has met its obligations under the roadmap agreement, what is the assumption of those obligations, and where did you find that?  Where is the source of that?

MS. FROST:  So for each City program, for example, to your point of roadmap program, that's described -- I don't -- give us a moment, we're going to point to it.

(Pause)

MS. BROWN:  Lisa Brown speaking.  I mean, hopefully this answers your question, but I think in Section 1.3, we have

a historical examination of each City program's development, and then in Section 2, 2.1, and 2.2, we talk about the City program structure and the types of housing interventions established by the City programs.  And that was really through an amalgamation of our review of contract documents, financial data, scopes of required services.  That was our attempt to kind of lay that out for the reader of what types of housing interventions are under each of these programs.

**MS. MYERS:**  So if the parties or the Court wanted to locate the specific benchmark against which you were measuring whether the City was fulfilling its obligations, then we would turn to Section 1.3 to figure out what that benchmark was against which you made the determinations?

**MS. BROWN:**  I think 1.3 would include the requirements as set out in the settlement agreements.

**MS. MYERS:**  And then that's the benchmark that you use to reach the determination.  That's really just what I'm trying to figure out for purposes of clarity.  If the audit is about is the City reaching its obligations under the settlement, and there have been these questions, is CARE Plus included?  All of those questions, what are we counting towards roadmap?  And I think you expressed that there was some concern about reaching documentation.  I'm just trying to get at what is the benchmark location of that assessment, and it sounds like it's that section.  That's where we would go.

**19**

THE COURT: All right. I think in reading this document, you'll find other locations in this document, as well. 1.3 is one of those. So I'm going to broaden that to say read the document. I think it's self-explanatory within the document what those parameters were.

MS. BROWN: Agreed. And I think it goes back to --

THE COURT: And I think -- I don't see how you can respond that it's in simply one section. 1.3 is an important section, but it's throughout the document.

Now, a couple things. First, this is -- I'm sorry. Ms. Rafferty?

MS. RAFFERTY: And, Your Honor, also we've mentioned this before in court that everyone in this room would like their -- you know, their questions answered in this report. And everyone needs to go back and look at our scope.

And so we, as a consulting firm, can't vary from the scope. So we don't answer every single question, we just kind of march through it, but I think if you read 1.3 and the sections in 2 and then through the report, that there's -- I know what you're asking for, it's not as succinct because this entire system is not that succinct. There's a lot of crossover.

So we did the best we could to explain the programs. You can hire us to do that.

THE COURT: Yeah.

**MS. RAFFERTY:**  I mean, it's not as -- I know what you're asking, but it's not as clear cut, like we can't point you to one paragraph to say, here's the descriptor.

**THE COURT:**  Uh-huh.

**MS. MYERS:**  Yeah, and I was simply asking if in reaching the conclusions that the City has not fulfilled its obligations or just -- I was simply asking, what was the benchmark against which you rated that assessment, when, where is the place that you derived that from, I think that -- you know, from our perspective is covered in the scope.

Certainly if that was not the purpose of the audit or the audit team didn't see that as the purpose of the audit or the Court didn't see that as the purpose of the audit, my apologies as intervenors were just trying to -- we're just trying to get at that question of --

**THE COURT:**  Let me respond directly then from the Court's perspective to that question.  First, this was a performance audit, not a forensic audit.  But in this audit, the auditors in some cases had to get into the forensics that they were allowed to do.

In the past, the city controller has taken a position contrary to the mayor about inside safe.  And you'll recall those discussions here in court.

The position of the City has been that there's a violation of the City charter that does not allow the

**21**

auditor/controller to audit the mayor or the council.  This Court has been concerned that for decades if that is the position under the charter, it has also caused the City not to be audited, literally forensically for decades.

It also has allowed providers not to be audited for decades.  There has not been a forensic audit of this City until these proceedings occurred.  And there's not a forensic audit of the City at the present time.  This was a performance audit.

Part of the evidentiary hearing I'm going to discuss with you in a few moments will decide if there is or is not a breach.  If there is a breach what actions the Court would take, and whether it would move potentially to ordering a forensic audit or not.  We're not there yet.

So I'm prepared after listening to the parties and will now adopt this audit as final, I want to thank you.  I think all of us in the room want to thank you and I think every city official, county official, all of us want success.  We're all on the same team.

We want to move forward with the homeless issues.  We also eventually may need to see where this money is going.  So with that final adoption, if you'd remain for just a moment, because what I say next may have some import in the hearing. And if you just want to have a seat up here in the jury box for a minute.

The third item on my agenda today is that the Court has received LAHSA's updates on recoupment.  I have no further comment at this time, concerning this recoupment of the $50.8 million.

I set out earlier a docket and then a subsequent docketed direction and throughout the course of this case, this Court sought to facilitate your efforts as parties to conform to the terms of your own settlement agreement.  Let me repeat that, your own settlement agreement.

However, this Court has tried to refrain from redrafting the agreement or continuously resolving the conflicts on things like definitions of terms that seemingly cannot be mutually agreed upon.  At this stage, it appears that the parties are at an impasse and the Court's jurisdiction over the road map agreement is nearing its expiration.

After over a year of disagreement between plaintiff and the City about settlement obligations, two motions for compliance by the plaintiff, the A&M findings through the audit, the special master's findings in her new report, the recent additional briefing from plaintiffs on the City's alleged breaches, this Court finds it necessary to hold an evidentiary hearing on whether the City has breached its obligations under the road map agreement and the LA Alliance settlement agreement.

That hearing will commence in Los Angeles on May 27

of 2025 at 9 a.m.  This Court has set aside minimally a week and up to three weeks to a month to conclude that hearing.  The hearing will address all of the alleged failures and breaches by the City including, but not limited to incorrect reporting of encampment resolutions under the LA Alliance settlement, lack of documentation of the TLS bed funding counted towards the road map agreement, and the City's ability to meet its bed creation obligations.

This Court recognizes that the LA Alliance settlement and the road map agreement have different terms and obligations.  The LA Alliance settlement expires in 2027.  The road map settlement agreement expires June 30th of 2025. Because there are serious doubts about the City's ability to fulfill its obligation by 2027, and because the road map agreement expires very soon, the upcoming evidentiary hearing is necessary now.

The City has objected to an evidentiary hearing on the road map agreement arguing that it is improper because LA Alliance is not a party to the agreement, that only the City and County are signatories, neither of which have made a motion to enforce the agreement.

The road map agreement, however, was entered into in direct response to the litigation brought by plaintiff, LA Alliance.  The agreement was specifically in response to the Court's May 2020 preliminary injunction requiring both the City

and County of Los Angeles to relocate and shelter homeless individuals living near freeway overpasses, underpasses and ramps because of the deadly hazards in the area.

Docket 138 and, Mirren, can I get that from you?  I'm sorry, you put it right on the bench, thank you.  Docket 138, dated June 18th, 2020 is the Court's order approving the binding term sheet of the road map agreement and vacating the preliminary injunction expressly because of this binding agreement.

The order states that the Court retains jurisdiction to monitor and enforce the terms of the binding term sheet, and that the Court may consider reinstating the injunction if the parties fail to comply with the binding term sheet.  Therefore, a hearing on compliance with the agreement's terms is proper.

Additionally, the provisions of the road map agreement namely the creation of the 6,700 beds were meant and are meant to increase housing opportunities and mitigate the impacts of unhoused homelessness in the city and the interests represented by the plaintiffs here.

The City and County defendants knew that the road map agreement would serve to resolve or effect the plaintiff's claims, and the parties and the Court have all relied on compliance with this agreement.  For all of these reasons, this Court can enforce and finds it can enforce the agreement and the plaintiff LA Alliance is the proper party to argue this

**25**

issue.

You've also raised some due process issues concerning briefing.  In light of the LA Alliance audit, the Court is not willing to delay with the road map agreement including on June 30th of 2025 and finds that this hearing is necessary and imperative.

Unless the parties can agree amongst yourselves on a briefing and disclosure schedule for the hearing, then this Court will set that schedule for you.  And this briefing and disclosure schedule will require the following to be submitted.

This briefing schedule I hope you can reach today, and I will be available throughout the day as you meet and confer.  Judge Birotte is available to help you also, as he was for any potential settlement discussions if other necessary parties had been present today.

But the witness list must be filed no later than May 23rd at 5 p.m.  And, you as the parties, are ordered to meet and confer during this lengthy recess and indicate to the Court if you've made progress at some time hopefully this morning and the Court will return and remain available for your convenience.

Now, I'm going to take a recess and set you about on your briefing schedule with the absolute expectation that we'll be going forward on May 23rd.  And concerning any due process -- May 27th, I'm sorry.  Concerning any due process arguments, I

**26**

will work with you including your briefing for such issues as the apex issue, et cetera, because I'm going to reserve almost a month for these hearings if needed.

Now, I want to thank the chairperson of the board of supervisors. I think now the lawyers become more involved today, you've got a City to run, a County to run, thank you for your courtesy. Why don't you go forward and we'll give you a microphone. I see that --

MS. BARGER: Early on, you said no more contact?

THE COURT: If the parties -- I've been involved with the Mayor with a number of breakfast, I've been involved with Kathryn Barger on many occasions with discussions around these homeless issues. I just worry from this point forward, if that contact now needs to be negated. And I think by the Mayor not being here today, the position you've taken on behalf of the City of her non-appearance, then I'm a little concerned if Kathryn Barger and I have conversations for instance, but if we're going to have conversations concerning further settlement, redefinitions, I would want that at the highest level.

The attorneys are welcome to be present, but as you as the board of supervisors, we were prepared to have some discussions today, I think that's a lost opportunity now. I was prepared to meet with the mayor and all parties, so was Judge Birotte today.

**27**

MS. BARGER: But like walking at skid row would not be --

THE COURT: Yeah, disclose that Kathryn Barger has been --

MS. BARGER: -- problem.

THE COURT: -- one of the few officials who's come down to skid row and thank you, and visited with the homeless and heard their personal --

MS. BARGER: But does that mean that we no longer can do that?

THE COURT: Until the pendency of the litigation is concluded --

MS. BARGER: Okay. I just wanted to understand.

THE COURT: -- I think it just -- so there's no accusation that I've reached out to the County or to any party. If that takes place, I'd appreciate it, it might go through Special Master Martinez, because I'd love to talk to you, would love to talk to the mayor, et cetera, but with this hearing I can understand some concern by all parties. Okay?

MR. MARCUS: Yes, Your Honor. And the -- Scott Marcus on behalf of the City. We agree with the Court's earlier comments and to the extent it's necessary to state on the record the City withdraws any consent to ex parte communications.

THE COURT: All right. Any further negotiation

**28**

concerning terms, modifications, that is unique your agreement that you entered into.  And because of your inability or unwillingness to define these terms with your settlement agreement, the Court finds itself constantly requested to define your definitions for you.  And then to appear to be entering in aggressively to an agreement that all of you folks reached and you should be able to define these terms.

So I look forward to talking to you in the future and if settlement discussions do take place, especially with the Mayor, you, I would want both of you personally involved with the Court, or the Governor, or whomever to make this worthwhile.  But as far as talking to staff, I'm unwilling to. They can go through -- so it's a great loss.  I think we lost an opportunity today.

Anything further?  Now, if you -- by the way, if you get together and consent that I can talk together, you know, with LA Alliance and the City and the County or the City especially now, to Chairperson Barger, I think it might be very beneficial, but you'd have to consent.

And second, if you get together and decide I can talk to Mayor Bass, you have to consent.  Because litigation will start on May 27th.  Now, I'll be back to LA Alliance, is there any disagreement with that?  In other words, from this point forward I'm simply going to take a much different position than I have in the past.

**29**

MS. MITCHELL:  No, I understand and I appreciate that, Your Honor.  From the LA Alliance's perspective, we don't have any objections to those ex parte communications.  I think that those can be very helpful, I think the Court's communications with the parties, particularly the elected officials have been very helpful.  So we maintain a lack of objection, but I do understand that the City is withdrawing their consent to ex parte communications at this time.

THE COURT:  Yeah, let me repeat today that Judge Birotte was available.  I think we've really lost an opportunity, not having the principals present.  But I'll leave that to the principals involved in this litigation.

SPECIAL MASTER MARTINEZ:  Your Honor?

THE COURT:  All right.  Counsel?

SPECIAL MASTER MARTINEZ:  Before you conclude, may I just please make a comment?

THE COURT:  Please.

SPECIAL MASTER MARTINEZ:  Yes, my comments are just as it relates to the Alvarez and Marsal assessment.  I just wanted to extend my gratitude and appreciation to the entire team over the past now 11 months, I really want to thank you.  I oversaw this assessment with you all and was out in the field and also want to thank the county staff, want to thank the city staff, the unhoused community, and many advocates that were interviewed during this process.

**30**

You were very receptive and lastly also thank LAHSA for the data that they did provide as well and also the CAO's office as well.  So many thanks to all of you and again my gratitude to the Alvarez and Marsal team, thank you.

THE COURT:  And finally before the recess and then notify me when you want the Court to return, your own hour, two hours, whatever.  If you reach an impasse concerning this briefing schedule, and I extend the same appreciation and I would hope that this would either move forward on behalf of the citizens of Los Angeles, including the homeless, which we sometimes have separated through an ability of the elected officials to move this ball forward.

But right now, this is set for a hearing on May 27th.  And as such, if you can get together with Judge Birotte, from the County's perspective, the City's, so be it.  But if not, then it may be resolved in a different way for these hearings.

So, counsel, what's your first suggested time that the Court return, an hour, two hours, 3 o'clock?

MS. MITCHELL:  Your Honor, if all we're talking about is a briefing and disclosure schedule I think that can be done in 10 minutes, 20 minutes.

THE COURT:  That means an hour, I'm just kidding you.  Why don't I simply return at 11 o'clock, so nobody's pressed.  You've got an hour to come up with that, if you can't, then I'll impose a briefing schedule on you.

**31**

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  Thank you very much, we're in recess. And, Supervisor Barger, thank you very much.

MS. BARGER:  Thank you.

(Recessed at 10:02 a.m.; reconvened at 10:59 a.m.)

THE COURT:  All right.  Counsel, with your consent, let's go back on the record.  And let me indicate that all counsel are present.  And, counsel, your briefing schedule if you've reached one.

MS. MITCHELL:  Yes, Your Honor, thank you.  First, I would like to state on behalf of LA Alliance we believe that we will be very efficient in putting on evidence, so I don't think that we will need more than two days to do it.

Now, obviously we have the City side and I appreciate the Court wanting to give them sufficient time to respond, so I just wanted to set expectations accordingly.

Now, regarding the briefing schedule, what we have agreed on is we will be filing a joint witness list on the 23rd.

THE COURT:  Okay.

MS. MITCHELL:  In addition with -- to a joint stipulation regarding Apex witnesses or any other witness objections.

THE COURT:  Okay.

MS. MITCHELL:  The City believes --

**UNIDENTIFIED:** May 23rd.

**MS. MITCHELL:** The City believes and we don't object to this that post evidentiary hearing briefing is going to be more effective than briefing prior to that. And so the proposal would be that two weeks after the last day of the hearing, the Alliance files its opening brief. The two weeks thereafter, the City can file any opposition. And two weeks thereafter, we would file a reply and that would also give the intervenors and the County and opportunity to reply to both briefs at that time.

**THE COURT:** And when would be the reply to the Court because the three way agreement runs on June 30th?

**MS. MITCHELL:** So it would obviously depend on how long that hearing lasted, Your Honor, but assuming that it was only one week that would mean that, you know, if we were wrapped up by no later than the 30th, our briefing would be due the 13th, the City's would be due the 27th, and that wouldn't put the reply until the middle of July.

**THE COURT:** Then if the three way agreement ran on June 3rd, would there be the argument that the Court's lost jurisdiction?

**MS. MITCHELL:** Unless there was an intervening order by the Court --

**THE COURT:** I'm sorry?

**MS. MITCHELL:** Unless there was an intervening order

by the Court suspending it or something or some agreement by --

THE COURT:  I'd rather conclude these proceedings --

MS. MITCHELL:  -- city and county.

THE COURT:  -- within the time limit of the settlement agreement running.  So why don't you two have another discussion about that.

MS. MITCHELL:  Sure.

THE COURT:  And you're right, I don't know when this will end.  I'm setting aside three weeks to a month though.

MS. MITCHELL:  May we have a moment, Your Honor?

**(Pause)**

THE COURT:  That way we have plenty of time for due process, et cetera, people who can't be here on a given day.

**(Pause)**

THE COURT:  And, counsel, I'm also in a month long trial.  I'm pretty certain we'll be done by the 27th.  The jury could be in deliberation, I don't think so.  But I'll always be courteous and reach out to you, but.

**(Pause)**

THE COURT:  Please.

MR. MARCUS:  Your Honor, Scott Marcus on behalf of the City.  With the -- based on the road map MOU expiration of June 30, if we assume that the hearing can be on that day, that makes the reply due one week prior to that, June 23rd, the opposition due one week before that, June 16.  The opening

motion due two weeks before that, June 2nd.

So taking the Alliance at its word that the evidentiary hearing won't take more than two to three days, we think that briefing schedule is doable.  And that allows the Court to have its full briefing into the Court and consideration and even schedule a hearing if it wants to, prior to the expiration of the road map MOU.

**MS. MITCHELL:**  May we have just one moment, Your Honor?

**THE COURT:**  In other words, all I want to know is the time period the Court would have to make a decision after the final briefing is before the Court.  And I don't want that to be on June 30th and I don't want that -- the Court to be pressed as I try to examine this record.

Now, if you both stipulate in light of the hearing that the matter is not going to be subject to an argument that the Court's lost jurisdiction on June 30th, then I don't think that there's the real press of time, but I'm not going to be in a position of having a claim that the Court's lost jurisdiction if the road map agreement runs on June 30th because the briefing comes to the Court just before that deadline.  So why don't you two talk about that.

In other words, you can proceed at a much leisurely pace, otherwise, you'll be proceeding at a little quicker pace because the Court will need time to thoughtfully consider

whatever you're submitting to the Court in the evidentiary hearing and your arguments.

MR. MARCUS:  Your Honor, if I could ask how much time the Court would like prior to the June 30 expiration date for the final brief to be submitted?

THE COURT:  I don't know because I don't know what's going to be submitted to me.  You're controlling that right now.  You have an idea of who these witnesses are and you have the time frame, but I don't want the Court in a precipitous position of jurisdiction allegedly running on June 30th and I have the last briefing coming so quick a period of time that I can't thoughtfully consider what each of you submitted.

MR. MARCUS:  If we could have --

THE COURT:  You know your case or maybe the parameters of it on both sides.  Now, I'm going to get off the bench again.  This is not a worthwhile discussion so far.  You have a conversation and I'll be back in a couple of minutes.

THE CLERK:  This Court's in recess.

(Recessed at 11:06 a.m.; reconvened at 11:07 a.m.)

THE COURT:  The Court has other commitments also in the last part of June.  And assuming the schedule, you two can reach a decision that gives the Court continuing jurisdiction to decide this matter by simply stipulating that if this matter isn't resolved by June 30th that the Court hasn't lost jurisdiction.  That's all within your power.

If you don't do that, then I'm going to have a much more expedited schedule.

**MS. MITCHELL:** Your Honor, on behalf of LA Alliance we certainly would be fine stipulating to that.

**THE COURT:** Well, talk to your colleague, see --

**MS. MITCHELL:** But I think the issue --

**THE COURT:** -- if they are.

**MS. MITCHELL:** -- I don't think the City and the County have authority today to enter into that I think is the issue.

**MR. MARCUS:** Scott Marcus on behalf of the City, Your Honor.  The Alliance isn't a party to the road map MOU, therefore, they don't have standing even --

**THE COURT:** Counsel --

**MR. MARCUS:** -- to waive that jurisdiction.

**THE COURT:** -- I've already resolved that issue.  I have my record.  Now, do you need to make a phone call, how do we resolve this?

**MR. MARCUS:** No phone call is necessary.

**THE COURT:** Or do I simply impose deadlines on you, Mr. Marcus?

**MR. MARCUS:** No phone call is necessary, Your Honor, if you can give us a few minutes to work out a better briefing schedule, one that's more acceptable to the Court.

**(Pause)**

**37**

MS. MITCHELL:  Okay, Your Honor.  New proposal for the Court.

THE COURT:  Okay.

MS. MITCHELL:  So obviously the LA Alliance submitted quite a lengthy brief last week.  I --

THE COURT:  Just a little slower.

MS. MITCHELL:  So the LA Alliance does not need additional time for briefing as far as case law.  I think we have just agreed to is the hearing will be done by May 30th, upon agreement of all parties.  We will then by June 2nd, the Alliance will submit its evidentiary cites, one week later by June 9th, the City will oppose.  And one week later, the 16th will be due the replies, and then any additional briefing by the County or the intervenors if they so choose.

So that gives the Court two weeks prior to the hearing on June 30th if that's the date the Court chooses to have the hearing.

THE COURT:  No, I can't have the hearing on June 30th, I'm not available that last week.

MS. MITCHELL:  Okay.  Is the Court available the week of June 23rd?

THE COURT:  Yes.

MS. MITCHELL:  So if we have all briefing submitted by June 16th, does that work for the Court?

THE COURT:  I don't know, but it may.  Let's try to

**38**

work with that.

MS. MITCHELL:  Okay.

THE COURT:  And then if there -- what I don't want is any precipitous decision where I feel I'm losing jurisdiction and I can't thoughtfully decide these issues.

MS. MITCHELL:  Understood.

THE COURT:  Okay.

MS. MITCHELL:  Thank you, Your Honor.

THE COURT:  So is that tentatively agreeable to all parties?

MR. MARCUS:  Yes, that schedule is agreeable, Your Honor.

THE COURT:  Okay.  Would you put that in writing then?

MS. MITCHELL:  Yes.

THE COURT:  Someone submit it to me by 12 noon tomorrow.

MS. MITCHELL:  Yes.

THE COURT:  Now, the next thing is, what are we going to do with Judge Gandhi who has the Court's greatest -- great appreciation in terms of replacement?  In other words, you both need to thoughtfully think about that.  I don't think you can reach a resolution today and I don't intend to hold you today.

Go back and talk to your principals about who that person would be, but I would expect some time next week.  How

long would you folks like to meet and confer concerning that?

**MS. BRODY:** You know I think we had a working list a few years ago when we initiated these discussions, that circumstances change and at least on the County's behalf, I think we'd like to consider some additional names and that who ultimately is selected to step into Judge Gandhi's esteemed shoes will depend a little bit on the party's -- you know, the future monitor's availability.

So I'm happy to meet and confer last week and we can exchange lists. I'm not sure how quickly we could get in contact with the requisite monitors to discuss their willingness to participate.

**MS. MITCHELL:** And Special Master Martinez is currently still the special master over the County agreement as well, so we have in the interim, we have some oversight in accountability and so I think that gives us a little bit of time.

So I think we can, you know, reach out and connect tomorrow and then over the next week or so try to contact some people and hopefully narrow it down.

**THE COURT:** I want your principals to be comfortable because I know as counsel you have to talk to your principals.

**MS. MITCHELL:** Yes.

**THE COURT:** But I also want a tickler deadline, in other words, something that's reasonable from the Court's

**40**

perspective after talking to each of you.  So give me a date.

MS. BRODY:  Your Honor, we're already scheduled to be back here on the 27th.  I think we could provide the Court at least an update by that time.

THE COURT:  Okay.  Does that work for the LA Alliance?

MS. MITCHELL:  That's fine for us, thank you, Your Honor.

THE COURT:  And May 27th, that gives us plenty of time, it's not added appearance.  Then I have no further business on my agenda other than recessing.

MR. MARCUS:  If I may, Your Honor, Scott Marcus on behalf of the City.  In light of the Court's order issued today concerning the road map agreements inclusion in the evidentiary hearing, the City asks the Court to stay that order so it can be reviewed by the Appellate Court.

THE COURT:  I'm going to deny that request.  Thank you, counsel.

MR. MARCUS:  Thank you.

THE COURT:  We're in recess.

(Proceedings concluded at 11:13 a.m.)

* * * * * *

41

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    May 16, 2025

              Signed                                        Dated


*TONI HUDSON, TRANSCRIBER*


EXCEPTIONAL REPORTING SERVICES, INC